## FORMS SCHEDULE

Policy Number: 625-49-23
Division No:     65
Insured Name:  EAST JEFFERSON LEVEE DISTRICT (INC)

Effective  Date: January 1, 2006
Expiration Date: January 1, 2007

Underwriter Name:HOWARD CHUNG
Underwriter Phone # :

Print date:   Jan 26, 2006
Printed by: SUE SANTOS
Phone # :

| ALIAS | FORM NUMBER | DESCRIPTION |
|---|---|---|
| ☐ ENVPGE | LETTER | Envelope Page |
| ☐ CLETR2 | LETTER | Regular Broker Cover Letter |
| ☐ NUSSUR | SURVEY | Policy Service Survey |
| ☐ PL85NR | 43247 | Public Officials & Employees Liability Insurance Policy-DEC |
| ☐ QT0001 | 81285 | Tria Dec Disclosure Form |
| ☐ PL85NA | 43248 | Public Officials & Employees Liability Insurance-GUTS |
| ☐ QE1435 | APPMAN | COVERAGE ENHANCEMENT ENDORSEMENT (FORM # 43248) |
| ☐ MNSCPT | MNSCPT | EPLI Expansionary (libel, slander, defamation) |
| ☐ MNSCPT | MNSCPT | FUNGUS AND MOLD EXCLUSION |
| ☐ MNSCPT | MNSCPT | INTELLECTUAL PROPERTY EXCLUSION |
| ☐ POL003 | | LIMITED PRIOR ACTS ENDORSEMENT |
| ☐ POL032 | 45121 | DEFENSE COSTS, CHARGES & EXPENSES |
| ☐ QE0692 | 52146 | LOUISIANA AMENDATORY - CANCELLATION/NONRENEWAL |
| ☐ QE4043 | 89644 | COVERAGE TERRITORY ENDORSEMENT (OFAC) |
| ☐ QE2392 | 78859 | FORMS INDEX ENDORSEMENT |
| ☐ MNSCPT | MNSCPT | EPLI w/ Law Enforcement |
| ☐ F2261L | LETTER | 2261 cover letter to Broker for ALL LOBS' |
| ☐ F2809L | LETTER | 2809 cover letter to Broker for ALL LOBS' |
| ☐ F2809B | LETTER | 2809 cover letter to CS agent |
| ☐ F2261B | LETTER | 2261 cover letter to CS agent |

**CERTIFIED ORIGINAL COPY**

REPRINT DATE: _5-24-07_

ORIGINAL ISSUE DATE: _1-29-07_

RECORDS CUSTODIAN: _J. Mrs M. Fillmore_

001

*Archive Copy*

NUSFRM

**National Union Fire Insurance Company of Pittsburgh, Pa.**
AIG Small Business
One Connell Drive Suite 2100
Berkeley Heights, NJ 07922
877- 867- 3783

 A Member Company of American International Companies

January 26, 2006

Direct Dial:

James Pittler
PITTLER, MICHAELSON & FROST, INC.
10400 COURTHOUSE RD
SPOTSYLVANIA, VA 22553- 1712

RE: **EAST JEFFERSON LEVEE DISTRICT (INC)**

Policy Number: **625- 49- 23**

Dear James

Enclosed please find the original and copy(ies) of the policy and/or endorsement(s) for the captioned account.

If you have any questions, please feel free to contact me at the above listed number.

Very truly yours,

HOWARD CHUNG
Underwriter

Enc.

7175253

**BRANCHive Copy**

**002**



# *NATIONAL UNION*
# *FIRE INSURANCE COMPANY*
# *OF PITTSBURGH, PA.*®

A CAPITAL STOCK COMPANY, HEREIN CALLED THE "COMPANY"
ADMINISTRATIVE OFFICES
175 WATER STREET, NEW YORK, NY 10038

### THIS IS A CLAIMS-MADE POLICY - PLEASE READ CAREFULLY

**NOTICE: THE POLICY PROVIDES THAT THE LIMITS OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. FURTHER NOTE THAT THE DEDUCTIBLE ALSO APPLIES TO AMOUNTS INCURRED FOR LEGAL DEFENSE.**

## PUBLIC OFFICIALS AND EMPLOYEES
## LIABILITY INSURANCE POLICY

REPLACEMENT OF POLICY NUMBER: *978-27-27*          POLICY NUMBER: *625-49-23*

### DECLARATIONS

Item 1. Insured: *EAST JEFFERSON LEVEE DISTRICT (INC)*

Address: *203 PLAUCHE COURT*
*HARAHAN, LA 70123-3413*

Item 2. Policy Period:
From: *January 1, 2006*          To: *January 1, 2007*
At 12:01 AM Standard Time at the Address of the Insured stated above.

Item 3. Limits of Liability (including Defense Costs, Charges and Expenses)

*$5,000,000*_____ Each Wrongful Act or series of continuous, repeated or
interrelated Wrongful Acts.
*$5,000,000*_____ Aggregate.

Item 4. Deductible: *$100,000*_____ Each Wrongful Act or series of
continuous, repeated or interrelated
Wrongful Acts.

Item 5. Premium: _____*$43,048*_____

*7175253*

**003**

Producer: *PITTLER, MICHAELSON & FROST, INC.*
Address: *10400 COURTHOUSE RD*
         *SPOTSYLVANIA, VA 22553-1712*

By acceptance of this policy the Insured agrees that the statements in the Declarations and the Application and any attachments hereto are the Insured's agreements and representations and that this policy embodies all agreements existing between the Insured and the Company or any of its representatives relating to this insurance.

**004**

*Jan 26, 2006*

*7175253*

AUTHORIZED COMPANY REPRESENTATIVE

POLICYHOLDER DISCLOSURE STATEMENT
UNDER
TERRORISM RISK INSURANCE ACT OF 2002

You are hereby notified that under the federal Terrorism Risk Insurance Act of 2002 (the "Act") effective November 26, 2002, you now have a right to purchase insurance coverage for losses arising out of an Act of Terrorism, which is defined in the Act as an act certified by the Secretary of the Treasury (i) to be an act of terrorism, (ii) to be a violent act or an act that is dangerous to (A) human life; (B) property or (C) infrastructure, (iii) to have resulted in damage within the United States, or outside of the United States in case of an air carrier or vessel or the premises of a U.S. mission and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. You should read the Act for a complete description of its coverage.    The Secretary's decision to certify or not to certify an event as an Act of Terrorism and thus covered by this law is final and not subject to review. There is a $50 billion dollar annual cap on all losses resulting from Acts of Terrorism above which no coverage will be provided under this policy and under the Act unless Congress makes some other determination.

For your information, coverage provided by this policy for losses caused by an Act of Terrorism may be partially reimbursed by the United States under a formula established by the Act.  Under this formula the United States pays 90% of terrorism losses covered by this law exceeding a statutorily established deductible that must be met by the insurer, and which deductible is based on a percentage of the insurer's direct earned premiums for the year preceding the Act of Terrorism.

**COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE**

Insured Name: *EAST JEFFERSON LEVEE DISTRICT (INC)*


Policy Number: *625-49-23*
Policy Period Effective Date From: *January 1, 2006*     To: *January 1, 2007*

**005**

# NATIONAL UNION
# FIRE INSURANCE COMPANY
# OF PITTSBURGH, PA.®

A CAPITAL STOCK COMPANY
**ADMINISTRATIVE OFFICES**
**175 WATER STREET, NEW YORK, NY 10038**

(herein called the Company)

## PUBLIC OFFICIALS AND EMPLOYEES LIABILITY INSURANCE
## THIS IS A CLAIMS-MADE POLICY - PLEASE READ CAREFULLY

In consideration of the payment of the premium, and in reliance upon the statements in the application and Declarations attached hereto and made a part hereof, and subject to the limits of liability stated in Item 3 of the Declarations and the terms, conditions and exclusions contained herein, the Company hereby agrees as follows:

1.  To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages resulting from any claim or claims first made against the Insured and reported in writing to the Company during the Policy Period for any Wrongful Act of the Insured or of any other person for whose actions the Insured is legally responsible, but only if such Wrongful Act occurs during or prior to the Policy Period and solely in performing or failing to perform duties of the Public Entity.

2.  DEFENSE COSTS, CHARGES & EXPENSES (INCLUDED IN THE LIMITS OF LIABILITY)

    With respect to any such Wrongful Act for which insurance is afforded by this policy under Insuring Agreement 1 above, the Company shall, as part of and subject to the limits of liability, pay on behalf of the Insured Defense Costs, Charges and Expenses.

    The Company shall at all times have the right but not the duty to assume the defense of any claim or suit against the Insured, and in the event of the exercise of this right the Insured shall provide the Company with full cooperation.

    The Insured shall not admit liability for or settle any claim or suit or incur any Defense Costs, Charges or Expenses without the Company's prior written consent, which consent shall not be unreasonably withheld.

    If the Insured refuses to consent to any settlement recommended by the Company and acceptable to the claimant:

    A.  the Company may then withdraw from the defense of the Insured (if it has assumed the Insured's defense) by tendering control of the defense to the Insured, and the Insured shall thereafter at his own expense negotiate or defend such claim or suit independently of the Company, and

    B.  the Company's liability shall not exceed the amount of damages for which the claim or suit could have been settled if such recommendation was consented to, plus Defense Costs, Charges and Expenses incurred by the

Company, and Defense Costs, Charges and Expenses incurred by the Insured with the Company's written consent, up to the date of such refusal.

## DEFINITIONS

1.  Public Entity means only that municipality, governmental body, department or unit, which is named in Item 1 of the Declarations.

2.  Insured means:

    A.  the Public Entity;

    B.  all persons who were, now are or shall be lawfully elected or lawfully appointed officials of the Public Entity;

    C.  members of commissions, boards or other units operating by and under the jurisdiction of such Public Entity and within an apportionment of the total operating budget indicated in the application for this policy;

    D.  employees of the Public Entity or of its commissions, boards or other units as described in C. above. The insurance afforded by this policy shall not extend to any independent contractor or any person working on a retainer.

3.  Policy Period means the period from the inception date of this policy shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy.

4.  Wrongful Act means any actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty, including misfeasance, malfeasance and nonfeasance.

5.  Defense Costs, Charges and Expenses means fees, costs and expenses (including premiums for any appeal bond, attachment bond, or similar bond) resulting from the investigation, adjustment, defense and appeal of any claim, suit or proceeding arising in connection therewith, if incurred by the Company or by the Insured with written consent of the Company; however, Defense Costs, Charges and Expenses shall not include salary charges or expenses of independent adjusters, or salaries of officials or employees of the Company or of any Insured or of any other governmental body.

## EXCLUSIONS

This Policy does not apply:

a)  to any claim seeking the return of any profit, advantage, gain or remuneration to which any Insured is not legally entitled;

b)  to any claims alleging fraud, dishonesty, criminal or malicious acts or omissions; however, if after final adjudication such allegations are not proven then the Company shall reimburse the Insured for all reasonable Defense Costs, Charges and Expenses which would have been collectible under this policy;

c) to any claim seeking non-pecuniary relief;

d) to any claim for bodily injury to, or sickness, disease or death, or mental anguish of any person, or loss of or damage to or destruction of any property, including the loss of use thereof;

e) to any claim for false arrest, detention or imprisonment; assault or battery; malicious prosecution; abuse of process; disparagement or defamation, including but not limited to libel, slander or violation of an individual's right of privacy; or wrongful entry or eviction or other invasion of the right of private occupancy;

f) to any claim arising from inverse condemnation and/or adverse possession;

g) to any claim arising from strikes, riots or civil commotions;

h) to any claim arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water;

i) to any claim arising out of any actual or alleged breach of fiduciary duty, responsibility or obligation in connection with any employee benefit plan or pension plan;

j) to any claim arising out of the providing of or failure to provide professional services by a lawyer, medical personnel, architect, engineer or accountant; however, notwithstanding the foregoing the Insureds shall be protected under the terms of this policy as to any claims made against them otherwise as public officials or employees of the Public Entity;

k) to any Wrongful Act committed prior to the beginning of the Policy Period, if on or before the inception date of this policy any Insured knew or could have reasonably foreseen that such Wrongful Act did or could lead to a claim or suit;

l) to any claim arising out of breach of contract;

m) to any claim arising out of the operation of or activities of any schools, airports, transit authorities, hospitals, clinics, nursing homes or other health care operations, utilities, housing authorities, law enforcement agencies or fire fighting authority;

n) to any awards or settlements of back salary or wages or other employee compensation;

o) to any cross claim or counterclaim brought by one Insured under this policy against another Insured;

p) to any Wrongful Act committed with knowledge that it was a Wrongful Act;

q)  to fines, penalties, or punitive, exemplary or multiplied damages; however, only
    where permitted by law, this policy shall cover, subject to all the terms,
    conditions and exclusions contained herein, up to $25,000 punitive, exemplary or
    multiplied damages, as part of and not in addition to the limits of the Company's
    liability otherwise afforded by this policy;

r)  to any claim arising out of the planning, construction, maintenance, operation or
    use of any nuclear reactor, nuclear waste storage or disposal site or any other
    nuclear facility, or the transportation of nuclear material.

## SPECIAL PROVISIONS

1.  LIMITS OF LIABILITY

    The Limits of Liability stated in the Declarations as applicable to "Each Wrongful Act or
    series of continuous, repeated or interrelated Wrongful Acts" is the limit of the
    Company's liability for all amounts payable hereunder in settlement or satisfaction of
    claims, judgments or awards and Defense Costs, Charges and Expenses arising out of the
    same Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts,
    without regard to the number of Insureds, claims, demands, suits or proceedings or
    claimants. If additional claims are subsequently made which arise out of the same
    Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts as claims
    already made and reported to the Company, all such claims, whenever made, shall be
    considered first made within the Policy Period or the extended reporting period in which
    the earliest claim arising out of such Wrongful Act or series of continuous, repeated or
    interrelated Wrongful Acts was first made and reported to the Company, and all such
    claims shall be subject to one such limit of liability.

    The Limits of Liability stated in the Declarations as "Aggregate" is subject to the above
    provisions respecting "Each Wrongful Act or series of continuous, repeated or
    interrelated Wrongful Acts", the limit of the Company's liability for all amounts payable
    hereunder in settlement or satisfaction of claims, judgments or awards and Defense
    Costs, Charges and Expenses arising out of claims first made and reported to the
    Company during the Policy Period or during the extended reporting period. The
    aggregate limit of liability for the extended reporting period shall be part of, and not in
    addition to, the aggregate limit of liability for the Policy Period.

    The inclusion herein of more than one Insured shall not operate to increase the limits of
    the Company's liability.

    Defense Costs, Charges and Expenses, as well as amounts paid in settlement or
    satisfaction of claims, judgments or awards are subject to the applicable limits of
    liability. All Defense Costs, Charges and Expenses shall first be subtracted from the
    Limits of Liability with the remainder, if any, being the amount available to pay damages.

2.  DEDUCTIBLE

    The Company shall only be liable for those amounts payable hereunder in settlement or
    satisfaction of claims, judgments or awards, Defense Costs, Charges and Expenses which
    are in excess of the Deductible stated in Item 4 of the Declarations. This deductible shall

43248 (11/85)   **BRANCHive Copy**           -4-                    **009**

apply to each Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts and shall be borne by the Insured and remain uninsured.

3.    LOSS PROVISIONS

The Insured shall, as a condition precedent to the availability of the rights provided under this policy, give written notice to the Company as soon as practicable during the Policy Period, or during the extended reporting period (if applicable), of any claim made against the Insured. Notice given by or on behalf of the Insured to any authorized representative of the Company, with particulars sufficient to identify the Insured, shall be deemed notice to the Company.

4.    SPECIAL REPORTING CLAUSE

If during the Policy Period or during the extended reporting period (if the right is exercised by the Insured in accordance with Provision 5), the Insured shall become aware of any occurrence which may reasonably be expected to give rise to a claim against the Insured for a Wrongful Act which occurred during or prior to the Policy Period, and provided the Insured gives written notice to the Company during the Policy Period or the extended reporting period (if applicable) of the nature of the occurrence and specifics of the possible Wrongful Act, any claim which is subsequently made against the Insured arising out of such Wrongful Act shall be treated as a claim made during the Policy Period.

5.    EXTENDED REPORTING PERIOD

If the Company or the Insured shall cancel or refuse to renew this policy, the Insured shall have the right, upon payment of an additional premium of 50% of the total annual premium, to a period of twelve (12) months following the effective date of such cancellation or non-renewal (herein referred to as the extended reporting period) in which to give written notice to the Company of claims first made against the Insured during said (12) month period for any Wrongful Act committed during or prior to the Policy Period and otherwise covered by this policy.

The rights contained in this clause shall terminate, however, unless written notice of such election together with the additional premium due is received by the Company within thirty (30) days of the effective date of cancellation or non-renewal. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

6.    REIMBURSEMENT OF THE COMPANY

If the Company has paid any amount in settlement or satisfaction of claims, judgments or awards, Defense Costs, Charges and Expenses in excess of the applicable limit of liability or within the amount of the applicable deductible, the Insureds, jointly and severally, shall be liable to the Company for any and all such amounts and, upon demand, shall pay such amounts to the Company.

## GENERAL CONDITIONS

1.    This policy only applies to Wrongful Acts committed in, and suits brought against the
Insured in, the United States of America, its territories or possessions, or Canada.

2.    All notices of claims, applications, demands or requests provided for in this policy shall
be in writing and addressed to the Company's Administrative Offices, 175 Water Street,
New York, NY 10038, or any authorized agent of the Company.

3.    The Insured shall cooperate with the Company and, upon the Company's request, assist
in making settlements, in the conduct of suits or proceedings, and in enforcing any right
of contribution or indemnity against any person or organization who may be liable to the
Insured. The Insured shall attend hearings, trials and depositions and shall assist in
securing and giving evidence and obtaining the attendance of witnesses. The Insured
shall not, except at his own cost, voluntarily make any payment, assume any obligation
or incur any expense.

4.    No action shall lie against the Company unless, as a condition precedent thereto, there
shall have been full compliance with all the terms of this policy, nor until the amount of
the Insured's obligation to pay shall have been finally determined either by judgment
against the Insured after actual trial or by written agreement of the Insured, the claimant
and the Company. Any person or organization or the legal representative thereof who
has secured such judgment or written agreement shall thereafter be entitled to recover
under this policy to the extent of the insurance afforded by this policy. No person or
organization shall have any right under this policy to join the Company as a party to any
action against the Insured to determine the Insured's liability nor shall the Company be
impleaded by the Insured or his legal representative.

5.    In the event of any payment under this policy, the Company shall be subrogated to all
the Insured's rights of recovery therefor, and the Insured shall execute and deliver
instruments and papers and do whatever else is necessary to secure such rights. The
Insured shall do nothing to prejudice such rights. Any amount recovered in excess of the
Company's total payment shall be restored to the Insured, less the cost to the Company
of recovery.

6.    Such insurance as is provided under this policy shall apply only as excess over any other
valid and collectible insurance.

7.    This policy may be cancelled by the Insured by surrender of this policy to the Company
or by giving written notice to the Company stating when thereafter such cancellation
shall be effective. This policy may also be cancelled by the Company by mailing to the
Insured by registered, certified or other first class mail, at the Insured's address shown in
Item 1 of the Declarations, written notice stating when, not less than thirty (30) days
thereafter, the cancellation shall be effective. However, if the Insured has failed to pay
the premium when due, then this policy may also be cancelled by the Company by
mailing to the Insured by registered, certified or other first class mail, at the Insured's
address shown in Item 1 of the Declarations, written notice stating when, not less than
ten (10) days thereafter, the cancellation shall be effective. The mailing of such notice as
aforesaid shall be sufficient proof of notice and this policy shall terminate at the date
and hour specified in such notice. If this policy shall be cancelled by the Insured, the

Company shall retain the customary short rate proportion of the premium hereon. If this policy shall be cancelled by the Company, the Company shall retain the pro rata proportion of the premium hereon. Payment or tender of any unearned premium by the Company shall not be a condition of cancellation, but such payment shall be made as soon as practicable.

8.     Assignment of interest under this policy shall not bind the Company until its consent is endorsed hereon; however, subject otherwise to the terms hereof, this policy shall cover the estate, heirs, legal representative or assigns of the Insured in the event of the Insured's death, bankruptcy, insolvency or being adjudged incompetent.

9.     Bankruptcy or insolvency of the Insured or of the Insured's estate shall not relieve the Company of any obligation hereunder.

10.    Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the Company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy and signed by an authorized representative of the Company.

11.    The Insured first named in Item 1 of the Declarations shall be the sole agent of all Insureds hereunder for the purpose of effecting or accepting any amendments to or cancellation of this policy, for the payment of premium and the receipt of any return premium that may become due under this policy, and the exercising or declining to exercise any right to an extended reporting period.

IN WITNESS WHEREOF, the Company has caused this policy to be signed by its President and Secretary, and countersigned on the Declaration Page by a duly authorized representative of the Company.

*Elizabeth M. Tuck*

SECRETARY

*John Roy*

PRESIDENT

### ENDORSEMENT# *1*

This endorsement, effective *12:01 am*     *January 1, 2006*     forms a part of
policy number   *625-49-23*
issued to *EAST JEFFERSON LEVEE DISTRICT (INC)*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

#### COVERAGE ENHANCEMENT ENDORSEMENT (Form #43248)

In consideration of the premium charged it is understood and agreed that the following changes are made to this Policy:

I

The Declarations Page shall be amended as follows:

Item 6 is hereby added to the Declarations page and shall read as follows:

ITEM 6.              ADDITIONAL COVERED OPERATIONS

| | |
|---|---|
| *n* Port Authority | *n* Housing Authority |
| *n* Transit Authority | *n* Utility Authority |
| *n* Water/Sewer Authority | |

II

INSURING AGREEMENTS 1 and 2 DEFENSE COSTS, CHARGES & EXPENSES (INCLUDED IN THE LIMITS OF LIABILITY) are deleted in their entirety and replaced by the following:

#### INSURING AGREEMENTS

To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as Damages resulting from any Claim first made against the Insured during the Policy Period or the Discovery Period (if applicable) and reported to the Company pursuant to the terms of this policy for any Wrongful Act of the Insured in the performance of duties for the Public Entity.

#### DEFENSE PROVISIONS

a)     The Company shall, in addition to the Limit of Liability, appoint an attorney and defend any Claim against the Insured alleging a Wrongful Act, even if such Claim is groundless, false or fraudulent; and pay on behalf of the Insured Defense Costs.

b)     The Insured shall not admit liability or settle any Claim or incur any cost or expense without the written consent of the Company. The Company shall have the right to make such investigation and negotiations and, with the written consent of the Public Entity, such settlement of any Claim as the Company deems expedient. If the Public Entity refuses to consent to any settlement recommended by the Company, the Insured shall thereafter negotiate or defend such Claim independently of the Company and the liability of the Company shall not exceed the amount for which the Claim could have been settled plus Defense Costs incurred with the Company's consent up to the date of such refusal.

### *END 001*

*BRANCHive Copy*                                                              **013**

**ENDORSEMENT#** *1*    (continued)

c)   The Company shall not be obligated to pay any Damages or Defense Costs or to undertake or continue defense of any Claim after the Limit of Liability has been exhausted by payment of Damages or after deposit of the applicable limit of the Company's liability in a court of competent jurisdiction, and in such case the Company shall have the right to withdraw from the further defense thereof by tendering control of said defense to the Insured.

III

DEFINITIONS section of the Policy shall be changed as follows:

Definition 2. Insured subparts B, C and D are deleted in their entirety and replaced by the following:

B.   all persons who were, now are or shall be lawfully elected or appointed officials or employees while acting for or on behalf of the Public Entity;

C.   commissions, boards, or other units, and members and employees thereof, operated by and under the jurisdiction of such Public Entity and within an apportionment of the total operating budget indicated in the application for this policy;

D.   volunteers acting for or on behalf of, and at the request and under the direction of, the Public Entity;

In addition subpart E. shall be added to the Definition of Insured and shall read as follows:

E.   officials and employees of the Public Entity appointed at the request of the Public Entity to serve with an outside tax exempt entity.

Definition 4., Wrongful Act, is deleted in its entirety and replaced by the following:

4.   Wrongful Act means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or Employment Practices Violation by an Insured solely in the performance of duties for the Public Entity.

Definition 5., Defense Costs, Charges and Expenses is deleted in its entirety and replaced by the following:

5.   Defense Costs means reasonable and necessary fees, costs, and expenses incurred by the Company, or incurred by the Insured with the written consent of the Company, (including premiums for any appeal bond, attachment bond, or similar bond but without any obligation to apply for or furnish any such bond) resulting from the investigation, adjustment, defense, and appeal of a Claim against any Insured; provided, however, that Defense Costs do not include salaries of employees or officers of the Company.

In addition the following Definitions 6. Arising Out Of, 7. Claim, 8. Damages, 9. Employment Practices Violation and 10. Retaliation are added to the Policy and shall read as follows:

6.   Arising Out Of means originating from, having its origin in, growing out of, flowing from, incident to or having connection with, whether directly or indirectly;

*END 001*

ENDORSEMENT# *1*   (continued)

7.  Claim means a judicial proceeding alleging a Wrongful Act that is filed against
    an Insured in a court of law or equity and which seeks Damages or other
    relief. Claim shall also mean an administrative proceeding alleging a Wrongful
    Act, provided an enforceable award of Damages can be made against an
    Insured at the administrative proceeding.

8.  **Damages means a monetary judgment or settlement agreed to with the
    consent of the Company.**

9.  Employment Practice Violation(s) means any actual or alleged:

    (1)  wrongful dismissal, discharge or termination (either actual or
         constructive) of employment, including breach of an implied contract:

    (2)  harassment (including sexual harassment whether "quid pro quo",
         hostile work environment or otherwise);

    (3)  discrimination, (including   but not limited to discrimination based
         upon age, gender, race, color, national origin, religion, sexual
         orientation or preference, pregnancy or disability);

    (4)  Retaliation (including lockouts);

    (5)  employment- related misrepresentation(s) to an employee or applicant
         for employment with the Public Entity;

    (6)  wrongful failure to employ or promote;

    (7)  wrongful deprivation of career opportunity, wrongful demotion or
         negligent employee evaluation, including the giving of negative or
         defamatory statements in connection with an employee reference;

    (8)  wrongful discipline;

    (9)  failure to grant tenure;

    (10) failure to provide or enforce adequate or consistent policies and
         procedure relating to any Employment Practices Violation;

    (11) violation of an individual's civil rights relating to any of the above

    but only if the Employment Practices Violation relates to an employee or
    applicant for employment with the Public Entity whether direct, indirect,
    intentional or unintentional.

10. Retaliation means a wrongful act of an Insured relating to or alleged to be in
    response to any of the following activities: (1) the disclosure or threat of
    disclosure by an Employee of the Public Entity to a superior or to any
    governmental agency of any act by an Insured which statutory, or any rule or
    regulation promulgated thereunder: (2) the actual or attempted exercise by an
    Employee of the Public Entity of any right that such employee has under law,
    including rights under workers' compensation laws, the Family and Medical
    Leave Act, the Americans with Disabilities Act or any other law relating to
    Employee rights; (3) the filing of any claim under the Federal False Claims Act
    or any other federal, state, local or foreign "whistle- blower" law; (4) strikes by
    employees of the Public Entity or (5) political affiliation:

IV

The EXCLUSIONS Section of the Policy SHALL BE DELETED IN ITS ENTIRETY AND
REPLACED BY THE FOLLOWING:

## END 001

**BRANCHive Copy**

**ENDORSEMENT#** *1*    (continued)

## EXCLUSIONS

This policy does not apply to any Damages or Claim:

(a) alleging fraud, dishonesty or criminal acts or omissions; however, the Insured shall be reimbursed for the reasonable amount which would have been collectible under this policy if such allegations are not subsequently proven;

(b) seeking relief or redress in any form other than Damages, or attorney's fees, costs or expenses which the Insured shall become obligated to pay as a result of an adverse judgment or settlement for a Claim seeking such relief; however, the Company shall defend such a Claim in accordance with Insuring Agreement 2, subject to a Policy Period aggregate limit of $100,000. This limit shall be part of the Limit of Liability stated in Item 3 of the Declarations

(c) Arising Out Of (1) false arrest, detention or imprisonment, (2) libel, slander or defamation of character, (3) assault or battery, (4) malicious prosecution or abuse of process, (5) wrongful entry or eviction, or invasion of any right of privacy, (6) any allegation relating to the foregoing exclusions (c)(1) through (c)(5) that an Insured negligently employed, investigated, supervised or retained any person, or based on an alleged practice, custom or policy and including, without limitation, any allegation that the violation of a civil right caused or resulted from such Damages or Claim;

(d) Arising Out Of (1) bodily injury to, or sickness, disease, emotional distress or death of any person, (2) damage to or destruction of any property, including the loss of use thereof, (3) any allegation relating to the foregoing exclusions (d)(1) through (d)(2) that an Insured negligently employed, investigated, supervised or retained a person, or based on an alleged practice, custom or policy and including, without limitation, any allegation that the violation of a civil right caused or resulted from such Damages or Claim;

(e) Arising Out Of inverse condemnation, temporary or permanent taking, adverse possession or dedication by adverse use;

(f) Arising Out Of strikes, riots or civil commotions;

(g) Arising Out Of the failure to effect or maintain any insurance or bond, which shall include, but not be limited to, insurance provided by self-insurance arrangements, pools, self-insurance trusts, captive insurance companies, retention groups, reciprocal exchanges or any other plan or agreement of risk transfer or assumption; however, the Company will defend such a Claim but without obligation to pay Damages;

(h) Arising Out Of the gaining in fact of any profit or advantage to which the Insured is not legally entitled; the return of taxes, assessments, penalties, fines or fees; any award of salary, wages or earnings;

(i) alleging, Arising Out Of, based upon, attributable to, or in any way involving, directly or indirectly:

  (1) the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants, or

  (2) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants.

  "Pollutants" include, but are not limited to, any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis,

## END 001

ENDORSEMENT# *1*    (continued)

chemicals, asbestos, lead and Waste. "Waste" includes, but is not limited to, materials to be recycled, reconditioned or reclaimed;

(j)  **Arising Out Of the planning, construction, maintenance, operation or use of any nuclear reactor, nuclear waste storage or disposal site or any other nuclear facility, or the transportation of nuclear material;**

(k)  Arising Out Of a breach of fiduciary duty, responsibility or obligation in connection with any employee benefit or pension plan, or to any amount due under any fringe benefit or retirement program; however, the Company will defend such a Claim but will have no obligation to furnish any benefits due or pay Damages;

(l)  brought by or on behalf of one Insured against another Insured,  however, as respects any Claim alleging an Employment Practices Violation, this exclusion shall only apply to cross-claims or counter-claims brought by one Insured against another Insured;

(m)  Arising Out Of breach of contract, except this exclusion shall not apply to any Claim alleging an Employment Practices Violations;

(n)  **Arising Out Of the operation of or activities of any schools, airports, transit authorities, hospitals, clinics, nursing homes or other health care operations, utilities, housing authorities, jails or detention facilities, law enforcement agencies or fire fighting authorities unless specifically included in Item 6 of the Declarations or by endorsement attached**

(o)  **for fines, penalties, or punitive, exemplary or the multiplied portion of multiplied Damages; however, only where permitted by law, this policy shall cover, subject to all the terms, conditions and exclusions contained herein, up to $50,000 punitive, exemplary or the multiplied portion of multiplied Damages, as part of and not in addition to the Limit of Liability of the Company otherwise afforded by this policy;**

(p)  arising from all pending or prior litigation or hearing as well as future Claims Arising Out Of said pending or prior litigation or hearing.  If this policy is a renewal of a policy issued by the Company, this exclusion shall only apply with respect to a pending or prior litigation or hearing prior to the effective date of the first policy issued and continuously renewed by the Company;

(q)  Arising Out Of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained, in any Claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(r)  Arising Out Of any Wrongful Act prior to the inception date of the first policy issued by the Company and continuously renewed and maintained, if on or before such date any Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim.

**The following exclusions shall also apply to any Claim alleging an Employment Practices Violation(s)**

This policy does not apply to any Damages or Claim:

(s)  **Arising Out Of any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; provided, however, this exclusion shall not apply to a Claim for Retaliation;**

*END 001*

**BRANCH** **Archive Copy**                                                017

**ENDORSEMENT#** *1*    (continued)

(t)    Arising Out Of any violation of the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder and amendments thereto or any similar provisions of any federal, state, local or foreign statutory law or common law; provided however, this exclusion shall not apply to a Claim for Retaliation;

(u)    Arising Out Of any costs or liability incurred by any Insured to modify any building, property or facility to make said building, property or facility more accessible or accommodating to any disabled person as mandated by the Americans With Disabilities Act of 1992, and as amended, or any similar federal, state or local law, regulation or ordinance.

V

SPECIAL PROVISIONS section of the Policy, Clause 1. LIMITS OF LIABILITY and Clause 2. DEDUCTIBLE, ARE DELETED IN THEIR ENTIRETY AND REPLACED BY THE FOLLOWING:

1.    LIMITS OF LIABILITY/DEDUCTIBLE

    (a)    The total liability of the Company for all Damages arising from all Claims made against the Insured during the Policy Period and during the Discovery Period, if applicable, shall not exceed the Limit of Liability stated in Item 3 of the Declarations.  The inclusion herein of more than one Insured shall not increase the Limit of Liability of the Company.  The Limit of Liability stated in Item 3 of the Declarations shall apply to all Claims Arising Out Of the same Wrongful Act or related Wrongful Acts.

    (b)    If additional Claims are subsequently made which Arise Out Of the same Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts as Claims already made and reported to the Company, then all such Claims, whenever made, shall be considered first made within the Policy Period or the Discovery Period in which the earliest Claim Arising Out Of such Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts was first made and reported to the Company, and all such Claims shall be subject to one such Limit of Liability.

    (c)    If two or more policies of Public Officials and Employment Practices Liability Insurance issued by the Company or any other member company of American International Group, Inc. ("AIG") apply to the same Claim for which the Insured is liable, then the Company shall not be liable under this policy for a greater proportion of Defense Costs and Damages than the liability of the Company under this policy bears to the total liability of the AIG member companies under all such applicable valid and collectible insurance issued by the AIG member companies; however, the maximum amount payable under all such policies shall not exceed the Limit of Liability of that policy referred to above that has the highest applicable Limit of Liability. In determining the applicable Limit of Liability of any policy for purposes of this paragraph, it shall not be a factor that Defense Costs may be payable as part of the Limit of Liability, in addition to the Limit of Liability or subject to a sublimit of liability.  Nothing contained herein shall be construed to increase the Limit of Liability of this policy.

*END 001*

*BRANCH Hive Copy*                                                                    **018**

**ENDORSEMENT#** *1*   (continued)

(d).   Subject to the Limit of Liability, exclusions and other terms of this policy, the Company shall only be liable for those Damages and Defense Costs which are in excess of the Deductible stated in Items 4 Declarations. This Deductible shall apply as follows:

   1)   to each Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts,

   2)   to Employment Practice Violations or a series of continuous, repeated or interrelated Employment Practice Violations, provided that the Deductible applicable to Employment Practice Violations shall be ten thousand ($10,000) Dollars or the amount noted in Item 4 of the Declarations whichever is greater.

The Public Entity shall also be responsible for payment of the Deductible. The Company may direct the Public Entity to make partial or full payment of the Deductible to others. The Deductible shall be borne by the Public Entity and remain uninsured.

VI

**SPECIAL PROVISIONS section of the Policy, Clause 3. LOSS PROVISIONS, Clause 4. SPECIAL REPORTING CLAUSE and Clause 5. EXTENDED REPORTING PERIOD ARE DELETED IN THEIR ENTIRETY AND REPLACED BY THE FOLLOWING:**

2.   **NOTICE / CLAIM REPORTING PROVISIONS**

**Notice hereunder shall be given in writing to the Company named on the Declarations page at the address indicated on the Declarations page.**

**If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. A Claim shall be considered to have been first made against an Insured when written notice of such Claim is received by any Insured, by the Public Entity on the behalf of any Insured or by the Company, whichever comes first.**

(a)   The Public Entity or the Insureds shall, as a condition precedent to the obligations of the Company under this policy, give written notice to the Company of any Claim made against an Insured as soon as practicable and either:

   (1)   anytime during the Policy Period or during the Discovery Period (if applicable)

   (2)   within 30 days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim is reported no later than 30 days after the date such Claim was first made against an Insured.

(b)   If written notice of a Claim has been given to the Company pursuant to Clause 2 (a) above, then any Claim which is subsequently made against the Insureds and reported to the Company Arising Out Of the facts alleged in the Claim for which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the claim of which such notice has been given, shall be considered made at the time such notice was given.

*END 001*

*BRANCHive Copy*

**019**

**ENDORSEMENT#** *1*     (continued)

(c)   If during the Policy Period or during the Discovery Period (if applicable) the Public Entity or the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against the Insureds and shall give written notice to the Company of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then any Claim which is subsequently made against the Insureds and reported to the Company Arising Out Of such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

## 3.   DISCOVERY CLAUSE

(a)   Automatic Discovery Period

If the Company or the Public Entity shall cancel or refuse to renew this policy and the Public Entity does not obtain replacement coverage as of the effective date of such cancellation or non-renewal,  the Public Entity shall have the right to a period of sixty (60) days following the effective date of such cancellation or non-renewal in which to give written notice to the Company of any Claim made against the Insured during said 60 day period for any Wrongful Act before the end of the Policy Period. This Automatic Discovery Period shall immediately expire upon the purchase of replacement coverage by the Public Entity.

(b)   Optional Discovery Period

If the Company or the Public Entity shall cancel or refuse to renew this policy, the Public Entity shall have the right, upon payment of an additional premium of 50% of the total policy premium, to a period of twelve (12) months following the effective date of such cancellation or non-renewal in which to give written notice to the Company of any Claim made against the Insured during said twelve (12) month period for any Wrongful Act before the end of the Policy Period. This right shall terminate, however, unless written notice of such election together with the additional premium due is received by the Company within thirty (30) days after the effective date of cancellation or non-renewal. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

VII

**SPECIAL PROVISIONS section of the Policy, Clause 6. REIMBURSEMENT OF THE COMPANY shall be renumbered to be SPECIAL PROVISIONS Clause 4.**

VIII

GENERAL CONDITIONS Section of the Policy shall be amended to include the following General Condition 12:

12.   Subject otherwise to the terms hereof, the policy shall cover Claims made against the estates, heirs, or legal representatives of deceased Insureds, and the legal representatives of Insureds in the event of an Insured's incompetency, insolvency or bankruptcy, who were Insureds at the time the Wrongful Acts upon which such Claims are based were committed.

**Subject otherwise to the terms hereof, this policy shall cover Claims made against the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the**

*END 001*

*BRANCHive Copy*                                                          **020**

ENDORSEMENT# *1*     (continued)

world) of an Insured for all Claims arising solely out of his or her status as the spouse of an Insured, including a Claim that seeks damages recoverable from marital community property, property jointly held by the Insured and the spouse, or property transferred from the Insured to the spouse; provided, however, that this extension shall not afford coverage for any Claim for any Wrongful Act of the spouse, but shall apply only to Claims Arising Out Of the Wrongful Acts of an Insured, subject to the policy's terms, conditions and exclusions.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THE POLICY REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

*END 001*

BRANCH Archive Copy

## ENDORSEMENT# *2*

This endorsement, effective *12:01 am*     *January 1, 2006*     forms a part of
policy number   *625-49-23*
issued to   *EAST JEFFERSON LEVEE DISTRICT (INC)*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

### EPLI Expansionary (libel, slander, defamation)

In consideration of the premium charged, it is hereby understood  and agreed that solely as
respects coverage  for Employment Practice Violations,  the **EXCLUSIONS** Section of  the
policy, as amended by the "Coverage Enhancement Endorsement (Form #43248)," in
Section IV. of the Coverage Enhancement Endorsement, paragraphs (c) and (d)  are deleted
in their entirety and replaced with the following:

    (c)    Arising Out Of  (1) false  arrest,  detention or  imprisonment,  (2)  assault or
battery, (3) malicious prosecution or abuse  of process, (4) wrongful entry or
eviction, or invasion of any right of privacy,  or (5) any allegation  relating to
the foregoing  exclusions  (c)(1) through  (c)(4) that an Insured  negligently
employed, investigated, supervised  or retained  any person,  or based on  an
alleged practice, custom or policy and including, without limitation, any
allegation that  the  violation of  a  civil right caused  or  resulted from  such
Damages or Claim;

    (d)    Arising Out Of  (1) bodily injury to, or sickness,  disease  or death of  any
person, (2) damage  to or destruction  of any  property, including  the loss of
use thereof, or  (3) any allegation  relating to the  foregoing exclusions  (d)(1)
through (d)(2) that an Insured negligently employed, investigated,  supervised
or retained a person,  or based on an  alleged practice, custom  or policy and
including, without limitation, any  allegation that the  violation of a  civil right
caused or resulted from such Damages or Claim;

    ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**022**

AUTHORIZED REPRESENTATIVE

*BRANCH* *Archive Copy* *END 2*

## ENDORSEMENT# *3*

This endorsement, effective *12:01 am    January 1, 2006*    forms a part of
policy number   *625-49-23*
issued to    *EAST JEFFERSON LEVEE DISTRICT (INC)*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

### FUNGUS AND MOLD EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the
following amendments to the policy shall apply:

1.    The Section of the policy entitled " **DEFINITIONS**" is hereby amended to add the
following at the end thereof:

Fungus(i) includes, but is not limited to, any of the plants or organisms belonging to
the major group Fungi, lacking chlorophyll, and including Molds, rusts, mildews,
smuts, and mushrooms.

Mold(s) includes, but is not limited to, any superficial growth produced on damp or
decaying organic matter or on living organisms, and Fungi that produce Molds.

Spore(s) means any dormant or reproductive body produced by or arising or
emanating out of any Fungus(i), Mold(s), mildew, plants, organisms or
microorganisms.

2.    The Section of the policy entitled " **EXCLUSIONS**" is amended to add the following
at the end thereof:

The Company shall not be liable to make any payment of Loss in connection with
any claim:

(a) alleging, arising out of, based upon, attributable to, or in any way involving,
directly or indirectly:

   (1) Fungus(i), Mold(s), mildew or yeast;

   (2) Spore(s) or toxins created or produced by or emanating from such Fungus(i),
   Mold(s), mildew or yeast;

   (3) substance, vapor, gas, or other emission or organic or inorganic body or
   substance produced by or arising out of any Fungus(i), Mold(s), mildew or
   yeast; or

   (4) material, product, building component, building or structure, or any
   concentration of moisture, water or other liquid within such material,
   product, building component, building or structure, that contains, harbors,
   nurtures or acts as a medium for any Fungus(i), Mold(s), mildew, yeast, or
   Spore(s) or toxins emanating therefrom,

*BRANCHive CopyEND 3*                                                   **023**

ENDORSEMENT# 3     (Continued)

This endorsement, effective *12:01 am*      *January 1, 2006*        forms a part of
policy number    *625-49-23*
issued to    *EAST JEFFERSON LEVEE DISTRICT (INC)*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

      regardless of any other cause, event, material, product and/or building
      component that contributed concurrently or in any sequence to such Claim.

    ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED

**024**

AUTHORIZED REPRESENTATIVE

BRANCHive CopyEND 3

## ENDORSEMENT# *4*

This endorsement, effective *12:01 am*      *January 1, 2006*      forms a part of
policy number   *625-49-23*
issued to   *EAST JEFFERSON LEVEE DISTRICT (INC)*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### INTELLECTUAL PROPERTY EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the
**EXCLUSIONS** section of the policy is amended to include the following:


This Policy does not apply:


to any claim arising out of any misappropriation of trade secret or infringement of patent,
copyright, trademark, trade dress  or any  other intellectual property right;


All other terms, conditions and exclusions remain unchanged.

**025**

AUTHORIZED REPRESENTATIVE

*BRANGHive CopyEND 4*

## ENDORSEMENT# *5*

(POL #3)

This endorsement, effective  *12:01 am*      *January 1, 2006*      forms a part of
policy number   *625-49-23*
issued to   *EAST JEFFERSON LEVEE DISTRICT (INC)*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

In consideration of the premium charged, it is hereby understood and agreed that notwithstanding
anything in this policy to the contrary, this policy does not apply to any Wrongful Act committed
prior to  *January 1, 2002*                .

_____

AUTHORIZED REPRESENTATIVE

*END 005*

**026**

**BRANCHCopy**

## ENDORSEMENT# *6*                                   (POL #32)

This endorsement, effective *12:01 am*      *January 1, 2006*      forms a part of
policy number   *625-49-23*
issued to    *EAST JEFFERSON LEVEE DISTRICT (INC)*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

### AMENDATORY ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that Insuring Agreement 2., DEFENSE COSTS, CHARGES & EXPENSES (INCLUDED IN THE LIMITS OF LIABILITY) is deleted in its entirety and replaced with the following:

2.     DEFENSE COSTS, CHARGES & EXPENSES                                          .

With respect to any such Wrongful Act for which insurance is afforded by this policy under Insuring Agreement 1 above, the Company shall, in addition to the applicable limit of liability, pay on behalf of the Insured Defense Costs, Charges and Expenses.

The Company shall at all times have the right but not the duty to assume the defense of any claim or suit against the Insured, and in the event of the exercise of this right shall provide the Company with full cooperation.

The Insured shall not admit liability for or settle any claim or suit or incur any Defense Costs, Charges or Expenses without the Company's prior written consent, which consent shall not be unreasonably withheld.

If the Insured refuses to consent to any settlement recommended by the Company and acceptable to the claimant:

A.     the Company may then withdraw from the defense of the Insured (if it has assumed the Insured's defense) by tendering control of the defense to the Insured, and the Insured shall thereafter at his own expense negotiate or defend such claim or suit independently of the Company, and

B.     the Company's liability shall not exceed the amount of damages for which the claim or suit could have been settled if such recommendations were consented to, plus Defense Costs, Charges and Expenses incurred by the Company, and Defense Costs, Charges and Expenses incurred by the Insured with the Company's written consent, up to the date of such refusal.

The Company shall not be obligated to pay any claim or judgement or to defend or continue to defend, or pay Defense Costs, Charges and Expenses resulting from, any claim or suit after the applicable limit of the Company's liability has been exhausted by payments of judgements and/or settlements.

<div align="center">

*END 006*

**027**

</div>

**ENDORSEMENT#** *6*    (Continued)    (POL #32)

It is further understood and agreed that all references in this policy to Defense Costs, Charges and Expenses being included within the limits of liability are deleted. Nothing herein shall be construed to mean that settlements for damages are not subject to the limits of liability.

It is further understood and agreed that definition 5 is deleted in its entirety and replaced with the following:

5.    Defense Costs, Charges and Expenses means fees, costs and expenses (including premiums for any appeal bond, attachment bond, or similar bond) resulting from the investigation, adjustment, defense and appeal of any claim, suit or proceeding arising in connection therewith, if incurred by the Company or by the Insured with written consent of the Company; however, Defense Costs, Charges and Expenses shall not include salaries of officials or employees of any Insured or of any other governmental body.

AUTHORIZED REPRESENTATIVE

*END 006*

45121    *BRANCHive Copy*                                                 **028**

ENDORSEMENT# *7*

This endorsement, effective   *12:01 am*     *January 1, 2006*      forms a part of
policy number    *625-49-23*
issued to   *EAST JEFFERSON LEVEE DISTRICT (INC)*

by   *National Union Fire Insurance Company of Pittsburgh, Pa.*

## LOUISIANA CANCELLATION/NONRENEWAL
## AMENDATORY ENDORSEMENT

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy; and 2) "you", "your", "named Insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

The cancellation provision of the policy is replaced by the following:

A.   The First Named Insured may cancel this policy by mailing or delivering to the Insurer advance written notice of cancellation.

> Within thirty days following such cancellation the insurer shall pay to the insured or to the person entitled thereto as shown by the insurer's records, any unearned portion of any premium paid on the policy as computed on the customary short rate or as otherwise specified in the policy and any unearned commission. If no premium has been paid on the policy, the insured shall be liable to the insurer for premium for the period during which the policy was in force.

B.   CANCELLATION OF NEW POLICIES IN EFFECT FOR LESS THAN SIXTY (60) DAYS

If this policy has been in effect for less than sixty (60) days and is not a renewal, the Insurer may cancel this policy for any reason, by mailing or delivering to the First Named Insured written notice of cancellation at least sixty (60) days before the effective date of cancellation.

C.   CANCELLATION OF RENEWAL POLICIES AND NEW POLICIES IN EFFECT FOR SIXTY (60) DAYS OR MORE

If this policy has been in effect for sixty (60) days or more, or is a renewal of a policy the Insurer issued, the Insurer may cancel only for one or more of the following reasons:

(1)   Nonpayment of premium;

(2)   Fraud or material misrepresentation made by, or with the knowledge of, the First Named Insured or Other Insured(s) in obtaining the policy, continuing the policy or in presenting a claim under a policy;

(3)   Activities or omissions by the First Named Insured which change or increase any hazard insured against, (including a failure to comply with loss control recommendations);

*END 007*

**ENDORSEMENT#** *7*    (continued)

(4)    Change in the risk which increases the risk of loss after the Insurer issued or renewed this policy, including an increase in exposure due to regulation, legislation, or court decision;

(5)    Determination by the Commissioner of Insurance that the continuation of this policy would jeopardize the solvency of the Insurer or would place the Insurer in violation of the insurance laws of this or any other state;

(6)    The violation or breach of any policy terms or conditions by the Insured or Other Insured(s); or

(7)    Any other reasons that are approved by the Commissioner of Insurance.

The Insurer will mail or deliver written notice of cancellation under Item C to the First Named Insured at least:

(a)    Ten (10) days before the effective date of cancellation if the Insurer cancels for nonpayment of premium; or

(b)    Twenty (20) days before the effective date of cancellation if the Insurer cancels for a reason described in C.(2) through (7) above.

D.    WHEN A MORTGAGE HOLDER IS SHOWN IN THE POLICY

If the Insurer cancels this policy, the Insurer will give written notice to the mortgage holder at least twenty (20) days before the effective date of cancellation or ten (10) days written notice of cancellation if cancellation is for nonpayment of premium.

E.    THE FOLLOWING IS ADDED:

NONRENEWAL

1.    If the Insurer decides not to renew this policy, the Insurer will mail or deliver written notice of nonrenewal to the First Named Insured, at least sixty (60) days before its expiration date, or its anniversary date if it is a policy written for a term of more than one year or with no fixed expiration date.

2.    The Insurer need not mail or deliver this notice if:

(a)    The Insurer or another company within the same insurance group has offered to issue a renewal policy; or

(b)    The First Named Insured has obtained replacement coverage or has agreed in writing to obtain replacement coverage.

3.    Any notice of nonrenewal will be mailed or delivered to the First Named Insured at the last mailing address known to the Insurer. If notice is mailed, proof of mailing will be sufficient proof of notice.

All other terms, conditions and exclusions remain unchanged.

AUTHORIZED REPRESENTATIVE

**END 007**

## ENDORSEMENT# *8*

This endorsement, effective *12:01 am*     *January 1, 2006*        forms a part of
policy number   *625-49-23*
issued to *EAST JEFFERSON LEVEE DISTRICT (INC)*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### COVERAGE TERRITORY ENDORSEMENT

Payment of loss under this policy shall only be made in full compliance with all United
States of America economic or trade sanction laws or regulations, including, but not
limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury
Department's Office of Foreign Assets Control ("OFAC").

*John Doy*

AUTHORIZED REPRESENTATIVE

*END 008*

**ENDORSEMENT#** 9

This endorsement, effective 12:01 am January 1, 2006 forms a part of
policy number 625-49-23
issued to EAST JEFFERSON LEVEE DISTRICT (INC)

by National Union Fire Insurance Company of Pittsburgh, Pa.

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| 43247 | 11/85 | Public Officials & Employees Liability Insurance Policy-DEC |
| 81285 | 01/03 | Tria Dec Disclosure Form |
| 43248 | 11/85 | Public Officials & Employees Liability Insurance-GUTS |
| APPMAN | | COVERAGE ENHANCEMENT ENDORSEMENT (FORM # 43248) |
| MNSCPT | | EPLI Expansionary (libel, slander, defamation) |
| MNSCPT | | FUNGUS AND MOLD EXCLUSION |
| MNSCPT | | INTELLECTUAL PROPERTY EXCLUSION |
| | | LIMITED PRIOR ACTS ENDORSEMENT |
| 45121 | | DEFENSE COSTS, CHARGES & EXPENSES |
| 52146 | 05/96 | LOUISIANA AMENDATORY - CANCELLATION/NONRENEWAL |
| 89644 | 07/05 | COVERAGE TERRITORY ENDORSEMENT (OFAC) |
| 78859 | 10/01 | FORMS INDEX ENDORSEMENT |
| MNSCPT | | EPLI w/ Law Enforcement |

032

AUTHORIZED REPRESENTATIVE

**END 009**

ENDORSEMENT# *10*

This endorsement, effective *12:01 am*     *January 1, 2006*          forms a part of
policy number    *625-49-23*
issued to    *EAST JEFFERSON LEVEE DISTRICT (INC)*

by      *National Union Fire Insurance Company of Pittsburgh, Pa.*

**EPLI w/ Law Enforcement**

### EMPLOYMENT PRACTICES VIOLATIONS ENDORSEMENT
### INCLUDING LAW ENFORCEMENT

In consideration of the premium charged, it is hereby understood and agreed that solely as respects coverage for Employment Practice Violations, the **EXCLUSIONS** Section of the policy, as amended by the "Coverage Enhancement Endorsement (Form #43248)," in Section IV. of the Coverage Enhancement Endorsement, paragraphs (c), (d) and (n) are deleted in their entirety and replaced with the following:

(c)     Arising Out Of (1) false arrest, detention or imprisonment, (2) assault or battery, (3) malicious prosecution or abuse of process, (4) wrongful entry or eviction, or invasion of any right of privacy, or (5) any allegation relating to the foregoing exclusions (c)(1) through (c)(4) that an Insured negligently employed, investigated, supervised or retained any person, or based on an alleged practice, custom or policy and including, without limitation, any allegation that the violation of a civil right caused or resulted from such Damages or Claim;

(d)     Arising Out Of (1) bodily injury to, or sickness, disease or death of any person, (2) damage to or destruction of any property, including the loss of use thereof, or (3) any allegation relating to the foregoing exclusions (d)(1) through (d)(2) that an Insured negligently employed, investigated, supervised or retained a person, or based on an alleged practice, custom or policy and including, without limitation, any allegation that the violation of a civil right caused or resulted from such Damages or Claim;

(n)     Arising Out Of the operation of or activities of any schools, airports, transit authorities, hospitals, clinics, nursing homes or other health care operations, utilities, housing authorities, jails or detention facilities, or fire fighting authorities unless specifically included in Item 6. of the Declarations or by endorsement attached hereto;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**033**

AUTHORIZED REPRESENTATIVE

*BRANCH Archive Copy END 10*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES                    CIVIL ACTION
      CONSOLIDATED LITIGATION

                                                 NO.: 05-4182

                                                 SECTION "K" (2)

FILED IN:    05-4181, 05-4182, 05-4191, 05-4568, 05-5237, 05-6073,
             05-6314, 05-6324, 05-6327, 05-6359, 06-0020, 06-1885,
             06-0225, 06-0886, 06-11208, 06-2278, 06-2287, 06-2346,
             06-2545, 06-3529, 06-4065, 06-4389, 06-4634, 06-4931,
             06-5032, 06-5042, 06-5159, 06-5163, 06-5367, 06-5471,
             06-5771, 06-5786, 06-5937, 06-7682, 07-0206, 07-0647,
             07-0993, 07-1284, 07-1286, 07-1288, 07-1289.

PERTAINS TO: LEVEE

## FIRST SUPPLEMENTAL AND AMENDING LEVEE MASTER
## CONSOLIDATED CLASS ACTION COMPLAINT

        NOW INTO COURT, COMES THE LEVEE PLAINTIFFS' SUBGROUP

LITIGATION COMMITTEE ("LEVEE PSLC"), pursuant to Case Management Order No. 4,

for the purpose of filing this (Superseding) First Supplemental and Amending Levee Master

Consolidated Class Action Complaint:

**034**

## I.

## INTRODUCTION

1.    This action results from one of the most predictable and preventable catastrophes in
      American history. On or about August 29, 2005, Hurricane Katrina ("Katrina") hit the Gulf
      Coast largely sparing Greater New Orleans, which fortunately lay in Katrina's rapidly
      deteriorating western eye-wall. The result was that Katrina laid waste to virtually everything
      in its path along the Mississippi Gulf Coast; but in Orleans Parish, Katrina's winds did not
      register as a Category 3 on the Saffir-Simpson scale, instead barely reaching 100 miles per
      hour. Nevertheless, through the fault and negligence of Defendants, Katrina's surge rushed
      from the Gulf of Mexico through the Mississippi River Gulf Outlet ("MR-GO") and
      converged with another storm surge rushing from Lake Borgne through the Gulf Intracoastal
      Waterway ("GIWW"). The combined surge was then funneled into the joint MR-
      GO/GIWW, otherwise known as Reach 1 of the MR-GO inundating the heart of the City
      of New Orleans from the east by overwhelming levees/floodwalls and/or spoil banks that
      had been negligently designed, constructed, maintained, undermined, weakened, inspected
      and/or operated by the Defendants.  In addition, through the fault and negligence of
      Defendants, Katrina's surge rushed unhindered through the Rigolets and Chef Menteur
      Passes into Lake Pontchartrain to inundate the heart of the City of New Orleans from the
      north by breaching levees/floodwalls and/or spoil banks that had been negligently designed,
      constructed, maintained, undermined, weakened and/or operated by the Defendants.

-2-

**035**

2.      This (Superseding) First Supplemental and Amending Levee Master Consolidated Class
        Action Complaint is an Administrative Master Complaint ("AMC") which incorporates all
        parties to the class action proceedings consolidated or cumulated before this Court, including
        those named in any and all subsequently filed class actions which are later transferred to this
        Court. This AMC does not merge the above referenced suits into a single cause nor does it
        alter the rights of any party in any respect. This AMC shall not be given the same effect as
        an ordinary Complaint, but shall only be considered as an administrative device to aid
        efficiency and judicial economy. *See In re Propulsid Products Liability*, 208 F.R.D. 133
        (E.D. La. 2002).

## II.

## JURISDICTION

3.      This Court maintains subject matter jurisdiction over this action pursuant to 28 U.S.C. §
1346(b) (Defendant United States), and 28 U.S.C. § 2671, *et seq.* (Federal Tort Claims Act,
"FTCA").

4.      The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question
jurisdiction), inasmuch as Plaintiffs' claims arise under the Constitution and/or laws of the United
States, which statutory laws include, without limitation, the Federal Water Pollution Control Act,
33 U.S.C. §§ 1251 *et seq.*, the Coastal Zone Management Act, 16 U.S.C. §§ 1451 *et seq.*, and the
River & Harbors Act, 33 U.S.C. §§ 403 *et seq.*

5.      The Court also has subject matter jurisdiction pursuant to the provisions of 28 U.S.C. §
1332(d)(2), which vests original jurisdiction over the class claims asserted herein based upon the
Class Action Fairness Act of 2005, 28 U.S.C. §§ 1711 *et seq.*

-3-

**036**

6.     The Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1367 as to those claims asserted under state law because they are so related to claims within the federal jurisdiction of the Court that they form part of the same case or controversy within the meaning of Article III of the United States Constitution.

7.     The Court also has subject matter jurisdiction over those claims asserted herein which arise under the Admiralty/Maritime Law of the United States, pursuant to 28 U.S.C. § 1333(1) and saving to all Plaintiffs as suitors all legal and equitable remedies to which they otherwise are entitled.

8.     The Court also has subject matter jurisdiction as to the defendant Corps of Engineers pursuant to 46 U.S.C. §§ 741-752 (the Suits in Admiralty Act, "SAA"), and/or 46 U.S.C. §§ 781-790 (the Public Vessels Act, "PVA") as applicable, and/or 46 U.S.C. § 740 (the Admiralty Extension Act, "AEA")).

9.     All named Defendants have engaged in sufficient conduct within the jurisdiction of this Honorable Court, and/or have sufficient contacts with the jurisdiction of this Honorable Court related to the events complained of herein, to be subject to the Court's *in personam* jurisdiction.

## Administrative Claim Requirements

10.    All named Plaintiffs/Complainants have presented their administrative claims in writing to the Corps as provided under appropriate federal law and regulation and a period of at least six months has expired since the filing of their claims. Further, named Plaintiffs/Complainants, individually, and on behalf of all others, reserve the right to contest the legal and/or jurisdictional necessity of administrative claim filing as a consequence of the inaction and failure to act on the part of the Corps in failing to process and evaluate said claims.

-4-

**037**

## Futility Doctrine

11.    While the Named Plaintiffs and the proposed Class Representatives herein have timely filed
their administrative claims for damages with the Corps and have allowed the requisite time
to file suit against the Corps to elapse, Class Representatives, individually and on behalf of
the Putative Class they seek to represent, expressly plead the futility doctrine on behalf of
any member of the Putative Class herein who either did not timely file an administrative
claim for monetary damages under any applicable law or regulation, or if they did file such
a claim and six months has not yet run from time of filing. All administrative exhaustion
requirements imposed by 28 U.S.C. § 2675 (applicable to suits under the FTCA) and 46
U.S.C. § 30101 (applicable to suits under the AEA) have been waived by the "futility of
exhaustion" doctrine because they can serve no purpose at all. Requiring all potential class
members to present administrative claims to the Corps of Engineers prior to filing suit would
serve no purpose at all because:

a.     The Corps of Engineers has made it clear through its actions and inactions that it
does not intend to resolve any of these claims through its administrative claim
process;

b.     While many months have passed since many potential class members filed
administrative claims, the Corps of Engineers has taken no action to resolve them,
signaling its decision to let the judicial process decide them;

c.     The regulations enacted by the Corps to handle the FTCA administrative claims, 28
CFR Sections 14.1- 14.11, do not provide a mechanism by which potential class
members can conduct the necessary discovery needed to prove their cases, and such
discovery can only be provided by this Court;

-5-

**038**

   d.   Many potential class members will suffer irreparable harm if they are required to file administrative claims (which the Corps will not act upon) because they have no knowledge of the need to file them in order to protect their rights;

   e.   No regulations have been enacted prescribing the manner in which claims brought under the AEA should be handled, leading to much confusion among potential class members; and

   f.   It is impossible to comply with the requirements of 46 U.S.C. § 30101 because there is no "agency owning or operating (all) vessel(s) causing the injury or damage."

12.   Additionally, as to the Corps' administrative claim requirements, Class Representatives, and the Class they seek to represent, challenge those requirements as a violation of the rights of Class Representatives and the Class under the United States Constitution, as amended. Enforcement of administrative filings will cause denial of access to the Courts and a denial of due process. Class Representatives and the Class further aver that the Corps is incapable of providing administrative relief in any reasonable time frame because of the massive, unprecedented, number of claims and the inherent inability of the Corps to properly staff and run any meaningful claims administration. Thus, the Corps' administrative procedure (and thus any future relief) is inadequate under the special circumstances following Hurricane Katrina. The requirement by the Corps that an administrative procedure be followed following Hurricane Katrina is an unreasonable governmental action that is not substantially justified. Unless Class Representatives and the class are able to proceed in Court immediately, Class Representatives are threatened or will be threatened with impending irreparable injury from the delay of the Corps' prescribed administrative procedure. Accordingly, Class Representatives and the Class expressly plead that individuals and

-6-

**039**

entities harmed due to the negligence and fault of the Corps be relieved of the need to file administrative claims as a requirement precedent to suit against the Corps. Class Representatives and the Class further complain of the illegal and unconstitutional denial of equal access to justice through the Corps' administrative filing claim as predicate to suit. Class Representatives and the Class further expressly plead for attorney fees and costs to be awarded in addition to any other right to claim attorney fees and costs pursuant to the Equal Access to Justice Act passed by the United States Congress (5 U.S.C. § 504).

## III.

### VENUE

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Defendants' negligent and wrongful actions occurred in the Eastern District of Louisiana, a substantial part of the events and omissions giving rise to this action occurred in the Eastern District of Louisiana, and at the time of the damage the Class Representatives all resided in the Eastern District of Louisiana, and the damage to the Class Representatives and the Class occurred within the Eastern District of Louisiana.

## IV.

### WAIVER OF SOVEREIGN IMMUNITY

14.     The United States of America and the United States Army Corps of Engineers waived its sovereign immunity in connection with the claims asserted in this suit by the enactment of the FTCA, 28 U.S.C. § 2671, *et seq.* While Class Representatives believe that all of the Class' claims against the Corps are derived from the FTCA applying the tort and other laws of the State of Louisiana, out of an abundance of caution, the Class Representatives alternatively plead admiralty and maritime jurisdiction and causes of action under the AEA,

-7-

**040**

46 U.S.C. App. § 740, the SAA, 46 U.S.C. §§ 741-52, the PVA, 46 U.S.C. §§ 781-90 and/or

the Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.*, the Coastal Zone Management

Act, 16 U.S.C. §§ 1451 *et seq.*, and the River & Harbors Act, 33 U.S.C. §§ 403 *et seq.*

Furthermore, any immunity sought by the Defendant Corps pursuant to 33 U.S.C. §702c (the

Flood Control Act of 1928) is not available to the extent the provisions of this Act do not

apply, have not been complied with, and/or the liability of the Corps is not predicated on

flood control activity

## V.

## PARTIES

### Proposed Class Representatives

15.   Named Plaintiffs, MICHELLE HENNESSEY, LENNIECE MORRELL, KENNETH A.

POLITE, SR., MICHELE HARRISON, THURMAN R. KAISER, SR., ROSEMARY R.

KAISER, BETTY SONNIER STALBERT, EMANUEL ESTEVES, JR., STELLA

WASHINGTON, JOHN B. WILLIAMS, EMANUEL WILSON, ELOIS BELL, LEO

MITCHELL, TRENISE JACKSON, DWAYNE MALLET, LESLIE DORANTES, DONNA

AUGUSTINE, GLADYS LABEAUD, DAISY INNIS, BETTY JONES, JOSE' LOUIS

RODRIGUEZ, BEATRICE DREW, EDDIE KNIGHTEN, CALVIN LEVY, NICOLA

MCCATHEN and CHARLES MOSES, are all persons of the age of majority and citizens

of the United States who, at all times relevant hereto resided within the jurisdiction of this

Court, who, for themselves individually and on behalf of others similarly-situated, seek

damages resulting from the above-referenced catastrophe. The definitions of the proposed

class and subclasses to which these named Plaintiffs belong and which they seek to

represent, are specified *infra* under the heading CLASS ACTION ALLEGATIONS.

-8-

**041**

## Defendants

16.   Named Defendants herein are:

   a.   The UNITED STATES OF AMERICA, a sovereign government amenable to suit
        for civil liability in accordance with the federal laws and regulations set forth
        herein; and the UNITED STATES ARMY CORPS OF ENGINEERS, a division
        of the United States Government under the direct jurisdiction of the Department
        of the Army (both defendants collectively referred to hereafter as "CORPS");

   b    The BOARD OF COMMISSIONERS OF THE ORLEANS PARISH LEVEE
        DISTRICT (hereafter "OLD"), a local government entity created by LSA-R.S.
        38:291, amenable to suit, and domiciled in the Parish of Orleans, State of Louisiana;

   c    The SEWERAGE AND WATER BOARD OF NEW ORLEANS (hereafter
        "S&WB" or "SWB"), a political subdivision of the State of Louisiana created by La.
        R.S. 33:4071 *et seq.*, amenable to suit, and domiciled in the Parish of Orleans, State
        of Louisiana;

   d    The BOARD OF COMMISSIONERS OF THE EAST JEFFERSON LEVEE
        DISTRICT (hereafter "EJLD"), a political subdivision of the State of Louisiana
        created by LSA-R.S. 38:291, amenable to suit, and domiciled in the Parish of
        Jefferson;

   e.   The BOARD OF COMMISSIONERS OF THE PORT OF NEW ORLEANS
        (hereafter "PORT OF NO", or "PORT"), a local government entity created by LSA-
        R.S. 34:21, amenable to suit, and domiciled in New Orleans, Louisiana;

   f.   CSX TRANSPORTATION CORPORATION (hereafter "CSX CORP."), a foreign
        corporation doing business in the Parish of Orleans, State of Louisiana;

-9-

**042**

g.   CSX TRANSPORTATION, INC. (hereafter "CSX INC."), a foreign corporation doing business in the Parish of Orleans, State of Louisiana;

h.   PUBLIC BELT RAILROAD COMMISSION FOR THE CITY OF NEW ORLEANS (hereafter "PUBLIC BELT"), an entity amenable to suit and domiciled in the Parish of Orleans, State of Louisiana; and

I.   ST. PAUL FIRE AND MARINE INSURANCE COMPANY (hereafter "ST. PAUL"), a foreign insurer authorized to do and doing business as an insurer in the State of Louisiana, who at all times relevant herein had in full force and effect a policy or policies of liability insurance, under the terms, provisions, and conditions of which it assumed liability for the acts and/or negligence of its insured, OLD, and further had in full force and effect a policy or policies of liability insurance, under the terms, provisions, and conditions of which it assumed liability for the acts and/or negligence of its insured, EJLD, and against whom Class Representatives assert their claims under the Louisiana Direct Action Statute, La. R.S. 22:655.

j.   NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH (hereafter "NATIONAL UNION"), a foreign insurer authorized to do and doing business as an insurer in the State of Louisiana, who at all times relevant herein had in full force and effect a policy or policies of liability insurance, under the terms, provisions, and conditions of which it assumed liability for the acts and/or negligence of its insured, EJLD, and against whom Class Representatives assert their claim under the Louisiana Direct Action Statute, La. R.S. 22:655

-10-

**043**

## VI.

## CLASS ACTION ALLEGATIONS

### Proposed Class

17.   This action is appropriate for determination through the Federal Class Action Procedure

(Fed. R. Civ. P. 23, *et seq.*) and the proposed Class Representatives herein seek to represent

the following proposed Greater New Orleans Class, and subclasses as outlined, *infra.*:

> All individuals and entities, both private and public and both natural
> and juridical, in "**GREATER NEW ORLEANS METRO**" (the
> geographic area bounded to the north by Lake Pontchartrain, to the
> south by the Mississippi River, to the east by the IHNC, and to the
> west by the 17th Street Canal running from Lake Pontchartrain south
> to Metairie Road and then west on Metairie Road to Causeway
> Boulevard, and then south on Causeway Boulevard to the Mississippi
> River) who/which sustained damages as a result of the inundation in
> this area which occurred during and immediately following the
> landfall of Hurricane Katrina on or about August 29, 2005, and
> who/which, as to the defendant Corps only, have, or by a date to be
> determined by the Court, will have fulfilled whatever administrative
> claim filing requirements this Court deems applicable in this matter.

### Class Representatives are:

1.   **MICHELLE HENNESSEY**.   At the time of the storm, Ms. Hennessey resided at

417-419 40th Street, New Orleans, Louisiana, 70124  Ms. Hennessey is 40 years old

and employed as a dentist analyst, CCMSI. Ms. Hennessey owned the property, a

duplex, in which she resided in half. The duplex was approximately 1600 square feet

per unit and was situated on a lot 50 feet x 110 feet.  The property had a new roof

prior to the storm and an unattached shed, which washed away during the storm. Ms.

Hennessey now resides at 3808 N. Labarre Road in Metairie, Louisiana, 70002. Ms.

Hennessey suffered damages as a result of the negligent acts of the defendants.

-11-

ii.     **LENNIECE MORRELL**. At the time of the storm, Ms. Morrell resided at 114
        Winthrop Place, New Orleans, Louisiana, 70119. She is a 38 year old Louisiana Air
        National Guard Civil Service Technician. The property was a single family dwelling
        that she owned. The property was approximately 1310 square feet. Upon moving in,
        Ms. Morrell had all interior walls repainted, ceiling fans, air conditioning units, and
        some electrical work updated. Ms. Morrell has returned home and resides at 114
        Winthrop Place, New Orleans, Louisiana, 70119. Ms. Morrell suffered damages as
        a result of the negligent acts of the defendants.

iii.    **KENNETH A. POLITE, SR.** At the time of the storm, Mr. Polite resided at 5651
        Cartier Avenue in New Orleans, Louisiana, 70122. Mr. Polite is currently 49 years
        old and is employed by the New Orleans Police Department. The property is a single
        family residence which he and his wife own. Mr. Polite has now returned to his
        home and he and his wife are again residing at 5651 Cartier Avenue, New Orleans,
        Louisiana, 70122. Mr. Polite suffered damages as a result of the negligent acts of the
        defendants.

iv.     **MICHELE HARRISON**. At the time of the storm, Ms. Harrison owned and
        resided at 2418-A and 2418-B North Robertson Street in New Orleans, Louisiana
        70117, and owned 2420 North Robertson Street and 5904-5906 Marigny Street, New
        Orleans, Louisiana. She is 45 years old and currently a student. The property on
        North Robertson was a residential triplex, which she owned and resided in two of the
        units. Ms. Harrison now resides at 3630 North Johnson Street in New Orleans,
        Louisiana 70117. Ms. Harrison suffered damages as a result of the negligent acts of
        the defendants.

-12-

v.     **THURMAN R. KAISER, SR.** At the time of the storm Mr. Kaiser resided at 3801
North Turnbull Drive in Metairie, Louisiana, 70002. Mr. Kaiser is 77 years old and
presently retired. He owns eighteen (18) rental properties in Orleans Parish, all but
four (4) of those properties suffered flood damages as a result of the levee breaches.
Mr. Kaiser's damaged property addresses are: 2506-2508 Acacia Street; 2541, 2541A,
2543, 2543A Acacia Street; 1619-1621 N. Broad Street; 3221-3223 Belfort Avenue;
6574-6576 Catina Street, 4029-4031 Clematis Street; 612-614 South Cortez Street;
4125-4127 D'Hemecourt Street; 4129-4131 D'Hemecourt Street; 1618-1620 Paul
Morphy Street; 612 North Murat Street; 3223-3225 St. Philip Street; and 436-438
Telemachus Street. Mr. Kaiser has returned and is residing in his home at 3801 North
Turnbull Drive, Metairie, Louisiana, 70002. Mr. Kaiser suffered damages as a result
of the negligent acts of the defendants.

## Proposed Sub-Classes

18.    In addition to requesting certification of the foregoing, general class as defined, named
Plaintiffs request pursuant to the provisions of Rule 23(c)(4) that the above class be divided
into the following subclasses, each subclass to be treated as a class:

### a.     ZONE ONE SUBCLASS:

> All individuals and entities, both private and public and both
> natural and juridical, in the geographic area bounded to the
> north by Lake Pontchartrain, to the south by Metairie Road and
> City Park Avenue, to the east by the Orleans Avenue Canal,
> and to the west by the 17th Street Canal, who/which sustained
> damages as a result of the inundation/flooding in this area
> which occurred during and immediately following the landfall
> of Hurricane Katrina on or about August 29, 2005, and
> who/which, as to the defendant Corps only, have, or by a date
> to be determined by the Court, will have fulfilled whatever
> administrative claim filing requirements this Court deems
> applicable in this matter.

-13-

**046**

**Zone One Sub-Class Representatives are:**

I.     **MICHELLE HENNESSEY**. At the time of the storm, Ms. Hennessey resided at 417-419 40th Street, New Orleans, Louisiana, 70124 Ms. Hennessey is 40 years old and employed as a dentist analyst, CCMSI. Ms. Hennessey owned the property, a duplex, in which she resided in half. The duplex was approximately 1600 square feet per unit and was situated on a lot 50 feet x 110 feet. The property had a new roof prior to the storm and an unattached shed, which washed away during the storm. Ms. Hennessey now resides at 3808 N. Labarre Road in Metairie, Louisiana, 70002. Ms. Hennessey suffered damages as a result of the 17th Street Canal breach.

ii.    **THURMAN R. KAISER. SR. and ROSEMARY R. KAISER.** At the time of the storm Mr. and Ms. Kaiser resided at 3801 North Turnbull Drive in Metairie, Louisiana, 70002. Mr. and Ms. Kaiser are both 77 years old and presently retired. They own eighteen (18) rental properties in Orleans Parish, all but four (4) of those properties suffered flood damages as a result of the levee breaches, including their property at 6574-6576 Catina Street, New Orleans, Louisiana, 70122. The Kaiser's other damaged property addresses are: 2506-2508 Acacia Street; 2541, 2541A, 2543, 2543A Acacia Street; 1619-1621 N. Broad Street; 3221-3223 Belfort Avenue; 4029-4031 Clematis Street; 612-614 South Cortez Street; 4125-4127 D'Hemecourt Street; 4129-4131 D'Hemecourt Street; 1618-1620 Paul Morphy Street; 612 North Murat Street; 3223-3225 St. Philip Street; and 436-438 Telemachus Street. The Kaisers have returned and are residing in their home at 3801 North Turnbull Drive, Metairie, Louisiana, 70002. The Kaisers suffered damage as a result of the 17th Street Canal breach and as a result of the various levee breaches and the negligent acts of the defendants.

-14-

**047**

**b.      ZONE TWO SUB-CLASS:**

All individuals and entities, both private and public and both natural and juridical, in the geographic area bounded to the north by Lake Pontchartrain, to the west by the Orleans Avenue Canal, to the east by the London Avenue Canal, to the south from where the London Avenue Canal intersects with Gentilly Boulevard, along Gentilly Boulevard to the south-west to North Broad Street, where it intersects with Esplanade Avenue, and then running northwest along Esplanade Avenue to City Park Avenue where it meets Marconi Boulevard, then running north to the Orleans Canal, who/which sustained damages as a result of the inundation/flooding in this area which occurred during and immediately following the landfall of Hurricane Katrina on or about August 29, 2005, and who/which, as to the defendant Corps only have, or by a date to be determined by the Court, will have fulfilled whatever administrative claim filing requirements this Court deems applicable in this matter.

**Zone Two Sub-Class Representatives are:**

I.       **BETTY SONNIER STALBERT.** At the time of the storm, Ms. Stalbert resided at 3913 Virgil Blvd. in New Orleans, Louisiana, 70122. She is 53 years old and works as an insolvency specialist with the Internal Revenue Service. She owned her residence which was a single family home. Ms. Stalbert has still not been able to return to her home and currently resides at 2225 College Drive, Apt. 104, Baton Rouge, Louisiana, 70808. Ms. Stalbert suffered damages as a result of the western breach of the London Avenue Canal and the breach of the 17th Street Canal.

ii.      **EMANUEL ESTEVES, JR.** At the time of the storm, Mr. Esteves owned and resided at 4543 Cartier Avenue in New Orleans, Louisiana, 70122, and owned property at 1559-1561 Senate Street, New Orleans, Louisiana, 70122. He is 68 years old and a retired United States postman. His home was a single family home of

-15-

**048**

approximately 3,500 square feet on a lot of 40 feet x 100 feet. Mr. Esteves had recently renovated his kitchen with new cabinets and counter tops and installed new hardwood floors in the study, dining, and living rooms prior to the storm. Mr. Esteves now resides at 4656 Gaines Street, New Orleans, Louisiana, 70126. Mr. Esteves suffered damages as a result of the western breach of the London Avenue Canal and the breach of the 17th Street Canal.

iii.   **STELLA WASHINGTON.** At the time of the storm, Ms. Washington resided at 1478 Mithra Street, New Orleans, Louisiana, 70122. She is 56 years old and employed as a casino dealer. Her property was a single family home that she owned consisting of approximately 2,500 square feet on a lot of 51.5 feet x 120 feet. Ms. Washington is now back and residing in her home at 1478 Mithra Street, New Orleans, Louisiana, 70122. Ms. Washington suffered damages as a result of the western breach of the London Avenue Canal and the breach of the 17th Street Canal.

iv.   **JOHN B. WILLIAMS.** At the time of the storm, Mr. Williams owned and resided at 6 Charlotte Drive, New Orleans, Louisiana, 70122, and owned property at 1830-1832 Hope Street and 2640 Bruxells, New Orleans, Louisiana, 70119. He is a retired and 82 years old. His home was a single family dwelling of approximately 3,300 square feet and situated on a lot 60 feet x 130 feet. Mr. Williams now resides at 1830 Hope Street, New Orleans, Louisiana, 70119. Mr. Williams suffered damages as a result of the western breach of the London Avenue Canal and the breach of the 17th Street Canal.

-16-

**049**

v.     **EMANUEL WILSON.**  At the time of the storm, Mr. Wilson resided at 1512

Mandolin Street in New Orleans, Louisiana, 70122. He is a 25 years old and while

previously employed and the Ramada Hotel he is currently searching for new

employment. The property was a single family home owned by his grandmother that

he rented. The property was approximately 1,600 square feet with an unattached 340

square foot garage. Mr. Wilson is now back in his home at 1512 Mandolin Street,

New Orleans, Louisiana, 70122. Mr. Wilson suffered damages as a result of the

western breach of the London Avenue Canal and the breach of the 17th Street Canal.

c.     **ZONE THREE SUB-CLASS:**

> All individuals and entities, both private
> and public and both natural and juridical, in the
> geographic area bounded to the north by Lake
> Pontchartrain, to the east by the IHNC, to the
> west by the London Avenue Canal, and to the
> south by Gentilly Boulevard/Gentilly Road,
> who/which sustained damages as a result of the
> inundation/flooding in this area which occurred
> during and immediately following the landfall of
> Hurricane Katrina on or about August 29, 2005,
> and who/which, as to the defendant Corps only,
> have, or by a date to be determined by the Court,
> will have fulfilled whatever administrative claim
> filing requirements this Court deems applicable in
> this matter.

**Zone Three Sub-Class Representatives are:**

1..     **ELOIS BELL.**  At the time of the storm, Ms. Bell resided at 1866 Carnote Street,

in New Orleans, Louisiana 70122. She is a retired 65 year old. The property was a

single family home that she owned. The property was approximately 2,500 square

feet on a lot of 30 feet x 120 feet and had a new roof within the five years prior to the

-17-

**050**

storm and had new floors installed in 2005. Ms. Bell is 65 years old, retired and now resides at 750 Landwood Drive in Baton Rouge, Louisiana 70806. Ms. Bell suffered damages as a result of the London Avenue Canal eastern breach and inundation from the Inner Harbor Navigational Canal.

ii.     **LEO MITCHELL**. At the time of the storm, Mr. Mitchell resided at 6203 Waldo Drive in New Orleans, Louisiana, 70122. He is a 40 year old commercial truck driver. The property was a duplex of approximately 2,200 square feet which he rented one side. Mr. Mitchell now resides in a FEMA Trailer at 10821 Dreux Avenue, New Orleans, Louisiana, 70127. Mr. Mitchell suffered damages as a result of the London Avenue Canal eastern breach and inundation from the Inner Harbor Navigational Canal.

iii.    **TRENISE JACKSON.** At the time of the storm, Ms. Jackson resided at 5010 Frankfort Street, New Orleans, Louisiana, 71026 She is a 37 year old student. Her property was a single family home that she owned. Ms. Jackson now resides at 1 Gibson Street, Apt. 172, Houston, Texas, 77060. Ms. Jackson suffered damages as a result of the London Avenue Canal eastern breach and inundation from the Inner Harbor Navigational Canal.

iv.     **DWAYNE MALLET.** At the time of the storm, Mr. Mallet resided at 1924 Wildair Drive, New Orleans, Louisiana, 70122.   He is 42 years old and employed as a purchasing director. The property was a single family home that he owned, situated on a lot approximately 60 x 120 feet. In 2005 prior to the storm, Mr. Mallet had new floors and carpet installed in his home. Mr. Mallet now is now living in a FEMA trailer at 208 Maumas, New Orleans, Louisiana, 70131. Mr. Mallet suffered damages as a result of the London Avenue Canal eastern breach and inundation from the Inner Harbor Navigational Canal.

-18-

**051**

v.      **LESLIE DORANTES.** Prior to the storm, Ms. Dorantes resided at 3614 Virgil

Boulevard, New Orleans, La., 70122. The property was a residential apartment where

she resided as a renter. The property was approximately 2500 square feet. Ms.

Dorantes is 59 years old and works as an administrative assistant. She now resides in

Convent, Louisiana, 9216 Sugar Hill Street, Lot 127, Convent, Louisiana, 70723-2749

Ms. Dorantes suffered damages as a result of the London Avenue Canal eastern

breach and inundation from the Inner Harbor Navigational Canal.

### d. ZONE FOUR SUB-CLASS:

> All individuals and entities, both private and public and both
> natural and juridical, in the geographic area bounded to the north
> by Gentilly Boulevard/Gentilly Road to North Broad Street
> (Gentilly Ridge), to the south by the Mississippi River, to the east
> by the IHNC, and to the west by Esplanade Avenue, who/which
> sustained damages as a result of the inundation/flooding in this
> area which occurred during and immediately following the landfall
> of Hurricane Katrina on or about August 29, 2005, and
> who/which, as to the defendant Corps only, have, or by a date to
> be determined by the Court, will have fulfilled whatever
> administrative claim filing requirements this Court deems
> applicable in this matter.

### Zone Four Sub-Class Representatives are:

I..     **DONNA AUGUSTINE.** At the time of the storm, Ms. Augustine resided at 2126

North Broad Street, New Orleans, Louisiana, 70119.   She is 57 years old and

currently disabled. The property was a single family dwelling of approximately 2,000

square feet, which she rented. Ms. Augustine now resides at 2230 Sherwood Meadow

Drive, Apartment A, Baton Rouge, Louisiana, 70816.  Ms. Augustine suffered

damages as a result of inundation from the Inner Harbor Navigational Canal.

-19-

**052**

ii.     **GLADYS LABEAUD.** At the time of the storm, Ms. LaBeaud resided at 1708-1710
        Industry Street in New Orleans, Louisiana 70119.  She is 76 years old and presently
        retired.  The property, which she owned, was a duplex of approximately 2,500 square
        feet and situated on a lot of approximately 30 x 130 square feet.  Ms. LaBeaud now
        resides at 500 South Jefferson Davis Parkway, Apt. 1, New Orleans, Louisiana,
        70119.  Ms. LaBeaud suffered damages as a result of inundation from the Inner
        Harbor Navigational Canal.

iii.    **DAISY INNIS.**  At the time of the storm, Ms. Innis resided at 4024 Stutz Street,
        New Orleans, Louisiana, 70126.  She is a retired and 64 years old. The property was
        a single family residence that she owned.  Ms. Innis has now returned to her home
        and is living at 4024 Stutz Street, New Orleans, 70126.  Ms. Innis suffered damages
        as a result of inundation from the Inner Harbor Navigational Canal.

iv.     **BETTY JONES.**  At the time of the storm, Ms. Jones resided at 2111 Clouet Street,
        New Orleans, Louisiana, 70117.  She is 69 years old and presently retired.   The
        property, which she owned, was a residential duplex of approximately 3,000 square
        feet and situated on a lot of approximately 30 x 81 square feet.  Ms. Jones has now
        returned home and is living in her home at 2111 Clouet Street, New Orleans,
        Louisiana, 70117.  Ms. Jones suffered damages as a result of inundation from the
        Inner Harbor Navigational Canal

v.      **JOSE LOUIS RODRIGUEZ.**  Jose Louis Rodriguez is representing the claim of
        his father, Jose Rodriquez, including the wrongful death claim.  Mr. Rodriguez was
        born in 1927 and at the time of the storm resided at 2923 Bruxelles Street, New

-20-

**053**

Orleans, Louisiana, 70119, which he was renting. Mr. Rodriguez drowned as a result

of the floodwaters from the inundation from the Inner Harbor Navigational Canal.

Jose Louis Rodriguez currently resides at 2223 Prentiss Street, New Orleans,

Louisiana, 70122.

e    **ZONE FIVE SUB-CLASS:**

> All individuals and entities, both private and public and both
> natural and juridical, in the geographic area bounded to the
> north by Metairie Road/City Park Avenue, to the south by the
> Mississippi River, to the west by Causeway Boulevard, and
> to the east by Esplanade Avenue, who/which sustained
> damages as a result of the inundation/flooding in this area
> which occurred during and immediately following the
> landfall of Hurricane Katrina on or about August 29, 2005,
> and who/which, as to the defendant Corps only, have, or by
> a date to be determined by the Court, will have fulfilled
> whatever administrative claim filing requirements this Court
> deems applicable in this matter.

Zone Five Sub-Class Representatives are:

I.    **BEATRICE DREW.** At the time of the storm, Ms. Drew resided at 1227 South

Galvez Street, New Orleans, Louisiana, 70125. She is 58 years old and currently

disabled. The property was a single family residence of approximately 1,500 square

feet, which she rented. Ms. Drew now resides at 606 Egle Street in Morgan City,

Louisiana, 70380. Ms. Drew suffered damages as a result of the breaches on the 17th

Street Canal, the London Avenue Canal, and the Inner Harbor Navigational Canal.

ii.   **EDDIE KNIGHTEN.** At the time of the storm, Mr. Knighten resided at 7726-7728

Edinburgh Street, New Orleans, Louisiana, 70125 He is 64 years old and employed

as a truck driver. The property was a duplex that he owned. Mr. Knighten has now

returned and is living in his property at 7726 Edinburgh Street, New Orleans,

-21-

**054**

Louisiana, 70125. Mr. Knighten suffered damages as a result of the breaches on the 17th Street Canal, the London Avenue Canal, and the Inner Harbor Navigational Canal.

iii.     **CALVIN LEVY.** At the time of the storm, Mr. Levy resided at 3205 College Court, New Orleans, Louisiana, 70125 He is 46 years old and employed as a taxi driver. The property was a single family home that he owned. Mr. Levy has returned and is living in his property at 3205 College Court, New Orleans, Louisiana, 70125. Mr. Levy suffered damages as a result of the breaches on the 17th Street Canal, the London Avenue Canal, and the Inner Harbor Navigational Canal.

iv.     **NICOLA McCATHEN.** At the time of the storm, Ms. McCathen resided at 961 S. Telemachus Street, New Orleans, Louisiana, 70125. She is 35 years old and employed as a financial coordinator. The property was a single family residence of approximately 722 square feet in size, which she rented. Ms. McCathen now resides at 1805 Berrymore Drive, Slidell, Louisiana, 70461. Ms. McCathen suffered damages as a result of the breaches on the 17th Street Canal, the London Avenue Canal, and the Inner Harbor Navigational Canal.

v.     **CHARLES MOSES.** At the time of the storm, Mr. Moses resided at 3717 General Perishing Street in New Orleans, Louisiana, 70125. He is retired and 55 years old. The property was a single family dwelling of approximately 3,000 square feet which Mr. Moses rented. Mr. Moses now resides at 8536 South Claiborne Avenue in New Orleans, Louisiana, 70118. Mr. Moses suffered damages as a result of the breaches on the 17th Street Canal, the London Avenue Canal, and the Inner Harbor Navigational Canal.

-22-

**055**

19.    The numerosity prerequisite of Fed.R.Civ.P. 23(a)(1) is satisfied because the proposed class

       and subclasses are so numerous that joinder of all members is impracticable.

20.    The commonality prerequisite of Fed.R.Civ.P. 23(a)(2) is satisfied because there are common

       questions of law and fact applicable to both the named Plaintiffs and putative class and

       subclass members, including, but not limited to:

       (a)    The cause or causes of the breaches and/or failures of the hurricane protection
              systems associated with the 17th Street Canal, the London Avenue Canal, and
              the Lake Pontchartrain and Vicinity Hurricane Project;

       (b)    The legal duties of the defendants owed to the Plaintiffs and the class
              members;

       c)     Each defendant's breach of said duties;

       (d)    The causal relationship between any such breaches and the failures of the
              hurricane protection systems at issue; and

       (e)    Whether the named defendants may assert certain affirmative defenses
              applicable to all named Plaintiffs and putative class members.

21.    The typicality requirement of Fed.R.Civ.P. 23(a) is satisfied because the claims of the class

       and sub-class representatives are typical of the claims of the putative class and sub-class

       members.

22.    The adequacy of representation prerequisite of Fed.R.Civ.P. 23(a) is satisfied because the

       Class and Sub-Class Representatives will fairly and adequately represent the interests of the

       proposed classes. Each representative is represented by skilled counsel, experienced in the

       handling of mass tort cases and class action litigation. These attorneys may be expected to

       handle this matter in an expeditious and economical manner, serving the interests of all class

       and sub-class members. Moreover, the representatives will protect the interests of all class and

       sub-class members by remaining involved as necessary in the decision-making required on the

       part of claimants herein.

-23-

**056**

23.    The predominance prerequisite of Fed.R.Civ.P. 23(b)(3) is satisfied because the common

       questions or issues of law and fact predominate over individualized issues of law and fact.

24.    The superiority prerequisite of Fed R.Civ.P. 23 (b)(3) is satisfied because the class action

       procedure is the superior vehicle for the efficient handling and disposition of the issues and

       claims presented in this litigation. In addition, superiority is satisfied because piecemeal

       litigation would be judicially inefficient, enormously expensive, greatly protracted, time-

       consuming, and unduly burdensome for the litigants and the Court.

25.    Additionally, or in the alternative, Plaintiffs suggest that this matter should be certified as

       a class pursuant to Fed.R.Civ.P. 23(b)(2), inasmuch as certain defendants have acted or

       refused to act on grounds generally applicable to the class, thereby making appropriate final

       injunctive relief with respect to the class as a whole. The actions of the defendants have

       resulted in harm to the class as a whole which harm includes the breakdown of New Orleans

       social structure, the loss of cultural heritage, and the dramatically altered physical,

       economic, political, social and psychological character of the New Orleans area. Such harm

       is appropriately remedied by injunctive relief to the class as a whole because the harm is not

       suffered by any single individual, rather it is societal in nature and is suffered by the class

       as a whole, and can only be fairly and efficiently adjudicated as such.

## VII.

## COUNT ONE

## THE 17TH STREET CANAL DRAINAGE PROJECT ALLEGATIONS AGAINST THE DEFENDANTS CORPS, SWB, OLD, EJLD, NATIONAL UNION , AND ST. PAUL, APPLICABLE TO THE OVERALL CLASS, AND SUB-CLASS ZONES ONE, TWO, AND FIVE.

-24-

**057**

## HISTORY OF THE 17TH STREET CANAL

26.     The canal known today as the "17th Street Canal" forms a significant portion of the boundary
        between Orleans Parish, Louisiana and Jefferson Parish, Louisiana. Historically, the 17th
        Street Canal has also been known as the "Metairie Outlet Canal," the "Metairie Outfall
        Canal," the "Metairie Relief Canal," and the "Upperline Canal."

27.     The 17th Street Canal was dug in the early 1850's through swampy ground to provide a right-
        of-way. It was located where the Jefferson and Lake Pontchartrain Railway was built. The
        railway connected the town of Carrollton with a shipping port on Lake Pontchartrain in the
        area today known as "Bucktown."

28.     In 1858, a secondary canal was built, connecting the original canal to the river side of the
        Metairie Ridge. This spur canal was situated alongside a projected street numbered "17th
        Street," and thus, became known as the "17th Street Canal." The name eventually came to
        commonly refer to the original, larger canal to which this spur canal connected.

29.     The community of Bucktown, where the northern end of the 17th Street Canal enters Lake
        Pontchartrain, began more than a hundred years ago as a group of fishing and hunting camps
        along the canal and Lake Pontchartrain. The earliest structures were wooden huts raised on
        stilts; and the canal provided transportation as well as a harbor for fishing boats.

30.     More substantial development in this area occurred during the mid-19th century, with
        construction of a commercial wharf and a resort called "Lakeport." Steamboats docked at
        the entrance to the New Basin Canal (now Pontchartrain Boulevard), and at the terminus of
        the Jefferson and Lake Pontchartrain Railway (where Bucktown is today).

31.     At the end of the 19th century, the defendant S&WB took over the operation of the canal.
        In 1897 the canal was re-dredged, and in 1929 it was re-dredged again. In 1913, the S&WB

-25-

**058**

completed the construction of Pumping Station No. 6, which drained a large portion of New
Orleans through the canal.

32.     Until recent years, the 17th Street Canal was home to a fleet of approximately one hundred
        shrimp boats. The fleet previously had a lease agreement with the defendant S&WB.

33.     In addition, to its use as a home for the shrimping fleet, the Louisiana Department of
        Wildlife & Fisheries permitted commercial fishing and crabbing activities along the entire
        length of the 17th Street Canal.

34.     The 17th Street Canal historically is, and at all times pertinent hereto has been, a Navigable
        Water of the United States within the meaning of 33 C.F.R. 329.5.

## THE DREDGING PERMIT APPLICATION

35.     On July 15, 1974, the S&WB initiated a project to improve drainage from the 17th Street
        Canal Drainage Basin. Initially, this project called for the dredging of 2.4 miles of the 17th
        Street Canal from Pump Station No. 6 to Lake Pontchartrain. The purpose of the dredging
        was to remove sediment from the canal bottom and re-shape the canal cross section to
        improve the canal's flow characteristics, and to increase the pump capacity of Pump Station
        No. 6. The removal of approximately 85,000 cubic yards of bottom sediment was
        anticipated. That dredge material was then to be deposited along the banks of Breakwater
        Drive and an area of the then proposed Bucktown Dock Facility (West End Park).

36.     Dredging projects in navigable waters of the United States require a permit from the
        Department of the Army pursuant to Section 10 of the Rivers and Harbors Act of March 3,
        1899 (30 Stat. 1151; 33 U.S.C. 403). Accordingly, on July 15, 1974, the S&WB filed an
        application for a "Permit To Discharge Or Work In Navigable Waters And Their
        Tributaries" with the Corps' New Orleans District.

-26-

**059**

37.     The Army Corps of Engineers is a Department of the United States Army. It has seven
        divisions in the United States, one of them being the Lower Mississippi River Valley
        Division. Each division is divided into districts. The New Orleans District is a district of the
        Lower Mississippi Valley Division and it is divided into six technical divisions.     The
        technical divisions are: Real Estate, Contracting, Construction New Orleans/Lafayette,
        Engineering, Planning Program Project Management (PPPMD), and Operations. The
        Operations division is responsible for navigation and the issuance of permits. Issues
        regarding flood control come under the ambit of the Engineering division. Thus, the
        issuance of the permit to dredge was the primary responsibility of the Operations division
        rather than the Engineering division which is responsible for flood control.

38.     The permit approval process required the S&WB to obtain approval from, among others, the
        Louisiana Department of Public Works.

39.     In August of 1974, the Louisiana Department of Public Works, in response to the permit
        application, indicated that it could not complete a review of the permit because the applicant
        had no soil data substantiating the stability or integrity of the levees in question.

40.     On May 23, 1977, the Corps returned the application with no action because the S&WB
        failed to furnish information requested by, among others, the Louisiana Department of
        Public Works.

41.     In 1978, the S&WB retained the civil engineering firm, Modjeski & Masters, Inc.
        ("Modjeski"), to provide a plan for the design and implementation of the dredging project,
        and, on August 23, 1979, Modjeski submitted a second dredging permit application on
        behalf of the S&WB.

-27-

**060**

42.     The same application was resubmitted on December 29, 1980 after environmental concerns
        were raised relative to the disposal of the dredged material in Lake Pontchartrain and on the
        banks of the canal.

43.     On January 28, 1981, Modjeski, in response to inquiries about the impact of the dredging on
        existing levees, provided the Corps with its first memorandum addressing the stability of the
        existing levees and sheet pile wall along the canal. The memo indicated that on three of the
        six test locations, the factors of safety fell below the required values set by the Corps. The
        handwritten report stated:

> "These two locations yielded low factors of safety due to two
> basic causes, (1) the existence of very soft clays with minimal
> (illegible). . . ."

44.     On February 6, 1981, Modjeski provided the Corps with a stability analysis of the existing
        sheet pile wall along the east side of the canal north of Hammond Highway. This report is
        difficult to read, but states in pertinent part that:

> "This analysis indicates that portions of the wall are
> extremely unstable as they now stand. This instability, even
> under normal water level situations is due to several factors:
> a) the soft to very soft clays which make up the soil stratum.
> (Illegible). . . ."

45.     On March 5, 1981, the Corps' Engineering Division issued an internal memorandum
        addressing the soil stability analyses provided by Modjeski. Item No. 4 of the memorandum
        states:

> "The factors of safety at 554+00 and 604+00[1] are
> substantially below the minimum 1.30 factor of safety,

---

These numbers reference points along the Orleans levee bank of the 17th Street Canal, the lower number
being closer to the lake, moving higher as one gets closer to the pump station.

061

therefore, the design sections should be redesigned."[2]

46.   On March 31, 1981, the Corps held a public hearing regarding the dredging permit
      application. Discussion was had about whether raising the existing sheet pile wall instead
      of dredging the bottom would provide a greater cross section and greater pump capacity.
      Modjeski's consulting engineer voiced his concerns about widening the canals, stating that
      the levees were already in violation of the Corps' engineering standards for levee stability
      and that attempts to dig away more dirt adjacent to the levees would worsen the stability
      problem.

47.   On April 20, 1981, in response to the concerns that the dredging would negatively impact
      the existing levee, Modjeski submitted on behalf of the S&WB another application under
      the River and Harbor Act. This application specified a preliminary plan to install sheet pile
      walls with concrete caps for the entire length of the project, then excavation of the canal.
      The sheet pile walls were to be of a sufficient height to meet flood protection criteria.

48.   In reviewing the April 20, 1981 application referenced in the preceding paragraph, an
      internal Corps memorandum dated June 16, 1981 indicated that a number of levee and flood
      wall stability problems were likely if the S&WB plan were implemented.

49.   In addition to their own efforts, Modjeski hired Eustis Engineering Company to assist with
      the subsoil investigation at the 17th Street Canal. On October 27, 1981, Eustis submitted its
      first report entitled "Subsoil Investigation—S&W Board of New Orleans—Metairie Relief
      Canal" Eustis reported that the natural ground surface consists primarily of extremely soft
      to medium soft organic clay, humus and wood that continue to elevations between 7 C.D.
      (Cairo Datum) and 3.5 C.D.

2

The breach along the 17th Street Canal occurred at station 560+00.

-29-

50.     An internal memorandum from the Corps' Engineering Division to the Corps' Operations

        Division, dated February 12, 1982 noted the existence of a stability problem between station

        625+00 and station 670+00 where excavation of the canal will directly tap the sands

        underlying the levee. The memo suggested that a stability analysis be done for the landside

        of the canal incorporating effects of seepage to determine what corrective action is needed.

        In fact, sands underlay the entire 2.4 miles of the 17th Street canal from Pumping Station No.

        6 to Lake Pontchartrain and as such the stability problem was not confined to any one

        section of the canal.

51.     On August 23, 1982, Eustis provided Modjeski with a more comprehensive subsoil

        investigation report. This report states in pertinent part:

                        "Between Stations 617+50 and 663+00, computations
                        indicate the possibility of a blow-out during extreme high
                        water in the canal. Unless more definite information can be
                        developed regarding the potential hydrostatic uplift pressure
                        at the levee toe through this reach, measures should be taken
                        to prevent a blow-out during extreme high water conditions."

The report then goes on to suggest "preventive measures":

                        "Preventive measures include the installation of a seepage
                        cutoff through the levee crown, installation of pressure
                        relief wells near the landside toe of the levee, and sealing
                        the canal bottom:

                        "Seepage Cutoff. The most positive measure to minimize
                        the possibility of a blow-out is the installation of a
                        seepage cutoff, steel sheetpiling and/or a slurry wall
                        should penetrate the sand stratum. Considering that the
                        bottom of the sand stratum is at or near elevation -30 C.D.
                        (Cairo Datum), a 65-ft long cutoff wall would be
                        required."

-30-

**063**

> "Relief Wells. Consideration should also be given to
> installation of pressure relief wells near the landside toe
> of the levee. To be effective, relief wells should penetrate
> close to the bottom of the sand, and, therefore, wells
> approximately 50 feet deep will be required. For planning
> purposes, it is estimated that a well spacing of 30 to 45
> feet may be necessary."

> "Conclusions. Unless a test section can be dredged to develop more
> definitive information regarding the potential hydrostatic pressure at
> the landside levee toe, measures should be taken between Stations
> 617+00 and 663+00 to prevent a possible blowout indicated by
> theoretical analysis."

This report demonstrates that although the problem was well understood, the assumption that

it existed at only one section was grossly incorrect.

52.    On November 30, 1982, Modjeski furnished the Corps with copies of the Eustis soils report.

53.    On February 22, 1983, the Chief of the Corps' Engineering Division, Frederic M. Chatry,

addressed a letter to Mr. G. Joseph Sullivan, the Superintendent of the S&WB. He stated the

following in response to Modjeski's recommendations:

> "our problems with the solution selected by your
> consultant relate to our opinion that a sheet pile cutoff is,
> in fact, not impermeable, and is therefore not a
> dependable means of reducing uplift. It is not our policy
> to specify to applicants the measures to be used in
> meeting Corps criteria, but we do provide advice and
> suggestions about such measures. In this instance, we feel
> that the installation of relief wells would be an
> appropriate way to provide the necessary assurance
> against uplift."

54.    On May 9, 1983, Modjeski submitted a new permit application for the 17th Street Drainage

Canal Improvement Project. This application was to supersede the application for Phase I,

submitted on December 29, 1980, and Phase II, submitted on April 20, 1981, by combining

the two phases into one project, with the project limits being Pump Station No. 6 on the

-31-

**064**

south, and 370.0 ft. north of the Bucktown Pedestrian Bridge. The project now envisioned 470,000 cubic yards of canal bottom to be removed, whereas the original plan only called for 85,000 cubic yards.

55.    On July 27, 1983, Eustis submitted a revised soil stability report that confirmed the potential for a blow-out at the land side toe of the levee extending the area of concern from station 617 to the pumping station due to hydrostatic uplift pressure in the underlying stratum. In this report Eustis recommended to dredge a test section in the canal to study the hydrostatic uplift pressure after the test section was dredged. Once again, there was a failure to understand that the problem existed on the entire length of the canal.

56.    From November 29, to December 16, 1983, a test section was dug just south of Interstate I-10. Six piezometers were installed on the Jefferson side of the canal to closely monitor changes in the hydrostatic pressures before, during, and after completion of the excavation. Eustis' report concerning the test was submitted to the Corps on January 17, 1984. The report concluded that no relevant changes were monitored by the piezometers when the test section was dug, and that it was, therefore, believed that the possibility of a blow-out during high water conditions in the canal was probably slight.

57.    The piezometer study of the test section failed to take into account that the seepage flow through the permeable soils was already in progress when the piezometers were installed and that therefore the conclusions as to stability and permeability were incorrect.

58.    On June 13, 1984, the Army Corps issued the Department Of The Army Permit to "dredge to enlarge and maintain an area and install and maintain flood walls and mooring structures, in the 17th Street Canal (Metairie Relief Canal) from Pumping Station No. 6 to a point about 400 feet north of the Bucktown Pedestrian Bridge" This permit was issued in spite of the fact

-32-

that the Corps' internal engineering procedure and good engineering practice mandated that

a permit which would allow the canal bottom to be below the sheet pile tips be denied.

59. The "Statement of Findings" issued with the permit states that factors considered in issuing

the permit included, *inter alia*:

> "navigation, present and prospective; flood
> heights floodplain use; other public interests."

Clearly, the federal regulations requiring a determination that the permitted action not

negatively impact flood protection was violated.

## PROJECT IMPLEMENTATION

60. The Project was ultimately divided into the following Phases:

Phase I:      from Pump Station No. 6 to Interstate 10
Phase II-A:  from Interstate 10 to Hammond Highway – Orleans Side
Phase II-B:  from Interstate 10 to Hammond Highway – Jefferson Side
Phase III:    from Hammond Highway to Lake Pontchartrain

61 The Work Order for Phase I was issued on December 5, 1983, and the job was completed

on June 1, 1984.

62. Because the S&WB and the OLD could not yet effect an Agreement with the East Jefferson

Levee District regarding Phase II of the Project, an extension of the 1984 permit was applied

for on February 4, 1987, and granted by the Corps on February 20, 1987. On April 24, 1987

the Corps created a drawing showing a sheet pile design which located the sheet pile tips 16

feet lower than the bottom of the canal. While the Operations Division was working on the

S&WB permit, the Engineering Division was working on a flood wall design that might

incorporate the sheet piles that were permitted under the dredging project.

-33-

**066**

63.    In connection with the consideration of using the sheet piles as the base of a flood wall, on
       December 23, 1987, the Corps' Mississippi River Commission in Vicksburg issued a
       memorandum to the Commander of the Corps' New Orleans District relative to sheet pile
       wall design criteria. This memorandum summarized the results of the Corps' "E-99 Sheet
       Pile Wall Load Test Report".

64.    The "E-99 Sheet Pile Wall Load Test" was a full scale instrumented lateral load test of a
       200-foot long sheet pile wall conducted by the Corps in the Atchafalaya basin in 1985. This
       location in the Atchafalaya basin was chosen because of the close correlation of its soil
       conditions with those in the New Orleans area.  Test data from the sheet pile wall and
       adjacent supporting soils indicated a gapping behavior (separation of the steel sheet piles
       from the soils) exactly like that which occurred during Hurricane Katrina. From the E-99
       sheet pile test the Corps learned, among other things that there was potential soil separation
       from the sheet piles (allowing water to penetrate below the ground surface between the piles
       and the soils) and that the calculated safety factor was not reached. The Corps failed to take
       into consideration the fact that the fundamental purpose of sheet piles is to prevent water
       seepage. They incorrectly focused on whether the sheet piles could support a concrete wall.

65.    All of the information about bad soils and the potential for water seepage was completely
       ignored in connection with the design of the flood walls contemplated to be built on the
       previously permitted sheet pile wall.

66.    On August 31, 1988, Eustis provided another geo-technical report containing the results of
       revised cantilever floodwalls analyses and revised slope stability analyses for the proposed
       modifications along the Orleans side of the 17th Street Drainage Canal between Stations
       553+70 and 670+00, the reach where the breach of the canal wall would later occur. The

-34-

**067**

recommended tip depth of the sheet pile wall already permitted to be higher than the canal
bottom was 12.8 feet, five feet higher than the canal bottom.

67.    On August 11, 1988, the S&WB issued the Work Order for Phase III of the Project, and the
       job was completed on December 6, 1989.

68.    On July 4, 1990, the work order for Phase II-A of the previously permitted S&WB dredging
       project, including the installation of sheet piles on the Orleans side of the canal was issued.
       The job was completed on January 10, 1992. The contractor for that part of the Project was
       Boh Bros. Construction Co., Inc.

69.    The dredging activity conducted in the 17th Street Canal pursuant to the S&WB permit was
       specified contractually to entail "bucket dredging" from a series of flex-float barges in the
       canal. These barges constituted vessels in navigation for the time period during which the
       dredging occurred.

## ALLEGATIONS OF FAULT AND/OR LIABILITY
## AGAINST THE UNITED STATES

70.    The United States, through Defendant Army Corps of Engineers, violated Federal law
       because the River and Harbors Act of 1899 (33 U.S.C. § 403) prohibits the Corps of
       Engineers from granting a dredging permit that is contrary to the public interest.

71.    Title 33 C.F.R § 320.4 establishes general policies for evaluation of permit applications.
       That policy requires that the benefits which reasonably may be expected to accrue from the
       proposal must be balanced against its reasonably foreseeable detriments. Among the factors
       required to be considered is the effect on flood control. The Corps violated this policy by
       failing to consider the impact of the approval of the permit on flood control and/or if the
       Corps did consider the impact on flood control, it did so with reckless disregard of

-35-

**068**

overwhelming evidence that the approval would, in fact, damage the flood protection levee.

72. The Corps failed to exercise due care in its evaluation of the dredging permit as evidenced by its failure to employ its own engineering guidelines and general engineering guidelines in considering the impact of the application on the public interest, including flood protection.

73. The Corps breached its duty by negligently issuing a permit which allowed changes to the canal bottom, resulting in subsurface soil destabilization of the levee.

74. The Plaintiffs' and class members' damages were proximately caused by the negligent acts and/or omissions as described herein.

75. Each Plaintiff has complied with all conditions precedent to this action.

76. Pursuant to the federal maritime and admiralty statutes, the Corps is liable or is responsible to Plaintiffs for money damages for its negligence in permitting of the improvements and appurtenances to the 17th Street Drainage Canal.

77. In addition or in the alternative, the United States is liable pursuant to the FTCA, for money damages for its negligence in the permitting of the improvements and appurtenances to the 17th Street Drainage Canal.

78. The activities for which the Corps of Engineers issued a permit did not involve any activities as part of a federally authorized and funded flood control project.

79. The United States is not immune from civil liability for its negligence under the Flood Control Act, as amended, 33 U.S.C. § 702©, because the actions of the Corps of Engineers in issuing the dredging permit were wholly unrelated to any federally authorized and funded flood control project.

80. The Corps' negligence was such that, if a private person, it would be liable to Plaintiffs in accordance with the law of the place where the act or omission occurred—in this case—the

-36-

**069**

State of Louisiana.

81.     The Corps had no discretion to permit the dredging and construction associated with the 17th
        Street Drainage Canal Improvement Project because the approved work damaged the public
        interest by undermining existing flood protection.

82.     The failure of the 17th Street Drainage Canal sheet pile retaining wall and the resulting
        inundation of the New Orleans Metropolitan Area was directly and proximately caused by
        the Corps' negligence and approval of the S&WB's proposed dredging of the 17th Street
        Drainage Canal and its improvements.

83.     The permitting of the dredging and attendant construction of the 17th Street Drainage Canal
        Improvement Project was a substantial contributing factor to the failure of the 17th Street
        Drainage Canal sheet pile retaining wall, and the resulting inundation of the New Orleans
        Metropolitan Area .

84.     The Corps knew, or reasonably should have known, that its acts and/or omissions would
        proximately cause the damages suffered by the Plaintiffs and the Class.

## ALLEGATIONS OF FAULT AND/OR LIABILITY AGAINST
## S&WB, OLD, EJLD, ST. PAUL AND NATIONAL UNION

85.     In addition to the liability of the United States, Defendants S&WB, OLD, EJLD, and
        S&WB, had the legal responsibility and duty to the Plaintiffs and the Putative Class to
        cause, allow, and/or conduct the aforesaid dredging activity in a manner that would not
        compromise the safety of the canal's levee/flood wall system. The Defendant St. Paul is
        directly liable to these Plaintiffs as the liability insurer of Defendants OLD, and EJLD, and
        Defendant National Union is directly liable to these Plaintiffs as the liability insurer of
        Defendant EJLD.

-37-

**070**

## SEWERAGE AND WATER BOARD

86.     The S&WB breached its legal responsibilities and duties to Plaintiffs in proposed Subclasses

One, Two, and Five by seeking the dredging permit for the 17th Street Canal, and by failing

to withdraw its application for the permit upon learning of the flood protection dangers

which might result from the requested dredging activity.

87.     The S&WB was negligent in the following non-exclusive particulars:

   a.      in requesting and causing the 17th Street Canal to be dredged to a depth lower than
           the sheet piles;

   b.      in requesting and causing the canal to be dredged only on the Orleans Parish side;

   c.      in requesting and causing the canal to be dredged too close to the flood wall on the
           Orleans Parish side;

   d.      in requesting and causing the canal to be dredged in a manner that compromised the
           safety of the canals/levee flood walls; and

   e.      in having received reports from residents of water underseeping the levee and onto
           adjacent residential property and then failing to take any action on said reports,
           including but not limited to actions to investigate the source or sources of the water,
           report the existence of the water on the adjacent properties to other authorities,
           and/or to take measures to remedy the cause of the under seepage.

## THE ORLEANS LEVEE DISTRICT

88.     The Defendant, OLD, violated its legal responsibilities and duties to the Plaintiffs

and the Putative Class in proposed Subclasses One, Two, Four and Five in the following

non-exclusive particulars:

-38-

**071**

a.      by negligently allowing, and/or by negligently failing to challenge and prevent, the
aforesaid dredging in the 17th Street Canal; and

b.      by negligently failing to conduct appropriate oversight, maintenance and inspection
of the 17th Street Canal levee/flood wall system, thus allowing the safety flaws and
discoverable dangers of the system to remain uncorrected and undisclosed to the
public.

### THE EAST JEFFERSON LEVEE DISTRICT

89.     The EJLD violated its legal responsibilities and duties to the Plaintiffs and the Putative Class
in proposed Subclasses One, Two, Four and Five in the following non-exclusive particulars:

a.      by negligently allowing, and/or by negligently failing to challenge and prevent, the
aforesaid dredging in the 17th Street Canal; and

b.      by negligently failing to conduct appropriate oversight, maintenance and inspection
of the 17th Street Canal levee/flood wall system, thus allowing the safety flaws and
discoverable dangers of the system to remain uncorrected and undisclosed to the
public.

### ST. PAUL FIRE AND MARINE INSURANCE COMPANY
### and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH

90.     Plaintiffs in proposed Subclasses One, Two, and Five aver that Defendant, St. Paul, had in full
force and effect a policy of liability insurance affording liability coverage to the Defendant
OLD, and a policy of liability insurance affording liability coverage to the defendant EJLD,
thereby affording Plaintiffs and the Putative Class the a cause of action against St. Paul
pursuant to the provisions of the Louisiana Direct Action Statute, LSA-R.S. 22:655.

-39-

**072**

91.     Plaintiffs in proposed Subclasses One, Two, and Five aver that Defendant, National Union,

        had in full force and effect a policy of liability insurance affording liability coverage to the

        Defendant, EJLD, thereby affording Plaintiffs and the Putative Class the a cause of action

        against National Union pursuant to the provisions of the Louisiana Direct Action Statute,

        LSA-R.S. 22:655.

## VIII.

## COUNT TWO

### THE LAKE PONTCHARTRAIN, LOUISIANA AND VICINITY, HURRICANE PROTECTION PROJECT ALLEGATIONS AGAINST THE CORPS OF ENGINEERS, APPLICABLE TO THE ENTIRE CLASS

92.     Most of the levee and/or I-Wall structures that surround the New Orleans Metropolitan area

        were constructed, in part, under the authority of the "Lake Pontchartrain, Louisiana and

        Vicinity, Hurricane Protection Project" (hereinafter referred to as "Lake Pontchartrain

        Project"). Congress first authorized construction of the Lake Pontchartrain Project in the

        Flood Control Act of 1965 to provide hurricane protection to areas around Lake

        Pontchartrain. The Corps was responsible for project design and construction.

#### Negligent and Inherently Dangerous Design Criteria and Violation of Congress' Mandate

#### The Standard Project Hurricane

93.     The overall design criterion of the Lake Pontchartrain Project mandated by Congress was

        to protect the area from "the most severe combination of meteorological conditions

        considered characteristic for the region." The Corps expected these conditions to occur once

        in 200 to 300 years, and they were deemed to be equivalent with the "Standard Project

-40-

**073**

Hurricane" ("SPH"). However, the Corps based its overall design specifications on the 1959

U.S. Weather Bureau 1-in-100 year SPH, which was contradictory to Congress' mandate to

protect from a 1-in-200 year to a 1-in-300 year hurricane.

94.    By 1972, just as the construction of initial parts of the Lake Pontchartrain Project and

floodwalls along the INHC were getting underway, the 1959 SPH was known by the Corps

to be obsolete. By this time, the 1959 SPH specification of maximum sustained wind speeds

of 107 mph had been increased by the National Weather Service to 129 mph. An increase

of 20 percent in maximum winds results in up to a 40 percent increase of maximum surge

elevation.

95.    Again in 1979, the National Oceanic and Atmospheric Administration ("NOAA") raised the

maximum sustained winds, this time to 140 mph, a category 4 hurricane (Technical Report

NWS 23), which further exacerbated the Corps' design deficiencies.

96.    In 1981, the Office of the Chief of Engineers in Washington issued Engineering Regulation

ER 1110-2-1453. The regulation provides direction for the development of SPH and

Probable Maximum Hurricane wind fields along the Gulf and east coast of the United States.

The regulation states specifically:

> 5. Requirements. ER 1110-2-1453 provides direction on the selection of the
> level of protection to be afforded by Corps flood damage prevention projects
> in urban areas. All field operating activities having Civil Works
> responsibilities are required to use the National Oceanic and Atmospheric
> Administration (NOAA) Technical Report NWS 23 for specifying
> meteorological criteria for SPH and PMH wind fields along the gulf and east
> coasts of the United States.

97.    Notwithstanding these events as set forth in Paragraphs 98–101, and the history of the area

to date, the Corps negligently failed to consider any alteration of the project to strengthen

the protection from flooding, and in failing to do so, negligently and/or intentionally violated

-41-

Engineering Regulation ER 1110-2-1453. In ignoring this order to revise all SPH-based

analysis to reflect the new understanding of threat, the Corps elected to base its designs for

the Lake Pontchartrain Project on the 1959 SPH. Such negligence and/or intentional act in

violation of law significantly increased the flooding risk to the Greater New Orleans Area

from Hurricane storm surge.

## Negligent and Inherently Dangerous Design Criteria – the Elevation Datum

98.     In addition to applying the outdated and incorrect SPH, the Corps elected to base the overall

design specifications on outdated and incorrect elevation datum. The Corps applied the

National Geodetic Vertical Datum of 1929 ("NGVD29"), even though they were aware of

the fact that NGVD29 was no longer equal to–and interchangeable with–local mean sea level

("LMSL"). LMSL was the only relevant datum for superimposition of hurricane surge and

wave height from a 1950's era oceanographic analysis. However, when the Corps adopted

design specifications for the Lake Pontchartrain Project in 1965, zero NGVD29 was already

between 1.3 and 1.6 feet below LMSL at different parts of the system, and thus, the

floodwalls crowns were constructed lower by this margin. This design flaw continued with

the use by the Corps of the outdated NGVD29 adjustment for elevation control up to the

time of Katrina. As a result, no provision was made to account for the 3 to 4 feet per century

subsidence rates characteristic of the Greater New Orleans metropolitan area even though

this rate was known or should have been known by the Corps at the time of Congressional

authorization of the Lake Pontchartrain Project. Crown elevation deficiencies ranging up

to 6 feet at the time Katrina struck resulted in prolonged overtopping of floodwalls and

levees that otherwise would have been overtopped only briefly, if at all. Prolonged

overtopping led to catastrophic breaches into the Greater New Orleans area.

-42-

**075**

**The Unauthorized Change from the Barrier Plan to the High-Level Plan**.

99.     The original and only project design authorized by Congress, known as the "Barrier Plan,"

included a series of levees along the lakefront, and control structures, including barriers and

flood control gates located at the Rigolets, Chef Menteur Pass, and Seabrook, Louisiana.

These structures were intended to prevent storm surges from entering Lake Pontchartrain,

thus protecting from overflowing the levees along the lakefront and other areas.

100.    The Barrier Plan, estimated to be completed in 1978, was selected by the Corps and

authorized by Congress over another alternative, known as the "High-Level Plan," which

would have excluded the barriers and flood control gates at the Rigolets, Chef Menteur Pass,

and Seabrook complexes, and instead employed higher levees and flood protection structures

along the lakefront and other areas. The Barrier Plan was selected because the High-Level

Plan was believed to have many serious drawbacks, including the following:

   a.    High-Level Levees would take years longer to construct because of
         subsidence problems;

   b.    High-Level Levees would be wider, thus requiring more rights of way, result
         in displacement of more residences, businesses, et cetera;

   c.    In some locations less efficient and less esthetically pleasing floodwalls
         would be required rather than levees;

   d.    With higher Lake levels, the interior drainage system would be severely
         hampered;

   e.    The High Level Plan would offer no protection to less densely populated
         areas such as the North Shore;

   f.    Lakefront Levees would have to be 6 to 9 feet higher than the present design
         grade; and

   g.    In studies leading to project authorization, the high level plan was determined
         to cost approximately 50 percent more than the Barrier Plan.

-43-

**076**

The final design memoranda for the Barrier Plan were completed in the late 1960s, and construction commenced thereafter.

101.    During the 1970s, the control complexes at the Rigolets and Chef Menteur were facing significant opposition from environmentalists. This opposition culminated in a December 1977 court decision that enjoined the Corps from constructing the barrier complex and certain other parts of the Project, until a revised Environmental Impact Statement was prepared and accepted.

102.    The Corps was unable to produce a satisfactory Environmental Impact Statement for the Barrier Plan, and in 1984 the Corps finally abandoned the Barrier Plan and elected to implement the High-Level-Plan, despite the many serious flaws as outlined hereinabove.

103.    The Corps knew that Congressional Re-Authorization was required for a major change in the design of a public works project.

104.    The Corps implemented the change without obtaining the required Congressional Re-Authorization.

105.    Following the design change, the Corps took no action to adjust certain floodwalls to the new high-level design thus leaving their crests at a considerably lower design height than what was necessary under the High-Level Plan.

106.    Moreover, the Corps knew that the High Level Plan provided no protection against high lake surges entering the drainage canals.

107.    Nineteen years after Congress mandated the Corps to provide the Greater New Orleans Metro Area with protection from the "most severe combination of meteorological conditions," the Corps had now exposed the citizenry to the risk of catastrophic storm surges to inundate the city.

108.    By the mid 1980's, a dense network of single family residences abutted the drainage canals along their entire courses. The encroachment of these homes adjacent to the canal embankments circumvented any possibility of using conventional methods to heighten the levees, which is usually accomplished by adding compacted earth on the land-side of the levees. To achieve the Congressional mandated level of protection, the Corps would

-44-

**077**

therefore have had to displace hundreds of residences, which would have been extremely costly, time-consuming, and controversial.

109.    Therefore, the Corps proposed to provide protection from storm surge by placement of flood gates and new pump stations at the end of the drainage canals.

110.    The Corps had no funds available, and no Congressional authorization for the construction of flood gates and pump stations at the ends of the canals. In addition, the Defendants OLD and SWB objected to such a plan citing fears that the city could not be drained of rain waters when the gates were closed in the event of a storm.

111.    Therefore, the Corps opted to provide "parallel protection" by raising the height of the existing levees and sheet pile flood walls along each side of the canals. By 1991, the Corps, OLD, and SWB decided to proceed with this plan.

112.    Among the flood-wall options were "T-Walls" and "I-Walls." The Corps first considered the more expensive T-Walls which provide a higher level of stability and reliability, especially in soft soil conditions. However, in many locations along the canals there was insufficient space to install T-Walls.

113.    As a result, twenty-six years after Congress' mandate to the Corps to provide hurricane protection from a severe hurricane, the Corps opted to construct I-Wall systems in the soft to very soft soils, including the beach sands of the Pine Island trend, that are characteristic for the entire area of the drainage canals.

114.    Construction of the I-Walls along the 17th Street, Orleans Avenue, and London Avenue canals was completed by the end of 1990s.

115.    On or about August 29, 2005, floodwalls on the east side of the 17th Street Canal, on both sides of the London Avenue Canal, failed catastrophically due to the Corps' unauthorized,

-45-

negligent, grossly negligent, wanton and/or reckless, and unilateral decision to abandon the congressionally authorized Barrier Plan and opt instead for the unauthorized parallel protection utilizing an I-Wall design.

116.    The Corps knew or reasonably should have known that the Barrier Plan would have prevented large amounts of Katrina's surge from entering Lake Pontchartrain, reducing the surge level in Lake Pontchartrain by more than 3 feet, and thus preventing any floodwalls from failing along the 17th Street and London Avenue Canals.

117.    The Corps knew or reasonably should have known that the design and construction of I-walls with particularly short sheet pile depths was impracticable, unsafe, and subject to overflow and damage, putting Plaintiffs' safety and property at risk.

118.    More than forty years after authorization, the Lake Pontchartrain Project remains incomplete. While most public works structures would be scheduled for replacement or rehabilitation after 40 years, planning for a more modern system was negligently, grossly negligently, and/or wantonly or recklessly postponed while the original project remained incomplete and continued to fall further behind schedule. The Corps' design assumptions and policy negligently made in 1965 continue to diminish the Lake Pontchartrain Project today, and were a proximate cause of the innundation of the Greater New Orleans Area.

119.    None of the projects constructed as part of the High-Level Plan were ever authorized by Congress. Thus, the High Level Plan is not an Congressionally authorized federal flood control project, and, as such the Flood Control Act of 1928 and the immunity afforded by section 702c is inapplicable.

120.    Alternatively, if the Flood Control Act of 1928 is applicable, the immunity afforded by section 702c is not applicable because the Corps breached its affirmative duty to institute

-46-

proceedings to acquire either the absolute ownership of the lands adjacent to the canal which

was subject to overflow and damage, or to acquire the floodage rights over such lands, as

required by the Act.

## IX.
## COUNT THREE

### NEGLIGENT DESIGN AND CONSTRUCTION OF FLOODWALLS AT THE 17TH STREET CANAL ALLEGED AGAINST THE CORPS, OLD, S&WB, NATIONAL UNION, AND ST. PAUL, AND APPLICABLE TO THE ENTIRE CLASS AND/OR SUB-CLASSES ONE, TWO, FOUR AND FIVE

121. Class representatives of Sub-Classes One, Two, Four and Five re-allege and re-aver each and every allegation of paragraphs 1–25, and each and every allegation set forth in Count 1, as if copied herein in their entirety.

122. In the 1990s, I-walls were constructed at the 17th Street Canal under the direction of the OLD and the SWB. The design memorandum for these I-walls was provided by the Corps.

123. The U.S. Army Corps of Engineers Manual on Engineering, Design and Construction of Levees dated April 30, 2000 states that, for stability reasons, flood walls utilizing the "I-wall" design rarely exceed seven (7) feet above ground surface, and that an inverted "T-wall" design is the proper design when walls higher than seven feet are required.

124. The I-walls on the 17th Street Canal were built in concrete sections that rise eleven (11) feet above the ground.

125. The "I-wall" design consists of steel sheet pilings driven into the compacted dirt atop the levee with reinforcing steel rods threaded through the top of the piling. Concrete is then poured to encapsulate the top of the piling and form the wall. The wall is composed of individual concrete slab sections (monoliths) that are linked together by rubbery gaskets which allow the monoliths to expand and contract.

-47-

**080**

126.   As stated herein, extensive analysis of the 17th Street Canal soils had been performed since
       the early 1980s by Modjeski, and Eustis. The analysis utilized soil borings taken along the
       canal's levee.

127.   The borings revealed alternating layers of soft clay and black humus or peat, a soft, spongy
       soil comprised of decaying trees and other organic material, occurring from fifteen to
       twenty-one feet below sea level. The layer of humus or peat substantially reduced the
       strength of the soil, particularly its strength in resisting lateral pressure and its ability to
       support the levee and flood walls under pressure from flood water.

128.   Despite the discovery of such soil composition, the flood walls of the 17th Street Canal levee
       were constructed with steel sheet piling driven to a depth that was seventeen (17) feet below
       sea level. At such depths, the bottom of the sheet pilings terminated above or within the
       layers of weak soil. Moreover, the sheet pilings' bottoms terminated at a depth higher than
       the deepest point of the canal bottom.

129.   Additionally, the soil adjacent to the 17th Street Canal levee had subsided significantly after
       construction of the levee and flood wall, thereby significantly reducing the amount of
       support that the land behind the levee provided against the pressure of flood waters.

130.   In 1993, Pittman was retained for the construction of the monoliths atop the sheet pile wall
       along the 17th Street Canal.

131.   During the construction of the monoliths, Pittman reported to the Corps that it was
       encountering major problems in that the sheet pile walls with the monoliths installed on top
       were beginning to lean towards the canal side because the supporting soil foundation was
       of insufficient strength, rigidity and stability.

-48-

**081**

132. Despite these concerns and problems, the construction of the I-walls was allowed to proceed, and was completed prior to the events giving rise to this litigation.

133. Soil studies performed in connection with this construction activity failed to account for the possible weakening of the soil in connection with the affect of subsidence of land alongside the levee, soft soils at the base of the levee, and/or soil that would be weakened if flood waters pushed through the subterranean levels under the levee and flood wall.

134. In the course of conducting construction activity, Pittman built and placed concrete flood walls on top of sheet piling driven into unstable soil beneath the sheet piling. The soil conditions were either discovered or discoverable at the time of this activity.

135. Upon information and belief, reports of canal water in the yards of homes adjacent to the 17th Street Canal were made to the Defendant SWB prior to Hurricane Katrina. The presence of canal water in adjacent yards is an indicator of under seepage due to the flawed design and construction of flood walls.

136. The Defendants Corps, OLD, and SWB, had a duty to Plaintiffs to design and construct the I-walls at the 17th Street Canal in a manner that would not compromise the safety of the canal's levee/flood wall system.

137. The Defendants, SWB and OLD, were negligent in their rejection of the "Barrier Plan," and insistence on the implementation of the flawed High Level parallel plan implemented for the 17th Street Canal.

138. In addition, or in the alternative, Defendants OLD and EJLD had the care, custody and control, and the *garde* of the 17th Street Canal Levee and flood wall system at all times pertinent hereto, and accordingly are strictly liable in accordance with Articles 2317 & 2317.1 of the Louisiana Civil Code for the vices and/or defects in the levee and flood wall

-49-

**082**

system which caused the damages of which Plaintiffs complain.

139. On information and belief, the Defendant, SWB, received reports of canal water in the yards of homes adjacent to the 17th Street Canal, said water being an indicator of under seepage of water from the canal. SWB was negligent in failing to properly respond to said reports.

## X.

## COUNT FOUR

## ALLEGATIONS OF NEGLIGENT DESIGN AND CONSTRUCTION OF FLOODWALLS AT THE LONDON AVENUE CANAL AND THE ORLEANS AVENUE CANAL AGAINST DEFENDANTS CORPS, OLD, SWB, AND ST. PAUL, AND APPLICABLE TO ENTIRE CLASS AND SUB-CLASSES TWO, THREE, FOUR AND FIVE

140. The London Avenue Canal was constructed in the first half of the 19th century, through an area that was mostly swampland, and later became part of the City of New Orleans. The canal originally served a dual purpose of commerce and drainage, *i.e.*, it both permitted small boat traffic from Lake Pontchartrain to a section of New Orleans, and provided for swamp drainage.

141. A major project of upgrading the flood walls and bridges along the London Avenue Canal began in the early 1980's. In connection with this upgrading project, Defendant, OLD, contracted several firms for engineering, design, and construction, namely: B&K Construction, James Construction, Gotech, C.R. Pittman, and Burk-Kleinpeter.

142. The Defendant, Corps, previously proposed to provide protection from storm surge by placement of a flood gate at the hurricane levees where the London Avenue Canal entered Lake Pontchartrain. Defendants, OLD and SWB, objected to this plan and instead favored building and raising the height of the parallel flood walls and levee structures along each

-50-

**083**

side of the canal (the aforementioned Parallel Protection Plan). By 1991, the Corps, OLD and SWB had decided to proceed with this plan.

143. The resulting flood walls along the London Avenue Canal were constructed atop earthen levees with an "I-wall" design, consisting of steel sheet pilings driven into the compacted dirt atop the levee with reinforcing steel rods threaded through the top of the piling. Concrete was poured to encapsulate the top of the piling and form the wall. The wall is composed of individual concrete slab sections (monoliths) that are linked together by rubbery gaskets (water stops), intended to prevent water from flowing between the monoliths and to allow the concrete to expand and contract.

144. The entirety of the London Avenue Canal is constructed over beach sands of the Pine Island trend. The sands are encountered about 13 to 15 feet below the crowns of the I-wall levees of the canal, but are deeper at the vicinity of the northern breach (stations 113 to 118). The sand is covered with a veneer of peaty swamp deposits.

145. Of primary importance in constructing an I-wall atop an earthen levee are the composition of the soil into which the sheet piles will be driven and upon which the I-wall will rest, and the depth of the sheet piles as dictated by the composition of the soil.

146. Soil borings of the levee at the site of London Avenue Canal south breach indicate the presence of sand at a depth of 10 to 15 feet below sea level.

147. Soil borings of the levee at the site of London Avenue Canal north breach indicate conditions similar to those of the south breach site, with the layer of sand present at the north breach site at a depth of 12 feet below sea level, as well as a layer of peat, a highly porous material that shrinks when dry and expands when wet, and makes for highly unstable soil conditions.

-51-

**084**

148.  The sheet piles supporting the flood wall monoliths at the site of the London Avenue Canal south breach were driven to a depth of 14 feet below sea level. Thus, the bottom of the sheet piles terminated within a layer of sand.

149.  The flood walls along the London Avenue Canal are constructed with an "I-wall" design. The U.S. Army Corps of Engineers Manual on Engineering, Design and Construction of Levees dated April 30, 2000 states that, for stability reasons, flood walls utilizing the "I-wall" design rarely exceed seven (7) feet above ground surface, and that an inverted "T-wall" design is used when walls higher than seven feet are required.

150.  The I-walls at both breach sites on the London Avenue Canal have concrete sections that rise to eleven (11) feet above ground surface.

151.  The Orleans Avenue Canal is a canal in Orleans Parish connected on its north end to Lake Pontchartrain and with the SWB's Pumping Station No. 7 on its south end.

152.  The floodwalls system along the Orleans Canal designed and constructed by the Corps ended abruptly 200 feet away from the pumping station. The height of the area within the gap was 6 feet lower than the top of the floodwalls protection system. As a result, there was no flood protection provided due to the 200 foot long gap that was 6 feet lower than the nearby floodwalls. A smaller gap existed on the opposite side of the canal as well.

153.  Plaintiffs and class representatives of proposed Subclasses Two, Three, Four and Five refer to all preceding allegations of fact which relate to the design and construction of the London Avenue Canal levees and flood walls, and the Orleans Canal flood walls. All allegations of fault incorporated therein are respectfully re-averred.

154.  The Defendants Corps, and OLD, had a duty to design and construct the levees and flood walls of the London Avenue Canal, and the Orleans Canal in a manner that would not

-52-

**085**

compromise the safety of the canal's levee/flood wall system.

155. The Defendants Corps, and OLD, breached their duty to design and construct the levees and flood walls of the London Avenue Canal, and the Orleans Canal in a manner that would not compromise the safety of the canal's levee/flood wall system.

156. As a result of Defendants' Corps, and OLD's, breach of their duty, the floodwalls of the London Avenue Canal failed, and the floodwalls of the Orleans Canal were incomplete, causing Plaintiffs' and class members damages.

157. In addition, or in the alternative, Defendant, OLD, had the care, custody and control, and the *garde* of the London Avenue Canal, and Orleans Canal levee and flood wall systems at all times relevant hereto, and accordingly is strictly liable in accordance with Articles 2317 & 2317.1 of the Louisiana Civil Code for the vices and/or defects in the levee and flood wall system which caused the damages of which Plaintiffs complain.

158. Plaintiffs in proposed Subclasses Two, Three, Four and Five aver that Defendant, St. Paul, had in full force and effect a policy of liability insurance affording coverage to the Defendant OLD, and with respect to the matters, risks and things for which this Defendant is liable herein, thereby affording Plaintiffs the right to proceed against this Defendant insurer under the provisions of the Louisiana Direct Action Statute LSA-R.S. 22:655.

## XI.

## COUNT FIVE

## THE MR-GO ALLEGATIONS AGAINST CORPS AND APPLICABLE TO SUB-CLASS FOUR AND FIVE

### A. THE COMMERCIAL NAVIGATION CANALS PERVADING GREATER NEW ORLEANS

**The Gulf Intracoastal Waterway**

-53-

159.    The Gulf Intracoastal Waterway ("GIWW") forms a protected shipping lane between Port
        Isabel, Texas (the Mexican border) and Apalachee Bay, Florida. The GIWW was a
        navigation canal project completed between New Orleans and Corpus Christi, Texas by mid-
        1942. The GIWW was officially completed in June, 1949. In 1944, under the authority of
        the Corps, the GIWW was rerouted to pass through the southern part of the IHNC, creating
        the first shallow channel through the wetlands that would facilitate propagation of hurricane
        surge from Lake Borgne into the heart of New Orleans. This act of the Corps negligently
        created the first part of a "Hurricane Alley" right into the heart of New Orleans.

### The Mississippi River Gulf Outlet

160.    The "Hurricane Highway" was enlarged in the 1960s by construction of the Mississippi
        River Gulf Outlet navigational canal ("MR-GO"). This enlargement  exponentially
        enhanced both the likelihood and risk of storm surge for Greater New Orleans.  The surge
        threat was first realized during Hurricane Betsy in September of 1965. 6,560 homes and 40
        businesses were flooded with water up to seven feet deep.

161.    Since its inception over forty years ago, the MR-GO runs from the Gulf of Mexico alongside
        St. Bernard and into the GIWW in New Orleans.

162.    The Plaintiffs and class members' damages were sustained as a direct and proximate result
        of the Corps' breach of its duty to adequately design, construct, maintain, inspect and
        operate the MR-GO. But for the fault and/or negligence of the Corps, the severe flooding
        of parts of the New Orleans Metro Area would not have occurred.

163.    The Federal Tort Claims Act (FTCA) places the United States in the same position as a
        private defendant and authorizes Plaintiffs to sue for damages arising from the Corps'
        negligence and fault in the design, construction, repair, and maintenance of the MR-GO.

-54-

**087**

Such negligent acts and/or fault on the part of the Corps were a proximate cause of the innundation of the New Orleans Metropolitan area.

**The MR-GO's Faulty Design and Construction.**

164. The Corps' negligence and/or fault in designing, engineering, inspecting and/or constructing MR-GO, included, without limitation:

a. failing to take account of the waterway's inherent and known capability of serving as a funnel or conduit for rapidly-accelerated, storm-driven surges which would magnify the storm surge's force against levees, flood walls and spoil banks in New Orleans and St. Bernard Parish;

b. failing to "armor" levees on both banks of the MR-GO; and

c. failing to recognize that the construction of the MR-GO, as well as subsequent salt water intrusion and accelerated erosion, would result in the devastation of the wetlands, forests, and land masses thus denuding and destroying a critical natural buffer against storm surge, and thereby further exacerbating the funnel effect created by the MR-GO's design.

**Negligent Operation and Maintenance of the MR-GO**

165. The Corps is responsible for the operation and maintenance of the MR-GO. This on-going responsibility included dredging the bottom of the waterway to remove deposited soil and silt. The Corps knew, or in the exercise of reasonable care and discretion should have known, that proper dredging of the MR-GO would ameliorate the "funneling effect" of the waterway by maintaining its design depth, thereby diminishing the lethal threat to residents and businesses in the New Orleans Metropolitan area during hurricanes. Notwithstanding that dredging is a critical safety requirement for the MR-GO, the Corps negligently failed

-55-

**088**

to maintain the MR-GO and failed to properly dredge the canal. While the negligent design of the MR-GO caused destruction of the surrounding wetlands, the Corps' ongoing negligent maintenance of the MR-GO, further exacerbated it. The loss of thousands of acres of marshlands due to the MR-GO contributed significantly to the drowning of Greater New Orleans, including each of the Plaintiffs' and class members respective properties.

166. The banks of the MR-GO and, especially the northeast shore juncture of the MR-GO and the GIWW are particularly susceptible to erosion induced by saltwater intrusion and the force of waves from passing vessels. The Corps was negligent in failing to provide bank stabilization measures, as well as in allowing the saltwater intrusion which degraded the wetlands adjacent to MR-GO.

## B.   REGULATORY VIOLATIONS OF THE CORPS

### Illegal Failure of Corps to Coordinate with the State of Louisiana

167. The Corps designed, constructed, operated, and maintained the MR-GO according to faulty plans and specifications in violation of the Rivers and Harbor Act of 1945, P.L. 79-14, 50 Stat. 10 (March 2, 1945) ("MR-GO Planning Law") which reflected clear Congressional intent to involve the State of Louisiana (through its Governor or the Governor's designee), as an "affected state" in investigation and planning. Congress also directed the Corps to "coordinate" its investigation and planning with the United States Department of Interior ("DOI"). The Corps failed to coordinate with and involve the Governor and the DOI, and thus violated its duties and obligations established under the MR-GO Planning Law as well as the FWCA, *infra*.

-56-

**089**

## Violation of Fish and Wildlife Coordination Act of 1934, as Amended – Failure to Coordinate with Louisiana and Department of Interior and to Perform Required Study

168.    The Fish and Wildlife Coordination Act ("FWCA"), 16 U.S.C. § 662, as amended in 1946 and 1958, also required coordination between any federal agency, proposing to "impound," "divert," or "control" a waterway or body of water, and the Fish and Wildlife Service. The MR-GO is such a waterway. The FWCA statute also required the Corps to consult with officials of the State of Louisiana and DOI during all phases of the MR-GO project, including investigation, planning and construction. The Corps was also directed therein to incorporate any of the observations or concerns raised by these state and federal agencies into any plans and specifications for the design and construction of the MR-GO. The Corps failed in its duties under said laws. In fact, a 1958 DOI report concluded that detailed investigations, coordinating hydrological, vegetative, fish and wildlife findings, as well as a model study, would be a prerequisite to predictions of the MR-GO's effects and establishment of mitigatory measures. 1958 Interior Report at 19. The report further concluded that "this project should be thoroughly investigated from the biological standpoint before construction through the marshes below Paris Road and the Sound is undertaken." 1958 Interior Report at 19-20. A four year regime of testing and study to assess the impact of the MR-GO was recommended. The Corps negligently, recklessly, wantonly, and illegally proceeded to build the MR-GO without waiting for the completion of the essential four year study requested by the DOI. The Corps knew or should have known that construction of the MR-GO through the wetlands from the GIWW to the Gulf would devastate Louisiana and wetlands and result in the negligent, reckless, wanton, or illegal destruction by the Corps of the best "speed-brake" and inhibitor to tidal surges.

-57-

**Failure of the Corps to Follow MR-GO 1951 Authorization Report**

169.     On September 25, 1951, the Corps submitted a report to Congress with its recommendations
         for construction of the MR-GO ("MR-GO Authorization Report"). This report contained a
         letter from the former Corps Chief of Engineers stating that the proposed MR-GO would be
         connected to the IHNC by its own *separate* canal running parallel to the GIWW. MR-GO
         Authorization Report at 5. However, as built, such a separate parallel canal was not built
         and, instead, the Corps unilaterally deviated from the MR-GO Authorization Report and did
         not dig a separate parallel canal to the IHNC. Rather the Corps connected the MR-GO into
         the existing GIWW and significantly deepened and widened the GIWW, thus increasing
         vessel traffic and producing significantly increased hydrologic consequences that were a
         proximate cause of the flooding of the New Orleans Metro Area.

**Failure of Corps to do studies recommended by its own Board of Engineers**

170.     The MR-GO Authorization Report further included a report from the Corps' Board of
         Engineers recommending further studies into the MR-GO's impact on the Louisiana coast
         and opined: "(t)he exact location of the outlet to the Gulf and the alignment of the seaway
         should be determined after more complete studies of sand movement, wave action, and local
         currents are made in cooperation with the Beach Erosion Board. Hence, if the improvement
         is authorized, ample provision should be made for modifications of the location and
         alignment of the canal should further studies show that a more suitable location is available."
         MR-GO Authorization Report at 14. No such studies were done and, thus, the Corps did not
         consider alternatives that would be less destructive to the lands and wetlands of Louisiana;
         such negligent, reckless, wanton or illegal acts or omissions were a proximate cause of the
         damages sustained by Class Representatives and the class they putatively represent.

-58-

091

## Other Regulatory Violations by Corps

171. The Corps further failed to follow requirements of 33 CFR §§ 335-38, particularly 33 CFR § 336.1(c)(4) and 33 CFR § 320.4(b) and Executive Order 11990. The Corps deviated from and/or failed to execute their dredging activities (maintenance and operation of the MR-GO) in the manner required by the Corps pursuant to 33 CFR §§ 337.5 and 338.2. Furthermore, the Corps failed to follow requirements of the State of Louisiana (made applicable by 33 CFR § 337.2) including those contained in Chapter 7, Sections 701 and 707 of the Louisiana Administrative Code relating to dredging activities. In its actions and omissions set forth above, the Corps also violated several federal and state statutes implicated in the design, construction, maintenance, and operation of the MR-GO, including the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 ©; the Water Resources Development Act of 1990 (WRDA), 33 U.S.C. §§ 2316 and 2317; the Coastal Zone Management Act, 16 U.S.C. § 1452, *et. seq.* and the Louisiana State and Local Coastal Resources Management Act, La. R.S. 49:214.21 *et. seq.* Additionally, the Corps and its contractors (with the actual knowledge or under the direction of the Corps) illegally and improperly transported or otherwise disposed of dredge spoil including, but not limited to, negligent and illegal placement of said spoil as spoil banks.

## Illegal And/or Negligent Failure of Corps to Follow Authorized Design, Route, and Alignment.

172. After hearings, Congress authorized the construction of the MR-GO in 1956 (P.L.-455) and the record thereof that the Corps unlawfully did not follow the Congressionally authorized design, route, or alignment, and it did not conduct required studies, consultation and coordination to mitigate adverse environmental impact to Louisiana in the destruction of highly productive estuarine water and marsh areas; nor did the Corps reduce or eliminate

-59-

**092**

what would prove to be disastrous hydrologic consequences to the New Orleans Metro Area.

**Failure of Corps to Heed Multiple Warnings of Impending Disaster.**

173.   After the hurricane of 1947 and Hurricane Betsy in 1965, the Corps knew or reasonably
should have known of the hazards posed by the MR-GO and the effects of its negligent
design, construction, operation and maintenance. Additionally, the Corps knew or reasonably
should have known of the high probability of future damages likely to result from the
inundation of Greater New Orleans. In recognition of the probability of future damage to
the New Orleans Metropolitan area as a consequence of the MR-GO  project, the Corps
illegally and/or negligently (or through gross negligence, wanton and/or reckless acts and/or
omissions) failed to close the MR-GO, construct Control Structures, and/or constructed
levees, floodwalls, and other structures in a defective, negligent, sub-standard fashion; such
"Levee" allegations are detailed separately herein.

174.   Virtually from the inception of the planning and construction of the MR-GO, the Corps
received numerous warnings of the eventual disaster that would occur as a result of the
negligent design, construction, operation, and maintenance of the MR-GO, and the Corps'
failure to take appropriate steps to prevent or reduce the impending inundation of the New
Orleans Metro Area.  Such warnings were voiced by private citizens, scholars, scientists,
engineers, journalists, municipal and Parish governments, and the State of Louisiana.  Such
warnings repeatedly put the Corps on notice of massive destruction to marshes, wetlands and
other land and forest areas -- all resulting from the negligent and/or faulty inspection, design,
construction, operation, and maintenance of MR-GO.

175.   As a result of the negligence and/or fault of the Corps, during and/or immediately following
Hurricane Katrina an accelerated/enhanced hurricane surge was propelled up the MR-GO

-60-

**093**

and then through the MR-GO/GIWW in an even greater surge smashing into the 1-Walls and/or levees along the MR-GO/GIWW causing massive inundation of to the Sub-Class Four and Five geography.

176. As a proximate result of the negligent, grossly negligent, reckless, wanton and/or illegal acts or omissions of the Corps described herein, the Class Representatives and the Class sustained damages.

## XII.

## COUNT SIX

## ALLEGATIONS AGAINST CORPS, OLD, PORT OF NO, AND THE RAILROAD DEFENDANTS, AND APPLICABLE ENTIRE CLASS AND/OR SUB-CLASSES FOUR AND FIVE

177. All allegations of fault incorporated herein are respectfully re-averred.

178. The Corps, OLD, St. Paul, CSX, PBR, and PNO had the legal responsibility and duty to the Plaintiffs and the Class to protect against the harm and damages alleged herein.

179. The City of New Orleans is the sole owner of the New Orleans Public Belt Railroad Commission, a non-profit switching railroad which operates switches and terminal services for over 100 miles of track in New Orleans, Louisiana.

180. On or about September 11, 2004, a New Orleans Public Belt Railroad Train derailment caused a thirty-two and a half foot wide gap in Floodgate W-30.

181. On December 14, 2004, the defendant PBR paid OLD $427,387.96, the full estimated cost of the reconstruction of Floodgate W-30. Despite PBR's making of said payment and the OLD's receipt of said payment, both PBR and OLD failed to assure the repairs were made.

182. Upon information and belief, Defendant, CSX, designed and constructed a railroad crossing at or near the certain flood protection structures. In so doing, CSX utilized highly erodible,

-61-

**094**

lightweight, and/or porous materials including, but not limited to, "shell sand" and gravel, which caused CSX's structure to be significantly weaker than its surrounding flood protection structures.

183.    Upon information and belief, CSX, also failed to install a "sheet pile cutoff" or similar device to prevent or limit erosion of its structure.

184.    Upon information and belief, CSX, could have prevented the failure of its structure at minimal additional cost by installing concrete "splash pads" or other erosion protection devices at the base of the "I-walls."

185.    CSX failed to exercise due care in buildings its structure, and its failures directly and/or proximately caused and/or contributed to the breaches of certain levees or floodwalls.

186.    The PNO has the full and exclusive right, jurisdiction, power, and authority to govern the Port and is responsible for the maintenance of its wharves, terminals, marshaling yards, cranes, and all transportation infrastructure affecting the regulation of commerce.

## XIII.

### COUNT SEVEN
### NUISANCE

187.    Plaintiffs re-allege all previous allegations contained herein, and allege that, as the proprietor of the MR-GO, the Corps had a duty, pursuant to Louisiana Civil Code article 667, to refrain from creating a nuisance with respect to the 17th Street and London Avenue canals, and the MR-GO that has deprived, and threatens imminently to deprive, the Proposed Class from the enjoyment of their property in the event of a hurricane. Defendants have violated this state statutory duty by creating the hazardous conditions in the 17th Street and London Avenue canals, and the MR-GO.

-62-

**095**

188.   As the designer, builder, owner, and operator of the 17th Street, London Avenue, and MR-
        GO canals - as applicable, the Corps also had a federal common law duty to avoid creating
        a hazardous condition that harms, and threatens imminently to harm, the lives and property
        of nearby residents in the event of a hurricane.  Defendants have violated this federal
        common law duty by allowing the 17th Street and London Avenue canals, and the MR-GO
        to become a lethal threat to human life, property, and the environment.

189.   Accordingly, the Class is entitled to recover damages sustained by them as a result of such
        nuisance.

## XIV.

## RES IPSA LOQUITUR

190.   Plaintiffs expressly plead the doctrine of *Res Ipsa Loquitur* against each and all of the
        Defendants, as may be appropriate under the circumstances and permitted by law.

## XV.

## DAMAGES

191.   In addition to damages as alleged throughout this Complaint, Plaintiffs on behalf of
        themselves and the Class and Subclasses, allege as a result of the Defendants' negligent,
        grossly negligent, reckless, wanton and or illegal inactions described throughout this
        Complaint damages as follows:

    a..   **PROPERTY AND OTHER SPECIAL DAMAGES**:  As a direct and proximate
          result of the Defendants' negligence,  gross negligence, reckless, wanton and or
          illegal acts and/or failures to act, Plaintiffs, Class and Subclass Members have
          suffered property damages and other special damages including, but not limited to,
          the following: loss of property (real and personal), immovable and movable;

-63-

**096**

> diminution of property value; loss of income; costs of relocation; loss of business
> opportunities and business interruption; evacuation expenses; loss of opportunity to
> avoid injury and damage through preventative measures, including but not limited
> to relocation, raising of homes, and purchase of additional insurance, which actions
> would have been taken had knowledge of the insufficiency of the flood protection
> system been known, and other special damages to be proven at trial.

b.    **PERSONAL INJURY AND OTHER GENERAL DAMAGES**: As a direct and
proximate result of the Defendants' negligence, gross negligence, reckless, wanton
and or illegal acts and/or failures to act, Plaintiffs, Class and Subclass Members have
suffered personal injury and other general damages including, but not limited to, the
following: wrongful death, survival damages, fear, fright and emotional distress,
grief, mental anguish, inconvenience, pain and suffering, loss of the capacity to enjoy
life; loss of consortium; and costs of suit.

c.    **DAMAGES TO THE CLASS AS A WHOLE**. As a direct and proximate result
of the Defendants' negligence, gross negligence, reckless, wanton and or illegal acts
and/or failures to act, the Class as a whole has suffered a societal harm which
includes the breakdown of New Orleans social structure, the loss of cultural heritage,
and the dramatically altered physical, economic, political, social, and psychological
character of the New Orleans area.

-64-

**097**

## XVI.

## PRAYER FOR RELIEF

**WHEREFORE**, Class Representatives individually and on behalf of the Class and Sub Classes they seek to represent pray that after due proceedings had that there be a judgment or judgments entered in plaintiffs favor and against the defendants:

a.    Certifying the requested class and sub-classes;

b.    Appointing undersigned counsel as Class Counsel;

c.    For economic and compensatory damages in amounts to be determined at trial;
together with interest thereon from the time of demand until paid, and for Attorneys'
fees and costs of litigation pursuant to the Federal Tort Claims Act, and/or the Equal
Access to Justice Act; and

d.    Such other relief to the Class Representatives and Class as is available under
Louisiana and/or Federal law; and

e.    Such other relief as the Court deems just and equitable.

### Respectfully Submitted,

LAW OFFICES OF JOSEPH M. BRUNO

s/ Joseph M. Bruno
JOSEPH M. BRUNO
Plaintiff's Liaison Counsel
LA Bar Roll Number: 3604
DAVID S. SCALIA
LA Bar Roll Number 21369
L. SCOTT JOANEN
LA Bar Roll Number 21431
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@jbrunolaw.com

-65-

**098**

and

PLAINTIFFS LEVEE SUB-GROUP LIAISON COUNSEL

s/Gerald E. Meunier
GERALD E. MEUNIER
Levee PSLC Liaison Counsel
LA. Bar Roll Number: 9471
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800
Telephone:504/522-2304
Facsimile:504/528-9973
E-mail:gmeunier@gainsben.com

For
LEVEE PLAINTIFFS SUB GROUP LITIGATION
COMMITTEE

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this Motion upon all known counsel for all

parties via the Court's CM/ECF system, or by placing same in the United States mail, properly

addressed and with first class postage prepaid, or by facsimile, e-mail, or other electronic

transmission this 10th day of August, 2007.

/s/ Joseph M. Bruno
**JOSEPH M. BRUNO**

-66-

**099**

**DIV. H**

JUDGE

TWENTY-FOURTH JUDICIAL DISTRICT COURT KERNAN A. HAND

FOR THE PARISH OF JEFFERSON

635-514

STATE OF LOUISIANA

GAYE T. BENNETT, WILLIAM T. BENNETT, DONNA S. CUMMINGS,
KENNETH GORDON and DIANE GORDON

versus

BOARD OF COMMISSIONERS FOR THE EAST JEFFERSON LEVEE DISTRICT,
DRAINAGE DEPARTMENT OF JEFFERSON PARISH PUBLIC WORKS DEPARTMENT,
JEFFERSON PARISH,
SEWERAGE AND WATER BOARD OF NEW ORLEANS,
BOARD OF COMMISSIONERS FOR THE ORLEANS LEVEE DISTRICT,
CITY OF NEW ORLEANS, and the
LOUISIANA DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT
BOARD OF COMMISSIONER OF THE PORT OF NEW ORLEANS

FILED: _____
                                    **DEPUTY CLERK**

## CLASS ACTION PETITION FOR DAMAGES
## JURY TRIAL REQUESTED

The Petition of Kenneth Gordon, Diane Gordon, and Donna Cummings, persons of the full

age of majority and domiciled in the Parish of Jefferson, State of Louisiana, and of Gaye T. Bennett

and William T. Bennett, persons of the full age of majority and residents of the State of Texas, who

meet the definition of class members provided in Paragraph 1, below, with respect represents:

**INTRODUCTION:**

1.      This is a class action on behalf of all residents, real and personal property owners, business

interests, and other economic and non-economic interests present on August 29, 2005 in an area of

the East Bank of Jefferson Parish including "Old Metairie," which is bounded by Interstate Highway

10 on the North, the Orleans Parish line on the East, the Mississippi River on the South, and

Causeway Boulevard on the West, and on behalf of persons whose decedents were located in that

area on that date, who as a result of wrongful conduct occurring in Jefferson Parish and in Orleans

Parish, suffered catastrophic flood-related damages during and after Hurricane Katrina.

**PARTIES PLAINTIFF:**

2.      The persons who bring this action for damages, pursuant to Louisiana Code of Civil

Procedure Articles 591, *et seq.*, on behalf of all similarly situated Louisiana citizens, (herein

collectively referred to as "Plaintiffs"), are:

**EXHIBIT**

**1**

Page 1

A.   Gaye T. Bennett and William T. Bennett, persons of the full age of majority, domiciled in Houston, Texas and citizens of the State of Texas.

B.   Donna S. Cummings, who is a person of the full age of majority, a resident of Jefferson Parish, and a citizen of the State of Louisiana.

C.   D'ane and Kenneth Gordon, persons of the full age of majority, residents of Jefferson Parish, citizens of the State of Louisiana.

3.   The number of persons who are Plaintiffs is unknown at present, but is reasonably believed to be numbered in the thousands, such that joinder of all putative class members in one proceeding would be impracticable.

**PARTIES DEFENDANT:**

4.   Named as Defendants are:

A.   Board of Commissioners of the East Jefferson Levee District, a political subdivision of the State of Louisiana created by La. R.S. 38:291 D, *et seq.*, for the purpose of construction and maintenance of levees and drainage projects;

B.   The Drainage Department of the Public Works Department of Jefferson Parish, a political subdivision of the State of Louisiana;

C.   Jefferson Parish, a political subdivision of the State of Louisiana;

D.   Sewerage and Water Board of New Orleans, a political subdivision of the State of Louisiana created by La. R.S. 33:4071, *et seq.*, for the purpose of constructing, controlling, maintaining, and operating the public drainage system of the City of New Orleans;

E.   Board of Commissioners of the Orleans Levee District, a political subdivision of the State of Louisiana created by La. R.S. 38:307, *et seq.*, for the purpose of locating, relocating, constructing, maintaining, extending, and improving levees, embankments, sea walls, jetties, breakwaters, water-basins, and other works in relation to such projects, and to conduct all dredging operations necessary in connection therewith or incidental thereto along, over, and on the shores, bottom, and bed of Lake Pontchartrain in the Parish of Orleans;

E.   The City of New Orleans, a political subdivision of the State of Louisiana; and

Page 2

**101**

F.   The Louisiana Department of Transportation and Development, a political subdivision of the State of Louisiana created by La. R.S. 36:501, *et seq.* Its purposes include "....developing and implementing programs in all areas of transportation including ..... hurricane flood protection ...." *Id.* at §501 B, and establishing an Office of Public Works, Hurricane Flood Protection, and Intermodal Transportation " ..... which shall administer all matters, including engineering, relating to the programs of the state with respect to the design, construction, extension, improvement, repair, and regulation of hurricane flood protection, including but not limited to the construction and design of a hurricane flood protection system consisting of levees and associated elements to provide protection against tidal surges within the Louisiana coastal zone as defined in R.S. 49:214.24, and other special hurricane flood protection programs as may be directed by the secretary ....." *Id.* at §508.3 A.

G.   The Board of Commissioners of the Port of New Orleans is a political subdivision of the State of Louisiana pursuant to La. R.S. 34:1 et seq. which regulates commerce and traffic of the Port and Harbor of New Orleans and is legally responsible for construction, maintenance and operation of the Mississippi River Gulf Outlet.

## JURISDICTION:

5.   This Court has subject matter jurisdiction over the controversy pursuant to La. Const. Art. 5 §16 A 2 and because the damages are within the jurisdictional limits of the Court as set forth in La. C.C.P. art. 1, *et seq.*

## VENUE:

6.   Venue is appropriate in this Honorable Court pursuant to Louisiana Code of Civil Procedure Article 74.

## THIS CAUSE IS MAINTAINABLE AS A CLASS ACTION BECAUSE:

7.   This cause is maintainable as a class action because:

A.   One or more members of the class may sue as representative parties on behalf of all;

B.   The class is so numerous that joinder of all members is impracticable;

C.   Virtually all of the persons, things, and interests located in the area described in Paragraph 1, *supra*, to a greater or lesser degree of damage, were affected by the concurrent negligent acts or omissions of the Defendants and the U.S. Army Corps

Page 3

**102**

of Engineers; and

    D.    There are questions of law and/or facts common to the class; and

    E.    The claims of the representative parties are typical of the claims of the putative class.

8.    The questions of law and fact common to the Plaintiffs, the putative class, or to Plaintiffs and subdivisions of the putative class, include but are not limited to:

    A.    Whether any percentage of the negligence causing Plaintiffs' harm is attributable to the U.S. Army Corps of Engineers;

    B.    Whether any or all of the Defendants are comparatively at fault with the U.S. Army Corps of Engineers;

    C.    Whether Plaintiffs' damages were caused by the escape of water from the 17th Street Canal between U.S. Highway 61 and Northline Street in Jefferson Parish;

    D.    Whether Plaintiffs' damages were caused by the lack of a bilateral flood wall between U.S. Highway 61 and Northline Street on the 17th Street Canal;

    E.    Whether Plaintiffs' damages were caused and/or exacerbated by the continued pumping of water from Jefferson and Orleans Parishes into the 17th Street Canal after Sewerage and Water Board Pumping Station No. 6 was shut down;

    F.    Whether some of the water affecting Plaintiffs came from more remote sources such as the Inner Harbor Navigation Canal, or the "north" 17th Street Canal;

    G.    Whether the Defendants concealed information from Plaintiffs regarding the safety of the 17th Street Canal;

    H.    Whether the Defendants' conduct has created a long-term heath risk in the proposed class area due to its inundation with polluted waters; and

    I.    Whether any of the Defendants assumed flood protection responsibility for the U.S. Army Corps of Engineers.

9.    The claims of the named Plaintiffs are typical of the claims of the class, *which include* wrongful death, property damage, property losses, evacuation expenses, mental anguish and suffering, loss of income and other economic losses, and a need for medical monitoring.

10.    The named Plaintiffs will fairly and adequately protect the interests of the class because:

    A.    They are free of any interests which might be antagonistic to the other putative class members; and

B.   They will actively participate in the litigation to ensure that the interests of the class members are protected from abuse.

11.   The class may be defined objectively, using such readily ascertainable criteria such as neighborhoods as bounded by streets and avenues.

**IN ADDITION, THIS CAUSE MAY BE MAINTAINED AS A CLASS ACTION BECAUSE:**

12.   The prosecution of separate actions by individual class members would create the risk of:

A.   Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

B.   Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not party to the adjudications or substantially impair or impede their ability to protect their interests.

13.   This cause is proper for certification due to the fact that Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making equitable relief, including the establishment and administration of a medical monitoring program, injunctive relief, and/or declaratory relief appropriate with respect to the class as a whole.

14.   The Court will find that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy, and matters pertinent to that finding include:

A.   The interest of the class individually controlling the prosecution of separate actions;

B.   The extent and nature of any litigation concerning the controversy already commenced by members of the class;

C.   The desirability or undesirability of concentrating the litigation in the particular forum;

D.   The difficulties likely to be encountered in the management of a class action;

E.   The practical ability of individual class members to pursue their claims without class certification; and

F.   The extent to which relief plausibly demanded on behalf of the class, including vindication of public policies and legal rights as may be implicated, justifies the costs

Page 5

**104**

and burdens of class litigation.

**PROPOSED CLASS DEFINITION:**

15.     Plaintiffs allege and propose that the class be defined as:

*All residents, domiciliaries, business entities, property owners, and other persons
and entities residing or present on August 29, 2005 inside the geographic area
bounded by (1) U.S. Interstate Highway 10 on the North, (2) the Orleans Parish line
on the East, (3) the Mississippi River on the South, and (4) Causeway Boulevard on
the West, or whose decedents were present in said area on or after August 29, 2005,
who or which suffered damages as a result of Hurricane Katrina-related flooding on
and after August 29, 2005, and thereafter suffered additional damages including but
not limited to wrongful death, personal injury, loss of income and other and non-
economic losses, mental anguish, long term health risks associated with exposure to
polluted flood waters, relocation expenses, damage to real property, and damage to
personal property.*

Or, alternatively, an appropriate definition designated by the Court.

**FACTS:**

16.     The Board of Commissioners of the East Jefferson Levee District is responsible for the
construction and maintenance of levees and drainage projects in Jefferson Parish.

17.     The Drainage Department of the Public Works Department of Jefferson Parish has immediate
responsibility for the removal of flood waters in Jefferson Parish and the proposed class area.

18.     The Sewerage and Water Board of New Orleans has immediate responsibility for controlling
and operating the public drainage system of the City of New Orleans.

19.     The Board of Commissioners for the Orleans Levee District has the statutory responsibility
to develop, construct, and maintain flood control systems and structures within the City of
New Orleans, including levees, flood walls, sea walls, and flood gates, in order to protect the
City of New Orleans from flooding.

20.     On and before August 29, 2005, the 17th Street Canal, which is parallel and adjacent to the
Jefferson Parish-Orleans Parish line, carried water northward into Lake Pontchartrain.

21.     This canal is divided into two sections by the Sewerage and Water Board of New Orleans'
Pumping Station No. 6. The "south" portion, which is fed by tributary drainage canals and

Page 6

**105**

culverts, is located between the pumping station and the Mississippi River. The "north" portion is located between the pumping station and Lake Pontchartrain.

22.   South of Pumping Station No. 6, between U.S. Highway 90 and Pumping Station No. 6, a flood wall is present on the west side of the 17th Street Canal.

23.   However, this wall is discontinuous on its west side, with a 300 foot gap at its intersection with U.S. Highway 61.

24.   On August 29, 2005, the greater New Orleans area was struck by Hurricane Katrina, which produced torrential rainfall of up to nine (9) inches, and also breached levees and sea walls.

25.   The Sewerage and Water Board pumped flood waters from their gathering point at Pumping Station No. 1 into the Washington Avenue Canal, which along with various other drainage culverts, is a tributary of the "south" 17th Street Canal.

26.   Simultaneously, additional flood waters were introduced into the "south" 17th Street Canal by the Drainage Department of Jefferson Parish.

27.   Many drainage pumps failed and Sewerage and Water Board Pumping Station No. 6 eventually slowed and was taken offline.

28.   Water in the"south" portion of the 17th Street Canal, which could no longer be pumped into Lake Pontchartrain, rose over the tops of the canal where there were no flood walls and where there were gaps in the embankments.

29.   These flood waters entered an area bounded by Airline Hwy., the 17th Street Canal and Metairie Road, herein after referred to as "Old Metairie" at the intersection of the canal and U.S. Highway 61, and at the intersection of the canal and Monticello Street where , Northline Street and Orpheum Street meet. Thereafter, the homes of Plaintiffs and the other class members were flooded with a combination of water from the 17th Street Canal and water that came from other areas and was mixed with the 17th Street Canal.

30.   Either the Parish of Orleans, or the Parish of Jefferson, or the City of New Orleans, or the Board of Commissioners of the Orleans Levee District, or the Board of Directors of the East Jefferson Levee District, or the Sewerage and Water Board of New Orleans, or a combination of them, owned the bottom of the 17th Street Canal.

31.   Either the Parish of Orleans, or the City of New Orleans, or the Board of Directors of the Orleans Levee District, or the Sewerage and Water Board of New Orleans, or a combination

Page 7

**106**

of them, owned the bottoms of the 17th Street Canal, the Orleans Avenue Canal, the London Avenue Canal, and the Inner Harbor Navigation Canal.

32.     At some point the intruding waters from various points of entry in the City of commingled with each other to form a saltwater sea.

## NEGLIGENCE OF JEFFERSON PARISH:

33.     Plaintiffs incorporate by reference Paragraphs 16 through 32 of this Petition as if fully set forth herein.

34.     Jefferson Parish was negligent in the following non-exclusive particulars:

    A.     Failing to erect flood walls or embankments on parish property located on the east side of the "south" 17th Street Canal;

    B.     Failing to erect flood walls or embankments at the intersections of the "south" 17th Street Canal at U.S. Highway 90, U.S. Highway 61, and Northline Street, including 300 feet on west side of the canal north of U.S. Highway 61;

    C.     Failing to prevent the foreseeable incursion of flood waters into "Old Metairie" through obvious gaps and/or low points in the parish drainage system;

    D.     Owning the land on the eastern side of the "south" 17th Street Canal yet failing to erect a flood wall or an embankment between Jefferson Highway and Northline Street; and

    D.     Owning the land on both sides of the canal, but using it to the detriment of the adjoining landowners.

## NEGLIGENCE OF THE EAST JEFFERSON LEVEE BOARD:

35.     Plaintiffs incorporate by reference Paragraphs 16 through 32 of this Petition as if fully set forth herein.

36.     The Board of Commissioners for the East Jefferson Levee District was negligent in the following non-exclusive particulars:

    A.     Failing to timely halt the continued flow of drainage water into the "south" 17th Street Canal from its Jefferson Parish canal and culvert tributaries so as to reduce the amount of water flooding into "Old Metairie" through gaps in the canal's embankments;

    B.     Failing to erect flood walls or embankments at the intersections of the "south" 17th Street Canal at U.S. Highway 90, U.S. Highway 61, and Northline Street; and

Page 8

107

C.    Failing to prevent the foreseeable incursion of flood waters into "Old Metairie" through obvious gaps and/or low points in the parish drainage system; and

D.    Failing to erect a flood wall on the east side of the "south" 17th Street Canal which, upon information and belief, is located in Jefferson Parish.

## NEGLIGENCE OF THE DRAINAGE DEPARTMENT OF JEFFERSON PARISH:

37.    Plaintiffs incorporate by reference Paragraphs 16 through 32 of this Petition as if fully set forth herein.

38.    The Drainage Department of the Jefferson Parish Public Works Department was negligent in the following non-exclusive particulars:

A.    Failing to timely halt the continued flow of drainage water into the "south" 17th Street Canal from its Jefferson Parish canal and culvert tributaries so as to reduce the amount of water flooding into "Old Metairie" through gaps in the canal's embankments;

B.    Failing to prevent the foreseeable incursion of flood waters into "Old Metairie" through obvious gaps and/or low points in the parish drainage system; and

C.    Owning the land on the eastern side of the "south" 17th Street Canal (i.e., Monticello Street) yet failing to erect a flood wall or an embankment between Jefferson Highway and Metairie Road.

## NEGLIGENCE AND/OR FAULT OF THE SEWERAGE AND WATER BOARD:

39.    Plaintiffs incorporate by reference Paragraphs 16 through 32 of this Petition as if fully set forth herein.

40.    The Sewerage and Water Board of New Orleans was negligent in the following non-exclusive particulars:

A.    Failing to install a flood wall on the east side of the 17th Street Canal between U.S. Highway 90 and Pumping Station No. 6;

B.    Failing, on August 29, 2005, to close a flood gate [when requested to do so by the Jefferson Parish Drainage Department] which allowed a severe back flow of flood waters into "Old Metairie" from the 17th Street Canal.

C.    Failing to realize that pumping waters into the "south" 17th Street Canal via the

Page 9

108

Washington Avenue Canal would immediately result in severe flooding when Pumping Station No. 6 was shut down;

D.   Continuing to pump flood and rain waters from the Broad Street, Pritchard Place, and Lakeview pumping stations into the "south" 17th Street Canal after Pumping Station No. 6 was reduced in flow and then shut down, preventing water from being pumped into Lake Pontchartrain and exacerbating the severe flooding in "Old Metairie;"

E.   Failing historically to measure levee heights while aware that these levees continued to subside;

F.   Generally engaging in ineffective and counterproductive water pumping activities;

G.   Failing, in 2004, to understand and correct seepage along the 17th Street Canal; and

H.   Failure to provide auxiliary power sources for extended emergency operation of Pumping Station No. 6.

I.   Dredging the 17th Street Canal to a level below the sheet pile;

J.   Breaching several acts of assurances given to the United States of America through the Army Corps of Engineers enacted for the benefit of the plaintiffs

NEGLIGENCE AND/OR FAULT OF THE ORLEANS LEVEE BOARD:

41.  Plaintiffs incorporate by reference Paragraphs 16 through 32 of this Petition as if fully set forth herein.

42.  The Board of Commissioners of the Orleans Levee District was negligent in the following non-exclusive particulars:

A.   Failing to adequately inspect the east side of the "south" 17th Street Canal between U.S. Highway 90, Metairie Road, and Pumping Station No. 6;

B.   Failing to discover there was no flood wall or embankment on the east side of the "south" 17th Street Canal between Jefferson highway and Metairie Road;

C.   Failing to erect a flood wall or embankment on the east side of the "south" 17th Street Canal between U.S. Highway 90 and Metairie Road;

D.   Failing historically to measure levee heights while aware that these levees continued to subside; and to maintain all of the levees under its jurisdiction;

E.   Failing, in 2004, to understand and correct seepage along the 17th Street Canal; and

F.   Failing to warn the public, including Plaintiffs and class members, that severe

Page 10

flooding would result from the overflow of the "south" 17th Street Canal between U.S.

Highway 90 and Metairie Road.

G.    Dredging the 17th Street Canal to a level below the sheet pile;

H.    Failing to maintain all levees under its jurisdiction

I.    Breaching several acts of assurances given to the United States of America

through the Army Corps of Engineers enacted for the benefit of the plaintiffs

## NEGLIGENCE AND/OR FAULT OF THE CITY OF NEW ORLEANS:

43.   Plaintiffs incorporate by reference Paragraphs 16 through 32 of this Petition as if fully set

forth herein.

44.   The City of New Orleans was negligent in the following non-exclusive particulars:

A.    Owning portions of the property adjacent to the Jefferson Parish line but failing to

protect the public, including Plaintiffs and class members, from foreseeable flooding;

B.    Failing to erect flood walls or embankments on Orleans Parish Property along the

"south" 17th Street Canal;

C.    Failing to warn Plaintiffs and class members of the grave danger posed by continued

drainage of storm and flood waters into the "south" 17th Street Canal before Pumping

Station No. 6 was shut-down and

D.    Through the negligence of each of the Mayors of the City of New Orleans in serving

as the head of the Sewerage and Water Board since its inception, and in concurring

in the negligence, actions, and inactions of the Sewerage and Water Board.

E.    Liability through ownership of defective real property causing damage to

adjacent owners.

## NEGLIGENCE AND/OR FAULT OF THE LOUISIANA DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT:

45.   Plaintiffs incorporate by reference Paragraphs 16 through 32 of this Petition as if fully set

forth herein.

46.   The Louisiana Department of Transportation and Development was negligent in the following

non-exclusive particulars:

A.    Failing to foresee the entry of flood waters from the "south" 17th Street Canal into

"Old Metairie" through wide gaps in canal embankments at U.S. Highway 90, U.S.

Page 11

**110**

Highway 61, and Pumping Station No. 6;

B.     Failing to inspect properly the "south" 17th Street Canal;

C.     Failing to close the gaps in protective embankments on the "south" 17th Street Canal;

D.     Failing to extend levees and embankments across critical inter-parish roadway intersections; and

E.     Failing to improve the levees and embankments providing hurricane flood protection to "Old Metairie."

**LIABILITY OF THE BOARD OF COMMISSIONERS FOR THE PORT OF NEW ORLEANS**

47.    The Board of Commissioners of The Port of New Orleans entered into acts of assurances with the United States of America including, the years 1957, 1969 and 1974, wherein it assumed responsibility for any claim for damages due to construction, maintenance and operation of the Mississippi River Gulf Outlet project.

48.    Pursuant to the controlling jurisprudence in Louisiana, the Port may not invoke the immunity provision that is personal to the Corps of Engineers (USA).

49.    The Board of Commissioners of the Port of New Orleans has a real interest in the Mississippi River Gulf Outlet waterway.

50.    The Port failed to maintain and assure safe operation of the project.

51.    By agreement the Port is responsible for the water that flowed from the Mississippi River Gulf Outlet into the area defined in # 1 above.

**DAMAGES:**

52.    These Defendants breached duties owed to Plaintiffs and the putative class.

53.    As a result of the comparative negligence and/or fault of the Defendants and the U.S. Army Corps of Engineers, Plaintiffs have been damaged.

54.    As a result of the foregoing misconduct, Plaintiffs have sustained damages which include but are not limited to:

A.     Loss of /or damage to movable property;

B.     Loss of /or damage to real property;

C.     Profound mental anguish and suffering;

D.     Exposure of individuals and property to flood-borne toxic substances requiring future medical monitoring;

Page 12

**111**

E.  Economic losses including business losses, increased insurance costs, insurance deductibles, lost wages and salaries, and the expenses of emergency relocation; and

F.  Family separation and evacuation.

G.  Physical injury

H.  Past and future medical expenses.

I.  Wrongful death of plaintiffs' decedents.

## DEMAND FOR JURY TRIAL:

56.  Plaintiffs hereby demand a trial by jury as to all issues triable by jury.

## RELIEF REQUESTED:

WHEREFORE, the representative Plaintiffs, individually and on behalf of all those similarly situated, pray that Defendants be served with a copy of the Petition and be cited to appear and answer it; that the forgoing class action petition be certified as a class action pursuant to Louisiana Code of Civil Procedure Articles 591, *et seq.*; that the suggested class representatives or other representatives designated by the Court be approved as class representatives; that the subclasses and subclass representative to be proposed in the Class Certification Petition be approved by the Court; that the boundaries suggested above be approved or alternative boundaries be designated by the Court; that after due proceedings had there be judgment herein in favor of Plaintiffs and against, Defendants, Jefferson Parish, the Board of Commissioners for the East Jefferson Levee District, the Drainage Department of the Public Works Department of Jefferson Parish, the Sewerage & Water Board of New Orleans, Board of Commissioners of the Orleans Levee District, the City of New Orleans, and the Louisiana Department of Transportation and Development, the Board of Commissioners for the Port of New Orleans, jointly, severally and in solido, as their respective liabilities may ultimately be determined, for any and all money damages which may be reasonable under these premises, plus legal interest thereon from date of judicial demand, for trial by jury, for all costs of these proceedings and for attorney fees as provided for in La. Code of Civil Procedure 595.

Respectfully submitted,

JOHN J. CUMMINGS, III, Bar # 4652
CUMMINGS & CUMMINGS
416 Gravier Street
New Orleans, LA 70130
Phone: (504) 586-0000
Fax:   (504) 522-8423

Page 13

**112**

RICHARD M. MARTIN, Bar # 8998
416 Gravier Street
New Orleans, LA 70130
(504) 586-0000
(504) 522-8423

DEBORAH SULZER, Bar # 19806
650 Poydras Street, Suite 2635
New Orleans, LA 70130
Phone: (504) 299-3380
Fax:    (504) 299-3385

RICHARD A.WEIGAND, Bar # 13324
WEIGAND & LEVENSON
427 Gravier Street
New Orleans, LA 70130
Phone:  (504) 568-1256
Fax:     (504) 525-3368

Of Counsel:

WILLIAM C. GAMBEL, Bar # 5900
**MILLING BENSON WOODWARD, LLP**
909 Poydras Street, Suite 2300
New Orleans, LA 70112
Phone: (504) 569-7210
Fax:    (504) 569-7001

**PLEASE SERVE:**

**Jefferson Parish:**
Thomas Wilkerson, Esq.
Jefferson Parish Attorney's Office
200 Derbigny Street, Suite 5200
Gretna, LA 70003

**Board of Commissioners for the East Jefferson Parish Levee District:**
through its President,
Mr. Alan Alario
203 Planche Court
Harahan, LA 70123

**Drainage Department of the Jefferson Parish Public Works Department:**
on behalf of Jose Gonzalez, Director
Thomas Wilkerson, Esq.
Jefferson Parish Attorney's Office
200 Derbigny Street, Suite 5200
Gretna, LA 70003

Page 14

**113**

**Sewerage and Water Board of New Orleans**
through its Director,
Ms. Marcia St. Martin
625 St. Joseph Street
New Orleans, LA 70130

**Board of Commissioners for the Orleans Levee District**
through its President,
Mr. Michael McCrossen
6920 Franklin Avenue
New Orleans, LA 70122

**City of New Orleans**
through its Mayor
Honorable C. Ray Nagin, Mayor
New Orleans City Hall
New Orleans, LA 70112

**Louisiana Department of Transportation and Development:**
Through its Secretary,
Mr. Johnny Bradberry
1201 Capitol Avenue
3rd Floor
Baton Rouge, LA 70802

**Board of Commissioners for the Port o f New Orleans**
through any corporate office,
1350 Port of New Orleans Place
New Orleans, LA 70130

Page 15

**114**



FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 AUG 28 PM 4: 23

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LESLIE SIMS, JR., ROSA MARQUEZ FLOYD S. AARON, III, AND HASSAR SLEEM | * * | CIVIL ACTION |
| Plaintiffs | * * | **06-5116** |
| Versus | * | SECTION |
| THE BOARD OF COMMISSIONER OF THE ORLEANS LEVEE DISTRICT, THE BOARD OF COMMISSIONERS OF THE PORT OF NEW ORLEANS, THE SEWERAGE & WATER BOARD OF THE NEW ORLEANS, THE EAST JEFFERSON LEVEE DISTRICT, THE PARISH OF JEFFERSON, AND THE LOUISIANA DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, | * * * * * * * * * * * | **SECT. K MAG. 2** MAGISTRATE |
| Defendants. | * | |

***********************************

### COMPLAINT FOR DECLARATORY JUDGMENT AND DAMAGES
### AND REQUEST FOR JURY TRIAL

**NOW COMES** Plaintiffs, Leslie Sims, Jr., Rosa Marques, Floyd S. Aaron, III, Hassar

Sleem, and other persons identified in the first allegation hereof, residing in, or doing business in

Fee___

Proces___

X___

**115**

ᵗ          ᶜ

Lakeview and Carrollton-Hollygrove areas of Orleans Parish, more particularly defined herein,

who suffered damages due to failure of the flood protection system for the New Orleans East

Bank polder file this complaint for damages and for Declaratory Judgment, and in furtherance

thereof to allege that.

1.

Plaintiffs are persons of the full age of majority domiciled and residing in the State of

Louisiana filing for relief Federal Rule of Civil Procedure 20, to-wit:

| | |
|---|---|
| Madeline Bertucci | 310 Robert E Lee Blvd, New Orleans 70124 |
| Craig R. Dermody | 232 Lake Marina Dr, #PH2, New Orleans 70124 |
| Ernest J. Lorch, Jr. | 6161 Louis XIV St, New Orleans 70124 |
| Mary K. and Ernest J. Lorch, Jr. | 939 Walker St, New Orleans 70124 |
| Mary Kuchler Lorch, executor for | 6965 Louisville St, New Orleans 70124 |
| Estate of Marie Helen Kuchler | |
| Joel C. Weibelt | 7019 Louis XIV St, New Orleans 70124 |
| Floyd S. Aaron, III | 2319 Leonidas St, New Orleans 70118 |
| Jeanette M. Allen | 3521 1/2 Live Oak St, New Orleans 70118 |
| Kenneth Allen | 3521 Like Oak St, New Orleans 70118 |
| Monica Anderson-Clay | 8919 Palm St, New Orleans 70118 |
| Leatrice Barrow | 4426 S Liberty St, New Orleans 70115 |
| Charlene Beverly | 8610 Oleander St, New Orleans 70118 |
| Melvin Briggs | 2920 Josephine St, New Orleans 70113 |
| Barbara Burns | 8939 Peach St, New Orleans 70118 |
| Janice and Clarence Cargo | 9413-15 Stroelitz St, New Orleans 70118 |
| John Chinn | 3318 Broadway St, New Orleans 70125 |
| Elizabeth R. Collins | 3528 Monroe St, New Orleans 70118 |
| Vernon A. Cooper | 1419 Leonidas St, New Orleans 70118 |
| Dolores and Joseph Dugas | 1433 & 1433-1/2 Joliet St, New Orleans 70119 |
| Dolores and Joseph Dugas | 1434 Dante St, New Orleans 70118 |
| Dolores and Joseph Dugas | 2212 & 2214 Cadiz St, New Orleans 70115 |
| Linda and Loran K. Ebarb | 8918 Palm St, New Orleans 70118 |
| Berdie H. Edward | 2226 Josephine St, New Orleans 70113 |
| Jacob Geraue, III | 2930 Magazine St, New Orleans 70115 |
| Thaddeus Griffin | 3514 Hamilton St, New Orleans 70118 |
| Delores Hamilton | 8225 Apricot St, New Orleans 70118 |
| Sheila Harry | 8335 Palm St, New Orleans 70118 |
| William K. Jacobs | 7931 Forshey St, New Orleans 70125 |
| Clarence Jasper | 940 S Cortez St, New Orleans 70125 |

2

| | |
|---|---|
| DeLisa Jenkins | 3318 Broadway St, New Orleans 70125 |
| Marcel A. Jenkins, Jr. | 2823 Eagle St, New Orleans 70118 |
| Sandra E. Jenkins | 2823 Eagle St, New Orleans 70118 |
| William R. Jenkins | 3321 Audubon Ct, New Orleans 70125 |
| Estelle J. Joseph | 4219 Erato, New Orleans 70125 |
| Roselyn and Barry Koretzky | 4016 Vendome Pl, New Orleans 70125 |
| Lillian Koretzky | 4257 Vincennes Pl, New Orleans 70125 |
| Tai Jasmine Louis | 3521 Like Oak St, New Orleans 70118 |
| Gwendolyn and Donald Marco | 3628 & 23 General Ogden, New Orleans 70118 |
| Rhonda Marquez | 8618 Oleander St, New Orleans 70118 |
| Rosa Marquez | 8618 Oleander St, New Orleans 70118 |
| Freddie Marshall, Jr. | 2217 Josephine St, New Orleans 70113 |
| Jeannette B. McCurnin | 427 Bellaire Dr, New Orleans 70124 |
| Leo Patrick McCurnin, Jr. | 427 Bellaire Dr, New Orleans 70124 |
| Eloise and Raozuan Muhammal | 8403 Oleander St, New Orleans 70118 |
| Collette F. Norwood | 2636 Valence St, New Orleans 70115 |
| Eula T. Parker | 4116 General Ogden St, New Orleans 70118 |
| Joseph Perriatt, Jr. | 940 S Cortez St, New Orleans 70125 |
| Terrence Riley | 2504 Delachaise St, New Orleans 70115 |
| Terracenion and Jabbar Rodney | 3636 Leonidas St, New Orleans 70118 |
| Jamesetta Saunders | 8810 Stroelitz St, New Orleans 70118 |
| Patricia Shelby | 4632 Freret St, New Orleans 70118 |
| Leslie Sims, Jr. | 3608-3610 Louisiana Ave Pkwy, NO 70125 |
| Hassar Sleem | 3609 Toledano St, New Orleans 70125 |
| Joan Swearington | 2426 Josephine St, New Orleans 70125 |
| Carla M. Weathersby | 8816 Stroelitz St, New Orleans 70118 |
| Alfred Weber | 4119 Hollygrove St, New Orleans 70118 |
| Onettia Weber | 4117 Hollygrove St, New Orleans 70118 |
| Sosthene George Weber, Jr. | 4117 Hollygrove St, New Orleans 70118 |

2.

Made defendant herein is the Board of Commissioner of the Orleans Levee District, a

political Subdivision of the State of Louisiana created by La. R.S. 38:307 et seq. for the

purposes of exercising full and exclusive right, jurisdiction, power, and authority to locate,

relocate, construct, maintain, extend, and improve levees, embankments, seawalls, jetties,

breakwaters, water-basins, and other works within its district;

**117**

3.

Made defendant herein is the Board of Commissioners of the Port of New Orleans, a
political Subdivision of the State of Louisiana created by La. R.S. 34:1 et seq., for the purposes
of regulating commerce and traffic of the Port and Harbor of New Orleans;

4.

Made Defendant herein is the Sewerage & Water Board of New Orleans, a political
Subdivision of the State of Louisiana created by La. R.S. 33:4071 et seq.. for the purposes of
constructing, controlling, maintaining, and operating the public drainage system of the city of
New Orleans;

5.

Made Defendant herein is the East Jefferson Levee District; , a political Subdivision of
the State of Louisiana created by La. R.S. 38:291 et seq. for the purposes of constructing and
maintaining, as it requires, levees, drainage, and levee drainage, and do all other things incidental
thereto.and do all such all drainage work incidental to or made necessary by the construction of
the levee system;.

6.

Made Defendant herein is the Parish of Jefferson;

7.

Made defendant is the Louisiana Department of Transportation and Development a body
corporate created by La. R.S. 36:501 and charged by law, under La. R.S. 36:501B to develop and
implement programs in all areas of transportation, including waterways, hurricane flood
protection and under La. R.S. 36:507C to perform the public works functions of the state, related
to flood and drainage control;

4

**118**

**Claims against the United States Army Corps of Engineers**

8.

On August 29, 2005, Plaintiffs resided in and owned property in Lakeview and

Carrollton-Hollygrove areas of the Parish of Orleans damaged and destroyed by flood waters

associated with Hurricane Katrina;

9.

Plaintiffs' claims arise out of the compromise of the portion flood control system

referenced due to its proximity to and geography of the IWW, Inner Harbor Navigational Canal

and Mississippi River Gulf Outlet waterways of commerce;

10.

The plight of the Levee District and Port, and indeed your plaintiffs, was worsened when

the Corps of Engineers published the Lake Pontchartrain, Louisiana, and Vicinity Hurricane

Protection Project Reevaluation Study, dated July, 1984, approved February 7, 1985, which

unilaterally abandoned the Barrier Plan which had been approved by the Levee District and was

subject to the March 30, 1976, Agreement in favor of the High Level Plan.

11.

Plaintiffs' claims derive from the construction, operation and maintenance of the Inner

Harbor Navigational Canal, a waterway of commerce;

**Abandonment of Barrier Plan**

12.

The plight of the Levee District and Port, and indeed your plaintiffs, was worsened when

the Corps of Engineers published the Lake Pontchartrain, Louisiana, and Vicinity Hurricane

Protection Project Reevaluation Study, dated July, 1984, approved February 7, 1985, which

5

**119**

unilaterally abandoned the Barrier Plan which had been approved by the Levee District and was subject to the March 30, 1976, Agreement in favor of the High Level Plan

13.

Plaintiffs damages are not due to the forces of nature but rather, the artificial acts of man;

14.

Plaintiffs' claims derive from the construction, operation and maintenance of the London Avenue Canal, a drainage canal;

15.

Plaintiffs' claims derive from the construction, operation and maintenance of the Orleans Canal, a drainage Canal;

16.

Plaintiffs' claims derive from the construction, operation and maintenance of the 17th Street Canal, a drainage Canal serving the area;

17.

The United States Army Corps of Engineers undertook to render services which it recognized as necessary for the protection of the persons or property of Plaintiffs, who relied on the Corps., its failure to exercise due care increased the risk, and the loss was suffered because of the reliance;

18.

Plaintiffs have filed claims for Loss and Damage to Property with the United Stated Army Corps of Engineers under Federal Tort Claim Form 95, provided filed a for this purpose;

6

**120**

19.

Under the Federal Tort Claims Act plaintiffs are precluded from bringing suit for six months, unless the United States denies the claim;

20.

Plaintiffs' claims against the Corps total greater than $20,450,00;

21.

The United States has not denied any of the plaintiffs claim;

**Maintenance and Operation of the System;**

22.

The Orleans Levee District is charged by state law with the responsibility of maintaining the Levees within its District;

23.

The Department of Transportation is charged by law with performing the public works functions of the state related to flood protection.

24.

The East Jefferson Levee District is charged by state law with the responsibility of maintaining the Levees within its District;

25.

The East Jefferson Levee District, the Parish of Jefferson and/or the Sewerage and Water Board are charged by law with the responsibility of maintaining and operating the Hoey Canal;

26.

The East Jefferson Levee District, the Parish of Jefferson and the Sewerage and Water Board are charged with the responsibility of maintaining the 17th Street Canal;

7

**121**

27.

The Plaintiffs' damages resulted from the closure of the 17th Street Canal, and the continued operation of the pumping stations feeding the 17th Street Canal and the failure to close the Hoey Canal flow, not within the reach of Section 702(c) of the Flood Control Act of 1928;

28.

The Sewerage and Water Board is charged by law with the responsibility of operating the pumping stations, drainage ditches and canals feeding the 17th Street Canal from east, including the Broad Street, Florida Avenue and New Basin pumping station, and the Palmetto Canal;

**Acts of Assurances – Levee District**

29.

The Orleans Levee District is sued under the September 19, 1950, Act of Assurance pursuant to and in furtherance of the requirements of local cooperation in which it agreed to hold and save the United States harmless from claims for damages resulting from the construction of the project.

30.

Under the April 15, 1957, Act of Assurance the Port agreed to provide and maintain "bridges required over the waterway . . . and the maintenance thereof"

31.

The East Jefferson Levee District, the Parish of Jefferson and/or the Sewerage and Water Board are charged by law with the responsibility of maintaining and operating drainage ditches which flow into the 17th St. Canal from the West.

8

**122**

**Acts of Assurances – Levee Districts**

32.

Under a September 19, 1950 Act of Assurance "to comply with all the requirements of federal cooperation" the Orleans Levee District assured . . . the Secretary of the Army that it will:

(a) maintain all flood control structure . . . . ."

33.

Under an October 1, 1969, Act of Assurance the Orleans Levee District assured . . . the Secretary of the Army that it will: (c) maintain and operate, in a manner satisfactory to the Chief of Engineers, all the repair or restoration work after completion;"

34.

Under an October 1, 1969, Act of Assurance "the Orleans Levee District "maintenance and operation obligation was extended to all levees under the control of the Orleans Levee District"

35.

Under an July 28, 1966 and September 16, 1971 Act of Assurance the Orleans Levee District assured . . . the Secretary of the Army that it will: (g) Maintain and operate all features of the project in accordance with regulations prescribed by the Secretary of the Army, including levees, flood gates and approach channels, drainage structures , drainage ditches or canals, flood walls sea walls and stoplog structures . . . ."

36.

In an Interim Agreement of February 20, 1985 and the Supplemental Agreement of June 21, 1985, the Orleans Levee District repeated the assurance that it will "(g) Maintain and operate all features of the project in accordance with regulations prescribed by the Secretary of the

9

**123**

Army, including levees, flood gates and approach channels, drainage structures , drainage ditches
or canals, flood walls sea walls and stoplog structures [the remainder of this item is deleted ];"

**Acts of Assurance – Orleans Parish Levee District**

37.

The defendant Levee District is sued under the Act of Assurance given under date of
September 19, 1950, "to comply with all requirements of federal cooperation", and pursuant the
to and furtherance of Public Law 516 of the 81st Congress under item "Lower Mississippi River"
that authorized" that "flood control improvements, substantially as contemplated by the Federal
Flood Control Act of 15 May 1928, as amended, to be extended to include such improvements in
the Parish of Orleans";

38.

Under the September 19, 1950, Act of Assurance the Levee District "assured and does
hereby assure the Secretary of the Army . . . . That it will . . . . participate . . .in the project to
the extent that it will . . . (d) hold and save the United States free from all damage claims
resulting from the construction of the project";

39.

The defendant Levee District is sued under the Acts of Assurance given under date of 28
July 1966, "to comply with all requirements of federal cooperation for the Lake Pontchartrain
and Vicinity, Louisiana Project, and pursuant to and furtherance of Public Law 516 of the 81st
Congress under item "Lower Mississippi River" that authorized" that "flood control
improvements, substantially as contemplated by the Federal Flood Control Act of 15 May 1928,
as amended, to be extended to include such improvements in the Parish of Orleans";

10

**124**

40.

Under the July 28th, 1966, Act of Assurance the Port "has assured and does hereby assure the Secretary of the Army . . . . that it will . . . . participate . . . in the project to the extent that it will . . . (b) Hold and save the United States free from damage due to the construction works";

41.

The defendant Levee District is sued under the Supplemental Act of Assurance given under date of 1st October, 1969, "to comply with all requirements of federal cooperation for emergency repairs TO ALL EXISTING LEVEES under the jurisdiction of the Orleans Levee District";

42.

Under the October 1, 1969, Supplemental Act of Assurance in which the Levee District "assured and does hereby assure the Secretary of the Army . . . . that it will . . . . participate . . . in the project to the extent that it will . . . (b) Hold and save the United States free from damage due to the authorized work";

43.

The defendant Levee District is sued under September 16, 1971 Act of Assurance in which it assured and does hereby assure the Secretary of the Army . . . . that it will . . . . participate . . . in the project to the extent that it will . . . (b) Hold and save the United States free from damage due to the construction works;

44.

The defendant Levee District is sued under the Agreement between the United States of America and the Board Of Commissioners of the Orleans Levee District for the Lake Pontchartrain and Vicinity, Louisiana Project, under date of March 30, 1976;

11

45.

The defendant Levee District is sued under the Agreement between the United States of America and the Board Of Commissioners of the Orleans Levee District for the Lake Pontchartrain and Vicinity, Louisiana Project, exchanged under date of February 20, 1985;

46.

Under the February 20, 1985, Agreement the defendant Orleans Levee District "agree(d)" . to " (c) Hold and save the United States free from damage due to the construction works";

47.

The Agreement between the United States of America and the Board Of Commissioners of the Orleans Levee District for the Lake Pontchartrain and Vicinity, Louisiana Project, under date of June 21, 1985;

48.

Under the June 21st, 1985, Agreement the defendant Orleans Levee District "agree(d) that it will, without cost to the United States , . . . "(c) Hold and save the United States free from damage due to the construction works";

**Acts of Assurance – Port of New Orleans**

49.

The defendant Port is sued under the Act of Assurance given under dates of April 15, 1957, pursuant to and in furtherance of Public Law 455 or the 84th Congress appeared March 25, 1956, to construct the Mississippi River Gulf Outlet from a point south of the Intracoastal Waterway at Michaud to the Industrial Canal;

12

**126**

50.

Under the April 15, 1957 Act of Assurance the Port "has assured and does assure . . . . .
that it will participate . . . to the extent that it will hold and save the United States free from all
claims for damages due to the construction, maintenance and operation of the project";

51.

The defendant Port is sued under the Act of Assurance given under dates of February 3rd
1969, pursuant to and to comply with all required conditions of local cooperation for the
Mississippi River Gulf Outlet Michaud La. – Project Orleans Parish;

52.

Under the February 3rd 1969 Act of Assurance the Port agreed to "hold and save the
United States free from damages due to the construction and subsequent maintenance of the
project";

53.

The defendant Port is sued under the Act of Assurance given under date January 10,
1974, pursuant to and in furtherance of Public Law 483 of the 90th Congress which authorized
"inter alia, the Mississippi River Gulf Outlet Michaud Canal Project" wherein "the Port agreed to
fulfill the non federal cooperation";

54.

Under the January 10, 1974 Act of Assurance the Port agreed to "hold and save the
United States free from damages" due to the project;

13

**Act of Assurance East Jefferson Levee District**

55.

The defendant East Jefferson Levee District is sued under the Act of Assurance given under date of February 21, 1997, pursuant to and in furtherance of Public Law 298 of the 89th Congress which authorized the construction of the Lake Pontchartrain, Louisiana Vicinity Hurricane Protection Project;

56.

Under the February 18, 1997 Act of Assurance the East Jefferson Levee District assured the Secretary of the Army that it had the authority and capability to furnish local cooperation required by federal legislation authorizing the Lake Pontchartrain and Vicinity Hurricane Protection Project, "agree(d) that it will:

(a) Hold and save the Government free from all damages due to construction works;"

**Act of Assurance- Sewerage & Water Board**

57.

The defendant Sewerage & Water Board is sued under a first Act of Assurance given under dates of February 18, 1997, pursuant to and in furtherance of Public Law 298 of the 89th Congress which authorized the construction of the Lake Pontchartrain, Louisiana Vicinity Hurricane Protection Project, and the Reevaluation Study , dated December 1983 , approved February 7th 1985 which authorized the construction of the High Level Plan, and agreed to hold and save the Government free from damages due to the construction works;

14

**128**

58.

Under the second Act of Assurance the Sewerage & Water Board assured the Secretary of the Army that it had the authority and capability to furnish local cooperation required by federal legislation authorizing the fronting protection to pumping station No. 6 located at the 17th Street Canal, and with the consent of the Orleans Levee District and the East Jefferson Levee District in which it "agree(d) that it will:

(a) Hold and save the Government free from all damages arising from the operation, maintenance repair replacement and rehabilitation of the fronting project, and any fronting project related betterments, except for damages due to the fault of the Government or Government contractors;"

**Claims against the Port**

59.

Plaintiffs avail themselves of the right of direct action against the Port under the Act of Assurance under R.S. 22:655;

60.

Plaintiffs are the third party beneficiaries of the covenant given by the Port in favor of the United Sates Secretary of the Army and are entitled to, and hereby, avail themselves of the benefits under the doctrine "stipulation pour autri" and Civil Code Article 1978;

**Claims Against the Orleans Levee District**

61.

Plaintiffs avail themselves of the right of direct action against the Levee District under the Act of Assurance under R.S. 22:655;

15

**129**

62.

The Port is liable for damages due to its failure to maintain the highway bridges and approaches as agreed under the March, 1957 Act of Assurance;

63.

Plaintiffs are the third party beneficiaries of the covenant given by the Levee District in favor of the United Sates Secretary of the Army and are entitled to, and hereby, avail themselves of the benefits under the doctrine "stipulation pour autri" and Civil Code Article 1978;

64.

The Levee District is liable under Civil Code Article 2322 for the deterioration of the levees and levee improvements and structures known to it before the events causing loss and damage and the failure to repair same.

65.

The Levee District is liable for the failure to maintain the levees as required by state law and by its various acts of Assurance and Agreements with the United States Corps of Engineer;

66.

The Levee District performance of its duties and responsibilities was so inadequate and ineffective that it fell to the Corps to undertake same;

**Claims against the Department of Transportation**

67.

The Department of Transportation failed to perform its duties and responsibilities in connection with hurricane flood protection;

16

**130**

**Claims Against the Sewerage and Water Board;**

68.

The Sewerage and Water Board is liable for the failure to maintain the drainage canals under its jurisdiction including the New London and Orleans Canals.

69.

Plaintiffs avail themselves of the right of direct action against the Sewerage & Water Board under the February 1997 Act of Assurance under R.S. 22:655;

70.

Plaintiffs are the third party beneficiaries of the covenant given by the Sewerage & Water Board in favor of the United Sates Secretary of the Army and are entitled to, and hereby, avail themselves of the benefits under the doctrine "stipulation pour autri" and Civil Code Article 1978;

71.

The Sewerage &Water Board is liable under Civil Code Article 2322 for the deterioration of the levees and levee improvements and structures known to it before the events causing loss and damage and the failure to repair same.

72.

The Sewerage &Water Board is liable for the failure to maintain the drainage canals as required by state law and/or by its Act of Assurance with the United States Corps of Engineers

**131**

**Claims Against the Parish of Jefferson and or the East Jefferson Levee District;**

73.

Plaintiffs avail themselves of the right of direct action against the East Jefferson Levee District under the Act of Assurance under R.S. 22:655;

74.

Plaintiffs are the third party beneficiaries of the covenant given by the Levee District in favor of the United Sates Secretary of the Army and are entitled to, and hereby, avail themselves of the benefits under the doctrine "stipulation pour autri" and Civil Code Article 1978;

75.

The East Jefferson Levee District and Parish of Jefferson are liable for the failure to maintain the drainage canals as required by state law and/or by its Act of Assurance with the United States Corps of Engineers;

**Jurisdiction**

76.

Plaintiffs claims arise under the laws of the United States, this court has original jurisdiction under 28 U.S.C. 1331.

77.

Federal question jurisdiction is also implicated where as here the complaint requires construction of federal law or a distinctive federal policy of a federal statute requires federal legal principles for its disposition.

18

**132**

78.

This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. 1367, in that they are so related to claims in the action within such original jurisdiction, that they form part of the same case or controversy under Article III of the United States Constitution.

**Venue**

79.

Venue of this action lies in this judicial district under 28 U.S.C. 1391(b), a substantial part of the events or omissions giving rise to the claims having occurred in this district and or a substantial part of property that is the subject of the action being situated here, and all defendants reside in the Louisiana and are found here.

80.

Venue is also appropriate under the Rules of Decision Act 1 Stat. 92, under La. R.S. 22:655;

**Inferences of liability**

82.

The Secretary of the Army Corps of Engineers has made numerous admissions of interest from which the trier of fact may infer that was is responsible for the damages suffered by Plaintiffs;

83.

The Defendants are held to the admissions by virtue of privity with the Corps under the Acts of Assurances and Agreements with the Corps;

19

**133**

84.

Given the volume of circumstantial evidence supporting a finding of negligence, the defendants superior knowledge of facts respecting same and the lack of knowledge of Plaintiffs, the belief that in these circumstances an erroneous finding of no liability would be more harmful than a liability, the trier of fact is entitled to infer negligence and impose upon the defendants, the burden of proving the absence of negligence;

85.

Plaintiffs plead res ipsa loqutur, given that the loss would not have occurred in the absence of negligence. .

**Solidary Liabillty**

86.

The Liability of the Port and the Levee District is conventional, coextensive and coterminous, and as such the two are solidary obligors liable to Plaintiffs as solidary obligees pursuant to the Assurance Agreement under Civil Code Articles 1790 and 1794 ;
Declaratory Judgment

87.

Plaintiffs avail themselves of the right under 28 U.S.C. 2201(a), 28 U.S.C. 2202 and F.R.C.P 57, and invoke the judicial power of this Court to a summary declaration of their rights as third party beneficiaries of the Acts of Assurances given by the defendants to the United States Secretary of the Army and other Agreements, and define other legal relations, ith the force and effect of a final judgment or decree.

88.

Plaintiffs seek declaratory judgment that:

**134**

(a) Plaintiffs' "claims for damages" resulted from "the construction of the (Mississippi River Gulf ) project" within the meaning of the April 15, 1957 Act of Assurance;

(b) Plaintiffs "damages" were "due to the construction and subsequent maintenance of the project" within the meaning of the February 3rd 1969 and the January 10, 1974 Acts of Assurance ;

(c) Plaintiffs "claims for damages" resulting from "the construction of the project" within the meaning of the September 19, 1950 Act of Assurance;

(d) Plaintiffs "damages" was "due to the authorized work" within the meaning of the July 28th , 1966 Act of Assurance and "damage due to the construction works" under the February 28, 1985 and June 21st, 1985, Agreements;

(e) The Corps of Engineers is liable to Plaintiffs under the Restatement (Second) Torts § 324A, as interpreted in *Bujol v. Entergy Services, Inc. et al.*, 03-0492, 502 (La.5/25/04), 922 So.2d 1113; rehearing granted 10/29/04.

(f) Neither the Defendant Port nor the Defendant Levee Board are immune from suit under the Louisiana Constitution Article 12, § 10(A)

(g) The immunity of the United States under Section 702(c) of the Flood Control Act is personal to it, neither the Defendant Port nor the Defendant Levee Board have standing under the Act to assert the defense, and the immunity does not inure to either of them;

(h) In any event the immunity does not apply to damages due to flooding from the Intracoastal Waterway, the Mississippi River Gulf Outlet, the 17th Street Canal, the Hoey canal or the Inter-harbor Navigational Canal;

(i) The Liability of the Corps of Engineers under the Restatement (Second) Torts § 324A, to it; arising as it does by virtue of its undertaking to perform the duties of the Orleans Levee

District outside the expectation of immunity under Section 702 (c) of the Flood Control Act of 1928, and unavailable to it;

(j) With respect to damages lisbility for which arises under the Acts of Assurance Defendants Obligors are solidarily liable to Plaintiffs for the whole of the such damages;

(k) With respect to the damages resulting from failure to perform a duty, liability is affixed with others who proximately caused the damages, under the rules of comparative negligence;

(l) The Plaintiffs are the third party beneficiaries of the Corps waiver of such  immunity, and, as an intended beneficiary, entitled to assert the claims foe damages referenced therein, occasioned by the Government's fault;

(m) The Government waived any immunity it might have otherwise enjoyed under section 702(c) of the Flood Control Act of 1928 with respect to damages due to the operation of the pumping stations feeding the 17th Street Canal via the Acts of Assurance from the Sewerage & Water Board of February 28, 1997;

**Comparative Fault**

89.

The degree of percentage of fault of the defendants causing or contributing to the loss shall be determined under the Rules of Comparative Fault provided in Civil Code Article 2323;

**Notice**

90.

Contemporaneous with the filing of this Complaint, plaintiffs gave notice to defendants Levee District and Port of their intention to accept the benefits of the Acts of Assurances and

22

**136**

Agreements given pursuant to the various Public Laws in furtherance of the representation of

local cooperation and required by Federal Law;

**Jury Trial**

91.

Plaintiffs avail themselves of their right under the Seventh Amendment to the United

States Constitution, and request trial by jury.

**WHEREFORE,** Plaintiffs pray that the defendants be duly cited to appear and answer

this complaint, and after due proceeding had there be judgment in Plaintiffs' favor and against

defendants holding that Plaintiffs' "claims for damages" resulted from "the construction of the

(Mississippi River Gulf ) project" within the meaning of the April 15, 1957 Act of Assurance;

that those "damages" were "due to the construction and subsequent maintenance of the project"

within the meaning of the September 19, 1950, February 3rd 1969, and the January 10, 1974 Acts

of Assurance; due to " the authorized work" within the meaning of the July 28th , 1966 Act of

Assurance and "damage due to the construction works" under the February 28, 1985, and June

21st, 1985, Agreements;

That the Corps of Engineers is liable to Plaintiffs under the Restatement (Second) Torts §

324A; that neither the Defendant Port, the Public Belt Railroad, the Defendant Levee Board, nor

the Defendant Department of Transportation are immune from suit under the Louisiana

Constitution Article 12, § 10(A); that the immunity of the United States under Section 702(c) of

the Flood Control Act is personal to it, neither the Defendant Port nor the Defendant Levee

Board have standing under the Act to assert the defense, and the immunity does not inure to

either of them; and that , in any event, the immunity does not apply to damages due to flooding

from the Intracoastal Waterway, the Mississippi River Gulf Outlet, the Michoud Canal or the

23                                    ' **137**

Inner-Harbor Navigational Canal; and holding the Defendant Port and Levee District solidarily

under the Acts of Assurances and Agreements; and holding the Defendant Levee District,

Defendant Public Belt, Defendant CSX Transportation, Inc., and Defendant Burlington Northern

and Santa Fc Railway Company liable for the damages proximately caused by its own

negligence, and affixing the amount of Plaintiffs' damages;.

Respectfully submitted,

OF COUNSEL:

William C. Gambel (LA Bar No. 5900)

MILLING BENSON WOODWARD LLP     909 Poydras Street, Suite 2300
                                New Orleans, LA 70112-1010
                                Telephone: (504) 569-7000
                                Telecopy: (504) 569-7001
                                wgambel@millinglaw.com

John J. Cummings, III, (LA Bar No. 4652)
Cummings, Cummings & Dudenhefer
416 Gravier Street
New Orleans, LA 70130
Telephone: (504) 586-000
Telecopy: (504) 586-8423
ccdlawfirm@aol.com

W351715

24                                                            **138**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LESLIE SIMS, JR., ROSA MARQUEZ | * | |
| FLOYD S. AARON, III, AND HASSAR | | |
| SLEEM | * | CIVIL ACTION |
| | | |
| Plaintiffs | * | |
| | | |
| | | |
| Versus | * | SECTION |
| | | |
| THE BOARD OF COMMISSIONER OF | * | |
| THE ORLEANS LEVEE DISTRICT, | | |
| THE BOARD OF COMMISSIONERS OF | * | |
| THE PORT OF NEW ORLEANS, | * | |
| THE SEWERAGE & WATER BOARD | * | |
| OF THE NEW ORLEANS, THE EAST | * | MAGISTRATE |
| JEFFERSON LEVEE DISTRICT, THE | * | |
| PARISH OF JEFFERSON, AND THE | * | |
| LOUISIANA DEPARTMENT OF | * | |
| TRANSPORTATION AND | * | |
| DEVELOPMENT, | * | |
| | | |
| Defendants. | * | |

*************************************

## CERTIFICATE UNDER LOCAL RULE 3
## NOTICE OF PENDENCY OF COLLATERAL PROCEEDING

There is pending before this Court, Section K, (Judge Stanwood R. Duval),

proceeding entitled *Berthelot et al v. Boh Brothers Construction Co., LLC et al*, Civil

Action No. 2:05-cv-04182-SRD-JCW, which raises the issue of liability for damages due

to flooding associated with Hurricane Katrina on August 29-30, 2005.

Respectfully submitted,

OF COUNSEL:

MILLING BENSON WOODWARD LLP

William C. Gambel (LA Bar No. 5900)
909 Poydras Street, Suite 2300

**139**

New Orleans, LA 70112-1010
Telephone: (504) 569-7000
Telecopy: (504) 569-7001
wgambel@millinglaw.com

John J. Cummings, III (LA. Bar No. 4652)
Cummings, Cummings & Dudenhefer
416 Gravier Street
New Orleans, LA 70130
Telephone: (504) 586-0000
Telecopy: (504) 586-8423
ccdlawfirm@aol.com

W351849

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 AUG 28   PM 4:30

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ELIZABETH H. AND WILLIAM KEITH DEPASS, IV, MARSHALL L. HARRIS, MANUEL C. TRELLES, WILLIAM B. COLEMAN, III, CAROL C. AND WILLIAM C. GAMBEL, AND RONALD, LANDRY | * | CIVIL ACTION |
| Plaintiffs | * | |
| Versus | * | SECTION 06 - 5127 |
| THE BOARD OF COMMISSIONER OF THE ORLEANS LEVEE DISTRICT, THE BOARD OF COMMISSIONERS OF THE PORT OF NEW ORLEANS, THE SEWERAGE & WATER BOARD OF THE NEW ORLEANS, THE EAST JEFFERSON LEVEE DISTRICT, THE PARISH OF JEFFERSON, AND THE LOUISIANA DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, | * | SECT. K MAG. 2 |
| | * | MAGISTRATE |
| Defendants. | * | |

**********************************

## COMPLAINT FOR DECLARATORY JUDGMENT AND DAMAGES AND REQUEST FOR JURY TRIAL

NOW COME Plaintiffs, Elizabeth H. and William Keith DePass, IV, Marshall L. Harris,

Manuel C. Trelles, William B. Coleman, III, Carol C. and William C. Gambel, and Ronald

Landry, and others, residing in, or doing business in Metairie, Jefferson Parish Louisiana, more

particularly defined herein, who suffered damages due to failure of the flood protection and

141

drainage system for the New Orleans East Bank polder file this complaint for damages and for

Declaratory Judgment, and in furtherance thereof to allege that.

1.

Plaintiffs are persons of the full age of majority domiciled and residing in the State of

Louisiana filing for relief Federal Rule of Civil Procedure 20, to-wit:

| | |
|---|---|
| William B. Coleman, III | 530 Woodvine Ave, Metairie 70005 |
| Elizabeth H. and William Keith DePass, IV | 414 Northline St, Metairie 70005 |
| Carol C. and William C. Gambel | 435 Northline St, Metairie 70005 |
| Marshall L. Harris | 1813 Edinburgh St, Metairie 70001 |
| Ronald Landry | Northline St, Metairie 70005 |
| Manuel C. Trelles | 421 Iona St, Metairie 70005 |

2.

Made defendant herein is the Board of Commissioner of the Orleans Levee District, a

political Subdivision of the State of Louisiana created by La. R.S. 38:307 et seq. for the purposes

of exercising full and exclusive right, jurisdiction, power, and authority to locate, relocate,

construct, maintain, extend, and improve levees, embankments, seawalls, jetties, breakwaters,

water-basins, and other works within its district;

3.

Made defendant herein is the Board of Commissioners of the Port of New Orleans, a

political Subdivision of the State of Louisiana created by La. R.S. 34:1 et seq., for the purposes

of regulating commerce and traffic of the Port and Harbor of New Orleans;

4.

Made Defendant herein is the Sewerage & Water Board of New Orleans, a political

Subdivision of the State of Louisiana created by La. R.S. 33:4071 et seq., for the purposes of

constructing, controlling, maintaining, and operating the public drainage system of the city of

New Orleans;

2

**142**

5.

Made Defendant herein is the East Jefferson Levee District, a political Subdivision of the State of Louisiana created by La. R.S. 38:291 et seq. for the purposes of constructing and maintaining, as it requires, levees, drainage, and levee drainage, and do all other things incidental thereto, .and do all such all drainage work incidental to or made necessary by the construction of the levee system;.

6.

Made Defendant herein is the Parish of Jefferson;

7.

Made defendant is the Louisiana Department of Transportation and Development a body corporate created by La. R.S. 36:501 and charged by law, under La. R.S. 36:501B to develop and implement programs in all areas of transportation, including waterways, hurricane flood protection and under La. R.S. 36:507C to perform the public works functions of the state, related to flood and drainage control;

**Claims against the United States Army Corps of Engineers**

8.

On August 29, 2005, Plaintiffs resided in and owned property in Metairie, Louisiana which damaged and destroyed by flood and rain waters associated with Hurricane Katrina;

9.

Plaintiffs' claims arise out of the compromise of the portion flood control system referenced due to its proximity to and geography of the IWW, Inner Harbor Navigational Canal and Mississippi River Gulf Outlet waterways of commerce;

3

**143**

10.

The plight of the Levee District and Port, and indeed your plaintiffs, was worsened when the Corps of Engineers published the Lake Pontchartrain, Louisiana, and Vicinity Hurricane Protection Project Reevaluation Study, dated July, 1984, approved February 7, 1985, which unilaterally abandoned the Barrier Plan which had been approved by the Levee District and was subject to the March 30, 1976, Agreement in favor of the High Level Plan.

11.

Plaintiffs' claims derive from the construction, operation and maintenance of the Inner Harbor Navigational Canal, a waterway of commerce;

12.

Plaintiffs' damages are not due to the forces of nature but rather, the artificial acts of man;

13.

Plaintiffs' claims derive from the construction, operation and maintenance of the London Avenue Canal, a drainage canal;

14.

Plaintiffs' claims derive from the construction, operation and maintenance of the Orleans Canal, a drainage Canal;

15.

Plaintiffs' claims derive from the construction, operation and maintenance of the 17th Street Canal, a drainage Canal serving the area;

4

**144**

16.

The United States Army Corps of Engineers undertook to render services which it recognized as necessary for the protection of the persons or property of Plaintiffs, who relied on the Corps., its failure to exercise due care increased the risk, and the loss was suffered because of the reliance;

17.

Plaintiffs have filed claims for Loss and Damage to Property with the United Stated Army Corps of Engineers under Federal Tort Claim Form 95, provided filed a for this purpose;

18.

Under the Federal Tort Claims Act plaintiffs are precluded from bringing suit for six months, unless the United States denies the claim;

19.

Plaintiffs' claims against the Corps total greater than $12,533,000;

20.

The United States has not denied any of the plaintiffs claim;

**Maintenance and Operation of the System;**

21.

The Orleans Levee District is charged by state law with the responsibility of maintaining the Levees within its District;

22.

The Department of Transportation is charged by law with performing the public works functions of the state related to flood protection.

5

**145**

23.

The East Jefferson Levee District is charged by state law with the responsibility of maintaining the Levees within its District;

24.

The New Orleans Sewerage and Water Board is charged with the responsibility of operating the pumping station and drainage canals which feed the 17th Street Canal from the East, including the Broad Street Pumping Station and the Palmetto and Florida Avenue Canals;

25.

The East Jefferson Levee District, the Parish of Jefferson and/or the Sewerage and Water Board are charged by law with the responsibility of maintaining and operating the Hoey Canal, including the drainage for Metairie and the Hoey Canal Gate;

26.

The East Jefferson Levee District, the Parish of Jefferson and the Sewerage and Water Board are charged with the responsibility of maintaining the 17th Street Canal;

27.

The Plaintiffs' damages resulted from the closure of the 17th Street Canal, and the continued operation of the pumping stations feeding the 17th Street Canal and the failure to close the Hoey Canal flow, not within the reach of Section 702(c) of the Flood Control Act of 1928;

28.

The Sewerage and Water Board is charged by law with the responsibility of operating the pumping stations, drainage ditches and canals feeding the 17th Street Canal from east, including the Broad Street, Florida Avenue and New Basin pumping station, and the Palmetto Canal;

6

**146**

**Acts of Assurances – Levee District**

29.

The Orleans Levee District is sued under the September 19, 1950, Act of Assurance pursuant to and in furtherance of the requirements of local cooperation in which it agreed to hold and save the United States harmless from claims for damages resulting from the construction of the project.

30.

Under the April 15, 1957, Act of Assurance the Port agreed to provide and maintain "bridges required over the waterway . . . and the maintenance thereof"

31.

The East Jefferson Levee District, the Parish of Jefferson and/or the Sewerage and Water Board are charged by law with the responsibility of maintaining and operating drainage ditches which flow into the 17th St. Canal from the West.

**Acts of Assurances – Levee Districts.**

32.

Under a September 19, 1950 Act of Assurance "to comply with all the requirements of federal cooperation" the Orleans Levee District assured . . . the Secretary of the Army that it will:

(a) maintain all flood control structure . . . . ."

33.

Under an October 1, 1969, Act of Assurance the Orleans Levee District assured . . . the Secretary of the Army that it will: (c) maintain and operate, in a manner satisfactory to the Chief of Engineers, all the repair or restoration work after completion;"

34.

Under an October 1, 1969, Act of Assurance "the Orleans Levee District "maintenance and operation obligation was extended to all levees under the control of the Orleans Levee District"

35.

Under an July 28, 1966 and September 16, 1971 Act of Assurance the Orleans Levee District assured . . . the Secretary of the Army that it will: (g) Maintain and operate all features of the project in accordance with regulations prescribed by the Secretary of the Army, including levees, flood gates and approach channels, drainage structures , drainage ditches or canals, flood walls sea walls and stoplog structures . . . ."

36.

In an Interim Agreement of February 20, 1985 and the Supplemental Agreement of June 21, 1985, the Orleans Levee District repeated the assurance that it will "(g) Maintain and operate all features of the project in accordance with regulations prescribed by the Secretary of the Army, including levees, flood gates and approach channels, drainage structures , drainage ditches or canals, flood walls sea walls and stoplog structures [the remainder of this item is deleted ];"

**Acts of Assurance – Orleans Parish Levee District**

37.

The defendant Levee District is sued under the Act of Assurance given under date of September 19, 1950, "to comply with all requirements of federal cooperation", and pursuant the to and furtherance of Public Law 516 of the 81st Congress under item "Lower Mississippi River" that authorized" that "flood control improvements, substantially as contemplated by the Federal

8                                        **148**

Flood Control Act of 15 May 1928, as amended, to be extended to include such improvements in the Parish of Orleans";

38.

Under the September 19, 1950, Act of Assurance the Levee District "assured and does hereby assure the Secretary of the Army .... That it will .... participate . . .in the project to the extent that it will . . . (d) hold and save the United States free from all damage claims resulting from the construction of the project";

39.

The defendant Levee District is sued under the Acts of Assurance given under date of 28 July 1966, "to comply with all requirements of federal cooperation for the Lake Pontchartrain and Vicinity, Louisiana Project, and pursuant to and furtherance of Public Law 516 of the 81st Congress under item "Lower Mississippi River" that authorized" that "flood control improvements, substantially as contemplated by the Federal Flood Control Act of 15 May 1928, as amended, to be extended to include such improvements in the Parish of Orleans";

40.

Under the July 28th, 1966, Act of Assurance the Port "has assured and does hereby assure the Secretary of the Army .... that it will .... participate . . . in the project to the extent that it will . . . (b) Hold and save the United States free from damage due to the construction works";

41.

The defendant Levee District is sued under the Supplemental Act of Assurance given under date of 1st October, 1969, "to comply with all requirements of federal cooperation for emergency repairs to all existing levees under the jurisdiction of the Orleans Levee District";

9                                                                                    **149**

42.

Under the October 1, 1969, Supplemental Act of Assurance in which the Levee District "assured and does hereby assure the Secretary of the Army . . . . that it will . . . . participate . . . in the project to the extent that it will . . . (b) Hold and save the United States free from damage due to the authorized work";

43.

The defendant Levee District is sued under September 16, 1971 Act of Assurance in which it assured and does hereby assure the Secretary of the Army . . . . that it will . . . . participate . . . in the project to the extent that it will . . . (b) Hold and save the United States free from damage due to the construction works;

44.

The defendant Levee District is sued under the Agreement between the United States of America and the Board Of Commissioners of the Orleans Levee District for the Lake Pontchartrain and Vicinity, Louisiana Project, under date of March 30, 1976;

45.

The defendant Levee District is sued under the Agreement between the United States of America and the Board Of Commissioners of the Orleans Levee District for the Lake Pontchartrain and Vicinity, Louisiana Project, exchanged under date of February 20, 1985;

46.

Under the February 20, 1985, Agreement the defendant Orleans Levee District "agree(d)" to " (c) Hold and save the United States free from damage due to the construction works";

10                                                                **150**

47.

The Agreement between the United States of America and the Board Of Commissioners of the Orleans Levee District for the Lake Pontchartrain and Vicinity, Louisiana Project, under date of June 21, 1985;

48.

Under the June 21st, 1985, Agreement the defendant Orleans Levee District "agree(d) that it will, without cost to the United States , . . . "(c) Hold and save the United States free from damage due to the construction works";

**Acts of Assurance – Port of New Orleans**

49.

The defendant Port is sued under the Act of Assurance given under dates of April 15, 1957, pursuant to and in furtherance of Public Law 455 or the 84th Congress appeared March 25, 1956, to construct the Mississippi River Gulf Outlet from a point south of the Intracoastal Waterway at Michaud to the Industrial Canal;

50.

Under the April 15, 1957 Act of Assurance the Port "has assured and does assure . . . . . that it will participate . . . to the extent that it will hold and save the United States free from all claims for damages due to the construction, maintenance and operation of the project";

51.

The defendant Port is sued under the Act of Assurance given under dates of February 3rd 1969, pursuant to and to comply with all required conditions of local cooperation for the Mississippi River Gulf Outlet Michaud La. – Project Orleans Parish;

11

52.

Under the February 3rd 1969 Act of Assurance the Port agreed to "hold and save the
United States free from damages due to the construction and subsequent maintenance of the
project";

53.

The defendant Port is sued under the Act of Assurance given under date January 10,
1974, pursuant to and in furtherance of Public Law 483 of the 90th Congress which authorized
"inter alia, the Mississippi River Gulf Outlet Michaud Canal Project" wherein "the Port agreed to
fulfill the non federal cooperation";

54.

Under the January 10, 1974 Act of Assurance the Port agreed to "hold and save the
United States free from damages" due to the project;

**Act of Assurance East Jefferson Levee District**

55.

The defendant East Jefferson Levee District  is sued under the Act of Assurance given
under date of  February 21, 1997, pursuant to and in furtherance of Public Law 298 of the 89th
Congress which authorized the construction of the Lake Pontchartrain, Louisiana Vicinity
Hurricane Protection Project;

56.

Under the February 18, 1997 Act of Assurance the East Jefferson Levee District  assured
the Secretary of the Army that it had the authority and capability to furnish local cooperation
required by federal legislation authorizing the Lake Pontchartrain and Vicinity Hurricane
Protection Project, "agree(d) that it will:

(a) Hold and save the Government free from all damages due to construction works;"

**Act of Assurance- Sewerage & Water Board**

57.

The defendant Sewerage & Water Board is sued under a first Act of Assurance given under dates of February 18, 1997, pursuant to and in furtherance of Public Law 298 of the 89th Congress which authorized the construction of the Lake Pontchartrain, Louisiana Vicinity Hurricane Protection Project, and the Reevaluation Study , dated December 1983 , approved February 7th 1985 which authorized the construction of the High Level Plan, and agreed to hold and save the Government free from damages due to the construction works;

58.

Under the second Act of Assurance the Sewerage & Water Board assured the Secretary of the Army that it had the authority and capability to furnish local cooperation required by federal legislation authorizing the fronting protection to pumping station No. 6 located at the 17th Street Canal, and with the consent of the Orleans Levee District and the East Jefferson Levee District in which it "agree(d) that it will:

(a) Hold and save the Government free from all damages arising from the operation, maintenance repair replacement and rehabilitation of the fronting project, and any fronting project related betterments, except for damages due to the fault of the Government or Government contractors;"

13

**153**

**Claims against the Port**

59.

Plaintiffs avail themselves of the right of direct action against the Port under the Act of Assurance under R.S. 22:655;

60.

Plaintiffs are the third party beneficiaries of the covenant given by the Port in favor of the United Sates Secretary of the Army and are entitled to, and hereby, avail themselves of the benefits under the doctrine "stipulation pour autri" and Civil Code Article 1978;

**Claims Against the Orleans Levee District**

61.

Plaintiffs avail themselves of the right of direct action against the Levee District under the Act of Assurance under R.S. 22:655;

62.

The Port is liable for damages due to its failure to maintain the highway bridges and approaches as agreed under the March, 1957 Act of Assurance;

63.

Plaintiffs are the third party beneficiaries of the covenant given by the Levee District in favor of the United Sates Secretary of the Army and are entitled to, and hereby, avail themselves of the benefits under the doctrine "stipulation pour autri" and Civil Code Article 1978;

14

**154**

64.

The Levee District is liable under Civil Code Article 2322 for the deterioration of the levees and levee improvements and structures known to it before the events causing loss and damage and the failure to repair same..

65.

The Levee District is liable for the failure to maintain the levees as required by state law and by its various acts of Assurance and Agreements with the United States Corps of Engineer;

66.

The Levee District performance of its duties and responsibilities was so inadequate and ineffective that it fell to the Corps to undertake same;

**Claims against the Department of Transportation**

67.

The Department of Transportation failed to perform its duties and responsibilities in connection with hurricane flood protection;

**Claims Against the Sewerage and Water Board;**

68.

The Sewerage and Water Board is liable for the failure to maintain the drainage canals under its jurisdiction including the New London, 17th Street and Orleans Canals.

69.

Plaintiffs avail themselves of the right of direct action against the Sewerage & Water Board under the February 1997 Act of Assurance under R.S. 22:655;

15                                                   **155**

70.

Plaintiffs are the third party beneficiaries of the covenant given by the Sewerage & Water Board in favor of the United Sates Secretary of the Army and are entitled to, and hereby, avail themselves of the benefits under the doctrine "stipulation pour autri" and Civil Code Article 1978;

71.

The Sewerage & Water Board is liable under Civil Code Article 2322 for the deterioration of the levees and levee improvements and structures known to it before the events causing loss and damage and the failure to repair same.

72.

The Sewerage & Water Board is liable for the failure to maintain the drainage canals as required by state law and/or by its Act of Assurance with the United States Corps of Engineers

**Claims Against the Parish of Jefferson and or the East Jefferson Levee District;**

73.

Plaintiffs avail themselves of the right of direct action against the East Jefferson Levee District under the Act of Assurance under R.S. 22:655;

74.

Plaintiffs are the third party beneficiaries of the covenant given by the Levee District in favor of the United Sates Secretary of the Army and are entitled to, and hereby, avail themselves of the benefits under the doctrine "stipulation pour autri" and Civil Code Article 1978;

**156**

75.

The East Jefferson Levee District and Parish of Jefferson are liable for the failure to maintain the drainage canals as required by state law and/or by its Act of Assurance with the United States Corps of Engineers;

76.

The East Jefferson Levee District and the Parish of Jefferson and the Sewerage and Water Board were negligent in failing to close the drainage lines to prevent the back flow from the 17th Street Canal into Metairie, which flooded Plaintiffs properties;

77.

The East Jefferson Levee District and the Parish of Jefferson and the Sewerage and Water Board were negligent in failing to close the Hoey canal to prevent the flow of water from the 17th Street Canal into Metairie, which flooded Plaintiffs properties;

78.

The Sewerage and Water Board were negligent in failing to close the Hoey canal to prevent the flow of water from the 17th Street Canal into Metairie, which flooded Plaintiffs properties;

79.

The Sewerage and Water Board was negligent in failing to halt the pumping at feeder stations, Broad Street and Florida, given the closure of the 17th Street Canal, thus pumping flood and rain water into the 17th Street canal and into Hoey Canal, damaging plaintiffs property.

17

**157**

80.

The Corps of Engineers was negligent in ordering the closure of the 17th Street Canal without coordinating the closure of the Hoey canal gate, thus flooding plaintiffs property;

**Jurisdiction**

81.

Plaintiffs claims arise under the laws of the United States, this court has original jurisdiction under 28 U.S.C. 1331.

82.

Federal question jurisdiction is also implicated where as here the complaint requires construction of federal law or a distinctive federal policy of a federal statute requires federal legal principles for its disposition.

83.

This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. 1367, in that they are so related to claims in the action within such original jurisdiction, that they form part of the same case or controversy under Article III of the United States Constitution.

**Venue**

84.

Venue of this action lies in this judicial district under 28 U.S.C. 1391(b), a substantial part of the events or omissions giving rise to the claims having occurred in this district and or a substantial part of property that is the subject of the action being situated here, and all defendants reside in the Louisiana and are found here.

18

**158**

85.

Venue is also appropriate under the Rules of Decision Act 1 Stat. 92, under La. R.S.
22:655;

**Inferences of liability**

86.

The Secretary of the Army Corps of Engineers has made numerous admissions of interest
from which the trier of fact may infer that was is responsible for the damages suffered by
Plaintiffs;

87.

The Defendants are held to the admissions by virtue of privity with the Corps under the
Acts of Assurances and Agreements with the Corps;

88.

Given the volume of circumstantial evidence supporting a finding of negligence, the
defendants superior knowledge of facts respecting same and the lack of knowledge of Plaintiffs,
the belief that in these circumstances an erroneous finding of no liability would be more harmful
than a liability, the trier of fact is entitled to infer negligence and impose upon the defendants,
the burden of proving the absence of negligence;

89.

Plaintiffs plead *res ipsa loqutur*, given that the loss would not have occurred in the
absence of negligence. .

19

**159**

**Solidary Liability**

90.

The Liability of the Port and the Levee District is conventional, coextensive and coterminous, and as such the two are solidary obligors liable to Plaintiffs as solidary obligees pursuant to the Assurance Agreement under Civil Code Articles 1790 and 1794 ;

Declaratory Judgment

91.

Plaintiffs avail themselves of the right under 28 U.S.C. 2201(a), 28 U.S.C. 2202 and F.R.C.P 57, and invoke the judicial power of this Court to a summary declaration of their rights as third party beneficiaries of the Acts of Assurances given by the defendants to the United States Secretary of the Army and other Agreements, and define other legal relations, with the force and effect of a final judgment or decree.

92.

Plaintiffs seek declaratory judgment that

(a) Plaintiffs' "claims for damages" resulted from "the construction of the (Mississippi River Gulf) project" within the meaning of the April 15, 1957 Act of Assurance;

(b) Plaintiffs "damages" were "due to the construction and subsequent maintenance of the project" within the meaning of the February 3rd 1969 and the January 10, 1974 Acts of Assurance ;

(c) Plaintiffs "claims for damages" resulting from "the construction of the project" within the meaning of the September 19, 1950 Act of Assurance ;

20

**160**

(d) Plaintiffs "damages" was "due to the authorized work" within the meaning of the July 28th, 1966 Act of Assurance and "damage due to the construction works" under the February 28, 1985 and June 21st, 1985, Agreements;

(e) The Corps of Engineers is liable to Plaintiffs under the Restatement (Second) Torts § 324A, as interpreted in *Bujol v. Entergy Services, Inc. et al.*, 03-0492, 502 (La.5/25/04), 922 So.2d 1113; rehearing granted 10/29/04.

(f) Neither the Defendant Port nor the Defendant Levee Board are immune from suit under the Louisiana Constitution Article 12, § 10(A)

(g) The immunity of the United States under Section 702(c) of the Flood Control Act is personal to it, neither the Defendant Port nor the Defendant Levee Board have standing under the Act to assert the defense, and the immunity does not inure to either of them;

(h) In any event the immunity does not apply to damages due to flooding from the Intracoastal Waterway, the Mississippi River Gulf Outlet, the 17th Street Canal, the Hoey canal or the Inter-harbor Navigational Canal;

(i) The Liability of the Corps of Engineers under the Restatement (Second) Torts § 324A, to it; arising as it does by virtue of its undertaking to perform the duties of the Orleans Levee District outside the expectation of immunity under Section 702 (c) of the Flood Control Act of 1928, and unavailable to it;

(j) With respect to damages liability for which arises under the Acts of Assurance Defendants Obligors are solidarily liable to Plaintiffs for the whole of such damages;

(k) With respect to the damages resulting from failure to perform a duty, liability is affixed with others who proximately caused the damages, under the rules of comparative negligence;

21

**161**

(l) The Plaintiffs are the third party beneficiaries of the Corps waiver of such immunity, and, as an intended beneficiary, entitled to assert the claims foe damages referenced therein, occasioned by the Government's fault;

(m) The Government waived any immunity it might have otherwise enjoyed under section 702(c) of the Flood Control Act of 1928 with respect to damages due to the operation of the pumping stations feeding the 17th Street Canal via the Acts of Assurance from the Sewerage & Water Board of February 28, 1997;

**Comparative Fault**

93.

The degree of percentage of fault of the defendants causing or contributing to the loss shall be determined under the Rules of Comparative Fault provided in Civil Code Article 2323;

**Notice**

94.

Contemporaneous with the filing of this Complaint, plaintiffs gave notice to defendants Levee District and Port of their intention to accept the benefits of the Acts of Assurances and Agreements given pursuant to the various Public Laws in furtherance of the representation of local cooperation and required by Federal Law;

**Jury Trial**

95.

Plaintiffs avail themselves of their right under the Seventh Amendment to the United States Constitution, and request trial by jury.

22

**162**

**WHEREFORE,** Plaintiffs pray that the defendants be duly cited to appear and answer this complaint, and after due proceeding had there be judgment in Plaintiffs' favor and against defendants holding that Plaintiffs' "claims for damages" resulted from "the construction of the (Mississippi River Gulf ) project" within the meaning of the April 15, 1957 Act of Assurance; that those "damages" were "due to the construction and subsequent maintenance of the project" within the meaning of the September 19, 1950, February 3rd 1969, and the January 10, 1974 Acts of Assurance; due to " the authorized work" within the meaning of the July 28th , 1966 Act of Assurance and "damage due to the construction works" under the February 28, 1985, and June 21st, 1985, Agreements;

That the Corps of Engineers is liable to Plaintiffs under the Restatement (Second) Torts § 324A; that neither the Defendant Port, the Defendant Levee Boards, Defendant Parish of Jefferson, nor the Defendant Department of Transportation are immune from suit under the Louisiana Constitution Article 12, § 10(A); that the immunity of the United States under Section 702(c) of the Flood Control Act is personal to it, neither the Defendant Port nor the Defendant Levee Boards or the Sewerage and Water Board have standing under the Act to assert the defense, and the immunity does not inure to either of them; and that , in any event, the immunity does not apply to damages due to flooding from the Intracoastal Waterway, the Mississippi River Gulf Outlet, or the Inner-Harbor Navigational Canal; and holding the Defendant Port, Sewerage and Water Board  and Levee Districts solidarily under the Acts of Assurances and Agreements; and holding the Defendant Levee Districts, Parish of Orleans and Sewerage & Water Board

23

**163**

liable for the damages proximately caused by its own negligence, and affixing the amount of

Plaintiffs' damages;.

Respectfully submitted,

OF COUNSEL:

William C. Gambel (LA Bar No. 5900)

MILLING BENSON WOODWARD LLP    909 Poydras Street, Suite 2300
New Orleans, LA 70112-1010
Telephone: (504) 569-7000
Telecopy: (504) 569-7001
wgambel@millinglaw.com

John J. Cummings, III, (LA Bar No. 4652)
Cummings, Cummings & Dudenhefer
416 Gravier Street
New Orleans, LA 70130
Telephone: (504) 586-000
Telecopy: (504) 586-8423
ccdlawfirm@aol.com

W351883

**164**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ELIZABETH H. AND WILLIAM KEITH DEPASS, IV, MARSHALL L. HARRIS, MANUEL C. TRELLES, WILLIAM B. COLEMAN, III, CAROL C. AND WILLIAM C. GAMBEL, AND RON, LANDRY | * * * | CIVIL ACTION |
| Plaintiffs | * | |
| Versus | * | SECTION |
| THE BOARD OF COMMISSIONER OF THE ORLEANS LEVEE DISTRICT, THE BOARD OF COMMISSIONERS OF THE PORT OF NEW ORLEANS, THE SEWERAGE & WATER BOARD OF THE NEW ORLEANS, THE EAST JEFFERSON LEVEE DISTRICT, THE PARISH OF JEFFERSON, AND THE LOUISIANA DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, | * * * * * * | MAGISTRATE |
| Defendants. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### CERTIFICATE UNDER LOCAL RULE 3
### NOTICE OF PENDENCY OF COLLATERAL PROCEEDING

There is pending before this Court, Section K, (Judge Stanwood R. Duval),

proceeding entitled *Berthelot et al v. Boh Brothers Construction Co., LLC et al*, Civil

Action No. 2:05-cv-04182-SRD-JCW, which raises the issue of liability for damages due

to flooding associated with Hurricane Katrina on August 29-30, 2005.

**165**

Respectfully submitted,

OF COUNSEL:

_____
William C. Gambel (LA Bar No. 5900)

MILLING BENSON WOODWARD LLP    909 Poydras Street, Suite 2300
New Orleans, LA 70112-1010
Telephone: (504) 569-7000
Telecopy: (504) 569-7001
wgambel@millinglaw.com

John J. Cummings, III (LA. Bar No. 4652)
Cummings, Cummings & Dudenhefer
416 Gravier Street
New Orleans, LA 70130
Telephone: (504) 586-0000
Telecopy: (504) 586-8423
ccdlawfirm@aol.com

W351849

**166**

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of the form.  Use additional sheet(s) if necessary.  See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit To Appropriate Federal Agency: | 2. Name, Address of claimant and claimant's personal representative, if any. *(See instructions on reverse.)  (Number, street, city, State and Zip Code)* |
|---|---|

| 3. TYPE OF EMPLOYMENT  MILITARY [ ]  CIVILIAN [ ] | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME *(A.M. or P.M.)* |
|---|---|---|---|---|

8. Basis of Claim *(State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof) (Use additional pages if necessary.)*

**9. PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT *(Number, street, city, State, and Zip Code)*

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. *(See instructions on reverse side.)*

**10. PERSONAL INJURY/WRONGFUL DEATH**

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM.  IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

**11. WITNESSES**

| NAME | ADDRESS *(Number, street, city, State, and Zip Code)* |
|---|---|

| 12. *(See instructions on reverse)* | AMOUNT OF CLAIM *(In dollars)* |
|---|---|

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL *(Failure to specify may cause forfeiture of your rights.)* |
|---|---|---|---|
|  |  |  | 0.00 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT *(See instructions on reverse side.)* | 13b. Phone number of signatory | 14. DATE OF CLAIM |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant shall forfeit and pay to the United States the sum of $2,000 plus double the amount of damages sustained by the United States. *(See 31 U.S.C. 3729.)* | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. *(See 18 U.S.C. 287, 1001.)* |

95-109
*Previous editions not usable.*      NSN 7540-00-634-4046      *STANDARD FORM 95 (Rev. 7-85) (EG) PRESCRIBED BY DEPT. OF JUSTICE 28 CFR 14.2*

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.

A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 38 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.

C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.

D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim

## INSTRUCTIONS

**Complete all items - insert the word NONE where applicable**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

Any instructions or information necessary in the preparation of your claim will be furnished, upon request, by the office indicated in Item #1 on the reverse side. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplemental regulations also. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with said claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file claim for both personal injury and property damage, claim for both must be shown in Item 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* Failure to completely execute this form or to supply the requested material within two years from the date the allegations accrued may render your claim "invalid". A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

**Failure to specify a sum certain will result in invalid presentation of your claim and may result in forfeiture of your rights.**

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden,

to Director, Torts Branch
Civil Division
U.S. Department of Justice
Washington, DC 20530

and to the
Office of Management and Budget
Paperwork Reduction Project (1105-0008)
Washington, DC 20503

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance? ☐ Yes, If yes, give name and address of insurance company *(Number, street, city, State, and Zip Code)* and policy number. ☐ No

16. Have you filed claim on your insurance carrier in this instance, and if so, is it full coverage or deductible?

17. If deductible, state amount

18. If claim has been filed with your carrier, what action has your insurer taken or proposes to take with reference to your claim? *(It is necessary that you ascertain these facts)*

19. Do you carry public liability and property damage insurance? ☐ Yes, If yes, give name and address of insurance company *(Number, street, city, State, and Zip Code)* ☐ No

168