# EXHIBIT 1

```
1               UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF LOUISIANA

3                                        COPY

4   RONALD A. HOLBROOK      *
    and APRIL HOLBROOK      *
5                           *  CIVIL ACTION
                            *  NO.06-2617
6       VERSUS              *
                            *  SEC. K
7                           *  JUDGE DUVAL
    AAA INSURANCE AGENCY    *
8   INC, AND FIDELITY       *
    NATIONAL PROPERTY AND   *
9   CASUALTY INSURANCE      *  MAG.3
                            *  MAGISTRATE JUDGE KNOWLES
10  *   *   *   *   *   *   *   *

11

12

13

14              Deposition of RONALD HOLBROOK,

15     taken at the offices of Sessions, Fishman &

16     Nathan, LLP, 3850 North Causeway Boulevard,

17     Lakeway II, Suite 1240, Metairie, Louisiana,

18     on Friday, July 13, 2007, at 9:00 a.m.

19

20

21

22

23

24

25
```

```
 1        Q     What about the artwork?

 2        A     The artwork was left there.  It's

 3   still -- well, it was still there when the

 4   house was demolished.

 5        Q     Did you take any pictures of your

 6   artwork?

 7        A     Yes, I did.

 8        Q     I couldn't identify it in the

 9   pictures you provided, and maybe you can show

10   me that when we have a moment.

11        A     I can show you that; yes.

12        Q     I'm assuming that you decided that

13   the artwork was not salvageable?

14        A     It was not salvageable.

15        Q     When did you first speak with someone

16   from AAA?

17        A     It was May of 2005.

18        Q     And who did you speak with?

19        A     I spoke to Lisa Dufour.

20        Q     And as best you can, summarize that

21   discussion.

22        A     That discussion was we had received

23   the -- a fax copy of the policy quote for the

24   homeowner's and flood insurance, and I think

25   that I asked for some amendments to that,
```

**JOHNS, PENDLETON & ASSOCIATES, INC.**

CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101          619 JEFFERSON HIGHWAY, SUITE 2G
METAIRIE, LA 70005                       BATON ROUGE, LA 70806
PHONE (504) 219-1993                     (225) 922-4527

1    to me?

2         A    Yes, I did.

3         Q    Request No. 1 says, "Please produce

4    any and all documents that support the

5    allegation in paragraph 12 of Plaintiff's

6    amended complaint that on or about August 3,

7    2005 Fidelity informed the Holbrooks that it

8    would not honor its contract for $223,000 of

9    flood coverage bargained for by their agents."

10        Did you have any particular documents

11   in reference to that statement that came out

12   of your complaint or your lawsuit?

13        A    Yes.  I have the document that was

14   sent to me by Fidelity saying that our policy

15   coverage amounts had been reduced.  I do

16   believe that document was dated on the 25th.

17        Q    And you have that document?

18        A    Yes.

19        Q    Any other document?

20        A    That was the only document that we

21   received.

22             MR. ARCHEY:

23                  Well, we produced -- I don't

24             know -- 400 pages worth of

25             documents.  I mean, I don't know if

1        Q     Did you have any other type of

2   insurance at the time of Hurricane Katrina?

3        A     We had auto insurance.

4        Q     No other type of insurance policies

5   that you were aware of other than homeowner's

6   through AAA, flood through Fidelity, and the

7   National Flood Insurance Program, and

8   automobile through AAA?

9              MR. ARCHEY:

10                  Any?  Life?

11       A     I do not recall.

12       Q     (By Mr. Barreca) Let me ask it --

13             Property?  Property insurance?

14       A     No, I did not have other property

15   insurance.

16       Q     What's the current status of the

17   house on Charlotte Drive?

18       A     It has been demolished.

19       Q     When was that?

20       A     The demolition happened right about,

21   either the end of 2006, beginning of 2007.

22       Q     Did you tell your lawyer that it was

23   being demolished?

24       A     Yes.

25       Q     And he said that's fine, go ahead --

JOHNS, PENDLETON & ASSOCIATES, INC.

CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

1    $25,000.

2           When you received the document with

3    the $25,000 content coverage, is that because

4    you requested $25,000?  Or do you recall?

5       A    I don't recall.  That may have been

6    Joan Farabaugh asking for a statement based on

7    some ballpark figure.

8       Q    What about the $183,000 in building

9    coverage?

10      A    That was the offer on the house.  So

11   we insured --

12      Q    That was the selling price?

13      A    Yes, that was the selling.

14      Q    Eventually you increased the request

15   for contents.  Is that correct?

16      A    Yes.

17      Q    And so that is what I'm going to show

18   you now --

19           MR. BARRECA:

20               And I'm going to mark this

21           HOL -- well, it's going to be P-4.

22           The Bates numbers are HOL 0023

23           through 27.

24                   (Exhibit P-4 was marked.)

25

**JOHNS, PENDLETON & ASSOCIATES, INC.**

CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101          619 JEFFERSON HIGHWAY, SUITE 2G
METAIRIE, LA 70005                    BATON ROUGE, LA 70806
PHONE (504) 219-1993                  (225) 922-4527

1    elevation certificate used?

2        A    I have subsequently learned that yes,

3    that that was the case.

4        Q    Going to the next page which is

5    HOL 0026, and it is the actual premium

6    information and coverage information, and they

7    have one block that talks about basic limits

8    and then the additional limits.  If you add

9    the building basic and the building

10   additional, you'd get the coverage you

11   initially requested.  Is that correct?

12       A    Yes.

13       Q    Same thing for the contents; the

14   basic limits plus the additional limits is the

15   $40,000 in contents you initially requested?

16       A    Yes.

17       Q    So this document reflects the

18   coverages that you wanted for your home?

19       A    Yes.

20       Q    The Charlotte Drive home.

21       A    (Witness nods head affirmatively.)

22       Q    And this was the premium quote that

23   was told to you which is in the middle of the

24   page, $836?

25       A    Yes.

**JOHNS, PENDLETON & ASSOCIATES, INC.**

CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

```
 1        Q    Well, it appears that your wife

 2   signed it on June 23, 2005?

 3        A    Yes.

 4        Q    I'm looking at your Attachment A,

 5   Chronology of Events.

 6             THE WITNESS:

 7                  Can I look at that as well?

 8        MR. BARRECA:

 9                  Sure.

10             THE WITNESS:

11                  I have a copy of it.

12        Q    (By Mr. Barreca) On the first page

13   under June 8, 2005 --

14        A    Yes.

15        Q    -- the second paragraph talks about

16   the -- I call it the artwork.  It's the

17   "Maui Dawn" by Wyland?

18        A    Yes.

19        Q    Do you remember specifically the

20   conversation you had with the AAA agent

21   regarding the policy and that piece of art?

22        A    Yes, I do.

23        Q    Tell me about it.

24        A    A previous insurance policy that my

25   wife and I had for renter's insurance, in
```

JOHNS, PENDLETON & ASSOCIATES, INC.
CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101                    619 JEFFERSON HIGHWAY, SUITE 2G
METAIRIE, LA 70005                              BATON ROUGE, LA 70806
PHONE (504) 219-1993                            (225) 922-4527

1      A      Discussed increasing the contents

2   coverage to the $40,000.

3      Q      Because that's when you prior had

4   received the quote from Joan that had the

5   $25,000 content coverage?

6      A      Yes.

7      Q      I'm going to follow down your

8   chronology memo since I think that might be

9   the best way to get through all of this in

10   some kind of organized fashion.

11          Going to June 9, it says

12   approximately 4 o'clock you called Lisa Dufour

13   to amend the quote and she informed you that

14   the total premium for flood insurance with the

15   $183,000 coverage with the $1,000 deductible

16   and the $40,000 coverage on the contents with

17   a $500 deductible would be $836.  Is that

18   accurate?

19      A      Yes.

20      Q      Is that the same quote that you were

21   previously faxed on -- well, and I apologize.

22   I think I'm getting ahead of it.

23          This is the same quote that we talked

24   about that was sent to you via fax on June 23.

25   The same quote with the same information?

**JOHNS, PENDLETON & ASSOCIATES, INC.**

CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

1      A     Could you clarify?  I guess I don't

2  understand.

3      Q     I want -- just reading it, my

4  understanding is that on June 9 you spoke to

5  Lisa and she gave you the quote over the

6  phone.

7      A     Yes.

8      Q     But subsequently on June 23, she sent

9  it to you -- or maybe she sent it to Joan and

10  Joan sent it to you with the written

11  information of the quote you discussed over

12  the phone.

13     A     No.  This was -- my understanding,

14  this was not the quote.  This was the policy

15  application.

16     Q     Got it.

17     MR. ARCHEY:

18          "This" referring to?

19     MR. BARRECA:

20          I think it's P-4.

21     MR. ARCHEY:

22          Thank you.

23               (Off the record.)

24     Q     (By Mr. Barreca) And I know you

25  provided to me some handwritten notes.  Is

1    documents?

2        A    No.

3        Q    Lost them in the flood?

4        A    Yeah.

5        Q    Did you ever at any time take a copy

6    of this to AAA?

7        A    No.

8        Q    So after your closing, the next piece

9    of information you received regarding any

10   insurance on your home was -- if I'm following

11   your outline -- was the notice from Fidelity?

12   And I'm looking at July 25.

13       A    That was the date that it was mailed.

14       Q    Got it.

15            Do you remember the date you received

16   it?

17       A    Don't recall the exact date.  My wife

18   and I moved to -- we moved into the property

19   the last week of July.  I know that our mail

20   was not delivered until a couple of days into

21   the week, so I can't remember the exact date

22   that we received it, but it was not long

23   before August 4, probably August 3.

24       Q    Do you recall what else came in that

25   envelope besides that letter?

1          MR. BARRECA:

2               Yes.

3          MR. ARCHEY:

4               Okay.

5     Q    (By Mr. Barreca) And I apologize for

6  repeating myself.  You don't recall if they

7  came the same envelope or separate envelopes?

8     A    I don't recall if they came in

9  separate envelopes or together.

10    Q    Do you recall if they even came on

11 the same day?

12    A    I don't recall if they came on the

13 same day.

14    Q    Do you recall receiving P-10 at all?

15 The flood declarations page?

16    A    Yes, I do recall receiving that.

17    Q    And you read this?

18    A    I read that front cover page, yes.

19    Q    Do you recall receiving the actual

20 policy which I marked P-11?

21    A    Yes.

22    Q    I'm just showing you the cover page

23 at the moment.

24    A    Yes, I do.

25    Q    Did you read the policy when you

JOHNS, PENDLETON & ASSOCIATES, INC.

CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101          619 JEFFERSON HIGHWAY, SUITE 2G
METAIRIE, LA 70005                    BATON ROUGE, LA 70806
PHONE (504) 219-1993                  (225) 922-4527

1       A     The substance of the conversation as

2   I recall was, I just received this letter,

3   what's going on.

4           Lisa's reply to me was, "I've been

5   meaning to call you on this," and didn't go

6   into particular details.

7           And what I suggested was that I did

8   have to establish car insurance.  I was

9   planning on establishing car insurance through

10  AAA.  I know that I'll need to come in and

11  sign some documents for that.  Why don't I

12  come in and we can discuss this.

13          And we set up a time to discuss it:

14  2 p.m. on the 4th of August.

15      Q     And you think that was the same day

16  you called?

17      A     Yes; I do believe I called in the

18  morning, and we were able to set up an

19  appointment immediately that day.

20      Q     You said that she told you that she's

21  been meaning to call you on this assuming that

22  she had also received this letter?

23      A     My assumption was that there was

24  something that she knew in regards to this

25  that had not been disclosed to me.

**JOHNS, PENDLETON & ASSOCIATES, INC.**

CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101                                    619 JEFFERSON HIGHWAY, SUITE 2G
METAIRIE, LA 70005                                              BATON ROUGE, LA 70806
PHONE (504) 219-1993                                            (225) 922-4527

1    Q    Well, she knew something was up?

2    A    Yes.

3    Q    It wasn't that you called and said,

4    "Hey, I got this letter."

5         And she says, "Oh, my God.  What was

6    that all about?  Come on in."

7         Nothing like that?

8    A    The response was, "I've been meaning

9    to call you on this."

10        And I said, "Well, then I should --

11   I'm coming in for auto insurance.  Let's

12   discuss it at that time."

13   Q    Got it.

14        So you go in at 2 o'clock, I presume?

15   A    Yes.

16   Q    Tell me what happens then.

17   A    Lisa and I sat at her desk.  We -- I

18   pulled this out and -- I do believe I also had

19   the signed applications from the 30th -- or

20   rather the 23rd of June.

21        And I said, "We requested 183 and 40.

22   Why is this different?"

23        And I got a story regarding that

24   there was something with the elevation

25   certificate; that an incorrect elevation

JOHNS, PENDLETON & ASSOCIATES, INC.
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993
619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

1    certificate had been submitted by her to the

2    flood insurance underwriters.

3          And I said, "Well, where did you get

4    that?  And when did you get it?"

5          And I can't recall her answer, but I

6    think it was something to the extent that she

7    received it from the title company and she

8    just faxed it on to them.

9          Then, for some reason, that the

10   correct flood insurance policy was provided --

11   or the correct -- excuse me -- the correct

12   elevation certificate was provided, and that

13   this somehow triggered the change in requested

14   coverage amounts.

15         MR. BARRECA:

16              Let me show you what I'm going

17              to mark as number P-12.

18                   (Exhibit P-12 was marked.)

19              And it's also marked AAA 0043.

20              And this also has been produced to

21              you earlier.

22   Q    (By Mr. Barreca) And I understand

23   that this is the incorrect flood elevation

24   certificate that was initially used for the

25   quote that was provided to you on or about

1    flood elevation, and the new quote does match

2    up to what Fidelity is saying in P-9.

3            MR. ARCHEY:

4                    You said "they."  I don't know

5            who "they" is.

6                    He said AAA could never give

7            him the quote.  All that came was

8            from Fidelity.

9            MR. BARRECA:

10                   Right.  And you can object.

11           I'm just trying to clarify.

12           MR. ARCHEY:

13                   "They" was not clear.

14           MR. BARRECA:

15                   I think he and I both are

16           trying to get to what really

17           happened.  It is what it is.

18                   There happens to be,

19           unfortunately, a difference of

20           opinion in what happened.

21    Q    (By Mr. Barreca) "They" I was

22    referring to would be Jo-Ann and Lisa of AAA.

23           I understood that they ran the quote

24    based upon the correct elevation, whether it

25    be provided by you or someone at the title

1    company or your real estate agent.  And AAA

2    determined yes, the Fidelity quote that was

3    referenced in P-9 where you had to pay an

4    additional premium was correct.

5             Is it your position that was never

6    discussed?

7    A    What my position -- No; we did

8    discuss this.  And what they told me at the

9    time was that they provided an incorrect

10   elevation certificate at the time of the

11   application -- the application.  And that

12   subsequent to that, that they provided the

13   corrected information, and that that led to

14   the -- the document where the increased

15   premium was asked for.

16            So when I asked for sort of a

17   clarification of that, they went to another

18   room.  And my understanding is that they ran

19   the numbers with the correct policy amount, or

20   with the correct elevation amounts, and came

21   up with numbers, although I don't know exactly

22   what those numbers were.

23            But they said this is correct.  They

24   were pointing to --

25   Q    P-9 is correct?

```
 1      A      Saying that P-9 is correct.

 2      Q      Right.

 3      A      That's what they told me.

 4      Q      Okay.  And at that point, you still

 5   didn't believe them?

 6      A      Absolutely not.

 7      Q      And why is that?

 8      A      Because at the time, all the

 9   information that I had provided to them and

10   everything that I had signed I thought was

11   absolutely 100 percent correct.  I did not

12   understand how something within a couple weeks

13   could suddenly be incorrect, and that's why I

14   was questioning it.

15      Q      And I completely understand that part

16   of the story.

17             But the part that's confusing me is

18   now that you go in on August 4, and they say,

19   look, we had the wrong flood elevation, it

20   matches up with the original quote which had

21   the wrong numbers.  That's why the premium was

22   wrong.

23      A      Well, my understanding -- could you

24   repeat that, because that isn't my

25   recollection of what happened.
```

1      Q    Okay.  My understanding was, and I

2    think you've already said this, AAA

3    acknowledges that the initial flood elevation

4    used was wrong.  As a result, the premium and

5    the quote provided to you was wrong.  It was

6    too low.

7         Once they figured that out,

8    presumably -- well, we can go into how they

9    figured it out, but it got figured out.

10        At the same time, you get a letter

11    from Fidelity saying, hey, you've got to pay

12    more money.

13        Conversation goes on August 4, I

14    understand it went, the quote was wrong

15    because the elevation was wrong.  We now have

16    the correct elevation, and this is what you

17    have to pay; meaning, P-9 is the correct

18    amount you have to pay.  You have to pay the

19    additional $342.  Is that not correct?

20     A    That -- that is what those series of

21    events seem.  Correct.

22        Now I do believe your original

23    question was why -- what was my problem with

24    that particular line of --

25     Q    Well, why --

```
 1    upon the actual elevation certificate for my

 2    property.

 3         Q    But you just didn't believe them?

 4         A    Yeah; I had no evidence of that.

 5         MR. ARCHEY:

 6               And he just got through saying

 7               they couldn't replicate the quote.

 8         MR. BARRECA:

 9               Let me stand corrected.

10         Q    (By Mr. Barreca) I thought you said

11    they couldn't replicate the original 836

12    quote?

13         A    I was not party to that.  I don't

14    know what they were able to replicate.

15               I was told that they went into the

16    other room, went -- to my understanding -- the

17    Fidelity website to try to do everything that

18    got us up to August 4.  And they came out and

19    told me that they put in both the incorrect

20    elevation numbers and the correct elevation

21    numbers and that neither of those could get it

22    back to the 836.

23         Q    So they put in the incorrect numbers

24    to get back to the incorrect quote?

25         A    Yes.
```

JOHNS, PENDLETON & ASSOCIATES, INC.

CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

1      Q      And couldn't get it done?

2      A      That's correct.

3      Q      But they did say that the current

4  quote that's discussed in P-9 is the correct

5  quote for your flood insurance for the

6  Charlotte Drive property?

7      A      That's what they told me.

8             MR. ARCHEY:

9                 Were they able to replicate

10            the quote, though?

11            THE WITNESS:

12                They -- I did not see anything

13            being able to replicate that quote.

14                And, in fact, there is a

15            document in here that -- documents

16            we have been provided -- where a

17            replication was attempted on

18            August -- or rather November 9, and

19            it does not replicate the number

20            mentioned here on the 725 document

21            from Fidelity.

22     Q      (By Mr. Barreca) We'll get to that.

23     A      So it's my understanding to this day

24  that neither of those quotes have been

25  replicated.

**JOHNS, PENDLETON & ASSOCIATES, INC.**
CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101          619 JEFFERSON HIGHWAY, SUITE 2G
METAIRIE, LA 70005                    BATON ROUGE, LA 70806
PHONE (504) 219-1993                  (225) 922-4527

1    A    Yes.

2    Q    And let's talk about contents real

3    quick and close that out.  The contents list

4    that has been provided, and we've marked that

5    as -- we didn't mark it.  We just described

6    the total contents numbers.

7         MR. BARRECA:

8              Right.

9    Q    (By Mr. Treas) And it was around

10   $58,000.  My question to you is this:  Is that

11   the exclusive list, or did you get to a

12   point -- because I do this all over the

13   country.  Some people get to the deductible

14   and say, I'm tired.  I'm well over my

15   deductible and I'm going to stop.

16         Is that the total list?  Or did you

17   just stop at some number?

18   A    That's the total list.

19   Q    And that was based on your memory and

20   pictures.  Anything else you based that on?

21   A    Just basically those two things.

22   Q    The house sold for $183,000.  You

23   requested flood policy for $183,000.  Was that

24   something that you requested, or did the

25   mortgage company say you got to have 183?

1      A      I requested it, but I think part of

2  my decision making was that there's no way we

3  could get a mortgage unless we had flood

4  insurance coverage for the entire -- for the

5  full value of the house.

6      Q      And that leads to my next question.

7  My review of the documents for the homeowner's

8  policy, the building limits were only

9  $145,000.  Was there a reason why you had

10 lower limits on homeowner's?

11     A      I don't recall.  I never requested

12 that that be brought down to $145.  I don't

13 understand how those numbers came to be about

14 because I always requested $183 and $40.

15     Q      Okay.  And let me ask to maybe be

16 more clear:  Did you ask for $183 and $40 for

17 both your homeowner's and your flood?

18     A      Yes.

19     Q      Or is this $183 and the $40 only

20 dealing with flood?

21     A      It was -- my request was for both of

22 them.  My understanding was if I'm getting the

23 policy at one amount for one policy, that's

24 what it should be for the other one.

25     Q      Also my review of the documents for

1    the homeowner's policy, you had obtained

2    $87,000 contents.  Do you have any

3    understanding of why that was obtained?

4        A    I don't know how that number came

5    about.  If I remember, those two numbers added

6    up to the $223, and I didn't know if that was

7    just the way that the policy had to be

8    structured.

9        Q    It might have.

10       A    Because some parts of a building are

11   not considered building, are considered

12   contents.  That was an assumption on my part.

13       Q    Let's talk about the elevation

14   certificate dated 2004 that's been marked as

15   P-12, I believe.  We're close to the August 4,

16   and I want to clean that up.

17       A    Okay.

18       Q    How did you first come to know about

19   P-12, the 2004 elevation certificate?

20       A    I was told by Lisa that an incorrect

21   elevation certificate was provided to the

22   underwriter -- to Fidelity.  Whether it was

23   this document or another document, I don't

24   know.  I can't really.  I can't exactly recall

25   when I first saw this document, whether it was

1    August 4 or if it was provided in subsequent

2    documents or provided by you or Kevin Barreca.

3        Q    In your conversation with -- I

4    believe you just said Ms. Dufour, Lisa, on

5    this 2004 elevation certificate -- is that

6    when you just said?

7        A    My conversation on August 4?

8        Q    I'm taking about the elevation

9    certificate.  I believe you just said Lisa?

10       A    I guess -- could you ask the

11   question?  I can't remember.

12       Q    I'm going to assume you just said

13   Lisa.

14            In your conversation with Ms. Dufour

15   about this 2004 -- or an incorrect elevation

16   certificate, did anyone at AAA or Ms. Dufour

17   explain to you who submitted that 2004

18   elevation certificate to Fidelity?

19       A    She said she faxed it to Fidelity.

20       Q    And was there any conversation of

21   when that was faxed, to your knowledge?

22       A    I requested that particular

23   information.  I asked when was the fax

24   received and when was it sent.  There still

25   does not seem to be an answer.

JOHNS, PENDLETON & ASSOCIATES, INC.

CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101          619 JEFFERSON HIGHWAY, SUITE 2G
METAIRIE, LA 70005                    BATON ROUGE, LA 70806
PHONE (504) 219-1993                  (225) 922-4527

1     Q     If I can get just a really quick

2     run-through here.  June 23 is when your wife

3     signs the application, and that's when you

4     say, "I need homeowner's insurance and flood

5     insurance."  Is that correct?

6     A     That is correct.

7     Q     And it is faxed to AAA?

8     A     That is correct.

9     Q     You closed on the house when?

10     A     On the 30th of June.

11     Q     And you were here in Louisiana,

12     physically, for the closing.  Is that correct?

13     A     Do you know what?  It's funny.  I

14     can't recall if we flew down or were able to

15     do that via long distance.  I seem to recall

16     long distance as well.

17     Q     Let's talk about the closing.  Who

18     was present at closing?

19     A     My wife, myself; John Curp was there,

20     our attorney; and there was one other witness,

21     Jen Nolan, who is -- let me -- now that I'm

22     remembering this, we did this -- we closed,

23     signed all the closing documents and title

24     documents in Ohio.  We met at a Wendy's

25     restaurant, and my wife and I signed the

1    to discuss the elevation certificate and the

2    premium mix-up, and you also want to get an

3    auto policy.  Is that correct?

4        A    That's correct.

5        Q    At any time did you pay the $342

6    additional premium before August 24, 2005

7    either to your agent or to Fidelity?

8        A    No.

9        Q    Did you instruct your mortgage

10   company to pay the additional $342 to either

11   Fidelity or to your agent before August 24,

12   2005?

13       A    No.

14       Q    Do you have any knowledge of your

15   wife making that payment or instructing the

16   mortgage company?

17       A    I have no knowledge of that.

18       Q    Did you do any sort of investigation,

19   phone calls, before the August 4 meeting with

20   AAA regarding the elevation certificate?

21   Because I'm a little bit confused with the

22   testimony earlier of whether or not you

23   brought the old one with you at that time.

24            Was it later?

25            Did you do any investigation before

1    difference.  And it's part of the reason I

2    didn't -- was reluctant to pay the additional

3    premium because I couldn't get a straight

4    answer on this one.

5         Q    (By Mr. Treas) Did you receive any

6    quote while you're there on August 4 from

7    Ms. Dufour or Ms. Daleo?

8         A    I don't recall.  What I recall is

9    just being told that the quote amounts were

10   the same.

11        Q    And you just don't recall what number

12   that was?

13        A    Yes, I do not recall.

14        Q    Do you not recall, or they didn't

15   tell you those are two different things?

16        A    I don't recall them telling me -- I

17   should say I don't remember being told a

18   specific dollar amount.  That's all that I can

19   testify to.

20        Q    Did -- while you're there on

21   August 4 -- still August 4, 2005 -- did AAA

22   confirm the quote or the premium based on the

23   new elevation certificate where you had to pay

24   an additional $342?  Did they confirm that

25   premium for your property for $183,000

**JOHNS, PENDLETON & ASSOCIATES, INC.**
CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

1    building, $40,000 for contents?

2        A    By -- could you clarify what you mean

3    by "confirm"?

4        Q    In other words, did AAA indicate to

5    you, hey, we've plugged in this new elevation

6    information, and Fidelity's $342 initial

7    premium is correct?  Did that come up at all?

8        A    That came up.  I can't remember

9    exactly -- I'm trying to answer this

10   appropriately because I don't remember any

11   specific dollar amounts being mentioned.

12            I just remember saying that this is

13   your -- I remember being told that the numbers

14   that came across in that Fidelity document,

15   they seemed to be saying, look, we think those

16   are the correct numbers based on your actual

17   elevation certificate.

18       Q    And as part of that -- who had that

19   conversation?

20       A    That was between Lisa and myself

21   at -- during some point during this period.

22       Q    And did Ms. Dufour indicate to you

23   that that number was correct because of what

24   she did on the computer, or was it a phone

25   conversation?  Did she indicate to you why

**JOHNS, PENDLETON & ASSOCIATES, INC.**

CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

```
 1   other room and came back out -- Ms. Dufour I'm
 2   referring to -- was there any indication, "I
 3   just called Fidelity.  This is correct."
 4   Anything like that?
 5      A    I don't recall that.  So no, I don't
 6   think so.
 7      Q    So what was this phone call about
 8   that was talked about earlier?
 9      A    This phone call was brought up by
10   Mr. Barreca, as far as this was concerned.
11           I think I testified earlier to -- I
12   don't recall being on a conference call with
13   anybody from Fidelity -- on August 4, I should
14   say.
15      Q    You had testified earlier that you
16   had called Fidelity on August 27, 2005.
17   Correct?
18      A    Yes.
19      Q    And what was the purpose for that
20   call?
21      A    To see if I could pay the $342.  This
22   discrepancy aside, I wanted to protect my
23   property and wanted to pay the $342 and deal
24   with the possibility of getting that back
25   later.
```

**JOHNS, PENDLETON & ASSOCIATES, INC.**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993
619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

```
 1      Q    Why would you -- why did you make

 2   that call on August 27 and not before

 3   August 24?

 4      A    Because Hurricane Katrina on

 5   August 27, that's when we knew that Hurricane

 6   Katrina was a Category 5 and headed towards

 7   New Orleans.

 8      Q    And the office was closed because

 9   that was a Saturday?

10      A    Yes.

11      Q    And August 28 you called and it was

12   closed because it was Sunday.  Correct?

13      A    That's correct.

14      Q    But you finally got through on the

15   29th because you were in Ohio.  Is that

16   correct?

17      A    That is correct.

18      Q    Because the phones weren't working

19   here.

20           The ICC -- which in the flood world

21   is Increased Cost of Compliance -- the ICC

22   proof of loss for the $10,000-plus, you were

23   paid half of that amount beforehand.  Correct?

24      A    Before the demolition?

25      Q    Yes.
```

**JOHNS, PENDLETON & ASSOCIATES, INC.**

CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

1          A      Yes.

2          Q      And you cashed that check?

3          A      I didn't cash the check -- Okay.  Let

4    me be -- I can't remember exactly how this

5    happened, because I think -- I recall -- it

6    was made out jointly to my wife and myself and

7    to the mortgage company.  So we had the

8    mortgage company endorse it and we endorsed

9    it.

10         I can't recall exactly, but I think

11   we deposited it and then wrote a personal

12   check to the contractor who demolished our

13   house.

14         Q      And after the house was demolished,

15   did you receive the other half of your ICC

16   payment with the additional $750 to cap the

17   plumbing?

18         A      Yes.

19         Q      So you've been paid in full for your

20   ICC claim under your flood policy.  Is that

21   correct?

22         A      For what we have requested in regards

23   to ICC, we have been paid in full.

24         Q      The house has been demolished.  We've

25   said that here today.  You're living in Ohio

```
 1    meet with Mr. Jerden at the property?

 2        A    No.

 3        Q    Did you have any conversations with

 4    Mr. Jerden?

 5        A    Yes.

 6        Q    Was the initial conversation to set

 7    up an inspection?  What was the initial

 8    conversation?

 9        A    The initial conversation was, he

10    contacted -- I can't remember who contacted

11    who, but it was basically to set up the time

12    to view the property.  I believe he asked me

13    if I knew any impediment to him getting there,

14    and I told him I haven't been down there.  I

15    have no idea.  And so that was the first

16    discussion.

17             And then I had another discussion

18    with him subsequent to him viewing the

19    property.

20        Q    Now the policy limits that were in

21    place -- and I know there's a disagreement on

22    whether or not it's correct or not -- but you

23    were, in fact, paid $111,600 for the building

24    portion of your flood policy by Fidelity.  Is

25    that correct?
```

JOHNS, PENDLETON & ASSOCIATES, INC.

CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

```
 1        A      That is correct.
 2        Q      And you were paid $20,000 for your
 3   contents coverage under your flood policy by
 4   Fidelity.  Is that correct?
 5        A      That is correct.
 6        Q      And have those proceeds been cashed
 7   or deposited?
 8        A      Yes, they have.
 9        Q      Is the mortgage extinguished?
10        A      No; we are still making mortgage
11   payments.
12        Q      We talked about the contents.  What
13   you're claiming is damaged by contents is
14   approximately $58,000.
15               My question now is what is the dollar
16   amount of the damage to the building that
17   you're claiming?
18        A      The dollar amount of the damage to
19   the building that we're claiming -- the claim
20   is that the building is a total loss.  So I
21   don't know exactly what the value of the
22   building less the value of the land is.
23        Q      Who can tell me that?  In other
24   words, you sued me for building damages.  This
25   is my opportunity.  Who can tell me what those
```

JOHNS, PENDLETON & ASSOCIATES, INC.
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527