## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | |
| | * | NO. 05-4182 |
| | * | |
| PERTAINS TO: | * | SECTION "K"(2) |
| *Katz*, C.A. 06-4155 | * | |

**************************************************

### PLAINTIFF'S MEMORANDUM IN OPPOSITION
### TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
### TO DISMISS PLAINTIFF'S EXCESS FLOOD ALLEGATIONS

MAY IT PLEASE THE COURT:

This memorandum is submitted on behalf of plaintiff Marlene Katz in opposition to the motion of defendants State Farm Fire and Casualty Company ("State Farm") and Anthony Cemo ("Cemo") for partial summary judgment to dismiss plaintiff's excess flood allegations. Because the evidence submitted in support of this opposition shows that plaintiff has stated a valid claim against defendants for breach of their fiduciary duties, which are well-established under Louisiana law, and because there are genuine issues of material fact that remain in dispute, defendants' motion for partial summary judgment should be denied.

1



## I. Introduction and Factual Background

This action arises, in part, out of defendants' negligence breach of duties owed to plaintiff Marlene Katz, whose home was severely damaged by flooding during Hurricane Katrina. Specifically, in September of 2004, Ms. Katz heard that flood insurance in excess of the limits available through the National Flood Insurance Program ("NFIP") could be purchased from private insurers. Desiring to obtain adequate flood coverage, Ms. Katz called Cemo, her State Farm agent, and specifically asked whether flood insurance over and above the NFIP limits of $250,000 for dwelling coverage and $100,000 for contents coverage could be purchased. Cemo misrepresented to plaintiff that excess flood insurance could not be purchased on the private market, either from State Farm or any other insurer, and that the $250,000/100,000 NFIP limits were the maximum flood insurance available. Accordingly, plaintiff wrote a check[1] to increase her flood insurance coverage to the NFIP limits.

Cemo knew that plaintiff's State Farm homeowner's policy (policy number 18-70-0937-4)[2] provided over $1 million in dwelling and contents coverage, because he sold her the original policy in 1985, and had renewed it every year, since. Nevertheless, Cemo did not divulge to plaintiff that she could purchase excess flood insurance, and thus gain adequate flood protection, from other insurance carriers. Instead, Cemo simply told plaintiff that additional flood insurance was not available, and plaintiff relied on that misrepresentation.

Plaintiff was justified in relying on the misrepresentation by Cemo, because Cemo is a trained and licensed Louisiana agent, and owes plaintiff a duty to exercise reasonable care, skill, and diligence. *Durham v. McFarland, Gay and Clay, Inc.*, 527 So.2d 403, 405 (La.App. 4th Cir.1988). Cemo also owes a fiduciary duty to advise plaintiff of recommended coverages. *Id.*

---

[1] A photocopy of this check is attached hereto as Exhibit 1.
[2] A photocopy of the declarations page of plaintiff's homeowner's policy is attached hereto as Exhibit 2.

Plaintiff was also justified in relying on statements made by Cemo, because State Farm proudly advertises that it provides "one-stop shopping" for insurance needs, and that its agents conduct "annual check-ups" to evaluate whether their insured's coverage is adequate.  In short, State Farm holds itself and its agents out as experts in the insurance industry.  It warns the public in its advertising websites that appropriate flood insurance should be purchased because a home is three times more likely to be destroyed by flood than by fire – indicating that a home should be insured for its full value.

Cemo's statement that the NFIP coverage limits were the maximum flood insurance available seemed plausible in light of State Farm's "one-stop shopping" motto, which implies that all insurance needs can be met through State Farm.  Likewise, State Farm's annual check-up program to determine the adequacy of coverage indicates that a State Farm agent would recommend that a client obtain sufficient coverage to insure against all potential losses.  According to State Farm and Cemo, the NFIP coverage limits were the best that plaintiff could do – not just the best that State Farm could do for plaintiff.

Clearly, when plaintiff specifically asked Cemo about the availability of flood insurance in excess of the NFIP coverage limits, she was entitled to an accurate answer, even if that coverage was not available through State Farm.  The accurate answer from an agent exercising reasonable care, skill, and diligence would have been that excess insurance does, in fact, exist, and is available through other insurance carriers.  Even if State Farm chooses not to offer such coverage, neither State Farm nor Cemo is entitled to respond falsely to an inquiry by its insured regarding whether such coverage is available.[3]

---

[3] Apparently, State Farm is reluctant to inform its insureds of the availability of excess flood insurance, because it fears that its policyholders will then purchase other types of coverage from those providers.  This self-serving

When Hurricane Katrina struck New Orleans on August 29, 2005, it caused a number of canal levees to be breached, resulting in widespread flooding of homes and businesses, including plaintiff's home.  The damage to plaintiff's home and contents far exceeded the NFIP coverage limits.  Indeed, according to State Farm's own estimate, the replacement cost of the damage to her dwelling was $426,852.84.[4]  Had State Farm and Cemo provided accurate information and advice to plaintiff, she would have had the opportunity to obtain excess flood insurance and could have been fully protected against the losses she sustained as a result of Hurricane Katrina.

Plaintiff filed suit against State Farm and Cemo, alleging, *inter alia*, that defendants are liable to plaintiff for her uninsured flood losses, because they breached their fiduciary duties owed to plaintiff by misrepresenting, when plaintiff specifically asked, that flood insurance in excess of the NFIP coverage limits was not available, and by negligently failing to advise plaintiff on insurance needs and to procure adequate coverage.  Defendants hold themselves out as experts in the insurance industry, and as providers of all available insurance needed by plaintiff ("one-stop shopping").  As the law and evidence will show, defendants undertook a duty to advise plaintiff on insurance needs and to procure insurance, defendants breached that duty, and plaintiff suffered significant damages as a result.  At the very least, there are genuine issues of material fact that remain in dispute.  Accordingly, defendants' motion for partial summary judgment to dismiss plaintiff's excess flood allegations should be denied.

## II.  Legal Standard for Insurance Agents

Under Louisiana law, an insurance agent owes a fiduciary duty to the insured, and is liable for intentional or negligent breach of that duty.  *Roger v. Dufrene*, 613 So.2d 947, 949

---

motive does not justify intentionally misrepresenting that excess flood insurance is not available on the private market.
[4] A photocopy of State Farm's Statement of Loss and Inspection report is attached hereto as Exhibit 3.

(La.1993). *See also Taylor v. Sider*, 765 So.2d 416, 418-19 (La.App. 4th Cir.2000); *Offshore Prod. Contractors, Inc. v. Republic Underwriters Ins. Co.*, 910 F.2d 224, 229 (5th Cir.1990). An agent's fiduciary duty includes advising his client with regard to recommended coverage. *Barash v. Encompass Indemnity Co.*, 2006 WL 3791310, *4 (E.D.La.2006) (*citing Durham v. McFarland, Gay and Clay, Inc.*, 527 So.2d 403, 405 (La.App. 4th Cir.1988)). "When an agent has reason to know the risks against which an insured wants protection and has experience with the types of coverage available in a particular market, '[courts] must construe an undertaking to procure insurance as an agreement by the agent to provide coverage for the client's specific concerns.'" *Botnick v. Vigilant Insurance Co.*, 2006 WL 2947912 (E.D.La.10/13/2006) (*quoting Offshore Prod. Contractors*, 910 F.2d at 229 (internal citations omitted)). Furthermore, **"an agent may breach his duty to advise a plaintiff of needed flood insurance even if a plaintiff does not specifically request flood insurance."** *Id.*, (emphasis added). *See also Roby v. State Farm Fire and Casualty Co.*, 464 F.Supp.2d 572, 579 (E.D.La.2006).

In *Durham*, the insured sued his insurance agent for failing to procure flood insurance coverage on the insured's residence. The trial court concluded that Clay, the insurance agent, (1) failed to properly advise Durham on the need to secure flood insurance; (2) failed to secure said coverage; (3) failed to exercise due diligence in not specifically discussing flood protection on Durham's residence; (4) failed to notify Durham of the absence of flood protection; and (5) failed to implement a system whereby he would be alerted that Durham had not received pertinent correspondence regarding his insurance coverage. *Durham*, 527 So.2d at 404. Defendant argued that the Louisiana Supreme Court set out an exclusive list of duties owed by

an agent or broker to the insured in *Karam v. St. Paul Fire & Marine Ins. Co.*, 281 So.2d 728

(La.1973).[5]  The Louisiana Fourth Circuit Court of Appeal rejected this argument.

> According to the *Durham* Court:
>
> Clay was acting as Durham's broker[6] and thus is responsible for any fault or neglect while performing in that capacity. The jurisprudence has recognized that a broker's fiduciary duty includes advising his client with regards to recommended coverage, to investigate and ascertain the financial condition of prospective companies, and to notify the insured of cancellation or termination of coverage. **We conclude that the *Karam* decision does not relegate the insurance broker to a mere "order taker."** That case sets out the broker's duties when there is an admitted request for insurance, but is not an exclusive recitation of a broker's duties to his client.

527 So.2d at 405 (internal citations omitted)(emphasis added).  The Court went on to affirm a

finding of fault on the part of the agent, "even absent a specific finding that Durham requested

flood insurance." *Id.*, at 407.

Similarly, in *Zinsel Co., Inc. v. J. Everett Eaves, Inc.*, 749 So.2d 798 (La.App. 5th

Cir.1999), the insured sustained a $300,000 underinsured flood loss due to the fact that its

coverage had not been increased when Congress increased the available limits of federal flood

insurance. The insured sued its insurance agency, claiming that the agency breached its duty to

keep the insured informed of changes in available flood insurance. The Court found that the

agency owed a fiduciary duty to keep its client abreast of pertinent changes in available flood

insurance. *Id.*, at 800. The Court affirmed the lower court's denial of liability, however, based

---

[5] In *Karam*, the Louisiana Supreme Court held that:
> An agent who undertakes to procure insurance for another owes an obligation to his client to use reasonable diligence in attempting to place the insurance requested and to notify the client promptly if he has failed to obtain the requested insurance. The client may recover from the agent the loss he sustains as a result of the agent's failure to procure the desired coverage if the actions of the agent warranted the assumption of the client that he was properly insured in the amount of the desired coverage.

281 So.2d at 730-31.

[6] The Louisiana Supreme Court has also rejected the argument that the duty of an agent/broker depends on his status an either an agent or broker. *See, e.g., Tiner v. Aetna Life Insurance Co.*, 291 So.2d 774 (La.1974).

on evidence that the agency's duty was satisfied by the fact that the insurer mailed a letter to the insured advising of the change in available flood insurance.

### III. Legal Standard For Summary Judgment

A motion for summary judgment is not to be used as a substitute for trial on the merits. *Rodgers v. Food Lion*, 756 So.2d 624, 626 (La.App. 2d Cir.2000). Rather, summary judgment is properly granted only when the pleadings and summary judgment evidence establish that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir.1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The moving party has the burden of showing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548; *see also Lavespere,* 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts *520 showing that a genuine issue exists. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See id.* at 325, 106 S.Ct. 2548; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994).

7

As the following will establish, there are genuine issues of material fact that remain in dispute, and that preclude summary judgment in this matter.

**IV. Argument**

According to her deposition testimony, plaintiff Marlene Katz contacted her agent, Anthony Cemo, in September of 2004 and specifically and affirmatively asked whether she could purchase flood insurance in excess of the NFIP limits, so that her flood coverage would be equal to her homeowner's coverage.[7]  Cemo told plaintiff that no such excess flood insurance was available, and that the NFIP coverage limits were the maximum flood insurance that could be purchased.[8]  According to the expert opinion of Mr. Haig G. Neville, CLU, CPCU, this information was incorrect, because excess flood insurance was available in September of 2004, and Cemo either knew, or in the exercise of reasonable care and diligence, should have known this.[9]

Cemo undertook to increase plaintiff's flood coverage to the NFIP limits, but failed to advise plaintiff – even after she specifically and affirmatively asked – that she could purchase excess flood insurance from other insurers.[10]  Cemo also knew that plaintiff's dwelling and contents coverage under her homeowner's policy was over $1 million, because he was the agent on that policy.[11]  Even absent a specific request by plaintiff, Cemo thus breached his duty to advise plaintiff of the availability of excess flood insurance. *Durham*, 527 So.2d at 405.  In this case, however, plaintiff did specifically and affirmatively inquire about excess flood insurance. Cemo either intentionally or negligently misrepresented to plaintiff that such coverage was not

---

[7] See excerpts of plaintiff's deposition testimony, attached hereto as Exhibit 4.
[8] *Id.*
[9] See Report of Observations and Opinions by Haig G. Neville, CLU, CPCU attached hereto as Exhibit 5.
[10] See excerpts of plaintiff's deposition testimony, attached hereto as Exhibit 4.
[11] See excerpts of Cemo's deposition testimony, attached hereto as Exhibit 6.

available,[12] in clear breach of his fiduciary duties to plaintiff. *Id.*; *see also Zinsel Co., Inc. v. J. Everett Eaves, Inc.*, 749 So.2d 798; *Taylor v. Sider*, 765 So.2d 416 (La.App. 4th Cir.2000).

Plaintiff relied on Cemo's misrepresentation, based on what she believed to be his superior knowledge, training, experience, competence and reputation as a licensed insurance agent, and based on the fact that State Farm and Cemo held themselves out as experts in the insurance industry. Plaintiff suffered significant damages as a result of defendants' breach of their fiduciary duties and is entitled under Louisiana law to recover those damages.

The cases cited by defendants in their memorandum in support of motion for partial summary judgment are distinguishable based on the fact that none of the cases involves a request by an insured for additional coverage, and an erroneous response by the agent and/or insurance company that no such coverage exists. Plaintiff does not claim that State Farm should have undertaken to sell excess flood insurance, or that Cemo was obligated to advise plaintiff of recommended coverages for risks that were not foreseeable and to which she was not exposed. What plaintiff has claimed, and what Louisiana law requires, is that a licensed insurance agent respond honestly and accurately to direct requests about insurance coverage, and advise clients on recommended coverages for their foreseeable risks. As an insurance agent licensed by the State of Louisiana, Cemo is required to know what coverages are available for the foreseeable risks of the clients he undertakes to sell insurance to – **even if those coverages are not available through State Farm**.

---

[12] See excerpts of Cemo's deposition testimony, attached hereto as Exhibit 6. Although Cemo denied that Plaintiff called him to inquire about purchasing excess flood insurance, he admitted that he would not have been able to accurately advise her about the availability of excess flood insurance in September, 2004, because neither he nor anyone in his office was aware of excess of flood insurance at that time. *Id.*

## V. Federal Claims

Defendants also argue that there is no federal statutory or jurisprudential authority to support plaintiff's claim that defendants breached their fiduciary duties to plaintiff by affirmatively misrepresenting that excess flood insurance was not available and could not be purchased.  Plaintiff agrees.  Her claims for breach of fiduciary duty are brought pursuant to Louisiana law, exclusively.

## VI. Plaintiff's Claims Against Defendants Are Not Perempted

Plaintiff's claims against Cemo and State Farm are not perempted or prescribed under La. Rev. Stat. § 9:5606.  The negligent act giving rise to plaintiff's claims occurred in September of 2004, when Cemo negligently or intentionally misrepresented to plaintiff that flood insurance in excess of the NFIP limits did not exist.[13]  Plaintiff discovered Cemo's negligent act or omission sometime after August 29, 2005.[14]  The instant suit was filed August 8, 2006.  Thus, this action was brought within one year of the date that plaintiff discovered defendants' negligent act or omission, and within three years from the date of defendants' negligent act or omission.  Accordingly, pursuant to La. Rev. Stat. § 9:5606, this action is not perempted or prescribed.

## VII. Conclusion

It is well-established under Louisiana law that insurance agents are more than "mere order takers."  Like other professionals who must be licensed by the State in order to practice in their given field, insurance agents owe a duty to exercise reasonable care, skill and diligence, and they may be liable for damages resulting from a breach of that duty.  Louisiana law also establishes that an insurance agent's duties include advising clients of recommended coverages for foreseeable risks.  Clearly, the law contemplates that an agent may be required to advise a

---

[13] See excerpts of plaintiff's deposition testimony, attached hereto as Exhibit 4.
[14] See excerpts of plaintiff's deposition testimony, attached hereto as Exhibit 4.

client to purchase insurance coverage that the agent does not or cannot sell. In that case, the agent could satisfactorily discharge his duty by advising the client that the identified coverage should be purchased, and informing the client that the agent is unable to sell a policy providing such coverage. Obviously, this would require that the client purchase such a policy from another insurer. State Farm and its agents, including Cemo, chose not to give such advice, because it is in their financial interest not to do so. Unfortunately, plaintiff relied on the negligent advice of her State Farm agent, Anthony Cemo, and she incurred significant damages as a consequence. Accordingly, for all of the foregoing reasons, defendants' motion should be denied.

Respectfully submitted,


_/s/ Jeffery B. Struckhoff_____
**TERRENCE J. LESTELLE – 8540**
**ANDREA S. LESTELLE – 8539**
**JEFFERY B. STRUCKHOFF - 30173**
**LESTELLE & LESTELLE**
3421 N. Causeway Blvd, Ste. 602
Metairie, LA 70002
Telephone: 504-828-1224
Facsimile: 504-828-1229
**Attorneys for Plaintiff**
**Marlene Katz**

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 28th day of August, 2007, electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are not CM/ECF participants.

_/s/ Jeffery B. Struckhoff_____
**Jeffery B. Struckhoff**

11

FROM :REMAX of Stuart          FAX NO. :                  Jun. 28 2003 05:35PM P2/2

22-Jun-07                                                 6725-22JUN07

## THIS ITEM IS A SINGLE ITEM PHOTOCOPY REQUEST
### Sequence number 106230753110  Posting date 21-SEP-04

MARLENE L. KATZ                                    3975
5683 MARCIA  PH. 504 482-8407
NEW ORLEANS, LA 70124                  DATE  9/17/04

State of an                                    $62.00

PAY TO THE ORDER OF
Sixty Two                                      DOLLARS

**BANKTONE.**

MEMO

⑆065400137⑆  020390444⑈3975  ⑈00000005200⑈

⑆065400137⑆                    ⑈00000006200⑈

AcctNum: 00000000203904427 Amount: 000000000062000
Xerns: 0000003975 PostDate: 20040921 Sequence: 106230075110
BankRun: 0352 AppCode: 0001 F.cld4: 0000 ImageStat: 05
UOK: 655204092211b6230753110 BOFD: CapERC: 00
TranCode: 000076 RouteTran: 06540013 DocType: 8
EntryRun: ItemType:

Folder contains 0 total pages.



A Stock Company With Home Offices in Bloomington, Illinois

12222 State Farm Boulevard
Tulsa, OK 74146-5402

**Named Insured**

L-22-1374-F692 F H

KATZ, MARLENE
C/O BRUCE LURIE
2110 PELHAM DR
HOUSTON TX  77019-3529

| DECLARATIONS PAGE | AMENDED NOV 2 2005 |
|---|---|

| Policy Number | 18-70-0937-4 |
|---|---|

| Policy Period | Effective Date | Expiration Date |
|---|---|---|
| 12 Months | APR 29 2005 | APR 29 2006 |

The policy period begins and ends at 12:01 am
standard time at the residence premises.

llmllmlllmmllllhmllmlhlmllllllmmllllmmllml

## HOMEOWNERS POLICY

**Automatic Renewal** - If the **policy period** is shown as **12 months**, this policy will be renewed automatically subject to the premiums, rules and forms in effect for each succeeding policy period. If this policy is terminated, we will give you and the Mortgagee/Lienholder written notice in compliance with the policy provisions or as required by law.

Location of Residence Premises
5600 MARCIA AVE
NEW ORLEANS LA  70124-1006

**Your policy is amended NOV 2 2005**
1ST MORTGAGEE DELETED

Zone: 61  Protection Class: 2   Year Built: 1967  Construction: Veneer
Number of Units: 01

| Coverages & Property | Limits of Liability |
|---|---|
| **SECTION I** | |
| A  Dwelling | $ 562,200 |
| Dwelling Extension    up to | $ 56,220 |
| B  Personal Property | $ 421,650 |
| C  Loss of Use | Actual Loss Sustained |
| **SECTION II** | |
| L  Personal Liability | $ 300,000 |
| (Each Occurrence) | |
| Damage to Property | |
| of Others | $ 500 |
| M  Medical Payments to | |
| Others (Each Person) | $ 5,000 |

Inflation Coverage Index: 161.5
**Deductibles - Section I**

| All Losses | $ 1,000 |
|---|---|

In case of loss under this policy, the deductibles will be applied per occurrence and will be deducted from the amount of the loss. Other deductibles may apply - refer to policy.

Fire Protection Area
**NEW ORLEANS**

**Loss Settlement Provision (See Policy)**
A1 Replacement Cost - Similar Construction
B1 Limited Replacement Cost - Coverage B

Forms, Options, & Endorsements
Homeowners Policy                    FP-7955
Amendatory Endorsement               FE-7218.6
Fungus (Including Mold) Excl          FE-5398
Policy Endorsement                   FE-5320
Cov 'A' Loss Settlement              FE-5273
Jewelry and Furs $2,500 Each         Option JF
  Article/$5,000 Aggregate
Ordinance/Law  10%/$  56,220         Option OL
Increase Dwlg Up to $ 112,440        Option ID

Endorsement Premium                          NONE

Discounts Applied:
  Home Alert
  Home/Auto
  Claim Record

───── Other limits and exclusions may apply - refer to your policy ─────

Your policy consists of this page, any endorsements
and the policy form. Please keep these together.

FP-7005.5C

2061   2 51  I
N                    Prepared    NOV 03 2005


EXHIBIT
2

555-7920          555-7920 1 Rev. 10-2002 (o11039fc)

FE-5273
(6/00)

## COVERAGE A LOSS SETTLEMENT ENDORSEMENT

### SECTION I - LOSS SETTLEMENT

COVERAGE A - DWELLING (Applicable to HOMEOWNERS POLICY)

**A1 - Replacement Cost Loss Settlement - Similar Construction** is replaced with the following:

a. We will pay up to the applicable limit of liability shown in the Declarations, the reasonable and necessary cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I - COVERAGES, COVERAGE A - DWELLING, except for wood fences.

We will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure, except as provided under **Option OL - Building Ordinance or Law Coverage.**

b. Wood Fences: We will pay the actual cash value at the time of loss for loss or damage to wood fences, not to exceed the limit of liability shown in the Declarations for COVERAGE A - DWELLING EXTENSION.

**A2 - Replacement Cost Loss Settlement - Common Construction** is replaced with the following:

a. We will pay up to the applicable limit of liability shown in the Declarations, the reasonable and necessary cost to repair or replace with common construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I - COVERAGES, COVERAGE A - DWELLING, except for wood fences, subject to the following:

(1) we will pay only for repair or replacement of the damaged part of the property with common construction techniques and materials commonly used by the building trades in standard new construction. We will not pay the cost to repair or replace obsolete, antique or custom construction with like kind and quality;

(2) we will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure, except as provided under **Option OL - Building Ordinance or Law Coverage.**

b. Wood Fences: We will pay the actual cash value at the time of loss for loss or damage to wood fences, not to exceed the limit of liability shown in the Declarations for COVERAGE A - DWELLING EXTENSION.

### SECTION I - LOSS SETTLEMENT

COVERAGE A - BUILDING PROPERTY (Applicable to CONDOMINIUM UNITOWNERS POLICY)

This section is replaced with the following:

1. We will pay up to the applicable limit of liability shown in the Declarations, the reasonable and necessary cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the building property covered under SECTION I - COVERAGES, COVERAGE A - BUILDING PROPERTY, except for wood fences.

We will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure.

2. Wood Fences: We will pay the actual cash value at the time of loss for loss or damage to wood fences, not to exceed the limit of liability shown in the Declarations for COVERAGE A - BUILDING PROPERTY.

### OPTIONAL POLICY PROVISIONS

Option ID - Increased Dwelling Limit (Applicable to HOMEOWNERS POLICY)

This section is replaced with the following:

**Option ID - Increased Dwelling Limit.** We will settle losses to damaged building structures covered under COVERAGE A - DWELLING according to the SECTION I - LOSS SETTLEMENT provision shown in the Declarations.

If the reasonable and necessary cost to repair or replace damaged building structures exceeds the applicable limit of liability shown in the Declarations, we will pay the additional amounts not to exceed:

1. the Option ID limit of liability shown in the Declarations to repair or replace the Dwelling; or

2. 10% of the Option ID limit of liability to repair or replace building structures covered under COVERAGE A - DWELLING, Dwelling Extension.

**Report Increased Values.** You must notify us within 90 days of the start of any new building structure costing $5,000 or more; or any additions to or remodeling of building structures which increase their values by $5,000 or more. You must pay any additional premium due for the increased value. We will not pay more than the applicable limit of liability shown in the Declarations, if you fail to notify us of the increased value within 90 days.

CONTINUED

Option OL - Building Ordinance or Law. (Applicable to HOMEOWNERS POLICY)

This section is replaced with the following:

1. **Coverage Provided.**

The total limit of insurance provided by this Building Ordinance or Law provision will not exceed an amount equal to the Option OL percentage shown in the **Declarations** of the Coverage A limit shown in the **Declarations** at the time of the loss, as adjusted by the inflation coverage provisions of the policy. This is an additional amount of insurance and applies only to the dwelling.

2. **Damaged Portions of Dwelling.**

When the dwelling covered under **COVERAGE A - DWELLING** is damaged by a Loss Insured we will pay for the increased cost to repair or rebuild the physically damaged portion of the dwelling caused by the enforcement of a building, zoning or land use ordinance or law if the enforcement is directly caused by the same Loss Insured and the requirement is in effect at the time the Loss Insured occurs.

3. **Undamaged Portions of Damaged Dwelling.**

When the dwelling covered under **COVERAGE A - DWELLING** is damaged by a Loss Insured we will also pay for:

a. the cost to demolish and clear the site of the undamaged portions of the dwelling caused by the enforcement of a building, zoning or land use ordinance or law if the enforcement is directly caused by the same Loss Insured and the requirement is in effect at the time the Loss Insured occurs; and

b. loss to the undamaged portion of the dwelling caused by enforcement of any ordinance or law if:

(1) the enforcement is directly caused by the same Loss Insured;

(2) the enforcement requires the demolition of portions of the same dwelling not damaged by the same Loss Insured;

(3) the ordinance or law regulates the construction or repair of the dwelling, or establishes zoning or land use requirements at the described premises; and

(4) the ordinance or law is in force at the time of the occurrence of the same Loss Insured; or

c. the legally required changes to the undamaged portion of the dwelling caused by the enforcement of a building, zoning or land use ordinance or law if the enforcement is directly caused by the same Loss Insured and the requirement is in effect at the time the Loss Insured occurs.

4. **Building Ordinance or Law Coverage Limitations.**

We will not pay more under this coverage than:

a. the reasonable and necessary increased cost to repair or rebuild the dwelling at the same premises, or if relocation is required by ordinance or law, at another premises in the same general vicinity; and

b. the reasonable and necessary cost to demolish and clear the site of the undamaged portions of the dwelling caused by enforcement of building, zoning or land use ordinance or law.

We will never pay for more than a dwelling of the same height, floor area and style on the same or similar premises as the dwelling, subject to the limit provided in paragraph 1. **Coverage Provided** of this option.

All other policy provisions apply.

FE-5273
(8/00)

(CONTINUED)

FE-7218.6
(2/01)

# AMENDATORY ENDORSEMENT
## (Louisiana)

### SECTION I - ADDITIONAL COVERAGES

Item 6.c.(1), Credit Card, Bank Fund Transfer Card, Forgery and Counterfeit Money is replaced with the following:

We may make any investigation and settle any claim or suit that we decide is appropriate. Our obligation to defend any claim or suit ends when the amount we pay for loss to effect settlement or satisfy a judgment equals our limit of liability.

### SECTION I - CONDITIONS

**Loss Payment**: Reference to "60 days" is changed to "30 days".

**Intentional Acts** is replaced with the following:

If you cause or procure a loss to property covered under this policy for the purpose of obtaining insurance benefits then this policy is void as to you.

### SECTION II - CONDITIONS

**Suit Against Us**: the following is deleted:

No one shall have the right to join us as a party to an action against an **insured**. Further, no action with respect to Coverage L shall be brought against us until the obligation of the **insured** has been determined by final judgment or agreement signed by us.

### SECTION I AND SECTION II - CONDITIONS

**Concealment or Fraud** is replaced with the following:

**Concealment or Fraud**.

a. This policy is void as to you and any other **insured**, if you or any other **insured** under this policy has concealed or misrepresented any material fact or circumstance relating to this insurance in the application for or negotiation of this policy and made with the intent to deceive.

b. We do not provide any coverages under this policy for you or any other **insured** if you or any other **insured** under this policy, whether before or after a loss, has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance.

**Cancellation**, item b.(2): Reference to "10 days" is changed to "20 days".

**Cancellation**, item b.(3) is replaced with the following:

(3) When this policy has been in effect for 60 days or more, or at any time it is a renewal with us, we may cancel:

(a) if you have committed fraud;

(b) if the insured risk has undergone a material change;

(c) if you have filed two or more claims within three years; or

(d) if the continuation of this policy endangers our solvency.

We may cancel this policy by notifying you at least 30 days before the date cancellation takes effect.

**Cancellation**: item b.(4) is deleted.

**Nonrenewal**: The following is added:

Once this policy has been in effect more than three years, we may elect not to renew this policy based only on:

a. nonpayment of premium;

b. fraud of the **insured**;

c. a material change in the risk being insured;

d. two or more claims within a period of three years; or

e. our solvency being endangered if we continue this policy.

**Natural Causes** is added:

**Natural Causes**. We will not cancel, fail to renew or increase the premium of this policy based solely upon a loss caused by natural causes without human intervention. This does not apply when area-wide premium changes are made at the beginning of a new policy period.

**Right to Inspect** is added:

**Right to Inspect**. We have the right but are not obligated to make inspections and surveys at any time, give you reports on conditions we find and recommend changes. Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged.

We do not:

a. make safety inspections;

b. undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public;

c. warrant that conditions are safe or healthful; or

d. warrant that conditions comply with laws, regulations, codes or standards.

This condition applies not only to us but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**Joint and Individual Interests** is added:

**Joint and Individual Interests**. When there are two or more named insureds, each acts for all to cancel or change the policy.

All other policy provisions apply.

FE-7218.6
(2/01)

FE-5898

## FUNGUS (INCLUDING MOLD) EXCLUSION ENDORSEMENT

### DEFINITIONS

The following definition is added:

"fungus" means any type or form of fungus, including mold, mildew, mycotoxins, spores, scents or byproducts produced or released by fungi.

### SECTION I - LOSSES INSURED

Item 12.d. is replaced with the following:

d. caused by or resulting from continuous or repeated seepage or leakage of water or steam which occurs over a period of time and results in deterioration, corrosion, rust, or wet or dry rot.

Item 13.b. is replaced with the following:

b. caused by or resulting from continuous or repeated seepage or leakage of water or steam which occurs over a period of time and results in deterioration, corrosion, rust, or wet or dry rot.

### SECTION I - LOSSES NOT INSURED

Item 1.i. is replaced with the following:

i. wet or dry rot;

In item 2., the following is added as item g.:

g. **Fungus.** We also do not cover:

(1) any loss of use or delay in rebuilding, repairing or replacing covered property, including any associated cost or expense, due to interference at the residence premises or location of the rebuilding, repair or replacement, by fungus;

(2) any remediation of fungus, including the cost to:

(a) remove the fungus from covered property or to repair, restore or replace that property; or

(b) tear out and replace any part of the building or other property as needed to gain access to the fungus; or

(3) the cost of any testing or monitoring of air or property to confirm the type, absence, presence or level of fungus, whether performed prior to, during or after removal, repair, restoration or replacement of covered property.

All other policy provisions apply.

FE-5898

FE-5820
(4/99)

## POLICY ENDORSEMENT

### SECTION I AND SECTION II - CONDITIONS

The following condition is added:

**Premium.** The premium for this policy may vary based upon the purchase of other insurance from one of the State Farm affiliated companies.

All other policy provisions apply.

FE-5820
(4/99)

| CLAIM NO 18-R239-668 | POLICY NO 98-D774434-5 | | | LOSS DATE 8/29/2005 | PAYMENT NO 1 22 326789 J |
|---|---|---|---|---|---|
| Coverage Description | | Amount | COV/Line Pay Cd | | DATE 12/06/2005 |
| Flood - Contents | | $90,000.00 | 18/002   3 | | AMOUNT $90,000.00 |
| | | | | | TIN |

REMARKS    PERSONAL PROPERTY

RETAIN STUB FOR RECORDS

AUTHORIZED BY  SCHUMACHER, CURTIS X5731
PHONE  (866) 787-8676

# STATEMENT OF LOSS

Claim Number _____ 18 R239-668 _____

Insured _____ KATZ, MARLENE _____

## COVERAGE A - BUILDING          Limit of Liability $ _____ $250,000.00 _____

| Description | | | |
|---|---|---|---|
| TOTAL VALUATION | $426,852.84 | Amount $ | 250,000.00 |
| DEDUCTIBLE ABSORBED | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | Total A     $ | 250,000.00 |

## COVERAGE B - CONTENTS          Limit of Liability $ _____

| Description | | |
|---|---|---|
| | Amount $ | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | Total B     $ | 0.00 |

## COVERAGE C - LOSS OF USE          Limit of Liability $ _____

| Description | | |
|---|---|---|
| | Amount $ | |
| | | |
| | | |
| | | |
| | Total C     $ | 0.00 |

Comments/Supplements:

| | |
|---|---|
| Total A + B + C | 250,000.00 |
| Plus Special Coverage | |
| **Total Loss** | 250,000.00 |
| Less Depreciation - Cov. A | |
| Less Depreciation - Cov. B | |
| **Subtotal** | 250,000.00 |
| Less Deductible | |
| Less Prior Payments | 0.00 |
| **Total Payable** | $250000.00 |

**EXHIBIT 3**

CURTIS SCHUMACHER _____          10/10/2005 _____
Name          Date

104658.4  Rev. 02-26-2003

## State Farm Insurance Companies

P.O. Box 231198
New Orleans, Louisiana 70183
504-737-9016   (fax)

## Administrative Information:

| | | | |
|---|---|---|---|
| **Policy Number:** | 98-D7-7434-5 | **Interviewer:** | Schumacher, Curtis |
| | | **Agent Code:** | |
| **Name:** | KATZ, MARLENE | **Cellular Phone:** | 504-913-5888 |
| **Home Address:** | 5600 MARCIA AVE | | |
| | NEW ORLEANS, LA 70124--1006 USA | | |
| **Date Entered:** | 10/10/2005 | **Date Inspected:** | 10/6/2005 |
| **Date Assigned:** | 9/9/2005 | | |

## Profile Information:

|  |  |
|---|---|
| **Configuration:** | 100% 2 Story |
| **Style:** | Ranch |
| **Built In:** | 1963 |
| **Purpose:** | Single Family |
| **Sq. Feet:** | 4,300 |
| **Roof Type:** | 100% Hip |
| **Overall Quality:** | Premium |

## Foundation:

|  |  |
|---|---|
| **Shape:** | Simple Rectangle |
| **Construction:** | 100% Concrete Slab |
| **Lot Slope:** | None/Moderate |
| **Foundation Material:** | 100% Concrete |

## Room Information:

**Avg Interior Wall Height**

| | | |
|---|---|---|
| **Living Spaces:** | 1 Dining Room | (see Room Finishes & Features section) |
| | 1 Family Room | (see Room Finishes & Features section) |
| | 1 Foyer/Entryway | (see Room Finishes & Features section) |
| | 1 Great Room | (see Room Finishes & Features section) |
| | 3 Hallway | (see Room Finishes & Features section) |
| | 1 Living Room | (see Room Finishes & Features section) |
| | 1 Nook | (see Room Finishes & Features section) |
| | 1 Play Area/Room | (see Room Finishes & Features section) |
| **Bedrooms:** | 3 Bedroom | (see Room Finishes & Features section) |
| | 1 Library | (see Room Finishes & Features section) |
| | 1 Master Bedroom | (see Room Finishes & Features section) |
| | 1 Master Bedroom | (see Room Finishes & Features section) |
| **Kitchens:** | 1 Kitchen | (see Room Finishes & Features section) |
| **Bathrooms:** | 2 1/2 Bath | (see Room Finishes & Features section) |
| | 3 Full Bath | (see Room Finishes & Features section) |
| | 1 Master Bath | (see Room Finishes & Features section) |
| **Utility/Closets:** | 1 Laundry Room | (see Room Finishes & Features section) |
| | 1 Utility Room | (see Room Finishes & Features section) |
| | 2 Walk-In Closet | (see Room Finishes & Features section) |
| **Garage:** | 1 Two Car Garage | 8'0" |

**State Farm Insurance Companies**

P.O. Box 231198
New Orleans, Louisiana 70183
504-737-9016  (fax)

Room Finishes and Features:

|  |  |
|---|---|
| **Wall Materials:** | 100% 1/2" Drywall over Wood or Steel Framing, Ready for Paint |
| **Wall Finishes:** | 30% Paint |
|  | 70% Wallpaper |
| **Ceiling Finishes:** | 100% Sponge Paint |
| **Floor Covering:** | 50% Carpet |
|  | 20% Marble/Granite |
|  | 30% Ceramic Tile/Slate |
| **Room Features:** | 8 Ceiling Fan |
|  | 100 Cornice or Crown Molding |
|  | 4 Track Lighting (enter the number of spotlights) |
|  | 18 Recessed Light |
|  | 1 Chandelier |
|  | 3 Chandelier with Real Crystal |
|  | 14 Built-in Bookcase/Entertainment Center |
|  | 2 Built-in Speaker System (per speaker) |
|  | 1 Wet Bar |
|  | 1 Laundry Tub |
| **Avg Interior Wall Height:** | 8'0" |

Kitchens and Bathroom Features:

|  |  |
|---|---|
| **Kitchen Appliances:** | 1 Garbage Disposal |
|  | 1 Dishwasher |
|  | 1 Range Hood |
|  | 1 Cook Top |
|  | 1 Built-in Oven |
| **Bath Fixtures & Features:** | 4 Ceramic Tile Tub or Shower Surround |
|  | 1 Natural Marble Tub or Shower Surround |
|  | 12 Brass Faucet (enter the number of plumbing fixtures with this feature) |
| **Counter/Vanity Tops:** | 25% Cultured Marble Countertop |
|  | 75% Imported Granite or Marble Countertop |
| **Cabinet/Vanity Features:** | 1 Peninsula Bar (enter the number in all selected rooms) |

Garage and Attached Structures Finishes and Features:

|  |  |
|---|---|
| **Wall Material:** | 100% 1/2" Drywall over Wood or Steel Framing, Ready for Paint |
| **Interior Wall Finishes:** | 100% Paint |
| **Ceiling Finishes:** | 100% Paint |
| **Floor Covering:** | 100% Bare Concrete |
| **Ext. Wall Finishes:** | 75% Aluminum or Metal Siding |
|  | 25% Brick Veneer |
| **Roof Covering:** | 100% Composition Shingles |

**State Farm Insurance Companies**

P.O. Box 231198
New Orleans, Louisiana 70183
504-737-9016   (fax)

Exterior Finishes and Features:

| | |
|---|---|
| **Exterior Wall Finish:** | 100% Brick Veneer |
| **Roof Covering:** | 100% Slate |
| **Exterior Features:** | 3 Exterior Doors |
| | 3 Patio Door |
| | 1 Double Garage Doors |
| | 1 Bay or Bow Window |

Home Systems:

| | |
|---|---|
| **Heating, AC and** | 1 Forced Air Heating System |
| **Fireplace:** | 1 Central Air Conditioning |
| | 1 Masonry Fireplace |
| **Home Specialty Systems:** | 1 Fire and Burglar Alarm System |
| | 1 Intercom System |

Additional Features:

| | |
|---|---|
| **System Defined:** | 1 Built-in Theater Speakers |
| | 1 Built-in Safe |
| | 1 Dumbwaiter |
| **User Defined:** | |

Detached Structures:

| | |
|---|---|
| **Detached Structures:** | 1 Detached Two Car Garage |

## State Farm Insurance Companies

P.O. Box 231198
New Orleans, Louisiana 70183
504-737-9016  (fax)

## Administrative Information:

**Policy Number:** 98-D7-7434-5

**Interviewer:** Schumacher, Curtis
**Agent Code:**
**Cellular Phone:** 504-913-5888

**Name:** KATZ, MARLENE
**Home Address:** 5600 MARCIA AVE
NEW ORLEANS, LA 70124-1006 USA
**Date Entered:** 10/10/2005
**Date Assigned:** 9/9/2005

**Date Inspected:** 10/6/2005

## Profile Information:

**Configuration:** 100% 2 Story
**Style:** Ranch
**Built In:** 1963
**Purpose:** Single Family
**Sq. Feet:** 4,300
**Roof Type:** 100% Hip
**Overall Quality:** Premium

## Cost Breakdown:

| | |
|---|---|
| Rough Framing: | $44,902.16 |
| Exterior Finish: | $54,431.34 |
| Windows: | $33,472.40 |
| Roofing: | $29,384.79 |
| Electrical: | $15,837.61 |
| Plumbing: | $19,600.51 |
| Heating/AC: | $7,114.65 |
| Floor Covering: | $33,604.51 |
| Interior Finish: | $116,471.06 |
| Appliances: | $3,724.30 |
| Special Features: | $34,058.81 |
| Additional Features: | $12,784.85 |
| **Sub Total:** | $405,386.99 |
| Permits & Fees: | $0.00 |
| Overhead & Profit: | $0.00 |
| Sales Tax: | $21,465.85 |
| **Estimated Replacement Cost:** | $426,852.84 |

**Cost Per SF Finished Living Area:** $99.27 (Total Replacement Cost/SF of Finished Living Area only)
**Cost Per SF Total Structure:** $162.30 (Total Replacement Cost/SF of Finished and Unfinished Areas)

Dwelling Replacement Cost*: $426,852.84

Policyholder Signature: _____    Date: _____

* The Replacement Cost figure represents the estimated reconstruction cost for the above described residence and includes such things as labor & materials to meet current building codes and contractor profit and overhead. The estimate does not include cost for such items as excavation, land value, or detached structures. This information is to be used for insurance purposes only and is provided upon the condition that the user agrees that it represents only an estimate and that the provider is not responsible for good faith errors.

*Check Mailed to Mtg Co.*

| CLAIM NO 18-R239-668 | POLICY NO 98-D77434-5 | LOSS DATE 8/29/2005 | PAYMENT NO 1 22 724661 J |
|---|---|---|---|
| | | | DATE 10/13/2005 |
| | | | AMOUNT $250,000.00 |
| | | | TIN |

| Coverage Description | Amount COL/Line Pay Cd | |
|---|---|---|
| Flood - Building | $250,000.00  17/001 | 1 |

RETAIN STUB FOR RECORDS
AUTHORIZED BY  SCHUMACHER, CURTIS X5731
PHONE  (866) 787-8676

REMARKS    Policy limits dwelling

---

STATE FARM FIRE AND CASUALTY COMPANY
MONROE, LA
ZCAT HARAHAN  22-819 L213

BANK ONE  56-1544/441
JPMORGAN CHASE BANK
COLUMBUS, OH

1 22 724661 J
10/13/2005

INSURED  KATZ, MARLENE

CLAIM NO 18-R239-668

LOSS DATE 8/29/2005

***********************************************EXACTLY TWO HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS    $***250,000.00

Pay to the
order of: MARLENE L. KATZ & FNMA-MBS EUSTIS POOL 211767 STANDARD MORTGAGE CORP
ISAOA ATIMA
4141 VETERANS BLVD STE 100
METAIRIE LA 70002-5540

AUTHORIZED SIGNATURE

⑆22⑆724661⑆ ⑈044115443⑈  6771196391⑈

CLAIM NO  18-R239-668          POLICY NO  98-D77434-5          LOSS DATE  8/29/2005

PAYMENT NO  1 22 724661 J
DATE  10/13/2005
AMOUNT  $250,000.00
TIN

| Coverage Description | Amount | CGL/Line | Pay Cd |
|---|---|---|---|
| Flood - Building | $250,000.00 | 17/001 | 1 |

REMARKS    Policy limits dwelling

RETAIN STUB FOR RECORDS

AUTHORIZED BY  SCHUMACHER, CURTIS X5731
PHONE  (866) 787-8676

STATE FARM FIRE AND CASUALTY COMPANY
MONROE, LA
ZCAT MARAHAN  22-819 L213

BANC ONE  56-1544/441
JPMORGAN CHASE BANK,
COLUMBUS, OH

1 22 724661 J
10/13/2005

LOSS DATE  8/29/2005

$***250,000.00

INSURED  KATZ, MARLENE                    CLAIM NO  18-R239-668

*******************************EXACTLY TWO HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS

Pay to the  MARLENE L. KATZ & FNMA MBS EUSTIS POOL 211767 STANDARD MORTGAGE CORP
Order of:  ISAOA ATIMA
4141 VETERANS BLVD STE 100
METAIRIE LA 70002-5540

AUTHORIZED SIGNATURE

⑈22172466⑈  ⑈044115443⑈  627196391⑈

1      UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF LOUISIANA

3

4    MARLENE KATZ                    CIVIL ACTION
              Plaintiff,            NO. 06-4155
5
     VS.                            SECTION "R" (2)
6
     STATE FARM FIRE AND            JUDGE VANCE
7    CASUALTY COMPANY, AND
     ANTHONY J. CEMO,               MAG. JUDGE WILKINSON
8    INDIVIDUALLY AND AS
     AGENT OF STATE FARM
9    FIRE AND CASUALTY
     COMPANY                        COPY
10           Defendants.

11

12

13

14

15          Deposition of **MARLENE L. KATZ**, taken

16   in the above-entitled cause, pursuant to the

17   following stipulation, before Dawn H. Hymel,

18   Certified Court Reporter, at the offices of

19   Lestelle & Lestelle, 3421 N. Causeway

20   Boulevard, Suite 602, Metairie, Louisiana, on

21   Thursday, the 14th of June, 2007, commencing

22   at 2:05 p.m.

23

24

25



1    APPEARANCES:

2    Appearing on Behalf of Marlene L. Katz:

3        LESTELLE & LESTELLE
         BY:  JEFFERY B. STRUCKHOFF, ESQ.
4        3421 N. Causeway Boulevard
         Suite 602
5        Metairie, Louisiana  70002

6

7    Appearing on Behalf of State Farm Fire and
     Casualty Company and Anthony J. Cemo:
8
         STONE PIGMAN WALTHER WITTMANN
9        BY:  DOUGLAS J. COCHRAN, ESQ.
         2431 South Acadian Thruway
10       Suite 290
         Baton Rouge, Louisiana  70808-2365
11

12

13   REPORTED BY:

14       DAWN H. HYMEL
         Certified Court Reporter #81016
15

16

17

18

19

20

21

22

23

24

25

1   A.   P-a-i-l-e-t.

2   Q.   Okay.  And Barbara Pailet is what

3   relation to you, a friend?

4   A.   Friend.

5   Q.   Do you know where she lives?

6   A.   On Beau Lac Lane.

7   Q.   How do you spell that?

8   A.   Metairie.

9   Q.   Metairie?

10  A.   Metairie.  Sorry.

11  Q.   Does she still live in Metairie?

12  A.   Yes, sir.

13  Q.   At Beau Lac Lane?

14  A.   Yes.

15  Q.   B-o-l-l-o-c-k?

16  A.   B-e-a-u, Beau, Lac, L-a-c.

17  Q.   Okay.

18  A.   I don't know how you spelled that one.

19  Q.   I flunked on that one.  Okay.  Here we

20  go.  Beau Lac Lane.  And do you remember

21  anything more specific about the conversation,

22  of how that occurred?

23  A.   No, it was very casual conversation.

24  Q.   Okay.  And when was that conversation?

25  A.   Don't even remember.

JOHNS, PENDLETON & ASSOCIATES, INC.
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993
619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

1  Q.   Before you went to Houston or after you
2  went to Houston?
3  A.   Don't remember.
4  Q.   And what, from the best you can recall,
5  what was -- what did Mr. Cemo tell you --
6  A.   He said -- I'm sorry.  Go ahead.
7  Q.   No.  No.
8  A.   I'm sorry.  I'm sorry.  I didn't
9  understand.
10  Q.   What did he tell you in regards to you
11  telling him something about only Lloyd's of
12  London could provide it, what were his
13  specific words that you can remember?
14  A.   I asked Mr. Cemo if I could buy
15  additional flood insurance over -- First off,
16  I wanted to increase my policy to the max,
17  which is the 250/100, since I wasn't even at
18  the max, and I asked him the amount that I
19  needed to write out the check, and he told me
20  that.  And I asked him if I could get
21  additional, and he said no.  And I said, I
22  heard you could get it from Lloyd's of London.
23  And he told me, no, you can't get it.
24  Q.   Did you undertake any other inquiries in
25  regards to determining whether or not you

JOHNS, PENDLETON & ASSOCIATES, INC.
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993
619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

1   could get more than the $250,000 coverage from

2   Lloyd's of London?

3   A.   Well, first off, you know, I relied on my

4   agent, Tony Cemo, to give me correct insurance

5   information, so the only thing I did in

6   addition to that was I called Ken Pailet, who

7   was Barbara's husband, and I asked him did he

8   have, you know, the additional coverage, and

9   he said no, he didn't.  And that was basically

10   the end of the conversation.

11   Q.   Okay.  Now, Ken Pailet, what's his

12   occupation?

13   A.   CPA.

14   Q.   Okay.  After talking to Mr. Pailet, did

15   you inquire with anyone else regarding the

16   flood coverage over $250,000?

17   A.   No.  My expert, Tony Cemo, told me you

18   couldn't get it.

19   Q.   Okay.  In your duties as a real estate

20   agent, what do you discuss with potential

21   sellers and buyers in regards to flood

22   insurance?

23   A.   I recommend that they talk to a qualified

24   insurance agent.

25   Q.   At any of the training to be an insurance

JOHNS, PENDLETON & ASSOCIATES, INC.
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

1    A.   I don't know what you mean by used

2    heavily.

3    Q.   Did you have a website prior to Hurricane

4    Katrina?

5    A.   Yes, sir.

6    Q.   And that website would have been for

7    advertising and getting clients for your real

8    estate business?

9    A.   Among other things, yes, sir.

10   Q.   Now, after Hurricane Katrina, when was

11   the first time that you learned that excess

12   flood insurance, and when I say excess, higher

13   than $250,000, was available?

14   A.   I heard it on the news.

15   Q.   Okay.  Prior to Katrina, did you know

16   anyone that had excess coverage?

17   A.   No, sir.

18   Q.   Okay.  Now, after Katrina, did you learn

19   of anybody, anybody that you knew of that had

20   excess coverage?

21   A.   Yes, sir.

22   Q.   Okay.  Who do you know that had that?

23   A.   I heard Allan Berger had it.

24   Q.   And who is Allan Berger?

25   A.   Somebody I knew socially.

JOHNS, PENDLETON & ASSOCIATES, INC.
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993
619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

MARLENE KATZ v. STATE FARM FIRE & CASUALTY COMPANY, et al

Report of Observations and Opinions

Prepared by:

Haig G. Neville, CLU, CPCU
Associate in Risk Management — IIA

May 14, 2007

EXHIBIT
5

HAIG NEVILLE ASSOCIATES

## MARLENE KATZ v. STATE FARM FIRE & CASUALTY COMPANY, et al

### Basis of this Report:

This report is based upon the sum total of my education, practical experience and qualification in the insurance industry for more than forty years as an agent and risk management professional and as part-time faculty at the University of Michigan/Wayne State University/Eastern Michigan University and other institutions, including as a lecturer at continuing education forums on Responsibilities of Insurance Agents/Brokers and other topics in the United States, Canada, United Kingdom, Bermuda and Japan.

This report is also based upon an examination of the relevant documentation furnished and subject to further discovery as developed and produced. My c.v. is the subject of Exhibit A. attached.

### The Factual Situation:

For several years Marlene Katz insured her home located at 5600 Marcia Avenue, New Orleans, Louisiana through State Farm Insurance Company agent Anthony J. Cemo under Homeowners Policy #18-70-0937-4 and NFIP flood policy #98-D7-7434-5.

In September of 2004, Marlene Katz requested of State Farm agent Anthony J. Cemo for flood coverage in excess of the $250,000/$100,000 NFIP maximum limit. Agent Cemo represented to Ms. Katz that additional flood coverage was not available, which was a false statement. Several insurance companies offered excess flood coverage.

On or about August 29th 2005, the Katz home suffered severe wind and flood damage as a result of hurricane Katrina. The flood damage far exceeded the maximum NFIP limits.

### Issues in this Matter:

Among the issues addressed in this report are a) whether State Farm agent Cemo breached the standard of skill, care and diligence of a trained and licensed insurance agent, b) whether State Farm advertised its agents' training, expertise and reputation to persuade customers to rely on them, c) whether Ms. Katz relied on its State Farm agent Cemo's perceived superior knowledge, licensure, training, experience, competence and reputation to offer and provide adequate flood coverage for Ms. Katz' home.

- 2 -

**Observations and Opinions:**

1.     **Duties and Responsibilities of Agents:**   An insurance agent owes a duty to exercise reasonable care, skill and diligence to the insurance transaction and to follow its policyholder instructions.  In order to qualify for an agent's license, State Farm agents are trained not to make misrepresentations related to insurance coverages.

These are fundamental State Farm teachings found in basic licensure courses and Continuing Education training seminars.  As a trained and licensed State Farm agent, Mr. Cemo is attributed with knowledge of these standards.

As a "Write Your Own" (WYO) facility for NFIP flood insurance, State Farm and its agents are also attributed with knowledge of the NFIP coverage limitations and are aware or should be aware of the availability of coverage in excess of NFIP's offerings for higher valued home policies.

Accordingly, State Farm agents owe a duty to respond truthfully when a coverage inquiry is made.  In this matter, Cemo's failure to provide a factual response constitutes a misrepresentation and a negligent breach of the standard of care duty owed.

2.     **Expertise and Superior Knowledge:**  State Farm agent Cemo is a  trained and licensed Louisiana agent.  Ms. Katz has no insurance training and relied on the counsel and advice of her State Farm agent Cemo.

To the extent that Ms. Katz relied on Mr. Cemo's erroneous representation to her detriment, constitutes a negligent breach of State Farm agent Cemo's duty to Ms. Katz.

3.     **Duty to Anticipate Foreseeable Risks:**  As a licensed, trained and experienced State Farm agent, Mr. Cemo knew or should have known that in Louisiana an agent has a duty to advise clients of recommended coverage for foreseeable risks.  If an agent fails to do so, he/she can be held liable for their policyholder's damages.  In the Katz matter, it is obvious that the dwelling was valued at more than $500,000 and the personal property greater than $400,000 *(see State Farm policy Declaration page)*.  To the extent that the home was subject to a flood risk, the maximum amount of NFIP coverage was grossly inadequate.

In view of the above, State Farm and its agent Cemo violated the doctrine that agents *"agents owe a fiduciary duty to advise clients of recommended coverages"*.  If this doctrine is breached, it imposes greater culpability on agent Cemo for intentionally misleading policyholders contrary to the law and upon State Farm for negligent training, direction and supervision of their agents.

- 3 -

**HAIG NEVILLE ASSOCIATES**

- 3 -

**Concluding Observations and Summary of Opinions:**

In view of the foregoing observations it is concluded and opined that State Farm agent Cemo negligently breached the duty owed to his policyholder Marlene Katz, by his failure to exercise the standard of reasonable skill, care and diligence in misrepresenting the availability of flood insurance excess over NFIP when Ms. Katz inquired, and upon which misrepresentation Ms. Katz relied, to her detriment.

It is further opined that State Farm agent Cemo, as a State Farm trained and licensed Louisiana agent, knew or should have known of the availability of excess flood insurance for high value homes by his extensive State Farm training.  To the extent that he attended State Farm classes, he is attributed with superior knowledge and his response to Ms. Katz inquiry, upon which she relied, constitutes an intentional misrepresentation.

Finally, it is opined that State Farm agent Cemo negligently and intentionally breached his fiduciary duty to advise Ms. Katz of recommended coverages for foreseeable risks.

May 14, 2007

Haig G. Neville

**HAIG NEVILLE ASSOCIATES**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

MARLENE KATZ                          \*      CIVIL ACTION

VERSUS                                \*      NUMBER 06-4155

STATE FARM FIRE AND CASUALTY  \*      JUDGE SARAH VANCE
COMPANY, and ANTHONY J. CEMO,
individually and as agent of  \*      MAGISTRATE JOSEPH
STATE FARM FIRE AND CASUALTY          C. WILKINSON, JR.
COMPANY                               \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


        Deposition of **ANTHONY JOSEPH CEMO**, taken
on Wednesday, August 1, 2007, in the offices of
STONE PIGMAN, Attorneys at Law, 546 Carondelet
Street, New Orleans, Louisiana 70130.


APPEARANCES:

        **Representing the Plaintiff:**

                Mr. Jeffery B. Struckhoff
                LESTELLE & LESTELLE
                Attorneys at Law
                3421 North Causeway Boulevard, Suite 602
                Metairie, Louisiana   70002


        **Representing the Defendant, Anthony J. Cemo:**

                Mr. Douglas J. Cochran
                STONE PIGMAN WALTHER WITTMANN
                Attorneys at Law
                2431 South Acadian Thruway, Suite 290
                Baton Rouge, Louisiana   70808

Reported by:  Cindi Cameron, CCR

                EXHIBIT
                6

1   incorrect advice to one of your clients and your

2   client relies on that to their detriment that you

3   can be sued for negligence?

4        A.    I understand that.

5        Q.    Okay.  I want to ask you some questions

6   about excess flood insurance.

7              As you sit here today, is it your

8   understanding that excess flood insurance was

9   available prior to Hurricane Katrina?

10       A.    No.

11       Q.    Today, you're not aware that excess flood

12  insurance was available?

13       A.    Today?

14       Q.    Yes, as you sit here right now, is it your

15  understanding right now, as you and I speak, that

16  you realize that flood insurance was available

17  prior to Hurricane Katrina?

18       A.    Today I understand it.

19       Q.    You know that today?

20       A.    Correct.

21       Q.    Prior to Hurricane Katrina, were you aware

22  that excess flood insurance was available?

23       A.    No.

24       Q.    You never had a request from any client

25  for excess flood insurance --

```
 1        Q.    Okay.  Who did she talk to?

 2        A.    Holly Woodall.

 3        Q.    Okay.  Did you ever speak to Marlene Katz

 4   in September of 2004?

 5        A.    No.

 6        Q.    Okay.  If I told you that I had her cell

 7   phone records from September of 2004 and she showed

 8   two calls of approximately three minutes each to

 9   your agency number, then in both of those phone

10   calls, she would have spoken with Holly Woodall?

11        A.    That's correct.

12        Q.    Did you know anything about the substance

13   of the conversation between Holly Woodall and

14   Marlene Katz in September of 2004?

15        A.    She wanted to increase her flood.

16        Q.    Okay.  If Marlene Katz said that she asked

17   about excess flood insurance and she was told that

18   it did not exist, do you have any basis to dispute

19   that sworn testimony?

20        A.    Yes, I do.

21        Q.    What basis do you have?

22        A.    Secretary would have told her the maximum

23   we wrote and that's it.

24        Q.    Okay.

25        A.    Then she would come to me and ask me, the
```

```
 1   secretary, they're asking for excess amount and I

 2   would have told them to tell them that we only

 3   write 250 building, 100 on the contents and that's

 4   it.

 5       Q.    Okay.  Who is the secretary?

 6       A.    One of them.

 7       Q.    Holly was the secretary?

 8       A.    They're all secretaries, office manager.

 9       Q.    So explain it to me again.  She would have

10   called Holly.  Holly would have said $250,000 is

11   the most you can get?

12       A.    Yes.

13       Q.    Okay.  What if Marlene Katz asked her

14   about excess flood insurance, how would Holly

15   respond?

16       A.    State Farm only writes 250/100.  That's

17   all we offer.

18       Q.    So she increased her coverage to $250,000

19   for dwelling and $100,000 for contents at that

20   time, correct?

21       A.    That's correct.

22       Q.    Okay.  But $250,000 doesn't represent the

23   actual value of her home, does it?

24       A.    250,000 represents the maximum we sell.

25       Q.    But that doesn't represent the value of
```

1  her home, does it?

2      A.   I assume it does.  I don't know.

3      Q.   Okay.  You're aware, though, that you

4  issued a homeowners policy for $562,000 for

5  homeowners coverage, right?

6      A.   Uh-huh.

7      Q.   So, obviously, $250,000 wouldn't fully

8  insure her home for the risk of flood; isn't that

9  right?  $250,000 --

10     A.   Yes.

11     Q.   -- that's less than $562,000.

12     A.   I know it's less.

13     Q.   Okay.

14     A.   But it all depends what's in the house or

15  what's in the value of the house.  I'm not an

16  adjustor.  I can't tell you that.

17     Q.   Okay.  But you did issue a policy of

18  homeowners insurance covering her dwelling for

19  $562,000?

20     A.   That's correct.

21     Q.   Okay.  And you told her or Holly told her

22  that $250,000 was the most flood insurance that she

23  could buy?

24     A.   That's the most State Farm offers.

25     Q.   Did you tell her that she could buy excess

59

```
 1   flood insurance?
 2        A.    No.
 3        Q.    Why not?
 4        A.    Did not know excess exist.
 5        Q.    Okay.  Would you agree that if you knew
 6   that excess flood insurance existed in September of
 7   2004, if the other --
 8        A.    Had I known it existed --
 9        Q.    In 2004 --
10        A.    2004.
11        Q.    -- you would have recommended that she get
12   excess flood coverage; would you not?
13        A.    I would have recommend her to go look for
14   it.
15        Q.    But you didn't know it existed in
16   September of 2004 --
17        A.    Did not know.
18        Q.    -- cannot recommend it?
19        A.    Can't recommend it.
20        Q.    Okay.  And no one in your office knew that
21   it existed in September of 2004?
22        A.    No.
23        Q.    Okay.  If someone came to you today and
24   said, Tony, I have a house worth $500,000.  I got a
25   homeowners policy from you, I got all my NFIP
```

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **IN RE KATRINA CANAL BREACHES** | * | **CIVIL ACTION** |
| **CONSOLIDATED LITIGATION** | * | |
| | * | **NO. 05-4182** |
| | * | |
| **PERTAINS TO:** | * | **SECTION "K"(2)** |
| *Katz*, C.A. 06-4155 | * | |

**************************************************

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Plaintiff Marlene Katz submits this Statement of Material Facts as to Which There is No Genuine Issue to be Tried, in support of her memorandum in opposition to defendants' motion for partial summary judgment to dismiss plaintiff's excess flood allegations.

### I.

Plaintiff Marlene Katz owned immovable property located at 5600 Marcia Avenue, New Orleans, Louisiana, 70124.

### II.

Plaintiff's home was insured under a homeowners policy (policy number 18-70-0937-4) issued by defendant State Farm Fire and Casualty Company ("State Farm"), which provided over $1 million in dwelling and contents coverage.

III.

In September of 2004, Plaintiff increased her flood insurance coverage under her NFIP policy to $250,000 for her dwelling and $100,000 for her contents.

IV.

Dwelling coverage of $250,000 and contents coverage of $100,000 were the maximum coverages that could be purchased through the NFIP in September of 2004.

V.

In September of 2004, flood insurance in excess of the NFIP coverage limits was available through private insurers on the private market.

VI.

On or about August 29, 2005, plaintiff's home suffered severe wind and flood damage as a result of Hurricane Katrina.

VII.

Plaintiff was underinsured for the flood damage to her dwelling and contents.

Respectfully submitted,


___/s/ Jeffery B. Struckhoff_____
**TERRENCE J. LESTELLE – 8540**
**ANDREA S. LESTELLE – 8539**
**JEFFERY B. STRUCKHOFF - 30173**
**LESTELLE & LESTELLE**
3421 N. Causeway Blvd, Ste. 602
Metairie, LA 70002
Telephone:  504-828-1224
Facsimile:  504-828-1229
**Attorneys for Plaintiff**
**Marlene Katz**

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 28th day of August, 2007, electronically refiled the foregoing with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are not CM/ECF participants.


_/s/ Jeffery B. Struckhoff_____
**Jeffery B. Struckhoff**

3