# EXHIBIT
# A

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF LOUISIANA
 3
    RONALD A. HOLBROOK      *
    and APRIL HOLBROOK      *
 5                          *  CIVIL ACTION
                            *  NO.06-2617
 6       VERSUS             *
                            *  SEC. K
 7                          *  JUDGE DUVAL
    AAA INSURANCE AGENCY    *
 8  INC, AND FIDELITY       *
    NATIONAL PROPERTY AND   *
    CASUALTY INSURANCE      *  MAG.3
                            *  MAGISTRATE JUDGE KNOWLES
10  *  *  *  *  *  *  *  *
11
12
13
14          Deposition of RONALD HOLBROOK,
15    taken at the offices of Sessions, Fishman &
16  Nathan, LLP, 3850 North Causeway Boulevard,
17  Lakeway II, Suite 1240, Metairie, Louisiana,
18  on Friday, July 13, 2007, at 9:00 a.m.
19
20
21
22
23
24
25
```

Page 3

```
 1  ALSO PRESENT:
 2     INOCENCIA DUFOUR
 3     JO-ANN DALEO
 4
 5
 6  REPORTED BY:
 7     MARLANE A. GAILLE, CCR-RPR
 8     CERTIFIED COURT REPORTER #21005
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1  APPEARANCES:
 2  KANTROW, SPAHT, WEAVER & BLITZER
 3  BY:  CONNELL L. ARCHEY, ESQ.
 4      445 North Boulevard
 5      Suite 300 - City Plaza
 6      Baton Rouge, LA 70802
 7      (225)383-4703
 8  ATTORNEYS FOR PLAINTIFFS
 9
10  SESSIONS FISHMAN & NATHAN, LLP
11  BY:  KEVIN G. BARRECA, ESQ.
12      3850 North Causeway Boulevard
13      Lakeway II
14      Metairie, LA 70002
15      (504)828-3737
16  ATTORNEYS FOR DEFENDANT, AAA
17
18  NIELSEN LAW FIRM, LLC
19  BY:  WILLIAM T. TREAS, ESQ.
20      3838 North Causeway Boulevard
21      Suite 2850
22      Metairie, Louisiana 70002
23      (504)837-2500
24  ATTORNEYS FOR DEFENDANTS,
25    FIDELITY NATIONAL INSURANCE COMPANY
```

Page 4

```
 1          EXAMINATION INDEX:
 2
 3  EXAMINATION BY:      PAGE:
 4  Mr. Barreca      7
 5  Mr. Treas        172
 6
 7        EXHIBIT INDEX:
 8  EXHIBIT NO.:      PAGE:
 9     P-1          21
10     P-2          33
11     P-3          36
12     P-4          38
13     P-5          52
14     P-6          55
15     P-7          65
16     P-8          70
17     P-9          73
18     P-10         75
19     P-11         75
20     P-12         83
21     P-13         109
22     P-14         126
23     P-15         128
24     P-16         129
25     P-17         133
```

## Page 5

| | | |
|---|---|---|
| 1 | P-18 | 141 |
| 2 | P-19 | 147 |
| 3 | P-20 | 156 |
| 4 | P-21 | 160 |
| 5 | P-22 | 180 |
| 6 | P-23 | 222 |
| 7 | P-24 | 223 |

## Page 6

1    S T I P U L A T I O N
2        IT IS STIPULATED AND AGREED by
3    and among counsel for the parties hereto that
4    the deposition of the aforementioned witness
5    may be taken for all purposes permitted within
6    the Federal Rules of Civil Procedure, in
7    accordance with law, pursuant to notice;
8        That the formalities of reading
9    and signing are specifically waived;
10       That the formalities of filing,
11   sealing, and certification are specifically
12   waived;
13       That all objections, save those
14   as to the form of the question and the
15   responsiveness of the answer, are reserved
16   until such time as this deposition, or any
17   part thereof, is used or sought to be used in
18   evidence.
19               * * *
20       MARLANE A. GAILLE, CCR-RPR,
21   Certified Court Reporter in and for the State
22   of Louisiana, officiated in administering the
23   oath to the witness.
24
25

## Page 7

1                    RONALD HOLBROOK,
2    3491 Leighton Road, Columbus, Ohio 43221,
3          having been first duly sworn,
4    was examined and testified as follows:
5                  EXAMINATION
6    BY MR. BARRECA
7      Q   Mr. Holbrook, my name Kevin Barreca,
8    and I'm here today representing Club Insurance
9    Agency, Inc, in connection with a lawsuit that
10   you have filed against it in connection with
11   your Katrina-related claims; specifically, I
12   understand that your claim is based upon the
13   Fidelity Flood Insurance Policy you secured
14   through Club Insurance Agency, Inc.  Is that
15   correct?
16     A   Yes.
17         MR. ARCHEY:
18            That's part of it.
19         MR. BARRECA:
20            He's correct.  Let me clarify
21          that.
22     Q   (By Mr. Barreca) Subsequently, I
23   understand that you supplemented your lawsuit
24   and you've also sued your homeowner's
25   insurance which is through AAA -- the proper

## Page 8

1    name escapes me at this moment -- but it's
2    Automobile Club Family Insurance Company,
3    something similar?
4      A   That sounds close to it or close
5    enough.
6      Q   That claim has been consolidated
7    with -- or actually the entire lawsuit has
8    been consolidated with a lawsuit that has been
9    generally referenced the "Katrina Canal Breach
10   Cases."  And that part of the claim we are not
11   going to spend a lot of time on today.  That
12   is going to be a consolidated or
13   class-action-type litigation.
14         Today I'm here mostly focusing on
15   your claim involving the Fidelity Flood
16   Insurance policy.  Okay?
17     A   Okay.
18     Q   Have you ever given a deposition
19   before?
20     A   No, I have not.
21     Q   I get to ask the questions and you
22   answer them.  Sometimes I'll start asking a
23   question and you know what the answer is
24   immediately.  Let me finish answering so that
25   we have a clear record because this lovely

Page 9

1  lady would like to take down the record
2  accurately, and it's very difficult to do this
3  if we're cross-talking.  So you'll agree with
4  me that you'll wait for me to finish my
5  answers --
6      A   Yes, I will.
7      Q   -- my questions?
8      A   I just cut you off there.
9      Q   Do you have any health problems today
10  that might prevent you from giving an accurate
11  re-occurrence, or do you have any health
12  problems that might impinge your ability to
13  give truthful testimony?
14      A   There is nothing that would impinge
15  my ability to give truthful testimony.  I do
16  have a hearing loss.  I wear two hearing
17  aides.  And as such, I may ask you to repeat
18  questions so I make sure I heard them
19  correctly.
20      Q   And I would be glad to do that.  That
21  brings up a good point.  Before the day is
22  over and probably sooner than later, even if
23  you understand or hear my question, you may
24  not understand it.  I don't want you to answer
25  a question you don't understand.  Sometimes my

Page 10

1  questions can be confusing, and it's not my
2  purpose to try to confuse you or trick you
3  into an answer.  That's not why we're here
4  today.  I want to get the most accurate answer
5  possible.
6          So if there is a question that I pose
7  to you and you're not sure of the answer, just
8  say, "Kevin, I don't understand what you're
9  asking," and I will gladly try to rephrase it.
10  Because everything that you say, she is
11  going -- the court reporter is going to take
12  down, and we are going to assume that your
13  response is a response to the question I asked
14  and that you understood it.
15      A   I understand.
16      Q   Great.
17          Are you on any medications today?
18      A   No.
19      Q   What did you do to prepare for the
20  deposition, if anything?
21      A   I read the documents that I have
22  provided and the documents that have been
23  provided by your office.  And I also met with
24  my attorney of record, Connell Archey.
25      Q   In addition to the documents that I

Page 11

1  provided to you and the documents that you
2  provided to me, did you review any other
3  documents?
4      A   No.
5      Q   When I say "documents," I mean that
6  in the broadest sense.  Did you review any
7  photographs?  Any videotape?  Anything of that
8  nature that you didn't already provide to me?
9      A   No.
10      Q   I'm going to spend 15 minutes going
11  through your very abbreviated summary of your
12  life history.  Where did you grow up?
13      A   I grew up in Dayton, Ohio.
14      Q   And when I say "grow up," you went to
15  grammar school, high school, and college
16  there?
17      A   Yes.
18      Q   Where did you go to college?
19      A   I went to college at Wright State
20  University which is in Dayton, Ohio.  I also
21  went to the University of Cincinnati for two
22  years.
23      Q   Wright State University?
24      A   Yes.
25      Q   What years did you attend?

Page 12

1      A   I first attended there in 1988 to
2  1989, then attended University of Cincinnati
3  from 1989 to 1991 and returned to Bright State
4  University in 1992 and finished my degree in
5  1994.
6      Q   What degree?
7      A   It was a bachelor of arts in
8  political science.
9      Q   Any other degrees after your bachelor
10  of arts?
11      A   Yes, I have a master's degree and a
12  Ph.D. from Ohio State University.
13      Q   Did you get your master's immediately
14  following receiving your BA?
15      A   No, I did not.  I received that and I
16  cannot recall if it was 2002 or 2003.  I do
17  believe it was 2002 when I received my
18  master's degree.  I received the Ph.D. in
19  2005.
20      Q   What is your master's in?
21      A   Political science as well as is my
22  Ph.D.
23      Q   And Wright state is the college you
24  went to for the master's and Ph.D?
25      A   No; I went to Ohio State for my

Page 13

1   master's and my Ph.D.
2       MR. TREAS:
3           We'll let that slide.
4       Q    (By Mr. Barreca) After you received
5   your Ph.D. in 2005, what did you do?
6       A    I took a job at University of
7   New Orleans as a professor of -- assistant
8   professor of political science.
9       Q    When did you start?
10      A    My effective start date was, I do
11  believe, August 14, 2005; essentially two
12  weeks before Hurricane Katrina.
13      Q    And you haven't come back?
14      A    I come back to visit and will
15  continue to do so, but no. My wife and I
16  returned to Columbus, Ohio, and have now taken
17  up residence there.
18      Q    Your wife is April Leigh Holbrook?
19      A    April Leigh Merchant Holbrook.
20      Q    Was that your first wife?
21      A    Yes.
22      Q    Only wife?
23      A    Only wife.
24      Q    Does she have a master's degree in
25  anything?

Page 14

1       A    No; she does not.
2       Q    Spend five minutes with me about your
3   wife. Did she go to college at Wright State?
4       A    No, she did not. She went to Cal
5   State Long Beach in Southern California.
6       Q    Did she receive a degree?
7       A    Yes; I do believe it's a bachelor of
8   arts in communications.
9       Q    Do you know about when she received
10  that degree?
11      A    I would say in the early '90s. But
12  other than that, I don't know the exact date.
13      Q    Any post-graduate work by your wife?
14      A    No; not that I'm familiar with.
15      Q    What did she do during the '90s after
16  she graduated in communications?
17      A    She worked at a couple jobs. I know
18  she was previously married and subsequently
19  divorced.
20      Q    So "Merchant," was that her maiden
21  name or previous marriage?
22      A    That was her maiden name.
23      Q    Do you know her previous married
24  name?
25      A    Yes. It was "Long," April Long;

Page 15

1   L-O-N-G.
2       Q    Where did you meet your wife?
3       A    Met her at the Biltmore Hotel in
4   Los Angeles during the 1998 Senate elections
5   of Barbara Boxer.
6       Q    How did you convince -- was she
7   living in California at the time?
8       A    We were both living in California at
9   the time.
10      Q    How did you get to California? I
11  must have missed that.
12      A    After obtaining my undergraduate
13  degree, a friend of mine convinced me to move
14  out to Los Angeles and work in television,
15  which I did for approximately five years.
16      Q    What did you do in television?
17      A    I started off as an actor, and then
18  got on to the production side as a production
19  assistant.
20      Q    Anything that we might have seen you
21  in?
22      A    Yes, I did. I was an extra on
23  some -- let's see -- "90210," "Malibu Shores."
24  I can't remember some other shows, but a few
25  things; but never as a starring role or

Page 16

1   speaking actor.
2       Q    How did you then decide to get back
3   to politics or political science?
4       A    Basically the entertainment industry
5   is not a kind industry, and I decided that
6   I -- like, how should I put it? I'm an
7   egghead, and returning to academia was more
8   suited to my way of --
9       Q    To eggheads?
10      A    Yes; more eggheads. Entertainment
11  industry, not many eggheads there.
12      Q    And you brought your wife or future
13  wife with you I would assume?
14      A    She was my future wife at the time.
15  But yes, she moved out when I returned to
16  graduate school at Ohio State in 1999. She
17  followed in 2000 and we subsequently were
18  married in 2001.
19      Q    How did you go about finding a house
20  to purchase when you were in Ohio when you
21  planned on moving down to New Orleans?
22      A    One of my colleagues at the
23  University of New Orleans provided me with
24  contact information of a real estate agent,
25  Joan Farabaugh, and we contacted Joan and

Page 17

1   arranged for my wife and I to come down here
2   to visit properties within, I do believe, both
3   February and May of 2005.
4       Q   So at least by February of 2005 you
5   had already accepted the position at UNO?
6       A   Yes.
7       Q   Tell me about when you found the
8   Charlotte Street house that you wanted to buy.
9       A   It's Charlotte Drive.  I know on some
10  documents it says "street," but it's Charlotte
11  Drive.
12          We were looking in neighborhoods
13  close to UNO, and, in fact, found another
14  property that we were interested in, made an
15  offer, and that offer was turned down.
16          And subsequently after being turned
17  down for that offer, the agent representing
18  that client said, hey, I just learned of a new
19  property closer to the university on Charlotte
20  Drive, and that's when we learned of it.
21      Q   Do you know about when you first went
22  and saw it?
23      A   We first went and saw it in mid-May.
24      Q   When did you make an offer?
25      A   We made an offer the day that we saw

Page 18

1   it.
2       Q   When did the seller accept?
3       A   The seller accepted I think the
4   following day, but I cannot testify to that
5   exactly.
6       Q   So sometime in mid-May she accepted
7   and then you started the, I assume, inspection
8   process?
9       A   Yes; in fact the day that we saw it,
10  we had the house inspected.
11      Q   Only one inspection?  Somebody just
12  walked through and did it that day?
13      A   It was more than just a walk-through.
14  They had heat imaging photography.  They did a
15  very thorough inspection of it, yes.
16      Q   There was no followup, or was there
17  anything that needed to be corrected, is what
18  I'm trying to get it?
19      A   I can't recall.  I can't recall there
20  being anything major.
21      Q   And so Ms. Farabaugh, the real estate
22  agent, did she assist in finding a mortgage
23  company?  Or how did you get to title
24  mortgage, or to the mortgage company that you
25  were using for the sale?

Page 19

1       A   Joan Farabaugh assisted us in every
2   detail in regards to both the title company
3   the -- and the mortgage company.  But also was
4   the person to first contact insurance agents
5   here requesting quotes for that particular
6   property.
7       Q   Do you know who she requested quotes
8   from?
9       A   I know at least AAA.  I can't
10  remember all of them.  I may or may not have
11  records for that, but I can always contact
12  Joan and request that information.
13      Q   So Joan was the person in New Orleans
14  that was helping you put the deal together
15  essentially from the mortgage to the title
16  company insurance?  The whole works?
17      A   Yes.
18      Q   So she reported to you, "I researched
19  the insurance issues and AAA is the best one
20  to go with," or AAA had the cheapest price, or
21  what was the discussion?
22      A   Well, she faxed me copies of all the
23  policy quotes, and we had previously had
24  insurance through AAA in Ohio and were very
25  pleased with them.  We had at least an auto

Page 20

1   insurance policy and I can't recall if we also
2   had a renter's policy.
3           Based upon our previous experience
4   with AAA, we thought, okay, there's a company
5   that we're familiar with and comfortable with.
6   And if I recall the policy quotes were on par
7   with the other ones that we received.
8       Q   You said that she faxed to you other
9   quotes:  Do you know if you still have those?
10      A   I do not know if I still have those.
11      Q   Did you check when you received -- or
12  I assume your attorney received the deposition
13  notice with the request for documents?
14      A   Uh-huh (nods head).
15      Q   Did you look for any documents at
16  that point?
17      A   Yes, I did; and to my knowledge, I
18  don't recall coming across any other policy
19  quotes.
20          MR. ARCHEY:
21              I don't think your request
22          would have covered those.  I'm not
23          objecting and I'm not saying we
24          won't -- I'm just, you know -- I
25          guess I'm saying that just so I

Page 21

1  don't know we had a duty to look
2  for them or that we were looking
3  for them.
4      MR. BARRECA:
5          Let me check quickly.
6      MR. ARCHEY:
7          If you think they're necessary
8  or relevant, we'll certainly follow
9  up.
10     MR. BARRECA:
11         Sure. And I'll show you this
12 when I get finished asking you
13 questions.
14         What I'm looking at now is the
15 deposition notice. I guess I'll
16 mark this as Exhibit 1 -- or P-1.
17             (Exhibit P-1 was marked.)
18         Marked as Exhibit P-1 is the
19     notice of deposition and Rule
20     30(b)(5) request.
21  Q   (By Mr. Barreca) Did you see this
22 document before you came here today?
23  A   Yes, I did.
24  Q   Is this the document you used to look
25 for additional records or documents to produce

Page 22

1  to me?
2   A   Yes, I did.
3   Q   Request No. 1 says, "Please produce
4  any and all documents that support the
5  allegation in paragraph 12 of Plaintiff's
6  amended complaint that on or about August 3,
7  2005 Fidelity informed the Holbrooks that it
8  would not honor its contract for $223,000 of
9  flood coverage bargained for by their agents."
10         Did you have any particular documents
11 in reference to that statement that came out
12 of your complaint or your lawsuit?
13  A   Yes. I have the document that was
14 sent to me by Fidelity saying that our policy
15 coverage amounts had been reduced. I do
16 believe that document was dated on the 25th.
17  Q   And you have that document?
18  A   Yes.
19  Q   Any other document?
20  A   That was the only document that we
21 received.
22      MR. ARCHEY:
23         Well, we produced -- I don't
24 know -- 400 pages worth of
25 documents. I mean, I don't know if

Page 23

1  you're trying to parse it out by
2  paragraphs. Is that what you're
3  asking?
4      MR. BARRECA:
5          Well, I want to know if he has
6  any other documents that he might
7  think are responsive.
8          He just talked about some
9  documents which I'm not sure I
10 received or maybe they weren't
11 responsive, but I'm just wondering
12 what other documents there might be
13 that I don't have copies of.
14     MR. ARCHEY:
15         Well, I object to that
16 characterization completely.
17 You're asking about potential
18 quotes from other insurance agents
19 that have nothing to do with those
20 allegations.
21     MR. BARRECA:
22         No; this is a quote directly
23 from his lawsuit.
24     MR. ARCHEY:
25         I understand. But that is a

Page 24

1  quote from Fidelity. You have now
2  asked about other insurance quotes.
3  And that quote -- or that paragraph
4  in that allegation, as I understand
5  what you're reading, has to do with
6  the reduction of coverages.
7          You're mixing apples and
8  oranges greatly, and those things
9  don't connect.
10         I'm not arguing that it may
11 not be in there that it could
12 potentially be covered. We didn't
13 read it that way, if it's in there.
14 I don't think it is. But if it is,
15 I won't sit here and quibble with
16 you over that.
17     MR. BARRECA:
18         Well, I'm not trying to be
19 confusing. I'm just trying to make
20 sure I have all the documents.
21         And it happens every time
22 where just things get overlooked,
23 or things that I think might be
24 important, you may not have thought
25 were pertinent or Mr. Holbrook may

Page 25

1  not have thought were pertinent.
2  And so I'm just trying to make sure
3  I have all the documents.
4  MR. ARCHEY:
5      And the only reason why I
6  speak up is that it sounds to me
7  like you were trying to narrow it
8  down that those were the only
9  documents responsive to the item.
10  And I'm telling you we produced 400
11  pages, or however many it was, of
12  documents and we're not going
13  through them and parsing them out
14  which ones are responsive to the
15  paragraphs.  They are what they
16  are.
17  MR. BARRECA:
18      I think you should have.
19  MR. ARCHEY:
20      I will go further and say we
21  produced everything which we were
22  aware of in dealings with Fidelity.
23  We did not go produce the documents
24  prior to the dealings with
25  Fidelity, and I don't think they

Page 26

1  were asked for and we didn't do so.
2  Q   (By Mr. Barreca) Did you make any
3  application to the SBA for some kind of loan?
4  Small Business Association?
5  A   No, I did not.
6  Q   Did you apply for the Road Home
7  program?  Louisiana Road Home program?
8  A   I have not made any applications for
9  that.
10  Q   Do you intend to?
11  A   No, I do not.
12  Q   I understand that you did receive
13  some money from FEMA.  Is that correct?
14  A   That is correct.
15  Q   How much did you receive from FEMA?
16  A   We received the $2,000 check that was
17  disbursed to most Hurricane Katrina evacuees
18  and the rental assistance, which I can't
19  remember the exact amounts, but those are the
20  two amounts that we have received.
21  Q   Other than what you received from
22  Fidelity and from AAA, your insurers, you just
23  received the -- what you talked about from
24  FEMA; the $5,000 or so?
25  A   It was less than $5,000; but yes.

Page 27

1  Q   Did you have any other type of
2  insurance at the time of Hurricane Katrina?
3  A   We had auto insurance.
4  Q   No other type of insurance policies
5  that you were aware of other than homeowner's
6  through AAA, flood through Fidelity, and the
7  National Flood Insurance Program, and
8  automobile through AAA?
9  MR. ARCHEY:
10      Any?  Life?
11  A   I do not recall.
12  Q   (By Mr. Barreca) Let me ask it --
13  Property?  Property insurance?
14  A   No, I did not have other property
15  insurance.
16  Q   What's the current status of the
17  house on Charlotte Drive?
18  A   It has been demolished.
19  Q   When was that?
20  A   The demolition happened right about,
21  either the end of 2006, beginning of 2007.
22  Q   Did you tell your lawyer that it was
23  being demolished?
24  A   Yes.
25  Q   And he said that's fine, go ahead --

Page 28

1  well, withdraw that question.
2      When the house was demolished, had it
3  been gutted?
4  A   No.
5  Q   So when the demolition company came
6  in, your furniture, your clothes, appliances,
7  all those types of things were still in the
8  house?
9  A   Yes.
10  Q   Was it basically -- the house was the
11  way it was when you left to evacuate for
12  Katrina?
13  A   Roughly; because we had come back and
14  inspected the house and taken pictures in
15  October after Katrina.
16  Q   And that's October 2005?
17  A   That's correct.
18  Q   Did you take anything out of the
19  house in October 2005?
20  A   Yes, we did.
21  Q   What did you take out?
22  A   We there was one box filled with my
23  wife's poetry that had managed to float.  We
24  took that.  And we took our china which had
25  not been damaged.

Page 29

1    Q   What about the artwork?
2    A   The artwork was left there. It's
3  still -- well, it was still there when the
4  house was demolished.
5    Q   Did you take any pictures of your
6  artwork?
7    A   Yes, I did.
8    Q   I couldn't identify it in the
9  pictures you provided, and maybe you can show
10  me that when we have a moment.
11    A   I can show you that; yes.
12    Q   I'm assuming that you decided that
13  the artwork was not salvageable?
14    A   It was not salvageable.
15    Q   When did you first speak with someone
16  from AAA?
17    A   It was May of 2005.
18    Q   And who did you speak with?
19    A   I spoke to Lisa Dufour.
20    Q   And as best you can, summarize that
21  discussion.
22    A   That discussion was we had received
23  the -- a fax copy of the policy quote for the
24  homeowner's and flood insurance, and I think
25  that I asked for some amendments to that,

Page 30

1  maybe an increase in property coverage. I
2  also asked very specifically -- because we had
3  had dealings with AAA before -- whether or not
4  AAA was the underwriter of all of our
5  policies, and I was told by Lisa that they
6  were the underwriting agent or that they were
7  the underwriters.
8    Q   What was the purpose of asking that?
9    A   In our dealings with AAA in Ohio we
10  learned that AAA was not the underwriter. And
11  we had a claim for our auto insurance, and
12  instead of going through AAA directly, we had
13  to go through a different company through
14  which they had -- they were brokers.
15      And so we preferred to deal with our
16  agents one-on-one. And in that case, you
17  know, we wanted to make sure if we were
18  dealing with an agent, we would always do our
19  dealings through that agent.
20    Q   Got it.
21      And your automobile policy and your
22  homeowner's policy, I understand that AAA is
23  the underwriter. Is that correct?
24    A   My understanding is that AAA --
25    MR. ARCHEY:

Page 31

1      Let me clarify. Then or now?
2    His understanding then or his
3    understanding now?
4    MR. BARRECA:
5      Let's start with now.
6    MR. ARCHEY:
7      Okay.
8    Q   (By Mr. Barreca) What is your
9  understanding now?
10    A   My understanding now is that AAA --
11  the St. Louis based AAA is the underwriter of
12  the auto insurance policy.
13      The homeowner's insurance policy, I'm
14  pretty certain that it's the St. Louis office,
15  but I'm not all that familiar with all of
16  this.
17    Q   What was your impression when you
18  first spoke to Lisa Dufour then?
19    A   My first impression was --
20    Q   Let me clarify that a little bit.
21      What was your -- your attorney made a
22  point that what is your understanding then and
23  now. Now, you said that you understand that
24  AAA in Missouri -- that AAA division that
25  wrote or underwrote your policies for home and

Page 32

1  auto is the entity. What did you think when
2  you spoke to Ms. Dufour either in May or
3  sometime in the summer of 2005?
4    A   I was under the impression, and I was
5  told point-blank that for both the homeowner's
6  insurance and the flood insurance that AAA was
7  the underwriter for that.
8      I had never purchased flood insurance
9  before. This was my first house. I was
10  unaware of the National Flood Insurance
11  program. So that's what I wanted to make,
12  that that's why there's some confusion.
13    Q   Got it.
14      Would that have changed your mind
15  whether you would have insured through AAA?
16    A   I do not know.
17    Q   What I'm going to show you now is,
18  it's entitled "Fidelity National Property and
19  Casualty Insurance Company," and it is a
20  confirmation of a quote that has a fax tag
21  line of May 20, 2005.
22      And I'll mark this as Exhibit P-2.
23    MR. TREAS:
24      Is there a Bates number so I
25    can follow along?

**Page 33**

```
 1      MR. BARRECA:
 2         Yes.  It is HOL 0015 and
 3      HOL 0016.
 4         (Exhibit P-2 was marked.)
 5    Q   (By Mr. Barreca) Do you remember ever
 6  receiving a copy of this?
 7    A   Yes.
 8    Q   And who did you receive that from?
 9    A   I received that via Joan Farabaugh,
10  and it looks like from AAA through Joan
11  Farabaugh.
12    Q   So AAA sent the quote to Joan; Joan
13  forwarded it to you?
14    A   Yes.
15    Q   At this point did you realize that
16  AAA wasn't the flood insurer?
17    A   No, I did not.
18    Q   Why would you think it would be
19  entitled "Fidelity National Flood" -- excuse
20  me -- "Fidelity National Property and Casualty
21  Insurance"?
22    A   I don't know why it would be called
23  that.  I'm just -- I was trying to answer your
24  question earlier as to my conversations with
25  Lisa in regards to this.  I don't know what I
```

**Page 34**

```
 1  thought.
 2    Q   Did you think about it at all?  Was
 3  it something that even crossed your mind?
 4    A   It may have prompted my asking Lisa
 5  that particular question.
 6    Q   So you might have received this
 7  before you had the discussion with Lisa about
 8  who was the underwriter?
 9    A   Yes.
10    Q   Do you think that's what happened?
11    A   I think so.
12    Q   Did you ask her specifically, "Well,
13  it says Fidelity on top of the flood quote
14  that you provided to me"?
15    A   I don't recall if I asked that
16  particular question.
17    Q   While we're looking at P-2, did you
18  read this quote when you received it?
19    A   Yes.
20    Q   I'm going to direct you to -- I'll
21  highlight it if you like.
22         You read this part; that is, I'm
23  going to call it in the left margin of P-2
24  that says, "Standard Flood Nonbinding Quote."
25    A   No, I did not read that.
```

**Page 35**

```
 1    Q   What does "nonbinding" mean to you?
 2      MR. ARCHEY:
 3         Objection.  You're asking for
 4      a legal question.
 5         You can go ahead and answer.
 6      THE WITNESS:
 7         What's that?
 8      MR. ARCHEY:
 9         You can go ahead and answer.
10      I'm sorry.  I was making an
11      objection for the record.  Go
12      ahead.
13    A   "Nonbinding" means it's not binding.
14  I know that's not answering the question, but
15  that it's just a quote.
16    Q   (By Mr. Barreca) This doesn't insure
17  or guaranty that you have any insurance.
18  Correct?
19    A   That is my understanding of what that
20  document means, yes.
21    Q   It's just an estimate of a price that
22  insurance may cost if you decide to buy it?
23    A   Yes; that's my understanding.
24    Q   On Page 2 of P-2 it has two stars
25  next to the building amount and the contents
```

**Page 36**

```
 1  amount.  Do you know who made those two stars?
 2    A   No, I don't.
 3    Q   It wasn't you, though?
 4    A   No, it wasn't me.
 5      MR. ARCHEY:
 6         For the record, those numbers
 7      are different.
 8      MR. BARRECA:
 9         From what?
10      MR. ARCHEY:
11         The two different quotes.
12      MR. BARRECA:
13         Well, thanks for correcting
14      me.
15      MR. ARCHEY:
16         I didn't mean to be
17      correcting.
18      MR. BARRECA:
19         Well, it's a good point.
20  These are two different documents.
21  I assumed it was the second page of
22  P-2, but it is not.
23         Let me mark this document also
24  as P-3.
25         (Exhibit P-3 was marked.)
```

Page 37

```
1       MR. TREAS:
2          You're making 16, P-3?
3       MR. BARRECA:
4          Right. Contrary to what I
5       said before, P-2 consists only of
6       HOL 0015. P-3 is document marked
7       HOL 0016.
8       Q   (By Mr. Barreca) This one is dated --
9    P-3 is dated -- has a tag line also of May 20,
10   2005. Correct?
11      A   Yes.
12      Q   Do you know if Joan was sending you
13   different quotes -- well, why was Joan sending
14   you two quotes?
15      A   I don't know why. I do know that we
16   wanted contents coverage, of course.
17      Q   Got it.
18      A   So one does not have contents, one
19   does.
20      Q   So you don't ever recall saying, "Fax
21   me a quote with contents coverage and then one
22   without contents coverage?
23      A   No; I don't recall ever saying that.
24      Q   Because P-2 is a document that
25   contains no contents; P-3 has contents of
```

Page 38

```
1    $25,000.
2          When you received the document with
3    the $25,000 content coverage, is that because
4    you requested $25,000? Or do you recall?
5       A   I don't recall. That may have been
6    Joan Farabaugh asking for a statement based on
7    some ballpark figure.
8       Q   What about the $183,000 in building
9    coverage?
10      A   That was the offer on the house. So
11   we insured --
12      Q   That was the selling price?
13      A   Yes, that was the selling.
14      Q   Eventually you increased the request
15   for contents. Is that correct?
16      A   Yes.
17      Q   And so that is what I'm going to show
18   you now --
19      MR. BARRECA:
20          And I'm going to mark this
21       HOL -- well, it's going to be P-4.
22       The Bates numbers are HOL 0023
23       through 27.
24          (Exhibit P-4 was marked.)
25
```

Page 39

```
1          I apologize, guys. This is
2    one that's written on.
3       Q   (By Mr. Barreca) Could you take a
4    moment and look at that?
5       A   (Perusing document.) I've had a
6    moment to look at it.
7       Q   Do you recall receiving this
8    document? We can go through page-by-page, but
9    it looks like these all relate to the Fidelity
10   flood application and they were all sent on
11   June 23, 2005?
12      A   Yes.
13      Q   Yes, you received them?
14      A   Yes, I received them.
15      Q   Do you know the flood elevation zone
16   for the Charlotte Drive property?
17      A   Yes.
18      Q   And what would that be?
19      A   A05.
20      Q   A05?
21      A   Yes.
22      Q   Can you identify what the flood
23   elevation is on this document?
24      A   Flood Zone A05.
25      Q   So that's the correct flood zone?
```

Page 40

```
1       A   Yes; that is correct.
2       Q   And going down towards the bottom of
3    the page of 0023 it says, "Elevation
4    Certificate," and it has a response "Yes"?
5       A   Yes.
6       Q   Did you provide Ms. Dufour with a
7    flood elevation certificate, or anyone at AAA?
8       A   Subsequent to this policy quote, we
9    did not directly send it to her, no.
10      Q   Do you know if there was a flood
11   elevation certificate provided by anyone on or
12   about June 23, 2005?
13      A   My understanding is that I gave
14   contact information of our mortgage company
15   and our title company, and that Lisa procured
16   the elevation certificate from the title
17   company.
18      Q   Got it.
19          And that's why you believe on this
20   document, 0023, it says "Elevation
21   Certificate," and they marked it "Yes"?
22      MR. ARCHEY:
23          Object to the form of the
24       question.
25      MR. BARRECA:
```

**Page 41**

1    I can make it more clear if
2 you like.
3    MR. ARCHEY:
4    You're asking him what she
5 meant by this document that they
6 filled out.
7    MR. BARRECA:
8    Let's keep going.
9    MR. ARCHEY:
10    All right. Okay.
11    Q    (By Mr. Barreca) Going to the third
12 page of the document which is HOL 0025 in the
13 last block of information it says, "Elevation
14 Information." Do you see that there?
15    A    Yes, I do.
16    Q    Do you know anything about what's in
17 that box?
18    A    I now know.
19    Q    Can you tell me what you do know?
20    MR. ARCHEY:
21    And to be clear on all these
22 questions, you're talking about
23 today with the benefit of all
24 investigation as opposed to that
25 time.

**Page 42**

1    MR. BARRECA:
2    Sure.
3    MR. ARCHEY:
4    Okay.
5    A    Now I understand that -2.3 and the
6 -7.0, these numbers apparently apply to a
7 property other than the one on Charlotte
8 Drive.
9    Q    (By Mr. Barreca) Correct. Do you now
10 understand that the information in that block
11 marked "Elevation Information" is information
12 that would come from an elevation certificate?
13    A    I do now.
14    Q    When you received this sometime in
15 late June of 2005, you didn't know what those
16 words meant or letters meant or numbers?
17    A    Yeah; I was not -- I did not know
18 what all of these different terms referred to.
19    Q    But now you understand that there was
20 some kind of flood elevation certificate used
21 in connection with this quote?
22    A    That is my understanding, yes.
23    Q    And come to find out, if my
24 investigation is correct and what has been
25 told to me, that there was a wrong flood

**Page 43**

1 elevation certificate used?
2    A    I have subsequently learned that yes,
3 that that was the case.
4    Q    Going to the next page which is
5 HOL 0026, and it is the actual premium
6 information and coverage information, and they
7 have one block that talks about basic limits
8 and then the additional limits. If you add
9 the building basic and the building
10 additional, you'd get the coverage you
11 initially requested. Is that correct?
12    A    Yes.
13    Q    Same thing for the contents; the
14 basic limits plus the additional limits is the
15 $40,000 in contents you initially requested?
16    A    Yes.
17    Q    So this document reflects the
18 coverages that you wanted for your home?
19    A    Yes.
20    Q    The Charlotte Drive home.
21    A    (Witness nods head affirmatively.)
22    Q    And this was the premium quote that
23 was told to you which is in the middle of the
24 page, $836?
25    A    Yes.

**Page 44**

1    Q    Well, it appears that your wife
2 signed it on June 23, 2005?
3    A    Yes.
4    Q    I'm looking at your Attachment A,
5 Chronology of Events.
6    THE WITNESS:
7    Can I look at that as well?
8    MR. BARRECA:
9    Sure.
10    THE WITNESS:
11    I have a copy of it.
12    Q    (By Mr. Barreca) On the first page
13 under June 8, 2005 --
14    A    Yes.
15    Q    -- the second paragraph talks about
16 the -- I call it the artwork. It's the
17 "Maui Dawn" by Wyland?
18    A    Yes.
19    Q    Do you remember specifically the
20 conversation you had with the AAA agent
21 regarding the policy and that piece of art?
22    A    Yes, I do.
23    Q    Tell me about it.
24    A    A previous insurance policy that my
25 wife and I had for renter's insurance, in

Page 45

1    order to have a policy covering such an
2    expensive item we needed to have a special
3    rider attached.
4        I asked Lisa, point-blank, I have an
5    $8,000 piece of artwork. Do I need a required
6    attached?
7        And I was told point-blank no; that
8    as long as it's within the coverage of
9    contents that it would be covered under the
10   contents coverage in both homeowner's and
11   flood insurance policies.
12   Q    And we're talking about -- well,
13   you're specific that you were talking about
14   both homeowner's and flood?
15   A    Yes.
16   Q    And she said that homeowner's and
17   flood, the artwork would be protected or
18   covered?
19   A    That it would be covered under the
20   contents and covered.
21   Q    Did you discuss in any kind of detail
22   about the artwork?
23   A    Yes, I did; specifically mentioned
24   that it was an artist's proof. It's one of 10
25   in the world, and that there is -- it's a

Page 46

1    highly prized item.
2    Q    Did she say before we need to do any
3    type of insurance that there would have to be
4    some kind of appraisal? Anything of that
5    nature?
6    A    No.
7    Q    Any questions directed to you about
8    the artwork at all?
9    A    Not that I recall, no.
10   Q    So you just volunteered the
11   information about the artwork. Correct?
12   A    Yes.
13   Q    You said, "I have this special piece.
14   It's worth $8,000-plus. It is a Wyland
15   "Maui Dawn" cibachrome" -- is that correct?
16   A    That is correct.
17   Q    "Cibachrome artist proof," and she
18   said, "No. Don't worry about it. It's all
19   covered"?
20   A    Yes.
21   Q    Got it.
22       Did she ask if you had it appraised
23   and that's how you got the $8,000 figure?
24   A    She did not ask that. I volunteered
25   that information.

Page 47

1    Q    So she didn't basically ask you
2    anything about it. Is that your testimony?
3    A    Yes.
4    Q    Do you recall if the coverage that
5    you had for the proof when you were in Ohio
6    was a rider or was it a separate policy?
7    A    My recollection is that it was a
8    rider.
9    Q    Who was your agent in Ohio?
10   A    I do not recall.
11   Q    Do you remember the company that he
12   or she worked for?
13   A    No, I do not. And unfortunately,
14   those records were destroyed by the hurricane.
15   Q    And is your understanding if we went
16   and found the renter's policy, it would be
17   policy from ABC company with an attached rider
18   from ABC company covering the artwork?
19       MR. ARCHEY:
20           Asked and answered.
21           Go ahead.
22   A    Yes.
23   Q    (By Mr. Barreca) Do you recall if you
24   discussed anything else with Lisa Dufour on
25   June 8?

Page 48

1    A    Discussed increasing the contents
2    coverage to the $40,000.
3    Q    Because that's when you prior had
4    received the quote from Joan that had the
5    $25,000 content coverage?
6    A    Yes.
7    Q    I'm going to follow down your
8    chronology memo since I think that might be
9    the best way to get through all of this in
10   some kind of organized fashion.
11       Going to June 9, it says
12   approximately 4 o'clock you called Lisa Dufour
13   to amend the quote and she informed you that
14   the total premium for flood insurance with the
15   $183,000 coverage with the $1,000 deductible
16   and the $40,000 coverage on the contents with
17   a $500 deductible would be $836. Is that
18   accurate?
19   A    Yes.
20   Q    Is that the same quote that you were
21   previously faxed on -- well, and I apologize.
22   I think I'm getting ahead of it.
23       This is the same quote that we talked
24   about that was sent to you via fax on June 23.
25   The same quote with the same information?

Page 49

1  A   Could you clarify?  I guess I don't
2  understand.
3  Q   I want -- just reading it, my
4  understanding is that on June 9 you spoke to
5  Lisa and she gave you the quote over the
6  phone.
7  A   Yes.
8  Q   But subsequently on June 23, she sent
9  it to you -- or maybe she sent it to Joan and
10  Joan sent it to you with the written
11  information of the quote you discussed over
12  the phone.
13  A   No.  This was -- my understanding,
14  this was not the quote.  This was the policy
15  application.
16  Q   Got it.
17  MR. ARCHEY:
18  "This" referring to?
19  MR. BARRECA:
20  I think it's P-4.
21  MR. ARCHEY:
22  Thank you.
23  (Off the record.)
24  Q   (By Mr. Barreca) And I know you
25  provided to me some handwritten notes.  Is

Page 50

1  that how you constructed this document here
2  that is the Attachment A, Chronology of Events
3  you produced?
4  A   It was based in part by notes and in
5  part by memory.
6  Q   The June 9, do you recall if you had
7  a note relating to your June 9 conversation?
8  And we can get to the notes in a moment, but I
9  don't remember seeing one.  That's why I was
10  asking.
11  A   I would have to see.  I cannot recall
12  precisely.  There was a lot of notes that were
13  all over the place.
14  Q   The notes that you do have, was
15  there -- how did you keep those?
16  A   Handwritten notes in a notebook.
17  Q   Was this a notebook that was, you
18  know, a homeowner's insurance notebook, or was
19  this Ronald Holbrook's jot-down notes
20  every-day-of-my-life-as-I-go-along-type
21  notebook?
22  A   It was more the former.
23  Q   Do you still have the notebook?
24  A   I have -- yes; most of the items from
25  the notebook.  I ripped out pages regarding

Page 51

1  this particular event, put in a folder when we
2  evacuated -- when we left before Hurricane
3  Katrina.
4  So other parts of the notebook are
5  probably destroyed by Hurricane Katrina.
6  Q   What made you tear the pieces of
7  pages out of the notebook to put in a folder
8  before you left?
9  A   Because this was still in limbo when
10  I left New Orleans on the 26th of August and
11  was going to continue to pursue this policy,
12  nonresponsive agents regarding this policy.
13  Q   It was a spiral notebook?
14  A   I think so.
15  Q   You just didn't feel the need to grab
16  the whole notebook?
17  A   I'm trying to recall; but no.
18  Q   On June 22, 2005, you sent a fax --
19  you or your wife sent a fax to Lisa Dufour.
20  Do you recall that?
21  A   I cannot recall exact dates.  I do
22  believe there were some faxes that went back
23  and forth, and the 20th sounds like when we
24  agreed to have the policies written up.
25  Q   I'll show you a fax in just a moment.

Page 52

1  MR. BARRECA:
2  And it's going to be marked --
3  Bates number is AAA 100.  That's
4  going to be P-5.
5  (Exhibit P-5 was marked.)
6  MR. TREAS:
7  AAA 100?
8  MR. BARRECA:
9  Yes.
10  Q   (By Mr. Barreca) This has my
11  highlights, but you can just disregard my
12  highlights if you like because the original
13  document, I assume, had no highlights on it.
14  Do you remember that document?
15  A   Yes.
16  Q   Do you remember if it was you or your
17  wife who sent that?
18  A   I sent this one.
19  Q   The 15 percent protective services
20  discount, did you secure that, or did you get
21  the discount on your insurance policy?
22  A   I do not recall exactly.  I know that
23  there were two policy quotes on the
24  homeowner's insurance, one without the alarm
25  attached to it and one with, and we did not

Page 53

1  activate the alarm system.
2       MR. TREAS:
3           Can I stop for a second?  I
4  only have 16 pages from AAA.  Was
5  there a subsequent disclosure?
6       MR. BARRECA:
7           There was a previous
8  disclosure -- well --
9       MR. ARCHEY:
10          No.  Yesterday.  Day before --
11  yesterday.
12      MR. BARRECA:
13          I will get it for you if you
14  want to take a break.  Is this a
15  good time to take a break?  I don't
16  know if they put it in the mail to
17  you.
18      MR. TREAS:
19          I have the initial disclosure
20  up to Page 16.
21      MR. BARRECA:
22          No.  It was another hundred
23  pages that went out.
24      MR. ARCHEY:
25          Here's a set of it.  You can't

Page 54

1  have them, but you can look at
2  them.
3       MR. TREAS:
4           Okay.  Wow; secret documents.
5       THE WITNESS:
6           For the record, I looked at
7  those yesterday.
8       Q   (By Mr. Barreca) So you didn't have
9  the alarm system activated or a monitor system
10  in place at Katrina?
11      A   No, we did not.
12      Q   So I assume you didn't get the
13  discount?
14      A   Yes; if -- the actual policy quote
15  that we signed did not have the coverage
16  amounts that are listing on that particular
17  fax.
18          My recollection is that subsequent to
19  this fax being sent that I had a conversation
20  with Lisa and we changed it to the policy
21  quotes that we then signed off on.
22      Q   Which did not include the 15 percent
23  discount because you didn't get the --
24      A   Yes.  Precisely.
25      Q   Got it.

Page 55

1           The same day that you received the
2  fax from AAA with the Fidelity flood, you also
3  received the fax regarding the homeowner's
4  coverage?
5       A   Yes.
6       Q   It is marked HOL 28.
7           Was it you or your wife reviewing the
8  documents, or both?
9       A   Both of us were reviewing these
10  documents.
11      Q   Let me show you what I've marked
12  as P-6 which is entitled "Auto Club Family
13  Insurance Company Homeowner's Application."
14          (Exhibit P-6 was marked.)
15      MR. ARCHEY:
16          I understood that to be
17  multiple pages.
18      MR. BARRECA:
19          Yes, it is.
20          (Off the record.)
21      Q   (By Mr. Barreca) The document I'm
22  going to give you I'm going to reference it as
23  HOL 0028 through 0031.  This seems to be
24  consistent with -- because of the tag line --
25  the fax tag line June 23, 2005 from AAA I

Page 56

1  assume it was being sent to you -- it starts
2  with Page 7 and goes to Page 10.
3       MR. TREAS:
4           28 through 31, that's of HOL?
5       MR. BARRECA:
6           Yes.
7       MR. ARCHEY:
8           I don't have any objection but
9  it is part of a 10-page fax.  It's
10  all right there together.
11      MR. BARRECA:
12          We can put it together.  I was
13  talking about it separately.  What
14  I talked about earlier was P-4
15  which is Page 2 -- we'll put it all
16  together for convenience.
17      MR. ARCHEY:
18          I don't have any objection.
19  It's just that the fax cover sheet
20  does show it coming from AAA, and
21  then going back from the Holbrooks
22  to them.  And it's 10 pages
23  altogether.  However you want to
24  it.  I just -- let record reflect
25  that.

Page 57

```
 1        MR. BARRECA:
 2           Let the record reflect that
 3        P-4 is Pages 2 through 6 of a
 4        10-page fax. I have not attached
 5        the Page 1 of the 10-page fax.
 6        Just so everyone is clear, it is a
 7        fax memorandum from AAA initially
 8        Lisa Dufour to April Holbrook on
 9        June 23, 2005. And then it looks
10        like the same fax cover sheet was
11        used to return the signed documents
12        to Lisa Dufour from April Holbrook.
13        MR. ARCHEY:
14           Thank you.
15    Q    (By Mr. Barreca) So now I'm going to
16  show you P-6 which is the last four pages of
17  the fax which is the AAA homeowner's policy.
18    A    I've reviewed the documents.
19    Q    When you received this fax, did you
20  read it?
21    A    Yes.
22    Q    Did your wife also read it?
23    A    Yes.
24    Q    Did you have any questions about it
25  when you first received it on June 23?
```

Page 58

```
 1    A    No.
 2    Q    This was your insurance policy. Did
 3  you read every line?
 4    A    I do not recall if I read every line.
 5    Q    Do you think you would be obligated
 6  to read every line?
 7        MR. ARCHEY:
 8           Objection. Calls for a legal
 9        conclusion.
10           You can go ahead and answer
11        the question.
12    A    To the best of my ability, I read as
13  much of the pertinent information regarding
14  this property or this homeowner application.
15    Q    (By Mr. Barreca) I assume you would
16  think it would be prudent to read your
17  insurance application?
18    A    Yes.
19    Q    And you agree that once you sign a
20  document, that suggests that you read it and
21  approve it?
22    A    That -- I'm sorry?
23    Q    By your signature on a document, do
24  you agree that means that you approve and
25  accept the document?
```

Page 59

```
 1    A    Yes.
 2        MR. ARCHEY:
 3           Object to the form of the
 4        question.
 5           Did you read every page in
 6        your real estate closing document
 7        package?
 8        MR. BARRECA:
 9           Yes, I did.
10        MR. ARCHEY:
11           I'm proud of you. You'd be
12        one of the only people in the
13        state.
14    Q    (By Mr. Barreca) Regardless that you
15  may not have read every single line in your
16  real estate closing package, by signing all
17  those dozens, if not hundreds, of pages when
18  you went to your sale, you agreed or
19  understood that you were binding yourself to
20  the terms in those documents.
21        MR. ARCHEY:
22           Objection. Still calls for
23        legal conclusion.
24           You can answer.
25    A    When I signed those documents, my
```

Page 60

```
 1  understanding was I agreeing to purchase a
 2  house and agreeing to all of the issues
 3  involved with purchasing a house.
 4    Q    (By Mr. Barreca) All the terms and
 5  conditions in those stacks of papers.
 6        MR. ARCHEY:
 7           Same objections.
 8           Go ahead.
 9    A    Yes.
10    Q    (By Mr. Barreca) After all that, I
11  realize you didn't even sign this. But it was
12  signed by your wife.
13    A    Yes, it was.
14           If I may explain why April signed
15  most of these documents is because she is the
16  first-named party in this, and we were
17  instructed that the first-named party is the
18  one that should sign this.
19    Q    So even if you might have been there
20  when the fax came through, because you were
21  following instructions, she signed?
22    A    Yes.
23    Q    You can just -- Page 9 of the fax
24  which happens to be Holbrook 0030 just
25  indicates that by signing, you're agreeing to
```

Page 61

1  the terms, generally speaking?  I'm not
2  paraphrasing greatly.
3        MR. ARCHEY:
4           Wait.  Is that a question?
5        MR. BARRECA:
6           That's a question.  I'm asking
7        him if that's what he understands,
8        this paragraph before the signature
9        block.
10       MR. ARCHEY:
11          Object to the form.
12          It says what it says.  I mean,
13       we can all read it.  You can.
14          Go ahead and answer his
15       question.
16       THE WITNESS:
17          Could you clarify what the
18       question was again?
19    Q   (By Mr. Barreca) Sure.  The paragraph
20  right before your wife's signature in part
21  says, "I have read this application and the
22  attachments hereto."
23       MR. ARCHEY:
24          Those are what the words say.
25          Is that the question?

Page 62

1        MR. BARRECA:
2           Yes.
3        MR. ARCHEY:
4           Document speaks for itself.
5        MR. BARRECA:
6           I understand.
7    Q   (By Mr. Barreca) But you agreed --
8        MR. ARCHEY:
9           He can read English, and those
10       are the words.
11       MR. BARRECA:
12          Okay.
13   Q   (By Mr. Barreca) Can you read the
14  next sentence for me that follows "I have
15  read the application and the attachments
16  hereto"?
17   A   Are you asking me if I can read
18  those?
19   Q   Could you read it for me?  I'm asking
20  you to read it.
21       MR. ARCHEY:
22          What are you asking him to
23       read?  He can read it.
24       THE WITNESS:
25          The second sentence in this

Page 63

1  particular paragraph?
2        MR. BARRECA:
3           Correct.
4        MR. ARCHEY:
5           Go ahead.
6    A   "I hereby apply for the insurance
7  indicated and represent that I have read this
8  application and attachments hereto."
9    Q   (By Mr. Barreca) And read the third
10  sentence also.
11   A   "I warrant the statements hereon are
12  true and correct and I understand these
13  statements will be relied upon by the Auto
14  Club Family Insurance Company in issuing the
15  policy."
16   Q   Thank you.  Let me point this out to
17  you and tell me if you can even read what that
18  says down there.  And I'm looking at P-6, the
19  bottom right of P-6.
20   A   I cannot read what's on your
21  document.
22   Q   Mine's been faxed over so many times.
23       Can you even read what's on yours?
24   A   I can read "Unscheduled," and that's
25  about it.

Page 64

1        MR. ARCHEY:
2           For the record, in the bottom
3        right paragraph block of the
4        document, there's "No" is what's
5        typed in below.
6           Is that accurate?
7        MR. BARRECA:
8           Correct.
9    Q   (By Mr. Barreca) If I had to tell you
10  what it says on a cleaner copy, I would say
11  that it says, "No Jewelry."
12       LISA DUFOUR:
13          "Unscheduled Jewelry."
14       JO-ANN DALEO:
15          Over -- I think it's over
16       $1,000.
17       MR. BARRECA:
18          It's "Unscheduled Jewelry Over
19       $1,000."
20   Q   (By Mr. Barreca) And it has been
21  identified as "No"?
22       MR. ARCHEY:
23          Wait, wait.  So what's the
24       question?  We're not answering
25       that.  We can't even read it.

**Page 65**

1    Ya'll could barely read it looking
2    at multiple copies.  What's the
3    question?
4        First of all, we don't agree
5    that's what it says.
6    MR. BARRECA:
7        Well, let's go, and I will
8    provide to you --
9    MR. ARCHEY:
10        The copies we have are exactly
11    as you said.  We couldn't make it
12    out.  A clean copy is fine, but
13    this is what we got.
14    MR. BARRECA:
15        I understand.
16        This is AAA-96.  I'll mark
17    this as P-7.
18        (Exhibit P-7 was marked.)
19    Q    (By Mr. Barreca) Would you look at
20    P-7 and see if it is --
21    MR. TREAS:
22        427?
23    MR. BARRECA:
24        P-7.
25    MR. TREAS:

**Page 66**

1        I missed that.
2    MR. ARCHEY:
3        AAA 96.
4    MR. TREAS:
5        96.  Sorry.
6    Q    (By Mr. Barreca) Is that essentially
7    the same document that is the first page of
8    P-6?
9    A    It appears to be essentially the same
10    document.
11    MR. ARCHEY:
12        And appears to be the nonfaxed
13    copy.  I guess the original that
14    they had.  He has the holes at the
15    top and no fax header.
16    Q    (By Mr. Barreca) Looking at the same
17    block, can you now read what it says?
18    A    It says, "Unscheduled Jewelry over
19    $1,000?"
20    Q    And what is the response?
21    A    The response is "No."
22    Q    Do you know if you answered that
23    question or your wife answered that question?
24    A    I guess -- what's the question?
25    Q    I'm just wondering, do you recall a

**Page 67**

1    conversation with anyone at AAA where you
2    would go through these questions and your
3    response was no to the unscheduled jewelry
4    over $1,000?
5    A    My recollection was that during the
6    same discussion that I had with Lisa regarding
7    the Wyland, the $8,000 piece of art, that I
8    also mentioned that my wife has an engagement
9    ring that is valued at about $1500.  And the
10    same question regarding the Wyland, I said,
11    "Look, do we need to have special riders for
12    that?"
13        And her reply was no.
14        So when we received this fax, we saw
15    "No Jewelry over $1,000," our assumption was
16    because of Lisa's discussions with us, that
17    those -- that everything that was in the house
18    was covered under the contents coverage.
19    Q    So what did you think this
20    "Unscheduled Jewelry Over $1,000" meant?
21    A    I cannot testify to remembering
22    exactly what I thought of that.
23    Q    Do you recall if anyone from AAA
24    asked you that question or asked your wife
25    that question?

**Page 68**

1    MR. ARCHEY:
2        What question?
3    THE WITNESS:
4        Yeah.
5    Q    (By Mr. Barreca) The question of any
6    unscheduled jewelry over $1,000?
7    A    I don't recall being asked that
8    question.
9    Q    Do you know if your wife was asked
10    that question?
11    A    I cannot testify to what she was
12    asked.
13    Q    Do you know if your wife ever spoke
14    to Lisa Dufour?
15    A    I know that she did not speak to Lisa
16    Dufour.
17    Q    Do you know if your wife ever spoke
18    to Jo-Ann Daleo?
19    A    I know that she never spoke to Jo-Ann
20    Daleo.
21    Q    So she had no communications
22    whatsoever with AAA?
23    A    Yes.
24    Q    Do you know if anyone from AAA asked
25    if you had any pets?

Page 69

1    A   I can't recall if that question was
2   asked.
3    Q   Here it says no. Do you have any
4   pets?
5    A   Yes, we did have a pet.
6    Q   What was it?
7    A   A cat.
8    Q   You had the cat when you were in
9   Ohio?
10    A   Yes.
11    Q   Residing in the residence, it says,
12   "two." I would assume two people.
13       Do you know if anybody ever asked you
14   that?
15    A   I can't recall if that particular
16   question was asked. But it is correct. Two
17   people were residing in that house.
18    Q   Let's go back to you said a moment
19   ago that you had a discussion with I believe
20   it was Lisa Dufour about your wife's
21   engagement ring, and that was at the same time
22   you talked about the Wyland print?
23    A   Yes.
24    Q   And she said, similar to what she
25   told you about the Wyland print, that that was

Page 70

1   covered?
2    A   Yes.
3    Q   Covered in the flood insurance as
4   well as in the homeowner's?
5    A   Yes.
6    MR. BARRECA:
7       This is going to be Exhibit
8    No. next, P-8.
9       (Exhibit P-8 was marked.)
10    Q   (By Mr. Barreca) I'm going to show
11   you P-8 which is a flood elevation certificate
12   from Dading, Marques and Associates dated
13   June 28, 2000.
14       Have you ever seen that before?
15    A   Yes, I have.
16    MR. TREAS:
17       Is there a Bates number?
18    MR. ARCHEY:
19       AAA 37.
20    Q   (By Mr. Barreca) When was the first
21   time you recall seeing that?
22    A   Late June.
23    Q   Who provided that to you?
24    A   If I remember correctly, this was one
25   of a series of documents that was provided by

Page 71

1   the title company when we went through to sign
2   over the title when we purchased the house.
3    Q   Do you know where they received it
4   from?
5    A   My understanding was that they
6   received it from the previous homeowner.
7    Q   Do you know who the previous
8   homeowner was?
9    A   I can't remember their names exactly.
10   So no.
11    Q   But you don't know if Joan Farabaugh
12   received it from the previous homeowners, or
13   do you think that the title company received
14   it directly from the previous homeowners?
15    A   I don't know exactly what happened on
16   that.
17    Q   You think the first time you saw this
18   was when you went to closing?
19    A   Yes.
20    Q   Did anybody provide you a copy --
21   strike that.
22       It was, I assume, part of your
23   closing documents?
24    A   Yes.
25    Q   Do you still have the closing

Page 72

1   documents?
2    A   No.
3    Q   Lost them in the flood?
4    A   Yeah.
5    Q   Did you ever at any time take a copy
6   of this to AAA?
7    A   No.
8    Q   So after your closing, the next piece
9   of information you received regarding any
10   insurance on your home was -- if I'm following
11   your outline -- was the notice from Fidelity?
12   And I'm looking at July 25.
13    A   That was the date that it was mailed.
14    Q   Got it.
15       Do you remember the date you received
16   it?
17    A   Don't recall the exact date. My wife
18   and I moved to -- we moved into the property
19   the last week of July. I know that our mail
20   was not delivered until a couple of days into
21   the week, so I can't remember the exact date
22   that we received it, but it was not long
23   before August 4, probably August 3.
24    Q   Do you recall what else came in that
25   envelope besides that letter?

Page 73

1    A   All I recall was that letter.
2    MR. BARRECA:
3        I'm going to mark the letter
4    as P-9.
5        (Exhibit P-9 was marked.)
6    Q   (By Mr. Barreca) And that, for the
7    record, is HOL 0060. And that's the letter
8    that we're talking about that was mailed on
9    the 25th that talks about the reduction in
10   flood coverage?
11   A   Yes.
12   Q   What did you do when you received
13   that letter?
14   A   I called Fidelity to ask what was
15   going on, and they directed me to speak to my
16   agent.
17   Q   The "agent" being AAA?
18   A   Yes. And then I called my agent;
19   called Lisa.
20   Q   So when you received the letter, do
21   you recall if you, as soon as you got the
22   letter, picked up the phone and called
23   Fidelity or within the same day?
24   A   I do not recall if it was the same
25   day. It was, I do believe, the very next day

Page 74

1    because, if I remember correctly, we were out
2    that day, got home kind of late, opened up the
3    mail, saw this. Both my wife and I, we were
4    upset by it, and so immediately reacted on it.
5    Q   So you think the next day -- if you
6    suspect that you received it on the 3rd, you
7    think you made the phone call on the 4th?
8    A   Well, I know that I made the phone
9    call on the 4th. And my recollection is that
10   I called the first business day that I could.
11   Q   And so the records that show that you
12   called on the 4th, you think that was -- the
13   first day you called, you actually got through
14   and spoke to someone?
15   A   I called -- that's the first time
16   that I called Lisa and got through and spoke
17   to somebody.
18   Q   I want to be clear that it wasn't
19   that you were trying to call several times
20   earlier than the August 4th day that shows up
21   on some time records that you produced to us,
22   your phone records.
23   A   No. That was the first -- the first
24   time that I contacted Lisa regarding this
25   document, yes.

Page 75

1    MR. BARRECA:
2        Just so we can talk about it
3    all together, I'm going to mark as
4    Exhibit 10 the flood declarations
5    page from Fidelity -- well,
6    correct -- that it actually says
7    it's a AAA flood declarations page.
8        (Exhibit P-10 was marked.)
9    MR. TREAS:
10       What's the Bates number?
11   MR. BARRECA:
12       Holbrook 34.
13   MR. TREAS:
14       Thank you.
15   MR. BARRECA:
16       And just for reference, I'm
17   going to mark as P-11, Holbrook 36,
18   which is the cover page of the
19   Fidelity National Property and
20   Casualty Insurance Company Dwelling
21   Policy, National Flood Insurance
22   Program.
23       (Exhibit P-11 was marked.)
24   Q   (By Mr. Barreca) Mr. Holbrook, do you
25   recall P-9, P-10, and P-11 all appear that

Page 76

1    they were generated on July 25? Do you know
2    if you received these in the same envelope?
3    You stated earlier that you didn't think you
4    did.
5    A   I don't know if they came in separate
6    envelopes or if they came in the same
7    envelope.
8    Q   Do you recall if you received them on
9    the same day?
10   A   No, I do not recall.
11   Q   Just to have the record as accurate
12   as possible, P-11 is the Fidelity Flood
13   Insurance Policy. It begins with Holbrook 36.
14   I'm sure it goes on for several pages. And
15   according to my records it's Holbrook 36
16   through Holbrook 58.
17       You obviously read P-9 which talks
18   about the lower limits. Correct?
19   A   Yes.
20   MR. ARCHEY:
21       And back to the policy, you're
22   not going to attach the other
23   additional pages of the policy or
24   the cover page at this time. Is
25   that correct?

Page 77

1    MR. BARRECA:
2        Yes.
3    MR. ARCHEY:
4        Okay.
5    Q    (By Mr. Barreca) And I apologize for
6    repeating myself. You don't recall if they
7    came the same envelope or separate envelopes?
8    A    I don't recall if they came in
9    separate envelopes or together.
10    Q    Do you recall if they even came on
11    the same day?
12    A    I don't recall if they came on the
13    same day.
14    Q    Do you recall receiving P-10 at all?
15    The flood declarations page?
16    A    Yes, I do recall receiving that.
17    Q    And you read this?
18    A    I read that front cover page, yes.
19    Q    Do you recall receiving the actual
20    policy which I marked P-11?
21    A    Yes.
22    Q    I'm just showing you the cover page
23    at the moment.
24    A    Yes, I do.
25    Q    Did you read the policy when you

Page 78

1    received the mail?
2    A    I did not read the entire policy when
3    I received it in the mail.
4    Q    Just summarize to me what P-9 says.
5    MR. ARCHEY:
6        I object. You're going to
7        have to ask a better question than
8        that.
9    MR. BARRECA:
10        I will. I was actually trying
11        to save time.
12    MR. ARCHEY:
13        Well, I mean -- go ahead.
14    Q    (By Mr. Barreca) My reading of P-9 --
15    and correct me if I'm wrong -- do you have
16    this document in front of you? It's actually
17    Holbrook 60.
18    A    Yes, I do have a copy of it in front
19    of me.
20    Q    And it says, "Your flood policy has
21    been issued with lower limits than originally
22    requested because the submitted premium was
23    adequate."
24    A    That's -- I acknowledge reading that
25    and understanding that.

Page 79

1    Q    And then it goes on to say, "You can
2    purchase additional coverage for your policy,"
3    in essence receiving the coverage you
4    initially wanted, if you pay an additional
5    $342 by August 24, 2005.
6        Is that an accurate statement? And I
7    might have left out a couple of words. Is
8    that essentially what the letter says?
9    A    Yes; that's my understanding of what
10    the letter essentially says.
11    Q    What did you do when you got this
12    letter? I know I asked this, but let's try to
13    keep it in order.
14    A    I called the 1-800 number down there
15    regarding the policy information of Fidelity
16    asking why this had been issued at lower
17    policy amounts than what we had signed to.
18        And then they directed me saying you're
19    going to have to ask your agent, meaning Lisa
20    Dufour -- or in this case, Jo-Ann Daleo is
21    named on this.
22        But they said go to your agent. I
23    took that to me Lisa and/or Jo-Ann.
24    Q    Got it.
25        But you agreed that, according to

Page 80

1    this letter, as of the date you received it,
2    you did not have the coverage that you
3    requested?
4    MR. ARCHEY:
5        Object to the form of the
6        question. That's a legal -- calls
7        for a legal conclusion.
8        You can go ahead and answer
9        the question.
10    A    My understanding was that this was in
11    error and that it just needed to be corrected.
12    Q    (By Mr. Barreca) An error meaning
13    that at this point you still weren't convinced
14    that you had a lower coverage than what you
15    initially asked for?
16    A    That's correct.
17    Q    You call Fidelity. They direct you
18    to your agent who, on this letter, P-9, says
19    Jo-Ann Daleo. And you call her?
20    A    I called AAA -- called -- I called
21    and spoke to Lisa.
22    Q    Lisa Dufour?
23    A    Yes, Lisa Dufour.
24    Q    What was the substance of that
25    conversation, if you recall?

Page 81

1    A    The substance of the conversation as
2  I recall was, I just received this letter,
3  what's going on.
4         Lisa's reply to me was, "I've been
5  meaning to call you on this," and didn't go
6  into particular details.
7         And what I suggested was that I did
8  have to establish car insurance.  I was
9  planning on establishing car insurance through
10  AAA.  I know that I'll need to come in and
11  sign some documents for that.  Why don't I
12  come in and we can discuss this.
13        And we set up a time to discuss it:
14  2 p.m. on the 4th of August.
15    Q    And you think that was the same day
16  you called?
17    A    Yes; I do believe I called in the
18  morning, and we were able to set up an
19  appointment immediately that day.
20    Q    You said that she told you that she's
21  been meaning to call you on this assuming that
22  she had also received this letter?
23    A    My assumption was that there was
24  something that she knew in regards to this
25  that had not been disclosed to me.

Page 82

1    Q    Well, she knew something was up?
2    A    Yes.
3    Q    It wasn't that you called and said,
4  "Hey, I got this letter."
5         And she says, "Oh, my God.  What was
6  that all about?  Come on in."
7         Nothing like that?
8    A    The response was, "I've been meaning
9  to call you on this."
10        And I said, "Well, then I should --
11  I'm coming in for auto insurance.  Let's
12  discuss it at that time."
13    Q    Got it.
14        So you go in at 2 o'clock, I presume?
15    A    Yes.
16    Q    Tell me what happens then.
17    A    Lisa and I sat at her desk.  We -- I
18  pulled this out and -- I do believe I also had
19  the signed applications from the 30th -- or
20  rather the 23rd of June.
21        And I said, "We requested 183 and 40.
22  Why is this different?"
23        And I got a story regarding that
24  there was something with the elevation
25  certificate; that an incorrect elevation

Page 83

1  certificate had been submitted by her to the
2  flood insurance underwriters.
3         And I said, "Well, where did you get
4  that?  And when did you get it?"
5         And I can't recall her answer, but I
6  think it was something to the extent that she
7  received it from the title company and she
8  just faxed it on to them.
9         Then, for some reason, that the
10  correct flood insurance policy was provided --
11  or the correct -- excuse me -- the correct
12  elevation certificate was provided, and that
13  this somehow triggered the change in requested
14  coverage amounts.
15        MR. BARRECA:
16           Let me show you what I'm going
17        to mark as number P-12.
18             (Exhibit P-12 was marked.)
19           And it's also marked AAA 0043.
20           And this also has been produced to
21        you earlier.
22    Q    (By Mr. Barreca)  And I understand
23  that this is the incorrect flood elevation
24  certificate that was initially used for the
25  quote that was provided to you on or about

Page 84

1  June 23.  We're talking about the flood
2  insurance quote.
3    A    Okay.
4    Q    Have you ever seen that before?
5    A    I have seen it in the documents that
6  you have provided also us.
7    Q    But you hadn't seen it before I
8  produced the documents in connection with this
9  litigation?
10    A    To my recollection, I cannot recall
11  if Lisa had this and showed it to me at the
12  time that we met on the 4th or not.  But -- so
13  I will qualify my answer that I know for a
14  fact that I saw it when I received the
15  documents from you.
16    Q    I'll just tell you this part and --
17  it was part of the AAA file.
18    A    Okay.
19    Q    Part of your AAA file.  And I
20  understand that was the incorrect flood
21  elevation that was used that resulted in the
22  incorrect quote on the flood policy.
23    A    Okay.
24    Q    Is that what Lisa Dufour explained to
25  you happened when you met with her on the 4th?

Page 85

1   August 4th?
2       A   What was explained to me was that she
3   allegedly received an incorrect elevation
4   certificate regarding our property.
5       Q   And I'm just, for the sake of making
6   it easy -- whether or not it's this one -- I
7   just believe it is P-12 which is this document
8   because that was in your file.
9       A   Can't testify to that, but okay.
10  That seems to jog with everything that I've
11  now seen in the documents.
12      Q   Okay.  When she said that -- she
13  received the wrong quote that was provided to
14  you because of a wrong flood elevation -- what
15  was her response after that?  How did she try
16  to correct it?
17      A   What was -- what did she tell me she
18  tried to do to correct it?
19      Q   Right.  Because when -- I assume you
20  called, and she said we need to talk about it.
21  She already knew what was going on and tried
22  to work things out.  Or she was doing
23  something or was at least aware of something.
24      A   She was aware of something.  I can't
25  testify as to what was actually done.

Page 86

1       Q   So she -- you come in.  She says the
2   wrong flood elevation was used, but now we
3   have the correct flood elevation.
4           I mean, you fill in the pieces that
5   I'm trying to fill in.  I don't know what
6   happened next.
7       A   What all -- what I know is that the
8   elevation certificate that does apply to our
9   property, the numbers on that did not -- do
10  not match what was used for the policy quotes.
11  This document seems to match those policy
12  quotes.  This document.
13      Q   And just so that we're clear, the
14  numbers that you're talking about, we're
15  talking about the original quote that we
16  discussed earlier where I made you identify
17  the numbers in that certain block of the
18  June 23 flood application.
19          I can go back and get the exact
20  title -- P-4 (presenting).
21      A   Looking at the numbers on P-4, the
22  document HOL 0025, the elevation information
23  here matches the document P-12, and it was my
24  understanding --
25      Q   Don't forget the read the number down

Page 87

1   there.
2       A   It says --
3       Q   No.  This number.
4       A   AAA 0043.
5       Q   Thank you.  You're getting better at
6   this than me, so I'll make you read the
7   numbers and stay on track so I don't get
8   blamed for losing it.
9           At that point, what happens when
10  you're sitting with Lisa Dufour?
11      A   At this point I ask, "Well, when did
12  you receive the incorrect elevation
13  certificate?  From whom did you receive it?
14  And why did you fax it on to the underwriter
15  if you know it to be incorrect?"
16          And the response was, "I don't know,"
17  and "I don't know," and "I don't know."
18          She then subsequently went -- and I
19  said, well, how did this happen?
20          And what she tried to do -- my
21  understanding -- I didn't see this -- she
22  tried to replicate the policy quotes that were
23  provided to me prior to August 4, and went in
24  with both these numbers and the numbers -- the
25  correct numbers for our property, and was not

Page 88

1   able to replicate that particular -- those
2   particular quotes.
3           I was very suspicious at that time,
4   and I said, look, I need to have an answer to
5   this before I'm willing to pay subsequent
6   premium because it seems that you've made an
7   error and I had nothing to do with that.
8       Q   Got it.
9           I don't think there's anybody that's
10  going to dispute that there was an error in
11  the initial flood elevation being submitted.
12          At this point, we still can't figure
13  out where it came from, but it clearly is not
14  for your property because it says some address
15  on Colbert?
16          MR. ARCHEY:
17              Hold on.  I don't want accept
18          your statement or qualification
19          that you just made.  You can
20          proceed with --
21          MR. BARRECA:
22              What do you not accept?
23          MR. ARCHEY:
24              I don't accept -- you want to
25          insinuate there that this is some

Page 89

1   error that's not attributable to
2   somebody. It is attributable to
3   someone from our perspective.
4       MR. BARRECA:
5           Understood.
6   Q   (By Mr. Barreca) At that point, did
7   Lisa Dufour have the correct flood elevation?
8   A   When I went on August 4, yes, she did
9   have the correct flood elevation certificate.
10  Q   It's your position that you didn't
11  come in with it that day?
12  A   No, no, no. I did have it on that
13  date, and I did come in with it.
14      I don't -- I was under the impression
15  that she had the correct one as well, and I do
16  believe that she showed it to me. I can't
17  recall if I provided it or she provided it or
18  what.
19  Q   Regardless, as of August 4, which is
20  the date we assume all this took place --
21  A   Yes.
22  Q   -- you and Lisa Dufour had the
23  correct flood elevation?
24  A   Yes.
25  Q   Got it.

Page 90

1       So was -- at that point, was a quote
2   provided, or what did they do?
3   A   At that time, I was -- what I said is
4   I need to have an explanation as to what
5   happened. I need you to show me how the
6   quotes -- the numerous quotes that I received
7   from May -- mid-May to mid-June, all of those
8   quotes were in the range of $700 -- or $600 to
9   $850, how suddenly this changed to whatever
10  the amount was -- the $836 plus the $342. I
11  need -- I cannot respond to this until I have
12  sort of an accurate portrayal of what
13  happened.
14  Q   Let's back up for a moment.
15  A   Sure.
16  Q   You're saying the $700 numbers. You
17  initially agreed to pay the $836?
18  A   Yes. Exactly.
19  Q   And you acknowledged that the numbers
20  on the initial flood elevation did not match
21  your house but they matched the flood
22  elevations in P-12?
23      MR. ARCHEY:
24          Asked and answered.
25      You keep asking questions and

Page 91

1   keep cutting him off when he tries
2   to tell you what happened.
3       MR. BARRECA:
4           I haven't.
5       MR. ARCHEY:
6           You have, and it's slowing
7   down the process.
8       MR. BARRECA:
9           I apologize.
10      MR. ARCHEY:
11          Let me finish. You can
12  conduct the deposition the way you
13  want.
14      MR. BARRECA:
15          I'm trying to conduct it the
16  way I want, but you're interrupting
17  me.
18      MR. ARCHEY:
19          Well, I get to speak
20  sometimes. And I don't speak much,
21  but my objection is you're cutting
22  him off. You keep asking him what
23  she says, and every time he tries
24  to tell you, you only let him get a
25  little ways and you jump in.

Page 92

1       MR. BARRECA:
2           I apologize for cutting you
3   off on occasion.
4           Sometimes I mean to because I
5   want to get pieces and parts to
6   track what's going on. I could
7   say, "Mr. Holbrook, come in and
8   tell me everything that happened,"
9   and just listen. But it wouldn't
10  work that way. That's not how
11  depositions work, and it would be
12  very difficult to do my job and
13  represent my clients by just
14  letting you on go and go.
15  Q   (By Mr. Barreca) Now --
16      MR. TREAS:
17          Where's your bathroom?
18          (Break.)
19      MR. BARRECA:
20          You know you're still under
21  oath. You're still obligated to
22  tell the truth. Do you understand
23  that?
24      THE WITNESS:
25          I do understand that.

Page 93

1      MR. BARRECA:
2           And to Mr. Archey's chagrin,
3      I'm going to have to almost ask the
4      same question. We could have the
5      court reporter read it back, but I
6      think it's easier for me to ask.
7      MR. ARCHEY:
8           My chagrin is noted for the
9      record.
10     Q   (By Mr. Barreca) You went to Lisa
11     Dufour. You acknowledge -- we talked about
12     it -- that the correct elevation is now in
13     AAA's possession?
14     A   Yes.
15     Q   At that point, does she take the
16     correct elevation and give you a quote?
17     A   No. If I may --
18     MR. ARCHEY:
19          Please do.
20     A   -- elaborate on what happened?
21     Lisa went to another room in order to
22     try to replicate the quotes that were
23     originally given to me as well as try to do it
24     with updated information.
25          And at that point, after doing that,

Page 94

1      she returned and told me that she couldn't
2      replicate the original quotes with the
3      incorrect information nor with the correct
4      information. And that --
5      Q   This is the part that I'm confused
6      about.
7      A   Yes.
8      Q   To replicate the original quote would
9      seem immaterial because we know it's not the
10     right quote. Correct?
11     A   We know that it's not the correct --
12     correct -- well, I don't know that for a fact,
13     and that's what I was trying to figure out.
14     Q   Well, you admit that the flood
15     elevation was incorrect that was used to give
16     you the quote?
17     A   It -- Yes.
18     Q   So that quote, just because the wrong
19     flood elevation was used, could not be the
20     right quote for your house.
21     A   I would -- it would seem that if the
22     incorrect information for the wrong address is
23     being used to provide a quote, yes, it's not
24     for my house.
25     Q   So now I'm not so worried about

Page 95

1      whether she could recreate the original quote,
2      even though that might have been something
3      that occurred -- maybe it didn't -- but either
4      way, I don't think that is of any
5      significance, unless you for some reason
6      understand it to be some significance.
7      MR. ARCHEY:
8           Yes.
9      A   I do believe.
10     MR. BARRECA:
11          Don't answer for him, please.
12     MR. ARCHEY:
13          You just got through saying
14     it's of no significance to you. It
15     is of significance.
16     MR. BARRECA:
17          Let me ask it another way.
18     Q   (By Mr. Barreca) Is it any -- does it
19     have any significance as to what the true
20     quote should be for your house?
21     A   It does because I didn't -- I could
22     not identify what the true quote of my house
23     was. That's why I was asking for a
24     replication of both the incorrect and the
25     correct one.

Page 96

1      Q   Okay. And now I'm a little bit
2      confused.
3           Explain to me again why you think the
4      quote based upon an inaccurate flood elevation
5      is significant.
6      A   I did not know exactly what that
7      quote was based on, so I'm trying to explain
8      what happened that day.
9           What I was concerned with and what I
10     expressed at that time was I was concerned
11     that there was a bait-and-switch tactic being
12     performed, and that a lower quote had been
13     provided, and that subsequent to closing on my
14     house, paying for my house, and paying for all
15     the premiums and the insurance premiums that
16     then the policy was being changed.
17     Q   Now I understand a little better. So
18     you thought that was something nefarious going
19     on. They come in, low-ball me. I go with AAA
20     all, and now when it's all said and done, they
21     jack up the rates, and, of course, now what am
22     I going to do?
23     A   That is a very accurate depiction of
24     what was going on in my head.
25     Q   Now I understand the picture a little

---

**Page 97**

1  better. I never got that sense before.
2       So now that we have the accurate
3  quote, does Jo-Ann or Lisa Dufour, or anyone
4  from AAA for that matter, give you a quote
5  based upon the new elevation -- the correct
6  elevation?
7    A   The only information I received
8  regarding a quote or anything was the Fidelity
9  National Property and Casualty Insurance just
10  telling me that the $183,000 in building and
11  $40,000 in contents, that an additional
12  premium of $342 would be necessary. But there
13  was no -- another quote was not generated to
14  my recollection.
15    Q   Got it.
16       And I'm going to ask you again,
17  because this is where the stories conflict --
18    A   Okay.
19    Q   It's my understanding that regardless
20  of what happened previously, once they got the
21  original -- the correct flood elevation, they
22  ran the quote and provided to you -- or at
23  least ran the quote on the Fidelity system and
24  said yes, the quoted premium originally was
25  too low because it was based on the wrong

---

**Page 98**

1  flood elevation, and the new quote does match
2  up to what Fidelity is saying in P-9.
3       MR. ARCHEY:
4          You said "they." I don't know
5       who "they" is.
6          He said AAA could never give
7       him the quote. All that came was
8       from Fidelity.
9       MR. BARRECA:
10          Right. And you can object.
11       I'm just trying to clarify.
12       MR. ARCHEY:
13          "They" was not clear.
14       MR. BARRECA:
15          I think he and I both are
16       trying to get to what really
17       happened. It is what it is.
18          There happens to be,
19       unfortunately, a difference of
20       opinion in what happened.
21    Q   (By Mr. Barreca) "They" I was
22  referring to would be Jo-Ann and Lisa of AAA.
23       I understood that they ran the quote
24  based upon the correct elevation, whether it
25  be provided by you or someone at the title

---

**Page 99**

1  company or your real estate agent. And AAA
2  determined yes, the Fidelity quote that was
3  referenced in P-9 where you had to pay an
4  additional premium was correct.
5          Is it your position that was never
6  discussed?
7    A   What my position -- No; we did
8  discuss this. And what they told me at the
9  time was that they provided an incorrect
10  elevation certificate at the time of the
11  application -- the application. And that
12  subsequent to that, that they provided the
13  corrected information, and that that led to
14  the -- the document where the increased
15  premium was asked for.
16          So when I asked for sort of a
17  clarification of that, they went to another
18  room. And my understanding is that they ran
19  the numbers with the correct policy amount, or
20  with the correct elevation amounts, and came
21  up with numbers, although I don't know exactly
22  what those numbers were.
23          But they said this is correct. They
24  were pointing to --
25    Q   P-9 is correct?

---

**Page 100**

1    A   Saying that P-9 is correct.
2    Q   Right.
3    A   That's what they told me.
4    Q   Okay. And at that point, you still
5  didn't believe them?
6    A   Absolutely not.
7    Q   And why is that?
8    A   Because at the time, all the
9  information that I had provided to them and
10  everything that I had signed I thought was
11  absolutely 100 percent correct. I did not
12  understand how something within a couple weeks
13  could suddenly be incorrect, and that's why I
14  was questioning it.
15    Q   And I completely understand that part
16  of the story.
17          But the part that's confusing me is
18  now that you go in on August 4, and they say,
19  look, we had the wrong flood elevation, it
20  matches up with the original quote which had
21  the wrong numbers. That's why the premium was
22  wrong.
23    A   Well, my understanding -- could you
24  repeat that, because that isn't my
25  recollection of what happened.

---

Page 101

1    Q   Okay. My understanding was, and I
2  think you've already said this, AAA
3  acknowledges that the initial flood elevation
4  used was wrong. As a result, the premium and
5  the quote provided to you was wrong. It was
6  too low.
7        Once they figured that out,
8  presumably -- well, we can go into how they
9  figured it out, but it got figured out.
10       At the same time, you get a letter
11 from Fidelity saying, hey, you've got to pay
12 more money.
13       Conversation goes on August 4, I
14 understand it went, the quote was wrong
15 because the elevation was wrong. We now have
16 the correct elevation, and this is what you
17 have to pay; meaning, P-9 is the correct
18 amount you have to pay. You have to pay the
19 additional $342. Is that not correct?
20    A   That -- that is what those series of
21 events seem. Correct.
22       Now I do believe your original
23 question was why -- what was my problem with
24 that particular line of --
25    Q   Well, why --

Page 102

1        MR. ARCHEY:
2          Whoa, whoa. Let him answer.
3  Don't -- you don't let him answer.
4        MR. BARRECA:
5          I apologize again.
6        THE WITNESS:
7          I appreciate both of you doing
8          your jobs.
9    A   So the concern was for me that my
10 first notice of any change in my policy did
11 not come from my agents but came from
12 Fidelity. I had to contact my agents and had
13 to contact Lisa in order to say, what's going
14 on. I didn't get a straight answer over the
15 phone. I came into the office, and then I get
16 this answer of, well, you owe more money; you
17 own more money.
18       And I said, wait a second. How did
19 this happen? You need to explain this to me.
20 And that's when -- I mean, because, as I
21 mentioned earlier, I was very concerned that
22 there was a bait-and-switch going on, you
23 know.
24       I was new to the area, didn't know --
25 I thought, you know -- my understanding was

Page 103

1  AAA is a reputable company, but I still had my
2  concerns regarding these particular
3  transactions. So until some evidence could be
4  presented that this is exactly what happened
5  and this is how the policy change happened, I
6  felt, look, you made the error, not me.
7    Q   (By Mr. Barreca) So you came down to
8  Southeast Louisiana and thought they were
9  trying to put the screws to you?
10    A   I can't --
11    Q   You don't need to answer that.
12    A   I certainly did not think, by any
13 stretch of the imagination, that had anything
14 to do with the location. I was concerned that
15 I'm new to the area. I don't know anybody.
16    Q   Certainly, if you don't trust people
17 in Louisiana, you absolutely don't trust
18 people in Louisiana that are lawyers. So I'm
19 just trying to get that clear.
20       MR. ARCHEY:
21          Let's move on.
22    A   I will say that I don't trust people
23 who provide me one bit of information and then
24 provide me with another bit of information
25 without substantiating it.

Page 104

1    Q   (By Mr. Barreca) Do you have no
2  recollection that they contacted Fidelity
3  while you were there?
4    A   I do believe an attempt was made to
5  contact Fidelity while I was there. In fact,
6  if I recall, a contact was made and Lisa said
7  to me that, look, I need to get back to
8  this person -- I don't know who exactly it was
9  at Fidelity -- and I'll get back to you.
10    Q   So as far as you can recollect,
11 neither Lisa Dufour or Jo-Ann Daleo at AAA
12 contacted Fidelity and had Fidelity confirm
13 over the phone that, in fact, the P-9 -- the
14 letter -- the information in P-9 was actually
15 correct?
16    A   That's not what I said, and that's
17 not what I recall happening.
18    Q   Okay.
19    A   What I said was --
20    Q   Take it one at a time.
21    A   Okay.
22    Q   What did you say, and then go to --
23       MR. ARCHEY:
24          Wait. What do you mean what
25          did he say?

Page 105

MR. BARRECA:

That's exactly what he said to me. He said that's not what I said. I was asking, well, what did he say.

MR. ARCHEY:

About what?

MR. BARRECA:

I don't know.

MR. ARCHEY:

Do you know what he's trying to ask you?

THE WITNESS:

I don't understand what I'm being asked.

MR. BARRECA:

Let me ask it again. That's exactly what I want you to do. I'm not trying to play games as confusing as I might sound.

Q  (By Mr. Barreca) Was there ever a time on August 4 when you were in the office that Jo-Ann Daleo or Lisa Dufour or both got on the phone with you present and contacted a representative at Fidelity?

Page 106

A  I was not present for the phone call. I was told that either -- when Lisa went into the other room to rerun the numbers, she said that she got on the phone with somebody -- she or Jo-Ann got on the phone with somebody at Fidelity, and that there was still some questions in regards to why they couldn't replicate the quote.

And because of that, I said, well, then could you do that, get back with Fidelity and then get back to me. And at that point, we agreed to that; that I would be contacted again and told what happened.

Q  Now they were going to get back to you about why they couldn't replicate the quote. By that you meant the original $836 quote?

A  I mean -- yeah, the $836 quote in particular. But yes, also the quote they were claiming was the correct quote for the flood insurance policy.

Q  And did they explain to you why they thought the correct quote was correct?

A  Yes; because the elevation certificate for the correct quote was based

Page 107

upon the actual elevation certificate for my property.

Q  But you just didn't believe them?

A  Yeah; I had no evidence of that.

MR. ARCHEY:

And he just got through saying they couldn't replicate the quote.

MR. BARRECA:

Let me stand corrected.

Q  (By Mr. Barreca) I thought you said they couldn't replicate the original 836 quote?

A  I was not party to that. I don't know what they were able to replicate.

I was told that they went into the other room, went -- to my understanding -- the Fidelity website to try to do everything that got us up to August 4. And they came out and told me that they put in both the incorrect elevation numbers and the correct elevation numbers and that neither of those could get it back to the 836.

Q  So they put in the incorrect numbers to get back to the incorrect quote?

A  Yes.

Page 108

Q  And couldn't get it done?

A  That's correct.

Q  But they did say that the current quote that's discussed in P-9 is the correct quote for your flood insurance for the Charlotte Drive property?

A  That's what they told me.

MR. ARCHEY:

Were they able to replicate the quote, though?

THE WITNESS:

They -- I did not see anything being able to replicate that quote.

And, in fact, there is a document in here that -- documents we have been provided -- where a replication was attempted on August -- or rather November 9, and it does not replicate the number mentioned here on the 725 document from Fidelity.

Q  (By Mr. Barreca) We'll get to that.

A  So it's my understanding to this day that neither of those quotes have been replicated.

Page 109

1 Q Since you brought it up, I'm going to
2 go to that document you're talking about, if I
3 can find it.
4 Are you looking at the document?
5 A I am not.
6 MR. TREAS:
7 I think it's 28, 29. I may be
8 wrong.
9 THE WITNESS:
10 It's in the documents that
11 were provided to us yesterday.
12 MR. ARCHEY:
13 AAA 28, 29 it looks like.
14 MR. BARRECA:
15 28, 29?
16 MR. ARCHEY:
17 You produced it to us
18 yesterday. That's the first time
19 we had seen it.
20 MR. BARRECA:
21 I'll just mark this as P-13.
22 (Exhibit P-13 was marked.)
23 Q (By Mr. Barreca) For the record, P-13
24 is Bates No. AAA 0028 and 0029. It's entitled
25 "Standard Flood Nonbinding Quote," and it was

Page 110

1 looks like the quote was run on November 9,
2 2005.
3 And I'll show it to Mr. Holbrook, and
4 that's the document we were just talking about
5 where you say it doesn't match the original
6 number quoted?
7 A This document, which was a quote that
8 was generated on the 9th of November 2005
9 using what appeared to be the correct property
10 address and correct elevation certificates,
11 has a one-year premium of $1,229. And $1,229
12 does not equal the 836 plus the 342 that were
13 requested. That amount is 1,178.
14 Q Since you are the professor, did you
15 also calculate the difference between the two?
16 A Since the first time that I saw that
17 document was yesterday?
18 Q Well, I'll do the calculations myself
19 then, but I don't have calculator.
20 LISA DUFOUR:
21 $49.
22 Q (By Mr. Barreca) $49. So this quote
23 is -- if Ms. Dufour's calculations are
24 correct -- are $49 higher than your original
25 quote -- the correct quote?

Page 111

1 MR. ARCHEY:
2 Object to the term "correct
3 quote."
4 Q (By Mr. Barreca) Okay. The quote
5 that was provided on or about July 25 from
6 Fidelity which, as I understand your
7 testimony, is what Fidelity and then AAA
8 represented to you was the, in quotes,
9 "correct quote"?
10 MR. ARCHEY:
11 Still object to the term
12 "correct quote," but go ahead.
13 Answer the question.
14 THE WITNESS:
15 Could you ask -- I guess --
16 I'm sorry.
17 MR. ARCHEY:
18 Subject to my objection, go
19 ahead.
20 THE WITNESS:
21 I think that I'm answering
22 your question but could you ask it
23 again, please? I'm not quite
24 clear.
25 Q (By Mr. Barreca) Sure. If I can

Page 112

1 recall your testimony properly, I understood
2 that the July letter from Fidelity and your
3 conversations with Lisa Dufour and/or Jo-Ann
4 Daleo from AAA in early August, that the
5 correct -- what they understood -- AAA and
6 Fidelity understood the correct premium for
7 your house on Charlotte was the amount
8 discussed in the P-9 letter?
9 A The P-9 letter --
10 MR. ARCHEY:
11 Subject to my objection, go
12 ahead.
13 A The P-9 letter that suggested that
14 the premium was 1,178 in total?
15 Q (By Mr. Barreca) Correct.
16 MR. TREAS:
17 We got 78? I get 58. Am I
18 doing the math wrong?
19 THE WITNESS:
20 It's 342 plus --
21 MR. TREAS:
22 Oh, 342. I had 322, so that
23 is correct.
24 THE WITNESS:
25 A difference of $51.

Page 113

1    MR. TREAS:
2       Okay.
3    MR. ARCHEY:
4       What's the number on this,
5    please?
6    MR. BARRECA:
7       Marked as P-13, AAA --
8    MR. ARCHEY:
9       What's the dollar amount?
10   MR. BARRECA:
11      The quote is $1,229, so it's
12   off $51.
13   THE WITNESS:
14      Yes.
15   Q    (By Mr. Barreca) Do you have any idea
16   why it's off $51?
17   A    No idea.
18   Q    Do you have any idea why this was
19   produced -- not produced to you, but generated
20   by AAA or whoever generated it?
21   A    I do believe that this was in
22   response to a letter that I sent after leaving
23   numerous messages with Lisa and/or Jo-Ann and
24   having received no response from August 4
25   until mid-November. I sent them a certified

Page 114

1    letter requesting information on errors and
2    omissions policy because I was claiming that
3    they submitted incorrect information to
4    Fidelity.
5       And so this looks like this document
6    was properly generated in November or about
7    the time that I sent that. So I don't know
8    exactly why it was generated.
9    Q    But that's just pure speculation.
10   A    Pure speculation on my part.
11   Q    You didn't speak to anyone at AAA or
12   Fidelity about this P-13?
13   A    No. The first time I saw this
14   document was yesterday.
15   Q    I'm not quite finished yet with
16   August 4.
17   MR. ARCHEY:
18      You've never let him answer
19   the question, but go ahead.
20   MR. BARRECA:
21      What question?
22   MR. ARCHEY:
23      You keep asking what happened,
24   and every time he tells you, you
25   cut him off.

Page 115

1       Go ahead.
2       (Off the record.)
3    Q    (By Mr. Barreca) Let's get back to
4    the Fidelity. After Lisa goes into some
5    separate room, they come back and say they
6    can't duplicate the quote. Tell me what
7    happens then.
8    A    What happens next is Lisa told me
9    that they were going to get back in touch with
10   Fidelity and that I would be contacted to
11   do -- basically, I was still requesting -- I
12   don't know exactly what happened. "You guys
13   need to show me what happened."
14      And when they came back and said they
15   weren't able to replicate it, I said, well,
16   get back to Fidelity. Can you explain to me
17   what happened? Why did the policy amounts
18   decreased?
19      And the response was that they were
20   going to get back to Fidelity and then get
21   back to me the following day.
22   Q    At this point, I sense you getting
23   somewhat aggravated. On August 4 were you
24   getting aggravated?
25   A    I was really concerned, but I was

Page 116

1    willing to give them the opportunity to figure
2    out what was going on.
3    Q    How long were you willing to give
4    them the opportunity?
5    A    I called them again on the 14th, I do
6    believe -- I can't remember the exact date --
7    and said, hey, follow up on this. I was going
8    to -- I don't know how long I was going to
9    give them. I'm trying to be a nice person on
10   that kind of stuff.
11   Q    As of receiving the -- I'm going to
12   call it the P-9 letter from Fidelity -- as of
13   that date, Fidelity says you don't have the
14   coverage you requested. I mean, you
15   understand that part, don't you?
16   A    Yes.
17   Q    And so they say they'll get back to
18   you. And you say, all right, I'm a nice guy.
19   I'll give them a couple of days.
20      Then what happened?
21   A    Then I called them.
22   Q    What was their response?
23   A    They didn't respond.
24   Q    Do you remember when you called them?
25   A    I recall calling them either, I do

Page 117

1  believe, the 13th or the 14th of August. And
2  then I called them on the 24th of August to --
3  because I knew that that was sort of the final
4  date. And I called them, I do believe, at
5  10 a.m. that day and said, look, we need to
6  figure this out right now.
7       And no response was ever tendered.
8    Q   Did you call Fidelity?
9    A   I don't recall if I called Fidelity
10  between those two points, but I don't think
11  so.
12   Q   Well, you're realizing that your
13  cut-off date is the 24th of August. Do you
14  ever say, hey, maybe I will pay the $342 and
15  deal with it later?
16   A   No.
17   Q   Never entered your mind?
18   A   It entered my mind on the 29th of
19  August. And actually it entered my mind on
20  the 27th of August, and I called and their
21  offices were closed.
22   Q   Who is "they"?
23   A   I'm sorry. I called Fidelity's
24  offices and said, look, I'll go ahead and pay
25  this. And then tried again on the 28th. The

Page 118

1  offices were closed. And finally connected on
2  the 29th and they were open. I spoke to an
3  individual -- I think his name is Dave. I
4  have to look at my notes.
5    Q   You can look at your notes if it
6  helps.
7    A   And I offered at that time --
8           (Conference between Witness
9           And his counsel.)
10  MR. BARRECA:
11       Let him read the notes
12  himself, if you don't mind?
13  MR. ARCHEY:
14       You said he could look at the
15  notes.
16  MR. BARRECA:
17       But not with your instruction.
18  MR. ARCHEY:
19       I'm instructing him to look at
20  the notes. I sat here and didn't
21  point to them or anything until you
22  directed us to the notes.
23  MR. BARRECA:
24       I would prefer if you wouldn't
25  direct him to specific parts.

Page 119

1  MR. ARCHEY:
2       Read all your notes.
3  THE WITNESS:
4       On the advice of counsel, I'm
5  going to read all of my notes.
6  MR. ARCHEY:
7       Let me say something now that
8  I do it under fear of whatever, but
9  the way you've covered the
10  discussion on August 4, I'm going
11  to go back and ask questions on it.
12  You have not covered it fairly and
13  completely.
14       He's got notes there which
15  address it. You have not asked him
16  and never allowed him to tell you
17  the whole everything that's
18  happened.
19  MR. BARRECA:
20       You're more than welcome to go
21  back and ask questions.
22  MR. ARCHEY:
23       The reason why I say that is
24  if you want to clean it up and get
25  it, then okay. If you don't, we

Page 120

1  can wait until the end. I can ask
2  the questions, and you can spend
3  however much longer going back
4  behind me, whichever. I don't
5  care. I'm just saying that for the
6  record to make it clear.
7  MR. BARRECA:
8       Thank you.
9  MR. ARCHEY:
10       So where are we now?
11  MR. BARRECA:
12       Now I'm going to take a break
13  and read everything he wrote on
14  August 4 to make sure I got it all.
15  Give me two moments.
16  MR. ARCHEY:
17       Certainly.
18   Q   (By Mr. Barreca) Since we're talking
19  about this flood, I'm going to skip to the
20  last paragraph.
21  MR. ARCHEY:
22       Of?
23  MR. BARRECA:
24       Of the infamous August 4 day.
25  MR. ARCHEY:

Page 121

1        Okay.
2        Q   (By Mr. Barreca) And I'm going to
3    read it and you can tell me what it means. It
4    seems clear to me. I want to make sure I
5    understand what you're saying or what you
6    wrote and we can talk about it some more if
7    need be.
8        "Before I left, Lisa told Jo-Ann in
9    my presence that when she entered the correct
10   flood elevation information into her computer
11   interface with Fidelity that it did not change
12   our premium."
13       MR. ARCHEY:
14          Keep reading.
15       MR. BARRECA:
16          I want to ask him about this
17       sentence first.
18       Q   (By Mr. Barreca) What does that mean?
19   And now -- well --
20       A   What it means is that when they --
21   when Lisa went to enter the numbers, both
22   incorrect and the correct numbers, the correct
23   elevation numbers for the property, that
24   regardless of which numbers she used, the same
25   premium came out which seemed to not jog with

Page 122

1    the story of incorrect numbers were provided
2    and then correct numbers were provided and
3    that that led to the change.
4        And that was the big sticking point
5    for me and why I said I need this replicated.
6    Because if you're telling me now that you
7    can't -- when you put in the incorrect
8    information and the correct information that
9    you get the same numbers, that seems to me
10   that that didn't jog with what I was told
11   previously.
12       Q   So at this point, it is your
13   understanding that when she says she puts the
14   incorrect elevation, meaning the original --
15   I'm going to call it the wrong elevation for
16   the wrong property, and then she puts the
17   correct information for your property she gets
18   the same number?
19       A   Yes; that was my understanding.
20       Q   Could you have been mistaken on what
21   she was telling you?
22       MR. ARCHEY:
23          Object to the form of the
24       question. Don't answer that.
25       MR. BARRECA:

Page 123

1        Why can't he answer it?
2        MR. ARCHEY:
3           Could --
4        Q   (By Mr. Barreca) Is there a chance
5    that you misunderstood?
6        MR. ARCHEY:
7           Answer the question. Go
8        ahead.
9        A   Is it possible that I misunderstood?
10       Q   (By Mr. Barreca) Yes.
11       A   I do not believe I misunderstood at
12   all.
13       Q   So there was no discussion regarding
14   the -- your particular flood zone in your
15   neighborhood as opposed to your particular
16   flood elevation of your house? Was there any
17   discussion regarding that?
18       A   I don't recall if there was a
19   particular discussion on that.
20       Q   What I'm asking, do you ever recall
21   anybody from AAA saying, regardless of your
22   flood elevation, your particular flood
23   elevation for 6123 Charlotte Drive, the flood
24   zone A05, if used, doesn't change your
25   premium?

Page 124

1        A   I don't recall a particular
2    discussion regarding the flood zone.
3        Q   Okay. When did the car insurance
4    come up? Was that at the end of the
5    discussions with AAA on August 4, or was that
6    in the middle, or when did that happen?
7        A   It was essentially in the middle in
8    that Lisa and I had had this conversation and
9    this is where we spoke to -- about -- oh, now
10   it's beginning to jog a little bit better.
11       It was during this period of time
12   that Lisa went to do the Fidelity numbers --
13   went to the Fidelity computer, I assume. And
14   I said, well, okay. I'll talk with Jo-Ann
15   about setting up the car insurance.
16       At the end of my discussion with
17   Jo-Ann and once we set up the car insurance,
18   that's when we had the discussion between
19   where Lisa said, look, I can't -- I entered
20   both the correct and incorrect information and
21   it gets me the same number. That's when it
22   was both -- in all three of our presences.
23       Then I went back to Lisa's desk and
24   we chatted about this a little more. And I
25   can't remember exactly what happened, but I

Page 125

1  know that I did go back to try to bring Jo-Ann
2  into the conversation. I knew she had already
3  left at that point.
4      Q   You don't ever recall a situation
5  when you were in Jo-Ann's office with Jo-Ann
6  and Lisa all discussing this issue?
7      A   Yeah. What I'm saying is I was at
8  Lisa's desk first, then went to Jo-Ann's
9  office to discuss the car insurance and take
10 care of that. And then at the end of that
11 process, that's when Lisa came to the door and
12 said that, look, I put in both the correct and
13 incorrect numbers. It gets -- the correct and
14 incorrect elevation numbers gets us the same
15 number.
16          This is when they were both kind of
17 perplexed. And I said let's figure this out,
18 and get back to me on this.
19     Q   But at that point, they didn't try to
20 call Fidelity with you in the room?
21     A   Not that I recall. Not at that
22 point, no.
23     Q   So you were never involved in a
24 conversation in where there was a
25 speaker-phone conversation with Fidelity where

Page 126

1  they ran the quotes again?
2      A   I do not recall being party to a
3  conversation -- on a speaker-phone
4  conversation.
5      Q   Was there any discussion when you
6  were leaving about paying the additional $342?
7      A   There was no discussion about that.
8  The discussion was you guys got to figure out
9  what's going on and get back to me.
10     Q   Nobody said, "Mr. Holbrook, you need
11 to pay the 342"?
12     A   No; that was definitely not said.
13     Q   No discussions that if you don't pay
14 the 342, the coverage you will have will be
15 the coverage referenced in P-9?
16     A   That discussion did not happen. The
17 onus was put on them that they were going to
18 look into what happened and get back to me.
19     MR. BARRECA:
20          This is going to be No. 14,
21     Holbrook 0074.
22          (Exhibit P-14 was marked.)
23          And this is a letter dated
24     November 3, 2005. "To Whom It May
25     Concern," but directed to Fidelity

Page 127

1          National Property and Casualty
2      Insurance Company signed by the
3      Holbrooks.
4      Q   (By Mr. Barreca) At that point, you
5  knew that your coverage limits for flood were
6  reduced. Correct?
7      A   Yes.
8      MR. ARCHEY:
9          Object to the form of the
10     question, though.
11         We'll dispute that. Okay?
12     That's a disputed legal fact.
13     MR. BARRECA:
14         Okay.
15     MR. ARCHEY:
16         Okay? Now I know you need to
17     use it in the terms and ask the
18     questions. I want to make my
19     objection continuing and you can
20     continue along.
21     MR. BARRECA:
22         I understood.
23     Q   (By Mr. Barreca) I've highlighted a
24 sentence in there. Can you read that?
25     A   Yeah.

Page 128

1      Q   In P-14 -- and I'll just actually
2  read it. It says, "Please explain in writing
3  why coverage limits were reduced from the
4  amounts printed on the application."
5          And I assume that's the application
6  you were referring to. The first June --
7      A   June 23.
8      Q   Got it.
9          No dispute that you knew your limits
10 were reduced.
11     MR. ARCHEY:
12         Hold on. And our legal
13     position is that they were not.
14         Go ahead and answer.
15     A   At this time in November we had
16 contacted Fidelity and they told us that these
17 are the policy amounts.
18     Q   Got it.
19     A   So after we had submitted our flood
20 insurance claim, those were our standing
21 coverage amounts, and so we were requesting
22 information on why that occurred.
23     MR. BARRECA:
24         This is P-15, Holbrook 0084.
25         (Exhibit P-15 was marked.)

Page 129

1          This is a letter date the
2     November 3, 2005 directed to Jo-Ann
3     Daleo at AAA signed by the
4     Holbrooks.
5     Q    (By Mr. Barreca) I'll read from this
6   one. Midway through the first paragraph it
7   says, "It is our contention that you and/or
8   your agent, Lisa Dufour, provided incorrect
9   information to the underwriter of our flood
10  insurance policy which resulted in a reduction
11  of coverage from that policy."
12    A   I do recall signing and sending that
13  document, yes.
14    MR. BARRECA:
15          Now I'm going to mark what is
16      going to be P-16, Holbrook 0086.
17          (Exhibit P-16 was marked.)
18    Q   (By Mr. Barreca) Have you ever seen
19  that letter?
20    A   Yes, I have. It is an unsigned
21  letter from AAA addressed to me at my
22  Charlotte Drive address.
23    Q   Can you take a moment and read it? I
24  know it's a long one paragraph.
25    MR. ARCHEY:

Page 130

1          I think he's fairly familiar
2      with it. If you have a question
3      you want to ask while he's reading
4      it -- All right. He's read it.
5     Q   (By Mr. Barreca) Do you think this is
6   not an accurate summary of what occurred -- or
7   let me ask it another way.
8          What do you think on this letter is
9   inaccurate, if anything?
10    MR. ARCHEY:
11          I'm going to object. It's too
12      long, too many parts to it. I
13      mean, that's too broad a generality
14      of a question.
15          I know it'll slow us down, but
16      it'll slow us down if that's what
17      you want.
18    MR. BARRECA:
19          That's fine.
20    Q   (By Mr. Barreca) Midway through the
21  paragraph it says, "I" -- and I'm going to let
22  you know that even though this isn't signed, I
23  understand that this was drafted by Lisa
24  Dufour, and so the "I" refers to Lisa Dufour.
25    A   Okay.

Page 131

1     Q   "I processed the quote for him" --
2   Mr. Holbrook -- "with the correct information
3   which the premium was higher than originally
4   wrote" -- "than we originally wrote it for.
5   He was not satisfied with that estimate."
6          Is that your -- Do you recall that
7   happening?
8     A   I recall the first sentence that
9   there was -- a quote was processed. Nothing
10  was shown to me.
11         It was not that I -- it was not that
12  I was not satisfied with the estimate. I just
13  did not understand why the estimate was jacked
14  up.
15    Q   Went up. Got it.
16         Do you recall the conversation as
17  Ms. Dufour summarizes that "I explained to him
18  that we were dealing with two different
19  figures, and unfortunately for him, the
20  figures that we had -- have to use for his
21  address" -- I must be reading that wrong.
22  Hold on.
23         I'll have to read the sentence over
24  again. "He wanted to know why the original
25  premium was much lower than the new estimate.

Page 132

1   I explained to him that we were dealing with
2   two different figures, and unfortunately for
3   him, the figures that we have to use for his
4   address."
5          Do you understand that?
6     A   I understand that.
7     Q   Do you recall that discussion at any
8   level?
9     A   I do. I, of course, recall that
10  discussion. And I agreed that, yes; in order
11  to process this claim that she should use my
12  correct information not the incorrect
13  information that she provided earlier.
14    Q   But then she provided you with what
15  she thought was the correct information.
16    A   She told me that the number that
17  Fidelity had sent me was the correct
18  information.
19    MR. ARCHEY:
20          But when she tried to run it,
21      it was different. Correct?
22    THE WITNESS:
23          That is correct.
24    MR. BARRECA:
25          This, I'm going to mark as

Page 133

1    P-17, and this is Holbrook 0042.
2        (Exhibit P-17 was marked.)
3    And it is Page 5 of 19 of the
4    Fidelity flood policy.
5    Q    (By Mr. Barreca) Do you know if you
6    ever read the flood policy, Mr. Holbrook?
7    MR. ARCHEY:
8        Cover to cover.
9    MR. BARRECA:
10       I didn't ask Mr. Archey. I
11   asked Mr. Holbrook.
12   MR. ARCHEY:
13       Is that your question? I'm
14   clarifying. You're asking this man
15   if he read every word of his
16   Fidelity flood insurance policy.
17   Is that what you're asking?
18   MR. BARRECA:
19       All 19 pages. Yes.
20   A    No; I did not read all 19 pages
21   word-for-word, top to bottom.
22   Q    (By Mr. Barreca) Well, did you read
23   the declarations page? And declarations page,
24   it's Holbrook 0034, which I believe we've
25   already marked.

Page 134

1    A    The flood declarations page -- what
2    has it been marked?
3    Q    Marked it as P-10.
4    A    Yes, I did read that.
5    Q    Can you identify what your flood
6    limits or coverage limits are?
7    A    Yes, I can.
8    MR. ARCHEY:
9        Objection. The document
10   speaks for itself.
11       If you want him to read it?
12   MR. BARRECA:
13       I do.
14   MR. ARCHEY:
15       Objection. This is so    ....
16   redundant. You already established
17   it's 111 and whatever the numbers
18   are.
19       Go ahead. Kevin, you're
20   wasting time. Go ahead. Go ahead.
21   MR. BARRECA:
22       I think it's important.
23   MR. ARCHEY:
24       You've asked him this about
25   seven or eight times.

Page 135

1    MR. BARRECA:
2        Not about this document.
3    MR. ARCHEY:
4        Yes, you have. Go ahead. Go
5    ahead. You have.
6    A    Exhibit P-10?
7    Q    (By Mr. Barreca) First, did you
8    receive that document?
9    A    Yes.
10   Q    Did you read it?
11   MR. ARCHEY:
12       Asked and answered. He just
13   said two minutes ago he did. I'm
14   not going to let him answer it
15   again. I'm going to start cutting
16   this off. He has read it. Now go.
17   Q    (By Mr. Barreca) You read it so you
18   understood that your policy limits were what
19   they say in that document?
20   MR. ARCHEY:
21       Objection. That's not our
22   position.
23   Q    (By Mr. Barreca) What did you
24   understand that declaration to say then?
25   A    I understood the declaration to be

Page 136

1    evidence of the mistake that was perpetrated
2    by my agents. And when I received this sort
3    of confirmation of what was sent to me by
4    Fidelity, then I thought that was part and
5    parcel of that whole issue.
6        So it looked to me as if the policy
7    that the flood declarations page had been
8    issued with lower limits without any
9    discussion -- without any notice to me.
10   Q    I understand you disagree with how
11   AAA handled the claim and there is a huge
12   dispute there. I acknowledge that part.
13       Do you agree that as of the date you
14   received that document, Fidelity advised that
15   your limits were as written?
16   A    No.
17   Q    And why not?
18   A    Because my understanding was that
19   there was some grace period here, that there
20   was something going on. And this was sort of
21   their shot across the bow, if you will,
22   saying, look, we think you owe us more
23   premium.
24       My understanding is this is -- this
25   document was generated incorrectly, and so

Page 137

1  that's what prompted some of the questions.
2      Q   And the shot across the bow was that
3  P-9 letter saying you owe us more premium.
4  Right?
5      A   Yes.
6      Q   And did that P-9 letter say when you
7  had to respond?
8      A   It said -- it didn't specify when,
9  but it did say that 8/24/05, that the policy
10 amounts will be entered in as whatever the
11 coverage amounts on that were.  I do believe
12 the numbers were $111,000 for building and
13 $27,000 for contents.
14     Q   I guess you didn't have to respond,
15 but the flip side of that question is if you
16 did not respond, the premiums would be as they
17 are represented in P-10?
18     MR. ARCHEY:
19         Objection to form.
20         Go ahead.
21     A   Could you ask the question again?
22 I'm a little confused.
23     Q   (By Mr. Barreca) If you didn't
24 respond to the shot cross the bow letter, as
25 you described it, saying you have to pay the

Page 138

1  $342 before August 24, that your Fidelity
2  policy limits would be as reflected in the
3  declarations page that you received which
4  we've marked as P-10?
5      MR. ARCHEY:
6          Object to the form of the
7      question.
8          Go ahead and answer.
9      A   My understanding was that it was --
10 I'm trying to answer the question because this
11 is -- I sign a document and then three weeks
12 later get another document telling me this is
13 what my policy is going to be.  Four weeks
14 later I get a letter saying no, no; this is
15 what your policy is unless you pay us more
16 money.
17         So I thought that -- I saw this and
18 said this has got to be a mistake and tried to
19 get to the bottom of where the mistake was.
20         So as far as what the actual policy
21 amounts were going to be, yes, it stated
22 certain dates -- and I'm not familiar enough
23 with the laws of everything -- but it stated,
24 and we have since found out, that yes, the
25 policy amount -- the coverage amounts were

Page 139

1  reduced to $11,000 and $20,000 -- or $111,000
2  and $20,000.
3      Q   (By Mr. Barreca) Thank you.  I'm not
4  sure if I showed you P-17, part of the flood
5  policy -- Fidelity's flood policy.  And I
6  understand that you haven't read it all, but
7  would you agree that you were bound by that
8  document?
9      MR. ARCHEY:
10         Objection.  It calls for a
11     legal conclusion.
12     Q   (By Mr. Barreca) We talked earlier
13 that even though sometimes you don't read
14 every word, that if you sign on the dotted
15 line that usually means that you're bound by
16 it?
17     MR. ARCHEY:
18         Objection.  He didn't sign
19     anything on this piece of paper you
20     gave him.
21     Q   (By Mr. Barreca) Do you think that
22 this policy was the policy that was in effect?
23     A   No, I do not.
24     Q   Let's assume it was the policy in
25 effect just for the sake of argument.  Can you

Page 140

1  read what Section 6 says?
2      MR. ARCHEY:
3          Read what?  The whole thing?
4      The highlighted?  Read to himself?
5      MR. BARRECA:
6          Yes.  Read it to himself.
7      A   Interesting.
8      Q   (By Mr. Barreca) Do you understand
9  what that section states?
10     A   I understand -- I think I do
11 understand what it states, but what's your
12 particular question?
13     Q   I was wondering, this policy as I
14 read it, states that there is a $2,500 limit
15 for any particular piece of artwork.
16     A   That's what I understand the document
17 to say.
18     Q   Thank you.
19     A   A document that I did not sign.
20     MR. ARCHEY:
21         So that would be another claim
22     against Ms. Dufour.
23     Q   (By Mr. Barreca) When you left a
24 message for someone at AAA on August 24, do
25 you remember if you left it for Lisa Dufour or

**Page 141**

```
 1    Jo-Ann Daleo, or did you leave one for both?
 2        A    I cannot recall if I left for both.
 3    I remember leaving one for Lisa.
 4        Q    Now I'm looking at your handwritten
 5    notes.
 6        MR. ARCHEY:
 7            Why don't you go ahead -- Off
 8        the record.
 9            (Off the record.)
10        Q    (By Mr. Barreca) I'm going to show
11    you what has been marked Holbrook 151, and it
12    appears to be just -- I guess some handwritten
13    notes on various days starting with 8/29/05
14    and 8/31/05 and 9/2/05, and then there's a
15    date scratched out. I don't know if it
16    originally said 9/7/05. I want to direct you
17    to the 8/31/05 entry.
18        MR. BARRECA:
19            This one will be P-18.
20            (Exhibit P-18 was marked.)
21        Q    (By Mr. Barreca) Are all these notes
22    contemporaneous, meaning did you write them --
23    when it says 8/31/05, the notes below it, you
24    actually wrote on that date?
25        A    Yes; I wrote it as I was speaking to
```

**Page 142**

```
 1    the representatives from Fidelity which those
 2    notes refer to.
 3        Q    I'm going to -- under the 8/31/05
 4    note there's another note with a date 8/1/05.
 5    If you could read that and tell me when the
 6    intention of that note is because I'm not
 7    clear what it means.
 8        A    Okay. When I called on the 29th to
 9    file the claim, kind of still in a daze -- so
10    on the 31st I called because still hadn't
11    heard from Lisa or Jo-Ann at this point.
12            So I contacted Fidelity directly and
13    asked what happened; I mean, how it I go from
14    having full coverage on June 30 of 2005 to
15    having partial coverage by 8/29/05 in two
16    months. And I said what's going on.
17            They said that they received an
18    elevation certificate on the 1st of August.
19    That was the first time that they received an
20    elevation certificate for the property. And
21    when I mean "they," I first spoke with a woman
22    named Melissa and she transferred me to
23    Tomika, and it was Tomika that told me that an
24    elevation certificate hadn't been provided but
25    she seemed to indicate that it wasn't
```

**Page 143**

```
 1    necessary in order to write the policy, and
 2    that sometimes people provide elevation
 3    certificates to reduce policy -- the cost of a
 4    particular policy. I don't know that to be
 5    true or not.
 6            But she said that, look, this
 7    elevation certificate didn't help or hurt you.
 8    And she said -- and I said, "Can I have a copy
 9    of that? I'd like to see a copy."
10            And she said, "Sure. I'll fax it."
11            And I provided the fax number at Ohio
12    State University, and I did not receive that
13    fax.
14        Q    And this -- I guess I'm asking you to
15    take a guess, or maybe you know from some of
16    the conversations you had with people at
17    Fidelity, but when someone informed you that
18    the elevation certificate didn't make a
19    difference, does that relate back to what I
20    was asking you earlier that your A05 zone and
21    even with the flood elevation certificate for
22    the property, the correct flood elevation
23    didn't make a difference? Is that what you
24    understood her statement to you meant?
25        A    What I understood the statement to
```

**Page 144**

```
 1    mean was that the elevation certificate was
 2    immaterial to the policy. That was what she
 3    told me.
 4            And being -- having no expertise in
 5    this field whatsoever, I was trying to figure
 6    out questions at this point.
 7        Q    So you really don't even know what
 8    those words mean?
 9        MR. ARCHEY:
10            Objection.
11        Q    (By Mr. Barreca) I'm just trying to
12    find out.
13        A    I don't know whether or not what
14    Tomika told me is correct.
15        Q    We all agree that -- do you even know
16    who Tomika is other than someone who answered
17    the phone at Fidelity?
18        A    No. I assume she was one of their
19    highly-trained individuals.
20        Q    Got it. All right.
21            If you had any inkling of what that
22    meant, what did it mean to you? And I know it
23    could be wrong.
24        A    What it meant to me was that the
25    story that I was told regarding the elevation
```

# STANDARD FLOOD INSURANCE APPLICATION (PREVIEW)

**FIDELITY**

Fidelity National Property And Casualty Insurance Company
PO Box 33003
St. Petersburg, FL 33733-8003
Office: 800-820-3242
Fax: 800-850-3299

## AGENCY INFORMATION

| | |
|---|---|
| gency Number | 45603 |
| gency | JO ANN DALEO-AAA |
| ddress | 3445 N CAUSEWAY BLVD # 200, |
| ity, State, Zip | METAIRIE, LA 70002-3734 |
| hone Number | (504) 838-7500 |

| APPLICANT | EFFECTIVE DATE | TERM | QUOTE NUMBER |
|---|---|---|---|
| APRIL LEIGH MERCHANT HOLBROOK | 06/30/2005 | 12 Months | 17 QT70489339 99 |
| RONALD ANDREW HOLBROOK | | | |

| SOCIAL SECURITY | BILL TO | DISASTER ASSIST | PRIMARY POLICY |
|---|---|---|---|
| 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 | First Mortgagee | None | None |
| | **WAITING PERIOD** | | |
| | Loan Requirement - No Wait | | |

**NSURED MAILING**
123 CHARLOTTE DR
EW ORLEANS, LA 70122-2733
hone

**INSURED PROPERTY**
6123 CHARLOTTE DR
NEW ORLEANS, LA 70122-2733
(504) 638-7992

## BUILDING INFORMATION

| | |
|---|---|
| ocated within City Limits | Yes |
| lood Zone | A05 |
| ommunity Name | NEW ORLEANS/ORLEANS PARISH |
| uilding Type | One Floor |
| ommunity Number | 225203 |
| uilding Occupancy | Single Family |
| ommunity Program Type | Flood Regular Policies |
| asement | None |
| nclosure | None |
| umber of Units in Building | 0 |
| ondominium Coverage | None |
| roperty owned by State Government | No |
| uilding in course of construction | No |
| nsured Principal Residence | Yes |
| uilding Elevated | Building is not elevated |
| ocation of Contents | Lowest Floor Only - Above Ground Level |
| ousehold Contents | Yes |
| onstruction Date | 01/01/1960 |
| levation Certificate | Yes |
| uilding Flood Proofed | No |
| eplacement Cost | $ 183,000 |



EXHIBIT

HOL 0023

# STANDARD FLOOD INSURANCE APPLICATION (PREVIEW)

**FIDELITY**

Fidelity National Property And Casualty Insurance Company
PO Box 33003
St. Petersburg, FL 33733-8003
Office: 800-820-3242
Fax: 800-850-3299

## LENDER / MORTGAGEE INFORMATION

nder 1 Information
ATIONAL CITY BANK OF INDIANA
AOA ATIMA
BOX 1024
AYTON, OH 45401-1024

Lender 2 Information
NATIONAL CITY BANK NATIONAL
CITY SVC CTR ISAOA ATIMA
294 TREEMONT DR
ORANGE CITY, FL 32763-7945

## STANDARD FLOOD INSURANCE APPLICATION (PREVIEW)

 **FIDELITY**

Fidelity National Property And Casualty Insurance Company
PO Box 33003
St. Petersburg, FL 33733-8003
Office: 800-820-3242
Fax: 800-850-3299

| APPLICANT | EFFECTIVE DATE | TERM | QUOTE NUMBER |
|---|---|---|---|
| APRIL LEIGH MERCHANT HOLBROOK | 06/30/2005 | 12 Months | 17 QT70489339 99 |
| RONALD ANDREW HOLBROOK | | | |

### ELEVATION INFORMATION

| | |
|---|---|
| Lowest Floor Elevation | -2.3 feet |
| Elevation Difference | 0 feet |
| Highest Adjacent Grade | 0.0 feet |
| Lowest Adjacent Grade | -7.0 feet |
| Diagram Number | 1 |
| Elevation Certificate Date | 02/06/2004 |

HOL 0025

# STANDARD FLOOD INSURANCE APPLICATION (PREVIEW)

# FIDELITY

Fidelity National Property And Casualty Insurance Company
PO Box 33003
St. Petersburg, FL 33733-8003
Office: 800-820-3242
Fax: 800-850-3299

| APPLICANT | EFFECTIVE DATE | TERM | QUOTE NUMBER |
|---|---|---|---|
| APRIL LEIGH MERCHANT HOLBROOK | 06/30/2005 | 12 Months | 17 QT70489339 99 |
| RONALD ANDREW HOLBROOK | | | |

## GARAGE INFORMATION

arage attached to or part of building          NO EQUIPMT BSMNT/ATTACH GARAGE

## BASIC LIMITS INFORMATION

| overage | Limits | Deductible | RPH | Premium |
|---|---|---|---|---|
| uilding | $ 50,000 | $ 500 | 1.08 | $ 540 |
| ontents | $ 20,000 | $ 500 | 1.10 | $ 220 |

## ADDITIONAL LIMITS INFORMATION

| overage | Limits | RPH | Premium | Schg/Disc | Total |
|---|---|---|---|---|---|
| uilding | $ 133,000 | 0.08 | $ 106 | $ 0 | $ 646 |
| ontents | $ 20,000 | 0.12 | $ 24 | $ 0 | $ 244 |

| | |
|---|---|
| Annual Premium | $ 890 |
| ICC | $ 6 |
| 10% Community Rate Discount | $ 90 |
| Federal Policy Fee | $ 30 |
| **Total Premium Due** | **$ 836** |

## INFORMATION AFFIRMATION

licy includes increased cost of compliance (ICC) coverage.

e above statements are correct to the best of my knowledge. I understand that any false statements may be punishable by
e or imprisonment under applicable federal law.

ll amount of premium must accompany this application for issuance.

_April Leigh Merchant Holbrook_          _April Leigh Merchant Holbrook_          6/23/05

nt Name of Insured          Signature of Insured          Date

_Roxanne A. Dufour_          _(signature)_

t Name of Agent/Broker          Signature of Agent/Broker          Date

HOL 0026

# STANDARD FLOOD INSURANCE APPLICATION (PREVIEW)



**FIDELITY**

Fidelity National Property And Casualty Insurance Company
PO Box 33003
St. Petersburg, FL 33733-8003
Office: 800-820-3242
Fax: 800-850-3299

| APPLICANT | EFFECTIVE DATE | TERM | QUOTE NUMBER |
|---|---|---|---|
| APRIL LEIGH MERCHANT HOLBROOK | 06/30/2005 | 12 Months | 17 QT70489339 99 |
| RONALD ANDREW HOLBROOK | | | |

## LEGAL INFORMATION

**Non-Discrimination**

No person or organization shall be excluded from participation in, denied the benefits of, or subjected to discrimination under the Program authorized by the Act, on the grounds of race, color, creed, sex, age or national origin.

**Privacy Act**

The information requested is necessary to process your application for flood insurance. The authority to collect the information is Title 42, U.S. Code, Section 4001 to 4028. It is voluntary on your part to furnish the information. It will not be disclosed outside the Federal Emergency Management Agency except to the servicing office acting as the government's fiscal agent, to routine users, to your agent and any mortgagee named on your policy.

**Disclosure of your Social Security Number Under Public Law 93-579 Section 7(b)**

Solicitation of the Social Security Number (SSN) is authorized under provisions of E.O. 9397, dated November 22, 1943. The disclosure of your SSN is voluntary. However, since many persons appearing in the Government's administrative records possess identical names, the use of your SSN would provide for your precise identification.

HOL 0027

FEDERAL EMERGENCY MANAGEMENT AGENCY
NATIONAL FLOOD INSURANCE PROGRAM

# ELEVATION CERTIFICATE

Important: Read the instructions on pages 1 - 7.

O.M.B. No. 3067-0077
Expires December 31, 2005

## SECTION A - PROPERTY OWNER INFORMATION

For Insurance Company Use:
Policy Number

Company NAIC Number

BUILDING OWNER'S NAME
CLABEOUS RENOVATION

BUILDING STREET ADDRESS (Including Apt., Unit, Suite, and/or Bldg. No.) OR P.O. ROUTE AND BOX NO.
6702 COLBERT ST.
STATE LA
ZIP CODE 70124

CITY
NEW ORLEANS

PROPERTY DESCRIPTION (Lot and Block Numbers, Tax Parcel Number, Legal Description, etc.)
Lot 43-44 Sq:118 Sub: LAKEVIEW Dist: SECOND

BUILDING USE (e.g., Residential, Non-residential, Addition, Accessory, etc. Use a Comments area, if necessary.)
Residential

LATITUDE/LONGITUDE (OPTIONAL)
( ##° - ##' - ##.##" or ##.#####°)
HORIZONTAL DATUM:  [ ] NAD 1927  [ ] NAD 1983
SOURCE:  [ ] GPS (Type): _____
[ ] USGS Quad Map  [ ] Other: _____

## SECTION B - FLOOD INSURANCE RATE MAP (FIRM) INFORMATION

| B1. NFIP COMMUNITY NAME & COMMUNITY NUMBER | B2. COUNTY NAME | B3. STATE |
|---|---|---|
| CITY OF NEW ORLEANS, 225243 | ORLEANS | LA |

| B4. MAP AND PANEL NUMBER | B5. SUFFIX | B6. FIRM INDEX DATE | B7. FIRM PANEL EFFECTIVE/REVISED DATE | B8. FLOOD ZONE(S) | B9. BASE FLOOD ELEVATION(S) |
|---|---|---|---|---|---|
| 225203 0095 | E | 03/01/1984 | 01/01/1984 | A-3 | -1.50 |

B10. Indicate the source of the Base Flood Elevation (BFE) data or base flood depth entered in B9.
[ ] FIS Profile  [X] FIRM  [ ] Community Determined  [ ] Other (Describe): _____

B11. Indicate the elevation datum used for the BFE in B9: [ ] NGVD 1929  [X] NAVD 1988  [ ] Other (Describe): _____

B12. Is the building located in a Coastal Barrier Resources System (CBRS) area or Otherwise Protected Area (OPA)?  [ ] Yes  [X] No
Designation Date: _____

## SECTION C - BUILDING ELEVATION INFORMATION (SURVEY REQUIRED)

C1. Building elevations are based on:  [ ] Construction Drawings*  [X] Building Under Construction*  [ ] Finished Construction
*A new Elevation Certificate will be required when construction of the building is complete.

C2. Building Diagram Number _____ (Select the building diagram most similar to the building for which this certificate is being completed - see pages 6 and 7. If no diagram accurately represents the building, provide a sketch or photograph.)

C3. Elevations – Zones A1-A30, AE, AH, A (with BFE), VE, V1-V30, V (with BFE), AR, AR/A, AR/AE, AR/A1-A30, AR/AH, AR/AO
Complete Items C3.a-i below according to the building diagram specified in Item C2. State the datum used. If the datum is different from the datum used for the BFE in Section B, convert the datum to that used for the BFE. Show field measurements and datum conversion calculation. Use the space provided or the Comments area of Section D or Section G, as appropriate, to document the datum conversion.

Datum NAVD _____  Conversion/Comments VERICON CONVERSION 0.29' +/-

Elevation reference mark used C140   Does the elevation reference mark used appear on the FIRM?  [ ] Yes  [X] No

|  |  |  |
|---|---|---|
| [ ] a) Top of bottom floor (including basement or enclosure) | -2.15 | ft.(m) |
| [ ] b) Top of next higher floor | N/A | ft.(m) |
| [ ] c) Bottom of lowest horizontal structural member (V zones only) | N/A | ft.(m) |
| [ ] d) Attached garage (top of slab) | N/A | ft.(m) |
| [ ] e) Lowest elevation of machinery and/or equipment servicing the building (Describe in a Comments area.) | N/A | ft.(m) |
| [ ] f) Lowest adjacent (finished) grade (LAG) | -7.90 | ft.(m) |
| [ ] g) Highest adjacent (finished) grade (HAG) | -6.50 | ft.(m) |
| [ ] h) No. of permanent openings (flood vents) within 1 ft. above adjacent grade | 0.00 |  |
| [ ] i) Total area of all permanent openings (flood vents) in C3.h | 0.00 | sq. cm) |

## SECTION D - SURVEYOR, ENGINEER, OR ARCHITECT CERTIFICATION

This certification is to be signed and sealed by a land surveyor, engineer, or architect authorized by law to certify elevation information.
I certify that the information in Sections A, B, and C on this certificate represents my best efforts to interpret the data available.
I understand that any false statement may be punishable by fine or imprisonment under 18 U.S. Code, Section 1001.

CERTIFIER'S NAME  JAMES F COUTURE
LICENSE NUMBER 1050

TITLE PROFESSIONAL LAND SURVEYOR
COMPANY NAME  Gilbert, Kelly & Couvrie, Inc.

ADDRESS 3131 N. Causeway Blvd. Suite 121
CITY Metairie
STATE LA
ZIP CODE 70001

SIGNATURE
DATE 02/00/2008 d.
TELEPHONE 504-836-3121

FEMA Form 81-31, January 2003

See reverse side for continuation.

Replaces all previous editions



EXHIBIT
P-12
MB 71307-RH

AAA-0043

## ATTACHMENT A: CHRONOLOGY OF EVENTS

### 20 May 2005 (Attachment C)

A quote on our flood insurance policy (Quote #17 QT70489339 99) was faxed by the underwriter, Fidelity Property and Casualty Insurance Company, to AAA Club Insurance Agency. That quote was then faxed to our real estate agent, Joan Farabaugh, who then faxed it to us. The total premium listed in the quote was $788 for $183,000 of insurance on the building and $25,000 of insurance on contents, with $1000 deductibles on both building and contents coverage. A quote for homeowner's hazard insurance was also provided at this time.

### 8 June 2005

I spoke to Lisa Dufour, our representative at AAA Club Insurance, about amending the flood and hazard policies to cover $40,000 worth of contents with a deductible of $500. Lisa said she would call back on 9 June 2005. At that time I asked Lisa if AAA Insurance was the underwriter of the policies, or if it was an insurance broker. At that time she told me that AAA was the insurance company, not a broker of insurance policies.

Because my wife and I own a piece of art (A Cibachrome artist's proof, #8 of 10, of "Maui Dawn" by Wyland) valued at over $8000.00 I asked if that item needed to be itemized and/or covered under a separate insurance policy. Lisa said that it would not be necessary to specify the item in any policy, and that the hazard and flood insurance contents coverage would include coverage for the artwork.

### 9 June 2005, approximately 4 p.m. EST

Having not heard from Lisa, I called her to obtain the amended quote. She informed me that the total premium for flood insurance with $183,000 of coverage on the building (with a $1000 deductible) and $40,000 of coverage on the contents (with a $500 deductible) was $836.

### 17 June 2005

I called Lisa to obtain another amended quote. The total premium for flood insurance with $183,000 of coverage on the building (with a $1000 deductible) and $40,000 of coverage on the contents (also with a $1000 deductible) was $804. At this point, I told



HOL· 0001

Lisa to move ahead with the policy at the coverage amounts quoted on 9 June. Lisa stated that she would contact the mortgage lender, National City Bank, and the title company, Partner's Title, on 20 June to make the necessary arrangements to move ahead with the flood and hazard insurance policies.

## 23 June 2005 (Attachment E)

Lisa faxed to us a standard flood insurance application to be signed and faxed back to her. We signed and faxed it back at 3:11 p.m. EST.

## 30 June 2005

We closed on our house. Payment was remitted to AAA Club Insurance in the amount of $836 for our flood insurance policy.

## 25 July 2005 (Attachments F & G)

Fidelity National Property and Casualty Insurance Company mailed us a notice (Attachment G) that our flood insurance policy (Attachment F) had been issued with lower limits of coverage than we had originally requested because our premium was inadequate.

## 4 August 2005

I called Jo Ann Daleo, the AAA Club Insurance agent named on the 25 July notice from Fidelity, to inquire about the reason for the change in our requested coverage. She said that Lisa Dufour was handling our file and transferred me to her. Lisa said that she did not have an explanation for the change, but said that she would look into it. I informed her that I needed to sign up for car insurance as part of the multi-policy discount offered to us, and requested that I come to her office to better deal with all of these issues. We agreed that I should stop by the AAA office at 2 p.m. CST.

At 2 p.m., I met with Lisa to discuss the flood insurance policy. She informed me that our title company, Partner's Title, faxed to her an elevation certificate that was not for our house and that she then faxed it on to the flood insurance underwriter. The underwriter caught the mistake and asked her to remit the true elevation certificate. She obtained one from the title company and then faxed it on to the underwriter. Lisa claimed that the cause of our increased premium was due to information provided on the true elevation certificate. However, when I asked her if our insurance application had been processed with the incorrect elevation certificate she could not definitively say that that was the case. (The insurance underwriting company claims that it did not receive any elevation certificate until late July, suggesting that the policy application was

processed without an elevation certificate.) Lisa attempted to enter the old, incorrect elevation information that was in our original flood insurance application into her computer interface with Fidelity, to see if it would change our premium back to the original quote. She said that it did not. Because she did not know why this would be the case, she said that she would look into it and give me a call.

I then spoke to Jo Ann regarding our car insurance. Once I had paid for our car insurance policy, I asked Jo Ann if I should be dealing directly with her since she is the agent named on all of our policies. Jo Ann told me that I was to conduct all transactions through Lisa.

Before I left, Lisa told Jo Ann—in my presence—that when she entered the correct flood elevation information into her computer interface with Fidelity that it did not change our premium. Both were perplexed by this and noted that it was unusual. Lisa elaborated on her previous promise and told me that she would try to get to the bottom of it by contacting the underwriter and by checking with the title company to see if there was additional information about the elevation of our property. She also said that she would call me the following day.

### Thursday, 11 August 2005

Having not heard from Lisa, I called again to inquire as to what she had learned from the title company and the underwriter. I left a voicemail requesting that she call me back. She did not call me back.

### Wednesday, 24 August 2005

I contacted Lisa again to see if she had learned anything regarding the change in our policy. I left a message on her voicemail requesting that she call me before the end of the day. Lisa did not return my phone call.

### Saturday, 27 August 2005 10:01 a.m. EST

News reports first mentioned that Hurricane Katrina was likely to make landfall near New Orleans. I attempted to contact Fidelity National Property and Casualty Insurance Company directly at 800-820-3242 in order to pay the additional premium requested in the 25 June notice. The offices were closed.

## Sunday, 28 August 2005 2:33 p.m. EST

I attempted, again, to contact Fidelity National Property and Casualty Insurance Company directly at 800-820-3242 in order to pay the additional premium requested in the 25 June notice. The offices were still closed.

## Monday, 29 August 2005, 8:48 a.m. EST

I contacted Fidelity National Property and Casualty Insurance Company policy information department at 800-820-3242 and spoke to Dave. I asked why our insurance premium went up. He said that the elevation certificate was disregarded because the house had a negative elevation. I asked if I could pay the requested additional premium amount of $342.00 to gain full coverage for our property. He put me on hold to check with someone else at Fidelity. He returned to tell me that I could pay the premium but that the increased coverage would not go into effect for 30 days. He then advised me to save the money to apply to losses that I was likely to incur with the impending landfall of Hurricane Katrina.

## 31 August 2005

I contacted Fidelity National Property and Casualty Insurance Company policy information department at 800-820-3242 and spoke to Melissa. I asked for clarification as to when they received an elevation certificate for our property. Melissa informed me that they did not receive that elevation certificate until 1 August. I asked her if she had records of all of the quotes provided to us as well as communications between our insurance agent/broker and Fidelity. She transferred me to Tamika who said that they did have such records. I asked that she fax copies of those records to my fax number 614-292-1146. I did not receive that fax.

## 2 September 2005, 4:45 p.m. EST (Attachment H)

I contacted the claims department at Fidelity National Property and Casualty Insurance Company at 800-725-9472 to file a claim for losses associated with Hurricane Katrina. Their representative, Jeanette, provided me with a claim number (FNF-1-05-00-14170) and said that paperwork would be sent to us at our temporary address at 1787 Woods Dr., Dayton, OH 45432-2257. I also contacted the policy information department to ask that the records I originally requested on 31 August be sent. I was disconnected before a confirmation of remittance could be secured. I tried to call back, but the recorded message stated that Fidelity offices were closed.

## 8 September 2005, 9:00 a.m. EST

I contacted Fidelity National Property and Casualty Insurance Company policy information department at 800-820-3242 to ask if insurance records are regularly purged at Fidelity. The young woman on the line said that records are not purged for six (6) years. I again asked that a copy of all information regarding our policy, including communications between Fidelity and our insurance agent, be faxed to 614-292-1146. She agreed to fax those documents. I asked if our policy included "loss of use" coverage. She said that it did not, and that no flood insurance policies underwritten by Fidelity included such a provision. I asked where I might obtain a copy of the National Flood Insurance Program policy jacket. She referred me to the FEMA web page where that information can be found.

## 9 September 2005 (Attachment I)

I picked up a copy of the fax sent by Fidelity. It was a three-page fax (including a cover page) that provided the Flood Declarations Page from our flood insurance policy. No additional documents were provided.

## 13 September 2005 (Attachment J)

I faxed a request for all documents regarding our flood insurance policy (including communications between the underwriter and our insurance agent) to Fidelity. I have yet to receive a response to this request.

## 4 October 2005

Having not heard from flood insurance claims adjuster listed on the 2 September 2005 notice of receipt of our claim (Attachment H), I contacted Fidelity to find direct contact information for our claims adjuster. They provided me a telephone number (734-658-7908) for Will Jerden of Colonial Claims. I called Mr. Jerden and requested that he visit our property. He said that he would visit in a couple of days and requested that I compile a list of items destroyed by the storm.

## 23 October 2005, 11:17 a.m. EST

Will Jerden called me to inform me that he had an opportunity to visit our property and that he considered it a total loss. He also informed me that he had submitted paperwork to the underwriter recommending that they "max out" our policy. He also stated that it should take 2-3 weeks for the underwriter to process our check.

## 3 November 2005 (Attachments K & L)

I faxed and then sent via certified mail a request for an explanation of the reduced policy coverage amounts to the underwriter (Attachment K) and a request for information on filing an errors and omissions claim to the insurance agent (Attachment L).

## 21 November 2005 (Attachment M)

I received the attached letter from the insurance agent via certified mail. No information regarding my request for information on filing an errors and omissions claim was included.

## 22 November 2005, 4:01 p.m. EST

I contacted the underwriter to ascertain whether or not my request was going to be honored and whether a check had been cut for our claim. I spoke to Judy who said that no check had been issued because the claim was still under review. Judy informed me that no flood elevation certificate was provided when the policy quote was generated. She said that the elevation certificate generated the increased premium. I requested that she remit to me written evidence of what she was stating, including notes from communications between Fidelity and Lisa Dufour. She put me on hold to speak with a supervisor. Gayshawn then got on the phone with me and informed me that it is against company policy to provide copies of all of the information that was communicated to me over the phone and as such that she could not honor my request. I asked her to confirm Judy's assessment of the situation. She stated that the root of the problem was that the insurance agent did not provide a Base Flood Elevation when requesting a quote for our policy or in the policy application.

## ATTACHMENT A: CHRONOLOGY OF EVENTS

### 20 May 2005 (Attachment C)

A quote on our flood insurance policy (Quote #17 QT70489339 99) was faxed by the underwriter, Fidelity Property and Casualty Insurance Company, to AAA Club Insurance Agency. That quote was then faxed to our real estate agent, Joan Farabaugh, who then faxed it to us. The total premium listed in the quote was $788 for $183,000 of insurance on the building and $25,000 of insurance on contents, with $1000 deductibles on both building and contents coverage. A quote for homeowner's hazard insurance was also provided at this time.

### 8 June 2005

I spoke to Lisa Dufour, our representative at AAA Club Insurance, about amending the flood and hazard policies to cover $40,000 worth of contents with a deductible of $500. Lisa said she would call back on 9 June 2005. At that time I asked Lisa if AAA Insurance was the underwriter of the policies, or if it was an insurance broker. At that time she told me that AAA was the insurance company, not a broker of insurance policies.

Because my wife and I own a piece of art (A Cibachrome artist's proof, #8 of 10, of "Maui Dawn" by Wyland) valued at over $8000.00 I asked if that item needed to be itemized and/or covered under a separate insurance policy. Lisa said that it would not be necessary to specify the item in any policy, and that the hazard and flood insurance contents coverage would include coverage for the artwork.

### 9 June 2005, approximately 4 p.m. EST

Having not heard from Lisa, I called her to obtain the amended quote. She informed me that the total premium for flood insurance with $183,000 of coverage on the building (with a $1000 deductible) and $40,000 of coverage on the contents (with a $500 deductible) was $836.

### 17 June 2005

I called Lisa to obtain another amended quote. The total premium for flood insurance with $183,000 of coverage on the building (with a $1000 deductible) and $40,000 of coverage on the contents (also with a $1000 deductible) was $804. At this point, I told



HOL 0001

Lisa to move ahead with the policy at the coverage amounts quoted on 9 June. Lisa stated that she would contact the mortgage lender, National City Bank, and the title company, Partner's Title, on 20 June to make the necessary arrangements to move ahead with the flood and hazard insurance policies.


## 23 June 2005 (Attachment E)

Lisa faxed to us a standard flood insurance application to be signed and faxed back to her. We signed and faxed it back at 3:11 p.m. EST.


## 30 June 2005

We closed on our house. Payment was remitted to AAA Club Insurance in the amount of $836 for our flood insurance policy.


## 25 July 2005 (Attachments F & G)

Fidelity National Property and Casualty Insurance Company mailed us a notice (Attachment G) that our flood insurance policy (Attachment F) had been issued with lower limits of coverage than we had originally requested because our premium was inadequate.


## 4 August 2005

I called Jo Ann Daleo, the AAA Club Insurance agent named on the 25 July notice from Fidelity, to inquire about the reason for the change in our requested coverage. She said that Lisa Dufour was handling our file and transferred me to her. Lisa said that she did not have an explanation for the change, but said that she would look into it. I informed her that I needed to sign up for car insurance as part of the multi-policy discount offered to us, and requested that I come to her office to better deal with all of these issues. We agreed that I should stop by the AAA office at 2 p.m. CST.

At 2 p.m., I met with Lisa to discuss the flood insurance policy. She informed me that our title company, Partner's Title, faxed to her an elevation certificate that was not for our house and that she then faxed it on to the flood insurance underwriter. The underwriter caught the mistake and asked her to remit the true elevation certificate. She obtained one from the title company and then faxed it on to the underwriter. Lisa claimed that the cause of our increased premium was due to information provided on the true elevation certificate. However, when I asked her if our insurance application had been processed with the incorrect elevation certificate she could not definitively say that that was the case. (The insurance underwriting company claims that it did not receive any elevation certificate until late July, suggesting that the policy application was

processed without an elevation certificate.) Lisa attempted to enter the old, incorrect elevation information that was in our original flood insurance application into her computer interface with Fidelity, to see if it would change our premium back to the original quote. She said that it did not. Because she did not know why this would be the case, she said that she would look into it and give me a call.

I then spoke to Jo Ann regarding our car insurance. Once I had paid for our car insurance policy, I asked Jo Ann if I should be dealing directly with her since she is the agent named on all of our policies. Jo Ann told me that I was to conduct all transactions through Lisa.

Before I left, Lisa told Jo Ann—in my presence—that when she entered the correct flood elevation information into her computer interface with Fidelity that it did not change our premium. Both were perplexed by this and noted that it was unusual. Lisa elaborated on her previous promise and told me that she would try to get to the bottom of it by contacting the underwriter and by checking with the title company to see if there was additional information about the elevation of our property. She also said that she would call me the following day.

### Thursday, 11 August 2005

Having not heard from Lisa, I called again to inquire as to what she had learned from the title company and the underwriter. I left a voicemail requesting that she call me back. She did not call me back.

### Wednesday, 24 August 2005

I contacted Lisa again to see if she had learned anything regarding the change in our policy. I left a message on her voicemail requesting that she call me before the end of the day. Lisa did not return my phone call.

### Saturday, 27 August 2005 10:01 a.m. EST

News reports first mentioned that Hurricane Katrina was likely to make landfall near New Orleans. I attempted to contact Fidelity National Property and Casualty Insurance Company directly at 800-820-3242 in order to pay the additional premium requested in the 25 June notice. The offices were closed.

HOL 0003

### Sunday, 28 August 2005 2:33 p.m. EST

I attempted, again, to contact Fidelity National Property and Casualty Insurance Company directly at 800-820-3242 in order to pay the additional premium requested in the 25 June notice. The offices were still closed.

### Monday, 29 August 2005, 8:48 a.m. EST

I contacted Fidelity National Property and Casualty Insurance Company policy information department at 800-820-3242 and spoke to Dave. I asked why our insurance premium went up. He said that the elevation certificate was disregarded because the house had a negative elevation. I asked if I could pay the requested additional premium amount of $342.00 to gain full coverage for our property. He put me on hold to check with someone else at Fidelity. He returned to tell me that I could pay the premium but that the increased coverage would not go into effect for 30 days. He then advised me to save the money to apply to losses that I was likely to incur with the impending landfall of Hurricane Katrina.

### 31 August 2005

I contacted Fidelity National Property and Casualty Insurance Company policy information department at 800-820-3242 and spoke to Melissa. I asked for clarification as to when they received an elevation certificate for our property. Melissa informed me that they did not receive that elevation certificate until 1 August. I asked her if she had records of all of the quotes provided to us as well as communications between our insurance agent/broker and Fidelity. She transferred me to Tamika who said that they did have such records. I asked that she fax copies of those records to my fax number 614-292-1146. I did not receive that fax.

### 2 September 2005, 4:45 p.m. EST (Attachment H)

I contacted the claims department at Fidelity National Property and Casualty Insurance Company at 800-725-9472 to file a claim for losses associated with Hurricane Katrina. Their representative, Jeanette, provided me with a claim number (FNF-1-05-00-14170) and said that paperwork would be sent to us at our temporary address at 1787 Woods Dr., Dayton, OH 45432-2257. I also contacted the policy information department to ask that the records I originally requested on 31 August be sent. I was disconnected before a confirmation of remittance could be secured. I tried to call back, but the recorded message stated that Fidelity offices were closed.

**8 September 2005, 9:00 a.m. EST**

I contacted Fidelity National Property and Casualty Insurance Company policy information department at 800-820-3242 to ask if insurance records are regularly purged at Fidelity. The young woman on the line said that records are not purged for six (6) years. I again asked that a copy of all information regarding our policy, including communications between Fidelity and our insurance agent, be faxed to 614-292-1146. She agreed to fax those documents. I asked if our policy included "loss of use" coverage. She said that it did not, and that no flood insurance policies underwritten by Fidelity included such a provision. I asked where I might obtain a copy of the National Flood Insurance Program policy jacket. She referred me to the FEMA web page where that information can be found.

**9 September 2005 (Attachment I)**

I picked up a copy of the fax sent by Fidelity. It was a three-page fax (including a cover page) that provided the Flood Declarations Page from our flood insurance policy. No additional documents were provided.

**13 September 2005 (Attachment J)**

I faxed a request for all documents regarding our flood insurance policy (including communications between the underwriter and our insurance agent) to Fidelity. I have yet to receive a response to this request.

**4 October 2005**

Having not heard from flood insurance claims adjuster listed on the 2 September 2005 notice of receipt of our claim (Attachment H), I contacted Fidelity to find direct contact information for our claims adjuster. They provided me a telephone number (734-658-7908) for Will Jerden of Colonial Claims. I called Mr. Jerden and requested that he visit our property. He said that he would visit in a couple of days and requested that I compile a list of items destroyed by the storm.

**23 October 2005, 11:17 a.m. EST**

Will Jerden called me to inform me that he had an opportunity to visit our property and that he considered it a total loss. He also informed me that he had submitted paperwork to the underwriter recommending that they "max out" our policy. He also stated that it should take 2-3 weeks for the underwriter to process our check.

### 3 November 2005 (Attachments K & L)

I faxed and then sent via certified mail a request for an explanation of the reduced policy coverage amounts to the underwriter (Attachment K) and a request for information on filing an errors and omissions claim to the insurance agent (Attachment L).

### 21 November 2005 (Attachment M)

I received the attached letter from the insurance agent via certified mail. No information regarding my request for information on filing an errors and omissions claim was included.

### 22 November 2005, 4:01 p.m. EST

I contacted the underwriter to ascertain whether or not my request was going to be honored and whether a check had been cut for our claim. I spoke to Judy who said that no check had been issued because the claim was still under review. Judy informed me that no flood elevation certificate was provided when the policy quote was generated. She said that the elevation certificate generated the increased premium. I requested that she remit to me written evidence of what she was stating, including notes from communications between Fidelity and Lisa Dufour. She put me on hold to speak with a supervisor. Gayshawn then got on the phone with me and informed me that it is against company policy to provide copies of all of the information that was communicated to me over the phone and as such that she could not honor my request. I asked her to confirm Judy's assessment of the situation. She stated that the root of the problem was that the insurance agent did not provide a Base Flood Elevation when requesting a quote for our policy or in the policy application.