# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RONALD A. HOLBROOK           *
and APRIL HOLBROOK           *
                             * CIVIL ACTION
                             * NO.06-2617
     VERSUS                  *
                             * SEC. K
                             * JUDGE DUVAL
AAA INSURANCE AGENCY         *
INC, AND FIDELITY            *
NATIONAL PROPERTY AND        *
CASUALTY INSURANCE           * MAG.3
                             * MAGISTRATE JUDGE KNOWLES
* * * * * * * *

          Deposition of JO-ANN DALEO, taken
at the offices of Sessions, Fishman & Nathan,
LLP, 3850 North Causeway Boulevard, Lakeway
II, Suite 1240, Metairie, Louisiana, on
Friday, July 13, 2007, at 5:00 p.m.

Page 2

APPEARANCES:
   KANTROW, SPAHT, WEAVER & BLITZER
   BY: CONNELL L. ARCHEY, ESQ.
      445 North Boulevard
      Suite 300 - City Plaza
      Baton Rouge, LA 70802
      (225)383-4703
   ATTORNEYS FOR PLAINTIFFS

   SESSIONS FISHMAN & NATHAN, LLP
   BY: KEVIN G. BARRECA, ESQ.
      3850 North Causeway Boulevard
      Lakeway II
      Metairie, LA 70002
      (504)828-3737
   ATTORNEYS FOR DEFENDANT, AAA

   NIELSEN LAW FIRM, LLC
   BY: WILLIAM T. TREAS, ESQ.
      3838 North Causeway Boulevard
      Suite 2850
      Metairie, Louisiana 70002
      (504)837-2500
   ATTORNEYS FOR DEFENDANTS,
   FIDELITY NATIONAL INSURANCE COMPANY

Page 3

ALSO PRESENT:
  INOCENCIA DUFOUR

REPORTED BY:
  MARLANE A. GAILLE, CCR-RPR
  CERTIFIED COURT REPORTER #21005

Page 4

EXAMINATION INDEX:

EXAMINATION BY:        PAGE:
Mr. Archey             6, 30
Mr. Treas              26


          EXHIBIT INDEX:
           NO EXHIBITS

Page 5

1    STIPULATION
2         IT IS STIPULATED AND AGREED by
3    and among counsel for the parties hereto that
4    the deposition of the aforementioned witness
5    may be taken for all purposes permitted within
6    the Federal Rules of Civil Procedure, in
7    accordance with law, pursuant to notice;
8         That the formalities of reading
9    and signing are specifically waived;
10        That the formalities of filing,
11   sealing, and certification are specifically
12   waived;
13        That all objections, save those
14   as to the form of the question and the
15   responsiveness of the answer, are reserved
16   until such time as this deposition, or any
17   part thereof, is used or sought to be used in
18   evidence.
19              * * *
20        MARLANE A. GAILLE, CCR-RPR,
21   Certified Court Reporter in and for the State
22   of Louisiana, officiated in administering the
23   oath to the witness.
24
25

Page 6

1         INOCENCIA DUFOUR,
2    2324 Maine Avenue, Metairie, Louisiana 70003,
3         having been first duly sworn,
4    was examined and testified as follows:
5         MR. ARCHEY:
6              Ms. Daleo, Connell Archey. I
7         represent the Holbrooks. You've
8         been sitting here the whole day and
9         seeing what we're doing.
10             Same rules. If you don't
11        understand, let me know. And let's
12        get into it. Okay?
13        THE WITNESS:
14             Yes, sir.
15             EXAMINATION
16   BY MR. ARCHEY:
17   Q    Have you given a deposition before?
18   A    I don't remember going through this
19   before in my life.
20   Q    Good for you. Make sure you
21   understand my questions. I don't think my
22   questions are going to be all that exceedingly
23   difficult, but that's easy for me to say.
24        How long have you been with AAA
25   agency?

Page 7

1    A    September 16, 1985.
2    Q    And give me an idea on -- I don't
3    understand what Club Auto Agency is compared
4    to AAA compared to whatever else. Can you
5    give me a feel for what all that is?
6    A    AAA has divisions. We're part of AAA
7    Missouri.
8    Q    When you say "we," who is we?
9    A    This office.
10   Q    Which is?
11   A    The Causeway office.
12   Q    And what is the Causeway office? Is
13   that Club Auto Insurance agency?
14   A    No. That's AAA Missouri.
15   Q    Okay.
16   A    The company that we write through is
17   Club Insurance, Inc.
18   Q    The company you write through is Club
19   Insurance, Inc.
20   A    That's the way I understand it.
21   Q    Who are you employed by?
22   A    I'm employed by AAA Missouri.
23        MR. ARCHEY:
24             And you answered on behalf of
25        Club?

Page 8

1         MR. BARRECA:
2              Club is the --
3         MR. ARCHEY:
4              Let's go off the record for a
5         second.
6         (Off the record.)
7    Q    (By Mr. Archey) Ms. Daleo, I'm not
8    going to continue into the AAA arrangements.
9         What is your status with AAA?
10   A    I'm an insurance agent.
11   Q    Anything more?
12   A    No.
13   Q    I don't mean that in any kind of
14   disrespect.
15   A    I'm a good AAA member.
16   Q    Sure. As an agent you are authorized
17   to bind AAA and issue policies?
18   A    Yes.
19   Q    And you have an assistant,
20   Ms. Dufour, that works for you also?
21   A    Yes.
22   Q    And she provides things to you but
23   it's really through your name as the agent.
24   Is that right?
25   A    Yes.

Page 9

1  Q   If I say anything wrong, please jump
2  in. I'm just trying to sort of get to it, and
3  I could be mistaken.
4        As to the Holbrooks, tell me what you
5  know or recall about the Holbrooks. Do you
6  recall anything prior to this August 4
7  meeting?
8  A   No, sir.
9  Q   Did you have any contact with the
10 Holbrooks after the August 4 meeting?
11 A   No, sir.
12 Q   So your entire involvement with the
13 Holbrooks was this one meeting on August 4.
14 Is that correct?
15 A   Yes, sir.
16 Q   Let's cover that then. I probably
17 got some other background things I ought to
18 get.
19       But on August 4, prior to when
20 Mr. Holbrook came into the office, were you
21 aware of a problem with their file?
22 A   No, sir.
23 Q   Had Ms. Dufour, anytime prior to when
24 Mr. Holbrook sat in there and told you that we
25 got a problem, we got a quote and it's gotten

Page 10

1  cross-wise with them?
2  A   No, sir.
3  Q   Tell me what happened. What your
4  involvement is. Tell me first off what did
5  Ms. Lisa Dufour, what did she tell you?
6  A   Well --
7  Q   Tell me how it went down. Let's go
8  that way.
9  A   The way I recall is that he came into
10 the office to purchase the auto insurance but
11 also to bring in the elevation certificate to
12 discuss with Lisa the difference in the
13 elevation certificates. At that time I found
14 out about the wrong one and the right one.
15 Q   How did you find that out?
16 A   That day.
17 Q   How?
18 A   Because we were doing different
19 quotes.
20 Q   Who told you about the wrong
21 certificate?
22 A   Lisa.
23 Q   Go ahead. I'm sorry. I did what I
24 accused your counsel of doing.
25 A   He was at Lisa's desk, and Lisa was

Page 11

1  trying to do the quote and with the new
2  certificate was still getting the higher
3  price.
4        And he didn't understand why, and we
5  did the comparison of the two and knew that
6  the old one was a different address with
7  different levels on it than the new one.
8        So at that point when we put the new
9  figures in, obviously it came up higher
10 because he didn't have this lower levels. And
11 when it came up higher, we explained to him
12 that he has to pay the $400 or -- I'm sorry --
13 I don't know the exact amount -- in order for
14 him to have the coverage that he originally
15 signed off on.
16 Q   Did you try to run quotes with the
17 incorrect elevation certificate with him
18 there?
19 A   No; because it would be no use. He's
20 not going to get it even if we could get it to
21 work because this elevation certificate goes
22 to this address.
23 Q   Did he ask you to run the elevation
24 certificate or -- I'm sorry -- quotes with the
25 incorrect elevation certificate?

Page 12

1  A   That, I can't remember. But I would
2  have looked at him and said there's no use in
3  doing it.
4  Q   Well, if it would have satisfied him,
5  that would have been a reason?
6  A   Well, yeah; but --
7  Q   I'm not being argumentative.
8  A   I understand. But it would have been
9  of no use because we can't submit something
10 that's not correct. It's regulated, and this
11 is it.
12 Q   When you ran the quotes with the
13 correct elevation certificate that he brought
14 in, did you get the same numbers that were
15 being quoted to him?
16 A   Which numbers were quoted to him?
17 Q   The additional higher amount that he
18 needed to pay?
19 A   Yes.
20 Q   You got the exact number?
21 A   Yes; because we came up with the same
22 $300-something.
23 Q   Do you have any records to show this?
24 A   Unfortunately, we didn't print it.
25 The only thing I can think is that day we were

Page 13

1  looking at screens and realized, okay, now we
2  know what's wrong. You have the paper showing
3  that you owe it.
4      Q  Is there any written document that
5  you have from August 4, 2005?
6      A  No, sir.
7      Q  Is it true that the quote came out
8  the same if you just put in the A05 flood
9  level or if you put in his correct elevation
10 certificate?
11     A  That's correct.
12     Q  Do you know when -- strike that.
13        Did you speak with Pam Nusbaum?
14     A  No, sir.
15     Q  Who did you get on the phone with
16 Fidelity?
17     A  We just did a random customer service
18 call -- not "we," I did. A random customer
19 service call, put the person on speaker phone,
20 and I told them we were having trouble trying
21 to get a quote settled, would they mind
22 helping us to walk us through it to make sure
23 we did it correct.
24     Q  Do you know when the incorrect
25 elevation certificate was provided to

Page 14

1  Fidelity?
2      A  No, I don't.
3      Q  All the dealings prior to August 4
4  were with -- were with your assistant,
5  Ms. Lisa Dufour. Right?
6      A  Yeah.
7         I wanted to say something.
8      Q  Go ahead and tell me. What do you
9  want to say?
10     A  But I feel like -- this is just my
11 speculation and what normally is done in our
12 agency. In order for Lisa to have done this
13 quote with these figures, she would have had
14 to have the elevation certificate. There's no
15 way that she could come up with these figures
16 out of the air.
17     Q  And that's the June 23 application
18 the Holbrooks signed. Right?
19     A  Correct.
20     Q  When you go back to the May 20 quote
21 there is no indication of those numbers, is
22 there?
23     A  I don't know. Which one is May 20?
24     Q  P-1 -- P-2. I'm sorry. Here.
25        If you look at P-2 and P-3 -- I guess

Page 15

1  P-3 particularly.
2      A  Well, two different forms here too.
3  This is an application, and this is a quote.
4         I don't know if right now, looking at
5  you, if I could say the elevation levels show
6  up on a quote. I'd have to go back to the
7  office and do one and print it and then look
8  at it.
9      Q  They don't show up on what's on
10 there, do they?
11     A  No. But what I'm saying, this might
12 be the common, that they come out like this
13 without elevations.
14     Q  Your training as an agent with AAA,
15 let me ask you about that.
16        When the client signs the application
17 and sends the money in, as of that time, do
18 they have insurance?
19     A  It would be bound --
20        MR. TREAS:
21           Homeowner's or flood? They're
22        two different animals here.
23     Q  (By Mr. Archey) Is it different? Let
24 me ask you about flood specifically.
25        MR. TREAS:

Page 16

1           Object to the form.
2      Q  (By Mr. Archey) I'm asking -- and I
3  don't mean to be sliding off into legal areas,
4  and I probably am but -- when the application
5  is signed and money is in hand and you have it
6  as the agent for AAA, client walks out the
7  door, are they insured?
8         MR. TREAS:
9           Objection. Form.
10     A  (By Mr. Archey) My understanding is
11 that it would be effective this date as long
12 as all the documentation and everything is
13 correct and there's no misrepresentation.
14     Q  Did the Holbrooks make a
15 misrepresentation?
16     A  Not that I can see.
17     Q  Because on your quote you have this
18 nice language about this is not binding and
19 it's subject to verification and all those
20 types of thing. That language is nowhere on
21 the application, is it?
22     A  I heard you asking that before.
23        (Perusing document.)
24        No, it's not.
25     Q  How long was Mr. Holbrook in your

Page 17

1  office on August 4?
2     A  I couldn't begin to tell you. I can
3  only go by looking at the auto application and
4  the time we signed that to give you an idea of
5  what time of the day he was there.
6     Q  Do you have that?
7     A  It's written on the auto application,
8  the time of the day.
9           MR. ARCHEY:
10             Do I have that? I may have.
11    A  To be honest with you, it was like
12  2:37 in the afternoon.
13    Q  (By Mr. Archey) You had gone through
14  these documents to prepare for today. Right?
15    A  Uh-huh (nods head).
16    Q  I would expect you to.
17        Are there any documents -- are you
18  aware of any other documents pertaining to the
19  Holbrooks -- strike that.
20        Are you aware of any documents
21  pertaining to the Holbrooks other than what
22  you produced to us?
23    A  No, sir.
24    Q  I'm looking at AAA 053, and it's got
25  a time received stamp for 2:28 -- or not

Page 18

1  stamp -- of entry.
2     A  That's right.
3     Q  And that would be the internet
4  submittal that they were talking about before.
5  Is that right?
6     A  Yes, sir.
7     Q  Is a similar document like that
8  generated for the flood application when it's
9  submitted over the internet?
10    A  No; because we probably did not have
11  payment at the time when it was submitted.
12    Q  So when would it be submitted?
13    A  It was submitted at the time but
14  didn't have payment, so we would not have
15  written up a receipt. You can't write a
16  receipt for money you didn't receive.
17    Q  Is there an acknowledgement or
18  receipt printed off the internet when you send
19  it in?
20    A  For flood?
21    Q  Yes, ma'am.
22    A  I think it's just these things right
23  here. Maybe a transmittal form, but that's
24  about it.
25    Q  Do you see anything like that?

Page 19

1     A  Just this right here saying the total
2  premium.
3     Q  But I guess I'm asking when you send
4  it in over the internet, if that's the way it
5  went in, does that generate any kind of
6  document saying yes, it's been sent and
7  received?
8     A  No.
9     Q  I'd like to ask you about the notes
10  from Fidelity. Are you familiar with these
11  types of notes that the agents keep, or
12  whoever at Fidelity keeps?
13    A  I've never seen this before.
14    Q  I know, and that's a different
15  question.
16        Are you familiar with this system of
17  entering these notes?
18    A  No, sir.
19    Q  Do you know Pam Nusbaum?
20    A  I've talked to her before. I don't
21  remember for what particular incidences, but I
22  know her name.
23    Q  Have you spoken with her about the
24  Holbrooks?
25    A  No, sir. Certain people you get to

Page 20

1  like there that help you, and sometimes you'll
2  call them.
3     Q  Is Pam one of those?
4     A  Uh-huh (nods head).
5     Q  Good.
6        From the records, can you say when
7  the incorrect flood or elevation certificate
8  was sent to Fidelity?
9     A  No; other than what I've said before
10  that to me it seems like it had to have been
11  sent with this app in order for Lisa to have
12  these figures.
13    Q  I think you and I are
14  miscommunicating. Let me make sure I'm clear.
15  I'm not asking when you got it. I'm asking
16  when it was sent to Fidelity.
17    A  With this app.
18    Q  Why do you say -- just because it's
19  on here, why do you jump to the conclusion
20  that it means the elevation certificate had to
21  be with it?
22    A  That's part of the procedure in order
23  for the policy to be issued. If you don't
24  send an elevation certificate, they won't
25  issue it. They'll call asking where the

Page 21

1  elevation certificate is.
2    Q   Or issue with the A05 level.
3  Correct?
4    A   I don't think so. I don't know, but
5  I would imagine they would request this before
6  they'd issue it.
7    Q   Are you aware of a claim ever being
8  made against you as an agent?
9    A   No.
10   Q   Are you aware of a claim being made
11 of any other agent in your office?
12       MR. BARRECA:
13           Object. I don't think that's
14       relevant.
15           You can answer.
16   A   I think that I have, yeah.
17   Q   (By Mr. Archey) And how many?
18   A   I have no idea.
19   Q   What were the nature of the claims?
20   A   I don't even know that either.
21   Q   In your training, are you given
22 training that if you make a mistake that it
23 could cost money?
24   A   We have E and O.
25   Q   For when you make mistakes. Right?

Page 22

1    A   Depends on what type of mistake it
2  is.
3    Q   That's fair.
4        November 3 after that letter came in,
5  did you see that letter? November 3 letter?
6        I mean, I'll show it to you. Yeah.
7  Let's make sure it's in here. By all means.
8        There it is. It's P-15.
9        When that came in from the Holbrooks,
10 did you see it?
11   A   Who's this letter from?
12 Ms. Holbrook?
13   Q   They both signed it at the bottom.
14 Do you see that?
15   A   Yeah, I do.
16       I'll be honest with you, when ya'll
17 were discussing it before, I don't even
18 remember this letter. But this is just
19 November 3, and we came back on the 1st.
20       And the first week that we were in
21 our office, we were pretty much doing cleaning
22 up and things. I don't even know if it was
23 handed to me or when.
24   Q   So the world was still upside down
25 for you?

Page 23

1    A   Yes.
2    Q   That's fair.
3    A   She wasn't with me either. I was
4  doing the cleaning up by myself, you know.
5    Q   The November 14, P-16, did you speak
6  with Ms. Lisa Dufour about that letter before
7  or as she was drafting it?
8    A   No.
9    Q   When was of the first time you saw
10 the November 14 letter that's marked P-16?
11   A   Probably that day.
12   Q   Before it went out?
13   A   Probably; but I can't tell you for
14 sure because I don't remember this letter
15 either. I mean, I remember it being written,
16 but I don't remember when it went out or when
17 I saw it.
18   Q   Did you have any discussions with
19 Tom Pollock about the Holbrook situation?
20   A   No.
21   Q   Did you have any discussions with
22 anyone at AAA regarding the Holbrook situation
23 after November 3?
24   A   No; other than Lisa.
25   Q   What did you and Lisa speak about?

Page 24

1    A   When I saw this.
2    Q   What did ya'll talk about?
3    A   Nothing; just --
4        MR. BARRECA:
5            Don't talk about anything that
6        we talked about all together as a
7        meeting with your lawyers.
8    Q   (By Mr. Archey) That's true. I'm not
9  asking about the lawyers.
10       You had a meeting with the lawyers
11 and Lisa and everything and that's what you're
12 telling me?
13   A   Yeah.
14   Q   I don't want to go there.
15       Other than that meeting, did you
16 speak with Lisa about this letter?
17   A   No.
18   Q   When Lisa Dufour, as your assistant,
19 takes the application from the client and they
20 sign it, it's important to have the correct
21 elevation information on it. Is that true?
22   A   Yes.
23   Q   And she should have noticed -- and
24 read and noticed that the elevation
25 certificate that came from title company was

Page 25

1   incorrect. True?
2   A   It would be easy to make a mistake
3   with that, but true.
4           Because we're looking for one thing
5   when we get that. All we're looking for is
6   the levels. We don't even look at any of the
7   rest of it especially with somebody on the
8   phone holding and saying, you got my figure
9   yet?
10  Q   But before it's sent off, you had
11  plenty of opportunity to go through these
12  documents and review them. True?
13  A   Yes.
14  Q   And I understand the -- you know, the
15  nature of the way these things go sometimes.
16  But at the end of the day, it was her duty and
17  your duty?
18          MR. BARRECA:
19              Object to the form of the
20          question if you're asking a duty in
21          the legal sense.
22  Q   (By Mr. Archey) As your agent, you
23  would expect Ms. Dufour to ensure that she
24  sent the correct elevation certificate on when
25  she sent the application in to Fidelity.

Page 26

1   True?
2   A   Yes.
3           MR. ARCHEY:
4              Ms. Daleo, it's 5:30 on
5           Friday. I want to quit while I'm
6           ahead or behind.
7              You got any, Bill?
8           MR. TREAS:
9              A little bit.
10              EXAMINATION
11  BY MR. TREAS:
12  Q   I asked Ms. Dufour and you were
13  itching to answer, so can you give me the
14  layman's term explanation as to why the
15  elevation did not make a difference? Spell it
16  out nice and simple.
17  A   Okay.
18          MR. ARCHEY:
19              And to be clear, you're
20          talking about the elevation on the
21          correct certificate for the
22          property.
23          MR. TREAS:
24              Yes.
25  A   When we got the correct certificate,

Page 27

1   we put in the name, the address, and those
2   figures of the elevation. We already had the
3   A05 zone when we get that. That determines
4   his price, and those levels that are listed
5   determine his house as based to the street.
6           The original quote was done with
7   levels that were lower. I've actually seen --
8   actually -- I mean higher. I've actually seen
9   the house from the original quote and it's
10  built lying this far -- he has a very large
11  pad before his slab. Okay?
12          So what it means is that if a flood
13  comes through, he's not going to get flooded
14  as bad as the gentleman who's got the house
15  down here.
16          So when we put those figures in the
17  first time, if we would not have had the wrong
18  certificate and just said okay, we're going to
19  quote you as an A05 zone, we would have came
20  up with the same figure that we came with when
21  we did have the elevation that was correct.
22  Q   (By Mr. Treas) So the fact that the
23  2004 -- call it the incorrect elevation
24  certificate -- had a higher lowest floor
25  elevation compared to the base flood

Page 28

1   elevation, that's why the premium was lower.
2   Is that correct?
3   A   Correct.
4   Q   Now you're saying if you just run
5   A05, meaning there's no elevation at all --
6   A   At all. Because he was built
7   before '74, we always say to people, do you
8   have an elevation certificate. If you don't,
9   try to get one because it may help your price.
10          So when we got the elevation
11  certificate for the wrong place and put in
12  those figures, that gave us the wrong price.
13  But if we would have just did a quote without
14  any elevations at all, we would have got that
15  11, whatever it was, price just based on the
16  address and an A05 zone.
17  Q   Two more topics. You as the agent --
18  I'm not getting into who you're the agent of.
19  I'm staying away from that -- but as an
20  insurance agent, when you are setting up and
21  obtaining homeowner's or flood insurance for
22  particular prospective customers, you receive
23  a commission. Is that correct?
24  A   Yes.
25  Q   Now the commissions are going to vary

Page 29

1  upon the company and the type of insurance.
2  Is that correct?
3      A   Yes.
4      Q   With regard to the Holbrooks' flood
5  policy, would you have received a higher
6  commission if you had -- would have gotten the
7  183 that they requested compared to the 111?
8  Or does that make a difference?
9      A   No; it does. The higher premium, the
10 more commission.
11     Q   So you have no incentive to have a
12 lower premium for the homeowner's because
13 you're going to give up your commission. Am I
14 saying that correctly?
15     A   Say that again?
16     Q   You don't have any incentive to have
17 a $111,000 policy for the Holbrooks compared
18 to the $183,000 because you would make a
19 higher commission for the $183,000. Is that
20 correct?
21     A   Correct.
22     Q   The rates, these --
23         MR. ARCHEY:
24             $11,000 versus $183,000?
25         MR. TREAS:

Page 30

1             $111,000 for the building
2  compared to the $183,000 that was
3  requested.
4          MR. ARCHEY:
5              I'm sorry. Thank you.
6      Q   (By Mr. Treas) The premiums, or what
7  we call the rates, the $836 compared to the
8  $1,178 for the Holbrooks' property for flood,
9  those rates are not dictated by your office or
10 AAA. Is that correct?
11     A   No, sir.
12     Q   Those rates are dictated by FEMA. Is
13 that correct?
14     A   Yes, sir.
15     Q   At least your understanding?
16     A   No; we can't change them in any way.
17 It's regulated by the government.
18         MR. TREAS:
19             Thank you.
20         MR. ARCHEY:
21             I think one more question.
22              EXAMINATION
23 BY MR. ARCHEY:
24     Q   At what level would it make a
25 difference? What elevation level would make a

Page 31

1  difference on A05?
2      A   I have no idea. I don't even -- see,
3  with flood, I have learned to not even try to
4  do the minus and the adding because our
5  computer does it for us.
6      Q   It's not that simple. There are more
7  moving parts to this, aren't there?
8      A   Oh, yeah.
9          MR. ARCHEY:
10             That's all I have.
11 (The deposition concluded at 5:32 p.m.)

Page 32

1          REPORTER'S CERTIFICATE
2          I, MARLANE A. GAILLE, CCR-RPR,
3  Certified Court Reporter in and for the State
4  of Louisiana, do hereby certify that the
5  aforementioned witness, after having been
6  first duly sworn by me to testify to the
7  truth, did testify as hereinabove set forth;
8              That said deposition was taken by
9  me in computer shorthand and thereafter
10 transcribed under my supervision, and is a
11 true and correct transcription to the best of
12 my ability and understanding.
13             I further certify that I am not
14 of counsel, nor related to counsel or the
15 parties hereto, and am in no way interested in
16 the result of said cause.

                            _____
                            MARLANE A. GAILLE, CCR-RPR
                            CERTIFIED COURT REPORTER #21005

| A | | B | C | D | E |
|---|---|---|---|---|---|
| AAA 1:7 2:16 6:24 7:4,6,6,14,22 8:8,9 8:15,17 15:14 16:6 17:24 23:22 30:10 ability 32:12 accused 10:24 acknowledgement 18:17 ACTION 1:5 adding 31:4 additional 12:17 address 11:6,22 27:1 28:16 administering 5:22 aforementioned 5:4 32:5 afternoon 17:12 agency 1:7 6:25 7:3 7:13 14:12 agent 8:10,16,23 15:14 16:6 21:8,11 25:22 28:17,18,20 agents 19:11 AGREED 5:2 ahead 10:23 14:8 26:6 air 14:16 amount 11:13 12:17 animals 15:22 answer 5:15 21:15 26:13 answered 7:24 anytime 9:23 app 20:11,17 APPEARANCES 2:1 application 14:17 15:3,16 16:4,21 17:3,7 18:8 24:19 25:25 APRIL 1:3 Archey 2:3 4:4 6:5,6 6:16 7:23 8:3,7 15:23 16:2,10 17:9 17:13 21:17 24:8 | 25:22 26:3,18 29:23 30:4,20,23 31:9 areas 16:3 argumentative 12:7 arrangements 8:8 asked 26:12 asking 16:2,22 19:3 20:15,15,25 24:9 25:20 assistant 8:19 14:4 24:18 ATTORNEYS 2:8 2:16,24 August 9:6,10,13,19 13:5 14:3 17:1 authorized 8:16 auto 7:3,13 10:10 17:3,7 Avenue 6:2 aware 9:21 17:18,20 21:7,10 A05 13:8 21:2 27:3 27:19 28:5,16 31:1 | back 14:20 15:6 22:19 background 9:17 bad 27:14 BARRECA 2:11 8:1 21:12 24:4 25:18 base 27:25 based 27:5 28:15 Baton 2:6 behalf 7:24 best 32:11 Bill 26:7 bind 8:17 binding 16:18 bit 26:9 BLITZER 2:2 bottom 22:13 Boulevard 1:16 2:4 2:12,20 bound 15:19 bring 10:11 | brought 12:13 building 30:1 built 27:10 28:6 call 13:18,19 20:2,25 27:23 30:7 CASUALTY 1:8 cause 32:16 Causeway 1:16 2:12 2:20 7:11,12 CCR-RPR 3:6 5:20 32:2,21 Certain 19:25 certificate 10:11,21 11:2,17,21,24,25 12:13 13:10,25 14:14 20:7,20,24 21:1 24:25 25:24 26:21,25 27:18,24 28:8,11 32:1 certificates 10:13 certification 5:11 Certified 3:7 5:21 32:3,22 certify 32:4,13 change 30:16 City 2:5 Civil 1:5 5:6 claim 21:7,10 claims 21:19 cleaning 22:21 23:4 clear 20:14 26:19 client 15:16 16:6 24:19 Club 7:3,13,17,18,25 8:2 come 14:15 15:12 comes 27:13 commission 28:23 29:6,10,13,19 commissions 28:25 common 15:12 company 2:25 7:16 7:18 24:25 29:1 compared 7:3,4 27:25 29:7,17 30:2 | 30:7 comparison 11:5 computer 31:5 32:9 concluded 31:11 conclusion 20:19 Connell 2:3 6:6 contact 9:9 continue 8:8 correct 9:14 12:10 12:13 13:9,11,23 14:19 16:13 21:3 24:20 25:24 26:21 26:25 27:21 28:2,3 28:23 29:2,20,21 30:10,13 32:11 correctly 29:14 cost 21:23 counsel 5:3 10:24 32:14,14 Court 1:1 3:7 5:21 32:3,22 cover 9:16 coverage 11:14 cross-wise 10:1 customer 13:17,18 customers 28:22 D Daleo 1:14 6:6 8:7 26:4 date 16:11 day 6:8 10:16 12:25 17:5,8 23:11 25:16 dealings 14:3 DEFENDANT 2:16 DEFENDANTS 2:24 Depends 22:1 deposition 1:14 5:4 5:16 6:17 31:11 32:8 desk 10:25 determine 27:5 determines 27:3 dictated 30:9,12 difference 10:12 26:15 29:8 30:25 31:1 | different 10:18 11:6 11:7 15:2,22,23 19:14 difficult 6:23 discuss 10:12 discussing 22:17 discussions 23:18,21 disrespect 8:14 DISTRICT 1:1,2 divisions 7:6 document 13:4 16:23 18:7 19:6 documentation 16:12 documents 17:14,17 17:18,20 25:12 doing 6:9 10:18,24 12:3 22:21 23:4 door 16:7 drafting 23:7 Dufour 3:2 6:1 8:20 9:23 10:5 14:5 23:6 24:18 25:23 26:12 duly 6:3 32:6 duty 25:16,17,20 DUVAL 1:7 E E 21:24 EASTERN 1:2 easy 6:23 25:2 effective 16:11 either 21:20 23:3,15 elevation 10:11,13 11:17,21,23,25 12:13 13:9,25 14:14 15:5 20:7,20 20:24 21:1 24:21 24:24 25:24 26:15 26:20 27:2,21,23 27:25 28:1,5,8,10 30:25 elevations 15:13 28:14 employed 7:21,22 ensure 25:23 entering 19:17 |

entire 9:12
entry 18:1
especially 25:7
ESQ 2:3,11,19
evidence 5:18
exact 11:13 12:20
EXAMINATION
  4:1,3 6:15 26:10
  30:22
examined 6:4
exceedingly 6:22
EXHIBIT 4:9
EXHIBITS 4:10
expect 17:16 25:23
explained 11:11
explanation 26:14

F
fact 27:22
fair 22:3 23:2
familiar 19:10,16
far 27:10
Federal 5:6
feel 7:5 14:10
FEMA 30:12
Fidelity 1:8 2:25
  13:16 14:1 19:10
  19:12 20:8,16
  25:25
figure 25:8 27:20
figures 11:9 14:13,15
  20:12 27:2,16
  28:12
file 9:21
filing 5:10
find 10:15
FIRM 2:18
first 6:3 10:4 22:20
  23:9 27:17 32:6
Fishman 1:15 2:10
flood 13:8 15:21,24
  18:8,20 20:7 27:12
  27:25 28:21 29:4
  30:8 31:3
flooded 27:13
floor 27:24
follows 6:4

form 5:14 16:1,9
  18:23 25:19
formalities 5:8,10
forms 15:2
forth 32:7
found 10:13
Friday 1:18 26:5
further 32:13

G
G 2:11
GAILLE 3:6 5:20
  32:2,21
generate 19:5
generated 18:8
gentleman 27:14
getting 11:2 28:18
give 7:2,5 17:4 26:13
  29:13
given 6:17 21:21
go 8:4 10:7,23 14:8
  14:20 15:6 17:3
  24:14 25:11,15
goes 11:21
going 6:18,22 8:8
  11:20 27:13,18
  28:25 29:13
good 6:20 8:15 20:5
gotten 9:25 29:6
government 30:17
guess 14:25 19:3

H
hand 16:5
handed 22:23
happened 10:3
head 17:15 20:4
heard 16:22
help 20:1 28:9
helping 13:22
hereinabove 32:7
hereto 5:3 32:15
higher 11:2,9,11
  12:17 27:8,24 29:5
  29:9,19
Holbrook 1:3,3 9:20
  9:24 16:25 22:12

23:19,22
Holbrooks 6:7 9:4,5
  9:10,13 14:18
  16:14 17:19,21
  19:24 22:9 29:4,17
  30:8
holding 25:8
homeowner's 15:21
  28:21 29:12
honest 17:11 22:16
house 27:5,9,14

I
idea 7:2 17:4 21:18
  31:2
II 1:17 2:13
imagine 21:5
important 24:20
incentive 29:11,16
incidences 19:21
incorrect 11:17,25
  13:24 20:7 25:1
  27:23
INDEX 4:1,9
indication 14:21
information 24:21
INOCENCIA 3:2
  6:1
insurance 1:7,8 2:25
  7:13,17,19 8:10
  10:10 15:18 28:20
  28:21 29:1
insured 16:7
interested 32:15
internet 18:3,9,18
  19:4
involvement 9:12
  10:4
issue 8:17 20:25 21:2
  21:6
issued 20:23
itching 26:13

J
JO-ANN 1:14
JUDGE 1:7,8
July 1:18

jump 9:1 20:19
June 14:17

K
K 1:6
KANTROW 2:2
keep 19:11
keeps 19:12
KEVIN 2:11
kind 8:13 19:5
knew 11:5
know 6:11 9:5 11:13
  13:2,12,24 14:23
  15:4 19:14,19,22
  21:4,20 22:22 23:4
  25:14
KNOWLES 1:8

L
L 2:3 5:1
LA 2:6,14
Lakeway 1:16 2:13
language 16:18,20
large 27:10
law 2:18 5:7
lawyers 24:7,9,10
layman's 26:14
learned 31:3
legal 16:3 25:21
letter 22:4,5,5,11,18
  23:6,10,14 24:16
let's 6:11 8:4 9:16
  10:7 22:7
level 13:9 21:2 30:24
  30:25
levels 11:7,10 15:5
  25:6 27:4,7
life 6:19
Lisa 10:5,12,22,25
  14:5,12 20:11 23:6
  23:24,25 24:11,16
  24:18
Lisa's 10:25
listed 27:4
little 26:9
LLC 2:18
LLP 1:16 2:10

long 6:24 16:11,25
look 14:25 15:7 25:6
looked 12:2
looking 13:1 15:4
  17:3,24 25:4,5
Louisiana 1:2,17
  2:22 5:22 6:2 32:4
lower 11:10 27:7
  28:1 29:12
lowest 27:24
lying 27:10

M
MAGISTRATE 1:8
MAG.3 1:8
Maine 6:2
marked 23:10
MARLANE 3:6 5:20
  32:2,21
ma'am 18:21
mean 8:13 16:3 22:6
  23:15 27:8
meaning 28:5
means 20:20 22:7
  27:12
meeting 9:7,10,13
  24:7,10,15
member 8:15
Metairie 1:17 2:14
  2:22 6:2
mind 13:21
minus 31:4
miscommunicating
  20:14
misrepresentation
  16:13,15
Missouri 7:7,14,22
mistake 21:22 22:1
  25:2
mistaken 9:3
mistakes 21:25
money 15:17 16:5
  18:16 21:23
moving 31:7

N
N 5:1

ame 8:23 19:22
  27:1
Nathan 1:15 2:10
NATIONAL 1:8
  2:25
nature 21:19 25:15
needed 12:18
never 19:13
new 11:1,7,8
nice 16:18 26:16
NIELSEN 2:18
nods 17:15 20:4
normally 14:11
North 1:16 2:4,12,20
notes 19:9,11,17
notice 5:7
noticed 24:23,24
November 22:4,5,19
  23:5,10,23
NO.06-2617 1:5
number 12:20
numbers 12:14,16
  14:21
Nusbaum 13:13
  19:19

        O
O 5:1 21:24
oath 5:23
Object 16:1 21:13
  25:19
Objection 16:9
objections 5:13
obtaining 28:21
obviously 11:9
office 7:9,11,12 9:20
  10:10 15:7 17:1
  21:11 22:21 30:9
offices 1:15
officiated 5:22
oh 31:8
okay 6:12 7:15 13:1
  26:17 27:11,18
old 11:6
opportunity 25:11
order 11:13 14:12
  20:11,22

original 27:6,9
originally 11:14
ought 9:17
owe 13:3

        P
P 5:1
pad 27:11
PAGE 4:3
Pam 13:13 19:19
  20:3
paper 13:2
part 5:17 7:6 20:22
particular 19:21
  28:22
particularly 15:1
parties 5:3 32:15
parts 31:7
pay 11:12 12:18
payment 18:11,14
people 19:25 28:7
permitted 5:5
person 13:19
pertaining 17:18,21
Perusing 16:23
phone 13:15,19 25:8
place 28:11
PLAINTIFFS 2:8
Plaza 2:5
please 9:1
plenty 25:11
point 11:8
policies 8:17
policy 20:23 29:5,17
Pollock 23:19
premium 19:2 28:1
  29:9,12
premiums 30:6
prepare 17:14
PRESENT 3:1
pretty 22:21
price 11:3 27:4 28:9
  28:12,15
print 12:24 15:7
printed 18:18
prior 9:6,19,23 14:3
probably 9:16 16:4

  18:10 23:11,13
problem 9:21,25
procedure 5:6 20:22
produced 17:22
property 1:8 26:22
  30:8
prospective 28:22
provided 13:25
provides 8:22
purchase 10:10
purposes 5:5
pursuant 5:7
put 11:8 13:8,9,19
  27:1,16 28:11
P-1 14:24
P-15 22:8
P-16 23:5,10
P-2 14:24,25
P-3 14:25 15:1
p.m 1:18 31:11

        Q
question 5:14 19:15
  25:20 30:21
questions 6:21,22
quit 26:5
quote 9:25 11:1 13:7
  13:21 14:13,20
  15:3,6 16:17 27:6,9
  27:19 28:13
quoted 12:15,16
quotes 10:19 11:16
  11:24 12:12

        R
ran 12:12
random 13:17,18
rates 29:22 30:7,9,12
read 24:24
reading 5:8
realized 13:1
really 8:23
reason 12:5
recall 9:5,6 10:9
receipt 18:15,16,18
receive 18:16 28:22
received 17:25 19:7

  29:5
record 8:4,6
records 12:23 20:6
regard 29:4
regarding 23:22
regulated 12:10
  30:17
related 32:14
relevant 21:14
remember 6:18 12:1
  19:21 22:18 23:14
  23:15,16
REPORTED 3:5
Reporter 3:7 5:21
  32:3,22
REPORTER'S 32:1
represent 6:7
request 21:5
requested 29:7 30:3
reserved 5:15
responsiveness 5:15
rest 25:7
result 32:16
review 25:12
right 8:24 10:14 14:5
  14:18 15:4 17:14
  18:2,5,22 19:1
  21:25
RONALD 1:3
Rouge 2:6
rules 5:6 6:10
run 11:16,23 28:4

        S
S 5:1
sat 9:24
satisfied 12:4
save 5:13
saw 23:9,17 24:1
saying 15:11 19:1,6
  25:8 28:4 29:14
screens 13:1
sealing 5:11
SEC 1:6
second 8:5
see 16:16 18:25 22:5
  22:10,14 31:2

seeing 6:9
seen 19:13 27:7,8
send 18:18 19:3
  20:24
sends 15:17
sense 25:21
sent 19:6 20:8,11,16
  25:10,24,25
September 7:1
service 13:17,19
Sessions 1:15 2:10
set 32:7
setting 28:20
settled 13:21
shorthand 32:9
show 12:23 15:5,9
  22:6
showing 13:2
sign 24:20
signed 11:15 14:18
  16:5 17:4 22:13
signing 5:9
signs 15:16
similar 18:7
simple 26:16 31:6
sir 6:14 9:8,11,15,22
  10:2 13:6,14 17:23
  18:6 19:18,25
  30:11,14
sitting 6:8
situation 23:19,22
slab 27:11
sliding 16:3
somebody 25:7
sorry 10:23 11:12,24
  14:24 30:5
sort 9:2
sought 5:17
SPAHT 2:2
speak 13:13 23:5,25
  24:16
speaker 13:19
specifically 5:9,11
  15:24
speculation 14:11
Spell 26:15

| | | | | |
|---|---|---|---|---|
| spoken 19:23 | 27:17 | waived 5:9,12 | **#** | 504)837-2500 2:23 |
| stamp 17:25 18:1 | title 24:25 | walk 13:22 | #21005 3:7 32:22 | |
| State 5:21 32:3 | today 17:14 | walks 16:6 | | **6** |
| STATES 1:1 | told 9:24 10:20 13:20 | want 14:9 24:14 26:5 | **0** | 6 4:4 |
| status 8:9 | Tom 23:19 | wanted 14:7 | 053 17:24 | |
| staying 28:19 | topics 28:17 | wasn't 23:3 | | **7** |
| STIPULATED 5:2 | total 19:1 | way 7:20 10:8,9 | **1** | 70002 2:14,22 |
| street 27:5 | training 15:14 21:21 | 14:15 19:4 25:15 | 1st 22:19 | 70003 6:2 |
| strike 13:12 17:19 | 21:22 | 30:16 32:15 | 11 28:15 | 70802 2:6 |
| subject 16:19 | transcribed 32:10 | WEAVER 2:2 | 111 29:7 | 74 28:7 |
| submit 12:9 | transcription 32:11 | week 22:20 | 1240 1:17 | |
| submittal 18:4 | transmittal 18:23 | went 10:7 19:5 23:12 | 13 1:18 | |
| submitted 18:9,11,12 | Treas 2:19 4:5 15:20 | 23:16 | 14 23:5,10 | |
| 18:13 | 15:25 16:8 26:8,11 | we're 6:9 7:6 25:4,5 | 16 7:1 | |
| Suite 1:17 2:5,21 | 26:23 27:22 29:25 | 27:18 | 183 29:7 | |
| supervision 32:10 | 30:6,18 | WILLIAM 2:19 | 1985 7:1 | |
| sure 6:20 8:16 13:22 | trouble 13:20 | witness 5:4,23 6:13 | | |
| 20:14 22:7 23:14 | true 13:7 24:8,21 | 32:5 | **2** | |
| sworn 6:3 32:6 | 25:1,3,12 26:1 | work 11:21 | 2:28 17:25 | |
| system 19:16 | 32:11 | works 8:20 | 2:37 17:12 | |
| | truth 32:7 | world 22:24 | 20 14:20,23 | |
| **T** | try 11:16 28:9 31:3 | write 7:16,18 18:15 | 2004 27:23 | |
| T 2:19 5:1,1 | trying 9:2 11:1 13:20 | written 13:4 17:7 | 2005 13:5 | |
| taken 1:14 5:5 32:8 | two 11:5 15:2,22 | 18:15 23:15 | 2007 1:18 | |
| takes 24:19 | 28:17 | wrong 9:1 10:14,20 | 225)383-4703 2:7 | |
| talk 24:2,5 | type 22:1 29:1 | 13:2 27:17 28:11 | 23 14:17 | |
| talked 19:20 24:6 | types 16:20 19:11 | 28:12 | 2324 6:2 | |
| talking 18:4 26:20 | | | 26 4:5 | |
| tell 9:4 10:3,4,5,7 | **U** | **Y** | 2850 2:21 | |
| 14:8 17:2 23:13 | U 5:1 | ya'll 22:16 24:2 | | |
| telling 24:12 | Uh-huh 17:15 20:4 | yeah 12:6 14:6 21:16 | **3** | |
| term 26:14 | understand 6:11,21 | 22:6,15 24:13 31:8 | 3 22:4,5,19 23:23 | |
| testified 6:4 | 7:3,20 11:4 12:8 | | 30 4:4 | |
| testify 32:6,7 | 25:14 | **Z** | 300 2:5 | |
| Thank 30:5,19 | understanding 16:10 | zone 27:3,19 28:16 | 3838 2:20 | |
| thereof 5:17 | 30:15 32:12 | | 3850 1:16 2:12 | |
| they'd 21:6 | Unfortunately 12:24 | **$** | | |
| thing 12:25 16:20 | UNITED 1:1 | $1,178 30:8 | **4** | |
| 25:4 | upside 22:24 | $11,000 29:24 | 4 9:6,10,13,19 13:5 | |
| things 8:22 9:17 | use 11:19 12:2,9 | $111,000 29:17 30:1 | 14:3 17:1 | |
| 18:22 22:22 25:15 | | $183,000 29:18,19,24 | 445 2:4 | |
| think 6:21 12:25 | **V** | 30:2 | | |
| 18:22 20:13 21:4 | vary 28:25 | $300-something | **5** | |
| 21:13,16 30:21 | verification 16:19 | 12:22 | 5:00 1:18 | |
| time 5:16 10:13 | versus 1:6 29:24 | $400 11:12 | 5:30 26:4 | |
| 15:17 17:4,5,8,25 | | $836 30:7 | 5:32 31:11 | |
| 18:11,13 23:9 | **W** | | 504)828-3737 2:15 | |