# EXHIBIT
# C

Page 3

```
 1          UNITED STATES DISTRICT COURT
 2          EASTERN DISTRICT OF LOUISIANA
 3
    RONALD A. HOLBROOK        *
    and APRIL HOLBROOK        *
 5                           * CIVIL ACTION
                             * NO.06-2617
 6     VERSUS                *
                             * SEC. K
 7                           * JUDGE DUVAL
    AAA INSURANCE AGENCY      *
 8  INC, AND FIDELITY         *
    NATIONAL PROPERTY AND     *
    CASUALTY INSURANCE       * MAG.3
                             * MAGISTRATE JUDGE KNOWLES
10  *  *  *  *  *  *  *  *
11
12
13
14         Deposition of INOCENCIA DUFOUR,
15  taken at the offices of Sessions, Fishman &
16  Nathan, LLP, 3850 North Causeway Boulevard,
17  Lakeway II, Suite 1240, Metairie, Louisiana,
18  on Friday, July 13, 2007, at 3:05 p.m.
19
20
21
22
23
24
25
```

Page 3

```
 1  ALSO PRESENT:
 2    ROBERT HOLBROOK
 3    JO-ANN DALEO
 4
 5
 6  REPORTED BY:
 7    MARLANE A. GAILLE, CCR-RPR
 8    CERTIFIED COURT REPORTER #21005
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1  APPEARANCES:
 2  KANTROW, SPAHT, WEAVER & BLITZER
 3  BY: CONNELL L. ARCHEY, ESQ.
 4      445 North Boulevard
 5      Suite 300 - City Plaza
 6      Baton Rouge, LA 70802
 7      (225)383-4703
 8  ATTORNEYS FOR PLAINTIFFS
 9
10  SESSIONS FISHMAN & NATHAN, LLP
11  BY: KEVIN G. BARRECA, ESQ.
12      3850 North Causeway Boulevard
13      Lakeway II
14      Metairie, LA 70002
15      (504)828-3737
16  ATTORNEYS FOR DEFENDANT, AAA
17
18  NIELSEN LAW FIRM, LLC
19  BY: WILLIAM T. TREAS, ESQ.
20      3838 North Causeway Boulevard
21      Suite 2850
22      Metairie, Louisiana 70002
23      (504)837-2500
24  ATTORNEYS FOR DEFENDANTS,
25  FIDELITY NATIONAL INSURANCE COMPANY
```

Page 4

```
 1         EXAMINATION INDEX:
 2
 3  EXAMINATION BY:       PAGE:
 4  Mr. Archey        8, 103
 5  Mr. Treas         88
 6
 7
 8
 9         EXHIBIT INDEX:
10  EXHIBIT NO.:       PAGE:
11    AAA-1        25
12    AAA-2        34
13    AAA-3        35
14    AAA-4        43
15    AAA-5        46
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1          S T I P U L A T I O N
 2          IT IS STIPULATED AND AGREED by
 3   and among counsel for the parties hereto that
 4   the deposition of the aforementioned witness
 5   may be taken for all purposes permitted within
 6   the Federal Rules of Civil Procedure, in
 7   accordance with law, pursuant to notice;
 8          That the formalities of reading
 9   and signing are specifically waived;
10          That the formalities of filing,
11   sealing, and certification are specifically
12   waived;
13          That all objections, save those
14   as to the form of the question and the
15   responsiveness of the answer, are reserved
16   until such time as this deposition, or any
17   part thereof, is used or sought to be used in
18   evidence.
19                  * * *
20          MARLANE A. GAILLE, CCR-RPR,
21   Certified Court Reporter in and for the State
22   of Louisiana, officiated in administering the
23   oath to the witness.
24
25
```

**Page 6**

```
 1          INOCENCIA DUFOUR,
 2   3709 Bissonet Drive, Metairie, Louisiana 70003,
 3          having been first duly sworn,
 4     was examined and testified as follows:
 5          MR. ARCHEY:
 6          Good afternoon, Ms. Dufour.
 7     We've been here all day. I know
 8     you've been sitting here. 1
 9     Connell Archey. I represent Andrew
10     Holbrook and his wife.
11          First off, give me your name
12     and address for the record, please.
13          THE WITNESS:
14          Inocencia Dufour, 3709
15     Bissonet Drive, Metairie,
16     Louisiana 70003.
17          MR. ARCHEY:
18          First thing is about the
19     deposition process. You just saw
20     your attorney and the other
21     gentleman, the way they took the
22     deposition. I operate very much
23     the same.
24          If you don't understand a
25     question, please tell me and I will
```

**Page 7**

```
 1   either try to re-ask it or come up
 2   with a better question. It's
 3   important that you understand my
 4   questions.
 5          It's the same as if you're
 6   sworn in a court of law. We're
 7   taking everything down that can be
 8   used later. Okay?
 9   THE WITNESS:
10          Okay.
11   MR. ARCHEY:
12          You need to answer out loud,
13   yes or no, as opposed to nodding
14   the head. We'll prompt you.
15          It is getting late in the day.
16   If you need a break let me know and
17   we'll take a break. This doesn't
18   need to be any more of a torture
19   than it need be. Okay?
20   THE WITNESS:
21          Okay.
22   MR. ARCHEY:
23          Have you ever given a
24   deposition before?
25   THE WITNESS:
```

**Page 8**

```
 1          No.
 2          EXAMINATION
 3   BY MR. ARCHEY:
 4   Q    Where you are currently employed?
 5   A    AAA Insurance Agency.
 6   Q    When did you start work for AAA?
 7   A    June 2, 1998.
 8   Q    And have you worked for anyone else
 9   from June 2, 1998 to present?
10   A    No.
11   Q    Give me your educational background
12   briefly.
13   A    Went to high school in Belize. Got
14   my GED in Belize and took some night courses
15   in Belize.
16   Q    When did you get your GED?
17   A    I was 16 -- no -- yeah 16, 17.
18   Q    That's going to be a backdoor way of
19   asking your age. What year was that?
20   A    1986, '87.
21   Q    When did you come to the United
22   States?
23   A    1989, December 17.
24   Q    Very broad scope -- I don't want to
25   get into details probably much at all, but
```

Page 9

1 between 1989 and 1998, what work did you do?
2    A   I worked at K and B as a cashier, and
3 then I worked at Lulu Buras Beauty Spa, and
4 then Chatta Box, and then State Farm, and then
5 AAA.
6    Q   When did you go work for State Farm?
7    A   I think it was 1996.
8    Q   What were you doing for State Farm?
9    A   I was an assistant office
10 representative.
11    Q   And what does that mean?  Dealing
12 with people who are --
13    A   Basically same thing I'm doing now;
14 selling insurance.
15    Q   When you went to work for AAA in June
16 of 1998, what was your position?
17    A   Customer service rep.  I handle all
18 the house accounts.
19    Q   You handle all the what?
20    A   House accounts; accounts that did not
21 have agents assigned to them.
22    Q   And how would one get to be a house
23 account?  They just call in -- explain it to
24 me.
25    A   I think what happened was agents that

Page 10

1 were there and they left, AAA didn't share
2 their business within the agents that were
3 left there; they just put it in a house
4 account and the customer service person took
5 care of those accounts.
6    Q   What is the name of your actual
7 employer?  We've been using this term "AAA
8 Club Insurance Agency."
9    A   I think the name now is Club
10 Insurance Agency.
11    Q   Do you know if that changed at some
12 point?  Is this better for Ms. Daleo?
13        J0-ANN DALEO:
14           No; I was just thinking, is it
15        AAA Missouri who we work for?
16        THE WITNESS:
17           I see on the application it's
18        Club Insurance Agency.  So I don't
19        know.  I call it AAA.
20    Q   (By Mr. Archey) Is AAA or Club
21 Insurance Agency a captive agent for AAA?
22    A   AAA is the company.
23    Q   Do you write policies in insurance
24 for anyone other than AAA?
25    A   We used to.  Now we're writing for

Page 11

1 Progressive and the Fair Plan and Fidelity.
2    Q   In May through August of 2005 who
3 were you writing for?
4    A   For AAA and Fidelity.  If we write a
5 homeowner's, it's through AAA.
6    Q   Were you writing for any other
7 insurers at that time?
8    A   If somebody does not qualify for AAA,
9 then we put them through to Louisiana Fair
10 Plan.
11    Q   Which was at that time the state's
12 insurer of last resort?
13    A   I'm sorry?
14    Q   The Fair Plan at that time was the
15 State's insurer of last resort?
16    A   Yes.
17    Q   How many employees did AAA have back
18 in May through August 2005 time frame?
19    A   In the insurance department or whole
20 company in that office?
21    Q   Your agency; that Club Insurance
22 Agency, or whatever we're calling it?
23    A   Oh, gosh.  I really don't know.  We
24 have insurance agents, travel agents, domestic
25 travel agents, and we have emergency roadside

Page 12

1 department.  So I really couldn't tell you.
2    Q   Who was your supervisor at that time?
3    A   Tom Pollack.
4        MR. TREAS:
5           Pollack?
6        THE WITNESS:
7           Pollack.  You have to excuse
8        my accent.
9    Q   (By Mr. Archey) You're fine.
10        What was your relation with
11 Ms. Daleo?  Was she a supervisor?  Co-equal?
12    A   She's an agent.  I'm her assistant.
13    Q   And did you work solely for
14 Ms. Daleo?
15    A   Yes.
16    Q   So you worked under Ms. Daleo as an
17 assistant?
18    A   Yes.
19    Q   She was the agent and you were the
20 assistant?
21    A   Yes.
22    Q   And Tom Pollack, where did he fit in?
23 Was he a supervisor for Ms. Daleo also?
24    A   He's a regional manager.
25    Q   How many agents were there?  Can you

**Page 13**

1  tell me that?
2      A   Seven? Seven?  Six or seven.
3      Q   As between you and Ms. Daleo, who was
4  the primary contact for the Holbrooks?
5      A   I was.
6      Q   Do you know how the Holbrooks came to
7  see you?
8      A   No, I don't recall that.
9      Q   When he first contacted you, what's
10  your earliest memory of dealing with the
11  Holbrooks?  Let me ask you that first.
12      A   I really can't say -- give you a
13  date. I can go from my quote sheet that I
14  wrote down that he was going to call back on
15  June 8 at 3 p.m, and I can go from the quotes
16  that I did that has a date on it.  But I can't
17  say for sure, you know, when in May he
18  contacted me.
19      Q   Do you have a specific recollection
20  of dealing with the Holbrooks?
21      A   Yes.
22      Q   What service were you providing for
23  the Holbrooks?
24      A   Homeowner's, flood, and auto.
25      Q   Let me show you what's been marked as

**Page 14**

1  P-2, and I believe this to be -- yes, I
2  believe this to be the earliest quote.
3          Is that something you would have
4  prepared and run for them?
5      A   I'm going to say yes because I was
6  the only person at the time that they were
7  dealing with and it has my fax number on
8  there.  So yes.
9      Q   Did you have a different fax number
10  from Ms. Daleo?
11      A   No.
12      Q   Where was your office in relation to
13  Ms. Daleo's office?
14      A   We -- her door -- I sit right across
15  from her door.
16      Q   She had the office with the window,
17  and you were outside in the cubicle?
18      A   Yes.  I think we were already there.
19  Right?
20          I used to sit in the front and then
21  they put me in the back.
22      Q   Understood.
23          This initial quote that you ran, tell
24  me how you would run these quotes.  Tell me,
25  physically, how you do it; go in the computer,

**Page 15**

1  input information.
2      A   What we do first is put in the
3  address because we have to do a flood
4  determination.  Once we get the flood
5  determination, then we would run a quote.  I
6  could run a quote without a flood elevation or
7  I can run it with one because the house was
8  built before 1974.
9      Q   When you put the address in, does
10  that give you the flood zone the property is
11  located in?
12      A   Right.  The flood determination tells
13  us what zone, the community number, the panel
14  number, the suffix number.
15      Q   So you knew at this time, without
16  regard to anything the Holbrooks had given
17  you, you knew this property was an A05 flood
18  zone?
19      A   According to the flood determination,
20  yes.
21      Q   Who selected the amount of insurance?
22  The $183,000 here.
23      A   Whatever I quote him is what is being
24  told to me to quote, whether he told me to
25  quote that or his real estate agent.  I cannot

**Page 16**

1  recall.
2          But whatever figures I have here is
3  given to me.  I just don't go, okay, well let
4  me quote 183.
5      Q   Now this, obviously, your attorney
6  has already highlighted on the left-hand side
7  here.  It says it's a nonbinding quote.
8  Correct?
9      A   Right.
10      Q   And after the initial, there was
11  another quote run -- looks like that same
12  day -- it's marked as P-3 -- for $183,000
13  building and $25,000 for contents.
14          Is that -- that would have been you
15  running that quote also?
16      A   Yes.
17      Q   Do you have any recollection of the
18  various quotes and the numbers changing?
19      A   Wait. I'm sorry?
20      Q   Do you recall the various quotes and
21  the different numbers, and do you remember any
22  of that?
23      A   One is with -- without contents and
24  the other one is with contents.  That's why
25  there's a difference.

Page 17

1    Q    And do you remember discussing with
2  the Holbrooks or anybody else, for that
3  matter, you need to put some value down for
4  contents?
5    A    No, I don't.
6    Q    Do you advise -- do you give advice
7  to the client that, you really ought to have,
8  say, $25,000 for contents, or $20,000 or
9  $40,000 or what have you?
10    A    Absolutely.
11    Q    And were you advising the Holbrooks
12  as to the amount of insurance they ought to
13  have for their contents?
14    A    Like I said, I can't recall if I was
15  dealing with Mr. Holbrook or I was just told
16  to fax these quotes to his real estate agent.
17    Q    Do you know who put the asterisks on
18  P-3?
19    A    I would believe I did. And the
20  reason I did that is because I wanted them to
21  see the difference; that if you notice this
22  paper, I didn't have any asterisk because it
23  has no contents, and I put that there to
24  highlight that I'm quoting contents now.
25  That's why the premium is different.

Page 18

1    Q    And as of the time of both of these
2  quotes, just to be clear, it's solely based
3  upon the A05 flood zone without an elevation
4  certificate. Is that correct?
5    A    Wait. I'm sorry?
6    Q    Let me try again. As of May 20 when
7  you ran both of these quotes, did you have an
8  elevation certificate?
9    A    I would believe that I did, because
10  if I didn't -- I can't recall. I would think
11  that I did; that I had already had elevation
12  certificate. I can't say for sure because the
13  premium is low. It's a low premium.
14    Q    And that's why you believe that you
15  must have had an elevation certificate?
16    A    Yes. I can't say for sure if I did
17  or not.
18    Q    Is there anything on either of these
19  quotes that tells you whether you had an
20  elevation certificate?
21    A    No, it doesn't. It doesn't.
22    Q    Prior to the infamous August 4
23  meeting, telephone conference, all that, do
24  you recall speaking with the Holbrooks on the
25  telephone at all?

Page 19

1    A    You mean when we were in the process
2  of doing the quotes and -- yeah, I would have
3  to speak to them to get all the information to
4  do the paperwork.
5    Q    And who did you get the elevation
6  certificate from?
7    A    Their title company.
8    Q    And just for the record or to be
9  clear, did the Holbrooks provide you with that
10  elevation certificate?
11    A    No.
12    Q    Do you recall having any discussion
13  with Mr. Holbrook or Ms. Holbrook, either of
14  them, regarding the piece of art that they had
15  which they value at $8,000?
16    A    No, I don't.
17    Q    If they had called and told you, we
18  have a piece of art that we value at $8,000,
19  an artist's proof, "Maui Dawn" by Wyland, all
20  that information, what would have been your
21  advice as to whether it needed to be a
22  scheduled item or not?
23    A    Going into that much detail, from my
24  experience, I would have called my underwriter
25  for the home -- called Fidelity. Because if

Page 20

1  it's an $8,000 artwork, from what I've done
2  with people that has jewelry is I call my
3  underwriter and find out what I need to
4  schedule this or what his advice is.
5         If he had discussed that with me that
6  he had an $8,000 piece of artwork, I would
7  have definitely told him to get an appraisal.
8  That is a requirement.
9    Q    Are you -- is it your position that
10  he did not discuss this piece of art with you
11  at all?
12    A    From my recollection, I don't believe
13  so.
14    Q    Do you have any notes or anything
15  that you kept at the time of the conversation?
16  Mr. Holbrook has handwritten notes and those
17  types of things. Do you have anything like
18  that?
19    A    Everything that I had is in his
20  files, and --
21    Q    Like insurance adjustors will keep
22  these running logs in the computer and it's
23  saved by day. Do you have anything like that?
24    A    No. Everything is written down -- at
25  that time, we did not have a program where we

Page 21

1  can document notes. But we used, you know --
2      Q   In light of not having any notes, can
3  you state with certainty that as of June 8,
4  2005 you did not speak with Mr. Holbrook about
5  this piece of art?
6      A   I would say that if I had spoken to
7  Mr. Holbrook about his $8,000 piece of artwork
8  that it wouldn't be just, hey, Lisa, I have a
9  $8,000 piece of artwork.
10      Oh, okay, don't worry about it
11  because it's covered --
12      No, it does not work that way. I
13  would have done some research with my
14  underwriters.
15      Q   Can you say under oath that you did
16  not speak with Mr. Holbrook about his piece of
17  art on June 8, 2005?
18      MR. BARRECA:
19          Asked and answered.
20      MR. ARCHEY:
21          It's a little bit different
22      question.
23      THE WITNESS:
24          What does that mean?
25      Q   (By Mr. Archey) Can you state under

Page 22

1  oath that you did not speak --
2      A   From my experience --
3      Q   Let me finish the question.
4      A   Okay.
5      Q   Can you state under oath that you
6  have a specific memory that you did not speak
7  with Mr. Holbrook about this piece of art on
8  June 8, 2005?
9      MR. BARRECA:
10          Asked and answered. Same
11      objection.
12          You can answer it.
13      A   I would say that I can't recall us
14  discussing his artwork.
15      Q   (By Mr. Archey) When I show you his
16  handwritten notes where he says he spoke with
17  you about the art, and these notes were made
18  on June 8, 2005, would that be evidence that
19  yes, you did talk about it?
20      A   No. I'm telling you my procedure
21  that I would do with somebody telling me that
22  they have an $8,000 piece of artwork.
23      I have written homeowner's policies
24  with clients that have expensive jewelry, and
25  my procedure is we need an appraisal. He

Page 23

1  tells me he has an $8,000 piece of artwork,
2  I'm not going to say, don't worry about it,
3  it's covered.
4      Q   You keep referring to jewelry. Have
5  you ever issued a policy with a piece of art?
6      A   No, I haven't. I'm talking dollar
7  value. I'm talking something that is
8  expensive.
9      Q   Do you recall speaking with
10  Mr. Holbrook where he inquired or asked about
11  who was the insurance company; whether it was
12  AAA, whether you were the insurance company,
13  whether you were with the agency? Do you
14  recall any of that?
15      A   I wouldn't say that I recall that
16  conversation, but I've had -- I've been asked
17  that question before by clients.
18      And my answer to that would be, like,
19  AAA, our company, the homeowner's, we
20  underwrite our own homeowner's but the flood
21  goes through Fidelity. That would be my
22  answer to that.
23      Q   I want to know whether you recall
24  discussing that with Mr. Holbrook; "that"
25  being whether AAA was the insurance company or

Page 24

1  not?
2      A   I can't they say that I did. But
3  that would have been my answer if he had asked
4  me that question.
5      Q   What was the number at AAA?
6      A   Phone number?
7      Q   Yes, ma'am.
8      A   838-7500.
9      Q   What was the 888 number?
10      A   888-452-7198.
11      JO-ANN DALEO:
12          No. It's 1-800.
13      Q   (By Mr. Archey) Let me try this.
14  There's an (888)222-2582 number. Do you know
15  who that is?
16      A   No.
17      Q   What about Extension 6017?
18      A   That's mine.
19      MR. ARCHEY:
20          Let me go ahead and mark this
21      as -- should I continue with the
22      P numbers or give it a AAA No. 1?
23      How would you think?
24      MR. BARRECA:
25          However you would like to do

Page 25

```
 1        it. Give it a different number,
 2        then.
 3           MR. ARCHEY:
 4              AAA No. 1.
 5                 (Exhibit AAA-1 was marked.)
 6              Holbrook 0154.
 7        Q   (By Mr. Archey) Let me show you these
 8    notes. Have you seen that before today?
 9        A   No.
10        Q   At the top it says, "Lisa at AAA,"
11    and it's got the number -- that extension, at
12    least, is your extension. Is that right?
13        A   Yes.
14        Q   And "NCB." Do you recall who that
15    was?
16        A   I have no idea.
17        Q   Next question on the document --
18    handwritten document -- is who is handling the
19    title. It says, "Partners Title."
20           Do you recall Partners Title being
21    involved?
22        A   Yes.
23        Q   Next entry, if you will, "Lisa will
24    call 6/9 in the a.m. with quotes for flood at
25    $40,000 deductible, $500 adding Wyland to
```

Page 26

```
 1    homeowner's."
 2           Initially, let's begin with the
 3    contents. The contents were increased up to
 4    $40,000. Correct?
 5        A   I quoted him $40,000, yes.
 6        Q   With a $500 deductible?
 7        A   Yes.
 8        Q   And even though we've got a
 9    handwritten note, it's your position, just
10    based upon what you would have done, that he
11    must have never discussed the Wyland with you?
12        A   Wait --
13           MR. BARRECA:
14              Asked and answered.
15        Q   (By Mr. Archey) It's your position,
16    just based upon what you would have done --
17           MR. BARRECA:
18              It's asked and answered.
19        Q   (By Mr. Archey) -- that you would not
20    have discussed the Wyland -- did not discuss
21    the Wyland with you even though you have no
22    specific memory of it?
23        A   I don't understand the question. I'm
24    sorry.
25        Q   It's your position, because of the
```

Page 27

```
 1    way you operated, that he did not discuss this
 2    Wyland piece of art with you even though he's
 3    got notes that say he did?
 4        A   No. Also have notes on the paper
 5    that he will call on June 8 at 3 p.m.
 6        Q   What notes are you talking about?
 7        A   On his quote sheet that I originally
 8    wrote on.
 9        Q   This would be consistent with the
10    call. Right?
11        A   Well, he has there that I will call
12    him. I have that he will call me.
13           So I mean, if he's asking me for
14    $40,000 quote, okay, I can't remember and I
15    don't recall him saying, oh, I have an $8,000
16    artwork, so let's do $40,000 quote. No, I
17    don't remember that.
18        Q   And it could very well have been more
19    than one conversation on this day; maybe you
20    called him in the morning and he called you
21    back in the afternoon. Is that fair?
22        A   Like I said, I have all my notes, and
23    I can only go by my notes have that he will
24    call me on June 8 at 3 p.m.
25        Q   You have no additional memory of
```

Page 28

```
 1    this. Right?
 2        A   No.
 3        Q   And car insurance, you did talk with
 4    him about that. Right?
 5        A   Yes.
 6        Q   And then there's a note about the
 7    insurance company, "not like Ohio." Do you
 8    have any memory of that?
 9        A   No, sir.
10        Q   This number at the bottom, 325-8800,
11    do you know what that number is?
12        A   No, sir.
13        Q   Let me show the next document P-4,
14    already marked. This document does -- is for
15    $188,000 for the building and $40,000 for the
16    contents first. Is that correct?
17        A   $183,000 on the building?
18        Q   Yes.
19        A   And $40,000 on the contents, yes.
20        Q   Now is anywhere on that document
21    there, does it say that is a nonbinding quote?
22        A   No, sir. Because it's not a quote.
23    It's an application for insurance.
24        Q   As of the date of that application,
25    what information did you have on the property
```

Page 29

1  as far as the flood elevation and what have
2  you?
3      A    What information I had on the
4  property?
5      Q    Yes, ma'am.
6      A    We use a quote sheet, and whatever
7  information I ask him, that's on the quote
8  sheet.
9      Q    As far as the elevation -- let me
10  pull this out.  Turning now to P-12, using
11  P-12, is that the elevation certificate that
12  you used to --
13      A    Yes.
14      Q    -- in order for the application
15  there?
16      A    Yes.
17      Q    Where did you get P-12?
18      A    I got it from the fax machine that
19  the title company, when they call, they ask
20  me -- the girl called and asked me if I got
21  the fax that she sent me.
22      And I said, I have not been to the
23  fax machine.  I told her to stay on hold and I
24  will check the fax machine.  This was on the
25  fax machine.  I grabbed it.  I went back to

Page 30

1  her, and I said, yeah, I got the fax.  And
2  then I did the quote.
3      Q    Did this document P-12, the elevation
4  certificate, did it come from the Holbrooks in
5  any manner?
6      A    No, sir.
7      Q    And you used the information on P-12
8  to fill out the application for the Holbrooks.
9  Is that correct?
10      A    Yes, sir.
11      Q    And serving as their agent.  Right?
12      A    Serving as their agent?
13      Q    Yes.
14      A    Well, yeah; assistant to Jo-Ann.
15      Q    But you were their representative at
16  that time.  Correct?
17      A    Well --
18      MR. BARRECA:
19          I object.  That's a legal
20      question.
21          And if she wants to try to
22      answer it, she can answer it that
23      she doesn't have the ability to
24      answer that particular legal
25      question.

Page 31

1          If you can try to guess, go
2      ahead and try to guess.
3      THE WITNESS:
4          I was representing Jo-Ann
5      Daleo.
6      Q    (By Mr. Archey) But your client at
7  that time was the Holbrooks.  Right?
8      A    It was her client.
9      MR. BARRECA:
10          I object to the question.
11      It's a legal question.
12      Q    (By Mr. Archey) Who were you working
13  for?
14      A    For Jo-Ann Daleo.
15      Q    Solely for her interest, not for the
16  Holbrooks?
17      A    You asked me who I was working for.
18      Q    Right.
19      A    She's my employer.
20      Q    What was your relationship to the
21  Holbrooks then?
22      A    He was my client.
23      Q    That's what I asked.  He was your
24  client.  Right?
25      A    You asked if I was working for her.

Page 32

1      Q    All right.  He's your client that
2  you're trying to do this business for.
3  Correct?
4      A    Yes.
5      Q    When you got this elevation
6  certificate --
7      MR. BARRECA:
8          Before we continue down this
9      road, I am going to put on the
10      record that I object to your
11      statement that the Holbrooks --
12      that AAA is the agent for the
13      Holbrooks because that has all
14      kinds of legal implications which
15      have not been sorted out here.
16      Q    (By Mr. Archey) When you received
17  P-12 did you see that this was an elevation
18  certificate for property other than the
19  Holbrooks?
20      A    No, sir.
21      Q    Does it show that on that document?
22      A    If I -- yeah; if I read it closely.
23      Q    And you didn't do that, did you?
24      A    Well, I looked at it.  She said she's
25  faxing it to me.  I grabbed it.

Page 33

1    Yes; I didn't look at it. I didn't
2  go like -- you know, I looked at it. It's an
3  elevation certificate. I looked at the base
4  flood and lowest flood, and that's what I --
5    Q  You made a mistake, didn't you?
6    A  Yes, I made an error.
7    Q  Because this quote is for 6123
8  Charlotte Drive in New Orleans. Correct?
9    A  Yes, sir.
10   Q  And this elevation certificate, P-12,
11 that you used is for what address?
12   A  6762 Colbert Street.
13   Q  And using the incorrect information
14 that you got directly from the title company,
15 you submitted this application to the
16 Holbrooks which they signed. Is that correct?
17   A  Yes.
18   Q  What was the amount of the premium
19 that they were to pay under the application?
20   A  $836.
21   Q  I'm going to show you another quote
22 which I don't believe we have seen yet.
23     MR. ARCHEY:
24       I'm going to mark this as
25     AAA-2. The Bates number of the

Page 34

1  document is AAA-5.
2       (Exhibit AAA-2 was marked.)
3    Q  (By Mr. Archey) This AAA-2 I'm
4  showing you, that's another quote for the
5  $183,000 for the building and $40,000 for
6  contents. Correct?
7    A  Yes.
8    Q  And it comes up with the same premium
9  of $836 that the Holbrooks eventually paid
10 through their closing. Correct?
11   A  Yes.
12   Q  The bottom of that has this language
13 about "This is not an offer for insurance.
14 This quote is subject to change with
15 verification by the company." Correct?
16   A  Right; because it's a quote.
17   Q  Do you see any language like that
18 anywhere in P-4, which is the application that
19 the Holbrooks actually signed?
20   A  No, sir; because this is a quote
21 sheet and this is an application.
22   Q  And on the quote sheet, it's subject
23 to change. The application has no "subject to
24 change" language, does it?
25   A  Right.

Page 35

1     MR. ARCHEY:
2       This is a little bit out of my
3     chronological order, but I'll mark
4     it AAA-3. It's Bates Holbrook
5     0156.
6       (Exhibit AAA-3 was marked.)
7    Q  (By Mr. Archey) Again, these are
8  Mr. Holbrook's handwritten notes. And he has
9  on -- before a June entry -- dated entry, he's
10 got, "Lisa will contact NCB Title Company" --
11     MR. BARRECA:
12       Where's the dated entry first?
13     MR. ARCHEY:
14       It's right here. It's just
15     before that.
16   Q  (By Mr. Archey) "List will contact
17 NCB Title Company, et cetera, on Monday to get
18 the ball rolling."
19       That would be consistent with what
20 you did when you contacted the title company
21 to get the elevation certificate. Correct?
22   A  Right. I don't know who NCB is,
23 though.
24   Q  If I tell you that's National City
25 Bank, the mortgage company, does that help

Page 36

1  you?
2    A  The mortgage company?
3    Q  Yes, ma'am.
4    A  Okay.
5    Q  Do you recall that?
6    A  I can't say that I do. I know I
7  dealt with -- usually we deal with the title
8  company. We don't deal with the mortgage
9  company.
10   Q  Did you ever ask the Holbrooks to
11 produce an elevation certificate to you?
12   A  I can't say that I can recall that.
13 We usually get that from the title company.
14   Q  You had no reason to because you had
15 one from the title company. Right?
16   A  Right.
17   Q  Going back to the application that
18 the Holbrooks actually did sign, last page
19 contains legal information, all kinds of
20 wonderful legal stuff that lawyers get paid to
21 draw up.
22       Is there anything in there that says
23 it's not an offer of insurance subject to
24 change?
25     MR. BARRECA:

Page 37

1   I object. If you're asking
2   her for some kind of legal
3   interpretation of what that says, I
4   object.
5       If you want to redo that and
6   take a shot at it, you're more than
7   welcome.
8   Q   (By Mr. Archey) Are you familiar with
9   these documents in your duty or in your
10  position as an employee of Club Insurance
11  Agency, or whatever the name is, are you
12  familiar with these documents?
13  A   Have I seen this before?
14  Q   Yes, ma'am.
15  A   Yes, I have.
16  Q   And do you have to explain these
17  conditions and terms to your clients as they
18  sign these documents?
19  A   No, sir.
20  Q   Clients ask you what that means, what
21  do you tell them?
22  A   We'll read it together and analyze it
23  together.
24  Q   Can you read that and analyze that?
25  It's real simple. There's nothing there that

Page 38

1   says it's an offer of insurance subject to
2   change, is there?
3   A   So the question is does it have that
4   your insurance is going to change once this
5   application is submitted?
6   Q   Yes, ma'am.
7   A   Okay. No, it doesn't.
8   Q   And when you sent this to the
9   Holbrooks, it was actually part of a 10-page
10  fax in which you sent the homeowner's policy
11  also. Do you recall that?
12  A   Yes.
13  Q   And let me show you the portion of
14  the homeowner's which has already been marked
15  as P-6.
16      And you were dealing with them and
17  they were your clients for the homeowner's
18  insurance also. Correct? Is that right?
19  A   From writing -- if I did write their
20  homeowner's and their flood? Is that your
21  question?
22  Q   They were also your clients for
23  procuring homeowner's?
24      MR. BARRECA:
25      Standard objection regarding

Page 39

1   the clients.
2   Q   (By Mr. Archey) You used the word
3   "client." Correct?
4   A   Yes.
5   Q   All right. They were also your
6   clients --
7       MR. BARRECA:
8       I object regarding that you
9       cannot imply that there's some
10      legal obligation.
11      And if she uses the word
12      "client," that's fine. I'm not
13      allowing her to say that there is
14      some legal obligation by using the
15      word "client".
16      MR. ARCHEY:
17      I'm going to more than imply
18      there's a legal; I'm going to
19      flat-out allege it.
20  Q   (By Mr. Archey) But for purposes of
21  the question you used the word "client" here
22  today in describing the Holbrooks. They were
23  your client. Right?
24  A   Right.
25  Q   All right. And they were also your

Page 40

1   client for obtaining the homeowner's
2   insurance. Correct?
3   A   Yes.
4   Q   Now I want you to look at this P-6.
5   Is that the application for the homeowner's
6   insurance?
7   A   Yes.
8   Q   Let's look over at the third page of
9   this document. I want to direct your
10  attention to the bottom where the paragraph is
11  scratched out. Did you do that?
12  A   Yes.
13  Q   What did you scratch out there?
14  A   Because this is not a pending
15  application. This is a binding application.
16  Q   What does that language say that you
17  scratched out?
18  A   This says that -- this is saying that
19  if this was a pending application where I
20  would discuss with him -- I'm only putting
21  this application in to see if it's going to be
22  accepted with no monies collected. Okay?
23  That's what that means.
24  Q   So subject to change.
25  A   No. This does not -- he didn't sign

Page 41

1    that.
2        Q    I know he didn't.
3        A    Because it was not a pending
4    application, so he didn't need to sign that.
5        Q    Were you aware of when the sale of
6    their property took place that the loan
7    actually closed?
8        A    What do you mean?
9        Q    Did you know that it had occurred?
10   It occurred on June 30. Were you aware of on
11   June 30 or whereabouts that the sale had
12   actually taken place, the loaned closed?
13       A    Whatever effective date I put on that
14   application that they're going to close, then
15   that's the date that I'm assuming they're
16   closing, because that's the date that they're
17   telling me; that's the date the mortgage
18   company or the title company, they're telling
19   me, hey, make this policy effective June 30
20   because that's when they're going to close.
21       Q    What I'm trying to ask you is a
22   little different. Were you aware of that
23   there was a closing taking place? That the
24   sale was actually closing. Someone call you?
25   Did you find out through some other means that

Page 42

1    yes, the house has now been purchased? The
2    Holbrooks are the proud --
3        A    No.
4        Q    -- owners of the house as of this
5    date?
6        A    No; not that I can recall.
7        Q    Were you aware that the amount that
8    you quoted them that they signed on the
9    application, that it was actually paid on
10   their behalf when the amount was paid? Were
11   you aware of that?
12       A    What they do is cut us a check and
13   mail it to us.
14       Q    Did you know that?
15       A    I would have had to know because I
16   sent the check to Fidelity. I can't recall
17   when.
18       Q    Do you have any record that would
19   show when?
20       A    It should be in his file if the check
21   was sent to me directly; if the check was cut
22   to me directly or if they paid it.
23           I can't recall did they pay it
24   directly. Most of the times, the mortgage
25   company -- the title company cut us the check

Page 43

1    and they will send us the check after closing.
2    So we might receive a check a week later or
3    three days later.
4        Q    And would the check go directly to
5    you or to AAA in Missouri?
6        A    It really all depends on the title
7    company. Sometimes to AAA, sometimes to
8    Fidelity, sometimes to us. Every case is
9    different.
10       Q    If it goes to AAA in Missouri, how
11   would you know that the premium had been paid?
12       A    How would I know?
13       Q    Yes, ma'am.
14       A    I would not be able to know until I
15   get their policy in the mail.
16       Q    Was there anything on the computer
17   system that would tell you?
18       A    Not automatically, no.
19           MR. ARCHEY:
20               Let me show you -- mark as
21           AAA-4. This is Bates stamped
22           PC 92.
23               (Exhibit AAA-4 was marked.)
24       Q    (By Mr. Archey) Have you seen that
25   document before?

Page 44

1        A    No, sir.
2        Q    I'm going to walk you through it as I
3    understand it, and then you can tell me what
4    you know.
5            First entry is July 7, 2005. It
6    says, "Pending payment added to policy by" --
7    and there's a number there.
8            Do you know what that means?
9        A    No, sir. That doesn't come from our
10   office.
11       Q    Do you know what this document is?
12       A    No, sir. It looks like something
13   from Fidelity, the company themselves. What
14   they see, we don't see all that.
15       Q    It goes on to indicate that, payment
16   type, check from lender for $836, gives a
17   check number. Effective date June 30, 2005.
18           That would be the effective date of
19   their flood insurance. Correct?
20       A    Yes, sir.
21       Q    If Katrina hit on July 1, 2005, how
22   much insurance did they have?
23       A    I --
24           MR. BARRECA:
25               That's purely speculation.

Page 45

1    A   Yeah. I can't --
2    Q   (By Mr. Archey) You're their agent.
3  Client calls you up and says, "What do I
4  have?"
5        What would you tell them?
6    A   I'd put in for the $183,000.
7    Q   That's what you would tell them,
8  isn't it?
9    A   Because that's what I put in for. I
10 did not know at that time that I had put in an
11 incorrect elevation certificate.
12   Q   And you would also tell them $40,000
13 contents. True?
14   A   Actually, you know what I would have
15 done to be on the safe side? Because I didn't
16 know, that I probably would have called the
17 company and make sure.
18   Q   This "PNUSBAUM," do you know who that
19 is?
20   A   Pam Nusbaum. That's the lady that
21 sent me a memo on July 21 regarding the
22 elevation certificate.
23   Q   Did you have any dealings with Pam
24 Nusbaum prior to this?
25   A   Prior to Mr. Holbrook?

Page 46

1    Q   Yes, ma'am.
2    A   I can't say I did. I can't say I
3  did, and I can't say I didn't. I deal with a
4  lot of people.
5    Q   Let me show you what I think you're
6  referring to.
7        MR. ARCHEY:
8            I'll mark it as AAA-5, Bates
9        stamp AAA-13.
10           (Exhibit AAA-5 was marked.)
11   Q   (By Mr. Archey) It says it's to
12 Jo-Ann Daleo from Pam Nusbaum dated July 21,
13 2005.
14       Is that the memo you were referring
15 to?
16   A   Yes, sir.
17   Q   She's asking for a copy of the
18 elevation certificate. Correct?
19   A   Yes, sir.
20   Q   Did you not submit that to her
21 earlier?
22   A   My procedure is that when we are
23 sending out an application, we have to send
24 the elevation certificate.
25       Now when she sent this, I assumed --

Page 47

1  I thought that she did not receive the
2  elevation certificate, so I faxed it to her a
3  day later -- I can't recall exactly when she
4  sent that to me again.
5        And I keep thinking, why is she
6  asking me for an elevation certificate when I
7  keep sending her an elevation certificate.
8        That's when I put this letter on
9  there to please call me so I know what's going
10 on, because I'm sending her the elevation
11 certificate. I did not know it was the
12 incorrect certificate until she called me and
13 we discuss it.
14   Q   Can you state for certainty that you
15 sent the elevation certificate -- be it an
16 incorrect one -- to her or along with the
17 application that the Holbrooks signed?
18   A   It's my procedure to do that.
19   Q   That's not what I asked you. Can you
20 say that you did it under oath? You have a
21 specific memory of --
22       MR. BARRECA:
23           Asked and answered.
24       MR. ARCHEY:
25           No, no, no.

Page 48

1        MR. BARRECA:
2            Ask the question again.
3            If she doesn't recall -- she
4        doesn't recall the details.
5    Q   (By Mr. Archey) Do you have a
6  specific recollection of attaching the
7  elevation certificate to the Holbrooks
8  application and mailing it off?
9    A   I can't recall if I did it, but I
10 would have because that's part of the
11 procedure. They are not going to issue an
12 application without an elevation.
13   Q   So it's your practice to do so?
14   A   Yes, sir.
15   Q   But you have no memory. Is that what
16 you're telling me?
17       MR. BARRECA:
18           That's what she said. Asked
19       and answered.
20   Q   (By Mr. Archey) Of course, you've
21 already made one mistake in not correcting --
22 finding the correct elevation certificate.
23 Correct?
24   A   I made an error --
25       MR. BARRECA:

**Page 49**

1      Asked and --
2    MR. ARCHEY:
3      All right.
4    COURT REPORTER:
5      Wait. Hold on.
6    Q    (By Mr. Archey) But you made a
7  mistake. Right?
8    MR. BARRECA:
9      Asked and answered.
10   MR. ARCHEY:
11     She (referring to court
12   reporter) talked over her when she
13   gave me the answer.
14   Q    (By Mr. Archey) What was your answer?
15   MR. BARRECA:
16     You asked and she answered it
17   three times ago and four times ago.
18   MR. ARCHEY:
19     I figure I'm catching up with
20   you. That's all.
21   MR. BARRECA:
22     That's okay.
23   Q    (By Mr. Archey) So it's not possible
24  that you had made a mistake again, is it?
25   A    In sending the elevation certificate?

**Page 50**

1    Q    Yes, ma'am.
2    A    Everything is possible.
3    Q    When I looked at Ms. Nusbaum's notes,
4  I don't see anywhere on there she says, I have
5  an elevation certificate, the wrong one. She
6  just says I need it.
7    A    I -- I --
8    MR. BARRECA:
9      If you can speculate to what
10   Pam Nusbaum thinks or how she takes
11   her notes, do that.
12     But I'm objecting to the form
13   of the question.
14   Q    (By Mr. Archey) In light of
15  Ms. Nusbaum's notes -- it's still your
16  testimony that she had the elevation
17  certificate with the application.
18   A    You're asking me if I'm speculating
19  that she had the elevation when I sent the
20  application?
21   MR. BARRECA:
22     If you can speculate and try
23   to interpret what this woman means
24   by these notes --
25   A    I can't.

**Page 51**

1    Q    (By Mr. Archey) Is it more likely
2  than not she did not have an application
3  certificate until after these conversations
4  when you sent it to her?
5    A    I can't say.
6    Q    When she says that she received it
7  on --
8    MR. BARRECA:
9      Asked and answered.
10   Q    (By Mr. Archey) -- July 25, 2005?
11   MR. BARRECA:
12     Maybe she speculates as to
13   getting the right one. Maybe she
14   doesn't acknowledge that she gets
15   the wrong one.
16   THE WITNESS:
17     That's what I'm thinking.
18   MR. ARCHEY:
19     Counsel, your speaking
20   objections are wonderful, and I
21   will stop this deposition and call
22   the federal court if you do it
23   again.
24     Make your objection. That's
25   all you need to do.

**Page 52**

1    MR. BARRECA:
2      Stop harassing the witness,
3   then.
4    MR. ARCHEY:
5      No.
6    MR. BARRECA:
7      You've asked the question four
8   times.
9    MR. ARCHEY:
10     You need to allow me to ask my
11   questions.
12   MR. BARRECA:
13     I can allow you to ask once
14   and sometimes twice, even three
15   times. But four times is getting
16   ridiculous.
17   Q    (By Mr. Archey) You have no
18  knowledge, no specific memory at all as to
19  whehter that elevation certificate went with
20  the application. True?
21   MR. BARRECA:
22     Asked and answered.
23   A    I answered.
24   Q    (By Mr. Archey) You can answer.
25   A    It's my practice to send the

Page 53

1    application.
2        Q   I didn't ask you what your practice
3    was. That's not what I asked.
4        You have no specific recollection, no
5    knowledge --
6        A   I have no specific recollection. I
7    can't recall.
8        Q   All we have to go on are the records.
9        Do you have any record which shows
10   that the elevation certificate went with the
11   application that you sent?
12       A   I always keep a copy.
13       MR. BARRECA:
14           Show her the application.
15       MR. ARCHEY:
16           I'll be glad to.
17       Q   (By Mr. Archey) Counsel's pointed you
18   something from the document, although he
19   objected me doing it earlier.
20       So what specific evidence do you have
21   that the elevation certificate went with the
22   application?
23       A   I don't have any -- what -- I don't
24   have anything to say that -- you know, that I
25   sent it. I sent this, and we keep a copy of

Page 54

1    the elevation certificate. We make copies off
2    the application, and we -- and I sent it off.
3    That's it.
4        Q   When it came to light that you had
5    made a mistake and because of your mistake the
6    numbers were going to be different, who made
7    the decision that the amount of the building
8    coverage was going to be reduced and the
9    amount of contents reduced?
10       A   Fidelity does.
11       Q   Did you ever speak with the Holbrooks
12   about whether they wanted to maintain the
13   building at a higher level and the contents at
14   a lower level, or the contents at a higher
15   level and the building at a lower level? Did
16   you ever speak with them about that?
17       A   About having the figures go back to
18   what he applied for?
19       Q   Not quite. I'm asking something a
20   little different.
21       Did you speak with him about, you've
22   paid Fidelity $836. With that, you only get
23   certain amount of insurance according to what
24   you're saying.
25       And did you ever speak with them

Page 55

1    about maybe they want more building coverage,
2    less contents; less contents, more building?
3    Did you have any of those discussions?
4    Because Fidelity arbitrarily set those numbers
5    based on the money that was sent to them.
6    Right?
7        A   When Mr. Holbrook came in the office
8    and he brought in a copy of the right
9    elevation certificate, we sat at my desk and I
10   redid a quote -- I redid a quote at my desk
11   with the correct elevation and gave him the
12   correct figures which showed the difference of
13   the 342 that he was being billed.
14       He asked me why is his premium
15   different. I advised him that because we're
16   dealing with two different properties. His is
17   more because that's his location. That is
18   where he lived.
19       That other person's elevation that I
20   did is incorrect. That's theirs, not his
21   property, and I kept telling him that.
22       He couldn't comprehend what I was
23   telling him. That was when we got up. I went
24   to Jo-Ann, and I explained it to her --
25       Q   Let me cut you off. We have to

Page 56

1    retrace all that ground, and we're going to.
2    And let's get there in a little more orderly
3    fashion so we don't have to redo all that too
4    terribly much.
5        A   Okay.
6        Q   Let me show you first the July 25
7    notice addressed to April Holbrook, P-9. Did
8    you receive a copy of that?
9        A   I'm sure we did receive a copy.
10       Q   Did you call the Holbrooks when you
11   received a copy?
12       A   Well, by the time we got our copy --
13   because Pam and I had been going back and
14   forth with the elevation certificate -- by the
15   time we received our copies, the same time he
16   received his copy, and that was when we
17   started talking about what happened. He had
18   called to ask me --
19       Q   My question: Did you call the
20   Holbrooks and advise them when you received
21   the copy of P-9?
22       A   It was the same time he called. So
23   yes, we did talk about it.
24       Q   I didn't ask you if you talked about
25   it. I asked did you call the Holbrooks and

Page 57

1    advise them when you received July 25, 2005
2    notice?
3        A    Okay. I didn't have to call him
4    because he called at the same time.
5        Q    So you did not call him. Correct?
6    He called you?
7        A    Right. He called me. I did not see
8    that copy yet. It goes into a file.
9        Q    When were you going to see it?
10       A    We have a mailbox where everything is
11   put in there, and then we go get that.
12          Now if he -- let's just say if I got
13   it -- he said he got it around the third or
14   whatever. I got it the same time, but he
15   caught me before I caught it.
16          I had already known around -- I don't
17   know -- around the -- I don't know to be
18   honest with you. I don't know. I don't know
19   how long Pam and I went back and forth with me
20   faxing her the elevation certificate.
21       Q    When did you first know that they
22   were not going to get the insurance that they
23   had bargained for and paid?
24       A    That's what I'm saying. I can't
25   recall what day because Pam originally faxed

Page 58

1    me that note on July 21. So I faxed her the
2    elevation certificate.
3          It was a while -- it was at least a
4    few days before I asked her to call me because
5    I did not know -- she did not state that you
6    have the wrong -- you're faxing me the wrong
7    elevation. She just sent fax me an elevation.
8    I did not know it was the wrong elevation.
9          So I just kept faxing her the same
10   elevation over and over again until I finally
11   put a note, please call me to discuss this. I
12   keep faxing her the same thing and she keeps
13   telling me to send her another one.
14       Q    Did you know prior to seeing this
15   July 25, 2005 letter that the Holbrooks did
16   not get the insurance that they bargained for
17   and paid for?
18       A    Before July 25?
19       Q    Before you received this letter.
20       A    I can't say because I can't say
21   exactly what date that I received that letter.
22       Q    When was the first time you learned
23   that the Holbrooks did not get what they
24   bargained for and paid for?
25       A    I don't recall what time. It had to

Page 59

1    be -- I had told him on the phone that, hey, I
2    was going to call you to tell you that --
3    what's going on with the situation.
4          And I remember us discussing on the
5    phone, and he stated that he was going to
6    bring in a copy of the elevation certificate.
7        Q    How did you learn that they did not
8    get what they bargained for and paid for?
9        A    When Pam finally called me and
10   explained to me that I was sending her the
11   incorrect elevation. I can't tell you what
12   day it was.
13       Q    According to Pam's notes she says,
14   "Called Lisa; received EC; different PA;
15   called Lisa; she will advise; P. Nusbaum;
16   8/1/05."
17          So as of August 1, 2005 you knew that
18   the Holbrooks did not get what they had
19   bargained for. Isn't that true?
20       A    I'm sorry?
21       Q    "Received EC." That would be
22   elevation certificate. Right?
23       A    I can't go by what --
24          MR. BARRECA:
25              I object to you asking her

Page 60

1              questions about the document she
2              knows nothing about.
3              If she wants to speculate as
4              to what that means and if
5              Ms. Nusbaum put it in properly,
6              then she can.
7        Q    (By Mr. Archey) Did you -- according
8    to this note, Ms. Nusbaum spoke with you on
9    August 1, 2005 telling you that the additional
10   premium was acquired. Do you have any
11   recollection of that?
12       A    She could have. I can't speculate
13   what she's writing on there.
14       Q    Let's go up to the infamous August 4
15   conversation. By the way, prior to this
16   August 4 conversation, what conversations had
17   you had with Ms. Daleo about the Holbrooks?
18       A    I don't think that I had discussed
19   anything with her yet because I did not know
20   the situation. I did not know that I had a
21   wrong elevation certificate. That's what I'm
22   saying.
23          I can't recall when between July 21
24   and August 4 that Pam and I -- Pam told me
25   that, you know, you have the incorrect

**Page 61**

1    elevation.
2        Q   Well, it was before August 4 because
3    when Mr. Holbrook called you up, he said,
4    "I've been meaning to call you." Correct?
5        A   Yes. It could have been that day. I
6    could have found out that day and said that I
7    was going to call you.
8        Q   It could have been August 1 as
9    reflected on Ms. Nusbaum's notes. Right?
10       A   I don't know. I can't speak for her.
11       Q   Had you told Ms. Nusbaum prior to
12   when the Holbrooks came in that you had sent
13   in an incorrect elevation certificate with the
14   Holbrooks' application?
15       A   Whenever she got to call me. I
16   can't -- I don't know when she called me.
17       Q   Who called you?
18       A   When Pam called me. I left her a
19   note.
20       Q   Whenever she called you, you told
21   Ms. Daleo at that time?
22       A   I don't think so. I don't think so
23   because it could have been the day before; it
24   could have been that day.
25       Q   When did you first tell Ms. Daleo

**Page 62**

1    about the problem with the Holbrooks that
2    existed because you had submitted an incorrect
3    elevation certificate?
4        A   From what I can recall, it was the
5    day Mr. Holbrook came in.
6        Q   He called and ya'll set up a meeting
7    for later that afternoon. Is that correct?
8        A   He called wanting to find out -- that
9    he received that letter, what happened to
10   his -- why did his coverages drop,
11   blah-blah-blah.
12           And I said that because I put in the
13   incorrect elevation certificate, they need the
14   correct elevation certificate. And he said
15   he's going to bring in the elevation
16   certificate.
17       Q   So you set up a meeting for that
18   afternoon. Correct?
19       A   He came in --
20       Q   Correct?
21       A   Yes, yes, yes.
22       Q   Take it little-bitty steps.
23           And he also needed to talk about the
24   car insurance with you at that time. Right?
25       A   Yes.

**Page 63**

1        Q   Do you recall that?
2        A   To be honest with you, I can't recall
3    the auto part because -- I guess because I was
4    focused on him bringing in the flood elevation
5    certificate that I don't -- I don't -- I
6    didn't recall the auto part.
7            But going over it with Jo-Ann and
8    everything, it makes sense because his
9    document is signed on the 4th.
10       Q   According to Mr. Holbrook's notes, he
11   met with you at 2 o'clock that day. Do you
12   recall?
13       A   I can't recall if he met with me at
14   2:00.
15       Q   Do you have any notes from that
16   meeting?
17       A   No.
18       Q   You've been trying to tell me -- tell
19   me what you recall about the meeting.
20       A   Okay. Mr. Holbrook came in and he
21   sat at my desk, gave me the flood elevation.
22   I sat at my desk and worked up a new quote
23   with the flood elevation he provided.
24           I gave him the figures. I told him
25   the figures. I can't recall whether I gave

**Page 64**

1    him a piece of paper or printed a quote or
2    anything like that. But I worked up the
3    figures and I gave it to him.
4            I told him that based on this
5    elevation -- that is, on his property -- this
6    is the premium. He could not understand why
7    the premium is changing because of the
8    elevation, and I kept explaining to him
9    because we're dealing with two different
10   properties. This elevation is for your
11   property; this elevation is for somebody
12   else's property. This is why the premium is
13   different.
14           And I think we kept going on about
15   that, and I can't really recall whether he
16   went into Jo-Ann's office and did the quote
17   while I was -- his auto insurance, while I was
18   working on his quote at my desk. But I
19   remember we were at my desk when we discussed
20   it. And I couldn't get him to understand
21   that.
22           So that's when I went to Jo-Ann. I
23   went into her office, asked her to pull up a
24   quote for me. She did it. We called him into
25   Jo-Ann's office and he sat in Jo-Ann's office.

Page 65

1  And Jo-Ann sat there and gave him a quote with
2  the same elevation -- his correct elevation --
3  and gave him that figure and said, that is
4  correct. You do need to pay that difference
5  because that's how much the premium is if you
6  want your coverages back.
7      He still did not -- could not
8  comprehend why the premium was different. So
9  we called Fidelity on a conference call, and
10  we had Fidelity run a quote with the elevation
11  certificate -- the correct elevation
12  certificate -- and gave him that quote.
13      And he still insisted that he does
14  not understand why it's different. I kept
15  telling him that it's because it's two
16  different properties. I mean, how can I not
17  tell him when it's right there in black and
18  white?
19      And I remember specifically saying
20  these are two different properties. This is
21  your elevation for your property; this is that
22  elevation for that other property. This is
23  how much yours is coming up. This is what you
24  need to pay. And Jo-Ann told him the same
25  thing.

Page 66

1      Q   Do you recall him asking you to
2  recreate the $836 quote?
3      A   He could have. I wouldn't see what
4  the sense of it would make. That's not his
5  premium.
6      Q   Did you do that?
7      A   I can't recall.
8      Q   Were you able to do that?
9      A   I can't recall that. I can't say
10  whether I was able to or not because I don't
11  know if I did or not.
12      Q   He says that he asked for that and
13  you weren't able to do it.
14      As you sit here, are you able to
15  dispute him? Do you have any recollection?
16      A   I can't say I did or I didn't.
17      Q   Now as to the quote you ran with the
18  new flood or the correct elevation
19  certificate, did the quote that you obtained,
20  was it identical to the dollar amount that he
21  was being asked to pay?
22      A   To his new premium?
23      Q   Yes, ma'am.
24      A   Yes. That's where we come up and
25  decide that the 342 would have been the

Page 67

1  difference.
2      Q   Did you print out any of that?
3      A   I can't say whether I did or not. If
4  he doesn't have a copy, I don't have a copy.
5  I can't say if I gave him a copy or not. I
6  don't recall.
7      Q   Is there any evidence which you can
8  show me -- written evidence that you ran the
9  numbers, the quote on August 4, and came up
10  with the same number -- the additional larger
11  number that he was being asked to pay based
12  upon the correct elevation certificate?
13      A   Like I said, I don't have a copy, and
14  I don't recall whether he got a copy or not.
15  But I know I went to Jo-Ann and we called
16  Fidelity all in his presence.
17      Q   He goes on and says that when the
18  quote was run with the old certificate -- or
19  the certificate -- elevation certificate on
20  the incorrect property and the elevation
21  certificate on the correct property, it came
22  out with the same premium. Do you recall
23  that?
24      A   Wait. What's that?
25      Q   Mr. Holbrook says when you ran the

Page 68

1  quote with the elevation certificate on the
2  incorrect property and then ran a quote with
3  the elevation certificate on the correct
4  property that the premium was the same.
5      A   I don't see how that would happen,
6  but I don't remember that happening. I don't
7  recall that happening.
8      Q   I want to compare the two elevation
9  certificates. This is the one on the
10  incorrect property marked as P-12. I want to
11  compare it to the elevation certificate on his
12  property which has been marked as P-8.
13      What is the base flood elevation for
14  each of the -- for his correct property --
15      A   That's a -1.
16      Q   And what is the base flood elevation
17  on the one marked P-12 on the incorrect
18  property?
19      A   From what I can see, it's a 2.5.
20      Q   On the base flood elevation?
21      A   Yes.
22      Q   What is the -- they have on here
23  the --
24      A   Elevation of the lowest floor?
25      Q   Yes, ma'am.

Page 69

1    A    Elevation of the lowest floor is
2    -3.47.
3    Q    On his correct property.
4         On the other property, what is it?
5    A    -2.35.
6    Q    So it's actually better on the
7    incorrect property?
8    A    The premium?
9    Q    No, no, no. The elevation is higher
10   on the incorrect property as to the lowest
11   floor?
12   A    Because he's a negative. That's why
13   his premium came out more.
14   Q    And then which is the -- what is the
15   other number we can compare off these?
16   A    There's only two numbers we use.
17   Q    Lowest adjacent grade?
18   A    Once you put that in, it doesn't make
19   a difference. The main focus is the base
20   flood and the lowest floor.
21   Q    What is the lowest adjacent grade?
22   What does that mean?
23   A    I think the lowest adjacent grade is
24   like, say, this is the slab. The base is from
25   the top -- the adjacent I think is from the

Page 70

1    bottom of the slab.
2         I'm not sure because I'm not an
3    expert in doing surveys.
4    Q    The lowest adjacent grade on the
5    incorrect property is -7 while -- where the
6    adjacent ground, if we will, on his is a
7    -4.21. Right?
8    A    You're asking me something -- I'm
9    telling you --
10        MR. BARRECA:
11            Well, he hasn't asked anything
12        yet other than identifying the
13        numbers.
14        THE WITNESS:
15            Well, he's asking me about
16        adjacent ground?
17   A    These are the two in figures we use.
18   The base flood and the elevation of the lowest
19   floor. That's what the computer asks us to
20   put in.
21   Q    Let's turn to the application. What
22   numbers do you have on the application?
23   A    I mentioned that before that the
24   lowest adjacent floor, it does ask you for
25   that, but it doesn't make a difference.

Page 71

1    Q    But it asked for it?
2    A    Yeah; I mentioned that before.
3         I said main focus on the -- when the
4    computer asks us do you have a flood elevation
5    certificate, it asks us for the base flood
6    elevation and the lowest floor elevation.
7         Way into the application, then it
8    asks us to put in that figure.
9    Q    Do you have any document where you've
10   run quotes with each of the information for
11   these two?
12   A    No.
13   Q    When Mr. Holbrook left that day, how
14   did you and he leave it?
15   A    We were in Jo-Ann's office both
16   telling him that that is the correct premium,
17   that he needs to make that payment. He kept
18   insisting that he was not going to pay it. He
19   kept insisting that he was not going to pay it
20   because he could not understand why the
21   premium was coming up different after me
22   telling him why it was different, Jo-Ann
23   telling him why the premium was coming up
24   different.
25        When he left, from what I understood

Page 72

1    when he walked out that door, he understood
2    that that is his premium. That's what he
3    needs to pay in order to get his coverages
4    back to what he applied for, that he needed to
5    pay that 342.
6         In the conversation, I said we -- I
7    said -- I don't know if "we," but I'm going to
8    talk for me because I'm the one sitting
9    here -- I said, is there by any chance that
10   they could have done a new flood elevation on
11   the property?
12        He's, like, they don't know.
13        Call your title company. If you want
14   me to call them for you, I'll call them.
15        But the bottom line was when he left
16   that office he was advised that he needed to
17   pay the $342. That's his premium.
18   Q    He says when he left you were going
19   to check into things and get back with him.
20   A    That's not correct.
21   Q    Do you have any notes?
22   A    That's not correct.
23   Q    Do you have any notes?
24   A    No.
25   Q    He also says that the insurance

Page 73

1    underwriting company claims it did not receive
2    any elevation certificate until late July
3    suggesting the policy application was
4    processed without an elevation certificate.
5        A   That could be correct. If she's
6    talking about the correct elevation, Pam
7    didn't get in contact with me starting
8    July 21.
9        Q   It says "any" elevation certificate.
10           MR. BARRECA:
11              I'm going to object. If you
12           want to speculate as to what that
13           person meant when they were writing
14           that, go ahead.
15           THE WITNESS:
16              I can't.
17           MR. ARCHEY:
18              She was speculating, so I get
19           to follow up.
20       Q   (By Mr. Archey) Have you seen
21    Mr. Holbrook's notes where he says -- from
22    August 4 where he says, "Elevation incorrect;
23    looking into it; will contact me."
24           Have you seen those?
25       A   Yes, I saw those.

Page 74

1        Q   And -- okay. Mr. Holbrook called you
2    at least twice thereafter on August 11th and
3    August 24, 2005. Is that correct?
4        A   That's what he stated.
5        Q   No. Do you know if he called you
6    after August 4, 2005 prior to Katrina?
7        A   I can't recall that. I don't recall
8    him leaving me a message, no.
9        Q   If he called and left you a message
10    on August 11, would you call him back?
11       A   Absolutely.
12       Q   It's your position that the Holbrooks
13    are just lying?
14       A   I'm not saying he's lying.
15       Q   He's got notes where he says I
16    called, left messages. She didn't call me
17    back. Contemporaneous notes.
18           MR. BARRECA:
19              If you can guess what
20           Mr. Holbrook is thinking, go ahead.
21       A   I -- I -- (Witness shakes head
22    negatively).
23       Q   (By Mr. Archey) Did you know what his
24    deadline was for paying the allegedly
25    additional premium he owed?

Page 75

1        A   Yeah; when he brought in his letter.
2        Q   Did you ever contact him prior to
3    that, after August 4?
4        A   I can't say whether I did or not.
5        Q   Do you have any record that you
6    contacted him?
7        A   Not that I know of.
8        Q   Do you have any memory of contacting
9    him after August 4?
10       A   No.
11       Q   Isn't it true that you never
12    contacted him after August 4, 2005?
13       A   No; I can't say whether I did or not.
14       Q   How many times did you meet
15    Mr. Holbrook?
16       A   I think once. Once. It had to be
17    once because we did the transaction for the
18    business over the phone, and I think that was
19    the only time I met him was when he came in
20    the office to do his auto and discuss his
21    premium on his flood.
22       Q   When Hurricane Katrina hit, what
23    happened to the office? Where was it? It was
24    open? Shut down? I know ya'll were out of
25    town obviously evacuated. I know that. What

Page 76

1    happened? Did you set up a satellite office?
2    Was it completely shut down? When did it get
3    back up and going? Was the office under water
4    for that matter?
5        A   Well, I wasn't here, because when I
6    left that Friday, I had no idea that we were
7    even going to be evacuated for a Hurricane.
8    And that was the last time I saw the office
9    was that Friday evening when I left.
10           I was in Houston. From what I heard
11    that they did -- they were working out the
12    Baton Rouge office, but I wasn't in Baton
13    Rouge so I can't tell you how they operated.
14       Q   When did you come back to work with
15    AAA?
16       A   I think it was early the second week
17    in November. I'm not sure. I didn't go back
18    until November. I can't tell you exactly what
19    date in November I went back.
20       Q   When you went back, where did you go?
21    To Baton Rouge or here?
22       A   Our Metairie office opened up in -- I
23    don't even know. I wasn't here when it opened
24    up.
25       Q   That's what I'm trying to get to.

Page 77

```
 1    A   I wasn't here.  I think it was
 2  November 1.  I'm not sure.
 3    Q   Did the -- were any records lost?
 4  Did the office lose records during Hurricane
 5  Katrina?
 6    A   None of our records was lost, so not
 7  that I know of.
 8    Q   Where is the office?  The location it
 9  was then?
10    A   (Witness nods head affirmatively.)
11    Q   Where is that?
12    A   3445 Causeway.
13    Q   What building is that?  Which
14  building is that?
15    A   3445 North Causeway.
16    Q   A big building like this?
17    A   It's a 10-floor building.  We're on
18  the second floor.
19    Q   Very clumsy, but that's what I was
20  trying to ask.
21       When did you first become aware after
22  Hurricane Katrina that the Holbrooks were
23  making a claim, not happy, still contending
24  that they had been done wrong?
25    A   I think it was that same day that my
```

Page 78

```
 1  supervisor asked me to type up a summary of
 2  the transaction that happened.
 3    Q   You say your supervisor.  Who was
 4  that?
 5    A   Tom Pollack.
 6    Q   What about Ms. Daleo?  Was she there
 7  at the office then too?
 8    A   Oh, God.  I can't recall.
 9    Q   At any time after August 4, 2005 --
10  strike that.
11       The Holbrooks have their phone
12  records, and they have gotten those together.
13  And they show no phone calls coming from you
14  after August 4, 2005.  Do you have any records
15  which would indicate that you had called them?
16    A   No.
17    Q   Let me show you the November 3 letter
18  that I think you've been referring to.
19       MR. TREAS:
20           Is that the one paragraph
21       dissertation?
22       MR. ARCHEY:
23           It's been marked as P-15
24       already.
25       MR. BARRECA:
```

Page 79

```
 1           His letter to Jo-Ann.
 2    Q   (By Mr. Archey) Is this the first
 3  time you were aware of a problem or issue with
 4  s, if you will?
 5    A   This first time?
 6    Q   Yes, ma'am.
 7    A   The only thing I can recall was when
 8  my supervisor came and asked me to do a
 9  summary.
10    Q   When he did that, did he show you any
11  demand letters from the Holbrooks?
12    A   No.
13    Q   What did he tell you?
14    A   He just asked me about the situation;
15  am I aware of the situation.
16       I was like, yeah; and I explained to
17  him the situation that happened.
18       And he said, just put it -- just type
19  up what your story of what happened and send
20  it.  And that's exactly what I did.
21    Q   The November 9, 2005 quote, why was
22  it -- and it's been marked as --
23       MR. TREAS:
24           13?
25       MR. ARCHEY:
```

Page 80

```
 1           No.  Here it is -- yeah, 13.
 2       Sorry.
 3    Q   (By Mr. Archey) The November 9 quote,
 4  why was it run?
 5    A   I don't know.
 6    Q   Did you do it?
 7    A   I can't say if I did or not.  I
 8  really can't.
 9    Q   Do you have any recollection, any
10  knowledge about the November 9, 2005 quote?
11    A   No.  I really -- in November, did I
12  know about this quote?  Are you asking me now?
13    Q   Have any participation in this?  Talk
14  to anybody about it?  Know that it was
15  occurring?  Any knowledge at all?
16    A   Not that I can recall.  Not that I
17  can recall.
18    Q   What did Mr. Pollack tell you about
19  the situation that had developed with the
20  Holbrooks?
21    A   He just asked me am I familiar with
22  the Holbrooks and, you know, what happened.
23  And I told him the story of what happened.
24  And he said, well, put something up on paper
25  and mail it to them.  And that's exactly what
```

**Page 81**

1   I did.
2      Q   Is that the full substance of what he
3   told you?
4      A   Yeah, basically.  I mean -- I can't
5   recall word-for-word, but I know that he told
6   me -- you know, I remember him asking me about
7   if I was familiar with them and what happened.
8         And I told him what happened, and he
9   was like just put it on a paper and mail it to
10   them.  And that's exactly what I did.
11      Q   Your November 14, 2005 letter marked
12   as P-16, is that your one-page --
13         MR. ARCHEY:
14            I forgot the word you used to
15         describe it.
16         MR. TREAS:
17            Dissertation.
18      Q   (By Mr. Archey) -- dissertation on
19   what occurred?
20      A   From what I could remember at that
21   time, yes.  And I still go by it.
22      Q   And you drafted the November 14, 2005
23   letter.  Correct?
24      A   Yes.
25      Q   It's not signed, is why I'm asking

**Page 82**

1   this.
2      A   Yeah.
3      Q   And you also mailed it to the
4   Holbrooks.  Correct?
5      A   Yes.
6      Q   I'm curious about the third sentence.
7   It says, "Pam from Fidelity faxed a letter
8   requesting a flood certificate which I faxed
9   to her with a note asking her to call me so we
10   can discuss the file."
11         I'm still back to this point.  Pam
12   doesn't say -- you don't say that Pam from
13   Fidelity faxed a letter requesting the correct
14   flood certificate or that I had sent her the
15   wrong flood certificate.  Isn't it true she
16   didn't have the flood certificate until you
17   faxed it to her?
18         MR. BARRECA:
19            I object.  That's speculation,
20         and if you can tell what Pam
21         Nusbaum was thinking, go right
22         ahead.  Answer what you know.
23         MR. ARCHEY:
24            I didn't ask Pam.
25      Q   (By Mr. Archey) Isn't it true that

**Page 83**

1   she didn't have any flood certificate?
2         MR. BARRECA:
3            I object again.  It's not what
4         it says.
5         MR. ARCHEY:
6            It's not what it says, but
7         that's the implication easily drawn
8         from it.
9         MR. BARRECA:
10            Stop putting words in her
11         mouth.
12         MR. ARCHEY:
13            Quit speaking objections,
14         then.
15      Q   (By Mr. Archey) Isn't it true that
16   based upon what you wrote that Pam did not
17   have a flood certificate at all until you
18   faxed it to her?
19      A   No.  I had just came back from
20   evacuating, being away from work, and my boss
21   came and discussed this with me.  I just typed
22   this up, and I sent it.
23         How it's being read, I just put it --
24   I mean, I can't say it was true that Pam did
25   not have a flood certificate.  I can't say

**Page 84**

1   that.
2      Q   You can't say that she did either?
3      A   No; I can't say that she did either.
4      Q   After the August 4 meeting with
5   Mr. Holbrook, you did undertake to do some
6   things on his behalf, did you not?
7      A   I said that I would call Maureen at
8   the title company to see if they had done a
9   new flood elevation for him.  But I also told
10   him before that that was his correct premium
11   and he needed to make that payment.
12      Q   Did you ever call him back?
13      A   I never heard back from Maureen.
14      Q   And you never called Mr. Holbrook
15   back, did you?
16      A   No; not that I could recall.
17      Q   Did you ever -- other than Pam, did
18   you ever speak with anyone at Fidelity
19   regarding the problem that was created because
20   you sent the wrong elevation certificate?
21      A   I don't recall who we spoke with when
22   we had a quote, when we had somebody give us a
23   quote with Mr. Holbrook in the office with me
24   and Jo-Ann.  I can't tell you if it was Pam.
25   I can't tell you who it was that we spoke with

Page 85

1    that day on the 4th.
2        Q   Other than that conversation that you
3    say occurred then, any other times that you
4    spoke with anyone at Fidelity regarding
5    Mr. Holbrook or the Holbrooks?
6        A   No; because we had figured what the
7    situation was in the office. We knew at the
8    time what happened. It was an incorrect
9    elevation. Now we have a new elevation. Here
10   is the new figure and you do owe the $342. I
11   mean, we had already called Fidelity.
12       Q   Did you ever run a quote just with
13   the A05 flood elevation to see what that
14   number would be?
15       A   I can't say for sure. I think that
16   we did. I didn't do it when we were sitting
17   at Jo-Ann's computer with Fidelity on the
18   phone.
19       I think we did that because it didn't
20   make a difference whether he had an elevation
21   certificate or not. The elevation certificate
22   did not change the premium from what -- you
23   know, including the 836 including the 342, the
24   elevation did not make a difference.
25       Q   This is probably covered under the

Page 86

1    other questions. I apologize if it is. But
2    let me ask directly.
3        Have you spoke with Pam since
4    July 25, 2005?
5        A   I spoke with Pam between July 25 and
6    August 4. I can't remember what date it was.
7        Q   Good enough. After that time, after
8    August 4, 2005, did you ever speak with Pam
9    Nusbaum again?
10       MR. BARRECA:
11           Relating to this particular
12       case, or just anything?
13       MR. ARCHEY:
14           Fair. This case.
15       A   Not that I recall. I wouldn't -- I
16   don't believe that I needed to speak to
17   anybody because we had already spoke with
18   Fidelity in Mr. Holbrook's presence and
19   advised him that that was the correct premium
20   and that was what he needed to pay in order to
21   have his coverage back to where he had
22   originally signed up for.
23       Q   (By Mr. Archey) Anyone ever suggest
24   that maybe the agent ought to pay the
25   additional premium because of your mistake?

Page 87

1        MR. BARRECA:
2            Answer the question.
3        A   No.
4        MR. ARCHEY:
5            Let me take a break.
6            (Break.)
7            (Mr. Holbrook leaves the
8            deposition.)
9        Q   (By Mr. Archey) What did you do to
10   prepare for today?
11       A   I met with my lawyer, with Kevin
12   yesterday.
13       Q   Right. Don't tell me about it.
14       Did you view any of the documents or
15   files?
16       A   Yeah; went over the paperwork.
17       Q   Have you gone through your personal
18   files to see if you have anything?
19       A   No; because we went over it so many
20   times.
21       Q   Have you ever been sued before?
22       A   No.
23       Q   Have you ever sued anyone before?
24       A   Car accident.
25       Q   How many times? Just once?

Page 88

1        A   Twice.
2        Q   Any criminal charges against you?
3        A   No.
4        Q   You said you come from Belize. Are
5    you a U.S. citizen now?
6        A   Resident.
7        MR. ARCHEY:
8            It's late Friday evening.
9        You've been very kind. Thank you.
10       THE WITNESS:
11           Thank you.
12       MR. TREAS:
13           A couple, and it's more for my
14       information than anything. And I'm
15       really confused.
16           EXAMINATION
17   BY MR. TREAS:
18       Q   At the very end, you had stated that
19   the information inputted when you went back
20   into Ms. Daleo's office did not make a
21   difference. A difference in what?
22       A   In the premium that he was -- that
23   Fidelity said, okay, your premium has jumped
24   from 836 to -- what was it? 11-something.
25   The elevation usually -- well, sometimes an

Page 89

1   elevation helps you and sometimes it doesn't.
2         In his case, the elevation did not
3   help him. It did not change the premium from
4   what Fidelity said the new premium was.
5         Q   836 plus 342 is 1178.
6         A   Okay.
7         Q   So my question next is going to be
8   you said no matter what information you put
9   in, it didn't make a difference, you still get
10  the 1178.
11        What information are you putting in?
12        A   No; the elevation. The elevation.
13        When a house is built before 1974,
14  okay, you don't need a flood elevation
15  certificate. But sometimes it helps you to
16  make your premium lower if you have a flood
17  elevation. It saved me $150 every year
18  getting a flood elevation.
19        In his case, it didn't help him. It
20  didn't hurt or help him. The premium did not
21  change from 1178.
22        Q   So it didn't matter if you put in the
23  correct elevation numbers. It didn't change
24  the premium of 1178. Is that what you're
25  telling me?

Page 90

1         A   Right. It didn't help him.
2         MR. BARRECA:
3             Compared to what?
4         MR. TREAS:
5             I'm confused. I'm sorry.
6         A   The elevation certificate did not
7   make the premium go down from 1178. It kept
8   it at 1178.
9         MR. BARRECA:
10            Can I say one thing?
11        MR. TREAS:
12            Yeah.
13        MR. BARRECA:
14            Compared to just using the A05
15        zone as a general -- explain that
16        part to him.
17        A   If we didn't use an elevation
18  certificate, his premium is 1178.
19        Q   (By Mr. Treas) Okay.
20        A   If we use the elevation, his correct
21  one, it didn't change it. It didn't make a
22  difference.
23        Q   So how was the quote, the 836, ever
24  generated then?
25        A   Because we used an incorrect

Page 91

1   elevation certificate.
2         Q   Meaning the 2004 caused the 836
3   premium?
4         A   Right.
5         Q   Poor question. The 2004 elevation
6   certificate is what caused the 836 premium
7   that you quoted beforehand?
8         A   Originally, yes.
9         Now when Fidelity saw that it wasn't,
10  you know, the correct elevation certificate,
11  they based it on without having an elevation
12  certificate which is 1178.
13        MR. BARRECA:
14            You just used the A05 zone.
15        THE WITNESS:
16            Right. Right. They didn't
17        use an elevation certificate.
18        Q   (By Mr. Treas) Did you inform
19  Fidelity to run it with an A05 zone?
20        A   No; they did when they got the
21  application.
22        Q   So the application has A05 zone.
23  Let's look at that. I'm trying to figure this
24  out.
25        MR. BARRECA:

Page 92

1             13, I think.
2         MR. TREAS:
3             Is the application --
4         THE WITNESS:
5             I don't have it here.
6         MR. TREAS:
7             (to Jo-Ann Daleo) Do you know
8         this? Can you explain this in
9         layman's terms?
10        J0-ANN DALEO:
11            (Nods head.)
12        MR. TREAS:
13            That's going to be the
14        question I'll ask you.
15        THE WITNESS:
16            I got the application. I'm
17        looking for the elevation.
18        MR. TREAS:
19            I want to see the app. Does
20        it have "A05" on the app? Yes, it
21        does.
22        THE WITNESS:
23            It should.
24        Q   (By Mr. Treas) And this was run with
25  the 2004 elevation certificate?

Page 93

1    A   Yes.
2    Q   I understand now.
3        Since it was a prefirm building, they
4  ran it with just an A05 without any elevation
5  numbers, and that was the 1178. Is that your
6  understanding?
7    A   Right.
8    Q   Okay. And then when Mr. Holbrook
9  comes in on the 4th -- and that's one of my
10  questions. When did you, Lisa Dufour -- when
11  did you get the 2000 elevation certificates
12  specifically for the Holbrook property?
13    A   When he came in the office that 4th.
14  He brought it. He brought in that elevation
15  certificate.
16    Q   I understand. Okay. And then that's
17  when you turned it over to Fidelity.
18        Is that when you presented it to
19  Fidelity was the 4th or the 5th? Do you have
20  any recollection of that?
21    A   No. The 4th was when he came in and
22  I sat at my desk and saw that the premium was
23  correct. Okay?
24        Explained it to him. He didn't
25  comprehend, so that's when we went into

Page 94

1  Jo-Ann's office. I think I went into Jo-Ann's
2  office previously. She ran a quote and was
3  getting the same figures.
4        So I brought him in there. Maybe he
5  would listen to her. And he didn't listen to
6  her either.
7        So that's when we got Fidelity on the
8  phone. And that's when we realized with
9  Fidelity that it didn't matter -- the
10  elevation certificate did not matter. The
11  premium stayed --
12    Q   I asked a poor question. I
13  apologize.
14        The first question: Did you, Lisa
15  Dufour, submit the 2000 elevation certificate
16  to Fidelity, or was it somebody else?
17    A   I don't -- I don't think we did
18  because it didn't make a difference.
19    Q   I understand. We got that.
20    A   We didn't need it. Put it that way.
21    Q   So your answer is you don't recall if
22  you did specifically?
23    A   Right.
24    Q   Do you have any knowledge as to
25  anybody else submitting it to Fidelity?

Page 95

1    A   It would be either me or Jo-Ann, but
2  talking to Fidelity that they -- with the
3  quote and the elevation, we didn't need to
4  submit that elevation certificate because it
5  did not make a difference. The premium stayed
6  the same.
7        The only time we would need to submit
8  an elevation is if it makes the premium lower.
9  That's the only time to submit an elevation to
10  show proof that that is the correct elevation.
11    Q   Just a couple loose things here. On
12  P-16, your one-paragraph long statement, did
13  you review anything to prepare that statement?
14    A   No. I just went from my
15  recollection.
16    Q   On P-13, which I believe is the
17  November quote --
18    A   Yes.
19    Q   -- of 2005, there was questions about
20  that quote. And my initial question is did
21  you even prepare that?
22    A   I don't recall preparing this quote,
23  no.
24    Q   When quotes are prepared in the
25  office, will there be any kind of code on

Page 96

1  there saying --
2    A   I used her code.
3    Q   Who is "her"?
4    A   Jo-Ann Daleo. So it's going to
5  automatically have her name on there.
6    Q   So if somebody else in the office
7  prepared it, there's no way on the document to
8  know who actually typed up and did the quote.
9  Is that right?
10    A   Right. It's going to be either
11  Jo-Ann or I. Nobody else knows her code to
12  get into her system. But I don't recall
13  running this quote.
14    Q   This is more of a general question
15  for the agency and you in particular: In
16  August -- July and August of 2005, how did --
17  how were messages taken or recorded?
18        And I guess where I'm going at is if
19  somebody calls in, do you have a voicemail
20  system? Is it a sticky note? How is that
21  done?
22    A   A voicemail system. But you also
23  have to understand that we have a lot of --
24  people will -- we get this all the time that
25  people will call and they will leave messages

Page 97

1  on somebody else's voicemail, or we have what
2  we call sitting desk -- duty desk. That's the
3  main line where everybody's phone call goes to
4  if they don't know the agent's number. Even
5  if they do, they still leave messages down
6  there.
7      I'm not saying that Mr. Holbrook did
8  that. I don't know.
9   Q   I'm just curious how that would work.
10      You said you have a voicemail system.
11  Does that only work after hours? Or if
12  somebody calls the main number, the
13  receptionist answers it if you're not at the
14  desk and it goes to the voicemail?
15   A   If they know my extension and if they
16  call it, it goes straight -- they would leave
17  a message on my voicemail.
18   Q   "They" meaning whoever the caller is?
19   A   Whoever the caller is, yes.
20   Q   It's the first I hear about this
21  conference call. That happened August 4. Is
22  that right?
23   A   Yes, sir.
24   Q   And that was in Ms. Daleo's office?
25   A   Yes, sir.

Page 98

1   Q   Was that on a speaker phone?
2   A   Yes, sir.
3   Q   And who was in the room? I want to
4  make sure. It was you, Ms. Daleo, and
5  Mr. Holbrook. Is that correct?
6   A   Yes, sir.
7   Q   Anybody else?
8   A   No. She made the call because she
9  was sitting at her desk in her office.
10   Q   And that was the call to Fidelity
11  about the whole underwriting issue with the
12  elevation certificate. Is that right?
13   A   We asked them to run a quote with the
14  new flood elevation certificate.
15   Q   "New" meaning the 2000 elevation
16  certificate?
17   A   Yes.
18   Q   And then is that when you learned or
19  is that when you confirmed that it didn't make
20  a difference? 1178 is it?
21   A   That's when we learned, oh, we don't
22  even need this elevation certificate because
23  it didn't change the premium. Like for me, it
24  was like a light bulb went off -- or you
25  mentioned it (referring to Jo-Ann Daleo) --

Page 99

1  either me or you that mentioned it. Oh, we
2  don't even need the elevation certificate.
3      And we confirmed that with Fidelity
4  that we didn't need it because it didn't make
5  a difference.
6   Q   Do you as an assistant -- I think you
7  call it -- are you an assistant agent or
8  assistant -- what's your title, I guess?
9   A   I think on my business card is
10  "Assistant to Jo-Ann Daleo."
11      JO-ANN DALEO:
12         Sales assistant.
13      MR. TREAS:
14         Okay.
15   Q   (By Mr. Treas) You, as a sales
16  assistant, do you receive any sort of
17  commission for new business when you get these
18  policies written?
19   A   No.
20   Q   Does that go to Ms. Daleo?
21   A   Yes.
22   Q   Do you have any knowledge of that?
23   A   Yes.
24   Q   Do you have any knowledge -- I'll ask
25  Ms. Daleo. That's a question for her.

Page 100

1      You say that you obtained the
2  elevation certificate from the title company,
3  and I want to make very clear that is the 2004
4  elevation certificate. Is that correct?
5   A   Correct. The incorrect elevation.
6   Q   Partners Title Agency, had you dealt
7  with them prior to July of 2005?
8   A   Prior to Mr. Holbrook?
9   Q   Correct. I'm talking about you
10  personally.
11   A   I deal with so many title companies,
12  I really can't recall who I deal with.
13   Q   I need to know this myself. How
14  does -- how are -- are the applications
15  submitted to the insurance companies that you
16  will write for?
17   A   It's submitted via the internet.
18   Q   Is that what happened with this
19  Fidelity? In other words, when you gathered
20  everything, was it faxed to Fidelity? Was it
21  internet? Was it email? Was it mail? How
22  was the application submitted with regard to
23  flood from Mr. and Mrs. Holbrook?
24   A   Via the internet.
25   Q   Then the next question is, well, how

Page 101

1    would you -- how does the elevation
2    certificate get there through the internet?
3        A    Send it with a copy of the
4    application.
5        Q    Scan it and it goes? I'm confused.
6        A    No; mailed it. Put it in the mail.
7    Mailed a copy of the elevation certificate
8    with a copy of the application.
9        Q    Like a signed application?
10       A    Yes.
11       Q    So the actual application is
12   submitted over the internet, and then you
13   follow that up with signed application, the
14   premium, or -- and an elevation certificate,
15   if an elevation certificate is needed. Is
16   that correct?
17       A    Yes.
18       Q    Do ya'll submit money via internet as
19   well, or it just depends on what's going on?
20       A    If a customer pays with a check at
21   the desk, then we get a transmittal form to
22   send the check with the transmittal form. If
23   they do a credit card, we still get a
24   transmittal form because it's a receipt.
25       Q    Is that just for Fidelity? For a

Page 102

1    specific company what ya'll do there?
2        A    Mainly with Fidelity, because for us
3    with our company, we just deposit the money to
4    our cashier and -- well, you know, due to --
5    give the money to the cashier and they deposit
6    it.
7            As far as Fidelity, we mail the
8    payments to them if it's a check or money
9    order.
10       Q    And in the Holbrooks' case, who
11   submitted the flood application?
12       A    I submitted the flood application, I
13   would believe, because I did it.
14           Now as far as the payment, I don't
15   know if the payment came to our office or
16   where it went. But obviously he got it, so.
17       Q    And how did you verify that the
18   premium was paid? That was my next question.
19       A    We don't verify if the premium was
20   paid. Their policy comes in the mail once
21   their declaration gets in the mail to us.
22   Then that's proof it's paid. They're not
23   going to submit a declaration without payment.
24       MR. TREAS:
25           Thank you.

Page 103

1        MR. ARCHEY:
2            Very short.
3            FURTHER EXAMINATION
4    BY MR. ARCHEY:
5        Q    Do you know when you received the
6    incorrect elevation certificate?
7        A    The incorrect?
8        MR. BARRECA:
9            I'm not sure it's proper
10           cross-examination, but I'll let you
11           go.
12       Q    (By Mr. Archey) When did you get
13   that?
14       A    I can't recall when I got that.
15       Q    Was it after Mr. Holbrook called you
16   and said you were going to get the ball
17   rolling?
18       A    I can't recall that.
19       Q    Did you have it first thing?
20       A    I can't recall that. I really can't
21   recall that to give a date and say that I
22   received that on that date.
23       Q    Was it after you started dealing with
24   Mr. Holbrook at some point?
25       A    Yeah; because I wouldn't know to get

Page 104

1    it. It had to be when -- after I talked to
2    him and after he gave me the number for
3    Partners Title and all that. But I can't give
4    you a date.
5        Q    According to his notes, he gave you
6    the name of Partners Title on June 8. Any
7    basis to dispute that?
8        A    Could be after June 8 that I talked
9    to them. I can't give you a date.
10       Q    Then how did you run a certificate,
11   then, on May 30 if you used an incorrect
12   certificate you didn't have yet -- on
13   May 20 -- I'm sorry.
14       A    I really -- I don't know. I don't
15   know if -- your question was did I get the
16   elevation certificate after I started talking
17   to Mr. Holbrook? I could have gotten it on
18   that first day I talked to Mr. Holbrook. I
19   don't know.
20       Q    You don't know, do you?
21       A    I don't recall.
22       MR. ARCHEY:
23           That's all I have.
24   (The deposition concluded at 5:00 p.m.)
25

Page 105

```
 1          REPORTER'S CERTIFICATE
 2          I, MARLANE A. GAILLE, CCR-RPR,
 3   Certified Court Reporter in and for the State
 4   of Louisiana, do hereby certify that the
 5   aforementioned witness, after having been
 6   first duly sworn by me to testify to the
 7   truth, did testify as hereinabove set forth;
 8          That said deposition was taken by
 9   me in computer shorthand and thereafter
10   transcribed under my supervision, and is a
11   true and correct transcription to the best of
12   my ability and understanding.
13          I further certify that I am not
14   of counsel, nor related to counsel or the
15   parties hereto, and am in no way interested in
16   the result of said cause.
17
18
19
20
21   _____
         MARLANE A. GAILLE, CCR-RPR
22       CERTIFIED COURT REPORTER #21005
23
24
25
```



# FIDELITY

Fidelity National Property And Casualty Insurance Company

| APPLICANT | CURRENT DATE | EFFECTIVE DATE | QUOTE NUMBER |
|---|---|---|---|
| RONALD AND APRIL HOLBROOK | 06/23/2005 | 06/30/2005 | 17 QT70489339 99 |

## AGENCY INFORMATION

| | |
|---|---|
| ncy Number | 45603 |
| ncy | JO ANN DALEO-AAA |
| ress | 3445 N CAUSEWAY BLVD # 200, |
| , State, Zip | METAIRIE, LA 70002-3734 |
| ne Number | (504) 838-7500 |

## COMMUNITY INFORMATION

| | |
|---|---|
| munity Number | 225203 NEW ORLEANS/ORLEANS PARISH |
| ram Type | Flood Regular Policies |
| d Zone | A05 |

## BUILDING INFORMATION

| | |
|---|---|
| erty Address | 6123 CHARLOTTE DR |
| State, Zip | NEW ORLEANS, LA 70122-2733 |
| truction Date | 01/01/1960 |
| dominium Coverage | None |
| pancy Type | Single Family |
| ing Type | One Floor |
| tion Certificate | Yes |
| ing Flood Proofed | No |
| sure | None |
| ing Elevated | Building is not elevated |
| ructions | No |
| st Floor Elevation | -2.3 feet |
| est Adjacent Grade | 0.0 feet |
| tion Difference | 0 feet |
| ion of Contents | Lowest Floor Only - Above Ground Level |
| ing Replacement Cost | $ 183,000 |

## COVERAGE/PREMIUM INFORMATION

| | Limits | Deductible | RPH Basic | RPH Additional |
|---|---|---|---|---|
| rage | | | | |
| g | $ 183,000 | $ 500 | 1.08 | 0.08 |
| ts | $ 40,000 | $ 500 | 1.10 | 0.12 |
| nt/Surcharge | | | | $ 0 |
| r Premium | | | | $ 836 |

## NOTES

cy includes increased cost of compliance (ICC) coverage
ommunity Discount Applied



**THIS IS NOT AN OFFER FOR INSURANCE.**
THIS QUOTE IS SUBJECT TO CHANGE WITH VERIFICATION BY THE COMPANY.

**The online application process must be completed.**
*Please do not submit this form with your payment.*

AAA-2

AAA-0005