# Exhibit A

**01/02/08 DRAFT**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER: 05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO:  *Robinson,* (No. 06-2268) | |

## JOINT STIPULATION OF UNDISPUTED FACTS FOR SUMMARY JUDGMENT MOTIONS ON SECTION 702C IMMUNITY

The Plaintiffs and Defendant hereby stipulate that the following are undisputed

facts for purposes of motions for summary judgment on the issue of the availability of 33

U.S.C. § 702c to the Government in this case.  The following abbreviations are used

below:

| | |
|---|---|
| ACE, USACE, Corps | U.S. Army Corps of Engineers |
| ASCE | American Society of Civil Engineers |
| EBSBs | Earthen Berms/Spoil Banks |

| | |
|---|---|
| GIWW | Gulf Intracoastal Waterway |
| Government | United States Government |
| GNO | Greater New Orleans (Jefferson, Orleans, and St. Bernard Parishes) |
| HPS, HFPS | Hurricane Flood Protection System |
| IHNC | Inner Harbor Navigational Channel (aka Industrial Canal) |
| ILIT | Independent Levee Investigation Task Force |
| IPET | Interagency Performance Evaluation Task Force |
| LPVHPP, LPV | Lake Pontchartrain and Vicinity Hurricane Protection Project |
| LSU | Louisiana State University Hurricane Center |
| LWLFC | Louisiana Wild Life and Fisheries Commission |
| MR-GO, MRGO | Mississippi River-Gulf Outlet |
| NOFDS | New Orleans Flood Defense System (same as HPS and HFPS) |
| NOD | New Orleans District, U.S. Army Corps of Engineers |
| NSF | National Science Foundation |
| PMH | Probable Maximum Hurricane |
| SPH | Standard Probable Hurricane |
| USFWS, FWS | U.S. Fish and Wildlife Service |

2

A.        **MISSISSIPPI RIVER-GULF OUTLET**

1.        **Authorization, Construction, and Eventual Closure**

| UNDISPUTED FACT | EVIDENTIARY SUPPORT |
|---|---|
| 1.  The Mississippi River-Gulf Outlet ("MRGO" or "MR-GO") is a navigable waterway constructed under the authority of Public Law No. 455, 84th Congress, 2nd Session, approved March 29, 1956, substantially in accordance with the recommendation of the Chief of Engineers as contained in House Document 245, 82nd Congress, 1st Session, at an estimated cost of $88,000,000. 70 Stat. 65. | MSJ Exh. 136, *Graci v. United States,* 435 F. Supp. 189 (E.D. La. 1977) ("*Graci  IV*"); MSJ Exh. 55 (House Document No. 245 (October 1, 1951)) ("House Document No. 245") |
| 2.  The MRGO was constructed by the U. S. Army Corps of Engineers as an aid to navigation (distinguished from a flood control project) pursuant to legislative mandate of the U. S. Congress. | MSJ Exh. 136*, Graci IV* |
| 3.  The MR-GO is a 76-mile long navigation, deep water channel connecting the Gulf of Mexico to the Port of New Orleans Inner Harbor Navigation Canal ("IHNC") via the Gulf Intracoastal Waterway ("GIWW").  It was authorized to be 38 feet deep with a 500 foot bottom width and 650 top width.  The channel includes a "landcut" of 46 miles and bisects the marshes of lower St. Bernard Parish and the shallow waters of Chandeleur Sound.  The outlet enables ships from ports east of the Mississippi River to head north for New Orleans at Breton Sound, many miles east of the river mouth, at a saving of sixty miles.  Its construction by the U.S. Army Corps of Engineers | MSJ Exh. 72, Independent Levee Investigation Team, New Orleans Levee System: Hurricane Katrina ("MSJ Exh. 72, ILIT"), July 3, 2006, p. 12-8 to 12-9; MSJ Exh. 136*, Graci IV*; MSJ Exh. 55, House Document No. 245; MSJ Exh. 93, O'Cain Depo. 494:11-16 |

| | |
|---|---|
| ("ACE") was started in 1958 and completed in 1968. Continuing operation and maintenance (including dredging) was the responsibMSJ Exh. 72, ILITy of the ACE. | |
| 4.  Nearly 300 million cubic yards of earth was moved to construct the MR-GO between 1958 and 1968—60 million more cubic yards than for the Panama canal. | MSJ Exh. 56, Team Louisiana, p. 225 |
| 5.  Hydrologically, the MRGO created a short, new pathway for astronomical and storm-driven tides to flow directly from Breton Sound to Lake Borgne and Lake Pontchartrain. There are three reaches (Figure 164).  The 6-mile connection between the junction of the GIWW and the MRGO terminus in the IHNC has been designated by IPET (2006b) as MRGO Reach 1, and plays the most significant role in transmission of hurricane surge . . . . Reach 2, the segment dredged through the marsh, has caused the most environmental degradation, while Reach 3 is the financial albatross, requiring continual dredging to keep the channel open. | MSJ Exh. 56, Team Louisiana, p. 229 |
| 6.  In 1988, the ACE wrote: "Major surface waters in the study area include the MRGO, the GIWW, the IHNC, the Mississippi River, Lakes Pontchartrain and Borgne, Chandelier and Breton Sounds .. . . All of these waters bodies are connected  hydraulically." | MSJ Exh. 23, Naomi Depo. Exhibit 26 at p. 8 |
| 7.  The MR-GO, GIWW, and IHNC have a hydrologic connection.  If a hydrological event occurs in one, it affects the other.  The MR-GO is open to tidal effects and water movement because there is an opening to Lake Borgne. | MSJ Exh. 92, Naomi Depo. 324:20-325:4; MSJ Exh. 93, O'Cain Depo. |

| | 492:18-494:1 |
|---|---|
| 8.  At the time the MR-GO was being constructed, the ACE wrote:  "The Mississippi River Gulf Outlet provides a deep direct route for the in-flow of saline currents from the Gulf of Mexico to the area along this channel and to Lake Pontchartrain, which results have an adverse effect on fishery resources in the area. . . . The Gulf Outlet Channel also will produce high velocity currents in the Inner Harbor Navigation Channel, creating a hazard to navigation and causing serious scouring damage, particularly in constricted areas of bridge crossings." | MSJ Exh. 9, H.R. Doc. No. 231, 89th Cong., 1st Sess. (1965) ("House Doc. No. 231") at p. __. |
| 9.  The landscape of the GNO east of the IHNC is a maze of contradictions. Levees built to stop storm surge sit incongruously next to ship channels that speed it through a 'funnel' into the heart of the City (Figure 158). Navigation channels like the GIWW and MRGO facMSJ Exh. 72, ILITate trade, but are liabMSJ Exh. 72, ILITies when storms threaten. Both are federally funded projects, designed and built by the USACE. The MR-GO and the GNO HPS were planned by the USACE at the same time, and were projected to have similar construction costs, about $90 million each.  The effect of one project on the other, however, was not considered until after MR-GO construction began in 1958. | MSJ Exh. 56, Team Louisiana, p. 224 |
| 10. New Orleans port interests made an economic case for construction of the navigation channels, and they were built first, before anyone thought about the storms or the environment.  The GIWW was dredged during World War | MSJ Exh. 56, Team Louisiana, p. 225-26; MSJ Exh. 92, Naomi Depo. |

| | |
|---|---|
| II through the wetlands that separated Lake Pontchartrain from Lake Borgne to provide sheltered, submarine-free, inland waterway access for barges and shallow-draft vessels from Mississippi Sound and points east to the Mississippi River via the IHNC lock, built in the early 1920s. It was a relatively small channel 125 ft wide by 12 ft deep, with a design cross-section of 1,400 square feet. The IHNC, which is about 5.8 miles long, was originally a local channel constructed by the Port of New Orleans to connect Lake Pontchartrain and the Mississippi River.  It later became a federal project. | 162:3-9;<br><br>MSJ Exh. 9, House Doc. No. 231, p. 63 |
| 11. Even before World War II was over, however, the business community began promoting a far grander project that eventually became the Mississippi River Gulf Outlet (MRGO), a 76 mile long, 40 foot deep, and 500 foot wide ship channel to complement the shallow-draft GIWW (Figure 159). This channel (Figure 160) was planned to have a cross-section of more than 23,000 square feet, sixteen times that of the GIWW (Figure 161). It took more than a decade to marshal support for Congressional authorization because the channel proposed was expensive and would have to compete with the Mississippi River—a reliable, deep, natural outlet with an already mature port infrastructure serving the same city. After much debate through the 1950s, port interests succeeded in securing local political support and federal funding, but the promise of an economic windfall for the City has never materialized. The MRGO was opened to ocean-going | MSJ Exh. 56, Team Louisiana, p. 226 |

| | |
|---|---|
| traffic in 1963 but was not fully completed until 1968. | |
| 12. The new channel failed to attract the vessel traffic predicted by boosters, averaging less than 5 inbound and outbound passages per day in a typical year (1998), and carrying only about 3 percent of the New Orleans port freight tonnage (Caffey and Leblanc 1999). On the other hand, it has cost the nation between $10 and $30 million annually for dredging to maintain the authorized channel section, at an estimated price of about $13,000 per ship passage. Most of this dredging has been required for the 40 mile open-water reach between the marsh edge jetties into Breton Sound and the 38 foot contour on the continental shelf that IPET (2006b) has designated Reach 3.  The ACE has now recommended to Congress the de-authorization (closure) of the MR-GO on economic, environmental and safety grounds. | MSJ Exh. 56, Team Louisiana, p. 227; Exhibit __ (ACE Final Report on De-Authorization of the MR-GO), p. __ |
| 13. Originally conceived as a way to get deep draft ships to the Port of New Orleans facMSJ Exh. 72, ILITies in the IHNC, the MR-GO failed to realize its commercial justification because of changes in ships (deeper drafts) and because of the need for almost continuous dredging to keep the channel open. | MSJ Exh. 72, ILIT, p. 12-8 to 12-9 |
| 14. Between the late 1950s right up to the time of Katrina, St. Bernard Parish continually communicated to the ACE its concerns about the MR-GO.  In 1988, the St. Bernard Parish Council unanimously adopted a resolution to close MR-GO because it constituted a threat to public health and safety from hurricane storm surge.  In October | MSJ Exh. 72, ILIT, p. 12-8 to 12-9; Naomi Depo. Exhibit 32 |

| 2004, the Louisiana Legislature passed a resolution urging closure of the MR-GO and immediate implementation of remedial measures to address the hurricane flood risk posed by the MR-GO. | |

## 2.    Never a Flood Control Project

| 15. When the MRGO was first designed and constructed, it did not have any flood protection levees or structures. | MSJ Exh. 93, O'Cain Depo. 20-24 |
| --- | --- |
| 16. The United States "accepts the claim that MRGO was a navigation project . . . [and] the United States does not contend that the MRGO has flood control features, nor does the United States contend that the MRGO ever became anything other than what it always was:  a navigation project." | Defendant United States' Rebuttal of Plaintiffs' Sur-Reply in Support of Opposition to Defendant's Motion to Certify (Document 6052), p. ____ |
| 17. The United States has conceded that "it is undisputed that the MRGO is and always was a navigable waterway and is undisputed that the MRGO did not become a 'flood control facMSJ Exh. 72, ILITy'. . . ." | Document 6052, p. _____ |
| 18. The Government has conceded that "the MRGO was not a flood control project and was not absorbed into the LVHPP." | Document 6052, p. _____ |
| 19. The Government has conceded that "the MRGO did not have a flood control purpose or function" and "no levees were constructed as part of the MRGO project." | Document 6052, p. _____ |
| 20. At the time of Hurricane Betsy in 1965, the MRGO was a navigation channel, and it had no flood control features. | MSJ Exh. 92, Naomi Depo. 332:23-25, 333:1 |

| | |
|---|---|
| 21. "The United States does not contend that "the MRGO became a flood control project either in whole or in part. The character of the MRGO remained unchanged from its inception until Hurricane Katrina." | Document 6052, p. _____ |
| 22. The United States has disavowed any argument that the MRGO was related to the national flood control program or was a "constituent component" of the LPVHPP or morphed into a hybrid flood control project/navigational aid project. | Document 6052, p. _____ |
| 23. The ACE has always differentiated between the MR-GO and the LPV. The MRGO was in operation and maintenance phase, while the LPV was funded by the construction appropriations. As such, they were handled and operated separately. LPV funding comes from the Construction General Account while MR-GO funding comes from the O&M and General Appropriations Accounts. MR-GO has separate appropriations. | MSJ Exh. 92, Naomi Depo. 323:1-23, 392:21-25, 393:1 |

### 3.     Dredging and Spoil Banks

| | |
|---|---|
| 24. The MR-GO dredging operation was a cutterhead hydraulic dredge that breaks up the material and, through pumping as an effluent, disposes of the material in a diked retainage area. A cutterhead dredge has an actual suction pipeline that goes to the bottom with a head on it that rotates and can cut soil, stumps, and tree roots like a Roto-Rooter. A suction pump shoots the material in liquid suspension through a line from the dredge to a spoilbank disposal area. This process essentially separates the | MSJ Exh. 93, O'Cain Depo. 501:10-25, 502:1-17, 565:16-25, 521:11-23; Theis Expert Report ¶ 15 |

| | |
|---|---|
| material, and the heavier sand and shell settles out immediately at the discharge point.  The clays and silts, on the other hand, remain in suspension and are dispersed over the large 4,000 ft. wide disposal area.  The Reach 2 spoilbank area has always been about 4,000 feet wide, and the 2,000 feet closer to the MR-GO channel has been the deposit area for the periodic dredging over the years. | |
| 25. The MR-GO land cut produced large volumes of spoil material that had to be disposed of during its construction. The spoil material was the byproduct of the excavation of the channel by a variety of dredges during its construction and during maintenance cycles, and it was placed primarily in spoil bank areas (about 6 to 8 feet high) on the south side of the navigation channel.  The spoil material consisted of an amalgamation of deltaic fine grained and organic sediments.  Since construction, the MR-GO has required periodic dredging to remove silt deposited at the bottom of the channel from a natural shoaling process from ships' waves on the bankline causing erosion of the bankline.  If this silt was left unremoved, it would reduce the canal's depth. | Penland Expert Report, p. 14; Theis Report, ¶ 9; MSJ Exh. 136, *Graci IV*; MSJ Exh. 92, Naomi Depo. 337:2-8, 338:8; MSJ Exh. 93, O'Cain Depo. 492:18-25, 493:1-25, 494:1 |
| 26. It has been a constant process or struggle over the history of the MRGO to keep it at 36 feet depth for deep draft barges and  ships. | MSJ Exh. 93, O'Cain Depo. 494:11-16 |
| 27. The soil along Reach 2 is largely silt and clay with an overlaying of peat.  When it is all mulched up by the cutterhead dredge and deposited in the spoil bank area, it is still loose material even with the water out of it. | MSJ Exh. 93, O'Cain Depo. 517:3-11 |

10

| | |
|---|---|
| 28. The porous soil materials on the spoil bank area of Reach 2 is uncompacted hydraulic fill material from the bottom. | MSJ Exh. 93, O'Cain Depo. 518:3-11 |
| 29. Over time, the original spoil bank area was at one elevation and the newer part, the 2000 feet part grew higher because of the periodic dredge material deposited on it.  The flood structures along Reach 2 were generally built on the same alignment as the newer 2,000 feet width of spoil material. | MSJ Exh. 93, O'Cain Depo. 522:5-18 |

### 4.    Adverse Effects

| | |
|---|---|
| 30. In the planning for the MR-GO, little attention was devoted to any aspects other than the engineering of the channel itself, namely the type of material to be dredged, the spoil areas in which it would be placed, the stabMSJ Exh. 72, ILITy of the cut and expected costs. In the 1959 General Design Memorandum No. 1B for the MR-GO, the effects of this massive channel on the environment of the Lake Borgne estuary and Lake Pontchartrain were addressed in a single paragraph, unsupported by data. | MSJ Exh. 56, Team Louisiana, pp. 230-31; Exhibit __ (General Design Memorandum 1B for the MR-GO (1959) |

### a.    Bank Erosion

| | |
|---|---|
| 31. At the time of designing the MR-GO, the ACE knew that there would be stabMSJ Exh. 72, ILITy problems with the channel cut.  The channel was to be dredged through relatively unconsolidated Holocene materials, primarily clays, but including an almost ubiquitous 10 feet of marsh/swamp peat at the surface and | MSJ Exh. 56, Team Louisiana, p. 234 |

11

| | |
|---|---|
| scattered deposits of sandy-silt and silty-sand at greater depths within the cut (Figure 166). The channel cut was designed with 1V:2H side-slopes. It was not expected they would stay that way very long. Concern about channel expansion appears to have been limited, however, as is seen in the General Design Memorandum discussion of the need for channel protection below.<br><br>"No channel protection is recommended initially; however, erosion due to wave wash in open areas can be expected in the upper part of the channel slope where the peat and highly organic clays are exposed. Protection for this area can be provided if and when the need for it becomes necessary. No channel protection is included in the overall cost estimate of the project."  (GDM 1B 1959, p. 5). | |
| 32. When the Army Corps was designing and constructing the MR-GO, it was aware that the banks would be subject to wave wash and the channel subject to shoaling.  The Corps was also aware that the widening of the MR-GO through bank erosion would result in marsh loss. | MSJ Exh. 93, O'Cain Depo. 515:1-5, 15-18 |
| 33. The construction of the MR-GO navigational waterway did not include any levee flood protection levees or structures construction.  The waterway construction also did not include any bank protection works (such as armoring) to provide bankline stabMSJ Exh. 72, ILITy and prevent erosion that subsequently substantially widened the canal to as much as 2000 feet or more.  This bank | MSJ Exh. 93, O'Cain Depo. 20-24; Theis Expert Report, ¶ 8 |

| | |
|---|---|
| erosion, primarily from ship generated wakes, also resulted in a substantial loss of wetlands adjacent to the canal. | |
| 34. Despite the limited vessel traffic, expansion of the channel has been rapid, between 10 and 20 feet per year on each bank, such that the top width of the channel now exceeds 2,000 feet in some reaches (Figure 163).  (At some places, repeated ACE dredging and shipwaves have widened the channel to 3,000 feet.)  This has necessitated placement of limestone boulders on the south bank where the dredged material was discharged, and upon which the Chalmette hurricane protection levee was later built, to protect the stabMSJ Exh. 72, ILITy of this structure. Until recently, the north bank was left unprotected, resulting in several openings through the shoreline of Lake Borgne. | MSJ Exh. 56, Team Louisiana, p. 234; <br><br> MSJ Exh. 72, ILIT, p. F-65; <br><br> Kemp Expert Report ¶ 31 |
| 35. The ship waves from the larger ships can reach as high as three or four feet in height in the MR-GO. Obviously that exerts an energy on the bank line.  The bank lines are basically a marsh environment with silty clay soils.  They are easily broken up by a wave.  Those soils then go into suspension in the water and settle to the bottom.  They are moved around by waves and tides again and ultimately settle to the bottom. | MSJ Exh. 93, O'Cain Depo. 495:11-23 |
| 36. Over time, the banks of Reach 2 of the MR-GO, widened several times beyond its design width of 500 feet creating an uneven shelf and encroaching upon and eating up marshland.  As the water moves laterally, it destroys marshland because of the shelves that are being created. | MSJ Exh. 93, O'Cain Depo. 496:23-498:7; 500:1-11 |
| 37. For much of the history of the MRGO, there were | MSJ Exh. 93, O'Cain Depo. |

13

| | |
|---|---|
| no rocks along this stretch of Reach 2 to stabilize the banks. | 495:1-4 |
| 38. The construction of bank stabilization works along the MR-GO would have prevented or reduced erosion, which would in turn reduce wetland loss and greatly reduce maintenance dredging.  Moreover, this reduction in dredging and placement of material in the spoil disposal area would also have a beneficial result in greatly reducing the amount of dredge effluent into the spoil disposal area. This would have benefited the spoil area by allowing more material drying to take place and also allow some of the marsh area to recuperate. | Theis Expert Report, ¶ 10 |
| 39. In 1988, the ACE wrote:  "Most of the Mississippi River Gulf Outlet is experiencing severe erosion along its unleveed banks.   The erosion is a result of both man-induced and natural forces, including combinations of channelization, ship- and wind-generated waves, storm activity, and subsidence." | Naomi Depo. Exhibit 26 at p. 10 |

**b.** **Destruction of Marshes and Cypress Forests**

| | |
|---|---|
| 40. In 1988, the ACE wrote: "The marshes along the north bank of the MR-GO have been especially hard hit by these forces and are disappearing at an alarming rate."  The north bank is the side closer to Lake Borgne. | Naomi Depo. Exhibit 26 15 p. 10; MSJ Exh. 92, Naomi Depo. 326:21-23, 327:2-4 |
| 41. In 1988, the ACE wrote: "Because erosion is steadily widening the MRGO, the east bank along Lake Borgne is dangerously close to being breached.  Once the | Naomi Depo. Exhibit 26 at p. 10; |

| | |
|---|---|
| bank is breached, the following will happen:  Sediment from Lake Borgne will flow into the channel, resulting in large increases in dredging cost to maintain the channel; development to the southwest would be exposed to direct hurricane attacks from Lake Borgne." | MSJ Exh. 92, Naomi Depo. 327:2-4 |
| 42. In 1988, the ACE wrote: "Erosion of the channel banks has caused an average loss of 211 acres of marsh per year during the 20 year period between 1968 and 1967." "Most of the lost acreage is in the marsh/estuarine area along the northeast bank [in the upper Reach 2 area near the intersection with Reach 1.]" | Naomi Depo. Exhibit 26 at p. 27; MSJ Exh. 92, Naomi Depo. 329:22-25, 330:3-5 |
| 43. In 1993, the ACE wrote:  "Since the completion of the MRGO ship channel in 1963, thousands of acres of marsh along the channel have been lost due to bank erosion and saltwater intrusion" | Naomi Depo. Exhibit  at 45 |
| 44. There are tides in Lake Borgne and Reach 2 of the MR-GO.  Under normal weather conditions, the MRGO is responsible for a minimum of 88% of the flow of tide water reaching the area at its upper end, the balance being conveyed by the Intercoastal Waterway and other bayous and canals. | MSJ Exh. 136, *Graci IV*; Powell Depo. 455:1-5 |
| 45. Since the construction of the MRGO, increased amounts of salt water have flowed into the upper reaches of the area involved in this litigation, increasing the salinity of the marsh as well as Lake Pontchartrain and Lake Borgne. | MSJ Exh. 136, *Graci IV* |
| 46. USACE construction of MRGO was destructive to the Breton Sound estuary east of the City. Dredging of the | MSJ Exh. 56, Team Louisiana, p. 227 |

| | |
|---|---|
| 680 foot channel destroyed more than 10,000 acres of marsh and swamp in the 36 mile reach that IPET (2006b) has called Reach 2. The spoil placed along the south bank buried another 18,000 acres, for a total of nearly 30,000 acres destroyed (Caffey and LeBlanc 1999). Since it was constructed, the channel width has expanded well beyond the design width – up to more than 2,000 ft in places (Figure 162) – resulting in erosion of an additional 7,000 acres of adjacent marsh (Figure 163). | |
| 47. The full environmental impacts of the MR-GO are not limited to the most proximate or obvious.  Exclusive of effects in Breton Sound, it includes conversion of 38,000 acres of low salinity to higher salinity wetlands and creation of a 64,000 acre low-oxygen 'dead zone' in Lake Pontchartrain (LPBF 2006). These are a consequence of increased intrusion of higher salinity waters from Breton Sound into the marsh and, ultimately, Lake Pontchartrain. The north bank of the channel has eroded through the south shoreline of Lake Borgne to facMSJ Exh. 72, ILITate new routes for direct tidal exchange. A significant portion of the wetlands surrounding Lake Borgne that were forced to undergo the ecological succession to more salt-tolerant marsh species did not survive the transition, converting instead to open water. The USACE New Orleans District (NOD) estimated in 1999 that the loss or severe degradation of wetlands attributable to the indirect effects of the MRGO included 1,500 acres of cypress swamps and levee forests, 3,400 acres of fresh and | MSJ Exh. 56, Team Louisiana, pp. 227-28; MSJ Exh. 72, ILIT, p. 12-8 to 12-9 |

| | |
|---|---|
| intermediate marsh, 10,000 acres of brackish marsh and 4,200 acres of saline marsh, for a total of 19,100 acres (USACE 1999). | |
| 48. Prior to construction of the MR-GO, the environmental setting for coastal wetlands in southeastern Louisiana was significantly different than at the present time. The area under consideration includes wetlands that are now deemed the Central Wetlands Unit (CWU), around Lake Borgne, and north and south of the Bayou La Loutre natural levee ridge. Prior to the construction of the MR-GO, there were extensive baldcypress – water tupelo swamps in the CWU and adjacent to the Bayou La Loutre Ridge. The semi-enclosed and protected nature of this area—and the exclusion of deadly salt water— allowed the survival of these swamps (see historic photos in Penland Report). Water budget analyses for southeastern Louisiana show that about one third of rainfall remains after evaporation (Brantley 2005, Shaffer and Day 2007). Thus, there was sufficient fresh water to maintain the baldcypress – water tupelo swamps in the CWU, so long as the system did not have a direct input of salt water. Greater than 12,000 acres of the swamps in the CWU were killed shortly after the opening of MR-GO when the U.S. Army Corps cut through the natural ridge at Bayou La Loutre and allowed salt water to move up the tidewater channel and into the Central Wetlands Unit (MSJ Exh. 56, Team Louisiana 2007). Tens of thousands of wetland acres were subsequently destroyed by the MR-GO over the | Day Expert Report, pp. 3-4 |

| | |
|---|---|
| succeeding decades leading up to Hurricane Katrina (MSJ Exh. 56, Team Louisiana 2007). | |
| 49. The construction of MR-GO directly caused the destruction of tens of thousands of acres of wetlands and led to the indirect death of tens of thousands of additional acres of wetlands.  Following the opening of MR-GO, there were significant increases in salinity in the area north of the Bayou La Loutre Ridge. This had a dramatic effect on fresh water and low salinity wetlands. | Day Expert Report, p. 11 |

### c.      The "Funnel" Effect

| | |
|---|---|
| 50. Reaches 1 and 2 of the MR-GO had an appreciable, negative effect on hurricane protection and repeated flooding through New Orleans' "back door" during Hurricanes Betsy, Camille and Katrina. | MSJ Exh. 56, Team Louisiana, p. 230 |
| 51. In 1969, the ACE was aware of the "funnel" effect at the convergence of Reach 1 and Reach 2 of the MR-GO and was told that "[t]his will cause water to funnel up Intracoastal Canal into the Industrial Canal from the Gulf of Mexico. | Naomi Depo. Exhbit 33 at p. __. |
| 52. At the same time, the ACE was advised to construct "a lock in the MRGO, Mississippi River Gulf Outlet, west of Paris Road in order to prevent hurricane surges from entering the IHNC, Inner Harbor Navigation Canal." | Naomi Depo. Exhibit 33 at p. __. |
| 53. The ACE responded to the notice of the "funnel" effect by stating:  "We have previously investigated a | Naomi Depo. Exhibit 33 at p. __ |

| | |
|---|---|
| similar plan and found the net increase in benefits was small in comparison to the increased cost if the plan would provide the  same degree of protection as the currently authorized plan." | |
| (A) | |

## B.      TOPOGRAPHY OF GREATER NEW ORLEANS AND VULNERABMSJ Exh. 72, ILITY TO HURRICANE SURGE

### 1.      Environmental Setting

| UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|
| 54. The MRGO is located wholly within the Mississippi River deltaic plain. The entire deltaic plain extending southeasterly from the confluence of the MR-GO and Gulf Intercoastal Waterway ("GIWW") consists predominantly of low elevation forested wetlands and marshes. Locally, narrow, low-elevation ridges—the natural levees of active or formerly active bayous and distributaries of the deltaic plain—separate these wetlands from one another. Within the northern part of this area, freshwater swamps dominate the landscape and are characterized by the accumulation of large amounts of highly organic sediment. | Expert Report of P. Shea Penland ("Penland Expert Report"), p. 12 |
| 55. As the ACE has stated, the southeast Louisiana coastal plain is one of "the most productive and important natural assets" in the nation. | Exhibit _____ (ACE, 1 Louisiana Control Area (LCA), Louisiana, Ecosystem Restoration Study, Final p. 1.1 (Nov. 2004) |
| 56. The Greater New Orleans area, composed of | U.S. Government |

| | |
|---|---|
| Orleans, Jefferson, St. Charles, and St. Tammany Parishes, sits in the tidal lowlands of Lake Pontchartrain and is bordered generally on its southern side by the Mississippi River. Lake Pontchartrain, a tidal basin of some 640 square miles, is connected with the Gulf of Mexico through Lake Borgne and the Mississippi Sound.   Lake Borgne is an extension of the Gulf of Mexico. | Accountability Office, Hurricane Protection : Statutory and Regulatory Framework for Levee Maintenance and Emergency Response for the Lake Pontchartrain Project (GAO-06-322T), December 15, 2005 ("GAO1"), p. 3; MSJ Exh. 92, MSJ Exh. 92, Naomi Depo. 158:15-16 |
| 57. The Gulf of Mexico has a mean tide range of about 1 ft through most of coastal Louisiana. Tropical cyclones can push storm surges of significant height into Lake Borgne, Lake Pontchartrain and other lakes and bays with catastrophic results. | IPET, p. III-13 |
| 58. Greater New Orleans (GNO) is surrounded by large estuarine embayments. Deteriorating swamps and marshes approach the city closely on all sides except to the north, where it meets the brackish waters of Lake Pontchartrain. | MSJ Exh. 56, Team Louisiana, p. 12 |
| 59. Prior to the MRGO construction, the marsh area between Lake Borgne and the Chalmette Back Levee was interlaced and interconnected by hundreds of tributaries of varying size, the largest being Bayous Bienvenue and Dupre.  Flow through these tributaries was unimpeded. Following MRGO construction, the majority of these tributaries were closed by the MRGO spoil area excepting Bayous Bienvenue and Dupre which remained unimpeded. | MSJ Exh. 136, *Graci IV* |

| | |
|---|---|
| 60. The city of New Orleans is situated along the eastern edge of the Mississippi River's deltaic plain. Broad natural levees associated with the Mississippi River, Bayou des Familles, and Bayou Metairie are the most prominent physiographic features in the area (Figure 5-1). Surface elevations are generally near sea level and range from approximately 15 ft above sea level along the crests of the Mississippi River levees to below sea level over much of the area north of the river. | IPET, p. 1-5-1 |
| 61. Much of New Orleans is located below sea level; with the Mississippi River to the south, Lake Pontchartrain to the north, and Lake Borgne to the east, the area is prone to flooding from the river, the lakes, and the Gulf of Mexico.  Development of a system to protect the city from flooding began when the city was founded in the early 1700s and has grown with the increase in population and expansion into additional flood prone areas. | The Federal Response To Hurricane Katrina: *Lessons Learned*, p. 35 |
| 62. Metropolitan New Orleans is built on subsiding swampland on the delta of the Mississippi River, which makes the city inherently vulnerable to flooding.  The City of New Orleans is shaped like a bowl, with an average elevation of 6 feet below sea level.  Some elevations are as high as 12 feet above sea level, and some elevation are as low as 9 feet below sea level.  The Mississippi River, which flows through the middle of New Orleans, is on average 14 feet above sea level, and Lake Ponchartrain, which establishes the northern border of New Orleans, is on average one foot above sea level. | A Failure of Initiative, p. 51 |

| | |
|---|---|
| 63. While the New Orleans metropolitan area has been referred to as a "bowl," it would be more accurately described as three distinct, large, urban bowls, and one very thin, elongated, predominantly rural bowl. These four areas are known as polders: (1) Orleans East Bank, (2) New Orleans East, (3) Ninth Ward/St. Bernard, and (4) Plaquemines Parish. | *A Nation Still Unprepared*, Chapter 4-3 |
| 64. Elevations in the marsh are generally at or below mean sea level (msl), never rising above 2 feet above msl. Elevations in the remaining Chalmette area range from 0 to 4 feet above msl. The marsh area, excepting the MR-GO spoil bank, is completely inundated with tides of 2.6 feet or greater. | MSJ Exh. 136, *Graci IV* |
| 65. The only natural high land, up to 15 ft above mean sea level (MSL), is found adjacent to the Mississippi River, and to a lesser degree on abandoned channels and crevasse deposits that provide the only relief from the low-lying and hummocky bottoms of reclaimed swamps and marshes (Figure 6). The former wetlands that make up most of the city have responded to drainage by sinking to greater or lesser degrees, but generally from 5 to 10 ft below MSL. Higher areas (5 to 10 ft MSL) along the Lake Pontchartrain shoreline and adjacent to navigation channels like the Inner Harbor Navigation Channel (IHNC), the Gulf Intracoastal Waterway (GIWW) and Mississippi River Gulf Outlet (MRGO) have been formed artificially by placement of dredged sediments beginning in the 1920s. | MSJ Exh. 56, Team Louisiana, p. 12-13 |
| 66. The MRGO is bordered on the northeast for | MSJ Exh. 136, *Graci IV* |

| | |
|---|---|
| approximately 16 miles by Lake Borgne which has a surface area of approximately 350 square miles but a relatively shallow depth of 3 feet to 25 feet maximum. Lake Borgne is fed directly from the Gulf of Mexico via the Mississippi Sound (through a six mile wide water course). | |
| 67. The highest storm surges that have caused flooding in the GNO since Hurricane Betsy have always come from Lake Borgne rather than Lake Pontchartrain. | MSJ Exh. 56, Team Louisiana, p. xii; MSJ Exh. 92, Naomi Depo. 179:13-15 |
| 68. The largely sedimentary geology of southeast Louisiana poses major challenges to engineers and urban planners. Soils in the area consist of geologically young sedimentary layers deposited by riverine flows during the last 10,000 years. Geologically, the area is predominately classified as Holocene alluvium and Holocene coastal marsh. Soils generally contain a high percentage of organics and voids and thus tend to compact when loads are applied. | IPET, p. III-13 |
| 69. The geology of New Orleans contributed to the destruction of New Orleans during Katrina, not just because much of it lies below sea level, but because the soils that underlie it imposed significant challenges for engineers designing and constructing the HPS. | MSJ Exh. 56, Team Louisiana, p. 18 |
| 70. Ninety percent of the GNO is covered by highly organic and unconsolidated swamp or marsh deposits that are characterized from an engineering standpoint as poorly | MSJ Exh. 56, Team Louisiana, p. 23 |

23

| | |
|---|---|
| suited to support the loads imposed by adding buildings or levees or other structures to the surface.  As a consequence, virtually every building built in New Orleans today is supported by pilings or piles that are driven into the ground as much as 150 feet. | |

### 2.      <u>Constant Threat From Hurricane Surges</u>

| | |
|---|---|
| 71. The greatest natural threat posed to the New Orleans area continues to be from hurricane-induced storm surges, waves, and rainfalls. Several hurricanes have struck the area over the years including Hurricane Betsy in 1965, Hurricane Camille in 1969, and Hurricane Lili in 2002. The hurricane surge that can inundate coastal lowlands is the most destructive characteristic of hurricanes and accounts for most of the lives lost from hurricanes. Hurricane surge heights along the Gulf and Atlantic coasts can range up to 20 feet or more and there is growing concern that continuing losses of coastal wetlands and settlement of land in New Orleans has made the area more vulnerable to such storms. Because of such threats, a series of control structures, concrete floodwalls, and levees was proposed for the area along Lake Pontchartrain in the 1960s. | GAO2, p. 2; Naomi Depo. Exhibit 24, p. 1 |
| 72. A hurricane is the strongest form of a "tropical cyclone," the term used to describe weather systems that develop over tropical or sub-tropical waters with organized | A Nation Still Unprepared, Chapter 3-1 |

| | |
|---|---|
| thunderstorms and a well-defined eye.  Most Atlantic hurricanes begin as atmospheric waves that move westward from Africa across the tropical North Atlantic and Caribbean Sea. | |
| 73. A storm surge, rather than being a wall of water, is a dome-like water increase, centered under the eye of the storm, which diminishes gradually in all directions from the center.  Its fore-runners are the tidal rises preceding the hurricane's advance and the water height gradually increases as the highest winds and lowest barometric pressures approach a land mass. | MSJ Exh. 136, *Graci IV* |
| 74. You can put more surge through a wider body," said Thomas Sands, a retired corps general who headed the New Orleans district.  "When I was district engineer, the erosion along the MR-GO was horrible."  Henry "Junior" Rodriguez, president of St. Bernard Parish, said that the heavy flooding that topped his community's levees during Katrina was far worse than during Hurricane Betsy in 1965.  "Listen, we didn't even have levees during Hurricane Betsy and the flooding wasn't as bad," Rodriguez said. | MSJ Exh. 72, ILIT, p. F-65 |
| 75. Louisiana is more vulnerable to hurricanes and major flooding than any other state.  Prior to Katrina, 70 percent of the population lived on 36 percent of the land, much of which is at or below sea level. This includes portions of cities such as New Orleans, Houma and Morgan City. It has been known for at least a decade that the bulge of water, or "surge," pushed ashore by a Saffir- | MSJ Exh. 56, Team Louisiana, p. 1 |

| | |
|---|---|
| Simpson Category 3 hurricane, approaching at a range of speeds from a number of directions, could overtop New Orleans flood defenses on both the east and west banks of the Mississippi (van Heerden 1999, Times-Picayune 2002, IEM Inc. 2004, Brouwer 2003). | |
| 76. The waters of the IHNC enjoyed free exchange with Lake Pontchartrain through the passage at Seabrook, and with the GIWW at their intersection.  In addition, the waters of the MRGO enjoyed free exchange with Lake Borgne through the hundreds of tributaries connecting the two.  The waters of the GIWW later enjoyed free exchange with the Mississippi Sound and the IHNC and were joined by the MRGO southeast of Paris Road. | MSJ Exh. 136, *Graci IV* |
| 77. At the time of the LPV's enactment in 1965, Congress and the ACE were aware that:  "The eastern portion of the area is also subject to flooding by surges and waves that move directly from Lake Borgne, overtopping the existing inadequately protected systems [40 Arpent Canal] seaward of the developed land areas.  As a result, residences and industrial commercial establishments suffer damage.  Business activities are disrupted, lives endangered, and hazards to health created.  From Lake Pontchartrain all the way down past Lake Borgne on the east to where it turns back towards the Mississippi River is the eastern portion of the project and this area is subject to flooding during hurricanes." | MSJ Exh. 92, Naomi Depo. 156:4-10; MSJ Exh. 9, House Doc. No. 231 at p. _____ |
| 78. Prior to Hurricane Katrina, the ACE knew that Lake | MSJ Exh. 56, Team Louisiana, |

| | |
|---|---|
| Borgne was historically a pathway for hurricane storm surge to enter St. Bernard Parish and other areas of Greater New Orleans.  One conspicuous example was the flooding that occurred during and after Hurricane Betsy in 1965. | p. 1; *Decision-Making Chronology*, p. __ |

### C.       HURRICANE BETSY

| UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|
| 79. New Orleans is particularly vulnerable because of its location and topography.  The majority of the metropolitan area is below sea level.  Over the years, the city has continued to sink, due to drainage, subsidence, and compaction of the soils. As an example of previous damage, Hurricane Betsy brought extensive destruction to New Orleans when it made landfall in Louisiana in September, 1965.  Unfortunately, many of the descriptions and photos from Hurricane Betsy sound and look familiar to our nation as it considers the damage from Hurricane Katrina, forty years later. According to USACE's after action report on Hurricane Betsy: <br> 'She left in her wake a path of devastation unparalleled by any other storm in the recorded history of Louisiana. <br> 'Betsy inundated over 5,000 square miles in Louisiana, including highly populated urban areas in Orleans and St. Bernard Parishes. <br> 'Extensive flooding was caused by overtopping and breaching of existing protection levees in Orleans, Plaquemines, and St. Bernard Parishes. <br> 'As Betsy's winds and tidal surge rolled inland, entire | A Failure of Initiative, pp. 87-88 |

| | |
|---|---|
| buildings were swept away from their foundations and floated as far as 10 miles away.<br>'Betsy left 81 dead, over 17,600 injured, and caused the evacuation of 250,000 to storm shelters.<br>'Betsy left thousands homeless in south Louisiana. Returning refugees often found only a pile of debris where their homes had stood just days before.<br>'Betsy left numerous towns in south Louisiana with no means of communication.' | |
| 80. There was catastrophic flooding of the GNO region as a result of Hurricane Betsy.  And 40 years later, almost to the day, there was catastrophic flooding of the same general area in Orleans and St. Bernard Parishes as a result of Hurricane Katrina. | MSJ Exh. 92, MSJ Exh. 92, Naomi Depo. 252:14-21 |
| 81. Hurricane Betsy made landfall as what we would now call a Category 3 storm near Grand Isle during the last hours of September 9, 1965, and tracked south of New Orleans following the west bank of the Mississippi River. It caused disastrous flooding in New Orleans East, the Lower 9th Ward, parts of St. Bernard and in eastern parts of the Orleans Metro area (Figure 175). Flooding depths in parts of the Lower 9th Ward, and in several neighborhoods west of the IHNC and south of the Gentilly ridge, reached up to 8 feet.  Flooding resulted from overtopping and breaches of levees and floodwalls along the IHNC and GIWW, and the 40 Arpent Levee in St. Bernard (USACE 1965). Flooding in New Orleans and St. Bernard resulted from a surge that rose in Lake Borgne. This is illustrated | MSJ Exh. 56, Team Louisiana, pp. 240-241; MSJ Exh. 136, *Graci IV* |

| | |
|---|---|
| by a comparison of gage data from the MRGO at Paris Road and the IHNC at Seabrook near the opening to Lake Pontchartrain. The MRGO at Paris Road reached 10 feet (NGVD29), while the IHNC near the Lake peaked 4 feet lower, at about 6 feet. | |
| 82. During Hurricane Betsy, high water marks in the IHNC were up to 10 feet (NGVD29) opposite the MRGO junction and south toward the lock, the same as the Paris Road gage peak (USACE 1965). Floodwall and levee breaches on the IHNC occurred in essentially the same locations, albeit on lower structures, as they did 40 years later during Katrina. | MSJ Exh. 56, Team Louisiana, p. 241 |
| 83. Lake Pontchartrain, under the effects of northerly winds was the first water body to influence the water levels in the Industrial Canal via Seabrook and provided early high water levels at the south end of the Industrial Canal. Lake Borgne, under the stress of northeasterly winds, was next affected and provided additional flooding into the Industrial Canal.  This is borne out through the fact that the salinity at Seabrook was the same as Lake Borgne and not Breton Sound, indicative of Lake Borgne as the origin of the waters.  Salinity levels of the waters in Chalmette were similarly indicative of Lake Borgne as the water's origin. | MSJ Exh. 136, *Graci IV* |
| 84. Levee failures in the Industrial Canal area during Hurricane Betsy were caused by overtopping of the levees from storm-driven waters originating in Lake Borgne and carried to the Industrial Canal over the open marsh and through the Gulf Intercoastal Waterway. | MSJ Exh. 136, *Graci IV* |

| | |
|---|---|
| 85. Many people contend that the MR-GO played a prominent role developing the flooding of St. Bernard Parish and East New Orleans during Hurricane Betsy in 1965). Before, during, and after construction of the MR-GO (48 years), many concerns were expressed regarding the effects of this canal on the adjacent wetlands and on its potential focusing effect on storm surge propagation into the IHNC. | MSJ Exh. 72, ILIT, pp. 12-8 to 12-9, F-1 |
| 86. Hurricane Betsy provided a "wake-up call" that should have alerted USACE designers developing the GNO HPS that the original plan developed in the 1950s - prior to MRGO construction - was too exclusively oriented toward a Lake Pontchartrain surge. Hurricane Camille [in 1969] provided yet another demonstration of the way a Lake Borgne surge would outflank this protection scheme. This clear warning went unheeded by the ACE and no remedial measures were undertaken – for the intervening 40 years before Hurricane Katrina. Currently, designs are being developed to overcome the shortcomings of this "Maginot Line." The barriers originally proposed for two of the Lake Pontchartrain passes are being augmented with a third to address surge arising in the funnel. Most concepts include a levee through Lake Borgne to break up the funnel geometry, with a gate on the GIWW and possibly a second to accommodate drainage and shallow-draft traffic on a deauthorized MRGO. | MSJ Exh. 56, Team Louisiana, p. 253; Kemp Expert Report, ¶ 51 |
| (C) | |

D.        **LAKE PONTCHARTRAIN AND VICINITY
          HURRICANEPROTECTION PROJECT ("LPVHPP")**

1.        **Congressional Mandate**

| | |
|---|---|
| 87. The greatest natural threat posed to the New Orleans area is from hurricane-induced storm surges, waves, and rainfalls. Because of this threat, a series of control structures, concrete flood walls, and levees was proposed by the ACE for the area along Lake Pontchartrain in the 1960s. In fact, the planning process was begun as early as 1955. Congress first authorized the construction of the Lake Pontchartrain and Vicinity, Louisiana Hurricane Protection Project ("LPVHPP" or "LPV") in the Flood Control Act of 1965 to provide hurricane protection to areas around Lake Pontchartrain in Orleans, Jefferson, St. Bernard, and St. Charles Parishes. | GAO 1, p. 3; MSJ Exh. 92, Naomi Depo. 170:19-22 |
| 88. Congress authorized the Lake Pontchartrain project in 1965, substantially in accordance with a Chief of Engineers report (House Document No. 231), to protect the areas around Lake Pontchartrain from flooding caused by storm surge or rainfall associated with a Standard Project Hurricane ("SPH"). For the coastal region of Louisiana, an SPH was expected to have a frequency of occurrence of once in about 200 years, and the SPH represented "the most severe combination of meteorological conditions considered reasonably characteristic for the region." According to the Chief of Engineers report (House Document No. 231), an SPH was selected as the design hurricane because of the | GAO1, p. 4; *Decision-Making Chronology*, pp. 2-3 to 2-17 (Chronology of Key Project Decisions and Events), 2-21, 2-27 to 2-28, 2-29 (Map 2-2); MSJ Exh. 92, Naomi Depo. 144:3-8; IPET, p. III-35; MSJ Exh. 56, Team Louisiana, p. 95; MSJ Exh. 9, House Doc. No. 231 |

| | |
|---|---|
| urban nature of the area.  The legislation was enacted a month after Hurricane Betsy.  Upon receipt of the funds in 1966, construction of the system began shortly thereafter. | |
| 89. House Document No. 231 recommended: "Construction of a new levee extending from the Inner Harbor Canal along the south side of the Gulf Outlet Channel to Bayou Dupre; thence, westward to the Mississippi River levee at Violet; together with rip-rap slope protection along the navigation channel and flood gates and strengthening of the existing floodwall at Mandeville on the north shore." | MSJ Exh. 9, House Doc. No. 231, p. __ (Paragraph 12). |
| 90. The Corps was responsible for project design and construction of the approximately 125 miles of levees, with the federal government paying 70 percent of the costs, and state and local interests paying 30 percent. Each of the four parishes protected by the project is associated with a local levee district that is generally composed of state-appointed officials and is considered a state entity. Specifically, Orleans Parish is associated with the Orleans Levee District, Jefferson Parish is associated with the East Jefferson Levee District, St. Bernard Parish is associated with the Lake Borgne Levee District, and St. Charles Parish is associated with the Pontchartrain Levee District. These levee districts are the local sponsors of the project. | GAO1, pp. 3-4 |
| 91. The project, when designed, was expected to take about 13 years to complete and cost about $85 million. Although federally authorized, it was a joint federal, state, and local effort. | GAO2, Highlights United States Government AccountabMSJ Exh. 72, ILITy Office |

| | Army Corps Of Engineers History of the Lake Pontchartrain and Vicinity[sic] Hurricane Protection Project (GAO-06-02445), November 9, 2005 ("GAO2") |
|---|---|
| 92. The Lake Pontchartrain and Vicinity project two employed generations of USACE employees and contractors at an estimated total cost of more than $700 million, while consuming nearly $200 million in state and locally generated funds. Prior to Katrina, it was estimated to be about 85 percent constructed, but was not expected to reach completion until 2015 – 50 years after Congressional authorization of the LPV. | MSJ Exh. 56, Team Louisiana, pp. ii, xi |
| 93. The LPV as originally envisioned ended at the levee along the MRGO at Bayou Dupre.  A supplemental report was done at the request of the people in St. Bernard to extend the levee southward, and that extension was approved.  The new definition of the project supplanted the route along Violet Canal, and it was taken out of the plan. | MSJ Exh. 92, Naomi Depo. 146:15-25, 147:1, 149:6-10 |

## 2.   Standard Project Hurricane

| | |
|---|---|
| 94. In the Flood Control Act of 1965, Congress authorized the ACE to design and construct a hurricane flood protection system ("HFPS") to protect against what the ACE called a standard project hurricane ("SPH").  SPH is based on a series of assumptions using historical data developed by the ACE. | Deposition of Richard Varuso ("Varuso Depo."), 32:19-21 |

| | |
|---|---|
| 95. The Corps' New Orleans District (the District) completed an "Interim Survey Report" for the LP&VHPP in 1962, after seven years of planning, that outlined a comprehensive plan for preventing flooding in the Greater New Orleans area resulting from the "Standard Project Hurricane" (SPH). The original project plan, termed the "Barrier Plan," included floodgates (surge barriers) in the passes to Lake Pontchartrain to prevent SPH-driven surges from entering the lake. The planned barriers were meant to reduce the "stillwater" surge heights along the lakefront. Barrier-dampened hurricane surges would then be contained by the existing local levees along the three outfall canals that penetrated into metro New Orleans from Lake Pontchartrain.  The barrier complexes were to be accompanied by levees and floodwalls in other locations designed to withstand SPH surges. | Wooley and Shabman, Decision-Making Chronology For The Lake Pontchartrain & Vicinity Hurricane Protection Project Draft Final Report For The Headquarters, U.S. Army Corps Of Engineers Submitted To The Institute For Water Resources Of The U.S. Army Corps Of Engineers ("Decision-Making Chronology"), p. ES-6 |
| 96. The Corps planners for the LPV came up with the maximum surge heights for SPH dimensions.  That figure became a basic calculation that was part of the determination of what the design grade (elevation) level would be for these levees. | MSJ Exh. 92, Naomi Depo. 181:7-14 |
| 97. The ACE told Congress that the "[t]he occurrence of an SPH for any location in the study area would produce maximum surge heights of 11.2 feet along the south shore of Lake Pontchartrain, 12.5 feet in Mandeville, 11.9 feet in the Chalmette area, 12.5 feet at the Citrus in New Orleans East Back Levees, and 13 feet in the Rigolets and Chef Menteur Pass. | MSJ Exh. 9, House Doc. No. 231, p. 46 |

| | |
|---|---|
| 98. In designing a hurricane flood protection system, the planners must take into account the nature of the area to be protected (for example, urban or agricultural), local weather conditions, topography, geomorphology and historical flooding. The "priceless" value of a large populated area dictates maximum protection consistent with available funding. | Dalrymple Depo., 155:24-25, 156:1-25, 157:1-25, 158:1-25, 159:1-17 |
| 99. The ACE claims that it built the HFPS mandated authorized in the Flood Control Act of 1965—known as the Lake Pontchartrain and Vicinity Hurricane Protection Plan ("LPVHPP") project—to the SPH criteria for New Orleans mandated by Congress. For a variety of reasons, the concept of storms much more intense than the SPH was not allowed to explicitly enter the engineering process even though the development of the SPH also involved a probable Maximum Hurricane (PMH) (National Weather Service 1979): "The PMH is a hypothetical steady state hurricane having a combination of values of meteorological parameters that will give the highest sustained wind speed that can probably occur at a specified coastal location. One of several possible uses of the values of meteorological parameters is to compute maximum storm surge at coastal points when the hurricane approaches along the most critical track." The PMH was recognized in the general design plan for the Lake Pontchartrain Project (House Doc. 231, 89th Congress, 1st Session, July 6, 1965, p. 47), but not applied by the ACE in designing and construction of the LPVHPP. | Dalrymple Depo., 51:2-5 |

### 3.   Description Of The Hurricane Flood Protection System

| | |
|---|---|
| 100.      In development of the NOFDS [New Orleans Flood Defense System], the Corps of Engineers had the primary responsibMSJ Exh. 72, ILITies for development of the concepts, design, and construction (Collins 2005; National Academy of Engineering 2006). | MSJ Exh. 72, ILIT, p. 12-3. |
| 101.      The hurricane protection system ("HPS") of Greater New Orleans consists of a number of areas, or polders, completely surrounded by levees.  [Two of them include:] First, New Orleans East, which is bounded on the northwest by a variety of levees:  at the northwest corner of the polder, the New Orleans Lakefront Levee, then further east along Lake Pontchartrain shoreline, the Citrus Lakefront Levee, and the New Orleans East Lakefront Levee.  From the northeast corner going south, the levee is the New Orleans East Levee, then along the Gulf Intracoastal Waterway (GIWW) there is the New Orleans East Back Levee.  Moving to the west, there is the Citrus Back Levee that connects to the Inner Harbor Navigational Canal (IHNC) Levee.  These levees are of a variety of different constructions:  earthen levees along the lakefront, floodwalls embedded in levees along the IHNC, and a variety of earthen levees, sheetpile flood walls and concrete floodwalls along the GIWW.  Further, their elevations differ—even when side-by-side. 102.      Second, the Lower Ninth Ward and St. Bernard Parish are within another polder, surrounded by levees.  The western portion of this polder is formed by the | Dalrymple Expert Report, pp. 5-6, Decision-Making Chronology, pp. 2-2 (Map 2-1), 2-24 (Map 2-3) |

| | |
|---|---|
| I-walls of the IHNC, which is also known as the Industrial Canal.  The polder is bounded on the north side by the earthen levees on the south side of the GIWW, and along the east side of the earth/sand levee of the Mississippi River Gulf Outlet (MRGO).  The south end of the polder is protected by a levee that connects the MRGO levees in the vicinity of Verret to those on the Mississippi River, connecting near Caernarvon.  The entire polder is divided between the populated area to the southwest and the unpopulated wetlands to the northeast by the 40 Arpent Levee.  Further, the Violet Canal, connecting the town of Violet to the MRGO, is flanked by levees in the populated areas. Again, these levees in and around the Lower Ninth Ward and St. Bernard Parish are of a variety of different construction types and elevations. | |
| 103.       The New Orleans Flood and Hurricane Protection System ("System") is complex and massive, consisting of a highly irregular layout of 350 miles of levees, which are embankments, usually earthen, that serve as flood barriers.  The System also includes floodwalls, hundreds of bridges, closable gates, culverts and canals that facMSJ Exh. 72, ILITate transportation in and out of the system.  It is comprised of a series of four main compartmented basins designed to limit the flooding impacts on the entire system resulting from individual failures of levees and floodwalls.  In addition, large pump stations are used to pump out and redirect water from the city.  These pumps are designed to mitigate flooding that | The Federal Response To Hurricane Katrina: *Lessons Learned*, p. 35; IPET, pp. IV-256 to IV-257 |

| | |
|---|---|
| results from significant rainfall and can, over time, remove water from moderate overtoppings. | |
| 104.       After authorization of the Barrier Plan in 1965, the NOD set out to develop the detailed engineering designs for plan features, secure the required funding, acquire land rights needed for project implementation, and construct project features.  At the time of authorization, the District estimated that the project would be completed by the mid-to-late-1970s. | Decision-Making Chronology, p. ES-6 |
| 105.       The integration of a large, free-flowing ship channel (the MR-GO) into the GNO HPS clearly posed a great hazard to the City, yet never led to a proposal for the flood gate that IPET (2006b) has since found was so obviously needed.  "The Reach 1 GIWW/MRGO section is very important in determining the magnitude of the storm surge that reaches the IHNC from Lake Borgne and Breton Sound. If the hydraulic connectivity between Lake Pontchartrain and Lake Borgne is eliminated at a point within this section of channel, tide or surge to the west of this point will become primarily influenced by conditions in Lake Pontchartrain" (IPET 2006b, IV-6-2). | MSJ Exh. 56, Team Louisiana, pp. 252-53 |
| 106.       Soon after authorization, the planned surge barriers at the passes to Lake Pontchartrain met with opposition from certain state government elected officials, congressional representatives, and various local citizen and interest groups.  Years of litigation halted the construction of the surge barriers at the passes to Lake Pontchartrain.  However, design and construction of the floodworks in the | Decision-Making Chronology, p. ES-7 |

| | |
|---|---|
| Chalmette Loop and New Orleans East Loop (except along the lakefront) were not affected by the litigation. | |
| 107.   In 1985, well after the original date projected for project completion, the ACE Director of Civil Works approved replacing the barriers with increased levee heights along the lakefront (the "High Level Plan").  No other aspects of the original LPVHPP plan were reevaluated or modified; construction in those locations proceeded in accordance with the original designs as modified after Hurricane Betsy. | Decision-Making Chronology, p. ES-7 |
| 108.   The navigation structure at Bayou Bienvenu and at Bayou Dupre is a scepter gate that closes when there is a high tide or a storm surge to keep the water out of the protected area.  The structure also allows boat traffic to come in and out of the MR-GO into the bayou. | MSJ Exh. 92, Naomi Depo. 330: 2-11, 330:24-25, 331:1-2; Dalrymple Depo. 66:4-23 |

### 4.   Design Grade Elevations

| | |
|---|---|
| 109.   The definition of Standard Project Hurricane is as follows:  "A hurricane that may be expected from the most severe combination of meteorological conditions that are considered characteristic of the region involved." | MSJ Exh. 9, House Doc. No. 231 at p. 20 |
| 110.   A SPH has a wind speed roughly equivalent to the wind speed of a Category 3 hurricane on the Saffir-Simpson Scale. | MSJ Exh. 72, ILIT, p. 12-11; Varuso Depo. 49:5-10; MSJ Exh. 56, Team Louisiana, p. 96; Dalrymple Depo., 49:5-10 |
| 111.   The "standard project hurricane" is a statistical compilation of many combined hurricane parameters or characteristics intended to simulate a natural | A Failure of Initiative, p. 89 |

| | |
|---|---|
| hurricane occurrence in southeast Louisiana. The standard project hurricane was used not only for the Lake Ponchartrain project, but also nationwide for all hurricane protection projects where the loss of human life is possible. | |
| 112.      The Weather Bureau provided storm parameters, including minimum central pressure (CPI), rate of movement (translation) and maximum sustained wind speed at landfall. The USACE had to carry out oceanographic analyses of the combined tide, surge and wave conditions that would be generated by an SPH approaching the city at a range of speeds from all possible directions. This conversion of the wind storm into an oceanographic phenomenon was based on theory, experience with past storms, and the computational technology available at the time. Finally, engineers had to make allowances for uncertainties and changes that might be expected over the lifetime of the project, particularly subsidence or settling, in order to establish the "design elevation of protective structure"—the required crown height for each levee or floodwall reach. Once this elevation was decided, the engineers would choose the structure type, whether a floodwall or levee, and ensure that it could resist all static and dynamic loads with water to the top. | MSJ Exh. 56, Team Louisiana, p. 96 |
| 113.      Still water levels are used in determining the design grade level (i.e., crown height or elevation) of a specific section of flood protection works.  Typically, an additional two or three feet for wave run-up is added to the stillwater elevation to determine the final design grade level. | Varuso Depo., 24:8-25; 26:13-17; MSJ Exh. 9, House Doc. No. 231, p. 61 |

| | |
|---|---|
| 114.　　After conducting technical studies and reviewing historical hurricane data, the ACE performed calculations for various locations in GNO to determine still-water levels (including wave run-up and settlement). | Varuso Depo., 24:18-25; 33:2-10 |
| 115.　　Still water is not calm water, but rather the surge elevation without waves for the SPH based on hydraulic and hydrologic analysis—the elevation of the water in NGVD that the SPH storm would produce. | Varuso Depo., 63:5-25; 64:1; MSJ Exh. 92, Naomi Depo. 165:6-13 |
| 116.　　In complying with the Congressional mandate to build a hurricane protection system commensurate with the Standard Project Hurricane, a still water level for Reach 2 and Reach 1 of the MR-GO was determined at around 12.5 to 13 feet.  The still water during a hurricane is assumed to be about 13 feet.  The planners provided a further measure or margin of safety by adding more height—in this case about four and a half feet. | MSJ Exh. 92, Naomi Depo. 166:8-23, 169:4-9 |
| 117.　　After the plans were done, the design grade level was always 17.5 feet for the Reach 1 and Reach 2 of the MRGO.  The 17.5 design grade is after settlement. | MSJ Exh. 92, Naomi Depo. 169:17-20, 170:3-11 |
| 118.　　Between Paris Road and Violet where wave action will occur, an allowance varying from 4.3 to 4.7 feet was made for computed wave run-up, yielding a net grade of 17.5. | Naomi Depo. Exhibit 17, P. 8 |
| 119.　　After Congress approved the project, the ACE made upward grade revisions for the Citrus Back Levee, the area west of Paris Road was increased one foot, from 13 to 14 feet; the area east of Paris Road was increased from 16 to 18 feet; and the New Orleans East Back Levee was | MSJ Exh. 92, Naomi Depo. 221:3-25, 222:1-6 |

| | |
|---|---|
| increased a foot and a half, from 16 to 17 and a half feet. That remained the design grade level thereafter. | |
| 120.    The ACE has set a post-Katrina design grade for the MR-GO Reach 2 structures of about 26-27 feet. That is the design elevation that provides protection for the 100 year surge elevation. | Powell Depo. 442:4-25, 443:1-25, 444:1-24, 445:1-13 |
| 121.    NGVD stands for National Geodetic Vertical Datum.  In 1967, zero NGVD would be approximately mean sea level. | Varuso Depo., 34:14-19 |
| 122.    The design grade of SPH selected by the ACE assumed no overtopping. | Varuso Depo., 67:3-8 |
| 123.    The ACE interpreted the Congressional mandate for the HFPS to design the flood protection works "to hold back water at a given still-water elevation, not for overtopping." | Varuso Depo., 61:6-9 |
| 124.    The ACE contends that Congress never authorized the ACE to construct flood protection works for the HFPS that would protect against overtopping above the authorized design grade for SPH. | Varuso Depo., 61:16-25; 62:1-9 |

### 5.    ACE Fails To Revise HFPS Designs Consistent With Changes in SPH Criteria

| | |
|---|---|
| 125.    Wind speed has a disproportionately large effect on surge. If all other factors are kept constant, for example, an increase in wind speed from 105 to 115 mph (9.5 percent) could add an additional 3 feet to a 15 foot surge on the MRGO levee, for a 20 percent increase. | MSJ Exh. 56, Team Louisiana, p. 107 |
| 126.    IPET obtained a similar result when testing | MSJ Exh. 56, Team |

| | |
|---|---|
| the sensitivity of the ADCIRC surge output to 5 percent increases or decreases in wind speed. A 5 percent reduction or increase in wind speed in the vicinity of the MRGO levee resulted in a 1.5 foot change in the surge elevation (IPET 200b, IV-140,141). The difference between the maximum wind velocities associated with the 1959 and 1972 SPHs, 107 and 129 mph, respectively, is 21 percent. If all other variables are again held constant, the general wind tide equation predicts that a 21 percent increase in wind velocity would cause surge to increase on the MRGO levee by 6.5 ft, or 41 percent (Figure 81). The differences between the 1959 and 1979 SPHs would have resulted in a significant increase in expected SPH surge heights. Most importantly, the NOD admitted in 1976 to the GAO that they needed to raise levee heights because of the 1972 SPH change, but then appear not to have taken action. | Louisiana, p. 109 |
| 127.      For the ACE SPH evolved to represent the most severe storm the Government should guard against when designing hurricane protection projects. The SPH came to represent not only a method for comparative assessment of storm risks between geographic areas, but also a design standard that carried its own assurance of adequate reliabMSJ Exh. 72, ILITy. For a variety of reasons, the concept of storms much more intense than the SPH was not allowed to explicitly enter the engineering process. | MSJ Exh. 72, ILIT, p. 12-13; Bea Expert Report ¶ 157 |
| 128.      The SPH was adopted in the 1960s and never updated by the ACE before Hurricane Katrina. | Varuso Depo., 215:8-15 |

| | |
|---|---|
| 129.    Doubts about the adequacy of the original project designs were soon raised by the experience of Hurricane Betsy in 1965.  While Hurricane Betsy had wind speed and central pressure parameters very similar to those chosen to define the design hurricane (SPH), Betsy's wind fields and associated wave action called into question the adequacy of the original design heights for project levees and floodwalls. Accordingly, the District requested and received permission from the Division and Corps Headquarters to increase structure heights by 1-2 feet across the project network. | Decision-Making Chronology, p. ES-6 |
| 130.    The evolution of the Standard Project Hurricane shows that this level of protection was known by the ACE to be inadequate by at least the early 1970s. | MSJ Exh. 56, Team Louisiana, p. xii. |
| 131.    The GNO HPS was not properly conceived to accomplish the 1965 Congressional mandate to protect against the "most severe combination of meteorological conditions reasonably expected."  "The initial meteorological and oceanographic analysis based on the 1959 U.S. Weather Bureau 1 in 100 year Standard Project Hurricane (SPH) was known to be obsolete by 1972, just as construction of initial parts of the GNO HPS was getting underway. The primary deficiency of the 1959 SPH was in the specification of maximum sustained wind speed, which the National Weather Service (NWS) had increased by 20 percent, from 107 to 129 mph. The steady-state analytical approach used by the USACE to develop surge estimates was as sensitive to the effect of wind velocity as later | MSJ Exh. 56, Team Louisiana, p. iv |

| | |
|---|---|
| numerical modeling approaches (i.e. SLOSH or ADCIRC), and should have alerted the USACE to the danger of underestimating wind speed. This analysis provided a design basis for setting the minimum heights above mean sea level for levee and floodwall crowns to resist overtopping by combined SPH waves and surge.  A 20 percent underestimate of maximum winds can lead to a 40 percent reduction in the predicted surge elevation. In 1979 the NWS raised the maximum sustained winds to 140 MPH, a category 4 hurricane. | |
| 132.      The New Orleans District USACE was aware of this deficiency in the original analysis, as is indicated by testimony in 1976 and 1982 General Accounting Office (GAO) reports.  However, it never revised the original SPH-based analysis to reflect the new understanding of the threats, even after being ordered to do so by the Chief of Engineers in 1981 (ER 1110-2-1453). | MSJ Exh. 56, Team Louisiana, p. iv; Bea Expert Report ¶ 159 |
| 133.      The U.S. Weather Bureau, and its successor the National Weather Service, redefined SPH parameters for the Gulf Coast in 1965, 1968, 1972 and 1979 (Graham and Nunn 1972, Schwerdt et al. 1979) to reflect the increase in experience and understanding regarding extreme hurricanes, particularly Hurricanes Audrey (1957), Carla (1961) and Camille (1969). The categories of the Saffir-Simpson Scale were not introduced until 1971 (Table 5), but can be applied if the 5-minute average wind speeds in the 1959 report and the 10-minute averages in the 1972 and 1979 report are converted to 1- minute averages (Table 5). | MSJ Exh. 56, Team Louisiana, p. 98 |

| | |
|---|---|
| 134.      The design assumptions for the GNO HPS remained static despite growing scientific evidence that the threat posed by surge was actually far greater than originally estimated. Design histories for individual HPS elements showed a pervasive trend over time toward substitution of less reliable structures for more conservative designs. On a regional perspective, management of the Lake Pontchartrain and Vicinity project led, over time, to ever greater departures from the overall objective of the original authorization: to protect against the "the most severe meteorological conditions considered reasonably characteristic for that region." This Congressional objective could be read as a mandate for continual reevaluation and adjustment. | MSJ Exh. 56, Team Louisiana, p. ix; Bea Expert Report ¶ 159 |
| 135.      The SPH is often referred to as the "design storm," but this is misleading. First, it is a hypothetical construct rather than any single storm. Second, the storm-generated oceanography sets minimum, rather than maximum, criteria for the crown elevation of levees and floodwalls relative to mean sea level. Over time, however, the SPH increasingly was conflated with the design itself in USACE General Design Memoranda (GDMs) and in the culture of the New Orleans District. Indeed, discussion of the SPH "design storm" continues to permeate the IPET post-Katrina analyses, as we read, for example, that "the surge exceeded design criteria, but the performance was less than design intent" (IPET 2006b, I-3).  The designers initially understood that the SPH was only one factor to be | MSJ Exh. 56, Team Louisiana, p. 96 |

| | |
|---|---|
| considered, but this holistic view appears to have been lost later as the SPH became enshrined as the 1965 "authorized level of protection." | |
| 136.      The 1959 SPH was just one stop on a learning curve for the meteorologists. For the USACE, however, the 1959 SPH became the "design storm." Following Hurricane Camille in 1969, the Weather Bureau began a serious re-evaluation that led in 1972 and 1979 to an SPH with maximum sustained winds (1-minute average) nearly 40 percent higher than in 1959. Clearly, by 1972, at a relatively early stage in the construction of the GNO HPS, the SPH used as a basis for design was obsolete. | MSJ Exh. 56, Team Louisiana, p. 98 |
| 137.      Four of the severe hurricanes that have affected the GNO area over the past 110 years had central pressures lower than the 1959 SPH, while six made landfall with a higher maximum sustained wind speed. So the 1959 SPH would have been a severe storm, but should not have been considered "the most severe meteorological conditions considered reasonably characteristic for that region." More than half of these 10 storms made landfall before the 1965 authorization for the HPS, and provided a clear indication that the 1959 SPH was deficient. The 1972 and 1979 SPHs are placed on this list for comparison and clearly would have been a better choice. Both the 1972 and 1979 SPHs were available – and ignored – before most construction on the HPS had proceeded to a point of no return (Table 8). | MSJ Exh. 56, Team Louisiana, p. 103 |
| 138.      A 1976 GAO report noted that USACE was requesting an additional "$22 million for increasing the size | MSJ Exh. 56, Team Louisiana, p. 105 |

| | |
|---|---|
| of the levees based on better definition of the standard project hurricane as furnished by the United States Weather Bureau." | |
| It is not clear what happened to this request or why the analysis backing this request was never incorporated in the many design memoranda then under development.  What is important here is that as early as 1976, the USACE knew that the original SPH-based design criteria were deficient, but it never acted on that knowledge to upgrade the level of protection. | |
| 139.        The Chief of Engineers distributed an order in March, 1981, to all districts with urban hurricane flood damage prevention projects under construction or in planning (Figure 77).  The order directed that all such projects be designed using the SPH as it had been redefined in the 1979 NWS 23 report (Schwerdt et al. 1979).  The 1979 SPH was a slight refinement of the 1972 version (Table 7).  Many GDMs were finalized after this date, but there is no evidence that the New Orleans District ever complied with the 1981 order on any portion of the East Bank GNO HPS. | MSJ Exh. 56, Team Louisiana, p. 104 |
| 140.        The ACE's failure to apply the new 1979 SPH design criteria to any of the LPV flood structures resulted in many of the failures in the NOFDS in the wake of Hurricane Katrina. | Bea Expert Report ¶ 159 |

## 6.   ACE Fails To Use Available Surge Models In Designing The HFPS

| | |
|---|---|
| 141.     Scientists had been using computers to run increasingly sophisticated numerical models to predict hurricane surge for many years when Chester Jelesnianski of the U. S. Weather Bureau developed the "Special Program to List Amplitudes of Surge from Hurricanes," or SPLASH model (Jelesnianski 1972). This model scored an immediate triumph by accurately hindcasting the devastating surge that accompanied Hurricane Camille in 1969 (van Heerden and Bryan 2006). Jelesnianski then developed SLOSH (Sea, Lake, and Overland Surges from Hurricanes), which was first released in 1979 and is still in use by the National Oceanographic and Atmospheric Administration and other agencies (Jelesnianski et al. 1992). So SLOSH became available at about the same time as the NWS 23 revision of the SPH (Schwerdt et al. 1979). | MSJ Exh. 56, Team Louisiana, pp. 109-11 |
| 142.     The Corps helped fund the development of SLOSH, and later ADCIRC, and conducted surveys around New Orleans so that the topography and bathymetry could be presented with an appropriate level of detail. The 1979 version of SLOSH predicted that a Category 5 storm could generate a surge of more than 20 feet along the south shore of Lake Pontchartrain. Other runs in the 1980s indicated that the GNO HPS was insufficient to prevent overtopping by a wide range of Category 3 hurricanes. While there was nearly universal agreement in the scientific community that SLOSH was a superior tool in many ways for predicting the | MSJ Exh. 56, Team Louisiana, p. 111-12 |

| | |
|---|---|
| oceanographic response to hurricane winds, there is no indication that the Corps ever used the SLOSH model in developing GDMs for the HPS. | |
| 143.     The New Orleans District USACE missed opportunities to revise the original SPH-based analysis after the National Weather Service revised the SPH in 1972 and 1979, and when the SLOSH storm surge model came into use in 1979. SLOSH showed clearly that the GNO HPS, as it was constructed at the time, was vulnerable to overtopping by many possible Category 3 storms. This result was confirmed later by the ADCIRC model, as recently as during the 2004 FEMA Hurricane Pam exercise (http://hurricane.lsu.edu/floodprediction/PAM_Exercise04/). The USACE supported development of both surge models and was aware of GNO HPS vulnerabMSJ Exh. 72, ILITies, but appeared to accept the inadequacy of the system with a complacency that undercut efforts to sound alarms and begin pressing for improvement. | MSJ Exh. 56, Team Louisiana, p. v |

### 7.     The ACE Fails to Account for Diminished Surge Protection from Disappearing Wetlands

| | |
|---|---|
| 144.     The scientific community had been raising the alarm about Louisiana's disappearing wetlands since the late 1970s. The Corps was obviously aware of this problem because in September 1986 the chief of the Engineering Division of the New Orleans District wrote the commander and director of the ACE Waterways Department Station | MSJ Exh. 56, Team Louisiana, p. 112 |

| | |
|---|---|
| requesting funding to undertake an assessment of the wetlands loss. Specifically they investigated land loss between 1932 and 1983.  In July 1987, the Corps released its report "Geological Investigation of the Mississippi River Deltaic Plan- Land Loss and Land Accretion," authored by J. May and L. Britsch. This excellent report shows in detail just how devastating the land loss had been since 1932. This action proves that the NOD was fully aware of the land loss problem and surely the consequences for reduction in surge protection. But nowhere in the General Design Memoranda (GDMs") does the NOD discuss the need to give extra free board to levees and floodwalls because of the worsening land loss. The land loss research ordered and paid for by the USCAE was ignored by those responsible for the GNO HPS. | |

### 8.    The ACE Fails To Account For Known Problems With Datums and Subsidence

| | |
|---|---|
| 145.      Pre-Katrina flood control structures in this region were authorized, designed, and numerically modeled relative to a water level reference datum (e.g., mean sea level). However, these structures were constructed relative to a geodetic vertical datum that was incorrectly assumed as being equivalent to, or constantly offset from, a water level datum. | IPET, p. II-1 |
| The U.S. Coast & Geodetic Survey, later the NGS, notified the USACE New Orleans District (NOD) of subsiding benchmarks in the GNO in 1958 (IPET 2006b, II-132). It | MSJ Exh. 56, Team Louisiana, p. 126 |

| | |
|---|---|
| appears clear now that the NOD did not use this information when developing initial plans and cost estimates for the 100-year Lake Pontchartrain & Vicinity Hurricane Protection Project prior to the 1965 authorization. This blindness to the effects of continuing subsidence on the effective level of flood protection continued at least through the 1990s.  As a result, the flood structures as built were in fact several feet lower than represented by the ACE. | |
| 146.        Typical subsidence values for benchmarks in the GNO area are on the order of 3 ft/century at the GNO lakefront, and higher, more than 4 ft/century, at the IHNC Lock (Figure 87). The trends have been consistent since at least 1952 and should have been recognized in 1965 when the GNO HPS was authorized. The potential for subsidence of areas under forced drainage has been documented in the Mississippi River delta since the early 1900s (Harrison and Kollmorgen 1947).  The ACE's planning did not take proper account of the expected, continual subsidence and settlement of flood structures due to the compressible foundation and the need for continuous lifts and enlargements. | MSJ Exh. 56, Team Louisiana, p. 128 |
| 147.        In-depth background and understanding of the geologic and depositional environment and history of vital importance to understanding the characteristics of the Mississippi Basin soils were developed in the 1950s and 1960s (Fisk et al. 1952; Kolb and Van Lopek 1958; Krinitzsky and Smith 1969), and the Corps of Engineers led | MSJ Exh. 72, ILIT, p. 12-16 |

| | |
|---|---|
| in the development of this background.  Of particular importance was recognition that the marsh and swamp deposits were "treacherous" and highly variable. | |
| 148.      The deposits along the MR-GO alignment at the time of its original construction, as well as those to be used for the proposed "levees" after 1965, are compressible. This means that the soils will deform under the load of the levee. This response of the soil to load is time-dependent and variable in amount at different locations. In other words, settlement begins at the placement of load (the levee) and continues to increase as time passes. Since this response differs according to properties of the soil, certain segments of the levee will experience more settlement than others at a given time. Thus, the crest grade of the levee, originally built to one elevation, will over time display an uneven grade. | Expert Report of Jesse L. Arnold ("Arnold Expert Report"), ¶ 31 |
| 149.      At the time of Hurricane Katrina, the ACE had determined design grade levels (elevations/heights) for the flood protection works along the west side of the IHNC, the south side of Reach 1 of the MR-GO, and Reach 2 of the MR-GO as depicted in Figure 7 of USACE, IPET 2007 and Figure 2.6 of MSJ Exh. 72, ILIT. | Dalrymple Depo., Exhibit 4; MSJ Exh. 72, ILIT, Figure 2.6 (p. 2-19) |
| 150.      Soil in the earthen embankment has voids and the soil becomes compacted because of the weight of the soil added on top, leading to consolidation of the soil and sinking of the entire flood protection work. | Dalrymple Depo., 104:17-25, 105:1-8. |
| 151.      A "lift" is the first piece of construction on a levee such as base preparation.  The first lift would be the | MSJ Exh. 92, Naomi Depo. 409:3-23, Naomi Depo. Exhibit |

| | |
|---|---|
| first engineering construction work done to progress toward the levee of 17 and a half feet. | 53 AT P. __ |
| 152.     The USACE knew that it would require a number of "lifts" to elevate such a hurricane flood protection levee to the required and designed grade.  The base on which the levees was constructed, however, was unconsolidated marsh land with some 80 feet plus being of recent geological deposit.  This means that inevitable short term and long term subsidence would require the levee to be topped out every few years and that a stable embankment – requiring years to develop – was a prerequisite for a sufficiently sound hurricane flood protection "levee".  Based on my observations of the USACE construction over the years, and my review of relevant data, reports and other materials, the USACE did not "top out" the so-called levee.  There is no record that the USACE imported select material from off-site borrow or installed a hard structure such as T-walls or other equally secure sea walls except at outlet structures such as Bayou Bienvenue and Bayou Dupre.  Thus, the embankments that the USACE constructed after 1965 never reached a constant, stabilized height that would have afforded a reasonable measure of protection from the 17.5 feet of surge that hit Reach 2 during and after Hurricane Katrina. | Theis Expert Report, ¶ 18 |
| 153.     The flood protection works along Reach 1 and Reach 2 of the MR-GO were designed and built in a series of lifts and enlargements which are layers (usually several feet) of soil added in stages or phases several years apart to | Varuso Depo., 40:7-25 |

| | |
|---|---|
| allow for inevitable subsidence and settlement.  For example, the 6.2 mile stretch of Reach 2 of the MR-GO—between Bayou Bienvenue and Bayou Dupre—had an initial lift and at least two enlargements before Hurricane Katrina. | |
| 154.      Before each new lift or enlargement of sections, a survey is done to determine the actual existing crown elevation, and construction "as built drawings" (cross-sections) are prepared to document the new raised, crown elevation. | Varuso Depo., 41:11-23; 42:5-11 |
| 155.      "As built" drawings depict how the features were actually installed in the ground.  It is the engineering and construction document of record of what was built. | MSJ Exh. 92, Naomi Depo. 228:13-25, 229:1-7, 404:8-14 |
| 156.      If the levee was originally built to the planned grade, any settlement later would represent that the planned grade was not attained. This is a real concern since the grade chosen is based on the height of storm surge and wave action expected at the site. Thus, the height of the grade at the crest is the maximum level of hurricane surge protection. | Expert Report of Jesse L. Arnold ("Arnold Expert Report"), ¶ 32 |
| 157.      "In designing, constructing and maintaining the hurricane-protection system the Corps did not adequately address: (a) the effects of local and regional subsidence of land upon which the protection system was built; and (b) then-current information about the threat posed by storm surges and hurricanes in the region." | MSJ Exh. 72, ILIT, p. 12-8 (quoting The report of the Senate Committee on Homeland Security and Governmental Affairs (2006)) |

**9.      ACE Fails To Provide Armoring For Flood Structures**

| | |
|---|---|
| 158.      Armoring for the banks and flood structures | MSJ Exh. 9, House Doc. No. |

| | |
|---|---|
| built to SPH dimensions was contemplated at the time of Congressional authorization of the LPV.. | 231, p. ___ |
| 159. The flood structures along Reach 2 of the MR-GO were not armored, and they had no breakers or protective wetlands in front of them to serve as a buffer to storm surge and waves. | MSJ Exh. 72, ILIT, p. 12-9, Figure 2.6, (p. 2-19 |
| 160. The local, non-federal levees like the 40 Arpent Canal Levee were constructed from adjacent protected side borrow which also served as the drainage conveyance to the pumping plant that then discharged into the unprotected wetlands. These levees were built with draglines using large buckets to place the borrowed material. This excavation method produced a reasonably cohesive embankment that was allowed to dry to the extent that bulldozers could compact and dress the embankment into a stable levee. In addition, the slopes were fertilized, seeded and sodded to form a section that generally prevented rain wash erosion and erosion from tidal wave action. As a result, the 40 Arpent Canal Levee, while overtopped, did not catastrophically fail during Hurricane Katrina. | Theis Expert Report, ¶ 27 |
| (d) | |

## E.        CHALMETTE SYSTEM (LOOP)

| UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|
| 161. The St. Bernard Basin Hurricane Protection System includes the levee/floodwall extending from the | IPET, p. III-208 and Figure 14 |

| | |
|---|---|
| Inner Harbor Navigation Channel (IHNC) easterly, along the Gulf Intracoastal Waterway (GIWW), to the Bayou Bienvenue Control Structure, continuing along the Mississippi River Gulf Outlet (MRGO) southeasterly, then turns generally to the west, where it ties into the Mississippi River Levee at Caernarvon, as shown in Figure 14. A portion of the hurricane protection system in this area also provides hurricane protection to the Lower 9th Ward area in Orleans Parish.  The pertinent data for the Chalmette Area Plan (Orleans and St. Bernard's Parishes) was 1.51 miles of floodwall along the IHNC and 19.95 miles of levee which extend to the lower end of St. Bernard Parish. Also included in the plan are the Bayou Bienvenue and Bayou Dupre structures. | |
| 162.  For the Chalmette System, hydraulic dredging was used and resulted in retention of the coarse grounded materials (sands, silt, shell) which were not compacted and are highly erodible. | Bea Report, pp. 90-91; ACE, Design Memorandum No. 3 (General Design) Chalmette Area Plan ("DEM No. 3") (1966), Plate 65. |
| 163.  The soils used to construct the flood protection works along Reach 1 and Reach 2 of the MR-GO were largely existing materials borrowed (taken) from the adjacent spoil banks created when the MR-GO was constructed by means of hydraulic dredging and later augmented by deposition of soil materials from periodic dredging.  Observations during construction (and confirmed by extensive soil borings) indicate that practically all of the dredged material was sand with | Varuso Depo. 54:7-16; 55:23-25; Bea Report, pp. A. 4 (Figure A. 3), A.5 (Figure A. 4) Theis Expert Report ¶ 14, 17 |

| | |
|---|---|
| prodigious amounts of shell and some silts and clays.  This means that the entire embankment was essentially pure sand with some shell dispersed in it.  The foundation of the flood protection works along Reach 1 and Reach 2 of the MR-GO was largely spongy, organic soils with substantial water content which were subject to significant subsidence and settlement from the weight of soil materials placed to top of them during construction of the flood protection works. | |
| 164.      While the soils vary somewhat from location to location, the soils used to construct the flood protection works along Reach 1 and Reach 2 were for the most part uncompacted hydraulic soil composed of silts, clays, and silty sands. | Varuso Depo., 38:13-21; 54:7-12; 56:2-8; 71:10-13 |
| 165.      Pre-Katrina, the Reach 2 flood protection works (between miles 47 and 60) were composed of 100% dredged material, and post-Katrina, none of this stretch is comprised of dredge material. | Varuso Depo., 118:13-25 |
| 166.      When the original flood protection works along Reach 2 of the MR-GO were constructed, it was a lot cheaper to use hydraulic fill instead of clay that must be imported by barges from a clay borrow pit near the Pearl River in Mississippi. | Varuso Depo., 115:18-25; 116:1-25; 117:1-11 |
| 167.      The USACE, NOD, decided to use spoil from the MR-GO dredging operations to construct this "levee" instead of importing more substantial soils. | Theis Expert Report ¶ 12 |
| 168.      The USACE's own design documentation states that the materials used in Reach 2 are potentially | MSJ Exh. 72, ILIT, p. 12-9 |

| | |
|---|---|
| susceptible to erosion (USACE, DM-___, 19__). Additional construction was proposed to increase the height of the levee at the time of Hurricane Katrina. While these materials were highly susceptible to scour and erosion, the MSJ Exh. 72, ILIT study has failed to discover documentation of plans or proposals for armoring this levee prior to hurricane Katrina. | |
| 169.     Other than spotty patches of grass, there was no substantial armoring of the flood protection works along Reach 2 of the MRGO. | Bea Expert Report, p. 91 |
| 170.     Flood protection works along Reach 2 of the MRGO that had swamp and wetlands protection on both sides, even though severely overtopped, were not damaged or breached during Hurricane Katrina. | Bea Expert Report, p. 94 (Figures 60 and 61) |
| 171.     The flood protection works along Reach 2 of the MR-GO were designed and constructed in stages— commonly referred to as "lifts" or "enlargements." The first lift was initiated around 1968, and the design elevation was 4.0 NGVD.  The second lift was initiated around 1972, and the design elevation was 18 feet NGVD. The first enlargement was initiated in 1980, and the design elevation was 18 feet NGVD.  The second enlargement was initiated in 1985, and the design elevation was 20.5 feet.  By this time, the levee crown level had settled as much as 3 feet to a height of 15 feet NGVD, and the majority of the crowns had a crest elevation of 16 feet NGVD. | Bea Expert Report, pp. A.14, A. 15, A. 19, A. 21, Figure A. 21 |
| 172.     For Reach 2 of the MR-GO, the initial design | Varuso Depo., 33:11-18 |

| | |
|---|---|
| grade was approximately 15 to 15.5 feet NGVD in 1967, later increased to 17.5 feet NGVD. | |
| 173.　　Along Reach 2 of the MR-GO, the design grade elevation for the flood protections works was 17.5 feet at the time of Hurricane Katrina, but the crowns were several feet lower than the design grade elevation. | Dalrymple Depo., 85:1-8 |
| 174.　　At the time of the Hurricane Katrina, some places along the IHNC had subsided to a height lower than the 14 foot design elevation. | MSJ Exh. 92, Naomi Depo. 172:7-11 |
| 175.　　Along Reach 2 of the MR-GO, the flood side is the northeastern side closest to Lake Borgne and the surge, and the protected side is the southwest side. | Dalrymple Depo., 88:10-13, 89:3-5 |
| 176.　　By the time of Hurricane Katrina, the Army Corps of Engineers had not turned over to the St. Bernard Parish and the Lake Borgne Levee District the operation and maintenance of Reach 2 of the MRGO levees. | MSJ Exh. 92, Naomi Depo. 207:22-25, 208:1-3 |
| (E) | |

## F.　　NEW ORLEANS EAST SYSTEM (LOOP)

| **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|
| 177.　　The New Orleans East HPS includes the easternmost suburbs in Orleans Parish located between Lake Pontchartrain and the IHNC (Figure 7c). Orleans East consists almost entirely of drained wetlands and is the "deepest" of the compartments, averaging 5.8 ft below sea level in the area flooded during Katrina. Orleans East includes on its east end an undeveloped formerly tidal | MSJ Exh. 56, Team Louisiana, p. 15 |

| | |
|---|---|
| wetland covering nearly 22,000 acres that is now largely at or below sea level. This is the Bayou Sauvage National Wildlife Refuge, separated from the developed area by a local levee, and constituting one of the buffer areas that provide some redundancy to the HPS (Figure 6). | |
| 178.　　The flood protection works along the New Orleans East Back Levees were composed largely of moist hydraulic fill.  Like Reach 2 of the MR-GO, the New Orleans East Back Levee was largely constructed of spoil materials from the excavation of the adjacent GIWW Chanel, constituting mostly of highly erodible (and pervious) soils and including large quantities of sand and lightweight shell sands. | Darlymple Depo., 57:4-18, Exhibit 2; Bea Expert Report, pp. A. 5 (Figure A. 4 ("hydraulic pump material"), pp. 34, 73 |
| 179.　　The Citrus Back Levee and New Orleans Back Levee were constructed from hydraulic fill. | Dalrymple Depo., 71:15-25, 72:1; Dalrymple Exhibit 2 |
| 180.　　The Lakefront Levee had a substantial amount of clay, and clay is a better (more erosion resistant) material than sand. | Dalrymple Depo., 73:13-16; 76:1-4 |
| 181.　　The construction on the levees on Citrus Back, New Orleans East Back, and New Orleans East Levee as well as Reach 2 of the MR-GO had not been completed by the Army Corps of Engineers by Hurricane Katrina | MSJ Exh. 92, Naomi Depo. 209:21-25 |
| 182.　　The ACE's projection for completion of the flood protection works for the HFPS were never met.  For example, for the Citrus Back Levee, the target completion date was March, 1975, but it was not completed by the time of Hurricane Katrina 30 years later. | MSJ Exh. 92, Naomi Depo. 231:8-25, 232:1-6 |

| | |
|---|---|
| 183.    By the time of Katrina, the Army Corps of Engineers had not turned over to the Orleans Levee District the Citrus Back Levee operation and maintenance with two exceptions:  The Bayou Bienvenu and Bayou Dupre structures were formally turned over.  Bayou Bienvenu was turned over to Orleans Levee District, and Bayou Dupre structure was turned over to St. Bernard and Lake Borgne Levee Districts. | MSJ Exh. 92, Naomi Depo. 208:5-21 |
| (F) | |

## G.    INCOMPLETE HURRICANE FLOOD PROTECTION SYSTEM AT TIME OF HURRICANE KATRINA

### 1.    An Unfinished, Dysfunctional System

| | |
|---|---|
| 184.    Forty years after Congressional authorization, the Hurricane Flood Protection System ("HPS") for Greater New Orleans at the time of Hurricane Katrina was still under construction and uncompleted—a sprawling work in process, chronically underfinanced by Congress and complacently managed by the ACE.  It was hardly a completed "system" but rather a patchwork quilt of several hundred miles of earthen berms, spoilbanks, sheetpile, concrete and floodwalls—virtually all of which were below design protection elevation and whose most salient features were their uneven height and admitted resulting inabMSJ Exh. 72, ILITy to afford the Standard Project Hurricane ("SPH") level of protection mandated by Congress in the Flood Control Act of 1965.  Still years | MSJ Exh. 72, ILIT, pp.12-8, 12-9, 12-10<br>IPET, p. 1-2; 160:9-22;<br>Dalrymple Depo., 160:9-22;<br>162:14-20; Bea Report, pp. 36, 103; *Decision-Making Chronology*, pp. ES-8; 3-38 (Table 15); 3-39 (Map 3-1); 3-40 (Map 3-2); Theis Expert Report, ¶ 23; MSJ Exh. 56, Team Louisiana, Table 15; Katrina Structures Height Maps; Bea Report, p. 125 (Table 3); Unnatural Disaster, |

| | |
|---|---|
| from completion and decades behind schedule, the HPS for Greater New Orleans existed in name only, and to no Army Corps  official's surprise, it was catastrophically overwhelmed when tested by Hurricane Katrina.  This tragedy would not have occurred if the ACE had designed and constructed the HPS to even the modest SPH dimensions. | p. 4 |
| The Lake Pontchartrain Project, as it stood in the path of Katrina was still not complete as designed.  Some portions were still under construction, and soil subsidence (sinking) had left portions of the project with less elevation above seal level than intended.  In other words, some elements of the project were not even high enough to protect against the Standard Project Hurricane, let alone a genuine Category 3 hurricane.  The Corps was well aware of this fact.  As Jerry Colletti, the New Orleans District's Manager for Completed Works explained, the Corps never tried "to provide full-level protection on an annual basis . . . .we just can't raise everything to the design height for each storm that would come through." | MSJ Exh. 72, ILIT, p. F-34 (quoting A Nation Still Unprepared) |
| 185.      Forty years after the devastating flooding caused by Hurricane Betsy, the flood protection system— authorized in 1965 and based on the Standard Project Hurricane (SPH)—was still not completed (Government AccountabMSJ Exh. 72, ILITy Office 2005a, 2005b). Design, construction, operation, and maintenance of the system occurred in a piecemeal fashion.  (Collins and | MSJ Exh. 72, ILIT, p. 12-18; Katrina Structures Height Maps |

| | |
|---|---|
| Lieberman 2005). | |
| 186.      The planning and implementation process for the HFPS for Greater New Orleans occurred over a 50-year period up to Hurricane Katrina. Ten years of planning preceded LPVHPP authorization, and design and construction was still underway when Hurricane Katrina struck Greater New Orleans. | Decision-Making Chronology, pp. 2-20, 2-55 |
| 187.      Soon after authorization, the project was projected to be completed by 1979, but the expected completion date was repeatedly extended and the project was never reported to be fully complete.  Prior to Katrina, the HPS was estimated to be about 85 percent constructed, but it was not expected to reach completion until 2015— six decades after its authorization by Congress.. | Decision Making Chronology, Chapter 6-4; MSJ Exh. 56, Team Louisiana, p. xi |
| 188.      The planning, design, and construction of the LPVHPP took place over a time period roughly equivalent to one-quarter of the history of the United States – much longer than originally envisioned and as much greater cost. | Decision-Making Chronology, p. ES-9; GAO2, p. 8 |
| 189.      At the time of Hurricane Katrina, the HPS – which was originally planned to take 13 years at a total cost of $90 million, stretched out over 40 years and consumed nearly $900 million – was still incomplete.  In fact, the level of hurricane protection on some segments of the HPS diminished over time. | MSJ Exh. 56, Team Louisiana, pp. viii, 7. |
| 190.      Since the beginning of the project, the Corps has encountered project delays and cost increases. As a result, by 1982, project costs had grown to $757 million and the expected completion date had slipped to 2008. | GAO2, Highlights |

| | |
|---|---|
| 191.      When Hurricane Katrina struck, the project, including about 125 miles of levees, was estimated to be from 60-90 percent complete in different areas with an estimated completion date for the whole project of 2015. | GAO2, Highlights |
| 192.      While the ACE reported to Congress in 2005 (and had been so reporting since 1994) that the flood protection works for the Chalmette Loop and the New Orleans East Loop were completed 98% and 92%, respectively, this was not true.  What ACE was not disclosing is that "the reported project completion progress does not reflect the fact that the many completed reaches of the project were below design grades due to regional land subsidence over time since construction." | Decision-Making Chronology, p. ES-8 |
| 193.      It is evidence of how pervasively under-built the system was that it has cost as much after Katrina to repair the GNO HPS to a marginally stable pre-storm condition as was spent in the previous 40 years. | MSJ Exh. 56, Team Louisiana, p. xii |
| 194.      The flood protection works along Reach 2 were still under construction at the time of Hurricane Katrina—almost 40 years after Congress approved their construction in the Flood Control Act of 1965. | Bea Expert Report, pp. 26-28, 91 |
| 195.      In light of the fact that actual crown elevations of the flood protections works along Reach 2 of the MR-GO were several feet lower than the design grade level, "the Reach 2 work was still a work in process by the time Katrina arrived because they had not yet achieved their desired design height of 17.5 feet." | Dalrymple Depo., 85:1-14 |
| 196.      Hurricane protection systems must have a | IPET, p. III-8; MSJ Exh. 72, |

| | |
|---|---|
| unified, integrated, comprehensive system based approach. Variations in the system levee and floodwall heights can compromise system performance.  While individual parts of a complex system can be adequate, when these parts are joined together to form an interactive-interdependent-adaptive system, foreseeable failure modes developed in the NOFDS during Hurricane Katrina | ILIT, p. 15-10 |
| 197.       The ACE pursued a "piecemeal process" by which the flood protection works for the HFPS "were constructed in individual segments and stages."  At the time of Hurricane Katrina, there was not a system affording any meaningful protection against a hurricane with the force and storm surge of Hurricane Katrina. | Bea Expert Report, p. 104 |
| 198.       As noted in the IPET Draft Final Report (IPET; June 1, 2006), the New Orleans regional flood protection system was largely a system in name only.  Pre-Katrina, there were no integrated series of components to provide a reliable NOFDS (ASCE 2006a).  An effective system must function literally seamlessly as contiguous defenses. | MSJ Exh. 72, ILIT, pp. 11-3, 12-19, 15-11 |
| 199.       As one report observes, the protective system is a "piecemeal" assemblage of elements that "evolved over a long period of time."  By contrast, a proper system "would integrate components and . . . would contain a level of redundancy sufficient that, if a levee failed, all would not be lost." | A Nation Still Unprepared, Chapter 17-3, quoting ASCE, "ERP Progress Report Number 1, p. 3 |
| 200.       The HPS is just that—a system that is only effective in hurricane flood protection if all the component | MSJ Exh. 56, Team Louisiana, p. xii; Naomi Depo. ___; |

| | |
|---|---|
| units have been built to the design protection elevation. Like a chain, the HPS is only as strong as its weakest section.  As Dr. Bob Bea has observed, "strong pieces embedded within weak pieces do not translate to a reliable system."  (Bea 2006)  By the time of Katrina, the uncompleted hurricane protection system created many weak links when dozens of points below design elevations contributed to flooding when water flowed unimpeded through these gaps. | Exhibit __ (Ralph Vartabedian and Stephen Braun, "Unfinished 1965 Project Left Gaps," Los Angeles Times, January 17, 2006, p. A16) ("Vartabedian and Braun") |
| 201.      "The system did not perform as a system.  In some areas it was not completed, and in others, datum misinterpretation and subsidence reduced its intended protective elevation.  The capacity for protection varied because of some structures that provided no reliable protection above their design elevations and others that had inadequate designs leaving them vulnerable at water elevations significantly below the design intent." | IPET, p. 1-2 |
| 202.      There was no integral hurricane protection system at the time of Hurricane Katrina.  "Levees in the New Orleans area are at different heights. . . . [W]e have a photograph in our report at one section where you can clearly see five different elevations, all within 100 yards of each other.  If you have got five different elevations within 100 yards, the person who built the lowest section wins because they become the public hazard.  There is a need to coordinate these things." | A Nation Still Unprepared, Chapter 17-6, quoting Statement of Dr. Raymond Seed, Team Leader, National Science Foundation, U.S. Senate, Committee on Homeland Security and Governmental Affairs, hearing on Hurricane Katrina: Why Did the Levees Fail?, Nov. 2, 2005, pp. 96-97. |

| | |
|---|---|
| 203. At the time of Hurricane Katrina, there was "not a completed Hurricane Protection System to the extent Congress or the Corps or both thought they were getting a level of protection of 17 and a half feet." | Dalrymple Depo., 98:4-9 |
| 204. The northwest flank of the St. Bernard/9[th] Ward's protecting "ring" of levees and floodwalls was incomplete at the time of Katrina's arrival. Large portions of the critical 11 mile-long section fronting Lake Borgne were several feet below design grade. | MSJ Exh. 72, ILIT, p. xx |
| 205. "What makes the New Orleans levees unusual is the high stakes involved in terms of the population being protected . . . . In a system with several hundred miles of levees, it is very difficult to do suitable investigation and basically to nail all the details . . . . If you leave one detail unnailed, you leave a vulnerabMSJ Exh. 72, ILITy which may in the end bring the whole system down." | Dr. Raymond Seed, National Science Foundation-Sponsored Independent Levee Inspection Team (MSJ Exh. 72, ILIT), University of California at Berkley; quoted in *A Nation Still Unprepared*, Chapter 17 |
| 206. Configuration of the elements that comprise the NOFDS as an integrated flood defense system (Seed et al. 2005, ASCE 2006a). Many failures of the NOFDS occurred at a variety of types of interfaces in the physical elements such as interfaces between earth levees and concrete and steel flood protection elements and between the flood control structures and pump station structures (Carter 2005a). Flood discharge pumps were not sufficiently protected from backflow and exacerbated flooding. Many vulnerabMSJ Exh. 72, ILITies were found at transitions and interfaces between flood protection | MSJ Exh. 72, ILIT, p. 12-11 (emphasis in original) |

| | |
|---|---|
| elements and/or where other infrastructure elements were involved (Seed et al. 2005). The NOFDS was not an integrated, coherent system; rather "it is a jointed series of individual pieces conceived and constructed piecemeal" (ASCE 2006a). | |
| 207.      At the time of Hurricane Katrina, there were gaps in the system for flood protection works and not a seamless series of sections at the same design grade level. | Bea Expert Report, pp. 36, 103 |
| 208.      The HFPS as constructed was a series of separate projects with differing local sponsors, no overall ownership, and no external oversight.  This is an underlying cause for the lengthy construction period for the LP&VHPP, and an explanation as to why it did not function as a system. | Decision-Making Chronology, ES-8 |
| 209.      What the project record shows is that the District knew in at least general terms of the lessening of the project DOP and LOP over time. However, the Corps' reporting requirements did not inform higher authorities or local sponsors that the project, if completed with the estimated required funds, would not provide SPH protection. | Decision-Making Chronology, Chapter 6-17 |

### 2.      The ACE Never Designed or Constructed a Hurricane Flood Protection System To The Congressionally-Mandated Standard Project Hurricane Dimensions

| | |
|---|---|
| 210.      "[W]hatever system the Corps built by the time of Katrina after 1965 was [not] designed to deal with the most severe combination of meteorological conditions | Dalrymple Depo., 162:14-20 |

| | |
|---|---|
| that are considered reasonable characteristics of this region"—the definition of the SPH that Congress mandated for Greater New Orleans in the Flood Control Act of 1965. | |
| 211.    "[The] amount of flood protection provided to any given area must be a function of the value of the area to be protected.  If you have an urban area as priceless as the greater New Orleans metropolitan area, you must accordingly design and build a hurricane protection system that provides maximum and redundant hurricane protection.  In the case of the Lake Pontchartrain and Vicinity, Hurricane Protection Project which was supposed to protect the Greater New Orleans metropolitan area after 1965 from the "most severe combination of meteorological conditions that are considered reasonably characteristic of the region," the structures designed and constructed by the United States Army Corps of Engineers fundamentally failed to do so." | Expert Report of Johannes Vrijling, p. 4; Supplemental Expert Report of Johannes Vrijling, ¶ 2(g) |
| 212.    On a regional perspective, management of the Lake Pontchartrain and Vicinity project led, over time, to ever greater departures from the overall objective of the original authorization, to protect against the "the most severe meteorological conditions considered reasonably characteristic for that region." | MSJ Exh. 56, Team Louisiana, p. ix. |
| While ACE records report different figures at different times and the design elevations varied somewhat along sections of the Chalmette and New Orleans East Loops, the design elevations of sections of the HFPS were | Dalrymple Depo., 52:9-16; USACE IPET 2007, Figure 7 (Lake Pontchartrain, LA Vicinity, Hurricane Protection |

| | |
|---|---|
| generally as follows:<br><br>Reach 1 of MR-GO:  15-18 feet<br><br>Reach 2 of MR-GO:  14-17.5 feet<br><br>IHNC (eastside south of MR-GO): 14.5-15 feet | Plan, Chalmette Area Plan);<br>Expert Report of Robert Bea<br>("Bea Report"), p. 8, Table 3<br>(p. 125), Table A-1 (p. A.3), p.<br>53; *Decision-Making*<br>*Chronology*, p. 3-11 (Table 3-<br>4), MSJ Exh. 56, Team<br>Louisiana, Table 15. |
| 213.      At the time of Hurricane Katrina, the<br>referenced section of the flood protection works for the<br>HFPS were below design grade as follows:<br><br> IHNC (east side, south of MR-GO):  2 to 7 feet<br><br> Reach 1:  1 to 2.5 feet<br><br> Reach 2:  0-6 feet | Bea Report, p. 125 (Table 3);<br>MSJ Exh. 56, Team Louisiana,<br>Table 15; *Decision-Making*<br>*Chronology*, pp. 3-38 (Table 3-<br>5), 3-39 (Map 3-1), 3-4 (Map 3-<br>2); Katrina Structure Height<br>Maps |

a.      <u>**Design Grades/Elevationa Below Standard Project**</u>
       <u>**Hurricane Dimensions**</u>

| | |
|---|---|
| 214.      The design elevation of the HPS is a<br>statement of the level of protection authorized by<br>Congress.  The ACE failed to design and build the HPS to<br>the level of protection mandated in the Flood Control Act<br>of 1965 because the levee crown's were lower than<br>specified for the SPH dimension due to predictable<br>settlement and sea level rise. | MSJ Exh. 56, Team Louisiana,<br>p. 116 |
| 215.      When Katrina struck, the crown height on | MSJ Exh. 56, Team Louisiana, |

| | |
|---|---|
| most levee and floodwall reaches was between 1 and 3 ft low relative to current mean sea level, the only datum that is relevant to the oceanography of hurricane waves and surge. | pp. viii to ix. |
| 216.     One reason why the height of the flood protection was not at levels authorized by Congress was poor understanding and lack of effective resolution of the different benchmark datums that were incorporated into the engineering of the flood protection system. Congress authorized a level of protection that was not achieved because of faulty resolution of the datum and historic changes from subsidence. | IPET, p. I-5-19 |
| 217.     In designing levels of protection, the ACE made no consideration for the continuing coastal land loss in determining crown elevations even though the NOD had determined that 2.7 miles of wetlands reduce the storm surge by one foot. | MSJ Exh. 56, Team Louisiana, p. 137 |
| 218.     In addition to design and construction issues, soil subsidence – "the lowering or sinking of [the] earth's surface" – has impaired the protection offered by the New Orleans levee system. In the New Orleans area, subsidence is caused primarily by the cumulative weight of millions of years of soil and silt deposits left by the Mississippi River as it enters the Gulf of Mexico. The sediment literally presses down on the earth's crust, causing the land to sink. As a result, the water level rises, gradually increasing its vulnerabMSJ Exh. 72, ILITy to tides and storms.  The levees themselves can also subside because of their own | A Nation Still Unprepared, Chapter 17-6 to 17-7 |

weight pressing down on the swampy soils upon which
they are built.

As a result, it appears that the level of protection actually
provided by the levee system in the New Orleans region,
at the time of Katrina, was significantly less than
intended:  "many sections of the levees and floodwalls
were substantially below their original design elevations,
an effective loss of protection. For example, the structures
associated with the Inner Harbor Navigation Canal were
originally constructed to an elevation of 15 feet (relative
to mean sea level) but are now just over 12 feet, a typical
loss of approximately 2.7 feet in elevation over the
lifetime of the project."  The report noted that
"subsidence is occurring at a rate of up to one inch every
three years" in the New Orleans region.

Subsidence routinely creates problems for those trying to
construct levees and other structures at known heights
above sea level. As stated in one IPET report, due to the
complex and variable subsidence in Southeast Louisiana,
"establishing an accurate vertical reference for
measurements has been a constant challenge."
Unfortunately, until the October 2005 release (by [the
U.S. Department of Commerce's National Oceanic and
Atmospheric Administration's (NOAA)] National
Geodetic Survey) of 85 benchmarks located in southern
Louisiana, which showed heights (elevations) accurate to
between 2 and 5 centimeters (roughly 1 to 2 inches),
surveyors, engineers, and the U.S.  Army Corps of

| | |
|---|---|
| Engineers in New Orleans evaluated the levees and structures built and in use with vertical heights that had not been calibrated nor checked for several years. As a result, it appears that the levees were not built and maintained at the proper level above sea level. Since the level of protection that the levees provide is so closely related to their height above sea level, and thus their abMSJ Exh. 72, ILITy to block increased water levels driven by hurricanes, the failure to build and maintain the levees at the proper elevation diminished the level of protection they would provide. | |
| 219.    Due to this inaccurate relationship between geodetic datum and mean sea level, much of the system was built below specified design elevations. The hurricane protection projects have also subsided as a result of regional subsidence. | IPET, p. III-7 |
| Pre-Katrina flood control structures in this region were authorized, designed, and numerically modeled relative to a water level reference datum (e.g., mean sea level). However, these structures were constructed relative to a geodetic vertical datum that was incorrectly assumed as being equivalent to, or constantly offset from, a water level datum. | IPET, pp. II-1, III-7 |
| 220.    The variable and considerable subsidence in the New Orleans area was reflected in the performance of the system in Katrina.  It was well known that the New Orleans area experiences significant subsidence, and structures such as levees had some increases in their initial | IPET, p. I-61 |

| | |
|---|---|
| design elevations as compensation.  The amount of elevation loss for critical hurricane protection structures was not well quantified prior to Katrina.  The IHNC structures, for example, are more than 2 ft below their intended design elevations, mostly from subsidence over the 35-year life of the project.  This resulted in a significant loss of protection capabMSJ Exh. 72, ILITy in areas such as the IHNC.  The lack of knowledge of accurate elevations was directly tied to the incomplete update of the geodetic reference datum and LMSL. | |
| 221.      "It was not clear how projected subsidence rates were applied in structural elevation design, if at all. Subsidence was apparently not factored into the design freeboard allowance." | IPET, p. II-78 |
| 222.      The levees and floodwalls were built lower than they should have been because of an unshakable erroneous assumption that the NGVD29 datum plane was equivalent to LMSL. This problem was further amplified by a policy decision to explicitly ignore well-known datum issues, subsidence and sea level rise in the construction of the GNO HPS. | MSJ Exh. 56, Team Louisiana, p. 130 |
| 223.      The 1959 SPH and early 1960s oceanographic analysis set minimum crown elevation heights necessary to prevent overtopping by surge and waves. The designers added some freeboard in some cases for various reasons. By the time many of the elements of the GNO HPS were constructed 20 to 30 years later, long after the original SPH analysis was known to be obsolete, | MSJ Exh. 56, Team Louisiana, pp. 130-31 |

| | |
|---|---|
| the design level of protection on floodwalls was reduced by 1 to 2 feet because of the vertical datum issues. Because no provisions were made to accommodate subsidence rates that were known at the time of authorization, or sea level changes that became apparent later, the 100-year project was deficient from the beginning, and would deliver an ever lessening level of protection through its design life. | |
| 224.      There was constant subsidence of the flood protection works along the IHNC and Reach 1 and Reach 2 of the MR-GO. | Varuso Depo. 36:14-22; MSJ Exh. 72, ILIT, p. 2-6; MSJ Exh. 56, Team Louisiana, pp. 125-26; Decision-Making Chronologies, pp. 3-38 (Table 3-5), p. 3-39 (Maps 3-1), p. 3-40 (Map 3-2) |

### i.      Inner Harbor Navigation Channel

| | |
|---|---|
| 225.      The IHNC had massive gaps at the time of Hurricane Katrina.  The flood protect structure along the IHNC was a patchwork of construction, uneven heights and gaps that allowed water to pour into the Lower 9th Ward through overtopping before any breaches occurred. | IPET, p. II-2; MSJ Exh. 56, Team Louisiana, pp. 125-26; Vartaobedian and Braun, p. A16 |
| 226.      When the crests of undamaged floodwalls adjacent to the southern breach on the east bank of the IHNC adjacent to the Lower 9th Ward were surveyed after the storm, they had an average elevation of 12.5 feet NAVD88(2004.65), which is about 1.5 feet below the 15 feet LMSL78 level specified in the design. Top of | MSJ Exh. 56, Team Louisiana, p. 125 |

| | |
|---|---|
| floodwall elevations recently surveyed farther north on the IHNC by IPET vary from 1.5 to more than 3 ft below the design elevation (Figure 86). | |
| 227.      The Katrina surge elevation measured at the IHNC lock was determined to be 14.2 ft relative to NAVD88(2004.65), and was perhaps a foot higher at the junction with the MRGO. Waves there were estimated at less than 1.5 ft and were lower elsewhere (IPET 2006b, IV-227, Fig. 163). If the floodwall crowns were built to the design specification, they would have had an elevation of approximately 14 ft NAVD88(2004.65), or no more than a foot below the maximum surge elevation anywhere in the IHNC.  Given the variation in floodwall crown elevations that IPET documented farther north, it is possible that the floodwall crest elevation at the point where overtopping initiated the south breach into the Lower 9th Ward could have been a foot lower than the 12.5 ft found in surviving adjacent segments. | MSJ Exh. 56, Team Louisiana, pp. 125-26 |
| 228.      Current (pre-Katrina) flood protection elevations along the Inner Harbor Navigation Canal (IHNC) were also found to be below original design/constructed elevations—just over 2 ft in places.  For the floodwall on the east bank between Florida Avenue and Claiborne Avenue, the deficiency below the design elevation was 2.5 feet.  Most of this deficiency is the result of subsidence occurring over the past 35 years. As in the Lake Pontchartrain outfall canals, this equates to a loss of most, if not all, of the design freeboard allowance. | IPET, p. II-2 |

| | |
|---|---|
| 229.       Pre-Katrina elevations along the East Bank floodwall north of the breach area were around 12.6 to 12.7 ft NAVD88 (2004.65). South of the breach area the elevations range from 12.7 to 13.4 ft near the Claiborne Avenue Bridge.  Assuming a 0.3-ft difference between LMSL (1983-2001) and NAVD88 (2004.65)—based on CO-OPS estimates—then the post-Katrina floodwall elevation relative to LMSL is approximately 12.5 ft. This 12.5 ft LMSL elevation would also be representative of the 2005 pre-Katrina floodwall elevation in this reach. Thus, elevations are approximately 2.5 ft below those authorized and constructed ca 1970. | IPET, p. II-110 and Figure 53 (p. II-112) |
| 230.       The east side of the GNO that faces Lake Borgne experienced a higher level of storm surge during Katrina than the Orleans Metro south of Lake Pontchartrain (Figure 26).  The surge from Lake Borgne propagated as a high velocity bore through the MRGO and GIWW to the IHNC causing maximum water levels in that canal to rise to 15 ft NAVD88(2004.65), while surge along the lakefront to the west was 2 to 4 ft lower. The highest surges predicted and observed for the Greater New Orleans area were in the throat of the funnel east of Paris Road. Overtopping of levees in the MRGO connection to the IHNC west of Paris Road is believed to have provided the majority of the water that flooded New Orleans East.<br>  The MRGO and GIWW levees east of the junction are the only GNO HPS levees that should have experienced extensive overtopping during Katrina. Unfortunately for | MSJ Exh. 56, Team Louisiana, pp. 46-47 |

| | |
|---|---|
| St. Bernard, the MRGO levee did not wait for overtopping, but was largely destroyed before it could be overtopped, at an earlier stage in the storm sequence. | |

## ii. New Orleans East

| | |
|---|---|
| 231.    Virtually every stretch of the Chalmette Loop and the New Orleans East Loop of the HPS was below design elevations at the time of Hurricane Katrina. | *Decision-Making Chronology*, pp. 3-38 (Table 3-5), p.3-39 (Map 3-1), 3-40 (Map 3-2); Katrina Structure Height Maps |
| 232.    At the time of Hurricane Katrina, the elevations along the Citrus Back Levee (Reach 1) along the MR-GO were uneven and different even side by side. | Dalrymple Depo., 103:10-25, 104:1-5 |
| 233.    South of New Orleans East, the maximum surge is interpreted as rising from 14 to 16 ft MSL, increasing towards the GIWW/MRGO junction, but dropping by 1.5 ft in the throat of the funnel just west of Paris Rd (Figure 21). IPET added more than a foot to the computed surge in this area to match the HWMs, and up to 2 ft more for waves, arriving at a combined surge/wave level of 16.5 to 18.2 ft MSL, somewhat below the design elevation of protection (17.5 to 23 ft MSL) but above the actual levee crown (15 to 17.5 ft MSL). IPET shows a potential for overtopping (0.5 to 2.0 ft) with depths similar to the crown elevation deficiency. | MSJ Exh. 56, Team Louisiana, pp. 38-39 |

## iii. MR-GO Reach 2

| | |
|---|---|
| 234.    At the time of Hurricane Katrina, the people of St. Bernard Parish had no protection from a SPH | Dalrymple Depo., 96:3-14 |

79

| | |
|---|---|
| because the ACE "had not yet built a Hurricane Protection System according to their plans . . . [for] design elevation" of 17.5 feet. | |
| 235.       The design grade level selected for the Chalmette area extension was 17.5 feet along Reach 2 of MRGO. | MSJ Exh. 92, Naomi Depo. 293:7-10; Naomi Depo. Exhibit 18 |
| 236.       At the time of Hurricane Katrina, almost no stretches of flood protections works along Reach 2 of the MR-GO were at design grade elevation.  A representative location is Station 497+00 where the crest elevation had settled approximately 1.5 feet below the target crest elevation of 17.5 NGVD.  (Still water elevation of 13 feet plus 4.5 wave run-up).  Only for a brief time (around 1985) was this location at the enlarged height of 21.5 feet, settlement began almost immediately, and after 1991-92 the crest elevation was below the design elevation of 17.5 NGVD.  The surge at this site during and after Hurricane Katrina exceeded the crest elevation of 16 feet. | Bea Report, p. A. 25, Figure A. 25 |
| 237.       The USACE constructed embankment along the south bank of Reach 2 of the MR-GO was not a completed levee system to project design and grade.  The very unstable foundation for this proposed levee resulted in below grade crown elevations being attained on a sustained basis.  This also resulted in substantially reduced protection. | Theis Expert Report, ¶ 23 |
| 238.       At the time of Hurricane Katrina, very significant stretches of flood protection works along the 11-mile northeast frontage of Reach 2 of the MR-GO were | Bea Expert Report, p. 22, citing USACE 2007, MSJ Exh. 56, Team Louisiana 2007, MSJ |

| | |
|---|---|
| several feet (up to 6 feet) below the authorized design elevation. | Exh. 72, ILIT 2006 |
| 239.      At the time of Hurricane Katrina, the actual crown elevation of the flood protection works along miles 43 to 60 of Reach 2 of the MR-GO that remained intact were only about 15 feet (versus 17.5 feet design height) according to LIDAR surveys conduced by the ACE. LIDAR (LIght Detection And Ranging) is a terrestrial 3D laser mapping tool for data collection that was used by the United States Geological Survey post-Katrina to survey the actual crown elevations. | Varuso Depo., 44:12-22; Katrina Structure Height Maps; MSJ Exh. 72, ILIT, p. A-1 |
| 240.      At the time of Hurricane Katrina, none of the sections of flood protection works along the 12 mile stretch of Reach 2 of the MR-GO between Bayou Bienvenue and the return levee at Veret were at the design height of 17.5 feet.  At most elevations along this 12-mile stretch of Reach 2 of the MR-GO that was supposed to protect St. Bernard Parish, the crowns of the flood protection work were on average five feet below design elevation of 17.5 feet. | Varuso Depo., 48:12-25, 49:1-17, 49:18-21; 50:12-23, 66:23-25, 67:1-2 |
| 241.      By 1992, the ACE had determined that crest elevations along Reach 2 of the MR-GO had dropped to approximately 18 feet NGVD which is below the target (design) level of 20.5 feet NGVD, while in some sections the crown elevations had settled to 14 feet. | Bea Report, p. A. 23, Table A.2 |
| 242.      The USACE found that it could not retain this earthen structure along the Reach 2 of the MR-GO at the design grade despite two major augmentations in the | MSJ Exh. 56, Team Louisiana, p. xiii. |

| | |
|---|---|
| late 1970s and mid-1980s, and a less extensive rebuilding in the early 1990s. | |
| 243.      On the south side of the funnel along the MRGO, IPET interprets the maximum surge as being more uniform, ranging from 17.5 to 19.5 ft MSL (Figure 22). IPET had to add more than 2 ft to the computed surge to get to this level. Based on our understanding of the HWMs in this area, we would place the maximum surge at least a foot lower along the MRGO, but this is a matter for interpretation, and there is no right answer. IPET adds between 1 and 3 feet for waves, giving a combined water level that ranges from 19.5 to 23.0 ft MSL. The design elevation for the levee crown in this area is 17.5 ft MSL, and the actual elevation ranged from 15 to 18 ft MSL, so the stage was set for general overtopping. This overtopping, and the wave attack that preceded it, destroyed the MRGO levee, causing complete loss in some places and significant degradation in most (Figure 23). | MSJ Exh. 56, Team Louisiana, p. 39 |

### b.      No Armoring

| | |
|---|---|
| 244.      Another indication that the flood protection works along Reach 2 of the MR-GO were still "a work in process toward a hurricane protection structure" at the time of Hurricane Katrina was the absence of some form of armoring like a clay cap. | Dalrymple Depo., 99:16-23 |

c.   **The Incomplete Hurricane Flood Protection System Was Not Turned Over To Local Sponsors**

| | |
|---|---|
| 245.      Because the USACE never completed the LPVHPP, it could not legally pass responsibility for major maintenance or upgrades to the local sponsors, or initiate a new project to bring protection to a higher standard. | MSJ Exh. 56, Team Louisiana, p. viii. |
| 246.      By the time of Hurricane Katrina, the Army Corps had not provided formal notices to local sponsors concerning transfer of any of the flood protection works along Reach 1 and Reach 2 of the MR-GO.  These flood protection works were not turned over to local sponsors because none of them had been completed to a stable design elevation. | MSJ Exh. 92, Naomi Depo., p. _____; Dalrymple Depo. 80:20-25, 81:1-9 |
| 247.      While the assurances signed by local sponsors do not define project completion, internal Corps regulations provide that completed projects or completed project units will normally be turned over when all construction, cleanup work, and testing of mechanical, electrical, and other equipment are complete and the project is in proper condition for the assumption of operation and maintenance by the local sponsors.  See Corps Regulation No. ER 1150-2-301.  Transfer is to be accomplished through a formal notice from the Corps to the local sponsor that includes a transfer date determined by the Corps' district engineers. According to Corps officials, the formal notice generally is in the form of a letter to the local sponsor. | GAO1, pp. 7-8 |

| | |
|---|---|
| 248.     Consistent with federal law, agreements between the Corps and local sponsors of the LPVHPP project specify that local sponsors are responsible for operation, maintenance, repair, replacement, and rehabMSJ Exh. 72, ILITation ("OMRR&R") of the levees when the construction of the project, or a project unit, is complete. See 33 U.S.C. § 2213(j). | GAO1, p. 6 |
| 249.     Once construction of LPVHPP project units were completed, the Corps was supposed to transfer these project units to the local sponsors for OMRR&R. These sponsors include the Orleans, East Jefferson, Lake Borgne, and Pontchartrain levee districts.  For example, on March 2, 1999, the ACE notified the Board of Commissioners of the East Jefferson Levee District that the ACE's work for this area "had been completed" under the Flood Control Act of 1965 and turned over to the local sponsor responsibMSJ Exh. 72, ILITy "for the operation and maintenance of the completed features of the Lake Pontchartrain and Vicinity Hurricane Protection Project in Jefferson Parish."  This is a typical ACE notice of completion and turnover to a local operator for completed features of the LPVHPP.  Some day when other portions of the LPV are in fact completed, similar notices will be given to the local districts. | GAO1, p. 6; Naomi Depo. Exh. 29; Naomi Depo. Exh. 30; MSJ Exh. 92, Naomi Depo. 323:11-20, 345:8-11 |
| 250.     At the time of Hurricane Katrina, the ACE had not yet completed the man-made flood protection features along Reach 2 of the MRGO because of continuing soil consolidation (settlement), and these flood | Dalrymple Depo., 80:2-25; 81:1-9 |

| | |
|---|---|
| protection works had not been turned over to local sponsors. | |
| 251.      At the time of Hurricane Katrina, none of the LPVHPP project units, including flood protection works along Reach 1 and Reach 2 of the MR-GO, had been turned over to the local sponsors by the Army Corps because they were not complete and remained in an "interim" status. | Naomi Depo. __; MSJ Exh. 72, ILIT, p. F-35 (quoting A Nation Still Unprepared) |
| 252.      "There are still pieces that have to be done. We are not going to turn over a piece of the project until every piece in that ring of protection is completed.  If there is one little thing left to do I think by regulation – I could be wrong – I think we have to have the entire system 100 percent complete so we turn over the entire segment that is protected, a certain area of the City." | MSJ Exh. 72, ILIT, p. F-35 (quoting Al Naomi, LPVHPP Senior Project Manager) |
| 253.      Before Hurricane Katrina, the 17th Street, Orleans and London Avenue Canal flood protection structures had been certified as complete by the ACE and had been turned over to the Orleans Levee District. | CITE TO BE PROVIDED |

**3.    The ACE Never Even Undertook to Design or Construct A Hurricane Flood Protection System Against Probable Maximum Hurricane Dimensions**

| | |
|---|---|
| 254.      A Probable Maximum Hurricane is defined by the ACE as: "The hurricane that may be expected from the most severe combination of meteorological conditions that are reasonably possible in the region." | Hurricane Document No. 231, p. 20 |
| 255.      In the Flood Control Act of 1965, Congress, | MSJ Exh. 9, House Doc. No. |

| | |
|---|---|
| in addition to authorizing a Standard Project Hurricane dimension, also mandated a Hurricane Flood Protection System designed according to the Probable Maximum Hurricane criteria for designing flood control structures. The ACE never designed or constructed a system according to the more protective PMH criteria that would result in flood control structures that would not fail upon overtopping. | 231, pp. 20, 46-47; IPET, p. III-35; American Society of Civil Engineers, *The New Orleans Hurricane Protection System: What Went Wrong And Why* (External Review Panel, 2007), "ACE"), p. 66 |
| 256.     The PMH was not integrated into the design process and as a result the flood protection structures were not designed for overtopping that would accompany storms whose intensity exceeded that of the SPH.  The structures failed to be resilient and robust and were not able to tolerate expected overtopping damage.  Floodwalls were designed without such provisions, and as a result, upon overtopping, the soils behind the walls were eroded and contributed significantly to failure of these flood protection structures.  Earthen levees were also designed without such provisions, and as a result, upon overtopping, the soils on the protected side of the levees were severely eroded and contributed to failure of these flood protection structures. | MSJ Exh. 9, House Doc. No. 231, pp. 46-47; Bea Expert Report ¶ __; ASCE, pp. 65-66 |
| 257.     The ACE did not evaluate the hurricane protection system for the effects of a more severe storm such as the PMH.  While it is clear that using a stronger wind field would have led to a higher estimated surge level, without extensive modeling there is no way to predict how much higher the levees would have been if the PMH had been used instead of the SPH.  Regardless of the | ASCE, p. 66; IPET, p. 12-13 |

| | |
|---|---|
| actual numbers, if the hurricane protection system had been evaluated using PMH criteria, the consequences of a more severe storm could have been incorporated.  For example, levees susceptible to overtopping and erosion could have been armored.  Pump stations could have been strengthened.  More comprehensive evacuation programs could have been instituted.  The USACE's apparent non-conservative selection of the design hurricane is inconsistent with that needed to protect public safety when an extreme natural force such as Hurricane Katrina strikes. | |

### 4.    The Incomplete System Caused Catastrophic Consequences

| | |
|---|---|
| 258.    "Approximately 80 percent of New Orleans was flooded, in many areas with depth of flooding exceeding 15 ft.  The majority, approximately two-thirds overall in areas such as Orleans East Bank and St Bernard, of the flooding and half of the economic losses can be attributed to water flowing through breaches in floodwalls and levees.  There were at least 727 fatalities in the five parishes in and around New Orleans, and over 70 percent of the fatalities were people over age 70.  The poor, elderly, and disabled, the groups least likely to be able to evacuate without assistance, were disproportionately impacted." | IPET, p. 1-3 |
| 259.    The flooding resulting from the overtopping and breaching was catastrophic. Figure 23 shows the extent and depth of flooding for the New Orleans metropolitan area where almost 80 percent was inundated.  The greatest | IPET, pp. I-48, I-49 |

| | |
|---|---|
| depths of flooding exceeded 15 feet. | |
| 260.　　The incompleteness of the HPS made a material contribution to the catastrophic flooding.  Lower than authorized elevations of flood protection structures contributed to the overtopping and failure of both floodwalls and levees.  A completed system would have prevented much of the catastrophic flooding and resulting loss of life and property. | IPET, p. 1-5-20 |
| 261.　　The Katrina tragedy demonstrates that federal government inaction – particularly not completing even the modest HFPS of 40 years after Congressional approval – has devastating consequences. | Exhibit __ ("An Unnatural Disaster:  The Aftermath of Hurricane Katrina, Scholars of the Center for Progressive Reform (September 2005), p. 1. |
| 262.　　The catastrophic flooding of GNO was not a natural disaster, but a man-made disaster caused in part by the ACE's decision not to design or construct proper hurricane flood protection structures along the MR-GO consistent with the Congressional mandate and the ACE's awareness from Hurricane Betsy and its aftermath that the MR-GO had opened the southern and eastern flanks of GNO to attack by the hurricane storm surge. | Bea Expert Report, ¶ 26 |
| 263.　　"Essentially, the city was at risk along its entire perimeter because much of the land is significantly below sea level and any breach in the protective structure that encircles the city has the potential to cause flooding over much of the project area." | Decision-Making Chronology, p. 3-37 |
| 264.　　"With the exception of four foundation design failures, all of the major breaches were caused by | IPET, pp. 1-2 to 1-3; MSJ Exh. 56, Team Louisiana, p. 132 |

| | |
|---|---|
| overtopping and subsequent erosion. Reduced protective elevations increased the amount of overtopping, erosion and subsequent flooding, particularly in Orleans East. Ironically, the structures that ultimately breached performed as designed, providing protection until overtopping occurred and then becoming vulnerable to catastrophic breaching." | |
| 265.      Regardless of which mechanism contributed most to the failure (ie., overtopping, erosion, and/or underseepage), it is hard to overestimate the significance to the breaching process of constructing the I-walls on the east side of the IHNC almost 2 feet low. From the surge hydrograph, we can determine that overtopping would have been initiated about 3 hours later if the wall was built to a true LMSL78 value. Given that many miles of low IHNC I-walls withstood the surge even though they were overtopped for a prolonged period, it is likely that the large catastrophic southern breach in the Lower 9th Ward, as well as the smaller to the north, may not have occurred if the proper crown elevation had been specified for construction. | MSJ Exh. 56, Team Louisiana, p. 126 |

| | |
|---|---|
| 266.     The design elevations of most levees, floodwalls and structures affected by the Lake Borgne funnel were less than required to prevent overtopping by Katrina's surge and waves. This could have been prevented only if the pre-1965 hurricane oceanography had been updated to incorporate the 20 percent increase in maximum wind speed specified in 1973 and expanded in 1979 SPH (see Figure 81a). But most levee and floodwall crown levels were deficient by more than 2 ft below the already inadequate design level, at least in part because (1) of the confusion of NGVD29 with local mean sea level, and (2) a lack of accommodation for the subsidence rates of 3 to 4 ft/century known since at least the 1950s to affect the GNO area. These deficiencies did not cause the foundation failures that doomed the Orleans Metro, but clearly had an effect in the failure along the IHNC into the Lower 9th Ward. These deficiencies undoubtedly contributed significantly to the early onset and depth of flooding in New Orleans East and St. Bernard. | MSJ Exh. 56, Team Louisiana, pp. 135-36 |
| 267.     Crown elevation deficiencies ranging up to 5 feet at the time Katrina struck resulted in prolonged overtopping of floodwalls and levees along the Inner Harbor Navigation Canal (IHNC) and to the east in the Lake Borgne funnel that otherwise would have been overtopped only briefly. | MSJ Exh. 56, Team Louisiana, The Failure of the New Orleans Levee System During Hurricane Katrina, December 26, 2006 ("MSJ Exh. 56, Team Louisiana"), p. v |
| 268.     Prolonged overtopping led to catastrophic breaches into the Lower 9th Ward on the east and into Orleans Metro on the west, and contributed to the early | MSJ Exh. 56, Team Louisiana, The Failure of the New Orleans Levee System During |

| | |
|---|---|
| failures of levees along the Gulf Intracoastal Waterway (GIWW) and MRGO. Early failure of the MRGO levee allowed the 32,000 acre wetland buffer between MRGO and 40 Arpent back levee to fill and overtop the 40 Arpent back levee while the surge was still rising, and resulted in catastrophic flooding in St. Bernard to an elevation of 11 ft (NAVD88). | Hurricane Katrina, December 26, 2006, p. v. |
| 269.      As shown in Map 3-2, the differences [between the design protection elevations and the actual pre-Katrina protection elevations] are substantial for the Citrus Back Levee, IHNC, East and West, New Orleans East Back Levee, and Chalmette Extension, in some instances at least three feet.  Consequently, Katrina-induced overtopping of structures was worse than would have been the case had all structures been constructed and maintained at the originally intended design elevations." This loss of levee crest and floodwall height exacerbated problems with overtopping. | *Decision-Making Chronology*, p. 3-36 (footnote omitted); Map 3-2; MSJ Exh. 72, ILIT, II-7 |
| 270.      One of the lessons of Katrina that is already obvious is that once the levees were overtopped, destruction was catastrophic. | MSJ Exh. 72, ILIT, p. F-40 |
| 271.      Some overtopping of the structures was expected due to the intensity of the storm, which would result in localized flooding.  However, the catastrophic flooding was caused by the massive and numerous failures (breaches) of levees and floodwalls resulting from the sustained overtopping. | MSJ Exh. 72, ILIT, p. F-22 (quoting *Lessons Learned*; MSJ Exh. 72, ILIT, p. II-4) |
| 272.      As various investigators have concluded, if | Bea Expert Report ¶ 25 |

91

| | |
|---|---|
| the breaching in the EBSBs or the overtopping of Levees and floodwalls along the MR-GO had not occurred, there would have been minor inundation in New Orleans East, Lower 9th Ward, and St. Bernard Parish, but not catastrophic flooding (USACE 2007, MSJ Exh. 56, Team Louisiana, Kok *et al.* 2007).  Much of the catastrophic flooding, property damage, injuries, and loss of life could have been prevented if the USACE had designed and constructed proper hurricane flood protection Levees in place of EBSBs along the MR-GO.  Similar observations apply to the breaches that developed at the IHNC on both east and west sides. | |
| 273.     On the IHNC and MRGO, every foot of crown deficiency when the surge was above 11 ft meant that overtopping and levee erosion started a half hour earlier. A half-hour in the lifetime of a moving hurricane can mean the difference between success and failure in preventing catastrophic flooding. | MSJ Exh. 56, Team Louisiana, p. ix |
| 274.     Overtopping of a resilient MRGO (Reach 2) levee constructed to the design level (MSL) would have delivered only about half of the volume necessary to fill the 32,000 acre wetland behind the levee and initiate overtopping of the 40 Arpent back levee. Had this levee failed at a later stage in the surge hydrograph, or failed less completely, it is possible that the storage capacity of the 32,000 acre wetland buffer would have absorbed the discharge across the levee alignment for long enough to save Chalmette and the rest of St. Bernard from the | MSJ Exh. 56, Team Louisiana, p. 135 |

| | |
|---|---|
| disastrous flooding that occurred across the local 40 Arpent levee. | |
| 275.       All of the levee and floodwall reaches exposed to the Lake Borgne surge system, including those along the IHNC, experienced overtopping. If the IHNC floodwalls had been at the design elevation, they should have experienced less than 1 ft of overtopping at peak surge, rather than 1.5 to 3.0 ft that occurred. This would have prevented some of the breaches and transition failures. | MSJ Exh. 56, Team Louisiana, pp. 133-34 |
| 276.       MSJ Exh. 56, Team Louisiana analyzed the pre-Katrina level of deficiency relative to current sea level (LMSL05) for each of 22 HPS named levee/floodwall reaches (with GDMs) using 1999 LIDAR data, limited ground truth surveys and post-storm survey data scattered throughout the final IPET report (Table 15).  MSJ Exh. 56, Team Louisiana found that of the 22 HPS elements analyzed, 18 had deficiencies of 2 feet or more from the design level for the protective structure when assessed relative to current sea level (LMSL05).  Except for the uncapped Orleans Avenue Canal levee which overtopped but did not breach, all of the most deficient levee reaches were affected by the Lake Borgne funnel and were exposed to the highest surge and largest waves experienced in the GNO area. | MSJ Exh. 56, Team Louisiana, pp. 132-33 |
| 277.       The 8.4 mile long New Orleans East Levee protecting the east side of the Bayou Sauvage National Wildlife Refuge should not have been overtopped at all, | MSJ Exh. 56, Team Louisiana, p. 134 |

| | |
|---|---|
| although the overwash there during Katrina appears to have been relatively minor and did not result in breaches (Figure 39). There was one wall transition failure. The sandy New Orleans East Back Levee along the GIWW would probably not have been resilient even if it was up to grade, rather than 4 ft low in places. It was overtopped by 2 feet of surge topped by substantial waves, and was constructed of a poor quality sandy hydraulic fill. Over 4 miles of levee and integrated floodwalls breached catastrophically as the surge and waves rose 4 to 5 ft over the crown elevation. | |
| 278. The Citrus Back Levee (along GIWW) east of Paris Road (Figure 39) was less than 2 ft below the 18 ft design level, and was constructed of resistant clay materials. It was overtopped primarily by waves (Figure 42a.) but was not breached, and proved to be quite resilient. The design level of protection of the Citrus Back Levee to the west of Paris Road was 3 ft lower, and was perhaps as low as 12.5 ft in places (Table 15). It experienced a surge up to 16.5 ft with some unanticipated waves. Here the levee held up well under 4 ft of overtopping, but I-walls integrated into the levee failed as a result of back scour (Figure 41). | MSJ Exh. 56, Team Louisiana, p. 134 |
| 279. South of the MRGO/GIWW channel that forms the throat of the funnel, the Chalmette Levee west of Paris Road (Figure 44) was up to 4 ft deficient in spots, but, like the Citrus Back Levee on the north side of the channel, it held up well under 4 to 6 ft of overtopping. The | MSJ Exh. 56, Team Louisiana, p. 134 |

| | |
|---|---|
| extent of the overtopping was exacerbated by the deficiencies, and hastened the filling of the St. Bernard wetland buffer to the south, but this 7 mile levee reach did not breach. | |
| 280.        The 12 miles of the Chalmette levee that follows the south bank of the MRGO were deficient from the 17.5 ft design elevation by up to 5 ft (Table 15). This levee was also constructed primarily of hydraulic fill obtained from the MRGO channel, much of which was sand, silt and shell. It is essentially a sea dike that experienced the most severe wave attack of any levee reach in the GNO HPS (Figure 44). If it was up to grade and had been built to survive the wave attack with the crown intact, it would eventually have been overtopped by 2 to 3 ft of surge and waves.  Because of grade deficiencies and the poor materials used in its construction, however, there is little doubt that most of this levee was washed away before the surge ever reached the design level of protection (Figure 89a). Failures of transitions, sheetpile walls and bayou closures also occurred in this 12 mile levee run, but most damage was done by wave-induced overtopping and erosion. | MSJ Exh. 56, Team Louisiana, pp. 134-35, Table 15 |
| 281.        The 11 miles of the Chalmette Extension that turns south from the MRGO and to the west to rejoin the main east bank levee of the Mississippi River (Figure 44) was fronted by wetlands and did not experience the kind of wave attack that affected the MRGO levee (Figure 89b). It was also built more robustly with a river sand core covered | MSJ Exh. 56, Team Louisiana, p. 135 |

| | |
|---|---|
| by a substantial thickness of hauled clay. This levee experienced overtopping in places where it was up to 4.5 ft deficient in elevation relative to the design, but there was no breaching and very little damage overall. The volume of water contributed by overtopping of this reach was negligible compared to what came across the failed MRGO alignment. | |
| 282.      The storm surge and waves first attacked the Plaquemines Levees well before Katrina's landfall, causing significant overtopping and erosion before dawn.  The MRGO Levees were soon hit with similar conditions and eventually both Plaquemines and St. Bernard Levees would be overtopped by both high surge and high, long-period waves.  The persistent east to west winds had also built up a significant surge level at the convergence of the GIWW and the IHNC. Wind-generated waves reached at least 4 ft in the IHNC, contributing to very high water and dynamic loading on structures.  The surge and waves had a devastating effect on the sections of the levees along the GIWW (Figure 17) and MRGO (Figure 18) (p. I-43) that were constructed with materials dredged from the adjacent channels using hydraulic fill. | IPET, p. I-42 |
| 283.      The overtopping waves created very high water velocities down the back sides of the levees, reaching 10 to 15 ft/sec.  These velocities were two to three times those experienced on the water side of the levees (4 to 6 ft/sec).  Since the potential for erosion is related to the cube of velocity, it is no wonder that the back | IPET, p. I-42; Figure 19 (pp. I-44, I-45) |

| | |
|---|---|
| sides of the levees, especially where they were comprised of erodible materials, were scoured away leading to, in many cases, complete breaching.  Figure 19 (pp. I-44, I-45) shows the close correlation between the degree of breaching from overtopping and erosion and the types of materials. In this example for New Orleans East, the correspondence of breaching and hydraulic fill constructed levees is obvious. | |
| During mid-morning, the I-walls along the IHNC were overtopped and erosion behind the wall reduced their stabMSJ Exh. 72, ILITy, causing three separate sections to fail.  The top photograph in Figure 22 shows a section of I-wall along the IHNC collapsed after overtopping created a scour trench behind it and reduced its stabMSJ Exh. 72, ILITy.  The bottom photograph shows an adjacent section of I-wall where the scour trench formed but the wall did not fail.  Water levels reached over 14 ft in the IHNC.  There was also a levee failure along the west side of the IHNC that caused additional flooding into the Upper Ninth Ward. | IPET, p. I-47; Figure 22 |

### 5.     Construction Of A Hurricane Flood Protection System To Prevent Catastrophic Flooding Was An Achievable Mission In A 40-Year Time Span

| | |
|---|---|
| 284.     When a project like the HPS for GNO has "such clear and obvious ramifications for public safety," there must be a sense of urgency in completing the mission in a more timely manner than over half a century. | MSJ Exh. 72, ILIT, p. xxv |

| | |
|---|---|
| 285.      It should not take 50 years to construct a critical system providing life-safety for a region like GNO with a population of nearly one million people. | MSJ Exh. 72, ILIT, p. xxiv |
| Two years before the GNO HPS was originally scheduled for completion, the Comptroller General of the United States reported in 1976 on the progress of the New Orleans levee protection plan (http://archive.gao.gov/f0402/098185.pdf). This GAO report points out that only 27 of 73 plans and specifications had been issued, and, further, that the New Orleans District was not spending its full annual allotment for the project despite the assertion that it was the top priority. | MSJ Exh. 56, Team Louisiana, p. 105 |
| 286.      The ACE was not sufficiently diligent in building a completed HPS 40 years after the devastating flooding caused by Hurricane Betsy in 1965. | MSJ Exh. 72, ILIT, p. 15-9, Appendix F, p. F-3 |
| 287.      The GAO was more critical of the USACE in a 1982 report than it had been in 1976, noting that estimated costs to complete the GNO HPS had escalated by a factor of ten and were now close to $1 billion, while the originally authorized work was only 49 percent complete after 15 years (http://archive.gao.gov/d42t14/119206.pdf). The increases in costs were largely attributed to foundation problems discovered after the work began, but were also attributed to the need to raise levees, particularly along the drainage canals to meet the "Weather Bureau's new data pertaining to hurricane severity." It is not clear what steps, if any, the | MSJ Exh. 56, Team Louisiana, p. 112 |

| | |
|---|---|
| USACE took to address the deficiency in maximum sustained wind speed associated with the pre-1965 SPH-based analysis.  While the USACE offered many excuses about the slow progress and cost overruns, it does not appear that they ever raised alarms about the inadequacy of the level of protection that they were, in fact, expecting to provide. The report quotes statements by local sponsors that they believed that the work would not be expedited until another tragedy struck the city. These statements, sadly, have been proved correct. | |
| 288.      "Good intentions and good beginnings are not the measure of success.  What matters in the end is completion:  Performance and results.  Not just making promises, but making good promises." | U.S. Office of Management and Budget, *Agency Scorecards* (Washington, D.C. 2006) |
| 289.      For many years, the Corps of Engineers was severely criticized for delays and cost increases in the Lake Pontchartrain and Vicinity Hurricane Protection Project (Government AccountabMSJ Exh. 72, ILITy Office 1972, 1982, 2005b, 2005c; Carter 2003, 2005a, Carter and Sheikh 2003, Carter et al 2005). | MSJ Exh. 72, ILIT, p. 12-5 |
| 290.      There is no evidence that the ACE ever told Congress, before or after Hurricane Katrina, that the Congressionally-mandated Hurricane Flood Protection System – designed and built to a Standard Project Hurricane dimension, was unachievable or impossible or that the ACE lacked the expertise to carry out this mission. | |
| 291.      The Corp's mission was, in fact, achievable. | MSJ Exh. 72, ILIT, Chapter 12 |

6.      **The Reasons For Mission Failure Are Largely Attributable To Congress And The ACE**

a.      **Incorrect Datums**

| | |
|---|---|
| 292.      There is a very simple reason for near universal deficiencies observed on floodwall crest levels. Most levee crown levels are also low, but these structures are more likely to be affected by local settling. In examining design and construction contract documents and drawings, IPET noted that the New Orleans District (NOD) constructed virtually all structures to the elevation specified in the SPH-based design, but relative to the National Geodetic Vertical Datum of 1929 (NGVD29), rather than to the local mean sea level (LMSL) elevation (IPET 2006b, II). A geodetic datum is a land-based reference system. It is not explicitly connected to the oceanographically relevant mean sea level surface upon which must be superimposed the SPH-based levels of tide, surge and waves.  In 1965, when the HPS was authorized, the mean level of Lake Pontchartrain was more than 1.3 ft above 0.0 ft NGVD29 in the GNO area.  This failure to build and maintain the flood structure at the proper height above sea level diminished the level of protection they would provide since a structure's level of protection is so closely related to its height above sea level. | MSJ Exh. 56, Team Louisiana, pp. 116-17 |
| 293.      At the time Katrina struck, we can account for more than two feet of the observed deficiencies in IHNC floodwall elevations through (1) the conflation of | MSJ Exh. 56, Team Louisiana, pp. 123-24 |

| | |
|---|---|
| NGVD29 and LMSL, and (2) lack of provision for sea level rise. Localized settlement played a lesser role in some places, as would be expected for an older structure. | |
| 294.      The levees and floodwalls were not at or above the crown elevations specified in designs for HPS elements necessary to resist overtopping by surge and waves associated with the Standard Project Hurricane. Floodwall and levee crown elevations were built 1 to 2 ft low because of an erroneous assumption at USACE New Orleans District (NOD) that an elevation of zero referenced to the National Geodetic Vertical Datum of 1929 (NGVD29) was equal to -- and interchangeable with -- local mean sea level (LMSL). LMSL was the relevant datum for superimposition of hurricane surge and wave height from a 1950's era oceanographic analysis. In 1965, zero NGVD29 was between 1.3 and 1.6 feet below LMSL at different parts of the system, and floodwalls and levee crowns were constructed lower by this margin. This mistake was locked in for continuing HPS construction when the NOD adopted a policy in 1985, with the approval of the USACE Lower Mississippi Valley Division (LMVD), to explicitly use the outdated 1965 NGVD29 adjustment for elevation control. As a result, no provision was made to account for the 3 to 4 ft/century subsidence rates characteristic of the GNO area even though this rate was known at the time of authorization. | MSJ Exh. 56, Team Louisiana, The Failure of the New Orleans Levee System During Hurricane Katrina, December 26, 2006 ("MSJ Exh. 56, Team Louisiana"), p.v |

b.    **Well Known Subsidence/Settlement**

| | |
|---|---|
| 295.    All of the projects in the LPVHPP are constructed over weak and compressible soils. StabMSJ Exh. 72, ILITy and settlements of the structures are generally critical design issues. The weak and compressible foundation soils generally require that all levees be constructed with staged construction procedures. Consequently, relatively long periods of time were frequently required to achieve project grades for levees. | IPET, p. III-3 |
| 296.    Concerns regarding settlements and subsidence were expressed early in the development of the NOFDS, but apparently no effective action was taken by the ACE to quantify the regional subsidence and settlements and to make appropriate adjustments to the NOFDS.  Even though information was developed by the National Geodetic Survey that the reference benchmarks being used as controls in construction of the NOFDS were in excess of one foot low, the decision was made in August 1985 to use the benchmarks "current at the time of construction of the first increment of the project" (1965) (Chatry 1985). | MSJ Exh. 72, ILIT, p. 12-8 |

c.    **Funding**

| | |
|---|---|
| 297.    Estimated costs to complete the project grew nearly ten-fold over the project history due to price inflation and project design changes. | Decision Making Chronology, Chapter 6-4 |
| 298.    One of the primary difficulties was the Byzantine process by which large, complex, regional-scale | MSJ Exh. 72, ILIT, p. II-2 |

| | |
|---|---|
| flood protection systems are conceived, approached, designed, funded, constructed, maintained, and operated. | |
| 299.      The ACE's efforts to build the HFPS for Greater New Orleans after 1965 were delayed because of sporadic and inadequate funding by Congress.  The appropriations came in stages, and the ACE did not receive the funding levels requested.  Among other reasons, this uncertain and insufficient funding contributed to the substantial delays and the failure of the flood protection works along the IHNC as well as Reach 1 and Reach 2 of the MR-GO to be completed to design elevations by the time of Hurricane Katrina. | Dalrymple Depo. 160:9-22; Naomi Depo., _____ |
| 300.      Congress never appropriated at any time all the money that the ACE needed to build the HFPS authorized by the LPUHPP legislation.  The money came in stages over time and was not always the amount requested. | Dalrymple Depo., 160:11-21 |
| 301.      Over the years, the ACE's request to fund construction of the HFPS was declined by several Administrations. | Unnatural Disaster, p. 4 |
| 302.      In June 2005, the ACE New Orleans District and its LPVHPP construction projects experienced a "drastic" reduction in its funding, causing a hiring freeze and delay in all army contracts. | MSJ Exh. 92, Naomi Depo. 431:1-25, 432:1-17, Naomi Depo. Exhibit 63 at p. __. |
| 303.      One effect of project cost growth within a constrained budget environment was to extend the time to project completion. Growing project costs had to be funded from a static federal budget spread among competing civil | Decision-Making Chronology, p. ES-10 |

| | |
|---|---|
| works priorities nationally. | |

### d. Lack of ACE In-house Engineering CapabMSJ Exh. 72, ILITy

| | |
|---|---|
| 304.      In 1969, the ACE wrote:  "Hurricane Betsy caused extensive damage in the New Orleans area in 1965. The repetition is feared by all concerned including the Louisiana Congressional delegation.  Heavy pressure has been exerted to expedite construction of protective works particularly for the Lake Pontchartrain barrier and Seabrook lock. . . . The engineering effort required to plan this project and other projects of the continuing program plus the new starts for this fiscal year far exceeds the present in-house engineering capabMSJ Exh. 72, ILITy of the [New Orleans] District." | Naomi Depo. Exhibit 23 |
| 305.      The U.S. Army Corps of Engineers is historically an insular agency, known for doing things its own way.  The Army Corps' staff failed to recognize and prioritize the challenges of levee upgrades and receding wetlands to the city of New Orleans and surrounding areas. Over the past few decades, the Corps' organization outsourced more work, lost many engineers to private industry, and consequently suffered a diminished capacity to attract top-notch engineers. | MSJ Exh. 72, ILIT, 12-9 |
| (G) | |

H.        **HURRICANE KATRINA, CATASTROPHIC FLOODING OF
          GREATER NEW ORLEANS, AND PERFORMANCE OF THE
          HURRICANE FLOOD PROTECTION**

1.        **Storm Surge**

| UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|
| 306.      The storm surge, not the winds, is the most destructive part of a hurricane, and Katrina produced a massive storm surge. A precise measurement of Katrina's storm surge in the New Orleans area is difficult to measure, in part because of the widespread failures of tide gauges.  While the surge varied by location, some preliminary estimates are that the storm surge off Lake Borgne, which abuts New Orleans, was approximately 18-25 feet depending on the location. | *A Failure of Initiative*, p. 93; A Nation Still Unprepared, Chapter 1-1 |
| 307.      Katrina made landfall as an "extraordinarily powerful" hurricane.  A recent updated analysis from the National Weather Service concluded it made landfall at the upper end of a category 3 hurricane (with estimated maximum sustained winds of 110 knots) near Buras, Louisiana.  The sustained winds over all of metropolitan New Orleans and Lake Ponchartrain likely remained weaker than category 3 strength. | A Failure of Initiative, p. 93 |
| 308.      At landfall, which was approximately 60 miles southeast of New Orleans, Hurricane Katrina had a central pressure of 27.17 Hg and a wind speed of 140 mph. The center of Katrina's eye, which was estimated at 25 to | MSJ Exh. 56, Team Louisiana, p. 27; GAO1, p. 5; MSJ Exh. 72, ILIT, p. _____ |

| | |
|---|---|
| 35 miles in diameter, passed about 40 miles east of downtown New Orleans, but the city did not experience winds stronger than Category 1 or weak Category 2 (95 mph) velocities.  Katrina's strongest winds were in the right-hand leading quadrant that was almost continually over water. | |
| 309.      Because the eye of Katrina passed just slightly to the east of New Orleans, the hurricane threw unusually severe wind loads and storm surges on the flood protection systems.  The surge overtopped large sections of the levees during the morning of August 29 east of New Orleans, in Orleans and St. Bernard Parish, and it also pushed water up the Intercoastal waterway and into the Industrial Canal.  In the Chalmette Loop, the storm surge was between 15.5 and 18.7 feet, while the design elevation was between 14.5 and 18 feet. | A Failure of Initiative, p. 94; Decision-Making Chronology, p. 3-36 |
| 310.      Observed peak water levels at the entrances to canals along the south shore of Lake Pontchartrain were 10.8 to 11.8 ft, which were slightly less than or at the design peak water levels of 12.0 ft. In the Inner Harbor Navigation Canal (IHNC), north of the intersection of IHNC with the Gulf Intracoastal Waterway (GIWW)/Mississippi River Gulf Outlet (MRGO), there was a large gradient in observed peak water level, from 15 ft at the intersection to 11.8 ft at the IHNC entrance to Lake Pontchartrain. In this reach of canal, peak water levels were at, above, or below design levels, depending on location. Between this intersection and the IHNC Lock to | IPET, pp. IV-2, IV-4 |

| | |
|---|---|
| the south, peak water levels exceeded the design water level of 13.5 ft by as much as 2 ft. Along the east/west-oriented GIWW/MRGO channel section, peak water levels exceeded the design value of 13.5 ft by approximately 2 ft. Along the MRGO adjacent to the St. Bernard Parish hurricane protection levee, peak water levels were 16 to18 ft, which exceeded design levels by as much as 5 ft. | |
| 311.      Peak significant wave height along the south shore of Lake Pontchartrain reached at least 8.7 ft, exceeding design values by about 1.0 ft. Wave periods were about equal to design values.  Along the levees adjacent to Lake Borgne, computed significant wave heights were consistent with or less than design values, but wave periods (15 to 16 sec) exceeded the design wave periods by a factor of 3. | IPET, p. IV-2 |
| 312.      Peak water levels along the south shore of Lake Pontchartrain, at lakefront entrances to the three drainage canals and the IHNC, ranged from 10.8 to 11.8 ft NAVD88 (2004.65).  These values were slightly below or at the design water levels.  The same is true for the northernmost section of the IHNC, north of the I-10 bridge over the canal, and for some distance to the east of Lakefront Airport along the Lake Pontchartrain shoreline of east Orleans Parish. Everywhere else along the east bank portion of the protection system, the maximum water levels produced by Katrina (14 to 20 ft) exceeded design values.  Along the east-facing levees of St. Bernard and Plaquemines Parishes, the storm piled water up against the | IPET, p. IV-257 |

| | |
|---|---|
| levee system to levels that exceeded design values by as much as 5.5 ft. | |
| 313.    Hurricane Katrina has been widely reported to have overwhelmed the eastern side of the New Orleans flood protection system with storm surge and wave loading that exceeded the levels used for design of the system in that area.  That is a true statement, but it is also an incomplete view.  The storm surge and wave loading at the eastern flank of the New Orleans flood protection system was not vastly greater than design levels, and the carnage that resulted owed much to the inadequacies of the system as it existed at the time of Katrina's arrival.  Some overtopping of levees along the eastern flank of the system (along the northeastern frontage of the St. Bernard and Ninth Ward protected basin, and at the southeast corner of the New Orleans East protected basin), and also in central areas (along the GIWW channel and the IHNC channel) was inevitable given the design levels authorized by Congress and the surge levels produced in these areas by the actual storm.  It does not follow, however, that this overtopping had to result in catastrophic failures and breaching of major portions of the levees protecting these areas, nor the ensuing catastrophic flooding of these populous areas. | MSJ Exh. 72, ILIT, p. xx |
| 314.    Along the south shore of Lake Pontchartrain, significant wave heights produced by Katrina were between 8 and 9 ft, slightly exceeding design values. Wave periods were consistent with design values, about 7 sec. | IPET, p. IV-258 |

| | |
|---|---|
| Wave heights and periods were consistent with design values along the eastfacing levees of eastern Orleans Parish. Levees adjacent to Lake Borgne, and the east-facing levees to the south in Plaquemines Parish, were subjected to long-period storm wave energy from the Gulf of Mexico that propagated between and over the inundated barrier islands and inundated wetlands.  Wave periods along these east-facing levees were 15 to 16 sec, approximately three times greater than design values.  Wave heights along the east-facing St. Bernard Parish protection levees (heights as great as 6 ft) were less than or consistent with design values.  In light of the exposure of levees in St. Bernard and Plaquemines Parishes to long-period hurricane wave energy from the gulf, design wave values should be reassessed for these levee systems.  Wave height and period are both important in dictating runup and overtopping of levees and floodwalls. | |
|     315.      As the eye approached New Orleans, Katrina shoved a 14 to 17 foot storm surge up a "funnel" created by the hurricane protection levees at the convergence of the south bank of the MRGO and the north bank of the Gulf Intracoastal Waterway, and focused a torrent of water on the Inner Harbor Navigation Canal.  Winds over the greater New Orleans metropolitan area were most likely weaker than Category 3, but were probably stronger several hundred feet above ground, where brutal wind punched out windows in hotels and office buildings.  As the counterclockwise-moving hurricane passed over Lake | *A Nation Still Unprepared*, Chapter 4-3 to 4-4; Kemp Expert Report ¶ 29 |

Borgne on the eastern side of the city with a storm surge estimated at 18-25 feet, it shoved water west onto an edge of the levee that protected the northern edge of the Ninth Ward and St. Bernard Parish; 5 to 10 feet of excess surge easily slid over the levee walls.  Upon reaching Lake Pontchartrain, Katrina's winds produced a southward surge of lakewater along the northern edges of the Orleans East Bank and New Orleans East polders, with overtopping and a breach in New Orleans East, adjacent to the Lakefront Airport.

The surge from Lake Pontchartrain and Lake Borgne streamed into the Industrial Canal and the MRGO channel.  Here, too, the floodwaters easily overflowed the levees.  In time, the erosion of the earthen levees by overtopping led to numerous breaches that added to the torrent of water quickly filling the "bowls" that included the New Orleans East and Ninth Ward/St. Bernard polders.

| | |
|---|---|
| 316.      The inundation of New Orleans happened in two stages.  A "surge funnel" that attacked the levees and floodwalls along the MRGO, the Gulf Intracoastal Waterway and the Inner Harbor Navigation Canal caused the first flooding.  The second stage began when Katrina's storm surge muscled into Lake Pontchartrain.  "Both events caused overtopping, or flow over intact levees and floodwalls, as well as breaching that resulted in flow under and through levees and floodwalls," according to a report by the Center for the Study of Public Health Impacts of Hurricanes at Louisiana State University.  "In some cases, | *A Nation Still Unprepared*, Chapter 4-4 to 4-5; *see also id.*, Chapter 4-19; Kemp Expert Report ¶ 29 |

overtopping preceded or led to breaching, while in other places breaches opened before surge levels rose high enough to cause overtopping." A report by the American Society of Civil Engineers and the National Science Foundation reached a similar conclusion, noting that "most of the levee and floodwall failures were caused by overtopping, as the storm surge rose over the tops of the levees and/or their floodwalls and produced erosion that subsequently led to failures and breaches." Because the storm surge arrived ahead of the hurricane, some residential areas in the greater New Orleans area began to flood just after 4 a.m. Between 4 and 5 a.m., minor breaches opened in the levees at the intersection of the CSX Railroad and the northern arm of the Industrial Canal (adjacent and parallel to I-10) sending water into the New Orleans East polder to the east and the Orleans East Bank polder to the west. The flooding continued for over 12 hours. At approximately 6:50 a.m., the levees along all reaches of the Industrial Canal began to be overtopped and water started to pour into the city both to the east and the west. Between 5 and 7 a.m., the storm surge coming through Lake Borgne struck and destroyed several levee reaches along the MRGO channel and the Industrial Canal, flooding portions of the New Orleans East, Orleans East Bank and the Ninth Ward/St. Bernard polders. In some places, flooding continued for days. Levees along several reaches of the Industrial Canal were overtopped, resulting in water gushing to the west into the Orleans East Bank

polder and to the east into the New Orleans East and Ninth Ward/St. Bernard polders. At about 7 a.m., the 18-foot Lake Borgne storm surge peaked and almost certainly caused the rapid flooding at the Louisiana National Guard's Jackson Barracks in St. Bernard Parish. For years, the Louisiana National Guard had used this compound to deploy a small group of soldiers and officers close to the area where a major hurricane was likely to strike. The facMSJ Exh. 72, ILITy had stood up to numerous strong storms, including 1965's Hurricane Betsy. Brigadier General Brod Veillon, who was in command at Jackson Barracks on the night of August 28, said that, by dawn, Jackson Barracks had 6 to 12 inches of water in the parking lot, a typical amount from heavy rainfall. Within 30 minutes, however, the compound was engulfed by 10 feet of water. "It rose about a foot every 3 minutes. We watched it climb the stairs . . . I knew it was significant when the walls of Jackson Barracks, which are brick walls, began to collapse." By 7:30 a.m., levees along the west side of the Industrial Canal (at the railroad yard) failed and began a flood of the Orleans East Bank polder that continued for about 12-15 hours. By this time, there was massive flooding in much of the city, and the pumping stations had died.

At approximately 7:45 a.m., the levees along the east side of the southeastern section of the Industrial Canal failed, sending a wall of water into the neighborhoods of the Ninth Ward/St. Bernard polder, especially the Lower

| | |
|---|---|
| Ninth Ward.  The National Weather Service reported that 3-8 feet of flooding was possible.  Then, at 8:30 a.m., a continuous wave of storm surge poured over a one-mile section of levee along Lake Pontchartrain behind the Lakefront Airport. The water kept coming for another two to three hours.  In the Ninth Ward/St. Bernard polder, floodwaters were reaching the second stories of bigger buildings and residents were fleeing to their attics. | |
| 317.        The angle of storm approach to the coastline, the rate of travel, and the radius of maximum wind are important meteorological considerations for determining the hurricane surge.  This was certainly true for Katrina that generated a 30 foot surge in Mississippi over a much greater stretch of coast than Hurricane Camille, yet was nominally a storm that fit most SPH criteria (Table 6). | MSJ Exh. 56, Team Louisiana, p. 99 |
| 318.        The storm surge, extreme amounts of rain, and high winds stressed the city's complex 350 mile levee system to its breaking point.  Several of the levees and floodwalls were overtopped, and some were breached throughout the day of landfall.  It was these overtoppings and breaches of the levee system that led to the catastrophic flooding of New Orleans. | *The Federal Response To Hurricane Katrina: Lessons Learned*, p. 34 |
| 319.        The storm surges produced by Hurricane Katrina overwhelmed the wetland system between Lake Borgne and Reach 2 of the MR-GO. | IPET, p. IV-258 |
| 320.        The 40 Arpent Canal Levee—southwest of Reach 2 of the MR-GO—is the nonfederal flood protection work that was severely overtopped along much of its | Bea Expert Report, p. 85 |

| | |
|---|---|
| length.  The design crest elevation is between 7.5 and 10 feet (MSL).  This structure suffered relatively little erosion damage even though its highest points were lower than the EBSBs along Reach 2 of the MR-GO.  This local flood protection work was composed of significantly more erosion resistant materials (primarily clay) than Reach 2 of the MR-GO. | |
| 321.      The 40 Arpent Canal Levee, while being overtopped in both Hurricanes Betsy and Katrina, survived largely intact because of the well constructed and grass sodded embankment and the limited protection afforded by the forested wetlands in a sizeable area seaward of the developed area. | Theis Expert Report, ¶ 28 |
| 322.      The healthy wetlands in front of large portions of the earthen 40 Arpent Canal Levee in St. Bernard Parish had an anti-erosion or buffering effect in protecting this levee during and after Hurricane Katrina because the wetlands absorbed some of the energy of the surge and some of the energy of the waves. | Dalrymple Depo., 108:1-16. |

### 2.     Overtopping of Flood Structures Caused Most Of The Flooding

| | |
|---|---|
| 323.      A "breach" of a flood protection work refers to "when the section of a levee erodes away or is washed away and no longer exists or you no longer have the levee crown elevation you had prior to the storm surge."  By contrast, "overtopping: entails storm water crossing over the crown elevation of a flood protection work to the protected side and the structure remains intact. | Varuso Depo., 159:22-25; 160:1-12 |

114

| | |
|---|---|
| 324.    Overtopping of levees was a major source of water into the polders of New Orleans, particularly during the early part of the flooding event.  Levees can be overtopped in two ways.  The first is wave overtopping, which means that the wind waves, created by the strong hurricane winds and propagating in channels and lakes, have a wave crest that exceeds the floodwall or levee crest elevation.  But since waves are time-varying and consist of the crest and the trough, this wave overtopping is intermittent and occurs when the surge level approaches the top of the floodwalls.  As the surge level climbs and then becomes greater than the elevation of the floodwall or levee, (flow) overtopping occurs, which is the flow of the hurricane surge water over the wall.  In New Orleans East, both wave overtopping and then (flow) overtopping occurred, for example, over the I walls of the Entergy Plant near the Paris Road bridge over the GIWW, over the earthen levee along the GIWW, and along the shoreline of Lake Pontchartrain. | Dalrymple Expert Report, pp. 6-7 |
| 325.    Water can overtop a flood protection work in two different ways:  (1) intermittent wave overtopping where the surge levels have not exceeded the height and splash over the crown and (2) actual surge overtopping where the surge exceeds the height of the structure and then an immense amount of water flows over the structure and into the protected area.  Even wave overtopping over time can result in a substantial amount of water flowing over the structure and into the protected area. | Dalrymple Depo., 117:14-25, 118:1-7 |

| | |
|---|---|
| 326.     Most of the levee and floodwall failures in the metropolitan New Orleans area—including New Orleans East, the Lower Ninth Ward, St. Bernard Parish, and Plaquemines Parish—"were caused by overtopping, as the storm surge rose over the tops of the levees and/or their floodwalls and produced erosion that subsequently led to failures and breaches."  One report described the overtopping as follows:<br><br>"Overtopping was most severe on the east side of the flood protection system, as the waters of Lake Borgne were driven west towards New Orleans, and also farther to the south, along the lower reaches of the Mississippi River. Significant overtopping and erosion produced numerous breaches in these areas.  The magnitude of overtopping was less severe along the Inner Harbor Navigation Canal (IHNC) and along the western portion of the Mississippi River Gulf Outlet (MRGO) channel, but this overtopping again produced erosion and caused additional levee failures." | A Nation Still Unprepared, Chapter 17-3 |
| 327.     Surges driven by Hurricane Katrina breached the LPVHPPP protective structures at 50 different locations, primarily as a result of overtopping. | Decision-making Chronology, p. 2-17. |
| 328.     If there had been no overtopping or breaching of flood protection works throughout the HFPS and there was only the 12 inches of recorded rainfall, there would have been "some localized flooding, but not catastrophic." | Dalrymple Depo., 111:12-17 |
| 329.     Overtopping of flood protection works along the IHNC and Reach 1 and Reach 2 of the MR-GO was a | Dalrymple Report, p. 7; Bea Report, pp. 98-99, 125 (Table |

| | |
|---|---|
| major source of flooding of populated areas in New Orleans East, St. Bernard Parish and the Lower Ninth Ward. Many of the breaches (failures) of flood protection works in these areas was preceded by overtopping which in turn caused erosion of the soil on the protected (population) side of the flood protection works and then a breach (failure) of the structure and even more extensive flooding. | 32); MSJ Exh. 56, Team Louisiana, Table 15; IPET, p. I-5-1 |
| 330.      Along Reach 2 of the MR-GO, there was largely "overtopping and then associated breaching" of the flood protection works, leading to massive erosion of the structures and water pouring into St. Bernard Parish. | Dalrymple Depo., 119:14-23 |
| 331.      During and after Hurricane Katrina, the structures along Reach 2 of the MR-GO were overtopped anywhere between five and six feet above the existing elevation, and significant amount of overtopping caused the erosion and subsequent breaches. | Varuso Depo., 362:8-14 |
| 332.      Overtopping of the hurricane protection by Hurricane Katrina was evident along nearly all portions of the IHNC. There were four breaches in the protection system, two on the east side and two on the west side. The east side breaches are both located in the Lower 9th Ward neighborhood and the west side breaches are both in the vicinity of France Road and Benefit Street. | IPET, p. III-439 |
| 333.      In contrast [to the MR-GO and IHNC], there was little or no overtopping along most of the levees in the vicinity of Lake Ponchartrain. The only breach along Lake Ponchartrain was in New Orleans East, which was probably due to overtopping. | *A Failure of Initiative*, p. 97 |

| | |
|---|---|
| 334.     The sections of the Citrus Back Levee along the north side of Reach 1 of the MR-GO that were not severely eroded were constructed from more cohesive, less erodible, and more compacted soils than the soils used for the Reach 2 and New Orleans Back Levee flood protection works. | Bea Expert Report, p. 38 |
| 335.     The flood protection works along the south side of Reach 1 of the MR-GO performed very well during and after Hurricane Katrina, in part because they were constructed from cohesive, compactable and less erodible soils, particularly strong and erosion resistant clay. | Bea Expert Report, pp. 42-44. |
| 336.     This overtopping of the flood protection works along the southern side of Reach 1 of the MR-GO, and this was to be expected since the maximum design elevation (before settling) was generally 15-16.5 feet and the surge plus waves in the area were estimated to be 13.5 to 15.5 feet. | MSJ Exh. 56, Team Louisiana, Table 15; Bea Expert Report, p. 42. |
| 337.     The maximum surge elevation (in feet) and current velocity (in feet per second) during Hurricane Katrina is estimated as follows:<br><br>Location / Elevation / Current Velocity<br>Lake Borgne   15.4   2.0<br>MR-GO   17.4   6.3<br>QIWW/Reach 1   16.7   8.1<br>(Paris Road)<br>IHNC   15.7   0.9<br>QIWW to Mississippi River | MSJ Exh. 56, Team Louisiana, Figure 26,(p. 46) |

| | | | |
|---|---|---|---|
| IHNC<br>QIWW to Lake<br>Pontchartrain | 11.7 | 8.3 | |
| 17th St. Canal | 11.4 | 1.9 | |
| 338.      After Hurricane Katrina, the ACE is designing and constructing flood protection works to a design grade at least 20 feet—2.5 feet higher than the design grade before Hurricane Katrina. | | | Varuso Depo., 90:3-6 |

### 3.      Catastrophic Flooding

| | |
|---|---|
| 339.      The flooding of Greater New Orleans during and after Hurricane Katrina was "a major and terrible disaster." | Expert Report of Robert A Dalrymple ("Dalrymple Expert Report"), p. 3 |
| 340.      [The NOFDS] failed catastrophically producing the single most catastrophic failure of an engineered system in the history of the United States. | MSJ Exh. 72, ILIT, p. 12-10 |
| 341.      The hurricane protection system (HPS) that all residents of GNO depended upon for their security from surge floods failed catastrophically with over 50 breachings or breaks. Over 170 miles of the 350 miles of the levees that protected greater New Orleans were either destroyed or damaged (IPET 2006b). | MSJ Exh. 56, Team Louisiana, p. 3. |
| 342.      Of the populated areas that constitute Greater New Orleans (GNO), 80 percent of Orleans Parish, 99 percent of St. Bernard Parish, and approximately 40 percent of Jefferson Parish were flooded, in some cases for weeks. | MSJ Exh. 56, Team Louisiana, p. 2. |
| 343.      New Orleans, the largest affected city— | The Federal Response to |

| | |
|---|---|
| which dominated much of what Americans saw on their televisions—suffered first from the initial impact of Katrina and then from the subsequent flood caused by breaches in its 350 mile levee system. Over an estimated eighteen-hour period, approximately 80 percent of the city flooded with six to twenty feet of water, necessitating one of the largest search and rescue operations in our Nation's history.  The flooding destroyed New Orleans, the Nation's thirty-fifth largest city. | Hurricane Katrina:  *Lessons Learned* (White House, 2006) ("*Lessons Learned*"), pp. 1-2, 6 |
| 344.        A throbbing metropolis of 470,000 before the storm, New Orleans had become at the time of our writing a struggling city that is home to barely 100,000 people. . . .  Significant portions of the city and region remain uninhabitable. In St. Bernard Parish, a few miles east of downtown New Orleans, only four houses did not suffer catastrophic damage from wind, rain, or the sudden flood that resulted from the breaking of the levees of the Mississippi River-Gulf Outlet Canal (MR-GO). The parish, once home to nearly 70,000 people, has seen its population dip to about 7,000, with nearly all of those people living in temporary housing. | A Failure of Initiative, p. 9 |
| 345.        When the winds and floods of Hurricane Katrina subsided, an estimated 1,330 people were dead as a result of the storm.  The vast majority of the fatalities—an estimated 80 percent—came from the New Orleans metropolitan area . . . . Many of the dead were elderly or infirm.  In Louisiana, approximately 71 percent of the victims were older than sixty, and 47 percent of those were | Lessons Learned, p. 8 |

| | |
|---|---|
| over seventy-five.  At least sixty-eight were found in nursing homes . . . .  Of the total known fatalities, there are almost two hundred unclaimed bodies remaining at the Victim Identification Center in Carville, Louisiana.47 As awful as these horrifying statistics are, unfortunately they are not the end of the story. As of February 17, 2006, there were still 2,096 people from the Gulf Coast area reported missing.  For the survivors, the aftermath of Hurricane Katrina has been characterized by a mixture of grief, anxiety, and frustration. Around 770,000 people were displaced—the largest since the Dust Bowl migration from the southern Great Plains region in the 1930s. | |

### 4.    Sources of Flooding

#### a.    Reach 1 Is The Conduit For Storm Surge Into The IHNC, New Orleans East, and Northern Sections of Lower 9th Ward

| | |
|---|---|
| 346.    From the perspective of storm surge propagation into the IHNC and New Orleans Metropolitan area, the critical section of the MR-GO channel is the one where the GIWW and MRGO occupy the same channel. It is through this connection that Lakes Pontchartrain and Borgne are hydraulically connected to one another via the IHNC. A water level gradient is established within the IHNC and the GIWW/MRGO; the gradient is determined by the storm surge levels in both lakes. The presence of an open channel is the key factor. The hydraulic connectivity | IPET, p. IV-258; MSJ Exh. 9, House Doc. No. 231, p. __. |

| | |
|---|---|
| existed prior to construction of the MRGO, due to the presence of the GIWW channel. | |
| 347.     This six-mile portion of the combined GIWW and MR-GO (Reach 1) is a 1,500 foot wide 40+ feet deep channel that "connects the funnel with the IHNC." | MSJ Exh. 56, Team Louisiana, pp. 59-60 |
| 348.     MSJ Exh. 56, Team Louisiana called the stretch of the shipping channel "Hurricane Alley." | MSJ Exh. 56, Team Louisiana, pp. 59-60 |
| 349.     The highest surge observed in the GNO was against the MRGO levee in the funnel formed by the convergence of the levee systems built along the north bank of the GIWW and the south bank of the MRGO. The surge penetrated six miles into the GNO through the portion of the GIWW that was enlarged as part of the MRGO project. | MSJ Exh. 56, Team Louisiana, p. 28 |
| 350.     The major breach sites in New Orleans and St. Bernard Parish from Hurricane Katrina are depicted in Figures 8-1, 8-2 and 8-3 and characterized in Table 8-1 of IPET. | IPET at 1-8-1 to 1-8-7; Figures 8-1, 8-2, 8-3, Table 8-1 |

**b.**    **St. Bernard Parish**

| | |
|---|---|
| 351.     The flooding of upper St. Bernard Parish was caused by waters originating in Lake Borgne and Reach 2 of the MR-GO overwhelming the MR-GO banks and flood protection works along Reach 2, passing to the west over the largely deteriorated wetlands, overtopping the 40 Arpent Canal Levee and flowing into the population areas. | Dalrymple Depo., 137:12-25, 138:1-14; Delft Team Report, p. _____ |
| 352.     Along Reach 2 of the MRGO, the surge | Dalrymple Depo., 77:13-17, |

| | |
|---|---|
| water went over the flood protection works, eroded the bank materials, and then the structures failed.  There were 50 breaches along Reach 2 alone.  Some of the crowns along a 12-mile stretch of Reach 2 eroded 10 feet below the crowns existing before Hurricane Katrina. | 156:2-13; Varuso Depo. 73:2-8, 156:2-13 |
| 353.       The waters that inundated St. Bernard Parish ponded to a high elevation of about 12 feet above mean sea level, destroying homes and businesses at all elevations above sea level in the populated St. Bernard Parish. | Bea Report, p. 85. |

c.    **Lower 9th Ward**

| | |
|---|---|
| 354.       The flooding of the Lower 9th Ward was largely caused by the waters overflowing the flood protection works on the west side of the IHNC and two breaches of flood protection works on the west side and some overtopping of the flood protection works on the south side of Reach 1 of the MR-GO.  It appears that overtopping preceded the two breaches of the flood protection works on the west side of the IHNC. | Dalrymple Depo., 138:11-25, 139:1-9, 11-17; Delft Team Report, p. __; IPET, p. IV-200 |
| 355.       The surge waters produced two massive breaches in the east bank of the IHNC at the western edge of the Lower Ninth Ward.  The south breach was the largest (nearly 900 feet in length), and the inrushing waters inundated the adjacent Lower Ninth Ward with great force. Overtopping and scouring occurred at both ends of the breach. | Bea Report, pp. 47, 52 |
| 356.       An interesting observation is that without the IHNC breaches almost the same volume of flood water | Kok, p. 45 |

| | |
|---|---|
| enters the populated area of the St. Bernard bowl compared with the scenario of MRGO breaches plus overtopping plus rain.  Without the IHNC breaches, it takes a little longer in the western part of bowl to reach the peak water level, but the peak itself is only marginally lower.  In the eastern part of the bowl, the influence of the IHNC breaches on the development of the water level is even smaller. | |

### d.    New Orleans East

| | |
|---|---|
| 357.        The New Orleans East area is bounded on the south by the GIWW, on the west by the IHNC, and on the north and east by Lake Pontchartrain and marshlands. Significant levee overtopping and breaches occurred all along the GIWW. There were also a few breaches along the floodwall on the IHNC near I-10, as well as overtopping of the floodwall near the Lakefront Airport. Overtopping also occurred along the levee at Lake Pontchartrain, but to a much lesser degree than on the GIWW. Therefore, the New Orleans East area received floodwaters from all directions. | IPET, p. IV-190; Delft Team Report, p. __ |
| 358.        IPET believes the main route of floodwater to New Orleans East was from the MRGO/GIWW funnel throat to the south.  It is likely that some of the water that flooded this area also came from breaches that occurred along the GIWW levee east of the Michaud Canal slip that filled the marshy area behind the federal levee and then overtopped the local levee (Figure 39). | MSJ Exh. 56, Team Louisiana, pp. 71-72; IPET, p. __ |

| | |
|---|---|
| Breaches along the GIWW affecting the residential areas of New Orleans East were much less extensive than those affecting the MRGO levee on the south side of the funnel. As a result, most flooding was caused by overtopping that stopped once surge levels dropped. IPET reports that the water level in New Orleans East initially got to +1.5 ft in some residential areas close to sources of overtopping, and higher in the industrial land to the south, and in the Bayou Sauvage marsh to the east. Once the surge abated on the GIWW, MRGO and IHNC, the surge water that had entered then spread out, dropping in some areas and rising in others until it reached equilibrium more than a foot below mean sea level. Because Little Woods is so low, however, with many homes between 8 and 12 ft below sea level, even flooding to this modest elevation had catastrophic consequences. | |
| 359.      The flooding of the largely unpopulated area behind the New Orleans East Back Levee came from waters in the Gulf Intracoastal Waterway ("GIWW") that overtopped and/or breached the earthen flood protection works on the north side. | Dalrymple Depo., 140:14-25, 141:1-14 |

## 5.      Flooding Even If Crowns Were At Design Elevation, But Not Catastrophic Flooding

| | |
|---|---|
| 360.      Even if the flood protection works had been completed to design grade elevation by the time of Hurricane Katrina, the surge would have exceeded the design grade elevation of all the flood protection works | Bea Expert Report, p. 125 (Table 3); MSJ Exh. 56, Team Louisiana, Table 15 |

| | |
|---|---|
| along the IHNC and Reach 1 and Reach 2 of the MR-GO by between 0.5 and 3 feet. | |
| 361.      Even if the flood protection works along Reach 2 of the MRGO had been at the desired design elevation of 17.5 feet, the surge from Hurricane Katrina of about 18 feet for two hours would have exceeded that height. | Dalrymple Depo., 85:15-25; 86:1-2 |
| 362.      The maximum storm surge along Reach 2 during and after Hurricane Katrina (at least 18 feet) exceeded the design grade level for several hours, facMSJ Exh. 72, ILITating overtopping of the flood protection works. | Dalrymple Depo., 85:15-25, 86:1-10, 93:17-24 |
| 363.      Flowing water seeks the path of least resistance—the lowest and weakest place.  Overtopping by waves and surge occurred much earlier at the section of flood protections works that had reduced elevations caused by settling, and the hurricane surges, current and wave action concentrated their corrosive and scour effects at the lowest sections. | Bea Expert Report, pp. 22-23; Bea Depo. _____ |

**6.      MR-GO Funnel Effect Contributed At Lease Three Catastrophic Feet Of Excess Surge and Current**

| | |
|---|---|
| 364.      Without the Reach 1 connector, the IHNC floodwalls would have seen a surge of 11 to 12 feet coming from Lake Pontchartrain and would have escaped most, if not all, of the catastrophic overtopping and breaching.  The Lake Borgne surge – delivered by the MR-GO funnel – added an additional three feet to Katrina's | Kemp Expert Report, ¶ 42 |

| | |
|---|---|
| storm surge.  The flow from the funnel also prolonged the period of high surge in Reach 1 and the IHNC because the storm surge from Lake Borgne was conveyed into this region earlier than the storm surge generated in Lake Pontchartrain.  The cumulative affect was to extend the period of high water beyond that which would have resulted from storm surge emanating from Lake Pontchartrain alone.  Both of these outcomes resulted from the decision to join the MR-GO and the GIWW and the design and construction of the MR-GO in a manner that created and intensified storm surges to cause the catastrophic inundation and destruction during Hurricane Katrina. | |
| 365.      During and after Hurricane Katrina, the surge height on Reach 2 of the MR-GO would have been "about a meter of water lower" if the adjacent wetlands had not been destroyed.  A meter is 3.28 feet. | Dalrymple Depo. 143:3-25, 144:1-17 |
| 366.      The geometry of what has become known as the MRGO funnel is formed by the convergence of levees that follow the GIWW and MRGO channels, open on the east to Breton Sound, partially enclosing Lake Borgne, and narrowing to a 1,500 ft wide, 40+ foot deep ship channel west of the junction of the MRGO and GIWW (Figure 38). The 6- mile portion of the combined MRGO/GIWW that connects the funnel with the IHNC (IPET "MRGO Reach 1") is what IPET has called the hydraulically critical reach, though the USACE apparently still objects to the "hurricane highway monicker," as they called it (IPET | MSJ Exh. 56, Team Louisiana, pp59-60; Kemp Report, ___; MSJ Exh. 72, ILIT, p. F-28 (quoting *A Nation Still Unprepared*) |

2006b, I-6). MSJ Exh. 56, Team Louisiana has used the term "Hurricane Alley" for this reach.  The USACE said much the same after Hurricane Betsy flooded many of the same areas in 1965 (Shallat 2000). It was this channel reach that added 3 ft to the surge in the IHNC that would otherwise have mirrored Lake Pontchartrain, and raised water levels so quickly that it caused IHNC breaches before the hurricane made landfall (Figure 39).  In the 0500 to 0600 period, still prior to landfall, the Katrina surge rose above 12 ft (Figure 40) on the New Orleans East Back Levee that follows the GIWW and faces south toward Lake Borgne. This levee experienced significant wave attack (Figure 39). IPET reports that it was built of erosive sandy material dredged from the GIWW and was severely degraded in numerous places. The areas protected behind these levees are largely undeveloped, however, and these wetlands provided some storage before a lower, local levee (Maxcent Levee) was overtopped on the back side (Figure 39).  By 0600, an eyewitness at a New Orleans East pump station close to where the MRGO/GIWW enters the IHNC reported that levees on both the north and south banks were submerged. An LSU ADCIRC model hydrograph for the IHNC predicts this (Figure 40). This overtopping event caused minor degradation of the 12 to 15 ft MRGO/GIWW levees on both sides of the funnel throat, and caused about 2,000 ft of Iwall to lean precariously on the north bank (Figure 41). Waves were present and more of a factor than accounted for in the

| | |
|---|---|
| original design (Figure 42), but were traveling down the axis of the channel rather than breaking against the levees, as has been pointed out by IPET (IPET 2006b, IV-250). | |
| 367.      At around 0500, the surge in the funnel rose to 10 ft and long-period waves from Lake Borgne began breaking on the 12 to 18 ft federal levees fronting the MRGO. This part of the GNO HPS protects St Bernard Parish and the Lower Ninth Ward (Figure 44). The waves initially eroded a wave bench on the unprotected side of the sandy levee face.  Discharge from overtopping waves then eroded the back side (Figure 45). The back side scour holes expanded upgradient through the crown, called 'head cutting,' to merge with the wave bench, essentially removing the crown and creating the breach.  This "levee capping" process occurred at dozens of locations, starting at spots that were lower or faced with more easily eroded materials. Eventually, the breaches grew to include virtually the entire 60,000 ft of the levee along the MRGO, most of which was eventually overflowed. | MSJ Exh. 56, Team Louisiana, p. 63 |
| 368.      As the eye of the storm approached the latitude of New Orleans, the surge continued to rise in the funnel (Figures 40 and 43), and this increase in water level was conveyed with little reduction through the MRGO/GIWW connection into the IHNC. The surge jet moving west was directed to the south by a turn in the channel at the junction with the IHNC (Figure 44). There it pushed against the floodwalls and levees protecting the west bank but was ultimately stopped on the south by the | MSJ Exh. 56, Team Louisiana, p. 66 |

lock structure that connects the Industrial Canal to the Mississippi River. Water that could not exit in this direction flowed north toward Lake Pontchartrain, which at 0700 was about 6 ft lower (Figure 40). One indication of the energy conveyed by this flow is the scour that occurred in the IHNC near the entrance to Lake Pontchartrain where two scour holes were eroded to a depth of nearly 90 ft while the normal depth is less than 40 ft (Figure 48).

At approximately 0600 levees and floodwalls along both banks of the IHNC were overtopped, beginning on the south end where the surge was highest. Surviving floodwall crown elevations along the IHNC were surveyed after the storm by IPET and found to range from 11.1 to 13.0 ft (LMSL) (Figure 49). Water pouring over I-wall structures (Figure 40) began to scour trenches on the back sides where the supporting earth levees were unprotected against scour (Figure 50). In the Lower 9th Ward, the influx of water overtopping the levees added to the flooding coming from the GIWW.  At the Louisiana National Guard's Jackson Barracks in Arabi, situated on the high ground of the natural levees of the Mississippi River and about 2 miles from the IHNC, flood waters were first seen about 0700, but started rising rapidly after 0730.

(H)

I.        **BEFORE HURRICANE KATRINA, THE ARMY CORPS GAVE NO WARNINGS OF THE INADQUACY OF THE UNFINISHED HURRICANE PROTECTION SYSTEM AND THE THREAT TO HUMAN SAFETY AND PROPERTY FROM CATASTROPHIC FLOODING**

1.        **Flooding Risks Must Be Communicated To Those In Harm's Way**

| UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|
| 369.        Risk associated with flooding caused by storms must be communicated in ways stakeholders and the public can understand. Especially interim risk while the system is under construction, and residual risk which is the portion of total risk that will always remain after avoiding, preventing, mitigating, and assuming all other risk. | IPET, p. III-8 |
| 370.        Recognition of the failure potential might have inspired the USACE to carefully attend to maintaining levee crown elevations at the design level, but this was clearly not the case. Levee crown elevations, particularly in hydraulic fill reaches more prone to settlement, were allowed to drop several feet below the design grade over many years, thereby compromising the overall integrity of the GNO HPS. This deterioration took place without advising populations put at additional risk. Effective planning, or failing that, just official notice of the hazard, would have raised the level of public alarm that is unfortunately key to ensuring appropriation of emergency | MSJ Exh. 56, Team Louisiana, p. 275 |

| | |
|---|---|
| funding or establishing a sensible ordering of public priorities. The potential for action by the public through their elected representatives is thwarted if engineers with superior knowledge of deficiencies are complacent or silenced by dysfunctional bureaucracies. | |
| 371.      [T]he SPH did not represent a maximum set of conditions for design against hurricane conditions. It is also clear that general public was not informed about the flooding risks that the selection of the SPH as a basis for design implied.  In many cases, even though very inexpensive defenses could have been provided for the potential for hurricane surges exceeding those of the SPH (e.g., splash-pads behind I-walls and other similar floodwalls sensitive to overtopping erosion), these defenses were not provided. | MSJ Exh. 72, ILIT, pp. 12-13 |

## 2.      The ACE Knew That The HPS As Designed Would Not Withstand The Most Severe Hurricane

| | |
|---|---|
| 372.      Hundreds of miles of levees were constructed to defend metropolitan New Orleans against storm events. These levees were not designed to protect New Orleans from a Category 4 or 5 hurricane, and all of the key players knew this.  The original specifications of the levees offered protection that was limited to withstanding the forces of a moderate hurricane. | *A Failure of Initiative*:  Final Report of the Select Bipartisan Committee, U.S. House of Representatives, 109th Congress (2006), p. 12-1 ("Failure") |
| 373.      The ACE knew that the levees protecting New Orleans were not designed to withstand the most severe hurricanes.  According to the ACE's plans for | A Failure of Initiative, p. 89 |

| | |
|---|---|
| unwatering New Orleans, "the hurricane protection system is not designed for the largest storms and as a result, the metropolitan area is vulnerable to flooding from hurricane storm surges." Thus, long before Hurricane Katrina, the ACE knew that its unfinished HPS did not afford the people and property of Orleans and St. Bernard Parish even the modest level of hurricane flood protection contemplated by the SPH design.  Yet the ACE never notified local officials or the public of the risks. | |
| 374.     In June 2002, the ACE concluded that there was a federal interest in considering an increase in the level of protection afforded by the HFPS as measured by the LDVPP.  In its reconnaissance report, the ACE wrote: "While the Lake Pontchartrain Vicinity Louisiana and West Bank Vicinity Louisiana projects provide protection for the Standard Project Hurricane, this level of protection cannot protect against slow moving Category 3 or higher strength storms." | Naomi Depo. Exhibit 37 at p. 9-10 |
| 375.     In the same 2002 report, the ACE wrote:  "In addition, the project area is experiencing high levels of coastal wetlands losses which is likely increasing the threat from hurricanes.  Although coastal restoration projects have been constructed, these have not significantly reversed the current rate of losses.  Additional projects have been proposed and are under study to address the coastal land loss problem, but these projects have not moved beyond a study stage at this time." | Naomi Depo. Exhibit 37 at p. __. |
| 376.     In the same 2002 report, the ACE wrote:  "In | Naomi Depo. 372:9-15 |

| | |
|---|---|
| addition, overtopping of the existing protection areas will flood vast areas of the metropolitan area.  Vast areas of the metropolitan area were flooded because a storm hit Greater New Orleans that exceeded the capacity of the hurricane protection system even if it had been at design grade to stop the surge." | |
| 377.      These statements in the 2002 ACE report were "prophetic and probably an understatement of the devastation in the wake of Hurricane Katrina." | MSJ Exh. 92, Naomi Depo. 373:10-15 |
| 378.      The potentially devastating threat of a catastrophic hurricane to the Gulf Coast has been known for 40 years: New Orleans experienced flooding in some areas of remarkably similar proportions from Hurricane Betsy in 1965, and Hurricane Camille devastated the Gulf Coast in 1969. More recently, numerous experts and Governmental officials had been anticipating an increase in violent hurricanes, and New Orleans' special and growing vulnerabMSJ Exh. 72, ILITy to catastrophic flooding due to changing geological and other conditions was widely described in both technical and popular media. | *Hurricane Katrina:  A Nation Still Unprepared*, Report of The Senate Committee on Homeland Security and Governmental Affairs (May 2006) ("A Nation Still Unprepared"), p. 4 |
| 379.      Catastrophic flooding of the Greater New Orleans area due to surge from an intense hurricane had been predicted for several decades (Townsend 2006).  The consequences observed in the wake of hurricane Katrina were also predicted (Members Scholars of the Center for Progressive Reform 2005). The hazards associated with the NOFDS were not adequately recognized, defensive measures were not identified and prioritized, and effective | MSJ Exh. 72, ILIT, p. 12-17 to 12-18 |

| | |
|---|---|
| action was not mobilized to effectively deal with these hazards (Irons 2005; Senate Committee on Homeland Security and Governmental Affairs 2006). | |
| 380.      In more recent years, well before Hurricane Katrina, questions were raised about the abMSJ Exh. 72, ILITy of the Lake Ponchartrain project to withstand more powerful hurricanes than the "standard project hurricane," such as a Category 4 or 5 hurricane. USACE had discussed undertaking a study of modifications needed to increase the strength of the existing levees, but no formal study was undertaken by the time of Hurricane Katrina. | A Failure of Initiative, p. 90 |
| 381.      Emergency planners in the local area were particularly knowledgeable about this potentiality.  A November 2004 article in *Natural Hazards Observer* — written by Shirley Laska, of the Center for Hazards Assessment, Response and Technology, at the University of New Orleans — laid out the hypothetical case that Hurricane Ivan had hit New Orleans.  The article cites a fictional situation that is now all too real to the nation. <br><br>   New Orleans was spared, this time, but had it not been,   Hurricane Ivan would have… caused the levees between   the lake and the city to overtop and fill the city "bowl"   with water from lake levee to river levee, in some places   as deep as 20 feet…. Recent evacuation surveys show that   two thirds of non-evacuees with the means to evacuate   chose not to leave because they felt safe in their homes.   Other non-evacuees with means relied on cultural   traditions of not leaving or were discouraged by negative | A Failure of Initiative, p. 90 |

| | |
|---|---|
| experiences with past evacuations. Should this disaster become a reality, it would undoubtedly be one of the greatest disasters, if not the greatest, to hit the United States, with estimated costs exceeding 100 billion dollars. Survivors would have to endure conditions never before experienced in a North American disaster. Hurricane Ivan had the potential to make the unthinkable a reality. Next time New Orleans may not be so fortunate. | |

### 3.   The ACE Misled The Public By Concealing That The HPS Would Not Withstand Even A Standard Project Hurricane

| | |
|---|---|
| 382.    Before Hurricane Katrina, New Orleans residents were not advised that the GNO HPS required significant improvements to meet even 1 in 100 year SPH requirements. Instead, the New Orleans District claimed at times that the GNO HPS would protect against a 1 in 200 to 1 in 300 year hurricane. No basis for this claim has been established, while numerous storms that have affected the GNO area – before and after the 1965 initiation of the HPS—were more severe than the 1959 SPH. | MSJ Exh. 56, Team Louisiana, The Failure of The New Orleans Levee System During Hurricane Katrina (December 18, 2006), p. iv |
| 383.    The ACE knew that the HPS was not capable of protecting GNO because of gaps in the system. NOD managers told IPET that "funding levels were insufficient to complete construction at existing holes in the system that were crucial to flood protection . . . . hence levees were below grade in quite a few areas" (IPET) | MSJ Exh. 56, Team Louisiana, p. 130 |
| 384.    The ACE project Budget Justification Sheet ("BJS") for fiscal year 2006 includes text stating that the | Independent External Review Report on the "Decision |

| | |
|---|---|
| project, once completed as authorized, would provide SPH surge protection. However, that degree of protection could not in fact be provided by a completed LP&VHPP.  The increased understanding over time of potential storm frequency and intensity, potential surge levels, and subsidence in the project area indicating that a completed project would provide less than SPH protection -- were not reported in any BJS or other venue by the ACE. | Making Chronology for the Lake Pontchartrain & Vicinity Hurricane Protection Project." (December 2006 Draft), Prepared by the National Association of Flood and Stormwater Management Agencies (NAFSMA) External Review Panel (ERP) (March 2, 2007) ("Decision Making Chronology"), Chapter 5-14 |
| 385.      Even with its hurricane protection system, it was common knowledge that New Orleans was susceptible to hurricane caused flooding.  The risks of a major hurricane and flooding in New Orleans had been covered in the general media — by *Scientific American* (October 2001) and *National Geographic* (October 2004) — as well as in emergency management literature.  A recent article in the *Natural Hazards Observer* stated:  "When Hurricane Katrina came ashore on August 29, she ended decades of anticipation.  There were few hazards in the United States more studied by scientists and engineers and there was ample warning that a strong storm could cause the City of New Orleans to flood." | A Failure of Initiative, p. 90 |
| 386.      New Orleans had dodged the bullet many times, with the major force of hurricanes skirting around the area. Nevertheless, most people with a reason to know about it were aware that a Category 3 hurricane posed a | MSJ Exh. 72, ILIT, p. 12-10 |

| | |
|---|---|
| severe threat to the New Orleans' levee protection system, and a Category 5 hitting land as a Category 4, as with Katrina, posed a catastrophic threat. | |
| 387.  Given the recognized degradation of the protection afforded by wetlands (Hallowell  2001), recognition of the erodabMSJ Exh. 72, ILITy of the levee soils, the lack of provision of protection for the levee soils, recognized deficiencies in the design criteria, the continued challenges of keeping these levees at their authorized elevations (significant subsidence and compression), and the repeated expressions of concerns for the adequacy of these protective works, the performance of this part of the NOFDS was a "predictable surprise." The Member Scholars of the Center for Progressive Reform (2005) arrived at similar conclusions. | MSJ Exh. 72, ILIT, p. 12-9 |
| 388.  In 1987, the ACE knew that the MR-GO's banks would easily be overtopped by hurricane surge and that there were already breakthroughs in the land between Lake Borgne and Reach 2 of the MR-GO resulting in no land in some places separating  the MR-GO and Lake Borgne. | Naomi Depo. Exhibit 47, ¶ 4 |
| 389.  In April 2005, an ACE official stated that New Orleans is "The most vulnerable major city to hurricanes." | MSJ Exh. 92, Naomi Depo. 431:4-19, Naomi Depo. Exhibit 63 at p. __. |
| 390.  Before Hurricane Katrina, local, state and federal leaders knew about the vulnerabMSJ Exh. 72, ILITy of the New Orleans flood protection system and the threats it posed to the area.  Most experts knew about the | Larry Irons, "Hurricane Katrina As A Predictable Surprise," Homeland Security Affairs, Vol. 1, Issue 2 (2005), p. 4; |

| | |
|---|---|
| vulnerabMSJ Exh. 72, ILITy for many hears. | Exhibit __("New Orleans Disaster Was Predicted," *Reuters*, September 2, 2005) |
| 391.      In December 2001, the Houston Chronicle ran a story by Eric Berger reporting that New Orleans is "perilously close to disaster . . .  In the face of an approaching storm, scientists say . . . [flooding] would probably kill one of 10 left behind in this city drowned under ten feet of water, . . . Economically, the fact would be shattering." | Exhibit __  (Eric Berger, "Keeping Its Head Above Water;" *Houston Chronicle*, December 1, 2001. |
| 392.      The receding coastal wetlands were a well-known fact, increasing the vulnerabMSJ Exh. 72, ILITy of Louisiana and New Orleans to hurricanes." | Irons, p. 5. |
| 393.      The threats posed to New Orleans by a Katrina-like hurricane . . . were well known and unsurprising to most (including the ACE) who thought about the hurricane threat to New Orleans.  Along with other state local, federal leadership, the ACE appears to have remained complacent about preparing the flood protection structures for a catastrophic hurricane. | Irons, p. 14 |
| 394.      The evidence indicates the U.S. Army Corps of Engineers knew about the threat of breaches, as opposed to overtopping, since the early 1980s. Moreover, all concerned agencies, including those at the local, state, and federal levels, knew about the threat of overtopping and consequent flooding in even a Category 3 hurricane. | MSJ Exh. 72, ILIT, p. 12-7 |
| 395.      Before Hurricane Katrina, the ACE knew that it would "take a combination of higher levees, new | MSJ Exh. 92, Naomi Depo. 400:19-25, 401:1-22; Naomi |

| flood gates and restored wetlands to save New Orleans and time is not an ally.  Hurricane protection projects are moving slowly even as the threat seems to grow each year. It's possible to protect New Orleans from a Category 5 hurricane, said Al Naomi, Senior Project Manager for the Corps of Engineers, but we've got to start.  To do nothing is tantamount to negligence." | Depo. Exhibit 50 at p. __ |
|---|---|

### 4.   The Virtual Hurricane Pam Exercise Foreshadowed Catastrophic Flooding During Hurricane Katrina

| 396.      In 1998, Hurricane Georges narrowly missed New Orleans, striking Mississippi and Alabama instead. Roused by the close call, local emergency-management planners began to seek federal funding for a massive exercise to consider the potential impact of a direct strike on New Orleans by a slow-moving – and, therefore, more damaging, by virtue of its longer duration – Category 3 hurricane. That funding did not arrive for five years.  The effort, known as the Hurricane Pam exercise, finally began in 2004, and tried to address the consequences of a Katrina-like hurricane as developed by Government scientists and emergency-management officials and contractors: Widespread flooding; 67,000 dead; 200,000 to 300,000 in need of evacuation after landfall, and hundreds of thousands displaced in need of shelter, exceeding state and local capabMSJ Exh. 72, ILITies; hospitals and nursing homes overcrowded and short on critical resources; and incapacitated first responders.  Sadly, | A Nation Still Unprepared, Chapter 1-2 |
|---|---|

| | |
|---|---|
| Katrina proved many of these predictions true. | |
| 397.      On the day after Katrina made landfall, the New Orleans Times-Picayune headline said it all: "The storm we have always feared."  Hurricanes are a fixture of life on the Louisiana Coast. Years before Katrina, all levels of Government knew that a large, slow-moving catastrophic hurricane was likely to hit New Orleans, flood the city, and claim thousands of lives, overwhelming state and local agencies' abMSJ Exh. 72, ILITy to respond effectively and requiring assistance from the federal Government to respond to the disaster.  This understanding prompted efforts in 1999 to secure federal support to develop a comprehensive plan to respond to a catastrophic hurricane in New Orleans. Following nearly five years of delays, in 2004 the Federal Emergency Management Agency (FEMA) provided funding to begin that development.  The project, "Southeast Louisiana Catastrophic Hurricane Plan," confirmed the limitations of the state and local agencies.  It used an exercise scenario known as "Hurricane Pam" that incorporated well-founded assumptions about the impact of a slow-moving Category 3 hurricane on New Orleans. | A Nation Still Unprepared, Chapter 8-1; *A Failure of Initiative*, p. 81 |
| 398.      One of the key planning and preparedness steps many of the local, state, and federal officials involved in the response to Katrina in Louisiana took part in was the July 2004 exercise commonly known as "Hurricane Pam." FEMA funded and participated in this five-day disaster simulation exercise in which a fictional, strong category | A Failure of Initiative, p. 81 |

| | |
|---|---|
| three — with qualities of a category four — hurricane named Pam hit the New Orleans area.  The Hurricane Pam exercise scenario was prescient. The virtual storm brought sustained winds of 120 mph, up to 20 inches of rain in parts of Southeast Louisiana, and storm surges that topped the levees and flooded the New Orleans area. | |
| 399.       In the 2004 Hurricane Pam exercise, officials were presented with a hurricane scenario designed by Louisiana State University (LSU) researchers.  Ivor Van Heerden, an LSU professor who used computer modeling to help create a realistic hurricane, said, "It was a slow moving category three storm, something that could quite easily happen, and designed so that it totally flooded the city, so that the participants could try to understand the full impacts of a flooded New Orleans."  Indeed, experts involved in the Hurricane Pam exercise were struck by the similarity of the simulation to the actual destructive conditions wrought by Katrina.  According to [Malhhu] Beriwal, Pam's slow-moving category three "made it virtually equal in force and devastation to Katrina's category four based on its surge and wind capacity."  And, of course, Katrina itself was later recategorized as a strong category__. CHECK TEXT | A Failure of Initiative, p. 82 |
| (I) | |

J.      **PLAINTIFFS' ALLEGATIONS OF CAUSE OF DAMAGE AND
        SUBSTANTIAL SUPPORTING EVIDENCE**

1.      **Plaintiffs' Allegations**

| UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|
| 400.      The Plaintiffs are not predicating Defendant's liabMSJ Exh. 72, ILITy on claims of levee breaches or failures or overtopping or the defective design, construction, operation and/or maintenance of levees, flood protection works, or any other Government structures or facMSJ Exh. 72, ILITies intended for hurricane flood control protection.  Put another way, Plaintiffs' claims against the United States do not relate to a federal flood control project or its design, construction, operation or maintenance or its performance during Hurricane Katrina.  Instead, Plaintiffs allege that the ACE was negligent in designing, constructing, operating, and maintaining the MR-GO in at least three critical aspects:  (1) the intrusion of saltwater from the Gulf of Mexico that quickly killed the wetlands and Tupelo cypress trees that form a natural protective buffer against hurricane surge; (2) the failure to armor the MR-GO's banks which led to massive erosion, widening of the channel, and loss of wetlands and Tupelo cypress trees; and (3) by connecting the Reach 2 channel with the GIWW and the resulting "funnel effect" that concentrated waters from Reach 2 and Lake Borgne into a small area and amplified and intensified storm surge that | Complaint in *Robinson v. United States*, Civil Action No. 06-2268, ¶¶ 1-4, 6, 29-30, 33-34, 47, 49-50, 52, 53-59, 70-75, 78-80, 82-84, 94, 102, 104. |

| | |
|---|---|
| overtopped the structures along Reach 1 and the IHNC. | |
| 401. The Complaint alleges as follows: "If the MR-GO had not been defectively designed and constructed, [a Katrina-like surge] would have resulted in minimal levee overtopping and occasional flooding – but not a disaster on a Biblical scale largely submerging an entire city. . . . Indeed, but for the Army Corps' negligence [with respect to the MR-GO] most or all of the severe flooding of Plaintiffs' neighborhoods would not have occurred." | Complaint, ¶ 72, 74 |
| 402. As this Court has recognized: "Plaintiffs are not seeking damages for the failure of the levees or flood projects. Plaintiffs contend that MRGO has absolutely nothing to do with a flood control project. Plaintiffs are seeking damages for the effects of the waters in the MRGO with respect to the decimation of the wetlands over a long period of time which in turn created the hazard which resulted in flooding which plaintiffs maintain could not have been controlled by any flood control project." | Document 2994, p.15. |
| 403. As this Court has also recognized, "while arguably the immediate cause of the [plaintiffs'] damage was indeed 'floodwaters,' the causation for such floodwaters force and breadth are alleged to have been the defalcations of the Government with respect to the MR-GO." | Document 2994, p. 16. |

### 2. Substantial Evidence Establishes Plaintiffs' Claims

| | |
|---|---|
| 404. There is substantial evidence—most of it | See fact Nos. ___-___, infra; |

144

| | |
|---|---|
| from Government documents and witnesses—supporting Plaintiffs' allegations that the MR-GO was negligently designed, constructed, operated, and maintained in at least the three critical respects alleged in the Complaint and that this negligence resulted in foreseeable (and foreseen) excess incremental surge during Hurricane Katrina that was a cause of the overtopping of structures along Reach 1 and Reach 2 of the MR-GO and the IHNC and the resulting catastrophic flooding of New Orleans East, the Lower Ninth Ward, and St. Bernard Parish. | Dalrymple Depo.35:23-35, 36:1-4, 108:1-16, 137:12-25, 138:22-25, 139:1, 143:3-25, 144:1-17, 144:18-25, 145 |

### a.      Three Feet of Excess Surge

| | |
|---|---|
| 405.      During and after Hurricane Katrina, the surge height in Reach 2 of the MR-GO would have been "about a meter of water level" lower if the adjacent wetlands had not been destroyed.  A meter is 3.28 feet. | Dalrymple Depo., 143:3-25, 144:1-17 |
| 406.      Three feet of additional surge along Reach 2 of the MR-GO "made the difference in terms of overtopping and washing away Reach 2 . . . ." | Dalrymple Depo., 144:18-25, 145:1 |
| 407.      The Lake Borgne surge—delivered by the MR-GO funnel—added an additional three feet to Katrina's surge. | Kemp Expert Report ¶ 42 |
| 408.      This increment of surge—exceeding the design height of the flood protection works on the south side of Reach 1 and leading to overtopping and massive flooding—was caused by the original defective design and construction of the MR-GO and the resulting "funnel effect" and loss of protective wetlands and cypress | Bea Report, pp. 42-43, citing MSJ Exh. 56, Team Louisiana; Bea Expert Report ¶ 20; MSJ Exh. 56, Team Louisiana, pp. 59-60; Kemp Expert Report ¶ 42 |

| | |
|---|---|
| swamps. | |
| 409.      The flooding of the Lower Ninth Ward, New Orleans East, and St. Bernard Parish was exacerbated in Reach 1 and Reach 2 of the MRGO by the design, construction and operation of the MRGO. | M. Kok, M. Aalberts, and L. de Wit, *Polder Flood Simulations for Greater New Orleans*, Hurricane Katrina August 2005 (July 2007) ("Kok"); Kemp Expert Report ¶ 29 |

### b.      **Funnel Effect**

| | |
|---|---|
| 410.      According to preliminary information from NSF, ASCE, and LSU, most of the levees and floodwall breaches on the east side of New Orleans were caused by overtopping, as the storm surge rose over the tops of the levees and/or their floodwalls and produced erosion that subsequently led to breaches.   A variety of factors led to overtopping of the Industrial Canal and the Mississippi River Gulf Outlet (MR-GO).  An LSU Scientist, Hassan Mashriqui, said that MR-GO worked as a funnel which increased the height of the storm surge and "caused floodwaters to stack up several feet higher than elsewhere in the metro area and sharply increased the surge's speed as it rushed through the MR-GO and into the Industrial Canal."  The overtopping eroded the backside of the canals, scoured out the foundations, and led to their collapse and thus major flooding of adjacent neighborhoods.  According to Berkeley Professor Raymond Seed: "A majority of them [levee breaches] were the result of overtopping, and that simply means that | *A Failure of Initiative*, p. 96-97; Kemp Expert Report ¶¶ 38, 39 |

| | |
|---|---|
| the hurricane was bigger than the levees were built to take . . . ." | |
| 411. As the eye approached New Orleans, Katrina shoved a 14 to 17 foot storm surge up a "funnel" created by the hurricane protection levees at the convergence of the south bank of the MRGO and the north bank of the Gulf Intracoastal Waterway, and focused a torrent of water on the Inner Harbor Navigation Canal. | A Nation Still Unprepared, Chapter 4-3 to 4-4 |
| 412. Congress authorized construction of the Mississippi River Gulf Outlet (MRGO in 1956 to facMSJ Exh. 72, ILITate commercial shipping access to the Port of New Orleans from the Gulf of Mexico . . . . Though the MRGO produced commercial benefits, those benefits came at a cost to the environment.  The Corps estimates that the construction of the channel led to substantial loss of wetlands, which, as noted above, help slow and decrease the power of storms before they hit populated areas.  The MRGO also contributed to a potential "funnel" for storm surges emerging from Lake Borgne and the Gulf into the New Orleans area.  The "funnel" was created by the intersection of the MRGO from the southeast and the GIWW from the northwest into the confined channel, referred to as the GIWW/MRGO that separates New Orleans East and the Ninth Ward/St. Bernard Parish.  The levees on the south side of the MRGO and the levees on the north side of the GIWW converge from being about 10 miles apart where they straddle Lake Borgne to a few hundred yards apart where the MRGO merges into the | *A Nation Still Unprepared*, Chapter 9-4 to 9-6; MSJ Exh. 56, Team Louisiana, pp. 28, 59-60; Kemp Expert Report ¶¶ 29, 35, 38-41; IPET, pp. iv-135 to iv-136 |

GIWW.  The western part of the "funnel" is a 6 mile-long section of the combined GIWW/MRGO which was enlarged by a factor of three when the MRGO was built in order to expand from a barge channel to accommodate oceangoing vessels. Prior to Hurricane Katrina, many warned that the potential funnel would accelerate and intensify storm surges emerging from Lake Borgne and the Gulf into the downtown New Orleans area.  The funnel had been described as a "superhighway" for storm surges or the "Crescent City's Trojan Horse" that had the potential to "amplify storm surges by 20 to 40 percent," according to some storm modeling.  Researchers at LSU believed that in creating this funnel, "the US Army Corps of Engineers had inadvertently designed an excellent storm surge delivery system – nothing less – to bring this mass of water with simply tremendous 'load' – potential energy – right into the middle of New Orleans." The extent to which MRGO, and the funnel it helped create actually contributed to the hurricane's damage is still being investigated, but there have been some preliminary findings.  A recent report issued by the Corps' IPET concluded that . . . the 6-mile combined section of the GIWW/MRGO (called "Reach 1") carried the storm surge from Lake Borgne into New Orleans.  The combined GIWW/MRGO served as a link between Lake Borgne and Lake Pontchartrain, enabling the storm surge in one lake to affect the storm surge in the other.  During Katrina, a 14 to 17-foot surge coming from Lake Borgne into the funnel between MRGO and the

| | |
|---|---|
| 413. The notion of the "funnel" was known to oceanographers who studied bays, river mouths, and other coastal re-entrants where astronomically forced tides or | Kemp Expert Report, ¶ 37 |

| | |
|---|---|
| "tidal bores" routinely attain heights of up to 20 feet well inland, while tides on adjacent shorelines have perhaps 20 to 30 percent of the amplitude. | |
| 414.　　　The MR-GO's role in propagation of low amplitude astronomical tide and influx of higher saline water into Lake Pontchartrain has been established. Concerns have been raised regarding the role of the MR-GO on storm surge propagation into the metropolitan New Orleans vicinity.  From the perspective of long wave propagation, of which the tide and storm surge are examples, the critical section of the MRGO is Reach 1, the section of waterway where the GIWW and MRGO occupy the same channel (see Figure 93).  It is through this channel that Lake Pontchartrain and Lake Borgne are hydraulically connected to one another via The Rigolets and Chef Menteur Passes; the IHNC is the smallest of the three connections.  Reach 1 existed as the GIWW prior to the construction of the MRGO, although the maintained depth was less.  As a result of this hydraulic connection, the storm surge experienced within the IHNC and Reach 1 (GIWW/MRGO) is a function of storm surge in both lakes; a water level gradient is established within the IHNC and Reach 1 that is dictated by the surge levels in both lakes. This is true for both low and high amplitude storm surge conditions. | Kemp Expert Report ¶ 42; IPET, p. iv-135 |
| 415.　　　In 1988, the ACE acknowledged "The possibMSJ Exh. 72, ILITy of catastrophic damage to urban areas by a hurricane surge coming up [the MR-GO]." | Kemp Expert Report ¶ 42 |

| | |
|---|---|
| 416. To prevent storm surge in Lake Borgne from influencing water levels experienced in the IHNC or GIWW/MRGO sections of waterway, flow through the Reach 1 channel must be dramatically reduced or eliminated, either by a permanent closure or some type of structure that temporarily serves to eliminate this hydraulic connectivity. The presence of an open channel is the key factor. The hydraulic connectivity existed prior to construction of the MRGO, due to the presence of the GIWW channel. If the hydraulic connectivity between Lake Pontchartrain and Lake Borgne is eliminated at a point within Reach 1, tide or surge to the west of this point will become primarily influenced by conditions at the IHNC entrance to Lake Pontchartrain; and tide or storm surge to the east of this point will become primarily influenced by conditions in Lake Borgne. | IPET, p. IV-135 to IV-136 |
| 417. The free-flowing, deep-draft navigation MR-GO that pierces the HPS on its eastern side compromised hurricane flood protection system performance. The MRGO and GIWW channels provide efficient conduits to funnel surge into the heart of New Orleans. As a result, surge elevations peaked in Lake Borgne and the IHNC almost simultaneously at higher levels relative to levee and floodwall crowns, and earlier, than would have been true if the MRGO had not been built, and if the wetland loss it caused had not occurred. The MRGO and GIWW channels provide efficient conduits to funnel surge into the heart of New Orleans. As a result, surge elevations peaked | MSJ Exh. 56, Team Louisiana, p. vii; Kemp Expert Report ¶ 35 |

| | |
|---|---|
| in Lake Borgne and the IHNC almost simultaneously at higher levels relative to levee and floodwall crowns, and earlier, than would have been true if the MRGO had not been built, and if the wetland loss it caused had not occurred. | |
| 418.      Damaging storm surges propagated into the IHNC from Lake Borgne through the MRGO channel reach west of the junction with the GIWW in 1965, 1969 and 2005, during Hurricanes Betsy, Camille and Katrina, respectively. These were all storms that generated higher surges in Lake Borgne than in Lake Pontchartrain and caused flooding in New Orleans through the MRGO "back door" (Figure 168). The convergence of the two navigation channels, and the levee systems built along their banks, created what has widely been described as a 'funnel,' with the mouth open to Lake Borgne on the east, that favors the amplification of surges generated by cyclones tracking over the city or to the east (Figure 158). The throat of this funnel is the 6 mile portion of the MRGO channel that was constructed inside the original GIWW right-of-way (Figure 169) that IPET has referred to as the "hurricane highway" (IPET 2006b, I- 6) or "MRGO Reach 1" (Figure 160). | MSJ Exh. 56, Team Louisiana, pp. 235-6 |
| 419.      Hurricane-generated surge arises from the interaction between wind-forced water flow and the geometry of the receiving coastal landscape. Like a tsunami, the elevation of the surge is trivial in deep water but rises up against any barrier, whether an island, beach, floodwall or levee, particularly if there is no ready avenue | MSJ Exh. 56, Team Louisiana, p. 236; Kemp Expert Report ¶ 34 |

| | |
|---|---|
| for escape. In coastal Louisiana, the hurricane protection and river levees are the highest features in the landscape, so this is where the surge rises to its greatest heights. At the same time, dredged channels, far deeper than any natural waterway, convey the surge inland particularly if they run normal to the coast. Adjacent wetlands also convey surge, but provide far greater resistance and a shallower depth of flow. | |
| 420.       While the throat of the funnel, MRGO Reach 1, is a large navigation channel (44 by 1,000 ft), it is small relative to the gap (7.5 miles) so that water pushed into the jaws tends to pile up as can be seen in an ADCIRC simulation of the surge from Hurricane Betsy (Figure 170). IPET describes MRGO Reach 1 with respect to storm surge as the "critical section" through which Lake Pontchartrain and Lake Borgne are hydraulically connected to one another via the IHNC.  ". . .  The Reach 1 GIWW/MRGO section is very important in determining the magnitude of the storm surge that reaches the IHNC from Lake Borgne and Breton Sound."  (IPET 2006b, IV-6-2)." | MSJ Exh. 56, Team Louisiana, pp. 237-38 |

c.      **The ACE Knew About The Funneling Effect**

| | |
|---|---|
| 421.       At least as early as late 1965, the ACE was on notice of the "funnel effect" relating to the MR-GO when it received comments from the Citizen's Committee for Hurricane Flood Control ("Citizen's Committee") on its 1962 Master Plan from Hurricane Flood Control for the | Letter from Kenneth J. LeSieur to Colonel Thomas J. Bowen, November 24, 1965 (Exhibit ___ to Deposition of Paul Kemp (November 27, 2007)); |

| | |
|---|---|
| New Orleans area ("1962 Master Plan"). On November 24, 2965, Captain Kenneth J. LeSieur, Chairman of the Citizen's Committee, sent a letter to ACE New Orleans District Engineer Colonel Thomas J. Bowen, which forwarded comments and proposed changes to the ACE's 1962 Master Plan.  Among other things, the Citizen's Committee noted the following: | Kemp Expert Report ¶ 36 |

"The U.S. Army Engineers proposal for a levee along the south shore of the Gulf Outlet to Bayou Dupre, and along the north shore of the Intercoastal Waterway would form a funnel, channeling all hurricane surges and wind driven water into the Intercoastal Waterway and Industrial Canal.

"Construction of flood gates [at various points] and connected by the new 30-foot levees [connecting flood gates on the MR-GO to gates on Bayou Bienvenue and gates on the Intercoastal Canal], would completely eliminate the funnel effect and stop all storm and hurricane surges from entering the city."

"The raising of these [New Orleans East and Chalmette] levees from 16 feet to 30 feet would complete the barrier to stop all surges from entering the developed areas of New Orleans and Chalmette."

The Citizen's Committee also warned the ACE that if hurricane surge waters entered the city by mean of canals like the MR-GO and GIWW, levees much higher than those proposed by the ACE in its 1962 Master Plan (16 feet) would be required.

| | |
|---|---|
| In particular, the Citizen's Committee stated: "The Committee believes that surges from storms and hurricanes should not be allowed to enter the canals in the developed areas of the city.  The containment of these waters behind levees inside the city would require levees much higher than those proposed by the Army Engineers, especially so if locks are placed at Seabrook levees of sufficient height would not be practical."   [Check text] | |
| 422.        In late 1969, the ACE was again put on notice about the "funnel effect" by means of a letter from New Orleans resident Manuel Pinto to Vice President Spiro T. Agnew, dated October 21, 1969.  Mr. Pinto attached to the letter a map of the area where Reach 2 of the MR-GO connects with the Gulf Intercoastal Waterway ("GIWW") and depicting Lake Borgne in the vicinity.  On the map, Mr. Pinto drew an arrow from Lake Borgne pointing to the confluence of Reach 2 and GIWW and wrote the words "THE FUNNEL."  In his letter, Mr. Pinto wrote that the funnel "will cause water to funnel up the Intracoastal Canal into the Industrial Canal from the Gulf of Mexico."  On November 26, 1969, Steven G. West, Acting District Engineer for the ACE New Orleans District, responded to Mr. Pinto's letter to Vice President Agnew.  West stated: "You also recommend construction of a lock on the Mississippi River Gulf Outlet west of Paris Road in order to prevent hurricane surges from entering the Inner Harbor Navigation Canal.  We have previously | Exhibit 33, MSJ Exh. 92, Naomi Depo., 357:15-25; 358:1-25; 359:1-25; 360:1-12 |

| | |
|---|---|
| investigated a similar plan and found the net increase in benefits was small in comparison to the increased cost of the plan would provide the same degree of protection as the currently authorized plan." | |
| 423.　　Over the intervening few decades leading up to Hurricane Katrina, the ACE never took any corrective action to protect the urban areas of Greater New Orleans from the known danger of flooding from surge waters in the MR-GO "funnel." | MSJ Exh. 56, Team Louisiana Report, p. ____ |

### d.　　Decimation of Hurricane Buffering Wetlands

| | |
|---|---|
| 424.　　The destruction of the wetlands and marshes greatly exacerbated Hurricane Katrina's storm surge to its catastrophic proportions.  Had the MR-GO not destroyed the natural surrounding environment, nature's defenses would have battled Hurricane Katrina quite effectively.  By destroying the natural balance, however, the MR-GO became a lethal weapon of destruction at the hands of Hurricane Katrina and a substantial factor in the catastrophic flooding in New Orleans East, Lower 9th Ward, and St. Bernard Parish | Kemp Expert Report ¶ 57 |
| 425.　　There is general agreement that the presence of the MRGO destroyed wetlands that otherwise would have provided additional defenses.  This happened because the MRGO served as a conduit for saltwater from the Gulf of Mexico to intrude into the freshwater wetlands. The saltwater damaged and destroyed wetlands, which resulted in the loss of land that had served as part of the city's | A Nation Still Unprepared, Chapter 9-4 to 9-6 |

| | |
|---|---|
| defenses against hurricanes and other storms.  According to the National Academy of Sciences, MRGO has resulted in "tremendous environmental damage, including saltwater intrusion, land loss, and worsening the effects of wave damage during hurricanes and storms."  Over the past 40 years, the erosion from the saltwater has contributed to the widening of the MRGO from 600 feet to 2,000 feet, an average of 35 feet per year, and the loss of more than 19,000 acres of land.  Had there been no wetlands at all east of the MRGO and the GIWW, preliminary storm modeling has shown, the Katrina storm surge may have been anywhere from three to six feet higher along St. Bernard Parish/Ninth Ward and New Orleans East. Continued wetland loss will increase the vulnerabMSJ Exh. 72, ILITy of the city, making overtopping by storm surges even more likely in the future. | |
| 426.      Simulated flowlines indicate that most of the water that was delivered to New Orleans East and the Lower 9th Ward came via the MR-GO (Reach 1) rather than across the wetlands west of Lake Borgne.  Prior to the MR-GO's construction, New Orleans was protected by about 10 miles of wetlands consisting of very dense swamp (average 445 trees/acre), marsh (1m height with a density of 586 stems/yd$^2$) and a forested natural ridge  (personal communication, H.S. Mashriqui, LSU)  If these wetlands had not been destroyed by the MR-GO's construction and maintenance, they would have reduced surge caused by Hurricane Katrina by about 3 feet and spared Greater New | Kemp Expert Report ¶ 54 |

| | |
|---|---|
| Orleans from catastrophic flooding. | |
| 427.    The building of MRGO and the combined GIWW/MRGO resulted in substantial environmental damage, including a significant loss of wetlands that had once formed a natural barrier against hurricanes threatening New Orleans from the east. MRGO and the GIWW/MRGO provided a connection between Lake Borgne and Lake Pontchartrain that allowed the much greater surge from Lake Borgne to flow into both New Orleans and Lake Pontchartrain. These channels further increased the speed and flow of the Katrina surge into New Orleans East and the Ninth Ward/St. Bernard Parish, increasing the destructive force against adjacent levees and contributing to their failure.  As a result, MRGO and the combined GIWW/MRGO resulted in increased flooding and greater damage from Hurricane Katrina.  U.S. Army Corps of Engineers. Performance Evaluation of the New Orleans and Southeast Louisiana.  Hurricane Protection System. Washington: Interagency Performance Evaluation Task Force, March 10, 2006, p. E-7.  National Academy of Sciences, Drawing Louisiana's New Map: Addressing Land Loss in Coastal Louisiana. Washington: National Academies Press, 2006, pp. 30, 38-39. | A Nation Still Unprepared, Chapter 9-4 to 9-6 |
| The primary cause of the catastrophic flooding in New Orleans East, Lower 9th Ward, and St. Bernard Parish was the defective design, construction operation, and maintenance of the MR-GO itself from 1958 to the date of Hurricane Katrina. The design of a tidewater channel | Bea Expert Report, pp. 12-13; Kemp Expert Report ¶¶ 58, 59 |

immediately adjacent to Lake Borgne and connecting the channel into the GIWW created a predicted and predictable "funnel effect." In addition, the waterway's construction and maintenance had multiple environmental effects, primarily salt water intrusion that led to the rapid destruction of tens of thousands of acres of protective cypress forests, wetlands and swamps (Kemp 2007, Freudenberg et al 2007; *see also* Declarations of Paul Kemp, Patrick Shea Penland, and John Day and Gary Shafer). Loss of these natural protective barriers—which are highly effective in reducing hurricane surge, currents and waves—resulted in exposing the MR-GO EBSBs [earthen berms/spoilbanks] directly to hurricane surge, current, and wave effects from the Gulf of Mexico, and the geometry of the constructed features magnified the forces and effects of the storm surge in some sections. Maintenance dredging—required to keep the MR-GO in operation—wave action and bank erosion caused by the wakes of ships traversing the channel significantly widened the channel in many areas beyond its authorized width (MSJ Exh. 56, Team Louisiana 2007).  The widening of the MR-GO had a further damaging effect in that the bank erosion exacerbated the settling of the soil constituting the EBSB. Consequently, the settling of this soil reduced the height of the tops of the EBSB when measured against mean sea level. But for the increased and sustained surge caused by the MR-GO during and after Hurricane Katrina, large portions of Greater New

| | |
|---|---|
| Orleans (particularly the Lower 9th Ward, New Orleans East, and St. Bernard Parish) would not have experienced catastrophic flooding of Biblical proportions. The system in place—even though along the MR-GO it did not constitute Levees—would have been adequate to contain most of the surge but for the increased and sustained surge, currents, and waves exacerbated by the MR-GO. | |
| 428.      There is "a strongly-held belief that wetlands provide a buffer between storm surges out in the Gulf of Mexico and the uplands, including New Orleans.  So if you have wetlands in place, then, in fact, you should have lower storm surge at New Orleans." | Dalrymple Depo., 35:23-25, 36:1-4 |
| 429.      Wetlands do provide some buffering effect. It varies depending on a number of variables, including what type of wetlands, where they are, how they are located, what kind of features are in front of them, behind them, whether they are cypress and so forth. | MSJ Exh. 92, Naomi Depo. 281:35, 282:1-5 |
| 430.      Wetlands absorb some of the storm surge and wave energy. They also provide a buffer area for the water going over the MR-GO flood protection works by filling up with water like a sponge before the water goes into protected areas. | Dalrymple Depo., 108:1-16 |
| 431.      The presence of wetlands will impact still water elevation. | Varuso Depo., 324:23-25; 325:1-4 |
| 432.      Anecdotal data accumulated after Hurricane Andrew suggests a storm-surge reduction along the Louisiana coast of about three inches per mile of marsh. | A Nation Still Unprepared, Chapter 9-3 |
| 433.      Researchers at the Louisiana State University | *A Nation Still Unprepared*, |

| | |
|---|---|
| (LSU) Hurricane Center found that, during Hurricane Katrina, levees protected by wetlands had a much higher survival rate than those bordering open water.  For example, large sections of the Mississippi River Gulf Outlet (MRGO) levees that had little or no wetlands separating them from Lake Borgne disintegrated, while the nearby 20-Arpent Canal levee, protected by a buffer of marsh and wooded wetlands, remained standing.  According to LSU researchers, an area about the size of a football field with the tree density equal to that found in most Louisiana swamps would reduce wave energy in a storm by 90 percent.  These researchers further found that friction from marsh grasses and shrubs reduced water speed from Hurricane Katrina in some places from seven feet per second to three feet per second. | Chapter 9-3; Kemp Expert Report ¶ 46, 48, 53, Figure 13 (p. 37) |
| 434.      Over 50 years ago, the USACE recognized the importance of the coastal zone in dampening storm surges. The rule of thumb was a reduction of 1 foot in storm surge for every 2-3 miles of wetlands. (Kemp 2007) The hurricane models called SPLASH, SLOSH and ADCIRC recognized the importance of coastal landforms and elevation in hurricane protection.  (Kemp 2007) Louisiana's first large-scale restoration program, the Coastal Wetland Protection, Planning, and Restoration of 1990, followed by Coast 2050, LCA, CPRA and LACPRA, all articulate the importance of wetland forest, marshes and barrier islands in protecting our citizens, their property and the economic well-being of our state, region, | Penland Expert Report, p. 19; Kemp Expert Report ¶ 48 |

| | |
|---|---|
| and nation.  (Kemp 2007) | |
| 435.       In a November 2004 report entitled *Louisiana Coastal Area, Ecosystem Restoration Study* (the "*2004 Corps Ecosystem Report*"),the ACE acknowledged the prophylactic role played by this marshland in suppressing hurricane storm surge:<br><br>  "The past and continued loss of Louisiana's coastal wetlands will significantly affect the ecology, society, and economy of the region and the Nation.  The capacity of the coastal wetlands to buffer storm surges from tropical storm events will diminish, which will increase the risk of significant damage to oil, gas, transportation, water supply, and other private and public infrastructure and agriculture lands and urban areas."  *2004 Corps Ecosystem Report*, Executive Summary at pp.iii-iv (emphasis added). | Penland Expert Report, p. 20 |
| 436.       Baldcypress – water tupelo (Taxodium distichum – Nyssa   aquatica) swamps offer excellent hurricane protection, while the intermediate and brackish marshes and open areas created by the Mississippi River-Gulf Outlet (MR-GO) are much more inferior with regard to wind- and storm-surge reduction. | Expert Report of John W. Day ("Day Expert Report"), p. 2 |
| 437.       A vital part of the Hurricane Katrina story lies in nearly two centuries of natural and manmade changes to the Louisiana coastline.  When New Orleans was settled in 1718, the primary flood threat was the Mississippi River, not the Gulf of Mexico, which was separated from the city by an expansive coastal landscape | A Nation Still Unprepared, Chapter 9-1 |

| | |
|---|---|
| that served as a buffer from storms emerging from the Gulf. That protective landscape no longer exists. The ever changing and disappearing coastline left New Orleans more susceptible to hurricanes and contributed to the damage inflicted by Katrina.  Should this trend continue, New Orleans and the rest of coastal Louisiana will become even more vulnerable to damage from future storms, and efforts to protect the city with levees and floodwalls will be undermined. | |
| 438.      The deterioration of Louisiana's coastal landscape of barrier islands, wetlands and higher ridges, and the effects of subsidence have made coastal communities more vulnerable to hurricane flooding.  New Orleans, in particular, is widely considered to be more vulnerable to hurricanes both because land in the city has subsided and because much of the barrier islands and wetlands that once surrounded the city have disappeared. Forested wetlands can greatly diminish wind penetration, reducing surface waves and storm surge.  Shallow water depths weaken waves via bottom friction and breaking, while vegetation provides additional frictional drag and further limits wave buildup.  Where wetlands and shallow waters are in front of levees, they absorb wave energy and reduce the destructiveness of storm waves on the levees. Depending on the rate of relative sea-level rise, healthy coastal wetlands can maintain a near sea-level landscape by trapping sediments or accumulating organic material, thus helping to counter subsidence and global sea-level | A Nation Still Unprepared, Chapter 9-2 to 9-3 |

| | |
|---|---|
| rise. In contrast, when Louisiana's coastal wetlands deteriorate and disappear, the land held in place by the wetlands undergoes wave erosion, eventually washing away and leaving behind open water 10 to 12 feet deep. | |
| 439.      In terms of storm-surge and wind-damage reduction, baldcypress – water tupelo swamps are far superior to most other wetland habitat types.  Only live oak (Quercus virginica) and palms are more resistant to wind throw (i.e., blow down) than baldcypress and water tupelo (Williams et al. 1999).  Cypress – tupelo swamps faired far better than other forest types in Hurricanes Camille (Touliatos and Roth 1971), Andrew (Doyle et al. 1995), and Hugo (Gresham et al. 1991, Putz and Sharitz 1991). | Day Expert Report, p. 3 |
| 440.      Although baldcypress – water tupelo swamps are extremely resistant to wind throw and deep flooding, they are far less resistant to saltwater intrusion (Penfound and Hathaway 1938), and to stressors coupled with salinity stress (Shaffer et al. 2007).  Therefore, they require a reliable source of fresh water for system flushing following tropical storm events and during droughts.  In stark contrast to this, the MR-GO brought the swamps contiguous with Orleans and St. Bernard Parishes the exact opposite:  a steady influx of lethal salt water.  This in turn caused extensive loss of the baldcypress – water tupelo swamps of the Central Wetlands Unit (CWU) by serving as a constant saltwater intrusion conduit for more than four decades. | Day Expert Report, pp. 3, 10-11. |
| 441.      The dangers of increasing salinity in a | Day Expert Report, pp. 4-5 |

| | |
|---|---|
| wetland, including baldcypress – water tupelo swamps, are three-fold: direct osmotic imbalance, salt toxicity, and production in the soils of highly toxic sulfides. Salt water contains sodium chloride ions and when these reach concentrations higher than the solutes in plant cells, fresh water escapes from the plant through osmosis and uptake of fresh water ceases. In essence, the salt-intolerant vegetation is experiencing "drought" conditions (Mendelssohn and Burdick 1988). Plants also absorb ions such as sodium from salt water and these ions may be lethal when in high concentration.  Finally, salt water contains a much higher concentration of sulfate than fresh water. In wetlands, the sulfate, through alternative metabolic pathways of soil microbes (Mitsch and Gosselink 2007), becomes chemically reduced to deadly compounds such as hydrogen sulfide (Mendessohn et al. 1981). | |

**e.**  **Before Construction of the MR-GO, the ACE Knew About the Lethal Effects of Salt Water And Bank Erosion On Wetlands And Cypress Trees**

| | |
|---|---|
| 442.  In building the MR-GO, the Army Corps ignored well-known scientific knowledge about the sensitive habitat through which it was planning to build a major waterway. The southeast coast of Louisiana is part of "one of the most complex, dynamic, and productive environments of the United States, with an underlying geology shaped by tectonic forces and sedimentation | Penland Expert Report, pp. 14-15 |

| | |
|---|---|
| processes, varied estuarine and coastal ecosystems, and a turbulent climate." American Geophysical Union, *Hurricanes and the U.S. Gulf Coast: Science and Sustainable Rebuilding*, June 19, 2006 at p. 6. Like so many other ecologically sensitive areas throughout the nation, the Army Corps' hydraulic dredging pillaged the Louisiana wetlands by constructing MR-GO in a manner that inflicted massive environmental devastation. | |
| 443.    The lethal effects of salt water on freshwater wetland vegetation were known long before the initial construction of the MR-GO (e.g., Penfound and Hathaway 1938).  Both the U.S. Fish and Wildlife Service (USFWS) and the Louisiana Department of Wildlife and Fisheries warned the U.S. Army Corps of Engineers (USACE) that construction of the MR-GO could have catastrophic effects on the surrounding flora and fauna. In a report to USACE (the April "1958 Interior Report"), the USFWS predicted that the MR-GO construction "particularly by breaching the natural east-west ridges between fresh/brackish and salt water" would introduce salt water into the wetlands and destroy tens of thousands of acres of marshes and mature baldcypress – water tupelo swamps. In a letter of September 23, 1957, Secretary Seaton of the Department of the Interior made it clear that USACE had not followed the protocol put forth in the Wildlife Coordination Act of August 14, 1946 (60 Stat. 1080), and requested funds to model potential impacts of the MR-GO (MSJ Exh. 56, Team Louisiana 2007). Modeling funds were not granted | Day Expert Report, pp. 5-6; Penland Expert Report, p. 15 |

| | |
|---|---|
| and, when the USACE finally modeled MR-GO scenarios (USACE 1963), a salinity increase of 4-6 ppt (lethal to cypress – tupelo swamps) was found (MSJ Exh. 56, Team Louisiana 2007). Furthermore, the USFWS (in their Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies 1958) recognized the wetlands of coastal Louisiana as "perhaps the densest and richest wild fauna in the world…[with a] flora [that] has narrow salinity range; therefore, desirable production must result from exacting conditions… [and] the 36-foot-deep cut will result in direct changes of salinity…" The USACE ignored their concerns and began construction, or perhaps better put, massive wetlands destruction—the very ecological disaster predicted by the /USFWS. | |
| 444.    The Army Corps also refused to heed the plea of the Louisiana Wildlife and Fisheries Commission in 1958, urging that the route for the MR-GO be modified in order to avoid the destruction of "highly productive estuarine water and marsh areas." *See e.g.*, May 31, 1979 correspondence from Cary W. Kerlin, Field Supervisor, U.S. Department of Interior, Fish and Wildlife Service to Jack A. Stephens, Director-Secretary St. Bernard Parish Planning Commission.  The Army Corps rejected this recommendation because a more environmentally responsible alignment "would increase the construction and maintenance cost by going through the lower part of | Penland Expert Report, p. 15: Exhibit __(Kerlin Letter of May 31 1979) |

| | |
|---|---|
| Lake Borgne. . . . .” *Id.* | |
| 445.　　The LWLFC was the lead state agency with environmental expertise. Before ground on the MR-GO was broken, the LWLFC put the ACE on notice that the MR-GO's proposed route "bisects highly productive estuarine water and marsh areas, causing the department to be greatly concerned about the influence on fish and wildlife resources.  In addition to the immediate influence on the annual fish and wildlife value of 10 to 14 million dollars and direct losses to valuable habitat, we anticipate considerable indirect losses due to changes in currents, saltwater intrusion, drifting of spoil into adjacent areas and other project associated factors."  Louisiana Wild Life and Fisheries Commission 1958-1959, Eighth Biennial Report at p. 39.  Based on these genuine fears, the LWLFC urged the Army Corps to modify "channel alignment to minimize damages to [the marsh areas]." *Id.* at 40. "This proposed realignment would have bypassed high quality waterfowl marshes and oyster water bottoms, and confined the middle section of the new channel within the natural levees of Bayou La Loutre, thereby making available more suitable material for retention dikes." *Id.*  Upset by the Army Corps' disregard of the dire environmental consequences of the route selected for the MR-GO, LWLFC criticized the Government's engineers for failing to prepare "a careful benefit-cost study . . . of this proposal" and continued "to question whether their cursory review justified the | Penland Expert Report, pp. 15-16 |

| | |
|---|---|
| incurrence of valuable habitat losses . . ." *Id.* | |
| 446.        By 1963, while the MR-GO was still under construction, the ACE knew from its own study that the MR-GO would result in significant salinity intrusion into the Lake Pontchartrain Basin.  Because the MR-GO was already built, the modelers recommended that the barrier structure proposed at the mouth of the IHNC at Seabrook as part of the HPS barrier plan be manipulated to reduce these effects. This structure was never built, and the increases in salinity predicted by the model for Lakes Pontchartrain and<br><br>Borgne have largely taken place as predicted. Results of more recent numerical model studies (Tate et al. 2002, Carillo et al. 2001, McAnnally and Berger 1997) confirmed that the MR-GO has an important role in the propagation of astronomical and moderate meteorological tide into Lake Pontchartrain, and in the flux of higher salinity water into the Lake. | MSJ Exh. 56, Team Louisiana, p. 232; MSJ Exh. 9, House Doc. No. 231 at p. ____ |
| 447.        Forty-three miles of the MR-GO fall within a "landcut" through low-lying marshland, most of which traverses the ecologically sensitive wetlands of St. Bernard Parish.  Even the Army Corps—in its *MR-GO Bank Erosion Reconnaissance Report* ("*Corps Erosion Report*") published in 1988—admitted that the MR-GO had accelerated the "loss of marshes, ridges, bayous, ponds, aquatic grass beds and shorelines needed for the Lake Borgne, Lake Pontchartrain and Breton Sound estuaries." In that same study—published almost  two decades ago— | Exhibit __ (*Corps Erosion Report*); Penland Expert Report, p. 16 |

| | |
|---|---|
| the Army Corps characterized the MR-GO as one of the eight areas in southeast Louisiana where "erosion stabilization measures are urgently needed." | |

**f.** **The MR-GO Directly And Indirectly Killed Tens Of Thousands And Acres Of Wetlands And Cypress Trees And Left New Orleans Vulnerable To Hurricane Surge Along The MR-GO "Hurricane Freeway"**

| | |
|---|---|
| 448.      The loss of the protective buffer of the wetlands was accelerated by the MR-GO navigation channel which acted like a "hurricane highway" allowing storms to sweep inland, past marshlands, like liquid bulldozers. | An Unnatural Disaster:  p. 4. |
| 449.      The construction of the MR-GO, the severing of the Bayou La Loutre Ridge, and the steady influx of salt water into the baldcypress – water tupelo swamps in Orleans and St. Bernard Parishes quickly and directly killed much of this previously-thriving, extensive habitat. | Day Expert Report, p. 2 |
| 450.      The MR-GO greatly accelerated and contributed to the marsh and baldy cypress – water tupelo swamp loss in the Pontchartrain and Breton Sound Basins by the introduction of salt water into this sensitive ecosystem. | Day Expert Report, p. 10 |
| 451.      Salinity killed tens of thousands of acres of baldcypress – water tupelo swamps in the CWU alone—a salt kill accurately predicted by state and federal agency personnel before the construction of the MR-GO. | Day Expert Report, pp. 11-12 |
| 452.      The saltwater intrusion—caused by the | Penland Expert Report, p. 14 |

| | |
|---|---|
| penetration of the natural ridge at Bayou La Loutre— indirectly destroyed dozens of square miles of baldcypress-tupelo swamps that would have afforded considerable storm surge protection during and after Hurricane Katrina. | |
| 453.       The MR-GO contributed to the direct destruction or degradation of over 40,000 acres of hurricane buffering wetlands, through construction and expansion of the channel, and through the building of the huge adjacent spoil disposal area (MSJ Exh. 56, Team Louisiana 2007, p. 227), while the USACE estimates that it has indirectly damaged another 20,000 as a consequence of salt water intrusion (USACE 1999). | Kemp Expert Report ¶ 51 |
| 454.       This direct and indirect loss of tens of thousands of acres of forested wetlands and coastal marshes caused by the MR-GO left vulnerable New Orleans and the surrounding low-lying communities in St. Bernard, Plaquemines, Orleans, and St. Tammany Parishes to the impacts of Hurricane Katrina. (Figure 9).  In 2004, the Army Corps admitted that the MR-GO had devastated the marshland to the southeast of New Orleans, and that this marshland served as a natural hurricane storm surge buffer.  In a November 2004 report from the Army Corps, entitled Louisiana Coastal Area, Ecosystem Restoration Study (the "2004 Corps Ecosystem Report"), the Army Corps noted:  455.       "After the MRGO was completed, significant habitat shifts occurred because the impacted area converted to a higher salinity system with the influx of saltwater | Exhibit ___(*2004 Corps Ecosystem Report*); Penland Expert Report, p. 19 |

| | |
|---|---|
| through ridges and marsh systems that were severed or destroyed during channel construction. Continued operation of the MRGO results in high rates of shoreline erosion from ship wakes, which destroy wetlands and threaten the integrity of adjacent communities, infrastructure, and cultural resources." | |
| 456.     2004 Corps Ecosystem Report at Section 4, p. 18, (emphasis added). | |
| 457.     In total, at least 65,000 acres of hurricane buffering wetlands – some 101 square miles – have been obliterated or impaired because of the MR-GO. More than 27,000 acres of wetlands have been destroyed since the opening of the MR-GO, while some 38,000 more acres have undergone much change in habitat. | Penland Expert Report, p. 16 |
| 458.     The loss of critical habitat exposed the Greater New Orleans area to the ravages of Hurricane Katrina. | Penland Expert Report, p. 12 |
| 459.     *In Holding Back the Sea: The Struggle for America's Natural Legacy on the Gulf Coast* (Harper Collins 2001), Christopher Hallowell prophetically noted that "erosion from ships and storms has gouged [the MR-GO] 2,000 feet wide and made it a freeway to New Orleans for any hurricane that happens to come from the right direction.  The surrounding marsh, now vulnerable to storms and salt water, has all but died as a result, along with 40,000 acres of mature cypress trees.  Now, storm surges can invade the marsh through the straight arrow channel and smash into New Orleans." | Penland Expert Report, pp. 16-17 |

| (j) | |
|-----|-----|

**K.**     **CONTRARY TO THE CONGRESSIONAL MANDATE IN THE FLOOD CONTROL ACT OF 1965 AND IT'S OWN STANDARDS, THE ARMY CORPS OF ENGINEERS DID NOT CONSTRUCT HURRICANE FLOOD PROTECTION STRUCTURES FOR HUMAN POPULATION AREAS ALONG REACH 1 AND REACH 2 OF THE MISSISSIPPI RIVER-GULF OUTLET OR THE INNER HARBOR NAVIGATION CHANNEL THAT MET EITHER THE "STANDARD PROBABLE HURRICANE" OR "PROBABLE MAXIMUM HURRICANE" DESIGN CRITERIA**

    **1.**     **The Hurricane Flood Protection System For Greater New Orleans Was An Uncompleted Work in Progress At The Time of Katrina**

| UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|
| 460.     By the time of Hurricane Katrina, the USACE had not completed, and was far from completing, constructing a hurricane flood protection "levee" along Reach 1 or Reach 2 of the MR-GO as that concept is generally understood by engineers and as specified in relevant USACE manuals and guidelines.  Instead, construction was, and still remains, a work in progress. | Expert Report of Jesse L. Arnold ("Arnold Expert Report"), ¶¶ 7, 44;  Bea Report, ¶__; Height Structure Maps; see also Section G, supra |
| 461.     What is evident from the ACE documents available is that over the years after 1965, the USACE undertook multiple design and construction efforts to raise | Arnold Expert Report, ¶ 34 |

| | |
|---|---|
| crest grade on those Reach 2 levee segments to correct the effects of settlement.  (MSJ Exh. 56, Team Louisiana, The Failure of the New Orleans Levee System During Hurricane Katrina, Report to the Louisiana Department of Transporation and Development (2007)("MSJ Exh. 56, Team Louisiana Report") at page 270). Thus, at the time of Hurricane Katrina, the construction of the structure by the USACE remained an uncompleted work in progress but it was not a levee offering flood control protection. (Independent Levee Investigation Team, Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005 (2006) ("MSJ Exh. 72, ILIT Report") at  Sections 10.5.7,  10.5.8, and 10.5.9, first paragraph in each section, pages 10-18 to 10-20). | |
| 462.      Virtually all of the flood structures along the IHNC and Reach 1 and Reach 2 of the MR-GO were incomplete and not at SPH design elevation at the time of Hurricane Katrina. | See Section G, supra; Height Structure Maps |
| 463.      The spoil bank was located on the south side of Reach 2.  It was not functioning as a flood levee at that point.  That pile of dirt in and of itself would not be a flood protection levee and certainly not one mandated by Congress in the LPV HPP. | MSJ Exh. 92, Naomi Depo. 338:19-25, 339:1-7 |
| 464.      At the time of Hurricane Katrina, the features along the south bank of the MR-GO remained a pile of dirt that was higher than eight feet, but still not a completed flood protection work mandated by Congress for the | MSJ Exh. 92, Naomi Depo. 262:22-25, 338:19-25, 229:1-7, Naomi Exhibit 20 |

| LPVHPP. | |

### 2. The ACE Did not Design or Construct Flood Protection Structures For Human Population Areas In A Coastal Environment As Mandated By Congress And Prescribed By ACE Criteria

| 465.     To the extent that Congress mandated a hurricane flood protection system for Greater New Orleans in the wake of the catastrophic flooding during and after Hurricane Betsy in 1965, the USACE did not design and build such a system along vast stretches of the MR-GO.  In Section 204 of the Flood Control Act of 1965 (Pub.L.No. 89-298, 79 Stat. 1073 (October 27, 1965), Congress directed the USACE to build "works of improvement for . . . the control of destructive floodwaters" and a "project for hurricane-flood protection on Lake Pontchartrain, Louisiana."  The level of protection anticipated by this authorization was to protect the project area from the Standard Project Hurricane ("SPH").  The SPH is one that may be expected from the "most severe combination of meteorological conditions that are considered reasonably characteristic of the region." (See House Doc. 231, 89th Congress, 1st Session, dated July 6, 1965, at p. 46. House Doc. 231 was incorporated by reference in Section 204 of the Flood Control Act of 1965).  The SPH was expected to have a frequency of once in about 200 years in the project area (House Doc. 231, at p. 46), to once in 300 years ("Army Corps of Engineers – History of the Lake | Bea Expert Report ¶ 23 |

| | |
|---|---|
| Pontchartrain and Vicinity Hurricane Protection Project," United States Government AccountabMSJ Exh. 72, ILITy Office (GAO), Testimony before the Committee on Environment and Public Works, U.S. Senate, November 9, 2005). The evidence is overwhelming that the USACE did not design and construct such a project for either reach of the MR-GO. | |
| 466.     It is my opinion that the earthen structures along Reach 2 of the MR-GO were not a hurricane flood protection "levee" system either by design, construction, or functionality.  At most, they were earthen embankments affording no hurricane flood protection because (among other reasons) of the poor, highly erodeable soil composition, lack of compaction, construction on unstable, subsiding material, uneven heights of the elevation crests, and lack of any front or back slope protection. | Theis Report, ¶¶ 17, 30 |
| 467.     Coastal engineering is the engineering that is performed in a coastal area, as distinguished from hydraulic engineering that might be more in a riverine area.  It is to distinguish coastal processes that could occur during floods and other types of events.  The hydraulic and hydrologic dynamics of a river are a great deal different than that of a coastal area. | Powell Depo. 450:16-25, 451:1-2 |
| 468.     There is a difference between flood protection and hurricane or storm flood protection in terms of computing design water levels, slope, and armoring of a flood structure.  Flood protection relates to a riverine locale, while there is a wave climate in a coastal process | Powell Depo. 482:13-25, 483:1-23 |

| | |
|---|---|
| that must be accounted for. | |
| 469.    The structures in place  along Reach 2 of the MR-GO—which were designed to protect the developed areas of St. Bernard and Orleans Parishes—were nothing more than earthen embankments that were not  "levees" because, among other things, they offered no meaningful protection to human population and property in the vicinity. | Arnold Expert Report ¶ 7; Theis Expert Report ¶ 13; Bea Expert Report ¶¶ 16(b) |
| 470.    The ACE failed to design and construct a hurricane flood protection levee along Reach 2 of the MR-GO that met its own criteria.  Accordingly, the earthen berms along the southern banks of Reach 2 of the MR-GO could not have been a hurricane flood protection levee. | Arnold Expert Report ¶ 25; Bea Expert Report ¶ 16 (b) |
| 471.    According to the ACE's own manuals, the soil materials selected for construction of the Reach 2 flood structures—adjacent borrow materials that were rich in sandy soils and shells with inferior erosion resistance— were inappropriate for this type of project in close proximity to an urban area along the coast (due to the immediate proximity of Lake Borgne). | Arnold Expert Report ¶¶ 16-26; Bea Expert Report ¶¶ 16 (b), 23 |
| From time to time over many years, the ACE promulgated versions of a *Design and Construction of Levees Manual* ("*DCL*") that sets forth the Corps' policies and practices for design and construction of levees as flood protection structures in human population areas.  At page 6-3 (b), the *DCL* explicitly warns that such "hydraulic fill" with "porous" sands that are "pervious" "shall not normally be used in constructing levee embankments." | Exhibit ___ (*Design and Construction of Levees*, EM 1110-2-1912, dated April 30, 2000); Arnold Expert Report ¶ 25, 22, 23 |

| | |
|---|---|
| The *DCL* also warns that hydraulic fill should be used only in a "temporary emergency" and in circumstances where the flood structures' "failure would not endanger human life . . . " *Id.* at p. 6-3 (b) and Table 7-1 (III). | |
| 472.       The ACE did not adhere to its own design standards and guidelines for storm flood protection in various manuals, including the TR-4 Manual, Shore Protection Manual, and Coastal Engineering.  The decision to construct a "levee" along Reach 2 of the MRGO from the existing available materials was based on the USACE's normal flood control levee construction methods employed on the inland waterways. This system heavily uses adjacent borrow to build levees.  Using conventional land based equipment and not a cutterhead hydraulic dredge, the USACE had proceeded to construct these inland levees on an embankment of the spoil material which was primarily sand and shell, but much less erodeable silt and clay. | Theis Expert Report, ¶ 16; Arnold Expert Report ¶¶ 10, et seq. |
| 473.       Flood protection levees should not be made "entirely out of stand." The post-Katrina levee repairs and replacement require use of clay, composition of the soils, and vegetation on the embankments which "provides significant erosion resistance than just earth and fill itself." | Dalrymple Depo., 76:3-5; Varuso Depo. 105:1-25 |
| 474.       ACE standards at the time required the use of clays and silts and no other type of soil material in construction of the flood protection work along Reach 1 and Reach 2 of the MR-GO. | Varuso Depo., 57:20-25; 58:1 |
| 475.       Many miles of the Chalmette and New Orleans East Levees were constructed of shell-rich sands | MSJ Exh. 56, Team Louisiana, p. vii |

| | |
|---|---|
| with poor erosion resistance derived from the hydraulic excavation of the adjacent GIWW and MRGO channels, rather than the hauled clay soils specified for levees protecting urban areas (EM 1110-2-1913, 1978 ed.). | |
| 476.     The flood protection works along Reach 2 of the MR-GO eroded because of the sandy soil composition, and there was no armoring for scour protection. | Dalrymple Depo., 86:15-25; 87:12-14 |
| 477.     Scouring occurred extensively along Reach 2 of the MR-GO during and after Hurricane Katrina. | Dalrymple Depo., 90:3-8 |
| 478.     Idealized design templates were applied to long levee and floodwall reaches without adjustment for variable subsoil conditions or for variations in elevation on the protected side. IPET believes that such a mistake caused the levee supporting the I-wall levee on the IHNC to be constructed improperly in the vicinity of the north breach into the Lower 9th Ward, where the ground elevation on the protected side was lower. The foundation may have failed early in the storm sequence at a water elevation well below the design level of protection because of inadequate resistance. | MSJ Exh. 56, Team Louisiana, p. vi |
| 479.     The idea of using hydraulically dredged fill (containing sand, salt and steel materials) to construct hurricane protection levees [for the Chalmette, New Orleans and East Bank Levees] was considered unusual at the time, but was initially suggested by the mounds of dredged material that remained apparently stable at heights of 5 to 10 feet above ground level within the spoil retention area established during MRGO construction. This | MSJ Exh. 56, Team Louisiana, pp. 267, 269, 270 |

| | |
|---|---|
| approach was later considered for construction of the Jefferson Parish lakefront levee, but was rejected. | |
| 480.　　　Post-Katrina soil testing by IPET of samples obtained from earth levees throughout the GNO HPS exhibited a wide range of erodibMSJ Exh. 72, ILITy indices from very low to very high categories (Figure 199), but those from the Chalmette (MRGO) and New Orleans East Back Levee (GIWW) tended to fall in the very high to high-erosion potential ranges. MSJ Exh. 72, ILIT (2006, 9-52) found, furthermore, that MRGO samples that tested in the high-erodibMSJ Exh. 72, ILITy categories could be greatly improved with respect to erosion resistance by subjecting them to compaction in the laboratory (Figure 200). | MSJ Exh. 56, Team Louisiana, p. 270 |
| 481.　　　The lakefront flood protection works made of clay did not have vast stretches that washed away like Reach 2 of the MRGO.  The lakefront flood protection works performed as designed. | Dalrymple Depo., 78:2-9; 80:1-6 |
| 482.　　　The ACE did not build a human flood protection system along Reach 2 of the MR-GO for the additional reasons that the structures in place at the time of Hurricane Katrina did not meet other Corps' criteria for such a system.　For example, The ACE failed to adhere to standards for dealing with settlement, stabMSJ Exh. 72, ILITy, seepage, erosion, overtopping, wave action, and armoring for slope protection.  Thus, the man-made features in place along Reach 2 of the MR-GO were merely earthen | Arnold Expert Report ¶¶ 27-44; Theis Expert Report ¶ 20; Bea Expert Report ¶ 16 (b),(c) |

| | |
|---|---|
| embankments but nowhere completed "levees" offering any realistic storm surge protection for the adjacent communities of the Lower 9th Ward and Chalmette. | |
| 483.        The New Orleans District did not follow standard engineering practice or Corps guidance when evaluating whether to protect (armor) earthen sea dikes from erosion caused by waves in the funnel area east of the city. Such evaluations should have followed the 1954 TR-4 Shore Protection Planning and Design (Beach Erosion Board) or its successor, the Shore Protection Manual, first published in 1973. Instead of the required analysis, Design Memoranda for the New Orleans East and Chalmette Levees substitute the following disclaimer. | MSJ Exh. 56, Team Louisiana, p. vi-vii |
| 484.        "Due to the short duration of hurricane flood stages and the resistant nature of clayey soils, no erosion protection is considered necessary on the levee slopes." | |
| 485.        These levees were not designed to withstand general overtopping, as was amply demonstrated in Katrina. | |
| 486.        In order to qualify as a "levee" for flood protection for humans and property, the ACE's own Design and Construction of Levees and Coastal Engineering Manual prescribe that these man-made features must be either (a) composed mostly of compacted clay-like cohesive soils, or (b) if constructed of more loosely compacted soils, they must be capped or covered with more dense materials that will protect against the underlying soils being washed away by wave action, storm | Bea Expert Report  ¶¶ 16 (b), (c), 17 |

| | |
|---|---|
| surge, elevated tides and other water related phenomena associated with hurricanes.  Accordingly, there were no "levees" along virtually all of Reach 2 and portions of Reach 1of the MR-GO to protect human population living with this urban area before Hurricane Katrina.  Instead, this frontage had no effective hurricane protection since the ACE decided after 1965 to construct man-made features that were nothing more than miles of Earthen Berms/Spoil Banks ("EBSB")—comprised of dredged sandy, silty soil containing organic matter and shells and/or uncompacted hydraulic fill –that  was not suitable for "levees." | |
| 487.      The ACE had sufficient experience and available expertise to know that an embankment from sand only without surface protection would not be sufficient to withstand ocean generated waves and tidal surges resulting from hurricanes  The plans did not include toe or slope protection and therefore would not withstand the onslaught of severe wave action associated with a storm such as a hurricane with high winds.  For this additional reason, the structure built by the ACE could not have been and was not a hurricane protection "levee" for a populated area. | Theis Expert Report, ¶ 17 |
| 488.      USACE levee designers generally dismissed the need to provide protective covering for the earthen levees constructed as part of the GNO HPS, beyond that afforded by establishment of a grassed surface.  Along most of the Lake Pontchartrain lakefront, more resistant hauled clay soils were, in fact, used to face the levees, and wave berms and sea walls were placed in front of the levee | MSJ Exh. 56, Team Louisiana, p. 274-75 |

| | |
|---|---|
| faces at critical locations. These levees were not overtopped except by limited wave overwash and generally performed well. The sea dikes constructed along the boundaries of the funnel were provided with rip-rap protection at the toe on the channel side to retard erosion of the channel into the levee base, and some were constructed with stabMSJ Exh. 72, ILITy berms to offset the relatively low strength of the soils used, but no additional protection, usually referred to as "armoring," particularly on the back side, was added to address erosion caused by expected overtopping within the statistical range inherent in the definition of the "significant" wave. Again, as was universally true throughout the GNO HPS, the design approach adopted was extraordinarily "brittle," or accepting of the potential for catastrophic failure in the event of even relatively minor overtopping (MSJ Exh. 72, ILIT 2006, F-14). | |
| 489. Engineers involved in the design, construction and operation of the Dutch flood defense system remain mystified by the way the USACE continues to separate coastal levee design from the need to defend such structures from waves. The MRGO levee, for example, has been rebuilt to the pre-Katrina design grade, and the materials used for the patches are far better than those originally used. But the levee was not initially designed as a true coastal defense structure that could survive both surge and waves. The need for armoring has been treated as an add-on that must be separately justified, | MSJ Exh. 56, Team Louisiana, p. 275 |

| | |
|---|---|
| rather than as integral to the overall design. In the wait-and-see world of post-Katrina flood protection funding priorities, no assurance exists at present that the MRGO and GIWW levees will ever be upgraded to survive overtopping, despite awareness at the highest levels in the USACE that they remain among the most fragile parts of the GNO HPS. | |
| 490.      It is important to try to protect against or minimize scouring to maintain integrity of the structure. Significant scouring can lead to instabMSJ Exh. 72, ILITy of the structure by means of erosion. | Powell Depo. 471:5-15 |
| 491.      Armoring will provide you protection when your design parameters are exceeded.  It also can allow you to lower your design elevations because you don't need as much run-up because you have a rough slope which breaks the waves. | Powell Depo. 466:21-25, 467:1 |
| 492.      Scouring is the erosion of the land by the action of the water overtopping the structure.  Armoring on the protected side helps prevent souring when the structure is overtopped. | Dalrymple Depo., 89:23-25, 90:3-4 |
| 493.      The functional benefit of armoring by means of a clay cap, grass, concrete, rock, pavement, and/or riprap is preventing direct water or wave action from scouring or naturally dredging the soil materials. | Dalrymple Depo., 90:12-25, 91:1-4 |
| 494.      There was no protected (back) side scour protection (such as armoring) of the Reach 2 structures at the time of Hurricane Katrina. | Dalrymple Depo. 86:19-23, 87:12-14 |
| 495.      The ACE should have followed the criteria | Bea Expert Report ¶ 16 (b); |

| | |
|---|---|
| specified in the Coastal Engineering Manual (and its predecessors The Shore Protection Manual (1984) and Shore Protection and Design, TR-4 Manual (1966)) which is used as guidance in design of coastal flood protection features.  These standards would be particularly useful for coastal engineering hydraulic issues.  They would be appropriate for use in the design and construction of flood protection works along Reach 2 with respect to waves because it would be expected that waves would propagate into the Reach 2 area during a hurricane because of the small, dwindling amount of land (if any) between Lake Borgne and the MR-GO and the fact that a lot of marshland was no longer alive or functioning as a surge buffer.  In fact, that is exactly what happened during Hurricane Katrina. | Arnold Expert Report ¶¶ 10, 11, 30, 42, 43; Powell Depo. 448: 6-18, 451: 16-21, 452, 8-14, 457: 24-25, 458: 1-10; 466: 21-25,467:1, 472:3-9, 15-20, 474: 10-17; Baumy Depo. 106:20-25, 107:1-3; Powell Depo. Exhibit 64; Baumy Depo. Exhibit 6 (Coastal Engineering Manual) |
|     496.       In order to qualify as a "levee" for flood protection for humans and property, the ACE's own Design and Construction of Levees and Coastal Engineering Manual prescribe that these man-made features must be either (a) composed mostly of compacted clay-like cohesive soils, or (b) if constructed of more loosely compacted soils, they must be capped or covered with more dense materials that will protect against the underlying soils being washed away by wave action, storm surge, elevated tides and other water related phenomena associated with hurricanes.  Accordingly, there were no "levees" along virtually all of Reach 2 and portions of Reach 1of the MR-GO to protect human population living | Bea Expert Report ¶¶ 16(b), (c), 17 |

| | |
|---|---|
| with this urban area before Hurricane Katrina.  Instead, this frontage had no effective hurricane protection since the ACE decided after 1965 to construct man-made features that were nothing more than miles of Earthen Berms/Spoil Banks ("EBSB")—comprised of dredged sandy, silty soil containing organic matter and shells and/or uncompacted hydraulic fill –that  was not suitable for "levees." | |
| (K) | |

Dated:  January __, 2008                Respectfully submitted,

**O'Donnell & Associates**


By:_____
     Pierce O'Donnell (*pro hac vice*)
550 South Hope Street, Suite 1000
Los Angeles, California 90071-2627
Telephone: (213) 347-0290
Facsimile:  (213) 347-0299


**The Andry Law Firm, LLC**


By:_____
     Jonathan B. Andry (LSBA No. 20081)
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 586-8899
Facsimile:  (504) 585-1788


**Law Offices of Joseph M. Bruno**

Joseph M. Bruno (LSBA No. 3604)

855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

**Domengeaux Wright Roy & Edwards LLC**

Bob F. Wright (LSBA No. 13691)
James P. Roy (LSBA No. 11511)
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, Louisiana 70502-3668
Telephone: (337) 233-3033
Facsimile:  (337) 233-2796

**Fayard & Honeycutt**

Calvin C. Fayard, Jr. (LSBA No. 5486)
Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193
Facsimile:  (225) 664-6925

**Girardi & Keese**

Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile:  (213) 481-1554

**Ranier, Gayle & Elliot, LLC**

N. Frank Elliot III
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337).494.7218

187

**Levin, Papantonio, Thomas, Mitchell Echsner & Proctor, P.A.**

Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123

**McKernan Law Firm**

Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202

**Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC**

Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Law Office of Elwood C. Stevens, Jr., a Professional Law Corporation**

Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381

Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Cotchett, Pitre, Simon & McCarthy**

Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Law Office of Frank J. D'Amico, Jr.
APLC**

Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No.
25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Salas & Co., LC**

Camilo K. Salas, III (LSBA No. 11657)
650 Poydras Street, Suite 1650
New Orleans, LA  70130
Telephone: (504) 799-3080
Facsimile:  (504) 799-3085

**Attorneys for Plaintiffs
ADD SIGNATURE BLOCK FOR THE
UNITED STATES**

# TABLE OF CONTENTS

A.     MISSISSIPPI RIVER-GULF OUTLET ...................................................... 3

    1.     Authorization, Construction, and Eventual Closure .......................... 3

    2.     Never a Flood Control Project ......................................................... 8

    3.     Dredging and Spoil Banks .............................................................. 9

    4.     Adverse Effects ............................................................................. 11

B.     TOPOGRAPHY OF GREATER NEW ORLEANS AND     VULNERABMSJ
    Exh. 72, ILITY TO HURRICANE SURGE                       19

    1.     Environmental Setting ................................................................... 19

    2.     Constant Threat From Hurricane Surges ........................................ 24

    C.     HURRICANE BETSY ................................................................... 27

D.     LAKE PONTCHARTRAIN AND VICINITY HURRICANE
    PROTECTION PROJECT ("LPVHPP") ........................................................ 31

    1.     Congressional Mandate .................................................................. 31

    2.     Standard Project Hurricane ............................................................ 33

    3.     Description Of The Hurricane Flood Protection System ...................... 36

    4.     Design Grade Elevations ................................................................ 39

    5.     ACE Fails To Revise HFPS Designs Consistent With Changes in SPH
    Criteria ......................................................................................... 42

    6.     ACE Fails To Use Available Surge Models In Designing The HFPS .... 49

    7.     The ACE Fails to Account for Diminished Surge Protection from
    Disappearing Wetlands .................................................................. 50

    8.     The ACE Fails To Account For Known Problems With Datums and
    Subsidence ................................................................................... 51

    9.     ACE Fails To Provide Armoring For Flood Structures ...................... 55

E.      CHALMETTE SYSTEM (LOOP) ....................................................................56

F.      NEW ORLEANS EAST SYSTEM (LOOP).......................................................60

G.      INCOMPLETE HURRICANE FLOOD PROTECTION SYSTEM AT
        TIME OF HURRICANE KATRINA ...................................................................62

        1.      An Unfinished, Dysfunctional System ....................................................62

        2.      The ACE Never Designed or Constructed a Hurricane Flood Protection
                System To The Congressionally-Mandated Standard Project Hurricane
                Dimensions ..............................................................................................69

        3.      The ACE Never Even Undertook to Design or Construct A Hurricane Flood
                Protection System Against Probable Maximum Hurricane Dimensions 85

        4.      The Incomplete System Caused Catastrophic Consequences .................87

        5.      Construction Of A Hurricane Flood Protection System To Prevent
                Catastrophic Flooding Was An Achievable Mission In A 40-Year Time Span
                ..................................................................................................................97

        6.      The Reasons For Mission Failure Are Largely Attributable To Congress And
                The ACE ...............................................................................................100

H.      HURRICANE KATRINA, CATASTROPHIC FLOODING OF GREATER NEW
        ORLEANS, AND PERFORMANCE OF  THE HURRICANE FLOOD
        PROTECTION ...............................................................................................105

        1.      Storm Surge .........................................................................................105

        2.      Overtopping of Flood Structures Caused Most Of The Flooding ..........114

        3.      Catastrophic Flooding ..........................................................................119

        4.      Sources of Flooding...............................................................................121

        5.      Flooding Even If Crowns Were At Design Elevation, But Not Catastrophic
                Flooding................................................................................................125

                2.      Substantial Evidence Establishes Plaintiffs' Claims ...........144

K.   CONTRARY TO THE CONGRESSIONAL MANDATE IN THE FLOOD
     CONTROL ACT OF 1965 AND IT'S OWN STANDARDS, THE ARMY CORPS
     OF ENGINEERS DID NOT CONSTRUCT HURRICANE FLOOD PROTECTION
     STRUCTURES FOR HUMAN POPULATION AREAS ALONG REACH 1 AND
     REACH 2 OF THE MISSISSIPPI RIVER-GULF OUTLET OR THE INNER
     HARBOR NAVIGATION CHANNEL THAT MET EITHER THE "STANDARD
     PROBABLE HURRICANE" OR "PROBABLE MAXIMUM HURRICANE"
     DESIGN CRITERIA ........................................................................   173

     1.   The Hurricane Flood Protection System For Greater New Orleans Was
          An Uncompleted Work in Progress At The Time of Katrina173

     2.   The ACE Did not Design or Construct Flood Protection Structures For
          Human Population Areas In A Coastal Environment As Mandated By
          Congress And P6.MR-GO Funnel Effect Contributed At Lease Three
          Catastrophic Feet Of Excess Surge and Current ..................................... 126

I.   BEFORE HURRICANE KATRINA, THE ARMY CORPS GAVE NO WARNINGS
     OF THE INADQUACY OF THE UNFINISHED HURRICANE PROTECTION
     SYSTEM AND THE THREAT TO HUMAN SAFETY AND PROPERTY FROM
     CATASTROPHIC FLOODING ........................................................................ 131

     1.   Flooding Risks Must Be Communicated To Those In Harm's Way ...... 131

     2.   The ACE Knew That The HPS As Designed Would Not Withstand The Most
          Severe Hurricane ...................................................................................... 132

     3.   The ACE Misled The Public By Concealing That The HPS Would Not
          Withstand Even A Standard Project Hurricane ....................................... 136

     4.   The Virtual Hurricane Pam Exercise Foreshadowed Catastrophic Flooding
          During Hurricane Katrina ....................................................................... 140

J.   PLAINTIFFS' ALLEGATIONS OF CAUSE OF DAMAGE AND SUBSTANTIAL
     SUPPORTING EVIDENCE ........................................................................... 143

     1.   Plaintiffs' Allegations ............................................................................ 143

          rescribed By ACE Criteria ................................................... 175

iii