**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION**

| | |
|---|---|
| In Re:  KATRINA CANAL BREACHES  * | CIVIL ACTION NO. 05-4182 |
| CONSOLIDATED LITIGATION  * | |
| * | SECTION "K" |
| * | |
| PERTAINS TO:  * | MAGISTRATE (2) |
| NO.   06-4389  * | |
|        07-3500  * | JUDGE DUVAL |
| * | |
| * | MAGISTRATE WILKINSON |
| * | |
| * * * * * * * * * * * * * * * * * * | |

### AFFIDAVIT OF DAVID JOHN ROSENBERG

**STATE OF LOUISIANA**

**PARISH OF ORLEANS**

   **BEFORE ME**, the undersigned authority, personally came and appeared:

**DAVID JOHN ROSENBERG**

who, after being duly sworn, did depose and say:

   1. This affidavit is submitted to address the contractual history and authorizations of work at the East Bank Industrial Area site (EBIA) as part of the MRGO IHNC Lock Replacement Project.  Two major breaches occurred at the EBIA site during Hurricane Katrina.

   2. This declaration is divided into the following sections.  Section I summarizes my qualifications and experience regarding matters of Heavy Civil

Engineering construction and contracting and before the Court on work pertaining to Katrina Litigation. Section II provides relevant background on the MRGO Lock Replacement Project and the EBIA site. Section III explains the basic features of the Total Environmental Restoration Contract (TERC), and how it relates to Federal Acquisition practices. Section IV addresses specifics of Contract DACA56-94-D0021 and Delivery Order 0026, which appear to authorize the work which Washington Group International performed at the EBIA. This is based on the limited information that has been made available to date (see REFERENCES below).

## I. QUALIFICATIONS

3. I have 10 years experience working on Heavy Civil Engineering and Marine Construction projects, including offshore oil & gas, pipeline, coastal, waterfront, and other water resource facilities. This includes trades of Commercial Diving, Pile Driving and Heavy Construction and related Marine Operations, duties as a Project Engineer, consulting engineer, and Owner's Representative/ Quality Assurance for public works projects. A resume is attached as Exhibit 1 which further details this experience.

4. I am a registered Professional Civil Engineer (CA #C67357) and currently pursuing post-Bachelors' engineering education at the University of New Orleans, College of Engineering (Ref: Dr. Donald Barbe.) I received a Bachelor's of Science in Civil & Environmental Engineering at the University of California, Berkeley, 1996.

5. Since 2006 I have assisted Experts in the Court on matters related to Katrina Litigation.

## II. LOCK REPLACEMENT PROJECT BACKGROUND

6. The following excerpt from the USACE's 1997 "Evaluation Report" (see references) contains a brief history of how the Lock Replacement project was authorized:

BEGIN EXCERPT

"Corps of Engineers - Inner Harbor Navigation Canal Evaluation Report - March 1997

OVERVIEW

The Evaluation Report presents the results of studies that address the feasibility of improving navigation between the Mississippi River in New Orleans, Louisiana, and the Gulf Intracoastal Waterway and the Mississippi River-Gulf Outlet on the east side of the River.

Navigation between the Mississippi River and these waterways east of the river is via the Inner Harbor Navigation Canal (IHNC) and Lock, locally known as the Industrial Canal and Lock. The IHNC and Lock were completed by the Port of New Orleans in 1923 to provide navigation between the Mississippi River and Lake Pontchartrain, a distance of approximately 5 miles, and to provide areas away from the Mississippi River for industrial development. The lock is 75 feet wide and 640 feet long and has a depth over the sill of 31.5 feet Mean Low Gulf (MLG) and is located at Mississippi River Mile 92.6 Above Head of Passes (AHP).

During World War II, the Gulf Intracoastal Waterway was rerouted through the Inner Harbor Navigation Canal, and the Federal Government leased the lock and a 2.1-mile reach of the canal and assumed its operation and maintenance. The Federal Government then purchased the lock in 1986. The River and Harbor Act of 1956 authorized the Mississippi River-Gulf Outlet, a navigation channel which was completed in the mid-1960's. The channel has a depth of 36 feet MLG over a 500-foot bottom width

and extends from the Inner Harbor Navigation Canal to the Gulf of Mexico, a distance of approximately 76 miles.

The 1956 Act also provided for the construction of a new lock and connecting channel when economically justified by obsolescence of the existing lock or by increased traffic. Studies were initiated in 1960 for a new lock and connecting channel because at that time it was estimated that the lock would become dimensionally obsolete by 1970."

END EXCERPT

7. The East Bank Industrial Area (EBIA) is identified as the area bounded by Claiborne Ave., Florida Avenue, from the Eastern Shoreline of the IHNC to the Floodwall. The 32-acre site was dedicated to industrial and maritime use throughout the facility's 70 year history (see Site History, WGI000005 and 1992 Land use History Document.)

8. The 1997 Report which appears to serve as the Project's Environmental Impact Statement (EIS) also describes the overall project scope and phases of work. In addition to increasing the size and changing the location of the navigation lock, the project also addressed flood protection requirements, environmental and neighborhood impacts, and even vehicular traffic across the St. Claude, Claiborne, and Florida Avenue Bridges—calling for replacement or major modifications to all four. A series of slides are included in the EIS which present a phased demolition and construction plan for accomplishing all of the work, including Demolition and Site Preparation of the EBIA, as well as its future use as a "bypass" navigation channel during construction of the new lock. The 1997 EIS document also addresses requirement and design guidelines for flood protection structures, and other geologic and foundation engineering issues.

Among these were the need for improving the levees and floodwalls between the Lock and the Mississippi River—relocation of the lock would result in additional waterfront being exposed to the waters of the Mississippi River and it was recognized that the existing protection was inadequate.  An Executive Addendum to the 1997 EIS recognized that part of the EBIA  site would also be deficient with respect to Mississippi River Protection.  It was also decided that the existing level of protection would remain during the construction of the project until the necessary improvements to Mississippi River Protection levels were made (e.g. there would be no interim measures or projects to improve the level of protection.)  Thus the flood protection system in this area would remain "as-is"—except for the work being performed at the EBIA site.

## II.  TERC CONTRACTING BACKGROUND

9. The Total Environmental Restoration Contract (TERC) is specific type of contracting strategy used by the Federal Government, and this affidavit explores its application to the work performed at the EBIA.  The EBIA was known as a  Hazardous, Toxic, and Radioactive Waste (HTRW) site and thus a TERC was utilized for the task of Demolition and Site Preparation for the Lock Replacement Project.  The application of TERC to HTRW sites is succinctly described in the following excerpt from EPA Quick Reference Fact Sheet "The TERC—Procedure for Use of USACE Preplaced Contracts to Expedite Superfund Cleanup Tasks", 1994 as follows:

BEGIN EXCERPT

"Total Environmental Restoration Contracts (TERC):  The USACE has also initiated a new contracting strategy which can provide cradle-to-grave services at HTRW clean-up sites through a Total Environmental Restoration Contract (TERC).  A TERC is

an environmental response contract that permits a single contractor to provide full clean-up services (preliminary assessment through remedial action and O&M) at certain large, high priority sites or in a geographic region where it has been determined to be in the best interests of the governments.  A TERC has the capability to be used throughout actual remediation, and it can be initiated at any investigation or engineering stage; however it is never used solely for remedial actions.  A potential EPA use of TERCS contracts would be an integrated design and construction project, such as a non-time critical removal or a redial action with special requirements.  These contracts are long-term (up to 10 years). Indefinite delivery, with cost reimbursement delivery orders."

    END EXCERPT

The previous excerpt from EPA's Quick Reference Fact Sheet, 1994, indicates that TERC contracts conceive a wide-range of engineering and design-build services, and in fact that a TERC contract *"is never used solely for remedial actions."*

    10.    The Government's purchase of services is addressed in the Federal Acquisition Regulation (FAR), which addresses Construction Contracting and Architect-Engineer (A-E) Services.  The Regulations have evolved and changed throughout the twentieth century, but with respect to Architect-Engineer (A-E) services the basic concept of Qualification Based Selection is embodied in the Brooks A-E Act of 1972, which addresses Qualifications- Based Selection of Architect-Engineer (A-E) Services for federal projects and is the subject of the following commentary by the American Society of Civil Engineers then president Tom Jackson, PE (ACSE, 2002):

    BEGIN EXCERPT

    "QUALIFICATIONS-BASED SELECTION PROCEDURES UNDER THE

BROOKS ARCHITECT-ENGINEERS ACT

Title IX, commonly referred to as the Brooks Architect-Engineers Act of 1972, 40 U.S.C.A. §§ 541-544 (West 2002), has withstood the test of time.

Traditionally, federal government procurement procedures properly have emphasized awarding contracts to the lowest bidder, or using price as a dominant factor. For many goods that the government purchases (paper, office equipment, desks, military aircraft) this process serves the government and the taxpayer well. Specifications can be written, products can be inspected and tested, and safeguards can be built in to assure saving money. General Sometimes, however, agencies mistakenly assume professional architecture, engineering, surveying and mapping services fall into this category. Unfortunately, the assumption ignores the increase in costs to administer the preparation of detailed scopes of work and bid specifications, to evaluate numerous bids, and to remedy serious consequences of unprofessional A/E related services.

Quality, therefore, should always be the primary focus in the competition for architectural, engineering and surveying and mapping procurement. Only after high-quality performance is ensured should the focus turn to the contract price. That is exactly what QBS provides. The Brooks A/E Act ensures that specialized skills and technologies are evaluated properly and are not overlooked. At the same time, the Act also ensures that small businesses are able to compete on an even basis with large A/E design firms. In this manner, the government benefits from direct control of both the quality of the services and the project's development.

The Brooks A/E Act applies to the acquisition of all architectural and engineering services, including services of an architectural or an engineering nature that are logically

and justifiably to be performed by architects or engineers. The language of the Brooks Act governs the broadest range of A/E design services, i.e., any that are performed by architects or engineers and those that may be. Nothing in the Act limits or restricts the application of QBS procedures to some architectural or engineering services while exempting others.

The use of negotiated procedures directs the focus of procurement activity where it should be, on the quality of the professional A/E services specifically suited to a given contract. All competitors must submit their qualifications to the procuring agency; the agency assesses the relative expertise of the competing firms; and the one most qualified firm is selected for the particular procurement. Such procedures produce a more cost effective design, map and related professional service than can be achieved under price bidding procedures.

The qualifications-based selection law was codified to protect the interest of taxpayers. It is federal law because over the life of a project, engineering-related services account for less than one-half of one percent of total costs. Yet these important services play a major role in determining the other 99.5 percent on the project's "life cycle costs," such as construction, operation, and maintenance.

This process has been so successful at the federal level that it is recommended by the American Bar Association in its model procurement code for state and local government. At the present time, 42 states have enacted their own qualifications-based selection laws for architecture, engineering, surveying and mapping services based on the federal model. Others use it as a standard procedure. Today, no state has a specific law requiring bidding of these services.[1]

Since 1972, moreover, Congress has clarified and extended the application of the QBS process to the awarding of architectural and engineering services contracts for:

• Aviation programs project grant application (49 U.S.C.A. § 47107 (West 2002)).

• Mass transportation contract requirements, management and architectural engineering (49 U.S.C.A. § 5325 (West 2002)).

• Military construction projects (10 U.S.C.A. § 2855 (West 2002)).

• Engineering services as competitive procedures for procurement purposes (10 U.S.C.A. § 2302; 41 U.S.C.A. § 259 (West 2002)).

• River and harbor improvements (33 U.S.C.A. § 569b (West 2002)).

• Surveying, mapping, charting and geodesy contracts of the National Imagery and Mapping Agency (NIMA), (144. CONG. REC. H8718 (daily ed. Sept. 25, 1998)).

---

1  Eight states — Georgia, Hawaii, Iowa, Michigan, North Dakota, South Dakota, Vermont and Wisconsin — operate under state procurement laws. No state leaves the acquisition of architectural and engineering design contracts unregulated.

END OF EXCERPT

In the case of TERC contracts, the Brooks A-E Act may or may not be directly applied as the A-E portion of the contract is often relatively small, however the principles of Qualification Based Selection (QBS) are utilized and cite Professional Engineering registration qualification (the registration of Professional Engineering being a state function, not a federal one.)

**III.  CONTRACT HISTORY—DACA56-94-D0021 AND DELIVERY ORDER 0026**

10.     On August 17, 1994, Total Environmental Restoration Contract (TERC) No. DACA56-94-D0021 was awarded to MK Engineering, Construction & Environmental (aka Morrison Knudsen Corporation, later to become Washington Group International, Inc., and on Nov. 15, 2007 WGII was purchased by the URS Corporation.) This contract, administered by USACE's Tulsa District appears to have been valued at maximum $300,000,000.00 (see WGI000126) and was to address any of several HTRW contaminated government sites throughout the USACE's Southwest Division geographical region.

The Solicitation for this contract was in the form of a technical proposal and price, a process that involved many of the nation's largest and well-known Engineering Contractors as well as specialists in many related fields who would then submit competing proposals to the Government. (see Tulsa Proposal Meeting WGI000195 to WGI000200.)

The Basic Contract calls for the necessary expertise and resources to provide complete services, including Project Management, Geotechnical Engineering Expertise, and the necessary Quality Control to achieve the required level of performance. WGI 000135 to WGI 000141. Based on the Government's Statement of Work for a given Delivery Order, the Contractor was then required to develop and submit a Project Work Plan (PWP or WP) for approval by the Government's Contracting Officer (CO.) Any changes to the Work Plan require the subsequent approval of the CO.

11.     Delivery Order No. 0026, issued on July 12, 1999, identifies as Item No. 0001, in the quantity of 1.00 JB ("job"), a scope of work or Schedule of supplies/ services described as "DEMOLITION AND SITE PREPARATION FOR INNER HARBOR

NAVIGATION CANAL LOCK REPLACEMENT PROJECT, EAST BANK INDUSTRIAL AREA, NEW ORLEANS, LOUISIANA." (all caps retained--see WGI000003.)

Thus, as suggested in this scope of work for a TERC which *"is never used solely for remedial actions," (EPA, 1994)* the specific services which the future use of the site as part of the Lock Replacement Project are simply stated. The June 1, 1999 Statement of Work for Delivery Order No. 0026, Demolition and Site Preparation for Inner Harbor Navigation Canal Lock Replacement Project, East Bank Industrial Area (WGI00005 to WGI00009) lists the following "Project Requirements": "

> **Project Requirements.** The Contractor shall furnish all engineering services, materials, supplies, labor, as required, in connection with the technical review of site documents, attendance at site meetings and travel necessary for the period of approximately 21 June 99 through 30 Sep. 99 associated with the demolition and remediation of the east bank of the Inner Harbor Navigation Canal (IHNC). In addition to reviewing the site documents the Contractor shall prepare a comprehensive report recommending the scope and duration of the remediation and demolition that will be required, including any data gaps that may need to [be] filled by sampling or other investigations. insert [ ] added.

The term "all engineering services" specifically appears as one of the "project Requirements". Also, another of the requirements of the project was that the Contractor would "prepare a comprehensive report recommending the scope and duration of the remediation and demolition that will be required, including any data gaps that may need to [be] filled by sampling or other investigations." That description of the comprehensive report to be prepared by the Contractor includes engineering services.

12. Delivery Order No. 0026 was subsequently amended by a series of contract modifications "MODs" which specified additional tasks and contract funding particulars.

13. It is to be noted that the TERC "Section C", Description/SPECS/Work Statement includes in Paragraph 4.10 a "Project Geotechnical Engineer", with certain qualifications, clearly indicating that provision of geotechnical engineering services was contemplated.

My analyses, evaluations, assessments and conclusions have been based on the background information and documentation cited in this Affidavit. I reserve the right to modify my analyses, evaluations, assessments, and conclusions in the case that new or additional information becomes available in the future.

                                                      **S/David John Rosenberg**
                                                      **DAVID JOHN ROSENBERG**

**Sworn to and subscribed before me,**

**this 8th day of January, 2008.**

      **S/Ashton R. O'Dwyer, Jr.**
        **NOTARY PUBLIC**
**No. 10166**
**My commission expires at death.**