EXHIBIT   10
part 1

89th Congress, 1st Session — — — — — — — — — House Document No. 231

# LAKE PONTCHARTRAIN AND VICINITY, LOUISIANA

## LETTER

FROM

## THE SECRETARY OF THE ARMY

TRANSMITTING

A LETTER FROM THE CHIEF OF ENGINEERS, DEPART-
MENT OF THE ARMY, DATED MARCH 4, 1964, SUBMIT-
TING A REPORT, TOGETHER WITH ACCOMPANYING
PAPERS AND ILLUSTRATIONS, ON A REVIEW OF THE
REPORTS ON, AND AN INTERIM HURRICANE SURVEY
OF LAKE PONTCHARTRAIN AND VICINITY, LOUISIANA,
REQUESTED BY RESOLUTIONS OF THE COMMITTEE ON
PUBLIC WORKS, UNITED STATES SENATE, ADOPTED
JANUARY 28, 1949, AND FEBRUARY 4, 1957, AND AUTHOR-
IZED BY THE RIVER AND HARBOR ACT APPROVED
MARCH 2, 1945.  IT IS ALSO IN PARTIAL RESPONSE TO
PUBLIC LAW 71, 84TH CONGRESS, APPROVED JUNE 15, 1955



JULY 6, 1965.—Referred to the Committee on Public Works and
ordered to be printed with illustrations

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1965

50-354 O

## COMMENTS OF THE BUREAU OF THE BUDGET

### EXECUTIVE OFFICE OF THE PRESIDENT
#### BUREAU OF THE BUDGET
##### WASHINGTON, D.C. 20503

June 8, 1965

Honorable Stephen Ailes
Secretary of the Army
Washington, D. C.  20310

Dear Mr. Secretary:

Mr. Harry C. McPherson's letter of May 11, 1964, submitted the proposed
report of the Chief of Engineers on an interim hurricane survey of Lake
Pontchartrain and vicinity, Louisiana, in response to several resolutions
listed in the report.

The Chief of Engineers recommends a plan involving new or enlarged levees,
several control structures, and other works to protect against hurricane
tides, areas along the south shore of Lake Pontchartrain, the Chalmette
region south of New Orleans, and the community of Mandeville to the north.
Total first cost of the improvements is estimated at $84,826,000.  All
separable units of the plan have favorable benefit-cost ratios.  In addi-
tion to other stated conditions of local cooperation, local interests
would be required to bear 30 percent of total project cost allocated to
hurricane protection, now estimated to comprise $5,926,000 for lands,
easements, rights-of-way and relocations, and a cash contribution of
$18,028,000 towards the cost of construction.  In addition, a further
cash contribution, equivalent to the estimated 100-year maintenance cost
for the recommended Rigolets lock, now estimated at $3,950,000 would be
required of local interests.  The net Federal first cost is now estimated
at $56,922,000.

The Department of Commerce in its letter of comment expressed concern that
the proposed location of a levee involved in the hurricane barrier plan
conflicted with plans for location of Interstate Highway 10.  We have been
advised that highway construction plans have subsequently been modified
and are assured that the conflict has been resolved.

Two comments regarding the proposed Seabrook Lock feature are necessary.
The report of the Chief of Engineers states that the facility would serve
a dual purpose--mitigating anticipated adverse effects of the Mississippi
River-Gulf Outlet navigation project, now under construction, and serve
as an element in the hurricane surge-control project.  The Department of
the Interior, in its letter of comment, has questioned the adequacy of
the Seabrook feature, as presently designed, to function effectively as
a mitigation device.  The Bureau of the Budget supports the Interior re-

ix

quest for such further studies, as may be needed, in developing design criteria for the dual purpose Seabrook facility to assure protection of fish and wildlife values in Lake Pontchartrain and in the marshes adjacent to the Gulf Outlet Canal.

The cost sharing arrangements spelled out in the report of the Chief indicate that 93 percent of Seabrook facility costs have been allocated to mitigation, 7 percent to hurricane protection. Supplemental information provided by the Corps of Engineers confirms the fact that the Seabrook facility is as much needed for one purpose as the other, and that single-purpose structures would cost approximately as much as that which is recommended.

Overall average annual benefits anticipated from the hurricane project are several times greater than for the navigation project. However, in the absence of quantitative information as to the relative benefits of the Seabrook Lock feature to navigation and hurricane protection, standard methods of cost allocation appear inapplicable. Given these circumstances, a reasonable alternative would be to allocate costs of the Seabrook feature equally between the two purposes.

Subject to your consideration of the above comments, you are advised that there would be no objection to the submission of the report to the Congress. No commitment, however, can be made at this time as to when any estimate of appropriation would be submitted for construction of the project modification, if authorized by the Congress, since this would be governed by the President's budgetary objectives as determined by the then prevailing fiscal situation.

Sincerely,

ELMER B. STAATS
Deputy Director

# LAKE PONTCHARTRAIN AND VICINITY, LOUISIANA

## REPORT OF THE CHIEF OF ENGINEERS, DEPARTMENT OF THE ARMY



**HEADQUARTERS
DEPARTMENT OF THE ARMY
OFFICE OF THE CHIEF OF ENGINEERS
WASHINGTON 25, D.C.**

IN REPLY REFER TO

ENGCW-PD

**4 March 1964**

SUBJECT:  Lake Pontchartrain and Vicinity, Louisiana

TO:       THE SECRETARY OF THE ARMY


1.  I submit for transmission to Congress the report of the
Board of Engineers for Rivers and Harbors, accompanied by the reports
of the District and Division Engineers and the concurring report of
the Mississippi River Commission for those areas under its jurisdic-
tion, in response to a resolution of the Committee on Public Works of
the United States Senate adopted 28 January 1949 requesting a review
by the Board of existing reports on Lake Pontchartrain, Louisiana,
concerning navigation, flood control, and shore erosion in Orleans
Parish.  It is also in review of reports by the District and Division
Engineers in response to an item in the River and Harbor Act approved
2 March 1945 authorizing and directing a survey concerning shore
erosion and seawall damage at Mandeville, Louisiana; in response to a
resolution of the Committee on Public Works of the United States
Senate adopted 4 February 1957, requesting a review by the Chief of
Engineers of reports on Lake Pontchartrain to determine the advisa-
bility of constructing a levee connecting the existing south guide
levee of the Bonnet Carre Spillway with the existing Jefferson Parish
levee; and in partial response to Public Law 71, Eighty-fourth Con-
gress, first session, approved 15 June 1955, authorizing and directing
a survey with a view to determining means for preventing loss of lives
and damages to property by hurricanes along the eastern and southern
seaboard of the United States.

2.  The District and Division Engineers find that the most suit-
able plan for protecting the partially developed areas bordering Lake
Pontchartrain would consist of two parts:  a levee and floodwall bar-
rier along the southeast side of the areas to prevent entry of surges
from Lake Borgne into the areas and Lake Pontchartrain; and new or
enlarged levees along the south shore of Lake Pontchartrain, together
with repair and reinforcement of the existing seawall at Mandeville on

the north shore, to prevent entry of lake surges into the areas. The barrier would include a lock and flood gates in the Rigolets, a navigation gate and flood gates in Chef Menteur Pass, and a multiple-purpose lock in the lakeward end of the Inner Harbor Canal. Based upon price levels of December 1961, the reporting officers estimate the first cost of the barrier plan at $64,703,000, the annual charges at $2,535,600, and the average annual benefits at $48,009,000. The benefit-cost ratio is 18.9. The cost apportionment is based upon that adopted by Congress in the 1958 Flood Control Act for similar projects wherein the Federal share is 70 percent of the total project cost and the non-Federal share is 30 percent, including lands, easements, rights-of-way, relocations, and the remainder, if any, in cash. However, the reporting officers consider that operation and maintenance of the Rigolets lock as a part of the hurricane barrier is a local responsibility, but that performance by the Federal Government would be in the public interest. Accordingly, they propose a cash contribution equivalent to the 100-year present worth of this item, presently estimated at $125,000 annually, or a total of $4,092,000. On these bases the Federal share of the first cost is estimated at $41,200,000 and the non-Federal share at $23,503,000, including $18,476,000 in cash. For the Chalmette area, the reporting officers find that the most suitable plan would consist of about 17.3 miles of new and enlarged levees extending generally along the southerly banks of the Gulf Intracoastal Waterway and the Mississippi River-Gulf Outlet channel to Bayou Dupre and thence westerly to the Mississippi River levee at Violet. The first cost is estimated at $15,143,000, the annual charges at $572,200, and the average annual benefits at $5,152,000. The benefit-cost ratio is 9.0. The Federal share of the first cost is estimated at $10,600,000 and the non-Federal share at $4,543,000, including $3,644,000 in cash. The reporting officers further find that a lock is required in the Inner Harbor Navigation Canal near Seabrook to prevent velocities hazardous to navigation in the canal, and increased salinity in Lake Pontchartrain, which will occur upon completion of the Mississippi River-Gulf Outlet navigation project, presently under construction. It would serve a dual purpose in controlling tidal exchange into the lake and as an element in the hurricane surge-barrier. The first cost of the lock allocated to the Gulf Outlet project is estimated at $4,980,000 and the annual charges at $278,600, including $120,000 for Federal operation and maintenance in addition to that now required. Inclusion of these costs in those for the Gulf Outlet project decreases the benefit-cost ratio from 1.8 to 1.7. Subject to particular conditions of local cooperation applying to each of the three plans, the reporting officers recommend authorization for construction in accordance with their plans.

3. The Mississippi River Commission concurs in general in the views and recommendations of the reporting officers insofar as they pertain to proposed improvements under the jurisdiction of the Commission in St. Charles and Jefferson Parishes.

2

4.  The Board of Engineers for Rivers and Harbors concurs in general in the views and recommendations of the reporting officers pertaining to the three plans.  Subject to re-examination of the levee alignment in the preconstruction planning stage with a view to protecting additional lands, and to certain requirements of local cooperation, the Board recommends authorization for construction of the improvements, essentially as planned by the reporting officers, provided that each separable independent feature may be undertaken independently of the others whenever funds for that purpose are available and the prescribed local cooperation has been provided.

5.  Application of an interest rate of 3 percent, as recently prescribed, would not change the benefit-cost ratios appreciably for the barrier plan and for the Chalmette area.  However, it would reduce the cash contribution for Federal operation and maintenance of the Rigolets lock from $4,092,000 to $3,950,000.  The Federal share of the first cost of the barrier plan is presently estimated at $41,342,000 and the non-Federal share at $23,361,000, including $18,334,000 in cash.  Application of 3 percent interest rate in the analysis causes no change in the benefit-cost ratio or the cost apportionment for the modified Gulf Outlet project.

6.  Subject to these modifications, I concur in the recommendations of the Board of Engineers for Rivers and Harbors.

W. K. WILSON, JR.
Lieutenant General, USA
Chief of Engineers

3

pumping systems for interior drainage; a levee for protection of the
Chalmette area extending southeasterly from the Inner Harbor Naviga-
tion Canal to Bayou Dupre, and thence westward to the Mississippi
River levee, drained partly by pumps and partly by floodgates; a
6-foot seawall 1.5 miles along the lakefront at Mandeville on the
north shore; and the Inner Harbor Navigation Canal 30 feet deep and
125 to 300 feet wide, extending northward from the Mississippi River,
2.9 miles below Canal Street, to Lake Pontchartrain, together with a
lock 75 feet wide and 640 feet long. All of the non-Federal improve-
ments are operated and maintained by local interests except that part
of the Inner Harbor Navigation Canal, including the lock, which is
part of the Gulf Intracoastal Waterway.

7. <u>Area subject to flooding</u>.--Because of the configuration of
the bodies of water in the area and the characteristics of hurricanes,
no one hurricane would cause critical flooding in all shore areas.
Accordingly, for design purposes, a hurricane having forces that may
be expected from the most severe combination of meteorological con-
ditions reasonably characteristic of the region was routed along sev-
eral likely paths, at different speeds of translation for each, to
determine the conditions critical to each shore. This resulted in
three design hurricanes, each approaching from a different direction
and having a different speed of translation. The area subject to
flooding is considered to be that within the envelope of areas which
would be flooded by these design hurricanes. It consists of about
700,000 acres, or 1,100 square miles. About 240,000 acres are along
the shores of Lake Borgne extending from near the mouth of Pearl
River to the southerly limits of the Chalmette levee in St. Bernard
Parish. This area contains the Louisville and Nashville Railroad,
United States Highway 90, the Gulf Intracoastal Waterway, the Missis-
sippi River-Gulf Outlet, fishing camps and residences near Chef
Menteur Pass, numerous industrial plants between the levees along
the Inner Harbor Navigation Canal, and a planned Florida-type devel-
opment west of Chef Menteur Pass to consist of residential, commercial,
and industrial areas. Of the remaining 460,000 acres, about 82,000
are within the leveed areas in Jefferson, Orleans, and St. Bernard
Parishes, 600 in Mandeville, 29,600 in St. Charles Parish, 338,000
acres in marsh and swamp, and the remainder in scattered residential,
commercial, and pasture lands mainly along the north shore. All of
the leveed areas contain residential, commercial, industrial, and
other improvements, except in the eastern part of Orleans Parish
where construction of streets and utilities is planned. In addition,
there is room for expansion in each, except in New Orleans proper
where about 95 percent of the area is occupied.

constructed by lifts or stages, with a minimum interval of 2 years
between lifts. The cost of construction and annual charges together
with benefits and benefit-cost ratios for the plan, based on price
levels of December 1961, are given in Table 1 hereto. The cost ap-
portionment is based on that adopted by Congress in the 1958 Flood
Control Act for hurricane projects at New Bedford, Massachusetts;
Narragansett Bay, Rhode Island; and Texas City, Texas. Subject to
certain requirements of local cooperation, the District Engineer
recommends authorization for construction of his plan. The Division
Engineer concurs.

13.  Public notice.--The Division Engineer issued a public
notice stating the recommendations of the reporting officers and
affording interested parties an opportunity to present additional
information to the Board. Several communications were received,
one of which suggested eastward extension of the levee system to
the vicinity of Chef Menteur Pass. Careful consideration has been
given to the communications received.

Views and Recommendations of the Board of Engineers for Rivers and Harbors.

 14.  Views.--The Board of Engineers for Rivers and Harbors
concurs in general in the views and recommendations of the report-
ing officers. The Board believes that the proposed improvements
for hurricane flood protection are economically justified, that
they are adequate for the purpose, and that the requirements of
local cooperation are appropriate. The possibility of modifying
the levee alignment to protect additional lands should be examined
during preconstruction planning. The Board is cognizant of the
report of the Mississippi River Commission dated 30 January 1963,
concurring in the views and recommendations of the reporting offi-
cers relative to the proposed work under the jurisdiction of the
Commission in St. Charles and Jefferson Parishes. The Board be-
lieves that the Seabrook Lock is needed to prevent loss to the
fishery in Lake Pontchartrain, and extensive erosion and vessel
damages in the Inner Harbor Navigation Canal. It concurs in the
view that construction of the Seabrook Lock is to correct detri-
mental effects not previously foreseen and that the first-stage
and annual costs are properly chargeable as mitigating costs to
the Gulf Outlet project.

15.  Recommendations.--Accordingly, the Board recommends:

    a.  That the barrier plan for protection from hurricane
floods of the shores of Lake Pontchartrain and the separate plan
for protection of the Chalmette area be authorized for construction,

well as to limit objectionable salinity intrusion into the lake and tidal currents in the canal now developing from construction of the Mississippi River-Gulf Outlet.  Additional protective works along the shores of the lake consist of new lakeshore levees in St. Charles Parish, Citrus, and New Orleans East, and the enlargement or strengthening of existing protective works in Jefferson and Orleans Parishes, and at Mandeville.  Gravity drainage facilities are included as integral parts of all new levees. Costs of these features and distribution of costs between navigation and hurricane protection are given in the pertinent data table.

The plan of protection recommended for the Chalmette area provides for the improvement of the existing levee along the Inner Harbor Navigation Canal and construction of new levees along the south side of the Mississippi River-Gulf Outlet from the Inner Harbor Navigation Canal to Bayou Dupre and thence along the bayou to Violet.  Gravity drainage structures are included as an essential part of the plan.

For the Lake Pontchartrain barrier plan and for the Chalmette area, local interests will be required to provide all lands, easements, rights-of-way, and relocations without cost to the United States; to maintain and operate the project and all drainage facilities after completion except as described below; to hold and save the United States free from damages due to the construction works; to contribute 30 percent of the first costs in cash or equivalent work necessary to accomplish approved construction schedules, said 30 percent to include fair market values of lands and relocations, unless they exceed the value of the 30 percent contribution; to acquire adequate easements or other interests in land to prevent encroachment on existing ponding areas unless substitute storage capacity or equivalent pumping capacity is provided promptly without cost to the United States; and to provide all interior drainage and pumping plants required for reclamation and development of the protected areas.  Local interests also will provide, at the time of construction of the hurricane protection works, an additional cash contribution equal to the capitalized value of the annual cost for the operation and maintenance of the Rigolets lock and navigation canal, said operation and maintenance to be undertaken by the United States.

Local interests will be required to provide for the Mississippi River-Gulf Outlet lock project at Seabrook all lands, easements, and rights-of-way without cost to the United States, and hold and save the United States free from damages due to the construction works.

Additional protection from hurricane tides can be afforded by local interests to residents of low-lying coastal communities by the establishment of building codes and zoning regulations, provision of adequate havens of refuge, and organization of hurricane preparedness committees to formulate plans for effective preventive measures, evacuation and rescue work, all at no cost to the United States.

18

U. S. ARMY ENGINEER DISTRICT, NEW ORLEANS
CORPS OF ENGINEERS
Foot of Prytania Street
New Orleans, Louisiana

21 November 1962

SUBJECT:  Interim Survey Report on Hurricane Study of
Lake Pontchartrain, Louisiana and Vicinity

THRU:    Division Engineer
U. S. Army Engineer Division
Lower Mississippi Valley
Vicksburg, Mississippi

TO:      Chief of Engineers
Department of the Army
Washington 25, D. C.

SECTION I – AUTHORIZATION, PURPOSE, AND SCOPE

1.  AUTHORITY

This report is submitted in response to the following:

a.  Public Law 71, 84th Congress, 1st Session, approved 15
June 1955:

"BE IT ENACTED BY THE SENATE AND HOUSE OF REPRESENTATIVES
OF THE UNITED STATES OF AMERICA IN CONGRESS ASSEMBLED, That:

"In view of the severe damage to the coastal and tidal
areas of the eastern and southern United States from the
occurrence of hurricanes, particularly the hurricanes of
August 31, 1954, and September 11, 1954, in the New England,
New York, and New Jersey coastal and tidal areas, and the
hurricane of October 15, 1954 in the coastal and tidal areas
extending south to South Carolina, and in view of the damages
caused by other hurricanes in the past, the Secretary of the
Army, in cooperation with the Secretary of Commerce and other
Federal agencies concerned with hurricanes, is hereby author-
ized and directed to cause an examination and survey to be
made of the eastern and southern seaboard of the United States
with respect to hurricanes, with particular reference to areas
where severe damages have occurred.

23

"Sec. 2.  Such survey, to be made under the direction of the Chief of Engineers, shall include the securing of data on the behavior and frequency of hurricanes, and the determination of methods of forecasting their paths and improving warning services, and of possible means of preventing loss of human lives and damages to property, with due consideration of the economics of proposed breakwaters, seawalls, dikes, dams, and other structures, warning services, or other measures which might be required.

"Sec. 3.  There are hereby authorized to be appropriated such sums as may be necessary to carry out the provisions of this Act."

b.   Provisions of the River and Harbor Act as approved 2 March 1945, which read in part as follows:

"Sec. 6.  The Secretary of War is hereby authorized and directed to cause preliminary examinations and surveys to be made at the following-named localities: * * *

"Lake Pontchartrain, Louisiana, * * * with a view to the protection of the shoreline and repairs to the existing protective works on Lake Pontchartrain at Mandeville, Louisiana."

c.   A resolution of the United States Senate Committee on Public Works as adopted 28 January 1949, which states:

"RESOLVED BY THE COMMITTEE ON PUBLIC WORKS OF THE UNITED STATES SENATE, That the Board of Engineers for Rivers and Harbors, created under Section 3 of the River and Harbor Act, approved June 13, 1902, be, and is hereby, requested to review existing reports on Lake Pontchartrain, Louisiana, with a view to determining if any modifications of recommendations contained therein are advisable at the present time with respect to flood control, navigation, and beach erosion control in Orleans Parish, Louisiana."

d.   A resolution of the United States Senate Committee on Public Works as adopted 4 February 1957, which states:

"RESOLVED BY THE COMMITTEE ON PUBLIC WORKS OF THE UNITED STATES SENATE, That the Chief of Engineers of the United States Army is hereby requested to review the reports published as House Document Numbered 691, Seventy-ninth Congress, Second Session, and subsequent reports on Lake Pontchartrain, Louisiana, with a view to determining the advisability of extending the existing levee on the south shore of Lake Pontchartrain in Jefferson Parish, along the lake shore in St. Charles Parish to tie-in with the south guide levee of the Bonnet Carre Spillway, in view of recent changed physical or economic conditions."

2.   PURPOSE AND EXTENT OF INVESTIGATION

a.   The authorizing legislation cited in paragraph 1.a. pre-
scribes a Hurricane Study for the eastern and southern seaboards
of the United States.  In order to facilitate the study, the entire
Louisiana coast within the limits of the U. S. Army Engineer Dis-
trict, New Orleans, was divided into six independent areas.  The
study area covered by this interim report, designated "Lake
Pontchartrain, Louisiana and Vicinity," is one of these areas and
is shown on plate 1.  The purpose of this report is to present plans
and recommendations for protection of life and property against
hurricane flooding.  This includes consideration of hurricane pro-
tective works at New Orleans and Mandeville.  Beach erosion and
navigation are discussed in paragraph 26 a.  A report in response
to the resolution cited in paragraph 1.d. was assigned to the
Mississippi River Commission but that report has been combined with
the hurricane study.

b.   Basic data were available for the study from surveys and
studies made in connection with previous reports and existing proj-
ects in the area.  These data consisted of topographic maps and
aerial photographs, topographic and geological surveys, construc-
tion drawings, hurricane damage survey reports, census reports,
development planning reports and records of hurricane damages from
newspapers, periodicals, miscellaneous reports, and U. S. Weather
Bureau files.  Details and descriptions of experienced hurricane
characteristics and damage are given in supplement 1, which is pub-
lished separately.  Additional data required for the study were
obtained from field surveys, appraisal studies to determine damages
for selected surge heights, and research of technical bulletins,
reports, and publications.  The U. S. Army Engineer Waterways Ex-
periment Station conducted model studies to determine the effect
of proposed plans on the existing circulation patterns and
salinity regimen of Lake Pontchartrain.

c.   The following agencies and organizations were consulted
during the course of the study:  U. S. Department of Commerce,
Weather Bureau; U. S. Department of Interior, Fish and Wildlife
Service and Geological Survey; U. S. Coast Guard; U. S. Department
of Agriculture, Soil Conservation Service; U. S. Department of
Health, Education and Welfare, Public Health Service; State of
Louisiana, Department of Public Works, Department of Wild Life and
Fisheries, Department of Highways, Board of Health, Port of New
Orleans, Orleans Levee Board, and Chalmette Back Levee District;
Sewerage and Water Board of New Orleans; and Jefferson Parish, De-
partment of Sanitation.

d.   The District Engineer made a reconnaissance of the area
during the preparation of this report.

25

3.   PRIOR REPORTS

The prior reports in the area have been concerned with naviga-
tion, and with flood control in the Lower Mississippi River and Lake
Pontchartrain.  Pertinent reports are as follows:

a.   House Document No. 90, 70th Congress, 1st Session, sub-
mitted 8 December 1927, is the basis of the Flood Control, Mississippi
River and Tributaries project adopted by the Flood Control Act of 15
May 1928.  The Mississippi River levee system is included in this
general plan.

b.   House Document No. 215, 76th Congress, 1st Session, sub-
mitted 15 March 1939, is the basis of the existing project "Missis-
sippi River, Baton Rouge to the Gulf of Mexico, La.," adopted by the
River and Harbor Act of 2 March 1945.

c.   House Document No. 96, 79th Congress, 1st Session, sub-
mitted 19 May 1942, provides the basis for the existing project on
the Gulf Intracoastal Waterway east of New Orleans.

d.   House Document No. 245, 82nd Congress, 1st Session, sub-
mitted 25 September 1951, recommended the 36- by 500-foot channel
for the Mississippi River-Gulf Outlet project.

e.   Senate Document No. 139, 81st Congress, 2nd Session, sub-
mitted 20 February 1950, provides the basis for the existing Lake
Pontchartrain, La. levee project along the Jefferson Parish lake-
front.

## SECTION II - DESCRIPTION

4.   DESCRIPTION

a.   Location and extent.  The study area, as shown on plate 1,
is located in southeastern Louisiana in the vicinity of New
Orleans.  It comprises the low land and water areas between the
Mississippi River alluvial ridge and the Pleistocene escarpment to
the north and west.  The dominant topographic feature is Lake
Pontchartrain, a shallow landlocked tidal basin approximately 640
square miles in area and averaging 12 feet in depth.  It connects
with lesser Lake Maurepas to the west and through Lake Borgne and
Mississippi Sound to the Gulf of Mexico to the east.  The lake
drains approximately 4,700 square miles of tributary area.

b.   Topography.

(1)  South shore.  The south shore area from the Bonnet
Carre Spillway to Lake Borgne, comprising part of the Parishes of
St. Charles, Jefferson, Orleans, and St. Bernard, is essentially

uniform in topography. The land slopes gently downward as shown on
plate 2, from an average elevation 12 feet above m.s.l.,* along the
natural banks of the river to approximately sea level near the lake
shores. All of this area is protected from Mississippi River over-
flow by the main line Mississippi River levee system. A ridge at
an elevation of approximately 4 feet and about 2 to 3 miles from
the lake runs about parallel to the lake shore in eastern Jefferson
Parish and throughout Orleans Parish. This ridge, known as the
Metairie-Gentilly Ridge, is the remains of the natural levees of an
ancient distributary of the Mississippi River. U. S. Highway 90
generally traverses this ridge in the eastern part of Orleans Parish.

(a) St. Charles Parish. The principal topographical
feature of the area is the Bonnet Carre Spillway located in the west-
ern part of the parish. Artificial guide levees along both sides of
the spillway protect the adjacent land from Mississippi River flood
waters diverted through the spillway. Most of the area is unprotect-
ed from tidal overflows from the lake.

(b) Jefferson Parish. The Jefferson Parish area is
partially protected from tidal overflow from the lake by a Federal
levee system, as shown on plate 2, and all runoff is pumped into the
lake. The operation of drainage systems has caused subsidence of
the natural ground elevations. Interior areas remote from the river
are as low as 4 feet below mean sea level.

(c) Orleans Parish. The city of New Orleans includes
all of the lands within the boundaries of Orleans Parish. In order
to facilitate the study, division of the city into five study areas
was necessary.

1. New Orleans. The portion of the city be-
tween Jefferson Parish and the Inner Harbor Navigation Canal is
designated New Orleans. It is protected from moderate lake stages
by a step-face concrete seawall along the lakefront and levees along
its east and west boundaries. The drainage system, with pumping
plants discharging into the lake and in operation for many years, has
caused subsidence of natural ground elevations as much as 6 feet be-
low mean sea level.

2. Inner Harbor Navigation Canal. The lands
between the levees along both banks of the canal have been raised
to an average elevation of about 5 feet with spoil from the canal.
No other protection is afforded to this area against flooding from
the canal.

---

*Mean sea level, the datum to which all elevations in this report
 are referenced, unless otherwise indicated.

3.  Citrus.  The section between the Inner Harbor Navigation Canal and the levee along Paris Road and the slip at Michoud, extending from the lake to the Gulf Intracoastal Waterway, is designated Citrus.  It is partially protected from tidal overflow. The area south of U. S. Highway 90 (Chef Menteur Highway) is composed generally of low-lying undeveloped swamp, woodland, and marsh, with an average elevation of about 1.5 feet, and is largely undrained.  The area north of the highway, drained by pumping for many years, has subsided as much as 7 feet below mean sea level in the low areas.  The Gulf Intracoastal Waterway joins the Inner Harbor Navigation Canal in this area.

4.  New Orleans East.  The remaining area to the east of the Citrus area is known as New Orleans East.  It is partially protected from tidal overflow and consists of low-lying undeveloped marshland, with an average elevation of about 1.5 feet. The Mississippi River-Gulf Outlet, a tidewater channel, connects with the Gulf Intracoastal Waterway in this area.

5.  The remainder of the area to the east of New Orleans East is unprotected tidal marsh with an elevation of 1.5 feet.  Dominant features are the Rigolets, a tidal channel approximately 3,500 feet wide, 28 feet deep, and about 9 miles long, connecting Lake Pontchartrain with Mississippi Sound; and Chef Menteur Pass, a tidal channel approximately 1,000 feet wide, 43 feet deep, and about 7 miles long, connecting Lake Pontchartrain with Lake Borgne, an embayment of brackish water having access to the gulf by way of Mississippi Sound in the north.  U. S. Highway 90, which crosses the marsh from the south shore levee system to the north shore escarpment ranges in elevation between 5 and 12 feet.

(d)  Chalmette.  The sections of St. Bernard and Orleans Parishes, between the Mississippi River and the Mississippi River-Gulf Outlet, extending from the Inner Harbor Navigation Canal to Bayou Dupre, is designated Chalmette.  The higher segment along the river (about 35% of the total) is protected from tidal overflow by a locally built back levee.  The area west of Paris Road is drained by pumping and the remainder by gravity.  The remainder of the area fronting on the Gulf Outlet consists mainly of undeveloped marshland unprotected and undrained with an average elevation of about 1.5 feet.

(2)  North shore.  The north shore, comprising the area in St. Tammany Parish, is composed of low-lying marsh and swamp at an elevation of about 1.5 feet, and the adjacent higher land comprising the edge of the escarpment.  The principal tributaries of the area, which drain directly into Lake Pontchartrain, are the Tchefuncta River and Bayous Lacombe, Liberty, Bonfouca, and Castine.

(3) West shore.  The portions of the study area to the west
in Tangipahoa, Livingston, Ascension, St. James, and St. John the
Baptist Parishes are essentially similar in topography.  The major
portion of the area is undeveloped low-lying marsh and swamp; having
an average elevation of about 1.5 feet.  Developed sections; averaging
about 10 feet in elevation, are located along the Mississippi River
bank.  To the west and north of the study area, the land slopes up-
ward from the marsh to higher, developed sections of land.  Lake
Maurepas, a shallow landlocked tidal basin of approximately 90 square
miles, is located in this area.  The principal tributaries are the
Blind, Amite, Natalbany, and Tickfaw Rivers which drain into Lake
Maurepas and the Tangipahoa River which drains into Lake Pontchartrain.

c.  Geology.

(1) Physiography.  The study area, known as the Pontchar-
train Basin, is situated along the northeastern flank of the
Mississippi River Deltaic Plain and includes a small portion of the
Central Gulf Coastal Plain.  The basin is a shallow depression which
lies between the alluvial ridge of the Mississippi River and gulf-
ward sloping uplands on the north and west.  A low alluvial ridge
(Metairie-Gentilly ridge), marking the position of an ancient dis-
tributary and subdelta of the river, extends northeastward from New
Orleans towards the uplands and subdivides the basin.  In addition
to the alluvial ridges and the uplands, the region includes large
lakes of which Lake Pontchartrain is the most prominent.  Except for
short stretches along the northern shore of Lake Pontchartrain in
the vicinity of Mandeville where the uplands border the lake, and
behind the seawall along the south shore at New Orleans where sand
fill has been placed, the lakes are surrounded and separated from
the uplands and alluvial ridges by marsh and swamp lands.  The
shorelines of the lakes are smoothly rounded and in many places
poorly defined because of encroachment of the lake waters into the
marsh and swamp lands, and the absence of well-defined beach ridges.
The area is of extremely low relief.

(2) Geologic history.  During the later part of the Pleis-
tocene epoch, the Mississippi River built a large delta centered in
southwest Louisiana, which extended from approximately the Missis-
sippi State boundary to the Texas State boundary, and far gulfward
of the present gulf shoreline.  At the end of the Pleistocene
epoch, sea level dropped and the Mississippi River and the coastal
plain streams became deeply entrenched in the Pleistocene deposits.
At that time the Pleistocene surface in the study area remained
relatively undissected as a shelf on the northeast side of the deep
trench of the Mississippi River, and the soils on this shelf were
weathered and desiccated.  During the Recent epoch sea level rose
to its present position, and sediments carried down by the Missis-
sippi River were deposited and completely filled the river entrench-
ment and buried the Pleistocene shelf in the study area.  As burial

was accomplished, the Mississippi River was confined to the central part of the Deltaic Plain and the Pontchartrain depression area was a shallow arm of the gulf, or a huge bay, marginal to the northeastern and distal ends of the Deltaic Plain. During this period marine and brackish water sediments were deposited in the Pontchartrain embayment. Approximately 2,500 years ago, the Mississippi River changed its course and began rapidly filling the embayment with alluvial sediments. Concomitantly, the alluvial ridges along the Mississippi River and the Metairie-Gentilly subdelta course were formed, regional subsidence gradually occurred, the swamp and marsh deposits around the lakes accumulated, and the waters in the lakes became less saline. During the filling of the embayment a few fine sand and shell beaches were formed locally. The major known beach thus formed lies buried in the northern part of New Orleans, near the present shoreline of Lake Pontchartrain. The main elements of the history of the area have been the burying of the ancient Pleistocene surface and the filling of the Pontchartrain embayment with Recent sediments that were carried into the area by the Mississippi River, and the accumulating of organic matter, derived from local vegetation, at the surface in the low areas surrounding the lakes. With construction of artificial levees along the river, the basin has been largely deprived of the sediment-laden overflow waters and there is evidence that for the past century the lakes are enlarging.

(3) <u>Surface drainage.</u> Drainage from most of Louisiana east of the Mississippi River and a considerable area in southwestern Mississippi is accomplished by relatively small streams which flow generally southward into the basin from the uplands on the north. At present the only water from the Mississippi River received by the basin is that discharged occasionally into Lake Pontchartrain through Bonnet Carre Spillway. The alluvial ridges drain down-slope into the adjacent marsh or swamp lands which, under natural conditions, are underdrained. In the reclaimed areas of the marsh and swamp lands protection levees have been constructed and drainage is accomplished by large pumps that generally discharge into canals that connect with the lakes.

(4) <u>Subsidence.</u> Progressive subsidence of the region in the vicinity of New Orleans has been recorded by many observers. It has been estimated that the Pleistocene surface has been downwarped towards the south and west from zero at the Pleistocene outcrop north of Lake Pontchartrain, to a maximum of 350 feet near the present gulf shoreline. It has been estimated that the rate of subsidence in the New Orleans area has been about 0.4 foot per century. In addition to the regional subsidence, large settlements of the ground surfaces have occurred in the marsh and swamp land areas that have been relcaimed and drained. These settlements were the results of the shrinking of the highly organic surface soils when they were drained.

30

(5)  Subsurface conditions.  Except for the Pleistocene
deposit that outcrops along the northern boundary of the basin, the
subsurface consists of Recent deposits varying in thickness from
zero at the Pleistocene outcrop to about 50 feet at the south shore
of Lake Pontchartrain in New Orleans.  Generally, the Recent depos-
its in the marsh and swamp lands consist of a surface stratum of peat
and very soft highly organic clay 8 to 14 feet thick, overlying soft
and very soft gray clay containing lenses and local zones of loose
silt.  The Recent deposits lie unconformably upon the Pleistocene.
Exceptions to the prevailing deposits in the Recent are the buried
sand beach situated near the southern shore of Lake Pontchartrain,
relatively firm lean clays and silt comprising the natural levee
deposits, the silt and fine sand filling in the ancient distributary
stream channel, and zones of predominantly sandy soils in the sub-
surface at the distal end of the ancient Metairie-Gentilly subdelta.
The Pleistocene deposit that underlies the Recent and forms the
uplands to the north of the lakes consists predominantly of very
stiff to stiff oxidized clays with local zones and strata of firm
silt and dense sands.

(6)  Ground water conditions.  All of the sand and silt
deposits in the area are water bearing, and the piezometric head in
these deposits is generally equal to sea level.

(7)  Foundation problems.  From a geologic standpoint no
unusual problems are anticipated for the proposed work that is
located where the Pleistocene soils outcrop.  However, in the
Recent deposits which include most of the project, the very low
shear strengths and unusually high compressibility of the soft
peats and clays, and the perviousness of and the excessive heads
in the silts and sands create problems in the design of protective
works.  The detailed discussion of these problems and their consid-
eration in the design of the various features of the project are
included in appendix B.

(8)  Mineral deposits.  The study area is located in a
region where oil and gas are likely to exist in the subsurface.
However, exploration and production of petroleum in this area will
not be adversely affected by the proposed hurricane protection works.

(9)  Source of construction material.  Rock is not avail-
able in the vicinity of the proposed works and will have to be
imported from sources as remote as Texas, Arkansas, or Alabama.
Concrete sand and gravel are available from sources within a dis-
tance of less than 50 miles from the proposed structures.  Clam
shells are available in the general vicinity of the proposed work.

d.  Tides.  Under normal conditions, the tide in both Lakes
Pontchartrain and Borgne is diurnal and has a range of approximately
one-half foot and 1 foot, respectively.  The Rigolets and the Chef
Menteur Pass have developed naturally deep and wide channels having

adequate capacity for normal tidal flows and for discharge of tribu-
tary flow. Fluctuations in the level of Lake Pontchartrain are
greatly influenced by wind. This effect is evident in winds as low
as 5 miles per hour. Easterly winds cause a rise in Mississippi
Sound and Lake Borgne, producing an increase in flow through the
passes and a subsequent rise in the lake level. Westerly winds
have the reverse effect. Major storms and hurricanes produce signi-
ficant changes in the lake. Tide gage readings are available at
six locations in Lake Pontchartrain. Five of these are of the
recording type with periods of record ranging from 4 to 14 years.
Three of these previously had staff gages, with additional periods
of record ranging from 16 to 18 years. Other gages include one
staff in Lake Maurepas (6 years), one in Rigolets (12 years' re-
cording and 18 years' staff), and three recording in Lake Borgne
(4 to 13 years). Sixteen high water (crest) pipe indicators are
distributed within the study area to obtain data on maximum surge
heights. Location and description of gages and their periods of
record are shown in table A-6, appendix A. Maps showing areas
flooded and maximum water surface elevations of record in the study
area are contained in supplement 1 to this report. Observed stages
for regular locations are published annually in "Stages and Dis-
charges of the Mississippi River and Tributaries and Other Streams
and Waterways in the New Orleans District," by the U. S. Army Engi-
neer District, New Orleans.

    e.   Flood protection and interior drainage.  The Mississippi
River levee system affords complete protection from headwater floods
on the river. Partial protection from tidal overflow from the
lakes is afforded to the south shore area in Jefferson and Orleans
Parishes and to the north shore at Mandeville. All of the south
shore protected areas, except the New Orleans East area, are
drained by pumping into the tidal lakes or waterways.

        (1)  St. Charles Parish and west.  Along the entire western
shore of Lake Pontchartrain and along the St. Charles Parish front,
there is no effective protective system against flooding from the
lake. The embankment of the Illinois Central Railroad offers a
limited degree of protection. Some of the developed areas near the
river are leveed and pumped. These systems are operated by the
Pontchartrain Levee District.

        (2)  Jefferson Parish.  A Federal levee with a 10-foot grade
extends along the entire 10.4 miles of Jefferson Parish lakefront.
The levee returns along the St. Charles Parish line 4.8 miles with a
grade of 7 feet at the terminus. The Metairie Relief outfall canal
divides Jefferson and Orleans Parishes. The levee on the Jefferson
side has a grade of 10 feet at the lake and 7 feet 2.5 miles inland.
The drainage system of Jefferson Parish, operated by the Sanitation
Department, consists of a series of collection ditches and canals
(shown on plate 2) leading to four pumping stations discharging
directly into Lake Pontchartrain. The diesel operated pumps have a

total combined capacity of approximately 4,600 c.f.s. and serve a drainage area of approximately 29,000 acres. The floor of each station is at an elevation of 2.6 feet. The pumps can operate with several feet of flooding over the floor because all of the fuel connections and oil vents are above the floor level.

(3) New Orleans. The New Orleans lakefront protection consists of a seawall backed by a low levee from its western boundary to the Inner Harbor Navigation Canal. The first one-half mile adjacent to Jefferson Parish is a vertical seawall having a crown elevation of 7.5 feet protected by a breakwater at an elevation of 6.0 feet which forms the Municipal Yacht Harbor and backed by a levee with an elevation of 10 feet. To the east of the harbor area a stepped type seawall with a crown elevation of 8.2 to 9.0 feet extends along the lakefront for a distance of 5.2 miles. Several hundred feet landward of the seawall a small levee, with a crown elevation of 9.6 feet, provides secondary protection. The area is protected on the west by a levee on the east bank of the Metairie Relief outfall canal with a controlling grade of 9.5 feet, and on the east by a levee along the Inner Harbor Navigation Canal having an elevation of 9.6 feet. Extending into the interior of this highly developed area are three major channels. The Orleans Avenue Relief outfall canal, 2.5 miles long, and the London Avenue outfall canal, 2.9 miles long, each has levees with net grades of about 10.0 feet terminating at major pumping stations. The third, Bayou St. John, is now closed by a floodgate about one-half mile from the lake with 10-foot levees tying-in to the seawall. The drainage system in New Orleans, operated by the Sewerage and Water Board of New Orleans, comprises a network of collecting ditches, covered and open canals, relay pumping stations, and outfall pumping stations, that ultimately empty into Lake Pontchartrain, as shown on plate 2. The canal system is so designed that normal or light rainfall is discharged into Bayou Bienvenue and heavy rainfall is discharged into the lake. The total nominal capacity of outfall pumps for New Orleans is 20,830 c.f.s. for the drainage of an area that is approximately 27,800 acres, including the 2,000 acres in the Chalmette area. Internal relay pumps have a capacity of 8,340 c.f.s. The design elevation of the floors of the stations is 2.6 feet. The pumps are electrically driven with power from a central generating station. Emergency power is available from the local power company.

(4) Citrus and New Orleans East. The New Orleans Airport is fronted by a vertical seawall with an average elevation of 11.5 feet and a length of 2.3 miles. The embankment of the Southern Railway extends along the remainder of the south shore to the east for approximately 11.5 miles with an average elevation of about 9.3 feet. The embankment is a heterogeneous fill composed largely of cinders, and has been severely damaged on many occasions in the past by relatively minor hurricane tides and waves. This type of embankment will not provide dependable protection against major hurricane tides and waves. The area is protected on the west by a

33

levee along the Inner Harbor Navigation Canal having a grade of 9.6 feet, on the east by a levee that extends from South Point to the Gulf Intracoastal Waterway with an elevation of 11.6 feet, and on the south by a levee along the Gulf Intracoastal Waterway with elevation 9.6 to 14. The Paris Road-Michoud slip levee separates this area into two segments, Citrus and New Orleans East. The Citrus area drains through a system of open canals with one pumping station at Citrus. This partially developed area of 8,900 acres is drained by a 520-c.f.s. electrically driven plant. An emergency power source is provided. Improvements to this system are being planned. The New Orleans East area has no major drainage system at this time but plans for the development of an adequate system for the area are well advanced. Some small units are in operation.

(5) <u>Chalmette</u>. In the Chalmette area about 10,400 acres of the higher lands along the Mississippi River are protected by a locally built levee with a net grade of 10 to 10.5 feet. Partial protection is afforded the remaining area by a spoil bank with an elevation of approximately 8.0 feet along the south bank of the Mississippi River-Gulf Outlet between the Inner Harbor Navigation Canal and Bayou Dupre. The leveed portion of the Chalmette area in St. Bernard Parish, west of Paris Road, is drained by pumping plants. The capacity of the stations in this area is 666 c.f.s. existing plus 478 c.f.s. being installed for an area of approximately 8,000 acres. East of Paris Road, runoff is conveyed to the marshes by flood gates.

(6) <u>Inner Harbor Navigation Canal</u>. The highly developed industrial areas along the canal between its levees are not protected against flooding from the canal. The area has been raised to about elevation 5 with spoil from the canal.

(7) The area bounded by the Mississippi River-Gulf Outlet, the Gulf Intracoastal Waterway, and Lake Borgne and the area east of U. S. Highway 90 between New Orleans East and Pearl River are unprotected. The area west of U. S. Highway 90 is afforded a limited degree of protection against flooding from Lake Borgne by the highway embankment.

(8) <u>Mandeville</u>. A vertical seawall with a height of 6.0 feet and a length of 1.5 miles protects the town of Mandeville. Plans to expand this structure to provide a height of 9.5 feet are being developed by the town officials. Drainage is by gravity into the lake.

f. <u>Maps</u>. Reference is made to U. S. Geological Survey quadrangles Yscloskey, scale 1:62,500 and Malheureaux Point, Drum Bay, Door Point, Lake Eugenie, Oak Mound Bayou, Mitchell Keys, Lake Eloi, and Morgan Harbor, scale 1:24,000; U. S. Army Corps of Engineers quadrangles Slidell, Covington, Ponchatoula, Springfield, Denham Springs, Donaldsonville, Mt. Airy, Bonnet Carre, Spanish Fort, Chef

34

Menteur; Rigolets, St. Bernard, New Orleans, and Hahnville; scale
1:62,500; U. S. Coast and Geodetic Survey Charts Nos. 1115 and 1116,
scales 1:456,394 and 1:458,596; and the maps attached to this report.

5.   ECONOMIC DEVELOPMENT

a.   Population.  The 1960 population of the study area was
about 772,000, essentially all urban.  The majority of the popula-
tion is located inside the south shore protected areas and is
composed of about 593,000 in the city of New Orleans (Orleans Par-
ish), 133,000 in Jefferson Parish, 27,300 in St. Bernard Parish,
and 9,800 in St. Charles Parish.  The population of the New Orleans
metropolitan area, comprised of Orleans, Jefferson, and St. Bernard
Parishes was 868,480 (1960).  The population north of Lake Pontchar-
train was 8,900 (1960), most of which was in the towns of Mandeville,
Slidell, and Madisonville.  The rate of growth of the population for
the study area and for St. Charles, Jefferson, Orleans, and St.
Bernard Parishes is shown in the following tabulation:

| Year | Area (Total) | St. Charles Parish | Jefferson Parish | Orleans Parish | St. Bernard Parish |
|------|------|------|------|------|------|
| 1930 | 466,000 | 6,300 | 13,400 | 438,000 | 3,800 |
| 1940 | 506,000 | 5,300 | 18,800 | 473,000 | 4,300 |
| 1950 | 618,000 | 6,300 | 54,000 | 545,000 | 7,100 |
| 1960 | 772,000 | 9,800 | 133,000 | 593,000 | 27,300 |

b.   Industry.  Industries in and adjacent to the study area,
including those on the west bank of the Mississippi River, consist
of the manufacture and processing of food and kindred products,
transportation equipment, paper and allied products, ships and
boats, stone, clay and glass products, fabricated metal products,
printing and publishing, chemical and allied products, apparel and
related products, basic chemicals, concrete and plaster, nonmetallic
minerals, petroleum and coal products, and structural metal products.
These industries accounted for about 95 percent of the value added
by manufacture, which was in excess of $466,000,000 in 1958.  The
majority of industry is located within the New Orleans metropolitan
area.  Several small industrial plants are located in Slidell, in-
cluding clay products, building products, and boat building and
repair.

c.   Mineral production.  The area contains 11 producing oil
and gas fields.  Three fields are located in Lake Pontchartrain,
one in Lake Maurepas, and one in Lake Borgne.  The remaining six
fields are situated between the lake and the Mississippi River
westward of Kenner, Louisiana.  Shell deposits at or near the land
surface are mined in Lake Pontchartrain and in the bays to the east
of the lake.

d.   Fisheries and fur animals.  Lake Pontchartrain, Lake Maurepas, and the extensive marshlands and water bottoms to the east contribute to an important seafood industry and support an important trapping program.

e.   Recreation.  New Orleans long has been renowned as a recreation and vacation center.  The city offers a variety of enter- tainment, including the historic French Quarter, numerous night clubs, extensive hotel facilities, and French, Spanish, and Italian restaurants.  Annual events are the Mardi Gras; and the Mid-Winter Sports Carnival, including the Sugar Bowl Football Game, the horse race season, and the Spring Fiesta.  City parks cover 1,800 acres and provide a variety of recreation facilities.  Lake Pontchartrain is popular for sailing, motor boating, water skiing and swimming. Sport fishing is popular on Lake Pontchartrain and in the connecting outlets to the Gulf of Mexico, and on streams that enter the lake. The areas north of the lake along the Tchefuncta and Bogue Falaya Rivers, Bayous Lacombe and Liberty, and other streams are popular as sites for summer homes of New Orleans residents.

f.   Agriculture.  Agriculture holds a relatively unimportant position in the economy of the area.  A considerable amount of truck crops is grown in St. Bernard Parish and at scattered locations in the Little Woods section of Orleans Parish and near the western edge of Jefferson Parish.  In Jefferson Parish there are several small dairies and small acreages of grazing lands.  These lands are de- creasing as urban areas are developed and probably will disappear completely within a few years.

g.   Foreign trade.  The port of New Orleans ranks as the second port of the nation in value of foreign trade.  Imports were 5,423,330 and exports were 9,144,075 short tons during 1960.

h.   Navigation.  In addition to the Mississippi River project, 40-foot depth; the Gulf Intracoastal Waterway, 12-foot depth; and the Mississippi River-Gulf Outlet, 36-foot depth, which is under construction, the area is served by numerous improved waterways, natural streams, and lakes including Lakes Pontchartrain and Maure- pas that are navigable by shallow draft vessels.  Projects for im- proved waterways include Amite River and Bayou Manchac; Bayou Bonfouca; Bayou Lacombe; Tchefuncta River and Bogue Falaya; Pass Manchac; Tangipahoa River; Tickfaw, Natalbany, Ponchatoula, and Blood Rivers; and the Inner Harbor Navigation Canal (Industrial Canal) between the Mississippi River and Lake Pontchartrain.

i.   Transportation.  The area is served by an extensive system of highways and railroads.  U. S. Highways 11, 51, and 61 enter from a northerly direction and terminate in New Orleans.  U. S. Highway 90 passes through New Orleans in an east-west direction and crosses the Mississippi River.  U. S. Highway 190 passes north of Lake Pontchartrain in an east-west direction.  The Greater New Orleans

Expressway Bridge (toll) connects U. S. Highways 61, 90, and 190.
The proposed Federal Interstate Highway System, under construction,
will be located near present U. S. Highways 51, 61, and 11. Eight
trunk line railroads that terminate at New Orleans provide through
train service to major cities in the nation and direct connections
to practically all others. The New Orleans Public Belt Railroad,
owned by the city of New Orleans, provides a connection over the
Huey P. Long Mississippi River Bridge between rail lines and to in-
dustries and wharves. The New Orleans International Airport,
Moisant Field, which is located near Kenner, is the center of commer-
cial aviation. Major airlines provide regularly scheduled flights
to all parts of the United States and to parts of Central and South
America. The New Orleans Airport, located on the southeast shore of
Lake Pontchartrain, at present, serves mostly local commercial and
private aviation. Extension of a runway to accommodate commercial
jet planes is under construction.

j. <u>Defense establishments.</u> New Orleans is a strategic major
port on which the defense of the nation will depend to a great ex-
tent in any national emergency. As in the past, it is probable that
the areas along the Inner Harbor Navigation Canal and the Mississippi
River-Gulf Outlet will accommodate extensive defense industries and
military operations in the event of war. The National Aeronautics
and Space Administration recently has contracted for the manufacture
of the Saturn Booster at the Michoud plant on the Gulf Intracoastal
Waterway in the Citrus area. This plant was used in the recent
past for the manufacture of Army tank motors.

k. <u>Trends of growth and development.</u> The 1960 population of
metropolitan New Orleans, which includes Orleans, Jefferson, and
St. Bernard Parishes, was 868,480 in 1960. The population was
685,405; 552,244; and 505,306 in the years 1950, 1940, and 1930.
These statistics indicate that the population will exceed 2,000,000
by the end of the next 50 years. The major part of the growth will
be in Jefferson Parish, the Citrus and New Orleans East areas of
Orleans Parish, and in St. Bernard Parish. The section of New
Orleans between Jefferson Parish and the Inner Harbor Navigation
Canal is largely developed and the remaining vacant areas will
likely be developed during the next 15 years. It is probable that
the population within the study area on the north shore of Lake
Pontchartrain will double during the next 50 years, with a major part
of the growth occurring in and around Slidell. It is probable that
areas near Slidell that are located outside of tidal overflow limits
will grow at a much faster rate. No significant development of the
areas to the west of Lake Pontchartrain is indicated. The residen-
tial development in St. Charles Parish would probably double during
the next 50 years without additional flood protection.

6.   CLIMATOLOGY

    a.   Climate.   The study area is located in a subtropical lati-
tude having mild winters and hot, humid summers.  During the summer,
prevailing southerly winds produce conditions favorable for afternoon
thundershowers.  In the colder seasons, the area is subjected to
frontal movements which produce squalls and sudden temperature drops.
River fogs are prevalent in the winter and spring when the tempera-
ture of the Mississippi River is somewhat colder than the air tempera-
ture.  Climatological data for the area are contained in monthly and
annual publications by the U. S. Department of Commerce, Weather
Bureau, titled "Climatological Data for Louisiana," and "Local
Climatological Data, New Orleans, La.," and in appendix A.

    b.   Temperature.   The first-order weather station in New
Orleans has temperature records extending back to 1871.  The mean
annual temperature is 70°F. and the recorded extremes range from 7°
to 102°.  The average temperature in summer is 82.3° and in winter
56.3°.  Detailed temperature records are shown in appendix A.

    c.   Rainfall.  Precipitation generally is heavy in two fairly
definite rainy periods.  Summer showers last from about mid-June to
mid-September, and heavy winter rains generally occur from mid-December
to mid-March.  The drainage area tributary to Lake Pontchartrain is
served by 29 precipitation stations of the U. S. Weather Bureau,
with periods of record ranging from 5 to 90 years.  Average annual
precipitation is 60 inches, with annual variations of plus or minus
50 percent.  Extreme monthly rainfalls exceeding 12 inches are not
uncommon, and as much as 25 inches have been recorded in a single
month.  Average monthly rainfalls range from 6.9 inches in July to
3.2 inches in October.  Several stations have experienced periods in
which no rainfall was recorded in a calendar month.  Snow occurs
infrequently in the area.  New Orleans had an 8.2-inch fall on
14-15 February 1895.  The last appreciable snowfall occurred on 12
February 1958, when stations reported from 1.3 to 4.0 inches.
Pertinent temperature and precipitation data and location of climat-
ological stations are shown in appendix A.

    d.   Wind.  Wind records are available adjacent to and over
Lake Pontchartrain for various periods.  Periods of record of
anemometers are shown in appendix A.

        (1)  Two over-water recording anemometers were established
in 1957 on the Greater New Orleans Expressway Bridge across Lake
Pontchartrain, approximately 4 miles from the north and south termin-
als.  Recording anemometers were installed around the perimeter of
the lake at West End (New Orleans), Madisonville, Frenier, and Slidell
in 1957-59.  The installations on the bridge furnish the only valid
over-water record of winds.  The other locations are influenced by
the friction incurred by the winds traversing land masses.

(2) The U. S. Weather Bureau anemometer coverage at the New Orleans International Airport, Moisant Field, since 1949 is the longest record adjacent to the lake. A 10-year summary of winds at Moisant is shown in appendix A. The average wind velocity is 8.8 m.p.h., but winds over 100 m.p.h. are experienced occasionally in hurricanes. The predominant wind directions are S. to SSE. from January through July, and NE. to ENE. from September through November. In applying Moisant wind summaries to Lake Pontchartrain, the factors for comparing over-land to over-water conditions, as described in the U. S. Weather Bureau Hydrometeorological Report No. 32, are considered applicable. It is a matter of record that important changes in lake level reflect changes in the wind patterns. The most serious consequences of high winds occur over the lake during hurricanes.

7.   HURRICANES OF RECORD

   a.   Historical hurricanes. This area has experienced many severe hurricanes and lesser storms which caused loss of life and damage to property. Official U. S. Weather Bureau meteorological records are not available prior to 1893 and most accounts had to be obtained from newspapers and historical documents. Because a large portion of the area was relatively uninhabited, most of the flooding went unobserved.

   (1) Prior to 1800, New Orleans had little protection from flooding by lake waters entering the city. Bienville's newly established capital city of New Orleans was severely damaged by a hurricane in 1722. The church, crops, stores, and 35 huts were destroyed and the city was reduced to a state of famine. As a result all property owners were ordered to erect palisades within 2 months. The 1723 hurricane caused similar damage. Other storms in 1776, 1779, 1780, 1781, 1793, and 1794 struck the area. Severe crop damage was reported for a few of these storms. The lack of storm reports during the midcentury is thought primarily due to the lack of records rather than the absence of storms.

   (2) In 1800, 1811, 1812, and 1821, storms struck the area. A particularly severe storm in 1831 devastated the area near the gulf and caused considerable damage in the study area. Waves swept over the village of Milneburg in New Orleans. Almost all of the boats in both the river and the lake sustained heavy damage, and several vessels were stranded in the marshes around Lake Pontchartrain. Several lives were lost and all of the buildings fronting on the lake in the vicinity of New Orleans were washed away. The hurricane of 1837 inundated the city of New Orleans for a distance of approximately 2 miles from the shoreline of the lake. Several lives were lost and crops suffered heavily once again. All of the boats in the pens near the lake were swamped, and four lake steamers were sunk during this storm. In 1860 another severe hurricane struck the area. Heavy damage was reported in Mandeville, and

storm water was several feet deep over the railroad track between
Pass Manchac and Frenier. On the southwestern shore of Lake
Pontchartrain about 8 people lost their lives. Several deaths oc-
curred in New Orleans where approximately two-thirds of the city
was inundated. Flooding occurred in the city during a storm in
1877 although the storm struck well to the west near Galveston,
Texas. In 1887 a storm which had paralleled the entire coast of
Texas passed inland near New Orleans. Flooding occurred in the
rear of the city as well as in some interior localities through
levee breaks along drainage canals. Considerable crop damage was
experienced and property near the lakefront was heavily damaged.
The next year, 1888, another storm passed inland near Grand Isle.
During this storm a maximum wind of 90 m.p.h. was reported at New
Orleans.

(3) In October 1893, a hurricane of great violence
devastated the coastal region of Louisiana just west of the Missis-
sippi River. The great loss of life, placed at 2,000 persons, and
heavy damage in other areas in Louisiana occupied most of the storm
records. It was indicated that the lack of any advance warning of
the approach of a storm was in part responsible for such a high
death toll. It was noted that the rate of forward motion of this
storm decreased to nearly zero in the vicinity of the Mississippi
River. As a result of this stalling, the winds in the area were
of long duration and great volumes of gulf waters were forced from
Lake Borgne into Lake Pontchartrain. Winds of 65 m.p.h. were
recorded in New Orleans and it is estimated that if wind tides had
been recorded they would be in the order of 10 feet along the New
Orleans lakefront under present conditions.

(4) The storm of 4-16 August 1901 had a barometric
pressure of 28.72 inches and passed just east of New Orleans. The
U. S. Weather Bureau was commended for the excellent advanced
warnings issued. This storm caused considerable property damage
and the loss of 10 lives. It also tended to stall, and although
the wind velocity at New Orleans reached only 39 m.p.h., the duration
and direction of that wind caused considerable flooding in the area.
Approximately 3 square miles of the city were inundated to depths
of from 1 to 4 feet. A 2-foot depth of flow was observed over the
9-foot railroad embankment on the southeast shore of Lake Pontchar-
train.

(5) The storm of 24-30 September 1905 flooded many low
sections of the area. Stages of 6 feet above normal were reported
in Lake Pontchartrain at Mandeville. Water was reported to have
been 5 feet over the marshes in the vicinity of North Shore. The
lakefront area of New Orleans was again flooded.

(6) The hurricane of 10-22 September 1909 caused damage
exceeding $6 million and a loss of 353 lives. The railroad between
Frenier and Ruddock was washed out. The stage at New Orleans reached

6.2 feet, and the western portion of the city was flooded to depths
of 1 to 2 feet. Stages were 8 feet at the west shore of Lake
Pontchartrain, 7 feet on the north shore, and 6 feet in the area
near the Rigolets.

(7) Two storms in 1915 caused damage in this area.  On
5-24 August, a storm struck west of Galveston, Texas and produced
tides of only 3 feet at the south shore of Lake Pontchartrain and
the Rigolets, and damage was small.  The later storm, 22 September
to 2 October, which had a central pressure of 27.87 inches and
winds at New Orleans of 75 m.p.h. caused considerable damage.  Tor-
rential rains accompanied the storm, causing severe flooding in the
southeastern portion of Louisiana.  New Orleans reported a total
of 8.2 inches of rain with a maximum of 1.59 inches in 1 hour.
Maximum stages around Lake Pontchartrain were 13 feet at Frenier,
6.1 feet at West End, New Orleans, 7.2 to 11 feet on the east
shore, and 7.7 feet on the north shore.  The south shore of Lake
Borgne had stages up to 11.6 feet and the marshland had stages of
9.0 feet.  In New Orleans 25,000 buildings were destroyed or
damaged.  The city was flooded to depths of from 1 to 8 feet.
Failure of the drainage pumps caused the impounded water to re-
main for several hours.  Total property losses exceeded $13
million and the death toll was 275.

(8) The hurricane of 21-29 September 1917 approached
the coast of Louisiana but curved sharply to the east approximately
50 miles south of Port Eads and moved inland near Pensacola,
Florida.  Little damage was reported in the inhabited sections.

(9) The hurricane of 2-10 August 1940 followed an un-
usual path across Florida, moved across the northern gulf, and
finally struck the Texas coast near the Louisiana border.  Tides
of 6.4 feet were recorded at Frenier on the southwest shore of
Lake Pontchartrain, 4.4 feet on the north shore, 3 to 4 feet in
the vicinity of Violet, and 3.6 to 3.8 in the area between Lakes
Pontchartrain and Borgne.

(10) The hurricane of 4-21 September 1947 ranked as one
of the greatest of record.  It originated near West Africa, crossed
the Atlantic Ocean and the Florida Peninsula causing maximum damage,
then passed into the Gulf of Mexico.  It struck the Louisiana coast
just south of Lake Borgne and continued westward just south of Lake
Pontchartrain.  The path of the storm center in relation to the
converging coasts of Mississippi and southeastern Louisiana was
conducive to the generation of a very high tidal surge in that
zone.  Water surface elevations in Lake Pontchartrain were 6.8 feet
at Mandeville, and 5.5 feet at New Orleans.  Water flowed over the
seawall at New Orleans lakefront (see fig. 1) inundating approx-
imately 8.9 square miles of lakefront area, of which 2.7 square
miles were covered by sheet flow 2 feet or more in depth.  Sheet
flow over the low protective embankment along the lakeshore caused

41



official U.S.Navy Photograph

Waves breaking over New Orleans Lake Pontchartrain seawall in vicinity of
U. S. Naval Air Station near London Ave., September 1947.



Official U. S. Navy Photograph

Sheet flow across Lake Shore Development in New Orleans at Pontchartrain
Beach between Inner Harbor Navigation Canal and London Avenue, September 1947.

Fig. I

flooding in Jefferson Parish of approximately 31 square miles, making the drainage pumps inoperative for a considerable period of time. Water stood 6 feet deep in some sections. New Orleans International Airport, Moisant Field, had one-half foot of water on the runways and could not operate. Stages around the lake were 4.2 feet on the west shore; 8 to 10 feet in the Rigolets, and 2.4 to 5 feet in the marsh west of the lake. On the south shore of Lake Borgne the stage was 11.2 feet at the shore and 7.4 to 7.8 feet inland near the Chalmette back levee. Wind was reported as high as 98 m.p.h. with gusts to 112 m.p.h. from the northeast at Moisant Field. The barometer reading at New Orleans was 28.57 inches. Total storm damage was estimated at $110 million with 51 lives lost, of which 12 were in Louisiana.

(11) During the period 28 August-6 September 1948 a storm passed just east of the city. The highest wind reported at Moisant Field was 78 m.p.h. with gusts to 90 m.p.h. The barometric pressure was 29.21 inches. Tides rose to 4.4 feet along the southwest shore of Lake Pontchartrain and some lakefront flooding occurred.

(12) Hurricane "Flossy," 21-30 September 1956, passed over the mouth of the Mississippi River on a northeasterly track. Heavy rains, varying from 4 to 10 inches, fell along the path of the storm from Florida to Louisiana. Tides were unusually high along the coast from Florida to Grand Isle. Shell Beach, on the south shore of Lake Borgne, had a tide of 10.9 feet. Flooding in the surrounding marshland ranged from 6.4 to 8.6 feet. Lake Pontchartrain had stages of 7.3 feet at Frenier, 7.1 feet at Little Woods, and 5.4 feet at New Orleans. The seawall was overtopped by waves, flooding an area of approximately 2.5 square miles, in the eastern part of the city. Jefferson Parish was protected by the levee built since the 1947 storm. Total deaths reported on the coast were 15 and damage was estimated at $20 million.

(13) Other storms in 1894, 1923, 1926, 1941, and 1961, caused minor damage and storms in 1886, 1892, 1897, 1900, 1902, 1904, 1906, 1907, 1914, 1919, 1920, July 1936, August 1936, 1943, 1945, 1946, July 1955, August 1955, and 1961 resulted in unassessed damages to the area.

b. Hurricane frequency. Although damaging floods caused by hurricane tides have been experienced throughout the study area on numerous occasions in the past, it was not possible to establish adequate stage-frequency relationships for the entire study area because of the sparse records of observed maximum high water elevations. Observed stages were analyzed and adjustments made where necessary to reflect stages that would have occurred along the south shore of Lake Pontchartrain had existing protective works been in place. It was found that adjustments were required for only the 1893 and 1901 hurricanes, both of which stalled over the

area.  In addition, a synthetic method for computing stage-frequencies was derived by relating central pressure frequencies and stages that were computed for selected hurricane tracks.  After computing hurricane frequencies for the south shore of Lake Pontchartrain by the synthetic frequency procedure, the two relationships were combined, using the synthetic data to establish shape and the observed data to establish placement of the final stage-frequency curve.  This procedure, verified in other study areas for which sufficient data were available, was applied to all sections in the Lake Pontchartrain study area.  A detailed discussion of methods used in the computation of hurricane stage-frequencies is presented in appendix A.

8.  HURRICANE CHARACTERISTICS

a.   General description.  A hurricane is a well-developed cyclonic storm, usually of tropical origin.  The term "hurricane" meaning "big wind" is thought to be of Carib Indian origin and it applies to cyclonic storms that have hurricane characteristics and occur in the North Atlantic Ocean, Gulf of Mexico, Caribbean Sea, and Eastern and Southern Pacific Oceans.  Storms having similar characteristics but occurring in other locations are named typhoons, baguios or willy-willies.  The South Atlantic Ocean is excluded because its generally cool temperatures prevent hurricane formation. Hurricane characteristics are violent winds, tremendous waves and surges, and torrential rainfall.  Size and duration vary with each hurricane but generally they extend over thousands of square miles, reach heights of 30,000 feet or more, and last from 9 to 12 days.

b.   Origins and tracks.  Hurricanes apparently originate exclusively in the shifting zone of equatorial calms called the "doldrums" which lie between the two trade wind systems.  However, since all hurricanes cannot be traced to a point of genesis, it is possible that they may originate elsewhere.  Cyclonic storms are not likely to develop when the doldrums belt is within 6° of the equator because there the deflecting effect of the earth's rotation, which is an important factor in cyclonic formation, is at a minimum. Other conditions necessary for cyclonic formation are light variable winds, warm moist air, an ocean surface temperature in excess of 80°F., and a moderately low pressure area.  However, these conditions may produce a cyclone and yet not increase in severity so as to produce a hurricane.  Just what causes the actual formation of a hurricane is not readily apparent.  It has been observed that a continuation of stormy weather for 2 to 10 days, a continued lowering of barometric pressure in the storm center, and perhaps well-developed circulation in the upper level of air above the storm may be important steps towards hurricane development.  Some of the hurricanes which affect the Atlantic and gulf coasts develop in the eastern North Atlantic Ocean off the coast of Africa near the Cape Verde Islands, while others develop in the western Caribbean Sea when that