EXHIBIT   10
part 2

body of water is influenced by an extension of the Pacific doldrums.
Early in the hurricane season, June and July, there is a tendency
for the storms to develop in the western Caribbean but late in the
season, September and October, storms are more likely to develop in
the Atlantic. While still in the initial stages of development the
storms are affected by the trade winds and begin to move toward the
west or northwest. In the vicinity of 30° north latitude, they re-
curve and begin to move in a northeasterly direction at an accelerated
speed. This is only a very general path that hurricanes follow and
actually there are many deviations, for hurricanes have been known
to circle back and cross over their earlier paths.

    c. <u>Barometric pressures and winds.</u> Normal barometric pressures
in the tropics are about 30 inches of mercury whereas the pressures
recorded in hurricane centers range between about 29 and 27 inches.
The pressure system of a hurricane appears on a weather map as a low
pressure area encircled by lines called isobars which connect points
of equal barometric pressure. The isobars have a circular pattern
near the center of the storm but become asymmetric towards the
periphery. With the counterclockwise wind direction deflecting about
30° inward towards the center of the storm the wind system of a
hurricane also follows a circular pattern. At the storm's outer
limits, the winds are light to moderate; at about 30 miles from the
center, they reach a maximum velocity of about 100 m.p.h.* with
gusts as high as 150 m.p.h.; and at the center, they are relatively
calm. This calm area, called the "eye" of the storm, ranges between
7 and 20 miles in diameter. Here the sky is sometimes unclouded
enough to see the sun, while from all sides is heard the roar of
the hurricane winds. The point of lowest barometric pressure is
located in the vicinity of or within the eye. The lowest recorded
barometric pressure for hurricanes occurring along the gulf coast
was 26.35 inches.

    d. <u>Surge.</u> The hurricane surge which inundates low coastal
lands is the most destructive of the hurricane characteristics.
It alone accounts for three-fourths of the lives lost from hurri-
canes. It is the product of meteorological, beach, and shore condi-
tions. In the initial stage of development, it reaches a height of
about 3 feet in the open sea from the combined effects of high
velocity winds and a lowered barometric pressure. Simultaneously,
at shore, the water level slowly begins to rise. As the hurricane
approaches and the surge develops under the influence of a gently
rising ocean floor and a favorable or indented shore contour, the
shoreline water level rises more rapidly. A higher surge will be
produced if the hurricane path is perpendicular to shore, the
velocity of forward movement is slow, or the storm's diameter is

---

*Wind velocities represent a 5-minute average, 30 feet above ground
level

very large.  Maximum surge heights experienced along the gulf and
Atlantic coasts range between 10 and 16 feet.

    e.  <u>Waves</u>.  The waves generated by hurricane winds cause a
great deal of damage to ships and shore structures.  At sea the
waves are high and turbulent, particularly in the right front quad-
rant and the eye of the storm.  The pyramidal shaped waves in the
eye have been observed to reach heights of 45 feet or more.  Near
shore, wave heights which have diminished some since origin, begin
to increase again because of the slowing and therefore building
effect of the shallow water.  Further, breaking waves can run up
and overtop shore structures whose crowns are higher than the wave
heights.  But the force expended when they break is the most damaging
to the shore structures.  Some waves which are generated in midocean
travel away from the point of origin faster than the storm advances,
and arrive at the shore 2 to 3 days ahead of the full fury of the
storm.

    f.  <u>Rainfall</u>.  The rainfall accompanying a hurricane usually
is heavy and sometimes torrential.  However, its distribution during
the passage of a hurricane is not uniform.  The rain may begin long
before the storm's arrival.  Prior to the passage of the eye, rain-
fall generally reaches its maximum rate, and after the eye has
passed, it ceases almost entirely.  Rainfall is particularly heavy
in the right front quadrant.  Some hurricanes, however, are accom-
panied by little or no rainfall over considerable lengths of their
paths.

9.    STANDARD PROJECT HURRICANE

    a.  A standard project hurricane, SPH, is one that may be
expected from the most severe combination of meteorological condi-
tions that are considered reasonably characteristic of the region.
The general SPH that is characteristic for the coastal region of
Louisiana was developed in cooperation with the Hydrometeorological
Section, U. S. Weather Bureau, and corresponds to one having a
frequency of once in about 200 years in the study area.  The
derivation of procedures and frequency computations are described
in detail in appendix A.  Each of the specific SPH's for the study
area has a central pressure index, CPI, of 27.6 inches and a maxi-
mum wind velocity of 100 m.p.h. at a radius of 30 nautical miles.
These parameters define a hurricane which is similar in intensity to
the September 1915 hurricane.  Various translation speeds, rates of
hurricane forward movement, and paths are necessary to produce SPH
effects with maximum winds perpendicular to the shores at different
locations in the study area.  The occurrence of an SPH for any loca-
tion in the study area would produce maximum surge heights of 11.2
feet along the south shore of Lake Pontchartrain, 12.5 feet at
Mandeville, 11.9 feet in the Chalmette area, 12.5 feet at the
Citrus and New Orleans East back levees, and 13 feet in the Rigolets
and the Chef Menteur Pass.

b. The SPH critical to the south shore of Lake Pontchartrain
has an average translation speed of 6 knots. Over water the speed
is about 8 knots, and over land, at the time of recurvature, the
speed is 4 knots. This SPH approaches from the south, traverses the
coast west of the Mississippi River delta and curves eastward over
Lake Borgne. The SPH critical to the north shore of Lake Pontchar-
train has a translation speed of 5 knots. This hurricane approaches
from the south-souteast, traverses the coast west of the Mississippi
River delta, and curves northward passing west of Lake Maurepas.
The SPH critical to the Chalmette area, the back levees of Citrus
and New Orleans East, and from the Lake Borgne side in the vicinity
of the Rigolets and the Chef Menteur Pass has a translation speed of
11 knots. This hurricane approaches from the east, traverses the
coast east of the Mississippi River delta and south of Lake Borgne,
and curves slightly northward passing to the west of Lake Maurepas.

10.  PROBABLE MAXIMUM HURRICANE

The probable maximum hurricane, PMH, is one that may be expected
from the most severe combination of critical meteorological condi-
tions that are reasonably possible for the region. It has an infinite
recurrence period. The PMH for the study area has a CPI of 26.9
inches with a maximum wind velocity of 115 m.p.h. at a radius of 30
nautical miles. Translation speeds and paths are identical to those
for the SPH. The occurrence of a hurricane of PMH characteristics
in the study area would produce surge heights of 12.7 feet along the
south shore of Lake Pontchartrain, 14.7 feet at Mandeville, 13.8
feet in the Chalmette area, 14.6 feet at the back levees of Citrus
and New Orleans East, and 15.2 feet in the Rigolets and the Chef
Menteur Pass region.

11.  EXTENT AND CHARACTER OF FLOODED AREA

The standard project hurricane would inundate a land area of
approximately 700,000 acres to depths of up to 16 feet in the study
area. About 240,000 acres of this area are situated eastward of a
line extending along U. S. Highway 90 from near Pearl River to Chef
Menteur, then along the Gulf Intracoastal Waterway to the Inner
Harbor Navigation Canal, around the Inner Harbor Navigation Canal,
and thence along the back levee of the Chalmette area in Orleans and
St. Bernard Parishes. All of this land is marsh except for the spoil
areas along the banks of the improved navigable channels. Improve-
ments include the Gulf Intracoastal Waterway, the Mississippi River-
Gulf Outlet which is under construction, the Louisville and Nashville
Railroad, fishing camps and residences along U. S. Highway 90 and
the L. & N. Railroad, and the numerous industrial plants along the
Inner Harbor Navigation Canal. Westward of the above described line
approximately 460,000 acres of land are subject to inundation. This
area includes a major part of metropolitan New Orleans. The extent
and character of the flooded areas within the several subareas are
as follows:

47

a.   St. Charles Parish.  The total area subject to inundation is 29,600 acres comprised of 630 acres of residential development; 740 acres of commercial and industrial development; 1,710 acres of open land; 15,450 acres of swamp and 11,070 acres of marsh.  An oil field occupies about 1,000 acres of swamp.  The Illinois Central and the Louisiana and Arkansas railroads, and U. S. Highway 61 cross the flood plain.  The lack of flood protection from Lake Pontchartrain and inadequate drainage have hindered the development of this area except for the high ground located near the Mississippi River and limited development along U. S. Highway 61.

b.   Jefferson Parish.  The total area subject to overflow is 21,500 acres comprised of 6,190 acres of residential development; 1,040 acres of commercial and industrial improvements; 1,950 acres of other developments; 7,870 acres of open land; and 4,450 acres of woodland.  The overflow area covers about 70 percent of eastern Jefferson Parish.  The New Orleans International Airport, Moisant Field, U. S. Highway 61, and the approach to the Greater New Orleans Expressway Bridge are located within the flood plain.  This area has experienced a rapid growth since about 1946 and its steady growth will continue.

c.   New Orleans.  The area subject to inundation, comprising about 65 percent of the land area of this segment of New Orleans, is 16,800 acres including 11,120 acres of residential development; 1,900 acres of commercial and industrial development; and 3,780 acres of other developed areas.  Essentially all of the area is developed to the extent of having streets and utilities and about 95 percent of the area available for residences and other improvements is occupied.

d.   Citrus.  The area subject to flooding, comprising all of the Citrus area, is 14,800 acres, including 1,610 acres of residential development; 1,210 acres of commercial and industrial development; 540 acres of other development; 2,335 acres of open land; and 9,105 acres of swamp, woodland, and marsh.  The portion of the area north of U. S. Highway 90 is zoned mainly for residential use, and the area adjoining and south of U. S. Highway 90 is zoned mainly for commercial and industrial use.  The residential development in this area began after 1946 and its continued steady growth is anticipated.  Substantial industrial and commercial development has taken place and water transportation available on the Gulf Intracoastal Waterway and the Mississippi River-Gulf Outlet will insure continued steady growth.

e.   New Orleans East.  The entire area of New Orleans East is subject to overflow.  Approximately 18,300 acres are in the area, of which 3 acres are presently occupied by residences and about 5 acres are occupied by commercial developments.  Plans are being developed for installing drainage, streets, and utilities on the 18,300 acres situated within the levees.  Some 7,000 acres will

48

be residential; 1,200 acres will be commercial; and 4,500 acres will be other development, all located north of the present U. S. Highway 90. Some 5,600 acres south of U. S. Highway 90 are planned for industrial development.

 f. <u>Mandeville.</u>  About 600 acres within the town of Mandeville are subject to overflow.  Approximately 590 acres are covered by residences and the park behind the seawall, and 10 acres are occupied by commercial establishments.  The section of the town subject to flooding has been essentially developed for many years and future growth is expected to be moderate.

 g. <u>Remaining areas on the shores of Lake Pontchartrain.</u>  About 348,000 acres of land outside of the subareas described above are subject to overflow.  Of this area, 2,025 acres are residential and 95 acres are commercial development, the major part of which is in and near Slidell, 7,600 acres are open land, and 338,280 acres are marsh and swamp.  Open land is used primarily as range pasture.  Substantial residential and commercial growth is indicated for the areas around Slidell.  About 5,700 acres of marsh situated between the New Orleans East levee, the shore of Lake Pontchartrain, and Chef Menteur Pass is planned for so-called Florida-type development consisting of numerous dredged waterways with the spoil utilized as land fill material.  About 2,400 acres will be residential; 1,900 acres of commercial and other development; and 1,400 acres industrial.

 h. <u>Chalmette.</u>  The total Chalmette area in Orleans and St. Bernard Parishes consists of 29,230 acres.  The area within the existing Chalmette back levee, 10,400 acres, includes 3,190 acres residential development, 1,290 acres commercial and industrial, 160 acres other development, 1,810 acres open land, and 3,950 acres woodland.  This area has experienced a rapid growth since about 1951 and future steady and increasing growth is indicated.  The remaining 18,830 acres of marsh and swamp land outside the Chalmette levee system is undeveloped.  The 5,000 acres west of Paris Road is expected to develop rapidly on completion of the Gulf Outlet.  Development of the remaining 13,830 acres is more remote.

12.  HURRICANE FLOOD DAMAGES

 a. <u>Flood damage surveys.</u>  Flood damage surveys were made of this region following the occurrences of hurricane "Flossy" on 23-24 September 1956 and hurricane "Audrey" on 27 June 1957.  Factual data for the hurricane of 19 September 1947 were obtained from the results of surveys conducted by two private firms for local governmental agencies, compilations by individuals and business concerns, and results of surveys by Federal, state, and local governmental agencies.

49

(1)  The hurricane of 19 September 1947 caused severe flooding along the south shore of Lake Pontchartrain.  In Jefferson Parish, flood waters inundated about 21,000 acres of land and 2,800 residential and commercial buildings.  Wave action along the New Orleans seawall resulted in extensive erosion of backfill and collapse of much of the adjoining concrete sidewalk.  The lakeshore development area landward of the wall, some 1,725 acres in extent, was subjected to sheet flow to a depth of 2 feet at several places and the water flowed into the lower areas south of original shore line, flooding some 4,000 acres additionally.  Breaks in the railroad embankment resulted in the flooding of about 900 acres of partially developed residential area east of the Inner Harbor Navigation Canal.  Overtopping of the Chalmette back levee caused flooding of about 4,000 acres of land between the Chalmette and Violet communities.  Wave action and tidal flooding destroyed or damaged numerous camps and small business buildings along the shore of the lake, U. S. Highways 90 and 11, and the Louisville and Nashville Railroad.  U. S. Highways 90, 11, and 51 were inundated and closed for several days.  The track, ballast, and trestles of the Louisville and Nashville Railroad were severely damaged.  The Illinois Central Railroad ballast was damaged at several locations. A total of 12 lives was lost.

(2)  Hurricane "Flossy" in 1956 caused overtopping of the New Orleans seawall for practically its entire length by waves (see fig. 2), but damage was caused only to about 1,450 acres of residential area between the London Avenue Canal and the Southern Railway.  The St. Bernard Parish back levee between Chalmette and Violet was overtopped and crevassed, flooding 4,700 acres (see fig. 2).  Damage was sustained by several business establishments along the Inner Harbor Navigation Canal, and by numerous camps and commercial establishments along the lakeshore, and along U. S. Highways 90 and 11.  Traffic was stopped on U. S. Highways 11, 90, and 51 for about 2 days and the Louisville and Nashville Railroad lost one day of operation.

(3)  Tidal overflow resulting from hurricane "Audrey" in 1957 was confined to the low marsh and swamp areas and caused no damage of consequence in the study area.

b.  Experienced damages.  The hurricane of 19 September 1947 caused flood damage of about $6,600,000 in the study area, including $3,900,000 in eastern Jefferson Parish, $1,210,000 in New Orleans, $40,000 in St. Bernard Parish, and $1,450,000 in areas outside of local protection systems.  Flood damage in the study area from "Flossy" in 1956 amounted to $1,523,000, of which $261,000 was in New Orleans, $459,000 in St. Bernard Parish, and $803,000 in areas outside of the protective works.

c.  Estimates of probable future damages.  Flood damage data from experienced hurricanes are of little value in estimating future



Photo Courtesy of The Times-Picayune

Overtopping of Lake Pontchartrain seawall at New Orleans in vicinity of Inner Harbor Navigation Canal by waves during abating hurricane, 24 Sept 1956.



Typical scene of flooding in St. Bernard Grove Subdivision, located on Louisiana State Highway No. 39, approximately one mile east of Paris Road, 25 Sept 1956.

Fig. 2

probable damages from major hurricanes approaching the SPH for several reasons. Rapid development makes obsolete all but the most recent data. Partial protection works are effective against the moderate hurricanes of the past 20 years. Thus, hurricanes of magnitude somewhat larger than those of recent experience and approaching the SPH occurring under present conditions of protection and development would cause damage of catastrophic proportions. The calculated damage within the study area that would result from an occurrence of the standard project hurricane under the present state of development is in excess of $475,000,000.

d.   Average annual damages. Average annual losses from tidal flooding were derived by correlating stage-damage, stage-frequency, and damage-probability relationships. The derivation of stage-frequency curves is described in appendix A. Details on estimates of average annual damages are contained in appendix C. Average annual damage, based on December 1961 price levels and present development, is estimated as follows:

## Average Annual Damage

| Area | Damage |
|---|---|
| St. Charles Parish | $     9,400 |
| Jefferson Parish | 2,256,000 |
| New Orleans | 2,741,100 |
| Citrus | 4,497,000 |
| New Orleans East | None |
| Mandeville | 62,400 |
| Remaining areas along shores of Lake Pontchartrain | 112,100 |
| Subtotal | $ 9,678,000 |
| Chalmette | $ 1,212,000 |
| Inner Harbor Navigation Canal | 90,000 |
| Unprotected areas adjacent to Lake Borgne | 100,000 |
| Study area total | $11,080,000 |

13.   EXISTING CORPS OF ENGINEERS' PROJECTS

The existing projects in the study area are as follows:

a.   The Flood Control, Mississippi River and Tributaries project, authorized by the Flood Control Act of 15 May 1928, as amended, includes, among other features, the Mississippi River levee system, the Bonnet Carre Spillway guide levees, and the lakefront levee in Jefferson Parish. The costs of features of work within the study area are not separable from total project costs. Further information on this project is contained in "Report of the Mississippi River Commission" in "Annual Report of the Chief of Engineers, U. S. Army on Civil Works Activities, 1961."

b.   The Mississippi River-Gulf Outlet, La., authorized by Public Law 455, 84th Congress, 2d Session, as a modification of the Mississippi River, Baton Rouge to the Gulf of Mexico, La. project (described in appendix I) will provide a tidewater channel 36 feet deep and 500 feet wide, extending from the Inner Harbor Navigation Canal in New Orleans to the Gulf of Mexico.  As of 30 June 1961 the project was 20 percent complete and the funds expended for construction were $18,912,713.

c.   The Gulf Intracoastal Waterway project extending from Florida to Brownsville provides a channel 12 feet deep by 125 feet wide through this area, except in the section between Lake Borgne and New Orleans which has a width of 150 feet.  The project provides for a 9-foot channel from the Inner Harbor Navigation Canal across Lake Pontchartrain and through the Rigolets.  The costs for these improvements are not separable from the total cost of the project within Louisiana.  For further details on this project, see the "Annual Report of the Chief of Engineers, U. S. Army, on Civil Works Activities, 1961."

d.   The following additional Corps of Engineers' projects within the study area are described in appendix I:

(1)  Mississippi River, Baton Rouge to the Gulf of Mexico, La.

(2)  Pass Manchac, La.

(3)  Bayous La Loutre, St. Malo, and Yscloskey, La.

(4)  Chefuncte River and Bogue Falia, La.

(5)  Tangipahoa River, La.

(6)  Bayou Lacombe, La.

(7)  Bayou Bonfouca, La.

(8)  Amite River and Bayou Manchac, La.

(9)  Amite River and Tributaries, La.

(10) Tickfaw, Natalbany, Ponchatoula, and Blood Rivers, La.

14.  IMPROVEMENTS BY OTHER FEDERAL AND NON-FEDERAL AGENCIES

a.   Federal.  No other Federal water resource projects exist in the study area.

53

b.   Non-Federal.  All of the protective works and drainage facilities described in par. 4.e., exclusive of those outlined in par. 13.a., were constructed through the combined efforts of the State of Louisiana, local levee and drainage districts, and parish police juries, and all excepting the Mississippi River and Bonnet Carre levees are being maintained by local interests.

## SECTION III - PROBLEMS UNDER INVESTIGATION

15.  IMPROVEMENTS DESIRED

a.   Public hearings.  Three public hearings were held to obtain data on hurricane problems and the views of local interests relative to their solution.  The hearings at New Orleans, Morgan City, and Lake Charles, Louisiana, on 13, 15, and 20 March 1956, respectively, were attended by about 50 representatives of business, transportation, industrial interests, civic organizations, and Federal, state, and local agencies.  Reflecting the preponderance of local opinion, local interests and the State of Louisiana, Department of Public Works, requested that maximum consideration be given to the provision of protective works required to safeguard lives and property from hurricane damage and to the development of an adequate warning system, and indicated that they would actively support the studies.  A transcript of the public hearings is presented in supplement 2, published separately.  Subsequent to the public hearings and hurricane "Flossy" in September 1956, letters requesting studies of protective measures and commenting on proposed plans of improvement were received from local governmental offices, civic associations, sportsmen's organizations, and residents.  A number of meetings and conferences were held with representatives of state agencies as the details of the plans were developed.

b.   Proposals by local interests.  Local interests in New Orleans suggested an offshore breakwater extending the full length of the existing seawall.  St. Charles Parish interests proposed the construction of a lakeshore levee between Bonnet Carre Spillway and the Jefferson Parish boundary, coupled with the establishment of a drainage district.  Representatives of Jefferson Parish requested a continuance of levee maintenance.  Residents and local officials of the north shore of Lake Pontchartrain were concerned with a shore erosion problem which is accelerated during the occurrence of hurricanes.  Construction of a seawall was proposed as a possible solution.  Interests in Mandeville requested a new seawall.  Local interests in Orleans and St. Bernard Parishes requested the construction of a levee along Paris Road, between the Mississippi River-Gulf Outlet and the Chalmette back levee, and along the Gulf Intracoastal Waterway to provide protection to approximately 9 square miles of undeveloped lands west of Paris Road.  Interests in St. Bernard Parish also informally requested the construction of levees along the Mississippi River-Gulf Outlet from Paris Road to Bayou Dupre and

54

thence along the bayou to the Chalmette back levee to provide protection to an additional area of approximately 22 square miles of undeveloped lands.

16. HURRICANE FLOOD PROBLEMS, RELATED PROBLEMS, AND SOLUTIONS CONSIDERED

a.   Hurricane flood problems.   The area surrounding Lake Pontchartrain is susceptible to flooding from wind-driven hurricane tides from the lake.  This condition is aggravated by increases in lake level resulting from the influx of surges from Lake Borgne and the Gulf of Mexico that accompany hurricanes from the southeast, south, and southwest.  Historical hurricanes have produced recorded stages up to 13 feet on the southwest shore of the lake, 6.2 feet at the south shore, 7.1 feet at the southeast shore, and 7.7 feet at the north shore.  Overtopping of protective works and flooding of developed areas have occurred several times during recent hurricanes.  The 1947 hurricane caused extensive flooding in Jefferson Parish when a lakeshore embankment that was in a poor state of repair proved inadequate to prevent overtopping, even though the stage was only about 5 feet.  Considerable overtopping of the New Orleans seawall occurred during this storm and about 9 square miles of residential area were flooded.  In 1956, the New Orleans seawall was again overtopped, resulting in the flooding of about 2.5 square miles of residential and commercial area in the lakefront area, fig. 3.  On the north shore in 1915, the 7.7-foot stage flooded a considerable area of the land.  Wave action during moderate to high lake stages has undercut the existing seawall at Mandeville causing the backfill which was subsequently developed into a public park to slump and the seawall to become hazardous as a hurricane protective structure. The 13-foot stage experienced at the southwest shore during the 1915 storm caused extensive flooding in the marsh to the west of Lake Maurepas.  On several occasions, the marsh area between Lake Pontchartrain and Lake Borgne has been flooded by stages up to 11 feet.  Much of the developed area in New Orleans and Jefferson Parishes is below lake level, some land being as low as 7 feet below mean sea level, with a considerable portion lower than 2 feet below mean sea level.  Flooding as deep as 16 feet above ground level could result from severe overtopping.  Stages attending a standard project hurricane would cause overtopping of all existing protective works by several feet and ponding in the developed areas.  The pumping system on which removal of all flood waters is dependent would be inoperable for an extended period of time.  This prolonged inundation would cause enormous damage to private and public property, create serious hazards to life and health, disrupt business and community life, and require immense expenditure of public and private funds for evacuation and subsequent rehabilitation of local residents.

b.   Related problem.   Prior to the initiation of construction of the Mississippi River-Gulf Outlet the interchange of tidal flow between Lake Pontchartrain and Lake Borgne was through the Rigolets, Chef Menteur Pass, and the Gulf Intracoastal Waterway-Inner Harbor Navigation Canal channel.  Salinities of the incoming tides from Lake Borgne were controlled primarily by fresh water flows from the Pearl River basin and brackish water outflows from Lake Pontchartrain.



Photo Courtesy of The Times-Picayune

Aerial view of general inundation in Gentilly Area of New Orleans
behind Lakefront, looking west from Peoples Ave., between Inner Harbor
Navigation Canal and London Ave., 24 Sept. 1956.



Photo Courtesy of The Times-Picayune

View of typical residential flooding at St. Roch Ave. and Vienna St.
in Gentilly Area, 24 Sept 1956.

Fig. 3                                        56

Upon completion of the Gulf Outlet, tidal flows also will enter Lake
Pontchartrain directly through the Inner Harbor Navigation Canal via
the enlarged Gulf Outlet channel to Breton Sound and to the Gulf of
Mexico without first passing through Lake Borgne. Thus, salinities
in the lake will be increased significantly. Current velocities in
the Inner Harbor Navigation Canal have increased notably as construc-
tion of the Gulf Outlet progresses with a corresponding increase in
navigation difficulties and the creation of major scour problems
along existing bridges and harbor developments. The restricted sec-
tion through the Seabrook Bridge has enlarged greatly since the
initiation of construction of the Gulf Outlet. These conditions
will worsen as the channel approaches completion.

    c.   Protective measures considered.

    (1)  General.  Preliminary studies indicated that the ex-
tensive marsh, swamp areas, and water bottoms experience a minor
degree of damage from hurricane tides and that protective works
are impracticable and uneconomical. Hence, detailed studies were
not made of these areas. These preliminary studies revealed that
justification could be established for the highly developed and
inhabited portions of the study area on the north and south shores
of Lake Pontchartrain and in the vicinity of Chalmette, and that
solution of the problems created by the Mississippi River-Gulf
Outlet was required.

    (2)  Protective structures.

    (a)  The problems of excessive current velocity and
scour in the Inner Harbor Navigation Canal and increased salt water
intrusion into Lake Pontchartrain caused by the Mississippi River-
Gulf Outlet can be solved only by construction of a lock in the
system which can also be utilized to regulate salinity intrusion.
The logical site for such a structure is at the Lake Pontchartrain
end of the Inner Harbor Navigation Canal at Seabrook. This struc-
ture, if raised to the required height, will also serve as an essen-
tial part of the barrier plan by preventing the entry of hurricane
surges from the lake through the Gulf Outlet.

    (b)  Protection plans for the areas bordering Lake
Pontchartrain were of two types. One plan, the high level plan,
contemplated raising, strengthening, and extending the existing
protective systems to meet design hurricane requirements. The
other plan, the barrier-low level plan, involved the control
of hurricane stages in Lake Pontchartrain by construction of a
barrier along the east shore of the lake together with a lesser
modification of protective works fronting the lake. Protective
systems facing Lake Borgne, including the levees along the Inner
Harbor Navigation Canal, the Gulf Intracoastal Waterway, and the
Gulf Outlet were high level, being unaffected by the barrier. The
high level plan, estimated to cost approximately $100 million, was
determined to be much more costly than the barrier-low level plan
and to require a much longer construction period in view of the

**57**

required height of levees and poor foundation conditions.  Therefore, detail study was limited to the barrier-low level plan.

 _.          (c)  An offshore breakwater was considered for the New Orleans reach to alleviate the erosion problem behind the New Orleans seawall.  It was found that such a structure, while effectively reducing wave action at the seawall, would not prevent overtopping of the seawall and its appurtenant back levee by major hurricane tides.  In the meantime, local interests have repaired the erosion damage in such a manner as to prevent its recurrence, and they now consider that erosion is no longer a major problem and that such a breakwater is unnecessary and undesirable.  A letter expressing the views of the Board of Levee Commissioners of the Orleans Levee District is presented in appendix G.

           (d)  Several plans were studied for the Chalmette area. One contemplated the enlargement of the existing Chalmette back levee. Another envisioned construction of the hurricane protective system along the south bank of the Gulf Outlet, extending from the Inner Harbor Navigation Canal to Bayou Dupre with gravity drainage structures in Bayou Bienvenue and Bayou Dupre.  The existing Chalmette back levee and drainage system would remain in effect.  An intermediate plan, extending the expanded protective system only to Paris Road, was also studied.  The Gulf Outlet levee system protecting the maximum area was found to be most practicable.  Its cost was essentially no higher than the lesser protective systems and it offered substantial additional benefits for the future.

           (e)  Replacement of the existing seawall at Mandeville by a new wall along the present alignment or offshore was found to be excessive in cost.  The wall alone would cost about $850,000.  It was found that strengthening the existing wall in conjunction with the Lake Pontchartrain barrier would provide adequate hurricane protection.  The addition of a levee landward of the wall to increase the height of protection was not justified.

           (f)  The provision of an offshore seawall for Citrus in lieu of the levee at this location also was investigated, but excessive construction costs precluded detail study of this proposal.

           (g)  The erosion problem along unprotected reaches of the north shore of Lake Pontchartrain was found to be primarily one of beach erosion control which can be studied under other existing legislation and which is not within the purview of the hurricane study authority, hence a detailed study was not made.  Erosion control studies of these reaches will require appropriate resolution from the Public Works Committee of either the U. S. House of Representatives or Senate as provided by Section 110 of Public Law 87-874.  This Act provides for surveys of coastal areas of the United States in the interest of beach erosion control, hurricane protection, and related purposes.

           (h)  Local interests requested that the barrier levee be located along the Gulf Intracoastal Waterway from the existing levee to and across Chef Menteur Pass, in order to protect a larger

area of land from Lake Borgne stages. Construction of a closure dam
together with a combined control structure and navigation gate in
the pass between the railroad bridge and the Gulf Intracoastal Water-
way presents a number of unusual and complex problems, of seepage,
settlement, and structural stability under design conditions. In
addition, the navigation gate could not be converted to a lock if
later found necessary. Accordingly, a detail study was not made.

(3) <u>Hurricane warning and flood evacuation measures.</u>

(a) Experience in recent past hurricanes along the
Louisiana coast indicates that inhabitants of the low areas are not
fully responsive to the adequate and timely hurricane warnings of the
U. S. Weather Bureau. Some leave promptly, some prefer to remain,
and others elect to evacuate after such action is no longer feasi-
ble. This last group creates the major problem and usually suffers
greatest mortality. Action is necessary at the local or state
level to implement the warnings and coordinate timely evacuation
while such action is still feasible. The populace of the vulner-
able communities must be made fully cognizant of advance hurricane
preparedness planning, and advised of the inherent danger of in-
decision after evacuation warnings have been issued. Local
authorities should be informed of the potential hurricane stages
along the coastline and the estimated time of arrival, thereby
helping to determine the approximate number of hours left before
roads become flooded.

(b) Highways traversing the unprotected portions
of the problem area adjacent to the east bank of the Mississippi
River and the shores of Lake Pontchartrain serve as evacuation
routes for the populace prior to the time of occurrence of maxi-
mum hurricane tides. These highways have minimum elevations rang-
ing from 4 to 6 feet, and the majority are located some distance
inland from open waters. Ample time is available for safe and
orderly evacuation to protected areas should the populace of
low-lying unprotected areas heed warnings of the authorities.

(4) <u>Zoning regulations and building codes.</u> Public
buildings in unprotected areas including schools, churches,
auditoriums, and gymnasiums should be designed with upper floor
elevations above the height of hurricane surges, and of adequate
structural stability to withstand wind and wave forces to be
anticipated. Building codes should require sturdy structures in
places where buildings and homes are subject to destruction
by hurricane surges, and zoning regulations should restrict con-
struction in critical flood areas. Provisions for the future
construction of havens of refuge are dependent upon the enactment
of legislation by state and local authorities prescribing zoning
regulations and building codes.

d.   Model study.

(1)  The control structures in the Rigolets and Chef
Menteur Pass as elements of the barrier plan were early recognized
as potentially hazardous to the established salinity and circulation
patterns in Lake Pontchartrain.  In order to determine the economical
proportions and design of these structures and evaluate their ef-
fect on the ecology of the lake a model study of the problem was
determined to be necessary.  The model included Lakes Pontchartrain,
Maurepas, and Borgne and a portion of Mississippi Sound, to scales
of 1:2000 horizontally and 1:100 vertically.  Tests were run to
verify the salinity and flow patterns under existing conditions.
The model was then altered to include the Mississippi River-Gulf
Outlet.  Tests were made to determine the severity of any increase
in salt water intrusion into Lake Pontchartrain, the extent of
change in salinity gradient in the lake, the increase in channel
velocities that ultimately will result from construction of the
project, and the effect of prolonged closure of any structure upon
the salinity of the lakes and the channel areas.  Tests were then
run with barrier structures of several sizes for representative
years of low and high rainfall inflow into the area, and with the
Bonnet Carre Spillway in operation during a flood year.  Storm
effects were excluded as being impracticable of model determina-
tion.  A description and the results of this model study are
presented in supplement 3 to this report, published separately.
A description of the program for the collection of prototype data,
and the data are presented in supplement 4 to this report, pub-
lished separately.

SECTION IV - PROPOSED SOLUTIONS AND PROJECT FORMULATION

17.  PLANS OF PROTECTION

a.   General.  The most effective plan to protect the develop-
ments and the navigation along the Inner Harbor Navigation Canal
from high velocities, and to prevent excessive saltwater intrusion
into Lake Pontchartrain involves a lock and dam at Seabrook.  This
feature is necessary to correct the adverse conditions resulting
from construction of the Mississippi River-Gulf Outlet.  The most
effective plan for the control of hurricane tides along the shores
of Lake Pontchartrain involves the construction of a barrier along
the eastern boundary of the lake with navigation and hurricane con-
trol gates in Chef Menteur Pass and the Rigolets.  These protective
works, together with the strengthening and extension of existing
protective works and the raising of the Seabrook Lock and dam will
afford full protection to the south shore from Bonnet Carre Spill-
way to the eastern limit of the city of New Orleans.  Levees along
the Gulf Intracoastal Waterway and the Inner Harbor Navigation
Canal, and a new back levee for the Chalmette area would complete
the protective system.  Strengthening of the existing seawall at

Mandeville on the north shore at its present height will insure that future hurricanes will not seriously damage this resort community.

b.  Design hurricane.  Areas to be protected are highly developed for residential, commercial and industrial use, or have immediate potential for such development.  Because of the serious threat to human life and property involved, the design of the protective plan must be based on the standard project hurricane for the region, as described in paragraph 9.  Additional details pertinent to the design hurricane are shown in appendix A.

c.  Design elevations.

(1)  Mississippi River-Gulf Outlet, Seabrook Lock.  The lock and dam at Seabrook will be adequate to provide navigation between the Inner Harbor Navigation Canal and Lake Pontchartrain for any combination of tides up to 3 feet and winds up to 25 m.p.h.  Navigation by barge traffic is not considered practicable under conditions of higher tides or winds.  All components of the lock and dam will have crest elevations of 7.2 feet except the control houses which will have floor elevations of 12.2 feet.

(2)  Hurricane protection plan.  The elevations of protective structures were established by computing the most critical combination of wind tide level and corresponding significant wave runup for the design hurricane for each reach.  With the barriers and connecting levees in place and operating, the occurrence of the design hurricane would produce a mean lake level of approximately 2 feet and maximum wind tide levels between 5.5 and 6.5 feet along the south shore of Lake Pontchartrain, 6.5 feet at Mandeville, 11 feet at the barrier, between 12 and 12.5 feet along the Gulf Intracoastal Waterway and the Mississippi River-Gulf Outlet, and 12 feet along the Inner Harbor Navigation Canal.  Levee grades were determined by adding an amount equal to wave runup for the significant wave to these maximum wind tide levels.  Runups range between 2 and 4.5 feet, the exact amount dependent upon the types of structures, slopes of structure, water depths, and wave characteristics.  The elevation of the barrier has an allowance of approximately 1 foot above design hurricane surge elevation, because in this reach overtopping can be allowed that does not significantly alter the mean lake elevation.  Additional details pertaining to the hydraulic design of the structures are presented in appendix A.

d.  Description of the plans.  The major features of the plans are described in the following paragraphs.  Additional details are shown in appendix E.

(1)  Mississippi River-Gulf Outlet, Seabrook Lock.  The lock and dam at Seabrook will be located lakeward of the existing Southern Railway bridge, as shown on plate 4.  The chamber will be

61

84 by 800 feet with sill elevation at -15.8 feet. Gates will be 60-degree radial type. The walls will be composed of 54-inch round pre-stressed concrete shells 5 inches thick on 5.5-foot centers filled with sand and capped. Reinforced concrete sections comprise the filler wall between piling. Chamber bottom is riprap on a shell blanket. The landward sector gate structure will be connected to the existing seawalls along the shore by a rockfill embankment. Riprap aprons will be provided at both ends.

### (2) Lake Pontchartrain barrier plan.

(a) Barrier levee. The barrier levee, which will extend between the New Orleans East levee and the high ground about 2 miles north of the Rigolets, will have a crest elevation of 9 feet and a crown width of 10 feet, as shown on plate 7. It will utilize the embankment of U. S. Highway 90 where its grade is adequate and will require adjacent levee construction east of the highway where the highway grade is inadequate. The total length of this levee enlargement is 5.6 miles.

(b) Chef Menteur Pass. The barrier structure at Chef Menteur Pass will consist of a gated control structure, navigation channel and floodgate, closure dam, and flanking and connecting levees, as shown on plate 5. The concrete control structure with a crest elevation at 14.0 feet, and a sill elevation at -25 feet will consist of 8 bays with vertical lift steel gates, 50 feet on centers, and will be 700 feet in length between abutments. The gates will be operated by a gantry crane. The approach channels will flare at a 12.5° angle horizontally and slope downward from the sill on 1 on 10 slopes to natural bottom. Riprap aprons 50 feet wide both upstream and downstream will prevent erosion of the channel bottom adjacent to the structure. The sector-gated navigation floodgate, shown on plate 5, will have a crest elevation at 14 feet, a width of 56 feet, and a sill elevation of -12 feet. The connecting channels will have a bottom width of 100 feet at an elevation of -12 feet. The closure dam, earthfill with riprap slope protection, will have a crest elevation of 14 feet and a crown width of 20 feet, as shown on plate 7. The grade of the levees adjacent to the structures and the closure dam will have a crest elevation of 14 feet for a minimum distance of 100 feet. The high grade will extend continuously between the closure dam and the control structure.

(c) Rigolets. The barrier structure at the Rigolets will be similar to that at Chef Menteur Pass except that a navigation lock will replace the floodgate, and with other exceptions, as noted and as shown on plate 6. The control structure will have a sill elevation at -20 feet and will consist of 23 50-foot bays for an overall length of 1,450 feet. Incorporated into the structure will be a roadway for the relocation of U. S. Highway 90. The lock chamber will be 84 by 800 feet with sill

elevation at -14 feet as shown on plates 6 and 8. Gates will be 60-degree radial type. The chamber walls are composite type with concrete sheet piles to elevation -2 feet mounted by buttress walls and stabilized by concrete batter piles. Chamber bottom is riprap on a shell blanket. The west gate bay along the barrier alignment will have a crest elevation at 14 feet, and the chamber and east gate a crest elevation at 6 feet. Connecting channels will have bottom widths of 100 feet at an elevation of -14 feet. A minor relocation of U. S. Highway 90 is required.

(d)   Seabrook. A dual purpose control structure is required to complete the Lake Pontchartrain barrier system and prevent the entry of hurricane tides through the Mississippi River-Gulf Outlet. The Seabrook Lock, required as a feature of the Mississippi River-Gulf Outlet and described in par. 17.d.(1) above, may be utilized for this purpose by increasing the grade of the rock dike and the landward gate bay to an elevation of 13.2 feet, as shown on plate 9.

(e)   St. Charles Parish. The plan provides for the construction of a new levee 5.5 miles in length along the St. Charles Parish lakeshore from the Bonnet Carre Spillway to the east St. Charles Parish boundary. The levee, shown on plate 10, will have a crown elevation of 10 feet and a crown width of 20 feet with slope protection on the lakeside extending from 15 feet beyond the toe to elevation 6.5 feet. A lateral return levee will extend 3.8 miles along an existing canal adjacent to the east St. Charles Parish line to the Illinois Central Railroad. The levee grade will be elevation 8 feet and the crown width 15 feet, as shown on plate 11. Interior drainage ditches will be provided along the entire length of both levees, as shown on plate E-1, appendix E. A drainage structure, as shown on plate 12, will be constructed at the lake end of the lateral levee, equipped with flapgates to provide maximum drainage with tidal fluctuations in the lake, and obviate the employment of operating personnel at the inaccessible site. Additional details related to the hydraulic design for interior drainage are shown in appendix A. Alteration of one 16-inch pipeline crossing will be required.

(f)   Jefferson Parish. The grade and section of the existing Jefferson Parish levee system are adequate. The existing riprap slope protection along the lakefront will be extended upward to elevation 6.5 feet. Length of the improvement is 9.7 miles. A typical section is shown on plate 10.

(g)   New Orleans. The existing low levees landward of the seawall in this 4.1-mile reach will be raised to an elevation of 11.5 feet, as shown on plate 10. The ramping of streets will be required at 12 locations of levee crossings, as shown in appendix E. The levee along 5.8 miles of the Inner Harbor Navigation Canal can be raised only by construction of a

63

sheet piling wall with concrete cap at elevation 13 feet in the crown of the existing levee. Stoplog structures will be provided at an elevation of 13 feet for crossings of the Southern Railway at Seabrook and Florida Avenue, and of the Louisville and Nashville Railroad. Low bridge crossings over London Avenue at Robert E. Lee Boulevard and Gentilly Boulevard will require minor sandbagging for the occurrence of a design hurricane.

(h)  Citrus.  A levee 4.5 miles in length will be constructed lakeward of the existing railroad embankment with a crest elevation of 11 feet and a crown width of 20 feet, as shown on plate 10. Riprap slope protection will be provided on the lake-side slope below elevation 6.5 feet. Incorporation of the railroad embankment in the protective levee was impracticable because of the heterogeneous nature of the fill and because of adverse effects on the railroad facilities. Other features include a stoplog structure at the entrance to Lincoln Beach, modification of the existing Citrus pumping station outfall, and the Lincoln Beach protection walls. The Inner Harbor Navigation Canal levee on the east side, 3.1 miles in length, will be raised by sheet pile construction similar to that described for the west side. Stoplog structures also will be required for the three railroad crossings on the east side similar to those previously described for the west side. The Citrus levee, 7.4 miles along the Gulf Intra-coastal Waterway, will be enlarged to an elevation of 13 feet west and 16 feet east of Paris Road, as shown on plate 11. Riprap foreshore protection against erosion by wave wash from shipping will be provided.

(i)  New Orleans East.  A levee 6.3 miles long will be required lakeward of the railroad embankment. It will have a crest elevation of 10 feet and a crown width of 20 feet, and rip-rap slope protection on the lakeside below elevation 6.5 feet, as shown on plate 10. Other features include modification of two pipeline crossings and alteration of an existing drainage culvert. The existing levee from South Point to U. S. Highway 90 is adequate. From this point to the Gulf Intracoastal Waterway, and thence along the waterway the levee will require enlargement for a distance of 9.3 miles to a crest elevation of 16 feet with a crown width of 10 feet, as shown on plate 11. Riprap foreshore protection against wave wash from shipping is required. Other features include a stoplog structure for the Louisville and Nashville Railroad cross-ing and modification of two pipeline crossings.

(j)  Mandeville.  The existing seawall at Mandeville will be strengthened by the placement of a shell backfill to an elevation of 5 feet and a riprap blanket along the toe in the lake to an elevation of 1 foot along the entire length of the existing wall, and construction of 200 feet of concrete sheet pile wall to an elevation of 6 feet (see plate 10).

(3)  Chalmette protection plan.  The plan provides for the construction of a new levee 13.5 miles in length along the south

shore of the Mississippi River-Gulf Outlet from the Inner Harbor
Navigation Canal to Bayou Dupre, thence along the west bank of the
bayou for a distance of 3.8 miles to Violet. The levee, shown on
plate 11, will have a crown width of 10 feet and a grade of 13
feet west of Paris Road and 16 feet east of Paris Road. Riprap
foreshore protection against erosion by wave wash from shipping
will be provided. A sheet piling wall with concrete cap, with
crest elevation of 13 feet and similar to that for the New Orleans
reach, will be required for a distance of 1 mile along the Inner
Harbor Navigation Canal levee. Gravity drainage structures will
be required in the levee at Bayou Bienvenue and at Bayou Dupre.
These will be of the sector gate type designed to pass small
boats and tidal flows. Other features include alteration of five
pipeline crossings and the construction of a stoplog structure at
the Florida Avenue crossing of the Southern Railway.

   e.   Construction. The generally adverse foundation condi-
tions and the methods of construction that must be utilized will
require that the levees be built in from one to as many as six
stages or lifts, with a minimum interval of 2 years between lifts.
Levees requiring four lifts or less will be based in one lift
and require only the shaping of the fill in place to accomplish
the succeeding lifts. Levees requiring five or more lifts will
be constructed by multiple castings of fill and shapings.
Adequate allowances have been made for shrinkage and settlement
during and after construction. Typical sections shown on plates
5, 6, 7, 10, and 11 are representative for the various reaches.

   f.   Operation and maintenance.

      (1)  The control structures will be operated to main-
tain a mean lake level not exceeding 2 feet during periods of
hurricane hazard, as defined by advisories and forecasts from
the U. S. Weather Bureau. The gates will be kept closed during
hurricane periods and until stages return to normal. At all
other times the control gates at the Rigolets and at the Chef
Menteur Pass will remain open. The lock structures at the Rigo-
lets and at Seabrook will be operated as necessary to permit
navigation until the lock chamber walls are overtopped by
rising hurricane tides, at which time the higher level gate will
be closed and remain closed until tides recede. Under normal
tide conditions, the Rigolets Lock can be left open whenever
velocities are not excessive. The Seabrook Lock will be oper-
ated in cooperation with the U. S. Fish and Wildlife Service to
control the salinity in Lake Pontchartrain and in the Missis-
sippi River-Gulf Outlet area provided such operation will not
interfere with navigation.

      (2)  The physical operation and maintenance of all
project features, with the exception of the two lock structures

and the Rigolets navigation channel, will be the responsibility
of local interests.  The Seabrook Lock will be maintained and
operated by and at the expense of the United States as a feature
of the Mississippi River-Gulf Outlet project.  The Rigolets lock
and channel will be maintained and operated by the United States
in the public interest but the costs for operation and mainte-
nance will be contributed by local interests as a feature of local
cooperation of the hurricane project.

18.  OTHER DESIRABLE IMPROVEMENTS

    a.  Hurricane preparedness plans.  Each coastal community
should organize a permanent committee of parish and local officials
essentially in accordance with the recommendations outlined in the
U. S. Weather Bureau report, National Hurricane Research Project,
Report No. 28, March 1959.  The committee would establish a pre-
paredness plan; direct a public educational program on the hazards
of hurricanes and the need for desirable protective measures;
maintain preparations for a hurricane emergency; and direct
evacuation when authorized, and rescue work when necessary.  The
committee would utilize and coordinate the resources and efforts
of state and Federal agencies.

    b.  Refuge shelters.  An inventory should be made and plans
developed for the use of buildings suitable for shelters of
refuge and these should be incorporated in the preparedness plan.
The data should be reviewed and revised periodically to insure
the availability of all shelters, such as courthouses, schools,
churches, and other suitable buildings.  All public buildings to
be constructed in the future should be designed to withstand an-
ticipated wind and wave forces and with the upper floor grades of
sufficient elevation to serve as an emergency shelter in addition
to its principal purpose.  Agreements with owners of non-public
buildings should be incorporated in the preparedness plan in
advance of any required emergency use.

    c.  Zoning regulations and building codes.  One of the im-
portant functions of the preparedness committee would be to
recommend appropriate building codes and zoning regulations for
exposed communities, to review codes and regulations in effect,
and to recommend desirable revisions.


                 SECTION V - ECONOMIC ANALYSIS

19.  ESTIMATES OF FIRST COST

    The costs of the Mississippi River-Gulf Outlet and the pro-
posed lock at Seabrook, and the costs of the two hurricane

protection plans are summarized below.  Prices include contingen-
cies and are of the level of December 1961.  Detailed estimates are
given in appendix D.

    a.   Mississippi River-Gulf Outlet, Seabrook lock.

| Item | Federal | Non-Federal | Total |
|---|---|---|---|
| Mississippi River-Gulf Outlet (existing project) | $ 95,490,000 | $ 8,730,000 | $104,220,000* |
| Seabrook Lock (proposed) | | | |
|   Lock and dam | 4,371,000 | - | 4,371,000 |
|   Engineering and design | 250,000 | - | 250,000 |
|   Supervision and administration | 359,000 | - | 359,000 |
|     FIRST COST | $ 4,980,000 | $ - | $ 4,980,000 |
| Mississippi River-Gulf Outlet (recommended modification) | $100,470,000 | $ 8,730,000 | $109,200,000 |

*Approved cost estimate from PB 3 effective 1 July 1962.

    b.   Lake Pontchartrain barrier plan.

| Item | Federal | Non-Federal | Total |
|---|---|---|---|
| Rigolets barrier structures | $ 16,488,000 | $ - | $ 16,488,000 |
| Chef Menteur barrier structures | 6,184,000 | - | 6,184,000 |
| Modification of Miss. River-Gulf Outlet Seabrook Lock | 400,000 | - | 400,000 |
| Levee enlargements and appurtenant works: | | | |
| St. Charles Parish | 4,938,000 | - | 4,938,000 |
| Jefferson Parish | 463,000 | - | 463,000 |
| New Orleans | 4,379,000 | - | 4,379,000 |
| Citrus | 9,451,000 | - | 9,451,000 |
| New Orleans East | 10,990,000 | - | 10,990,000 |
| Barrier levee | 214,000 | - | 214,000 |
| Mandeville | 196,000 | - | 196,000 |
| Land and damages | - | 4,479,000 | 4,479,000 |
| Relocations | - | 548,000 | 548,000 |
| Engineering and design | 2,435,000 | - | 2,435,000 |
| Supervision and administration | 3,538,000 | - | 3,538,000 |
|   Subtotal | $ 59,676,000 | $ 5,027,000 | $ 64,703,000 |
| Cash contribution* | -18,476,000 | 18,476,000 | - |
|   FIRST COST | $ 41,200,000 | $23,503,000 | $ 64,703,000 |

(Cost estimates are exclusive of preauthorization costs of $449,000)

*See par. 24 and table D-15 of appendix D.

c.   Chalmette.

| Item | Federal | Non-Federal | Total |
|------|---------|-------------|-------|
| Levees and appurtenant works | $ 12,921,000 | $      - | $ 12,921,000 |
| Lands and damages | - | 452,000 | 452,000 |
| Relocations | - | 447,000 | 447,000 |
| Engineering and design | 518,000 | - | 518,000 |
| Supervision and administration | 805,000 | - | 805,000 |
| Subtotal | $ 14,244,000 | $ 899,000 | $ 15,143,000 |
| Cash contribution* | -3,644,000 | 3,644,000 | - |
| FIRST COST | $ 10,600,000 | $ 4,543,000 | $ 15,143,000 |

(Cost estimates are exclusive of preauthorization costs of $26,000)

*See par. 24 and table D-24 of appendix D.

20.   ESTIMATES OF ANNUAL CHARGES

The estimated annual economic costs of the plans of protection are based on an interest rate of 2-7/8 percent on both Federal and non-Federal costs, and on an economic life of 100 years.  Details are given in appendix D.

a.   Mississippi River-Gulf Outlet, Seabrook Lock.

### Mississippi River-Gulf Outlet
### (existing project)

| Item | Federal | Non-Federal | Total |
|------|---------|-------------|-------|
| Interest | $ 2,704,000 | $ 337,600 | $ 3,041,600 |
| Amortization | 219,400 | 11,200 | 230,600 |
| Maintenance and operation | 1,627,500 | 62,000 | 1,689,500 |
| Replacements | 4,000 | - | 4,000 |
| TOTAL | $ 4,554,900 | $ 410,800 | $ 4,965,700 |

### Seabrook Lock (proposed)

| Item | Federal | Non-Federal | Total |
|------|---------|-------------|-------|
| Interest | $ 149,300 | $ - | $ 1  ,300 |
| Amortization | 9,300 | - | 9,300 |
| Maintenance and operation | 120,000 | - | 120,000 |
| TOTAL | $ 278,600 | $ - | $ 278,600 |

### Mississippi River-Gulf Outlet
(recommended modification)

| Item | Federal | Non-Federal | Total |
|------|---------|-------------|-------|
| Interest | $ 2,853,300 | $ 337,600 | $ 3,190,900 |
| Amortization | 228,700 | 11,200 | 239,900 |
| Maintenance and operation | 1,747,500 | 62,000 | 1,809,500 |
| Replacements | 4,000 | - | 4,000 |
| TOTAL | $ 4,833,500 | $ 410,800 | $ 5,244,300 |

b.   Lake Pontchartrain barrier plan.

| Item | Federal | Non-Federal | Total |
|------|---------|-------------|-------|
| Interest | $ 1,284,500 | $ 718,600 | $ 2,003,100 |
| Amortization | 80,000 | 44,700 | 124,700 |
| Economic loss on land | - | 79,500 | 79,500 |
| Maintenance and operation | 125,000 | 96,800 | 221,800 |
| Replacements | - | 106,500 | 106,500 |
| TOTAL | $ 1,489,500 | $ 1,046,100 | $ 2,535,600 |

c.   Chalmette.

| Item | Federal | Non-Federal | Total |
|------|---------|-------------|-------|
| Interest | $ 348,600 | $ 149,400 | $ 498,000 |
| Amortization | 21,700 | 9,300 | 31,000 |
| Economic loss on land | - | 2,700 | 2,700 |
| Maintenance | - | 29,000 | 29,000 |
| Replacements | - | 11,500 | 11,500 |
| TOTAL | $ 370,300 | $ 201,900 | $ 572,200 |

21.   ESTIMATES OF BENEFITS

a.   Mississippi River-Gulf Outlet, Seabrook Lock.   Benefits at-
tributable to the basic low level lock at Seabrook are primarily
corrective in nature.   The lock will facilitate navigation of an in-
creasing annual tonnage between the Inner Harbor Navigation Canal and
Lake Pontchartrain currently estimated at approximately 3,000,000
tons annually.   The structure will prevent serious salt water in-
trusion and adverse effect on fishery values in Lake Pontchartrain
which will otherwise result from the Gulf Outlet project.   As modi-
fied for the hurricane project the lock forms an integral element
of the hurricane barrier to exclude hurricane surges from Lake
Pontchartrain.   Its benefits for this purpose are not separable.

b.   The areas along the south shore of Lake Pontchartrain, excepting St. Charles Parish; the area within the existing Chalmette levee; and the area at Mandeville have a fair degree of flood protection at this time.   Benefits accruing to these areas are predominantly flood damage prevented.   Little enhancement will result from the added protection.   On the other hand, the unprotected areas in St. Charles Parish and in the Chalmette area outside the present levee system will be enhanced considerably by the protective works proposed.   Average annual benefits derived from the prevention of flood damages were computed by determining the difference between annual losses without the projects and the losses remaining after construction of the proposed improvements.   These benefits were then adjusted to allow for the development and growth to be expected without the proposed protective works.   Population projections indicate that development of essentially all available areas will take place within 50 years.   The projects are designed to protect against the standard project hurricane, which has a recurrence frequency of about 200 years.   Residual damage with the projects in place would be the annual damages from the less frequent great hurricanes.   Depths of flooding from rainfall were assumed to be the same for all hurricane occurrences; since damage from this cause would not be preventable, it was eliminated from all damage calculations.

c.   Flood damages and flood damages prevented.   The estimated average annual flood damage in the project area under present conditions and under conditions with the proposed projects in place, the average annual damage prevented under the present state of development, and the annual damage prevented as adjusted to reflect future growth are shown in the following tabulation.   Damage prevented on future development was based on population projections. It was assumed that improvements constructed in the future, without additional flood protection, would be similar to that in adjoining areas.   Stage-damage relationships, based on ultimate development, were constructed and annual values obtained were then discounted on the basis of estimated growth periods indicated for the several reaches.   Price levels are December 1961.   Detailed estimates of benefits are outlined in appendix C.

| Area | Avg. annual damage under present conditions | Avg. annual damage with project | Avg. annual damage prevented | Avg. annual damage prevented as adjusted for future development |
|---|---|---|---|---|
| Lake Pontchartrain barrier plan | | | | |
| St. Charles Ph. | $    9,400 | $    - | $    9,400 | $    14,200 |
| Jefferson Ph. | 2,256,000 | 12,000 | 2,244,000 | 10,214,100 |
| New Orleans | 2,741,100 | - | 2,741,100 | 3,046,200 |
| Citrus | 4,497,000 | 24,100 | 4,472,900 | 22,092,200 |
| New Orleans East | - | - | - | 11,536,700 |
| Mandeville | 62,400 | 400 | 62,000 | 62,000 |
| Remaining areas along shores of Lake Pontchartrain | 112,100 | 2,500 | 109,600 | 693,600 |
| TOTAL | $9,678,000 | $39,000 | $9,639,000 | $47,659,000 |
| Chalmette | $1,212,000 | $ 7,000 | $1,205,000 | $ 4,773,000 |

d.  Enhancement.

(1)  Lake Pontchartrain barrier plan.  Protection will be
afforded to an area of 29,600 acres in St. Charles Parish, with a
present appraised value of $16,399,000.  The project will make
possible the drainage and development of the entire area.  Con-
sidering the rate of development experienced in adjoining Jefferson
Parish, it is probable that sale of these lands to developers would
be accomplished within 20 years.  The value is estimated to be
enhanced during that period to $25,614,000, exclusive of enhance-
ment that will result from drainage and other improvements by local
interests.  The annual value of the enhancement based on the in-
creased value of $9,215,000 at a 5 percent interest rate is
$460,000.  The discounted annual value of the enhancement on this
basis is $350,000 ($460,000 x 0.760).

(2)  Chalmette.  The portions of Orleans and St. Bernard
Parishes inclosed by the proposed Chalmette levee and the existing
Chalmette back levee aggregate 18,830 acres, consisting of 12,830
acres of marsh, 5,875 acres of wooded swamp, and 125 acres of open
land, which will be protected from tidal overflow.  The appraised
value is $3,710,000.  It is estimated that these lands after pro-
tection will enhance in value to $13,010,000, exclusive of
enhancement that would result from drainage and other improvements
by local interests.  The annual value of the enhancement based on
the increased value of $9,300,000 at 5 percent is $465,000.  In
consideration of the proximity of this area to New Orleans, and the
Mississippi River-Gulf Outlet, which is nearing completion, it is

probable that sale of these lands to developers will be accomplished within 15 years. The discounted annual value of the enhancement on this basis is $379,000 ($465,000 x 0.815).

e.   Average annual benefits from the hurricane protection plans are as follows:

|  | Lake Pontchartrain barrier plan | Chalmette |
|---|---|---|
| Flood damage prevented | $ 47,659,000 | $ 4,773,000 |
| Enhancement | 350,000 | 379,000 |
| TOTAL | $ 48,009,000 | $ 5,152,000 |

f.   Intangible benefits include the protection of human life, the prevention of hazards to health arising from pollution, and the improvement of sanitary facilities and water supplies in the area.

22.   ECONOMIC JUSTIFICATION

a.   A comparison of the estimated average annual benefits and annual economic costs for the authorized Mississippi River-Gulf Outlet and proposed modification thereof, and for the two plans of hurricane protection investigated are as follows:

| Area | Avg. annual benefit | Avg. annual cost | Benefit-cost ratio |
|---|---|---|---|
| Mississippi River-Gulf Outlet (existing project) | $ 9,080,000 | $4,965,700 | 1.8 to 1 |
| Mississippi River-Gulf Outlet (recommended modification) | 9,080,000 | 5,244,300 | 1.7 to 1 |
| Lake Pontchartrain barrier plan | 48,009,000 | 2,535,600 | 18.9 to 1 |
| Chalmette | 5,152,000 | 572,200 | 9.0 to 1 |

b.   Modification of the Mississippi River-Gulf Outlet, to include a lock at Seabrook, is remedial construction. It reduces the benefit-cost ratio from 1.8 to 1 for the existing project to 1.7 to 1 for the modified project.

c.   The Lake Pontchartrain barrier plan, including the cost for modification of the Seabrook Lock chargeable to the barrier plan, is amply justified as a comprehensive coordinated plan. The several separable protective systems around the lake shore were analyzed incrementally to the barrier system sufficiently to determine that each was justified. Analysis of the Citrus and New

Orleans East lakefront protection, which consists of the embankment of the Southern Railway, indicated that the embankment would fail under severe hurricane conditions and would be overtopped by the less severe storms resulting in annual damages with the barrier in place and under conditions of future development of $3,637,000 in the Citrus area and $1,110,000 in the New Orleans East area. Provision of the proposed levee enlargements would reduce these damages to $176,000 and $80,000 and result in annual benefits of $3,461,000 and $1,030,000, respectively. Annual costs of the Citrus levee are $127,300 and the annual costs of the New Orleans East levee are $232,400. The benefit-cost ratios are 27.0 and 4.4 to 1 for these levees incremental to the barrier plan. Flood damage in the St. Charles Parish area will be essentially eliminated by the barrier system. Subsequent construction of the proposed St. Charles Parish area levee will place the lands in a condition whereby local interests can provide pumped drainage and develop the area. It is estimated that the levee will cause these lands to be enhanced by $350,000 annually. The annual cost of the levee and appurtenances is $204,000, resulting in a benefit-cost ratio of 1.7 to 1 for this feature. Improvement and strengthening of the protection in Jefferson Parish, New Orleans, and Mandeville, to insure that these protective works do not fail are considered necessary in view of the threat to life and property, and the relatively small costs for these improvements, $509,000, $282,000, and $224,000, respectively, are amply justified.

     d.    The Chalmette hurricane protection plan is justified.

## SECTION VI - COORDINATION AND LOCAL COOPERATION

23.  PROPOSED LOCAL COOPERATION

     a.  Mississippi River-Gulf Outlet, Seabrook Lock. It is proposed that modification of the existing Mississippi River-Gulf Outlet project to include authorization for the construction of a lock in the vicinity of Seabrook shall be subject to the conditions that prior to initiation of construction local interests give assurances satisfactory to the Secretary of the Army that they will:

        (1)  Provide without cost to the United States, and upon the request of the Chief of Engineers, all lands, easements, and rights-of-way, including borrow and spoil-disposal areas required for construction, operation, and maintenance of the project; and

        (2)  Hold and save the United States free from damages due to the construction works.

     b.  Lake Pontchartrain barrier plan and Chalmette. It is proposed that construction of the barrier plan of protection for the areas around Lake Pontchartrain, and of the plan of protection for Chalmette shall be subject to the conditions that prior to

73

initiation of construction on each separable independent feature local interests give assurances satisfactory to the Secretary of the Army that they will without cost to the United States:

(1) Provide all lands, easements, and rights-of-way, including borrow and spoil-disposal areas necessary for construction, operation, and maintenance of the project;

(2) Accomplish all necessary alterations and relocations to roads, railroads, pipelines, cables, wharves, drainage structures, and other facilities required by the construction of the project;

(3) Hold and save the United States free from damages due to the construction works;

(4) Bear 30 percent of the first cost, to consist of the fair market value of the items listed in subparagraphs (1) and (2) above and a cash contribution as presently estimated below, to be paid either in a lump sum prior to initiation of construction or in installments at least annually in proportion to the Federal appropriation prior to start of pertinent work items, in accordance with construction schedules as required by the Chief of Engineers, or, as a substitute for any part of the cash contribution, accomplish in accordance with approved construction schedules items of work of equivalent value as determined by the Chief of Engineers, the final apportionment of costs to be made after actual costs and values have been determined:

| Project | Total contribution for construction | Lands and relocations | Cash contribution for construction |
|---|---|---|---|
| Lake Pontchartrain barrier plan | $19,411,000 | $5,027,000 | $14,384,000 |
| Chalmette | 4,543,000 | 899,000 | 3,644,000 |

(5) Provide for the Lake Pontchartrain barrier plan an additional cash contribution equivalent to the estimated capitalized value of maintenance and operation of the Rigolets navigation lock and channel to be undertaken by the United States, presently estimated at $4,092,000, the final determination to be made after construction is complete, said amount to be paid either in a lump sum prior to initiation of construction of the barrier or in installments at least annually in proportion to the Federal appropriation for construction of the barrier;

(6) Provide all interior drainage and pumping plants required for reclamation and development of the protected areas;

(7) Maintain and operate all features of the project in accordance with regulations prescribed by the Secretary of the Army, including levees, floodgates and approach channels, drainage structures, drainage ditches or canals, floodwalls,

74

seawalls, and stoplog structures, but excluding the Rigolets nav-
igation lock and its appurtenant navigation channels and the modified
Seabrook Lock; and

(8)  Acquire adequate easements or other interest in land
to prevent encroachment on existing ponding areas unless substitute
storage capacity or equivalent pumping capacity is provided promptly.

24.  APPORTIONMENT OF COSTS AMONG INTERESTS

a.  Mississippi River-Gulf Outlet, Seabrook Lock.  First
costs and annual costs of operation and maintenance for the low
level lock at Seabrook will be borne by the United States.  The ap-
portionment of costs between Federal and non-Federal agencies for
the existing Mississippi River-Gulf Outlet project; for the pro-
posed new lock near Seabrook under the authority of the Mississippi
River-Gulf Outlet project; and the modified Mississippi River-Gulf
Outlet project are as follows:

| Item | First cost | Federal | Non-Federal |
|------|-----------|---------|-------------|
| Mississippi River-Gulf Outlet (existing project) | $104,220,000 | $95,490,000 | $8,730,000 |
| Seabrook Lock (proposed) | 4,980,000 | 4,980,000 | - |
| Mississippi River-Gulf Outlet (recommended modification) | $109,200,000 | $100,470,000 | $8,730,000 |

b.  Hurricane protection plans.  The apportionment of costs
of the proposed plans for hurricane protection is based on the cost
sharing formula adopted in the Flood Control Act of 1958 for the
Narragansett Bay, New Bedford, and Texas City projects.  This act
specifies that first costs, including the costs of lands, ease-
ments, rights-of-way, and relocations, but excluding the cost of
preauthorization studies, shall be apportioned at least 30 percent
to non-Federal interests and not to exceed 70 percent to the Federal
government.  Land, easements, rights-of-way, and relocations shall
be provided by non-Federal interests without cost to the United
States and will be credited to the local contribution.  Operation
and maintenance costs of all levees, structures, and drainage
facilities, except the modified Seabrook Lock, shall be the
responsibility of non-Federal interests.  The Rigolets lock and
navigation channel will be operated by the Federal government with
funds to be contributed by local interests.  The estimated annual
cost of operation and maintenance is $125,000.  The local cash
contribution is based on the capitalized value of $125,000 over
the life of the project.  On this basis, the apportionments of
first costs of the proposed plans found to be economically justi-
fied are as follows:

### (1)   Lake Pontchartrain barrier plan.

| Item | First cost | Federal | Non-Federal |
|---|---|---|---|
| Construction | $59,676,000 | 70% | 30% |
| Lands, damages, and relocations | 5,027,000 | | |
| Total | $64,703,000 | $45,292,000 | $19,411,000 |
| Less costs of lands, damages, and relocations | | | -5,027,000 |
| Cash contribution for construction | | | $14,384,000 |
| Cash contribution for capitalized annual maintenance and operation | | -4,092,000 | 4,092,000 |
| Total cash contribution | | | $18,476,000 |
| Plus costs of lands, damages, and relocations | | | 5,027,000 |
| FIRST COSTS | | $41,200,000 | $23,503,000 |

### (2)   Chalmette.

| Item | First cost | Federal | Non-Federal |
|---|---|---|---|
| Construction | $14,244,000 | 70% | 30% |
| Lands, damages, and relocations | 899,000 | | |
| Total | $15,143,000 | $10,600,000 | $ 4,543,000 |
| Less costs of lands, damages, and relocations | | | -899,000 |
| Cash contribution | | | $ 3,644,000 |

25.   COORDINATION WITH OTHER AGENCIES

This study has been coordinated with Federal, state, and local agencies that are concerned with hurricane problems, or that are responsible for the protection of public and private property or

76

fish and wildlife resources. They have been consulted during the course of the study to obtain technical data, pertinent information, or cooperation where mutual responsibilities were involved. The participation of these agencies and a summary of their views are stated below.

a.   U. S. Department of Commerce.   The Weather Bureau furnished technical information regarding intensity, frequency, and duration of future hurricanes and expanded data related to historic hurricanes which were necessary for verification of procedures. Descriptions of these data are included in appendix A.

b.   U. S. Department of the Interior.

(1)  The Fish and Wildlife Service was kept fully informed of the plans of protection under consideration throughout the study.  Numerous conferences and discussions were held during the development and design phases of the plans of protection. The Service found that construction of the proposed hurricane tide barrier along the east side of Lake Pontchartrain would not significantly affect the existing salinity gradient pattern in the lake, and that improvement of existing levees, or construction of new levees would cause no significant project effects because of the normal metropolitan expansion that the area is presently undergoing.  The Service found, however, that the salt water intrusion problem induced by the construction of the Mississippi River-Gulf Outlet would be detrimental to existing conditions in the lake, the navigation channel area, and the contiguous areas, and that proper control should be provided.  Reports of the Fish and Wildlife Service are presented in appendix F.

(2)  The recommendations presented in the report dated 13 March 1962 are that:

(a)  "In the event you recommend the low level plan, your plan include provision for enlarging the structures in the tidal passes should the salinity gradient in Lake Pontchartrain, as established by a cooperative sampling program, be adversely affected.

(b)  "The existing salinity gradient in Lake Pontchartrain be maintained insofar as salt water intrusion control requirements in the overall Lake Pontchartrain-Gulf Outlet complex will permit.

(c)  "A structure, as necessary for salt water intrusion control, be built as a feature of the Gulf Outlet project in the Gulf Outlet-Industrial Canal connection with Lake Pontchartrain.

77

(d)  "The pertinent design-criteria and operational procedure for this structure be developed as a part of the continuing studies on the Gulf Outlet project."

(3)  The recommendations presented in the report dated 22 October 1962 are:

(a)  "That two floodgates proposed for the Chalmette section of the hurricane protection area be modified as necessary to provide, within feasible limits, for maintenance of the natural salinity regimen of interior waters.  Design and operation for this purpose be established during advanced planning for this project.

(b)  "Your request for authorization on this project should provide sufficient flexibility in regard to the Seabrook structure that design and operation can be established during advanced planning and in accordance with findings of salinity studies currently in progress."

(4)  The above recommendations are acceptable with the exception of that in par. 25.b.(2)(a).  The design of the control structures presented in this report is considered adequate for the preservation of the present salinity gradient of Lake Pontchartrain.  The design is based upon the most conservative application of engineering principles and results of extensive model tests, with the full cooperation and concurrence of the Service in the plan, and the structures will require no foreseeable enlargement. In addition, the lock at Seabrook will provide control of sufficient flexibility to regulate salinity in the lake within reasonable limits.  Any modification later found necessary should be authorized through normal review procedures.

(5)  A report, entitled "A Detailed Report on Hurricane Study Area I, Lake Pontchartrain and Vicinity, Louisiana," was published by the U. S. Fish and Wildlife Service in June 1962. This report, supplement 5, provides detailed information supporting the summarized findings presented in the Service's letter report of 13 March 1962.

c.  U. S. Coast Guard.  The Coast Guard was consulted as to the requirements of aids to navigation and has stated that the proposed improvements will require no changes in the existing aids to navigation nor will additional Coast Guard aids to navigation be required.

d.  U. S. Department of Agriculture.  The Soil Conservation Service was consulted during the study and requested to furnish views and comments on the plans of protection.  The Service feels that agriculture holds a relatively unimportant position in the economy of the area, and that intensively developed agricultural

land is decreasing and will probably be converted to urban development within a few years. It is not expected that the proposed project will adversely affect any potential P.L. 566 project or other Soil Conservation Service activities within the project area.

    e.    State of Louisiana.

        (1)  The Department of Public Works was consulted throughout the development phase of the study. The Department concurs in the suitability of the proposed plans of protection.

        (2)  The Department of Health was requested to furnish views and comments on the proposed plan of protection and stated that public health problems would not result from the plans presented.

        (3)  The Wild Life and Fisheries Commission was requested to furnish its views and comments relative to the project. The U. S. Fish and Wildlife Service has stated that the Commission concurs with the findings of the Service and has attached to its reports letters of confirmation from that organization, appendix F.

        (4)  In the early phases of the study, the Department of Highways was consulted relative to the merits of a dual-purpose interstate highway-hurricane barrier embankment, but the plan was abandoned because of the incompatible schedules of the two projects. The minor modifications to U. S. Highway 90 in connection with the barrier plan are acceptable to the Highway Department.

        (5)  The Board of Levee Commissioners of the Orleans Levee District and the Board of Commissioners of the Port of New Orleans have been consulted during the course of the study and have furnished important data in connection therewith. Representatives of both Boards have reviewed the plans of protection and have expressed general concurrence with the recommendations of this report.

    f.    Assurances of cooperation.  The State of Louisiana, Department of Public Works, the agency designated to act in such matters on behalf of the Governor of the State of Louisiana, has concurred in the suitability of the plans of protection, and has stated that assurances from local interests will be provided when required.

## SECTION VII - RESULTS OF INVESTIGATION

### 26.  DISCUSSION AND CONCLUSIONS

    a.    The Louisiana coastal area, including the shores of Lake Pontchartrain, is subject to flooding by hurricane surges. Much of the

area is tidal marsh remote from any developments and its protection is impracticable and uneconomical. The partially protected areas along the south shore of the lake, including the Greater New Orleans Metropolitan area, along the north shore of Mandeville, and along the Mississippi River at Chalmette, as well as contiguous areas of potential development in St. Charles Parish and in the Chalmette area, are feasible of protection. A related problem exists, in that observations during the construction of the Mississippi River-Gulf Outlet, supplemented by the model studies made in connection with the hurricane study, show that current conditions in the Gulf Outlet and in the Inner Harbor Navigation Canal will be hazardous to navigation and will further and seriously impair the safety of structures along and across these waterways, particularly the existing major traffic bridge across the Inner Harbor Navigation Canal. The Gulf Outlet will, by reason of its direct connection to the Gulf of Mexico, greatly increase the salinity regimen of Lake Pontchartrain and in the area contiguous to the canal. Provision of a low level lock at the lakeward terminus of the Inner Harbor Navigation Canal is necessary to alleviate the adverse effects on navigation and on the ecology of the area affected by the Mississippi River-Gulf Outlet. Benefits of the existing project are sufficient to justify the additional authorization of the proposed lock. The lock required as a corrective measure for navigation can be readily incorporated in a plan for a hurricane barrier to a higher elevation. The incremental cost of raising the lock walls and gates as necessary to complete the barrier and exclude hurricane surges from Lake Pontchartrain is properly a charge to the hurricane plan.

b.   Lake Pontchartrain barrier plan. The plan found most suitable for the protection of the shores of Lake Pontchartrain from flooding by hurricane tides is the barrier plan. This plan provides for the construction of a barrier along the east side of Lake Pontchartrain, a levee along the St. Charles Parish lakefront, a new levee along the Citrus and New Orleans East lakeshores, the improvement or enlargement of existing protective works on the south and north shores of the lake, along the Gulf Intracoastal Waterway and the Inner Harbor Navigation Canal including a dual-purpose lock at Seabrook, and necessary modifications to roads, pipelines, pumping stations, and drainage facilities. The project is amply justified.

c.   The Gulf Intracoastal Waterway was formerly routed from the Inner Harbor Navigation Canal through Lake Pontchartrain and thence through the Rigolets to connect with the existing route east of the Rigolets. Thus, the Rigolets is a segment of an authorized navigation channel. Increased channel velocities through the Rigolets barrier structure would make navigation hazardous for the heavy commercial traffic that uses the pass. Therefore, a lock is necessary at this location. The proposed lock in the Rigolets is a feature of the hurricane protective plan and its maintenance and operation are properly chargeable to local interests. However, it is deemed appropriate in the public interest that physical operation and maintenance be kept

under the jurisdiction of the United States. Accordingly, a lump sum
contribution of $4,092,000, representing the capitalized annual costs
of $125,000, should be made by local interests during the construction
period. At Chef Menteur Pass, the traffic is local in nature and will
be adequately served by a floodgate structure with long approach chan-
nels. The Chef Menteur structure is designed to permit expansion to
a lock should conditions in the future indicate the need for such a
facility.

d.  Chalmette. The Chalmette area can be afforded adequate pro-
tection against hurricane flooding by construction of a new levee along
the Mississippi River-Gulf Outlet from the Inner Harbor Navigation Canal
to Bayou Dupre, thence along the bayou to Violet and the improvement
of existing protective structures along the Inner Harbor Navigation
Canal, including necessary modifications to railroads, pipelines, and
drainage facilities. Benefits are sufficient to justify authorization
of the project.

e.  The plans described above for prevention of flooding by hurri-
cane tides, and for corrective action to alleviate the adverse effects
of the Mississippi River-Gulf Outlet on navigation and on the ecology
of the area are based on thorough and careful analysis of experienced
and potential flood situations. Protective works will provide dependa-
ble protection to a high degree and will result in major reduction in
average annual damage, in damage resulting from flooding by the
standard project hurricane, and in damage to navigation and conservation
interests.

f.  Effects on other interests. The proposed plans will have
negligible effect on other interests in the area. The barrier will
not modify the salinity regimen or ecology of the Lake Pontchartrain
area and fishery values will undergo little or no change. The improve-
ment of existing protective works will not affect wildlife values.
The plans will in no way hamper business and industrial operations,
or agricultural activities. The plans of protection make adequate
provision for preserving existing navigation facilities. The dual
purpose Seabrook Lock makes adequate provision for existing and future
traffic between the Inner Harbor Navigation Canal and Lake Pontchartrain.

g.  Local measures. Further protection of human life and proper-
ty can be afforded by the more widespread dissemination of information
relative to potential hurricane tide elevations and limits of flooding.
This can be accomplished through the organization of a hurricane pre-
paredness committee in each community. Such a committee would establish
a continual preparedness plan, conduct public educational programs,
formulate plans for use of buildings as hurricane shelters, recommend
desirable zoning regulations and building codes, and direct evacuation
and rescue work when necessary. Zoning regulations and building codes
should be established and enforced where not presently in effect. All
of these measures will be undertaken by local interests at no cost to
the United States.

h.   The report is fully responsive to all of the resolutions
cited in par. 1.  The authorization cited in par. 1.c. requires study
with respect to flood control, navigation and beach erosion control in
Orleans Parish.  Flood control measures desired by local interests
were those which would prevent flooding by hurricane tides and waves
from Lake Pontchartrain, and were not related to flooding resulting
from inadequate interior drainage.  Although mentioned in the resolu-
tion, navigation is not involved as a basic problem, but only as
affected by protective measures to be provided.  As discussed in par.
16.c.(2)(c), local interests have solved the erosion problem and no
longer consider it of major importance.

i.   Additional information on recommended projects outlined in
Senate Resolution 148, 85th Congress, adopted 28 January 1958, is
shown in the attachment to this report.


## SECTION VIII - RECOMMENDATIONS

### 27.  RECOMMENDATIONS

a.   <u>Lake Pontchartrain barrier plan.</u>

(1)  It is recommended that the barrier plan for the hurri-
cane protection of the shores of Lake Pontchartrain be authorized for
construction to include the following features:

(a)  A barrier across the east side of Lake Pontchar-
train, to consist of a levee along U. S. Highway 90; a control
structure and approach channels, navigation lock and channels, and
closure dam at the Rigolets; a control structure, floodgate, navigation
channel, and closure dam at Chef Menteur Pass;

(b)  A levee along the lakeshore of St. Charles Parish
between the Bonnet Carre Spillway and Jefferson Parish; a lateral
levee along the St. Charles-Jefferson Parish line; and a drainage
structure in the lateral levee near its lakeward extremity; and

(c)  Improvement of existing levees along the lakeshores
of Jefferson Parish and New Orleans, a new levee along the lakeshore
of Citrus and New Orleans East, and improvement of existing protective
works between U. S. Highway 90 and the Gulf Intracoastal Waterway in
the northeastern section of Orleans Parish, along the Gulf Intracoastal
Waterway and the Inner Harbor Navigation Canal in Orleans Parish,
including the incremental cost of a dual purpose lock in the Inner
Harbor Navigation Canal at Seabrook chargeable to Hurricane Protection,
and along the lakeshore at Mandeville, La.

(2)  The proposed plan shall be generally in accordance with
the plan of improvement described herein and as shown on the accompanying

plates and with such modification thereof as in the discretion of the Chief of Engineers may be advisable, at estimated costs to the United States of $41,200,000 for new work, and $125,000 annually for operation and maintenance.

(3)  Construction of the project shall be subject to the conditions that prior to initiation of construction on each separable independent feature local interests give assurances satisfactory to the Secretary of the Army that they will without cost to the United States:

(a)  Provide all lands, easements, and rights-of-way, including borrow and spoil-disposal areas necessary for construction, operation, and maintenance of the project;

(b)  Accomplish all necessary alterations and relocations to roads, railroads, pipelines, cables, wharves, drainage structures, and other facilities required by the construction of the project;

(c)  Hold and save the United States free from damages due to the construction works;

(d)  Bear 30 percent of the first cost, to consist of the fair market value of the items listed in subparagraphs (a) and (b) above and a cash contribution as presently estimated below, to be paid either in a lump sum prior to initiation of construction or in installments at least annually in proportion to the Federal appropriation prior to start of pertinent work items, in accordance with construction schedules as required by the Chief of Engineers, or, as a substitute for any part of the cash contribution, accomplish in accordance with approved construction schedules items of work of equivalent value as determined by the Chief of Engineers, the final apportionment of costs to be made after actual costs and values have been determined:

| Project | Total contribution for construction | Lands and relocations | Cash contribution for construction |
|---|---|---|---|
| Lake Pontchartrain barrier plan | $19,411,000 | $5,027,000 | $14,384,000 |

(e)  Provide an additional cash contribution equivalent to the estimated capitalized value of maintenance and operation of the Rigolets navigation lock and channel to be undertaken by the United States, presently estimated at $4,092,000, the final determination to be made after construction is complete, said amount to be paid either in a lump sum prior to initiation of construction of the barrier or in installments at least annually in proportion to the Federal appropriation for construction of the barrier;

(f)  Provide all interior drainage and pumping plants required for reclamation and development of the protected areas;

(g)  Maintain and operate all features of the project in accordance with regulations prescribed by the Secretary of the Army, including levees, floodgates and approach channels, drainage structures, drainage ditches or canals, floodwalls, seawalls, and stoplog structures, but excluding the Rigolets navigation lock and its appurtenant navigation channels and the modified dual purpose Seabrook Lock; and

(h)  Acquire adequate easements or other interest in land to prevent encroachment on existing ponding areas unless substitute storage capacity or equivalent pumping capacity is provided promptly.

b.  Chalmette.

(1)  It is further recommended that a plan for hurricane protection of the Chalmette area be authorized for construction to provide for a levee along the Mississippi River-Gulf Outlet from the Inner Harbor Navigation Canal to Bayou Dupre, thence along the bayou to Violet, La.; the improvement of the existing levee along the Inner Harbor Navigation Canal; and drainage structures in the levee alignment at Bayous Bienvenue and Dupre.

(2)  The proposed plan shall be generally in accordance with the plan of improvement described herein and as shown on the accompanying plates and with such modification thereof as in the discretion of the Chief of Engineers may be advisable, at an estimated cost to the United States of $10,600,000 for new work.

(3)  Construction of the project shall be subject to the conditions that prior to initiation of construction on each separable independent feature local interests give assurances satisfactory to the Secretary of the Army that they will without cost to the United States:

(a)  Provide all lands, easements, and rights-of-way, including borrow and spoil-disposal areas necessary for construction, operation, and maintenance of the project;

(b)  Accomplish all necessary alterations and relocations to roads, railroads, pipelines, cables, wharves, drainage structures, and other facilities required by the construction of the project;

(c)  Hold and save the United States free from damages due to the construction works;

(d)  Bear 30 percent of the first cost, to consist of the fair market value of the items listed in subparagraphs (a) and (b) above and a cash contribution as presently estimated below, to be

84

paid either in a lump sum prior to initiation of construction or in installments at least annually in proportion to the Federal appropriation prior to start of pertinent work items; in accordance with construction schedules as required by the Chief of Engineers, or, as a substitute for any part of the cash contribution, accomplish in accordance with approved construction schedules items of work of equivalent value as determined by the Chief of Engineers, the final apportionment of costs to be made after actual costs and values have been determined:

| Project | Total contribution for construction | Lands and relocations | Cash contribution for construction |
|---|---|---|---|
| Chalmette | $4,543,000 | $ 899,000 | $3,644,000 |

(e)  Provide all interior drainage and pumping plants required for reclamation and development of the protected areas;

(f)  Maintain and operate all features of the project in accordance with regulations prescribed by the Secretary of the Army, including levees, floodgates and approach channels, drainage structures, drainage ditches or canals, floodwalls, and stoplog structures;

(g)  Acquire adequate easements or other interest in land to prevent encroachment on existing ponding areas unless substitute storage capacity or equivalent pumping capacity is provided promptly.

c.  Mississippi River-Gulf Outlet, Seabrook Lock.

(1)  It is further recommended that the existing project for the Mississippi River, Baton Rouge to the Gulf of Mexico, La., project, authorized by the River and Harbor Act of 2 March 1945, Public Law No. 14, 79th Congress, 1st Session, and modified by the addition of the Mississippi River-Gulf Outlet, authorized by the River and Harbor Act of 29 March 1956, Public Law No. 455, 84th Congress, 2d Session, be further modified to provide for the construction of a dual purpose lock at the lakeward terminus of the Inner Harbor Navigation Canal in the vicinity of Seabrook, La.

(2)  The proposed plan shall be generally in accordance with the plan of improvement described herein and as shown on the accompanying plates and with such modification thereof as in the discretion of the Chief of Engineers may be advisable, at estimated costs to the United States of $4,980,000 for new work, and $120,000 annually for operation and maintenance, in addition to that now required for the authorized Mississippi River-Gulf Outlet.

(3)  Construction of the project shall be subject to the conditions that prior to initiation of construction local interests give assurances satisfactory to the Secretary of the Army that they will:

(a)  Provide without cost to the United States and upon the request of the Chief of Engineers, all lands, easements, and rights-of-way, including borrow and spoil-disposal areas required for construction, operation, and maintenance of the project; and

(b)  Hold and save the United States free from damages due to the construction works.

Incls
  Plates 1-13
  Appendixes A-I
  Attachment

EDWARD B. JENNINGS
Colonel, CE
District Engineer

86

[First endorsement]

LMVGN (NOD rpt 21 Nov 62)
SUBJECT:  Interim Survey Report on Hurricane Study of Lake Pontchartrain,
          Louisiana and Vicinity

U. S. Army Engr Div, Lower Mississippi Valley, Vicksburg, Miss., 18 Jan 63

TO:  Chief of Engineers, Department of the Army, Washington 25, D. C.

    I concur in the findings and recommendations of the District Engineer.

Incl
nc

ELLSWORTH I. DAVIS
Major General, USA
Division Engineer

