UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE Duval MAG. Wilkinson |
| PERTAINS TO:  MRGO, Robinson (No. 06-2268) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION**

## I.      **INTRODUCTION**

In the wake of Hurricane Betsy's devastation of Greater New Orleans, this Court and the Fifth Circuit held that the United States Army Corps of Engineers ("Army Corps") and the United States of America (collectively, the "Government") lacked immunity under 33 U.S.C. § 702c from damage suits alleging injury from flooding caused by the negligent construction, design, maintenance, and operation of the Mississippi River-Gulf Outlet ("MR-GO"). *See Graci v. United States,* 301 F. Supp. 947, 955-56 (E.D. La 1969); *Graci v. United States*, 435 F. Supp. 189, 195-96 (E.D. La. 1977); *Graci v. United States*, 456 F. 2d 20 (5th Cir. 1971). No subsequent Supreme Court or Fifth Circuit decision has altered this holding.  Nor has the partial construction of structures along the MR-GO, as part of the Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPVHPP"), in any way affected the *Graci* decisions.

Plaintiffs' motion for summary adjudication as to the second affirmative defense (§ 702c immunity) should be granted for three reasons.

1.      Section 702(c) is inapplicable because Plaintiffs are not predicating Defendant's liability on levee breaches or the failure, overtopping, or defective design, construction, operation or maintenance of other forms of flood protection works. Plaintiffs' Undisputed Facts ("PUF") No. 311.

2.      Section 702c is inapplicable here because it is undisputed that the flood control structures were not designed or constructed in accordance with the Congressional authorization of the Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPVHPP") in the Flood Control Act of 1965, requiring the use of the Standard Project Hurricane design criteria for flood control structures.

3.      Section 702c is inapplicable here because it is undisputed that the Congressionally-mandated hurricane flood protection system ("HPS") was still substantially incomplete by the time of Hurricane Katrina, thereby not affording Greater New Orleans the level of hurricane protection mandated by Congress *forty years earlier.*

Section 702c does not immunize the Government from tort claims arising from the Army Corps' faulty design, construction, operation, and maintenance of a navigational waterway such as the MR-GO.  As the Fifth Circuit unequivocally held: "when, as here, the plaintiffs allege that they have suffered floodwater damage as a result of the negligence of the United States unconnected with any flood control project, § 3 of the Flood Control Act of 1928 does not bar an action against the United States under the Federal Tort Claims Act."  456 F.2d at 27; *see also Graci v. United States,* 301 F. Supp. at 951, (E.D. La 1969).  And as this Court has recognized: "Plaintiffs are not seeking damages for the failure of the levees or flood projects.  Plaintiffs contend that MRGO has absolutely nothing to do with a flood control project.  Plaintiffs are seeking damages for the effects of the waters in the MRGO with respect to the decimation of the wetlands over a long period of time which in turn created the hazard which resulted in flooding which plaintiffs maintain could not have been controlled by any flood control project."  PUF No. 313, *see also* PUF No. 314.

In addition to the dispositive point that the LPVHPP is irrelevant to Plaintiffs' case, the Government cannot invoke sovereign immunity because the LPVHPP *was never constructed.*  When authorizing the LPVHPP, Congress explicitly mandated that the Army Corps design and construct a Greater New Orleans hurricane protection system that would provide protection for an urbanized area from the storm surge or rainfall effects

associated with a Standard Project Hurricane ("SPH").  PUF No. 66.  The SPH criteria were clearly articulated in—and the Congress expressly adopted—the Army Corps' report outlining the design dimensions for the LPVHPP. PUF Nos. 66, 74; MSJ Exh.10, House Document No. 231, at pp. 46-47.  Inexplicably, as demonstrated below, the Army Corps did not comply with Congress's directive.  PUF No. 163.  It is undisputed that this tragedy would not have occurred if the Army Corps had designed and constructed the HPS to even the modest SPH dimensions.  PUF Nos. 142, 208, 210.

In addition to not delivering a hurricane flood protection system designed and constructed pursuant to the SPH design standards, the LPVHPP was not a completed *system* by the time of Hurricane Katrina.  Four decades after Congressional authorization, the LVPHPP was still under construction and uncompleted even as misdesigned.  A system in name only, it was a sprawling work in process, constructed piecemeal and incapable of providing a reliable flood defense system against even an SPH.  PUF Nos. 142, 143, 144, 152, 154.  Incredibly, the system was not expected to be completed until 2015—50 years after Congress authorized the project.  PUF No. 70.

The Army Corps utterly failed to design and construct a "system" that could withstand hurricane surge.  A hurricane protection system is effective only if *all* the component units have been built to the design protection elevation.  Like a chain, the HPS is only as strong as its weakest link.  PUF No. 155.  At the time of Hurricane Katrina, however, there were massive gaps in the LVPHPP, rather than a seamless series of sections built to the same design grade level.  PUF Nos. 156, 157, 159, 161.  As the Army Corps had known—but concealed—for decades, soil subsidence had left portions

of the project up to five feet below design elevation—a fatal deficiency that was a critical

cause of the catastrophic flooding. PUF Nos. 169, 172, 173, 178, 179, 191, 192, 195, 196.

On this undisputed record, the Government has not earned 702c immunity

because it never furnished the required consideration—the Congressionally-specified

SPH level of protection and flood structures built to design grade.  Indeed, the most

compelling reason for rejecting immunity here was articulated in the official investigative

report commissioned by the Army Corps.  The Interagency Performance Evaluation Task

Force ("IPET") concluded:

> The system did not perform as a system.  In some areas it was not
> completed, and in others, datum misinterpretation and subsidence reduced
> its intended protective elevation. . . . The incompleteness of the HPS made
> a material contribution to the catastrophic flooding.  Lower than
> authorized elevations of flood protection structures contributed to the
> overtopping and failure of both floodwalls and levees.  A completed
> system would have prevented much of the catastrophic flooding and
> resulting loss of life and property.

PUF Nos. 156, 208.

## II.    <u>STANDARD OF REVIEW</u>

Summary judgment should be granted if "there is no genuine issue as to any

material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  "Where the record taken as a whole could not lead a rational trier of fact

to find for the non-moving party, there is 'no genuine issue for trial.'"  *Matsushita*

*Electric Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Substantive

law determines the materiality of facts, and "[o]nly disputes over facts that might affect

the outcome of the suit under the governing law will properly preclude the entry of

summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the burden shifts to the opposing party "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 317. "[M]ere allegations or denials" will not defeat a well-supported motion for summary judgment. Fed. R. Civ. P. 56(e). Rather, the opponent must come forward with "specific facts" that establish an issue for trial. *Id.*

The first basis for Plaintiffs' summary adjudication motion—Plaintiffs' damage claims are not related to a flood control project—can be decided now because "there is no genuine issue as to any material fact" and Plaintiffs are "entitled to judgment as a matter of law." F.R.Civ. P. 56(c).

With respect to the second and third bases concerning the Army Corps' failure to comply with the Congressional mandate and to complete the HPS, the dispositive facts are established by irrefutable evidence. Indeed, the factual record here is unique because the evidentiary support for Plaintiffs' undisputed facts is largely admissible Government reports, documents, and witnesses. *See* Rule 803(8)(C), Federal Rules of Evidence; *Beech Aircraft Corporation v. Rainey*, 488 U.S. 153, 170 (1988) (Government investigative reports and factual findings are admissible). While Plaintiffs support some of their uncontested facts with citations to independent investigative reports and their own experts, the core facts essential to resolution of Plaintiffs' motion for summary judgment are admitted by the Government in its own records, reports, and testimony by

5

Army Corps employees (Richard Varuso, Al Naomi, Nancy Powell, Walter Baumy, and Keith O'Cain) and an Army Corps expert (Dr. Robert Dalrymple).

## III.   **STATEMENT OF FACTS**

In successfully defending the British soldiers accused of the Boston Massacre, John Adams reminded the jury that "[f]acts are stubborn things, and whatever may be our wishes, inclinations or the dictums of our passions, they cannot alter the state of facts and evidence."  David McCullough, *John Adams* (New York: Simon & Schuster, 2001), p. 68.  For the Government, the dispositive facts here are stubbornly inescapable.

The facts set forth in Plaintiffs' Statement of Undisputed Facts—and summarized below—conclusively establish that the Government cannot evade its liability for the drowning of Greater New Orleans by resort to § 702c.  The worst engineering disaster in American history was exhaustively investigated by the Army Corps, Congress, and independent organizations. As the Court will see, there is remarkable agreement on the material facts among Army Corps officials; the Army Corps-sponsored report by the Interagency Performance Evaluation Task Force ("IPET") (Exhibit 20); the Army Corps-commissioned historical study of the LPVHPP (Wooley and Shabman, *Decision-Making Chronology For The Lake Pontchartrain & Vicinity Hurricane Protection Project Draft Final Report For The Headquarters, U.S. Army Corps of Engineers Submitted To The Institute For Water Resources of The U.S. Army Corps of Engineers* ("*Decision-Making Chronology*") (Exhibit 26); the independent investigative reports of Team Louisiana (Exhibit 4), the Independent Levee Investigation Task Force ("ILIT") (Exhibit 3), and the American Society of Civil Engineers ("ASCE") (Exhibit 42); the Department of Homeland Security and Counterterrorism (Exhibits 21 and 47); Congressional

6

committees (Exhibits 22 and 23); Government Accountability Office reports to Congress (Exhibits 19 and 24); and Plaintiffs' experts' reports (Exhibits 13, 14, 17, 31, 33, 39 and 40).

As the Court will see, every single material fact essential for resolving this motion is supported by a Government source.  In short, Plaintiffs' proof is a host of "stubborn facts" from the Defendant's own binding admissions.  Accordingly, Plaintiffs are entitled to summary adjudication on the second affirmative defense because there can be no genuine issue as to any material facts.

### A.      The MR-GO Has Never Been A Flood Control Project

The Government concedes that the MR-GO had no flood control features when constructed. PUF No. 15. The Government also admits that "the MR-GO did not have a flood control purpose or function," and "no levees were constructed as part of the MRGO project." PUF No. 19.  At the time of Hurricane Betsy in 1965, the MR-GO was still a navigation channel with no flood control features.  PUF No. 20.

In the wake of Hurricane Betsy's catastrophic flooding, Congress enacted the Flood Control Act of 1965 authorizing the LPVHPP.  PUF No. 65.  The MR-GO, however, was never part of the new flood control project.  PUF No. 23. The Government has further conceded that "the MR-GO was not a flood control project and was not absorbed into the LVHPP."  PUF No. 18.  Likewise, the United States has disavowed any argument that the MRGO was either (1) related to the national flood control program, (2) a "constituent component" of the LPVHPP, or (3) morphed into a hybrid flood control project/navigational aid project. PUF. No 22; *see also* PUF Nos. 16-17. In short, "the

character of the MRGO remained unchanged from its inception until Hurricane Katrina."
PUF  No. 21.

The upshot of these concessions is that if the MR-GO caused catastrophic
flooding of Plaintiffs' property, it was an independent act of negligence unconnected with
any federal flood control project.  *See* Section IV.A, *infra*.

> **B.**    **In Constructing the MR-GO, The Army Corps Ignored Known
> Hazards Posed by The "Funnel Effect"**

Bowing to decades of lobbying by Louisiana politicians and business interests,
Congress authorized in 1956 the MR-GO as a 76-mile deep water, navigation channel
connecting the Gulf of Mexico to the Port of New Orleans Inner Harbor Navigation
Canal ("IHNC").  PUF Nos. 1, 2, 3, 10, 11.  The Army Corps designed, constructed,
operated, and maintained the MR-GO.  PUF No. 2.   The channel was gouged out of a
"landcut" of 46 miles bisecting the sensitive marshes of lower St. Bernard Parish and the
shallow waters of Chandeleur Sound.  PUF Nos. 2, 3, 24.  Between 1958 and 1968, 300
million cubic yards of earth were moved to construct the MR-GO—60 million more
cubic yards than for the Panama Canal.  PUF No. 4.

The MR-GO has been divided into three reaches.  *See* Attachment A (Map of
MR-GO).

The six-mile connection between the junction of the Gulf Intracoastal Waterway
("GIWW") and the MR-GO terminus in the IHNC has been designated as Reach 1.  In
IPET's words, Reach 1 is "the critical reach" playing the most significant role in
transmission of hurricane surge.  Reach 2—the segment dredged through the marsh
beginning at the convergence with the GIWW and extending to Veret—has caused the
most environmental degradation.  Finally, Reach 3 further south to the Gulf of Mexico is

the financial albatross, requiring continual dredging to keep the channel open.  PUF No. 5.

The MR-GO features a funnel created by joining Reach 1 and Reach 2 west of the large gape adjacent to Lake Borgne.  *See* Attachment A (Map of MR-GO).  The earthen berms on the south side of the MR-GO and the north side of the GIWW converge from being about 10 miles apart where they straddle Lake Borgne to a few hundred yards apart where the MR-GO merges into the GIWW.  The western part of the "funnel" is the six mile-long section of the combined GIWW/MRGO (Reach 1); it was enlarged by a factor of three when the MR-GO was built in order to expand from a barge channel and accommodate oceangoing vessels.  This geometry created the potential for a "funnel effect" enabling hurricane storm surge from Lake Borgne and the Gulf of Mexico (via Reach 2) to flow into the confined channel of the GIWW/Reach 1 separating New Orleans East and the Ninth Ward/St. Bernard Parish.  PUF Nos. 50-58.

For decades, the Army Corps has known that hydrologically, the MR-GO created a short, new pathway for astronomical and storm-driven tides to flow directly from Breton Sound to Lake Borgne and Lake Pontchartrain.  PUF No. 5. As the Army Corps told Congress, "[t]he Gulf Outlet Channel also will produce high velocity currents in the Inner Harbor Navigation Channel, creating a hazard to navigation and causing serious scouring damage, particularly in constricted areas of bridge crossings." PUF No. 8.  In other words, the Army Corps knew that by linking the MR-GO and GIWW, it was building an efficient storm delivery conduit to funnel hurricane storm surge into the heart of New Orleans.  PUF Nos. 50-58.

While the MR-GO was being constructed, and for many years right up to Hurricane Katrina, the Army Corps was warned that the funnel created a back door that would accelerate and intensify hurricane storm surges emerging from Lake Borgne and the Gulf into the Greater New Orleans area.  PUF Nos. 8, 51-53, 63.  The funnel had been described as a "superhighway" and "freeway" for storm surges—or the "Crescent City's Trojan Horse"—that could amplify storm surges by 20 to 40 percent.  PUF No. 295a.  LSU researchers concluded that in creating this funnel, "the US Army Corps of Engineers had inadvertently designed an excellent storm surge delivery system—nothing less—to bring this mass of water with simply tremendous 'load'—potential energy—right into the middle of New Orleans." PUF No. 295a.

The "funnel effect" also accelerated the speed of Katrina's surge when the larger volume in the funnel, and especially the water in the MR-GO, was forced into the single merged GIWW/MRGO channel.  PUF No. 50-58, 295.  The increased water velocity further weakened the already unstable earthen berms (due to poor design, materials, and construction), heightening their vulnerability to overtopping and scouring.  PUF Nos. 185, 228.  Maximum current velocities in the combined GIWW/MRGO channel were greater than eight feet per second—nearly three times the velocity necessary to cause serious potential for erosion in the soils of the adjacent levee.[1]  PUF No. 228.  The

---

[1] By use of the term "levee," Plaintiffs do not concede that the structures that the Army Corps designed and constructed along Reach 1 and Reach 2 and the IHNC are in fact the authorized hurricane flood protection system mandated by Congress in the Flood Control Act of 1965.  The fact that the Army Corps considers these structures to be "levees" is hardly dispositive on the Section 702c immunity issue.  By referring sometimes to these structures as "levees," Plaintiffs are using the term, as others also have, in the generic sense and are not admitting that they qualify as the flood works contemplated by Congress in authorizing the LPVHPP.  In fact, as Plaintiffs' expert Dr. Bob Bea of the University of California at Berkeley has noted, "levee" has a technical meaning among

amplified and supercharged storm surge caused massive overtopping of structures along

Reach 1, Reach 2, and the IHNC and contributed to the failure of the IHNC floodwalls in

two locations along the west side—and the resulting catastrophic flooding of the Lower

Ninth Ward and portions of St. Bernard Parish.  PUF Nos. 253-55.

### C.   The MR-GO Spoil Banks Became The Highly Erodable Foundation for The LPVHPP Flood Control Structures

The MR-GO initial land cut excavation and ongoing maintenance dredging

produced large volumes of spoil material disposed of in spoil bank areas along the south

bank of Reach 2 (about 6 to 8 feet high).  PUF Nos. 24, 25.  A hydraulic dredging

machine sucked soil and water from the floor of the MR-GO and discharged the soil in

liquid suspension—uncompacted hydraulic fill consisting of an amalgamation of porous,

deltaic fine grained and organic sediments—through a line from the dredge to a spoil

bank disposal area.  PUF Nos. 24, 27, 28.  To keep the channel at 36 feet depth for deep

draft barges and ships, the MR-GO has required periodic, expensive dredging to remove

silt deposited at the bottom of the channel from natural shoaling and erosion of the

unarmored banks by ship's waves.  PUF No. 25, 26.

The soils used for the later construction of flood protection embankments along

both Reach 1 and Reach 2—prodigious amounts of highly erodable sand mixed with shell

and some silts and clays—were largely existing materials borrowed from the adjacent

spoil banks.  PUF No. 163.  Consequently, the foundation of the flood protection works

---

engineers and in the Army Corps's own manuals for design and construction of such
flood works. *See* Exhibit 31(Bob Bea Expert Report), ¶ 16(b); *see also* PUF Nos. 324-
331.  Indeed, as the evidence shows, the Army Corps did not build along Reach 2 and
most of Reach 1 "levees" in accordance with its own standards.  *See, e.g.,* PUF Nos. 322-
39.  In any event, the pertinent issue here is whether the Army Corps designed and built a
hurricane flood protection *system* in accordance with Congress' directives, not whether
some structures in the LPVHPP are "levees."

along Reach 1 and Reach 2 of the MR-GO—characterized as "treacherous" and highly

variable by the Army Corps—was mostly spongy, organic soils (pure sand with some

shell) with substantial water content.  PUF  Nos. 114-15, 330-35.

Not surprisingly, the stage was set for the catastrophic flooding during Hurricane

Katrina:  These water pervious earthen berms were highly vulnerable to severe erosion

from hurricane storm surge overtopping and to significant subsidence and settlement

from the weight of soil materials placed on top of them during construction of the flood

protection works.  PUF Nos. 120, 129-31, 332.

> **D.** **The Army Corps Spurned Warnings That The MR-GO Would**
> **Ravage The Storm Surge Buffering Wetlands Protecting**
> **Greater New Orleans**

During the MR-GO planning, little attention was devoted to any aspects other

than the engineering of the channel itself, namely the type of material to be dredged, the

spoil areas in which it would be placed, the stability of the cut, and expected costs.  PUF

No. 30.   Before the first cypress grove was dynamited in 1958, however, United States

and Louisiana environmental agencies warned the Army Corps that the MR-GO would

devastate the storm surge buffering wetlands.  For example, in a 1958 report to the Army

Corps, the U.S Fish and Wildlife Service predicted that the MR-GO's construction—

"particularly by breaching the natural east-west ridges between fresh/brackish and salt

water"—would introduce salt water from the Gulf of Mexico into the wetlands and

destroy tens of thousands of acres of marshes and mature bald cypress – water tupelo

swamps.

Even without these warnings, the Army Corps was already aware of the lethal

effects of salt water on fish, wetlands, and cypress trees.  In particular, the Army Corps

knew that the MR-GO "provides a deep direct route for the in-flow of saline currents from the Gulf of Mexico to the area along this channel and to Lake Pontchartrain." PUF Nos. 8. The Army Corps ignored these concerns and began construction. PUF No. 40.

The very ecological disaster predicted by the U.S. Fish and Wildlife Service and its Louisiana counterpart came to pass: The MR-GO directly and indirectly destroyed tens of thousands of acres of wetlands and cypress forests. PUF Nos. 40-49. It is widely agreed—and the Army Corps has acknowledged—that the presence of the MR-GO destroyed wetlands that otherwise would have provided additional surge defenses during Hurricane Katrina. PUF No. 292.

Healthy wetlands provide a protective buffer between storm surge and populated areas. PUF Nos. 110, 123, 213, 219, 223, 260, 309, 322. It has long been known that marshlands and cypress tress absorb some of the storm surge and wave energy, while also providing a buffer area for storm surge before it reaches flood protection works, by filling or soaking up hurricane storm surge. *Id.* Prior to the MR-GO's construction, Greater New Orleans was protected by miles of wetlands consisting of very dense swamp, marsh, and a forested natural ridge. PUF No. 42-43, 46-49.

The decimation of this proven ring of hurricane protection spelled disaster. If these marshlands had not been destroyed by the MR-GO, nature's defenses would have reduced surge caused by Hurricane Katrina by about three feet and spared Greater New Orleans from catastrophic flooding. PUF Nos. 292. By destroying this natural storm surge buffer, however, the MR-GO became a substantial factor in the catastrophic flooding in New Orleans East, Lower Ninth Ward, and St. Bernard Parish. *Id.* Indeed, the Army Corps' own expert, Dr. Robert Dalrymple, attributes over three feet of

additional storm surge against Reach 2 because of the destroyed adjacent wetlands. PUF No. 294.  As one Congressional committee summarized: "The loss of the protective buffer of the wetlands was accelerated by the MR-GO navigation channel which acted like a 'hurricane highway' allowing storms to sweep inland, past marshlands, like liquid bulldozers."  PUF No. 295b.

### E.    The MR-GO's Unarmored Bank Erosion Exacerbated Wetlands Destruction and Flooding During Hurricane Katrina

In designing the MR-GO, the Army Corps knew that there would be stability problems with the channel cut because of ship wake erosion of the unstable banks, comprised of an almost ubiquitous 10 feet of marsh/swamp peat at the surface and scattered deposits of sandy-silt and silty-sand at greater depths.  PUF Nos. 30, 31.  The Corps designers were also aware that this bank erosion would accelerate the loss of protective marshland.  PUF Nos. 31, 32.  Inexplicably, however, the Army Corps intentionally neglected to prescribe erosion protection from wave wash (such as armoring) for the MR-GO's unstable banks. PUF Nos. 31, 33, 36, 37.

The predicted bank erosion in fact occurred.  Over the years, ship wakes (as high as three or four feet) widened the original 650 feet channel—at a rate of between 10 and 20 feet per year on each bank—to 2,000 feet and in some places, to 3,000 feet.  PUF Nos. 33, 35.  This massive increase in the unprotected channel's width and volume of water had several adverse effects, including (1) the breaching of the Lake Borgne shoreline adjacent to the MR-GO which allowed storm surge within Lake Borgne to dump directly into the MR-GO; (2) the enormous loss of marshland adjacent to the channel; and (3) shoaling within the MR-GO.  PUF Nos. 32-35, 40-42. As the Army Corps itself acknowledged in 1988: "Most of the Mississippi River Gulf Outlet is experiencing severe

erosion along its unleveed banks.   The erosion is a result of both man-induced and

natural forces, including combinations of channelization, ship- and wind-generated

waves, storm activity, and subsidence." PUF No. 39.

The construction of bank stabilization works along the MR-GO would have

prevented or reduced erosion, which in turn would have reduced wetland loss and greatly

minimized maintenance dredging.  Moreover, this reduction in dredging and would have

minimized the amount of dredged sludge deposited in the MR-GO spoil banks.  This in

turn would have allowed more soil to adequately dry or "recuperate" before being used to

constrict the putative "levees."  Simply put, less uncompacted hydraulic fill deposited

into the spoil banks would have meant more adequately dried and cohesive soils with

which to construct levees along the MR-GO.  PUF No. 138, 226, 297, 328.

### F.   Congress Mandated A Standard Project Hurricane Design For The LPVHPP Hurricane Protection System

In Section 204 of the Flood Control Act of 1965 (Pub.L.No. 89-298, 79 Stat. 1073

(October 27, 1965), Congress directed the Army Corps to build "works of improvement

for . . . the control of destructive floodwaters" and a "project for hurricane-flood

protection on Lake Pontchartrain, Louisiana."  PUF No. 321.  Mindful that the priceless

value of a large populated area like Greater New Orleans dictates maximum protection

consistent with available funding, Congress envisioned that a specific level of protection

should be afforded by the hurricane flood protection system for Greater New Orleans.

PUF Nos. 75, 165.  Accepting the Chief of Engineer's recommendation in House

Document No. 231,[2] Congress authorized the LPVHPP to protect the areas around Lake

---

[2] House Document No. 231 was incorporated by reference in Section 204 of the Flood
Control Act of 1965.  PUF No. 321.

Pontchartrain from flooding caused by storm surge or rainfall associated with an SPH. PUF No. 66.

For the coastal region of Louisiana, an SPH was expected to have a frequency of occurrence of once in about 100 years.  The SPH represented "the most severe combination of meteorological conditions considered reasonably characteristic for the region."  Exhibit 10 (House Document No. 231) at p. 46; PUF No.66.  An SPH was selected because of the urban nature of the area.  PUF Nos. 66, 73.

The SPH is a theoretical hurricane based on a series of assumptions using historical data developed by the Army Corps, the most critical of which is wind speed that generates potentially deadly storm surge.[3]  PUF No. 94.  Following seven years of analysis, the LPVHPP planners came up with the maximum surge heights for SPH dimensions.  PUF No. 72.  That figure became a basic calculation that was part of the recommendation for the design grade (elevation) level for the authorized flood control structures.  PUF No. 73.  Congress approved specific design heights for various stretches of the system. PUF No. 72.

A project built to SPH criteria also contemplated protection against overtopping. For example, by adopting the Army Corps's recommendations in House Document No. 231, Congress explicitly mandated armoring in the form of rip-rap slope protection along the navigation channel and flood gates.  PUF No. 67; Exhibit 10 (House Document 231) at Paragraph 12, pp. 64-65.  Likewise, Congress directed the Army Corps to consider in the engineering design process the concept of storms much more intense than the SPH.

---

[3] Wind speed has a disproportionately large effect on surge. For example, if all other factors remain constant, an increase in wind speed from 105 to 115 mph (9.5 percent) could add an additional 3 feet to a 15 foot surge on the MR-GO embankment, for a 20 percent increase. PUF No. 94; *see also* PUF No. 95.

House Document No. 231 references for the general design plan a more stringent design hurricane known as the Probable Maximum Hurricane ("PMH").  Exhibit 10 (House Document No. 231) at pp. 20, 46-47; PUF No. 203.

Neither armoring nor PMH assumptions were incorporated into the LPVHPP. PUF Nos. 76, 204.  Along with the many other deviations from the Congressional mandate discussed in Sections III. G and H, *infra*, these two omissions proved disastrous. A hurricane protection system designed with the more protective PMH criteria and armoring would have yielded more resilient and robust flood control structures that would not fail upon expected overtopping in the event of storms whose intensity exceeded that of the SPH.  PUF Nos. 204-205.  Without this added measure of protection afforded by higher elevations and armoring, however, overtopped floodwalls failed because the soils behind them were eroded.  Similarly, earthen levees were also designed without such provisions, and as a result, upon overtopping, the soils on the protected side of the levees (*i.e.*, facing towards land) were severely eroded and contributed to failure of these flood protection structures.   PUF No. 204.  As the American Society of Engineers concluded, the Army Corps's "apparent non-conservative selection of the design hurricane is inconsistent with that needed to protect public safety when an extreme natural force such as Hurricane Katrina strikes."  PUF No. 205.

> **G.    The Army Corps's Failure to Build The Congressionally-Mandated Standard Project Hurricane System Caused The Catastrophic Flooding of Greater New Orleans**

The Army Corps indisputably failed to build the HPS according to the Congressionally-mandated SPH requirements *in at least seven critical respects*. The Army Corps:

* knowingly used obsolete SPH design criteria instead of the updated 1972 and 1979 versions—despite admitting in 1976 that it needed to raise levee heights because of the 1972 SPH change and a 1981 order of the Chief Engineer to use the 1979 SPH (PUF Nos. 95-106);

* failed to use available SLOSH and ADCIRC storm surge computer models that it helped develop and finance; (PUF Nos. 107-109);

* ignored a warning in 1958 from the U.S. Coastal and Geodetic Survey of subsiding benchmarks in Greater New Orleans and failed to use updated vertical datums in designing crown elevations for flood control structures (PUF Nos. 112-113)[4];

* did not take into account known subsidence problems in establishing design elevations for flood control structures (PUF Nos.112-15; 119-23);

* did not take into consideration known diminished surge protection from vanishing wetlands and cypress forests (PUF Nos. 46-49, 110);

* used sandy, erosion-prone soils prohibited by its own levee and coastal engineering manuals (PUF Nos. 326-335); and

* did not armor flood control structures to prevent scouring and erosion upon overtopping (PUF Nos. 125, 127-128, 198).

These glaring omissions led the Army Corps's own expert, Dr. Robert Dalrymple of Johns Hopkins University to conclude: "[w]hatever system the Corps built by the time of Katrina after 1965 was [not] designed to deal with the most severe combination of

---

[4] Pre-Katrina flood control structures were authorized, designed, and numerically modeled relative to a water level reference datum (*e.g.*, mean sea level). However, these structures were constructed relative to a geodetic vertical datum that was incorrectly assumed as being equivalent to, or constantly offset from, a water level datum. This led to flood control structures much lower than planned. PUF Nos. 111-112.

meteorological conditions that are considered reasonably characteristic of this region"—the definition of the SPH that Congress mandated for Greater New Orleans in the Flood Control Act of 1965.  PUF No. 163; *see also* PUF No. 164 (Plaintiffs' expert); 102 (Team Louisiana).

The Army Corps's misfeasance had deadly consequences when Hurricane Katrina hit Greater New Orleans.   PUF No. 263-67, 269-76.  For example, use of the 1959 (instead of the updated 1972 or 1979) SPH led to underestimating surge height by 6.5 feet on Reach 2 alone and resulted in many failures of flood control structures.  PUF Nos. 95, 99, 275.  Similarly, the Army Corps' failure to consider the effects of continuing subsidence on the effective level of flood protection translated into flood structures several feet lower than represented by the agency.  PUF No. 112-13.[5]

In the final analysis, the catastrophic flooding of Greater New Orleans was not a natural disaster, but an avoidable man-made disaster, caused in part by (1) the Army Corps decision not to design or construct proper hurricane flood protection structures along the MR-GO consistent with the Congressional mandate and (2) casting a blind eye towards the fact—confirmed by from Hurricane Betsy and its aftermath—that the MR-GO had opened the region's southern and eastern flanks to attack by hurricane storm surge.  PUF No. 210.  Thus, as IPET concluded, virtually all of the major breaches were caused by overtopping and subsequent erosion because reduced protective elevations

---

[5] The Army Corps consistently failed to warn the stakeholders about the inadequacy of the unfinished HPS and the threat to human life and property from catastrophic flooding caused by either a severe or a more moderate SPH hurricane.  PUF Nos. 296-310.  Thus, before Hurricane Katrina, New Orleans residents were not advised that the GNO HPS required significant improvements to meet even 1 in 100 year SPH requirements.  PUF No. 302.  Worse yet, the New Orleans District actually misled the public by falsely claiming at times that the GNO HPS would protect against a 1 in 200 to 1 in 300 year hurricane.  *Id.*

increased the amount of overtopping, erosion, and subsequent catastrophic flooding.

PUF Nos. 211-14, 221, 269-80.

### H.      The Unfinished LPVHPP Materially Contributed To The Catastrophic Flooding

The LPVHPP was originally expected to take about 13 years to complete at a cost

about $85 million. PUF No. 69.  Tragically for New Orleans and St. Bernard Parish,

however, the 125 miles of levees were never finished.  PUF No. 142-44.  The project

employed two generations of Army Corps employees and contractors at an estimated

total cost of more than $700 million, while consuming nearly $200 million in state and

locally generated funds.  Prior to Katrina, the system was estimated to be about 85

percent constructed, but was not expected to reach completion until 2015–50 years after

Congressional authorization of the LPV and 60 years after initiation of the planning

process.  PUF Nos. 65, 70.

Every investigation has concluded that the LPVHPP was an unfinished,

dysfunctional system at the time of Katrina.  The consensus can be summarized as

follows:

> Forty years after Congressional authorization, the Hurricane Flood
> Protection System ("HPS") for Greater New Orleans at the time of
> Hurricane Katrina was still under construction and uncompleted—a
> sprawling work in process, chronically underfinanced by Congress and
> complacently managed by the ACE.  It was hardly a completed "system"
> but rather a patchwork quilt of several hundred miles of earthen berms,
> spoilbanks, sheetpile, concrete and floodwalls—virtually all of which were
> below design protection elevation and whose most salient features were
> their uneven height and admitted resulting inability to afford the Standard
> Project Hurricane ("SPH") level of protection mandated by Congress in
> the Flood Control Act of 1965.  Still years from completion and decades
> behind schedule, the HPS for Greater New Orleans existed in name only,
> and to no Army Corps official's surprise, it was catastrophically
> overwhelmed when tested by Hurricane Katrina.  This tragedy would not

have occurred if the ACE had designed and constructed the HPS to even the modest SPH dimensions.

PUF No. 142; *see also* PUF Nos. 143-62.

As vividly illustrated by the two flood structure height maps in Attachments B and C, the failure to build the entire Chalmette and New Orleans Systems to full design elevation eviscerated any effective hurricane surge protection. PUF No. 142. Simply put, the Army Corps never completed any significant stretch, much less all, of the system to even the modest elevations required by Congress.

The Katrina tragedy demonstrates that Government inaction—particularly not completing even the HFPS four decades after Congressional approval—has devastating consequences. PUF No. 209. IPET put it best:

> The incompleteness of the HPS made a material contribution to the catastrophic flooding. Lower than authorized elevations of flood protection structures contributed to the overtopping and failure of both floodwalls and levees. A completed system would have prevented much of the catastrophic flooding and resulting loss of life and property.

PUF No. 208 (emphasis added).

## IV.   ARGUMENT

### A.   Section 702c Is Inapplicable Because It Is Undisputed that Plaintiffs Do Not Allege That Their Damages Were Caused By Flood Waters Related To A Flood Control Project

The Fifth Circuit conclusively decided 37 years ago that § 702c was never intended to grant the Government blanket immunity for tort claims arising from its negligent design, construction, operation, and maintenance of the MR-GO.

> These three consolidated cases present the single question whether the immunity clause contained in . . . 33 U.S.C. § 702c, applies to these actions under the Federal Tort Claims Act . . . for floodwater damage allegedly caused by the negligence of the United States in the construction of the *Mississippi River-Gulf Outlet . . . . We conclude that § 3 does not*

> bar these suits and affirm the judgment of the district court denying the
> Government's motion to dismiss.

*Graci II*, 456 F. 2d at 21-22 (emphasis added).

Nothing since *Graci* affects this holding. Indeed, the Supreme Court in *James v. United States,* 478 U.S. 597, 601, n. 2 (1986) explicitly approved the Fifth Circuit's conclusion. To the extent that the Government argues that *Graci* has been superseded by the LPVHPP, this argument fails because Plaintiffs are not predicating their claims on any negligence in the design and construction of the LPHVHPP or its performance during Hurricane Katrina. Moreover, the Government cannot rely on the structures in place at the time of Hurricane Katrina because they were not the comprehensive hurricane protection system mandated by Congress (*see* Section IV.B., *infra*), and they were far from completion (*see* Section IV.C., *infra).* In short, whatever works were in place, they do not alter the conclusion that *Graci* is binding precedent requiring summary adjudication in Plaintiffs' favor.

The two material facts for ruling on Plaintiffs' motion on this first ground are uncontested:

1. Plaintiffs do not allege that their damages were caused by a flood control project but instead by the Government's independent negligence with respect to the MR-GO. *See* PUF Nos. 309-13.[6]

---

[6] Discovery has disclosed additional negligent conduct that contributed to the failure of the I-walls on the east side of the IHNC and the ensuing catastrophic flooding of the Lower Ninth Ward. The Army Corps undertook site clearing for the Lock Expansion Project at the East Bank Industrial Area sites, and the remediation work had material adverse effects on the soil stability and protection for the flood control structure. Thus, there is a high correlation between the locations of this excavation and the two breach locations. PUF No. 345. Plaintiffs will soon be moving to amend their Complaint to add this separate claim for negligence.

2.    The MR-GO—either before or after Hurricane Betsy and *Graci*—was never a flood control project, a constituent component of the LPVHPP, or otherwise related to any national flood control program.  *See* Section III.A, *supra*.

Accordingly, the only question here is whether § 702c sweeps within its ambit Government negligence unconnected to a flood control project.  As the Fifth Circuit and this Court more recently have held, the answer is a resounding "no." *See Graci*, 456 F.2d at 21-22; *In Re Katrina Canal Breaches Consolidated Litigation,* 471 F.Supp.2d 684, 691 (E.D. La. 2007).[7]

### 1.    The Fifth Circuit in *Graci v. United States* Dispositively Decided That Section 702c Immunity Does Not Attach To The Government's Tortious Acts Arising From The MR-GO

Both the Fifth Circuit and this Court have found that the MR-GO is a navigational waterway, not a flood control project, and therefore does not meet the threshold requirements for Section 702c immunity.  In *Graci*, homeowners sued the United States under the Federal Tort Claims Act ("FTCA") for Hurricane Betsy related property damage resulting from the Government's negligent design, construction, operation, and maintenance of the MR-GO.  *Graci II*, 456 F. 2d at 22.  The District Court denied the Government's motion for rehearing on the District Court's earlier denial of a motion to dismiss on § 702c grounds.  *Graci I*, 301 F. Supp. at 956.  The Fifth Circuit affirmed the lower court's ruling, holding that "Judge Heebe concluded that [Section 702c] . . . should not be construed to be a wholesale immunization of the Government from all liability for

---

[7] The passage of more than three decades only confirms the *Graci* opinions precedential value.  *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 32 (2005)("Considerations of stare decisis are particularly forceful in the area of statutory construction, especially when a unanimous interpretation of a statute has been accepted as settled law for several decades.")

flood water damage *unconnected with flood control projects* … [w]e are constrained to agree." *Graci II,* 456 F.2d at 27 (emphasis added).

In *Graci I*, the District Court reaffirmed an earlier denial of a Government motion to dismiss:

> Section 3 [of the Flood Control Act of 1928] . . . *should not be interpreted as a wholesale immunization from all liability for floodwater damage unconnected with flood control projects*, and that *insofar as § 3 is to be interpreted, it stands on a less crucial basis and is superseded by the general waiver of immunity of the Federal Tort Claims Act.*

*Graci I*, 301 F. Supp. at 951 (emphasis added).

The Fifth Circuit affirmed the *Graci I* decision:

> [*T*]*he purpose of* § 3 was to place a limit on the amount of money that Congress would spend in connection with flood control programs. . . . *The question then becomes whether it is reasonable to suppose that in exchange for its entry into flood control projects, the United States demanded complete immunity from liability for the negligent and wrongful acts of its employees unconnected with flood control projects. Judge Heebe answered that it would not be reasonable so to conclude.* . . . Our analysis of another group of § 3 cases leads us to agree.

*Graci II*, 456 F. 2d at 26 (emphasis added);[8] *accord Seaboard Coast Line Railroad Co. v United States*, 473 F. 2d 714 (5th Cir. 1973) (no §702c immunity for flooding of plaintiff's property caused by construction of defective drainage canal at federal aircraft maintenance center).

---

[8] Section 702c's legislative history reinforces the conclusion that immunity is predicated on a nexus between the alleged damages and a flood control project. *See* Plaintiffs' Opposition to Government's Motion to Dismiss, at pp. 39-43; *James v. United States*, 740 F.2d 365, 372-73 (5th Cir. 1985), *rev'd,* 478 U.S. 597 (Congress sought to limit the costs of the Mississippi River Valley flood control system to damages for "destruction of property *in conjunction with the construction of the flood control projects*.")  (Emphasis added.)

### 2.     This Court Has Adopted The *Graci* Holding

This Court expressly embraced this interpretation of the *Graci* opinions in denying the Government's motion to dismiss.  *See In Re Katrina Canal Breaches Consolidated Litigation,* 471 F.Supp.2d at 691-92.  Specifically, the Court adopted *Graci's* holding that "when, as here, the plaintiffs allege that they have suffered floodwater damage as a result of negligence of the United States *unconnected with any flood control project*, [§ 702c] does not bar an action against the United States under the Federal Tort Claims Act."  *Id.* at 692 (emphasis added).

### 3.     The Supreme Court in *James* Expressly Endorsed The Fifth Circuit's Conclusions in *Graci*

Like the Fifth Circuit in *Graci,* the Supreme Court in *James v. United States*, 478 U.S. 597 (1986) concluded that § 702c was enacted to protect the Government from liability stemming from flood control projects that it had expended funds and effort to construct.  Notwithstanding confusing *dicta* about the terms "flood" and "flood waters" in § 702c, the Supreme Court was crystal clear that § 702c applied only to the Government's negligent acts related to *flood control projects*.  *Id.* at 605 ("The Act concerns flood control projects designed to carry flood waters.")  Nowhere in *James* did the Supreme Court extend § 702c to apply to non-flood control related projects such as the MR-GO.  Indeed, the Supreme Court stated unequivocally:  "We have noted that here the District Court in each [consolidated ] case found that the *waters were being released from federal flood control facilities to prevent flooding*."  478 U.S. at 605 n. 7 (citations omitted; emphasis added).[9]

----

[9] The two consolidated cases in *James* involved damage suits against the Government related to accidents in Arkansas and Louisiana flood control reservoirs.  Recreational

Most significantly, the Supreme Court explicitly endorsed the Fifth Circuit's

holding in *Graci*.

> In *Graci v. United States,* property owners in Louisiana brought suit for
> flooding allegedly caused by negligent design in the Mississippi River
> Gulf Channel Outlet, a navigation project that provides a shortcut from the
> Gulf of Mexico to New Orleans. The Federal Government contended that
> § 702c granted immunity from damages caused by any flood waters, even
> those unconnected with flood control projects. The court rejected this
> argument, and held that the provision conferred immunity only for
> floods or flood waters connected with a flood control project."

478 U.S. at 602, n. 2; *see also id*. at 605, note 7 (collecting cases with similar holdings).

### 4.       Supreme Court in *Central Green* Likewise Endorsed The Fifth Circuit's Conclusions in *Graci*

In *Central Green Co. v. United States*, 531 U.S. 425 (2001), the Supreme Court

clarified its view of the terms "flood" or "flood waters" used in § 702c. The Supreme

Court held that the character of the waters should be the focus in order to determine

whether immunity should be applied:  "Accordingly, the text of the statute directs us to

determine the scope of the immunity conferred, not by the character of the federal project

or the purposes it serves, *but by the character of the waters that cause the relevant

damage and the purposes behind their release*." *Id*. at 434 (emphasis added).

 The plaintiff in *Central Green* sued the Government for damages due to

subsurface flooding of his farmland caused by an irrigation canal that was part of the

Central Valley Project.  The issue presented therefore was the extent of the Government's

immunity for harms caused by irrigation waters as opposed to waters released for flood

control purposes.  At no point in *Central Green* did the Court address or even consider

---

users of the reservoirs were injured or drowned when they were swept through tainter
gates after they were opened by the Army Corps to control flooding.  478 U.S. at 599-
600.

the issue here:  Whether the Government can claim immunity under § 702c for harms caused independent of any flood control project.

As this Court has noted, the Supreme Court in *Central Green* restricted rather than enlarged the scope for immunity in connection with waters related to a federal flood control project.[10]  Moreover, *Central Green* did not address waters within a non-flood control, navigation-related canal like the MR-GO.  Indeed, unlike the MR-GO which the Government concedes exclusively serves a navigational purpose and was not "designed to carry flood waters," *James*, 470 U.S. at 605, the canal in *Central Green* served the dual purpose of irrigation and flood control.

The Government has consistently misconstrued the Supreme Court's analysis in *Central Green,* asserting that immunity attaches to any "flood waters" irrespective of whether those waters bear any relation to a federal flood control project.  Nothing in *Central Green* suggests that the Supreme Court was viewing the term "flood waters" in isolation or conferring wholesale immunity for any flood waters regardless of the source.  To the contrary, the Supreme Court in *Central Green* remanded the case for further determination about the *source* of the water because the water's source (*i.e.,* irrigation vs. flood control) would dictate the scope of the Government's liability.  531 U.S. at 437.  The Supreme Court made clear that if, as here, "the character of the waters that cause the relevant damage" was not related to a flood control purpose, § 702c immunity would not apply.  *Id.* at 434.

---

[10]*See In re Katrina Canal Breaches Consolidated Litigation*, 471 F.Supp.2d at 695 (Court rejects "the Government's contention that *Central Green* broadens the immunity provided by 702c . . . ."); *see also Sanko Steamship Co., Ltd. v. United States*, 272 F. 3d 1231, 1232 (9th Cir. 2001) (The Supreme Court in *Central Green* "established *a more restrictive test* for determining sovereign immunity.") (Emphasis added.)

5.     **This Court Has Properly Rejected The Government's Extreme Interpretation of Section 702c**

On three occasions, this Court has properly rejected the Government's radical interpretation of § 702c.  First, in *In re Katrina Canal Breaches Consolidated Litigation*, the Court stated:

> "The Government maintains that the plain language of § 702c clearly means that the United States cannot be liable for damages caused by any flood waters of any kind occurring anywhere. . . . *The Court finds that this wholesale approach to immunity in the context of this motion to dismiss is neither supported by the history of the Flood Control Act of 1928, nor in a fair reading of  Central Green Co. v. United States*, 531 U.S. 425 . . . (2001) as the Government contends."

471 F.Supp.2d at 690 (emphasis added).

Instead, this Court correctly concluded that the proper interpretation of *Central Green* is not an expansive reading of the terms "flood" and "flood waters"[11] but rather a focused inquiry into whether the flood waters causing the damage was related to a flood control project or some other cause—in *Central Green*, irrigation, and in this case, the MR-GO. *Id.* at 694-95.

Furthermore, this Court ruled that "the concept that the Government might be immune from damage from the effect of some water and not as to other water is recognized in *Central Green*." *Id.* at 694-95.  The Supreme Court "opened the possibility of a segregation of damages—those for which the Government would be immune under §

---

[11] In *Central Green*, Justice Stevens, writing for a unanimous Supreme Court, expressly rejected the *dicta* in *James* as an "isolated comment" unnecessary to the holding.  531 U.S. at 431. As this Court observed, the Supreme Court in *Central Green* observed that its decision in *James* concluded "the phrase 'flood or flood waters' is not narrowly confined to those waters that a federal project is unable to control and that it encompasses waters that are released for flood control purposes when reservoired waters are at flood stage." *Id.* at 431." *In re Katrina Canal Breaches Consolidated Litigation*, 471 F.Supp.2d at 694.

702c and those for which immunity would not attach. Indeed, the Government even concurred with this reading at oral argument." *Id.* at 694-95.[12]  Consequently, this Court must "identify *the cause of the damage* rather than base a decision on the mere fact that a flood control project was involved." *Id.* at 695 (emphasis added).  And if, as alleged, the cause of the damage is the excess flood surge generated by the MR-GO (PUF Nos. 214, 291-93), Section 702c would not be applicable because the cause is "'totally unrelated to any natural waterway **or the national flood control program'** *Graci,* 301 F.Supp. at 956." 471 F.Supp.2d at 695 (bold in original).

For a second time in this case, the Court again rejected the Government's extreme construction of § 702c in denying its motion to certify an interlocutory appeal.  See Document No. 6194 (July 2, 2007) at p. 5 (emphasis added) ("Clearly, there are circumstances where the United States may be held liable for damages resulting from flood water caused by its acts or omissions.").

Finally, in the course of granting the Government's motion to dismiss a lawsuit brought by the Louisiana Environmental Action Network concerning the London Avenue Canal, the Court had a third opportunity to explicate its reading of § 702 as applied to Hurricane Katrina flooding.  *See* Document No. 8844 (November 2, 2007).  The Court reiterated that *Central Green*  "abrogated" the *dicta* in *James,* and as the Court held in *In re Katrina Canal Breaches Consolidated Litigation*, the appropriate focus is identification of "'*the cause of the damage* rather than base a decision on the mere fact that a flood control project was involved.'" *Id.* at p. 11 (emphasis in original; citation

---

[12] This Court cited as an example whether "the United States [would] be immune for all damages if a Navy vessel lost control and broke through [a] levee where the sole cause of the failure was . . . the Navy vessel's negligence?" *Id.* at 695.

omitted).  Applying this test to the London Avenue Canal, the Court held that § 702 applied because unlike *Robinson v. United States*, where the alleged cause of the damages is a navigable waterway, instead of a flood control project, the London Avenue Canal was "part  of a flood control project" (the LPVHPP) and the alleged damage was caused by the levee breaches. *Id.* at 11-12.

> **B.    Sovereign Immunity Does Not Apply Because The Undisputed Facts Establish That Army Corps Violated The Congressionally-Prescribed Course Of Conduct In Designing and Constructing The LPVHPP**

It has long been established that "'if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow . . . sovereign immunity does not bar suits based on an employee's failure to follow the prescribed course of conduct." *Burkhart v. WMATA*, 112 F.3d 1207, 1217 (D.C.Cir.1997) (*citing United States v. Gaubert*, 499 U.S. 315, 322 (1991); and *Cope v. Scott*, 45 F.3d 445, 448 (D.C.Cir.1995); *Kiska Const. Corp. v. Washington Metropolitan,* 321 F. 3d 1151, 1159 (D.C. Cir. 2003).  Thus, when a federal agency violates a statutory mandate, "there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *United States v. Gaubert* at 324.   This case is a paradigm for applying this doctrine because Congress specifically mandated a precise safety and engineering standard—a hurricane protection system with the SPH level of protection. *See* Section III. F, *supra*.  The Army Corps simply had no authority "to deviate from this mandated [standard]" because such deviation would represent "failure on the part of the agency to perform its clear duty under federal law." *Berkovitz v. United States*, 486 U.S. 531, 544 (1988); *see also id*. at 536 ("The employee has no rightful option but to adher to the directive.")

For more than two centuries, a fundamental precept of sovereign immunity has remained immutable:  the Government is not immune if a federal employee violates specific statutory mandates.  *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 166 (1803) (a government officer has no "discretion" to ignore "a specific duty . . . assigned by law").  This rule has particular resonance when Congress prescribes safety and engineering standards.  As the Ninth Circuit stated in holding that the discretionary function exception did not bar damage claims based on the negligent construction of a canal:  "*Berkovitz* thus establishes that a safety or engineering standard operates to remove discretion under the FTCA when it is embodied in a *specific* and *mandatory* regulation or statute which creates clear duties incumbent upon the governmental actors." *Kennewick Irrigation District v. United States*, 880 F.2d 1018, 1026 (9th Cir.1989) (emphasis is original).

In our case, it is indisputable that Congress gave the Army Corps an explicit mandate to follow a prescribed course of conduct with respect to the LPVHPP.  *See* Section III. F, *supra*.  The SPH is a specific safety and engineering standard for designing and constructing a hurricane flood protection system that will withstand a hurricane with meteorological characteristics of certain assumed barometric pressure, wind speed, and surge levels.  *See* PUF Nos. 66, 71-75.  In our constitutional scheme, it was exclusively Congress' prerogative—after balancing the safety and cost considerations—to make the ultimate determination of the authorized protection level for Greater New Orleans.  *See, e.g., Kennewick Irrigation District v. United States.*, 880 F.2d at 1026.  As the evidence shows, the Army Corps failed to build the LPVHPP hurricane protection system according to the Congressionally-mandated SPH *in at least seven critical respects,* and

these failures caused the catastrophic flooding of Greater New Orleans.  *See* Section III.G., *supra*.

There is no room for doubt that the Army Corps had no authority to deviate so markedly from the SPH criteria.  Over 60 years ago, Congress legislated a prohibition against the Army Corps unilaterally modifying a previously-authorized flood control project.  *See* Flood Control Act of 1946, P.L. 79-526, 52 Stat. 1215, § 2 (July 24, 1946).  In addition, the Army Corps itself has recognized that material project modifications— like those reducing the level of protection below that authorized by Congress—require Congressional authorization.  In the 1952 Annual Report of the Chief of Engineers submitted to the House of Representatives, the Chief of Engineers stated:

> [T]he Corps considers it necessary to bring project modifications to the attention of Congress for specific action, whenever such modification will (a) [m]aterially alter the *scope or functions* of the project[,] (b) *[m]aterially change the authorized plan of improvement*[, or ] (c) *[i]nvolved special circumstances unknown to the Corps and to Congress when the project was authorized*.

H. Doc. No. 272, vol. 3 (1952) at 27 (emphasis added); *see also* 1972 Opinion Letter of the Army Corps' General Counsel (quoted in *Environmental Defense Fund, Inc. v. Alexander*, 467 F. Supp. 885, 901(N.D. Miss. 1979)) (emphasis added).  Indeed, the Army Corps has no discretion to deviate from its own rules and regulations—much less a statutory safety and engineering standard.  *See, e.g., Phillips v. United* States, 956 F.2d 1071, 1077 (11th Cir. 1992).

Accordingly, implementation of the Congressional mandate to design and build the LPVHPP left no room for the exercise of discretion or choice about whether to construct the hurricane protection system according to the prescribed SPH dimensions.  The Army Corps was not free to ignore material elements such as using the correct SPH

criteria or providing armoring.  In specifying SPH as the design hurricane for the LPVHPP, Congress made the critical policy judgment concerning the level of protection to be afforded Greater New Orleans, leaving the Army Corps no authority to second-guess this legislative decision—much less *lower* the level of protection.  *See Berkovitz v. United States*, 486 U.S. at 537-38.  In sum, by failing to design and construct the LVPHPP in accordance with the SPH mandate, the Army Corps is not entitled to immunity.

      **C.**      **Section 702c Is Not Applicable Here Because It is Undisputed That The Congressionally-Mandated Hurricane Protection System Was Not Completed By The Time of Hurricane Katrina**

It is undisputed that the Greater New Orleans HPS was not completed by the time of Hurricane Katrina.  *See* Section III.H, *supra*.  Indeed, the Army Corps' own expert succinctly admitted that when Hurricane Katrina struck, there was "not a completed Hurricane Protection System to the extent Congress or the Corps or both thought they were getting a level of protection of 17 and a half feet."  PUF  No. 156.  The Government is not entitled to § 702c immunity unless and until it completes the authorized flood works.  This conclusion is compelled by (1) the undeniable fact that only a unified, coordinated, and complete hurricane flood protection system can be effective, (2) the legislative history of § 702c and the LPVHPP, and (3) the modern trend of limiting sovereign immunity in the wake of the FTCA's passage.

      **1.**      **Effective Flood Protection Requires A Completed System**

In response to the devastation from "the most disastrous of all recorded floods," *United States v. Sponenbarger*, 308 U.S. 256, 261 (1939), the federal government embarked on an unprecedented national flood control program that was "the largest

public works project undertaken up to that time in the United States." *United States v. James*, 478 U.S. at 606. Enacted as Congress' response to the Great Mississippi Flood of 1927, the Flood Control Act of 1928 ("FCA") "provided for a comprehensive ten-year program for the entire valley, embodying a general bank protection scheme, channel stabilization and river regulation, all involving vast expenditures of public funds." *Sponenbarger*, 308 U.S. at 262; *accord United States v. James*, 478 U.S. at 606; *Mocklin v. United States*, 877 F. 2d 427, 429 (5th Cir. 1989). One of the chronic problems addressed by the plan was the historic, ineffective "*piecemeal flood protection* for separate areas . . . through uncoordinated efforts [because e]xperience demonstrated that these *disconnected levees were utterly incapable of safeguarding* an ever increasing people drawn to the fertile valley." *Sponenbarger*, 308 U.S. at 261 (emphasis added).

Viewed in the context of its conception, the intent of the FCA becomes readily understandable: To grant the United States immunity for its role and expenditures in providing flood control protection. Implicit in this scheme is the requirement that the Government in fact provide the full measure of promised flood control protection in order to qualify for the immunity. Thus, where, as here, "the New Orleans regional flood protection system was largely a system in name only," (PUF No. 140), the Government cannot expect to be immunized from damage suits.

This conclusion is rooted in the very nature of hurricane flood protection systems. When enacting the FCA, Congress, as noted above, knew that effective flood control protection depends on a unified, integrated *system*, not isolated flood works which were never constructed to their promised design elevation. As IPET stated, "[v]ariations in the system levee and floodwall heights can compromise system performance." PUF No.

141.  Every link in the chain of protection must be strong—and at its full design elevation—for a hurricane protection system to achieve its intended goal.  PUF Nos. 153, 199 ("We are not going to turn over a piece of the project until every piece in that ring of protection is completed.")  Thus, the HPS for Greater New Orleans "is just that—a system that is only effective in hurricane flood protection if all the component units have been built to the design protection elevation."  PUF No. 153.

The bargain struck with Section 702c is therefore an exchange:  The people protected by (and who rely upon) a federal flood control project will not be allowed to increase the costs of constructing the flood works by damages claims if the flood prevention measures are unsuccessful *so long as* the Government furnishes the promised, systemic level of protection.  *Cf.  United States v. Sponenbarger*, 308 U.S.at 266 (no liability for a taking "[i]f major floods may sometime in the future overrun the river's banks despite—not because of—*the Government's best efforts*") (emphasis added).

In light of this rationale for the immunity conferred by § 702c, it would be inequitable—and impute "a perverse design" (*United States v. James,* 478 U.S. at 614 (Stevens, J., dissenting)) to the statute—to bar damages claims when the system was concededly never finished and so many elements of the LPVHPP were not even high enough to protect against the Standard Project Hurricane, let alone a genuine Category 3 hurricane.  PUF No.143.  Indeed, by its own admission, the Army Corps " never tried 'to provide full-level protection on an annual basis . . . .'" *Id.*  Applying this admittedly "harsh immunity doctrine," *Hiersche v.United States*, 503 U.S. 923, 926 (1992) (Stevens, J.) would only reward the Government for its lack of diligence and disregard for the safety of the people of Greater New Orleans.  *See* PUF No. 228 (need for a sense of

urgency in completing a mission with "such clear and obvious ramifications for public safety")

Forty years was more than sufficient time to complete the HPS.  PUF Nos. 228-36.  Only full completion to the mandated level of protection throughout the system warrants immunity. As the U.S. Office of Management and Budget recently remarked about the Army Corps' poor performance:  "Good intentions and good beginnings are not the measure of success.  *What matters in the end is completion*:  Performance and results. Not just making promises, but making good promises."  PUF No. 235 (emphasis added).

**2.  The Legislative History of the Flood Control Acts of 1928 and 1965  Reinforces The Unavailability Of Section 702c When The System Is Not Completed**

The legislative history of Section 702c, as well as the Flood Control Act of 1965 authorizing the LPVHPP, reinforces the conclusion that the United States struck a bargain with the American people by which the Government agreed to construct flood control structures in return for immunity if those *completed* structures were overwhelmed by natural forces.

**a.  *Flood Control Act of 1928***

After opening the debate on the FCA in the House of Representatives on April 17, 1928, Representative Bertrand Snell from New York noted that:

> I want this bill so drafted so that it will contain all the safeguards necessary for the Federal Government.  *If we go down there and furnish protection to these people* . . .  I do not want to open up a situation that will cause thousands of lawsuits for damages against the Federal Government in the next 10, 20, or 50 years.

MSJ Exh. 61, p. 6641 (Cong. Rec., vol. 69) (emphasis added).

Representative Frank R. Reid from Illinois, Chairman of the House of Representatives *Committee on Flood Control*, added that "[t]he committee's study and investigation of this question has convinced it that what the people of the Mississippi Valley need is *protection of their lives and property* while they are following their ordinary pursuits of life," and "*[n]o levee system can be effective unless it is unified, coordinated, and complete . . . .*" *Id.* (emphasis added).

Representative William Whittington from Mississippi voiced his opposition to local contribution for levee construction because the inability of local municipalities to pay for construction could result in gaps in the system which would undermine the efficacy of the whole:

> The great lesson from the flood of 1927 is that the dual responsibility resulting from the local contributions will not solve the problem. . . .  It is conceded that the inability of some to contribute may result in *the levee line being broken*, so that those who have contributed will suffer because of the failure of others to make their contribution. . . .  If local contributions obtain, there is the matter of interdependence.  This interdependence may be *fatal to the effectiveness of the entire system*.

*Id.* at 6653 (emphasis added).

Representative Whittington was one of a long line of legislators recognizing that an incomplete flood protection network was essentially worthless.  The desired protection came only from a "unified, coordinated and complete" defense system against rising waters.  Once this system was *complete*, however, Representative Whittington believed that the United States should be immunized from liability: "Levees have been *built* on the theory that the public interest required that they be *constructed* without any damage or liability except for rights of way actually taken.  The continuance of this principle is essential to flood control."  *Id.* at 6652 (emphasis added).

37

Thus, § 702, when read in the context of the FCA's underlying rationale, must be interpreted to require that the Government in fact hold up its end of the bargain—deliver a "unified, coordinated, and complete" flood protection system as authorized by Congress—before it can invoke immunity.

### b.    *The Flood Control Act of 1965*

This conclusion is fortified by the legislative history of the LPVHPP.  In the wake of Hurricane Betsy, Congress swiftly enacted the Flood Control Act of 1965 approving the Army Corps' plan for a hurricane protection system for Greater New Orleans.  Section 204 directed the Army Corps to build "works of improvement for . . . the control of destructive floodwaters" and a "project for hurricane-flood protection . . . ." PUF No. 319.  It is clear that Congress wanted the Army Corps to build a viable system to the full measure of protection of a Standard Project Hurricane. *See* Section III.F, *supra*.

The House of Representatives debate was led by two veteran Louisiana Congressmen:  Edward Hebert and Hale Boggs.  During the September 21, 1965 House Representative Hebert noted that, as a result of Hurricane Betsy, "[p]ractically my whole district in the lower section bordering on the Gulf of Mexico was wiped out."  He "mention[ed] this fact . . . because of the urgency to focus attention on this needed authorization for a *flood control system* in this particular area." (MSJ Exh. 63, p. 24610 Cong. Rec., vol. 111) (emphasis added).  Representative Hebert further observed that the hurricane protection system could not be constructed in a "piecemeal" manner:

> I think the devastation wrought by Hurricane Betsy has clearly demonstrated that *we cannot wait nor postpone from year to year efforts and preparations* to eliminate as far as possible that which has happened to us in Louisiana.

*Id.* (emphasis added).

Representative Boggs also endorsed the need to construct a *complete* hurricane

protection system:

> [T]he Corps of Engineers, working in close collaboration with this
> distinguished committee of this Congress, has already perfected *a*
> *hurricane protection plan* for southeast Louisiana . . . .  *It is a*
> *comprehensive plan.*  . . . [I]t is the opinion of the Corps of Engineers that
> had the plan been in effect the damage from floodwaters would have been
> incalculably less than has been experienced.

*Id.* at 24612 (emphasis added).

Congressman Boggs added that "[o]ne of the projects in this bill—the Lake

Pontchartrain and vicinity project—is designed to provide the Metropolitan New Orleans

area and southeast Louisiana with more extensive, stronger hurricane and flood

protection."  *Id.* at 24614.  He also noted that "[t]here is no doubt that Hurricane Betsy

points up the need, too, *of accelerated action* to begin the construction of this sweeping

barrier plan for the Metropolitan New Orleans area."  *Id.* at 24615 (emphasis added).

When the two statutes and their legislative histories are read together, it is evident

that the only plausible interpretation of § 702c—in the context of a comprehensive

hurricane protection system like the LPVHPP—is that (1) Congress recognized that only

a *completed* flood control system has any value, but (2) once the system is finished and

functioning as intended, the Government should be immunized against any damages.

Any other interpretation of the law would be absurd.

### 3.      Section 702c Must Be Narrowly Construed

Section 702c is a throwback to a bygone era when the national sovereign was

immune for tortious acts.  With the passage of the FTCA, however, the Government gave

a broad waiver of sovereign immunity with only a few exceptions.  While Section 702c

39

was not repealed, its continued existence is "an anachronism." *Hiersche v. United States*, 503 U.S. at 926.

The modern trend, as evidenced by the FTCA, puts Americans and their Government on a level playing field in litigating injuries allegedly caused by the negligence of federal employees.  *See, e.g., United States v. Olson,* 546 U.S. 43, 46-47 (2005); *Feres v. United States,* 340 U.S. 135, 139-140 (1950).  Disputes like this one should be resolved on the merits and not by invoking "an obsolete legislative remnant [that] is nothing more than an engine of injustice."  *Hiersche v.  United States*, 503 U.S. at 926*.* This is particularly true here because extinguishing Plaintiffs' claims for negligence with respect to the MR-GO would create a perverse incentive:  No matter how derelict the Army Corps is in fulfilling the Congressional mandate of affording and completing the prescribed level of hurricane protection, not only is there no sanction for the Army Corps' dereliction of duty, but it will be rewarded with complete immunity for disobeying direct orders.  Congress never intended such a Draconian result.

**V.      CONCLUSION**

For the following reasons, the Court should grant Plaintiffs' Motion for Summary Adjudication as to the second affirmative defense.

///

///

///

Dated: January 11, 2008            Respectfully submitted,

**O'Donnell & Associates P.C.**

By: s/ Pierce O'Donnell

Pierce O'Donnell (*pro hac vice*)
550 S. Hope St., Suite 1000
Los Angeles, California 90071
Phone:  (213) 347-0290
Fax:  (213) 347-0298

**The Andry Law Firm, LLC**

By: s/ Jonathan B. Andry
Jonathan B. Andry (LSBA No. 20081)
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 586-8899
Facsimile:  (504) 585-1788

**Law Offices of Joseph M. Bruno**

Joseph M. Bruno (LSBA No. 3604)
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

**Domengeaux Wright Roy & Edwards LLC**

Bob F. Wright (LSBA No. 13691)
James P. Roy (LSBA No. 11511)
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, Louisiana 70502-3668
Telephone: (337) 233-3033
Facsimile:  (337) 233-2796

**Fayard & Honeycutt**

Calvin C. Fayard, Jr. (LSBA No. 5486)
Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193
Facsimile:  (225) 664-6925

**Girardi & Keese**

Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile:  (213) 481-1554

**Ranier, Gayle & Elliot, LLC**

N. Frank Elliot III
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337).494.7218

**Levin, Papantonio, Thomas, Mitchell Echsner & Proctor, P.A.**

Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123

**McKernan Law Firm**

Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202

**Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC**

Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Law Office of Elwood C. Stevens, Jr., a Professional Law Corporation**

Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Cotchett, Pitre, Simon & McCarthy**

Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**

Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Salas & Co., LC**

 Camilo K. Salas, III (LSBA No. 11657)
 650 Poydras Street, Suite 1650
 New Orleans, LA  70130
Telephone: (504) 799-3080
Facsimile:  (504) 799-3085
**Attorneys for Plaintiffs**

**Robinson, Calcagnie & Robinson, Inc.**

Mark Robinson (Cal State Bar No. 54426
620 Newport Center Drive – 7th Floor
Newport Beach, CA 92660
1-888-701-1288

## <u>CERTIFICATE OF SERVICE</u>

I, Pierce O'Donnell, hereby certify that on January 11, 2008, I caused to be served

**<u>PLAINTIFFS' CHRONOLOGY</u>**, upon Defendants' counsel, Robin D. Smith,

Catherine Corlies, Traci Colquette, and Jim McConnon by ECF and email at

robin.doyle.smith@usdoj.gov; catherine.corlies@usdoj.gov, traci.colquette@usdoj.gov,

and jim.mcconnon@usdoj.gov

<u>/s/ Pierce O'Donnell</u>

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................. 1

II.   STANDARD OF REVIEW ................................................... 4

III.  STATEMENT OF FACTS .................................................... 6

      A.   The MR-GO Has Never Been A Flood Control Project ......................... 7

      B.   In Constructing the MR-GO, The Army Corps Ignored
           Known Hazards Posed by The "Funnel Effect" ..................................... 8

      C.   The MR-GO Spoil Banks Became The Highly Erodable
           Foundation for The LPVHPP Flood Control Structures ......................... 11

      D.   The Army Corps Spurned Warnings That The MR-GO Would
           Ravage The Storm Surge Buffering Wetlands Protecting
           Greater New Orleans ........................................................................... 12

      E.   The MR-GO's Unarmored Bank Erosion Exacerbated
           Wetlands Destruction and Flooding During Hurricane Katrina ............. 14

      F.   Congress Mandated A Standard Project Hurricane Design For
           The LPVHPP Hurricane Protection System ........................................ 15

      G.   The Army Corps' Failure to Build The Congressionally-
           Mandated Standard Project Hurricane System Caused The
           Catastrophic Flooding of Greater New Orleans ................................... 17

      H.   The Unfinished LPVHPP Materially Contributed To The
           Catastrophic Flooding ........................................................................ 20

IV.   ARGUMENT ......................................................................... 21

      A.   Section 702c Is Inapplicable Because It is Undisputed that
           Plaintiffs Do Not Allege That Their Damages Were Caused
           By Flood Waters Related To A Flood Control Project ........................... 21

           1.   The Fifth Circuit in *Graci v. United States* Dispositively
                Decided That Section 702c Immunity Does Not Attach To
                the Government's Tortious Acts Arising From The MR-GO. ........... 23

           2.   The Court Had Adopted The *Graci* Holding. ................................. 25

i

3. The Supreme Court in *James* Expressly Endorsed The Fifth
   Circuit's Conclusions in *Graci*..........................................................25

4. Supreme Court in *Central Green* Likewise Endorsed The
   Fifth Circuit's Conclusions in *Graci*..................................................26

5. This Court Has Properly Rejected The Government's Extreme
   Interpretation of Section 702c............................................................28

B.   Sovereign Immunity Does Not Apply Because The Undisputed Facts
     Establish That Army Corps Violated The Congressionally-Prescribed
     Course Of Conduct In Designing and Constructing The LPVHPP .........30

C.   Section 702c Is Not Applicable Here Because It Is Undisputed
     That The Congressionally-Mandated Hurricane Protection
     System Was Not Completed By The Time of Hurricane Katrina ..........33

1. Effective Flood Protection Requires A Completed System ...............34

2. The Legislative History of the Flood Control Acts of 1928
   and 1965 Reinforces The Unavailability Of Section 702c
   When The System Is not Completed . .................................................36

   a. Flood Control Act of 1928 .......................................................36

   b. The Flood Control Act of 1965 .................................................38

3. Section 702c Must Be Narrowly Construed ....................................40

V.   CONCLUSION...............................................................................40

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)......................................................................................... 4

*Beech Aircraft Corporation v. Rainey*,
488 U.S. 153 (1988)......................................................................................... 5

*Berkovitz v. United States*,
486 U.S. 531 (1988)................................................................................... 30, 33

*Burkhart v. WMATA*,
112 F.3d 1207, 1217 (D.C.Cir.1997) ........................................................... 30

*Celotex Corp v. Catrett*,
477 U.S. 317 (1986)......................................................................................... 5

*Central Green Co. v. United States*,
531 U.S. 425 (2001)................................................................................... 26, 28

*Cope v. Scott*,
45 F.3d 445 (D.C.Cir.1995) ........................................................................... 30

*Environmental Defense Fund, Inc. v. Alexander*,
467 F. Supp. 885(N.D. Miss. 1979)............................................................... 32

*Feres v. United States*,
340 U.S. 135, 139-140 (1950) ....................................................................... 40

*Graci v. United States*,
301 F. Supp. 947, 955-56 (E.D. La 1969)...................................... 1, 2, 23, 24

*Graci v. United States*,
435 F. Supp. 189, 195-96 (E.D. La. 1977)...................................................... 1

*Graci v. United States*,
456 F. 2d 20 (5th Cir. 1971) ............................................................. 1, 23, 24

*Hiersche v.United States*,
503 U.S. 923, 926 (1992)......................................................................... 35, 40

*In Re Katrina Canal Breaches Consolidated Litigation*,
471 F.Supp.2d 684, 691 (E.D. La. 2007)................................. 23, 25, 28, 29

*James v. United States*,
    478 U.S. 597 (1986) ........................................................................ 22, 25, 34, 35

*Kennewick Irrigation District v. United States*,
    880 F.2d 1018 (9th Cir.1989) ............................................................... 31

*Kiska Const. Corp. v. Washington Metropolitan*,
    321 F.3d 1151 (D.C. Cir. 2003) ............................................................ 30

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) ............................................................... 31

*Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................. 4

*Mocklin v. United States*,
    877 F.2d 427 (5th Cir. 1989) ............................................................... 34

*Phillips v. United States*,
    956 F.2d 1071 (11th Cir. 1992) ........................................................... 32

*Seaboard Coast Line Railroad Co. v United States*,
    473 F.2d 20 (5th Cir. 1973) ................................................................. 24

*United States v. Gaubert*,
    499 U.S. 315 (1991) ........................................................................... 30

*United States v. Olson*,
    546 U.S. 43 (2005) ............................................................................. 40

*United States v. Sponenbarger*,
    308 U.S. 256 (1939) ...................................................................... 33, 35

## **Statutes**

33 U.S.C. § 702c ................................................................................... 1, 21

F.R. Civ. P. 56(c) ................................................................................. 4, 5

Fed. R. Civ. P. 56(e) ................................................................................ 5

Fed. R. Evid. 803(8)(C) ............................................................................ 5