UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION<br>NUMBER: 05-4182 "K"(2)<br>JUDGE DUVAL<br>MAG. WILKINSON |
| PERTAINS TO:  *Robinson,*<br>(No. 06-2268) | |

**<u>PLAINTIFFS' UNDISPUTED FACTS FOR SUMMARY</u>**

**<u>ADJUDICATION ON SECTION 702C IMMUNITY</u>**

The Plaintiffs hereby contend that the following are undisputed facts for purposes of their motion for summary adjudication on the issue of the availability of 33 U.S.C. § 702c to the Government in this case.  The following abbreviations, terms and definitions are used below:

| | |
|---|---|
| ACE, USACE, Corps | U.S. Army Corps of Engineers |
| ASCE | American Society of Civil Engineers |
| *Decision Making Chronology* | *Decision Making Chronology for the Lake Pontchartrain & Vicinity Hurricane Protection Project*, Draft Final Report for the Army Corp, D. Woolley, L. Shabman (June 2007) |
| EBSBs | Earthen Berms/Spoil Banks |
| *A Failure of Initiative* | *A Failure of Initiative*, Final Report of Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Cong., 2d Session (Feb. 15, 2006) |
| GAO | Government Accountability Office |
| GIWW | Gulf Intracoastal Waterway |
| Government | United States Government |
| GNO | Greater New Orleans (Jefferson, Orleans, and St. Bernard Parishes) |
| HPS, HFPS | Hurricane Flood Protection System |
| IHNC | Inner Harbor Navigational Channel (aka Industrial Canal) |
| ILIT | Independent Levee Investigation Team, *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August* |

| | |
|---|---|
| | *29, 2005*, (July 31, 2006) |
| IPET | Interagency Performance Evaluation Task Force, *Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System*, Final Report of IPET (March 26, 2007) |
| *Lessons Learned* | *The Federal Response to Hurricane Katrina, Lessons Learned*, Office of Homeland Security & Counterterrorism (Feb. 2006) |
| LPVHPP, LPV, LVP | Lake Pontchartrain and Vicinity Hurricane Protection Project |
| LSU | Louisiana State University Hurricane Center |
| LWLFC | Louisiana Wild Life and Fisheries Commission |
| MR-GO, MRGO | Mississippi River-Gulf Outlet |
| *A Nation Still Unprepared* | *Hurricane Katrina: A Nation Still Unprepared*, Special Report of the Committee on Homeland Security and Governmental Affairs, 109th Cong., 2d Session, S. Rept. 109-322 (Jan. 2006) |
| NOFDS | New Orleans Flood Defense System (same as HPS and HFPS) |
| NOD | New Orleans District, U.S. Army Corps of Engineers |
| NSF | National Science Foundation |
| PMH | Probable Maximum Hurricane |
| SPH | Standard Project Hurricane – National Weather Bureau 1959.  Meteorological Considerations Pertinent to Standard Project Hurricane. |
| Team Louisiana | Team Louisiana, *The Failure of the New Orleans Levee System during Hurricane Katrina* (Dec. 18, 2006) |
| USFWS, FWS | U.S. Fish and Wildlife Service |

A.      **MISSISSIPPI RIVER-GULF OUTLET**

1.      **Authorization, Construction, and Eventual Closure**

| UNDISPUTED FACT | EVIDENTIARY SUPPORT |
|---|---|
| 1.     The Mississippi River-Gulf Outlet ("MRGO" or "MR-GO") is a navigable waterway constructed under the authority of Public Law No. 455, 84th Congress, 2nd Session, approved March 29, 1956, substantially in accordance with the recommendation of the Chief of Engineers as contained in House Document 245, 82nd Congress, 1st Session, at an estimated cost of $88,000,000. 70 Stat. 65. | MSJ Exh. 1, *Graci v. United States*, 435 F. Supp. 189, 192, ¶ 15 (E.D. La. 1977) ("*Graci IV*"); MSJ Exh. 2 (House Document No. 245, p. 2 (October 1, 1951)) ("House Document No. 245") |
| 2.     The MRGO was constructed by the U. S. Army Corps of Engineers as an aid to navigation (distinguished from a flood control project) pursuant to legislative mandate of the U. S. Congress. | MSJ Exh. 1, *Graci IV* at 192, ¶ 19 |
| 3.     The MR-GO is a 76-mile long navigation, deep water channel connecting the Gulf of Mexico to the Port of New Orleans Inner Harbor Navigation Canal ("IHNC") via the Gulf Intracoastal Waterway ("GIWW").  It was authorized to be 38 feet deep with a 500 foot bottom width and 650 top width.  The channel includes a "landcut" of 46 miles and bisects the marshes of lower St. Bernard Parish and the shallow waters of Breton/Chandeleur Sound.  The outlet enables ships from ports east of the Mississippi River to head north for New Orleans at Breton Sound, many miles east of the river mouth, at a saving of sixty | MSJ Exh. 3, Independent Levee Investigation Team, New Orleans Levee System: Hurricane Katrina ("ILIT"), July 3, 2006, p. 12-8 to 12-9; MSJ Exh. 1, *Graci IV* at 192, ¶ 17; MSJ Exh. 2, House Document No. 245, p. 2; MSJ Exh. 8, Deposition of Corps 30(b)(6) witness, Keith O'Cain |

| | |
|---|---|
| miles.  Its construction by the U.S. Army Corps of Engineers ("ACE") was started in 1958 and completed in 1968.  Continuing operation and maintenance (including dredging) was the responsibility of the ACE. | ("O'Cain Depo."), 494:2-16 |
| 4.     Nearly 300 million cubic yards of earth was moved to construct the MR-GO between 1958 and 1968—60 million more cubic yards than for the Panama canal. | MSJ Exh. 4, Team Louisiana, p. 225 |
| 5.     Hydrologically, the MRGO created a short, new pathway for astronomical and storm-driven tides to flow directly from Breton Sound to Lake Borgne and Lake Pontchartrain. There are three reaches (Figure 164).  The 6-mile connection between the junction of the GIWW and the MRGO terminus in the IHNC has been designated by IPET (2006b) as MRGO Reach 1, and plays the most significant role in transmission of hurricane surge . . . . Reach 2, the segment dredged through the marsh, has caused the most environmental degradation, while Reach 3 that crosses the shallow Breton Sound is the financial albatross, requiring continual dredging to keep the channel open. | MSJ Exh. 4, Team Louisiana, p. 229 |
| 6.     In 1988, the ACE wrote: "Major surface waters in the study area include the MRGO, the GIWW, the IHNC, the Mississippi River, Lakes Pontchartrain and Borgne, Chandelier and Breton Sounds. . . .  All of these waters bodies are connected hydraulically." | MSJ Exh. 9, Corps 30(b)(6) Depo. Exhibit 26 at p. 8 (Bank Erosion Reconnaissance Report, Feb. 1988) |
| 7.     The MR-GO, GIWW, and IHNC have a hydrologic connection.  If a hydrological event occurs in one, it affects the other.  The MR-GO is open to tidal effects and water | MSJ Exh. 8, Deposition of Corps 30(b)(6) witness, Al Naomi ("Naomi Depo."), 324:17-325:6; |

| | |
|---|---|
| movement because there is an opening to Lake Borgne. | MSJ Exh. 8, O'Cain Depo. 492:18-494:1 |
| 8. At the time the MR-GO was being constructed, the ACE wrote: "The Mississippi River Gulf Outlet provides a deep direct route for the in-flow of saline currents from the Gulf of Mexico to the area along this channel and to Lake Pontchartrain, with resultant adverse effect on fishery resources in the area. . . . The Gulf Outlet Channel also will produce high velocity currents in the Inner Harbor Navigation Channel, creating a hazard to navigation and causing serious scour and damage, particularly in constricted areas of bridge crossings." | MSJ Exh. 10, H.R. Doc. No. 231, 89th Cong., 1st Sess. (1965) ("House Doc. No. 231") at p. 17 |
| 9. The landscape of the GNO east of the IHNC is a maze of contradictions. Levees built to stop storm surge sit incongruously next to ship channels that speed it through a 'funnel' into the heart of the City (Figure 158). Navigation channels like the GIWW and MRGO facilitate trade, but are liabilities when storms threaten. Both are federally funded projects, designed and built by the USACE. The MR-GO and the GNO HPS were planned by the USACE at the same time, and were projected to have similar construction costs, about $90 million each. The effect of one project on the other, however, was not considered until after MR-GO construction began in 1958. | MSJ Exh. 4, Team Louisiana, p. 224 |
| 10. New Orleans port interests made an economic case for construction of the navigation channels, and they were built first, before anyone thought about the storms or the environment. The GIWW was dredged during World War | MSJ Exh. 4, Team Louisiana, p. 225-26; MSJ Exh. 8, Naomi Depo. 162:3-9; |

| | |
|---|---|
| II through the wetlands that separated Lake Pontchartrain from Lake Borgne to provide sheltered, submarine-free, inland waterway access for barges and shallow-draft vessels from Mississippi Sound and points east to the Mississippi River via the IHNC lock, built in the early 1920s. It was a relatively small channel 125 ft wide by 12 ft deep, with a design cross-section of 1,400 square feet. The IHNC, which is about 5.8 miles long, was originally a local channel constructed by the Port of New Orleans to connect Lake Pontchartrain and the Mississippi River. It later became a federal project. | MSJ Exh. 10, House Doc. No. 231, p. 63 |
| 11.   Even before World War II was over, however, the business community began promoting a far grander project that eventually became the Mississippi River Gulf Outlet (MRGO), a 76 mile long, 40 foot deep, and 500 foot wide ship channel to complement the shallow-draft GIWW (Figure 159). This channel (Figure 160) was planned to have a cross-section of more than 23,000 square feet, sixteen times that of the GIWW (Figure 161). It took more than a decade to marshal support for Congressional authorization because the channel proposed was expensive and would have to compete with the Mississippi River—a reliable, deep, natural outlet with an already mature port infrastructure serving the same city. After much debate through the 1950s, port interests succeeded in securing local political support and federal funding, but the promise of an economic windfall for the City has never materialized. The MRGO was opened to ocean-going | MSJ Exh. 4, Team Louisiana, p. 226 |

| | |
|---|---|
| traffic in 1963 but was not fully completed until 1968. | |
| 12.   The new channel failed to attract the vessel traffic predicted by boosters, averaging less than 5 inbound and outbound passages per day in a typical year (1998), and carrying only about 3 percent of the New Orleans port freight tonnage (Caffey and Leblanc 1999). On the other hand, it has cost the nation between $10 and $30 million annually for dredging to maintain the authorized channel section, at an estimated price of about $13,000 per ship passage.  Most of this dredging has been required for the 40 mile open-water reach between the marsh edge jetties into Breton Sound and the 38 foot contour on the continental shelf that IPET (2006b) has designated Reach 3.  The ACE has now recommended to Congress the de-authorization (closure) of the MR-GO on economic, environmental and safety grounds. | MSJ Exh. 4, Team Louisiana, p. 227;<br>MSJ Exh. 11, ACE Integrated Final Report to Congress and Legislative Environmental Impact Statement, on MR-GO, Deep Draft De-Authorization Study, pp 73-77 |
| 13.   Originally conceived as a way to get deep draft ships to the Port of New Orleans facilities in the IHNC, the MR-GO failed to realize its commercial justification because of changes in ships (deeper drafts) and because of the need for almost continuous dredging to keep the channel open. | MSJ Exh. 3, ILIT, p. 12-9 |
| 14.   Between the late 1950s right up to the time of Katrina, St. Bernard Parish continually communicated to the ACE its concerns about the MR-GO.  In 1988, the St. Bernard Parish Council unanimously adopted a resolution to close MR-GO because it constituted a threat to public health and safety from hurricane storm surge.  In October | MSJ Exh. 3, ILIT, p. 12-9; |

| 2004, the Louisiana Legislature passed a resolution urging closure of the MR-GO and immediate implementation of remedial measures to address the hurricane flood risk posed by the MR-GO. | |

## 2.   Never a Flood Control Project

| | |
|---|---|
| 15.   When the MRGO was first designed and constructed, it did not have any flood protection levees or structures. | MSJ Exh. 8, O'Cain Depo. 516:20-24 |
| 16.   The United States "accepts the claim that MRGO was a navigation project . . . [and] the United States does not contend that the MRGO has flood control features, nor does the United States contend that the MRGO ever became anything other than what it always was:  a navigation project." | MSJ Exh. 12, Defendant United States' Rebuttal of Plaintiffs' Sur-Reply in Support of Opposition to Defendant's Motion to Certify (Document 6052), p. 9 |
| 17.   The United States has conceded that "it is undisputed that the MRGO is and always was a navigable waterway and is undisputed that the MRGO did not become a 'flood control facility'. . . ." | MSJ Exh. 12, Document 6052, p. 10 |
| 18.   The Government has conceded that "the MRGO was not a flood control project and was not absorbed into the LVHPP." | MSJ Exh. 12, Document 6052, p. 4 |
| 19.   The Government has conceded that "the MRGO did not have a flood control purpose or function" and "no levees were constructed as part of the MRGO project." | MSJ Exh. 12, Document 6052, p. 4 |
| 20.   At the time of Hurricane Betsy in 1965, the MRGO was a navigation channel, and it had no flood control features. | MSJ Exh. 8, Naomi Depo. 332:23-333:1 |
| 21.   "The United States does not contend that "the | MSJ Exh. 12, Document 6052, p. |

| | |
|---|---|
| MRGO became a flood control project either in whole or in part.  The character of the MRGO remained unchanged from its inception until Hurricane Katrina." | 8 |
| 22.   The United States has disavowed any argument that the MRGO was related to the national flood control program or was a "constituent component" of the LPVHPP or morphed into a hybrid flood control project/navigational aid project. | MSJ Exh. 12, Document 6052, p. 8 |
| 23.   The ACE has always differentiated between the MR-GO and the LPV.  The MRGO was in operation and maintenance phase, while the LPV was funded by the construction appropriations.  As such, they were handled and operated separately.  LPV funding comes from the Construction General Account while MR-GO funding comes from the O&M and General Appropriations Accounts.  MR-GO has separate appropriations. | MSJ Exh. 8, Naomi Depo. 322:25-323:23 |

### 3.        Dredging and Spoil Banks

| | |
|---|---|
| 24.   The MR-GO dredging operation was a cutterhead hydraulic dredge that breaks up the material and, through pumping as an effluent, disposes of the material in a diked retainage area.  A cutterhead dredge has an actual suction pipeline that goes to the bottom with a head on it that rotates and can cut soil, stumps, and tree roots like a Roto-Rooter.  A suction pump shoots the material in liquid suspension through a line from the dredge to a spoilbank disposal area.  This process essentially separates the material, and the heavier sand and shell settles out immediately at the discharge point.  The clays and silts, on | MSJ Exh. 8, O'Cain Depo. 500:25-502:17, 505:16-25, 521:11-23; MSJ Exh. 13, Expert Report of Arthur Theis, ("Theis Expert Report"), ¶ 15 |

| | |
|---|---|
| the other hand, remain in suspension and are dispersed over the large 4,000 ft. wide disposal area.  The Reach 2 spoilbank area has always been about 4,000 feet wide, and the 2,000 feet closer to the MR-GO channel has been the deposit area for the periodic dredging over the years. | |
| 25.   The MR-GO land cut produced large volumes of spoil material that had to be disposed of during its construction. The spoil material was the byproduct of the excavation of the channel by a variety of dredges during its construction and during maintenance cycles, and it was placed primarily in spoil bank areas (about 6 to 8 feet high) on the south side of the navigation channel.  The spoil material consisted of an amalgamation of deltaic fine grained and organic sediments.  Since construction, the MR-GO has required periodic dredging to remove silt deposited at the bottom of the channel from a natural shoaling process from ships' waves on the bankline causing erosion of the bankline.  If this silt was left unremoved, it would reduce the canal's depth. | MSJ Exh. 14, Expert Report of Dr. Shea Penland, ("Penland Expert Report"), p. 14; MSJ Exh. 13, Theis Expert Report, ¶ 9; MSJ Exh. 8, Naomi Depo. 337:2-8 MSJ Exh. 8, O'Cain Depo. 492:18-494:1 |
| 26.   It has been a constant process or struggle over the history of the MRGO to keep it at 36 feet depth for deep draft barges and ships. | MSJ Exh. 8, O'Cain Depo. 494:9-16 |
| 27.   The soil along Reach 2 is largely silt and clay with an overlaying of peat.  When it is all mulched up by the cutterhead dredge and deposited in the spoil bank area, it is still loose material even with the water out of it. | MSJ Exh. 8, O'Cain Depo. 516:25-517:12 |
| 28.   The porous soil materials on the spoil bank area of Reach 2 are uncompacted hydraulic fill material from the | MSJ Exh. 8, O'Cain Depo. 518:3-11 |

| | |
|---|---|
| bottom. | |
| 29.   Over time, the original spoil bank area was at one elevation and the newer part, the 2000 feet part grew higher because of the periodic dredge material deposited on it.  The flood structures along Reach 2 were generally built on the same alignment as the newer 2,000 feet width of spoil material and were constructed of coarser-grained (sandier) materials dredged from the bed of the pre-existing MR-GO, ie. Nearshore Gulf of Mexico beach deposits are buried between 40 and 60 ft. | MSJ Exh. 8, O'Cain Depo. 522:5-18 MSJ Exh. 9, Corps 30(b)(6) Depo. Exhibit 26 at p. 16 |

### 4.   Adverse Effects

| | |
|---|---|
| 30.   In the planning for the MR-GO, little attention was devoted to any aspects other than the engineering of the channel itself, namely the type of material to be dredged, the spoil areas in which it would be placed, the stability of the cut and expected costs.  In the 1959 General Design Memorandum No. 1B for the MR-GO, the effects of this massive channel on the environment of the Lake Borgne estuary and Lake Pontchartrain were addressed in a single paragraph, unsupported by data. | MSJ Exh. 4, Team Louisiana, pp. 230-31; MSJ Exh. 15, General Design Memorandum 1B for the MR-GO (1959), p. 3, ¶ 11 |

### a.   Bank Erosion

| | |
|---|---|
| 31.   At the time of designing the MR-GO, the ACE knew that there would be stability problems with the channel cut.  The channel was to be dredged through relatively unconsolidated Holocene materials, primarily clays, but including an almost ubiquitous 10 feet of marsh/swamp peat at the surface and scattered deposits of | MSJ Exh. 4, Team Louisiana, p. 234 |

| | |
|---|---|
| sandy-silt and silty-sand at greater depths within the cut (Figure 166). The channel cut was designed with 1V:2H side-slopes. It was not expected they would stay that way very long. Concern about channel expansion appears to have been limited, however, as is seen in the General Design Memorandum discussion of the need for channel protection below. <br><br> "No channel protection is recommended initially; however, erosion due to wave wash in open areas can be expected in the upper part of the channel slope where the peat and highly organic clays are exposed. Protection for this area can be provided if and when the need for it becomes necessary. No channel protection is included in the overall cost estimate of the project." (GDM 1B 1959, p. 5). | |
| 32.   When the Army Corps was designing and constructing the MR-GO, it was aware that the banks would be subject to wave wash and the channel subject to shoaling.  The Corps was also aware that the widening of the MR-GO through bank erosion would result in marsh loss. | MSJ Exh. 8, O'Cain Depo. 515:1-18 |
| 33.   The construction of the MR-GO navigational waterway did not include any levee flood protection levees or structures construction.  The waterway construction also did not include any bank protection works (such as armoring) to provide bankline stability and prevent erosion that subsequently substantially widened the canal to as much as 2000 feet or more.  This bank erosion, primarily | MSJ Exh. 8, O'Cain Depo. 516:20-24; <br> MSJ Exh. 13, Theis Expert Report, ¶ 8 |

| | |
|---|---|
| from ship generated wakes, also resulted in a substantial loss of wetlands adjacent to the canal. | |
| 34.   Despite the limited vessel traffic, expansion of the channel has been rapid, between 10 and 20 feet per year on each bank, such that the top width of the channel now exceeds 2,000 feet in some reaches (Figure 163).  (At some places, repeated ACE dredging and shipwaves have widened the channel to 3,000 feet.)  This has necessitated placement of limestone boulders on the south bank where the dredged material was discharged, and upon which the Chalmette hurricane protection levee was later built, to protect the stability of this structure. Until recently, the north bank was left unprotected, resulting in several openings through the shoreline of Lake Borgne. | MSJ Exh. 4, Team Louisiana, p. 234; MSJ Exh. 7, Expert Report of Dr. G. Paul Kemp, ("Kemp Expert Report"), pp. 21-24 at ¶ 31 |
| 35.   The ship waves from the larger ships can reach as high as three or four feet in height in the MR-GO. Obviously that exerts an energy on the bank line.  The bank lines are basically a marsh environment with silty clay soils.  They are easily broken up by a wave.  Those soils then go into suspension in the water and settle to the bottom.  They are moved around by waves and tides again and ultimately settle to the bottom. | MSJ Exh. 8, O'Cain Depo. 495:5-23 |
| 36.   Over time, the banks of Reach 2 of the MR-GO, widened several times beyond its design width of 500 feet creating an uneven shelf and encroaching upon and eating up marshland.  As the water moves laterally, it destroys marshland because of the shelves that are being created. | MSJ Exh. 8, O'Cain Depo. 496:23-498:7; 500:1-11 |
| 37.   For much of the history of the MRGO, there were | MSJ Exh. 8, O'Cain Depo. |

| | |
|---|---|
| no rocks along this stretch of Reach 2 to stabilize the banks. | 495:1-4 |
| 38.   The construction of bank stabilization works along the MR-GO would have prevented or reduced erosion, which would in turn reduce wetland loss and greatly reduce maintenance dredging.  Moreover, this reduction in dredging and placement of material in the spoil disposal area would also have a beneficial result in greatly reducing the amount of dredge effluent into the spoil disposal area. This would have benefited the spoil area by allowing more material drying to take place and also allow some of the marsh area to recuperate. | MSJ Exh. 13, Theis Expert Report, ¶ 10 |
| 39.   In 1988, the ACE wrote:  "Most of the Mississippi River Gulf Outlet is experiencing severe erosion along its unleveed banks.   The erosion is a result of both man-induced and natural forces, including combinations of channelization, ship- and wind-generated waves, storm activity, and subsidence." | MSJ Exh. 9, Corps 30(b)(6) Depo. Exhibit 26 at p. 10 |

**b.      Destruction of Marshes and Cypress Forests**

| | |
|---|---|
| 40.   In 1988, the ACE wrote: "The marshes along the north bank of the MR-GO have been especially hard hit by these forces and are disappearing at an alarming rate."  The north bank is the side closer to Lake Borgne. <br> The ACE was also warned about the potential destructive effects the MR-GO would have on the wetlands protecting New Orleans before construction on the MR-GO commenced. | MSJ Exh. 9, Corps 30(b)(6) Depo. Exhibit 26 at p. 10; MSJ Exh. 8, Naomi Depo. 326:20-327:4 <br> MSJ Exh. 17, Day Expert Report, pp. 5-6. <br> MSJ Exh. 14, Penland Expert Report, p. 15 |
| 41.   In 1988, the ACE wrote: "Because erosion is | MSJ Exh. 9, Corps 30(b)(6) |

| | |
|---|---|
| steadily widening the MRGO, the east bank along Lake Borgne is dangerously close to being breached.  Once the bank is breached, the following will happen:  Sediment from Lake Borgne will flow into the channel, resulting in large increases in dredging cost to maintain the channel; development to the southwest would be exposed to direct hurricane attacks from Lake Borgne." | Depo. Exhibit 26 at pp. 10-11; MSJ Exh. 8, Naomi Depo. 327:2-9 |
| 42.   In 1988, the ACE wrote: "Erosion of the channel banks has caused an average loss of 211 acres of marsh per year during the 20 year period between 1968 and 1967." "Most of the lost acreage is in the marsh/estuarine area along the northeast bank [in the upper Reach 2 area near the intersection with Reach 1.]" | MSJ Exh. 9, Corps 30(b)(6) Depo. Exhibit 26 at p. 27; MSJ Exh. 8, Naomi Depo. 328:14-329:7 |
| 43.   In 1993, the ACE wrote:  "Since the completion of the MRGO ship channel in 1963, thousands of acres of marsh along the channel have been lost due to bank erosion and saltwater intrusion" | MSJ Exh. 16, Corps 30(b)(6) Depo. Exhibit 45, p. 1 |
| 44.   There are tides in Lake Borgne and Reach 2 of the MR-GO.  Under normal weather conditions, the MRGO is responsible for a minimum of 88% of the flow of tide water reaching the area at its upper end, the balance being conveyed by the Intracoastal Waterway and other bayous and canals. | MSJ Exh. 1, *Graci IV* at 192, ¶ 8; 193, ¶ 22; |
| 45.   Since the construction of the MRGO, increased amounts of salt water have flowed into the upper reaches of the area involved in this litigation, increasing the salinity of the marsh as well as Lake Pontchartrain and Lake Borgne. | MSJ Exh. 1, *Graci IV* at 193, ¶ 23 |

| | |
|---|---|
| 46.   USACE construction of MRGO was destructive to the Breton Sound estuary east of the City. Dredging of the 680 foot channel destroyed more than 10,000 acres of marsh and swamp in the 36 mile reach that IPET (2006b) has called Reach 2. The spoil placed along the south bank buried another 18,000 acres, for a total of nearly 30,000 acres destroyed (Caffey and LeBlanc 1999). Since it was constructed, the channel width has expanded well beyond the design width – up to more than 2,000 ft in places (Figure 162) – resulting in erosion of an additional 7,000 acres of adjacent marsh (Figure 163). | MSJ Exh. 4, Team Louisiana, p. 227 |
| 47.   The full environmental impacts of the MR-GO are not limited to the most proximate or obvious.  Exclusive of effects in Breton Sound, it includes conversion of 38,000 acres of low salinity to higher salinity wetlands and creation of a 64,000 acre low-oxygen 'dead zone' in Lake Pontchartrain (LPBF 2006). These are a consequence of increased intrusion of higher salinity waters from Breton Sound into the marsh and, ultimately, Lake Pontchartrain. The north bank of the channel has eroded through the south shoreline of Lake Borgne to facilitate new routes for direct tidal exchange. A significant portion of the wetlands surrounding Lake Borgne that were forced to undergo the ecological succession to more salt-tolerant marsh species did not survive the transition, converting instead to open water. The USACE New Orleans District (NOD) estimated in 1999 that the loss or severe degradation of wetlands attributable to the indirect effects of the MRGO included | MSJ Exh. 4, Team Louisiana, pp. 227-28; MSJ Exh. 3, ILIT, p. 12-8 to 12-9 |

| | |
|---|---|
| 1,500 acres of cypress swamps and levee forests, 3,400 acres of fresh and intermediate marsh, 10,000 acres of brackish marsh and 4,200 acres of saline marsh, for a total of 19,100 acres (USACE 1999). | |
| 48.   Prior to construction of the MR-GO, the environmental setting for coastal wetlands in southeastern Louisiana was significantly different than at the present time. The area under consideration includes wetlands that are now deemed the Central Wetlands Unit (CWU), around Lake Borgne, and north and south of the Bayou La Loutre natural levee ridge. Prior to the construction of the MR-GO, there were extensive baldcypress – water tupelo swamps in the CWU and adjacent to the Bayou La Loutre Ridge. The semi-enclosed and protected nature of this area—and the exclusion of deadly salt water— allowed the survival of these swamps (see historic photos in Penland Report). Water budget analyses for southeastern Louisiana show that about one third of rainfall remains after evaporation (Brantley 2005, Shaffer and Day 2007).  Thus, there was sufficient fresh water to maintain the baldcypress – water tupelo swamps in the CWU, so long as the system did not have a direct input of salt water. Greater than 12,000 acres of the swamps in the CWU were killed shortly after the opening of MR-GO when the U.S. Army Corps cut through the natural ridge at Bayou La Loutre and allowed salt water to move up the tidewater channel and into the Central Wetlands Unit (Team Louisiana 2007). Tens of thousands of wetland acres were subsequently | MSJ Exh. 17, Expert Report of Dr. John Day ("Day Expert Report"), pp. 3-4 |

| | |
|---|---|
| destroyed by the MR-GO over the succeeding decades leading up to Hurricane Katrina (Team Louisiana 2007). | |
| 49.   The construction of MR-GO directly caused the destruction of tens of thousands of acres of wetlands and led to the indirect death of tens of thousands of additional acres of wetlands.  Following the opening of MR-GO, there were significant increases in salinity in the area north of the Bayou La Loutre Ridge. This had a dramatic effect on fresh water and low salinity wetlands.  Additionally, if these wetlands and cypress had not been destroyed by the MR-GO, Katrina's storm surge would have been reduced by about three feet and could have spared GNO from catastrophic flooding.  The ASCE has acknowledged the storm surge buffering effect of wetlands and cypress.  Congress has also acknowledged the storm surge buffering effect that wetlands have on storm surge. | MSJ Exh. 17, Day Expert Report, p. 11 MSJ Exh. 23, *A Nation Still Unprepared*, p. 125 MSJ Exh. 28, Deposition of Defendants' MR-GO Expert, Robert A. Dalrymple ("Dalrymple Depo."), 35:19-36:6 MSJ Exh. 8, Naomi Depo., 281:20-202:6 MSJ Exh. 37, *Unnatural Disaster*, p. 4 |

### c.    The "Funnel" Effect

| | |
|---|---|
| 50.   Reaches 1 and 2 of the MR-GO had an appreciable, negative effect on hurricane protection and repeated flooding through New Orleans' "back door" during Hurricanes Betsy, Camille and Katrina. | MSJ Exh. 4, Team Louisiana, p. 230 |
| 51.   In 1969, the ACE was aware of the "funnel" effect at the convergence of Reach 1 and Reach 2 of the MR-GO and was told that "[t]his will cause water to funnel up Intracoastal Canal into the Industrial Canal from the Gulf of Mexico. | MSJ Exh. 5, Corps 30(b)(6) Depo. Exhibit 33 at pp. 7-9 |
| 52.   At the same time, the ACE was advised to construct | MSJ Exh. 5, Corps 30(b)(6) |

| | |
|---|---|
| "a lock in the MRGO, Mississippi River Gulf Outlet, west of Paris Road in order to prevent hurricane surges from entering the IHNC, Inner Harbor Navigation Canal." | Depo. Exhibit 33 at pp 1-2 |
| 53.   The ACE responded to the notice of the "funnel" effect by stating:  "We have previously investigated a similar plan and found the net increase in benefits was small in comparison to the increased cost if the plan would provide the same degree of protection as the currently authorized plan." | MSJ Exh. 5, Corps 30(b)(6) Depo. Exhibit 33 at pp. 1-2 |
| 54.   The MRGO is bordered on the northeast for approximately 16 miles by Lake Borgne which has a surface area of approximately 350 square miles but a relatively shallow depth of 3 feet to 25 feet maximum. Lake Borgne is fed directly from the Gulf of Mexico via the Mississippi Sound (through a six mile wide water course). | MSJ Exh. 1, *Graci IV* at 191, ¶ 7 |
| 55.   The highest storm surges that have caused flooding in the GNO since Hurricane Betsy have always come from Lake Borgne rather than Lake Pontchartrain. | MSJ Exh. 4, Team Louisiana, p. xii; MSJ Exh. 8, Naomi Depo. 178:23-179:16 |
| 56.   The waters of the IHNC enjoyed free exchange with Lake Pontchartrain through the passage at Seabrook, and with the GIWW at their intersection.  In addition, the waters of the MRGO enjoyed free exchange with Lake Borgne through the hundreds of tributaries connecting the two.  The waters of the GIWW later enjoyed free exchange with the Mississippi Sound and the IHNC and were joined by the MRGO southeast of Paris Road. | MSJ Exh. 1, *Graci IV* at 192, ¶ 12 |

| | |
|---|---|
| 57.   At the time of the LPV's enactment in 1965, Congress and the ACE were aware that:  "The eastern portion of the area is also subject to flooding by surges and waves that move directly from Lake Borgne, overtopping the existing inadequately protected systems [40 Arpent Canal] seaward of the developed land areas.  As a result, residences and industrial commercial establishments suffer damage.  Business activities are disrupted, lives endangered, and hazards to health created." | MSJ Exh. 10, House Doc. No. 231 at p. 17 MSJ Exh. 8, Naomi Depo. 156:1-11 |
| 58.   Prior to Hurricane Katrina, the ACE knew that Lake Borgne was historically a pathway for hurricane storm surge to enter St. Bernard Parish and other areas of Greater New Orleans.  One conspicuous example was the flooding that occurred during and after Hurricane Betsy in 1965. The "funnel" effect and its role in the flooding of Greater New Orleans have been well documented. | MSJ Exh. 4, Team Louisiana, pp. 223-24, Fig. 158; 235-40; MSJ Exh. 26, *Decision Making Chronology*, pp. ES-6-7 MSJ Exh. 2, ILIT, p. 8-6 MSJ Exh. 7, pp. 25-33 |

**B.**        **HURRICANE BETSY**

| **UNDISPUTED FACTS** | **EVIDENTIARY SUPPORT** |
|---|---|
| 59.   Hurricane Betsy brought extensive destruction to New Orleans when it made landfall in Louisiana in September, 1965.  Unfortunately, many of the descriptions and photos from Hurricane Betsy sound and look familiar to our nation as it considers the damage from Hurricane Katrina, forty years later. | MSJ Exh. 22, *A Failure of Initiative*, pp. 87-88 |
| 60.   There was catastrophic flooding of the GNO region as a result of Hurricane Betsy.  And 40 years later, almost | MSJ Exh. 8, Naomi Depo. 252:14-24 |

| | |
|---|---|
| to the day, there was catastrophic flooding of the same general area in Orleans and St. Bernard Parishes as a result of Hurricane Katrina. | |
| 61. Levee failures in the Industrial Canal area during Hurricane Betsy were caused by overtopping of the levees from storm-driven waters originating in Lake Borgne and carried to the Industrial Canal over the open marsh and through the Gulf Intracoastal Waterway. | MSJ Exh. 1, *Graci IV* at 195, ¶ 45 |
| 62. Many people contend that the MR-GO played a prominent role developing the flooding of St. Bernard Parish and East New Orleans during Hurricane Betsy in 1965). Before, during, and after construction of the MR-GO (48 years), many concerns were expressed regarding the effects of this canal on the adjacent wetlands and on its potential focusing effect on storm surge propagation into the IHNC. | MSJ Exh. 3, ILIT, p. 12-9<br>MSJ Exh. 5, Corps 30(b)(6) Depo. Exhibit 33, at pp. 7-9<br>MSJ Exh. 6, Kemp Depo. Exh. 8 at pp. 1-3 |
| 63. Hurricane Betsy provided a "wake-up call" that should have alerted USACE designers developing the GNO HPS that the original plan developed in the 1950s - prior to MRGO construction - was too exclusively oriented toward a Lake Pontchartrain surge. | MSJ Exh. 4, Team Louisiana, p. 253;<br>MSJ Exh. 7, Kemp Expert Report, p. 39 ¶ 51 |
| 64. Hurricane Camille [in 1969] provided yet another demonstration of the way a Lake Borgne surge would outflank this protection scheme. This clear warning went unheeded by the ACE and no remedial measures were undertaken – for the intervening 40 years before Hurricane Katrina. | MSJ Exh. 4, Team Louisiana, p. 253;<br>MSJ Exh. 7, Kemp Expert Report, p. 39 ¶ 51 |

C.        **LAKE PONTCHARTRAIN AND VICINITY HURRICANE PROTECTION PROJECT ("LPVHPP")**

1.        **Congressional Mandate**

| | |
|---|---|
| 65.   The greatest natural threat posed to the New Orleans area is from hurricane-induced storm surges, waves, and rainfalls. Because of this threat, a series of control structures, concrete flood walls, and levees was proposed by the ACE for the area along Lake Pontchartrain in the 1960s.  In fact, the planning process was begun as early as 1955. Congress first authorized the construction of the Lake Pontchartrain and Vicinity, Louisiana Hurricane Protection Project ("LPVHPP" or "LPV") in the Flood Control Act of 1965 to provide hurricane protection to areas around Lake Pontchartrain in Orleans, Jefferson, St. Bernard, and St. Charles Parishes. | MSJ Exh. 19, GAO 1, p. 3; MSJ Exh. 8, Naomi Depo. 170:19-24 |
| 66.   Congress authorized the Lake Pontchartrain project in 1965, substantially in accordance with a Chief of Engineers report (House Document No. 231), to protect the areas around Lake Pontchartrain from flooding caused by storm surge or rainfall associated with a Standard Project Hurricane ("SPH"). For the coastal region of Louisiana, an SPH was expected to have a frequency of occurrence of once in about 200 years, and the SPH | MSJ Exh. 19, GAO 1, p. 4; MSJ Exh. 26, *Decision Making Chronology*, pp. 2-3 to 2-17, 2-29 (Map 2-2); MSJ Exh. 8, Naomi Depo. 144:3-9; MSJ Exh. 20, IPET, p. III-35; MSJ Exh. 4, Team Louisiana, p. 95; MSJ Exh. 10, House Doc. No. 231, pp. 46-47 |

| | |
|---|---|
| represented "the most severe combination of meteorological conditions considered reasonably characteristic for the region." According to the Chief of Engineers report (House Document No. 231), an SPH was selected as the design hurricane because of the urban nature of the area.  The legislation was enacted a month after Hurricane Betsy.  Upon receipt of the funds in 1966, construction of the system began shortly thereafter. | |
| 67.   House Document No. 231 recommended: "construction of a new levee extending from the Inner Harbor Canal along the south side of the Gulf Outlet Channel to Bayou Dupre; thence westward to the Mississippi River levee at Violet; together with riprap slope protection along the navigation channel and flood gates and strengthening of the existing floodwall at Mandeville on the north shore." | MSJ Exh. 10, House Doc. No. 231, p. 9, ¶ 12 |
| 68.   The Corps was responsible for project design and construction of the approximately 125 miles of levees, with the federal government paying 70 percent of the costs, and state and local interests paying 30 percent. Each of the four parishes protected by the project is associated with a local levee district that is generally composed of state-appointed officials | MSJ Exh. 19, GAO 1, pp. 3-4 |

| | |
|---|---|
| and is considered a state entity. Specifically, Orleans Parish is associated with the Orleans Levee District, Jefferson Parish is associated with the East Jefferson Levee District, St. Bernard Parish is associated with the Lake Borgne Levee District, and St. Charles Parish is associated with the Pontchartrain Levee District. These levee districts are the local sponsors of the project. | |
| 69.   The project, when designed, was expected to take about 13 years to complete and cost about $85 million. Although federally authorized, it was a joint federal, state, and local effort. | MSJ Exh. 24, GAO 2, Highlights |
| 70.   The Lake Pontchartrain and Vicinity project two employed two generations of USACE employees and contractors at an estimated total cost of more than $700 million, while consuming nearly $200 million in state and locally generated funds. Prior to Katrina, it was estimated to be about 85 percent constructed, but was not expected to reach completion until 2015 – 50 years after Congressional authorization of the LPV. | MSJ Exh. 4, Team Louisiana, p. xi |

## 2.  Standard Project Hurricane

| | |
|---|---|
| 71.   In the Flood Control Act of 1965, Congress authorized the ACE to design and construct a hurricane flood protection system ("HFPS") to protect against a | MSJ Exh. 27, Deposition of Corps 30(b)(6) witness Richard Varuso in the *Turner v. Murphy* |

| | |
|---|---|
| standard project hurricane ("SPH").  SPH is based on a series of assumptions using historical data developed by the U.S. Weather Bureau (now the National Weather Service). | *Oil* litigation, Case No. 05-4206 ("Varuso Depo."), 32:19-22;<br><br>MSJ Exh. 4, Team Louisiana at p. 95 |
| 72.   The Corps' New Orleans District (the District) completed an "Interim Survey Report" for the LP&VHPP in 1962, after seven years of planning, that outlined a comprehensive plan for preventing flooding in the Greater New Orleans area resulting from the "Standard Project Hurricane" (SPH). The original project plan, termed the "Barrier Plan," included floodgates (surge barriers) in the passes to Lake Pontchartrain to prevent SPH-driven surges from entering the lake. The planned barriers were meant to reduce the "stillwater" surge heights along the lakefront. Barrier-dampened hurricane surges would then be contained by the existing local levees along the three outfall canals that penetrated into metro New Orleans from Lake Pontchartrain.  The barrier complexes were to be accompanied by levees and floodwalls in other locations designed to withstand SPH surges. | MSJ Exh. 26, *Decision Making Chronology*, p. ES-6 |
| 73.   The Corps planners for the LPV came up with the maximum surge heights for SPH dimensions.  That figure became a basic calculation that was part of the determination of what the design grade (elevation) level would be for these levees. | MSJ Exh. 8, Naomi Depo. 181:7-15 |
| 74.   The ACE told Congress that the "[t]he occurrence of an SPH for any location in the study area would produce | MSJ Exh. 10, House Doc. No. 231, p. 46 |

25

| | |
|---|---|
| maximum surge heights of 11.2 feet along the south shore of Lake Pontchartrain, 12.5 feet in Mandeville, 11.9 feet in the Chalmette area, 12.5 feet at the Citrus in New Orleans East Back Levees, and 13 feet in the Rigolets and Chef Menteur Pass." | |
| 75.   In designing a hurricane flood protection system, the planners must take into account the nature of the area to be protected (for example, urban or agricultural), local weather conditions, topography, geomorphology and historical flooding.  The "priceless" value of a large populated area dictates maximum protection consistent with available funding. | MSJ Exh. 28, Dalrymple Depo., 155:24-159:17 |
| 76.   For a variety of reasons, the concept of storms much more intense than the SPH was not allowed to explicitly enter the engineering process for the LPVHPP even though the development of the SPH also involved a probable Maximum Hurricane (PMH) (National Weather Service 1979):  "The PMH is a hypothetical steady state hurricane having a combination of values of meteorological parameters that will give the highest sustained wind speed that can probably occur at a specified coastal location.  One of several possible uses of the values of meteorological parameters is to compute maximum storm surge at coastal points when the hurricane approaches along the most critical track."  The PMH was recognized in the general design plan for the Lake Pontchartrain Project but not applied by the ACE in designing and construction of the LPVHPP. | MSJ Exh. 28, Dalrymple Depo., 50:21-51:5<br>MSJ Exh. 10, House Doc. 231, p. 47 |

### 3.      Description Of The Hurricane Flood Protection System

| | |
|---|---|
| 77.   In development of the NOFDS [New Orleans Flood Defense System], the Corps of Engineers had the primary responsibility for development of the concepts, design, and construction (Collins 2005; National Academy of Engineering 2006). | MSJ Exh. 3, ILIT, p. 12-3 |
| 78.   The hurricane protection system ("HPS") of Greater New Orleans consists of a number of areas, or polders, completely surrounded by levees.  [Two of them include:] First, New Orleans East, which is bounded on the northwest by a variety of levees:  at the northwest corner of the polder, the New Orleans Lakefront Levee, then further east along Lake Pontchartrain shoreline, the Citrus Lakefront Levee, and the New Orleans East Lakefront Levee.  From the northeast corner going south, the levee is the New Orleans East Levee, then along the Gulf Intracoastal Waterway (GIWW) there is the New Orleans East Back Levee.  Moving to the west, there is the Citrus Back Levee that connects to the Inner Harbor Navigational Canal (IHNC) Levee.  These levees are of a variety of different constructions:  earthen levees along the lakefront, floodwalls embedded in levees along the IHNC, and a variety of earthen levees, sheetpile flood walls and concrete | MSJ Exh. 29, Dalrymple Expert Report, pp. 5-6, MSJ Exh. 26, *Decision Making Chronology*, pp. 2-2 (Map 2-1), 2-24 (Map 2-3) |

| | |
|---|---|
| floodwalls along the GIWW.  Further, their elevations differ—even when side-by-side.  <u>Second</u>, the Lower Ninth Ward and St. Bernard Parish are within another polder, surrounded by levees.  The western portion of this polder is formed by the I-walls of the IHNC, which is also known as the Industrial Canal.  The polder is bounded on the north side by the earthen levees on the south side of the GIWW, and along the east side of the earth/sand levee of the Mississippi River Gulf Outlet (MRGO).  The south end of the polder is protected by a levee that connects the MRGO levees in the vicinity of Verret to those on the Mississippi River, connecting near Caernarvon.  The entire polder is divided between the populated area to the southwest and the unpopulated wetlands to the northeast by the 40 Arpent Levee.  Further, the Violet Canal, connecting the town of Violet to the MRGO, is flanked by levees in the populated areas. Again, these levees in and around the Lower Ninth Ward and St. Bernard Parish are of a variety of different construction types and elevations. | |
| 79.   The New Orleans Flood and Hurricane Protection System ("System") is complex and massive, consisting of a highly irregular layout of 350 miles of levees, which are | MSJ Exh. 21, *Lessons Learned*, p. 35; MSJ Exh. 20, IPET, pp. IV-256 to IV-257 |

| | |
|---|---|
| embankments, usually earthen, that serve as flood barriers.  The System also includes floodwalls, hundreds of bridges, closable gates, culverts and canals that facilitate transportation in and out of the system.  It is comprised of a series of four main compartmented basins designed to limit the flooding impacts on the entire system resulting from individual failures of levees and floodwalls.  In addition, large pump stations are used to pump out and redirect water from the city.  These pumps are designed to mitigate flooding that results from significant rainfall and can, over time, remove water from moderate overtoppings. | |
| 80.   At the time of authorization, the District estimated that the project would be completed by the mid-to-late-1970s. | MSJ Exh. 26, *Decision Making Chronology*, p. ES-6 |
| 81.   The integration of a large, free-flowing ship channel (the MR-GO) into the GNO HPS clearly posed a great hazard to the City, yet never led to a proposal for the flood gate that IPET (2006b) has since found was so obviously needed.  "The Reach 1 GIWW/MRGO section is very important in determining the magnitude of the storm surge that reaches the IHNC from Lake Borgne and Breton Sound. If the hydraulic connectivity between Lake Pontchartrain and Lake Borgne is eliminated at | MSJ Exh. 4, Team Louisiana, pp. 252-53 |

| | |
|---|---|
| a point within this section of channel, tide or surge to the west of this point will become primarily influenced by conditions in Lake Pontchartrain" (IPET 2006b, IV-6-2). | |
| 82.   Soon after authorization, the planned surge barriers at the passes to Lake Pontchartrain met with opposition from certain state government elected officials, congressional representatives, and various local citizen and interest groups.  Years of litigation halted the construction of the surge barriers at the passes to Lake Pontchartrain.  However, design and construction of the flood works in the Chalmette Loop and New Orleans East Loop (except along the lakefront) were not affected by the litigation.  In 1985, well after the original date projected for project completion, the ACE Director of Civil Works approved replacing the barriers with increased levee heights along the lakefront (the "High Level Plan").  No other aspects of the original LPVHPP plan were reevaluated or modified; construction in those locations proceeded in accordance with the original designs as modified after Hurricane Betsy. | MSJ Exh. 26, *Decision Making Chronology*, p. ES-7 |

## 4.    Design Grade Elevations

| | |
|---|---|
| 83.   The definition of Standard Project Hurricane is as follows:  "A hurricane that may | MSJ Exh. 10, House Doc. No. 231 at p. 20 |

| | |
|---|---|
| be expected from the most severe combination of meteorological conditions that are considered characteristic of the region involved." | |
| 84.   A SPH has a wind speed roughly equivalent to the wind speed of a Category 3 hurricane on the Saffir-Simpson Scale. | MSJ Exh. 4, Team Louisiana, pp. 99-100, Tables 5 & 6; MSJ Exh. 3, ILIT, p. 12-11; MSJ Exh. 28, Dalrymple Depo., 49:2-11 |
| 85.   The "standard project hurricane" is a statistical compilation of many combined hurricane parameters or characteristics intended to simulate a natural hurricane occurrence in southeast Louisiana. The standard project hurricane was used not only for the Lake Pontchartrain project, but also nationwide for all hurricane protection projects where the loss of human life is possible. | MSJ Exh. 22, *A Failure of Initiative*, p. 89 |
| 86.   The ACE engineers determined the "design elevation of protective structure"—the required crown height for each levee or floodwall reach. Once this elevation was decided, the engineers would choose the structure type, whether a floodwall or levee, and ensure that it could resist all static and dynamic loads with water to the top. | MSJ Exh. 4, Team Louisiana, p. 96 |
| 87.   After the plans were done, the design grade level was always 17.5 feet for the Reach 1 and Reach 2 of the MR-GO.  The 17.5 design | MSJ Exh. 8, Naomi Depo. 169:17-170:11 |

| | |
|---|---|
| grade is after settlement. | |
| 88.   Between Paris Road and Violet where wave action will occur, an allowance varying from 4.3 to 4.7 feet was made for computed wave run-up, yielding a net grade of 17.5. | MSJ Exh. 30, ACE, Design Memorandum No. 3 (General Design) Chalmette Area Plan (1966), p. 8 |
| 89.   After Congress approved the project, the ACE made upward grade revisions for the Citrus Back Levee, the area west of Paris Road was increased one foot, from 13 to 14 feet; the area east of Paris Road was increased from 16 to 18 feet; and the New Orleans East Back Levee was increased a foot and a half, from 16 to 17 and a half feet.  That remained the design grade level thereafter. | MSJ Exh. 8, Naomi Depo. 220:3-222:7 |
| 90.   The ACE has set a post-Katrina design grade for the MR-GO Reach 2 structures of about 26-27 feet.  That is the design elevation that provides protection for the 100 year surge elevation. | MSJ Exh. 8, Deposition of Corps 30(b)(6) witness, Jean Powell ("Powell Depo."), 442:4-445: 13 |
| 91.   "NGVD" stands for National Geodetic Vertical Datum.  The NOD constructed virtually all structures to the elevation specified in the SPH-based design, but relative to the National Geodetic Vertical Datum of 1929 (NGVD29), rather than to the local mean sea level (LMSL) elevation.  In 1965, when the HPS was authorized, the mean level of Lake Pontchartrain was more than 1.3 ft above 0.0 ft | MSJ Exh. 4, Team Louisiana at pp. 117-18; MSJ Exh. 27, Varuso Depo., 34:11-19 |

| | |
|---|---|
| NGVD29 in the GNO area. | |
| 92.   The design grade of SPH selected by the ACE assumed no overtopping. | MSJ Exh. 27, Varuso Depo., 67:3-8 |
| 93.   The ACE interpreted the Congressional mandate for the HFPS to design the flood protection works "to hold back water at a given still-water elevation, not for overtopping." | MSJ Exh. 27, Varuso Depo., 61:1-9 |

### 5.   ACE Fails To Revise HFPS Designs Consistent With Changes in SPH Criteria

| | |
|---|---|
| 94.   Wind speed has a disproportionately large effect on surge. If all other factors are kept constant, for example, an increase in wind speed from 105 to 115 mph (9.5 percent) could add an additional 3 feet to a 15 foot surge on the MRGO levee, for a 20 percent increase. | MSJ Exh. 4, Team Louisiana, p. 107 |
| 95.   IPET obtained a similar result when testing the sensitivity of the ADCIRC surge output to 5 percent increases or decreases in wind speed. A 5 percent reduction or increase in wind speed in the vicinity of the MRGO levee resulted in a 1.5 foot change in the surge elevation (IPET 200b, IV-20,141). The difference between the maximum wind velocities associated with the 1959 and 1972 SPHs, 107 and 129 mph, respectively, is 21 percent. If all other variables are again held constant, the general wind tide equation predicts that a 21 percent increase in wind velocity would cause surge to increase on the MRGO levee by 6.5 ft, or 41 percent (Figure 81). The differences between the 1959 and 1979 SPHs would have resulted in a significant increase in expected SPH surge heights. Most importantly, the NOD | MSJ Exh. 4, Team Louisiana, p. 109 |

33

| | |
|---|---|
| admitted in 1976 to the GAO that they needed to raise levee heights because of the 1972 SPH change, but then appear not to have taken action. | |
| 96.   For the ACE, SPH evolved to represent the most severe storm the Government should guard against when designing hurricane protection projects. The SPH came to represent not only a method for comparative assessment of storm risks between geographic areas, but also a design standard that carried its own assurance of adequate reliability. For a variety of reasons, the concept of storms much more intense than the SPH was not allowed to explicitly enter the engineering process. | MSJ Exh. 3, ILIT, p. 12-13; MSJ Exh. 31, Expert Report of Dr. Bob Bea, ("Bea Expert Report") pp. 112-13, ¶ 157 |
| 97.   The SPH was adopted in the 1960s and never updated by the ACE before Hurricane Katrina. | MSJ Exh. 27, Varuso Depo., 215:8-15 |
| 98.   The evolution of the Standard Project Hurricane shows that this level of protection was known by the ACE to be inadequate by at least the early 1970s. | MSJ Exh. 4, Team Louisiana, p. xii. |
| 99.   The GNO HPS was not properly conceived to accomplish the 1965 Congressional mandate to protect against the "most severe combination of meteorological conditions reasonably expected."  "The initial meteorological and oceanographic analysis based on the 1959 U.S. Weather Bureau 1 in 100 year Standard Project Hurricane (SPH) was known to be obsolete by 1972, just as construction of initial parts of the GNO HPS was getting underway. The primary deficiency of the 1959 SPH was in the specification of maximum sustained wind speed, which the National Weather Service (NWS) had increased by 20 | MSJ Exh. 4, Team Louisiana, p. iv |

| | |
|---|---|
| percent, from 107 to 129 mph. The steady-state analytical approach used by the USACE to develop surge estimates was as sensitive to the effect of wind velocity as later numerical modeling approaches (i.e. SLOSH or ADCIRC), and should have alerted the USACE to the danger of underestimating wind speed. This analysis provided a design basis for setting the minimum heights above mean sea level for levee and floodwall crowns to resist overtopping by combined SPH waves and surge.  A 20 percent underestimate of maximum winds can lead to a 40 percent reduction in the predicted surge elevation. In 1979 the NWS raised the maximum sustained winds to 140 MPH, a category 4 hurricane. | |
| 100. The New Orleans District USACE was aware of this deficiency in the original analysis, as is indicated by testimony in 1976 and 1982 General Accounting Office (GAO) reports.  However, it never revised the original SPH-based analysis to reflect the new understanding of the threats, even after being ordered to do so by the Chief of Engineers in 1981 (ER 1110-2-1453). | MSJ Exh. 4, Team Louisiana, p. iv; MSJ Exh. 31, Bea Expert Report pp. 113-14, ¶ 159 |
| 101. The U.S. Weather Bureau, and its successor the National Weather Service, redefined SPH parameters for the Gulf Coast in 1965, 1968, 1972 and 1979 (Graham and Nunn 1972, Schwerdt et al. 1979) to reflect the increase in experience and understanding regarding extreme hurricanes, particularly Hurricanes Audrey (1957), Carla (1961) and Camille (1969). The categories of the Saffir-Simpson Scale were not introduced until 1971 (Table 5), but can be applied | MSJ Exh. 4, Team Louisiana, p. 98 |

| | |
|---|---|
| if the 5-minute average wind speeds in the 1959 report and the 10-minute averages in the 1972 and 1979 report are converted to 1- minute averages (Table 5). | |
| 102. The design assumptions for the GNO HPS remained static despite growing scientific evidence that the threat posed by surge was actually far greater than originally estimated. Design histories for individual HPS elements showed a pervasive trend over time toward substitution of less reliable structures for more conservative designs. On a regional perspective, management of the Lake Pontchartrain and Vicinity project led, over time, to ever greater departures from the overall objective of the original authorization: to protect against the "the most severe meteorological conditions considered reasonably characteristic for that region." This Congressional objective could be read as a mandate for continual reevaluation and adjustment. | MSJ Exh. 4, Team Louisiana, p. ix; MSJ Exh. 31, Bea Expert Report pp. 113-114, ¶ 159 |
| 103. The 1959 SPH was just one stop on a learning curve for the meteorologists. For the USACE, however, the 1959 SPH became the "design storm." Following Hurricane Camille in 1969, the Weather Bureau began a serious re-evaluation that led in 1972 and 1979 to an SPH with maximum sustained winds (1-minute average) nearly 40 percent higher than in 1959. Clearly, by 1972, at a relatively early stage in the construction of the GNO HPS, the SPH used as a basis for design was obsolete. | MSJ Exh. 4, Team Louisiana, p. 98 |
| 104. A 1976 GAO report noted that USACE was requesting an additional "$22 million for increasing the size | MSJ Exh. 25, Corps 30(b)(6) Depo. Exhibit 24, p. 11 |

| | |
|---|---|
| of the levees based on better definition of the standard project hurricane as furnished by the United States Weather Bureau."  It is not clear what happened to this request or why the analysis backing this request was never incorporated in the many design memoranda then under development.  What is important here is that as early as 1976, the USACE knew that the original SPH-based design criteria were deficient, but it never acted on that knowledge to upgrade the level of protection. | MSJ Exh. 4, Team Louisiana, p. 105 |
| 105. The Chief of Engineers distributed an order in March, 1981, to all districts with urban hurricane flood damage prevention projects under construction or in planning (Figure 77).  The order directed that all such projects be designed using the SPH as it had been redefined in the 1979 NWS 23 report (Schwerdt et al. 1979).  The 1979 SPH was a slight refinement of the 1972 version (Table 7).  Many General Design Memoranda in the LPVHPP were finalized after this date, but there is no evidence that the New Orleans District ever complied with the 1981 order on any portion of the East Bank GNO HPS. | MSJ Exh. 4, Team Louisiana, p. 104 |
| 106. The ACE's failure to apply the new 1979 SPH design criteria to any of the LPV flood structures resulted in many of the failures in the NOFDS in the wake of Hurricane Katrina. | MSJ Exh. 31, Bea Expert Report pp. 113-14, ¶ 159 |

6.      ACE Fails To Use Available Surge Models In Designing The HFPS

| | |
|---|---|
| 107. Scientists had been using computers to run increasingly sophisticated numerical models to predict | MSJ Exh. 4, Team Louisiana, pp. 109-11 |

| | |
|---|---|
| hurricane surge for many years when Chester Jelesnianski of the U. S. Weather Bureau developed the "Special Program to List Amplitudes of Surge from Hurricanes," or SPLASH model (Jelesnianski 1972). This model scored an immediate triumph by accurately hindcasting the devastating surge that accompanied Hurricane Camille in 1969 (van Heerden and Bryan 2006). Jelesnianski then developed SLOSH (Sea, Lake, and Overland Surges from Hurricanes), which was first released in 1979 and is still in use by the National Oceanographic and Atmospheric Administration and other agencies (Jelesnianski et al. 1992). So SLOSH became available at about the same time as the NWS 23 revision of the SPH (Schwerdt et al. 1979). | |
| 108. The Corps helped fund the development of SLOSH, and later ADCIRC, and conducted surveys around New Orleans so that the topography and bathymetry could be presented with an appropriate level of detail. The 1979 version of SLOSH predicted that a Category 5 storm could generate a surge of more than 20 feet along the south shore of Lake Pontchartrain. Other runs in the 1980s indicated that the GNO HPS was insufficient to prevent overtopping by a wide range of Category 3 hurricanes. While there was nearly universal agreement in the scientific community that SLOSH was a superior tool in many ways for predicting the oceanographic response to hurricane winds, there is no indication that the Corps ever used the SLOSH model in developing GDMs for the HPS. | MSJ Exh. 4, Team Louisiana, p. 111-12 |
| 109. The New Orleans District USACE missed | MSJ Exh. 4, Team Louisiana, |

| | |
|---|---|
| opportunities to revise the original SPH-based analysis after the National Weather Service revised the SPH in 1972 and 1979, and when the SLOSH storm surge model came into use in 1979. SLOSH showed clearly that the GNO HPS, as it was constructed at the time, was vulnerable to overtopping by many possible Category 3 storms. This result was confirmed later by the ADCIRC model, as recently as during the 2004 FEMA Hurricane Pam exercise (http://hurricane.lsu.edu/floodprediction/PAM_Exercise04/). The USACE supported development of both surge models and was aware of GNO HPS vulnerabilities, but appeared to accept the inadequacy of the system with a complacency that undercut efforts to sound alarms and begin pressing for improvement. | p. v |

### 7.   The ACE Fails to Account for Diminished Surge Protection from Disappearing Wetlands

| | |
|---|---|
| 110. The scientific community had been raising the alarm about Louisiana's disappearing wetlands since the late 1970s. The Corps was obviously aware of this problem because in September 1986 the chief of the Engineering Division of the New Orleans District wrote the commander and director of the ACE Waterways Department Station requesting funding to undertake an assessment of the wetlands loss. Specifically they investigated land loss between 1932 and 1983.  In July 1987, the Corps released its report "Geological Investigation of the Mississippi River Deltaic Plan- Land Loss and Land Accretion," authored by J. May and L. Britsch. This excellent report shows in detail | MSJ Exh. 4, Team Louisiana, p. 112 |

| | |
|---|---|
| just how devastating the land loss had been since 1932. This action proves that the NOD was fully aware of the land loss problem and surely the consequences for reduction in surge protection. But nowhere in the General Design Memoranda (GDMs") does the NOD discuss the need to give extra free board to levees and floodwalls because of the worsening land loss. The land loss research ordered and paid for by the USACE was ignored by those responsible for the GNO HPS. | |

### 8.   The ACE Fails To Account For Known Problems With Vertical Datums and Subsidence

| | |
|---|---|
| 111. Pre-Katrina flood control structures in this region were authorized, designed, and numerically modeled relative to a water level reference datum (e.g., mean sea level). However, these structures were constructed relative to a geodetic vertical datum that was incorrectly assumed as being equivalent to, or constantly offset from, a water level datum. | MSJ Exh. 20, IPET, p. II-1 |
| 112. The U.S. Coastal & Geodetic Survey, later the NGS, notified the USACE New Orleans District (NOD) of subsiding benchmarks in the GNO in 1958 (IPET 2006b, II-132). It appears clear now that the NOD did not use this information when developing initial plans and cost estimates for the 100-year Lake Pontchartrain & Vicinity Hurricane Protection Project prior to the 1965 authorization. This blindness to the effects of continuing subsidence on the effective level of flood protection continued at least through the 1990s.  As a result, the flood structures as built were in | MSJ Exh. 4, Team Louisiana, p. 126 |

| | |
|---|---|
| fact several feet lower than represented by the ACE. | |
| 113. Typical subsidence values for benchmarks in the GNO area are on the order of 3 ft/century at the GNO lakefront, and higher, more than 4 ft/century, at the IHNC Lock (Figure 87). The trends have been consistent since at least 1952 and should have been recognized in 1965 when the GNO HPS was authorized. The potential for subsidence of areas under forced drainage has been documented in the Mississippi River delta since the early 1900s (Harrison and Kollmorgen 1947). The ACE's planning did not take proper account of the expected, continual subsidence and settlement of flood structures due to the compressible foundation and the need for continuous lifts and enlargements. | MSJ Exh. 4, Team Louisiana, p. 128 |
| 114. From studies in the 1950s and 1960s, the ACE knew that the marsh and swamp deposits were "treacherous" and highly variable. | MSJ Exh. 3, ILIT, p. 12-16 |
| 115. The deposits along the MR-GO alignment at the time of its original construction, as well as those to be used for the proposed "levees" after 1965, are compressible. This means that the soils will deform under the load of the levee. This response of the soil to load is time-dependent and variable in amount at different locations. In other words, settlement begins at the placement of load (the levee) and continues to increase as time passes. Since this response differs according to properties of the soil, certain segments of the levee will experience more settlement than others at a given time. Thus, the crest grade of the levee, originally | MSJ Exh. 33, Expert Report of Jesse L. Arnold ("Arnold Expert Report"), ¶ 31 |

| | |
|---|---|
| built to one elevation, will over time display an uneven grade. | |
| 116. At the time of Hurricane Katrina, the ACE had determined design grade levels (elevations/heights) for the flood protection works along the west side of the IHNC, the south side of Reach 1 of the MR-GO, and Reach 2 of the MR-GO as depicted in Figure 14 of IPET at III-208, and Figure 2.6 of ILIT. | MSJ Exh. 20, IPET, Figure 14, III-208; MSJ Exh. 3, ILIT, Figure 2.6, p. 2-19 |
| 117. Soil in the earthen embankment has voids and the soil becomes compacted because of the weight of the soil added on top, leading to consolidation of the soil and sinking of the entire flood protection work. | MSJ Exh. 28, Dalrymple Depo., 104:17-105: 8 |
| 118. A "lift" is the first piece of construction on a levee such as base preparation. The first lift would be the first engineering construction work done to progress toward the levee of 17.5 feet. | MSJ Exh. 8, Naomi Depo. 408:25-409:23, MSJ Exh. 34, Corps 30(b)(6) Depo. Exhibit 53 |
| 119. The USACE knew that it would require a number of "lifts" to elevate such a hurricane flood protection levee to the required and designed grade. The base on which the levees was constructed, however, was unconsolidated marsh land with some 80 feet plus being of recent geological deposit. This means that inevitable short term and long term subsidence would require the levee to be topped out every few years and that a stable embankment –requiring years to develop – was a prerequisite for a sufficiently sound hurricane flood protection "levee". The USACE did not "top out" the so-called levee. There is no record that the USACE imported select material from off-site borrow or | MSJ Exh. 13, Theis Expert Report, ¶ 18 |

42

| | |
|---|---|
| installed a hard structure such as T-walls or other equally secure sea walls except at outlet structures such as Bayou Bienvenue and Bayou Dupre.  Thus, the embankments that the USACE constructed after 1965 never reached a constant, stabilized height that would have afforded a reasonable measure of protection from the 17.5 feet of surge that hit Reach 2 during and after Hurricane Katrina. | |
| 120.  The flood protection works along Reach 1 and Reach 2 of the MR-GO were designed and built in a series of lifts and enlargements which are layers (usually several feet) of soil added in stages or phases several years apart to allow for inevitable subsidence and settlement.  For example, the 6.2 mile stretch of Reach 2 of the MR-GO—between Bayou Bienvenue and Bayou Dupre—had an initial lift and at least two enlargements before Hurricane Katrina. | MSJ Exh. 27, Varuso Depo., 40:7-25 |
| 121.  Before each new lift or enlargement of sections, a survey is done to determine the actual existing crown elevation, and construction "as built drawings" (cross-sections) are prepared to document the new raised, crown elevation. | MSJ Exh. 27, Varuso Depo., 41:5-23; 42:2-11 |
| 122.  If the levee was originally built to the planned grade, any settlement later would represent that the planned grade was not attained. This is a real concern since the grade chosen is based on the height of storm surge and wave action expected at the site. Thus, the height of the grade at the crest is the maximum level of hurricane surge protection. | MSJ Exh. 33, Arnold Expert Report, ¶ 32 |
| 123.  "In designing, constructing and maintaining the | MSJ Exh. 3, ILIT, p. 12-8 |

| hurricane-protection system the Corps did not adequately address: (a) the effects of local and regional subsidence of land upon which the protection system was built; and (b) then-current information about the threat posed by storm surges and hurricanes in the region." | (quoting The Report of the Senate Committee on Homeland Security and Governmental Affairs (2006)) |

### 9.   ACE Fails To Provide Armoring For Flood Structures

| 124.  Armoring for the banks and flood structures built to SPH dimensions was contemplated at the time of Congressional authorization of the LPV. | MSJ Exh. 10, House Doc. No. 231, pp. 61-65 |
| 125.  The flood structures along Reach 2 of the MR-GO were not armored, and they had no breakers or protective wetlands in front of them to serve as a buffer to storm surge and waves. | MSJ Exh. 3, ILIT, p. 2-19, Figure 2.6 |
| 126.  Because it was constructed of cohesive soils on its slopes and the slopes were fertilized, seeded and sodded to form a section that generally prevented rain wash erosion and erosion from tidal wave action, the 40 Arpent Canal Levee, while overtopped, did not catastrophically fail during Hurricane Katrina. | MSJ Exh. 13, Theis Expert Report, ¶ 27 |
| 127.  The USACE's own design documentation states that the materials used in Reach 2 are potentially susceptible to erosion. Additional construction was proposed to increase the height of the levee at the time of Hurricane Katrina. While these materials were highly susceptible to scour and erosion, the ILIT study has failed to discover documentation of plans or proposals for armoring this levee prior to hurricane Katrina. | MSJ Exh. 3, ILIT, p. 12-9 |
| 128.  Other than spotty patches of grass, there was no | MSJ Exh. 31, Bea Expert |

| | |
|---|---|
| substantial armoring of the flood protection works along Reach 2 of the MRGO. | Report, p. 91, ¶ 119 |

### D.     CHALMETTE SYSTEM (LOOP)

| UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|
| 129. For the Chalmette System, hydraulic dredging was used and resulted in retention of the coarse grained materials (sands, silt, shell) which were not compacted and are highly erodible.  While the soils vary somewhat from location to location, the soils used to construct the flood protection works along Reach 1 and Reach 2 were for the most part uncompacted hydraulic soil composed of silts, clays, and silty sands. | MSJ Exh. 31, Bea Expert Report, pp. 90-91, ¶¶ 118-19; MSJ Exh. 30, ACE, Design Memorandum No. 3 (General Design) Chalmette Area Plan (1966), Plate 65; MSJ Exh. 27, Varuso Depo., 37:16-38:21; 53:18-54:16; 71:7-13 |
| 130. The materials used to construct the flood protection works along Reach 1 and Reach 2 of the MR-GO were largely materials placed in the disposal area where the Chalmette levee loop was built for different reasons and in two separate time-spans.  Initially, the MR-GO was excavated to a channel depth of 36 feet and material derived from dredging from +1.5 (marsh elevation) to -36 feet were flowed into the disposal area.   This was fine-grained and organic material with relatively little sand paid for under the MR-GO Navigation Project construction funds and was complete by 1968.  Later, the decision was made to build the Chalmette and Chalmette Extension Levee Loop as part of the LPVHPP within the original MR-GO spoil containment area. Beginning around 1968, | MSJ Exh. 7, Kemp Expert Report, pp. 22-23, ¶ 31(b); pp. 38-39 ¶ 50 MSJ Exh. 27, Varuso Depo. 54:7-16; 55:19-25; MSJ Exh. 31, Bea Expert Report, Appendix A, pp. A-4-5, (Figures A. 3, A.4) MSJ Exh. 13, Theis Expert Report ¶¶ 14, 17 |

| | |
|---|---|
| the portion of MR-GO's Reach 2 that fronts the Chalmette Levee loop was overdredged to about -60 feet to provide material that would be used for the initial and subsequent levee lifts.  Thus, this material was mined from a depth of -36 to -60 ft, and came from a much sandier stratum and is the source of the sand that was subsequently found to make up most of the levee. | |
| 131.  When the original flood protection works along Reach 2 of the MR-GO were constructed, it was a lot cheaper to use hydraulic fill instead of clay that must be imported by barges from a clay borrow pit near the Pearl River in Mississippi. | MSJ Exh. 27, Varuso Depo., 115:18-117:11 |
| 132.  Flood protection works along Reach 2 of the MRGO that had swamp and wetlands protection on both sides, even though severely overtopped, were not damaged or breached during Hurricane Katrina. | MSJ Exh. 31, Bea Expert Report, p. 93 (Figures 60 and 61) |
| 133.  The flood protection works along Reach 2 of the MR-GO were designed and constructed in stages— commonly referred to as "lifts" or "enlargements."  The first lift was initiated around 1968, and the design elevation was 4.0 NGVD.  The second lift was initiated around 1972, and the design elevation was 18 feet NGVD. The first enlargement was initiated in 1980, and the design elevation was 18 feet NGVD.  The second enlargement was initiated in 1985, and the design elevation was 20.5 feet.  By this time, the levee crown level had settled as much as 3 feet to a height of 15 feet NGVD, and the majority of the crowns had a crest elevation of 16 feet | MSJ Exh. 31, Bea Expert Report, Appendix A, pp. A.14, A. 15, A. 19, A. 21, A. 22, Figure A. 21 |

46

| | |
|---|---|
| NGVD. | |
| 134. For Reach 2 of the MR-GO, the initial design grade was approximately 15 to 15.5 feet NGVD in 1967, later increased to 17.5 feet NGVD. | MSJ Exh. 27, Varuso Depo., 33:11-18 |
| 135. Along Reach 2 of the MR-GO, the design grade elevation for the flood protections works was 17.5 feet at the time of Hurricane Katrina, but the crowns were several feet lower than the design grade elevation. | MSJ Exh. 28, Dalrymple Depo., 85:1-8 |
| 136. At the time of the Hurricane Katrina, some places along the IHNC had subsided to a height lower than the 14 foot design elevation. | MSJ Exh. 8, Naomi Depo. 172:3-11 |
| 137. By the time of Hurricane Katrina, the Army Corps of Engineers had not turned over to the St. Bernard Parish and the Lake Borgne Levee District the operation and maintenance of Reach 2 of the MRGO levees because they had not been completed. | MSJ Exh. 8, Naomi Depo. 207:22-208:3 |

E.        NEW ORLEANS EAST SYSTEM (LOOP)

| UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|
| 138. The flood protection works along the New Orleans East Back Levees were composed largely of moist hydraulic fill.  Like Reach 2 of the MR-GO, the New Orleans East Back Levee was largely constructed of spoil materials from the excavation of the adjacent GIWW Chanel, constituting mostly of highly erodible (and pervious) soils and including large quantities of sand and lightweight shell sands.  The Citrus Back Levee and New Orleans Back Levee were also constructed from hydraulic | MSJ Exh. 28, Dalrymple Depo., 57:4-18; 71:15-72:1, 73:13-16; 75:22-76:11; MSJ Exh. 31, Bea Expert Report, Appendix at p. A-5, Figure A. 4 ("hydraulic pump material"), pp. 34, 73 |

| | |
|---|---|
| fill.  The Lakefront Levee had a substantial amount of clay, and clay is a better (more erosion resistant) material than sand. | |
| 139.  The construction on the levees on Citrus Back, New Orleans East Back, and New Orleans East Levee as well as Reach 2 of the MR-GO had not been completed by the Army Corps of Engineers by Hurricane Katrina | MSJ Exh. 8, Naomi Depo. 209:21-210:5 |
| 140.  The ACE's projection for completion of the flood protection works for the HFPS were never met.  For example, for the Citrus Back Levee, the target completion date was March, 1975, but it was not completed by the time of Hurricane Katrina 30 years later. | MSJ Exh. 8, Naomi Depo. 231:8-232:6 |
| 141.  By the time of Katrina, the Army Corps of Engineers had not turned over to the Orleans Levee District the Citrus Back Levee operation and maintenance with two exceptions: | MSJ Exh. 8, Naomi Depo. 208:4-21 |

## F.       INCOMPLETE HURRICANE FLOOD PROTECTION SYSTEM AT TIME OF HURRICANE KATRINA

### 1.       An Unfinished, Dysfunctional System

| | |
|---|---|
| 142. Forty years after Congressional authorization, the Hurricane Flood Protection System ("HPS") for Greater New Orleans at the time of Hurricane Katrina was still under construction and uncompleted—a sprawling work in process, chronically underfinanced by Congress and complacently managed by the ACE.  It was hardly a completed "system" but rather a patchwork quilt of several hundred miles of earthen berms, spoilbanks, sheetpile, | MSJ Exh. 3, ILIT, pp.12-8-12-10; MSJ Exh. 20, IPET, p. I-2; MSJ Exh. 28, Dalrymple Depo., 159:7-21; 162:14-20; MSJ Exh. 31, Bea Expert Report, pp. 36, ¶ 47; pp. 102-03, ¶¶ 138-40; p. 125 (Table 3); |

| | |
|---|---|
| concrete and floodwalls—virtually all of which were below design protection elevation and whose most salient features were their uneven height and admitted resulting inability to afford the Standard Project Hurricane ("SPH") level of protection mandated by Congress in the Flood Control Act of 1965.  Still years from completion and decades behind schedule, the HPS for Greater New Orleans existed in name only, and to no Army Corps official's surprise, it was catastrophically overwhelmed when tested by Hurricane Katrina.  This tragedy would not have occurred if the ACE had designed and constructed the HPS to even the modest SPH dimensions. | MSJ Exh. 26, *Decision Making Chronology*, pp. ES-8; 3-38 (Table 15); 3-39 (Map 3-1); 3-40 (Map 3-2); MSJ Exh. 13, Theis Expert Report, ¶ 23; MSJ Exh. 4, Team Louisiana, p. 133, Table 15 MSJ Exhs. 35 & 36, Katrina Structures Height Maps; MSJ Exh. 37, "An Unnatural Disaster:  The Aftermath of Hurricane Katrina," Scholars of the Center for Progressive Reform ("*Unnatural Disaster*") (September 2005), p. 4 |
| 143. The Lake Pontchartrain Project, as it stood in the path of Katrina was still not complete as designed.  Some portions were still under construction, and soil subsidence (sinking) had left portions of the project with less elevation above seal level than intended.  In other words, some elements of the project were not even high enough to protect against the Standard Project Hurricane, let alone a genuine Category 3 hurricane.  The Corps was well aware of this fact.  As Jerry Colletti, the New Orleans District's Manager for Completed Works explained, the Corps never tried "to provide full-level protection on an annual basis . . . we just can't raise everything to the design height | MSJ Exh. 3, ILIT, p. F-34 (quoting MSJ Exh. 23, *A Nation Still Unprepared*) |

| | |
|---|---|
| for each storm that would come through." | |
| 144. Forty years after the devastating flooding caused by Hurricane Betsy, the flood protection system—authorized in 1965 and based on the Standard Project Hurricane (SPH)—was still not completed (Government Accountability Office 2005a, 2005b).  Design, construction, operation, and maintenance of the system occurred in a piecemeal fashion.  (Collins and Lieberman 2005). | MSJ Exh. 3, ILIT, p. 12-18; MSJ Exhs. 35 & 36, Katrina Structures Height Maps; MSJ Exh. 31, Bea Expert Report, pp. 26-28, ¶ 36; p. 91, ¶ 119 |
| 145. The planning and implementation process for the HFPS for Greater New Orleans occurred over a 50-year period up to Hurricane Katrina – a time period roughly equivalent to one-quarter of the history of the United States.  Ten years of planning preceded LPVHPP authorization, and design and construction was still underway when Hurricane Katrina struck Greater New Orleans. | MSJ Exh. 26, *Decision Making Chronology*, pp. ES-9, 2-20, 2-55; MSJ Exh. 24, GAO 2, p. 8 |
| 146. Soon after authorization, the project was projected to be completed by 1979, but the expected completion date was repeatedly extended and the project was never reported to be fully complete. | MSJ Exh. 26, *Decision Making Chronology*, p. 6-4; MSJ Exh. 4, Team Louisiana, p. xi |
| 147. At the time of Hurricane Katrina, the HPS – which was originally planned to take 13 years at a total cost of $90 million, stretched out over 40 years and consumed nearly $900 million – was still incomplete.  In fact, the level of hurricane protection on some segments of the HPS diminished over time. | MSJ Exh. 4, Team Louisiana, p. 7 |
| 148. When Hurricane Katrina struck, the project, | MSJ Exh. 24, GAO 2, Highlights |

| | |
|---|---|
| including about 125 miles of levees, was estimated to be from 60-90 percent complete in different areas with an estimated completion date for the whole project of 2015. | |
| 149. While the ACE reported to Congress in 2005 (and had been so reporting since 1994) that the flood protection works for the Chalmette Loop and the New Orleans East Loop were completed 98% and 92%, respectively, this was not true. What ACE was not disclosing is that "the reported project completion progress does not reflect the fact that the many completed reaches of the project were below design grades due to regional land subsidence over time since construction." | MSJ Exh. 26, *Decision Making Chronology*, p. ES-8 |
| 150. In light of the fact that actual crown elevations of the flood protections works along Reach 2 of the MR-GO were several feet lower than the design grade level, "the Reach 2 work was still a work in process by the time Katrina arrived because they had not yet achieved their desired design height of 17.5 feet." | MSJ Exh. 28, Dalrymple Depo., 85:1-14 |
| 151. Hurricane protection systems must have a unified, integrated, comprehensive system based approach. Variations in the system levee and floodwall heights can compromise system performance. While individual parts of a complex system can be adequate, when these parts are joined together to form an interactive-interdependent-adaptive system, foreseeable failure modes developed in the NOFDS during Hurricane Katrina | MSJ Exh. 20, IPET, p. III-8; MSJ Exh. 3, ILIT, p. 15-10 |
| 152. The ACE pursued a "piecemeal process" by which the flood protection works for the HFPS "were constructed | MSJ Exh. 31, Bea Expert Report, pp. 103-04, ¶ 140 |

| | |
|---|---|
| in individual segments and stages."  At the time of Hurricane Katrina, there was not a system affording any meaningful protection against a hurricane with the force and storm surge of Hurricane Katrina. | |
| 153.  As noted in the IPET Draft Final Report (IPET; June 1, 2006), the New Orleans regional flood protection system was largely a system in name only.  Pre-Katrina, there were no integrated series of components to provide a reliable NOFDS (ASCE 2006a).  An effective system must function literally seamlessly as contiguous defenses. | MSJ Exh. 3, ILIT, pp. 11-3, 12-19 |
| 154.  As one report observes, the protective system is a "piecemeal" assemblage of elements that "evolved over a long period of time."  By contrast, a proper system "would integrate components and . . . would contain a level of redundancy sufficient that, if a levee failed, all would not be lost." | MSJ Exh. 23, *A Nation Still Unprepared*, p. 277, quoting ASCE, "ERP Progress Report Number 1," p. 3 |
| 155.  The HPS is just that—a system that is only effective in hurricane flood protection if all the component units have been built to the design protection elevation.  Like a chain, the HPS is only as strong as its weakest section.  As Dr. Bob Bea has observed, "strong pieces embedded within weak pieces do not translate to a reliable system." (Bea 2006).  At the time of Hurricane Katrina, there were gaps in the system for flood protection works and not a seamless series of sections at the same design grade level.  The uncompleted hurricane protection system created many weak links when dozens of points below design elevations contributed to flooding when water flowed | MSJ Exh. 4, Team Louisiana, p. xii;<br>MSJ Exh. 38, "Unfinished 1965 Project Left Gaps," Los Angeles Times, Ralph Vartabedian and Stephen Braun, Jan. 17, 2006, p. A16) ("Vartabedian and Braun");<br>MSJ Exh. 31, Bea Expert Report, pp. 102-04, ¶¶ 138-40 |

| | |
|---|---|
| unimpeded through these gaps. | |
| 156. The system did not perform as a system.  In some areas it was not completed, and in others, datum misinterpretation and subsidence reduced its intended protective elevation.  The capacity for protection varied because of some structures that provided no reliable protection above their design elevations and others that had inadequate designs leaving them vulnerable at water elevations significantly below the design intent. | MSJ Exh. 20, IPET, p. I-2 |
| 157. There was no integral hurricane protection system at the time of Hurricane Katrina.  "Levees in the New Orleans area are at different heights. . . . [W]e have a photograph in our report at one section where you can clearly see five different elevations, all within 100 yards of each other.  If you have got five different elevations within 100 yards, the person who built the lowest section wins because they become the public hazard.  There is a need to coordinate these things." | MSJ Exh. 23, *A Nation Still Unprepared*, p. 279, quoting Statement of Dr. Raymond Seed, Team Leader, National Science Foundation, U.S. Senate, Committee on Homeland Security and Governmental Affairs, hearing on Hurricane Katrina: Why Did the Levees Fail?, Nov. 2, 2005, pp. 96-97 |
| 158. At the time of Hurricane Katrina, there was "not a completed Hurricane Protection System to the extent Congress or the Corps or both thought they were getting a level of protection of 17 and a half feet." | MSJ Exh. 28, Dalrymple Depo., 98:4-9 |
| 159. The northeast flank of the St. Bernard/9[th] Ward's protective "ring" of levees and floodwalls was incomplete at the time of Katrina's arrival.  Large portions of the critical 11 mile-long section fronting Lake Borgne were several feet below design grade. | MSJ Exh. 3, ILIT, p. xx |

| | |
|---|---|
| 160. "What makes the New Orleans levees unusual is the high stakes involved in terms of the population being protected . . . .  In a system with several hundred miles of levees, it is very difficult to do suitable investigation and basically to nail all the details . . . .  If you leave one detail unnailed, you leave a vulnerability which may in the end bring the whole system down." | MSJ Exh. 23, *A Nation Still Unprepared*, p. 275, quoting Dr. Raymond Seed, National Science Foundation-Sponsored Independent Levee Inspection Team University of California at Berkeley |
| 161. Configuration of the elements that comprise the NOFDS as an integrated flood defense system (Seed et al. 2005, ASCE 2006a) played a role in the failure of the NOFDS.  Many failures of the NOFDS occurred at a variety of types of interfaces in the physical elements such as interfaces between earth levees and concrete and steel flood protection elements and between the flood control structures and pump station structures (Carter 2005a).  The NOFDS was not an integrated, coherent system; rather "it is a jointed series of individual pieces conceived and constructed piecemeal" (ASCE 2006a). | MSJ Exh. 3, ILIT, p. 12-11 (emphasis in original) |
| 162. What the project record shows is that the District knew in at least general terms of the lessening of the project DOP and LOP over time. However, the Corps' reporting requirements did not inform higher authorities or local sponsors that the project, if completed with the estimated required funds, would not provide SPH protection. | MSJ Exh. 26, *Decision Making Chronology*, p. 6-17 |

2. **The ACE Never Designed or Constructed a Hurricane Flood Protection System To The Congressionally-Mandated Standard Project Hurricane Dimensions**

| | |
|---|---|
| 163. "[W]hatever system the Corps built by the time of Katrina after 1965 was [not] designed to deal with the most severe combination of meteorological conditions that are considered reasonable characteristics of this region"—the definition of the SPH that Congress mandated for Greater New Orleans in the Flood Control Act of 1965. | MSJ Exh. 28, Dalrymple Depo., 162:14-20 |
| 164. "[The] amount of flood protection provided to any given area must be a function of the value of the area to be protected.  If you have an urban area as priceless as the greater New Orleans metropolitan area, you must accordingly design and build a hurricane protection system that provides maximum and redundant hurricane protection.  In the case of the Lake Pontchartrain and Vicinity, Hurricane Protection Project which was supposed to protect the Greater New Orleans metropolitan area after 1965 from 'the most severe combination of meteorological conditions that are considered reasonably characteristic of the region,' the structures designed and constructed by the United States Army Corps of Engineers fundamentally failed to do so." | MSJ Exh. 39, Expert Report of Johannes Vrijling, p. 4, ¶ 10 and Supplemental Report at ¶ 2(g) |
| 165. On a regional perspective, management of the Lake Pontchartrain and Vicinity project led, over time, to ever greater departures from the overall objective of the original authorization, to protect against the "the most severe meteorological conditions considered reasonably characteristic for that region." | MSJ Exh. 4, Team Louisiana, p. ix. |
| 166. While ACE records report different figures at different times and the design elevations varied somewhat | MSJ Exh. 28, Dalrymple Depo., 52:2-16; |

| | |
|---|---|
| along sections of the Chalmette and New Orleans East Loops, the design elevations of sections of the HFPS were generally as follows:<br><br>Reach 1 of MR-GO:  15-18 feet<br><br>Reach 2 of MR-GO:  14-17.5 feet<br><br>IHNC (eastside south of MR-GO): 14.5-15 feet | MSJ Exh. 20, IPET, p. III-208, Figure 14 (Lake Pontchartrain, LA Vicinity, Hurricane Protection Plan, Chalmette Area Plan);<br><br>MSJ Exh. 31, Bea Expert Report, pp. 8, Figure, 1; p. 53, ¶ 68; p. 125 at Table 3, Appendix A-3 at Table A-1;<br><br>MSJ Exh. 26, *Decision Making Chronology*, p. 3-11 (Table 3-4),<br><br>MSJ Exh. 4, Team Louisiana, p. 133, Table 15. |
| 167.  At the time of Hurricane Katrina, the referenced section of the flood protection works for the HFPS were below design grade as follows:<br><br>IHNC (east side, south of MR-GO):  1.5 to 3 feet<br><br>Reach 1:  0 to 4 feet<br><br>Reach 2:  0-6 feet | MSJ Exh. 4, Team Louisiana, p. 133, Table 15;<br><br>MSJ Exh. 26, *Decision Making Chronology*, pp. 3-38 (Table 3-5), 3-39 (Map 3-1), 3-4 (Map 3-2);<br><br>MSJ Exhs. 35 & 36, Katrina Structure Height Maps |

a.     <u>**Design Grades/Elevations Below Standard Project Hurricane Dimensions**</u>

| | |
|---|---|
| 168.  The design elevation of the HPS is a statement of the level of protection authorized by Congress.  The ACE failed to design and build the HPS to the level of protection mandated in the Flood Control Act of 1965 because the levee crowns were lower than specified for the SPH | MSJ Exh. 4, Team Louisiana, p. 116 |

| | |
|---|---|
| dimension due to predictable settlement and sea level rise. | |
| 169. When Katrina struck, the crown height on most levee and floodwall reaches was between 1 and 3 ft low relative to current mean sea level, the only datum that is relevant to the oceanography of hurricane waves and surge. | MSJ Exh. 4, Team Louisiana, pp. viii to ix; MSJ Exhs. 35 & 36, Katrina Structures Height Maps |
| 170. One reason why the height of the flood protection was not at levels authorized by Congress was poor understanding and lack of effective resolution of the different benchmark datums that were incorporated into the engineering of the flood protection system. Congress authorized a level of protection that was not achieved because of faulty resolution of the datum and historic changes from subsidence. | MSJ Exh. 20, IPET, p. I-5-19 |
| 171. In designing levels of protection, the ACE made no consideration for the continuing coastal land loss in determining crown elevations even though the NOD had determined that 2.7 miles of wetlands reduce the storm surge by one foot. | MSJ Exh. 4, Team Louisiana, p. 137 |
| 172. As a result of the Corps using incorrect vertical datums, it appears that the levees were not built and maintained at the proper level above sea level. Since the level of protection that the levees provide is so closely related to their height above sea level, and thus their ability to block increased water levels driven by hurricanes, the failure to build and maintain the levees at the proper elevation diminished the level of protection they would provide. | MSJ Exh. 23, *A Nation Still Unprepared*, pp. 279-80 |
| 173. Due to this inaccurate relationship between geodetic | MSJ Exh. 20, IPET, p. III-7; |

| | |
|---|---|
| datum and mean sea level, much of the system was built below specified design elevations. The hurricane protection projects have also subsided as a result of regional subsidence.  For example, the structures associated with the Inner Harbor Navigation Canal were originally constructed to an elevation of 15 feet (relative to mean sea level) but are now just over 12 feet, a typical loss of approximately 2.7 feet in elevation over the lifetime of the project." | MSJ Exh. 23, *A Nation Still Unprepared*, pp. 279-80 |
| 174.  Pre-Katrina flood control structures in this region were authorized, designed, and numerically modeled relative to a water level reference datum (e.g., mean sea level). However, these structures were constructed relative to a geodetic vertical datum that was incorrectly assumed as being equivalent to, or constantly offset from, a water level datum. | MSJ Exh. 20, IPET, pp. II-1, |
| 175.  The IHNC structures are more than 2 ft below their intended design elevations, mostly from subsidence over the 35-year life of the project.  This resulted in a significant loss of protection capability in areas such as the IHNC. | MSJ Exh. 20, IPET, p. I-61 |
| 176.  It was not clear how projected subsidence rates were applied in structural elevation design, if at all. Subsidence was apparently not factored into the design freeboard allowance. | MSJ Exh. 20, IPET, p. II-77 |
| 177.  The levees and floodwalls were built lower than they should have been because of an unshakable erroneous assumption that the NGVD29 datum plane was equivalent | MSJ Exh. 4, Team Louisiana, p. 130 |

| | |
|---|---|
| to LMSL. This problem was further amplified by a policy decision to explicitly ignore well-known datum issues, subsidence and sea level rise in the construction of the GNO HPS. | |
| 178. The 1959 SPH and early 1960s oceanographic analysis set minimum crown elevation heights necessary to prevent overtopping by surge and waves. The designers added some freeboard in some cases for various reasons. By the time many of the elements of the GNO HPS were constructed 20 to 30 years later, long after the original SPH analysis was known to be obsolete, the design level of protection on floodwalls was reduced by 1 to 2 feet because of the vertical datum issues.  Because no provisions were made to accommodate subsidence rates that were known at the time of authorization, or sea level changes that became apparent later, the 100-year project was deficient from the beginning, and would deliver an ever lessening level of protection through its design life. | MSJ Exh. 4, Team Louisiana, pp. 130-31 |
| 179. There was constant subsidence of the flood protection works along the IHNC and Reach 1 and Reach 2 of the MR-GO. | MSJ Exh. 27, Varuso Depo. 36:5-25; MSJ Exh. 3, ILIT, p. 2-5; MSJ Exh. 26, *Decision Making Chronology*, pp. 3-38 (Table 3-5), p. 3-39 (Maps 3-1), p. 3-40 (Map 3-2) |

### i.      Inner Harbor Navigation Channel

| | |
|---|---|
| 180. The IHNC had massive gaps at the time of Hurricane Katrina.  The flood protect structure along the | MSJ Exh. 20, IPET, p. V-1; MSJ Exh. 4, Team Louisiana, |

| | |
|---|---|
| IHNC was a patchwork of construction, uneven heights and gaps that allowed water to pour into the Lower 9th Ward through overtopping before any breaches occurred. | pp. 125-26; MSJ Exh. 38, Vartabedian and Braun, p. A16 |
| 181. When the crests of undamaged floodwalls adjacent to the southern breach on the east bank of the IHNC adjacent to the Lower 9th Ward were surveyed after the storm, they had an average elevation of 12.5 feet NAVD88(2004.65), which is about 1.5 feet below the 15 feet LMSL78 level specified in the design. Top of floodwall elevations recently surveyed farther north on the IHNC by IPET vary from 1.5 to more than 3 ft below the design elevation (Figure 86). | MSJ Exh. 4, Team Louisiana, p. 125 |
| 182. The Katrina surge elevation measured at the IHNC lock was determined to be 14.2 ft relative to NAVD88 (2004.65), and was perhaps a foot higher at the junction with the MRGO. Waves there were estimated at less than 1.5 ft and were lower elsewhere (IPET 2006b, IV-227, Fig. 163). If the floodwall crowns were built to the design specification, they would have had an elevation of approximately 14 ft NAVD88 (2004.65), or no more than a foot below the maximum surge elevation anywhere in the IHNC.  Given the variation in floodwall crown elevations that IPET documented farther north, it is possible that the floodwall crest elevation at the point where overtopping initiated the south breach into the Lower 9th Ward could have been a foot lower than the 12.5 ft found in surviving adjacent segments. | MSJ Exh. 4, Team Louisiana, pp. 125-26 |
| 183. Current (pre-Katrina) flood protection elevations | MSJ Exh. 20, IPET, p. II-2; |

| | |
|---|---|
| along the Inner Harbor Navigation Canal (IHNC) were also found to be below original design/constructed elevations—just over 2 ft in places.  For the floodwall on the east bank between Florida Avenue and Claiborne Avenue, the deficiency below the design elevation was 2.5 feet.  Most of this deficiency is the result of subsidence occurring over the past 35 years. As in the Lake Pontchartrain outfall canals, this equates to a loss of most, if not all, of the design freeboard allowance. | MSJ Exh. 35 & 36, Katrina Structures Height Maps |
| 184. Pre-Katrina elevations along the East Bank floodwall north of the breach area were around 12.6 to 12.7 ft NAVD88 (2004.65). South of the breach area the elevations range from 12.7 to 13.4 ft near the Claiborne Avenue Bridge.  Assuming a 0.3-ft difference between LMSL (1983-2001) and NAVD88 (2004.65)—based on CO-OPS estimates—then the post-Katrina floodwall elevation relative to LMSL is approximately 12.5 ft. This 12.5 ft LMSL elevation would also be representative of the 2005 pre-Katrina floodwall elevation in this reach. Thus, elevations are approximately 2.5 ft below those authorized and constructed circa 1970. | MSJ Exh. 20, IPET, p. II-110 and Figure 53 (p. II-112) |
| 185. The east side of the GNO that faces Lake Borgne experienced a higher level of storm surge during Katrina than the Orleans Metro south of Lake Pontchartrain (Figure 26).  The surge from Lake Borgne propagated as a high velocity bore through the MRGO and GIWW to the IHNC causing maximum water levels in that canal to rise to 15 ft NAVD88(2004.65), while surge along the | MSJ Exh. 4, Team Louisiana, pp. 46-47 |

| | |
|---|---|
| lakefront to the west was 2 to 4 ft lower. The highest surges predicted and observed for the Greater New Orleans area were in the throat of the funnel east of Paris Road. Overtopping of levees in the MRGO connection to the IHNC west of Paris Road is believed to have provided the majority of the water that flooded New Orleans East. The MRGO and GIWW levees east of the junction are the only GNO HPS levees that should have experienced extensive overtopping during Katrina. Unfortunately for St. Bernard, the MRGO levee did not wait for overtopping, but was largely destroyed before it could be overtopped, at an earlier stage in the storm sequence. | |

### ii.   New Orleans East

| | |
|---|---|
| 186. Virtually every stretch of the Chalmette Loop and the New Orleans East Loop of the HPS was below design elevations at the time of Hurricane Katrina. | MSJ Exh. 26, *Decision Making Chronology*, pp. 3-38 (Table 3-5), p.3-39 (Map 3-1), 3-40 (Map 3-2); MSJ Exhs. 35 & 36, Katrina Structure Height Maps |
| 187. At the time of Hurricane Katrina, the elevations along the Citrus Back Levee (Reach 1) along the MR-GO were uneven and different even when side by side. | MSJ Exh. 28, Dalrymple Depo., 103:10-104:5 |
| 188. South of New Orleans East, the maximum surge is interpreted as rising from 14 to 16 ft MSL, increasing towards the GIWW/MRGO junction, but dropping by 1.5 ft in the throat of the funnel just west of Paris Rd (Figure 21). IPET added more than a foot to the computed surge in this area to match the HWMs, and up to 2 ft more for | MSJ Exh. 4, Team Louisiana, pp. 38-39 |

| waves, arriving at a combined surge/wave level of 16.5 to 18.2 ft MSL, somewhat below the design elevation of protection (17.5 to 23 ft MSL) but above the actual levee crown (15 to 17.5 ft MSL). IPET shows a potential for overtopping (0.5 to 2.0 ft) with depths similar to the crown elevation deficiency. | |
|---|---|

### iii. MR-GO Reach 2

| 189. At the time of Hurricane Katrina, the people of St. Bernard Parish had no protection from a SPH because the ACE "had not yet built a Hurricane Protection System according to their plans . . . [for] design elevation" of 17.5 feet. | MSJ Exh. 28, Dalrymple Depo., 96:3-14 |
|---|---|
| 190. The design grade level selected for the Chalmette area extension was 17.5 feet along Reach 2 of MRGO. | MSJ Exh. 8, Naomi Depo. 293:7-12; MSJ Exh. 41, Corps 30(b)(6) Depo. Exhibit 18, p. 9 |
| 191. At the time of Hurricane Katrina, almost no stretches of flood protections works along Reach 2 of the MR-GO were at design grade elevation. A representative location is Station 497+00 where the crest elevation had settled approximately 1.5 feet below the target crest elevation of 17.5 NGVD. (Still water elevation of 13 feet plus 4.5 wave run-up). Only for a brief time (around 1985) was this location at the enlarged height of 21.5 feet, settlement began almost immediately, and after 1991-92 the crest elevation was below the design elevation of 17.5 NGVD. The surge at this site during and after Hurricane Katrina exceeded the crest elevation of 16 feet. | MSJ Exh. 31, Bea Expert Report, Appendix A, pp. A-25-26, Figure A.25; MSJ Exhs. 35 & 36, Katrina Structure Height Maps |

| | |
|---|---|
| 192. The USACE constructed embankment along the south bank of Reach 2 of the MR-GO was not a completed levee system to project design and grade.  The very unstable foundation for this proposed levee resulted in below grade crown elevations being attained on a sustained basis.  This also resulted in substantially reduced protection. | MSJ Exh. 13, Theis Expert Report, ¶ 23 |
| 193. At the time of Hurricane Katrina, very significant stretches of flood protection works along the 11-mile northeast frontage of Reach 2 of the MR-GO were several feet (up to 6 feet) below the authorized design elevation. | MSJ Exh. 31, Bea Expert Report, p. 22, ¶ 33 MSJ Exh. 4, Team Louisiana p. 130, MSJ Exh. 3, ILIT, 10-20-10-21 |
| 194. At the time of Hurricane Katrina, the actual crown elevation of the flood protection works along miles 43 to 60 of Reach 2 of the MR-GO that remained intact were only about 15 feet (versus 17.5 feet design height) according to LIDAR surveys conduced by the ACE. LIDAR (LIght Detection And Ranging) is a terrestrial 3D laser mapping tool for data collection that was used by the United States Geological Survey post-Katrina to survey the actual crown elevations. | MSJ Exh. 27, Varuso Depo., 44:9-23; MSJ Exhs. 35 & 36, Katrina Structure Height Maps; |
| 195. At the time of Hurricane Katrina, none of the sections of flood protection works along the 12 mile stretch of Reach 2 of the MR-GO between Bayou Bienvenue and the return levee at Veret were at the design height of 17.5 feet.  At most elevations along this 12-mile stretch of Reach 2 of the MR-GO that was supposed to protect St. Bernard Parish, the crowns of the flood protection work | MSJ Exh. 27,Varuso Depo., 48:12-50:23, 66:23-67:2 |

| | |
|---|---|
| were on average five feet below design elevation of 17.5 feet. | |
| 196.  The USACE found that it could not retain this earthen structure along the Reach 2 of the MR-GO at the design grade despite two major augmentations in the late 1970s and mid-1980s, and a less extensive rebuilding in the early 1990s.  By 1992, the ACE had determined that crest elevations along Reach 2 of the MR-GO had dropped to approximately 18 feet NGVD which is below the target (design) level of 20.5 feet NGVD, while in some sections the crown elevations had settled to 14 feet. | MSJ Exh. 31, Bea Expert Report, Appendix A, p. 23, Table A.2;<br><br>MSJ Exh. 4, Team Louisiana, p. xiii |
| 197. On the south side of the funnel along the MRGO, IPET interprets the maximum surge as being more uniform, ranging from 17.5 to 19.5 ft MSL (Figure 22). IPET had to add more than 2 ft to the computed surge to get to this level. Based on our understanding of the HWMs in this area, we would place the maximum surge at least a foot lower along the MRGO, but this is a matter for interpretation, and there is no right answer. IPET adds between 1 and 3 feet for waves, giving a combined water level that ranges from 19.5 to 23.0 ft MSL. The design elevation for the levee crown in this area is 17.5 ft MSL, and the actual elevation ranged from 15 to 18 ft MSL, so the stage was set for general overtopping. This overtopping, and the wave attack that preceded it, destroyed the MRGO levee, causing complete loss in some places and significant degradation in most (Figure 23). | MSJ Exh. 4, Team Louisiana, p. 39 |

**b.**      **No Armoring**

65

| | |
|---|---|
| 198. Another indication that the flood protection works along Reach 2 of the MR-GO were still "a work in process toward a hurricane protection structure" at the time of Hurricane Katrina was the absence of some form of armoring like a clay cap. | MSJ Exh. 28, Dalrymple Depo., 99:16-23 |

### c.      The Incomplete Hurricane Flood Protection System Was Not Turned Over To Local Sponsors

| | |
|---|---|
| 199. Because the USACE never completed the LPVHPP, it could not legally pass responsibility for major maintenance or upgrades to the local sponsors, or initiate a new project to bring protection to a higher standard. | MSJ Exh. 4, Team Louisiana, p. viii. |
| 200. By the time of Hurricane Katrina, the Army Corps had not provided formal notices to local sponsors concerning transfer of any of the flood protection works along Reach 1 and Reach 2 of the MR-GO.  These flood protection works were not turned over to local sponsors because none of them had been completed to a stable design elevation and remained in an "interim" status. | MSJ Exh. 8, Naomi Depo. 207:22-210:5; 345:2-12; MSJ Exh. 28, Dalrymple Depo. 80:7-81:9; MSJ Exh. 19, GAO 1, pp. 6-8; Naomi Dep. Exhs 26, 27, 30; MSJ Exh. 3, ILIT, p. F-35 (quoting MSJ Exh. 23, *A Nation Still Unprepared* |
| 201. "There are still pieces that have to be done.  We are not going to turn over a piece of the project until every piece in that ring of protection is completed.  If there is one little thing left to do I think by regulation – I could be wrong – I think we have to have the entire | MSJ Exh. 3, ILIT, p. F-35 (quoting Al Naomi, LPVHPP Senior Project Manager) |

| | |
|---|---|
| system 100 percent complete so we turn over the entire segment that is protected, a certain area of the City." | |

### 3.   The ACE Never Even Undertook to Design or Construct A Hurricane Flood Protection System Against Probable Maximum Hurricane Dimensions

| | |
|---|---|
| 202. A Probable Maximum Hurricane is defined by the ACE as: "The hurricane that may be expected from the most severe combination of meteorological conditions that are reasonably possible in the region." | MSJ Exh. 10, House Doc No. 231, p. 20 |
| 203. In the Flood Control Act of 1965, Congress, in addition to authorizing a Standard Project Hurricane dimension, also mandated a Hurricane Flood Protection System designed according to the Probable Maximum Hurricane criteria for designing flood control structures. The ACE never designed or constructed a system according to the more protective PMH criteria that would result in flood control structures that would not fail upon overtopping. | MSJ Exh. 10, House Doc. No. 231, pp. 20, 46-47, ¶¶ 9-10; MSJ Exh. 20, IPET, p. III-35; MSJ Exh. 42, American Society of Civil Engineers, *The New Orleans Hurricane Protection System:  What Went Wrong And Why* (External Review Panel, 2007), ("ASCE Report"), pp. 65-66 |
| 204. The PMH was not integrated into the design process and as a result the flood protection structures were not designed for overtopping that would accompany storms whose intensity exceeded that of the SPH.  The structures failed to be resilient and robust and were not able to tolerate expected overtopping damage.  Floodwalls were designed without such provisions, and as a result, upon overtopping, the soils behind the walls were eroded and | MSJ Exh. 10, House Doc. No. 231, pp. 46-47, ¶¶ 9-10; MSJ Exh. 31, Bea Expert Report pp. 113-14, ¶¶ 158-160; MSJ Exh. 42, ASCE Report, pp. 65-66 |

| | |
|---|---|
| contributed significantly to failure of these flood protection structures.  Earthen levees were also designed without such provisions, and as a result, upon overtopping, the soils on the protected side of the levees were severely eroded and contributed to failure of these flood protection structures. | |
| 205. The ACE did not evaluate the hurricane protection system for the effects of a more severe storm such as the PMH.  If the hurricane protection system had been evaluated using PMH criteria, the consequences of a more severe storm could have been incorporated.  For example, levees susceptible to overtopping and erosion could have been armored.  Pump stations could have been strengthened.  More comprehensive evacuation programs could have been instituted.  The USACE's apparent non-conservative selection of the design hurricane is inconsistent with that needed to protect public safety when an extreme natural force such as Hurricane Katrina strikes. | MSJ Exh. 42, ASCE Report, p. 66; |

### 4.    The Incomplete System Caused Catastrophic Consequences

| | |
|---|---|
| 206. Approximately 80 percent of New Orleans was flooded, in many areas with depth of flooding exceeding 15 ft.  The majority, approximately two-thirds overall in areas such as Orleans East Bank and St Bernard, of the flooding and half of the economic losses can be attributed to water flowing through breaches in floodwalls and levees.  There were at least 727 fatalities in the five parishes in and around New Orleans, and over 70 percent of the fatalities were people over age 70.  The poor, | MSJ Exh. 20, IPET, p. I-3 |

| | |
|---|---|
| elderly, and disabled, the groups least likely to be able to evacuate without assistance, were disproportionately impacted. | |
| 207. The flooding resulting from the overtopping and breaching was catastrophic. Figure 23 shows the extent and depth of flooding for the New Orleans metropolitan area where almost 80 percent was inundated.  The greatest depths of flooding exceeded 15 feet. | MSJ Exh. 20, IPET, pp. I-48, I-50 at Figure 23 |
| 208. The incompleteness of the HPS made a material contribution to the catastrophic flooding.  Lower than authorized elevations of flood protection structures contributed to the overtopping and failure of both floodwalls and levees. | MSJ Exh. 20, IPET, p. 1-5-20 |
| 209. The Katrina tragedy demonstrates that federal government inaction – particularly not completing even the modest HFPS of 40 years after Congressional approval – has devastating consequences. | MSJ Exh. 37, *Unnatural Disaster*, p. 1. |
| 210. The catastrophic flooding of GNO was not a natural disaster, but a man-made disaster caused in part by the ACE's decision not to design or construct proper hurricane flood protection structures along the MR-GO consistent with the Congressional mandate and the ACE's awareness from Hurricane Betsy and its aftermath that the MR-GO had opened the southern and eastern flanks of GNO to attack by the hurricane storm surge. | MSJ Exh. 31, Bea Expert Report, pp. 16-17, ¶ 26 |
| 211. With the exception of four foundation design failures, all of the major breaches were caused by overtopping and subsequent erosion. Reduced protective | MSJ Exh. 20, IPET, pp. I-2 to I-3;<br>MSJ Exh. 4, Team Louisiana, p. |

69

| | |
|---|---|
| elevations increased the amount of overtopping, erosion and subsequent flooding, particularly in Orleans East. Ironically, the structures that ultimately breached performed as designed, providing protection until overtopping occurred and then becoming vulnerable to catastrophic breaching. | 132 |
| 212. Regardless of which mechanism contributed most to the failure (*i.e.*, overtopping, erosion, and/or underseepage), it is hard to overestimate the significance to the breaching process of constructing the I-walls on the east side of the IHNC almost 2 feet low. From the surge hydrograph, we can determine that overtopping would have been initiated about 3 hours later if the wall was built to a true LMSL78 value. Given that many miles of low IHNC I-walls withstood the surge even though they were overtopped for a prolonged period, it is likely that the large catastrophic southern breach in the Lower 9th Ward, as well as the smaller to the north, may not have occurred if the proper crown elevation had been specified for construction. | MSJ Exh. 4, Team Louisiana, p. 126 |
| 213. The design elevations of most levees, floodwalls and structures affected by the Lake Borgne funnel were less than required to prevent overtopping by Katrina's surge and waves. This could have been prevented only if the pre-1965 hurricane oceanography had been updated to incorporate the 20 percent increase in maximum wind speed specified in 1973 and expanded in 1979 SPH (see Figure 81a). But most levee and floodwall crown levels | MSJ Exh. 4, Team Louisiana, pp. 135-36 |

| | |
|---|---|
| were deficient by more than 2 ft below the already inadequate design level, at least in part because (1) of the confusion of NGVD29 with local mean sea level, and (2) a lack of accommodation for the subsidence rates of 3 to 4 ft/century known since at least the 1950s to affect the GNO area. These deficiencies did not cause the foundation failures that doomed the Orleans Metro, but clearly had an effect in the failure along the IHNC into the Lower 9th Ward. These deficiencies undoubtedly contributed significantly to the early onset and depth of flooding in New Orleans East and St. Bernard. | |
| 214. Crown elevation deficiencies ranging up to 5 feet at the time Katrina struck resulted in prolonged overtopping of floodwalls and levees along the Inner Harbor Navigation Canal (IHNC) and to the east in the Lake Borgne funnel that otherwise would have been overtopped only briefly. | MSJ Exh. 4, Team Louisiana, p. v |
| 215. Prolonged overtopping led to catastrophic breaches into the Lower 9th Ward on the east and into Orleans Metro on the west, and contributed to the early failures of levees along the Gulf Intracoastal Waterway (GIWW) and MRGO. Early failure of the MRGO levee allowed the 32,000 acre wetland buffer between MRGO and 40 Arpent back levee to fill and overtop the 40 Arpent back levee while the surge was still rising, and resulted in catastrophic flooding in St. Bernard to an elevation of 11 ft (NAVD88). | MSJ Exh. 4, Team Louisiana, p. v. |
| 216. As shown in Map 3-2, the differences [between the design protection elevations and the actual pre-Katrina | MSJ Exh. 26, *Decision Making Chronology*, p. 3-36; p. 3-40, |

| | |
|---|---|
| protection elevations] are substantial for the Citrus Back Levee, IHNC, East and West, New Orleans East Back Levee, and Chalmette Extension, in some instances at least three feet.  Consequently, Katrina-induced overtopping of structures was worse than would have been the case had all structures been constructed and maintained at the originally intended design elevations."  This loss of levee crest and floodwall height exacerbated problems with overtopping. | Map 3-2 |
| 217.  One of the lessons of Katrina that is already obvious is that once the levees were overtopped, destruction was catastrophic. | MSJ Exh. 3, ILIT, p. F-40 |
| 218.  Some overtopping of the structures was expected due to the intensity of the storm, which would result in localized flooding.  However, the catastrophic flooding was caused by the massive and numerous failures (breaches) of levees and floodwalls resulting from the sustained overtopping. | MSJ Exh. 3, ILIT, p. F-22 (quoting *Lessons Learned*) |
| 219.  As various investigators have concluded, if the breaching in the EBSBs or the overtopping of Levees and floodwalls along the MR-GO had not occurred, there would have been minor inundation in New Orleans East, Lower 9th Ward, and St. Bernard Parish, but not catastrophic flooding (USACE 2007, Team Louisiana, Kok *et al.* 2007).  Much of the catastrophic flooding, property damage, injuries, and loss of life could have been prevented if the USACE had designed and constructed proper hurricane flood protection Levees in place of | MSJ Exh. 31, Bea Expert Report p. 16, ¶ 25 |

| | |
|---|---|
| EBSBs along the MR-GO.  Similar observations apply to the breaches that developed at the IHNC on both east and west sides. | |
| 220.  On the IHNC and MRGO, every foot of crown deficiency when the surge was above 11 ft meant that overtopping and levee erosion started a half hour earlier. A half-hour in the lifetime of a moving hurricane can mean the difference between success and failure in preventing catastrophic flooding. | MSJ Exh. 4, Team Louisiana, p. ix |
| 221.  Overtopping of a resilient MRGO (Reach 2) levee constructed to the design level (MSL) would have delivered only about half of the volume necessary to fill the 32,000 acre wetland behind the levee and initiate overtopping of the 40 Arpent back levee. Had this levee failed at a later stage in the surge hydrograph, or failed less completely, it is possible that the storage capacity of the 32,000 acre wetland buffer would have absorbed the discharge across the levee alignment for long enough to save Chalmette and the rest of St. Bernard from the disastrous flooding that occurred across the local 40 Arpent levee. | MSJ Exh. 4, Team Louisiana, p. 135 |
| 222.  All of the levee and floodwall reaches exposed to the Lake Borgne surge system, including those along the IHNC, experienced overtopping. If the IHNC floodwalls had been at the design elevation, they should have experienced less than 1 ft of overtopping at peak surge, rather than 1.5 to 3.0 ft that occurred. This would have prevented some of the breaches and transition failures. | MSJ Exh. 4, Team Louisiana, pp. 133-34 |

| | |
|---|---|
| 223. Team Louisiana analyzed the pre-Katrina level of deficiency relative to current sea level (LMSL05) for each of 22 HPS named levee/floodwall reaches (with GDMs) using 1999 LIDAR data, limited ground truth surveys and post-storm survey data scattered throughout the final IPET report (Table 15). Team Louisiana found that of the 22 HPS elements analyzed, 18 had deficiencies of 2 feet or more from the design level for the protective structure when assessed relative to current sea level (LMSL05). Except for the uncapped Orleans Avenue Canal levee which overtopped but did not breach, all of the most deficient levee reaches were affected by the Lake Borgne funnel and were exposed to the highest surge and largest waves experienced in the GNO area. | MSJ Exh. 4, Team Louisiana, pp. 132-33 |
| 224. The Citrus Back Levee (along GIWW) east of Paris Road (Figure 39) was less than 2 ft below the 18 ft design level, and was constructed of resistant clay materials. It was overtopped primarily by waves (Figure 42a.) but was not breached, and proved to be quite resilient. The design level of protection of the Citrus Back Levee to the west of Paris Road was 3 ft lower, and was perhaps as low as 12.5 ft in places (Table 15). It experienced a surge up to 16.5 ft with some unanticipated waves. Here the levee held up well under 4 ft of overtopping, but I-walls integrated into the levee failed as a result of back scour (Figure 41). | MSJ Exh. 4, Team Louisiana, p. 134 |
| 225. South of the MRGO/GIWW channel that forms the throat of the funnel, the Chalmette Levee west of Paris Road (Figure 44) was up to 4 ft deficient in spots, but, like | MSJ Exh. 4, Team Louisiana, p. 134 |

74

| | |
|---|---|
| the Citrus Back Levee on the north side of the channel, it held up well under 4 to 6 ft of overtopping. The extent of the overtopping was exacerbated by the deficiencies, and hastened the filling of the St. Bernard wetland buffer to the south, but this 7 mile levee reach did not breach. | |
| 226.  The 12 miles of the Chalmette levee that follows the south bank of the MRGO were deficient from the 17.5 ft design elevation by up to 5 ft (Table 15). This levee was also constructed primarily of hydraulic fill obtained from the MRGO channel, much of which was sand, silt and shell. It is essentially a sea dike that experienced the most severe wave attack of any levee reach in the GNO HPS (Figure 44). If it was up to grade and had been built to survive the wave attack with the crown intact, it would eventually have been overtopped by 2 to 3 ft of surge and waves.  Because of grade deficiencies and the poor materials used in its construction, however, there is little doubt that most of this levee was washed away before the surge ever reached the design level of protection (Figure 89a). Failures of transitions, sheetpile walls and bayou closures also occurred in this 12 mile levee run, but most damage was done by wave-induced overtopping and erosion. | MSJ Exh. 4, Team Louisiana, pp. 134-35, p. 133, Table 15 |
| 227.  The 11 miles of the Chalmette Extension that turns south from the MRGO and to the west to rejoin the main east bank levee of the Mississippi River (Figure 44) was fronted by wetlands and did not experience the kind of wave attack that affected the MRGO levee (Figure 89b). It | MSJ Exh. 4, Team Louisiana, p. 135 |

| | |
|---|---|
| was also built more robustly with a river sand core covered by a substantial thickness of hauled clay. This levee experienced overtopping in places where it was up to 4.5 ft deficient in elevation relative to the design, but there was no breaching and very little damage overall. The volume of water contributed by overtopping of this reach was negligible compared to what came across the failed MRGO alignment. | |
| 228. The overtopping waves created very high water velocities down the back sides of the levees, reaching 10 to 15 ft/sec.  These velocities were two to three times those experienced on the water side of the levees (4 to 6 ft/sec). Since the potential for erosion is related to the cube of velocity, it is no wonder that the back sides of the levees, especially where they were comprised of erodible materials, were scoured away leading to, in many cases, complete breaching.  Figure 19 (pp. I-44, I-45) shows the close correlation between the degree of breaching from overtopping and erosion and the types of materials. In this example for New Orleans East, the correspondence of breaching and hydraulic fill constructed levees is obvious. | MSJ Exh. 20, IPET, p. I-42; Figure 19 (pp. I-44, I-45) |
| 229. During mid-morning, the I-walls along the IHNC were overtopped and erosion behind the wall reduced their stability, causing three separate sections to fail.  The top photograph in Figure 22 shows a section of I-wall along the IHNC collapsed after overtopping created a scour trench behind it and reduced its stability.  The bottom photograph shows an adjacent section of I-wall where the | MSJ Exh. 20, IPET, p. I-47;  p. I-49, Figure 22 |

| | |
|---|---|
| scour trench formed but the wall did not fail.  Water levels reached over 14 ft in the IHNC.  There was also a levee failure along the west side of the IHNC that caused additional flooding into the Upper Ninth Ward. | |

**5.    Construction Of A Hurricane Flood Protection System To Prevent Catastrophic Flooding Was An Achievable Mission In A 40-Year Time Span**

| | |
|---|---|
| 230.  When a project like the HPS for GNO has "such clear and obvious ramifications for public safety," there must be a sense of urgency in completing the mission in a more timely manner than over half a century. | MSJ Exh. 3, ILIT, p. xxv |
| 231.  It should not take 50 years to construct a critical system providing life-safety for a region like GNO with a population of nearly one million people. | MSJ Exh. 3, ILIT, p. xxiv |
| 232.  The ACE was not sufficiently diligent in building a completed HPS 40 years after the devastating flooding caused by Hurricane Betsy in 1965. | MSJ Exh. 3, ILIT, p. 15-9 |
| 233.  Two years before the GNO HPS was originally scheduled for completion, the Comptroller General of the United States reported in 1976 on the progress of the New Orleans levee protection plan (http://archive.gao.gov/f0402/098185.pdf).  This GAO report points out that only 27 of 73 plans and specifications had been issued, and, further, that the New Orleans District was not spending its full annual allotment for the project | MSJ Exh. 4, Team Louisiana, p. 105 |

| | |
|---|---|
| despite the assertion that it was the top priority. | |
| 234. The GAO was more critical of the USACE in a 1982 report than it had been in 1976, noting that estimated costs to complete the GNO HPS had escalated by a factor of ten and were now close to $1 billion, while the originally authorized work was only 49 percent complete after 15 years (http://archive.gao.gov/d42t14/119206.pdf). While the USACE offered many excuses about the slow progress and cost overruns, it does not appear that they ever raised alarms about the inadequacy of the level of protection that they were, in fact, expecting to provide. | MSJ Exh. 4, Team Louisiana, p. 112 |
| 235. In evaluating the ACE's performance, the U.S. Office of Management and Budget stated in 2006: "Good intentions and good beginnings are not the measure of success. What matters in the end is completion: Performance and results. Not just making promises, but making good promises." | MSJ Exh. 43, U.S. Office of Management and Budget, Agency Scorecards (Washington, D.C. 2006) |
| 236. For many years, the Corps of Engineers was severely criticized for delays and cost increases in the Lake Pontchartrain and Vicinity Hurricane Protection Project (Government Accountability Office 1972, 1982, 2005b, 2005c; Carter 2003, 2005a, Carter and Sheikh 2003, Carter et al 2005). | MSJ Exh. 3, ILIT, p. 12-5 |
| 237. There is no evidence that the ACE ever told Congress, before or after Hurricane Katrina, that the Congressionally-mandated Hurricane Flood Protection System – designed and built to a Standard Project Hurricane dimension, was unachievable or impossible or | |

| | |
|---|---|
| that the ACE lacked the expertise to carry out this mission. | |
| 238. The Corps' mission was, in fact, achievable. | MSJ Exh. 3, ILIT, Chapter 12 |

**6.**  **The Reasons For Mission Failure Are Largely Attributable To Congress And The ACE**

**a.**  **Incorrect Datums**

| | |
|---|---|
| 239. There is a very simple reason for near universal deficiencies observed on floodwall crest levels. Most levee crown levels are also low, but these structures are more likely to be affected by local settling. In examining design and construction contract documents and drawings, IPET noted that the New Orleans District (NOD) constructed virtually all structures to the elevation specified in the SPH-based design, but relative to the National Geodetic Vertical Datum of 1929 (NGVD29), rather than to the local mean sea level (LMSL) elevation (IPET 2006b, II). A geodetic datum is a land-based reference system. It is not explicitly connected to the oceanographically relevant mean sea level surface upon which must be superimposed the SPH-based levels of tide, surge and waves.  In 1965, when the HPS was authorized, the mean level of Lake Pontchartrain was more than 1.3 ft above 0.0 ft NGVD29 in the GNO area.  This failure to build and maintain the flood structure at the proper height above sea level diminished the level of protection they would provide since a structure's level of protection is so closely related to its height above sea level. | MSJ Exh. 4, Team Louisiana, pp. 117-18 |
| 240. At the time Katrina struck, we can account for more | MSJ Exh. 4, Team Louisiana, |

| | |
|---|---|
| than two feet of the observed deficiencies in IHNC floodwall elevations through (1) the conflation of NGVD29 and LMSL, and (2) lack of provision for sea level rise. Localized settlement played a lesser role in some places, as would be expected for an older structure. | pp. 123-24 |
| 241. The levees and floodwalls were not at or above the crown elevations specified in designs for HPS elements necessary to resist overtopping by surge and waves associated with the Standard Project Hurricane.  Floodwall and levee crown elevations were built 1 to 2 ft low because of an erroneous assumption at USACE New Orleans District (NOD) that an elevation of zero referenced to the National Geodetic Vertical Datum of 1929 (NGVD29) was equal to -- and interchangeable with -- local mean sea level (LMSL). LMSL was the relevant datum for superimposition of hurricane surge and wave height from a 1950's era oceanographic analysis. In 1965, zero NGVD29 was between 1.3 and 1.6 feet below LMSL at different parts of the system, and floodwalls and levee crowns were constructed lower by this margin. This mistake was locked in for continuing HPS construction when the NOD adopted a policy in 1985, with the approval of the USACE Lower Mississippi Valley Division (LMVD), to explicitly use the outdated 1965 NGVD29 adjustment for elevation control. As a result, no provision was made to account for the 3 to 4 ft/century subsidence rates characteristic of the GNO area even though this rate was known at the time of authorization. | MSJ Exh. 4, Team Louisiana, p. v |

b. **Well-Known Subsidence/Settlement**

| | |
|---|---|
| 242. All of the projects in the LPVHPP are constructed over weak and compressible soils.  Stability and settlements of the structures are generally critical design issues.  The weak and compressible foundation soils generally require that all levees be constructed with staged construction procedures.  Consequently, relatively long periods of time were frequently required to achieve project grades for levees. | MSJ Exh. 20, IPET, p. III-3 |
| 243. Concerns regarding settlements and subsidence were expressed early in the development of the NOFDS, but apparently no effective action was taken by the ACE to quantify the regional subsidence and settlements and to make appropriate adjustments to the NOFDS.  Even though information was developed by the National Geodetic Survey that the reference benchmarks being used as controls in construction of the NOFDS were in excess of one foot low, the decision was made in August 1985 to use the benchmarks "current at the time of construction of the first increment of the project" (1965) (Chatry 1985). | MSJ Exh. 3, ILIT, p. 12-8 |

c. **Funding**

| | |
|---|---|
| 244. Estimated costs to complete the project grew nearly ten-fold over the project history due to price inflation and project design changes. | MSJ Exh. 26, *Decision Making Chronology*, pp. ES-10; 4; 6-5 |
| 245. One of the primary difficulties was the Byzantine process by which large, complex, regional-scale flood protection systems are | MSJ Exh. 3, ILIT, p. 11-2 |

| | |
|---|---|
| conceived, approached, designed, funded, constructed, maintained, and operated. | |
| 246.  The ACE's efforts to build the HFPS for Greater New Orleans after 1965 were delayed because of sporadic and inadequate funding by Congress.  The appropriations came in stages, and the ACE did not receive the funding levels requested.  Among other reasons, this uncertain and insufficient funding contributed to the substantial delays and the failure of the flood protection works along the IHNC as well as Reach 1 and Reach 2 of the MR-GO to be completed to design elevations by the time of Hurricane Katrina. | MSJ Exh. 28, Dalrymple Depo. 159:7-160:21; MSJ Exh. 8, Naomi Depo. 159:7-160:21, 236:8-23; 237 238:1 |

### d.    Lack of ACE In-House Engineering Capability

| | |
|---|---|
| 247. In 1969, the ACE wrote:  "Hurricane Betsy caused extensive damage in the New Orleans area in 1965.  The repetition is feared by all concerned including the Louisiana Congressional delegation.  Heavy pressure has been exerted to expedite construction of protective works particularly for the Lake Pontchartrain barrier and Seabrook lock. . . . The engineering effort required to plan this project and other projects of the continuing program plus the new starts for this fiscal year far exceeds the present in-house engineering capability of the [New Orleans] District." | MSJ Exh. 32, Corps 30(b)(6) Depo. Exhibit 23, p. 3 |
| 248. "The U.S. Army Corps of Engineers is historically | MSJ Exh. 3, ILIT, 12-9, quoting |

| | |
|---|---|
| an insular agency, known for doing things its own way. The Army Corps' staff failed to recognize and prioritize the challenges of levee upgrades and receding wetlands to the city of New Orleans and surrounding areas.  Over the past few decades, the Corps' organization outsourced more work, lost many engineers to private industry, and consequently suffered a diminished capacity to attract top-notch engineers." | Larry Irons, "Hurricane Katrina As A Predictable Surprise," Homeland Security Affairs, Vol. 1, Issue 2 (2005) ("Irons") |

## G.    HURRICANE KATRINA, CATASTROPHIC FLOODING OF GREATER NEW ORLEANS, AND PERFORMANCE OF  THE HURRICANE FLOOD PROTECTION

### 1.    Storm Surge and "Funnel"

| UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|
| 249. The storm surge, not the winds, is the most destructive part of a hurricane, and Katrina produced a massive storm surge. A precise measurement of Katrina's storm surge in the New Orleans area is difficult to measure, in part because of the widespread failures of tide gauges.  While the surge varied by location, some preliminary estimates are that the storm surge off Lake Borgne, which abuts New Orleans, was approximately 18-25 feet depending on the location. | MSJ Exh. 22, *A Failure of Initiative*, p. 93; MSJ Exh. 23, *A Nation Still Unprepared*, p. 53 |
| 250. Because the eye of Katrina passed to the east of New Orleans, the hurricane threw severe wind loads and storm surges on the flood protection systems.  The surge overtopped large sections of the levees during the morning | MSJ Exh. 22, *A Failure of Initiative*, p. 94; MSJ Exh. 26, *Decision Making Chronology*, p. 3-36 |

| | |
|---|---|
| of August 29 east of New Orleans, in Orleans and St. Bernard Parish, and it also pushed water up the Intracoastal waterway and into the Industrial Canal. In the Chalmette Loop, the storm surge was between 15.5 and 18.7 feet, while the design elevation was between 14.5 and 18 feet. | |
| 251. The peak storm surge versus design elevation at the time of Hurricane Katrina was as follows:<br><br>              <u>Design</u>           <u>Peak Surge</u><br>              <u>Elevation</u><br>Chalmette Loop   13 to 18 ft         15.5 to 18.7 ft<br>IHNC (GIWW     13.5 ft          15 ft<br>to IHNC Locks) | MSJ Exh. 20, IPET, pp. IV-2, IV-4, IV-27, IV-257 |
| 252. Hurricane Katrina has been widely reported to have overwhelmed the eastern side of the New Orleans flood protection system with storm surge and wave loading that exceeded the levels used for design of the system in that area. That is a true statement, but it is also an incomplete view. The storm surge and wave loading at the eastern flank of the New Orleans flood protection system was not vastly greater than design levels, and the carnage that resulted owed much to the inadequacies of the system as it existed at the time of Katrina's arrival. Some overtopping of levees along the eastern flank of the system (along the northeastern frontage of the St. Bernard and Ninth Ward protected basin, and at the southeast corner of the New Orleans East protected basin), and also in central areas (along the GIWW channel and the IHNC channel) was inevitable given the design levels authorized by Congress | MSJ Exh. 3, ILIT, p. xx |

| | |
|---|---|
| and the surge levels produced in these areas by the actual storm.  It does not follow, however, that this overtopping had to result in catastrophic failures and breaching of major portions of the levees protecting these areas, nor the ensuing catastrophic flooding of these populous areas. | |
| 253.  As the eye approached New Orleans, Katrina shoved a 14 to 17 foot storm surge up a "surge funnel" created by the hurricane protection levees at the convergence of the south bank of the MRGO and the north bank of the Gulf Intracoastal Waterway, and focused a torrent of water on the Inner Harbor Navigation Canal. This caused the first flooding.  Winds over the greater New Orleans metropolitan area were most likely weaker than Category 3, but were probably stronger several hundred feet above ground, where brutal wind punched out windows in hotels and office buildings.  As the counterclockwise-moving hurricane passed over Lake Borgne on the eastern side of the city with a storm surge estimated at 18-25 feet, it shoved water west onto an edge of the levee that protected the northern edge of the Ninth Ward and St. Bernard Parish; excess surge easily slid over the levee walls.  Upon reaching Lake Pontchartrain, Katrina's winds produced a southward surge of lakewater along the northern edges of the Orleans East Bank and New Orleans East polders, with overtopping and a breach in New Orleans East, adjacent to the Lakefront Airport. 253.  The surge from Lake Pontchartrain and Lake Borgne streamed into the Industrial Canal and the MRGO | MSJ Exh. 23, *A Nation Still Unprepared*, p. 53-55, MSJ Exh. 7, Kemp Expert Report, pp. 25-32 at ¶¶ 32-42 |

| | |
|---|---|
| channel.  Here, too, the floodwaters easily overflowed the levees.  In time, the erosion of the earthen levees by overtopping led to numerous breaches that added to the torrent of water quickly filling the "bowls" that included the New Orleans East and Ninth Ward/St. Bernard polders. | |
| 254. From the perspective of storm surge propagation into the IHNC and New Orleans Metropolitan area, the critical section of the MR-GO channel is the one where the GIWW and MRGO occupy the same channel. It is through this connection that Lakes Pontchartrain and Borgne are hydraulically connected to one another via the IHNC. A water level gradient is established within the IHNC and the GIWW/MRGO; the gradient is determined by the storm surge levels in both lakes. The presence of an open channel is the key factor. The hydraulic connectivity existed prior to construction of the MRGO, due to the presence of the GIWW channel. | MSJ Exh. 20, IPET, p. IV-258; MSJ Exh. 10, House Doc. No. 231, p. 17 |
| 255. This six-mile portion of the combined GIWW and MR-GO (Reach 1) is a 1,500 foot wide 40+ feet deep channel that "connects the funnel with the IHNC."  Team Louisiana called the stretch of the shipping channel "Hurricane Alley."  The highest surge observed in the GNO was against the MRGO levee in the funnel formed by the convergence of the levee systems built along the north bank of the GIWW and the south bank of the MRGO.  The surge penetrated six miles into the GNO through the portion of the GIWW that was enlarged as part of the MRGO project. | MSJ Exh. 4, Team Louisiana, pp. 28, 59 |

| | |
|---|---|
| 256. The major breach sites in New Orleans and St. Bernard Parish from Hurricane Katrina are depicted in Figures 8-1, 8-2 and 8-3 and characterized in Table 8-1 of IPET. | MSJ Exh. 20, IPET at I-8-1 to I-8-7; Figures 8-1, 8-2, 8-3, Table 8-1 |
| 257. The angle of storm approach to the coastline, the rate of travel, and the radius of maximum wind are important meteorological considerations for determining the hurricane surge.  This was certainly true for Katrina that generated a 30 foot surge in Mississippi over a much greater stretch of coast than Hurricane Camille, yet was nominally a storm that fit most SPH criteria (Table 6). | MSJ Exh. 4, Team Louisiana, p. 99 |
| 258. The storm surge, extreme amounts of rain, and high winds stressed the city's complex 350 mile levee system to its breaking point.  Several of the levees and floodwalls were overtopped, and some were breached throughout the day of landfall.  It was these overtoppings and breaches of the levee system that led to the catastrophic flooding of New Orleans. | MSJ Exh. 21, *Lessons Learned*, p. 34 |
| 259. The storm surges produced by Hurricane Katrina overwhelmed the wetland system between Lake Borgne and Reach 2 of the MR-GO. | MSJ Exh. 20, IPET, p. IV-258 |
| 260. The 40 Arpent Canal Levee—southwest of Reach 2 of the MR-GO—is the nonfederal flood protection work that was severely overtopped along much of its length. The design crest elevation is between 7.5 and 10 feet (MSL).  This structure suffered relatively little erosion damage even though its highest points were lower than the EBSBs along Reach 2 of the MR-GO.  This local flood | MSJ Exh. 31, Bea Expert Report, p. 85, ¶ 112 |

| | |
|---|---|
| protection work was composed of significantly more erosion resistant materials (primarily clay) than Reach 2 of the MR-GO. | |
| 261. The 40 Arpent Canal Levee, while being overtopped in both Hurricanes Betsy and Katrina, survived largely intact because of the well constructed and grass sodded embankment and the limited protection afforded by the forested wetlands in a sizeable area seaward of the developed area. | MSJ Exh. 13, Theis Expert Report, ¶ 28 |
| 262. The healthy wetlands in front of large portions of the earthen 40 Arpent Canal Levee in St. Bernard Parish had an anti-erosion or buffering effect in protecting this levee during and after Hurricane Katrina because the wetlands absorbed some of the energy of the surge and some of the energy of the waves. | MSJ Exh. 28, Dalrymple Depo., 108:1-16. |

### 2.    Overtopping & Breaching of Flood Structures Caused Catastrophic Flooding

| | |
|---|---|
| 263. The flooding of Greater New Orleans during and after Hurricane Katrina was "a major and terrible disaster." | MSJ Exh. 29, Dalrymple Expert Report, p. 3 |
| 264. [The NOFDS] failed catastrophically producing the single most catastrophic failure of an engineered system in the history of the United States. | MSJ Exh. 3, ILIT, p. 12-10 |
| 265. The hurricane protection system (HPS) that all residents of GNO depended upon for their security from surge floods failed catastrophically with over 50 breachings or breaks. Over 170 miles of the 350 miles of the levees that protected greater New Orleans were either destroyed or damaged (IPET 2006b). | MSJ Exh. 4, Team Louisiana, p. 3 |

| | |
|---|---|
| 266. Of the populated areas that constitute Greater New Orleans (GNO), 80 percent of Orleans Parish, 99 percent of St. Bernard Parish, and approximately 40 percent of Jefferson Parish were flooded, in some cases for weeks. Over an estimated eighteen-hour period, approximately 80 percent of the city flooded with six to twenty feet of water, necessitating one of the largest search and rescue operations in our Nation's history.  The flooding destroyed New Orleans, the Nation's thirty-fifth largest city.  Significant portions of the city and region remain uninhabitable. In St. Bernard Parish, a few miles east of downtown New Orleans, only four houses did not suffer catastrophic damage from wind, rain, or the sudden flood that resulted from the breaking of the levees of the Mississippi River-Gulf Outlet Canal (MR-GO). The parish, once home to nearly 70,000 people, has seen its population dip to about 7,000, with nearly all of those people living in temporary housing. | MSJ Exh. 4, Team Louisiana, p. 2; MSJ Exh. 21, *Lessons Learned*, pp. 1-2, 6; MSJ Exh. 22, *A Failure of Initiative*, p. 9 |
| 267.      When the winds and floods of Hurricane Katrina subsided, an estimated 1,330 people were dead as a result of the storm.  The vast majority of the fatalities—an estimated 80 percent—came from the New Orleans metropolitan area . . . . Many of the dead were elderly or infirm.  For the survivors, the aftermath of Hurricane Katrina has been characterized by a mixture of grief, anxiety, and frustration. Around 770,000 people were displaced—the largest since the Dust Bowl migration from the southern Great Plains region in the 1930s. | MSJ Exh. 21, *Lessons Learned*, p. 8 |
| 268. A "breach" of a flood protection work refers to | MSJ Exh. 27, Varuso Depo., |

| | |
|---|---|
| "when the section of a levee erodes away or is washed away and no longer exists or you no longer have the levee crown elevation you had prior to the storm surge." By contrast, "overtopping entails storm water crossing over the crown elevation of a flood protection work to the protected side and the structure remains intact. | 159:22-160:12 |
| 269. Overtopping of levees was a major source of water into the polders of New Orleans, particularly during the early part of the flooding event.  Even wave overtopping over time can result in a substantial amount of water flowing over the structure and into the protected area. | MSJ Exh. 29, Dalrymple Expert Report, pp. 6-7; MSJ Exh. 28, Dalrymple Depo., 117:14-118:7 |
| 270. Most of the levee and floodwall failures in the metropolitan New Orleans area—including New Orleans East, the Lower Ninth Ward, St. Bernard Parish, and Plaquemines Parish—"were caused by overtopping, as the storm surge rose over the tops of the levees and/or their floodwalls and produced erosion that subsequently led to failures and breaches."  One report described the overtopping as follows:  "Overtopping was most severe on the east side of the flood protection system, as the waters of Lake Borgne were driven west towards New Orleans, and also farther to the south, along the lower reaches of the Mississippi River.  Significant overtopping and erosion produced numerous breaches in these areas.  The magnitude of overtopping was less severe along the Inner Harbor Navigation Canal (IHNC) and along the western portion of the Mississippi River Gulf Outlet (MRGO) channel, but this overtopping again produced erosion and caused additional | MSJ Exh. 23, *A Nation Still Unprepared*, p. 54 |

| | |
|---|---|
| levee failures." | |
| 271.  Surges driven by Hurricane Katrina breached the LPVHPP protective structures at 50 different locations, primarily as a result of overtopping. | MSJ Exh. 26, *Decision Making Chronology*, p. 2-17. |
| 272.  If there had been no overtopping or breaching of flood protection works throughout the HFPS and there was only the 12 inches of recorded rainfall, there would have been "some localized flooding, but not catastrophic." | MSJ Exh. 28, Dalrymple Depo., 111:3-17 |
| 273.  Overtopping of flood protection works along the IHNC and Reach 1 and Reach 2 of the MR-GO was a major source of flooding of populated areas in New Orleans East, St. Bernard Parish and the Lower Ninth Ward.  Many of the breaches (failures) of flood protection works in these areas was preceded by overtopping which in turn caused erosion of the soil on the protected (population) side of the flood protection works and then a breach (failure) of the structure and even more extensive flooding. | MSJ Exh. 29, Dalrymple Expert Report, p. 7; MSJ Exh. 31, Bea Expert Report, pp. 98-99, ¶¶ 128-32; MSJ Exh. 4, Team Louisiana, p. 133, Table 15; MSJ Exh. 20, IPET, p. I-5-1 |
| 274.  Along Reach 2 of the MR-GO, there was largely "overtopping and then associated breaching" of the flood protection works, leading to massive erosion of the structures and water pouring into St. Bernard Parish. | MSJ Exh. 28, Dalrymple Depo., 119:14-23 |
| 275.  During and after Hurricane Katrina, the structures along Reach 2 of the MR-GO were overtopped anywhere between five and six feet above the existing elevation, and significant amount of overtopping caused the erosion and subsequent breaches. | MSJ Exh. 27, Varuso Depo., 362:2-14 |
| 276.  Overtopping of the hurricane protection by Hurricane Katrina was evident along nearly all portions of the IHNC. | MSJ Exh. 20, IPET, p. III-439 |

| | |
|---|---|
| There were four breaches in the protection system, two on the east side and two on the west side. The east side breaches are both located in the Lower 9th Ward neighborhood and the west side breaches are both in the vicinity of France Road and Benefit Street. | |
| 277.  In contrast [to the MR-GO and IHNC], there was little or no overtopping along most of the levees in the vicinity of Lake Pontchartrain.  The only breach along Lake Pontchartrain was in New Orleans East, which was probably due to overtopping. | MSJ Exh. 22, *A Failure of Initiative,* p. 97 |
| 278.  The sections of the Citrus Back Levee along the north side of Reach 1 of the MR-GO that were not severely eroded were constructed from more cohesive, less erodible, and more compacted soils than the soils used for the Reach 2 and New Orleans Back Levee flood protection works. | MSJ Exh. 31, Bea Expert Report, pp. 37-38, ¶¶ 49-50 |
| 279.  The flood protection works along the south side of Reach 1 of the MR-GO performed very well during and after Hurricane Katrina, in part because they were constructed from cohesive, compactable and less erodible soils, particularly strong and erosion resistant clay. | MSJ Exh. 31, Bea Expert Report, pp. 42-44, ¶¶ 56-58 |
| 280.  After Hurricane Katrina, the ACE is designing and constructing flood protection works to a design grade at least 20 feet—2.5 feet higher than the design grade before Hurricane Katrina. | MSJ Exh. 27, Varuso Depo. 90:1-6 |

**3.      Sources of Flooding**

| | |
|---|---|
| 281. The flooding of upper St. Bernard Parish was caused by waters originating in Lake Borgne and Reach 2 of the MR-GO overwhelming the MR-GO banks and flood protection works along Reach 2, passing to the west over the largely deteriorated wetlands, overtopping the 40 Arpent Canal Levee and flowing into the population areas. | MSJ Exh. 28, Dalrymple Depo., 137:12-138:14; MSJ Exh. 53, Delft University Flood Report, pp. 38-41 |
| 282. Along Reach 2 of the MRGO, the surge water went over the flood protection works, eroded the bank materials, and then the structures failed.  There were 50 breaches along Reach 2 alone.  Some of the crowns along a 12-mile stretch of Reach 2 eroded 10 feet below the crowns existing before Hurricane Katrina. | MSJ Exh. 28, Dalrymple Depo., 77:13-17; 155:24-156:13; MSJ Exh. 27, Varuso Depo. 72:19-73:8 |
| 283. The waters that inundated St. Bernard Parish ponded to a high elevation of about 12 feet above mean sea level, destroying homes and businesses at all elevations above sea level in the populated St. Bernard Parish. | MSJ Exh. 31, Bea Expert Report, p. 85, ¶ 111 |
| 284. The flooding of the Lower 9th Ward was largely caused by the waters overflowing the flood protection works on the west side of the IHNC and two massive breaches of flood protection works on the west side and some overtopping of the flood protection works on the south side of Reach 1 of the MR-GO.  It appears that overtopping preceded the two breaches of the flood protection works on the west side of the IHNC.  The south breach was the largest (nearly 900 feet in length), and the inrushing waters inundated the adjacent Lower Ninth Ward with great force.  Overtopping and scouring occurred at both ends of the breach. | MSJ Exh. 28, Dalrymple Depo., 138:7-139:9; MSJ Exh. 53, Delft University Flood Report, pp. 37-41; MSJ Exh. 20, IPET, p. IV-200; MSJ Exh. 31, Bea Expert Report, pp. 47 at Figure 28; p. 52, ¶ 66, Figure 32 |

| | |
|---|---|
| 285. Without the IHNC breaches almost the same volume of flood water enters the populated area of the St. Bernard bowl compared with the scenario of MRGO breaches plus overtopping plus rain.  Without the IHNC breaches, it takes a little longer in the western part of bowl to reach the peak water level, but the peak itself is only marginally lower.  In the eastern part of the bowl, the influence of the IHNC breaches on the development of the water level is even smaller. | MSJ Exh. 53, Delft University Flood Report, p. 45 |
| 286. The New Orleans East area is bounded on the south by the GIWW, on the west by the IHNC, and on the north and east by Lake Pontchartrain and marshlands. Significant levee overtopping and breaches occurred all along the GIWW.  There were also a few breaches along the floodwall on the IHNC near I-10, as well as overtopping of the floodwall near the Lakefront Airport. Overtopping also occurred along the levee at Lake Pontchartrain, but to a much lesser degree than on the GIWW. Therefore, the New Orleans East area received floodwaters from all directions. | MSJ Exh. 20, IPET, p. IV-190; MSJ Exh. 53, Delft University Flood Report, pp. 26-36 |
| 287. IPET believes the main route of floodwater to New Orleans East was from the MRGO/GIWW funnel throat to the south.  It is likely that some of the water that flooded this area also came from breaches that occurred along the GIWW levee east of the Michaud Canal slip that filled the marshy area behind the federal levee and then overtopped the local levee (Figure 39). | MSJ Exh. 4, Team Louisiana, pp. 71-72; MSJ Exh. 20, IPET, p. IV-190-93 |

| | |
|---|---|
| 288.  Breaches along the GIWW affecting the residential areas of New Orleans East were much less extensive than those affecting the MRGO levee on the south side of the funnel. As a result, most flooding was caused by overtopping that stopped once surge levels dropped. IPET reports that the water level in New Orleans East initially got to +1.5 ft in some residential areas close to sources of overtopping, and higher in the industrial land to the south, and in the Bayou Sauvage marsh to the east.  Once the surge abated on the GIWW, MRGO and IHNC, the surge water that had entered then spread out, dropping in some areas and rising in others until it reached equilibrium more than a foot below mean sea level.  Because Little Woods is so low, however, with many homes between 8 and 12 ft below sea level, even flooding to this modest elevation had catastrophic consequences. | MSJ Exh. 4, Team Louisiana, pp. 71-72; MSJ Exh. 20, IPET, p. IV-190-93 |
| 289.  The flooding of the largely unpopulated area behind the New Orleans East Back Levee came from waters in the Gulf Intracoastal Waterway ("GIWW") that overtopped and/or breached the earthen flood protection works on the north side. | MSJ Exh. 28, Dalrymple Depo., 140:9-141:14 |

**4.    Flooding Even If Crowns Were At Design Elevation, But Not Catastrophic Flooding**

| | |
|---|---|
| 290.  Even if the flood protection works had been completed to design grade elevation by the time of Hurricane Katrina, the surge would have exceeded the | MSJ Exh. 31, Bea Expert Report, p. 125 (Table 3); MSJ Exh. 4, Team Louisiana, p. |

| | |
|---|---|
| design grade elevation of all the flood protection works along the IHNC and Reach 1 and Reach 2 of the MR-GO by between 0.5 and 3 feet. | 133, Table 15 |
| 291. Even if the flood protection works along Reach 2 of the MRGO had been at the desired design elevation of 17.5 feet, the maximum surge from Hurricane Katrina of about 18 feet for two hours would have exceeded that height, facilitating overtopping of the flood protection works. | MSJ Exh. 28, Dalrymple Depo., 85:15-86:10, 93:17-24 |
| 292. Flowing water seeks the path of least resistance— the lowest and weakest place.  Overtopping by waves and surge occurred much earlier at the section of flood protections works that had reduced elevations caused by settling, and the hurricane surges, current and wave action concentrated their corrosive and scour effects at the lowest sections. | MSJ Exh. 31, Bea Expert Report, pp. 22-23, ¶ 33; MSJ Exh. 45, Bea Depo. 283:24-285:3 |

**5.**   **MR-GO "Funnel Effect" Contributed At Least Three Feet Of Catastrophic Excess Surge and Current**

| | |
|---|---|
| 293. Without the Reach 1 connector, the IHNC floodwalls would have seen a surge of 11 to 12 feet coming from Lake Pontchartrain and would have escaped most, if not all, of the catastrophic overtopping and breaching.  The Lake Borgne surge – delivered by the MR-GO funnel – added an additional three feet to Katrina's storm surge.  The flow from the funnel also prolonged the period of high surge in Reach 1 and the IHNC because the storm surge from Lake Borgne was conveyed into this region earlier than the storm surge generated in Lake Pontchartrain.  The cumulative affect was to extend the | MSJ Exh. 7, Kemp Expert Report, p. 31 at ¶ 42 |

| | |
|---|---|
| period of high water beyond that which would have resulted from storm surge emanating from Lake Pontchartrain alone.  Both of these outcomes resulted from the decision to join the MR-GO and the GIWW and the design and construction of the MR-GO in a manner that created and intensified storm surges to cause the catastrophic inundation and destruction during Hurricane Katrina. | |
| 294. During and after Hurricane Katrina, the surge height on Reach 2 of the MR-GO would have been "about a meter of water lower" if the adjacent wetlands had not been destroyed.  A meter is 3.28 feet. | MSJ Exh. 28, Dalrymple Depo. 143:6-144:17 |
| 295. The geometry of what has become known as the MRGO funnel is formed by the convergence of levees that follow the GIWW and MRGO channels, open on the east to Breton Sound, partially enclosing Lake Borgne, and narrowing to a 1,500 ft wide, 40+ foot deep ship channel west of the junction of the MRGO and GIWW (Figure 38). The 6- mile portion of the combined MRGO/GIWW that connects the funnel with the IHNC (IPET "MRGO Reach 1") is what IPET has called the hydraulically critical reach, though the USACE apparently still objects to the "hurricane highway moniker," as they called it (IPET 2006b, I-6).  Team Louisiana has used the term "Hurricane Alley" for this reach.  The USACE said much the same after Hurricane Betsy flooded many of the same areas in 1965 (Shallat 2000). It was this channel reach that added 3 ft to the surge in the IHNC that would otherwise have | MSJ Exh. 4, Team Louisiana, pp. 59-60; MSJ Exh. 7, Kemp Expert Report, pp. 25-32; MSJ Exh. 3, ILIT, p. F-28 (quoting MSJ Exh. 23, *A Nation Still Unprepared*) |

| | |
|---|---|
| mirrored Lake Pontchartrain, and raised water levels so quickly that it caused IHNC breaches before the hurricane made landfall (Figure 39). | |
| 295a. "Researchers at LSU believed that in creating this funnel, 'the U.S. Army Corps of Engineers had inadvertently designed an excellent storm surge delivery system – nothing less – to bring this mass of water with simply tremendous "load" – potential energy – right into the middle of New Orleans." | MSJ Exh. 23, pp. 123-24 |
| 295b. The loss of the protective buffer of the wetlands was accelerated by the MR-GO navigation channel which acted like a "hurricane highway" allowing storms to sweep inland, past marshlands, like liquid bulldozers. | MSJ Exh. 37, *Unnatural Disaster*, p. 4. |

H.  **BEFORE HURRICANE KATRINA, THE ARMY CORPS GAVE NO WARNINGS OF THE INADEQUACY OF THE UNFINISHED HURRICANE PROTECTION SYSTEM AND THE THREAT TO HUMAN SAFETY AND PROPERTY FROM CATASTROPHIC FLOODING**

| UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|
| 296. Risk associated with flooding caused by storms must be communicated in ways stakeholders and the public can understand. Especially interim risk while the system is under construction, and residual risk which is the portion of total risk that will always remain after avoiding, preventing, mitigating, and assuming all other risk. | MSJ Exh. 20, IPET, p. III-8 |
| 297. Recognition of the failure potential might have inspired the USACE to carefully attend to maintaining | MSJ Exh. 4, Team Louisiana, p. 275 |

| | |
|---|---|
| levee crown elevations at the design level, but this was clearly not the case. Levee crown elevations, particularly in hydraulic fill reaches more prone to settlement, were allowed to drop several feet below the design grade over many years, thereby compromising the overall integrity of the GNO HPS. This deterioration took place without advising populations put at additional risk. Effective planning, or failing that, just official notice of the hazard, would have raised the level of public alarm that is unfortunately key to ensuring appropriation of emergency funding or establishing a sensible ordering of public priorities. The potential for action by the public through their elected representatives is thwarted if engineers with superior knowledge of deficiencies are complacent or silenced by dysfunctional bureaucracies. | |
| 298. [T]he SPH did not represent a maximum set of conditions for design against hurricane conditions. It is also clear that general public was not informed about the flooding risks that the selection of the SPH as a basis for design implied.  In many cases, even though very inexpensive defenses could have been provided for the potential for hurricane surges exceeding those of the SPH (e.g., splash-pads behind I-walls and other similar floodwalls sensitive to overtopping erosion), these defenses were not provided. | MSJ Exh. 3, ILIT, pp. 12-13 |
| 299. The ACE knew that the levees protecting New Orleans were not designed to withstand the most severe hurricanes.  According to the ACE's plans for unwatering | MSJ Exh. 22, *A Failure of Initiative*, pp. 89-90 |

| | |
|---|---|
| New Orleans, "the hurricane protection system is not designed for the largest storms and as a result, the metropolitan area is vulnerable to flooding from hurricane storm surges." Thus, long before Hurricane Katrina, the ACE knew that its unfinished HPS did not afford the people and property of Orleans and St. Bernard Parish even the modest level of hurricane flood protection contemplated by the SPH design. Yet the ACE never notified local officials or the public of the risks. | |
| 300. In a 2002 report, the ACE wrote: "In addition, the project area is experiencing high levels of coastal wetlands losses which is likely increasing the threat from hurricanes." In the same 2002 report, the ACE wrote: "In addition, overtopping of the existing protection areas will flood vast areas of the metropolitan area. Vast areas of the metropolitan area were flooded because a storm hit Greater New Orleans that exceeded the capacity of the hurricane protection system even if it had been at design grade to stop the surge." These statements in the 2002 ACE report were "prophetic and probably an understatement of the devastation in the wake of Hurricane Katrina." | MSJ Exh. 46, Corps 30(b)(6) Depo. Exhibit 37 at pp. 9-10 MSJ Exh. 8, Naomi Depo. 372:9-15, 373:10-15 |
| 301. The potentially devastating threat of a catastrophic hurricane to the Gulf Coast has been known for 40 years: New Orleans experienced flooding in some areas of remarkably similar proportions from Hurricane Betsy in 1965, and Hurricane Camille devastated the Gulf in 1969. More recently numerous experts and Governmental officials had been anticipating an increase in violent | MSJ Exh. 23, *A Nation Still Unprepared*, p. 4; MSJ Exh. 3, ILIT, pp. 12-9, 12-10, 12-17 to 12-18; MSJ Exh. 22, *A Failure of Initiative*, p. 90 MSJ Exh. 47, Larry Irons, |

| | |
|---|---|
| hurricanes, and New Orleans' special and growing vulnerability to catastrophic flooding due to changing geological and other conditions was widely described in both technical and popular media. | "Hurricane Katrina As A Predictable Surprise," Homeland Security Affairs, Vol. 1, Issue 2 (2005) ("Irons"), p. 4; MSJ Exh. 48, "Keeping Its Head Above Water;" *Houston Chronicle*, December 1, 2001. |
| 302. Before Hurricane Katrina, New Orleans residents were not advised that the GNO HPS required significant improvements to meet even 1 in 100 year SPH requirements.  Instead, the New Orleans District claimed at times that the GNO HPS would protect against a 1 in 200 to 1 in 300 year hurricane. No basis for this claim has been established, while numerous storms that have affected the GNO area – before and after the 1965 initiation of the HPS—were more severe than the 1959 SPH. | MSJ Exh. 4, Team Louisiana, p. iv |
| 303. The ACE knew that the HPS was not capable of protecting GNO because of gaps in the system.  NOD managers told IPET that "funding levels were insufficient to complete construction at existing holes in the system that were crucial to flood protection . . . . hence levees were below grade in quite a few areas" (IPET) | MSJ Exh. 4, Team Louisiana, p. 130 |
| 304. In 1987, the ACE knew that the MR-GO's banks would easily be overtopped by hurricane surge and that there were already breakthroughs in the land between Lake Borgne and Reach 2 of the MR-GO resulting in no land in some places separating  the MR-GO and Lake Borgne. | MSJ Exh. 54, Corps 30(b)(6) Depo. Exhibit 57, ¶ 4 |
| 305. The ACE project Budget Justification Sheet ("BJS") | MSJ Exh. 26, *Decision Making* |

| | |
|---|---|
| for fiscal year 2006 includes text stating that the project, once completed as authorized, would provide SPH surge protection. However, that degree of protection could not in fact be provided by a completed LP&VHPP.  The increased understanding over time of potential storm frequency and intensity, potential surge levels, and subsidence in the project area indicating that a completed project would provide less than SPH protection – were not reported in any BJS or other venue by the ACE. | *Chronology*, p. 5-14 |
| 306. The receding coastal wetlands were a well-known fact, increasing the vulnerability of Louisiana and New Orleans to hurricanes." | MSJ Exh. 47, Irons, p. 5. |
| 307. The threats posed to New Orleans by a Katrina-like hurricane . . . were well known and unsurprising to most (including the ACE) who thought about the hurricane threat to New Orleans.  Along with other state local, federal leadership, the ACE appears to have remained complacent about preparing the flood protection structures for a catastrophic hurricane. | MSJ Exh. 47, Irons, p. 14 |
| 308. The evidence indicates the U.S. Army Corps of Engineers knew about the threat of breaches, as opposed to overtopping, since the early 1980s. Moreover, all concerned agencies, including those at the local, state, and federal levels, knew about the threat of overtopping and consequent flooding in even a Category 3 hurricane. | MSJ Exh. 3, ILIT, p. 12-7 |
| 309. Before Hurricane Katrina, the ACE knew that it would "take a combination of higher levees, new flood gates and restored wetlands to save New Orleans and time | MSJ Exh. 8, Naomi Depo. 400:19-401:22; MSJ Exh. 49, Corps 30(b)(6) |

| | |
|---|---|
| is not an ally.  Hurricane protection projects are moving slowly even as the threat seems to grow each year.  It's possible to protect New Orleans from a Category 5 hurricane, said Al Naomi, Senior Project Manager for the Corps of Engineers, but we've got to start.  To do nothing is tantamount to negligence." | Depo. Exhibit 50 at p. 3 |
| 310. In 1998, Hurricane Georges narrowly missed New Orleans, striking Mississippi and Alabama instead. Roused by the close call, local emergency-management planners began to seek federal funding for a massive exercise to consider the potential impact of a direct strike on New Orleans by a slow-moving – and, therefore, more damaging, by virtue of its longer duration – Category 3 hurricane. That funding did not arrive for five years.  The effort, known as the "Hurricane Pam" exercise, finally began in 2004, and tried to address the consequences of a Katrina-like hurricane as developed by Government scientists and emergency-management officials and contractors: Widespread flooding; 67,000 dead; 200,000 to 300,000 in need of evacuation after landfall, and hundreds of thousands displaced in need of shelter, exceeding state and local capabilities; hospitals and nursing homes overcrowded and short on critical resources; and incapacitated first responders.  Sadly, Katrina proved many of these predictions true. | MSJ Exh. 23, *A Nation Still Unprepared*, Chapter 1-22 MSJ Exh. 22, Failure of Initiative, p. 81 |

I.          **PLAINTIFFS' ALLEGATIONS OF CAUSE OF DAMAGE**

| UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|
| 311.  The Plaintiffs are not predicating Defendant's liability on claims of levee breaches or failures or overtopping or the defective design, construction, operation and/or maintenance of levees, flood protection works, or any other Government structures or facilities intended for hurricane flood control protection.  Put another way, Plaintiffs' claims against the United States do not relate to a federal flood control project or its design, construction, operation or maintenance or its performance during Hurricane Katrina.  Instead, Plaintiffs allege that the ACE was negligent in designing, constructing, operating, and maintaining the MR-GO in at least three critical aspects:  (1) the intrusion of saltwater from the Gulf of Mexico that quickly killed the wetlands and Tupelo cypress trees that form a natural protective buffer against hurricane surge; (2) the failure to armor the MR-GO's banks which led to massive erosion, widening of the channel, and loss of wetlands and bald cypress and water tupelo cypress trees; and (3) by connecting the Reach 2 channel with the GIWW and the resulting "funnel effect" that concentrated waters from Reach 2 and Lake Borgne into a small area and amplified and intensified storm surge that overtopped the structures along Reach 1 and the IHNC. | MSJ Exh. 67, Complaint in *Robinson v. United States*, Civil Action No. 06-2268, ¶¶ 1-4, 6, 29-30, 33-34, 47, 49-50, 52, 53-59, 70-75, 78-80, 82-84, 94, 102, 104. |
| 312.  The Complaint alleges as follows: "If the MR-GO | MSJ Exh. 67, Complaint, ¶ 72, |

| | |
|---|---|
| had not been defectively designed and constructed, [a Katrina-like surge] would have resulted in minimal levee overtopping and occasional flooding – but not a disaster on a Biblical scale largely submerging an entire city. . . . Indeed, but for the Army Corps' negligence [with respect to the MR-GO] most or all of the severe flooding of Plaintiffs' neighborhoods would not have occurred." | 74 |
| 313. As this Court has recognized: "Plaintiffs are not seeking damages for the failure of the levees or flood projects.  Plaintiffs contend that MRGO has absolutely nothing to do with a flood control project.  Plaintiffs are seeking damages for the effects of the waters in the MRGO with respect to the decimation of the wetlands over a long period of time which in turn created the hazard which resulted in flooding which plaintiffs maintain could not have been controlled by any flood control project." | MSJ Exh. 50, Order and Reasons Denying Motion to Dismiss,, Feb. 2, 2007 ("Document 2994"), p. 15 |
| 314. As this Court has also recognized, "while arguably the immediate cause of the [plaintiffs'] damage was indeed 'floodwaters,' the causation for such floodwaters force and breadth are alleged to have been the defalcations of the Government with respect to the MR-GO." | MSJ Exh. 50, Document 2994, p. 16 |
| 315. There is substantial evidence—most of it from Government documents and witnesses—supporting Plaintiffs' allegations that the MR-GO was negligently designed, constructed, operated, and maintained in at least the three critical respects alleged in the Complaint and that this negligence resulted in foreseeable (and foreseen) excess incremental surge during Hurricane Katrina that | MSJ Exh. 28, Dalrymple Depo. 35:19-36:6, 108:1-16, 137:12-139:1, 143:6-145:1; <br> MSJ Exh. 3, ILIT, pp.2-8-9; 4-26-28; 6-1-21; 7-1-11; <br> MSJ Exh. 4, Team Louisiana Report, pp. 223-77; |

| | |
|---|---|
| was a cause of the overtopping of structures along Reach 1 and Reach 2 of the MR-GO and the IHNC and the resulting catastrophic flooding of New Orleans East, the Lower Ninth Ward, and St. Bernard Parish. | MSJ Exh. 7, Kemp Expert Report, pp. 21-44; MSJ Exh. 17, Day Expert Report, pp. 3-12; MSJ Exh. 14, Penland Expert Report, pp. 4-20; MSJ Exh. 13, Theis Expert Report, ¶¶ 11-30; MSJ Exh. 31, Bea Expert Report, pp. 12-14, ¶ 22; pp. 42-43, ¶ 56; p. 45, ¶ 60; p. 137, ¶ 188 |

J.      CONTRARY TO THE CONGRESSIONAL MANDATE IN THE
        FLOOD CONTROL ACT OF 1965 AND ITS OWN STANDARDS,
        THE ARMY CORPS OF ENGINEERS DID NOT CONSTRUCT
        HURRICANE FLOOD PROTECTION STRUCTURES FOR HUMAN
        POPULATION AREAS ALONG REACH 1 AND REACH 2 OF THE
        MISSISSIPPI RIVER-GULF OUTLET OR THE INNER HARBOR
        NAVIGATION CHANNEL THAT MET EITHER THE "STANDARD
        PROBABLE HURRICANE" OR "PROBABLE MAXIMUM
        HURRICANE" DESIGN CRITERIA

   1.   The Hurricane Flood Protection System For Greater New
        Orleans Was An Uncompleted Work in Progress At The
        Time of Katrina

| UNDISPUTED FACTS | EVIDENTIARY SUPPORT |
|---|---|
| 316. By the time of Hurricane Katrina, the USACE had not completed, and was far from completing, constructing a hurricane flood protection "levee" along Reach 1 or Reach 2 of the MR-GO as that concept is generally understood by engineers and as specified in relevant USACE manuals and guidelines.  Instead, construction was, and still remains, a work in progress. | MSJ Exh. 33, Arnold Expert Report, ¶¶ 7, 44; MSJ Exh. 31, Bea Expert Report, ¶¶ 27-38; 83-125; 178-85; Appendix A; *see also* Section F, *supra* MSJ Exhs. 35 & 36, Height Structure Maps |
| 317. What is evident from the ACE documents available is that over the years after 1965, the USACE undertook multiple design and construction efforts to raise crest grade on those Reach 2 levee segments to correct the effects of settlement.  (Team Louisiana, The Failure of the New | MSJ Exh. 33, Arnold Expert Report, ¶ 34 |

| | |
|---|---|
| Orleans Levee System During Hurricane Katrina, Report to the Louisiana Department of Transportation and Development (2007)("Team Louisiana Report") at page 270). Thus, at the time of Hurricane Katrina, the construction of the structure by the USACE remained an uncompleted work in progress but it was not a levee offering flood control protection. (Independent Levee Investigation Team, Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005 (2006) ("ILIT Report") at Sections 10.5.7, 10.5.8, and 10.5.9, first paragraph in each section, pages 10-18 to 10-20). | |
| 318.  Virtually all of the flood structures along the IHNC and Reach 1 and Reach 2 of the MR-GO were incomplete and not at SPH design elevation at the time of Hurricane Katrina. | *See* Section G, *supra*; MSJ Exhs. 35 & 36, Height Structure Maps |
| 319.  The spoil bank was located on the south side of Reach 2.  It was not functioning as a flood levee at that point.  That pile of dirt in and of itself would not be a flood protection levee and certainly not one mandated by Congress in the LPVHPP. | MSJ Exh. 8, Naomi Depo. 338:19-339:8 |
| 320.  At the time of Hurricane Katrina, the features along the south bank of the MR-GO remained a "pile of dirt" that was higher than eight feet, but still not a completed flood protection work mandated by Congress for the LPVHPP. | MSJ Exh. 8, Naomi Depo. 262:22-25, 338:19-339:8, MSJ Exh. 52, Corps 30(b)(6) Depo. Exhibit 20 |

**2.**     **The ACE Did not Design or Construct Flood Protection Structures For Human Population Areas In A Coastal Environment As Mandated By Congress And Prescribed By ACE Criteria**

| | |
|---|---|
| 321. To the extent that Congress mandated a hurricane flood protection system for Greater New Orleans in the wake of the catastrophic flooding during and after Hurricane Betsy in 1965, the USACE did not design and build such a system along vast stretches of the MR-GO.  In Section 204 of the Flood Control Act of 1965 (Pub.L.No. 89-223, 79 Stat. 1073 (October 27, 1965), Congress directed the USACE to build "works of improvement for . . . the control of destructive floodwaters" and a "project for hurricane-flood protection on Lake Pontchartrain, Louisiana."  The level of protection anticipated by this authorization was to protect the project area from the Standard Project Hurricane ("SPH").  The SPH is one that may be expected from the "most severe combination of meteorological conditions that are considered reasonably characteristic of the region." (See House Doc. 231, 89th Congress, 1st Session, dated July 6, 1965, at p. 46. House Doc. 231 was incorporated by reference in Section 204 of the Flood Control Act of 1965)  The evidence is overwhelming that the USACE did not design and construct such a project for either reach of the MR-GO. | MSJ Exh. 31, Bea Expert Report ¶ 23<br><br>MSJ Exh. 10, House Doc. No. 231, p. 46 |
| 322. The earthen structures along Reach 2 of the MR-GO were not a hurricane flood protection "levee" system either by design, construction, or functionality.  At most, they | MSJ Exh. 13, Theis Report, ¶¶ 17, 30 |

| | |
|---|---|
| were earthen embankments affording no hurricane flood protection because (among other reasons) of the poor, highly erodible soil composition, lack of compaction, construction on unstable, subsiding material, uneven heights of the elevation crests,  and lack of any front or back slope protection. | |
| 323. Coastal engineering is the engineering that is performed in a coastal area, as distinguished from hydraulic engineering that might be more in a riverine area.  It is to distinguish coastal processes that could occur during floods and other types of events.  The hydraulic and hydrologic dynamics of a river are a great deal different than that of a coastal area.  Thus, there is a difference between flood protection and hurricane or storm flood protection in terms of computing design water levels, slope, and armoring of a flood structure.  Flood protection relates to a riverine locale, while there is a wave climate in a coastal process that must be accounted for. | MSJ Exh. 8, Powell Depo. 450:15- 451:2, 482:13-483:23 |
| 324. The ACE should have followed the criteria specified in the *Coastal Engineering Manual* (and its predecessors *The Shore Protection Manual* (1984) and *Shore Protection and Design, TR-4 Manual* (1966)) which is used as guidance in design of coastal flood protection features.  These standards would be particularly useful for coastal engineering hydraulic issues.  They would be appropriate for use in the design and construction of flood protection works along Reach 2 with respect to waves because it would be expected that waves would propagate | MSJ Exh. 31, Bea Expert Report p. 7-9, ¶ 16(b); MSJ Exh. 33, Arnold Expert Report ¶¶ 10, 11, 30, 42, 43; MSJ Exh. 8, Powell Depo. 448: 6-18, 451:16-21, 452:8-14, 457:24-458:13; 466:20-467:2, 472:3-20, 474:10-19; MSJ Exh. 8, Baumy Depo. 106:20-107:3; |

| | |
|---|---|
| into the Reach 2 area during a hurricane because of the small, dwindling amount of land (if any) between Lake Borgne and the MR-GO and the fact that a lot of marshland was no longer alive or functioning as a surge buffer. In fact, that is exactly what happened during Hurricane Katrina. | |
| 325. The structures in place along Reach 2 of the MR-GO—which were designed to protect the developed areas of St. Bernard and Orleans Parishes—were nothing more than earthen embankments that were not "levees" because, among other things, they offered no meaningful protection to human population and property in the vicinity. | MSJ Exh. 33, Arnold Expert Report ¶¶ 7, 16-44; MSJ Exh. 13, Theis Expert Report ¶¶ 13-30; MSJ Exh. 31, Bea Expert Report pp. 7-9, ¶ 16(b); Appendix A |
| 326. The ACE failed to design and construct a hurricane flood protection levee along Reach 2 of the MR-GO that met its own criteria. Accordingly, the earthen berms along the southern banks of Reach 2 of the MR-GO could not have been a hurricane flood protection levee. | MSJ Exh. 33, Arnold Expert Report ¶¶ 7, 16-44; MSJ Exh. 13, Theis Expert Report ¶¶ 13-30; MSJ Exh. 31, Bea Expert Report pp. 7-9, ¶ 16(b); Appendix A |
| 327. According to the ACE's own manuals, the soil materials selected for construction of the Reach 2 flood structures—adjacent borrow materials that were rich in sandy soils and shells with inferior erosion resistance—were inappropriate for this type of project in close proximity to an urban area along the coast (due to the immediate proximity of Lake Borgne). | MSJ Exh. 33, Arnold Expert Report ¶¶ 7, 16-44; MSJ Exh. 13, Theis Expert Report ¶¶ 13-30; MSJ Exh. 31, Bea Expert Report pp. 7-9, ¶ 16(b); Appendix A |
| 328. From time to time over many years, the ACE promulgated versions of a *Design and Construction of Levees Manual* ("*DCL*") that sets forth the Corps' policies | MSJ Exh. 56, *Design and Construction of Levees*, EM 1110-2-1912, dated April 30, |

| | |
|---|---|
| and practices for design and construction of levees as flood protection structures in human population areas.  At page 6-2(b), the *DCL* explicitly warns that such "hydraulic fill" with "porous" sands that are "pervious" "shall not normally be used in constructing levee embankments." The *DCL* also warns that hydraulic fill should be used only in a "temporary emergency" and in circumstances where the flood structures' "failure would not endanger human life . . .." | 2000, at p. 6-2(b) and Table 7-1 (III); MSJ Exh. 33, Arnold Expert Report ¶¶ 10, 21-25 |
| 329.  The ACE did not adhere to its own design standards and guidelines for storm flood protection in various manuals, including the *TR-4 Manual*, *Shore Protection Manual*, and *Coastal Engineering Manual*.  The decision to construct a "levee" along Reach 2 of the MRGO from the existing available materials was based on the USACE's normal flood control levee construction methods employed on the inland waterways. This system heavily uses adjacent borrow to build levees.  Using conventional land based equipment and not a cutterhead hydraulic dredge, the USACE had proceeded to construct these inland levees on an embankment of the spoil material which was primarily sand and shell, but much less erodable silt and clay. | MSJ Exh. 13, Theis Expert Report, ¶ 16; MSJ Exh. 33, Arnold Expert Report, ¶ 10 |
| 330.  Flood protection levees should not be made "entirely out of sand." The post-Katrina levee repairs and replacement require use of clay, composition of the soils, and vegetation on the embankments which "provides significant erosion resistance than just earth and fill itself." | MSJ Exh. 28, Dalrymple Depo., 75:22-76:5; MSJ Exh. 27, Varuso Depo. 105:1-25 |
| 331.  ACE standards at the time required the use of clays | MSJ Exh. 27, Varuso Depo., |

| | |
|---|---|
| and silts and no other type of soil material in construction of the flood protection work along Reach 1 and Reach 2 of the MR-GO. | 57:20-58:1 |
| 332. Many miles of the Chalmette and New Orleans East Levees were constructed of shell-rich sands with poor erosion resistance derived from the hydraulic excavation of the adjacent GIWW and MRGO channels, rather than the hauled clay soils specified for levees protecting urban areas (EM 1110-2-1913, 1978 ed.). | MSJ Exh. 4, Team Louisiana, p. vii |
| 333. Post-Katrina soil testing by IPET of samples obtained from earth levees throughout the GNO HPS exhibited a wide range of erodability indices from very low to very high categories (Figure 199), but those from the Chalmette (MRGO) and New Orleans East Back Levee (GIWW) tended to fall in the very high to high-erosion potential ranges. ILIT (2006, 9-52) found, furthermore, that MRGO samples that tested in the high- erodability categories could be greatly improved with respect to erosion resistance by subjecting them to compaction in the laboratory (Figure 200). | MSJ Exh. 4, Team Louisiana, p. 271 |
| 334. The lakefront flood protection works made of clay did not have vast stretches that washed away like Reach 2 of the MRGO. The lakefront flood protection works performed as designed. | MSJ Exh. 28, Dalrymple Depo., 78:2-9; 80:1-6 |
| 335. The ACE did not build a human flood protection system along Reach 2 of the MR-GO for the additional reasons that the structures in place at the time of Hurricane Katrina did not meet other Corps' criteria for such a | MSJ Exh. 33, Arnold Expert Report ¶¶ 7, 16-44; MSJ Exh. 13, Theis Expert Report ¶¶ 13-30; |

| | |
|---|---|
| system.  For example, The ACE failed to adhere to standards for dealing with settlement, stability, seepage, erosion, overtopping, wave action, and armoring for slope protection.  Thus, the man-made features in place along Reach 2 of the MR-GO were merely earthen embankments but nowhere completed "levees" offering any realistic storm surge protection for the adjacent communities of the Lower 9th Ward and Chalmette.  These structures were not designed to withstand even general overtopping, as was amply demonstrated in Katrina. | MSJ Exh. 31, Bea Expert Report pp. 7-9, ¶¶ 16(b)(c), Appendix A; MSJ Exh. 4, Team Louisiana, p. vi-vii |
| 336. The New Orleans District did not follow standard engineering practice or Army Corps guidance when evaluating whether to protect (armor) earthen sea dikes from erosion caused by waves in the funnel area east of the city. Such evaluations should have followed the *1954 TR-4 Shore Protection Planning and Design Manual* (Beach Erosion Board) or its successor, the *Shore Protection Manual*, first published in 1973. | MSJ Exh. 4, Team Louisiana, p. vi-vii |
| 337. In order to qualify as a "levee" for flood protection for humans and property, the ACE's own *Design and Construction of Levees Manual* and *Coastal Engineering Manual* prescribe that these man-made features must be either (a) composed mostly of compacted clay-like cohesive soils, or (b) if constructed of more loosely compacted soils, they must be capped or covered with more dense materials that will protect against the underlying soils being washed away by wave action, storm surge, elevated tides and other water related phenomena | MSJ Exh. 31, Bea Expert Report pp. 7-10, ¶¶ 16(b)(c), 17, Appendix A |

| | |
|---|---|
| associated with hurricanes.  Accordingly, there were no "levees" along virtually all of Reach 2 and portions of Reach 1of the MR-GO to protect human population living with this urban area before Hurricane Katrina.  Instead, this frontage had no effective hurricane protection since the ACE decided after 1965 to construct man-made features that were nothing more than miles of Earthen Berms/Spoil Banks ("EBSB")—comprised of dredged sandy, silty soil containing organic matter and shells and/or uncompacted hydraulic fill –that  was not suitable for "levees." | |
| 338. The ACE had sufficient experience and available expertise to know that an embankment from sand only, without surface protection, would not be sufficient to withstand ocean generated waves and tidal surges resulting from hurricanes.  The plans did not include toe or slope protection and therefore would not withstand the onslaught of severe wave action associated with a storm such as a hurricane with high winds.  For this additional reason, the structure built by the ACE could not have been, and was not, a hurricane protection "levee" for a populated area. | MSJ Exh. 13, Theis Expert Report, ¶ 17 |
| 339. USACE levee designers generally dismissed the need to provide protective covering for the earthen levees constructed as part of the GNO HPS, beyond that afforded by establishment of a grassed surface.  Along most of the Lake Pontchartrain lakefront, more resistant hauled clay soils were, in fact, used to face the levees, and wave berms and sea walls were placed in front of the levee faces at critical locations.  These levees were not overtopped | MSJ Exh. 4, Team Louisiana, p. 274-75 |

| | |
|---|---|
| except by limited wave overwash and generally performed well. The sea dikes constructed along the boundaries of the funnel were provided with rip-rap protection at the toe on the channel side to retard erosion of the channel into the levee base, and some were constructed with stability berms to offset the relatively low strength of the soils used, but no additional protection, usually referred to as "armoring," particularly on the back side, was added to address erosion caused by expected overtopping within the statistical range inherent in the definition of the "significant" wave. Again, as was universally true throughout the GNO HPS, the design approach adopted was extraordinarily "brittle," or accepting of the potential for catastrophic failure in the event of even relatively minor overtopping | |
| 340. Engineers involved in the design, construction and operation of the Dutch flood defense system remain mystified by the way the USACE continues to separate coastal levee design from the need to defend such structures from waves. The MRGO levee, for example, has been rebuilt to the pre-Katrina design grade, and the materials used for the patches are far better than those originally used. But the levee was not initially designed as a true coastal defense structure that could survive both surge and waves.  The need for armoring has been treated as an add-on that must be separately justified, rather than as integral to the overall design. In the wait-and-see world of post-Katrina flood protection funding priorities, no assurance exists at present that the MRGO and GIWW | MSJ Exh. 4, Team Louisiana, p. 275 |

| | |
|---|---|
| levees will ever be upgraded to survive overtopping, despite awareness at the highest levels in the USACE that they remain among the most fragile parts of the GNO HPS. | |
| 341. Scouring is the erosion of the land by the action of the water overtopping the structure.  Armoring on the protected side helps prevent scouring when the structure is overtopped.  It is important to try to protect against or minimize scouring to maintain integrity of the structure. Significant scouring can lead to instability of the structure by means of erosion. | MSJ Exh. 8, Powell Depo. 471:5-17; MSJ Exh. 28, Dalrymple Depo., 89:23-90:4 |
| 342. Armoring will provide you protection when your design parameters are exceeded.  It also can allow you to lower your design elevations because you do not need as much run-up because you have a rough slope which breaks the waves. | MSJ Exh. 8, Powell Depo. 466:20-467:2 |
| 343. The functional benefit of armoring by means of a clay cap, grass, concrete, rock, pavement, and/or riprap is preventing direct water or wave action from scouring or naturally dredging the soil materials. | MSJ Exh. 28, Dalrymple Depo., 90:9-91:4 |
| 344. There was no protected (back) side scour protection (such as armoring) of the Reach 2 structures at the time of Hurricane Katrina.  As a result, scouring occurred extensively along Reach 2 during and after Hurricane Katrina.  The erodable sandy soils and lack of armoring caused the erosion of the structures along Reach 2. | MSJ Exh. 28, Dalrymple Depo. 86:6-87:14, 90:1-8 |
| 345. The ACE engaged in additional negligent conduct that contributed to the failure of the I-walls on the west side of the IHNC and the ensuing catastrophic flooding of | MSJ Exh. 31, Bea Expert Report, Appendix C, p. c.1 |

| the Lower Ninth Ward.  The Army Corps undertook site clearing for the Lock Expansion Project at the East Bank Industrial sites, and the remediation work had material adverse effects on the soil stability and protection for the flood control structure.  Thus, there is a high correlation between the locations of this excavation and the two breach locations. | |
|---|---|

Dated:  January 11, 2008                    Respectfully submitted,

**O'Donnell & Associates P.C.**

By: s/ Pierce O'Donnell
Pierce O'Donnell (*pro hac vice*)
550 S. Hope St., Suite 1000
Los Angeles, California 90071
Phone:  (213) 347-0290
Fax:  (213) 347-0298

**The Andry Law Firm, LLC**

By: s/ Jonathan B. Andry
Jonathan B. Andry (LSBA No. 20081)
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 586-8899
Facsimile:  (504) 585-1788

**Law Offices of Joseph M. Bruno**
Joseph M. Bruno (LSBA No. 3604)
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

**Domengeaux Wright Roy & Edwards LLC**
Bob F. Wright (LSBA No. 13691)
James P. Roy (LSBA No. 11511)
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, Louisiana 70502-3668
Telephone: (337) 233-3033

118

Facsimile:  (337) 233-2796

**Fayard & Honeycutt**

Calvin C. Fayard, Jr. (LSBA No. 5486)
Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193
Facsimile:  (225) 664-6925

**Girardi & Keese**

Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile:  (213) 481-1554

**Ranier, Gayle & Elliot, LLC**

N. Frank Elliot III
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337).494.7218

**Levin, Papantonio, Thomas, Mitchell Echsner & Proctor, P.A.**

Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123

**McKernan Law Firm**

Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202

**Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC**

Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Law Office of Elwood C. Stevens, Jr., a Professional Law Corporation**

Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Law Office of Frank J. D'Amico, Jr. APLC**
Frank J. D'Amico, Jr. (LSBA No. 17519)Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Robinson, Calcagnie & Robinson, Inc.**
Mark Robinson (Cal State Bar. No. 54426)
620 Newport Center Drive - 7th Floor
Newport Beach, CA 92660
1-888-701-1288

**Cotchett, Pitre, Simon & McCarthy**

Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Salas & Co., LC**

Camilo K. Salas, III (LSBA No. 11657)
650 Poydras Street, Suite 1650
New Orleans, LA  70130
Telephone: (504) 799-3080
Facsimile:  (504) 799-3085
**Attorneys for Plaintiffs**

## <u>CERTIFICATE OF SERVICE</u>

     I, Pierce O'Donnell, hereby certify that on January 11, 2008, I caused to be

served **<u>PLAINTIFFS' UNDISPUTED FACTS SUMMARY ADJUDICATION</u>**

**<u>ON SECTION 702c IMMUNITY</u>**, upon Defendants' counsel, Robin D. Smith,

Catherine Corlies, Traci Colquette, and Jim McConnon by ECF and email at

robin.doyle.smith@usdoj.gov; catherine.corlies@usdoj.gov,

traci.colquette@usdoj.gov, and jim.mcconnon@usdoj.gov

                                     /s/ Pierce O'Donnell