## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Robinson* (06-2268) | § | |
| | § | |

## DEFENDANT UNITED STATES' MEMORANDUM IN SUPPORT
## OF UNITED STATES' MOTION TO DISMISS OR, IN THE
## ALTERNATIVE, FOR SUMMARY JUDGMENT

Based on its sovereign immunity from "liability of any kind for any damage from or by floods or flood waters at any place," 33 U.S.C. § 702c, the United States has moved to dismiss or, alternatively, for a summary judgment.  Plaintiffs seek to recover for flood damage to their homes and commercial property on August 29, 2005, when the federal hurricane protection system for Greater New Orleans was overtopped and breached by Hurricane Katrina's floodwaters.  Undoubtedly, the performance of the federal hurricane protection system was, is, and will forever be the defining event in this catastrophe.  Had there been no flood protection system in place, no one would have been surprised that a storm the size and strength of Katrina sent floodwaters surging over New Orleans, a city constructed very close to sea level.

1

The performance of the hurricane protection system is a key fact within the legal framework previously employed by this Court for analyzing the attachment of Flood Control Act immunity to the waters that caused the alleged damage.  Those waters, as the record now makes clear, were floodwaters that the United States sought to control by the construction of flood works around New Orleans East, the Lower Ninth Ward, and St. Bernard Parish.  Erected under the Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPVHPP" or "LPV"), they surrounded the plaintiffs' properties at the time the storm struck.  When these levees and floodwalls were overtopped and breached, floodwaters rushed in a torrent into Plaintiffs' communities.  Because the flood damages alleged by Plaintiffs resulted from floodwaters that the United States sought but failed to control, this case must be dismissed for lack of subject matter jurisdiction.

Dismissal is warranted even though Plaintiffs attempt to base their case not on the hurricane protection system itself but on the supposed impact of the Mississippi River-Gulf Outlet ("MRGO") on it.  Neither the text of the statute itself nor any controlling legal authority limits § 702c to conduct that is intrinsic to a flood control project.  As the Supreme Court observed in *Central Green,* "the text of the statute does not include the words 'flood control project.'"  531 U.S. 425, 434 (2001).  Moreover, if the Fifth Circuit decisions antedating *Central Green* have any continuing vitality, then those cases also militate against Plaintiffs' contention that conduct must be intrinsic to a flood control project in order to be protected by § 702c.  The Fifth Circuit has employed an approach that analyzes the association between the challenged conduct and flood control.  Conduct that is related in some manner to flood control is immune under § 702c.

Although funded and constructed separately, the MRGO and the LPVHPP have always been inextricably interconnected. The MRGO was an important part of the network of waterways that were potential sources and conduits of flooding during any hurricane. The waterway was also the source of soil used to construct the LPV levees alongside it. Plaintiffs do not dispute these connections between the two projects. On the contrary, their claims emphasize the fundamental relationship between the projects. Plaintiffs allege that the erosion of the banks of the MRGO affected the storm surge created by Hurricane Katrina. They point to the hydraulic dredging of soils from the bottom of the MRGO as a prime reason for the breaching of the levees that were constructed of those soils.

By asserting that the design, construction, operation, maintenance, and repair of the MRGO affected storm surge and caused the breaching of the LPV levees, Plaintiffs make plain that this case is nothing less than an attempt to hold the United States liable for conduct associated with flood control. Though the MRGO project was a formally separate project and not part of the LPV project, the former project is alleged to have created the very conditions that the latter project was authorized, designed, and built to counter. In other words, Plaintiffs are necessarily saying the United States negligently constructed flood works that failed to account for the hydrological influence of the MRGO. This innate relationship warrants application of § 702c to the Katrina flood and to this case.

Inasmuch as this case seeks to impose liability on the United States for damage from and by a flood and floodwaters that a federal project sought to control, this case must be dismissed for lack of subject matter jurisdiction.

## FACTS

The facts that establish application of § 702c are not in dispute.  In October of 1965, Congress enacted legislation authorizing the LPVHPP for construction.  Pub. L. 89-298, 79 Stat. 1073, 1077 (Exh. 57).  The law authorized the Army Corps of Engineers to execute the project "substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 231, Eighty-ninth Congress."  *Id.*  In that document, the Chief of Engineers recommended authorization for construction of hurricane protection improvements "essentially as planned by the reporting officers" in the "Interim Survey Report on Hurricane Study of Lake Pontchartrain, Louisiana and Vicinity," the November 21, 1962, memorandum prepared for the Chief of Engineers by the District Engineer for New Orleans and endorsed by the Division Engineer for the Lower Mississippi Valley.  H.R. Doc. No. 89-231 (Exh. 10), at 3; *cf. id.* at 23-87 (Dist. Eng'r Mem.).[1]

The planned improvements for protection of New Orleans East included a new levee along the shore of Lake Pontchartrain, improvement of existing protective works between the lake and the Gulf Intracoastal Waterway, and improvement of existing works along the GIWW and the Inner Harbor Navigation Canal.[2]  H.R. Doc. No. 89-231 (Exh. 10), at 82; *see also id.* at Plate 3 ("Plans of Protection").  The plan for protection of St. Bernard Parish and the Lower

---

[1]     The Chief's recommendation was couched in terms of his "concur[rence] in the recommendations of the Board of Engineers for Rivers and Harbors," which he in turn characterized as a concurrence "in general in the views and recommendations of the reporting officers." H.R. Doc. No. 89-231 (Exh. 10), at 3.  The "reporting officers" were the New Orleans District Engineer and the Lower Mississippi Valley Division Engineer.  *Id.* at 86-87.

[2]     The plan for New Orleans East also included "[a] barrier across the east side of Lake Pontchartrain" and "a dual purpose lock in the Inner Harbor Navigation Canal," neither of which was ever built.  H.R. Doc. No. 89-231, (Exh. 10) at 82.

Ninth Ward (collectively referred to as "Chalmette") entailed "construction to provide for a levee along the Mississippi River-Gulf Outlet from the Inner Harbor Navigation Canal to Bayou Dupre, thence along the bayou to Violet, La.; the improvement of the existing levee along the Inner Harbor Navigation Canal; and drainage structures in the levee alignment at Bayous Bienvenue and Dupre." *Id.* at 84; *see also id.* at Plate 3 ("Plans of Protection"). By extending the planned improvements to the existing Mississippi River levee, developed areas of St. Bernard Parish and the Lower Ninth Ward would be completely encircled by protective works. *See id.* at 7, Plate 3 ("Plans of Protection") (depicting river levee as "embankment"). It was contemplated, even as the Army was recommending to Congress that the planned works be authorized for construction, that the proposed alignment of the levee protecting St. Bernard Parish might be enlarged to protect additional lands. *Id.* at 3; *see also id.* at 10.

After construction was authorized, detailed designs were developed.[3] As had been anticipated, the plan for the Chalmette area was modified to enlarge the protected area. The revised plan, "Chalmette Extension," extended the levee past Bayou Dupre along the bank of the MRGO to Verret before turning the levee south and then west, to connect it with the Mississippi River levee at Caernarvon.[4]

The LPV levees along the GIWW and the MRGO were built in stages because of poor foundation conditions. Naomi Decl. (Exh. 79) at ¶ 14; *see also* Bea Rep. App. A (Exh. 31) at 1-

---

[3]      *See generally, e.g.,* USACE LPVHPP General Design Mem. No. 2, Supp. No. 4, "New Orleans East Back Levee" (Mar. 1971)(Exh. 74);  USACE LPVHPP General Design Mem. No. 2, "Citrus Back Levee" (Aug. 1967)(Exh. 73); USACE LPVHPP General Design Mem. No. 3, "Chalmette Area Plan" (Nov. 1966)(Exh. 30).

[4]      *See* USACE LPVHPP General Design Mem. No. 3, Supp. No. 1, "Chalmette Extension" (Sept. 1968) (Exh. 41) at 1-2 & Plate (LPV Authorized Plan of Protection (Rev. Apr. 1968)) (showing location of work covered in document); Bea Dep. (Exh. 45) at 191:25 – 193:2.

4; IPET Report (Exh. 20) Vol. III at 33-34;  ILIT Report (Exh. 3) at 2-6; Team Louisiana Report
(Exh. 4) at 131; (*accord* Bea Dep. (Exh. 45) at 138:15-138:23).  On August 29, 2005, New
Orleans East was protected on its southern border by levees and other protective structures
erected pursuant to the LPVHPP.  Naomi Decl. (Exh. 79) at ¶ 9; *see also* IPET Report (Exh. 20)
Vol III at 154-155; ILIT Report (Exh. 3) at 2-1 to 2-2; Bea Dep. (Exh. 45) at 78:9 – 80:2, 119:10-
19, 268:11-16; Bea Report at 32 (Fig. 15).  New Orleans East was encircled by LPV flood
control structures on August 29, 2005.  *See* IPET Report (Exh. 20) Vol. III at 154-155; ILIT
Report (Exh. 3)at 2-1 to 2-2, Fig. 2.4 at 2-17; Team Louisiana Report (Exh. 4) at 14-15; Vrijling
702c Dep. (Exh. 40) 31:4-32:7. Likewise, federal levees, floodwalls, and other control structures
encircled St. Bernard Parish and the Lower Ninth Ward on that date.  Naomi Decl. (Exh. 79) at
¶¶ 6-7, 16; Bea Dep. (Exh. 45) at 192:21 – 193:2.  LPV levees and other flood control structures
were in place on the south side of the MRGO between the IHNC and Verret (Reach 1 and Reach
2) at that time.  Naomi Decl. (Exh. 79) at ¶¶ 15-16; *see also* Bea Dep. (Exh. 45) at 119:2 –
123:25.  The floodworks along the GIWW and the MRGO were designed and constructed to
protect against hurricane-induced storm surge coming from Lake Borgne and the larger bodies of
water that lay beyond it.  *See* Chief's Report (Exh. 10) at 1.  These works, which consisted
primarily of levees paralleling the GIWW and the MRGO, were also intended to combat any
surge conveyed by the waterways themselves.  Naomi Decl.  (Exh. 79) at ¶ 15.

During Hurricane Katrina, the New Orleans East Back Levee, which stood on the north
side of the GIWW east of the GIWW-MRGO junction, was overtopped and breached in
numerous places.  *See* Kok Report (Exh. 53) at 28-31, (Fig. 4.2) (Fig. 4.3); Bea Dep. (Exh. 45) at
265:17 – 266:3; ILIT Report Fig. 2.11 (Exh. 3) at 2-24.  The floodwaters that inundated New

Orleans East also flowed over the top of the Citrus Back Levee, which stood on the north side of the MRGO and the GIWW between the IHNC and the MRGO-GIWW junction (*i.e.,* "Reach 1," the reach in which the GIWW and the MRGO shared a single course).  Kok Report (Exh. 53) at 3.  Similarly, the levees protecting St. Bernard Parish and the Lower Ninth Ward, which ran along the south side of the MRGO between the IHNC and Verret (*i.e.,* "Reach 1" and "Reach 2") were overtopped and breached in many places.  The floodwall on the east side of the IHNC, at the western edge of the Lower Ninth Ward, was overtopped and collapsed.  The floodwaters that inundated St. Bernard Parish and the Lower Ninth Ward on August 29, 2005, flowed over the top of and through breaches in the federal levees and other flood control structures that were designed and constructed to control them.  Naomi Decl. (Exh. 79) at ¶ 16; Kok Report (Exh. 53) at 38-42 (Fig. 5.2) (Fig. 5.3).

## ARGUMENT

I. SECTION 702C REQUIRES DISMISSAL BECAUSE THE RELEVANT DAMAGE RESULTED FROM A FLOOD AND WAS CAUSED BY ITS FLOODWATERS, WHICH THE LPVHPP FAILED TO CONTROL.

"The starting point in statutory interpretation is the language of the statute itself," and it is to be "assume[d] that the legislative purpose is expressed by the ordinary meaning of the words used."  *United States v. James,* 478 U.S. 597, 604 (1986) (brackets by Court, internal quotation marks, and citations omitted).  Thus, in *Central Green* the Court held "that it is the text of § 702c, as informed by our holding in *James,* . . . that governs the scope of the United States' immunity from liability for damage caused 'by floods or flood waters.'"  531 U.S. 425, 437 (2001).  The text of § 702c is straightforward and unambiguous:  "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any

place."  33 U.S.C. § 702c.  This "sweeping" assertion of sovereign immunity "'safeguard[s] the United States against liability of any kind for damage from or by floods or flood waters in the broadest and most emphatic language.'"  *James,* 478 U.S. at 608 (citation omitted).  On its face, the statute's plain language, which has been given full effect and has not been abrogated in any way by the Supreme Court, bars this case.  Contrary to the express language of the statute, Plaintiffs seek to hold the United States liable for damage caused by "floodwaters from the MRGO."  Complaint (Exh. 67) ¶¶ 10, 13, 14;  *see also id.* ¶¶ 1-3, 11-12, 15-25 (alleging flood damage).

Application of the Flood Control Act here to bar Plaintiffs' claims is also required by the core teachings of *James* and *Central Green.*  In *James* the Court determined that the statutory word "damage" encompasses not just property damage, but also personal injuries and death.  478 U.S. at 605.  Subsequently, in *Central Green,* the Supreme Court emphasized that § 702c immunity turns on "the character of the waters that cause the relevant damage."  531 U.S. at 437.  These Supreme Court precedents make it clear that the United States cannot be held liable for "any damage," whether to property or to person, caused by or resulting from "floods or flood waters."  The latter statutory phrase was expressly construed to include "those waters that a federal project is unable to control."  *Id.* at 431; *accord James,* 478 U.S. at 605; *cf.* R.D. 6194 (order on motion for 28 U.S.C. § 1292(b) certification) (Exh. 72), at 4 (statutory phrase is limited to waters that "have a nexus to a flood control project").

This authoritative construction disposes of this case, for the "floodwaters from the MR-GO" were undeniably "waters that a federal project [was] unable to control."  It is undisputed that flood control structures were put in place along the MRGO to keep storm surge from Lake

Borgne out of the developed areas adjacent to the lake.  *See* H.R. Doc. No. 89-231 (Exh. 10) at 1;

Naomi Decl. (Exh. 79) at ¶ 15; Bea Dep. (Exh. 45) at 17:16 – 18:1, 38:8-23, 40:20 – 41:9, 65:4-

11, 74:11 – 75:14, 119:10-15, 252:15-21; Bea Report (Exh. 31) at A.1, A.10–A.24.  Plaintiffs'

own expert, Bob Bea, reports that "the design target elevation" of 17.5 feet for the MRGO levee

was "achieved" on Reach 2 in 1987.  Bea Report (Exh. 31) at A.25.  "At the time Hurricane

Katrina hit the MR-GO area, the crest elevation had settled approximately 1.5 feet below the

target crest elevation . . . ."[5]  *Id.*.  According to Plaintiffs' expert Paul Kemp, "the actual

elevation" of the MRGO levee "ranged from 15 to 18 ft MSL [mean sea level] prior to Katrina.

Kemp Data Report (Exh. 68) at 18; *see also* Morris Decl. (Exh. 70) at 14-15, Figs. 5-2, 5-3, 5-4.

(showing MRGO Reach 2 crest elevations).

     Because storm surge during Hurricane Katrina exceeded the crown elevation of the

MRGO levee, "the stage was set for general overtopping.  This overtopping, and the wave attack

that preceded it, destroyed the MRGO levee, causing complete loss in some places and

---

[5]     Station 497, the location of these elevation measurements, is between Bayou Bienvenue and Bayou Dupre.  *See* USACE LPVHPP General Design Mem. No. 3, (Chalmette Area Plan, Nov. 1966) (Exh. 30) Plate 1.  Dr. Bea's representation that the Chalmette Area Plan had "a target completion date" and a "target elevation" for what Dr. Bea terms "the EBSBs in the vicinity of Station 497+00" illustrates that "EBSB" is a synonym for the Reach 2 levees described in the Corps's plans and designs.  Bea Report at (Exh. 31) A.25; *see also id.* at A.1.  Dr. Bea uses the terms interchangeably.  On page A.1 he asserts that "[t]he construction of the MR-GO EBSBs was a component of the Chalmette Area Plan (USACE, 1966)."  On the following page he reports that "[t]he levee design elevations are presented in the Chalmette Area Plan (USACE, 1966).  *Id.* at A.2.

     The levee on the south bank of Reach 2 of the MRGO was not a mere spoil bank.  Following completion of the waterway, it was dredged below the authorized channel depth for the specific purpose of obtaining "additional levee material."  Bea Report (Exh. 31) at A.11; Bea Dep. (Exh. 45) at 86:18-25.  These dredged materials from the MRGO were not "spoils."  Bea Dep. (Exh. 45) at 83:1.  They were, as he reports, "levee material," whose quantity could not be estimated because "no bathymetry data was available following *completion of the levee construction* . . . ."  Bea Report (Exh. 31) at A.11 (emphasis added).

significant degradation in most (Figure 13)."  Kemp Data Report (Exh. 68) at 18; *see also* Kok

Report (Exh. 53) at 37-38.  Kemp Figure 13 illustrates "MRGO levee degradation from near

junction with GIWW to Verret."  Kemp Data Report (Exh. 68) at 19; *see also id.* at 3 (noting

"massive" levee failure adjacent to breaches "at the Bayou Bienvenue and Bayou Dupre control

structures on the MRGO levee").  These breaches in the MRGO levee are illustrated and

enumerated by Plaintiffs' hydrology experts.  *See* Kok Report (Exh. 53) at 37, Fig. 5.1.  As set

forth in Kok Table 5.1, overtopping of the MRGO levee caused erosion of "[v]arious sections

along [the] MRGO levee."  *See id.* at 38.

     The breaching of the MRGO levee and the IHNC floodwall were significant occurrences

in the chain of events that produced the flood.  All of the waters that contributed to the

inundation of St. Bernard Parish, the Lower Ninth Ward, and New Orleans East entered those

polders either as water that flowed over or through the levees and floodwalls surrounding them or

as rainfall.  *See id.* at 1.  Had the levees and floodwalls withstood Katrina's onslaught intact, St.

Bernard Parish, the Lower Ninth Ward, and New Orleans East would have been inundated to

elevations much lower than those to which the floodwaters actually rose during the event.

     A series of hydrographs showing water depths at ten locations illustrates this point.[6]  At

two locations in the Lower Ninth Ward, flooding reached a maximum elevation of nearly 11 feet

on August 29, 2005.  *See* Kok Report (Exh. 53) at 46, Figs. 5.6 & 5.7.  Had there been no

breaches in the IHNC floodwall or the MRGO levees, Plaintiffs' experts estimate that flooding in

those two places would have reached an elevation of 2 feet.  *See id.*  Similarly, at the two

---

[6]     The ten locations in the St. Bernard/Lower Ninth polder are depicted in Figure 5.5 of the Kok
Report.  *See id.* at 44. (Exh. 53).

easternmost St. Bernard Parish locations, the floodwaters are calculated to have reached an elevation of 11 feet, but would not have exceeded 1 foot if the MRGO levee had not been breached.[7]  *See id.* at 47, Figs. 5.8 & 5.9.  The same stark disparity appears in the hydrographs for the remaining six locations in St. Bernard Parish.  *See id.* at 48-50, Figs. 5.10 – 5.15.  "[I]f the structures along the IHNC and the MRGO had not breached, there would have been limited flooding in the St. Bernard bowl."[8]  *Id.* at 44.

In New Orleans East, as in the St. Bernard bowl, "overtopping and breaches [were] the main causes of flood water."  *Id.* at 34.  Floodwater depths would not have exceeded two feet at any of the selected locations in the absence of overtopping and breaching.  *See id.* at 34-36, Figs. 4.6–4.10.  But because the levees were overtopped and breached, floodwater depths ranged from 11 feet to 14 feet.  *See id.*  Breaching alone would have resulted in the floodwaters reaching those depths even in the absence of rain and overtopping.  *See* Vrijling Class Certification Dep. Vol. 2, (Exh. 76) at 180:20–182:4; *cf. id.* at 121:13-17 ("rainfall is not the real threat . . . the breach of the dikes is paramount"); Vrijling Class Cert. Dep. Vol. 1, (Exh. 75) at 59 ("the major

---

[7]     Water elevations are expressed in terms of NAVD88 2004.65, a geodetic vertical datum. Actual flood depths at specific locations were greater or less than the indicated floodwater elevation, depending on whether the ground elevation was greater or less than zero.  *See* Kok Report (Exh. 53) at 3; Vrijling Class Certification Dep. Vol. 1 (Exh. 75), at 133:4–134:5.

[8]     "Bowl," is synonymous with "polder" and is defined as "[a]n area that is below sea level and is enclosed by an uninterrupted chain of water retaining structures, levees and/or high grounds."  Kok Report (Exh. 53) at 3.  The St. Bernard Parish bowl included the Lower Ninth Ward of Orleans Parish. *See id.* at 37.  "This bowl is divided into two parts by an internal levee, the 40-Arpent levee. To the east there is a large wetland, 30,000 acre plus basin or bowl and to the west the inhabited part of this parish. The crest height of the 40-Arpent levee between the wetlands and populated areas is 6.5 ft."  *Id.*

According to Plaintiffs' experts, the St. Bernard bowl flooded from the northeast and the west, through breaches in the IHNC floodwall and the MRGO Reach 2 levee.  *See* Kok Report (Exh. 53) at 40-41.  Kok Figure 5.2 shows progressive "snapshots" of the flooding in the St. Bernard bowl as a consequence of the breaches and overtopping initiated by Hurricane Katrina.  *Id.* at 41.

contributions are from the breaches, so the moments at which people report that the dikes, the levees have broken, are important").[9]

No more germane or appropriate nexus between a flood control project and floodwaters is imaginable, for purposes of § 702c analysis.  A flood occurred, inundating and damaging protected areas because flood control structures were overtopped and breached.  Flooding of Citrus, New Orleans East, the Lower Ninth Ward, and St. Bernard Parish was exactly what the LPV project was intended to prevent.  As the Chief of Engineers reported in recommending that the project be authorized for construction, a principal purpose was "to prevent the entry of surges from Lake Borgne into the areas" adjacent to it.  Chief's Report (Exh. 10) at 1; *accord* Naomi Decl. (Exh. 79) at ¶ 15.

Applying § 702c to this flood would be consistent with Fifth Circuit decisions rendered prior to *Central Green*, including the principal case on which Plaintiffs have relied.  In *Graci v. United States,* 456 F.2d 20 (5th Cir. 1971), the Court of Appeals determined that the goal of § 702c is to ensure "that uniformly and throughout the country at any place where there is damage 'from' or 'by' a flood or flood waters in spite of and notwithstanding federal flood control works no liability of any kind may attach to or rest upon the United States therefor."  *Id.*

---

[9]     The hydrographs also illustrate another salient fact: the LPV levees and floodwalls provided protection from Katrina's rising storm surge until the structures were breached.  Prior to the catastrophic failure of the flood control structures, the floodwaters rose gradually and to no great depth.  Upon failure of the control structures, the elevation of the floodwaters shot suddenly upward and reached their maximum elevation within minutes.  As Plaintiffs' expert Paul Kemp testified, these flood control structures "[u]ndoubtedly . . . had some impact."  Kemp Dep. (Exh. 69) at 104:14.  The surge piled up against these structures until they were overtopped and washed away.  *Id.* at 104:18-23.

The breaching of the MRGO Reach 2 levee is described in narrative form in all three of the studies performed by engineers and other scientists after the disaster.  *See* IPET Report (Exh. 20) Vol I at 1-42; ILIT Report (Exh. 3) at 6-1 to 6-6; Team Louisiana Report (Exh. 4) at 63-65.  Plaintiffs' expert Paul Kemp was the principal author of the Team Louisiana Report, and their expert Bob Bea was a principal author of the ILIT Report.

at 24; *see also E. Ritter & Co. v. Dep't of the Army, Corps of Eng'rs,* 874 F.2d 1236, 1239 (8th

Cir. 1989) ("the congressional intent of § 702c was to keep the government entirely free from

liability when floods occur, despite attempted control by federal projects"); *Valley Cattle Co. v.*

*United States,* 258 F. Supp. 12, 16 (D. Haw. 1966) (§ 702c "was aimed at flooding occurring in

areas involved in actual or potential flood control projects."). The purpose of the immunity

provision "was to place a limit on the amount of money that Congress would spend in connection

with flood control programs. Congress undoubtedly realized that the cost of extensive flood

control projects would be great and determined that those costs should not have added to them

the floodwater damages that might occur in spite of federal flood control efforts." *Graci*, 456

F.2d at 25; *see also id.* at 25 n.7. "'[I]mmunity from liability for floodwater damage arising in

connection with flood control works was the condition on which the government decided to enter

into the area of nationwide flood control programs.'" *Id.* at 26 (quoting *Graci,* 301 F. Supp. at

952).

As explained above and in the accompanying Declaration of Alfred C. Naomi (Exh. 79),

the LPVHPP was an ambitious undertaking to protect Greater New Orleans from hurricane-

induced storm surge, which periodically threatens to flood the city from the array of lakes, bays,

rivers, bayous, canals, and other waterways that distinguish the region. Numerous LPV

structures failed to withstand the unprecedented surge generated by Hurricane Katrina. When the

levees along the MRGO were overtopped and breached during the storm, the result was a more

widespread flood. That the levees' failure is alleged to have been due to their negligent design,

construction, and maintenance does not change the character of the waters escaping through the

levee breaches or over the tops of the levees. The waters were "flood waters," and the result was

a "flood" in the plain meaning of the terms.  *In re Katrina Canal Breaches Consol. Lit.,* 495 F.3d 191, 215 (5th Cir. 2007).  These unassailable facts warrant application of § 702c to this case and mandate dismissal.

## II.  SECTION 702C REQUIRES DISMISSAL BECAUSE THE CHALLENGED CONDUCT WAS RELATED TO FLOOD CONTROL.

Plaintiffs seek to avoid § 702c by purporting to base their action on MRGO-related conduct rather than on the failure of the LPV flood control structures.  They argue that § 702c immunity attaches only to conduct intrinsic to the LPV and not to the extrinsic activities of designing, building, maintaining and operating the MRGO.  Though the waterway lay alongside the LPV levees and indeed sliced between them en route to the IHNC, Plaintiffs assert that flooding attributable to the waterway lies beyond the scope of the statute.  But the sweeping immunity accorded by § 702c cannot be so easily evaded.  The plain text of the statute makes no reference to "conduct" or "flood control" but instead bases immunity entirely on a causal relationship between "damage" and "floods or flood waters."  Regardless of whether Plaintiffs can establish that flooding would not have occurred but for negligence extrinsic to the LPVHPP, the Flood Control Act bars *any* claim for "damage from or by floods or flood waters." Application is particularly clear where, as here, the flood occurred despite the presence of federal flood control works.

The holdings of the Supreme Court in *Central Green* and *James* hew closely to the text of 33 U.S.C. § 702c, and the Court's construction of it flows from the text's plain language. Neither *Central Green* nor *James* imposes any extra-textual limitation on the immunity afforded by the statute, nor does either case support an inference that flood damage covered by § 702c

would be actionable if the damage resulted from conduct lacking a nexus to a flood control project.  Indeed, *Central Green* stressed that under § 702c "courts should consider the character of the waters that cause the relevant damage rather than the relationship between the damage and a flood control project."  531 U.S. at 437.

To be sure, the *James* opinion does address (and refute) the argument advanced by two of the respondents that the challenged conduct there was insufficiently related to flood control to warrant application of the immunity provision.  *See James,* 478 U.S. at 609-10.  But the structure of the opinion makes it clear that this refutation did not embrace the respondents' reading of the statute and forms no part of the holding of the case.

The Court's construction of the immunity provision appears in parts II and III of the opinion.  Part III concludes by reiterating the theme that pervades both of these parts: "the unambiguous words of the statute" must be given "their ordinary meaning."  *Id.* at 608.  Following this conclusion, the Court then addresses, in Part IV, "several alternative readings of § 702c's seemingly clear language."  *Id.* at 608.  Among these "alternative readings" is one in which immunity does not attach unless the relevant damage was caused by conduct related to flood control.  *Id.* at 609-10.  The Court's discussion of this reading and its conclusion that the respondents' argument failed on the facts do not indicate acceptance of the variant reading.  To the contrary, the Court ultimately rejected the argument of "narrowly limited immunity" and concluded by reciting "the broad principle applicable here":  "a 'clear relinquishment of sovereign immunity [is required] to give justification for tort actions.'"  *Id.* at 610 (interpolation by Court; citation omitted).

Prior to *Central Green,* a number of the Courts of Appeals engrafted a variety of extra-textual limitations onto the unambiguous words of the statute.[10]  After *James,* the Fifth Circuit adopted a "fact-specific" approach.  *Boudreau v. United States,* 53 F.3d 81, 84 (1995).  Under this approach, the application of § 702c turns on whether "there is a sufficient association between" the challenged conduct and flood control.  *See id.*  Thus, in *Mocklin v. Orleans Levee District,* the key fact was that the injury occurred in a Lake Pontchartrain channel that was "inescapably part of a flood control project" because it had been dredged to allow barges to deliver equipment and materials used in the reinforcement of flood control levees.[11]  877 F.2d 427, 430 (5th Cir. 1989).  The court considered application of § 702c to be warranted inasmuch as the dredging of the channel was not "'wholly unrelated' to flood control."  *Id.* n.6.  In *Boudreau,* the second case decided after *James,* the court decided that the rescue of a recreational boater who was stranded on a flood control lake was sufficiently related to flood control because

---

[10]     *See, e.g., Washington v. East Columbia Basin Irrigation Dist.,* 105 F.3d 517, 519 (9th Cir. 1997) (§ 702c applies if, and only if, plaintiff's damages are not "wholly unrelated" to operation of flood control project); *Cantrell v.  U.S. Dep't of Army Corps of Eng'rs,* 89 F.3d 268, 273 (6th Cir. 1996) (§ 702c applies if, and only if, challenged conduct is related to flood control); *Holt v. United States,* 46 F.2d 1000, 1004 (10th Cir. 1995) (§ 702c applies if, and only if, flood control project "triggers" Flood Control Act and nexus between flood control activities and injuries sustained is "sufficient"); *Bailey v. U.S. Dep't of Army Corps of Eng'rs,* 35 F.3d 1118, 1122 (7th Cir. 1994) (§ 702c applies if, and only if, flood control activities increase the probability of injury); *Henderson v. United States,* 965 F.2d 1488, 1492 (8th Cir. 1992) (§ 702c applies if challenged activity is related to flood control); *Hayes v. United States,* 585 F.2d 701, 703 (4th Cir. 1978) (§ 702c only applies to flood control activities).

[11]     Misled by the *James* dictum that "all waters contained in or carried through a federal flood control project for purposes of or related to flood control" could be considered "flood waters," 877 F.2d at 429, the court thought it sufficient that "[t]he flotation channel in which the Mocklins allege[d] the drowning occurred properly can be said to contain water related to flood control."  *Id.* at 430 (footnote omitted).

the rescue was part of the "'management of flood waters.'"[12]  *Id.* at 86.   In *Kennedy v. Texas Utilities,* the third and last case decided by the Fifth Circuit following *James,* injuries caused by an electrical cable that served no flood control purpose were held to be insufficiently "associated with" or "related to" flood control.  179 F.3d 258, 263 (5th Cir. 1999).  The court found no reason to apply § 702c to "an injury occurring on dry land, as a result of a condition on such land that is wholly unrelated to flood control."  *Id.*

Whether the Fifth Circuit's pre-*Central Green* approach has continuing vitality is doubtful.  The Fifth Circuit, like other courts, had for many years given controlling weight to the existence of a relationship between the challenged conduct and a flood control project.  *See James v. United States,* 740 F.2d 365, 369-70 (5th Cir. 1984) (panel opinion), *vacated,* 760 F.2d 590 (5th Cir. 1985) (en banc).  This error was reinforced by the overly broad Supreme Court dictum in *James* ("the terms 'flood' and 'flood waters' apply to all waters contained in or carried through a flood control project for purposes of or related to flood control"), which seemed to measure the breadth of § 702c's protection by the breadth of the relevant flood control project rather than the character of the water causing the damage.  When the *Central Green* Court surveyed the baleful effect of the dictum on the courts that had been misled by it, 531 U.S. at 430-31, the Court found it necessary to emphasize that "[t]he text of the statute does not include the words 'flood control project.'  Rather, it states that immunity attaches to 'any damage from or by floods or flood waters . . . .''  *Id.* at 434.

---

[12]     Here, again, the influence of the *James* dictum can be seen.  The mere fact that the injury occurred on a flood control lake was enough to convince the court that the rescue was related to the management of "flood waters."  *See id.*

In the light of *Central Green,* the emphasis in *James* on the "ordinary meaning" of "the unambiguous words of the statute" can be fully appreciated.  478 U.S. at 608.  *James* began and ended its interpretation of § 702c by emphasizing the language of the statute itself, and the loadstar of its interpretation was the time-worn adage that the language of the statute is almost always conclusive when its terms are unambiguous.  *See id.* at 606.  Taking this as its touchstone, the *Central Green* Court repeatedly emphasized that the text of the statute determines the scope of the immunity conferred.  531 U.S. at 431, 434, 437.  Case law that limits § 702c immunity by requiring a nexus between the challenged conduct or the alleged damage and flood control or a flood control project does not accord with the authoritative teaching of the Supreme Court concerning the proper construction of the immunity provision.

But even if this case were to be decided under the Fifth Circuit's pre-*Central Green* precedents, § 702c immunity would attach to the design, construction, operation, maintenance, and repair of the MRGO because those activities were sufficiently associated with and related to the flood control activities that were taking place at the same time in virtually the same place.  As noted above, numerous links between the MRGO and the LPVHPP existed throughout the history of the two projects.  That this is so should be unsurprising, given the physical and temporal proximity of the projects and that one is a waterway and the other a subsequent flood control project designed and built to protect adjacent areas from flooding.  Most significantly, Plaintiffs' theory of liability depends on an elemental relationship between the two projects.  Plaintiffs posit that the LPVHPP failed to protect them from flooding because the MRGO increased the storm surge from Hurricane Katrina.  *See, e.g.,* Complaint (Exh. 67) ¶¶ 1-3, 75, 82.  Plaintiffs allege that "the collapse of so much of the levee system is directly attributable to the

storm surge acceleration produced by the MR-GO." *Id.* ¶ 80.  They assert that "the MR-GO significantly intensified Katrina's surge height and velocity, contributing to the scouring that undermined the spoilbanks and levees along the MR-GO and the Industrial Canal." *Id.* ¶ 73; *see also id* ¶ 51-57, 84-85.  Plaintiffs contend that the breaches and failure of the floodwalls and levees were directly caused by the design, construction, operation, repair, and maintenance of the MRGO.  *See id.* ¶ 102.

Taken as true, these allegations reveal the existence of an essential nexus between the MRGO and the LPVHPP:  the MRGO, forming a significant part of the network of waterways and lakes surrounding Greater New Orleans, created hydrologic conditions that the LPVHPP needed to counter in order to fulfill the protective purpose for which the flood control project was authorized.  *See* Naomi Decl. (Exh. 79) at ¶¶ 15-16.  If Plaintiffs' claims have any merit, this conclusion is inescapable.  Within the framework of Plaintiffs' allegations, the MRGO can be viewed as extraneous to the LPVHPP  in only the most hyper-technical sense, in that the Government undertook and prosecuted them as separate projects.  But though they had divergent purposes and separate lines in the federal budget, the flood control project and the ship channel that ran beside and through it were inextricably interconnected.  The elemental association between the MRGO and the LPVHPP centered on flood control—one project creating conditions that the other was intended to address.

An additional association exists between the projects:  some of the LPV levees were constructed of material that was dredged from the bottom of the MRGO.  Some of this dredging of the MRGO occurred for the specific purpose of obtaining material to be used in levee construction.  *See* 1988 Reconnaissance Study (Exh. 9) at 16; Bea Report (Exh. 31) at A.11; Bea

Dep. (Exh. 45) at 86:18-25, 88:20–89:11.  After the MRGO was completely dredged for

navigation purposes, material was obtained from the bed of the MRGO for the specific purpose

of constructing hurricane protection levees.  Bea Dep. (Exh. 45) at 89:5-11.  This dredging of the

MRGO for flood control purposes shows the same sort of relationship that was sufficient in

*Mocklin* to warrant a finding that dredged channels in Lake Pontchartrain "were inescapably part

of a flood control project."  877 F.2d at 430 (footnote omitted).  If the MRGO as a whole was not

a flood control project, *Mocklin* provides a basis for concluding that at least portions of it were

part of the LPVHPP.  And in any event, concluding that the MRGO was (in whole or in part) a

flood control project is unnecessary for purposes of analyzing whether § 702c applies to the

damage caused by the floodwater allegedly attributable to the dredging of the waterway.  The

pertinent question under the Fifth Circuit's pre-*Central Green* precedents is not whether the

MRGO was a flood control project, but whether it was "associated with flood control" or "clearly

related to flood control."  *Kennedy,* 179 F.3d at 263 (footnote omitted).  The answer to this

question is quite clearly yes.

The challenged conduct here is fundamentally related to flood control, much more closely

related to flood control than was the conduct at issue in *Boudreau,* which was found sufficient to

trigger § 702c immunity.  The conduct at issue in *Boudreau,* rescuing a stranded boater, was only

tangentially related to flood control.  On the continuum of conduct that is more or less

"associated with flood control," building, operating, and maintaining a waterway that links

bodies of water that a flood control project seeks to control are activities that possess a necessary

and, indeed, elemental association with flood control—an association that is far stronger than

that which exists between flood control and the rescue of a stranded boater.   Changing the

hydrology that is the subject of a flood control project cannot be likened to conduct that bears only a remote association with flood control.  *See Kennedy,* 179 F.3d at 263; *cf. James,* 760 F.2d at 596 (describing hypothetical situations in which "the floodwater is only a condition that is incidental to the governmental fault"), *rev'd,* 478 U.S. 597 (1986). To the contrary, the LPV flood works were intended to protect Greater New Orleans from the very floodwaters that caused the relevant damage: "surges from Lake Borgne" and the waterways adjacent to it.  Naomi Decl. (Exh. 79) at ¶ 15; Chief's Report (Exh. 10) at 1.  The MRGO-related conduct at issue is directly related to the very conditions that a flood control project would ordinarily be expected to anticipate and address.  The floodwaters allegedly resulted from the challenged conduct; they were not merely "incidental" to it.

If, as Plaintiffs contend, the Army Corps of Engineers has, since 1958, been "on written notice that the MR-GO posed a serious threat to human life and property" by virtue of "a funnel effect" that "furiously accelerat[es] the power and force of the storm surge," Complaint (Exh. 67) ¶¶ 3-4, then that dangerous condition is one that clearly lay within the LPVHPP mandate and calls for attachment of immunity to the conduct that allegedly created it.  *See* Naomi Decl. (Exh. 79) at ¶¶ 15-16.  Though Plaintiffs have chosen to place the blame on the MRGO project, they are at bottom arguing that the LPVHPP caused the relevant damage.  *Cf. In re Katrina Canal Breaches Consol. Lit.,* 495 F.3d at 218 ("If a levee fails despite not being overtopped by the floodwaters, it is because the levee was not adequately designed, constructed, or maintained. If a levee fails due to the floodwaters overtopping it or loosening its footings, it is because the levee was not built high enough or the footings were not established strongly or deeply enough.").

In sum, "the peril of negligence," as the Court of Appeals termed it, "did not act, apart from flood, to bring about damage . . . ." *Id.* at 223. Plaintiffs are attempting to hold the United States liable for damage resulting from a catastrophic flood. Both the flood itself and the challenged conduct were related to flood control and had numerous connections to a flood control project. Under these circumstances, no liability can attach to or rest upon the United States.

## CONCLUSION

For these reasons, the United States' Motion to Dismiss or, in the alternative, for Summary Judgment should be granted.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR.
Assistant Director, Torts Branch

s/ Robin D. Smith
ROBIN D. SMITH
Trial Attorney, Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 888, Benjamin Franklin Station
Washington, D.C.  20044
(202) 616-4289 / (202) 616-5200 (fax)
robin.doyle.smith@usdoj.gov
Attorneys for Defendant United States

## CERTIFICATE OF SERVICE

I certify that on January 11, 2008, a true copy of Defendant United States' Memorandum in

Support of its Motion to Dismiss or, in the Alternative, For Summary Judgment, was served on

all counsel of record by ECF.


s/ Robin D. Smith
ROBIN D. SMITH