RECEIVED
U.S. DISTRICT COURT
EAST DISTRICT OF LA

2006 APR 23  AM II: 16

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

NORMAN ROBINSON, KENT LATTIMORE,
LATTIMORE & ASSOCIATES, TANYA
SMITH, ANTHONY FRANZ, JR., and
LUCILLE FRANZ, INDIVIDUALLY

        Plaintiffs,

    v.

THE UNITED STATES OF AMERICA, and
THE UNITED STATES ARMY CORPS OF
ENGINEERS

        Defendants.

CIVIL ACTION

NUMBER:  **06-2268**

SECTION:  **SECT. D MAG. 4**

## COMPLAINT FOR DAMAGES CAUSED BY THE DESIGN, CONSTRUCTION, OPERATION, AND MAINTENANCE OF THE MISSISSIPPI RIVER GULF OUTLET

Plaintiffs NORMAN ROBINSON, KENT LATTIMORE, LATTIMORE & ASSOCIATES, TANYA SMITH, ANTHONY FRANZ, JR., and LUCILLE FRANZ, INDIVIDUALLY, and for their Complaint, with respect state the following:

### INTRODUCTION

1.      This action results from one of the most predictable and preventable catastrophes in American history—the tragic devastation of homes and lives during Hurricane Katrina—caused by the United States Army Corps of Engineers' negligent design, construction,

maintenance, and operation of the Mississippi River Gulf Outlet ("MR-GO"). The epic destructive forces of the MR-GO during Hurricane Katrina—and the drowning of the Lower Ninth Ward, New Orleans East, and St. Bernard Parish ("Greater New Orleans")—were foreseeable consequences of two fatally defective conditions known by the United States Army Corps of Engineers ("Army Corps") for decades: (1) the destruction of the marshlands surrounding the MR-GO that intensified a huge east-west storm surge resulting in the inundation of much of New Orleans; and (2) the funnel effect stemming from the MR-GO's faulty design that accelerated the force and strength of the storm surge to lethal proportions. Absent the exacerbating effect of the MR-GO, aptly nicknamed the "Hurricane Highway," Katrina would have been an endurable event in New Orleans' history rather than the obliterating force that destroyed lives and businesses, displaced thousands of people, and devastated much of a great American city known for its historic grace and beauty. Plaintiffs—who have lost homes, possessions, businesses, and loved ones—bring this case against the United States Government and its division, the Army Corps, seeking just compensation for their unfathomable losses and hoping to rebuild their lives from what remains.

2.      The MR-GO runs from the Gulf of Mexico alongside St. Bernard and into the Industrial Canal in New Orleans. From its conception over 40 years ago, the MR-GO was riddled with inherent problems that worsened steadily over the years due to the Army Corps' neglect. First, the design, construction, operation, and maintenance of the MR-GO eradicated thousands of acres of ecologically-sensitive marshland which provided a valuable natural barrier to storm surges. Such destruction of the MR-GO marshland greatly exacerbated an east-west storm surge during Hurricane Katrina by leaving the surrounding area vulnerable and unprotected to the ravages of the storm.

3.     Second, the Army Corps was well aware of—but did nothing to correct—the faulty design of the MR-GO, described in 2002 as "a shotgun pointed straight at New Orleans, should a major hurricane approach from that angle." The MR-GO is a straight arrow pointed at Greater New Orleans with no barriers or other means to slow down storm-driven surges. In addition, the MR-GO creates a funnel effect where the MR-GO intersects the Gulf Intracoastal Waterway ("GIWW"), furiously accelerating the power and force of the storm surge while channeling it directly into the Industrial Canal (also known as the Inner Harbor Navigational Canal ("IHNC")). This funnel effect caused the inundation of New Orleans East, St. Bernard Parish, and the Lower Ninth Ward.

4.     Since 1958, the Army Corps was on written notice that the MR-GO posed a serious threat to human life and property in Greater New Orleans. Despite repeated warnings from knowledgeable experts and public officials over the next 47 years before Katrina, the Army Corps did nothing to mitigate or prevent the very calamity that occurred during Katrina. This lawsuit seeks to expose this egregious legacy of our government's dereliction of duty, not only to compensate Plaintiffs, but to prevent such a travesty from ever occurring again.

5.     The Federal Tort Claims Act ("FTCA") places the United States in the same shoes as a private defendant and authorizes Plaintiffs to recover damages based on the Army Corps' faulty design, construction, repair, and maintenance of the MR-GO. Such negligent acts on the part of the Army Corps were substantial factors in causing the flooding of Greater New Orleans. Katrina and its devastating aftermath were clearly foreseeable and foreseen events to the Army Corps. Indeed, the Army Corps' reckless disregard for the effects of its negligent acts with regard to the MR-GO may well be the paradigmatic example of an FTCA action against the United States for federal employees' negligent acts.

3



Source: R.B. Seed, et al., *Preliminary Report on the Performance of the New Orleans Levee System in Hurricane Katrina on August 29, 2005*, Report No. UCB/CITRIS-05/01, at 1-10, Figure 1.4 (2005).

10.    NORMAN ROBINSON, an individual, is an adult who owned and resided in a house located in an area known as "New Orleans East" at 6965 Mayo Boulevard, New Orleans in Orleans Parish, Louisiana, which was destroyed by floodwaters from the MR-GO on August 29 and 30, 2005. On or about October 24, 2005, Mr. Robinson presented a claim to the Army Corps and the United States for damages arising out of the incident described above. By April 24, 2006, six months later, the Army Corps had neither accepted nor rejected this claim and, pursuant to 28 U.S.C. § 2675(a), Mr. Robinson elects to consider such failure to act as a final denial of the claim.

11.     Mr. Robinson lived with his wife Monica, and together, they were helping to raise their granddaughter, who lived with them part-time before Katrina. Mr. Robinson is a respected television news anchor and his home was conveniently located close to the offices of television station WDSU-TV, where he worked in New Orleans. As a news anchor, Mr. Robinson made his living reporting about the community where he lived, and he had worked hard for many years to be able to pay off the mortgage on his home.

12.     On August 29 and 30, 2005, Mr. Robinson's life was torn apart. For many days following the storm, Mr. Robinson was unable to return home to survey the damage. Due to the storm damage, his front door was swollen, and he had to have it broken down in order to enter his once beautiful home. The sight he encountered left him speechless. Murky, stagnant water was everywhere, and an inch or more of mold covered his furniture. The flooding destroyed the first floor of his home, and the entire house suffered severe structural damage. All of his possessions were destroyed by the floodwaters flowing from the MR-GO. Mr. Robinson—who has no permanent residence and has been forced to relocate to a rented residence in a different location—has lost irreplaceable belongings such as photographs and personal records. Moreover, Mr. Robinson and his wife can no longer assist in raising their granddaughter who had to relocate to Houston, Texas, change schools, and lose contact with all of her friends in New Orleans. They miss their granddaughter terribly and have suffered extreme grief and mental anguish due to the flooding caused by the MR-GO.

13.     KENT LATTIMORE, an individual, is an adult who owned and resided in a house trailer located at 2100 Marcelle Drive in St. Bernard Parish, Louisiana, which was destroyed by floodwater from the MR-GO on August 29 and 30, 2005. On or about October 24, 2005, Mr. Lattimore presented a claim to the Army Corps and the United States for damages

6

arising out of the incidents described in this complaint. By April 24, 2006, six months later, the Army Corps had neither accepted nor rejected this claim and, pursuant to 28 U.S.C. § 2675(a), Mr. Lattimore elects to consider such failure to act as a final denial of the claim.

14.     LATTIMORE & ASSOCIATES, a real estate appraisal business incorporated under the laws of Louisiana since 1992, was located at 9117 West St. Bernard Highway in St. Bernard Parish, Louisiana and was destroyed by floodwater from the MR-GO on August 29 and 30, 2005. On or about October 24, 2005, Lattimore & Associates presented a claim to the Army Corps and the United States for damages arising out of the incidents described above. By April 24, 2006, six months later, the Army Corps had neither accepted nor rejected this claim and, pursuant to 28 U.S.C. § 2675(a), Lattimore & Associates elects to consider such failure to act as a final denial of the claim.

15.     Mr. Lattimore, in his own words, had "a very good situation" before Hurricane Katrina, living in a comfortable trailer home adjacent to his prospering real estate appraisal business. On August 29 and 30, 2005, Mr. Lattimore's life dramatically changed for the worse. On those dates, his property was completely destroyed by floodwaters that came from the MR-GO. The loss of Mr. Lattimore's residence and worldly possessions, including irreplaceable items such as photographs and personal records, left him grief-stricken and emotionally devastated.

16.     For Mr. Lattimore before Katrina, a life filled with hard work seemed to have brought him just rewards, and the "American Dream" had become a tangible reality. Mr. Lattimore was the owner and chief operating officer of his rapidly-growing real estate appraisal business, Plaintiff Lattimore & Associates. His keen business acumen and friendly manner had produced a burgeoning clientele, and Lattimore & Associates, which was still in its growth

7

phase, was constantly getting inquiries from new banks and mortgage companies. Just before

Katrina, Lattimore & Associates had four employees and was looking to hire more to assist with

performing approximately 80 to 100 appraisals per month at $350 per appraisal, as well as more

complex appraisals of multi-family dwellings for $450 to $500 per appraisal. The gross revenue

of Lattimore & Associates before Katrina was between $350,000 and $420,000 year.

17.     On August 29 and 30, 2005, Lattimore & Associates was flooded with water from

the MR-GO, which ruined all of the business' computers, phone system, credit card machines,

camera equipment, software applications, and furniture such as expensive map cabinets. The

business, shut down as of August 29, has not reopened since due to lack of facilities to operate its

business. It will take years, if ever, to rebuild Lattimore & Associates to the business it was

before MR-GO floodwaters ruined it. As a result of MR-GO flooding, Lattimore & Associates

generates no income. Lattimore & Associates has been deprived of at least $6 million in lost

revenue.

18.     TANYA SMITH, an individual, is an adult who owned and resided in a house

located at 3920 Despaux Drive in Chalmette within St. Bernard Parish, Louisiana. On or about

October 24, 2005, Ms. Smith presented a claim to the Army Corps and the United States for

damages arising out of the incident described above. By April 24, 2006, six months later, the

Army Corps had neither accepted nor rejected this claim and, pursuant to 28 U.S.C. § 2675(a),

Ms. Smith elects to consider such failure to act as a final denial of the claim.

19.     Ms. Smith resided in her home located at 3920 Despaux Drive in Chalmette,

Louisiana in St. Bernard Parish. Her house was her pride and joy since she had it designed and

custom built. The hefty mortgage she paid monthly seemed a worthwhile and necessary expense

for a stable future for herself and her two young sons. Her neighborhood was nice and

8

comfortable before Katrina, and her home was close to Louisiana State University's Health Sciences Center where she was studying to become a nurse/anesthesiologist. She also had a good job as a registered nurse specializing in the care of premature infants. Ms. Smith's children were attending St. Mark's Catholic School in Chalmette. St. Bernard Parish was not only their home, it was the only "world" they knew.

20.     On August 29 and 30, 2005, Ms. Smith and her family's lives were shattered. MR-GO destroyed their beautiful family home and all of their worldly possessions. The hospital where Ms. Smith worked was shut down following the storm, and she has been unable to find another comparable job. Ms. Smith and her sons are now living in a small apartment, paying $975 a month in rent plus the remaining mortgage of over $1,000 a month for her destroyed home. Times are tough. Her sons have been forced to change schools three times and have lost contact with all of their friends. Ms. Smith and her sons lost everything but their lives, including irreplaceable items such as photographs of Ms. Smith's beloved deceased husband and the father to her eldest son, as well as personal records. Ms. Smith states that she "does not know what normal is any more." Ms. Smith and her sons now struggle for survival in what remains of their shattered lives.

21.     LUCILLE FRANZ, an individual, is an adult who owned and resided in a house located in the Lower Ninth Ward at 5926 St. Claude Avenue in Orleans Parish, Louisiana, which was destroyed by the MR-GO on August 29 and 30, 2005. On or about October 24, 2005, Ms. Franz presented a claim to the Army Corps and the United States for damages arising out of the incident described above. By April 24, 2006, six months later, the Army Corps had neither accepted nor rejected this claim and, pursuant to 28 U.S.C. § 2675(a), Ms. Franz elects to consider such failure to act as a final denial of the claim.

22.     ANTHONY FRANZ, JR., an individual and husband of Lucille Franz, is an adult who owned and resided in a house located in the Lower Ninth Ward at 5926 St. Claude Avenue in Orleans Parish, Louisiana, which was destroyed by the MR-GO on August 29 and 30, 2005. On or about October 24, 2005, Mr. Franz presented a claim to the Army Corps and the United States for damages arising out of the incident described above. By April 24, 2006, six months later, the Army Corps had neither accepted nor rejected this claim and, pursuant to 28 U.S.C. § 2675(a), Mr. Franz elects to consider such failure to act as a final denial of the claim.

23.     Anthony Franz, Jr. at age 77, and his wife, Lucille, at age 72, shared the dream of a comfortable retirement. After a lifetime of hard work, they had paid off the mortgage on the multi-plex where they lived. Their plan to have a working retirement, managing and renting their five unit multi-plex, reflected their strong sense of responsibility and work ethic. The Franz couple had just installed a new roof and made electricity and plumbing repairs as well as other improvements. Mr. and Mrs. Franz, who are extremely family-oriented, were also renting the unit adjacent to their own to their adult son, who helped with their care and provided companionship and emotional support. Mr. and Mrs. Franz had ample room for their treasured family heirlooms, including pictures of their beloved children and grandchildren. They also shared a close relationship to Mrs. Franz' sister, Rosemary Davis, who, at age 78, lived in a nearby nursing home.

24.     On August 29 and 30, 2005, the Franz' lives changed forever when the MR-GO floodwaters extinguished the life of a loved one, destroyed property and possessions acquired over a lifetime of hard work, undermined the comfort and security of their long-time neighborhood, and shattered their dream of self-sufficiency during their retirement.

10

(a)   Mr. and Mrs. Franz faced many tragic losses during the storm, but the greatest was the death of Mrs. Franz' sister, Rosemary Davis, who drowned not long after her 78th birthday in the now infamous St. Rita's Nursing Home, where so many abandoned elderly died during and after the storm from flooding caused by the MR-GO.  Mrs. Davis never had a chance. She drowned in her wheelchair under a table in the nursing home.  Suffering extreme grief and loss, Mrs. Franz is unable to sleep, haunted by the recurring flashbacks of her beloved sister's horrible death.

(b)   The Franz' son, who lived in the adjacent apartment, also came dangerously close to losing his life when he chose to stay to protect his family's multi-plex rather than evacuate with the storm's onset.  With the storm in full force and water rising to his chest, he had no choice but to evacuate in order to save his life.  He shot his own dog before he left his family's multi-plex so that it would not suffer the storm alone.

25.   In addition to the emotional devastation caused by the flooding, Mr. and Mrs. Franz face financial uncertainty rather than a secure retirement.  Now, they live in Jefferson Parish and pay monthly rent for a small apartment rather than collecting rents from their own tenants.  They have lost their multi-plex, which is torn apart on one side and filled with mold, as well as all of their worldly possessions.  Many of the items they lost were irreplaceable, including family heirlooms, photographs, and personal records.  At this stage in their lives, they have no employment and are not in a position to rebuild their multi-plex.  Their house was not covered by any type of insurance, and they have literally lost everything.  Mrs. Franz, who has overcome many difficult obstacles in her 72 years, describes this as "the worse thing that could happen—a nightmare."

through land and water area. Along the south/southwest shore of the MR-GO, the 18 miles of embankments have been provided as foreshore protection. A dredged material disposal area approximately 0.5 miles wide extends along the remaining 23 miles of the MR-GO south bank.

49.     The MR-GO's design was flawed in several respects, at least two of which proved critical in contributing to the drowning of Greater New Orleans: (1) the Army Corps failed to take account of the waterway's inherent and known capability of serving as a funnel or conduit for rapidly-accelerated, storm-driven surges which would magnify the storm surge's force against levees and spoilbanks in New Orleans and St. Bernard Parish; and (2) the Army Corps failed to "armor" levees on both banks of the MR-GO.

50.     Equally important, in the design and construction of the waterway, the Army Corps failed to account for the devastation of the wetlands that the MR-GO, by its design, would facilitate. In a vicious cycle, destruction of the surrounding wetlands not only altered adversely storm surge dynamics with respect to hurricanes such as Katrina, but denuded a critical natural buffer against storm surge, thereby exacerbating the funnel effect created by the MR-GO's design.

**Faulty Maintenance of the MR-GO**

51.     The Army Corps is responsible for the maintenance of the MR-GO. This ongoing responsibility included dredging the bottom of the waterway to remove deposited soil and silt and to retain its originally designed 36-foot depth. Silting has been a major problem for the MR-GO. In fact, the first ship to navigate the MR-GO in March 1957 ran aground and was stuck for two days.

52.     The Army Corps knew, or in the exercise of reasonable care and discretion should have known, that proper dredging of the MR-GO would ameliorate the "funneling effect" of the

19

waterway, thereby diminishing the lethal threat to residents and businesses in Orleans and St. Bernard Parishes during hurricanes such as Katrina.

53.     Notwithstanding that dredging is a critical safety requirement for the MR-GO, the Army Corps negligently failed to maintain the MR-GO and failed to properly dredge the canal, all to the harm and detriment of each of the Plaintiffs.  Indeed, in November 2005, dredging of the MR-GO was suspended indefinitely due to alleged lack of funding and controversy about the waterway's future.

54.     As alleged above, the negligent design of the MR-GO invited destruction of the surrounding wetlands.  The Army Corps' ongoing negligent maintenance of the MR-GO, however, ensured it.

55.     For decades, there has been massive and widely publicized damage to the environment due to the MR-GO, particularly the incalculable loss of precious wetlands that act effectively as nature's "surge buster" during hurricanes—a phenomenon known for decades by the Army Corps.  The loss of thousands of acres of marshlands due to the MR-GO contributed significantly to the drowning of Greater New Orleans, including each of the Plaintiffs' respective properties.  In a "NOVA" series episode entitled *Hurricane Katrina, Storm That Drowned A City*, which aired on the Public Broadcasting System on November 22, 2005, Professor Ivan van Heerden of Louisiana State University stated: "The ultimate key to Louisiana's survival and reducing the impacts of surges is to restore our coastal wetlands.  These wetlands knock down the surge and they also reduce wind energy as the storms pass over them."

56.     Forty-three miles of the MR-GO fall within a "landcut" through low-lying marshland, most of which traverses the ecologically sensitive wetlands of St. Bernard Parish. Even the Army Corps—in its *MR-GO Bank Erosion Reconnaissance Report* ("*Corps Erosion*

Report") published in 1988—was forced to admit that the MR-GO has accelerated the "loss of marshes, ridges, bayous, ponds, aquatic grass beds and shorelines needed for the Lake Borgne, Lake Pontchartrain and Breton Sound statuaries." In that same *Corps Erosion Report*— published almost two decades ago—the Army Corps characterized MR-GO as one of the eight areas in south Louisiana where "erosion stabilization measures are urgently needed."

57.    Over 65,000 acres of hurricane buffering acres of wetlands—over 101 square miles—have been obliterated or impaired because of the MR-GO.  More than 27,000 acres of wetlands have been destroyed since the opening of the MR-GO, while some 38,000 more acres have undergone serious change in habitat.  The banks of the MR-GO have eroded so extensively that the width of the channel has grown nearly threefold from 650 to more than 2,000 feet, sharply increasing its potential to serve as a conduit of wind-driven water surges during hurricanes.  As illustrated below in a March 2006 *Times-Picayune* graphic, that is precisely what happened during Katrina.



58.   The northeast shore juncture of the MR-GO and the GIWW is particularly susceptible to erosion induced by saltwater intrusion and the force of waves from passing vessels. Yet this critical area has never received adequate protective stabilization measures. Erosion on the northeast shore of the MR-GO between 1965 and 1981 ranged from 100 feet to 600 feet of direct shoreline recession, with rates of erosion measured between 6 to 26 feet per year; and the volume of erosion is calculated at 9,333,000 cubic yards during this period or 583,000 cubic yards per year.

22

**May 2005**: A hydrodynamic model from Louisiana State University's Hurricane Center further exposed MR-GO as a "superhighway for storm surge" and predicted that a "funnel" created by MR-GO would amplify storm surges by 20 to 40 percent.

72.     Of all these prescient warnings, the prognostication about the MR-GO's "funneling" effect on a hurricane-generated storm surge proved to be deadly accurate.  The Louisiana State University's Hurricane Center presented hurricane scenarios to the Army Corps in May 2005, predicting devastating flooding as a result of MR-GO's design.  According to civil engineers from the Hurricane Center, if MR-GO had not been defectively designed and constructed, a modeled storm surge, similar to that experienced with Katrina, would have resulted in minimal levee overtopping and occasional flooding—but not a disaster on a Biblical scale largely submerging an entire city.  A civil engineer from the Hurricane Center was quoted in a *Times-Picayune* article published on October 24, 2005, stating that without the funnel effect, "you would have had maybe 2 to 3 feet of flooding at the max, but not everybody's house underwater.  It's still flooding, but one is significant and one is catastrophic."

73.     As was predicted long before Katrina, the MR-GO amplified Katrina's surge speed and force, much as the nozzle of a water hose funnels a wide flow of water into a bottleneck, creating a vastly accelerated and more forceful jet from an otherwise slow and limpid flow of water.  Predictably, then, the MR-GO significantly intensified Katrina's surge height and velocity, contributing to the scouring that undermined the spoilbanks and levees along the MR-GO and the Industrial Canal.

## MR-GO Was A Substantial Factor In Causing The Flooding

74.     Eyewitness accounts as well as scientific studies indicate that the MR-GO contributed significantly to the drowning of large portions of Greater New Orleans.  The flawed

31

design, poor construction, and inadequate repair and maintenance of the MR-GO—as well as the resulting destruction of the protective adjoining wetlands—was a substantial factor in causing the flooding.  Indeed, but for the Army Corps' negligence, most or all of the severe flooding of the Plaintiffs' neighborhoods would not have occurred.

75.    In November 2005, an in-depth field investigation—funded by the National Science Foundation and performed by prestigious teams from the University of California at Berkeley and the American Society of Civil Engineers—concluded that the MR-GO was a prime culprit in Katrina's unprecedented inundation of the city.  As illustrated below, the MR-GO's "funneling" effect resulted in widespread overtopping of the earthen levees which in turn undermined soil stability on the "land-side" of the levee and contributed to their ultimate collapse.



Source: *Times-Picayune*, Dec. 8, 2005, available at http://www.nola.com/katrina/graphics/.

76.     Faced with mounting evidence concerning MR-GO's prominent role in the

flooding of the Lower Ninth Ward, New Orleans East, and St. Bernard Parish, the Army Corps

reluctantly acknowledged—at least initially—the possibility that MR-GO's design exacerbated

Katrina's storm surge and subsequent flooding.  John Paul Woodley Jr., the assistant Army

secretary who oversees the Army Corps, responded to statements concerning MR-GO's

contribution to the Katrina tragedy with: "I've heard those concerns, and I wouldn't discount them."

77.    The Army Corps' own investigators have stated that overtopping led to many of the levee breaches that caused the most serious flooding during Katrina, including large sections of the MR-GO levees that sent floodwaters rushing into St. Bernard Parish, as well as sections of the GIWW levee that flooded homes in East New Orleans and the Lower Ninth Ward.

78.    This overtopping would have been prevented if the Army Corps had implemented a well-known process called "armoring" on the MR-GO's banks.  Armoring involves putting a water-resistant layer, such as concrete or grass-protecting synthetic blankets, on the surface of a levee or bank to guard against two threats:  (1) the pounding by waves from wind-driven storm surge that can dislodge soil or vegetation and cause the levees to collapse; and (2) the overtopping by the surge or waves that, as the water rushes down the land-side levee slope, erode soil on the land-ward side, again leading to eventual soil instability and collapse.

79.    With proper armoring of the MR-GO, the structures would have remained intact, and flooding in those areas would have been greatly reduced from catastrophic to inconvenient. Flooding from overtopping lasts only as long as the storm surge is higher than the levees, usually only for a few hours.  When a levee collapses, however, flooding continues until the surge retreats to sea level—a matter of days.  In November 2005, the American Society of Civil Engineers team, in an early report on Katrina, found the lack of armoring a "fundamental flaw" in the system that must be corrected in any future designs.

80.    The Army Corps has admitted to MR-GO's funneling effect during Hurricane Katrina.  The Army Corps has maintained that the design and function of New Orleans' floodwalls were adequate.  In fact, in a September 21, 2005 *New York Times* article, Al Naomi,

senior project manager for Army Corps, stated in defense of the floodwalls: *"The floodwalls have functioned over the years very successfully and without incident. The design works. It has worked in other locales. And will likely continue to be used as long as you do not subject it to pressures that it was not designed to handle."* (Emphasis added). Therefore, according to the Army Corps, it was the fact that the floodwalls were subjected "to pressures [they were] not designed to handle" that caused them to fail and caused the resulting flooding. The increased "pressure" triggering the collapse of so much of the levee system is directly attributable to the storm surge acceleration produced by the MR-GO.

81. Viewing the MR-GO as two discrete sections helps to explain the MR-GO's powerful impact on the levees:

- **Reach 1:** the east-west oriented section running between the Industrial Canal and the confluence of the GIWW and MR-GO near Paris Road Bridge. It is through this critical section that Lake Pontchartrain and Lake Borgne—in the words of one recent study commissioned by the Army Corps—are "hydraulically connected to one another via the IHNC [Industrial Canal]."

- **Reach 2:** the much longer southeast-northwest section extending from just east of the Paris Road Bridge down through Breton Sound into the Gulf of Mexico.

82. The Army Corps interconnected Reach 1 of MR-GO with the GIWW in 1957, thereby joining together the well-known storm surge potentials of Lake Borgne and Lake Pontchartrain within the Industrial Canal. During Katrina, the resultant, powerful combined stream surged from this junction and overwhelmed the levees along Reach 1 and the Industrial Canal.

35

83.     Even the Army Corps' own commissioned evaluation on the Louisiana hurricane protection system—by The Interagency Performance Evaluation Task Force ("IPET")—recently found that the majority of the flooding of the Lower Ninth Ward and St. Bernard Parish resulted from overtopping and two breaches along the Industrial Canal and Reach 1 of MR-GO. Significantly, these are precisely the locations that experts predicted would be overcome by MR-GO's deadly storm surge "funneling effect."  Moreover, an urgent recommendation from IPET is a telling admission about the serious, continuing threat of the Reach 1 surge to public health and safety.  The Army Corps' consulting experts state unequivocally:  "Flow through the Reach 1 channel must be dramatically reduced or eliminated, either by a permanent closure or some type of structure that temporarily serves to eliminate this hydraulic connectivity."

84.     Besides a defective design and no armoring on its fragile banks, the MR-GO contributed to the flooding of Plaintiffs' neighborhoods by vastly accelerating the destruction of the coastal habitat protecting Greater New Orleans.  In 1988, the *Corps Erosion Report* specifically analyzed MR-GO's impact on bank erosion in St. Bernard Parish.  The report recognized the marshland between Lake Borgne and St. Bernard Parish acted as a natural buffer to hurricane storm surge.  The Army Corps acknowledged that between 1968 and 1987, severe bank erosion—caused mostly by human-induced channelization and shipping traffic—resulted in approximately 4,200 acres of "highly productive marsh adjacent to MR-GO" to vanish.

85.     Today, the marshlands—nature's sturdy barrier against storm surge from hurricanes—have been largely destroyed by the MR-GO.  Each mile of marshland absorbs a significant amount of storm surge.  The destruction of that bulwark by the Army Corps altered storm surge dynamics in Lake Borgne and compromised the area's natural ability to mitigate the

36

destructive power of storm surge, thus further exacerbating the MR-GO's already perilous "funneling" effect.

86.     As the 1988 *Corps Erosion Report* detailed, there was a need to study potential benefits of completely closing MR-GO.  Indeed, the Army Corps' Lower Mississippi Valley Division ("LMVD") suggested prophetically:

> [A complete closure]…will control all future channel maintenance problems by controlling bank erosion, prevent[] the associated biological resources problem…[and] *reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up [MR-GO]* . . . .

LMVD Comments to the *Corps Erosion Report*, at 1 (emphasis added).  The Army Corps ignored its own predictions to the peril of Plaintiffs and tens of thousands of their neighbors.

87.     As the reports and testimony of Army Corps officials noted above demonstrate, MR-GO's funneling effect was well known to the Army Corps from past hurricanes, scientific studies, and a simulated "Hurricane Pam" conducted a year earlier.  In a "NOVA" series episode entitled *Hurricane Katrina, Storm That Drowned A City*, which aired on the Public Broadcasting System on November 22, 2005, Professor Ivor van Heerden of Louisiana State University, stated "[a]t the Hurricane Pam exercise we had a number of [federal government] officials who, basically scoffed at us."

### MR-GO's Deadly Role In Katrina Was Foreseeable And Foreseen

88.     Katrina and its devastating aftermath were clearly foreseeable and foreseen events to the Army Corps.  Indeed, its engineers had actual notice from the outset of constructing MR-GO that its design would only exacerbate a hurricane's power and destructive effect.  Unfortunately, such notice was recklessly ignored.

37

way as to avoid having it pose a threat to residents like Plaintiffs and serve as a "hurricane highway" for surge water directed at Orleans and St. Bernard Parishes.

96.     Each Plaintiff has complied with all conditions precedent to this action.

97.     The Defendants may be sued pursuant to the FTCA for their negligence in the design, construction, operation, maintenance, and repair of the MR-GO.

98.     The MR-GO was built as an aid to navigation, not as, or in connection with, a flood control project, and Congressional directives provided no authorization for construction of flood control works in coordination with construction of the MR-GO as was admitted by Defendants and determined by the Fifth Circuit in *Graci v. United States*, 456 F.2d 20 (5th Cir. 1971).

99.     Neither Defendant is immune from civil liability under the Mississippi Flood Control Act of 1928, *as amended*, 33 U.S.C. § 702a for negligence in the design, construction, operation, maintenance, and repair of MR-GO.

100.    The Defendants' negligence was such that the United States, if a private person, would be liable to Plaintiffs in accordance with the law of the place where the act or omission occurred—in this case Louisiana.

101.    The United States was the grantee of the right of way, designer, builder, and maintainer of the MR-GO and as such assumed a standard of care with relationship to damages caused by the works to neighboring lands and individuals.

102.    The breaches and failures of the spoilbanks, floodwalls, and/or levees along the MR-GO and the Industrial Canal, and the resulting inundation of New Orleans East, the Lower Ninth Ward, and St. Bernard Parish, were directly and proximately caused by the Army Corps' negligence in the design, construction, operation, repair, and maintenance of the MR-GO, and

39

the design, construction, operation, repair, and maintenance of the MR-GO was a substantial contributing factor to same.

103.    The Defendants knew or should have known that their acts and omissions would proximately cause the damages suffered by each Plaintiff.

104.    As a direct and proximate result of the Defendants' negligence, Plaintiff NORMAN ROBINSON suffered damages including the following: loss of property, immovable and movable; diminution of property value; costs of relocation; loss of business opportunities; grief, mental anguish, inconvenience, and loss of the capacity to enjoy life; and costs of suit.

105.    As a direct and proximate result of the Defendants' negligence, Plaintiff KENT LATTIMORE suffered damages including the following: loss of property, immovable and movable; diminution of property value; loss of income; costs of relocation; loss of business; loss of business opportunities, customers and goodwill; loss of business revenues and profits; grief, mental anguish, inconvenience, and loss of the capacity to enjoy life; and costs of suit.

106.    As a direct and proximate result of the Defendants' negligence, Plaintiff LATTIMORE & ASSOCIATES suffered damages including the following:  loss of property, immovable and movable; diminution of property value; loss of income; costs of renovation; loss of business; loss of business opportunities, customers and goodwill; loss of business revenues and profits; and costs of suit.

107.    As a direct and proximate result of the Defendants' negligence, Plaintiff TANYA SMITH suffered damages including the following: loss of property, immovable and movable; diminution of property value; loss of income; costs of relocation; loss of business opportunities; grief, mental anguish, inconvenience, and loss of the capacity to enjoy life; and costs of suit.