UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION<br>NUMBER: 05-4182 "K"(2)<br>JUDGE Duval<br>MAG. Wilkinson |
| PERTAINS TO: MRGO, Robinson<br>(No. 06-2268) | |

**PLAINTIFFS' REVISED STATEMENT OF UNDISPUTED FACTS FOR SUMMARY ADJUDICATION ON SECTION 702C IMMUNITY**

The Plaintiffs hereby contend that the following are undisputed facts for purposes of their motion for summary adjudication on the issue of the availability of 33 U.S.C. § 702c to the Government in this case.

1. The Government concedes that the MR-GO had no flood control features when constructed, "the MR-GO did not have a flood control purpose or function," and "no levees were constructed as part of the MRGO project." PUF Nos. 15, 19, 20.

2. In the wake of Hurricane Betsy's catastrophic flooding, Congress enacted the Flood Control Act of 1965 authorizing the LPVHPP, but the MR-GO was never part of the new flood control project and the Government has conceded that "the MR-GO was not a flood control project and was not absorbed into the LPVHPP." PUF No. 18, 23, 65.

3. The United States has disavowed any argument that the MR-GO was either

1

(1) related to the national flood control program, (2) a "constituent component" of the LPVHPP, or (3) morphed into a hybrid flood control project/navigational aid project. PUF. No 22; *see also* PUF Nos. 16-17, 21-22.

4. Congress authorized in 1956 the MR-GO as a 76-mile deep water, navigation channel connecting the Gulf of Mexico to the Port of New Orleans Inner Harbor Navigation Canal ("IHNC"). PUF Nos. 1, 2, 3, 10, 11.

5. The Army Corps designed, constructed, operated, and maintained the MR-GO. PUF Nos. 2, 9, 15, 315.

6. The MR-GO has been divided into three reaches:

(a) The six-mile connection between the junction of the Gulf Intracoastal Waterway ("GIWW") and the MR-GO terminus in the IHNC has been designated as Reach 1, and in IPET's words, Reach 1 is "the critical reach" playing the most significant role in transmission of hurricane surge.

(b) Reach 2—the segment dredged through the marsh beginning at the convergence with the GIWW and extending to Veret—has caused the most environmental degradation.

(c) Reach 3 further south to the Gulf of Mexico has required continual dredging to keep the channel open. PUF No. 5.

7. In designing and constructing the MR-GO, the Army Corps ignored known hazards posed by the "funnel effect" enabling hurricane storm surge from Lake Borgne and the Gulf of Mexico (via Reach 2) to flow into the confined channel of the GIWW/Reach 1 separating New Orleans East and the Ninth Ward/St. Bernard Parish. PUF Nos. 50-58.

8. For decades, the Army Corps has known that hydrologically, the MR-GO created a short, new pathway for astronomical and storm-driven tides to flow directly from Breton Sound

to Lake Borgne and Lake Pontchartrain and for hurricane storm surge to be efficiently delivered into the heart of New Orleans.  PUF No. 5-8, 50-58, 295, 295a.

9.  While the MR-GO was being constructed, and for many years right up to Hurricane Katrina, the Army Corps was warned that the funnel created a back door that would accelerate and intensify hurricane storm surges emerging from Lake Borgne and the Gulf into the Greater New Orleans area.  PUF Nos. 8, 51-53, 63.

10.  Hurricane Katrina's amplified and supercharged storm surge caused massive overtopping of structures along Reach 1, Reach 2, and the IHNC and contributed to the failure of the IHNC floodwalls in two locations along the east side—and the resulting catastrophic flooding of the Lower Ninth Ward and portions of St. Bernard Parish.  PUF Nos. 250-55; 293.

11.  The soils used for the later construction of flood protection embankments along both Reach 1 and Reach 2 of the MR-GO were prodigious amounts of highly erodable sand mixed with shell and some silts and clays and largely existing materials borrowed from the adjacent spoil banks that were constructed of materials dredged from the MR-GO.  PUF Nos. 24-28, 129-31, 138-39, 332-33.

12.  Consequently, the foundation of the flood protection works along Reach 1 and Reach 2 of the MR-GO—characterized as "treacherous" and highly variable by the Army Corps—was mostly spongy, organic soils (pure sand with some shell) with substantial water content.  *Id.*, *see also*, PUF Nos. 114-15, 330-35.

13.  The catastrophic flooding during Hurricane Katrina was caused in part because these water pervious earthen berms along Reach 1 and Reach 2 of the MR-GO were highly vulnerable to severe erosion from hurricane storm surge overtopping and to significant subsidence and

settlement from the weight of spoil materials placed on top of them during construction of the flood protection works. PUF Nos. 120, 129-31, 138-39, 332.

14. Before the MR-GO's construction began in 1958, the Army Corps knew that the MR-GO would destroy the storm surge buffering wetlands by "increas[ing] tidal action in marsh pond areas; higher average salinities with wider salinity ranges; increase[ing] turbidity. . . [that] would eliminate 6,200 acres of shallow open water and 17,400 acres of marsh. . MSJ Exh. 51 at p. 4.

15. In 1965 during the MR-GO's construction, the Army Corps told Congress that the MR-GO "provides a deep direct route for the in-flow of saline currents from the Gulf of Mexico to the area along this channel and to Lake Pontchartrain." PUF Nos. 8.

16. The MR-GO directly and indirectly destroyed tens of thousands of acres of wetlands and cypress forests. PUF Nos. 40-49.

17. It is widely agreed—and the Army Corps has acknowledged—that the presence of the MR-GO destroyed wetlands that otherwise would have provided additional surge defenses during Hurricane Katrina. PUF Nos. 40, 47-49, 110, 123, 295b, 309.

18. If these marshlands had not been destroyed by the MR-GO, nature's defenses would have reduced surge caused by Hurricane Katrina by about three feet and spared Greater New Orleans from catastrophic flooding. PUF Nos. 49, 294.

19. The Army Corps' expert, Dr. Robert Dalrymple, attributes over three feet of additional storm surge against Reach 2 because of the destroyed adjacent wetlands. PUF No. 294.

20. In designing the MR-GO, the Army Corps knew that there would be stability problems with the channel cut because of ship wake erosion of the unstable banks, comprised of

4

an almost ubiquitous 10 feet of marsh/swamp peat at the surface and scattered deposits of sandy-silt and silty-sand at greater depths and that this bank erosion would accelerate the loss of protective marshland.  PUF Nos. 30-32.

21  The Army Corps did not prescribe erosion protection from wave wash (such as armoring) for the MR-GO's unstable banks. PUF Nos. 31, 33, 36, 37.

22.  Over the years, ship wakes (as high as three or four feet) widened the original 650 feet channel—at a rate of between 10 and 20 feet per year on each bank—to 2,000 feet and in some places, to 3,000 feet.  PUF Nos. 33, 34.

23.  This increase in the unprotected channel's width and volume of water had several adverse effects, including (1) the breaching of the Lake Borgne shoreline adjacent to the MR-GO which allowed storm surge within Lake Borgne to dump directly into the MR-GO; (2) the enormous loss of marshland adjacent to the channel; and (3) shoaling within the MR-GO.  PUF Nos. 32-35, 38-39, 40-42.

24.  In Section 204 of the Flood Control Act of 1965 (Pub.L.No. 89-298, 79 Stat. 1073 (October 27, 1965), Congress directed the Army Corps to build "works of improvement for . . . the control of destructive floodwaters" and a "project for hurricane-flood protection on Lake Pontchartrain, Louisiana."  PUF No. 321; *see also* PUF No. 65.

25.  Accepting the Chief of Engineer's recommendation in House Document No. 231, Congress authorized the LPVHPP to protect the areas around Lake Pontchartrain from flooding caused by storm surge or rainfall associated with a Standard Project Hurricane ("SPH").  PUF No. 66, 71, 321.

26. The SPH—selected because of the area's urban nature—represented "the most severe combination of meteorological conditions considered reasonably characteristic for the region."  MSJ Exh. 10 (H.R. Doc. No. 89-231) at p. 46; PUF Nos. 66, 73, 83.

27. Congress approved specific design heights for various stretches of the system. PUF No. 74.

28. In the Flood Control Act of 1965, Congress mandated armoring in the form of rip-rap slope protection along the navigation channel and flood gates.  PUF Nos. 5, 67, 124; MSJ Exh. 10 (H.R. Doc. No. 89-231) at p. 9, ¶ 12.

29. In the Flood Control Act of 1965, Congress directed the Army Corps to consider in the engineering design process the concept of storms much more intense than the SPH by referencing for the general design plan a more stringent design hurricane known as the Probable Maximum Hurricane ("PMH").  MSJ Exh. 10 (H.R. Doc. No. 89-231) at pp. 20, 46-47; PUF Nos. 202-03.

30. Neither armoring nor PMH assumptions were incorporated into the LPVHPP.  PUF Nos. 76, 204.

31. A hurricane protection system designed with the more protective PMH criteria and armoring would have yielded more resilient and robust flood control structures that would not fail upon expected overtopping in the event of storms whose intensity exceeded that of the SPH. PUF Nos. 95-96, 204-205.

32. Without this added measure of protection afforded by higher elevations and armoring, overtopped floodwalls and earthen structures failed because the soils behind them on the protected side (facing towards land) were eroded and contributed to the failure of the floodwalls and earthen structures.  PUF Nos. 204, 205.

33. The Army Corps did not build the HPS according to the Congressionally-mandated SPH requirements in at least eight critical respects. The Army Corps:

∗ knowingly used obsolete SPH design criteria instead of the updated 1972 and 1979 versions—despite admitting in 1976 that it needed to raise levee heights because of the 1972 SPH change and a 1981 order of the Chief Engineer to use the 1979 SPH (PUF Nos. 95-106);

∗ failed to use available SLOSH and ADCIRC storm surge computer models that it helped develop and finance; (PUF Nos. 107-109);

∗ ignored a warning in 1958 from the U.S. Coastal and Geodetic Survey of subsiding benchmarks in Greater New Orleans and failed to use updated vertical datums in designing crown elevations for flood control structures (PUF Nos. 112-113; 239-41);

∗ did not take into account known subsidence problems in establishing design elevations for flood control structures (PUF Nos.112-15; 119-23242-43);

∗ did not take into consideration known diminished surge protection from vanishing wetlands and cypress forests (PUF Nos. 46-49, 110);

∗ used sandy, erosion-prone soils prohibited by its own levee and coastal engineering manuals (PUF Nos. 24-28, 129-31, 138-39, 326-35);

∗ did not armor flood control structures to prevent scouring and erosion upon overtopping (PUF Nos. 125, 127-128, 198); and

∗ failed to design and build the HPS to the level of protection mandated in the Flood Control Act of 1965 because the levee crowns were lower than specified for the SPH dimension due to predictable settlement and sea level rise (PUF Nos. 168-69, 171-73, 178-79).

34. The Army Corps' expert, Dr. Robert Dalrymple of Johns Hopkins University has testified that "[w]hatever system the Corps built by the time of Katrina after 1965 was [not]

designed to deal with the most severe combination of meteorological conditions that are considered reasonably characteristic of this region"—the definition of the SPH that Congress mandated for Greater New Orleans in the Flood Control Act of 1965.  PUF No. 163; *see also* PUF No. 164 (Plaintiffs' expert); 102 (Team Louisiana).

35.  The Army Corps' failure to build the LPVHPP system as mandated by Congress had deadly consequences when Hurricane Katrina hit Greater New Orleans.   PUF No. 106, 210, 263-67, 269-76.

36.  The Army Corps' use of the 1959 (instead of the updated 1972 or 1979) SPH led to underestimating surge height by 6.5 feet on Reach 2 alone and resulted in many failures of flood control structures.  PUF Nos. 94-95, 99, 275.

37.  The Army Corps' failure to consider the effects of continuing subsidence on the effective level of flood protection translated into flood structures several feet lower than represented by the agency.  PUF No. 112-13.

38.  At the time of Hurricane Katrina, the 125 miles of LPVHPP flood control structures had not been finished as designed and not functioning as a complete, integrated, unified and comprehensive system necessary for effective hurricane flood protection as mandated by Congress. PUF Nos. 68, 140-62; 199-200.

39.  Forty years after Congressional authorization, the Hurricane Flood Protection System ("HPS") for Greater New Orleans at the time of Hurricane Katrina was still under construction and uncompleted—a sprawling work in process that was a patchwork quilt of several hundred miles of earthen berms, spoilbanks, sheetpile, concrete and floodwalls—virtually all of which were below design protection elevation and whose most salient features were their uneven height and admitted resulting inability to afford

the SPH level of protection mandated by Congress in the Flood Control Act of 1965. PUF No. 142; *see also* PUF Nos. 78-79, 143-62.

40. IPET noted that the New Orleans regional flood protection system was largely a system in name only and not effective because pre-Katrina, there were no integrated series of components—functioning literally seamlessly as contiguous defenses—to provide a reliable New Orleans Flood Defense System (NOFDS). PUF No. 153; MSJ Exh. 20 at I-70 (IPET).

41. The Army Corps' expert, Dr. Robert Dalrymple, concluded that at the time of Hurricane Katrina, there was "not a completed Hurricane Protection System to the extent Congress or the Corps or both thought they were getting a level of protection of 17 and a half feet." PUF No. 158; *see also* PUF Nos. 116, 135-36.

42. The uncompleted hurricane protection system created many weak links when dozens of points below design elevations contributed to flooding when water flowed unimpeded through these gaps. PUF No. 155.

43. IPET concluded that the system did not perform as a system because some areas it was not completed, and in others, datum misinterpretation and subsidence reduced its intended protective elevation, resulting in a varying capacity for protection varied since some structures provided no reliable protection above their design elevations and others that had inadequate designs leaving them vulnerable at water elevations significantly below the design intent. PUF No. 156; *see also* PUF Nos. 165-67, 170, 174-77, 180-97.

44. The LPVHPP was originally expected to take about 13 years to complete at a cost about $85 million, but at the time of Hurricane Katrina the system was estimated to be about 85 percent constructed and was not expected to reach completion until 2015–50 years after

9

Congressional authorization of the LPV and 60 years after initiation of the planning process. PUF Nos. 65, 69, 70.

45. IPET and other investigators concluded that virtually all of the major breaches were caused by overtopping and subsequent erosion because reduced protective elevations increased the amount of overtopping, erosion, and subsequent catastrophic flooding. PUF Nos. 207, 211-14, 221, 250, 269-80.

46. IPET concluded as follows: "The incompleteness of the HPS made a material contribution to the catastrophic flooding. Lower than authorized elevations of flood protection structures contributed to the overtopping and failure of both floodwalls and levees. A completed system would have prevented much of the catastrophic flooding and resulting loss of life and property." PUF No. 208; *see also* PUF Nos. 215-20, 222-29.

47. The Army Corps did not warn the stakeholders about the known inadequacy of the unfinished HPS and the threat to human life and property from catastrophic flooding caused by either a severe or a more moderate SPH hurricane, including not advising New Orleans residents that the GNO HPS required significant improvements to meet even 1 in 100 year SPH requirements. PUF Nos. 296-310.

48. The New Orleans District actually misled the public by falsely claiming at times that the GNO HPS would protect against a 1 in 200 to 1 in 300 year hurricane. PUF No. 302.

49. The Government contends that there were no defects in the design or construction of the flood control structures along Reach 1 and Reach 2 of the MR-GO that contributed to the catastrophic flooding of Greater New Orleans.

50.  The Government contends that the catastrophic flooding during Hurricane Katrina was the result of hurricane storm surge greater than anticipated in its SPH design.  MSJ Exh. 27, Varuso Depo. 61:1-62:9

51.  The Government expected the flood structures to be overtopped if hurricane storm waters exceed the SPH design elevations used by the Army Corps in designing and constructing the flood structures.  PUF Nos. 290, 291

52.  Plaintiffs are not predicating Defendant's liability on claims of levee breaches or failures or overtopping or the defective design, construction, operation and/or maintenance of levees, flood protection works, or any other Government structures or facilities intended for hurricane flood control protection, and their claims against the United States do not relate to a federal flood control project or its design, construction, operation or maintenance or its performance during Hurricane Katrina.  PUF Nos. 311-14.

53.  Plaintiffs also contend that the Army Corps engaged in additional negligent conduct that contributed to the failure of the I-walls on the west side of the IHNC and the ensuing catastrophic flooding of the Lower Ninth Ward by negligently undertaking site clearing for the Lock Expansion Project at the East Bank Industrial sites that had material adverse effects on the soil stability and protection for the flood control structure.  PUF No. 345.

Dated:  January 17, 2008                                         Respectfully submitted,


**O'Donnell & Associates P.C.**

By: s/ Pierce O'Donnell

Pierce O'Donnell (*pro hac vice*)
550 S. Hope St., Suite 1000
Los Angeles, California 90071
Phone:  (213) 347-0290

Fax: (213) 347-0298

**The Andry Law Firm, LLC**

By: s/ Jonathan B. Andry
Jonathan B. Andry (LSBA No. 20081)
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 586-8899
Facsimile: (504) 585-1788

**Law Offices of Joseph M. Bruno**

By: s/ Joseph M. Bruno
Joseph M. Bruno (LSBA No. 3604)
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile: (504) 581-1493

**Domengeaux Wright Roy & Edwards LLC**

Bob F. Wright (LSBA No. 13691)
James P. Roy (LSBA No. 11511)
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, Louisiana 70502-3668
Telephone: (337) 233-3033
Facsimile: (337) 233-2796

**Fayard & Honeycutt**

Calvin C. Fayard, Jr. (LSBA No. 5486)
Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193
Facsimile: (225) 664-6925

**Girardi & Keese**

Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile: (213) 481-1554

**Ranier, Gayle & Elliot, LLC**

N. Frank Elliot III
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337).494.7218

**Levin, Papantonio, Thomas, Mitchell Echsner & Proctor, P.A.**

Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile: (850) 436-6123

**McKernan Law Firm**

Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway

**Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC**

Gerald E. Meunier (LSBA 9471)
2800 Energy Centre

Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile: (225) 926-1202

1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile: (504) 528-9973

**Law Office of Elwood C. Stevens, Jr., a Professional Law Corporation**

Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile: (985) 385-4861

**Cotchett, Pitre, Simon & McCarthy**

Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**

Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Salas & Co., LC**

 Camilo K. Salas, III (LSBA No. 11657)
650 Poydras Street, Suite 1650
New Orleans, LA  70130
Telephone: (504) 799-3080
Facsimile: (504) 799-3085
**Attorneys for Plaintiffs**

**Robinson, Calcagnie & Robinson, Inc.**

Mark Robinson (Cal State Bar No. 54426
620 Newport Center Drive – 7th Floor
Newport Beach, CA 92660
1-888-701-1288

## CERTIFICATE OF SERVICE

I, Pierce O'Donnell, hereby certify that on January 17, 2008, I caused to be served **PLAINTIFFS' REVISED STATEMENT OF UNDISPUTED FACTS FOR SUMMARY ADJUDICATION ON SECTION 702c IMMUNITY**, upon Defendants' counsel, Robin D. Smith, Catherine Corlies, Traci Colquette, and Jim McConnon by ECF and email at robin.doyle.smith@usdoj.gov; catherine.corlies@usdoj.gov, traci.colquette@usdoj.gov, and jim.mcconnon@usdoj.gov

/s/ Pierce O'Donnell