# EXHIBIT 21

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 04-439                    DIVISION "I"                    SECTION 14

CHARLES C. FOTI, JR., et al.

versus

BAYER CORPORATION, et al.

FILED:_____        _____
                                                        DEPUTY CLERK

### PETITIONERS' MEMORANDUM IN OPPOSITION TO
### DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION

NOW COME Petitioners, the Louisiana Attorney General, et al., and, respectfully oppose Defendants' Motion for Preliminary Injunction, seeking to enjoin Petitioners' outside counsel from representing Petitioners.  The Attorney General has authorized outside counsel to investigate and pursue litigation on behalf of the Attorney General and the State related to Baycol.

### INTRODUCTION

This is not a case in which injunctive relief is available to Defendants.  No statute provides them with the remedy; they have not even attempted to show irreparable harm; and the letter of authorization which they seek to enjoin does not clearly violate any express law.

The issue before the Court is of great importance, and the Court should know at the outset that the Attorney General is keenly interested in pursuing this case.  In addition, the Court should know that the Attorney General has determined that the best means by which to pursue the case is to utilize outside counsel, who have experience in handling this type of litigation.  There is nothing nefarious about outside counsel's representation of Petitioners.

The Louisiana Medicaid program spent substantial sums purchasing Baycol and caring for its participants who were injured by Baycol.  These Defendants knew Baycol was less effective and more dangerous than other cholesterol-lowering drugs on the market.  Not only did Defendants fail to disclose these important facts, Defendants made active misrepresentations regarding the efficacy

1

and safety of Baycol in order to maximize their sales and profits.[1] Ultimately, Baycol was withdrawn from the market.

This suit seeks restitution and damages for the Defendant's past misconduct and also seeks to enjoin the Defendants from similar future misconduct. The suit also seeks the recovery of attorney's fees and costs, to be awarded on top of whatever restitution and damages are awarded to the State. Both LUTPA section 1409 and Civil Code article 2545, governing bad faith redhibition claims, expressly authorize the recovery of fees and costs.

LUTPA section 1409 provides, in pertinent part:

> Any person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages***__In the event that damages are awarded under this Section, the court shall award to the person bringing such action reasonable attorney's fees and costs.__

La. Rev. Stat. Ann. §51:1409 A (emphasis added).

With respect to bad faith redhibition, Civil Code article 2545 provides:

> A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and __also for damages and reasonable attorney fees***__.

La. Civ. Code Ann. art. 2545 (emphasis added).

The Attorney General's letter of authorization is not an "illegal contingency fee contract." It does not run afoul of the Louisiana Supreme Court's holding in *Meredith v. Ieyoub*, 96-1110 (La. 9/9/97), 700 So. 2d 478. The fee agreement which the Court nullified in *Meredith* provided that the lawyers whom the Attorney General engaged to pursue certain environmental actions on behalf of the State were to receive 25% of the State's gross recovery in each claim brought pursuant to the agreement. *Id*. at 479. The Court found that contingency fee agreement to be invalid on the basis

---

[1] As an aside, Petitioners note that according to their SEC filings, GlaxoSmithKline, PLC (SmithKline Beecham Corp.'s parent) reported last quarter gross profits of 7.43 Billion Dollars. Bayer AG (Bayer Corp.'s parent) reported 2004 quarterly gross profits of 4.182 Billion Dollars. While these profits came from the sales of drugs other than Baycol, it smacks of irony to have these profiteers accuse anyone of wanting to make a dollar.

that the Attorney General lacked the authority to alienate a percentage of the State's recovery without legislative authorization to do so. *Id.* at 481.

In contrast to the contingency fee agreement in *Meredith*, the letter of authorization at issue here expressly provides that the attorneys are not entitled to any portion of the recovery due to the State. Instead, any recovery to be paid to the attorneys must come by court order pursuant to the statutes under which this suit has been brought.

To that end, the Attorney General's letter of authorization states:

> After successful prosecution of this litigation, the attorneys of the law firm will be compensated either by court order or by private agreement between the litigants. At no time and for no reason will any attorneys' fees come out of the recovery that is due the State of Louisiana.

Given that the letter of authorization does not alienate a percentage of the State's recovery in this suit, the holdings of *Meredith* and/or its progeny do not apply.

Curiously, Defendants have failed to advise the Court that the Lafourche Parish district court has already rejected Defendants' precise arguments. In *Chevron U.S.A., Inc. v. State of Louisiana, et al.,*[2] Chevron U.S.A. filed a motion for partial summary judgment, seeking to invalidate a retention agreement between the Attorney General and outside counsel for the same reasons articulated by Defendants in this action.

The *Chevron U.S.A.* case involved a crude oil royalty dispute, and the retention agreement at issue provided that the State's outside counsel were not entitled to any portion of the State's recovery. Like in our case, the retention agreement provided that outside counsel would be compensated for reasonable attorney's fees as provided by law, and the Mineral Code provided for the recovery of attorney's fees. The Lafourche Parish court denied Chevron U.S.A.'s motion seeking to invalidate the retention agreement. The case was tried earlier this year, and the jury ordered Chevron to pay fees in addition to the amounts awarded to the State. Chevron U.S.A. has appealed, and the case is currently pending in the First Circuit.

Bottom line, Defendants have not shown that the authorization letter at issue in this suit clearly violates any express law. As such, no injunction is warranted.

---

[2]     No. 93,658, 17th Judicial District Court for the Parish of Lafourche, State of Louisiana

# ARGUMENT

Pursuant to La. Code Civ. Proc. Ann. art. 3601, a preliminary injunction should issue only in very limited and specific circumstances.  Article 3601 provides, in pertinent part:

> An injunction shall issue in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided by law***.

Defendants have not attempted to show irreparable harm, and they point to no specific law affording them an injunctive remedy in this instance.

Because their injunction claims do not fall into either of the grounds set forth in article 3601, Defendants have based their injunction claim on "a seldom-used, judicially-created exception to article 3601," providing that an injunction may issue without a showing of irreparable harm "to enjoin a course of action that is forbidden by law."  *New Orleans Pub. Serv. Co. v. Citizens Utilities, Co.*, 539 So. 2d 891, 893 (La. App. 4th Cir. 1989).  As the Fourth Circuit noted, the situations in which injunctions have been granted pursuant to this judicial expansion of article 3601 "do not involve arguable violations of the law, but **clear violations** of **express law**."  *Id.* (emphasis added).

As set forth below, Defendants have failed to show a clear violation of an express law.  As such, the Court should deny their motion for preliminary injunction.

### 1.     *Meredith* **Does Not Apply in this Instance.**

Defendants contend that the March 7, 2003 letter constitutes a "classic contingency fee" agreement because fees, if any, require a successful resolution of the case.  They say that such an agreement is prohibited by *Meredith*.

The Supreme Court's objection to the contingency fee agreement at issue in *Meredith*, however, was not based upon the fact that fees to outside counsel were dependent upon the success of the case.  Instead, the Court's opinion focused on the fact that the contingency fee agreement provided that outside counsel were to receive 25% of the State's recovery.  Voiding that contingency fee agreement, the Court held that the Attorney General's unilateral decision to alienate 25% of the State's recovery to outside counsel, without legislative approval, exceeded his own Constitutional

authority and usurped the legislature's Constitutional authority to appropriate State funds. *Meredith*, 700 So. 2d at 481.[3]

Likewise, in *Ieyoub v. W.R. Grace & Co.–Conn.*, 1997-728 (La. App. 3rd Cir. 3/6/98), 708 So. 2d 1227, the Louisiana Third Circuit voided a contingency fee agreement in which the Attorney General agreed to pay an outside firm 30% of the State's gross recovery, subject to a $20,000,000 cap, to pursue asbestos claims involving State buildings. *Id.* at 1229-30. Following *Meredith*, the Third Circuit held that the Attorney General lacked the Constitutional authority to alienate 30% of the State's recovery by contingency fee agreement. *Id.*

The letter of authorization at issue here is far from a "classic contingency fee agreement." It does not require that any portion of the State's recovery on its claims be paid to outside counsel. The only factor the letter of authorization has in common with a contingency fee agreement is the fact that outside counsel must be successful in the prosecution of the claim to have a chance of receiving fees. Because the letter does not alienate a percentage of the State's recovery, however, neither *Meredith* nor *W.R. Grace* operates to void the engagement.

**2.    Whatever Fees May Ultimately Be Awarded By the Court Will Have to Be Reasonable Under the Circumstances.**

Under the agreement with the Attorney General, in order to recover any fees, not only must outside counsel must win the case, they must prevail on a claim for which attorney's fees are authorized,[4] and have those fees set by the Court.

Contrary to Defendants' accusations, Petitioners' counsel are not looking for a windfall fee out of proportion to the work performed and the risk involved. At the end of the day and should they prevail on the necessary claims, Petitioners' counsel have every confidence that the Court will award reasonable fees. In this regard, the Court has much discretion, but the customary factors to be considered when setting reasonable fees include:

> (1) the ultimate result obtained;  (2) the responsibility incurred;  (3) the importance of the litigation;  (4) the amount of money involved;

---

[3]    In further support of its *Meredith* decision, the Supreme Court noted that, with respect to environmental claims, the **Legislature had specifically** mandated that "all sums" recovered by the State pursuant to environmental statutes be deposited into the State Treasury. *Meredith*, 700 So. 2d at 482 (citing La. Rev. Stat. Ann. §30:2055(A)). The Court held: "The language of the statute is clear and unambiguous: '[a]ll sums recovered through judgments' means *all* sums, not all sums remaining after the Attorney General has paid his contingency fee lawyers." *Id.* at 482 (emphasis in original).

[4]    If any of the Petitioners are entitled to recover damages under LUTPA section 1409, the Court must award attorney's fees and costs. La. Rev. Stat. Ann. §51:1409. Likewise, attorney's fees and costs are recoverable to the extent that Petitioners prevail on their bad faith redhibition claims. La. Civ. Code. Ann. art. 2545.

(5) the extent and character of the work performed;  (6) the legal knowledge, attainment, and skill of the attorneys;  (7) the number of appearances involved;  (8) the intricacies of the facts involved;  (9) the diligence and skill of counsel;   and (10) the court's own knowledge.

*Rivet v. State, DOTD*, 96-0145 (La. 9/5/96), 680 So. 2d 1154, 1161 (citing *State, DOTD v. Williamson*, 597 So. 2d 439, 442 (La.1992)). These same standards apply when assessing reasonable fees in successful LUTPA and redhibition claims.  *See, e.g., Roustabouts, Inc. v. Hammer*, 447 So. 2d 543, 550-51 (La. App. 1st Cir. 1984) (setting forth the basic standards to be applied when evaluating the reasonableness of attorney's fees in LUTPA cases); *Dupree-Simpson Farms v. Helena Chemical Co.*, 28,739 (La. App. 2nd Cir. 10/30/96), 682 So. 2d 838, 843 (assessing reasonableness of fees on a bad faith redhibition claim).

**3.    The Attorney General's Agreement that Petitioners Counsel Be Allowed to Receive Reasonable Fees, Set by the Court on Top of the Amounts Awarded to Petitioners, Does Not Constitute an Unlawful Diversion of Funds from the State Treasury so as to Justify the Injunction Defendants Seek.**

Defendants contend that the letter of authorization, providing that Petitioners counsel be allowed to receive reasonable fees, set by the Court on top of the amounts awarded to Petitioners, constitutes an unlawful diversion of funds from the state treasury, thereby justifying an injunction. Defendants say those fees "would necessarily belong to the State itself."   See Defendants' Memorandum in Support of Motion for Preliminary Injunction at p. 2.

However, when a statute authorizes an award of attorney's fees to the prevailing party, in addition to that party's damages, case law holds that **the fees awarded belong to the lawyers–notwithstanding that they are awarded in the name of the party.**  See, e.g., *Marre v. United States*, 117 F.3d 297, 304 (5th Cir. 1997).

In *Marre*, plaintiffs sued the government for wrongful disclosure of their tax return information. The applicable Internal Revenue Code provisions allowed for the recovery of attorney's fees, costs, and other items in addition to plaintiffs damages.  Plaintiffs ultimately prevailed and were awarded damages as well as attorney's fees on top of their damages.  The government then sought to setoff those amounts against the plaintiffs' tax liability.  While the Fifth Circuit recognized the government's right to setoff the damages awarded against the tax liability, the Fifth Circuit held that the government could not setoff the amounts awarded as attorney's fees **because those fees belonged to the attorneys–not the prevailing party.**  The Fifth Circuit held:

> Under the statute, if the court decides to award attorneys' fees to the prevailing party, the fees are to be awarded *in addition to* any damages awarded to the prevailing party. In other words, the attorneys' fees are not awarded out of the prevailing party's damages, but rather are awarded on top of any damages the prevailing party receives.***Thus, damages and attorneys' fees under section 7430 are separate awards, the former going to the prevailing party and the latter to the prevailing party's attorneys.   In this case, because **the attorneys' fees awarded under section 7430 belong to Urquhart & Hassell [the attorneys]**, and not Marré, the government cannot set off Marré's tax obligations against the attorneys' fees award.

*Id.* (emphasis added, internal citations and footnote omitted).  Furthermore, the Fifth Circuit held that the statute's requirement that fees be awarded in the name of the party—not the attorneys—was irrelevant to the determination that the fees truly belonged to the attorneys.  The court stated:

> ***That the statute provides that attorneys' fees are to be awarded to the prevailing party is not controlling.  The issue "is not whether plaintiff is nominally to receive the money but whether ultimately it is to go to her attorney***.

*Id.* (emphasis added).

Marre, it should be noted, is not a jurisprudential anomaly.  Several other cases also hold that awards of attorney's fees actually belong to the attorneys—not the clients in whose name they may be awarded.

In *General Investment, Inc. v. Thomas*, 422 So. 2d 1279 (La. App. 5th Cir. 1982), a creditor sued a debtor on an unpaid auto note and chattel mortgage.  The debtor reconvened against the creditor for improper seizure.  Although the creditor prevailed on its main demand, the debtor also prevailed on his reconventional demand and was awarded damages as well as attorneys fees.  *Id.* at 1280.  The court held that the creditor could not offset the reconventional demand judgment in favor of the debtor to the extent of any sums awarded as attorney fees, because the attorney fee award belonged to attorney and not to client.  The court stated:

> Our jurisprudence establishes that the attorney's fee award belongs to the attorney and not to his client.

*Id.* at 1281.  The court analyzed a number of prior Louisiana decisions and ultimately held:

> while the law is somewhat confusing with regard to an attorney's right to sue in his own name for a contractual or statutory attorney's fees, *Robbins, Begnaud, Post, Ethridge* and *Daspit* all make clear that once a claim is placed in the hands of an attorney and the attorney obtains a judgment in favor of his client, **the attorney's fees stated in the judgment belong to the attorney whether sued for procedurally by his client or by him.**

*Id.* at 1282 (emphasis added).

In *Plant v. Blazer Financial Services, Inc. of Georgia*, 598 F. 2d 1357 (5th Cir. 1979), *reh'g denied*, 605 F.2d 555 (5th Cir. 1979), the court held that the award of attorneys fees to the plaintiff in a Truth in Lending Act case was not subject to defendant's setoff claim. *Id.* at 1365. The Fifth Circuit rejected the defendant's argument that the statute providing for fees mandated that the fees be paid to the party, not the attorney. The court held:

> Such an approach misstates the issue before the Court, places greater emphasis upon form than substance, and attaches to this phrase an unintended significance. **The issue with which the Court is concerned is not whether plaintiff is nominally to receive the money but whether ultimately it is to go to her attorney** or to be credited toward defendant in repayment of plaintiff's debt.

*Id.* at 1366 (emphasis added). *See also Duncan v. United States, Dept. of the Army*, 887 F.2d 1078, 1989 WL 117742 (4th Cir. 1989). In *Duncan*, the court disallowed setoff of attorneys fee award against plaintiff's indebtedness. Quoting the Fifth Circuit in *Plant*, the Fourth Circuit held: "We agree with the Fifth Circuit's perceptive observation that the issue 'is not whether plaintiff is nominally to receive the money but whether ultimately it is to go to her attorney or to be credited toward defendant in repayment of plaintiff's debt.' " *Duncan*, WL slip op. at 3 (quoting *Plant*, 598 F. 2d at 1366). *See also United States v. Smith*, 55 F. Supp. 2d 917 (N.D. Ind. 1999) (specifically following *Marre).*

**4.    Fee Awards to Outside Counsel, Like that Contemplated by the Attorney General's Letter of Authorization, Have Been Upheld in the Past. Furthermore, Should a Dispute Arise between Outside Counsel and the State, Mechanisms Are in Place to Resolve Them.**

In addition, Louisiana jurisprudence supports the validity of fee provisions like the one set forth in the Attorney General's letter of authorization. *State, ex rel. Guste v. Texaco, Inc.*[5] To the extent that there is any disagreement between Petitioners' counsel and any State officials regarding the right to be paid any fees awarded in this suit, procedures exist to resolve those disputes, such as putting the issue to the Commissioner of Administration.

In *Guste*, outside counsel represented the State in a suit against Texaco for cancellation of mineral leases. The parties amicably resolved the dispute, and the Court entered two judgments following the settlement. In the first judgment, Texaco was ordered to pay the settlement amount as well as an amount of attorney's fees directly to the State to cover its in-house counsel fees. The

---

[5]    *State, ex rel. Guste v. Texaco, Inc.*, 433 So. 2d 756 (La. App. 1st Cir.), *writ granted*, 441 So. 2d 207 (La. 1983), *appeal dismissed*, 453 So. 2d 557 (La. 1984).

court entered a second judgment in favor of outside counsel, ordering Texaco to pay an additional amount of fees. *Guste*, 433 So. 2d at 757. At the request of outside counsel, those fees were deposited into the registry of the court for further proceedings to handle disbursement.

The Governor and certain other state officials intervened and objected to the payment of the second judgment amount to the outside counsel. The First Circuit ultimately concluded that because the State and outside counsel could not reach mutual agreement as to the payment to be made to the outside counsel, the funds in dispute should be deposited into the State Treasury and the dispute resolved by the Commissioner of Administration pursuant to La. Rev. Stat. Ann. §39:1524, et seq. *Id.* at 759-60. The court did not even hint that such a fee provision was "illegal" and/or "unenforceable."

Following the First Circuit's ruling, outside counsel and the State officers objecting to their recovery of the fees sought writs at the Louisiana Supreme Court, which were granted. *Guste*, 441 So. 2d 207 (La. 1983). Before the Supreme Court heard the appeals, outside counsel and the State officials settled their dispute, and their respective appeals were dismissed. *Guste*, 453 So. 2d 557 (La. 1984). It is worth noting that in the order dismissing the appeals, the Supreme Court ordered the district court clerk and the State Treasurer:

> to immediately pay to [outside counsel], the sum of $873,000.00 [the full amount of fees at issue] previously ordered to be paid by Texaco Inc. to [outside counsel], and the interest which has accrued thereon.

*Guste*, 453 So. 2d at 558.

## 5. The Ethics Board Opinion Regarding Attorney's Fees in the Tobacco Settlement Is of No Moment Here.

Defendants point to the Ethics Board Opinion in the Tobacco Settlement as further grounds to justify their request for an injunction here. Recognizing that anything is possible, it is unlikely that fees will be awarded here in the manner utilized in the nationwide settlement of state claims against the tobacco industry.

Even if fees were awarded in a similar fashion, however, the Ethics Board opinion in the Tobacco matter would not necessitate the finding of an ethics violation here. The board's opinion in the tobacco matter was a **consent opinion**, entered into by all parties, to avoid further

administrative and/or judicial action.[6]  See the Opinion at p. 9, n. 1.  For the ethics rules even to apply, outside counsel would have to be determined to be "public officials" as opposed to private lawyers acting as independent contractors.  It should also be noted that the tobacco manufactures were not found to have committed any ethics violation by paying attorneys fees in that matter.  See the Opinion at p. 10, n. 3.

## CONCLUSION

In summation, Defendants have not established that the Attorney General's authorization of outside counsel constitutes a clear violation of an express law to justify an injunction.  At most, Defendants have raised issues regarding whether Petitioners' counsel can and how Petitioners' counsel will have to go about collecting any fees that ultimately may be awarded.  Petitioners' counsel appreciate that concern.  Perhaps, counsel will have to jump through some extra hoops at the end of the suit, assuming it is successful and assuming fees are awarded, in order to be paid for their services.  Perhaps, counsel will enter into an additional agreement(s) with Petitioners to clarify or simplify the fee collection process.  However, collecting fees is a long way off.  In any event, those issues should be the concern of Petitioners' counsel–not Defendants–and none of those issues should justify the granting of Defendant's injunction.

Respectfully submitted, this 30th day of August, 2004,

**DUGAN & BROWNE, a P.L.C.**
JAMES R. DUGAN, II, T.A. (Bar No. 24785)
DAVID L. BROWNE (Bar No. 20729)
DOUGLAS R. PLYMALE (Bar No. 28409)
3500 North Hullen Street
Metairie, Louisiana  70002
Telephone:  (504) 456-8220
Facsimile: (504) 456-8624

**HOUGHTALING & WILLIAMS, L.L.C.**

_____
JOHN J. HOUGHTALING (Bar No. 25099)
JAMES M. WILLIAMS (Bar No. 26141)
3500 North Hullen Street
Metairie, Louisiana  70002
Telephone:  (504) 456-8676
Facsimile: (504) 456-7495

**USRY, WEEKS & MATTHEWS**
T. ALLEN USRY (Bar No. 12988)
LAMBERT J. HASSINGER, JR. (Bar No. 21683)
1717 St. Charles Avenue
New Orleans, Louisiana 70130
Telephone:  (504) 592-4600
Facsimile: (504) 592-4641

**MURRAY LAW FIRM**
STEPHEN B. MURRAY, SR. (Bar No. 9858)
STEPHEN B. MURRAY, JR. (Bar No. 23877)
909 Poydras Street - Suite 2550
New Orleans, Louisiana 70112
Telephone: (504) 525-8100
Facsimile: (504) 584-5249

---

[6]      To avoid further dispute, the attorneys accepted a fine of roughly 1/10 of 1% of the fees paid to them (actually $1.13 of every $10,000.00 in fees).  Stated another way, the attorney's retained 99.9% of the fees awarded to them.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Petitioners' Memorandum in Opposition to Defendants' Motion for Preliminary Injunction has this day been served on all counsel of record via facsimile, via hand delivery, via Federal Express, or via United States Mail, this 6th day of July, 2004.

C:\Documents and Settings\David L. Browne\My Documents\DUGAN & BROWNE\Bayeol\pleadings\pleading.010.memo.opp injunction.wpd

# EXHIBIT 22

 **2000-381**

Created By: Sylvia Scott on 09/04/2001 at 11:10 AM
Category: Ethics Rulings

# LOUISIANA BOARD OF ETHICS

**DATE**: May 17, 2001 **OPINION NO.: 2000-381**
**RE**: In the matter of Attorneys' Fees paid to Louisiana Counsel in the Tobacco Litigation

The Board of Ethics (the "Board"), pursuant to the authority contained in Section 1141 of the Code of Governmental Ethics (the "Code") [LSA-R.S. 42:1141] and following consideration of a complaint dated May 16, 2000, conducted an investigation into allegations that the respondents, tobacco litigation attorneys (hereafter "Louisiana Counsel"), who represented the State of Louisiana (hereafter "State" or "Louisiana") in litigation against the tobacco industry (hereafter "tobacco manufacturers") were paid legal fees for the provision of these governmental services from private sources, i.e., tobacco manufacturers, in violation of the provisions of Section 1111A(1) of the Code.

On the basis of the information obtained by the Board during the course of that investigation, and with the concurrence of Louisiana Counsel, the Board now makes the following essential:

## I.

### FINDINGS OF FACT

#### 1.

In 1993, Louisiana's Attorney General, Richard Ieyoub, began discussions with lawyers in Louisiana and elsewhere with a view toward planning, formulating legal theories, and preparing to initiate litigation against several tobacco manufacturers.

#### 2.

On November 7, 1996, Attorney General Ieyoub signed a contract with a law firm to prosecute a lawsuit on behalf of the State against several tobacco manufacturers. Under the firm's contract with the State, entitled "Representation Agreement", it was appointed as a special assistant attorney general and was authorized to "pursue, litigate and prosecute on behalf of the State of Louisiana" the proceedings captioned *Richard P. Ieyoub, Attorney General ex rel State of Louisiana v. the American Tobacco Company, et al*, Case No. 96-1209, then pending on the docket of

**EXHIBIT**
F



Louisiana's 14th Judicial District Court, Calcasieu Parish, Louisiana. The firm agreed that the State would have no obligation to "be responsible for payment of any attorneys' fees to Counsel." Instead, the firm agreed to accept whatever fee could be awarded "in accordance with law." The firm associated other law firms to handle the proceedings with it, i.e., Louisiana Counsel, which other firms subsequently were designated as special assistant attorneys general.

3.

Louisiana Counsel also represented the State against the tobacco manufacturers in companion litigation captioned *Richard Ieyoub in his capacity as Louisiana's Attorney General v. Phillip Morris, Inc., et al*, Case No. 98-6473, on the docket of Louisiana's 14th Judicial District Court.

4.

On November 23, 1998, a settlement agreement between the State and the tobacco manufacturers was reached and memorialized in a document known as the Master Settlement Agreement (the "MSA"). The MSA constitutes the comprehensive nationwide settlement between the tobacco manufacturers and forty-six states that had filed lawsuits, including Louisiana.

5.

Settlement negotiations leading to the MSA were conducted at a national level and the MSA's documentation, which comprises Louisiana's settlement provisions, follows a national pattern.

6.

If called to testify, Louisiana Counsel would state that on or about November 23, 1998, Attorney General Ieyoub executed the Louisiana-specific MSA on behalf of the State without any modifications because he did not then have the option of altering its nationally agreed upon provisions; the MSA either had to be accepted in its entirety or rejected in its entirety. Further, Louisiana Counsel would state that the method of payment to attorneys representing the State and the procedure used to determine the amount of that payment was provided for by the MSA and that any refusal by Louisiana Counsel or the State to accept these provisions would have disqualified Louisiana as a participant in the settlement and would have resulted in the State losing its approximately $4.6 billion share of the settlement. According to Louisiana Counsel, in the context of the national settlement dynamic, no alternative existed.

7.

Under the MSA, Louisiana will receive, over time, approximately $4.6 billion. The MSA also provides for public health initiatives in Louisiana, curtailing tobacco advertising and seeking to protect youths from starting to smoke.

8.

The MSA contains a procedure requiring the tobacco manufacturers to pay the attorneys' fees to the states' attorneys. Section XVII(d) of the MSA requires the tobacco manufacturers to create a separate fund, above the $205 billion amount payable to the states, to compensate the lawyers that represented each of the 46 states.

9.

According to an affidavit submitted by Mississippi Attorney General Mike Moore, he was the first to sue the tobacco manufacturers and a leader of the attorneys general in the tobacco litigation. Attorney General Moore confirms that the origin of the attorneys' fee payment provisions in the MSA was a result of negotiations by the Attorney General Negotiating Committee, not the private lawyers representing the states involved.

10.

Attorney General Ieyoub has confirmed by affidavit the genesis of the fee provisions.

11.

The MSA contains as Exhibit O a model agreement for the payment of the attorneys' fees to the states' attorneys.

12.

On February 19, 1999, Louisiana Counsel entered into the Louisiana Fee Payment Agreement with the tobacco manufacturers, which agreement parallels the model agreement required by MSA Exhibit O.

13.

The MSA and its Exhibit O do not establish a specific fee for any lawyer or firm; rather, the fees for the private legal team of each state would be fixed and established, after an adversarial proceeding, by an arbitration panel made up of one person chosen by the tobacco manufacturers, one person chosen by the attorneys, and a neutrally



selected Chairperson. This procedure was agreed to by all parties to the MSA, including the tobacco manufacturers.

14.

The arbitration panel for Louisiana Counsel included a retired federal judge, the immediate former head of the Federal Mediation and Conciliation Service, and a Washington, D.C. practicing attorney.

15.

In determining each fee award, Exhibit O to the MSA provides that the panel is bound by the American Bar Association's Code of Professional Responsibility.

16.

Under the procedure mandated by Exhibit O, each state's legal team presents the arbitration panel with evidence concerning the services rendered. In each proceeding, the tobacco manufacturers oppose the fee application and present evidence they believe warrants denying or minimizing the fee sought by the states' lawyers.

17.

In a two-day hearing before the arbitration panel in October of 1999, Louisiana Counsel presented its evidence to support their fee award, including video testimony from expert witnesses including three former Louisiana Supreme Court Justices, Revius O. Ortique, Jr., Luther Cole, and the late Pike Hall, Jr., who served as consultants to Louisiana Counsel regarding governmental, professional and legal ethics in connection with the MSA-related attorney fee payment mechanism.

18.

On January 31, 2000, the arbitration panel, by split decision, awarded Louisiana Counsel to receive, over time, approximately $575 million in attorneys fees which were to be paid by the tobacco manufacturers.

19.

No evidence exists that any state's private counsel, including Louisiana Counsel, was responsible for inclusion of the MSA's fee provisions. Nor is there evidence that the agreement to arbitrate fees reduced the states' monetary and non-monetary benefits. Moreover, no evidence has been received by the Board that the tobacco manufacturers would have paid more to the states without the MSA's fee provisions.



20.

On December 11, 1998, the Court, in the litigation styled *Richard Ieyoub in his capacity as Louisiana's Attorney General v. Phillip Morris, Inc., et al*, Case No. 98-6473, entered a Consent Decree and Judgment (the "Final Judgment") approving the MSA and ordering it put into effect in all respects insofar as it applied to the State and to Louisiana Counsel.

21.

In the Final Judgment, the Court held that "the persons signing the [Master Settlement] Agreement have full and complete authority to enter into the binding and fully effective settlement of the action as set forth in the Agreement."

22.

The Final Judgment provides that the Court found "entering into this settlement is in the best interests of the State of Louisiana."

23.

The Court further states in the Final Judgment its authority to supervise the implementation of the settlement by reserving "[j]urisdiction of this case . . . for the purposes of implementing and enforcing [the Master Settlement] Agreement and this Consent Decree and Final Judgment and enabling the continuing proceedings contemplated herein."

24.

The Final Judgment was not appealed and became final on or about February 22, 1999.

25.

Minutes of a January 22, 1997 meeting of the Senate Judiciary A Committee reflect that a hearing was held with respect to the tobacco litigation at which questions were asked by members of the Louisiana Legislature of Attorney General Ieyoub and one of the Louisiana Counsel. The responses to those questions indicated that the State would not be paying the attorneys' fees of Louisiana Counsel and, instead, they would be paid as provided for in the litigation.

26.

Through affidavits, then President of the Senate, Randy Ewing, and then Speaker of

the House, Hunt Downer, have described a meeting held in the State Capitol in February of 1999, attended by certain members of the Louisiana Legislature, where it was represented to all in attendance that the money to be received by the State would not be reduced in any amount to pay the attorneys' fees; instead, the fees were to be paid over and above the settlement amount by the tobacco manufacturers.

27.

The affidavit of Mr. Downer further described that not only were there no objections to this method and form of payment by the tobacco manufacturers but, that members of Louisiana Legislature present were appreciative of the fact that the State received such a large settlement and had to pay no legal fees.

28.

Consequently, it appears to the Board that the leadership and other members of the Louisiana Legislature apparently knew that the MSA provided for the direct payment of attorneys' fees to Louisiana Counsel by the tobacco manufacturers prior to its enactment of legislation approving the MSA and Final Judgment.

29.

Exhibit T to the MSA contains a model statute that was to be adopted by the settling states, for the stated reason of furthering the public interest in each state and to provide the citizens of the state some financial security if a non-settling tobacco manufacturer sells cigarettes in the state.

30.

Louisiana appears to have complied when the Legislature enacted Acts 1999, No. 721, enacting Part XIII of Chapter 32 of Title 13 of the Louisiana Revised Statutes, to be comprised of LSA-R.S. 13:5061 through 5063, relative to the requirements for non-settling tobacco manufacturers.

31.

Act No. 721 was approved by the House of Representatives on April 15, 1999 by a vote of 84-5. The Act was approved in the Senate on May 26, 1999 by a vote of 34-2. On June 20, 1999, a Conference Committee report was adopted by the House of Representatives by a vote of 94-3 and adopted by the Senate by a vote of 36-0. The Act was signed by the Governor on July 1, 1999.

32.

Act No. 721 requires those tobacco manufacturers who did not participate in the MSA, and who sell tobacco products in the State, to place certain funds in escrow to pay a portion of the State's financial burden imposed on the State by cigarette smoking. The Act also provides for the distribution of those funds and for related matters. The title of the Part comprising LSA-R.S. 13:5061-63 is "Master Settlement Agreement - Requirements for Tobacco Product Manufacturers".

33.

Thus, it appears to the Board that the Louisiana Legislature fulfilled part of the State's MSA obligation by enacting, almost verbatim, the model statute attached as Exhibit T to the MSA and, in so doing, these statutes expressly cite to the MSA and rely on definitions contained therein. *See* LSA-R.S. 13:5062 (1) & (5).

34.

Acts 1999, No. 1295, enacts Subpart E of Part II-A of Chapter 1 of Subtitle 1 of Title 39 of the Louisiana Revised Statutes, to be comprised of LSA-R.S. 39:98.1 through 98.6, and provides for disposition of the tobacco settlement proceeds. The Act does so by creating the Millennium Trust, Louisiana Fund and the Millennium Leverage Fund within the State Treasury. The Act also creates the Health Excellence Fund, the Education Excellence Fund and the TOPS Fund within the Millennium Trust. The Act further provides for deposit of monies into the various funds. Finally, the Act provides for the investment and uses of monies in the funds.

35.

Act No. 1295 was approved by the House of Representatives on May 25, 1999 by a vote of 91-8. The Act was approved by the Senate on June 15, 1999 by a vote of 34-1. On June 21, 1999, a Conference Committee was adopted by the House of Representatives by a vote of 90-8, and adopted by the Senate by a vote of 38-0. On July 12, 1999, the Act was signed by the Governor.

36.

The Subpart comprising LSA-R.S. 39:98.1 through 98.6 is entitled "Tobacco Settlement Proceeds" and each of these statutes are based on the State's tobacco litigation and, specifically, the MSA:

1. LSA-R.S. 39:98.1, Tobacco Settlement Proceeds - Creation of Funds

2. LSA-R.S. 39:98.2, Tobacco Settlement Proceeds - Investment of Millennium Trust

3. LSA-R.S. 39:98.3, Tobacco Settlement Proceeds - Appropriations for the Health Excellence Fund, the Education Excellence Fund and the TOPS Fund

4. LSA-R.S. 39:98.4, Tobacco Settlement Proceeds - Louisiana Fund

5. LSA-R.S. 39:98.5, Tobacco Settlement Proceeds - Millennium Leverage Fund

6. LSA-R.S. 39:98.6, Tobacco Settlement Proceeds - Louisiana Fund.

37.

LSA-R.S. 39:98.1, 98.4, 98.5, and 98.6 provide for the deposit, into the statutorily created funds, of:

> "certain monies received as a result of the Master Settlement Agreement, hereinafter the 'Settlement Agreement', executed November 23, 1998, and approved by Consent Decree and Final Judgment entered in the case 'Richard P. Ieyoub, Attorney General, ex rel. State of Louisiana v. Phillip Morris, Incorporated, et al.', bearing Number 98-6473 on the docket of the Fourteenth Judicial District Court for the parish of Calcasieu, state of Louisiana."

38.

The Governor of Louisiana signed the foregoing legislation.

39.

The Governor informed Attorney General Ieyoub by correspondence dated January 2, 1999 that:

"As we discussed in our recent meeting, you and your legal team have done a tremendous service to the state of Louisiana in achieving a settlement agreement which will provide much needed financial resources to our state. You and your legal team are to be complemented on your role in initiating and pursuing legal procedures which were critical to the successful resolution of the case.

I certainly agree that your efforts should be recognized as significant contributions to the litigation and settlement and that, because of your work, the state of Louisiana should be recognized as deserving a significant share of the Strategic Contribution Fund."

## II.

## APPLICABLE LAW

Section 1111A(1) of the Code provides in pertinent part as follows:

No public servant shall receive anything of economic value, other than compensation and benefits from the governmental entity to which he is duly entitled, for the performance of the duties and responsibilities of his office or position . . .

## III.

## OPINION

The issue in the present case is whether the receipt by respondents of payments from the tobacco manufacturers violated Section 1111A(1).[1]  The Board finds no evidence of an actual conflict of interest or corruption in this case but believes that Section 1111A(1) applies regardless of whether an actual conflict of interest was present and irrespective of whether the state benefitted from the actions of the respondents.

---

[1] The Board acknowledges that Louisiana Counsel (a) deny that they were acting as public servants subject to the provisions of the Code and that this Board has jurisdiction over them, instead maintaining that they were private attorneys acting as independent contractors to the State, and (b) deny that they violated the Code or that the conduct described in this Consent Opinion implicates Section 1111A(1) of the Code.  Regardless, Louisiana Counsel have agreed to enter into this Consent Opinion for the purpose of amicably settling this dispute without the need for administrative and/or judicial action, thereby obviating the need to adjudicate the matter.

The Board recognizes that the mechanism for payment of legal fees to Louisiana Counsel was developed as a part of the nationwide MSA and was not subject to Louisiana Counsel's control. The MSA resulted in Louisiana's eligibility to receive $4.6 billion from the tobacco manufacturers, a result the Board believes was advanced by the efforts of the Louisiana Counsel.[2]

The Board also finds significant that Louisiana's participation in the MSA was supported by the Attorney General, the Governor, and the then legislative leadership. In fact, the contract between the Attorney General and Louisiana Counsel specifically provided that the State had no obligation to pay attorneys' fees, clearly anticipating such fees would be paid by a third party. Further, a final judgment in the 14th Judicial District Court approves the MSA settlement, including the direction that legal fees be borne by the tobacco manufacturers.

Nevertheless, the Board concludes Section 1111A(1) applies. The Section manifests the legislative proscription against the receipt of value, other than from a governmental entity, for governmental services. Accordingly, it is the opinion and conclusion of the Board that Louisiana Counsel, as listed below, violated Section 1111A(1) of the Code by receiving from the tobacco manufacturers payment for services rendered on behalf of the State of Louisiana in the tobacco litigation. The Board reaches this conclusion notwithstanding the absence of any evidence suggesting the violation was intentional.

Section 1111A(1) prohibits the receipt of any thing of economic value other than from a governmental entity for the performance of the public employee's responsibilities. In the present case, Louisiana Counsel were engaged to represent the interests of the State of Louisiana in the tobacco litigation. The attorneys' fees received and to be received by Louisiana Counsel were ordered by the arbitration panel, pursuant to the State's settlement with the tobacco companies, to be paid as a result of such representation. Section 1111A(1) prohibits Louisiana Counsel from receiving such fees other than from a governmental entity, notwithstanding the fact that the representation agreement provided that the State would not be responsible for the payment of attorneys' fees.[3]

---

[2] This opinion in no way attempts to challenge or address the validity of the MSA.

[3] Section 1117 of the Code contains a prohibition against making payments to a public servant that the Code prohibits the public servant from receiving. However, given the involuntary nature of the payments, the Board declines to consider or take any enforcement action as to the tobacco manufacturers. The Board specifically considers all Code-related issues regarding the fees paid to Louisiana Counsel by the tobacco manufacturers closed as to all persons and entities.

Sections 1153 through 1155 of the Code set out sanctions to be applied when violations of the Code occur.

[4]Given the totality of the circumstances here, particularly the successful results achieved for the State and the apparent acceptance of the method of payment by the Attorney General, a district court, and the then legislative leadership, the Board concludes that a payment of $650,000 to the State Treasurer by Louisiana Counsel would appropriately redress these violations of the operational provision of the Code.

---

[4] Section 1155 prescribes penalties for "illegal gain" and provides that if an investigation reveals that a public servant has violated the Code to his economic advantage, the Board may order additional civil penalties equal to one and a half times the amount of such economic advantage. The Board is of the opinion that Louisiana Counsel did not violate Section 1111A(1) to their economic advantage. There was no "illegal gain" in this case. An arbitration panel concluded that Louisiana Counsel performed the services for which they were paid. Further, the Governor, Attorney General, and the then leadership of the Legislature of Louisiana were all aware of the fee payment mechanism contained in the MSA and did not object to such payment. It is the opinion and conclusion of the Board that punishing the respondents for receiving awarded fees, or precluding respondents from continuing to receive and retain awarded fees, would not advance any legitimate governmental interest, particularly since such fees cannot revert to the State and, to the contrary, an attack on the efficacy of the payment of the attorneys' fees could put at risk the validity of the entire MSA and undermine Louisiana's ability to participate in that agreement.

## IV.

### DECREE AND ORDER

For the foregoing reasons:

**IT IS ORDERED AND DECREED** that the Board finds that the receipt of compensation from the tobacco manufacturers for the provision of services on behalf of the State of Louisiana in the tobacco litigation, while authorized and directed by other governmental agencies and officials, nevertheless results in a violation of Section 1111A(1) of the Code of Governmental Ethics by Badon & Ranier; Andry and Andry; Baggett, McCall & Burgess; Bencomo & Associates; Carter & Cates; Delphin & Simien, L.L.C.; Domengeaux, Wright, Roy & Edwards; Paul H. Dué; Herman, Herman, Katz & Cotlar, L.L.P.; Kelly, Townsend & Thomas; Leger & Mestayer; McKernan Law Firm; and St. Martin & Williams;

**IT IS FURTHER ORDERED AND DECREED** that Badon & Ranier; Andry and Andry; Baggett, McCall & Burgess; Bencomo & Associates; Carter & Cates; Delphin & Simien, L.L.C.; Domengeaux, Wright, Roy & Edwards; Paul H. Dué; Herman, Herman, Katz & Cotlar, L.L.P.; Kelly, Townsend & Thomas; Leger & Mestayer; McKernan Law Firm; and St. Martin & Williams be and they are hereby ordered to pay to the State Treasurer of Louisiana the aggregate sum of $650,000.

By Order of the Board this 17th day of May , 2001.

| | |
|---|---|
| s/Robert L. Roland | s/T.O. Perry, Jr. |
| Robert L. Roland, Chairman | T. O. Perry, Jr., Vice-Chairman |
| | |
| s/E. L. Guidry, Jr. | Did not participate |
| Judge E. L. Guidry, Jr. | Billy J. Guin, Jr. |
| | |
| Abstained | s/Virgil Orr |
| Joseph Maselli | Dr. Virgil Orr |
| | |
| Did not participate | s/Hank Perret |
| Justice Revius O. Ortique, Jr. | Henry C. Perret, Jr. |
| | |
| Did not participate in adoption of opinion | Did not participate in adoption of opinion |
| Ronald L. Sawyer | Edwin O. Ware |
| | |
| Did not participate in adoption of opinion | |
| Rev. Carole Cotton Winn | |

# CONSENT

The undersigned duly authorized agents for their respective law firms (a) stipulate to the findings of fact found by the Board in this Consent Opinion without concurring in the conclusions of law issued therein; (b) waive the procedural requirements contained in Section 1141 of the Code; (c) consent to the publication of this Consent Opinion; (d) agree to comply with the conditions and orders set forth in this Consent Opinion for the purpose of amicably resolving this matter; and (e) agree not to seek direct judicial review of the findings and actions taken in this Consent Opinion with the agreement that this Board will likewise not seek judicial review.


By: s/Drew Ranier
Badon & Ranier

By: s/Jonathan Andry
Andry & Andry

By: s/W. B. Baggett
Baggett, McCall & Burgess

By: s/Paul Bencomo
Bencomo & Associates

By: s/Kenneth M. Carter
Carter & Cates

By: s/Eulis Simien
Delphin & Simien

By: s/Bob Wright
Domengeaux, Wright, Roy & Edwards

By: s/Paul H. Due'
Paul H. Dué

By: s/Russ Herman
Herman, Herman, Katz & Cotlar

By: s/Donald G. Kelly
Kelly, Townsend & Thomas

By: s/Franklin G. Shaw
Leger & Mestayer

By: s/J. J. McKernan
McKernan Law Firm

By: s/Conrad S. P. Williams
St. Martin & Williams