Westlaw.

1985 WL 669416                                                    Page 1
1985 WL 669416 (U.S.)


For opinion see 106 S.Ct. 3116

<<Material appearing in DIGEST section, including Topic and Key Number
classifications, Copyright 2007 West Publishing Company>>

Supreme Court of the United States.
United States of America, petitioner,
v.
Charlotte JAMES.
United States of America, petitioner,
v.
Kathy BUTLER, Individually and as Surviving wife and Heir of Eddy Butler.
United States of America, petitioner,
v.
Susan B. CLARDY, Individually and as Natural Tutrix of the Minors, Bridget
Marie Clardy and Kenneth Clardy.
**No. 85-434.**
October Term, 1985.
ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

Brief for the United States
Charles Fried, Solicitor General, Richard K. Willard, Assistant Attorney General,
Kenneth S. Geller, Deputy Solicitor General, Andrew J. Pincus, Assistant to the Solicitor
General, Department of Justice, Washington, D.C. 20530, (202) 633-2217.

**\*I QUESTION PRESENTED**
Whether 33 U.S.C. 702c, which provides that "[n]o liability of any kind shall attach
to or rest upon the United States for any damage from or by floods or flood waters at
any place," bars respondents from recovering damages under the Federal Tort Claims Act
for injuries allegedly caused by the release of flood waters from federal flood control
projects.

**\*III TABLE OF CONTENTS**

Opinions below ... 1

Jurisdiction ... 2

Statute involved ... 2

Statement ... 2

Summary of argument ... 8

Argument:

33 U.S.C. 702c immunizes the United States from liability for any damage resulting from
the release of flood waters from a federal flood control project ... 11

A. Section 702c's plain language unambiguously bars liability for all damage caused
by the release of flood waters ... 12

B. The legislative history confirms that Section 702c should be interpreted in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669416                                                      Page 2
1985 WL 669416 (U.S.)

accordance with its plain meaning ... 19

  C. Even if this Court concludes that the legislative history of Section 702c is
ambiguous, it should construe Section 702c in accordance with settled, long standing
judicial interpretation ... 32

Conclusion ... 35

TABLE OF AUTHORITIES

Cases:

Aetna Insurance Co. v. United States, 628 F.2d 1201, cert. denied, 450 U.S. 1025 ...
14, 19

American Bank & Trust Co. v. Dallas County, 463 U.S. 855 ... 29

American Stevedores, Inc. v. Porello, 330 U.S. 446 ... 15

American Tobacco Co. v. Patterson, 456 U.S. 63 ... 13, 29

Blau v. Lehman, 368 U.S. 403 ... 33

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 ... 33

Burlison v. United States, 627 F.2d 119, cert. denied, 450 U.S. 1030 ... 14

Callaway v. United States, 568 F.2d 684 ... 14, 25

Central Trust Co. v. Official Creditors' Committee of Geiger Enterprises, Inc., 454
U.S. 354 ... 10, 18, 32

*IV  Clark v. United States, 218 F.2d 446 ... 14

CPSC v. GTE Sylvania, Inc., 447 U.S. 102 ... 18

Dalehite v. United States, 346 U.S. 15 ... 28

Dickerson v. New Banner Institute, Inc., 460 U.S. 103 ... 18

Escondido Mutual Waters Co. v. La Jolla Band, No. 82-2056 (May 15, 1984) ... 18

Flood v. Kuhn, 407 U.S. 258 ... 33

Florida East Cost Ry. v. United States, 519 F.2d 1184 ... 14

Graci v. United States, 456 F.2d 20 ... 12, 25

Griffin v. Oceanic Contractors, Inc., 458 U.S. 564 ... 18

Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186 ... 10, 33

Harrison v. PPG Industries, Inc., 446 U.S. 578 ... 13

Hayes v. United States, 585 F.2d 701 ... 12

Jackson v. United States, 230 U.S. 1 ... 20

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Kosak v. United States, 465 U.S. 848 ... 13

Laird v. Nelms, 406 U.S. 797 ... 30

Lenoir v. Porters Creek Watershed District, 586 F.2d 1081 ... 14, 19

McClaskey v. United States, 386 F.2d 807 ... 14

Missouri v. Ross, 299 U.S. 72 ... 33

Morici Corp. v. United States, 681 F.2d 645 ... 12, 13

National Manufacturing Co. v. United States, 210 F.2d 263, cert. denied,   347 U.S. 967
... 12, 14, 19, 24

Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669 ... 29

Parks v. United States, 370 F.2d 92 ... 14

Perrin v. United States, 444 U.S. 37 ... 9, 17

Peterson v. United States, 367 F.2d 271 ... 12, 25

Pierce v. United States, 650 F.2d 202 ... 14

Portis v. Folk Construction Co., 694 F.2d 520 ... 13

Richards v. United States, 369 U.S. 1 ... 17

Rothschild v. United States, 179 U.S. 463 ... 14

Rubin v. United States, 449 U.S. 424 ... 18

Shea v. Vialpando, 416 U.S. 251 ... 13

Stover v. United States, 332 F.2d 204, cert. denied, 379 U.S. 922 ... 14

Taylor v. United States, 590 F.2d 263 ... 14

TVA v. Hill, 437 U.S. 153 ... 9, 15, 18

United States v. Rosenwasser, 323 U.S. 360 ... 13

United States v. Sponenbarger, 308 U.S. 256 ... 19, 20, 21-22

**\*V** Constitution and statutes:

U.S. Const. Amend. V. ... 17

Act of May 15, 1928, ch. 569, 45 Stat. 534 et seq.:

  § 1, 45 Stat. 534-535 (33 U.S.C. 702a) ... 22

  § 2, 45 Stat. 535 (33 U.S.C. 702b) ... 23

  § 3, 45 Stat. 535 (33 U.S.C. 702c) ... passim

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669416
1985 WL 669416 (U.S.)                                            Page 4

§ 4, 45 Stat. 536 (33 U.S.C. 702d) ... 27

Clayton Act § 2(a), 15 U.S.C. 13(a) ... 33

Federal Torts Claims Act:

  28 U.S.C. 1346(b) ... 3

  28 U.S.C. 2671 et seq ... 3

  28 U.S.C. 2680(f) ... 25

  28 U.S.C. 2680(j) ... 25

Flood Control Act of 1936, 33 U.S.C. 701 et seq.:

  33 U.S.C. 702a-4 ... 19

  33 U.S.C. 702a-6 ... 19

Flood Control Act of 1946, ch. 596, 60 Stat. 647 ... 19

Miscellaneous:

Black's Law Dictionary (5th ed. 1979) ... 15

Bureau of the Census, U.S. Dep't of Commerce, Historical Statistics of the United States. Colonial Times to 1970 Pt. 2 (1975) ... 22

Bureau of the Census, U.S. Dep't of Commerce, Statistical Abstract of the United States 1985 (105th ed. 1985) ... 22

69 Cong. Rec. (1928):

p. 5485 ... 22

pp. 5494-5495 ... 21

p. 6641 ... 24

pp. 6642-6643 ... 21

p. 6644 ... 22

p. 6645 ... 21

p. 6649 ... 21

p. 6651 ... 21

p. 6652 ... 22

p. 6654 ... 21

p. 6656 ... 27

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 2, p. 37

1985 WL 669416
1985 WL 669416 (U.S.)

p. 6657 ... 27

p. 6659 ... 27

**\*VI**   p. 6669-6670 ... 21

pp. 6706-6709 ... 21

p. 6709 ... 21

p. 6712 ... 27

p. 6718 ... 27

pp. 6724-6725 ... 21

pp. 6999-7000 ... 23

p. 7022 ... 28

pp. 7022-7023 ... 26

p. 7023 ... 28

p. 7028 ... 23, 24

p. 7030 ... 26-27

p. 7126 ... 23

p. 7130-7132 ... 21

p. 8119 ... 16

p. 8121 ... 27

p. 8182 ... 22

p. 8187 ... 16, 22

pp. 8190-8191 ... 21

p. 8194 ... 22

H.R. 9285, 70th Cong., 1st Sess. (1928) ... 25

H.R. 17168, 71st Cong., 3d Sess. (1931) ... 25

H.R. Rep. 1072, 70th Cong., 1st Sess. (1928) ... 19, 20, 22, 23, 27

H.R. Rep. 1100, 70th Cong., 1st Sess. (1928) ... 20, 22

S. 4567, 72d Cong., 1st Sess. (1932) ... 25

S. Rep. 619, 70th Cong., 1st Sess. (1928) ... 20, 22

T. Sedgwick, A Treatise on the Measure of Damages, (9th ed. 1912) ... 15

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669416
1985 WL 669416 (U.S.)                                                    Page 6


J. Sutherland, A Treatise on the Law of Damages (Berryman 4th ed. 1916) ... 15

Webster's Third New International Dictionary (4th ed. 1976) ... 13, 15, 17

### *1 OPINIONS BELOW
The opinion of the en banc court of appeals (Pet. App. 1a-38a) is reported at  760 F.2d
590. The opinion of the court of appeals panel (Pet. App. 39a-58a) is reported at 740
F.2d 365. The opinions of the district courts (Pet. App. 59a-65a, 66a-76a) are unreported.

### *2 JURISDICTION
The judgments of the en banc court of appeals (Pet. App. 77a-80a) were entered on May
16, 1985. On August 6, 1985, Justice White extended the time for filing a petition for
a writ of certiorari to and including September 13, 1985. The petition was filed on that
date and was granted on November 12, 1985. The jurisdiction of this Court rests upon
28 U.S.C. 1254(1).

### STATUTE INVOLVED
33 U.S.C. 702c provides in pertinent part:
No liability of any kind shall attach to or rest upon the United States for any damage
from or by floods or flood waters at any place: Provided, however, That if in carrying
out the purposes of sections 702a, 702b to 702d, 702e to 702g, 702h, 702i, 702j, 702k,
702l, 702m, and 704 of this title it shall be found that upon any stretch of the banks
of the Mississippi River it is impracticable to construct levees, either because such
construction is not economically justified or because such construction would
unreasonably restrict the flood channel, and lands in such stretch of the river are
subjected to overflow and damage which are not overflowed or damaged by reason of the
construction of levees on the opposite banks of the river it shall be the duty of the
Secretary of the Army and the Chief of Engineers to institute proceedings on behalf of
the United States Government to acquire either the absolute ownership of the lands so
subjected to overflow and damage or floodage rights over such lands.

### STATEMENT
1. a. The Millwood dam and reservoir, a federal project located in the State of Arkansas,
is operated by the Army Corps of Engineers. One of the purposes of the *3 project is
the control of flood waters. Pet. App. 67a, 75a. On June 8, 1979, the reservoir's water
level was at "flood stage" (id. at 68a). The project "was in flood control status, and
water was being discharged [from the reservoir] through the tainter gates of the dam
structure at the rate of approximately 24,000 cubic feet per second. The water being
discharged had been previously entrapped as part of the flood control function of the
facility" (id. at 67a-68a).

Respondents Charlotte James and Kathy Butler were water skiing on the Millwood reservoir
on June 8, 1979. The current created by the discharge of water from the reservoir drew
respondents and the boat containing their companions toward the dam. Respondents were
pulled through the dam's gates; respondent Butler's husband drowned attempting to assist
his wife. The boat became lodged in the gates and its remaining passengers were rescued.
Pet. App. 68a.

Respondents James and Butler filed separate actions in the United States District Court
for the Eastern District of Texas seeking damages under the Federal Tort Claims Act,
28 U.S.C. 1346(b), 2671 et seq. The district court found that the government had violated
the duty of care imposed by Arkansas law by "willful[ly] and malicious[ly]" failing to
warn respondents of the danger from the current created by the discharge of water through
the dam. Pet. App. 70a-72a. The court stated that buoys normally were placed in the
reservoir to mark the area of strong current but that government employees were aware
that the buoys were not in place on June 8 (id. at 68a-69a). The court determined that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669416
1985 WL 669416 (U.S.)

respondents suffered damage in the amounts of $1 million for Kathy Butler and $40,000 for Charlotte James (id. at 70a).

The district court nonetheless entered judgment in favor of the United States on the ground that the government was immune from liability under 33 U.S.C. 702c, which *4 provides in pertinent part that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place" (see Pet. App. 67a, 72a). The court found that the Millwood dam's tainter gates had been opened for flood control purposes and that respondents' injuries therefore were caused by "flood control waters" (id. at 67a-68a, 72a).

b. The Courtableau Drainage Structure, a flood control project located in the State of Louisiana, is operated by the Army Corps of Engineers. The structure contains gates that can be opened to divert water through the West Atchafalaya Basin Protection Levee in order to prevent the water level of the Bayou Courtableau from rising higher than the levee. Pet. App. 61a, 63a. On May 17, 1980, the structure's gates were opened because the water level "'would have caused flood conditions and flooding landside of the levee if the gates of the Courtableau Drainage structure had not been opened'" (id. at 61a (citation omitted)). Kenneth Clardy and his father, Joseph Clardy, were fishing in the Bayou Courtableau on May 17, 1980. Their boat was caught in the current created by the open drainage gates, the boat overturned, and Kenneth Clardy drowned. Id. at 4a. [FN1]

> FN1. The district court opinion erroneously identifies Joseph Clardy as the decedent (Pet. App. 60a-61a).

Respondent Susan B. Clardy, Kenneth Clardy's wife, commenced an action in the United States District Court for the Western District of Louisiana seeking damages under the Federal Tort Claims Act. She alleged that the Corps of Engineers failed to post adequate warnings of the danger from the current caused by the open gates. The district court granted summary judgment for the government, holding that the government was immune from liability under 33 U.S.C. 702c (see Pet. App. 59a-61a). The court found that the drainage structure's gates had been opened in order to prevent flooding and that excess waters that create the potential for flooding are "flood *5 waters" within the meaning of Section 702c. It concluded that Section 702c immunized the government from liability for damage caused by the release of such waters (Pet. App. 62a).

2. The cases were consolidated on appeal and the court of appeals panel affirmed (Pet. App. 39a-58a). The panel observed that Section 702c consistently had been interpreted to bar the imposition of liability upon the government for damage related to flood control projects (Pet. App. 42a-47a), and stated that this interpretation of the statute presented an "insurmountable" barrier to respondents' claims because their injuries plainly were related to flood control projects (id. at 47a-48a).

Despite the "floodtide of authority" supporting this result and "the sometimes-heard argument that Congress has signaled its agreement with [this] statutory construction by leaving the statute unchanged," the panel expressed its view that previous courts had erred in interpreting Section 702c to bar damages claims similar to respondents' claims in these cases (Pet. App. 49a). Relying upon its interpretation of Section 702c's legislative history, the panel concluded that the provision was intended by Congress to disclaim only "liability for 'takings' and not liability for consequential damages" (Pet. App. 55a). In the panel's view, therefore, "the Federal Tort Claims Act should subject the United States to tort claims for flood control projects 'in the same manner and to the same extent as a private individual under like circumstances'" (id. at 56a (citation omitted)). The panel affirmed the district courts' judgments in favor of the government because it was bound to apply the broader interpretation of Section 702c previously adopted by panels of the Fifth Circuit (Pet. App. 57a).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669416                                                             Page 8
1985 WL 669416 (U.S.)

3. The full court of appeals ordered rehearing of the cases en banc and reversed the
district courts' judgments by a divided vote (Pet. App. 1a-38a). The majority concluded
**6** that the language of Section 702c contained "latent ambiguities" necessitating
reference to the legislative history in order to ascertain the scope of Section 702c
(Pet. App. 5a).

The en banc court's analysis of Section 702c's legislative history differed somewhat
from the result reached by the panel (see Pet. App. 11a-20a). The court stated that in
enacting the Flood Control Act of 1928, which contained Section 702c, "Congress was
concerned with allocating the costs of a major public works program between the federal
government and the state and local interests, both public and private" (Pet. App. 12a).
It concluded that Congress intended Section 702c to immunize the federal government from
liability for damage resulting directly from construction of flood control projects and
from liability for flooding caused by factors beyond the government's control (Pet. App.
8a, 17a-20a), but that it was "doubtful that Congress intended to shield the negligent
or wrongful acts of government employees -- either in the construction or in the continued
operation" of flood control projects (id. at 18a-19a).

Turning to prior judicial interpretations of Section 702c, the en banc court rejected
the unanimous conclusion of other courts of appeals that Section 702c confers immunity
from liability for all damage resulting from flood control efforts (Pet. App. 21a-27a).
The court concluded that "the limitations on the immunity should be elaborated more
particularly" (id. at 27a). It stated (id. at 27a-28a):
   The government is not liable for any fault of its employees in controlling floodgates
or managing lands to contain, prevent, or manage floods or floodwaters. This immunity,
however, does not extend to the fault of government employees in failing to warn the
public of the existence of hazards to their accepted use of government-impounded water,
or nearby land.
   **7** Thus, "[i]f a producing cause of the damage or injury is a government employee's
negligence in omissions or commissions that diverge from acts strictly for the purpose
of controlling floods or floodwaters, and the presence or movement of water for flood
control purposes merely furnishes a condition of the accident, there is no section 702c
immunity" (id. at 28a).

The en banc court held that this standard required reversal of the district courts'
judgments in these cases. It stated that the claims asserted by respondents James and
Butler were based upon injuries resulting from the government's failure adequately to
warn of the danger of the current in the reservoir. The court concluded that Section
702c did not bar these claims, apparently because it viewed the breach of a duty to warn
recreational users of a danger arising from the discharge of flood waters as an omission
that "diverge[d]" from the government's flood control responsibilities. Pet. App.
28a-29a. The court remanded the action for entry of a judgment consistent with its opinion
(id. at 30a). With respect to respondent Clardy, the court remanded to allow the
development of facts concerning the adequacy of the warning of the danger resulting from
the discharge of flood waters (id. at 29a).

Six judges dissented. Judge Gee, writing for himself and Judges Garwood, Jolly, Davis
and Hill, stated that the majority's decision was contrary to the "the statute's plain
words and, insofar as I can understand the holding, simply brushes them aside and
substitutes for them the court's notion of good policy" (Pet. App. 32a). Judge Gee
"disagreed with [the majority's] massive judicial recasting of Congressional intent,"
observing that "[b]oth the language of § 702c and the legislative history" showed that
Congress intended to limit the government's total financial exposure as a result of a
flood control program of "unprecedented scope and laden with foreseeable and
unforeseeable prospects of liability" (id. at 34a-35a). He **8** noted that this was the
unanimous view of previous appellate decisions construing Section 702c and that this
"construction has stood for three decades without any sign of Congressional

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669416                                                    Page 9
1985 WL 669416 (U.S.)

dissatisfaction" (Pet. App. 36a). Judge Gee concluded that respondents' claims were barred under this interpretation of the statute. Id. at 34a-36a.

  Judge Higginbotham filed a separate dissenting opinion. He stated that "[w]ithout clear evidence of what Congress meant to do in 1928 [when Section 702c was enacted], I would defer to the longstanding and unanimous construction placed on § 702c by this and other courts -- a construction which has given specific and unambiguous content to the clause. The majority has not made the case for turning about at this date, regardless of any ambiguity of § 702c as an original proposition" (Pet. App. 38a).

                          SUMMARY OF ARGUMENT
  This case concerns the scope of the government's immunity from liability for damage resulting from the release of flood waters from a federal flood control project. Congress specifically addressed this question in 1928 when it first determined that the federal government should assume complete responsibility for efforts to control flooding by the Nation's rivers. The statute initiating this public works program contained an express, comprehensive affirmation of the government's sovereign immunity: "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place" (33 U.S.C. 702c).

  Section 702c clearly establishes a sweeping rule of immunity from damages liability. Congress's consistent use of the term "any," referring to "liability of any kind" and "any damage" (emphasis added), demonstrates beyond a doubt that Section 702c confers all-encompassing immunity from liability in the flood control context. An exception *9 to this broad rule could be created only by "ignor[ing] the ordinary meaning of plain language." TVA v. Hill, 437 U.S. 153, 173 (1978). Indeed, every appellate court to construe Section 702c other than the court below has recognized this fact, holding that the provision is an absolute bar to the imposition of liability for damage relating to a flood control project.

  The court of appeals stated that the statute could not be interpreted according to its plain meaning because Section 702c contains "latent ambiguities" (Pet. App. 5a). However, there is no basis for finding ambiguity in the clear command of this statute. The court of appeals itself created the purported ambiguities by failing to follow the "fundamental canon of statutory construction * * * that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42 (1979). When this rule of construction is applied to Section 702c, it is clear that the statute unambiguously bars respondents' attempt to impose liability upon the United States for damage incurred as the result of the release of water from a flood control project.

  Moreover, the legislative history of Section 702c confirms that Congress intended to confer comprehensive immunity from liability when it enacted the provision. The statute that included Section 702c was passed in response to the disastrous Mississippi River flood of 1927. Congress decided that a comprehensive federal flood control program was the only effective way to eliminate the threat posed by flood waters. In view of the large expense involved in this public works project -- and the vast harm that potentially could be caused by flood waters -- Congress limited the federal government's financial exposure, making clear that the government assumed responsibility only for the direct costs of constructing the flood control structures and not for any damage caused by *10 flood waters. Section 702c thus is an express affirmation of Congress's decision to limit the government's monetary liability in connection with the flood control program. This policy judgment mandates construing Section 702c to immunize the government from tort liability for damage caused by the release of flood waters, such as the damage for which respondents seek recovery here.

  The restrictive interpretation of Section 702c adopted by the court of appeals is not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

supported by either the language of the statute or the legislative history. It rests solely upon the court's judgment that it is appropriate to impose liability upon the United States in this context. However, Congress determined that the federal government would embark upon the flood control program only if the federal treasury was not thereby required to provide compensation for damage caused by flood waters. The court of appeals plainly erred by relying upon its own policy judgment to "justify its disregard of a clear congressional directive." Central Trust Co. v. Official Creditors' Committee of Geiger Enterprises, Inc., 454 U.S. 354, 359 (1982) (per curiam).

Even if the legislative history of Section 702c were ambiguous regarding the application of the statute in the circumstances presented in this case, the court of appeals erred by rejecting the settled, unanimous construction of the provision. This Court several times has approved an interpretation of a statute supported by "long-standing [judicial] interpretation and * * * continued congressional silence." Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 200-201 (1974). Since the courts of appeals for over 30 years have agreed upon the proper interpretation of Section 702c, "[t]he task of changing such a settled construction should now be left to Congress." Pet. App. 38a (Higginbotham, J., dissenting).

                              **11** ARGUMENT
     33 U.S.C. 702c IMMUNIZES THE UNITED STATES FROM LIABILITY FOR ANY DAMAGE
   RESULTING FROM THE RELEASE OF FLOOD WATERS FROM A FEDERAL FLOOD CONTROL PROJECT
     Floods are among the most dangerous forces found in nature. Virtually uncontrollable when unleashed, they can inflict tremendous damage upon both people and property, and have resulted in many tragic chapters in our Nation's history. Congress was well aware of the great danger posed by floods when it determined in 1928 that only a comprehensive plan implemented by the federal government could tame the flood waters that long had plagued the Mississippi River Valley. Congress therefore made clear that its decision to embark upon this vast public works project did not mean that the federal government would provide compensation for damage caused by flood waters. The statute establishing the flood control program included 33 U.S.C. 702c--a comprehensive affirmation of the government's immunity from liability for damage caused by flood waters. The plain language of Section 702c, and Congress's underlying purpose, are so clearly directed toward this goal that prior to the decision below every appellate court to address the question had construed Section 702c as conferring complete immunity upon the United States for all damage caused by the release of flood waters from a federal flood control project.

     The court below rejected the plain language, legislative history, and settled judicial interpretation of Section 702c and held the federal government liable for damage resulting from releases of flood waters from federal flood control projects. It reached this unprecedented result even though the district court in each case found that the release of water from the project was a flood control measure. As **12** one of the dissenting judges below observed, the decision simply "substitutes for [the statute's plain words] the court's notions of good policy" (Pet. App. 32a (Gee, J., dissenting)). Congress's policy determination must prevail, however, and Section 702c therefore should be interpreted to bar respondents' claims. [FN2]

     FN2. Section 702c was enacted as part of the statute establishing the federal flood control program, but the provision is not by its terms restricted to damage relating in some way to a federal flood control project. Some courts have stated that Section 702c does not apply when damage is caused by an act that is "wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization." Peterson v. United States, 367 F.2d 271, 275 (9th Cir. 1966); see also Morici Corp. v. United States, 681 F.2d 645, 647-648 (9th Cir. 1982); Hayes v. United States, 585 F.2d 701, 702-703 (4th Cir. 1978); Graci v. United States, 456 F.2d 20, 26-27 (5th Cir. 1971). In

          ©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Peterson, for example, the court held that Section 702c did not confer immunity from liability because the plaintiff's claim was based upon a flood that resulted from the dynamiting of an ice jam by government employees. Other courts have interpreted the provision more broadly. National Manufacturing Co. v. United States, 210 F.2d 263 (8th Cir.), cert. denied, 347 U.S. 967 (1954). This case does not present an occasion for resolving this issue concerning the scope of Section 702c because the damage for which respondents seek compensation plainly resulted from the operation of federal flood control projects. Thus, the government would be immune from liability even under the narrower interpretation of Section 702c adopted by some courts of appeals.

A. Section 702c's Plain Language Unambiguously Bars Liability For All Damage Caused By The Release Of Flood Waters

Section 702c sets forth a comprehensive rule of immunity: "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." In analyzing the effect of this provision, "[t]he starting point * * * must, of course, be the language of [the statute]. '[W]e assume "that the legislative **13 purpose is expressed by the ordinary meaning of the words used.""' Kosak v. United States, 465 U.S. 848, 853 (1984) (quilting American Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982)).

The scope of Section 702c could not be broader; Congress utilized all-encompassing phrases such as "liability of any kind," "any damage," and "any place" (emphasis added). The term "any" generally means a thing "selected without restriction or limitation of choice"; when used as a modifier as in Section 702c "any" indicates "the maximum or whole of a number or quantity" (Webster's Third New International Dictionary 97 (4th ed. 1976)). Thus, Congress's references to "any" kind of liability for "any" damage at "any" place must mean that Section 702c confers upon the United States blanket immunity from damages liability in the flood control context. See Harrison v. PPG Industries, Inc., 446 U.S. 578, 588-589 (1980); Shea v. Vialpando, 416 U.S. 251, 260 (1974); United States v. Rosenwasser, 323 U.S. 360, 363 (1945). Indeed, as Judge Gee demonstrated in his dissenting opinion (Pet. App. 31a-32a), any attempt to make the provision more comprehensive would "serve [] small purpose beyond making the enactment read like an insurance company's form general release rather than a statute."

In view of the statute's clear directive, it is not surprising that every court of appeals other than the court below has interpreted Section 702c's broad language to bar the imposition of tort liability upon the United States for all damage resulting from flood control activities. See, e.g., Portis v. Folk Construction Co., 694 F.2d 520, 522 (8th Cir. 1982) (Section 702c "assure[[s] the government of absolute immunity for [damage caused by flooding related to] flood control projects"); Morici Corp. v. United States, 681 F.2d 645, 647 (9th Cir. 1982) ("if [the **14 plaintiff's] injury resulted from the operation of [a] federal project for flood control purposes, government immunity is complete"); Callaway v. United States, 568 F.2d 684, 687 (10th Cir. 1978) (rejecting arguments that Section 702c did not apply to flood damage resulting from the operation of a flood control project in view of "broad and emphatic language of § 702c"); Parks v. United States, 370 F.2d 92, 93 (2d Cir. 1966) (same); National Manufacturing Co. v. United States, 210 F.2d 263 (8th Cir.), cert. denied, 347 U.S. 967 (1954). [FN3] Prior to the en banc court's decision in this case, the Fifth Circuit also adhered to this view. See Florida East Coast Ry. v. United States, 519 F.2d 1184, 1192 (5th Cir. 1975) (footnote and citation omitted) (Section 702c grants immunity from liability for damage resulting from flood waters in "the broadest and most emphatic language").

FN3. See also Pierce v. United States, 650 F.2d 202 (9th Cir. 1981); Aetna Insurance Co. v. United States, 628 F.2d 1201 (9th Cir. 1980), cert. denied, 450 U.S. 1025 (1981); Burlison v. United States, 627 F.2d 119 (8th Cir. 1980), cert. denied,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

450 U.S. 1030 (1981); Taylor v. United States, 590 F.2d 263 (8th Cir. 1979); Lenoir v. Porters Creek Watershed District, 586 F.2d 1081 (6th Cir. 1978); McClaskey v. United States, 386 F.2d 807 (9th Cir. 1967); Stover v. United States, 332 F.2d 204 (9th Cir.), cert. denied, 379 U.S. 922 (1964); Clark v. United States, 218 F.2d 446 (9th Cir. 1954).

The court of appeals' contrary decision rests in large part upon its conclusion that Section 702c contains "latent ambiguities" (Pet. App. 5a). Given the plain language of Section 702c, however, "it requires some ingenuity to create ambiguity." Rothschild v. United States, 179 U.S. 463, 465 (1900). The discovery of "ambiguities" undetected by any of the other appellate courts that have construed Section 702c appears to be a product of the court of appeals' eagerness to adopt a narrow construction of the statute rather than the result of an objective evaluation of the statute's terms. See Pet. App. 32a (Gee, J., dissenting); *15 cf. TVA v. Hill, 437 U.S. 153, 173 n.18 (1978) (unjustified assertions of ambiguity do not transform a clear statute into an ambiguous provision).

For example, the court of appeals found that the word "damage" was ambiguous, because it might refer only to damage to property and exclude damage to persons (Pet. App. 7a & n.7). But the ordinary meaning of the word carries no such limitation. "Damage" means "loss due to * * * injury or harm to person, property, or reputation." Webster's Third New International Dictionary, supra, at 571; see also Black's Law Dictionary 351 (5th ed. 1979) (damage is a "[l] oss, injury, or deterioration" caused by "one person to another, in respect of the latter's person or property. * * * By damage we understand every loss or diminution of what is a man's own, occasioned by the fault of another"); American Stevedores, Inc. v. Porello, 330 U.S. 446, 450 (1947) (the term "damages" includes compensation for both injury to property and injury to persons). [FN4] Moreover, the term "damage" does not stand alone in the statute. Congress referred to "any damage" and "[n]o liability of any kind" (33 U.S.C. 702c (emphasis added)). This express adoption of the broadest possible meaning of the term precludes the narrow construction suggested by the court of appeals. [FN5]

FN4. "Damage" carried the same meaning at the time Section 702c was enacted. Thus, treatises of the time characterized both harm to person and harm to property as "damage." See J. Sutherland, A Treatise on the Law of Damages (J. Berryman 4th ed. 1916); T. Sedgwick, A Treatise on the Measure of Damages (9th ed. 1912).

FN5. The fact that the other appellate decisions construing Section 702c concerned suits seeking to impose liability upon the United States for damage to property does not support the court of appeals' narrow construction of the statute. Pet. App. 19a n.16. Those decisions do not draw any distinction between damage to property and damage to persons.

*16 The court below also stated that it was not "clear why 'at any place' was tacked on to the sentence, inasmuch as the immunity language is already comprehensive without it" (Pet. App. 7a (footnote omitted)). The court hypothesized that Congress might have meant to refer to damage "to any place," thereby limiting the provision to property damage, but there is absolutely no basis for interpreting this straightforward phrase in such a peculiar manner. Congress wrote "at," not "to," and plainly was referring to the location of the flood waters, not the sort of damages liability barred by the immunity provision. There can be no question about the justification for including the phrase in the statute. The court of appeals itself suggested the reason: Congress wanted to ensure that Section 702c was as comprehensive as possible so that the government would not be subjected to monetary liability for any damage related to flood waters. [FN6]

FN6. The court of appeals also stated (Pet. App. 6a-7a n.5) that the Congress that enacted Section 702c considered the immunity provision ambiguous, but the authorities cited by the court do not support this assertion. There is no reference

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669416
1985 WL 669416 (U.S.)

to Section 702c in the portion of the congressional debates quoted by the court of appeals (see 69 Cong. Rec. 8187 (1928) (remarks of Sen. King)). In addition, the committee report cited by the court states that the proviso of Section 702c was amended to clarify its meaning; the report does not refer to the portion of the statute setting forth the government's immunity from liability (see 69 Cong. Rec. 8119 (1928)).

Finally, the court of appeals stated that the terms "flood" and "floodwaters" were ambiguous because they could refer either to all waters held in flood control structures or "'waters that are out of control'" (Pet. App. 7a & n.6 (citation omitted)). Even if this observation were correct, any possible ambiguity would be irrelevant in this case because the district courts both held that respondents were injured by waters that were at flood level (id. at 61a, 63a, 67a-68a), and the court below "assume[d] that the waters in this case were floodwaters" (id. at 7a n.6). *17 Moreover, "flood" is defined as "a rising and overflowing of a body of water that covers land not usually under water" (Webster's Third New International Dictionary, supra, at 873). Since Congress was legislating with respect to flood control projects designed to carry flood waters, the conclusion is inescapable that the statute refers to all waters contained in or carried through such structures as well as waters the structures could not retain. [FN7]

FN7. The court of appeals elaborated on this supposed ambiguity by discussing several hypothetical situations in which Section 702c allegedly might not apply because the damage that formed the basis for the tort claim might not be related to the operation of a flood control project (Pet. App. 8a-10a). However, this issue is irrelevant here because the damage for which respondents seek to impose liability on the government did result from the release of flood waters from a federal flood control project. Any question regarding the application of Section 702c in the very different circumstances hypothesized by the court of appeals cannot render the statute ambiguous with respect to its application in the situation now before the Court. See note 2, supra.
The court of appeals also suggested (Pet. App. 10a) that Section 702c is ambiguous because the provision bars the payment of compensation for a taking of property by the government, and the statute would be unconstitutional if it actually had this effect. However, the Flood Control Act itself makes clear that Section 702c does not bar such payments; it expressly authorizes compensation for flowage rights (see pages 26-27, infra). Moreover, the fact that Section 702c must be construed to permit payments required by the Fifth Amendment does not render the statute ambiguous with regard to the government's liability for damage for which compensation is not constitutionally required.

In sum, the court of appeals found the statute ambiguous only because it failed to look to "the ordinary meaning of the words used." Richards v. United States, 369 U.S. 1, 9 (1962); see also Perrin v. United States, 444 U.S. 37, 42 (1979) ("[a] fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, *18 common meaning"). Section 702c actually contains no ambiguities; its plain language immunizes the United States from all liability for all damage caused by flood waters.

This Court repeatedly has recognized that "[w]hen * * * the terms of a statute [are] unambiguous, judicial inquiry is complete, except 'in "rare and exceptional circumstances."'" Rubin v. United States, 449 U.S. 424, 430 (1981) (citations omitted); see also Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570-571 (1982); Central Trust Co. v. Official Creditors' Committee of Geiger Enterprises, Inc., 454 U.S. 354, 359-360 (1982) (per curiam). In TVA v. Hill, supra, the Court applied this rule in interpreting another provision with "terms [that] were * * * plain[]" and "language admitt[ing] of no exception" (437 U.S. at 173). The Court refused to create an exception to the broad statutory rule because "[t]o sustain that position * * * [it] would be forced

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669416
1985 WL 669416 (U.S.)

to ignore the ordinary meaning of plain language" (ibid.). It would be equally difficult to incorporate an exception to the all-encompassing immunity from liability provided by Section 702c. Indeed, this conclusion is inescapable in the present case because the damage for which respondents seek compensation unquestionably was caused by the release of flood waters from a flood control project. Respondents' claims thus fall squarely within the terms of Section 702c.

Furthermore, this Court should give full effect to the unambiguous mandate of Section 702c because a review of the provision's legislative history reveals no "clearly expressed legislative intention to the contrary." CPSC v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980); see also Escondido Mutual Waters Co. v. La Jolla Band, No. 82-2056 (May 15, 1984), slip op. 6; Dickerson v. New Banner Institute, Inc., 460 U.S. 103, 110 (1983). As we discuss below, the legislative history of Section 702c in fact confirms that Congress meant what it said: the government is immune from liability for any damage caused by flood *19 waters other than the specific costs that Congress expressly agreed to shoulder when it embarked upon the flood control program. [FN8]

> FN8. Although Section 702c was enacted as part of the Flood Control Act of 1928, the provision consistently has been interpreted to bar liability for damage related to federal flood control projects authorized by other statutes. See Aetna Insurance Co. v. United States, 628 F.2d 1201, 1204 (9th Cir. 1980), cert. denied, 450 U.S. 1025 (1981); Lenoir v. Porters Creek Watershed District, 586 F.2d 1081, 1086 & n.4 (6th Cir. 1978); cf. National Manufacturing Co. v. United States, 210 F.2d 263, 270 (8th Cir.), cert. denied, 347 U.S. 967 (1954).
> The projects at which respondents incurred their injuries were authorized by two different statutes. The Courtableau Drainage Structure is part of a project that was authorized by the Flood Control Act of 1928, as amended in 1936 (see 33 U.S.C. 702a-4, 702a-6), and the Millwood project was authorized by the Flood Control Act of 1946 (see ch. 596, 60 Stat. 647). The court below criticized the decisions holding that Section 702c applies to projects constructed under subsequent flood control acts, but did not dispute that Section 702c is applicable to damage related to these projects (see Pet. App. 24a-25a n.23). Since Section 702c is not by its terms restricted to the projects authorized in 1928, there is no basis for the court of appeals' criticism. In view of the unconditional language of the statute, Congress undoubtedly assumed that the immunity provided by Section 702c would apply with respect to all federal flood control projects unless a different result was specified by statute.

B. The Legislative History Confirms That Section 702c Should Be Interpreted In Accordance With Its Plain Meaning

The Flood Control Act of 1928, the statute that includes Section 702c, was enacted in response to the 1927 Mississippi River flood, the "most disastrous of all [of the river's] recorded floods." United States v. Sponenbarger, 308 U.S. 256, 261 (1939); see also H.R. Rep. 1072, 70th Cong., 1st Sess. 3, 17-18 (1928). Flooding had long been a problem for residents of the Mississippi River Valley; "[t]o enjoy the promise of [the valley's] fertile soil in safety ha[d], for generations, been the ambition of the valley's *20 occupants" (Sponenbarger, 308 U.S. at 261). Flood protection techniques for most of the nineteenth century consisted of disconnected levees along the banks of the river constructed pursuant to the "uncoordinated efforts of individuals, communities, counties, districts and States" (ibid.). [FN9]

> FN9. A levee is an earthen embankment along a river designed to keep the river from overflowing when it rises to flood stage.

In 1883, the federal government adopted the Eads plan, "undert[aking] to cooperate with, and to coordinate the efforts of the people and authorities of the various river

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

localities in order to effect a continuous line of levees along both banks of the Mississippi for roughly nine hundred and fifty miles." Sponenbarger, 308 U.S. at 261; see also Jackson v. United States, 230 U.S. 1, 18-19 (1913). Congress established the Mississippi River Commission to coordinate these flood control efforts, but the states supplied over two-thirds of the construction costs. S. Rep. 619, 70th Cong., 1st Sess. 20 (1928).

The 1927 flood conclusively discredited the "levees-only" approach of the Eads Plan. It showed that "levees alone, though continuous, would not protect the valley from floods" because the river rose higher than the levees. Sponenbarger, 308 U.S. at 261; see also H.R. Rep. 1072, supra, at 4-5. The legislative history of the 1928 Act is replete with references to the devastation caused by the flood waters. Secretary of Commerce Herbert Hoover described the flood as "'a disaster unprecedented in the peace-time history of our Nation'" (H.R. Rep. 1072, supra, at 18). More than 200 persons were killed, over 700,000 were left homeless, and property losses exceeded $200 million. H.R. Rep. 1100, 70th Cong., 1st Sess. 69 (1928); H.R. Rep. 1072, supra, at 3, 242-248. During *21 the debate on the 1928 Act, members of Congress recounted in detail the destruction visited upon their states. [FN10]

> FN10. See 69 Cong. Rec. 8190-8191 (1928) (remarks of Sen. Caraway); id. at 7130-7132 (remarks of Rep. Reed); id. at 6724-6725 (remarks of Rep. Martin); id. at 6709 (remarks of Rep. Kopp); id. at 6706-6709 (remarks of Rep. Gregory); id. at 6669-6670 (remarks of Rep. Nelson); id. at 6651, 6654 (remarks of Rep. Whittington); id. at 6649 (remarks of Rep. Driver); id. at 6645 (remarks of Rep. Wilson); id. at 6642-6643 (remarks of Rep. Reid); id. at 5494-5495 (remarks of Sen. Harrison).

Congress's response to the disaster was to adopt a new comprehensive flood control plan developed by Major General Edgar Jadwin, Chief of the Army Corps of Engineers. The new plan differed from past efforts because the federal government undertook sole responsibility for flood control. The plan "provided for a comprehensive ten-year program for the entire valley, embodying a general bank protection scheme, channel stabilization and river regulation, all involving vast expenditures of public funds" (Sponenbarger, 308 U.S. at 262). The key element of the plan was the use of floodways to divert flood waters from the Mississippi's main channel at selected points along the river:
   The height of the levees at these predetermined points was not to be raised to the general height of the levees along the river. These lower points for possible flood spillways were designated "fuse plug levees." Flood waters diverted over these lower "fuse plug levees" were intended to relieve the main river channel and thereby prevent general flooding over the higher levees along the banks. Additional "guide levees" were to be constructed to confine the diverted flood waters within limited floodway channels leading from the fuse plugs.
   *22 Ibid. Thus, the Jadwin Plan was "fundamentally" different from the prior approach to flood control because it was designed to "limit[] the amount of flood water carried in the main river to its safe capacity and send [[] surplus water through lateral floodways" (S. Rep. 619, supra, at 13 (memorandum from General Jadwin)). [FN11]

> FN11. The Mississippi River Commission proposed its own plan for a new approach to flood control that was similar in some respects to the Jadwin Plan. Congress adopted the Jadwin Plan but created a board to evaluate the differences between the plans and directed the President to make a final decision regarding the specifics of the plan to be implemented. Act of May 15, 1928, ch. 569, § 1, 45 Stat. 534-535.

Congress recognized that in adopting the Jadwin Plan it was embarking on a vast public works project. H.R. Rep. 1072, supra, at 18 ("gigantic undertaking"); 69 Cong. Rec. 6644 (1928) (remarks of Rep. Wilson) ("the greatest internal project in America"). The statute authorized $325 million for the program, [FN12] but estimates of the total cost of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669416
1985 WL 669416 (U.S.)

Page 16

project ranged from $500 million to over $1 billion. H.R. Rep. 1100, supra, at 18; S. Rep. 619, supra, at 11 (the $325 million authorized for the project is "simply an estimate. The actual cost of the work will, doubtless, be much more"); 69 Cong. Rec. 8194 (1928) (letter from General Jadwin); id. at 8187 (remarks of Sen. King); id. at 8182 (remarks of Sen. Frazier); id. at 6652 (remarks of Rep. Whittington); id. at 5485 (remarks of Sen. Jones). [FN13] Moreover, for the first time the states were not required to *23 contribute to the cost of the flood control efforts. See Act of May 15, 1928, ch. 569, § 2, 45 Stat. 535 ("no local contribution to the project herein adopted is required"); H.R. Rep. 1072, supra, at 21-46. [FN14]

FN12. Act of May 15, 1928, ch. 569, § 1, 45 Stat. 534-535.

FN13. To place the program in perspective it is noteworthy that all federal expenditures in 1928 totaled less than $3 billion. Bureau of the Census, U.S. Dep't of Commerce, Historical Statistics of the United States, Colonial Times to 1970 Pt. 2, at 1104 (1975). Since the total expenditures for fiscal year 1984 were approximately $854 billion (Bureau of the Census, U.S. Dep't of Commerce, Statistical Abstract of the United States 1985, at 305 (105th ed. 1985)), a present-day program of a similar relative magnitude would amount to between $140 and $280 billion.

FN14. The final statute required the states to obtain the rights of way needed for the construction of levees, but this was not viewed as a major contribution.

In view of the project's vast scope, and this already-tremendous commitment of federal resources, one of Congress's principal concerns in drafting the legislation was to ensure that the federal government's financial liability did not extend beyond the expenditures directly necessary for the construction of the project. President Coolidge's message to Congress concerning the flood control proposals stated that "it would be very unwise for the United States in generously helping a section of the country to render itself liable for consequential damages" (69 Cong. Rec. 7126 (1928)). Similarly, a number of congressmen stated during the debates that the United States should not be liable for expenses other than the direct cost of constructing the project. See id. at 7028 (1928) (remarks of Rep. Spearing); id. at 6999-7000 (remarks of Rep. Frear).

This concern undoubtedly was intensified by the extensive evidence before Congress of the devastation wrought by the 1927 flood (see pages 20-21, supra). The flood control plan could not completely eliminate the possiblity of such damage and Congress did not want the federal government to be liable for any damage that did in fact occur. The chairman of the House Rules Committee stated in opening the discussion on the rule governing debate on the 1928 Act that he "want[ed] th[e] bill so drafted that it will contain all the safeguards necessary for the Federal Government. If we go down there and furnish protection to these people--and I assume it is a national responsibility--I do not want to have anything left out of the bill *24 that would protect us now and for all time to come. I for one do not want to open up a situation that will cause thousands of lawsuits for damages against the Federal Government in the next 10, 20, or 50 years" (69 Cong. Rec. 6641 (1928) (remarks of Rep. Snell)).

Congress thus enacted Section 702c to reaffirm the principle that the United States would not be subject to any monetary liability in connection with the flood control program other than those costs specified in the statute. A portion of the legislative history that specifically addresses the meaning of the grant of immunity contained in Section 702c confirms that the provision was viewed as a broad restatement of the government's sovereign immunity. A congressman stated that "[w]hile it is wise to insert that provision in the bill, it is not necessary, because the Supreme Court of the United States has decided * * * that the Government is not liable for any of these damages [[resulting from flooding]" (69 Cong. Rec. 7028 (1928) (remarks of Rep. Spearing)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Congress knew that the flood control program would deeply involve the federal government in an extremely hazardous activity. It wanted to confirm the general rule that the government was not liable for any damage resulting from flood waters. As the court concluded in National Manufacturing Co. v. United States, supra, the first appellate decision interpreting Section 702c, "when Congress entered upon flood control on the great scale contemplated by the [Flood Control] Acts it safeguarded the United States against liability of any kind for damage from or by floods or flood waters in the broadest and most emphatic language. The cost of the flood control works itself would inevitably be very great and Congress plainly manifested its will that those costs should not have the flood damages that will inevitably recur added to them." 210 F.2d at 270; accord Pet. App. 35a (footnote omitted) (Gee, J., dissenting) ("Congress, poised over a half-century ago on the brink of entry into a massive public works program -- one of then unprecedented scope and *25 laden with forseeable and unforseeable prospects of liability -- [intended] to state clearly that the federal treasury was to be placed at risk * * * no further than was required by the Constitution"); Callaway v. United States, 568 F.2d at 686; Graci v. United States, 456 F.2d 20, 25-26 (5th Cir. 1971); Peterson v. United States, 367 F.2d 271, 275-276 (9th Cir. 1966). [FN15]

> FN15. It is not suprising that Congress took this step. The Federal Tort Claims Act exempts the United States from liability for damage related to especially hazardous activities such as "the imposition or establishment of a quarantine by the United States" and claims "arising out of * * * combatant activities * * * during time of war" (28 U.S.C. 2680(f) and (j)). Indeed, early versions of the Tort Claims Act contained an exception for "[a]ny claim arising out of the activities or work of the Government, its agents or employees, relating to flood control." H.R. 9285, 70th Cong., 1st Sess. § 8(a)(6) (1928); see also S. 4567, 72d Cong., 1st Sess. § 206(6) (1932); H.R. 17168, 71st Cong., 3d Sess. § 3(a)(6) (1931). This provision undoubtedly was removed from the proposed legislation when Congress realized that the necessary immunity was supplied by Section 702c.

Respondents seek compensation for damage resulting from the release of flood waters from a flood control project -- precisely the type of claim that Congress intended to bar when it enacted Section 702c. Congress knew that the government would be engaged in the diversion and controlled release of flood waters because that was the purpose of the flood control program. In view of Section 702c's broad language and Congress's general intent to limit the government's financial liability, Congress plainly contemplated that the government would not be liable for damage caused by the operation of a project for flood control purposes. Yet respondents seek compensation for damage resulting from just such releases of flood waters.

The court of appeals' revisionist view of Section 702c is based upon its erroneous reading of the provision's legislative history. The court of appeals correctly stated that the purpose of Section 702c was to "declare[] in *26 advance what part of the expenses of this project the United States was to pay. That was to be what items Congress specified and nothing more" (Pet. App. 16a). The court's mistake was its decision to adopt an unjustifiably narrow view of the scope of this congressional declaration. The court stated that Section 702c replaced a provision of the Senate bill providing monetary compensation for property damaged as a result of the implementation of the flood control plan, and thus that "the disclaimer of liability must be read as a direct negation or repudiation of the provision it superseded, which would have provided munificence to those whose property was affected [by a flood control project]" (Pet. App. 17a).

In fact, the provision that became Section 702c was added to the bill on the floor of the House of Representatives; it was not a substitute for an existing provision of the Senate bill. Moreover, Section 702c was added to the bill before the House considered the compensation provision cited by the court of appeals. See 69 Cong. Rec. 7022-7023

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669416
1985 WL 669416 (U.S.)                                                    Page 18

(1928). A review of the House debate concerning the latter provision confirms that Congress did not view Section 702c in the limited manner described by the court of appeals.

The Senate bill, as reported by the House committee, did provide for generous compensation to persons whose lands were subject to flooding when waters were diverted into the flood ways. The provision granted "just compensation" for property "used, taken, damaged, or destroyed" in carrying out the flood control plan, including "all property located within the area of the spillways, flood ways, or diversion channels" (69 Cong. Rec. 7030 (1928)). Thus, the bill required the government to purchase or condemn rights of way or flowage rights for such property. In addition, it mandated compensation for "all expenditures by persons, corporations, and public-service corporations made necessary to adjust or conform their property, or to *27 relocate same because of the spillways, flood ways, or diversion channels" that would be constructed pursuant to the flood control plan (ibid.).

This compensation requirement was the subject of a great outcry on the House floor. It was viewed as providing a windfall for the railroads, because their representatives had testified that costs of over $71 million would be incurred in rearranging railway lines to avoid the flood ways and spill ways. Many congressmen expressed the view that property owners should absorb such costs because of the protection that their property would receive as a result of the flood control program. 69 Cong. Rec. 6718 (1928) (remarks of Rep. Hull); id. at 6712 (remarks of Rep. Kopp); id. at 6656, 6657, 6659 (remarks of Rep. Frear); H.R. Rep. 1072, supra, at 146, 224-228. The House of Representatives therefore amended the compensation provision. The bill as enacted simply required the government to purchase flowage rights over land that would be newly flooded as a result of the construction of the flood works. The provision for relocation expenses was deleted from the final bill. 69 Cong. Rec. 8121 (1928) (remarks of Rep. Frear); 33 U.S.C. 702d.

Since Section 702c did not replace the compensation provision contained in the Senate bill, the court of appeals obviously erred in interpreting Section 702c by reference to the scope of the Senate bill provision. In addition, Section 702c must have had a purpose other than prohibiting generous compensation for property owners because Congress eliminated that possiblity by deleting the offending provision of the Senate bill. Section 702c accordingly must have been designed to restate the government's sovereign immunity with respect to all damage related to the flood control program. [FN16]

> FN16. Other than its erroneous analysis of the legislative history, the court of appeals cited no evidence for its conclusion that Congress did not intend to immunize the government from all damage caused by flood waters (see Pet. App. 18a-19a). In fact, there was good reason for Congress to reaffirm the government's sovereign immunity from all damages liability. Congress had waived sovereign immunity in a related area by enacting the Suits in Admiralty Act, and the more general waiver of sovereign immunity that became the Federal Tort Claims Act already was being considered by Congress. Dalehite v. United States, 346 U.S. 15, 24 (1953); see note 15, supra. Judge Gee correctly observed that "[d]riving down a clear stake in such a dangerous area might well have been seen by Congress as wise" (Pet. App. 35a n.4).

*28 The court of appeals also intimated (Pet. App. 19a n.16) that Congress intended Section 702c solely as a bar to liability for property damage, and that the provision therefore might not bar respondents' claims for damages based upon personal injuries. However, the court's analysis of the legislative history again is incorrect. First, its reliance upon the provisio of Section 702c to support this conclusion is totally misplaced. The proviso was not proposed at the same time as the immunity provision of Section 702c. The proviso was introduced by a different congressman as a separate amendment to the bill, and was designed to address the specific problem of compensation for damage to riverfront land when such land could not be protected through the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669416
1985 WL 669416 (U.S.)                                         Page 19

construction of a levee. 69 Cong. Rec. 7022, 7023 (1928) (remarks of Rep. Garrett). Since the adoption of the proviso was not tied to the immunity provision, the proviso does not supply a reliable basis for ascertaining the scope of the grant of immunity set forth in Section 702c.

Second, the court of appeals justified its limited view of Section 702c on the ground that the congressional debate related only to claims for property damage and that the terms "liability" and "damage" were used during the debate only to refer to property damage caused by the construction of the flood control projects (Pet. App. 8a, 19a n.16). However, the court of appeals cited no evidence that Congress intended to limit the scope of Section 702c *29 to these circumstances. The debates contain considerable discussion regarding the injuries inflicted on persons by flood waters (see pages 20-21, supra). Of course, even if the court of appeals were correct that the debates focused upon property damage, that fact "does not create a 'negative inference' limiting the scope of [Section 702c] to the specific problem that motivated its enactment." Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 679 (1983); see also American Bank & Trust Co. v. Dallas County, 463 U.S. 855, 867 (1983).

In sum, these "fragments of legislative history * * * regardless of how liberally they are construed, do not amount to a clearly expressed legislative intent contrary to the plain language of the statute" (American Tobacco Co. v. Patterson, 456 U.S. at 75). [FN17] Indeed, it is significant that the court of appeals declined to construe Section 702c in the manner dictated by its own analysis of the legislative history. The court summarized its view of the legislative history by stating that "[i]t seems doubtful that Congress intended to shield the negligent or wrongful acts of government employees -- either in the construction or in the continued operation of the Mississippi [flood control] plan" (Pet. App. 18a-19a (footnote omitted)), but it held that the statute does immunize the government "for any fault of its employees in controlling floodgates or managing lands to contain, prevent, or manage floods or floodwaters" (id. at 27a-28a). The court of appeals thus *30 recognized that Congress intended to broadly immunize the United States from liability, even when damage resulted from the negligence of government personnel. [FN18]

> FN17. We note in this regard that the panel of the court of appeals relied upon similar legislative history in reaching a wholly different conclusion. The panel stated that "[w]e think it clear that Congress intended to disclaim liability for 'takings' and not liability for consequential damages" (Pet. App. 55a). In view of these quite different conclusions reached by the same judges (the panel opinion also was written by Judge Reavley) on the basis of this legislative history, these statements in the debates do not appear to provide reliable guides to ascertaining Congress's intent.

> FN18. In addition, despite its assertion that Congress did not intend to immunize the United States from liability for personal injuries (see pages 28-29, supra), the court of appeals' construction of the statute would immunize the United States from liability for personal injuries resulting from "any fault of its employees in controlling floodgates or managing lands to contain, prevent, or manage floods or floodwaters" (Pet. App. 27a-28a).

Instead of resting its decision upon the language or legislative history of Section 702c, the court of appeals simply created its own exception to the government's immunity from liability, holding that Section 702c applies with respect to damage resulting from the release of flood waters but "does not extend to the fault of government employees in failing to warn the public of the existence of hazards to their accepted use of government-impounded water, or nearby land" (Pet. App. 28a). Where "the presence or movement of water for flood control purposes merely furnishes a condition of the accident, there is no section 702c immunity" (ibid.). The court's inability to cite any authority

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669416
1985 WL 669416 (U.S.)

Page 20

for its imaginative construction of the statute reveals the flaw in the court's conclusion: there is no justification for this restriction of the broad immunity conferred by Congress.

To begin with, the court of appeals' distinction between the government's management of flood waters and its failure to warn of the hazards of such waters is completely artificial. Cf. Laird v. Nelms, 406 U.S. 797, 802 (1972) (holding that the plaintiff could not assert under the Federal Tort Claims Act a trespass claim that actually was a claim in strict liability because "[t]o permit [plaintiff] to proceed on a trespass theory here would be to judicially admit at the back door that which has been legislatively turned away at the front door"). Respondents' damage obviously *31 resulted from the release of flood waters from flood control projects; they would have incurred no injury if the waters had not been released (see Pet. App. 33a (Gee, J., dissenting)).

In addition, deciding whether to give a warning and the manner in which to convey a warning are determinations that are part and parcel of the management of a flood control project. Thus, it often would be possible to transform a claim based upon damage from the release of flood waters into a claim based upon failure to warn. A farmer whose cattle are swept away as the result of a release of flood waters from a flood control project could argue that his injury was caused by the government's failure to inform him that waters were to be released. Judge Gee correctly concluded that the test formulated by the court of appeals would work a considerable reduction in the government's immunity and amounts to "a classic exercise in granting with one hand and taking away with the other" (Pet. App. 33a (Gee, J., dissenting)).

Furthermore, the court of appeals' determination that the immunity should depend upon the nature of the government's conduct cannot be squared with Congress's declaration that the government is immune from liability for "any" damage "from or by" flood waters, without regard to the character of the particular flood control activity that might have caused the injury. Congress plainly concluded that, in view of the vast scope of the flood control program, the fact that the damage was caused by flood waters was a sufficient reason to bar liability. The court of appeals' decision that immunity should not be available in some circumstances even though the damage is related to flood waters "simply brushes [the statute's plain words] aside and substitutes for them the court's notions of good policy" (Pet. App. 32a (Gee, J., dissenting)). But a court may not rely upon its own assessment of the relevant *32 policies to "justify its disregard of a clear congressional directive" (Central Trust Co. v. Official Creditors' Committee of Geiger Enterprises, Inc., 454 U.S. at 359).

It is regrettable that respondents have suffered serious losses, but that fact provides no justification for overriding the policy determination made by Congress when it enacted Section 702c. Congress recognized that floods are extremely hazardous and concluded that the federal government could shoulder the burden of protecting the public at large from this threat only if the government was assured that it would not be subject to liability for any damage caused by flood waters. Although this determination may deprive some claimants of compensation for their injuries, its principal effect has been to benefit society by making possible the large network of flood control projects that have reduced substantially the harm caused by flooding. The court of appeals erred by tampering with the balance between these competing interests that Congress struck more than a half-century ago.

C. Even If This Court Concludes That The Legislative History Of Section 702c Is Ambiguous, It Should Construe Section 702c In Accordance With Settled, Longstanding Judicial Interpretation

Prior to the decision of the court below, every court of appeals to address the question had construed Section 702c as a broad grant of immunity from tort liability for damage

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669416
1985 WL 669416 (U.S.)                                        Page 21

caused by flood waters. The court of appeals erred by rejecting this settled longstanding interpretation of the provision. It is for Congress, not the court of appeals, to adopt a new rule governing the liability of the United States in this context.

This Court several times has declined to overturn a longstanding consistent judicial interpretation of a statute even though there might be some support for a contrary conclusion regarding the meaning of the statute. For *33 example, in Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186 (1974), the Court construed the jurisdictional requirement of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. 13(a). The issue was whether Congress intended to apply the statute to the full extent of its commerce power -- to any case in which the violation had an effect on commerce -- or whether the provision was limited to cases concerning goods in the flow of interstate commerce.

The Court observed that the provision's legislative history weighed against the former theory, but went on to state that "even if the legislative history were ambiguous, the courts in nearly four decades of litigation have interpreted the statute in a manner directly contrary to an 'effects on commerce' approach. * * * In the face of this long-standing interpretation and the continued congressional silence, the legislative history does not warrant" a contrary interpretation of Section 2(a). 419 U.S. at 200-201. The Court has accorded similar weight in other cases to the courts of appeals' consistent view regarding a question of statutory interpretation. See, e.g., Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731-733 (1975); Blau v. Lehman, 368 U.S. 403, 413 (1962); Missouri v. Ross, 299 U.S. 72, 75 (1936); cf. Flood v. Kuhn, 407 U.S. 258, 282 (1972).

As we have discussed (see pages 13-14, supra), every court of appeals to construe Section 702c aside from the court below has held that the provision immunizes the United States from all liability for damage caused by the release of flood waters from a flood control project. See Pet. App. 21a-22a (majority opinion), id. at 35a-36a (Gee, J., dissenting), id. at 38a (Higginbotham, J., dissenting). Thus, it has been settled for over 30 years that the United States is not subject to liability for flood control activities, such as those at issue in this case, and Congress has never objected to that construction of the statute. In view of the *34 tremendous scope of the present-day flood control program, [FN19] elimination of the immunity conferred by Section 702c could result in the imposition of enormous financial liability upon the United States.

> FN19. We have been informed that the Army Corps of Engineers administers approximately 518 flood control structures, the Bureau of Reclamation operates some 54 reservoirs that serve flood control purposes, the Soil Conservation Service administers approximately 8,592 flood control dams, and the Tennessee Valley Authority operates or manages some 35 dams that serve flood control purposes.

Accordingly, even if the legislative history of Section 702c could be viewed as ambiguous, the court of appeals erred by overturning the settled interpretation of the statute. As Judge Higginbotham concluded in his dissenting opinion, it is appropriate to "defer to the longstanding and unanimous construction placed on § 702c by this and other courts -- a construction which has given specific and unambiguous content to the clause. The majority has not made the case for turning about at this date, regardless of any ambiguity of § 702c as an original proposition. The task of changing such a settled construction should now be left to Congress" (Pet. App. 38a).

                              *35 CONCLUSION
The judgments of the court of appeals should be reversed.

U.S. v. James
1985 WL 669416
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1985 WL 669416
1985 WL 669416 (U.S.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.