1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE: KATRINA CANAL BREACHES  *    Civil Action
            CONSOLIDATED LITIGATION *    No. 05-CV-4182
6                                    *
                                     *    Section K
7    _____  *
                                     *    New Orleans, Louisiana
8    PERTAINS TO LEVEE:              *    October 27, 2006
                                     *
9    MR-GO ROBINSON, NO. 06-2268     *
     DOCUMENT NO. 822                *
10   *******************************

11                   HEARINGS ON MOTIONS BEFORE THE
12                 HONORABLE STANWOOD R. DUVAL, JR.
                     UNITED STATES DISTRICT JUDGE
13

14

15   APPEARANCES:

16

17   For Plaintiffs:            O'Donnell & Mortimer LLP
                                BY:  PIERCE O'DONNELL, ESQ.
18                              550 South Hope Street
                                Suite 2000
19                              Los Angeles, California 90071-2627

20

21
     For Defendant             U.S. Department of Justice
22   United States:            BY: ROBIN D. SMITH, ESQ.
                                Torts Branch, Civil Division
23                              P.O. Box 888
                                Benjamin Franklin Station
24                              Washington, D.C.  20044

25

1   Official Court Reporter:       Jodi Simcox, RMR
                                   500 Poydras Street, Room HB-406
2                                  New Orleans, Louisiana 70130
                                   (504) 589-7780
3

4

5   Proceedings recorded by mechanical stenography, transcript

6   produced by computer.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          __PROCEEDINGS__

2                        (October 27, 2006)

3                            * * * * *

4          **THE DEPUTY CLERK:**  All rise.

5          **THE COURT:**  Good morning.

6          **MR. SMITH:**  Good morning, Your Honor.

7          **MR. O'DONNELL:**  Good morning, Your Honor.

8          **THE DEPUTY CLERK:**  This is Civil Action 05-4182.

9    This is dealing with document number 822, motion to dismiss

10   party by the USA.

11         **THE COURT:**  Do you want to make your appearances for

12   those of you who are going to be participating in the argument?

13         **MR. SMITH:**  Good morning, Your Honor Robin Smith for

14   the United States.

15         **THE COURT:**  Good morning.

16         **MR. O'DONNELL:**  Good morning, Pierce O'Donnell for

17   the plaintiffs and the opposing party.

18         **THE COURT:**  Thank you.  Before we start, I'll give

19   you a broad overview, very broad.  And, first, let me say that

20   we all learn from these type of proceedings.  In the future, in

21   order to get an order from me exceeding the page limit, it's

22   going to have to be very persuasive.  We've had a lot of

23   briefing in this, and it's been a lot of hard work, a lot of

24   meticulous effort.

25                 And the Court appreciates it.  But I always keep

4

1    in mind, to paraphrase:  That incisiveness is the soul of
2    persuasion.  So when your brief links get too long, no matter
3    how bright we are, occasionally, generally, invariably, they
4    become didactic and pathologic.  Court is going get your point;
5    and the quintessential points need to be made with precision
6    and with clarity.
7                    But, again, I might point out the briefing has
8    been quite thorough and quite professional.  I'm just saying:
9    In the future, I'm looking for shorter briefs.
10                   The way we approach this this morning is that,
11   one, we have a 12(b)(1) motion.  And we're in the Fifth
12   Circuit, so we have the *Montez* case, and it's a question of how
13   we deal with these issues.  In a normal 12(b)(1) situation,
14   certainly, you're allowed to make certain factual findings and
15   resolve certain factual disputes.  The Fifth Circuit, when it's
16   inextricably intertwined with an FTCA claim, we district judges
17   are taught to apply a 12(b)(1) rubric and/or a Rule 56 rubric.
18                   I think that there may be some difference
19   between the 702(c) immunity issue and the FTCA issue.  The
20   immunity issue may be more amenable, that is the 702(c)
21   immunity issue, may be more amenable for resolution in a
22   12(b)(1) context.
23                   I'm inclined to look at the FTCA in a 12(b)(1)
24   context, just to let you know.  It seems to me when we boil
25   down the 702(c) immunity question, we have issues such as:

1    Does the fundamental issue, really, one, were there flood
2    control or flood protection efforts made to make it a
3    flood-control project that protected certain areas from the
4    surge caused by the MR-GO; and, two, does the fact that -- even
5    if not, even if that's not so -- there were hurricane
6    protection levees in effect that were compromised that clearly
7    were part of a flood-control project.
8                    And does the fact that a tort may occur -- we're
9    talking about in the abstract now; I'm not making any
10   findings -- a tort would occur outside of the scope of the
11   flood-control project, but then it would cause waters from the
12   flood-control project to flood.  Is that within the scope of
13   the 702 immunity?
14                   And I'm interested in:  One, were there levees
15   specifically built -- were there flood-control devices that
16   would qualify as such constructed to protect certain areas from
17   the MR-GO, or were they simply not flood-control projects at
18   all?
19                   And even so, if water got beyond that and then
20   compromised, clearly, what were flood-control projects, does
21   the fact that the proximate cause may be negligence negate the
22   702(c) immunity?
23                   Then we get to the argument -- because I'm not
24   going to rule on immunity.  We're simply going to discuss it
25   today.  I'm not going to rule on the 702(c) immunity today.

1    We're going to discuss the Federal Tort Claims Act.

2                    And really that issue distills into, first, the

3    due care and what precisely the Congressional mandate was; and

4    then, two, the specific acts of negligence that were allegedly

5    committed by the Corps.

6                    And discussing the 2860 exceptions, were they

7    statutes or regulations that the Corps failed to comply with,

8    which would then take it out of that, at least in general

9    terms.  And there's a lot of stuff in the briefs about that and

10   I need more information.

11                   And, two, was this something that -- were the

12   acts policy decisions?  And, of course, I've read all of the

13   cases, going back to *Dalehite*, and *Indian Towing*, *Varig*, and

14   the progeny thereof, including some recent Ninth Circuit cases,

15   which were interesting.  And I'm going to be familiar with the

16   cases under the Federal Tort Claims Act and I'm going to be

17   asking you about some of them and how they may apply.

18                   And another aspect of that is:  Does the fact

19   that some of these allegedly involve professional or scientific

20   decisions, to what extent, if any, does that take it out of the

21   policy-making arena?  Because a vast number of these cases, in

22   my opinion, since *Varig* -- well *Varig* reaffirmed *Dalehite* --

23   seem to expand what is policy and what isn't.  Those are my

24   concerns.

25                   And enough of me, let's hear from you.

1     **MR. SMITH:**  Good morning, Your Honor.  And may it
2  please the Court.  My name is Robin Smith and I represent the
3  United States.
4     The United States has moved under Rule 12(b)(1)
5  for dismissal of this action, which seeks to recover damages
6  caused by the floodwaters of Hurricane Katrina.  On August 29th
7  of last year, those floodwaters overwhelmed and swept away
8  levees and floodwalls built by the United States to protect
9  St. Bernard Parish, New Orleans East and the Lower Ninth Ward.
10     The flood was undeniably tragic.  And the
11  plaintiffs in this case claim to be among those whose homes and
12  businesses were damaged by the flood.  This case must be
13  dismissed because the United States is immune to suits that
14  seek to hold the United States liable for damages caused by
15  floods or floodwaters.
16     In the Flood Control Act of 1928, Congress
17  provided that:  No liability of any kind shall attach to or
18  rest upon the United States for any damage from or by floods or
19  floodwaters at any place.
20     **THE COURT:**  And I take it you distinguish the *Graci*
21  cases -- I don't want to speak for you -- but the *Graci* cases,
22  because you contend that there were no flood-control structures
23  in place at the time of that decision -- or tell me how you
24  distinguish it?
25     **MR. SMITH:**  Well, obviously, *Graci* was decided long

1    before we had the benefit of the Supreme Court's interpretation
2    of Section 702(c) in *James* and *Central Green,* but I think
3    the --
4              **THE COURT:**  Do you think *James* and *Central Green*
5    compromise the holding of *Graci* leaving the alleged absence of
6    flood-control projects on the side?
7              **MR. SMITH:**  Yes, I think they do.  They certainly
8    call it into doubt, Your Honor.  Particularly, the emphasis in
9    *Central Green* upon measuring the scope of the immunity by the
10   character of the waters, as opposed to the federal project
11   that's involved.
12             **THE COURT:**  And I don't want to get you off track too
13   much, but *Central Green*, if read literally and, I guess, if the
14   statute were read literally, at least in one context, all
15   waters that were floodwaters that caused any damage from
16   whatever source would render immunity to the United States,
17   given its broadest read.
18             **MR. SMITH:**  I agree, Your Honor.
19             **THE COURT:**  But do you contend that *Central Green* is
20   holding that the floodwaters must be released or -- let me use
21   the right word -- the floodwaters must involve a federal
22   control project?
23                  In other words, if we just have floodwaters with
24   no federal control project around, you don't think that the
25   Supreme Court would hold that there was immunity for the

1  government under the literal meaning 702(c), do you?

2          **MR. SMITH:**  I think it's an open question, Your

3  Honor, after *Central Green*.  The facts in *Central Green,*

4  obviously, were a flood -- the issue was, in fact, whether

5  there were floodwaters or not involved in causing the damage.

6          **THE COURT:**  I'm thinking that there was subsurface

7  flooding, as I recall, an irrigation --

8          **MR. SMITH:**  Irrigation.

9          **THE COURT:**  Yes.  I'm well familiar with *Central*

10  *Green*.  Fortunately, it was a very incisive Supreme Court

11  decision.  It wasn't too long.  Go ahead.

12          **MR. SMITH:**  But because the facts of the case

13  involved a flood-control project, it's impossible to say with

14  certainty whether when confronted with a fact situation that

15  did not involve a flood-control project the Court would hue to

16  the teaching, which I think it sets forth in *James* and

17  reaffirms in *Central Green* that the task of interpreting

18  Section 702(c) begins and ends with the language of the statute

19  itself.

20          The Supreme Court said that in *James* because it

21  noted that the terms that are used in the immunity provision

22  are unambiguous.  And when the Court is confronted with the

23  statutory provision that is unambiguous on its face, then the

24  Court begins and ends it's interpretation of that statute with

25  the text.  So...

1          **THE COURT:**  I understand there's some appeal to your

2    argument.  Because we, and certainly the Supreme Court, attempt

3    to construe the language of statute as its intended, but it has

4    to be in context.

5               So it would seem to be very outre, in my mind,

6    for the United States to be immune from floodwaters causing a

7    flood not related to a flood-control project since the entire

8    statute, the River and Harbors Act of 1928, was passed after

9    the 1927 flood in order to get levees constructed.  If we get

10   literal, we're just talking about the Mississippi River.

11              And some jurists have said and was just talking

12   about -- and they've been wrong up in the Supreme Court --

13   about private property rights.  So I feel it's a bit of a

14   strain to apply it literally, but I understand your argument

15   there.

16              And I understand your argument.  But what

17   concerns me more, and which I think is your better argument, is

18   what was in place at the time of this flood that would, in

19   fact, constitute a flood-control project.

20          **MR. SMITH:**  Right.  I would just suggest, Your Honor,

21   I don't want to push that initial argument further than I need

22   to in this case.  And I really don't think I need to rely on

23   that argument in this case.

24              But I will just throw out for, Your Honor's,

25   consideration the fact that given the Supreme Court's

1   application of 702(c) to flood-control projects nationwide, as

2   opposed to as initially it might have been thought, just the

3   Mississippi River, it can be seen that when a flood results

4   where there is no flood-control project, the imposition of

5   flood damages on the United States in that locale calls into

6   question the negative decision, if you will, of Congress not to

7   fund and authorize the erection of a flood-control project in

8   that place.

9                 So, in other words, there's a -- sort of a

10  dis -- an incentive or a disincentive not to build

11  flood-control projects everywhere.  Because if you'd begin one,

12  then you would have immunity if a flood were to occur.

13            **THE COURT:**  So you're saying that the United States

14  shouldn't -- perhaps the reading of *Central Green* and the

15  statute would mean if the United States failed to build a

16  flood-control project and a flooding occurred, it should not be

17  rendered liable for that --

18            **MR. SMITH:**  Right, right.

19            **THE COURT:**  I understand.

20            **MR. SMITH:**  Because that represents, in effect, a

21  negative decision not to engage in that sort of conduct there.

22            **THE COURT:**  I understand.

23            **MR. SMITH:**  But moving on to the point, Your Honor,

24  made.  I think, in this case, the facts allow us to distinguish

25  *Graci* from the present case.  And the factual change is that

1  this flood involved a flood-control project, whereas the

2  Hurricane Betsy flooding did not involve a federal

3  flood-control project.

4              **THE COURT:**  For the purposes of this motion, I'm

5  going to use the acronym all of you have used, the LPVHPP --

6  and we'll determine what that means later on, but I might even

7  say the LPV -- and that's the project you're talking about, I

8  take it?

9              **MR. SMITH:**  Yes, Your Honor.

10             **THE COURT:**  Okay.

11             **MR. SMITH:**  Yes, Your Honor.  And I think it's

12 important to realize that the Fifth Circuit, even prior to the

13 teaching in *James* and *Central Green,* never viewed *Graci* as an

14 opinion that stood for the proposition that the plaintiffs here

15 are citing it for.

16             The plaintiffs here are citing it for the

17 proposition that if the -- and as, Your Honor, described it in

18 his preamble before argument this morning -- if the negligence

19 occurs outside of the flood-control project, but impacts a

20 flood-control project so that there is flooding that results

21 from the failure of the flood-control project, that, external

22 to the project negligence, will be actionable.

23             And I think the reason -- where you can see why

24 that was not the construction given by the Fifth Circuit is

25 because the Fifth Circuit referred to *Graci* several times

1    subsequently to its decision.  And the first time that it did

2    so was in Florida East Coast Railway Company, 519 F.2nd, and

3    I'm reading from Page 1191.

4                    THE COURT:  All right.

5                    MR. SMITH:  And there's a citation to *Graci* in the

6    footnote to the passage I'm going to quote, Your Honor, as well

7    as to two other cases that did not involve flood-control

8    projects.  But here's the proposition that the Fifth Circuit

9    cited *Graci* for:  The federal courts have reached a consensus

10   that the United States is protected from liability for damages

11   caused by, quote, floods or floodwaters, closed quote, in

12   connection with, in connection with, flood-control projects.

13                   THE COURT:  Didn't *Central Green* read out in relation

14   to?

15                   MR. SMITH:  In relation to --

16                   THE COURT:  I'm not sure.  I'm not --

17                   MR. SMITH:  -- in their dictum.  In the dictum that

18   was in *James*, right.  They were -- and that was what the Courts

19   of Appeals had seized upon after *James*, and had led them

20   astray.  They began looking for some limiting principle outside

21   the text.  Because they took that dictum, as you recall, in

22   *James* to say:  Any water contained in a flood-control project

23   satisfies the definition of a flood -- floodwater.

24                   And that led them astray because then the courts

25   began to say:  Well, what limitation is there then?  If any

1   water is floodwater, there's no other limiting term in the
2   text.  So this is -- if you will, this is much prior to that,
3   Your Honor.
4           **THE COURT:**  Yes, I understand that.
5           **MR. SMITH:**  This is 1975.  And I just want, Your
6   Honor, to see how the Fifth Circuit was reading *Graci* at that
7   time.  The federal courts have reached a consensus the United
8   States is protected from liability from floods in connection
9   with flood-control projects, even when the government's own
10  negligence has caused or aggravated the losses.
11          And then this is the sentence that they cite to
12  *Graci* -- and you'll forgive me if I call it *Graci*, Your Honor,
13  because I've been calling it *Graci* since I got involved.
14          **THE COURT:**  You may well be right.
15          **MR. SMITH:**  I have no idea how it's pronounced, so I
16  apologize if I get it wrong.  And I'm sure the plaintiffs can
17  tell me.
18          **MR. O'DONNELL:**  We've been told it's *Graci*, Your
19  Honor.
20          **MR. SMITH:**  *Graci*.  Thank you.
21          **THE COURT:**  All right.  Go ahead.
22          **MR. SMITH:**  The Court goes on to say:  There are
23  decisions which impose liability on the United States for
24  damages from flooding, but such decisions do not involve
25  flood-control projects.

1           And they cite to *Graci*; and they also cite to

2   *Peterson*, a Ninth Circuit case.  So they're looking at *Graci* as

3   a case that's significant because it did not involve a

4   flood-control project.

5           **THE COURT:**  Can I ask you -- let me just read a

6   little language from *Central Green* and you tell me what you

7   think it means:

8           The sentence that we have italicized, and in

9   particular the phrase "related to flood control" have generated

10  conflicting opinions among the Courts of Appeals.  In an

11  attempt to make sense that what is admittedly confusing dictum,

12  some courts had focused on whether the damage relates in some,

13  often tenuous, way to a flood-control project, rather than

14  whether it relates to "floods or floodwaters".

15          However, more than one court has pointed out

16  that if read literally, the sentence sweeps so broadly as to

17  make little sense.

18          That's -- they're talking to the related-to --

19  about their related-to issue.

20          **MR. SMITH:**  And that was a reaction, Your Honor, to,

21  again, the dictum, which essentially -- essentially divorced

22  the statute from a flood.  Because the dictum said, and this is

23  what gave the Courts of Appeals pause, there doesn't have to be

24  a flood.  All you have to have is water in a flood-control

25  project.

1          And so when they say -- when Judge Easterbrook,

2     I think, wrote the *Fryman* opinion said, it makes little sense,

3     he was actually basing it -- his statement about it making

4     little sense on the teaching which he misunderstood from *James*,

5     and he wasn't alone in that.

6          **THE COURT:**  And, apparently, the Supreme Court in

7     *Central Green* disavowed that portion of the dictum.

8          **MR. SMITH:**  Yes, Your Honor.

9          **THE COURT:**  So I guess then we get into the situation

10    is the negligence of the MR-GO and what happened there related

11    to a flood project?

12         **MR. SMITH:**  Well, Your Honor -- Your Honor, sent us a

13    few questions to think about yesterday.

14         **THE COURT:**  Yes, and I've refined that list, but I

15    did.

16         **MR. SMITH:**  Right.  But one of the things that struck

17    me, I think it was the first question was:  Does 702(c) apply

18    to the MR-GO?

19         And what struck me about that question is I

20    think it fosters the same mistake that the Courts of Appeals

21    were entangled in prior to *Central Green*, which is:  We have to

22    look at the project to figure out whether 702(c) applies.

23         And I think what *Central Green* was intended to

24    do was to stop that sort of analysis and say go back to the

25    text, read the text.  When you have damages caused by floods or

1    floodwaters, you have immunity.  Now, that can be refined a

2    bit.  Because I know, Your Honor, was troubled -- that sounds

3    like sort of like an absolutist position.  It does concern

4    me -- in your favor it concerns me that ultimately water that

5    was supposed to be contained by flood-control projects

6    encroached over or through those projects causing damage.  And

7    it distills doubt if I don't agree with the broadest

8    interpretation of *Central Green* or the statute, then it boils

9    down to whether if the cause outside the project caused the

10   project to fail -- and we're talking only in the abstract now.

11            **MR. SMITH:**  Yes, I understand, Your Honor.

12            **THE COURT:**  Then is that something covered by 702 or

13   not?

14                 And I don't know if there are any cases on -- we

15   have to -- we have to mine these cases for very small ore to

16   get comfort there.  And I'm interested in your thoughts.

17            **MR. SMITH:**  Well, what I wanted to suggest, Your

18   Honor --

19            **THE COURT:**  Go ahead.

20            **MR. SMITH:**  -- is that if you look in *Central Green*,

21   you can find a definition of floods and floodwaters that

22   incorporates the presence of a flood-control project into the

23   definition.

24                 So, in other words, there is a construction

25   that's less than the broadest that is textually based; and,

1 yet, brings the presence or absence of a flood-control project,

2 if you will, into relevance in construing the phrase, floods or

3 floodwaters.

4          And it's on the same page, Your Honor, was just

5 reading to me from, Page 431 of *Central Green*.

6          **THE COURT:**  Okay.

7          **MR. SMITH:**  The last full paragraph the Court said in

8 *James* -- and this is interesting, because I think this is the

9 only place where we really see succinctly the holding of *James*

10 stated, which was part of the problem in *James*, the holding in

11 *James* was obscured.

12          So we go to *Central Green* and we find what the

13 holding in *James* was.  But the holding in *James* was that the

14 phrase, floods or floodwaters, is not narrowly confined to

15 those waters that a federal project is unable to control, but

16 also encompasses waters that are released for flood-control

17 purposes when reservoired waters are at flood stage.

18          So that was the -- that was, if you will, if

19 there was an innovation in *James* it was a broadening, if you

20 will, of the definition of floods or floodwaters.  So that it

21 wasn't the narrowest, if you will, definition of the statutory

22 phrase, floods or floodwaters, would be what we have in this

23 case, Your Honor:  Waters that a flood-control project failed

24 to contain.

25          In *James*, however, they didn't have that sort of

1    flood.  But the Supreme Court gave its blessing to the

2    application of the statutory immunity in a situation in which

3    reservoired waters, which were at flood stage, were being

4    released for flood-control purposes.

5                    So I would say to, Your Honor, that in this

6    case, even the very narrowest definition that can be imposed

7    upon the phrase, floods or floodwaters, is satisfied in this

8    case.

9                    So as was the case in -- in -- as the Fifth

10   Circuit said in *Boudreau* -- I'm sorry -- in *Mocklin*, which was

11   the first case they cited after *James*:  When you have water

12   that causes the damage, the inquiry is at an end; and that's

13   what we have in this case.

14                   We have floodwaters, however you define it; if

15   you define it narrowly, if you define it broadly.  In this case

16   we have floodwaters that caused the plaintiffs' damages;

17   therefore, you have immunity from the damages that are alleged.

18           **THE COURT:**  A few factual questions and the -- it's

19   my understanding that -- and I hate to use words that's going

20   to make the plaintiffs or you cringe -- but the so-called

21   levee, I'll put it in quotes, along the MR-GO, are you

22   contending that that was part of the LVP --

23           **MR. SMITH:**  Yes, Your Honor.  That was another one of

24   the questions that, Your Honor, sent to us was, you know, what

25   were -- what's the nature of these works that were overwhelmed

1    by Hurricane Katrina?  And that's why I have what is Exhibit

2    Number 11 to the government's motion to dismiss --

3              **THE COURT:**  Yes.

4              **MR. SMITH:**  -- that I've blown up here for, Your

5    Honor.

6              **THE COURT:**  I wanted to look at that.  Okay.  I'm

7    looking at it right here.

8              **MR. SMITH:**  Yes.  All of the levees and floodwalls

9    that were involved in the Hurricane Katrina event were part of

10   the Lake Pontchartrain and Vicinity Hurricane Protection

11   system.  And those works are shown on Defendant's Exhibit

12   Number 11 in the dark black lines.

13              And as Exhibit Number 11 shows, those levees ran

14   along the Industrial Canal from the Mississippi River to the

15   Gulf Intercoastal Waterway, and then followed the southern bank

16   of the Gulf Intercoastal Waterway until the MR-GO diverged from

17   the GIWW and headed towards the southeast.

18              And then those works follow the MR-GO to the

19   southeast until they turned back toward the south and then back

20   toward the west where they met back up with the banks of the

21   Mississippi River.

22              So the Lake Pontchartrain and Vicinity Project

23   was designed and intended to protect that area, St. Bernard

24   Parish and the Lower Ninth Ward, where some of the plaintiffs

25   in this action, according to their complaint, resided and their

1    business was located as well.

2         **THE COURT:**  There's some -- and I'm sure we'll hear

3    from the plaintiffs -- but there's some allusion in the

4    plaintiffs brief that these weren't really levees at all, but

5    were, in essence, spoil from dredging and weren't really part

6    of the project.

7              And, again, I'm in a 12(b)(1) situation so I --

8    and I can find some facts to some degree.  And I know there

9    have been objections to the exhibits and I'll -- I'm going to

10   look at all of that when we render our opinions as to what

11   really is or isn't something we can look at.

12             But what's your contention about that?  And I'm

13   going to give you a little chance to rebut as well since it's

14   your motion.

15        **MR. SMITH:**  Well, I think this exhibit shows that

16   they're described as improvements in this exhibit.  And I think

17   if you look at the Defendant's Exhibit, I think it was number

18   3, which is the papers that were submitted to Congress

19   describing this project, I think it's a fair inference to say

20   that these improvements are levees.

21        **THE COURT:**  Can you tell me the source of Exhibit 11?

22   I intended to ask you that.  How is it prepared; who prepared

23   it?

24        **MR. SMITH:**  It is a -- it's a Corps of Engineers' map

25   as it appears to be, Your Honor.  And it was prepared to depict

1  the progress of the project in 1995.  That's date on this map.

2           THE COURT:  So are the levees placed on here placed

3  by the Corps?

4           MR. SMITH:  Yes, yes.  Well, under contracts.

5           THE COURT:  Under contracts.

6           MR. SMITH:  Right.

7           THE COURT:  Right.  The auspices of the --

8           MR. SMITH:  Yes, Your Honor.

9           THE COURT:  And who was this -- or what entity was

10 this -- was it provided to Congress to the --

11          MR. SMITH:  No, Your Honor, it's an internal

12 document.  It's been published to the Web by the Corps.

13          THE COURT:  Okay.

14          MR. SMITH:  It's for the -- to my knowledge, it's

15 solely for the Corps' use.

16          THE COURT:  All right.  Thank you.

17          MR. SMITH:  I think, just to go on -- and I don't

18 want to belabor this because I think it's fairly obvious -- but

19 it does show the works circumscribing New Orleans East as well.

20          THE COURT:  I see that.

21          MR. SMITH:  So there's really no question, at least

22 if this map is to be credited, that the improvements that were

23 part of the Lake Pontchartrain Vicinity Hurricane Protection

24 Project were completed in these areas where the plaintiffs

25 resided prior to Hurricane Katrina.

1           **THE COURT:**  I know you cited one exhibit in your

2   brief.  And there's lots of exhibits.  I have them all here.  I

3   said we looked at a lot, but not all.

4               What exhibits do you have that show that the --

5   let's take the levee along the MR-GO, and I'm -- everybody

6   understand, I'm putting levee in quotation marks, italics, et

7   cetera until we write the opinion -- that that was, in fact,

8   part of LPVHPP?  If I'm saying it right.  We know what I mean.

9           **MR. SMITH:**  I think if you look at all the

10  government's exhibits, Your Honor, I think it's referenced, not

11  only in the papers that were submitted to Congress that this

12  was the intent to construct these levees, they're also

13  mentioned in the 1988 and 1994 reconnaissance surveys that were

14  done -- mentioned only in passing, but mentioned -- that MR-GO

15  was dredged to construct the levees for the Lake

16  Pontchartrain -- that run along the MR-GO.

17          **THE COURT:**  So the question becomes -- and I'm not

18  sure it's lucid; it may be -- but whether that structure was,

19  in fact, constructed for flood control, or for -- simply to

20  prevent widening of the MR-GO, and/or the result of the

21  deepening of the dredging -- the dredging of the MR-GO.

22              And it becomes -- if we don't take the broadest

23  meaning of *Central Green*, which I know is your first argument,

24  and we've talked about that, and the statute, as you've argued,

25  there's plenty of language in the statute, if we don't go

1    there, then we'd have to find that this was a flood-controlled

2    project it would seem -- I mean, for purposes of this motion.

3              MR. SMITH:  Yes, I agree, Your Honor.  I don't

4    disagree with you.  I think that's why --

5              THE COURT:  You're saying it is?

6              MR. SMITH:  You know, I think that's why that's

7    relevant here and I know that's why, Your Honor, is asking

8    that.

9              THE COURT:  Right.  And we're really just talking

10   about St. Bernard and the Ninth Ward, because the others, which

11   I think the plaintiff is also seeking damage for, seem to be

12   more, at least indisputably, even by the plaintiffs' part of

13   flood-control plan -- the Lake Pontchartrain flood-control

14   plan.

15             MR. SMITH:  Uh-huh.

16             THE COURT:  I'm talking about the New Orleans East

17   levees.

18             MR. SMITH:  Yes, I understand what you're saying,

19   Your Honor.

20                  I think, Your Honor, that the documents that the

21   United States has submitted, and we've only, Your Honor, asked

22   which particular pages should, Your Honor, look at.

23             THE COURT:  Which I appreciate.

24             MR. SMITH:  And we've attached as exhibits only a few

25   of the pages from the complete documents, which we furnished

1   for, Your Honor's, convenience --

2           **THE COURT:**  Yes, you did.

3           **MR. SMITH:**  -- in case, Your Honor, needs to see the

4   context of those things.  But I think it's perfectly clear:

5   There are two projects.  There's the MR-GO project and there's

6   the Lake Pontchartrain and Vicinity Hurricane Protection

7   Project.

8               This is a map of the flood-control project.

9   These are flood-control works.  These are not navigation works.

10  The plaintiffs have sought to use the distinction between the

11  two projects to their advantage.  But when it's to their

12  disadvantage to conflate the two, they've tried to -- perhaps

13  there's some confusion that has been engendered by the fact

14  that spoilbanks were created during the process of dredging the

15  MR-GO.

16          **THE COURT:**  So I guess my next question is, since I

17  want to be as right as I can be about this -- although, I'm

18  going to certify it to the Court of Appeals immediately, as I'm

19  going to do any significant ruling in this case -- we get to an

20  issue as to whether this is amenable to a 12(b)(1).

21              Do I have to have a hearing to determine, or is

22  there enough here that I can look at that's indisputable that

23  can drive me to the conclusion that, yes, this is a -- it is

24  not a question of fact to look at -- you know, it is, in fact,

25  indisputable because of the *Montez* case in the Fifth Circuit

1    that this is a flood-control project?

2                    If it is, you're -- you certainly have a -- the

3    plaintiffs have a difficult burden.

4            **MR. SMITH:**  Your Honor, it has been mentioned, and

5    maybe that's because the argument's not well taken -- I don't

6    know -- but we have argued to, Your Honor, that the involvement

7    of flood-control works in the flooding of St. Bernard Parish,

8    the Lower Ninth and New Orleans East is so widely and well

9    known within this jurisdiction as to be beyond controversion.

10   In other words, it's subject to judicial notice.

11                   I haven't been down here constantly.  I don't

12   live here.  But every time I come down it seems -- at least

13   until the summer came and the anniversary of the flood

14   occurred, it seemed like every day there was an article about

15   how the flood-works had failed and why the Corps had not done a

16   good enough job of protecting the citizens from the flood,

17   which is what they were supposed to do.

18                   So I understand, Your Honor, is interested in

19   being precise and careful in his findings.

20           **THE COURT:**  Only because the other side has stated:

21   This isn't a flood-control project.  When I say *this*, I'm

22   talking about some of the structures along the, I think, the

23   south side of the MR-GO.

24           **MR. SMITH:**  Your Honor, the presence of spoilbanks is

25   plain, but that's not what this depicts, and that's not what's

1    described in the project as it's described to Congress.  So
2    there are separate things.

3              The plaintiffs have cited to the presence of
4    spoilbanks; and from that they have argued that we don't know
5    the true nature of these structures.  And I would argue to,
6    Your Honor, that we don't need to know the true nature.

7              If these are flood-works, they may have just
8    been piles of dirt.  And as one of my colleagues said to me:
9    Well, what is a levee?  A levee is a pile of dirt.  And these
10   are flood-works.

11             **THE COURT:**  Okay.  And then we get to the next
12   question before we get -- is that:  Even if they aren't, which
13   you're going to certainly -- that may affect the St. Bernard
14   and the Ninth Ward area, but the others are clearly
15   flood-works.

16             So I assume it's your argument that:  Well, if
17   water goes up over a flood-work, regardless of the cause -- if
18   water is not contained by a flood-control project, regardless
19   of the cause -- of the myriad of causes which caused the water
20   to come over, then clearly 702(c) is applicable.

21             I assume that's what --

22             **MR. SMITH:**  And, Your Honor, I got sidetracked
23   because I just cited to you --

24             **THE COURT:**  That's what happens when we start asking
25   a lot of questions.  I apologize. Go ahead.

1          **MR. SMITH:**  I did quote from the Florida East Coast

2    Railway Company as to the Fifth Circuit's construction of

3    *Graci*, but that's not the only time the Fifth Circuit talked

4    about what *Graci* stood for.  In the *James* case, in separate

5    opinions, both in the panel opinion and in the unmarked

6    opinion, the Court described -- cited *Graci* for this

7    proposition, and this is at the *James* panel opinion at 740

8    F.2nd, 369:  If the flooding is unconnected with flood-control

9    projects, the United States may be subject to liability.

10   Citation, *Graci v United States*.

11          So, again, it is what, Your Honor, is describing

12   it.  And I think it's consistent with the Fifth Circuit's

13   understanding of *Graci* to say:  When you have the involvement

14   of a flood-control project and flooding, you have immunity

15   under 702(c).  The Court -- the panel went on to say, in fact,

16   that the plaintiffs -- they put the burden on the plaintiffs to

17   establish that their injuries, quote, had no relation to a

18   flood-control project.  That was their burden.  They could not

19   meet it in *James*, and they cannot meet it here, Your Honor.

20          The *en banc* opinion also has the same sort of

21   description of *Graci* at 760 F.2nd, 602.  The Court again says:

22   If the flooding is unconnected with flood-control projects, the

23   United States may be subject to liability.  Citation, *Graci v

24   United States*.  So, hence, this is what they read *Graci* to

25   stand for:  When the government's construction of a navigation

1    project diverted flood waters, its actions did not come within
2    the grant of immunity.
3                    So the significance, again, of the navigation
4    project is that it was a, if you will, a one-project case.  We
5    have a two-project case here.
6           **THE COURT:**  I understand that.  Let me ask you this
7    question, which I think gets to the heart of the legal issue
8    that I have to resolve under the 702(c), again, if I don't
9    adopt your initial construction of *Central Green* as it
10   interprets the statute.
11                   I'm going give you a hypothetical.  Sometimes
12   they're a little ludicrous, but it's a way of testing our
13   logic:  Mississippi River is at its highest stage, practically
14   on the verge of flooding.  A United States tanker, owned and
15   operated by the Navy, losses control on the river, hits the
16   levee causing a breach, it inundates St. Louis Cathedral and
17   kills all the tourists at your ports and pews, all on the
18   moonwalk.
19                   Would the Navy be immune because of the Flood
20   Control Act of 1928?
21          **MR. SMITH:**  It would, Your Honor, certainly under the
22   broadest reading; and, I think, also under the narrower
23   reading, that is, that these are waters that a flood-control
24   project failed to contain.  Certainly the flood damages would
25   be -- the damages that resulted from the flooding, as opposed

1   to any other damages, would be covered.

2                   And, I think, there's a policy -- I think we can

3   cite a policy reason for reaching this conclusion, Your Honor.

4               **THE COURT:**  All right.

5               **MR. SMITH:**  And that's that when flood-works are

6   erected, people rely on those flood-works and they begin to

7   invest in the lands that are protected by those flood-works,

8   they build homes, they locate businesses there because they

9   expect to be safe because those flood-works are there.

10                  And when those flood-works fail then and flood

11  damages result, those damages are greater than they would be,

12  at least theoretically, had those flood-works not been

13  constructed.  So by not extending immunity to that situation,

14  again, you are adding a hidden cost to the flood-control

15  project.

16              **THE COURT:**  I understand your argument.  Go ahead.

17              **MR. SMITH:**  And I would, Your Honor, say, because I

18  thought about the sorts of -- that very sort of hypothetical

19  and, I think, what makes that hypothetical very different from

20  the plaintiffs' allegations here is that the risk in this case

21  was a risk that the flood-control project itself was intended

22  to protect against.

23              **THE COURT:**  You did argue that in your brief, and I

24  think that's an interesting argument and it has -- it has some

25  persuasion.  In other words, if these devices were, in fact,

Case 2:05-cv-04182-SRD-JCW   Document 11031-5   Filed 02/01/08   Page 31 of 112

31

1   constructed contemplating the exacerbation to the situation
2   that could be caused by the MR-GO, then if that's the very harm
3   they were designed to protect, why wouldn't it apply?

4           And I understand your argument.

5           **MR. SMITH:**  Right.  And in that context, then, you
6   know, looking for some active negligence beyond the confines of
7   the flood-control project can be seen, and I think perhaps
8   properly characterized as an attempt to evade the immunity that
9   would attach if you sued for the failure of the flood-works
10  themselves.

11          **THE COURT:**  I've struggled with that myself, and I
12  understand that.  Let me ask you this about *Central Green*, and
13  I don't want to sidetrack you too much here, and you can go
14  back to where you were.  It's just something that's on my mind
15  now.

16          And I'm going to read this to you:  In *Central*
17  *Green* the Court alluded to the fact that the damage in the case
18  was allegedly, quote, caused by repeated flows occurring over a
19  period of years rather than a single discreet incident.  It
20  noted that the damage may have been caused over a period of
21  time in part by flood waters, in part by the routine use of the
22  canal which would contain a little more than a trickle.  How
23  that may apply here.

24          Is that -- my question is:  Can the damage be
25  divisible between the LPVHPP and the MR-GO?  Because it's -- I

1    don't know if that's dicta.  It probably is dicta.

2                    But what the Court's getting at, in other words:

3    Can you allocate fault?  Does comparative fault apply, in

4    essence?

5              MR. SMITH:  I think --

6              THE COURT:  That's at 436 and 37.

7              MR. SMITH:  Yeah, I'm looking at it.

8              THE COURT:  I should have told you that.

9              MR. SMITH:  I was trying to buy myself time to think

10   a little bit, Your Honor, and see what it said.

11             THE COURT:  Take your time.

12             MR. SMITH:  I think I had always -- and the reason

13   why I wanted to read it is I had misinterpreted that passage a

14   little bit differently.  I had thought that the task on remand

15   from the Supreme Court was to be to ascertain whether the

16   damages -- and maybe this is this is what, Your Honor, is

17   asking -- resulted from floodwaters as opposed to irrigation

18   waters in that case.

19             THE COURT:  Right.  That is somewhat --

20             MR. SMITH:  And the plaintiffs have made a similar

21   argument in this case.

22             THE COURT:  Right.

23             MR. SMITH:  They said:  We're not suing for damage

24   from floodwaters, we're suing for damage from navigation

25   waters.

1          THE COURT:  Right.

2          MR. SMITH:  I think I would construe *Central Green*

3   the same way, Your Honor, suggests, which is that you don't

4   have immunity from the damages that could be segregated.  In

5   other words, if the damages could be segregated, you would not

6   have immunity for damages caused by irrigation waters.

7              I think that's the point of that --

8          THE COURT:  That's exactly what I'm trying to say.

9          MR. SMITH:  I think that's the point of that there.

10         THE COURT:  And I don't know if it's possible.

11         MR. SMITH:  Sure.

12         THE COURT:  I have no idea to segregate the MR-GO

13  from waters -- from the other floodwaters and what -- I don't

14  know.

15         MR. SMITH:  What's very different, I think, between

16  that case and this case is --

17         THE COURT:  Tell me.

18         MR. SMITH:  -- they didn't have what we would

19  commonly refer to as a flood.  I mean, they had the floodwaters

20  in the sense that these are the waters at flood stage that are

21  reservoired that may have escaped and caused damage.  And the

22  Court's saying that may be floodwaters and if you can find that

23  that happened, then you can have immunity.

24             But in this case whether the waters that were in

25  the MR-GO, you know, on August the 25th or the 26th or the

1   27th or the 28th were navigation waters in the sense that, you

2   know, ships went through that channel and navigated up to the

3   harbor, you know, the dock in New Orleans, the character of

4   those waters changed on October [sic] the 29th.

5                    The waters that rushed into St. Bernard Parish

6   and that rushed into the Lower Ninth Ward and into New Orleans

7   East ceased to be navigation waters.  They were floodwaters.

8           THE COURT:  And to some extent you could argue that

9   *Central Green* talks about that.

10          MR. SMITH:  A little bit.

11          THE COURT:  A little bit.

12          MR. SMITH:  You could see perhaps that.  Because they

13  do talk about the water when its in the reservoir, what's it's

14  nature and -- right, so... but I think in this case it's

15  just -- you know, almost defies common sense to say that the

16  people who lived in these areas were damaged by navigation

17  waters as opposed to floodwaters.

18          THE COURT:  To the extent that I'm questioning you a

19  lot, I'm not going to penalize you on time.

20          MR. SMITH:  I'm not sure how I am, Your Honor, but if

21  you want me to move on, I'll be happy to move on.

22          THE COURT:  Yeah.  Are you ready to move on to the

23  FTCA?

24          MR. SMITH:  If, Your Honor, has no more questions,

25  I'm ready to move on.

1          **THE COURT:**  Yes.  Hold on one second.

2                          **(OFF THE RECORD)**

3          **THE COURT:**  My law check was worried about your time,

4     but I'm going to give you some leeway.  I did that just to

5     focus us, but I'm going to give you some leeway.

6          **MR. SMITH:**  And I'm happy to move on, Your Honor.

7          **THE COURT:**  Because I'm the one who is constraining

8     your time; and this isn't the Fifth Circuit where you really

9     will have to move on.

10         **MR. SMITH:**  The light will go on.

11         **THE COURT:**  Yeah, right.  You won't have quite as

12    much latitude.  Go ahead.

13         **MR. SMITH:**  Your Honor, we believe this action is

14    also barred by the Federal Tort Claims Act under one of two

15    provisions that are codified at 28 U.S.C. 2688.

16              The first of those provisions is known as the

17    due care exception, and it takes its name from the language of

18    exception which says:  The provisions of the FTCA shall not

19    apply to any claim based upon an act or omission of an employee

20    of the government exercising due care in the execution of a

21    statute or regulation.

22              We believe that provision applies here because

23    the plaintiffs have very pointedly identified what they see as

24    two major flaws in the MR-GO, and both of those can be traced

25    back to the law that authorized this project.

1          In other words, these are, as the complaint
2   itself says, inherent in the project that was authorized.  And
3   those two flaws, according to the plaintiffs, are that the
4   MR-GO served as a conduit that carried floodwaters into the
5   Industrial Canal where it overwhelmed the flood-works and
6   caused flooding.
7          And the second is that the MR-GO formed a
8   funnel, which, again, intensified the storm surge as it came
9   through the Industrial Canal and into the -- and into the
10  Industrial Canal where it overtopped the flood-works there.
11      THE COURT:  You're basically saying the concept, the
12  location, any inherent flaw in the MR-GO, if any, was, in fact,
13  part of the Congressional mandate, ergo, immunity?
14      MR. SMITH:  I think that's what -- if the word
15  *inherent* has any meaning in the plaintiffs' complaint, it means
16  it's something that, you know, couldn't be taken out without
17  changing the nature of the project.
18          And I think that's our argument:  There were
19  other routes that could have been built.  It could have been
20  placed on the West Bank.
21      THE COURT:  Right.  Was there a change of course
22  after Congress approved the general plan?  I know there was
23  something -- there was -- and, I guess, specifically what about
24  the change of course from the Chandeleur and Breton Sound?  Did
25  Congress mandate the location, or was that left to the

1    discretion of the Corps?

2              MR. SMITH:  Well, yes, I think that was left to the

3    discretion.  And what we would argue is that they could modify

4    the project, but they couldn't build a different one, if you

5    know what I'm saying.  In other words, they couldn't build the

6    West Bank after the East Bank was authorized, but they could

7    tinker with the particular details as they did as, Your Honor,

8    is alluding to.

9              THE COURT:  Right.

10             MR. SMITH:  But the farthest, the most eastern, the

11   most reach as it goes into the --

12             THE COURT:  Now, why would that tinkering -- extend

13   your argument.  Why would that tinkering -- we'll call it

14   tinkering for now -- why would that tinkering, if flawed, be

15   immune under the due care exception?

16             MR. SMITH:  I won't -- I --

17             THE COURT:  It may be immune under other exceptions,

18   that is, the discretionary function exception.

19             MR. SMITH:  Right, right.

20             THE COURT:  But we'll get to that later.  But why

21   under the due care exception?

22             MR. SMITH:  I would not argue that that would be

23   protected by the due care exception, Your Honor.

24             THE COURT:  All right.

25             MR. SMITH:  Because, obviously, if it's not

1  mandated -- and that's our position:  That that change wasn't

2  mandated.  Obviously, if it was mandated, it couldn't be

3  protected by the discretionary function exception.  So the fact

4  that details could be changed in the project --

5        THE COURT:  Can I ask you a question?  And this is

6  something that we were working with last night, and maybe we

7  were tired, trying to determine which route -- we mentioned

8  B -- several routes, B, D.  Which was the route that you recall

9  in some of the Design Memorandums that we looked at, which was

10  the route that was ultimately chosen; do you recall the letter

11  designation?

12        And if you don't, that's fine.  We can get it

13  later.  I was just curious.

14        MR. SMITH:  No, Your Honor, I sorry, I don't.

15        THE COURT:  Okay.  We'll find it out and we'll comb

16  through it and get it.  It may never tell us.  We're not

17  sure --

18        THE LAW CLERK:  It's in Exhibit 6.

19        (PAUSE IN PROCEEDINGS)

20        THE COURT:  Counsel, if it takes too long, don't

21  worry about it.  We'll try to find it.  Go ahead and resume

22  your argument.  We were just trying to figure out -- they

23  mentioned the letters.  We'll find that out from you later on.

24        MR. SMITH:  Yes, Your Honor.

25        Let me get an exhibit here to recite to, Your

1   Honor.  I think the significant -- with respect to the route,

2   Your Honor, the significance with respect to the due care

3   exception can be seen from examining Defendant's Exhibit Number

4   1.

5               The very end of the exhibit, excuse me, there is

6   a map, which is identified as Plate 2 and has the caption, Plan

7   of Improvement.  And it shows that what was planned was the

8   route that was, in fact, built, with the exception from Bayou

9   La Loutre into the Breton Sound.

10              And if Bayou La Loutre, which is more than

11  23 miles from the juncture of MR-GO with the GIWW, from Bayou

12  La Loutre to the east, they took a slightly more southerly

13  route so that, as, Your Honor, has alluded to, it ended closer

14  to Breton Island as to the Chandeleur Islands.

15              **THE COURT:**  Okay.

16              **MR. SMITH:**  That change, Your Honor, is -- we would

17  submit is irrelevant to the pending motion.  There's nothing in

18  the plaintiffs' papers that suggests that that change had any

19  effect upon this case.

20              **THE COURT:**  Okay.

21              **MR. SMITH:**  It's a fact.  It was changed.  If you

22  look at the Design Memorandum Number 1C and compare the Plate

23  1, I believe in Design Memorandum 1C with not only this plate,

24  but also with the plate in Design Memorandum Number 1A, you can

25  see -- you can just hold the two up next to each other and you

1   can see that the only change that was made was in that most

2   eastern part of the route.

3           **THE COURT:**  And you're saying a reading of the

4   complaint, does not make any allegation that would be

5   sufficient to say that that change caused anything?

6           **MR. SMITH:**  Right.  They've alleged to degradation of

7   wetlands as a result of MR-GO.  This is farther south and east

8   beyond Lake Borgne and those wetlands that would have been

9   buffering the MR-GO levees.

10          And so I think it's -- while it's a fact that it

11  was changed, it seems to be an irrelevant fact in this case.

12  And we would not argue, though, just to be clear, that that is

13  protected by the due care exception.

14          **THE COURT:**  Thank you, sir.

15          **MR. SMITH:**  With respect to the discretionary

16  function exception, Your Honor -- and if you don't have any

17  more questions about due care, I'll move on.

18          **THE COURT:**  I don't have any more questions.

19          **MR. SMITH:**  With respect to the discretionary

20  function exception, Your Honor, we think that exception applies

21  to the extent that the plaintiffs are challenging the failure

22  of the Corps, or the lack of shoreline protection to prevent

23  the widening of the waterway and the erosion of wetlands.

24          **THE COURT:**  Yes.  It looks like, as I understand it,

25  and as best we could condense it -- let me see.  I just wanted

1   to go over the what I understand are the things that they're

2   complaining about.

3           On the original design you say:  Well, that was

4   approved by Congress, due care.  The failure to armor the

5   levees, now, that would be --

6           **MR. SMITH:**  Discretionary function exception.

7           **THE COURT:**  Failed to account for the devastation of

8   the wetlands which would occur, did not properly dredge the

9   MR-GO, and you should have know that proper dredging would have

10  eliminated the funnel effect.  They do talk about the Breton

11  Sound location in Paragraph 37.

12          Did the Corps fail to take erosion stabilization

13  measures, ignoring warning of ecological damages as early as

14  1958?  And some of that may be part of your inherent argument,

15  and some of it is --

16          **MR. SMITH:**  No, I think almost all -- I think all of

17  those are part of our discretionary function exception

18  argument.

19          **THE COURT:**  Okay.

20          **MR. SMITH:**  And I think you've described in several

21  different ways, and I think even the plaintiff describes in

22  several different ways, essentially one challenge, which is the

23  challenge not to protect the wetlands in some way --

24          **THE COURT:**  However --

25          **MR. SMITH:**  -- whether it's -- however you were going

1   to do it.  Right.  If you were going to armor the levees, if
2   you're going to build shoreline protection, you know, if -- you
3   needed to protect those wetlands because they were a buffer and
4   you failed to do that.
5        THE COURT:  Right.  Right.  I think that's a fair
6   assessment for the purposes of this argument, certainly.
7        MR. SMITH:  We have submitted what the Corps has
8   called reconnaissance reports, which were performed in 1988 and
9   1994, which detail the studies that the Corps undertook of the
10  problem of wetlands loss and examined what measures could
11  possibly be taken to ameliorate that.
12       THE COURT:  Before we get to that, real quickly let
13  me ask you:  The discretionary function exception, and I put it
14  in a bench memo DFE, that's if the Corps would fail to follow a
15  mandate, either by statute or regulation, I think you would
16  agree that that certainly could have the effect --
17       MR. SMITH:  Would render the discretionary function
18  exception inapplicable.
19       THE COURT:  And the plaintiff gave a couple of
20  instances, and it's hard for me to wade through it and really
21  figure out the full context of it, that you didn't comply with
22  the Federal Act and I think, at that time, 16:662, you didn't
23  sufficiently consult with and coordinate with Fish and Wildlife
24  either through the Department of Interior and, at that time,
25  Louisiana Fish and Wildlife.

1           You say you did, and you attached exhibits

2    indicating that you did consult with them.  And, I guess,

3    what's left out, even in this long briefing, is to what extent

4    are you -- you did put a footnote and said:  You know, we're

5    supposed to consult, but we're not dictated to by them, and

6    we're not mandated if they suggest something to do it.  We just

7    have to consult.  We did consult.  We complied with our

8    statutory duties, our CFR duties.

9           And, I think, they also argued that you didn't

10   submit those reports to Congress as you were required to do.

11   And briefly, if you could, you've certainly covered it in your

12   brief, but if you want to talk about that.

13        **MR. SMITH:**  I think it's Plaintiff's Exhibit N which

14   has the text of Wildlife Coordination Act --

15        **THE COURT:**  Yes.

16        **MR. SMITH:**  -- as it existed in 1956, '58 when the

17   project got underway; '51 when the papers were submitted to

18   Congress.

19           The text of the statute, Your Honor, is plain.

20   It says "consult", and it doesn't require any more than

21   consultation.  The papers show there was extensive

22   consultation, but the Fish and Wildlife Service, in particular,

23   was not on board, if you will, with the project.  They had

24   reservations.  They submitted preliminary studies.

25           Essentially, I think, you could conclude, at

1   least I've concluded, I may be wrong about this, but just based

2   upon what you read in there that the Fish and Wildlife Service

3   wanted the Corps to wait a couple more years to fund a half

4   million dollar study.  And the Corps said:  Thank you, we've

5   considered this already and we're going to build this waterway.

6              **THE COURT:**  Right.

7              **MR. SMITH:**  Our position, Your Honor, is that's all

8   the law requires.

9              **THE COURT:**  That complies with the law?

10             **MR. SMITH:**  Yes.  They consulted.  They took their

11  views into account.  In fact, they did make some changes to

12  satisfy -- in an attempt, at least, to satisfy or to

13  accommodate some of the concerns that were raised by the Fish

14  and Wildlife Service.

15             But they did not wait until all of the studies

16  that the Fish and Wildlife Service wanted to conduct were

17  finished before they did the project.

18             **THE COURT:**  You're saying they're not required to do

19  that under the law?

20             **MR. SMITH:**  Yes, the law is plain.  It just says

21  consult.

22             **THE COURT:**  All right.  You can move on, if you wish

23  to the --

24             **MR. SMITH:**  Yes.

25             **THE COURT:**  And I'll tell you what interests me is,

1    as I said earlier, I've looked at the cases from going on from

2    *Dalehite*, I guess, from *Indian Towing* through *Varig*, and then

3    I've looked at Gaubert.  And I've looked at the Fifth Circuit

4    cases, *Buchanan*, *Lively* and all of them.  And it really boils

5    down to, in my mind, then what is policy and what isn't?

6              And your argument is these are clearly -- these

7    decisions are clearly policy decisions based on those cases.

8         **MR. SMITH:**  I think what we see here are broad

9    challenges to the project as a whole, Your Honor.  For

10   instance, and I think it's most easily seen with respect to the

11   protection against wetlands loss.

12             The plaintiffs' argument is the Corps should

13   have done more to prevent wetlands loss because the wetlands

14   would have served as a buffer against storms.  That is one

15   policy consideration.

16             How should we construct this waterway, or should

17   we take into account the effects this waterway may have on a

18   future storm?  Or should we take into account the environmental

19   loss just in and of itself without even considering whether the

20   wetlands and the marshlands have a storm-reducing effect, but

21   they have a benefit, a value in and of themselves?  Should we

22   devote our resources to protecting against wetlands loss, or

23   should we devote our resources to keeping this channel open by

24   dredging when shoaling occurs?

25             And it was, as the plaintiffs say, and we don't

1   dispute, a navigation aid project.  It was authorized to

2   facilitate commerce, to facilitate shipborne traffic.  So this,

3   in and of itself, it seems to me, brings into play competing

4   policies here.

5              So I think with respect to whether you're

6   talking about armoring levees, shoreline protection, or taking

7   any other steps, you have a process.

8              **THE COURT:**  Those are strong arguments.  And I wanted

9   to ask you about -- I know that *Indian Towing* is not a DFE --

10  what I'll call a DFE -- case in the sense that it was a unique

11  governmental function argument by the government and it's been

12  sort of placed on the side by a lot of courts, but it's still

13  alive and *Berkovitz* said it illuminated the discretionary

14  function exception.  I'm not sure how, but *Berkovitz* did say

15  that.

16             And I'll tell you where I'm going:  With *Indian*

17  *Towing* in mind, you look at some in an Eighth Circuit -- first,

18  I'll go there and then I'll go to the second thing.  We look

19  at, to some extent, at the *Ayala* case, which I know you

20  think -- that's the fellow who finally offered some advice

21  about how to technically do something, the federal employee.

22             Then we get to more comprehensive cases, Ninth

23  Circuit cases, *O'Toole* where the BIA's irrigation repair

24  decisions were protected in the deviation from duty portion,

25  but its decision not to spend its funds to maintain the

1    navigation system -- excuse me, the irrigation system is not a

2    protected policy decision.

3                    Then the *Whisnant* case, and that's a Ninth

4    Circuit 2005 case where:  The decision to adopt safety

5    precautions may be based on policy considerations, but the

6    implementation of those precautions is not.... [S]afety

7    measures once undertaken cannot be shortchanged in the name of

8    policy.

9                    I guess my question is:  If *Indian Towing* is

10   still alive, if you build it, do you have to maintain it

11   properly and do you have to keep it safe?  Once you make the

12   policy decision to build it, and how do you address those

13   cases?  That's a long question, so you --

14           **MR. SMITH:**  Sure, sure.  I would say this, Your

15   Honor:  When there are some types of maintenance and technical

16   activities that really don't lend themselves to policy

17   analysis, they just -- they're too -- they're too small in

18   scope, for instance, they have very little effect on the

19   overall project.

20                   It's very difficult to see how, you know, giving

21   a miner instructions to why a particular continuous mining

22   machine implicates the broad purposes --

23           **THE COURT:**  I think *Ayala*, I agree, you can

24   distinguish it here.  The other ones, you may.  The *O'Toole*

25   case, the one where the failure to spend your money to maintain

1    it, basically, the BIA's decision not to spend its funds to

2    maintain the system was not protected by policy.

3                    That's a --

4              **MR. SMITH:**  There are -- yeah.  And, Your Honor, this

5    is --

6              **THE COURT:**  You may think it's wrong.  But I'm

7    wondering:  Besides that, how do you distinguish it?

8              **MR. SMITH:**  I think allocation of funds, most

9    circuits, if not the Ninth, is generally viewed as implicating

10   policy concerns.

11             **THE COURT:**  I understand that.

12             **MR. SMITH:**  And that would be our -- I think, our

13   point here is:  Notwithstanding other views that may have been

14   expressed in some cases, in this case these were big picture

15   issues that were at stake here.

16             **THE COURT:**  What about even though it's a lot more

17   than a lighthouse, I agree, but when you see things going

18   wrong, we see the situation deteriorating, what about the duty

19   then since you -- since you created it, we'll call it for the

20   monster, don't you have a duty to keep the monster under

21   control?  Is that a policy decision once you put something into

22   effect?

23                    And that's something *Indian Towing* -- although,

24   again, I understand it's not a DFE case.

25             **MR. SMITH:**  Right.  And Justice Scalia mentioned, and

1    I think there was concurrence later, that even in that case if

2    the facts had been different, it was plausible there could have

3    been policy considerations that would have led them to perform

4    cursory inspections and maybe the light might not have been

5    properly maintained.  It just wasn't in the facts of that case.

6              And I think with the discretionary function

7    exception, you really do need to look at the conduct that's

8    being challenged in that case to identify whether when you look

9    at that conduct in its very nature, can that be driven by the

10   policies that underline --

11             THE COURT:  I want to ask you, and I know a lot of

12   cases that do, but in this case, do you think this is amenable

13   for a decision?  I think at the very least I have to use the

14   12(b)(6) standard, if I get to this point.

15             In other words, if I don't agree with all or

16   part of your immunity argument, and I get to the Federal Tort

17   Claims Act, is this amenable to a 12(b)(6) disposition with a

18   case like this?

19             MR. SMITH:  Your Honor, I just would --

20             THE COURT:  Because I can't --

21             MR. SMITH:  -- perhaps ask, Your Honor, to maybe

22   reconsider *Montez* and whether it really compels conversion

23   of --

24             THE COURT:  You tell me why it doesn't.  Because I'm

25   looking at *Montez* right now and...

50

1      **MR. SMITH:**  I think *Montez* is a scope of employment

2   case, Your Honor.  And the issue in that case --

3      **THE COURT:**  Well, it says:  Two Courts of Appeals

4   have held that an FTCA claim cannot be dismissed for lack of

5   subject matter jurisdiction where disputed jurisdictional facts

6   concerning immunity are inextricably intertwined with the

7   merits of plaintiff's claim.

8      **MR. SMITH:**  But they aren't here, that would be my

9   point, Your Honor.  They are not inextricably intertwined in

10  this case.  They were in *Montez* because it was a scope of

11  employment issue and --

12     **THE COURT:**  Whether or not it's a policy decision,

13  whether or not it's what actually occurred, there's no facts to

14  be found?

15     **MR. SMITH:**  We're not disputing the allegations of

16  the complaint.  For purposes of resolving the application of

17  the discretionary functions --

18     **THE COURT:**  I'm going to use 12(b)(6) is what I'm

19  saying.

20     **MR. SMITH:**  Right, Your Honor.  But what I would

21  urge, Your Honor, to consider is whether or not, Your Honor,

22  cannot rule on the application of the discretionary function

23  exception in this case without resolving disputed facts.

24         You know, ironically the real --

25     **THE COURT:**  Well, if I can't, I'm going to go to

 1    Rule 56.  I'm just letting you know that now.

 2            **MR. SMITH:**  Well, but the disputed facts in this

 3    case, such as they may be, if there are any, seem to revolve

 4    around whether or not there were flood-works in existence, as,

 5    Your Honor, has asked a number of questions.

 6            **THE COURT:**  Well, that may be if there are no

 7    disputed facts relating to the FTCA, that's simple.  I'll now

 8    hear from the plaintiff on that.

 9                If there are no disputed facts.  If no one can

10    point out to me in the context of the DFE, there are no

11    undisputed facts.  But that's what I'm --

12            **MR. SMITH:**  That's all I would say, Your Honor, is

13    we're not challenging the loss of wetlands.  You know, we're

14    granting that and making a legal argument based upon --

15            **THE COURT:**  And the other point I want to get to is

16    that the plaintiffs have argued, and they argue the *Alabama*

17    *Electric Cooperative* case and -- hold on; make sure I get them

18    all here -- *Alabama Electric*, and to some extent the *Whisnant*

19    case that I cited earlier, that a professional judgment is at

20    issue, that it takes it out of the policy realm, where it's

21    scientific and technical expertise are involved.

22                And, again, I don't know if there were any

23    internal standards that the Corps did not follow itself.  If

24    there were, that may be a problem.  And it may be.  And I'm

25    interested in your discussion on that.  Don't forget, I'm going

1   to give you a little rebuttal as well.

2            MR. SMITH:  I appreciate that, Your Honor.

3            THE COURT:  Go ahead.  Do you want to --

4            MR. SMITH:  I would just say that I think, you know,

5   in this case, what's alleged is not that the Corps undertook to

6   prevent wetlands loss, but did a bad job of it because of poor

7   engineering.

8                 The allegation in this claim is the Corps

9   studded it, but decided not to do it.  That's not an

10  engineering judgment, that's a policy judgment.  I think it's

11  a --

12           THE COURT:  So you don't think the plaintiffs allege

13  any specific engineering judgments that would be the standard

14  and practice of the industry that would be applicable here?

15  The reason we didn't do these were policy, not failure to

16  comply with engineering standards; that's what you're --

17           MR. SMITH:  That's what I understand the complaint to

18  say, Your Honor.

19           THE COURT:  All right.  Thank you.

20           MR. SMITH:  Thank you, Your Honor.

21           THE COURT:  Would you guys like a five minute recess,

22  or would you prefer to go on?

23           MR. O'DONNELL:  How about you, Judge?

24           THE COURT:  I'm fine.

25           MR. O'DONNELL:  I think we're good to go.

53

1          **UNIDENTIFIED SPEAKER:**  Your Honor, on behalf of the

2     Robinson Litigation Group, I'd like to introduce Pierce

3     O'Donnell.

4          **THE COURT:**  Okay.

5          **MR. O'DONNELL:**  I'd like to hand up to the Court and

6     your Clerk, to make it easy, and to Mr. Smith, the printout of

7     Powerpoint graphics that I'm going to use.  And you can ignore

8     them, follow me, take them home, start a fire, whatever you

9     want, Your Honor.

10          **THE COURT:**  Thank you.  Thank you.

11          **MR. O'DONNELL:**  And before I start, let me pass up to

12     counsel and the Court -- we don't get a response to the reply

13     and there were some cases cited, and I'd like to -- I'm going

14     to refer to one case I don't have a slide for, so I'd like to

15     just have it available to you and your clerk so when I get to

16     it, I can save a little time, Your Honor.

17          **THE COURT:**  Thank you very much.

18          **MR. O'DONNELL:**  I even highlighted what I'm going to

19     talk about when I get to there.

20               Good morning, Your Honor.  Pierce O'Donnell for

21     the plaintiffs.

22               May it please the Court.

23          **THE COURT:**  If I look over here, it's because I'm

24     looking at your --

25          **MR. O'DONNELL:**  I understand that.

1          **THE COURT:**  I don't mean to be rude to you.

2          **MR. O'DONNELL:**  No.  In jury trials everybody says:

3    Just be yourself and do the eyeball thing, but there's so much

4    information it's really --

5          **THE COURT:**  I like this.  That's fine.

6          **MR. O'DONNELL:**  And I have it all here printed out.

7    I am not going to do all 195 slides.  I promise everybody that

8    right now.  I have seen the words in your decisions: *Incisive,*

9    *succinct, concise.*

10         **THE COURT:**  You're getting my drift.  Thank you.

11         **MR. O'DONNELL:**  And I plead guilty to not having done

12   any of those in the papers.

13         **THE COURT:**  Go ahead.

14         **MR. O'DONNELL:**  Your Honor, I'm from California, and

15   I'm here because I care.  And I care to point out to the Court

16   that this motion to dismiss is a 12(b)(1) motion for lack of

17   jurisdiction.

18              And the government seeks to end this case at the

19   courthouse door.  Now, we have a famous governor in my state,

20   Arnold Schwarzenegger, who became famous as *The Terminator.*

21   Well, for my clients, and the people who are looking to this

22   case, this is *The Terminator* motion.

23              We have done our best to put forward to the

24   Court both the legal and factual and procedural reasons why

25   this motion is poorly taken.

1           It is not a 12(b)(1) motion.  It is not a

2    12(b)(6) motion.  It is, at best, a stealth Rule 56 motion.

3    One that wouldn't pass government inspection, I suspect, as

4    stealth because it's plain to the eye that it's a defective

5    attempt at Rule 56.

6           For example, there's no notice of motion that

7    tells us it's a Rule 56.  There's not a single affiant or

8    declarant setting forth the list of undisputed facts that

9    *Anderson versus Liberty Lobby* requires to meet their burden.

10   There are 11 exhibits in the motion and 5 or 6 in the reply

11   that appear magically without a sponsor, not authenticated and

12   incompetent.

13          And I filed objections.  I now orally, because I

14   don't get to move to, I oppose the ones in the reply, just so

15   the record's clear, for all the myriad of reasons I stated

16   before.  And if you ask me to give you a specific submission,

17   give me leave, I will give that to the Court.

18          This case is not levees.  It's about the

19   Mississippi River Gulf Outlet, which the Fifth Circuit held is

20   not a flood-control project subject to 702(c) immunity.  It

21   purports to be a 12(b)(1), but it's a 12(b)(6).

22          **THE COURT:**  Let me ask you, Mr. O'Donnell, and get

23   down to the threshold question:  What's concerning me is

24   clearly in this case damages are sought for people who lived

25   behind and are protected by levees that come under the LVP,

1    I'll call it -- excuse me, the LPVHPP.  There's a dispute in
2    your papers as to the MR-GO structure.
3               And my concern is if those levees didn't contain
4    water, whatever the source of that water, why is it that 702
5    doesn't apply?  And that's something that really that can be
6    resolved on a 12(b)(1) motion, if I find that that's the law.
7         **MR. O'DONNELL:**  Well, with all due respect, you can't
8    get there from here on a 12(b)(1) because there are key
9    jurisdictional facts at issue.
10              I'll give you a couple of them:  One, here's the
11   map.  The unauthenticated map, which we sharply dispute that it
12   depicts accurately what is on that map.  What does that legend
13   mean up there when it says, improvements completed,
14   improvements disputed.
15              And, remember, I have expressed these
16   declarations.  I'm sorry it's so long.  And I have a Rule 56(F)
17   request for discovery which I'm supposed to do if I think I'm
18   being hit with a converted Rule 51 to 56.
19        **THE COURT:**  Right.
20        **MR. O'DONNELL:**  I'm going to be a stickler for
21   procedure in this case because the government --
22        **THE COURT:**  Well, what about New Orleans East?
23   You're asking for damages for New Orleans East, are you not?
24        **MR. O'DONNELL:**  Absolutely.
25        **THE COURT:**  Well, let me ask you first:  Isn't there

1    a flood-control structure, not an amorphous alleged spoilbank,

2    but an actual flood-control structure protecting New Orleans

3    East that was, in fact, compromised by Hurricane Katrina?

4              MR. O'DONNELL:  For purposes of this argument, I will

5    say yes, okay?  I think there's an issue about whether it's --

6              THE COURT:  So under 12(b)(1) if we had levees all

7    around New Orleans and they're clearly a flood-control project,

8    water is breached and/or overtopped the flood-control project.

9    702(c) is a very broad immunity statute.

10             So why should I go on and cause all of you to

11   spend million of dollars when it's clear that the broad

12   immunity set forth in 702(c) says: floodwaters -- certainly

13   that it seems that's what it says, and you can tell me why I'm

14   wrong -- floodwaters that compromise a flood-control project,

15   there's immunity of the government.

16             MR. O'DONNELL:  Well, first of all, Your Honor.

17             THE COURT:  And I realize you're saying that one is

18   not a flood-control project.  I understand.

19             MR. O'DONNELL:  It's not a flood-control project.  It

20   may have flood-control features; it's not a project.

21             THE COURT:  When I said that, I'm talking about the

22   structure on the MR-GO.

23             MR. O'DONNELL:  Congress never -- I think it's

24   undisputed that Congress never authorized any money for

25   flood-control works along the MR-GO.  They did the Lake

1    Pontchartrain, LPV for short, whatever.

2              It's clear the government has forgotten

3    something.  The theory of our case is not that our clients'

4    property and business were damaged as a result of the failure

5    of a flood-control project.

6              It is the tank, the Navy tanker, hitting the

7    levee.  It is the military transport plane hitting a levee.

8         **THE COURT:**  Any case at all like this?

9         **MR. O'DONNELL:**  Yes, *Central Green*.  Absolutely on

10   point.

11        **THE COURT:**  Okay.  I'll let you explain that to me.

12        **MR. O'DONNELL:**  It is not clear in the record when it

13   gets to the Supreme Court, there's issues of fact, and Justice

14   Stevens finally getting his due by getting to write *Central*

15   *Green* having dissented in *James*, and a dissent from the

16   concurrence of the denial of the circuit where he calls the

17   immunity a Draconian measure in our modern day in light of the

18   waiver of immunity from the FTCA.

19             He makes it clear that the Madera Canal, which

20   is part of that whole Central Valley project, is multi-purpose,

21   hydroelectric, irrigation and flood control.

22        **THE COURT:**  Simply not for flood-control.  No

23   question about that.

24        **MR. O'DONNELL:**  And it's not clear that the

25   plaintiff's property was destroyed because some floodwaters

1    came through and were unable to be contained or the gradual,

2    slow accretion of leaks.  Okay.

3                    If our case -- and, you know, you got to accept

4    my well pled allegations.  I am the master of my complaint.

5    You got to accept it.  You may not like it.  You may avert it.

6    You may want to defeat it some day in a proper summary

7    judgment.  But you got to accept it.

8                    We make it clear in our complaint that we are

9    not alleging that a federal flood-control project failed.  We

10   are saying that it was as if there were no ring of -- I'll call

11   them levees -- flood-control -- real levees around New Orleans

12   East.  Let's pick it, okay?

13                   And whether there was a floodwall there or not,

14   MR-GO was going to destroy that neighborhood.  We don't allege

15   that it wasn't built properly.  We don't allege that it wasn't

16   designed properly.  This is not a levee case like --

17            **THE COURT:**  All right.

18            **MR. O'DONNELL:**  Our theory -- and we're allowed to

19   have this theory because of *Central Green*, if nothing else --

20   is that we -- my client, Norman Robinson, the lead plaintiff,

21   his house was destroyed and his life shattered because of the

22   MR-GO, because of the velocity and the amplitude, because of

23   the design, construction and maintenance defects.

24            **THE COURT:**  You're saying but for the MR-GO, this

25   would have occurred regardless of there being a hurricane

1   protection in effect?

2           **MR. O'DONNELL:**  I allege it.  Dr. Kemp's declaration

3   says it.  And I'll have a list of LSU professors, Dutchman,

4   Dyson, from California Berkeley, coming into this courtroom if

5   I survive this motion telling you exactly that, Your Honor.

6               It's the Navy tanker.  It's the Madera Canal.

7   And for better or worse, the government has to accept my

8   allegations as true.  I'm not alleging that an I-wall or a

9   T-wall in the New Orleans East perimeter was negligently

10  designed, constructed or maintained.

11          **THE COURT:**  While we're on this -- and I'm going to

12  let you get to your presentation.

13          **MR. O'DONNELL:**  No problem.

14          **THE COURT:**  Your worthy opponent has said *Central*

15  *Green*, if read literally, means floodwaters.  And if its

16  floodwaters, you lose.

17          **MR. O'DONNELL:**  Well, with all due respect --

18          **THE COURT:**  And he points to the Justices emphasizing

19  the language of the statute, which simply says:  Floodwaters.

20  It doesn't say flood-control project.

21          **MR. O'DONNELL:**  You and I'd be out of a job if we

22  just took the literal language of a statute and ignored its

23  context, its history and it evolvement.  As you point out:  Why

24  does it involve just the Mississippi River Valley, for which

25  after the '27 flood, the 28 Act was legislated.  The Supreme

1    Court said:  No, it covers everything.

2                      And literally why haven't all those cases that

3    I've cited to you where there were floodwaters, but unrelated

4    to a federal project, starting with *Graci*, why weren't they

5    determined the other way around?  *Central Green* was a

6    plaintiffs victory.  The Ninth Circuit was so reluctant to find

7    702(c) immunity under those facts.

8                      And the Supreme Court said --

9              **THE COURT:**  I recall the last paragraph, they were

10   very --

11             **MR. O'DONNELL:**  And Justice Stevens for the unanimous

12   Court says:  We understand your angst.  We share it because the

13   language in *James*, the dictum, was admittedly confusing, says

14   Justice Stevens.

15                     And just because there's some relationship, no

16   matter how attenuated, like my case, with a fed control

17   project.  Okay.  Let's take the example:  The government

18   decides that they're going to have troop transports dump lots

19   of water on New Orleans East.  Okay.  It comes from the top,

20   okay?

21                     There's flood-control projects there.  There's

22   some relationship to a flood-control project.  It's highly

23   attenuated.  I mean, they're just there.  But they don't have

24   anything to do with what?  What is *Central Green* about?

25   Causation.  And my allegation is a failure of a flood-control

1  work, a wall, or whatever, is not why my clients are out of

2  their homes and lost their business.

3              It's because but the MR-GO was so poorly

4  designed, and 50 years of warnings that you're maintaining it

5  in an unsafe condition, that there might have been no walls

6  there.  Because the evidence is going to show -- I think I put

7  it in the declaration -- pardon me for testifying, but it

8  doesn't seem to be a problem sometimes here.

9              The truth is that the surge amplitude was at

10 least three feet or higher.  That's in the reports we've seen

11 that have been coming out, and we'll put on evidence to that

12 effect, that three feet of additional high-speed surge makes

13 the difference.  If the wall is 15 feet and it goes to 18 or

14 20, as it did, that's the difference.  You might as well not

15 have a wall.  So that's my theory of the case --

16        **THE COURT:**  I understand.

17        **MR. O'DONNELL:**  -- which is cut-to-the-chase, as we

18 do say where I come from, an answer to all of the argument that

19 they've made in this case.

20        **THE COURT:**  On the 702 issue?

21        **MR. O'DONNELL:**  On the 702 issue.  I'm so totally

22 sidetracked from what I was going to say, but that's okay.  All

23 right.  I think that I'm going to skip the summary of my

24 argument, because I think you understand.

25              I want to go right to a couple of points on

1    702(c) and then I want to get to due care and discretionary

2    function.  I had a fine law professor at Georgetown, Sherman

3    Comb.  And he said that:  He who is right on procedure usually

4    wins.  Okay.

5                    Respectfully, the government is wrong on

6    procedure here.  And it's stunning to me that there's not a

7    single discussion in the opening memo or in the reply brief,

8    Your Honor, to the legal standard that applies here.  I invited

9    when I cite your case, *McWaters versus FEMA*, I cite *Montez*, I

10   cite all of the Fifth Circuit authority that said -- I also

11   cite Supreme Court authority, too, *Bell v Hood*, pretty good

12   case. We all studied in law school from 50 years ago -- and I

13   invited the government in their response to tell me why I'm

14   wrong about the procedural issue.  And I'm going to stick to

15   the procedure for a couple of minutes because I think it's

16   actually the appropriate route here.

17                   I think the Court has -- I got all the answers

18   to your questions.  I mean, I can get to them, but they're all

19   in my Powerpoint.  We were up very late last night trying to

20   cram for the exam this morning, Your Honor.  And we'll see in

21   about six weeks whether we passed or not.

22                   But the truth of the matter is, this is not a

23   12(b)(1) motion.  Because the minute you anticipate my defense,

24   Your Honor -- see, the immunity is a defense.  Federal rules

25   make it clear the case law I cite right in *Miller* say:

1    Immunities are defenses.  Okay.

2              But on the four corners of my complaint, I don't

3    allege anything that gives rise to an immunity argument.  So

4    they have to reach out.  It's as inappropriate as anticipating

5    a federal defense to create removal jurisdiction in federal

6    court.  That's an exact analogy.

7              So the important thing to understand here is

8    that it's not a 12(b)(1).  Now, I'm not sure, Your Honor, about

9    whether the 702(c) is a 12(b)(1), versus you have to say it's a

10   12(b)(6).  I understand exactly why the Court is suggesting

11   that.  Believe me I do.

12             But I want to move you a little further about,

13   oh, 44 or so more down the Federal Rules to Rule 56.  Because

14   this is a terminating motion for my clients.

15        THE COURT:  And, as you know, throughout the country

16   cases are terminated under, as you've read, under 12(b)(1),

17   even under FTCA on occasion.

18        MR. O'DONNELL:  Well, one of my colleagues last night

19   Matt, Mr. Schultz, from Florida, did his best late into the

20   night and he found the vast, vast majority of the cases were on

21   summary judgment after there had been a full development.

22             Why?  Because *Miller* in the Fifth Circuit tells

23   us what?  That many times the issue of discretionary function,

24   is it susceptible to policy; was there a violation of statute,

25   which takes you out from the protection; what was the nature of

1    decision; what choices were made, are quintessentially fact

2    intensive and need to be determined.

3                    Just like the determination in *Central Green*.

4    You know the outcome of that case was:  Plaintiffs win.  Case

5    was remanded for what?  Further factual development.  And I've

6    checked the remand on that case.  There was further factual

7    development and the case was settled.  There was a settlement

8    order entered.  Okay.  That was the outcome in that case, in

9    *Central Green*.

10                   So the point I'm making here is that:  Yes,

11   sometimes a 12(b)(1) can be determined.  For example, if you

12   had *James* again in this courtroom and I conceded that I'm suing

13   because a I-wall failed in New Orleans East, and I concede

14   there was an I-wall there, you can decide that probably on a

15   12(b)(1).

16                   But the minute that they come in and say:  Well,

17   you know, we had the Lake Pontchartrain Vicinity Project and we

18   built all this and here's two maps -- unauthenticated maps that

19   show you exactly what happened, Your Honor.  And I come in with

20   a ton of declarations and a ton of exhibits in rebuttal and

21   say:  No, it ain't so, Your Honor.

22                   The entire greater New Orleans was not a ring of

23   flood-control protection.  Maybe as part of New Orleans East

24   was, but most of the MR-GO, and I put a lot of evidence in

25   there from Dr. Kemp.  I put in a lot of evidence from Dr. Kemp

1   and Ms. Froeschle, and lots of exhibits -- sorry about that,

2   but this is a terminating motion for us.

3                   I got these exhibits through public records,

4   Freedom of Information Act.  I haven't issued a subpoena, or

5   request for production of documents, request for admissions,

6   interrogatories, or had a witness from the Corps yet raise his

7   or her right hand.

8                   And I submit to you, if we prevail on this

9   motion and come back here next year for a trial, a lot of

10  things that you've been told in the government's papers will

11  not be so.  And I submit that to you, because based just what I

12  can find -- remember, I'm at the courthouse door:  Please, let

13  me in, make them answer, let us have discovery.  This is the

14  record that I've been able to put together.  And I submit to

15  you --

16          **THE COURT:**  Even the questions of fact that I might

17  agree with you, the fundamental legal issue I have is that if a

18  tort of the government causes water to overflow a breach, a

19  flood-control project, because clearly waters from the

20  flood-control project were part of the waters that caused the

21  damage, it's a question of whether your causation argument then

22  takes you out of 702.  That's a legal question I have to

23  decide.

24                   I'm assuming your facts are right.  But for the

25  MR-GO, et cetera, let's assume all that's right.  And it's a

1  question of how literally you read 702.  And that's a legal

2  decision I have to make, and I'm going to have to make that.

3         MR. O'DONNELL:  The lesson of *Central Green* -- and,

4  you know, I rarely have seen the Supreme Court be as candid

5  that we goofed.  We made a mistake.  *James* is not a well

6  reasoned --

7         THE COURT:  They definitely --

8         MR. O'DONNELL:  -- not a well drafted decision.  And

9  it's not just Justice Stevens getting his revenge from having

10  to dissenter in *James*.  He's speaking a truth.  Because he says

11  it: *Central Green*, if you read this language literally, it

12  swallows up any tort action against the government if

13  floodwaters happen to be involved.

14         THE COURT:  I realize it would be a very broad

15  interpretation of 702 to do what I'm saying.  I understand

16  that.

17         MR. O'DONNELL:  And let's go back to *James*, *Central*

18  *Green*, *Graci*, and the wonderful decision of Judge Heebe, which

19  is affirmed in *Graci*.  And, by the way, you can read a case 100

20  times and not see something.

21            I point out to the Court, not only was *Graci* not

22  modified or undercut by *James* and *Central Green*, the *James*

23  court in Footnote 2 cites -- let's put that up -- cites

24  approvingly the holding in *Graci*.  Yes, it's not in my brief.

25  I apologize to the Court.

1           But in *James* -- and I think this helps make my

2   point, Your Honor -- *James* discusses the history of 702(c).

3   And what do they tell you six times in that opinion:  The Act

4   relates to liability related to flooding from a flood-control

5   project.

6           Congress did not want to build what turned out

7   to be a billion dollars in today's money of works along the

8   Mississippi River after the 1927 flood and then be held liable

9   in damages if there was a failure of those levees along the

10  Mississippi.

11          One of my questions was that I neglected to ask

12  you:  What does *connected to* mean in the *Graci* decision?

13          **MR. O'DONNELL:**  Well --

14          **THE COURT:**  What does *connected to* mean; and you said

15  it isn't connected to.

16          **MR. O'DONNELL:**  It's not connected to.

17          But in Footnote 2 of *James* -- this is as good as

18  it gets in our business without the case being directly

19  appealed by the government and affirmed by it -- they point out

20  that the holding in *Graci*, okay, the government contended, just

21  as it does here today, Your Honor -- I'm reading it -- the

22  federal government contended that section 702(c) granted

23  immunity from damages caused by --

24          The government contended -- it's an echo of what

25  you hear in this courtroom -- that 702(c) granted immunity from

1    damages caused by any floodwaters, even though it was

2    unconnected with federal -- with flood-control projects.

3              The Court, *Graci*, rejected this argument and

4    held that the provision conferred immunity only for floods or

5    floodwaters connected with a flood-control project.

6              And the Supreme Court cited that, and also

7    Footnote 7, the *Morici* and *Hayes* cases, to make the point clear

8    that just having floodwaters is not enough.  That's what *Graci*

9    says.  That's what the Supreme Court in *James* says *Graci* says.

10   Okay.

11             And I think the other thing, Your Honor, when

12   you look at the legislative history as it was discussed by

13   Judge Heebe, by the Fifth Circuit in *Graci*, by the Supreme

14   Court in *James*, and to a more limited extent, in *Central Green*,

15   you see the courts trying to come to a practical and equitable

16   resolution.

17             There's a Draconian remedy where the sovereign

18   is immune, even though when the sovereign is at fault,

19   negligent.  And what the courts have evolved to, by the time we

20   get to *Central Green*, is a pragmatic determination of whether

21   federal monies having been authorized and spent for

22   flood-control projects, and those flood-control projects fail,

23   and that's the causative element of the plaintiff's injury,

24   then the courts are more likely, Your Honor, to say, okay, as

25   Draconian as they may be, immunity.

1          We don't allege that in this case.  We're not

2    alleging that they did anything poorly.  Whatever may be in the

3    levee cases, Your Honor, well, that's not our case.  That's why

4    I started by saying this is Robinson, this is the MR-GO.

5    That's as good as an answer I'm gonna give you.  But I think

6    you get reinforcement for my conclusion from Footnote 2 in

7    *James*.

8          **THE COURT:**  All right, sir.

9          **MR. O'DONNELL:**  One last thing on the facts.  Because

10   I don't have discovery yet.  Because I had to state a claim.

11   And I've stated a claim.  They don't argue that I didn't allege

12   under Louisiana law duty, breach of duty, causation, and

13   damages.  We're here because they're improperly trying to raise

14   an affirmative defense, which is outside the four corners of

15   the pleadings.  Facts are important here.  I think the 702(c)

16   analysis is only a secondary issue for me.

17          My primary issue is the theory of my damages

18   case is *but for*.  Okay.  I think the Court understands my

19   position.

20          **THE COURT:**  I do.

21          **MR. O'DONNELL:**  Alternatively, there's a serious

22   factual dispute of whether federal flood-control works were

23   ever erected along the breach two area.  Okay.  Senator -- I

24   came from New York originally, and I've moved around a lot, I

25   guess.

1          But the great Senator Moynihan was once

2   feverishly debating a college in the senate and he finally

3   turns and he said:  Sir, you're entitled to your opinion, but

4   not your version of the facts.

5          And I think what we have regrettably here is the

6   government trying to get you to accept, at this so preliminary

7   stage, their version of the facts.  And I don't think that's

8   appropriate.  And I really don't have anything else on the

9   procedure, Your Honor.

10          **THE COURT:**  All right.

11          **MR. O'DONNELL:**  To the extent that you have to

12   wrestle with:  What was in place, what was it, a levee, what is

13   a levee, those are factual issues that I've raised in --

14          **THE COURT:**  I will tell you that the part of this

15   that gives me, at least right now, the most concern is the

16   Federal Tort Claims Act.

17          **MR. O'DONNELL:**  I understand that --

18          **THE COURT:**  Okay.

19          **MR. O'DONNELL:**  -- and I'm going go to it.

20          **THE COURT:**  I don't want to cut you short if there's

21   anything else you want to point out.

22          **MR. O'DONNELL:**  You know, Your Honor, I have -- Tab

23   41.  I've listed in your book there, and it goes from slide 41

24   all the way through 45, a dozen or more disputed facts that

25   bear on both the 702(c) issue.  And let's go to the next page.

1      **THE COURT:**  Yes, and there was a litany of facts in
2   your papers as well.
3      **MR. O'DONNELL:**  I list in the papers.  They come from
4   Ms. Froeschle's declaration.  They also come from my request
5   for Rule 56(f) discovery.  But here, Your Honor -- and, you
6   know, Your Honor, it was unfortunate the government suggests
7   this, the Seabrook Lock was never --
8      **THE COURT:**  We all know that the Seabrook Lock was
9   not constructed.
10      **MR. O'DONNELL:**  I'll let you take judicial notice of
11   that, Your Honor.
12      **THE COURT:**  I think the government's acknowledged it.
13      **MR. O'DONNELL:**  But not judicial notice that there
14   were levees all along the MR-GO, because I don't think there
15   were.
16          The reason I'm starting with the FTCA, if you
17   look in the middle of this slide that I have up there, Your
18   Honor, there's a list, and I think I've got six or eight,
19   factual issues that bear on either due care, or the nature of
20   the discretion exercised susceptible to policy analysis.
21          We have serious -- we've raised serious issues
22   that they violated at least two statutes.  And they've also
23   violated the Water Resources Development Act of '86 because you
24   have to put as a premium the protection of the marshlands.
25   Again, I can't get -- I think that's in my conjuncture

1  complaint.

2             But here I have the River and Harbor Act of

3  1945, and the Fish and Wildlife Coordination Act; and we need

4  to know the facts that bear on how they executed those

5  statutes.  I need evidence on that.  It's not something that

6  they can just say, oh, look here's a letter that we sent to

7  Congress, oh, forget the Secretary of Interior, Seaton's 1967

8  letter where he blasts us for violating the law.

9             Remember, consultation is one requirement of

10 these two statutes.  Coordination is another.  Coordination is,

11 thank you very much for your letter, we're going to do what we

12 want anyway.  Because Congress, they were kind of green even

13 back then.

14        **THE COURT:**  I was grappling with this and what is

15 consultation and coordination under the statute, and then

16 precisely what was done.  They cite a number of exhibits --

17        **MR. O'DONNELL:**  And I'm going to say something.

18        **THE COURT:**  Okay.  Go ahead.

19        **MR. O'DONNELL:**  I'm going to say something.

20             Another fact:  Did they consult with the Fish

21 and Wildlife Service and the Department of Wildlife and

22 Fisheries here in Louisiana?  Was it done timely?  You see, I

23 say the law requires in coordination, timely consultation.

24             We have evidence that when they submitted their

25 report to Congress in '51 they had violated the 1945 River and

1   Harbor Act, had not even consulted the Department of Interior,
2   and yet that report became the blueprint for the ultimate MR-GO
3   authorization in 1956.

4            **THE COURT:**  Let me ask you this:  From a time
5   standpoint, when do you contend that the coordination and
6   consulting had to take place, between what period of time?

7            **MR. O'DONNELL:**  Well, the consultation had to occur
8   between 1945 and 1958 when they started --

9            **THE COURT:**  When the construction started, in
10  essence?

11           **MR. O'DONNELL:**  When the scoops came in.

12           **THE COURT:**  All right.

13           **MR. O'DONNELL:**  As to the second law, which has a
14  1946 and a 1958 amendments -- and the '58 amendments apply
15  here; we've alleged it; I think I've proven that they apply
16  here -- it was a far higher duty.  And that was a duty of
17  coordination.  You got to sit down on a peer-to-peer basis with
18  the state and federal environmental agencies.

19           We think environmental law started Earth Day in
20  1970.  No.  They were conscious back in the 40s and 50s of
21  these issues.  And you have to meaningfully consult.  And when
22  the Secretary of Interior says, please, do not choose this
23  route and do not go about the dredging because there's going to
24  be such an ecological disaster -- I mean, I'm not exaggerating.
25  That's what he says in 1957 to the Army Corps -- and I've got

1    that letter in the record --

2              THE COURT:  Well, it seems to me, even in the

3    government exhibits, the government candidly acknowledged that

4    and certainly Fish and Wildlife, through the DOI, was very

5    concerned about this and wanted a study that would take years

6    and wanted an appropriation of substantial money at that time.

7              MR. O'DONNELL:  Right.  You may have to decide

8    ultimately what the *consultation* and *coordination* means in the

9    blending of these two statutes.  But I don't think it means not

10   giving the Fish and Wildlife sufficient time to do the studies

11   they need, not respectfully listening to the state agency --

12   and I have evidence on that -- and just bulldozing ahead.

13             I mean, and that's the reputation of my

14   adversary in this case, but I think that's what happened here.

15             And if I say it happened and I offer you

16   credible documents at this early stage when all I'm doing is

17   going on their database and getting some stuff out of the

18   St. Bernard Parish very soggy archives and have a guy in

19   Washington go and try and find things for me, that's all I've

20   been able to do at this point.  I think I've certainly raised

21   enough facts on the discretionary function -- oh, this is due

22   care point.  Next slide, please.

23             What were the decisions that they made.  Now,

24   we're getting into the issue of what kinds of decisions did

25   they make.  I think I can prove -- and I have a list for you.

```
 1   In answer to my questions, I will go through all of the
 2   defalcations, I think you said, in your question --
 3            THE COURT:  Right.
 4            MR. O'DONNELL:  -- and I'll tell you why none of them
 5   are policy analysis.
 6            THE COURT:  Yes.  Because I've read a lot of the
 7   cases on the discretionary function exception even before here,
 8   and in the Fifth Circuit as well.  And it's, let me say,
 9   difficult to find one that isn't policy.
10                 It's very difficult to find a case where there's
11   not a mandate -- if we put aside your mandate argument --
12   failure to comply with a statute of regulation where decisions
13   aren't policy, from storing asbestos, to blowing up French
14   ships.  A lot of things are policy.
15                 And I'm interested in your answers because the
16   cases are sparse since *Varig*.  Very sparse.  Your *Alabama*
17   *Electric* case is a great case --
18            MR. O'DONNELL:  Well, I think *Seaboard Coast Line* in
19   the Fifth Circuit is pretty good.  *Whisnant* is pretty good.
20   *O'Toole* is pretty good.
21            THE COURT:  There are -- I realize they're Ninth
22   Circuit cases, but if they're persuasive, I will certainly --
23            MR. O'DONNELL:  Well, *Indian Towing* has been adopted
24   by the Supreme Court.
25            THE COURT:  Again, as you know, not a DFE case, but
```

1   in *Berkovitz* it did say it illuminated the DFE --

2          **MR. O'DONNELL:**  Yes, and --

3          **THE COURT:**  -- as an aside.  I'm not sure what that

4   means, but it's not a discretionary function exception.

5          **MR. O'DONNELL:**  No, but *Seaboard Coast Line* echoing

6   *Indian Towing* is, and that's your circuit and that says --

7          **THE COURT:**  Well, I'm interested to hear your

8   argument on this.

9          **MR. O'DONNELL:**  Let me begin by saying:  There's two

10  prongs to this, due care exception and there is discretionary

11  function exception.  Now, let's talk briefly about due care.  I

12  really don't think they come close to satisfying.

13          I allege -- go to 115.  I allege that the first

14  prong of 2688 was not satisfied here.  I say:  You didn't use

15  due care, okay?  Now, the government is not willing to accept

16  my allegations.

17          They say:  First of all, I'm challenging the

18  execution of law.  Your Honor, you know, I'm not challenging

19  the legality or the constitutionality of the authorization of

20  the MR-GO in 1956.  I'm talking about the implementation of

21  that statute by the Army Corps.  And if you look at Tab 118, I

22  allege point blank that the Army Corps did not comply with this

23  Congressional mandate.  I allege it.

24          And, you know, under Rule 8(a), Your Honor,

25  that's all I have to say.

1          THE COURT:  Well, if it's purely conclusory, though,

2     I have a right to ignore it.  Tell me what you base it on.

3          MR. O'DONNELL:  Well, I base it on 120.  I have about

4     15 -- 20 paragraphs in my complaint where I go through the

5     investigation, planning, design, construction, maintenance and

6     operational phases of this entire law as it was implemented and

7     carried out by the Army Corps.  And I say you did not comply

8     with the statutory mandate.

9               And two particular things ab initio, Your Honor,

10    I will concede for purposes of this argument that the route

11    change -- and, by the way, they chose route B I'm told by one

12    of my colleagues.

13         THE COURT:  That's what I thought, but I wasn't sure.

14         MR. O'DONNELL:  I only know what I'm told on that

15    one, Your Honor.

16         THE COURT:  Myself as well.

17         MR. O'DONNELL:  But the point is that I don't think

18    that when they're down around the 50, 60-mile mark and they

19    don't go out to Chandeleur, but they go down to Breton, that's

20    not really the heart of my case.

21         THE COURT:  So we agree that, at the very least,

22    that's substantially attenuated from the heart of your case?

23         MR. O'DONNELL:  Yes.  But what is not attenuated is

24    the funnel.  If there's one culprit in all of this flooding

25    that occurs in the upper Reach 1 -- Reach 2.  Reach 1 it's the

1   funnel.

2          THE COURT:  And I'm interested how that deviates from

3   the Congressional mandate.

4          MR. O'DONNELL:  Because I have evidence in the record

5   that the plan, the 1951 report, House Document Number 245,

6   which is in the record, approved by Congress, provided for not

7   the MR-GO to go into the GIWW, but rather, for safety

8   considerations, I submit, a second parallel waterway to be

9   built in an east-west nexus into the Industrial Canal.  And

10  I've got evidence about that.

11          For whatever reason, Your Honor -- we don't need

12  to decide that today -- the Corps did not follow that approved

13  alignment.

14          THE COURT:  I had a question:  What is the

15  significance concerning whether Congress dictated the location

16  of the MR-GO not parallel to the GIWW, but tied to Reach 2, the

17  MR-GO directly into the GIWW and the fact that it didn't?

18          That's one of my questions.

19          MR. O'DONNELL:  It is probably, along with the

20  destruction of 101 square miles of precious surge buffering

21  wetlands, the single most egregious deviation from the mandate

22  of Congress, and the single most negligent act performed by

23  these engineers.

24          THE COURT:  So it's your contention:  One, it's not

25  part of the mandate of Congress and you have proof to that

1    effect?

2              **MR. O'DONNELL:**  I do.  I've offered evidence.  Your

3    Honor, I may be in error, but I'm not in doubt.

4              **THE COURT:**  Okay.  Good.  We'll get in to the --

5              **MR. O'DONNELL:**  We'll find out at trial whether I'm

6    right or wrong.

7              **THE COURT:**  Well, get into a reason why it's not a

8    policy decision where I determine.  Because the Congress

9    certainly left the Corps discretion to -- we used *tweak* -- but,

10   I mean, to make certain decisions after the mandate was issued.

11   And why those decisions are not policy decisions in part -- but

12   you go ahead your argument.

13             **MR. O'DONNELL:**  Well, you got it.  You understand

14   what I'm saying.  I only need one.  I only need one deviation

15   from mandated law to survive this particular prong.  I got it.

16                   And they tried to rebut it, maybe in their -- I

17   don't remember, but I think they tried to rebut it.  But it's a

18   factual dispute.  It's probably one of the quintessential

19   factual disputes in the case.  And we have a right to discovery

20   to take witnesses and define --

21             **THE COURT:**  Clearly, clearly, if there is a factual

22   dispute as to whether a mandate were followed, that's certainly

23   in your favor.

24             **MR. O'DONNELL:**  Right.  If Congress says:  Okay,

25   we're approving this waterway, and go ahead and build it

1  according to House Document Number 245 and they don't do that,

2  that's the same as violating any other law.

3        **THE COURT:**  Okay.  In other words, it was mandated

4  not to -- is the mandate a negative or a positive?  In other

5  words, did they say:  You go ahead -- it's my understanding

6  they gave the Corps discretion.  But did the Corps specifically

7  not follow a mandate, that is by placing it --

8        **MR. O'DONNELL:**  Their map in that document says:

9  We're going to build a parallel waterway, and they don't do it,

10  okay?  You have to assume that Congress reads the reports and

11  you have to indulge in that assumption, Your Honor.

12        **THE COURT:**  It may be a question of whether that is

13  or is not a mandate?

14        **MR. O'DONNELL:**  Correct.

15        **THE COURT:**  I understand.

16        **MR. O'DONNELL:**  And I think we've got to go further

17  in this case to find out the answer to that.  The government

18  doesn't shed any light on that.

19        **THE COURT:**  All right.  Go ahead.

20        **MR. O'DONNELL:**  Let's go to the second aspect of

21  discretionary function -- or the first.  I'm sorry.  Now we're

22  in discretionary function, not due care.  Okay.  There's two

23  issues there:  One, the Army Corps violated federal law.  I

24  mentioned earlier the River and Harbor Act of 1945 and the 1946

25  and the 1958 Fish and Wildlife Coordination Act.

1                  Secondly, the choices that were made here were

2    professional engineering judgments and not immunized conduct.

3              **THE COURT:**  Tell me why.

4              **MR. O'DONNELL:**  Okay.  I'm going to get to it.  You

5    know, something, Your Honor, I'll tell you exactly why.

6              **THE COURT:**  Because this is --

7              **MR. O'DONNELL:**  First of all, I'm going to skip over

8    to my -- the first prong about whether they violated federal

9    law.  I'm going to get to the nature of the decisions they

10   made. I've got it on the slides.  I put it in my brief.  I said

11   they violated two federal statutes.

12             **THE COURT:**  All right.

13             **MR. O'DONNELL:**  And they ignored the plea of 133.

14   This is the letter I referred to, Your Honor.  This is the

15   letter from the Secretary of Interior.  You know, government

16   agencies don't usually write letters like this, in my

17   experience, other governmental agencies.

18                  And they said:  Basically, you've given us the

19   brush-off here and we really have important studies that we

20   want to consult with you about so we can coordinate the

21   development of this waterway.

22             **THE COURT:**  And you say the '58 Act would apply to

23   this letter?

24             **MR. O'DONNELL:**  Yes.  Well, no, the '46 Act would

25   clearly apply.  The '58 Act even tighten it more.

1          THE COURT:  Maybe in the coordination aspects.  We

2    weren't in the coordination stage here.  We were in the

3    consulting stage.

4          MR. O'DONNELL:  Well, actually, there's a

5    coordination required by the '46 Act, but it was ratchetted up

6    even further in the '58 Act.

7          THE COURT:  I see.  All right.

8          MR. O'DONNELL:  Let's go to 136.  Before I get to the

9    analysis -- and I'm going to go through the six or seven cases

10   that I've cited, four or five which you've cited.  This has,

11   first of all, been found in this circuit to be a narrow

12   exception.  It's a narrow exception.

13              And the focus here --

14         THE COURT:  It's narrow, but I just had a case

15   involving it.  It's narrow, but I sure can't find many cases

16   that don't find that something done by the government wasn't

17   policy.

18              I'm just letting you know.

19         MR. O'DONNELL:  Well, I'm going to sell you half a

20   dozen cases.  But there's another important issue here --

21         THE COURT:  Go ahead.  Go ahead.

22         MR. O'DONNELL:  The issue is the conduct involved

23   here, Your Honor.  Okay.  And let's go to -- here's the

24   following kinds of decisions that have been held not to involve

25   policy analysis or discretionary choices:  Objective scientific

1  standards, *Berkovitz* itself.

2         **THE COURT:**  I think the government will acknowledge

3  that to some limited extent.

4         **MR. O'DONNELL:**  Well, it's an objective scientific

5  and engineering standard in 1958 through 1967 to armor banks of

6  a waterway to avoid the kind of erosion and catastrophic

7  wipeout that occurred here.

8         **THE COURT:**  But what if you don't do that because you

9  decide not to do it because of economic reasons; isn't that

10  clearly policy?  Doesn't every case say that?

11         **MR. O'DONNELL:**  Your Honor --

12         **THE COURT:**  Because you haven't decided to build it

13  yet, which distinguishes the *O'Toole* case.  If you decide not

14  to build it, that's clearly a policy decision.  I don't know if

15  you can find one case that's going to persuade me that deciding

16  not to build something, based on the cases that I've read, is

17  not policy.

18         Give me a case that says that.

19         **MR. O'DONNELL:**  It is my challenge to disabuse of

20  that notion.

21         **THE COURT:**  Good.

22         **MR. O'DONNELL:**  And I'm going to try to do it in 30

23  seconds.  The decision to build the MR-GO is a discretionary

24  decision.  It is not discretionary to follow safety rules,

25  federal regulations, the criteria we believe they didn't follow

1   their own Design Memorandum and design standards in 1958 to

2   1967.

3         **THE COURT:**  They didn't follow their own --

4         **MR. O'DONNELL:**  I don't think they followed the

5   Design memo.  We've offered evidence about that.

6         **THE COURT:**  That's important.

7         **MR. O'DONNELL:**  Now, furthermore, if it's true that

8   every time a government official has to decide whether to spend

9   money that that's some kind of an immune discretionary policy

10  decision, there is no Federal Torts Claim Act.  It is over,

11  other than the mail truck hitting the pedestrian in the

12  crosswalk when the light was red.

13        **THE COURT:**  Given some of the cases I've read lately,

14  I'm beginning to think the same thing myself.  And I realize

15  you have the *O'Toole* case out there that expands it.

16        **MR. O'DONNELL:**  A foolish consistency is, what, the

17  hobgoblin of a little mind?  And, Your Honor, I will concede

18  that if there's one area of federal appellate jurisprudence

19  that is in conflict, that is schizophrenic, that needs help, it

20  is this issue of susceptible to policy analysis.

21        **THE COURT:**  I would say that I would concur with you

22  on that.

23        **MR. O'DONNELL:**  Now, having said that, this is not

24  one of those cases.

25        **THE COURT:**  All right.

1          **MR. O'DONNELL:**  This is a starkly different
2   situation.

3                  And let me just finish, Your Honor:  Engineering
4   and scientific judgments have been classically found not to
5   be --

6          **THE COURT:**  Well, I think the *Alabama Co-op* case is
7   your best case.

8          **MR. O'DONNELL:**  I'm going to get to it.

9          **THE COURT:**  Yes.  I've read it.  I know it.

10         **MR. O'DONNELL:**  So you understand what I'm saying?

11         **THE COURT:**  I understand it completely.  In other
12  words, it criticizes severely in an Idaho law review article
13  about being an outlier and deviating from the concepts
14  post-Varig.

15         **MR. O'DONNELL:**  Is *O'Toole* an outlier?  Is *Whisnant*
16  an outlier?  Is your circuit's decision, *Seaboard Coast Line* --

17         **THE COURT:**  I mentioned that because I think I've
18  read that --

19         **MR. O'DONNELL:**  -- an outlier?  And let's turn to our
20  friendly handout, if you will, Your Honor.

21         **THE COURT:**  Yes.

22         **MR. O'DONNELL:**  A former colleague of yours, who I
23  now believe sits above -- in the Fifth Circuit --

24         **THE COURT:**  Yes, above me.  You're correct.

25         **MR. O'DONNELL:**  I promised Calvin Fayard I wouldn't

1   say that, and I did.  I'm sorry, Calvin.

2           **THE COURT:**  Let me say:  Certainly in the hierarchal

3   structure of the court.

4           **MR. O'DONNELL:**  I was suggesting only that, Your

5   Honor.

6           **THE COURT:**  Yes.

7           **MR. O'DONNELL:**  And I understand that Judge Clement

8   may be of a more conservative bench, I've heard.  Okay.  Well

9   her Honor, in the *Bean Horizon* case denies the motion for

10  summary judgment by the United States of America involving the

11  Army Corps dredging activities.

12          By the way, this was a case they cited in the

13  reply.  That's why I'm here talking about.

14          **THE COURT:**  This is one I have not read.

15          **MR. O'DONNELL:**  But we're going to spend a little

16  time with it, okay, Your Honor.  And there was a pipeline, a

17  dredge came along and dropped an anchor and there was an

18  explosion and there was property and personal injury damage.

19          The dredging company sues the government.  The

20  government files a motion for summary judgment, by the way,

21  after discovery, okay -- which we'd like a little taste of

22  here -- and moves for summary judgment.  And she did not --

23  Judge Clement denies it.

24          But it's important to understand why *Indian*

25  *Towing*, and why *Seaboard Coast Line*, why *O'Toole* are totally in

1   line with Judge Clement's decision.  If you turn to Page 3

2   of -- I don't have it on the screen.  It's the handout I gave

3   you, Your Honor.  It's this handout here.

4              **THE COURT:**  Yes, I have it.

5              **MR. O'DONNELL:**  If we turn to Page 3.

6              **THE COURT:**  Page 3 of the Westlaw.  All right.

7              **MR. O'DONNELL:**  Yes.  She first states in the left

8   column what I've already mentioned, the conduct rather than who

9   made the decision.  In the upper right side of Page 3 she

10  states the bedrock law of this circuit:  In examining the scope

11  of the discretionary exception, the Fifth Circuit has noted

12  that the exception, quote, only reaches the discretionary

13  decision as to whether to supply the service or not.  Here,

14  whether to build the MR-GO or not.

15             Continuing:  Once the government takes an

16  action, such as marking a reef, or placing a navigational aid,

17  however, it must act reasonably with respect to those who are

18  likely to rely upon it.

19             Once the government has made a decision to act,

20  the government is responsible for acts negligently carried out,

21  even though discretionary decisions are constantly made as to

22  how those acts are carried out.

23             **THE COURT:**  Yes, I know that, and I understand that.

24  And, I think, that that's an *Indian Towing* type situation.  I'm

25  just concerned that cases after that may have mitigated that by

1    the Fifth Circuit.

2              **MR. O'DONNELL:**  Well, this is 1998.

3              **THE COURT:**  Yeah, this is when Judge Clement was a

4    district judge, of course.

5              **MR. O'DONNELL:**  Well, we hope that she would be

6    consistent on this, if she ever gets to review your

7    interlocutory appeal, Your Honor.

8              **THE COURT:**  I'm concerned about the *Lively* case

9    and --

10             **MR. O'DONNELL:**  I'm going get to that.  Okay.  But,

11   you know, when I got a good one, your Honor, I got to milk it.

12             **THE COURT:**  No, no.  I agree.  I agree.

13             **MR. O'DONNELL:**  And let's go to Page 5, and I'll wrap

14   this up, but this is so important in this case.

15             **THE COURT:**  Go ahead.  I agree.  Go ahead.

16             **MR. O'DONNELL:**  And on Page 5 I've highlighted, okay,

17   she says:  Summary judgment must also be denied because of the

18   existence of genuine issues of material fact concerning whether

19   the Corps acted negligently in carrying out its discretionary

20   function.  And then she goes on from there.

21             And the point I'm making, Your Honor, is --

22             **THE COURT:**  Was that on -- excuse me.  I'm sorry.  I

23   picked up the wrong case.

24             **MR. O'DONNELL:**  Page 5 of the handout.

25             **THE COURT:**  You see, if you act negligently in

 1  carrying out a discretionary function, you only get to that if
 2  you find it's not a policy.  No question.
 3         MR. O'DONNELL:  Yes, but I -- you know -- let's go to
 4  our list of defalcations.  It's at the very end of 191.
 5             I'm going to jump to the end, and then I'm going
 6  to come back again, Your Honor.
 7         THE COURT:  All right.
 8         MR. O'DONNELL:  You asked me to incisively -- I'm
 9  going to Tab 191 -- tell you what the government did wrong here
10  and why it's not a policy determination.  Okay.
11         THE COURT:  Other than that case, I've read virtually
12  all the other cases.
13         MR. O'DONNELL:  This is totally consistent, Your
14  Honor, with the cases I've cited, okay?  The *O'Toole* case, the
15  *Whisnant* case, the *Seaboard Coast Line* --
16         THE COURT:  Those cases are very -- I admit, there
17  are two really good cases, and especially *O'Toole*, is very
18  helpful to you.
19         MR. O'DONNELL:  I don't know whether your rule is to
20  follow the Ninth Circuit -- the Supreme Court doesn't like it,
21  I know.  There are those of us who love it sometimes.
22         THE COURT:  My rule is to follow the most persuasive
23  jurisprudence out there as long as I'm not bound by something
24  by the Fifth Circuit.
25         MR. O'DONNELL:  Let's take Judge Clement in *Bean*,

1   let's merge her with *O'Toole*, let's through in a dash of your
2   *Seaboard Coast Line*, let's put in a sprinkle of *Whisnant*, and
3   you get a denial of this motion.  Because we've got to go
4   forward and have factual determinations.
5           **THE COURT:**  With the *Alabama Electric* case.
6           **MR. O'DONNELL:**  And most importantly, it's built on
7   the solid foundation of Eleventh Circuit decision in *Alabama*
8   *Electric Cooperative*.  But we just went through -- these are
9   not all of the allegations; but each one of these, creating a
10  funnel, not armoring the levees, okay, not accounting for a
11  devastation when you know you're putting a waterway through --
12          **THE COURT:**  We need to know the reasons they didn't
13  do that.  And you may be right --
14          **MR. O'DONNELL:**  I've got to have discovery.
15          **THE COURT:**  I'm interested in the government's
16  position on that.  These may well be policy decisions and you
17  may well be wrong.  They may well not be engineering or
18  scientific judgment, but policy decisions.  And we may need
19  discovery on that.
20          But I'm also interested in something you said
21  about failure to follow your own internal regulations.  That to
22  me has appeal in and of itself.
23          **MR. O'DONNELL:**  We have a sneaking suspicion, without
24  the benefit of compulsory discovery --
25          **THE COURT:**  I understand.

1      **MR. O'DONNELL:**  -- that buried in the files of the
2  government that I haven't been able to get to yet -- I have the
3  design memo -- are rules and regulations that govern all of
4  this.
5          You know, the government -- GPO, you can get a
6  lot of books about the Corps and they publish very helpful
7  standards which become part of the professional engineering
8  standards of our nation.  After all, they are -- someone once
9  said, they're called the Army Corps of Engineers and not the
10  Army Corps of Biologists.
11          So the fact of the matter is they're engineers
12  and they have standards.  And I believe discovery in this case
13  is going to show fairly well that in the, not only the design
14  and construction, but the ongoing operation of the MR-GO, they
15  violated a number of those standards.
16          And you know what's telling:  In their motion
17  they try to make a virtue out of a vice.  They concede -- the
18  government concedes in their opening motion:  Yes, we knew
19  about soil erosion, the reconnaissance report of 1988; yes, we
20  knew that there was surge potential; yes, we knew about the
21  intrusion of solidity; and, yes, we knew about the devastation
22  of the wetlands.
23          I could add they probably also knew that they
24  had a surge buffering in the time of a calamity like Betsy or
25  Katrina or Rita.  And the fact of the matter is you can't

1    extricate yourself.  *O'Toole* tells us that.  *Seaboard Coast*
2    *Line* tells us that.  You can't extricate --
3                    And, by the way, Judge Clement tells us that in
4    the *Beacon* case.  You cannot make a policy decision -- what is
5    really a safety decision -- and once you've undertaken to build
6    a waterway, you have to do it prudently.
7                    If the government builds a nuclear reactor, are
8    they telling me that they don't have to take precautions to
9    make sure the thing doesn't blow up, that the water that's
10   coming out of there isn't contaminated and radioactive and
11   kills people and destroys crops.  The answer is no.
12              **THE COURT:**  That's a provocative and interesting
13   point.  And there's a melange of cases here.  And you
14   distinguish -- you might do this briefly -- the National Union
15   case, which came out of, as well, the Ninth Circuit.  You know,
16   that breakwater case.  You know the one I'm talking about?
17              **MR. O'DONNELL:**  Oh, I know it very well.
18              **THE COURT:**  I figured you would.
19              **MR. O'DONNELL:**  It's in Redondo Beach.  I know it
20   well.
21                    Well, let's understand:  The National Fire Union
22   Insurance, I would say this is a sport on the law.  I cannot
23   understand how three federal judges, looking at the case law
24   and facts of that case reached the conclusion.  I'm gonna
25   relegate that --

```
 1            THE COURT:  O'Toole and Whisnant came after.
 2            MR. O'DONNELL:  Thank you very much.  O'Toole
 3   without -- by the way, the Ninth Circuit's never cited National
 4   Fire Insurance again.  I think I checked that.  I may have even
 5   represented that in my brief.  If they did, they may have done
 6   it sparingly and maybe it's even a but see.
 7                O'Toole doesn't even talk about it.  Whisnant
 8   doesn't talk about it.  So if you want to take the latest
 9   articulation of the Ninth Circuit, much, much more careful
10   analysis of precedence, and a correct decision.
11                The government cannot say:  You know, we're a
12   few million dollars short this year, we're not going to put a
13   surge barrier in Reach 1; we're a few million dollars short
14   this year and we're not going to armor the levees even though
15   they could have catastrophic consequences; we're short of
16   money --
17                You know, one of the problems I'm going to prove
18   here is they didn't even go to Congress to ask for money in
19   many instances.  It wasn't that Congress turned them down; they
20   didn't ask for this.
21                And they're writing reports in 1988, reports in
22   the 90s that acknowledge -- they're even studying the closure
23   of the MR-GO.  I think they even tentatively reached that
24   conclusion at one point.  And in the 1988 soil erosion report
25   I've cited, Your Honor, they say the MR-GO is a very dangerous
```

1    instrumentality because of surge potential.  They actually say
2    it themselves, but they take no action.
3                   And if you grant this motion on this particular
4    issue, what is the policy implication?  What conduct are we
5    rewarding?  And *O'Toole*, and *Whisnant*, and *Seaboard Coast Line*,
6    and *Alabama Electrical Co-op* say you can't do it.
7                   There was no defense in *Alabama Electrical*
8    *Co-op*.  By the way, that is a great example.  The
9    Eleventh Circuit cites the internal Army Corps design criteria.
10   That's where I'm coming from.
11          **THE COURT:**  That's precisely what I was talking
12   about.  And I don't see that in the form I'd like to see it;
13   but I understand that may be for another day, if you get past
14   this.
15          **MR. O'DONNELL:**  You know what the engineer testified:
16   No, I didn't follow all the technical requirements and criteria
17   and all the good -- the literature we have here at the Army
18   Corps on how to build, what, a river project with jetties,
19   et cetera.  And that's what the -- they washed away the tower
20   and they have to fix the tower.
21                   And you know what he said:  Well, I just
22   eyeballed it and did a seat-of-the-pants analysis.  I'm
23   entitled to discovery to see whether or not this guy may have
24   worked on the MR-GO, or he has a cousin.
25                   And I'm trying to make my point.  I got enough

1   cases, I hope, where we can show that the MR-GO falls much
2   more -- based on my allegations, falls much more on the line of
3   having once undertaken to build a waterway, you don't have
4   discretion to do it incompetently at the risk of public health
5   and safety.
6                   You know, I'm not supposed to give a Fourth of
7   July speech.  I haven't given one yet.  But I can say an awful
8   lot about a government agency that knows for 20 or 30 years
9   that they have a hurricane highway and do nothing about it.
10  And if you grant the motion that they say:  Well, everything
11  that Mr. O'Donnell lists up here as defalcations of the
12  government were within our sound judgment, you're rewarding
13  conduct that I don't think the Congress in 1946 when they
14  passed the Federal Tort Claims Act ever contemplated would
15  happen here.
16          **THE COURT:**  Just a quick aside, I noted in the
17  government's brief they cited a number of cases where improper
18  dredging were policy decisions.
19          **MR. O'DONNELL:**  Right.  It's usually a decision
20  whether you do the dredging.
21                  But as Judge Clement points out in the *Beacon*
22  case:  Once you start to dredge and you're creating charts of
23  the waterway and you don't disclose known pipelines, which when
24  the dredger comes along, he blows up his dredge and hurts
25  himself, hurts people, once you undertake to do the job, it's a

1  discretion whether to provide the service, but once you

2  undertake it, you've got to do it competently.

3          **THE COURT:**  If this case goes to the Supreme Court,

4  we may find out how much of *Indian Towing* is alive, even though

5  it wasn't classically a discretionary function exception case.

6          **MR. O'DONNELL:**  And I'd like you to give *Indian*

7  *Towing* and *O'Toole* and *Whisnant* and *Seaboard Coast Line* a good

8  send off to the Supreme Court, Your Honor, and follow those

9  cases in denying this motion.

10          **THE COURT:**  Well, you know, and that's what I wanted

11  to ask you about.  If you look at the recent Fifth Circuit

12  cases, and I know you may have -- hold on just a second here.

13  Let me find it.

14          *Lively*, *Hicks*, *Dunaway* -- *Dunaway* is a federal

15  district court decision -- *Lively* held the government decision

16  to stockpile asbestos and not require safety equipment or

17  safety program is defective as a policy decision.

18          *Hicks*, 2005, unpublished decision, they removed

19  warning signs that the City had up that were good and put their

20  own lousy ones and people drowned, policy.  *Dunaway*, Judge

21  Vance, held that the decision not to warn, or mark off, or

22  remove a sandbar pale -- and there are a lot of cases on

23  navigational aids in the Fifth Circuit, which always find

24  policy, but it may be that they haven't undertaken to do it.

25          There may be some distinction, but there are a

1   ton of them like that.

2            **MR. O'DONNELL:**  But you also have *Seaboard Coast*

3   *Line*, which none of those cases overrule or even say it's not

4   still good law.

5                    But you have government undertaking the planning

6   and design of a drainage system, I think it's a direct analogy

7   of the MR-GO in that circumstance, there is no discretion once

8   you undertake it.  It's the same as the lighthouse.  It's the

9   same as Judge Clement said.  And I think that you can rest

10  comfortably that this is settled jurisprudence in the Fifth

11  Circuit.

12                   In this particular -- it's far closer than any

13  of those fact patterns.  You know, I have to concede those

14  cases say what they say.  But this case, and *Alabama Electrical*

15  *Co-op* -- but this Seaborg's a Fifth Circuit case.

16                   The Court says:  Once the government decides to

17  build a drainage ditch, it wasn't exercising a discretionary

18  policy making function and it's required to perform the

19  operational function of building the ditch in a non-negligent

20  manner.

21                   And it's really an echo of *Indian Towing*.

22            **THE COURT:**  I'll tell you my problem.  And my problem

23  is that *Varig*, *Varig* kind of reaffirmed *Dalehite*, which is

24  really broad.  I mean, the commentators have said, and even the

25  courts:  My God, if we follow these cases literally, all

1   they'll be is postal truck cases.

2             I don't know what to do about doctors now who

3   work for the VA.  Those are all policy decisions.  And I think

4   when you decide to cut this way or that way, maybe they are.

5             But I'm saying those cases are so broadly

6   written that it's caused the inferior courts, including the

7   appellate courts, a lot of problems in struggling with what's

8   policy and what isn't.

9             And *Alabama Electric* is a good case for you.

10  And I think it's a better case if their facts here are similar

11  to there that the Corps didn't follow it's own -- because I

12  don't know if that's policy or not to follow your own --

13            **MR. O'DONNELL:**  It is not policy.

14            **THE COURT:**  Yes, exactly.  But I just --

15            **MR. O'DONNELL:**  There's no discretion not to follow

16  your own -- I think we call it negligence, per se.  But the

17  point I want to make, Your Honor, is that if -- it's like the

18  floodwaters -- I'm out of time, I think.

19            **THE COURT:**  Go ahead.

20            **MR. O'DONNELL:**  But if the floodwaters means

21  literally in the statute what it says, nobody ever -- I mean,

22  702(c) applies in any factual circumstance as long as there's

23  some floodwater that causes damage.  I think that isn't so.

24            The same is true here.  The case law says:

25  Look, any decision by a government official is susceptible to

1    some policy determination, but we do not credit and we do not

2    immunize every policy decision or else we wouldn't have a

3    Federal Tort Claims Act.

4              The only person who can really achieve the

5    result the government wants in this case is Congress, and not

6    the courts.  Because they want, basically, anytime a government

7    official decides not to take safety precautions, not to spend

8    any money, it's an economic consideration under *Berkovitz* and,

9    therefore, you lose, okay.

10             But 166, Your Honor.  I'm going to end on this.

11   The courts have said that there's a right for a plaintiff to

12   have discovery on the nature of the discretionary decisions.

13   And I've cited in Tab 167*, Miller v United States*.  And in

14   cases like this when fact finding on the nature of the acts

15   complained of may be necessary before the Court has an adequate

16   basis to decide whether they are discretionary.

17             I think the very fact that the jurisprudence in

18   the circuits is across the landscape, although I think the

19   Fifth Circuit's okay when you get to *Seaboard*, Judge Clement's

20   decision, and the fact that the government says every single

21   thing basically that we do with a navigable waterway is a

22   discretionary function begs to have discovery.

23             I'm going to end by John Adams took the

24   unpopular defense of the British of the soldiers in 1770 in the

25   Boston Massacre.  He lost two-thirds of his practice and his

1   cousin, Sam, wouldn't talk to him for three years.

2                    And when he got the soldiers acquitted because

3   his defense was that they were provoked by the populous and

4   they shot in, basically, self-defense.  He summed up to this

5   jury, a hostile Boston jury, and he said:  Gentlemen, facts are

6   stubborn things.

7                    I want to know the facts in this case.  I want

8   to come back to you next year where the government and I then

9   are arguing either a summary judgment or a trial on the merits.

10  This is *The Terminator* motion and this is not the time to

11  terminate my clients' only chance for justice.

12           **THE COURT:**  Thank you very much.

13           **MR. O'DONNELL:**  Thank you, Your Honor.

14           **THE COURT:**  And we will review all of your slides, so

15  if you didn't have time for now, we'll look at each and every

16  one of them carefully.

17           **MR. O'DONNELL:**  My staff will thank you.

18           **THE COURT:**  All that work will not go, at least,

19  unobserved.  All right.  Mr. Smith?

20           **MR. SMITH:**  Thank you, Your Honor.

21           **THE COURT:**  I told you I would give you rebuttal.

22           **MR. SMITH:**  Facts are stubborn things, Your Honor.

23  And merely removing fact from the allegations of the complaint,

24  does not remove facts from reality.

25                    In point of fact here, the Court need not resort

1    to any of the exhibits, any of the materials beyond the
2    plaintiffs' complaint in resolving this matter.  The plaintiffs
3    have plainly alleged that the floodwaters that damaged them
4    were floodwaters that a flood-control project failed to
5    control.
6              The plaintiffs did not realize the legal
7    significance of the facts that they pled.  And so they've tried
8    to obscure those facts, but the facts remain.  And the facts
9    can be found in their complaint, because they're true.  They
10   pled them because they're true.  They've included a number of
11   graphics in their complaints, which describe how the storm
12   surge breached the levees.
13             Paragraph 9 in the complaint has a map which
14   shows where the plaintiffs live.  And that very map in the
15   legend shows breaches in the levee around St. Bernard Parish,
16   breaches in the levee around New Orleans East.
17             Your Honor, you need not rely on the
18   government's characterization of those works that surrounded
19   these areas.  Your Honor can rely upon the characterization of
20   those works in the plaintiffs' complaint, and that
21   characterization is in the complaint because it's true.
22             Notwithstanding plaintiffs' suggestions to the
23   contrary, there is no need to conduct discovery in this case
24   because discovery will not produce any evidence to controvert
25   what, in fact, occurred last year.

1              Federal flood-control works were overtopped and

2  swept away by a storm surge, which was far beyond the designed

3  hurricane that they were designed to prevent and protect

4  against.

5              The plaintiffs have played fast and loose with

6  the facts, Your Honor.  Mr. O'Donnell says he's produced

7  evidence to this Court that the Corps deviated from what it

8  told Congress it was going to do when it built the MR-GO

9  waterway.  He claims that they planned to build a parallel

10  waterway.  And he says he's given the Court evidence of that;

11  and yet there is no evidence of that.

12              The only so-called evidence of that is the

13  plaintiffs' own misconstruction of the documents -- of the very

14  documents that were submitted to Congress.  The plaintiffs come

15  up with their idea -- I hesitate to call it a wild-eyed idea --

16  but it's -- their whole basis of their contention that this was

17  supposed to be a parallel waterway is found in the description,

18  the verbal description, of the route that the waterway was to

19  take.

20              And they get it from the words, *extending

21  westerly along the Gulf Intercoastal Waterway*, and from the

22  ambiguity that lies in word *along* the waterway.  They would

23  have this Court find that the Corps planned to built it

24  parallel to the waterway when, in fact, they never intended to

25  do any such thing.

1              And the refutation of the plaintiffs

2    construction of these words is found in the very document that

3    was submitted to Congress.  The plate at the very end of these

4    papers shows the plan of improvement.  And it shows the MR-GO

5    as it was proposed, as it was presented to Congress, taking the

6    route of the Gulf Intercoastal Waterway until it goes about

7    five or eight miles and then diverges and passes along the

8    shores of Lake Borgne on its way to the Gulf.

9              The plaintiffs want to create factual disputes

10   where there are none, Your Honor, because the law is against

11   them.  The law and the facts are against them.  Yes, facts are

12   stubborn things.  But the fact is in this case that the

13   plaintiffs' damages were caused by flood or floodwaters.  And

14   they seek to recover flood damages, which they cannot do

15   because Congress has provided that the United States cannot be

16   held liable for any damage from or by floodwaters at any place.

17             Plaintiffs touted *Bean Horizon* to, Your Honor,

18   as though it stands for the proposition that the government's

19   activities once it undertakes to do something aren't protected

20   by the discretionary function exception, only initial decisions

21   are.  In point of fact, that was the Fifth Circuit's view of

22   discretionary function exception prior to *Gaubert*.

23             And in *Gaubert*, the Court expressly rejected the

24   notion that discretionary function exception only applies to

25   initial decisions, it does not protect the effectuation of

1   those decisions.

2                    And, in fact, in *Bean Horizon*, it's not a case

3   of Judge Clement saying dredging is not protected by the

4   discretionary function exception.  She says, in fact, to the

5   contrary.  She says:  Determinations by the Corps regarding

6   frequency and location of maintenance dredging are similarly

7   decisions based upon policy considerations properly left to the

8   discretion of the Corps.

9                    What was at issue in *Bean Horizon* was the

10  failure to chart the location of a pipeline, the failure to

11  keep accurate records so that they would know when the dredge

12  operator was about to strike something that would be a hazard.

13  That's not this case, Your Honor.

14                   And the plaintiffs want to obscure the facts of

15  that case, which set it apart from the conduct at issue here to

16  make their own point.  Your Honor, I've been arguing

17  discretionary function exception motions to dismiss for 17

18  years.  And I can tell, Your Honor, that I wouldn't have been

19  able to handle nearly the number of cases I've handled if they

20  all had to go to summary judgment before we won.

21                   Routinely in our office, we bring motions to

22  dismiss based upon discretionary function exception.  And

23  routinely, those motions are granted.  They're granted because

24  the application of the discretionary function exception depends

25  upon the nature of the conduct that's challenged, not the

1    individual subjective motivations, not the individual minute
2    details of how something was done.
3                    By the very nature of the conduct that's at
4    issue, courts are able to look at that conduct without going
5    into discovery to determine whether or not it's susceptible of
6    policy analysis.
7                    **THE COURT:**  Yes, sir.
8                    **MR. SMITH:**  In this case we have two categories of
9    conduct that are susceptible of policy analysis:  The dredging
10   of the MR-GO, and the failure to build some sort of preventive
11   structures to protect against the loss of wetlands.  Those are
12   both subject to policy analysis.  They implicate a variety of
13   broad policy concerns.  They are not engineering choices, not
14   at heart.  They really are about:  What's the proper thing to
15   do; what's the wisest course of action here; how can we best
16   allocate our resources?
17                    The plaintiffs would defeat discretionary
18   function exception by bringing to, Your Honor, examples of
19   egregious negligence, and, argue that certainly the
20   discretionary exception function cannot apply if a nuclear
21   reactor was left unattended.
22                    But in point of fact, the Supreme Court has
23   emphasized time and time again, the exception applies whether
24   or not the discretion is abused.
25                    The concept of negligence is foreign to the

1    application of the discretionary function exception.

2              THE COURT:  Well, that's in the Act itself.  Whether

3    it's abused or not is in the --

4              MR. SMITH:  So in this case, Your Honor, if it was

5    the worse choice that could possibly have been made to just

6    keep dredging this waterway and not to devote some of those

7    funds to protecting the buffering wetlands, if that was the

8    worse decision that could possibly have been made, that does

9    not remove this conduct from the scope of discretionary

10   function exception.

11             Your Honor, the plaintiffs have alleged that

12   there was a failure to consult and to coordinate with the Fish

13   and Wildlife Service.  And yet the government has adduced

14   numerous exhibits which would show that the Corps went far

15   above and beyond what was required of it in terms of consulting

16   with the Fish and Wildlife Service.

17             In October of 1958 -- this is Defendant's

18   Exhibit 8A, I believe.  It's part of Design Memorandum 1B.

19   It's an endorsement.

20             THE COURT:  We did -- I must say, we did go over all

21   of those, but I'm interested in you making your point.  Go

22   ahead.

23             MR. SMITH:  I simply want to point out, Your Honor,

24   that they deferred submission of the general Design Memorandum

25   to permit local interest and the US Fish and Wildlife Service

1    to complete studies underway.  They made numerous modifications

2    to the project because of the concerns and the advice that they

3    received from the Fish and Wildlife Service.

4                    This goes far above and beyond anything that's

5    required by the law.  The Corps did go ahead and build it; but

6    the Corps was not required to hold the project in abeyance

7    until everyone was satisfied with the results.

8                    And, point in fact, it may never have been able

9    to satisfy all their concerns.

10           **THE COURT:**  Any case law about what extent the

11   government has to consult under these Acts?

12           **MR. SMITH:**  Your Honor, I've consulted with my

13   colleagues in the environmental section, and I'm afraid I

14   didn't come up with anything.  They don't litigate it very

15   much, to be honest, is what I was told.

16           **THE COURT:**  I think there's a paucity --

17           **MR. SMITH:**  Yes, I haven't been able to find

18   anything, Your Honor.

19                    So I would turn, I think -- you know, the

20   plaintiffs have made an argument that the Corps was required to

21   consult before they began this project, before they submitted

22   their papers to Congress.  I think that argument is foreclosed

23   by the language of the statute itself.

24                    Reading from 60 Stat. 1080 this is what the

25   Wildlife Coordination Act in 1946 said --

1          **THE COURT:**  Are you reading from --

2          **MR. SMITH:**  I'm reading from the Plaintiff's Exhibit

3     N.

4          **THE COURT:**  Exhibit N.  Go ahead.

5          **MR. SMITH:**  Whenever the waters of any stream or

6     other body of water are authorized to be impounded, diverted or

7     otherwise controlled for any purpose whatsoever --

8          **THE COURT:**  Slow down a little bit.

9          **MR. SMITH:**  I'm sorry.  Whenever they are authorized

10    to be impounded for any purpose whatever by any department or

11    agency of the United States, such department or agency shall

12    first consult with the Fish and Wildlife Service and the head

13    of the agency exercising administration over the wildlife

14    resources of the state wherein the impoundment, diversion or

15    control facility is to be constructed with a view to preventing

16    loss of and damage to wildlife resources.

17              The language of the statute says:  Whenever the

18    waters of any stream are authorized to be impounded.  They had

19    not been authorized to be impound in 1951.  That was the point

20    of submitting the papers was to seek authorization.  Subject to

21    the authorization, the Corps did consult.  That's what the

22    government's exhibits demonstrate.

23              They did consult.  And, in fact, there's

24    evidence -- although, it's not as detailed as I would like, but

25    we're dealing with things that are now 60 years old -- there is

1   evidence of consultation even prior to 1951.  They held a

2   public hearing in New Orleans.  The US Fish and Wildlife

3   Service was invited to attend.

4                We don't know what lies behind that; but we do

5   know that the Corps was not doing this in a dark corner.  The

6   US Fish and Wildlife Service was aware of what was going on.  I

7   don't know the earliest point at which consultations began to

8   occur.  We've adduced enough evidence, I think, Your Honor, to

9   find that they satisfied what the Act requires.

10               Your Honor, we would ask that the United States'

11  motion to dismiss be granted.  The record is complete.  There

12  need not be any further fact finding.  And we think that given

13  the clear lack of subject matter jurisdiction, the Court is

14  obligated to dismiss this case.

15               Thank you very much.

16          THE COURT:  Thank you, sir.  I want to thank the

17  attorneys for presenting a fine oral argument and giving the

18  Court plenty of information and things to think about.

19               And I will point out that insofar as the Federal

20  Tort Claim Act and the cases involving it, it is indeed a

21  quagmire for the courts.

22          MR. O'DONNELL:  One thing counsel said that we have

23  not pointed out that the original plan for the MR-GO required a

24  parallel waterway.  I just want to correct counsel.  On the

25  Government Exhibit O, which is House Document Number 245.  It's

1   the document 1951, Page 2.

2                  The Bureau of the Budget, Executive Office of

3   the President tells Congress in sub-paragraph 2 that they're

4   going to build a parallel waterway.  And so I just want to make

5   the record clear that that was part of the original plan.

6                  Thank you, Your Honor.

7           THE COURT:  I'm going to give you -- since you

8   brought this motion, I'll give you one minute to respond, if

9   you wish.

10          MR. SMITH:  Well, Your Honor, I will, but I'm not

11  sure I understand the point of Mr. O'Donnell's citation to

12  Paragraph 2.  Because Paragraph 2 contains the exact language

13  that I quoted, Your Honor, earlier.

14                 It merely says that what is proposed is a

15  connecting channel extending westerly along the GIWW.

16          THE COURT:  Is there a map attached to that?

17          MR. SMITH:  Well, this is all part of the same

18  document.  It's Government Exhibit Number 1, Your Honor.  This

19  is the document, the report that was submitted to Congress.

20          THE COURT:  Was the map part of the report that was

21  submitted to Congress?

22          MR. SMITH:  Yes, Your Honor, the map that shows it

23  superimposed over the GIWW is part of this very document.

24          MR. O'DONNELL:  You can't read the map.  First of

25  all, it's almost illegible.

1        **THE COURT:**  Well, I'll have to look at all of that

2    and make a determination.

3        **MR. O'DONNELL:**  Thank you, Your Honor.

4        **MR. SMITH:**  Thank you, Your Honor.

5        **THE COURT:**  Thank you very much.  We are adjourned

6    until 1:00.

7            **(WHEREUPON, the Court was adjourned.)**

8                        **\*\*\*\*\***

9                      **CERTIFICATE**

10        I, Jodi Simcox, RMR, Official Court Reporter for the

11   United States District Court, Eastern District of Louisiana, do

12   hereby certify that the foregoing is a true and correct

13   transcript, to the best of my ability and understanding, from

14   the record of the proceedings in the above-entitled and

15   numbered matter.

16

17

18                        _____

19                        Jodi Simcox, RMR
                          Official Court Reporter

20

21

22

23

24

25

JODI SIMCOX, RMR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA