UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE Duval MAG. Wilkinson |
| PERTAINS TO:  MRGO, Robinson (No. 06-2268) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS

Plaintiffs hereby respond to the Defendant's Statement of Undisputed Facts filed in

support of the United States' Motion To Dismiss Or, In The Alternative, For Summary

Judgment.  In addition to the particularized responses set forth below, Plaintiffs interpose where

noted the following overall objection to the thrust of the proposed undisputed facts to the extent

that they state or imply that the Army Corps of Engineers ("Army Corps") designed and

constructed "levee," "flood works," or other "flood control structures" by the time of Hurricane

Katrina on August 29, 2005 ("Overall Objection"):

There is substantial evidence that  the Army Corps did not design and construct hurricane

protection flood works or structures in accordance with (a) Congress' mandate in the Flood

Control Act of 1965 to build "works of improvement for . . . the control of destructive

floodwaters" and "a project for hurricane-flood protection on Lake Pontchartrain, Louisiana"

(Pub. L. No. 89-298, 79 Stat. 1073)(October 27, 1965) (Exh. 57) and to construct flood works to

protect the project area from flooding caused by storm surge or rainfall associated with a

1

Standard Project Hurricane and Probable Maximum Hurricane (House Document No. 231) (Exh. 10); (b) the Army Corps' own regulations, standards, and guidelines; and (c) the Army Corps' own design specifications.  There is also substantial evidence that the Army Corps did not complete the Lake Pontchartrain and Vicinity Hurricane Protection Project, even as designed, by the time of Hurricane Katrina.  *See* Plaintiff's Corrected Revised Statement of Undisputed Facts for Summary Adjudication on Section 702c Immunity (Attachment "A") and Plaintiffs' Evidentiary Support (Paragraphs 24 to 46) (Attachment "B") filed in connection with Plaintiffs' Motion for Summary Adjudication, all of which are incorporated by reference and attached hereto for the Court's convenience.

**1.     In October of 1965, Congress enacted legislation authorizing the Lake Pontchartrain and Vicinity Hurricane Protection Project. Pub. L. 89-298 (Exh. 57).**

Undisputed.

**2.     The law authorized the Army Corps of Engineers to execute the project "substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 231, Eighty-ninth Congress." Pub. L. 89-298 (Exh. 57).**

Undisputed.

**3.     The Chief of Engineers recommended authorization for construction of hurricane protection improvements "essentially as planned by the reporting officers" in the "Interim Survey Report on Hurricane Study of Lake Pontchartrain, Louisiana and Vicinity," the November 21,1962, memorandum prepared for the Chief of Engineers by the District Engineer for New Orleans and endorsed by the Division Engineer for the Lower Mississippi Valley. H.R. Doc. No. 89-231 (Exh. 10), at 3 (Chief's Report); *cf. id.* at 23-87 (Dist. Eng'r Mem.). The Chief's recommendation was couched in terms of**

2

his"concur[rence] in the recommendations of the Board of Engineers for Rivers and Harbors," which he in turn characterized as a concurrence "in general in the views and recommendations of the reporting officers." *Id.* at 3 (Chief's Report). The "reporting officers" were the New Orleans District Engineer and the Lower Mississippi Valley Division Engineer. *Id.* at 86-87 (Dist. Eng'r Mem.)

Undisputed.

4.    The planned improvements for protection of New Orleans East included a new levee along the shore of Lake Pontchartrain, improvement of existing protective works between the lake and the Gulf Intracoastal Waterway, and improvement of existing works along the GIWW and the IHNC. H.R. Doc. No. 89-231 (Exh. 10), at 82 (Dist. Eng'r Mem.); *see also id.* Plate 3 ("Plans of Protection").

Undisputed.

5.    The plan for protection of St. Bernard Parish and the Lower Ninth Ward (collectively referred to as "Chalmette") entailed "construction to provide for a earthen embankment along the Mississippi River-Gulf Outlet from the Inner Harbor Navigation Canal to Bayou Dupre, thence along the bayou to Violet, La.; the improvement of the existing levee along the Inner Harbor Navigation Canal; and drainage structures in the levee alignment at Bayous Bienvenue and Dupre." *Id.* at 84 (Dist. Eng'r Mem.); *see also id.* Plate 3 ("Plans of Protection"); Army Corps of Eng'rs Dep. (Exh. 8) at 146:15 –147.

Disputed.  Defendants cite page 84 of H.R. Doc. 231 (Exh. 10) for the proposition that protection of the "Chalmette" area "entailed 'construction to provide for a earthen embankment along the Mississippi River-Gulf Outlet . . . ."  This is not what the cited text states.  Rather, Paragraph (b)(2) reads:

> It is further recommended that a plan for hurricane protection of the Chalmette area be authorized for construction to provide for *a levee along the Mississippi River-Gulf Outlet* from the Inner Harbor Navigation Canal to Bayou Dupre, thence along the bayou to Violet, Ls.; the improvement of the existing levee along the Inner Harbor Navigation Canal; and drainage structures in the levee alignment at Bayous Bienvenue and Dupre.

H.R. Doc. 231 (Exh. 10) at 84.

Likewise, the Rule 30(b)(6) deposition of Army Corps' representatives does not mention approval of an "earthen embankment." Instead, Alfred Naomi, the LVPHPP Project Manager, testified that the project as originally authorized called for a "levee" that terminated a Bayou Dupree: "If you read the definition, the project as defined initially, *the levee* terminated at Bayou Dupre and then returned to the Mississippi River." Rule 30(b)(6) Depo. 146:7-10 (emphasis added). He further testified that *a levee*, not an earthen embankment, was approved to Bayou Bienvenue in a subsequent authorization. "There was a . . . supplemental report that was done at the request of the folks in St. Bernard to extend *the levee* southward. I think a report was done and it set up the line, and that extension was approved." *Id*. at 146:21-147:1.

In sum, Defendants' evidence does not substantiate their claim that authorization mandated construction of an "earthen embankment" along Reach 2 of the MR-GO.

**6.      By terminating the planned improvements at the existing Mississippi River levee, developed areas of St. Bernard Parish and the Lower Ninth Ward would be completely encircled by protective works.  *See id.* at 7, Plate 3 ("Plans of Protection")(depicting river levee as "embankment"); *see also* IPET (Exh. 20) Vol. III, at 208.**

Disputed.  In addition to the Overall Objection, Defendants' statement is a conclusion, rather than a statement of fact.  There is no evidence as to what is meant by "protective works."

Does this mean a river flood control structure or a hurricane protection structure mandated by Congress?  *See* Plaintiffs' Corrected Revised Statement of Undisputed Facts for Summary Adjudication on Section 702c Immunity ("Plaintiffs' Statement"), No. 33 and Plaintiffs' Evidentiary Support Nos. 326-35.

Defendants cite "*id*. at 7, Plate 3" to support their contention.  The descriptive "map key" indicates that the map shows only "Improvements Considered," under the "barrier plan" or the alternative "high level" plan.  Accordingly, by its own terms, it does not establish what form of hurricane flood protection was submitted by the Army Corps to, or approved by, Congress, much less what was designed and actually constructed.

Moreover, Page III-208 of the IPET report also does not support Defendants' statement.  There is no mention in the text that "developed areas of St. Bernard Parish and the Lower Ninth Ward" were "completely encircled by protective works."  Furthermore, this page, or the map contained therein, does not specify whether the supposedly "levees" depicted were based on (1) the initial LPVHPP authorization; (2) the subsequent Chalmette area enlargement; (3) the project designs; or (4) the structures actually constructed.

**7.     It was contemplated, even as the Army was recommending to Congress that the planned works be authorized for construction, that the proposed alignment of the levee protecting St. Bernard Parish might be enlarged to protect additional lands. *See id.* at 3,10; *see also* Army Corps of Eng'rs Dep. (Exh. 8) 146:15 – 147:7, 147:22 – 148:7; LPV Chalmette Area Plan Map (Exh. 82).**

Disputed.  *See* Overall Objection.  Defendants first cite "*id.* at 3,10" in support of this proposition.  The previous citation, however, was to the IPET Report at III-208, and there was nothing in this text supporting this statement.

In the Rule 30(b)(6) Deposition at 146:16-148:7 cited by Defendants, the Army Corps'
representative, Al Naomi, testified that the approved LPVHPP project was enlarged, but when
asked "The enlargement requested by the St. Bernard folks . . .  and Congress and the President
enacted, do you remember approximately what year that was[,]" he responded, "I do not."  Rule
30(b)(6) depo. (Exh. 8) at 147:22-148:1."

Finally, the "Chalmette Area Plan Map" cited by Defendants does not specify when this
Chalmette area "enlargement" was authorized.  In sum, none of Defendants citations support
Defendants' claim that the enlargement was being contemplated even as the original plan was
proposed to Congress.

**8.      After construction was authorized, detailed designs were developed. *See
generally, e.g.,* USACE LPVHPP General Design Mem. No. 2, Supp. No. 4, "New Orleans
East Back Levee" (Mar. 1971) (Exh. 74); USACE LPVHPP General Design Mem. No. 2,
"Citrus Back Levee" (Aug. 1967) (Exh. 73); USACE LPVHPP General Design Mem. No. 3,
"Chalmette Area Plan" (Nov. 1966) (Exh. 30).**

Undisputed.

**9.      As had been anticipated, the plan for the Chalmette area was modified to
enlarge the protected area.  The revised plan, "Chalmette Extension," extended the levee
past Bayou Dupre along the bank of the MRGO to Verret before turning the levee south
and then west, to connect it with the Mississippi River levee at Caernarvon. *See* USACE
LPVHPP General Design Mem. No. 3, Supp. No. 1, "Chalmette Extension" (Sept.
1968)(Exh. 41) at 1-2 & Plate (LPV Authorized Plan of Protection (Rev. Apr. 1968))
(showing location of work covered in document); Bea Dep. at 191:25 – 193:2, Nov. 19, 2007;
Army Corps of Eng'rs Dep. (Exh. 8) 146:15 – 147:7, 147:22 – 148:7; LPV Chalmette Area**

**Plan Map (Exh. 82).**

Disputed. The General Design Mem. No. 3, Supp. No. 1 described the enlargement of the project, but does not establish that it was "anticipated" during passage of the LPVHPP, or at any time before the September, 1968 date of the design memo (Exh. 41).

Likewise, Defendants cite Dr. Bob Bea's deposition at 191:25-193:2, but Dr. Bea merely agreed that "this Design Memorandum Number 3, supplement number 1, address[ed] the construction of levees southeast from Bayou Dupre to Verrit and then back to – from Verret back to Caernarvon at the Mississippi River." Bea Depo. (Exh. 45) at 191:25-192:5 (bracketed text added). Nothing in his testimony establishes that the Chalmette area modification was "anticipated" prior to the design memo (Exh. 41) date.

In the Rule 30(b)(6) Depo. cited by Defendants, the Army Corps' representative, Al Naomi, testified that he did not know when the Chalmette area enlargement was approved, while the Chalmette Area Plan Map (Exh. 82) cited by Defendants does not include a date for the Chalmette area extension.

Accordingly, none of Defendants citations support the conclusion that the Chalmette area extension was "anticipated," considered or approved at the same time as the LPVHPP, or at any time prior to the September, 1968 date of General Design Memo No. 3, Supp. 1.

**10.     At all times relevant to this litigation, the Army Corps of Engineers has considered "an embankment whose primary purpose is to furnish flood protection from seasonal high water and which is therefore subject to water loading for periods of only a few days or weeks a year" to be a levee. USACE Eng'r Manual (EM)1110-2-1913,"Design and Construction of Levees," ¶ 1-5(a)(1) (Mar. 31, 1978) (Exh. 55); USACEEng'r Manual (EM)1110-2-1913, "Design and Construction of Levees," ¶ 1-5(a)(1) (Apr.30, 2000) (Exh.**

56); *see also* **Bea Dep. (Exh. 45) 223:11 – 224:4 (USACE definition "is reasonable and customary in use among civil engineers who are engaged in designing and constructing earthen embankments for flood protection purposes"); *cf.* Theis Dep. (Exh.81) at 11:9-15 ("A levee is an earthen embankment constructed for the purpose of protecting an adjacent area . . .from floods or high water, inundation from an exterior source.").**

Undisputed that the quoted statement is contained in Exh. 55, but disputed as to whether the Army Corps was directed by Congress in the Flood Control Act of 1965 to construct "an embankment whose primary purpose is to furnish flood protection from seasonal high water and which is therefore subject to water loading for periods of only a few days or weeks a year." Indeed, in H.R. 231 (Exh. 10) at p. 58, the 1965 Army Corps report submitted to, and approved by, Congress, the Army Corps noted:

> Several plans were studied for the Chalmette area. Once contemplated the enlargement of the existing Chalmette back levee. Another envisioned the construction *of the hurricane protective system*, along the south bank of the Gulf Outlet, extending from the Inner Harbor Navigation Canal to Bayou Dupre.

Exh. 10 at 58 (emphasis added).

**11.    The LPV flood works along the GIWW and the MRGO constructed prior to August 29, 2005, consisted primarily of levees paralleling the waterways, on the southside of the MRGO between the IHNC and Verret, and on the north side of the GIWW eastward from the IHNC for a distance of about 12 miles. Chronology (Exh. 26) p. 2-2;Vrijling 702c Dep. (Exh. 40) 31:10-23.**

Disputed. *See* Overall Objection. The statement expressly or impliedly assumes that the structures along the GIWW and the MRGO prior to August 29, 2005 were actually "flood

works" and that they were actually constructed and completed prior to August 29, 2005. This is not true.

The first cited source, *Desision-Making Chronology for the Lake Pontchartrain & Vicinity Hurricane Protection Project* (Exh. 26) at p. 2-2 contains a map showing purported "protective structures" in the Greater New Orleans, but there is no evidence showing that the structures depicted in the map were either (1) designed to satisfy the relevant Congressional mandates summarized in the Overall Objection; (2) designed in accordance with the Army Corps' own regulations and standards; (3) constructed or completed at all, much less in accordance with the Army Corps' own design specifications; or (4) the dates of any alleged construction or completion.

The Vrijling 702c Depo. (Exh. 20) 31:10-23 provides only a general statement about polders without discussing any particular alleged "levee." ("So what we call a polder is such an area which *in principle* low-lying, below the water level, and which is surrounded by closed encirclements of levees *or dikes*.") Vrijling 702c Depo. At 31:11-15. (emphasis added).

Thus, the evidence does not support Defendants' claim that (1) there were "LPV flood works along the GIWW and the MRGO constructed prior to August 29, 2005," or (2) these "floodworks" consisted "primarily of levees paralleling the waterways the waterways, on the southside of the MRGO between the IHNC and Verret, and on the north side of the GIWW eastward from the IHNC for a distance of about 12 miles."

**12.  The LPV flood works along the GIWW and the MRGO constructed prior to August 29, 2005, were composed, in part, of materials hydraulically dredged from the bottom of the MRGO.  *See* Final Composite Environmental Statement for Operation and**

**Maintenance Work on Three Navigation Projects in the Lake Borgne Vicinity Louisiana(Mar. 1976) (Exh. 83) § 1.05(b)(2)(a), at I-8; 1988 MR-GO Recon. Rep. (Exh. 9) at 16;1994 MR-GO Recon. Rep. (Exh. 84) at 11; Bea Report (Exh. 31) at A.11; Bea Dep. (Exh.45) at 86:18-25.**

Disputed.  *See* Overall Objection.  The statement expressly or impliedly assumes that the structures along the GIWW and the MRGO prior to August 29, 2005 were "flood works" and that they were actually constructed and completed prior to August 29, 2005.  This is not true.

The first cited source – *Final Composite Environmental Statement for Operation and Maintenance Work on Three Navigation Projects in the Lake Borgne Vicinity Louisiana* (Exh. 83) – states the "project" being examined is the "Operation and Maintenance of the following navigation projects in the vicinity of Lake Borgne, Louisiana."  Exh. 83 at p. I-8.  Thus, the project was never intended to analyze the design, construction, composition, or characteristics of any alleged flood control structures.

Likewise, the 1988 MR-GO Recon. Rep. (Exh. 9)–entitled *Mississippi River-Gulf Outlet St. Bernard parish, La.: Bank Erosion, Reconnaissance Report – February, 1988* –was intended to investigate "bank erosion and erosion-related problems in the vicinity of the Mississippi River-Gulf Outlet (MR-GO) channel."  Exh. 9, syllabus (Prod. # MRGOX0456).  The 1994 MR-GO Recon. Rep. (Exh. 84)–entitled  *Mississippi River-Gulf Outlet St. Bernard parish, La.: Bank Erosion, Reconnaissance Report – February, 1988*–also presented "the results of continued reconnaissance phase investigation of bank erosion and erosion-related problems in the vicinity of the Mississippi River-Gulf Outlet (MR-GO) channel."  Exh. 84, syllabus at p. 1.  Neither report examined the status of any alleged "flood works" along the GIWW or the MR-GO prior to August 29, 2005.

Defendants' citation to the Bea Report and Dr. Bea's deposition is likewise unavailing. Dr. Bea's Report (Exh. 31) at A.11 does not specify that levees along the MR-GO were constructed or completed.  Indeed, he refers to such structures merely as "EBSBs" or "Earthen Banks/Spoil Banks," rather than levees.  Similarly, while Dr. Bea inadvertently used the term "levee" during his deposition (Exh. 45) 86:18-25, Defendants' omit his statement on the very next page where he clarifies his understanding that the structure along the MR-GO was an "earthen berm," not a levee.  Dr. Bea Deposition (Exh. 45) at 87:8-17.  Indeed, at Paragraph 17 of the Bea Report, Dr Bea states:

> As a further preliminary matter, some of the documents, charts, photos, and other exhibits referenced in my Declaration refer variously to "levee(s)," "levee sections," "levee beaches," and so forth.  The use of these terms is not intended to suggest or agree that the referenced man-made flood protection features along Reach 2 and portions of Reach 1 of the MR-GO before Hurricane Katrina were in fact "Levees" as I have defined them above.  In fact, as detailed below, it is my opinion that the vast stretches of Reach 2 and portions of Reach 1 of the MR-GO and GIWW before Katrina for the most part did not have hurricane flood protection "Levees" as I have defined them but instead these man-made features were "EBSBs" [earthen berms and spoil banks] as I have defined them above and consequently they were not properly designed or constructed to protect human population living within urban areas.

Bea Report (Exh. 31) at 9-10, ¶ 17.

In sum, none of the sources cited by Defendants supports their express or implied assertions that there were "LPV flood works" along the GIWW or the MRGO or that such "flood works" had been constructed or completed prior to August 29, 2005.

**13.   The LPV levees along the GIWW and the MRGO were built in stages because of poor foundation conditions. *See* Naomi Declar. (Ex 79) at ¶ 14; Bea Report at A.1-A.4; IPET Report (Exh. 20) Vol. III at 33-34; ILIT Report (Exh. 3) 2-6; Team**

**Louisiana Report (Exh. 4) at 131;** *cf.* **Bea Dep. (Exh. 45) at 138:15-23 (building levees in**
**stages was within standard of care).**

Disputed. *See* Overall Objection. In addition to the lack of evidence establishing the
existence of "LPV levees" along the GIWW and the MRGO, none of the Defendants' cited
authority supports the conclusion that a "stage" method of construction was selected to
compensate for poor foundation conditions. Instead, "staging" is a commonly used method of
levee construction, regardless of soil conditions, and the so-called "levees" along the GIWW and
the MRGO were simply never completed.

First, the IPET report at page 33 states that "in general, the relatively poor soils in
southeast Louisiana impact the methods used to construct levees." The IPET Report does not
state whether "poor soil" conditions existed along the GIWW or the MR-GO, specifically, nor
does the IPET Report identify *how* these conditions "impact[ed] the methods used to construct
levees." IPET Report (Exh. 20) at III-33. The IPET Report then goes on to state that
"[c]onstruction of levees usually requires several lifts." *Id*. Thus, according to this statement,
"lifts" are not used where the soil is substandard, but is the common method of construction for
supposed "levees." Finally, there is no mention in these two pages of alleged "levees" along the
MR-GO or the GIWW, and while page III-33 includes a map, the map key does not specify
which alleged flood control structures are "levees."

Al Naomi's declaration at ¶ 14 is simply another conclusory statement by Defendants'
own employee without any foundational facts. Indeed, it is questionable whether he had
personal knowledge of the relevant facts since he only became the LPVHPP project manager in
1998 (Naomi Dec. (Exh. 79) at ¶ 2), while the design memoranda for the LPVHPP were dated
between 1966 and 1971. *See* Defendants' Statement of Uncontested Facts, Nos. 8 & 9.

Dr Bea's Report (Exh. 31) at A.1-A.4 classifies the structures along the MR-GO as EBSB's, not levees.  Exh. 31 at A.1 ("The construction of the MR-GO EBSB's was a component of the Chalmette Area Plan . . . .").  Dr. Bea's Report makes no mention of using "lifts" to compensate for poor construction soils.

Defendant's' citation to Dr. Bea's deposition transcript (Exh. 45 at 138:15-23) also does not substantiate their statement.  Dr. Bea answered "yes" to the following question:

> Was the decision to build these levees – *and when I say 'these levees', the levees that are the subject of this design memorandum* – was the decision to build those levees through a series of lifts within the standard of care for the design and construction of a hurricane protection structure.

*Id*.

All this exchange established was that the decision to use "lifts" in the design of the earthen structures along the MR-GO was within the "standard of care."  It does not support the conclusion that (1) lifts were used because of poor soil conditions; (2) the earthen structures actually constructed along the MR-GO complied with these designs; (3) the construction of the earthen structures along the MR-GO complied with any "standard of care"; or (4) that the earthen structures actually constructed along the MR-GO qualified as a hurricane flood protection device.

Likewise, the ILIT Report (Exh. 3) at 2-6 specifically states that the so-called "levees" along the MR-GO "were intended to be built to provide protection to a level of approximately + 17.5 feet, but at the time of Hurricane Katrina many of the levees along this frontage had crest elevation approximately 2 to 4 feet lower than that.  *This was because the levees along this frontage had not yet been completed*."

The Team Louisiana Report (Exh. 4) at p. 131 states that "[e]arthen levees were generally constructed in stages over many years to allow for consolidation and to improve strength

between lifts." This quote does not state that the use of "stages" was necessitated by poor soil conditions.

There is therefore no evidence suggesting that (1) the "staging" method of construction was used to compensate for substandard or weak soils, or (2) there were "LPV levees along the GIWW and the MRGO."

**14.    The LPV levees along the GIWW and the MRGO were designed and constructed to protect against hurricane-induced storm surge coming from Lake Borgne and the larger bodies of water that lay beyond it, including any surge propagated or conveyed by the GIWW and the MRGO themselves.** *See* **H.R. Doc. No. 89-231 (Exh. 10) at ix, 1-2, 18, 80-81, 82, 84; Naomi Declar. (Exh. 79) at ¶ 15; Bea Dep. (Exh. 45) at74:11-16; Vrijling 702c Dep. (Exh. 40) at 31:24-32:7.**

Disputed.  *See* Overall Objection.  H.R. Doc. 89-231 (Exh. 10), cited by Defendants, was the Army Corps' 1965 proposal for the LPVHPP submitted to Congress *before* project "designs" were even drafted or "construction" commenced.  *See* Defendants' Statement of Uncontested Facts, Nos. 1-3 & 8-9.

In the cited portions of Dr. Bea's deposition (Exh. 45) (74:11-16), he talked about EBSBs, *not levees*.

In the cited portions of Professor Vrijling's depo. (Exh. 40), he generally describes polders without discussing any particular alleged "levee."  ("So what we call a polder is such an area which *in principle* low-lying, below the water level, and which is surrounded by closed encirclements of levees *or dikes*.") Vrijling 702c Depo. at 31:11-15 (emphasis added).

Defendants use of the term "hurricane-induced storm surge" is misleading.  None of the cited sources analyzed (1) the nature of the water the supposed LPV Levees were supposed to

protect against, or (2) the nature of the water that actually impacted these supposed "levees," *i.e.* was it unaffected hurricane storm surge, or was it storm surge amplified or accelerated by the effects of the MR-GO.

Accordingly, Defendants cited no evidence establishing (1) the existence of "LPV levees along the GIWW and the MRGO," (2) that these purported "LPV levees" were "designed and constructed to protect against hurricane-induced storm surge coming from Lake Borgne and the larger bodies of water that lay beyond it;" or (3) that these purported "LPV levees" were designed and constructed to protect against . . . surge propagated or conveyed by the GIWW and the MRGO themselves."

**15.    On August 29, 2005, New Orleans East was protected by levees and other LPV flood control structures that stood on the north bank of the GIWW and the MRGO. *See* IPET Report (Exh. 20) Vol. III at 154-155; ILIT Report (Exh. 3) at 2-1 to 2-2, Fig.2.4 at 2-17; Team Louisiana Report (Exh. 4) at 14-15; Bea Dep. (Exh. 45) 78:9 – 80:2,119:10-19, 268:11-16.**

Disputed.  *See* Overall Objection.  The statement is misleading because the MR-GO and the GIWW are not merged along the entire southern perimeter of New Orleans East.  The southeastern portion of New Orleans East, where the most serious EBSB failures occurred, is only "fronted" by the GIWW, not the combined GIWW and MR-GO.

The IPET Report, Vol. III at 154-155 states that "[t]he hurricane protection system for the New Orleans East (NOE) Basin *was designed* as part of the . . . [LPVHPP] . . . The line of protection *was designed* to provide protection from the SPH."  The IPET Report, however, includes no facts establishing (1) what was actually built, (2) whether these alleged "levees and other flood control structures" were "constructed" in accordance with the designs referenced in

this portion of the IPET Report, (3) whether these designed or constructed "levees and other LPV flood control structures" complied with Congressional directives, or (4) whether the "levees and other LPV flood control structures" complied with the Army Corps' own regulations, standards or policies.

According to the IPET Report, a map on page 155 was provided by the New Orleans District "specifically because it shows as-built levee and floodwall elevations."  But there is no foundation for the underlying data on which this map is based.  Simply put, IPET simply took the word of the New Orleans District of Army Corps of Engineers.

The ILIT Report at 2-1 to 2-2 and Fig. 2.4 at p. 2-17 provide a general description of the four Greater New Orleans protected areas, without any analysis of whether the New Orleans East "levees and other LPV flood control structures" satisfied the Congressionally-mandated or the Army Corps' own criteria.

The Team Louisiana Report (Exh. 4) at 14-15 does not even describe the alleged flood protection structures surrounding the New Orleans East area.  Instead, there is a single paragraph at the end of page 15 describing the character of the land in New Orleans East.

In the cited portion of Dr. Bea's Depo. (Exh. 45) 78:9-80:2, he testified that the part of the purported New Orleans East Back Levee along the GIWW was an EBSB, *not a levee*. (Q: "Were these EBSBs along the GIWW and along the MRGO . . . ." A. "Correct.") (Exh. 45 at 79:22-80:2).

At page 119:10-19 of Dr. Bea's Depo, also cited by Defendants, Dr. Bea only discussed the Citrus Back Levee and Reach 1 of the MR-GO, not the entire ring of alleged protection surrounding New Orleans East.

In Dr. Bea's Depo. (Exh. 45) at 268:11-16, again relied on by Defendants, Dr. Bea was

only responding to questions about a map, rather than offering in opinion about the character of alleged flood control structures.  Dr. Bea Depo. (Exh. 45) at 266: 18-20 (Q.  "Is this not the same base map that we have been looking at previously?" A. "I believe so, yes.").

Accordingly, Defendants own evidence does not support their statement that on August 29, 2005, New Orleans East was protected by levees and other LPV flood control structures on the north bank of the GIWW and the MR-GO.

**16.     On August 29, 2005, the LPV flood control structures along the MRGO and the GIWW joined with flood control structures along the IHNC, Lake Pontchartrain, and the eastern edge of New Orleans East to form a polder that was encircled by these flood control structures.** *See* **IPET Report (Exh. 20) Vol. III at 154-155; ILIT Report (Exh. 3)at 2-1 to 2-2, Fig. 2.4 at 2-17; Team Louisiana Report (Exh. 4) at 14-15; Vrijling 702cDep. (Exh. 40) 31:4-32:7.**

Disputed. *See* Overall Objection.     The IPET Report, Vol. III at 154-155 states that "[t]he hurricane protection system for the New Orleans East (NOE) Basin *was designed* as part of the . . . [LPVHPP] . . . The line of protection *was designed* to provide protection from the SPH."  The IPET Report, however, includes no facts establishing (1) what was actually built, (2) whether these alleged "levees and other flood control structures" were "constructed" in accordance with the designs referenced in this portion of the IPET Report, (3) whether these designed or constructed "levees and other LPV flood control structures" complied with Congressional directives, or (4) whether the "levees and other LPV flood control structures" complied with the Army Corps' own regulations, standards or policies.

According to the IPET Report, a map on page 155 was provided by the New Orleans District "specifically because it shows as-built levee and floodwall elevations."  But there is no

foundation for the underlying data on which this map is based.  Simply put, IPET simply took the word of the New Orleans District of Army Corps of Engineers.

The ILIT Report at 2-1 to 2-2 and Fig. 2.4 at p. 2-17 provides a general description of the four Greater New Orleans protected areas, without any analysis of whether the New Orleans East "levees and other LPV flood control structures" satisfied the Congressionally-mandated, or the Army Corps' own, criteria.

The Team Louisiana Report (Exh. 4) at 14-15 does not even mention alleged flood control structures of any kind along either the GIWW or the MR-GO.

In the cited portions of Professor Vrijling's depo. (Exh. 40), he generally describes polders without discussing any particular alleged "levee."  ("So what we call a polder is such an area which *in principle* low-lying, below the water level, and which is surrounded by closed encirclements of levees *or dikes*.") Vrijling 702c Depo. at 31:11-15 (emphasis added).

Again, none of Defendants' cited authority supports Defendants conclusions that (1) on August 29, 2005, there were "LPV flood control structures along the MRGO and the GIWW;" (2) on August 29, 2005, there were "flood control structures along the IHNC, Lake Pontchartrain, and the eastern edge of New Orleans East;" (3) these alleged "LPV flood control structures" "along the MRGO and the GIWW" joined with the second set of "flood control structures; or (4) these structures formed "a polder that was encircled by these flood control structures."

**17.     On August 29, 2005, the New Orleans East back levee, which stood on the north side of the GIWW east of the MRGO junction, was overtopped and breached by**

**storm surge in numerous places, flooding New Orleans East.** *See* **ILIT Report (Exh. 3)Fig. 2.11, at 2-24; Kok Report. (Exh. 53) at 26-28, Sept. 17, 2007; Bea Dep. (Exh. 45)265:17 – 266:3; Bea Decl. (Exh. 31) ¶ 127.**

Disputed.  In addition to the Overall Objection, this statement is also misleading.  The "New Orleans East Back Levee" is the name applied to an earthen structure along the southeastern border of New Orleans East (*i.e.,* adjacent to the GIWW).  Defendants, however, describe it as the New Orleans East "back levee," uncapitalized, thereby implying that the entire structure is a "levee."

The ILIT Report (Exh. 3) Fig. 2.11 at p. 2-24 is simply a depiction of breaches without any analysis as to the nature of the structures breached.

The Kok Report (Exh. 53) at 26-28 discussed only the mechanism of flooding, without any analysis of the structures overtopped or breached.

Page 97 (¶ 127) of Dr. Bea's Report describes only the mechanism of flooding, and indeed, he states in this paragraph "*a large section of EBSB* comprised of hydraulic fill from the GIWW channel in the southeastern corner of the area catastrophically eroded and breached . . . ."  (Emphasis added).

In Dr. Bea's Depo. (Exh. 45) 265:17-266:3, he was examined and testified as to what appears on a drawing; he did not testify as to either the composition of the New Orleans Back Levee or the mechanism of flooding.  ("Q: "Let me direct your attention to figure 2.11, which is referenced in the paragraph you just read.  . . . Do you see it, sir?" A: "Yes.") Bea Depo. (Exh. 45) 265:4-8.

Finally, this statement is also misleading because of the use of the term "storm surge."  The cited sources included no discussion or analysis of the nature of the water causing damage,

*i.e.*, was it storm surge directly from the Gulf of Mexico, or was it water accelerated or amplified by the MR-GO or the funnel formed by the intersection of the MR-GO and the GIWW. *See* Plaintiff's Statement of Facts, Nos. 8-10.

In sum, there is no evidence as to (1) the design, composition, or construction of the New Orleans East Back Levee or (2) the nature or attributes of the damaging waters.

**18.    On August 29, 2005, storm surge from Hurricane Katrina overtopped the Citrus back levee, flooding Citrus and New Orleans East. *See* Kok Report (Exh. 53) at 26-28; Bea Decl. (Exh. 31) ¶ 50.**

Disputed.  In addition to the Overall Objection, this statement is also misleading because of the use of the term "storm surge."  The two cited sources discussed the mechanism of flooding and the failure of the Citrus Back Levee.  There was no discussion or analysis of the nature of the water causing damage, *i.e.*, was it storm surge directly from the Gulf of Mexico, or was it water accelerated or amplified by the MR-GO or the funnel formed by the intersection of the MR-GO and the GIWW.  *See* Plaintiff's Statement of Facts, Nos. 8-10.

**19.    On August 29, 2005, levees and other flood control structures on the south side of the MRGO extended along the waterway from the IHNC to Verret. *See* Naomi Decl. (Exh. 79) ¶ 15; Colletti Decl. (Exh. 78) ¶¶ 3-8; Bea Dep. (Exh. 45) at 119:2 –123:25; Vrijling 702c Dep. (Exh. 40) at 31:4-32:7.**

Disputed.  *See* Overall Objection.  Mr. Naomi, an Army Corps employee, states in his declaration at ¶ 15 that "[t]he levees and other flood control structures along the MRGO and the GIWW . . . were designed and constructed to control storm surge associated with a SPH Hurricane moving across Lake Borgne and adjacent wetlands and waterways."   There is no foundation or support given for this opinion, nor does he provide a date for the design or

construction of these "levees or other LPV flood control structures", even though Defendants claim that such structures existed on August 29, 2005.

Likewise, the declaration of Gerard A. Colleti (Ex. 78) only recounts an alleged inspection of alleged "levees." There is no foundation for his opinion that what he examined was, in fact, a "levee."

In Dr. Bea's Depo. (Exh. 45) at 119:2-123:25, he testified that there were levees along Reach 1 of the MR-GO, but the precise location of those levees was never identified.

In the Vrijling Depo. (Exh. 40) at 31:4-32:7, Professor Vrijling described polders and there is no discussion of a levee on the south side of the MR-GO along the waterway from the IHNC to Verret.

Accordingly, there is no evidence establishing the conclusion that on August 29, 2005, there were "levees and other flood control structures on the south side of the MRGO extend[ing] along the waterway from the IHNC to Verret."

**20.      On August 29, 2005, the levees and other flood control structures along the south side of the MRGO, together with the LPV levees between Verret and Caernarvon and the Mississippi River levee and the LPV flood control structures on the east side of the IHNC, encircled the Lower Ninth Ward and St. Bernard Parish. Naomi Decl. (Exh79) at ¶ 7; ILIT Report (Exh. 3) at 2-17, Fig. 2.4; Vrijling 702c Dep. (Exh. 40 ) 31:11 –32:7; IPET Report (Exh. 20) Vol I at 30, Fig. 4.**

Disputed. *See* Overall Objection. In Paragraph 7 of the declaration of Al Naomi, an Army Corps employee, Mr. Naomi simply states that Design Memorandum 3, Supplement 1, for the Chalmette extension was *intended* to provide protection to a larger area. ("Design Memorandum 3, Supplement 1, also known as the 'Chalmette Extension,' . . . provided

protection to a larger area . . . .").  But, this quotation does not state that (1) what is meant by "protection;" (2) whether the designs contained in the document complied with Congressional or the Army Corps' own criteria, regulations, or standards; (3) whether the structures contemplated in the document were actually constructed and completed; and (4) whether any structures constructed in fact complied with either the design memorandum, Congressional requirements, or the Army Corps's own guidelines.

The ILIT Report (Exh. 3) at p. 2-17, Fig. 2.4, is simply a map showing "levee" breaches but there is no foundation provided analyzing (1) the composition or construction of the alleged "levees and other flood control structures along the south side of the MRGO," (2) the composition or construction of the "LPV levees between Verret and Caernarvon and the Mississippi River levee," or (3) whether the "LPV flood control structures on the IHNC" were actually built as designed, built to satisfy Congressional directives, or built according to the Army Corps' own regulations or standards.

Likewise, the IPET Report (Exh. 20) Vol I at 30, Fig. 4 is another map purporting to show the existence of "levees" without any foundation examining (1) the composition or construction of the alleged "levees and other flood control structures along the south side of the MRGO," (2) the composition or construction of the "LPV levees between Verret and Caernarvon and the Mississippi River levee," or (3) whether the "LPV flood control structures on the IHNC" were actually built as designed, built to satisfy Congressional directives, or built according to the Army Corps' own regulations or standards.

Finally, in the Vrijling Depo. (Exh. 40) at 31:4-32:7, Professor Vrijling discussed polders generally, but did not discuss or examine (1) the alleged "levees and other flood control structures along the south side of the MRGO, (2) the "LPV levees between Verret and

Caernarvon and the Mississippi River levee, or (3) the "LPV flood control structures on the IHNC."

In sum, Defendants cited evidence does not support the conclusion that there were either (1) "levees and other flood control structures along the south side of the MRGO," (2) "LPV levees between Verret and Caernarvon and the Mississippi River levee," or (3) "LPV flood control structures on the IHNC."

**21.     On August 29, 2005, the LPV levees on the south side of the MRGO between the IHNC and Verret were overtopped and breaches developed, flooding St. Bernard Parish and the Lower Ninth Ward.** *See* **Team Louisiana Report (Exh, 4) at 133, Table 15; Vrijling 702c Dep. (Exh. 40) 53:8-25.**

Disputed.  *See* Overall Objection.  The statement is also misleading because it assumes that the cause of the "overtopping" and "breaches" was solely attributable to natural hurricane storm surge rather than waters affected by the MR-GO either by the destruction of buffering wetlands or by other hydrologic effects caused by the funnel or the existence of the channel itself.  *See* Plaintiff's Statement of Facts, Nos.  8-10.  Indeed, as Professor Vrijling stated on page 52, one page before Defendants' cited portion of Professor Vrijling's deposition transcript, "the MR-GO [was] also a heavy contributor" to the flooding of St. Barnard Parish and the Lower Ninth Ward.

With respect to Table 15 at page 133 of the Team Louisiana Report (Exh. 4), the table described (1) surge height, (2) whether there was overtopping or alleged levee breaches, (3) the design elevations of the relevant structures, (4) the observed elevation of the relevant structures, and (5) the deficiency or difference between the designed and observed heights.  Nothing in this table, however,  describes the areas flooded or the extent of flooding due to these factors.

Moreover, on the next two pages of the Team Louisiana Report (Exh. 4) at pages 134-135, the authors note:

> The 12 miles of the Chalmette levee that follows the south bank of the MRGO were deficient from the 17.5 ft. design elevation by up to 5 ft. . . . .  The levee was also constructed primarily of hydraulic fill obtained from the MRGO channel, much of which was sand, silt and shell.  . . . *Because of the grade deficiencies and the poor materials used in its construction, . . . there is little doubt that most of this levee was washed away before the surge ever reached the design level of protection.*

Team Louisiana Report (Exh. 4) at 134-35 (emphasis added).

Accordingly, the evidence does not support the conclusion that (1) there were "LPV levees on the south side of the MRGO between the IHNC and Verret" or that (2) on August 29, 2005, these allege levees "were overtopped and breaches developed, flooding St. Bernard Parish and the Lower Ninth Ward."

**22.    On August 29, 2005, the LPV floodwall on the east side of the IHNC at the western edge of the Lower Ninth Ward was overtopped by hurricane-induced storm surge, flooding the Lower Ninth Ward and St. Bernard Parish. *See* IPET Report (Exh.20) Vol. IV at 200, Vol. V at 67-69; Bea Decl. (Exh 31) ¶ 69.**

Disputed.  *See* Overall Objection.  The statement is misleading because of the use of the term "storm surge."  The cited sources included no discussion or analysis of the nature of the water causing damage, *i.e.*, was it storm surge directly from the Gulf of Mexico, or was it water accelerated or amplified by the MR-GO or the funnel formed by the intersection of the MR-GO and the GIWW.   *See* Plaintiff's Statement of Facts, Nos.  8-10.

The IPET Report (Exh. 20) Vol IV at 200 cited by Defendants does not include an analysis of the nature of the structure "on the east side of the IHNC at the western edge of the Lower Ninth Ward."   Moreover, the text states that the IHNC floodwall was "breached" in two

places before it was "overtopped," whereas Defendants assert that the structure was only overtopped.  There is no statement that this alleged "overtopping" was the sole cause of flooding in the Lower Ninth Ward or St. Bernard Parish.  Indeed, the plain text does not mention any flooding in St. Bernard Parish at all due to overtopping of the alleged floodwall on the east side of the IHNC.  Specifically, the IPET Report (Exh. 20) at IV-200 states:  "Flooding in the Chalmette area came from the northeast, entering this area about 1320 UTC."  There is nothing specifically stating that this water came from either a breach or overtopping of flood walls along the IHNC.

The IPET Report (Exh. 20) Vol. V at 67-69, also cited by Defendants, again states that the alleged flood walls were breached, while Defendants claim they were only overtopped:

> *Four breaches* occurred on the IHNC during Hurricane Katrina on the morning of 29 August.  . . .  *Three of the breaches involved failures of floodwalls on levees,* and one involved failure of a levee due to overtopping erosion.

IPET Report (Exh. 20) Vol. V at 67 (emphasis added).

These three pages of the IPET report addressed only the failure mechanism of these structures.  There is no reference to the portions of the Greater New Orleans area inundated as a result of these failures.

Paragraph 69 on page 54 of Dr. Bea's Report (Exh. 31), also cited by Defendants, states:

>  Three breaches occurred to the south of the MR-GO-ICWW 'T' intersection with the IHNC on the west side of the main Port of New Orleans.  Several additional levee and flood wall sections were 'distressed' or damages, but did not fully breach along this same section.

Dr. Bea Report (Exh. 31) at 54, ¶ 69.

Clearly, there is no mention in this text of (1) the nature of the water that caused the related damage to the alleged flood control structures, (2) the overtopping of alleged floodwalls

on the east side of the IHNC, or (3) the areas flooded due to this alleged overtopping.  Simply

put, none of Defendants cited authority supports its statement.

**23.    On August 29, 2005, certain portions of the LPV floodwall on the east side of**

**the IHNC at the western edge of the Lower Ninth Ward collapsed.** *See* **IPET Report(Exh.**

**20) Vol. V at 67-69.**

Undisputed that certain structures on the east side of the IHNC at the western edge of the

Lower Ninth Ward collapsed.  Disputed that these structures were "LPV floodwalls." *See*

Overall Objection.

The cited portion of the IPET Report discussed the failure mechanism of certain

structures, but did not examine, discuss or assess the nature or attributes of the structures that

failed.

**24.    The floodwaters that inundated St. Bernard Parish and the Lower Ninth**

**Ward on August 29, 2005, flowed over the top of and through breaches in the federal levees**

**and other flood control structures that were designed and constructed to control them.** *See*

**Chronology (Exh. 26) at 2-17; Vrijling 702c Dep. (Exh. 40) at 53:8-25; Kok Report (Exh.53)**

**at 44-45; Bea Decl. (Exh. 31) ¶ 27.**

Disputed.  *See* Overall Objection.

There is nothing in any of the cited authorities discussing whether the waters causing

Plaintiffs' damage were "floodwaters" as used in the Flood Control Act of 1928, 33 U.S.C. §

702c.

In addition, these sources are silent as to whether the injury causing waters were direct

hurricane storm surge from the Gulf of Mexico, or waters amplified or accelerated by the MR-

GO, either through (1) the destruction of storm surge buffering wetlands, (2) the funnel effect

produced by the confluence of the MR-GO and the GIWW, or (3) the creation of a direct conduit of water from the Gulf of Mexico to the Greater New Orleans area, or a combination thereof. *See* Plaintiffs' Statement, Nos. 8-10, 14-19.

Moreover, Defendants fail to specify which alleged "federal levees" or "flood control structures" failed and therefore flooded St. Bernard Parish or the Lower Ninth Ward, nor do they provide evidence that such "federal levees" or "flood control structures" even existed.  The Chronology (Exh. 26) at 2-17 cited by Defendants, is not a scientific or engineering analysis of the events associated with Hurricane Katrina.  Moreover, the Chronology merely claims that on August 29, 2005 "Hurricane-driven surges breach the LP&VHPP protective structures at 50 different locations, primarily as a result of overtopping."  Not only is there no foundation for this manifestly conlusory opinion, the statement does not even state that St. Bernard Parish or the Lower Ninth Ward were flooded as result of these "breaches."

Professor Vrijling's 702c deposition (Exh.40) at 53:8-25, discussed the causation of the flooding of the "St. Bernard Bowl," but there is no analysis of the design, composition, or construction of the "levees" or other "flood control" structures.  Nor is there any discussion of whether these structures satisfied Congress' mandate in the Flood Control Act of 1965 for the Army Corps to (1) build "works of improvement for . . . the control of destructive floodwaters" and "a project for hurricane-flood protection on Lake Pontchartrain, Louisiana" (Pub. L. No. 89-298, 79 Stat. 1073) (October 27, 1965) (Exh. 57) and (2) construct flood works to protect the project area from flooding caused by storm surge or rainfall associated with a Standard Project Hurricane and Probable Maximum Hurricane (House Document No. 231)(Exh. 10).

In addition, Professor Vrijling does not address whether these supposed levees or flood control structures complied with the Army Corps' own regulations, standards, and guidelines, or

whether they even met the Army Corps' own design specifications.  In other words, nothing in Professor Vriling's deposition establishes the existence of "federal levees and other flood control structures."  Similarly, Dr. Vriling's Report is silent as to whether any alleged flood control structures were "designed and constructed to control" the "floodwaters that inundated St. Bernard Parish and the Lower Ninth Ward."

The Kok Report (Exh. 53) at 44-45 suffers from the same limitations.  There is nothing in the cited pages, or indeed anywhere in the document, establishing that a "federal levee" or other federal "flood control structure" was involved in the "inundation" of St. Bernard Parish and the Lower Ninth Ward.  Nor is there any mention of the design or construction of those structures.

Finally, Defendants' reliance of Dr. Bea's Report conclusively undermines Defendants' assertion, since at Paragraphs 17 and 19 of his Report, Dr. Bea states:

> [I]t is my opinion that the vast stretches of Reach 2 and portion of Reach 1 of the MR-GO and GIWW before Katrina for the most part *did not have hurricane flood protection "Levees"* . . .  [T]he [Army Corps] did not design and construct hurricane flood protection Levees as specified in its own manuals, guidelines, criteria, standards, and policies in effect from 1965 to the present or in accordance with the prevailing, generally-accepted engineering standards for coastal flood protection Levees.

Dr. Bea Report (Exh. 31) at pp. 9-10, ¶¶ 17 & 19 (emphasis added).

///

///

///

In sum, Defendants cited authorities do not support their statement.

Dated: January 31, 2008                          Respectfully submitted,


**O'Donnell & Associates P.C.**

By: s/ Pierce O'Donnell
Pierce O'Donnell (*pro hac vice*)
550 S. Hope St., Suite 1000
Los Angeles, California 90071
Phone:  (213) 347-0290
Fax:  (213) 347-0298


**The Andry Law Firm, LLC**

By: s/ Jonathan B. Andry
Jonathan B. Andry (LSBA No. 20081)
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 586-8899
Facsimile:  (504) 585-1788

**Law Offices of Joseph M. Bruno**          **Domengeaux Wright Roy & Edwards LLC**
By: s/ Joseph M. Bruno
Joseph M. Bruno (LSBA No. 3604)            Bob F. Wright (LSBA No. 13691)
855 Baronne Street                         James P. Roy (LSBA No. 11511)
New Orleans, Louisiana 70133               556 Jefferson Street, Suite 500
Telephone: (504) 525-1335                  P.O. Box 3668
Facsimile:  (504) 581-1493                 Lafayette, Louisiana 70502-3668
                                           Telephone: (337) 233-3033
                                           Facsimile:  (337) 233-2796

**Fayard & Honeycutt**                      **Girardi & Keese**

Calvin C. Fayard, Jr. (LSBA No. 5486)       Thomas V. Girardi (*pro hac vice*)
Blayne Honeycutt (LSBA No. 18264)           1126 Wilshire Boulevard
519 Florida Avenue, S.W.                    Los Angeles, CA 90017
Denham Springs, Louisiana 70726             Telephone: (213) 489-5330
Telephone: (225) 664-4193                   Facsimile:  (213) 481-1554
Facsimile:  (225) 664-6925

**Ranier, Gayle & Elliot, LLC**             **Levin, Papantonio, Thomas, Mitchell**

N. Frank Elliot III
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337).494.7218

**McKernan Law Firm**

Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202

**Law Office of Elwood C. Stevens, Jr., a
Professional Law Corporation**

Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Echsner & Proctor, P.A.**

Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123

**Gainsburgh, Benjamin, David, Meunier &
Warshauer, LLC**

Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Cotchett, Pitre, Simon & McCarthy**

Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**

Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Salas & Co., LC**

 Camilo K. Salas, III (LSBA No. 11657)
650 Poydras Street, Suite 1650
New Orleans, LA  70130
Telephone: (504) 799-3080
Facsimile:  (504) 799-3085
**Attorneys for Plaintiffs**

**Robinson, Calcagnie & Robinson, Inc.**

Mark Robinson (Cal State Bar No. 54426
620 Newport Center Drive – 7th Floor
Newport Beach, CA 92660
1-888-701-1288

## <u>CERTIFICATE OF SERVICE</u>

I, Pierce O'Donnell, hereby certify that on February 1, 2008, I caused to be served

**<u>PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED</u>**

**<u>FACTS</u>**, upon Defendants' counsel, Robin D. Smith, Catherine Corlies, Traci Colquette, and Jim

McConnon by ECF and email at <u>robin.doyle.smith@usdoj.gov</u>; <u>catherine.corlies@usdoj.gov</u>,

<u>traci.colquette@usdoj.gov</u>, and <u>jim.mcconnon@usdoj.gov</u>

<u>/s/ Pierce O'Donnell</u>
Pierce O'Donnell
