**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
|              CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Robinson* (06-2268) | § | |
| _____ | § | |

**DEFENDANT UNITED STATES' OPPOSITION TO PLAINTIFFS'**
**MOTION FOR SUMMARY ADJUDICATION**

Plaintiffs have moved for "summary adjudication" of the immunity of the United States

under the Flood Control Act of 1928, 33 U.S.C. § 702c.  They argue that § 702c does not bar

their claims for three reasons:  (1) their claims are not based on the performance of the Lake

Pontchartrain and Vicinity Hurricane Protection Project ("LPV") during Hurricane Katrina or

the "defective design, construction, operation or maintenance of" the LPV flood protection

works; (2) "the flood control structures were not designed or constructed in accordance with the

Congressional authorization of" the LPV; (3) the "hurricane flood protection system ('HPS')

was still substantially incomplete by the time of Hurricane Katrina."  Plt. Mem. (R.D. 10337-2)

at 1-2.

1

These three misguided and internally inconsistent arguments provide no basis for concluding that § 702c does not apply to this case. The legally relevant question is not whether Plaintiffs base (or, as it were, attempt to base) their claims on the Mississippi River-Gulf Outlet ("MRGO") rather than the LPV. The relevant question is whether Plaintiffs' alleged "damage" resulted "from" or was caused "by" the Katrina "flood" or its "flood waters." 33 U.S.C. § 702c. It is *this* nexus, the causal nexus set forth in the text of § 702c, that defines the scope of the United States' immunity. *Central Green Co. v. United States,* 531 U.S. 425, 437 (2001).

If, as Plaintiffs contend, the scope of immunity is restricted to floods or flood waters connected with a flood control project or to conduct related to a flood control project, then Plaintiffs' motion must be denied. To say that the Katrina flood had connections with a flood control project would be an understatement. Hurricane Katrina's storm surge caused massive overtopping of LPV levees and floodwalls along the MRGO, the Gulf Intracoastal Waterway, the Inner Harbor Navigation Canal, and elsewhere, resulting in the catastrophic flooding of which Plaintiffs complain. In addition, the alleged negligent design, operation, and maintenance of the MRGO was related to the LPV in numerous ways. Indeed, it can fairly be said that much of the challenged conduct was *intrinsic* to the LPV. For example, the MRGO was dredged to provide the soil that was eventually shaped into the LPV levees that paralleled the waterway when Katrina struck.

LPV levees and floodwalls were constructed along the MRGO, the GIWW, the IHNC, Lake Pontchartrain, and between the lake and the GIWW. Together with the Mississippi River levees in St. Bernard Parish, they surrounded New Orleans East, the Lower Ninth Ward, and St. Bernard Parish at the time of Hurricane Katrina. The project's purpose was to protect the developed areas adjacent to Lake Pontchartrain, including specifically the developed areas of

New Orleans East, the Lower Ninth Ward, and St. Bernard Parish, where Plaintiffs allegedly resided.  All of the floodwaters that rushed into these communities were floodwaters that overtopped or breached LPV levees, floodwalls, and other control structures.  The floodwaters came from numerous sources, including Lake Pontchartrain, the IHNC, the MRGO, the GIWW, Lake Borgne, the Gulf of Mexico, as well as bayous and wetlands.  Having been driven into Plaintiffs' communities by Hurricane Katrina, they were the very hurricane-induced storm surge that the LPV was designed and constructed to control.  Plaintiffs' motion should be denied because the waters that caused the alleged damage were floodwaters that a flood control project was unable to control.

Plaintiffs' fallback arguments, that § 702c immunity does not apply because the LPV did not conform to the initial project plans  and was "a work in progress" at the time of the flood have no merit.  Neither the text of the statute nor any case law makes the United States' immunity contingent on the completion of a hurricane protection system that conforms to initial project plans.  It is well established that the Army Corps of Engineers possesses broad latitude to revise plans after authorization has been granted.  Moreover, Plaintiffs' argument that application of § 702c depends on the nature of the works actually constructed—*i.e.,* "the character of the project"—has been roundly rejected by the Supreme Court and by this Court as well.  Neither the alleged "incompleteness" of the parallel protection for the Orleans Avenue Canal nor the alleged deviation from the mandated form of protection for the London Avenue canal prevented dismissal of claims for damage caused by the floodwaters that emanated from those canals.  Here too dismissal is required by § 702c even if the LPV differed from the initial plans or was still under construction when the storm struck.

For these reasons, Plaintiffs' motion should be denied.

3

**ARGUMENT**

**I. THE UNITED STATES IS IMMUNE BECAUSE PLAINTIFFS ALLEGE "DAMAGE FROM OR BY" A "FLOOD OR FLOOD WATERS" THAT A FLOOD CONTROL PROJECT WAS UNABLE TO CONTROL.**

Plaintiffs argue that 33 U.S.C. § 702c does not apply to this case because "Plaintiffs *do not allege* that their damages were caused by flood waters related to a flood control project." Plt. Mem. at 21 (emphasis added; capitalization altered). They cite two "material facts" as grounds for their argument: (1) Plaintiffs allege that their damages were caused by the MRGO, not the LPV, and (2) the MRGO was not "a flood control project, a constituent component of the LPV, or otherwise related to any national flood control program." *Id.* at 22-23. This argument fails, for two reasons. First, the argument itself is false on its face. Plaintiffs *do* allege that their damages were caused by flood waters related to a flood control project.[1] Second, Plaintiffs' argument is misguided. Regardless of Plaintiffs' *allegations,* the undisputed facts show that the flood *was* related to the LPV. Plaintiffs did not suffer any damage other than the damage caused by the flood and its floodwaters, which the LPV was unable to control.

---

[1] *See, e.g.,* Complaint (Exh. 67) at ¶ 57 ("Large sections of the MR-GO levee . . . disintegrated" during Hurricane Katrina"), ¶ 73 ("MR-GO significantly intensified Katrina's surge height and velocity, contributing to the scouring that undermined the . . . levees along the MR-GO and the Industrial Canal"), ¶ 77 ("overtopping led to many of the levee breaches that caused the most serious flooding during Katrina, including large sections of the MR-GO levees that sent floodwaters rushing into St. Bernard Parish, as well as sections of the GIWW levee that flooded homes in East New Orleans and the Lower Ninth Ward"), ¶ 80 ("the storm surge acceleration produced by the MR-GO" "trigger[ed] the collapse of . . . much of the levee system").

**A. *GRACI* CONCERNED A FLOOD THAT HAD NO CONNECTION OR RELATIONSHIP TO A FLOOD CONTROL PROJECT AND THEREFORE IS NOT DISPOSITIVE OF THIS CASE.**

Plaintiffs rest their motion almost entirely on *Graci v. United States,* 456 F.2d 20 (5th Cir. 1971).  The lynchpin of their argument, however, is the erroneous assertion that "[n]othing since *Graci* affects [its] holding."  Plt. Mem. at 21-22.  They contend that liability can "attach to" the United States for damage caused by the Hurricane Katrina flood because in *Graci* the United States was held to be subject to liability for damage caused by the Hurricane Betsy flood.  Plaintiffs' argument fails to account for the crucial involvement of the LPV in the flooding caused by Hurricane Katrina.  *Graci* could only be dispositive of this case if it were immaterial that Katrina's floodwaters were floodwaters that overtopped and breached the LPV levees and floodwalls that surrounded Plaintiffs' properties.  But *Graci* itself makes the overtopping and breaching of LPV flood protection structures material, because *Graci* "held that [§ 702c] conferred immunity . . . for floods or flood waters connected with a flood control project." *Central Green,* 478 U.S. at 602 n.2; *accord* Plt. Mem. at 26 (quoting this recitation of the *Graci* holding with approval).  Plaintiffs' assertion that *Graci* forecloses application of § 702c to MRGO-related conduct depends on an anachronistic reading that takes the holding out of context.

The flood at issue in *Graci* was a flood that did not involve a flood control project.  It was the absence of *any* flood control project that gave legal significance to the fact that the MRGO was "a navigational waterway, not a flood control project."  Plt. Mem. at 23.  The fact that *only* project then in existence, the MRGO, was "not a flood control project" led inexorably to the conclusion that the challenged conduct was "unconnected with any flood control project."  *Graci,*

456 F.2d at 27; *see also Callaway v. United States,* 568 F.2d 684, 686-87 & n.1 (10th Cir. 1978);

*Fla. East Coast Ry. v. United States,* 519 F.2d 1184, 1191 & n.6 (5th Cir. 1975).

The construction of the LPV after Hurricane Betsy and the role it played in the Katrina

catastrophe are the "since *Graci*" developments that explain why the application of § 702 to this

case is consistent with *Graci.* Under *Graci* the question is whether the damage was caused by

"'floods or flood waters connected with a flood control project.'" Plt. Mem. at 26 (quoting

*James,* 478 U.S. at 602 n.2) (emphasis added). In *Graci,* the floodwaters were not connected

with a flood control project. In this case, they were.

The LPV was designed and constructed to prevent the entry of hurricane-induced surges

into New Orleans East, the Lower Ninth Ward, and St. Bernard Parish. *See* H.R. Doc. No. 89-

231 (Exh. 10), at 1, 17-18, 33-34, 48-49, 64-65, 71-74, 82-85; Plt. Orig. Facts (R.D. 10337-8) ¶¶

65-67; Plt. Rev. Facts (R.D. 10643) ¶ 24-25. To that end, flood protection embankments (*i.e.,*

levees) were constructed along the MRGO and the GIWW.[2]  *See* Plt. Orig. Facts (R.D. 10337-8)

_____

[2]To avoid using the term *levee,* Plaintiffs refer to the " flood protection embankments along both
Reach 1 and Reach 2 of the MRGO." Plt. Rev. Facts ¶ 11; *cf. id.* ¶ 12 ("flood protection works
along Reach 1 and Reach 2 of the MRGO"), ¶ 13 ("earthen berms along Reach 1 and 2 of the
MRGO"). *But see id.* ¶ 33 ("the levee crowns were lower than specified"); Plt. Orig Facts ¶ 78
("The hurricane protection system ("HPS") of Greater New Orleans consists of a number of
areas, or polders, completely surrounded by levees." New Orleans East comprises one polder,
and "the Lower Ninth Ward and St. Bernard Parish are within another polder, surrounded by
levees."), ¶ 79 ("The New Orleans Flood and Hurricane Protection System . . . "is comprised of a
series of four main compartmented basins designed to limit the flooding impacts on the entire
system resulting from individual failures of levees and floodwalls."), ¶ 137 ("By the time of
Hurricane Katrina, the Army Corps of Engineers had not turned over to the St Bernard Parish and
the Lake Borgne Levee District the operation and maintenance of Reach 2 of the MRGO levees
because they had not been completed."). Even if Plaintiffs had not given the game away by
repeatedly using the term *levee* to denote the "flood protection embankments along . . . the
MRGO," their myriad circumlocutions would have fooled no one. After all, a levee is, by
definition, an embankment constructed along the edge of a waterway to prevent flooding.
Black's Law Dictionary (8th ed. 2004).

(continued...)

¶¶ 78-79, 120, 129-33, 138, 150, 159, 166-69, 192-96; Plt. Rev. Facts ¶¶ 10-13.  The inability of

these levees to control Katrina's surging floodwaters resulted in the catastrophic flooding of St.

Bernard Parish and New Orleans East.  *See* Plt. Orig. Facts ¶¶ 207-29; Plt. Rev. Facts ¶¶ 42, 45-

47.

     Plaintiffs themselves assert that the "best" explanation of how the floodwaters were

related to the flood control project is this: "The incompleteness of the HPS made a material

contribution to the catastrophic flooding.  Lower than authorized elevations of flood control

structures contributed to the overtopping and failure of both floodwalls and levees.  A completed

system would have prevented much of the catastrophic flooding . . . ."  Plt. Mem. at 21.

"[O]vertopped floodwalls failed because the soils behind them were eroded.  Similarly, . . . the

---

[2](...continued)

Plaintiffs' groundless legal contention that these "flood protection embankments" do not
"qualify" as "levees" for purposes of § 702c immunity does not create a genuine issue of material
*fact.*  The *fact* of the levees' existence is not disputed, and their existence when Katrina struck is
an undisputed material *fact.*  (Inasmuch as Plaintiffs themselves repeatedly employ the term
*levee* to denote these flood protection embankments, it would be inaccurate even to say that there
is a genuine lexical dispute over the use of the term *levee.*)  In truth, what was successfully
foisted on the Court as a factual dispute to prevent dismissal on the pleadings more than a year
ago, *see In re Katrina,* 471 F. Supp. 2d 684, 695 (E.D. La. 2007) ("There is intense disagreement
as to the scope of the 'levees' that were created in the dredging of the MRGO—are these
spoilbanks or actual flood control projects?"), is now revealed to be nothing more than an
artifice, a contrivance that was employed solely to delay the entry of a judgment of dismissal.
The reports of the IPET, the ILIT, and Team Louisiana, which set forth the facts that Plaintiffs
can (and do) no longer deny (indeed, they rely on these reports as evidence supporting their
"uncontested facts" submissions), were published *before* Plaintiffs filed their opposition to
Defendant's motion to dismiss.  Unable to continue feigning ignorance of what they have known
all along, Plaintiffs now admit that LPV levees and floodwalls were overtopped and breached
during Hurricane Katrina, resulting in the flooding of St. Bernard Parish, the Lower Ninth Ward,
and New Orleans East.  *See, e.g.,* Plt. Orig. Facts ¶¶ 207-15, 226-29, 249-53, 263-75.  Facing
the indisputable facts, Plaintiffs now employ the lexical artifice as a prop for their meritless *legal
argument* that the MRGO levees do not "qualify" for application of § 702c because the levees
were not high enough and strong enough to withstand Hurricane Katrina and therefore were not
"the flood works contemplated by Congress in authorizing the LPV."  Plt. Mem. at 10. n.1.

soils on the protected side of the levees (*i.e.,* facing towards the land) were severely eroded and contributed to failure of these flood protection structures." *Id.* at 17.  "[V]irtually all of the major breaches were caused by overtopping and subsequent erosion . . . ." *Id.* at 19-20.  "In the final analysis," Plaintiffs conclude, "the catastrophic flooding of Greater New Orleans was . . . caused . . . by . . . the Army Corps decision not to design or construct proper hurricane flood protection structures . . . ." *Id.* at 19.

This lone, undisputed fact—that the alleged damages were caused by floodwaters that the LPV could not control—warrants the attachment of § 702c immunity.  *See Central Green,* 531 U.S. at 431; *James,* 478 U.S. at 605.

## C.  *CENTRAL GREEN* DID NOT ENDORSE *GRACI* AND INSTEAD REFOCUSED ATTENTION ON THE TEXT OF STATUTE AS THE TRUE MEASURE OF IMMUNITY.

In *Central Green Co. v. United States,* 531 U.S. 425 (2001), the Supreme Court resolved "the meaning of the words 'floods or flood waters.'  The narrow question presented [was] whether those words encompass all the water that flows through a federal facility that was designed and is operated, at least in part, for flood control purposes." *Id.* at 427.  Certiorari was granted to resolve a conflict between the Ninth Circuit's rule, which made the nature and purpose of a federal project the *sine qua non* of immunity under § 702c and required that immunity attach to any "event" that was "not wholly unrelated to" a project that had flood control as one of its purposes.  *Id.* at 427-28.  The Ninth Circuit's construction of § 702c was broader than the construction adopted by some other federal courts.  *Id.* at 427. In holding that the Ninth Circuit's construction of § 702c was too broad, the Supreme Court painstakingly demonstrated that its own prior construction of the statutory provision in *James* "was vastly different from the Ninth Circuit's reading of § 702c." *Id.* at 431.

Applying § 702c to the *Central Green* facts was "difficult . . . because the property damage at issue was allegedly caused by continuous or repeated flows occurring over a period of years rather than by a single, discrete incident." *Id.* at 436.  Inasmuch as "a serious flood did occur in the San Joaquin [Valley] in 1997," there was a "distinct possibility that flood waters may have surged down the Madera Canal and harmed petitioner's property." *Id.* at 437.  It was also possible that the damage may have been caused by non-flood waters, or even by both.  If, as alleged, the property damage was "caused by continuous or repeated flows over a period of years," the water that seeped from the canal into the ground beneath the pistachio trees may at times have possessed the character of "flood waters" and at other times not.  *See id.* at 436.  This factual uncertainty led the Court to remand the case for a determination of "whether § 702c immunity attaches" based on "the character of the waters that cause[d] the relevant damage." *Id.* at 437.

The dichotomy in *Central Green* between damage caused by "flood waters" and damage not caused by 'flood waters" does not exist in this case.  *All* of Plaintiffs' alleged damage resulted from "a single discrete incident":  the catastrophic flooding of Greater New Orleans on August 29, 2005.  Plaintiffs do not allege any other damage.  *See* Complaint (Exh. 67) ¶¶ 10-25. Having been driven by Hurricane Katrina out of the Gulf of Mexico and into the numerous lakes, bayous, wetlands, and waterways in Southeastern Louisiana before spilling over the LPV levees and floodwalls in Greater New Orleans, the waters that caused the alleged damage were certainly the floodwaters that the LPV was intended to control.  *See* H.R. Doc. No. 89-231 (Exh. 10) at 1-2.  And when, after overtopping and breaching the LPV levees and floodwalls, they rushed in a torrent into New Orleans East, the Lower Ninth Ward, and St. Bernard Parish—there they became a flood.  *See, e.g.,* Complaint (Exh. 67) ¶¶ 72-73, 75, 77-79, 82; Plt. Rev. Facts ¶¶ 10,

12-13, 32, 35, 45-46, 53.  According to Plaintiffs, it is "obvious" that  "once the levees were overtopped, destruction was catastrophic."  Plt. Orig. Facts ¶ 217.  "All of the levee and floodwall reaches exposed to the Lake Borgne surge system, including those along the IHNC, experienced overtopping."  *Id.* ¶ 222.  "[T]he catastrophic flooding was caused by the massive and numerous failures (breaches) of levees and floodwalls resulting from the sustained overtopping."  *Id.* ¶ 218.

To blunt the force of these facts, Plaintiffs argue that § 702c does not apply to floods or floodwaters related to a flood control project if the relevant damage was "caused independent of any flood control project."  Plt. Mem. at 27.  But Plaintiffs do not allege (nor could they possibly have experienced) "harms caused independent of any flood control project."  All of their harms occurred during a single discrete event, the Katrina flood, which occurred when floodwaters overflowed and breached the LPV levees and floodwalls that "completely surrounded" Plaintiffs' properties.  Plt. Orig. Facts ¶ 78.  "Hurricane Katrina . . . overwhelmed the eastern side of the New Orleans flood protection system with storm surge and wave loading that exceeded the levels used for design of the system in that area.  [This] is a true statement . . . ."  *Id.* ¶ 252.  If "the overtopping of Levees [sic] and floodwalls along the MR-GO had not occurred, there would have been minor inundation in New Orleans East, Lower 9th Ward, and St. Bernard Parish, but not catastrophic flooding."  *Id.* ¶ 219.  Plaintiffs' alleged harms—all of them—were caused by floodwaters that the LPV, a flood control project, was unable to control.  *See* Plt. Rev. Facts ¶¶ 38-42.

Even though "Plaintiffs are not predicating Defendant's liability on levee breaches or the failure, overtopping, or defective design, operation or maintenance of other forms of flood protection works," Plt. Mem.  at 1, the fact remains that *all* of Plaintiffs' alleged damages were

caused by floodwaters that the LPV was unable to control.  The waters in the MRGO prior to Hurricane Katrina did not harm Plaintiffs.  Plaintiffs merely allege that the pre-flood waters created conditions that increased and accelerated the surge generated by Hurricane Katrina.  At no time before Hurricane Katrina entered the Gulf of Mexico did the "navigational waters" in the MRGO damage Plaintiffs' properties or impact them in any way.  Therefore the damage to wetlands from ships plying the MRGO is not analogous to the damage that was alleged in *Central Green.*  The plaintiff there owned the pistachio orchards that were allegedly harmed over a period of years, and the grower had allegedly experienced increased operating costs and property damage in years when the canal did not contain any floodwaters.  Those harms could therefore, at least in theory, be separated from any harm experienced in 1997, which was the year of the San Joaquin deluge.

In contrast, Plaintiffs' alleged damage occurred at one time.  Accordingly, even if they were able to prove that the loss of wetlands over a period of years prior to Hurricane Katrina was a contributing cause to the catastrophic flood that caused their alleged damage, there could be no separation or segregation of damage.  Plaintiffs allege no damage separate from or independent of the damage caused by the Katrina flood.  This distinction reveals why *Central Green* does not provide Plaintiffs with an avenue of escape from the § 702c bar.  The statute "does not limit the bar against such recovery to cases where floods or flood waters are the sole cause of damages. . . . [T]he bar against federal liability for damages is made to apply wherever floods or flood waters have been substantial and material factors in destroying or damaging property." *Nat'l Mfg.,* 210 F.2d at 271.  Inasmuch as the entirety of Plaintiffs' alleged damage was caused by floods or flood waters that the LPV was unable to control, Plaintiffs' motion must be denied.

**D. UNDER THIS COURT'S PRIOR RULINGS, THE UNCONTROVERTED FACTS REQUIRE THAT PLAINTIFFS' MOTION BE DENIED.**

When this Court first ruled on the application of § 702c to this case, it did not have the benefit of the record now before it. At that time the Court was not prepared to "tak[e] judicial notice that there were flood control projects," because it believed that doing so would require it to "ignore[] the pleadings presented." *In re Katrina Canal Breaches Consol. Lit.,* 471 F. Supp. 2d 684, 694 (E.D. La. 2007). The Court found no basis for "find[ing] that all of the projects, levees and activities in that area are flood control projects," or for concluding that "(1) flood waters caused the damage alleged or (2) . . . flood waters were not contained by these presumptive flood control projects." *Id.* at 695. There was "intense disagreement as to the scope of the 'levees' that were created in the dredging of the MRGO—are these spoilbanks or actual flood control projects?" *Id.* In addition, there were "serious questions as to the relationship between the MRGO and the LPV." *Id.* Given the lack of an evidentiary record, the Court concluded that it was not clear "as a matter of law" that § 702c would prevent a recovery "for the damages caused by the MRGO and not the failure of the flood control projects." *Id.*

In concluding that it needed more information about the "actual flood control projects" in the area when Katrina struck, the Court cited the fact "that the MRGO was 'totally unrelated to any natural waterway or the national flood control program" at the time of the Hurricane Betsy flood. *Id.* The Court needed evidence showing "that certain 'levees' that were constructed in conjunction with MRGO constitute projects that would be subject to immunity under § 702c." *Id.* "Plaintiffs successfully opposed the motion to dismiss because they alleged that the MRGO was not a flood control project and alleged that their damage was caused by normal water flow as opposed to . . . the hurricane-caused flood." *In re Katrina Canal Breaches Consol. Lit.,* No. 06-

9147 [hereafter "*LEAN*"], slip op. at 11-12 (E.D. La. Nov. 2, 2007).  Dismissing the case on the

pleadings would, in the Court's view, have been "extremely precipitous" because it would have

required the Court "to make factual determinations in the posture of a Rule 12(b)(6) motion to

dismiss."  *Id.* at 12.

The uncertainties that underlay the Court's prior ruling no longer exist.  The uncontested

facts now show that (1) LPV levees and floodwalls parallel to the MRGO guarded against

flooding from the waterway at the time of Hurricane Katrina and (2) those flood protection

structures were overtopped and breached by Katrina's floodwaters.  *See* Plt. Orig. Facts ¶¶ 206-

29 ("The Incomplete System Caused Catastrophic Consequences"); Plt. Mem. at 20-21 ("The

Unfinished LPV Materially Contributed to the Catastrophic Flooding"); Def. Facts ¶¶ 19-21, 24.

"The flooding of upper St. Bernard Parish was caused by waters originating in Lake Borgne and

Reach 2 of the MR-GO overwhelming the MR-GO banks and flood protection works along

Reach 2, . . . flowing into the population areas."  Plt. Orig. Facts ¶ 281.  "Along Reach 2 of the

MRGO, the surge water went over the flood protection works, eroded the bank materials, and

then the structures failed.  There were 50 breaches along Reach 2 alone.  Some of the crowns

along a 12-mile stretch of Reach 2 eroded 10 feet below the crowns existing before Hurricane

Katrina."  *Id.* ¶ 282.  "The flooding of the Lower 9th Ward was largely caused by the waters

overflowing the flood protection works on the west side of the IHNC and two massive breaches

of flood protection works on the west side and some overtopping of flood protection works on

the south side of Reach 1 of the MRGO."  *Id.* ¶ 284.  "Significant levee overtopping and breaches

occurred all along the GIWW.  There were also a few breaches along the floodwall on the IHNC

near I-10, as well as overtopping of the floodwall near the Lakefront Airport.  Overtopping also

occurred along the levee at Lake Pontchartrain . . . . Therefore, the New Orleans East area received floodwaters from all directions." *Id.* ¶ 286.

These facts are analogous to the factual predicates that required dismissal in *LEAN*. There it was established that "the London Avenue Canal levees were breached during Hurricane Katrina, which caused 'water . . . to pour into the Vista Park neighborhood and the City of New Orleans.'" *LEAN,* slip op. at 12 (citation omitted). There was "evidence that the London Avenue Canal levees were part of a federal flood control project." *Id.* "The character of the waters that caused [the alleged] damage also qualifie[d] under the *Central Green* standard as flood waters, considering that LEAN allege[d] that the damage was caused by surges from a hurricane that breached the levee walls, instead of damage that was caused by 'routine use of the canal.'" *Id.* at 13 (citation omitted). Even though the plaintiffs "claim[ed] that the London Avenue Canal 'was neither designed nor operated as a federal flood control project," the Court found that it was "indeed part of a federal flood control project" because it was clear that the levees and floodwalls paralleling the canal were part of the LPV. *Id.* Because the London Avenue Canal was part of the flood control project and the damage resulting from the levee breach during the Hurricane was "damage from or by floods or floodwaters," the Court concluded that the Flood Control Act applied to the case. *Id.*

In this case it is now established that the levees and floodwalls along the MRGO, the GIWW, and the IHNC during Hurricane Katrina were part of the LPV. *See generally* Plt. Orig. Facts ¶¶ 142-246 ("Incomplete Hurricane Flood Protection System at Time of Hurricane Katrina"); Plt. Rev. Facts ¶¶ 24-46; Plt. Mem. at 20-21 ("The Unfinished LPV Materially Contributed to the Catastrophic Flooding"). It is further established that the alleged damage was caused by surges from a hurricane that breached the LPV levees and floodwalls and not by

"routine use of" the MRGO.   *See, e.g.,* Plt. Orig. Facts ¶¶ 206-29 ("The Incomplete System Caused Catastrophic Consequences"); Plt. Mem. at 17-21 ("Failure to Build the Congressionally Mandated Standard Project Hurricane System Caused the Catastrophic Flooding of Greater New Orleans"; "The Unfinished LPV Materially Contributed to the Catastrophic Flooding").  As in *LEAN,* the LPV levees stood parallel to the waterways out of which waters were driven by Hurricane Katrina.  The construction of LPV levees along the MRGO, the GIWW, and the IHNC, supports a finding that the floodwaters that overtopped and breached them were floodwaters that the LPV was unable to control and to which § 702c immunity attaches.  *See LEAN,* slip op. at 13.

Fearing that the reasoning which compelled dismissal in *LEAN* will lead to a dismissal here and now, Plaintiffs desperately recite (and distort[3]) statements made by counsel for the United States in prior briefs concerning the nature and purpose of the MRGO.  *See* Plt Rev. Facts ¶¶ 1, 3; Plt. Orig. Facts ¶¶ 16-19, 21-22; Plt. Mem. at 7.  The United States stands by its prior statements and the arguments made in support of its motion to dismiss.  It is now, as it has always been, the position of the United States that § 702c compels dismissal even if the MRGO "always was a navigable waterway that was not transformed into a flood control project or a

_____

[3]Plaintiffs erroneously assert that "the United States has disavowed any argument that the MRGO was . . . related to the national flood control program" Plt. Mem. at 7, even though the source documents that they cite provide no support for the assertion and, indeed, refute it.  *See* R.D. 6052 (Defendant's Rebuttal of Plaintiffs' Sur-reply) at 2-3 (discussing evidence that "levees built as part of that project [the LPV] along some of the banks of the MRGO" were breached and caused "the flooding of which the plaintiffs complain"); *cf.* R.D. 5395 (Def. Reply in Sup. of Mot. to Certify) at 3 ("even to the extent that the applicability of § 702c immunity here turned on a granular examination of whether there were flood control works specifically along MR-GO (as opposed to the acknowledged general existence of the LPVHPP), there is no factual dispute on that issue. . . . Plaintiffs' Complaint expressly averred both the existence of LPVHPP levees and floodwalls along MR-GO and that it was these flood control structures that were breached during Hurricane Katrina thereby releasing the flood waters that allegedly caused plaintiffs' damages").

flood control 'facility.'"  R.D. 6052 (Defendant's Rebuttal of Plaintiffs' Sur-Reply) at 10.  Now,

even more than before, there is abundant evidence that the LPV and the MRGO were related in

numerous ways and that the challenged conduct is not "wholly unrelated" to the Act of Congress

that authorized expenditures of federal funds for "[t]he project for hurricane-flood protection on

Lake Pontchartrain, Louisiana."  Pub. L. 89-298, 79 Stat. 1073, 1077 (Oct. 27, 1965); *see also*

*Graci,* 456 F.2d at 27; Plt. Orig. Facts ¶ 130 (LPV levees constructed of materials dredged from

MRGO, including material dredged specifically for levee construction after construction of the

MRGO was complete), ¶ 133 (levee construction along Reach 2 of the MRGO began in the

1960s and continued in the 1970s and 1980s), ¶ 167 (at time of Hurricane Katrina some sections

of flood works along MRGO were at the elevation specified in the LPV designs, and all of them

were within 4-6 feet of the specified elevation), ¶ 253 (MRGO lay within "a 'surge funnel'

created by the hurricane protection levees" that paralleled the MRGO and the GIWW); Plt. Mem.

at 11 ("The MR-GO Spoil Banks Became The Highly Erodable Foundation for The LPV Flood

Control Structures").

Even though the MRGO and the LPV were separate projects, with separate and distinct

purposes, the United States has consistently described the two projects as being "inherently and

inextricably intertwined."  *See, e.g.,* R.D. 822 (Mot. to Dismiss) at 4; R.D. 10378-2 (Mot. to

Dismiss or for Sum Judg.) at 3, 19.  In the very first brief filed with respect to the immunity

issue, it was pointed out that "[t]he MR-GO waterway forms a *constituent element* of the

hydrologic system that the flood control project was designed to contain.  It is no mere

happenstance that LPVHPP levees were built on the banks of MR-GO."  *Id.* (emphasis added);

*see also id.* 11-12 (LPVHPP planners studied role of MRGO in LPV hydrologic system and

recognized that storm surge would contribute to "enormous volumes of water pass[ing] in both

directions through" MRGO), 15 (construction of LPV levee on south bank of MRGO required dredging of waterway to obtain materials for levee construction), 25 ("papers submitted to Congress recommending authorization of the LPVHPP were filled with references to MR-GO and described its involvement in the hydrologic system that the LPVHPP was designed and intended to restrain"), 26 (impact of LPV was on salinity was modeled two ways—with MRGO and without MRGO), 27 (noting "significant inter-relatedness of the two projects), 28 (citing "inter-relationship between MR-GO and the flood control project").  It is as true and as relevant today as it was 18 months ago:  "The "waters that caused the relevant damage" were "flood waters" and the alleged negligent acts and omissions were flood control activities *innately related to* (if not formally part of) a flood control project." *Id.* at 28 (emphasis added); *see also* R.D. 1183-1 (U.S. Mot. to Dismiss Reply) at 4-6.  The innate relationship between the LPV and the MRGO requires that § 702c immunity must attach to the conduct on which Plaintiffs base their case:

> The alleged negligent acts and omissions in the design, construction, operation, and maintenance of MR-GO were not wholly unrelated to the LPVHPP, which indisputably was a flood control project designed to prevent the waters flowing through MR-GO from flooding greater New Orleans. Thus, *when the Complaint challenges acts and omissions related to MR-GO, it is challenging acts and omissions related to a flood control project,* as the Complaint itself avers.

*Id.* at 6 (emphasis added); *see LEAN,* slip op. at 13; *cf. Mocklin v. Orleans Levee Dist.,* 877 F.2d 427, 430 (5th Cir. 1989) (channel dredged for flood control purposes was "inescapably part of a flood control project").

For the same reasons that § 702c immunity was held to apply in *LEAN,* the provision can be held to apply in this case:  LPV levees and floodwalls were constructed parallel to the MRGO to protect against flooding from the waterway.  It is obvious, based upon the location of the flood

control structures, that the LPV was intended to control floodwaters emanating from the MRGO

no less than waters emanating from Lake Borgne and the Gulf of Mexico, which lay.  In the

"Report of the District Engineer," which set forth the plans that the Chief of Engineers endorsed

in the Army's submittal to Congress, the first two recommendations for protection of the

Chalmette area were as follows:

> b. <u>Chalmette</u>.
>
>   (1) It is further recommended that a plan for hurricane protection of the Chalmette area be authorized for construction to provide for a levee along the Mississippi River-Gulf Outlet from the Inner Harbor Navigation Canal to Bayou Dupre, thence along the bayou to Violet, La..; the improvement of the existing levee along the Inner Harbor Navigation Canal; and drainage structures in the levee alignment at the Bayous Bienvenue and Dupre.
>
>   (2) The proposed plan shall be generally in accordance with the plan of improvement described herein and as shown on the accompanying plates and with such modification thereof as in the discretion of the Chief of Engineers may be advisable, at an estimated cost to the United States of $10,600,000 for new work.

H.R. Doc. No. 89-231 (Exh. 10) at 84.[4]

Inasmuch as flood control structures were built parallel to the MRGO, the GIWW, and

the IHNC to protect Greater New Orleans from hurricane-induced floods, the floodwaters that

were driven out of them by Hurricane Katrina were among the floodwaters that the LPV was

intended to control.  Accordingly, it must be said that *all* of the floodwaters that inundated

Plaintiffs' properties were floodwaters to which § 702c immunity attaches.  Furthermore, even

the waters that Plaintiffs have characterized as "navigational waters of the MRGO," R.D. 1003

---

[4]The area to be protected was subsequently enlarged by extending the levee beyond Violet, along the waterway to Verret and from that location westward to the Mississippi River levee at Caernarvon.  *See* USACE LPVHPP General Design Mem. No. 3, Supp. No. 1, "Chalmette Extension" (Sept. 1968) (Exh. 41) at 1-2 & Plate (LPV Authorized Plan of Protection (Rev. Apr. 1968)) (showing location of work covered in document); Bea Dep. (Exh. 45) at 191:25 – 193:2.

(Plt.Opp. Mot. to Dismiss) at 46, were, like the putative "drainage water" in the 17th Street Canal, waters to which § 702c attached when they flowed out of the MRGO and became the floodwaters that overtopped and breached the LPV levees and floodwalls that paralleled the waterway.

Under this Court's prior rulings, as under the relevant rulings of the Supreme Court and the Court of Appeals, Plaintiffs' motion should be denied because § 702c immunity attaches to and bars Plaintiffs' claims.

## II. WHETHER THE HURRICANE PROTECTION SYSTEM CONFORMED TO INITIAL PROJECT PLANS OR WAS AN UNFINISHED "WORK IN PROGRESS" IS IRRELEVANT TO THE IMMUNITY OF THE UNITED STATES UNDER § 702C.

In a final, futile attempt to persuade the Court that § 702c does not bar their claims, Plaintiffs make two arguments that have no support whatsoever in the relevant case law and that are demonstrably contrary to the teachings of the Supreme Court in *James* and *Central Green* and to this Court's application of § 702 to the Levee Master Complaint.  Plaintiffs first argue that the immunity provision does not apply because the LPV flood works did not sufficiently conform to the "course of conduct" that Congress supposedly prescribed.  Plt. Mem. at 30-33.  Then they argue that the provision does not apply because the hurricane protection system was not completed by the time of Hurricane Katrina.  *Id.* at 33-40.

The notion that "the scope of the immunity conferred" by § 702c is determined by "the character of the federal project" was expressly rejected by the Supreme Court in *Central Green.* 531 U.S. at 434.  As discussed above, the *Central Green* ruling was necessitated by the Ninth Circuit's overbroad and nontextual construction of the immunity provision.  *See supra,* part C, at 16-22.  The Ninth Circuit's construction focused on the existence of a flood control project and

whether there was a nexus between such a project and the water that harmed the plaintiff. *Central Green,* 531 U.S. at 428. The Supreme Court held that it is the text of § 702c (which does not include the words "flood control project") that governs the scope of the United States' immunity from liability for damage caused "by floods or flood waters." *Id.* at 434, 437. The Court flatly stated that the scope of the immunity conferred by § 702c is *not* determined "by the character of the federal project." *Id.* at 434. Plaintiffs' arguments are refuted by this holding of the Supreme Court, for the character and nature of the federal project, indeed, the very details of the project, would govern the scope of the immunity conferred by § 702c. In utter disregard of *Central Green*, Plaintiffs plainly argue that "[t]his conclusion is rooted in the very nature of hurricane flood protection systems." Plt. Mem. at 34.

Even if Plaintiffs' arguments were not foreclosed by *Central Green,* they would fail because they are based on the false premise that Congress "'specifically prescribed a course of action for [the Corps of Engineers] to follow.'" Plt. Mem. at 30 (citations omitted).[5] Contrary to Plaintiffs' contention, Congress did not "g[i]ve the Army Corps an explicit mandate to follow a prescribed course of conduct with respect to the LPV." Plt. Mem. at 31. Plaintiffs' contention is based on the false premise that all of the details set forth in the LPV papers that the Army submitted to Congress were incorporated into the law that authorized the construction of the project. *See id.* at 15-17 ("Congress Mandated a Standard Project Hurricane Design for the LPV Hurricane Protection System"). In truth, the law gave the Corps of Engineers considerable discretion in the execution of the project.

---

[5]Plaintiffs' inapposite citation of cases pertaining to the Federal Tort Claims Act's discretionary function exception is explicable only as a tacit admission that their arguments are bereft of pertinent supporting case law.

By its terms, the law (with an exception not relevant here) authorized "[t]he project for hurricane-flood protection on Lake Pontchartrain, Louisiana, . . . substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 231, Eighty-ninth Congress . . . ."  Pub. L. No. 89-298, 79 Stat. 1073, 1077 (Oct. 27, 1965) (Exh. 10).  It is well established that laws such as this one, which authorize projects "substantially in accordance with" the Corps's recommendation do not prescribe a particular course of conduct but merely set guidelines that give the Corps discretion to modify plans as the project proceeds.  *See Creppel v. U.S. Army Corps of Eng'rs,* 670 F.2d 564, 572-73 (5th Cir. 1982); *Allison v. Froehlke,* 470 F.2d 1123, 1125-26 (5th Cir. 1972); *Missouri v. Ashcroft,* 526 F. Supp. 660, 668 (W.D. Mo. 1980); *United States v. 2,606.84 Acres of Land,* 309 F. Supp. 887 (N.D. Tex. 1969), *rev'd on other grounds*, 432 F.2d 1286 (5th Cir. 1970); *cf. United States v. Spoonbarger,* 308 U.S. 256, 268 (1939) (Flood Control Act of 1928 "envisaged a vast program, [and therefore] the Act naturally left much to the discretion of its administrators and future decisions of Congress. Recognizing the value of experience in flood control, Congress and the sponsors of the Act did not intend to foreclose the possibility of changing the program's details as trial and error might demand."); H.R. Rep. No. 79-2165 (1946) (Exh. 87), at 4 ("[I]t has been the policy of the Flood Control Committee and the Congress to recognize that changing conditions often make plans obsolete, and to avoid undue rigidity they have given the Secretary of War and the Chief of Engineers the authority to modify plans as may be found necessary and desirable.").[6]   Inasmuch as Congress did not "prescribe" a "course of conduct in designing and constructing the LPV,"  Plt. Mem. at 30, Plaintiffs' argument is utterly without foundation.

---

[6]These case are discussed further in R.D. 6921 (U.S. Reply Mem.) at 17-20.

Plaintiffs' argument is also foreclosed by the Court's recent dismissal of the Levee Master Complaint.  In opposing dismissal, the plaintiffs there argued that "the Corps did not build what it was told to build . . . ."  R.D. 10984 (Order & Reasons) at 28.  This argument was based in part on Plaintiffs' contention that "the protection constructed along the Orleans Avenue Outfall Canal did not comply with the Congressional definition of 'parallel protection'" because, [a]lthough the Corps did raise levees along the Orleans Avenue Outfall Canal, it failed to raise levees along the 'entire length of the Orleans Avenue' Outfall Canal."  R.D. 6674-5 (Plt. Opp.) at 30 (emphasis omitted).  The Levee plaintiffs alleged that "[t]he Corps left a 200 foot gap at the end of the Canal . . . . By failing to construct *anything* along the south end of the Orleans Avenue Outfall Canal, the Corps's construction of protection does not comply with the Congressional definition of 'parallel protection.'"  *Id.*  Under *Central Green,* the Court correctly concluded that these allegations of incompleteness and nonconformity with a putative congressional directive did not prevent the application of § 702c to their claims.  *See* R.D. 10984 (Order & Reasons) at 33-35; *see also Mocklin,* 877 F.2d at 430 (§ 702c barred claim of injury during reinforcement of levees along Lake Pontchartrain).

Plaintiffs' final argument, that § 702c "must be narrowly construed," Plt. Mem. at 39, is an invitation to commit legal error.  The Supreme Court has stated flatly that "the sweeping language of § 702c was no drafting inadvertence. . . . . Congress clearly sought to ensure beyond doubt that sovereign immunity would protect the Government for 'any' liability associated with flood control."  *James,* 478 U.S. at 608.  The Court in *James* rejected a "proffered interpretation of § 702c [that] ignore[d] the broad language of the statute."  *Id.* at 609; *see also id.* at 610 (*citing Dalehite v. United States,* 346 U.S. 15, 31 (1953) for "the broad principle applicable here . . . that a 'clear relinquishment of sovereign immunity [is required] to give justification for tort

22

actions'").  Even if Justice Stevens at one time regarded *James* as "an unfortunate decision" and

characterized § 702c as "'an obsolete legislative remnant [that] is nothing more than an engine of

injustice,'" *Hiersche v. United States,* 503 U.S. 923, 925 (1992) (Stevens, J., dissenting from

denial of cert.), when later tasked with explicating the law,  he stated clearly and emphatically

that "it is the text of § 702c, as informed by our holding in *James,* that governs the scope of the

United States' immunity from liability for damage caused 'by floods or flood waters.'"  *Central*

*Green,* 531 U.S. at 437.  Limiting the scope of § 702c immunity in the manner requested by

Plaintiffs would require this Court to disregard both the text of § 702c and the holdings of the

Supreme Court in *James* and *Central Green.*  Under those precedents and this Court's own prior

decisions, § 702c bars this action.[7]

---

[7]As the uncontested facts now demonstrate, Plaintiffs' claims are also barred by 28 U.S.C. §
2680(a).  The construction and operation of the MRGO through the wetlands adjacent to Lake
Borgne was required by the law that authorized the project.  To the extent that the alleged
damage resulted from the location of the waterway, Plaintiffs' action is barred by the "due care"
exception.  Furthermore, the discretionary function exception bars claims concerning the
dredging of the MRGO and the shoreline protection.  There were no statutes or regulations that
cabined the Corps's discretion as to how to maintain the waterway at its authorized depth.
Whether to accomplish this maintenance by dredging the channel or by protecting the shore from
erosion was a choice that lay within the agency's discretion.  Even if 33 U.S.C. § 702c did not
attach to and require dismissal of Plaintiffs' claims, they would not be actionable under the
Federal Tort Claims Act.  *See* R.D. 814 (U.S. Mot. to Dismiss) at 31-47.

## CONCLUSION

For these reasons, Plaintiffs' motion for "summary adjudication" should be denied.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR.
Assistant Director, Torts Branch
Civil Division

s/ Robin D. Smith
ROBIN D. SMITH
Senior Trial Counsel
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, D.C.  20044
(202) 616-4289
(202) 616-5200 (fax)
robin.doyle.smith@usdoj.gov
Attorneys for Defendant United States

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 1, 2008, a true copy of the foregoing was served on all counsel of record by ECF.


<u>s/ Robin D. Smith</u>
Robin D. Smith