**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Robinson* (06-2268) | § | |
| _____ | § | |

**DEFENDANT UNITED STATES' RESPONSE TO PLAINTIFFS'**
**REVISED STATEMENT OF UNDISPUTED FACTS**

Defendant United States hereby responds to Plaintiffs' contention that the following

statements set forth facts that are undisputed for purposes of their motion for summary

adjudication on the issue of the application of 33 U.S.C. § 702c to Plaintiffs' claims.

**Plaintiffs' Revised Fact No. 1**:

The Government concedes that the MR-GO had no flood control features when

constructed, "the MR-GO did not have a flood control purpose or function," and "no levees were

constructed as part of the MRGO project." PUF Nos. 15, 19, 20.

1

**Response to Plaintiffs' Revised Fact No. 1**:

Uncontested, but irrelevant.  Irrelevant because the nature of the MRGO when constructed does not make any fact of consequence to the issue of § 702c more or less probable. The material fact is that the MRGO was related to the LPV, a flood control project, because Congress authorized the building of levees along the MRGO to protect Chalmette from floodwaters emanating from the MRGO.

**Plaintiffs' Revised Fact No. 2**:

In the wake of Hurricane Betsy's catastrophic flooding, Congress enacted the Flood Control Act of 1965 authorizing the LPVHPP, but the MR-GO was never part of the new flood control project and the Government has conceded that "the MR-GO was not a flood control project and was not absorbed into the LPVHPP."  PUF No. 18, 23, 65.

**Response to Plaintiffs' Revised Fact No. 2**:

Uncontested, but irrelevant, for the reasons stated in response to PUF No. 1.

**Plaintiffs' Revised Fact No. 3**:

The United States has disavowed any argument that the MR-GO was either
(1) related to the national flood control program, (2) a "constituent component" of the LPVHPP, or (3) morphed into a hybrid flood control project/navigational aid project.  PUF No 22; see also PUF Nos. 16-17, 21-22.

**Response to Plaintiffs' Revised Fact No. 3**:

Contested.  The United States has never disavowed the argument that the MRGO and the national flood control program are related.  The MRGO and the LPV are related in numerous

respects.  The remaining contentions are uncontested but irrelevant.  *See supra,* response to PUF No. 1.

**Plaintiffs' Revised Fact No. 4**:

Congress authorized in 1956 the MR-GO as a 76-mile deep water, navigation channel connecting the Gulf of Mexico to the Port of New Orleans Inner Harbor Navigation Canal ("IHNC").  PUF Nos. 1, 2, 3, 10, 11.

**Response to Plaintiffs' Revised Fact No. 4**:

Uncontested.

**Plaintiffs' Revised Fact No. 5**:

The Army Corps designed, constructed, operated, and maintained the MR-GO.  PUF Nos. 2, 9, 15, 315.

**Response to Plaintiffs' Revised Fact No. 5**:

Uncontested.

**Plaintiffs' Revised Fact No. 6**:

The MR-GO has been divided into three reaches:

(a) The six-mile connection between the junction of the Gulf Intracoastal Waterway ("GIWW") and the MR-GO terminus in the IHNC has been designated as Reach 1, and  in IPET's words, Reach 1 is "the critical reach" playing the most significant role in transmission of hurricane surge.

(b) Reach 2-the segment dredged through the marsh beginning at the convergence with the GIWW and extending to Veret-has caused the most environmental degradation.

(c) Reach 3 further south to the Gulf of Mexico has required continual dredging to keep the channel open.  PUF No. 5.

**Response to Plaintiffs' Revised Fact No. 6**:

Contested and irrelevant.  The designations "Reach 1" and "Reach 2" are arbitrary and have been used to denote various and different reaches of the MRGO.  What Plaintiffs denominate "Reach 3" is irrelevant, as is the dredging of it.  The comparison implied by "most" is vague and ambiguous.  None of the factual allegations is of any legal consequence to the issue of § 702c immunity.

**Plaintiffs' Revised Fact No. 7**:

In designing and constructing the MR-GO, the Army Corps ignored known hazards posed by the "funnel effect" enabling hurricane storm surge from Lake Borgne and the Gulf of Mexico (via Reach 2) to flow into the confined channel of the GIWW/Reach 1 separating New Orleans East and the Ninth Ward/St. Bernard Parish.  PUF Nos. 50-58.

**Response to Plaintiffs' Revised Fact No. 7**:

Contested.   The MRGO did not create a "funnel effect."  *See* IPET Vol. IV, App. 6, 6-1 to 6-34.

**Plaintiffs' Revised Fact No. 8**:

For decades, the Army Corps has known that hydrologically, the MR-GO created a short, new pathway for astronomical and storm-driven tides to flow directly from Breton Sound to Lake Borgne and Lake Pontchartrain and for hurricane storm surge to be efficiently delivered into the heart of New Orleans.  PUF No. 5-8, 50-58, 295, 295a.

**Response to Plaintiffs' Revised Fact No. 8**:

Contested.  The MRGO did not create a pathway for tides to flow directly to Lake Borgne, Lake Pontchartrain, or to the "heart of New Orleans."  *See* H.R. Doc. No. 82-245 (1951) at 2; IPET Vol. IV, App. 6, at 6-1 to 6-34.  Further, the metaphor is not a statement of fact.

**Plaintiffs' Revised Fact No. 9**:

While the MR-GO was being constructed, and for many years right up to Hurricane Katrina, the Army Corps was warned that the funnel created a back door that would accelerate and intensify hurricane storm surges emerging from Lake Borgne and the Gulf into the Greater New Orleans area.  PUF Nos. 8, 51-53, 63.

**Response to Plaintiffs' Revised Fact No. 9**:

Contested.  The MRGO did not create a "funnel effect."  *See* IPET Vol. IV, App. 6, 6-1 to 6-34.  Whether warnings about a purported "funnel effect" were received is immaterial to the issue of § 702c immunity.

**Plaintiffs' Revised Fact No. 10**:

Hurricane Katrina's amplified and supercharged storm surge caused massive overtopping of structures along Reach 1, Reach 2, and the IHNC and contributed to the failure of the IHNC floodwalls in two locations along the east side-and the resulting catastrophic flooding of the Lower Ninth Ward and portions of St. Bernard Parish.  PUF Nos. 250-55; 293.

**Response to Plaintiffs' Revised Fact No. 10**:

Contested.  The MRGO did not "amplify" or "supercharge" Katrina's storm surge.  *See* IPET Vol. IV, App. 6, 6-1 to 6-34.  The overtopping of flood protection structures along the

MRGO and the IHNC by Hurricane Katrina's storm surge, resulting in catastrophic flooding of the Lower Ninth Ward and portions of St. Bernard Parish is uncontested.

**Plaintiffs' Revised Fact No. 11**:

The soils used for the later construction of flood protection embankments along both Reach 1 and Reach 2 of the MR-GO were prodigious amounts of highly erodable sand mixed with shell and some silts and clays and largely existing materials borrowed from the adjacent spoil banks that were constructed of materials dredged from the MR-GO. PUF Nos. 24-28, 12931, 138-39, 332-33.

**Response to Plaintiffs' Revised Fact No. 11**:

Contested and irrelevant. The nature of the LPV levees along the MRGO is irrelevant because § 702c immunity does not turn on "the character of the federal project." *Central Green Co. v. United States,* 531 U.S. 425, 434, 437 (2001). It is uncontested that some of the soils used for construction of levees along the MRGO were obtained by dredging the MRGO, but those soils were not comprised of "prodigious amounts of highly erodable sand mixed with shell and some silts and clays." *See* Bea Report (Exh. 31)¶ 56; Bea Dep. (Exh. 45) at 252:15-21.

**Plaintiffs' Revised Fact No. 12**:

Consequently, the foundation of the flood protection works along Reach 1 and Reach 2 of the MR-GO—characterized as "treacherous" and highly variable by the Army Corps—was mostly spongy, organic soils (pure sand with some shell) with substantial water content. *Id.; see also* PUF Nos. 114-15, 330-35.

**Response to Plaintiffs' Revised Fact No. 12**:

Contested and irrelevant. *See* IPET Report (Exh. 20) Vol. III at 213.  The nature of the LPV levees along the MRGO is irrelevant because § 702c immunity does not turn on "the character of the federal project" but rather on the nexus between the relevant damage and the floodwaters that the LPV was unable to control.  *Central Green Co. v. United States,* 531 U.S. 425, 434, 437 (2001).

**Plaintiffs' Revised Fact No. 13**:

The catastrophic flooding during Hurricane Katrina was caused in part because these water pervious earthen berms along Reach 1 and Reach 2 of the MR-GO were highly vulnerable to severe erosion from hurricane storm surge overtopping and to significant subsidence and settlement from the weight of spoil materials placed on top of them during construction of the flood protection works.  PUF Nos. 120, 129-31, 138-39, 332.

**Response to Plaintiffs' Revised Fact No. 13**:

Contested and irrelevant.  The levees along the MRGO were not "water pervious" nor were they "highly vulnerable to severe erosion."  *See* IPET Report (Exh. 20) Vol. V at V-127; Bea Report (Exh. 31) ¶ 56; Bea Dep. (Exh. 45) at 252:15-21.  The nature of the LPV levees along the MRGO is irrelevant because § 702c immunity does not turn on "the character of the federal project."  *Central Green Co. v. United States,* 531 U.S. 425, 434, 437 (2001).  The existence of flood protection embankments, *i.e.,* levees, along the MRGO at the time of Hurricane Katrina is uncontested, as is their overtopping and erosion by storm surge.

Plaintiffs' Revised Fact No. 14:

Before the MR-GO's construction began in 1958, the Army Corps knew that the MR-GO would destroy the storm surge buffering wetlands by "increas[ing] tidal action in marsh pond areas; higher average salinities with wider salinity ranges; increase[ing] turbidity. . . [that] would eliminate 6,200 acres of shallow open water and 17,400 acres of marsh.  MSJ Exh. 51 at p. 4.

**Response to Plaintiffs' Revised Fact No. 14:**

Contested and irrelevant.  *See* Exh. 51 at p. 4.  The quotation reflects an opinion of another entity, not the Corps, and was only an opinion as to "possible" effects.  Furthermore, the Corps responded by constructing a system of diked containment areas south of the channel alignment, equipped with weir outlets in the levee farthest removed from the channel.  The Corps also studied alternate routes for channel alignment. *See also* Day Dep. (Exh. 85) at 151:14-25 to 152:1-12.  Finally, whether the MRGO had a deleterious impact on wetlands and whether wetlands would have "buffered" Katrina's storm surge are irrelevant.  The storm surge generated by Hurricane Katrina was so high and so prolonged as to make the nature and extent of wetlands inconsequential.  *See* IPET Vol. IV, App. 6, 6-1 to 6-34.

**Plaintiffs' Revised Fact No. 15:**

In 1965 during the MR-GO's construction, the Army Corps told Congress that the MR-GO "provides a deep direct route for the in-flow of saline currents from the Gulf of Mexico to the area along this channel and to Lake Pontchartrain."  PUF Nos. 8.

**Response to Plaintiffs' Revised Fact No. 15:**

Uncontested and irrelevant.  What the Corps told Congress is irrelevant to the immunity of the United States under § 702c.  The hydrological influence of the MRGO confirms a relationship between the LPV and the MRGO.

**Plaintiffs' Revised Fact No. 16**:

The MR-GO directly and indirectly destroyed tens of thousands of acres of wetlands and cypress forests.  PUF Nos. 40-49.

**Response to Plaintiffs' Revised Fact No. 16**:

Contested and irrelevant.  *See* Day Dep. (Exh. 85) at 153:16-20 (reference pertains to a "larger system" and "was sort of a bit of rhetorical flourish)."

**Plaintiffs' Revised Fact No. 17**:

It is widely agreed—and the Army Corps has acknowledged—that the presence of the MR-GO destroyed wetlands that otherwise would have provided additional surge defenses during Hurricane Katrina.  PUF Nos. 40, 47-49, 110, 123, 295b, 309.

**Response to Plaintiffs' Revised Fact No. 17**:

Contested and irrelevant.  Plaintiffs' § 702c expert, G. Paul Kemp, testified at his November 27, 2007 deposition that he did not have the ability to calculate or quantify the attenuating effect of wetlands on storm surge in the throat of the hurricane protection system at Lake Borgne during Hurricane Katrina.  Kemp Dep. (Exh. 69) 200:3-16.  Plaintiffs' § 702c expert, Shea Penland, testified during his deposition that he could not quantify the amount of wetlands loss attributable to the MR-GO.  Penland Dep. (Exh. 86) 52:11-25- 54:1-14.  The impact of the MRGO on wetlands is only relevant insofar as it demonstrates that the MRGO and the LPV were inextricably intertwined because the MRGO was a waterway within the hydrological system that the LPV was constructed to control during hurricanes.

**Plaintiffs' Revised Fact No. 18**:

If these marshlands had not been destroyed by the MR-GO, nature's defenses would have reduced surge caused by Hurricane Katrina by about three feet and spared Greater New Orleans from catastrophic flooding.  PUF Nos. 49, 294.

**Response to Plaintiffs' Revised Fact No. 18**:

Contested and irrelevant.  *See* Kemp Dep. (Exh. 69) 200:3-16 (wetlands effect during Hurricane Katrina cannot be calculated or quantified).  The impact of the MRGO on wetlands is only relevant insofar as it demonstrates that the MRGO and the LPV were inextricably intertwined because the MRGO was a waterway within the hydrological system that the LPV was constructed to control during hurricanes.

**Plaintiffs' Revised Fact No. 19**:

The Army Corps' expert, Dr. Robert Dalrymple, attributes over three feet of additional storm surge against Reach 2 because of the destroyed adjacent wetlands.  PUF No. 294.

**Response to Plaintiffs' Revised Fact No. 19**:

Contested and irrelevant.  Robert Dalrymple has provided no testimony in this case and is not an expert for the United States in *Robinson.*  Dr. Dalrymple testified that he had not performed any studies to determine what the surge height would have been in Reach 2 of the MR-GO if the wetlands had not been destroyed.  He also stated that there were uncertainties with the ADCIRC modeling of storm surge.  Dalrymple Dep. (Exh. 28) at 143:6-25 to 144:1-13.  This statement is not relevant for purposes of determining the United States immunity under 33 U.S.C. § 702c.  The impact of the MRGO on wetlands is only relevant insofar as it demonstrates

that the MRGO and the LPV were inextricably intertwined because the MRGO was a waterway

within the hydrological system that the LPV was constructed to control during hurricanes.

**Plaintiffs' Revised Fact No. 20**:

In designing the MR-GO, the Army Corps knew that there would be stability problems

with the channel cut because of ship wake erosion of the unstable banks, comprised of

an almost ubiquitous 10 feet of marsh/swamp peat at the surface and scattered deposits of

sandy-silt and silty-sand at greater depths and that this bank erosion would accelerate the loss of

protective marshland.  PUF Nos. 30-32.

**Response to Plaintiffs' Revised Fact No. 20**:

Contested and irrelevant.  *See* GDM 1B (Exh. 15) at 5, ¶ 19; Army Corps of Eng'rs Dep.

(Exh. 8) at 490:18-25-492:1-14, 147:7 (describing effect of wave-wash on MRGO shoreline).

**Plaintiffs' Revised Fact No. 21**:

The Army Corps did not prescribe erosion protection from wave wash (such as armoring)

for the MR-GO's unstable banks.  PUF Nos. 31, 33, 36, 37.

**Response to Plaintiffs' Revised Fact No. 21**:

Contested and irrelevant.  *See* General Design Memorandum 1B (Exh. 15) at at 5, ¶ 19

(recommending against "channel protection" despite expectation that wave wash would result in

erosion of channel slope);  Army Corps of Eng'rs Dep. (Exh. 8) at 490:18-25-492:1-14, 147:7

(foreshore protection consisting of limestone rock was eventually provided).  This statement is

not relevant for purposes of determining the United States immunity under 33 U.S.C. § 702c.

The impact of the MRGO on wetlands is only relevant insofar as it demonstrates that the MRGO

and the LPV were inextricably intertwined because the MRGO was a waterway within the hydrological system that the LPV was constructed to control during hurricanes.

**Plaintiffs' Revised Fact No. 22**:

Over the years, ship wakes (as high as three or four feet) widened the original 650 feet channel—at a rate of between 10 and 20 feet per year on each bank—to 2,000 feet and in some places, to 3,000 feet.  PUF Nos. 33, 34.

**Response to Plaintiffs' Revised Fact No. 22**:

Contested and irrelevant.  *See* MR-GO Deep-Draft De-authorization Study, Main Report, Vol. I, at 5-7.  The impact of the MRGO on wetlands is only relevant insofar as it demonstrates that the MRGO and the LPV were inextricably intertwined because the MRGO was a waterway within the hydrological system that the LPV was constructed to control during hurricanes.

**Plaintiffs' Revised Fact No. 23**:

This increase in the unprotected channel's width and volume of water had several adverse effects, including (1) the breaching of the Lake Borgne shoreline adjacent to the MR-GO which allowed storm surge within Lake Borgne to dump directly into the MR-GO; (2) the enormous loss of marshland adjacent to the channel; and (3) shoaling within the MR-GO.  PUF Nos. 32-35, 38-39, 40-42.

**Response to Plaintiffs' Revised Fact No. 23**:

Contested and irrelevant.  *See* IPET (Exh. 20) Vol. IV, at 136, 258.  The impact of the MRGO on wetlands is only relevant insofar as it demonstrates that the MRGO and the LPV were inextricably intertwined because the MRGO was a waterway within the hydrological system that the LPV was constructed to control during hurricanes.

**Plaintiffs' Revised Fact No. 24**:

In Section 204 of the Flood Control Act of 1965 (Pub.L.No. 89-298, 79 Stat. 1073 (October 27, 1965), Congress directed the Army Corps to build "works of improvement for . . . the control of destructive floodwaters" and a "project for hurricane-flood protection on Lake Pontchartrain, Louisiana."  PUF No. 321; *see also* PUF No. 65.

**Response to Plaintiffs' Revised Fact No. 24**:

Uncontested.

**Plaintiffs' Revised Fact No. 25**:

Accepting the Chief of Engineer's recommendation in House Document No. 231, Congress authorized the LPVHPP to protect the areas around Lake Pontchartrain from flooding caused by storm surge or rainfall associated with a Standard Project Hurricane ("SPH").  PUF No. 66, 71, 321.

**Response to Plaintiffs' Revised Fact No. 25**:

Uncontested.

**Plaintiffs' Revised Fact No. 26**:

The SPH—selected because of the area's urban nature—represented "the most severe combination of meteorological conditions considered reasonably characteristic for the region." MSJ Exh. 10 (H.R. Doc. No. 89-231) at p. 46; PUF Nos. 66, 73, 83.

**Response to Plaintiffs' Revised Fact No. 26**:

Contested and irrelevant.  There is no evidence that the SPH was selected because of the "area's urban nature."  *See generally* H.R. Doc. No. 89-231 (Exh. 10).  The reason for selecting the SPH and what it was intended to represent are irrelevant because § 702c immunity does not

turn on "the character of the federal project." *Central Green Co. v. United States,* 531 U.S. 425, 434, 437 (2001).  The existence of flood protection embankments, *i.e.,* levees, along the MRGO at the time of Hurricane Katrina is uncontested, as is their overtopping and erosion by storm surge.

**Plaintiffs' Revised Fact No. 27**:

Congress approved specific design heights for various stretches of the system.  PUF No. 74.

**Response to Plaintiffs' Revised Fact No. 27**:

Contested and irrelevant.  Congress did not approve specific design heights.  It is well established that laws such as Pub. L. No. 89-298 which authorize projects "substantially in accordance with" the Corps' recommendations do not prescribe a particular course of conduct, but merely set guidelines that give the Corps discretion to modify plans as the project proceeds. *See Creppel v. U.S. Army Corps of Eng'rs,* 670 F.2d 564, 572-73 (5th Cir. 1982); *Allison v. Froehlke,* 470 F.2d 1123, 1125-26 (5th Cir. 1972); *Missouri v. Ashcroft,* 526 F. Supp. 660, 668 (W.D. Mo. 1980); *United States v. 2,606.84 Acres of Land,* 309 F. Supp. 887 (N.D. Tex. 1969), rev'd on other grounds, 432 F.2d 1286 (5th Cir. 1970); *cf. United States v. Spoonbarger,* 308 U.S. 256, 268 (1939).     Furthermore, this statement is irrelevant because the scope of immunity conferred by § 702c is not determined "by the character of the flood control project." *Central Green* Co. v. United States, 531 U.S. 425, 434 (2001).

**Plaintiffs' Revised Fact No. 28**:

In the Flood Control Act of 1965, Congress mandated armoring in the form of rip-rap slope protection along the navigation channel and flood gates.  PUF Nos. 5, 67, 124; MSJ Exh. 10 (H.R. Doc. No. 89-231) at p. 9, 12.

**Response to Plaintiffs' Revised Fact No. 28**:

Contested and irrelevant.  The cited documents do not support the assertion that Congress mandated any form of 'armoring."  Laws such as Pub. L. No. 89-298, which authorize projects "substantially in accordance with" the Corps' recommendations, do not prescribe a particular course of conduct but merely set guidelines that give the Corps discretion to modify plans as the project proceeds.  *See Creppel v. U.S. Army Corps of Eng'rs*, 670 F.2d 564, 572-73 (5th Cir. 1982); *Allison v. Froehlke*, 470 F.2d 1123, 1125-26 (5th Cir. 1972); *Missouri v. Ashcroft*, 526 F. Supp. 660, 668 (W.D. Mo. 1980); *United States v. 2,606.84 Acres of Land*, 309 F. Supp. 887 (N.D. Tex. 1969), rev'd on other grounds, 432 F.2d 1286 (5th Cir. 1970); cf. *United States v. Spoonbarger*, 308 U.S. 256, 268 (1939).

Furthermore, this statement is irrelevant.  The issue of immunity under 702c is not determined "by the character of the flood control project."  *Central Green*, 531 U.S. at 434. Whether LPV had slope protection "armoring" has not bearing on whether the United States is immune from liability for the damage caused by the floodwaters that the LPV was unable to control.  Further,  Plaintiffs have conflated "armoring," which is a form of protection for flood control structures, with shoreline protection, which pertains to waterways, not flood control structures.

**Plaintiffs' Revised Fact No. 29**:

In the Flood Control Act of 1965, Congress directed the Army Corps to consider in the engineering design process the concept of storms much more intense than the SPH by referencing for the general design plan a more stringent design hurricane known as the Probable Maximum Hurricane ("PMH").  MSJ Exh. 10 (H.R. Doc. No. 89-231) at pp. 20, 46-47; PUF Nos. 202-03.

**Response to Plaintiffs' Revised Fact No. 29**:

Contested and irrelevant.  The documents cited by Plaintiffs do not support the notion that Congress directed the Corps specific "concepts."  It is well established that laws such as Pub. L. No. 89-298 which authorize projects "substantially in accordance with" the Corps' recommendations do not prescribe a particular course of conduct, but merely set guidelines that give the Corps discretion to modify plans as the project proceeds.  *See Creppel v. U.S. Army Corps of Eng'rs,* 670 F.2d 564, 572-73 (5th Cir. 1982); *Allison v. Froehlke*, 470 F.2d 1123, 1125-26 (5th Cir. 1972); *Missouri v. Ashcroft*, 526 F. Supp. 660, 668 (W.D. Mo. 1980); *United States v. 2,606.84 Acres of Land*, 309 F. Supp. 887 (N.D. Tex. 1969), rev'd on other grounds, 432 F.2d 1286 (5th Cir. 1970); *cf. United States v. Spoonbarger,* 308 U.S. 256, 268 (1939).

Furthermore, this statement is irrelevant.  The issue of immunity under 702c is not determined "by the character of the flood control project."  *Central Green*, 531 U.S. at 434. What the Corps considered has no bearing on the immunity of the United States from liability for damage from the floodwaters that the LPV was unable to control.

**Plaintiffs' Revised Fact No. 30**:

Neither armoring nor PMH assumptions were incorporated into the LPVHPP.  PUF Nos. 76, 204.

**Response to Plaintiffs' Revised Fact No. 30**:

Contested and irrelevant.  Grass is suitable as a form of armoring.  *See* MSJ Ex. 8, at 83:1-17.  The Plaintiffs' expert, Dr. Bea, admits that the levees along MRGO were armored by grass.  *See* MSJ Ex. 31 at 91.  This statement is irrelevant because the issue of immunity under 702c is not determined "by the character of the flood control project."  *Central Green*, 531 U.S. at 434.  What the Corps incorporated into the LPV has no bearing on the immunity of the United States from liability for damage from the floodwaters that the LPV was unable to control.

**Plaintiffs' Revised Fact No. 31**:

A hurricane protection system designed with the more protective PMH criteria and armoring would have yielded more resilient and robust flood control structures that would not fail upon expected overtopping in the event of storms whose intensity exceeded that of the SPH.  PUF Nos. 95-96, 204-205.

**Response to Plaintiffs' Revised Fact No. 31**:

Contested and irrelevant.  This is an opinion rather than a statement of fact.  The proffered consequence is unsupported by the citations referenced.  This statement is irrelevant because the issue of immunity under 702c is not determined "by the character of the flood control project."  *Central Green*, 531 U.S. at 434.  What the Corps incorporated into the LPV has no bearing on the immunity of the United States from liability for damage from the floodwaters that the LPV was unable to control.

**Plaintiffs' Revised Fact No. 32**:

Without this added measure of protection afforded by higher elevations and armoring, overtopped floodwalls and earthen structures failed because the soils behind them on the protected side (facing towards land) were eroded and contributed to the failure of the floodwalls and earthen structures.  PUF Nos. 204, 205.

**Response to Plaintiffs' Revised Fact No. 32**:

Contested and irrelevant.  This is an opinion rather than a statement of fact.  The proffered consequence is unsupported by the citations referenced.  This statement is irrelevant because the issue of immunity under 702c is not determined "by the character of the flood control project."  *Central Green*, 531 U.S. at 434.  What the Corps incorporated into the LPV has no bearing on the immunity of the United States.

**Plaintiffs' Revised Fact No. 33**:

The Army Corps did not build the HPS according to the Congressionally-mandated SPH requirements in at least eight critical respects.  The Army Corps:

    *   knowingly used obsolete SPH design criteria instead of the updated 1972 and 1979 versions-despite admitting in 1976 that it needed to raise levee heights because of the 1972 SPH change and a 1981 order of the Chief Engineer to use the 1979 SPH (PUF Nos. 95-106);

    *   failed to use available SLOSH and ADCIRC storm surge computer models that it helped develop and finance; (PUF Nos. 107-109);

    *   ignored a warning in 1958 from the U.S. Coastal and Geodetic Survey of subsiding benchmarks in Greater New Orleans and failed to use updated vertical datums in designing crown elevations for flood control structures (PUF Nos. 112-113; 239-41);

    \*  did not take into account known subsidence problems in establishing design elevations for flood control structures (PUF Nos.112-15; 119-23242-43);

    \*  did not take into consideration known diminished surge protection from vanishing wetlands and cypress forests (PUF Nos. 46-49, 110);

    \*  used sandy, erosion-prone soils prohibited by its own levee and coastal engineering manuals (PUF Nos. 24-28, 129-31, 138-39, 326-35);

    \*  did not armor flood control structures to prevent scouring and erosion upon overtopping (PUF Nos. 125, 127-128, 198); and

    \*  failed to design and build the HPS to the level of protection mandated in the Flood Control Act of 1965 because the levee crowns were lower than specified for the SPH dimension due to predictable settlement and sea level rise (PUF Nos. 168-69, 171-73, 178-79).

**Response to Plaintiffs' Revised Fact No. 33**:

Contested and irrelevant.   The documents cited by Plaintiffs provide not support for this statement.  Congress did not mandate particular requirements.  Pub. L. No. 89-298 did not prescribe a particular course of conduct but merely set guidelines that afforded considerable room for discretion.  See *Creppel v. U.S. Army Corps of Eng'rs*, 670 F.2d 564, 572-73 (5th Cir. 1982); *Allison v. Froehlke*, 470 F.2d 1123, 1125-26 (5th Cir. 1972); *Missouri v. Ashcroft*, 526 F. Supp. 660, 668 (W.D. Mo. 1980); *United States v. 2,606.84 Acres of Land*, 309 F. Supp. 887 (N.D. Tex. 1969), rev'd on other grounds, 432 F.2d 1286 (5th Cir. 1970); cf. *United States v. Spoonbarger*, 308 U.S. 256, 268 (1939).  This statement is irrelevant because the issue of immunity under 702c is not determined "by the character of the flood control project."  *Central Green*, 531 U.S. at 434.  What the Corps incorporated into the LPV has no bearing on the immunity of the United States

19

**Plaintiffs' Revised Fact No. 34**:

The Army Corps' expert, Dr. Robert Dalrymple of Johns Hopkins University has testified that "[w]hatever system the Corps built by the time of Katrina after 1965 was [not] designed to deal with the most severe combination of meteorological conditions that are considered reasonably characteristic of this region" -the definition of the SPH that Congress mandated for Greater New Orleans in the Flood Control Act of 1965.  PUF No. 163; see also PUF No. 164 (Plaintiffs' expert); 102 (Team Louisiana).

**Response to Plaintiffs' Revised Fact No. 34**:

Contested and irrelevant.  Robert Dalrymple has provided no testimony in this case and is not an expert for the United States in *Robinson.*   Furthermore, the statement is too vague to be relevant.  The parameters of the SPH changed between 1959 and 1979.  *See* MSJ Ex. 26 at 3-8, Table 3-1.  The statement is vague as to which iteration of the SPH is being referenced, making a specific response impossible. This statement is irrelevant because the issue of immunity under 702c is not determined "by the character of the flood control project."  *Central Green*, 531 U.S. at 434.  What the Corps incorporated into the LPV has no bearing on the immunity of the United States.

**Plaintiffs' Revised Fact No. 35**:

The Army Corps' failure to build the LPVHPP system as mandated by Congress had deadly consequences when Hurricane Katrina hit Greater New Orleans.  PUF No. 106, 210, 263-67, 269-76.

**Response to Plaintiffs' Revised Fact No. 35**:

Contested and irrelevant.  The only consequence of any relevance to the issue of § 702c immunity is the alleged damage that was caused by the floodwaters that the LPV were unable to control.  Pub. L. No. 89-298, which authorize projects "substantially in accordance with" the Corps's recommendations, did not prescribe a particular course of conduct, but merely set guidelines that afforded considerable discretion to the Corps as the project proceeded.  *See Creppel v. U.S. Army Corps of Eng'rs*, 670 F.2d 564, 572-73 (5th Cir. 1982); *Allison v. Froehlke*, 470 F.2d 1123, 1125-26 (5th Cir. 1972); *Missouri v. Ashcroft*, 526 F. Supp. 660, 668 (W.D. Mo. 1980); *United States v. 2,606.84 Acres of Land*, 309 F. Supp. 887 (N.D. Tex. 1969)*, rev'd on other grounds,* 432 F.2d 1286 (5th Cir. 1970); *cf. United States v. Spoonbarger*, 308 U.S. 256, 268 (1939).

Furthermore, this statement is irrelevant.  The issue of immunity under 702c is not determined "by the character of the flood control project."  *Central Green*, 531 U.S. at 434.

**Plaintiffs' Revised Fact No. 36**:

The Army Corps' use of the 1959 (instead of the updated 1972 or 1979) SPH led to underestimating surge height by 6.5 feet on Reach 2 alone and resulted in many failures of flood control structures.  PUF Nos. 94-95, 99, 275.

**Response to Plaintiffs' Revised Fact No. 36**:

Contested and irrelevant.  The claimed increase in storm surge is derived from two hypothetical storms in which all of the relevant storm factors except wind speed are kept constant.  *See* MSJ Ex. 4, at 110, Fig. 81(a).  Plaintiffs' application of this hypothetical construct to Hurricane Katrina is simplistic and not supported by the documents on which they rely.

Furthermore, this statement is irrelevant.  The issue of immunity under 702c is not determined "by the character of the flood control project."  *Central Green*, 531 U.S. at 434.

**Plaintiffs' Revised Fact No. 37**:

The Army Corps' failure to consider the effects of continuing subsidence on the effective level of flood protection translated into flood structures several feet lower than represented by the agency.  PUF No. 112-13.

**Response to Plaintiffs' Revised Fact No. 37**:

Contested and irrelevant.  What the Corps did or did non consider has no bearing on the immunity of the United States from liability for damage caused by the floodwaters that the LPV levees and floodwalls were unable to control.  The Corps did consider the effects of land subsidence on the LPVHPP.  *See* MSJ Ex. 26 at 3-19 to 3-22.

**Plaintiffs' Revised Fact No. 38**:

At the time of Hurricane Katrina, the 125 miles of LPVHPP flood control structures had not been finished as designed and not functioning as a complete, integrated, unified and comprehensive system necessary for effective hurricane flood protection as mandated by Congress.  PUF Nos. 68, 140-62; 199-200.

**Response to Plaintiffs' Revised Fact No. 38**:

Contested and irrelevant.  Pub. L. No. 89-298 did not require that the LPV be completed by any specific time.  *See Creppel v. U.S. Army Corps of Eng'rs*, 670 F.2d 564, 572-73 (5th Cir. 1982); *Allison v. Froehlke*, 470 F.2d 1123, 1125-26 (5th Cir. 1972); *Missouri v. Ashcroft*, 526 F. Supp. 660, 668 (W.D. Mo. 1980); *United States v. 2,606.84 Acres of Land*, 309 F. Supp. 887 (N.D. Tex. 1969), *rev'd on other grounds,* 432 F.2d 1286 (5th Cir. 1970); *cf. United States v.*

22

*Spoonbarger*, 308 U.S. 256, 268 (1939).   As set forth in Defendant's Opposition to Plaintiffs'
Motion for Summary Adjudication, immunity under 702c is not contingent upon completion of
the flood control project.

**Plaintiffs' Revised Fact No. 39**:

Forty years after Congressional authorization, the Hurricane Flood Protection System
("HPS") for Greater New Orleans at the time of Hurricane Katrina was still under construction
and uncompleted-a sprawling work in process that was a patchwork quilt of several hundred
miles of earthen berms, spoilbanks, sheetpile, concrete and floodwalls-virtually all of which were
below design protection elevation and whose most salient features were their uneven height and
admitted resulting inability to afford the SPH level of protection mandated by Congress in the
Flood Control Act of 1965.  PUF No. 142; see also PUF Nos. 78-79, 143-62.

**Response to Plaintiffs' Revised Fact No. 39**:

Contested and irrelevant.  The documents on which Plaintiffs rely do not specify the
method or time by which construction must be completed.  As set forth in Defendant's
Opposition to Plaintiffs' Motion for Summary Adjudication, immunity under 702c is not
contingent upon completion of the flood control project.

**Plaintiffs' Revised Fact No. 40**:

IPET noted that the New Orleans regional flood protection system was largely a system in
name only and not effective because pre-Katrina, there were no integrated series of
components-functioning literally seamlessly as contiguous defenses-to provide a reliable New
Orleans Flood Defense System (NOFDS).  PUF No. 153; MSJ Exh. 20 at I-70 (IPET).

**Response to Plaintiffs' Revised Fact No. 40:**

Uncontested, but irrelevant.  IPET's description of the regional flood protection system is irrelevant to this case, which concerns the Chalmette Area Plan.  There is no basis for concluding that the cited description pertains to the part of the LPV that is at issue in this case.  Furthermore, the immunity of the United States is not determined "by the character of the flood control project."  *Central Green*, 531 U.S. at 434.

**Plaintiffs' Revised Fact No. 41**:

The Army Corps' expert, Dr. Robert Dalrymple, concluded that at the time of Hurricane Katrina, there was "not a completed Hurricane Protection System to the extent Congress or the Corps or both thought they were getting a level of protection of 17 and a half feet." PUF No. 158; see also PUF Nos. 116, 135-36.

**Response to Plaintiffs' Revised Fact No. 41**:

Contested and irrelevant.  Robert Dalrymple has provided no testimony in this case and is not an expert for the United States in *Robinson.* The immunity of the United States is not dependent upon a "completed" flood control project.  *See Mocklin v. Orleans Levee Dist.,* 877 F.2d 427, 430 (5th Cir. 1989) (§ 702c barred claim of injury during reinforcement of levees along Lake Pontchartrain).

**Plaintiffs' Revised Fact No. 42**:

The uncompleted hurricane protection system created many weak links when dozens of points below design elevations contributed to flooding when water flowed unimpeded through these gaps.  PUF No.  155.

**Response to Plaintiffs' Revised Fact No. 42**:

Contested and irrelevant.  The immunity of the United States is not determined "by the character of the flood control project."  *Central Green*, 531 U.S. at 434.  The statement is vague and ambiguous.  It is not clear what "gaps" and what "weak links" are being referenced.  The statement is relevant only to the extent that it shows a relationship between the LPV and the flooding that allegedly caused the relevant damage.

**Plaintiffs' Revised Fact No. 43**:

IPET concluded that the system did not perform as a system because in some areas it was not completed, and in others, datum misinterpretation and subsidence reduced its intended protective elevation, resulting in a varying capacity for protection since some structures provided no reliable protection above their design elevations and others that had inadequate designs leaving them vulnerable at water elevations significantly below the design intent.  PUF No. 156; see also PUF Nos. 165-67, 170, 174-77, 180-97.

**Response to Plaintiffs' Revised Fact No. 43**

Uncontested but irrelevant.  The IPET's characterization of the "system" is irrelevant because the immunity of the United States is not determined "by the character of the flood control project."  *Central Green*, 531 U.S. at 434.  The statement is also irrelevant because it is unclear whether the statement refers to the levees along the MRGO or to portions of the system that are not at issue in this case, such as the floodwalls parallel to the outfall canals.

**Plaintiffs' Revised Fact No. 44**:

The LPVHPP was originally expected to take about 13 years to complete at a cost about $85 million, but at the time of Hurricane Katrina the system was estimated to be about 85 percent constructed and was not expected to reach completion until 2015-50 years after Congressional authorization of the LPV and 60 years after initiation of the planning process. PUF Nos. 65, 69, 70.

**Response to Plaintiffs' Revised Fact No. 44**:

Contested and irrelevant.  The documents on which Plaintiffs rely do not state whether different organizations or individuals had the same or different expectations about how long the construction would take or how much it would cost.  Opinions as to the length and cost of construction are irrelevant to determining immunity under 702c.

**Plaintiffs' Revised Fact No. 45**:

IPET and other investigators concluded that virtually all of the major breaches were caused by overtopping and subsequent erosion because reduced protective elevations increased the amount of overtopping, erosion, and subsequent catastrophic flooding.  PUF Nos. 207, 21114, 221, 250, 269-80.

**Response to Plaintiffs' Revised Fact No. 45**:

Uncontested.  The overtopping and subsequent breaching of the LPV by Hurricane Katrina's floodwaters, and the damage that allegedly was caused by the floodwaters are connections that bring § 702c to bear on Plaintiffs' claims under Plaintiffs' own construction of the statute.

**Plaintiffs' Revised Fact No. 46**:

IPET concluded as follows:  "The incompleteness of the HPS made a material contribution to the catastrophic flooding.  Lower than authorized elevations of flood protection structures contributed to the overtopping and failure of both floodwalls and levees.  A completed system would have prevented much of the catastrophic flooding and resulting loss of life and property."  PUF No. 208; see also PUF Nos. 215-20, 222-29.

**Response to Plaintiffs' Revised Fact No. 46**:

Uncontested but irrelevant.  Only the LPV structures along the GIWW, the MRGO, and the IHNC are at issue for purposes of § 702c, so it cannot be ascertained whether the IPET's conclusions about the overall HPS are applicable to the parts of the system relevant to this action. To the extent that the statement shows that the LPV levees and floodwalls protecting St. Bernard Parish, the Lower Ninth Ward, and New Orleans East were overtopped by floodwaters that caused the alleged damage, the statement is relevant under constructions of § 702c that make attachment of immunity conditional upon the existence of these nexus.

**Plaintiffs' Revised Fact No. 47**:

The Army Corps did not warn the stakeholders about the known inadequacy of the unfinished HPS and the threat to human life and property from catastrophic flooding caused by either a severe or a more moderate SPH hurricane, including not advising New Orleans residents that the GNO HPS required significant improvements to meet even 1 in 100 year SPH requirements.  PUF Nos. 296-310.

**Response to Plaintiffs' Revised Fact No. 47**:

Contested and irrelevant.  The inadequacy of the unfinished HPS was a matter of public knowledge and was made known by the Corps prior to Hurricane Katrina.  Whether warnings were given is irrelevant to immunity under § 702c.  *See United States v. James,* 478 U.S. 597, 610 (1986) (immunity for negligent conveyance of warnings); *Clark v. United States,* 218 F.2d 446, 450-51 (9th Cir. 1954) (immunity for giving false assurance of safety); *Nat'l Mfg. Co. v. United States,* 210 F.2d 263, 266-69 (8th Cir.) (immunity for failure to warn of flood danger), *cert. denied,* 347 U.S. 967 (1954).

**Plaintiffs' Revised Fact No. 48**:

The New Orleans District actually misled the public by falsely claiming at times that the GNO HPS would protect against a 1 in 200 to 1 in 300 year hurricane.  PUF No. 302.

**Response to Plaintiffs' Revised Fact No. 48**:

Contested and irrelevant.  The inadequacy of the unfinished HPS was a matter of public knowledge and was made known by the Corps prior to Hurricane Katrina.  Whether warnings or false information were given is irrelevant to immunity under § 702c.  *See James,* 478 U.S. at 610 (immunity for negligent conveyance of warnings) *Clark,* 218 F.2d at 450-51 (immunity for giving false assurance of safety); *Nat'l Mfg.,* 210 F.2d at 266-69 (immunity for failure to warn of flood danger).

**Plaintiffs' Revised Fact No. 49**:

The Government contends that there were no defects in the design or construction of the flood control structures along Reach 1 and Reach 2 of the MR-GO that contributed to the catastrophic flooding of Greater New Orleans.

**Response to Plaintiffs' Revised Fact No. 49**:

Uncontested, but irrelevant.  The reason or reasons why the LPV was unable to control Hurricane Katrina's floodwaters have no bearing on the immunity of the United States.  The immunity of the United States is determined by the character of the waters that caused the alleged damage, not "by the character of the flood control project."  *Central Green*, 531 U.S. at 434, 427.  The relevant uncontested fact is that the overtopping and breaching of the levee along the MRGO and the GIWW by floodwaters resulted in the damage of which Plaintiffs complain.

**Plaintiffs' Revised Fact No. 50**:

The Government contends that the catastrophic flooding during Hurricane Katrina was the result of hurricane storm surge greater than anticipated in its SPH design.  MSJ Exh. 27, Varuso Depo. 61:1-62:9

**Response to Plaintiffs' Revised Fact No. 50**:

Uncontested, but irrelevant.  The unprecedented storm surge was certainly the reason why the levees and floodwalls protecting New Orleans East, the Lower Ninth Ward, and St. Bernard Parish were unable to prevent the flooding of which Plaintiffs complain.  The reason or reasons why the LPV levees and floodwalls were overtopped and breached are irrelevant to the immunity of the United States.  The fact that they *were* overtopped and breached by Hurricane Katrina's

floodwaters and that those floodwaters then caused Plaintiffs' alleged damage *is* relevant and required application of § 702c.  *Central Green*, 531 U.S. at 434, 427.

**Plaintiffs' Revised Fact No. 51**:

The Government expected the flood structures to be overtopped if hurricane storm waters exceed the SPH design elevations used by the Army Corps in designing and constructing the flood structures.  PUF Nos. 290, 291

**Response to Plaintiffs' Revised Fact No. 51**:

Contested and irrelevant.  Expectations concerning design elevations are irrelevant to the issue of the immunity of the United States under § 702c.  The elevations of the levees and floodwalls at issue were at various heights.  Some were as high as the design elevations, but others were not.  The documents on which Plaintiffs rely do not support the statement that overtopping was expected "if hurricane storm waters exceed the design elevations" because they pertain to actual structure and not hypothetical ones.  The fact that the storm surge generated by Hurricane Katrina overtopped the LPV levees and floodwalls protecting New Orleans East, the Lower Ninth Ward, and St. Bernard Parish  and caused the flooding of which Plaintiffs complain are the facts that require application of § 702c to Plaintiffs' claims.

**Plaintiffs' Revised Fact No. 52**:

Plaintiffs are not predicating Defendant's liability on claims of levee breaches or failures or overtopping or the defective design, construction, operation and/or maintenance of levees, flood protection works, or any other Government structures or facilities intended for hurricane flood control protection, and their claims against the United States do not relate to a federal flood

control project or its design, construction, operation or maintenance or its performance during

Hurricane Katrina.  PUF Nos. 311-14.

**Response to Plaintiffs' Revised Fact No. 52**:

Contested.  Plaintiffs' claims are based on the overtopping and breaching of LPV levees

and floodwalls.  *See* Complaint ¶ 57 ("Large sections of the MR-GO levee . . . disintegrated"

during Hurricane Katrina"), ¶ 73 ("MR-GO significantly intensified Katrina's surge height and

velocity, contributing to the scouring that undermined the . . . levees along the MR-GO and the

Industrial Canal"), ¶ 77 ("overtopping led to many of the levee breaches that caused the most

serious flooding during Katrina, including large sections of the MR-GO levees that sent

floodwaters rushing into St. Bernard Parish, as well as sections of the GIWW levee that flooded

homes in East New Orleans and the Lower Ninth Ward"), ¶ 80 ("the storm surge acceleration

produced by the MR-GO" "trigger[ed] the collapse of . . . much of the levee system").  These

facts are not immaterial to Plaintiffs' claims.  They allege that their damage resulted from the

flooding that ensued upon the breaching of the levees and floodwalls, and they allege that the

flooding would not have occurred if the hurricane protection system had been stronger and higher

when the hurricane struck.  *See* Plt. Orig. Facts ¶¶ 207-29; Plt. Rev. Facts ¶¶ 42, 45-47.  All of

their harms occurred on August 29, 2005, when floodwaters overflowed and breached the LPV

levees and floodwalls that "completely surrounded" Plaintiffs' properties.  Plt. Orig. Facts ¶ 78.

"Hurricane Katrina . . . overwhelmed the eastern side of the New Orleans flood protection system

with storm surge and wave loading that exceeded the levels used for design of the system in that

area.  [This] is a true statement . . . ."  *Id.* ¶ 252.  If "the overtopping of Levees [sic] and

floodwalls along the MR-GO had not occurred, there would have been minor inundation in New

Orleans East, Lower 9th Ward, and St. Bernard Parish, but not catastrophic flooding." *Id.* ¶ 219. To establish their claims, Plaintiffs must prove causation. They must prove that the MRGO caused the LPV levees to fail. They must prove this in order to establish that the MRGO caused their alleged damage, since they maintain that there would not have been catastrophic flooding if the LPV levees had not failed. The statement that their claims are not based on the failure of the levees is therefore false.

**Plaintiffs' Revised Fact No. 53**:

Plaintiffs also contend that the Army Corps engaged in additional negligent conduct that contributed to the failure of the I-walls on the west side of the IHNC and the ensuing catastrophic flooding of the Lower Ninth Ward by negligently undertaking site clearing for the Lock Expansion Project at the East Bank Industrial sites that had material adverse effects on the soil stability and protection for the flood control structure. PUF No. 345.

**Response to Plaintiffs' Revised Fact No. 53**:

Contested and irrelevant.  Plaintiffs have not made such an allegation.  Any such allegation would be irrelevant inasmuch as the immunity of the United States is established by the evidence showing that Plaintiffs' alleged damage resulted from and was caused by floodwaters that the LPV was unable to control.

Respectfully submitted,

 JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR.
Assistant Director, Torts Branch
Civil Division

s/ Robin D. Smith
ROBIN D. SMITH
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, D.C.  20044
(202) 616-4289
(202) 616-5200 (fax)
robin.doyle.smith@usdoj.gov
Attorneys for Defendant United States

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on February 1, 2008, I served a true copy of the foregoing upon all counsel of record by ECF.


<u>s/ Robin D. Smith</u>
Robin D. Smith