**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

In re:  KATRINA CANAL BREACHES
          CONSOLIDATED LITIGATION

CIVIL ACTION
NO. 05-4182 "K" (2)
JUDGE DUVAL
MAG. WILKINSON

PERTAINS TO:  MRGO, *Robinson* (06-2268)

**BRIEF OF *AMICI CURIAE* THE AT&T ENTITIES IN OPPOSITION
TO DEFENDANT UNITED STATES' RENEWED MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ........................................................................................................ ii

STATEMENT OF INTEREST .................................................................................................... 1

BACKGROUND ......................................................................................................................... 2

ARGUMENT ............................................................................................................................... 4

      A.     Section 702c Does Not Provide Immunity for Conduct Undertaken
           Outside the Sphere of Federal Flood Control ........................................................ 5

      B.     The United States' "Nexus" Theory Is Unavailing ............................................... 14

CONCLUSION .......................................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases:**

*Aetna Ins. Co. v. United States*, 628 F.2d 1201 (9th Cir. 1980) ...................................................19

*Boudreau v. United States*, 53 F.3d 81 (5th Cir. 1995) ...........................................................14, 15

*Cantrell v. United States*, 89 F.3d 268 (6th Cir. 1996).......................................................6, 10, 14

*Central Green v. United States*, 531 U.S. 425 (2001) .........................................................8, 9, 12

*Coleman v. School Bd. of Richland Parish*, 418 F.3d 511 (5th Cir. 2005)...................................16

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264 (1821)...................................................................11

*Downs v. United States*, No. 06-20861-CIV-HUCK, 2007 WL 842136 (S.D. Fla.
   Mar. 20, 2007)...................................................................................................................11

*E. Ritter & Co. v. Department of the Army, Corps of Eng'rs*, 874 F.2d 1236 (8th
   Cir. 1989) ........................................................................................................................9, 14

*Felton v. Greyhound Lines, Inc.*, 324 F.3d 771 (5th Cir. 2003) .....................................................18

*Florida E. Coast Ry. Co. v. United States*, 519 F.2d 1184 (5th Cir. 1975) ...................................19

*Fortner v. TVA*, No. 3:04-cv-363, 2005 WL 2922190 (E.D. Tenn. Nov. 4, 2005) ........................9

*Fryman v. United States*, 901 F.2d 79 (7th Cir. 1990)...................................................................5

*Graci v. United States*:

    301 F. Supp. 947 (E.D. La. 1969), *aff'd*, 456 F.2d 20 (5th Cir. 1971) ...........................5, 18

    456 F.2d 20 (5th Cir. 1971) ..................................................................................5, 6, 13

    435 F. Supp. 189 (E.D. La. 1977)........................................................................................5

*Hayes v. United States*, 585 F.2d 701 (4th Cir. 1978) .............................................................7, 10

*Henderson v. United States*, 965 F.2d 1488 (1992)................................................................12, 13

*Hiersche v. United States*, 503 U.S. 923 (1992) .......................................................................11

*Katrina Canal Breaches Consol. Litig.*, *In re*, 471 F. Supp. 2d 684 (E.D. La. 2007) ..............9, 14

*LeBoeuf v. Gulf Oil Corp.*, 634 F.2d 261 (5th Cir. 1981).............................................................18

*Landgraf v. USI Film Prods.*, 551 U.S. 244 (1994)................................................................11

*Lunsford v. United States*, 570 F.2d 221 (8th Cir. 1977)..........................................................6, 13

*Mocklin v. Orleans Levee Dist.*, 877 F.2d 427 (5th Cir. 1989).................................................14, 15

*Sanko S.S. Co., Ltd. v. United States*, 272 F.3d 1231 (9th Cir. 2001) .........................................11

*United States v. James*, 478 U.S. 597 (1986)..........................................................................7, 8

*Watson v. Philip Morris Cos.*, 127 S. Ct. 2301 (2007) ................................................................12

*Valley Cattle Co. v. United States*, 258 F. Supp. 12 (D. Haw. 1966) ...........................................19

**Statutes:**

28 U.S.C. § 2675(a) ........................................................................................................1

33 U.S.C. § 702c ................................................................................................... *passim*

**Rules and Regulations:**

Fed. R. Civ. P. 56(c) ......................................................................................................16

28 C.F.R. §§ 14.1 *et seq.*..................................................................................................1

**Other Authorities:**

USACE, N.O. Dist., *Mississippi River – Gulf Outlet, Louisiana*, Design Memorandum
      No. 1-A (rev. July 1957)......................................................................................2

USACE, N.O. Dist., *Mississippi River – Gulf Outlet, Louisiana*, Design Memorandum
      No. 1-B (rev. May 1959)......................................................................................3

USACE, N.O. Dist., *Mississippi River – Gulf Outlet, St. Bernard Parish, La., Bank
      Erosion*, Reconnaissance Report (Feb. 1988)........................................................2

**<u>STATEMENT OF INTEREST</u>**

BellSouth Telecommunications, Inc., BellSouth Advertising & Publishing Corporation, BellSouth Long Distance, Inc., Campanile Assurance Line Limited, New Cingular Wireless PCS, LLC, Acadiana Cellular, Houma-Thibodaux Cellular Partnership, Lafayette MSA, Louisiana RSA No. 7, and Louisiana RSA No. 8 (collectively, "the AT&T entities")[1] provide, among other things, telecommunications and Internet services throughout the United States, including in the Greater New Orleans metropolitan area. Most of the AT&T entities owned properties and other assets and/or provided services in the Greater New Orleans metropolitan area on or about August 29, 2005, when New Orleans suffered catastrophic losses as a result of the negligence of the United States Army Corps of Engineers ("Corps").

The AT&T entities' interests may be directly affected by this proceeding. In connection with Hurricane Katrina, and as a result of negligence of the Corps with respect to the Mississippi River Gulf Outlet ("MRGO"), the AT&T entities have suffered and will continue to suffer substantial damages, including, but not limited to, damages to property and lost business and revenues. Accordingly, pursuant to 28 U.S.C. § 2675(a) and 28 C.F.R. §§ 14.1 *et seq.*, the AT&T entities filed Form 95s with the Corps in August 2007, the last of which was filed on August 28, 2007. The Corps has acknowledged receipt of the AT&T entities' claims and assigned claim numbers. If the Corps fails to act on those claims by February 28, 2008, the AT&T entities would be able to bring a civil suit against the United States. *See* 28 U.S.C.

---

[1] As a result of the merger between BellSouth Corporation (and related entities) and AT&T Inc. in 2006, BellSouth Corporation and related BellSouth entities are now subsidiaries or other related entities of AT&T Inc. Accordingly, "the AT&T entities" is used to describe *amici* collectively. The term also includes Campanile Assurance Line Limited, a captive insurance company that provides property and casualty insurance to BellSouth Corporation and related entities. Campanile Assurance Line Limited made substantial payments to various BellSouth (now AT&T) entities in connection with damages arising in the Greater New Orleans metropolitan area in connection with Hurricane Katrina.

§ 2675(a).  Because the outcome of this proceeding could affect the AT&T entities' ability to pursue such claims against the Corps, the AT&T entities have a direct interest in this proceeding. Both plaintiffs and the United States have consented to the AT&T entities' participation as *amici*.

## BACKGROUND

This Court is familiar with the history of the MRGO, as well as allegations of the Corps' negligence in connection with the MRGO, and the AT&T entities will not repeat that history or those allegations in full here.  A few facts, however, bear emphasis as they substantially affect the positions the United States has taken in moving for summary judgment.

*First*, although the United States has taken conflicting positions on the issue,[2] it is now common ground that the MRGO is a navigation project, not a flood control project.  *See* Pls.' Corrected Revised Statement of Facts for Summ. Adjudication of Section 703C Immunity ¶¶ 1-3 (filed Jan. 21, 2008) (Doc. No. 10643) ("Pls.' Revised Statement").  The Corps itself recommended construction of the MRGO as a "navigation improvement," USACE, N.O. Dist., *Mississippi River – Gulf Outlet, Louisiana*, Design Memorandum No. 1-A, at 1 (rev. July 1957), in order "to provide a safer and shorter outlet from the Mississippi River to the Gulf of Mexico" in the interest of national defense and general commerce, USACE, N.O. Dist., *Mississippi River – Gulf Outlet, St. Bernard Parish, La., Bank Erosion*, Reconnaissance Report at 13 (Feb. 1988).

*Second*, since Congress's authorization of the MRGO in 1956, the Corps has consistently operated under erroneous scientific and technical understandings regarding the dangers the MRGO posed.  Although intended to aid navigation by allowing ships to access the Greater New Orleans metropolitan area more directly, the MRGO also created a pathway for storm-driven

---

[2] *See* Order and Reasons at 2-3 (July 2, 2007) ("*Order Denying Certification*") (Doc. No. 6194) (noting shifting positions).

surges to hit at the heart of New Orleans.  Nonetheless, in constructing, operating, maintaining, and repairing the MRGO, the Corps has labored under the mistaken belief that the MRGO would not increase storm-surge risks.  In a 1958 Design Memorandum, for example, the Corps stated that, "[f]or major storms and hurricanes when tides roll across the marsh many feet deep, as well as through the open water connections, the effect of the new channel *will be of no consequence*."  USACE, N.O. Dist., *Mississippi River – Gulf Outlet, Louisiana*, Design Memorandum No. 1-B, at 3 (rev. May 1959) (emphasis added).

*Third*, since at least 1965, the Corps has been on notice of scientific disagreements with its assessment of the hazards created by its navigation project.  *See, e.g.*, Pls.' Mem. of Points & Authorities in Supp. of Mot for Summ. Adjudication at 8-11 (filed Jan. 11, 2008) (Doc. No. 10337-2) ("Pls.' Summ. A. Mem.").  Prior to Hurricane Katrina, for example, the MRGO was described by a Louisiana State University study as a "superhighway" for storm surges and was described by a hurricane scientist as the "Crescent City's Trojan Horse."  *See*, *e.g.*, *Robinson* Compl. ¶ 71 (filed Apr. 25, 2006).

In short, the basic story of the MRGO is that the Corps, for reasons unrelated to flood control, constructed a navigation project that, as a side effect, created substantial dangers for New Orleans.  The Corps, however, negligently failed to ameliorate those dangers — ignoring repeated warnings to the contrary — because of scientific and technical misjudgments.  The United States has, in fact, acknowledged in this litigation that it took no steps to counter the dangers the MRGO created because it believed that the MRGO did not create any dangers: "*[b]ecause* [the Corps] thought that the new channel [would] be of *no consequence* in affecting water surface elevations for major storms and hurricanes, it was constructed with no barriers or

3

other means to slow down storm-driven surges."[3]  As a result of the Corps' negligence, New

Orleans, including the AT&T entities, suffered catastrophic damages on and after August 29,

2005.

## ARGUMENT

The United States takes an altogether implausible position in this litigation.  In

constructing, operating, maintaining, and repairing the MRGO — all activities *unrelated* to flood

control — the Corps created substantial dangers for the greater New Orleans metropolitan area,

and then, based on erroneous scientific and technical determinations, negligently failed to take

any actions to counter those dangers.  The results for New Orleans were devastating.  Yet the

United States argues that it is completely immune from suit under 33 U.S.C. § 702c because the

resulting damages were caused by water.

As this Court has now held on multiple occasions, this argument conflicts with a long line

of decisions in this Circuit, which establish that the United States may not create a danger that is

unrelated to flood control, negligently fail to remedy it, and then seek immunity under § 702c.

The United States has not, and cannot, cite a single decision in which § 702c has been applied to

shield the United States from liability for conduct unconnected to a federal flood control effort.

The United States' alternative argument for summary judgment — that its conduct was loosely

related to flood control — is no more persuasive.[4]

---

[3] Def. United States' Mem. in Supp. of Mot. to Dismiss at 12 (filed July 24, 2006) (Doc.
No. 822-2) ("U.S. Mot. to Dismiss Mem.") (citations, internal quotation marks and alterations
omitted; emphases added).

[4] The AT&T entities take no position here on plaintiffs' secondary arguments regarding
alleged deficiencies in the Lake Pontchartrain Vicinity Hurricane Protection Project
("LPVHPP").  *See* Pls.' Summ. A. Mem. at 15-17.

A.    **Section 702c Does Not Provide Immunity for Conduct Undertaken Outside the Sphere of Federal Flood Control**

1.    In a series of decisions arising in connection with Hurricane Betsy, federal courts in the Fifth Circuit have held that the Corps' alleged negligent conduct in managing the MRGO is *not* protected by § 702c.  *See, e.g.*, *Graci v. United States*, 301 F. Supp. 947, 949 (E.D. La. 1969), *aff'd*, 456 F.2d 20 (5th Cir. 1971); *Graci v. United States*, 435 F. Supp. 189, 192 (E.D. La. 1977).  Those decisions establish the key principle that § 702c does not operate as a roaming immunity that attaches to any act of governmental negligence that happens to result in damages from inundation or flooding.  *See Graci*, 456 F.2d at 27; *Graci*, 301 F. Supp. at 951 (§ 702c does not provide "wholesale immunization from all liability for floodwater damage unconnected with flood control projects").  Rather, § 702c applies to conduct undertaken in furtherance of flood control efforts; as the Fifth Circuit has said, "when . . . the plaintiffs allege that they have suffered floodwater damage as a result of the negligence of the United States unconnected with any flood control project . . . [§ 702c] does not bar an action against the United States under the Federal Tort Claims Act ['FTCA']."  456 F.2d at 27.

The history of the Flood Control Act of 1928 ("FCA") lends strong support to the Fifth Circuit's construction of § 702c.  In response to the Mississippi flood of 1927, "Congress authorized a complex system of dams and diversionary channels to reduce the damage high water produces."  *Fryman v. United States*, 901 F.2d 79, 79-80 (7th Cir. 1990).  Congress recognized, however, that, "[a]ny system of flood control shifts the incidence of loss even if it substantially reduces the net damage" because "[p]eople upstream of the dams will be inundated although safe before; people downstream face spectacular loss if a dam fails or the floodgates must be opened at an inopportune time."  *Id.*  Section 702c was intended to prevent claims for liability by these "new victims of floods."  *Id.* at 80.  The bargain struck in the FCA was thus that

the United States would make substantial expenditures from the federal fisc to carry out large-scale flood control efforts (voluntarily assuming a task it need not undertake), and in return injured parties forfeited the right to sue for damages caused by the United States' negligence. In light of those specific terms of the bargain, it defies commonsense "to suppose that in exchange for its entry into flood control projects the United States demanded *complete immunity* from liability for the negligent and wrongful acts of its employees *unconnected with flood control projects*." *Graci*, 456 F.2d at 26 (first emphasis added).

In addition, the purpose of § 702c confirms an interpretation that focuses upon whether the challenged conduct falls within the sphere of flood control activity. Section 702c was intended "to place a limit on the amount of money that Congress would spend in connection with flood control programs." *Id.* at 25; *see also Lunsford v. United States*, 570 F.2d 221, 228 (8th Cir. 1977) ("It is clear from the legislative history and the case law that the purpose of § 702c was to place a limit on the amount of money that Congress would spend in connection with flood control programs.") (internal quotation marks omitted); Order and Reasons at 29 (Jan. 30, 2008) (Doc. No. 10984) ("*Levee Dismissal Order*"). That purpose is not implicated when liability is imposed on the United States for conduct falling outside the sphere of flood control efforts; in such cases, liability would not raise the costs of flood control. Liability may, to be sure, impose costs on other governmental activities, such as navigational and commercial conduct, but Congress balanced the costs of liability and the need to remedy negligence in those cases under the FTCA, not § 702c. *See Cantrell v. United States*, 89 F.3d 268, 273 (6th Cir. 1996) ("focus on the allegedly tortious act is the only way to reconcile the [FCA] with the general principles of governmental responsibility embodied in [the FTCA]").

**2.** The Supreme Court's two subsequent decisions interpreting § 702c do not call into question the validity of — but in fact confirm — the Fifth Circuit's interpretation of § 702c, as this Court has held. *See Levee Dismissal Order* at 31-33. The Supreme Court first considered § 702c in *United States v. James*, 478 U.S. 597 (1986). *James* decided two cases involving death and bodily injuries resulting from the Corps' purposeful release of water from federal "flood control projects in Arkansas and Louisiana," both of which had reached "'flood stage'" prior to release. *Id.* at 599-601. The Court held that § 702c "[o]n its face" covered the accidents because of the causal relationship between plaintiffs' injuries and flood control conduct: the "injuries occurred," the Court said, "as a result of the release of waters from reservoirs that had reached flood stage." *Id.* at 604; *see also id.* at 605 n.7 (waters were "released from federal flood control facilities to prevent flooding").

Other aspects of the opinion demonstrate the importance of flood control activity to the Court's analysis. For example, the Court cited with approval a Fourth Circuit decision for the holding that damages from a dam's operation "'as a recreational facility *without relation to the operation of the dam as a flood control project* . . . would avoid the absolute bar of § 702c.'" *Id.* at 605 n.7 (quoting *Hayes v. United States*, 585 F.2d 701, 702-03 (4th Cir. 1978)). In addition, in response to an argument that governmental immunity must be confined to the sphere in which it was intended, the Court stressed that the conduct alleged in *James* was "part of the 'management' of a flood control project" and that the "release of the waters . . . was clearly related to flood control." *Id.* at 610. *James* is thus in keeping with the Fifth Circuit's focus on the character of the conduct challenged and causation: for § 702c immunity to attach, damages must be caused by flood control conduct, which in *James* was the "release of waters from reservoirs" that had reached flood stage.

The Court in *James*, however, went on in *dictum* to suggest that it may be sufficient for immunity to apply if the damages were caused by water that had once been carried in a flood control project:  "the terms 'flood' and 'flood waters' apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control."  *Id.* at 605.

That *dictum* led to significant confusion in the federal courts — especially in cases like *James* but unlike this case, which involved the purposeful release of waters from flood control projects.  The Supreme Court granted certiorari in *Central Green v. United States*, 531 U.S. 425 (2001), to resolve that confusion and to rule on whether § 702c "encompass[es] all the water that flows through a federal facility that was designed and is operated, at least in part, for flood control purposes."  *Id.* at 427.  The specific issue was whether § 702c provided immunity from damages to a farm resulting from waters that had escaped an irrigation canal that was "part of [a division] of a [larger project], . . . [where] flood control [was] one of the purposes served by that project."  *Id.* at 431.

The Court's key objective in *Central Green* was to cabin the broad *dictum* of *James*.  To that end, the Court held that it was improper to say that "every drop of water" that flowed through a flood control project was "flood water"; instead, whether water is flood water within § 702c should be determined, the Court said, both "by the character of the waters that cause the relevant damage *and* the purposes behind their release."  *Id.* at 434 (emphasis added).  The Court remanded for a determination of whether the waters that damaged the farm were, in fact, flood waters, taking into account the purposes of the release.  *See id.* at 436-37.

The Court said nothing in *Central Green* inconsistent with the Fifth Circuit's reading of § 702c.  The lesson of *Central Green* is that it is not sufficient that water runs through a flood control project for § 702c to apply; instead, the character of the water *and* the purpose for its

release must also be analyzed.  Indeed, by remanding for consideration of, *inter alia*, the

"purpose behind the release" — *i.e.*, whether the release was for flood control or non-flood

control purposes — *Central Green* affirmatively supports the rule that a connection to flood

control activity is a precondition to § 702c immunity.  *See Levee Dismissal Order* at 32 (holding

the purpose behind release inquiry is "key" to *Central Green*).[5]

      **3.**      The guiding principle of § 702c immunity in controlling Fifth Circuit decisions,

reinforced in *James* and *Central Green*, is that, if the governmental conduct that causes the

damage was not flood control activity, § 702c does not apply.  Put differently, for the United

States to avail itself of immunity under § 702c, the conduct upon which a plaintiff seeks to

impose liability must have been performed within the sphere of federal flood control and the

cause of plaintiffs' damages must follow from that conduct.  *See In re Katrina Canal Breaches*

*Consol. Litig.*, 471 F. Supp. 2d 684, 694-95 (E.D. La. 2007) ("*Central Green* requires the Court

to identify the *cause of the damage* rather than base a decision on the mere fact that a flood

control project was involved."); *id.* at 695 ("the causation for such floodwaters force and breadth

are alleged to have been the defalcations of the Government with respect to the MRGO,"

rendering § 702c inapposite); *Fortner v. TVA*, No. 3:04-CV-363, 2005 WL 2922190, at *4 (E.D.

---

      [5] An additional principle to be drawn from *Central Green* is that waters that escape from
a flood control project are not necessarily "flood waters" under § 702c.  Plaintiffs in *Central
Green* alleged "subsurface flooding resulting in damage" to a farm.  531 U.S. at 427.  The Court,
in rejecting the United States' position, held that, "[u]nder the Government's approach,"
immunity would attach "even if the water never approached *flood stage*."  *Id.* at 436 (emphasis
added).  *Central Green* thus shows that colloquial references to flooding are not determinative of
whether waters are flood waters under § 702c; were it otherwise, the allegation that "subsurface
flooding" occurred should have sufficed to render the United States immune.  *Cf. E. Ritter & Co.
v. Department of the Army, Corps of Eng'rs*, 874 F.2d 1236, 1239 (8th Cir. 1989) (merely
because certain waters "factually . . . constitute[] a flood" does not address whether "legally"
those waters are "'flood' and 'flood waters'" under § 702c).

Tenn. Nov. 4, 2005) ("relevant conduct for purposes of determining the application of [FCA] immunity . . . is the conduct that is the proximate cause of . . . damage").

Applied to plaintiffs' MRGO claims here, that principle compels the conclusion that § 702c is inapplicable. Where, as here, plaintiffs do not "predicat[e] . . . [the] liability [of the United States] on [negligence in connection with] levee breaches or the failure, overtopping, or defective design, construction, operation or maintenance of other forms of flood protection works" but rather on the "faulty design, construction, operation, and maintenance of" the MRGO, § 702c does not shield the United States. Pls.' Summ. A. Mem. at 1-2; *see also* Pls.' Revised Statement ¶¶ 9-10, 52. In constructing, operating, maintaining, and repairing a *navigation project*, the Corps created substantial risks for New Orleans, but, based on its erroneous scientific and technical judgments, failed to ameliorate those risks. The liability of the United States thus turns upon conduct that occurred within the sphere of navigational, not flood control, activity. *See Cantrell*, 89 F.3d at 273 (where plaintiff was "not challenging flood control decisions," but rather negligence of a boat pilot that "was not part of government activity to control floods or flood waters, [§ 702c] is irrelevant"); *Hayes*, 585 F.2d at 703.

4.     The United States advocates an extraordinarily broad reading of § 702c, under which the nature of conduct causing plaintiffs' damages is irrelevant; all that is relevant is whether the damage was caused by flooding. Despite the fact that the Court has rejected the view on at least four prior occasions, *see* Pls.' Summ. A. Mem. at 28; *Levee Dismissal Order* at 29 (noting this Court will "continue" to reject the United States' broad interpretation), the United States continues to press its interpretation in moving for summary judgment. The United States argues, for example, that § 702c applies merely because "[a] flood occurred, inundating and damaging protected areas because flood control structures were overtopped and breached." Def.

United States' Mem. in Supp. of [Renewed] Mot. to Dismiss or, in the Alt., for Summ. J. at 12 (filed Jan. 14, 2008) (Doc. No. 10378-2) ("U.S. Summ. J. Mem.").  The United States insists, moreover, principally invoking *Central Green*, that "[n]either the text of the statute nor any controlling legal authority limits § 702c to conduct that is intrinsic to a flood control project." *Id.* at 2; *see also id.* at 15-18.  That reading of § 702c is deeply flawed.

*First*, as shown above, *Central Green* was a "purposeful release" case in which it was common ground that the canal carrying the relevant waters was part of a project that served flood control purposes.  *See supra* pp. 8-9.  The Court thus had no occasion to decide whether § 702c immunity applies to conduct unrelated to flood control or a flood control project, and its opinion must be read with that factual context in mind.[6]  It is thoroughly implausible to suggest that the Court — in an opinion by Justice Stevens, who dissented in *James* and once described § 702c as an "obsolete legislative remnant [that] is nothing more than an engine of injustice," *Hiersche v. United States*, 503 U.S. 923, 926 (1992) (Stevens, J., respecting denial of petition) — intended to expand the reach of § 702c to include every circumstance in which governmental negligence results in water damage, without discussing at all the consequences of such an expansion.  As has been uniformly recognized, *Central Green* limited § 702c, not expanded it.  *See Sanko S.S. Co., Ltd. v. United States*, 272 F.3d 1231, 1232 (9th Cir. 2001) (noting *Central Green* adopted a "restrictive test for determining sovereign immunity"); *Downs v. United States*, No. 06-20861-CIV-HUCK, 2007 WL 842136, at *3 (S.D. Fla. Mar. 20, 2007) (*Central Green* "tempered [the] broad reading" given § 702c in *James*); *Order Denying Certification* at 4-5 (*Central Green* "did not broaden § 702c immunity.").

---

[6] *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) (It is a "canon of unquestionable vitality . . . 'that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.'") (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821)).

*Second*, in arguing (at 8) that it is the "character of the waters" that is dispositive under *Central Green*, the United States consistently ignores the second, conjunctive part of the test the Court articulated: flood-water status depends upon "the character of the waters . . . *and the purpose behind their release*." 531 U.S. at 434 (emphasis added). The latter clause puts beyond question that the Court assumed the water in *Central Green* was part of a flood control project inasmuch as it could be held or "releas[ed]" from a reservoir. Indeed, in remanding for an inquiry into the purpose behind the release of the water, the Court underscored that the nature of the United States' conduct — whether the release was for flood control or irrigational purposes — would be dispositive. *See id.* at 436 (citing the Eighth Circuit's decision in *Henderson v. United States*, 965 F.2d 1488 (1992), for the proposition that it is "easy" to determine "that a release directed by a power company for the commercial purpose of generating electricity" is *not* flood water).[7] It is thus only by ignoring the second aspect of the *Central Green* framework that the United States can claim that a connection to flood control is irrelevant.

*Third*, the United States' interpretation of § 702c would result in a broad, unprincipled immunity that Congress could never have intended. Although the United States puts great stock in the broad language of § 702c, *see*, *e.g.*, U.S. Summ. J. Mem. at 17-18, the Supreme Court has been clear that "broad language is not limitless" and that limits can be found in, among other things, a statute's "context, history, and purposes." *Watson v. Philip Morris Cos.*, 127 S. Ct.

---

[7] The Court's citation to *Henderson* directly answers the United States' overreaching argument here that the Court intended, without saying so, to overrule all appellate decisions between *Central Green* and *James* that looked to whether the challenged conduct has flood control characteristics. *See* U.S. Summ. J. Mem. at 16-18. Indeed, the United States cites *Henderson* in its papers here in a list of cases it suggests did not survive *Central Green*, *see id.* at 16 n.10, which — given the Court's endorsement of *Henderson* — further undermines the United States' reading of *Central Green*.

2301, 2305 (2007); *see also Henderson*, 965 F.2d at 1491 (Section 702c immunity may be broad, but "the immunity it bestows upon the government is not absolute.").

As explained fully above, Congress enacted § 702c to control liability in connection with flood control efforts, thereby effectively capping flood control expenditures and ensuring that Congress would have the final say on how much of the public treasury was spent. *See Graci*, 456 F.2d at 25-26; *Lunsford*, 570 F.2d at 228. To interpret § 702c as a free-floating immunity that attaches to any conduct that results in water damage — for example, a naval ship colliding with a levee, or dynamiting done to construct a highway that busts open a dam — makes nonsense of that basic purpose. *See Order Denying Certification* at 3. Indeed, the United States has not cited *a single* decision in which § 702c has been applied to shield the United States from liability for conduct unconnected to a federal flood control effort.

The United States thus misreads *James* when it argues (at 8-9) that *any* waters a federal project is unable to control necessarily fall within § 702c. The proper inquiry is *why* the structure was unable to control the water: if it is because the United States negligently drove a truck (with no connection to flood control) into a flood control project, it would be absurd to assume that Congress intended immunity under § 702c to attach, and nothing in *James* suggests otherwise. *See supra* p. 7. So, too, here. Through its faulty design and management of the MRGO (which had no connection to flood control), the United States effectively drove a storm surge directly into New Orleans, with devastating effect.

In short, the proper legal standard is not — as the United States would have it — whether plaintiffs "seek[] to impose liability on the United States for damage from and by a flood and floodwaters that a federal project sought to control." U.S. Summ. J. Mem. at 3. Instead, the test is whether "plaintiff[s] can recover without holding the government liable for a privileged

activity — i.e., an activity . . . somehow necessary in the government's battle to control floods."
*Cantrell*, 89 F.3d at 274; *In re Katrina Canal Breaches Consol. Litig.*, 471 F. Supp. 2d at 694-95.
Because plaintiffs here seek to impose liability on the United States for conduct in connection
with a navigation project, the United States cannot prevail on summary judgment.  *See Cantrell*,
89 F.3d at 274 ("claim of injury from a negligent act that has nothing to do with flood control
*should* survive summary judgment"); *E. Ritter & Co.*, 874 F.2d at 1239 (§ 702c does not "extend
immunity to every damage caused by water"); *Order Denying Certification* at 5.

> **B.**     **The United States' "Nexus" Theory Is Unavailing**

Recognizing that its interpretation of *Central Green* has not persuaded this Court, the
United States falls back on an alternative theory — *viz.*, that the MRGO was "inextricably
interconnected," or had a nexus, with flood control.  U.S. Summ. J. Mem. at 3; *see also id.* at
18-22 (explaining the nexus theory).  The United States argues that, "[p]laintiffs' theory of
liability depends on an elemental relationship between [the MRGO and the LPVHPP].  Plaintiffs
posit that the LPVHPP failed to protect them from flooding because the MRGO increased the
storm surge effect from Hurricane Katrina."  *Id.* at 18.  According to the United States, that is
sufficient for immunity under § 702c to attach even though the conduct challenged is not flood
control activity.

The United States' alternative theory cannot support summary judgment for multiple,
independent reasons.  *First*, the cases the United States cites (at 18-22) in support of its nexus
argument do not encompass the conduct at issue here.  Those cases, instead, fall into two
categories — conduct involving the management of flood control projects or acts necessary to
carry out flood control ends.  *See Boudreau v. United States*, 53 F.3d 81 (5th Cir. 1995)
(negligent management of the recreational uses of a flood control project); *Mocklin v. Orleans
Levee Dist.*, 877 F.2d 427 (5th Cir. 1989) (negligence in an effort to build a flood control

project).  By contrast, the Corps' negligent acts in constructing, operating, maintaining, and

repairing the MRGO were undertaken neither to manage a federal flood control project nor to

carry out federal flood control efforts.  *See* Pls.' Revised Statement ¶¶ 1-3.

Attempting to fit the Corps' conduct within one of those two narrow categories, the

United States asserts that "[t]he challenged conduct here is fundamentally related to flood

control, much more closely related to flood control than was the conduct at issue in *Boudreau*"

— namely, rescuing a stranded boater.  U.S. Summ. J. Mem. at 20.  That is not so.  *Boudreau*

was a garden-variety § 702c case involving the management of recreational aspects of a flood

control project — a category of cases to which *James* held immunity should attach.  *See* 53 F.3d

at 85 (reading *James* as extending liability to "management of a flood control project").  Nothing

in *Boudreau* supports the expansive view that negligent conduct outside the sphere of flood

control is protected merely because the ultimate injury results from inundation or flooding.

The United States' reliance on *Mocklin* is even further afield.  The conduct at issue there

was dredging in Lake Pontchartrain so that "barges carrying necessary equipment" to construct

flood control structures could access the lake.  *See* 877 F.2d at 428.  As the Court explained, the

channels that gave rise to the injury were dredged to give access to barges "needed to deliver the

equipment and materials used in reinforcement of the levees to prevent flooding" and, for that

reason, "[t]he channels were inescapably part of a flood control project."  *Id.* at 430.  Here, the

Corps' negligence had nothing to do with a flood control project.  That the Corps dredged dirt

from the MRGO to build certain levees along the MRGO could not possibly, as the United States

contends, *see* U.S. Summ. J. Mem. at 19-20, shield the United States from all liability for its

decades of negligent conduct in connection with the navigational aspects of the MRGO.

Plaintiffs, in any event, are not seeking to hold the United States liable based on negligence in

that dredging or the effects of that dredging but rather the Corps' construction, operation, maintenance, and repair of the MRGO.[8]

*Second*, the United States' claim that it was the failure of the LPVHPP and not negligence in connection with the MRGO that caused plaintiffs' damages raises substantial factual issues that preclude summary judgment. *See* U.S. Summ. J. Mem. at 1 ("[T]he performance of the federal hurricane protection systems was, is, and will forever be the defining event in this catastrophe."); *id.* at 18-19. It is settled that summary judgment is appropriate only "if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.' " *Coleman v. School Bd. of Richland Parish*, 418 F.3d 511, 515 (5th Cir. 2005) (quoting Fed. R. Civ. P. 56(c)). The party that moves for summary judgment, moreover, "bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Id.* (internal quotation marks omitted).

The United States has not carried that burden here. As the AT&T entities have explained, plaintiffs seek to hold the United States liable for negligent acts related to the MRGO. *See*, *e.g.*, *Robinson* Compl. ¶¶ 29-30 (alleging the "MR-GO was not properly designed, constructed, and maintained" and that such negligence caused plaintiffs' damages); Kemp Decl. ¶ 32 (filed Aug. 21, 2006) (Doc. No. 1003-4) (stating that the MRGO caused the "catastrophic inundation" of parts of New Orleans); Pls.' Revised Statement ¶ 52. The United States seeks to avoid liability by locating any negligent acts in the design and construction of the LPVHPP, rather than in connection with the MRGO. But, even assuming that the United States can prove

---

[8] Even if plaintiffs had challenged those acts of dredging, the United States' immunity would extend only to damages arising from that conduct; it would not render the MRGO a flood control project.

that it acted negligently in designing or constructing the LPVHPP (a showing that the United States has not attempted to make), that is not mutually exclusive with a finding that the Corps also acted negligently in constructing, operating, maintaining, and repairing the MRGO.  If the United States acted negligently in the realms of *both* flood control (LPVHPP) and non-flood control (MRGO), there are multiple, factbound issues of causation unanswered by the United States' proffer of facts:

> ➢ What was the cause of the breaches and overtopping of levees of the LPVHPP? Was the cause (whether in-fact or proximate) of plaintiffs' damages negligence in connection with the LPVHPP or the MRGO or both?[9]

> ➢ Had the Corps not negligently constructed, operated, maintained, and repaired the MRGO, would the LPVHPP have failed at all or to the same degree and/or would plaintiffs have suffered damages?

> ➢ Did the Corps, in fact, design the LPVHPP to counter the dangers posed by the MRGO?  What risk of storm surge (if any) did the Corps believe that the MRGO posed?  What acts were taken to remedy that risk?

> ➢ Could a non-negligently constructed LPVHPP have countered the external dangers created by the MRGO?  Could any reasonable flood control measures have countered the threat posed by the MRGO?

> ➢ Was the proximate cause of plaintiffs' damages the Corps' failure to build structures or to take acts with respect to the MRGO to counter the storm surge or the Corps' negligence in connection with the LPVHPP?

These unresolved issues of material fact preclude the United States from prevailing on summary judgment.  If it were the Corps' conduct in connection with the MRGO that caused plaintiffs' damages rather than its negligence (if any) in connection with the LPVHPP, § 702c immunity does not, as the AT&T entities have argued, apply.  *See supra* pp. 5-6.  The United

---

[9] The United States claims that "[i]t is undisputed that flood control structures were put in place along the MRGO to keep storm surge from Lake Borgne out of the developed areas adjacent to the lake."  U.S. Summ. J. Mem. at 8-9.  But that is beside the point:  that fact does not address, for example, whether the cause of plaintiffs' damages was a shoddily constructed LPVHPP or whether the Corps created a risk through the MRGO that no reasonable flood control measures could have countered.

States has neither pointed to undisputed facts nor submitted evidence that addresses these issues

of causation, making summary judgment in its favor impossible.  *See Felton v. Greyhound Lines,*

*Inc.*, 324 F.3d 771, 778 (5th Cir. 2003) (denying summary judgment where defendant did not

show absence of "genuine issue[s] of material fact . . . as to whether it acted in accordance with

[a] standard of care, whether its actions were the cause-in-fact of [the] injury, and whether they

were the proximate cause of that injury"); *LeBoeuf v. Gulf Oil Corp.*, 634 F.2d 261, 262 (5th Cir.

1981) (denying summary judgment where record did not "demonstrate, as a matter of law, that

the issue of proximate cause is free from genuine factual controversy").  That LPVHPP levees

breached or were overtopped during Hurricane Katrina — which is, in essence, the extent of the

United States' factual proffer, *see* Def.'s Statement of Uncontested Facts ¶¶ 15-18 (filed Jan. 14,

2008) (Doc. No. 10378-4)[10] — tells the Court nothing about *why* the levees breached or were

overtopped, and thus nothing about the nature of conduct that caused plaintiffs' damages.

     *Third*, even if the United States did, as a factual matter, rely upon the LPVHPP to counter

the risks created by the MRGO *and* even if plaintiffs' damages did result from failure of or

negligence in connection with the LPVHPP, § 702c would not apply.  Section 702c was intended

to provide the Corps with immunity from failures in connection with *voluntarily assumed*

obligations to combat natural floods.  *E.g.*, *Graci*, 301 F. Supp. at 953 (noting the purpose of

§ 702c was to limit damages from "natural floods").  Section 702c was enacted, in other words,

---

[10] The United States avers that it is undisputed that "[t]he LPV levees along the GIWW and the MRGO were designed and constructed to protect against hurricane-induced storm surges . . . including any surge propagated or conveyed by the GIWW and the MRGO."  Def.'s Statement of Uncontested Facts ¶ 14.  But there is a substantial question of fact on this issue given that the Corps believed the MRGO would *not* create storm-surge effects.  *See supra* pp. 2-3.  Indeed, the United States has claimed here that the Corps understood that "the new channel [would] be of no consequence in affecting water surface elevations for major storms and hurricanes," U.S. Mot. to Dismiss Mem. at 12 (internal quotation marks and alterations omitted), which demonstrates a dispute on this material issue of fact.

"to prevent the Government from being held liable for the staggering amount of damages caused by natural floods, *merely because* the Government had embarked upon a vast program of flood control in an effort to alleviate the effects of the floods." *Valley Cattle Co. v. United States*, 258 F. Supp. 12, 16 (D. Haw. 1966) (emphasis added).[11]

It would be incompatible with that understanding to apply § 702c when the United States itself creates a hazard in undertaking conduct unrelated to flood control, and neglects to remedy sufficiently the hazard that it creates, *even if* remedial measures the United States did or could have adopted might be deemed flood control activities.  If, for example, the United States constructed a water system to provide an independent water supply for military bases across the United States, but constructed the system negligently, resulting in water damage to various communities across the country, it would be bizarre to think the United States could claim immunity under § 702c, even if structures constructed to prevent such dangers failed.

The bottom line is that, when the United States undertakes non-flood control projects — for its own interests — that would ordinarily give rise to legal obligations, and the United States acts in derogation of those obligations, no case law supports the proposition that the United States may claim immunity under § 702c simply because the resulting damages came from a deluge.[12]  Applied here, that principle means that regardless of whether the United States relied

---

[11] It is true that § 702c extends to circumstances beyond unusual climatic conditions. *See*, *e.g.*, *Aetna Ins. Co. v. United States*, 628 F.2d 1201, 1204 (9th Cir. 1980).  But those cases involve negligence *in connection with a flood control project* that causes water damage unrelated to climatic conditions, and are nothing like this one, where the Corps' negligence is unrelated to flood control.  *See Florida E. Coast Ry. Co. v. United States*, 519 F.2d 1184, 1191 (5th Cir. 1975) (protected floods can be "artificially precipitated" because § 702c provides immunity in connection with "damages caused by 'flood or flood waters' *in connection with flood control projects*, even when the government's own negligence has caused or aggravated the losses") (emphasis added).

[12] The United States asserts that, "[h]ad there been no flood protection system in place, no one would have been surprised that . . . Katrina sent floodwaters surging over New Orleans."

upon the LPVHPP to counter the hazards it created with the MRGO (a disputed factual issue)

and regardless of whether it was the negligent design and operation of the MRGO or the

LPVHPP that caused plaintiffs' damages (a disputed factual issue), § 702c is unavailable here:

the United States, in pursuing ends unrelated to flood control, created substantial risks it was

legally bound to control.  Section 702c cannot be construed to absolve the United States of its

failure to remedy those risks, even it its failure could be called a flood control failure.

## **CONCLUSION**

For the foregoing reasons, the United States' Renewed Motion to Dismiss or, In the

Alternative, for Summary Judgment should be denied.

Respectfully submitted,

_     /s/ James F. Perot, Jr.             _

MICHAEL K. KELLOGG                    JAMES F. PEROT, JR. (23547)
SCOTT H. ANGSTREICH                   BELLSOUTH TELECOMMUNICATIONS, INC. D/B/A
KELLY P. DUNBAR                           AT&T LOUISIANA
KELLOGG, HUBER, HANSEN, TODD &        365 Canal Street, Suite 3060
    EVANS, P.L.L.C                        New Orleans, LA  70130
1615 M Street, N.W., Suite 400        (504) 528-2058
Washington, D.C. 20036                (504) 528-2948 (facsimile)
(202) 326-7900
(202) 326-7999 (facsimile)

*Counsel for the AT&T Entities*

February 1, 2008

---

U.S. Summ. J. Mem. at 1.  But this proves our point:  were there no flood control projects ever
built under the auspices of the LPVHPP, the Corps would *nonetheless* have had a duty to remedy
the dangers it created in the MRGO.  This suit is about a breach of that duty.

## <u>CERTIFICATE OF SERVICE</u>

I, James F. Perot, Jr. hereby certify that, on February 1, 2008, I served a true copy of

<u>Brief of *Amici Curiae* The AT&T Entities In Opposition to Defendant United States' Renewed</u>

<u>Motion to Dismiss or, in the Alternative, for Summary Judgment</u> upon all counsel of record by

ECF or first class mail.


                                          */s/ James F. Perot, Jr.*
                                           James F. Perot, Jr.