# CHAPTER EIGHT: THE ORLEANS EAST BANK (DOWNTOWN) AND CANAL DISTRICT PROTECTED AREA

## 8.1  Overview

The most populous of the four major protected areas that suffered significant flooding during Hurricane Katrina was the Orleans East Bank (downtown) protected area.  As shown in Figures 2.4, 8.1 and 8.2, the Orleans East Bank (downtown) section is one contiguously protected section.  This protected unit contains the downtown district, the French Quarter, the Garden District, and the "Canal" District.  The northern edge of this protected area is fronted by Lake Pontchartrain on the north, and the Mississippi River passes along its southern edge. The Inner Harbor Navigation Canal (also locally known as "the Industrial Canal") passes along the east flank of this protected section, separating the Orleans East Bank protected section from New Orleans East (to the northeast) and from the Lower Ninth Ward and St. Bernard Parish (directly to the east.)  Three large drainage canals extend into the Orleans East Bank protected section from Lake Pontchartrain to the north, for the purpose of conveying water pumped north into the lake by large pump stations within the city.  These canals, from west to east, are the 17th Street Canal, the Orleans Canal, and the London Avenue Canal.

Figure 8.2 shows how this single, contiguously protected unit can be sub-divided into several localized sub-basins separated by a series of ridges, levees and canals.  The base map of Figure 8.2 is the flooding map of Figure 2.17 (repeated here) which shows the flooding on September 2, four days after the passage of Katrina.  The elevation of the top of the floodwaters in this figure is Elev. +3 feet (NAVD 88).  This is approximately the peak flooding, and the depths of flooding shown at this point in time reflect the underlying basin topography and thus serve well to illustrate how the overall protected zone can be approximately subdivided into four separate zones or sub-basins.

The original city of New Orleans had been founded on the high ground adjacent to the Mississippi River (along the southern edge of this protected area.)  The river "climbs" within its own channel, periodically depositing overbank sediment deposits which form "natural levees" to constrain its path, until it rises above the surrounding countryside.  Then, periodically, the river breaks through its own "natural levees" and takes a new path to the Gulf.  The riverbank deposits thus represent the highest ground locally, and it was here that the city began.

As shown in Figure 8.2, this high ground adjacent to the river now comprises much of the expensive Garden District, and much of downtown New Orleans and the historic French Quarter as well.  Due to their elevation (typically Elev. +2 feet above Mean Sea Level and higher) these areas remained largely unflooded.  Most of the remainder of this large and densely populated protected zone lies at lower elevations, however, and so most of the rest of this zone was flooded.

As also shown in Figure 8.2, a ridge of high ground known as Metairie Ridge separates the low-lying northern (Canal District) portion of this protected area from the

southern half. Metairie Ridge is the result of a previous river "stand", and resulting river deposits. The Metairie Ridge did not quite successfully separate the northern and southern halves of this protected section during Katrina; flow passed over the ridge at a number of locations carrying floodwaters from the catastrophic northern drainage canal breaches into much of the rest of the protected area to the south. This flow over (across) the Metairie Ridge was noted by eyewitnesses (Van Heerden, 2006), and is also confirmed by calculations of flows through the various breaches.

As described previously in Chapter 2, the initial breaches in this protected area occurred along the eastern flank (on the west bank of the IHNC). Several breaches occurred along this frontage. These breaches allowed significant amounts of water to flow into the adjacent neighborhoods, but these breaches were non-catastrophic; they breaches did not scour to a depth below mean sea level, so that as the storm surge subsequently subsided the flow inwards through these breaches was eventually halted as the IHNC water levels fell below the (mean sea level plus) "lips" of these breaches. Our current estimates, based on simplistic calculations of flow and surge heights vs. time, suggest that approximately 10% to 20% of the eventual flow into the overall Orleans East Bank (Downtown) protected area came through these breaches. Similar calculations, in a bit more detail, by Team Louisiana suggest that approximately 12 to 15% of the overall floodwaters eventually filling the Orleans East Bank protected area came through the breaches on this east bank of the IHNC (Mashriqui, 2006).

The vast majority of the flow into the Orleans East Bank came through the three subsequent, catastrophic breaches in the drainage canals at the northern edge of the Orleans East Bank protected area. As shown in Figures 8.1 and 8.2, one catastrophic breach occurred on the 17th Street drainage canal and two catastrophic breaches occurred on the London Avenue drainage canal. These all eroded (scoured) to depths well below mean sea level, and so continued to admit flow into the city from Lake Pontchartrain well after the initial storm surge had subsided. The drainage canal located between these two (the Orleans Canal) did not suffer any breaches, but the southern end of this canal was unfinished and a "gap" (low area) in the floodwall at the southern end of this canal allowed water to flow freely into New Orleans for a number of hours during the peak of the storm surge.

It was, however, mainly the flow through the three catastrophic breaches in the 17th Street and London Avenue drainage canals that accounted for approximately 85% of the flooding that slowly filled this Orleans East Bank protected area during and after the storm. Flow from the canals overfilled the northern basin and eventually also flowed over the Metairie Ridge and into the other zones shown as flooded in Figures 8.1 and 8.2. This flooding continued to progress after the initial storm surge had subsided, and flooding in the southern portions of this protected zone continued to worsen overnight and into the three days that followed, finally equilibrating with the slightly inflated water levels in Lake Pontchartrain on Thursday (September 1.)

As discussed in Chapter 2, this flooding had catastrophic consequences, accounting for approximately half of the total loss of life in this event, and a similar share of the economic damages as well. The performance of the flood protection system in this Orleans East Bank

(downtown) basin is thus of great importance, and was studied in some detail by this investigation.

## 8.2  Performance of the Flood Protection System Along the West Bank of the Inner Harbor Navigation Channel (IHNC)

8.2.1  An Early Breach at About 4:45 a.m.

As described previously in Chapter 2, the first levee breach and failure in the metropolitan New Orleans area appears to have occurred along one of the banks of the IHNC.

Figure 8.3 shows water elevations at three gage stations as well as at a manual water elevation station in the IHNC as the hurricane storm surge initially began to raise the water levels throughout the IHNC region on the morning of August 29th. As the storm began to approach the coast, water levels within the IHNC began to rise. By about 4:30 a.m. the water level within the IHNC had risen to approximately +9 to +9.5 feet (MSL). Then, at approximately 4:45 a.m., two of the gauges near the Highway I-10 bridge registered a sudden change in the otherwise relatively constant rate of rise in water levels. The U.S. Geological Survey (USGS) gage at this location shows a precipitous drop in water levels at approximately 4:45 a.m. The Orleans Levee District gage was "sampled" less frequently, but it also shows a reduction in rate of local water level rise between about 4:45 and about 5:00 a.m.

These gage readings appear to indicate that a levee breach occurred at about 4:45 a.m. near the I-10 Bridge across the IHNC channel, resulting in a local and temporary drawdown of the otherwise rising water levels in the IHNC.

A number of levee breaches occurred during Hurricane Katrina along the north-south channel of the IHNC, so there is no shortage of candidate sites for this breach.

Many of the partial breaches and distressed levee sections of New Orleans East fronting the IHNC (on the east bank of the IHNC) were relatively minor features, with minor flow potential, and could not have accounted for the significant changes observed in the gage readings shown in Figure 8.3. In addition, a number of these features showed evidence of erosion and scour specifically due to overtopping, indicating that water elevations significantly greater than +9 feet (MSL) eventually occurred at their locations.

Similarly, the timing(s) of the occurrences of the two large breaches on the east side of the IHNC at the edge of the Ninth Ward are well-established by eye witnesses as well as by "stopped clock" data, and these two major breaches appear to have occurred considerably later at about 7:45 a.m.

A significant breach occurred on the west side, behind the main Port of New Orleans, due to overtopping and erosion of soil support for an I-wall (see Section 8.2.3.1.). The elevation of the I-wall, and the observed overtopping erosion, indicate that this failure occurred later in the morning as well when the storm surge had risen high enough to pass water over the top of this floodwall (see Section 8.2.3.1.).

That leaves only three candidate breach sites that might have caused the drop in water level rise shown at about 5:00 a.m. in Figure 8.3.

One of these is the breach on the east side of the IHNC at the CSX railroad crossing and roadway crossing over the levee, as described in Chapter 7.

A second candidate site is the pair of breaches that occurred closely adjacent to each other at the south end of the main Port of New Orleans, as described in Section 8.2.3.3. These were large breaches, and might well have had sufficient flow as to account for the drop in water level rise shown in Figure 8.3. In addition, these sections were constructed of highly erodeable lightweight shell-sand fill, and might well have eroded early due to through-passage of seepage flows through the "earthen" levee embankment as the storm surge rose (but prior to full overtopping of the levee embankment at this location.) This is discussed further in Section 8.2.3.3.

A third candidate breach site is the west bank of the IHNC at the CSX railroad crossing, as described in Section 8.2.2. At this location, a steel "storm gate" on rollers had been damaged by a train accident several months prior to Hurricane Katrina, and was away for repair. In lieu of this missing gate, a sandbag levee crest section had been constructed in the opening left by the missing floodgate. The sandbags washed out at some point during Katrina, and this may have been the early breach reflected by the gage readings shown in Figure 8.3. At this same site, flow along the juncture between the railroad embankment and the adjacent embankment fill supporting an asphalt paved roadway passing over the earthen Federal levee resulted in erosion and scour that produced a second breach feature at essentially this same site, as is also described in Section 8.2.2.

In the end, based on the information currently available to this investigation team, any of these three candidate breach sites might have been responsible for the for the observed gage level drops shown in Figure 8.3.

8.2.2    The CSX Railroad Breach

As shown in Figure 8.2, the CSX railroad crosses the IHNC channel immediately to the south of the I-10 Highway bridge. On both the east and west banks of the IHNC, the railroad passes through the levee system by means of a gate through a structural concrete floodwall. Steel gates are used to close these openings during storms.

Figure 8.4 shows the concrete structural floodwall on the west side of the IHNC, at the east edge of the Orleans East Bank (Downtown) protected area. Note that there is no steel gate shown in this photograph. The steel gate at this location had been damaged by a train accident several months prior to Katrina's arrival, and it was away for repair at the time of the hurricane.

In lieu of this missing steel gate, a temporary sandbag "levee" was erected across the opening. At some point during the storm this sandbag "levee" section either was pushed over by the rising storm surge or was overtopped and washed away.

In addition, erosion occurred at the juncture between the railroad embankment fill and the fill supporting an adjacent roadway passing over the earthen federal levee at this location, as shown in Figure 8.5. This roadway passed over the levee crest to provide access to port facilities on the outboard (water) side of the Federal levee system. This is shown in Figure 8.5, which is a view from the inboard side of this breach showing the erosion of the roadway fill. The elevated I-10 highway bridge is at the left of this photo, and the CSX railroad is just to the left (north) of the roadway. The roadway fill at this location was comprised largely of highly erodeable lightweight "shell sand" fill; a material not suitable for levee fill in a levee protecting a large population (especially without sheetpile cutoff or similar features to prevent erosion.) The flow appears to have passed initially through the pervious gravel ballast supporting the train rails (which is the "low point" at this complicated location), and then undermined the less competent fill beneath the roadway. The resulting flow through the eroded breach then passed to the inboard (protected) side and made its way into the adjacent neighborhood.

The erosion and scour at this conjoined pair of breach locations did not erode the base (lips) of these breach features to a level below mean sea level. Accordingly, although flow passed through this pair of features for a number of hours, the flow eventually ceased as the storm surge (water level rise in the IHNC) eventually subsided.

The failure at this site is an excellent example of a failure produced by multiple adjoining jurisdictions, and a lack of overall coordination of the various system elements constructed and operated by each. The Federal levee system was "penetrated" here by both the railway and the Port roadway, and the interactions of the pervious railway ballast and the highly erodeable roadway fill combined to fail the overall flood protection system at this location. Lack of coordination, and lack of authoritative oversight, of these disparate organizations and their disparate system components was a critical problem here.

It should be further noted that this same site had also failed catastrophically in 1965 during hurricane Betsy, so that the re-failure of this same location represents a daunting case of lack of progress and learning over the intervening 40 years. As discussed in Chapter 7, the east bank CSX rail crossing, which also failed during hurricane Katrina, was also a "repeat" failure (as it, too, had failed during hurricane Betsy in 1965.) The continued failure to recognize and suitably address the hazards associated with these complex "penetrations", despite their demonstrated history of previous failure, is difficult to understand.

In addition, it is interesting to note that the steel gate was allowed to be removed for repair, rather than requiring it to be fixed in place until a suitable replacement gate (or at least interim replacement gate) could be fabricated and be brought in, so that trains could continue to operate. This created an obvious potential hazard to the safety of the very large community inboard of this rail crossing; placing the safety of many at increased risk. In hindsight; that was a decision that is difficult to justify.

8.2.3  Breaches and Distressed Sections at the Port of New Orleans

Three breaches occurred to the south of the CSX railroad breach on the west side of the IHNC at the main Port of New Orleans. Several additional levee and floodwall sections

were "distressed" or damaged, but did not fully breach along this same section. These breach and distress sites along this reach are jointly indicated as the suite of "Industrial Canal Overwash Sites" in Figure 8.2.

As the storm surge raised the water levels in Lake Borgne, and then pushed the elevated waters (and flow) westward through the "funnel" at the east end of the east/west trending GIWW/MRGO channel between New Orleans East and St. Bernard Parish, large flows and a major rise in water elevations pushed westward along the GIWW/MRGO channel to this channel's "T" intersection with the IHNC channel, and raised the water levels within the IHNC channel.

This resulted in rising waters rushing directly at the west bank of the IHNC, coupled with overall raising of the water levels throughout the IHNC region. This produced distress, and several breaches, on the west side of the IHNC in the general vicinity of the main Port of New Orleans. The sub-sections that follow will describe each of these in turn.

### 8.2.3.1 Breach at Rail Yard Behind the Port of New Orleans

The northern-most of these features was a breach in a combined earthen levee and concrete I-wall section, as shown in Figures 8.6 and 8.7. This breach occurred behind the main Port of New Orleans, just to the south of the juncture between the east-west trending GIWW/MRGO channel and the IHNC, so the water pressures and overtopping from the lateral flow from the east-west trending GIWW/MRGO channel were particularly severe at this location, as indicated in hydrodynamic modeling by Team Louisiana (Mashriqui, 2006).

At the time of our field team's arrival in late September, this site was already under repair. The field team arrived at this site on the morning of September 30, 2005, and at that time the trench that had been scoured behind the wall on the north end of the breach had been "filled" with clayey backfill and additional backfill had been placed behind the wall to form an additional buttressing berm, as shown in Figure 8.6. A temporary access road had also been placed through the breach, as is also shown in this photo.

Figure 8.7 shows conditions on the north side of this breach, at the same point in time (on September 30.) The interim repair efforts had not yet reached the north side of the breach, and the mechanisms that contributed to this failure were still clearly evident here. As shown in Figure 8.7, significant overtopping had passed over the concrete I-wall and then cascaded down the backside, resulting in erosion of a "trench" at the base of the backside of the I-wall. It should be noted that water falling over an 8 foot high I-wall strikes the ground at a velocity on the order of about 20 to 25 feet per second; sufficient to cause rapid erosion at the point of impact.

The initial height of the compacted embankment fill on the backside of the I-wall prior this erosion can be clearly seen in Figure 8.7 by the soil markings on the I-wall at the left of the photograph. The depth of this erosion (scour) from the elevation of the top of the pre-event I-wall/soil crest contact to the base of the eroded trench was 4.5 feet at the location of the photographer taking the photo of Figure 8.7, and it deepened progressively towards the actual breach location approximately 25 feet to the North. Just before reaching the actual

displaced I-wall section shown in Figure 8.7 this depth of erosion was approximately 5.5 feet, so that the depth of erosion at the location of the actual I-wall failure was likely on the order of 5.5 to 6.5 feet.

The depth of the sheetpiles was unusually shallow at this location, as shown in Figure 8.8. The I-wall "stick-up" had not been large at this location, and it was not felt that very long sheetpiles were needed to support this I-wall by means of cantilever action given its relatively short unsupported length (stick-up). There was no sign of lateral embankment movement at this site, and the sheetpiles and I-wall showed no signs of flexure on their vertical axis (along their length from top to bottom.) The I-wall failed by rigid body "toppling" laterally towards the inboard (protected) side in a "rigid, post-hole" toppling mode as it became progressively unbraced by the erosion of the supporting soil at the inboard toe. Eventually, it became unable to support the water pressures on the outboard (canal) side due to the storm surge and hydrodynamic forces, and the I-wall toppled far enough to permit catastrophic erosion at the main breach section.

As shown in the cross-section of Figure 8.8, the sheetpiles at this section were only 14 feet in length, and were tipped at a base elevation of approximately -6 feet (MSL). As the overtopping water cascaded over the top of the concrete I-wall, the resulting trench eroded to a depth of approximately 6 feet below the original wall/soil crest contact, and the critical section achieved approximately the geometry shown in Figure 8.8. Soil properties are not well established at this location, as site specific investigation was not possible within the budget and time constraints of this independent investigation. Accordingly, soil stratigraphy and soil properties used in our analyses are inferred from the original design data available from the USACE.

Based on the field observation that no major embankment foundation failure was observed, the most significant properties for analysis of this section were the sheetpile sections (which were PZ-22) and the properties of the engineered embankment fill (which was a moderately compacted silty clay of medium plasticity). Shear strength of the embankment fill was modified to determine the strength (and stiffness) at which the observed failure would be expected to occur, and it was found that the I-wall section would be marginally unstable with a fill strength of approximately 600 to 1000 $lb/ft^2$. This appeared to be well-representative of the strength of the observed fill, and the failure mode (shown in Figure 8.9) matched well with the field observations. Figure 8.9 shows the results of Finite Element Analyses (FEA) performed using the program PLAXIS; in this case for embankment shear strength of approximately 800 $lb/ft^2$, and with a trench to a depth of 6 feet behind the floodwall. This Figure shows calculated displacements, and the rigid toppling mode of wall failure can be clearly seen. Lateral failure of the I-wall results in large part from shearing at the transition between the base of the embankment fill and the underlying foundation soils.

It appears that this failure could have been prevented, simply and at little incremental cost, by installation of concrete "splash pads" or other erosion protection at the base of the inboard side of the I-wall to prevent the observed erosion. Similarly, this failure would have been prevented if the floodwall had been a "T-wall" section, as illustrated in Figure 8.10(b), rather than the less expensive "I-wall" section, as illustrated in Figure 8.10(a). The I-wall sections are supported laterally only by the cantilever action of their supporting sheetpile

walls, and this cantilever action is adversely affected by this erosion.  T-walls, on the other hand, have lateral concrete stems at their bases and these are supported both laterally and rotationally by battered piles (providing a much higher level of rotational resistance.)

Instead a significant breach occurred, and floodwaters passed through the adjacent railroad yard and into the adjacent neighborhoods for a number of hours.  This breach was located well inboard from the actual edge of the IHNC channel, however, and the breach did not erode its front lip to a depth below mean sea level.  Hence, this flow eventually ceased as the storm surge subsequently subsided later in the morning of August 29th.

### 8.2.3.2  Erosional Distress at Floodgate Structure Behind the Port of New Orleans

Just a few hundred yards to the south of the breach described in the previous section, significant erosional distress occurred at a concrete I-wall and floodgate structure behind the Port of New Orleans.  As shown in Figure 8.11, this concrete wall and steel gate structure provided access from the rail yard (on the protected side) to Port facilities (on the water side) which can be closed off by means of a rolling steel floodgate.

Significant erosional distress occurred at each end of this floodgate structure as it "transitioned" to join the earthen levee and floodwall at each end. An example, at the north end of this structure, is shown in Figure 8.12.  In this figure, the canal is on the left and the "protected" side is on the right.  The trench-like feature at the outboard side toe of the floodwall is the "gap" left when the wall displaced to the right as overtopping eroded a trench on the right side of this wall, laterally unbracing the very short sheetpiles and wall.  New fill has been placed on the right side (as an interim repair), so this erosion is no longer visible. The concrete wall of the gate structure has not displaced, as it is supported on a T-wall basis, and the rotational stiffness of the battered piles has been sufficient to prevent wall rotation.

The erosion at the juncture between the concrete gate structure and the adjacent concrete I-wall was locally exacerbated by the disparity in top elevations between these two walls; which acted to locally concentrate the overtopping flow.  Erosional distress of this sort, at the "transitions" between differing elements of the flood protection system, was a recurring theme in the damages caused by Hurricane Katrina.

### 8.2.3.3  Two Adjacent Erosional Embankment Breaches at the North End of the Port of New Orleans

Additional erosional "distress" and two large erosional breaches occurred slightly farther to the south, at the southern end of the main Port of New Orleans.

Figures 8.13 and 8.14 show two views of a large breach through an earthen levee at the contact ("transition") between the levee and a concrete floodwall section. As shown in Figure 8.14, the embankment fill material is lightweight shell-sand, a material known to be unusually highly erodeable.  This type of shell-sand material performed notably poorly at a number of locations during Hurricane Katrina, and is a material not suitable for construction of critical levees protecting large populations.  At this location, no provisions (e.g. a sheetpile cut-off, etc.) had been made to prevent catastrophic erosion of this shell-sand fill due to either

overtopping or through-erosion (erosion due to through-flow prior to full overtopping.)  In the absence of an eyewitness, it was not possible to discern from evidence at this site whether the embankment was actually overtopped, or whether flow through this highly erodeable fill caused progressive erosional failure prior to full overtopping.

Figure 8.15 shows a second large erosional breach, less than 50 yards from the breach shown in Figures 8.13 and 8.14.  This embankment section was also comprised largely of highly erodeable shell-sand fill.  A large scour hole can be seen to the right, immediately inboard of this large breach.  The massive flows have rippled the asphalt tarmac, and detritus from the eroded shell sand fill is scattered over a large area.  As shown in this photo, some of this shell sand detritus has been scooped back into the breach as part of the initial repair.

Although these two adjacent erosional breaches were both of good size, they were both located some distance inboard from the IHNC channel, and neither eroded a pathway all the way back to the IHNC channel that was continuously below sea level.  As a result, although both breaches admitted significant volumes of water into the adjacent neighborhoods, flows through these two breaches eventually ceased as the storm surge subsequently subsided.

8.2.4  Summary and Findings

The breaches along the west bank of the IHNC were each "non catastrophic" as none of them eroded or scoured to such depth that their lip dropped below mean sea level.  Accordingly, although they admitted significant volumes of floodwaters into the greater Orleans East Bank (downtown) protected area, these flows eventually ceased as the storm surge subsided.  Together, these features appear to have contributed approximately 10% to 20% of the overall volume of floodwaters that eventually flowed into the Orleans East Bank (downtown) protected area.

Although they were each "non-catastrophic", these features each had the potential to cause significant localized flooding and damage.  They were also each the result of engineering lapses and/or lapses in oversight during design and construction; none of the failures in this area should have occurred at the storm surge and wind/wave loadings produced at these locations by Hurricane Katrina had proper design and construction features been included.

The removal of the steel floodgate at the CSX Railroad crossing, and the inadequate sandbagging of the resulting "gap" in the overall regional flood protection system should not have been permitted.  The steel gate should have been immediately replaced with a suitable and serviceable temporary replacement until the original gate could be repaired and returned.  Instead it was missing for approximately three months of the hurricane season.  In view of the events during Katrina, it is difficult to justify the decision to remove the gate and thus maintain the "operability" of the railroad line when it placed the "operability" of the flood protection system, and the safety of the community, at risk.

Similarly, the confluence of the CSX railroad embankment and the adjacent roadway both passing over/through the Federal levee system immediately to the south of the I-10

bridge represents one of many "transitions" between disparate flood protection system elements that performed poorly as an apparent result of lack of appropriate oversight and/or poor design with regard to how abutting elements of the system joined at their edges. In addition, highly erodeable shell sand fill was used at this roadway location without suitable cut-off by means of sheetpiles, etc., representing a hazardous condition that should have been caught and remedied prior to Katrina's arrival.

The erosional "distress" that occurred at the junctures of structural I-wall sections and the structural T-wall gate structure at the rail yard behind the Port of New Orleans represent additional examples of inadequate attention to details at "transitions" between adjacent sections of differing type and geometry.

The two large erosional breaches at the south end of the Port of New Orleans were clearly the result of use of inappropriate fill materials (highly erodeable lightweight shell-sand fill) in earthen embankment sections with no suitable provisions to reduce the obvious risk of catastrophic erosion and breaching. This, too, should have been spotted and remedied prior to Katrina's arrival. It is not clear whether these two breach sections were overtopped by the rising storm surge, or whether the embankment sections eroded as a result of "through flow" prior to full overtopping as the waters rose within the IHNC.

Finally, the I-wall section breach behind the Port of New Orleans was largely the result of overtopping and subsequent erosion at the base of the inboard toe of the concrete I-wall. This failure could have been prevented, at relatively little incremental cost, by installation of concrete splash pads or other erosion protection at the inboard toe of this floodwall. In addition, there was ample right of way available to construct a somewhat wider (and heavier) levee embankment on the inboard side of this I-wall. The incremental cost of doing so would have relatively small, and that too would likely have prevented this failure.

### 8.3   The Canal District Failures

8.3.1   Introduction

As the eye of the hurricane began to pass to the northeast of New Orleans, the counterclockwise swirl of the storm winds caused a surge in water levels along the southern end of Lake Pontchartrain. The storm surge along the Pontchartrain lakefront (which peaked at about 9:00 to 9:30 a.m. at an elevation of about +10 feet, MSL) did not produce water levels sufficiently high as to overtop the crests of the concrete floodwalls atop the earthen levees lining the three drainage canals that extend from just north of downtown to Lake Pontchartrain; the 17th Street Canal, the Orleans Canal, and the London Avenue Canal. Three major breaches occurred along these canals, however, and these produced catastrophic flooding of large areas within the Orleans East Bank protected area (as shown in Figure 8.2.)

The first major breach along the drainage canals occurred near the south end of the London Avenue canal, between about 7:00 to 8:00 a.m. The second breach occurred near the north end of the London Avenue canal, and the best current estimates of the timing of this breach are between about 7:30 to 8:30 a.m. The third major breach occurred near the north

end of the 17th Street canal. The main breach here occurred between about 9:00 to 9:15 a.m., but this may have been preceded by earlier visually observable distress at this same location. All three of these breaches rapidly scoured to depths well below mean sea level, so they continued to transmit water into the main Orleans East Bank (downtown) protected area for three days after the initial peak storm surge subsided. More detailed discussions and analyses of these catastrophic drainage canal breaches are presented in the sections that follow.

The resulting flooding of the main Orleans East Bank (Downtown) protected area was catastrophic, and resulted in approximately half of the 1,293 deaths attributed (to date) to the flooding of New Orleans by this event. Contributions to this flooding came from the overtopping and breaches along the IHNC channel at the east side of this protected area, as described previously in Section 8.2, but the majority of the flooding (approximately 80% to 90% of it) came from the three catastrophic failures along the drainage canals at the northern portion of this protected area.

In addition, one of the drainage canals (the Orleans Canal) had not yet been fully "sealed" at its southern end, so that floodwaters flowed freely into New Orleans during the peak of the storm surge through this unfinished drainage canal. A section of levee and floodwall approximately 200 feet in length had been omitted at the southern end of this drainage canal, so that despite the expense of constructing nearly 5 miles of levees and floodwalls lining the rest of this canal, as the floodwaters rose along the southern edge of lake Pontchartrain, the floodwaters did not rise fully within the Orleans Canal; instead they simply flowed freely into downtown New Orleans.

By about 9:30 a.m. all of the levee failures had occurred, and the main Orleans East Bank (downtown) protected area was slowly filling with water. As the northern end filled from the three catastrophic breaches along the drainage canals, water eventually began to pass over low spots in the Metairie Ridge and flowed into the southern zones within this protected area as well.

The sections that follow present more detailed examinations of the performance of the flood protection system in the "Canal District".

8.3.2   The Lining of the Drainage Canals

There were a number of lapses, errors and poor decisions that led to the catastrophic breaches along the drainage canals and thus the flooding of the main section of metropolitan New Orleans. Several of these began right at the start, in the aftermath of Hurricane Betsy (of 1965) and the flooding caused in New Orleans by that event.

The decision was made, in the wake of Hurricane Betsy, to raise the level of flood protection throughout the region. The three drainage canals (the 17th Street, Orleans and London Avenue canals) were problematic in this regard, however, due to limited right-of-way adjacent to the existing embankments lining these canals.

As described in Chapter 3, the USACE argued (correctly as it turned out) that the low-rise levees lining the canals were not adequately stable as to sustain a significant raising, and

that the preferred solution would be to place storm gates at the north ends of the three canals which could be closed in the event of a Hurricane to prevent storm surge rise within the canals.

This proposal was bitterly contested by the local Water and Sewerage Board, who were concerned that the gates would be under the control of the local Levee Board, and that they might therefore be impeded in their efforts to operate the massive pumps to "unwater" the city from heavy rainfall (which is also a source of frequent, though non-catastrophic, flooding problems in New Orleans.)

The USACE was, in the end, not allowed to install the floodgates, which would have been the technically superior solution, largely as a result of the internecine distrust between the local Levee Board and the local Water and Sewerage Board.  In response, the USACE attempted to "exempt" the three canals from the otherwise contiguous levee system around the main metropolitan Orleans East Bank (downtown) protected area.

As discussed in Chapter 3, lobbying by State and local interests next resulted in a Senate rider (inserted clause) on a bill that un-exempted the three canals and specifically required the USACE to raise the level of flood protection along these three canals.  This was the first of a number of causative errors that would prove catastrophic here.  The canals would remain open to hurricane-induced storm surges at the south end of Lake Pontchartrain; essentially "allowing the enemy (storm surges) right into the backyard" of metropolitan New Orleans.

A second problem now arose.  The existing levees were low, and they were relatively narrow as well.  Homes had been constructed throughout the area, and the private property at the inboard (protected side) toes of these existing levees left inadequate space for construction of wider levees.  Accordingly, a decision was made to raise the level of flood protection by adding reinforced concrete floodwalls to the crests of the existing earthen embankments.

This, in effect, represented a decision to work within the narrow space available rather than purchasing additional property to allow construction of wider, and more stable, levee sections.  That was a second issue that contributed significantly to the catastrophic failures that occurred along the drainage canals.

It also resulted in difficulties with regard to both maintenance and inspection, as private homes at the toes of the levees often had property lines interfering with inspection of conditions at the inboard (protected side) toes.  In some locations, private property (mainly people's back yards) extended up the inboard slope faces of the levee embankments, and trees grown on these faces and at the inboard toes of the levees represented an obvious hazard both with regard to seepage erosion and also with regard to the possibility that trees would blow over (in water softened ground) during hurricanes.  This would leave large voids (the sizes of their root balls) at a very dangerous location (right at the inboard toes of the levees) at a time when storm surges in the canals were simultaneously rendering seepage erosion, and inboard slope stability, very tenuous.  During Hurricane Katrina a number of large trees did indeed topple, leaving dangerous voids at the toes and on the inboard slope faces of the levees along these canals.

In addition, along some sections private homeowners excavated and constructed in-ground swimming pools in close proximity to the inboard toes of these levees, effectively partially undermining them and rendering them less stable. This, too, should have been prevented.

The abutting private properties also led to inspection difficulties, as inspection of conditions immediately inboard of the levee toes is of great importance and private property rights largely prevented inspectors from walking these critical areas. Reports of seepage and wetness at some locations were made to the local Water and Sewerage Board (who were responsible for "unwatering", and were thus the group to whom such reports were made), but this investigation team has not been able to determine whether these were then passed along to the local Levee Board or to the USACE, to whom they might have represented unanticipated seepage problems warranting further investigation. Certainly the USACE has stated that they were unaware of such reports.

Lack of appropriate control of conditions at the inboard levees toes, and lack of suitable access for inspection and maintenance at the inboard toes, represented additional inadvisable sources of increased hazard.

8.3.3 The E-99 Sheetpile Wall Test Section:

In order to effect the raising of the flood protection levels within the narrow right-of-way available, the decision was made to erect concrete floodwalls at the crests of the existing earthen levee embankments. To facilitate the analysis and design of these challenging sections (on narrowly confined rights-of-way, and on very difficult foundation soil conditions) the New Orleans District of the USACE made an admirable decision to construct a test section and perform a full-scale test of this type of design.

Very similar (difficult, swampy, riverine delta) soil conditions exist nearby in the Atchafalaya river basin (approximately 80 miles to the west), and a site in this area was selected. A sheetpile "I-wall" and contiguous sheetpile curtain, was constructed on the inboard side stability berm of a federal levee in the Atchafalaya basin in a configuration that was very similar to the eventual installation of similar sheetpile-supported concrete floodwalls at the crests of the low-rise levees along the drainage canals in New Orleans (Foott and Ladd, 1977). The swampy foundations soils at this test site were remarkably similar to those at the north end of the 17th Street canal in New Orleans. A sheetpile cofferdam was constructed adjacent to the full-scale test section, and was filled with water to load the test section's I-wall and its supporting sheetpile curtain.

Two important lessons were learned from this test, and from subsequent analyses (e.g.: Jackson, 1988; Foott and Ladd, 1977; Oner, Dawkins and Mosher, 1997; Oner, Dawkins, Mosher and Hallal, 1997). One was that a gap opened between the sheetpile curtain and the outboard side earthen embankment during loading (by raising of the outboard side water level), and then water penetrated into this gap. This effectively cut the supporting embankment in half, and the water pressures applied against the lower sheetpile sections helped to push the inboard half of the embankment, as well as the I-wall and its supporting sheetpile curtain, towards the inboard (protected) side. This was a failure mechanism that had

not traditionally been considered in the local design of floodwall systems in the New Orleans District. The other lesson was the shape of the failure surface, which was more curved than the deeply plunging three-wedge "planar" failure surfaces considered in the "method of planes" used for analysis of these types of sections in the New Orleans District of the USACE.

Unfortunately, despite publication of these important findings in both internal USACE reports as well as in electronic professional journals (e.g.: Oner, Dawkins and Mosher, 1997; Oner, Dawkins, Mosher and Hallal, 1997), and despite the fact that these studies had been undertaken to facilitate the design of the challenging floodwalls along the drainage canals and the IHNC, neither of these lessons were then incorporated in the subsequent design of the floodwalls along the 17th Street, Orleans and London Avenue drainage canals, nor along the IHNC.

8.3.4   Field Tests for Assessment of Underseepage Risk at the Canals

The USACE also commissioned a pair of local permeability tests at two selected sections along the drainage canals to assess the rate at which changes in water levels within the canals were transmitted through the soils beneath the embankments. The intent here was to assess whether or not it would be necessary to drive the sheetpile curtains deep enough to "cut off" such underseepage flows for the transient loading conditions represented by a storm surge that would raise and then lower the canal water levels within a matter of hours.

The two sections selected were instrumented with piezometers at a series of stations orthogonal to the canals so that the water levels (phreatic surface) could be observed. The canal sections were then excavated to increase the cross-section available for pumping flows. It was assumed that this excavation and deepening would remove the sediment that "sealed" the canals, and would result in an increase in the observed phreatic surface. If little rapid rise was observed, then that would indicate that the increased hydraulic pressures of a transient storm surge would not propagate rapidly under the levees.

There were two critical flaws to this reasoning. One was the assumption that two such tests could suitably characterize the highly variable soil conditions along many miles of the three drainage canals (and also the IHNC). The other was that this testing program failed to note the alternate possibility that the canals were not well "sealed" at all; in which case simply excavating the canals to greater depth would result in no net change in the observed phreatic surface in the piezometers installed inboard at the test sections (the canal water levels would be unchanged by the excavation of the canal bases, and if "steady state" seepage conditions were already established based on full connectivity between the canals and the inboard toe areas then no net change in phreatic surfaces would be observed.)

When the canals were excavated, no significant change in inboard water levels was noted, and it was concluded that underseepage would not pose a significant risk for a short-lived (transient) storm surge. That would prove to be a very serious error, and would result in sheetpiles throughout the system (the three drainage canals and the IHNC as well) routinely being far too short to adequately cut off underseepage. Several major failures along the

drainage canals and the IHNC would result from underseepage during Hurricane Katrina, and the short sheetpiles continue to pose a risk to the remaining sections today.

8.3.5  Water Levels Within the Canals During Hurricane Katrina

Figure 8.16 shows the calculated peak storm surge heights along the southern shore of Lake Pontchartrain based on the most recently available IPET analyses (IPET Report No. 2: April, 2006).  These are in close agreement with similar analyses by Team Louisiana along the canal frontage (Kemp and Mashriqui, 2006).  As shown in this figure, the storm surge was estimated to be a bit higher at the west end of the "Canal District" than at the east.  The water elevations shown in Figure 8.16 are based on the NGVD 29 datum, and must be reduced by about 1 foot to be compatible with the approximate local Mean Sea Level datum used in this report.  With this adjustment, the projected peak water levels at the northern ends of the drainage canals are on the order of +10 to +11 feet (MSL) based on these hydrodynamic analyses.

Figure 8.17 shows locations at which relatively reliable high water marks near the mouth of the 17th Street Canal [IPET Report No. 2, 2006].  These high water locations were selected so as to be affected as little as possible by wave action, so that the water levels recorded would be the mean surge height (without wave action.)  Based on these data, the IPET study concluded that the maximum storm surge rise at the mouth of the 17th Street Canal was on the order of +11 feet (NAVD 88-2004.66 datum, which is approximately MSL).

Figure 8.18 shows a hydrograph of estimated water elevations vs. time within the 17th Street Canal, based on the hydrodynamic calculations performed by IPET and on observations of water levels at nearby sites [IPET Report No. 2; April, 2006].  This hydrograph peaks at an assumed height of approximately +11 feet, and it peaks fairly sharply between about 9:00 to 10:00 a.m.

Based on the watermark data, our own field observations, and observations and data provided by Team Louisiana (Kemp, Mashriqui and Van Heerden, 2006), our team feel that these are realistic estimates of the surge heights near the mouths of the three key drainage canals (the 17th Street, Orleans, and London Avenue canals), but that they likely slightly overestimate the water levels.  Our team has assumed a peak surge height of approximately +10 to +10.5 feet (MSL) at the mouth of the 17th Street Canal, and slightly lesser heights of on the order of +9.5 to +10 feet (MSL) at the mouths of the Orleans and London Avenue canals.

Accordingly, the hydrograph of Figure 8.18, but with a slight reduction of peak surge height (to approximately +10 to +10.5 feet, MSL in the 17th Street Canal, and +9.5 to +10 feet, MSL in the Orleans and London Avenue Canals) will be used for these current studies.

8.3.6  The Orleans Canal

As described previously in Chapter 3, the U.S. Army Corps of Engineers had lobbied and fought for many years to install floodgates to close off the three drainage canals (the 17th Street, Orleans, and London Avenue canals) during hurricanes so that storm surges would not push their way up into these canals.  That would have been a superior technical solution, but it was not allowed as there was internecine fighting between the local Levee Board (who are in charge of "protection"; including levees, walls and floodgates) and the local Water and Sewerage Board (who are in charge of "unwatering" by means of pumping for both rainfall and other flooding.)  The Water and Sewerage Board were concerned that the floodgates would not be under their control, and so their ability to pump out rainwater from rainstorms (also a cause of flooding in New Orleans) might be obstructed.

As a result of the two disparate local Boards being unable to resolve their differences in the interest of the greater Public good (and safety), the sides of all three drainage canals were instead lined with floodwalls topping the earthen levees along both sides.  This, in effect, opened many additional miles of narrow levees and floodwalls atop difficult (and often marshy) foundation soil conditions to storm surges; greatly increasing vulnerability by "allowing the enemy right into the backyard" of this protected area.

An extreme example of the dangers resulting from the poor interaction between the local Water and Sewerage Board and the local Levee Board occurred at the south end of the Orleans Canal.

At the south end of this canal, the main pumping plant crosses the end of the canal as a "T".  Levees and floodwalls provide storm surge protection to an elevation of approximately +13 feet (MSL) along essentially the full length of both sides of the canal, except at the southern end.

The pumping plant is a brick masonry building that was constructed in 1903, and it houses several of the large capacity Woods pumps of that same era.  When the water level within the canal rises three to four feet above normal, the operators report that water seeps through the wall of the building that fronts the canal.  It is clear that raising the water level significantly higher against the brick face of this old structure would induce water pressures that could collapse this wall.

The obvious solution would have been either: (1) for the Levee Board to construct a floodwall across the south end of the canal, joining to the levees and floodwalls lining the east and west banks of the canal, thus sealing the end of the canal and simultaneously protecting the ancient structure, or (2) for the Water and Sewerage Board to construct a stronger wall, to achieve the same two purposes.

Neither happened.

The Levee Board did not construct the wall to protect the property of the Water and Sewerage Board (and the safety of the Public by closing the base of the canal), and the Water and Sewerage Board did not assist the Levee Board by closing off the end of the canal (and

protecting their own building at the same time.)  Instead, an opening of approximately 200 feet in length was left "open" on the east side at the south end of the otherwise continuous levee and floodwall system lining the rest of this canal.  A concrete "spillway" section occupies this gap, to prevent erosion from further exacerbating the flows emanating from this hole in an otherwise continuous flood protection system.

Figure 8.19 is a view of the south end of the Orleans canal, showing the brick masonry pumping house, the levees and floodwalls on both sides of the canal, and the "gap" at the south end of the east bank (on the left side of this photo.)  Figure 8.20 shows this "gap" from the outboard side, with elevations of key features indicated.  Figure 8.21 shows an oblique view from rotation of three-dimensional LIDAR survey measurements (see Appendix A) of this same section.  All dimensions, and elevations, are captured by this LIDAR dataset to an accuracy of approximately ±0.1 feet (or less). The "spillway" section across the open gap has a crest elevation of approximately +6.8 feet (MSL), with a marginally lower "low spot" slightly to the north of the concrete "spillway" section at Elev. +6.5 feet (MSL).  The "gap" thus represents a long opening in the otherwise contiguous levees and floodwalls along many miles of both sides of this canal, and with a top elevation of approximately 6 feet below the top of the adjacent floodwalls topping the levees (permitting overflow at approximately Elev. +6.5 to +6.8 feet, MSL.)

As a result, while the storm surge along the southern shore of Lake Pontchartrain was raising the water levels within the full lengths of the adjacent 17th Street and London Avenue drainage canals, the rising storm surge (after reaching an elevation of approximately +6.5 feet, MSL) simply caused floodwaters to flow freely into the heart of New Orleans through this "gap" in the flood protection system.

The opening left at the south end of the Orleans canal resulted in lower water levels toward the south of the canal, but did little to alleviate the storm surge rise at the north end. The lack of failures along the north end of the canal must therefore have been the result of more favorable embankment and floodwall geometries and/or foundation soil properties than occurred along failed sections of the nearby London Avenue and 17th Street drainage canals.

On both sides of this canal there was considerably more right of way available, and the earthen levee embankments along the Orleans canal are considerably wider than those along either the 17th Street or London Avenue canals.  Figures 8.22 and 8.23 show views of these levee and floodwall sections along the east and west sides of the Orleans canal.   The embankment widths shown in these photos are in strong contrast to the narrower embankments (and crowding from adjacent homes and yards) along the London Avenue and 17th Street canals, as shown for example in Figures 8.109, and 8.24 and 8.30, respectively.

An additional factor working in favor of the stability of the Orleans Canal levees and floodwalls was the fact that the relationship between effective soil overburden stress and resulting soil shear strength in the soft clayey and organic marsh soils near the north end of the Orleans Canal embankments and floodwalls had been better treated during initial analysis and design than it was for 17th Street Canal embankments and floodwalls for similar soils.

### 8.3.7 The 17th Street Canal

*8.3.7.1 The Breach on the East Bank*

*(a) Introduction*

One of the most catastrophic failures during Hurricane Katrina was a breach near the north end of the 17th Street Canal, on the east side, just to the south of the Hammond Highway bridge. The location of this breach is shown in Figures 8.1 and 8.2.

Figure 8.24 (which is a repeat of Figure 2.14) shows the use of military helicopters to place oversized bags of gravel into this breach. This photo shows a number of important features at this breach site. In this photo, it can be clearly seen that the inboard side of the levee embankment (on the "protected" side of the floodwall) has translated laterally to the east (to the right in this photo, which is taken looking north.) The translated embankment section is relatively intact along the northern two-thirds of this breach, and appears to have swung much like a door about the northern end. Severe scour and damage to structures on the inboard ("protected") side at the south end of this feature support this mode; the major rush of inflow was concentrated near the southern end of this breach.

A number of borings and Cone Penetration Test (CPT) probes were performed at this site by the IPET investigation, by Team Louisiana, and by the ILIT investigation team. In addition, several borings had been performed earlier, as part of the initial design studies for the raising of the floodwalls at this location. Figure 8.25 is an approximate plan view of this site, showing the locations of the borings and CPT performed by our (ILIT) investigation. This plan view also shows the locations of a number of important features that help to shed light on the causes and mechanism of this failure. Figure 8.25(a) shows the approximate locations of borings and CPT probes performed at this site by the IPET investigation.

Figure 8.26 shows two views of a cross-section through the heart of this breach along Section A-A′ from Figure 8.25. Figure 8.26(a) shows this cross-section before the failure, and Figure 8.26(b) shows this same section after the failure. Nearby cultural features (including buildings, fences, and floodwall sections) as well as boring logs and CPT probes are projected to this cross section for graphical clarity.

As shown in Figures 8.25 and 8.26, the intact levee segment near the center of the breach moved laterally approximately 49 feet. To the inboard side ("protected" side) of the displaced levee embankment sections, three sets of exiting toe overthrust features were mapped, as also shown in these figures.

As shown in Figure 8.26(b), the breach was the result of a translational failure of the inboard section of the embankment, pushed laterally by the water pressures exerted by the storm surge in the canal acting on the outboard face of the floodwall and sheetpile curtain. Figure 8.27 illustrates the sequence of movements associated with this failure, again for the cross-section through Section A- A′. As discussed in the text sections that follow, the rising waters in the canal pushed laterally against the floodwall and eventually (progressively) opened a gap between the floodwall and the outboard section of the levee embankment, as

illustrated in Figure 8.27(b).  Water then entered this gap, and increased the lateral push against the sheetpile curtain and floodwall.  A shear failure then occurred in the foundation soils beneath the embankment, and the embankment section along with the sheetpile curtain/floodwall slid inboard, pushed laterally by the storm surge as illustrated in Figures 8.27(c) and (d).

Figure 8.28 is an oblique aerial view of this breach section, showing tops of the I-wall sections that "pushed" the inboard section of the earthen embankment (driven by water pressures on their outboard sides), and then toppled backwards towards the canal as the translating levee embankment section finally came to rest and as water pressures equilibrated when the neighborhood filled with water and the storm surge eventually subsided.  It also shows two sections of floodwall at the northern end of the failure (the near end in this photo) toppled forward (toward the "protected" side) by the inrushing floodwaters at the north end of this breach.

Figure 8.29 shows the tops of the I-wall sections at the very southern end of the breach, which were also left "toppled forward" (towards the inboard, or "protected" side) by the inrushing floodwaters passing through the breach opening.

Figure 8.30 shows a collapsed metal shed, with a corrugated roof, that was pushed against the side of the home at 6914 Belaire Drive by "plowing" at the toe of the laterally translating earthen embankment section, as is also shown in Figures 8.26 and 8.27.

Figure 8.31 shows a foundation slab at the toe of the failed section, immediately to the south of the home at 6914 Belaire Drive.  The final exiting toe thrust feature rises just at the near end of this slab, which was partially laterally displaced despite being supported by piles, as shown previously in Figures 8.26 and 8.27.  Scour caused by the floodwaters also left an erosional depression beneath and behind this slab, resulting in the "pond" shown in the background of Figure 8.31.  Also clearly visible in this photo are blocks of peat that were scoured from the foundation strata by the inrushing floodwaters.

Figure 8.32 shows a piece of one of the exiting toe thrusts (Toe Thrust #1, from Figure 8.26(b)) at a location between the slab of Figure 8.31 and the home and collapsed shed of Figure 8.30.  Figures 8.33 and 8.34 show two views of the other two toe thrust features which occur farther to the inboard (protected) side of the failure (Toe Thrusts #2 and #3, from Figure 8.26(b)).

The general failure mode involved water pushing on the canal side of the floodwall, resulting in the opening of a gap between the sheetpile curtain/floodwall and the outboard side of the earthen embankment.  Water then flowed into this gap, and the resulting water pressures pushed the inboard half of the earthen embankment (and the sheetpile curtain/floodwall) sideways.  This "cutting the embankment in half, opening a gap, filling it with water, and then pushing the inboard half of the embankment (along with the sheetpile curtain/floodwall)" mode of failure had not been considered or analyzed during the original design of the floodwalls along the drainage canals.  It was, however, not an unexpected mode of failure as it had been clearly evinced in the E-99 full-scale test section experiment near

Morgan City in the nearby Atchafalaya basin in 1977 (as described previously in Section 8.3.3.)

In the second IPET interim report (IPET; April 1, 2006) this mode was selected as the likely mode of failure based on stability analyses and centrifuge model testing performed as part of the IPET studies. Our own investigation team had favored this failure mode from the time of the initial post-event field observations in September and October of 2005. It was apparent that this mode had been in operation at this site based on the field observations made at that time. In addition, the same mode had also been in operation, and was "frozen" in place as a partially developed or incipient failure, on the east bank near the north end of the London Avenue drainage canal (see Section 8.3.8), and the field evidence also clearly indicated that this same "half embankment with a water-filled crack pushing laterally" had been the mode of failure at the large breach on the west bank near the north end of the London Avenue Canal (see Section 8.3.8). Also, we had read the E-99 full-scale test section reports, and were aware of the likelihood of this mechanism.

The deeper question is: What was the underlying mechanism that produced the observed failure within the foundation soils beneath the embankment?

Here the findings of our investigation differ significantly from those of the second IPET interim report, and those of the IPET Draft Final Report of June 1, 2006 as well. The IPET report's finding was that the failure was the result of a largely rotational failure, shearing mainly through the soft gray clays occurring beneath the organic, marshy layers that support the base of the embankment. Our own studies found that there were two mechanisms that were each capable of producing the failure and breach, and that the margins of safety associated with each of these did not differ by large amounts. The actual failure that occurred followed the weakest and least stable of these two mechanisms, and was a largely translational failure along a relative thin but laterally continuous stratum of weak and highly sensitive organic clayey silt silty clay embedded within the "marsh" layer as shown in the cross-sections of Figures 8.26 and 8.27.

An examination of the various soil units, the various potential failure modes, and analyses and explanation of the findings as to the nature of the actual failure mechanism, follow.

*(b) Geotechnical Analyses of the Failure*

As shown previously in Figures 4.14 through 4.17, the north end of the 17th Street Canal is situated atop largely paludal marsh clays and organic marsh deposits, in an area long riven with erosional drainage features associated with the Lake Pontchartrain basin.

Figures 8.35(a) and (b) present two additional cross-sections showing conditions prior to the failure along Sections B-B and C-C in Figure 8.25. As shown, the foundation soil conditions differed somewhat, but were largely similar along the width of the breach (failure) section.

As shown in Figures 8.26, 8.27 and 8.35, the levee embankment was comprised of two distinct soil fill zones. The upper embankment was a moderately compacted imported brown

clay fill, placed in the early 1970's. This fill had raised the pre-existing levee, which was comprised largely of locally available gray clay fill from the local swamp deposits. Placement of the original layer of gray clay fill dated back to the previous century, and these earlier "historic" fills had consisted of simply piling up locally available gray paludal marsh clays without compaction.

These two embankment fill zones were underlain by a layer of "marsh" deposits. This was actually a relatively complex and layered zone, consisting of strata of peaty organics interbedded with soft, sensitive organic clayey silts and plastic clays with very high water contents, and of varying organic and fibrous organic contents. Cypress tree root systems were common in this mixed "marsh" layer, apparently representing two distinct "stands" or levels of cypress marsh as shown in Figure 8.26(a), and these root systems often interfered with drilling and sampling.

The "marsh" layer was underlain by a transitional layer of progressively less organic soils, with fewer fibrous and peaty inclusions and an increasing fraction of soft, plastic gray clays. Beneath this transitional "intermixing" zone, the foundation consisted of soft, weak gray paludal marsh clays (CH) of high natural water content (natural water contents of $w_o \approx$ 85 to 95 %.) These marsh clays were both weak and "sensitive". Sensitivities (the ratio of peak undrained shear strength vs. residual undrained shear strength) were typically on the order of 2 to 6.

These soft gray clays were underlain by fine sands. These sands are adequately strong and competent relative to the softer (and weaker) overlying soil units that they were not involved in the failure. Similarly, although these sands were relatively pervious, this was not a significant issue at this site as they occurred at sufficient depth that they were effectively "capped" by the relatively thick low permeability layer of soft gray clays.

The plan views of Figures 8.25 and 8.25(a) show the locations of borings and CPT probes performed for the original design studies, as part of the IPET investigation, and as part of our own studies. The pre-design and IPET borings generally used 5-inch diameter thin-walled fixed-piston samplers to obtain samples. Most shear strength data reported from both efforts that are currently available to our investigation team are the result of unconsolidated-undrained triaxial tests (UUTX) performed on these samples, although some samples were tested in unconfined compression ($q_{unc}$). A limited number of in-situ vane shear test results (VST) were also reported for some sites.

Our own field investigations involved primarily the use of 3-inch diameter thin-walled, fixed-piston Shelby tube samples, and laboratory UUTX tests were performed on many of these samples. The Shelby tubes were "modified" prior to use to eliminate the "roll-in" at the cutting end that produces overcutting and then allows lateral expansion of the sample during sample entry into the tubes. It has been shown (e.g. Lunne and Lacasse, 1994) that the use of this type of constant tube diameter, sharp-edged, thin-walled fixed piston sampling with good technique can greatly reduce the disturbance otherwise associated with sampling of the soft, sensitive clayey soils of principal concern at this site.

Some of the borings were sampled continuously and the samples were extruded onsite to examine the stratigraphy and geology in detail. Some of the borings were not sampled at all; instead in-situ vane shear tests were performed at selected depths within these boreholes. Some of the samples were retrieved and brought to the laboratory for testing. Finally, some of the samples were subjected to rather unusual laboratory vane shear testing, and this will be discussed in detail a bit later in this section.

The boring logs for all borings performed as part of these current studies are presented in Appendix B. Laboratory test data, including laboratory vane shear strength test data, are presented in Appendix D. In-situ vane shear strength test data for tests performed within the borings is summarized in Appendix D, and on the boring logs in Appendix B.

In addition to the borings, in-situ and laboratory vane shear and laboratory testing, both the IPET investigation and our own team performed a number of piezocone Cone Penetration Test (CPTU) probes. Logs of the CPTU probes performed as part of our studies are presented in Appendix C.

Figure 8.36 shows a summary of the shear strength test data available to our investigation team for the embankment fill at and near the 17th Street drainage canal breach site. Shear strength of the embankment fill is not of significant direct importance for the conventional overall stability analyses that will follow, as the embankment fill "went for the ride" and was carried along on shear surfaces that sheared through lower, weaker foundation soil units. The strength data from Figure 8.36 was of some importance, however, in selection of properties to model the nonlinear stiffness of these embankment soils in finite element modeling of this levee and floodwall section. The heavy line shown in Figure 8.34 is the shear strength modeled through the embankment fill along the embankment centerline (directly beneath the levee crest) in these studies. The strength lines representing CPT data in Figure 8.36 are based on interpretation of the CPT data using a cone tip factor of $N_k = 12$ in the upper, brown clay fill and $N_k = 12$ in the lower, gray clay fill as well.

Figure 8.37 shows an example of the available CPTU data beneath the central portion of the levee embankment, for "Marsh", "Intermixing Zone" and "Gray Clay" strata shown in the cross-sections of Figures 8.27 and 8.35. Figure 8.38 shows a similar example of CPTU data, but this time for locations outboard of the toe of the levee embankment. As expected, shear strengths are notably lower here, due to lesser effective vertical stresses resulting from lesser overburden loads.

As shown in Figures 8.37 through 8.40, there are distinct differences between the "gray clay" strata and the "marsh" strata, and these will therefore be treated separately.

Beginning with the deeper unit, the gray clays, it must be observed that our interpretation differs somewhat from that presented in the second IPET interim report. The IPET report assumed that these clays were normally consolidated as they had been protected from desiccation by the overlying swamp deposits. Our interpretation differs, as we found three separate "stands" in the evolution of this layer of soft gray clays and the overlying marsh deposits, with three corollary desiccation-induced overconsolidation profiles associated with these.

The shear strength data based on UUTX tests from the initial design studies, as well as the IPET studies, showed considerable scatter and this was considered likely to reflect the issues associated with sampling disturbance for these soft, sensitive soils. The CPTU data from both the IPET and our own (ILIT) studies, on the other hand, appeared far more consistent within this stratum (as shown in Figures 8.37 and 8.38.) Figure 8.39 shows a typical plot of the pore pressure parameter $B_q$ from a CPTU performed through the crest of the levee ($B_q = \Delta u/(q_t- \sigma_{vo})$), highlighting the value of $B_q$ where the clay appears to be normally consolidated. Figure 8.40 then shows these values of transposed onto the relationships of Lunne et al. (1985) and Karlsrud et al. (1996) to determine appropriate values of the cone tip factor $N_{kt}$ for conversion of CPT tip resistance to undrained shear strength. As shown in this Figure, the value determined for this stratum was approximately $N_{kt} = 12$.

Figure 8.41 then shows the values of $[Su/P]_{OC}/[ Su/P]_{NC}$ vs. OCR determined for minerologically similar Mississippi River clays of similar depositional history in Atchafalaya as determined by Foott & Ladd (1977). The SHANSEP exponent for these similar clays was found to be $\lambda = 0.75$, a relatively normal value for clays of this plasticity and character.

Using a value of $N_{kt} = 12$, and $\lambda = 0.75$, the CPTU data within the soft gray clay foundation stratum was then processed to develop plots of Su/P vs. depth, and OCR vs. depth, for CPT beneath the full height of the levee (Figure 8.42) and inboard of the levee toe where effective overburden stresses were significantly lower (Figure 8.43).

As shown in Figures 8.42 and 8.43, the results show a pleasingly consistent pattern. The clay inboard of the levee toe clearly evinces three "stands" of the marsh development, with three OCR profiles associated with surficial desiccation. The clays beneath the levee embankment loads show just the residual tips of these same three OCR "crusts", as the clays have been further loaded by the placement of the overlying embankment fill and so are more nearly normally consolidated over most of the stratum. Near the base of this stratum, the clays inboard of the levee toe show a minor degree of overconsolidation associated with secondary compression (as verified by subsequent consolidation analyses using the program PLAXIS which successfully modeled the evolution of this site and accurately reproduced this basal OCR profile).

In establishing the plots shown in Figures 8.42 and 8.43, the value of $(S_u/\sigma_v')_{NC} = 0.31$ was found to best fit the data. This is a fairly normal value for clays of this plasticity, and it was exactly the same value found by Foott & Ladd (1977) for the minerologically similar clays at Atchafalaya.

The green lines in Figure 8.44 shows the resulting profiles of $S_u$ vs depth within the soft gray clay foundation stratum (a) beneath the crest of the levee, and (b) inboard of the levee toe, based on $S_u/P = 0.31$ and $\lambda = 0.75$. Also plotted on this figure are the CPTU tip resistance data converted to Su based on $N_{kt} = 12$, and the results of UUTX tests on "undisturbed" ILIT samples, lab vane tests (LVT) on ILIT samples and in situ field vane shear strength tests (FVT). The overall "fit" to all the data is generally very good.

Figure 8.45 then repeats Figure 8.44, but adds the rest of the available IPET and pre-Katrina strength data (including UUTX, FVST and CPT data.) For the "toe" region some

adjustment of this data is necessary in viewing this figure, as some of the IPET data is located such that some portion of the embankment overburden stresses slightly increase the shear strengths for some of the "toe" data; as a result these data (including the CPT) tend to drift to the right (to the stronger side) a bit, especially at depth.  Overall, these additional data also well support the relationships developed.

Figure 8.46 then shows the selected value of $(S_u/P)_{NC} = 0.31$ for UUTX, field vane and lab vane tests plotted vs. data for other clays (Ladd, 2003). It also shows the value of $(S_u/P)_{NC}$ for direct simple shear (DSS) tests on the minerologically similar Atchafalaya clays by Foott and Ladd (1973).  Both sets of data fit well with the overall background relationship implied for other clays.  This suggests that an appropriate scaling factor for the $S_u$ values for conversion from "triaxial" conditions to the DSS stress path conditions that will better represent the stability and deformation analyses for this embankment and floodwall system is approximately 0.80 to 0.84, as shown in Figure 8.46.  A value of $S_{u,dss} = 0.82 \times S_{u,tx}$ was used for this soft gray clay in these studies.

As an additional check, the value of $(S_u/P)_{NC} = 0.31$ (for triaxial and in situ vane shear) determined for these clays was also checked against other clays (Figure 8.47.)

Figure 8.48 shows similar treatment of the derivation of the CPT cone factor $N_{kt}$ based on $B_q$, this time for the "marsh" deposits overlying the soft gray foundation clays. Based on a value of $B_q = 0.25$ to $0.40$, a value of $N_{kt} = 16$ was determined and used to process the CPT data for this unit.

A second approach was also used to also develop profiles of $S_u/P$ vs depth and OCR vs. depth for these marsh deposits, as shown in Figure 8.49.  The relationship of Mayne and Mitchell (1978) was used, in conjunction with the available UUTX, LVST and FVST data to iteratively develop relationships for Su/p vs. depth and OCR vs. depth, as a function of Plasticity Index (PI, %) over the range PI $\approx$ 55% to 140%, which encompasses the range observed in this complex soil unit.  The resulting relationships confirm the classic desiccated OCR crust profile shown previously in Figure 8.41 for this "marsh" deposit.

Figure 8.50 then shows the resulting interpretation, based on all available data, of strength vs. depth within this complex marsh unit for conditions (a) beneath the overburden of the central embankment, and (b) inboard of the toe of the levee.  The green lines in this figure represent the final interpreted soil shear strength profiles at these two indicative locations.  As with the soft clays, these strengths were, finally, further slightly reduced by multiplying them by a factor of 0.82 to develop the DSS-type strengths needed for the stability analyses performed in these studies.

The red zone near the center of the "marsh" deposits shown in Figure 8.50 is a thin layer of soft, highly sensitive organic silty clay that varies slightly in depth across the profile (and so is thinner than it appears in this figure.)  This was the material in which the main lateral translational shear failure occurred at this site.

Figure 8.52 shows a sample of this thin layer at one of three boreholes within the slide region (near to the large, relatively intact displaced levee block) that captured a sheared

sample of this layer. The material is completely remolded and sheared to a fully residual condition with negligible remaining strength, and uni-directional extension and tearing of organic fibers across the sheared zone clearly indicate the shear failure within this sample.

This layer is typically only one to several inches in thickness, but was found to be laterally continuous across essentially the full site (as well as at the distressed section on the opposite, west side of the canal.) It is exceedingly difficult to spot, and to sample, because it is closely overlain (and even partially mixed with) a layer of leaves and twigs and bark that is typically also one to several inches in thickness, as illustrated on the auger stem in Figure 8.51. The very dark, shiny material also coating the auger stem in this photo is the sensitive organic silty clay and indicates that we have just drilled through the layer in question (and so now have to move our hole laterally a few feet and re-drill to attempt to sample it.)

This layer of sensitive organic silty clay is the result of a previous major storm that churned up organics and sediments, mixed them with the locally prevalent clays, and also greatly (temporarily) increased the salinity of the water so that the ensuing deposit is unusually heavily flocculated. The result is a material of low strength and extremely high sensitivity (sensitivities of between about 10 and 20+.)

The same storm was accompanied by winds that knocked down leaves and twigs and bark (and other organic detritus), accounting for the closely overlying layer of organic impediments that "mask" this thin layer.

Figure 8.53 shows a plan view of the site, highlighting with red the 10 locations at which this layer was positively identified. It was not always possible to positively identify this thin layer in CPT, as the strength of this layer is not much less than that of the closely overlying and underlying soils; it is the combination of low strength and high sensitivity that made this thin layer so dangerous. "Thin layer" effects also made spotting this layer in CPT (based on tip resistance) difficult. The best initial "marker" or signature of the presence of this layer was found to be a positive spike in friction ratio; as the sleeve continued to drag through the overlying and underlying deposits but the tip resistance dipped a bit.

Figure 8.54 shows a photo of an "undisturbed" sample of this sensitive organic silty clay. The local clays have a gray, peanut butter-like appearance and consistency. They are not highly shiny, but rather semi-glossy, and their stiffness and texture are not unlike peanut butter. The sensitive organic clay, on the other hand, is dark and has a very shiny and translucent appearance; much like "jelly", as shown in Figure 8.54. In Figure 8.54, hints of the organic detritus that closely overlies and masks access to this thin layer can also be seen.

Two approaches were taken to attempt to characterize the strength (and stress-deformation) behavior of this material. At any location, the precise depth of this layer was first determined by drilling to encounter it. One approach was then to move the drill rig laterally several feet and to re-drill to within approximately one foot of this layer. A 3-foot long Shelby tube, 3-inches in diameter (and modified to eliminate the turn-in that produces overcutting at the mouth) was then used, with a fixed piston system, to drive the tube approximately two feet past the target layer so that more competent underlying soils would "plug" the bottom of the tube and permit careful withdrawal of a sample. Otherwise, the