samples remoulded upon attempted withdrawal and slopped out of the base of the tube making sample recovery nearly impossible.

The samples thus obtained were then taken to the lab at the University of California at Berkeley, where they were subjected to an unusual process, as illustrated in Figure 8.55. The tubes were cut off in 2-inch increments, and a small spoon was used to carefully dig ahead into the remaining tube. When the tell-tale organic detritus was encountered digging stopped and the organic material was hand-plucked form the tube to daylight the underlying sensitive layer. A lab vane shear test was then performed.

The second method used to evaluate the strength of this material also began by pre-locating the precise depth of this layer, usually by sacrificially "oversampling" it (to plug the base of the tube to foment retrieval) and then extruding the sample to determine the precise location of the layer. A second, adjacent hole was then carefully hand augered, and an in situ vane shear test was performed using a shallow-bladed vane. Insertion disturbance, and obstruction by unremoved organic detritus (mixed in the top of the layer) sometimes defeated this effort, often making multiple attempts necessary. Unacceptable insertion disturbance was apparent when the characteristically brittle peak to residual transition was absent and the material exhibited only residual strength.

Figure 8.56 shows typical stress-displacement plots for tests on the thin layer of highly sensitive organic silty clay, and on the local deposits of sensitive gray clay. As shown in Figure 8.56(b), which shows normalized behavior in the form of shear strength divided by maximum shear strength on the vertical axis, the sensitive organic clay was more highly brittle, failed at lower displacement, and exhibited even more pronounced sensitivity and rapid post-peak strength degradation. It was the combination of low strength, and this very brittle sensitivity, that caused this material to "capture" the failure surface at this site.

Finite element analyses were performed for this levee and floodwall section using the program PLAXIS. Figure 8.57 shows the principal parameters and the mesh used for these analyses. The gray foundation clays (CH) and the "marsh layer" were modeled using the "soft soil" effective stress model within PLAXIS, and the soil parameters used were fitted to the values of $S_u/p$ vs. OCR as described previously to match the evaluated strengths of these units and their distribution.

It was necessary to establish the stress state at the end of incremental construction and consolidation of the embankment and foundation. Initial overconsolidation profiles due to desiccation and secondary compression were input, and embankment construction was modeled in two stages (the "historic" fill, and the more recent engineered top fill), and both the OCR vs. depth and the settlement pattern (the bowl shaped pattern at the base of the oldest fill) were well matched to the observed field conditions. Figure 8.58 shows the settlements calculated at the end of initial construction and consolidation.

The front lip of the embankment was then "excavated" and the floodwall installed (as with the actual field case), and displacements were re-zeroed to prepare for the remaining analyses to follow.

Water levels within the canal were incrementally raised, and within a range of stiffnesses considered reasonable it was found that initiation of "gapping" between the outboard toe of the floodwall and the outboard embankment section typically initiated at a surge elevation of between about 7.5 to 8 feet, as illustrated in Figure 8.59. This Figure shows normalized shear strain contours, with the red color indicating shear strains equal to or greater than the shear strain to "peak" shear strength (and thus localized failure.) As shown in this figure, with a water elevation of +8 feet (MSL) gapping has opened partially down the front face of the sheetpile curtain (on the outboard, or water side), and the thin, sensitive organic silty clay layer has already sheared to failure along a short segment inboard of the crest of the levee.

If one looks <u>very</u> carefully at Figure 8.59, a second "lighter" area can be seen beneath this shear zone, representing the beginning of shear deformations along a more "rotational" shear surface passing through the deeper soft gray foundation clays (CH). A dashed line has been added to indicate this surface. This deeper, and more rotational failure surface has a calculated factor of Safety only slightly higher than that calculated for the upper sensitive organic silty clay layer, and this deeper surface represents the failure mechanism favored by the IPET studies reported to date.

As the analysis began to calculate the progressive development of tensile effective stresses between the front of the sheetpiles and the soil, the mesh was revised to model the development of a "gap" between these, and the intrusion of water into the gap as well. Once this "gapping" began, it then developed rapidly. Figure 8.60 shows the situation with an additional foot of storm surge rise to Elev. + 9 feet (MSL) based on our best estimates of the soil parameters. As shown in this figure, the gap has now extended nearly to the base of the sheetpiles. Further extension of the gap is temporarily held up by the malleability of the marsh soils, but further gapping does not provide significant additional lateral water pressures against the front of the sheetpile curtain because the lateral permeability of the "marsh" deposits is relatively high. At this stage, the shear failure along the thin layer of sensitive organic silty clay is well developed, and embankment movements are now significant. This figure also shows quite clearly the deeper, more rotational failure surface that represents the second least stable mechanism at this site (the mechanism favored to date by the IPET studies.)

Figure 8.61 shows calculated displacements for a surge height of 8.5 feet, with displacements exaggerated times two for clarity. Initially, the floodwall tilts slightly forward as it compresses the soils a bit. As sliding then develops, the floodwall base begins to move along with the displacing embankment and the whole moving mass (inboard embankment section, floodwall and sheetpile curtain) displace laterally together, as shown previously in Figure 8.27.

Figure 8.62 shows the Factors of Safety calculated (by c-Ø reduction) using PLAXIS for a variety of water levels in the canal. Three cases are presented: (1) failure dominated by the thin layer of sensitive organic silty clay, but without gapping between the sheetpile curtain and the outboard side soils, (2) a more rotational failure through the deeper soft gray foundation clays, again without gapping, and (3) failure dominated largely by the upper

sensitive organic silty clay layer, but this time with a water-filled gap on the outboard side of the sheetpile curtain.

As shown in this figure, the Factors of Safety for the upper lateral shear failure, and the deeper more rotational failure, are not very different. The heavy red line shows the best-estimated path to failure at this site. Based on these analyses, it appears that gapping would have developed at a surge height of between about 7.5 to 9 feet (MSL), and the intrusion of water into this gap would have increased the lateral forces and rapidly driven the section to instability.

Figure 8.63 shows the cross-section and principal soil properties used to perform more classical limit equilibrium analyses (using Spencer's Method, cross-checked against Morgenstern's and Janbu's Methods) using the program SLOPE/W.

Figure 8.65 shows the most critical failure mode for the "no gapping" case with a surge height to Elevation +6 feet (MSL). The PLAXIS analyses had shown very little likelihood of gapping at this water elevation, and this probably represents the best estimate of Factor of safety for this surge height. As shown, the calculated Factor of Safety is FS = 1.51 for this case, and as shown in Table 8.1, the associated probability of failure for this surge height is approximately $P_f = 0.01$. These calculated low probabilities of gapping and of failure are reassuring, as the water in the canal had previously reached an elevation of approximately +6 to +6.5 feet (MSL) during previous storm surges, and no gapping or failure had occurred in those events.

Figures 8.66 and 8.67 show the most critical failure surfaces for a surge to Elev. +9.5 feet (MSL) for (a) a shallow translational failure dominated by sensitive organic silty clay layer, and (b) a deeper, more rotational failure through the soft gray foundation clays. In both analyses, a water-filled gap was modeled at the outboard side of the sheetpile curtain. This water elevation is approximately the maximum elevation achieved (maximum surge at this location is estimated by our team to be approximately Elev. +9.5 to +10 feet, MSL). The calculated Factors of safety are again similar for both modes, and the shallow lateral translation along the sensitive organic silty clay again provides the lower Factor of Safety.

Figure 8.68 shows calculated Factors of Safety for various water elevations (Spencer's Method) for the four cases of principal interest: (a, b) lateral translation along the sensitive organic silty clay layer, with and without a water-filled gap, and (c, d) deeper and more rotational failure, again with and without a water-filled gap. The solid red line again shows the best-estimated path to failure at this site, this time based on the suite of limit equilibrium analyses.

It is challenging to make an estimate of the probability of failure at any given canal water level, as there are numerous uncertainties involved, and some of these are cross-correlated. The principal uncertainties are those associated with shear strengths of the foundation soils, and also with the "representative" shear strength that can be mobilized at any given moment by the very sharply strain-softening soils (especially the highly sensitive, thin organic silty clay layer.) Additional significant uncertainties are those associated with the likelihood (and severity) of opening of the water-filled gap at the outboard side of the

floodwall and its supporting sheetpile curtain, and the unit weights of some of the soils. These were not all accurately reflected in these probabilistic estimates, and as a result the overall uncertainty is expected to have been somewhat underestimated.

One important set of variables are the shear strengths of the various soil units controlling each of the potential instability modes. Each of the conventional limit equilibrium analyses performed was performed using probabilistic variation of these shear strengths. The coefficient of variability in soil shear strengths was taken as log-normally distributed, and was estimated as approximately $COV \approx 30\%$ for the soft gray clays, and $COV \approx 40\%$ for the thin, sensitive organic silty clay layer. The resulting distributions of probable factor of safety are shown (approximately) graphically in Figure 8.68(a) for both the "un-gapped" case and the case of a water-filled gap at the outboard side of the sheetpile curtain. These are only approximate, as they do not precisely fit themselves to any single well-known distribution.

The next critical uncertainty is the probability of cracking. The probability of cracking cannot be calculated or evaluated in any closed-form manner, and so requires a judgmental estimate based on the preceding finite element analyses (and supported in part by the observed field behavior). It should be noted that the stiffnesses used in the PLAXIS analyses to estimate inception of cracking are a bit time dependent, so that a slower rising and falling storm surge would be a bit more deleterious here. The inception of cracking was not taken as the point at which cracking "occurred"; instead cracking was taken to be significant when the crack propagated more than halfway towards the base of the sheetpile curtain. Figure 8.68(b) shows the judgmentally derived estimates of probability of significant crack formation as a function of rising canal water elevation. The upper and lower bounds shown were inferred to represent approximately $\pm 3\varepsilon$ values.

Monte Carlo simulation was used to estimate the distribution of the factor of safety considering the analysis with and without a gap and the probability of a gap forming. The formulation is as follows:

$$P(FS) = P(FS_{NG}|NG)P(NG) + P(FS_G|G)P(G)$$

This equation reads; the distribution of the factor of safety is equal to the conditional distribution of the factor of safety for the levee with no gap multiplied by the probability of there being no gap, plus the conditional distribution of the factor of safety for the levee with gap multiplied by the probability of there being a gap. The conditional distribution of the factor of safety with or without a gap is based on the mean and standard deviation from stability calculations. For the probability of gapping, which can also be considered a transition function from no gap to gap conditions, a mean probability function and upper and lower bounds were estimated from Figure 8.68(b). The above equation is for any single canal water elevation.

All the distributions were treated as Gaussian based on observation of the data. The gap and no gap conditions were considered statistically independent scenarios. A Monte Carlo simulation was run for 10,000 samples. Typical simulation results are shown in Figure 8.68(c) for a single depth increment. The first plot is a histogram of the simulation results of the factor of safety for no gap conditions [$FS_{NG}|NG$], the second is for gap conditions

[FS$_G$|G], the third is the probability distribution of a gap (no gap) occurring [P(G) and P(NG)=(1-P(G))], and the fourth is the total distribution of the factor of safety [P(FS)].

Figure 8.68(a) showed the distributions of factor of safety for the gap and no-gap cases (separately) as a function of rising canal water levels. Figure 8.68(d) repeats this figure as a background, but adds the now calculated distributions of conjugate overall factor of safety as a function of rising canal water levels, showing how the conjugate distribution "transitions" from the un-gapped to the water-filled gap case. Based on these approximate simulations, the resulting probabilities of failure at any given canal water elevation are then as shown in Table 8.1.

As shown in Table 8.1, the probability of failure was found to be very low for surge heights of less than about Elev. + 7 feet (MSL), and they rise rather quickly as the surge elevation passes above about + 8.5 feet (MSL). Failure at the estimated actual maximum surge elevation of approximately + 9.5 to + 10 feet (MSL) is calculated to have had a likelihood, on the order of P$_f$ ≈ 0.8 to 0.9. Failure at the originally intended "design" surge height of Elev. + 12.5 feet (MSL) was essentially certain.

Finally, Figure 8.69 shows a comparison between the observed failure mode and the rotational mode determined by IPET. There have been a number of IPET representations (to date) of their failure mode, each varying slightly as to actual depth and dimensions, but all were semi-rotational failures through the soft gray clay stratum underlying the marsh deposits. The rotational surface shown in Figure 8.69 is a somewhat "average" representation of these various failure surfaces, from both the second interim report (IPET, April 1, 2006) and the more recent Draft Final Report (IPET, June 1, 2006.) The rotational IPET failure is superimposed, as carefully as possible, onto our own investigation's more detailed cross-section. The two modes are not wholly dissimilar, and both lead to low factors of Safety.

More detailed examination of the IPET mode, however, shows it to be problematic with regard to agreement with key field evidence. The rotational IPET mode would have left the chain link fence at the edge of the crest road (on the displaced intact levee block) rotated backwards, but as shown clearly in Figure 8.26 (and Figure 8.69(a)) this crest fence was essentially perfectly vertical at the end of the displacements. Massive rotation would have been necessary to produce the observed very large lateral displacement of the upper "intact crest" section of the levee (lateral displacement of up to 50 feet), and this would not have been feasible with the IPET failure mode. Also, the IPET rotational mode would have significantly back-rotated the floodwall; but the floodwall instead traveled the full lateral distance (50 feet) in contact with the displacing levee embankment section, and then toppled backwards as the water pressures began to equilibrate (as illustrated in the top of Figure 8.69, and in Figures 8.28 and 8.69(a). The IPET mode also fails to explain the large lateral extent of the mapped toe exit features, and the multiple toe thrust features, as shown in Figures 8.26, 8.27, and 8.32 through 8.34.

Most importantly, the shear failure along the thin, highly sensitive organic silty clay stratum was confirmed at several locations based on remoulding and also uni-directional extension and tearing of organic fibers; conclusive evidence as to the occurrence of massive uni-directional shear failure along this stratum within the marsh sequence.

The failure of the IPET investigation to discover the critical thin stratum of sensitive organic silty clay that was the principal culprit in the failure at this site represents an important lesson both for current geotechnical practice at large, and also for subsequent design studies for the levees and floodwalls of the new Orleans regional flood protection system. The IPET studies drove numerous geotechnical borings and CPT probes right through this stratum (see Figure 8.25(a)) but did not discover it. That was, in large part, because the crews performing the field borings and CPT were "separated" from those who had performed the initial IPET post-event forensic field studies, and both sub-teams were separated from the expert "engineering geology" team also working on the IPET studies. The analysis sub-team was a fourth, separate group. There were geological experts on the IPET team who could certainly have pointed out the possibility, and even likelihood of such a layer if they had been asked. Instead the four sub-teams performed their tasks largely separately, without adequate interchange of knowledge and findings.

Our own investigation team took a wholly different approach. We began by carefully assessing the visually observable surface forensic evidence at this site in the wake of the failure, and by back-tracking through the original (pre-Katrina) field and lab data for this site. We also studied the challenging geology of the region (including seminal publications by the USACE's geological experts.) Based on all of this, our site team (which included senior investigative team members right out on the drill rigs) went in search of an unusual layer, of high sensitivity, and considerable lateral extent, that would have been capable of producing a lateral translational stability failure with toe thrust features extending to unusually great distances inboard of the original levee toe. The suspected depth of this stratum, inboard of the levee toe, was fairly shallow; probably between several feet to as much as 10 feet at most. We encountered and identified the critical layer with our first boring, and then sampled and tracked it across the site in a total of 11 borings and CPT's.

Two important lessons here are: (1) the importance of fully integrating all phases of field investigation, laboratory testing, analysis and design (and the team members performing these), and (2) the importance of suitably involving expert engineering geologists in all phases of site investigation and site characterization, as well as the other project phases. These two things are, unfortunately, not always done in contemporary geotechnical practice, and they are also not the norm for many contemporary Corps design studies which tend to be relatively segmented (as were the IPET studies in this case.)

Overall, it can be concluded that there were two potentially critical failure modes at this site, but that the lateral translational failure along the sensitive organic silty clay layer within the "marsh" deposits was the weaker of the two, and that this was the mode of failure that actually occurred at this site.

*(c) Initial Section Design Studies*

The obvious next question to address is then how the original design studies failed to note this. The answer is a bit complex as a number of poor judgements and errors contributed to the mis-perception of the original "design" section as being adequately stable (and reliable)

for targeted design canal water elevations significantly higher than those that caused the actual failure (the design canal water level was Elev. +12 feet, MSL). The original design studies have been reviewed, and the following are significant errors and poor judgements during initial design that contributed to this failure:

1.   Figure 8.70 shows the longitudinal cross section along the segment of the east bank of the 17th Street Canal as developed for the original design studies. An early error in the design process was the use of borings that were too widely spaced to attempt to characterize challenging and complex foundation geology. The savings achieved by not performing more borings now appear miniscule relative to the cost of the catastrophe that has ensued. [It should also be noted, however, that even the borings that <u>were</u> performed appear to have been sufficient as to correctly predict the failure, if the resulting data had been suitably processed and then used in the ensuing analyses.]

2.   The longitudinal section of Figure 8.70 was prepared by the USACE, and was based on a number of assumptions; including the assumption the "marsh" deposits were typically flat-bottomed. The history of previous drainage channel erosion across this area would lead to the expectation of likely non-level transitions even for swamp bottoms, and Figure 8.71 shows our own team's re-interpretation of the original (sparse) longitudinal data to develop an alternative longitudinal subsurface soil profile. This difference in interpretation might be considered the second problem at this site during original design.

3.   The USACE then passed the design on to outsourced engineers, who developed the strength data and interpretations for analysis of stability of the intended levee and floodwall section. A major problem occurred here, as data from far too large a lateral distance was eventually transposed to the design analysis cross-section. In the vicinity of the actual failure, there are only 5 sample locations shown within the critical "marsh deposits" (in the 4 borings shown intersecting this unit.)

4.   Two of the sample locations shown within the "marsh" deposit of Figure 8.69 were non-recovered samples, and at approximately the same depth in nearly adjacent borings. <u>This is the location of the sensitive organic silty clay layer that actually caused this failure and breach.</u> Failure to note the importance of the non-recovery of testable samples, and in two nearly adjacent borings at essentially the same elevation, should have represented a red flag and an effort should have been made to further investigate this location.

5.   Figure 8.72 shows the stability calculations for the critical section nearest to the actual breach and failure. The limit equilibrium method used for these was the "Method of Planes", a three-wedge analysis with conservative side force assumptions. This method continues to be preferred by the New Orleans District of the USACE, but it is now a relatively archaic anachronism given the availability of more accurate methods and the availability of the simple computer programs necessary to run these. The method itself provides a slightly conservative answer so long as the most critical failure surface can be closely represented by the steeply plunging wedges at the front and back, and by the horizontal surface in between. In the original design analyses, layers were assumed to be laterally horizontal, so

this analysis was a good fit for the cross-sections analyzed. Unfortunately, the actual stratigraphy was <u>not</u> horizontally layered (see for example <u>any</u> of the cross-sections analyzed in these current studies), so this method was poorly suited to the finding of the failure mechanism that was actually most critical.

6. And the assumption of laterally horizontal layering was itself a major problem too. It was born of necessity, as no borings had been performed significantly off the embankment centerline alignment to permit development of full lateral cross-sections. Again, the minimal savings on exploration and testing costs here pale relative to the costs of the catastrophe that ensued. Stratigraphy is a vitally important issue, especially given the low strengths of many of the foundation soils. Looking at the cross-sections at the 17th Street canal breach site as analyzed in this current study, for example, one will note a subtle "bowl shaped" settlement pattern at the base of the embankment fill, and a corresponding bowl shape to the critical sensitive organic silty clay layer just beneath it. Without this "bowl shape", the original embankment would have been unstable during initial construction; it would have slid sideways on the sensitive layer if that layer had been horizontal. Instead the layer dipped in the center, so that the evolving embankment would have had to slide up a small slope (up a hill) to fail during construction. Minor changes in stratigraphy details can have a <u>major</u> impact on overall stability on these soft, weak soils. Use of "assumed" horizontal layers therefore missed a vitally important element of the problem.

7. Figure 8.73 shows the now well-circulated summary of strength data for stability analyses at this section. The data are based on UU triaxial tests and on vane shear tests. Scatter in the data is considerable, and is likely due in large part to sampling disturbance issues for these sensitive soils. Most samples were obtained from borings through the crests of the levees (the most accessible location) and so represent strength information for locations under full embankment overburden stresses. The solid lines in this figure show the strength interpretation used in the actual design analyses. This line represents an unconservative assessment of the data points presented, in both sides of the figure, even without allowance for the additional effects of overburden stress reduction away from the levee centerline. This interpretation is especially unconservative at elevations of between + 10 feet to − 10 feet (Cairo datum) in the figure at the right, and between -10 feet to -30 feet (NGVD datum) in the figure at the left. These both represent the same 20 foot range of critical elevations, which correspond approximately to Elev. -10 feet to -30 feet (MSL), <u>and this is the region in which strengths are important in the</u> <u>"Method of Planes" analysis performed for this location in the original design</u> <u>studies.</u> As shown in Figure 8.74, a majority of the available shear strength data is lower than the shear strength actually used for the stability analyses in this critical depth range; violating customary "Corps" procedures in this regard. (Corps procedures generally require that approximately 1/3 of the data fall below the strength used for analysis and design, and that 2/3 of the data be greater.) As shown in Figure 8.70, the resulting calculated Factor of Safety was found to be FS = 1.30….., barely enough to satisfy the design criteria which required a FS of at least 1.3 for the case of "transient" storm surge loading. It is very difficult to

justify the apparently unconservative strengths selected in this critical elevation range based on the data presented.

8. Figure 8.74 is a repeat of Figure 8.73, but with additional red and blue lines added to illustrate another major error made in determination of shear strengths for stability analyses. Shear strengths of soils are very strongly a function of effective overburden stress, so the samples obtained from beneath the overburden of the embankments would consistently overestimate the strengths under the levee toes, and in the "free field" out beyond the levee toes. This fundamental principle of soil mechanics was well-known in local practice in the New Orleans region at the time that these analyses were performed. However, it was ignored in the original design studies at this section, and the result was a massive additional increase in the unconservative error in the overall stability analyses. The blue lines on Figure 8.74 represent our own team's assessment (as described in preceding sections) of the shear strength vs. depth beneath the crest of the levee, and the red lines represent our assessment of the shear strength vs. depth inboard of the levee toe. The contrast is very significant, and the unconservatism involved in the mis-use of strengths from "beneath the full levee overburden" to model conditions beneath and inboard of the levee toe is readily apparent.

9. Despite having adroitly invested significant funds and effort in the E-99 test section (near Atchafalya; see Section 8.3.3) to perform a very well-designed full-scale field test on appropriate foundation soil conditions, the results of this field test of a model floodwall/sheetpile curtain in a levee embankment founded on weak marshy soils were not subsequently used (as had been intended.) The failure mechanism disclosed by this field test was the opening of a gap at the outboard side of the sheetpile curtain, the filling of this gap with water, and thus the resulting exertion of increased lateral water pressures against the sheetpile curtain. This mechanism, which proved to be the actual field failure mechanism at this site, was not among the suite of cases/mechanisms analyzed in the original design studies.

10. And the use of a design Factor of Safety of only 1.3 was also a major problem. As discussed in detail in Chapters 11 and 12, this was far too low a value for a system protecting a large urban population. This value has a history of development that is traced in Chapter 12 back to use for design of levees protecting agricultural lands in the first half of the last century, and failure to update this in the face of both the passage of time and the increased level of potential consequences associated with flood protection of a major urban area was a significant lapse that left little room for the other errors and judgements cited above.

Calculations using the data available at the time of the initial design, and using analysis methods widely available and in common use at that time (though not necessarily within the new Orleans District of the USACE), clearly indicate that this section would be expected to be unstable at canal water levels less than those for which the design was intended (water level of less than Elev. +12 feet, MSL). The more sophisticated analyses employed in these current (ILIT) studies give more precise answers, but this level of sophistication was not necessary to demonstrate overall deficiency of the original design.

### 8.3.7.2  Distressed Section on the West Bank

There is a "distressed" levee and floodwall section on the west bank of the 17th Street Canal, across from the large breach discussed above. This "distress" was visually minor, but this section was studied both as a check of the ramifications of "minor" visually observable distress, and also because it provided an opportunity to see if the same analysis methods that correctly predicted the failure on the east bank could also accurately predict the observed performance of a second section that it was hoped would be somewhat similar.

Figure 8.75 shows measurement of observed lateral wall offset at the point of maximum offset. Wall tilt is less than 0.75 inches, and the maximum lateral offset is approximately 3.5 inches.

As shown previously in Figure 8.25, only a few borings and CPT were performed at this distressed section on the west bank of the canal, so data is sparse. Figure 8.77 presents the interpreted cross-section used for analysis at this site. The same basic sequence of strata observed on the east bank are again present, but the details of the stratigraphy differ a bit.

Passing quickly through intermediate details (as were presented in detail in Section 8.3.6), the same procedures were used to process and interpret the limited available data, and this was supplemented by the knowledge gained from across the canal. Figures 8.78 and 8.79 show an example determination of the value of $N_{kt} = 12$ for the soft gray foundation clay (CH), and this matches with this same deposit on the east bank. Using the same methods, and the same SHANSEP exponent $\lambda = 0.75$, Figure 8.80 shows the iterative processing of the CPTU data to develop profiles of $S_u/p$ vs depth, and OCR vs depth for this clay unit. These too match well with the east bank deposit data.

Figure 8.81 then presents our SHANSEP-based profiles of strength vs. depth (a) beneath the crest, and (b) at the toe, along with the available strength and CPT data. The fit with the available data is excellent.

Figure 8.82 shows the use of the correlation proposed by Mayne and Mitchell to develop profiles of Su/P vs depth and OCR vs. depth within the "marsh" deposits overlying the soft gray clays. This matches well with the CPTU-based interpreted OCR profile within this stratum, and with the data from the east bank as well.

Figure 8.83 presents the resulting overall profiles of strength vs. depth within the marsh deposits (a) beneath the crest, and (b) at the toe, along with all available data (including CPT tip resistances interpreted using $N_{kt} = 16$. The thin layer of sensitive organic silty clay was encountered in one boring, again at the approximate mid-point in the "marsh deposits, and again closely overlain by leaves and twigs. This sample is shown in Figure 8.76. Strengths for this thin layer were based on Su/P values from the east bank deposit. This thin layer was not critical at this west bank site, as the sheetpiles penetrated well below this sensitive layer and so forced a deeper, more rotational failure through the soft gray clays to be the most critical mode.

Once again, all shear strengths determined represented triaxial or vane shear strengths, and these were reduced slightly (multiplied by a factor of 0.84) to develop shear strengths suitable for the direct simple shear (DSS) dominated shear surfaces to be evaluated.

Figures 8.84 and 8.85 show the most critical failure surfaces (without gapping) for a storm surge level of +9 feet (MSL) for failure (a) to the top of the soft gray clay, and (b) within the lower marsh deposits. These both give low Factors of Safety, but the failure through the lower marsh strata is the more critical case.

Figures 8.84 and 8.85 show these same two potential failure modes, again for a storm surge elevation of +9 feet (MSL), but this time with an assumed water-filled gap at the outboard face of the sheetpile curtain. Once again the lower marsh units present the more critical mechanism.

Figure 8.88 shows calculated Factors of Safety vs. canal water elevation for the failure through the lower marsh stratum, both with and without gapping. The heavy red line in this figure shows the best estimate of the likely critical failure path, based on these limit equilibrium analyses. It is judged that gapping is most likely to be initiated at surge elevations of approximately +10 to +11 feet (MSL) as the Factor of Safety (without gapping) drops below about 1.25 to 1.35. Gapping was relatively unlikely during Katrina (max surge level ~ +10 feet, MSL), and indeed no gap could be seen.

Based on these analyses, probabilities of failure were again estimated using the same procedure as described previously in Section 8.3.7.1. Figure 8.88(a) shows distributions of factor of safety as a function of rising canal water elevations for the "water-filled gap" and the "ungapped" cases, and Figure 8.88(b) shows the resulting estimated distributions of the overall conjugate factor of safety for this west bank section.

Table 8.2 then presents the resulting estimated probabilities of failure vs. canal water elevation. The probability of failure at the actual peak Katrina water elevation of approximately + 10 feet (MSL) was low, but it was not negligible. Moreover, it would have increased rapidly with even minor additional increase in canal water level. The probability of failure becomes very high at the "design" water level of +12.5 feet (MSL).

It should also be noted that the marsh soils have likely been sheared (and thus softened) a bit, and that the overall strength of this section was therefore likely somewhat degraded by the loading it received during Katrina. Accordingly, it may not perform quite as well in subsequent loading in the future.

This levee and floodwall section protects the large population of the still undamaged Jefferson Parish. If the canal floodgate currently being installed, and future control of pumping, cannot guarantee that canal water levels will never exceed about Elev. +5 to 6 feet (MSL), then this section should be remediated.

8.3.8    The Breach Near the South End of the London Avenue Canal

A major breach occurred on the east bank, near the south end of the London Avenue Canal, as shown in Figures 8.1 and 8.2.  Figure 8.89 shows an oblique aerial view of this breach under repair.  The breach was approximately 80 feet in length, and it scoured to significant depth.  Sands eroded and transported by the inrushing floodwaters blanketed the neighborhood inboard of the breach to considerable depth over a surprisingly wide area, as shown for example in Figure 8.90.

Figures 8.91 and 8.92 show the floodwall sections at the south and north ends of the breach, respectively.  In these photos it can be seen that these wall sections have not displaced (translated) laterally towards the inboard ("protected") side; instead they have simply "dropped" into the hole eroded by the scour of the breach flow.

Clearance for the footprint of the levee and floodwall was very limited, and the neighboring homes and their back yards encroached closely on the levee.  Levee maintenance was very poor along this section, and numerous large trees had been allowed to grow along the inboard toe.  Many of these were actually rooted part way up the inboard slope face of the levee embankment itself, as shown in Figure 8.93 which is a view looking north from the breach location.  These trees at the inboard toe represented an unacceptable  risk as they can be blown over by storm winds, creating sudden voids that represent favorable paths for concentration of seepage flows and erosion in the critical toe area.  Also, when they die the rotting root system can leave voids that can pose a significant hazard with regard to seepage and erosion in the critical inboard toe area.

Several large trees did topple at this site during Katrina, but in the absence of eyewitnesses it is not possible to be certain if they toppled before the breach, or as a result of erosion and scour after the breach opened.  Figure 8.94 shows toppled trees at this site.  Two large trees from the levee toe area within the breach footprint toppled during this event.

This breach was much shorter in length than the large breaches at the 17th Street Canal, the north end of the London Avenue Canal, and the southern breach on the IHNC at the west side of the Ninth Ward (each of which were hundreds of feet in length.)  Instead, like the northern breach at the IHNC at the west end of the Ninth Ward, this was a narrow and deep breach; suggesting that underseepage rather than foundation instability may have been the key issue here.

As discussed previously in Chapter 4, the geology of the London Avenue canal differs significantly from that of the north end of the 17th Street Canal.  The buried sand "ridge" runs laterally across the canal region, as shown in Figure 4.10 in Chapter 4, and relatively thick sand strata occur at shallow depths in the London Avenue Canal (and the south Orleans Canal) region.  On the south side of this buried sand ridge, the sands tend to be dense as a result of wave action and energy from the Gulf side.  On the lee side (the north side), the sands, especially at shallow depth, were protected and tend to be looser.

Figure 8.95 shows the locations of borings and CPT probes performed by the ILIT investigation at this site.  Figure 8.96 shows a cross-section through the breach, based on our

own (ILIT) data as well as IPET data and data available prior to Katrina. The embankment has a modern (engineered fill) crown consisting of lightly compacted clay and silty clay, underlain by older fill of more variable composition. The embankment section rests atop variable "marsh" deposits consisting primarily of variably interbedded clays and organics. This "marsh" stratum is relatively thin, with a thickness of only 3 to 4 feet at the inboard toe, and it is underlain by about 2 to 3 feet of soft gray clay (CH).

This thin surficial marsh and clay "crust" is underlain by deep deposits of medium dense and then dense sands. In addition to the sheetpile curtain supporting the current concrete floodwall, there is an older sheetpile curtain on the outboard side that used to support a previous small floodwall at this location.

Strengths of the marsh deposits and the thin layer of underlying clay were determined based on the available data, and the resulting strength characterizations are summarized in the table within Figure 8.97, along with the estimated friction angles for the underlying sand units. Stability analyses showed high factors of safety with regard to "landslide type instability failure", even for steady state seepage conditions at the maximum storm surge height of approximately Elev. +9 feet (MSL). Figure 8.106 shows the most critical potential slide surface for these worst case steady state seepage conditions. It was concluded that this breach was unlikely to have resulted from conventional foundation stability failure.

Numerous analyses of seepage were performed, varying the horizontal and vertical permeabilities of the various soil units and strata (in both the horizontal and vertical directions) over ranges considered reasonable for these soils. For all reasonable ranges of conditions, it was found the soils in the inboard toe area were vulnerable to erosion and potential piping at storm surge levels of less than Elev. +9 feet (MSL).

An example is shown in Figure 8.98, which shows the flownet and flow velocity vectors for a surge to Elev. +9 feet (MSL). Ranges of values of in situ permeability were modeled for the sandy strata (in transient flow analyses), and it was concluded for reasonable ranges of lateral permeabilitites that nearly full equilibration of pore pressures (greater than 90 to 95% equilibration) at the inboard side levee toe region would occur within 30 minutes or less of outboard side canal water level rises. Given the rate at which the outboard side canal waters rose (see Figure 8.18), steady state seepage analyses were considered to provide an accurately (to slightly conservative) basis for assessment of underseepage pore pressures. The analysis shown in Figure 8.98 thus represents steady state flow conditions.

Figure 8.99 is a close-up from this figure showing localized conditions in the vicinity of the levee and floodwall. The sheetpiles are nowhere near deep enough to be effective in reducing massive underseepage flows through the pervious sands, and exit gradients near the inboard toe are unsafe with regard to erosion and the initiation of potential piping.

Figure 8.100 shows pore pressure contours from this same flow analysis. Hydraulic uplift forces at and just inboard of the toe exceed the weight of soil overburden, suggesting the possibility that hydraulic uplift ruptured the less pervious thin clay and marsh crust causing a "blowout" failure in this toe area.

Figure 8.101 shows hydraulic gradients for this same flow analysis. The exit gradients at the inboard toe are on the order of $i_o \approx 0.5$, representing a factor of safety with respect to erosion of approximately

$$FS = \gamma_b / ( i_o \cdot \gamma_w )$$

where $\gamma_b$ is the buoyant unit weight of soil, $\gamma_w$ is the unit weight of water, and $i_o$ is the exit gradient. For the lightweight marsh soils, with light buoyant unit weights, the calculated factor of safety is on the order of $FS \approx 0.8$ to $1.05$ for the conditions shown in Figure 8.101. Any "bunching" or localized constriction of the flownet near the exiting face would further exacerbate the tendency to initiate erosion and the beginning of piping. Given the high variability of the thin surficial marsh deposits that "cap" this site, erosion and piping are highly under these conditions.

Figures 8.101 through 8.105 illustrate how such erosion can rapidly escalate as the flownet converges on even a slight void (Figure 8.102) to rapidly increase the localized exit gradient and accelerate the erosion process (as occurs progressively as the erosion enlarges the hole at the inboard toe in Figures 8.103 through 8.105.) This is actually a three-dimensional process, so the rate of acceleration of this erosion and "piping" process is actually more severe than can be properly illustrated in these two-dimensional figures.

Figure 8.107 is a schematic illustration of this process. As the flownet increasingly converges, and erosion continues to accelerate, and the erosion literally tries to "tunnel" back under the levee embankment. This produces slumping and periodic collapses into the opening void, and the process continues to accelerate until the crest is finally breached, at which point the inrushing flows rapidly further scour the breach.

An additional possibility is that this type of erosion process may have been exacerbated by the toppling of a tree near the levee toe, as illustrated schematically in Figure 8.108. Flow towards the toe (and the trees rootball zone) weakens the ground and thus weakens the tree's resistance to pullout failure under storm wind loading. Many trees toppled in this manner during the hurricane. If the tree near the toe topples, it created a large void toward which the exiting flownet would rapidly converge, initiating or greatly accelerating the type of erosion and piping process described above.

Figure 8.109 shows another view of this breach section, this time from the waterside and in late September of 2005. In this photo it can be clearly seen the breach is a very narrow feature, deeper at the north end (to the left in this view). On the inboard side our field team felt that the evidence suggested that the breach initiated either as a seepage erosion "blowout" or similar near the north end of the feature. There was a large tree that was uprooted at that location, but it could not be determined whether the tree fell before or after (as a result of) this failure and breach.

In the end, this breach scoured to significant depth and was then rapidly buried by the emergency embankment repair section, so there is no conclusive evidence left with which to determine which of the above described possible mechanisms (in detail) caused the actual

failure. It is apparent, however, that this failure was the result of underseepage and erosion of some form. The lack of sufficient sheetpile depth as to adequately reduce underseepage flows and toe exit gradients was an engineering lapse, and so was allowing the rampant growth of large trees in the inboard toe area.

The original design analyses for this section were performed by an outsourced engineering consultant, and were reviewed by the USACE (USACE; DM-19A.) In these analyses, the canal-side phreatic level was taken at the full design level (Elev. +12 feet, MSL), and the phreatic level at the inboard side levee toe was taken at Elev. -5 feet (MSL). Based on our investigation's transient flow analyses, for reasonable ranges of in situ lateral permeability, for the full (design) canal water elevation of +12 feet (MSL), the phreatic level at the inboard side levee toe due to underseepage would have actually been on the order of +2 to +5 feet (MSL). This represents a large increase in underseepage-induced uplift pore pressures and exit gradients, and is the principal difference between the pre-Katrina "design" analyses and our investigation's post-Katrina forensic analyses at this section.

8.3.9   The Breach and Distressed Sections Near the North End of the London Avenue Canal

An additional major breach occurred on the west bank near the north end of the London Avenue Canal, as shown in Figures 8.1 and 8.2. This too was a catastrophic breach as it rapidly scoured below mean sea level and so was one of the three large drainage canal breaches that continued to push water into downtown New Orleans for three days after Hurricane Katrina's passage.

Figure 8.110 shows an aerial view of the breach on the west bank. There was also a "distressed" section on the opposite side (on the east bank) that represents an incipient failure in progress; this failure was arrested in a partially developed state by the failure of the west bank section (which drew down the water level and thus saved the east bank.)

Figure 8.111 shows a view looking south along the canal, with the emergency repair embankment section on the west bank on the right, and the incipient failure section on the left side. If one looks closely, the floodwall on the left (east) side can be seen to be leaning away from the canal in this photo.

This was one of the most challenging sites for our investigation. Foundation soil conditions, and embankment and floodwall geometries, were similar on both sides of the canal. One side failed catastrophically, and the other appears to have begun to fail but to have been saved by the failure on the opposite bank. It was a challenge to develop a model that would predict the failure of the west bank before the east bank failure was able to fully develop. There are also a variety of data and evidence suggestive of a number of potential failure and distress modes evident at both sites (both sides of the canal), and sorting through these posed a significant challenge as well.

Figure 8.112 shows a view of the main breach on the west bank, taken from the south end of the breach on the outboard (water) side. In this photo it can be clearly seen that the water-side toe section of the earthen embankment is still in place, and that the

floodwall/sheetpile curtain and the inboard side of the earthen levee have been separated from it and pushed to the inboard side.

Figure 8.113 shows conditions at the inboard toe of the failed embankment section on the west shoreline. The small clubhouse shown had originally been at the same elevation as the nearly adjacent house, but was lifted nearly 7 feet vertically by the displacements during the failure. Some initial field investigators suggested that this was evidence of rotational movement, but our investigation found that this clubhouse (and the ground upon which it stood) was raised vertically by heave due to "plowing" as the main levee embankment displaced laterally (without rotation.) The confined uplift region, and its "humped" nature, are clearly evident beneath the small clubhouse in this photo.

Figure 8.114 shows a view of the inboard toe of the "distressed" (displaced) embankment and floodwall section on the east shoreline, taken on the outboard (water) side. As shown in this photo, the concrete floodwall leaned away from the canal, and a gap with a maximum width of 2.5 feet (and a common width of 1.5 to 6 feet) opened between the outboard side of the earthen levee embankment and the concrete floodwall (and its supporting sheetpile curtain.)

Figure 8.115 shows the other side of this same floodwall section. As shown in this photo, the displaced floodwall leaned to the inboard with a readily discernable tilt of up to 8°. The next photo, Figure 8.116, shows conditions along the inboard base of the floodwall (at the feet of the photographer who took the photo of Figure 8.115.) A series of apparent "sinkholes" occurred along the inboard side contact between the concrete floodwall and the crest of the earthen levee at this location.

Figure 8.117 shows conditions at the inboard toe immediately below the sinkholes of Figure 8.116. A prominent sand boil feature, with sandy ejecta, occurred at this location. Less apparent, but important, was the hummocky wrinkling of the nearly level ground inboard of the toe of the levee, and the slight overthrust feature adjacent to the sand boil. This overthrust feature was apparently missed by many field investigators, but our team noted it and went back and excavated it during our subsequent field boring, sampling and CPT program and found that it was indeed the toe thrust of the beginning of a translational instability feature.

Figure 8.118(a) shows a cross-section through the west side breach prior to Katrina, and Figure 8.118(b) shows this same section after the failure. The failure on the west side was a translational failure of the embankment, sliding along the interface between the foundation sands and the overlying less pervious layer of silty clay (CL/ML).

Figure 8.119(a) shows a cross-section through the east side "distressed" section prior to Katrina, and Figure 8.119(b) shows this same section after the hurricane. The displacement and tilting of the floodwall was the result of the initiation of slippage, once again at the interface between the foundation sands and the overlying less pervious layer of silty clay. Unlike the west bank, this slippage progressed only enough to produce displacements of approximately 1.5 to 2.5 feet, whereupon these movements were arrested as the failure and breaching on the opposite bank rapidly drew down the canal water level and reduced the lateral push against the sheetpile curtain and floodwall.

Figure 8.120 shows a plan view of both sides of the canal, indicating the locations of the borings and CPT performed as part of this investigation.

Figure 8.121 shows the longitudinal subsurface soil profile developed along this section of levee on the west bank during the original design studies, and Figure 8.122 shows the re-interpretation of this section by this study team based on the original boring data. Figures 8.123 and 8.124 show the same pairing of profiles for the east bank side.

Processing of the available geotechnical data was performed using essentially the same methods and procedures as were described in detail in the preceeding sections, and much of the detail will be omitted here in the interest of brevity.

Figures 8.125 and 8.126 show the best estimated profiles of strength vs. depth and Su/P vs depth on the west bank (breach) side for profiles (a) beneath the full levee embankment overburden, and (b) inboard of the levee toe.

Figure 8.127 shows estimated friction angles across the transition from the base of the silty clay stratum (CL/ML) into the underlying clayey sands and sands. Friction angles were estimated from the CPT data using two correlations, and they were also estimated based on the SPT data available from the borings. Also shown are the results of two direct shear tests performed on "undisturbed" samples as part of these studies.

Figure 8.109(a) shows an "undisturbed" sample from the transition across the silty clay into the underlying sands. As shown in this figure, this transition was semi-gradational rather than abrupt. The base of the silty clay layer is underlain by fine clayey sands with variable fines content. Near the contact the fines content is high enough that the clayey fines dominate the shear strength behavior. The fines content rapidly decreases over the next 6 inches or so, and eventually the fines content of the remainder of the layer remains relatively stable at between 5% to 10%. The green line in this figure represents our best estimate of the approximate operative effective friction angle through this zone.

It was not possible to discern with certainty the elevation to which pore pressures arising from underseepage passing beneath the sheetpile curtain through the more open, pervious sands at depth due to the transient rising storm surge penetrated (vertically) upwards into this transition zone. Accordingly, various combinations of partial pore pressure development may be postulated at different elevations across this transition, and these may be paired with various effective friction angles to evaluate the shear strength within this narrow, and critical zone.

Several combinations were postulated and analyzed in these studies. Higher (more completely penetrating) pore pressures more nearly approaching steady state flow are clearly appropriate at the base of this transition zone, and these would be paired with friction angles on the order of $\acute{\varnothing} \approx 30$ to $32°$. A few inches higher in the transition zone the effective friction angle would be somewhat lower, but this would be offset by reduced penetration of pore pressures, resulting in largely similar estimates of resultant frictional shear strength. In the end, an effective friction angle of $31°$ was selected, and this was coupled with assumed rapid

development of steady state pore pressures as the storm surge rose. (For reasonable ranges of in situ permeability of the deeper, more open and pervious sands and with reasonable ranges of specific storage for these initially saturated deposits; pore pressure development at the inboard side toe region within the pervious deeper sands was approximately 65 to 90% developed within two hours of outboard side (canal) water level increases.)

Figures 8.128 through 8.130 show the same sequence of figures, this time for conditions on the east bank (distressed) side of the canal. Once again the transition between the silty clay and the underlying clayey sand is the critical region. As with the west bank, an effective friction angle of 31° was selected for analysis, and this was coupled with assumed rapid development of full steady state underseepage as the storm surge rose within the canal.

Figure 8.131 shows the analysis cross-section and principal soil properties modeled for analysis of the west bank breach site. Analyses were performed using both finite element analysis methods (again using the program PLAXIS) and limit equilibrium methods (Spencer's Method).

Figure 8.132 shows normalized shear strain contours for the west bank (breach) section at a storm surge level of Elev. +9 feet (MSL). Gapping initiated at the outboard side of the floodwall and its supporting sheetpile curtain initiated in this analysis at a canal surge elevation of between +7 to +8 feet (MSL), and was fully developed by a surge elevation of +9 feet, as shown in this figure.

Figure 8.133 shows normalized shear strain contours for the east bank (distressed) section, this time for a slightly higher surge to elevation +10 feet (MSL). This the upper bound estimate of the surge elevations achieved during Katrina. Gapping developed in this east bank section at a surge elevation of between +7 to +8 feet, and was fully developed by a surge elevation of +9.5 feet (MSL).

These conditions produce a predicted failure of the west (breach) side at a surge elevation of approximately +9.5 feet (MSL) in these PLAXIS analyses, and the east side displaces a bit (with associated lateral displacement and tipping of the floodwall) but remains barely stable to a surge elevation of +10 feet (MSL).

Figures 8.134 and 8.135 show a simultaneous analysis of both sides of the canal, and the predicted ("best estimated" properties and flow) conditions for a storm surge to elevation +9 feet (MSL). Figure 8.134 shows normalized shear strain contours, and Figure 8.135 shows the associated predicted deformations and displacements. The west side has failed catastrophically, and the east side section is "distressed" (with lateral displacements of approximately 2 to 3 feet and some tilting of the floodwall). This closely matches the field observations.

Figure 8.136 shows the associated PLAXIS-based prediction of the critical path to failure for each side of the canal. Once gapping occurs, the extra "push" of the water in the gap is sufficient to destabilize the west bank at a surge height of approximately +9 to +9.5 feet (MSL), but the east bank section remains barely stable until a surge height of +10 feet (the upper bound of the estimated surge height that actually occurred).

Figures 8.137 through 8.159 repeat these same analyses, this time using classic seepage analyses to predict pore pressures and gradients resulting from the underseepage flows as the storm surge rises, and limit equilibrium analyses (Spencer's Method) coupled with these predicted pore pressure and gradient conditions to evaluate overall stability for both sides of the embankment. Once again, rapid development of essentially full steady state underseepage was assumed, and an effective friction angle of 31° was modeled at the interface between the silty clay and the underlying clayey sand.

Figures 8.142 and 8.146 show the most critical failure surfaces on the west bank (breach) side for a surge elevation of +9 feet (MSL), with and without gapping respectively. Figures 8.153 and 8.157 show the same two cases for the east bank (distressed) side, again for a surge height of +9 feet (MSL).

Figure 8.159 summarizes the results of these limit equilibrium analyses for both sides of the canal, and the heavy red lines show the estimated most critical paths to failure. Once again the west bank side fails at a surge height of slightly less than +9 feet, but the east bank (distressed) side remains barely stable at this surge elevation. The blue horizontal dashed line in this figure represents our investigation team's best estimated surge elevation in the canal at the time of the breach and failure of the west bank section.

These analyses show that the observed behaviors were not the result of underseepage and resultant piping erosion. The behaviors on both sides of the canal were, instead, the result of lateral translational instability (and incipient instability), with the critical potential failure mode on both banks being lateral translational sliding on the interface between the silty clay and the underlying clayey sands. This sliding was made possible by the high porewater pressures in the foundation soils at and near the base of the inboard-side levee toe due to underseepage.

This exactly fits with the observed field data. The "sinkholes" at the crest of the embankment on the east side were the result of tilting of the slightly displaced floodwall, and the resulting opening of a gap between the floodwall and the embankment into which embankment soils could fall. This correlates with the observation the "sinkhole features" were all narrow, and were all parallel and adjacent to the floodwall (see Figures 8.114 and 8.117.)

8.3.10   Summary and Findings

A large number of critical errors and poor judgements jointly contributed to the catastrophic failures that occurred along the drainage canals. There were conceptual errors in the layout and fundamental design of the levees and floodwalls, there were policy and funding issues that greatly reduced the level of safety of the overall system, and there were engineering errors in the analysis and design of individual sections.

No one organization, agency or group of individuals had a monopoly on their contribution to this disaster. Federal government (including the Congress), the Corps of

Engineers, local government and local oversight agencies (including the local Levee Board and the local Water and Sewerage Board), and outsourced engineering firms all contributed.

The resulting system failed catastrophically, and at multiple locations. And it failed at significantly less than the intended levels of "design" (storm surge) loading. Moreover, it is clear that additional sections were saved from failure only by the catastrophic failures of nearby breaches, which drew down the water levels and so reduced the loading on additional potentially unstable levee and floodwall sections.

The results of these failures were catastrophic. The vast majority (approximately 80%) of the eventual floodwaters that flowed into the main Orleans East Bank (downtown) protected area came through the breaches in the drainage canals. These flows overfilled the sub-basin north of the Metairie Ridge, and then crossed this ridge and flowed into the southern areas as well where they greatly exacerbated flooding that had already occurred as a result of overtopping and failures of levees and floodwalls along the west side of the IHNC. In the absence of the drainage canal failures there would still have been localized flooding and damage near the IHNC, but this would have been minor relative to the eventual damages that resulted when the canal breaches filled a majority of the overall basin.

The localized flooding near the IHNC would have posed relatively little threat of loss of life; the damages would have been (relatively) limited and the floodwaters could have been pumped out in a matter of days. Instead, roughly half of the 1,293 fatalities (to date) attributed to flooding of the New Orleans region occurred in the Orleans East Bank (downtown) protected basin, and a roughly similar fraction of the devastating regional economic damages as well.

The following is a listing of critical errors and poor judgements and decisions that contributed significantly to the poor performance of the drainage canal levees and floodwalls during Hurricane Katrina:

1. The decision not to install floodgates at the north ends of the three drainage canals to prevent uncontrolled water level rise due to storm surge within the canals was largely the result of poor interaction between the local Levee Board and the local Water and Sewerage Board, and their inability to resolve their differences in the interests of the greater Public good (and safety). Lawsuits by environmentalists agisnt this system also worked against the floodgates. As a result, the canals remained open to storm surges; essentially inviting the enemy (storm surge) into a poorly protected section of the interior of the protected ring around metropolitan New Orleans.

2. The decision not to purchase additional land (right of way) to permit widening of the levees required that the system be extended vertically without allowing provision of additional levee width and mass with which to resist the increased floodwater forces associated with the increased height. Short-term savings here resulted in tens of billions of dollars in losses.

3. Similarly, the failure to garner access and control of property at the inboard (protected side) toe of the levees prevented full and proper inspection of this critical area. It also

led to unacceptable risk associated with growth of trees on the inboard side levee slopes and toes, and the literal undermining of levee toes by excavation of in-ground swimming pools in this critical inboard toe area.

4. The designers failed to take advantage of critical lessons from an expensive and well-directed research program that involved construction of a full-scale model levee and floodwall on nearly identical foundation soils in the nearby Atchafalya basin. This model was loaded to failure, and the failure mode observed involved opening of a gap on the outboard side of the floodwall, water entering into the gap, and subsequent pressures on the floodwall and sheetpiles pushing the inboard side section of the earthen embankment sideways (the "cut the cake in half and slide it" failure mode). This failure mode was neglected in the subsequent design of the levees and floodwalls lining the canals, and at least two of the catastrophic failures (breaches), and two additional "incipient" failures were the result of this failure mechanism.

5. The designers also failed to take account of the influence of stress history and effective overburden stresses on the strengths of the foundation soils beneath a number of the embankments. Furthermore, they deviated from USACE policy by using average shear strengths (not strengths slightly lesser than the average data), and by "averaging" strengths across lateral distances that were too large. These errors and shortcomings in the determination and selection of soil shear strength parameters played a critical role in the catastrophic failure of the east bank near the north end of the 17th Street canal.

6. Optimistic assumptions, and misinterpretation of two field tests, led to the assumption that system permeability was low enough that underseepage would not be a critical issue during "transient" (short-term) rises in canal water levels during hurricane induced storm surges. This was a critical error, and it resulted in inadequate sheetpile lengths throughout the drainage canals (especially the London Avenue Canal), and along the IHNC. These sheetpile curtains routinely extend to insufficient depths as to adequately "cut off" underseepage flows, and the resulting underseepage flows were principal contributors to the catastrophic failures observed at both of the major breach sections on the London Avenue canal. These inadequate cut-offs continue to be a potentially critical issue at other sections that did not (yet) breach during hurricane Katrina, and they appear to have been a principal factor in the two massive breaches on the east bank of the IHNC (at the edge of the Lower Ninth Ward; see Chapter 6) as well.

7. Insufficient site investigation was performed for the design of these critical systems protecting a major metropolitan population. Given the difficult and complex foundation soil conditions, additional borings and testing would have represented a very modest incremental expenditure, and would have greatly improved the information available as a basis for analysis and design of these important sections.

8. Errors and poor judgements were made in engineering analysis and design of these sections. Soil properties were extrapolated laterally over inappropriately large distances, and without adjustment for the resulting uncertainties. Archaic analysis

techniques were employed (the Method of Planes), and project-specific research (a full scale test embankment and floodwall in the nearby Atchafalya basin) was ignored, resulting in failure to analyze the failure mode ("cut the cake in half and slide it") that proved critical for at least two of the catastrophic drainage canal breaches, and likely also for the two massive breaches at the east side of the IHNC (adjacent to the Ninth Ward.) This mode was also evident at an additional "incipient" failure section on the London Avenue canal that was saved from failure, by the failure of the even weaker section on the opposite shoreline (which immediately drew down the local water levels.) The stability of the entire canal system should be considered potentially suspect until it can be properly re-evaluated with regard to this potentially critical mechanism.

9. Design review was inadequate. Errors and questionable judgements that would have been expected to be caught and challenged by a properly convened independent external review panel went unchallenged. On one occasion when reviewers from the USACE Division level in Vicksburg did catch and challenge such issues, they were rebuffed by the local District Chief who declared those issues to be a matter of "judgement".

10. The Factor of Safety (FS) used for design of these vital levees and floodwalls was set at only FS = 1.3 for the case of "transient" storm surge loading. As discussed in detail in Section 8.3.7.1 this is inappropriately low for systems critical for the safety of large populations, and for the difficult and challenging foundation soils conditions of the region. This issue is discussed in significantly more detail in Chapters 11 and 12.

11. Congressional funding (appropriations) were problematic. Funding was irregular and somewhat unpredictable, representing a difficult basis for design and construction of a system intended to be contiguous (seamless) and to protect a large metropolitan population. Strategic decisions, and conceptual design, were often driven by a need for frugality. In addition, when appropriations did arrive, some elements of the system had to be further streamlined for economy. The relatively minor savings achieved now pale in comparison to the many tens of billions of dollars in losses that ensued.

12. Pace of funding was also problematic. At the time of Katrina's arrival, the flood protection system in the canal district was still incomplete.... fully 51 years after the flooding from Hurricane Betsy that inspired the inception of construction of the improved flood protection system. Three of the bridges across the drainage canals still had not yet had their side walls raised, so three "holes" remained in an otherwise contiguous system. These "holes" at the bridges were not critical during Hurricane Katrina only because: (a) the storm surge was less than the full design load case, and (b) catastrophic nearby breaches (failures) occurred. (An additional "hole" in the system, at the south end of the Orleans Canal, was yet another result of dysfunctional interactions between the local levee board and the local water and sewerage board (as discussed previously in item #1 above.)

Many of the issues above, from conceptual design issues through engineering analysis details and even selection of appropriate Factors of Safety would have been expected to be

challenged by a properly convened independent review panel. Unfortunately, in the current system with myriad local interests and no strong local entity able to convene appropriate levels of unbiased expert review capability, this critical element was absent during the design and construction of these important flood protection system elements.

In addition, there was a lack of centralized authority, and of clear areas of responsibility. Involvement of a significant "local" institutional presence of significant stature and resources was lacking. The local levee board lacked the resources and funding to mount serious review of the Federal plans and designs, and the mandate to challenge problems that should have been apparent at early stages.

In the end, the performance of the flood protection system along the three drainage canals was unacceptable, and resulted in catastrophic loss of life and property throughout a major metropolitan region.

## 8.4 References

Burk & Associates, Inc (1986) *Geotechnical Investigation of London Avenue Outfall Canal*, OLB Project No 2049-0269, Vol I and II, prepared for the Board of Levee Commissioners of the Orleans Levee District, New Orleans, Louisiana.

Foott, R and Ladd, C.C (1977) "Behavior of Atchafalaya levees during construction", Geotechnique,27, No2, pp 137-160.

GEO-SLOPE/W (2004) "Complete Set of Manuals", John Krahn (Edit.), Calgary, Alberta, Canada.

IPET – Interagency Performance Evaluation Task Force (2006) *Performance Evaluation Status and Interim Results*, Report 1 of a Series, Performance Evaluation of the New Orleans and Southeast Lousiana Hurricane Protection System, January 10, US Army Corps of Engineers.

IPET – Interagency Performance Evaluation Task Force (2006) *Performance Evaluation Status and Interim Results*, Report 2 of a Series, Performance Evaluation of the New Orleans and Southeast Lousiana Hurricane Protection System, March 10, US Army Corps of Engineers.

Jackson, R. B., (1988), "E99 Sheet Pile Wall Field Load Test Report", Technical report No.1, US Army Engineer Division, Lower Mississippi Valley, Vicksburg, MS

Jamiolkoski, M, Ladd, C.C., Germaine, J.T., and Lancellotta, R. (1985) "New developments in field and laboratory testing of soils." Proc. 11th International Conf. on Soil Mechanics and Foundation Eng., San Francisco, 1, 57-154.

Karlsrud, K., Lunne, T and Brattlien (1996) "Improved CPTU interpretations based on block samples", Nordic Geotechnical Conference, 12 Reykjavik 1996. Proc, Vol.1, pp 195-201.

Kaufman, R and Weaver, F (1967) "Stability of Atchafalaya Levees", Journal of the Soil Mechanics and Foundations Division, ASCE, SM 4, pp 157 -176.

Kemp, P., and Mashriqui, H. (2006).  Personal Communication

Lacasse, S., Ladd, C.C., and Baligh, M.M. (1978) "Evaluation of field vane, Dutch cone penetrometer and piezometer probe testing devices." Res. Report R78-26, Dept. of Civil Eng., MIT, 375 pp.

Ladd, C.C and DeGroot, D. 2003. "Recommended Practice for Soft Ground Site Characterization", Arthur Casagrande Lecture, 12th Panamerican Conference on Soil Mechanics and Geotechnical Engineering, June, Boston.

Lunne, T., Lacasse, S., and Rad, N.S., (1989) "General report: SPT, CPT, PMT, and recent developments in in-situ testing", Proceedings, 12th International Conference on soilmechanics and foundation engineering, Vol.4, Rio de Janeiro, pp. 2339-2403

Mashriqui, H., (2006), Personal Communication

Mayne, P,W and Mitchell, J.K (1988) "Profiling of Overconsolidation Ratio in Clays by Field Vane", Canadian Geotechnical Journal, Vol 25, No 1, February, pp 150-157.

Oner, M., Dawkins, W.P., and Hallal, I., (1997) "Soil Structure Interaction Effects in Floodwalls", Electronic Journal of Geotechnical Engineering

Oner, M., Dawkins, W.P., and Mosher, R., (1997) "Shearing Method for Soil Structure Interaction Analysis in Floodwalls", Electronic Journal of Geotechnical Engineering

Robertson, R.K, and Campanella, R.G. (1983) "Interpretation of Cone Penetration Tests. Part I: Sand", Canadian Geotechnical Journal, Vol 20, No 4, Nov, pp 718-733.

Seed, R.B. (2005) "CE 270B Class Notes", University of California, Berkeley.

PLAXIS Finite Element Code for Soil and Rock Analyses (2004). "Complete Set of Manuals", V8.2 , Brinkgreve yVermeer (Edit.), Balkema, Rotterdam, Brookfield.

USCE (1989) London Avenue Outfall Canal, Design Memorandum No 19A General Design, Vol 1 and Vol 2, Louisiana, Department of the Army, New Orleans District, Corps of Engineers, New Orleans, Louisiana.

USCE (1990) Orleans Parish (Jefferson Parish) 17th St. Outfall Canal, Metairie Relief, Design Memorandum No 20 General Design, Vol 1 and Vol 2, Louisiana, Department of the Army, New Orleans District, Corps of Engineers, New Orleans, Louisiana.

Van Heerden, I., (2006), Personal Communication



Figure 8.1:  Map showing principal features of the main flood protection rings or "protected areas" in the New Orleans area.
[Modified after USACE, 2005]