UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION<br>NUMBER:  05-4182 "K"(2)<br>JUDGE Duval<br>MAG. Wilkinson |
| PERTAINS TO:  MRGO, Robinson (No. 06-2268) | |

## **PLAINTIFFS' REPLY TO DEFENDANT UNITED STATES' RESPONSES TO PLAINTIFFS' CORRECTED REVISED STATEMENT OF UNDISPUTED FACTS**

## **INTRODUCTION**

Rule 56.2 of the Local Rules for the United States District Court for the Eastern District of Louisiana requires that:

> Each copy of the papers opposing a motion for summary judgment shall include a separate, short and concise statement *of the material facts as to which there exists a genuine issue to be tried*. All material facts set forth in the statement required to be served by the moving party *will be deemed admitted, for purposes of the motion, unless controverted as required by this rule.*

(Emphasis added).

This rule requires Defendant to specify *facts* establishing a factual dispute; conclusory statements or unsubstantiated conclusions of law.  *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993) ("'Summary judgment . . . may be appropriate . . . if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'") (citations omitted).  Indeed, Defendant understands this limitation since it responded to Plaintiffs' Corrected Revised Undisputed Facts Nos. 31 and 32 by objecting that the statements were "an opinion *rather than a statement of fact*."  (Emphasis added).  Thus,

1

notwithstanding Defendant's filing of an ostensible opposition separate statement of facts, any alleged factual controversy based on a legal argument does not manifest a genuine *dispute of facts*, and the corresponding fact in Plaintiffs' separate statement is therefore admitted. *See Gardels v. C.I.A.*, 637 F.2d 770 (D.C. Cir. 1980); *Innes v. City of New Orleans*, 2003 WL 1090241 at 2 (E.D. La. 2003); *Wache v. Inter-Continental Hotels Corp.*, 1997 WL 599308 at 1 & n.1 (E.D. La. 1997).

In particular, Defendant responds to Plaintiffs' Corrected Revised Undisputed Facts Nos. 1, 2, 15, 40, 43, 46, 49 and 50 as being "uncontested, but irrelevant." Plaintiffs' corresponding undisputed facts are clearly uncontested and admitted, regardless of whether Defendant considers them irrelevant.

Defendant responds to Plaintiffs' Corrected Revised Undisputed Facts Nos. 6, 27, 28, 29, 31, 32, 33, 35, 38, 42, 47 and 48, stating that each response was "contested and irrelevant." In each response, however, Defendant cites no evidence as to why Plaintiffs' fact is "contested;" nor does it provide any discussion of how Plaintiffs' evidentiary support of the underlying statements fails to validate Plaintiffs' factual assertions. Accordingly, as a matter of law, Plaintiffs' Corrected Revised Undisputed Facts Nos. 6, 27, 28, 29, 31, 32, 33, 35, 38, 42, 47, and 48 are also admitted. Likewise, Defendant responds to Plaintiffs' Corrected Revised Undisputed Fact No. 3, claiming the facts are "contested" again without providing any supporting facts. Therefore, Plaintiffs' Corrected Revised Undisputed Fact No. 3 is also admitted.

## PLAINTIFFS' SPECIFIC REPLIES

**Plaintiffs' Corrected Revised Undisputed Fact No. 1**

The Government concedes that the MR-GO had no flood control features when constructed, "the MR-GO did not have a flood control purpose or function," and "no levees were constructed as part of the MRGO project." PUF Nos. 15, 19, 20.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 1**:

Uncontested, but irrelevant. Irrelevant because the nature of the MRGO when constructed does not make any fact of consequence to the issue of § 702c more or less probable. The material fact is that the MRGO was related to the LPV, a flood control project, because Congress authorized the building of levees along the MRGO to protect Chalmette from floodwaters emanating from the MRGO.

**Plaintiffs' Reply to Defendant's Response to Fact No. 1:**

Undisputed by Defendant. *See* Introduction. As for Defendant's argument that the "MR-GO is related to the LPV," it offers no factual support of this assertion which was conceded *not to be true* in earlier pleadings. *See* Plaintiffs' Corrected Revised Undisputed Facts Nos. 2 and 3 and supporting evidence.

**Plaintiffs' Corrected Revised Undisputed Fact No. 2**

In the wake of Hurricane Betsy's catastrophic flooding, Congress enacted the Flood Control Act of 1965 authorizing the LPVHPP, but the MR-GO was never part of the new flood control project and the Government has conceded that "the MR-GO was not a flood control project and was not absorbed into the LPVHPP." PUF No. 18, 23, 65.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 2:**

Uncontested, but irrelevant, for the reasons stated in response to PUF No. 1.

**Plaintiffs' Reply to Defendant's Response to Fact No. 2:**

Undisputed by Defendant.  *See* Introduction.

**Plaintiffs' Corrected Revised Undisputed Fact No. 3**

The United States has disavowed any argument that the MR-GO was either

 (1) related to the national flood control program, (2) a "constituent component" of the LPVHPP,

or (3) morphed into a hybrid flood control project/navigational aid project. PUF. No 22; *see also*

PUF Nos. 16-17, 21-22.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 3**:

Contested. The United States has never disavowed the argument that the MRGO and the

national flood control program are related. The MRGO and the LPV are related in numerous

respects. The remaining contentions are uncontested but irrelevant. *See supra,* response to PUF

No. 1.

**Plaintiffs' Reply to Defendant's Response to Fact No. 3:**

Undisputed by Defendant.  *See* Introduction.  Defendant cites no facts to support its

sweeping assertion that "the MRGO and the LPV are related in numerous respects."

**Plaintiffs' Corrected Revised Undisputed Fact No. 4**

Congress authorized in 1956 the MR-GO as a 76-mile deep water, navigation channel connecting

the Gulf of Mexico to the Port of New Orleans Inner Harbor Navigation Canal ("IHNC").  PUF

Nos. 1, 2, 3, 10, 11.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 4**:

Uncontested.

**Plaintiffs' Reply to Defendant's Response to Fact No. 4:**

Undisputed by Defendant.

**Plaintiffs' Corrected Revised Undisputed Fact No. 5**

The Army Corps designed, constructed, operated, and maintained the MR-GO.  PUF Nos. 2, 9, 15, 315.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 5**:

Uncontested.

**Plaintiffs' Reply to Defendant's Response to Fact No. 5:**

Undisputed by Defendant.

**Plaintiffs' Corrected Revised Undisputed Fact No. 6**

The MR-GO has been divided into three reaches:

(a)  The six-mile connection between the junction of the Gulf Intracoastal Waterway ("GIWW") and the MR-GO terminus in the IHNC has been designated as Reach 1, and  in IPET's words, Reach 1 is "the critical reach" playing the most significant role in transmission of hurricane surge.

(b) Reach 2—the segment dredged through the marsh beginning at the convergence with the GIWW and extending to Veret—has caused the most environmental degradation.

(c)  Reach 3 further south to the Gulf of Mexico has required continual dredging to keep the channel open.  PUF No. 5.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 6:**

Contested and irrelevant. The designations "Reach 1" and "Reach 2" are arbitrary and have been used to denote various and different reaches of the MRGO. What Plaintiffs

denominate "Reach 3" is irrelevant, as is the dredging of it. The comparison implied by "most" is vague and ambiguous. None of the factual allegations is of any legal consequence to the issue of § 702c immunity.

**Plaintiffs' Reply to Defendant's Response to Fact No. 6:**

Undisputed by Defendant.  *See* Introduction.  As for who *arbitrarily* divided the MR-GO into three reaches, it was the Army Corps itself.  *See* IPET Report (Exh. 20), Vol. IV at IV-134 to IV-136 ("From the perspective of long wave propagation, of which the tide and storm surge are examples, the critical section of the MRGO is Reach 1, the section of waterway where the GIWW and MRGO occupy the same channel . . . .   Most concern seems to focus on MRGO/Reach 2 that runs from the GIWW/MRGO confluence . . . to the southeast . . . .")

**Plaintiffs' Corrected Revised Undisputed Fact No. 7**

In designing and constructing the MR-GO, the Army Corps ignored known hazards posed by the "funnel effect" enabling hurricane storm surge from Lake Borgne and the Gulf of Mexico (via Reach 2) to flow into the confined channel of the GIWW/Reach 1 separating New Orleans East and the Ninth Ward/St. Bernard Parish.  PUF Nos. 50-58.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 7**:

Contested. The MRGO did not create a "funnel effect." *See* IPET Vol. IV, App. 6, 6-1 to 6-34.

**Plaintiffs' Reply to Defendant's Response to Fact No. 7:**

"[S]ummary judgment is not a game of hide and seek." *Revlon Consumer Products Corp. v. Estee Lauder Companies, Inc.*, 2003 WL 21751833 at *42 & n.55 (S.D.N.Y. 2003). Accordingly, Defendant cannot point to the entire 34 pages of the document and expect the Court to unearth the portion that supports Defendant's contention.  *See also Maurer v. Heyer-Schulte Corp.*, 2002 WL 31819160 at *5 (E.D. La. 2002) ("'Judges are not like pigs, hunting for truffles buried in' the record.'") (citation omitted).  In any event, the cited authorities do not support Defendant's assertion.

Appendix 6 was primarily concerned with the effect of Reach 1 and Reach 2 of the MR-GO with respect to hurricane storm surge.  "It is important to distinguish between two sections of the MRGO and the role each plays in tide and storm surge propagation."  IPET Report, Vol. IV, App. 6 at 6-2.  Nevertheless, Appendix 6 *did in fact recognize the existence of the funnel effect*, contrary to Defendant's assertion:

> The hurricane protection levees along the south side of Orleans
> Parish and the eastern side of St. Bernard Parish along the MRGO,
> *which together are referred to as a funnel, can locally collect and*
> *focus storm surge* in this vicinity depending on wind speed and
> direction.

IPET Report, Vol. IV, App. 6 at 6-7 (emphasis added).

Defendant's cited evidence therefore is consistent with Plaintiffs' statement in Corrected Revised Fact No. 7. Indeed, Plaintiffs cited over a dozen sources for the "funnel effect" – all of which support the statement. *See* PUF Nos. 50-59. Therefore, there is no genuine dispute on this issue.

**Plaintiffs' Corrected Revised Undisputed Fact No. 8**

For decades, the Army Corps has known that hydrologically, the MR-GO created a short, new pathway for astronomical and storm-driven tides to flow directly from Breton Sound to Lake Borgne and Lake Pontchartrain and for hurricane storm surge to be efficiently delivered into the heart of New Orleans.  PUF No. 5-8, 50-58, 295, 295a.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 8**:

Contested. The MRGO did not create a pathway for tides to flow directly to Lake Borgne, Lake Pontchartrain, or to the "heart of New Orleans." *See* H.R. Doc. No. 82-245 (1951) at 2; IPET Vol. IV, App. 6, at 6-1 to 6-34. Further, the metaphor is not a statement of fact.

**Plaintiffs' Reply to Defendant's Response to Fact No. 8:**

The cited authorities do not support Defendant's claim.  Page 2 of H.R. Doc. No. 82-245 (Exh. 2) contains a September 17, 1951 letter from the Office of the President, Bureau of the Budget, to the Secretary of the Army discussing economic aspects of the proposed MR-GO.  It also included a short, three paragraph April 28, 1948 correspondence from former Louisiana Governor James H. Davis to the Army Corps, Chief of Engineers, lauding the project and stating the State's support for the project.  Neither letter discussed the effects of the MR-GO with respect to hurricane storm surge.

"[S]ummary judgment is not a game of hide and seek."  *Revlon Consumer Products Corp. v. Estee Lauder Companies, Inc.*, 2003 WL 21751833 at *42 & n.55 (S.D.N.Y. 2003). Accordingly, Defendant cannot point to the entire 34 pages of the document and expect the Court to unearth the portion that supports Defendant's contention.  *See also Maurer v. Heyer-Schulte*

*Corp.*, 2002 WL 31819160 at *5 (E.D. La. 2002) ("'Judges are not like pigs, hunting for truffles

buried in' the record.'") (citation omitted).  In any event, Appendix 6 of the IPET Report did, in

fact, find that the MRGO had a hydrological relationship with Lake Borgne and Lake

Pontchartrain:

> Reach 1 (the combined GIWW/MRGO section) and the IHNC,
> together, provide *a hydraulic connection between Lake Borgne and
> Lake Pontchartrain*.  As a result of this connection, the storm surge
> experienced within the IHNC and Reach 1 (GIWW/MRGO) is a
> function of storm surge in both Lakes; *a water level gradient is
> established within the IHNC and Reach 1 that is dictated by the
> surge levels in the two lakes.  This true for both low and high
> storm surge conditions.  To prevent storm surge in Lake Borgne
> from reaching the IHNC or GIWW/MRGO sections of waterway,
> flow though the Reach 1 channel must be dramatically reduced or
> eliminated*, either by a permanent closure or some type of structure
> that temporarily serves to eliminate this hydraulic connectivity.
> The presence of an open channel is the key factor.

IPET Report, Vol. IV, Appendix 6 at 6-6 to 6-7 (emphasis added).

Defendant's cited evidence therefore is entirely consistent with Plaintiffs' statement in

Corrected Revised Fact No. 8.

**Plaintiffs' Corrected Revised Undisputed Fact No. 9**

While the MR-GO was being constructed, and for many years right up to Hurricane Katrina, the Army Corps was warned that the funnel created a back door that would accelerate and intensify hurricane storm surges emerging from Lake Borgne and the Gulf into the Greater New Orleans area.  PUF Nos. 8, 51-53, 63.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 9**:

Contested. The MRGO did not create a "funnel effect." *See* IPET Vol. IV, App. 6, 6-1 to 6-34. Whether warnings about a purported "funnel effect" were received is immaterial to the issue of § 702c immunity.

**Plaintiffs' Reply to Defendant's Response to Fact No. 9:**

"[S]ummary judgment is not a game of hide and seek." *Revlon Consumer Products Corp. v. Estee Lauder Companies, Inc.,*  2003 WL 21751833 at *42 & n.55 (S.D.N.Y. 2003). Accordingly, Defendant cannot point to the entire 34 pages of the document and expect the Court to unearth the portion that supports Defendant's contention.  *See also Maurer v. Heyer-Schulte Corp.*, 2002 WL 31819160 at *5 (E.D. La. 2002)("'Judges are not like pigs, hunting for truffles buried in' the record.'") (citation omitted).  In any event, the cited authorities do not support Defendant's assertion.

Appendix 6 of the IPET Report was primarily concerned with effect of Reach 1 and Reach 2 of the MR-GO with respect to hurricane storm surge.  "It is important to distinguish between two sections of the MRGO and the role each plays in tide and storm surge propagation." IPET Report, Vol IV, App. 6 at 6-2.  However, Appendix 6 *did in fact* recognize the existence of

the funnel effect, contrary to Defendant's assertion:

> The hurricane protection levees along the sought side of the of
> Orleans Parish and the eastern side of St. Bernard Parish along the
> MRGO, *which together are referred to as a funnel, can locally
> collect and focus storm surge* in this vicinity depending on wind
> speed and direction.

IPET Report, Vol. IV Appendix at 6-7 (emphasis added).

Defendant's cited evidence, therefore, is consistent with Plaintiffs' statement in Corrected Revised Fact No. 9.  Indeed, as noted with respect to Plaintiffs' Corrected Revised Undisputed Fact No. 7, Plaintiffs cited over dozen sources for the "funnel effect" all of which support this statement.  *See* PUF Nos. 50-58.  Therefore, there is no genuine dispute on this issue.

**Plaintiffs' Corrected Revised Undisputed Fact No. 10**

Hurricane Katrina's amplified and supercharged storm surge caused massive overtopping of structures along Reach 1, Reach 2, and the IHNC and contributed to the failure of the IHNC floodwalls in two locations along the east side—and the resulting catastrophic flooding of the Lower Ninth Ward and portions of St. Bernard Parish.  PUF Nos. 250-55; 293.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 10**:

Contested. The MRGO did not "amplify" or "supercharge" Katrina's storm surge. *See* IPET Vol. IV, App. 6, 6-1 to 6-34. The overtopping of flood protection structures along the MRGO and the IHNC by Hurricane Katrina's storm surge, resulting in catastrophic flooding of the Lower Ninth Ward and portions of St. Bernard Parish is uncontested.

**Plaintiffs' Reply to Defendant's Response to Fact No. 10:**

The cited authorities do not support Defendant's claim.  Once again, ". . . summary judgment is not a game of hide and seek."  *Revlon Consumer Products Corp. v. Estee Lauder Companies, Inc.*, 2003 WL 21751833 at *42 & n.55 (S.D.N.Y. 2003).  Accordingly, Defendant cannot point to the entire 34 pages of the document and expect the Court to unearth the portion that supports Defendant's contention.  *See also Maurer v. Heyer-Schulte Corp.*, 2002 WL 31819160 at *5 (E.D. La. 2002) ("'Judges are not like pigs, hunting for truffles buried in' the record.'") (citation omitted).  In any event, Appendix 6 did find that the MRGO had a hydrological relationship with Lake Borgne and Lake Pontchartrain:

> Reach 1 (the combined GIWW/MRGO section) and the IHNC,
> together, provide *a hydraulic connection between Lake Borgne and
> Lake Pontchartrain*.  As a result of this connection, the storm surge
> experienced within the IHNC and Reach 1 (GIWW/MRGO) is a

> function of storm surge in both Lakes; *a water level gradient is*
> *established within the IHNC and Reach 1 that is dictated by the*
> *surge levels in the two lakes.  This true for both low and high*
> *storm surge conditions.  To prevent storm surge in Lake Borgne*
> *from reaching the IHNC or GIWW/MRGO sections of waterway,*
> *flow though the Reach 1 channel must be dramatically reduced or*
> *eliminated*, either by a permanent closure or some type of structure
> that temporarily serves to eliminate this hydraulic connectivity.
> The presence of an open channel is the key factor.

IPET Report, Vol. IV, Appendix 6 at 6-6 to 6-7 (emphasis added).

As for the remainder of Defendant's assertion, Defendant cites no facts supporting its claim that "[t]he overtopping of flood protection structures along the MRGO and the IHNC by Hurricane Katrina's storm surge, resulting in catastrophic flooding of the Lower Ninth Ward and portions of St. Bernard Parish is uncontested."  Defendant's cited evidence, therefore, is consistent with Plaintiffs' statement in Corrected Revised Fact No. 10.  Thus, the Government has admitted that the MR-GO funnel "amplified and supercharged" the storm surge – a proposition cited by Plaintiffs in PUF Nos. 250-255 and 293 – two of which are the IPET Report itself.  *See* PUF Nos. 251 and 254.

**Plaintiffs' Corrected Revised Undisputed Fact No. 11**

The soils used for the later construction of flood protection embankments along both Reach 1 and Reach 2 of the MR-GO were prodigious amounts of highly erodable sand mixed with shell and some silts and clays and largely existing materials borrowed from the adjacent spoil banks that were constructed of materials dredged from the MR-GO.  PUF Nos. 24-28, 129-31, 138-39, 332-33.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 11**:

Contested and irrelevant. The nature of the LPV levees along the MRGO is irrelevant because § 702c immunity does not turn on "the character of the federal project." *Central Green Co. v. United States,* 531 U.S. 425, 434, 437 (2001). It is uncontested that some of the soils used for construction of levees along the MRGO were obtained by dredging the MRGO, but those soils were not comprised of "prodigious amounts of highly erodible sand mixed with shell and some silts and clays." *See* Bea Report (Exh. 31)¶ 56; Bea Dep. (Exh. 45) at 252:15-21.

**Plaintiffs' Reply to Defendant's Response to Fact No. 11:**

        The first part of Defendant's statement is a legal argument, and therefore irrelevant to this separate statement *of facts*.  With respect to Defendant's assertion that earthen structures along the MR-GO "were not comprised of 'prodigious amounts of highly erodible sand mixed with shell and some silt and clays,'" the cited sources do not support the statement.  Plaintiffs' Corrected Revised Undisputed Fact No. 11, as noted in Defendant's response, stated that "[t]he soils used for the later construction of flood protection embankments *along both Reach 1 and Reach 2*" were comprised of this material.  Paragraph 56 from the Bea Report (Exh. 31)

addressed only the "man-made features" along "the southern side of Reach 1 of the MR-GO," not Reach 2.  Indeed, at Paragraph 36 of the Bea Report (Exh. 31), Dr. Bea notes that the earthen structures along Reach 2 of the MR-GO "were unusually vulnerable to erosion as they were 'sand core'" EBSBs, constructed largely using material (uncompacted hydraulic fill and the like) available from the adjacent MR-GO channel excavation."  In the same Paragraph, Dr. Bea observed that "[g]iven the nature of the local soils at this location, much of that excavated material *consisted of sands and lightweight shell sands* . . . .  As will be shown subsequently, these materials have very low resistance to erosion and scour."  (Emphasis added).

Similarly, in the cited portion of Dr. Bea's deposition (Exh. 45) at 252:15-21, Dr. Bea does not even mention the composition of the Reach 1 or Reach 2 levees (Q.  "Is it possible then that there were levee sections in that reach that were interspersed with what you have denominated EBSBs?"  A. "Correct").   Accordingly, Defendant's cited evidence is consistent with Plaintiffs' statement in Corrected Revised Fact No. 11.

**Plaintiffs' Corrected Revised Undisputed Fact No. 12**

Consequently, the foundation of the flood protection works along Reach 1 and Reach 2 of the
MR-GO—characterized as "treacherous" and highly variable by the Army Corps—was mostly
spongy, organic soils (pure sand with some shell) with substantial water content. *Id.*, *see also*,
PUF Nos. 114-15, 330-35.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 12**:

Contested and irrelevant. *See* IPET Report (Exh. 20) Vol. III at 213. The nature of the
LPV levees along the MRGO is irrelevant because § 702c immunity does not turn on "the
character of the federal project" but rather on the nexus between the relevant damage and the
floodwaters that the LPV was unable to control. *Central Green Co. v. United States,* 531 U.S.
425, 434, 437 (2001).

**Plaintiffs' Reply to Defendant's Response to Fact No. 12:**

Defendant's claim is a legal argument and accordingly, is irrelevant to this statement of
undisputed facts.  As for the composition and nature of the earthen structures, Defendant's cited
source does not contradict Plaintiffs' assertion, but rather supports it.  The IPET Report (Exh. 20)
Vol. III at 213 notes the existence of varying forms of "soft organic clays" in this area, but more
importantly, the IPET Report states that "[a]long the project alignment *paralleling the MRGO*,
the natural Recent soils *have been covered with hydraulic spoil from the excavation of the
MRGO channel*."  (Emphasis added).  This is entirely consistent with Plaintiffs' statement in
Corrected Revised Fact No. 12.

**Plaintiffs' Corrected Revised Undisputed Fact No. 13**

The catastrophic flooding during Hurricane Katrina was caused in part because these water

pervious earthen berms along Reach 1 and Reach 2 of the MR-GO were highly vulnerable to

severe erosion from hurricane storm surge overtopping and to significant subsidence and

settlement from the weight of spoil materials placed on top of them during construction of the

flood protection works.  PUF Nos. 120, 129-31, 138-39, 332.


**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 13**:

Contested and irrelevant. The levees along the MRGO were not "water pervious" nor

were they "highly vulnerable to severe erosion." *See* IPET Report (Exh. 20) Vol. V at V-127;

Bea Report (Exh. 31) ¶ 56; Bea Dep. (Exh. 45) at 252:15-21. The nature of the LPV levees along

the MRGO is irrelevant because § 702c immunity does not turn on "the character of the federal

project." *Central Green Co. v. United States,* 531 U.S. 425, 434, 437 (2001). The existence of

flood protection embankments, *i.e.,* levees, along the MRGO at the time of Hurricane Katrina is

uncontested, as is their overtopping and erosion by storm surge.


**Plaintiffs' Reply to Defendant's Response to Fact No. 13:**

The final five lines of Defendant's statement is a legal argument and accordingly, is

irrelevant to this statement of undisputed facts.  Moreover, Defendant misstates Plaintiffs'

statement.  Plaintiffs stated that the "*earthen berms* along Reach 1 and Reach 2 of the MR-GO"

were vulnerable, while Defendant asserts that "*[t]he levees* along the MRGO were not "water

pervious" . . . ."

Defendant's cited source also does not support Defendant's claim.  The IPET Report

(Exh. 20), Vol. V at V-127, cited by Defendant, stated that with respect to the alleged MR-GO levees that "[i]t is true that the *relatively permeable and erodible* materials of the levees constructed by hydraulic fill did contribute to their ultimate breaching."  (Emphasis added).  This is consistent with Plaintiffs' statement in Corrected Revised Fact No. 13.

Defendant again cites Paragraph 56 from the Bea Report (Exh. 31) which addressed only the "man-made features" along "the southern side of Reach 1 of the MR-GO," not Reach 2.  Indeed, at Paragraph 36 of the Bea Report (Exh. 31), Dr. Bea notes that the earthen structures along Reach 2 of the MR-GO "were unusually vulnerable to erosion as they were 'sand core' EBSBs, constructed largely using material (uncompacted hydraulic fill and the like) available from the adjacent MR-GO channel excavation."  In the same Paragraph, Dr. Bea observed that "[g]iven the nature of the local soils at this location, much of that excavated material consisted of sands and lightweight shell sands . . . .  As will be show subsequently, *these materials have very low resistance to erosion and scour*."  (Emphasis added).

The Bea Report at Paragraph 90 further added that "[d]uring periods of high water flow through an earthen embankment composed of and supported by highly permeable materials can cause significant erosion and hydraulic uplift effects. . . . This appears to be the case along some portions of the *MR-GO Reach 2 frontage EBSBs*."  (Emphasis added).

Finally, in the cited portion of Dr. Bea's deposition (Exh. 45) at 252:15-21, Dr. Bea does not mention the composition of the Reach 1 or Reach 2 levees (Q.  "Is it possible then that there were levee sections in that reach that were interspersed with what you have denominated EBSBs?"  A. "Correct").  Accordingly, Defendants cited sources do not contradict, but rather support, Plaintiffs' statement in Corrected Revised Fact No. 13.

**Plaintiffs' Corrected Revised Undisputed Fact No. 14**

Before the MR-GO's construction began in 1958, the Army Corps knew that the MR-GO would destroy the storm surge buffering wetlands by "increas[ing] tidal action in marsh pond areas; higher average salinities with wider salinity ranges; increase[ing] turbidity. . . [that] would eliminate 6,200 acres of shallow open water and 17,400 acres of marsh. .  MSJ Exh. 51 at p. 4.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 14**:

Contested and irrelevant. *See* Exh. 51 at p. 4. The quotation reflects an opinion of another entity, not the Corps, and was only an opinion as to "possible" effects. Furthermore, the Corps responded by constructing a system of diked containment areas south of the channel alignment, equipped with weir outlets in the levee farthest removed from the channel. The Corps also studied alternate routes for channel alignment. *See also* Day Dep. (Exh. 85) at 151:14-25 to 152:1-12. Finally, whether the MRGO had a deleterious impact on wetlands and whether wetlands would have "buffered" Katrina's storm surge are irrelevant. The storm surge generated by Hurricane Katrina was so high and so prolonged as to make the nature and extent of wetlands inconsequential. *See* IPET Vol. IV, App. 6, 6-1 to 6-34.

**Plaintiffs' Reply to Defendant's Response to Fact No. 14:**

Defendants cited sources do not contradict Plaintiffs' statement.  Defendant first contests this statement by citing p. 4 of a May 31, 1979 correspondence from the United States Fish and Wildlife Service to the St. Bernard Parish Planning Commission (Exh. 51), at page 4 of the letter, however, the author notes that:

> [The Louisiana Wildlife and Fisheries Commission (LWFC)]
> stated in a May 29, 1957, letter that the following adverse effects

*would result* if the channel was constructed through these marshes: increase of tidal action in marsh pond areas; higher average salinities and wider salinity ranges; increased turbidity; and the filling with spoil of numerous ponds attractive to waterfowl. The LWFC predicted that these processes would alter marsh vegetation types, eliminating high-value waterfowl food plants. FWS estimates indicated that channel excavation and spoil disposal would eliminate 6,200 acres of shallow open water and 17,200 acres of marsh.

(Emphasis added)

This paragraph is consistent with Plaintiffs' statement. Defendant fails to explain how the "construct[ion of] a system of diked containment areas south of the channel alignment, equipped with weir outlets in the levee farthest removed from the channel" raises a dispute with Plaintiffs' statement, when Plaintiffs' Corrected Revised Undisputed Statement No. 4 observes that it the construction of the MR-GO channel, itself, that caused the wetlands destruction. Likewise, the fact that the Corps also studied alternate routes for the channel alignment is irrelevant since it was the actual *construction* of the MR-GO that caused the problem.

Finally, Defendant cites all 34 pages of Appendix 6 to Vol. IV of the IPET Report to support its claim that "whether the MRGO had a deleterious impact on wetlands and whether wetlands would have 'buffered' Katrina's storm surge are irrelevant. The storm surge generated by Hurricane Katrina was so high and so prolonged as to make the nature and extent of wetlands inconsequential." As noted above, Defendant cannot simply point to the entire document and expect the Court to just "figure it out for itself." In any event, the Appendix itself stated that its analysis was limited to studying the "hydrodynamic effects" of the MR-GO channel itself, *i.e.,* water movement in the canal. "This note discusses hydrodynamic model simulations that evaluate the influence of the MRGO on flooding during major hurricane events." *Id.* at IV-6-1. Therefore, this Appendix did not even mention the effect of the MR-GO on wetlands or

marshland, or the relationship between such loss of the natural buffer and the Katrina storm surge.  There is therefore no evidentiary support for Defendant's bald assertions that "[t]he storm surge generated by Hurricane Katrina was so high and so prolonged as to make the nature and extent of wetlands inconsequential."

Simply put, none of Defendant's cited authorities contravenes Plaintiffs' statement in Corrected Revised Fact No. 14.

**Plaintiffs' Corrected Revised Undisputed Fact No. 15**

In 1965 during the MR-GO's construction, the Army Corps told Congress that the MR-GO "provides a deep direct route for the in-flow of saline currents from the Gulf of Mexico to the area along this channel and to Lake Pontchartrain."  PUF Nos. 8.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 15**:

Uncontested and irrelevant. What the Corps told Congress is irrelevant to the immunity of the United States under § 702c. The hydrological influence of the MRGO confirms a relationship between the LPV and the MRGO.

**Plaintiffs' Reply to Defendant's Response to Fact No. 15:**

Undisputed by Defendant.  *See* Introduction.  The last sentence is an unsubstantiated assertion and a legal argument.

**Plaintiffs' Corrected Revised Undisputed Fact No. 16**

The MR-GO directly and indirectly destroyed tens of thousands of acres of wetlands and cypress forests.  PUF Nos. 40-49.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 16**:

Contested and irrelevant. *See* Day Dep. (Exh. 85) at 153:16-20 (reference pertains to a "larger system" and "was sort of a bit of rhetorical flourish)."

**Plaintiffs' Reply to Defendant's Response to Fact No. 16:**

Defendant cites no contrary evidence. The portion of Dr. John Day's deposition transcript (Exh. 85) cited by the Defendant does not dispute Plaintiffs' statement. At 152:5-12, Dr. Day notes that "[t]he numbers that are published in this report by Coastal Environments, the 1990 EPA St. Bernard report, they all gave numbers indicating the area of different habitats before and after MRGO. And the general indication that here were about 15,000 acres of cypress were killed." At pp. 152-153, Dr. Day was asked about the reference in his expert report where he "reference[d] tens of thousands of wetland acres were subsequently destroyed." (Exh. 85) 152:22-25. He responded that the figure included the MR-GO area and the area around Lake Pontchartrain. "When we say that, we were talking about the broader Pontchartrain Basin, too." (Exh. 85) 153:2-4. It was in the context of this testimony that Dr. Day observed that his calculations included the "larger system" and "was a bit of rhetorical flourish." According, the cited portion of Dr. Day's transcript does not refute, but instead supports Plaintiffs' Corrected Revised Undisputed Fact No. 16.

In addition, Plaintiff cites more than a dozen sources for the fact that the MR-GO directly and exclusively destroyed tens of thousands of acres of wetlands and cypress forests – (*see* PUF Nos. 40-79) – several of which are Army Corps documents.

**Plaintiffs' Corrected Revised Undisputed Fact No. 17**

It is widely agreed—and the Army Corps has acknowledged—that the presence of the MR-GO destroyed wetlands that otherwise would have provided additional surge defenses during Hurricane Katrina. PUF Nos. 40, 47-49, 110, 123, 295b, 309.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 17**:

Contested and irrelevant. Plaintiffs' § 702c expert, G. Paul Kemp, testified at his November 27, 2007 deposition that he did not have the ability to calculate or quantify the attenuating effect of wetlands on storm surge in the throat of the hurricane protection system at Lake Borgne during Hurricane Katrina. Kemp Dep. (Exh. 69) 200:3-16. Plaintiffs' § 702c expert, Shea Penland, testified during his deposition that he could not quantify the amount of wetlands loss attributable to the MR-GO. Penland Dep. (Exh. 86) 52:11-25- 54:1-14. The impact of the MRGO on wetlands is only relevant insofar as it demonstrates that the MRGO and the LPV were inextricably intertwined because the MRGO was a waterway within the hydrological system that the LPV was constructed to control during hurricanes.

**Plaintiffs' Reply to Defendant's Response to Fact No. 17:**

Plaintiffs' Corrected Revised Undisputed Fact No. 17 does not mention the "quantity" of wetlands destroyed, and accordingly any alleged inability to "quantify" the amount of wetlands destroyed does not contradict the statement.

In any event, Professor Kemp did not state that he could not quantify the amount of wetlands destroyed in the portion of his deposition cited by Defendant.  Dr. Kemp was first asked whether "attenuating effect of wetlands on storm surge cannot be calculated using present

surge models such as ADCIRC S08." (Exh. 69) 200:3-6. He responded "OK" (200:7), but then clarified that ADCIRC S08 "is an obsolete tool." (200:11). Then, when asked a leading question by Defendant's counsel about not having a tool to determine storm surge, Dr. Kemp responded "I don't know whether I do or not. I think they've been requested, but I'm not sure whether we've gotten them or not." (200:14-16). Thus, Dr. Kemp was testifying about tools for calculating storm surge, *not wetlands loss or their attenuating effect*, and as to the these tools, he did not state that they did not exist, rather he testified that he did not know if the appropriate tools – which existed – had been received yet for his use. In sum, his testimony does not establish that the wetlands destruction or even storm surge could not be quantified.

As for the Shea Penland deposition transcript cited by Defendant (Exh. 86), Dr. Penland was asked at (Exh. 86) 51:5-10 for the basis for his opinion that "the MRGO navigation channel is directly and indirectly responsible for tens of thousands of acres of coastal land loss." Dr. Penland replied that he participated in a study for the United States Department of Interior in the mid-1990's examining land loss for the entire deltaic plain between 1932 and 1990. (Exh. 86) 51:11-19. He commented that in his opinion, he had a rough estimate that the MR-GO caused the destruction of 20,000 to 30,000 acres of wetlands [(Exh. 86) 52:5-16], and in "my final report for this specific project, I'll be more specific." (Exh. 86) 52: 2-3. Thus, Dr. Penland's testimony also does not support the conclusion that the amount of wetlands cannot be quantified – but just the opposite.

In sum, Defendant's cited sources do not dispute Plaintiffs' Corrected Revised Undisputed Fact No. 17.

The last sentence – about the MR-GO and LPV being "inextricably intertwined – is pure argument and not supported by any evidentiary citations.

**Plaintiffs' Corrected Revised Undisputed Fact No. 18**

If these marshlands had not been destroyed by the MR-GO, nature's defenses would have

reduced surge caused by Hurricane Katrina by about three feet and spared Greater New Orleans

from catastrophic flooding. PUF Nos. 49, 294.


**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 18**:

Contested and irrelevant. *See* Kemp Dep. (Exh. 69) 200:3-16 (wetlands effect during

Hurricane Katrina cannot be calculated or quantified). The impact of the MRGO on wetlands is

only relevant insofar as it demonstrates that the MRGO and the LPV were inextricably

intertwined because the MRGO was a waterway within the hydrological system that the LPV

was constructed to control during hurricanes.


**Plaintiffs' Reply to Defendant's Response to Fact No. 18:**

Defendant again misstates the substance of evidence, which in fact does not validate its

claim.  Defendant's assertion that "[t]he impact of the MRGO on wetlands is

only relevant insofar as it demonstrates that the MRGO and the LPV were inextricably

intertwined because the MRGO was a waterway within the hydrological system that the LPV

was constructed to control during hurricanes," is a legal argument, not supported by any factual

citation is therefore irrelevant, and, in any event, Defendant has previously denied this

relationship.  *See* June 22, 2007 United States' Rebuttal of Plaintiffs' Sur-Reply in Support of

Opposition to Defendant's Motion to Certify at 4 & 8-9.

In any event, Professor Kemp did not state that he could not quantify the amount of

wetlands destroyed in the portion of his deposition cited by Defendant.  Dr. Kemp was first

asked whether "attenuating effect of wetlands on storm surge cannot be calculated using present surge models such as ADCIRC S08." (Exh. 69) 200:3-6.  He responded "OK" (200:7), but then clarified that ADCIRC S08 "is an obsolete tool."  (200:11) Then, when asked a leading question by Defendant's counsel about not having a tool to determine storm surge, Dr. Kemp responded "I don't know whether I do or not. I think they've been requested, but I'm not sure whether we've gotten them or not."  (200:14-16).  Thus, Dr. Kemp was testifying about tools for calculating storm surge, *not wetlands loss or their attenuating effect*, and as to the these tools, he did not state that they did not exist, rather he testified that he did not know if the appropriate tools – which existed – had been received yet for his use.  In sum, his testimony does not establish that the wetlands destruction or storm surge could not be quantified, and Defendant's cited evidence does not contradict Plaintiffs' Corrected Revised Undisputed Fact No. 18

**Plaintiffs' Corrected Revised Undisputed Fact No. 19**

The Army Corps' expert, Dr. Robert Dalrymple, attributes over three feet of additional storm surge against Reach 2 because of the destroyed adjacent wetlands. PUF No. 294.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 19**:

Contested and irrelevant. Robert Dalrymple has provided no testimony in this case and is not an expert for the United States in *Robinson*. Dr. Dalrymple testified that he had not performed any studies to determine what the surge height would have been in Reach 2 of the MR-GO if the wetlands had not been destroyed. He also stated that there were uncertainties with the ADCIRC modeling of storm surge. Dalrymple Dep. (Exh. 28) at 143:6-25 to 144:1-13. This statement is not relevant for purposes of determining the United States immunity under 33 U.S.C. § 702c. The impact of the MRGO on wetlands is only relevant insofar as it demonstrates

that the MRGO and the LPV were inextricably intertwined because the MRGO was a waterway within the hydrological system that the LPV was constructed to control during hurricanes.

**Plaintiffs' Reply to Defendant's Response to Fact No. 19:**

Defendant inaccurately claims that Mr. Dalrymple's testimony is inadmissible because he has offered no testimony in this care and is not an expert for the United State in this action.  The United States designated Dr. Dalrymple as an expert in the consolidated MR-GO Master Complaint case in which this sited deposition testimony was taken.  Under Fifth Circuit jurisprudence, testimony by a person charged by a party with investigating or studying an incident is admissible as a party admission under Evid. Code § 801(d)(2)(C).  *See Collins v. Wayne Corp.*, 621 F.2d 777, 781 (5th Cir. 1980) ("The district court erred in not allowing the plaintiffs to offer Greene's deposition into evidence as an admission of Wayne. Wayne stated in its response to the plaintiffs' interrogatory that it had employed Greene as an expert to investigate and analyze the bus accident.").  Accordingly, Dr. Dalrymple's testimony is both relevant and admissible.

Plaintiffs' statement is predicated on Dr. Dalrymple's deposition testimony (Exh. 28) at 143:6-144:7.  In this portion of his transcript Dr. Dalrymple testified that he knew that IPET had performed some ADCIRC modeling and derived the figure of three feet of additional storm surge from the loss of wetlands.  Defendant counters this assertion by claiming Dr. Dalrymple "stated there were uncertainties with the ADCIRC modeling of storm surge," but Defendant provides this Court with only a skewed version of the facts.  Professor Dalrymple testified that the zone of uncertainty was only 15% or 20%.  Dalrymple Depo. (Exh. 28) 144:8-13.  Thus, the level of storm surge caused by the destruction of the wetlands, according to Dr. Dalrymple's testimony

and factoring in this "zone of uncertainty," could range from 2.4 meters to 3.6 meters, but this does not support Defendant's implication that these uncertainties undermine Plaintiffs' Corrected Revised Undisputed Fact No. 19.

As for the remainder other the Defendant's contention about the relevance of the MR-GO wetlands, this is a legal conclusion, not based on any facts, and therefore irrelevant. *See* Introduction.

**Plaintiffs' Corrected Revised Undisputed Fact No. 20**

In designing the MR-GO, the Army Corps knew that there would be stability problems with the channel cut because of ship wake erosion of the unstable banks, comprised of an almost ubiquitous 10 feet of marsh/swamp peat at the surface and scattered deposits of sandy-silt and silty-sand at greater depths and that this bank erosion would accelerate the loss of protective marshland.  PUF Nos. 30-32.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 20**:

Contested and irrelevant.  *See* GDM 1B (Exh. 15) at 5, ¶ 19; Army Corps of Eng'rs Dep. (Exh. 8) at 490:18-25-492:1-14, 147:7.

**Plaintiffs' Reply to Defendant's Response to Fact No. 20:**

Defendant's cited evidence does not dispute Plaintiffs' fact.  First, GDM 1B (Exh. 15) at 5, ¶ 19 specifically states that "erosion due to wave wash in open areas *can be expected* in the upper part of the channel slope where the peat and highly organic clays are exposed."  (Emphasis added).

With respect to the Army Corps Rule 30(b)(6) deposition (490:18-25-492:1-14) cited by

Defendant, the testimony at (Exh. 8) p. 490 came from a Army Corps employee Keith O'Cain, a civil engineer employed by the New Orleans District (Exh. 8) 485:6-7; 487:2-4.  In the portion of the transcript cited by Defendant (Exh. 8)490:18-25), Mr. O'Cain was asked if he was "involved at all in channel stabilizations for the M R G GO what I call the MRGO?"  Mr. O'Cain responded "*No, sir, not to any great extent*."  He clarified that he had *recently* been involved in performing a "maintenance lift on foreshore protection" which involved placing large stones and rocks along the MR-GO's banks.  (Exh. 8) 490:21-492:14.  In sum, other than being involved in some recent maintenance on the MR-GO, Mr. O'Cain *had no* knowledge about either the design or projected shoreline stability problems at the time the MR-GO was designed.

With respect to p. 147:7 from the Rule 30(b)(6) deposition also cited by Defendant, the cited line merely states "That's correct" without even identifying the question.  In fact, the person testifying was Alfred Naomi, (Exh. 8) 112:6-7.  Mr. Naomi is a Branch Chief in the Army Corps Protection and Restoration Office. (Exh. 8) 117:7-14.  At (Exh. 8) 147:2-6, Mr. Naomi was asked "[s]o the initial authorization that we see here from the Flood Control Act of 1965 in House document 231 was less – was smaller in scale than what was ultimately authorized."  Mr. Naomi then responded "That's correct."  (Exh. 8) 147:7.  In sum, (Exh. 8) 147:7 cited by Defendant to refute Plaintiffs' Corrected Revised Undisputed Fact No. 20 has absolutely nothing to do with erosion or channel stability, but rather addressed the size of the LPV.

As explained, none of Defendant's cited authorities refutes Plaintiffs' Corrected Revised Undisputed Statement No. 20.

**Plaintiffs' Corrected Revised Undisputed Fact No. 21**

The Army Corps did not prescribe erosion protection from wave wash (such as armoring) for the MR-GO's unstable banks. PUF Nos. 31, 33, 36, 37.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 21**:

Contested and irrelevant. *See* General Design Memorandum 1B (Exh. 15) at 5, ¶ 19 (recommending against "channel protection" despite expectation that wave wash would result in erosion of channel slope); Army Corps of Eng'rs Dep. (Exh. 8) at 490:18-25-492:1-14, 147:7 (foreshore protection consisting of limestone rock was eventually provided). This statement is not relevant for purposes of determining the United States immunity under 33 U.S.C. § 702c. The impact of the MRGO on wetlands is only relevant insofar as it demonstrates that the MRGO and the LPV were inextricably intertwined because the MRGO was a waterway within the hydrological system that the LPV was constructed to control during hurricanes.


**Plaintiffs' Reply to Defendant's Response to Fact No. 21:**

Defendant's cited evidence does not dispute Plaintiffs' fact.  First, GDM 1B (Exh. 15) did not "recommend against 'channel protection.'"  It simply stated that none would be provided even though "erosion due to wave wash in open areas *can be expected* in the upper part of the channel slope where the peat and highly organic clays are exposed."  (Emphasis added).

With respect to the Army Corps Rule 30(b)(6) deposition (490:18-25-492:1-14) cited by Defendant, the testimony at (Exh. 8) p. 490 came from a Army Corps employee Keith O'Cain, a civil engineer for the New Orleans District (Exh. 8) 485:6-7; 487:2-4.  In the portion of the transcript cited by Defendant (Exh. 8) 490:18-25, Mr. O'Cain was asked if he was "involved at all in channel stabilizations for the M R G GO what I call the MRGO?"  Mr. O'Cain responded "*No, sir, not to any great extent*."  He clarified that he had *recently* been involved in performing a "maintenance lift on foreshore protection" which involved placing large stones and rocks along

the MR-GO's banks. (Exh. 8) 490:21-492:14. In sum, other than being involved in some recent maintenance on the MR-GO, Mr. O'Cain *had no* knowledge about either the design or projected shoreline stability problems at the time the MR-GO was designed.

With respect to p. 147:7 from the Rule 30(b)(6) deposition also cited by Defendant, the cited line merely states "That's correct" without even identifying the question. In fact, the person testifying was Alfred Naomi, (Exh. 8) 112:6-7. Mr. Naomi is a Branch Chief in the Army Corps Protection and Restoration Office. (Exh. 8) 117:7-14. At (Exh. 8) 147:2-6, Mr. Naomi was asked "[s]o the initial authorization that we see here from the Flood Control Act of 1965 in House document 231 was less – was smaller in scale than what was ultimately authorized." Mr. Naomi then responded "That's correct." (Exh. 8) 147:7. In sum, (Exh. 8) 147:7 cited by Defendant to refute Plaintiffs' Corrected Revised Undisputed Fact No. 20 has absolutely nothing to do with erosion or channel stability, but rather addressed the size of the LPV.

As explained, none of Defendant's cited authorities refutes Plaintiffs' Corrected Revised Undisputed Statement No. 21.

As for the last five sentences in Defendant's response arguing that the statement is irrelevant, this is a legal conclusion unsupported by facts and is therefore irrelevant to Defendant's opposition separate statement *of facts*. *See* Introduction.

**Plaintiffs' Corrected Revised Undisputed Fact No. 22**

Over the years, ship wakes (as high as three or four feet) widened the original 650 feet channel—at a rate of between 10 and 20 feet per year on each bank—to 2,000 feet and in some places, to 3,000 feet. PUF Nos. 33, 34.

**Response to Plaintiffs' Corrected Revised Undisputed Fact No. 22**:

Contested and irrelevant. *See* MR-GO Deep-Draft De-authorization Study, Main Report, Vol. I, at 5-7. The impact of the MRGO on wetlands is only relevant insofar as it demonstrates that the MRGO and the LPV were inextricably intertwined because the MRGO was a waterway within the hydrological system that the LPV was constructed to control during hurricanes.

**Plaintiffs' Reply to Defendant's Response to Fact No. 22:**

The MR-GO Deep-Draft De-authorization Study at pp. 5-7 cited by Defendant does not refute Plaintiffs' Corrected Revised Undisputed Fact No. 23 – indeed, it supports the point. Page 5 included a map of the MR-GO and discussed the negative impact of the MR-GO on wetlands, and the necessity of bank stabilization measures. Page 6 addressed spoil disposal, costs of construction, operation, and maintenance, and shoaling during Hurricane Katrina. Page 7 outlines the proposed MR-GO shoreline protection measures. There is no discussion of ship wake erosion in any of these three pages.

In fact, there are statements in the document that establish the existence of erosion caused by ship wakes. The report (Exh. 11, p. 58) stated, with respect to an alternative to close the MR-GO at Bayou La Loutre, that "[i]t is assumed that there would be less bank erosion on the MRGO between the GIWW and the Gulf of Mexico than with the future without condition since *there would be no deep- or shallow-draft traffic on the closed channel.*" At page 59, the report states "[i]t can be assumed that some deep and shallow-draft vessels until about 2014, *which is estimated to cause more bank erosion on unprotected banks of the MRGO . . . .*"

Plaintiffs' Corrected Revised Undisputed Fact No. 22 is therefore not disputed by Defendant.

**Plaintiffs' Corrected Revised Undisputed Fact No. 23**

This increase in the unprotected channel's width and volume of water had several adverse

effects, including (1) the breaching of the Lake Borgne shoreline adjacent to the MR-GO which

allowed storm surge within Lake Borgne to dump directly into the MR-GO; (2) the enormous

loss of marshland adjacent to the channel; and (3) shoaling within the MR-GO.  PUF Nos. 32-35,

38-39, 40-42.


**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 23**:

Contested and irrelevant. *See* IPET (Exh. 20) Vol. IV, at 136, 258. The impact of the

MRGO on wetlands is only relevant insofar as it demonstrates that the MRGO and the LPV were

inextricably intertwined because the MRGO was a waterway within the hydrological system that

the LPV was constructed to control during hurricanes.


**Plaintiffs' Reply to Defendant's Response to Fact No. 23:**

The last four sentences of Defendant's response is a legal argument unsupported by any

fact, and therefore irrelevant.  *See* Introduction.

Moreover, the evidence cited by Defendant does not rebut Plaintiffs' statement.  The

IPET Report (Exh. 20) Vol. IV at IV-136 addressed only the "change in storm surge induced by

MRGO/Reach 2."  Similarly, the IPET Report (Exh. 20) Vol. IV at IV-258 noted that:

> From the perspective of storm surge propagation into the IHNC
> and New Orleans Metropolitan area, the critical section of channel
> is the one where the GIWW and MRGO occupy the same channel.
> It is through the connection that Lakes Pontchartrain and Borgne
> are hydraulically connected to one another via the IHNC.

Neither document examined the relationship between the widening of the MR-GO and

either (1) "the breaching of the Lake shoreline adjacent to the MR-GO which allowed storm

surge within Lake Borgne to dump directly into the MR-GO;" (2) "the enormous loss of

marshland adjacent to the channel;" or (3) "shoaling within the MR-GO."  Clearly, Defendant's

cited evidence did not refute Plaintiffs' Corrected Revised Undisputed Fact No. 23.

**Plaintiffs' Corrected Revised Undisputed Fact No. 24**

In Section 204 of the Flood Control Act of 1965 (Pub.L.No. 89-298, 79 Stat. 1073 (October 27,

1965), Congress directed the Army Corps to build "works of improvement for . . . the control of

destructive floodwaters" and a "project for hurricane-flood protection on Lake Pontchartrain,

Louisiana."  PUF No. 321; *see also* PUF No. 65.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 24**:

Uncontested.

**Plaintiffs' Reply to Defendant's Response to Fact No. : 24**

Undisputed by Defendant.

**Plaintiffs' Corrected Revised Undisputed Fact No. 25**

Accepting the Chief of Engineer's recommendation in House Document No. 231, Congress

authorized the LPVHPP to protect the areas around Lake Pontchartrain from flooding caused by

storm surge or rainfall associated with a Standard Project Hurricane ("SPH").  PUF No. 66, 71,

321.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 25**:

Uncontested.

**Plaintiffs' Reply to Defendant's Response to Fact No. 25:**

Undisputed by Defendant.

**Plaintiffs' Corrected Revised Undisputed Fact No. 26**

The SPH—selected because of the area's urban nature—represented "the most severe combination of meteorological conditions considered reasonably characteristic for the region." MSJ Exh. 10 (H.R. Doc. No. 89-231) at p. 46; PUF Nos. 66, 73, 83.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 26**:

Contested and irrelevant. There is no evidence that the SPH was selected because of the "area's urban nature." *See generally* H.R. Doc. No. 89-231 (Exh. 10). The reason for selecting the SPH and what it was intended to represent are irrelevant because § 702c immunity does not turn on "the character of the federal project." *Central Green Co. v. United States,* 531 U.S. 425, 434, 437 (2001). The existence of flood protection embankments, *i.e.,* levees, along the MRGO at the time of Hurricane Katrina is uncontested, as is their overtopping and erosion by storm surge.

**Plaintiffs' Reply to Defendant's Response to Fact No. 26:**

The last five sentences in Defendant's response is a legal argument, unsupported by facts, and therefore irrelevant to this separate statement of facts. With respect to Defendant's citation to Exh. 10, Defendant cannot simply point to a entire 265 page document, and expect the Court to simply figure out for itself what Defendant refers to. Therefore, Defendant has cited no facts refuting Plaintiffs' Corrected Revised Undisputed Fact No. 26, and it should be deemed

admitted.

Finally, all the evidence cited by Plaintiffs (*see* PUF Nos. 6, 73, and 78) fully support this statement.

**Plaintiffs' Corrected Revised Undisputed Fact No. 27**

Congress approved specific design heights for various stretches of the system.  PUF No. 74.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 27:**

Contested and irrelevant. Congress did not approve specific design heights.  It is well established that laws such as Pub. L. No. 89-298 which authorize projects "substantially in accordance with" the Corps' recommendations do not prescribe a particular course of conduct but merely set guidelines that giver the Corps discretion to modify plans as the project proceeds.  *See Creppel v. U.S. Army Corps of Eng'rs*, 670 F.2d 564, 572-73 (5th Cir. 1982); *Allison v. Froehlke*, 470 F.2d 1123, 1125-26 (5th Cir. 1972); *Missouri v. Ashcroft*, 526 F. Supp. 660, 668 (W.D. Mo. 1980); *United States v. 2,606.84 Acres of Land*, 309 F. Supp. 887 (N.D. Tex. 1969), rev'd on other grounds, 432 F.2d 1286 (5th Cir. 1970); cf. *United States v. Spoonbarger*, 308 U.S. 256, 268 (1939).  Furthermore, this statement is irrelevant because the scope of immunity conferred by § 702c is not determined "by the character of the flood control project." *Central Green*, 531 U.S. at 434.

**Plaintiffs' Reply to Defendant's Response to Fact No. 27:**

Defendant cites no facts creating a factual dispute as required by Rule 56.2 of the Local Rules for the United States District Court for the Eastern District of Louisiana, but only offers an inappropriate legal argument.  Pursuant to this Rule, therefore, Plaintiffs' Corrected Revised

Undisputed Fact No. 27 is admitted.  *See* Introduction.

Moreover, as explained in more detail in Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Motion for Summary Adjudication, the cases cited do not recognize the Army Corps's unfettered discretion to make unilateral project changes.  As the Fifth Circuit stated in *Creppel v. United States Army Corps of Engineers*, 670 F.2d 564 (5th Cir. 1982), "*[a]ny change must . . . serve the original purpose of the project*."  *Id*. at 573 (emphasis added).  It further noted that "[t]he modifications *must be accomplished with adequate notice and in accordance with the procedure mandated by federal regulations.*  The modifications must not disregard or seek to evade the substantive statutory requirements."  *Id*.  (emphasis added).

Finally, Plaintiffs cited as a source H.R. Doc. No. 89-231 (Exh. 10) at p. 46 which specifically stated that "[a] standard project hurricane, SPH, is one that may be expected from the most severe combination of meteorological conditions that are considered reasonably characteristic of the region."

**Plaintiffs' Corrected Revised Undisputed Fact No. 28**

In the Flood Control Act of 1965, Congress mandated armoring in the form of rip-rap slope protection along the navigation channel and flood gates.  PUF Nos. 5, 67, 124; MSJ Exh. 10 (H.R. Doc. No. 89-231) at p. 9, ¶ 12.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 28**:

Contested and irrelevant. The cited documents do not support the assertion that Congress mandated any form of 'armoring." Laws such as Pub. L. No. 89-298, which authorize projects "substantially in accordance with" the Corps' recommendations, do not prescribe a particular course of conduct but merely set guidelines that give the Corps discretion to modify plans as the

project proceeds. *See Creppel v. U.S. Army Corps of Eng'rs*, 670 F.2d 564, 572-73 (5th Cir. 1982); *Allison v. Froehlke*, 470 F.2d 1123, 1125-26 (5th Cir. 1972); *Missouri v. Ashcroft*, 526 F. Supp. 660, 668 (W.D. Mo. 1980); *United States v. 2,606.84 Acres of Land*, 309 F. Supp. 887 (N.D. Tex. 1969), rev'd on other grounds, 432 F.2d 1286 (5th Cir. 1970); cf. *United States v. Spoonbarger*, 308 U.S. 256, 268 (1939). Furthermore, this statement is irrelevant. The issue of immunity under 702c is not determined "by the character of the flood control project." *Central Green*, 531 U.S. at 434. Whether LPV had slope protection "armoring" has no bearing on whether the United States is immune from liability for the damage caused by the floodwaters that the LPV was unable to control. Further, Plaintiffs have conflated "armoring," which is a form of protection for flood control structures, with shoreline protection, which pertains to waterways, not flood control structures.

**Plaintiffs' Reply to Defendant's Response to Fact No. 28:**

Defendant cites no facts creating a factual dispute as required by Rule 56.2 of the Local Rules for the United States District Court for the Eastern District of Louisiana, but only offers an inappropriate legal argument. Pursuant to this Rule, therefore, Plaintiffs' Corrected Revised Undisputed Fact No. 28 is admitted. *See* Introduction.

Moreover, as explained in more detail in Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Motion for Summary Adjudication, the cases cited do not recognize the Army Corps's unfettered discretion to make unilateral project changes. As the Fifth Circuit stated in *Creppel v. United States Army Corps of Engineers*, 670 F.2d 564 (5th Cir. 1982), "*[a]ny change must . . . serve the original purpose of the project*." *Id*. at 573 (emphasis added). It further noted that "[t]he modifications *must be accomplished with adequate notice and in accordance with the*

*procedure mandated by federal regulations.*  The modifications must not disregard or seek to evade the substantive statutory requirements." *Id.*  (emphasis added).

Finally, the sources cited by Plaintiff (*see* PUF Nos. 5, 67, 127 and H.R. Doc. No. 89-231 (Exh. 10) at p. 9, ¶ 12 fully supports this statement.

**Plaintiffs' Corrected Revised Undisputed Fact No. 29**

In the Flood Control Act of 1965, Congress directed the Army Corps to consider in the engineering design process the concept of storms much more intense than the SPH by referencing for the general design plan a more stringent design hurricane known as the Probable Maximum Hurricane ("PMH").  MSJ Exh. 10 (H.R. Doc. No. 89-231) at pp. 20, 46-47; PUF Nos. 202-03.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 29**:

Contested and irrelevant. The documents cited by Plaintiffs do not support the notion that Congress directed the Corps specific "concepts." It is well established that laws such as Pub.L. No. 89-298 which authorize projects "substantially in accordance with" the Corps' recommendations do not prescribe a particular course of conduct, but merely set guidelines that give the Corps discretion to modify plans as the project proceeds. *See Creppel v. U.S. Army Corps of Eng'rs,* 670 F.2d 564, 572-73 (5th Cir. 1982); *Allison v. Froehlke,* 470 F.2d 1123, 1125-26 (5th Cir. 1972); *Missouri v. Ashcroft,* 526 F. Supp. 660, 668 (W.D. Mo. 1980); *United States v. 2,606.84 Acres of Land,* 309 F. Supp. 887 (N.D. Tex. 1969), rev'd on other grounds, 43 F.2d 1286 (5th Cir. 1970); *cf. United States v. Spoonbarger,* 308 U.S. 256, 268 (1939). Furthermore, this statement is irrelevant. The issue of immunity under 702c is not determined "by the character of the flood control project." *Central Green*, 531 U.S. at 434.

What the Corps considered has no bearing on the immunity of the United States from liability for damage from the floodwaters that the LPV was unable to control.

**Plaintiffs' Reply to Defendant's Response to Fact No. 29:**

Defendant cites no facts creating a factual dispute as required by Rule 56.2 of the Local Rules for the United States District Court for the Eastern District of Louisiana, but only offers an inappropriate legal argument.  Pursuant to this Rule, therefore, Plaintiffs' Corrected Revised Undisputed Fact No. 29 is admitted.  *See* Introduction.

Moreover, as explained in more detail in Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Motion for Summary Adjudication, the cases cited do not recognize the Army Corps's unfettered discretion to make unilateral project changes.  As the Fifth Circuit stated in *Creppel v. United States Army Corps of Engineers*, 670 F.2d 564 (5th Cir. 1982), "*[a]ny change must . . . serve the original purpose of the project*."  *Id*. at 573 (emphasis added).  It further noted that "[t]he modifications *must be accomplished with adequate notice and in accordance with the procedure mandated by federal regulations.  The modifications must not disregard or seek to evade the substantive statutory requirements*."  *Id*.  (emphasis added).

**Plaintiffs' Corrected Revised Undisputed Fact No. 30**

Neither armoring nor PMH assumptions were incorporated into the LPVHPP.  PUF Nos. 76, 204.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 30**:

Contested and irrelevant. Grass is suitable as a form of armoring. *See* MSJ Ex. 8, at

83:1-17. The Plaintiffs' expert, Dr. Bea, admits that the levees along MRGO were armored by grass. *See* MSJ Ex. 31 at 91. This statement is irrelevant because the issue of immunity under 702c is not determined "by the character of the flood control project." *Central Green*, 531 U.S. at 434. What the Corps incorporated into the LPV has no bearing on the immunity of the United States from liability for damage from the floodwaters that the LPV was unable to control.

**Plaintiffs' Reply to Defendant's Response to Fact No. 30:**

The last four sentences of Defendant's response is a legal conclusion, without any factual support, and therefore irrelevant. *See* Introduction. In addition, the statement states that neither armoring *nor* PMH assumptions were incorporated into the LPVHPP. Defendant attempts to rebut only the armoring issue, and it therefore admits that PMH assumptions were not incorporated into the LPVHPP.

The Army Corps Rule 30(b)(6) deposition transcript (Exh. 8) cited by Defendant at 83:1-17 provides testimony from Walter Baumy, Jr., Chief of Engineers for the New Orleans District. (Exh. 8) 17:22-18:4. In the portion of his testimony referenced by Defendant, Mr. Baumy merely confirmed that the 1978 version of an Army Corps manual – *Design and Construction of Levees* – stated that "[s]ometimes it may be concluded that low cost protection such as grass cover will be adequate in general for a levee reach." Defendant then asserts that grass "is suitable as a form or armoring." Even if this were true, this does not establish "armoring assumption were incorporated into the LPVHPP." Moreover, Defendant cites the Bea Report for the proposition that "[t]he Plaintiffs' expert, admits that the levees along MRGO were armored by grass." This is not true. Dr. Bea stated in his report at p. 91, ¶ 119 (Exh. 31) just the opposite, *i.e.*, that "*[t]here was no substantial armoring of these levees. The EBSBs were only

protected by spotty patches of grass."  (Emphasis added).

Once again, Defendant's cited evidence does not refute Plaintiffs' Corrected Revised Undisputed Statement No. 30.

**Plaintiffs' Corrected Revised Undisputed Fact No. 31**

A hurricane protection system designed with the more protective PMH criteria and armoring would have yielded more resilient and robust flood control structures that would not fail upon expected overtopping in the event of storms whose intensity exceeded that of the SPH.  PUF Nos. 95-96, 204-205.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 31**:

Contested and irrelevant. This is an opinion rather than a statement of fact. The proffered consequence is unsupported by the citations referenced. This statement is irrelevant because the issue of immunity under 702c is not determined "by the character of the flood control project." *Central Green*, 531 U.S. at 434. What the Corps incorporated into the LPV has no bearing on the immunity of the United States from liability for damage from the floodwaters that the LPV was unable to control.

**Plaintiffs' Reply to Defendant's Response to Fact No. 31:**

Defendant cites no facts creating a factual dispute as required by Rule 56.2 of the Local Rules for the United States District Court for the Eastern District of Louisiana, but only offers an inappropriate legal argument.  Pursuant to this Rule, therefore, Plaintiffs' Corrected Revised Undisputed Fact No. 31 is admitted.  *See* Introduction.

Moreover, Defendant fails to explain why the statement is "an opinion rather than a

statement of fact," or why "[t]he proffered consequence is unsupported by the citations

referenced."

**Plaintiffs' Corrected Revised Undisputed Fact No. 32**

Without this added measure of protection afforded by higher elevations and armoring,

overtopped floodwalls and earthen structures failed because the soils behind them on the

protected side (facing towards land) were eroded and contributed to the failure of the floodwalls

and earthen structures.  PUF Nos. 204, 205.


**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 32**:

Contested and irrelevant. This is an opinion rather than a statement of fact. The

proffered consequence is unsupported by the citations referenced. This statement is irrelevant

because the issue of immunity under 702c is not determined "by the character of the flood

control project." *Central Green*, 531 U.S. at 434. What the Corps incorporated into the LPV has

no bearing on the immunity of the United States.


**Plaintiffs' Reply to Defendant's Response to Fact No. 32:**

Defendant cites no facts contradicting Plaintiffs' Corrected Revised Undisputed Fact No.

32.  Nor does it explain why Plaintiffs' statement is an "opinion," or why the evidence cited by

Plaintiffs fails to support the statement.  Accordingly, Plaintiffs' Corrected Revised Undisputed

Fact No. 32 is admitted.  *See* Introduction.

**Plaintiffs' Corrected Revised Undisputed Fact No. 33**

The Army Corps did not build the HPS according to the Congressionally-mandated SPH

requirements in at least eight critical respects. The Army Corps:

∗   knowingly used obsolete SPH design criteria instead of the updated 1972 and 1979

versions—despite admitting in 1976 that it needed to raise levee heights because of the 1972

SPH change and a 1981 order of the Chief Engineer to use the 1979 SPH (PUF Nos. 95-106);

∗   failed to use available SLOSH and ADCIRC storm surge computer models that it helped

develop and finance; (PUF Nos. 107-109);

∗   ignored a warning in 1958 from the U.S. Coastal and Geodetic Survey of subsiding

benchmarks in Greater New Orleans and failed to use updated vertical datums in designing

crown elevations for flood control structures (PUF Nos. 112-113; 239-41);

∗   did not take into account known subsidence problems in establishing design elevations

for flood control structures (PUF Nos.112-15; 119-23242-43);

∗   did not take into consideration known diminished surge protection from vanishing

wetlands and cypress forests (PUF Nos. 46-49, 110);

∗   used sandy, erosion-prone soils prohibited by its own levee and coastal engineering

manuals (PUF Nos. 24-28, 129-31, 138-39, 326-35);

∗   did not armor flood control structures to prevent scouring and erosion upon overtopping

(PUF Nos. 125, 127-128, 198); and

∗   failed to design and build the HPS to the level of protection mandated in the Flood

Control Act of 1965 because the levee crowns were lower than specified for the SPH dimension

due to predictable settlement and sea level rise (PUF Nos. 168-69, 171-73, 178-79).


**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 33**:

Contested and irrelevant. The documents cited by Plaintiffs provide not support for this

statement. Congress did not mandate particular requirements. Pub. L. No. 89-298 did not

prescribe a particular course of conduct but merely set guidelines that afforded considerable room for discretion. See *Creppel v. U.S. Army Corps of Eng'rs*, 670 F.2d 564, 572-73 (5th Cir. 1982); *Allison v. Froehlke*, 470 F.2d 1123, 1125-26 (5th Cir. 1972); *Missouri v. Ashcroft*, 526 F. Supp. 660, 668 (W.D. Mo. 1980); *United States v. 2,606.84 Acres of Land*, 309 F. Supp. 887 (N.D. Tex. 1969), rev'd on other grounds, 432 F.2d 1286 (5th Cir. 1970); cf. *United States v. Spoonbarger*, 308 U.S. 256, 268 (1939). This statement is irrelevant because the issue of immunity under 702c is not determined "by the character of the flood control project." *Central Green*, 531 U.S. at 434. What the Corps incorporated into the LPV has no bearing on the immunity of the United States.

**Plaintiffs' Reply to Defendant's Response to Fact No. 33:**

Defendant cites no facts supporting its statement and therefore the Plaintiffs' Corrected Revised Undisputed Fact No. 33 is admitted. *See* Introduction.

Moreover, as explained in more detail in Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Motion for Summary Adjudication, the cases cited do not recognize the Army Corps's unfettered discretion to make unilateral project changes. As the Fifth Circuit stated in *Creppel v. United States Army Corps of Engineers*, 670 F.2d 564 (5th Cir. 1982), "*[a]ny change must . . . serve the original purpose of the project*." *Id*. at 573 (emphasis added). It further noted that "[t]he modifications *must be accomplished with adequate notice and in accordance with the procedure mandated by federal regulations*. The modifications must not disregard or seek to evade the substantive statutory requirements." *Id*. (emphasis added).

Defendant fails to explain how the plethora of documents, deposition testimony and expert reports cited by Plaintiffs fails to support their statement.

48

Defendant also omits any factual or even legal basis for its conclusion that Congress did not mandate particular requirements.  The remainder of Defendant's statement is an irrelevant legal argument.  Accordingly, Plaintiffs' Corrected Revised Undisputed Fact No. 33 is admitted. *See* Introduction.

**Plaintiffs' Corrected Revised Undisputed Fact No. 34**

The Army Corps' expert, Dr. Robert Dalrymple of Johns Hopkins University has testified that "[w]hatever system the Corps built by the time of Katrina after 1965 was [not] designed to deal with the most severe combination of meteorological conditions that are considered reasonably characteristic of this region"—the definition of the SPH that Congress mandated for Greater New Orleans in the Flood Control Act of 1965.  PUF No. 163; *see also* PUF No. 164 (Plaintiffs' expert); 102 (Team Louisiana).

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 34**:

Contested and irrelevant. Robert Dalrymple has provided no testimony in this case and is not an expert for the United States in *Robinson*. Furthermore, the statement is too vague to be relevant. The parameters of the SPH changed between 1959 and 1979. *See* MSJ Ex. 26 at 3-8, Table 3-1. The statement is vague as to which iteration of the SPH is being referenced, making a specific response impossible. This statement is irrelevant because the issue of immunity under 702c is not determined "by the character of the flood control project." *Central Green*, 531 U.S. at 434. What the Corps incorporated into the LPV has no bearing on the immunity of the United States.

**Plaintiffs' Reply to Defendant's Response to Fact No. 34:**

Defendant does not question the fact that Dr. Dalrymple made the statement attributed to him. The simply assert that he "has provided no testimony in this case and is not an expert for the United States in *Robinson*. As noted with respect to Plaintiffs' Corrected Revised Undisputed Fact No. 19, Dr. Dalrymple was designated by the United States as an expert in the Consolidated Master Complaint case. Under Fifth Circuit jurisprudence testimony by a person charged by a party with investigating or studying an incident is admissible as a party admission under Evid. Code § 801(d)(2)(C). *See Collins v. Wayne Corp.*, 621 F.2d 777, 781 (5th Cir. 1980) ("The district court erred in not allowing the plaintiffs to offer Greene's deposition into evidence as an admission of Wayne. Wayne stated in its response to the plaintiffs' interrogatory that it had employed Greene as an expert to investigate and analyze the bus accident."). Accordingly, Dr. Dalrymple's testimony is both relevant and admissible.

Citing Exhibit 26 Defendant claims that the reference to the SPH is too vague because the changed between 1959 and 1979, but Defendant misses the point. The issue is not whether Congress mandated compliance with any particular iteration of the SPH, but whether it directed the Army Corps to build a flood control system based on the SPH in general. Unquestionably, as Plaintiffs' sources demonstrate, this is precisely what Congress did. Defendant now concedes that the SPH changed over time; the problem was that the Army Corps never factored in these revisions despite having been told by Congress to construct a system that would protect against the "SPH."

The last three sentences of Defendant's response is an irrelevant legal argument, and therefore, Defendant cites no facts that refute Plaintiffs' Corrected Revised Undisputed Fact No. 34. *See* Introduction.

**Plaintiffs' Corrected Revised Undisputed Fact No. 35**

The Army Corps' failure to build the LPVHPP system as mandated by Congress had deadly consequences when Hurricane Katrina hit Greater New Orleans.   PUF No. 106, 210, 263-67, 269-76.


**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 35**:

Contested and irrelevant. The only consequence of any relevance to the issue of § 702c immunity is the alleged damage that was caused by the floodwaters that the LPV were unable to control. Pub. L. No. 89-298, which authorize projects "substantially in accordance with" the Corps's recommendations, did not prescribe a particular course of conduct, but merely set guidelines that afforded considerable discretion to the Corps as the project proceeded. *See Creppel v. U.S. Army Corps of Eng'rs*, 670 F.2d 564, 572-73 (5th Cir. 1982); *Allison v. Froehlke*, 470 F.2d 1123, 1125-26 (5th Cir. 1972); *Missouri v. Ashcroft*, 526 F. Supp. 660, 668 (W.D. Mo. 1980); *United States v. 2,606.84 Acres of Land*, 309 F. Supp. 887 (N.D. Tex. 1969)*, rev'd on other grounds,* 432 F.2d 1286 (5th Cir. 1970); *cf. United States v. Spoonbarger*, 308 U.S. 256, 268 (1939).  Furthermore, this statement is irrelevant. The issue of immunity under 702c is not determined "by the character of the flood control project." *Central Green*, 531 U.S. at 434.


**Plaintiffs' Reply to Defendant's Response to Fact No. 35:**

        Defendant cites no facts creating a factual dispute as required by Rule 56.2 of the Local Rules for the United States District Court for the Eastern District of Louisiana, but only offers an inappropriate legal argument.  Pursuant to this Rule, therefore, Plaintiffs' Corrected Revised Undisputed Fact No. 35 is admitted.  *See* Introduction.

Moreover, as explained in more detail in Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Motion for Summary Adjudication, the cases cited do not recognize the Army Corps's unfettered discretion to make unilateral project changes.  As the Fifth Circuit stated in *Creppel v. United States Army Corps of Engineers*, 670 F.2d 564 (5th Cir. 1982), "*[a]ny change must . . . serve the original purpose of the project*."  *Id*. at 573 (emphasis added).  It further noted that "[t]he modifications *must be accomplished with adequate notice and in accordance with the procedure mandated by federal regulations*.  The modifications must not disregard or seek to evade the substantive statutory requirements."  *Id*.  (emphasis added).

Finally, the sources cited by Plaintiffs (*see* PUF Nos. 106, 210, 263-67, 269-76) all support this statement.

**Plaintiffs' Corrected Revised Undisputed Fact No. 36**

The Army Corps' use of the 1959 (instead of the updated 1972 or 1979) SPH led to underestimating surge height by 6.5 feet on Reach 2 alone and resulted in many failures of flood control structures.  PUF Nos. 94-95, 99, 275.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 36**:

Contested and irrelevant. The claimed increase in storm surge is derived from two hypothetical storms in which all of the relevant storm factors except wind speed are kept constant.  *See* MSJ Ex. 4, at 110, Fig. 81(a). Plaintiffs' application of this hypothetical construct to Hurricane Katrina is simplistic and not supported by the documents on which they rely. Furthermore, this statement is irrelevant. The issue of immunity under 702c is not determined "by the character of the flood control project." *Central Green*, 531 U.S. at 434.

**Plaintiffs' Reply to Defendant's Response to Fact No. 36:**

Defendant's last two sentences are an irrelevant legal argument.  *See* Introduction.  Citing the Team Louisiana Report (Exh. 4) at 110, Fig. 81 (a), Defendant argues that the "claimed increase in storm surge is derived from two hypothetical storms in which all of the relevant storm factors except wind speed are kept constant."  Defendant, however, failed to explain why or how this fact refutes Plaintiffs' Corrected Revised Undisputed Fact No. 36.  Indeed, since Defendant has not designated any experts, it has no technical or scientific bases for challenging Plaintiffs' conclusions supported by substantial evidence.

Likewise, Defendant claims that "Plaintiffs' application of this hypothetical construct to Hurricane Katrina is simplistic," and Plaintiffs' statement is "not supported by the documents on which they rely."  In each case, however, Defendant not only fails to cite any supporting evidence, it fails to explain why its bold assertions should be considered accurate.  In sum, Defendant has provided no facts or argument refuting Plaintiffs' Corrected Revised Undisputed Fact No. 36.

**Plaintiffs' Corrected Revised Undisputed Fact No. 37**

The Army Corps' failure to consider the effects of continuing subsidence on the effective level of flood protection translated into flood structures several feet lower than represented by the agency.  PUF No. 112-13.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 37**:

Contested and irrelevant. What the Corps did or did not consider has no bearing on the immunity of the United States from liability for damage caused by the floodwaters that the LPV levees and floodwalls were unable to control. The Corps did consider the effects of land

subsidence on the LPVHPP. *See* MSJ Ex. 26 at 3-19 to 3-22.

**Plaintiffs' Reply to Defendant's Response to Fact No. 37:**

The last two sentences of Defendant's response are an irrelevant legal argument. *See* Introduction.

Moreover, the pages cited by Defendants do not support its claims that the "Corps did consider the effect of land subsidence on the LPVHPP." The source cited by Defendant is four pages from the *Decision-Making Chronology for the Lake Pontchartrain & Vicinity Hurricane Protection Project*. The first heading on page 3.3.3 of page 3-19 states "New Information on Subsidence and Vertical Datum." There is a single paragraph under this heading which discussed the "general subsidence of the region and localized settlement of structures." It further notes that "issues related to subsidence and vertical control datum can affect the extent to which the constructed elevations of protective structures correspond with their intended design grades." The remaining four pages dealt with "[p]roject decisions relating to the use of vertical control for project construction . . . ."

The next section heading (3.3.3.1) on page 3-19 read "Vertical Datum and Control Benchmarks *Not Updated Over Time*." (Emphasis added). Thus, the pages cited by Defendant dealt with the Army Corps decision not to update the "vertical datum and control benchmarks," rather than the Army Corps alleged consideration of the continuing effects of subsidence on the level of hurricane flood protection. Indeed, the pages cited by Defendant unquestionably reveal that the Army Corps improperly failed to consider changing the vertical datum:

> In addition to the mistaken equivalence of the NGVD with local MSL, significant parts of the project were constructed using outdated benchmark elevations referenced to NGVD, which exacerbated the problem caused by the erroneous equivalence of

> these reference points.  . . .  And when in 1994 Headquarters
> issued guidance to the field for conversion from NGVD to the new
> NAVD88 datum in studies and projects . . . , *the District did not
> follow it*.

*Id*. at 3-21 to 3-22.

Therefore, the evidence cited by Defendant does not contradict but in fact

supports Plaintiffs' Corrected Revised Undisputed Statement No. 37.

**Plaintiffs' Corrected Revised Undisputed Fact No. 38**

At the time of Hurricane Katrina, the 125 miles of LPVHPP flood control structures had not been

finished as designed and not functioning as a complete, integrated, unified and comprehensive

system necessary for effective hurricane flood protection as mandated by Congress. PUF Nos.

68, 140-62; 199-200.


**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 38**:

Contested and irrelevant. Pub. L. No. 89-298 did not require that the LPV be completed

by any specific time. *See Creppel v. U.S. Army Corps of Eng'rs*, 670 F.2d 564, 572-73 (5th Cir.

1982); *Allison v. Froehlke*, 470 F.2d 1123, 1125-26 (5th Cir. 1972); *Missouri v. Ashcroft*, 526 F.

Supp. 660, 668 (W.D. Mo. 1980); *United States v. 2,606.84 Acres of Land*, 309 F. Supp. 887

(N.D. Tex. 1969), *rev'd on other grounds,* 432 F.2d 1286 (5th Cir. 1970); *cf. United States v.

Spoonbarger*, 308 U.S. 256, 268 (1939). As set forth in Defendant's Opposition to Plaintiffs'

Motion for Summary Adjudication, immunity under 702c is not contingent upon completion of

the flood control project.

**Plaintiffs' Reply to Defendant's Response to Fact No. 38:**

Defendant cites no facts creating a factual dispute as required by Rule 56.2 of the Local Rules for the United States District Court for the Eastern District of Louisiana, but only offers an inappropriate legal argument. Pursuant to this Rule, therefore, Plaintiffs' Corrected Revised Undisputed Fact No. 38 is admitted. *See* Introduction.

Moreover, as explained in more detail in Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Motion for Summary Adjudication, the cases cited do not recognize the Army Corps's unfettered discretion to make unilateral project changes. As the Fifth Circuit stated in *Creppel v. United States Army Corps of Engineers*, 670 F.2d 564 (5th Cir. 1982), "*[a]ny change must . . . serve the original purpose of the project*." *Id*. at 573 (emphasis added). It further noted that "[t]he modifications *must be accomplished with adequate notice and in accordance with the procedure mandated by federal regulations*. The modifications must not disregard or seek to evade the substantive statutory requirements." *Id*. (emphasis added).

**Plaintiffs' Corrected Revised Undisputed Fact No. 39**

Forty years after Congressional authorization, the Hurricane Flood Protection System ("HPS") for Greater New Orleans at the time of Hurricane Katrina was still under construction and uncompleted—a sprawling work in process that was a patchwork quilt of several hundred miles of earthen berms, spoilbanks, sheetpile, concrete and floodwalls—virtually all of which were below design protection elevation and whose most salient features were their uneven height and admitted resulting inability to afford the SPH level of protection mandated by Congress in the Flood Control Act of 1965. PUF No. 142; *see also* PUF Nos. 78-79, 143-62.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 39**:

Contested and irrelevant. The documents on which Plaintiffs rely do not specify the

method or time by which construction must be completed. As set forth in Defendant's

Opposition to Plaintiffs' Motion for Summary Adjudication, immunity under 702c is not

contingent upon completion of the flood control project.


**Plaintiffs' Reply to Defendant's Response to Fact No. 39:**

The last two sentences of Defendant's statement are an irrelevant legal argument. *See*

Introduction.  With respect to the first contention, Defendant omits citation to any evidence, nor

does it explain how or why Plaintiffs' cited authority fails to support its statement.  Accordingly,

Defendant has failed to rebut Plaintiffs' Corrected Revised Undisputed Fact No. 39.  This fact is

therefore admitted. *See* Introduction.

**Plaintiffs' Corrected Revised Undisputed Fact No. 40**

IPET noted that the New Orleans regional flood protection system was largely a system in name

only and not effective because pre-Katrina, there were no integrated series of components—

functioning literally seamlessly as contiguous defenses—to provide a reliable New Orleans

Flood Defense System (NOFDS). PUF No. 153; MSJ Exh. 20 at I-70 (IPET).


**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 40:**

Uncontested, but irrelevant. IPET's description of the regional flood protection system is

irrelevant to this case, which concerns the Chalmette Area Plan. There is no basis for concluding

that the cited description pertains to the part of the LPV that is at issue in this case. Furthermore,

the immunity of the United States is not determined "by the character of the flood control

project." *Central Green*, 531 U.S. at 434.

**Plaintiffs' Reply to Defendant's Response to Fact No. 40 :**

Undisputed by Defendant.

**Plaintiffs' Corrected Revised Undisputed Fact No. 41**

The Army Corps' expert, Dr. Robert Dalrymple, concluded that at the time of Hurricane Katrina, there was "not a completed Hurricane Protection System to the extent Congress or the Corps or both thought they were getting a level of protection of 17 and a half feet."  PUF No. 158; *see also* PUF Nos. 116, 135-36.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 41**:

Contested and irrelevant. Robert Dalrymple has provided no testimony in this case and is not an expert for the United States in *Robinson*. The immunity of the United States is not dependent upon a "completed" flood control project. *See Mocklin v. Orleans Levee Dist.,* 877 F.2d 427, 430 (5th Cir. 1989) (§ 702c barred claim of injury during reinforcement of levees along Lake Pontchartrain).

**Plaintiffs' Reply to Defendant's Response to Fact No. 41 :**

       Defendant does not question the fact that Dr. Dalrymple made the statement attributed to him.  The simply assert that he "has provided no testimony in this case and is not an expert for the United States in *Robinson*.  As noted with respect to Plaintiffs' Corrected Revised Undisputed Fact No. 19, Dr. Dalrymple was designated by the United States as an expert in the

Consolidated Master Complaint case.  Under Fifth Circuit jurisprudence testimony by a person

charged by a party with investigating or studying an incident is admissible as a party admission

under Evid. Code § 801(d)(2)(C).  *See Collins v. Wayne Corp.*, 621 F.2d 777, 781 (5th Cir. 1980)

("The district court erred in not allowing the plaintiffs to offer Greene's deposition into evidence

as an admission of Wayne. Wayne stated in its response to the plaintiffs' interrogatory that it had

employed Greene as an expert to investigate and analyze the bus accident.").  Accordingly, Dr.

Dalrymple's testimony is both relevant and admissible.

　　　　Citing *Mocklin v. Orleans Levee District*, 877 F2d 427 (5th Cir. 1989), Defendant claims

that its immunity does not hinge upon the completion of a flood control project.  In *Mocklin*, an

Army Corps contractor dredged a channel in Lake Pontchartrain to allow barges to supply

construction materials to an Army Corps project to strengthen Lake Pontchartrain levees.  The

plaintiffs' son drowned in the channel, and the plaintiffs sued the Army Corps for damages.  The

Fifth Circuit affirmed the dismissal of the plaintiffs' action on Section 702c immunity grounds,

stating:

> The barges were needed to deliver the equipment and materials
> used in the reinforcement of the levees to prevent flooding.  *The
> channels were inescapably part of a flood control project.* The
> inquiry ends then, and the Government is protected from 'any'
> liability by these waters . . . .

*Id*. at 430 (emphasis added).

　　　　Throughout Defendant's opposition to Plaintiffs' separate statement, Defendant has

repeatedly argued that "[t]he nature of the LPV levees along the MRGO is irrelevant because §

702c immunity *does not turn on 'the character of the federal project*."  Defendant's Opposition

to Plaintiffs' Revised Facts Nos. 11, 12, and 26 9 (emphasis added).  Apparently Defendant does

not have a problem citing a case that contravenes its primary argument as long as it might

provide some misperceived legal advantage.

In any event, *Mocklin* is irrelevant for one major controlling reason. The plaintiff in that case was not injured by the fact that the project was incomplete. In other words, the failure to complete the project was not a substantial factor in causing the death of the Plaintiffs' son. Thus, the Fifth Circuit never considered whether Section 702c applies when a project is incomplete, and the failure to complete the project contributes to a party's injuries.

In sum, Defendant does not deny the statement, and the remainder of its discussion is merely an inappropriate legal argument. Accordingly, Plaintiffs' Corrected Revised Undisputed Fact No. 41 is admitted. *See also* Introduction.

**Plaintiffs' Corrected Revised Undisputed Fact No. 42**

The uncompleted hurricane protection system created many weak links when dozens of points below design elevations contributed to flooding when water flowed unimpeded through these gaps. PUF No. 155.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 42**:

Contested and irrelevant. The immunity of the United States is not determined "by the character of the flood control project." *Central Green*, 531 U.S. at 434. The statement is vague and ambiguous. It is not clear what "gaps" and what "weak links" are being referenced. The statement is relevant only to the extent that it shows a relationship between the LPV and the flooding that allegedly caused the relevant damage.

**Plaintiffs' Reply to Defendant's Response to Fact No. 42:**

Defendant cites no facts creating a factual dispute as required by Rule 56.2 of the Local

Rules for the United States District Court for the Eastern District of Louisiana, but only offers an inappropriate legal argument.  Pursuant to this Rule, therefore, Plaintiffs' Corrected Revised Undisputed Fact No. 42 is admitted.  *See* Introduction.

**Plaintiffs' Corrected Revised Undisputed Fact No. 43**

IPET concluded that the system did not perform as a system because in some areas it was not completed, and in others, datum misinterpretation and subsidence reduced its intended protective elevation, resulting in a varying capacity for protection since some structures provided no reliable protection above their design elevations and others that had inadequate designs leaving them vulnerable at water elevations significantly below the design intent.  PUF No. 156; *see also* PUF Nos. 165-67, 170, 174-77, 180-97.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 43**

Uncontested but irrelevant. The IPET's characterization of the "system" is irrelevant because the immunity of the United States is not determined "by the character of the flood control project." *Central Green*, 531 U.S. at 434. The statement is also irrelevant because it is unclear whether the statement refers to the levees along the MRGO or to portions of the system that are not at issue in this case, such as the floodwalls parallel to the outfall canals.

**Plaintiffs' Reply to Defendant's Response to Fact No. 43:**

Undisputed by Defendant.

**Plaintiffs' Corrected Revised Undisputed Fact No. 44**

The LPVHPP was originally expected to take about 13 years to complete at a cost about $85

million, but at the time of Hurricane Katrina the system was estimated to be about 85 percent constructed and was not expected to reach completion until 2015–50 years after Congressional authorization of the LPV and 60 years after initiation of the planning process.  PUF Nos. 65, 69, 70.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 44**:

Contested and irrelevant. The documents on which Plaintiffs rely do not state whether different organizations or individuals had the same or different expectations about how long the construction would take or how much it would cost. Opinions as to the length and cost of construction are irrelevant to determining immunity under 702c.

**Plaintiffs' Reply to Defendant's Response to Fact No. 44:**

Defendant's response to Plaintiffs' Corrected Revised Undisputed Fact No. 44 is another legal argument, unsupported by any facts or even a relevant analysis.  Therefore, Defendant has failed to refute Plaintiffs' Corrected Revised Undisputed Fact No. 44.

**Plaintiffs' Corrected Revised Undisputed Fact No. 45**

IPET and other investigators concluded that virtually all of the major breaches were caused by overtopping and subsequent erosion because reduced protective elevations increased the amount of overtopping, erosion, and subsequent catastrophic flooding.  PUF Nos. 207, 211-14, 221, 250, 269-80.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 45**:

Uncontested. The overtopping and subsequent breaching of the LPV by Hurricane Katrina's floodwaters, and the damage that allegedly was caused by the floodwaters are

connections that bring § 702c to bear on Plaintiffs' claims under Plaintiffs' own construction of the statute.

**Plaintiffs' Reply to Defendant's Response to Fact No. 45:**

Undisputed by Defendant.

**Plaintiffs' Corrected Revised Undisputed Fact No. 46**

IPET concluded as follows: "The incompleteness of the HPS made a material contribution to the catastrophic flooding. Lower than authorized elevations of flood protection structures contributed to the overtopping and failure of both floodwalls and levees. A completed system would have prevented much of the catastrophic flooding and resulting loss of life and property." PUF No. 208; *see also* PUF Nos. 215-20, 222-29.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 46**:

Uncontested but irrelevant. Only the LPV structures along the GIWW, the MRGO, and the IHNC are at issue for purposes of § 702c, so it cannot be ascertained whether the IPET's conclusions about the overall HPS are applicable to the parts of the system relevant to this action. To the extent that the statement shows that the LPV levees and floodwalls protecting St. Bernard Parish, the Lower Ninth Ward, and New Orleans East were overtopped by floodwaters that caused the alleged damage, the statement is relevant under constructions of § 702c that make attachment of immunity conditional upon the existence of these nexus.

**Plaintiffs' Reply to Defendant's Response to Fact No. 46:**

Undisputed by Defendant.

**Plaintiffs' Corrected Revised Undisputed Fact No. 47**

The Army Corps did not warn the stakeholders about the known inadequacy of the unfinished HPS and the threat to human life and property from catastrophic flooding caused by either a severe or a more moderate SPH hurricane, including not advising New Orleans residents that the GNO HPS required significant improvements to meet even 1 in 100 year SPH requirements. PUF Nos. 296-310.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 47**:

Contested and irrelevant. The inadequacy of the unfinished HPS was a matter of public knowledge and was made known by the Corps prior to Hurricane Katrina. Whether warnings were given is irrelevant to immunity under § 702c. *See United States v. James,* 478 U.S. 597, 610 (1986) (immunity for negligent conveyance of warnings); *Clark v. United States,* 218 F.2d 446, 450-51 (9th Cir. 1954) (immunity for giving false assurance of safety); *Nat'l Mfg. Co. v. United States,* 210 F.2d 263, 266-69 (8th Cir.) (immunity for failure to warn of flood danger), *cert. denied,* 347 U.S. 967 (1954).

**Plaintiffs' Reply to Defendant's Response to Fact No. 47:**

Defendant cites no facts creating a factual dispute as required by Rule 56.2 of the Local Rules for the United States District Court for the Eastern District of Louisiana, but only offers an inappropriate legal argument.  Pursuant to this Rule, therefore, Plaintiffs' Corrected Revised Undisputed Fact No. 27 is admitted.  *See* Introduction.

Likewise, Defendant provides no facts supporting its broad claim that "[t]he inadequacy of the unfinished HPS was a matter of public knowledge and was made known by the Corps

prior to Hurricane Katrina."

**Plaintiffs' Corrected Revised Undisputed Fact No. 48**

The New Orleans District actually misled the public by falsely claiming at times that the GNO

HPS would protect against a 1 in 200 to 1 in 300 year hurricane.  PUF No. 302.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 48**:

Contested and irrelevant. The inadequacy of the unfinished HPS was a matter of public

knowledge and was made known by the Corps prior to Hurricane Katrina. Whether warnings or

false information were given is irrelevant to immunity under § 702c. *See James,* 478 U.S. at 610

(immunity for negligent conveyance of warnings) *Clark,* 218 F.2d at 450-51 (immunity for

giving false assurance of safety); *Nat'l Mfg.,* 210 F.2d at 266-69 (immunity for failure to warn of

flood danger).

**Plaintiffs' Reply to Defendant's Response to Fact No. 48:**

Defendant cites no facts creating a factual dispute as required by Rule 56.2 of the Local

Rules for the United States District Court for the Eastern District of Louisiana, but only offers an

inappropriate legal argument.  Pursuant to this Rule, therefore, Plaintiffs' Corrected Revised

Undisputed Fact No. 48 is admitted.  *See* Introduction.

Likewise, Defendant provides no facts substantiating its claims that "[t]he inadequacy of

the unfinished HPS was a matter of public knowledge and made known by the Corps prior to

Hurricane Katrina."

**Plaintiffs' Corrected Revised Undisputed Fact No. 49**

The Government contends that there were no defects in the design or construction of the flood

control structures along Reach 1 and Reach 2 of the MR-GO that contributed to the catastrophic flooding of Greater New Orleans.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 49**:

Uncontested, but irrelevant. The reason or reasons why the LPV was unable to control Hurricane Katrina's floodwaters have no bearing on the immunity of the United States. The immunity of the United States is determined by the character of the waters that caused the alleged damage, not "by the character of the flood control project." *Central Green*, 531 U.S. at 434, 427. The relevant uncontested fact is that the overtopping and breaching of the levee along the MRGO and the GIWW by floodwaters resulted in the damage of which Plaintiffs complain.

**Plaintiffs' Reply to Defendant's Response to Fact No. 49:**

Undisputed by Defendant.

**Plaintiffs' Corrected Revised Undisputed Fact No. 50**

The Government contends that the catastrophic flooding during Hurricane Katrina was the result of hurricane storm surge greater than anticipated in its SPH design.  MSJ Exh. 27, Varuso Depo. 61:1-62:9

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 50**:

Uncontested, but irrelevant. The unprecedented storm surge was certainly the reason why the levees and floodwalls protecting New Orleans East, the Lower Ninth Ward, and St. Bernard Parish were unable to prevent the flooding of which Plaintiffs complain. The reason or reasons why the LPV levees and floodwalls were overtopped and breached are irrelevant to the immunity

of the United States. The fact that they *were* overtopped and breached by Hurricane Katrina's floodwaters and that those floodwaters then caused Plaintiffs' alleged damage *is* relevant and required application of § 702c. *Central Green*, 531 U.S. at 434, 427.

**Plaintiffs' Reply to Defendant's Response to Fact No. 50:**

    Undisputed by Defendant.

**Plaintiffs' Corrected Revised Undisputed Fact No. 51**

The Government expected the flood structures to be overtopped if hurricane storm waters exceed the SPH design elevations used by the Army Corps in designing and constructing the flood structures.  PUF Nos. 290, 291

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 51**:

Contested and irrelevant. Expectations concerning design elevations are irrelevant to the issue of the immunity of the United States under § 702c. The elevations of the levees and floodwalls at issue were at various heights. Some were as high as the design elevations, but others were not. The documents on which Plaintiffs rely do not support the statement that overtopping was expected "if hurricane storm waters exceed the design elevations" because they pertain to actual structure and not hypothetical ones. The fact that the storm surge generated by Hurricane Katrina overtopped the LPV levees and floodwalls protecting New Orleans East, the Lower Ninth Ward, and St. Bernard Parish and caused the flooding of which Plaintiffs complain are the facts that require application of § 702c to Plaintiffs' claims.

**Plaintiffs' Reply to Defendant's Response to Fact No. 51:**

Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 51 is another

legal argument, unsupported by any facts or cogent analysis.  Defendant fails to explain how its

statements -- "[t]he elevations of the levees and floodwalls at issue were at various heights. Some

were as high as the design elevations, but others were not" – refutes the statement that "[t]he

Government expected the flood structures to be overtopped if hurricane storm waters exceed the

SPH design elevations used by the Army Corps in designing and constructing the flood

structures."  Plaintiffs' Corrected Revised Undisputed Statement No. 51, therefore, remains

undisputed.

**Plaintiffs' Corrected Revised Undisputed Fact No. 52**

Plaintiffs are not predicating Defendant's liability on claims of levee breaches or failures or

overtopping or the defective design, construction, operation and/or maintenance of levees, flood

protection works, or any other Government structures or facilities intended for hurricane flood

control protection, and their claims against the United States do not relate to a federal flood

control project or its design, construction, operation or maintenance or its performance during

Hurricane Katrina.  PUF Nos. 311-14.


**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 52**:

Contested. Plaintiffs' claims are based on the overtopping and breaching of LPV levees

and floodwalls. *See* Complaint ¶ 57 ("Large sections of the MR-GO levee . . . disintegrated"

during Hurricane Katrina"), ¶ 73 ("MR-GO significantly intensified Katrina's surge height and

velocity, contributing to the scouring that undermined the . . . levees along the MR-GO and the

Industrial Canal"), ¶ 77 ("overtopping led to many of the levee breaches that caused the most

serious flooding during Katrina, including large sections of the MR-GO levees that sent floodwaters rushing into St. Bernard Parish, as well as sections of the GIWW levee that flooded homes in East New Orleans and the Lower Ninth Ward"), ¶ 80 ("the storm surge acceleration produced by the MR-GO" "trigger[ed] the collapse of . . . much of the levee system"). These facts are not immaterial to Plaintiffs' claims. They allege that their damage resulted from the flooding that ensued upon the breaching of the levees and floodwalls, and they allege that the flooding would not have occurred if the hurricane protection system had been stronger and higher  when the hurricane struck. *See* Plt. Orig. Facts ¶¶ 207-29; Plt. Rev. Facts ¶¶ 42, 45-47. All of their harms occurred on August 29, 2005, when floodwaters overflowed and breached the LPV levees and floodwalls that "completely surrounded" Plaintiffs' properties. Plt. Orig. Facts ¶ 78.  "Hurricane Katrina . . . overwhelmed the eastern side of the New Orleans flood protection system with storm surge and wave loading that exceeded the levels used for design of the system in that area. [This] is a true statement . . . ." *Id.* ¶ 252. If "the overtopping of Levees [sic] and floodwalls along the MR-GO had not occurred, there would have been minor inundation in New Orleans East, Lower 9th Ward, and St. Bernard Parish, but not catastrophic flooding." *Id.* ¶ 219. To establish their claims, Plaintiffs must prove causation. They must prove that the MRGO caused the LPV levees to fail. They must prove this in order to establish that the MRGO caused their alleged damage, since they maintain that there would not have been catastrophic flooding if the LPV levees had not failed. The statement that their claims are not based on the failure of the levees is therefore false.

**Plaintiffs' Reply to Defendant's Response to Fact No. 52:**

Defendant fails to cite a single fact supporting its conclusion.  Instead, Defendant relies

on Plaintiffs' Original Statement of Undisputed Facts which was withdrawn and replaced by the

Plaintiffs' Corrected Revised Statement of Undisputed Facts for Summary Adjudication on

Section 702c Immunity.  To the extent that Defendant relies on the allegations in Plaintiffs'

complaint, Defendant has already denied these allegations in their answer, and they cannot now

turn to a document is has rejected the foundation for their claim.

Finally, this Court has already rejected Defendant's attempts to rewrite Plaintiffs'

complaint:

> These pleading have been lodged in *Robinson, et al. v. United States*, in which a Complaint for Damages Caused by the Design, Construction, Operation and Maintenance of the Mississippi River Gulf Outlet . . . .   [P]laintiffs have sued the Government contending that the MRGO caused catastrophic damage . . . .  In essence, plaintiffs maintain that but for the MRGO, there would have not been the devastating flooding which damaged plaintiffs . . . .  The Government is asking this Court to ignore plaintiffs' pleadings, . . . to rewrite plaintiffs' complaint, find that all of the projects, levees and activities in that area are flood control projects , and . . . find the Government immune as a matter of law. . . .  [I]t is not clear that as a matter of law, should plaintiffs prove their allegations as to damages caused by the MRGO . . . that § 702c will prevent a recovery for the damages caused by MRGO.

*In re Katrina Canal Breaches Consol. Litig.*, 471 F. Supp. 2d 684, 686-96 (E.D. La. 2007).

**Plaintiffs' Corrected Revised Undisputed Fact No. 53**

Plaintiffs also contend that the Army Corps engaged in additional negligent conduct that

contributed to the failure of the I-walls on the west side of the IHNC and the ensuing

catastrophic flooding of the Lower Ninth Ward by negligently undertaking site clearing for the

Lock Expansion Project at the East Bank Industrial sites that had material adverse effects on the

soil stability and protection for the flood control structure.  PUF No. 345.

**Defendant's Response to Plaintiffs' Corrected Revised Undisputed Fact No. 53**:

Contested and irrelevant. Plaintiffs have not made such an allegation. Any such

allegation would be irrelevant inasmuch as the immunity of the United States is established by

the evidence showing that Plaintiffs' alleged damage resulted from and was caused by

floodwaters that the LPV was unable to control.

**Plaintiffs' Reply to Defendant's Response to Fact No. 53:**

Defendant once again makes a legal argument, unsupported by fact or law, and Plaintiffs'

Revised Fact No. 53 remains uncontested.

Dated: February 15, 2008                                         Respectfully submitted,

**O'Donnell & Associates P.C.**

By: s/ Pierce O'Donnell

Pierce O'Donnell (*pro hac vice*)
550 S. Hope St., Suite 1000
Los Angeles, California 90071
Phone:  (213) 347-0290
Fax:  (213) 347-0298

**The Andry Law Firm, LLC**

By: s/ Jonathan B. Andry
Jonathan B. Andry (LSBA No. 20081)
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 586-8899
Facsimile:  (504) 585-1788

**Law Offices of Joseph M. Bruno**          **Domengeaux Wright Roy & Edwards LLC**
By: s/ Joseph M. Bruno
Joseph M. Bruno (LSBA No. 3604)           Bob F. Wright (LSBA No. 13691)

855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493


**Fayard & Honeycutt**

Calvin C. Fayard, Jr. (LSBA No. 5486)
Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193
Facsimile:  (225) 664-6925


**Ranier, Gayle & Elliot, LLC**

N. Frank Elliot III
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337).494.7218




**McKernan Law Firm**

Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202

James P. Roy (LSBA No. 11511)
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, Louisiana 70502-3668
Telephone: (337) 233-3033
Facsimile:  (337) 233-2796


**Girardi & Keese**

Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile:  (213) 481-1554


**Levin, Papantonio, Thomas, Mitchell
Echsner & Proctor, P.A.**

Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123


**Gainsburgh, Benjamin, David, Meunier &
Warshauer, LLC**

Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Law Office of Elwood C. Stevens, Jr., a Professional Law Corporation**

Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Cotchett, Pitre, Simon & McCarthy**

Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**

Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Salas & Co., LC**

 Camilo K. Salas, III (LSBA No. 11657)
650 Poydras Street, Suite 1650
New Orleans, LA  70130
Telephone: (504) 799-3080
Facsimile:  (504) 799-3085
**Attorneys for Plaintiffs**

**Robinson, Calcagnie & Robinson, Inc.**

Mark Robinson (Cal State Bar No. 54426
620 Newport Center Drive – 7th Floor
Newport Beach, CA 92660
1-888-701-1288

## <u>CERTIFICATE OF SERVICE</u>

I, Pierce O'Donnell, hereby certify that on February 15, 2008, I caused to be served

**<u>PLAINTIFFS' REPLY TO DEFENDANT UNITED STATES' RESPONSES TO</u>**

**<u>PLAINTIFFS' CORRECTED REVISED STATEMENT OF UNDISPUTED FACTS</u>**, upon

Defendant's counsel, Robin D. Smith, Catherine Corlies, Traci Colquette, and Jim McConnon by

ECF and email at robin.doyle.smith@usdoj.gov; catherine.corlies@usdoj.gov,

traci.colquette@usdoj.gov, and jim.mcconnon@usdoj.gov

/s/ Pierce O'Donnell