UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Robinson* (06-2268) | § | |
| _____ | § | |

**DEFENDANT UNITED STATES' REPLY MEMORANDUM IN SUPPORT
OF DEFENDANT'S MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT**

In opposing the United States' motion to dismiss, Plaintiffs attempt to distract the Court from the uncontroverted facts that compel dismissal: Greater New Orleans was inundated by floodwaters that "[t]he project for hurricane-flood protection on Lake Pontchartrain, Louisiana" failed to control. Pub. L. No 89-298, 79 Stat 1073, 1077 (Oct. 27, 1965) (Exh. 57). The flood was not caused by an explosion. No one dynamited the levees. What caused the levees and floodwalls to fail was a hurricane. Hurricane Katrina created an unprecedented surge that overwhelmed the federal hurricane protection system put in place to protect New Orleans from hurricane-induced flooding. Hurricane Katrina produced the massive surge that caused the Lake

1

Pontchartrain and Vicinity levees and floodwalls to fail. Even if Plaintiffs could prove all of their fanciful claims about the influence of the MRGO on the storm surge generated by Hurricane Katrina, those facts would merely underscore the material fact that requires dismissal: Hurricane Katrina caused the flood by overwhelming the federal flood works protecting the city.

At no time whatsoever, either before or during Hurricane Katrina, did the waters in the MRGO cause the flood. The waters that flooded New Orleans were the waters driven out of the Gulf of Mexico by Hurricane Katrina, across Lake Borgne, across the GIWW, across the MRGO, through these channels, into the IHNC, and over the LPV structures that had been erected by the federal government to protect Greater New Orleans from hurricane-induced flooding. These are the *facts*—the incontrovertible *facts*—and they compel dismissal.

The construction of the LPV and the its crucial involvement in the Hurricane Katrina flood are the facts that distinguish the flood at issue here from the flood that was at issue in *Graci v. United States*. Even if, as Plaintiffs contend, *Graci* limits the application of § 702c to conduct related in some way to a flood control project, then immunity attaches here and bars this action. It is alleged that certain negligent acts and omissions created a conduit for hurricane-floodwaters, funneled hurricane-floodwaters, accelerated hurricane-floodwaters, elevated hurricane-floodwaters, and, in sum, made the hurricane-induced flood worse. Plaintiffs' theory is that conditions resulting from the creation and maintenance of the MRGO amplified the storm surge generated by the hurricane, allowing the hurricane-induced surge to overtop and breach the flood works. In Plaintiffs' view, the conditions that resulted from the MRGO were the proverbial straw that broke the camel's back. "Absent the exacerbating effect of the MR-GO, . . . Katrina would have been an endurable event in New Orleans' history rather than the obliterating force that . . . devastated much of a great American city." Complaint (Exh.

67) ¶ 1.  This is Plaintiffs' theory of the case, and this is why the case must be dismissed. Plaintiffs are challenging conduct that is closely related to "[t]he project for hurricane-flood protection on Lake Pontchartrain, Louisiana." Pub. L. No 89-298, 79 Stat 1073, 1077 (Oct. 27, 1965) (Exh. 57).

Plaintiffs' contention that the LPV was intended to prevent hurricane-induced flooding only from Lake Pontchartrain and Lake Borgne is not supported by any evidence.  Indeed, the contention is preposterous.  Congress did not authorize this massive project to provide "hurricane-flood protection" for Greater New Orleans only for waters that originated in or flowed out of the bodies of water mentioned by name in the authorizing Act or in some other congressional document.  Plaintiffs contend that the absence of an express statement that the project was intended to control flooding from the MRGO, the GIWW, or the IHNC supports their view that flooding from these waterways was excluded from the purview of the project. This contention lacks merit.  First, the Chief's Report to Congress *does* mention the MRGO and recommends that levees be built along it.  Second, the naming of major sources of floodwaters cannot be interpreted as an intent to exclude other nearby sources.  Can it even be imagined that Congress did not intend to provide "hurricane-flood protection" for Greater New Orleans from *all* hurricane induced storm surge, regardless of its "source" or "origin"?  Congress surely did not intend to leave the city at risk of flooding *from the very waterways and lakes on whose banks levees and floodwalls were to be constructed?*  Such an absurd intent cannot be ascribed to Congress.

Neither the facts nor the law supports Plaintiffs' opposition, especially not in the current posture of the case.  There is no *genuine* issue of *material* fact.  Plaintiffs evaded dismissal on the pleadings by disingenuously claiming that their pleadings should be ignored:  the

Complaint's numerous graphic descriptions of levees being overtopped and breached by hurricane storm surge did not prevent Plaintiffs from disputing whether the levees were really "levees." Now, despite the overwhelming and uncontroverted evidence that flood protection levees *were* constructed along the MRGO, Plaintiffs cling to the canard that the levees were "mere spoil banks," even though Plaintiffs in their own papers repeatedly refer to them as levees.

Since they can no longer plausibly controvert the *existence* of flood control works along the MRGO, Plaintiffs predictably pivot and attempt to create a dispute over the levees' *characteristics*. Plaintiffs now assert that § 702c does not apply because the levees were not designed and constructed "in accordance with" initial project plans, regulations, standards, guidelines, and specifications. Plaintiffs' factual contentions are designed to foment a dispute, but they do not and *cannot* create a genuine issue of *material* fact. The application of § 702c immunity does not depend on a resolution of Plaintiffs' contentions about the levees' *characteristics*. The particular characteristics of the levees have no bearing on the immunity issue before the Court. Whether the levees were high enough, wide enough, or strong enough is immaterial: § 702c bars Plaintiffs' claims because the flood control project levees and floodwalls were unable to control Hurricane Katrina's floodwaters. This fact is uncontroverted.

Plaintiffs cannot evade § 702c by basing their case exclusively on the MRGO. The MRGO was not an *independent* cause of the catastrophe. If storm surge from the MRGO caused the levees and floodwalls to fail, then the MRGO and the LPV were both causes of the flood. According to Plaintiffs' own theory, the failure of the LPV, is a "but for" cause of the flood. Accordingly, § 702c confers immunity on the United States for the MRGO-related acts and omissions that led to the failure of the LPV.

4

Plaintiffs cannot avoid dismissal by making baseless charges concerning supposed inconsistencies in Defendant's litigation of the case. Arguing that the challenged MRGO-related conduct was *also* related to the LPV is in no way inconsistent with acknowledging that the MRGO was not a flood control project. The MRGO project *was* a navigational waterway project. But the MRGO project was nevertheless *related to* a flood control project. To suggest that the MRGO was "wholly unrelated to" the LPV simply because it was a navigational waterway project rather than a flood control project would not only be untrue but would require the turning of a blind eye to the uncontroverted facts that demonstrate the relationships between the projects. Plaintiffs disingenuously conflate and equate the concepts of "relationship" and "identity." Two projects need not be identical, and they need not have the same purpose in order to be related. A stopper is not a drain. A stopper's purpose is very different from the purpose of a drain. But a stopper is certainly related to a drain, and that relationship inheres in their *divergent* purposes and functions. Likewise, the MRGO—a *water*way—and the LPV—a *flood control* project—were related despite their very distinct and different purposes. Plaintiffs' accusations of inconsistency lack merit. Section 702c confers immunity on the United States even though the MRGO was a waterway project and not a flood control project.

For these reasons, the motion to dismiss should be granted.

## ARGUMENT

**I. PLAINTIFFS' CONTENTIONS DO NOT CREATE A GENUINE ISSUE OF MATERIAL FACT.**

Plaintiffs claim that "there are numerous sharply disputed facts essential to the Government's arguments that bar summary judgment." Plt. Opp. at 3 (R.D. 11031). Upon examination, however, the "sharply disputed facts" turn out to be nothing more than quibbles

5

about words and arguments about the legal import of the uncontroverted facts. As noted previously, there is not evidence to support Plaintiffs' assertion that "the man-made features along the MR-GO were nothing more than piles of dirt." *Id.* at 4. Indeed, Plaintiffs themselves repeatedly refer to the levees along the MRGO. Their own experts do the same. They do so because of the incontrovertible evidence that levees *were* constructed along the MRGO and elsewhere to prevent hurricane-induced storm surge from flooding St. Bernard Parish and the Lower Ninth Ward. Plaintiffs *argue* that *levees* were not constructed, but their argument rests on fallacious reasoning and evidence that, at best, shows only that the levees lacked certain characteristics that would have made them bigger and stronger. Stripped to its core, Plaintiffs' argument is that an inadequate levee is not a levee at all but a mere "pile of dirt." By the same reasoning, a Yugo is a mere bucket of bolts and not a car, because it is not a Cadillac. There is substantial evidence that levees were constructed along Reach 2 of the MRGO just as they were constructed along Reach 1 and the GIWW. There is no contrary evidence, only a baseless argument that the levees were not "levees," because they lacked certain characteristics.

The insubstantial nature of Plaintiffs' argument is evident in their attempt to create a dispute based on Defendant's inadvertent substitution of the term "earthen embankment" for "levee" in its Statement of Uncontroverted Facts. *See* Plt. Resp. at 3-4. Plaintiffs correctly note that this was a mistake, but their argument that the plan of protection for St. Bernard Parish entailed construction of a levee, not an earthen embankment, simply betrays their inability to muster any meritorious argument.[1]

---

[1] A further indication that Plaintiffs' opposition to dismissal is based on groundless argument rather than any genuine factual dispute can be seen in Plaintiffs' Response to Defendant's Statement of Undisputed Facts. In their Response, Plaintiffs fail to cite *any* evidence controverting *any* of Defendant's Undisputed Facts. Their own summation reveals that they lack

The undisputed facts that require dismissal are these: (1) "structures were in fact constructed along" the MRGO, and (2) those structures were "flood protection embankments," *i.e.,* levees. Plt. Rev. Facts ¶ 11 (R.D. 10643); *see also id.* ¶ 12; Plt. Orig. Facts ¶¶ 34, 78, 137

---

any controverting evidence, for it merely asserts: "In sum, Defendants [sic] cited authorities do not support their statement." Plt. Resp. at 29.

The evidence *does* support the United States' Statement of Facts. Plaintiffs' Response itself reveals as much. Indeed, Plaintiffs' responses often include quotations of the very evidence that plainly and undeniably *does* support the United States' statement of fact. For example, in response to Undisputed Fact No. 21, Plaintiffs quote the Team Louisiana pericope that supports the existence of LPV levees on the south side of the MRGO that were overtopped and breached. *See* Plt. Resp. (R.D. 11031-7) at 24. Team Louisiana's reference to "[t]he 12 miles of the Chalmette levee that follows the south bank of the MRGO" supports the statement that there was a levee on the south side of the MRGO, and Team Louisiana's assertion that "this levee was washed away before the surge ever reached the design level" supports Defendant's statement that these levees were overtopped and breached.

In response to Undisputed Fact No. 20, Plaintiffs acknowledge that both the ILIT Report and the IPET Report include maps showing the levees and floodwalls along the MRGO and the IHNC. *See id.* at 22. Plaintiffs attempt to dismiss this evidence by arguing that the evidence fails to establish "the composition or construction" of the levees and floodwalls. The Statement of Undisputed Fact, however, makes no reference to "the composition or construction of" the levees. The evidence obviously supports the Undisputed Fact as stated, and Plaintiffs cite no evidence to the contrary.

Astonishingly, in response to Undisputed Fact No. 16. Plaintiffs assert that "[t]he IPET Report . . . includes no facts establishing . . . what was actually built." *Id.* at 17. This is a patent prevarication. "There are nine volumes in the Interagency Performance Evaluation Task Force (IPET) performance evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System report. . . . Volume III . . . addresses the design criteria for the pre-Katrina hurricane protection system, *any changes that have occurred during construction, and the operation and maintenance of the system after construction*." IPET Report (Exh. 20) Vol. III at III-1. Much, if not most, of Volume III addresses "what was actually built," not, as Plaintiffs misrepresent, what was designed. Plt. Resp. at 17. The IPET's principal finding is that, with certain exceptions, "[t]he system was generally built as designed, . . . using design approaches that were consistent with industry and local practices at the time of design." IPET Report (Exh. 20) Vol. III at III-7; *see also id.* at III-31 to III-32 ("Levee Construction Overview"); *id.* at III-38 to III-253 (detailed analyses of the project as constructed).

7

(R.D. 10337-8). Plaintiffs' attempt to define the levees out of existence fails because a levee, by definition, is nothing more than a flood protection embankment. *In re Katrina Canal Breaches Consol. Lit.,* 495 F.3d 191, 214 (5th Cir. 2007) (quoting, *inter alia,* Webster's Third New International Dictionary and 50 Am. Jur. 2d (Levees and Flood Control) § 1 ); *see also* Black's Law Dictionary (8th ed. 2004); USACE Engineer Manual 1110-2-1913 ("Design and Construction of Levees") (Apr. 30, 2000) (Exh. 56) ¶ 1-5(a)(1), at 1-1 (defining *levee* "as an embankment whose primary purpose is to furnish flood protection"); USACE Engineer Manual 1110-2-1913 ("Design and Construction of Levees") (Mar. 31,1978) (Exh. 55) ¶ 1-5(a)(1), at 1-1 (same). The levees can no more be defined out of existence than can the flood itself. *See In re Katrina Canal Breaches Consol. Lit.,* 495 F.3d at 209-17 (rejecting argument that "flood" is ambiguous and relying, *inter alia,* on dictionary definitions to ascertain "the generally prevailing meaning of the term"). These are not terms of art but common words with widely understood meanings. Given Plaintiffs' admission that flood protection embankments were constructed along the MRGO, and the substantial and uncontroverted evidence establishing this fact, there can be no genuine issue as to whether levees were constructed along Reach 2 of the MRGO.[2]

---

[2] Plaintiffs' contention that the "flood protection embankments" along Reach 2 of the MRGO were not "levees" is a red herring intended to distract attention from the uncontroverted fact that the hurricane-induced storm surge overtopped and breached levees and floodwalls in many places, not just along Reach 2 of the MRGO. *See* Plt. Orig. Facts ¶¶ 206, 256, 258, 268-73, 284, 286. Inasmuch as "[s]urges driven by Hurricane Katrina breached the LPVHPP protective structures at 50 different locations," *id.* ¶ 271, including many places along the GIWW, Reach 1 of the MRGO, and the IHNC, *id.* ¶¶ 273, 284, 286, it is clear that this was a flood that a flood control project was unable to control, regardless of whether "levees" were in fact constructed along" Reach 2 of the MRGO. Inasmuch as Plaintiffs do not dispute that there was overtopping and breaching of levees and floodwalls elsewhere, there can be no "upshot" of the "mass of evidence" that Plaintiffs rely on in attempting to create a dispute about the specific characteristics of the flood protection embankment along Reach 2 of the MRGO. *Id.*

**II. SECTION § 702C APPLIES TO THIS CASE BECAUSE THE RELEVANT DAMAGE WAS CAUSED BY A FLOOD AND FLOODWATERS THAT A FEDERAL PROJECT WAS UNABLE TO CONTROL.**

Plaintiffs argue that Defendant's motion to dismiss should be denied because § 702c does not confer immunity on the United States "regardless of the cause." Plt. Opp. at 6-10. They make this argument in opposition to the "plain language" construction of § 702c, under which immunity attaches to floods and floodwaters without regard to their relationship, if any, to a flood control project. In so doing, however, Plaintiffs are simply propping up a straw man so that they can knock him down. As the record now demonstrates, the application of § 702c to this case will not turn on whether the Court adopts the "plain language" construction of the immunity provision. This case concerns damage caused by a flood that a flood control project was unable to control. The Plaintiffs' own Statements of Undisputed Facts make this clear, and the entire record reveals that this fact is incontrovertible. Furthermore, it is uncontroverted that the flood was caused by Hurricane Katrina. Plaintiffs themselves describe the generating forces in terms that place this fact beyond dispute: "Surges *driven by Hurricane Katrina* breached the LPVHPP protective structures at 50 different locations." Plt. Orig. Facts ¶ 271 (emphasis added).[3]

---

[3] *See also id.* ¶ 252 ("Upon reaching Lake Pontchartrain, Katrina's winds produced a southward surge of lakewater along the northern edges of the Orleans East Bank and New Orleans East polders, with overtopping and a breach in New Orleans East, adjacent to the Lakefront Airport."); ¶ 249 ("The storm surge, not the winds, is the most destructive part of a hurricane, and Katrina produced a massive storm surge."); ¶ 250 ("Because the eye of Katrina passed to the east of New Orleans, the hurricane threw severe wind loads and storm surges on the flood protection systems. The surge overtopped large sections of the levees . . . ."); ¶ 252 ("Hurricane Katrina . . . overwhelmed the eastern side of the New Orleans flood protection system with storm surge and wave loading . . . ."); *cf id.* ¶ 259 ("storm surges produced by Hurricane Katrina overwhelmed the wetland system between Lake Borgne and Reach 2 of the MR-GO").

Plaintiffs cannot by artful pleading avoid the dispositive legal import of the unassailable fact that the alleged damage was caused by Hurricane Katrina. In the insurance cases, *Chehardy* and *Vanderbrook,* the plaintiffs attempted to avoid dismissal by arguing that the term *flood* "refers only to inundations of water with 'natural causes, not those with a 'non-natural' cause." *In re Katrina Canal Breaches Consol. Lit.,* 495 F.3d at 215. But the Court of Appeals was unwilling to "ignore[] the sizeable natural component to the disaster: a catastrophic hurricane and the excess water associated with it." *In re Katrina Canal Breaches Consol. Lit.,* 495 F.3d at 215. The court's appreciation of the reality of the event could not be circumscribed by the plaintiffs' attempt to restrict the focus of the case to the human factors that may have played a role in the flood. In the present case, likewise, the dispositive fact that the flood was caused by Hurricane Katrina cannot be excised from the case by dint of Plaintiffs' "circumscribed allegations" as to the cause of their damage. Plt. Opp. at 7. If the MRGO played any part in causing the flood, it did not do so independent of Hurricane Katrina.

### III. SECTION 702C APPLIES TO THIS CASE EVEN THOUGH THE FLOODWATERS WERE NOT PURPOSEFULLY RELEASED.

Plaintiffs fundamentally misapply the teachings of *James* and *Central Green* by arguing that § 702c does not apply to Katrina's floodwaters because they did not have a flood control purpose. *See* Plt. Opp. at 12 (emphasizing that "floods or floodwaters" "*encompasses waters that are released for flood control purposes*"). Plaintiffs fail to recognize that "floods or floodwaters" encompasses floodwaters that a flood control project is unable to control. *See id.* at 14. Such waters are not "released." Immunity attaches to them even though there is no "purpose" for them.

The seminal contribution of *James* was its recognition that the statutory phrase "floods or flood waters" connotes not only "those waters that a flood control project is unable to control," but also "waters that are released for flood control purposes when reservoired waters are at flood stage." *Central Green,* 531 U.S. at 437. What mandated application of § 702c was "[t]he fact that the injuries were caused by the turbulent current generated by unwarned releases of waters from a reservoir after the Army Corps of Engineers had determined that the waters were at 'flood stage.' The fact that the injuries were caused by 'flood waters' was undisputed." *Id.* at 429 (footnote omitted). After *James* it was clear that § 702c applies to two categories of cases: (1) cases in which damage occurs because of waters that a flood control project is *unable to control,* and (2) cases in which damage is caused by "flood waters" that a flood control project is *able to control. See id.* at 431. The floodwaters that caused the injuries in *James* fell into the latter category because they were being released to prevent flooding. *See id.* at 429 & n.3. By broadly applying the immunity provision even to damage caused by floodwaters under the Government's control, the Court in *James* demonstrated its obedience to the "sweeping language" that "was no drafting inadvertence" but was indeed intended to protect the Government from 'any' liability associated with flood control." 478 U.S. 597, 608 (1986).

*James* and *Central Green* fell into the second category; this case falls into the first. Waters were purposefully released in *James* and Central Green; here they were not. The waters at issue here were not "released" at all. They overwhelmed the levees intended to control them and escaped into the very communities that the LPV was authorized to protect. Inasmuch as the floodwaters were "waters that a federal project [was] unable to control," *Central Green,* 531 U.S. at 431, it would be nonsensical to attempt to apply the clause, "and the purposes behind

11

their release," to this case. *See* Plt. Opp. at 14.[4] The defining "relationship between 'flood control' and 'flood waters,'" *id.* at 12, derives not from a purposeful release but from the uncontroverted fact that they overflowed and breached the LPV. A federal project was unable to control them. Therefore even if, as Plaintiffs' contend, immunity attaches only to floodwaters with "some relationship" to flood control, *id.,* immunity attaches to the floodwaters that caused the alleged damage in this case.

### IV. SECTION 702C APPLIES TO THIS CASE EVEN THOUGH THE FLOODWATERS ORIGINATED IN BODIES OF WATER THAT WERE NOT FLOOD CONTROL PROJECTS.

Plaintiffs contend that § 702c does not confer immunity on the United States for flood damage caused by Hurricane Katrina because they have based their case on damage caused by floodwaters that originated in the MRGO. *See* Plt. Opp. at 11-14. In Plaintiffs' view, § 702c cannot attach to the floodwaters from the MRGO because the provision applies only to floodwaters that originate in and emanate from a flood control project. *See id.* Plaintiffs' argument lacks any basis in the text of the statute and is contradicted by both *Central Green* and

---

[4]In contrast to Plaintiffs' misapplication of *Central Green,* this Court aptly cited the phrase as illustrating the point being made by the Supreme Court in *Central Green*: to show that § 702c applies *only* to floodwaters. *See* R.D. 10984 (Order & Reasons) at 32-33. Inasmuch as the waters in the present case were "waters that a federal project [was] unable to control," it is beyond dispute that the relevant damage was caused by floodwaters. *Central Green,* 531 U.S. at 429. Indeed, as this Court has recognized, waters that overflow the bounds of a flood control project are indisputably floodwaters, and the result is a flood. Hrg. on Mot. to Dismiss Levee Master Compl. (Exh. 88) at 28:10-15 ("If it was an overflow, I don't know if any of us would be here on any of this. . . . . [I]t would have been truly a flood under any man's or woman's definition."); *cf.* R.D. 10984 (Order & Reasons) at 35 (immunity attaches to "drainage water" that causes flooding). And as this Court has further recognized, the cases in this consolidated litigation, unlike *James* and *Central Green,* concern *uncontrolled* floodwaters. The Court therefore explicitly noted that the phrase "and the purposes behind their release" was significant "[i]*n the factual context of Central Green*." R.D. 10984 (Order & Reasons) at 32(emphasis added).

*James.* In asserting that application of the statutory provision turns on the "source" of the floodwaters that cause the relevant damage, Plt. Opp. at 7, ll, 12, Plaintiffs fundamentally misapprehend the teachings of the Supreme Court and this Court's own prior decisions.

Plaintiffs argue that *Central Green* was remanded for a determination of the source of the waters that caused the relevant damage because the identifying the source would aid in determining whether the alleged damage to the pistachio orchards was caused by floodwaters or by non-floodwaters. *See* Plt. Opp. at 12. Nothing in *Central Green* supports Plaintiffs' argument. To the contrary, *Central Green* refutes Plaintiffs' argument. The waters that flowed through the Central Valley Project originated in the Sacramento and San Joaquin Rivers and in numerous unnamed "tributaries in their highland basins." 531 U.S. 425, 432-33 (2001). The United States asked the Court to take judicial notice of these facts, but the Court concluded that the character of the water rather than the source of the water was the determining fact. *See id.* at 435-37. The Court pointedly commented that "[u]nder the Government's approach" immunity would attach "even if the water never approached flood stage." *Id.* at 436. Whether the water originated in the rivers or in the project's extensive canals and reservoirs was immaterial to the dispositive issue of whether the "damage [was] caused by 'floods' or 'flood waters.'" *Id.* at 437; *see also* R.D. 10984 (Order & Reasons) at 31.

Plaintiffs repeat this mistake in arguing that § 702c applies only to waters that emanate from a flood control project. *See* Plt. Mem. at 14. They argue that § 702c does not apply to this case because they are suing for waters that emanated from the MRGO, which was not a flood control project. *See id.* They say the LPV levees were "intended to serve as protection against storm surges from Lakes Pontchartrain and Borgne, *rather than any negative effects of the MR-GO.*" *Id.* at 16. Plaintiffs base their argument on this Court's comment that "§ 702c

13

immunity is provided for damage caused by flood waters emanating from a flood control project." R.D. 10984 (Order & Reasons) at 31.  But here again Plaintiffs ignore the context in which this comment appears.  The Court is merely expressing its rejection of the "plain language" construction, which "read[s] any connexity to a flood control project out of" the immunity provision.  The allusion to "flood waters emanating from a flood control project" was drawn from *Central Green* and *James,* in which the waters at issue flowed out of reservoirs and canals containing them.  The allusion is apt insofar as it reveals that a relationship between flood control and floodwater exists in such cases.  But Plaintiffs attempt to transform the allusion into a limitation, because the flood control project at issue in the present case did not consist of reservoirs and canals constructed to contain floodwaters.

      Limiting the scope of § 702c as Plaintiffs propose would lead to the absurd conclusion that § 702c does not apply to flooding from Lake Borgne and Lake Pontchartrain or from any of the canals and waterways that pre-existed the flood control project.  Plaintiffs' insistence that § 702c applies only to flooding from flood control projects entails this very conclusion.  Plaintiffs correctly point out that it would be "absurd" to conclude that "Lake Borgne, Lake Pontchartrain and the Gulf of Mexico are . . . flood control projects." Plt. Opp. at 18.  Just so.  And just as § 702c immunity attaches to the floodwaters that flowed out of (*i.e.,* emanated from) these bodies of water, which it is undisputed were *not* flood control projects, so too does § 702c apply to the floodwaters that flowed out of the MRGO.  The relationship between these floodwaters and flood control—*i.e.,* the LPV's inability to control them—is what brings them

within the scope of § 702c regardless of their source or origin.[5]  *See* R.D. 10984 (Order &

Reasons) at 29-33.

The record amply demonstrates that Plaintiffs' alleged damage was caused by storm

surges from Lake Pontchartrain and Lake Borgne,[6] which the LPV indisputably was intended to

control.  *See* Plt Opp. at 16.  Because of the overwhelming and uncontroverted evidence that

Plaintiffs' alleged flood damage resulted from hurricane-induced storm surge that emanated

---

[5]Plaintiffs' construction of § 702c would also prohibit its application to riverine flooding, another indication that the construction is untenable.  The immunity provision was intended, in the first instance, to protect the United States from liability for flooding from the Mississippi River.

[6]*See* Plt. Orig. Facts ¶ 185 ("The surge from Lake Borgne propagated as a high velocity bore through the MRGO and GIWW to the IHNC causing maximum water levels in that canal to rise . . . ."); ¶ 249 ("While the surge varied by location, some preliminary estimates are that the storm surge off Lake Borgne, which abuts New Orleans, was approximately 18-25 feet depending on the location."); ¶ 252 ("As the counterclockwise-moving hurricane passed over Lake Borgne on the eastern side of the city with a storm surge estimated at 18-25 feet, it shoved water west onto an edge of the levee that protected the northern edge of the Ninth Ward and St. Bernard Parish; excess surge easily slid over the levee walls. Upon reaching Lake Pontchartrain, Katrina's winds produced a southward surge of lakewater along the northern edges of the Orleans East Bank and New Orleans East polders, with overtopping and a breach in New Orleans East, adjacent to the Lakefront Airport."); ¶ 253 ("The surge from Lake Pontchartrain and Lake Borgne streamed into the Industrial Canal and the MRGO channel" before overtopping and breaching "the earthen levees."); ¶ 270 ("'Overtopping was most severe on the east side of the flood protection system, as the waters of Lake Borgne were driven west towards New Orleans . . . .'"); ¶ 281 ("The flooding of upper St. Bernard Parish was caused by waters originating in Lake Borgne and Reach 2 of the MR-GO overwhelming the MR-GO banks and flood protection works along Reach 2 . . . ."); ¶ 293 ("The Lake Borgne surge – delivered by the MR-GO funnel – added an additional three feet to Katrina's storm surge. The flow from the funnel also prolonged the period of high surge in Reach 1 and the IHNC because the storm surge from Lake Borgne was conveyed into this region earlier than the storm surge generated in Lake Pontchartrain."); *cf. id.* ¶ 222 ("All of the levee and floodwall reaches exposed to the Lake Borgne surge system, including those along the IHNC, experienced overtopping.").

from Lake Borgne and Lake Pontchartrain, it is clear that § 702c confers immunity on the United States even under Plaintiffs' own reading of the case law.[7]

The very fact that the levees were to be built and, indeed, were built "along" the MRGO (and the GIWW and the IHNC, although Plaintiffs do not carry their argument to its logical conclusion) is the uncontroverted evidence that the LPV was intended to protect against hurricane-induced flooding from the MRGO (and the other waterways) no less than from the lakes that lay nearby. *See* Black's Law Dictionary (8th ed. 2004) (defining *levee* as an embankment constructed along the edge of a waterway to prevent flooding); 50 Am. Jur. 2d (Levees and Flood Control) § 1 ("'levee' means an embankment constructed along the edge of a river to prevent flooding").

In addition, the Chief's Report to Congress indicates that the LPV project was intended to protect against hurricane-induced flooding from the MRGO no less than from Lake Borgne or

---

[7]The United States' citation to Plaintiffs' factual averments does not indicate that the United States subscribes to them in whole or in part. Plaintiffs' factual averments do, however, show that there is no genuine issue as to the material facts. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At the summary judgment stage, the court must view facts in the light most favorable to the nonmoving party, but only when "there is a 'genuine' dispute as to those facts." *Scott v. Harris,* — U.S. —, —, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007); *see also Goodson v. City of Corpus Christi,* 202 F.3d 730, 735 (5th Cir.2000) ("[T]he nonmoving party may not rest on the mere allegations or denials of its pleadings, but must respond by setting forth specific facts indicating a genuine issue for trial." (internal quotation marks omitted)).

Plaintiffs' factual averments in support of their motion for "summary adjudication" are judicial admissions, unlike the factual assertions made by the United States in support of its initial motion to dismiss and its motion to certify. *See City Nat'l Bank v. United States,* 907 F.2d 536, 545 (5th Cir. 1990)*; cf. White v. ARCO/Polymers, Inc.,* 720 F.2d 1391, 1396 (5th Cir. 1983) ("factual assertions in pleadings and pretrial orders are judicial admissions conclusively binding on the party that made them").

16

Lake Pontchartrain. The Chief's Report communicated the Corps's conclusion that "[t]he Chalmette area can be afforded adequate protection against hurricane flooding by construction of a new levee along the Mississippi River-Gulf Outlet . . . ." H.R. Doc. No. 89-231, at 81. This is a clear indication that Chalmette was to be protected against hurricane-induced flooding from the MRGO, inasmuch as the flood protection structures were to be erected between Chalmette, the area to be protected, and the MRGO, a body of water that could be a source of hurricane-induced flooding.

Given the uncontroverted fact that the floodwaters hurled against the LPV by Hurricane Katrina came from Lake Pontchartrain, Lake Borgne, and the waterways on whose banks levees and floodwalls had been erected, Plaintiffs' own construction of § 702c mandates dismissal because this was a flood and these were floodwaters "'connected with a flood control project.'" Plt. Mot. for Sum. Adj. (R.D. 10337-2) at 26 (quoting *Central Green,* 478 U.S. at 602 n.2).

## CONCLUSION

For these reasons, the United States' motion to dismiss or, in the alternative, for summary judgment should be granted.

> Respectfully submitted,
>
> JEFFREY S. BUCHOLTZ
> Acting Assistant Attorney General
>
> PHYLLIS J. PYLES
> Director, Torts Branch
>
> JAMES G. TOUHEY, JR.
> Assistant Director, Torts Branch
> Civil Division
>
> s/ Robin D. Smith
> ROBIN D. SMITH
> Trial Attorney
> Torts Branch, Civil Division
> U.S. Department of Justice
> P.O. Box 888, Benjamin Franklin Station
> Washington, D.C.  20044
> (202) 616-4289
> robin.doyle.smith@usdoj.gov
> Attorneys for Defendant United States

**CERTIFICATE OF SERVICE**

I certify that on February 15, 2008, I served a true copy of the foregoing motion upon all counsel of record by ECF.

                                    s/ Robin D. Smith
                                    Robin D. Smith