# EXHIBIT 10

Case 2:05-cv-04182-SRD-JCW   Document 11271-4   Filed 02/15/08   Page 2 of 26

# LAKE PONTCHARTRAIN AND VICINITY, LOUISIANA

## LETTER

FROM

## THE SECRETARY OF THE ARMY

TRANSMITTING

A LETTER FROM THE CHIEF OF ENGINEERS, DEPART-
MENT OF THE ARMY, DATED MARCH 4, 1964, SUBMIT-
TING A REPORT, TOGETHER WITH ACCOMPANYING
PAPERS AND ILLUSTRATIONS, ON A REVIEW OF THE
REPORTS ON, AND AN INTERIM HURRICANE SURVEY
OF LAKE PONTCHARTRAIN AND VICINITY, LOUISIANA,
REQUESTED BY RESOLUTIONS OF THE COMMITTEE ON
PUBLIC WORKS, UNITED STATES SENATE, ADOPTED
JANUARY 28, 1949, AND FEBRUARY 4, 1957, AND AUTHOR-
IZED BY THE RIVER AND HARBOR ACT APPROVED
MARCH 2, 1945. IT IS ALSO IN PARTIAL RESPONSE TO
PUBLIC LAW 71, 84TH CONGRESS, APPROVED JUNE 15, 1955



JULY 6, 1965.—Referred to the Committee on Public Works and
ordered to be printed with illustrations

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1965

50-364 O

# LAKE PONTCHARTRAIN AND VICINITY, LOUISIANA

## REPORT OF THE CHIEF OF ENGINEERS, DEPARTMENT OF THE ARMY



**HEADQUARTERS**
**DEPARTMENT OF THE ARMY**
**OFFICE OF THE CHIEF OF ENGINEERS**
**WASHINGTON 25, D.C.**

IN REPLY REFER TO

ENGCW-PD

4 March 1964

SUBJECT:  Lake Pontchartrain and Vicinity, Louisiana

TO:     THE SECRETARY OF THE ARMY

     1.  I submit for transmission to Congress the report of the
Board of Engineers for Rivers and Harbors, accompanied by the reports
of the District and Division Engineers and the concurring report of
the Mississippi River Commission for those areas under its jurisdic-
tion, in response to a resolution of the Committee on Public Works of
the United States Senate adopted 28 January 1949 requesting a review
by the Board of existing reports on Lake Pontchartrain, Louisiana,
concerning navigation, flood control, and shore erosion in Orleans
Parish.  It is also in review of reports by the District and Division
Engineers in response to an item in the River and Harbor Act approved
2 March 1945 authorizing and directing a survey concerning shore
erosion and seawall damage at Mandeville, Louisiana; in response to a
resolution of the Committee on Public Works of the United States
Senate adopted 4 February 1957, requesting a review by the Chief of
Engineers of reports on Lake Pontchartrain to determine the advisa-
bility of constructing a levee connecting the existing south guide
levee of the Bonnet Carre Spillway with the existing Jefferson Parish
levee; and in partial response to Public Law 71, Eighty-fourth Con-
gress, first session, approved 15 June 1955, authorizing and directing
a survey with a view to determining means for preventing loss of lives
and damages to property by hurricanes along the eastern and southern
seaboard of the United States.

     2.  The District and Division Engineers find that the most suit-
able plan for protecting the partially developed areas bordering Lake
Pontchartrain would consist of two parts:  a levee and floodwall bar-
rier along the southeast side of the areas to prevent entry of surges
from Lake Borgne into the areas and Lake Pontchartrain; and new or
enlarged levees along the south shore of Lake Pontchartrain, together
with repair and reinforcement of the existing seawall at Mandeville on

the north shore, to prevent entry of lake surges into the areas. The barrier would include a lock and flood gates in the Rigolets, a navigation gate and flood gates in Chef Menteur Pass, and a multiple-purpose lock in the lakeward end of the Inner Harbor Canal. Based upon price levels of December 1961, the reporting officers estimate the first cost of the barrier plan at $64,703,000, the annual charges at $2,535,600, and the average annual benefits at $48,009,000. The benefit-cost ratio is 18.9. The cost apportionment is based upon that adopted by Congress in the 1958 Flood Control Act for similar projects wherein the Federal share is 70 percent of the total project cost and the non-Federal share is 30 percent, including lands, easements, rights-of-way, relocations, and the remainder, if any, in cash. However, the reporting officers consider that operation and maintenance of the Rigolets lock as a part of the hurricane barrier is a local responsibility, but that performance by the Federal Government would be in the public interest. Accordingly, they propose a cash contribution equivalent to the 100-year present worth of this item, presently estimated at $125,000 annually, or a total of $4,092,000. On these bases the Federal share of the first cost is estimated at $41,200,000 and the non-Federal share at $23,503,000, including $18,476,000 in cash. For the Chalmette area, the reporting officers find that the most suitable plan would consist of about 17.3 miles of new and enlarged levees extending generally along the southerly banks of the Gulf Intracoastal Waterway and the Mississippi River-Gulf Outlet channel to Bayou Dupre and thence westerly to the Mississippi River levee at Violet. The first cost is estimated at $15,143,000, the annual charges at $572,200, and the average annual benefits at $5,152,000. The benefit-cost ratio is 9.0. The Federal share of the first cost is estimated at $10,600,000 and the non-Federal share at $4,543,000, including $3,644,000 in cash. The reporting officers further find that a lock is required in the Inner Harbor Navigation Canal near Seabrook to prevent velocities hazardous to navigation in the canal, and increased salinity in Lake Pontchartrain, which will occur upon completion of the Mississippi River-Gulf Outlet navigation project, presently under construction. It would serve a dual purpose in controlling tidal exchange into the lake and as an element in the hurricane surge-barrier. The first cost of the lock allocated to the Gulf Outlet project is estimated at $4,980,000 and the annual charges at $278,600, including $120,000 for Federal operation and maintenance in addition to that now required. Inclusion of these costs in those for the Gulf Outlet project decreases the benefit-cost ratio from 1.8 to 1.7. Subject to particular conditions of local cooperation applying to each of the three plans, the reporting officers recommend authorization for construction in accordance with their plans.

3.  The Mississippi River Commission concurs in general in the views and recommendations of the reporting officers insofar as they pertain to proposed improvements under the jurisdiction of the Commission in St. Charles and Jefferson Parishes.

2

11.  _Improvements proposed._--The reporting officers find that the most suitable plan for controlling salinity exchange and velocity of flow in the Inner Harbor Navigation Canal, caused by construction of the Gulf Outlet, would be by construction of a lock at Seabrook, on the lake end of the canal.  It would be 84 feet wide, 800 feet long, with the gate sills 15.8 feet below mean sea level. All components of the lock would have crest elevations at 7.2 feet, except the control houses which would have floor elevation of 12.2 feet, and would be tied to the existing structures along the canal. The first cost of the lock and the annual cost of its maintenance and operation, shown in Table 1 hereto, would be Federal and are mitigating costs of the Gulf Outlet project.

12.  For protection from hurricane flood levels, the reporting officers find that the most suitable plan would consist of a barrier extending generally along United States Highway 90 from the easternmost levee to high ground east of the Rigolets, together with floodgates and a navigation lock in the Rigolets, and flood and navigation gates in Chef Menteur Pass; construction of a new lakeside levee in St. Charles Parish extending from the Bonnet Carre Spillway guide levee to and along the Jefferson Parish line; extension upward of the existing riprap slope protection along the Jefferson Parish levee; enlargement of the levee landward of the seawall along the 4.1-mile lakefront, and construction of a concrete-capped sheet-pile wall along the levee west of the Inner Harbor Canal in New Orleans; raising the rock dikes and landward gate bay of the planned Seabrook Lock; construction of a new levee lakeward of the Southern Railway extending from the floodwall at the New Orleans Airport to South Point; enlargement of the existing levee extending from United States Highway 90 to the Gulf Intracoastal Waterway, thence westward along the waterway to the Inner Harbor Canal, together with riprap slopes along the canal; construction of a concrete-capped sheet-pile wall along the east levee of the Inner Harbor Canal between the Gulf Intracoastal Waterway and the New Orleans Airport; construction of a concrete-capped sheet-pile wall along the east levee of the Inner Harbor Canal extending from the existing lock to the Gulf Intracoastal Waterway; construction of a new levee extending from the Inner Harbor Canal along the south side of the Gulf Outlet Channel to Bayou Dupre, thence westward to the Mississippi River levee at Violet, together with riprap slope protection along the navigation channel and floodgates; and strengthening of the existing floodwall at Mandeville on the north shore.  The improvements are designed to provide protection from hurricane flood levels and wave runup having an estimated frequency of occurrence of about once in 200 years. Because of adverse foundation conditions, the embankment must be

9

(6)   Provide all interior drainage and pumping plants required for reclamation and development of the protected areas;

(7)   Maintain and operate all features of the works in accordance with regulations prescribed by the Secretary of the Army, including levees, floodgates and approach channels, drainage structures, drainage ditches or canals, floodwalls, seawalls, and stoplog structures, but excluding the Rigolets navigation lock and channel and the modified dual-purpose Seabrook Lock; and

(8)   Acquire adequate easements or other interest in land to prevent encroachment on existing ponding areas unless substitute storage capacity or equivalent pumping capacity is provided promptly;

Provided that construction of any of the separable independent features of the plan may be undertaken independently of the others, whenever funds for that purpose are available and the prescribed local cooperation has been provided; and

b.  That the existing project for the Mississippi River, Baton Rouge to the Gulf of Mexico, Louisiana, as modified by the addition of the Mississippi River-Gulf Outlet, be further modified to provide for the construction of a dual-purpose lock at the lakeward terminus of the Inner Harbor Navigation Canal in the vicinity of Seabrook, Louisiana, generally in accordance with the plans of the District Engineer and with such modifications thereof as in the discretion of the Chief of Engineers may be advisable, at estimated costs to the United States of $4,980,000 for construction, and $120,000 annually for operation and maintenance in addition to that now required:  Provided that prior to construction, local interests furnish assurances satisfactory to the Secretary of the Army that they will:

(1)   Provide without cost to the United States and upon request of the Chief of Engineers, all lands, easements, and rights-of-way, including borrow and spoil-disposal areas, required for construction, operation, and maintenance of the project; and

(2)   Hold and save the United States free from damages due to the construction works.

FOR THE BOARD:

R. G. MacDONNELL
Major General, USA
Chairman

12

# REPORT OF THE DISTRICT ENGINEER

## HURRICANE STUDY
### INTERIM SURVEY REPORT
### LAKE PONTCHARTRAIN, LOUISIANA AND VICINITY

### SYLLABUS

The lowlands in the Lake Pontchartrain tidal basin are subject to tidal overflow.  The Greater New Orleans Metropolitan area which lies in this basin will continue its rapid economic development in the near future even though severe damages have resulted from several hurricanes in the recent past.  Hurricane damages result from surges entering Lake Pontchartrain from Lake Borgne through natural tidal passes at Rigolets and Chef Menteur Pass and through improved channels of the Mississippi River-Gulf Outlet and Inner Harbor Navigation Canal.  The surges are intensified by local wind effects, and the combination of waves and surges causes overtopping of the protective works along the shores of the lake. The eastern portion of the area is also subject to flooding by surges and waves that move directly from Lake Borgne and overtop the existing inadequate protective system seaward of the developed land areas.  As a result, residences and industrial and commercial establishments suffer damage, business activities are disrupted, lives endangered, and hazards to health created.  Hurricanes much more severe than any of record are possible.  In the event of the occurrence of such a severe hurricane, catastrophic property damage and loss of human life would be experienced. Local interests have requested protection against these threats to life and property.  Another and related problem exists in the area.  The Mississippi River-Gulf Outlet provides a deep, direct route for the inflow of saline currents from the Gulf of Mexico to the area along its channel and to Lake Pontchartrain, with resultant adverse effect on fishery resources in the area.  The Gulf Outlet Channel also will produce high velocity currents in the Inner Harbor Navigation Canal, creating a hazard to navigation and causing serious scour and damage, particularly in constricted areas at bridge crossings.  These adverse effects can be greatly alleviated by construction of a lock for navigation and salinity control at the lake end of the Inner Harbor Navigation Canal at Seabrook.  This lock is properly chargeable as a feature of the Gulf Outlet project.  A low level lock to the height of the existing protective works will serve the needs of the Gulf Outlet project.  By increasing the grade of the rock dike and the landward gate bay section and gates, this structure will also serve as an essential part of a hurricane barrier plan by preventing the entry of hurricane surges into Lake Pontchartrain through the Gulf Outlet. The incremental cost of raising the lock to serve the dual purpose of excluding hurricane surges is properly a charge to the hurricane plan.

The recommended protection plan for the Lake Pontchartrain basin consists of a barrier at the east end of the lake to exclude hurricane tides, coupled with construction or enlargement of protective works fronting developed or potentially developable areas.  The barrier would comprise enlarged embankments along the seaward levee system, new embankment extending to high ground on the north side of the Rigolets with regulating tidal and navigation structures in the Rigolets and Chef Menteur Pass, and a dual purpose navigation lock in the Inner Harbor Navigation Canal at Seabrook for control of hurricane inflows into the lake as

well as to limit objectionable salinity intrusion into the lake and tidal
currents in the canal now developing from construction of the Mississippi
River-Gulf Outlet.  Additional protective works along the shores of the
lake consist of new lakeshore levees in St. Charles Parish, Citrus, and
New Orleans East, and the enlargement or strengthening of existing protec-
tive works in Jefferson and Orleans Parishes, and at Mandeville.  Gravity
drainage facilities are included as integral parts of all new levees.
Costs of these features and distribution of costs between navigation and
hurricane protection are given in the pertinent data table.

The plan of protection recommended for the Chalmette area provides
for the improvement of the existing levee along the Inner Harbor Naviga-
tion Canal and construction of new levees along the south side of the
Mississippi River-Gulf Outlet from the Inner Harbor Navigation Canal to
Bayou Dupre and thence along the bayou to Violet.  Gravity drainage
structures are included as an essential part of the plan.

For the Lake Pontchartrain barrier plan and for the Chalmette area,
local interests will be required to provide all lands, easements, rights-of-
way, and relocations without cost to the United States; to maintain and
operate the project and all drainage facilities after completion except as
described below; to hold and save the United States free from damages due
to the construction works; to contribute 30 percent of the first costs in
cash or equivalent work necessary to accomplish approved construction
schedules, said 30 percent to include fair market values of lands and re-
locations, unless they exceed the value of the 30 percent contribution; to
acquire adequate easements or other interests in land to prevent encroach-
ment on existing ponding areas unless substitute storage capacity or
equivalent pumping capacity is provided promptly without cost to the United
States; and to provide all interior drainage and pumping plants required
for reclamation and development of the protected areas.  Local interests
also will provide, at the time of construction of the hurricane protection
works, an additional cash contribution equal to the capitalized value of
the annual cost for the operation and maintenance of the Rigolets lock and
navigation canal, said operation and maintenance to be undertaken by the
United States.

Local interests will be required to provide for the Mississippi
River-Gulf Outlet lock project at Seabrook all lands, easements, and
rights-of-way without cost to the United States, and hold and save the
United States free from damages due to the construction works.

Additional protection from hurricane tides can be afforded by
local interests to residents of low-lying coastal communities by the
establishment of building codes and zoning regulations, provision of
adequate havens of refuge, and organization of hurricane preparedness
committees to formulate plans for effective preventive measures,
evacuation and rescue work, all at no cost to the United States.

# GLOSSARY

ASTRONOMICAL TIDE - See PREDICTED NORMAL TIDE.

ATMOSPHERIC PRESSURE ANOMALY - The difference between atmospheric
    pressure at any point within the hurricane and normal pressure
    at the periphery of the hurricane.

BUILDUP - The increase, in feet, over that from other causes, of
    water surface elevation in a body of water resulting from:

        1.    Convergence in depth or width
        2.    Construction of a barrier
        3.    Ponding

CENTRAL PRESSURE - The minimum atmospheric pressure within the hurri-
    cane at any specific time.

FETCH - The continuous area of water over which the wind blows in es-
    sentially a constant direction.  Often used synonomously with
    FETCH LENGTH.

FETCH LENGTH - The horizontal distance over which the wind from a
    fixed direction may have unobstructed contact with the water
    surface.

HURRICANE - A cyclonic storm, usually of tropical origin, containing
    winds of 75 miles per hour or more.

    a.    DESIGN HURRICANE - That hurricane selected by the reporting
        office as a basis for design of the proposed plan of improve-
        ment.

    b.    STANDARD PROJECT HURRICANE - A hurricane that may be expec-
        ted from the most severe combination of meteorological
        conditions that are considered characteristic of the region
        involved.

    c.    PROBABLE MAXIMUM HURRICANE - The hurricane that may be
        expected from the most severe combination of meteorological
        conditions that are reasonably possible in the region.

    d.    MODERATE HURRICANE - A hurricane that may be expected from a
        combination of meteorological conditions that are frequently
        experienced in the region.

    e.    TRANSPOSED HURRICANE - A storm transferred from actually
        observed location to another location for the purpose of
        study, with appropriate changes in storm characteristics.

total combined capacity of approximately 4,600 c.f.s. and serve a drainage area of approximately 29,000 acres. The floor of each station is at an elevation of 2.6 feet. The pumps can operate with several feet of flooding over the floor because all of the fuel connections and oil vents are above the floor level.

(3) New Orleans. The New Orleans lakefront protection consists of a seawall backed by a low levee from its western boundary to the Inner Harbor Navigation Canal. The first one-half mile adjacent to Jefferson Parish is a vertical seawall having a crown elevation of 7.5 feet protected by a breakwater at an elevation of 6.0 feet which forms the Municipal Yacht Harbor and backed by a levee with an elevation of 10 feet. To the east of the harbor area a stepped type seawall with a crown elevation of 8.2 to 9.0 feet extends along the lakefront for a distance of 5.2 miles. Several hundred feet landward of the seawall a small levee, with a crown elevation of 9.6 feet, provides secondary protection. The area is protected on the west by a levee on the east bank of the Metairie Relief outfall canal with a controlling grade of 9.5 feet, and on the east by a levee along the Inner Harbor Navigation Canal having an elevation of 9.6 feet. Extending into the interior of this highly developed area are three major channels. The Orleans Avenue Relief outfall canal, 2.5 miles long, and the London Avenue outfall canal, 2.9 miles long, each has levees with net grades of about 10.0 feet terminating at major pumping stations. The third, Bayou St. John, is now closed by a floodgate about one-half mile from the lake with 10-foot levees tying-in to the seawall. The drainage system in New Orleans, operated by the Sewerage and Water Board of New Orleans, comprises a network of collecting ditches, covered and open canals, relay pumping stations, and outfall pumping stations, that ultimately empty into Lake Pontchartrain, as shown on plate 2. The canal system is so designed that normal or light rainfall is discharged into Bayou Bienvenue and heavy rainfall is discharged into the lake. The total nominal capacity of outfall pumps for New Orleans is 20,830 c.f.s. for the drainage of an area that is approximately 27,800 acres, including the 2,000 acres in the Chalmette area. Internal relay pumps have a capacity of 8,340 c.f.s. The design elevation of the floors of the stations is 2.6 feet. The pumps are electrically driven with power from a central generating station. Emergency power is available from the local power company.

(4) Citrus and New Orleans East. The New Orleans Airport is fronted by a vertical seawall with an average elevation of 11.5 feet and a length of 2.3 miles. The embankment of the Southern Railway extends along the remainder of the south shore to the east for approximately 11.5 miles with an average elevation of about 9.3 feet. The embankment is a heterogeneous fill composed largely of cinders, and has been severely damaged on many occasions in the past by relatively minor hurricane tides and waves. This type of embankment will not provide dependable protection against major hurricane tides and waves. The area is protected on the west by a

levee along the Inner Harbor Navigation Canal having a grade of 9.6 feet, on the east by a levee that extends from South Point to the Gulf Intracoastal Waterway with an elevation of 11.6 feet, and on the south by a levee along the Gulf Intracoastal Waterway with elevation 9.6 to 14. The Paris Road-Michoud slip levee separates this area into two segments, Citrus and New Orleans East. The Citrus area drains through a system of open canals with one pumping station at Citrus. This partially developed area of 8,900 acres is drained by a 520-c.f.s. electrically driven plant. An emergency power source is provided. Improvements to this system are being planned. The New Orleans East area has no major drainage system at this time but plans for the development of an adequate system for the area are well advanced. Some small units are in operation.

(5) Chalmette. In the Chalmette area about 10,400 acres of the higher lands along the Mississippi River are protected by a locally built levee with a net grade of 10 to 10.5 feet. Partial protection is afforded the remaining area by a spoil bank with an elevation of approximately 8.0 feet along the south bank of the Mississippi River-Gulf Outlet between the Inner Harbor Navigation Canal and Bayou Dupre. The leveed portion of the Chalmette area in St. Bernard Parish, west of Paris Road, is drained by pumping plants. The capacity of the stations in this area is 666 c.f.s. existing plus 478 c.f.s. being installed for an area of approximately 8,000 acres. East of Paris Road, runoff is conveyed to the marshes by flood gates.

(6) Inner Harbor Navigation Canal. The highly developed industrial areas along the canal between its levees are not protected against flooding from the canal. The area has been raised to about elevation 5 with spoil from the canal.

(7) The area bounded by the Mississippi River-Gulf Outlet, the Gulf Intracoastal Waterway, and Lake Borgne and the area east of U. S. Highway 90 between New Orleans East and Pearl River are unprotected. The area west of U. S. Highway 90 is afforded a limited degree of protection against flooding from Lake Borgne by the highway embankment.

(8) Mandeville. A vertical seawall with a height of 6.0 feet and a length of 1.5 miles protects the town of Mandeville. Plans to expand this structure to provide a height of 9.5 feet are being developed by the town officials. Drainage is by gravity into the lake.

f. Maps. Reference is made to U. S. Geological Survey quadrangles Yscloskey, scale 1:62,500 and Malheureaux Point, Drum Bay, Door Point, Lake Eugenie, Oak Mound Bayou, Mitchell Keys, Lake Eloi, and Morgan Harbor, scale 1:24,000; U. S. Army Corps of Engineers quadrangles Slidell, Covington, Ponchatoula, Springfield, Denham Springs, Donaldsonville, Mt. Airy, Bonnet Carre, Spanish Fort, Chef

very large.  Maximum surge heights experienced along the gulf and
Atlantic coasts range between 10 and 16 feet.

e.  Waves.  The waves generated by hurricane winds cause a
great deal of damage to ships and shore structures.  At sea the
waves are high and turbulent, particularly in the right front quad-
rant and the eye of the storm.  The pyramidal shaped waves in the
eye have been observed to reach heights of 45 feet or more.  Near
shore, wave heights which have diminished some since origin, begin
to increase again because of the slowing and therefore building
effect of the shallow water.  Further, breaking waves can run up
and overtop shore structures whose crowns are higher than the wave
heights.  But the force expended when they break is the most damaging
to the shore structures.  Some waves which are generated in midocean
travel away from the point of origin faster than the storm advances,
and arrive at the shore 2 to 3 days ahead of the full fury of the
storm.

f.  Rainfall.  The rainfall accompanying a hurricane usually
is heavy and sometimes torrential.  However, its distribution during
the passage of a hurricane is not uniform.  The rain may begin long
before the storm's arrival.  Prior to the passage of the eye, rain-
fall generally reaches its maximum rate, and after the eye has
passed, it ceases almost entirely.  Rainfall is particularly heavy
in the right front quadrant.  Some hurricanes, however, are accom-
panied by little or no rainfall over considerable lengths of their
paths.

9.  STANDARD PROJECT HURRICANE

a.  A standard project hurricane, SPH, is one that may be
expected from the most severe combination of meteorological condi-
tions that are considered reasonably characteristic of the region.
The general SPH that is characteristic for the coastal region of
Louisiana was developed in cooperation with the Hydrometeorological
Section, U. S. Weather Bureau, and corresponds to one having a
frequency of once in about 200 years in the study area.  The
derivation of procedures and frequency computations are described
in detail in appendix A.  Each of the specific SPH's for the study
area has a central pressure index, CPI, of 27.6 inches and a maxi-
mum wind velocity of 100 m.p.h. at a radius of 30 nautical miles.
These parameters define a hurricane which is similar in intensity to
the September 1915 hurricane.  Various translation speeds, rates of
hurricane forward movement, and paths are necessary to produce SPH
effects with maximum winds perpendicular to the shores at different
locations in the study area.  The occurrence of an SPH for any loca-
tion in the study area would produce maximum surge heights of 11.2
feet along the south shore of Lake Pontchartrain, 12.5 feet at
Mandeville, 11.9 feet in the Chalmette area, 12.5 feet at the
Citrus and New Orleans East back levees, and 13 feet in the Rigolets
and the Chef Menteur Pass.

46

b.   The SPH critical to the south shore of Lake Pontchartrain has an average translation speed of 6 knots.  Over water the speed is about 8 knots, and over land, at the time of recurvature, the speed is 4 knots.  This SPH approaches from the south, traverses the coast west of the Mississippi River delta and curves eastward over Lake Borgne.  The SPH critical to the north shore of Lake Pontchartrain has a translation speed of 5 knots.  This hurricane approaches from the south-southeast, traverses the coast west of the Mississippi River delta, and curves northward passing west of Lake Maurepas. The SPH critical to the Chalmette area, the back levees of Citrus and New Orleans East, and from the Lake Borgne side in the vicinity of the Rigolets and the Chef Menteur Pass has a translation speed of 11 knots.  This hurricane approaches from the east, traverses the coast east of the Mississippi River delta and south of Lake Borgne, and curves slightly northward passing to the west of Lake Maurepas.

10.   PROBABLE MAXIMUM HURRICANE

The probable maximum hurricane, PMH, is one that may be expected from the most severe combination of critical meteorological conditions that are reasonably possible for the region.  It has an infinite recurrence period.  The PMH for the study area has a CPI of 26.9 inches with a maximum wind velocity of 115 m.p.h. at a radius of 30 nautical miles.  Translation speeds and paths are identical to those for the SPH.  The occurrence of a hurricane of PMH characteristics in the study area would produce surge heights of 12.7 feet along the south shore of Lake Pontchartrain, 14.7 feet at Mandeville, 13.8 feet in the Chalmette area, 14.6 feet at the back levees of Citrus and New Orleans East, and 15.2 feet in the Rigolets and the Chef Menteur Pass region.

11.   EXTENT AND CHARACTER OF FLOODED AREA

The standard project hurricane would inundate a land area of approximately 700,000 acres to depths of up to 16 feet in the study area.  About 240,000 acres of this area are situated eastward of a line extending along U. S. Highway 90 from near Pearl River to Chef Menteur, then along the Gulf Intracoastal Waterway to the Inner Harbor Navigation Canal, around the Inner Harbor Navigation Canal, and thence along the back levee of the Chalmette area in Orleans and St. Bernard Parishes.  All of this land is marsh except for the spoil areas along the banks of the improved navigable channels.  Improvements include the Gulf Intracoastal Waterway, the Mississippi River-Gulf Outlet which is under construction, the Louisville and Nashville Railroad, fishing camps and residences along U. S. Highway 90 and the L. & N. Railroad, and the numerous industrial plants along the Inner Harbor Navigation Canal.  Westward of the above described line approximately 460,000 acres of land are subject to inundation.  This area includes a major part of metropolitan New Orleans.  The extent and character of the flooded areas within the several subareas are as follows:

47

a.   St. Charles Parish.   The total area subject to inundation is 29,600 acres comprised of 630 acres of residential development; 740 acres of commercial and industrial development; 1,710 acres of open land; 15,450 acres of swamp and 11,070 acres of marsh. An oil field occupies about 1,000 acres of swamp.  The Illinois Central and the Louisiana and Arkansas railroads, and U. S. Highway 61 cross the flood plain.  The lack of flood protection from Lake Pontchartrain and inadequate drainage have hindered the development of this area except for the high ground located near the Mississippi River and limited development along U. S. Highway 61.

b.   Jefferson Parish.   The total area subject to overflow is 21,500 acres comprised of 6,190 acres of residential development; 1,040 acres of commercial and industrial improvements; 1,950 acres of other developments; 7,870 acres of open land; and 4,450 acres of woodland.  The overflow area covers about 70 percent of eastern Jefferson Parish.  The New Orleans International Airport, Moisant Field, U. S. Highway 61, and the approach to the Greater New Orleans Expressway Bridge are located within the flood plain.  This area has experienced a rapid growth since about 1946 and its steady growth will continue.

c.   New Orleans.   The area subject to inundation, comprising about 65 percent of the land area of this segment of New Orleans, is 16,800 acres including 11,120 acres of residential development; 1,900 acres of commercial and industrial development; and 3,780 acres of other developed areas.  Essentially all of the area is developed to the extent of having streets and utilities and about 95 percent of the area available for residences and other improvements is occupied.

d.   Citrus.   The area subject to flooding, comprising all of the Citrus area, is 14,800 acres, including 1,610 acres of residential development; 1,210 acres of commercial and industrial development; 540 acres of other development; 2,335 acres of open land; and 9,105 acres of swamp, woodland, and marsh.  The portion of the area north of U. S. Highway 90 is zoned mainly for residential use, and the area adjoining and south of U. S. Highway 90 is zoned mainly for commercial and industrial use.  The residential development in this area began after 1946 and its continued steady growth is anticipated.  Substantial industrial and commercial development has taken place and water transportation available on the Gulf Intracoastal Waterway and the Mississippi River-Gulf Outlet will insure continued steady growth.

e.   New Orleans East.   The entire area of New Orleans East is subject to overflow.  Approximately 18,300 acres are in the area, of which 3 acres are presently occupied by residences and about 5 acres are occupied by commercial developments.  Plans are being developed for installing drainage, streets, and utilities on the 18,300 acres situated within the levees.  Some 7,000 acres will

be residential; 1,200 acres will be commercial; and 4,500 acres will be other development, all located north of the present U. S. Highway 90. Some 5,600 acres south of U. S. Highway 90 are planned for industrial development.

f. <u>Mandeville.</u> About 600 acres within the town of Mandeville are subject to overflow. Approximately 590 acres are covered by residences and the park behind the seawall, and 10 acres are occupied by commercial establishments. The section of the town subject to flooding has been essentially developed for many years and future growth is expected to be moderate.

g. <u>Remaining areas on the shores of Lake Pontchartrain.</u> About 348,000 acres of land outside of the subareas described above are subject to overflow. Of this area, 2,025 acres are residential and 95 acres are commercial development, the major part of which is in and near Slidell, 7,600 acres are open land, and 338,280 acres are marsh and swamp. Open land is used primarily as range pasture. Substantial residential and commercial growth is indicated for the areas around Slidell. About 5,700 acres of marsh situated between the New Orleans East levee, the shore of Lake Pontchartrain, and Chef Menteur Pass is planned for so-called Florida-type development consisting of numerous dredged waterways with the spoil utilized as land fill material. About 2,400 acres will be residential; 1,900 acres of commercial and other development; and 1,400 acres industrial.

h. <u>Chalmette.</u> The total Chalmette area in Orleans and St. Bernard Parishes consists of 29,230 acres. The area within the existing Chalmette back levee, 10,400 acres, includes 3,190 acres residential development, 1,290 acres commercial and industrial, 160 acres other development, 1,810 acres open land, and 3,950 acres woodland. This area has experienced a rapid growth since about 1951 and future steady and increasing growth is indicated. The remaining 18,830 acres of marsh and swamp land outside the Chalmette levee system is undeveloped. The 5,000 acres west of Paris Road is expected to develop rapidly on completion of the Gulf Outlet. Development of the remaining 13,830 acres is more remote.

12. HURRICANE FLOOD DAMAGES

a. <u>Flood damage surveys.</u> Flood damage surveys were made of this region following the occurrences of hurricane "Flossy" on 23-24 September 1956 and hurricane "Audrey" on 27 June 1957. Factual data for the hurricane of 19 September 1947 were obtained from the results of surveys conducted by two private firms for local governmental agencies, compilations by individuals and business concerns, and results of surveys by Federal, state, and local governmental agencies.

49

sheet piling wall with concrete cap at elevation 13 feet in the crown of the existing levee.  Stoplog structures will be provided at an elevation of 13 feet for crossings of the Southern Railway at Seabrook and Florida Avenue, and of the Louisville and Nashville Railroad.  Low bridge crossings over London Avenue at Robert E. Lee Boulevard and Gentilly Boulevard will require minor sandbagging for the occurrence of a design hurricane.

(h)  _Citrus._  A levee 4.5 miles in length will be constructed lakeward of the existing railroad embankment with a crest elevation of 11 feet and a crown width of 20 feet, as shown on plate 10.  Riprap slope protection will be provided on the lake-side slope below elevation 6.5 feet.  Incorporation of the railroad embankment in the protective levee was impracticable because of the heterogeneous nature of the fill and because of adverse effects on the railroad facilities.  Other features include a stoplog structure at the entrance to Lincoln Beach, modification of the existing Citrus pumping station outfall, and the Lincoln Beach protection walls.  The Inner Harbor Navigation Canal levee on the east side, 3.1 miles in length, will be raised by sheet pile construction similar to that described for the west side.  Stoplog structures also will be required for the three railroad crossings on the east side similar to those previously described for the west side.  The Citrus back levee, 7.4 miles along the Gulf Intracoastal Waterway, will be enlarged to an elevation of 13 feet west and 16 feet east of Paris Road, as shown on plate 11.  Riprap foreshore protection against erosion by wave wash from shipping will be provided.

(i)  _New Orleans East._  A levee 6.3 miles long will be required lakeward of the railroad embankment.  It will have a crest elevation of 10 feet and a crown width of 20 feet, and rip-rap slope protection on the lakeside below elevation 6.5 feet, as shown on plate 10.  Other features include modification of two pipeline crossings and alteration of an existing drainage culvert.  The existing levee from South Point to U. S. Highway 90 is adequate.  From this point to the Gulf Intracoastal Waterway, and thence along the waterway the levee will require enlargement for a distance of 9.3 miles to a crest elevation of 16 feet with a crown width of 10 feet, as shown on plate 11.  Riprap foreshore protection against wave wash from shipping is required.  Other features include a stoplog structure for the Louisville and Nashville Railroad cross-ing and modification of two pipeline crossings.

(j)  _Mandeville._  The existing seawall at Mandeville will be strengthened by the placement of a shell backfill to an elevation of 5 feet and a riprap blanket along the toe in the lake to an elevation of 1 foot along the entire length of the existing wall, and construction of 200 feet of concrete sheet pile wall to an elevation of 6 feet (see plate 10).

(3)  _Chalmette protection plan._  The plan provides for the construction of a new levee 13.5 miles in length along the south

64

shore of the Mississippi River-Gulf Outlet from the Inner Harbor Navigation Canal to Bayou Dupre, thence along the west bank of the bayou for a distance of 3.8 miles to Violet. The levee, shown on plate 11, will have a crown width of 10 feet and a grade of 13 feet west of Paris Road and 16 feet east of Paris Road. Riprap foreshore protection against erosion by wave wash from shipping will be provided. A sheet piling wall with concrete cap, with crest elevation of 13 feet and similar to that for the New Orleans reach, will be required for a distance of 1 mile along the Inner Harbor Navigation Canal levee. Gravity drainage structures will be required in the levee at Bayou Bienvenue and at Bayou Dupre. These will be of the sector gate type designed to pass small boats and tidal flows. Other features include alteration of five pipeline crossings and the construction of a stoplog structure at the Florida Avenue crossing of the Southern Railway.

e.  Construction.  The generally adverse foundation conditions and the methods of construction that must be utilized will require that the levees be built in from one to as many as six stages or lifts, with a minimum interval of 2 years between lifts. Levees requiring four lifts or less will be based in one lift and require only the shaping of the fill in place to accomplish the succeeding lifts.  Levees requiring five or more lifts will be constructed by multiple castings of fill and shapings. Adequate allowances have been made for shrinkage and settlement during and after construction.  Typical sections shown on plates 5, 6, 7, 10, and 11 are representative for the various reaches.

f.  Operation and maintenance.

(1)  The control structures will be operated to maintain a mean lake level not exceeding 2 feet during periods of hurricane hazard, as defined by advisories and forecasts from the U. S. Weather Bureau.  The gates will be kept closed during hurricane periods and until stages return to normal.  At all other times the control gates at the Rigolets and at the Chef Menteur Pass will remain open.  The lock structures at the Rigolets and at Seabrook will be operated as necessary to permit navigation until the lock chamber walls are overtopped by rising hurricane tides, at which time the higher level gate will be closed and remain closed until tides recede.  Under normal tide conditions, the Rigolets Lock can be left open whenever velocities are not excessive.  The Seabrook Lock will be operated in cooperation with the U. S. Fish and Wildlife Service to control the salinity in Lake Pontchartrain and in the Mississippi River-Gulf Outlet area provided such operation will not interfere with navigation.

(2)  The physical operation and maintenance of all project features, with the exception of the two lock structures

65

| Area | Avg. annual damage under present conditions | Avg. annual damage with project | Avg. annual damage prevented | Avg. annual damage prevented as adjusted for future development |
|---|---|---|---|---|
| Lake Pontchartrain barrier plan | | | | |
| St. Charles Ph. | $ 9,400 | $ - | $ 9,400 | $ 14,200 |
| Jefferson Ph. | 2,256,000 | 12,000 | 2,244,000 | 10,214,100 |
| New Orleans | 2,741,100 | - | 2,741,100 | 3,046,200 |
| Citrus | 4,497,000 | 24,100 | 4,472,900 | 22,092,200 |
| New Orleans East | - | - | - | 11,536,700 |
| Mandeville | 62,400 | 400 | 62,000 | 62,000 |
| Remaining areas along shores of Lake Pontchartrain | 112,100 | 2,500 | 109,600 | 693,600 |
| TOTAL | $9,678,000 | $39,000 | $9,639,000 | $47,659,000 |
| Chalmette | $1,212,000 | $ 7,000 | $1,205,000 | $ 4,773,000 |

d.   Enhancement.

(1) Lake Pontchartrain barrier plan.  Protection will be
afforded to an area of 29,600 acres in St. Charles Parish, with a
present appraised value of $16,399,000.  The project will make
possible the drainage and development of the entire area.  Con-
sidering the rate of development experienced in adjoining Jefferson
Parish, it is probable that sale of these lands to developers would
be accomplished within 20 years.  The value is estimated to be
enhanced during that period to $25,614,000, exclusive of enhance-
ment that will result from drainage and other improvements by local
interests.  The annual value of the enhancement based on the in-
creased value of $9,215,000 at a 5 percent interest rate is
$460,000.  The discounted annual value of the enhancement on this
basis is $350,000 ($460,000 x 0.760).

(2) Chalmette.  The portions of Orleans and St. Bernard
Parishes inclosed by the proposed Chalmette levee and the existing
Chalmette back levee aggregate 18,830 acres, consisting of 12,830
acres of marsh, 5,875 acres of wooded swamp, and 125 acres of open
land, which will be protected from tidal overflow.  The appraised
value is $3,710,000.  It is estimated that these lands after pro-
tection will enhance in value to $13,010,000, exclusive of
enhancement that would result from drainage and other improvements
by local interests.  The annual value of the enhancement based on
the increased value of $9,300,000 at 5 percent is $465,000.  In
consideration of the proximity of this area to New Orleans, and the
Mississippi River-Gulf Outlet, which is nearing completion, it is

71

probable that sale of these lands to developers will be accomplished within 15 years.  The discounted annual value of the enhancement on this basis is $379,000 ($465,000 x 0.815).

e.   Average annual benefits from the hurricane protection plans are as follows:

| | Lake Pontchartrain barrier plan | Chalmette |
|---|---|---|
| Flood damage prevented | $ 47,659,000 | $ 4,773,000 |
| Enhancement | 350,000 | 379,000 |
| TOTAL | $ 48,009,000 | $ 5,152,000 |

f.   Intangible benefits include the protection of human life, the prevention of hazards to health arising from pollution, and the improvement of sanitary facilities and water supplies in the area.

22.   ECONOMIC JUSTIFICATION

a.   A comparison of the estimated average annual benefits and annual economic costs for the authorized Mississippi River-Gulf Outlet and proposed modification thereof, and for the two plans of hurricane protection investigated are as follows:

| Area | Avg. annual benefit | Avg. annual cost | Benefit-cost ratio |
|---|---|---|---|
| Mississippi River-Gulf Outlet (existing project) | $ 9,080,000 | $4,965,700 | 1.8 to 1 |
| Mississippi River-Gulf Outlet (recommended modification) | 9,080,000 | 5,244,300 | 1.7 to 1 |
| Lake Pontchartrain barrier plan | 48,009,000 | 2,535,600 | 18.9 to 1 |
| Chalmette | 5,152,000 | 572,200 | 9.0 to 1 |

b.   Modification of the Mississippi River-Gulf Outlet, to include a lock at Seabrook, is remedial construction.  It reduces the benefit-cost ratio from 1.8 to 1 for the existing project to 1.7 to 1 for the modified project.

c.   The Lake Pontchartrain barrier plan, including the cost for modification of the Seabrook Lock chargeable to the barrier plan, is amply justified as a comprehensive coordinated plan.  The several separable protective systems around the lake shore were analyzed incrementally to the barrier system sufficiently to determine that each was justified.  Analysis of the Citrus and New

72

Orleans East lakefront protection, which consists of the embankment
of the Southern Railway, indicated that the embankment would fail
under severe hurricane conditions and would be overtopped by the
less severe storms resulting in annual damages with the barrier in
place and under conditions of future development of $3,637,000 in
the Citrus area and $1,110,000 in the New Orleans East area.  Provi-
sion of the proposed levee enlargements would reduce these damages
to $176,000 and $80,000 and result in annual benefits of $3,461,000
and $1,030,000, respectively.  Annual costs of the Citrus levee are
$127,300 and the annual costs of the New Orleans East levee are
$232,400.  The benefit-cost ratios are 27.0 and 4.4 to 1 for these
levees incremental to the barrier plan.  Flood damage in the St.
Charles Parish area will be essentially eliminated by the barrier
system.  Subsequent construction of the proposed St. Charles Parish
area levee will place the lands in a condition whereby local inter-
ests can provide pumped drainage and develop the area.  It is
estimated that the levee will cause these lands to be enhanced by
$350,000 annually.  The annual cost of the levee and appurtenances
is $204,000, resulting in a benefit-cost ratio of 1.7 to 1 for
this feature.  Improvement and strengthening of the protection in
Jefferson Parish, New Orleans, and Mandeville, to insure that these
protective works do not fail are considered necessary in view of
the threat to life and property, and the relatively small costs
for these improvements, $509,000, $282,000, and $224,000, respec-
tively, are amply justified.

    d.    The Chalmette hurricane protection plan is justified.

## SECTION VI - COORDINATION AND LOCAL COOPERATION

23.   PROPOSED LOCAL COOPERATION

    a.    *Mississippi River-Gulf Outlet, Seabrook Lock.*  It is pro-
posed that modification of the existing Mississippi River-Gulf
Outlet project to include authorization for the construction of a
lock in the vicinity of Seabrook shall be subject to the conditions
that prior to initiation of construction local interests give
assurances satisfactory to the Secretary of the Army that they will:

        (1)  Provide without cost to the United States, and upon
the request of the Chief of Engineers, all lands, easements, and
rights-of-way, including borrow and spoil-disposal areas required
for construction, operation, and maintenance of the project; and

        (2)  Hold and save the United States free from damages
due to the construction works.

    b.    *Lake Pontchartrain barrier plan and Chalmette.*  It is
proposed that construction of the barrier plan of protection for
the areas around Lake Pontchartrain, and of the plan of protection
for Chalmette shall be subject to the conditions that prior to

initiation of construction on each separable independent feature local interests give assurances satisfactory to the Secretary of the Army that they will without cost to the United States:

(1)  Provide all lands, easements, and rights-of-way, including borrow and spoil-disposal areas necessary for construction, operation, and maintenance of the project;

(2)  Accomplish all necessary alterations and relocations to roads, railroads, pipelines, cables, wharves, drainage structures, and other facilities required by the construction of the project;

(3)  Hold and save the United States free from damages due to the construction works;

(4)  Bear 30 percent of the first cost, to consist of the fair market value of the items listed in subparagraphs (1) and (2) above and a cash contribution as presently estimated below, to be paid either in a lump sum prior to initiation of construction or in installments at least annually in proportion to the Federal appropriation prior to start of pertinent work items, in accordance with construction schedules as required by the Chief of Engineers, or, as a substitute for any part of the cash contribution, accomplish in accordance with approved construction schedules items of work of equivalent value as determined by the Chief of Engineers, the final apportionment of costs to be made after actual costs and values have been determined:

| Project | Total contribution for construction | Lands and relocations | Cash contribution for construction |
|---|---|---|---|
| Lake Pontchartrain barrier plan | $19,411,000 | $5,027,000 | $14,384,000 |
| Chalmette | 4,543,000 | 899,000 | 3,644,000 |

(5)  Provide for the Lake Pontchartrain barrier plan an additional cash contribution equivalent to the estimated capitalized value of maintenance and operation of the Rigolets navigation lock and channel to be undertaken by the United States, presently estimated at $4,092,000, the final determination to be made after construction is complete, said amount to be paid either in a lump sum prior to initiation of construction of the barrier or in installments at least annually in proportion to the Federal appropriation for construction of the barrier;

(6)  Provide all interior drainage and pumping plants required for reclamation and development of the protected areas;

(7)  Maintain and operate all features of the project in accordance with regulations prescribed by the Secretary of the Army, including levees, floodgates and approach channels, drainage structures, drainage ditches or canals, floodwalls,

under the jurisdiction of the United States.  Accordingly, a lump sum
contribution of $4,092,000, representing the capitalized annual costs
of $125,000, should be made by local interests during the construction
period.  At Chef Menteur Pass, the traffic is local in nature and will
be adequately served by a floodgate structure with long approach chan-
nels.  The Chef Menteur structure is designed to permit expansion to
a lock should conditions in the future indicate the need for such a
facility.

   d.   Chalmette.  The Chalmette area can be afforded adequate pro-
tection against hurricane flooding by construction of a new levee along
the Mississippi River-Gulf Outlet from the Inner Harbor Navigation Canal
to Bayou Dupre, thence along the bayou to Violet and the improvement
of existing protective structures along the Inner Harbor Navigation
Canal, including necessary modifications to railroads, pipelines, and
drainage facilities.  Benefits are sufficient to justify authorization
of the project.

   e.   The plans described above for prevention of flooding by hurri-
cane tides, and for corrective action to alleviate the adverse effects
of the Mississippi River-Gulf Outlet on navigation and on the ecology
of the area are based on thorough and careful analysis of experienced
and potential flood situations.  Protective works will provide dependa-
ble protection to a high degree and will result in major reduction in
average annual damage, in damage resulting from flooding by the
standard project hurricane, and in damage to navigation and conservation
interests.

   f.   Effects on other interests.  The proposed plans will have
negligible effect on other interests in the area.  The barrier will
not modify the salinity regimen or ecology of the Lake Pontchartrain
area and fishery values will undergo little or no change.  The improve-
ment of existing protective works will not affect wildlife values.
The plans will in no way hamper business and industrial operations,
or agricultural activities.  The plans of protection make adequate
provision for preserving existing navigation facilities.  The dual
purpose Seabrook Lock makes adequate provision for existing and future
traffic between the Inner Harbor Navigation Canal and Lake Pontchartrain.

   g.   Local measures.  Further protection of human life and proper-
ty can be afforded by the more widespread dissemination of information
relative to potential hurricane tide elevations and limits of flooding.
This can be accomplished through the organization of a hurricane pre-
paredness committee in each community.  Such a committee would establish
a continual preparedness plan, conduct public educational programs,
formulate plans for use of buildings as hurricane shelters, recommend
desirable zoning regulations and building codes, and direct evacuation
and rescue work when necessary.  Zoning regulations and building codes
should be established and enforced where not presently in effect.  All
of these measures will be undertaken by local interests at no cost to
the United States.

h.   The report is fully responsive to all of the resolutions cited in par. 1.  The authorization cited in par. 1.c. requires study with respect to flood control, navigation and beach erosion control in Orleans Parish.  Flood control measures desired by local interests were those which would prevent flooding by hurricane tides and waves from Lake Pontchartrain, and were not related to flooding resulting from inadequate interior drainage.  Although mentioned in the resolution, navigation is not involved as a basic problem, but only as affected by protective measures to be provided.  As discussed in par. 16.c.(2)(c), local interests have solved the erosion problem and no longer consider it of major importance.

i.   Additional information on recommended projects outlined in Senate Resolution 148, 85th Congress, adopted 28 January 1958, is shown in the attachment to this report.

## SECTION VIII - RECOMMENDATIONS

27.  RECOMMENDATIONS

a.   Lake Pontchartrain barrier plan.

(1)  It is recommended that the barrier plan for the hurricane protection of the shores of Lake Pontchartrain be authorized for construction to include the following features:

(a)  A barrier across the east side of Lake Pontchartrain, to consist of a levee along U. S. Highway 90; a control structure and approach channels, navigation lock and channels, and closure dam at the Rigolets; a control structure, floodgate, navigation channel, and closure dam at Chef Menteur Pass;

(b)  A levee along the lakeshore of St. Charles Parish between the Bonnet Carre Spillway and Jefferson Parish; a lateral levee along the St. Charles-Jefferson Parish line; and a drainage structure in the lateral levee near its lakeward extremity; and

(c)  Improvement of existing levees along the lakeshores of Jefferson Parish and New Orleans, a new levee along the lakeshore of Citrus and New Orleans East, and improvement of existing protective works between U. S. Highway 90 and the Gulf Intracoastal Waterway in the northeastern section of Orleans Parish, along the Gulf Intracoastal Waterway and the Inner Harbor Navigation Canal in Orleans Parish, including the incremental cost of a dual purpose lock in the Inner Harbor Navigation Canal at Seabrook chargeable to Hurricane Protection, and along the lakeshore at Mandeville, La.

(2)  The proposed plan shall be generally in accordance with the plan of improvement described herein and as shown on the accompanying

plates and with such modification thereof as in the discretion of the Chief of Engineers may be advisable, at estimated costs to the United States of $41,200,000 for new work, and $125,000 annually for operation and maintenance.

(3) Construction of the project shall be subject to the conditions that prior to initiation of construction on each separable independent feature local interests give assurances satisfactory to the Secretary of the Army that they will without cost to the United States:

(a) Provide all lands, easements, and rights-of-way, including borrow and spoil-disposal areas necessary for construction, operation, and maintenance of the project;

(b) Accomplish all necessary alterations and relocations to roads, railroads, pipelines, cables, wharves, drainage structures, and other facilities required by the construction of the project;

(c) Hold and save the United States free from damages due to the construction works;

(d) Bear 30 percent of the first cost, to consist of the fair market value of the items listed in subparagraphs (a) and (b) above and a cash contribution as presently estimated below, to be paid either in a lump sum prior to initiation of construction or in installments at least annually in proportion to the Federal appropriation prior to start of pertinent work items, in accordance with construction schedules as required by the Chief of Engineers, or, as a substitute for any part of the cash contribution, accomplish in accordance with approved construction schedules items of work of equivalent value as determined by the Chief of Engineers, the final apportionment of costs to be made after actual costs and values have been determined:

| Project | Total contribution for construction | Lands and relocations | Cash contribution for construction |
|---------|-------------------------------------|-----------------------|------------------------------------|
| Lake Pontchartrain barrier plan | $19,411,000 | $5,027,000 | $14,384,000 |

(e) Provide an additional cash contribution equivalent to the estimated capitalized value of maintenance and operation of the Rigolets navigation lock and channel to be undertaken by the United States, presently estimated at $4,092,000, the final determination to be made after construction is complete, said amount to be paid either in a lump sum prior to initiation of construction of the barrier or in installments at least annually in proportion to the Federal appropriation for construction of the barrier;

83

(f)  Provide all interior drainage and pumping plants required for reclamation and development of the protected areas;

(g)  Maintain and operate all features of the project in accordance with regulations prescribed by the Secretary of the Army, including levees, floodgates and approach channels, drainage structures, drainage ditches or canals, floodwalls, seawalls, and stoplog structures, but excluding the Rigolets navigation lock and its appurtenant navigation channels and the modified dual purpose Seabrook Lock; and

(h)  Acquire adequate easements or other interest in land to prevent encroachment on existing ponding areas unless substitute storage capacity or equivalent pumping capacity is provided promptly.

b.  Chalmette.

(1)  It is further recommended that a plan for hurricane protection of the Chalmette area be authorized for construction to provide for a levee along the Mississippi River-Gulf Outlet from the Inner Harbor Navigation Canal to Bayou Dupre, thence along the bayou to Violet, La.; the improvement of the existing levee along the Inner Harbor Navigation Canal; and drainage structures in the levee alignment at Bayous Bienvenue and Dupre.

(2)  The proposed plan shall be generally in accordance with the plan of improvement described herein and as shown on the accompanying plates and with such modification thereof as in the discretion of the Chief of Engineers may be advisable, at an estimated cost to the United States of $10,600,000 for new work.

(3)  Construction of the project shall be subject to the conditions that prior to initiation of construction on each separable independent feature local interests give assurances satisfactory to the Secretary of the Army that they will without cost to the United States:

(a)  Provide all lands, easements, and rights-of-way, including borrow and spoil-disposal areas necessary for construction, operation, and maintenance of the project;

(b)  Accomplish all necessary alterations and relocations to roads, railroads, pipelines, cables, wharves, drainage structures, and other facilities required by the construction of the project;

(c)  Hold and save the United States free from damages due to the construction works;

(d)  Bear 30 percent of the first cost, to consist of the fair market value of the items listed in subparagraphs (a) and (b) above and a cash contribution as presently estimated below, to be

paid either in a lump sum prior to initiation of construction or in installments at least annually in proportion to the Federal appropriation prior to start of pertinent work items, in accordance with construction schedules as required by the Chief of Engineers, or, as a substitute for any part of the cash contribution, accomplish in accordance with approved construction schedules items of work of equivalent value as determined by the Chief of Engineers, the final apportionment of costs to be made after actual costs and values have been determined:

| Project | Total contribution for construction | Lands and relocations | Cash contribution for construction |
|---------|-------------------------------------|----------------------|-------------------------------------|
| Chalmette | $4,543,000 | $ 899,000 | $3,644,000 |

(e)  Provide all interior drainage and pumping plants required for reclamation and development of the protected areas;

(f)  Maintain and operate all features of the project in accordance with regulations prescribed by the Secretary of the Army, including levees, floodgates and approach channels, drainage structures, drainage ditches or canals, floodwalls, and stoplog structures;

(g)  Acquire adequate easements or other interest in land to prevent encroachment on existing ponding areas unless substitute storage capacity or equivalent pumping capacity is provided promptly.

c.  <u>Mississippi River-Gulf Outlet, Seabrook Lock.</u>

(1)  It is further recommended that the existing project for the Mississippi River, Baton Rouge to the Gulf of Mexico, La., project, authorized by the River and Harbor Act of 2 March 1945, Public Law No. 14, 79th Congress, 1st Session, and modified by the addition of the Mississippi River-Gulf Outlet, authorized by the River and Harbor Act of 29 March 1956, Public Law No. 455, 84th Congress, 2d Session, be further modified to provide for the construction of a dual purpose lock at the lakeward terminus of the Inner Harbor Navigation Canal in the vicinity of Seabrook, La.

(2)  The proposed plan shall be generally in accordance with the plan of improvement described herein and as shown on the accompanying plates and with such modification thereof as in the discretion of the Chief of Engineers may be advisable, at estimated costs to the United States of $4,980,000 for new work, and $120,000 annually for operation and maintenance, in addition to that now required for the authorized Mississippi River-Gulf Outlet.