# EXHIBIT 26

# DECISION-MAKING CHRONOLOGY FOR THE LAKE PONTCHARTRAIN & VICINITY HURRICANE PROTECTION PROJECT

## DRAFT FINAL REPORT FOR THE HEADQUARTERS, U.S. ARMY CORPS OF ENGINEERS

## SUBMITTED TO THE INSTITUTE FOR WATER RESOURCES OF THE U.S. ARMY CORPS OF ENGINEERS

**Douglas Woolley**

**Leonard Shabman**

**June 2007**



Table 3-1:  SPH Parameters Reported in 1959 and 1979

| SPH Parameters | 1959 SPH (Included in 1962 Interim Survey Report) | 1979 SPH (Included in 1984 Reevaluation Report) |
|---|---|---|
| Wind Speed | 100 mph @ 30 nautical miles | 100 mph @ 30 nautical miles |
| Central Pressure Index | 27.6 inches | 27.35 |

The Probable Maximum Hurricane (PMH) is a meteorological worst-case scenario. It has an infinitesimally small likelihood of occurrence and represents the upper boundary for hurricane severity in any project area. It is based on empirical evidence and scientific extrapolation. The PMH was defined in the 1962 Interim Survey Report as, "The hurricane that may be expected from the most severe combination of Meteorological conditions that are *reasonably possible* in the region."[32]

LP&VHPP planners could have selected the PMH as the design hurricane if they deemed that greater than SPH protection was justified for the project area. The PMH for the project area was identified and considered but not chosen for designing the LP&VHPP. As outlined earlier, the envelope used to define the SPH included the worst storms of record in Zone B to that point in time; the derivation of the original PMH for Zone B apparently relied on more-severe storms recorded for the Atlantic coast.

The 1962 Interim Survey Report reported PMH parameters for the project area that were derived in the NHRP Report No. 33 published in 1959.  In 1979 the National Weather Service (NWS) reported revised PMH parameters for the project area that indicated the possibility of more-severe hurricane events than what was reported in 1959. The updated PMH parameters were not reported in the 1984 Reevaluation Report, however. Table 3-2 shows the PMH parameters reported in 1959 and in 1979.

Table 3-2: PMH Parameters Reported in 1959 and 1979

| PMH Parameters | 1959 PMH (Included in 1962 Interim Survey Report) | 1979 PMH (Not included in 1984 Reevaluation Report) |
|---|---|---|
| Wind Speed | 115 mph | 133 mph |
| Central Pressure Index | 26.9 inches | 26.2 |

The increase in estimated severity of the reported PMH between 1959 and 1979 is largely due to the experience of Hurricane Camille and other large storms that occurred in Zone B in the ensuing twenty years and that were added to the database.[33] Of critical importance to understanding the performance of the project during Hurricane Katrina is the fact that the <u>difference</u> between the SPH and the PMH estimated parameters grew dramatically in the period between the 1962 Interim Survey Report and the 1984

---

[32] The PMH thus differs from the SPH through replacement of the phrase "reasonably *characteristic* of the region" with "reasonably *possible* in the region."

[33] Generally, it can be argued that the longer the period of record, the better the understanding and quantification of the SPH and PMH.

### 3.3.3 New Information on Subsidence and Vertical Datum

The entire Gulf coast is a topographically dynamic environment, which makes planning, constructing, operating and maintaining hurricane protection projects difficult in the New Orleans area and throughout coastal Louisiana. There is general subsidence of the region and localized settlement of structures. The sea level is rising. Importantly, issues related to subsidence and vertical control datum can affect the extent to which the constructed elevations of protective structures correspond with their intended design grades. Project decisions relating to the use of vertical control for project construction are reviewed below.

### 3.3.3.1 Vertical Datum and Control Benchmarks Not Updated Over Time

A geodetic vertical datum is a land-based reference system for determining geospatial coordinates—such as the heights of hurricane protection structures—with respect to some consistent reference surface. They are vital to civil works programs, the general construction industry, and flood insurance programs that require precision in measuring the elevations of structures relative to a consistent reference point.

Only two official national geodetic vertical datums have been established in the United States. The first was the Sea Level Datum of 1929, which in 1973 was re-named the National Geodetic Vertical Datum of 1929 (NGVD) to avoid confusion since it did not truly reflect local Mean Sea Level (MSL) at any location (19730507). The constructed elevations of LP&VHPP structures were largely referenced to this national datum, although a variety of other datums were also employed to varying degrees.  In 1993, the national geodetic datum was redefined as the North American Vertical Datum of 1988 (NAVD88) as derived from the satellite-based Global Positioning System (19930624). This new national datum was intended to remove inconsistencies and distortions in the previously defined datum and does not purport to represent MSL.

Because of continuous changes in the earth's surface at different locations caused by land subsidence, sea level rise, and other factors, any geodetic-based datum such as NVGD is dynamic and must be periodically adjusted for local surface conditions. This is particularly true in coastal Louisiana where lands are composed largely of accumulated sediments delivered by the Mississippi River and are influenced by many factors that cause land subsidence, including consolidation, faulting, and groundwater and minerals extraction. Datum adjustments are accomplished through periodic survey adjustments to the elevations of spatially distributed, marked vertical control points, called "benchmarks," which are referenced to vertical datums. These periodic adjustments (which may not extend to the full set of benchmarks in any area) are referred to as the datum "epochs" for the specific years in which adjustments are made. There have been

---

Georges in 1998, used the ADCIRC model to assess risks associated with hurricane events more severe than the 1962 SPH, to dramatic effect. The "Hurricane Pam" emergency planning exercise conducted in 2004 was based on ADCIRC model results assuming a "slow-moving Category 3 storm."  And over the last several years, numerous articles on New Orleans hurricane risks have appeared in journals, magazines, and newspapers.

many adjustments associated with the various datums used in coastal Louisiana over the last fifty years.

As part of the IPET study, the National Geodetic Survey (NGS) used 2004 survey data to develop an adjusted vertical reference framework for Southeast Louisiana, termed NAVD88(2004.65). This framework established a new relationship between local MSL and latest benchmark elevations for the NAVD88 datum, and its application to New Orleans found that local MSL in the city is about ½ foot above the last published benchmark elevations.

The IPET study used the new reference framework to evaluate the actual pre-Katrina elevations of LP&VHPP structures, finding that the pre-Katrina heights of structures were significantly below intended design levels. The IPET reported that deficiencies in the project were largely because the heights of protective structures were designed relative to local MSL, but were *constructed* relative to a geodetic vertical datum (NGVD) that was erroneously assumed to be equivalent to local water surface levels. The IPET reported that this mistake resulted in the three outfall canals, for example, having structure elevations that were constructed 1-2 feet below intended heights, which were further reduced over time by settlement since construction.[43]

Some project design memoranda reference design elevations to MSL, while others reference design elevations to NGVD[44]. This suggests that project engineers did indeed mistakenly believe that these reference points were equivalent. Nevertheless, the project record indicates that by 1993 the District was aware of the numerical elevation difference between NGVD and local MSL and its potential implications for the performance of the project as constructed. One objective of the District-sponsored 1993 CERC pilot storm surge study (discussed in the previous section) was to assess the effects of changes in the relationship between MSL and NGVD with respect to the required elevations of project structures designed to prevent overtopping from a storm surge derived in the MSL frame of reference. On this question the CERC study report concluded:

> "Construction of the levee is referenced to NGVD; however, because storm surges are referenced to MSL, the levee elevations should be referenced to MSL. The assumption used in the original flood protection project was that MSL was equal to NGVD. This assumption was correct according to the original concept of the 1929 NGVD datum, however, the relationship between sea level and NGVD in the Lake Pontchartrain area has been documented to be continuously changing. The relative sea level changes shown in Table 3 have been documented over the period 1931-1977 … As indicated in Table 3, either seal level has risen with respect to NGVD or there has been subsidence in the land. In either case, the crest of the levee is approximately 1.0 foot nearer to MSL than it is to NGVD, i.e., NGVD is now approximately 1.0 foot below MSL. Therefore, if the design freeboard for the levee system is x-ft, then the levee should be constructed to x + 1.0 ft NGVD." (19930000, page 7)

---

[43] IPET Volume II: Geodetic and Water Level Datum (https://ipet.wes.army.mil).
[44] Project documents prior to 1984 reference to MSL while later documents reference to NGVD.

In addition to the mistaken equivalence of NGVD with local MSL, significant parts of the project were constructed using outdated benchmark elevations referenced to NGVD, which exacerbated the problem caused by the erroneous equivalence of these reference points. As events stretched out project implementation over decades, the District faced a dilemma with respect to the use of NGVD benchmark elevations for project construction that were changing significantly with each round of adjustments (performed by NGS every ten years or so) due to subsidence. By the mid-1980s, no major part of the overall project had yet been completed and construction of significant portions had not yet even begun. At that point the District announced a policy not to switch to the latest published benchmark elevations for remaining project construction.

Although the IPET study found that contract plans for different project portions often do not explicitly note the specific datum epoch used, the study data and calculations suggest that project features implemented prior to the 1985 District datum policy were apparently referenced largely to the NGVD 1964/65 epoch. After the NGS in 1982/83 significantly adjusted local benchmark elevations, the Division and District solicited NGS confidence in the new benchmarks and advice on their use.[45] Following that dialogue with NGS, the Division in 1985 requested that the District "propose a course of action for incorporating the changes in elevation into your projects and studies and for defining in a more reliable manner the subsidence in your area."[46] In 1985, the District responded with a proposed policy (19850807) that was approved by the Division in that same year.[47]

The District policy froze the benchmark elevations used for project construction to those that were applied at the start of project construction, based on the argument that to do otherwise would result in varying levels of protection across the project area. It stated:

> "Hurricane protection projects which are partially complete will use the
> NGS benchmarks current at the time of construction of the first increment
> of the project. To shift to the latter NGS data without altering the heights
> of previously constructed portions would make 'fuseplugs' of those
> portions and thus impose a gratuitous servitude on the lands and facilities
> they protect. And altering previously constructed works would not be
> practicable." (19850807, page 3)

Other parts of the policy statement suggest that the expressed concern with the practicality of altering already constructed LP&VHPP structures at least partly reflected concerns about the high costs that such a change would entail. Specifically, with respect to other (non-LP&VHPP) projects within the District, the policy statement said,

---

[45] 19830000; 19840410; 19841100; 19841102; 19850305; 19850329; 19850412
[46] 19850501; 19850524
[47] In the Division approval of this course of action, it commented, "Consideration should be given to reanalyzing and modifying (if needed) hurricane protection work in high density urban areas where the datum changes will drastically reduce the level of protection." (19850916)

> "Modification of projects which have been completed will not be considered. The level of precision in the current data, and the practical difficulties and cost of changing such projects combine to mandate this course of action, at least for the foreseeable future." (19850807, page 2)

Indeed, it is important to recognize the historical context in which the 1985 District datum benchmark policy was adopted. At that time, much of the project was incomplete and the District was under intense pressure from local sponsors and their congressional representatives to move forward with providing protection. Further, estimated project costs had been steadily increasing since 1965, and by the mid-1980s federal budgets were being squeezed and local sponsors were expressing concerns about their ability to meet cost share requirements. The 1985 datum benchmark decision allowed the project to move forward without increasing project costs and without extending project completion even further into the future.

At the time the datum benchmark policy was adopted the District presumed that frontage protection would be the alternative used for providing protection for the three outfall canals. Because frontage protection involves floodgates at the canal mouths at the lakefront, these plans would not be as significantly affected by the datum benchmark policy. When the District was later directed by Congress to implement parallel protection at the outfall canals, the District datum benchmark policy, if applied to floodwall construction, would have affected the constructed elevations of those floodwalls. The data gathered by the IPET study indicate that the District datum policy was not evenly applied to the outfall canals, however.

In 1993, the Orleans Levee District wrote to the District noting that construction of the Orleans Avenue Canal floodwalls is based on a 1983 NGVD epoch, while construction of the London Avenue Canal floodwalls is based on a 1964 NGVD epoch. The letter requested that the District "adjust as may be required to provide maximum protection for both canals." (19930813) No documentation of District response to this request was uncovered during this study. However, the IPET study confirmed that the constructed elevations of most of the London Avenue Canal floodwalls were based on the 1964 NGVD epoch, while most of Orleans Avenue Canal levees and floodwalls were based on the 1983 NGVD epoch.

No project documentation secured for this study indicates the Corps Headquarters was involved in or even made aware of the 1985 District datum policy. And when in 1994 Headquarters issued guidance to the field for conversion from NGVD to the new NAVD88 datum in studies and projects (19940101), the District did not follow it. It was not until the year 2000 that the District proposed to the Division to switch to NADV88, noting that, "it is becoming untenable to maintain the existing [1985] policy." (20001026)