UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | * | CIVIL ACTION NO. 05-4182 |
| CONSOLIDATED LITIGATION | * | |
| | * | SECTION "K" |
| | * | |
| PERTAINS TO: | * | MAGISTRATE (2) |
| NO.   06-4389 | * | |
| 07-3500 | * | |
| | * | JUDGE DUVAL |
| | * | |
| | * | MAGISTRATE WILKINSON |
| | * | |

* * * * * * * * * * * * * * * * *

**CERTAIN PLAINTIFFS' SUPPLEMENTAL
MEMORANDUM IN OPPOSITION TO
MOTION(S) TO DISMISS FILED BY
WASHINGTON GROUP INTERNATIONAL, INC.
(RECORD DOCUMENT NOS. 4140 AND 8224)**

**MAY IT PLEASE THE COURT:**

At oral argument on Halloween, undersigned counsel for plaintiffs in Civil Action Nos. 06-4389 and 07-3500[1] raised as an issue the conflict of interests which at least two members of the Plaintiffs' Liaison Committee have with plaintiffs in the above-referenced civil actions by virtue of their recent appearance as counsel of record for the State of Louisiana in "Victims of KATRINA" litigation.  Plaintiffs respectfully submit that, for this reason alone, plaintiffs' claims against Washington Group International, Inc. (hereinafter referred to as "WGI") should not be dismissed on the papers.  In plain

---

[1] And previously in written papers filed with the Court (Record Document No. 8599).

-1-

English, while plaintiffs may have been content to be "represented" by the PLC previously, the events of August 29, 2007 have altered the landscape, and plaintiffs have a genuine fear that the PLC cannot ethically represent plaintiffs' interests.

Additional valid substantive grounds exist for why plaintiffs' claims against WGI should not be dismissed on the papers, and these valid additional grounds are the subject of this Supplemental Memorandum.

## WGI'S OWN DOCUMENTS REVEAL THE "ULTRA-HAZARDOUS" NATURE OF WGI'S WORK IN THE EAST BANK INDUSTRIAL AREA

At the conclusion of the presentation by undersigned counsel to This Honorable Court on Halloween, counsel asked rhetorically, "If WGI had been pile-driving in the East Bank Industrial Area adjacent to the levee breaches, would the Court be seriously contemplating dismissal of plaintiffs' claims against the pile-driver "on the papers"?" The obvious answer is "Of course not." Plaintiffs respectfully submit that the "vibratory extraction" method of clearing debris from the former industrial sites in the East Bank Industrial Area adjacent to the levee breaches, and the digging of large, deep holes, was no less hazardous than pile-driving or blasting with explosives, and which Louisiana Courts have held impose strict liability on the implementer, since such "ultra-hazardous activities" are capable of causing harm even in the exercise of ordinary care. Eason's, Louisiana Personal Injury Law, 2004 Edition, "Ultrahazardous Activities", p. 270, and authorities cited therein.

Plaintiffs respectfully submit that they have properly pleaded a claim against WGI for liability without fault for engaging in ultra-hazardous activities which included vibratory extraction and digging large, deep holes in the East Bank Industrial Area when

they pleaded liability pursuant to Article 667 of the Louisiana Civil Code in Article VIII of Civil Action No. 06-4389, and by invoking the doctrine of *res ipsa loquitur* in Article XVII of the same Complaint.  Plaintiffs also specifically pleaded strict liability in Articles XII and XV of the same Complaint.  Plaintiffs better particularized their allegations against WGI in Civil Action No. 07-3500 by specifically identifying "vibratory extraction" in Article XI(g), and "excavation" as well as "environmental remediation and removal of contaminated soil" in Article VII(2), as well as "extensive excavation work" in the last full paragraph of Article VII.

Plaintiffs respectfully submit that, with those particular matters having been specifically pleaded, the Court should not dismiss their claims against WGI on the papers.

### WGI'S OWN DOCUMENTS SHOW THE HAZARDOUS NATURE OF WGI'S WORK AND THE DANGER TO THE RETAINING WALLS

Documents produced by WGI demonstrate both the hazardous nature of their work and attendant danger to the retaining walls.  In a document entitled: "Recap Work Plan Amendment – Bank Material Remediation Inner Harbor Navigation Canal – East Bank Industrial Area", Bates No WGI-034901, prepared for the U.S. Army Corps of Engineers by WGI in June 2002, a copy of which is appended hereto and marked for identification as Exhibit No. 1, the following appears:

> In the workplan it was proposed to remediate all unacceptable contamination by excavation and disposal at a permitted landfill. However, there were problems associated with excavation of the bank material, two in particular.  . . .  The second is the variety of fill, construction materials and debris that composed the bank <u>make it extremely difficult to excavate without compromising the integrity of the entire bank and allowing water incursion</u>.  (emphasis supplied).

At Bates No. WGI 034905 of the same document, WGI addressed "liquid contamination" through the porous soils at the site, and even the possibility of "a canal breakthrough" as follows:

> The liquid contamination may have traveled by secondary porosity through areas of debris causing contamination at contiguous sampling locations. Since sampling locations are at 100-ft. intervals, when we assume that the contamination runs from one location to another, this means that large areas of the bank may be contaminated and require remediation.
>
> * * *
>
> . . . the proximity of the canal waters and the soil type will not allow excavation to exceed approximately 4-ft. bgs. Should deeper excavation take place, especially on the western portion of the canal bank area, <u>the potential for canal water intrusion is great, along with the possibility of broaching the excavation walls with a canal breakthrough</u>. (emphasis supplied).

Plaintiffs respectfully submit that the above and foregoing quotations from WGI's own documents are most revealing, particularly when one considers the "well-documented history of underseepage problems" at this location. At page 6-14 of the Independent Levee Investigation Team report of May 22, 2006, attached and marked as Exhibit No. 2, the ILIT clearly stated:

> This site has a well-documented history of underseepage problems; McElwee Construction had great difficulty dewatering an excavation at this site during earlier construction, and residents of the neighborhood had also previously reported problems with seepage at the inboard toe.

In a separate report which he authored, entitled: "Connecting the Lower 9th Ward Dots", attached as Exhibit No. 3, Dr. Robert Bea unequivocally stated: "The excavation was not backfilled", also stating that "Removal and disturbance of the surface soils

overlying the permeable sub-soils (marsh layers) would have facilitated under levee seepage in this area." Exhibit No. 3, page 7.

Plaintiffs respectfully submit that "the proof of the pudding is in the eating", and the Court is respectfully directed to page 6-15 of the ILIT report (attached as Exhibit No. 4), which reflects that the US Army Corps of Engineers is replacing pre-KATRINA sheetpiles driven to 18 to 24 feet with far-longer (deeper penetrating) sheet piles, with lengths of 60 feet and greater as part of the repair operations, an unusually frank admission that significantly deeper sheet piles were warranted at those locations. The Court is reminded that Exhibit No. 2 (A-F) to Record Document No. 8852 were communications to Plaintiffs' Liaison Counsel (never responded to), which were calculated to determine "What did WGI know and when did they know it" about the length of the existing sheetpiles prior to undertaking their work, and were they justified in relying on that information, and saying nothing about the possible effect of their work on the existing levees and sheetpiles. See infra.

### AT ORAL ARGUMENT ON 6/13/07
### COUNSEL FOR WGI MISREPRESENTED
### WHAT HER CLIENT WAS ASKED TO DO

At oral argument on June 13, 2007, counsel for WGI misrepresented to the Court ". . . that they [WGI] were not asked to perform engineering services".[2] The contract between the Corps of Engineers and WGI was a "Design/Build" contract, which put WGI in the place of the Corps to both design, from a professional engineering standpoint, the project, AND to build and implement the project. The Design/Build form of contract in

---

[2] The entire quote at pp. 33-34 of the Transcript, attached as Exhibit No. 5, is ". . . and they were not asked to perform engineering services. The fact that they were not asked to perform engineering services makes these allegations about regulations and standards and procedures even more curious, because its not clear if Washington Group was not performing engineering services, what code of conduct would govern its performance of the contract. And we certainly had no clue based on this allegation."

-5-

this particular instance included what is known as "TERC", which stands for Total Environmental Restoration Contract, governed by "FAC", which stands for Federal Acquisition Regulation. Accordingly, the representation to the Court that ". . . and they were not asked to perform engineering services" was misleading at best, and false at worst, a fact which had to be known to all counsel for WGI when the representation was made on the record in Open Court.

In none of the 40 boxes of documents which have been produced is there any Corps of Engineers' "permit" for the work, or any other documentation establishing the terms and conditions of the contract between the Corps and WGI. Even counsel for WGI conceded that WGI has not produced the specifications, boasting ". . . but I'm not going to take the bait, the bait that he hasn't seen the specifications", which plaintiffs submit is a patently absurd argument. See Transcript of oral argument on June 13, 2007, p. 53, attached as Exhibit No. 6. Plaintiffs respectfully submit that they are entitled to see the contract specifications prior to any dismissal of WGI in order to determine whether there was any deviation from the specifications and, since WGI itself prepared the specifications for this "Design/Build" project, whether the specifications are "missing" something that should have been included, particularly when the depth of the proposed lock went from 22 feet to 36 feet in 1997, and particularly when the work done by WGI was in such close proximity to already-existing levees and retaining walls.

### WGI'S ARGUMENT THAT, BECAUSE THEY WERE NOT (REPORTEDLY, AND COMPLETELY UNVERIFIED) ASKED BY THE CORPS OF ENGINEERS TO ADDRESS THE RETAINING WALLS, THEN <u>THEY CAN HAVE NO LEGAL LIABILITY, IS ABSURD</u>

A review of the allegations of plaintiffs' Complaints in Civil Action Nos. 06-4389 and 07-3500 will reveal that plaintiffs alleged "independent negligence" and strict liability on the part of WGI, because of an absolute absence of any documentary evidence whatsoever reflecting whether the Corps of Engineers or WGI evaluated the possible effect on the existing levees and retaining walls the work by WGI in the East Bank Industrial Area might have, and the obviously unprofessional and legally culpable "management structure" evident from that omission.  More particularly, in Civil Action No. 07-3500, Article VII (3) plaintiffs alleged:  "There was no managerial oversight within the lock preparation project . . . concerning how work . . . might impact the pre-existing levees and retaining walls."  Also, plaintiffs averred that, because the soil is all the same on the East side of the Industrial Canal from Lake Pontchartrain to the River, it is more than a coincidence that the only two breaches on the East side of the Industrial Canal occurred adjacent to where WGI did its work!  The Court will also recall that when plaintiffs filed their Certificate of Impossibility of Compliance (Record Document No. 6684), they attached photographs which showed huge "sink holes" directly in front of the breaches, which plaintiffs maintain were caused by WGI's extensive excavation work.

At oral argument on Halloween, undersigned counsel for plaintiffs reminded the Court that admiralty and maritime jurisdiction had been invoked, as well as the application of maritime substantive law, because the lock replacement project was a navigation project.  It does not require citation of authority that if there is no federal law in a maritime context, then one may look to the law of adjacent State for guidance, so long as State law is not destructive of the uniformity of maritime law.  Fortunately, there

is a large body of Louisiana State law which addresses the liability of "Contractors" and liability flowing from "Construction Plans".

In both Civil Action Nos. 06-4389 and 07-3500, plaintiffs pleaded violation of State laws which were alleged to be analogous to Federal maritime law. Looking at Easons, <u>Louisiana Personal Injury Law</u>, 2004 Edition, under the heading "Contractors and Construction Plans", at p. 257, the following axioms appear:

> In general, a contractor owes third parties a duty to exercise ordinary care and refrain from creating hazardous conditions in the fulfillment of its contractual obligations.

> \* \* \*

> However, regarding third parties, the contractor cannot blindly rely on plans and specifications.[3] To avoid liability, it must have no justifiable reasons to believe that its adherents to plans and specifications created a hazardous condition. Citations omitted.

> \* \* \*

> Further, a contractor has a duty to exercise ordinary care and an obligation to third parties to refrain from creating hazardous conditions. Citations omitted.

Plaintiffs respectfully submit that the uniformity of federal maritime law would not suffer in the least if the foregoing axioms were applied in a maritime context, and that plaintiffs should be allowed to proceed with their case against WGI to determine whether WGI followed or breached the rules contained therein.

### WGI'S MOTION(S) TO DISMISS SHOULD BE DENIED BECAUSE PLAINTIFFS' LIAISON COUNSEL HAS FAILED TO REQUEST RELEVANT DOCUMENTS FROM WGI

---

[3] To which plaintiffs would add: "Right, and particularly not when the contractor drafts the contract specifications pursuant to a "Design/Build" contract."

-8-

At oral argument on Halloween, undersigned counsel for plaintiffs learned, for the first time, that WGI didn't "cherry-pick" what documents would be produced by WGI; rather, Plaintiffs' Liaison Counsel did, unilaterally.  See redacted non-privileged communication from the undersigned to Plaintiffs' Liaison Counsel of November 1, 2007, attached as Exhibit No. 7, which seeks to "undo" whatever damage may have been caused to plaintiffs' case(s) by virtue of the PLC's failure to request documents necessary to the successful prosecution of the case(s).  More particularly, Plaintiffs' Liaison Counsel was requested as follows:

> Lastly, during oral argument on WGI's motion(s) yesterday, I learned for the first time that counsel for WGI didn't "cherry pick" what documents would be produced by WGI; rather, you did, unilaterally.  I now call upon you as Plaintiffs' Liaison Counsel to request from counsel for WGI immediate production, not only of all of the written records pertaining to remediation of all six (not just Boland and Saucier) industrial sites on the East side of the Industrial Canal between the Florida Avenue and Claiborne Avenue bridges, but also all documentation pertaining to any other work which WGI bid for or was awarded by the Corps of Engineers in connection with the entire "Mississippi River Gulf Outlet New Lock and Connecting Channels" project.  Please also include in your request(s) to WGI a request for copies of any and all indemnification agreements between WGI and the United States of America, its agencies and instrumentalities, etc.

Whether Plaintiffs' Liaison Counsel has done what he was asked to do is unknown.

At oral argument, it was learned that notwithstanding the fact that the 32-acre East Bank Industrial Area between the Claiborne Avenue and Florida Avenue bridges on the East side of the Industrial Canal involved six (6) former industrial sites, Plaintiffs' Liaison Counsel requested WGI's records pertaining to their remediation of only two (2) of those sites, being sites reported to be immediately adjacent to the two breaches, namely the Boland and Saucier Marine sites.  At oral argument, undersigned counsel for

plaintiffs demonstrated, through Exhibit No. 2 (A-F) to Record Document No. 8852, the difficulty he has experienced obtaining WGI documents already in the hands of Plaintiffs' Liaison Counsel. It now appears that not only has undersigned counsel for plaintiffs been denied documents in the hands of Plaintiffs' Liaison Counsel, but Plaintiffs' Liaison Counsel unilaterally agreed that WGI would not have to produce other documents potentially material and relevant to the breaches on the East Side of the Industrial Canal. Additionally, no documentation whatsoever has been produced by WGI pertaining to the entire project, which was called the "Mississippi River Gulf Outlet New Lock and Connecting Channels" project (See Exhibit No. 3 to Record Document No. 8852), causing undersigned counsel to question what else has WGI not produced?

### ALTERATIVELY, PLAINTIFFS AVER THAT THEY SHOULD BE GRANTED LEAVE TO AMEND THEIR COMPLAINT(S) AS AN ALTERNATIVE TO DISMISSAL

Plaintiffs respectfully submit that it would constitute an abuse of discretion to dismiss plaintiffs' claims against WGI without giving plaintiffs leave to amend.

### CONCLUSION

At oral argument on Halloween, undersigned counsel for plaintiffs began his presentation with a quote from Professor Robert Bea, Professor of Civil Engineering at the University of California at Berkeley. The document containing the quote already forms part of the record in this case. See Exhibit No. 1 to Record Document No. 8852. Professor Bea's quote is as follows:

> "based on the information and photographs I have been able to assemble, WGI definitely had a role in BOTH BREACHES at the Lower 9th Ward – in connection with the underground excavations immediately adjacent to the south and north breaches – all in connection with the USACE LOCK EXPANSION PROJECT – obviously a navigation project.

So if judge Duval has dismissed the claims against WGI, the reasons should be stated and logical – your business.

Plaintiffs respectfully submit that it would be illogical to dismiss WGI from this litigation at this very early stage. WGI's Motion(s) to Dismiss the claims against it on the papers should be denied.

>
> Respectfully submitted,
>
> **LAW OFFICES OF**
> **ASHTON R. O'DWYER, JR.**
>
> **By:   S/Ashton R. O'Dwyer, Jr.**
>    Ashton R. O'Dwyer, Jr.
>    Bar No. 10166
>    821 Baronne Street
>    New Orleans, LA 70113
>    Tel. 504-679-6166
>    Fax. 504-581-4336

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all counsel of record via Electronic filing, this 8th day of November 2007.

>    S/Ashton R. O'Dwyer, Jr.