

Figure C.28: Hydraulic exit gradients for the North Breach. Horizontal permeability of $10^{-4}$ cm/s. Storm surge at +14 feet MSL. (Seed et al 2007)

Even though a range of permeabilities and soil shear strengths were studied, they do not explain the occurrence of failure at this site as early as between 5:00 a.m. and 6:00 a.m. The conclusions drawn from the analyses were that under seepage and piping exacerbated by uplift or 'blowout' at the inboard toe of the levee was the principal cause of this failure. It is postulated that the substantially shortened seepage paths caused by the water filled gap and the unfilled excavations left immediately outside the floodwall and sheetpiling will show that 'blowout' conditions could have existed as early as 5:00 a.m. to 6:00 a.m., thus explaining the water observed coming from the breach area.

Analyses of this breach performed by the USACE IPET did not include permeability – seepage effects based on 'professional judgment'. Their analyses of lateral stability indicated a deep sliding mode of failure (USACE IPET 2007).

31

Both sets of these analyses have not addressed the potential effects of the 'holes' that existed on the IHNC side of the flood wall. As noted earlier, I am performing analyses to determine the effects of these excavations. The analyses will include a broad range of parameters to assist in development of additional insights into the reasons for the premature failure at the North Breach.

**South Breach Analyses**

Figure C.21 has presented a geologic cross section through the South Breach site. As for the North Breach site, transient flow analyses were performed for this site. The analyses showed that the rising storm surge in the canal was likely able to be partially effectively transmitted to foundation soils beneath the inboard side levee toe. The storm surge rose slowly at first, raising water levels in the IHNC from approximately +2 feet MSL to +5 feet MSL over a 22 hour period, and then the rate of water level rise increased as the eye of the storm approached, raising the water levels form + 5 feet to their full peak at approximately +14 feet MSL over an 11-hour period, and overtopping the concrete flood wall height by a bit more than a foot.

As for the North Breach, these analyses do not include the effects of the navigation channel lock expansion site clearing unfilled excavations left immediately outside two locations along this stretch of the floodwall and sheetpiling. These effects will be addressed by future analyses.

It is important to note that if these flood walls were designed, constructed, and maintained at their authorized elevations, and if breaching had not developed, there would have been minor overtopping and flooding of the Lower 9th Ward and adjacent areas.

Figure C.22 shows equipotential water pressure (contoured in 1 foot increments of water head) contours and seepage vectors for transient flow analyses of conditions as the canal water

levels reached + 14 feet MSL. The equipotential contours are those calculated based on a lateral coefficient of permeability for the "marsh" layer of $K_{h,marsh} = 10^{-4}$ cm/s. A range of permeability coefficients were analyzed ($K_{h,marsh} = 10^{-4}$ cm/s to $K_{h,marsh} = 10^{-6}$ cm/s).

As shown in Figure C.23, the fraction of the steady state pore pressure that accrues at this location is strongly affected by the lateral permeability of the marsh layer. For values of $K_{h,marsh} = 10^{-4}$ cm/s to $K_{h,marsh} = 10^{-6}$ cm/s, the fraction of the full steady state pore pressure (1,080 pounds per cubic foot) would be on the order of 85% to 77% of the steady state pore pressures. The pore pressures correspond to the 'gapped' wall – sheetpiling cases wherein it is assumed tat a gap opens between the sheetpiles and the levee embankment soils on the waterside as the canal water reaches an elevation of approximately +11 to +12 feet MSL. Such gapping was noted in the finite element analyses performed to model the behavior of this section. The effect of this gap is to permit direct entry of high water pressures at the base of the sheetpile curtain during the later states of the storm surge rise and this also adds to the pore pressure rise beneath the inboard side of the levee embankment.

Exit gradients at the toe were calculated to be marginally unstable with respect to initiation of erosion and piping at this stage by approximately 8:30 a.m. for conditions corresponding to $K_{h,marsh} = 10^{-4}$ cm/s or greater. Hydrostatic forces on the upper clay layer overlying the main marsh layer at the toe region were also marginally stable with regard to potential hydrostatic uplift for those conditions.

33



Figure C.22: Equipotential contours when canal water levels reached +14 feet MSL. Contours are at 1-foot intervals of water head (63 pounds per square foot). Horizontal permeability is $K_{h,marsh} = 10^{-4}$ cm/s (Seed et al 2007)



Figure C.23: Pore water pressure versus time at the top of the marsh layer at the toe of the levee (location D Figure C.22) as a function of permeability of the marsh layer (Seed et al 2007)

Figure C.24 shows results from the finite element analyses fir conditions at a canal water elevation of +13.5 feet MSL. Both the evolving outboard side 'gap' and the eroded inboard side trench are present at this stage. As shown in Figure C.24, two distinct failure mechanisms are approaching a failure state: an upper failure controlled by the relatively thin upper "marsh" layer, and a deeper mechanism along the top of the main lower "marsh" layer.

Figure C.25 shows the calculated evolution of the Factor of Safety (water driving forces divided by soil resisting forces) as canal water levels rose. At a water level of approximately +10 to +12 feet, a water-filled 'gap' began to open on the outboard side of the sheetpile curtain, and the analytical case began to transition form the 'un-gapped case' to the 'water –filled gap' case. Based on both conventional limit equilibrium analyses coupled with transient flow seepage analyses, and finite element analyses which internally incorporated the seepage analyses, the best analytical estimate was that failure would occur at a canal water elevation of about +12.5 to +14.5 feet MSL. This is in very good agreement with the observed field performance at this section which suggests that the failure occurred at a canal water level of approximately +12.5 to +14 feet MSL.



C.24: Relative shear strain levels at a canal water elevation of +13.5 feet MSL at the South Breach (Seed et al 2007)



C.25: Evolution of the Factor of Safety as canal water levels rose at South Breach (Seed et al 2007)

36

## Summary and Conclusions

At the site of both breaches, as the water level continued to rise the concrete floodwall and supporting sheet pilling leaned toward the protected side. Due to the levee crown (top) elevation (below water level at this time) and levee cross-section, water intruded into a gap that developed between the sheet piling and supporting soils on the canal side. This allowed substantial increases in the water lateral pressures acting on the floodwall – sheet piling – soil levee system. In addition, the leaning floodwall and sheet piling effectively cut the supporting levee in half substantially reducing its lateral capacity.

At the same time, the current (Seed et al 2007) transient flow analyses show that the rising storm surge in the IHNC was effectively transmitted to the inboard side levee toe area. Based on the analyses summarized here, by about 8:00 a.m., approximately 75% to 90% of the steady state flow surge-induced pore pressures reached the foundation soils beneath the inboard toe of the levee. It is important to note that these flow analyses did not include the dramatically shortened flow paths caused by the gaps formed behind the floodwall nor of the site clearing unfilled excavation holes. Abundant evidence of flood side cracking and sinkhole formation on the protected side was found in the surviving I-wall segment between the north and south breaches. These under seepage effects would have had extremely important effects on the soil strengths and resistance to lateral and vertical forces.

The IPET study did not analyze the potential effects of under seepage: "Piping and erosion from under seepage is unlikely because the I-walls were founded in a clay levee fill, a marsh layer made up of organics, clay and silt, and a clay layer. Because of the thickness, the low permeability of these materials, and the relatively short duration of the storm, this failure mode was considered not likely and was eliminated as a possible mode of failure" (IPET, 2007).

Both the NAE/NRC and ASCE IPET oversight and review committees criticized the IPET lack of recognition and treatment of under base seepage effects in their analyses of the breaches that developed in the flood protection system during hurricane Katrina.

As noted earlier, (due to their lower than authorized elevation and the surge water conducted into the IHNC by the ICWW and MRGO) from about 7 a.m. to 10 a.m., the floodwalls would have been overtopped. Because no protection (armoring) had been provided for the levee behind the floodwalls (e.g. splash pads), as the water overtopped the floodwalls, trenches were eroded behind the floodwalls. This led to removal of substantial portions of the levee and consequently reduced the lateral capacity of the flood protection structure (Figure C.26).



Figure C.26: Surge overtopping scour trench developed behind I-wall at south breach (USACE IPET 2007)

Analyses performed by the author indicate that sections of the I-wall could have failed due to removal of the lateral support caused by erosion of the deep trenches (5 to 6 feet) formed behind the supporting sheet piles. These analyses and conclusions have been corroborated by Gordon Boutwell (Flooding Evaluation Tank T-250-2, Murphy Oil Facility, Meraux, LA, Expert Report, August 2006) and NIST (2006). This possibility needs to be further analyzed to determine if it could have been a controlling mode of failure for some sections.

As the water continued to rise in the INHC, under the increased lateral pressures, the soil levee supporting the floodwall and sheet piling deformed laterally and differentially. The floodwall had vertical 'water stops' that separated the individual panels that comprised the concrete floodwall (expansion – settlement joints). Significant wall movement was found in the wall sections adjacent to the north breach. However, no such movement was evident adjacent to the south breach. As the flood protection structure deformed laterally under the water pressure, it is likely in the breach sections that the vertical water stops separating adjacent sections of the concrete flood wall opened sufficiently to all water to jet through the openings and erode the soils on the protected side of the levee. This behavior was photographed as the breach at the 17th Street Canal developed (Kardon, Bea, Williamson, "Validity and Reliability of Forensic Engineering Methods and Processes," Proceedings 4th Forensic Congress, ASCE, 2006; IPET Report 2006). This could help explain the report given by IPET that eyewitnesses indicated that water in the 9th Ward near Florida Avenue was accumulating as early as 5 AM when the water level in the IHNC was still well below the top of the floodwall.

Lateral translational instability was apparently involved at both north and south breaches. Inspections of the flood protection structure north and south of the North Breach indicated

significant movements had occurred in the adjacent sections of the flood protection structure. There was no such indication south of the southern breach.

However, the IPET analyses (2006, 2007) reached somewhat different conclusions for both the North Breach and the South Breach. IPET attributed the North Breach to a deep, semi-rotational failure through the soft gray clays of the foundation, and at an early time (well before 6:00 a.m. with water level at about 11 feet – well below the top of the floodwall) in order to explain the eyewitness observations cited earlier. This would indicate an 'unexpected' failure. The early eyewitness reports of water accumulation at the levee toe could be explained as resulting from water flowing through the water stops that could have been opened by differential deformations developed in the supporting soils. IPET stability analyses of the South Breach resulted in computer factors of safety larger than unity with the water level at the top of the wall and a crack behind the wall, indicating that the walls at those locations would have remained stable if none of the soil supporting the wall had been removed by erosion. As noted, IPET choose not to investigate the effects of under seepage and hence the effects were not included in their analyses.

Additional evidence for the nature of the under seepage potential at these two sites was provided by an impressive "crevasse splay" (local term for fan shaped under seepage erosion features, ILIT 2006). This crevasse splay developed at the outboard side of the interim repair section at the south breach (Figure C.23). This crevasse splay occurred at the relatively low reverse-flow gradients as the inboard area continued to drain after it had already been largely unwatered by pumping after initial drainage through open breaches. This crevasse splay undermined the otherwise continuous outboard side toe fill blanket along this frontage. The location of this crevasse splay, coincident with the location of the south breach failure provides

strong support for the presence of a foundation stratum of very high lateral permeability at this location. This zone or stratum of very high lateral permeability could be associated with the growth fault that has been mapped through the area of the South Breach (C.22).

Most egregious were oversimplified assumptions and analyses performed by the USACE IPET concerning mechanisms of seepage and hydraulic uplift effects. Such mechanisms have been well known for decades. Seepage beneath levees is discussed in depth in the USACE Engineer Manual EM 1110-2-1913, *Design and Construction of Levees*, Chapter 5 "Seepage Control." This chapter begins as follows: *"Without control, under seepage in pervious foundations beneath levees may result in (a) excessive hydrostatic pressures beneath an impervious stratum on the landside, (b) sand boils, and (c) piping beneath the levee itself. Under seepage problems are most acute where a pervious substratum underlies a levee and extends both landward and riverward of the levee and where a relatively thin top stratum exists on the landside of a levee."* Inappropriate evaluation and analyses of the hydraulic and strength – deformation characteristics of the highly pervious organic marsh (swamp) layers underlying most of the greater New Orleans area has been a historic and pervasive 'blind spot'. Forensic engineering investigations subsequent to hurricane Katrina clearly have identified its potential effects at the 17th Street Canal breach, the London Canal breaches, many of the important breaches along the MR-GO protective structures, and at the two breaches at the Lower 9th Ward.

The conclusions reached by the engineering forensic analyses are in substantial agreement; the flood protection structure adjacent to the Lower 9th Ward did not perform acceptably or as intended in the original design. If the flood protection structure had been built and maintained to the intended elevation, then no significant overtopping would have occurred. With no overtopping, there would not have been any erosion of the supporting soils behind the

floodwall. If the potential for formation of a water filled gap between the flood wall and its supporting sheet piling and the adjacent soils had been recognized, then the lateral stability performance would have not been compromised. Similarly, if the potential for under seepage had been recognized and the seepage prevented, then the lateral stability performance would not been further compromised.

There is substantial evidence to indicate that the USACE lock expansion EBIA site clearing and underground storage tank removal operations played important roles in initiation of the North Breach and South Breach. The information reviewed by the author provided by the USACE and Washington Group International has been limited. Time has not permitted review of the large number of documents provided by USACE and Washington Group International.

The information that is available clearly indicates a high degree of correlation with the site remediation work conducted by WGI in behalf of the USACE at the EBIA sites and the breach locations in the flood protection structure adjacent to the Lower 9th Ward. This remediation work (removal of soils, formation of cavities, vibrations) very probably had important effects on the soils relied upon to provide stability and protection for the flood protection structure. Removal and disturbance of the surface soils overlying the permeable subsoils (marsh layers) would have facilitated the under seepage discussed earlier in this Appendix. In addition, removal of the soils on the canal side of the floodwall would have reduced the lateral stability of the flood protection structure.