[14351]



DOCUMENT NO. 783
November 5, 2005

THE MARITIME LAW ASSOCIATION
OF THE UNITED STATES

## FALL MEETING—NOVEMBER 5, 2005

PRESENT:
THOMAS S. RUE
LIZABETH L. BURRELL
WARREN J. MARWEDEL
JAMES W. BARTLETT, III
PATRICK J. BONNER
PHILIP A. BERNS
RAYMOND P. HAYDEN

And the following 77 members:

Joseph E. Basenberg
F. Nash Bilisoly
Michael C. Black
Dennis L. Bryant
Mark J. Buhler
Phillip A. Buhler
Christopher E. Carey
Michael G. Chalos
Robert G. Clyne
Michael Marks Cohen
William R. Connor, III
James P. Cooney
Christopher O. Davis
William R. Dorsey, III
John A. Edginton
David J. Farrell, Jr.
Anthony J. Filiato
Joshua S. Force
Gene B. George

Alexander M. Giles
Geoffrey J. Ginos
Robert S. Glenn, Jr.
Donald C. Greenman
Robert J. Gruendel
Michael O. Hardison
Jason R. Harris
Raymond P. Hayden
Keith W. Heard
Barbara L. Holland
Robert B. Hopkins
Grady S. Hurley
Lawrence Jay Kahn
Kimbley A. Kearney
John D. Kimball
Bruce A. King
Peter Martin Klein
J. Dwight LeBlanc, III
Richard M. Leslie

**EXHIBIT F**

[14352]

| | |
|---|---|
| Raymond T. Letulle | Armand M. Paré, Jr. |
| John T. Lillis, Jr. | Mary Elisa Reeves |
| Marc G. Marling | Charles T. Rekerdres |
| Janet W. Marshall | Stephen V. Rible |
| Raymond L. Massey | C. Kent Roberts |
| Douglas P. Matthews | John M. Ryan |
| James L. McCulloch | Michael J. Ryan |
| Marion E. McDaniel, Jr. | Robert J. Ryniker |
| Daniel G. McDermott | John C. Scalia |
| Peter A. McLauchlan | Charles E. Schmidt |
| Michael F. Merlie | Steven L. Snell |
| Dennis Minichello | Michael F. Sturley |
| Michael T. Moore | Alan Van Praag |
| James F. Moseley, Jr. | Joseph A. Walsh, II |
| Thomas O. Murphy | James F. Whitehead |
| George W. Nowell | M. Hamilton Whitman, Jr. |
| Kevin G. O'Donovan | John M. Woods |
| Christina Owen | JoAnne Zawitoski |

And the following 4 guests:

Anthony Barker
Michael J. Bird
Peter J. Cullen
A. William Moreira

[14353]

## TABLE OF CONTENTS

**Page**

**Reports of Officers**
Report of Secretary  . . . . . . . . . . . . . . . . . . . . . .   14355
Report of Treasurer . . . . . . . . . . . . . . . . . . . . . .   14356
Report of Membership Secretary . . . . . . . . . . . . . .   14357

**Reports of Standing and Special Committees**
BIMCO Representative  . . . . . . . . . . . . . . . . . . . . .   14361
*Ad Hoc* Committee on Environmental Crimes . . . . . .   14363
Arbitration and ADR . . . . . . . . . . . . . . . . . . . . . .   14364
Carriage of Goods  . . . . . . . . . . . . . . . . . . . . . . .   14365
Fisheries  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14365
International Organizations, Conventions,
    and Standards . . . . . . . . . . . . . . . . . . . . . . . .   14367
Marine Ecology and Maritime Criminal Law
    and Regulation of Vessel Operations . . . . . . . . . .   14369
*Ad Hoc* Committee on the Codification of Title 46  . .   14370
Marine Financing  . . . . . . . . . . . . . . . . . . . . . . . .   14370
Marine Insurance and General Average . . . . . . . . . .   14371
Offshore Industries and Marine Torts
    and Casualties . . . . . . . . . . . . . . . . . . . . . . . .   14372
Practice and Procedure   . . . . . . . . . . . . . . . . . . . .   14373
Recreational Boating . . . . . . . . . . . . . . . . . . . . . .   14374
Stevedores, Marine Terminals, and Vessel Services . .   14375
Young Lawyers  . . . . . . . . . . . . . . . . . . . . . . . . . .   14376
American Bar Association Representative . . . . . . . . .   14377
Uniformity of U.S. Maritime Law . . . . . . . . . . . . . .   14380
Website and Technology . . . . . . . . . . . . . . . . . . . .   14381
Planning and Arrangements for the
    2005 Fall Meeting  . . . . . . . . . . . . . . . . . . . . .   14382
Planning and Arrangements for the
    2006 Fall Meeting  . . . . . . . . . . . . . . . . . . . . .   14384

**Adjournment**

**Formal Reports of Standing Committees**

Carriage of Goods  . . . . . . . . . . . . . . . . . . . . . . .   14387
Marine Ecology and Maritime Criminal Law
    and Regulation of Vessel Operations . . . . . . . . . .   14392
Marine Torts and Casualties . . . . . . . . . . . . . . . . .   14394

[14354]

American Bar Association Representative . . . . . . . . .     14403

**Minutes of the Meetings of the Board of Directors**

August 20, 2005  . . . . . . . . . . . . . . . . . . . . . . . .     14417
November 3, 2005  . . . . . . . . . . . . . . . . . . . . . .     14423

[14355]

### THE MARITIME LAW ASSOCIATION
### OF THE UNITED STATES

FALL MEETING
SCOTTSDALE, ARIZONA
NOVEMBER 5, 2005

**PROCEEDINGS**

PRESIDENT RUE: Good morning. Welcome, again, to the Scottsdale 2005 Fall Meeting of the Maritime Law Association. It is a pleasure to have you here. Please let me remind you to turn your cell phones either off or to the silent mode.

Mr. Bartlett, may we have the Secretary's report, please.

MR. BARTLETT: Thank you, Mr. President.

I would like to remind everyone that the sign-in sheets are at the rear of the room, so make sure to sign your name on those sheets. Speakers, when you come forward to give your report, please give your card to the court reporter. The microphone and the court reporter are to my left.

The Board has met twice since our last General Meeting. The first Board meeting was at Chateau Montebello in Montebello, Québec in August, and we met again just two days ago here in Scottsdale. I will briefly report on some of the topics discussed, but, in many cases, there will be reports from others who will go into more detail.

We received a report from Dennis Bryant concerning the status of the Title 46 codification, and Mr. Bryant will be reporting this morning. We received a report from Jim Moseley concerning the proposed ABA resolutions on ocean policy, and Mr. Moseley will also be addressing us this morning. We received a demonstration relating to the new improved MLA website, and Mr. O'Donovan will be providing you with a report on that this morning.

The 2006 MLA Spring Meeting will be held May 2 to 5, 2006 with a dinner on Friday, May 5th at Pier 60 at 20th Street and the Hudson River. That will be a change of venue from the Marriott Marquis, where we have been holding our dinner the last few years, and we think it will be a wonderful event.

[14356]

The 2006 Fall Meeting will be held in San Francisco October 3 to 7, 2006, and John Edginton will be reporting on that later this morning. As to the 2007 Fall Meeting, we received a report from the Site Selection Committee of Ben Reynolds and Dennis Minichello. They will be looking into that further and reporting to the Board.

We received a report on the status of the Hague Convention on the Exclusive Choice of Court Convention. On behalf of the MLA, Alan Van Praag attended a United States State Department Advisory Committee meeting last May. The Advisory Committee adopted the MLA position and that, in turn, was adopted by the State Department and has been incorporated into the Convention. That position was that contracts for carriage of goods and passengers at sea will be exempted from the draft Convention. Salvage contracts will will also be exempted, but all other types of marine contracts are included, including, and this is important, I'm told by Mr. Van Praag, insurance and reinsurance contracts.

On behalf of the MLA, President Rue attended the Average Adjusters meeting and dinner in London on May 12, 2005. He attended the SEALI seminar on June 24, 2005. He attended the MICA dinner and meeting on September 30 and October 1, 2005, and he attended the United States Average Adjusters meeting and dinner October 5 to 7, 2005.

Mr. President, that concludes my report and I move to its acceptance.

MR. RUE: Is there a second? Any discussion? All in favor please say aye. Those opposed, no. Motion carried. Mr. Bonner's report, please.

MR. BONNER: Thank you, Mr. President, members, and guests. As the Treasurer, I am always concerned on these away meetings that we're not going to make our guarantee and, again, the Planning and Arrangements Committee has come through. They deserve all our thanks for planning this great meeting and for coming in within budget.

Personally, I think W picked the wrong Locke, Liddell lawyer for the Supreme Court, but, you know, we benefited from that mistake, because we get to keep Marion and Mary.

Our finances remain strong. We have about $240,00 in assets. It is a little bit less than last year, but we had paid some advances this year for this meeting, and we also had to pay an advance for Pier 60 for the May dinner, which should be well worth it. It is going to be a fabulous dinner,

[14357]

but it really breaks my heart to pay anything in advance. I just want you to know, we're all creatures of habit, and we're going to dispatch a team from the Young Lawyers Committee to go up to the Marriott Marquis to try to lasso up any maritime lawyers who think that the dinner is there this May. We told them to especially look out for middle-aged guys wearing tuxedos.

We had our annual audit again this year, and I think by either law or regulation, as a nonprofit, I think I have to tell you that our annual report is available. If you want to read it, just come and see me. On a bright note, I think our members have more things to do in their lives, because nobody has ever asked me to read it. I promise you that if you do ask me to read it, I am not going to tell anybody.

The last thing, when you checked in you should have received a password and a member code for our new website. That will enable you to get online and to correspond with your fellow members. I have notified eBay, ESPN, and certain adult websites that their traffic is going to be going down over the next month, as all the MLA members are going to be on the MLA website.

This concludes my report, and I move for its adoption.

MR. RUE: Let's hear a second. All those in favor, please say aye. Those opposed, no. Motion carried.

Mr. Berns, the Membership Secretary's report.

MR. BERNS: Well, I felt very comfortable the last report, reading it, until finding out it is by the same people who did Enron.

Mr. President, a few years back we met in Bermuda. It cost me 250 bucks a day, and every night somebody was breaking into my room, pulling down the covers, and leaving chocolates. This time it is costing 300 for someone to break into my room every night, pull down the covers, and not leaving chocolates. Our next meeting I expect it to cost 400 bucks a day, and they're going to steal the sheets.

Also, Charlie Schmidt has asked that I announce all the candies that are in these jars that are on your table—if you don't eat them, please leave them. They cost extra.

On August 20th, 2005 with the approval of the Board, with the admission of nine Associates, the reinstatement of a former member, and the

[14358]

addition of one Judicial member, the Association membership totaled 3,117. Due to deaths, resignations, *et cetera,* as of October 10, 2005, the total was 3,113.

At our meeting here six Associate member applications for Proctor status were received, approved by the Committee, and approved by the Board on November 3, 2005: John A.C. Cartner, Anthony R. Filiato, F. Max Hardberg, Robert B. Hopkins, Christopher W. Nicoll, and Jason P. Waguespack.

Also, by special motion due to her exemplary work with the MLA, we approved the membership of Mary Helen Carlson with the immediate status of Proctor.

The Associate members—we had 18 lawyers who were nominated and approved, and I will not read all the names. I will send them individual notices. This is just to impress on you how many members we've gotten.

Non-lawyer members—on November 3, 2005 the Board approved the membership of three Non-lawyer applicants: James V. McGuire, John Stanley Poulson, Mark A. Cheglikov.

We had one application for reinstatement, Stephen J. Maher, and that application was approved. We also have a Judicial member who says he was not a member, but we have him listed as a member, but he definitely is now a member, and that is Honorable Richard Owen of the Southern District of New York. There were no applications from members.

I am also asking that in the future—we are still trying to get into the modern age—and that all applications and supporting documents for both membership and for Proctor status be presented by electronic means to me and to Robin. Her e-mail is mlaus.org. Mine is in there as well.

Everyone has scanning capabilities now. There should be no problem, and by receiving them in that manner, it makes it easier for me to forward them on and for Committees to review them. It would be appreciated. It will also be much appreciated—even though I am semi-retired, that we will not receive applications after the meeting for the meeting. They're coming in like a couple days before—and after. It just doesn't work that way.

I regret to report that the August 2005 Board meeting the following deaths were reported: Edward L. Tubens, M. Shea, the Honorable Morris

[14359]

Lasker, and the Honorable Nina Gershon. Since that report, I regret to now report the death of the following member, the Honorable Constance Baker Motley. Mr. President, I ask for a moment of silence.

MR. RUE: Will the membership please stand. Thank you.

MR. BERNS: Also, at the August 2005 Board meeting I recommended that the printed directory be issued every two years. One reason was cost of the publication and mailing, but the major reason was something that I have talked on continuously. The day we print or mail the publication it is already obsolete. I get several changes, firms, *et cetera, et cetera,* which we put on the website within a week or two weeks after receipt of the notice of those changes or additions, which I request that you keep up to date with us.

At the same time we do like to have a printed directory. It was thought that once every two years should suffice. If we run across a problem, let that be considered, but at this time it will be every two years. We should get it out in August of next year, hopefully, because there's always something that comes up, usually at the last minute.

Again, I will remind you to keep your information current, and that should be done by e-mail. I am continuing do the report, review rather, to meet the recommended By-laws about the three membership rule on Committees of 90-day membership to vote.

I am asking all standing Committee Chairs to, again, submit their list, up-to-date list, of the members whom they feel are the members of that Committee.

The special committees are appointed by the President, and the members must be designated by the President. Those you do not become a member merely by walking in. Those you have to be appointed.

With the approval of the Board of the elevation of seven Associates to Proctor status, the admission of 18 Associates and three Non-lawyer members, addition of one Judicial member, addition or subtraction, am not sure, and the reinstatement of a former member, as presented above, the Association is constituted as follows. You can review the individual members in your own information. Ex-officio, 13; Honorary, 3; Judicial, 142; Academic, 59; Proctors, 1,488; Associates, 1,240, Non-lawyers, 198, for a total of 3,143.

[14360]

I am, again, asking everyone here to attempt to bring in new members, not just for "numbers," but who will be assets to the Association and work for the Association. I ask that you put out a little effort trying to bring these members in—trying to at least bring them in "until it hurts" or if you want to stop when it reaches "excruciating," then do that and in the meantime see what you can do.

We do need new members to keep active and to keep an age diversity bracket. Some of the members here appear to be quite "elderly." As I mentioned to Ray Hayden, we're happy he's been designated our Past President on his nametag. But I also said, "Although at our age, I preferred they didn't use the word past."

So, again, I am emphasizing—please attempt to bring in members. We could use more judges, the younger judges. Some of them who are not being nominated for the Supreme Court may want to join the MLA. And also, our standing with the ABA, we also have to have members a certain percentage that are also members of the ABA.

And with that, Mr. President, that constitutes my report. I submit it for approval.

MR. RUE: Second? All those in favor, please say aye. Opposed, no. Motion carried.

MR. BERNS: That's the first time I've ever seen a membership report almost rejected.

MR. RUE: I'm sure you feel the fact that you gave it, would have nothing to do with that. We'll now move to our Committee reports, but before we do that, I want to make a couple of announcements.

Tonight's dinner is at the Fairmont East Pool from 7:00 p.m. to 9:00 p.m., and I am reliably informed that East Pool is—if you were able to walk out this door and keep going, you would end up at the East Pool.

Sailors are to meet right outside the auditorium in the outer lobby at 12:30 to embark for the sailing regatta, and I think Dwight LeBlanc is in charge of that. I also would like to recognize a special guest, Admiral John Crowley with the Coast Guard; Will Moreira, President of the Canadian Maritime Law Association; and Peter Cullen, the Immediate Past President of the Canadian Maritime Law Association.

[14361]

We would also like to extend a special thank you and recognition to all our speakers and foreign guests. Your presence makes our meeting much more interesting and enjoyable, and we truly thank you for giving up the time to come out here and join us. Thank you.

I also note the Past Presidents Dorsey and Moseley are with us. It is nice to have you here.

Keith Heard of BIMCO will give the first report. He will be followed by Mike Chalos of Environmental Crimes.

MR. HEARD: Good morning. Thank you, Mr. President.

I have been asked to say a few words about the Association's participation in the BIMCO's Documentary Committee. As many of you may know, I am the Association's co-opted delegate to that committee, whose work was explained by Soren Larsen in his interesting and informative remarks yesterday morning.

The Documentary Committee met in Copenhagen in May in conjunction with BIMCO's centennial celebration, a truly gala event graced by the presence of David Taylor and other illustrious members of Europe's and the world's maritime glitterati.

On a Monday night, all participants from the centennial celebration attended a performance of Aida at the new Copenhagen Opera House, which was constructed with financial and other assistance from Maersk McKinney Moller, the patriarch of the Maersk organization.

The performance was also attended by Denmark's Queen Margrethe II, who mixed and mingled with the crowd. The next evening we attended an open house and light dinner at Copenhagen's historic town hall across the street from Tivoli Gardens.

We did, however, do some work. The Documentary Committee itself had a very interesting meeting the same day, the Tuesday of that week. Over the course of the meeting the Committee adopted several new charter party forms including: GASVOY 2005, which is a standard gas voyage charter for the LPG, ammonia and petrochemical trade; BOXTIME 2004, a standard time charter for the container trades, which Soren discussed yesterday morning; SUPPLYTIME 2005, a time charter for offshore service vessels; and GENCOA, a standard contract of affreightment for dry bulk car-

[14362]

gos. We also adopted BOXCHANGE, which is a standard container inter-change agreement that we believe will be widely used, because it was drafted by industry representatives—commercial men, as it were—and reflects the practices actually used on a daily basis in the container trades.

In addition to these documents, we received status reports on other con-tracts that are in various stages of drafting and consideration. We also con-sidered some special clauses to be used in charter parties, including a vetting and inspection clause for chemical tankers and an ISPS security clause for voyage charters similar to the one BIMCO drafted for time charters.

I think you can tell it was an interesting and productive four-hour meeting of BIMCO's Documentary Committee, which will meet again the day after Thanksgiving in Nice in the south of France. I appreciate that spending a few days on the French Riviera will be a challenging and demanding assignment on behalf of the Association, but I am pleased to report that I am raring to go.

Now, that concludes my official comments, but, Mr. President, I have a bone to pick with our Membership Secretary. This will be very short.

It was reported to me by Gene George of Cleveland that Mr. Berns has been quietly lobbying to replace me on this trip to the south of France. Now, that seems hard to believe, because he has never done anything qui-etly in his life, but I would submit this is really nothing more than a trans-parent attempt to get an all-expense paid trip to Monaco, so that he can visit the casino. I would have thought there were enough of those in Las Vegas.

What I would suggest is that I make the trip, as planned, I'll be happy to visit Monaco. I'll send a postcard to Mr. Berns, buy him a T-shirt, and then report on the experience. Thank you very much.

MR. RUE: And send him the bill for the T-shirt.

MR. HEARD: I'll do that.

MR. BERNS: Mr. President, a point of order and reply. I did not try to replace him on his trip to BIMCO. I was trying to replace him over here in the medical transplant group that is also meeting at the hotel. They said they were short two heads.

I also believe we should table the motion on whether ship captains can perform same-sex marriages. We should table that for later discussion.

[14363]

MR. RUE: Mr. Chalos, will you rescue us, please.

MR. BERNS: If we're looking to him for rescue, we're in trouble.

MR. RUE: To be followed by Mr. Paré, Arbitration and ADR.

MR. CHALOS: Good morning, Mr. President. Good morning, delegates. I have nothing to say about Mr. Berns that I haven't already said.

As we discussed in our panel session with Greg Linsin of the Department of Justice and with Ian Gooch from Bilbrough's, there has been an increase in MARPOL violations, investigations, detentions, and prosecutions with ever-increasing fines and jail sentences.

Clearly, the government's effort through detentions, investigations, and prosecutions is not stemming the incidence of such violations. However, the continuation of these violations and the resulting investigations and prosecutions have created a certain amount of distrust and hostility in the relationship between the shipping community and the U.S. Government.

Through the auspices of the MLA and with the blessing and encouragement of President Rue, the MLA Ad Hoc Committee on Environmental Crimes has reached out to both the government, that's the Department of Justice and the Coast Guard, and to industry owners, operators, and underwriters, and to some industry groups to commence a dialogue—actually, to act as a catalyst to commence a dialogue between them to address the problems and ways and means of solving them through better communications, cooperation, and understanding, written or otherwise.

I am happy to report that we appear to be making some progress. We had a meeting yesterday morning with Greg Linsin, and he's warming up to the idea of getting both industry and government together. He is going to think about the issue a bit more and give us his views in due course. And while it's too early to report any substantive progress, I do hope that by the Spring Meeting we will have some positive news to report to the MLA.

And that concludes my remarks.

MR. RUE: Thank you, Mr. Chalos.

Mr. Paré to be followed by Donald Greenman, Carriage of Goods.

[14364]

MR. PARÉ: Thank you, Mr. President. I have five things to report on for the Arbitration and ADR Committee.

First, I would like to report—and to thank you, Mr. President—for posting on the website the recent Model Mediation Agreement and frequently asked questions that the Committee approved at its meeting in May and that can now be found on the Association website. This can be accessed on the Association's website either by going to "Library" or "Committees." One can then find this information under "Committee Reports and Newsletters."

The second thing I would like to report on is the UNCITRAL draft instrument. We were fortunate to borrow from Chet Hooper, Kaare Christofferson, who was acting as a trainee at Holland & Knight. Kaare is with the Danish Ministry of Transport and has been involved in the UNCITRAL draft. He was able to give the Committee a presentation at the beginning of the summer on the jurisdiction and arbitration provisions, which were at that point perplexing, and we were able to have a very good of that subject. Through the course of the summer, Michael Cohen of the Committee continued to liaise with Mary Helen Carlson on various subjects on the UNCITRAL draft.

The third thing that I would like to report on is court-annexed mediation. The Committee members have found that mediation is much more successful in the maritime field when the mediator has maritime experience, so we have been discussing the possibility of a program for providing a list of experienced maritime mediators. We communicated with Mr. Rue about that and the possibility of proposing court-annexed mediation with experienced maritime mediators.

The next thing I would like to report on is the awarding of attorneys' fees in arbitration. This is a fairly recent development in the United States, and we were fortunate to have some guidance on that subject here at this meeting from Lindsay East of Richards Butler. He provided us with a presentation on how attorneys' fees are "taxed" in England.

The next thing I would like to report on is that Keith Heard also gave a presentation on the subject of whether or not an arbitration agreement can expand the scope of judicial review of an arbitration award. There is currently a split in the circuits on that subject, and Keith gave an interesting presentation on that.

[14365]

Mr. President, that concludes my remarks.

MR. RUE: Thank you, Mr. Paré.

Mr. Greenman, Carriage of Goods, to be followed by Stephen Johnson of Fisheries.

MR. GREENMAN: Thank you, Mr. President, members, and guests.

The Committee on Carriage of Goods is sharpening its focus on the UNCITRAL Carriage of Goods by Sea. Those of you who attended the excellent CLE presentation by Mary Helen Carlson on Thursday should have noted that the Working Group goal is to submit the Convention to the General Assembly for approval in the fall of 2007, which is only two years from now.

The draft of the Convention is on Working Paper No. 56, which you could call WP 56. That is contained in the CD ROM that was handed out as part of the CLE program. It should also be accessible through the UNCITRAL website. If you go to Working Group III, you should find it there when it appears. Although it is a work in progress, our Committee plans to form its own various working groups to study the articles in the draft convention and hopefully give some comments within about a year.

We also understand that the UNCITRAL Working Group is developing a questionnaire to the countries regarding documentation, and we stand by to assist the government in answering whatever the questions may be.

I put out on the front for anybody who is interested a limited number of the copies of the table of contents for WP 56, which will give you some idea of the scope of this Convention and which I think is a matter that members of this Association need to start thinking about.

That concludes my report, Mr. President.

MR. RUE: Thank you, Mr. Greenman.

Mr. Johnson to be followed by Mr. Chris Davis of International Organizations, Conventions, and Standards.

MR. JOHNSON: Good morning, Mr. President, members of the Board, members, and guests. This is my first opportunity to report on behalf of the

[14366]

Fisheries Committee to the general membership. I would like to take this opportunity to thank my predecessor, Chairman of Fisheries Committee, David J. Farrell, Jr., of South Chatham, Massachusetts for his able service to the Committee in the past several years, which, in fact, still continues, as he was the member of the Committee that I was able to draft to do a case law update for this recent meeting. So thanks, David.

A small, but dedicated, band of members of the Fisheries Committee met on Thursday afternoon for an hour. The primary topic of discussion was a draft bill circulated by the staff of the Senate Commerce Committee to reauthorize and amend the Magnuson-Stevens Fishery Conservation Management Act.

The Fisheries Committee has made input to the Committee staff in support of legislative proposals contained in resolutions adopted by the general meeting of the MLA in November of last year at the New Orleans meeting. In particular, the Fisheries Committee has asked the Senate Commerce Committee staff to incorporate our proposals to facilitate lending to the fishing industry by clarifying that maritime liens do not attach to fishing rights or privileges under limited access systems and that security interests in such rights or privileges should be governed by Article 9 of the Uniform Commercial Code rather than by the Ship Mortgage Act.

A revised staff draft of the Magnuson-Stevens Act reauthorization bill is expected imminently, and Senator Stevens intends to introduce a bill to reauthorize the Magnuson-Stevens Act before Congress recesses for the year. So more is coming in this area.

We also discussed further developments based on the ocean policy reports that came out—that have come out over the last year and a half—the Pew Ocean Commission's report and a report of the U.S. Oceans Commission. The Fisheries Committee has submitted comments over the summer to the American Bar Association with respect to resolutions on ocean policy that were being considered by the ABA House of Delegates last August.

The Fisheries Committee comments supported a balanced policy in which economic and social values would be taken into account together with environmental values. As we advised the ABA, the Fisheries Committee supports existing policy that requires managers to both prevent overfishing while achieving the economic benefits of optimum yield from the fishery.

[14367]

Two bills have been submitted with respect to the Ocean Policy Committee reports. These are HR-2939 on June 16, 2005 by Representative Weldon of Pennsylvania and others in the House, and Senate Bill 1224, introduced on June 9, 2005 by Senators Boxer and Lautenberg. We don't expect a whole lot of action on these bills before the end of this year, and perhaps they'll be subject to substantial revision, as these bills are offered by the minority in both houses.

In addition to the bills that have been offered on ocean policy, there was an executive order issued by the President last December 17th creating a new Committee on Ocean Policy, and that committee is part of the Council on Environmental Quality and will be chaired by the Chairman of the Council on Environmental Quality.

The membership of this new Committee on Ocean Policy includes the secretaries of most of the major departments of Government, and I expect it will operate at such a level of abstraction that most of us will never be able to detect its hand.

Finally, there was a brief mention of a new bill by Senator Stevens to create a system to regulate offshore aquaculture developments, and this is Senate Bill 1195. It was introduced June 8th, 2005 by Senators Stevens and Inouye, who are the powers in the Senate Commerce Committee. So there's every reason to expect that the Senate will act on this bill, if not this year, in the near future. This bill would regulate permitting for aquaculture projects within the exclusive economic zone, offshore. So, an interesting wrinkle in the development of fisheries management.

Mr. President, that concludes my report.

MR. RUE: Thank you, Mr. Johnson.

Mr. Davis to be followed by Jim Moseley, for Marine Ecology and Maritime Criminal Law.

MR. DAVIS: Good morning, Mr. President, members, and guests. The International Organizations, Conventions, and Standards Committee hosted a Dutch treat luncheon on Thursday, November 3rd, as has become traditional at our resort meetings. The luncheon was well-attended and included informative and provocative presentations by two distinguished speakers.

[14368]

Patrick Griggs, former senior partner with Ince & Co. and Immediate Past President of the Comité Maritime International, gave us a preview of the CMI Colloquium that will take place in Cape Town, South Africa from February 12th through 15th, 2006.

The theme of the Colloquium is liberty and safety at sea, and topics include fair treatment of seafarers, places of refuge, wreck removal, marine insurance, limitation, and transport law. Additional information is available on the Colloquium's website, cmi2006capetown.info.

Patrick also summarized some of the current work that has been undertaken by the CMI in conjunction with the Legal Committee of the International Maritime Organization. This includes amendments to the SUA, or Suppression of Unlawful Acts, Convention, fair treatment of seafarers, a new wreck removal convention, places of refuge, and revisions to the CLC and Fund conventions.

Patrick Griggs' presentation was followed by Rhys Clift, a partner with Hill, Taylor, Dickinson, who gave us an overview of his recent and provocative paper entitled "The Shifting Nature of Salvage Law, a View from a Distance." Rhys outlined the shift in focus of salvage law from saving property and life to preventing damage to the environment. He also discussed the need to encourage professional salvors when they risk personnel, vessels, and equipment in order to save property and life at sea.

Finally, Rhys raised the somewhat controversial subject of whether liability insurers should be responsible in the first instance, rather than shipowners or hull and machinery underwriters, for salvage costs when they are incurred primarily to prevent damage to the environment.

Returning briefly to the CMI Colloquium in Cape Town, please note that the early registration deadline is November 11, 2005, which is less than a week away. Finally, if you plan on attending, please contact either Alan Van Praag, our CMI Subcommittee Chair, or me, so we can advise President Rue on the number of MLA members who will be attending.

Mr. President, that concludes the report. Thank you.

MR. RUE: Thank you, Mr. Davis.

Mr. Moseley to be followed by Mr. Bruce King.

[14369]

MR. BRYANT: I am really not Jim Moseley, Junior. I am Jim Moseley, Senior.

MR. RUE: This is Mr. Dennis Bryant.

MR. BRYANT: I am going to give three reports. Not to worry. There will be a break between the second and a third report. The Committee on Marine Ecology and Maritime Criminal Law and the Committee on Regulation of Vessel Operations had a joint meeting yesterday at which we were honored to have Greg Linsin from the Department of Justice, Captain Baumgartner from Coast Guard Maritime International Law, and Admiral Crowley, the Chief Counsel with the Coast Guard.

Mr. Linsin expanded on his comments from Thursday and provided a lot of interesting detail. He also successfully avoided answering direct questions, but the purpose of the meeting is to air issues, not necessarily resolve them.

Capital Baumgartner discussed recent activity of IMO and also recent developments within the Coast Guard and issues of interest to the Committee.

Dave Dickman brought us up to date on criminal law issues. Joe Walsh discussed recent developments on ballast water management. This is an issue that's in a great deal of flux right now with litigation going on in the Federal District Court in San Francisco; bills in Congress; states taking various actions; the Coast Guard rule-making on and off; and the IMO Convention having recently been developed and out for ratification. Pay close attention, because this could come down a myriad of different ways, and we don't know how it is going to come out yet.

Rob Hopkins discussed passenger vessel regulatory standards and recent initiatives to change how they determine the maximum passenger load on particularly small passenger vessels in the United States.

I discussed, among other things, maritime security. Actually, it turned out to be an extremely timely discussion, because those of you who checked the news this morning might have learned that at about two o'clock this morning local time, not Phoenix time, the SEABOURN SPIRIT, 440-foot Bahamian flag cruise ship sailing from Egypt to the Seychelles Islands in the Indian Ocean, was attacked by pirates 100 miles off the coast of Somalia with machine guns and rocket-propelled grenades.

[14370]

One crew member was injured. The vessel escaped without other—well, it did suffer physical damage, and one person was injured. My suspicion is that now that we've had a pirate attack on a passenger vessel that put civilians at risk, that the international community will finally wake up to the fact that this is a serious risk and will finally start taking some concrete measures to address this, because we in the industry have seen it for a number of years regarding cargo vessels, but the general public has ignored it.

Non-tank vessel oil spill response plans—the Coast Guard issued an NVIC. It also issued a notice saying it wasn't going to enforce the statute. Please understand—please advise your clients that the statute is self-executing. Whether the Coast Guard requires the submittal of plans is not the issue. The statute already requires it.

And, finally, Title 46 codification, the bill was reported out of the House Judiciary Committee on July 14th. It has languished in the House since then. Two weeks ago, President Rue sent a letter to Representative Sensenbrenner, the Chairman of the House Judiciary Committee, asking him to make best efforts to bring that to a vote on the House floor. We expect that will happen this—before this section of Congress adjourns at the end of the year. They will then move it over to the Senate, and we may finally have a completion to the effort after about a seven-year process.

That concludes my reports.

MR. RUE: Thank you, Mr. Bryant.

Mr. Bruce King for Marine Financing to be followed by Mr. Gene George for Marine Insurance and General Average.

MR. KING: Thank you, Mr. President.

After a discussion of new developments, we had a rather lengthy discussion resuming a topic that we have previously considered. We had a discussion of whether the United States should join other countries that have a statute that permits the documentation of a vessel under construction and the registration of a preferred mortgage on it with attendant maritime lien priority and the ability to foreclose it in the Federal District Court.

Some of the variations on that would be simply to allow that documentation to occur for a construction project in the United States. Also, it would be conceivable to allow that project to be documented under a foreign flag if that's the intended documentation of the vessel.

[14371]

It is becoming rather common for hulls to be constructed in one country and completed in another. Query, whether a hull that is documented under foreign flag as a vessel construction project and then brought to the United States either for completion or after repossession could be foreclosed upon in the United States.

It is a rather complicated topic because implicit in that is extending the maritime jurisdiction to a security interest in something that is not a vessel within traditional admiralty principles. It raises interesting priority questions against shipyard vendors and some notice to creditors issues.

It's fair to say that there is some skepticism about whether this should be done. We may continue the discussion at one more meeting. If there are any members who have an interest in this topic, we would like to hear from you.

And that concludes my report, Mr. President.

MR. RUE: Thank you, Mr. King.

Mr. George to be followed by Grady Hurley for Offshore Industries.

MR. GEORGE: Thank you, Mr. President.

The Marine Insurance and General Average Committee held a well-attended and lively meeting yesterday afternoon from 2:30 until they dragged us out to go to dinner, with three main items on the agenda.

First, Committee Chairman Steve Rible led a discussion, including Andy Wilson and myself, of news stories on the various effects on people and property of Hurricanes Katrina and Rita, with a special emphasis on various insurance coverage issues that are already cropping up. The difference between whether damage is covered as wind damage or not covered as flooding damage was a particular focus, along with several class action lawsuits that have already begun. We had the benefit of both Josh Force from New Orleans and Allan Kelley of Miami relating their personal experiences with Hurricanes Katrina and Wilma respectively and with insurance adjusters in particular.

Second, Andy Wilson of New Orleans gave an in-depth lecture on his ultimately successful defense of the *Avenal* case, a case in which holders of oyster bed leases alleged that fresh water diversion structures damaged or destroyed their oyster bed crops, if you will, in an illegal taking by the

[14372]

State of Louisiana. Andy ultimately succeeded in overturning two separate state court judgments for $1.3 billion, that's billion with a "B," and $1.1 billion respectively, a tremendous accomplishment on Andy's part. He gave us a real in-depth PowerPoint on the long-term effects of these claims and potential future claims like them on the offshore oil and gas industries as well as the coverage issues involved.

And, third, I presented an update on some of the developments and trends in the ongoing seamen's asbestos litigation, which really began in 1980 in New Orleans, and as Tom Murphy, who I see here today, knows very well, moved over to our city of Cleveland starting in 1986. I also presented an update on the proposed Fairness in Asbestos Injury Resolution Act of 2005 now pending before Congress.

Finally, we distributed our Committee newsletter, which has an excellent lead article by Jonathan Spencer of New York entitled "The Role of the Average Adjuster in Maritime Disasters." For those who don't have copies, there are some on the table outside.

And that concludes my reports, Mr. President.

MR. RUE: Thank you, Mr. George.

Mr. Hurley for Offshore Industries to be followed by Joshua Force of Practice and Procedure.

MR. HURLEY: President Rue, distinguished members and guests, on November 3rd the Offshore Industries Committee held a joint meeting with the Marine Torts and Casualty Committee. We thank Jack Scalia for his courtesy in helping to host that joint meeting. We had approximately 50 members in attendance.

There were four primary agenda items. Our Secretary, Ryan Acomb, discussed the Fifth Circuit's recent interpretation of the *Dutra* decision and *Holmes*, which involved a quarter boat vessel status case. It held that a quarter boat was not a vessel. Professor Michael Sturley added his comments predicated upon his work on *Dutra* and reported that an *en banc* reconsideration of *Holmes* will shortly be, or is expected to be, before the Fifth Circuit.

Vice Chairman Brad Jackson discussed some recent CLE programs addressing LNG issues and other offshore and insurance matters.

[14373]

Thirdly, we also discussed legal issues concerning the effect of Hurricanes Katrina and Rita on the offshore Gulf of Mexico and port operations. In particular, we discussed the issues of *force majeure*, which have arisen, as well as wreck removal, salvage, marking, insurance issues, and the class actions which are pending in south Louisiana at this time.

As is the tradition of our Committee, we were pleased to have a distinguished speaker. This time it was retired U.S. Coast Guard Tom Marian, who spoke on the issues of homeland security and its effect on the offshore industries.

That concludes our report, Mr. President. Thank you.

MR. RUE: Thank you, Mr. Hurley.

Mr. Force for Practice and Procedure to be followed by Todd Lochner for Recreational Boating.

MR. FORCE: Thank you, Mr. President, members of the Association, and guests.

The Practice and Procedure Committee met yesterday. We had a very spirited and rapid meeting so that everybody could make sure and get to the dinner last night properly attired.

We addressed a number of old business items and new business items about which we want to report today. Absent some adverse Congressional action between now and December 1st, the amendments to Rules B and C about which we've reported previously will go into effect.

Also, Rule G, which deals with civil forfeitures, is supposed to be put out to public comment early next year. In light of the pending amendments to Rules B and C, the Committee has appointed a subcommittee led by Mike Hardison to revise our Local Admiralty Rules to reflect the changes to Rules B and C and also to review the Local Admiralty Rules, which were last revised in 1977, as a whole. For anybody who's interested in seeing the current Local Admiralty Rules, you can obtain a copy of those on the Association's website.

Alan Van Praag gave the Committee an update on the Exclusive Choice of Court Convention, about which Mr. Bartlett has reported previously. This Convention is supposed to be addressed at a diplomatic con-

[14374]

ference next year. Where adopted, the Convention will allow parties that have entered into a contract that contains an exclusive choice of court provision and file suit based on that provision to enforce a judgment in other countries that adopt the Convention.

The Committee also discussed problems that have been experienced across the country with electronic filing and inconsistencies in both the practices and the rules governing those types of filings. The Committee has decided to prepare a memorandum addressing the various inconsistencies to be presented to the Civil Rules Committee, hopefully, to gain some greater consistency.

Lastly, we also addressed the *Holmes* decision about which Mr. Hurley just reported, and the only thing I would note is that, in addition to the discussion on vessel status, there's an interesting procedural discussion concerning the defendant's removal of the case to federal court, although it was filed in state court under the Jones Act. The defendants argued that the Jones Act claim had been fraudulently pleaded, and the Fifth Circuit affirmed the decisions of the district courts that allowed the parties to remove the Jones Act claim, argue that it had been fraudulently pleaded, and keep it in federal court under diversity.

Mr. President, that constitutes our report.

MR. RUE: Thank you, Mr. Force.

Mr. Lochner for Recreation Boating to be followed by Doug Matthews of Stevedores, Marine Terminals, and Vessel Services.

MR. LOCHNER: Thank you, Mr. President, members of the Association.

I am Todd Lochner. I'm the Secretary of the Recreational Boating Committee. I am standing in today for my Chair and Vice Chair, neither of whom could make it to Scottsdale for this event.

Yesterday we met at approximately 4:00 p.m., so in light of the advanced dinner schedule, we moved through our itinerary rather quickly. We heard from Leonard Schwigen and Jason Harris, who both provided this Association, as a whole, with presentations over the last two days. They gave us an opportunity to have a little bit more of an in-depth question and answer session. Of course, you'll recall that Leonard Schwigen's topic was investigating recreational boating claims, and Jason Harris's topic was marina liability.

[14375]

Following the Q and A sessions with those gentlemen, Kevin Thorton presented an article which he prepared entitled, "Owners and Lienholders Beware, Losing Title Under New Jersey's Abandoned Vessels Disposition Law." Of note, there is a uniformity concern on the face of the statute. This particular statute intends to divest both the owners and lienholders of their rights without regard to the existence of a preferred ship's mortgage or documentation. This New Jersey state law on its face purports to trump the federal law and specifically the Preferred Ship Mortgage Act. This, of course, is of moment because many states have similar laws. All of the laws are not quite as onerous as the New Jersey law appears to be.

And finally, we had some brief discussion on recent developments discussion. We took note that two days ago the National Marine Manufacturers Association called upon its membership in a grass-roots effort to fight, quote, "Any attempt to eliminate or refuse the mortgage interest tax deduction for boat owners." Apparently, there is some rumor or intelligence that this might be afoot.

That concludes my report.

MR. RUE: Thank you, Mr. Lochner.

Mr. Matthews for Stevedores, Marine Terminals, and Vessel Services to be followed by Katharine Newman for the Young Lawyers.

MR. MATTHEWS: Mr. President, members of the Board, members of the MLA, and guests.

The Stevedores, Marine Terminals, and Vessel Services Committee has the fine distinction this year of being the first—or the earliest committee to meet. We met at seven o'clock yesterday morning. I only have myself and Hurricane Katrina to blame for this. Seems that since Katrina hit, I wake up at four o'clock every morning and seven o'clock seems to be a mid-morning time that's good to meet. I forget that other people aren't in the same boat with me. I did suggest that we meet at seven o'clock next spring as a motion, and I never got a second to that.

We had ten people in attendance. We had an abbreviated schedule and, after some discussion, determined that there were no new legal developments within the scope of our Committee.

However, we did learn that John Chamberlain, has been with Signal for many years, is now moving over to the Department of Labor to over-

[14376]

see financial management, insurance, and assessments with regard to the Longshore & Harbor Workers' Compensation Act.

We also discussed the new technology that's available to us as a Committee. We plan to use the new web site to create our own newsletter, where we can post recent developments within our Committee and hope that members will turn to that and see what's going on in this field.

In addition to addressing issues of the whole Stevedores, Marine Terminals, and Vessel Services Committee, we also have two subcommittees. One is entitled Freight Forwarders and Custom House Brokers that's headed up by David Loh of the Nicoletti firm, and we also have a Subcommittee on Shipbuilding and Ship Repairs headed up by Clay Rankin of Mobile, Alabama.

Let me just address the last subcommittee, that being Shipbuilders and Ship Repairers. We are looking for members to join that subcommittee. There's not been a specific focus on shipyards, shipbuilders in so far as we can tell within the MLA, and Clay has asked me to invite anyone who has interest in that area to contact him and join his subcommittee or to refer this information to other members in your firm or fellow members of your local bars, so that we can get some more participation in that subcommittee, and it can then move forward with its work.

Mr. President, that concludes my report.

MR. RUE: Thank you, Mr. Matthews.

Katharine Newman for Young Lawyers. You're not going to have Mr. Bryant substituting in? Alexannder Giles to be followed by Jim Moseley, for the ABA.

MR. GILES: Clearly, I'm not Katharine Newman, at least that's hopefully clear to everyone. Yours truly, third string, has been called off the bench to make today's presentation regarding the Young Lawyers Committee meeting that was held yesterday.

The Young Lawyers met yesterday for an informal luncheon meeting at the LV Bistro here at the Fairmont Princess. Considering that this was a fall resort meeting, we had a pretty good attendance, 14 people featuring attorneys from as far away as Belgium and Panama.

[14377]

Aside from the normal business items, our Committee had a very good discussion led by Vice-President Burrell regarding the efforts of the MLA to encourage more young lawyers to attend these fall resort and non-resort meetings by making them more affordable for young lawyers. And in that regard, we are encouraged by the preliminary efforts by John Edginton for next fall's San Francisco meeting.

Finally, I'd be remiss if I did not thank and congratulate Jason Harris, Michael Black, and Brett Mason from the Young Lawyers Committee for their very thorough and informative presentations Friday morning.

Mr. President, that concludes my report.

MR. RUE: Thank you, Mr. Giles.

Mr. Moseley to be followed by Kim Kearney, Uniformity of U.S. Maritime Law.

MR. MOSELEY: Mr. President, Board Members, members of the MLA.

I will bring up some of the issues before the American Bar Association, of which this Association has one delegate to the House of Delegates. The House of Delegates is the policy-setting arm. The complexity of the ABA is something that will be in my written report.

Suffice it to say, there is substantial tension between the entities within the ABA. One is the state organization that has the leadership positions, and secondly the Sections that really finance the ABA and are huge working organizations. We were fortunate that Jim Carroll, one of our members, was the Chair of TTIPS, which has many members and many subcommittees.

The tension is further created by the fact that every five years the ABA reviews all of its governing procedures. That review was on the agenda at this General Meeting. We have one vote. TTIPS has only 3 votes in the House of Delegates.

One added ongoing issue is the fact that if our fiscal policies were the same as the ABA, Mr. Bonner would probably be in a coma right now.

The resolution of the ABA that I wanted to tell you about is one for which you need to be on the lookout. Steve Johnson addressed this just a

[14378]

few moments ago. There is a movement underway where the ABA saw it going in a direction, and it thought, well, we'll jump on board. There's a standing ABA Committee on Ecology. It consists of 11 members, none of whom are MLA members, many of which are by their own admission air pollution lawyers.

There are probably six or eight of the 11 who are from inland. A few are in New York, and a couple are in San Francisco. When the Pew Charity Report came out fairly recently, coupled with the US official report of about a year ago or thereabouts, the Standing Committee took those reports, put them together in three resolutions, and submitted the resolutions last April.

The three resolutions, in a nutshell, and I'll set out the details in my written report, but in summary, was that there should be some overarching agency to be created or else NOAA should be assigned to look after ocean policies of the government.

The second resolution would amend the existing Magnuson-Stevens Act, which you've heard a little bit about, but that's something else again that's happening. A couple of proposed legislation items have been filed in Congress this year. I don't think they're getting any worse. Certainly they will not be passed this year.

The third resolution was the rather pompous proposition that America should take some leadership role in oceans.

The three were presented together. The Board and your President, with the help of the Regulation of Vessel Operations Committee, the Fisheries Committee, and the Ecology Committee, drafted a message. The message was about six pages, which cited ten deficiencies in the ABA resolutions, in a nice way. Also, other important concerns were cited.

Just to give you a review of a few our points: There are 700 or 800 pages of the two reports but only about two or three paragraphs that mention commerce. There are only just a few words that mention other commercial involvement. The fisheries issues are viewed as something that there won't be another fish unless you have a guppy in your aquarium at next year.

The MLA and its position, under your President's signature and with the approval of the Board, that addressed certain faults of the resolutions: infrastructure has not been addressed, cabotage has not been addressed, and breaking up of vessels has not been addressed.

[14379]

Also, the ABA resolutions express a desire to create an overarching agency or put NOAA in charge. This is going to draw resources from agencies doing the job now, such as the Coast Guard, which is already overtaxed.

The MLA message was clear. It was sent to every state chair and to the Puerto Rico Chair. It was sent to most of the Section Chairs. I was able, as your messenger, to present our oral argument to the TTIPS Section, who took no position on it, which is what we were hoping for in most instances.

The debate was held in the House of Delegates. Mr. Golemon as Chair of the Standing Committee of the ABA on Ecology supported the three resolutions. His presentation was a capsule view of the Pew Report and the U.S. Report upon which all of the resolutions were based. Following Mr. Golemon, the Attorney General of the United States had a prearranged speech set for 11:00. Accordingly, a continuance was granted to the debate on the three resolutions. The Attorney General presented his speech on voting rights and other matters.

Thereafter the debate continued. I presented our opinion as outlined in the policy established by the Officers and Board presenting what we call multiple and principled objections to the resolutions. The resolutions prevailed by a voice vote. It is difficult to estimate exactly what the numbers were, but it appeared to be no question that the voices of "yea" exceeded the voices of "nay." All I received were a good many "thataboys."

This is the reason this report is important to you. You need to take some action if any matters come before Congress. I feel certain that the MLA will state its objections to various portions of legislation that may be proposed, if there are deficiencies.

You need to talk to your Congressmen and find out, through their staff, if any of the bills similar to the resolutions are coming forward. Your Congressmen would be the first place to start and then move on to your Senator. We can't be caught short if things start coming up that impact our clients or are proper subjects of maritime law. The message was clear that we need to be vigilant.

MLA has been a strong supporter for twenty years of the Law of the Seas Convention. ABA joined MLA about ten years later. We will continue this joint effort.

Even though the resolution passed, I don't think many ABA delegates fully understood the reports or the resolutions. I think we need to be vigi-

[14380]

lant with what Congress may be doing, so that we can have our input. This is a long-range project.

So, in summary, Mr. President, the MLA message was clear. Your message was good and well-supported. I think our loss was only attributable to the messenger.

MR. RUE: I doubt that seriously, Moseley. Thank you.

Kim Kearney for Uniformity to be followed by Kevin O'Donovan for Website and Technology.

MS. KEARNEY: Thank you, Mr. President. Good morning, members and guests.

The Committee on Uniformity of U.S. Maritime Law met on Thursday afternoon, and I am very happy to report that we tripled our usual attendance. This is likely because, for the first time, we were able to offer CLE credit for meeting participation. I would like to thank Vice-Chair Dan McDermott of New York and his associate Betsy Meers of the Young Lawyers Committee. They were both very helpful in assisting the Committee to secure the CLE credit.

Dan also presented a very informative paper analyzing five cases which have been handed down this year to interpret and analyze the Supreme Court's vessel status ruling in *Stewart v. Dutra,* including the October 25th *Holmes* decision.

The Committee also discussed the Supreme Court's decision in *Spector v. Norwegian Cruise Line,* as well as recent developments in forum selection clauses, marine insurance, salvage, and maintenance and cure. The paper analyzing all of those cases is available on the CD ROM disk that Larry Kahn provided in connection with all of the CLE courses. The Committee plans to continue to offer CLE credit in the future, and we hope that this will continue to increase participation.

Mr. President, that concludes my report.

MR. RUE: Thank you.

Kevin O'Donovan for Website and Technology to be followed by Marion McDaniel for the Planning and Arrangements for 2005.

[14381]

MR. O'DONOVAN: Thank you, Mr. President.

The Website and Technology Committee meeting was held November 3rd between 4:00 and 5:00. A small group as usual, but it was a well-attended and a very lively meeting.

There are two parts really to our Committee. One is to talk about the website and the developments of the website, and that subject took up a large part of the meeting.

After this meeting, if you would like, I will be outside with a laptop with an internet connection, and I can walk people through the private side of the website just to show you what is now available to the Committees on the private side. There are three or four categories designed to help the Committees work outside of the Committee meetings.

The first link is for discussion topics. This link provides the ability to post documents and to have a discussion about documents, including mod-ifications to documents.

Each member of the MLA has a profile. You will be able to change your profile to provide updated information.

You will be able to vote over the internet, so that Committees can have votes outside of meetings. There also will be the ability to send e-mails directly from the private side of the website. One of the main purposes of the changes is that discussions can happen faster—electronically—outside of the Fall and Spring Meetings.

Turning to the technology side of our Committee, we also talked about some of the technological advancements which various members have come across. For example, we learned there are now black boxes on ships which are on the bridge. These are becoming more and more common and are similar to the black box on an airplane where all of the electronic information that is exchanged on the bridge is recorded. This would include radar and voice communications. There was some discussion about the increased use of GPS in the tracking of containers.

One of the goals of the Committee is that if there are members of the MLA who have technological questions or who have learned of develop-ments which they think would be helpful to distribute amongst member-ship, we would like you to use the Committee as a sounding board to pass that information on that to the rest of the membership.

[14382]

Mr. President, that concludes my report.

MR. RUE: Thank you, Mr. O'Donovan.

Please do avail yourself of the opportunity to stop by and visit with Kevin briefly after this meeting so that you can get a bird's eye view and training, in the form of personal assistance in logging on to the website and into the private area of the website.

Mr. McDaniel to be followed by John Edginton.

MR. MCDANIEL: Thank you, Mr. President.

A couple of reminders, for everyone to register for the meeting. There are tables at the back to record your attendance. At the registration desk outside, there may be one or two of the CLE CD disks that are for your pickup.

We have copies of the MLA Report. We now have copies, got them late, of the MLA Proceedings. Those are on the desk and can be picked up and, as always, we have those wonderful MLA ties for sale. They're going hot, so be sure you get one.

We have—there are two or three folks that did not pick up—or we did not have available the bags that have the beautiful Arizona book. They're out there, and we have some extras—a few extras for sale, and they are going at a bargain price.

What remains for our meeting: We have a sporting event this afternoon, a sailing regatta. It is going to start around 2:30 or so. Dwight LeBlanc is in charge of that. I think we have between 15 and 20 registered participants. Spectators are invited. It's to be held at Tempe Town Lake. Again, if you've got nothing else to do, we invite your attendance, it's going to be a nice event.

Our final social event this evening will be from 7:00 to 9:00. It's at the East Pool, and I finally found out where east is here by getting up real early this morning. It is a huge complex, but, again, 7:00 to 9:00, the Farewell Party. The attire for men is sport casual. No tie. For women, dressy casual. Don't ask me what that is.

The fare will be various kinds of pizzas. We're going to have a pasta station, where you'll be able to order up what kind of pasta you want, and a

[14383]

salad bar. And then, last, I think it is a make-it-yourself ice cream sundae. So, again, this will be our final event and look forward to everyone's attendance.

Lastly, I don't know if all my Committee is here, but here today, but I want them to be recognized. Dennis is standing at the back. Dennis Minichello and his wife.

MR. RUE: Would you all come down here, please.

MR. MCDANIEL: Come on down here, everybody that's on the Committee.

Okay. Well, we've got Dennis Minichello, who you know is in charge of registration, and his wife, Janine. Both did, you know, fantastic jobs. Charlie Smith. Charlie is over there. Phyllis Kubey is there.

We have got for the CLE, Larry Kahn, and Kristen, his wife, could not make it. She's home sitting on the nest with a couple of baby boys that we'll see, hopefully, in February.

I would mention that in really an exercise of effort dedication, and self-sacrifice, Larry and Kristen burned all of these CLEs themselves. They did every one of those themselves, above and beyond.

Janet Marshall and Jim and Heather Moseley were in charge of our social events, the food, the arrangements, and the decorations. And, obviously, they've done a fantastic job.

I don't believe that Alan and Sorina Christian are here. They were in charge of our golfing event.

Donny and Dare Radcliff did both the tennis and the fun run.

Pat and Pam Cooney. I see Pat. They were in charge of this colorful program. If you noticed, we switched colors this year and got a little more oriented to where we are. Pat did a great job on that.

And Joe and Ann Walsh, they were in charge of local activities and events, and outside interests, restaurants, and sightseeing, and that type of thing.

Last thing, my wife, Mary, who helped me chair the thing. We had a great time. I hope you did too, and thanks for coming.

[14384]

MR. RUE: You have a correction?

MR. LEBLANC: I would just like to say the sailing is at 12:30, and we're going to meet at the reception area, just so that everyone would have that straight.

MR. McDANIEL: Looking forward to seeing you all tonight.

MR. RUE: Marion, from the Board of Directors and all the Officers, we thank you and your Committee for an excellent, excellent job. Again, many thanks. Well done.

MR. McDANIEL: Thank you, Mr. President.

MR. BERNS: Mr. President, a special thanks should be given to Janet Marshall for the anchovies.

MR. RUE: Take a bow, Janet.

John Edginton for Fall 2006 Planning and Arrangements.

MR. EDGINTON: Thank you, Mr. President.

You know, I've stood at the microphone before this body a number of times, but I can't think of any time when I have done it with more pleasure and more enthusiasm.

We're going back to San Francisco in October of 2006. We're going to be at the Sheraton Palace Hotel, which is located right in the center of downtown San Francisco on Market Street between 2nd and 3rd. It's right on the BART line. It's also on the surface trolley line. It is very centrally located and, much like a resort meeting, our meetings will all be centered in the hotel.

Arrival day is Tuesday, October 3rd. Wednesday and Thursday will be devoted to committee meetings all day on a schedule very much as occurs in New York. The difference will be that all of the meetings, we anticipate, will be held at the Sheraton Palace. If there's a need for overflow, we will have plenty of space in law firms.

On Wednesday night, October 4th, there will be a welcome reception. On Thursday evening we will have a dinner at the hotel that will celebrate some of the wonderful cuisines of San Francisco.

[14385]

Now, lots of people like to come to San Francisco for the restaurant experiences, so try to arrive early enough on Tuesday so you can do that on Tuesday night. The reception on Wednesday is certainly going to be designed so that you can go out to dinner after that. But our dinner on Thursday night will give you a choice of a number of different things from Asian to Hispanic to Italian to whatever and will be at the Sheraton Palace.

Friday is the day that will be devoted all day to continuing education. The Pacific Admiralty Seminar has reduced their normal two-day schedule to a one-day schedule to accommodate our needs, and that will be held at the San Francisco Bar Association's site at what used to be the old San Francisco Commercial Club at the top of the building. It is very lovely. That program will include a lunch at the top of the Bank of America building, the Carnelian Room. I think you will be probably be able to look down into the cockpits of some of the Blue Angels as they fly around. You will quickly see why we have picked the first week of October, which is Fleet Week in San Francisco. There are a lot of other celebrations and things going on.

That evening, thanks to Phil Berns, he will recreate his Pacific Admiralty Dinner for us at the California Culinary Academy, which I can tell you is a sumptuous feast of just about everything that you can imagine.

Some of these items will be separate ticket, so that you can arrange your finances *à la carte*, and so for those of you here who may be suffering a little bit of sticker shock, I can assure you that San Francisco will be a more affordable experience.

On Saturday morning, we will have the General Meeting, much as we have here. That will be followed by a bay cruise, which will allow you to see the Blue Angels perform really close up and personal. This is quite an experience, if you haven't experienced it. After that, you're on your own.

During the week we will have a number of attractions for spouses and others who come with you that want to see some of the various sights around San Francisco. We'll probably plan an excursion down to Carmel with a stop at the Monterey Aquarium, probably one of the most acclaimed aquaria in the world.

My wife has been persuaded to do another one of her tours, which she did for the board when we met in San Francisco some years ago, that explores Berkeley and Berkeley's historic architecture.

[14386]

Naturally, there will be a chance to visit the wine country, and I think we'll probably plan a hike in Muir Woods. So there will be lots to do. It's going to be a lot of fun. Remember to mark the dates. It is October 3 to 7, the first week of October in 2006.

Thank you, Mr. President.

MR. RUE: Thank you, Mr. Edginton.

Let me just comment on Jim Moseley, Sr.'s report. We are following the developments with the ABA oceans policy resolution very carefully. We're continuing the dialogue with that committee. Although we don't seem to be getting very far, you, as Jim asked, can help us watch for any other developments.

So if you become aware of anything and, of course, we'll be watching also, please contact me or some other officer so that we can be sure we have the bases covered on that.

I would also like to take this opportunity to thank all of the Committee Chairs. As you know, this is a volunteer organization. Our work is done primarily through the Committees and these individuals have done an out-standing job in organizing and conducting their meetings and reporting here today. I would like to give a round of applause to the Committee Chairs.

MR. RUE: Is there any further business to come before the Association this morning?

MR. BERNS: One thing, Mr. President, I would like to thank Robin, our representative in Buffalo. With all the changes with the upheaval that took place after the hurricanes, you'll notice on the website Robin tried to keep up-to-date all of the changes in the e-mail addresses, locations, and she just did a tremendous job, and I think notice should be on the record of the work she did.

MR. RUE: Here. Here.

MR. BONNER: Second.

MR. RUE: Mr. Moseley?

[14387]

MR. MOSELEY: Mr. President, with great glee in the leadership of you and the Board and the Officers have done, I move that we adjourn.

MR. RUE: All in favor, please stand up. Thank you.

### FORMAL REPORT OF THE COMMITTEE
### ON CARRIAGE OF GOODS

Working Group III of the United Nations Commission on International Trade Law (UNCITRAL) has held fifteen sessions to prepare a legislative instrument on issues relating to the international carriage of goods. Each session has dealt with particular topics as to which decisions have been tentatively reached or deferred.

At the time of this MLA meeting, the sixteenth session of the Working Group is scheduled to be held in Vienna from November 28 to December 9, 2005. In preparation for the session, a consolidation of revised provisions from the previous draft convention was made. The entire consolidation may be found at the UNCITRAL web site under Working Group III, document no. A/CN.9/WG.III/WP.56. Although the convention is still subject to change in the future sessions, the contents of WP.56 are listed below to show the breadth of the convention and the matters with which it deals.

### Draft convention on the carriage of goods
### [wholly or partly]
### [by sea]

Chapter 1. General provisions
      Article 1. Definitions
      Article 2. Interpretation of this Convention
      Article 3. Form requirements
      Article 4. Applicability of defences and limitations

Chapter 2. Electronic communication
      Article 5. Use and effect of electronic communications
      Article 6. Procedures for use of negotiable electronic transport records
      Article 7. Replacement of negotiable transport document or negotiable electronic transport record

[14388]

Chapter 3. Scope of application
          Article 8. General scope of application
          Article 9. Specific exclusions and inclusions
          Article 10. Application to certain parties

Chapter 4. Period of responsibility
          Article 11. Period of responsibility of the carrier
          Article 12. Transport beyond the contract of carriage

Chapter 5. Obligations of carrier
          Article 13. Carriage and delivery of the goods
          Article 14. Specific obligations
          Article 15. Goods that may become a danger
          Article 16. Specific obligations applicable to the voyage by sea

Chapter 6. Liability of the carrier for loss, damage or delay
          Article 17. Basis of liability
          Article 18. Carrier's liability for failure to provide information
                    and instructions
          Article 19. Vicarious liability of the carrier
          Article 20. Liability of maritime performing parties
          Article 21. Joint and several liability and set-off
          Article 22. Delay
          Article 23. Calculation of compensation
          Article 24. Notice of loss, damage, or delay

Chapter 7. Additional provisions relating to particular stages of carriage
          Article 25. Deviation during sea carriage
          Article 26. Deck cargo on ships
          Article 27. Carriage preceding or subsequent to sea carriage

Chapter 8. Obligations of the shipper
          Article 28. Delivery for carriage
          Article 29. Carrier's obligation to provide information and
                    instructions
          Article 30. Shipper's obligation to provide information,
                    instructions and documents
          Article 31. Basis of shipper's liability
          Article 32. Material misstatement by shipper
          Article 33. Special rules on dangerous goods
          Article 34. Assumption of shipper's rights and obligations
          Article 35. Vicarious liability of the shipper
          Article 36. Cessation of shipper's liability

[14389]

Chapter 9. Transport documents and electronic transport records
    Article 37. Issuance of the transport document or the electronic transport record
    Article 38. Contract particulars
    Article 39. Signature
    Article 40. Deficiencies in the contract particulars
    Article 41. Qualifying the description of the goods in the contract particulars
    Article 42. Reasonable means of checking and good faith
    Article 43. Prima facie and conclusive evidence
    Article 44. Evidentiary effect of qualifying clauses
    Article 45. "Freight prepaid"

Chapter 10. Delivery to the consignee
    Article 46. Obligation to accept delivery
    Article 47. Obligation to acknowledge receipt
    Article 48. Delivery when no negotiable transport document or negotiable electronic transport record is issued
    Article 49. Delivery when negotiable transport document or negotiable electronic transport record is issued
    Article 50. Failure to give adequate instructions
    Article 51. When goods are undeliverable
    Article 52. Notice of arrival at destination
    Article 53. Carrier's liability for undeliverable goods

Chapter 11. Right of control
    Article 54. Definition of right of control
    Article 55. Variations to the contract of carriage
    Article 56. Applicable rules based on transport document or electronic transport record issued
    Article 57. Carrier's execution of instruction
    Article 58. Deemed delivery
    Article 59. Obligation to provide information, instructions or documents to carrier
    Article 60. Variation by agreement

Chapter 12. Transfer of rights
    Article 61. When a negotiable transport document or negotiable electronic transport record is issued
    Article 62. Liability of holder
    Article 63. When no negotiable transport document or negotiable electronic transport record is issued

[14390]

Chapter 13. Limitation of liability
        Article 64. Basis of limitation of liability
        Article 65. Liability for loss caused by delay
        Article 66. Loss of the right to limit liability

Chapter 14. Rights of suit
        Article 67. Parties
        Article 68. When negotiable transport document or negotiable
               electronic transport record is issued

Chapter 15. Time for suit
        Article 69. Limitation of actions
        Article 70. Commencement of limitation period
        Article 71. Extension of limitation period
        Article 72. Action for indemnity
        Article 73. Counterclaims
        Article 74. Actions against the bareboat charterer

Chapter 16. Jurisdiction
        Article 75. Actions against the carrier
        Article 76. Exclusive jurisdiction agreements
        Article 77. Actions against the maritime performing party
        Article 78. No additional bases of jurisdiction
        Article 79. Arrest and provisional or protective measures
        Article 80. Consolidation and removal of actions
        Article 81. Agreement after dispute has arisen

Chapter 17. Arbitration
        Variant A. Article 82
        Article 83
        Article 84
        Article 85
        Article 85 bis.
        Article 86
        Variant B. Article 82
        Article 83
        Article 84
        Article 85
        Article 86

[14391]

Chapter 18. General average
        Article 87. Provisions on general average
        Article 88. Contribution in general average

Chapter 19. Other conventions
        Article 89. International instruments governing other modes
            of transport
        Article 90. Prevalence over earlier conventions
        Article 91. Global limitation of liability
        Article 92. Other provisions on carriage of passengers and
            luggage
        Article 93. Other provisions on damage caused by nuclear
            incident

Chapter 20. Validity of contractual stipulations
        Article 94. General provisions
        Article 95. Special rules for volume contracts
        Article 96. Special rules for live animals and certain other goods
Chapter 21. Final Clauses
        Article 97. Depositary
        Article 98. Signature, ratification, acceptance, approval or
            accession
        Article 99. Reservations
        Article 100. Effect in domestic territorial units
        Article 101. Entry into force
        Article 102. Denunciation of other conventions
        Article 103. Revision and amendment
        Article 104. Amendment of limitation amounts
        Article 105. Denunciation of this Convention

    All of the consolidation is not only the draft convention, but also has a separate annex with underlining and strikeouts and explanation of more substantive changes from the prior version. This a good time for our members to become acquainted with the broad scope of this convention, which is not the same as the MLA draft revision of U.S. COGSA, as the Working Group is approaching the end of its work.

                        Respectfully submitted,
                        Donald C. Greenman, Chair

[14392]

## JOINT FORMAL REPORT OF THE COMMITTEE ON MARINE ECOLOGY AND MARITIME CRIMINAL LAW AND THE COMMITTEE ON REGULATION OF VESSEL OPERATIONS

The Joint Meeting of the Committees on Marine Ecology and Maritime Criminal Law, and on Regulation of Vessel Operations was held on November 4, 2005 at 1:00 p.m. at the Fairmont Scottsdale Princess Hotel, Scottsdale, Arizona.

Mr. Gregory Linsin, Special Litigation Counsel, Environmental Crimes Section, Environment and Natural Resources Division, U.S. Department of Justice, explained the DOJ policy on prosecution of environmental crimes in general and waste oil dumping and oil record book violations in particular. He pointed out that by-passing of the oily water separator and the entry of fraudulent data in the oil record book are not negligent acts, but intentional crimes, generally undertaken in order to save money for the shipowner or operator. He also noted that as to the use of strict liability statutes, the Department of Justice is not aware of any case being solely premised on strict liability. Rather, the strict liability statutes are merely added as additional counts.

CAPT William Baumgartner, USCG—Chief, Maritime & International Law Division (G-LMI)—provided an update on relevant USCG and IMO activities. In terms of relevant USCG activities, he discussed the Coast Guard's coordination and response efforts pertaining to Hurricanes Katrina, Rita, and Wilma. As for Katrina, he shared some pretty impressive statistics regarding the USCG, which are as follows: 24,000 lives saved, 9,000 people evacuated from medical facilities, and 5,200 Coast Guard families that have been displaced from their homes in the region. Within 48 hours of Katrina, the Coast Guard had 26 cutters, 52 aircraft, and 4,000 people operating on the scene. As to international and IMO activities, he discussed the recently finalized amendments to the International Convention for the Suppression of Unlawful Acts Against the Safety of Navigation (SUA Convention). The amendments are intended to enhance the boarding regime and reduce the risk of proliferation of weapons of mass destruction, among other things. A final draft of the Wreck Removal Convention should be ready for consideration soon. Finally, piracy has become a major concern recently, especially in and around the waters of Somalia. On the domestic front, the Coast Guard is challenging the recent pollution prevention statute adopted by the Commonwealth of Massachusetts. It is our view that the statute's provisions regarding various vessel operational matters crosses the line into areas reserved for federal oversight and regulation.

[14393]

Joe Walsh of Long Beach presented an update on the Ballast Water Management Program. He reviewed the recent GAO report, which concluded that high seas ballast water exchange is not an effective long-term solution. Various experimental technologies hold potential promise, but further analysis and testing is necessary. The IMO recently finalized an international convention on ballast water management, but it has not yet come into effect. The Coast Guard is developing a ballast water discharge standard, but its finalization has been delayed. States are continuing to regulate ballast water discharges, and a new permitting requirement is expected to enter into force soon in Michigan. Various environmental advocacy groups won a preliminary victory in federal court in San Francisco when the court ruled that the EPA exemption of routine discharges from ships from the National Pollutant Discharge Elimination System (NPDES) permitting requirement was invalid. The matter is currently being reheard.

David Dickman of Washington, D.C. provided an update on criminal law developments. Mariners continue to be prosecuted for fraudulent oil record book entries under the false statements statute and for the underlying discharge of waste oil under the Act to Prevent Pollution from Ships, as well as obstruction of justice violations. The CEO of a U.S. shipping company was recently sentenced to three years confinement for violation of the Oil Dumping Act. His company and various other individuals had previously pled guilty to these offenses.

Robert Hopkins of Baltimore discussed recent developments regarding passenger regulatory standards. Several recent marine casualties involving the capsizing of small passenger vessels have identified the need for updating of USCG regulations regarding how the maximum safe passenger capacity of such vessels is determined. A rulemaking project has commenced. In the meantime, the passenger capacity of some craft has been decreased.

Dennis Bryant of Washington, DC discussed recent developments with regard to maritime security. The Department of Homeland Security (DHS) recently promulgated the National Strategy for Maritime Security. It is a good beginning, but seems late, coming four years after the 2001 terrorist attacks. Eight supporting plans have also been announced, but have not been made generally available. The Coast Guard continues to issue port security advisories and to strictly enforce the 96-hour advance notice of arrival requirement.

Mr. Bryant also discussed recent maritime legislation, relying on notes provided by Barbara Burke of Washington, DC. He stated that the Coast

[14394]

Guard Authorization Act has passed both the House and the Senate, but in different versions. A Conference Committee should be appointed soon to craft a mutually agreeable bill. The Energy Policy Act of 2005 places exclusive authority for licensing of new LNG facilities with the Federal Energy Regulatory Commission (FERC) and, effective April 1, 2006, reinstates the 5-cent per barrel tax on imported oil, until the Oil Spill Liability Trust Fund reaches $2.7 billion. Bills have been introduced in the House and Senate to amend the Nonindigenous Aquatic Nuisance Prevention and Control Act.

Mr. Bryant provided an update on the Non-Tank-Vessel Oil Spill Response Plan requirement. Legislation was enacted in 2004 requiring non-tank vessels of 400 gross tons or greater ITC to prepare oil spill response plans and submit them to the U.S. Coast Guard not later than August 9, 2005. The Coast Guard issued detailed guidance on how to prepare and submit the plans. Due to issues relating to the tonnage measurement system specified in the statute and the impossibility of promulgating regulations in such a short period, the Coast Guard issued a Notice stating, among other things, that it would not enforce the plan requirement until the regulations are finalized. It should be noted that the statute is self-effectuative and does not depend on regulations. Owners and operators of non-tank-vessels covered by the statute should be strongly encouraged to prepare and submit oil spill response plans at the earliest possible date.

Mr. Bryant stated that the bill to codify the uncodified portions of Title 46, U.S. Code was reported out of the House Judiciary Committee on July 14. MLA President Thomas Rue recently sent a letter to Representative Sensenbrenner, Chair of the Judiciary Committee, asking him to make best efforts to bring the matter to a vote on the House floor.

Respectfully submitted,
James F. Moseley, Jr. and
Dennis L. Bryant, Chairs

## FORMAL REPORT OF THE COMMITTEE ON
## MARINE TORTS AND CASUALTIES

Jack Scalia presided over the November meeting in the absence of John Schaffer, Chair, who could not attend. Mary Elisa Reeves and Paul Edelman were acknowledged for preparing a comprehensive update of cases. The cases were not discussed in detail, since time was short and there was a prior handout, but the highlights were mentioned.

[14395]

## The Supreme Court

Since our last report, the Supreme Court decided *Spector v. Norwegian Cruise Line, Ltd.*, 125 S. Ct. 2169, 2005 AMC 1521 (2005). At issue was whether the Americans with Disability Act (ADA) applies to foreign flag ships that call at or operate from U.S. ports. The vessel at issue had certain barriers affecting disabled passengers. The Court held these ships to be "public accommodations" and "public transportation" within the ADA. However, the ADA would require removal of barriers only if "readily achievable."

On remand from the Supreme Court, in *Stewart v. Dutra Construction Co.*, the dredge-scow case, the First Circuit held that Stewart was employed on a dredge in navigation. He qualified as a crew member under the Jones Act. 418 F.3d 32 (1st Cir. 2005).

## Asbestos Bill

Legislators are working on a possible $140 billion fund. A Senate committee gave its leaders authority to subpoena companies' records so as to allocate contributions. The bill may go to the Senate floor some time in October. However, the Congressional Budget Office foresees claims in excess of the proposed amount.

The Manville Personal Injury Settlement Trust has barred payments to claimants for claims based on reports of nine doctors and three x-ray screening companies. The trust funds are being reviewed by U.S. prosecutors for fraud.

The Sixth Circuit requires proof connecting a product to asbestos-caused mesothelioma. Conjecture or hypotheticals are insufficient (crew members v. manufacturers). *Lindstrom v. A-C Product Liability Trust*, 424 F.3d 488, 2005 AMC 2425 (6th Cir. 2005).

## Jones Act

The Third Circuit approves the featherweight standard for causation and probably proof of negligence. *Fasold v. Delaware River & Bay Auth.*, 117 Fed.Appx. 836 (3d Cir. 2004).

In *Ryan v. U.S.*, 331 F.Supp.2d 371, 2004 AMC 2151 (D. Md. 2004), the plaintiff was a diver who was involved with designing and building an amphibious assault vehicle. The court held he contributed to the mission

[14396]

of the vessel regardless of time in the water. However, his employer was not the owner of the vessel, so Jones Act coverage was denied. The court applied a one-employer rule rather than the multiple-employer rule described in *Spinks v. Chevron Oil Co.*, 507 F.2d 216 (5th Cir. 1975).

A crew member suffered injury when his neck was manipulated by a fellow crew member who was an amateur chiropractor. The employer was exonerated, as an employer is only liable for intentional torts committed while furthering the interests of the employer. *Sobieski v. Ispat Island, Inc.*, 413 F.3d 628, 2005 AMC 1735 (7th Cir. 2005).

A tugboat captain alleged employment discrimination under the N.Y. City Administrative Code when he was fired for failure to pass an alcohol test. The issue of whether this is actionable under the Jones Act was not reached, as the tugboat captain was an at-will employee. His emotional distress claim failed for lack of physical contact, and he was not defamed. *Smith v. McAllister Towing of New York*, 361 F.Supp.2d 348 (S.D. N.Y. 2005).

A worker on a bucket dredge was held to be a Jones Act seaman, and Longshore Act coverage was denied. His connection to the vessel was substantial. *Uzdavines v. Weeks Marine Inc.*, 418 F.3d 138, 2005 AMC 2024 (2d Cir. 2005).

A deckhand may not be a seaman for Fair Labor Standards Act status entitled to sue for overtime. Plaintiff worked on a ferry and was involved with overseeing the passengers. Under Department of Labor regulations, it is the type of work performed, and not the title, that counts. The First Circuit remanded for an evidentiary hearing on the plaintiff's claim for overtime pay. Seaman/crew members are exempt from FLSA overtime requirements. *McLaughlin v. Boston Harbor Cruise Lines, Inc.*, 419 F.3d 47, 2005 AMC 1968 (1st Cir. 2005).

The shipowner had no duty to warn a superintendent crew member of descending a stair with wet boots. *Patterson v. Allseas USA, Inc.*, 137 Fed. Appx. 633, 2005 AMC 1811 (5th Cir. 2005).

The Jones Act has a two-part test: (1) the employee must contribute to the function and mission; and (2) and connection with a vessel in navigation that is substantial in duration and nature. A cleaning barge not permanently tied to shore or anchored to a riverbed was a vessel even without self-propulsion. *Bunch v. Canton Marine Towing Co.*, 419 F.3d 868, 2005 AMC 2167 (8th Cir. 2005).

[14397]

A seaman claimed that a medical care provider wanted to dictate his case manager and wanted him to discharge his attorney. Plaintiff's lawyer conceded these were not maritime claims. The judge held they were state claims and not admiralty claims. *Ahmed v. Waterman S.S. Corp.*, 382 F.Supp.2d 923 (E.D. Mich. 2005).

Present law does not exempt a seaman from prepayment of court reporter's fees for trial transcripts. *Beasley v. U.S. Welding Service, Inc.*, 129 Fed. Appx. 901 (5th Cir. 2005).

*Holmes v. Atlantic Sounding Co.*, 429 F.3d 174, 2005 AMC 2612 (5th Cir. 2005), held, after the *Stewart* decision, that a floating dormitory was not a vessel, and an employee aboard was not a Jones Act crew member. A petition for rehearing has been filed.

### Fishermen

Under 46 U.S.C. § 10601 fishing boat owners are required to have a written employment contract with fishermen. Section 11107 allows recovery of the highest rate of wages if there is no written contract. *Doyle v. Huntress, Inc.*, 419 F.3d 3, 2005 AMC 2127 (1st Cir. 2005), allowed recoveries for plaintiffs who were on lay shares where there was a disparity among the fishermen based on experience, *etc.* and without a written contract. (*En banc* permission sought).

In *Thorman v. American Seafoods*, 421 F.3d 1090 (9th Cir. 2005), a class action was dismissed based on the statutory requirement that an *in rem* action against a fishing vessel on a wage claim or such a wage in a fisherman's contract must be filed within six months. A failure to calculate properly the value of the prospective catch on which lay shares were based was alleged. See 46 U.S.C. § 10602(a). There was no estoppel or fraudulent concealment proven to extend the lawsuit period. Some fishermen agreements do not specifically limit the time to sue, so a new question could arise in an in person wage claim.

### Maintenance, the Jones Act and
### Pre-Employment Misrepresentation

A pre-employment application denying an injury on which a later claim is made will lead to a denial of maintenance if concealment is shown to be willful. This misrepresentation does not affect a seaman's Jones Act claim. *Brown v. Parker Drilling Corp.*, 410 F.3d 166, 2005 AMC 1405 (5th Cir. 2005).

[14398]

## Longshore 905(b) Actions

*Lockheed Martin Corp. v. Morganti*, 412 F.3d 407, 2005 AMC 1655 (2d Cir. 2005), decided the status of a test engineer who tested acoustic devices in Lake Cayuga, New York. Morganti died due to the condition of a shuttle boat used to go to and from a platform that was not fixed to the ground. The court held that there was Longshore Act jurisdiction, consonant with pre- and post-1972 changes in the Act. He was a professional not a data processing clerk, which is an exception to jurisdiction under the Act. Implicit in the decisions is that the estate had a case against the employer under 905(b), since the waters were federal navigable waters—part of the Erie Canal system.

## ISM Code Compliance

In *Kyles v. Eastern Car Liners, Inc.*, 266 Ga. App. 784, 598 S.E. 2d 353 (2004), the Georgia Court of Appeals reversed the trial court and held, on a defense motion for summary judgment, that there were material issues of fact as to whether the shipowner had a duty of active control that was breached, whether the duty to intervene was breached, and whether the owner violated the International Safety Management Code. Back at the trial court, the defendant sought to show that as to its vessel the ISM Code was not yet mandatory. The trial court precluded any new argument concerning the issue. Plaintiff is a longshoreman. His lawyers are claiming violations of the Code and the ship's ISM manual.

In August the Coast Guard issued a press release indicating that port facilities should not delay a ship or file a penalty except for major nonconformities with the ISM Code.

## Cruise Ships

The Athens Convention was involved in *Henson v. Seabourn Cruise Line Ltd., et al.*, 2005 AMC 1964 (S.D. Fla. 2005). The plaintiff was on a cruise from Canada to New York. He was injured while still in Canadian waters. The Athens Convention is applicable in many foreign cruises, especially on foreign cruise lines. However, 46 U.S.C. § 183(c) does not allow a ticket limit on liability if the ticket involves a U.S. port of embarkation or debarkation—unlike the Athens Convention, which has a limit in Special Drawing Rights of about $70,000. The court held that the ticket provision prevailed and denied the Convention coverage, even though the plaintiff never reached New York or even U.S. waters. The Convention also has a two-year statute of limitations.

[14399]

## Suits in Admiralty Act

The Fourth Circuit has joined other circuits in applying the discretionary function exception (DFE) to the SAA despite the fact that it is not provided in the text of the Act. *McMellon v. U.S.*, 387 F.3d 329 (4th Cir. 2004), reported previously. However, if the accident is due to failure to warn, the exception will not apply, although a vessel's design would be covered. *Carney v. U.S.*, 368 F.Supp.2d 439, 2005 AMC 1443 (D. Md. 2005). In the *McMellon* case on remand, the Army Corps of Engineers' decisions concerning warning signs upstream from a dam were not protected by the DFE. 395 F.Supp.2d 422.

The DFE was also applied in *Simmons v. U.S.*, 2005 WL 1243760 (M.D. Fla. 2005), where plaintiff in a motorboat collided with a piling structure, not lit, adjacent to the Jacksonville Naval Air Station.

## Limitation of Liability

A letter to a shipowner indicating a claim being made that may exceed the value of the vessel starts the six months during which the owner must file his limitation proceedings. *Paradise Divers Inc. v. Upmal*, 402 F.3d 1087, 2005 AMC 1063 (11th Cir. 2005).

A river towboat's owner and manager sought exoneration and/or limitation where the towboat had a collision with a harbor barge and another collision by one or more runaway barges that struck a moored gaming vessel. The Court of Appeals for the Eighth Circuit held that (1) a manager did not have sufficient control to be considered an owner *pro hac vice*; (2) the towboat pilot's navigational error finding was not clearly erroneous; (3) the owner was not in privity with the captain; and (4) moored gaming vessel owner could be partly at fault. In a bench trial findings are reviewed for clear error while legal determinations are viewed *de novo*. *Matter of American Milling Co., Ltd.*, 409 F.3d 1005, 2005 AMC 1217 (8th Cir. 2005).

The trial court in *In re Livolsi*, 2005 AMC 1070 (D. Ct. 2005), held that even with the owner at the helm privity is not presumed as a matter of law in a recreational boating accident. The court also disallowed a venue change to the state court where claimant failed to stipulate to the value of the vessel. The limitation action was also held timely when the claimant's attorney provided notice to an insurance adjuster but not to the owner himself.

[14400]

A letter of representation from the injured party's attorney to vessel owner requesting relevant documents does not trigger the six-month period to bring suit. *Norfolk Dredging Co. Limitation Proceedings*, 2005 AMC 769 (E.D. Va.).

Notice of claim need not be served on a vessel owner in a manner consistent with federal rules for service of complaint or process. Delivery of notice by certified mail to the owner's employee was sufficient to commence six month time period, even if management claimed it never received the letter. *In re: Waterfront License Corp.*, 2005 AMC 2013 (S.D. Fla.).

A federal court can apply foreign limitation law if (1) foreign law applies to the liability aspect of the case and (2) the foreign limitation law is deemed to be substantive, rather than procedural. In this case, the court analyzed the qualifications and reasoning of the Nigerian law experts and declined to apply Nigerian law, because it was procedural rather than substantive. [Good thing for the claimant, since the limitation fund under Nigerian law was $265.78, and the claim was allegedly valued at $4.5 million!] *Nigeria National Petroleum v. M/V SEABULK MERLIN*, 2005 AMC 1092 (S.D. Fla. 2005).

Applying the Supreme Court's reasoning in *McDermott v. AmClyde*, a district court denied a motion by a potentially liable tugboat owner to file a late claim against the limitation plaintiff for indemnity or contribution after the limitation plaintiff settled with the injured seaman. The court held that the tugboat owner had no claim for indemnity or contribution, since any judgment against it would be reduced by the proportionate fault of the settling tortfeasor. *In re: J.A.R. Barge Lines*, 2005 AMC 830 (W.D. Pa. 2005).

After toxic fumes were allegedly emitted into a community, a class action was initiated against the barge owner, who filed a limitation action. Counsel for the class filed claims and and an answer on behalf of the class members, after which he amended his answer on four separate occasions to add claimants. After the time for filing claims had passed, counsel filed nine motions to add additional claimants. The Court exercised its discretion and denied the late claims, since no excuse was given and no proof offered that these claimants had not received notice. *In re: River City Towing Services, Inc.*, 2005 AMC 2083 (5th Cir. 2005).

Where the vessel owner filed its limitation action in one district, and was unaware that suit had been started in another, upon claimant's motion, the action would be transferred to the district in which the suit had been

[14401]

brought. The admiralty rules require such a result. *Campbell Transp. Co., Inc. v. Wilds*, 2005 AMC 786 (W.D. Pa. 2005).

The Second Circuit affirmed a district court that had exonerated the owner of a pleasure boat that had been in severe weather. Evidence as to foreseeability was ambiguous. A failure to check marine weather forecasts before launching is not negligence *per se. Cornfield v. Cornfield*, 2005 AMC 2702 (2d Cir. 2005), aff'g, 365 F. Supp.2d 271, 2005 AMC 201 (E.D. N.Y. 2004).

### The *Pennsylvania* and *Oregon* Rules

The *Pennsylvania* Rule creates a presumption of fault where the shipowner violates a statutory rule. It may be rebutted and is unnecessary where evidence is put in. The *Oregon* Rule is a presumption against a vessel owner whose vessel collides with a stationary vessel. Findings of proximate cause by a judge in a limitation proceeding are reviewed only for clear error. Credibility determinations are for the trier of fact. The trial court's determination of liability and proximate cause were affirmed. *In re: Matter of Mid-South Towing Co.*, 418 F.3d 526, 2005 AMC 1894 (5th Cir. 2005).

### Longshoremen's Act and Defense Bases Act

Contractor employees injured abroad on U.S. business may have injuries covered by the Defense Bases Act, which provides for recoveries under the Longshoremen's Act. In *Nordan v. Blackwater Security Consulting*, 382 F. Supp.2d 801 (E.D. N.C. 2005), four security personnel were killed in Iraq. State law death claims were filed alleging wrongful death and fraud. The court held that the Defense Bases Act did not completely preempt the state law claims. Removal to the federal court was denied.

### Collision Law

*In re Otal Investments Ltd.*, 2005 AMC 1926 (S.D. N.Y. 2005), dealt with three vessels involved in a collision resulting in a sinking with the loss of 2,000 cars. All three vessels were flagged in countries that were signatories of the 1910 Brussels Collision Convention. The Convention applies comparative fault unless the degrees cannot be determined. At issue in this decision was whether Article 6 applies, which does away with presumptions of fault in light of the *Pennsylvania* Rule, which places a burden on

[14402]

a party held to violate a statutory rule. The burden requires the violator to show that the violation could not have caused the casualty. Judge Baer followed a Ninth Circuit precedent that held that the Convention did away with judge-made presumptions as well as statutory presumptions. U.S. courts have applied the Convention where applicable although the U.S. is not a signatory.

### Proof of Foreign Law

A claim of application of foreign law need not be specific initially. *Rationis Enterprises v. Hyundai Mipo Dockyard*, 476 F.3d 580, 2005 AMC 2516 (2d Cir. 2005) (Place of negligence predominates over the flag in this case).

### Punitive Damages

Where a defendant shipowner in a Jones Act case failed to pay maintenance, alleging that the claimed accident was very questionable, it could not be held liable for punitive damages. The case also discussed *dicta* in a Third Circuit case questioning whether punitive damages are recoverable in a Jones Act or other statutory maritime claim. *Kopacz v. Delaware River & Bay Authority*, 2005 AMC 2481 (D. Del. 2005).

### *In Rem* Liability

A case was mentioned involving a limitation fund set up in the Netherlands where there is no in rem liability. A ship that was arrested in the U.S. and gave an undertaking, would not lead to a separate fund. Comity was in issue. *Vestoil Ltd. v. M/V M. Pioneer*, 148 Fed. Appx. 898, 2005 AMC 2404 (11th Cir. 2005).

### Foreign Seamen on U.S. Ships

The House of Representatives passed a bill allowing non-American citizens to serve on U.S. ships. This sent alarm bells ringing. Apparently the bill was meant to allow foreign maintenance workers to work short periods on U.S. ships as riding crews. A suit has been started alleging violation of wage statutes.

Respectfully submitted,
John P. Schaffer, Chair

[14403]

## FORMAL REPORT OF THE REPRESENTATIVE OF THE MARITIME LAW ASSOCIATION OF THE UNITED STATES TO THE AMERICAN BAR ASSOCIATION HOUSE OF DELEGATES

This written report is to supplement in greater detail the oral report that was presented in Scottsdale, Arizona at the Fall Meeting of the MLA. The report covers in greater detail the circumstances of the ABA Resolution on Ocean Policies.

### Background Information of the ABA

The House of Delegates is the sole policy-setting organization of the ABA. It is composed of state delegates that probably total about 350. Included in the state delegation groups are voluntary bar associations that have over 2000 members. Each organization is entitled to one vote. If the voluntary bar is over 6000, it is entitled to two and so on. Each of the substantive law sections, depending on size, is entitled to several delegates each. This probably accounts for another hundred.

Other delegates are affiliated organizations such as MLA. These organizations are required to have fifty percent of their members ABA members. A list of a few of the organizations includes: American Immigration Lawyers, the Association of American Law Schools, the Federal Communications Bar Association, the Federal Bar Association, the Judge Advocates Association, and the National Association of Attorneys General. Other smaller affiliate organizations also include the National Association of Bar Executives, the Conference of Chief Justices and other special interest groups. There are twenty-eight affiliated organizations, including the MLA.

The affiliated groups' delegates sit with their own home state. The House of Delegates meetings are closed to the extent that each delegate has a badge authorizing admittance, and the media is in controlled areas.

The current Chair of the House is from Florida. He ran a very effective meeting that principally involved issues of ABA governance. It is required that every ten years the governance structure be considered, modified or left the same. This was a very heated discussion for a long time. There were only a few resolutions outside of the governance issue that took the time of the House. One of those was the three composite resolutions of our concern.

[14404]

## Committees and Sections

There are also approximately forty standing and about half that number of special committees and commissions. There are also thirty-six sections, divisions and forums, of which the Litigation Section is the largest, about 90,000. TTIPS, until recently chaired by Jim Carroll, has about 60,000. Each of the sections has a "council" that consist of subcommittee chairs.

There is a Standing Committee on Environmental Law. This Committee is chaired by Ronald Golemon of Austin, Texas. There are eleven members including the chair plus a staff person. The other ten members are from the following areas: one from Canada, two from San Francisco, one from Los Angeles, one from Houston, one from Vienna, Virginia, one from Wilmington, Delaware, one from Raleigh, North Carolina, one from Columbus, Ohio and one from Washington, DC. From my research, none hold current membership in MLA.

There is also an Environment, Energy, and Resources Section chaired by Michael B. Gerrard of New York. This Section has many Substantive Environmental Committees covering numerous subjects of which, the "closest one" that bears upon admiralty might be Water Quality and Wetlands, chaired by a person from Washington, D.C. It also has a grouping of committees entitled "Energy and Resource" of which one is entitled "Marine Resources", whose chair is a gentleman from Indianapolis.

There is also an International Law Section currently chaired by a gentleman from Washington, D.C. Most of the active leadership of that committee is centered in either New York City or Washington. The International Section has a Committee on the Law of the Sea that is chaired by David J. Bederman, who is a MLA academic member.

It also appears that many sections have committees that at first glance would indicate some nodding acquaintance to maritime; for example, the Real Property Section has an Environmental Committee, the Science and Technology Law has an Environmental Law Committee, the Tort Trial and Insurance Practice Committee has both an Admiralty Law General Committee and an Environmental Law Committee. There may be a few more sections that have environmental interest; however, this gives you the flavor of every section creating their own committee that more than likely has a limited perspective that does not impact the MLA area of expertise.

[14405]

To refresh your recollection, the Standing Committee on Admiralty was abolished some ten or fifteen years ago. This committee had been chaired previously by various MLA members.

### Report of Action at the ABA Meeting in Chicago, August 8, 2005

I used the letter of the President and Board (see Appendix) as an outline to address, by telephone, the TTIPS Council on Saturday morning, chaired by Jim Carroll. There was an opposing view expressed prior to mine that did not, in my opinion, add any substantive comments. TTIPS decided not to endorse the Resolution or oppose it. I greatly appreciate the help of Jim Carroll in trying to guide his section into the proper position on behalf of the instant resolutions. He was most helpful.

Secondly, I spoke to the Florida delegation at the 7:30 o'clock meeting on Monday morning.

Thereafter, I addressed the House of Delegates. At 10:30 o'clock I was placed on the first row to be the second speaker. The first speaker was Mr. Golemon who addressed the House of Delegates. He felt that this was a worthwhile resolution, predicated upon the Pew Report and the U.S. Commission.

This debate was continued due to a scheduled address by the Attorney General of the United States, who gave a general address on law and his activities but not the instant resolutions.

I was the next speaker after the continuance. I addressed all three resolutions at the same time. Chairman Zack allowed me to do it in that fashion, and I reiterated the same objections to the final two resolutions.

There was rebuttal.

### Result of Vote

We objected to each and every resolution, provided substantial support for the objections, and provided our written objections in the letter signed by you, approved by the Board and delivered to each and every state's delegation. We should have no issue of estoppel or that MLA gave approval to any of the three ABA resolutions by anyone at any time. Basically, I stated that we had objections . . . very principled objections . . . and other serious concerns. As with almost every vote, there was a voice

[14406]

vote. We did not prevail. I have no way of informing you how many votes we received. It appeared to me to be about a third in opposition. I voted against all three, of course.

### Post Vote Conference with Committee Chair

After the debate, I met with Mr. Golemon and congratulated him on prevailing. We then had a lengthy talk that preceded the next activity. The gist of the talk was as follows: he would approve an MLA member becoming a non-voting ex officio member of the Standing Committee on Environment. This could be done without any other political red tape other than suggesting a name to him. Alternatively or additionally, he also suggested that a letter could be written to the current President-Elect of the ABA so that a full member with voting privileges could be made a member of the Standing Committee as soon as the next appointments are made.

Thus, we may have either or both opportunities. It would seem to me that the best approach would be to take the non-voting member now, since that is less red tape. However, we could always write to the President-Elect and get approval for another replacement member as a voting member. This would depend upon what you and the Board feel is the best policy. I have drafted a letter for you to Mr. Golemon accepting his offer of a non-voting member and stating that you will provide a name within thirty days. I have also asked him for any meeting schedule and dates that his Standing Committee might have within the next months and also whether these could be attended by telephone.

I will also draft a letter to Karen Mathis of Colorado, if you so direct, if we wish to have a voting member appointed for next year.

### Postscript

Since my report was submitted in Scottsdale the offer of a non voting member has been withdrawn by Mr. Golemon based upon his perception that he is not authorized to make such an appointment.

The MLA will coordinate our efforts with the President-Elect Mathis.

Respectfully submitted,
James F. Moseley
MLA Delegate to ABA House of Delegates

[14407]

## THE MARITIME LAW ASSOCIATION
## OF THE UNITED STATES

THOMAS S. RUE
VICE PRESIDENT
104 St. Francis Street, 6th Floor
Mobile, AL 36602
251-441-9200  FAX 251-432-2800
true@johnstoneadams.com

LIZABETH L. BURRELL
FIRST VICE PRESIDENT
800 Third Avenue, 13th Floor
New York, N.Y. 10022
212-603-6273  FAX 212-405-6290
llburrell@fdlaw.com

WARREN J. MARWEDEL
SECOND VICE PRESIDENT
10 S Riverside Plaza, Suite 720
Chicago, IL 60606
312-902-1600  FAX 312-902-6550
wmarwedel@mmmrlaw.com

JAMES W. BARTLETT, III
SECRETARY
830 W. Pratt Street, 16th Floor
Baltimore, MD 21201-2423
410-576-4833  FAX 410-539-5223
jbartlett@semmes.com

PATRICK J. BONNER
TREASURER
60 Pine Street
New York, N.Y. 10005-1759
212-425-1900  FAX 712-425-1601
bonner@freehill.com

PHILIP A. BERNS
MEMBERSHIP SECRETARY
450 Golden Gate Ave., 9th 7-5395
P.O. Box 36028
San Francisco, CA 94102-3463
415-436-6630  FAX 415-436-6632
philip.berns@usdoj.gov



July 28, 2005

R. Kinnan Golemon, Chair
Standing Committee on Environmental Law
Brown McCarroll LLP
1111 Congress Avenue, Suite 1400
Austin, Texas 78701-4043

Re:   Resolutions 101A, 101B and 101C

Dear Mr. Golemon:

I write to you as the President of The Maritime Law Association of the United States, an affiliated organization of the ABA, about the three above-cited Resolutions.

We appreciate the opportunity to have discussed these Resolutions on July 18, 2005. You and your members were most cordial and forthright. Nevertheless, The Maritime Law Association has serious reservations about the Resolutions. We are also concerned that there has been insufficient time to prepare and present a full analysis of the effect of these Resolutions. In this regard we were first apprised of the proposed Resolutions on or about April 19, 2005.

As an affiliated organization, we have supported many ABA resolutions in the House of Delegates. The issues raised by the instant Resolutions, however, fall peculiarly within our area of expertise,[1] impelling us to voice concerns.

---

[1]   In an enclosure to this letter, we have provided a brief description of our organization's goals and activities.

[14408]

July 28, 2005
Page 2

Please understand that we agree in principle that the United States Government needs a coordinated and comprehensive ocean policy.  The central issue is how can this be effected, taking into account all affected interests.

While the preliminary report of the U.S. Commission on Ocean Policies and the Pew Report cover a great deal, each is incomplete, making the three proposed Resolutions predicated upon these two reports similarly incomplete.

These deficiencies include the following:

1.  More traditional uses of the sea do not appear to have been considered.  In the government report, maritime commerce and transportation are mentioned on only a few of the report's 500 pages.  Despite the fact a majority of U.S. imports and exports travel by ship and that this commerce supports the economic well-being of our country, maritime commerce and transportation are almost ignored.

2.  Active federal agencies with comprehensive and longstanding involvement in maritime commerce were barely addressed.  The U.S. Coast Guard is mentioned a few times and the Maritime Administration (MARAD) is referred to even less.  The Federal Maritime Commission (FMC) is never discussed.

3.  The critical need for improvements in U. S. port infrastructure received only glancing attention.

4.  The Commission Reports and Resolutions assume that the existing system of fisheries management has failed or will not continue to be efficient in the future.  This is not a matter that can be solved, if a problem exists, by appointing or creating an overarching agency.  Much of the rhetoric addressing fisheries appears to evince a hostility towards commercial fishing and alarmism concerning the current state of fisheries resources.

5.  While the report discusses certain aspects of concern, such as offshore wind energy products, it fails in other areas.  As a result, significant subjects such as future planning for offshore terminals are not adequately addressed.

6.  The U. S. government's immense and on-going difficulty in scrapping and recycling its numerous excess and obsolete ships does not appear to be addressed in the ABA Resolutions.

[14409]

July 28, 2005
Page 3

7. The places or ports of refuge and the process for responding to requests for access by ships in distress is not discussed.

8. The International Convention Relating to Intervention on the High Seas in Cases of Oil Pollution Casualties, 1969, is not discussed.

9. The Resolutions do not address pollution that enters into the oceans that originates on shore. There needs to be a more balanced set of issues.

10. There also remains the significant issue of cabotage. It is impossible to deal with ocean matters without considering cabotage.

Having stated what we perceive as deficiencies, we also want to share our other concerns:

1. The ABA appears to have taken the two Commission Reports as wholly accurate without having made an independent legal or factual analysis of the oceans policy issues addressed by the two Commission Reports. We believe that it is fundamental to any analysis that the ABA go behind the Reports and at least make an evaluation of their conclusions in light of the existing law. It seems to us that the ABA should add something to the discussion, based on the expertise of its members, rather than simply making a political statement in support of the conclusions of one or both the Commission Reports.

2. We note that the U. S. Oceans Commission Report does not support the Pew Report's conclusion that a more centralized decision-making process is required on fisheries management issues. The ABA Resolutions as drafted adopt the Pew Report position even though it is not supported by the U. S. Oceans Commission Report in this regard. We are concerned that the ABA does not appear to have made any analysis of NOAA's existing authority or the requirements of existing law with respect to rebuilding depleted stocks, habitat protection or ecosystem management.

3. The ABA Resolutions support an "overarching" preservationist goal that would require many of the Nation's fisheries to be closed or radically restricted as a default option where potential ecosystem interactions are uncertain or relevant data is unavailable. We point out that this is not consistent with national environmental policy for land-based economic activity. The requirements for on-shore activities are that the environmental impacts be disclosed and taken into account, but the development activity is not automatically prohibited if potential environmental impacts are uncertain.

[14410]

July 28, 2005
Page 4

    4.    Creating new agencies, restructuring old agencies, and involving many players in this complex matter, seems to be non-productive. The ABA proposed Resolutions do not appear to correct this state of affairs.

    5.    The creation of another regulatory agency will likely further fragment the implementation of a comprehensive, uniform ocean policy. There might also be a negative impact on the funding of existing agencies which are already hampered in achieving their assigned goals by inadequate funding.

    There are other matters that can be expanded on and set forth, but the foregoing reasons are themselves cause enough for us to consider that the proposed ABA Resolutions 101A, 101B and 101C are not well taken at this time.

    We have not yet decided as to whether we will discuss this from the floor of the House of Delegates in the August meeting, but we will certainly let you know should such be the case.

    In order to pretermit a debate premised on inadequate factual and legal analysis at the House of Delegates, we request that you defer action on these Resolutions so that we can work with you to resolve the deficiencies and concerns noted above. If you take the Resolutions off the House of Delegates docket for August, 2005, we pledge to work diligently with you to prepare more cogent oceans policy resolutions that can be presented at the next House of Delegates meeting.

    If legislation proceeds in Congress, the Maritime Law Association of the United States and/or its Committee Chairs and/or its members will be called upon to testify. The Maritime Law Association does not wish to take any position in the ABA or its House of Delegates that will in any way limit the Maritime Law Association's freedom of expression before the United States Government on matters regarding ocean policy. In other words, we do not want our impending vote (even though not yet decided) to be a limit on our free expression to the United States Government on these Resolutions or any changes in current ocean policy.

    We appreciate the opportunity to discuss these matters with you. We look forward to our continued work with you and trust that you will find our comments of assistance. Enclosed herewith are comments from committees within the Maritime Law Association. These comments are solely the expressions of the committees or their chairs and do not represent the

[14411]

July 28, 2005
Page 5

official position of the Maritime Law Association.  You may also receive other comments
directly from MLA committees.

Very truly yours,

*Thomas S. Rue*

Thomas S. Rue

TSR:jn/305118.WPD
cc:  John B. Weiner, Esq.
     Robin Craig, Esq.
     Elissa Lichtenstein, Esq.
     James K. Carroll, Esq.
     All State Delegates

Enclosures:
 History of MLA
 Comment from James F. Moseley, Jr. of MLA Committee on Marine Ecology & Maritime
     Criminal Law
 Summary of Comments of MLA Committee on Fisheries

[14412]

## THE MARITIME LAW ASSOCIATION OF THE UNITED STATES

The Maritime Law Association of the United States was founded in 1899 with the intention of becoming a constituent member of the Comité Maritime International. The Association remains a supporter of uniformity in domestic and international maritime law and provides research into proposed and existing conventions and international agreements.

Our Association is composed of seventeen standing committees, including: Fisheries; Marine Ecology; Carriage of Goods by Sea; Regulation of Vessel Operations; and International Organizations, Conventions and Standards. Because of our expertise, we are called on by various governmental agencies to advise them on various aspects of maritime law. We are presently a private sector advisor to the Department of State in regard to the UNCITRAL initiative on carriage of goods by sea. We have been a supporter since the early 1980's of the Law of the Sea Convention of 1983. We remain a supporter of UNCLOS until this day.

We have also drafted and/or sponsored legislation concerning maritime affairs, some of which has been adopted into law, including the Carriage of Goods by Sea Act, the Maritime Lien Act, the Salvage Act, the Death on the High Seas Act, the Jones Act, the Suits in Admiralty Act, and the Public Vessels Act, to name a few. Most recently, we advised on the recodification of Title 46 of the U. S. Code. We continue to propose laws that will allow for the smooth functioning of maritime commerce. The U. S. Supreme Court has also considered our amicus briefs on important issues of maritime law.

36366A.WPD

[14413]

**MOSELEY PRICHARD PARRISH KNIGHT & JONES**

501 W. Bay Street
Jacksonville, FL  32202

James F. Moseley, Jr.
(904) 356-1306

E-Mail: jmoseleyjr@mppkj.com

http://www.mppkj.com

July 28, 2005

## COMMENT ON ABA RESOLUTIONS 101A, 101B, AND 101C
## OCEAN POLICY

The American Bar Association Resolutions 101A, 101B, and 101C urge Congress and the President to pass comprehensive legislation on United States Ocean Policy.  This memorandum is a brief comment submitted on behalf of the undersigned as Chairman of the Maritime Law Association Committee on Marine Ecology & Maritime Criminal Law.

Our Committee reviews legal and practical developments at the international, national, and state levels affecting liabilities arising from damage to the environment.  Our Committee promotes uniformity in the area of environmental and criminal law and educates the general membership on issues and problems that arise in this area.  In the past, our Committee has made submissions to Congress on proposed legislation on issues the Association felt were important including the ratification of proposed treaties and proposed statutory law.  After reading documentation concerning the above-referenced resolutions, it is respectfully submitted that there are serious reservations about same that should be addressed.

While the resolutions do address an important issue dealing with a coordinated and comprehensive ocean policy, these three resolutions are incomplete concerning marine ecology.  The resolutions do not address the needs and operations of agencies currently involved in ocean matters such as the United States Coast Guard, the U. S. Army Corps of Engineers, the Environmental Protection Agency, the Maritime Administration, and the Federal Maritime Commission.  In order to implement a comprehensive ocean policy, the needs and resources of these agencies must be addressed.  Next, ocean pollution which originates from shore-based facilities is a significant issue that the resolutions fail to address.  Any comprehensive ocean policy must address shore-based ocean pollution.  Further, these resolutions do not adequately address the places or ports of refuge for ships in distress, or the process for responding to requests for entry to such ports.  The International Convention relating to Intervention on the High Seas in Cases of Oil Spill Casualties, 1969 is also not addressed.  Finally, it is important

[14414]

Ocean Policy Comment
July 28, 2005
Page 2

that such a comprehensive uniform ocean policy should not negatively impact existing agencies in their crucial role of protecting our oceans.

While a comprehensive national ocean policy is indeed important, it must address in a uniform manner certain issues raised above.  If the Marine Ecology & Maritime Criminal Law Committee of the Maritime Law Association of the United States can assist with any of these issues, we stand ready to act.

The above comments represent the personal opinion of the undersigned and not the entire Committee.

Respectfully submitted.


James F. Moseley, Jr., Chairman
Marine Ecology & Maritime Criminal
Law Committee


308096 WPD

[14415]

**Summary of the**
**Comments of the MLA's Committee on Fisheries**
**on the**
**Proposed ABA Resolutions on Oceans Policy**

We oppose the proposed resolutions on governmental restructuring and the management of domestic fisheries for the following reasons:

1.    Governmental restructuring is unnecessary to ensure central federal coordination and oversight of fishery management. Under the Magnuson-Stevens Act, NOAA already provides central federal oversight of fishery management plans and regulations for the fisheries of the U.S. exclusive economic zone. See 16 USC §1854(a), (b), (c). The existing governmental structure, in which regional fishery management councils make recommendations for implementation by NOAA, is entirely consistent with sound management. NOAA has the authority under existing law to reject regional council recommendations that are not protective of the Nation's living marine resources and to initiate regulation where necessary if a regional council fails to do so. Further centralization of management decision making would not ensure better management decisions. Proposals to concentrate authority for fishery management decisions in Washington, D.C. seek to reduce the influence of coastal states and communities on fishery management decisions and increase the influence of remote environmental activists hostile to fishing. This is not desirable.

2.    Existing governmental structures are compatible with sustainable fisheries management. We do not accept the assumption of the draft resolutions and accompanying Reports that the existing system of fisheries management has failed or cannot be trusted to manage the Nation's fishery resources to achieve sustainability. The Reports accompanying the draft resolutions overstate the extent to which the Nation's fishery resources have been depleted by overfishing. In fact, the Nation's largest fisheries -- those of the EEZ off Alaska[1] -- are universally acknowledged to be healthy and well-managed. Existing governmental structures are capable of producing sound management decisions.

3.    An "overarching national oceans policy" that is hostile to commercial fishing is not in the national interest. The Magnuson-Stevens Act currently requires that federal fishery management measures "prevent overfishing while achieving on a continuing basis, the optimum yield from each fishery." 16 USC §1851(a)(1). The proposed resolutions would abandon this balanced approach in favor of an "overarching" protectionist policy that would require decision makers to resolve all uncertainties against commercial utilization of fishery resources. We do not believe that such a policy shift is desirable.

Preventing overfishing and promoting sustainable use are core objectives of existing national fisheries policy. We oppose shifting to a policy, reflected in the draft resolutions, that would require fisheries to be closed or radically restricted as the default option, solely because there is no reliable scientific data on ecosystem interactions or the data are inconclusive -- circumstances which are the norm rather than the exception in fisheries management.

---

[1] These fisheries generate harvests in excess of 2 million mt. annually; i.e., more than four billion pounds.

[14416]

4.   Marine protected areas should be used in only limited circumstances where their benefits can be demonstrated. The hostility of the draft resolutions and accompanying Reports to commercial fishing is reflected in their uncritical acceptance of the benefits touted for marine protected areas (MPAs). With a few exceptions, MPAs are not useful for preserving or restoring depleted fish stocks for the simple reason that fish can and do typically move over extensive ocean areas in response to changing ocean conditions, the distribution of prey species, etc. In their greater mobility, fish are generally very different from land animals. The ability of humans to permanently occupy and alter terrestrial habitat is very different from the impact of transient fishermen on the ocean environment. The analogy of the National Park system is inapt. Flexible, temporary area closures, gear restrictions or quota reductions are more likely to be protective than permanent MPAs, when special protections for depleted fish stocks are warranted. Use of permanent, fixed MPAs should be limited to the protection of unique benthic environments, such as those that support deep water coral beds or coral reefs.

5.   The draft resolutions are purely political statements unsupported by an independent analysis of either the facts or the law. The credibility of the ABA's resolutions is dependent on a close connection with the legal expertise of the ABA's members. However, the proposed resolutions are almost purely political statements. The proposed resolutions are not supported by an analysis of the legal issues relevant to the proposals. For example, there is no analysis of the existing authority of NOAA under the Magnuson-Stevens Act to ensure sustainable fishing practices or to introduce ecosystem management.[2]

The drafters of the proposed resolutions rely heavily on the Pew Oceans Commission for their facts and conclusions. In this regard, they appear to have been overly influenced by the Pew Commission's hostility toward commercial fishing and alarmism about the current state of the Nation's fishery resources.

Existing management structures are capable of effectively managing the Nation's fishery resources, rebuilding depleted stocks where they exist and implementing ecosystem-based management. Fisheries management should not be governed by an "overarching" national policy hostile to fishing. The existing balanced policy of the Magnuson-Stevens Act -- which requires fishery managers to meet environmental objectives while minimizing disruption of the Nation's fisheries -- is sound.

_____  __  ___  _____  __

[2] Relevant provisions of the Magnuson-Stevens Act already require that fishery management plans "(1) contain the conservation and management measures . . . necessary and appropriate . . . to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery; . . . (7) describe and identify essential fish habitat for the fishery . . . , minimize to the extent practicable adverse effects on such habitat caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat; . . . (9) . . . minimize bycatch . . . ; (10) specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished . . . , and, in the case of a fishery which the Council or the Secretary has determined is approaching an overfished condition or is overfished, contain conservation and management measures to prevent overfishing or end overfishing and rebuild the fishery; . . ." 16 USC §1853(a)(1), (7), (9), (10). "Optimum yield" is the harvest level that will produce "the greatest overall benefit to the Nation . . . taking into account the protection of marine ecosystems." 16 USC §1802(28)(A). In the case of an overfished fishery, the determination of optimum yield must provide for rebuilding of the population to a level sufficient to produce maximum sustainable yield. 16 USC §1802(28)(C). See also 16 USC §1854(e) (rebuilding overfished fisheries)

[14417]

## MINUTES OF THE BOARD OF DIRECTORS MEETING OF THE
## MARITIME LAW ASSOCIATION OF THE UNITED STATES

Held in the Québec Room
Fairmont le Château Montebello
392 Notre Dame
Montebello, Québec
on
August 20, 2005
8:30 a.m.

The August 20, 2005 meeting was called to order by President Thomas S. Rue at 8:30 a.m. In addition to President Rue, the following officers also were present:

Lizabeth L. Burrell, First Vice President
Warren J. Marwedel, Second Vice President
James W. Bartlett, III, Secretary
Patrick J. Bonner, Treasurer
Philip A. Berns, Membership Secretary
Raymond P. Hayden, Immediate Past President

The following directors also were present:

| | |
|---|---|
| Dennis L. Bryant | John M. Ryan |
| Christopher O. Davis | Harold K. Watson |
| Allan R. Kelley | M. Hamilton Whitman, Jr. |
| Edward F. Lebreton, III | John M. Woods |
| Stephen V. Rible | |

At the invitation of President Rue, Past Presidents Chester D. Hooper and James F. Moseley also attended the meeting.

## SECRETARY'S REPORT

Upon motion duly made and seconded, the minutes of the May 5, 2005 meeting were unanimously approved and accepted. The minutes of the May 5, 2005 meeting of the Board of Directors will be published in the Spring 2005 issue of the PROCEEDINGS.

[14418]

## TREASURER'S REPORT

Treasurer Patrick J. Bonner of New York presented the Treasurer's Report for the three months ended April 30, 2005. He reported that as of April 30, 2005, the MLA had cash and investments of approximately $356,783.98, which represents an improvement over that figure for this time last year.

Treasurer Bonner reported that approximately 85% of this year's dues have been collected.

The annual audit of the MLA books was recently completed, and all went well.

Upon motion duly made and seconded, the Treasurer's report was unanimously approved and accepted. A copy of the Treasurer's formal written report for the three months ended April 30, 2005 will be appended to the original of these minutes.

## MEMBERSHIP SECRETARY'S REPORT

Membership Secretary Philip A. Berns of Henderson, Nevada recommended the admission of nine lawyers nominated for Associate membership. Upon motion duly made and seconded, the applications of the following nine Associate members were approved:

> Antonios C. Backos of New York, New York
> Michael J. Daly of Providence, Rhode Island
> John T. Jozwick of Scottsdale, Arizona
> Paul G. Kratzig of Corpus Christi, Texas
> E. Richard Ogrodowski of Pittsburgh, Pennsylvania
> Kevin L. Mcgee of Philadelphia, Pennsylvania
> Lisa O'Neill of Miami, Florida
> Kevin J. Philbin of New York, New York
> H. Jake Rodriguez of New Orleans, Louisiana

Mr. Berns reported that a former member, Terence K. McGee, of Seattle, Washington, had applied for reinstatement. Upon motion duly made and seconded, the reinstatement of Terence K. McGee was approved.

Mr. Berns recommended approval of the nomination of the Honorable Richard J. Arcara of the United States District Court for the Western District of New York as a Judicial member. Upon motion duly made and seconded,

[14419]

the nomination of the Honorable Richard J. Arcara as a Judicial member was approved.

Mr. Berns reported with regret the deaths of the following MLA members:

Edward L. Tubens of Unadilla, New York
Francis M. Shea of Washington, D.C.
The Honorable Morris E. Lasker of New York, New York
The Honorable Nina Gershon of New York, New York

Mr. Berns recommended that the MLA directory be printed biannually rather than annually. Considerable savings will be realized if the directory is printed only every two years. The most current information relating to members can now be found on the MLA website. If the MLA directory were to be printed biannually, the next directory would be printed in August 2006. Upon motion duly made and seconded, the biannual printing of the MLA directory was approved.

After the admission of the nine new associate members, the reinstatement of Terence K. McGee, and the admission of the honorable Richard J. Arcara as a Judicial member, the total membership of the MLA is 3,117.

Upon motion duly made and seconded, the Membership Secretary's report was unanimously approved and accepted. A copy of the Membership Secretary's written report will be appended to the original of these minutes.

## DISCUSSION ITEMS AND REPORTS

### Title 46 Codification

Director Dennis J. Bryant, who also is Chair of the MLA Ad Hoc Committee on the Title 46 Codification, reported that the bill was reported out of the House Judiciary Committee on July 14, 2005. He expects Congress will vote to codify the uncodified portions of Title 46 of the United States Code during the current session.

### 2005 Fall Meeting

President Rue reported that the arrangements for the 2005 Fall Meeting in Scottsdale Arizona are going well. The CLE programs that will take place

[14420]

on Thursday, November 3 and Friday, November 4 will feature speakers Gregory Linsin of the Environmental Crimes Section of the Department of Justice and Mary Helen Carlson of the Office of the Assistant Legal Advisor for Private International Law of the Department of State. President Rue has sent invitations to numerous foreign guests.

## Comité Maritime International

Director Christopher O. Davis, who is Chair of the Committee on International Organizations, Conventions, and Standards and is a Councillor on the Executive Council of the CMI, reported that a CMI Colloquium will take place in Cape Town, South Africa on February 12-15, 2006. Some of the issues that will be addressed will be fair treatment of seafarers, places of refuge, wreck removal, marine insurance, limitation, and transport law.

## Proposed ABA Resolution on U.S. Oceans Policy

Past President James F. Moseley of Jacksonville, Florida reported on his attendance at the recent American Bar Association in Chicago, at which he voiced the MLA's concerns relating to three proposed resolutions that were before the ABA House of Delegates. President Rue had earlier expressed the MLA's concerns in a letter dated July 28, 2005 to the Chair of the ABA Standing Committee on Environmental Law, the content of which had been approved by the MLA Board of Directors. Mr. Moseley reported that the resolutions were approved by the ABA House of Delegates on a voice vote. Mr. Moseley, as the MLA's delegate to the House of Delegates, voted against the three resolutions. As a result of meetings following the House of Delegates vote, the MLA received an invitation to have a non-voting membership on the ABA Standing Committee on Environmental Law.

## UNCITRAL

Past President Chester D. Hooper reported on the progress of the working group dealing with choice of law relating to the proposed carriage of goods convention. It is the position of the MLA that the convention should preserve cargo's right to choose between the law of the place of origin, the place of destination, the principal place of business of the carrier, or the form chosen in the contract for arbitration of the dispute.

[14421]

## MLA Website

Treasurer Bonner reported that the upgrade of the MLA website should be completed by November, so as to allow us to introduce it to the membership at the Fall Meeting in Scottsdale.

## 2006 Spring Meeting

Negotiations are underway to hold the reception and dinner in connection with the 2006 MLA Spring Meeting in New York at Pier 60 at 20th Street and the Hudson River.

## 2006 Fall Meeting

As reported in the minutes of the May 5, 2005 meeting of the Board of Directors, it has been proposed that the 2006 MLA Fall Meeting be held in San Francisco on October 4–7, 2006. This meeting would be held in conjunction with the Pacific Admiralty Seminar and also would coincide with Fleet Week In San Francisco. Upon motion duly made and seconded, the Board unanimously approved holding the 2006 MLA Fall Meeting in San Francisco.

## Hague Convention

President Rue reported that on behalf of the MLA Alan Van Praag of New York attended a U.S. State Department Advisory Committee meeting in Washington on May 9, 2005. Mr. Van Praag reported that it appears that the Advisory Committee will adopt the position of the MLA that contracts for carriage of goods and passengers at sea will be exempted from the draft convention.

## Law Student Division

Membership Secretary Berns will prepare a letter to be sent to admiralty law professors.

## Board Liaisons

Board members are to monitor the Committees for which they are the liaisons and provide Board of Directors meeting agenda items to address subjects their Committees want addressed. Board liaisons also are to ensure that Committee Chairs are following the Committee Chair's Guide.

[14422]

## Presidential Activities

President Rue reported that he had attended the following meetings or events:

    A. Average Adjusters Association Meeting and Dinner, London—May 12, 2005.
    B. SEALI Seminar—June 24, 2005.

## Future Officer and Board Meetings

    A. MLA Fall Meeting, Scottsdale, Arizona—November 2–6, 2005.
    B. Officers Meeting, Washington, D.C.—January 2006.

There being no further business to come before the Board of Directors, the meeting was adjourned at 10:55 a.m.

Respectfully Submitted,
James W. Bartlett, III, Secretary

[14423]

## MINUTES OF THE BOARD OF DIRECTORS MEETING OF THE MARITIME LAW ASSOCIATION OF THE UNITED STATES

Held in the Salon Princesa
The Fairmont Scottsdale Princess
7575 East Princess Drive
Scottsdale, Arizona
on
November 3, 2005
2:00 p.m.

The November 3, 2005 meeting was called to order by President Thomas S. Rue at 2:08 p.m. In addition to President Rue, the following officers also were present:

Lizabeth L. Burrell, First Vice President
Warren J. Marwedel, Second Vice President
James W. Bartlett, III, Secretary
Patrick J. Bonner, Treasurer
Philip A. Berns, Membership Secretary
Raymond P. Hayden, Immediate Past President

The following directors also were present:

Dennis L. Bryant                        Stephen V. Rible
Robert J. Gruendel                     John M. Ryan
Christopher O. Davis                  Harold K. Watson
Allan R. Kelley                           M. Hamilton Whitman, Jr.
Sandra L. Knapp                        John M. Woods

At the invitation of President Rue, Marion E. McDaniel, Jr., John A. Edginton, Ben L. Reynolds, Dennis Minichello, and Kevin G. O'Donovan also attended the meeting.

## SECRETARY'S REPORT

Upon motion duly made and seconded, the minutes of the August 20, 2005 meeting of the Board of Directors were unanimously approved and accepted. The minutes of the August 20, 2005 meeting of the Board of Directors will be published in the Fall 2005 issue of the PROCEEDINGS.

[14424]

## TREASURER'S REPORT

Treasurer Patrick J. Bonner of New York presented the Treasurer's report for the three months ended July 27, 2005. He reported that as of July 27, 2005, the MLA had cash and investments of $334,066.01, which represents an improvement of approximately $40,000 over that figure for this time last year. Since July 27, 2005, the MLA has incurred various additional expenditures in the form of Comité Maritime International dues, an advance for the spring MLA dinner at Pier 60 in New York, and a working account for the Scottsdale meeting.

Treasurer Bonner reported that approximately 86.7% of this year's dues have been collected. Treasurer Bonner provided a copy of the statement of cash receipts and disbursements as of April 30, 2005 prepared by the MLA's independent auditors.

Upon motion duly made and seconded, the Treasurer's report was unanimously approved and accepted. A copy of the Treasurer's formal written report for the three months ended July 27, 2005 will be appended to the original of these minutes.

## MEMBERSHIP SECRETARY'S REPORT

Membership Secretary Philip A. Berns of Henderson, Nevada reported that six Associate member applications for Proctor status were received and approved by the Proctor Admissions Committee. Mr. Berns moved for the approval of the elevation of the six Associate members to become Proctor members. The motion was seconded, and the following Associate members were approved for Proctor status by a unanimous vote of the Board of Directors:

John A.C. Cartner of Washington, D.C.
Anthony R. Filiato of New York, New York
F. Max Hardberger of Lacomb, Louisiana
Robert B. Hopkins of Baltimore, Maryland
Christopher W. Nicoll of Seattle, Washington
Jason P. Waguespack of New Orleans, Louisiana

Pursuant to Section 203 of the MLA By-laws, an application was received nominating Mary Helen Carlson of the Office of Legal Advisor for Private International Law of the United States Department of State for mem-

[14425]

bership in the MLA and requesting a waiver of the four-year requirement for achieving Proctor status. The Proctor Admissions Committee recommended that the four-year requirement be waived. By a unanimous vote of the Board of Directors, Mary Helen Carlson was approved as a Proctor member.

Mr. Berns recommended the admission of 18 lawyers for Associate membership. Upon motion duly made and seconded, the applications of the following 18 Associate members were approved:

Kim A. Alexander of San Francisco, California
Timothy J. Bergere of Philadelphia, Pennsylvania
Keith A. Brady of New York, New York
Conte Cicala of San Francisco, California
John H. Cigavic of San Francisco, California
Mark J. Condon of Minneapolis, Minnesota
Michael D. Eriksen of West Palm Beach, Florida
Edward P. Flood of New York, New York
Matthew Johnson of Minneapolis, Minnesota
Brian Judge of Washington, D.C.
Atlantis Tillman Langkowski of San Francisco, California
Ian James Lennard of New York, New York
John J. Levy of Cherry Hill, New Jersey
Thomas P. Marian of The Woodlands, Texas
Anthony J. Mazzeo of Washington, D.C.
Jean Claude Mazzola of White Plains, New York
Thomas Kent Morrison of New Orleans, Louisiana
Eric Troels Wiberg of Charlestown, Massachusetts

The application for reinstatement of a former member, Stephen J. Maher of Albany, New York was received, Mr. Berns reported. Upon motion duly made and seconded, the reinstatement of Stephen J. Maher as an Associate member was approved.

Mr. Berns reported that three applicants had been recommended as Non-lawyer members. Upon motion duly made and seconded, the following three persons were approved as Non-lawyer members:

James V. McGuire of New York, New York
John Stanley Poulson of New York, New York
Mark A. Cheglikov of New York, New York

[14426]

Mr. Berns reported with regret the death of the following MLA member:

The Honorable Constance Baker Motley of New York, New York

After the admission of the 18 new Associate members, the reinstatement of one Associate member, and the admission of three Non-lawyer members, the total membership of the MLA is 3,142.

Upon motion duly made and seconded, the Membership Secretary's report was unanimously approved and accepted. A copy of the Membership Ssecretary's written report will be appended to the original of these minutes.

## DISCUSSION ITEMS AND REPORTS

### Title 46 Codification

Director Dennis L. Bryant, who also is Chair of the MLA *Ad Hoc* Committee on the Title 46 Codification, reported that the bill, which was reported out of the House Judiciary Committee on July 14, 2005, is languishing somewhat in Congress, but it is still expected that Congress will approve the bill during the current session.

### Comité Maritime International

Director Christopher O. Davis, who is Chair of the Committee on International Organizations, Conventions, and Standards and is a Councillor on the Executive Council of the CMI, reported that the CMI Colloquium on February 12-15, 2006 in Cape Town, South Africa will address the subjects of fair treatment of seafarers, places of refuge, and other timely subjects.

President Rue reported that he had received a questionnaire from the CMI concerning the clarification of procedural rules in limitation conventions, specifically the LLMC Convention, CLC, and HNS Convention. The United States is not a signatory to any of these conventions, and therefore it was felt by the Board of Directors that the MLA need not respond to the CMI questionnaire.

### UNCITRAL

A meeting of the UNCITRAL Working Group on Transport Law will be held in Vienna in late November 2006. A determination will be made of whom the MLA will send as its representatives to this meeting.

[14427]

**Proposed ABA Resolutions on U.S. Oceans Policy**

President Rue, Past President James F. Moseley, and First Vice-President Burrell will be following up on the MLA's cooperation and communication with the ABA Standing Committee on Environmental Law relating to the three resolutions passed by the ABA House of Delegates in August 2005. The MLA also will monitor developments with respect to these resolutions in Congress.

**MLA Website**

Kevin G. O'Donovan of Philadelphia, Chair of the MLA Website and Technology Committee, reported to the Board of Directors concerning the upgrade of the MLA website and demonstrated the interactive features of the website.

**2005 Fall Meeting**

Marion E. McDaniel, Jr., Chair of the 2005 Fall Meeting Arrangements Committee, reported that 151 MLA members and 34 invited guests had registered for the meeting.

**2006 Spring Meeting**

The dinner in connection with the 2006 MLA Spring Meeting in New York will be held on May 5, 2006 at Pier 60 at 20th Street and the Hudson River.

**2006 Fall Meeting**

John A. Edginton of Point Richmond, California, a member of the Arrangements Committee for the 2006 MLA Fall Meeting, reported that the meeting will be held at the Sheraton Palace Hotel, 2 New Montgomery Street, San Francisco, California 94105 on October 3-7, 2006. The meeting will be held in conjunction with the Pacific Admiralty Seminar, which will take place on Friday, October 6. The MLA dinner will take place on Thursday, October 5, 2006 at the Sheraton Palace Hotel, and a separately ticketed dinner will take place at the California Culinary Academy on Friday, October 6. Committee meetings will take place on October 4 and October 5 at the Sheraton Palace Hotel. The General Meeting will be held on Saturday, October 7, 2006.

[14428]

Upon motion duly made and seconded, the Board of Directors authorized Mr. Edginton to negotiate the best terms possible with the Sheraton Palace Hotel and to present the proposed contract to the Officers for approval and signature.

## Fall 2007 Meeting

Ben L. Reynolds of Houston and Dennis Minichello of Chicago, members of the Site Selection Committee for the Fall 2007 MLA Meeting, reported concerning possible sites for the meeting. The Board of Directors authorized the site Selection Committee to further investigate two possible sites and to enter into preliminary negotiations concerning meeting arrangements and costs.

## Hague Convention

President Rue reported that Alan Van Praag of New York attended a U.S. State Department Advisory Committee meeting in Washington relating to the Hague Convention on Exclusive Choice of Court on May 9, 2005. The Advisory Committee adopted the MLA position that contracts for carriage of goods and for passengers at sea should be exempted from the Convention. This position was adopted by the State Department and ultimately was incorporated into the Convention. Also excluded are salvage contracts. All other types of contracts, including insurance and reinsurance contracts, are covered by the Exclusive Choice of Court Convention.

## Arbitration and ADR Committee

The MLA Arbitration and ADR Committee proposed that it be authorized to prepare a list of approved maritime mediators or arbitrators to present to the United States District Court for the Southern District of New York. After discussion and a motion duly made and seconded, the Board of Directors voted that the Arbitration and ADR Committee should not provide a list of approved maritime mediators and arbitrators to the United States District Court for the Southern District of New York.

## Presidential Activities

President Rue reported that he had attended the following meetings or events:

A. Marine and Insurance Claims Association Meeting and Dinner—September 30–October 1, 2005
B. U.S. Average Adjusters Association Meeting and Dinner—October 5–7, 2005.

[14429]

**Future Officer and Board Meetings**

    A. Officers Meeting, Washington, D.C.—January 2006.
    B. MLA Spring Meeting, New York, New York—May 2–5, 2006.

    There being no further business to come before the Board of Directors, the meeting was adjourned at 4:35 p.m.

                            Respectfully submitted,
                            James W. Bartlett, III, Secretary