[14525]



DOCUMENT NO. 787
October 7, 2006

THE MARITIME LAW ASSOCIATION

OF THE UNITED STATES

## FALL MEETING—OCTOBER 7, 2006

PRESENT:

LIZABETH L. BURRELL
WARREN J. MARWEDEL
PATRICK J. BONNER
JAMES W. BARTLETT, III
ROBERT G. CLYNE
PHILIP A. BERNS
THOMAS A. RUE

And the following 92 members:

| | |
|---|---|
| Paul B. Arenas | John S. Farmer |
| Mark G. Beard | David J. Farrell, Jr. |
| Adriane Malanos Belton | Robert B. Fisher, Jr. |
| Richard C. Binzley | Joshua S. Force |
| Forrest Booth | Robert Force |
| Dennis L. Bryant | Peter F. Frost |
| Carl D. Buchholz, III | George D. Gable, Jr. |
| Christopher E. Carey | Gene B. George |
| Edward V. Cattell, Jr. | Geoffrey J. Ginos |
| John H. Cigavic, III | Robert S. Glenn, Jr. |
| Mark T. Coberly | Francis J. Gonynor |
| James Patrick Cooney | Glenn G. Goodier |
| Christopher O. Davis | Donald C. Greenman |
| Frank P. DeGiulio | Michael D. Hardison |
| Charles S. Donovan | Raymond P. Hayden |
| Susan M. Dorgan | Dana Henderson |
| Paul S. Edelman | Chester D. Hooper |
| John A. Edginton | Grady S. Hurley |
| Hamilton H. Emery, IV | Kim Jefferies |

EXHIBIT G

[14526]

| | |
|---|---|
| Stephen B. Johnson | C. Kent Roberts |
| George M. Jones | Thomas A. Russell |
| John Paul Jones | John M. Ryan |
| Mark O. Kasanin | Michael J. Ryan |
| Kimbley A. Kearney | David M. Salentine |
| Allan R. Kelley | David J. Sharpe |
| Bruce A. King | Stephen C. Smith |
| Sandra L. Knapp | Jonathan S. Spencer |
| Victor I. Koock | Michael F. Sturley |
| J. Dwight LeBlanc, Jr. | Michael L. Swain |
| Edward F. LeBreton | Kevin J. Thornton |
| Richard M. Leslie | G. Robert Toney |
| Raymond T. Letulle | Michael A. Underhill |
| Christopher S. Mann | Charlotte Valentin |
| Raymond L. Massey | Harold K. Watson |
| Marion E. McDaniel, Jr. | James F. Whitehead |
| Daniel G. McDermott | M. Hamilton Whitman, Jr. |
| Peter A. McLauchlan | Thomas L. Willis |
| Pamela L. Milgrim | John M. Woods |
| Damon C. Miller | Robert J. Zapf |
| Dennis Minichello | JoAnne Zawitoski |
| James F. Moseley, Jr. | Todd A. Zilbert |
| Mark M. Murakami | |
| David A. Nourse | |
| George W. Nowell | And the following 5 guests: |
| Christina L. Owen | |
| Raymond M. Paetzold | Anthony Barker |
| Armand M. Paré, Jr. | Michael Bird |
| Robert B. Parrish | Sergei Drozdov |
| A. Clay Rankin, III | Andrew Higgs |
| Mary Elisa Reeves | William Moreira |
| Stephen V. Rible | |

[14527]

## TABLE OF CONTENTS

**Page**

**Reports of Officers**
Report of Secretary . . . . . . . . . . . . . . . . . . . . . . . . . .   14529
Report of Treasurer . . . . . . . . . . . . . . . . . . . . . . . . .   14531
Report of Membership Secretary . . . . . . . . . . . . . . . .   14531

**Reports of Standing and Special Committees**
Planning and Arrangements for the 2006
    Fall Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14536
Arbitration and ADR  . . . . . . . . . . . . . . . . . . . . . . . .   14540
Carriage of Goods . . . . . . . . . . . . . . . . . . . . . . . . . .   14543
Cruise Lines and Passenger Ships . . . . . . . . . . . . . . .   14547
Fisheries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14548
Inland Waters and Towing  . . . . . . . . . . . . . . . . . . . .   14550
International Organizations, Conventions,
    and Standards  . . . . . . . . . . . . . . . . . . . . . . . . . . .   14551
Salvage  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14551
Marine Ecology and Maritime Criminal Law  . . . . . . .   14553
Marine Financing . . . . . . . . . . . . . . . . . . . . . . . . . . .   14554
Marine Insurance and General Average  . . . . . . . . . .   14555
Maritime Torts and Casualties . . . . . . . . . . . . . . . . . .   14558
Offshore Industries  . . . . . . . . . . . . . . . . . . . . . . . . .   14559
Practice and Procedure  . . . . . . . . . . . . . . . . . . . . . .   14559
Recreational Boating . . . . . . . . . . . . . . . . . . . . . . . .   14561
Regulation of Vessel Operations . . . . . . . . . . . . . . . .   14561
*Ad Hoc* Committee on the Codification
    of Title 46  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14563
Uniformity of U.S. Maritime Law  . . . . . . . . . . . . . . .   14564
Young Lawyers . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14566
Planning and Arrangements for the 2007
    Fall Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14568

**Adjournment**

**Formal Reports of Standing Committees**
Marine Insurance and General Average  . . . . . . . . . .   14570
Maritime Torts and Casualties . . . . . . . . . . . . . . . . . .   14575
American Bar Association Representative  . . . . . . . . .   14580

[14528]

**Minutes of the Meetings of the Board of Directors**

August 5, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14586
October 5, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . 14592

[14529]

## THE MARITIME LAW ASSOCIATION
## OF THE UNITED STATES

### FALL MEETING
### SAN FRANCISCO, CALIFORNIA
### OCTOBER 7, 2006

### **PROCEEDINGS**

MS. BURRELL: Good morning, everyone. There is a little confusion about the meeting's starting time. One publication said we were starting at 9:00; another said 9:30. I think we're going to compromise at 9:15. So if you would collect your last cups of coffee and please take a seat, we will get underway.

I'm not the person to say, "Welcome to San Francisco," but welcome to San Francisco. This has been, I think, a great time for all. We will give due thanks for that in a very short while, but in the meantime, I'd like to commence the meeting in the traditional way, which is to call for the reports from the officers. And we will begin with our Secretary, Jim Bartlett.

MR. BARTLETT: Thank you, Madam President. I would ask all of you, if you haven't done so yet, to sign in, both guests and members, on the sign-in sheets on the table toward the door at the rear of the room. Also, speakers, before you come to the podium and give your reports, please give your card to the court reporter, who is up here just in front of me.

The Board of Directors met twice since the last general meeting. They met on August 5th in Mystic, Connecticut and this week, of course, October 5th, here in San Francisco. I will briefly touch on some of the matters addressed. In many cases, however, later reports will address many of the subjects that the Board addressed at its two meetings.

At the Mystic meeting, the Board adopted an MLA financial aid policy. This is for CLE financial assistance to attorneys who wish to attend CLE courses sponsored by the MLA but who find it difficult to attend due to the cost. This is of minimal applicability, quite frankly, in the MLA, because there are no registration fees for most of the courses that we sponsor.

At both the Mystic and San Francisco meetings, Past President Rue and President Burrell reported on developments concerning the efforts of the *Ad Hoc* Committee on Environmental Crimes. The MLA is seeking to facilitate discussions between the industry—vessel owners, operators, and

[14530]

managers—and the government— the Department of Justice and the United States Coast Guard—in an effort to come up with best-practices guidelines. President Burrell, Past Present Rue, and Mike Chalos met with industry representatives in New York on July 31st of this year. Another meeting was attended by President Burrell in Washington in September with shipowner representatives. She will be attending still another meeting with the shipowners this coming Tuesday, October 10th, in New York.

The MLA received two questionnaires from the CMI: the first, dealing with limitation of liability for cargo claims, and the second, places of refuge. At the Mystic meeting, it was reported that the Committee on Carriage of Goods was preparing responses to the questionnaire relating to limitation of liability for cargo claims. The Committee on Regulation of Vessel Operations was consulting with the United States Coast Guard and was preparing responses to the questionnaire dealing with places of refuge. At Thursday's meeting in San Francisco, the responses prepared by those Committees were unanimously adopted and will be submitted to the CMI.

At Thursday's Board meeting, there was a motion to form a law student section of the MLA. The motion was passed. The Membership Subcommittee of the Board will formulate a proposal for the structure of this law student section and will formulate a By-Law amendment to implement a law student section of the MLA.

Also at Thursday's meeting, the Board passed a motion to name a liaison to the Transportation Lawyers Association. This is an association populated mainly by lawyers dealing with overland transportation. They've reached out to us, and we're reaching back in the form of naming a liaison.

There was a discussion at the Mystic meeting concerning a proposed resolution drafted by the Committee on Arbitration and ADR addressing the UNCITRAL draft instrument as prepared at the 16th Session of the UNCITRAL Working Group III respecting choice of court and arbitration clauses for cargo loss and damage claims. This will be the subject of the report of the Committee on Arbitration and ADR.

The Board is currently considering a request for the MLA's amicus participation in an appeal currently before the Second Circuit on the question of Rule B attachment of funds.

Since our last general meeting, President Burrell has attended the Average Adjusters Association meeting and dinner in London on May 11th, the

[14531]

Canadian MLA meeting in Halifax this past June, and the Houston Marine Insurance Seminar on September 18th and 19th.

This concludes my report, and I move its adoption.

MS. BURRELL: Second? All in favor? Opposed? Unanimity indicates the quality of the report. Thank you, Jim. Now, I'll call on our Treasurer, Bob Clyne.

MR. CLYNE: Thank you, Madam President.

The Association finances remain in very good shape, thanks in no small part to the past Treasurer, Pat Bonner, and his stewardship. At the end of July, we had approximately $370,000 in cash investments. We had some significant expenditures since then, including the publication of the directory. But as of now, we're at about $300,000 in cash and investments, which is roughly where we were last year at this time.

I'd like to thank Pat for his help in the transition, and I hope that I can only do half as good a job as both he and Marshall have done in the past. Marshall's not here today, but I feel his spirit hovering around the MLA checkbook. But I want to thank both of them, because Marshall has been a tremendous resource as well. And that concludes my report.

MS. BURRELL: Thank you. Second? All in favor? I would just like to say that the role of Treasurer in this Association has been extremely important, because we walk a pretty thin line, and somebody has to keep us on the right side of that line. Marshall Keating undertook that task for over 25 years, I believe. Whether or not his spirit has somehow become imbued in the checkbook, certainly his policies have been become imbued in our Treasurers. That's exactly how we've been able to continue on the right side of the line. Pat Bonner did a superb job when he was in that role, and he certainly eased Bob's transition, but Bob has been a very quick study, so we can proceed with the continuity that we need. I thank our line of Treasurers, because they have all been excellent managers of the Association.

Now I will call on our Membership Secretary, Philip Berns.

MR. BERNS: Madam President, I wasn't clear. Did you say Mr. Keating was 25 or 75 years?

MS. BURRELL: I'll let you do the math.

[14532]

MR. BERNS: I also have one complaint. It took me 45 minutes to get from the other end of the hall down to here, because I kept getting stopped by the attendees at the Plastic Surgical Nurses Convention.

In any event, as previously reported, the Board met on August 5, 2006, and admitted ten Associates and reinstated one Proctor member. As of September 25th, the report from our representative in Buffalo, Robin, we had a membership of 3,072. I will not read the names; they will be notified. At our Board meeting on October 5, 15 Associate members were approved for Proctor membership, which is excellent. This year we have had many Proctor members elected.

In addition, I will name this one, because this is special. We also voted to admit as a Proctor Rear Admiral John Crowley, who has done such outstanding work with the MLA when he was the Coast Guard JAG, and to waive—because this is a special case—the four-year membership requirement. So Admiral Crowley is both a member and a Proctor in this Association. If you ever want to get in touch with him, he's located in Cleveland.

We also have—I didn't have this in my written report, but Hank White of our Association has now become the administrator of the ABA located in Chicago and will still remain active with the MLA.

On October 5th we also approved the election of 20 lawyers for Associate membership. Additionally, we had two reinstatements of one Proctor and one Associate.

Non-lawyer applications, five non-lawyers were appointed. The President will do the necessary announcements on those. Judicial members, none were submitted. Academic members, no names were submitted.

I'm going to continue my harangue or harassment on membership and Proctor application requests—that the active members please get in names for application for, in particular, young, active people who would be assets to the Association and non-lawyers who are interested in the industry and admiralty law and the relationship of the two. Judges, we have a diversity of members here. And you should know of judges who would be interested in it. We already believe we have one additional one coming out of this meeting.

I, at this time, come to the part that none of us really relish, the report of the deaths. At the August Board meeting, the following deaths were

[14533]

reported: Herb Lord, who, as you all know, was MLA President 1974–1976. All of these reports do not mean that they just recently died; it's just that we had notice of their deaths. Augie Burns; Rear Admiral Maurice J. Bresnahan of Massachusetts Maritime; Henry W. Magenheimer; and our old friend Warren M. Faris of New Orleans. Subsequent to that meeting, I received notice of the following deaths: Joel M. Fein of Hartford, Connecticut; John P. Hammond of New Orleans; and Emil Kratovil of Greenwich, Connecticut.

MS. BURRELL: I'd like a moment of silence, please, for each of our departed members. Thank you very much.

MR. BERNS: The Directory report, everyone should have received his or her copy of the Directory. And again, as we've said, it is nice to have. It's really handy to have. And it's going to be out every two years now. But for your most recent information, you want to go to the mlaus.org website. There are continuous changes going on, including a new listing for our President. That is the way you will know up-to-date e-mail addresses, phone numbers, locations, *et cetera*. So I recommend you use that as your first point of contact to determine a member's information.

Also, please check the Directory for the accuracy of your own record, and let Robin and myself know, and we will make necessary corrections, additions, or modifications. Apparently, we also had—I only received reports on two directories that went out—one has inverted pages; the other has upside-down pages. I have asked them to return them to us, and we will send them a new copy. But both of these members believe they have received the "Inverted Jenny of 1918" and refuse to return them.

The Standing Committee review has been completed. Check your listing on the special portal site for your membership, Committee memberships, of your voting memberships, if you're a listener—"listener" meaning you attend but you can't vote because you've reached maximum. If there are any changes on that, again, in that case, Robin would be your contact. Again, check for accuracy.

And also, you will be getting notices. If you're on a Committee, and a Committee report is going out, all of a sudden you'll see on your e-mail, "Intranet." That means check in, go into portal, pick up the report. You will read it, and there will be a lot more work being done on e-mail via this portal.

[14534]

Now, as of February 27th, 2006, the membership totaled 3,058. With the approval of the Board of the elevation of 15 associates to Proctor, the admission of 20 Associates, the reinstatement of one Proctor and one Associate member, all as previously reported, and including the five non-lawyers, our total is now 3,100. And I'm happy to say that we are ending the year with a higher number than we started. And this is a progression that we've gone through. So again, I emphasize, please contact me. We always could use members of the Association who will be active.

And Madam President, that constitutes my report. I submit it for approval.

MS. BURRELL: Second? All in favor? All opposed?

MR. BERNS: Also, I did leave out one point. When we send out a notice, such as for coming to this meeting or submitting applications and all, and we put a last date in it, last date to be received, that is not to be considered a challenge. We will consider any reports that are received before that date. Thank you.

MS. BURRELL: Phil has taken his role as Membership Secretary quite seriously. He has been beating bushes for us all. That effort has clearly paid off, because I cannot remember the last time that we've reported significant increase in the membership of this Association.

I think that's not only due to some external circumstances but also due to Phil's diligence in getting us all out here, even if it takes a cattle prod, which he does not hesitate to use.

At this time, without diminishing the loss we feel at the death of any member, I'd like to say a few words about Herbert Lord.

My own debt and gratitude to Herbert are inexpressible, because they are immeasurable. You all have known him in this Association. You know the contributions he's made here. But he was the first person with whom I worked out of law school.

The very first day I started as a lawyer, Herbert put me on a case that exploded, and we were off and running. The way that that case was handled illustrated the way that he thought being a mentor ought to be. It included not only keeping me involved in every single aspect of that case, handing over more and more responsibility to me as he saw that I was

[14535]

learning his methods, but it also meant having lunch with me, asking me about my family and telling me about his family, as well as involving me in the Association.

When I was working late, he would come by my office and say, "Don't you have a home?" That was the kind of person that he was, concerned about others and concerned that they remain whole people.

Of course, Herbert was also the one who involved me in this Association. In fact, my initial participation was in a Committee that he created while he was President, the Uniformity Committee. He continued to watch over my career in this Association, to mention my name and put me forward for additional responsibility whenever he felt it was appropriate.

Herbert represents both the beginning of my career as a lawyer and perhaps the culmination when, last May, it was Herbert who moved for my nomination as President of this Association. He died four days later. I find it very moving and very eerie, really, that there was that conclusion to his life at the commencement of my role in a position that he once filled.

Herbert also had that same care, that same relationship with every person with whom he came into contact. At his memorial, there were messengers from Burlingham, secretaries, file clerks who had not seen him for 14 years. They came to honor him, because he honored them every day he was in contact with them. He would ask them about themselves. He knew their children's names. He knew who was getting married. He knew everything about everyone—because he asked—because he cared.

This was not just a tradition that he carried on only at Burlingham. As many of you know, I recently changed firms. This is another connection with Herbert, because it was his death that created a need for a maritime lawyer at Curtis, Mallet. When I was speaking with the members of that firm, they told me about the same man, the same wonderful colleague that I had known from all those years at Burlingham.

Apart from this private Herbert, this Herbert who cared about people, the Herbert who gave always more than he took, I'd like to mention an event which, as some of you may recall, showed his skill as an advocate.

Our Committees do very, very fine work, and we are inclined, quite properly, to accept those results. Some years back, however, there was a proposal by a Committee with which Herbert disagreed. After a Committee

[14536]

report, he stood up and spoke. I felt that room change temperature. I listened as he completely reversed a tide of opinion in just a few words.

This is not a group of people easily led, but here was a person who, because of his knowledge, his passion, his skills as an orator, and his belief in what he was saying was able to work a remarkable change. And I think he worked a remarkable change wherever he was.

As you may know, within the last year of his life, Herbert lost two children. This is a blow that very few people could withstand. Nevertheless, he came to the office every day, he continued his work in this Association, and he continued to give everywhere to everyone whom he touched.

I would like you all to honor Herbert in your minds and in your memories for just a moment.

Thank you all very much.

Now, in addition to Herbert's legacy to this Association, we also have some new goings-on here. We have a new context for our meeting, a new way of meeting, and we have some people to thank because, without a road map, they did an absolutely extraordinary job in making this meeting the success that I believe we all think it has been.

I've received so many comments throughout the week about how wonderful the Committee meetings and social events have been in every respect. Well, the thanks should not be going to me. They should be going to the people whom I'm about to name—our Arrangements Committee. Will you all come up here, please?

We have Forrest Booth, John Edginton, John Giffin, Mark O'Kasanin, George Nowell, Ray Paetzold, Mike Underhill, Bob Zapf, and Kent Roberts.

Everything that you've enjoyed is really as a result of the labors of these people, and the labors were really indefatigable. I was the recipient of e-mails at all hours, and that didn't just have to do with the time difference. Every little detail was carefully ironed out. We had a financial manager in George who kept everything going. We had leaders for every event. Our social events have been fantastic. We've met in surroundings that just couldn't be beat. All of this, not to mention getting all those extra chairs into all those Committee meetings, has been handled by this fantastic group who have made this meeting such a wonderful event for us all. So let us all

[14537]

please thank them right now. We owe some very special thanks to those who took overarching responsibility. They went where no man has gone before. As a very, very small token of appreciation, I have invited them to take the MLA tie of their choice.

I would like them to say a few words now about the remaining arrangements for this lovely meeting.

MR. BOOTH: Thank you, Madam President.

I'm glad that the officers of the Association enjoyed the meeting here as much as we did. The Arrangements Committee has really done an excellent job. And I think that I take very little credit for it, although I guess I was in on the early days of the discussions about having a meeting in San Francisco.

Many of you know that it stemmed from a committee that President Burrell chaired. And over the last few years, we've been talking about having meetings outside of New York. The first one was in New Orleans, which was very successful. This one was also very successful, and hopefully there will be some in the future as well.

The genesis of that committee, though, was the idea of involving younger lawyers in the MLA because, like any organization, if we don't involve younger people, eventually the Association will die.

The idea was that, if we moved to other ports where there were law firms that do maritime law, they could get their younger lawyers to come to an MLA meeting where they might not be able to get them to go to New York.

I think that has succeeded quite well. The Young Lawyers Committee had a lunch here in San Francisco. And I understand that was a great success. I'm not a young lawyer anymore, so I couldn't attend that meeting. But I hear it was a good event. And a variety of younger lawyers have come to the Committee meetings as well.

So I think we're off and running. I think if we have some future meetings outside of New York every two years or so, we will continue to bring in some younger people.

President Burrell mentioned the members of the Committee. I will only mention a couple specifically again. John Edginton did a fantastic job

[14538]

above and beyond the call of duty here. Everything that you saw, touched, ate, or drank during the last few days is due to John's efforts, because he was in charge of the hotel arrangements, the dinners, the cocktail parties, and so forth.

George Nowell did a great job on the finance side.

And finally, I need to recognize Ray Paetzold again. Ray stepped in at the last minute, when we really needed some help at the next-to-the-last hour, because I had to go out of town last week when a lot of these arrangements had to be made. Ray really stepped in with John to do that.

So those are my comments about the San Francisco meeting, except for one. There is one more event. I hope many of you are going on the Blue Angels Cruise this afternoon. And I'd like to point out how you get there. For those who went to the cocktail party at the World Trade Club, you go the same way. Go out to Market Street, the street that the trams go up and down, turn right. Go down toward the Ferry Building, the building with the big clock tower on it. And instead of going to the right, as you went to the World Trade Club, turn to the left. It's Pier No. 3. It's the second pier down on the left-hand side.

The company is called Hornblower Cruises and Events. And the ship is called the SAN FRANCISCO BELLE. But you will see it. There are signs. There's a big parking lot there. The SAN FRANCISCO BELLE is a bit like a pseudo-paddle wheeler. It's a big old—it's the largest of the Hornblowers. And it boards starting at 1:30. They sail very promptly at about 2:30. So I strongly recommend you get there about 1:30, 1:45 at the latest.

The ship holds about 850, and we have only 135. So we don't have the whole ship, but they are supposedly setting tables aside for us. We have tried to persuade them to take our tickets, and they seem to refuse to do that. So you will just give your name as a member of the MLA group, and in theory we should get everyone. If they take your ticket, fine. But—bring it—definitely bring your ticket along, but apparently they're not going to collect those.

So again, boarding at 1:30. Hope we'll see most of you there. Definitely bring a jacket. It is very chilly out there. The wind blows, and it is cold. For those of us whose Northern European ancestors never saw the sun, sunscreen and a hat are a very good idea, and sunglasses are an absolute necessity. Camera, if you have one, would be a good idea too.

[14539]

John, do you have anything to add?

MR. EDGINTON: Thanks, Forrest.

I just have a couple of little housekeeping items and one plea. First, when you check out of the hotel, those of you who signed up for internet services, you should not pay a duplicate charge for wireless and hardware connections to your room. They are in the process of a changeover, and at least on my pre-invoice this morning, I got a duplicate charge. Just bring that to the attention of the desk clerk. They should sort that out for you.

The second thing, really, is that I want to tell you how much cooperation we got from the various venues that we used for this meeting. The Palace Hotel has been on the spot instantly when there was anything wrong at all. I've already talked to President Burrell about acknowledging those people. The World Trade Club was very receptive to us. And of course, the Culinary Academy made it as smooth as silk to get through the dinner last night. The cooperation is something that really let us put on the meeting the way that we have.

There are some younger people who helped us on the Arrangements Committee that didn't get recognized this morning. There are just a few of those whose name I would like to mention to you because they really put a lot of energy into it—Frank Anders, Lynn Krieger, Jennifer Sanchez, and Courtney Crawford, who is one year out of law school. All worked to provide various sorts of information that you've received, helped with getting the registration packets together, and all of that sort of thing. I want to recognize them.

One plea: The only thing that led to a lot of the last-minute changes were Committee Chairs who didn't do their homework in advance. I think when you're going to a meeting of this kind, it really is an obligation of the Committee Chairs to start thinking about what needs to be done, what logistics that they require and that sort of thing. While we are able to whistle up almost everything at the last minute, it really helps a lot if you know what you're doing and have your meeting properly scheduled. I know many of you had last-minute speakers, that sort of thing, but please try to organize it as much in advance as you can, because that makes it work.

We really enjoyed putting on this meeting here. We actually went out and asked for it, pled for it, because we thought you would like to come back to San Francisco again. As was said, it wasn't just one cycle of New

[14540]

Orleans and San Francisco. If you think back to the 1960s, the first out-of-town meeting was New Orleans, the second out-of-town meeting was San Francisco, and then we went into the resort meeting routine after that.

Now we're thinking about doing port cities again. I think it's a wonderful idea, and I'm looking forward to visiting other cities around the country who would like to hold this meeting. And we're certainly glad to welcome you back to San Francisco in the future.

MS. BURRELL: Thank you. One more person?

MR. BOOTH: I'm sorry. One more person deserves to be recognized. He was too modest to come up. Steve Johnson from Seattle was our out-of-town representative from the Arrangements Committee, getting the people from the Northwest to come.

And Phil Berns points out, it would be a good idea if you brought your name tags to the Blue Angels cruise this afternoon. Thanks.

MS. BURRELL: I'd also like to point out that the Arrangements Committee put their money where their mouths were too. We've had sponsors for this event that have made it possible for us to keep the event prices down and thereby to not only make it a little easier on the pocketbooks but also to make it reachable for those who otherwise might not have been able to attend. These sponsors deserve some acknowledgment here, and I will read their names: Matthew Bender; National Maritime Services; American Maritime Cases; Emard, Danoff, Port, Tamulski & Paetzgold; Flynn, Delich &Wise; Gibson, Robb & Lindh; Keesal, Young & Logan; George Nowell's firm; Severson & Werson; Cox, Wootton Griffin, Hansen & Poulos; Bingham McCutchen; and of course, John Edginton. We ave them to thank for making this an event that we could have some confidence in and for achieving a greater level of attendance than perhaps would otherwise have been possible.

With that, I would like to go back to the usual format of our meetings and start calling upon our Committees. Let's start with the Arbitration and ADR Committee chaired by Jay Paré.

MR. PARÉ: Thank you, Madam President. It is a terrific meeting.

I'd like to report on two things. First, at the meeting here, we had the distinct pleasure of having Bob Force of Tulane Law School address us on

[14541]

the subject of the "Curse of *SKY REEFER* and Why Judge Friendly Was Right." This presentation was taken from a chapter of Bob Force's new book, written with his counterpart Martin Davies.

As you all recall, it was not too terribly long ago that foreign forum selection clauses in bills of lading were considered unenforceable. The reason for that was that it felt that enforcement of a forum selection clause in a foreign location would lead to a lessening of the liability of the carrier. That, of course, is prohibited by Section 3(8) of the Carriage of Goods by Sea Act.

The granddaddy case on that point was Judge Friendly's case, *Indussa v. RANBORG* decided in 1967. In that case, Judge Friendly concluded that the carrier's liability would be lessened if cargo had the ability to litigate a cargo claim in a foreign country. The landscape changed dramatically with the *SKY REEFER* decision, in which the Supreme Court rejected Judge Friendly's rationale. There was a very good dissent by Justice Stevens in that case.

The Supreme Court, as Bob Force pointed out, relied in part on the notion that, even if the arbitration award was decided in a manner inconsistent with COGSA, cargo interests could come back to the district court, which retained jurisdiction, and complain about the award there. That is, of course, as Professor Force pointed out, an illusion, because it is virtually impossible in this country to attack an arbitration award on such a basis.

In Bob Force's paper, which accompanied his presentation, he followed up on 44 cases decided after the *SKY REEFER* decision and corresponded with the lawyers involved in the cases. He asked them questions about what happened to the cases after they were dismissed on the grounds of the forum selection clauses, both of an arbitration and litigation nature.

The overarching conclusion of his paper and his presentation was that an overwhelming majority of 80 percent of the lawyers on both sides concluded that they settled those cases for either much less amounts or at least less amounts than they otherwise would have. In fact, I think the way the question read was, "Would you have litigated or a much higher amount if you could have litigated d States?" The answer to that was they would have settled for a much higher amount or a higher amount.

The presentation was very interesting and seemed to prove that Judge Friendly was indeed right when he concluded that the enforcement of

[14542]

foreign forum of selection clauses does, in fact, seem to lessen the liability of the carrier.

The second thing I'd like to report on is the Committee's involvement in following the UNCITRAL draft instrument and, in particular, two provisions involving jurisdiction and arbitration clauses. As you all know, our U.S. delegation has been tireless in its supporting us in the UNCITRAL draft efforts, in many cases literally against the world. And we owe them a debt of gratitude for that.

The Committee's concern, however, relates to two specific provisions. The first of the provisions is new draft Articles 76(4) and 76(5), which seem to be the product of recent efforts by certain foreign elements. I think I can best explain by reminding you all of the Chinese menu. The previous MLA model would allow cargo to sue in a choice of many locations—port of loading, port of discharge, and other locations—so that cargo got its choice of where to sue.

And that has long been, in fact, part of the draft instrument, except the recent draft, in which Articles 76(4) and 76(5) allow countries to give notice and say that they will exclusively enforce a forum selection clause to the exclusion of the Chinese menu, which otherwise would grant cargo a clear right to sue in a broad choice of locations. As you read the draft and papers along with it, it allows the carriers in such countries to seek anti-suit injunctions against cargo proceeding in jurisdictions where they are otherwise allowed to sue.

That, to the Committee's thinking, creates chaos. In fact, it seems to specifically allow duplicative litigation on cargo claims, with all the attendant costs and confusion of that. So that is something that the Committee thinks should be particularly looked at in future drafting sessions.

The second aspect of the draft instrument that we had a problem with was new Articles 80 through 84. In those provisions, there is new anti-SKY REEFER protection in the arbitration setting in the liner trade. These provisions allow cargo, even though there is an arbitration clause in a liner bill of lading, to sue in other jurisdictions, such as the port of loading and the port of discharge.

However, Article 84 now says that this protection is not available for a bill of lading in the non-liner trade. Going back to the *SKY REEFER* decision itself, that involved a bill of lading calling for arbitration in the non-liner trade. So the instrument, as currently drafted, would, in fact, codify the *SKY*

[14543]

*REEFER* decision that this Association has so long sought to change. The Committee, I should say, voted on these proposals or expressed concern about these. More specifically, it voted 36 to nothing—well, actually 37 to nothing—on the 76(4)/76(5) problem, and it opposed, 36 to 1, on the Article 84 vote. Following that vote, we wrote to the MLA Board and made a presentation at its meeting in August. We explained our concerns and wrote with the intent of coming to this meeting of the Association and submitting a resolution to the Association.

Since that time, however, Michael Marks Cohen, who has spearheaded these efforts, has met with Mary Helen Carlson, who, we all know, is the head of the State Department team. She has indicated that she understands our concerns and that she is going to do whatever she can to have these addressed at future drafting sessions.

On the strength of that, we have agreed to withdraw the resolution and see what further activity develops in these areas. If any of you want to look at this in any greater depth, we wrote a letter to the Board on July the 19th, which was sent out to everyone in the Association, I think, about three weeks ago.

Madam President, that concludes my report.

MS. BURRELL: Thank you very much. I will now call upon Donald Greenman, Carriage of Goods. While he's coming to the podium, let me remind those who have not signed in that you should do so at the back of the room so that we have a record of your attendance and a quorum. Go ahead, Don, please.

MR. GREENMAN: Thank you, Madam President, members and guests.

Our Committee met on Wednesday, October 4. Mike Ryan brought with him a Cargo Newsletter in its latest version, for which we thank him.

We noted that there are two American cases and one Canadian case that deal with the subject of an intermodal bill of lading, or multimodal as John Moore used to call it, with respect to whether the rail carrier or inland carrier can limit its liability under the through bill of lading. In *Sampo Japan Insurance v. Union Pacific*, 2006 AMC 1817, the Second Circuit held that the Carmack Amendment applies to rail carriage, even though there is no separate bill of lading issued by the railroad, and thus the Carmack Amendment requirements for the railroad to limit its liability are not met.

[14544]

Less than a month later, the Eleventh Circuit in *Altadis USA v. Sea Star LLC*, 2006 AMC 1846, held that Carmack does not apply to the railroad unless a separate bill of lading is issued. Obviously, these two cases are not consistent with each other, because one allows the railroad to limit its liability through a Himalaya clause, and one doesn't.

Interestingly, the second case, which was the Eleventh Circuit case, did not cite the Second Circuit's case on the same point. And both of the courts said that what they did was consistent with the Supreme Court's decision in *Kirby*. Stay tuned.

Also in this issue of AMC is a Canadian case on the same subject which finds that a railroad cannot limit its liability in Canada under a through bill of lading, because a Canadian law requires that there be a specific agreement between the rail carrier and the shipper to limit liability. And the Himalaya clauses and whatnot are not sufficient to do it. The Court said something like, "The railroad shouldn't be able to do by the Himalaya clause what it should have done by itself."

We also had a nice presentation—well, no, we didn't have a presentation, because he wasn't here. But Paul Keane had prepared a little booklet of sample service contract clauses which we went through. Service contracts are confidential, so it's difficult to find out what they are doing with respect to liability provisions. I think probably most of them rely on COGSA, but some of the ones we looked at were practically absolute liability and common carrier liability.

Our study of the UNCITRAL draft convention is underway, and we hope to have something we can put on the MLA web page in due course.

Lastly, previously I think we have discussed the Canadian versus the English case. Jay said that the UNCITRAL provisions as they exist would permit dual suits, two suits on same claim. And that's what's happening in the case of *OT Africa v. Magic Sportswear*.

Canada has a statute that provides a Canadian court with jurisdiction, even though there is a mandatory jurisdiction in another country, if certain things occur, such as the carrier has an office in Canada, not principal office, just an office. Or if the contract of carriage is made in Canada.

In the *OT Africa* case, there was no Canadian shipper; there was no Canadian cargo; but I believe the bill of lading was issued there, and the car-

[14545]

rier had an office there. So cargo sued the carrier in Canada. The judge in the federal trial court held that he had jurisdiction, and he wasn't going to dismiss it on *forum non conveniens* grounds.

The carrier sued the cargo in England to enjoin the suit in Canada. And the English court said, "Yes, we are going to enjoin you, because we are not enjoining a foreign court. The suit over there is, in fact, cargo's breach of its contract only to sue here."

From the trial court in Canada the decision went up on appeal to the Federal Court of Appeals, and the decision came down just this August in which the Canadian court, first of all, held that notwithstanding the anti-*SKY REEFER* statute, the Court still had jurisdiction or still had the ability to consider *forum non conveniens*. Then it proceeded to look at the English decision that was enjoining the suit in Canada. At the end of the day, they dismissed the case in Canada on *forum non conveniens* to favor the case in England.

A well-known Canadian professor commented that the Canadian Court of Appeals acted like a bunch of colonials. You can guess who said that.

Anyway, the subject of jurisdiction and arbitration was discussed at length at our meeting, but Jay has already talked about that subject, so I won't mention it.

I will call on Michael Sturley to let us know what UNCITRAL is doing.

PROF. STURLEY: Good morning, everyone. UNCITRAL Working Group III on Issues of Transport Law has not met since our last meeting, so I have nothing new to report in terms of actual developments. The Working Group's 17th session was immediately before our May meeting. Between now and our spring meeting, the Working Group will have four weeks of negotiations. The 18th session will be in Vienna next month, November 6th through 17th. And the 19th session will be in New York next spring, April 16th through 27th. So in May, we will have four weeks on which to report.

More information about what's happening in UNCITRAL is available on the UNCITRAL website, www.uncitral.org. Follow the links to Working Group III, Transport Law, and you will find all kinds of documents explaining what's going on.

Just briefly, there are six items on the agenda for next month's Working Group session.

[14546]

Item 1, "Transport Documents and Electronic Transport Records." There are some controversial issues on top here, including one in which the U.S. delegation is supporting the Association position against the entire rest of the world.

Item 2, "Delay." Again, the U.S. delegation is supporting the position of this Association against a majority of the world. There's more information on this in the current issue of Benedict's Maritime Bulletin. Copies are available on the desk.

Item 3, "Limitation of Liability." This Association has supported an increase to Hague-Visby limits. It seems likely that the rest of the world will want a greater increase, but the U.S. delegation is against supporting this Association's position.

Item 4, "Rights of Suit and Time for Suit." There's a fair chance that right of suit will, in fact, be dropped from the instrument. But obviously, time for suit is an important issue. Once again, the U.S. delegation is supporting this Association's position.

Item 5, "Jurisdiction Arbitration." We've already heard a fair bit about that this morning. Those of you who attended the Committee meetings heard a lot more about it. The U.S. delegation has been pushing for the position advocated by this Association against much of the rest of the world. We're winning some of these and losing some of these.

And finally, Item 6 on the agenda, "Final Clauses." We don't expect that one to be unusually controversial.

If all goes well, we will finish the second reading of the instrument next month in Vienna, and thus we will begin the third reading at the spring session in New York this coming April. If all goes well, we will finish the third reading at the 20th session in Vienna in the fall of 2007. The draft will then be circulated to governments for comment, approved by the Commission—the full Commission rather than the Working Group—in the summer of 2008, and in the fall of 2008 go to the UN General Assembly, which will briefly adjourn, immediately reconvene as a diplomatic conference, approve the instrument, adjourn, and then become the General Assembly again.

So if we stick to this somewhat ambitious schedule, the instrument will be open for signature in October 2008. This is one of those things that, if you miss a deadline by an hour, you're set back for an entire year, because

[14547]

the UNCITRAL Commission and the UN General Assembly meet only once a year. So the Commission approval has to come in the summer; the General Assembly approval has to come in the fall. And if we miss 2008, then we slide back to 2009.

But that is, at least, what is on the horizon. If you're interested in any of these subjects, we don't have time to explain in detail in these meetings exactly what's going on. We can alert you to things that are coming up. But go to the UNCITRAL website, look at some of these things; there's a lot of information out there. If you're interested, I encourage you to follow this or contact either me or the Association representatives on the U.S. delegation.

Thank you.

MS. BURRELL: Thank you, Don and Michael. We will now hear from Pam Milgrim, Cruise Lines and Passenger Ships. She will be followed by Steve Johnson for Fisheries.

MS. MILGRIM: Good morning, everyone, Madam President.

The Cruise Committee was very fortunate last Thursday to have attorneys Bob Peltz, who is the Vice Chair of the Cruise Committee, and Larry Kaye from Los Angeles to give us a presentation regarding crime aboard passenger ships and cruise line reporting requirements under the present law. They also discussed new regulations and legislation pending in Congress following what many of you may know is the extraordinary media attention that the industry received this year stemming from the highly publicized case involving the missing groom who went overboard on his honeymoon.

Our entire Committee thanks Bob and Larry for all their efforts. And for those of you who were not fortunate enough to come to our meeting, I'm going to try to get their presentation put on the MLA website so you can have access to them.

In addition to that presentation, our Committee discussed recent developments in the law. Those developments mostly focused on four topics—the enforcement of arbitration clauses in crew contracts; the enforcement of forum selection clauses in passenger contracts; the question of whether cruise lines are legally responsible to passengers for the medical malpractice of shipboard physicians who work aboard cruise ships as independent contractors; and then lastly, maintenance and cure obligations to crew members who have long-term illnesses.

[14548]

That concludes our report. Thank you.

MS. BURRELL: Thank you, Pam. Steve Johnson, who will be followed by Kent Roberts speaking for Inland Waters.

MR. JOHNSON: Thank you. Madam President, members, and guests.

The Fisheries Committee of the Maritime Law Association met on Thursday, October 5th, for a couple of hours. We had a great group of attendees. We had almost 24 members and guests, 19 in the room, and we had five participate by conference telephone, which is a facility we've offered to people who could not attend the meetings, now, the last couple of meetings of our Committee. We hope to be able to continue to do that.

We had some distinguished guests at our Committee meeting, including Tom Willis of the Coast Guard National Vessel Documentation Center and Murray Bloom and Rand Pixa of the MARAD Chief Counsel's Office, and we appreciated their attendance and their contributions to the Committee's meeting.

I was successful in basically laying off all of the jobs associated with this Committee meeting to members of the Committee this time, which I feel a great deal of pride about. We had four very interesting and informative presentations.

The first presentation was by Tim McKeever by conference telephone from Seattle with respect to the status of the Magnuson-Stevens Act reauthorization bills that have been working their way through and around in Congress for the last several years. As we expected when I reported at the last meeting in May, the Magnuson-Stevens Act reauthorization bill in the Senate was passed in June by unanimous consent.

Unfortunately for those who are interested in the contents of the Senate bill and in the process of Magnuson-Stevens Act reauthorization in general, there has arisen a problem on the House side. The House bill, HR-5018, passed out of the Resources Committee with some provisions in it that have incited the ire of the environmental community.

Representative Pombo, who chairs the Resources Committee, as you may know, is not the favorite of the environmental community in general. And he included a few provisions in the bill that passed out of the committee that were intended to streamline the NEPA process as it applies to the

[14549]

adoption of regulatory measures for the fishing industry. But the environmental community for some reason thought that the streamlining was at the expense of some of the substantive requirements of NEPA and have tangled that bill up in the House.

And then, it's interesting to note that that problem has arisen, of course, as you can just bet, on the Republican side. As you know, the House is run like a modest form of dictatorship, with the majority being substantially in control of what comes out of the House. And the Republican membership has kicked up a bit of a fuss about some of these provisions, and it has not passed.

As you know, now the Senate and the House are in recess and will not be returning until after the election. And so there is a question as to whether this Congress will pass the Magnuson-Stevens Act reauthorization legislation at all. I think the betting right at the moment is perhaps not.

We had another very interesting presentation by Sam Chi of the NOAA General Counsel's Office in Silver Spring, Maryland, who's also a member of the Committee—he's been active for the last several years—with respect to the NOAA Offshore Aquaculture Program. There's a Senate bill, S.1195, which has been offered by Senators Stevens and Inouye in the Senate Commerce Committee that would enact a regime to permit offshore aquaculture facilities, basically one-stop shopping for all the environmental, Coast Guard, and other authorizations that would be required to site an offshore facility within the exclusive economic zone.

This bill hasn't really gotten anywhere yet, but it's a very interesting one in terms of the long-term policy of the federal government dealing with aquaculture matters. And as we all know, aquaculture has a very significant impact on fisheries, economic and otherwise. This bill has some very interesting provisions, including a particular provision we noted during the presentation, which is that vessels used in offshore aquaculture would be exempt from the documentation laws. So that's an interesting matter.

Apparently, there's no citizenship requirement for holding an offshore aquaculture permit. It follows, I guess, from that position that, if you're going to allow non-citizens to permit offshore aquaculture facilities, then you couldn't very well require them to have fishery endorsements on the vessels that serve those facilities. And the result is a bill that includes a provision that exempts these vessels, apparently, from documentation in general, which would apply to the coastwise side of things as well.

[14550]

The third presentation was made by Stan Loosmore of Seattle on maritime liens and preferred mortgages on fishing rights, which is a subject that has been near and dear to the Fisheries Committee's processes for the last several years and the subject of resolution by the full MLA. In that context, we noted that the Coast Guard appropriation bill, H.R. 5681, includes a provision that would prohibit maritime liens from attaching to limited-access fishing permits and would prohibit enforcement of maritime liens on limited-access fishing permits in any civil action.

So this is a very interesting provision. Some of us are concerned that the courts may not be able to distinguish between maritime liens and mortgage liens. We were talking about trying to support some legislative history that would make clear that this prohibition, if it passes, does not gut the ability of lenders to take mortgage liens on fishery permits, which is a very significant asset for many fishing companies.

Finally, we had a presentation by Lisa Reeves of Philadelphia, presenting the inaugural issue of the Fisheries Committee newsletter on recent case law of interest to fishermen, vessel owners, and their underwriters. And there are copies of the newsletter prepared by Lisa in the back of the room. And I will refer you to that.

We're going to post a certain amount of this material from our meeting on the website, and we hope that people who have an interest will take advantage of that.

Thank you, Madam President.

MS. BURRELL: Thank you, Steve.

Kent Roberts, for Inland Waters and Towing, will be followed by Chris Davis, who will be speaking for two Committees.

MR. ROBERTS: Thank you, Madam President.

I am standing in for our Committee Chairperson for Inland Waters and Towing, Beau Gelpi, from New Orleans. We had a meeting on Wednesday that had a lot of information, very up to date, very topical for the towing industry and the inland waters.

We began with our annual report from Buck McAllister, from McAllister Towing in New York, who presented the AWO and Towing Safety Advisory

[14551]

Committee current issues of the presentation that he provided for us. One very important and timely topic was the effort by the towing industry to bring themselves within federal inspection for towboats. As you may know, most towboats are uninspected vessels, which opens up the towing industry to application of OSHA regulations and other types of regulations. The towing industry would rather not be subjected to them but instead be covered by uniform Coast Guard regulation and inspection.

That segued into the topic of a recent U.S. District Court decision in the District of Massachusetts that invalidated state regulation of tank vessels and tank barges in that state, prompted by a barge spill, the Bouchard spill into Buzzards Bay.

We then segued again into more state regulation of tank vessels in the State of Washington particularly in relation to tank barges and discussed the preemption issues that arose out of that regulation.

We had a written presentation by Hamilton Emery on recent developments in inland waters, including a discussion of a rather interesting case on Lake Tahoe, one of the navigable waters of the inland waterways, and the application of the safe berth warranty in the Lake Tahoe area.

Finally, we had a presentation by Gene George of the Great Lakes Subcommittee. That concludes my report.

MS. BURRELL: Thank you very much, Kent. Chris? Chris will be followed by Jim Moseley, Jr. Chris will be speaking on the International Organizations, Conventions and Standards and also volunteered to cover our Salvage Committee report.

MR. DAVIS: Good morning, Madam President, members and guests.

The International Organizations, Conventions, and Standards Committee met on Thursday, October 5, 2006. The meeting was well attended with over 50 Committee members and guests present. We had a full agenda, which began with reports from our three Subcommittees on Classifications Societies, the Comité Maritime International or CMI, and International Law of the Sea.

Thereafter, Tom Miller, Senior Vice President and General Counsel of the American Bureau of Shipping gave an informative presentation on societies and the EU, emphasizing the increasing regulation faced by shipping interests, including classification societies in Europe. This presentation was

[14552]

followed by an update on the UNCITRAL draft instrument on carriage of goods that was given by Michael Sturley and Chet Hooper.

We then heard from Jay Paré and Michael Marks Cohen regarding the Arbitration and ADR Committee's concerns on the current wording of the jurisdiction and arbitration provisions of the UNCITRAL draft instrument and efforts to amend these provisions.

Alan Van Praag presented updates on the Hague Convention on Private Law, which addresses exclusive choice-of-court provisions and will facilitate the enforcement of judgments once the Convention enters with force. Alan also addressed the concept of environmental salvage and the international salvage union's efforts to promote a new remuneration system to reward salvors for environmental benefits of the salvage operation.

Other topics covered during the meeting included recent developments on the Athens Convention Protocol, including the announcement of an agreement between the London insurance market and mega-broker Marsh to provide 500 million dollars' worth of coverage for terrorist attacks on cruise and ferry vessels.

We also discussed the proposed U.S. legislation to implement the agreement that has been negotiated with Canada, France, and the U.K. to promulgate final guidelines for research, exploration, and salvage of the TITANIC wreck, as well as artifacts contained therein.

Finally, we covered the work of other international organizations, in particular the IMO Legal Committee, which is finalizing its work on the draft Wreck Removal Convention and continuing its work on the Athens Convention Protocol, fair treatment of seafarers, places of refuge, crimes committed on vessels on the high seas, and finally abandonment of ships.

Two dates to keep in mind for those of you planning your CLE budget for 2007 and 2008: There will be a joint symposium sponsored by the CMI and the Croatian-Maritime Law Association that will take place in Dubrovnik on May 11th and 12th, 2007. That will follow the CMI Annual Assembly, which will also take place on Friday, May 11th. The CMI will also hold its 39th International Conference in Vouliagmeni, Greece, which is a suburb of Athens, in mid October 2008.

Moving on to the Salvage Committee report, that Committee met on October 5th and had its perhaps largest turnout ever with 40 members and

[14553]

guests attending, including three attendees by telephone. Vice-Chair John Driscoll delivered an interesting PowerPoint presentation highlighting recent and ongoing salvage operations offshore in the Gulf of Mexico as that area continues to recover from hurricanes Katrina and Rita.

Jason Harris, the Committee Secretary, provided an excellent overview of recent cases on U.S. salvage law. Dick Fredricks, the Executive Director of the American Salvage Association, spoke to the legal and regulatory issues of significant interest to the salvage industry, both domestic and international. He also discussed the planning efforts for the upcoming Third U.S. National Maritime Salvage Conference.

Rich Buckingham, the Committee Chair, reported on the legal theories behind, and the prospects for success of, the International Salvage Union's initiative to establish a separate, but parallel, environmental salvage compensation scheme for salvors. He also provided an overview of pending legislation that would grant enhanced protected status to the wreck of R.M.S. TITANIC. This was followed by a roundtable discussion on miscellaneous issues of interest, as well as a preview of upcoming salvage-related conferences both in Europe and the U.S.

Finally, the Salvage Committee would like to thank John Edginton for the excellent meeting room arrangements and the associate support in the form of audiovisual and teleconferencing equipment.

Madam President, that concludes the reports of both the IOCS and the Salvage Committees. Thank you.

MS. BURRELL: Thank you very much, Chris. Jim? Jim will be followed by Bruce King, Chair of the Committee on Marine Financing.

MR. MOSELEY: Good morning, Madam President, members and guests of the Association.

The Marine Ecology and Criminal Law Committee met on Wednesday afternoon and held a joint meeting with the Vessel Regulation Committee. I would like to thank Tony Whitman, Chairman of the Vessel Regulation Committee, who worked very hard on this agenda. Tony and we are going to do our best not to repeat ourselves in giving you this joint report.

Our meeting had 70 members in attendance. We very much appreciate the participation of the United States Coast Guard, Admiral Bill Baum-

[14554]

gartner as well as Charles Michel of the United States Coast Guard in Washington, D.C. Maritime International Law Division, for their attendance and participation.

We also heard from Mike Underhill of the San Francisco Department of Justice. He gave us a talk on the relationship between criminal, civil, and administrative proceedings in an oil spill context. He then discussed different problems that arise and different strategies that must be used when you want to achieve a global settlement. He spoke about the different issues relating to civil, criminal, administrative proceedings in oil spills.

We also heard from Larry Kiern from Washington, D.C., who gave us a Congressional update, and Dennis Bryant, who gave us an update on transportation workers identification cards.

Marc Greenberg of Keesal Young & Logan in Long Beach gave us an update on criminal law and answered the question, "When is a pollution case a criminal case?" The answer: It always is. He gave us an update on several cases that are still in litigation. One is the Third Circuit's decision in *U.S. v. Abrogar,* in which it was held that in order for the U.S. Courts to have jurisdiction, a pollution violation must occur in United States waters. In this case it was the accuracy of an oil record book. And once again, we heard from the court that that inaccuracy in an oil record book, once it is tendered in U.S. waters, it must be accurate or a criminal infraction occurs.

We also heard from Kent Roberts, and he gave us a brief summary of his report just earlier in this meeting here, but he also talked about federal preemption in the state legislation on pollution advocacy. He also gave us an update of what's going on in the state of Washington, and also the decision in Massachusetts where Judge Tauro ruled that the provisions of the Massachusetts Oil Spill Prevention Act of 2004 was preempted by federal law and thus unconstitutional pursuant to the Supremacy Clause. The case has now been appealed to the First Circuit, and our Committee will be following that decision, I'm sure, in the coming year.

That concludes our report, Madam President. And once again, we would like to thank the San Francisco committee for doing such a fantastic job.

MS. BURRELL: Thank you, Jim. Bruce King for Marine Financing, who will be followed by Jonathan Spencer.

MR. KING: Thank you, Madam President.

[14555]

The Marine Finance Committee meeting was on Wednesday. We are pleased to welcome our guests Tom Willis from the National Vessel Documentation Center and two attorneys from the Maritime Administration, Murray Bloom and Rand Pixa. Their participation was very helpful.

Instead of a full Committee meeting, we used this opportunity to have two back-to-back meetings of working groups that have been formed to consider and draft statutes relating to vessel documentation.

The first concerns vessel leasing, which was led by Francis Nolan. This Committee is considering and drafting a statute that will provide a mechanism to, essentially, file a notice of a bare-boat charter with the National Vessel Documentation. The purpose of this is to provide a mechanism comparable to the financing statement that can be filed under the Uniform Commercial Code so that, if a bare-boat charter is recharacterized by a bankruptcy court as the conveyance of the vessel and a retention of a security interest, then the owner, now a secured party, will have a perfected security interest in the vessel and will not be treated as a general creditor in the bankruptcy proceedings.

We followed that with the initial discussion of a statute that would provide, as some countries such as Canada do, for the documentation of a vessel while under construction and for the recording of a preferred mortgage during the construction period. This is quite a complicated topic.

For both projects, the materials are posted in the Marine Finance Committee area of the website. And we have created chat rooms for each of the projects so that interested members can observe and participate.

We hope to have these discussions continuing by these means so that we can make progress between meetings, or otherwise these projects could take a great deal of time. Thank you.

MS. BURRELL: Thank you very much, Bruce. Jonathan? Jonathan will be followed by Lisa Reeves.

MR. SPENCER: Madam President, members and guests of the MLA, the Marine Insurance Committee met in this room on Thursday morning. And I stand before you with some sense of paranoia, because I think I'm one of the Committee Chairs whose wrists have just been slapped by John Edginton. I had asked the organizers to expect 50 attendees. We had in excess

[14556]

of 80. So the unflappable Forrest Booth, thank goodness, was on hand and laid on numerous extra chairs and a microphone for us.

I can only say in my defense, that I had told the Committee by e-mail to ask how many members were attending; of the five who chose to respond, three told me that they wouldn't be here.

In keeping with our usual format, we heard from our three Subcommittee Chairs. In fact, we didn't hear from all three. We had—George Zacharkow, who chairs the Cargo Subcommittee, couldn't travel to these meetings. So in his absence, we talked about him, but only in the most positive terms, in the context of the all-risk annotation that he's been working on, the cargo all-risk annotation.

It seems to me, as a non-lawyer, having seen the prodigious amount of work that he's done, that it behooves us to open this up to include hull insurance and make it an across-the-board all-risk annotation. So I've asked some of the lawyer members of the committee to volunteer to help us bring that project to its next stage.

John Crotty, a fellow average adjuster who is the current chair of the GA Subcommittee, then gave us a report revolving around the adoption of the 2004 version of the York-Antwerp Rules. John had made an informal poll of the New York insurance market, both claims examiners and average adjusters. And so far there's only been one reported sighting of an adjustment done to the 2004 rules, which is very much in line with my observations on the subject, which nobody chose to listen to at the time.

He then talked to us about the work that BIMCO is doing to reform its charter parties, reword its charter parties to make more clear which version of the York-Antwerp Rules is to apply to the adjustment of general average. These charter parties have referred in the past to the York-Antwerp Rules 1994 or any modification thereto. And some confusion has arisen as to whether or not the 2004 Rules constitute a modification of the 1994 Rules. And the BIMCO charter parties are being modified to remove that reference to "any modification" to invoke solely the 1994 rules.

We also heard that in Norway, where historically each successive version of the York-Antwerp Rules has been enacted into law, the King has chosen not to take up the 2004 Rules, and the 1994 Rules remain the general average law of Norway.

[14557]

From our Hull and P&I Subcommittee, we heard from John Woods, who chairs that Subcommittee. And we were able to be among the first to congratulate him on his election the previous day as chairman of the Association of Average Adjusters in the United States.

John gave us some remarks on various law cases, which I won't attempt to describe, but they are in the Committee newsletter, and also gave us a brief report on a seminar that he had attended the previous day, in fact, moderated the previous morning, on Crimes and Misdemeanors. This again was an Average Adjusters' event, the subject of their annual seminar. And we had a panel talking about fraud in cargo insurance, hull insurance, and personal injury claims—very interesting presentations. And those are on the Adjusters website at usaverageadjusters.org. They will be posted next week.

Next, we heard from our tireless Committee Vice- Chairman, Gene George from Cleveland, who gave us the current episode in his ongoing study of the insurance fallout from the hurricanes in the Gulf last year. In particular, the continuing dilemma faced by homeowners as to what is to be held as wind damage under their property—under their homeowners policy, and what is to be considered water damage under the Federal Flood Program policy, and which policy indeed they have.

And then we heard from Rhys Clift, who is a solicitor from London who was visiting, gave us a presentation on market reform in London, where they are adopting various rules directed towards contract certainty. This stems from the requirements imposed on the market by the Financial Services Authority in the U.K. Rhys did a very good paper on that and has given us some notes from the Market Reform Group. And we will be posting those on the Committee's home page on the website.

And then we continued with our guest speaker series, which Steve Rible instituted when he was Chairman of the Committee. We heard from Ben Gleason, who is Director of Risk Management at Alexander & Baldwin and Matson Navigation. Alexander & Baldwin, of course, is one of the larger commercial interests in Hawaii. Matson Navigation is a subsidiary of theirs, based across the Bay in Oakland. They carry something like 65 percent of the traffic between the continental United States and Hawaii.

Ben talked to us about the business of Jones Act shipping and gave us a very interesting talk from the point of view of a ship operator about how difficult it truly is to operate under the Jones Act. The business of building

[14558]

ships, the expense of building ships in the United States, the expense, then, of insuring those ships because they're so expensive, and the magnitude of P&I deductibles because of the level of personal injury exposure that the shipowner is subject to, and the hidden costs, also. For example, Matson keeps a vessel idle in reserve in case one of their ships suffers a catastrophic accident, because they cannot simply charter another U.S.-flagged vessel of comparable particulars if they need to get one on short notice.

Then we concluded by—oh, by thanking Hal Watson for his contribution to our newsletter. There are copies of the newsletter at the back. It will also be on the website. I think it's already on the website on the Committee home page and on the library page, on the public side of the website.

Hal's done a wonderful article for us, law review standard, on underwriting intent and the legal effects of that. We have the usual dazzling array of case summaries, largely prepared by Gene George with a contribution now by Cary Wiener of New York. So I do recommend the newsletter to you.

MS. BURRELL: Thank you very much, Jon. Lisa will be followed by Grady Hurley. Lisa?

MS. REEVES: Thank you, Madam President. Good morning, everyone. I am standing in for the Chair of the Maritime Torts and Casualties Committee, Jack Scalia, who, regrettably, could not be with us at this meeting.

We had excellent attendance at our meeting, which was held jointly with the Committee on Offshore Industries on Thursday afternoon. Paul Edelman, our Vice-Chairman, presented recent developments in the personal injury arena, and we also discussed recent limitation of liability cases.

We then had a presentation on the liability of the owner of a bare-boat chartered vessel for injuries to a maritime worker on board the vessel while in the custody of the charterer. We were pleased to offer CLE credit for this program, as well as two presentations from the Offshore Committee.

In that regard, I want to thank the Young Lawyers Committee and in particular, Jennifer Sanchez of San Francisco, for their assistance with the whole CLE administrative work, which can be quite taxing.

Finally, there are limited copies of the Committee's newsletters in the back of the room. They will also be available on the Committee's website. Thank you very much.

[14559]

MS. BURRELL: Thanks very much, Lisa. Grady Hurley, speaking for Offshore Industries followed by Josh Force.

MR. HURLEY: Madam President, our Committee would like to join in thanking the San Francisco maritime bar, as well as our host committee, for facilitating our October 5th joint meeting with the Maritime Torts and Casualties Committee, which was well-attended.

The Offshore Industry Committee monitors both operations and issues arising from the East Coast, the West Coast, and developing fields in Mexico. We would like to solicit increased participation from those of you who practice on the East Coast and West Coast in the issues dealing with offshore industries, not necessarily purely oil and gas.

We had two presentations at our meeting on Thursday. The first presentation was by David Enriquez of Mexico. He discussed maritime operation and opportunities for offshore exploration off the coast of Mexico.

Our second presentation was by Hal Watson of Houston, Texas. He discussed the jurisdictional issues arising out of the Fifth Circuit decision in *Texaco Exploration & Production, Inc. v. AmClyde*. That case involved the transportation and installation of an offshore platform on the Outer Continental Shelf.

We concluded our meeting with some administrative discussions concerning our members taking advantage of the MLA Web page and posting not only the current issues but also agendas and using that as a means of communication.

That concluded our meeting and our report, Madam President, thank you.

MS. BURRELL: Thank you very much, Grady. Josh Force for Practice and Procedure, followed by Tony Whitman.

MR. FORCE: Thank you, Madam President.

The Practice and Procedure Committee met on Wednesday. We had approximately 50 members and guests in attendance.

The Committee devoted most of its discussion during the meeting to a question of Supplemental Rule B following the Second Circuit's decisions in *Winter Storm* and *Aqua Stoli*. As you may be aware, in *Winter Storm*,

[14560]

the Second Circuit permitted the attachment of electronic funds transfers, EFTs, while held in the hands of intermediary banks. The Court held that federal law preempted New York state law and allowed for the attachment, even though the New York law, which adopted the UCC Rule, defined these types of funds as not constituting property for purposes of seizure.

In the *Aqua Stoli* opinion, the Second Circuit rejected a needs-and-hardships-based test for *vacatur* of the Rule B attachment, although the Second Circuit recognized certain limited circumstances in which Rule B attachment might not be available.

The Committee was very happy to hear from several representatives of the banking community—The Clearing House, Federal Reserve Bank of New York, and Bankers Association for Finance and Trade—who explained what the banking community's views were as to the legal and practical problems presented by the Second Circuit's opinions. They offered their thoughts on what impact the rulings from the Second Circuit might have on the banking community.

In response, we also heard from members of the Association who are involved in litigating a number of these types of cases and presented the benefits of being able to attach this type of property under Rule B.

The Committee, in particular its Federal Rules Subcommittee, has determined to study this issue to decide whether or not there really is a problem under Rule B that should be addressed through some means of amendment of Rule B or some change in the local rules that would be able to address any problems that are being experienced right now.

In addition, the Committee heard from Alan Van Praag, who updated the Committee on the status of the proposed Exclusive Choice of Court Convention, which has been sent to the Senate for its consideration.

Lastly, the Committee addressed two ongoing projects on which the Committee is working. First, Professor Sharpe is chairing a working group looking to update the Local Admiralty Rules, which have not been updated for a while and need to be amended to conform to recent changes in the Supplemental Rules.

Second, the Committee is working with the Young Lawyers Committee and has undertaken a survey of E-filing practices and procedures through-

[14561]

out the country to determine the degree to which there are different practices in different courts and what prospects there may be for uniformity in that area.

The Committee will report further on these projects in the future. Thank you, Madam President. That concludes our report.

MS. BURRELL: Thank you very much, Josh. Frank DeGiulio, Recreational Boating, to be followed by Tony Whitman. I think at that point, it might also be appropriate for Dennis Bryant to speak about Title 46.

MR. DeGIULIO: Thank you, Madam President.

The Recreational Boating Committee met in San Francisco on October 5th, with three members and guests in attendance. We began with a presentation by Todd Lochner, the Committee's secretary, I believe, who discussed 15 recently reported recreational boating decisions. These are covered in our newsletter. There are some additional copies in the back, if you haven't received that.

Todd Lochner has kindly agreed to assume the role of editor of the newsletter, much to my relief. Kent Roberts, Chair of our State Legislation Subcommittee, gave us a report on the status of state recreational boating legislation. It's a very useful summary.

That was followed by a discussion of something that appears to have gone under the radar this summer. There was an attempt by the Coast Guard to approve a provision in the Maritime Appropriations Bill that would have given the Coast Guard statutory authority, which they do not currently have, to regulate recreational boating on a nationwide basis. The provision was removed from the bill before it was passed. The Committee has resolved to follow up with the Coast Guard to see what their intentions are in the future.

That concludes my report.

MS. BURRELL: Thank you very much, Frank. Tony and Dennis? After that report, I'll be calling on Kim Kearney.

MR. WHITMAN: Thank you, President Burrell, members, and honored guests.

[14562]

The Committee on Regulation of Vessel Operations, Safety and Security met on Wednesday of this week jointly, as Jim Moseley, Jr. has mentioned, with his Committee on Marine Ecology and Maritime Criminal Matters.

Our meeting was extremely well attended and was very informative. I will try not to duplicate any of Jim's report. Our first speaker was Captain Chuck Michel. Captain Michel is the new chief of the Office of LMI, Coast Guard headquarters within the Chief Counsel's Office. We were also honored to have in attendance Admiral Baumgartner, his predecessor, who is now Coast Guard JAG and Chief Counsel.

Captain Michel initially addressed the functions of his office and how his office really is designed to provide operational law advice to the Coast Guard in the three areas of safety, security, and stewardship. He reported that the activities of his office and the number of personnel assigned to that office have tripled in number since September of 2001.

On the international side, Captain Michel reported to the Committee on the activities of the Legal Committee of the IMO, including the draft Wreck Removal Convention, which is expected to go to diplomatic conference in May; the developments with regard to the Athens Protocol concerning liability for luggage on passenger planes; and implementation of MARPOL Annex VI, concerning air pollution and its effect on water quality—more on that in a moment.

On the domestic side, Captain Michel reported his personal amazement that the industry has not been able yet to come to grips with problems having to do with oil-and-water separators, oil record books, magic pipes, and the like. He had last been in that office something on the order of six or eight years ago and fully expected that all of these problems would have gone away by now. But he does say that he continues to have a great deal of time in his office expended to those matters which he would like to have expended on other, more worthwhile points.

Admiral Baumgartner also spoke briefly in connection with the new case entitled *Northwest Environmental Advocates v. EPA*. That case has permanently enjoined the EPA's 1973 general exemption for all discharges in the ordinary course of vessel operations. Admiral Baumgartner says that this is now subject to a two-year stay until the Coast Guard and the industry can figure out how to handle the elimination of this exemption for discharges of vessels in the ordinary course of operations. He did mention the irony that sewage discharges are not considered pollution in this regard.

[14563]

Also on the domestic side, Captain Michel reported briefly on developments in connection with security, including the Safe Port Act, in particular, implementation of the Transport Workers Identification Credential or "TWIC." The TWIC was the subject of a more in-depth report from Dennis Bryant, our former Chair, who addressed the significant flaws that he sees in the development of the TWIC implementation process, including technological problems in that the card-reader machine has not been developed sufficiently to read the card, which everyone will be expected to carry. The hearings last week by the House Committee on Small Business delved deeply into the undue burden that the TWIC process appears to be placing on small businesses.

The joint meeting was also treated to a report by Larry Kiern of Washington, D.C. concerning developments in the area of maritime legislation including the Defense Authorization Act, the Safe Port Act, and fallout from the Dubai Ports World debacle of earlier this year.

Mr. Kiern suggested that legislative developments, if there are any in this area, will undoubtedly stiffen under requirements of what is known as the Byrd Amendment, which requires that there be governmental review of such an acquisition at a high level if the acquiring company is controlled by a foreign government as opposed to simply another foreign commercial entity.

Finally, Mr. Kiern addressed the meeting on the political issues presented by MARPOL Annex VI and the implementation legislation. Specifically, Mr. Kiern delivered an impassioned plea to the industry and our clients that they take this as an opportunity to challenge continued criminalization by the United States of activity and conduct which is not considered criminal and certainly does not subject companies to criminal fines in other nations.

Madam President, that concludes our report.

MS. BURRELL: Thank you very much, Tony. Dennis Bryant will tell us about what's going on with the Title 46 Codification Committee.

MR. BRYANT: Thank you, Madam President.

Before I begin my formal remarks, how many of you remember several months ago in my newsletter that we talked about the Bolivian python eating the CFR? Now how many of you, at least for one fleeting moment,

[14564]

thought that might be true? The newsletter is intended to be both informative and interesting, and hopefully, that at least achieved the interesting part.

The Ad Hoc Committee on the Codification of Title 46 met in the Pied Piper briefly Friday night for a memorial service for the recently deceased statutes—the Jones Act, the Harter Act, the Bowaters Amendment, the Shipping Act of 1916, Merchant Marine Act of 1936, et cetera.

Yesterday afternoon, President Bush signed HR-1442, the act that codifies most of the uncodified portions of Title 46. So those acts no longer officially exist. And we will be living with only the section numbers for the future. The sole exception will be COGSA, which will be an uncodified note attached to Title 46.

That said, the members of the Ad Hoc Committee are not free to depart, because there is a cleanup bill that has been introduced in Congress. The Codification Bill was designed to codify the uncodified sections that existed at the time it was introduced. Various changes and additions have been made to Title 46 between the time back when it was introduced and yesterday.

So those need to be addressed. We also need to clean up any errors, oversights, or omissions that exist in Title 46. So there is a cleanup bill. I'm going to ask the members of the Ad Hoc Committee to continue to serve as they did so diligently the past seven years: to review the new codification legislation and to make sure it truly reflects the preexisting laws, that no substantive changes were inadvertently made, that we didn't miss anything, and that we included all the new provisions.

So it will be at least another year before we get this issue resolved. In other words, you're not expected to do anything with it in the lame-duck session. So we'll start over again with the next Congress.

Thank you very much.

MS. BURRELL: Thank you very much, Dennis. Things go on and on and on. Kim will be followed by Dana Henderson.

MS. KEARNEY: Thank you, Madam President, members, and guests.

I'm pleased to inform you that the Uniformity Committee met on Wednesday afternoon with more than double its usual attendance, and, in

[14565]

fact, a record attendance. Once again, we were able to offer CLE credit for participation at the meeting. That is in very large part due to the efforts of Vice-Chair Dan McDermott of New York and his associate, Betsy Meers of the CLE Committee.

Our Committee was very fortunate to have Professor Michael Sturley present a paper on three recent cargo cases with significant uniformity concerns. Two of those cases—*Sompo Japan Insurance v. Union Pacific* of the Second Circuit and *Altadis U.S.A. v. Sea Star Line* of the Eleventh Circuit—were just summarized for you by Donald Greenman.

Our Committee discussions of those two cases led to a very spirited debate about whether *Sompo* can be reconciled with *Norfolk Southern v. Kirby*.

Professor Sturley also analyzed for us *Ferostaal v. M/V SEA PHOENIX*, in which, interestingly, the Third Circuit parted company with seven other circuits by holding that the fair opportunity doctrine is not a requirement of COGSA.

We also discussed a recent Seventh Circuit case, *Tagliere v. Harrah's Illinois Corp.*, in which Judge Richard Posner of the Seventh Circuit makes the case for resolving all jurisdictional issues using the Admiralty Extension Act rather than the existing *Grubart* "significant relationship to marine activity" test.

We were very privileged to have Gray Staring in attendance at our meeting. He was able to share his thoughts on *Tagliere* based on his recently published monograph, "A Return to Objectivity in Admiralty Tort Jurisdiction," which was recently published in Benedict's Maritime Bulletin.

Professor Sturley's paper as well as our written analysis of other recent cases of interest will be part of our written Committee report and published or posted on the website.

Madam President, that concludes my report.

MS. BURRELL: Thank you very much, Kim. I will say that "spirited" is often a euphemism, but considering that the head-bumping was between me and Michael Sturley and me, I think that "spirited" is an accurate description. After Dana, Tom Rue.

[14566]

MS. HENDERSON: Madam President, members of the Association, the Young Lawyers Committee met on Thursday. We had 30 members and guests present. And we are pleased to report that one third of our attendees were from San Francisco.

We believe that having our meeting here has proven to be an effective way to get a lot of local young practitioners to the various meetings of the Association. They've been involved all week. So I think the Association's geographic outreach effort seems to be working.

We were treated to lunch by our friends at Severson & Werson, specifically Forrest Booth, Cynthia Mitchell, and Ryan Donlan. I would like to thank them for their hospitality and also for loaning us Caroline Faulk, Ryan's assistant. She was fantastic, and she was such a help to us.

We were lucky to have Bert Ray of Keesal Young & Logan's Anchorage office bring us a wonderful presentation on the challenges of practicing law in Alaska. It was a great presentation. He brought very interesting photos and war stories. We want to thank him for his presentation.

Last night, with many thanks to our dear friend Atlantis Langowski, also of the Keesal firm, we took on our traditional and long-standing night out. We went to Russian Hill, had a lovely neighborhood restaurant outing thanks to Atlantis. We so appreciate her help in organizing that event.

In terms of projects, we are pleased to be assisting the Practice and Procedure Committee by compiling a survey of the E-filing requirements in the various coast-side states. We hope to be completed with our project by our spring meeting.

To that end, we would ask our standing Committees to put us to work. We have a lot of young, interested, excited, eager members who really want to be involved in the Association. And the primary question we're always asked is, "How can we get better involved in the organization?" We know our members can be of help to the various projects and Committees. So please, let us know.

With that, Madam President, that concludes my report.

MS. BURRELL: Thank you very much, Dana. Tom, please tell us about the environmental crime initiative.

[14567]

MR. RUE: Thank you, Madam President, members and guests. I relay to you personal regrets of Mike Chalos, who is unable to be here to give the report, and I do that in his stead.

The MLA has undertaken to provide a platform for and a discussion of MARPOL violations amongst the U.S. Government, specifically the Department of Justice Environmental Crimes Section and the U.S. Coast Guard and the maritime industry at large. It is our hope that we can come together and hold discussions and arrive at some best practices to which the industry can adhere.

Last July 31st we held a meeting in New York with various industry representatives. At that time, it was our intention to hold a follow-up meeting with a larger representative group from the industry in Washington, D.C. on September 11th, to be followed by a meeting here this past October the 3rd with the Department of Justice and the Coast Guard. Regrettably, we were unable to adhere to that schedule, and so we are now going to meet with some owners in New York next Tuesday, President Burrell and myself, with an effort at moving this initiative forward.

We do have the agreement of Mr. Greg Linsin of the Environmental Crimes Section of the Department of Justice, Admiral Baumgartner, and Captain Michel to hold such a meeting with the industry.

Madam President, that concludes my report.

MS. BURRELL: Thank you very much for the report and, as Past President, for continuing to work for the good of the Association and, indeed, the maritime industry.

I am shortly going to be calling on Dennis Minichello for our last Committee report, Planning Arrangements for next fall's meeting.

But before that, I want to do two things. One is to compliment all of our Committee Chairs for the really exceptional programs that graced this particular meeting. I did not go to one meeting in which there was not a very lively discussion or a very sophisticated presentation that really went to the heart of the subject matter of each Committee's jurisdiction. I applaud all of you for what amounted to perhaps the best set of Committee meetings we've ever had as a whole.

[14568]

As I mentioned, Dennis will talk to us about planning arrangements for next fall, but I wanted to mention something that will take place in the interim. About a year ago, the Canadian Maritime Law Association very kindly invited us to visit them at a chateau in the mountains with every kind of recreation and every kind of beauty that you can imagine. It was a wonderful meeting, and the CMLA Board was so very hospitable to us that we could not wait to return their hospitality. We will therefore be meeting jointly with the Canadian Maritime Law Association's Board of Directors in March in New Orleans, to be followed by the Tulane Admiralty Law Institute.

We have at this meeting some representatives from the CMLA, who have contributed greatly to the fun of this meeting. One is the President of the CMLA, Will Moreira. Please don't believe anything that Will tells you about the dancing at the lobsterfest when I was in Halifax.

I will now call on Dennis Minichello.

MR. MINICHELLO: Madam President, fellow members and guests, the 2007 resort meeting will be held at the Sanibel Harbour Resort and Spa from October 24, through October 27, 2007.

The Committee has been constituted and will be getting together at the resort to plan what we hope to be an exciting and informative and educational program next month in November. I'm certainly looking forward to seeing all of you there.

We're going to have a hard act to follow with the Arrangements Committee's fine work for this meeting. But we hope to at least equal the good work that they have done here.

You can anticipate receiving notices via e-mail in the near future regarding the meetings, so I hope you will all take notice of those notices and put the date of the meeting in your calendars and budget your budgets for 2007 accordingly. Written materials, of course, will follow, as they always do, sometime next year, well in advance of the meeting.

If you have any questions or would like to make any comments or suggestions based on your attendance at past meetings, please feel free to send me an e-mail, call, write a letter, whatever. We are also looking for good suggestions to make the way of resort meetings as beneficial and fun and exciting as possible.

[14569]

I'll look forward to seeing all of you there. Thank you.

MS. BURRELL: Thank you very much, Dennis. I'm sure that will also be an exciting event.

I mentioned the Tulane Admiralty Law Institute earlier in the context of joint board meetings with the CMLA, but I'd also like to mention it again. Like the Pacific Admiralty Seminar, Tulane is a really stellar event for getting CLE and for enjoying ourselves in a lovely city.

Considering that New Orleans has suffered so much, I think that the folks there are to be greatly admired for getting together again and holding this event in March of 2007 as originally scheduled. It would be very appropriate if we showed our support for their fortitude, not to mention, gave ourselves an opportunity for another fine time by doing everything possible to attend the Tulane ALI.

Is there any new business?

MR. THORNTON: Good morning, Madam President. My name is Kevin Thornton from Atlantic City. You and I briefly spoke last night about an issue that I wanted to bring to the Association's attention. It's on the radar screen, and maybe other folks may have some interest, or their clients might be interested.

Off the Atlantic coast, at least, there is interest in developing windmills. And there's going to be perhaps a proliferation of windmills. That's of interest, certainly, to some people involved in the commercial fishing industry, and it also might be of interest to people involved in recreational boating. And also, to the extent that windmills may have some impact on international shipping and the established traffic in the lanes, people might be interested following that, or their clients might.

Dave Farrell has already done some work in connection with the offshore windmills. And the Fisheries Committee, with Steve Johnson and I, will be interested in following that. So if anyone has information that they can share or if they would like some information, we're going to start looking at that.

MS. BURRELL: Thank you very much, Kevin.

[14570]

Any other new business? Any old business? I think it's time for me to entertain another motion. I recognize Chet Hooper, our most senior Past President in attendance.

MR. HOOPER: Well, Madam President, I have one piece of advice before we move to adjourn. That is: Don't start something that takes an awful long time to finish. As Professor Black once said, "Don't pick up fly-paper; you might not be able to put it down." With that thought in mind, I move to adjourn.

MS. BURRELL: Thank you very much, Chet. I'll take your advice to heart.

## FORMAL REPORT OF THE COMMITTEE
## ON MARINE INSURANCE AND GENERAL AVERAGE

The Committee held an extremely informative and well attended meeting on October 5, 2006, at the Palace Hotel, San Francisco.

John F. Crotty, Chairman of the Subcommittee on General Average, presented a paper entitled "York Antwerp Rules 2004: 'Let the King Decide'." Mr. Crotty briefed the members about the York-Antwerp Rules 2004, which were adopted without the approval of shipowner interests as represented by BIMCO, Intertanko, and others. The Rules were drafted by the Comité Maritime International (CMI), a non-governmental international organization. The York-Antwerp Rules are not part of any international convention and usually are contractually binding when incorporated by reference into charter parties and bills of lading. At least one country, Norway, makes the York-Antwerp Rules binding through domestic law and has opted to preserve the 1994 Rules rather than adopting those of 2004. Similarly, BIMCO charter parties and model bill-of-lading clauses will continue to provide for the 1994 version. Mr. Crotty concludes that York-Antwerp Rules 2004 might "die on the vine."

Gene B. George, Committee Vice-Chair, continued his series of updates on the insurance and legal ramifications of the 2005 hurricanes. Mr. George summarily reported that Hurricane Andrew (August 1992) cost the insurance industry approximately $15 billion and that the loss incurred in Hurricane Katrina (August 2005) could reach $60 billion.

By way of comparison, the insurance costs for September 11, 2001 exceeded $20 billion. Mr. George reported that while Hurricane Katrina

[14571]

certainly will affect the profits of the insurance industry, no insolvencies have been directly reported. Property insurance premiums have increased an average of 8 percent, and most claims have been settled.

Mr. George further reported that toxic damage from Hurricane Katrina was not as severe as originally forecasted. There was substantial oil pollution with over 8 million gallons of oil products escaping from tanks and homes.

The general impact on the insurance industry was softened by rising interest rates on underwriters' investment. There were uneven increases in property and casualty premiums, such as a 26% increase in the southeast region (500% increase in some Florida policies) while other areas of the country saw a decrease. Some recent reinsurance renewals have seen a 57% increase in premiums.

Concerning Hurricane Katrina claims and litigation, Mr. George reports that riverboats have had issues concerning their business interruption policies, which covered loss for wind but not flooding. A class action was defeated and each insured will have to bring a separate lawsuit.

In another Hurricane Katrina related lawsuit, *Leonard v. Nationwide Mutual Ins. Co.*, 438 F.Supp. 2d 684 (S.D. Miss. 2006), the insureds brought a claim against the insurer to recover for damage to their home caused by Hurricane Katrina. The plaintiff did not have flood insurance as part of their policy. Flood insurance was available separately through the National Flood Insurance Program.

The Leonard residence encountered winds that exceeded speeds of 100 miles per hour. Also, as a result of the contents of the Mississippi Sound being driven ashore by the hurricane, the water level surrounding the Leonard home rose to a peak level of approximately five feet. As a result of the storm, there was extensive damage to the first floor of the house as well as to the attached garage. There were also some broken roof shingles, though the "water-tight integrity of the roof was not breached during the storm." There was a small hole in one of the windows of the second floor as a result of some wind damage. Also, the "exterior of the Leonards' home, and the attached garage were soiled by a combination of wind-driven materials and water-borne materials." The garage doors were damaged by both wind and water.

A Nationwide adjuster examined the damage to the Leonard residence and determined that the wind damage consisted of the broken

[14572]

shingles and the loss that resulted from a tree that was blown down across a fence. As compensation for this damage, Nationwide issued a check in the amount of $1,661.17, after applying the $500 deductible. The Leonards argued that the total damages resulting from the storm were $130,253.49. The Leonards identified $47,365.41 as being directly attributable to the wind.

The court held that the "[s]torm surge is a phenomenon associated with hurricanes. Atmospheric conditions and wind forces combine to force tidal waters ashore and temporarily inundate areas of normally dry land." Additionally, "[s]torm surge is a type of flooding that is covered by flood policies sold under the National Flood Insurance Program and excluded under standard homeowner's policies." The Leonards' policy similarly excluded water damage coverage, except for that of rain that enters the house after its watertight integrity has been breached.

The court concluded that the Nationwide policy was valid and enforceable. Nevertheless, Judge Senter rejected the specific "anti-concurrent causation" language of the exclusion provision of the policy as ambiguous. Thus, the court interpreted Nationwide's policy provisions to provide coverage for windstorm damage, an included peril, even when an excluded peril occurs at the same time. However, "[t]he Leonards have the burden of proving that the insured property was damaged or destroyed by a cause within the insuring language of the policy during the time the policy was in force." This meant that the Leonards had to prove that the damage in question was caused by wind rather than flooding. Conversely, Nationwide had the burden to prove that the portion of the damage for which they are withholding payment was caused by flooding and thereby falls within the water damage exclusion. "Under applicable Mississippi law, in a situation such as this, where the insured property sustains damage from both wind (a covered loss) and water (an excluded loss), the insured may recover that portion of the loss which he can prove to have been caused by wind." Likewise, the insurer does not bear responsibility for that damage it can prove was caused by water.

Gene also spoke about the *Murphy Oil Class Action Litigation* in the United States District Court for Eastern District of Louisiana (Civ. No. 05-4206). The court allowed a class action for damages sustained by property owners due to oil leakage from the Murphy Oil facility. Murphy Oil settled the action with cash payments and offered to buy the properties near the spill. It cost Murphy $330 million.

[14573]

The Committee next had the pleasure of hearing from Rhys Clift of Hill Taylor Dickinson on the issue of "Marine Insurance: Contract Certainty." Mr. Clift reported that the London Insurance Market set up the Market Reform Group (MRG) to improve the processes and procedures of the London insurance market. They have standardized the London Market Slip and the Contract Certainty Code of Practice.

Contract Certainty as devised by MRG means that full wording must be agreed between the insured/reinsured's agent (broker) on the one hand and the underwriter on the other hand before the underwriter commits to the insurance contract and that evidence of cover must be issued in a satisfactory form to the insured/reinsured within 30 days of inception. This means that there must be certainty of the slip, clauses and additional *ad hoc* clauses but of course not certainty of meaning or interpretation of the clauses. Phrases such as "wording to be agreed" or "wording as per original" will be eliminated from the slips. Where the terms and conditions are not full and complete, the court in an extreme case, could find that there is no binding contract.

Mr. Clift advised that even if the Contract Certainty initiative is full complied with, there is no guarantee that a dispute under a policy of insurance that contains an exclusive English jurisdiction clause will be brought before an English Court, at least where there is a possibility of competing proceedings in another EU Member state. If an English arbitration clause is included, it is much more likely that the forum of choice will be respected.

The Committee's guest speaker, Mr. Ben Gleason, Director of Risk Management for Matson Navigation and Alexander & Baldwin, gave an outstanding presentation on the "The Business of Jones Act Shipping." Mr. Gleason briefly reviewed the history of Matson Navigation, which began in 1882 with a schooner sailing between San Francisco to Hilo, Hawaii, carrying food, plantation supplies and general merchandise. The company grew and developed into a company that has been involved in oil exploration, hotels, tourism, and military support during the two World Wars. Its primary business was carrying freight between the Pacific Coast and Hawaii

The Jones Act, enacted in 1920, required that cargo moving between United States ports be carried in ships which are U.S. owned, U.S. built, and U.S. crewed. The purpose was to provide U.S. Flag carriers a level playing field for competition. The stated purpose of the Jones Act is so that the United States "shall have a merchant marine of the best equipped and the most suitable types of vessels . . ."

[14574]

The Jones Act, in addition to being a cabotage law, also provides remedies for crew members subject to the laws of the United States. An effect of the Act is that in negligence actions against their employer crew members have a "feather weight" causation standard to establish their case. The Jones Act crew member, in addition to his Jones Act remedy, is entitled to a warranty of seaworthiness and maintenance and cure.

Mr. Gleason then outlined some of the difficulties a Jones Act carrier faces, such as hiring expensive crews, older crews with increased injuries and illnesses, more expensive P&I insurance, and more frequent rotation of crews. In addition, the vessels used in the coastwise trade must be built in the United States at triple the cost of building overseas. Consequently, the replacement value of the Jones Act vessel is much higher, and insurance costs are correspondingly higher. P&I insurance costs are much higher than the world average because of the increased crew exposure. In addition, in the event of damage to or loss of a vessel, replacement vessels are non-existent on the spot market, so that Matson feel obliged to incur the expense of keeping a spare vessel available on stand-by.

Mr. John Woods, Chair of the Subcommittee on Hull and P&I Insurance, spoke briefly about a seminar held in New York the previous day, under the auspices of the Association of Average Adjusters of the United States, which he had moderated, called "Crimes and Misdemeanors." He mentioned that there are private service companies that have been successful in obtaining releases for ships being held by "rogue states."

Mr. Woods then reported on *Commercial Union Insurance Co. v. Pesante,* 2006 U.S. App. Lexis 20391 (1st Cir. 2006), a case in which the insurance policy contained an express warranty that the only commercial use the vessel could be used for was lobstering. The owner in fact used the vessel for gill netting and never for lobstering. The Court of Appeals held that the insurer would not have insured at the quoted premium and found that the insured made a material misrepresentation voiding the policy *ab initio.*

The meeting concluded with questions from the audience.

Respectfully submitted,
Jonathan S. Spencer
Chair

[14575]

## FORMAL REPORT OF THE COMMITTEE ON MARITIME TORTS AND CASUALTIES

### The Supreme Court

Certiorari was granted in *Norfolk Southern Ry. v. Sorrell*, No. 05-746 126 S. Ct. 2018, 170 S.W.3d 35 (Mo. App. E.D. 2005). The case is a railroad accident case, so it will impact on Jones Act cases. The Missouri court had its own charge for contributory negligence in FELA cases, which was the basis of the grant of certiorari. The issue is the proper FELA-Jones Act charge. Is the plaintiff entitled to a charge that if he/she is only slightly negligent that defendant will not establish its burden of proving causation? Is the negligence standard different from a causation standard?

The Supreme Court in *Ferguson v. Moore McCormack*, 352 U.S. 521 (1957), held that a plaintiff need only prove "slight negligence" to recover (the featherweight standard). This was recently affirmed in the Second Circuit. *Tiller v. Atlantic Coast Line*, 318 U.S. 54 (1943) held that to prove contributory negligence defendant must prove "by a preponderance of the evidence that plaintiff did not exercise slight care for his own protection". Since *Gautreaux v. Scurlock Marine*, 107 F.3d 331 (5th Cir. 1997), differentiated negligence from causation, some courts have followed the reasoning. Only causation is "slight" under this case; negligence is just "due care." *Gautreaux* was applied recently in *Roulston v. Yazoo River Towing*, 418 F. Supp.2d 851 (S.D.Miss. 2006) ("ordinary prudence").

### The Supreme Court and Punitive Damages

The Supreme Court has granted certiorari in a suit against a tobacco company. The issue is whether the reprehensible nature of the act, analogous to a crime, overrides the constitutional requirement that there be a reasonable relationship between punitive and non-punitive recoveries. Here an Oregon jury awarded $79.9 million in punitives, some 97 times the compensatory recovery. Punitives were reduced by the trial court but reinstated on appeal. The case below: *Williams v. Philip Morris, Inc.*, 340 Or. 35, 127 P.3d 1165 (2006).

### Punitive Damages

A punitive damage award was entered against Ford in a rollover case. Damages to a paraplegic were $27.6 million, punitives $55 million, a two-to-one ration. Ford was held in reckless disregard. *Wilson v. Ford Motor Co.*, 2006 WL 2002858 (Cal. App. 4th Dist. 2006).

[14576]

### Admiralty Jurisdiction

A Southern District of New York court has decided that the crash of an American Airlines Airbus in Queens, New York would have passenger damages decided under maritime law rather than New York law. While over Jamaica Bay, federal navigable waters, the vertical stabilizer and rudder separated and fell into the water. Thus, the case became a *Moragne* case subject to the international Warsaw Convention, and damages would be available for loss of society as well as compensatory losses. Any punitive damage passenger claim would involve French law as the manufacturer was French. New York punitive damage law would apply to land based injuries and death. *In re Air Crash at Belle Harbor, N.Y.*, 2006 U.S.Dist. LEXIS 27387, 2006 A.M.C. 1340 (2006). Plane crashes in the ocean have traditionally been in the maritime jurisdiction.

### Katrina Jurisdiction Case

Suit was brought against the U.S. for flooding due to defective levee design by the U.S. Corps of Engineers. Another claim was that the Coast Guard should have sunk a barge that damaged a levee. Admiralty claims were denied: the barge claim had to be brought under the Admiralty Extension Act, whereby suits against the U.S. require an administrative claim. The Corps of Engineers case was held non-maritime, so that suit had to be brought under the Federal Tort Claims Act, which also requires an administrative claim. *Matter of Ingram Barge Co.*, 435 F.Supp.2d 524 (E.D. La. 2006).

Another hurricane case allowed an "Act of God" defense where a vessel owner took reasonable precautions in mooring his pleasure boat. *Fischer v. S/Y Nerida*, 2006 A.M.C. 508 (S.D. Fla. 2005).

In *Tagliere v. Harrah's*, 445 F.3d 1012 (7th Cir. 2006), the plaintiff was injured when the stool she was leaning against on a gambling boat collapsed. Admiralty jurisdiction was upheld under the Admiralty Extension Act, where the boat was not permanently moored to the pier—only indefinitely. An *in rem* action is available even if the owner has no liability.

### Coast Guard and Maritime Transportation Act of 2006

H.R. 889 was passed last summer, which among other provisions allowed foreign citizens to act as riding gangs when U.S. citizens or residents were unavailable, but not for more than 60 days each calendar year.

[14577]

Also, only U.S.-flag vessels are allowed to engage in any activity in connection with the mooring or unmooring of a mobile offshore drilling unit.

### Jones Act, Unseaworthiness and Maintenance Claims

*Napier v. F/V Deesie, Inc.*, 454 F3d 61 (1st Cir. 2006) has a good review of the bases of these claims. The case involved a medical report opinion that aspirin as prescribed after an accident caused ulcers and thus provided genuine issues of material fact.

An unseaworthiness claim will not lie against a boat owner other than that of the employer. *Roulston v. Yazoo River Towing*, 418 F.Supp.2d 851 (S.D. Miss. 2006).

### The Primary Duty Rule

The Primary Duty Rule is not looked on with favor. The rule or doctrine holds that a crew member may not sue his employer if it was his duty to keep a dangerous condition safe. The rule does not apply if there is independent fault of the employer. If so, the issue is one of comparative negligence. *Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898 (6th Cir. 2006).

### Maintenance and Cure

A shipowner was allowed to proceed by a declaratory judgment action to deny a maintenance and cure claim. *Norfolk Dredging Co. v. Phelps*, 432 F.Supp.2d 718 (E.D. Va. 2006). The factors considered included whether the suit is a race to the courthouse. The seaman had not yet filed a suit. Cited are Fifth Circuit cases denying the shipowner the right to a DJ action where the seaman had filed suit. Keeping the DJ suit was discretionary. A DJ action was denied in *Lexington Ins. Co. v. Rolison*, 434 F.Supp. 2d 1228 (S.D. Ala. 2006).

### The Whistle Blower Statute

Officers on a gaming vessel reported improper hiring by the employer, and they were discharged. The reports involved safety violations reported to the Coast Guard, which are covered by the Whistle Blower statute. Coast Guard Authorization Act of 1985, 46 U.S.C. § 2114 and 46 C.F.R. §§ 10.501(b) and 15.915. *Gaffney v. Riverboat Services*, 451 F.3d 424 (7th Cir. 2006).

[14578]

### Shipowner Sues Crewmember

A shipowner was allowed to sue a crewmember who negligently damaged the owner's property. *Withhart v. Otto Candies*, 431 F.3d 840 (5th Cir. 2005).

### The Pennsylvania Rule

The Court of Appeals for the Fifth Circuit did not apply the Pennsylvania Rule where a barge owner suing a tugboat owner had a defective barge, had a master on duty too long hours, and failed to have a second licensed operator on board. *Halliburton Energy Services v. Denet Towing*, 2006 A.M.C. 1517, 2006 U.S. App. LEXIS 11391 (2006).

### Longshore Act – Third Party Case

In *Goldsmith v. Swan Reefer A.S.*, 173 Fed. Appx. 983 (3d Cir. 2006), a longshoreman was injured when a ship listed while loading a container. The shipowner had no duty under a time charter to supervise stevedoring operations. Although the charter required the owner to have an officer on deck during loading and discharging, there was no contract between the owner and the stevedore. The terminal operator was also exonerated because the duty was placed on the stevedore.

### Longshore Act Coverage

The Ninth Circuit has ruled that the Act covers an excavator killed at a trench part of a project to renovate three submarine berths at Pearl Harbor. Workers involved in a construction of a maritime facility are covered. *Healy Tibbitts Builders v. Maumau*, 444 F.3d 1095 (9th Cir. 2006).

### The Outer Continental Shelf Lands Act

A subcontractor's employees sued a helicopter shuttle service for an accident on an oil platform. The helicopter service sought indemnity against the platform service, which would not be allowed under Louisiana law. The OCSLA applies state law to situs platform accidents if (1) the situs is proper; (2) federal general maritime law does not apply; and (3) state law is not inconsistent with federal law. Parties cannot contract out OCSLA. The shuttle service was held non-maritime, so indemnity would be denied even though other cases hold helicopter flights replace boats. Here the crew was assigned to the helicopter. The Supreme Court case of *Norfolk So. Ry. Co. v.*

*Kirby*, 543 U.S.14 (2004), was discussed, which found a through bill of lading within the admiralty contract jurisdiction. *Alleman v. Omni Energy Svces, Corp.*, 434 F.Supp.2d 405 (E.D.La. 2006).

A products case can also be brought under OCSLA involving construction of a crane used in an offshore oil and gas facility. A jury trial was available under adjacent state law. *Texaco Exploration and Production, Inc. v. AmClyde*, 448 F.3d 760 (5th Cir. 2006).

### ISM Code

The only case dealing with the International Safety Management Code (ISM Code) reported so far is *Kyles v. Eastern Car Lines, Inc.*, a Georgia state court case brought by an injured longshoreman. The last reported decision noted that violation of the ISM Code (which among other items requires a risk assessment as well as safety standards in a safety manual) would be an enhanced negligence claim even if adopted voluntarily prior to the official date. 2006 G. App. Lexis 854, (July 10, 2006). The latest word is that the defendant is claiming that an expert is not needed and should be excluded in a *Scindia* case. There are many cases where experts have testified in *Scindia* cases, including federal appellate cases. The plaintiff's expert had testified on the provisions of the ISM Code.

### Passenger Cases

The Florida Supreme Court has taken a case to decide whether a cruise line is liable for a doctor's malpractice. *Rosenfeld v. Celebrity Cruises*. A minority view holding the cruise line liable was decided by an appellate court in 2003. *Carlisle v. Carnival Corp.*, 2003 A.M.C. 2433 (Fla. Dist. Ct. App. 2007).

*Bird v. Celebrity Cruise Line*, 428 F.Supp. 2d 1275 (S.D.Fla. 2005), involved a claim of food poisoning. The court held that the cruise line could not be held strictly liable under admiralty law. Also, a claim for breach of implied warranty of merchantability did not exist under admiralty law. Passengers are not due a warranty of seaworthiness. Florida cases are cited providing a warranty of merchantability, and there are products cases allowing it in an admiralty claim. In this case the ticket disclaimed a warranty concerning food and drink. The decision does cite many class action cases involving food poisoning, but each claimed negligence. Strict liability was applied in a sexual assault case of a passenger by a crew member by the Eleventh Circuit. *Doe v. Celebrity Cruises*, 394 F.2d 891.

[14580]

The Eleventh Circuit has ruled that an accident involving an intoxicated boat operator creates a rebuttable presumption of liability. In this case the operator of a recreational boat proved that the intoxication and statutory violation did not cause an allision. *In re Superior Construction Co.*, 445 F.3d 1334 (11th Cir. 2006). Also involved was the Oregon Rule, which creates a rebuttable presumption in an allision with a stationary object. The court upheld a ruling that the injuries were the sole fault of the owner of a barge and tugboat left in the wrong place and inadequately lit in violation of statute.

## Death In State Waters

The general maritime law applies to deaths in state waters, so punitive damages are recoverable. *Rebara v. Crew Boats*, 906 So. 2d 579, 2005 AMC 1272 (La. App. 1st Cir. 2005).

## Death on the High Seas Act

DOHSA was applied to a scuba diving accident in Bahamas waters, denying non-pecuniary damages. *Perkins v. Ottershaw Investments*, 2005 U.S. Dist. Lexis 31067 (S.D.Fla. 2001).

Respectfully submitted,
Paul S. Edelman
Vice-Chair

## FORMAL REPORT OF THE REPRESENTATIVE OF THE MARITIME LAW ASSOCIATION OF THE UNITED STATES TO THE AMERICAN BAR ASSOCIATION HOUSE OF DELEGATES

The House of Delegates met at Honolulu, Hawaii for two days, Monday, August 7th and Tuesday, August 8th.

There were several short speeches, but there were no "headliners," such as the Attorney General of the United States. There was a one-hour panel discussion on the morning of the first day's meeting that had as its moderator Catherine Crier of CNN, on the topic of "Liberty verses Security". The consensus of what I heard concerning the panel was slightly interesting albeit out of place and somewhat interfered with the other issues to be addressed by the House. It also had a national political "tilt". I am sure

[14581]

it would have been equally easy to have assembled a panel and moderator on general lawyer issues, such as professionalism, that would have been more warmly received.

Then, the current President, Michel Greco from Massachusetts, turned over the gavel to Karen Mathis of Colorado. A short speech was given by her, wherein she outlined the thrust of her program for the ensuing year. The thesis seems to be that the American bar needs to help seniors in general and its senior lawyers specifically. Following that presentation the new President-Elect from Seattle was introduced, William H. Neukom. He began his career in the law firm of Bill Gates, Sr. When Bill Gates, Jr. started his company his firm assigned Neukom as General Counsel, where he rapidly amassed a substantial fortune along with the other Microsoft founders. He seems to be a down-to-earth person. The thesis of his presentation is that someone, and it is going to start with him, needs to bring the ABA back to focusing on practitioners in the United States, significant lawyer issues in the United States, and how the ABA may assist practitioners. While he gave no details on this, he seems to indicate that there were going to be some changes in that direction.

A new Executive Director was introduced, Henry F. White, Jr. of New York. It appears that he was previously living in the greater New York area and had been the executive director of a container association. He was a Naval Reserve, two-star admiral and seemed to have a lot of other credentials in addition to being a lawyer.

There were fifteen major matters that were to be voted upon. These resolutions had been submitted to the House in a timely fashion and had been bound in book form. They were distributed in the middle of July. As so often occurs, many more late resolutions were given to us, unbound, for the first time at about 8:15 on Monday morning. Among these numerous resolutions, one resolution, number 304, was the most heated and controversial.

One administrative problem of the ABA continues to plague it. I have spoken with some of the ABA Past Presidents and they feel that this is an ongoing problem of substantial dimensions. It may also be a source of their financial problems that resulted in the raising of dues. The problem centers itself upon basically when the sitting President establishes a program, it never dies. For example, the presidential program for this year has been the "Renaissance of Idealism". I suspect that it will go on forever at a substantial cost to the ABA. Most of the projects that were undertaken over the

[14582]

last fifteen or twenty years are still ongoing. There is no "sunset policy". Thus, it is extremely difficult for there to be a clear focus on what is currently relevant. My own editorial comment is that the MLA has studiously avoided such matters in the past by termination of committees, merger of committees, and creation of study groups that are *ad hoc* in nature.

The following matters were approved, either unanimously or virtually unanimously:

1. Resolution 102. Commission on Civic Education and Separation of Powers.

2. Resolution 104. Standing Committee on Client Protection, Section of Business Law, Section of Labor and Employment Law, National Organization of Bar Counsel, Standing Committee on Professional Discipline.

3. Resolution 105. Standing Committee on Professional Discipline, Task Force on Gats Legal Services Negotiations, Section of International Law, Standing Committee on Client Protection, National Organizations of Bar Counsel.

4. Resolution 111. Standing Committee on legal Aid and Indigent Defendants, Steering Committee on Unmet Legal Needs of Children, Committee on Interest of Lawyers, Trust Accounts, National Legal Aid and Defender Association, Commission on Homelessness and Poverty, Commission on Domestic Violence, Standing Committee on the Delivery of Legal Services, New York State Bar Association, Section of Labor and Employment Law.

5. Resolution 118. Commission on Law and Aging, American Immigration Lawyers Association, Commission on Homelessness and Poverty, Commission on Renaissance of Idealism in the Legal Profession, Senior Lawyers Division, Standing Committee on Legal Aid and Indigent Defendants, Standing Committee on Pro Bono and Public Service, Health Law Section, Standing Committee on The Delivery of Legal Services, Tort Trial and Insurance Practice Section, Committee on Interest on Lawyers Trust Accounts, Section of Labor and Employment Law Young Lawyers Division.

6. Resolution 119. Section of Administrative Law and Regulatory Practice.

[14583]

7. Resolution 120A. Section of Litigation, Section of State and Local Government Law, Section of Science and Technology Law, Criminal Justice Section, Young Lawyers Division.

These were all passed on Monday, August 7th.

On Tuesday, August 8th, the following Resolutions were passed.

1. Resolution 120C. Section of Litigation, Section of State and Local Government Law, Criminal Justice Section, Tort Trial and Insurance Practice Section, Young Lawyers Division.

2. Resolution 120D. Section of Litigation, Section of State and Local Government Law, Criminal Justice Section, Tort Trial and Insurance Practice Section.

3. Resolution 121A. Commission on Renaissance of Idealism in the Legal Profession, Standing Committee on Pro Bono and Public Service, Standing Committee on Legal Aid and Indigent Defendants, Senior Lawyers Division, Law Student Division, Section of State and Local Government Law, Government and Public Sector Lawyers Division, Section of Litigation, Standing Committee on the Delivery of Legal Services, Commission on Domestic Violence, Section of Health Law, Law Practice Management Section, Santa Clara County Bar Association, Section of Labor and Employment Law, Section of Individual Rights and Responsibilities, Young Lawyers Division.

4. Resolution 123A. Section of International Law.

5. Resolution 301. Section of Legal Education and Admissions to the Bar.

6. Resolution 400. Report with Recommendation on Archiving Consent.

A few notes on particulars. Resolution 121B was passed with a substantial dissent. I voted against it. On Tuesday Resolution 123A, concerning the Hague Convention on Choice of Law Agreements, was passed. I very much appreciated the input that I received from Alan Praag, and I have written separately to him thanking him.

Also, I initially was inclined to vote against Resolution 301 (licensing of foreign legal consultants). I listened carefully to the argument, pros and cons. I was seated between the Delegate from the International Law Section and the Delegate from the Association of Life Insurance Counsel. Both

[14584]

explained the benefits of this Resolution and together with what I heard from the floor urged me to vote in favor of it. It is probably a good thing that I did since I would have been the sole vote crying out in opposition, since it passed unanimously. Whether any state will ever adopt this model rule remains to be seen; there were portions that needed further amplification.

Resolution 304 was placed on our desks on Monday morning. Apparently it had been placed on the ABA website a few days before, but very few, if any, were aware of this website entry. There was also a brief of 34 pages submitted. Summarizing, on April 30, 2006 a reporter for the Boston Globe wrote a lengthy article on the use of presidential "signing statements" in which he reported that President Bush had quickly claimed the authority to "disobey" more than 750 laws enacted since he took office. President Greco then appointed a task force. Apparently signing statements had been used by Presidents beginning with James Monroe continuing through Andrew Jackson, Abraham Lincoln, Theodore Roosevelt, Franklin Roosevelt, Dwight Eisenhower, Richard Nixon, John F. Kennedy, Lyndon Johnson, Jimmy Carter, Ronald Regan, George Herbert Walker Bush, Bill Clinton, and now President George W. Bush. However, President Greco indicated that the American public wants to know our answer to this, and they want to know it right now. This came as a surprise to many of us in the House of Delegates. It appears that there had been precious little time given to study this. This matter as written as argued to be "general" was directed at the current President.

One Delegate to the House had been informed by his Section he wasn't authorized to participate or approve this Resolution, but he did suggest a formal amendment that was passed without opposition. However, all groups were learning about this Resolution at a very late time. A motion was put on the floor to table the passage until the next meeting in 2007. I voted for the delay along with a substantial number of the Florida Delegates, but it was defeated 99 to 272. Then the Resolution was passed by approximately the same number. I was fearful that press releases and other communications were going to appear to be directed towards the sitting President since this procedure had started during the "era of good feeling" during James Monroe's term, and for the last hundred years the ABA had not gotten around to being incensed.

Shortly after the meeting I received the "ABA Watch," which is <u>not</u> an official ABA publication but is a publication of the Federal Society for Law and Public Policies Studies that is widely circulated, including to members of the House of Delegates, among others. It states in part that some have complained that by launching the campaign to promote judicial independ-

[14585]

ence (that everyone one hundred percent approves) the ABA has increasingly questioned the independence of the executive as a separate branch of government. It also cited that President Greco compared President Bush to King George III during an interview when he stated "we fought the Revolutionary War to get away from King George–and we have another one who is acting like a king".

I was considerably dismayed and disappointed that the political arguments reached such a high level. I compare this to the MLA, where I have heard on many occasions from several sources that the debates at the MLA are of high quality, because the debaters "check their clients at the door".

To end on a brighter note, I draw attention to item 7 that was passed on Monday shortly before 6:00 o'clock p.m. Of course, I am speaking of Resolution 120A. This Resolution urged the federal courts and state courts to adopt consistent rules governing the scope of required disclosure for discovery of testifying experts, and also that the draft expert reports be protected from discovery. This Resolution tracks the New Jersey State Rule. I frankly was surprised that there was so much opposition against this. The reported cases go in all directions, and this was just an effort to standardize matters as they have done in New Jersey. I cast my vote in favor. It passed easily.

I also had the opportunity to seek out Mr. Golemon of Austin, Texas, who serves as the Chairman of the Standing Committee on Environment. We discussed matters for a lengthy period of time. I do not know what will happen when the committees are set up next month at the Chair's meeting; however, I am not sanguine about the likelihood of our having a member on the Committee. Mr. Golemon explained that there were a good number of people waiting in line to become part of the Committee and gave a lot of other reasons for there being little or no change. I am continuing to pursue that issue and also the progress of the Foreign Sovereign Immunities Act amendment and will keep you posted.

I consider it an honor to be your House of Delegate representative. It is also a position of trust. I thank you for the opportunity.

Respectfully submitted,
James F. Moseley
Chair
American Bar Association Relations
and MLA Representative
in the House of Delegates

[14586]

## MINUTES OF THE BOARD OF DIRECTORS MEETING OF THE
## MARITIME LAW ASSOCIATION OF THE UNITED STATES

Held at the Hilton Mystic Hotel
Mystic, Connecticut
on
August 5, 2006
9:00 a.m.

The August 5, 2006 meeting was called to order by President Lizabeth L. Burrell at 9:05 a.m. In addition to President Burrell, the following officers also were present:

Warren J. Marwedel, First Vice President
Patrick J. Bonner, Second Vice President
James W. Bartlett, III, Secretary
Robert G. Clyne, Treasurer
Philip A. Berns, Membership Secretary
Thomas S. Rue, Immediate Past President

The following directors also were present:

Joseph E. Basenberg                John D. Kimball
Dennis L. Bryant                   Sandra L. Knapp
Christopher O. Davis               Stephen V. Rible
David J. Farrell, Jr.              John M. Ryan
Grady S. Hurley                    Harold K. Watson
Allan R. Kelley                    John M. Woods

### SECRETARY'S REPORT

Secretary James W. Bartlett, III of Baltimore reported that a blast e-mail had gone out to the MLA membership relating to the 2006 Fall Meeting in San Francisco on October 3–7, 2006.

Upon motion duly made and seconded, the minutes of the May 4, 2006 meeting of the Board of Directors were unanimously approved and accepted. The minutes of the May 4, 2006 meeting of the Board of Directors will be published in the Spring 2006 issue of the PROCEEDINGS.

[14587]

## TREASURER'S REPORT

Treasurer Robert G. Clyne of New York presented the Treasurer's report for the three months ended April 30, 2006. He reported that as of April 30, 2006, the MLA had $356,783.98 in cash and investments.

Treasurer Clyne made a motion that President Burrell, Second Vice-President Bonner, and Treasurer Clyne be made signatories to the money market account. After being seconded, the motion passed unanimously.

Upon motion duly made and seconded, the Treasurer's report was unanimously approved and accepted. A copy of the Treasurer's formal written report for the three months ended April 30, 2006 will be appended to the original of these minutes.

## MEMBERSHIP SECRETARY'S REPORT

Membership Secretary Philip A. Berns of Henderson, Nevada reported that ten applications for admission to the MLA as Associate members had been received, and he recommended the admission of those lawyers. Upon motion duly made and seconded, the applications of the following ten Associate members were approved:

T. Alexander Devine of Coral Gables, Florida
Richard P. Fiske of Washington, D.C.
Derek S. Merman of Houston, Texas
Mark M. Murakami of Honolulu, Hawaii
Wayne A. Parker of New York, New York
Michael R. Vaughn of Alameda, California
Garth S. Wolfson of New York, New York
Byron Christopher Romain of Moscow, Russia
Byron E. Countryman of Los Angeles, California
David E. Russo of San Francisco, California

By special approval of the Board by an e-mail vote taken on June 27, 2005, Cheri A. Chestnut of New York, New York had been elected as an Associate member.

An application for reinstatement was received from Joseph A. Kilborn of Mt. Kisco, New York. A motion for the approval of the Board for the reinstatement of Mr. Kilborn as a Proctor member, after being duly seconded, was passed unanimously.

[14588]

Mr. Berns reported with regret the deaths of the following MLA members:

Herbert M. Lord of New York, New York
August C. Burns of Newport Beach, California
RADM Maurice J. Bresnahan of Buzzard's Bay, Massachusetts
Henry W. Magenheimer of Chatham, New Jersey
Warren M. Faris of New Orleans, Louisiana

After the admission of the ten Associate members and the reinstatement of the one Proctor member, the total membership of the MLA is 3,087.

Mr. Berns reported that it is hoped that the 2066–2007 MLA Directory will be sent to the members prior to the 2006 Fall Meeting.

Upon motion duly made and seconded, the Membership Secretary's report was unanimously approved and accepted. A copy of the Membership Secretary's written report will be appended to the original of these minutes.

## COMMITTEE ASSIGNMENTS

President Burrell emphasized the importance of Board liaisons to Committees playing a role in those Committees. The Board liaison should report back to the Board if a Committee Chair is not effective, should ensure that there are accurate Committee votes, and should have input into the scheduling of the Committee meetings.

The Board unanimously approved the waiver of the Proctor status requirement for Cheri A. Chestnut as Chair of the Dinner Committee and John J. Driscoll, Jr. as Vice Chair of the Committee on Salvage. The Board liaisons reported on the activities and status of their respective Committees.

## BOARD SUBCOMMITTEES: MISSION STATEMENTS AND REPORTS

### Committees

Second Vice-President Bonner, Chair of the Board Subcommittee on Committees, reported his Subcommittee is studying the question of the Committee schedules for the New York meetings. One suggestion is to minimize overlap of the meetings of the larger Committees. Another is to "pair"

[14589]

similar memberships, so that the meetings of those Committees can be held one after the other at the same site.

## Finance

Treasurer Robert G. Clyne, Chair of the Board Subcommittee on Finance, reported the Subcommittee met telephonically on July 20, 2006. The Subcommittee adopted the following mission statement: "To assist the Treasurer in the performance of his or her duties, to work to ensure the Association's financial health, and to make recommendations where necessary in such matters as financial reporting, dues increases, budget, and audit procedures."

## Membership

Philip A. Berns, Chair of the Board Subcommittee on Membership, reported that a major need is for the MLA to make itself more "locally available" to members. The concept of regional MLA Meetings, including lunches, speakers, cocktail parties, was discussed with the possibility that MLA Board members or officers could attend. Another possibility is coordinated meetings similar to that in San Francisco, with the Pacific Admiralty Seminar or the Tulane Admiralty Law Institute. It was generally agreed that the non-lawyers' committee should be an open committee.

## Website

Warren J. Marwedel, Chair of the Board Subcommittee on Website, reported that the MLA Website and Technology Committee is in the process of revising its mission statement to clarify its responsibilities.

## DISCUSSION ITEMS AND REPORTS

### CLE Financial Aid Policy

As an accredited provider of continuing legal education (CLE) for the State of New York, it is necessary that the MLA implement a financial aid policy. The Committee on Continuing Legal Education drafted and proposed a financial aid policy. A motion was made and duly seconded to adopt the proposed financial aid policy, and the Board unanimously approved the following MLA Financial Aid Policy:

[14590]

## Financial Aid Policy of The Maritime Law Association of the United States

CLE financial aid assistance is available for attorneys who wish to attend CLE courses sponsored by The Maritime Law Association of the United States, but who find it difficult to attend due to cost considerations.

CLE financial aid assistance is available for all attorneys based upon attorney income as outlined in the following schedule:

| | |
|---|---|
| Unemployed: | Full Scholarship |
| Income up to $15,000: | 75% Discount |
| Income from $15,000 to $30,000: | 50% Discount |
| Income above $30,000: | No Discount |

Applications should be submitted by letter in writing via mail or e-mail to the Chair of the MLA's CLE Committee. Contact information for the CLE Committee Chair can be found on the MLA's website at www.mlaus.org, or in the MLA Directory. The letter should state the applicant's income level and the level of financial assistance sought. Please include the applicant's name, address, daytime phone and fax numbers, and e-mail address. At the discretion of the CLE Committee and the MLA Board of Directors, income verification may be required before financial aid is awarded. Applications should be submitted no later than one month prior to the offered course.

Note: Financial aid is not available for programs offered at no charge and does not cover portions of registration fees intended to cover provisions such as food, drinks, and/or accommodations, rather than the cost of CLE.

### Ad Hoc Committee on Environmental Crimes

President Burrell, Past President Rue, and Michael Chalos met last week with industry people in New York to discuss this subject. Another meeting will be held in Washington, D.C. on September 11, 2006. There will be a meeting on October 3, 2006 in San Francisco with the United States Coast Guard and the Department of Justice in an effort to come up with "best practices" guidelines.

### ABA House of Delegates

James F. Moseley, the MLA Delegate to the ABA House of Delegates, in a letter dated July 18, 2006 made various recommendations concerning

[14591]

how he should vote at the ABA House of Delegates Meeting. Upon motion duly made and seconded, the Board agreed with all of Mr. Moseley's recommendations.

## CMI Questionnaires

Questionnaires have been received from the CMI with respect to limitation of liability for cargo claims and places of refuge. The Chair and Vice-Chair of the Committee on Carriage of Goods have proposed answers to the questionnaire on limitations of liability applicable to cargo claims. It is felt that some refinement needs to be made to these answers, and then the answers will be submitted. Tony Whitman, Chair of the Committee on Regulation of Vessel Operations, is going to consult with the United States Coast Guard before finalizing proposed answers to the questionnaire on places of refuge.

## Proposed Resolution Addressing
## the UNCITRAL Draft Instrument

In a letter dated July 19, 2006, the Committee on Arbitration and ADR proposed a resolution for adoption by the MLA at the next General Meeting addressing the UNCITRAL draft instrument as prepared at the 16th Session of UNCITRAL Working Group III respecting choice of court and arbitration clauses for cargo loss and damage claims. The letter constituted the majority report of the Committee on Arbitration and ADR. The Chair of the Committee on Arbitration and ADR, Armand M. Paré, Jr., attended the Board meeting to discuss this proposal. Also attending the Board Meeting by telephone were Chester D. Hooper, who serves as an MLA representative on the United States delegation to UNCITRAL Working Group III, and Donald C. Greenman, Chair of the Committee on Carriage of Goods.

An extensive discussion followed concerning certain provisions of the UNCITRAL draft instrument and the most effective way to address those concerns. It ultimately was decided that the Committee on Arbitration and ADR and the United States delegation to UNCITRAL share the same concerns with the current UNCITRAL draft instrument, but that some of the wording of the proposed MLA resolution should be modified. Mr. Paré, Mr. Hooper, and other members of the Committee on Arbitration and ADR will meet in an attempt to come up with a modified resolution on which the MLA membership can vote at the General Meeting on October 7.

[14592]

**Presidential Activities**

President Burrell reported that she had attended the following meetings or events:

A. Average Adjusters Association Meeting and Dinner, London—May 11, 2006.

B. Canadian Maritime Law Association Meeting, Halifax, N.S.—June 15–17, 2006.

Future Officer and Board Meetings

A. MLA Fall Meeting, San Francisco, California—October 3–7, 2006.

B. Officers Meeting, Washington, D.C.—January 2007.

C. Officers and Board Meetings (joint meeting with Canadian Maritime Law Association Board), Tulane Admiralty Law Institute, New Orleans, Louisiana—March 13–16, 2007.

There being no further business to come before the Board of Directors, the meeting was adjourned at 11:56 a.m.

Respectfully submitted,
James W. Bartlett, III, Secretary

**MINUTES OF THE BOARD OF DIRECTORS MEETING
OF THE MARITIME LAW ASSOCIATION OF THE UNITED STATES**

Held at The Palace Hotel
San Francisco, California
on
October 5, 2006
8:00 a.m.

The October 5, 2006 meeting was called to order by President Lizabeth L. Burrell at 8:00 a.m. In addition to President Burrell, the following officers also were present:

Warren J. Marwedel, First Vice President
Patrick J. Bonner, Second Vice President
James W. Bartlett, III, Secretary

[14593]

Robert G. Clyne, Treasurer
Philip A. Berns, Membership Secretary
Thomas S. Rue, Immediate Past President

The following directors also were present:

| | |
|---|---|
| Dennis L. Bryant | Sandra L. Knapp |
| Christopher O. Davis | Stephen V. Rible |
| David J. Farrell, Jr. | John M. Ryan |
| Grady S. Hurley | Harold K. Watson |
| Allan R. Kelley | John M. Woods |
| John D. Kimball | |

## SECRETARY'S REPORT

Secretary James W. Bartlett, III of Baltimore reported that the PROCEEDINGS of the Spring Meeting would be received by the membership within the next few days.

Upon motion duly made and seconded, the minutes of the August 5, 2006 meeting of the Board of Directors were unanimously approved and accepted. The minutes of the August 5, 2006 meeting of the Board of Directors will be published in the Fall 2006 issue of the PROCEEDINGS.

## TREASURER'S REPORT

Treasurer Robert G. Clyne of New York presented the Treasurer's report for the three months ended July 31, 2006. He reported that the finances of the MLA are in good shape, with dues of approximately $302,000.00 being collected. He reported that as of July 31, 2006, the MLA had $370,790.93 in cash and investments.

Upon motion duly made and seconded, the Treasurer's report was unanimously approved and accepted. A copy of the Treasurer's formal written report for the three months ended July 31, 2006 will be appended to the original of these minutes.

## MEMBERSHIP SECRETARY'S REPORT

Membership Secretary Philip A. Berns of Henderson, Nevada reported that the Proctor Admissions Committee had approved 15 Associate member applications for Proctor status. Mr. Berns moved for the approval of

[14594]

the elevation of the 15 Associate members to become Proctor members. The motion was seconded, and the following Associate members were approved for Proctor status by unanimous vote of the Board of Directors:

W. Sean O'Neil of Houston, Texas
Jason R. Harris of Wilmington, North Carolina
Kristina Irvin of New Orleans, Louisiana
Charles W. McCammon of Philadelphia, Pennsylvania
Gregory W. Poulos of San Francisco, California
Jennifer Tomlin Sanchez of San Francisco, California
Peter Lindh of San Francisco, California
Andrew I. Port of San Francisco, California
Raymond M. Paetzold of San Francisco, California
W. Brett Mason of Baton Rouge, Louisiana
Jack Garyth Poulson of Juneau, Alaska
Richard S. Tweedie of Philadelphia, Pennsylvania
Barbara L. Ristow of Schaumburg, Illinois
Todd D. Lochner of Annapolis, Maryland
Sean A. Voyles of Norfolk, Virginia

Pursuant to Section 203 of the MLA By-Laws, an application was received nominating Rear Admiral John E. Crowley, Jr. for membership in the MLA and requesting a waiver of the four-year requirement for achieving Proctor status. The Proctor Admissions Committee recommended that the four-year requirement be waived. By unanimous vote of the Board of Directors, Rear Admiral John E. Crowley, Jr. was approved as a Proctor member.

Mr. Berns recommended the admission of 20 lawyers for Associate membership. Upon motion duly made and seconded, the applications of the following 20 Associate members were approved unanimously:

Mary A. Francis of San Ramon, California
Annemarie Y. Torrez of San Ramon, California
J. Rice Ferrelle, Jr. of Jacksonville, Florida
Deborah Lawson of Houston, Texas
John P. Cavanagh, Jr. of Mobile, Alabama
Dean T. Buckius of Norfolk, Virginia
Jared A. Washkowitz of San Francisco, California
Deborah C. Waters of Norfolk, Virginia
George R. Tadross of Philadelphia, Pennsylvania
Patrick L. Beam of Aransas, Texas
Brian L. Sykes of Norfolk, Virginia

[14595]

CDR Christopher J. Spain of Washington, D.C.
Michael C. Jacob of San Francisco, California
Bradley T. Soshea of Houston, Texas
Gregory W. O'Neal of Memphis, Tennessee
Thomas C. Jorgensen of Long Beach, California
Elissa M. Mulrooney of Memphis, Tennessee
Bryant C. McGann of Norfolk, Virginia
Oliver L. D. DuPont of New York, New York
Richard Branca of New York, New York

Mr. Berns reported that two applications for reinstatement had been received, and he moved for the reinstatement of those two applicants. After the motion was seconded, Gerald L. Gorman was reinstated as a Proctor member, and Jennifer Lynn Hayes of Houston, Texas was reinstated as an Associate member.

Mr. Berns reported that five applications for Non-Lawyer members were recommended by the Non-Lawyer Committee. After motion duly made and seconded, the applications of the following Non-Lawyer members were approved:

Alex McCarthy of New York, New York
Janice L. Jordan of Nashville, Tennessee
Darrin L. Huck of Houston, Texas
Richard W. Wood of Wilton, Connecticut
Michael R. Gomez of Norfolk, Virginia

Mr. Berns reported with regret the deaths of the following MLA members:

Joel M. Fain of Hartford, Connecticut
John P. Hammond of New Orleans, Louisiana
Emil A. Kratovil of Greenwich, Connecticut

Mr. Berns reported that the 2006–2008 MLA Directory was completed in September and should have been received by all members.

After the admission of the 20 Associate members and the reinstatement of one Proctor member and one Associate member, the total membership of the MLA is 3,100.

Upon motion duly made and seconded, the Membership Secretary's report was unanimously approved and accepted. A copy of the Membership Secretary's written report will be appended to the original of these minutes.

[14596]

## DISCUSSION ITEMS AND REPORTS

### Proposed Resolution Addressing
### the UNCITRAL Draft Instrument

President Burrell reported that the Committee on Arbitration and ADR was withdrawing its proposed resolution relating to the UNCITRAL Draft Instrument as prepared at the 16th Session of UNCITRAL Working Group III respecting choice of court and arbitration clauses for cargo loss and damage claims. Therefore, the Committee on Arbitration and ADR would not be making a motion at the General Meeting on October 7, 2006.

As a result of what has been learned through the process of addressing this proposed resolution, Secretary Bartlett will draft proposed revisions to By-Law 504 to update it in light of current methods of communication.

### Law Student Membership

The subject of having law student members of the MLA has been under consideration for some time. The MLA recently polled law professors teaching admiralty courses and has received their input on the subject. A motion to admit law student members to the MLA was made, seconded, and passed by a majority vote of the Board of Directors. The Membership Subcommittee will prepare a proposal and By-Law amendment to implement this change.

### Sponsors for Events

The President's Welcome Reception held at the San Francisco World Trade Club was supported by sponsors, something that is somewhat of a departure from the MLA's usual practice. Other organizations similar to the MLA, however, do this regularly. A motion was made and seconded that the President or the President's delegate is to be the clearing house for all sponsorships of MLA events. This motion was adopted by the Board of Directors by a unanimous vote.

### Transportation Lawyers Association

By a unanimous vote, the Board of Directors approved the creation of a liaison to the Transportation Lawyers Association. The parameters of this liaison will be worked out in the future.

[14597]

### *Ad Hoc* Committee on Environmental Crimes

Immediate Past President Thomas S. Rue reported on the progress of the Ad Hoc Committee on Environmental Crimes. On July 31, 2006 an organizational meeting was held in New York. Other meetings were to follow on September 11, 2006 in New York and October 3, 2006 in San Francisco. Those meetings, however, never took place, and a meeting is now scheduled for October 10, 2006 in New York. President Burrell will attend that meeting.

### CMI Questionnaires

The Committee on Carriage of Goods prepared a proposed response to the CMI questionnaire on limitation levels applicable to maritime claims. Upon motion duly made and seconded, the response of the Committee on Carriage of Goods to the CMI questionnaire was approved by the Board of Directors.

The Committee on Regulation of Vessel Operations had received input from the United States Coast Guard regarding the CMI questionnaire on places of refuge. The Committee on Regulation of Vessel Operations has prepared a proposed response of the MLA to the CMI questionnaire that incorporates the input of the United States Coast Guard. Upon motion duly made and seconded, the proposed response to the CMI places of refuge questionnaire was approved by the Board of Directors.

### Presidential Activities

President Burrell reported that she had attended the Houston Marine Insurance Seminar on September 18–19, 2006.

### Future Officer and Board Meetings:

A. Officers Meeting, Washington D.C.—January 9, 2007

B. Joint Meeting with the Canadian Maritime Law Association Board in conjunction with the Tulane Admiralty Law Institute, New Orleans, Louisiana—March 13, 2007.

C. MLA Fall Meeting, Sanibel Harbour Resort & Spa, Fort Myers, Florida—October 24–28, 2007.

[14598]

There being no further business to come before the Board of Directors, the meeting was adjourned at 10:30 a.m.

Respectfully submitted,
James W. Bartlett, III,
Secretary