[15240]

equipment lessor, when, due to its economic terms, the lease is considered by a court to be a sale of the asset and a retention of the security interest. As you probably know, currently under the U.S. flag, if the economics of a bare-boat charter are such that a bankruptcy court treats it as a sale with a retention of the security interest, the nominal owner is treated as an unsecured creditor in the bankruptcy. This statute would convert that nominal owner, as a matter of law, into a preferred mortgagee, with all the benefits of that status. As you can imagine, there are a number of technical difficulties that have to be worked through in drafting such a statute, but we're almost done. We're down to just a few tweaks in the language, so we expect to be bringing a final version of that legislation to the full Association in May.

We have a second statute drafting effort that is not quite as far along, but we do hope to bring it to a conclusion at the May meeting as well. This is a statute that would follow the example of our friends to the north in Canada, the Cayman Islands, and a few other countries, to allow a vessel under construction to be documented so that a ship construction mortgage could be filed that would enjoy preferred mortgage perfection, priority and *in rem* enforcement. That also presents a host of technical issues, as you can imagine.

With both statutes we were greatly aided by the attendance and participation of Tom Willis from the National Vessel Documentation Center, Rand Pixa from the General Counsel's Office at the Maritime Administration, as well as Robin Mintern and Jan Jordan from Caterpillar Financial Services. Their contributions were all very helpful. We were able to spend the entire afternoon drilling down into these statutes, and we advanced the ball considerably. Both statutes are available for your review on the Committee area of the website.

Madam President, that concludes my report.

PRESIDENT BURRELL: Thank you very much, Bruce. I dropped in for a little While on one of those drafting sessions, and it is such a pleasure and such a confirmation of the importance of the Association's work when you see people really trying to fix things. We don't just react and report, we also try to fix the law.

Jonathan Spencer will report for the Marine Insurance Committee.

MR. SPENCER: Thank you, Madam President.

**EXHIBIT H**

[15241]

The Marine Insurance Committee met on Thursday morning with some thirty members and guests in attendance. Hal Watson of Houston spoke on behalf of John Woods, the absent chair of our Hull and P&I Subcommittee, and he reviewed various recent cases addressing particularly the duty of disclosure and *uberrimae fidei*, and these are summarized in the Committee's newsletter.

Gene George of Cleveland, the Vice Chair, continued his ongoing review of the insurance ramifications of the 2005 Gulf hurricanes, particularly the wind versus water debate. And on the same theme Hal spoke again about the problems that are flowing from wreck removal claims, particularly spilling over onto excess liability policies in the Gulf, and this is a topic of such importance that he's going to give a speech in Long Beach to a joint meeting of the Marine Insurance Committee.

Gene also presented the Committee's fall newsletter, which is available in the MLA document library and on the Committee webpage, and we have some copies available just outside the door. This has a lead article by Rhys Clift, who's a London solicitor, on fraudulent insurance claims and the number of case summaries prepared principally by Gene and also by Cary Weiner, who is the Committee Secretary. We are grateful to both of them and also acknowledged Michael Marks Cohen of New York for bringing various cases to our attention.

Our guest speaker was Bill Boeringer, who is a member of the Miami firm of Hayden & Milliken, and he addressed the relationship between assured insurer and attorney, and he talked about it particularly within the context of a statement of insured clients' rights which members of the Florida Bar are required to give to assureds whom they are defending on the instructions of insurers. And although the talk had a Floridian emphasis, Bill did range over the situation in various other states, and we're going to reduce his remarks to paper in some form so that we can give those a wider circulation, because he's done a lot of research on this topic.

And we concluded with an open discussion of a problem that two west coast members are grappling with involving the overlap between labor and removal of wreck. It was the liveliest part of the meeting, I think. They received at least five different opinions from various members of the Committee and as far as I can tell, all those opinions were correct.

And that concludes my report.

[15251]

Chairs. This makes a better organization and makes us more learned in our field. Thank you.

So having said that and wanting everyone to go out today in the bright sunshine of Florida, albeit "cloud-filtered." The reason that it is "cloud-filtered," and you may not know this, is that the world's greatest citrus fruit, which is also the richest, comes from Florida. These six days of continued clouds here in Sanibel are needed to allow proper vitamin C, nutrients, and benefits to be created in the fruit. Having said those words, the first of which is heartfelt, the second of which shows that I'm still as silly as always, I move that we adjourn.

PRESIDENT BURRELL: Thank you very much. Thank you all for attending.

### FORMAL REPORT OF THE COMMITTEE
### ON MARINE INSURANCE AND GENERAL AVERAGE

The Committee held an informative meeting on October 25, 2007 at the Sanibel Harbour Resort and Spa in Fort Myers, Florida. Some 30 members and guests were in attendance.

Regrets were received from all three Subcommittee Chairs.

Hal Watson of Houston spoke in place of John Woods, Hull and P&I Subcommittee Chair, and he reviewed recent cases addressing particularly the duty of disclosure and *uberrimae fidei*.

Gene George of Cleveland, Vice Chairman of the Committee, reported on recent cases arising out of the 2005 Gulf hurricanes and, in particular, the wind versus water debate. Hal Watson then spoke on this theme and described the growing difficulties surrounding wreck removal claims following the hurricane activity, affecting in particular excess liability insurers. That situation has become complicated the fact that superannuated equipment that would in any case have been required to be removed on the expiration of the operator's concession had now become wrecks and thus the subject of removal claims. This topic presents so many challenges that Hal is preparing a paper on it for presentation at a joint meeting of the Marine Insurance Committee and Offshore Industries Committee, planned for the 2008 Fall MLA meeting in Long Beach.

Gene George, in his additional capacity as Editor of the Committee's Newsletter, next introduced the Committee's Fall newsletter, containing a

[15252]

lead article, Fraudulent Insurance Claims—Part II, by London solicitor Rhys Clift, and summaries of recent insurance cases prepared by Gene and by Committee Secretary Cary Wiener of New York. Gene acknowledged the contribution of Committee member Michael Marks Cohen of New York in drawing various cases of note to our attention.

Current and past issues of the Committee's newsletter can be found in the MLA document library and on the Committee's web page.

Our guest speaker, William R. Boeringer, Esq., a member of the Miami firm of Hayden & Milliken, addressed "The Tripartite Relationship—insurer/insured/defense attorney pitfalls". His talk was given largely in the context of the Statement of Insured Client's Rights, a Florida Bar Association document that Florida practitioners are required to give to, and have acknowledged by, clients whom they are appointed by insurers to defend. However, the talk also ranged over the ethical requirements in other states. It represented a significant amount of research, and we expect eventually to promulgate a written version.

The meeting concluded with open discussion of a topic raised by two West Coast members, involving a claim arising from a grounding incident in which the refloating costs fell into a grey area between sue & labor and wreck removal. Several Committee members had grappled with the point in their own practice and offered helpful insights.

Respectfully submitted,
Jonathan S. Spencer
Chair

## FORMAL REPORT OF THE COMMITTEE ON MARITIME TORTS AND CASUALTIES

### Punitive Damages

The employer filed suit seeking a declaratory judgment with respect to its maintenance and cure obligations to its seaman, Townsend, following an alleged injury. Townsend filed Jones Act and unseaworthiness claims in a separate action and also filed a counterclaim seeking compensatory and punitive damages for failure to pay maintenance and cure. The two actions were consolidated, and Atlantic Sounding moved to dismiss the punitive damages on the basis of *Miles v. Apex*. The district court denied the motion, holding

FALL 2005

## NEWSLETTER

Committee on Marine Insurance and General Average

Committee Chair and                    Editors:  Gene B. George
Contributing Editor:                             Cleveland, Ohio
Stephen V. Rible
Mendes & Mount, LLP                              Joshua S. Force
New York, New York                               New Orleans, Louisiana

                                                 George N. Proios
                                                 New York, New York

---

**Our primary thoughts at this time are with our friends and
colleagues in the areas affected by hurricanes Katrina and Rita.**

---

*The following articles, case notes and comments are for informational purposes only, are not
intended to be legal advice, and are not necessarily the views of the Maritime Law Association
of the United States or the Committee on Marine Insurance and General Average.*

### News and Information

## The Role of the Average Adjuster in Maritime Disasters
*Some Practical Observations*

### By Jonathan S. Spencer
**The Spencer Company "Marine Insurance Solutions" New York**

*\*Based on remarks delivered at the 2005 VIEWPOINTS seminar of the Association of Average
Adjusters of the United States held at St John's University in Manhattan on October 5, 2005.*

### Introduction

It is perhaps surprising, given the extent of the profession's involvement in the settlement of
general average and hull & machinery claims, how rarely average adjusting is mentioned in
jurisprudence.  When it is mentioned, often it is in complimentary terms. For example, The
Honourable Mr. Justice Mackinnon, speaking in 1935, is reported to have said that "Your
profession is a singular one - not merely because the vast majority of your fellow-citizens have
not the remotest idea what your duties are; but because, above any other profession that is not
actually legal, you are required to have, and in fact possess, a very exact knowledge of a very
special branch of the law."

EXHIBIT I

The profession itself rarely comes up in litigation but the need for and effect of an average adjustment has been addressed in some reported cases.

*Wavertree Sailing Ship v. Love [1897] A.C. 373* and *Crooks v. Allen (1879) 5 QBD 38; 49 L.J.Q.B. 201* are generally taken as supporting the principle that when there is a general average, the shipowner is under an obligation to have an adjustment prepared. In *Chandris v. Argo Insurance Co. Ltd. [1963] 2 Lloyd's Rep. 65,* as reported in *Lowndes,* it was held that a contract incorporating the York-Antwerp Rules 1924, by implication, provided that an average statement should be produced in support of a claim for general average contribution, but not that a professional average adjuster must be employed.

A statement of general average is not legally binding and is not conclusive of any party's liability to contribute. *Great Eastern Associates and Farrell Lines v. Republic of India, 1978 AMC 1288.* However, a statement of general average prepared by an average adjuster is, as summarized by Buglass, *prima facie* proof of:

1. The losses, damages, and expenses which, as factual matters, are the direct consequence of the general average act;
2. The values attaching to such losses, damages, and expenses; and
3. The computations apportioning these losses, damages, and expenses between the parties to the adventure.

A personal favorite is the *Joseph Farwell, 31 Fed. Rep. 844,* one of few American cases addressing abandonment of voyage, where the Court decided, in the particular circumstances applying, that there was a general average up until the completion of the discharge of the cargo, and instructed the Clerk of the Court to go off and prepare an average adjustment.

Despite being all but ephemeral in the annals of admiralty law, professional average adjusters are in fact quite central to the settlement of general average and various classes of blue water hull & machinery and loss of earnings claims, not to mention claims involving the liabilities of ship builders and repairers and, increasingly, claims involving brown water tonnage.

In fact, the most tangible affirmation of an Adjuster's existence can be found in the York Antwerp Rules, certain of which reflect the clear assumption that the general average will be stated by an average adjuster, and in a significant proportion of hull & machinery policies and other policies on marine property, where the average adjusters are named within the policy conditions.

The purpose of this paper is to review the principal aspects of the average adjuster's involvement as the catastrophe develops. It must be appreciated that particularly in the US and particularly where a casualty involves pollution, injury or loss of life, attorneys are likely also to be appointed and clear communication between them and the average adjusters is key to a smooth evolution of the case.

*Appointment of surveyors*

As soon as the average adjuster receives instructions in a given case, and has satisfied himself that the casualty is of a magnitude that will give rise to a claim in excess of the deductible provided for in the hull and machinery policy, he will arrange the appointment of Surveyors on behalf of hull & machinery underwriters. Quite often, the identity of the preferred surveyors will be found in the hull & machinery policy or, by virtue of familiarity with the account, the adjuster will know which surveying entity is preferred by the underwriters. He will usually make the appointment on underwriters' behalf and will act as a conduit for the surveyors' advance advices, their reports and, ultimately, their professional charges.

Depending on the nature of the casualty, the average adjuster might recommend the appointment of other surveyors. For example, in the case of a collision, it would often be prudent to arrange a speed and angle of blow survey, which has a forensic purpose, that of reconstructing the circumstances of the collision with the intention of establishing degrees of blame.

In the case of a general average, particularly one involving sacrifice of property (as opposed to the mere incurring of expenditure) or the forced discharge of cargo, with the concomitant risk of damage being suffered to cargo or to the ship during cargo handling, the average adjuster will recommend the appointment of a general average surveyor, also known as a surveyor in the general interest. Whilst the owners or insurers of individual items of property are likely to appoint their own, first-party, surveyors, the objective of the surveyor in the general average interest is to apply the same uniform set of criteria to measuring the damage and expenditure to be claimed by individual parties under the general average adjustment. The general average surveyor will comment on the reasonableness of steps proposed, and their cost, from the point of view of the commonality of interests of all the parties involved in the adventure. In order to be prepared for action within a moment's notice of a casualty, the average adjuster will typically maintain a database of qualified surveyors worldwide.

*Allocation of losses and determination of coverage*

At an early stage in the events, the shipowner is likely to require a preliminary analysis of whether he has full coverage for the losses that are in the course of being incurred and where those losses will lie. The average adjuster must make an early, provisional, determination about whether a given casualty gives rise to general average and, in the case of damage to the ship, he will ascertain where coverage is to be found under the hull and machinery insurances and whether any additional investigation is going to be necessary into the cause of damage to, for example, a piece of machinery, perhaps in the form of metallurgical testing, in order to establish exactly how a claim on underwriters is to be founded.

If the casualty gives rise to general average, the average adjuster will review the general average absorption provisions typically found in the hull and machinery insurances and will then attempt to ascertain the estimated contributory values of the ship, cargo and any other property such as containers and bunkers, and an estimate of the expenditure to be incurred, in order to make a preliminary recommendation as to whether the general average might be recoverable entirely within the absorption clause or whether a declaration of general average and the involvement of the owners of the cargo and other property is unavoidable.

It must be noted that invoking the absorption clause is discretionary. Even if the general average falls within the limits of the absorption clause, the shipowner might nevertheless elect to make a claim for general average against the cargo. For example, the shipowner may choose to proceed against cargo interests if the cargo comprises a single interest and the expense of collecting security and formally adjusting the claim make economic sense; or in order to minimize the negative effect of the claim on his hull & machinery loss record.

In order to assess the full impact of the casualty from the perspective of general average, it has become increasingly important for the average adjuster to discover at an early stage of the case which version of the York-Antwerp rules applies. For example, wages at a port of refuge have been abolished under the 2004 rules, and if salvage is settled directly with the salvors by the individual parties to the adventure, it is no longer dealt with under the general average adjustment. This means that if a very valuable piece of cargo is sacrificed during the course of salvage efforts, it no longer has to contribute to the salvage and receives a windfall benefit. The elimination of allowances for wages and maintenance at a port of refuge has more practical impact; often wages and maintenance make up the largest single allowance in general average when, for example, a vessel suffers an engine damage and is detained at a port of refuge in order to make repairs necessary for the safe prosecution of the voyage; the average adjuster might need to ascertain whether or not those wages and maintenance will be allowable in general average before he can guide the ship owner as to whether or not the cargo should be brought in as a contributing interest.

An assessment must also be made of whether the cargo has any potential defense to the general average claim on the grounds of unseaworthiness, since cargo's uncollectible proportion of general average expenditure gives rise to a claim on the P&I insurances. In these circumstances the effect of a further deductible must also be taken into consideration.

It should be noted that the great majority of general average absorption clauses in hull and machinery policies address only cargo's proportion of general average *expenditure*. If there is general average sacrifice of cargo, the shipowner is under an obligation to have a formal adjustment made up, in order to ensure that the owner of sacrificed property is made whole, unless he cares to pay for the sacrifice entirely himself. If the only sacrificial damage is to the ship, the owner has the option of claiming that damage in full under the hull and machinery policy.

If the shipowner carries any other insurances, such as insurance against loss of revenue or charter hire, the adjuster must make an early determination about whether the casualty is likely to give rise to a claim on those insurances and, if appropriate, put those underwriters on notice and give them the opportunity of arranging the attendance of their own Surveyors.

### Special insurances

Any major casualty is likely to give rise to the needs for special insurances. For example, if general average expenditure is incurred, it is advisable to obtain general average disbursements insurance, also known as a diminution in value insurance. The reason for this is that the general average is adjusted on the values of the property at the end of the adventure. If the ship and cargo suffer another casualty on the voyage subsequent to the general average expenditure being

incurred, the contributory values at the end of the voyage might not be sufficient to meet the general average expenditures, and the situation becomes worse if the property becomes a total loss. Disbursements insurance protects that expenditure against any diminution in value of the contributing property until the conclusion of the voyage and the cost of that insurance itself is admissible as general average expenditure.

If cargo is put ashore as a general average measure at a port of refuge, for example in the course of firefighting operations or to enable repairs necessary for the safe prosecution of the voyage, it is advisable to arrange an insurance on that cargo while it is ashore, and, indeed, in the U.S., it seems clear from the *MORMACMAR*[*] decision that the shipowner is under a legal obligation to take out such insurance. If he does not, he is liable to the cargo owner for any loss sustained to the cargo in consequence of shore perils.

Consideration must also be given to protecting the ship owner's liabilities towards the forced discharged cargo, as conventional P&I cover will not remain in force once the cargo is removed from the ship.

An exposure to unusual liabilities might also arise if, for example, the ship is drydocked with cargo on board. We have also seen cases where the ship is left in such a condition after the casualty as to constitute a perceived hazard to the repairers' facilities and to their employees, such that repairers have insisted on the shipowners taking out a special insurance for the potential liability arising therefrom.

Sometimes obstacles arise that can be satisfactorily removed by means of lien insurance. Salvors or the owners of a colliding vessel have a lien *in rem*, and will usually insist on satisfactory security being given before they will allow the ship to sail from the first port or place at which she safely lies after the conclusion of the salvage services or following the collision. A prolonged detention at that place can sometimes be avoided by persuading the lien holder to allow the ship to sail under the protection of lien insurance while satisfactory permanent security arrangements are put in place.

***General average formalities***
If the decision is made that a formal declaration of general average is unavoidable, and this is a decision that is usually made with great reluctance, then the average adjuster should be aware of any formalities that might be required of the shipowner in order to make the declaration of general average valid. In the U.S. and most other countries, no particular formalities are required and a notice is prepared and sent to receivers of cargo describing the casualty, the circumstances giving rise to general average, the identity of the appointed adjusters, the security requirements and the mechanism for providing that security.

In some countries, however, particularly in South America, there is a requirement that general average be declared in a specific form within a specific time before a specific court in order for claims successfully to be pursued against cargo. The average adjuster should be mindful of these and guide the shipowner accordingly.

---

[*] *1947 AMC 1611;* also see *1950 AMC 2018, 1952 AMC 1088, 1954 AMC 691* and *1956 AMC 1028*

If cargo is to be called upon to contribute to a general average, general average security will be required. This typically takes the form of an average bond signed by the cargo owner; and an average guarantee signed by the insurer or, if the cargo is not insured, a cash deposit. If a cash deposit is to be taken from uninsured cargo, and this is a problem that arises with some frequency in a hard cargo insurance market, the average adjuster has to make some quite reliable estimate of the eventual general average and of the value of the contributing interests in order to fix the amount of the cash deposit at a percentage of contributory value adequate to ensure that the general average contribution ultimately can be collected.

If sufficient information is available by this stage, a determination can also be made about the simplification of general average. For example, if the cargo comprises a number of higher value shipments, making up, say, 80% of its total value, with numerous low value shipments accounting for the rest, it will often be economical to eliminate those low value shipments from the general average and bring only the high value shipments into contribution, demonstrating that they pay less in this way than if they were to contribute to the costs of collecting security from, ascertaining the contributory value of and applying for contribution to, the concerned in the numerous low value shipments.

A decision has to be made about the mechanism for collecting the security; this can be done by the shipowner's personnel, by the shipowner's agents at the discharge ports or by the average adjusters. A determination must be made in each individual case as to which mechanism is going to result in the smoothest, most complete and most accurate results.

If the general average occurs quite close to destination or involves a large number of receivers of cargo, the ship owner will need to give consideration to whether or not to exercise a lien against the cargo, and detain it in his own possession and at his own expense until general average security has been proffered, or to deliver the cargo in the hope that the receivers and their insurance will reciprocate and provide general average security after delivery, in consideration of having received the cargo without delay.

If the casualty also entails a salvage under a contract by the terms of which separate security must be given to the salvors, it will usually be more efficient for the salvage security to be collected simultaneously with the general average security, by the same entities, and this procedure must be resolved with the salvors at the earliest possible stage in the case.

The place of adjustment also must be established at an early stage. If the 2004 version of the York Antwerp Rules applies, and if there is no specific provision in the contract of affreightment, it will behoove the ship owner to select a place of adjustment in the United States. Allowances for commission having been eliminated in the 2004 Rules, to the best of my knowledge the U.S. is the only place where local adjusting practice permits a similar advancing commission.

### Cash flow

The financial consequences of the casualty will become clear at an early stage and the average adjuster will start assessing the potential of the claim for payments on account. This is a somewhat nebulous area because most hull and machinery policies are policies of indemnity, in

other words, "pay to be paid." However, hull and machinery underwriters are almost invariably willing to make payments on account and, although they insist that this is a commercial concession to the insured and not a contractual obligation, the procedure has now become a matter of routine. Accordingly, when there has been a significant outlay of capital, the average adjuster will obtain repair invoices or available estimates, seek the underwriters' surveyor's approval of the expenditure that has been incurred or is in the course of being incurred, and will draw up a payment on account recommendation in order to approach underwriters for an interim payment. In the case of major repairs, payments might be made directly to the shipyard on completion of the work or, if the repairs are truly protracted, arrangements can be made for underwriters to make progress payments as the work advances to the satisfaction of their surveyors.

Similarly, in the case of a general average, if parcels of cargo have suffered significant loss by sacrifice, the average adjuster will make arrangements for payments on account by the other contributing interests pending the completion of the final adjustment.

***Preparation of the adjustment***
Average adjustments contain a narrative of the material events of the casualty and of the repairs, typically abstracts from the ship's log and reports by the ship's staff, together with particulars of all the expenditures claimed by the various parties as average. The average adjuster will already have assembled some of these during the early stages of the casualty, particularly if he has been engaged in preparing payments on account.  In due course, he will identify what additional documentation and information is going to be necessary for the preparation of the final adjustment and he will propose a list of adjusting inquiries and give this to the shipowner.

If the claim involves a general average to which cargo is going to be required to contribute, he will also correspond with the concerned in cargo in order to ascertain particulars of the value of the cargo and the amount of the losses it has sustained. The practice of average adjusters in the U.S., though not necessarily in other countries, is to agree on contributory values and damage allowances with the concerned in cargo before finalizing the adjustment.

The adjuster will likely put these various inquiries on a diary system, in order to issue periodic reminders with a view to completing the adjustment as soon as possible. Accusations of being slow have been laid at our door in the past but more often than not it is the ship owners and the cargo interests who bear most of the responsibility for delay.  The average adjuster gains nothing by delaying the issue of an adjustment, and, indeed, is unlikely to earn a fee until he has finished his work.

In the course of assembling the documentation and turning it into a draft adjustment, the average adjuster must take additional steps, such as having the invoices for the expenditures to be included in the adjustment approved by the general average surveyor, as appropriate, and by the surveyor acting on behalf of hull underwriters. Even this entails some mystery of art, because most underwriters will allow the average adjuster to use his own discretion in the adjustment of smaller bills, typically those under $5,000 or so, whereas some American underwriters require the adjuster to have all invoices, however small, approved by the underwriters' surveyor.

7

So far as concerns information to be received from cargo, the situation has been ameliorated somewhat by the most recent versions of the York-Antwerp Rules. These Rules allow the adjuster to estimate contributory values and allowances, if information has not been received from the cargo interests within twelve months after the termination of the adventure.

In the course of working on the draft adjustment, the average adjuster is quite likely also to sit down with a consulting surveyor in order to review certain aspects of the claim. These might include cause of damage, for the purpose of establishing the basis for the claim on the hull policy, or they might include marking up the repair accounts to identify any items not claimable, for example in terms of the exclusions contained in the Liner Negligence Clause. A consultant is often used to review allowances for consumables such as fuel and stores used in the course of removal passages, paints used in the course of repairs, and so on. It would also be appropriate to use a consultant to determine "deductions of thirds" when dealing in general average with sacrificial damage to the ship.

Recourse would be had also to consulting ship valuers when dealing with general average claims, in order to ascertain the sound market value upon which the contributory value of the ship is based. It is important to understand that although increasingly ships are deemed to be insured for their full contributory value under the hull insurance policy, even if the value agreed in the policy is less than the actual market value, a phenomenon which is not uncommon in an era of appreciating ship values, nevertheless the value for general average contribution has to be based on the commercial value and not upon the value agreed for insurance purposes.

Once this phase of the work has been completed, then depending on the procedure agreed with that particular client, the average adjuster either will go over the draft adjustment with the ship owner before finalizing it, or will submit his proposed final adjustment to the ship owner for review. If it is an adjustment dealing with general average, the agreement of the principal cargo interest might also be sought. The adjustment will then be submitted to all the debtor parties for settlement.

If the claim arises from collision, the average adjuster might also at this juncture draw up the statement of the claim against the other ship, which is likely to include not only amounts claimable by way of general average and particular average but also uninsured losses. Indeed, the average adjuster's skills readily lend themselves to drawing up statements of claim in any admiralty action.

***Settlements***
Finally, the average adjuster will assist with those settlements. He will deal with any inquiries received from underwriters requesting clarification of any of the allowances in the adjustment and he will likely act as the repository of funds, turning these over to the claimants by stages as they are received.

If the claim arises from a general average, and this is contested by the concerned in cargo on the grounds of some breach of the contract of affreightment, he will likely try to resolve cargo's concerns, and if he is unsuccessful he will turn the matter over to the P&I club for them to pursue. This process might also entail a readjustment of the general average, separating the

ship's sacrifices from the expenditures, since the sacrifices can be claimed in full from the hull insurers; the P&I club will only reimburse the uncollectible proportion of cargo's contribution to expenditures.

I might be faulted for having addressed inadequately the topics of catastrophe and disaster. However, any claim that occurs on a ship is a catastrophe and a disaster in its own way. The aim of our intervention is to make the disaster as un-catastrophic as possible for all concerned. This takes the form of ameliorating damage to cash flow to the fullest extent possible and doing the best job we can of setting out fairly, clearly and accurately the financial positions of the respective parties.

(Reprinted with the permission of Viewpoints).

[Our sincere thanks to Jonathan Spencer for the foregoing article.  He has been an unfailingly generous contributor to this Newsletter, and we are very grateful. – Eds.]

### Recent Cases of Interest

### LABOR CONTRACTOR MUST HOLD VESSEL OPERATOR HARMLESS FOR INJURIES TO CONTRACTOR'S EMPLOYEES

### Johnson v. Seacor Marine Corp, 404 F.3d 871 (5th Cir. 2005)

Employees of labor contractor injured while transferring between offshore platforms and chartered transfer vessels brought separate actions against operator of vessels.  Vessel owner brought third-party claims against labor contractor and its liability insurer.  Plaintiffs settled with vessel operator and trials went forward on third-party claims.  In two of the district court proceedings the judges granted summary judgment in favor of vessel owner on issue of whether the vessel boarding agreement signed by the labor contractor was supported by consideration.

Labor contractor's agreement to hold harmless and indemnify vessel operator in the event of injuries to contractor's employees while being transported on operator's vessels was supported by consideration because while operator owed duty to transport employees under its agreements with oil companies, operator owed no legally enforceable duty to contractor to do so prior to execution of hold harmless agreement, which gave contractor a separate, legally enforceable right to put its employees aboard operator's vessels.

Louisiana Oilfield Anti-Indemnity Act was not applicable to preclude enforcement of indemnity terms of vessel boarding agreement, which was a maritime contract governed by federal maritime law.

Labor contractor further agreed to name vessel operator as an additional assured under its comprehensive general liability (CGL) policy.  That policy would have provided the operator with additional insured status, but its watercraft exclusion was not deleted as to the operator, resulting in no coverage.  Operator's arguments that the insurance certificate was misleading,

and that the insurer is liable under theories of negligent misrepresentation and equitable estoppel are all rejected by the Court of Appeals.

There was no negligent misrepresentation in insurer's failure to delete the watercraft exclusion because insurance certificate contained no incorrect information and there was no evidence of the operator's detrimental reliance on the information provided.  Since operator could not prove it was aware of the contents of the certificate provided by the insurer to the insured labor contractor, it could not demonstrate that it relied to its detriment on the certificate. Its claim for equitable estoppel fails for the same reason.

Vessel operator is left with judgment against labor contractor, but not its insurer.

## STATE COURT THIRD-PARTY DEFENDANT P&I CLUB MAY NOT REMOVE CASE TO FEDERAL COURT

### Ribelin Lowell & Company v. Shipowners Mutual Protection and Indemnity Association (Luxembourg), 365 F. Supp. 2d 1063 (D. Alaska 2005)

Plaintiff filed state court action against insurance broker Ribelin, which in turn brought third party action against P&I underwriter, Shipowners Mutual.  Shipowners removed action to federal court pursuant to 28 USCA § 1441(a).

On Ribelin's motion to remand, District Court holds that removal was improper. Whether a third-party defendant may petition for removal under § 1441(a) appears to be a matter of first impressions in Alaska, although the Ninth Circuit Court of Appeals has addressed the issue indirectly.

Federal law determines who is a plaintiff and who is a defendant for purposes of the removal statute. 28 USCA § 1446(a) only authorizes removal by state court "defendants."  Thus state court third-party defendants may not petition for removal.

Noting that the Sixth Circuit Court of Appeals analyzed the issue in *First Nat. Bank of Pulaski v. Curry*, 301 F. 3d 456, 463-64 (6th Cir. 2002) and concluded that "third-party defendants are not 'defendants' for purposes of § 1441(a)," District Court rules that third-party defendant P&I underwriter did not have the right to petition for removal.

Even if Shipowners has standing to petition for removal, Ribelin's claims against it are not "separate and independent" of underlying claims in state court action, rendering removal inappropriate.

## NO BINDER, NO POLICY; NO DISCLOSURE OF TRUE OWNER TO INSURER, NO GOOD FAITH – NO COVERAGE

### Grande v. St. Paul Fire & Marine Ins. Co., 365 F. Supp. 2d 57 (D. Me. 2005)

Action by purported insured against insurer and agent for damage to vessel in transit, alleging that insurer had duty to pay under unissued trip insurance policy and that agent was liable for failing to procure policy. Judgment granted for defendants as a matter of law at conclusion of trial.

Applying Maine law, District Court holds that providing insurance quote that specifically stated "Coverage is NOT BOUND" did not bind trip insurance coverage. Issuance of oral binder only obligated insurer to provide coverage in line with its standard policy, and hence did not create coverage for damage to charter boat that occurred outside geographical limits of charter policy. Agent could not be held liable absent evidence that stand-alone trip coverage could have been procured under the circumstances.

Under Maine law, putative insured must disclose in application for insurance all known circumstances that materially affect the insurer's risk, including ownership interests in the vessel. Purported insured's failure to disclose that it was his cousin, not he, who purchased the vessel and was the owner of record rendered the policy voidable at the insurer's option under the doctrine of *uberrimae fidei*. Negligence and equitable estoppel arguments against the agent were defeated under the same doctrine due to the purported insured's misrepresentations.

## INJURED TRUCK DRIVER'S SUIT AGAINST BANKRUPT TERMINAL'S INSURER IS SOLIDLY TIMELY

### Torres Vazquez v. Commercial Union Ins. Co., 367 F. Supp. 2d 231 (D. Puerto Rico 2005)

Truck driver whose truck was lifted and dropped on pier by shore-based crane as he was delivering container to be loaded aboard vessel brought action against bankrupt marine terminal's liability insurer. Vessel, truck, container and crane were all owned by Sea Land Services, Inc., which also employed plaintiff driver. Crane was, and had been for some times, leased and maintained by the terminal, which also employed the crane operator.

On insurer's motion to dismiss, District Court holds that it lacks federal admiralty jurisdiction over claim for unseaworthiness under the Extension of Admiralty Act. The tort occurred on the pier rather than navigable waters, the crane was neither an appurtenance of of the vessel nor mounted on or physically connected to the vessel, and the crane was never under the control of the vessel or its personnel. Claims for unseaworthiness are therefore stricken.

Court further holds that truck driver stated a timely claim for intentional infliction of emotional distress under Puerto Rico law. Suit was originally filed within the one year stature of limitation under local law against the terminal, which denied the existence of an insurance policy in response to discovery. The Puerto Rico statute runs from "discovery by the injured party of the injury and of its author rather than at the time of the injury.... [and] insured defendants in tort actions are solidarity [sic] liable with its [sic] insurer." *Id.* at 240. Once plaintiff became aware of the existence of the insurer, the complaint was amended to add it as a party, "and, since the solidarity doctrine allows for the timely inclusion of a solidary tortfeasor as long as the original claim is considered to be timely, the action against Royal was not time barred." *Id.* at 240.

**INSURED DENIED SUMMARY JUDGMENT ON POLICY APPLICATION'S POLLUTION LOSS HISTORY QUESTION**

<u>Certain Underwriters at Lloyds, London v. Inlet Fisheries, Inc.,</u> 370 F. Supp. 2d 974 (D.Alaska 2004)

In vessel pollution insurer's declaratory judgment action seeking to void policy for insured's failure to disclose material facts, insured's motion for summary judgment on its claim that question on insurance application was ambiguous is denied.

In cases such as this, invoking the court's admiralty jurisdiction, federal common law applies to choice-of-law determinations. In this case dispute between Alaskan vessel owner and British insurer over validity of marine pollution policy negotiated in Washington state was governed by Alaska law. Vessel and insured were located in Alaska, insured risk was likely to occur in Alaska waters, and since policy was silent on the subject, insurer would have to make payment in the state where the insured is located.

Question 5 on policy application reads: "5. Pollution Loss History." Defendant's agent answered it: "None." Lloyds claims that Inlet in fact had a prior pollution loss history which, had it been disclosed, would have resulted in denial of the application.

Inlet contends that the question is ambiguous because it could be read as directed to both applicant and the vessels (as Lloyds alleges) or solely to the vessels (as Inlet says it was answered). Court concludes there is no evidence in the record that Inlet reasonably interpreted the question as it alleges, and denies summary judgment. It more likely did not interpret the question at all, since the form was filled out by its insurance agent, Totem, and there is no evidence that Totem interpreted the question in the manner suggested by Inlet.

It is unlikely that the insurance agent found the question ambiguous or thought that it was limited to the vessel's history:

> The court must express a significant degree of skepticism that Totem, an insurance agency familiar with underwriting practices, would interpret "prior pollution history" as being limited to the vessels to the exclusion of the applicant for insurance. Vessels do not cause toxic spills; it is the operators of vessels who cause spills. Anyone who has ever completed an application for automobile insurance knows that it is principally the driving records of the insured drivers of the vehicle that is of interest to the insurance company.

> Whether the court were to apply Alaska or Federal law to this issue the result would be the same. The court is unable to render a ruling as a matter of law based upon supposition or a hypothetical situation. Because Inlet failed to introduce any evidence that the application form was *in fact interpreted* in the manner ascribed to it

12

by Inlet, and because it is illogical to assume that it would have been considered ambiguous by Totem, the court cannot hold as a matter of law under the facts presented that the question "Pollution Loss History" is ambiguous.

*Id.* at 977-978.

## DISMISSAL OF INSURER'S DECLARATORY JUDGMENT ACTION ENDS RACE TO COURTHOUSE

**Great American Insurance Company v. A.G. Ship Maintenance Corp.**, 368 F. Supp. 2d 364 (S.D.N.Y. 2005)

Liability insurer's action seeking declaration of no coverage for personal injury claims settled by assured companies that provided various services to shipping lines and terminal operators in New Jersey ports. Defendants' motion to dismiss granted due to insurer's "procedural fencing" in filing suit in Southern District of New York after insureds advised they were about to sue in New Jersey for declaration of coverage, and for other factors.

Defendants are headquartered in New Jersey and supply various services in ports of Newark, Elizabeth and Bayonne. Court agrees that filing of federal court action in New York just before defendants commenced suit in New Jersey state court demonstrates that "the declaratory remedy 'is being used for "procedural fencing" or [in] a "race to res judicata",' " citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282-83, 115 S. Ct. 2137, 132 L. Ed. 2d 214 (1995).

In addition, applicability of federal admiralty jurisdiction is unclear; lack of substantial reason to exercise federal jurisdiction could increase friction between federal and state judicial systems; and state court affords remedy at least equal to any available in federal court.

## INDEMNITEES AND DUTIES TO DEFEND INJURY CLAIM OF SHIPYARD CONTRACTOR'S EMPLOYEE

**Ingalls Shipbuilding v. Federal Insurance Co.**, 410 F.3d 214 (5th Cir. 2005)

Skilled labor contractor's employee injured on vessel being equipped with derrick sued vessel owner and other contractors on project. Shipowner filed third-party actions against shipyard and other contractors seeking insurance defense, indemnity and coverage. Shipyard fourth-partied plaintiff's employer for indemnity and defense and made separate claim against employer's insurer.

After all claims were consolidated, plaintiff settled with shipowner and other contractors. Shipowner continued action against contractors and their insurers for reimbursement of its share of settlement. District Court granted shipowner summary judgment against two insurers and shipyard operator, entering final judgments as to amounts owed, and granted summary judgment to plaintiff's employer and its insurer on shipyard's claims. Vessel owner, insurers and shipyard appealed.

Court of Appeals holds that contractor's agreement to indemnify shipyard did not apply to shipowner's claim that shipyard breached agreement to provide it with insurance coverage against injury claims of contractors' employees. Plain language of the provision's first clause limited the contractor's responsibility to injuries or damage caused <u>by</u> the contractor, its subcontractors, agents and employees. In the present case the injury was <u>to</u> one of its employees. Second clause of the provision indemnifies the shipyard against claims by third persons arising out of the shipyard/contractor agreement. Here, the claims arose out of the shipyard's breach of its contract with the <u>shipowner</u> by failing to obtain insurance coverage, not its contract with the <u>labor contractor.</u>

Skilled labor contractor's comprehensive general liability insurer was not obligated under its policy to cover shipyard named as additional insured for shipyard's breach of its contract with shipowner. Policy endorsement limited its coverage to the indemnity obligations assumed by the labor contractor in its agreement with the shipyard, which, as set forth above, did not extend to the shipyard's breach of <u>its</u> contract with the shipowner.

Under Mississippi law, CGL insurer of welding contractor had duty to defend shipowner as additional insured from personal injury claim asserted by employee of another contractor, where policy covered liability of shipowner arising out of welding contractor's work <u>or</u> shipowner's negligent supervision of contractor. Shipowner/additional insured gave insurance company timely notice of claim where written notice was delivered four and a half months after complaint was amended to name primary insured as defendant, triggering additional insured's coverage. Timing of notice did not prejudice insurer, which actively participated in settlement proceedings on behalf of primary insured.

Applying choice-of-law rules of forum state, Mississippi, Court concludes that Texas law governs insurance contract, where insurer, a Pennsylvania corporation, and welding contractor, a Texas corporation with its principal place of business in Texas, negotiated and entered into the insurance contract in Texas, and the shipowner/additional insured is a Delaware corporation with its principal place of business in Texas. Under Texas law, insurer's actual knowledge of the suit including its additional insured as a party was sufficient to trigger its duty to defend, when coupled with shipowner's suit demanding a defense, with or without delivery by shipowner of actual suit papers filed on behalf of injured workman to insurer, which never requested them or objected to adequacy of shipowner's notice and demand for a defense.

Under Texas law, prevailing party is entitled to award of reasonable attorney's fees, to be determined by District Court on remand after deciding whether insurer breached its duty to defend shipowner.

[Our thanks to Committee Secretary Zachary M. Barth for the following summaries.]

## NEW YORK COURT OF APPEALS CONTINUES TO APPLY THE "NO PREJUDICE" RULE IN LATE NOTICE DISPUTES

<u>**Argo Corp. v. Greater N.Y. Mutual**</u>, 2005 WL 756613 (N.Y. App. 2005)

In *Argo Corp.* the court affirmed the dismissal of a policyholder's coverage complaint for failure to provide timely notice and held that an insurer can properly disclaim coverage based on late notice of a lawsuit without demonstrating prejudice. In early January 1997, the underlying plaintiff slipped and fell on an icy sidewalk owned by the policyholder. In late February 2000, the plaintiff filed suit against and effected service on the policyholder. The policyholder was served with a notice of default judgment in November 2000 and notice of the entry of default judgment in February 2001. The policyholder did not notify its insurer of the underlying suit until early May 2001 and the insurer disclaimed coverage based on the late notice.

The policyholder then brought a declaratory judgment action and the trial court ruled in favor of the insurer, holding that the policyholder failed to notify its insurer "as soon as practicable of an 'occurrence' or an offense which may result in a claim." The trial court held that the notice was late as the underlying lawsuit was not brought to the attention of the insurer until 14 months after the policyholder had received the summons and complaint, 6 months after service of the default, and 3 months after default had been entered. The intermediate appellate court affirmed the trial court's ruling.

The New York Court of Appeals agreed. In its opinion, the court noted New York's long-standing adherence to the rule that a failure on the part of a policyholder to provide timely notice of an occurrence vitiates coverage, and that no showing of prejudice on the part of the insurer is required. The court explained that the "no prejudice" rule clearly applied to late notice of a lawsuit under a liability insurance policy and that "[a]liability insurer, which has a duty to indemnify and often also to defend, requires timely notice of lawsuit in order to be able to take an active, early role in the litigation process and in any settlement discussions and to set adequate reserves." The court held that application of the "no prejudice" rule is clearly justified in these circumstances because late notice of a lawsuit in the liability insurance context is likely to be prejudicial.

## BREACH OF CONTRACT RESULTING IN CUSTOMERS' NEGATIVE PERCEPTION OF BEVERAGE IS A PHYSICAL LOSS COVERED UNDER POLICY

### Customized Distribution Services v. Zurich Ins. Co., No. A-1586-03T1 (App. Div. 2004)

Customized Distribution Services ("CDS") was sued by Campbell Soup Company ("Campbell") for failure to rotate and ship a beverage that CDS was storing in its warehouse. Campbell claimed that CDS's failure to rotate and ship the product before its expiration date forced Campbell to sell the product at less than 50 percent of its original value. CDS then sought coverage for the loss under a Warehousemen's Liability policy that covered for "'loss' caused by a 'covered cause of loss' to 'covered property.'" The policy defined "covered causes of loss" to mean "risk of direct, physical 'loss' to 'covered property'…" unless excluded. The policy excluded coverage for loss resulting from a "delay, loss of use, loss of market, or any other consequential loss."

The carrier, Zurich, denied the claim arguing that there was no "direct, physical" loss because there was no "change" in the product; rather, there was merely a reduction in the value of the product. Zurich also contended that Campbell's claim arose from the failure to rotate and

ship the product in advance of the expiration date and, as such, the loss resulted from a delay and/or loss of use of the product, which was excluded from coverage.

While the trial court agreed with Zurich, the Appellate Division reversed, finding no requirement in the policy that the product's material or chemical composition must be altered. The court stated that coverage would be available if the loss arose from the bottles containing the product being broken where the beverage itself would remain undamaged and unaltered. Moreover, the court held that the inclusion of the term "risk" within the definition of "covered causes of loss" supported the finding that the policy did not require any actual physical damage to or alteration of the material composition of the product. Because the court believed that Campbell's product had changed based on the customers' negative perception of the beverage, it concluded that this change was the "functional equivalent" of damage of a material nature or an alteration in physical composition. The court believed that if Zurich intended to provide a narrower scope of coverage it was "incumbent" on Zurich to "clearly and specifically rule out coverage in the circumstances where it was not to be provided."

Turning to the exclusion, the Appellate Division focused on the parties' reasonable expectations and assumed that both CDS and Zurich understood the "delay, loss of use" exclusion to bar coverage for losses that CDS may incur as a result of delay or loss of use, not losses of use suffered by its customers. Moreover, the court concluded that CDS's liability did not arise from a delay or loss of use because the market for Campbell's beverage was not lost but instead the value of the product was diminished due to customer perception. Finally, the court agreed with CDS that to adopt Zurich's interpretation that "loss of use" should be construed to mean the product's diminished utility would render the coverage illusory.

## A COMPREHENSIVE GENERAL LIABILITY POLICY ISSUED TO MARITIME BUSINESS IS A MARITIME CONTRACT SUBJECT TO ADMIRALTY JURISDICTION

**Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.**, 2005 U.S. App. Lexis 13041 (2d Cir. 2005)

The insured, Clean Water, obtained a policy providing (1) Shiprepairer's Legal Liability (SLL) and (2) modified Commercial General Liability (CGL) coverage. Notably the policy had over 12 named insured parties who were in the business of either ship repair, marine oil transport, marine cargo transport, or ship tank cleaning. After an employee of Clean Water's subcontractor sued Clean Water alleging negligence, the insurer, Folksamerica, sought avoidance and rescission of the CGL policy and a declaration that it was not obligated to defend or indemnify Clean Water.

The United States District Court for the Eastern District of New York concluded that the CGL policy was not "marine insurance" and did not have a "purely" or "wholly" maritime character. The district court observed that CGL coverage was a type of insurance used by many businesses to cover day-to-day operations, and that any maritime risks were "merely incidental."

On appeal the Second Circuit observed that there are two established rationales for asserting maritime jurisdiction over contracts that are not "wholly" maritime. The court stated that the first rationale is where a claim arises from a breach of maritime obligations when the maritime obligations are severable from the non-maritime obligations. The second is where the non-maritime obligations are "merely incidental" to the maritime obligations. The court then looked to recent Supreme Court precedent which indicated that the relevant inquiry is not whether the non-maritime obligations are "incidental," but rather, whether the primary object of the contract is maritime. Under this analysis the court reasoned that the policy was "primarily or principally concerned with maritime objectives."

In reaching this conclusion the Second Circuit found that the maritime nature of the claim depended on the coverage provided by the policy and the "predominant purpose" of the policy should be determined by "the dimensions of the contingency insured against and the risks assumed." Turning to the policy at issue the court observed that even though the CGL policy excluded some maritime risks, it insured against others. The court then analyzed each risk in light of the business operations of the insured. In light of the fact that the policy provided CGL and SLL coverage, the court held that the policy was marine in nature: "Combined, the CGL and SLL provisions round out the insureds' coverage for maritime transport operations and give fairly robust ship repair and maintenance coverage."

## LONG TERM LIVE IN BOYFRIEND IS NOT A MEMBER OF A "HOUSEHOLD" AND HOUSEHOLD EXCLUSION IN BOAT INSURANCE POLICY IS NOT APPLICABLE

### Continental Insurance Co. v. Roberts, 2005 WL 1313692 (11th Cir. 2005)

The underlying plaintiff/boyfriend had an "intimate" relationship with the insured/girlfriend for over 20 months. Among other things the two had been living with each other and the plaintiff had a cell phone and credit cards in the insured's name.

The plaintiff suffered severe injuries after diving off the insured's boat. The insurer offered the plaintiff $25,000 which was the maximum under the policy for "family members." According to the policy if the plaintiff was not a member of the same household as the insured he would be entitled to $100,000. The policy defined "family members" as "any member of the named insured's household." "Household" was not defined in the policy.

The trial court held that the word "household" was ambiguous and thus could require a relationship by blood, marriage, or adoption. The appeals court agreed, finding that the couple did not have to show that their interpretation of the policy term "household" was more correct than the insurer's, only that the term was ambiguous. Once it was shown that the term was ambiguous the term would be construed against the insurer, allowing coverage up to $100,000. Once judge dissented, noting that the couple chose to "litigate by day and copulate by night."

## BREACH OF LAY-UP WARRANTY CONTAINED IN POLICY PRECLUDES COVERAGE UNDER NEW YORK LAW

### New Hampshire Ins. Co. v. Dagnone, 2005 WL 936929 (D.R.I. 2005)

The insured's 49-foot motorboat went adrift during a storm, damaging the vessel and two sailboats docked nearby. At the time the vessel's engines had not been winterized and the vessel was waiting to be put in dry storage ashore. The insurer filed a declaratory judgment action and the court held that the insurer did not have to provide coverage as the insured had breached the policy's lay-up warranty, which provided: "Your yacht must be laid-up and out of commission during the period shown on the declarations." The court relied on the fact that the engines were not antifreezed and winterization was not completed at the time of the accident. Turning to causation the court held that under New York law the insured's breach of the policy foreclosed coverage "irrespective of the relation between the breach and the damage."

## INSURED WAS NOT IN BREACH OF MARINE INSURANCE POLICY WARRANTY AT TIME OF ACCIDENT AND INSURER IS NOT ENTITLED TO VOID POLICY

**Commercial Union Ins. Co. v. Pesante**, 359 F.Supp.2d 81 (D.R.I. 2005)

The policy included a warranty by the insured that the "only commercial use of the insured vessel(s) shall be for lobstering." Despite giving this warranty the insured was a gill fisherman.

Thereafter, the insured's vessel collided with a 21-foot Boston Whaler, injuring several occupants, who then sued the insured. Commercial Union sought to void the policy based on the breach of the lobstering-only warranty. In support the insurer submitted an affidavit that it would have charged a 25% higher premium had the insured stated that he was to use the boat for gill netting, which poses a higher risk of loss. While the court agreed there was "no question" the insured breached the warranty, the court held that the breach did not cause the loss as the boat was not engaged in gill netting at the time of the accident, and thus the insurer was not entitled to rely on the warranty to avoid coverage for the accident.

---

Items for future issues may be submitted to:

George N. Proios
Lyons, Skoufalos, Proios
   & Flood
1350 Broadway
New York, NY 10018

Gene B. George
Ray, Robinson, Carle & Davies P.L.L.
1717 East 9th Street, Ste. 1650
Cleveland, OH 44114-2878

Joshua S. Force
Sher Garner Cahill Richter Klein
McAlister & Hilbert, L.L.C.
Twenty-Eighth Floor
909 Poydras Street
New Orleans, Louisiana 70112-1033

**FALL 2006**

## NEWSLETTER

Committee on Marine Insurance and General Average

Committee Chair                                    Editor:  Gene B. George
Jonathan S. Spencer                                        Cleveland, Ohio
New York, New York

*The following articles, case notes and comments are for informational purposes only, are not intended to be legal advice, and are not necessarily the views of the Maritime Law Association of the United States or the Committee on Marine Insurance and General Average.*

### News and Information

#### "Underwriting Intent" and Interpretation of Marine Insurance Policies

by Harold K. Watson*

### 1.    Introduction

Most standard form marine insurance policies have been around so long that the "intention" of the drafters can only be surmised from the language used and what we know about particular claims that might have inspired particular clauses.[1]  With manuscript policies of recent origin, on the other hand, it is sometimes reasonable to ask what the parties intended by including particular language, since the parties who drafted and agreed to the wording are living human beings who could at least in theory shed some light on why the policy was drafted as it was.  Accordingly, it has become a common practice in analyzing insurance policies to attempt to determine actual "underwriting intent" by interviewing or deposing the underwriters and brokers who were "present at the creation."

This can be an important inquiry, depending upon what is meant by "underwriting intent."  There is a great deal of confusion, however, about what constitutes "underwriting intent," and, depending upon what questions one asks in making the inquiry, the answers one gets can be of varying help.  This article will explore the various "levels" of underwriting intent, and evaluate the significance of this concept in light of established rules of contract interpretation.

---

* Partner, Locke Liddell & Sapp, L.L.P., Houston, Texas.   The author wishes to express his appreciation to Mr. Chris Verducci for his invaluable assistance in the preparation of this article.
[1] For example, we know with a fair degree of certainty that the Inchmaree clause was included in hull and machinery policies in response to the holding in *Thames & Mersey Marine Ins. Co. v. Hamilton Fraser & Co.*, 12 App.Cas. 484 (H.L.1887).

**EXHIBIT J**

Of course, this issue is not specific to marine insurance law, and there are in fact few cases where the issue has been raised in a marine insurance context. Accordingly, most of the cases that will be cited will of necessity be non-marine insurance cases.

## 2.      The setting

To appreciate how the issue of underwriting intent arises, it is necessary to have some understanding of how manuscript insurance policies are created. Typically, a risk will be presented to an underwriter on a "slip," which sets forth in rather skeletal form the coverage that the broker wants to obtain for his client, the assured. The slip will serve as the basis for the negotiations between the parties. In many cases, at least some of the clauses may be well-recognized insurance forms, but there may be additional manuscript clauses set forth in the slip. In many cases, however, many issues will not be spelled out at all; it is not at all uncommon for the parties to agree to bind coverage with nothing more spelled out than that the language of the policy is "TBA" ("to be agreed").

The contract between the parties must then be fleshed out with a "wording" that spells out what risks the underwriter agrees to cover, what exclusions to coverage there will be, etc. More often than not, this document will be physically prepared by the assured's representative, the broker. Often the broker will start with a recognized form, such as the London Standard Drill Barge form, but the broker will then tailor this document to suit his client's needs, or will cobble together various bits and pieces of various forms or wordings that the broker has used for other clients. This wording will then be presented to the underwriter for his review and agreement. Once the wording has been agreed upon, it will be incorporated into a policy. It is against this background that the notion of "underwriting intent" must be evaluated.

## 3.      What is "underwriting intent"?

The term "underwriting intent" can mean a variety of things, and the significance that attaches can vary greatly from controlling the parties' legal rights and obligations to being legally irrelevant, depending upon what one means by the term "underwriting intent." Accordingly, it is important to first set forth how this term is used and abused.

At one level is the intention of the parties as evidenced by the words that the parties put down on paper in an insurance wording, which is of course always relevant. This is always the starting point in policy interpretation, and often the finishing point as well. However, often insurance policies are subject to different interpretations, and one or more of the parties may want to introduce evidence extrinsic to the policy of "underwriting intent" to determine the rights and obligations created by the policy.

The next level of "underwriting intent" is the intent that the parties had at the time they contracted as evidenced by what the parties may have said or done at the time of contracting. If in the course of negotiating the terms of coverage the underwriter and broker discuss whether the policy would cover a specific fact situation, that evidence can be of extreme legal and commercial significance.

However, very rarely is this what assureds, brokers, and underwriters' representatives have in mind when they suggest that the underwriters "intended" to cover or not cover a particular type of loss. Instead, what is usually involved is unexpressed intent. Unexpressed intention itself breaks down into two basic types. In some instances, the underwriter who wrote the risk or the broker who placed the risk had a specific fact pattern in mind at the time of contracting. Insurance policies tend to develop by accretion; a claim presents a difficult coverage issue, and policy language is crafted to expand, limit or clarify coverage to meet a market need or to avoid similar disputes in the future. For example, the so-called "Social Responsibility" clause often included in energy package policies that provides coverage for the cost of recovering human remains[2] probably came into being in response to *Grupo Protexa, S.A. v. All American Marine Slip*,[3] where the underlying reason for removing the wreck of a vessel was to obtain bodies for burial, but coverage was unavailable because removal was not "compulsory by law." When faced with the question of whether an underwriter intended to cover the cost of wreck removal under a social responsibility clause, an underwriter who was familiar with the details of the *Grupo Protexa* litigation might well have to honestly answer that that was precisely what he intended to cover.

More frequently, however, what is meant by "underwriting intent" is something much more ephemeral. Insurance wordings tend to be fairly voluminous documents, and while a cautious underwriter will read the wording before agreeing to its terms, this exercise has its shortcomings in terms of forming any precise "intent," since until a particular fact situation presents itself in the form of a claim, it is very difficult to have anything more than an impression of what general situations a clause is intended to address, and a particular claim will involve nuances that the underwriter did not and could not have foreseen at the time he agreed to write the risk and when he reviewed the wording. Accordingly, very frequently, when one asks an underwriter whether by agreeing to incorporate particular language into the wording he intended to cover a particular type of loss, the underwriter will never have given any thought to the particular situation presented. To use a concrete example, an underwriter who was not familiar with the *Grupo Protexa* litigation might well have never considered whether by agreeing to cover the cost of body recovery he was agreeing to cover the cost of voluntarily removing the wreck of a vessel as well as the bodies contained in the wreck. In such a situation, the best the underwriter can do is say what he would have thought if he had thought about it. Thus, in reality what one often gets when one asks an underwriter what he intended is just the underwriter's interpretation of the policy language at the time the question is posed. This is conceptually a very different thing from intent existing at the time of contract formation.

With this background, we can discuss how the courts have treated these different levels of "underwriting intent."

4.    **The legal relevance of "underwriting intent" in general**

---

[2] A typical social responsibility wording will provide that "in the event of any occurrence resulting from a peril insured against hereunder which caused the death of or injury to any person . . . then Underwriters will indemnify the Insured for the voluntary evacuation or recovery of human bodies or remains (including search costs) . . . ."

[3] 753 F.Supp. 1217 (D.N.J. 1990), *reversed*, 954 F.2d 130 (3d Cir. 1992), *on remand*, 1993 WL 166275 (D.N.J. May 12, 1993), *affirmed* 20 F.3d. 1224 (3d Cir. 1994).

The rules of construction for marine insurance policies are similar to the rules of construction for ordinary insurance policies.[4]  Further, because insurance policies are contracts, they are construed according to the general rules for contract interpretation.[5]  As such, courts must interpret marine insurance policies so as to give effect to the parties' intent.[6]

But what "intent" is at issue?  First, it is a fundamental principle of contract law that courts must construe and interpret ambiguous contract provisions in accordance with the intent of the contracting parties at the time the contracts were formed.[7]  Secondly, the purpose of contract law is to protect the reliance interest that parties have in view of the agreement that they have reached.  Since I have no basis to rely upon your unexpressed intentions, nor you on mine, the "intent" at issue is the mutual intent of the parties that they have expressed by the words and conduct.  Accordingly,

> [i]t makes not the least difference whether a promisor actually intends that
> meaning which the law will impose upon his words.  The whole House of
> Bishops might satisfy us that he had intended something else, and it would
> make not a particle of difference in his obligation. . . . Indeed, if both parties
> severally declared that their meaning had been other than the natural
> meaning, and each declaration was similar, it would be irrelevant, saving
> some mutual agreement between them to that effect.  When the court came
> to assign the meaning to their words, it would disregard such declarations,
> because they related only to their state of mind when the contract was made,
> and that has nothing to do with their obligations.[8]

Accordingly, even if the parties have a firm "intent" at the time they enter into the contract, that intent is meaningless unless they somehow manifest it, and the parties' subjective, unexpressed intent behind a particular policy provision is irrelevant.[9]

And the second level of unexpressed intent, i.e., the contracting party's after-the-fact supposition of what he would have intended if he had in fact thought about the issue in question is of even less relevance:

---

[4] *See Kalmach, Inc. v. Ins. Co. of State of Pa., Inc.*, 529 F.2d 552, 555 (9th Cir. 1976)("[W]e can see no significant difference between construction of an ordinary insurance policy and one with marine insurance overtones."); *see also Continental Oil Co. v. Bonanza Corp.*, 677 F.2d 455, 461 (5th Cir. 1982)(declining to rest its holding on a choice between federal maritime and state law because of the similarity between their insurance principles).

[5] *Valmont Energy Steel, Inc. v. Comm. Union Ins. Co.*, 359 F.3d 770, 773 (5th Cir. 2004)(construing a policy under Texas law); *American Int'l. Specialty Lines Ins. Co. v. Canal Indemn. Co.*, 352 F.3d 254, 262 (5th Cir. 2003)(construing a policy under Louisiana law).

[6] *Heinhuis v. Venture Associates, Inc.*, 959 F.2d 551, 553 (5th Cir. 1992).

[7] *Gulf Chemical & Metalurgic Corp. v. Associated Metals & Minerals Corp.*, 1 F.3d 365, 369 (5th Cir. 1993)(applying Texas law); *Cruz v. The Home Ins. Co.*, 511 So.2d 22, 23 (La. Ct. App. 1987).

[8] *Eustis Mining Co. v. Beer, Sondheimer & Co.*, 239 F. 976, 984-985 (S.D.N.Y. 1917) (per Hand, J.).

[9] *See Provident Life and Accident Ins. Co.*, 274 F.3d at 992 (finding that, because a policy amendment was unambiguous, the insured's subjective understanding of the amendment is not relevant); *see also Clardy Man. Co.*, 88 F.3d at 352 (while applying Texas law to an insurance policy, the Court states "We must enforce the unambiguous language of the contract as written, and the applicable standard is 'objective intent' evidenced by the language used, rather than the subjective intent of the parties.").

> In many disputes arising out of contemporary business transactions,
> however, the parties gave little or no thought to the impact of their words on
> the case that later arose.... The court will then have no choice but to look
> solely to a standard of reasonableness.  Interpretation cannot turn on
> meanings that the parties attached if they attached none, but must turn on
> the meaning that reasonable persons in the positions of the parties would
> have attached if they had given the matter thought.[10]

Accordingly, while the interpretation of an insurance policy does involve determining "intent," it is a particular type of intent, and any inquiry into intent has to focus on intent that has been objectively manifested.

## 5.    **Expressed intent: unambiguous policy language**

Unless the policy is ambiguous, even expressed intent is legally irrelevant in determining the meaning of an insurance contract.  Although not a marine insurance case, *Mustang Tractor & Equipment Co. v. Liberty Mutual Insurance Company*[11] illustrates this principle.  There, the policy excluded coverage for pollution unless the pollution was "sudden and accidental."  The plaintiff claimed that the word "sudden" could mean either "unexpected" or "something that occurs quickly, rapidly or abruptly,"[12] and sought to introduce evidence surrounding the clause's adoption to show that this was what was intended.[13]  The insurer claimed that, by trying to admit such evidence, the plaintiff was attempting "to create an ambiguity where none exists...."[14]  Applying Texas law to the dispute, the Fifth Circuit stated:

> Texas law requires that courts strive to effectuate the intentions of the parties as
> they are expressed in a contract....Only if a contract remains ambiguous, despite
> the application of these principles, may we consider extrinsic evidence....Parol
> evidence of intent is admitted to explain an ambiguous provision, never to create
> the ambiguity.[15]

After finding that the plain meaning of the word "sudden" included a temporal element, the Court held that, because there was "only one reasonable interpretation of the word as it is used in this policy, it is not ambiguous."[16]  Therefore, the Court held that the plaintiff was prohibited from offering extrinsic evidence of the intent of the parties regarding the word "sudden".[17]

---

[10] E. Allan Farnsworth, CONTRACTS §7.9 at 491 (1982).
[11] *Mustang Tractor & Equipment Co. v. Liberty Mutual Ins. Co.*, 76 F.3d 89, 91 (5th Cir. 1996).
[12] *Id.*
[13] While not spelled out in the opinion, presumably the assured wanted to introduce evidence that the insurance industry had told regulators that the term "sudden and accidental" was essentially the same as the term "accidental" that had been contained in previous versions of the pollution exclusion.
[14] *Id.*
[15] *Id.*
[16] *Id.* at 92.
[17] *Id. But see Morton International v. General Accident Ins. Co.*, 124 N.J. 1, 629 A.2d 831 (N.J. 1993), holding that evidence of industry statements to regulators was admissible to contradict the clear meaning of policy language.

This principle could have important practical tactical ramifications.   In coverage litigation, a typical tactic of assured's counsel is to seek to depose the claims and underwriting personnel in an attempt to get testimony that will suggest that the assured's interpretation is correct.  Under the broad leeway allowed under modern discovery rules, it is often difficult to get a court to preclude a party from conducting discovery, but if the policy is unambiguous, one can argue that discovery is not "reasonably calculated to lead to the discovery of admissible evidence," since evidence relating to the meaning of the policy will be inadmissible.   In any event, one can argue that discovery should be deferred until the court has concluded that the policy is ambiguous on a motion for summary judgment. [18]

There is one potential exception to the rule that extrinsic evidence of the parties' discussions is inadmissible unless the policy is ambiguous; some courts have held that such statements can bind an insurer under a promissory estoppel theory. [19]  In *Travelers Indemnity Co. v. Holman*, the insured approached his insurance agent and inquired whether there would be coverage for the operations he intended to conduct on his property. [20]   The agent posed the question to the underwriting department of the insurance company, which assured the insured that his present policy covered the operations and that no further coverage was needed. [21]   The Fifth Circuit stated that an interpretation of the relevant policy provisions was not necessary because the underwriter's post-contractual assurances subjected the underwriter to liability under the theory of promissory estoppel. [22]   Initially, the court noted that, while the coverage of an insurance policy cannot normally be extended by the doctrine of estoppel, promissory estoppel was an exception to this rule. [23]   The court then reiterated the promissory estoppel rule:

> A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. [24]

The court pointed out that the underwriter "knew better than anyone else that there would be reliance," [25] and that the insured in fact relied on the promise by not purchasing additional

---

[18] *See, e.g., Ameron, Inc. v. Ins. Co. of North America*, 1995 WL 139223, No. 93-56180, at *1 (9th Cir. March 29, 1995)(upholding district court's decision to prohibit insured from deposing underwriter regarding intent because a policy cannot be interpreted based on "the subjective beliefs of the insurer.").

[19] *See Travelers Indemnity Co. v. Holman*, 330 F.2d 142, 151 (5th Cir. 1964); *see also Nova Casualty Co. v. Wasertein*, 424 F.Supp.2d 1325, 1337-38 (S.D. Fla. 2006)(after finding that an unambiguous pollution exclusion precluded coverage for the insured's claim, the court held that the underwriter's post-contractual assurances that the policy covered the insured's renovation costs amounted to a promissory estoppel that bound the underwriter to such promise).

[20] *Id.*

[21] *Id.* at 148.

[22] *Id.* at 150-51.

[23] *Id.* at 150.  Other courts applying the doctrine of promissory estoppel to insurance coverage have recognized the doctrine as an exception to the normal rule that estoppel cannot expand the scope of a policy's coverage. *See Nova Casualty Co.*, 424 F.Supp.2d at 1337-38 ("[T]he general rule in applying equitable estoppel to insurance contracts provides that estoppel may be used defensively to prevent a forfeiture of insurance coverage, but not affirmatively to create or extend coverage....The exception to this rule is the doctrine of promissory estoppel....").

[24] *Id.* at 151.

[25] *Id.*

insurance.[26]   Consequently, the court held that the circumstances satisfied the promissory estoppel rule, and the underwriters were liable for the promised coverage.[27]

The exception to the general rule that extrinsic evidence is inadmissible in the absence of ambiguity recognized in *Holman* is probably of fairly limited application, since promissory estoppel by definition requires a promise of sufficient specificity to give rise to a second contract, and it is probably uncommon for an underwriter to make such assurances. However, underwriters would be well aware that their discussions can form the basis for a claim that the terms of coverage have been altered.

**6.     Use of extrinsic evidence to resolve ambiguities**

If the language in question is ambiguous, on the other hand, extrinsic evidence tending to show the parties' intent is admissible.   Courts will occasionally question whether this is permissible under the parol evidence rule, which bars consideration of prior and contemporaneous oral agreements that are inconsistent with the terms of the written agreement.[28] However, the parol evidence rule only bars the introduction of extrinsic evidence to vary a written agreement; it does not preclude the introduction of extrinsic evidence to explain an ambiguity.   Accordingly, if the policy is ambiguous, extrinsic evidence should be admissible to show the intent of the parties.[29]

But what kind of extrinsic evidence is relevant to the issue at hand?  As discussed above, the relevant issue is the intent of the parties at the time they contracted.  Accordingly, if the underwriter expresses views regarding the extent of coverage to the assured or the broker in discussions or negotiations prior to binding the risk, this evidence would presumably be relevant in determining the mutual intention of the parties, since a statement by one party to a contract at the time of contracting will logically affect the other party's understanding of what is intended. Similarly, other evidence that would tend to show what both parties understood at the time of contracting could logically show what they mutually intended.   To use the example discussed above, in a dispute over whether the Social Responsibility clause provided coverage for the cost of removing the wreck of a vessel to obtain bodies for removal, it might be relevant to show that both the underwriter and the broker had been involved in *Grupo Protexa*.

Statements made after the contract has been concluded, however, are more problematic. First of all, the statement will not necessarily reflect even what the party making the statement

---

[26] *Id.*

[27] *Id.*

[28] *Beijing Metals & Minerals Import/Export Corp. v. American Business Center, Inc.*, 993 F.2d 1178, 1182-83 (5th Cir. 1993).

[29] Some courts hold that if the policy is ambiguous, it must automatically be construed against the insurer.  Most courts and commentators reject this view, and conclude that the rule of interpreting ambiguities against the drafter is only applicable if the court cannot conclude how the policy should be interpreted after receiving any extrinsic evidence bearing on the subject.  *See* Barry R. Ostrager and Thomas R. Newman, HANDBOOK ON INSURANCE COVERAGE DISPUTES § 1.01[c] (9th ed. 1998).  Moreover, as this writer has discussed in a previous article in this publication, the better view is that *contra proferentem* is inapplicable to manuscript policies. *See* Harold K. Watson, *The Sophisticated Assured Exception to the Doctrine of Contra Proferentem in Marine Insurance Law*, Spring 2006 Newsletter, Committee on Marine Insurance and General Average, Maritime Law Association of the United States.

intended at the time of contracting.  As discussed above, in many instances neither party will have thought about the particular situation that is presented by the claim, and, accordingly, a statement by an underwriter as to what he "intended" is often really just a statement of how he presently would interpret the provision in question, which should be irrelevant in determining how the contract should be interpreted.

Moreover, even if one of the parties can honestly state that he recalls what he was thinking about at the time of contracting, this is of questionable relevance in interpreting the contract, since the relevant issue is the mutual and expressed intentions.  The purpose of allowing extrinsic evidence is to determine the mutual intention of the parties, and the statement of one of the parties after the contract has been agreed upon only goes to show the intent of one of the parties, and cannot logically show what the other party reasonably understood the contract to mean.

Accordingly, most courts that have addressed this issue have concluded that testimony regarding what was intended is inadmissible.  For example, in *General Star Indemnity Company v. Custom Editions Upholstery Corporation*,[30] the court prohibited the underwriter from offering testimony that it believed its policy did not cover the claim in question.  The court held that the determination of the parties' intent at the time they entered into the contract is not governed by their unexpressed, subjective views.[31]  The court stated:

> "The 'subjective views of [the insurer's] officials, never communicated to [the insured] until litigation' cannot establish the parties' intent....Plaintiff presents no evidence that it communicated this intent to Custom Editions at the time the insurance policy was issued....Thus, this evidence of intent is irrelevant in determining the proper interpretation of the policy."[32]

*Board of Education, Yonkers School District v. CNA Insurance Company*,[33] takes a similar view in part, but in some ways appears to depart from these principles.  There the issue was whether the insurer was obligated to pay the costs the assured had incurred in defending a racial discrimination suit.  The court concluded that the policy unambiguously required the insurer to pay the defense costs, and one might have expected no further discussion.  However, the insurer had argued that the "underwriting intent" was to exclude coverage, relying on the deposition testimony of its claims manager.  The court made short work of this argument:

> Undisclosed opinions of "underwriting intent" acquired after the fact have little weight in construing an insurance policy and will not be considered to raise a genuine issue of material fact.  This is the case especially where, as here, such opinions contradict the

---

[30] *General Star Indemnity Co. v. Custom Editions Upholstery Corp.*, 940 F.Supp. 645 (S.D.N.Y. 1996); *see also Ameron, Inc. v. Ins. Co. of North America*, 1995 WL 139223, No. 93-56180, at *1 (9th Cir. March 29, 1995)(upholding district court's decision to prohibit insured from deposing underwriter regarding intent because a policy cannot be interpreted based on "the subjective beliefs of the insurer.").
[31] *Id.*
[32] *Id.*
[33] 647 F.Supp. 1495 (S.D.N.Y. 1986).

interpretation compelled by the applicable canons for the construction of contracts.[34]

The testimony of the insurer regarding "intent" was thus irrelevant for all the reasons we have discussed—extrinsic evidence of intent is inadmissible unless the contract is ambiguous; evidence of the unexpressed intent of one party to the contract is irrelevant to prove the mutual intention of the parties, and the intent at issue is the intent at the time of contracting.

While the court could probably have ended its opinion there, it went on to give additional bases for its opinion. When the insurer was first put on notice of the claim, the insurer wrote a letter that stated that it "will respond for defense and investigation costs in connection with this litigation,"[35] and then proceeded to monitor the progress of the litigation, request status reports and invoices, notify its reinsurer of its exposure for defense costs, etc. The court concluded that this also supported the conclusion that the policy afforded coverage, since the "practical interpretation of a contract, prior to litigation, is deemed of great, if not controlling, influence."[36] The insurer had also written an internal memorandum stating that the policy does "provide coverage for costs of investigation and defense of legal actions." The court concluded that this and other similar statements could be construed to be an "admission."[37] While the court was probably correct in both regards in that case, the court's conclusions regarding the relevance of post-contracting actions and statements can easily be misapplied.

First, like any question involving extrinsic evidence, extrinsic evidence of the parties "practical interpretation" of the policy should be inadmissible if the policy is unambiguous. In *Continental Oil Company v. Bonanza Corp.,*[38] the assured argued that the insurer's practice of not insisting on payment by the assured precluded the insurer from relying on the "pay to be paid" provision in the P&I policy. The court rejected this argument,[39] presumably because the policy unambiguously stated that the underwriters were only liable when the assured "shall have become liable to pay and shall have paid." The court's reference to the post-contracting statements and actions in *Board of Education, Yonkers School District v. CNA Insurance Company* only makes sense if one reads the opinion as implicitly conditioning these alternative bases on the policy being ambiguous, since evidence of the insurer's interpretation and admissions by the insurer should not be admissible to aid in interpreting an unambiguous contract of insurance.

Assuming that the evidence of "practical interpretation" was admissible, the court's reliance on the insurer's handling of this particular claim makes sense, since the insurer's actions that evidenced its belief that these costs were indeed covered could logically be taken as some evidence that the insurer had understood at the time of contracting that there was coverage for these expenses. However, evidence of "practical interpretation" in other claims is far more suspect. Almost all insurance claims are fact specific, and one must be very careful about

---

[34] *Id.* at 1505.
[35] *Id.* at 1506.
[36] *Id.* at 1505.
[37] *Id.* at 1507.
[38] 706 F.2d 1365 (5th Cir. 1983) (en banc).
[39] *Id.* at 1369 n. 3.

drawing the conclusion that an insurer intended to cover claim A because it afforded coverage for claim B, since there can well be a variety of factors that distinguish the two claims. Moreover, unless the previous claims involve the same assured, evidence of "practical interpretation" would only tend to show the intention of the insurer, and unless the assured can be shown to have known of this practice, would logically be irrelevant to show the parties' mutual intention.

Post-contracting statements must also be scrutinized before one concludes that they are relevant to the policy interpretation. In *Board of Education, Yonkers School District v. CNA Insurance Company* the statements were internal memoranda that analyzed the coverage question at issue, and presumably were directed to the interpretation of the policy. As noted, however, often an underwriter's statements about the meaning of the policy are merely the underwriter's statement about how he would interpret the policy, not what he understood it to mean at the time he accepted the risk. A skillful lawyer can often get an underwriter to admit that the assured's lawyer's interpretation of the policy language is reasonable, and as a practical matter it may be very difficult for an insurer to get around an admission of this nature, but in theory such a statement should have no more impact than an underwriter's testimony that he did not intend for the policy language to cover the loss in question. Courts should be careful to distinguish whether testimony of this nature relates to intent at the time of contracting, and lawyers investigating coverage issues and defending underwriters in coverage litigation should take care to make sure that their clients understand this distinction.

7.   **Conclusion**

"Underwriting intent" properly understood is of course critical to policy interpretation, but its legal relevance is often misunderstood. This does not mean that it is not commercially relevant; an underwriter who really intended to cover a particular loss may well want to pay for commercial or ethical reasons even if the policy unambiguously excludes coverage. But hopefully a proper understanding of the role of underwriting intent in policy interpretation will enable insurers to properly understand the decisions they have to make.

**[Our sincere thanks to Hal Watson for the foregoing article - ed.]**

**Recent Cases of Interest**

**No Sovereign Immunity Defense**

*Northern Insurance Company of New York v. Chatham County, Georgia,* 126 S. Ct. 1689, 2006 U.S. LEXIS 3449 (S. Ct. 2006)

Petitioner insurer filed suit against respondent county due to damages to its insureds' boat caused by a malfunctioning drawbridge. The district court granted the county's motion for summary judgment on the ground that the suit was barred by sovereign immunity and the U.S. Court of Appeals for the Eleventh Circuit affirmed. Certiorari was granted as to whether an entity, not entitled to Eleventh Amendment immunity, could assert sovereign immunity in an admiralty suit.

The county owned, operated, and maintained a drawbridge over a river. A boat owner, the insured, requested that the bridge be raised to allow his boat to pass. The bridge malfunctioned and a portion of it fell, striking the boat and causing damages in excess of $ 130,000. The county conceded that Eleventh Amendment immunity did not extend to counties, but nonetheless contended that it was immune under the universal rule of state immunity from suit without the state's consent. The county argued that the Court's cases recognized a distinct "residual" immunity that permitted adoption of a broader test than that applied in the Eleventh Amendment context to determine whether an entity is acting as an arm of the State. The Supreme Court held that because the county could claim immunity neither based upon its identity as a county nor under an expansive arm-of-the-State test, it was subject to suit.

The county failed to demonstrate that it was acting as an arm of the state in operating the drawbridge. An entity that does not qualify as an "arm of the state" for Eleventh Amendment purposes cannot assert sovereign immunity as a defense to an admiralty suit.

The judgment of the Court of Appeals was reversed.


### Material Misrepresentation in Policy Application Warrants Rescission

*Commercial Union Ins. Co. v. Pesante*, 2006 U.S. App. LEXIS 20391 (1st Cir. 2006)

Appellant insurer brought a declaratory judgment action against appellee insured in the United States District Court for the District of Rhode Island, seeking a declaration that it was not liable under a marine insurance policy issued to the insured for losses incurred by the insured's vessel. The insurer appealed the district court's entry of judgment for the insured and denial of the insurer's motion for summary judgment.

The insurer issued a policy to the insured which contained an express warranty that the only commercial use of the insured vessel was to be for lobstering. The insured admitted that he never engaged in lobstering, but instead used the vessel for gill netting. Insurance for gill net vessels was more expensive due to greater risk. The district court based its denial of summary judgment on a finding that there was no causal relationship between the insured's breaches and the losses suffered. On appeal, the insurer argued that the insured made a material misrepresentation in his application for insurance and that the policy was therefore voidable under either federal or Rhode Island law. Reversing, the court found it clear that the insurer would not have insured the vessel at the quoted price had it known the true nature of the vessel's use. Therefore, the misrepresentation was material and R.I. Gen. Laws § 27-18-16 (2006) governed. Because of the material misrepresentation made in the policy application, the policy was voidable from the beginning. Under Rhode Island law, the insurer's decision to rescind on the basis of the material misrepresentation had to be upheld.

The court reversed the judgment of the district court and directed entry of judgment for the insurer.

**The Meaning of "Operated By"**

*Gfroerer v. Ace Am. Ins. Co.,* 2006 U.S. App. LEXIS 12975 (2nd Cir. 2006)

The U.S. District Court for the Western District of New York granted summary judgment in favor of defendant insurer, concluding (with the aid of extrinsic evidence) that the "High Performance Vehicle Endorsement" of the marine insurance policy was valid as to first party coverage issues because "operated by" was not reasonably susceptible to any meaning but "actually driving" and was, therefore, unambiguous. Plaintiff insured appealed.

The Court of Appeals held that the district court's consideration of the extrinsic evidence on a motion for summary judgment was clear error under New York law. However, because the error was harmless, the appellate court affirmed the grant of summary judgment in favor of the insurer. Looking within the four corners of the insurance policy, the term "operated by" unquestionably referred to the operation of the insured's particular vessel, which was precisely described as a thirty-eight foot Donzi 38 ZX "high performance vessel." In light of the Donzi's performance capabilities, the only one capable of truly operating such a vessel was the actual driver. Therefore, ignoring the extrinsic evidence and reading the policy in light of the insured's basic knowledge of the particular vessel which he sought to insure, the appellate court believed that the average insured would have understood the term "operated by" to mean, clearly and unambiguously, "directly and physically controlled by."

The judgment of the district court was affirmed.

**Insurer has Burden of Proving Insured Breached Warranty**

*Henry's Marine Serv. v. Fireman's Fund Ins. Co.,* 2006 U.S. App. LEXIS 12770 (5th Cir.2006)

In a declaratory judgment action regarding coverage under a boat broker's policy, defendant insurer appealed the judgment of the U.S. District Court for the Eastern District of Louisiana (1) granting summary judgment for plaintiff insured on the issue of coverage, (2) refusing to allow the insurer to amend its pleadings, and (3) refusing to exclude evidence offered by the insured on the issue of damages.

The Court of Appeals held that the district court did not err as a matter of law in finding coverage existed. The policy provision at issue was an explicit warranty; therefore, in order to negate coverage, the insurer had to prove that the insured breached the warranty. Because the insurer presented no evidence to show a breach, it did not meet its burden. There was no abuse of discretion in the district court's denial of the insurer's motion for leave to amend. Because the insurer filed its motion almost five months after the deadline for amendments set by the scheduling order, Fed. R. Civ. P. 16(a) applied, which required the insurer to show good cause. The insurer's admission that it did not previously assert the grounds for the motion to amend-- that it thought it would prevail on other grounds--did not constitute good cause. Finally, there was no abuse of discretion in the district court's decision not to exclude the insured's evidence of

damages under Fed. R. Civ. P. 37(c) for not meeting the requirements of Fed. R. Civ. P. 26(a)(1)(C), because, while the insured's initial response was not perfect, it was not a failure to disclose under Rule 26(a)(1).

The judgment of the district court was affirmed.

## *Pennsylvania* Rule Burden Shifting Inapplicable Where Statutory Faults Were Unrelated to Cause of Casualty

*Halliburton Energy Services v. Denet Towing Services, Inc.,* Case No. 05-30723 (5th Cir. 2006)

A barge owned by Halliburton suddenly listed to port while being towed by a Denet Towing tug on the Mississippi River near New Orleans, causing seven of eight large cargo tanks containing dry bulk barite mounted to the deck of the barge to break free and fall overboard.

Halliburton sued Denet and various insurers for damages under maritime tort, contract and cargo damage law, and for costs of the cargo recovery and contribution under CERCLA. Halliburton alleged that the tug's master negligently lost control of the tow and/or negligently took an unseaworthy barge under tow; that Denet breached the towage contract by failing to deliver the barge to its destination; and that it breached its warranty of workmanlike service by failing to provide a towing vessel and crew adequate to perform the contract. Denet responded that Halliburton tendered an unseaworthy barge, due to cracks and holes near the waterline that were not apparent on visual inspection.

The U.S. District Court for the Eastern District of Louisiana, following a bench trial, found for defendant Denet. The Court of Appeals affirmed.

The Court of Appeals agreed with the trial court that the tug's statutory violations (the master had been on duty for 18 1/2 hours in the relevant 24 hour period, and failed to have a second licensed operator on board) were unrelated to the cause of the casualty, the unseaworthiness of the barge. Therefore the *Pennsylvania* burden shifting rule did not apply. The Supreme Court did not intend to establish a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable or remote.

## The Meaning of "Less Unlikely" and "More Likely than Not"

*Sycamore Management, Ltd. v. International Marine Terminals Partnership,* Case No. 05-30271 (5th Cir. 2006)

Sycamore sued International Marine Terminals ("IMT") for damages resulting from the collision of Sycamore's vessel, the M/V Global Spirit, with several barges on the Mississippi River. After a bench trial, the U.S. District Court for the Eastern District of Louisiana found for Sycamore. The Court of Appeals affirms.

As the vessel was proceeding up the river at about 2:00 a.m., a chain at IMT's terminal parted, allowing eight barges to drift out into the river. The ship's pilot reported colliding with some unidentified barges, and the damage was consistent with collision with a barge. There was no evidence that any other barges were on the river in the vicinity at the time.

The parties' marine surveyors examined the barges, which displayed little or no visible damage, and disagreed as to whether they could have caused the damage to the vessel. The trial court reasoned that it must choose between two unlikely scenarios: 1) the ship collided with some unknown phantom object rather than the barges; or 2) the ship did collide with the barges, which displayed little or no recent damage. Issuing its ruling orally, the court stated at one point that as a matter of practicality the latter seemed "less unlikely" and was therefore adopted by the court as the explanation.

On Appeal, IMT argued that the district applied an incorrect legal standard, substituting a "less unlikely" standard for a more likely than not (i.e., preponderance of evidence) one. The Court of Appeals disagrees, noting that the district court's order specifically invoked the "more likely than not" standard in two other places. The Court of Appeals also concluded that the trial court's form of words ("although both scenarios are seemingly unlikely, as a matter of practicality, the latter is less unlikely than the former, and thus probably occurred") was not inconsistent with the application of a preponderance standard.

### The Meaning of "Specific Jurisdiction"

*Fortis Corporate Insurance v. Viken Ship Management,* 2006 WL 1549113 (6th Cir. 2006)

Fortis, a cargo insurer, as subrogee of the cargo owner, sued Viken Lakers and Viken Ship Management, the Norwegian owner and manager respectively of a fleet of ocean-going cargo vessels, for seawater rust damage to a cargo of steel coils carried aboard the M/V Inviken from Szczecin, Poland, to Toledo, Ohio. The vessel was under a long-term time charter to FedNav International, a Canadian company, and subchartered for the voyage in question to Metallia LLC, a U.S. company.

The U.S. District Court for the Northern District of Ohio, Western Division, at Toledo, granted defendants' motion to dismiss for lack of personal jurisdiction. The Sixth Circuit Court of Appeals reversed, holding that:
   1) the defendants purposely availed themselves of the forum state by rigging their ships for Great Lakes transport;
   2) the claims arose out of activities within the state of Ohio, when the vessel delivered damaged cargo in the state; and
   3) the exercise of specific personal jurisdiction over the defendants was reasonable.

"Specific jurisdiction" subjects a defendant to suit in the forum state only as to claims that arise out of or relate to a defendant's contacts with the forum state. In contrast, "general jurisdiction"

is established when a defendant has continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims.

The vessel owner defendants subjected themselves to specific jurisdiction both by rigging their ocean-going vessel to allow the charterers to transport cargo to Great Lakes ports, including ports in the forum state, Ohio, and by making frequent calls at Great Lakes ports. The exercise of specific personal jurisdiction was reasonable, as required by due process, where discovery across borders had posed few problems, all relevant witnesses spoke English, Ohio has a strong interest in ensuring that shipments to its ports are reliable, and the subrogee's interest in obtaining relief was particularly strong because it had sued only the foreign defendants.

**Storage Tank Leakage Claims Not Barred by Policy Exclusions**

*Wolf Lake Terminals, Inc. v. Mut. Marine Ins. Co.,* 2006 U.S. Dist. LEXIS 42090 (N.D. Indiana, Hammond Div. 2005)

Plaintiffs, bulk liquid storage companies, sued defendant insurers, seeking reimbursement for the indemnification and defense costs incurred during the course of environmental remediation at two sites, prejudgment interest, and attorneys' fees. In addition to the parties' cross motions for summary judgment, the storage companies filed a motion for default judgment against one insurer and a motion to strike certain affidavits and exhibits.

Because the insurers did not respond to the storage companies' arguments that the contamination at issue fell within the policy definition of "personal injury" and was not excluded by either the "sudden and accidental" or "absolute pollution" exclusions under Indiana law, the court concluded that the companies were correct. Despite these concessions by the insurers, the storage companies still had to show that the contamination occurred during the relevant policy period in order to establish that the policy actually was triggered. Because the insurers did not provide countervailing evidence to refute the companies' claims with respect to four tanks, the court found that the contamination was occurring at and around these tanks during the policy period. However, a genuine issue of material fact as to when the contamination began at one tank precluded a determination as a matter of law that the insurers had to reimburse the costs associated with that tank. In addition, although prejudgment interest was otherwise readily calculable, the issue regarding the tank in question and the remaining dispute over the appropriate deductible precluded an award of interest.

The cross-motions for summary judgment were granted in part and denied in part; the companies were successful with their claims as to four out of the five storage tanks at issue. The companies' motion for default judgment was denied, and the motion to strike was denied except with respect to one paragraph of a witness affidavit.

**Insurer Could Not Rescind Policy After Insured Brought Coverage Action**

*Atmel Corp. v. St. Paul Fire & Marine Ins. Co.,* 416 F. Supp. 2d 802; 2006 U.S. Dist. LEXIS 9842 (D. Cal. 2006)

Plaintiff insured sued defendant insurer alleging breach of contract and breach of the implied covenant of good faith and fair dealing. The insurer counterclaimed alleging rescission, breach of contract and intentional misrepresentation, and raised rescission as one of several affirmative defenses. The insured moved for partial summary judgment. The insurer moved for summary judgment.

The insured obtained a general liability and errors and omissions insurance policy from the insurer. The insured was sued by a customer for damages caused by defective computer chips. The insurer refused to provide a defense to the litigation. After the insured brought the present action, the insurer unilaterally rescinded the policy on the grounds that the insured knew about the computer chip problem before the policy was issued and failed to disclose it in the application for insurance. The court found that under Cal. Ins. Code 650 the insurer could not unilaterally rescind the policy because the insured had already filed suit to enforce its rights under the policy. However, the insurer could raise rescission as a counterclaim and as an affirmative defense. There were issues of fact as to whether the insured misrepresented or concealed information in its application and whether the information that was not disclosed was material. The evidence did not show that the insurer intentionally relinquished its right to rescind after knowledge of the facts of the computer chip problem.

The insured's motion for partial summary judgment was granted in the respect that the insurer was precluded from unilaterally rescinding the insurance policy after the insured filed a lawsuit to enforce the policy, but was denied in all other respects. The insurer's motion for summary judgment was denied.

**Attorney Fees and Costs Not Recoverable Absent Proof of Bad Faith**

*The Connecticut Indemnity Company v. Perrotti,* Case No. 301 CV 1410 (D. Conn. 2005)

The defendant's request for an award of attorneys' fees and expenses incurred in defending a declaratory judgment action is denied because he failed to establish that the plaintiff insurer acted in bad faith.  The established rule in the Second Circuit is that an award of fees and expenses in an admiralty action is discretionary with the district judge upon a finding of bad faith.  This rule trumps any state law on the subject.

The defendant's separate request for an award of attorney's fees for defending the underlying action is denied without prejudice to renewal because it cannot reasonably be determined from the invoices submitted (1) whether the work was performed in defense of that action or the present one, and, if so, (2) whether the charges are duplicative of fees already awarded by the court.

**State Law Applied to Helicopter Owner/Platform Owner Contracts**

*Alleman v. Omni Energy Servs. Corp.,* 434 F. Supp. 2d 405; 2006 U.S. Dist. LEXIS 36711 (E.D. Louisiana 2006)

Plaintiffs, including subcontractor employees, sued defendant helicopter owner for damages related to an accident. The helicopter owner and third-party plaintiff insurer filed a third-party complaint against third-party defendant platform owner seeking indemnification and defense costs, or, alternatively, contribution. The helicopter owner and the platform owner cross-moved for partial summary judgment as to contractual indemnification.

The accident occurred when a helicopter attempted to land on an oil production platform in the Gulf of Mexico. The helicopter owner argued that its contracts with the platform owner were governed by general maritime law. The platform owner argued that state law applied, as surrogate federal law under the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C.S. § § 1331-1356, and that the indemnity clause was unenforceable under the Louisiana Oilfield Anti-Indemnity Act (LOAIA), La. Rev. Stat. Ann. § 9:2780. The court determined that state law applied to the contracts through the OCSLA because (1) the contracts were non-maritime contracts since the agreements did not have a maritime purpose and the purpose of the contract, to transport workers to and from platforms over water in an aircraft, was not to effectuate maritime commerce, and (2) the LOAIA did not conflict with federal law. However, summary judgment was inappropriate because it could not be determined whether the LOAIA barred the helicopter owner's claims since there had been no judicial determination of whether it was at fault for the accident.

The court denied the partial summary judgment motions.

**More than Breach of Warranty Required to Void Coverage**

*Chambers v. Joshua Marine, Inc.,* 430 F. Supp. 2d 580; 2006 U.S. Dist. LEXIS 22948 (E.D. Louisiana 2006)

Plaintiff project manager, who broke his ankle while he was a passenger on a crewboat, sued defendant, which was the crewboat owner and operator. He subsequently filed a supplemental and amended complaint with the intent of bringing a direct action against defendant insurer pursuant to La. Rev. Stat. Ann. § 22.655. The insurer sought summary judgment on the ground that the insurance policy in issue did not cover the operator because the operator breached several conditions or express warranties that it was bound by when it accepted the policy, and that it was subject to the standards of *uberrimae fidei,* or "utmost good faith." Specifically, the insurer claimed that the boat was being operated in violation of the policy's seaworthiness, licensed captain, and persons on board warranties. However, the court held that the *uberrimae fidei* doctrine was not entrenched federal precedent, and that Louisiana had a substantial and legitimate interest in the application of its own insurance laws. While the mere breach of a warranty was sufficient to void coverage under the doctrine, La. Rev. Stat. Ann. § 22:619(A) required an intent to deceive as well. Because the insurer had to prove that the operator had an

17

intent to deceive in addition to breaching a warranty, the court held that there were genuine issues of material fact that would best be resolved by the trier of fact, and denied the insurer's motion for summary judgment.


**The Meaning of "Standard Time"**

*Empire Fire & Marine Ins. Co. v. Cont'l Cas. Co.,* 426 F. Supp. 2d 329; 2006 U.S. Dist. LEXIS 18946 (D. Md. 2006)

Plaintiff insurance carrier brought an action as a result of a dispute between plaintiff and defendant insurance carrier over the obligation of each insurance carrier, if any, to indemnify and defend an insured pursuant to commercial automobile insurance policies. The parties filed cross motions for summary judgment.

On May 7, 2004, at 12:28 a.m. daylight saving time, a driver was involved in an automobile accident while operating a tractor-trailer owned by the insured. Plaintiff claimed that because daylight saving time was in effect, the accident actually occurred on May 6, 2004, at 11:28 p.m. standard time. The language and the statutory intent of the Uniform Time Act, 15 U.S.C.S. § § 260-267, established that during a designated period, the standard time of each zone was advanced one hour. Thus, within a particular zone, the advanced, daylight saving time became the standard time for that zone during the designated period. Md. Ann. Code art. 1, § 35 did not exempt Maryland from daylight saving time. No legislation had been enacted in Maryland that would have exempted the state from the observance of daylight saving time. Thus, Maryland was required to observe daylight saving time, and to abide by the statutory definition of "standard time" when daylight saving time was in effect. The court concluded that daylight saving time was the standard time when daylight saving time was in effect and, accordingly, plaintiff's policy rather than defendant's was in effect at the time of the accident.

Plaintiff's motion for partial summary judgment was denied. Defendant's motion for summary judgment was granted.


**Misrepresentations as to Size Matter**

*Am. Home Assur. Co. v. Masters' Ships Mgmt. S.A.*, 423 F. Supp. 2d 193; 2006 U.S. Dist. LEXIS 18026 (S.D. N.Y. 2006)

Plaintiff marine insurers sought a declaratory judgment that the marine insurance policy issued to defendants, a vessel owner and the manager of the owner's vessel, was voidable *ab initio* because of defendants' alleged breaches of the duty of utmost good faith, or, alternatively, that they could deny coverage because defendants could not show a valid claim and because the vessel was unseaworthy. Defendants counterclaimed for coverage and damages.

The insurers underwrote hull and machinery insurance on the vessel. The insurers thought that they were insuring a fleet, based on representations by defendants that there was another vessel

and plans were to acquire a third vessel. In fact, the owner sold the second vessel before the inception of the policy and never acquired the third vessel. The insurers testified that, had they known that they were insuring only one vessel, they either would not have underwritten the risk or would have demanded a higher premium. The owner's sole remaining vessel ran aground. There was substantial evidence that the manager ordered the destruction of certain of the ship's logs and a computer. Although defendants claimed that the ship was a total loss, the insurers' expert testified otherwise. The court held that defendants made intentional, material misrepresentations concerning the size of the owner's fleet, that the insurers reasonably relied on those misrepresentations in making coverage decisions, and that the proper remedy for defendants' breach of the duty of utmost good faith was a declaratory judgment that the policy was voidable *ab initio* at the insurers' instance. In any event, defendants could not show a valid claim under the policy. The court denied defendants judgment on their counterclaims.

## All-Risk Coverage Reached Warehouse in China

*N. Am. Foreign Trading Corp. v. Mitsui Sumitomo Ins. USA, Inc.*, 413 F. Supp. 2d 295; 2006 U.S. Dist. LEXIS 3884 (S.D. N.Y. 2006)

Plaintiff insured sued defendants for breach of a marine insurance policy. The insured moved for summary judgment, arguing that defendants were obligated to indemnify it for the insured's loss of cordless telephones at a warehouse in China. Defendants cross-moved for summary judgment, arguing that the policy did not cover the insured's loss and that the insured's claim was time-barred under the policy.

The warehouse endorsement in the policy at issue provided all-risk coverage for goods shipped to the warehouse. Because the insured had demonstrated the existence of all-risk coverage for its loss, it did not need to prove the cause of the loss. Moreover, defendants had not argued that any express exception to the coverage was applicable. Further, defendants had not carried their burden of demonstrating that the cause of action accrued over a year before the insured preserved its right to file suit. Accordingly, the court would not grant summary judgment on defendants' time-bar argument. However, the insured had not demonstrated that defendants took any action that would have lulled a reasonable insured into delaying the filing of the litigation.

The insured's motion for summary judgment was granted in part and denied as to its claim that its delay in filing the action was caused by defendants. Defendants' cross-motion was denied.

## No Federal Court Jurisdiction Over Driver's Injury on Dock

*Torres Vazquez v. Commercial Union Ins. Co.*, 417 F. Supp. 2d 227; 2006 U.S. Dist. LEXIS 10094 (D. P.R. 2006)

Plaintiffs, an employee and others, sued defendants, a terminal and its insurer, seeking compensation for damages that the employee allegedly suffered while employed as a driver for a

trucker. The insurer moved for summary judgment on the grounds of lack of subject matter jurisdiction.

Plaintiffs alleged that the employee was injured at a port when a crane, which was leased by a terminal, its parent, and others, lifted a container that was still attached to the employee's truck. The court determined that the proper rule under which to challenge federal jurisdiction was Fed. R. Civ. P. 12(b)(1), rather than Fed. R. Civ. P. 56. There was no jurisdiction under 28 U.S.C.S. § 1337(a), because plaintiffs did not set forth facts sufficient to state a cause of action arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and or monopolies. There was no complete diversity of citizenship as required by 28 U.S.C.S. § 1332, because plaintiffs, the terminal, and the insurer were all citizens of Puerto Rico. The terminal's citizenship was Puerto Rican because its principal place of business was in Puerto Rico. Under § 1332(c)(1), the insurer's State of citizenship was the same as its insured because the claims were pursuant to Puerto Rico's direct action statute. In addition, plaintiffs did not pierce the corporate veil with respect to the terminal's parent.

The court treated the insurer's summary judgment motion as a motion to dismiss and granted the motion. The court dismissed the federal claims with prejudice and dismissed the state claims without prejudice.


### Insurer in Contempt of Bankruptcy Court Order for Failure to Pay Indemnity Claims

*In re Suncruz Casinos LLC,* 2006 Bankr. LEXIS 746 (U.S.B. S. D. Fla., Ft. Lauderdale Div. 2006)

Confirmed Chapter 11 cases came on for hearing on the joint motion of the post-confirmation Plan Administrator for the liquidating debtors, and their primary secured creditor, seeking an order under 11 U.S.C.S. § § 1129, 105(a), and Fed. R. Bankr. P. 9020, 9014, holding the debtors' maritime insurer in civil contempt and awarding sanctions for violation of the permanent injunction entered as part of the Order confirming the Chapter 11 Plan.

The Confirmation Order included specific injunctive language regarding the right of any party to assert a pre-confirmation claim. The question before the court was whether certain actions taken by the insurer since entry of the Confirmation Order violated the terms of that injunction such that the insurer was in contempt of court for acting in a manner prohibited by the Order. The insurer's failure to indemnify and reimburse the Plan Administrator under the liability policies was based solely and exclusively on the insurer's insistence that the policies were no longer in force by virtue of the debtors' failure to pay "Release Calls." Because it failed to file an Administrative Expense Claim, the insurer was barred by the permanent injunction contained in the Order and by virtue of the provisions of 11 U.S.C.S. § 1141. The insurer's failure to pay the indemnity claims was, therefore, a direct and knowing violation of the provisions of the Order. Because the insurer knew of the provisions of the Order and failed to abide by them, its actions were willful. The court accordingly found that the insurer was in civil contempt of court.

The Motion was granted. The insurer could purge its contempt on a preliminary basis by the payment of all outstanding claims for indemnification made by debtors or the Plan Administrator since February 20, 2005, as to which the insurer had no good faith objection. The insurer was directed to honor and continue to honor all contractual obligations it had under the policies, without regard to the debtors' non-payment of Release Calls.

## Subrogated Insurer Bound by COGSA Package Limitation

*Mitsui Marine & Fire Ins. Co. v. Hanjin Shipping Co.,* 2006 Ga. App. LEXIS 675; 2006 Fulton County D. Rep. 1778 (Ct. of App., Ga. 2006)

Plaintiff insurance company brought a subrogation claim against defendants shipping company and railroad, seeking reimbursement for a claim paid on goods damaged in shipment. The trial court granted summary judgment in favor of the shipping company, finding that liability was limited by the Carriage of Goods by Sea Act (COGSA), 46 U.S.C.S. app. § 1300 et seq., to $500 per package. The insurance company and the railroad appealed.

The shipping company contracted to ship yarn bobbins brought by the insured from Japan to the United States, and then to an Alabama rail facility. The bobbins were damaged while being hauled by the railroad on land. The shipping company argued that if it was liable at all, liability was limited to $ 500 per package since its bills of lading with the freight-forwarding company incorporated a COGSA liability limitation. The appellate court held that the $500 per package limit applied and that each pallet, containing three bobbins, was a "package." The appellate court affirmed. The railroad enjoyed the benefit of the liability limit, even though it was not a party to the bills of lading. The insured and the insurance company were bound by the liability limitations negotiated by the freight-forwarding company that the insured hired. The definition of "Merchant" in the bills made no difference. An intermediary bound a cargo owner to the liability limits it negotiated with downstream carriers, and neither privity of contract nor a traditional agency relationship were required. It did not matter whether the insurance company proceeded in contract or tort.

## Plaintiffs Lacked Standing to Sue for Declaration of Coverage

*Barron v. Shelter Mut. Ins. Co.,* 2006 Mo. App. LEXIS 1105 (Ct. of App., Mo., Western Dist. 2006)

Respondent family of children killed in a boating accident dismissed its original personal injury and wrongful death lawsuit upon settlement and filed a declaratory judgment action against appellant insurer of the defendant boaters in the original suit, seeking additional coverage under the insurer's policy. The Circuit Court of Buchanan County, Missouri, granted the family's motion for summary judgment. The insurer appealed.

On review, the appellate court did not reach the merits of the insurer's appeal because it found that the trial court erred in granting summary judgment. Because the family's petition did not

state a claim upon which relief could be granted, the trial court did not have jurisdiction to consider the family's claim. The family failed to present a justiciable controversy because it did not make the insured boaters from the original suit parties to the declaratory judgment action, and the boaters were indispensable parties. The family did not have a judgment against the boaters or a settlement establishing their liability. Furthermore, family members were not parties to the insurance contracts between the boaters and the insurer, and were not third-party beneficiaries. Because they had not yet secured a judgment against the boaters, the family did not stand in the boaters' shoes. Hence, there was no justiciable controversy, and the family lacked standing to request a declaration that coverage existed under the boaters' insurance policies.

The summary judgment was reversed and the family's petition was dismissed.

### The Meaning of "Follow the Fortunes"

*Granite State Insurance Company, et al. v. Ace American Reinsurance Company,* No. 604347/04 (Supreme Court of New York, County of New York 2006)

Plaintiff insurers sued their reinsurer, ACE, for indemnification of monies paid by plaintiffs on claims by five separate insureds for losses in toxic tort (asbestos and toxic chemical exposures) or property damage actions. Plaintiffs' motion for summary judgment is granted as to four of the five claims, and denied as to the fifth with leave to renew following completion of discovery to determine whether plaintiffs acted in bad faith in paying that claim.

Plaintiffs purchased a total of 11 facultative reinsurance policies from ACE, covering 11 policies of insurance issued to the five insureds, all evidenced by identical facultative reinsurance certificates that contained the following clauses.

### 1. APPLICATION OF CERTIFICATE

The Reinsurer agrees to indemnify the Company against loss or damage which the Company is legally obligated to pay under the Company's policy reinsured, resulting from occurrences taking place during the period this Certificate is in effect, subject to the Reinsurance Accepted limits shown in the declarations. The liability of the Reinsurer shall follow that of the Company and, except as otherwise specifically provided herein or designated as non-concurrent reinsurance in the declarations, shall be subject in all respects to all of the terms and conditions of the Company's policy except such as may purport to create a direct obligation of the Reinsurer to the original Insured.

\*\*\*

### 4. LOSS SETTLEMENT

> All claims involving this reinsurance, when settled by the Company shall be binding on the Reinsurer, which shall be bound to pay its proportion of such settlements.... .

> Payment of its proportion of the loss and expense paid by the Company will be made by the Reinsurer to the Company promptly following receipt of proof of loss.... .

After plaintiffs submitted timely claims for reimbursement, ACE claimed late notice and demanded responses to numerous questions and requests for documentation, which it contends were never fully answered. Plaintiffs commenced the action when it became clear that payment would not be forthcoming, and move for summary judgment on the basis that the unambiguous language of the policies calls for ACE to pay claims "promptly following receipt of proof of loss."

The court noted that while a presumption of prejudice applies to late notice received by an insurer from an insured, no such presumption applies to late notice of a claim between an insurer and its reinsurer. Under New York law the reinsurer must demonstrate how it was prejudiced by late notice. ACE had produced no evidence of prejudice, and would be unlikely to do so after any amount of discovery. Its demand for further discovery was "rather dubious, as ACE, if anyone, should know if it was prejudiced."

The Application of Certificate clause sets out the "follow the fortune" doctrine, pursuant to which the reinsurer must indemnify its reinsured and is not in a position to second guess good-faith determinations made by its reinsured to pay claims. The clause leaves a reinsurer little room to dispute the reinsured's conduct of the case.

There is no ambiguity in the phrase "proof of loss," and no need to read industry standards into its interpretation, as ACE contends. Plaintiffs' loss is simply the monies they were required to pay under their policies with their insureds.

The purpose of the "follow the fortunes" clause is to forestall extensive scrutiny of a cedent's settlement by its reinsurer. Absent fraud or bad faith, which is not shown as to four of the five claims, ACE cannot prevail simply by arguing that it is unsatisfied with how plaintiffs settled the claims.

Having received over 200 boxes of records from plaintiffs, as to which all claims of privilege were waived, ACE could not convince the court that more discovery is needed with respect to the claims on which summary judgment is granted to plaintiffs. As to the remaining claim, involving only a single insured, a limited factual question warrants some further discovery.

**Insurers had Burden of Proof on Lack of Due Diligence Defense**

*Secunda Marine Services Ltd. v. Liberty Mutual Insurance Company*, 2006 NSCA 82 (Nova Scotia Court of Appeal 2006)

Appellants, insurers under a policy of marine insurance, sought reversal of a decision and order entered by a Nova Scotia Supreme Court Justice after a three-day trial, holding that appellants were required to indemnify the respondent vessel owner (and named insured) Secunda for losses incurred as a result of damage to its tug, Chebucto Sea.  The Court of Appeals dismissed the appeal with costs to respondent.

While towing a barge from Prince Edward Island to Newfoundland, the tug lost its propeller and tail shaft.  The cost of repairs was close to Canadian $700,000.00.  The insurers refused to indemnify Secunda, claiming that a lack of due diligence caused the tail shaft to break.

The Court of Appeals addressed two primary issues:
1.   Who has the burden of proving that the loss did, or did not, result from lack of
     due diligence on the part of the shipowner/insured?
2.   Did the loss occur as a result of lack of due diligence?

The Court concluded that the trial judge was correct in placing the burden of proof on the appellant insurers; and that his finding that the loss did not result from any lack of due diligence on the part of the vessel owner should not be disturbed.

After reciting the tug's history of repairs, drydockings and general and special inspections, the court pointed out that only one day after the insurance policy in question came into effect, the tug lost pitch control to the propeller while entering Stephenville Harbor with the barge in tow. Inspection by divers revealed that the tail shaft had broken off at the flange, resulting in the loss of the propeller.  Metallurgical examination established that the tail shaft failed as a result of corrosion fatigue cracking which caused a brittle fracture.

Secunda brought suit for breach of the insurance contract after the underwriters refused to pay the claim, because of Secunda's alleged lack of due diligence in maintaining the vessel.  The trial judge found that Secunda exercised due diligence, complied with all statutory requirements, and used reasonable care in maintaining its vessel.  He awarded full damages in the amount of $699,135.80, together with costs of $25,349.07 and prejudgment interest of $120,673.65.  The Court of Appeals affirms the award in all respects, and added an award of costs on appeal.

The appellate court noted that a trial judge's findings of fact, and inferences drawn from those facts, are not to be disturbed unless it can be shown that they are "the result of some palpable and overriding error."  On questions of law, the trial judge must be right.  "The standard of review is one of correctness."  Mixed questions of fact and law are reviewed under the palpable and overriding error standard unless the alleged error can be traced to an error of law that can be isolated from the mixed question of fact and law.  If the legal principle in issue is not "readily extricable," the mixed issue of law and fact is reviewed under the palpable and overriding error standard.

As to the issue of burden of proof of absence or presence of due diligence, the trial transcript reveals that counsel for both sides were so confident that they agreed to have the case decided on its merits without regard to who bore the burden.  In any event, the trial court correctly

24

concluded that want of due diligence by the shipowner was not shown to have caused the casualty.

In the policy in question, the Inchmaree Clause was deleted and, for an additional premium, the Liner Negligence Clause was inserted to provide broader coverage. Thus the policy read:

> In consideration of <u>additional premium of included</u> (*sic*), it is understood and agreed that the ADDITIONAL PERILS (INCHMAREE) Clause of the attached policy is deleted and in place thereof the following inserted:
>
> Subject to the conditions of this Policy, this insurance also covers:
>
> a.  Breakdown of motor generators or other electrical machinery and electrical connections thereto; bursting of boilers; <u>breakage of shafts</u>; or any latent defect in the machinery or hull;
>
> b.  Loss of damage to the subject matter insured directly caused by:
>
>     1.   Accidents on shipboard or elsewhere, other than breakdown of or accidents to nuclear installations or reactors on board the Insured Vessel;
>
>     2.   Negligence, error or judgment or incompetence of any person;
>
> excluding under both "a" and "b" above only the cost of repairing, replacing or renewing any part condemned solely as a result of a latent defect, wear and tear, gradual deterioration or fault or error in design or construction;
>
> <u>provided such loss or damage</u> (either as described in said "a" or "b" or both) <u>has not resulted from want of due negligence by the Assured</u> (s), the Owner(s) or Manager(s) of the vessel, or any of them.  Masters, mates, engineers, pilots or crew not to be considered as part owners within the meaning of this clause should they hold shares in the Vessel. [Emphasis the Court's].

The Liner Negligence Clause is an extension of the Inchmaree Clause intended to provide additional coverage, but each clause excludes coverage for damage caused by the want of due diligence of the assured, the owners or the managers of the vessel.  The Liner Negligence Clause, in general, is said to cover all accidental damage to the vessel, its hull and machinery.

The Liner Negligence Clause covers the breakage of shafts whatever the cause; the exclusion in the clause is only for want of due diligence by the insured and/or the manager of the vessel.  Once an insured proves a *prima-facie* case of coverage, the

burden shifts to the insurers to prove the loss was caused by an exclusion, which was not done here.

The clear weight of Canadian and U.S. judicial authority confirms that because "want of due diligence" is an affirmative defense for insurers, the burden is on the insurer to bring itself within the exclusion.  The trial judge did not err in finding that Secunda exercised due diligence (defined as "reasonable care in the circumstances") in the maintenance of its vessel, so that appellants were liable under the terms of the policy to indemnify it for the full amount of the loss.  There was no "palpable and overriding error" in the trial court's findings of fact or the inferences drawn from those facts.

---

Items for future issues may be submitted to:

Gene B. George
Ray, Robinson, Carle & Davies P.L.L.
1717 East 9th Street, Ste. 1650
Cleveland, OH 44114-2878
ggeorge@rayrobcle.com

**FALL 2006**

<u>**SUPPLEMENT TO**</u>
<u>**NEWSLETTER**</u>

Committee on Marine Insurance and General Average

Committee Chair                                    Editor:  Gene B. George
Jonathan S. Spencer                                          Cleveland, Ohio
New York, New York

Committee Secretary
Cary R. Wiener
New York, New York

The following articles, case notes and comments are for informational purposes
only, are not intended to be legal advice, and are not necessarily the views of the
Maritime Law Association of the United States or the Committee on Marine
Insurance and General Average.

<u>**Breach Of Contract Action Barred By Laches**</u>

*The Puerto Rico Ports Authority v. Jose Alberto Umpierre Solares,* 2006 U.S. App. LEXIS
18797 (1st Cir. 2006)

In 1989, the vessel "La Isla Nena" sank in the navigable waters of San Juan Harbor during
Hurricane Hugo.  In 1991, the United States Army Corps of Engineers ("Corps") instructed the
PRPA, the owner, to remove the vessel because it was obstructing navigation.  In January 1992,
Defendants Jose Alberto Umpierre Solares and Divers Service Center, Inc., submitted a proposal
to the owners for the removal of the vessel.  Defendants raised the vessel but did not dispose of
the vessel, as per the contract.  In 2003, PRPA filed suit in Puerto Rico Superior Court against
the Defendants for specific performance under the contract to remove and dispose of the vessel.
Defendants removed the case to federal court invoking admiralty jurisdiction and moved to
dismiss on time bar.

The district court held that it had admiralty jurisdiction over the case because the vessel was
lying at the bottom of the harbor, obstructing navigation, and the contract at issue related to the
removal of that obstruction.  The court found that the district court did not err in holding that the
breach of contract action was barred by laches because, even assuming that the 15-year statute of
limitations set forth under Puerto Rican law, 31 P.R. Laws Ann Sec. 5294, was the most
analogous in this case, the fact that the plaintiffs filed their action within that period of time did
not save the action from being barred by laches.  Rather, the burden of proving unreasonable
delay and prejudice merely shifted to the defendants.  The uncontested facts showed that the
plaintiffs had known that the vessel had not been disposed of 11 years before bringing an action
for specific performance.  That delay was unreasonable.

The court stated that "[i]n an admiralty case, maritime law and the equitable doctrine of laches"- not federal or state statutes of limitations - "govern the time to sue." *TAG/ICIB Serv., Inc v. Pan American Grain Co., Inc.*, 215 F. 3d 172, 175 (1st Cir. 2000).


## Marine Contract Limitation Applied To Inland Carrier

*American Home v. Hapag Lloyd*, 2006 U.S. App LEXIS 11183 (2d Cir. 2006)

The shipment originated at Caterpillar's facility in Morton, Illinois, and was destined for a Caterpillar affiliate in Singapore. Caterpillar booked the entire shipment with Danzas AEI, a freight forwarder. Danzas, in turn, engaged G & D Transportation to carry the cargo from Morton to Chicago by truck and Hapag Lloyd Container Line to ship the cargo from Chicago to Singapore, via Long Beach. The carrier's train derailed and the derailment resulted in extensive damage to the engines. The case involved the carrier's right to limit its liability to $500 for the loss and damage to the engines pursuant to the contracts governing the shipment.

The subrogee contended that the district court confused two separate concepts: whether the express cargo bill (ECB) was issued and whether its terms, nonetheless, governed the parties. The subrogee also contended that the district court erroneously divided the shipment into two separate carriages -- one inland by rail and another overseas by ship. However, these contentions were not addressed by the court, as it found that the carrier was entitled to the same $500 per package limitation pursuant to a separate provision of the ECB. The court found that the language of the contractual provisions at issue were clear. Since the primary purpose of the agency relationship between the two companies was to arrange for the transportation of the engines on one of the company's behalf, it was plain that the carrier was "employed by" the company and thus entitled to limit its liability to $500 per package pursuant to the Himalaya Clause in the ECB.

Summary judgment for indemnity was granted by the court, including attorneys' fees in defending the main claim. Allowance of fees for pursuing indemnity was denied by the court.


## Broker's Right Of Offset

*Heath Lambert Ltd. v. Sociedad de Corretaje de Seguros*, [2004] EWCA Civ. 792, [2005] 1 Lloyd's Rep. 597

INC, A DREDGING COMPANY AND SHIPOWNER IN VENEZUELA, RETAINED SCORT, A FIRM OF VENEZUELAN INSURANCE BROKERS, TO PLACE ITS MARINE INSURANCE. IN 1994, BANESCO BECAME THE LOCAL INSURER, FRONTING FOR THE LONDON REINSURANCE MARKET. AS PART OF ITS RESPONSIBILITIES, SCORT WAS ALSO INVOLVED IN OBTAINING THE REINSURANCE FOR BANESCO IN THE LONDON MARKET. FOR THIS PURPOSE, BLACKWELL GREEN LTD. (SINCE SUBSUMED INTO HEATH LAMBERT), A FIRM OF LLOYD'S BROKERS, WAS RETAINED AS PLACING BROKER.

The Court's decision in this case restates the legal position that a broker in the London marine market who has paid premium on the client's behalf has a lien over claim recoveries and may offset the amount collected against the premium due from his client.

Heath had a legal obligation to pay premiums to the reinsurers, and neither Banesco nor the Venezuelan brokers had paid Heath for the premiums. *Section 53 (2) MIA* provides, "unless otherwise agreed, the broker has, as against the assured, a lien upon the policy for the amount of the premium and his charges in respect of effecting the policy."

The Court held that it is the placing broker's obligation to pay the premium to underwriters which gives rise to the broker's claim against the producing broker. It is not a defense to the producing broker that the placing broker has not in fact paid the premium. The time for indemnity starts when the placing broker has an obligation to make payment to the underwriters.

## Settlements Without Prejudice

*Faraday Capital Ltd.  v. Copenhagen Reinsurance Co. Ltd.*, [2006] EWHC 1474 (Comm)

The court in *Faraday* held that the parties to a contract of reinsurance may modify the standard clause by excluding without prejudice settlements. If the reinsured then settles an underlying claim on the basis of no admission of liability, reinsurers will not be bound by that settlement. The reinsured would then have to prove that there was actual liability to the insured in order to recover under the reinsurance.

*Faraday* concerned a Reinsurance by Copenhagen Re of Faraday's participation in an excess layer of a property insurance program covering an insured, Nevada Power. Nevada Power suffered two consecutive electrical failures at its Clark Generating Station in Las Vegas. Insurers admitted liability for the first failure, but contested liability in respect of the second failure. Nevada Power filed proceedings in the United States District Court for the District of Nevada.

The Nevada proceedings were ultimately settled by way of a lengthy settlement agreement. This constituted a full and final release but "by compromise and without prejudice to [the parties'] respective positions."

Faraday's reinsurance with Copenhagen Re included a follow the settlements clause:
"THIS REINSURANCE IS SUBJECT TO ALL TERMS, CLAUSES, AND CONDITIONS AS ORIGINAL EXCEPT AS PROVIDED FOR HEREIN, AND TO FOLLOW IN ALL RESPECTS THE SETTLEMENTS OR OTHER PAYMENTS OF WHATSOEVER NATURE EXCLUDING WITHOUT PREJUDICE AND EX-GRATIA SETTLEMENTS MADE BY THE ORIGINAL UNDERWRITERS ARISING OUT OF AND IN CONNECTION WITH THE ORIGINAL INSURANCE."

But for these words, there would have been no dispute between Faraday and Copenhagen Re. Both parties accepted that in the absence of such language the appropriate legal test would simply be that the settlement should be proper and businesslike, as set out in *Insurance Company of Africa v. Scor (UK) Reinsurance Company Limited.*

29

The "without prejudice" language was the point of contention.  Judge Aikens held that "settlement" means any binding agreement, which could be in any form – ranging from a formal settlement agreement to an underwriter's scratch. Purely provisional agreements would not come within the ambit of the clause to begin with, so there would be no need then to exclude them. The reference to without prejudice settlements, therefore, could only be a reference to settlements without admission of liability.

"But the reinsurers are entitled, in my view, to insist that if the original insurer is not prepared to admit liability under the original policy then, for the purposes of establishing the reassured's entitlement to recover under the reinsurance, the reassured must prove that there was, in fact, a liability under the original policy."


## Heart Valve Anxiety Claims And Reinsurance

*Integrity v. General Accident*, 2006 U.S. Dist. LEXIS 48209 (D. Ct. NJ 2006)

The Plaintiff, Karen L. Suter, the liquidator of the insurance estate, filed suit against the defendant insurance company, General Accident Insurance Company of America, alleging that the insurance company failed to pay reinsurance due to the estate.

This case arose out of the manufacture and sale by Pfizer Inc. of the Shiley heart valves.  Pfizer settled a large class action in 1992 when it was faced with numerous lawsuits alleging malfunction or fear of malfunction of the heart valves.  Pfizer agreed to pay hundreds of millions of dollars on account of claims by valve recipients, whose valves had not failed, but who claimed to suffer anxiety about the prospect that they would fail.  Pfizer did not actively pursue coverage from Integrity Insurance Company until early 1999.

Pfizer's settlement included claims by people with working valves for fear or anxiety that the Shiley heart valve might sometime fail in the future.  Integrity Insurance Company was a high level excess carrier which paid the limits of its policy and in turn looked to the defendant, General Accident Insurance Company, as its reinsurer for payment under the reinsurance doctrine of "follow the fortunes" or "follow the settlements."  Integrity allowed anxiety claims that did not arise during the policy period based on when the Shiley value was implanted, which was during the policy period.

The district court reached the following conclusions:

1. The Pfizer claims were not reasonably within the coverage of the 1983 and 1984 occurrence based policies of Integrity.

2. Since the anxiety claims should not have been allowed, the Integrity policies were not penetrated.

3. General Accident did not as a matter of contract agree to reinsure Integrity for injuries that did not occur within the time periods covered by the 1983 and 1984 policies.

4. Integrity's allowance of the Pfizer claims under all the circumstances surrounding the Shiley heart valve was grossly negligent and amounted to bad faith.

5. Integrity did not make a reasonable, businesslike investigation and determination as to whether the heart valve claims should have been allowed.

6. Consequently General Accident was not obligated to Integrity under the follow the settlements provision of its Facultative Certificate which stated that "the liability of the Reinsurer...shall follow that of [Integrity] and except as otherwise specifically provided herein, shall be subject in all respects to all the terms and conditions of [Integrity's] policy."

7. Judgment was entered for defendant General Accident.

**[Our sincere thanks to Committee Secretary Cary R. Wiener of DeOrchis, Wiener & Partners, LLP. for summarizing the foregoing five cases - ed.]**

**Underwriter Pays Without Reservation**

*Underwriters Insurance Co. v. Offshore Marine Contractors, Inc.*, 2006 WL 2128653 (E.D. La. 2006)

A marine insurer brought an action against a barge owner and the owner's commercial lender/barge mortgagee, seeking a declaration that the insurer was not liable to make any payments with respect to the sinking of the barge. On the defendants' motions for summary judgment, the District Court held that the insurer had waived its policy defenses against the barge owner; claims against the lender were not barred by laches; but the insurer lacked a cause of action against the lender. The defendants' motions were granted.

Notwithstanding reports of counsel indicating that prior to commencement of the voyage in question the barge owner may have known of defects in the barge and its equipment that contributed to causing the sinking, thereby breaching its warranty of seaworthiness under the policy, the insurer decided to pay the full amount of the hull and machinery coverage to the mortgagee as loss payee under the policy, which it did without any reservation of rights.

In a subsequent limitation of liability action brought to deal with numerous personal injury and property damage claims resulting from the sinking, discovery confirmed that the owner had sent the vessel to sea with knowledge of defects that contributed to the sinking. The insurer settled the personal injury and property claims, then brought the present action against the owner and the lender/loss payee, seeking a declaration that it was not liable for payments under the policy and was entitled to reimbursement of the payments made, costs and attorneys' fees.

Applying Louisiana law in the absence of any specific and controlling admiralty rules governing breach of warranty in contracts of marine insurance, the Court concluded that if an insurer has

31

knowledge of facts indicating noncoverage under the insurance policy and assumes or continues the insured's defense without obtaining a nonwaiver agreement to reserve its coverage defense, the insurer shall be found to have waived such defense. Here, the insurer had knowledge of facts indicating the barge was unseaworthy but did not obtain a nonwaiver agreement or issue a reservation of rights, thereby waiving its policy defenses.

Laches did not bar the claim against the lender, since the most analogous Louisiana statute of limitations was ten years. However, the insurer lacked a cause of action for unjust enrichment against the lender under Louisiana law. The lender was owed a valid debt by the barge owner and accepted the insurer's claim payments in good faith. The lender's "enrichment" was justified by its contract with the owner, and the underwriter has another remedy at law in the form of a suit for damages against the barge owner.

**[Our sincere thanks to Joshua S. Force of Sher Garner Cahill Richter Klein & Hilbert, L.L.C. for bringing this case to our attention - ed.]**

## Insured Must Prove Named Peril

*Miller Marine Services, Inc. v. Travelers Property Casualty Insurance Company*, No. 05-6384-CV (2nd Cir. 2006)

The Court of Appeals upheld the District Court's grant of summary judgment dismissing a claim under a hull policy for the insured's failure to meet its burden of proof in demonstrating the occurrence of a named peril. The affidavits of the insured in opposition to the insurer's summary judgment motion did not create a genuine issue of material fact and were either inadmissible or irrelevant.

The affidavit of Miller Marine's principal, expressing his "belief and conclusion" that the sinking of the insured vessel was caused by crewmember negligence was not based on personal knowledge as required by FRCP 56. The affidavit of its expert "not only makes an improper legal conclusion that the cause of the accident is a 'covered occurrence' under the policy,... but also presents no expert testimony relevant to the cause of the vessel's sinking."

A genuine issue of material fact is not created by conclusory allegations in affidavits.

**[Our sincere thanks to James W. Carbin of Duane Morris LLP for bringing this case to our attention – ed.]**

Gene B. George