UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | NO.: 05-4182 "K"(2) |
| | * | |
| | * | JUDGE DUVAL |
| PERTAINS TO: ROAD HOME | * | |
| *Louisiana State*, C.A. No. 07-5528 | * | MAGISTRATE JUDGE |
| | * | WILKINSON |
| | * | |
| | * | |

**AFFIDAVIT OF WILLIAM PATTON IN SUPPORT OF
DEFENDANTS' MOTION FOR PROTECTIVE ORDER**

William Patton, being duly sworn, deposes and states as follows:

1.    I am a Director of Property & Casualty Coverage and Underwriting for Hartford Fire Insurance Company.  I make this affidavit on behalf of Defendants Hartford Accident & Indemnity Company, Hartford Casualty Insurance Company, Hartford Fire Insurance Company, Hartford Insurance Company of the Midwest, Hartford Insurance Company of the Southeast, Hartford Underwriters Insurance Company, Property and Casualty Insurance Company of Hartford and Twin City Fire Insurance Company (collectively, "Hartford").  I make this affidavit based upon my own personal knowledge and business records of Hartford.

2.    According to information provided by the State of Louisiana (the "State"), approximately 1,300 policyholders of Hartford have applied for a grant under the Road Home Program, and hundreds of them have received a grant.  We have not verified the information provided by the State.

3.     I have reviewed the "Settlement Communication" form attached as Exhibit A hereto, which I understand the State intends to use to request Hartford and other insurance carriers to provide detailed information concerning policyholders, their insurance coverage, their insurance claims, payments made on insurance claims and proposed settlements of lawsuits.

4.     I have also reviewed the "Request for Consent Form" prepared by the State, attached as Exhibit B hereto, which I understand the State intends to use to request policyholders or their attorneys to provide detailed information concerning homeowners' insurance policies, flood insurance policies, homeowners' insurance claims, flood insurance claims, payments made on insurance claims, and proposed settlements of insurance claims.  The "Request for Consent Form" also requests information concerning whether the policyholder had a mortgage and, if so, the identity of the lender and amount of the mortgage.  The "Request for Consent Form" also requests information concerning whether the policyholder received an SBA loan.

5.     I understand that the State is claiming that it has rights to the insurance proceeds of Hartford policyholders who have received a Road Home grant, although Hartford has not consented to any transfer of rights from any policyholder to the State and disputes whether the State has any rights to policy proceeds.  I further understand that the State intends to use the information on both the "Settlement Communication" form and the "Request for Consent Form" to determine whether it will consent to settlements reached by Hartford with its policyholders.  I also understand that the State intends to insist on compliance with the "Settlement Communication" form and "Request for Consent Form" before it will make a decision on consenting to a proposed settlement.

2

6.      Hartford has adopted policies and procedures to protect the privacy of
personal information concerning its policyholders, as described in the "Privacy Policy
and Practices of The Hartford Financial Services Group, Inc. and its Affiliates," which is
attached as Exhibit C hereto. The information requested in the "Settlement
Communication" form and "Request for Consent Form" includes personal information
about Hartford's policyholders that is protected by Hartford's privacy policies, including,
for example, information concerning the policyholders' identity and home address,
detailed information concerning their home and their mortgage, the nature and extent of
their insurance coverage, and detailed information concerning their insurance claims.
This type of information is treated as confidential and proprietary by Hartford.

7.      If personal information concerning hundreds of Hartford's policyholders
became available to others in the insurance business, including Hartford's competitors
and insurance agents, that would put Hartford at a competitive disadvantage. Such
information could potentially be used by others to attempt to ascertain Hartford's
underwriting practices and pricing methodologies, which are confidential. Personal
information concerning Hartford's policyholders could also potentially be used to target
Hartford policyholders and encourage them to do business with another carrier.

8.      The "Request for Consent Form" also requests detailed information
concerning settlements reached by Hartford with policyholders who have sued Hartford.
In litigated matters, Hartford seeks to protect its confidential information during the
discovery process, including personal identifying information regarding insureds, through
the use of agreed protective orders. A sample protective order that Hartford typically

3

seeks to use in Hurricane Katrina homeowners insurance cases in Louisiana is attached as Exhibit D hereto.

     9.    Similarly, when Hartford settles a lawsuit filed by a policyholder, Hartford typically requires that the policyholder keep the terms of the settlement confidential by incorporating a confidentiality agreement into the final release documents. A sample confidentiality provision that Hartford typically includes in its release and settlement agreements in Hurricane Katrina homeowners insurance cases in Louisiana is attached as Exhibit E hereto.

     10.    Dissemination of confidential settlement information could negatively impact the company in a variety of contexts. Dissemination of information concerning Hartford's settlements of lawsuits to the general public, or to other litigants who have sued Hartford, would likely have an adverse effect on Hartford's ability to resolve other active lawsuits or lawsuits that might arise in the future. Hartford also would likely experience an adverse effect on its competitive position in the marketplace if information concerning settlements of individual lawsuits was made public. This is because persons could reach erroneous conclusions about Hartford's claim handling practices based on incomplete information concerning the settlement of particular claims. Hartford would also expect to see a direct and negative effect on its position in the marketplace if information concerning settlements of individual lawsuits were to be made available to Hartford's competitors, because such information could give Hartford's competitors some insight into Hartford's litigation and settlement strategies.

_William Patton_ (signature)

William Patton

Sworn to and Subscribed before me
this 3rd day of March, 2008.

_Karen K. Goodwin_ (signature)

Notary Public   10/31/2011

My commission expires:

5

## SETTLEMENT COMMUNICATION PURSUANT TO
## F.R.E. ART. 408 AND/OR LA. CODE OF EVIDENCE ART. 408

| | |
|---|---|
| **Insured Name:** | |
| **Insured Premises Address:** | |

| | | | |
|---|---|---|---|
| **Homeowner[†] Insurer:** | | **Flood Insurer[‡]:** | |
| **Homeowner[†]Policy No.:** | | **Flood Policy No.[‡]:** | |
| **Homeowner[†] Claim No:** | | **Flood Claim No.[‡]:** | |

### Flood Policy Information[‡]

| | Coverage A (Dwelling) | Coverage B (Other Structures) | Coverage C (Personal Property) | Coverage D (ALE) |
|---|---|---|---|---|
| **Flood Insurer Limits:** | $ | $ | $ | $ |
| **Total Payments By Flood Insurer:** | $ | $ | $ | $ |
| **Additional Loss Payee:** | Is there a mortgage company or other additional loss payee on the Flood Policy? Yes ____ No ____ If Yes, identify the name(s) of the additional loss payees: | | | |

### Homeowner[†] Policy Information

| | Coverage A (Dwelling) | Coverage B (Other Structures) | Coverage C (Personal Property) | Coverage D (ALE) |
|---|---|---|---|---|
| **Policy Limits:** | $ | $ | $ | $ |
| **Payments Made Prior to Final Settlement by HO[†] Insurer:** | $ | $ | $ | $ |
| **Proposed Final Settlement with HO[†] Insurer:** | $ | $ | $ | $ |
| **Additional Loss Payee:** | Is there a mortgage company or other additional loss payee on the Homeowner Policy? Yes ____ No ____ If Yes, identify the name(s) of the additional loss payee: | | | |

The undersigned certifies that the above information is true and correct to the best of his/her knowledge:

Printed Name: _____

Company: _____

Title: _____

Date: _____

The insurance company does not, by providing this information, consent to any subrogation and/or assignment that may have been executed in favor of the State of Louisiana, and does not waive any rights or policy provisions or defenses it may have. All rights, policy provisions, and defenses are expressly reserved.

[†]The term "Homeowner" and symbol "HO" refer generally to policies of insurance not issued pursuant to the NFIP.
[‡] Information related to the Flood Policy and flood payments are only to be included where the Homeowner Insurer and the Flood Insur[...] company.



# **Request for Consent Form**

**Instructions:** Please review and carefully respond to all of the following requested information on this Request for Consent Form. Once you have completely responded to all of the requested information, and the Form has been fully executed, please return the Form to:

Louisiana Division of Administration
Disaster Recovery Unit – Attention Subrogation
Post Office Box 94095
Baton Rouge LA 70804-9095

**(1) Recipient's/Applicant's Full Name**:
First:
Middle:
Last: _____        Suffix:

**(2) Co-Recipient's/Co-Applicant's Full Name**:
First:
Middle:
Last: _____        Suffix:

What is your Road Home Identification Number?
Have you closed on your Road Home grant application? _____ Yes _____ No
If you have not closed on your grant, do you have a closing date scheduled?_____ Yes
No
If you answered "Yes", what is the date of your scheduled closing?

**(3) Address of Damaged Property (as listed on grant application)**:
Street Address:
City: _____        State: _____        Zip:
**(4) Current Contact Information**:
Street Address:
City: _____        State: _____        Zip:
Phone : ( ) _____        Fax: ( )
E-Mail:

**(5) Flood Insurance:**
Did you have flood insurance at the time of Hurricanes Katrina and/or Rita?
_____ Yes        _____ No

01-29-2008 - FINAL



EXHIBIT

B

Did you make a claim? _____ Yes          _____ No

If you answered yes to making a claim, please answer the following:

Name of your Flood Insurance Company:

Policy Number:

(Please attach a copy of your Declaration page for the policy periods August 29, 2005, and/or September 24, 2005)

Claim Number:

Flood Insurance Agent's Name and Company Name:

Street Address:

City: _____ State: _____ Zip:

Phone : ( )_____ Fax: ( )

Did you receive any funds from your flood insurer? _____ Yes _____ No

If you answered "Yes" to receiving funds from your flood insurer, please complete the following questions:

How much did you receive for the primary residence?

(The term "primary residence" refers to your primary home or dwelling, and excludes other structures such as fences, sheds, and detached garages).

How much did you receive for other structures?

How much did you receive for contents?

How much did you receive for alternative living expenses?

How much did you receive for any other expenses or property damage?

**(6) Homeowners Insurance:**

Name of Homeowners Insurance Company:

Homeowner's Insurance Agent's Name and Company Name:

Street Address:

City: _____ State: _____ Zip:

Phone : ( )_____ Fax: ( )

Policy Number:

(Please attach a copy of your Declaration page for the policy periods August 29, 2005, and/or September 24, 2005)

Did you make a claim? _____ Yes          _____ No

If yes, what was your claim number?

If you answered yes to making a claim and you received any funds from your homeowner's insurer, please answer the following:

How much did you receive for the primary residence?

(The term "primary residence" refers to your primary home or dwelling, and excludes other structures such as fences, sheds, and detached garages).

How much did you receive for other structures?

How much did you receive for contents?

How much did you receive for alternative living expenses?

How much did you receive for any other expenses or property damage?

Have you settled your claim with your homeowners insurance company? _____ Yes No

If yes, please answer the following :

What is the total amount of the settlement?

How much did or will you receive for the primary residence?

01-29-2008 - FINAL

(The term "primary residence" refers to your primary home or dwelling, and excludes other structures such as fences, sheds, and detached garages).

How much did or will you receive for other structures?

How much did or will you receive for contents?

How much did or will you receive for alternative living expenses?

How much did or will you receive for any other expenses or property damage?

Please state the following information for any insurance company attorney or adjuster that negotiated the settlement:

Name and Company or Law Firm Name:

Street Address:

City: _____   State: _____   Zip:

Phone : ( ) _____   Fax: ( )

E-Mail:

## (7) Litigation:

Do you have an attorney representing you on an insurance claim relating to any damages you might have sustained or incurred as a result of Hurricanes Katrina and/or Rita?

Yes _____ No

If yes, please state the following for your attorney's contact information:

Name of Attorney:

Name of Law Firm:

Street Address:

City: _____   State: _____   Zip:

Phone : ( ) _____   Fax: ( )

E-Mail:

(Please attach a copy of the retainer contract with your attorney and provide a summary of any costs or expenses associated with this lawsuit).

Have you filed a lawsuit regarding a hurricane insurance claim? _____ Yes No

If yes, please provide identify the Court in which the lawsuit is filed and provide the case number:

(Please attach a copy of the first page of the lawsuit identified above)

What value did the insurer's adjuster assign for damages to your primary residence?
(Please attach a copy of the adjuster's report)

What value did your adjuster/expert assign for damages to your primary residence?
(Please attach a copy of the adjuster's/expert's report)

## (8) Mortgage Company:

Did you have a mortgage on your primary residence at the time of the hurricane?

Yes _____ No

If yes, please state the amount of the mortgage (Please include the applicable date for the balance and the Loan Number):

01-29-2008 - FINAL

Please state the name of the lender:
Please provide the name of a contact person, address and phone number for your lender:
If you did not have a mortgage on your primary residence at the time of the hurricane, was there any loss payee(s) on your homeowners insurance policy? _____ Yes _____
No
If yes, please state the name of loss payee(s):
Please provide the address and phone number for loss payee(s):
**(9) SBA**
Have you received a SBA Loan? _____ Yes _____ No
Please provide the name of a contact person, address and phone number for your SBA loan (Please include the Loan Number.):

      I solemnly swear that the information contained in this Road Home Consent Form is true and correct under penalty of law and penalty of perjury. The information contained herein and the documents submitted as part of this consent request may be the basis for determining benefits under the Road Home Program, and that Undersigned acknowledge that Undersigned may be prosecuted by Federal, State and/or local authorities in the event that Homeowner(s) make or file false, misleading and/or incomplete statements and/or documents, and that the State of Louisiana may seek

remittance of settlement proceeds from the Undersigned in the event that the Undersigned make or file false, misleading and/or incomplete statements and/or documents. <u>Additionally, I understand that any incomplete responses may result in grounds for a deficiency rejection. Finally, I understand that consent to settlement and agreement as to amount to be returned to the Road Home Program will only be evidenced by the written consent and approval of the Road Home Program.</u>

| | |
|---|---|
| _____ | _____ |
| Witness | Signature (Recipient/Applicant) |
| _____ | |
| Witness | Print Name (Recipient/Applicant) |
| _____ | |
| Witness | Signature (Co-Recipient/Co-Applicant) |
| _____ | |
| Witness | Print Name (Co-Recipient/Co-Applicant) |
| _____ | |
| Witness | Signature (Attorney) |
| _____ | |
| Witness | Print Name (Attorney) |

01-29-2008 - FINAL

Sworn to and subscribed before me the undersigned Notary Public on this day of

_____, 2007.

Notary Public

(Print Name, Date Commission Expires and Bar Number)

(For Official Use Only)

ROAD HOME CONSENT

\_\_\_\_ Request for consent denied.

\_\_\_\_ Request for consent denied, please respond to the State's request for additional information, so that further review may be made and consent granted.

\_\_\_\_ Request for consent granted. The State of Louisiana, Division of Administration, Office of Community Development ("the State"), solely as the assignee(s) and/or subrogee(s) of interests of the Road Home Grant recipient(s) to whose Request for Consent this is attached ("Recipient"), in consideration of the receipt of the sum of $_____, paid by or on behalf of Recipient(s) does hereby RELEASE, ACQUIT, AND FOREVER DISCHARGE _____, (hereinafter referred to as "Insurer" and as defined below), but only to the extent of any and all claims against the Insurer that the State may possess or allegedly possess or be entitled to by virtue of the execution of the Assignment and Subrogation Agreement made part of The Road Home Program Grant process including but not limited to contractual claims or any claims for damages, penalties, punitive damages and/or attorneys fees under any provision of state law, including but not exclusively La. Civ. Code art. 1997, La. R.S. 22:658 and/or 22:1220, arising out of or related to damages or losses caused in any way, whether in whole or in part, by Hurricanes Katrina and/or Rita to the insured premises of the Road Home Recipient and under or relating to Policy Number _____ issued by Insurer. With respect to the claims to which the State is the Recipient's alleged subrogee or assignee under the Road Home subrogation and assignment agreement, the sole reservation of rights against the Insurer are rights that the State may have for recovery of

01-29-2008 - FINAL

Increased Cost of Compliance benefits, if any, under any flood insurance policy issued to the Recipient pursuant to the National Flood Insurance Program and administered by the Insurer, as identified and defined herein.

> This Release does not apply to any claims that the State or the State of Louisiana may have in any capacity other than as the Recipient's subrogee or assignee under the Road Home subrogation and assignment agreement executed by that specific Recipient. This Release does not release any rights against the Recipient identified above or rights against any insurer not included within the term Insurer as defined herein.

> Insurer is defined herein to include any person or entity who sold or offered for sale Policy Number _____, independent program administrators, agents, or agencies involved in the sale or offer for sale of said policy, independent or contract claim adjusters, independent or contract engineers and engineering firms, together with any current and former agents, employees, officers, directors, attorneys, owners, shareholders, associated and affiliated companies, parent companies, divisions, subsidiaries, predecessors, successors, and assigns of any of them, in connection with any claim for damages or losses but only to the extent such claims are or could be asserted by Recipient(s), against Insurer under or relating to Policy Number _____ and arising out of or relating to claims for damages or losses from Hurricanes Katrina and/or Rita.

> It is expressly acknowledged that payment by Insurer does not constitute and shall not operate as an admission of liability, validate the Assignment and Subrogation Agreement made part of The Road Home Program Grant process, or waive any of Insurer's defenses.

The insurance company or you should make the State portion of the settlement funds payable to Louisiana Division of Administration – DRU" and mailed to

> Louisiana Division of Administration
> Disaster Recovery Unit – Attention Subrogation
> Post Office Box 94095
> Baton Rouge LA 70804-9095

Please include on the reference portion of the check the above referenced Road Home application number and include a copy of this correspondence with the check. The above release by the State is contingent on receipt of the State's portion of settlement funds as set forth in the consent and release.

01-29-2008 - FINAL

Approved by:

Print Name and Title

Date

## RECIPIENT ACKNOWLEDGMENT

I hereby authorize and irrevocably approve and agree to reimburse the Road Home the sum of _____ as set forth above in the Road Home Consent section. Further, I authorize and irrevocably direct the insurance company listed in the Request for Consent Form to deduct the sum of _____, as set forth above in the Road Home Consent section, from the gross settlement of any insurance claim and to remit the same directly to the Road Home, all funds should be remitted to The Road Home Program, through the Louisiana Division of Administration, as provided herein.

| | |
|---|---|
| _____ | _____ |
| Witness | Signature (Recipient/Applicant) |
| _____ | _____ |
| Witness | Print Name (Recipient/Applicant) |
| _____ | _____ |
| Witness | Signature (Co-Recipient/Co-Applicant) |
| _____ | _____ |
| Witness | Print Name (Co-Recipient/Co-Applicant) |

Sworn to and subscribed before me the undersigned Notary Public on this _____ day of _____, 2007.

Notary Public

(Print Name, Date Commission Expires and Bar Number)

01-29-2008 - FINAL

Page 7 of 8

**Privacy Policy and Practices of The Hartford Financial Services Group, Inc. and its Affiliates**

(herein called "we, our, and us")

*This Privacy Policy applies to our United States Operations*

We value your trust. We are committed to the responsible:

a)  management;
b)  use; and
c)  protection;

of **Personal Information.**

This notice describes how we collect, disclose, and protect **Personal Information.**

We collect **Personal Information** to:

a)  service your **Transactions** with us; and
b)  support our business functions.

We may obtain **Personal Information** from:

a)  **You;**
b)  your **Transactions** with us; and
c)  third parties such as a consumer–reporting agency.

Based on the type of product or service **You** apply for or get from us, **Personal Information** such as:

a)  your name;
b)  your address;
c)  your income;
d)  your payment; or
e)  your credit history;

may be gathered from sources such as applications, **Transactions,** and consumer reports.

To serve **You** and service our business, we may share certain **Personal Information.** We will share **Personal Information,** only as allowed by law, with affiliates such as:

a)  our insurance companies;
b)  our employee agents;
c)  our brokerage firms; and
d)  our administrators.

As allowed by law, we may share **Personal Financial Information** with our affiliates to:

a)  market our products; or
b)  market our services;

to **You** without providing **You** with an option to prevent these disclosures.

We may also share **Personal Information,** only as allowed by law, with unaffiliated third parties including:

a)  independent agents;
b)  brokerage firms;
c)  insurance companies;
d)  administrators; and
e)  service providers;

who help us serve **You** and service our business.

When allowed by law, we may share certain **Personal Financial Information** with other unaffiliated third parties who assist us by performing services or functions such as:

a)  taking surveys;
b)  marketing our products or services; or
c)  offering financial products or services under a joint agreement between us and one or more financial institutions.

We will not sell or share your **Personal Financial Information** with anyone for purposes unrelated to our business functions without offering **You** the opportunity to:

a)  "opt–out"; or
b)  "opt–in";

as required by law.

We only disclose **Personal Health Information** with:

a)  your proper written authorization; or
b)  as otherwise allowed or required by law.

Our employees have access to **Personal Information** in the course of doing their jobs, such as:

a)  underwriting policies;
b)  paying claims;
c)  developing new products; or
d)  advising customers of our products and services.

We use manual and electronic security procedures to maintain:

a)  the confidentiality; and
b)  the integrity of;

**Personal Information** that we have. We use these procedures to guard against unauthorized access.

1 of 2



EXHIBIT

C

Some techniques we use to protect **Personal Information** include:

a) secured files;

b) user authentication;

c) encryption;

d) firewall technology; and

e) the use of detection software.

We are responsible for and must:

a) identify information to be protected;

b) provide an adequate level of protection for that data;

c) grant access to protected data only to those people who must use it in the performance of their job-related duties.

Employees who violate our Privacy Policy will be subject to discipline, which may include ending their employment with us.

At the start of our business relationship, we will give **You** a copy of our current Privacy Policy.

We will also give **You** a copy of our current Privacy Policy once a year if **You** maintain a continuing business relationship with us.

We will continue to follow our Privacy Policy regarding **Personal Information** even when a business relationship no longer exists between us.

*As used in this Privacy Notice:*

**Application** means your request for our product or service.

**Personal Financial Information** means financial information such as:

a) credit history;

b) income;

c) financial benefits; or

d) policy or claim information.

**Personal Health Information** means health information such as:

a) your medical records; or

b) information about your illness, disability or injury.

**Personal Information** means information that identifies **You** personally and is not otherwise available to the public. It includes:

a) **Personal Financial Information;** and

b) **Personal Health Information.**

**Transaction** means your business dealings with us, such as:

a) your **Application;**

b) your request for us to pay a claim; and

c) your request for us to take an action on your account.

**You** means an individual who has given us **Personal Information** in conjunction with:

a) asking about;

b) applying for; or

c) obtaining;

a financial product or service from us if the product or service is used mainly for personal, family, or household purposes.

This Privacy Policy is being provided on behalf of the following affiliates of The Hartford Financial Services Group, Inc.:

Hartford Accident and Indemnity Company; Hartford Fire General Agency, Inc.; Hartford Fire Insurance Company; Hartford Insurance Company of Illinois; Hartford Insurance Company of the Midwest; Hartford Underwriters Insurance Company; Nutmeg Insurance Agency, Inc.; Nutmeg Insurance Company; Nutmeg Life Insurance Company; Property and Casualty Insurance Company of Hartford; Trumbull Insurance Company; Trumbull Services, L.L.C.; Twin City Fire Insurance Company.

If you have any questions regarding this Privacy Policy or Homeowners insurance, please call us, toll free,  at 1-800-423-4114.

If you have any questions regarding this Privacy Policy or Auto insurance, please call us, toll free, at 1-800-541-3717.

DRA-927-5

**Privacy Policy and Practices of The Hartford Financial Services Group, Inc. and its Affiliates**

(herein called "we, our, and us")

*This Privacy Policy applies to our United States Operations*

We value your trust. We are committed to the responsible:

a)  management;

b)  use; and

c)  protection;

of **Personal Information.**

This notice describes how we collect, disclose, and protect **Personal Information.**

We collect **Personal Information** to:

a)  service your **Transactions** with us; and

b)  support our business functions.

We may obtain **Personal Information** from:

a)  **You;**

b)  your **Transactions** with us; and

c)  third parties such as a consumer-reporting agency.

Based on the type of product or service **You** apply for or get from us, **Personal Information** such as:

a)  your name;

b)  your address;

c)  your income;

d)  your payment; or

e)  your credit history;

may be gathered from sources such as applications, **Transactions,** and consumer reports.

To serve **You** and service our business, we may share certain **Personal Information.** We will share **Personal Information,** only as allowed by law, with affiliates such as:

a)  our insurance companies;

b)  our employee agents;

c)  our brokerage firms; and

d)  our administrators.

As allowed by law, we may share **Personal Financial Information** with our affiliates to:

a)  market our products; or

b)  market our services;

to **You** without providing **You** with an option to prevent these disclosures.

We may also share **Personal Information,** only as allowed by law, with unaffiliated third parties including:

a)  independent agents;

b)  brokerage firms;

c)  insurance companies;

d)  administrators; and

e)  service providers;

who help us serve **You** and service our business.

When allowed by law, we may share certain **Personal Financial Information** with other unaffiliated third parties who assist us by performing services or functions such as:

a)  taking surveys;

b)  marketing our products or services; or

c)  offering financial products or services under a joint agreement between us and one or more financial institutions.

We will not sell or share your **Personal Financial Information** with anyone for purposes unrelated to our business functions without offering **You** the opportunity to:

a)  "opt-out"; or

b)  "opt-in";

as required by law.

We only disclose **Personal Health Information** with:

a)  your proper written authorization; or

b)  as otherwise allowed or required by law.

Our employees have access to **Personal Information** in the course of doing their jobs, such as:

a)  underwriting policies;

b)  paying claims;

c)  developing new products; or

d)  advising customers of our products and services.

We use manual and electronic security procedures to maintain:

a)  the confidentiality; and

b)  the integrity of;

**Personal Information** that we have. We use these procedures to guard against unauthorized access.

1 of 2

CAF-2665-7

Some techniques we use to protect **Personal Information** include:

a)  secured files;

b)  user authentication;

c)  encryption;

d)  firewall technology; and

e)  the use of detection software.

We are responsible for and must:

a)  identify information to be protected;

b)  provide an adequate level of protection for that data;

c)  grant access to protected data only to those people who must use it in the performance of their job-related duties.

Employees who violate our Privacy Policy will be subject to discipline, which may include ending their employment with us.

At the start of our business relationship, we will give **You** a copy of our current Privacy Policy.

We will also give **You** a copy of our current Privacy Policy once a year if **You** maintain a continuing business relationship with us.

We will continue to follow our Privacy Policy regarding **Personal Information** even when a business relationship no longer exists between us.

*As used in this Privacy Notice:*

**Application** means your request for our product or service.

**Personal Financial Information** means financial information such as:

a)  credit history;

b)  income;

c)  financial benefits; or

d)  policy or claim information.

**Personal Health Information** means health information such as:

a)  your medical records; or

b)  information about your illness, disability or injury.

**Personal Information** means information that identifies **You** personally and is not otherwise available to the public. It includes:

a)  **Personal Financial Information;** and

b)  **Personal Health Information.**

**Transaction** means your business dealings with us, such as:

a)  your **Application;**

b)  your request for us to pay a claim; and

c)  your request for us to take an action on your account.

**You** means an individual who has given us **Personal Information** in conjunction with:

a)  asking about;

b)  applying for; or

c)  obtaining;

a financial product or service from us if the product or service is used mainly for personal, family, or household purposes.

This Privacy Policy is being provided on behalf of the following affiliates of The Hartford Financial Services Group, Inc.:

American Maturity Life Insurance Company; First State Insurance Company; Hartford Accident and Indemnity Company; Hartford Administrative Services Company; Hartford Casualty Insurance Company; Hartford Equity Sales Company, Inc.; Hartford Fire Insurance Company; Hartford HLS Series Fund II, Inc.; Hartford Insurance Company of Illinois; Hartford Insurance Company of the Midwest; Hartford Insurance Company of the Southeast; Hartford International Life Reassurance Corporation; Hartford Investment Financial Services, LLC; Hartford Investment Management Company; Hartford Life and Accident Insurance Company; Hartford Life and Annuity Insurance Company; Hartford Life Insurance Company; Hartford Life Group Insurance Company; Hartford Lloyd's Insurance Company; Hartford Mezzanine Investors I, LLC; Hartford Securities Distribution Company, Inc.; Hartford Series Fund, Inc.; Hartford Specialty Company; Hartford Specialty Insurance Services of Texas, LLC; Hartford Underwriters Insurance Company; Hartford-Comprehensive Employee Benefit Service Company; HL Investment Advisors, LLC; Hartford Life Private Placement, LLC; M-CAP Insurance Agency, LLC; New England Insurance Company; Nutmeg Insurance Agency, Inc.; Nutmeg Insurance Company; Nutmeg Life Insurance Company; Pacific Insurance Company, Limited; Planco, LLC.; Planco Financial Services, LLC; Property and Casualty Insurance Company of Hartford; Sentinel Insurance Company, Ltd.; Specialty Risk Services, LLC.; The Hartford Income Shares Fund, Inc.; The Hartford Mutual Funds II, Inc.; The Hartford Mutual Funds, Inc.; Trumbull Insurance Company; Trumbull Services, L.L.C.; Twin City Fire Insurance Company; Woodbury Financial Services, Inc.

If you have any questions, please call us, toll free, at 1-800-624-5578.

## AGREED PROTECTIVE ORDER
## REGARDING CONFIDENTIAL INFORMATION

Plaintiff . . . ("Plaintiff") has sought or may seek from Hartford . . . ("Hartford"), the discovery of certain information that Hartford considers to be trade secrets and/or confidential or proprietary information and/or confidential personal information.

To expedite the flow of discovery material, facilitate the prompt resolution of disputes over alleged confidentiality, adequately protect and ensure the confidentiality of designated documents, deposition testimony and other materials, Plaintiff and Hartford agree to the entry of this Agreed Protective Order Regarding Confidential Information. Accordingly, this Order is being entered pursuant to the Court's authority under Rule 26(c)(7) of the Federal Rules of Civil Procedure.

Notwithstanding the foregoing, nothing contained herein shall be construed as an admission or agreement by any party or their counsel, that any documentation that Hartford contends is "confidential" is, in fact, confidential, proprietary or a trade secret. Plaintiff expressly reserves the right to contest the designation of confidentiality of any documents, deposition testimony or other material designated to be subject to this Order.

IT IS HEREBY ORDERED THAT:

1.    This Order shall govern the handling, disclosure, and disposition of Hartford's claim file and activity logs and such other documents or information, including deposition testimony, that Hartford may designate as "Confidential" at the time the documents or information are produced in response to a subpoena or other discovery request (hereinafter referred to as the "Discovery Material"). Hartford may designate specifically identified portions of deposition testimony of a witness as confidential at the time that the deposition testimony is



1

elicited by indicating on the record at the deposition that the testimony is "Confidential" or by notifying all other parties to this case in writing within 60 days of receipt of the transcript. Nothing in this Order shall be construed as prejudicial to either the rights of Hartford to designate any other materials as confidential, or to the rights of the other parties to contest any such designation of confidentiality.  If Plaintiff contests Hartford's designation of any document or information as "Confidential" under this Order, then Hartford has the burden to establish that the document or information is confidential, proprietary or a trade secret justifying protection under this Order.

The Discovery Material designated herein as "Confidential" by Hartford in Paragraph 1 may be used by Plaintiff only for purposes of preparing for and conducting pretrial and trial proceedings in this action.   The "Confidential" Discovery Material described above, and information derived there from, shall be shown only to Plaintiff and his counsel of record in this action, and may be disclosed by Plaintiff or his counsel to the following persons:

2.1   Counsel for Plaintiff and employees of such counsel as are required to assist in the preparation or conduct of this action; provided that, before being shown the above-referenced "Confidential" Discovery Material, such persons shall be given a copy of this Order, and advised that they are bound by it.

2.2   Officers, employees, agents, or representatives of Plaintiff who are actually engaged in preparing for or conducting pretrial proceedings in this action, but only to the extent necessary to do so; provided that, before being shown any "Confidential" Discovery Material, such persons shall be given a copy of this Order, and advise that they are bound by it.

2

2.3     Persons whose depositions are being taken or who are witnesses at any hearing or trial conducted by the Court in this action; provided that, before being shown any "Confidential" Discovery Material, such persons shall be given a copy of this Order, and advise that they are bound by it.

2.4     Persons hired or consulted with as experts during the course of this litigation; provided that, before being shown any "Confidential" Discovery Material, such persons shall be given a copy of this Order, and advise that they are bound by it.

2.5     This Court or any other court before which this action is pending, including any Court personnel, jurors, and all other persons lawfully present in the Court proceeding.

3.     The persons described in Paragraph 2 as having access to the "Confidential" Discovery Material described in Paragraph 1 shall be prohibited from disclosing any such information to any other person except as provided herein, and each such person shall take appropriate measures to safeguard the confidentiality of the "Confidential" Discovery Material to prevent the willful or inadvertent disclosure thereof and to assure that the provisions of this Order are accomplished.

4.     Upon conclusion of this action, all "Confidential" Discovery Material produced by Hartford, including designated deposition testimony, and all copies thereof shall be immediately returned to Hartford.  In addition, within forty-five (45) days of the conclusion of this action, an affidavit of compliance shall be provided to Hartford by counsel returning the "Confidential" Discovery Material swearing or affirming that all "Confidential" Discovery Material and all copies thereof from counsel for Plaintiff and all of the persons identified in paragraph 2 above have been returned to Hartford.

3

5.      This Order is entered without prejudice to Hartford's right to bring before the
Court at any time other objections to the production of any Discovery Material, and this Order is
entered without prejudice to the rights of any other party to contest any such allegation.

New Orleans, this _____ day of _____, 2007.


_____

PRESIDING JUDGE

4

AGREED:

---

Brian J. Houghtaling, T.A., La. Bar #30258
Gauthier, Houghtaling & Williams, L.L.P.
3500 North Hullen Street
Metairie, Louisiana 70002
Telephone:  (504) 456-8600
Facsimile:   (504) 456-8624

**Attorneys for Defendant,
Joseph Tedesco**

AND

---

Ralph S. Hubbard, III, T.A., La. Bar. #7040
Simeon B. Reimonenq, Jr., La. Bar #19755
Lugenbuhl, Wheaton, Peck, Rankin &
   Hubbard
601 Poydras Street, Suite 2775
New Orleans, Louisiana 70130
Telephone:  (504) 568-1990
Facsimile:   (504) 310-9195

And

OF COUNSEL:

Christopher W. Martin
Texas Bar No.: 13057620
Martin R. Sadler
Texas Bar No.: 00788842
Patrick M. Kemp
Texas Bar No.: 24043751
Martin, Disiere, Jefferson &
   Wisdom, L.L.P.
808 Travis Street, Suite 1800
Houston, Texas 77002
Telephone:     (713) 632-1700
Facsimile:      (713) 222-0101

**Attorneys for Defendant,
Hartford Insurance Company of the Midwest**

14.    **CONFIDENTIALITY.** The parties to this Release further warrant and agree that they shall maintain complete confidentiality as to the amount and terms of this Release as well as any negotiations relating thereto.    Notwithstanding the warranty of confidentiality, Hartford retains the right to release the amount of the settlement consistent with existing reporting requirements.    Claimants may disclose the amount of benefits received in connection with this Release to financial advisors, accountants or similar persons who need to know for purposes of financial, investment or tax advice. The parties further agree that this document together with any drafts hereof and any documents reflecting the negotiations preceding execution of this agreement reflect the compromise and settlement of a disputed claim and will not be offered in any legal proceeding for any purpose other than to enforce the Release.    Should any third party seek or attempt to obtain any information from the parties related to this Release or the amount paid in consideration of this Release through legal process, government action, judicial or extra-judicial methods, the parties mutually agree, each to notify the other, in writing, before any hearing, trial or formal action is taken.    Time is of the essence in the duty to report under this section.    If there is not sufficient time to report in writing, the party must report in person or by telephone.

EXHIBIT

E