## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF THE            *        CIVIL ACTION
COMPLAINT OF INGRAM BARGE       *
COMPANY, AS OWNER OF THE        *        NO. 05-4419
ING4727, PETITIONING FOR        *
EXONERATION FROM OR             *        SECTION "C" (2)
LIMITATION OF LIABILITY         *        JUDGE BERRIGAN
                                *        MAG. JUDGE WILKINSON
*    *    *    *    *    *    *    *

THIS DOCUMENT RELATES TO:  CASE NOS. 05-4237, 05-5531, 05-5724, 06-5054, 06-5342, 06-6299, 06-7516

### REPLY MEMORANDUM  IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS LAFARGE NORTH AMERICA'S THIRD-PARTY COMPLAINTS AGAINST THE UNITED STATES

In these cases which arise out of Hurricane Katrina's "catastrophic inundation of Orleans and St. Bernard Parishes," Defendant Lafarge North America, Inc. ("LNA"), has filed third-party complaints against the United States, alleging that "inadequacies of the levee and retaining wall systems and related structures" along three waterways—the Mississippi River-Gulf Outlet ("MRGO"), the Gulf Intracoastal Waterway ("GIWW" or "GICW") and the Inner Harbor Navigation Canal ("IHNC")—caused the flood damage of which the plaintiffs complain.  Record

Doc. (hereafter "R.D.") 590, ¶¶ 25, 26.[1]  LNA also alleges that the flood was caused by "the defective design, improper construction, and lack of inspection and maintenance of" the MRGO. R.D. 590, ¶¶ 25, 26. Under both tort and takings theories, LNA seeks contribution and indemnity from the United States for any liability that LNA may incur.  These claims must be dismissed for lack of subject matter jurisdiction.  First, the tort claims are barred by the Flood Control Act of 1928, 28 U.S.C. § 702c, which provides that "no liability of any kind" can be imposed on the United States "for any damage from or by floods or flood waters." 33 U.S.C. § 702c.  Second, the takings theory is not viable because LNA lacks standing to assert takings claims, and its claims sound in tort and cannot be properly characterized as takings claims.  And even if the claims did adequately allege takings, the claims nevertheless would be outside this Court's jurisdiction because each asserted claim exceeds $10,000.  *See* 28 U.S.C. § 1346(a)(2).

Despite the Flood Control Act's plenary retention of sovereign immunity to liability for flood damage, LNA argues that the United States can be held liable in these cases because LNA has alleged "acts of government negligence that are unconnected to any flood control project." Opp. at 16.  By reducing *Graci v. United States,* 456 F.2d 20 (5th Cir. 1971), to a single legal proposition, and by ignoring the dramatic difference between the legally significant facts of that case and the present cases, LNA asserts that the United States can be held liable for damage from floodwaters that a federal project, namely, the Lake Pontchartrain, Louisiana, and Vicinity Hurricane Protection Project ("LPVHPP"), failed to control.  But *Graci* does not stand—and

---

[1]LNA's first amended third-party complaint, R.D. 590, is identical to its third-party complaint in *Benoit*, R.D. 597.  For simplicity, this brief will reference only R.D. 590, with the intent that references to this document be understood to implicitly reference the identical third-party complaint paragraphs of R.D. 597.

indeed was never understood by either the Court of Appeals or the Supreme Court to stand—for the proposition that liability can be imposed on the United States whenever "*the government's negligent act* was unconnected to a flood control project."  Opp. at 2 (emphasis in original).  At most, *Graci* stands for the proposition that the United States may be subject to liability if "the flooding is unconnected with a flood control project."  *James v. United States,* 760 F.3d 590, 602 (5th Cir. 1985) (en banc) (citing *Graci*), *rev'd on other grounds,* 478 U.S. 597 (1986).  Neither the challenged conduct nor the flooding at issue in *Graci* had any connection to a flood control project, for a very simple reason:  the LPVHPP had not even been authorized, much less constructed when Hurricane Betsy stormed ashore in 1965.  In contrast, both the flood at issue in these consolidated cases and the conduct challenged by LNA were connected with a flood control project.  *Graci* therefore provides no support whatsoever for an imposition of liability in these cases.  On the contrary, *Graci's* explication of the purpose and rationale of § 702c reveals why the provision does attach to the floodwaters that caused LNA's alleged damage and therefore does bar LNA's claims.

　　To avoid dismissal, LNA vainly advances two more arguments against the application of § 702c to its claims.  LNA contends that the immunity provision "only applies to flood control projects designed to contain natural flooding, not to measures to remedy the government's own prior negligence."  Opp. at 2; *accord id.* at 18-19.  This argument fails because it too rests on an incorrect statement of the law and a misrepresentation of the relevant facts. The federal courts, including specifically the Fifth Circuit, have roundly rejected the proposition that the United States can be held liable for damage caused by "floods or flood waters" when negligence has caused or aggravated the losses.   Moreover, it is clear that the LPVHPP *was* designed to prevent

3

"natural flooding," having been authorized for the express purpose of "hurricane-flood protection," Pub. L. No. 89-231, 79 Stat. 1073, 1077 (1965).  It is equally clear that the flood at issue here was precipitated by natural forces, having been induced by one of the largest storms ever to strike the North American continent.  LNA's argument is therefore wholly lacking in merit.

LNA's final argument against dismissal under § 702c rests on the contention that there is "a factual dispute over the extent to which there had been flood control measures at the places from which flooding occurred." Opp. at 19.  This argument fails for at least three reasons.  First, LNA has admitted the relevant fact that there was a breach in an IHNC floodwall and that flooding of adjacent neighborhoods occurred due to multiple failures of levees adjacent to the IHNC, the GIWW, and the MRGO.  *See* R.D. 590 (LNA Answer), ¶¶ 9, 10.  LNA has also averred that the plaintiffs' alleged damages resulted from the United States' negligent design, construction and maintenance of these levees and floodwalls.  *See id.* (Third-party Complaint) ¶ 30.  Given these admissions and averments, LNA's proffered declaration by one of its lawyers does not create a genuine issue concerning any material fact.

Second, any dispute about whether some floodwaters flowed through pre-existing gaps in the LPVHPP and not through breaches created by Hurricane Katrina would be completely irrelevant to the pending motion.  The plaintiffs are seeking to recover for damage caused by floodwaters that flowed through a single, specific breach—the breach in the IHNC floodwall through which the Ingram barge passed.  Plaintiffs claim that this particular breach and the damage caused by the floodwaters that passed through it resulted from LNA's negligence.  LNA, in turn, has asserted indemnity and contribution claims against the United States.  Any liability of

4

the United States to LNA would therefore be coterminous with LNA's own liability to the plaintiffs. And inasmuch as plaintiffs are seeking to recover only for damage caused by floodwaters that flowed through a breach in an IHNC floodwall, any damage caused by floodwaters that came through other breaches or gaps in the LPVHPP could not serve to increase LNA's liability to the plaintiffs.

Third, the United States' sweeping immunity to "any liability from or by floods or floodwaters at any place" is broad enough to attach to any floodwaters that may have flowed through gaps in the LPVHPP. The Katrina flood was undeniably a flood that the LPVHPP was intended to prevent. Any imposition of liability for damage caused by or resulting from floodwaters that the LPVHPP failed to control would therefore be contrary to both the plain language of § 702c and the intent of Congress, which was to ensure that the United States would be immune in such circumstances.

Lastly, LNA's third-party complaints should be dismissed notwithstanding LNA's futile attempt to give them a constitutional dimension. LNA's second cause of action for indemnity or contribution is styled as a takings claim pursuant to the Fifth Amendment of the Constitution. The bare assertion of this claim is so facially insubstantial that it cannot establish this Court's jurisdiction under the Little Tucker Act. LNA's third-party complaints lack any allegation of a property interest that gives rise to a substantive right under the Constitution, and LNA cannot show that it has standing to assert the constitutional rights of the plaintiffs. Further, LNA makes no factual allegations to establish a takings claim. LNA's conclusory allegation of recurrent flooding is entitled to no deference, and it is apparent from the face of the third-party complaints that LNA's claims are based on a single incidence of flooding from Hurricane Katrina and

therefore sound in tort.  Finally, even if LNA were able to make out a takings claim, its demand

for $10,000 per plaintiff exceeds the limit of this Court's Little Tucker Act jurisdiction.  LNA

errs in suggesting that it can split its claims against the United States into as many separate

claims as there are plaintiffs.  LNA has one claim against the United States in each action, and as

alleged, each claim exceeds $10,000.  For this reason alone, LNA's putative takings claims must

be dismissed for lack of subject matter jurisdiction.  *See* 28 U.S.C. § 1346(a)(2).

## ARGUMENT

**I.  LNA's Claims Are Barred by the Flood Control Act, 33 U.S.C. § 702c, Because They Seek to Impose Liability "for Damage from or by Floods or Floodwaters."**

**A.  LNA's Attempt to Impose Liability for Katrina Flood Damage Fails Because the Katrina Flood Was Connected with the LPVHPP Through and Through, and *Graci* Allows Liability To Be Imposed for Flood Damage Only If the Flood Is Unconnected with a Flood Control Project.**

Despite the plain language of 33 U.S.C. § 702c, which provides that "[n]o liability of any

kind shall attach to or rest upon the United States for any damage from or by floods or flood

waters at any place," LNA asserts that liability can attach to the United States in these

consolidated actions "because LNA's claim is based on negligent conduct unconnected to a flood

control project."  Opp. at 15 (capitalization altered and emphasis omitted).  The slender reed on

which LNA's argument rests is *Graci v. United States,* 456 F.2d 20 (5th Cir. 1971), and, truly,

not even the entire case but just a single sentence that LNA has taken out of context in an attempt

to reduce the case to a single mistaken proposition.

*Graci* was decided more than a decade before the Supreme Court first construed § 702c,

and the Court's subsequent construction of the immunity provision casts doubt on *Graci's*

continuing viability.  But even if the case survives *Central Green Co. v. United States,* 531 U.S. 425 (2001), its holding has properly been limited to its facts.  And its facts are dramatically different from the facts of the cases at bar.  *Graci* arose from the Hurricane Betsy flood, which occurred in September of 1965.  301 F. Supp. 947, 948-49 (E.D. La. 1969), *aff'd,* 456 F.2d 20 (1971).  Although Hurricane Betsy inundated many of the same areas that would be inundated by Hurricane Katrina forty years later, Betsy's floodwaters did not have to surmount any federally constructed flood-control levees, floodwalls or related works in order to inundate Orleans and St. Bernard Parishes.  *See Graci,* 456 F.2d at 22; *Graci,* 435 F. Supp. 189, 191-95 (E.D. La. 1977).

When *Graci* was before the Fifth Circuit on interlocutory appeal, the court framed the question presented as being whether "§ 3 of the Flood Control Act of 1928, 33 U.S.C. § 702c, affords the Government an absolute immunity from liability for floodwater damage regardless whether the negligence alleged was in connection with a flood control project . . . ."  456 F.2d at 23.  Although the court answered that question in the negative, its opinion provides a sound basis for concluding that the answer was to be understood in the context of the facts presented.   The court quoted at length from "[t]he leading case on the construction of" § 702c, *National Manufacturing Co. v. United States,* 210 F.2d 263 (8th Cir. 1954), *cert. denied,* 347 U.S. 967 (1954).  There the Fifth Circuit found the "rationale" of the immunity provision:  preventing flood damages from being added to the cost of flood control works.  *See Graci,* 456 F.2d at 24.  The goal of the provision was that "at any place where there is damage 'from' or 'by' a flood or flood waters in spite of and notwithstanding federal flood control works no liability of any kind may attach to or rest upon the United States therefor."  *Id.* (quoting *Nat'l Mfg.*); *see also E. Ritter & Co. v. Dep't of the Army,* 874 F.2d 1236, 1239 (8th Cir. 1989) ("the congressional intent of

7

§ 702c was to keep the government entirely free from liability when floods occur, despite attempted control by federal projects); *Valley Cattle Co. v. United States,* 258 F. Supp. 12, 16 (D. Haw. 1966) (§ 702c "was aimed at flooding occurring in areas involved in actual or potential flood control projects.").  From *National Manufacturing Co.* and other cases, the Fifth Circuit concluded that "the purpose of § [702c] was to place a limit on the amount of money that Congress would spend in connection with flood control programs.  Congress undoubtedly realized that the cost of extensive flood control projects would be great and determined that those costs should not have added to them the floodwater damages that might occur in spite of federal flood control efforts."  *Graci,* 456 F.2d at 25; *see also id.* at 25 n.7.  "'[I]mmunity from liability for floodwater damage arising in connection with flood control works was the condition on which the government decided to enter into the area of nationwide flood control programs.'" *Id.* at 26 (quoting *Graci,* 301 F. Supp. at 952).

It was against the backdrop of this broad understanding of the rationale, purpose, and goal of § 702c that the Fifth Circuit framed the question "whether it is it is reasonable to suppose that in exchange for its entry into flood control projects the United States demanded complete immunity from liability for the negligent, and wrongful acts of its employees *unconnected with flood control projects.*"  *Id.* (emphasis in original).  Only by wresting this sentence from its context can LNA plausibly contend that *Graci* would allow liability to be imposed in the present cases, in which floodwater damage "occurr[ed] in spite of federal flood control efforts."  *Id.* at 25.  If, as the *Graci* court concluded, Congress intended § 702c "'to keep the Government entirely free from liability for damages when loss occurs, notwithstanding the works undertaken by the Government to minimize it,'" *id.* at 26 (quoting *Peterson v. United States,* 367 F.2d 271,

276 (9th Cir. 1966)), then the holding of *Graci* could not possibly be "that immunity turns on whether *the government's negligent act* was connected to a flood control project." Opp. at 2 (emphasis in original).

To be sure, the *Graci* plaintiffs had alleged that they incurred floodwater damage as a result of negligence "unconnected with any flood control project," but it was not this allegation alone that led the court to conclude that § 702c "is not applicable to the facts of this case." *Graci,* 456 F.2d at 27.  The flood itself was "unconnected with any flood control project."[2]  *See id.* at 22 ("plaintiffs alleged that the Government's negligence consisted of constructing the outlet 'without taking appropriate steps to impede and head off rising hurricane waters before they reached the residential areas of the surrounding country, and without taking the appropriate steps to build retaining levees to protect the residential areas of the surrounding country from flooding due to hurricane driven waters'"); *Callaway v. United States,* 568 F.2d 684, 686-87 & n.1 (10th Cir. 1978) (distinguishing *Graci* as case that "do[es] not involve flood control projects"); *cf.* Pub. L. No. 89-231, 79 Stat. 1073, 1077 (Oct. 27, 1965) (post-Betsy authorization of LPVHPP ).  Only by recognizing that factual context as a limitation on the holding of *Graci* can the holding be reconciled with the reasoning that undergirds it.  Construing the holding more broadly, to apply in the very different factual situation in which flood damage occurs "'in spite of

---

[2]The same factual situation existed in the cases cited by the Opposition—*Peterson v. United States,* 367 F.2d 271 (9th Cir. 1966); *Valley Cattle Co. v. United States,* 258 F. Supp. 12 (D. Haw. 1966); *Schell v. National Flood Insurers Ass'n,* 520 F. Supp 150 (D. Colo. 1981).  *See* Opp. at 8.  In none of those cases did the plaintiffs "seek to recover damages caused by floods or flood waters which occurred in spite of and notwithstanding the expenditure of federal funds for surveys, etc., and the construction of a levee."  *Peterson,* 367 F.2d at 275.   (*Downs v. United States,* 2007 WL 842136, also cited by LNA, did not involve a flood or floodwaters and is therefore wholly inapposite.)

9

and notwithstanding federal flood control works,'" *Graci,* 456 F.2d at 24 (citation omitted), would give the case an import contrary to both the "rationale," *id.,* and the "purpose," *id.* at 25, of the immunity provision.  Properly understood, then, the teaching of *Graci* is that § 702c provides "immunity from liability for floodwater damage arising in connection with flood control works," *id.* at 26, which is to say, whenever "floodwater damages . . . occur in spite of federal flood control efforts," *id.* at 25.

This reading of *Graci* is confirmed by subsequent authoritative readings of the case by both the en banc Court of Appeals itself and the Supreme Court.  In *James v. United States,* the Fifth Circuit repeatedly cited the case for the proposition that the United States can be held  liable for flood damage "[i]f the flooding is unconnected with flood control projects."  760 F.2d 590, 602 (5th Cir. 1985) (en banc), *rev'd on other grounds,* 478 U.S. 597 (1986); *accord James,* 740 F.2d 365, 369 (5th Cir. 1984) (panel decision vacated upon grant of rehearing en banc).  The Supreme Court also framed the *Graci* holding in terms of the connection between the floodwaters that caused the relevant damage and flood control projects:  "The Federal Government [in *Graci*] contended that § 702c granted immunity from damages caused by any floodwaters, even those unconnected with flood control projects.  The court [of appeals] rejected this argument, and held that the provision conferred immunity only for floods or floodwaters connected with a flood control project."  *James,* 478 U.S. at 601-02 n.2 (emphasis added).

These glosses on *Graci* are fatal to LNA's argument that "under *Graci,* the proper focus is on the government's allegedly negligent conduct."  Opp. at 17.  LNA simply misapprehends the case in asserting that "*Graci's* holding [is] that § 3 turns on whether the act of negligence was done in connection with a flood control project . . . ."  *Id.*  Even though the opinion itself

10

expresses the holding in terms of "negligent and wrongful acts," that particular phraseology was later ignored in favor of the view that, under *Graci,* the application of § 702c turns on "floods or floodwaters" and their connection with flood control projects. *James,* 478 U.S. at 602 n.2.

Notwithstanding the foregoing, LNA's contention that the "negligent and wrongful acts" of the United States" were unconnected with a flood control project does not withstand scrutiny. LNA's argument at this point is again premised on the incorrect factual assumption that the circumstances in the present cases are the same as those in *Graci.   See* Opp. at 16.  In reality, the authorization and construction of the LPVHPP created a connection that did not and could not have existed before the project's inception.  The LPVHPP addressed the threat of hurricane-induced floods in Orleans and St. Bernard Parishes, including specifically the impact of the MRGO on hurricane storm surge. *See, e.g.,* H.R. Doc. No. 89-231 (1965), at 4, 9-10, 17-18.  The assertion that the design, the construction, and the maintenance of the MRGO were unconnected with a flood control project, though certainly true with respect to events that occurred prior to October 27, 1965, is anachronistic with respect to events occurring after that date, when construction of the LPVHPP was authorized.  The connection between the MRGO and the LPVHPP is apparent in LNA's third-party complaints, which repeatedly allege the following:

> As a direct and inevitable result of the arrangement, configuration, and condition of [*inter alia,* the MRGO], the storm surge overtopped the levees and retaining walls in numerous places along the MR-GO, GICW, and IHNC. . . . Those structures were soon overcome, resulting in catastrophic inundation of Orleans and St. Bernard Parishes that would not have occurred but for the existence, design, and deteriorated and eroded condition of the MR-GO and the inadequacies of the levee and retaining wall systems and related structures along the GICW and IHNC.

R.D. 590, ¶ 25.

11

If, as LNA alleges, the LPVHPP was "overcome" by floodwaters as a result of the "arrangement, configuration, and condition" of the MRGO, then it is evident that the challenged conduct, namely, "the defective design, improper construction, and lack of inspection and maintenance of the MRGO," *id.* ¶ 26, was fundamentally connected with a flood control project. If LNA's allegation is true, it reveals a fundamental flaw in the design *of the LPVHPP,* which failed to take into account the deleterious effects of the MRGO.  *See* H.R. Doc. No. 89-231 (LPVHPP report to Congress), at 17 ("Hurricane damages result from surges entering Lake Pontchartrain . . . through improved channels of the Mississippi River-Gulf Outlet and Inner Harbor Navigation Canal. . . . The Mississippi River-Gulf Outlet provides a deep, direct route for the inflow of saline currents from the Gulf of Mexico to the area along its channel and to Lake Pontchartrain . . . . The Gulf Outlet Channel also will produce high velocity currents in the Inner Harbor Navigation Canal, creating a hazard to navigation and causing serious scour and damage . . . ."); *cf.* R.D. 590, ¶ 20 (United States' negligence included "failing to take account of the waterway's inherent and known capability for serving as a funnel or conduit for rapidly-accelerated, storm-driven surges which would magnify the storm surge's force against levees, floodwalls, and spoilbanks").

It is nonsensical to suggest that the alleged negligence ought to be attributed to the pre-existing MRGO, rather than the LPVHPP, which was specifically intended and authorized to address hurricane-induced storm surge.  The levees and floodwalls ought to have been built to withstand the "known" forces "inherent[ly]" generated by the MRGO.  *Id.*  At a minimum, the interplay between the two projects reveals that LNA's attribution of the alleged negligence to the MRGO project rather than the LPVHPP is a facile attempt to avoid the bar of  § 702c, which

12

under even LNA's reading of *Graci* would attach to the design and construction of the LPHVPP.

Even under LNA's reading of *Graci,* LNA's third-party claims against the United States are

barred by § 702c and must be dismissed for lack of subject-matter jurisdiction.[3]

### B. Contrary to LNA's Assertion, § 702c Prevents the United States from Being Liable For Flood Damage that Results from Governmental Negligence.

LNA argues that the United States can be held liable for flood damage caused by MRGO-

related activities and by the construction of levees because those activities are "not the kind of

flood control activity that § [702c] was intended to immunize." Opp. at 18.  According to LNA,

§ 702c "was enacted to prevent the government *from taking on new liability* as a result of actions

_____

[3]As noted above and in the United States' moving papers, it is not clear that *Graci* can be reconciled with *Central Green. See* Mot. at 13-14.  In *Central Green* the Court redirected the focus of the § 702c inquiry away from "the character of the federal project and the purposes it serves" and back to "the character of the waters that cause the relevant damage."  531 U.S. at 434.  In so doing, the Court hewed to the plain meaning of the text of § 702c, which as the Court pointed out, "does not include the words 'flood control project.'"  *Id.*  Contrary to LNA's contention, then, *Central Green* did not "narrow[] the scope of § 3 immunity."  Opp. at 13.  Rather, taking notice of the lower courts' mistaken reliance on "admittedly confusing dicta" in its *James* opinion, the Court in *Central Green* directed courts to "resort to the text of the statute, as illuminated by our holding in *James*" to determine whether *the water* that caused the relevant damage is covered by § 702c.  *Central Green,* 531 U.S. at 431; *accord id.* at 437.

To say that *Central Green* made "connection to a flood control project only one part, rather than all, of what the government had to show to establish immunity, " Opp. at 13, is to mischaracterize the Court's ruling.  The Court flatly stated that "the text of the statute directs us to determine the scope of the immunity conferred, *not by the character of the federal project or the purposes it serves,* but by the character of the waters that cause the relevant damage and the purposes behind their release."  *Central Green,* 531 U.S. at 434 (emphasis added).  The Court held that the application of § 702c turns on "the character of the waters that cause the relevant damage *rather than* a flood control project."  *Id.* at 437 (emphasis added); *see also In re Katrina Canal Breaches Lit.,* — F.3d — , 2200004, at *28 n.16. Under the plain language of § 702c, as construed by the Supreme Court, LNA's third-party claims, which seek to impose liability for "damage from or by floods or floodwaters," must be dismissed.  Regardless of whether this case is controlled by *Graci,* the United States' motion to dismiss should be granted.

13

taken to prevent *natural* flooding for which the government bore no responsibility." *Id.*
(emphasis in original).

The Fifth Circuit rejected this very argument in *Florida East Coast Railway Co. v. United States,* 519 F.2d 1184 (5th Cir. 1975). There it was alleged that "an extraordinarily heavy rainfall" damaged railroad tracks near a flood control project and caused the derailment of a train. *Id.* at 1187-89. Allegedly, "deficiencies in the design of the flood control system," *id.* at 1188, caused the damage by drawing surface-water runoff under the roadbed on which the tracks had been laid, *id.* at 1192. The railway company contended that § 702c did not apply because the provision "insulates the government from liability only with respect to natural, as opposed to artificially precipitated, floods." *Id.* at 1191. The Court of Appeals rejected this argument out of hand, observing that "[t]he federal courts have reached a consensus that the United States is protected from liability for damages caused by 'floods or flood waters' in connection with flood control projects, even when the government's own negligence has caused or aggravated the losses." *Id.* (footnote omitted). Among the cases cited by the Fifth Circuit was *Stover v. United States,* 332 F.2d 204 (9th Cir. 1964), in which the Court of Appeals held that "§ 702c is an immunity statute covering even ordinary negligent construction or maintenance of flood works . . . ." *Id.* at 206; *see also Aetna Ins. Co. v. United States,* 628 F.2d 1201, 1204 (9th Cir. 1980) (collecting cases); *Parks v. United States,* 370 F.2d 92, 93 (2d Cir. 1966).

LNA also mistakenly contends that § 702c does not attach to the alleged flood damage in these consolidated cases because "the MR-GO and the IHNC were man-made navigation channels," not natural waterways such as the Mississippi River. Opp. at 18. But it is far from clear that either the MRGO or the IHNC ought to be regarded as a man-made waterway when the

14

relevant flood damage occurred, since they were permanent in character and had been maintained

for many years before the flood.  *See In re Katrina Canal Breaches Lit.,* — F.3d — , 2200004, at

*18.  Regardless, numerous cases refute the notion that § 702c only provides protection for

flooding from natural waterways.  Chief among them is *Central Green* itself, for the putative

floodwaters at issue there had escaped from the Madera Canal, a man-made waterway whose

purpose was the conveyance and storage of  irrigation waters.  177 F.3d 834, 835 (9th Cir. 1999),

*rev'd,* 531 U.S. 425 (2001); *see also Central Green,* 531 U.S. at 427-28, 435-36; *cf. Central*

*Green,* 531 U.S. at 431 n.7 (*James* "rejected the previously arguable position . . . that the

immunity applied only to the flood control on the Mississippi River authorized by the 1928

Act").  That the water causing the damage had escaped from a canal did not prevent the Supreme

Court from remanding the case for a determination of the "character of the waters" that caused

the damage.  531 U.S. at 437.  Likewise, in *Washington v. East Columbia Basin Irrigation*

*District,* 105 F.3d 517 (9th Cir. 1997), the Ninth Circuit held that § 702c barred a claim of flood

damage even though the damage was caused by flooding that ensued when a retaining wall of an

irrigation canal burst.  *See id.* at 518-20.  And in *Stelly v. United States,* 644 F. Supp 107 (W.D.

La. 1986), the district court applied § 702c to damage that was allegedly caused by the negligent

operation of a lock on the GIWW, which is one of the canals at issue here.  *See Stelly,* 598 F.

Supp. 344, 345 ( W.D. La. 1984), *rev'd,* 770 F.2d 163 (5th Cir. 1985).  As these cases make

clear, § 702c immunity attaches to floods and floodwaters that emanate from man-made as well

as natural waterways.

**C. Section 702c Bars LNA's Claims Because LNA's Damages Were Caused by the Katrina Flood, Which the LPVHPP Was Authorized and Intended to Control.**

LNA's final attempt at avoiding dismissal under § 702c posits "a factual dispute over the extent to which there had been flood control measures at the places from which flooding occurred." Opp. at 19. As a foundation for this argument, LNA alludes to (1) "a 'substantial factual dispute'" in an unrelated case, (2) a reference in a 1988 document to "'[t]he unleveed banks of the MR-GO," and (3) a post-Katrina report that the LPVHPP project was incomplete when Hurricane Katrina struck.[4] *See id.* at 20.

As an initial matter, LNA's argument incorrectly places the burden on the United States to establish that flood control measures were in place at every location from which floodwaters flowed out of the banks that ordinarily contained them. The Flood Control Act is implicated by LNA's third-party complaints, which on their face allege that the relevant damages were caused by floodwaters, indeed floodwaters that levees and floodwalls failed to control. *See* R.D. 590, ¶¶ 14-15, 22-23[5], 25-26, 28-30. LNA has explicitly "aver[red] that plaintiffs' damages, if any, are the result of the USCOE's negligence, errors, acts, and/or omissions in the design, construction, and maintenance of the MR-GO, GICW, IHNC, and their respective levee and retaining wall systems, some or all of which caused or contributed to the multiple levee and retaining wall failures and resulted, in turn, in the injuries and damages (if any) complained of by the plaintiffs

---

[4]LNA also asserts that it is unclear "whether some of the purported 'levees' were simply the spoils of dredging operations, not structures built as part of a flood control project." Opp. at 20. This assertion does not withstand even superficial analysis, as it is based on two documents that merely describe the levees as having been constructed of hydraulic fill and dredging spoils and therefore provide no basis for supposing that the levees, however constructed, were simply the spoils of dredging operations.

[5]Paragraph 23 is erroneously enumerated.

16

in these cases." *Id.* ¶ 30.  Consequently, on the face of LNA's complaints, Flood Control Act

immunity attaches to these waters and bars LNA's claims.  It is LNA's burden, not the United

States', to establish subject matter jurisdiction by showing that 33 U.S.C.§ 702c does not bar its

claims.  *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).  It has failed to do so by

its allusions to an opinion in an unrelated case, a study concluded more than a decade before the

flood at issue here, and a report that the LPVHPP was incomplete when Hurricane Katrina hit.

None of the referenced documents, nor all of them collectively, is sufficient to controvert LNA's

averments.  "Factual assertions in pleadings are judicial admissions conclusively binding on the

party that made them." *White v. ARCO/Polymers, Inc.,* 720 F.2d 1391, 1396 (5th Cir.1983); *see

also Morales v. Dep't of the Army,* 947 F.2d 766, 769 (5th Cir.1991); *Davis v. A.G. Edwards &

Son, Inc.,* 823 F.2d 105, 108 (5th Cir.1987).  And in any case, none of the documents referenced

by LNA establishes that "flood control measures" were not located "at the places from which

flooding occurred."  Opp. at 19.  For this reason alone, LNA's argument fails.

   Second, LNA's argument fails because it assumes that a dispute over whether flood

control measures were located at every place where waters escaped their normal confines would

create a genuine issue of *material* fact.  Any such disputed fact would be immaterial. Whether

flooding came through breaches or gaps other than the breach putatively caused by the Ingram

barge is immaterial, because LNA's claims are indemnity or contribution claims.  R.D. 590,  ¶

31.  Any liability of the United States to LNA, then, is coterminous with LNA's liability to the

plaintiffs, *see id.*; *Naquin v. La. Power & Light Co.,* 951 So.2d 228, 231 (La. Ct. App. 2006);

*Truxillo v. Gentilly Med. Bldg., Inc.,* 225 So.2d 488, 495 (La. Ct. App. 1969), and the plaintiffs

are claiming damage solely from flooding that resulted from a single breach, the breach in the

IHNC floodwall allegedly caused by the barge.  *See Benoit* Complaint ¶ 10; *Mumford* Complaint ¶ 7.  Accordingly, even if LNA were able to show that some floodwaters flowed through gaps in the LPVHPP not caused by Hurricane Katrina, or were able to create a dispute concerning the existence of flood works at breaches or gaps other than the breach through which the barge passed, any such dispute would be irrelevant to the pending motion to dismiss, which is based on the character of the waters that flowed through a single breach—the breach in the IHNC floodwall in the Lower Ninth Ward, which was allegedly created by the Ingram barge that was in LNA's possession and control when the storm struck.

Finally, the motion to dismiss should be granted because the "sweeping" retention of sovereign immunity in the Flood Control Act, 33 U.S.C. § 702c must be construed broadly, "to ensure beyond doubt" that the United States is protected "from 'any' liability associated with flood control." *James,* 478 U.S. at 608.  Indisputably, the flood and floodwaters at issue in this case were the very object at which the LPVHPP was directed.  The project was authorized "for hurricane-flood protection on Lake Pontchartrain, Louisiana, . . . substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 231, Eighty-ninth Congress."  Pub. L. No. 89-298, 79 Stat. 1073, 1077 (1965).  The referenced House Document makes clear that this project was intended to protect against hurricane-induced flooding of the Lower Ninth Ward and St. Bernard Parish.  *See, e.g.,*  H.R. Doc. No. 89-231 (1965), at ix, 2 , 7, 10, 28.  Therefore, even if, as LNA contends, the project was incomplete when Hurricane Katrina struck, Opp. at 20, it would be incompatible with § 702c and inimical to the intent of Congress to hold that liability can "attach to or rest upon the United States for any damage from or by floods or flood waters" in the very place that Congress sought to protect when it authorized the

LPVHPP.  *See E. Ritter & Co.,* 874 F.2d at 1239; *Graci,* 456 F.2d at 24-26; *Nat'l Mfg. Co.,* 210 F.2d at 270-71.  As the Fifth Circuit has expressly recognized, "the United States is protected from liability for damages caused by 'floods or flood waters' in connection with flood control projects . . . ."  *Fla. E.C. Ry,* 519 F.2d at 1191.

Undoubtedly, the damages at issue in these consolidated cases were caused by a flood and its floodwaters "in connection with" a flood control project.  That the Katrina flood occurred "'in spite of and notwithstanding federal flood control works,'" *Graci,* 456 F.2d at 24 (citation omitted), is too well known to be subject to dispute, *see Preston v. Tenet Healthsys. Mem. Med. Ctr.,* 485 F.3d 804, 817 & n.6.  LNA has moreover admitted the relevant facts:

> At some point while or shortly after Hurricane Katrina passed through the Greater New Orleans metropolitan area on August 29,2005, the barge ING 4727 broke free from her moorings on the Inner Harbor Navigation Canal and was drawn through a pre-existing breach in the east side retaining wall.  Flooding of the adjacent neighborhoods occurred . . . due to multiple failures of the MR-GO levees and of levees and retaining wall and related structures on and around both the GICW and IHNC, none of which was occasioned or caused by the barge ING 4727.  To the extent that human factors played any part in causing the alleged damages, such alleged damages were caused by the defective design, improper construction, and improper inspection and maintenance of the MR-GO itself and of its levees, GICW levees and retaining wall structures, and of the IHNC levee structures, retaining walls (including I-walls), and related structures, by the U.S. Army Corps of Engineers . . . .

R.D. 597 (LNA Answer), ¶¶ 9, 10.

Under the circumstances admitted by LNA and widely known throughout the jurisdiction of this Court, the Flood Control Act of 1928, 33 U.S.C. § 702c, bars LNA's claims, and the United States' motion to dismiss should therefore be granted.

**II.  This Court Lacks Subject-Matter Jurisdiction Over LNA's Little Tucker Act Claims.**

"Federal courts are courts of limited jurisdiction having subject matter jurisdiction only over those matters specifically designated by the Constitution or Congress." *Johnson v. United States,* 460 F.3d 616, 621 n.6 (5th Cir. 2006).  This fundamental principle necessarily implies the corollary principle that "[f]ederal courts, both trial and appellate, have a continuing obligation to examine the basis for their jurisdiction. The issue may be raised by parties, or by the court *sua sponte,* at any time." *MCG, Inc. v. Great W. Energy Corp.,* 896 F.2d 170, 173 (5th Cir. 1990). Determining jurisdiction over the subject matter of a case is a threshold matter that must be resolved before the court may proceed with the merits of an action.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998); *see also FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Despite these foundational precepts, LNA argues that this Court may *not* determine the basis for its jurisdiction if "doing so . . . require[s] the Court to consider whether LNA has a valid cause of action against the government."  Opp. at 22.  LNA's argument, which flies in the face of controlling legal authority, betrays its desperate desire to stave off dismissal, indeed, the dismissal for lack of subject-matter jurisdiction that is inevitable because LNA's takings claims are so facially insubstantial as to make their establishment an impossibility.  The utter lack of merit in LNA's legal characterization of its claims makes this outcome inevitable.  Because LNA's argument rests on a legal characterization that cannot be sustained on the face of the complaints, the Court need not delay dismissal.

"The well-pleaded complaint rule . . . provides that the plaintiff's properly pleaded complaint governs the jurisdictional determination, and if, on its face, such a complaint contains no issue of federal law, then there is no federal question jurisdiction."  *Aaron v. Nat'l Union Fire*

*Ins. Co.,* 876 F.2d 1157, 1160-61 (5th Cir. 1989); *see also Howery v. Allstate Ins. Co.,* 243 F.3d

912, 917 (5th Cir. 2001); *Kawa v. United States,* 77 Fed. Cl. 294, 298 (Ct. Fed. Cl. 2007).

Jurisdiction is determined upon the allegations of the complaint, "not upon the facts as they may

turn out, or by a decision of the merits." *Levering & Garrigues Co. v. Morrin,* 289 U.S. 103, 105

(1933) (citation omitted).

> If . . . the complaint sets forth a substantial claim, a case is presented within the
> federal jurisdiction, however the court, upon consideration, may decide as to the
> legal sufficiency of the facts alleged to support the claim. But jurisdiction, as
> distinguished from merits, is wanting where the claim set forth in the pleading is
> plainly unsubstantial.

*Id.* LNA's reliance on *Montez v. Department of the Navy*, 392 F.3d 147 (5th Cir. 2004), is

misplaced, Opp. at 21, because the pending motion is based solely on the factual allegations in

LNA's third-party complaints, and the facts necessary to establish a claim under the Fifth

Amendment have not been pled.  There is therefore no need to find any facts or to resolve any

factual dispute, much less a dispute that would be relevant to both the merits and the

jurisdictional issues.  "Dismissal for lack of subject-matter jurisdiction because of the inadequacy

of the federal claim" is appropriate because LNA's takings claim "is 'so insubstantial,

implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit

as not to involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89

(1998) (quoting *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666 (1974)).

Further, LNA argues baselessly that the Constitution gives LNA standing to assert an

indemnity claim derivative of the plaintiffs' property rights.  The Constitution does not create or

protect any such derivative interest, however, and it is undisputed that LNA is not attempting to

enforce any right directly conferred upon it by the Constitution.  LNA has therefore failed to

21

allege the bare minimum elements of a claim within this Court's jurisdiction under the Little Tucker Act.

LNA's procedural arguments are equally mistaken. *See* Opp. at 21. The Federal Rules of Civil Procedure do not prohibit the filing of a motion to dismiss on grounds other than subject matter jurisdiction after an answer has been filed. A party is authorized to make a motion under Rule 12(h)(2) raising "any defense or objection then available to the party which this rule permits to be raised by motion" notwithstanding the omission of such defense or objection in a prior motion. Fed. R. Civ. P. 12(g); *cf.* Fed. R. Civ. P. 12(h)(2) (defense of failure to state claim may be made by motion for judgment on the pleadings); *In re Katrina Canal Breaches Consolidated Litigation*, 2007 WL 763742 at *3 (E.D. La. Mar. 9, 2007) (motion for judgment on pleadings is decided under same standard as motion under Rule 12(b)(1)); *S.E.C. v. Jorissen*, 470 F. Supp. 2d 764, 769-70 (E.D.Mich. 2007) (same); 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1367, at 218 (3d ed. 2004) (same). Even if the Court were to find that the jurisdictional issues are intertwined with the merits of the cause of action, the Court would be nonetheless empowered to dispose of LNA's claims under Rule 12(b)(6) or Rule 56, Fed. R. Civ. P. *See Hix v. U.S. Army Corps of Eng'rs*, 155 Fed. Apx. 121, 128 n.8 (5th Cir. 2005); *Montez*, 392 F.3d at 150; *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).

**A. LNA Lacks Standing to Assert the Claims it Alleges**

The Little Tucker Act, 28 U.S.C. § 1346(a)(2), provides a waiver of the United States' immunity for certain claims, but it does not create any substantive rights. *United States v. Mitchell*, 463 U.S. 206, 216 (1983); *Travelers Indem. Co. v. United States*, 72 Fed. Cl. 56, 59 (Ct. Fed. Cl. 2006). In order to assert a cognizable claim pursuant to the Little Tucker Act, a

party must allege a substantive right founded upon "the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1346(a)(2); *see also Mitchell*, 463 U.S. at 216; *Travelers Indem. Co.*, 72 Fed. Cl. at 59. For the substantive basis of its Little Tucker Act claims, LNA relies on the Takings Clause of the Constitution's Fifth Amendment. The Takings Clause, however, does not itself provide a right to indemnity. And, in order to establish a substantive right under the Takings Clause, "a plaintiff must initially show standing, including proof of personal injury, that is, the requisite interest in the property at issue and the deprivation thereof by the United States." *Maniere v. United States*, 31 Fed. Cl. 410, 420 (Ct. Fed. Cl. 1994); *see also Murray v. United States*, 817 F.2d 1580, 1583 (Fed. Cir. 1987) ("[O]nly one possessing an ownership interest in the real property at the time of the taking is entitled to receive the required compensation.").

As explained in the United States' opening memorandum, the property alleged by LNA to have been "taken" is that of *the plaintiffs*. Mot. at 22-24; R.D. 590, (Third-party Complaint) ¶ 32 ("The United States' actions . . . effectively destroyed the plaintiffs' property . . . entitling the owner of each such damaged property to 'just compensation' . . . ."). LNA has not alleged its own interest in property on which a takings claim could be based. Rather, it is the plaintiffs' ownership interests and corresponding constitutional rights that form the basis of LNA's takings claims. Ordinarily, "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991); *see also Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004); *Warth v. Seldin*, 422 U.S. 490, 499 (1975). LNA baldly asserts that it "is the party who has standing to assert a claim for indemnity or contribution." Opposition at 23. However, LNA makes no showing that it has

standing to assert a claim under the Fifth Amendment Takings Clause on an indemnity theory for an alleged deprivation of *the plaintiffs'* property.

"'Standing is the determination of whether a specific person is the proper party to bring a particular matter to the Court for adjudication.'" *Benjamin v. Aroostook Med. Ctr., Inc.*, 57 F.3d 101, 104 (1st Cir. 1995) (quoting Erwin Chemerinsky, *Federal Jurisdiction* § 2.3, at 48 (1989)). In order to bring an action on behalf of a third party, a litigant must satisfy "three important criteria." *Powers*, 499 U.S. at 410-11. First, "the litigant must have suffered 'an injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute;" second, "the litigant must have a close relation to the third party;" and third, "there must exist some hindrance to the third party's ability to protect his or her own interests." *Id.* (citations omitted).

It is apparent that LNA cannot satisfy these criteria. Even assuming LNA's exposure to liability would suffice as an "injury in fact," the remaining elements plainly are not met. There is no "commonality and congruence" of interests such that LNA is "'fully, or very nearly, as effective a proponent of the right'" as the plaintiffs. *Okpalobi v. Foster*, 190 F.3d 337, 352 (5th Cir. 1999) (quoting *Powers*, 499 U.S. at 413). Indeed, as adversaries in litigation, the relationship between LNA and plaintiffs is the opposite of what is required to establish third-party standing. The final criteria requires a showing "that some barrier or practical obstacle (*e.g.*, third party is unidentifiable, lacks sufficient interest, or will suffer some sanction) prevents or deters the third party from asserting his or her own interest." *Benjamin*, 57 F.3d at 106. With the plaintiffs here having initiated suit against LNA, no barrier to their ability to assert their own rights exists.

In its opposition, LNA argues that, rather than the *plaintiffs' property* referenced in its third-party complaints, the takings claims are based on LNA's own property interest in the *money* that LNA would pay to plaintiffs should LNA be held liable to them.  Opp. at 23 ("LNA's position is that the Takings Clause also creates a constitutional claim for indemnity or contribution in favor of any other party who is required to pay that just compensation on the government's behalf.").  This argument is meritless for several reasons.  First, LNA cannot defeat a motion to dismiss based on an argument not supported by the allegations of its third-party complaints.  Second, LNA cites no authority to support its position that the Constitution creates a claim for indemnity or contribution or that by paying a tort judgment against it, LNA would be paying any compensation "on the government's behalf."  LNA's only attempt to cite authority is by analogy to claims for "illegal exaction" and "subrogation."  These contract-based theories do not support the recognition of a constitutional claim for indemnity or contribution that LNA seeks.

An "illegal exaction" "involves money that was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation."  *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005).  In contrast to a claim based on the Takings Clause of the Fifth Amendment, "illegal exaction involves deprivation of property without due process of law, in violation of the Due Process Clause of the Fifth Amendment."  *Id.*  Tucker Act jurisdiction over an illegal exaction claim exists only "when the exaction is based upon an asserted statutory power."  *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996).  Additionally, it is a jurisdictional prerequisite that "'the government [action] has direct

and substantial impact on the plaintiff asserting the claim.'"  *Norman*, 429 F.3d at 1096 (quoting

*Casa de Cambio Comdiv v. United States*, 291 F.3d 1356, 1364 (Fed. Cir. 2002)).

LNA's theory is far too attenuated for the principle of illegal exaction to have any

application to the facts here.  LNA cites the Takings Clause as the source of the "illegal

exaction," but should LNA pay any money to the plaintiffs, the Takings Clause would not be the

direct cause of the "exaction."  Rather, the direct cause of any payment by LNA to the plaintiffs

would be as a result of a judgment entered by this Court.  Indeed, even the judgment against

LNA would not result from the Takings Clause, as plaintiffs' claims against LNA are based in

tort.  LNA's arguments regarding illegal exaction are misplaced.[6]

LNA makes a second argument that it "has standing to assert the plaintiffs' takings claims

acquired by way of subrogation."  Opp. at 25.  Again, LNA's third-party complaints make no

allegations regarding subrogation, and nothing in the complaints could be construed to create a

relationship whereby LNA would be subrogated to the rights of the plaintiffs.  For this reason

alone, LNA's argument is without merit.  Further, LNA offers no support for its subrogation

---

[6] The cases cited by LNA do not support LNA's arguments, nor do they involve facts analogous to the facts here.  *See Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1578 (Fed. Cir. 1996) (holding that "the Tucker Act provides jurisdiction to recover the sums exacted illegally by the [Immigration and Naturalization] Service due to its misinterpretation or misapplication of statutes, regulations, or forms;" no constitutional basis for the airlines' claims was raised); *Eastport Steamship Corp. v. United States*, 372 F.2d 1002, 1009-13 (Ct. Cl. 1967) (finding that the claim for compensation for business losses was based in tort; rejecting both illegal exaction and Fifth Amendment takings theories; and holding that "[t]here is no decision . . . holding or intimating that the United States will be liable under the Tucker Act for [a business loss] resulting from a failure or wrong done in the course of the regulatory process").

26

theory.  Whether the principle of subrogation exists—either under Louisiana or maritime law—is

irrelevant to LNA's third-party claims against the United States.[7]

      Subrogation is an equitable doctrine through which one party assumes the rights of

another, either by contract or through express acts of the parties involved.  *Black's Law*

*Dictionary* (8th ed. 2004).

> Subrogation, as a matter of right, independently of agreement, takes place only for
> the benefit of insurers; or of one who, being himself a creditor, has satisfied the
> lien of a  prior creditor; or for the benefit of a purchaser who has extinguished an
> incumbrance upon the estate which he has purchased; or of a co-obligor or surety
> who has paid the debt which ought, in whole or in art, to have been met by
> another.

*Aetna Life Ins. Co. of Hartford v. Town of Middleport*, 124 U.S. 534, 549 (1888).  *See also*

*Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1160 (Fed. Cir. 1985) ("A suretyship is the

result of a three-party agreement, whereby one party (the surety) becomes liable for the

principal's or obligor's debt or duty to the third party obligee . . . . [N]o suretyship *exists* in the

absence of any of the three parties.").  LNA makes no allegation of an agreement or contract

establishing a right to subrogation, nor are there allegations in the third-party complaints to

---

[7] None of the subrogation cases cited by LNA involves a third-party indemnity claim
based on the Takings Clause; instead, the cases involve subrogation in connection with
contractual relationships.  *See United States v. Aetna Cas. & Surety Co.*, 338 U.S. 366, 373-76
(1949) (involving insurance companies' ability to bring in their own name FTCA claims to
which they had become subrogated by payment to an insured); *Ins. Co. of the West v. United
States*, 243 F.3d 1367 (Fed. Cir. 2001) (analyzing whether the government's consent to suit on a
contract includes consent to suit brought by a subrogee); *Monarch Ins. Co. of Ohio v. District of
Columbia*, 353, F. Supp. 1249, 1252-53 (D.D.C. 1973) (dismissing claims brought by insurance
company plaintiff subrogated to rights of its insureds; "plaintiff's allegations in the instant case
do not set forth any ground for recovery of compensation from the government based on a taking
of property for public use").  LNA's discussion of the Anti-Assignment Act likewise is
irrelevant.

support such a relationship between the parties; LNA is not an insurer, creditor, co-obligor, or surety.

LNA alleges *indemnity* claims, and LNA has pointed to no authority to show that the Constitution allows a third-party plaintiff to assert a claim for indemnity based on the Takings Clause where the third-party plaintiff does not own the property at issue.[8]  "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."  *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).  Dismissal for lack of subject matter jurisdiction should be the result here, as LNA's third-party complaints lack allegations to establish standing to bring a third-party claim pursuant to the Fifth Amendment.

## B.  LNA's Third-party Complaints Set Forth Tort Claims Rather than Takings Claims.

The Little Tucker Act explicitly excludes cases "sounding in tort" from its waiver of immunity.  28 U.S.C. § 1346(a)(2).  As the United States' opening memorandum explained (at 26-27), it is well-established in takings jurisprudence that a claim for taking by flooding requires a showing that flooding is "intermittent, frequent, and inevitably recurring."  *Cooper v. United States*, 37 Fed. Cl. 28, 36 (Ct. Fed. Cl. 1996); *Hendricks v. United States*, 14 Cl. Ct. 143, 149 (Cl. Ct. 1987); *Singleton v. United States*, 6 Cl. Ct. 156, 162 (Cl. Ct. 1984).  Where flooding is not alleged to occur with the frequency necessary to establish a taking, it "occupies the category of mere consequential injury, or tort."  *Barnes v. United States*, 538 F.2d 865, 870 (Ct. Cl. 1976);

---

[8] LNA's citations to cases allowing indemnity actions pursuant to the Tucker Act all involve *contract* claims.

*see also Baird v. United States*, 5 Cl. Ct. 324, 328 (Cl. Ct. 1984); *Singleton*, 6 Cl. Ct. at 162-63;

*National By-Products, Inc. v. United States*, 405 F.2d 1256, 1273 (Ct. Cl. 1969).

LNA's opposition acknowledges that its third-party complaints include only one sentence

that references recurrent flooding, but LNA argues that this sentence is sufficient to allege its

claims under the notice pleading standard of Rule 8(a):  "The United States' actions and/or

inactions, described in paragraphs I - XXXI above, effectively destroyed the plaintiffs' property

resulting in a permanent taking and/or inevitably recurring inundation, which is equivalent to a

permanent taking . . . ."  R.D. 590, ¶ 32; *see also* Opp. at 28.  LNA's only reference to recurrent

flooding is no more than a conclusory recitation of the cause of action.  In contrast to factual

allegations, a pleading's conclusory allegations and legal conclusions are not entitled to

deference. *Jeanmarie v. United States*, 242 F.3d 600, 602-603 (5th Cir. 2001) (citing *Blackburn

v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995)).  The Supreme Court has recently

explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Bell Atlantic Corp. v. Twombly*, — U.S. — , 127 S. Ct. 1955, 1964-65

(2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)) ("on a motion to dismiss, courts 'are

not bound to accept as true a legal conclusion couched as a factual allegation'").  LNA's single

reference to "inevitably recurring inundation" does not meet the "minimum standard of adequate

pleading to govern a complaint's survival." *Twombly*, 127 S. Ct. at 1968-69.

LNA argues that "additional facts" setting forth a claim for recurrent flooding are

sufficiently alleged by the reference to the preceding paragraphs of the third-party complaints.

But there is *only one flood* discussed in paragraphs 1 through 31:  the flood caused by Hurricane

Katrina.  Additionally, those paragraphs set forth LNA's numerous allegations of negligence and wrongdoing that form the basis of its tort claims, which only further evidences the fact that LNA's "takings" claims are based in tort and outside the jurisdiction of the Little Tucker Act. *See Cottrell v. United States*, 42 Fed. Cl. 144, 149 (Ct. Fed. Cl. 1998) ("Even where the claim is framed under non-tort law, the court lacks jurisdiction if the essence of the claim lies in tort.").

The Court of Federal Claims has recently issued an opinion analyzing whether plaintiffs could assert a Fifth Amendment taking claim pursuant to the Tucker Act for flood damages suffered during Hurricane Katrina.  *Nicholson v. United States*, — Fed. Cl. — , 2007 WL 2206857 (Ct. Fed. Cl. July 27, 2007).  The Court of Federal Claims' analysis in *Nicholson* leaves no doubt that LNA's "takings" claims sound in tort and cannot be maintained under the Little Tucker Act.

Like LNA's allegations, in *Nicholson*, "[t]he primary basis of each of the [plaintiffs'] claims [was] that the flood control system in New Orleans was defectively designed and constructed and was maintained improperly by the Defendants."  *Id.* at 9.  The Court found several reasons why the plaintiffs' taking action could not be sustained.  The Court's analysis began with the accepted *Ridge Line* two-part inquiry for assessing whether alleged actions state a claim for inverse condemnation or sound in tort.  *See Ridge Line, Inc. v. United States*, 346 F.3d 1346 (Fed. Cir. 2003).  This inquiry first requires an assessment of whether the flooding was the "direct, natural, or probable result" of the government's authorized activity.  The *Nicholson* Court found "no indication that either the hurricane, storm surge or flood waters, were conditions initially set in motion by the construction of floodwalls."  2007 WL 2206857 at 18; *see also id.* at 17 ("Even if Plaintiffs could prove that the Corps' installation of floodwalls contributed to the

hurricane's destruction, it would not follow that the flooding was 'directly attributable' to the Corps' protective measures, as opposed to the severe nature of the storm."). The second element of the *Ridge Line* inquiry requires an assessment of the frequency of the alleged flooding to determine "whether the Corps' interference with property rights 'was substantial and frequent enough to rise to the level of a taking.'" *Id.* at 19 (quoting *Ridge Line*, 346 F.3d 1357). The Court acknowledged that "Hurricane Katrina [was] a unique and isolated atmospheric phenomenon which caused unprecedented flooding," and, further, that because of "remedial actions following Hurricane Katrina . . . the situation 'on the ground' has changed such that we could never replicate the circumstances of the Katrina flood." *Id.* at 19-20. To establish a takings claim by flooding, a plaintiff must show "the persistent threat of 'repeated invasions of the same type.'" *Id.* at 19 (quoting *Ridge Line*, 345 F.3d at 1357).[9] Because the "flooding was the result of the hurricane" and not directly caused by the government's activity, *id.* at 17, and because the plaintiffs had not alleged and could not establish recurrent flooding with the frequency necessary for a taking, the Court concluded that "[a]s tragic as they may be, the damages suffered by Plaintiffs appears to fall into 'the category of mere consequential injury, or tort.'" *Id.* at 20 (quoting *Ridge Line*, 345 F.3d at 1355).

---

[9] For this reason, LNA's argument that it may satisfy its obligation to allege recurrent flooding by asking the Court to take judicial notice of the 1965 flood caused by Hurricane Betsy must fail. First, LNA does not allege that the properties involved in this action were in fact flooded by Hurricane Betsy. But, moreover, just as the change in the situation "on the ground" now from when Katrina struck in 2005 prevents a showing of "repeated invasions of the same type," *Ridge Line*, 345 F.3d at 1357, the situation on the ground in 1965 during Hurricane Betsy and prior to construction of any flood protection system was vastly different than in 2005. Thus, even taking judicial notice of Hurricane Betsy's flooding does not aid LNA in satisfying the elements of a claim for taking by flooding.

In addition to its *Ridge Line* inquiry, the *Nicholson* Court noted several other reasons why the plaintiffs' allegations did not amount to a taking.  First, the plaintiffs had not identified "an affirmative act by the Government, as opposed to a broader failure on the part of the Corps to fulfill its duties."  *Id.* at 21.  Second, assessing plaintiffs' allegations of inadequate or defective design of the flood protection structures, the Court found "no authoritative takings guidance . . . that grants relief for omissions, oversights, or bad decisions."  *Id.*  Rather than allegations "that the Government should have done more to protect the public," plaintiffs needed to "demonstrate that the Corps erected floodwalls that will *inevitably* cause damage to their property."  *Id.* at 21-22; *see also Sanguinetti v. United States*, 264 U.S. 146, 149 (1924) (requiring that flooding "be the direct result of the structure, and constitute an actual, permanent invasion of the land").  Third, plaintiffs did not establish an "intent to convert Plaintiffs' property to a public use."  *Id.* at 24; *see also id.* at 23 ("where the government neither diverts flood waters onto a plaintiff's property nor creates a greater threat of damage to that property, there is no intent to convert it to public use").  Finally, the *Nicholson* Court found that the plaintiffs' claims were based on a failure to adequately protect the plaintiffs' properties, and held that "[a]ny challenge to the Corps' choice of its hurricane protection scheme cannot be heard" under the Court's Tucker Act jurisdiction.  *Id.* at 25-26 (citing *United States v. Sponebarger*, 308 U.S. 256, 265 (1939) ("When undertaking to safeguard a large area from existing flood hazards, the Government does not owe compensation under the Fifth Amendment to every landowner which it fails to or cannot protect.")).

For the same reasons identified by the *Nicholson* Court, LNA's allegations sound in tort, and the third-party complaints do not allege a takings claim within this Court's jurisdiction pursuant to the Little Tucker Act.

## C. LNA's Claims Exceed the Little Tucker Act's $10,000 Jurisdictional Limit

The District Court's jurisdiction over a Little Tucker Act claim is limited to $10,000, and the requirement that a plaintiff plead a claim within this limitation is "stringent."  R.D. 587 (Order & Reasons), at 11.  LNA argues it has set forth claims within this jurisdictional limit because it has limited its claims to $10,000 per plaintiff (and potential class action plaintiff). This argument is fallacious because LNA has asserted a single indemnity claim in each action, rather than separate claims.  Each claim therefore exceeds $10,000, and LNA errs in suggesting that it can split its claims or redefine them to mask the true value of each claim.

It is true that a plaintiff, or a third-party plaintiff, may waive any recovery to which it may otherwise be entitled in excess of $10,000 in order to establish jurisdiction under the Little Tucker Act.  It is also true that where separate claims could be brought individually, their joinder in one action is permissible, even if the total amount of the several claims exceeds $10,000, as long as each claim individually satisfies the Little Tucker Act jurisdictional requirements.  But by arguing that it is entitled to a $10,000 recovery "per plaintiff," LNA attempts to split the indemnity claim in each action into multiple claims.  This is impermissible:  if LNA brought an indemnity action based only on its liability to a single plaintiff, it would not later be permitted to bring additional indemnity actions with respect to the other plaintiffs.  Any subsequent indemnity action arising out of the same transaction through which LNA's liability initially was imposed would be precluded by principles of *res judicata*.  For this reason, LNA's attempt at claim

33

splitting here, by seeking a recovery "per plaintiff," which it could not do through separate actions, cannot be permitted.

In each of the cases cited by LNA where separate claims were permitted to be aggregated, the claims involved were considered separate and distinct from one another because each individual claim involved a separate contract. *See Alaska Airlines v. Austin*, 801 F. Supp. 760, 762 (D.D.C. 1992) ("The plaintiffs' claims are based on their contracts with the defendants to provide air travel for individual government travelers, i.e. the tickets they sold. Each contested overcharge is based on a single ticket and is for less than $10,000."); *In re All Asbestos Cases*, 603 F. Supp. 599 (D. Haw. 1984) ("manufacturers assert claims for contractual indemnification"); *Schowalter v. United States Army*, 2000 U.S. Dist. LEXIS 21905 (N.D. Ga. Aug. 9, 2000) ("Where separate and individual contract claims are asserted under the Tucker Act and no single contract claim seeks in excess of $10,000, the district courts may exercise jurisdiction."). These individual claims, therefore, did not arise out of the same transaction, and while they were permitted to be joined, joinder was not required.

The reason LNA's arguments must fail is apparent from *res judicata* principles and the general prohibition on "claim splitting." "*Res judicata*, also known as claim preclusion, forecloses litigation of matters that (1) have previously been litigated, or (2) have never been litigated but should have been advanced in an earlier suit." *Super Van Inc. v. City of San Antonio*, 92 F.3d 366, 370 (5th Cir. 1996). The Fifth Circuit's test for when a claim is precluded requires that: "'(1) The parties be identical in both suits, (2) A court of competent jurisdiction rendered the prior judgment, (3) There was a final judgment on the merits in the previous decision, and (4) The plaintiff raises the same cause of action or claim in both suits.'" *Id.*

34

(quoting *Matter of Howe*, 913 F.2d 1138, 1143044 (5th Cir. 1990)); *see also Travelers Ins. Co. v. St. Jude Hospital of Kenner, La.*, 37 F.3d 193, 195 (5th Cir. 1994) ("Under [the transactional] test, the critical issue is not the relief requested or the theory asserted but whether [the] plaintiff bases the two actions on the same nucleus of operative facts."); *Ocean Drilling & Exploration Co. Inc. v. Mont Boat Rental Servs., Inc.*, 799 F.2d 213, 217 (5th Cir. 1986) (adopting transactional test of the Restatement (Second) of Judgments to determine whether suits involve the same claim). Additionally, "claims that were not actually litigated" are barred if "they 'could and should' have been brought in the earlier suit." *Id.* "A main purpose behind the rule preventing claim splitting is to protect the defendant from being harassed by repetitive actions based on the same claim." *Super Van*, 92 F.3d at 371.

Given that the prohibition on claim splitting would prevent LNA from bringing individual indemnity actions "per plaintiff," LNA should not be able to evade this principle by seeking multiple recoveries "per plaintiff" in a single action. Cases permitting multiple Little Tucker Act claims in one action where the total damages exceed $10,000 without defeating jurisdiction all involve claims could have been brought individually, in separate actions. The principles of claim preclusion and res judicata show that LNA would not be permitted to bring individual indemnity actions ("per plaintiff") sequentially. Each of LNA's third-party complaints sets forth a single indemnity claim. To come within the Little Tucker Act's jurisdictional limitation, the total damages sought by LNA in each action must not exceed $10,000 because LNA has only a single claim in each one, regardless of the number of plaintiffs to whom LNA could conceivably be liable. Because LNA's third-party complaints expressly seek $10,000 for each named and

35

unnamed plaintiff, the complaints are beyond this Court's Little Tucker Act jurisdiction and must

be dismissed.

## CONCLUSION

For these reasons, the United States' motion to dismiss should be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

s/ Robin D. Smith
ROBIN D. SMITH
Senior Trial Counsel
KARA K. MILLER
Trial Attorney, Torts Branch, Civil Division
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 616-4448 / (202) 616-5200 (Fax)
Attorneys for the Defendant United States

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 24, 2007, I served a true copy of the foregoing United States'

Reply Memorandum upon all counsel of record by ECF.


<u>s/ Robin D. Smith</u>
Robin D. Smith