1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE: KATRINA CANAL BREACHES  *   Civil Action
          CONSOLIDATED LITIGATION  *   No. 05-CV-4182
6                                  *
                                   *   Section K
7   _____ *
                                   *   New Orleans, Louisiana
8   PERTAINS TO:                   *   March 7, 2008
                                   *
9   *Parfait* C.A. No. 07-3500      *
    MR-GO and BARGE                *
10  *******************************

11                  STATUS CONFERENCE BEFORE THE
12              HONORABLE STANWOOD R. DUVAL, JR.
            UNITED STATES DISTRICT JUDGE AND THE
13            HONORABLE JOSEPH C. WILKINSON, JR.
                UNITED STATES MAGISTRATE JUDGE
14

15

16  APPEARANCES:

17

    For Lafarge North              Goodwin Procter, L.L.P.
18  America:                       BY:  JOHN ALDOCK, ESQ.
                                   901 New York Avenue, NW
19                                 Washington, D.C. 20001

20
    For Lafarge North              Chaffe, McCall, Phillips,
21  America:                            Toler & Sarpy
                                   BY:  DEREK WALKER, ESQ.
22                                 1100 Poydras Street, Suite 2300
                                   New Orleans, Louisiana 70163

23

24  For New Orleans Levee          McCranie, Sistrunk, Anzelmo,
    District:                           Hardy, Maxwell & McDaniel
25                                 BY:  THOMAS P. ANZELMO, ESQ.
                                   3445 N. Causeway Blvd., Suite 800

            JODI SIMCOX, RMR - OFFICIAL COURT REPORTER
                 UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA

```
 1                                    Metairie, Louisiana 70002
     APPEARANCES:
 2

 3   For Washington Group           Stone Pigman Walther,
     International:                   Wittmann & Hutchinson
 4                                   BY: WILLIAM D. TREEBY, ESQ.
                                     546 Carondelet Street
 5                                   New Orleans, Louisiana 70130

 6
     For BARGE:                      BRIAN ARTHUR GILBERT, ESQ.
 7                                   821 Baronne Street
                                     New Orleans, Louisiana 70113
 8

 9   For MR-GO:                      The Andry Law Firm
                                     BY: JOHNATHAN ANDRY, ESQ.
10                                   610 Baronne Street
                                     New Orleans, Louisiana 70113
11

12   For American Club:             Montgomery, Barnett, Brown,
                                      Read, Hammond & Mintz
13                                   BY:  PHILIP S. BROOKS, JR., ESQ.
                                     1100 Poydras Street, Suite 3200
14                                   New Orleans, Louisiana 70163

15
     For the United States:         U.S. Department of Justice
16                                   BY: ROBIN D. SMITH, ESQ.
                                     Torts Branch, Civil Division
17                                   P.O. Box 888
                                     Benjamin Franklin Station
18                                   Washington, D.C.  20044

19

20   Official Court Reporter:       Jodi Simcox, RMR
                                     500 Poydras Street, Room HB-406
21                                   New Orleans, Louisiana 70130
                                     (504) 589-7780
22

23

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer.
```

1                    <u>**PROCEEDINGS**</u>

2                   **(March 7, 2008)**

3          **THE COURT:**  Good morning.

4          **MR. TREEBY:**  Good morning, Judge.

5          **THE DEPUTY CLERK:**  We have by phone Robin Smith and

6  Mr. McConnon.

7          **THE COURT:**  Okay.  There you go.  Mr. Smith, are you

8  there?

9          **MR. SMITH:**  Yes, I am, Your Honor.

10         **THE COURT:**  And who is with you?

11         **MR. SMITH:**  I have Jim McConnon with me.

12         **THE COURT:**  Thank you.  The Court has allowed the

13  government to appear telephonically.  Mr. Smith has a medical

14  issue and he's also -- I think you're going to be here Tuesday;

15  correct?

16         **MR. SMITH:**  Yes, I will, Your Honor.

17         **THE COURT:**  For another argument.  Call the case,

18  please, for the record.

19         **THE DEPUTY CLERK:**  This is in re:  Katrina Canal

20  Breaches, consolidation litigation *Parfait* reference 07-3500,

21  MR-GO and BARGE, document number 11449.

22         **THE COURT:**  All right.  I appreciate all of you being

23  here.  One of the many reasons I called this status

24  conference -- and, first, I know those of you in BARGE feel

25  like you're the step-child of the Katrina umbrella, and I don't

 1   want you to feel that way, although I can understand why you

 2   might.  We'll try to address that.

 3                  I'm going to go through various things to start

 4   this status conference.  They will not so much be proclamations

 5   as sort of a scream-of-consciousness discussion about what's on

 6   the Court's mind.  The first thing I wanted to address is the

 7   authority of the Court, Rule 23, in a class action.

 8                  There's a lot of things on it, but I, first, am

 9   going to let you know the only proclamation I'm going to make

10   is that I'm going to do dispositive motions, certainly the ones

11   that I have now, before I do any class certification.  That has

12   a lot of permutations to it that we'll discuss.

13                  Wright & Miller, Volume 7AA -- I know all of you

14   use Wright & Miller -- 1785.3, timing of certification, has a

15   great discussion about what "at an early practicable time", and

16   what the committee noted to the 2003 amendment.

17                  But it discusses, as an example, the reference

18   to "at an early practicable time", recognizing there may be

19   many valid reasons justifying that the deferral of the initial

20   certification decision, including that the opposing party may

21   prefer to win dismissal or summary judgment as to the

22   individual plaintiffs, and that time may be needed to explore

23   the designation of plaintiff's counsel.

24                  That's what I'm talking about here.  Further

25   under Rule 23(c)(1), the Court has wide discretion to make

1    determinations at such times and under such circumstances that

2    will best fit the needs of a particular case; and despite the

3    direction of the Rule, if the Court determines as soon as

4    practicable whether the action is to be maintained as a class

5    action is not mandatory and that the case class determination

6    be made before any settlement negotiations are undertaken.

7              And it goes on into even discussing what the law

8    is on certification after a decision on the merits.  Some

9    circuit split, but it goes on to talk about if it could even be

10   done, and not that I'm contemplating that.

11             And there's a lot of -- as an example, there's a

12   lot of discussion that I commend to you to read.  As emphasized

13   by the 2003 amendments to Rule 23(c)(1), the exact timing of

14   the Court's decision on class certification may vary depending

15   on the circumstances surrounding the case.

16             Thus, in some cases, even if a motion for class

17   certification is made at an early stage, the determination

18   under subdivision (c)(1) may have to be delayed substantially

19   because of the inability to determine whether the class action

20   treatment is appropriate based on the currently available

21   evidence and because of the pendency of other proceedings.

22             I have kind of -- I'm looking at the MDL

23   paradigm, even though I'm not in an MDL.  I'm in an

24   intra-district MDL.  I have, unfortunately, for you, maybe for

25   me, too, various categories of cases under the umbrella with

1  the light motif being breach of a levee and discovery that may

2  relate to the United States -- a liability that may relate to

3  the United States.

4           I also point you to -- and those are just a few

5  of the sections and a few of the comments of 1785.3.  I also

6  point you to Rule 23(d), which gives the Court very broad

7  powers in determining how a class action proceeds.  I commend

8  you to the Wright Miller Sections 1791 and 1792 in Volume 7B.

9           I won't read all of this to you, but it gives me

10 power to control the proceedings, period, as long as due

11 process is had.  And it gives you the power, if I exceed those

12 powers as viewed by discretion, certainly to take a writ or to

13 have an appeal.

14           I also refer you to the manual in complex

15 litigation.  I'm not going to read all the parts I've marked.

16 There's a lot of them in here.  That's the Fourth Edition,

17 Federal Judicial Center 2004:  The pending of overlapping or

18 duplicative cases in other courts -- this happens to be now the

19 overlapping cases in my court -- may affect the timing of the

20 certification decision.

21           Further -- let me find my marks --

22 precertification discovery may be necessary.  The Court may

23 rule on motions pursuant to Rule 12 and Rule 56 or other

24 threshold issues before deciding on certification.  That's Page

25 253 of the manual, the complex litigation.

1          So at the outset, just to let you know what I
2   consider my powers to be based on the case law, far more than
3   what's set forth in the memorandum.  That doesn't mean I want
4   to abuse these powers or use them unfairly.  I'm just telling
5   you what they are.  And you need to be very familiar with them.
6   Because it appears to me you are not, based on what I've read.
7          The bottom line is, it's my view that I have a
8   lot of discretion how this is going to occur.  I want to use it
9   wisely, however.  That's why you're here.  It also lets you
10  know if each side or all sides are overly postured, then we
11  will have no creativity, give and take, that's why I use the
12  words, "give and take", to come to some kind of rapprochement,
13  if possible in this matter, or at least to refine the areas
14  where we disagree.
15         I'm open to look at anything, as I should be.
16  One of the problems is the Court's time and resources.  How do
17  I use them?  The Fifth Circuit has blessed me with a third law
18  clerk through August 31st, 2009.  After that, that will
19  probably be over.  So I'm trying to get as much done as I can.
20         I have a lot of substantive motions that really
21  have to be decided.  They require a lot of time and resources,
22  and this isn't all I have.  I have a regular docket as well.  I
23  have a three-week criminal trial coming up in April.
24         But I have to decide what's the best way for me
25  to use this, hopefully, wisely and with input from all counsel.

1   It's a difficult decision.  So I have limited time and

2   resources.  But as an example, I have the government's 702(c)

3   immunity to decide.  It's not something that you do in a

4   vacillant manner.  It's going to take time; and whatever I do,

5   it's going to have to be written and be thorough.

6          And another matter that doesn't concern most of

7   you, I have to decide whether the dredgers are to get dismissed

8   or not.  I have to decide if I find that the government is not

9   immune under 702(c).  One, I know -- or even if I do find that

10  they are immune, I'm going to be asked for certification and I

11  have to decide what I'm going to do there.

12         Further, the government has yet another motion

13  based on the discretionary function exception stage to be heard

14  after that.  Then I have Washington Group's motion that will be

15  filed probably late April, or early May, reference does it have

16  the availability of the government contractor defense or not.

17         Those are all part of the dynamics; some of

18  which affects some of you, and some of which don't.  The

19  government immunity affects all of you because the BARGE group

20  is really only here, and I understand to your chagrin, I don't

21  blame you, because -- for two reasons:  One, the fact that even

22  though I've separated out *Parfait*, we still have a third-party

23  complaint where the government's liability must be determined.

24         The government's liability also has to be

25  determined in a lot of other cases, including the MR-GO.  So

1  there's an overlap there.  That's assuming the government is
2  not immune, which I must first decide.  I have to decide that
3  first.  If the government isn't immune, then we have the
4  government's liability to be determined in the MR-GO class
5  action, in *Robinson* and in BARGE.
6              Further, there's another reason, and I'm not
7  sure this can't be worked out, there's a coterminous part of
8  the class that's coterminous, that is they overlap, for BARGE
9  and MR-GO.
10              If I were to find the government not immune and
11  not subject to the discretionary function exception -- these
12  are all if's -- then the government's going to say, well, we
13  can't have a class action.  One, they're going to say, you're
14  wrong about your decisions, and want me to certify them.  If I
15  don't, they're going to say, Judge, no class action in a
16  federal tort claim.
17              Now, there are suits filed here, 300-something
18  thousand, in mass joinder cases.  I'll have to figure out what
19  to do about that.  Let's assume there's no class action against
20  the government, but still you have people in the same area of
21  BARGE who are going to be claiming that the MR-GO caused it.
22  I'm giving you all the problems.  We're going to get to some
23  solutions.
24              These are the things that the Court has
25  ruminated about; not necessarily had any epiphanies, because we

1    need to see how the ducks fall.  Let me get my note sheet here.

2    So, there are permutations.  It's conceivable if I were to find

3    the government immune, that you would go back to the good

4    graces of Judge Berrigan, except we have to figure out what to

5    do about the overlap on the class.

6                     And I'm hoping -- one reason, here, is to

7    implore you to help the Court come up with some creative

8    solutions.  I think this is the kind of thing where I need to

9    do that, and I'm going to want to hear from you.  That's the

10   purpose of your hearing from me now and you've seen my proposed

11   schedule.  It is not, as I've said many times, written with

12   lightning on a tabernacle -- on a tablet, excuse me.

13                    Therefore, I would love to see a joint -- and

14   we'll talk about that a little later -- a joint time schedule

15   from you, proposed, and where you disagree, and you note we

16   disagree about this and this and this, and then I'll have a

17   more definitive visual look at what you propose.

18                    I'm also interested in, if you would, please,

19   tell me what the state of the -- and I could have called Judge

20   Berrigan, I just did not, I forgot to do it -- about the state

21   of the limitation proceeding to the insurance case in New York,

22   which, unfortunately, or fortunately for somebody, we're

23   depending on that decision from New York.

24                    I want to talk about class counsel, because I

25   know it was mentioned.  I want to do something about that.  Oh,

 1   excuse me, or liaison counsel, or whatever the appropriate term

 2   is.  By the way, speaking of bellwether trials, just to note,

 3   although Judge Fallon could not have class certification

 4   hearings in Vioxx, he certainly had a lot of trials by consent

 5   of the parties.  And they're not classic bellwethers, but

 6   everyone's bound by it.  They're just indicative.

 7              And I have a suggestion here, that I'm sure I

 8   will not get, but many of you thought about it.  And that is

 9   this:  I guess what I'm looking for from you is to get

10   together -- for MR-GO, BARGE, to get together, MR-GO, and tell

11   me, Judge, I don't like this time line.

12              Let me tell you this, though, because I lose a

13   law clerk August 31st, 2009, I would like to get as much as

14   possible done before that time.  So that's kind of cramping me

15   with everything that I have.  We're doing our best, and we're

16   doing better with three law clerks, to get things out a little

17   quicker.  Not that we're a vending machine where you put a

18   quarter in and you get an opinion.  I could say, "denied", or,

19   "granted", but it wouldn't be too responsible.

20              So one of the things I was thinking about, and I

21   know it was mentioned before, is -- and let me preface this by,

22   I think I have the right to order this, but it may be an idea,

23   a lot of money is going to be spent.  A lot of money has been

24   spent.  Why not find out, at least a little bit, where the

25   rubber meets the road by having a single-issue trial on:  Did

1    the barge float across or did it -- in other words, not

2    assessing any liability, but the question:  Did it float or did

3    it break -- I'm simplifying it -- to a jury.  And then if it

4    floated, well, you guys are in good shape.  You guys aren't.

5              If it didn't -- but I would be willing to find a

6    time to do that with some expedience, because I think it's

7    important.  It's just something I'm thinking about.  I want to

8    hear what you have to say, and I'm going to give you time.  You

9    don't have to take definitive positions at all.  I guess what

10   I'm asking you to do, we'll have a discussion now, and mainly

11   it's going to be you discussing with me listening after my

12   monologue, but I want a discussion.

13             I just want to let you know, I really want to do

14   this right, but it's a vexing problem to the Court.  I'd like

15   you to get together and propose something to me and where you

16   disagree, or say, I want a class certification hearing.  If you

17   all agree on that, let's see when we want it.  It doesn't mean

18   you'll get it.  But at least I'll know this is when we want it,

19   and when we want the discovery.

20             Because Judge Wilkinson has got another problem.

21   I'm dealing with all this other stuff.  He's dealing with a lot

22   of things, too, including discovery.  And he's wondering:  What

23   am I doing?  Because it has an effect on what he's going to do

24   with discovery, which he's going to talk about and be here to

25   respond to any questions that you might have or any discussion.

1          So I guess that's really what, if something

2     comes out of this, if you could get together, and where you

3     disagree, disagreements are fine, just tell me in a time line,

4     chronologically, this is what our time line would be.  And then

5     where you disagree, say, we want this time or we want that

6     time, so I have something visual to look at.

7          What I sent out was proposed, based on the trial

8     date that was before me, based on the motions that are before

9     me.  Because, as a practical matter, I can't get to a lot of

10    this.  I can't do any class certification hearings very quickly

11    because they take time, and they cost money for you, and then

12    they have to be written.  They to be considered opinions.  And

13    I've got other things I have to get out, just as a practical

14    matter.  That's how I've decided to use the judicial resources

15    of this court in this rather anomalous umbrella.

16          I don't think there's been anything like it that

17    I know of in the country.  With all of that said, I am now --

18    Judge Wilkinson, do you want to weigh in on anything now or

19    would you rather --

20          **JUDGE WILKINSON:**  No, I'd rather hear from them.

21          **THE COURT:**  Okay.  Then you will discuss the

22    discovery aspect later on?

23          **JUDGE WILKINSON:**  Yes, sir.

24          **THE COURT:**  Okay.  With that, it's up to you.

25          **MR. TREEBY:**  Your Honor, please, could I speak?

1      **THE COURT:**  Go ahead.  We have no order of --

2      **MR. TREEBY:**  I didn't see one, and other people on my

3   side have spoken.

4      **THE DEPUTY CLERK:**  Would you, please, state your name

5   for the record.

6      **MR. TREEBY:**  William Treeby, Washington Group

7   International.

8            We didn't file any memos or briefs or written

9   arguments for this morning's conference, and we appreciate

10  that -- frankly, appreciate that Lafarge and the Barge

11  plaintiffs have, and we commend them.  We're glad to see both

12  of them believe, as we do, and it's a little bit contrary to

13  the Court's schedule, and I want to explain why.

14            I think both of them take the position that

15  class certification should be addressed first and as soon as

16  possible, given the Court's constraints.  For the reasons that

17  I want to try to attempt to outline for the Court, the two

18  memos don't seem to agree on very much else.

19            But they seem to agree on that fundamental

20  principle, even though they are the main parties who would have

21  to spend the time and effort to get ready for a class cert

22  hearing in terms of the parties since MR-GO is ready for that

23  hearing.

24            We agree far more with what the Lafarge memo

25  sets forth as the obstacles and pitfalls to proceeding on other

1   fronts before class cert is decided.  But we believe that the

2   brief that we filed in opposition to class cert sets out our

3   thoughts in that regard, and I won't talk to that at all.

4              We don't -- and I was glad to hear the Court say

5   what it did about bellwether and test cases.  We don't -- we

6   believe that -- so I think that there is a possibility here,

7   and no one else has -- that I've seen, has spoken to this

8   issue, but I think there is a possibility here for some kind of

9   case as a potential solution to some of the issues Your Honor

10  has raised.

11             Something like Judge Fallon did in the Vioxx

12  litigation, but that involved coordinating the trial of

13  individual cases to verdict or judgment as a means of providing

14  meaningful instruction and guidance to the parties.  And in

15  that case, it had the result of ultimately reaching, not a

16  court-administered settlement, but an agreement, a contract of

17  settlement in the case.

18             We believe these -- the following principles

19  kind of, we think, are applicable here.  First, we believe that

20  the completion of merits expert reports or merits fact and

21  expert discovery cannot be, or should not occur until a

22  decision is made as to what the merits trial will be, who the

23  plaintiff or plaintiffs are, who the defendant or defendants

24  are; and that implicates the motions -- the dispositive motions

25  Your Honor has spoken of.

1        In other words, it seems to us that this Court
2   cannot decide liability on this -- or even an issue relating
3   directly to liability in this complex case, which involves
4   potential shared or comparative fault and multiple causations
5   of claimed injury in a vacuum, and that's what would be
6   required to have an expert on merits try to come up with an
7   expert report.
8        A proper trial on the merits in this case, we
9   believe, should be considered in the context of real
10  plaintiffs, not hypothetical plaintiffs, who can respond to
11  affirmative defenses, properly pled, for which there's
12  sufficient facts to go to the finder of fact.
13       MR-GO is ready to go on class certification as
14  soon as the BARGE parties are prepared to go in a class
15  certification hearing, and we believe that should take place
16  first.  Based on reading what was filed in BARGE, it would seem
17  that both -- I may have misread it, but it would seem that both
18  the Barge plaintiffs and the Barge defendants believe that
19  should come first.  Again, they're the ones who would bear the
20  costs.
21       Now, while that preparation for a class
22  certification hearing is taking place, both BARGE and MR-GO can
23  be preparing for, filing, briefing and arguing the substantive
24  motions Your Honor has mentioned:  United States' immunities,
25  our government contractor immunity, even the United States'

1    issue of whether they can be subject to class treatment under

2    FTCA claims.

3                    This should allow, we believe -- and I want to

4    say this with pseudo-humility, because this is a massive

5    undertaking, I understand that -- but this should allow for a

6    class certification hearing sometime in the fall of 2008, after

7    Your Honor has heard the *Robinson* case, we believe.

8                    This would allow then for a determination of who

9    the plaintiffs and defendants are going to be and whether it

10   will be a class trial or not, at least at the level of this

11   Court.  And either way it's conceivable, if we're diligent,

12   that a merits trial would take place on, we believe, or close

13   to the schedule the Court envisions, early to mid-summer of

14   2009, after any appeals from class cert decisions have been

15   made.

16                   Once this Court makes that decision, no matter

17   which way the Court goes on that, while that class cert

18   decision is on appeal, as it no doubt will be, proper expert

19   reports, based on this Court's decision, can be pursued on

20   merits while that appeal is taking place, if the Court decides

21   that's the best course of action.

22                   Then the expert reports and the expert discovery

23   would be focused on what this Court believes the merits trial

24   will look like.  Once this Court's decision is made about class

25   cert, it will also inform issues regarding the possibility of

 1    merits trials, or trials, and whether there will be any Seventh
 2    Amendment issues.  All of that is somewhat in flux until that
 3    decision is made.
 4             If this Court decides to certify a class, which
 5    we believe would not be the case, but if it is, the Seventh
 6    Amendment issues could properly be addressed and decided in
 7    light of the certified class and what the trial is expected to
 8    look like:  Decisions about bifurcation or not; and if
 9    bifurcation exists, what that would look like.  All of that
10    would inform the Seventh Amendment issues, as we appreciate it.
11             If the Court decides a class cannot be
12    certified, the parties could make decisions about possible,
13    what Your Honor has referred to as bellwether in the sense that
14    Your Honor has used the term, or test cases that could be
15    scheduled to instruct or inform the parties as to the strengths
16    and/or weaknesses of their cases and defenses.
17             There would have been be a rational way, as
18    Judge Fallon entered into to select the cases, to bring to
19    trial cases that would attempt to expose a finder of fact to
20    the full panoply of issues that that case raises about
21    multiple --
22             **THE COURT:**  I'm sorry to interrupt you, because it's
23    very interesting what you're saying.  Am I correct -- and some
24    days I think I have it all down, and some days I don't -- but
25    your client, WGI, is certainly a defendant in the MR-GO

1   litigation.  Are you a defendant in, as now severed, are you

2   presently a defendant -- you're not a defendant as it stands

3   now in the BARGE litigation?

4           **MR. TREEBY:**  We are not.  But we will --

5           **THE COURT:**  Okay.  I just was --

6           **MR. TREEBY:**  Right.  But there are issues that will

7   come up in the MR-GO trial --

8           **THE COURT:**  Oh, there's no question.  That's part of

9   the conundrum, and you've convinced me about that.  No

10  question.

11          **MR. TREEBY:**  But there are multiple possible sources

12  of water causation of injuries about the fault allocation

13  between and among the various actors, including actors, who for

14  various reasons are before the Court or not before the Court,

15  depending on how it all sorts out.

16          If the United States is determined to be immune

17  from liability in this process, either in *Robinson*, or pursuant

18  to motions brought by the parties, this will certainly inform

19  the plaintiffs of the resources available to satisfy their

20  demands, and this could, depending on that outcome, make

21  settlements possible.

22          If Washington Group and the United States are

23  determined to be immune, this would also inform the finder of

24  fact and the parties as to the resources available to satisfy

25  the plaintiffs' demands, and would no doubt alter the landscape

1    considerably.

2             With great respect for this Court's effort in

3    this effort in this, what I consider a monumental undertaking,

4    to find ways to streamline and expedite the process, we believe

5    the best way to do this is to get class certification and

6    dispositive motions, such as immunities, or the United States'

7    susceptibility to class certification, determined up front as

8    quickly as possible, allowing then a proper understanding of

9    the merits trials that can take place consistent with due

10   process and the Seventh Amendment.

11            So that the experts can be focused on a real

12   trial with real plaintiffs, be they class plaintiffs or

13   individual plaintiffs, that will provide instruction for the

14   fact finder, the court, or jury.

15            If a class is upheld, the experts' merits

16   reports can address these issues.  If a class is not upheld,

17   then the individual cases are selected judiciously for trial.

18   The parties can be instructed by what takes place in those

19   trials, and without any guarantees, except the guarantees of

20   experience in such situations, rather than the specter of

21   speculation about, oh, we could be here for 30 years, or all

22   our grandchildren will be our age.  That's a specter, but it's

23   not realistic in light of experience.

24            The likelihood is that this massive case will be

25   resolved and finalized in that manner in a far more expeditious

1  way, we believe, than in any other manner.  In their latest

2  amended class complaint -- plaintiffs in MR-GO, in their latest

3  amended class complaint, and they were to be guided by the

4  leave they were granted in the Court's judgment dismissing the

5  United States from LEVEE.

6        In that regard the Court granted leave to amend to

7  modify the MR-GO geography to include what has been

8  described -- and I'm using a rough description -- as the upper

9  Ninth Ward and Gentilly, up to the Gentilly Ridge.  The Court,

10 with all due respect to Mr. Bruno, did not grant leave to amend

11 to add four new class reps in Chalmette in that area of

12 St. Bernard Parish lying below -- or south and east of

13 Paris Road, which he did.

14        Now, frankly, I can hear Mr. Bruno breathing down my

15 neck, because we've had this conversation:  Why are you

16 complaining about that since my amended complaint also limited

17 your exposure to Paris Road?  Well, that was driven by the

18 facts that his experts told him, and we're happy with that

19 either way.

20        But adding those new class reps would add significant

21 expense.  We have to redo expert reports, because it's in the

22 same subclass as we are, despite the fact Washington Group is

23 not being charged with that.  So if those class reps are not

24 added, then, indeed, all the discovery, all the briefing, the

25 listing of witnesses, the listing of exhibits have been

1   exchanged, and Mr. MR-GO is ready for class cert.

2           The expert reports have been done.  The experts have

3   been deposed.  The class cert hearing is ready as soon as BARGE

4   can be ready; and both Barge plaintiffs and Barge defendants,

5   apparently, are willing to work to do that step next while

6   other dispositive motions are being handled, and this is the

7   course we would recommend the Court take.

8           Trial organization then should properly be thought

9   about and planned for as soon as the parties know who the

10  plaintiffs will be in that trial or those trials if the Court

11  determines a class can be certified, what issues that trial can

12  handle, consistent with due process and without infringing on

13  Seventh Amendment rights.

14          We believe that's the fastest way to an expeditious

15  and efficient manner of disposing of this huge monster.  I'll

16  use a term that was in the news today.

17          **THE COURT:**  Thank you, sir.  I appreciate your

18  comments, and I'm hoping that -- and I'm going to certainly ask

19  you to have a meeting among yourselves and propose a schedule

20  to the Court and show me your areas of disagreement.  But I

21  understand and I appreciate your comments.

22          **MR. GILBERT:**  Your Honor, Brian Gilbert for the

23  BARGE.

24          At the outset, sir, we are enthralled with the

25  Court's order -- with the schedule the Court has devised.  And

1    I will speak to a lot of what Mr. Treeby said, and a lot of
2    what the Court has addressed.
3                    We do, however, detect one possibly easily-cured
4    technical glitch in the schedule in that -- and this,
5    obviously, presumes that class cert is going to be granted --
6    but we don't see an opt out period.  It would seem to me, based
7    upon what we expect in terms of the time the trial is going to
8    take, that the opt out period is going to toll sometime during
9    the trial.
10                   To the extent that this might lend credence to
11   any of the arguments that Lafarge has made in its response that
12   it filed a couple of days ago, this might be something that we
13   need to consider so that there is a 90-day period where people
14   can opt out without there being some unfair advantage.
15                   So that's just really -- otherwise, we're very
16   happy with this schedule.
17            THE COURT:  Nobody has spoken to the Court's rather
18   pregnant comment about the trial to the limited issue.
19            MR. GILBERT:  Oh, I'm about to.
20            THE COURT:  Oh, I believe you.
21            MR. GILBERT:  We love that.  We're very, very happy
22   with that suggestion, too.
23            THE COURT:  Okay.
24            MR. GILBERT:  We're not just a step-child.  We're
25   somewhat an idiosyncratic step-child because we have pending in

1  Section C the limitation action.

2          THE COURT:  Yes, I was going to ask you --

3          MR. GILBERT:  -- and the Court is aware of what the

4  elements are in a limitation action.

5          THE COURT:  Certainly.

6          MR. GILBERT:  The petitioners in limitation, and all

7  the parties in the limitation action agree that those issues

8  have got to be decided, and that includes what caused the wall

9  to break.  That includes the liability of the petitioners in

10 limitation, which is now taken under advisement by

11 Judge Berrigan.  We have not gotten a decision yet.

12         THE COURT:  I was going to ask you that.  Because

13 when we conferred -- and maybe this is a difficult arrangement,

14 but, hopefully, workable -- it was my understanding that

15 Judge Berrigan was going to decide privity and knowledge.

16         MR. GILBERT:  She has decided privity and knowledge.

17 She decided that in the Barge claimants', Barge plaintiffs'

18 here, favor against the petitioners in limitation --

19         THE COURT:  When was that decision --

20         MR. GILBERT:  -- that's been decided.

21              What was the date of that?  Maybe July of '06.

22 '07, I'm sorry.

23         THE COURT:  One minute.

24              It was my understanding that wasn't a definitive

25 decision.  Because when it came over here, it was my

1  understanding that's all she was going to do is make a

2  definitive decision on limitation, that is privity and

3  knowledge.

4         **MR. GILBERT:**  No.  She found that -- we did this in

5  kind of reverse order from what's usually done.

6               First, she entertained the question of whether

7  the petitioners in limitation had privity or knowledge of

8  punitive acts of negligence or punitive instances of

9  unseaworthiness.

10              Phase one was the decision, that, yes, if in

11 phase two we are able to prove that this negligence occurred,

12 or this -- the barge was unseaworthy in such and such respect,

13 I find that petitioners had privity or knowledge of these

14 conditions and, therefore, the limitation is defeated on that

15 ground.

16              She's still considering phase two, which was the

17 issue of negligence and unseaworthiness.  We submitted it on

18 paper November 26th of last year and we're awaiting a decision

19 on that, along these lines of punitive instances of negligence

20 and unseaworthiness that the Court found in phase one.  That's

21 where that is.

22              But limitation action, the elements include a

23 finding that that negligence caused the damages complained of.

24 So that trial is underway.  I mean, I look at it as if we're in

25 an extended recess right now, and that Judge Berrigan is going

 1   to need to decide the issue of whether that barge broke the

 2   floodwall.

 3                   So does that help this Court, or does it make

 4   the problem all that much more problematic?  I don't know.

 5   That may be a way of resolving this issue as the Court set out

 6   a few minutes ago, that we do a trial on whether or not the

 7   barge broke the floodwall.  Maybe we do it over in Section C,

 8   and that informs this Court.

 9                   That may be a way of accomplishing this.  I

10   don't know.

11            THE COURT:  Okay.  We do have a realtime reporter

12   here, and I'm going to -- the Court will order a copy of the

13   transcript be prepared.  So we'll have a copy of this fairly

14   quickly.

15            MR. GILBERT:  As far as other issues that the Court

16   has raised and that have been discussed so far with Mr. Treeby,

17   we don't necessarily agree that class certification has to

18   happen first.  We agree that the Court has wide latitude and

19   discretion to insert that part of the process wherever it deems

20   appropriate.

21                   And we agree that dispositive motions will

22   inform the Court about the shape of the trial on the merits,

23   about the class certification proceedings.  And this can be

24   done from a very cost-effective way, whether we're going to

25   call it a bellwether or a test case, whether we're going to

1  have cross-motions for summary judgment.  We think that this is

2  a good suggestion, and we're all on board with that.

3  　　　　　　　On the issue of causation, fault allocation,

4  Lafarge -- I'm well aware that Lafarge disagrees with us, but

5  the jurisprudence derived from the general maritime law is that

6  absolute joint and several liability apply in this maritime

7  case, *Edmonds*, *Coats*, *Penrod Drilling*, the *New York Ferry* case.

8  I think the Court understands where I'm going with this.

9  　　　　　　　The allocation of fault, it may be more

10  meaningful in terms of Lafarge's third-party complaint --

11  **THE COURT:**  Third-party complaint.  I understand.

12  **MR. GILBERT:**  Correct.

13  　　　　　　　As far as our affirmative case in chief, we're

14  looking at *Edmonds*.  Barring any unforeseen changes in the

15  status quo, we're looking at *Edmonds* as governing that issue.

16  　　　　　　　This is going to address another small -- in a

17  perfect world, the same jury is going to hear our whole case.

18  The same jury that's going to hear the witnesses is the jury

19  that's going to decide damages.  But we recognize this

20  litigation, with so many issues and so much overlap, that it

21  may be necessary to bifurcate or trifurcate, and we're not

22  opposed to that.

23  　　　　　　　But we agree with the Court's perspective that

24  this can be done in a sequential way so as we're not wasting

25  time or money.  We're defining issues, informing ourselves, and

1    informing the Court where to go next.

2            **THE COURT:**  I want everybody to understand that I

3    don't feel -- the Court does not feel like it has an absolute

4    clear idea as to what the best way to do this is.  That's why

5    we're having this conference.  There may be a variety of ways

6    to do it.  We'd like -- and, of course, it's going to be hard

7    to accommodate all of you.  I can't.  Because all of you are

8    not going to agree on everything.

9            But I want to hear from all of you and have you

10   get together and propose something, and then have the

11   differences -- in a format where I can see it in a linear

12   fashion.  Here's the dates that we propose, here's where we

13   agree, and here's where we disagree.  Then, ultimately, I'm

14   going to have to come up with something and, hopefully, really

15   soon.

16           **MR. GILBERT:**  I would like to inform the Court of

17   another issue we perceive, *Robinson*, whether you want to call

18   it a bellwether, whether you want to call it a test case.

19           **THE COURT:**  *Robinson* is certainly going to

20   determine -- if we get to the *Robinson* trial -- and Mr. Smith

21   is listening.  He's going to adamantly argue Tuesday the

22   government's immunity 702(c).  If he loses that, he's going to

23   adamantly argue that the government is not liable under the

24   discretionary function exception.

25           If he loses both of those, which he will

 1   adamantly be upset about, we will then conceivably have the

 2   trial in *Robinson*, and then I will determine the six

 3   plaintiffs.  Wonderfully, six plaintiffs.  I will determine:

 4   One, whether, in fact, the government was negligent; and, two,

 5   the damages to those claims.

 6          **MR. GILBERT:**  And I think, and for the Court's

 7   meeting, that there are a lot of hurdles between now and

 8   *Robinson*.

 9          **THE COURT:**  That's right.

10          **MR. GILBERT:**  But the only point that I wanted to

11   make, and this is just to raise the consciousness level, that

12   *Robinson*, to whatever extent -- and we don't know if there is

13   any extent -- to whatever extent that it might be adjudicative

14   or at least suggestive of findings in the BARGE case, there may

15   be some manner in which we need to be involved in *Robinson*.

16                  And we don't have a decision made on that yet.

17   We're going to explore this.  And what --

18          **THE COURT:**  Is that something you could talk to

19   counsel, Mr. Smith and Mr. O'Donnell?

20          **MR. GILBERT:**  Well, what we were going to suggest to

21   the Court is that maybe after today, we all huddle a little bit

22   and then come back and see if anything is refined a little bit

23   better.

24          **THE COURT:**  By the way, you're free to huddle here

25   for a while to determine when you're going to huddle again.

1          **MR. GILBERT:**  Okay.  But the bottom line is --

2          **THE COURT:**  So I think a huddle is important, and it

3     may not yield anything.

4          **MR. GILBERT:**  We agree with and appreciate the

5     Court's efforts to save everybody, the Court included, time,

6     money, effort, by narrowing as much as possible, and shaping as

7     much as possible, the course of this litigation before we spend

8     all this money to certify a class.  We agree with that.

9          **THE COURT:**  Well, that's one of the reasons I

10    suggested, and I'm not sure how long it would take or who would

11    try it:  Did the barge float or not?  And nobody's liability,

12    just -- and this is, shall we say, a nascent and undeveloped

13    thought, but it's one that I wanted to run by you.

14         **MR. GILBERT:**  By the same token, there may be a way

15    of killing two birds with one stone, being that we still have

16    this issue left undecided in the limitation action.

17         **THE COURT:**  I need to talk to Judge Berrigan as well.

18    I can see that.

19         **MR. GILBERT:**  Yeah.  One other thing, just as a minor

20    housekeeping matter.  Your Honor, I appreciate and I'm glad to

21    accept the committee appointment, something that I have meant

22    every week to do, oh, I need to file a motion for this, and I

23    need to talk to Joe.  I just never got around to it.

24              I'm happy that the Court did this.  As a lot of

25    people in this courtroom know, I'm going to be out of town for

1    the better part of March.  I'm getting married.  That's my

2    lovely bride sitting in the front row.  So Karen Wiedemann is

3    going to act as my proxy, my delegate.

4            **THE COURT:**  And I think Mr. Walker had made a request

5    as well in the briefing about an appointment.

6            **MR. WALKER:**  Yes, Your Honor.

7            **THE COURT:**  If somebody files a motion, and get

8    something before to me.

9            **MR. GILBERT:**  Oh, there is one more housekeeping

10   matter.  There's another motion that we need to submit

11   concerning the consistency of the BARGE PSLCs.  There's one

12   counsel that was left off, and another that we haven't had time

13   to --

14           **THE COURT:**  I'm sure Lafarge is maybe a little more

15   familiar.  Do you have any idea what's going on in New York?

16   I'll let Lafarge to speak to that.

17           **MR. GILBERT:**  We're under the impression that that's

18   not moving that fast up there.  But we've got New York counsel.

19           **THE COURT:**  From the judge's opinion, I thought he

20   was going to handle it with some alacrity.

21           **MR. GILBERT:**  We can check into this.

22           **MR. WALKER:**  Your Honor, Phil Brooks is here, and he

23   may be the most familiar --

24           **THE COURT:**  Okay.  Great.

25           **MR. WALKER:**  -- he represents the America Club.

1          **THE COURT:**  We'll get to that.

2          **MR. GILBERT:**  Thank you, Judge.

3          **THE COURT:**  Thank you.  I appreciate your comments.

4          **MR. WALKER:**  Mr. Aldock will speak for Lafarge, Your

5     Honor.

6          **THE COURT:**  Certainly.

7          **MR. ALDOCK:**  Your Honor, John Aldock for Lafarge.

8               Let me say at the outset that we appreciate the

9     opportunity to be here.  We'd like to be helpful in getting a

10    schedule that works for Your Honor, works for the parties.

11    We're not trying to throw any sand in the gears.

12              We just need, given the importance of all this,

13    to see to it that in a case of consequence it is for our

14    client, that everything is done in a manner that we think is

15    fair.

16         **THE COURT:**  I perfectly understand.

17         **MR. ALDOCK:**  Although it has not always been the case

18    in this proceeding, I must say I generally associate myself

19    with virtually everything Mr. Treeby said.  I thought much of

20    his analysis is consistent with our analysis on what's possible

21    and what's not possible.

22              Your Honor, there was a January scheduling order

23    that parties spent a lot of time on.  And they all got together

24    at the end of January and they came, and it certainly included,

25    at length, Mr. Gilbert, who hosted the discussions, and

1    ourselves, but also had WGI, and Mr. Bruno, and other people
2    were all there.

3              And we put an order in that, I thought, left
4    Your Honor the flexibility that Your Honor wants.  Because it
5    had a key sentence in it, and it said:  The hearing on class
6    certification will be determined as set by the Court.  But,
7    nevertheless, it got us through a schedule.  It got the
8    briefing.  It got the experts.  It got us ready, and got the
9    paper.  So that we would catch up with the MR-GO folks.

10             **THE COURT:**  Let me ask you your position on this, as
11   a money aspect for your clients -- and I'm sure there's some
12   strategy that only you know and I don't, and I shouldn't, that
13   if the barge floated over, that's the end of the game; right?

14             **MR. ALDOCK:**  It certainly is, Your Honor.

15             **THE COURT:**  At least -- except for the -- if there's
16   an improper mooring and it landed on a few people, other than
17   that -- so what would be so difficult about addressing that
18   issue?  And I'm throwing this out, that I know you may have
19   talked about it with Judge Berrigan.  I'm just wondering, it
20   seems like it would be a cost-saving measure if there's a real
21   genuine issue there.

22             And I don't -- let me say about the merits of
23   that, I know nothing -- not virtually nothing, nothing.  So
24   I -- if there's a real genuine issue there that needs to be
25   decided, that would be one way of going home early.

 1          **MR. ALDOCK:**  Let me say this, Your Honor, as Judge
 2  Wilkinson knows --
 3          **THE COURT:**  If you win, of course --
 4          **MR. ALDOCK:**  -- we made a proposal --
 5          **JUDGE WILKINSON:**  May 10th, 2006.  I made the
 6  proposal.
 7          **MR. ALDOCK:**  That's right.  Even better, and we
 8  agreed with you.
 9          **JUDGE WILKINSON:**  And it got voted down.
10          **MR. ALDOCK:**  Not by us.
11          **THE COURT:**  He did reiterate that to me.
12          **JUDGE WILKINSON:**  You were the only one in favor of
13  that.
14          **MR. ALDOCK:**  There were only two parties, and one of
15  us thought it was okay.
16          **JUDGE WILKINSON:**  There were four interests involved,
17  if you take me and you out of it -- three interests involved,
18  and they were not in favor of it.
19          **MR. ALDOCK:**  As I recall, Your Honor, we proposed a
20  summary judgment on wall causation that was joined into by the
21  other defendants in the -- Ingram and the other defendants in
22  the case.
23          **JUDGE WILKINSON:**  The summary judgment proposal was
24  not one that I was in favor of because it looked like a flat
25  denial.

1        **THE COURT:**  After the fact.

2        **JUDGE WILKINSON:**  What we discussed on May 10th, 2006

3   at a call docket, and I'm not sure you were there --

4        **MR. ALDOCK:**  I was.

5        **JUDGE WILKINSON:**  -- I know Rob Fisher was there --

6   was a trial on the question of whether that barge knocked down

7   that floodwall or floated over.  That's what we discussed.

8   Then when we got the 26(f) proposals -- I only have three of

9   them sitting in this pile here -- but Lafarge's was in favor of

10  that being the first thing tried.

11       **MR. HAYCRAFT:**  That was a joint proposal.

12       **JUDGE WILKINSON:**  I don't think Ingram joined in

13  that.  I don't think so.  I'll show you your letter, which is

14  sitting right here, if you want to see it.

15       **MR. HAYCRAFT:**  I recall the letter, Your Honor.

16       **JUDGE WILKINSON:**  So now we're back to that.  It's

17  two years later almost and we're back to that.

18       **MR. ALDOCK:**  We are.  We are, Your Honor.  And I know

19  that there were two parts to it, and one was summary judgment

20  and Your Honor was skeptical.  But summary judgment would do a

21  lot, we think, and we'd like a shot at it.

22            Nevertheless, it is certainly possible --

23       **THE COURT:**  No one can preclude you from filing same.

24  I won't.  But I'm saying I realize that there's a genuine issue

25  of material fact, no matter how well it's written, no matter

1    how adeptly it's argued, you will lose.

2                    So if it's that clear, we should have done that

3    a long time ago.  If it's something that you think is worth

4    that, showing that there's no genuine issues of material fact,

5    that should have been filed.

6            MR. ALDOCK:  We would like that opportunity, Your

7    Honor.  But, of course, we have to have the --

8            THE COURT:  Save your clients a lot of money.

9            MR. ALDOCK:  -- but we have to have discovery first.

10           THE COURT:  Let's make that clear.

11           MR. ALDOCK:  Otherwise, the other side would say, not

12   fair.  So until we've had discovery, they wouldn't let us file

13   it.

14           THE COURT:  Obviously, you have to have discovery.

15           MR. ALDOCK:  Correct.  So we'd like to do that.  We

16   don't rule out the possibility of a bellwether issue, barge

17   causation trial.  It is a tricky matter.

18           THE COURT:  That's more than bellwether.  That's

19   taking one piece of this, and it would be binding.

20           MR. ALDOCK:  It's a tricky matter because of the

21   issues of the Seventh Amendment and other issues Your Honor's

22   alluded to.  So it's not -- to make it a fair disposition is

23   not easy and would take some time.  We'd be prepared to try to

24   talk to people about that, see if we can reach some agreement.

25           THE COURT:  Right.

1          **MR. ALDOCK:**  But, Your Honor, the money to prepare

2  for summary judgment, the money to prepare for class, to be

3  sure, it's a lot of money.  But --

4          **THE COURT:**  And that would be both.

5          **MR. ALDOCK:**  Yeah.  Plus --

6          **THE COURT:**  I'm saying if you can do one.  But

7  that's -- I just throw that out.

8          **MR. ALDOCK:**  But to us, Your Honor, this, to our

9  company, is a capital case in the civil context.  If a class is

10  certified that said the barge has to pay for New Orleans, there

11  is not a private company in this country, so it's over.

12          If a class is not certified, we can deal

13  creatively with getting resolution of the cases.  So a short

14  cut to save a few dollars in the scheme of that, what we're

15  facing is not dispositive.  We're prepared to do it by the

16  book.  We're prepared to do it carefully.  We're prepared to do

17  it with real briefing.  Because for us, it's everything.

18          Now, if it's individual cases, we can deal with

19  it.

20          **THE COURT:**  I understand that completely.  I

21  understand that if a class were certified, economically, it

22  would be -- and the Fifth Circuit upheld it, and no writs were

23  granted by the Supreme Court, which I'm sure all would occur,

24  it would be economically devastating in the event the barge

25  didn't float over the levee.

1        But if the barge floated over the levee, none of

2  this is --

3           MR. ALDOCK:  We're pretty confident of our position,

4  Your Honor.  But, of course, the fact that we think this is a

5  matter of science, absolutely clear, that doesn't mean that the

6  jury couldn't do something else.

7           THE COURT:  But that doesn't mean the class is going

8  to be certified merely because the barge hit the levee.  It has

9  nothing to do with the class certification, nothing, in this

10  Court's mind, intellectually, at this time.

11          MR. ALDOCK:  That's why, Your Honor, we do agree with

12  Mr. Treeby and with others who have said, if we could resolve

13  the class issue.  Now, Mr. Gilbert assumes he's going to get a

14  class.  I'm assuming he has no chance to get a class.  He isn't

15  going to get a class.  But resolving the class issue tells us

16  where we are.

17          Really the only problem we have -- the problem

18  we have with Your Honor's latest possible situation --

19          THE COURT:  Oh, yeah, and I assumed there would be

20  problems, and that's why we're having this meeting.

21          MR. ALDOCK:  The nut of it -- we filed the paper

22  because we wanted to tell what we thought was the right answer

23  on the law.

24          THE COURT:  Right.

25          MR. ALDOCK:  But the real nut of it, and it's

1    something that Mr. Treeby said, too, a trial -- any kind of

2    trial, is going to be real important; and we really need to

3    know what that trial is going to be in advance of that trial.

4                So in the last rumination of the scheduling

5    order, with a class decision, up or down, and a month later a

6    trial, that, at least, Your Honor, passing everything else, I

7    implore you, would not be fair.

8                **THE COURT:**  How long -- not that I'm going to do any

9    of that.  I'm going to listen to all of you and, hopefully, get

10   something from you that's a suggestion from all of you and then

11   I can know exactly what your differences are from the time, in

12   a linear graphic standpoint.  What time would you need from

13   class certification to be ready for -- let's assume if a class

14   is not certified, that's one thing.

15               If class is certified, of course, then there's

16   an appeal time, which Mr. Treeby pointed out.  Then there's an

17   argument of whether I should stay it or not.  But what do you

18   consider the time you would need to go to trial if class were

19   certified, and your appeal, et cetera?

20               I guess that's what I'm asking for, a scenario:

21   Class certified, class not certified, and a proposed trial

22   schedule from each of you -- up front from all of you, and then

23   noting the differences from each of you.

24               **MR. ALDOCK:**  What I would do, Your Honor, is go back

25   to what we all agreed to in January, which wasn't so long ago.

1    In January, we all agreed to a schedule that --

2              THE COURT:  When was your class certification?

3              MR. ALDOCK:  -- had eight months --

4              THE COURT:  When was your class certification going

5    to be?

6              MR. ALDOCK:  Well, the hearing was unclear; but,

7    generally, it was eight months from class to trial.

8              JUDGE WILKINSON:  If I --

9              MR. ALDOCK:  You've got three months for opt out's

10   and notice.  You've got the appeal.  Now, that's not to say --

11   and if there's no class, we need to know -- have finished

12   merits and decided what it is we're going to try.

13             JUDGE WILKINSON:  I thought I heard Mr. Treeby say

14   earlier that he thought you-all could be ready for class

15   certifications hearings in August of this year.

16             THE COURT:  I think he said after *Robinson*.

17             MR. ALDOCK:  I think he said the fall, Your Honor.

18             MR. TREEBY:  After *Robinson*.  Their schedule had the

19   last brief.  Their schedule he's referring to had the last

20   brief due on November 1st.  That could be a hearing then

21   mid-November.

22             THE COURT:  Yeah, and again --

23             MR. ALDOCK:  We agree to that schedule, Your Honor.

24             JUDGE WILKINSON:  But Mr. Gilbert, I thought, just

25   said that they liked the proposed schedule, which has a class

1   certification hearing in May.  Is that what you just said?

2           **MR. ALDOCK:**  They do, Your Honor.  We heard that

3   today.  But Mr. Gilbert --

4           **MR. GILBERT:**  We agree that there should be an opt

5   out period, but we like the schedule.

6           **MR. ALDOCK:**  They agree there are practical problems

7   with that schedule, but they agree.

8           **THE COURT:**  I'm sorry.  Because I want to pay

9   attention.  Hold on one second.

10                          **(OFF THE RECORD)**

11          **THE COURT:**  Okay.  Sir, please, continue, with the

12  understanding that I had problems with the time issue set forth

13  to get the trial in June 2009, considering the appeals, the

14  delays, the motions, and these opinions have to be written and

15  decided.  So that all comes from that time.

16              It's not like, oh, okay, here's a decision.

17  We've got it now.  The time elements, and part of this is

18  driven by the proposed June 2009 trial date.  I'm still

19  mystified -- and, again, I may order this, if I can, keep in

20  mind, because I'm reserving the right -- this trial, the trial

21  on the single issue.  Just understand that.

22              I'll make sure I can before I do it.

23          **MR. ALDOCK:**  Let me say two things, Your Honor.  One,

24  in answer to Judge Wilkinson's question:  The schedule called

25  for the last briefing in November, and we're happy with the

1   schedule; and then when Your Honor held the hearing was left

2   totally open at Your Honor's discretion, and we're okay with

3   that.

4           **THE COURT:**  The last briefing, whenever I held the

5   hearing, let's say I held it in January, okay, and we rendered

6   an opinion in March, then eight months on the appeal.  There's

7   no way to do it by -- how do you figure in June?

8           **MR. ALDOCK:**  Well, there are two things about the

9   June --

10          **THE COURT:**  Any hearing by me is going to be

11  dependent upon the appeal.

12          **MR. ALDOCK:**  Right.  There are two things about the

13  June trial, Your Honor, and I know Your Honor treats that date

14  as sacred.

15          **THE COURT:**  Well, as sacred as anything is in this

16  case.  I've already stated this, but let me tell you:  After

17  August 31st, 2009, my resources are dwindled.  And I'll be --

18  keep in mind that I have the option to take senior status.  I

19  know the defense aren't as eager to get this resolved as the

20  plaintiffs, but I'm sure you're eager.  Who knows.

21              So time is a factor, and I'm going to be pushing

22  this thing any way that I can to push it, legally; and if it's

23  not by cooperation, it will be by -- and I understand your

24  argument on class certification.  I understand.

25              I just don't know any way how we get to the June

 1   trial date if I delay -- if I wait eight months for the

 2   court -- for the appeal.  Is that what we're saying?

 3            MR. ALDOCK:  No, the eight months is the time from

 4   the decision, your decision, on what kind of trial we're going

 5   to have.

 6            THE COURT:  That's assuming we're going to get a

 7   decision from the Court of Appeal in that time.

 8            MR. ALDOCK:  In that period sometime, you'll get a

 9   decision from the Court of Appeals, we assume.  Right.  You

10   never know, of course not.

11            THE COURT:  They're busy, too, like all of you and

12   all of us.

13            MR. ALDOCK:  Right.

14            Your Honor, let me say two things that, one,

15   both very important to us.

16            THE COURT:  Yes, sir.

17            MR. ALDOCK:  One, we, too, would like the matter

18   resolved.  But more important to us, given that it's what I

19   have called a capital case, is getting it resolved right.  So

20   speed is useful, but getting it right is critical.

21            THE COURT:  What's wrong with finding out whether the

22   barge went over or it didn't?  Tell me what's wrong with that.

23   Tell me why -- I'm not sure -- I bet you've done a lot of --

24   you ought to have a pretty good amount, if you're ready to file

25   a summary judgment, it ought to be not -- how much is that

 1   going to take?  How long would that take?

 2           **MR. ALDOCK:**  Your Honor, the scope and nature of that

 3   trial is tricky because of all of the legal issues we've talked

 4   about.  What I implore most of all --

 5           **THE COURT:**  Tell me what legal issues.

 6           **MR. ALDOCK:**  Seventh Amendment jury issues.

 7           **THE COURT:**  Let's assume I could figure that out in a

 8   day.

 9           **MR. ALDOCK:**  Yes, but, Your Honor --

10           **THE COURT:**  You could object to it.  And then if I

11   determine that the law is that the Seventh Amendment is not a

12   problem, then what's the next problem?

13           **MR. ALDOCK:**  Why, Your Honor --

14           **THE COURT:**  Why are you resisting it --

15           **MR. ALDOCK:**  I'm resisting, Your Honor, because --

16           **THE COURT:**  -- if you're ready to file a summary

17   judgment on it, for goodness sake?

18           **MR. ALDOCK:**  We're ready at the end of discovery to

19   file summary judgment.  It's a different question about what

20   the effect of such a trial would be.  Why does Your Honor -- I

21   don't want to be --

22           **THE COURT:**  Tell me why.  I'm asking you a question:

23   Intellectually, what is the problem?  I'm not getting it.

24   Maybe I'm opaque.  Tell me why, lucidly, why that's such a

25   complicated issue.  Tell me why.

1          **MR. ALDOCK:**  It depends on who it binds.  It depends

2    on what issues are tried.

3          **THE COURT:**  I told you what issue it tries.

4          **MR. ALDOCK:**  It depends on what issues belong to a

5    jury.

6          **THE COURT:**  I just told you --

7          **MR. ALDOCK:**  It is not simple, Your Honor.

8          **THE COURT:**  Were you listening to me?  I said:  Did

9    the barge float or did it hit?  I didn't say who's liable.  Did

10   it float or hit?  Okay.  If that's really complicated, I'm

11   going to tell you, welcome to some of my other cases, which are

12   vastly, vastly more complicated.  Vastly.

13             So tell me why that's complicated, regardless --

14   if the Seventh Amendment is eliminated, tell me why that's

15   complicated.  I'm not finding liability on Lafarge.  You're

16   exculpated, if it goes over, and that's a finding of --

17         **MR. ALDOCK:**  So we're exculpated if it goes over; and

18   if it's found the other way, there's no liability of any kind?

19         **THE COURT:**  To respond, there's no liability of

20   determination, no.  That would be for another --

21         **MR. ALDOCK:**  And no fact determination?

22         **THE COURT:**  The fact determination would be, yes, the

23   barge caused the -- the barge hit the levee.  That's it.  I'm

24   just -- I'm talking out loud, too.  So I'm not saying it's a

25   brilliant idea on my part.  I'm just testing it out by a robust

1    discussion.

2          **MR. ALDOCK:**  Right.  Your Honor, I'm not saying it's

3    a bad idea.  I'm receptive to consider it, and I'd like to

4    consider it.  But what I think would be a mistake, and which is

5    a problem in a case where --

6          **THE COURT:**  You proposed it two years ago.  That's

7    why I'm a little confused.  What happened?

8          **MR. ALDOCK:**  We had structure for that case and what

9    it would be, and we agreed to it.  And we're still in the

10   limitations case because causation hasn't been decided before

11   Judge Berrigan.  So we're still waiting on that piece of it.

12   We may be part of that.

13         **THE COURT:**  I'm sorry for interrupting you, and I'm

14   going to let you -- it wasn't my understanding, nor I think

15   Judge Wilkinson's, that Judge Berrigan was going to be deciding

16   what caused -- the causation, that is:  Did the levee break

17   result of the barge or not?  That was not my understanding, nor

18   yours.

19         **JUDGE WILKINSON:**  Mine either.  Did she try that?

20         **MR. ALDOCK:**  I think, Your Honor, there was a phase

21   three that she didn't get to.

22         **JUDGE WILKINSON:**  She hasn't finished phase two

23   yet --

24         **MR. ALDOCK:**  She hasn't finished phase two.

25         **JUDGE WILKINSON:**  -- and that wasn't part of phase

1    two.

2              **MR. ALDOCK:**  No, it's not part of phase two.

3              **JUDGE WILKINSON:**  So nobody's tried that issue yet.

4              **MR. ALDOCK:**  Nobody's tried that issue.

5              **JUDGE WILKINSON:**  Right.

6              **MR. ALDOCK:**  But it was contemplated to be tried as

7    part of phase two, and three after two.

8              **THE COURT:**  I think when it came here, it was sort of

9    my baby.  But I'll clear that up with Judge Berrigan.

10             **MR. ALDOCK:**  Right.

11             **THE COURT:**  So go ahead.

12             **MR. ALDOCK:**  Your Honor, June of 2009 is a long way

13   off.  The parties -- on any of the schedules we're talking

14   about, Your Honor, the parties have a lot to do.  They've got

15   all the discovery.  They've got all the experts.  They've got

16   all the class stuff.  They've got a lot to do.

17             Everything will get -- the parties will not be

18   wasting the next year.  They will be working very hard.

19             **THE COURT:**  I'm sure that's true.

20             **MR. ALDOCK:**  The outcome of some of the things that

21   will be decided, and it will happen in that year, including

22   *Robinson*, including class, those things will tell us, will

23   instruct us, will lead us to the obvious, or clear, or best

24   resolution of what we ought to do in the middle of 2009.

25             Please, don't decide today, tomorrow, or the

1    next day, in concrete what we're going to do in 2009.

2         THE COURT:  There's nothing in concrete here.

3         MR. ALDOCK:  Keep it -- keep our feet to the fire,

4    make us do all the things we said we were going to do, make us

5    do all of our things to get ready so that Your Honor will have

6    the flexibility, when you need it, and don't prejudge exactly

7    what we're going to do in the trial that is scheduled for 2009.

8    Because a lot will change between now and then.

9         THE COURT:  If you recall my opening comments, I

10   mentioned a few of the myriad combinations and permutations and

11   nuances that can affect this case.  So I'm acutely aware of it.

12        MR. ALDOCK:  Thank you, Your Honor.

13        THE COURT:  And as I said, lightning on a tablet is

14   not, unfortunately, a luxury I have in this case, and I respect

15   your comment and your insights into that regard.

16        MR. ALDOCK:  Thank you very much.

17        THE COURT:  Yes.

18        MR. BRUNO:  Good morning, Your Honor.

19        THE COURT:  I wish lightning would give me an

20   epiphany as to exactly what the best way to do it is.

21        MR. BRUNO:  Well, and I recognize that, and I hope

22   you'll allow me to say, with respect and without braggadocio, I

23   hope my words are informed by virtue of the fact that I was a

24   initial participant in the *Castano* litigation.  I've tried the

25   *Scott* class action against the tobacco industry.  I tried the

1  *CSX* case, *Gaylord* case, and I've tried class actions.

2                    And the first thing I asked myself is:  Where am

3  I in the world?  Well, I'm almost three years after the

4  hurricane, or the event, or after the damages.  So how soon can

5  I get to some kind of resolution of the case?  We've spent a

6  couple of million dollars and we've lost on the levee side.

7  That's fine.  We're big people.  No problem.  So we have --

8         **THE COURT:**  The Court makes somebody unhappy with

9  virtually every ruling.  It's a great job.  It is.

10         **MR. BRUNO:**  That's okay.  But, Judge, we come to this

11  courtroom informed of that possibility and that eventuality.

12  So let's start with just what we're talking about.  The first

13  thing we're talking about is a certain geography.

14         **THE COURT:**  True.

15         **MR. BRUNO:**  That geography is bounded by Paris Road

16  on the west, by the Industrial Canal -- I'm sorry, Paris Road

17  on the east, the Industrial Canal on the west, the Intercoastal

18  Waterway on the north, and the river on the south.  So

19  that's -- it's a tight -- it's not the whole city.  It's a

20  piece of the city.

21                    And why do I say that?  Because we've amended

22  our allegations against WGI to suggest that that's the area,

23  and the barge people have made it crystal clear that that's the

24  area that they're talking about with regard to the barge.  So

25  that's step number one.

1          **THE COURT:**  So we have coterminous areas.

2          **MR. BRUNO:**  No question.  The first problem that I

3   have, as a plaintiff lawyer, is I've got for the first time in

4   my career, in my experience, a group of plaintiff lawyers who

5   have theory A, and a separate group of plaintiff lawyers who

6   have theory B.

7               When we were proceeding on this two class action

8   track, I kept thinking to myself, boy, my head's going to

9   explode.  Because how do I opt out of one, stay in the other

10  one, and without committing malpractice?  Because I have no

11  earthly idea what truly caused the water to enter the Lower

12  Ninth Ward.

13              I have my theories.  I have my experts, of

14  course.  I've done my due diligence.  But at the end of the

15  day, I can't gamble 30,000 people's claims on my thought in

16  that regard.  So that's the first -- from the plaintiff

17  perspective, that's where I am.  I don't know how this going to

18  kind of all fall out.

19              Then I'm listening to these defense lawyers tell

20  me that, well, you know, somehow or other you can't try a

21  single case.  And I just heard Mr. Aldock say, well, I'll be

22  guided by the *Robinson* trial, which, in fact, is the trial of

23  an individual case.  So I'm thinking, well, what is that all

24  about?

25              I know in a class action, you have the

1   opportunity to opt out.  So you have the potential of many

2   trials, despite the existence of a class action.  So the notion

3   that you can't try a case is ridiculous.  You can try a case.

4   The manual says you can.  23 says you can.  *Castano* told us to

5   go try some cases.

6             Now, the issue is:  What is there to be gained?

7   Well, let's talk about -- what's in it for me if I get

8   certified?  Well, I'm facing an appeal of eight, nine, months,

9   which means my trial date is pushed back another however many

10  months.  So that doesn't help me.  And how would that have

11  served me in the context of LEVEE, given your ruling?

12            It wouldn't have done me any good.  I don't have

13  a sense of what you will do vis-á-vis the government and

14  702(c).

15       **THE COURT:**  I expect to be enlightened by Mr. Smith

16  and Mr. O'Donnell, and whoever else is arguing on that.

17       **MR. BRUNO:**  Without question.  So those things are

18  all hanging in the air, and I need that resolution.  I've got

19  the WGI who says, and has said over and over and over again,

20  you can't get a fair trial in this community.  Can't do it.

21  I'm going to go get certified, go up to the Fifth, come back

22  and address that issue then?

23            To me it just -- I think self-interest is one

24  thing, but practicality is another thing.  It would be very

25  easy for me to find a plaintiff who would agree to opt out of

 1  the class action and try their case.  I think, likewise, the
 2  BARGE people could easily find someone who could opt out of
 3  their class action and try their case.
 4          Now, why do I say both?  I say both because I
 5  think it doesn't do me any good to have a resolution of the
 6  cause of the water intruding into that geographic area without
 7  allowing these competing theories to be hashed out in one
 8  setting.
 9          So is there a way to do it?  Absolutely.  With
10  respect, though, Judge, I don't know that you can order these
11  parties to be bound by a fact determination in the absence of a
12  certification of a class.  I don't know -- I'm not -- it's
13  still kind of out there.
14          But I do know this.  I know if you tried Mr. A
15  and Mr. B at the same time, that we would, as Mr. Aldock
16  suggests, be guided substantially as to what a jury is likely
17  to do.  And this is not, by the way, a drug case.
18      **THE COURT:**  No, I was talking about simply whether
19  the barge floated or it didn't.
20      **MR. BRUNO:**  Well, the fact -- being, again with
21  respect, a lot more informed about the facts, the truth of it
22  is the barge did strike the sheet pump.  There's no question
23  about that.  There's evidence.  It's bent.  There's scrapes on
24  the barge.  Unfortunately, Judge, I want to be honest with you,
25  I don't know if that's going to solve the problem.

1           I think that to get where you want to go -- to

2    get where I think we need to go, I'd like to see how this thing

3    shakes out.  I'd like to hear the evidence.  I'd like to see

4    the evidence.  I'd like to see what a jury does with this

5    evidence in terms of deciding -- and it's interesting because

6    you said this way back in -- I don't even remember when --

7    where did the water come from and who was responsible for that

8    water?

9           That's why I started with the geography.  Sure

10   we know that the water came from the sky.  Well, we know who's

11   responsible for that.  We know there's the possibility of water

12   intrusion from Paris Road.  That issue is not in this case.  So

13   what are we left with?  What water entered the Lower Nine, and

14   why did it get there?

15          We have competing theories, of course, but we

16   all are asking the question of the trier of fact:  What caused

17   the water to go either over or through the Lower Nine levee?

18   That's what we all would like to know.  Simple, simple, simple.

19   And that could be tried and we could be informed by a trial

20   that resolved that issue.

21          And if Mr. Treeby wants to go all the way to

22   judgment for Mr. Plaintiff A, not a problem.  It could be

23   bifurcated; doesn't have to be.  Open to either way.  It

24   doesn't matter to me.

25          The point is that we would be informed.  We

1    would have a judgment.  We would all have a better sense of

2    whether the case, given the factual determinations in that

3    individual trial, lend itself to class certification or not;

4    and, frankly, provide a better record for the Fifth Circuit on

5    appeal in determining whether the case should, indeed, proceed

6    as a class action in the first instance.

7              So in the normal case where a class allegation

8    is made -- and, again, I say this with some experience -- but

9    you know, generally, you're going to get there if you have one

10   explosion and there's some allegation who caused the thing to

11   blow up.  Even with cigarettes.  I mean, are they addictive or

12   not?  You know you're going to get there.

13             But in this case, there's so many hurdles that

14   I've never really had to encounter before.  I mean, I've got

15   this immunity issue, which is extraordinary.

16        **THE COURT:**  I understand the hurdles.

17        **MR. BRUNO:**  We haven't even had filed yet the WGI

18   motion to dismiss --

19        **THE COURT:**  Right.

20        **MR. BRUNO:**  -- on it's immunity, with a trial date in

21   May.  Now, I respectfully suggest we could try the case in May

22   of '09.

23        **THE COURT:**  June of '09.

24        **MR. BRUNO:**  June of '09.  I'm sorry, Judge.  But the

25   point is we could try the case.  We could resolve these heady

1    issues of the immunities and that business, at least at the

2    trial level.

3                 We could have a record, which would allow us to

4    have a pretty good view of what the evidence looks like, what

5    it sounds like, and how its received by a jury.  And, indeed,

6    whether or not Your Honor would determine that you could get a

7    fair jury here.  So I just think it's time for us to be a lot

8    more practical.

9                 I can understand the defendant's view, and I'm

10   also, obviously, skeptical.  I understand that they don't want

11   to be bound for billions of dollars with just one trial, and

12   that's fine.  But the solution to that is, you're only bound

13   against one plaintiff or two plaintiffs.  That's not going to

14   cost you too much.

15          **THE COURT:**  I understand what you're saying.

16          **MR. BRUNO:**  So I'm just respectfully suggesting,

17   Judge, yes, I think we do have to be creative.  I think we

18   have --

19          **THE COURT:**  I would have to get an agreement on that.

20          **MR. BRUNO:**  No, I don't think you need an agreement

21   on that.

22          **THE COURT:**  That's an interesting point.

23          **JUDGE WILKINSON:**  There are two cases in the BARGE

24   section that were filed without any class allegations in them

25   at all --

1        **MR. BRUNO:**  Or they opt out.

2        **JUDGE WILKINSON:**  -- *Perry* and *Lagarde*.  I've always

3   assumed those are opt out people.  Why would they file it?

4   They only filed against Lafarge and Ingram and then Lafarge,

5   third-party United States.

6             Why don't you-all think about, as Judge Fallon

7   did in the Vioxx cases, pulling one of those or both of those

8   out, put them on their own individual, separate schedule.

9   Lafarge could file its motion for summary judgment.  There are

10  limited numbers of plaintiffs in those cases, too.

11       **MR. BRUNO:**  Judge, *Robinson* is one of those cases.

12       **JUDGE WILKINSON:**  Let those go forward on their own

13  track, like *Robinson* is going forward.  It's binding only as to

14  those parties in those cases and it's the same -- it seems to

15  me it's the same effect as the Vioxx pull-outs.

16       **THE COURT:**  It would be very similar.

17       **MR. BRUNO:**  My only response to that, Judge, is, I

18  think for -- for me -- this is me, nobody else, to be informed,

19  I think you've got to try my claim or my client's claims

20  against WGI and these claims against Lafarge at the same time

21  because you've got one pointing at, you know -- I haven't

22  actually filed third-party claims.

23       **THE COURT:**  I've already agreed with that concept.

24       **MR. BRUNO:**  Right.

25       **THE COURT:**  I'm not sure -- but, of course, I've got

```
 1   to decide a lot of motions before we get there.  Frankly, it's
 2   a little premature.  I've got to decide, certainly, WGI's
 3   motion and the government's motion, at the very least.
 4           MR. BRUNO:  Precisely.  And I can assure you, you
 5   will have a lot many more motions by WGI to follow.  I just
 6   have to --
 7           THE COURT:  Assuming that they -- that I don't grant
 8   the government contractor defense.
 9           MR. BRUNO:  Exactly.  That's something that we have
10   to address, and we will address it on this current track.
11           Now, I had just a couple of final notes, Judge.
12   I think it is still very important, though, to make these
13   parties prepare for a certification hearing.  I think that
14   should be in the can.  So that you have the option to have a
15   class certification whenever you want.  That should not be put
16   off.  It's not complicated discovery.  I don't care what
17   anybody says.
18           It's very straightforward and it's not
19   difficult.
20           THE COURT:  I may well do that.  Again, what I'd like
21   to see -- and tell me if I'm asking too much of you, and I know
22   a schedule was submitted to me.  I know that I put out a
23   proposed schedule -- it's not the schedule -- where, in light
24   of all our discussions, where a proposal was put to me by all
25   of you on how to handle this monster, including the possibility
```

1   of test cases.

2               If somebody disagrees, that's fine.  You have

3   every right to disagree.  But see what common ground we have

4   and what not, and what is a realistic trial date for what.  I

5   need to know these things because my resources are going to be

6   limited, and I don't want this to go on forever either.

7               I'm trying to -- we've got to get creative to

8   figure out a way where, as Mr. Treeby said, where the new judge

9   who's going to be taking my place doesn't have to inherit

10  this --

11          **MR. BRUNO:**  Judge, I would say to that, I think the

12  schedule, in general, that's been proposed --

13          **THE COURT:**  -- while I'm out mediating somewhere.

14          **MR. BRUNO:**  You're doing mediation work?  God bless.

15  Mediating hurricane cases.  We've got plenty of work for you

16  there.

17          **THE COURT:**  Exactly.

18          **MR. BRUNO:**  On that point, I think absolutely the

19  parties can agree to a date by which they will be prepared to

20  go to a certification hearing.  I think that's --

21          **THE COURT:**  I'm interested in more than that.  I'm

22  interested in a whole proposal, with the understanding, as

23  counsel said, it's not written in stone, it's flexible, a

24  proposed --

25          **MR. BRUNO:**  I think without question --

1          THE COURT:  -- trial.  That's how things end, trials.

2    Not certification hearings, but trials.

3          MR. BRUNO:  We could be prepared for a trial -- I

4    don't want to call them bellwether, that term has so many

5    meanings, I don't even know what it means anymore.  But we

6    would be prepared for the trial --

7          THE COURT:  Well, realistically, you cannot have a

8    bellwether trial that binds.

9          MR. BRUNO:  Exactly.

10         THE COURT:  There's no question.  We all know that.

11   That's the law.

12         MR. BRUNO:  That's why I hesitate to use the word

13   anymore.  But the point is we could try --

14         THE COURT:  Male sheep with little bells --

15         MR. BRUNO:  With a bell with --

16         THE COURT:  -- the Fifth Circuit.

17         MR. BRUNO:  -- no ding in it.  It could be just the

18   bell without the ringer part.

19         THE COURT:  Right.

20         MR. BRUNO:  But the point is we could try two or

21   three so-called MR-GO cases.  We could try two or three and we

22   could limit the trial to the geography.  Well, it would be

23   limited to those plaintiffs or addresses, anyway.  What am I

24   saying?  So it would resolve that issue of:  How did the water

25   enter through the Lower Nine and why?

1          **THE COURT:**  I understand the conundrum.  It's the

2     Court's conundrum.  Now that I have both of these overlapping

3     class actions with two different theories, it does present

4     problems.  No question.

5          I'm trying to -- as I've said, some of this is,

6     from my standpoint at least, because you're all more informed

7     than I am about the facts, a scream-of-consciousness talk.  So

8     don't let it alarm you.  I'm going to make a considered

9     decision, but I needed all your input.

10          I'd like something that is universal with the

11     understanding that the end of the universe -- in fact, all

12     parts of the universe, but especially the denouement, is

13     flexible.

14          **MR. BRUNO:**  Of course.  Now, there are some practical

15     issues, and I don't know if this is an appropriate time to

16     discuss it, with regard to discovery.  The WGI, for reasons

17     unknown to me, issued subpoenas out of Baton Rouge --

18          **THE COURT:**  Judge Wilkinson will tell you that --

19          **MR. TREEBY:**  Thank you.

20          **MR. BRUNO:**  He'll tell me that in a moment.  Okay.

21     Well, I'll hold that thought.  Because the judge in California,

22     had he known that this was pending here, would have sent the

23     case back here for resolution.  But I'll address that at the

24     appropriate time.

25          **MR. TREEBY:**  Your Honor, could I not comment on that,

1    but comment on some of the other stuff?

2               THE COURT:  Certainly, certainly.

3               MR. TREEBY:  I'll be very brief.  Washington Group

4    International, William Treeby.

5               THE COURT:  Look, I think this is important enough

6    where I need to hear from all of you so that this can begin to

7    distill and formulate and adduce in my own mind.  Go ahead.

8               MR. TREEBY:  I think it would help the parties, if

9    Your Honor, please, and I'm not that familiar with the *Robinson*

10   schedule.  I understand it's set in September; is that correct?

11              THE COURT:  Yes.

12              MR. TREEBY:  But I think it would help the parties to

13   know what Your Honor would think in terms of how -- when could

14   a class certification hearing, whether it's on papers or

15   whatever, there's a lot of paper already been generated --

16              THE COURT:  After *Robinson*, and after the *Robinson*

17   decision is rendered, frankly, probably in the -- please, don't

18   hold me to this.

19              MR. TREEBY:  No, sir.

20              THE COURT:  Because I'm not looking at my calendar,

21   and this thing -- there's so many tributaries, but conceivable,

22   January '09.

23              MR. TREEBY:  Not earlier, I take it?  A hearing?

24              THE COURT:  Maybe December.  I don't want to commit

25   to this.  It's conceivable.  I would think about it.

1        **MR. TREEBY:**  I understand, sir.  But it would inform
2   us, I think, in trying to come up with a calendar --
3        **THE COURT:**  Right.
4        **MR. TREEBY:**  -- that would work in --
5        **THE COURT:**  And I wish I could give something
6   definitive, but let's say December or January.
7        **MR. TREEBY:**  And I think this is the elephant in the
8   room that the plaintiffs kind of allude to but don't directly
9   address, but I think it needs to be addressed, which is -- and
10  I heard Mr. Bruno just now say:  Two or three cases for MR-GO
11  tried, and two or three cases from BARGE tried as test cases.
12        With all due respect, I think those have to be
13  tried together.
14        **MR. BRUNO:**  I just said that.  That's what I said.
15        **MR. TREEBY:**  Okay.  Well, then I misheard him.  Then
16  I misheard him.
17        **THE COURT:**  And I agree with you, and I have agreed
18  with you.
19        **MR. TREEBY:**  That was the only --
20        **THE COURT:**  Absolutely.
21        **MR. TREEBY:**  That was the only point.  If anything
22  would move this case toward a resolution, that would be it.
23        **THE COURT:**  I agree with you, and I agree with
24  Mr. Bruno in that regard.
25        **MR. TREEBY:**  It would resolve the issues that --

1   there are significant issues with Lafarge's -- with all due --

2   because I agree with Mr. Aldock.  There are all kinds of issues

3   that we've read and read and read that can be created if you

4   don't just try the whole -- all those whole cases.  Now, class

5   certification --

6               **THE COURT:**  I respect that position.

7               **MR. TREEBY:**  -- and what Judge Fallon did was he

8   ended up denying cert, but it still ended up resolving the

9   case, that process.

10              **THE COURT:**  In what case?

11              **MR. TREEBY:**  In Vioxx.

12              **THE COURT:**  I don't think he even had a class

13  certification.

14              **MR. TREEBY:**  Oh, yes, he denied class certification.

15  He denied class certification in late 2006.  I brought

16  Ms. Wimberly from my office here, who is very familiar with

17  those proceedings.

18              **THE COURT:**  He denied class certification?

19              **MR. TREEBY:**  Yes.  And it still resolved -- the case

20  still resolved.

21              **THE COURT:**  In the MDL setting, he could only deny

22  class cert, my understanding, in the ones that he had

23  jurisdiction over.

24              **MR. TREEBY:**  Right, not the state court cases,

25  obviously.

1          **THE COURT:**  Or even the federal cases that -- I'm

2    interested.  Maybe he did.

3          **MR. TREEBY:**  What was the date?  Ms. Wimberly is here

4    with all the facts.

5          **THE COURT:**  You may speak.  Yes, ma'am.

6          **MS. WIMBERLY:**  Certainly.  Your Honor, in the fall or

7    late summer of 2005, what happened in the Vioxx case was that

8    the plaintiffs steering committee filed three master class

9    action complaints.  After reviewing approximately 208 plus

10   class actions that had been transferred into the MDL --

11         **THE COURT:**  Right.

12         **MS. WIMBERLY:**  -- three master class action

13   complaints were filed.  A personal injury wrongful death class

14   action, a third-party purchaser class action, and a medical

15   monitoring class action.

16         **THE COURT:**  You had state law issues there besides

17   all the other issues, I'm sure.  Multi-state law issues, I see.

18         **MS. WIMBERLY:**  Only one of those class actions ever

19   went to the motion stage.  Merck answered the master class

20   action complaint for a class for personal injury wrongful

21   death.  It filed Rule 12(b) motions on the other two.  Those

22   motions were argued, are still under advisement with Judge

23   Fallon.

24              Judge Fallon, in early '06, heard the argument

25   on the motion for class cert for personal injury, wrongful

1   death.  That motion was denied in November of '06.

2          **THE COURT:**  Okay.  Thank you.

3          **MR. TREEBY:**  Thank you.

4          **THE COURT:**  I appreciate your comments, sir.

5          **MR. GILBERT:**  Your Honor, if I may --

6          **THE COURT:**  We may make some progress.  That's why

7   it's good -- I needed to have this status conference, no

8   question, to sit and talk with you.

9          **MR. ANDRY:**  Your Honor, may I address one thing on

10  behalf of the *Robinson* plaintiffs.  I'm Jonathan Andry on

11  behalf of the *Robinson* plaintiffs and the MR-GO PSLC.  In the

12  scheduling order you proposed, notwithstanding all of the macro

13  issues that you-all have been talking about, and it's not

14  really a scheduling issue because it goes to the -- there's

15  several --

16          We have to produce expert reports on

17  August 1st of 2008, and then the reports are due back to us on

18  September 15th of the defendants.

19          **THE COURT:**  This is in the MR-GO?

20          **MR. ANDRY:**  Yes, Your Honor, in the class and in the

21  BARGE.  We would ask, Your Honor, that to the extent any

22  scheduling is done with regard to expert reports either way,

23  that that be pushed back until after *Robinson*.  Simply because,

24  first and foremost, for Your Honor, you've had a lot of

25  judicial resources that you're using to decide motions, like

1   the 702(c) motion, et cetera.

2                And under the *Robinson* scheduling order, our

3   discovery cut off will fall about that time and the Daubert

4   motions, dispositive motions, and other substantive motions

5   will fall about that time.  And given the fact that the

6   *Robinson* litigation group is very similar in its make-up to the

7   MR-GO PSLC, that it would put a tremendous strain on us and a

8   tremendous strain on the Court.

9                And with regard to the expert reports, they'd be

10  pretty much the same.  I don't know that they'd be really

11  different.  So to the extent there's any Daubert challenges

12  that you hear in *Robinson*, they would also be, not necessarily

13  dispositive of, but indicative of what would come up in Daubert

14  challenges.  So even though it is somewhat of a scheduling

15  issue, it affects us, as well as the Court, by putting a strain

16  on the already limited resources that we have.

17               We agree with Your Honor, and think Your Honor

18  has done a very good job of moving the case with all deliberate

19  speed, and that we really do need to have a trial.  But by

20  pushing all of that back, it wouldn't really affect your

21  June 9th date to have a trial.  But it would help us and it

22  would help the Court to move more in an orderly fashion.

23               **THE COURT:**  Again, when you have your joint meeting

24  to come up with a specific schedule, if that's agreed upon,

25  that can be placed; if not, then you'll have --

1        I'd like it to where it's presented to me

2  visually, where I have the dates for everything; and then

3  what's agreed upon and what's disagreed upon, some kind of

4  blocks where, you know, MR-GO wants this -- it may be a little

5  cumbersome, but try to, as clearly and concisely as possible,

6  present something to me where I get the universe of views for

7  actual dates, for whatever it is it's going to be.

8        I'm sure that's why Mr. Treeby asked me about

9  December, January.  Look, I can't commit to that, but it would

10 seem that would be the earliest possible time.

11        **MR. ANDRY:**  Thank you, Your Honor.

12        **MR. GILBERT:**  Your Honor, Brian Gilbert again.  Just

13 a few more observations and suggestions.

14        Maybe a way of alleviating some of Lafarge's

15 concerns over the Seventh Amendment issues would be to try

16 negligence also along with causation.  Try Lafarge's negligence

17 at the same time.  Let the same jury decide both of those

18 issues.

19        I think it's a good possibility that that may

20 alleviate some of their concerns.

21        **THE COURT:**  I think all of you need to talk, and,

22 obviously, talk with your clients.  You should talk now

23 briefly.  Set up a time to meet where you have time to consult

24 with your clients and think about all of this, and then see

25 what you can agree on and what you can't agree on.

1          Then the Court will look at all of that, and not

2    give a proposed schedule, but a schedule, and taking into

3    consideration everything, and to go back to counsel's point,

4    realizing that it may be changed.  Nothing I'm going to do is

5    going to be perfect.  So I always have to look at it if it

6    simply doesn't work.

7          What I'm interested in -- we all have an

8    interest, I think, in resolution; but we all have different

9    vantage points to look from, and then I have to look at it from

10   the administration of justice.

11       **MR. GILBERT:**  I think we all want to be as efficient

12   and economical as possible.  I think that's the one thing that

13   binds all of us.

14       **THE COURT:**  I understand that.

15       **MR. GILBERT:**  Some of my co-counsel wanted me to

16   reiterate the point, and everybody who's a party in the

17   limitation action agrees, that wall breach causation has got to

18   be decided in that action.  Whether it's dispositive here or

19   not, I don't know.  I mean, that's an issue I've grappled with,

20   but I don't know what the effect of it is.

21       **THE COURT:**  I don't know if you-all have talked to

22   Judge Berrigan.  That wasn't my understanding.

23       **MR. GILBERT:**  I know.  I can infer that she does not

24   hold the impression that she needs to decide that, but --

25       **THE COURT:**  That's my understanding.

1          **MR. GILBERT:**  Can I get an amen from Mr. Haycraft?
2     Is that your understanding also?
3          **MR. HAYCRAFT:**  That's my understanding of the legal
4     argument we'll be presenting to her.
5          **MR. GILBERT:**  Yeah, and I've checked with counsel
6     from Domino, and Unique Towing --
7          **JUDGE WILKINSON:**  Regardless of what she does in
8     phase two?
9          **MR. GILBERT:**  Well, that's assuming that we prevail
10    in phase two.  If we don't prevail in phase two, then that's a
11    dead issue.
12         **JUDGE WILKINSON:**  Right.  That's why you had phase
13    two before you're having phase three.
14         **MR. GILBERT:**  Correct.
15         **JUDGE WILKINSON:**  So if you don't prevail on phase
16    two, she doesn't get to wall causation.
17         **MR. GILBERT:**  Then there is no phase three, correct.
18         **JUDGE WILKINSON:**  Okay.  All right.  Thank you.
19         **MR. GILBERT:**  Okay.  That's it.  Thank you.
20         **THE COURT:**  Thank you, counsel.  I was laughing with
21    Judge Wilkinson about --
22         **JUDGE WILKINSON:**  I'm a funny guy.
23         **THE COURT:**  He's a pretty funny guy.  You may not
24    realize it, but he's an incredibly witty person.  Mr. Anzelmo?
25    You might state your name, even though we know it.

1          **MR. ANZELMO:**  Yes, Your Honor.  May it please the

2    Court.  Tommy Anzelmo representing the New Orleans Levee

3    District.

4                    Your Honor, we're going to be presenting to the

5    Court a joint motion to amend CMO 4 relative to LEVEE.  And the

6    reason I'm bringing this up right now is because the change of

7    the geography that has occurred now that old LEVEE subclass 4

8    is now into MR-GO.

9          **THE COURT:**  Right.

10         **MR. ANZELMO:**  We believe that old -- that subclass 4

11   LEVEE would be eliminated from LEVEE.  I'm now moving under the

12   belief that that is not going to occur, that subclass 4 is

13   going to stay in LEVEE.  If that's the case, then the ability

14   to try LEVEE apart from MR-GO is going to be, in essence,

15   impossible.

16         **THE COURT:**  So we might have a Triamese twin.  A

17   Triamese triplet, excuse me.  Triamese twin is definitely an

18   oxymoron.  Gee-whiz.  We need a surgeon.

19         **MR. ANZELMO:**  We will certainly work toward

20   addressing these unique issues.

21         **THE COURT:**  Yes, and I understand that.  Thank you

22   for apprising us.

23         **MR. BRUNO:**  Judge, just so you know, we have filed a

24   joint meeting, plaintiffs and defendants, in LEVEE, just to

25   make the dates line up.  We have settlements pending, and we

1    hope it will all be moot, but the deadlines are fast

2    approaching and it just would be easier on all of us if they

3    matched up with MR-GO.

4            **THE COURT:**  I don't know if it's a violation of the

5    First Amendment for me to pray for that settlement, but I'm

6    going to anyway.  Go ahead.

7            **MR. BRUNO:**  I'll be filing a joint motion today.

8            **THE COURT:**  Okay.  Thank you.  Judge Wilkinson, do

9    you want to talk about Professor Bea, or does anybody want to

10   address that?

11           **JUDGE WILKINSON:**  It's my understanding that you-all

12   were supposed to bring up some problems that you're having.

13           **MR. TREEBY:**  Yes, Your Honor.  William Treeby for

14   Washington Group International.  I first have to do a profound

15   mea culpa.  I was in your Court watching an argument ten days

16   ago, I guess it was -- I lose track sometimes -- in which we

17   urged that under the rules on a subpoena issued out of the

18   Middle District of Louisiana that Your Honor didn't have

19   jurisdiction.  We consented to the jurisdiction, Your Honor, to

20   hear it.

21               I was scratching my head, and I went back to my

22   office and got into the books and found out that I should have

23   read a memo much more carefully than I did -- I didn't hardly

24   read it -- to determine that absolutely Your Honor was correct

25   in finding that the issuance of that subpoena from the Middle

1  District of Louisiana was odd, indeed.

2          **JUDGE WILKINSON:**  I made an oddness finding.

3          **MR. TREEBY:**  That was an oddness finding that I

4  profoundly agree with.  However, we have a different situation

5  that we have to address with the Court because Washington Group

6  issued third-party subpoenas to the University of California

7  Berkeley.

8          **JUDGE WILKINSON:**  That is different, and I told you

9  that at the hearing.

10          **MR. TREEBY:**  Right.  And ILIT and CITRIS, which is a

11  Berkeley entity, in MR-GO in a timely fashion on November 19th,

12  2007, the date to which the deadline had been extended by this

13  Court --

14          **JUDGE WILKINSON:**  Right.

15          **MR. TREEBY:**  -- on August 24 from August 31.  The

16  MR-GO PSLC filed a motion to remit in the Northern District of

17  California and that motion was denied by Judge Hamilton, who

18  then referred motion to quash that subpoena to

19  Magistrate Zimmerman in that court.

20          **JUDGE WILKINSON:**  Right.

21          **MR. TREEBY:**  It should be noted that this subpoena

22  could only issue from the Northern District of California.  It

23  could not issue from this court.

24          **JUDGE WILKINSON:**  That's correct.

25          **MR. TREEBY:**  A procedural telephone conference was

1    held on this motion on March 5th.  The hearing was set on April

2    16th, but the magistrate judge issued a briefing order coming

3    out of that hearing in which he stated, and I quote:  Counsel

4    for plaintiffs and Washington Group are directed to advise the

5    Eastern District of Louisiana of this dispute at the March 7th,

6    2008 conference -- and I'm doing that.

7              JUDGE WILKINSON:  I have the order right here.

8              MR. TREEBY:  Okay.  Good.  I've got all these as

9    exhibits for the Court if they're needed.  And request that

10   court's assistance in determining whether the subpoenas issued

11   from this court were in accordance with the various scheduling

12   and case management orders in effect in the underlying

13   litigation.

14             JUDGE WILKINSON:  I'm ready to rule.

15             MR. TREEBY:  Okay.

16             JUDGE WILKINSON:  The first one was timely.  The

17   second one was not.

18             MR. TREEBY:  The second?

19             JUDGE WILKINSON:  To Dr. Bea.  The one that you

20   issued in January.

21             MR. TREEBY:  Oh, that was in BARGE and it was timely.

22   It wasn't in MR-GO.

23             JUDGE WILKINSON:  It was in BARGE?

24             MR. TREEBY:  Yes.

25             MR. BRUNO:  That's the -- I want to invoke the

1   doctrine of oddness again, Your Honor.

2          **MR. TREEBY:**  We have different deadlines, and let me

3   speak to it.

4          **JUDGE WILKINSON:**  What I was going to say is it

5   doesn't make a bit of difference as far as we're concerned --

6   and I've already talked to Judge Duval about this -- in light

7   of what we're doing here.  In light of what we're doing here,

8   much of the scheduling in Case Management Order 4 is going by

9   the way side.

10          Case Management 4 was very much -- it was highly

11   structured and phased, and a lot of that is in the process of

12   being extended.  So it was my intention to tell Magistrate

13   Judge Zimmerman, don't worry about that timeliness issue since

14   he has been saddled with the burden of dealing with this.

15          Then what I was going to tell him, or have you

16   tell him.

17          **MR. TREEBY:**  We're instructed to jointly write him a

18   letter --

19          **JUDGE WILKINSON:**  All right.

20          **MR. TREEBY:**  -- based on what Your Honor's just said.

21          **JUDGE WILKINSON:**  The timeliness issue on the second

22   subpoena is not an impediment to resolution of the motion on

23   the merits of the motion.

24          **MR. TREEBY:**  Right.  Your Honor, please, we'll write

25   that letter.  Mr. Bruno --

1    **MR. BRUNO:**  No, I do not agree, Judge, because he's
2 no longer in BARGE.  He's not in BARGE --

3    **MR. TREEBY:**  I was when it was issued.

4    **JUDGE WILKINSON:**  Wait, wait, wait.  Listen.  It
5 doesn't matter.  I'm telling you this:  I don't care if you
6 agree.  I want you to tell the magistrate judge, forget about
7 that time limits objection.

8    **MR. BRUNO:**  Judge, well the other point is that the
9 magistrate judge indicated that had he known, the judge known,
10 about the pendency of these proceedings, he would have sent the
11 whole thing back here.

12    **JUDGE WILKINSON:**  You mean the district judge?

13    **MR. BRUNO:**  Yes.  And it was represented to us --
14 here's my problem, Judge, is that, and here's the oddness
15 doctrine, the fact of the matter is that Mr. Treeby knows that
16 Professor Bea is an expert in this case, and he knows that we
17 have a specific deadline by which we're supposed to give to him
18 our expert reports and discovery.

19    So he files a subpoena, as he must, in
20 California; and he's got a different judge who knows nothing
21 about this case to rule on whether Professor Bea should, out of
22 time, provide these expert reports.

23    **JUDGE WILKINSON:**  Let me tell you this:  I'd be happy
24 as a little clam in a shell to have this whole thing sent to
25 me, because I'm ready to rule on that, too.

1              Now, here's the magistrate judge's position in

2    California:  There was a district judge who was on duty --

3    which, that's something we ought to put in effect around

4    here --

5              **THE COURT:**  I agree.

6              **JUDGE WILKINSON:**  -- the district judge who was on

7    duty who denied the portion of the motion to send it here, and

8    referred the motion to the magistrate.  Now, what's the

9    magistrate judge supposed to do in that situation?  He's got to

10   address the motion.

11             Now, if you think that the district judge, if he

12   knew something different about the case, would change his mind,

13   reconsider and send it here, then go out there and file it.

14             **MR. BRUNO:**  Well, here's my thought:  I would like,

15   Your Honor, with respect, to include in this new order that any

16   time WGI files motions in other courts that they alert that

17   court that this is pending and that the matter -- that the

18   court here prefers to have it resolved here.

19             It's not dispositive.  It doesn't make

20   anybody --

21             **JUDGE WILKINSON:**  The Court here, I'll speak for

22   myself.

23             **THE COURT:**  I'm listening.  I'll wait for the appeal.

24             **JUDGE WILKINSON:**  The reason that Rule 45 says what

25   it says is to protect the recipient of a subpoena --

1          **MR. TREEBY:**  Exactly.  U-Cal Berkeley says they
2     wanted it in California.
3          **JUDGE WILKINSON:**  -- and U-Cal Berkeley is not here;
4     and if it were here, it would feel very out of place.
5          **MR. BRUNO:**  My beef is about Professor Bea, who I
6     represent, and he does not want it there.  You're right, Judge.
7          **JUDGE WILKINSON:**  Go tell the judge -- but Professor
8     Bea doesn't live here.  He lives out there.
9          **MR. BRUNO:**  Right.
10         **JUDGE WILKINSON:**  Go tell the judge in California,
11    who has authority, this is not like the one that issued from
12    the Middle District of Louisiana that I was so ticked about,
13    that's a technical term.
14         **MR. BRUNO:**  Right.
15         **JUDGE WILKINSON:**  This is completely different.
16         **MR. BRUNO:**  Spell it correctly, all right?
17         **JUDGE WILKINSON:**  The reason that rule exists is to
18    protect the subpoena recipient.  Sometimes subpoena recipients
19    in California don't want to come to New Orleans to fight that
20    battle.  Dr. Bea may.  If he does, then go tell the judge in
21    California that that's the case and see if he'll change his
22    mind and send it here.
23              Now, on the Dr. Bea issue, I don't know what
24    Dr. Bea was doing in what capacity at what particular time.  If
25    it were here, I'd have to figure that out by having you-all

1   submit evidence as to what he was doing at any particular time.

2              Because my understanding is, although I don't

3   have any evidence of this, is that when he first came out here

4   to do some investigation, he wasn't a retained expert or agent

5   of anybody.  They called it an independent investigation.  I

6   don't know what circumstances led that group to come out here.

7              At some point in time he became an expert.  If

8   that motion's here, I know how to rule on it and it would take

9   about 30 minutes.  But it's not here.  It's in California.  The

10  California court has authority to do so.  There are reasons why

11  it does.

12             Tell the magistrate judge that the timeliness

13  issue, in light of what we're doing here, is no longer an

14  impediment.  Although, under the old order, you should have

15  gotten leave.  Although, you filed it in BARGE, you were a

16  party in barge at the time.

17        **MR. TREEBY:**  I was a party.

18        **JUDGE WILKINSON:**  Now you're not a party anymore.

19  It's a big --

20        **MR. BRUNO:**  But they're also, under the CMO 4,

21  required to get authority to file third-party subpoenas --

22        **MR. TREEBY:**  Can I put that --

23        **MR. BRUNO:**  -- and they didn't do that.

24        **THE COURT:**  All right.  But I'm telling you:  Tell

25  the magistrate judge that's not an impediment, his ruling on

1   the motion, in light of what's going on.

2       **MR. BRUNO:**  If I could just say this though, we are,

3   as both of the judges have pointed out, under extremely short

4   deadlines.  We have in place the requirement for the production

5   of expert reports, and all the supporting information.

6   Mr. Treeby knows that.

7       Now, in the midst of all this, he wants to make

8   me run across the country to go deal with this while I'm trying

9   to put out about a thousand other fires.  I just respectfully

10  suggest that it's inappropriate and unfair, given what he knows

11  about the structure of this case management order.

12      That's the only thing I wish to point out, Your

13  Honor.

14      **JUDGE WILKINSON:**  Okay.

15      **MR. TREEBY:**  I'd like to respond to that.  He said it

16  about five times.

17      **JUDGE WILKINSON:**  You can respond to it, but --

18      **MR. TREEBY:**  Well, I understand it won't affect --

19  but I just hate -- this is a record, and I hate to have things

20  that are incorrect be stated.  We subpoenaed, in MR-GO, on a

21  timely fashion, ILIT, Berkeley, CITRIS, and Dr. Bea was part of

22  those entities.  They issued what's euphemistically called The

23  Independent Levee Investigation report that has been widely

24  cited in this matter.

25      He names Washington Group in some of his

1   affidavits and says the basis for it is information that he

2   supposedly got from people in New Orleans long before he was

3   retained by Mr. Bruno.

4                   **JUDGE WILKINSON:**  Okay.  Now listen, listen --

5                   **MR. TREEBY:**  We asked for all employees in that

6   subpoena.  Now, when Mr. Bruno first raised the issue, oh, he's

7   not a -- he's not an employee or whatever it is.  In an

8   abundance of caution, we were a party in BARGE, we issued a

9   subpoena to Dr. Bea.  That's why we did what we did.  We didn't

10  try to circumvent anybody.

11                  **MR. BRUNO:**  Just to round out the record, when we

12  issued the same subpoena to --

13                  **JUDGE WILKINSON:**  Gentleman, listen.  Listen.  The

14  record is as round as a ball.  We're moving on.

15                  **MR. BRUNO:**  Thank you, Judge.

16                  **JUDGE WILKINSON:**  We don't need to hear anymore on

17  this.  Tell the magistrate judge in California the timeliness

18  is no impediment to his determining the motion in light of the

19  consideration of extensions that's going on right now.

20  Mr. Bruno --

21                  **MR. BRUNO:**  Yes, Your Honor.

22                  **JUDGE WILKINSON:**  -- if you want, go tell that

23  district judge in California, A, that you'd like him to

24  reconsider his motion to send it here; and, B, that we're just

25  as happy as we can be to have it sent here, if that's what he

1  wants to do.  He has the authority to rule on it, and he can

2  rule on it if he wants.

3          **THE COURT:**  I know it's getting close to the lunch

4  hour.  What I would like, in a reasonable time, is for you to

5  submit a proposal to my proposal, and that's all it was; and to

6  do it as jointly as you can and where the disagreements -- have

7  a clear -- I'd like it to be in a -- I like time lines.  If you

8  can construct a way to do that where the disagreements are

9  shown and designated.

10          Then ultimately we will come forth with an order

11  and, hopefully, with some alacrity.  What's a reasonable time

12  period to do that?  I don't want to pressure you, but time is

13  of the essence for all of us, I know.

14          **MR. SMITH:**  Your Honor, this is Robin Smith.

15          **THE COURT:**  Yes.

16          **MR. SMITH:**  I'm sorry.  I've been waiting to break

17  in.  I didn't know what a good time was.

18          **THE COURT:**  Now is the time.

19          **MR. SMITH:**  I just have a couple of things.  One, it

20  seems to, I think, maybe perhaps just have fallen through the

21  cracks, but the schedule that Your Honor -- the tentative

22  schedule that Your Honor produced in this order that we've been

23  discussing today, doesn't address the cut off for the

24  production of documents.

25          I know none of the other parties are really that

1   concerned about production of documents, because I think most
2   of them have already completed their production of documents.
3   But we are still laboring to produce the remaining documents
4   that we have that are relevant to all this litigation.
5             Even though we've been working at this as
6   diligently as we can for many months now, we think we're going
7   to need until May the 1st to complete our production.  Even
8   with that date, I think we're probably going to try to get an
9   additional protective order that will allow us to produce
10  documents unreviewed.
11            Because we anticipate that -- we're now pretty
12  much into the area of electronic documents.  And we're using
13  automated means to collect those, which we've used search terms
14  that the parties have come up to identify documents that we
15  think will be relevant to the case.
16            And we're finding that it's just a huge -- still
17  a huge volume of documents, and we have no -- we barely have
18  the capacity to gather them all electronically and to copy them
19  and to produce them to the parties in the next six weeks or so.
20            But we certainly have no capability of reviewing
21  even the subset that we suspect will have perhaps some
22  privileged documents among them, and perhaps some documents
23  that would be protected under the prior Case Management Orders.
24  Anyway, it hasn't come up.  It wasn't in that order.
25            We did join in with some of the other defendants

1   recently in asking for enlargement of the time in LEVEE and

2   MR-GO and Your Honor, I think, granted that motion in part.

3   But as I understood the order, it only pertained to the LEVEE

4   category and didn't apply to MR-GO.

5           **THE COURT:**  All right.

6           **MR. BRUNO:**  Judge, we'll work with the government on

7   that.  I'm sure we can work that out.  Robin and I spoke a

8   little bit.  You've told us to meet.  We will meet.  We will

9   address Robin's issues.

10          **JUDGE WILKINSON:**  Just put a new proposed extended

11  deadline for that.

12          **MR. BRUNO:**  We will.  We'll cover it.

13          **THE COURT:**  Robin, you had something else, I think,

14  did you not?

15          **MR. SMITH:**  The only other thing was I just wanted to

16  echo Mr. Treeby's comments about the additional MR-GO

17  plaintiffs.  We agree that that will entail some additional

18  expense if the plaintiffs are permitted to substitute new class

19  representatives.

20              Also with respect to the United States, it's not

21  an issue that we've examined yet, but it may also, to the

22  extent that there are relation back issues involved in adding

23  new parties to these cases, there may be some problems with

24  respect to the newly added plaintiffs.

25              We haven't looked into that yet.  But those are

1   just some issues that we see there.

2           **THE COURT:**  All right.

3           **MR. BRUNO:**  We'll address all those, Judge.  That was

4   only done in an abundance of caution.  If it's a big

5   controversy, we can pull those people.  But, fundamentally,

6   when we drew a line, we had nobody on the other side.  So it's

7   a no-brainer.  It can be addressed.

8           **THE COURT:**  Okay.  On the time, because I know time

9   is getting short, what's the time for you to confer, one, with

10  your clients and among yourselves, to come up with this deal?

11  I don't want to press you too much.  What would be a reasonable

12  time?

13          **MR. WALKER:**  Judge, I think we can do some

14  preliminary discussions since many people will be here next

15  Tuesday, but I would say, to be reasonable, probably within 10

16  days to get something back to Your Honor.

17          **THE COURT:**  That's very reasonable.  Let's give you

18  two weeks.

19          **MR. BRUNO:**  Judge, we can do that.  We'll have a

20  preliminary meeting next week and then we'll get something

21  done.

22          **THE COURT:**  All right.  Then all of counsel who are

23  involved in at least this aspect of it, but certainly MR-GO --

24  well, it may be LEVEE, MR-GO, BARGE, and to the extent LEVEE

25  needs to participate, LEVEE as well, and the defendants

1  therein.

2              Yes, sir?

3        **MR. BROOKS:**  Your Honor, Philip Brooks for the

4  American Club, which relates to the declaratory judgment in New

5  York that you had asked about earlier.  So I just wanted to

6  give you that information.

7              As far as I understand it, the discovery

8  deadline in that dec action is April 18th, and that includes

9  all expert discovery and any dispositive motions would be due

10 May 20th, 2008.

11             And as I understand the way that it works up in

12 federal court in New York, they don't set a trial date ahead of

13 time.  Once the dispositive motion deadline runs, then

14 Judge Haight, who is the presiding judge, will schedule a

15 pretrial conference, which typically will happen within 20 to

16 30 days from the dispositive motion deadline.

17             Then they will get a trial date within 90 days

18 of the dispositive motion deadline, depending on scheduling

19 with the judge's calendars.

20       **THE COURT:**  Am I to understand that this is not an

21 insurance coverage issue that can be decided by, as most are,

22 by summary judgment?

23       **MR. BROOKS:**  They're in the middle of discovery right

24 now.  I know there's been a bunch of depositions taken and,

25 frankly, I don't know whether --

1          **THE COURT:**  Whether he's either going to do summary

2    judgment or whether there's going to be certain testimony?

3          **MR. BROOKS:**  Right.  I don't know that at this time,

4    but they have until May 20th --

5          **THE COURT:**  My guess is it will be, certainly,

6    several months before this is resolved --

7          **MR. GILBERT:**  Yes, sir.

8          **THE COURT:**  -- at the very earliest.

9          **MR. BROOKS:**  That's what it looks.  Thank you.

10         **THE COURT:**  Thank you very much.

11         **MR. TREEBY:**  I'm sorry, Your Honor.  William Treeby

12   for Washington Group.  The two, as I understand it, and

13   Ms. Wager-Zito was actually on this telephone conference and --

14   is Mr. Bruno here?

15         **THE COURT:**  Who is that?

16         **MR. TREEBY:**  Joe, I wanted you to hear this.  Because

17   if you disagree, I want you to have a chance to say something.

18   What the magistrate judge -- the two issues that concerned the

19   magistrate --

20         **THE COURT:**  We're back to the Dr. Bea?

21         **MR. TREEBY:**  Yes.  I'm sorry.  The magistrate judge

22   was concerned about was not just timeliness, but also whether

23   there was any impediment to the issuance of the subpoena

24   without cause.  And I know that's just a timeliness issue, but

25   he didn't seem to on the telephone conference, so we just want

1    to represent that to the --

2              **JUDGE WILKINSON:**  Tell him that there's no problem

3    with the issuance of the subpoena from this Court's point of

4    view.

5              **MR. TREEBY:**  Okay.  Thank you.

6              **THE COURT:**  Thank you for clearing that up.  Thank

7    you very much for your time and effort.

8              **MR. GILBERT:**  Thank you both.

9              **THE COURT:**  We'll do the best we can.  We're going to

10   try to listen to all of you and come up with, hopefully, a

11   workable trial plan, and plan for all of this, with the

12   understanding, as counsel pointed out, that it's always subject

13   to change if it's not working.  Okay.

14             **(WHEREUPON, the Court was adjourned.)**

15                            *\*\*\*\*\**

16                          <u>**CERTIFICATE**</u>

17             I, Jodi Simcox, RMR, Official Court Reporter for the

18   United States District Court, Eastern District of Louisiana, do

19   hereby certify that the foregoing is a true and correct

20   transcript, to the best of my ability and understanding, from

21   the record of the proceedings in the above-entitled and

22   numbered matter.

23

24                                    _____
                                     Jodi Simcox, RMR
25                                   Official Court Reporter