**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | **CIVIL ACTION** |
| | * | |
| | * | **NO. 05-4182** |
| | * | **and consolidated cases** |
| **PERTAINS TO:  BARGE** | * | |
| | * | |
| | * | **SECTION "K"  (2)** |
| *Boutte v. Lafarge* 05-5531 | * | |
| *Mumford v. Ingram* 05-5724 | * | |
| *Lagarde v. Lafarge* 06-5342 | * | **JUDGE** |
| *Perry v. Ingram* 06-6299 | * | **STANWOOD R. DUVAL, JR.** |
| *Benoit v. Lafarge* 06-7516 | * | |
| *Parfait Family v. USA* 07-3500 | * | **MAG. JOSEPH C. WILKINSON, JR.** |
| *Lafarge v. USA* 07-5178 | * | |
| | * | |

# BARGE PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PROTECTIVE ORDER AS TO THE SURREPTITIOUS RECORDINGS OF WITNESS INTERVIEWS BY COUNSEL FOR LAFARGE NORTH AMERICA, INC., THROUGH THEIR AGENT CENTANNI INVESTIGATIVE SERVICES, INC., FOR LAFARGE'S CONCEALMENT OF THE INTERVIEWS AND OTHER MISCONDUCT, AND FOR DECLARATORY AND OTHER RELIEF

### Table of Contents

I.  The Factual Basis for this Motion ............................................................................. 1

   A.  Lafarge's Surreptitious Recordings of *Ex Parte* Witness Interviews ..................... 1

     1.  Lafarge's Attempted Ambush of Sidney Williams at His Deposition ................ 1

     2.  Lafarge's Attempts to Conceal its Secret Tape Recordings ............................. 2

     3.  Lafarge's Breach of its Representation, that it Would Submit a List of All Centanni Interviewees No Later than February 15, 2008 .................................. 3

     4.  Lafarge's Failure to Honor its Representation Prejudiced Plaintiffs .................. 4

   B.  Lafarge's Counsel through Centanni Interviewed At Least 269 Separate Persons ............... 5

   C.  Lafarge's Draft Transcripts Are Incomplete ........................................................ 5

     1.  Lafarge's Redactions Interfere with the Integrity of Transcripts ..................... 5

     2.  There Appear to Be Unstated Redactions .......................................................... 5

     3.  Not Every Communication Was Transcribed ..................................................... 6

D.   Facts Concerning Ethical Problems in Lafarge's Counsel's Interviews.................................. 6

   1.   Lafarge's Counsel Interviewed or Attempted to Interview At Least Six Barge P.S.L.C. Clients Who Were Represented at the Time of their Interviews ........................................ 6

   2.   Lafarge's Counsel Interviewed At Least 32 Additional Persons Who Became Represented At Some Point ................................................................................................ 6

   3.   Centanni Acted as the Agent of Lafarge's Counsel.................................................... 7

   4.   Lafarge's Counsel's Failure to Comply with Louisiana RPC 4.2 ..................................... 8

   5.   Lafarge's Counsel's Failure to Comply with Louisiana RPC 4.3 ..................................... 9

      a.   Lafarge's Counsel Posed as Impartial Investigators........................................ 10

      b.   Lafarge's Counsel Evaded Direct Questions About their Client................................ 10

      c.   Lafarge's Counsel Left Interviewees with the Impression They Were on the Side of the Interviewees ................................................................................................ 11

      d.   Other Misleading Conduct of Lafarge's Counsel ........................................ 11

      e.   At Least One Interviewee Gave a Written Statement to Centanni, and It Has Not Been Produced .................................................................................................. 12

E.   Plaintiffs' Prompt Objections to Ex Parte Interviews with Putative Class Members........... 12

F.   Compliance with Local Rule 37.1E ...................................................................... 13

II.   The Legal Basis for this Motion ....................................................................... 13

A.   Lafarge's Counsel Have Committed Serious Ethical Violations................................. 13

   1.   Lafarge's Counsel Are Responsible for Centanni ........................................... 13

   2.   Lafarge's Counsel's Interviews Violated Louisiana RPC 4.3 .................................. 14

   3.   Lafarge's Counsel Violated Louisiana RPC 4.2(a) ........................................... 18

   4.   Lafarge's Counsel Violated RPC 3.3(a) ........................................................ 19

   5.   Lafarge's Counsel Violated RPC 3.4(a) and (d)............................................... 19

   6.   Lafarge's Counsel Violated RPC 4.1 and RPC 8.4(c)......................................... 20

   7.   This Court Has Authority to Enforce the Rules of Ethics Where Violations Interfere with the Administration of Justice ................................................................................. 20

B.   There is No Work-Product Privilege for Secretly Recorded Conversations, and Disclosure is a Proper Remedy ..................................................................................................... 21

C.   Lafarge's Failure to Produce the Recordings and Transcripts Was Improper.................... 21

D.   Lafarge Was Required to Turn Over the Asserted Recordings and Purported Transcripts in Advance of the Depositions of Interviewees .................................................................. 22

E.   Plaintiffs are Entitled to All Remedies Allowed by Rule 37(c)(1)...................................... 23

## Table of Authorities

### 1. Cases

*In re American Airlines, Inc.*,
   972 F.2d 605 (5th Cir. 1992), *cert. denied*, 507 U.S. 912 (1993)............................................20

*Brown v. St. Joseph County*,
   148 F.R.D. 246 (N.D. Ind. 1993) ...........................................................................................15

*Chiasson v. Zapata Gulf Marine Corp.*,
   988 F.2d 513 (5th Cir. 1993), *reh'g denied*, 3 F.3d 123 (5th Cir. 1993) ................................21

*City of Waco v. Bridges*,
  710 F.2d 220 (5th Cir. 1983), *cert. denied*, 465 U.S. 1066 (1984)..........................24
*Cole v. Appalachian Power Co.*,
  903 F. Supp. 975 (S.D. W.Va. 1995).................................................................15
*In re Debose-Parent*,
  869 So. 2d 80 (La. 2004) ...............................................................................19
*In re Domestic Air Transport Antitrust Litigation*,
  141 F.R.D. 556, 35 Fed. R. Evid. Serv. 207 (N.D. Ga. 1992) ............................15
*Douglas v. DynMcDermott Petroleum Operations Co.*,
  144 F.3d 364 (5th Cir. 1998), *reh'g denied*, 163 F.3d 223 (5th Cir. 1998),
  *cert. denied*, 525 U.S. 1068 (1999)..................................................................20
*In re Frank*,
  2006 WL 1133871 (W.D. La. April 25, 2006) (No. Misc. 06-04) ........................18
*First National Bank of St. Bernard v. Assavedo*,
  764 So. 2d 162 (La. App. 4th Cir. 2000) ..........................................................14
*Louisiana State Bar Association v. Harrington*,
  585 So. 2d 514 (La. 1990) .............................................................................14
*Mason v. T.K. Stanley, Inc.*,
  229 F.R.D. 533 (S.D. Miss. 2005) ...................................................................22
*Midwest Motor Sports, Inc. v. Arctic Cat Sales, Inc.*,
  144 F. Supp. 2d 1147 (D. S.D. 2001), *aff'd*, 347 F.3d 693 (8th Cir. 2003) ...........15
*Norton v. Sperling Law Office, P.C.*,
  437 F. Supp. 2d 398 (D. Md. 2006) .................................................................14
*Paulson v. Plainfield Trucking, Inc.*,
  210 F.R.D. 654 (D. Minn. 2002).....................................................................15
*Pfeifer v. State Farm Ins. Co.*,
  1997 WL 276085 (E.D. La. May 22, 1997) (No. Civ. A. 96-1895) ......................21
*Robertson v. National R.R. Passenger Corp.*,
  1999 WL 199093 (E.D. La. April 8, 1999) (No. CIV. A. 98-1397),
  *order clarified in other respects*, 1999 WL 350115 (E.D. La. May 27, 1999)
  (No. CIV. A. 98-1397)...............................................................................21, 22
*In re Tolchinsky*,
  740 So. 2d 109 (La. 1999) .............................................................................13
*Weider Sports Equipment Co., Ltd. v. Fitness First, Inc.*,
  912 F. Supp. 502 (D. Utah 1996).....................................................................15
*Williams v. Gunderson Rail Services, LLC*,
  2008 WL 145251 (W.D. La. Jan. 14, 2008) (No. CIV. A. 07-0887)................21, 22

## 2. **Court Rules**

Fed. Rule of Civil Procedure ...............................................................................
Fed. Rule of Civil Procedure 26(b)(3).....................................................................1
Fed. Rule of Civil Procedure 37(b)(2)(A)(ii)........................................................ 23
Fed. Rule of Civil Procedure 37(c)(1)(A)..............................................................23

Fed. Rule of Civil Procedure 37(c)(1)(B) ...................................................................23
Fed. Rule of Civil Procedure 37(c)(1)(C) ...................................................................23
Local Rule 37.1E ...........................................................................................................13
Local Rule LR83.2.10E, Rule 1(D) .............................................................................20

### 3.  <u>**Ethics Rules**</u>

American Bar Association Model Rule 4.2 .....................................................................18
American Bar Association Model Rule 4.2, cmt 8 .........................................................18
Louisiana Rule of Professional Conduct 3.3 .................................................................19
Louisiana Rule of Professional Conduct 3.3(a)(1) ........................................................19
Louisiana Rule of Professional Conduct 3.3(a)(2) ........................................................19
Louisiana Rule of Professional Conduct 3.4(a) .............................................................19
Louisiana Rule of Professional Conduct 3.4(d) .............................................................19
Louisiana Rule of Professional Conduct 4.1 .................................................................20
Louisiana Rule of Professional Conduct 4.2 .................................................................18
Louisiana Rule of Professional Conduct 4.2(a) .............................................................18
Louisiana Rule of Professional Conduct 4.3 ....................................................14, 17, 18
Louisiana Rule of Professional Conduct 5.3 .................................................................13
Louisiana Rule of Professional Conduct 7.3(b)(iii)(C ...................................................16
Louisiana Rule of Professional Conduct 8.4(a) .............................................................14
Louisiana Rule of Professional Conduct 8.4(c) .............................................................20
Pa Rules of Prof'l Conduct R. 4.3 & cmt 1 ...................................................................15

### 4.  <u>**Treatise**</u>

American Bar Association's Center for Professional Responsibility, THOMAS D. MORGAN,
    LAWYER LAW: COMPARING THE ABA MODEL RULES OF PROFESSIONAL CONDUCT WITH
    THE ALI RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS (ABA, 2005) .........16, 17

iv

I.      **The Factual Basis for this Motion**

    A.      **Lafarge's Surreptitious Recordings of _Ex Parte_ Witness Interviews**

        1.      **Lafarge's Attempted Ambush of Sidney Williams at His Deposition**

1.      On February 19, 2008, Lafarge took the deposition of Sidney Williams, a client of the Barge P.S.L.C.  During the course of the deposition, Lafarge attempted to use against him a previously undisclosed draft transcript of a secret tape recording of an interview Lafarge's counsel purportedly had with Mr. Williams, through their agent Centanni Investigative Services, on March 20, 2006.[1]  Counsel for Lafarge represented that it was a prior statement of Mr. Williams on which it intended to cross-examine him.[2]  Lafarge did not produce the recording.

2.      The deposition was suspended to make it possible to obtain a ruling from this Court.[3] This Motion seeks such a ruling.  Mr. Williams lives in Lilburn, Georgia, a suburb of Atlanta,[4] and is prepared to return to New Orleans to conclude his deposition after this Court rules.

3.      Lafarge's failure to produce this statement and recording in accordance with discovery requests and with Rule 26(b)(3) meant that plaintiffs' counsel were unable to prepare adequately for the deposition.  They were unable to show the purported statement to their client, compare it with the recording, find out if he was in fact the person on the recording, find out if the draft transcript accurately reflected the recording, and talk to him about the statement,

4.      Further information about the ambush is set forth in ¶¶ 14-18 below.

---

[1] A copy of the purported draft transcript of the March 20, 2006, interview of Sidney Williams by Centanni's Robert Garcia is Barge Plaintiffs' Exhibit 2 to this Motion.  Although labeled "Attorney Work Product," Lafarge's counsel has informed plaintiffs that the documents so labeled that have been produced to plaintiffs do not need to be filed under seal.

[2] The last page of the purported draft transcript of the Centanni interview states: "This telephone conversation between Robert Garcia and Sidney Williams was recorded on March 20, 2006 without Mrs. [sic] Williams [sic] knowledge or consent."  Barge Plaintiffs' Exhibit 2, p. 23.

[3] Tr. 89-103.  A copy of pp. 1-3 and 89-104 of the transcript of Mr. Williams' deposition is Barge Plaintiffs' Exhibit 3 to this Motion.

2.    **Lafarge's Attempts to Conceal its Secret Tape Recordings**

5.    Lafarge has previously denied obtaining any statements from others.[5]    Lafarge has

never amended or supplemented these discovery responses.

6.    Similarly, Lafarge used ambiguous wording in its December 28, 2007, response to

Plaintiffs' Request for Production No. 30 on the merits, wording that could mean that it had no

statements at the time of its answer pertaining to the events of August 28-29, 2005, as plaintiffs

took it, or that it did not take statements on the exact date of the hurricane and the day before,

which Lafarge now seems to have meant.  The response now seems deliberately worded to

mislead plaintiffs.  Lafarge's efforts to conceal the interviews was also exemplified in its

responses to plaintiffs' First Requests 3, 6, 17A, 20, and 21 on the merits.[6]

7.    Lafarge did not assert work-product privilege in its responses to these specific

discovery requests.

8.    Plaintiffs' First Requests for Production Regarding Class Certification requested that

defendant produce documents discussing flooding in the class area, including the sources of the

flooding (Request No. 5), the causes of the flooding (Request No. 6), the timing of the flooding

(Request No. 7), the depth of the flooding (Request No. 8), and "the timing, duration, and depth

of precipitation during the period August 27, 2005 through September 1, 2005."  Although

Lafarge's counsel's interviews enquired into witnesses' knowledge of all of these matters,

---

[4] Barge Plaintiffs' Exhibit 2 to this Motion, pp. 11-12.
[5] Lafarge's September 18, 2006, Responses to Plaintiff's Second Set of Interrogatories 26 (and cross-referenced responses to Interrogatories 1, 2, and 3) and Responses to Requests for Production 11, 17, and 18 in C.A. No. 05-04419, Section C.  These excerpts are attached as Barge Plaintiffs' Exhibit 4, exclusive of the hand-drawn asterisks.
[6] Excerpts from Lafarge's December 28, 2007, Responses to Plaintiffs' Requests for Production on the merits are attached as Barge Plaintiffs' Exhibit 5.

Lafarge's responses were virtually identical and highly misleading.[7]

9.   Lafarge's efforts to conceal the interviews continued in its December 28, 2007, responses to Barge Plaintiffs' First Interrogatories 5 and 17 on the merits.[8]

### 3.   Lafarge's Breach of its Representation, that it Would Submit a List of All Centanni Interviewees No Later than February 15, 2008

10. Lafarge repeatedly represented to this Court, as part of its papers in support of its Motion to Quash Subpoena Duces Tecum Served on Centanni Investigative Agency, that it would turn over to Barge Plaintiffs "no later than February 15, 2008," a list of all of the names and contact information for the persons Centanni interviewed.[9]

11. Lafarge's February 4, 2008, Memorandum in Support of its Motion to Quash repeatedly emphasized to the Court that it had provided, or would shortly provide, a list of all names and contact information for Centanni's interviewees.  See pp. 2, 3, 4, 8, 10, 11 and 12.[10]

12. A January 31, 2008, declaration by Wayne Centanni was filed with Lafarge's Motion to Quash.  It stated as part of ¶ 11(a) that Mr. Centanni had "been advised by counsel for LNA that counsel has now agreed to provide, or has provided to plaintiffs' counsel, the names and contact information of the witnesses called for in the subpoena)."[11]  (Emphasis supplied.)

---

[7] Excerpts from Lafarge's December 28, 2007, Responses to Plaintiffs' Requests for Production on Class Certification Issues are attached as Barge Plaintiffs' Exhibit 6.

[8] Excerpts from Lafarge's December 28, 2007, Responses to Plaintiffs' Interrogatories on the merits are attached as Barge Plaintiffs' Exhibit 7.

[9] Lafarge's February 1, 2008, Supplemental Response to Plaintiffs' Interrogatory No. 5, previously provided to the Court as Lafarge Motion to Quash Exhibit 2 and thus subject to Rule 11, Fed. R. Civ. Pro.  Excerpts are attached to this Motion as Barge Plaintiffs' Exhibit 8.

[10] Excerpts from Lafarge's February 4, 2008, Memorandum in Support of its Motion to Quash Subpoena Duces Tecum Served on Centanni Investigative Agency are attached as Barge Plaintiffs' Exhibit 9.

[11] Excerpts from the January 31, 2008, declaration of Wayne Centanni are attached to this Motion as Barge Plaintiffs' Exhibit 10 to this Motion.  See also Barge Plaintiffs' Exhibit 19.

3

13. Notwithstanding its promise to the Court, Lafarge did not give this chart to plaintiffs on February 15, 2008. It was exhibited to Mr. Gilbert at a meet-and-confer on that date but was not turned over then and Mr. Gilbert was not given an opportunity to read it.

### 4.   Lafarge's Failure to Honor its Representation Prejudiced Plaintiffs

14. The chart of Centanni interviewees promised no later than February 15, 2008, was not turned over until the midst of the February 19, 2008, deposition of Sidney Williams.

15. If Lafarge had kept its promise to the Court, counsel for plaintiffs would have seen immediately that numerous clients in this matter were on that list, including Sidney Williams.

16. At the time it breached its promise to the Court, Lafarge knew that Sidney Williams was a client of plaintiffs' counsel because he had been so identified in interrogatory answers provided by the Barge Plaintiffs to Lafarge on December 28, 2007.[12]

17. Lafarge's breach of its assurance to this Court deprived plaintiffs' counsel of the ability to insist with particularity on production of Mr. Williams' statement prior to the deposition, so that he could be prepared properly for his deposition.

18. Moreover, Rule 26(b)(3), Fed. R. Civ. Pro., requires that any person be able on request to obtain a copy of any statement made to a party. Plaintiffs had requested copies of all statements,[13] but had not even received statements of other clients until February 28, 2008, and the statement of Mr. Williams until the midst of Mr. Williams' February 19, 2008, deposition.

---

[12] Excerpts from Plaintiffs' December 28, 2007 (corrected Dec. 31, 2007), Answers to the Barge Entities' Interrogatories are Barge Plaintiffs' Exhibit 11 to this Motion. Mr. Williams was identified as a client in response to Interrogatory 10, on p. 17.

[13] See Plaintiffs' October 12, 2007, First Interrogatory 5 on the merits, and the Barge Entities' original and supplemental responses, in Barge Plaintiffs' Exhibits 7 and 8 to this Motion; and Plaintiffs' October 12, 2007, Request for Production No. 3 on the merits, and the Barge Entities' response, in Barge Plaintiffs' Exhibit No. 5.

**B.    Lafarge's Counsel through Centanni Interviewed At Least 269 Separate Persons**

19. Lafarge's chart shows interviews with 268 separate persons described as "Lower 9th Ward Residents Interviewed."[14]  Multiple interviews of the same person are not reflected, and in at least one instance two persons separately interviewed were counted as one in Lafarge's chart.

**C.    Lafarge's Draft Transcripts Are Incomplete**

**1.    Lafarge's Redactions Interfere with the Integrity of Transcripts**

20. Lafarge purports to have redacted some parts of interviews referring to other persons, or in which other persons spoke.[15]  There thus may be additional client interviewees.

21. Some of Lafarge's redactions are so pervasive that as a practical matter they deprive the statement of its integrity and defeat the production.  The purported draft transcript of the March 20, 2006, interview of Gloria Guy "and [NAMES REDACTED]," by Centanni's Robert Garcia, for example, shows 27 redactions of names, initials, or text in the body of the interview.[16]

**2.    There Appear to Be Unstated Redactions**

22. The draft transcript of the November 14, 2006, interview of Kenneth Robinson by Centanni's "Investigator BM" begins without any introduction, any identification of the

---

[14] A copy of Centanni's "List of Lower 9th Ward Residents Interviewed" is Barge Plaintiffs' Exhibit No. 12 to this Motion.  Client Robert Green and client Robert L. Green, Sr., are two different people, each of whom was interviewed and surreptitiously recorded.  The Centanni list erroneously conflates them into one person called Robert Green Sr.

[15] A copy of the February 28, 2008, letter of Derek Walker to Brian Gilbert transmitting 30 purported draft transcripts of surreptitiously recorded interviews of Barge P.S.L.C. clients is Barge Plaintiffs' Exhibit 13 to this Motion.

[16] A copy of the purported draft transcript of the March 20, 2006, interview of Gloria Guy by Centanni's Robert Garcia is Barge Plaintiffs' Exhibit 14 to this Motion.

investigator, or any identification of the interviewee.[17]  There was clearly an unstated redaction.

### 3.      Not Every Communication Was Transcribed

23. Many of the draft transcripts refer to other communications, which are not included in the draft transcripts.[18]

### D.      Facts Concerning Ethical Problems in Lafarge's Counsel's Interviews

### 1.      Lafarge's Counsel Interviewed or Attempted to Interview At Least Six Barge P.S.L.C. Clients Who Were Represented at the Time of their Interviews

24. Lafarge has turned over to counsel for plaintiffs 30 purported draft transcripts of surreptitious tape recordings of 28 clients of the Barge P.S.L.C.,[19] showing dates of interviews.

25. At least six of Lafarge's counsel's interviews occurred after the interviewees had retained Barge P.S.L.C. counsel to represent them in this matter: Montrell Hymes, Michael Jackson, Beverly Johnson, Patrice Milton, Kenneth Robinson, and Ronald McGill, discussed in ¶ 36 below, which ended when he volunteered that he was a client of Mr. Larry Wiedemann.

26. Lafarge has failed or refused, despite repeated requests, to produce the recordings of its counsel's interviews of Barge P.S.L.C. clients.

### 2.      Lafarge's Counsel Interviewed At Least 32 Additional Persons Who Became Represented At Some Point

27. In addition to the six already-represented Barge P.S.L.C. clients who were

---

[17] The first two pages of the purported draft transcript of the November 14, 2006, interview of Kenneth Robinson by Centanni's "Investigator BM" are Barge Plaintiffs' Exhibit 15.

[18] Purported Feb. 9, 2006, interview of Ernest Edwards, pp. 1-2, 16-17, Barge Plaintiffs' Exhibit 25 to this Motion (unredacted, as exemplar of questions asked to personns who did not evacuate); October 31, 2005, interview of Christopher Weaver, pp. 1-4, 17, Barge Plaintiffs' Exhibit 33.

[19] See Barge Plaintiffs' Exhibit 13, the February 28, 2008, letter of Derek Walker to Brian Gilbert.  Clients Ernest Edwards and Gloria Guy were each interviewed and surreptitiously

interviewed by Lafarge's counsel through Centanni, Lafarge's counsel interviewed at least 22 persons who were then or later in the process of becoming Barge P.S.L.C. clients and who later signed retainers with Barge P.S.L.C.

28. Lafarge knew that at least 35 interviewees were then or later clients of attorneys, because its chart included notes that the person was "interviewed prior to . . . being named as a client." Three or four additional persons, who then or later became clients, were interviewed.[20]

29. Lafarge's chart omits the dates of interviews by its counsel, so that plaintiffs' counsel cannot determine whether Lafarge's counsel knowingly interviewed represented adverse parties.

30. Lafarge's counsel through Centanni also requested these persons of adverse interest to turn over irreplaceable physical evidence.[21]

31. Lafarge has failed to produce the draft transcripts of any of the 241 interviewees who are not Barge P.S.L.C. clients, or the underlying recordings for either clients or non-clients.

### 3.   Centanni Acted as the Agent of Lafarge's Counsel

32. Lafarge has previously admitted to this Court that its counsel retained Centanni to

---

recorded twice.
     [20] Mr. Williams was not so identified on Centanni's list, Barge Plaintiffs' Exhibit 12, despite Lafarge's knowledge that he was a client. Other Centanni interviews of persons not so identified, although they had been listed as clients include (a) Kendrick Pounds(identified to Lafarge as a client in response to Plaintiffs' December 28, 2007, Answer to Interrogatory 10 on p. 17 of Barge Plaintiffs' Exhibit 11 to this Motion, and # 183 on the Centanni list; (b) Edward Lee Johnson, identified as a claimant in the limitations action on  May 8, 2006, and # 107 on the Centanni list; and (c) potentially Roy Reimonenq if he is the same as the "Roy Reimonenq" identified as one of the Boutte claimants on or about August 21, 2006, in the limitations action.
     [21] The signs posted by Centanni in the Lower Ninth Ward requested photographs and videos of the breaking of the levee.  See the February 12, 2008, Affidavit of Richard Seymour, ¶¶ 2-4, Exhibit A to Barge Plaintiffs' Opposition to Lafarge North America Inc.'s Motion to Quash Subpoena Duces Tecum Served on Centanni Investigative Agency, Barge Plaintiffs' Exhibit 16 to this Motion.  A copy of the photograph is Barge Plaintiffs' Exhibit 17 to this Motion.

perform factual investigations, that these included a program of interviewing witnesses in the

class area, that Centanni posted signs asking witnesses to get in touch with it, and that these

actions were all either after the filing of this class action or in its expectation.[22]

33. Lafarge has admitted that the acts of Centanni were performed as agents of its

counsel and has argued that Centanni's work product is therefore entitled to the privilege for trial

preparation materials under Rule 26(b)(3), Fed. R. Civ. Pro.[23]   The purported draft transcripts of

interviews with Lower Ninth Ward residents are all stamped "Attorney Work Product."[24]

### 4.     Lafarge's Counsel's Failure to Comply with Louisiana RPC 4.2

34. Centanni's activities were at the direction of defense counsel, and thus subject to the

Louisiana Rules of Professional Conduct ("RPC").  Louisiana Rule of Professional Conduct 4.2

bars counsel and their agents from communicating with persons of adverse interest represented

by counsel.

35. Lafarge, its counsel, and Centanni were well aware, prior to their interviews with

residents of the Lower Ninth Ward, that numerous persons in the Lower Ninth Ward had brought

claims against Lafarge, and thus of the risk that they would communicate with persons of

adverse interest represented by counsel.  See ¶¶ 25-34 above, and the cited exhibits.

36. The transcripts of the 30 surreptitiously recorded interviews produced to plaintiffs

---

[22] Barge Plaintiffs' Exhibits 9 and 10 to this Motion.

[23] "January xx, 2008" "Affidavit of Mark S. Raffman Pursuant to Fed. R. Civ. P. 26(b)(5)," Barge Plaintiffs' Exhibit 18 to this Motion, ¶ 8; Excerpts from January 31, 2008, Lafarge Objections to Rule 45 Subpoena to Centanni Investigative Agency, Barge Plaintiffs' Exhibit 19 to this Motion; Lafarge Memorandum in Support of its Motion to Quash Subpoena, Barge Plaintiffs' Exhibit 9 to this Motion; Lafarge's Privilege Log dated February 20, 2008, the day after the deposition of Sidney Williams, Barge Plaintiffs' Exhibit 20 to this Motion.

[24] Lafarge's counsel has informed counsel for plaintiffs that the documents so labeled do not need to be filed under seal.

show that Lafarge's counsel through Centanni did not ever ask interviewees if they were represented by counsel prior to asking substantive questions.[25]  In point of fact, the interview of Ronald McGill was ended after he volunteered, without being asked, that he had retained Barge counsel.[26]  Lafarge's counsel's interviews after that interview did not change; no questions were asked as to counsel. Lafarge's counsel through Centanni also interviewed at least five additional persons then represented by counsel.  See ¶ 25 above.

37. The procedure followed by Lafarge and Lafarge's counsel through Centanni made it both foreseeable and inevitable that Lafarge and Lafarge's counsel through Centanni would wind up communicating with persons of adverse interest represented by counsel.

**5.      Lafarge's Counsel's Failure to Comply with Louisiana RPC 4.3**

38. RPC 4.3 bars counsel and their agents from contacting persons with interests adverse to counsel's client unless clear disclosures are made.  In the situation at bar, Lafarge's counsel through Centanni were required to inform interviewee residents of the Lower Ninth Ward and putative class members that it was acting on behalf of counsel for Lafarge North America, that Lafarge's interests were adverse to theirs, and that they were under no obligation to speak with Centanni or to turn their irreplaceable physical evidence over to it.

39. At least one of the signs in the class area placed by Lafarge's counsel through Centanni asked witnesses to get in touch with it and asked if they had photos or videos.[27]  The sign did not make the required disclosures.

40. The draft transcripts of interviews with Barge P.S.L.C. clients show that Lafarge's

---

[25] March 24, 2008, Affidavit of Richard T. Seymour, ¶¶ 2-3, Barge Plaintiffs' Exhibit 21.
[26] A copy of the purported draft transcript of the June 5, 2006, interview of Ronald McGill by Centanni investigator Robert Garcia is Barge Plaintiffs' Exhibit 22.

counsel failed to inform interviewee residents of the Lower Ninth Ward that it was acting on

behalf of counsel for Lafarge, that Lafarge's interests were adverse to theirs, and that they were

under no obligation to speak with Centanni or to turn over irreplaceable physical evidence.[28]

### a.   Lafarge's Counsel Posed as Impartial Investigators

41. In the thirty purported draft transcripts of interviews of 28 Barge P.S.L.C. clients

produced by Lafarge, Lafarge's counsel through Centanni frequently described themselves as if

they were impartial investigators trying to sort through different stories and rumors.[29]  Draft

transcripts not attached hereto are similar.[30]

### b.   Lafarge's Counsel Evaded Direct Questions About their Client

42. Lafarge's counsel through Centanni attempted to evade direct questions about the

investigator's real client, including whether Centanni investigators were attorneys, and for whom

---

[27] Exhibit 16, ¶¶ 2-4; Centanni sign, Barge Plaintiffs' Exhibit 17.

[28] March 24, 2008, Affidavit of Richard T. Seymour, ¶¶ 2-8, Barge Plaintiffs' Exhibit 21 to this Motion.

[29] Purported July 25, 2006, interview of Nancy Conerly, pp. 1-2 and 9-10, attached hereto as Barge Plaintiffs' Exhibit 23; purported December 19, 2005, interview of Ernest Edwards, pp. 2-3, Barge Plaintiffs' Exhibit 24 (unredacted, as exemplar of questions asked to persons who did not evacuate); purported Feb. 9, 2006, interview of Ernest Edwards, pp. 9-10, 15-17, Barge Plaintiffs' Exhibit 25; purported draft transcript of the November 23, 2005, interview of Robert L. Green, Sr., pp. 1-2, Barge Plaintiffs' Exhibit 26; purported draft transcript of the March 20, 2006, interview of Antonio Guy, p. 1-2, Barge Plaintiffs' Exhibit 27;. purported draft transcript of the March 20, 2006, draft interview of Gloria Guy, pp. 1-2, and 17, Barge Plaintiffs' Exhibit 14; purported draft transcript of the December 12, 2006, interview of Montrell Hymes, pp. 1-2, 19, and 21-22, Barge Plaintiffs' Exhibit 28; purported draft transcript of the June 5, 2006, interview of Calvin Jenkins, pp. 2-3, Barge Plaintiffs' Exhibit 29; purported draft transcript of the March 17, 2006, interview of Stevens Keith, pp. 1-2 and 7; Barge Plaintiffs' Exhibit 31; purported draft transcript of the February 17, 2006, interview of Patricia Moses, pp. 1-2, 17-18, and 24-25, Barge Plaintiffs' Exhibit 32;  purported draft transcript of the December 7, 2005, interview of Michael Reed, pp. 1-2 and 6,  Barge Plaintiffs' Exhibit 30; Interview of Sidney Williams, pp. 1-2, Barge Plaintiffs' Exhibit 2.  There are no internal page numbers on the Centanni transcripts, so the stated page numbers refer to the unredacted transcripts.

[30] March 24, 2008, Affidavit of Richard Seymour, ¶¶ 2, 4-8, Barge Plaintiffs' Exhibit 21

they were working, or deflected the question by giving only their geographic location.[31]

### c.   Lafarge's Counsel Left Interviewees with the Impression They Were on the Side of the Interviewees

43. Lafarge's counsel's approach to these interviews through Centanni left some of the interviewees with the impression that the interviewers were on their side.[32]

### d.   Other Misleading Conduct of Lafarge's Counsel

44. Lafarge's counsel through Centanni lied to some putative class members and Barge clients, telling them that Centanni interviewers were "independent private investigators," thereby concealing the true role and function of the interviews.[33]

45. One interviewee thought the initial call had been made by the Fire Department, and kept asking how the interviewer had obtained his number.  He did not receive an answer, then asked if the number had been obtained from a form he had filled out.  The interviewer said: "Yeah probably." [34]  This was likely untruthful, given Lafarge's extensive mining of interviewees for others' telephone numbers.

---

to this Motion.

[31] February 9, 2006, interview of Ernest Edwards, pp. 9-10, Barge Plaintiffs' Exhibit 25; November 23, 2005, interview of Robert L. Green, Sr., pp. 2-3, Barge Plaintiffs' Exhibit 26; March 17, 2006, interview of Stevens Keith, pp. 1-2 and 7, Barge Plaintiffs' Exhibit 31; February 17, 2006, interview of Patricia Moses, pp. 17-18; December 7, 2005, interview of Michael Reed, pp. 9-10,  Barge Plaintiffs' Exhibit 30; purported draft transcript of the October 31, 2005, interview of Christopher Weaver, pp. 3-4, Barge Plaintiffs' Exhibit 33.

[32] December 19, 2005, interview of Ernest Edwards, p. 41, Barge Plaintiffs' Exhibit 24; June 5, 2006, draft interview of Calvin Jenkins, p. 11, Barge Plaintiffs' Exhibit 29; March 17, 2006, interview of Stevens Keith, pp. 12-13, Barge Plaintiffs' Exhibit 31; purported draft transcript of the February 17, 2006, interview of Patricia Moses, pp. 24-25, Barge Plaintiffs' Exhibit 32; October 31, 2005, interview of Christopher Weaver, pp. 3, 21-22, Barge Plaintiffs' Exhibit 33.

[33] December 19, 2005, interview of Ernest Edwards, p. 2, Barge Plaintiffs' Exhibit 24; December 7, 2005, interview of Michael Reed, p. 10, Barge Plaintiffs' Exhibit 30.

[34] October 31, 2005, interview of Christopher Weaver, pp. 1-3, 20, Barge Plaintiffs'

46. Lafarge's counsel through Centanni sometimes asked interviewees if they had spoken with anyone else.[35]  Such questions could mislead interviewees into thinking there was no need to speak with anyone else, such as counsel attempting to protect their interests.

47. Lafarge's counsel through Centanni asked at least one interviewee for photographs,[36] without revealing that if they were turned over they would be sequestered away from counsel trying to protect their interests.

48. Lafarge's counsel's approach to these interviews through Centanni left at least one interviewee with the impression that his remarks were being written down.  If there were written notes of Lafarge's counsel's interviews, they have not been produced.  If there are no written notes, Lafarge's counsel's through Centanni lied to interviewees about writing down their remarks, presumably to help conceal the surreptitious recording of the interviews.[37]

### e.    At Least One Interviewee Gave a Written Statement to Centanni, and It Has Not Been Produced

49. One of the draft transcripts of interviews indicates that a written statement was given to Centanni, but it has not been produced.[38]

### E.    Plaintiffs' Prompt Objections to Ex Parte Interviews with Putative Class Members

50.  Shortly after the Barge P.S.L.C. discovered that Lafarge's counsel was engaging in *ex parte* communications with putative class members, but long before learning of the

---

Exhibit 33.
    [35] Purported draft transcript of the Feb. 9, 2006, interview of Ernest Edwards, Barge Plaintiffs' Exhibit 25, pp. 16-17.
    [36] February 17, 2006, interview of Patricia Moses, pp. 26-27, Barge Plaintiffs' Exhibit 32.
    [37] Purported draft transcript of the Dec. 19, 2005, interview of Ernest Edwards, Barge Plaintiffs' Exhibit 24, p. 15; purported draft transcript of the February 9, 2006, interview of Ernest Edwards, Barge Plaintiffs' Exhibit 26 to this Motion, pp. 15, 17.

surreptitious recordings, plaintiffs' counsel objected, stated that such communications were improper, and requested cessation of such contacts.[39]   Lafarge responded by asserting its right to engage in *ex parte* communications but did not reveal the surreptitious recordings.[40]

51. No judicial ruling was sought at the time, because there was no record of abuse within the meaning of the authorities cited by defense counsel.  There is now such a record, and plaintiffs will shortly move to bar all further *ex parte* contacts by Lafarge.

### F.      Compliance with Local Rule 37.1E

52. The Local Rule 37.1E Certificates of Compliance of Brian A. Gilbert and Karen Wiedemann are Barge Plaintiffs' Exhibits 36 and 37.

## II.     The Legal Basis for this Motion

### A.      Lafarge's Counsel Have Committed Serious Ethical Violations

#### 1.      Lafarge's Counsel Are Responsible for Centanni

The relationship between Lafarge's counsel and Centanni is described above.  Louisiana Rule of Professional Conduct 5.3 placed nondelegable duties on counsel for Lafarge North America, to ensure that any assistant employed by counsel conform to the same ethical standards as counsel.[41]   There is no exception for private investigators.  For purposes of RPC 5.3, Centanni's actions were the actions of defense counsel.  *Cf. In re Tolchinsky*, 740 So.2d 109 (La. 1999) (consensual disbarment approved for attorney who failed to supervise activities of former employee, who acted unethically).

---

[38] February 9, 2006, interview of Ernest Edwards, Barge Plaintiffs' Exhibit 25, p. 8.
[39] November 28, 2007, letter from Brian Gilbert to counsel for Lafarge, Barge Plaintiffs' Exhibit 34 to this Motion.
[40] November 30, 2007, letter of Derek A. Walker and Robert B. Fisher, Jr., to Brian A. Gilbert, Barge Plaintiffs' Exhibit 35 to this Motion.
[41] Relevant provisions of the Louisiana Rules of Professional Conduct are contained in

Louisiana RPC 8.4(a) also bars violations of the Rules of Professional Conduct committed through the acts of another.  For purposes of RPC 8.4(a), Centanni's actions were the actions of defense counsel.

### 2.    Lafarge's Counsel's Interviews Violated Louisiana RPC 4.3

It is clear from the transcripts that Lafarge's counsel through Centanni executed a careful program, presumably designed by defense counsel, to attempt to mislead residents of the Lower Ninth Ward into believing that the investigator was neutral, or was even on their side, and to evade direct questions about their role.  This was exactly contrary to the requirements of RPC 4.3.  The Supreme Court of Louisiana has construed RPC 4.3 as requiring lawyers to identify themselves as lawyers.  *Louisiana State Bar Ass'n v. Harrington*, 585 So.2d 514, 517 (La. 1990), stated: "In addition, Harrington did not carefully explain to James his role in the matter; he did not even identify himself by name or indicate that he is a lawyer until he had asked James several questions about the purchase of the home and the carpet. His actions are, therefore, in violation of Rule 4.3 as well."  Similarly, *First Nat. Bank of St. Bernard v. Assavedo*, 764 So.2d 162, 163 (La. App. 4th Cir. 2000), stated: "A lawyer shall assume that an unrepresented person does not understand the lawyer's role in a matter and the lawyer shall carefully explain to the unrepresented person the lawyer's role in the matter."

Rule 4.3 or its equivalents in other states are frequently construed as requiring counsel dealing with an unrepresented person of adverse interest to identify himself or herself as counsel for a client adverse to them, and sometimes to state that the person in question has no obligation to answer questions.  *Norton v. Sperling Law Office, P.C.*, 437 F. Supp. 2d 398, 404 (D. Md.

---

Barge Plaintiffs' Exhibit 38.

2006), stated that "under the Pennsylvania Rules of Professional Conduct an attorney who contacts an unrepresented person must disclose her relationship with her client and explain that the client has interests contrary to that person. PA RULES OF PROF'L CONDUCT R. 4.3 & cmt 1.  It is highly doubtful that Evans would have discussed *anything* with a Lebowitz attorney had he made such a call and properly explained that he had been retained to sue her for hundreds of thousands of dollars."  (Emphasis in original.)  *Accord*, *Paulson v. Plainfield Trucking, Inc.*, 210 F.R.D. 654, 659 (D. Minn. 2002); *Brown v. St. Joseph County*, 148 F.R.D. 246, 254 (N.D. Ind. 1993); *In re Domestic Air Transp. Antitrust Litigation*, 141 F.R.D. 556, 562, 35 Fed. R. Evid. Serv. 207 (N.D. Ga. 1992).

 *Midwest Motor Sports, Inc. v. Arctic Cat Sales, Inc.*, 144 F. Supp. 2d 1147 (D. S.D. 2001), *aff'd*, 347 F.3d 693 (8th Cir. 2003), is similar to the case at bar.  The court held that Rule 4.3 applies to investigators employed by defense counsel who secretly tape-recorded conversations with plaintiff's employees.  It considered such employees to be of adverse interest, and held that there was a duty of disclosure: "The attorney or investigator shall: (1) fully disclose his or her representative capacity to the employee, (2) state the reason for seeking the interview as it concerns the attorney's client and the employer, and (3) inform the individual of his or her right to refuse to be interviewed."  (Citation omitted.)[42]  Accord, *Cole v. Appalachian Power Co.*, 903 F. Supp. 975 (S.D. W.Va. 1995) (investigators).

 Protective disclosures were particularly necessary here.  Many of the residents of the

---

[42] *Weider Sports Equipment Co., Ltd. v. Fitness First, Inc.*, 912 F. Supp. 502, 511-12 (D. Utah 1996), held that the rule may not apply to private investigators or "testers" because the public is not likely to think them disinterested, or to trust them, compared to the trust and assumptions of disinterest the public accords to lawyers.  Here, however, it is reasonable to believe that the public thought lawyers or an official investigative agency had placed the types of

Lower Ninth Ward had limited education.  The 2000 Census reported educational attainments by Census tract in the Lower Ninth Ward of New Orleans, where Centanni was active.  In most of this area imore than a third of the population aged 25 and up lacked a high school degree.[43]  The danger that a witness may be misled into trusting a lawyer or lawyer's investigator would be increased by lower educational levels in the area.

This Court can also take judicial notice that the survivors of the Lower Ninth Ward who lived through the flooding and its aftermath likely endured a trauma greater than that of the ordinary victim of a physical injury.  Yet even ordinary victims are assumed to need time to recover some equanimity before the lawyers are allowed to approach them for even a non-hostile activity such as offering their legal services.[44]  Here, many of the interviewees were still scattered far from their homes.

The American Bar Association's Center for Professional Responsibility publishes THOMAS D. MORGAN, LAWYER LAW: COMPARING THE ABA MODEL RULES OF PROFESSIONAL CONDUCT WITH THE ALI RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS (ABA, 2005)::

> This Section states two general requirements. First, the lawyer must not mislead the unrepresented nonclient to that person's detriment concerning the identity and interests of the person whom the lawyer represents.  For example, the lawyer may not falsely state or imply that the lawyer represents no one, that the lawyer is disinterestedly protecting the interests of both the client and the unrepresented nonclient, or that the nonclient will suffer no harm by speaking freely.  Such a false statement could disarm the unrepresented nonclient and result in unwarranted advantage to the lawyer's client.  Second, the lawyer is subject to a duty of disclosure when the lawyer knows or

---

signs Centanni posted.

[43] March 24, 2008, Affidavit of Richard T. Seymour, ¶ 9 at pp. 2-3, Barge Plaintiffs' Exhibit 21.

[44] *Cf.* Louisiana RPC 7.3(b)(iii)(C), barring lawyers' communications until more than thirty days after an accident or disaster.

> reasonably should know that the unrepresented nonclient misunderstands the lawyer's role in the matter and when failure to correct the misunderstanding would prejudice the nonclient or the nonclient's principal.

*Id.* at 651 (emphases supplied).  It continued: "A lawyer dealing with a sophisticated business person will have less need for caution than when dealing with an unsophisticated nonclient.  *Id.*

When these principles are applied to the members of the proposed class, who lived through the flooding and its aftermath, it is clear that RPC 4.3 required full disclosure of adverse interests before these persons of adverse interest were interviewed.

Centanni also requested persons of adverse interest to turn over irreplaceable physical evidence— photographs and videos of the breaking of the levee—without revealing that anything obtained would be sequestered from anyone trying to represent their interests, with Lafarge North America then claiming that work-product privilege applied to all aspects of the matter.  This presents one of the worst possible scenarios of abuse in violation of RPC 4.3.

While Lafarge's counsel have represented that no physical evidence was turned over by these witnesses, two years ago they also formally denied obtaining statements from others.  Their representations cannot reasonably be relied upon.

Centanni's sign looks for all intents and purposes as if it had been placed there by a government or other impartial agency, or by attorneys disinterestedly looking into the causes of the flood.  The statements of Centanni's interviewer at the beginning of the interview with Mr. Williams are equally misleading.  Neither the sign nor the Centanni interviewers provided any type of disclosure or caution to the persons of adverse interest to whom it was directed.

17

### 3.    Lafarge's Counsel Violated Louisiana RPC 4.2(a)

Lafarge admits that Centanni's contacts with witnesses in the Lower Ninth Ward were all either after the filing of this class action or in the immediate anticipation of such litigation, for the purpose of defending claims by persons in the targeted interview population.  It adopted a procedure of interviewing everyone it could find, while rigorously blinding itself to the possibility of their representation.  Their approach virtually guaranteed that they would wind up interviewing represented persons of adverse interest.  Plaintiffs have shown six instances in which they did so, and others are possible.  Lafarge and its counsel by design placed themselves in a position in which violations of RPC 4.2(a) were inevitable.

Louisiana RPC 4.2(a) is identical to ABA Model Rule 4.2: The ABA's Comment 8 states that the rule cannot be evaded by ignoring the obvious: "Thus, the lawyer cannot evade the requirement of obtaining the consent of counsel by closing eyes to the obvious."  Although the Louisiana Supreme Court has not adopted the comments to the ABA Model Rules, the Western District of Louisiana relied on this Comment in construing Louisiana RPC 4.2.  *In re Frank*, 2006 WL 1133871 (W.D. La. April 25, 2006) (No. Misc. 06-04), at p. *2, rejected respondent's argument that he did not know his client's co-defendants were represented by counsel.[45]

Moreover, Lafarge's counsel's violation of RPC 4.3 facilitated their violation of RPC 4.2.  By failing to disclose that the interviews were a project of counsel representing a client adverse to their interests, Lafarge's counsel minimized the likelihood that legally unsophisticated witnesses would think to mention that they already had counsel in the matter.  The duty of disclosure mandated by RPC 4.3 is part of the mechanism by which the policy of RPC 4.2 is

---

[45] A copy of *In re Frank* is attached as Plaintiffs' Exhibit 39 to this Memorandum.

protected.  By analogy, the Louisiana Supreme Court imposed discipline in *In re Debose-Parent*, 869 So.2d 80, 85 (La. 2004), relying in part on the fact that in the tape-recorded interview defense counsel failed to ask plaintiff whether her counsel had granted permission for the interview.  "The committee determined respondent desired to meet with Ms. Becnel in the absence of her attorney, noting respondent did not ask Ms. Becnel on the tape whether she had permission from her attorney to speak to respondent."  *Id.* at 83-84.

### 4.       Lafarge's Counsel Violated RPC 3.3(a)

Lafarge's counsel violated RPC 3.3(a)(1) by representing to the Court, in its filings on behalf of its Motion to Quash the subpoena directed to Centanni, that it would turn over the names and contact information of all interviewees by February 15, while intending to hide the information so as to ambush Sidney Williams in his interview.

Lafarge's counsel violated RPC 3.3(a)(2) by representing to the Court in the same filings that its interviews of Lower Ninth Ward residents were entitled to the work-product privilege, while concealing that the interviews were recorded and that local case law holds there is no privilege for secretly recorded interviews.

### 5.       Lafarge's Counsel Violated RPC 3.4(a) and (d)

Lafarge's counsel violated RPC 3.4(a) by unlawfully obstructing Barge counsel's access to evidence by concealing the interviews and the secret recordings, by failing to make the disclosures required by Rule 4.3 and thereby misleading interviewees into thinking they had provided the information necessary to protect their interests.

Lafarge's counsel violated RPC 3.4(d) by falsely denying that they had witness statements, by using frivolous work-product privilege assertions, and by failing to construe

discovery requests reasonably, and thus failing to make reasonably diligent efforts to comply with discovery requests.

### 6.     Lafarge's Counsel Violated RPC 4.1 and RPC 8.4(c)

Lafarge's counsel violated RPC 4.1 and RPC 8.4(c) by materially misleading interviewees or by lying to them.

### 7.     This Court Has Authority to Enforce the Rules of Ethics Where Violations Interfere with the Administration of Justice

This Court has adopted the Louisiana Rules of Professional Conduct. Local Rule LR83.2.10E, Rule 1(D).

Where ethical violations interfere with the administration of justice in a case, Federal courts have authority to enforce the State and national ethical rules. *In re American Airlines, Inc.*, 972 F.2d 605, 611 (5th Cir. 1992), *cert. denied*, 507 U.S. 912 (1993), rejected a "hands off" approach to ethical violations and cited and reaffirmed an earlier decision stating: "We have squarely rejected this hands-off approach in which ethical rules 'guide' whether counsel's presence will 'taint' a proceeding, holding instead that a '[d]istrict [c]ourt is *obliged* to take measures against unethical conduct occurring in connection with any proceeding before it.'" (Emphasis supplied by the court.) The court adopted this strong position in the context of a motion for disqualification of counsel, relief which goes well beyond what is sought by the Motion. Similarly, the court stated in *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 370 (5th Cir. 1998), *reh'g denied*, 163 F.3d 223 (5th Cir. 1998), *cert, denied*, 525 U.S. 1068 (1999), a case involving an attorney's breach of confidentiality to support her Title VII claim: "The obligations of this profession are not 'merely hortatory appeals to [one's]

20

conscience,' but enforceable strictures of a lawyer's conduct."  Citing an earlier decision, the court stated: "'An ethical code is not a garment that lawyers may don and doff at pleasure.'"

**B.      There is No Work-Product Privilege for Secretly Recorded Conversations, and Disclosure is a Proper Remedy**

Lafarge cannot excuse its failure to turn over the purported transcripts of surreptitious recordings of asserted conversations with persons in the Lower Ninth Ward, or the recordings themselves, on the basis of the work-product privilege.  The act of making a surreptitious recording destroys any work-product privilege in the contents of the conversation and warrants disclosure.  *Pfeifer v. State Farm Ins. Co.*, 1997 WL 276085 (E.D. La. May 22, 1997) (No. Civ. A. 96-1895) at p. *3;[46] *Robertson v. National R.R. Passenger Corp.*, 1999 WL 199093 (E.D. La. April 8, 1999) (No. CIV. A. 98-1397) at p. *1, *order clarified in other respects*, 1999 WL 350115 (E.D. La. May 27, 1999) (No. CIV. A. 98-1397);[47] *Williams v. Gunderson Rail Services, LLC*, 2008 WL 145251 (W.D. La. Jan. 14, 2008) (No. CIV. A. 07-0887),[48] at p. *2.

**C.      Lafarge's Failure to Produce the Recordings and Transcripts Was Improper**

Lafarge's false denial of the existence of any statements, its re-wording of discovery requests to deny the plain intention of the requests, its concealment of its actions behind a privilege it knew or should have known was nonexistent, and its refusals to produce the recordings and transcripts, were in violation of the discovery rules.  Lafarge cannot defend its actions on the ground that it needed to preserve the secrecy of the recordings for the sake of impeachment.  For at least a decade and a half, it has been clear that recordings and transcripts such as those in question are substantive, go to the merits of the controversy, and cannot be

---

[46] *Pfeifer* is Barge Plaintiffs' Exhibit 40.

[47] The opinion and clarification in *Robertson* are Barge Plaintiffs' Exhibit 41.

withheld because of any asserted interest in impeachment.

*Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517-18 (5th Cir. 1993), *reh'g denied*, 3 F.3d 123 (5th Cir. 1993) (*per curiam*), *cert. denied*, 511 U.S. 1029 (1994), vacated the judgment on a jury verdict for defendant because defendant had not disclosed in discovery a surveillance videotape it had made of the plaintiff.  Rejecting the defendant's argument that the videotape was only for impeachment, the court held that it went to the issues the jury had to determine, as well as to plaintiff's credibility.  As such, it should have been disclosed.

So too, here.  The purported draft transcripts show a concerted attempt to obtain information about the timing and cause of the flooding of the Lower Ninth Ward.  These transcripts and recordings should have been disclosed.  Lafarge's concealment of the recordings and transcripts have made this Motion necessary.

### D.    Lafarge Was Required to Turn Over the Asserted Recordings and Purported Transcripts in Advance of the Depositions of Interviewees

Because the purpose of disclosure of the recordings and transcripts is to prevent ambush of witnesses at deposition or trial, the relief sought by plaintiff's Motion is appropriate: barring depositions of interviewees until thirty days after Lafarge produces the recording and transcript of the witness.  That period of time is reasonable for checking the accuracy of the transcripts, which even Lafarge lists as "draft" transcripts, for determining whether the person on the recording is the same as the deponent, and for discussing the recording and transcript with the deponent.  *Robertson v. National R.R. Passenger Corp.*, 1999 WL 199093 (E.D. La. April 8, 1999), at p. *2.  *Accord*, *Mason v. T.K. Stanley, Inc.*, 229 F.R.D. 533, 536 (S.D. Miss. 2005); *Williams v. Gunderson Rail Services, LLC*, 2008 WL 145251 (W.D. La. Jan. 14, 2008) (No.

---

[48] *Williams* is Barge Plaintiffs' Exhibit 42.

CIV. A. 07-0887), at p. *3.

The balance of equities requires that the recordings and transcripts be produced in advance of depositions, as the motion seeks.

### E.    Plaintiffs are Entitled to All Remedies Allowed by Rule 37(c)(1)

Lafarge first denied obtaining any statements, then claimed a clearly inapplicable work-product privilege for any statements obtained while concealing the fact that destroyed the privilege to which it was not entitled: that it had surreptitiously taped its interviews of residents of the Lower Ninth Ward.

Rule 37(c)(1)(C) authorizes relief under Rule 37(b)(2)(A)(ii), which includes "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence."  This authorizes an Order barring defendants from making any direct use of the interviews.  Such relief is critical in the interests of justice. The deterrent value of precluding Lafarge and the Barge entities from making any direct use of the transcripts or recordings or referring to them at depositions or at trial would be great, and Lafarge and the Barge entities would still be able to use them to prepare questions for depositions or trial.  The transcripts and recordings would still need to be disclosed to plaintiffs, so that the witness can be prepared properly and the deposition and trial can occur on a fair and even-handed basis.  This meets the standard of *City of Waco v. Bridges*, 710 F.2d 220, 225 (5th Cir. 1983), *cert. denied*, 465 U.S. 1066 (1984), for suppression of evidence in a civil case: "For the exclusionary rule to ever be applicable in an action of this nature, the deterrent benefit of the exclusion must outweigh the detriment to the public interest in providing fact finders with all

relevant testimony." (Citation omitted.) Without preclusion of use, Lafarge would be rewarded for its actions and other litigants will see an incentive to act similarly.

Rule 37(c)(1)(A) also authorizes the Court to order that the travel expenses of Mr. Williams be reimbursed for having to return to complete his deposition if the deposition is to be resumed.

Rule 37(c)(1)(B), Fed. R. Civ. Pro., authorizes informing the jury of Lafarge's conduct. While informing the jury is a matter for the trial judge, the findings requested by the Motion are an essential first step.

Plaintiffs pray that their Motion be granted. A proposed Order is submitted herewith.

Respectfully submitted,

/s/ Brian A. Gilbert
Brian A. Gilbert, Esq.
LAW OFFICE OF BRIAN A. GILBERT, P.L.C.
821 Baronne Street
New Orleans, Louisiana 70113
        Telephone: (504) 885-7700
        Telephone: (504) 581-6180
        Facsimile: (504) 581-4336
        e-mail: bgilbert@briangilbertlaw.com

/s/ Lawrence D. Wiedemann
Lawrence D. Wiedemann.
Karl Wiedemann
Karen Wiedemann
WIEDEMANN & WIEDEMANN
821 Baronne Street
New Orleans, Louisiana 70113
        Telephone: (504) 581-6180
        Facsimile: (504) 581-4336
        e-mail: lawrence@wiedemannlaw.com,
karl@wiedemannlaw.com,     karen@wiedemannlaw.com,

/s/ Patrick J. Sanders
Patrick J. Sanders
3316 Ridgelake Drive, Suite 100
Metairie, LA 70002
    Telephone: 504-834-0646
    e-mail: pistols42@aol.com

/s/ Richard T. Seymour
Richard T. Seymour
Adele Rapport
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C.  20036-4129
    Voice: 202-862-4320
    Cell:   202-549-1454
    Facsimile:  800-805-1065 and 202-828-4130
    e-mail: rick@rickseymourlaw.net,
adele@rickseymourlaw.net

/s/ Lawrence A. Wilson
Lawrence A. Wilson
David W. Drucker
Wilson, Grochow, Druker & Nolet
Woolworth Building
233 Broadway, 5th Floor
New York, NY 10279-0003
    Telephone: (212) 608-4400
    Facsimile: (212) 227-5159
    e-mail: lwilson@wgdnlaw1.com, ddruker@wgdnlaw1.com

/s/ Alan L. Fuchsberg
Alan L. Fuchsberg, Esq.
Leslie Kelmachter, Esq.
The Jacob D. Fuchsberg Law Firm
500 Fifth Avenue, 45th Floor
New York, NY 10110-0002
    Telephone: 212-869-3500 ext. 235
    Facsimile:  212-398-1532
    e-mail: a.fuchsberg@fuchsberg.com,
    l.kelmachter@fuchsberg.com

Dated: March 25, 2008