**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | |
| | * | NO. 05-4182 "K"(2) |
| PERTAINS TO: ROAD HOME | * | |
| *Louisiana State*, C.A. No. 07-5528 | * | JUDGE DUVAL |
| | * | |
| | * | MAGISTRATE WILKINSON |
| | * | |

*********************************************************************************

**OPPOSITION TO MOTION OF**
**STATE FARM FIRE AND CASUALTY COMPANY**
**AND CERTAIN OTHER INSURER DEFENDANTS**
**TO DISQUALIFY PLAINTIFF'S PRIVATE COUNSEL**

Paul G. Aucoin, Attorney at Law; The Dudenhefer Law Firm, L.L.C.; Fayard & Honeycutt, A.P.C.; McKernan Law Firm; Ranier, Gayle and Elliot, L.L.C.; and Domengeaux Wright Roy & Edwards L.L.C., along with their individual counsel who have appeared in this case, all through their undersigned counsel, respectfully submit this opposition to State Farm Fire and Casualty Company and certain other insurer defendants' (collectively the "Insurers") motion to disqualify Plaintiffs' private counsel.

**I.    INTRODUCTION**

Motions to disqualify a party's chosen counsel brought by that party's opponent are disfavored due to the legitimate concerns about the "tactical use of disqualification motions to

harass opposing counsel."[1]  Therefore, an opponent seeking to disqualify counsel of the opposing party is held to a high standard of proof before disqualification will be granted.

Here, the insurers initially seek to disqualify the Plaintiffs' chosen counsel because of alleged conflicts of interest.  Insurers make these allegations even though all of the Plaintiffs in this litigation have the same fundamental objective—to maximize compensation from insurers for underpayment of amounts due for property damage under their policies.  Most notably, in making these allegations, the Insurers do not provide any evidence that there is currently a conflict in the representations of Plaintiffs' counsel.  Rather, the Insurers attempt to raise numerous instances in which conflicts <u>could potentially arise</u> in the future.

This approach to a motion to disqualify is legally insufficient for three reasons.  *First*, mere allegations that there is the potential for a conflict, should a particular set of circumstances occur, is an insufficient basis to disqualify counsel.  *Second*, many of these allegations are not conflicts and will never become conflicts because counsel's scope of representation of its clients excludes any claims adverse to one another.  *Third*, even if there is still the potential for a real conflict to arise—not just a purely self-serving manufactured hypothetical conflict, the individual clients themselves may waive the conflicts through informed consent.  Thus, the Insurers' motion to disqualify must be denied.

In addition to alleging potential future conflicts, the Insurers also contend that counsel must be disqualified from representing the State because counsel allegedly cannot be paid in accordance with certain state statutes.  This contention is also without merit because the Insurers confuse the difference between the Louisiana Attorney General's authority to hire counsel, and his authority to compensate counsel.  The Attorney General unquestionably has the constitutional authority to hire counsel, even if there may be limitations on how such counsel can be

---

[1] *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 436 (1985)(quotations omitted).

compensated for their efforts. Moreover, because the Attorney General has not agreed to compensate counsel here, any such limitations are premature and speculative. Finally, even if counsel were unable to receive compensation for their efforts representing the State, it would not be a basis to disqualify them as the State's counsel.

In sum, the Insurers have failed to establish any basis for disqualifying counsel due to an actual conflict of interest, or that any counsel lacks the authority to represent the State. Accordingly, the motion to disqualify Plaintiffs' counsel should be denied.

## II.    FACTUAL BACKGROUND

### A.    The Road Home Program

The Road Home Program is a state program that provides grants to individual homeowners to assist them in repairing and rebuilding their homes after Hurricanes Katrina and Rita and is administered by the Office of Community Development ("OCD").[2]   Under the program, an individual homeowner can be reimbursed up to $150,000 through a grant for the losses their home sustained due to the effects of those hurricanes.[3]   A grant award will be adjusted downward to reflect the amounts the individual homeowner received from his or her insurer.[4]   After a Road Home application is approved, there is a closing that the individual homeowner must attend before the grant payment will be disbursed.[5]

At that closing, the homeowner is required to sign a document entitled: "The Road Home/Limited Subrogation/Assignment Agreement" (hereinafter "Subrogation Agreement" or

---

[2] Affidavit of Daniel A. Rees (attached hereto as Ex. 1).

[3] *Id.*

[4] *Id.*

[5] *Id.*

"Agreement").[6]  This document facially grants the State an assignment of the grantee's interest, up to the amount of the Road Home grant, in, *inter alia*, any future insurance proceeds obtained by the individual homeowner for reimbursement of structural damage to his or her home.[7]  The Subrogation Agreement also purports to give the State preference and priority over any other party entitled to such proceeds.[8]  Finally, the Agreement requires the individual insured to obtain the State's written consent before settling any claim, unless the settlement provides the State reimbursement for the full amount of the Road Home grant.[9]

Since the Road Home Program has begun disbursing grants, there have been numerous settlements between individual insureds and their insurers. In these settlements, the State has exercised its rights under the Agreement through the OCD, which to date has conducted all negotiations for the State regarding the State's reimburseable portion of each individual homeowner's settlement.[10]  Further, the OCD has provided the written consent from the State necessary to effectuate these settlements.[11]  The attorneys for the six firms who submit this opposition have never negotiated with an individual insured on behalf of the State regarding the State's right to a portion of an insurance settlement.[12]

---

[6] *Id.*

[7] Subrogation Agreement (attached hereto as Ex. 2).

[8] *Id.*

[9] *Id.*

[10] Ex. 1, Rees Affidavit.

[11] *Id.*

[12] *Id.*

B.     **Procedural History**

On August 23, 2007, the State of Louisiana, individually and on behalf of a proposed class of actual and future recipients of benefits under The Road Home Program, filed suit against over two hundred foreign and domestic insurance carriers in Civil District Court for the Parish of Orleans, Case No. 2007-8970.[13]   On September 11, 2007, the defendants removed this case to the Eastern District of Louisiana asserting jurisdiction under the Class Action Fairness Act ("CAFA").[14]   The case was subsequently transferred from Section C to Section K and consolidated with the *In Re: Katrina Canal Breaches Consolidated Litigation* under a new Road Home subcategory.[15]   On October 10, 2007, the Plaintiffs filed a motion to remand this case back the state court, which this Court denied on November 14, 2007.[16]   The Plaintiffs filed a motion for leave to appeal this decision, which the U.S. Fifth Circuit granted on February 4, 2008.[17]   The Fifth Circuit held oral argument on March 25, 2008, and will render a decision on this appeal by April 14, 2008.[18]   Because there is a stay on all insurance proceedings in the consolidated

---

[13] *See* Certain Defendants' Notice of Removal, *State of Louisiana v. AAA Insurance, et al.*, No. 07-cv-5528 (E.D.La. Sept. 11, 2007) (Doc. 1) (attaching Petition).

[14] *Id.*

[15] Order Reallotting Case, *State of Louisiana v. AAA Insurance, et al.*, No. 07-cv-5528 (E.D.La. Sept. 12, 2007) (Doc. 4); Road Home Consolidation Order, *State of Louisiana v. AAA Insurance, et al.*, No. 07-cv-5528 (E.D.La. Sept. 18, 2007) (Doc. 6).

[16] Motion to Remand, *In re: Katrina Canal Breaches Litigation*, No. 05-cv-4182 (E.D.La. Oct. 10, 2007) (Doc. 8319); Minute Entry, *In re: Katrina Canal Breaches Litigation*, No. 05-cv-4182 (E.D.La. Nov. 14, 2007) (Doc. 9045).

[17] Notices of Interlocutory Appeal, *State of Louisiana v. AAA Insurance, et al.*, No. 07-cv-5528 (E.D.La. Feb. 7, 2008) (Docs. 7 & 8).

[18] Order of USCA as to Notice of Interlocutory Appeal, *In re: Katrina Canal Breaches Litigation*, No. 05-cv-4182 (E.D.La. Mar. 17, 2008) (Doc. 11661).

litigation pending the Louisiana Supreme Court's decision in *Joseph Sher v. Lafayette Ins. Co., et al.*, no defendant has yet answered this lawsuit.[19]

### C.       The Disqualification Motion

On January 9, 2008, State Farm Fire and Casualty Co., along with numerous other insurers, filed a motion to disqualify Plaintiffs' private counsel.[20]   The motion alleges that disqualification is required because Plaintiffs' counsel: (1) have or will have conflicts of interest related to their representation of both the State and homeowners, and (2) cannot represent the State at all because they were improperly hired and cannot be compensated for this representation.

### D.       Representations by the Individual Firms

The following six firms collectively file this opposition to the motion to disqualify:

(1)      Paul G. Aucoin, Attorney at Law,

(2)      The Dudenhefer Law Firm, L.L.C.

(3)      Fayard & Honeycutt, APC,

(4)      McKernan Law Firm,

(5)      Ranier, Gayle & Elliot, LLC, and

(6)      Domengeaux Wright Roy & Edwards, L.L.C.[21]

---

[19] Minute Entry, *In re: Katrina Canal Breaches Litigation*, No. 05-cv-4182 (E.D.La. Nov. 26, 2007) (Doc. 9227).

[20] Motion of State Farm Fire and Casualty Company and Certain Other Insurer Defendants to Disqualify Plaintiff's Private Counsel, *In re: Katrina Canal Breaches Litigation*, No. 05-cv-4182 (E.D.La. Jan. 9 2008) (Doc. 10290).

[21] The Insurers also seek to disqualify counsel from Gauthier, Houghtaling & Williams, L.L.P. and the Murray Law Firm, which will respond separately from this opposition.

Attorneys from each of these firms represent the State and the as-yet uncertified and putative class of individual homeowners who have received or will receive benefits under The Road Home Program.

Four of these six firms represent <u>no</u> individual homeowners who have received or will receive Road Home benefits.[22]   The remaining two firms, Ranier, Gayle & Elliot, LLC and Fayard & Honeycutt, APC, each currently represent a limited number of individual homeowner clients eligible to receive a Road Home grant.   Ranier, Gayle & Elliot, LLC is in the process of referring its individual homeowner clients who have received or will receive a Road Home grant to other competent counsel without retaining a fee interest.   This process will be complete before the scheduled hearing on this motion.   At that time, its position will be identical to that of the other four firms.   For Fayard & Honeycutt, each individual homeowner client has waived any potential future conflicts involving the State, limited the scope of representation to exclude claims or issues against the State, and has provided informed consent confirmed in writing to that effect.[23]   It is also considering whether to refer these clients to other competent counsel.

For each of these firms, whether the representation is of the State, a putative class, or individual homeowners, the purpose of each representation is the same–to obtain the largest possible recovery from insurers who did not meet their contractual and statutory obligations for payments due to property damage.

For this litigation, counsel has received authority to represent the Plaintiffs from the State.   In August 2007, the firms were authorized by then-Louisiana Attorney General Charles C.

---

[22] Affidavit of Paul G. Aucoin (attached hereto as Ex. 3); Affidavit of Frank C. Dudenhefer, Jr. (attached hereto as Ex. 4); Affidavit of Joseph J. McKernan (attached hereto as Ex. 5); Affidavit of James P. Roy (attached hereto as Ex. 6)

[23] Affidavit of Calvin C. Fayard, Jr. (attached hereto as Ex. 7).

Foti to represent the State in this litigation.[24]   In addition, the Attorney General also specifically explained the limits of the State's responsibilities for compensating these firms for their services:

> The State does not guarantee the payment of any attorney fees or costs in connection with such representation and specifically disclaims all liability for payment of fees and costs out of actions filed herein by you on behalf of the State. In the case where the State itself would be included as a member of a class action, the State would receive all amounts due and owing to it without discount and without any fees or costs subtracted from the corpus of the judgment or settlement; the attorneys handling this case may receive attorneys fees and costs permitted them by State or Federal law.[25]

In sum, although the State authorized the firms to represent it in this litigation, the State has incurred no financial responsibility to compensate the firms unless permitted by law.

The State and the individual homeowners represented by these firms are fully aware of the dual representations.   New Attorney General James C. "Buddy" Caldwell, through his representative T. Allen Usry, has reaffirmed the State's intent to pursue its interests against the Insurers in open court at a January 29, 2008 status conference.[26]   And for the firms that may continue to represent homeowners who have received or may receive Road Home benefits, each of their clients has executed a conflict waiver and has agreed that the firms' scope of representation of their interests does not include any claims or issues they may have against the

---

[24] *See* Memorandum in Support of Motion of State Farm Fire and Casualty Company and Certain Other Insurer Defendants to Disqualify Plaintiff's Private Counsel, Exs. 2 & 3, *In re: Katrina Canal Breaches Litigation*, No. 05-cv-4182 (E.D.La. Jan. 9 2008) (Doc. 10290) (hereafter "Insurers' Memo in Support").

[25] *Id*., Ex. 3.

[26] Transcript of Status Conference held Jan. 29, 2008, *In re: Katrina Canal Breaches Litigation*, No. 05-cv-4182 (E.D.La. Mar. 18, 2008) (Doc. 11671), at 23.   Counsel has also received authority to act for the Plaintiffs by this Court.   In November 2007, the Court appointed Calvin Fayard as Liaison and Lead Counsel for both the State and the putative class in this litigation and attorneys from the remaining firms as Plaintiffs' Co-Lead Counsel.   Interim "Road Home" Case Management Order, *In re: Katrina Canal Breaches Litigation*, No. 05-cv-4182 (E.D.La. Nov. 6, 2007) (Doc. 8873), at 3-4.

State.  Therefore, all of the parties who will be represented by these counsel are aware of each counsel's other representations, and still have engaged these firms to represent their interests in obtaining maximum structural damage recoveries from the insurers named in this action.

## III.   BACKGROUND LAW ON MOTIONS TO DISQUALIFY COUNSEL

"Ideally, conflict of interest problems should be settled between the attorney and his client," although an opposing party can "bring conflict of interest matters to the attention of the court."[27]  Disqualification motions, however, "should not be used as a tactical weapon to deprive the opposing party of the right to be represented by the lawyer of his or her choice."[28]  Thus, an opposing party's disqualification motion "'should be viewed with caution … for it can be misused as a technique of harassment.'"[29]  For this reason, motions brought by opposing counsel are "generally disfavored" and the party seeking the disqualification has a high standard of proof.[30]

Motions to disqualify are substantive motions affecting the rights of the parties that will be determined through the application of standards developed under federal law.[31]  When deciding whether to disqualify an attorney, a court "must 'consider the motion governed by the ethical rules announced by the national profession in light of the public interest and the litigant's

[27] *FDIC v. U.S. Fire Ins. Co*., 50 F.3d 1304, 1315 (5th Cir. 1995).

[28] *Id.* (quoting Tex. Rule 3.08 cmt. 10 (1990)).

[29] *Id.* (quoting Model Rule 1.7 cmt. (1992)).

[30] *Am. Mortgage Securities Funding Corp. v. First La. Fed. Sav'gs Bank of Lafayette*, Civ.A.No. 87-5933, 1988 WL 92026, at *2 (E.D.La. Aug. 26, 1988); *Babineaux v. Foster*, No.Civ.A. 04-1679, 2005 WL 711604, at *2 (E.D.La. Mar. 21, 2005)(citing *Parker v. Rowan Companies, Inc*., No. 03-CV-545, 2003 WL 22208569, at *8 (E.D.La. Sept. 23, 2003); *Cramer v. Sabine Transp. Co*., 141 F.Supp.2d 727, 730 (S.D.Tex. 2001); *Walker v. State Dep't of Transp. and Dev*., 817 So.2d 57, 60 (La. 2002)).

[31] *In re Dresser Industries, Inc*., 972 F.2d 540, 543 (5th Cir. 1992).

rights.'"[32]   Here, the relevant standards for this analysis will include: (1) the Local Rules for the Eastern District of Louisiana; (2) the American Bar Association ("ABA") Model Rules of Professional Conduct; and (3) Louisiana's Rules of Professional Conduct.[33]   But even though these "local and national ethical canons provide a useful guide for adjudicating motions to disqualify, they are not controlling."[34]

Therefore, despite these standards, the rigid application of ethical rules to disqualify counsel is inappropriate. The concern is that such an inflexible analysis can "abrogate important societal rights, such as the right of a party to his counsel of choice and an attorney's right to freely practice her profession."[35]   If counsel chosen by a party must withdraw from their representation, the ability of a party to present its case at trial will be substantially impacted.[36]

Accordingly, "[a] disqualification inquiry, particularly when instigated by an opponent, presents a palpable risk of unfairly denying a party the counsel of his choosing." [37]   Thus, "[a]ll of the facts particular to a case must be considered, in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights."[38]   "Depriving a party of the right to be

---

[32] *FDIC,* 50 F.3d at 1312 (quoting *Dresser*, 972 F.2d at 543).

[33] *Babineaux v. Foster*, 2005 WL 711604, at *1.  Courts have also considered the ABA Model Code of Professional Responsibility, but this Code was replaced by the ABA Model Rules for Professional Conduct in 1983.

[34] *FDIC,* 50 F.3d at 1314.

[35] *Id.* at 1314.

[36] *Id.* at 1313.

[37] *Id.* at 1316.

[38] *Id.* at 1314.

represented by the attorney of his or her choice is a penalty that must not be imposed without careful consideration."[39]

In sum, "notwithstanding the fundamental importance of safeguarding popular confidence in the integrity of the legal system, attorney disqualification … is a sanction that must not be imposed cavalierly."[40]  Indeed, "[w]hen, for purely strategic purposes, opposing counsel raises the question of disqualification, and subsequently prevails, public confidence in the integrity of the legal system is proportionately diminished."[41]

## IV.   LAW AND ARGUMENT – ALLEGED CONFLICTS

The Insurers initially argue that counsel's representation of the State, the putative class, and individual homeowners who are Road Home recipients results in an impermissible conflict of interest.  As stated above, this district looks to the Louisiana Rules of Professional Conduct, the ABA Model Rules of Professional Conduct, and the Eastern District of Louisiana local rules as a guide.  Rules 1.7 of the Louisiana Rules of Professional Conduct and of the ABA Model Rules of Professional Conduct govern conflicts of interest with current clients and are identical. Further, the Eastern District of Louisiana has adopted the Louisiana Rules of Professional Conduct in its local rules.  Therefore, the relevant standards are consistent.

Rule 1.7 concerns conflicts of interest with current clients.  Under Rule 1.7(a), a concurrent conflict of interest is presented if either: (1) the representation of one client is directly adverse to the representation of another or (2) there is a significant risk that the representation of

---

[39] *Id.* at 1313.

[40] *Id.* at 1316.

[41] *Id.*

one client will materially limit the lawyer's responsibilities to the other.[42]  But even if there is such a conflict, a representation of both clients may continue if: (1) the lawyer reasonably believes that he can provide proper representation to each client, (2) the representation is permitted by law, (3) the representation does not involve the assertion of a claim against the other client in the same litigation, and (4) each client gives informed consent in writing.[43]

In considering a motion to disqualify based on a conflict, a court needs "to ensure that any disqualification is linked to an actual, real conflict rather than an imaginary one."[44] Therefore, a "tenuous theoretical conflict" or the remote possibility that two clients "may eventually find themselves at odds" provide "too tenuous a thread to support the burdensome sanction of law firm disqualification."[45]  Thus, the fact that a movant can raise a hypothetical scenario in which the interests of the two representations might tangentially conflict will not sustain a motion to disqualify where the interests of the two parties are otherwise consistently aligned.[46]

The Insurers claim that a conflict arises under Rule 1.7 because individual homeowners are required to execute a Subrogation Agreement before receiving Road Home benefits.  They further allege that this Agreement results in numerous, unresolvable conflicts between

---

[42] La. Rules Prof. Conduct 1.7(a).

[43] *Id.* 1.7(b).  The Insurers also reference Rule 1.8(b), which refers to the use of information related to the representation of the client to the detriment of that client, and Rule 1.9(a), which prevents attorneys from representing clients if it would be materially adverse to the interests of a former client.  The Insurers raise no allegation that: (1) counsel has any information that it has or plans to use to the detriment of any client or (2) any of counsel's current representations would affect a former client.  Therefore, these provisions add nothing to the analysis of this motion.

[44] *In re: Complaint of Cardinal Services, Inc.,* 2006 WL 2089925, at *3 (E.D.La. July 21, 2006).

[45] *Id.* at *4; *FDIC*, 50 F.3d at 1314.

[46] *See FDIC*, 50 F.3d at 1314.

representing the State's interests and representing homeowners who have received Road Home benefits. These assertions fail because, as explained below: (1) there are no actual, concurrent conflicts, (2) the purported conflicts raised by the Insurers are too attenuated to warrant disqualification, and (3) the only potential conflicts that may exist would not occur unless the homeowner successfully recovers funds.

A.    **There are no actual, current conflicts.**

Initially, the Insurers have not shown any actual, concurrent conflicts between the State and the individual insureds. To determine whether there is a concurrent conflict, it is useful to begin with the types of situations in which the allegedly conflicting parties may interact. Here, an individual insured's only interaction with the State occurs when he receives Road Home benefits and once again when he attempts to settle his claim with his insurer. Thus, all interactions between the State and individual insureds should fit into one of the following three scenarios:

(1)    An individual insured settles his claim against his insurer and then receives a Road Home grant.

(2)    An individual insured receives Road Home benefits and then settles with his insurer.

(3)    An individual insured receives Road Home benefits, but has not settled with his insurer.

None of these scenarios pose an actual conflict under Rule 1.7.[47]

*First*, when an individual finally settles his or her insurance claim before receiving a Road Home grant, there is no Subrogation Agreement at issue (although one may be signed in the event of a future unexpected recovery). The State has already factored the final insurance

---

[47] A fourth scenario, where an individual receives no Road Home grant at all, obviously presents no potential issue whatsoever and can be summarily excluded.

settlement into its grant award, so insurance proceeds are no longer an issue.  Therefore, there can be no Rule 1.7 concurrent conflict of interest because the State and the individual insureds are not adverse to one another and counsel has no reason to limit their representation of either party in this situation.

*Second*, when an individual settles in full or in part with an insurer after receiving Road Home benefits, negotiations between the State and the individual insured are not being conducted by these firms.  Rather, the State negotiates through its attorney Dan Rees, as OCD counsel responsible for the Road Home Program, and the individual insured will be represented by his or her own separate counsel.  Moreover, even should one of the counsel subject to this motion represent the individual insured in reaching a settlement with his or her insurer, there will be separate counsel to negotiate with the State to reach agreement on satisfaction of the State's assignment rights.  To the extent a firm here is pursuing claims on behalf of individual clients, those clients have given their informed written consent to limit the firms' scope of representation to exclude any claims by or against the State, which includes subrogation rights.[48]  Due to the limited scope of counsel's representation, there will be no conflict.  Finally, even if the recovery effort by counsel were viewed, albeit incorrectly, as a potential conflict, the representation is still proper because the individual insured has given his or her informed consent in writing and the representation satisfies the remaining requirements of Rule 1.7(b).

*Third*, if the insured has not yet settled with his insurer, there is no concurrent conflict because there are as yet no funds subject to the Subrogation Agreement.  As in the first scenario, the lack of any adverse interests or limitations on a representation means that there is no

---

[48] *See supra* § II(D), at 6-9.

concurrent conflict of interest.[49]  Should the insured later settle with an insurer, the analysis of the second scenario would apply and either no conflict would exist, or it would have been waived.

### B.   The hypothetical conflicts raised by the Insurers do not warrant disqualification.

Without proof of an actual, concurrent conflict, the Insurers can only assert various future scenarios in which a conflict could potentially arise as support for their motion.  The Insurers assert that a conflict could occur: (1) if individual clients have interests adverse to the State, (2) if the State needed to intervene to assert a lien right against an individual insured, (3) if an insured needed to challenge the validity of the Subrogation Agreement, or (4) if the allocation of an insurer's payments to particular types of coverage becomes an issue.

These conflicts are both speculative and premature.  The first three issues will only arise if a fund is recovered from the Insurers.  Thus, they will not become ripe unless the homeowners are successful in their claims.  Because the Insurers have not yet even answered the Plaintiffs' petition, making any decision on the harsh remedy of disqualification based on the likelihood of that possibility is premature.  As for the last issue, a dispute over how the Insurers may allocate their payment to individual insureds is a red herring because the State's claims are not dependent on how such payments were allocated.

As the Fifth Circuit has stated, the remote possibility that the State and the individual insureds may eventually find themselves at odds is much too tenuous a thread to support the burdensome sanction of disqualification.[50]  In essence, the Insurers seek an advisory opinion as

---

[49] There is obviously no concurrent conflict at this time between the State and the putative class as the class is not yet in existence.

[50] *FDIC*, 50 F.3d at 1314.

to whether future events, should they occur, warrant disqualification.   But such hypothetical conflicts are premature and insufficient to justify depriving a party of his or her chosen counsel. A review of the relevant case law makes this clear.

Initially, in the rare instances when disqualifications based on Rule 1.7 are granted in this circuit, courts generally limit such disqualification to situations in clear violation of that rule. For instance, in *In Re Dresser Industries, Inc.*, [51] the Fifth Circuit disqualified counsel based on Rule 1.7 after counsel had sued a client in a civil antitrust case when it represented that same client in other pending matters.  And in *Adler v. U.S.*, [52] a debtor sought to act as counsel for his children against the trustee of his estate, who was seeking to return property given to the children by the attorney/debtor's estate.  The bankruptcy court disqualified the debtor from acting as his children's counsel under Rule 1.7(b) because his financial interest in the outcome of the dispute materially limited his representation.[53]   Both situations clearly implicate an actual Rule 1.7 conflict.   But here, as has been explained, counsel has not sued any individual insureds or the State or attempted to represent either in any claims they may have against the other.

Moreover, in situations where potential Rule 1.7 conflicts can be resolved without resort to disqualification, courts have declined to prohibit a party from employing its chosen counsel. In *In re: Suard Barge Services, Inc.*, [54] counsel represented the plaintiff in a maritime personal injury case and also represented an insurance company in an unrelated matter at the same time.

---

[51] 972 F.2d 540, 541-42 (5th Cir. 1992).  It should also noted that in *Dresser* the motion to disqualify was brought by counsel's client, rather than a party who would be unaffected by the conflict.

[52] No. 88-10415, 00-1023, 2000 WL 1753108, at *2 (Bkrtcy.E.D.La. Oct. 4, 2000).

[53] *Id*. at *2-*3.

[54] No. Civ. A. 96-3185 *et al.*, 1997 WL 703000, at *1 (E.D.La. Aug. 18, 1997).

In *Suard Barge*,[55] counsel had subpoenaed records from the insurance company and moved to compel copies of the records and sought sanctions for the failure to comply with the subpoena. Magistrate Judge Wilkinson held that counsel in moving to compel and seek sanctions against a current client had violated Rule 1.7(a) by that action.[56]   But rather than disqualify counsel completely from the representation, the Court only barred counsel from pursuing the motions to compel and for sanctions or any other action directly adverse to the insurer client in the litigation.[57]

Finally, concerns about potential conflicts in concurrent representations do not require disqualification if counsel has adequately addressed those concerns.  In *Venable v. Keever*,[58] a district court expressed concern about counsel's ability to simultaneously represent both themselves and two other defendants in a Sec. 1983 action for filing a retaliatory counterclaim on behalf of a school board. After briefing and a hearing, the district court concluded that there was no concurrent conflict of interest because the defendants' interests were aligned, there was no actual conflict, all potential conflicts could be properly handled under the ethical rules, and the clients were informed of the potential conflicts and consented to the continued representation:[59] in other words, the same situation we have here.  Because the following hypothetical conflicts raised by the Insurers either do not exist or have been resolved, there is no basis to disqualify counsel in this matter.

---

[55] *Id.*

[56] *Id.* at *3.

[57] *Id.* at *5.

[58] 960 F. Supp. 110, 110 (N.D.Tex. 1997); *Venable v. Keever*, 61 F. Supp. 2d 552, 555-56 (N.D. Tex. 1999).

[59] *Venable*, 960 F. Supp. at 111-13.

(1)    <u>Individual Clients</u>

The Insurers assert that the firms' representation of individual insureds is in conflict with their representation of the State.  It is not.  *First*, not every firm represents individual insureds who have received Road Home benefits.  If an individual insured has not applied for Road Home benefits, there is no possibility of having an interest adverse to the State.  Therefore, because (a) Paul G. Aucoin, Attorney at Law, (b) The Dudenhefer Law Firm, L.L.C. (c) McKernan Law Firm, and (d) Domengeaux Wright Roy & Edwards, L.L.C. have no such clients, they have no such conflict.[60]  *Second*, the remaining firms that represent individual insureds who applied for Road Home funds also do not have a conflict.  As stated earlier, because Ranier, Gayle & Elliot, LLC, will be referring its few individual homeowner clients who have received or will receive a Road Home grant to other competent counsel, its position will be identical to that of the other four firms.  Further, Fayard & Honeycutt, APC's individual clients have limited the scope of their representations, and recognized that the firm does not represent them with respect to any claims adverse to the State.[61]  Finally, the State negotiates its claims through its attorney Dan Rees, as OCD counsel or someone under his authority.[62]  Therefore, to the extent a firm has individual clients, both the State and the individual clients understand that each will have separate counsel should either have or wish to pursue interests adverse to one another in this situation.

In fact, the Insurers have provided a good example of how this works.  In *Lemaire v. State Farm Fire & Cas. Co.,* No. 06-cv-0672 (W.D.La.), attorney Frank Elliot represented an

---

[60] Ex. 3, Aucoin Affidavit; Ex. 4, Dudenhefer Affidavit; Ex. 5, McKernan Affidavit; Ex. 6, Roy Affidavit

[61] Ex. 7, Fayard Affidavit.

[62]  Ex. 1, Rees Affidavit.

individual insured against his insurer with whom he was able to reach a settlement.  With full knowledge and cooperation of State Farm, the insurer in the *Lemaire* case, Mr. Elliot, with his individual clients' concurrence, identified separate counsel, Mr. Paul Moresi, III, to represent the individual clients in seeking approval from the State of the insureds' settlement with State Farm. As is usual, the State was represented by Mr. Dan Rees, the OCD counsel responsible for oversight of the Road Home Program, and as State Farm is fully aware, Mr. Elliot's role was limited to providing background facts and documents in that process.[63]  Interestingly, State Farm, was fully aware of the accommodations made by Mr. Elliot, which resulted in State Farm finalizing the settlement with Mr. Moresi and actually issuing the settlement check in the name of the clients and Mr. Moresi, not Mr. Elliot.   One can only surmise why State Farm has failed to advise the Court of such material facts in attempting to assert a conflict in the handling of that case.  The Insurers' assertions are simply a prohibited attempt to assert a conflict "as a tactical weapon to deprive the opposing party of the right to be represented by the lawyer of his or her choice, and should be stricken from the record."[64]

In essence, this is identical to the second scenario discussed in the previous section, and for the same reasons, it will not result in a Rule 1.7 conflict.  Accordingly, this hypothetical conflict never became an actual conflict.

---

[63] *Id*.  The Insurers attempt to create the appearance of an inconsistency by alleging that Mr. Elliot has made conflicting statements about an insured's duty to include the State's name on a settlement check.  But Mr. Elliot's statements are not inconsistent as the State's independent counsel waived the requirement that its name be included on the check.  More importantly, significant events material to the determination of whether a real conflict exists have transpired since the dismissal of the *Lemaire* case by Judge Hill of the Western District of Louisiana and this Court's requests that the State's private counsel work with the Insurers to develop a protocol to help advance settlements through this Court.  Once again, State Farm failed to advise the Court of these important facts.

[64] *See supra*, at n. 28.

(2)     Intervening to Assert Subrogation Rights

Next, the Insurers cite to the State's intervention in a suit involving an individual insured against his insurer as an example of another actual conflict.  Again, it is not.  On August 16, 2007, the State intervened in *Flotte et al. v. State Farm Fire & Casualty Co*., seeking to protect its right to a portion of any amount recovered by the individual insured.[65]   The State is represented by The Preston Law Firm and the individual insured is represented by Preis & Roy.[66] None of the firms here had any role in this case.  Therefore, this case does not present any actual conflict for any of the Plaintiffs' counsel in this litigation.

Moreover, a future intervention by the State to assert subrogation rights would only involve the firms here if the State intervened in a case where counsel represented an individual insured.  But in this scenario, as in the first situation, the State would be represented through OCD counsel and the individual insured would retain separate counsel.  Accordingly, there is no situation in which a future intervention will present a Rule 1.7 conflict.

(3)     Challenges to the Subrogation Agreement

The Insurers also assert that "there are numerous possible disputes that could arise with respect to the application, interpretation, and/or enforceability of" the Subrogation Agreement.[67] Despite the supposed possibility of such disputes and the thousands of Road Home recipients pursuing litigation against their insurers, the Insurers could only point to one such example—a single declaratory judgment action that was subsequently withdrawn.  In *Gillard v. Am. Security*

---

[65] Petition of Intervention, *Flotte et al. v. State Farm Fire & Casualty Co*, No. 06-5011 c/w 06-7497 (E.D.La. Aug. 16, 2007) (Doc. 56). (attached hereto as Ex. 8).

[66] *Id.*

[67] Insurers' Memo in Support, at 15.

*Ins. Co.*,[68] the individual insured filed a petition against the "Louisiana Road Home" seeking a declaratory judgment on the enforceability of the Subrogation Agreement.  The petition was not filed until after the individual insured had reached a settlement with her insurer and was seeking guidance on how to distribute the proceeds from the check.[69]

Again, there is no actual conflict because none of the firms here participated in that case. Further, their role as insureds' counsel will not require any involvement in a similar scenario.  As in the other situations described above, the potential adverse interest between the State and the individual insured arises only after the creation of a fund to be distributed.  Thus, as in those other situations, the firms here will not file suit on behalf of or represent an individual insured against the State, and will not defend the State if such an action is filed.[70]  Therefore, no potential Rule 1.7 conflict exists here.

(4)   Allocation of Insurance Money

The last hypothetical conflict raised by the Insurers concerns how the insurers allocated their own payments to the insured.  Under the Subrogation Agreement, the State's subrogation right is limited to insurance recoveries for physical damage to the residence.[71]  However, many insureds also have received, or might receive in the future, payments from their insurers for coverages relating to personal property and additional living expenses.  Therefore, the Insurers allege that there is a potential conflict because the State may dispute or pursue overpayments to

---

[68] Insurers' Memo in Support, Ex. 10 (Petition for Concursus, or in the Alternative for Declaratory Judgment, *Gillard v. Am. Security Ins. Co.*, Case No. 06-9237, Div. E, Civil District Court, Parish of Orleans.)

[69] *Id.*

[70] For the State, that is the responsibility of the OCD or someone acting under the OCD's direction.  Ex. 1, Rees Affidavit.

[71] Ex. 2, Subrogation Agreement

individual insureds in these other, non-property damage coverage categories in order to maximize recovery.

This issue is a red herring. In this case, the State seeks recovery in this action solely for the Insurers' underpayment of property damage coverage, and has <u>not</u> sought to recover any funds related to the overpayment of personal property or adjusted living expenses.[72]   For the State, whether an insurer decided to overpay a different portion of its coverage is irrelevant to whether the insurer has underpaid its property coverage claim. Therefore, the State's position is not adverse to the individual insured.

The insurer's allocation of coverage only becomes relevant if the Insurers raise it as a defense to the Plaintiffs' claims. To do so, the Insurers will have to admit that they purposefully misrepresented the values of those items for which they did provide coverage, which may expose them to liability with their re-insurers and for misreporting losses to their shareholders and regulators. We expect such an admission would be unlikely. At a minimum, because the Insurers have not answered the lawsuit to assert overpayment in other coverage areas as a defense, a disqualification on this basis is clearly premature.[73]   Thus, absent ulterior motives on behalf of the Insurers—which neither the State nor the State's private counsel seek to address in this pleading, the Insurers' allocation process should be presumed to be based upon some reasonable basis or methodology that does not create a conflict between the State and the homeowner insureds.

---

[72] *See* The State of Louisiana's First Amended and Restated Class Action Petition for Damages and Declaratory and Injunctive Relief, attached to Certain Defendants' Notice of Removal, *State of Louisiana v. AAA Insurance, et al*., No. 07-cv-5528 (E.D.La. Sept. 11, 2007) (Doc. 1).

[73] Moreover, to the extent this is an issue in the attempted settlement of individual claims, as stated above, the State and the individual insured will have separate counsel to resolve these issues.

In sum, the Insurers have not met their burden of proving any actual, existing or "concrete" conflicts of interest. Rather, the Insurers have only raised tenuous theoretical conflicts insufficient to support the burdensome sanction of disqualification.

## V.  LAW AND ARGUMENT – ATTORNEY GENERAL'S RETENTION OF COUNSEL

The Insurers' second contention is that counsel is improperly representing the State because their retention contracts are invalid. The Insurers assert that: (1) any compensation paid to State's counsel is an impermissible infringement on the constitutional powers of the Louisiana Legislature for expenditures of funds, and (2) the contracts did not comply with other state statutes and regulations related to professional service contracts. All of these assertions are based on the erroneous presumption that the State has some existing obligation to pay counsel and overlook the more basic point that all of these counsel have the necessary authority to represent the State from the Attorney General. The Attorney General unquestionably has the constitutional authority to retain counsel, even though he may be restricted on how such counsel may be compensated. However, the contracts at issue here do not obligate the State to compensate counsel at all. Therefore, any constitutional or statutory restrictions placed on the Attorney General with respect to compensation simply are not at issue here, and provide no basis for disqualification.

### A.  The Attorney General has the authority to engage counsel,

The Insurers' entire argument is premised on the mistaken original premise that when the Attorney General exercises his authority to appoint counsel, he has necessarily obligated the State to compensate that attorney. But the two questions are separate. Although the Attorney General faces some limitations on whether he may obligate the public fisc to carry out the duties

of his office, he has always retained the inherent constitutional authority to appoint private counsel to assist him in carrying out the duties of his office.

In Louisiana, the Attorney General is an elected position created by the 1974 Constitution to act as the chief legal officer of the State.[74]  He is a member of the executive branch and has express constitutional authority to: (1) appoint assistant attorneys general to serve at his pleasure and (2) institute, prosecute, or intervene in any civil action or proceeding to assert or protect the rights of the State.[75]  It has long been recognized that as part of his duties, the Attorney General may authorize private counsel to assist him in performing those duties.[76]

The Louisiana Supreme Court's decision in *Meredith v. Ieyoub* reaffirms this authority.[77] The issue in *Meredith* was whether the Attorney General had "the inherent authority to hire outside attorneys on a contingency fee basis to prosecute" claims.[78]  Although the court concluded that the Attorney General did not have "the financial power to hire and pay outside attorneys on a contingency basis" under any Louisiana constitutional provision or statute, the Court reaffirmed that "it is beyond dispute that the Attorney General can hire private attorneys to

---

[74] La. Const. art. 4, § 7.

[75] *Id.* art. 4, §§ 1, 7.

[76] *State v. Anderson*, 29 La. Ann. 774 (La. 1877)("It is not uncommon for … the Attorney General to be assisted by other counsel…. The accused has no right to complain that the Attorney General availed himself of the services of another, in the trial of this case, nor can his rights have been in any manner prejudiced."); *Taylor v. Allen*, 91 So. 635, 638 (La. 1920)("We are not referred to any law, and are not aware of any, that forbids the Attorney General to associate with him in the prosecution of a lawsuit on behalf of the state a duly licensed attorney at law, who is not by statute an Assistant Attorney General."); *see also State v. Mangrum*, 35 La. Ann. 619 (La. 1883).

[77] 700 So. 2d 478 (La. 1997).

[78] *Id.* at 482.

represent the State."[79]  In fact, the Insurers appear to concede this point, when they note that "the Attorney General is empowered to initiate and conduct litigation on behalf of the State," contending only that the Attorney General lacks the unilateral power to finance the operations of his office.[80]  Therefore, there should be no dispute that the Attorney General has the authority to hire the private counsel chosen in this case, even if there may be some limitations on how he compensates that counsel.

**B.     The contracts do not require the State to pay compensation and thus do not violate any state constitutional provisions, statutes, or administrative regulations.**

Because the Attorney General has the right to hire counsel, the Insurers instead claim that the contracts are invalid because they: (1) violate the Louisiana Legislature's right to control the State's finances and (2) fail to comply with a number of statutory provisions and regulations related to professional service contracts.  This is incorrect.  The contracts at issue here specifically disclaim the State's responsibility to compensate counsel for its representation.  Thus, there is no impingement on the rights of the state legislature to control the State's finances.  Moreover, because the professional service contract statutes and regulations are implicated only when those contracts require the expenditure of public funds, these provisions also are inapplicable.  Therefore, there is no basis to invalidate the contracts at issue here.

The Insurers assert that the contracts are invalid because any compensation arrangement with counsel would be an unconstitutional exercise of undelegated powers as the Louisiana Constitution vests the power of State finances in the legislative branch.  Therefore, according to the Insurers' "[a]ny compensation arrangement unilaterally implemented by the Attorney

---

[79] *Id.* at 482-483.

[80] Insurers' Memo in Support, at 25.

General is an unconstitutional infringement upon the Legislature's power to control the financial affairs of the State."[81]

The Insurers also claim that the contracts are invalid because the Attorney General allegedly has failed to comply with several provisions related to professional service contracts.[82] Among those are a number of statutes, and administrative regulations promulgated pursuant thereto, that are contained in Title 39, Chapter 16 and which concern the procurement of professional service contracts.[83] This chapter requires the approval of the Office of Contractual Review and compliance with various procurement regulations for "every expenditure of public funds in excess of two thousand dollars by the executive branch of this state for professional, personal, consulting, and social service procurement."[84] In addition, the Insurers refer to La. Rev. Stat. § 39:32, which requires a state agency to provide professional service contract information in its budget requests to the Division of Administration.[85]

The Insurers' arguments are based on the presumption that the Attorney General has granted counsel the right to compensation for their services when he engaged counsel to

---

[81] *Id*. at 26.

[82] *See* La. Rev. Stat. §§ 39:32(C), 1497, 1498, 1498.1, 1499, 1502(A); *id.* § 49:258(1); 34 La. Admin. Code, Part V, §§ 118, 121.

[83] La. Rev. Stat. § 39:1481 *et seq*. The administrative regulations cited in the Insurers' Memo in Support are based on authority granted in La. Rev. Stat. § 39:1490.

[84] La. Rev. Stat. § 39:1482(A).

[85] *Id.* § 39:32(C). The Insurers also contend that counsel does not meet the minimum qualifications published annually in the Louisiana Bar Journal because counsel has a conflict of interest in representing both the State and homeowners. *See* La. Rev. Stat. § 39:258; 55 La. Bar J. 123 (Aug/Sept. 2007). For the same reasons explained in Section IV, *supra*, there is no conflict of interest in counsel's representation of these clients. Therefore, counsel does not fall below the minimal qualifications necessary to represent the State.

represent the State.[86]  This presumption is false.  In fact, the Attorney General's letter agreement

with counsel expressly disclaims all liability to compensate counsel, stating:

> The State does not guarantee the payment of any attorney fees or costs in
> connection with such representation and specifically disclaims all liability for
> payment of fees or costs out of actions filed herein by you or on behalf of the
> State.  In the case where the State itself would be included as a member of a class
> action, the State would receive all amounts due and owing to it without discount
> and without any fees or costs subtracted from the corpus of the judgment or
> settlement; the attorneys handling this case may receive attorneys' fees and costs
> permitted them by State or Federal law.[87]

Therefore, under the contract, the State has no liability to compensate counsel and will not

guarantee any payment for the representation.  The contract instead places the burden on counsel

to determine how they can be compensated for their work in this litigation in a manner that

complies with state and federal law.[88]  Because the contracts do not require the expenditure of

public funds: (1) there is no infringement upon the rights of the Legislature to control the State's

finances and (2) the statutes and regulations in Title 39, Chapter 16, which have a $2,000

---

[86] Insurers' Memo in Support, at 23 ("While the engagement letters do not make any direct
provisions for fees, it is reasonable to assume that the law firms in question are not representing
the State on a pro bono basis and that they expect to be paid, at least in the event of any
recoveries.").

[87] *Id.*, Ex. 3.

[88] As explained *infra* in Section V(C), there are means for counsel to satisfy this burden.  But
even if not, counsels' inability to receive compensation for their efforts is not a basis to
disqualify them from a representation they wish to pursue, even at the risk of not receiving
compensation.   An attorney-client relationship can be formed without an agreement to
compensate counsel.  *See* 21 LA. CIVIL LAW TREATISE § 5.22 ("Establishment of the attorney-
client relationship requires two conditions:  first, a person seeking assistance or advice from an
attorney, and second, an attorney appearing to agree to give assistance or advice."); *Brasseaux v.
Girouard*, 214 So. 2d 401, 407 (La. App. 3d Cir. 1968)("The canons and the duty to avoid
conflicting representation apply in all instances of a lawyer-client relationship, whether or not the
relationship includes the agreement to pay a fee for the representation.").

minimum threshold, and La. Rev. Stat. § 39:32(C), which applies only when there is a need to make a budget request, are inapplicable here.[89]

For the same reason, our situation is clearly different than in *Meredith*.  In *Meredith*, the Attorney General entered into a contingency contract with counsel that provided "that if damages are recovered, [counsel] are entitled to 'an amount equal to twenty-five (25%) of Gross Recovery, if any …' subject to a cap of '$10 million per claim to each of the two firms signing this Contract.'"[90]   Because the contract obligated the State to pay counsel in the event of a recovery, the Court held that it impinged upon the authority of the Louisiana Legislature to control the State's finances and declared the contract invalid.[91]   As the State has no obligation to compensate counsel here, *Meredith* does not apply.

Moreover, the decision of the Orleans Parish trial court in *Foti v. Bayer Corp.* is also inapposite.[92]   In that case, the State's agreement with its counsel provided:

> After successful prosecution of this litigation, attorneys of the law firm will be compensated either by court order or by private agreement between the litigants. At no time and for no reason will any attorneys' fees come out of the recovery that is due the State of Louisiana.[93]

---

[89] It should also be noted that the professional service contract provisions require approval from the Office of Contractual Review, an office within the Division of Administration, and the budget requests are also submitted to the Division of Administration.  La. Rev. Stat. § 39:1485; *id.* § 39:32.  The Division of Administration is a part of the executive branch.  *Id.* § 39:1. Therefore, compliance with these provisions does not invoke any separation-of-powers concerns.

[90] *Meredith*, 700 So. 2d at 479.

[91] *Id*. at 484.

[92] Insurers' Memo in Support, Ex. 20.

[93] Ex. A to Memorandum of Bayer Corporation and SmithKline Beecham Corporation d/b/a Glaxosmithkline in Support of Motion for Preliminary Injunction (attached hereto as Ex. 9).  The full *Bayer* memorandum is attached as Ex. 19 to Insurers' Memo in Support.

Therefore, as in *Meredith*, that agreement expressly gave counsel a contractual right to compensation upon a successful result in the litigation. That compensation could come by court order or by private agreement between the litigants, with the sole restriction being that the fees not come out of the State's recovery from the defendants. Therefore, under that contract, the State would be obligated somehow to compensate counsel at the end of a successful litigation–a situation functionally identical to *Meredith*. However, because the State has no such corresponding contractual obligation to provide compensation in this case, the *Bayer* trial court's decision–which was never subjected to appellate review–that the agreement in that case violated the Louisiana Constitution as well as other state statutes does not support an invalidation of the contracts at issue here.

In sum, the State's contracts with counsel here can only be invalidated if they presently obligate the State to compensate counsel. Because the contracts here do not, there are no separation-of-power concerns, and no professional service contract statutes or regulations are implicated. Accordingly, the Insurers' argument is without merit.[94]

### C.     If a fund is recovered from the Insurers, counsel may be compensated through common benefit awards.

The Court need not reach further in its analysis to deny the motion before it. It is plainly premature to speculate on the methods by which counsel might be compensated, whether in settlement or by judgment, in a case where the named defendants have not yet answered the

---

[94] Even if this Court were to find to the contrary, counsel still can represent the purported class in this case. Correspondingly, even if the Insurers' contentions are validated, counsel should not be permanently prohibited from representing the State in this case. In *Meredith*, the defendants raised the issue by seeking a declaratory judgment to nullify the State's contract with their counsel and an injunction prohibiting enforcement of the contract. *Meredith*, 700 So.2d at 479-80. In *Bayer*, the defendants sought a preliminary injunction enjoining counsel from representing the State without a valid contract. *See* Insurers Memo in Support, Ex. 19. In neither case was counsel categorically prohibited from representing the State if it later complied with the applicable state provisions.

complaint.  Nonetheless, in the interests of responding to all contentions, even those that are plainly premature, we shall address the Insurers' mistaken assumption that no legitimate avenue exists that would permit the lawful compensation of our clients.  Quite simply, counsel can be compensated in a manner that comports with state and federal law through this Court's assessment of a common benefit fund pursuant to both its inherent equitable authority and its authority under Federal Rule of Civil Procedure 23(h).

The Insurers' contention that there are absolutely no means for the State's counsel to be compensated that comports with state and federal law is incorrect as a matter of law, as counsel will be entitled to compensation through the common benefit fund doctrine.  In *Turner v. Murphy Oil USA, Inc*, Judge Eldon Fallon explained the common benefit doctrine as follows:

> Under what is generally termed the "American rule," every litigant is responsible for the payment of his or her own attorney's fees. If there is no attorney-client relationship, no attorney's fees are generally owed. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 245, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).  However, in certain settings, the American rule creates the problem of free riding, that is, when individuals who benefit from the litigation avoid sharing the full burden and expense of litigation by relying on the work of others. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) (citing *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881) and *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885)).

> Thus, to avoid the problem of free-riding, the U.S. Supreme Court over 125 years ago approved the common benefit doctrine, which provides that when the efforts of a litigant or attorney create, preserve, protect, increase, or discover a common fund, all who benefit from that fund must contribute proportionately to the costs of the litigation. *Boeing*, 444 U.S. at 479, 100 S.Ct. 745; *Pettus*, 113 U.S. at 123, 5 S.Ct. 387; *Greenough*, 105 U.S. at 532-33, 105 U.S. 527. "The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Boeing*, 444 U.S. at 478, 100 S.Ct. 745. *See also* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.121 (2004) (discussing the American Rule and the common-benefit exception in complex cases).

> The Louisiana Supreme Court has recognized the common benefit doctrine and has developed the following test to determine whether attorneys are

owed funds under the doctrine. *Kirkpatrick v. Young*, 456 So.2d 622, 625 (La.1984). First, the attorney must demonstrate that he acted 1) on his own and 2) at his own expense. *Id.* Second, the attorney must show that he maintained a successful suit for the preservation, protection, or increase of a common fund. *Id.*

The Fifth Circuit Court of Appeals has applied this doctrine in class actions and multi-district litigation cases. *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 823-25 (5th Cir.1996) (approving of district court's use of common benefit doctrine in ERISA class action); *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1021 (5th Cir.1977) (finding the doctrine could apply to an MDL).[95]

Therefore, under this doctrine the Court can award fees to an attorney when he or she creates a fund for the benefit of a class or others who benefited from the creation of the fund.

This is confirmed by Fed. R. Civ. Proc. 23(h), which provides that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or the parties' agreement."[96]   "This subdivision authorizes an award of 'reasonable' attorneys' fees and nontaxable costs.  This is the customary term for measurement of fee awards in cases in which counsel may obtain an award of fees under the 'common fund' theory that

---

[95] 422 F.Supp.2d 676, 680 (E.D. La. 2006); *In re: High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220, 227 n.10 (5th Cir. 2008)("The common fund doctrine provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees.")(quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 820 n. 39 (3d Cir.1995)); Manual for Complex Litigation (Fourth) § 14.121 (2004)("The common-fund exception to the American Rule is grounded in the equitable powers of the court under the doctrines of *quantum meruit* and unjust enrichment.  The exception applies where a common fund has been created by the efforts of a plaintiff's attorney and rests on the principle that 'persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.")(quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

[96] Fed. R. Civ. Proc. 23(h).  In discussing the common benefit fund doctrine, the Insurers mistakenly refer to the state class action provision for attorneys' fees, La. Code Civil Proc. art. 595.  In diversity cases, federal courts apply state substantive law and federal procedural law. *Exxon Corp. v. Burglin*, 42 F.3d 948, 950 (5th Cir. 1995).  As class actions are a procedural device, the federal rules on class actions apply here.  *Blaz v. Belfer*, 368 F.3d 501, 504 (5th Cir. 2004).

applies in many class actions and is used in many fee-shifting statutes."[97]  Therefore, Rule 23(h) clearly contemplates common benefit fee awards to class counsel for their work on behalf of a class.[98]  Accordingly, this Court has the authority to award attorneys' fees to counsel if they successfully create a recovery fund in this case.

      1.      <u>The Court can award counsel a common benefit award for its work on behalf of the class.</u>

The Insurers assert that any common benefit award is impermissible because, like contingency contracts, such awards require payment to counsel out of a fund.  This is incorrect. A contingency fee contract with the State would require it to pay counsel directly from its share of the recovery.  But here, the Court may award a common benefit fee award to counsel for creating a fund for the benefit of the class.  Because this award is reserved from the entire fund created before allocation to any party, it does not come from the class or the State and no state statutes, regulations, or provisions would be implicated.

Furthermore, recovery of attorneys' fees based on a contingency contract and a common benefit award are fundamentally different in this case because of the nature of the State's role in this litigation.  Here, the State's right to recover funds originates from its role as a subrogee of the individual homeowners and a lienholder on those claims.  Therefore, the State is not entitled to any funds in this litigation unless the homeowners first are able to recover.  As in situations in which there is a worker's compensation lien, attorneys' fees, as a reasonable litigation cost, would be subtracted from the recovery before the State's liens would be satisfied.[99]  Moreover,

---

[97] Fed. R. Civ. P. 23(h) advisory committee's note (1998 amend.).

[98] *Id.* Rule 23(g)(1)(B)-(C).

[99] *See, e.g., Ochoa v. Employers Nat'l Ins. Co*., 754 F.2d 1196, 1198 (5th Cir. 1985)(applying 33 U.S.C. § 933(f) and noting that the costs of litigation, including reasonable attorneys' fees, are subtracted from a gross recovery before a compensation carrier's lien will be satisfied.").

counsel would be entitled to the same award even if it did not represent the State.   If counsel only represented the class, they would have the same right to a common benefit award for the fund they created.   Accordingly, it is clear that the common benefit award would be reserved out of the fund created for the class, not the State, and that the Insurers' arguments concerning the impropriety of compensating counsel are without merit.[100]

For the same reason, the Louisiana Government Ethics Code is not implicated here. Under this state statutory provision, "[N]o public servant shall receive anything of economic value, other than compensation and benefits from the governmental entity to which he is duly entitled, for the performance of his duties and responsibilities of his office or position."[101]   The Insurers cite to a consent opinion by the Louisiana Board of Ethics, in which counsel for the State was paid by tobacco manufacturer defendants pursuant to a national settlement agreement.[102]   The tobacco counsel, without conceding either that they were "public servants" subject to this provision or that they actually violated this provision, agreed to pay a $650,000 fine and were allowed to retain the remainder of their $575 million fee.[103]

Neither the statute nor the consent opinion prevent a common benefit award here.   As has been explained, the common benefit award originates from the creation of a fund on behalf of the class, not the State, and is a payment awarded by the Court, not the defendants.   Moreover, the

---

[100] The result would be the same absent a common benefit award.   Louisiana state law grants counsel that provide legal services with a first priority on their client's settlements and judgments superior to all other privileges and security interests.  *See* La. Rev. Stat. § 9:5001; *id.* § 37:218.

[101] La. Rev. Stat. § 42:1111(A)(1).

[102] Insurers' Memo in Support, Ex. 22.

[103] *Id.* at 4, 9 n.1, & 11.

special procedures used to compensate the tobacco lawyers were unique to that multi-state settlement, and are unlikely to be duplicated here.

2.   The Court also may award a common benefit award to counsel for their work benefiting the State.

Although it is clearly premature at this point to decide if counsel will request a common benefit award for their work on behalf of the State, the Court would not be prohibited from granting that request.  As explained above, under the common benefit doctrine, the Court has the authority to require any party who benefits from the creation of a fund to contribute to the costs of the litigation.  Under the Supremacy Clause and basic principles of federalism, "States may not exercise their sovereign powers so as to control those instrumentalities of the United States which have been judged necessary and proper to carry into effect federal laws and policies."[104] The Rules Enabling Act authorizes the United States Supreme Court to "prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts."[105] "All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect."[106]  Under this Act, the Supreme Court promulgated the Federal Rules of Civil Procedure, including Rule 23 regarding class actions.[107]  Therefore, class action procedure in a federal court, including the award of fees under Rule 23(h), are instrumentalities necessary to carry into effect federal policies.

---

[104] *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 187 (1988)(Kennedy, J., dissenting)(citing *McCulloch v. Maryland*, 4 Wheat. 316, 4 L.Ed. 579 (1819)).

[105] 28 U.S.C. § 2072(a).

[106] *Id*. §2072(b).

[107] *Willy v. Coastal Corporation*, 503 U.S. 131, 134 (1992).

If a Federal Rule of Civil Procedure addresses an issue, then contrary state provisions will have no effect.  "Where … a federal procedural rule is 'clearly applicable,' then it applies unless unconstitutional or outside of the scope of the Rules Enabling Act."[108]  "'If the [federal] Rule speaks to the point in dispute and is valid, it is controlling, and no regard need be paid to contrary state provisions."[109]  Because there has been no contention that Rule 23 is unconstitutional or outside of the scope of the Rules Enabling Act, no state statute or constitutional provision can usurp this Court's authority to award attorneys' fees under that provision.

In considering an award of attorney fees, courts have complied with this precedent.  In *Utica Lloyd's of Texas v. Mitchell*, [110] the Fifth Circuit declined to apply Texas state law with respect to an award of attorneys' fees because it conflicted with federal procedural law.  And in *Tetra Applied Technologies v. Henry's Marine Service,*[111] a federal district court recently reached this same conclusion when it refused to apply state-law standards regarding the award of attorneys' fees because they offended the Supremacy Clause.  Accordingly, should the situation arise, this Court would be allowed to award common benefit fees to counsel for work performed on behalf of the State without regard for the state provisions referred to by the Insurers.[112]

---

[108] *Burglin*, 42 F.3d at 950.

[109] *Id.*

[110] 138 F.3d 208, 210 (5th Cir. 1998).

[111] Civ. Action No. H-04-2576, 2007 WL 1239240, at *4 (S.D. Tex. Apr. 27, 2007)(denying request for attorneys' fees based on state law and holding that "[m]aritime law does not permit the recovery of attorneys' fees.  Grafting state law exceptions into federal-international maritime law offends the supremacy clause").

[112] Besides a common benefit award, the Louisiana Legislature can always enact legislation to compensate counsel for their work at any point in this litigation.  In fact, the Legislature has done exactly that in previous cases.  In *Ieyoub v. W.R. Grace & Co.*, 708 So. 2d 1227, 1230 (La. App.

Even if counsel were not compensated in this case for their work on behalf of the State, that determination is irrelevant as to whether they can represent the State against the Insurers. Thus, even if not entitled to compensation, no rule or statute prevents counsel from representing the State as a public service on a pro bono basis.  If counsel are willing to assume the risk that they will not be compensated, there simply can be no basis for allowing an opposing party to circumvent that right through a motion to disqualify.

In conclusion, the Attorney General has the inherent constitutional authority to hire private counsel, although there are some limitations on how he may compensate that counsel. These limitations are not implicated in this case because the State's contracts do not obligate it to compensate the firms here.  Moreover, compensation is not an issue because counsel can be compensated out of a common benefit fund on behalf of the class and has assumed the risk of not receiving compensation even if they could not.

## VI.  **CONCLUSION**

The Insurers must meet a heavy burden before they may prevent the Plaintiffs from being represented by their chosen counsel.  They have not done so here.  First, they have not proven that any actual, concurrent conflict exists in representing the State and homeowners against the Insurers, despite their assertions of various hypothetical conflicts.  Second, no state provision prohibits counsel from representing the State because the contracts at issue here do not obligate the State to compensate counsel.  Accordingly, the Insurers' motion to disqualify should be denied.

---

3d Cir. 1998), cited by the Insurers in their Motion, counsel's contingency contract with the State was invalidated based on *Meredith* in a declaratory judgment action.  Within two months, the Louisiana Legislature ratified the previous actions and authorized payment to the State's counsel for all work performed prior to the passage of the Act.  La. Rev. Stat. § 39:97.4; La. Acts 1998, 1st Ex.Sess., No. 140 ("[T]he legislature hereby ratifies and approves of all acts or actions taken by the attorneys pursuant to the contract or contracts of employment prior to the effective date of this Act").

Respectfully submitted,

By: ____/s/ Thomas P. Owen, Jr.____

Richard C. Stanley, 8487
Thomas P. Owen, Jr., 28181
Melissa V. Beaugh, 28250
      Of
STANLEY, FLANAGAN &
REUTER, L.L.C
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: (504) 523-1580
Facsimile: (504) 524-0069

-and-

Basile J. Uddo, 10174
Attorney at Law
3445 North Causeway Boulevard
Suite 724
Metairie, Louisiana 70002
Telephone: (504) 834-1819
Facsimile: (504) 832-7208

Attorneys for Paul G. Aucoin, Attorney at Law; The Dudenhefer Law Firm, L.L.C.; Fayard & Honeycutt, A.P.C.; McKernan Law Firm; Ranier, Gayle and Elliot, L.L.C.; and Domengeaux Wright Roy & Edwards L.L.C.

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2008, I electronically filed the foregoing Opposition to Motion of State Farm Fire and Casualty Company and Certain Other Insurer Defendants to Disqualify Plaintiff's Private Counsel with the Clerk of Court using the CM/ECF system which will send a notice of filing to all counsel accepting electronic notice.  I further certify that I mailed the foregoing document and notice of electronic filing filed by first-class mail to all counsel of record who are non-CM/ECF participants.

/s/ Thomas P. Owen, Jr.