UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | § § § § | CIVIL ACTION NO. 05-4182 "K"(2) |
| PERTAINS TO: | § § | JUDGE DUVAL |
| MRGO: 08-1213 | § § § | MAG. WILKINSON |

## AMENDED COMPLAINT

Plaintiffs NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH PA, COMMONWEALTH INSURANCE COMPANY, and ARCH SPECIALTY INSURANCE COMPANY, as subrogees of, Air Products And Chemicals, Inc., wish to amend the complaint to more accurately allege the corporate status of Arch Specialty Insurance Company in paragraph number 4.  Otherwise the Amended Complaint is identical to the Original Complaint.

### INTRODUCTION

Beginning on August 29, 2005 following Hurricane Katrina's landfall, Greater New Orleans experienced catastrophic flooding caused not by the natural forces of the storm, but by the faulty design, construction and maintenance of waterways, levees and floodwalls for which the United States Army Corps of Engineers was responsible pursuant to Federal law. East of the City of New Orleans, as Lake Borgne crested with the storm surge, the man-made structures funneled and poured salt water into St. Bernard and Orleans Parishes. Air Products and Chemicals, Incorporated suffered damages to their fixed assets, past and future business

opportunity, and operating income occasioned by the wrongful conduct of the Army Corps of Engineers. Air Products and Chemicals, Incorporated's insurers, National Union Fire Insurance Company of Pittsburg Pa, Commonwealth Insurance Company, and Arch Specialty Insurance Company, bring this suit as subrogees to a portion of Air Products and Chemicals, Incorporated's damages.

### *PARTIES*

1.     Air Products and Chemicals, Incorporated is incorporated under the Laws of the State of Delaware, headquartered in Allentown Pennsylvania, with its principal Louisiana business establishment in Michoud, Parish of Orleans, State of Louisiana.

2.     National Union Fire Insurance Company of Pittsburg Pa, (National Union) is a foreign insurer organized under the laws of the State of Pennsylvania, qualified to do and doing business in the State of Louisiana; National Union was one of Air Products and Chemicals, Incorporated's excess insurers and is subrogated to part of Air Products and Chemicals, Incorporated's claims for damages caused by the United States Army Corps of Engineers as a result of the Mississippi River Gulf Outlet.

3.     Commonwealth Insurance Company (Commonwealth) is a foreign insurer incorporated under the laws of the State of Washington, qualified to do and doing business in the State of Louisiana; Commonwealth was one of Air Products and Chemicals, Incorporated's excess insurers and is subrogated to part of Air Products and Chemicals, Incorporated's claims for damages caused by the United States Army Corps of Engineers as a result of the Mississippi River Gulf Outlet.

4.    Arch Specialty Insurance Company (Arch) is a foreign insurer who, at the relevant time was incorporated under the laws of the State of Wisconsin and on December 28, 2006 moved its domicile to Nebraska; Arch at all relevant times was one of Air Products and Chemicals, Incorporated's excess insurers and is subrogated to part of Air Products and Chemicals, Incorporated's claims for damages caused by the United States Army Corps of Engineers as a result of the Mississippi River Gulf Outlet.

5.    The United States of America is a sovereign government amenable to suit in accordance with the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, the Suits in Admiralty Act, 46 U.S.C. § 30901 *et seq.,* and the Public Vessels Act, 46 U.S.C. § 31101 *et seq.*, for damages caused by the United States Army Corps of Engineers, a division of the United States government under the direct jurisdiction of the Department of the Army.

## *JURISDICTION*

6.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1346(b) (defendant United States).

## *VENUE*

7.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this district, and also because a substantial part of the property that is the subject of the action is situated in this district.

## *EXHAUSTION OF ADMINISTRATIVE REMEDIES*

8.    Air Products and Chemicals, Incorporated presented its administrative claims on behalf of itself and its subrogated insurers in writing to the Corps as provided under Federal law on August 22, 2007, and a period of at least six months has expired since the filing of the claims. Thus, the cause or controversy asserted herein is ripe for judicial resolution.

*FACTUAL BACKGROUND*

9.    MRGO is a deep water navigable waterway constructed under the authority of the River and Harbor Act of 1956, Public Law 455, 84th Congress, 2nd Session; MRGO was approved on March 29, 1956.

10.    MRGO was designed and constructed by the Corps in the 1950's and early 1960's; MRGO is approximately 76 miles long and runs generally in a northwest direction from Breton Sound in the Gulf of Mexico through the parishes of St. Bernard and Plaquemines to New Orleans, where it connects with the Gulf Intracoastal Waterway ("GIWW") and the Inner Harbor Navigational Canal ("IHNC"), known locally as the Industrial Canal.

11.    MRGO, intended as an aid to navigation and commerce, enables ships from ports east of the Mississippi River to head north to New Orleans at Breton Sound, east of the mouth of the Mississippi, at a savings of sixty miles.  MRGO also provides an alternative to the Mississippi River.

12.    The Corps' original plans provided for MRGO to have a depth of 36 feet and a bottom width of 500 feet.  The navigation channel was to extend from the Industrial Canal in eastern New Orleans approximately six miles eastward as part of the GIWW.  The channel was then to turn southeast approximately 60 miles to Chandeleur Island.  From Chandeleur Island, the project channel was to increase gradually to a bottom width of 600 feet and a depth of 38 feet in the Gulf of Mexico.  Prospective jetties were to be provided at the channel entrance.

13.   Construction on MRGO began in March 1958.  An interim channel with dimensions of 36 feet by 250 feet (bottom width) was opened to traffic in July 1963.  Enlargement to project dimensions was completed in January 1968.

14.   The Corps has always been responsible for the maintenance of MRGO.  This ongoing responsibility included dredging the bottom of the waterway to remove deposited soil and silt and to maintain MRGO's original design depth of 36 feet.  Silting has remained a problem for MRGO since 1957, when the first ship to navigate it ran aground and was stuck for two days.

15.   After its completion in 1965, use of MRGO steadily only until 1978, when, at its peak in 1978, MRGO carried 9.4 million tons of cargo and other goods.  Subsequently, fleets were replaced with larger vessels with drafts too deep for MRGO, and several terminals along the Industrial Canal were closed.  In 2004, only 226 deepwater ships passed through the channel, an average of slightly more than four ships per week, carrying only 1.3 million tons of cargo, roughly equal to tonnage figures from 1963, when MRGO first opened.  By 2005, MRGO had become a seldom used relic.

### MRGO'S FAULTY DESIGN, CONSTRUCTION AND MAINTENANCE

16.   MRGO's design was flawed in two fatal respects: First, the Corps failed to take account of the waterway's inherent and known capacity to funnel rapidly accelerated, hurricane driven storm surges, thereby increasing the force and even height of a storm surge against populated areas.

17.   Second, the Corps failed to take account of the destruction of wetlands that it knew or should have know would be caused by the construction of MRGO and also by consequent salt water intrusion into wetlands, thereby erasing a natural buffer against storm surge and exacerbating the funnel effect of MRGO's faulty design.

18.   Additionally, the Corps failed to maintain MRGO properly, especially in the Corps' failure to conduct proper dredging, which would have reduced MRGO's funnel effect.

19.   The Corps also failed to implement bank stabilization measures along MRGO and the GIWW, to minimize erosion induced by saltwater intrusion and also by the force of waves from passing vessels.

### THE CORPS' BREACHES OF ITS DUTIES
### IN THE DESIGN, CONSTRUCTION AND MAINTENANCE OF MRGO

20.   On September 25, 1951, the Corps submitted a report to Congress ("MRGO Authorization Report") with its recommendations for construction of MRGO.   This report contained a letter from the former Corps Chief of Engineering stating that the proposed MRGO would be connected to the IHNC by its own separate canal running parallel to the GIWW.

21.   The Corps deviated from the parameters of the proposed MRGO Authorization Report and connected MRGO into the existing GIWW.

22.   The Corps thus deepened and widened the GIWW from the point of connection to the IHNC, thereby increasing the hydrologic load upon MRGO.

23.   The MRGO Authorization Report also recommended that the exact location of the MRGO outlet should be determined only after complete studies of sand movement, wave action and local currents were made in cooperation with the Beach Erosion Boards, and that the outlet should be moved if a more suitable location were available.

24.   The Corps failed to conduct studies of such possible route alternatives, including alternatives that might have been less destructive to the coastal wetlands.

25.   The Corps' design, construction, operation and maintenance of MRGO violated the River and Harbor Act of 1945, P.L. 69-44, 50 Stat. 40 (March 2, 1941) ("MRGO Planning

Law"), which required the Corps to coordinate with the State of Louisiana, through its Governor or his/her designee as an "affected state" in the investigation and planning stages of MRGO.

26.   The Corps likewise failed to heed the MRGO Planning Law's mandate to coordinate the Corps' investigation and planning of MRGO with the United States Department of the Interior.

27.   The Corps' design, construction, operation and maintenance of MRGO violated the Fish and Wildlife Coordination Act ("FWCA"), 46 U.S.C. § 662, which requires any federal agency proposing to impound, divert or control a waterway or body of water to coordinate such a project with the Fish and Wildlife Service and to consult with the states involved as a prerequisite to implementing the project; both of which the Corps failed to do.

28.   In 1958, the Department of the Interior prepared a draft preliminary report for the Corps ("Fish and Wildlife Report") pursuant to the FWCA, noting the Corps' failure to permit fish and wildlife conservation agencies to study the project.

29.   The 1958 Fish and Wildlife Report expressly noted the harmful effects of MRGO upon existing water circulation patterns, thereby upsetting natural salinity levels and threatening the marsh's ecosystem.

30.   In failing to take into account such environmental matters in the design, construction and maintenance of MRGO, the Corps violated the Coastal Zone Management Act, 16 U.S.C. § 1452 et seq., the Water Resources Development Act of 1990, 33 U.S.C. §§ 2316 and 2317, the National Environmental Policy Act, 42 U.S.C. § 4332(c), and the Louisiana State and Local Coastal Resources Management Act, La. Rev. Stat. Ann. 49:244.21 et seq.

31.    Moreover, in the conduct of its dredging operations on MRGO, which similarly failed to take into account environmental impact, the Corps violated 33 C.F.R. §§ 336.1(c)(4), 320.4(b), 337.5 and 338.2.

32.    Indeed, the Corps has had abundant information to indicate that MRGO in fact aggravated the risk of flooding in New Orleans and surroundings, including the flooding caused by Hurricane Betsy in 1965 and the Corps' own report thereon, and various other studies, including that of Sherwood Gagliano in 1970, and data from the National Oceanic and Atmospheric Administration in 1972, a report from the National Weather Service in 1979, a study from the National Hurricane Center in 1998, with the Corps finally acknowledging MRGO' shortcomings in 1998 and adopting a coastal restoration plan calling for MRGO's eventual closure (but in the end failing to do so).

## THE CORPS' BREACHES OF ITS DUTIES
## WITH RESPECT TO THE DESIGN, CONSTRUCTION AND MAINTENANCE
## OF OTHER NAVIGABLE WATERWAYS

### The Inner Harbor Navigational Canal

33.    Plaintiff re-alleges all previous allegations contained herein, and in addition to the allegations regarding the MRGO set forth above, Plaintiffs aver, upon information and belief, that the breaches and failure of the bank retention structures, hurricane protection levees, and flood walls of the IHNC/Industrial Canal were caused by the negligence and fault of the Defendant Corps as set forth herein.

34.    On June 6, 1918, construction began on a deep water canal between the Mississippi River and Lake Pontchartrain, the Inner Harbor Navigational Canal ("IHNC")(locally known as the "Industrial Canal").

35.    The River and Harbor Act of 1965, and The Water Resources Development Acts of 1986 and 1996 authorized the enlargement and deepening of the Canal lock as part of the IHNC/Industrial Canal Lock Replacement Project.

36.    The USACE contracted for the leveling and clearing of abandoned industrial sites along the IHNC/Industrial Canal between the flood wall and the canal for the purpose of clearing acreage to make way for the digging of a new canal, which would be used temporarily for the same purpose as the existing IHNC/Industrial Canal while the new system of larger locks was constructed.

37.    The initial phases of work included demolition and site preparation of what was referred to as the East Bank Industrial Area – a 32-acre site located between Florida Avenue and Claiborne Avenue and extending from the canal to the floodwall, by means of removal of wharfage, salvage, debris, and other materials from the IHNC/Industrial Canal and/or its banks.

38.    Based on information and belief, Defendant USACE, through its agents, undertook works that included, but were not limited to: removal of underground structures referred to as "extensive excavation and subsurface activity"; abatement of vegetation; removal of canal side obstructions; removal of the Jourdan Road Wharf, including removal of concrete decking and support pilings to a depth of 36 feet below mean water level; removal of all electrical, sewer, gas, water, and telephone facilities on the site, including Boland sewer lift station; "bank removal" that included the vibratory extraction of bulkheads along the canal's water edge; removal of more than fifty structures and more than forty concrete slabs; grid trenching of the entire East Bank Industrial Area; removal of ten sunken or partially sunken barges; removal of barges that served as building foundations; removal of an estimated 3,000 pilings at the site by use of a vibratory extractor to a depth of 30 feet for land-based pilings, and between 40 and 50 feet for

canal pilings; grading and hydro-mulching the site; and other such work to be demonstrated through the course of discovery and trial.

39.   Based on information and belief, Defendant USACE, through its agents, in performing the IHNC/Industrial Canal Lock Replacement Project, undermined the integrity of levees, embankments, and/or flood walls along the eastern shoreline of the IHNC/Industrial Canal abutting the Lower Ninth Ward of Orleans Parish.

40.   Upon information and belief, from the outset of the project, the Corps' contractors acknowledged problems with slope stability of the parallel dikes on either side of the canal.

41.   Nevertheless, the Corps through its agents increased the size of the canal to a minimum depth of 30 feet at low water, with a minimum bottom width of 450 feet and a minimum channel width of 300 feet, roughly double the original size of the original design.  The Corps increased these dimensions again when new wharves were constructed.

42.   Later, the Corps undertook to demolish the East Bank Industrial Area of the IHNC—a 32 acre site located between Florida Avenue and Claiborne Avenue and extending from the canal to the floodwall.  In so doing, the Corps, through its agents, undertook to remove salvage, debris, and other materials from the IHNC.

43.   The Corps through its agents undertook extensive excavation and subsurface activity, thereby undermining the integrity of the eastern shoreline of the IHNC/Industrial Canal abutting the Lower Ninth Ward of Orleans Parish, and ultimately contributing to the flooding caused in those areas by Hurricane Katrina.

44.   Based on information and belief, Defendant USACE, through its agents, was negligent and/or at fault in the following non-exclusive resects: (1) it knew or should have known that its work was causing damage to the structural integrity of the Canal bank retention structures and

did nothing to correct the problem; (2) it failed to follow proper procedures in performing its work; (3) it failed to comply with appropriate regulations and standards in performing its work; (4) it failed to notice the damage caused by its work and failed to call that damage to the attention of the appropriate authorities; (5) and any other acts of fault or negligence to be proven upon the trial of the cause.

45.    Based on information and belief, the negligence and/or fault of the USACE, caused, or contributed to, the failure of the levee and/or floodwall and/or spoil bank on the sides of the IHNC/Industrial Canal.

46.    The negligence of the USACE consisted of the following non-exclusive particulars: (1) allowing the work to proceed; (2) failing to caution its agents as to potential damage to the levee and/or floodwall system as a result of work undertaken by said agents on behalf of Defendant USACE; (3) failing to monitor and/or properly inspect the work of its agents; (4) failing to adequately evaluate the potential damage to the levee and/or floodwall structure by the work of the its agents; (5) failing to correct the damage caused by the actions of its agents; (6) failing to discharge its duty to maintain the integrity of the levee and/or floodwall system of the IHNC/Industrial Canal; (7) and other acts of negligence or fault to be shown at trial of the cause

### *New Orleans East Back Levee*

47.    Plaintiff re-alleges all allegations in this complaint and in addition to the allegation regarding the MRGO set forth above, avers upon information and belief that the breaches and failure of the Canal bank retention structures of the IHNC/Industrial Canal and the New Orleans East Back Levee were caused by the negligence and fault of the Defendant USACE, as set forth herein.

48.   Based on information and belief, the negligence and/or fault of the United States of America, acting through its Agency, the Army Corps of Engineers, caused, or contributed to, the failure of the Canal bank retention structures, on the eastern side of the IHNC/Industrial Canal and the New Orleans East Back Levee.

49.   The negligence of the USACE consisted of the following: (1) failing to ensure the use of proper materials; (2) failing to preserve natural marshes and swamps which acted as a buffer to the New Orleans East Back Levee system from surges off of Lake Borgne; (3) failing to monitor the actions of its contractors; (4) failing to adequately evaluate the potential damage to the Canal bank retention structures by storm surges; (5) failing to correct known defects in the Canal bank retention structures; (6) failing to discharge its duty to maintain the integrity of the Canal bank retention structures and to comply with Congressional and other mandates; (7) and other acts of negligence to be shown at trial.

### *St. Bernard Parish*

50.   The banks of waterways adjacent to St. Bernard Parish, including MRGO and the 40 Arpent Canal, had subsided significantly since their initial construction.

51.   Independent studies concluded that a known and foreseeable change in elevation caused and contributed to their failure in St. Bernard Parish.  The responsibility for the failure of these systems lies, in whole or in part, with the Corps.

### *Gulf Intracoastal Waterway*

52.   Initially authorized in 1914, the Gulf Intracoastal Waterway ("GIWW") was completed by the Corps in 1949 as a navigation canal between New Orleans and Corpus Christi, Texas.

53.    However, in 1944, under the authority of the Corps, the GIWW was rerouted to pass through the southern part of the IHNC.

*54.*    The Corps' diversion created the first shallow channel through the wetlands that would enhance the hurricane surge impact from Lake Borgne into New Orleans.

*AND NOW, pleading in the alternative, plaintiffs aver as follows:*

### THE CORPS' BREACHES OF ITS DUTIES
### WITH RESPECT TO THE DESIGN, CONSTRUCTION AND MAINTENANCE
### OF OTHER STRUCTURES

#### Lake Pontchartrain and Vicinity Hurricane Protection Project

55.    Most of the levee and/or I-wall structures that surround the New Orleans metropolitan area were constructed, in part, under the authority of the Lake Pontchartrain, Louisiana and Vicinity Hurricane Protection Project ("Lake Pontchartrain Project").

56.    Congress first authorized construction of the Lake Pontchartrain Project in the Flood Control Act of 1965 to provide hurricane protection to areas around Lake Pontchartrain; the Corps was responsible for project design and construction.

57.    The Corps' design and construction of the Lake Pontchartrain Project was faulty from the beginning in several respects.

58.    In designing and constructing the Lake Pontchartrain Project, the Corps based its overall design specifications on the 1959 U.S. Weather Bureau 1-in-100 years Standard Project

Hurricane ("SPH"), which was contradictory to Congress' mandate to protect from a 1-in-200 to 1-in-300 year hurricane.

59.  Additionally, in designing and constructing the Lake Pontchartrain Project, the Corps intentionally and/or negligently with wanton and reckless disregard for the consequences of its actions used the National Geodetic Vertical Datum of 1929 ("NGVD29"), which was no longer equal to local mean sea level ("LMSL"), and failed to use data for the superimpositions of hurricane surge and wave height from a 1950's era oceanographic analysis instead.

60.  When the Corps adopted design specifications for the Lake Pontchartrain Project in 1965, it was on notice that zero NCVD29 was already between 1.3 and 1.6 feet below LMSL at different parts of the system, and, thus, the floodwalls were negligently constructed too low by at least this margin.  The Corps nonetheless continued to use the outdated NCVD29 data.

61.  Additionally, in 1984, the Corps intentionally and/or negligently with wanton and reckless disregard for the consequences of its actions abandoned the Barrier Plan, which had been approved by Congress, but implemented the High Level Plan, despite its many known defects and its rejection by Congress, taking no action to compensate for this change of plans with respect to the floodwalls along the IHNC, leaving them at considerably lower height than safety designs called for.

*62.*  Additionally, the Corps intentionally and/or negligently with wanton and reckless disregard for the consequences of its actions implemented defective design and construction criteria by utilizing defective fill material in the construction of the structural supports of MRGO without sheet pile cutoff, concrete armoring or similar features to prevent erosion, undercutting, collapse or failure.

*63.*   By virtue of the foregoing failures to abide the Congressional directions and mandates associated with the Lake Pontchartrain Project, the Corps' conduct falls outside any immunity normally afforded discretionary acts, and any immunity afforded Congressionally directed and mandated flood control projects.

### *THE CORPS' BREACHES OF ITS DUTIES*
### *CAUSED DAMAGES*

64.   On August 29, 2005, a tidal surge from Hurricane Katrina rushed from the Gulf of Mexico through MRGO and collided at the nexus of the GIWW and the MRGO with another storm surge from Lake Borgne, combining to flood New Orleans East, the Lower Ninth Ward, portions of Gentilly and St. Bernard Parish.

65.   Eyewitness accounts as well as scientific studies indicate that MRGO caused the drowning of large portions of the New Orleans metropolitan area.  The flawed design, poor construction, and inadequate repair and maintenance of MRGO—as well as the resulting destruction of the protective adjoining wetlands—was the overriding factor in causing the flooding.  But for the fault of the Corps, the severe flooding would not have occurred.

66.   In November 2005, an in-depth field investigation—funded by the National Science Foundation and conducted by teams from the University of California at Berkley and from the American Society of Civil Engineers—concluded that MRGO was a prime culprit in Katrina's unprecedented inundation of New Orleans and its environs.

67.   The Corps' own commissioned evaluation on the Louisiana hurricane protection system—conducted by the Interagency Performance Evaluation Task Force ("IPET")—recently found that the majority of flooding of the Lower Ninth Ward and St. Bernard Parish resulted

-15-

from overtopping and from two breaches along the IHNC, precisely where experts had predicted that MRGO's funnel effect would concentrate its force.

68.    The Corps' IPET consultants stated that flow through MRGO must be dramatically reduced or eliminated, either by a permanent closure or by a structure that would eliminate the hydraulic connectivity.

69.    As detailed below, Air Products and Chemicals, Incorporated had substantial assets located in the areas that were directly flooded by Katrina's storm surge as funneled through MRGO (within the "MRGO footprint").  These assets were lost or totally destroyed.


## COUNT I
## NEGLIGENCE

### *Negligence Related to Navigable Waterways*

70.    Plaintiffs incorporate and hereby re-allege all preceding paragraphs as if fully set forth herein and further alleges as follows:

71.    At all relevant times, Defendant United States, through the Corps, was responsible for the design, construction, operation and maintenance of MRGO pursuant to authorization provided by Congress in the River and Harbor Act of 1956.

72.    Defendant owed a duty to Plaintiffs and to others to refrain from negligent acts and omissions in carrying out defendant's responsibilities.

73.    Defendant breached that duty by negligently designing, constructing, operating and maintaining MRGO.

74.   Defendant's breaches of its duties foreseeably and proximately caused, or were the substantial contributing factor in, the widespread destruction and damages caused by MRGO, specifically including the damages suffered by Air Products and Chemicals, Incorporated.

75.   Defendant's negligence was such that were the United States a private person, it would be liable to Plaintiffs in accordance with the law of the place where the act or omission occurred – in this case the State of Louisiana.

### *Negligence Related to Flood Protection Levees*

76.   Plaintiffs incorporate and hereby re-allege all preceding paragraphs as if fully set forth herein and further allege as follows:

77.   At all relevant times, Defendant United States, through the Corps, was responsible for the Lake Pontchartrain and Vicinity Hurricane Protection Project.

78.   Defendant owed a duty to Plaintiffs and to others to refrain from negligent acts and omissions in carrying out defendant's responsibilities.

79.   Defendant breached that duty.

80.   In the alternative that Defendant's breaches of these duties are found to have foreseeably and proximately caused, and been a substantial contributing factor in, the widespread destruction and damages caused by MRGO, specifically including the damages suffered by Plaintiffs, Defendant is liable for the damages arising there from.

81.   Defendant's negligence was such that were the United States a private person, it would be liable to Plaintiffs in accordance with the law of the place where the act or omission occurred – in this case the State of Louisiana.

## COUNT II
## LIABILITY FOR DAMAGES CAUSED BY WORKS ON PROPERTY

### *Negligence Related to Navigable Waterways*

82.   Plaintiffs incorporate and hereby re-allege all preceding paragraphs as if fully set forth herein and further allege as follows:

83.   As the proprietor of MRGO, the Corps had a duty, pursuant to Louisiana Civil Code article 667, to refrain from creating a nuisance.  Intentionally defective or negligent, wanton, reckless and illegal construction of MRGO has deprived Air Products and Chemicals, Incorporated of the enjoyment of its property and has destroyed said property.

84.   Defendant's negligence was such that were the United States a private person, it would be liable to Plaintiff in accordance with the law of the place where the act or omission occurred – in this case the State of Louisiana.

### *Negligence Related to Flood Protection Levees*

85.   Plaintiffs incorporate and hereby re-allege all preceding paragraphs as if fully set forth herein and further allege as follows:

86.   At all relevant times, Defendant United States, through the Corps, was responsible for the Lake Pontchartrain and Vicinity Hurricane Protection Project.

87.   Defendant owed a duty to Plaintiffs and to others to refrain from negligent acts and omissions in carrying out defendant's responsibilities.

88.   Defendant breached that duty.

89.    In the alternative that Defendant's breaches of these duties are found to have foreseeably and proximately caused, and been a substantial contributing factor in, the widespread destruction and damages caused by MRGO, specifically including the damages suffered by Plaintiff, Defendant is liable for the damages arising therefrom.

90.    Defendant's negligence was such that were the United States a private person, it would be liable to Plaintiffs in accordance with the law of the place where the act or omission occurred – in this case the State of Louisiana.

## COUNT III
## STRICT LIABILITY

91.    Plaintiffs incorporate and hereby re-allege all preceding paragraphs as if fully set forth herein and further allege as follows:

92.    The Corps had, at all relevant times, the care, custody and control, and thus the *garde* of MRGO.

*93.*    The Corps is thus strictly liable for the damages occasioned by the vices and/or defects of MRGO in accordance with Louisiana Civil Code article 2317 *et seq.*

94.    Moreover, the Corps knew or, in the exercise of reasonable care, should have known of the vice or defect in MRGO which caused damages to Plaintiffs, and could have been prevented by the exercise of reasonable care by the Corps, but which the Corps failed to exercise, in contravention of Louisiana Civil Code article 2317.1.

95.    Defendant's conduct was such that were the United States a private person, it would be liable to Plaintiffs in accordance with the law of the place where the act or omission occurred— in this case the State of Louisiana.

## AIR PRODUCTS AND CHEMICALS INCORPORATED'S DAMAGES IN MICHOUD

96.   Plaintiffs incorporate and hereby re-allege all preceding paragraphs as if fully set forth herein and further allege as follows:

97.   As a result of the Corps' negligent, grossly negligent, reckless, wanton, and/or illegal acts and omissions described herein, Air Products and Chemicals, Incorporated  sustained damage to its property and to its business.

98.   As a result of the Corps' negligent, grossly negligent, reckless, wanton, and/or illegal acts conduct and omissions, Air Products and Chemicals, Incorporated sustained loss or damage to property including but not limited to the Air Products and Chemicals, Incorporated facility located in Michoud, Orleans Parish.

99.   As a result of the Corps' negligent, grossly negligent, reckless, wanton, and/or illegal acts conduct and omissions, Air Products and Chemicals, Incorporated also sustained: business interruption, economic damages, immediate business losses, long term business losses and relocation costs.

100. As a result of Air Products and Chemicals, Incorporated's losses sustained by the Corps' negligent, grossly negligent, reckless, wanton, and/or illegal acts conduct and omissions, Air Products and Chemicals, Incorporated filed a claim with its insurers for Ninety-Six Million, Two Hundred and Fifty Thousand, dollars ($96, 250,000).

101. As a result of Air Products and Chemicals, Incorporated's losses sustained by the Corps' negligent, grossly negligent, reckless, wanton, and/or illegal acts conduct and omissions, Air Products and Chemicals, Incorporated  received settlement from its excess layer insurers the

amount of Sixty-One Million, Eighty-Five Thousand, Two Hundred and Forty-Eight Dollars ($61,085,248).

102. At the time of Air Products and Chemicals, Incorporated's settlement with its excess insurers, Air Products and Chemicals, Incorporated ceded all rights of subrogation to the extent possible by law to its Insurers.

## NATIONAL UNION, COMMONWEALTH, AND ARCH
## CLAIMS FOR AIR PRODUCTS AND CHEMICALS INCORPORATED'S MRGO LOSSES

103. National Union, Commonwealth and Arch incorporate and hereby re-allege all preceding paragraphs as if fully set forth herein and further allege as follows:

104. As a result of Air Products and Chemicals, Incorporated's losses sustained by the Corps' negligent, grossly negligent, reckless, wanton, and/or illegal acts conduct and omissions, Air Products and Chemicals, Incorporated received settlement from its excess layer insurers the amount of Sixty-One Million, Eighty-Five Thousand, Two Hundred and Forty-Eight Dollars ($61,085,248).

105. At the time of Air Products and Chemicals, Incorporated's settlement with its excess insurers, Air Products and Chemicals, Incorporated ceded all rights of subrogation to the extent possible by law to its Insurers.

106. National Union is fully subrogated to Air Products and Chemicals, Incorporated's Michoud Facility losses against the Corps herein for Eighteen Million Three Hundred Twenty-Five Thousand, Five Hundred and Seventy Four Dollars ($18,325,574).

107. Commonwealth is fully subrogated to Air Products and Chemicals, Incorporated's Michoud Facility losses against the Corps herein for Four Million, Five Hundred Eighty-One Thousand Three Hundred and Ninety –Three Dollars ($4,481,393).

108. Arch is fully subrogated to Air Products and Chemicals, Incorporated's Michoud Facility losses against the Corps herein for Four Million, Five Hundred Eighty-One Thousand Three Hundred and Ninety –Three Dollars ($4,481,393).

## **PRAYER**

WHEREFORE, Plaintiffs demand judgment against defendant for:

a.   Economic and compensatory damages in the amount of $27, 488,360.00;

b.   Prejudgment interest as allowed by law;

c.   Attorneys fees and costs of litigation pursuant to the Federal Tort Claims Act and/or the Equal Access to Judgment Act;

d.   Such other relief to Plaintiffs as is available under Louisiana or Federal law; and

e.   Such other relief as the Court deems just and equitable.

April 8, 2008,

Respectfully submitted,

Ernest Svenson, Esq. (17164)
The Svenson Law Firm, LLC
Suite 1001
123 Walnut Street
New Orleans, LA 70118
Tel: (504) 208-5199

Fax: (504) 324-0453

and


Elisa T. Gilbert, Esq. (ETG 5713)
Brendan R. O'Brien, Esq. (BO-9033)
The Gilbert Firm, LLC
325 East 57th Street
New York, NY 10022
Tel: (212) 286-8503
Fax: (212) 286-8522