**DRAFT COPY**

## DECLARATION OF DR. ROBERT GLENN BEA

Robert G. Bea, under penalty of perjury, states as follows:

1.      This Declaration is submitted on behalf of the Plaintiffs in *Robinson v. United States* in connection with the Flood Control Act ("FCA") immunity issues. As detailed below, this Declaration constitutes my FCA expert report concerning the performance during Hurricane Katrina, of the man-made features bordering the Inner Harbor Navigation Canal (IHNC) at the Lower 9th Ward. In particular, this Declaration will address engineering forensic studies providing insights into the reasons for breaches, failures, and overtopping that developed with respect to those features. I reserve the right to revise and supplement this Declaration in light of the fact that the USACE has not completed production of documents, has not provided Plaintiffs' counsel with usable electronic copies of numerous documents identified for production. If called to testify, I could and would testify competently as follows:

2.      My Declaration is divided into three sections. Section I provides an overview of my qualifications to serve as an expert on the issues discussed herein. Section II provides a summary of engineering forensic analyses to determine the causes of the breaches, failures, and overtopping that developed with respect to the man-made features along the IHNC at the Lower 9th Ward during and following Hurricane Katrina. Section III summarizes the major conclusions drawn from this work. The following table of contents will serve as a guide to help reading this Declaration.

21.     At the present time, analyses are being performed to further evaluate the adverse effects of the MR-GO on hurricane Katrina waves, currents, and water elevations (surge, wave set-up). These analyses will characterize the waves, currents and water elevations with the swamps, marshes, and wetlands in-place that were destroyed by the MR-GO effects and without the MRGO channel.  When the results from these analyses become available, the analyses detailed in this Declaration will be continued to determine how these less severe conditions affected performance of the Lower 9th Ward levee and floodwall. When these extended analyses are completed, the information contained in this Declaration will be supplemented with the new results.


## III.      FORENSIC ENGINEERING ANALYSES


### Field Observations

22.     As the focused and amplified storm surge from Lake Borgne pushed westward along the east-west trending channel of the MR-GO and into the'T' formed with the IHNC, it rapidly raised the water levels in the IHNC. As described by Dr. Paul Kemp (2007) and others (van Heerden et al 2007; Mashriqui et al 2006; Team Louisiana 2007), the MR-GO – ICWW 'funnel' and its 'T' intersection with the IHNC had multiple effects that were responsible for the early arrival and increased intensity of the Hurricane Katrina surge at this location. Figure 2 shows a hydrograph of measured water levels versus time in the IHNC channel. Figure 3 shows the high water marks on IHNC west bank from the IHNC lock on the south to Lake Pontchartrain on the north. The highest values (in excess of 15 feet) occur directly opposite to the MR-GO –IHNC intersection. The IHNC lock also serves as a 'dam' to increase the water

elevations in that area. The 'venting' effect of Lake Pontchartrain to lower the surge water levels

is clearly evident.



Figure 2: Hydrographs showing measured (and photographed) water levels at gage stations along the IHNC (USACE IPET 2007)



Figure 3: High water marks on IHNC west bank from IHNC lock on south the Lake Pontchatrain on north (USACE IPET 2007)

23.     The surge waters produced two massive breaches on the east bank of the IHNC

(at the western edge of the Lower 9th Ward) (Figures 4 - 6). The larger of these two breaches

**DRAFT COPY**

was the South Breach. This was a very long breach, nearly 900 feet in length, and the inrushing waters entered the adjacent Lower 9th Ward with great force.



Figure 4: Breach locations at the Lower 9th Ward (USACE IPET 2007)

**DRAFT COPY**



Figure 5: South  Breach at Lower 90th Ward (USACE IPET 2006). Note large excavation on IHNC side of floodwall. This excavation was associated with the EBIA site clearing operations.



Figure 6: North Breach at Lower 9th Ward (USACE IPET 2006. Note excavation on IHNC side of floodwall. This excavation was associated with the EBIA site clearing operations.

24.     Available evidence indicates the North Breach initiated before the wall was overtopped, approximately between 5:00 and 7:00 am on August 29, 2005 (CDT) (USACE IPET 2007, ILIT 2006, Team Louisiana 2007). Available evidence indicates the South Breach occurred with some water overtopping the I-wall, between 7:00 and 8:00 am on the same day (USACE IPET 2007, ILIT 2006, Team Louisiana 2007).

25.     The observed movement on the North Breach was a short-narrow movement that apparently started under the landside toe and progressed towards the waterside. The concrete I-wall failed and the sheet pile was elongated landward. The movement and resting place of the sheet pile indicates that the supporting levee and foundation materials were washed away beneath the sheet pile and the water force pushed away the steel sheet piles and twisted them until a section of the sheet piles rotated 90 degrees – against the rising surge waters in the IHNC. Figure 7 shows the failed levee - floodwall at the North Breach.



Figure 7:  North Breach.  Note the sheet pile – concrete I-wall connection after rotating (ILIT 2006)

26.    Field observations indicate the South Breach to be a translational-relatively deep stability failure. It is longer than the North Breach, with approximately 900 feet of failed embankment, whereas the North Breach was approximately 250 feet long.   Evidence from available reports and photographs shows that the I-wall lost lateral support when a scour trench opened on the landside crown and subsequently a gap opened on the waterside allowing water pressures to load the sheet pile and trigger a non-circular failure.  Figure 8 shows the post-failure configuration of the South  Breach.



Figure 8:  South  Breach at Lower 9th Ward (ILIT 2006).  Note the sheet pile displaced landward without flipping as at the North Breach.

## Background

27.    The levees protecting the Lower Ninth Ward were relatively small earthen embankments with slopes inclined 3 feet horizontal to 1 foot vertical (USACE DM03, 1966). Design cross sections from the 1966 Design Memorandum show that in the proximity of the landside toe of the levee a drainage ditch known as the Jourdan Avenue Canal existed and was bottomed at elevation -10 feet to –12 feet NAVD88 (Figure 9).   Toe elevations along the landside (protected side) were approximately –4 feet NAVD88.   The landside canal was filled sometime in the 1990's with unknown materials (ILIT, 2006).



Figure 9:  Analysis cross-section for the levee stretch south of Florida Avenue (USACE DM 03 1966).

28.    Based on the design drawings (Figure 10) the design sheet piles were topped at elevation +14.8 feet NAVD88, and tipped at elevation –8 feet.  Elevation survey data provided by IPET (2007) indicate that the top of the sheet pile supported I-wall was located at elevation

+12 feet (NAVD88), and the sheet piles tipped at -10.5 feet.  This means a 2.5 feet elevation difference between the design and pre-Katrina conditions.



Figure 10: I-wall as-built drawings for Lower 9th Ward south of Florida Avenue (USACE DM 03 1966).

29.    Figure 11 shows the elevation difference between landside toe elevations from LIDAR surveys performed in 2000, showing an elevation difference of approximately 4 feet between the North Breach and the South  Breach. As shown in Figure 12, There were substantial differences between the design levee profiles and those actually present.



Figure 11: LIDAR survey along landside toe (USACE IPET 2007).



Figure 12: Comparison of the as-built I-wall levee profile with pre-construction surveys at south and North Breaches (Team Louisiana, 2007)

30.     The levee embankments are underlain by a thick irregular Marsh (Peat) deposit (Figures 13 - 15).  Field evidence and analysis results from the ILIT investigation (ILIT 2006) indicated this layer had important influences on the development, shape and extents of both the North and South  Breaches.

18



Figure 13:  North Breach geologic cross section (IPET 2006).



Figure 14:  South Breach geologic cross section (IPET 2006).

**DRAFT COPY**



Figure 15: East bank of IHNC geologic section through South Breach and North Breach sites (USACE IPET 2007)

31.     During the 1990s work was commissioned by the USACE to expand the IHNC locks to relieve shipping congestion and allow further expansion of the Port of New Orleans. Congress authorized the study for the lock enlargement / replacement in 1956. The proposed new locks would require a bypass channel that would be constructed at the East Bank Industrial Area (EBIA). The EBIA was located in the Lower 9th Ward, west of the floodwall and east of the IHNC, between Florida Avenue and Claiborne Avenue (Figure 16).



Figure 16: IHNC and EBIA (left side) (USACE photograph)

32.     Available documentation indicates that the USACE purchased the EBIA site from the Port of New Orleans in order to proceed with the bypass channel construction (WGI, "Project Work Plan, Project Site Development and Remedial Action of East Bank Industrial Area, Inner Harbor Navigation Canal Lock Replacement Project," report to USACE, New Orleans District, 2000). WGI began working at the job site in January 2001.

33.     The EBIA consists of 32 acres of former industrial sites previously leased from the Port of New Orleans to private owners. The EBIA consisted of six facilities named for their

former occupants (Figure 17). These included (starting at the south) the International Tank Terminal, Saucer Marine, Mayer Yacht – Distributors Oil, Indian Towing, McDonough Marine, and Boland Marine. Available information indicates that the two Lower 9th Ward breach sites were located entirely in the Saucer Marine Service property (South Breach site, used primarily for ship building operations) and Boland Marine property (North Breach site, used primarily for ship repairs, storage, office space, painting operations, and steel fabrication).



Figure 17: East Bank Industrial Area (EBIA) (WGI 2005). Site cleared to prepare for USACE Lock Expansion Project.

**DRAFT COPY**

34.     At one time, underground storage tanks were located at both the Boland property and the Saucer property. These tanks were reported to have been removed. The State of Louisiana listed Boland Marine as an unspecified hazardous waste generator.  In 1991, an anonymous employee contacted the Louisiana Department of Environmental Quality and reported that the company had buried drums containing hazardous waste onsite.

35.     The EBIA had a long history spanning more than 4 decades of industrial use by marine service and petroleum distribution companies. Purportedly, tenants contaminated the property as a result of their industrial operations. Also of particular significance at the EBIA was the active placement of construction materials (concrete rubble) and solid wastes (barges, metal turnings, concrete blocks) to protect the properties from the effects of ship wakes. These two activities had two primary impacts derived from the existence of hazardous constituents that could negatively affect: 1) the environment at the time of construction, and 2) construction of the bypass channel.

36.     To ameliorate these potential negative effects, the USACE New Orleans district contracted with WGI to characterize and remediate the EBIA's environmental contamination and identify and remove construction materials likely to interfere with bypass channel construction. Figures 18 and 19 summarize the site clearing activities at the north Boland site and south Saucier Marine site.