UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | |
| | * | NO. 05-4182 "K"(2) |
| PERTAINS TO: ROAD HOME | * | |
| *Louisiana State*, C.A. No. 07-5528 | * | JUDGE DUVAL |
| | * | |
| | * | MAGISTRATE WILKINSON |
| * * * * * * * * * * * * * * * * * * * * * * * * * * | * | |

**REPLY MEMORANDUM IN SUPPORT OF MOTION OF STATE FARM FIRE
AND CASUALTY COMPANY AND CERTAIN OTHER INSURER
<u>DEFENDANTS TO DISQUALIFY PLAINTIFF'S PRIVATE COUNSEL</u>**

## TABLE OF CONTENTS

I.   COUNSEL'S CONFLICTS OF INTEREST ARE REAL, LIKELY TO MANIFEST THEMSELVES, AND DISQUALIFYING ................................................... 1

    A.   Counsel Have Not Successfully Avoided Their Conflicts .................................... 2

    B.   Counsel's Conflicts Are Current and Real and Are in No Way Hypothetical or Attenuated .................................................................................. 3

    C.   Counsel Cannot Avoid Their Conflicts by Limiting the Scope of Representations, Nor Have They Adequately Documented Such Agreements ......................................................................................................... 9

    D.   The Conflicts at Issue Cannot Be Waived, and Even if Waivable, Counsel Have Not Adequately Shown That Effective Waivers Have Been Obtained ....... 11

II.  THE FORMER ATTORNEY GENERAL'S ARRANGEMENTS WITH COUNSEL ARE ILLEGAL AND/OR UNCONSTITUTIONAL ................................. 14

    A.   It Is Clear that Counsel Will Seek to Be Compensated and that Their Agreements Violate State Law in any Event ...................................................... 15

    B.   Counsel's Proposed Method of Compensation Is Illegal and Unconstitutional ................................................................................................. 17

    C.   Compensation From Any Source Other Than State Funds Would Violate the Louisiana Code of Governmental Ethics ...................................................... 20

III. CONCLUSION .............................................................................................................. 20

i

## TABLE OF AUTHORITIES

*Baas v. Dollar Tree Stores, Inc.*, No. 07-03108, 2008 WL 906496 (N.D. Cal. Apr. 1, 2008) ................................................................................................................................ 13

*Bellino v. Simon*, No. 99-2208, 1999 WL 1277535 (E.D. La. Dec. 28, 1999) ...................... 11-12

*Brown & Williamson Tobacco Corp. v. Daniel International Corp.*, 563 F.2d 671 (5th Cir. 1977) ...................................................................................................................................... 2

*Coaker v. Geon Co.*, 890 F. Supp. 693 (N.D. Ohio 1995) ........................................................ 12

*Cooper v. Koch Pipeline, Inc.*, Nos. Civ. A. 95-2373, 95-2463, 95-2725, 95-2726, 95-2727, 95-2729, 95-2730, 95-2731, 95-2728, 95-3307, 95-3238, 95-3308, 95-3960, 1995 WL 931091 (E.D. La. Dec. 11, 1995) ...................................................................................... 18

*El Camino Resource Ltd. v. Huntington National Bank*, No. 1:07-cv-598, 2007 WL 2710807 (W.D. Mich. Sept. 13, 2007) ....................................................................................... 10

*FDIC v. United States Fire Insurance Co.*, 50 F.3d 1304 (5th Cir. 1995) ................................... 5

*Foti v. Bayer Corp.*, No. 04-439, slip op. (La. Civ. Dist. Ct. Sept. 17, 2004) ................. 15, 16-17

*Grant v. Chevron Phillips Chemical Co.*, 309 F.3d 864 (5th Cir. 2002) ............................... 17, 18

*Groby v. Davis*, No. 08-1524 (E.D. La., filed Apr. 4, 2008) ....................................................... 6

*Guaranty Corp. v. National Union Fire Insurance Co. of Pittsburgh, Pa.*, No. 90-2695, 1993 WL 165690 (E.D. La. May 10, 1993) ................................................................................. 4

*In re Abbott Laboratories*, 51 F.3d 524 (5th Cir. 1995) ...................................................... 18, 19

*In re Cardinal Services, Inc.*, Nos. 00-1909, 00-1910, 2006 WL 2089925 (W.D. La. July 21, 2006) ................................................................................................................................ 4, 5

*In re Guardianship of Lillian P.*, 617 N.W.2d 849 (Wis. Ct. App. 2000) .................................. 14

*In re Katrina Canal Breaches Litigation*, No. 08-30145 (5th Cir. Apr. 11, 2008) ..................... 19

*In re Suard Barge Services, Inc.*, No. 96-3185, 1997 WL 703000 (E.D. La. Aug. 18, 1997) ...................................................................................................................... 10, 13, 14

*Kenny A. ex rel. Winn v. Perdue*, 454 F. Supp. 2d 1260 (N.D. Ga. 2006) ................................. 18

*Lange v. Orleans Levee District,* Nos 97-987, 97-988, 1997 WL 668216 (E.D. La. Oct. 23, 1997) ................................................................................................................................ 14

922324v.1

*Lease v. Rubacky*, 987 F. Supp. 406 (E.D. Pa. 1997)................................................................. 12

*Mathis v. Exxon Corp.*, 302 F.3d 448 (5th Cir. 2002)................................................................. 18

*Meredith v. Ieyoub,* No. 96-1110 (La. 9/9/97); 700 So. 2d 478................................................. 16

*Palumbo v. Tele-Communications, Inc.*, 157 F.R.D. 129 (D.D.C. 1994)............................... 2, 13

*Panola Land Buying Association v. Clark*, 844 F.2d 1506 (11th Cir. 1988)............................. 17

*Shelak v. White Motor Co.*, 636 F.2d 1069 (5th Cir. 1981)....................................................... 17

*State ex rel. Union Planters Bank, N.A. v. Kendrick*, 142 S.W.3d 729 (Mo. 2004) ................... 13

*Tetra Applied Technologies v. Henry's Marine Service,* No. H-04-2576, 2007 WL
1239240 (S.D. Tex. Apr. 27, 2007)............................................................................................ 18

*Turner v. Murphy Oil USA, Inc.*, 422 F. Supp. 2d 676 (E.D. La. 2006) ............................... 18-19

*Utica Llyod's of Texas v. Mitchell*, 138 F.3d 208 (5th Cir. 1998) ............................................ 18

*Venable v. Keever*, 960 F. Supp. 110 (N.D. Tex. 1997)............................................................. 14

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002)...................................................... 18

*White v. General Motors Corp.*, 97-1028 ( La. App. 1 Cir. 6/29/98); 718 So. 2d 480 ............... 18

*Yates v. Applied Performance Technologies, Inc.*, 209 F.R.D. 143 (S.D. Ohio 2002) .................. 2

## STATUTES, REGULATIONS & RULES:

LA Rev. Stat. § 39:32.C(2) ......................................................................................................... 15

LA Rev. Stat. § 39:1482 .............................................................................................................. 15

LA Rev. Stat. § 42:1111(A)(1) .................................................................................................... 20

LA Rev. Stat. § 49:258 ................................................................................................................ 15

LA Rev. Stat. § 49:258(1)............................................................................................................ 15

LA Code of Civ. Pro. art. 595..............................................................................................17, 18, 19

LA Code of Civ. Pro. art. 595(A) cmt. (a)................................................................................... 18

922324v.1

Fed. R. Civ. P. 23(h) .................................................................................................. 17-18

Fed. R. Civ. P. 23(h), Ad. Comm Notes to 2003 Amend. ...................................... 18

Model Rules Prof'l Conduct R.1.2(c) ...................................................................... 9

Model Rules Prof'l Conduct R. 1.7(b) ..................................................................... 11

Model Rules Prof'l Conduct R. 1.7, cmt. 8 .......................................................... 4, 9

Model Rules Prof'l Conduct R.1.7, cmt. 18 ............................................................ 13

Model Rules Prof'l Conduct R.1.7, cmt. 22 ............................................................ 13

Model Rules Prof'l Conduct R.1.7, cmt. 23 ............................................................ 14

Model Rules Prof'l Conduct R.1.7, cmt. 29 ............................................................ 11

Model Rules Prof'l Conduct R.1.7, cmt. 30 ............................................................ 13

LA R. Prof'l Conduct 1.0 ......................................................................................... 13

LA R. Prof'l Conduct 1.7 ........................................................................................... 5

LA R. Prof'l Conduct 1.7(a)(1) ................................................................................. 4

LA R. Prof'l Conduct 1.7(a)(2) ................................................................................. 4

LA R. Prof'l Conduct 1.7(b) ..................................................................................... 11

LA R. Prof'l Conduct 1.9(a) ..................................................................................... 13

LA R. Prof'l Conduct 3.7 ............................................................................................ 5

## OTHER AUTHORITIES:

Restatement (Third) of Law Governing Lawyers § 122 cmt. g(iii) (2000) ................................ 12

Restatement (Third) of Law Governing Lawyers § 128 cmt. b (2000) ..................................... 12

6 La. Civ. L. Treatise § 12.28 (2d ed. 2007) ............................................................. 17

State Farm Fire and Casualty Company and the other insurers identified in Docs. 10937 and 10304 (collectively "Defendants") moved to disqualify the eight law firms retained by the State in this putative class action lawsuit ("Counsel") based on conflicts of interests and the former Attorney General's non-compliance with Louisiana constitutional, statutory, and regulatory provisions.  Counsel previously complained Defendants' motion was delayed too long (Doc. 11671, 1/29/08 Tr. at 15, 18), but now argue it is premature because their conflicts are too contingent or attenuated and how they will be paid has not been determined.  Though dismissing the motion as premature, Counsel nonetheless assert (with very limited record support) that they have been trying to eliminate conflicts by terminating client relationships and/or asking individual clients to agree to limit the scope of representations and to grant waivers.  Notably, the present Attorney General has filed no response in defense of his predecessor's retention of Counsel.  Only Counsel themselves filed briefs responding to Defendants' motion.[1]

Defendants' motion is not premature, but rather has been brought timely and at a stage where it can be addressed without disrupting substantive proceedings on the merits that have yet to begin.  Counsel should be disqualified because their simultaneous representation of both the State and Road Home grant applicants or recipients presents real and imminent conflicts of interest and because their engagements by the former Attorney General are unlawful.

## I.     COUNSEL'S CONFLICTS OF INTEREST ARE REAL, LIKELY TO MANIFEST THEMSELVES, AND DISQUALIFYING.

Counsel both dismiss any conflicts as "remote," "attenuated," or "hypothetical" and claim to have contracted around and/or obtained waivers of any conflicts that do exist. Despite their arguments, affidavits, and actions in response to Defendants' motion, Counsel have

---

[1]  Counsel's three opposition briefs assert essentially the same arguments.  (Docs. 12293, 12306, 12310.)  Unless otherwise indicated, citations to "Opposition" or "Opp." refer to the first-filed brief, Doc. 12293.

922324v.1

not removed or avoided their conflicts and, in fact, have completely ignored a significant source of those conflicts: representation of classes of homeowners in pending putative class actions.[2]

### A.   Counsel Have Not Successfully Avoided Their Conflicts.

Five of the eight firms disclaim any current representation of "individual homeowners who have received or will receive Road Home benefits" (Opp. at 7, Exhs. 3-6, Doc. 12310, Exh. 1), and a sixth, Ranier, Gayle & Elliot, is said to be referring such clients to other counsel, but has provided no affidavit to that effect.  (*See* Opp. at 7.)  However, three of these firms (the McKernan Law Firm, Ranier, Gayle & Elliot, and the Murray Law Firm) represent plaintiffs in putative insurance class actions,[3] and the first two are counsel on the Insurance Master Consolidated Class Action Complaint (Doc. 3413) and on the Insurance PSLC.  As such, they continue to seek to represent putative classes including Road Home recipients.[4]  A seventh firm, Fayard & Honeycutt, represents that its 31 implicated clients have "provided informed consent confirmed in writing waiving any potential future conflicts involving the State and limiting the scope of representation to exclude claims or issues against the State" (Opp., Exh. 7 ¶ 5), but Mr. Fayard is also counsel in a putative insurance class action,[5] is counsel on the Insurance Master Consolidated Class Action Complaint, and is PSLC – Insurance Liaison Counsel.  He has not withdrawn from or limited any of those roles, nor does he claim to have

---

[2]   Counsel suggest that Defendants' motion is somehow improper because Defendants are "unaffected" by the conflicts (Opp. at 16 n.51), but Defendants have an interest in having this matter litigated by counsel free of conflicts, and the Fifth Circuit has recognized the standing of opposing parties to raise such issues.  *See Brown & Williamson Tobacco Corp. v. Daniel Int'l Corp.*, 563 F.2d 671, 673 (5th Cir. 1977).

[3]   Mr. McKernan represents Plaintiffs in *Chehardy v. State Farm Fire & Cas. Co.*, No. 2:06-cv-1672 (E.D. La.), and *Williams v. State Farm Fire & Cas. Co.*, No. 2:06-cv-2919 (E.D. La.), as does Mr. Ranier in the latter case.  The Murray Law Firm represents Plaintiffs in *Turk v. La. Citizens Prop. Ins. Corp.*, No. 6:06-cv-144 (W.D. La.).

[4]   Courts have applied the conflicts rules based on the interests of putative class members.  *See, e.g.*, *Yates v. Applied Performance Techs., Inc.*, 209 F.R.D. 143, 151-53 (S.D. Ohio 2002); *Palumbo v. Tele-Communications, Inc.*, 157 F.R.D. 129, 133 (D.D.C. 1994).

[5]   Mr. Fayard represents Plaintiffs in *Chehardy v. State Farm Fire & Cas. Co.*, No. 2:06-cv-1672 (E.D. La.).

obtained waivers and limited scope agreements from affected putative class members.  The eighth firm, Gauthier, Houghtaling & Williams, affirms that it represents an unspecified number of Road Home applicants or recipients, but claims all have been asked to waive any conflict and agree to limit the representation.  (*See* Doc. 12306 at 7-8, Exh. 3.)

            None of the eight firms has provided affidavits from their clients or any details of the disclosures made to their clients or the specific language by which they seek to limit their representations.  In addition, there is no reference to any waivers obtained from their former clients, whose informed consent is required by Rule 1.9(a).  Moreover, only Gauthier, Houghtaling & Williams affirmatively represents that it has obtained an informed waiver from the State (*see* Doc. 12306 at 7, Exh. 3), and the affidavit of Mr. Rees, counsel for DRU-OCD, does not reference any waivers by the State (Opp., Exh. 1).   Finally, none of the eight law firms has explained how they can avoid conflicts within this case, in which they seek to represent both the State and a putative class of Road Home applicants and recipients.[6]

### B.    Counsel's Conflicts Are Current and Real and Are in No Way Hypothetical or Attenuated.

            Having previously claimed "[t]hese issues have been prevalent throughout the Road Home process from day one" (Doc. 11671, 1/29/08 Tr. at 15), Counsel now seek to dismiss the conflicts as "hypothetical," "attenuated," and "remote," arguing that any conflicts would only arise if "a homeowner successfully recovers funds" (Opp. at 13, 14-16) or if the State or an individual client elects to take a position adverse to the other (*id.* at 20-21).  However, that some

---

[6]  Nor have they attempted to rebut the implication of Attorney General Foti's August 27, 2007 letter contemplating a working relationship among counsel for the joint preparation and prosecution of this litigation under the direction of Mssrs. Fayard and McKernan.  (*See* Exh. 3.)  (Unless otherwise noted, exhibit citations refer either to the 22 exhibits attached to Defendants' opening memorandum or the additional exhibits attached to this brief.)

conflicts might not have manifested themselves to date in proceedings focused largely on jurisdiction does not justify disregarding conflicts as to issues that are implicated by this case.

Courts do not look only at positions that have been advanced on the record as of the time a conflict issue is raised, as Counsel seek to do. Such a narrow and blinded view is rejected by Rule 1.7's use of the future tense in defining a concurrent conflict of interest as one where "the representation of one client *will be* directly adverse to another" or where "there is *a significant risk* that the representation of one or more clients *will be* materially limited." La. R. Prof'l Conduct 1.7(a)(1) & (2) (emphasis added). Rather, one must exercise reasonable foresight and consider the interests of all affected clients as they are reasonably likely to manifest themselves over the course of the representations. *See Guaranty Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 90-2695, 1993 WL 165690, at *8 (E.D. La. May 10, 1993) (disqualifying attorneys and their firms based explicitly on "possibility of" and "potential for" conflicts of interest). As explained in the commentary to the Model Rules, "[t]he critical questions are *the likelihood* that a difference in interests *will eventuate* and, *if it does*, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client." ABA Model R. Prof'l Conduct 1.7, cmt. 8 (emphasis added).

To be sure, Counsel's case law cautions that disqualification should not be based on imagined conflicts nor on the mere potential for a future conflict among parties otherwise aligned in their interests for the foreseeable course of a matter,[7] but that is not this case. Counsel

---

[7] For example, in *In re Cardinal Services, Inc.*, the court denied a motion to disqualify after finding *no conflict at all* between the defendant's attorney who previously and unsuccessfully advocated that settlement agreements between the defendant and certain of the plaintiffs were enforceable, rejecting the plaintiffs' apparent suggestion that the attorney's role as a fact witness to the settlement negotiations and his continued belief in their sufficiency somehow ran contrary to his client's interests. Nos. 00-1909, 00-1910, 2006 WL 2089925, at *3-4 (W.D. La. July

4

insist that "[f]or *each of these firms*, whether the representation is of the State, a putative class, or individual homeowners, the purpose of each representation is the same—to obtain the largest possible recovery from insurers who did not meet their contractual and statutory obligations for payments due to property damage."  (Opp. at 7 (emphasis added).)  But that *Counsel* may have as their single, unified goal the recovery of the largest possible sum from Defendants does not resolve the inherent conflict between their clients, who each seek the largest possible *personal* recovery.  The State and homeowners are each entitled to expect their attorneys to pursue all reasonable factual and legal arguments that advance that interest.  However, because the asserted rights of one of Counsel's clients consist of limited and defined subrogation interests in the rights of Counsel's other clients, many things Counsel could do to increase the recovery of the State would necessarily reduce the recovery of Counsel's individual homeowner clients.

First and foremost, the State and homeowners have directly adverse interests on any issues relating to the validity, interpretation, or application of the Subrogation/Assignment Agreement between them.[8]  Counsel dismiss these adverse interests by claiming that any such disputes would only arise upon a successful insurance claim and that such a challenge has only been raised in a small number of cases.  (Opp. at 20-21.)  However, whether and to what extent

---

21, 2006).  Further, in *FDIC v. United States Fire Ins. Co.*, the Fifth Circuit reversed disqualification of the plaintiff's attorney and his entire firm based on the alleged conflict presented by the attorney having failed to produce certain documents requested by the defendant prior to the litigation and the defendant having asserted the attorney's bad faith as a defense to the plaintiff's claim.  50 F.3d 1304, 1307, 1313-14 (5th Cir. 1995).  The court noted that the attorney and his client had a unified interest in disproving the defendant's bad faith claim and concluded that it would be "much too tenuous a thread" to order disqualification based only on the possibility that the plaintiff might have a claim against the attorney if the attorney's failure ultimately caused his client to lose the case.  *Id.* at 1313-14.  It should also be noted that both *FDIC* and *Cardinal Services* involved situations in which it was suggested that the attorney was or could be a witness in the matter, thus implicating Rule 3.7 in addition to Rule 1.7, and where the alleged conflict was between a client and the *attorney* himself rather than another of the attorney's clients.

[8]  To the extent the State may assert reimbursement or repayment rights under the agreement directly against grant recipients, the interests of the State and grant recipients are obviously adverse as to those matters as well.

the State's claimed rights are valid is an issue that could arise at any time in any case, including this case.  Even if it would be feasible and fair to their clients for Counsel to promise not to attempt to intervene on behalf of the State (as in *Flotte*) and not to file a concursus petition for an insured (as in *Gillard*) and to withdraw from any case upon the occurrence of any such event, the validity and enforceability of the Subrogation/Assignment Agreement is essential to the rights asserted by the State in this action.  In filing this case Counsel implicitly advanced a position contrary to the interests of their grant recipient clients and Counsel will be required to defend that position in order for the State to proceed.  Counsel cannot do so without simultaneously undermining the interests of their individual homeowner clients.[9]

In addition, the State and individual homeowners each have competing interests in any funds recovered in this or other insurance litigation.  Counsel's contention that competing claims only arise once funds become available by settlement or judgment both is contrary to the State's assertion that it has a current and independent right to assert claims against the insurers (Amended Petition ¶¶ 12-13, 16, 36, 37) and overlooks the fact that the parties' respective rights with respect to those funds will be affected by how any recovery is characterized.  The State's claimed subrogation right is limited to insurance payments for damage to the grant recipients' dwelling structure and does not apply to any payments on other coverages, such as contents or ALE.  Therefore, it is in the State's interest to advance evidence and arguments that characterize as much of a recovery as possible as payment for dwelling coverage while it is in the insured's

---

[9]  Counsel emphasize that the *Gillard* petition was subsequently withdrawn and is only a single example, but a new case suggests why more such challenges have not been brought.  A recently filed putative class action alleges that the State has impeded Road Home participants from filing lawsuits challenging program actions or seeking to protect insurance benefits affected by subrogation provisions in violation of their constitutional right of access to the courts by including in program agreements provisions purporting to preclude judicial review of Road Home determinations and giving the State the right to recover fees and costs in any legal action against the State, whether or not taken in good faith. *See Groby v. Davis*, No. 08-1524, Doc. 1 (E.D. La., filed Apr. 4, 2008) (Lemmon, J.).

922324v.1

interest to advance evidence and arguments that maximize the amount characterized as payment for other coverages, interests which insureds should expect their attorneys to account for in seeking and offering evidence on their insurance claim and negotiating a settlement.

Counsel now contend that the issue of disputes over allocation among various coverages is a "red herring because the State's claims are not dependent on how such payments were allocated" and "the State seeks recovery in this action solely for the Insurers' underpayment of property damage coverage, and has not sought to recover any funds related to the overpayment of personal property or adjusted living expenses." (Opp. at 15, 22.) This new-found position is directly contrary to positions the State has taken in connection with the settlement review process, where it has asserted a right to review insurance settlements, insisted upon receiving detailed information regarding personal property, ALE, and other non-dwelling payments, and expressly stated that it will examine the reasonableness of allocations. (*See* Doc. 11115 at 2 ("The State has determined that information as to prior payments, settlement payments, and apportionment between coverages is among the information needed."); Doc. 11592 at 4 (stating State would be reviewing "the reasonableness of the allocations" of insurance settlements among coverages); *see also* Exh. 23, Road Home Request for Consent Form § 6 (requesting information regarding payments or settlements for dwelling, other structures, contents, alternative living expenses, and any other expenses or property damage).)

Counsel also insist that they have not conducted and will not conduct negotiations on behalf of the State "regarding the State's reimburseable portion of each individual homeowner's settlement" (Opp. at 4; *see also id.* at 14, 18), but that insistence is inconsistent with their objection to protective order provisions that would not permit them access to information submitted to the State for purposes of Road Home review of settlements. (*See* Doc.

11440 ¶¶ 2.c, 2.m; Doc. 11592 at 6.)  Moreover, notwithstanding the current disclaimer, Counsel have been substantially involved in efforts to establish a settlement review process,[10] have in the past been involved in the State approval process for particular settlements,[11] and at one time even demanded that all communication with Mr. Rees and/or the Road Home Program be directed through Counsel.[12]

Moreover, the State and insureds have divergent interests with respect to factual issues other than allocation.  For example, consistent with the State's federal mandate to avoid duplication of benefits, the Subrogation/Assignment Agreement only grants the State a right to recover insurance payments to the extent those payments "would have reduced the amount of [the] grant had [the insured] received such insurance payments prior to … receipt of grant proceeds."  (Def. Mem., App. A.)  The starting point for the grant calculation is determining the value of the dwelling loss suffered by the applicant.  The higher the valuation of the loss, the more an insured can retain from an insurance settlement (because there is less or no duplication of benefits).  The lower the valuation of the dwelling loss, the more the State would recover.  Counsel simply cannot remain neutral as between their two clients' interests while litigating this factual issue present in every insurance claim case.[13]

---

[10]  *See* Exh. 24, Trans. 12/13/07 Status Conference, *In Re: Cameron Parish Rita Litig. Against State Farm*, 07-MD-01, W.D. La., pp. 6-8, 24-26; *see also* Exh. 16.

[11]  Exh. 12 (Mr. Dudenhefer describing information gleaned regarding specific settlements as "problematic" and specifically identifying self to State Farm counsel as contact person for inquiries on State review/approval of 21 specific settlements); *see also* Exh. 13.

[12]  *See* Exh. 11 (Mr. Dudenhefer requesting State Farm counsel to "communicate in the future with Mr. Rees or anyone else in the Road Home Program only thru counsel of record representing the State in the Federal Litigation.").

[13]  Counsel contend Mr. Elliot's handling of client's settlement in *Lemaire* illustrates how Counsel can represent both insureds and the State while avoiding conflicts, but even if Mr. Elliot did remove himself from negotiations with the State relating to its interest in the Lemaires' settlement proceeds, he was still involved in providing information regarding his client's insurance claim/settlement to the State (*see* Exh. 18), information which presumably he compiled and developed with a view to maximizing the interests of his homeowner client (and to the

**C.** **Counsel Cannot Avoid Their Conflicts by Limiting the Scope of Representations, Nor Have They Adequately Documented Such Agreements.**

Counsel seek to avoid disqualification by having their individual homeowner clients agree, presumably well into the representation, that the representation will not involve any claims or positions adverse to the State and that "each [client] will have separate counsel should either have or wish to pursue interests adverse to one another ...."[14]  (Opp. at 18.)  While Rule 1.2(c) generally permits limiting the scope of a representation "if the limitation is reasonable under the circumstances and the client gives informed consent," a limitation of the sort suggested would not be reasonable and Counsel cannot avoid the conflicts inherent in their representations of both homeowners and the State simply by getting their homeowner clients to agree that Counsel will not pursue challenges to the Subrogation/Assignment Agreement on their behalf.  Such limitations on the types of substantive *issues* Counsel will raise and pursue on behalf of their clients implicate a lawyer's duty of loyalty and zealous advocacy.[15]  In any event, since Counsel have not disclosed the precise terms of their restricted representations or the specific information provided to their clients regarding that limitation, it is not possible to find on this record that any limitations are reasonable or that any consent was informed.

---

detriment of the State).  Indeed, the Road Home Pilot Settlement Protocol Request for Consent Form presupposes the insured's attorney on his or her insurance claim will be a source of information for the State.  (*See* Exh. 23 § 7.)

[14]  It is not clear whether Counsel are amending their engagement agreements with the State to similarly limit the scope of that representation.  It would be neither reasonable nor sufficient for Counsel to obtain insureds' consent not to advance their position on a particular issue without also obtaining the State's consent not to advance its position on that same issue.  In any event, no one has produced any such modifications to the engagement agreements, either with briefing in this case or in response to records requests to state agencies.  (*See* Exh. 25, Second Declaration of Joey Bossom; Exh. 6, First Declaration of Joey Bossom.)

[15]  *See* ABA Model R. Prof'l Conduct 1.7, cmt. 8 ("Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests.  For example, a lawyer asked to represent several individuals seeking to form a joint venture is likely to be materially limited in the lawyer's ability to recommend or advocate all possible positions that each might take because of the lawyer's duty of loyalty to the others.  The conflict in effect forecloses alternatives that would otherwise be available to the client.").

The only authority Counsel cite to support avoiding disqualification by limiting the scope of representation is *In re Suard Barge Servs., Inc.*, No. 96-3185, 1997 WL 703000 (E.D. La. Aug. 18, 1997).  However, that case did not involve an attempt to avoid a conflict by a contractual limitation on the scope of representations of clients in related matters, but instead a district court's efforts to avoid disqualification where a collateral issue relating to an attorney's representation of a client in one matter by chance brought the attorney into an adverse position with another client the attorney was representing in a separate, unrelated matter.  In *Suard Barge*, the court declined to disqualify the plaintiff's attorney in a maritime personal injury case which had led the attorney to issue and seek to enforce by a motion to compel and for sanctions a records subpoena to an insurance company that the attorney was at that time representing in another unrelated matter.  *Id.* at *1.  The court elected to take a flexible approach to disqualification and simply bar the attorney from pursuing the motion to compel and for sanctions or taking any other action directly adverse to his other client.  *Id.* at *5.  The case is inapposite here.  The conflicting representations at issue in this case are in the same or substantially related matters and are not the result of mere happenstance.[16]  *See El Camino Res. Ltd. v. Huntington Nat'l Bank*, No. 1:07-cv-598, 2007 WL 2710807, at *21 (W.D. Mich. Sept. 13, 2007) ("Those few courts that have adopted the 'flexible approach' have done so reluctantly, recognizing that it represents an erosion of the duty of loyalty and therefore should be applied in limited circumstances, when the conflict is truly unforeseeable.").

---

[16]  Mr. Houghtaling's brief contends no conflicts are presented by a personal injury lawyer representing a plaintiff having a subrogation obligation for damages such as medical expenses against third-party tortfeasors (Doc. 12306 at 7), but here the respective rights of the subrogor and subrogee will be determined by and in the same proceeding in which the totality of those rights is determined and Counsel propose to represent both in that proceeding.

**D.      The Conflicts at Issue Cannot Be Waived, and Even if Waivable, Counsel Have Not Adequately Shown That Effective Waivers Have Been Obtained.**

Counsel state in summary affidavits that they have obtained conflict waivers from all of their impacted clients.  While Rule 1.7(b) does permit waivers under certain circumstances, the conflicts at issue here cannot be waived.  Such waivers are only permitted where (1) the lawyer reasonably believes that he or she will be able to provide competent and diligent representation to each affected client, (2) the representation is not prohibited by law, (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same matter, and (4) each affected client gives informed consent, confirmed in writing.  La. R. Prof'l Conduct 1.7(b).

Here, Counsel cannot reasonably believe (nor reasonably assure their clients) that they will be able to provide diligent representation throughout the litigation without being limited by the respective interests of their State and homeowner clients.

> In considering whether to represent multiple clients in the same matter, a lawyer should be mindful that if the common representation fails because the potentially adverse interests cannot be reconciled, the result can be additional cost, embarrassment and recrimination.  Ordinarily, the lawyer will be forced to withdraw from representing all of the clients if the common representation fails.  In some situations, the risk of failure is so great that multiple representation is plainly impossible.  For example, a lawyer cannot undertake common representation of clients where contentious litigation or negotiations between them are imminent or contemplated.

ABA Model R. Prof'l Conduct 1.7, cmt. 29.  Accordingly, "the Supreme Court has held that a 'district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.'"  *Bellino v. Simon*, No. 99-2208, 1999 WL 1277535, at *4 (E.D. La. Dec. 28, 1999) (quoting *Wheat v. United States*, 486 U.S. 153, 163 (1988)).  If "a

11

disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent." *Bellino*, 1999 WL 1277535, at *4.

While the State and its subrogees may have aligned interests on certain factual and insurance law issues, their interests are diametrically opposed on legal and factual issues relating to the Subrogation/Assignment Agreement and the characterization or valuation of a given property loss.[17] "When clients are aligned directly against each other in the same litigation, the institutional interest in vigorous development of each client's position renders the conflict nonconsentable. The rule applies even if the parties themselves believe that the common interests are more significant in the matter than the interests dividing them." Restatement (Third) of Law Governing Lawyers § 122 cmt. g(iii) (2000); *see also id.* § 128 cmt. b ("Even if the parties would give informed consent to being represented by one lawyer, in some cases the parties' positions cannot be effectively presented through the same advocate.").

In any event, Counsel have not obtained (and almost certainly cannot) waivers from all affected clients. It is not clear Counsel have obtained waivers from the State. Only Mr. Houghtaling's affidavit (Doc. 12306, Exh. 3) refers to such a waiver (and as to his firm only), Mr. Rees's affidavit makes no mention of a State waiver, and no State office has produced a copy of any waiver in response to public records requests.[18] Moreover, nowhere have Counsel

---

[17] *See Lease v. Rubacky*, 987 F. Supp. 406, 407-08 (E.D. Pa. 1997) (refusing to accept waiver of attorney's simultaneous representation of both law firm and law firm's client in breach of contract suit against expert witness based on potential latent legal malpractice claim by client against law firm, two plaintiffs' differing interests in receiving full recovery from expert-defendant, and potential hesitation of attorney to advise client to sue law firm); *Coaker v. Geon Co.*, 890 F. Supp. 693, 695 (N.D. Ohio 1995) (refusing to accept waiver where attorney sought to represent two corporate defendants where action raised issues of successor liability as between the two).

[18] *See* Exh. 25, Second Bossom Decl.; *see also* Exh. 6, First Bossom Decl. Of note, even the privilege log produced by Mr. Rees of the Office of Community Development in the Division of Administration does not contain *any* entries from communications of any sort between Counsel and the State. (Exh. 25, Second Bossom Decl., Exh. A.)

922324v.1

indicated they have obtained waivers from any now former clients as required by Rule 1.9(a), or that they have attempted to get waivers from putative class members in this and other cases.[19]

Further, even if the conflicts could be waived and waivers had been sought from *all* of Counsel's impacted clients, Counsel have not satisfied their burden of producing sufficient evidence to establish any such waivers have been informed and are otherwise valid.  Informed consent requires that the attorney communicate "adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct" and, in the context of multiple representations, explain the possible effects on loyalty, confidentiality, and the attorney-client privilege.  La. R. Prof'l Conduct 1.0.[20]  "To satisfy this requirement, it is not sufficient that both parties be informed of the fact that the lawyer is undertaking to represent both of them, but he must explain to them the nature of the conflict of interest in such detail so that they can understand the reasons why it may be desirable for each [to withhold consent]."  *In re Suard Barge Servs.*, 1997 WL 703000, at *4.  "The effectiveness of such waivers is generally determined by the extent to which the client reasonably understands the material risks that the waiver entails."  ABA Model R. Prof'l Conduct 1.7, cmt. 22.  General, open-ended consents ordinarily will be ineffective and the consent is more likely to be effective if the client "is

---

[19]  *See Palumbo*, 157 F.R.D. at 132-33 ("If Mr. Snyder were representing only an individual plaintiff, he could conceivably seek a written waiver of conflict of interest.  But in this case, Mr. Snyder seeks to represent a large, unenumerated and as yet unidentified class of plaintiffs.  Unidentified class members cannot waive a potential conflict of interest."); *see also Baas v. Dollar Tree Stores, Inc.*, No. 07-03108, 2008 WL 906496, at *4 (N.D. Cal. Apr. 1, 2008) ("Plaintiffs' counsel would need to obtain waivers from every class member, which, as a practical matter, they cannot do from the absent class members."); *State ex rel. Union Planters Bank, N.A. v. Kendrick*, 142 S.W.3d 729, 739 (Mo. 2004) ("It is unrealistic to speak of individual consultation with large numbers of class members and unrealistic to imagine that each client could give truly informed consent.").

[20]  *See also* ABA Model R. Prof'l Conduct 1.7, cmt. 18 ("When representation of multiple clients in a single matter is undertaken, the information must include the implications of the common representation, including possible effects on loyalty, confidentiality and the attorney-client privilege and the advantages and risks involved."), cmt. 30 (stating client should be advised attorney-client privilege does not attach as between commonly represented plaintiffs and that "it must be assumed that if litigation eventuates between the clients, the privilege will not protect any such communications").

13

independently represented by other counsel in giving consent and the consent is limited to future conflicts unrelated to the subject of the representation." *Id.* cmts. 22 & 23.

While the Court has discretion to determine whether or not to accept a conflict waiver, Counsel's cursory statements in summary affidavits are insufficient to justify accepting any purported waivers. For example, in *Venable v. Keever*, relied on by Counsel for the proposition that conflicts can be waived, the court sought both testimony and an affidavit from the clients themselves. 960 F. Supp. 110, 111 (N.D. Tex. 1997). Moreover, in *Lange v. Orleans Levee Dist.*, even where plaintiff provided an affidavit, the court found it to be insufficient to establish an effective waiver. Nos. 97-987, 97-988, 1997 WL 668216, at *4 (E.D. La. Oct. 23, 1997); *see also In re Guardianship of Lillian P.*, 617 N.W.2d 849, 856 (Wis. Ct. App. 2000) (granting motion to disqualify in spite of client's waiver where record contained "no representation by [the attorney] of what she disclosed to [the client]" and "no testimony of what [the client] might have understood about the conflicts which we have identified or her understanding of the effect they could have on [the attorney]'s representation of her").

## II.   THE FORMER ATTORNEY GENERAL'S ARRANGEMENTS WITH COUNSEL ARE ILLEGAL AND/OR UNCONSTITUTIONAL.

Defendants' motion demonstrated that Counsel must also be disqualified for the additional, independent reasons that their engagements violate various Louisiana statutes, regulations, and constitutional provisions. The current Attorney General has not filed a brief defending these arrangements. Counsel, however, respond that none of these provisions apply because "the contracts at issue here do not obligate the State to compensate counsel at all." (Opp. at 23.) Despite this disclaimer, Counsel go on to explain how they contemplate being compensated. However, because Counsel's agreements with the State are indistinguishable from

14

those held unconstitutional in *Foti v. Bayer Corp.* and Counsel's proposed means of compensation would still violate Louisiana law, Counsel's agreements are invalid.

### A.     It Is Clear that Counsel Will Seek to Be Compensated and that Their Agreements Violate State Law in any Event.

Counsel do not dispute that their agreements (a) were not submitted to or approved by the Louisiana Office of Contractual Review and (b) do not comply with statutory and regulatory requirements for professional services contracts cited by Defendants.  Instead, they argue that these provisions do not apply and the Louisiana Constitution is not violated because their arrangements do not require the expenditure of public funds.  (Opp. at 25-29.)

Initially, while Chapter 16 of title 39 of the Louisiana Revised Statutes may only apply to "expenditure[s] of public funds in excess of two thousand dollars by the executive branch of this state," LSA-R.S. 39:1482, as discussed below, Counsel do propose to receive public funds, surely in excess of $2,000.  However, even if they were unambiguously working for free, state law would still require including their contracts in the Attorney General's budget requests, *see* LSA-R.S. 39:32.C(2) ("*No contract* for professional, personal, or consulting services *shall be entered into* unless said contract was submitted in the budget request as provided in this Subsection except for a contract thereafter specifically approved by the legislature.") (emphasis added); the concurrence of the commissioner of administration would still be required, LSA-R.S. 49:258 ("*any* appointment of private legal counsel to represent the state or a state agency shall be made by the attorney general with the concurrence of the commissioner of administration") (emphasis added); and Counsel would still have to meet published minimum qualifications (including having no conflicts).  LSA-R.S. 49:258(1).

Counsel criticize Defendants for presuming that "the Attorney General has granted counsel the right to compensation for their services" (Opp. at 26), but their agreements

15

do not unambiguously declare that Counsel shall not receive any compensation.   Rather, Attorney General Foti's letters only disclaim direct payment of fees and limit the contingent fee disclaimer to "the case where the State itself would be included as a member of a class action." (Exh. 3.)   The letters do not purport to preclude a contingent fee in the event no class is certified but the State prevails on some subrogation claims.   Further, the letter quoted by Counsel goes on to provide that "the attorneys handling this case may receive attorneys fees and costs permitted them by State or Federal law."   (*Id.*)

Indeed, *Foti v. Bayer Corp.* held unconstitutional an agreement containing the following more explicit attempt to disclaim any compensation from State property:

> The … law firm will be responsible for all costs and expenses associated with the pursuit of the aforementioned investigation and litigation.   After successful prosecution of this litigation, attorneys of the law firm will be compensated either by court order or by private agreement between the litigants.   At no time and for no reason will any attorneys' fees come out of the recovery that is due the State of Louisiana.

(Opp., Exh. 9.)   Counsel concede that this language obligates the State "*somehow* to compensate counsel at the end of a successful litigation—a situation functionally identical to *Meredith*," yet insist their contracts "can only be invalidated if they *presently* obligate the State to compensate counsel."   (Opp. at 29 (emphasis added).)   There is no support for the suggestion that only presently payable commitments not conditioned on future events violate the constitution. Indeed, the contingent fee arrangement struck down in *Meredith v. Ieyoub* did not involve any present State obligation.   *See* No. 96-1110, pp. 6-10 (La. 9/9/97); 700 So. 2d 478, 482-84.

Counsel apparently attempt to distinguish the *Bayer* letter (which made the law firm responsible for costs and expenses and declared that "[a]t no time and for no reason" would any fees come out of the State's recovery) from their letters (which only disclaim direct liability for fees and leave open a possible contingent fee from a non-class State recovery) on the basis

922324v.1

that the *Bayer* letter states that counsel "will be compensated either by court order or by private agreement between the litigants" whereas some of their letters state "the attorneys … may receive attorneys' fees and costs permitted them by State or Federal law."  However, Counsel's agreements are illegal and unconstitutional for the same reason as in *Bayer*, namely the fact that any award of fees or costs under state or federal law or by agreement would be the property of *the State*.  The law does not permit *Counsel* recovery of attorney fees and costs; such recovery is permitted to prevailing *parties*.  6 La. Civ. L. Treatise § 12.28 (2d ed. 2007); *Panola Land Buying Ass'n v. Clark*, 844 F.2d 1506, 1511 (11th Cir. 1988); *see generally* Def. Mem. at 30-31.

> **B.    Counsel's Proposed Method of Compensation Is Illegal and Unconstitutional.**

After denying that their agreements will permit them to be compensated from State property, Counsel explain they contemplate being compensated out of a common fund, which would have precisely that effect.[21]  (*See* Def. Mem. at 33-34.).

Initially, Counsel seek to apply federal common law relating to common funds rather than the applicable Louisiana law, LSA-C.C.P. art. 595(A).  (Opp. at 31 n.96.)  The Fifth Circuit, however, has held that attorney's fees are a substantive issue governed by state law. *Grant v. Chevron Phillips Chem. Co.*, 309 F.3d 864, 875 n.37 (5th Cir. 2002); *Shelak v. White Motor Co.*, 636 F.2d 1069, 1072 (5th Cir. 1981).  Counsel's suggestion that Article 595 is preempted or displaced by Rule 23(h) (Opp. at 29-32, 34-36) is refuted by case law.  Rule 23(h) does not create any independent basis for a fee award, but only provides that a court may award

---

[21]  Counsel also speculate the Legislature could simply enact new legislation compensating them (Opp. at 35 n.112), a noteworthy departure from their criticism of taking any sort of prospective approach.

fees and costs where otherwise "authorized by law or by the parties' agreement."[22]  As such,

Rule 23(h) does not conflict with Article 595 but rather makes that underlying law applicable.[23]

*See Grant*, 309 F.3d at 871-75 (applying Article 595 to class action); *In re Abbott Labs.*, 51 F.3d

524, 526-27 (5th Cir. 1995) (same).  Accordingly, any common fund fee award in this case

would be governed by Louisiana law.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th

Cir. 2002) (holding state law governed fees from common fund produced by state law claim); *see

also Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002) ("State law controls both the

award of and the reasonableness of fees awarded where state law supplies the rule of decision.").

In any event, both Article 595 and federal common law permit compensation *out

of the common recovery fund*.  Article 595 does not provide for the award of attorney fees *in

addition to* the plaintiffs' underlying recovery, but rather as a percentage of that recovery.[24]

Federal courts take a similar approach.  Indeed, Judge Fallon's opinion in *Turner v. Murphy Oil

USA, Inc.*, relied on by Counsel, applied the percentage approach and explained that the common

fund doctrine is intended to make sure "*all* who benefit from that fund must contribute

proportionately to the costs of the litigation."  422 F. Supp. 2d 676, 680-83 (E.D. La. 2006)

---

[22]  *See* Fed. R. Civ. P. 23(h), Ad. Comm. Notes to 2003 Amend. ("This subdivision does not undertake to create new grounds for an award of attorney fees or nontaxable costs.  Instead, it applies when such awards are authorized by law or by agreement of the parties."); *Kenny A. ex rel. Winn v. Perdue*, 454 F. Supp. 2d 1260, 1272 (N.D. Ga. 2006).

[23]  The cases Counsel cites are inapposite as neither involved a class action brought under state law. *Utica Lloyd's of Texas v. Mitchell* refused to permit fees under the Texas Declaratory Judgment Act in an action under the federal Declaratory Judgment Act.  138 F.3d 208, 209-10 (5th Cir. 1998).  *Tetra Applied Tech. v. Henry's Marine Serv.* held that because attorney fees were not recoverable under federal maritime law, the Supremacy Clause precluded a recovery under state law fee-shifting provisions.  No. H-04-2576, 2007 WL 1239240 (S.D. Tex. Apr. 27, 2007).

[24]  *White v. Gen. Motors Corp.*, 97-1028, pp. 65-68 (La. App. 1 Cir. 6/29/98); 718 So. 2d 480, 508-10; LSA-C.C.P. art. 595(A) cmt. (a) ("It is intended . . . that the reasonable expenses of litigation allowed the successful representative parties is to be paid out of the fund or benefits made available by their efforts."); *see also Cooper v. Koch Pipeline, Inc.*, Nos. 95-2373 *et al.*, 1995 WL 931091, at *2 (E.D. La. Dec. 11, 1995) (Fallon, J.) ("La. C. Civ. Pro. 595 allows the court to designate a certain amount of a specific fund to be awarded as attorney's fees and does not compel the defendant's to pay anything over and above the amount of compensatory damages awarded."), *abrogated on other grounds by Grant*, 309 F.3d at 868.

(emphasis added).  Of course, in this case "all" would include the State.  Counsel seek to distinguish concededly unconstitutional contingency fees from common fund compensation because the former "would require [the State] to pay counsel directly from its share of the recovery" while the latter would be "reserved from the entire fund created before allocation to any party."  (Opp. at 32.)  There is no difference.  The State's property is still diminished.

        Counsel also argue that no State funds are implicated because the State's subrogation rights would be resolved only after determining what if any damages the putative class is to recover.  Elevating form over substance, Counsel propose to apply the common fund doctrine at this abstract analytical point, calculate the percentage of the homeowners' fund that should go to Counsel, and only then determine the State's subrogation rights.  (*See* Opp. at 32-33.)  Counsel's suggestion the State is not asserting a direct interest in any recovery is contrary to its pleadings (Amended Petition ¶¶ 12-13, 16, 36, 37) and its assertions it is a real party in interest seeking relief.  *See In re Katrina Canal Breaches Litig.*, No. 08-30145, slip op. at 7-8 (5th Cir. Apr. 11, 2008).  Even if the determination of State interests were delayed, the State would still be a beneficiary of the hypothesized common fund from which Counsel propose to be paid.  Given that the common fund doctrine requires that *all* beneficiaries of the fund share in the fees, any reduction of the hypothesized fund would necessarily come at least in part at the expense of the State.[25]

        Accordingly, any award under Article 595 would be indistinguishable from a contingency fee and just as unconstitutional: (1) fees would be *contingent* on a successful

---

[25]    Moreover, courts have characterized attorney's fees paid from a common fund as a fee award *to* the representative party, which the State seeks to be here.  *See Abbott Labs.*, 51 F.3d at 526 ("The plain text of the first sentence of 595 awards the fees to the 'representative parties.'").

922324v.1

outcome, (2) fees would not be paid *in addition* to damages, but out of a common fund from which all benefit (including the State), and (3) fees would be a percentage of the recovery.

### C. Compensation From Any Source Other Than State Funds Would Violate the Louisiana Code of Governmental Ethics.

If, as Counsel must insist in order for it to be constitutional, any compensation would come from a source other than State funds, such an arrangement would still violate LSA-R.S. 42:1111(A)(1)'s prohibition on receipt by public servants of anything of value for their work other than compensation from the State.  Counsel's only response is to argue that its award would "originate[] from the creation of a fund on behalf of the class, not the State, and is a payment awarded by the Court, not the defendants."  (Opp. at 33.)  However, any money conveyed by the class, the defendants, or even the Court would be from a source other than the State and would thus violate the ethics code.  (*See* Def. Mem. at 35-37.)

### III.  CONCLUSION

For the reasons set forth above and in Defendants' opening brief, the private law firms representing the State should be disqualified.

Respectfully submitted,

*/s/ Wayne J. Lee*
Wayne J. Lee, 7916
  wlee@stonepigman.com
Stephen G. Bullock, 3648
  sbullock@stonepigman.com
Mary L. Dumestre, 18873
  mdumestre@stonepigman.com
Andrea L. Fannin, 26280
  afannin@stonepigman.com
            Of
STONE PIGMAN WALTHER
    WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-3200
Facsimile:  (504) 581-3361

922324v.1

And

Charles L. Chassaignac IV, 20746
  cchassaignac@phjlaw.com
            Of
PORTEOUS, HAINKEL
  & JOHNSON, L.L.P.
343 Third Street, Suite 202
Baton Rouge, Louisiana  70801
Telephone:  (225)383-8900
Facsimile:  (225) 383-7900

*Attorneys for State Farm Fire and Casualty
Company and State Farm General
Insurance Company*

/s/ Maura Z. Pelleteri
Maura Z. Pelleteri, 8463
Amy S. Malish, 28992
            Of
KREBS, FARLEY & PELLETERI, L.L.C.
Texaco, Center, Suite 2500
400 Poydras Street
New Orleans, Louisiana  70130
Telephone:  (504) 299-3570
Facsimile:  (504) 299-3582

*Attorneys for Aegis Security Insurance
Company*

/s/ Howard B. Kaplan
Howard B. Kaplan, 14414
            Of
BERNARD CASSISA ELLIOTT & DAVIS
1615 Metairie Road
P.O. Box 55490
Metairie, Louisiana  70055-5490
Telephone:  (504) 834-2612

*Attorneys for Lafayette Insurance Company,
United Fire and Casualty Company and
United Fire and Indemnity Company*

21

/s/ Judy Y. Barrasso
Judy Y. Barrasso, 2814
H. Minor Pipes, III, 24603
Stephen L. Miles, 31263
     Of
BARRASSO USDIN KUPPERMAN
  FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2400
New Orleans, Louisiana  70112
Telephone:  (504) 589-9700
Facsimile:  (504) 589-9701

*Attorneys for America First Insurance Company, Liberty Mutual Fire Insurance Company, and Liberty Mutual Insurance Company*


/s/ Judy Y. Barrasso
Judy Y. Barrasso, 2814
H. Minor Pipes, III, 24603
Stephen L. Miles, 31263
     Of
BARRASSO USDIN KUPPERMAN
  FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2400
New Orleans, Louisiana  70112
Telephone:  (504) 589-9700
Facsimile:  (504) 589-9701

*Attorneys for Metlife, Inc., Economy Premier Assurance Company, Metropolitan Casualty Insurance Company, and Metropolitan Property & Casualty Insurance Company*


/s/ Seth A. Schmeeckle
Seth A. Schmeeckle, 27076
Ralph S. Hubbard, III, 7040
     Of
LUGENBUHL, WHEATON, PECK,
  RANKIN & HUBBARD
601 Poydras Street, Suite 2775
New Orleans, Louisiana  70130
Telephone:  (504) 568-1990
     And

22

922324v.1

Christopher W. Martin,
Texas Bar No. 13057620
Martin R. Sadler,
Texas Bar No. 00788842
        Of
MARTIN, DISIERE, JEFFERSON &
  WISDOM, L.L.P.
808 Travis Street, Suite 1800
Houston, Texas  77002
Telephone:  (713) 632-1700
Facsimile:  (713) 222-0101

*Attorneys for United Services Automobile Association, also separately named by plaintiffs as USAA, USAA Casualty Insurance Company and USAA General Indemnity Company*


/s/ Seth A. Schmeeckle
Seth A. Schmeeckle, 27076
Ralph S. Hubbard, III, 7040
        Of
LUGENBUHL, WHEATON, PECK,
  RANKIN & HUBBARD
601 Poydras Street, Suite 2775
New Orleans, Louisiana  70130
Telephone:  (504) 568-1990

        And

Of Counsel:

Kevin P. Kamraczewski
Alan S. Gilbert
Paul E. B. Glad
David R. Simonton
        Of
SONNENSCHEIN NATH &
  ROSENTHAL LLP
7800 Sears Tower
Chicago, Illinois  60606
Telephone:  (312) 876-8000

*Attorneys for The Hanover Insurance Company, The Hanover American Insurance Company, and Massachusetts Bay Insurance Company*

23

922324v.1

/s/ Deborah B. Rouen
Deborah B. Rouen, 2084
Chris A. D'Amour, 26252
     Of
ADAMS AND REESE LLP
4500 One Shell Square
New Orleans, Louisiana  70139
Telephone:  (504) 581-3234
Facsimile:  (504) 566-0210

*Attorneys for Union National Fire Insurance Company*


/s/ Dominic J. Ovella
Dominic J. Ovella, 15030
Anne E. Medo, 24556
Sean P. Mount, 27584
Daniel M. Redmann, 30685
John Christopher Dippel, Jr., 30480
     Of
HAILEY, MCNAMARA, HALL,
  LARMANN & PAPALE, L.L.P.
One Galleria Boulevard, Suite 1400
P. O. Box 8288
Metairie, Louisiana  70011-8288
Telephone:  (504) 836-6500

*Attorneys for Fidelity and Deposit Company of Maryland, Empire Fire and Marine Insurance Company, Empire Indemnity Insurance Company, Centre Insurance Company, ZC Sterling Insurance Agency, Inc., and ZC Sterling Corporation*

24

*/s/ Judy Y. Barrasso*
Judy Y. Barrasso, 2814
Edward R. Wicker, Jr., 27138
    Of
BARRASSO USDIN KUPPERMAN
  FREEMAN & SARVER, LLC
LL&E Tower
909 Poydras Street, Suite 1800
New Orleans, Louisiana  70112
Telephone:  (504) 589-9700
Facsimile:  (5040 589-9701

*Attorneys for Allstate Insurance Company,
Allstate Indemnity Company, Encompass
Insurance Company, Encompass Insurance
Company of America, and Encompass
Property and Casualty Company*


*/s/ Seth A. Schmeeckle*
Seth A. Schmeeckle, 27076
Ralph S. Hubbard, III, 7040
    Of
LUGENBUHL, WHEATON, PECK,
  RANKIN & HUBBARD
601 Poydras Street, Suite 2775
New Orleans, Louisiana  70130
Telephone:  (504) 568-1990

    And

Of Counsel:

Kevin P. Kamraczewski
Alan S. Gilbert
Paul E. B. Glad
David R. Simonton
    Of
SONNENSCHEIN NATH &
  ROSENTHAL LLP
7800 Sears Tower
Chicago, Illinois  60606
Telephone:  (312) 876-8000

*Attorneys for Horace Mann Insurance
Company, Teachers Insurance Company,
and Horace Mann Property & Casualty
Insurance Company*

25

922324v.1

_/s/ Alan J. Yacoubian_
Alan J. Yacoubian, 17213
Neal J. Favret, 24412
Rachel P. Catalanotto, 31095
     Of
JOHNSON, JOHNSON, BARRIOS &
  YACOUBIAN
701 Poydras Street, Suite 4700
New Orleans, Louisiana  70139-7708
Telephone:  (504) 528-3001

_Attorneys for Auto Club Family Insurance_
_Company_


_/s/ Neil C. Abramson_
Neil C. Abramson, 21436
Nora B. Bilbro, 22955
Jacqueline M. Brettner, 30412
     Of
PHELPS DUNBAR LLP
Canal Place
365 Canal Street, Suite 2000
New Orleans, Louisiana  70130-6534
Telephone:  (504) 566-1311
Facsimile:  (504) 568-9130

     And

Marshall M. Redmon, 18398
     Of
PHELPS DUNBAR LLP
City Plaza
445 North Boulevard, Suite 701
Baton Rouge, Louisiana  70802
Telephone:  (225) 346-0285
Facsimile:  (225) 381-9197

_Attorneys for Homesite Insurance Company_

922324v.1

/s/ Harry Rosenberg
Harry Rosenberg, 11465
Jacqueline M. Brettner, 30412
     Of
PHELPS DUNBAR LLP
Canal Place
365 Canal Street, Suite 2000
New Orleans, Louisiana  70130-6534
Telephone:  (504) 566-1311
Facsimile:  (504) 568-9130

*Attorneys for Fidelity National Insurance Company and Fidelity National Property and Casualty Insurance Company*


/s/ Marshall M. Redmon
Marshall M. Redmon, 18398
     Of
PHELPS DUNBAR LLP
City Plaza
445 North Boulevard, Suite 701
Baton Rouge, Louisiana  70802
Telephone:  (225) 346-0285
Facsimile:  (225) 381-9197

     And

Amy R. Sabrin
     Of
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
1440 New York Avenue, NW
Washington, DC  20005
Telephone:  (202) 371-7000
Facsimile:  (202) 393-5760

*Attorneys for Farmers Insurance Exchange, Foremost Insurance Company, Foremost Property and Casualty Company, and Foremost Signature Insurance Company*

27

*/s/ Neil C. Abramson*
Neil C. Abramson, 21436
Jacqueline M. Brettner, 30412
      Of
PHELPS DUNBAR LLP
Canal Place
365 Canal Street, Suite 2000
New Orleans, Louisiana  70130-6534
Telephone:  (504) 566-1311
Facsimile:  (504) 568-9130

*Attorneys for American Manufacturers Mutual Insurance Company, Kemper Casualty Insurance Company, Lumbermens Mutual Casualty Company, Merastar Insurance Company, Unitrin Preferred Insurance Company, Unitrin Auto and Home Insurance Company, Trinity Universal Insurance Company, and Trinity Universal Insurance Company of Kansas, Inc.*


*/s/ Harry Rosenberg*
Harry Rosenberg, 11465
Jay R. Sever, 23935
Jacqueline M. Brettner, 30412
      Of
PHELPS DUNBAR LLP
Canal Place
365 Canal Street, Suite 2000
New Orleans, Louisiana  70130-6534
Telephone:  (504) 566-1311
Facsimile:  (504) 568-9130

*Attorneys for Scottsdale Indemnity Company and Scottsdale Insurance Company*


*/s/ Ralph S. Hubbard*
Ralph S. Hubbard, III, 7040
Seth A. Schmeeckle, 27076
      Of
LUGENBUHL, WHEATON, PECK,
  RANKIN & HUBBARD
601 Poydras Street, Suite 2775
New Orleans, Louisiana  70130
Telephone:  (504) 568-1990

922324v.1

And

Stephen E. Goldman
Wystan M. Ackerman
        Of
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, Connecticut  06103-3597
Telephone:  (860) 275-8200
Facsimile:  (860) 275-8299

*Attorneys for The Standard Fire Insurance Company, "St. Paul" (a non-existent entity), "St. Paul Travelers Insurance Company" (a non-existent entity), St. Paul Fire & Marine Insurance Company, St. Paul Guardian Insurance Company, St. Paul Mercury Insurance Company, St. Paul Protective Insurance Company, St. Paul Surplus Lines Insurance Company, Travelers Casualty Insurance Company of America, Travelers Casualty and Surety Company, Travelers Home & Marine Insurance Company, The Travelers Indemnity Company, The Travelers Indemnity Company of America, The Travelers Indemnity Company of Connecticut, Travelers Insurance Company (a non-existent entity), Travelers Property Casualty Company of America, Travelers Property Casualty Insurance Company, and The Automobile Insurance Company of Hartford, Connecticut*


*/s/ Christopher R. Pennison*
Jay M. Lonero, 20642
Christopher R. Pennison, 22584
Angie Arceneaux Akers, 26786
Of
LARZELERE PICOU WELLS SIMPSON LONERO, LLC
Suite 1100 - Two Lakeway Center
3850 N. Causeway Boulevard
Metairie, LA  70002
Telephone:  (504) 834-6500
Fax:  (504) 834-6565
*ATTORNEYS FOR REPUBLIC FIRE AND CASUALTY INSURANCE COMPANY,*

29

*AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY, AMERICAN NATIONAL GENERAL INSURANCE COMPANY, AND ANPAC LOUISIANA INSURANCE COMPANY*

## <u>CERTIFICATE</u>

I hereby certify that a copy of the foregoing Memorandum in Support of Motion of State Farm Fire and Casualty Company and Certain Other Insurer Defendants to Disqualify Plaintiff's Private Counsel has been served upon all counsel of record by electronic notice from the Court's CM/EC Filing System, this 21st day of April, 2008.

*/s/ Wayne J. Lee* _____

30

922324v.1