# **EXHIBIT 24**

1

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF LOUISIANA
 2                       LAKE CHARLES DIVISION

 3

 4

 5                   MASTER DOCKET CASE 07-MD-01
            (Consolidated for Certain Pretrial Purposes Only)
 6

 7
     IN RE:  CAMERON PARISH RITA      JUDGES MINALDI, TRIMBLE & HAIK
 8   LITIGATION AGAINST STATE FARM    MAGISTRATE JUDGE METHVIN

 9

10
                          [STATUS CONFERENCE]
11

12             Transcript of Proceedings before The Honorable

13      Mildred E. Methvin, United States Magistrate Judge,

14      Lafayette, Lafayette Parish, Louisiana, commencing

15      on December 13, 2007.

16

17

18

19

20

21

22

23               Cathleen E. Marquardt, RMR, CRR
                   United States Court Reporter
24                    Post Office Box 5056
                    Lafayette, Louisiana 70502
25                    Phone:  (337) 593-5223
```

```
 1    Appearances of Counsel:

 2        Plaintiffs:                    MR. JASON BELL
                                         MR. DAVID P. BRUCHHAUS
 3                                       MS. JENNIFER A. JONES
                                         MR. PATRICK JODY LAVERGNE
 4                                       MR. RICK NORMAN
                                         MR. J. ROCK PALERMO
 5                                       MR. SCOTT JAMES PIAS
                                         MS. PENELOPE QUINN RICHARD
 6
          Louisiana Attorney
 7        General, Road Home
          Program:                       MR. N. FRANK ELLIOT, III
 8

 9        State Farm:                    MR. TODD M. AMMONS
                                         MR. JAMES A. BLANCO
10                                       MR. JEFFREY M. COLE
                                         MR. BRIAN L. COODY
11                                       MR. KENDRICK JAMES GUIDRY
                                         MR. CHRISTOPHER P. IEYOUB
12                                       MR. ANDREW R. JOHNSON
                                         MR. WAYNE LEE
13                                       MR. V. ED McGUIRE
                                         MR. ALLEN J. MITCHELL
14                                       MR. DAVID L. MORGAN
                                         MR. JAMES R. NIESET
15                                       MR. JOSEPH R. POUSSON
                                         MR. ERIC W. ROAN
16                                       MR. DAVID H. VAUGHAN
                                         MR. MICHAEL WILLIAMSON
17

18

19

20

21

22

23

24

25
```

```
 1   here on how to keep this from occurring.
 2             THE COURT:  Who is that?
 3             MR. ELLIOT:  It's me, Your Honor, Frank Elliot from
 4   Lake Charles.
 5             THE COURT:  Okay.  And what firm are you with?
 6             MR. ELLIOT:  I'm with Ranier, Gayle & Elliot in Lake
 7   Charles.
 8             THE COURT:  Okay.  And you are representing --
 9             MR. ELLIOT:  The Attorney General.
10             THE COURT:  Okay.  And would you like to give us, me, a
11   short synopsis of how this is all working?
12             MR. ELLIOT:  Sure.  It's actually very good timing
13   because I spent yesterday in New Orleans and was in Baton Rouge
14   this morning, and we spent a lot of time yesterday meeting with a
15   lot of State Farm people.  I worked with Mr. Lee's counterpart.
16             We are working at the request of -- at the request of
17   Judge Duval and Magistrate Judge Wilson to try to come up with a
18   protocol.  And what we are doing right now and in the process of
19   being very close to having is a form that you will be able to
20   fill out, get it off the web site, fill it out.  The carriers, I
21   think, are close to agreeing on a, what we would call an exhibit
22   or attachment to that form.  It would provide payment history,
23   like past payment history, what they are going to pay in
24   settlement and some additional information, so that someone can
25   look at it at the Road Home and essentially stamp it off that
```

```
 1   it's approved or not.
 2            The second part of that is to actually get a release
 3   because I know the carriers want not just approval, but they want
 4   to be released, you know, by the state since we have filed the
 5   suit against the carriers, the Attorney General has, and that is
 6   in the works.  I know we met yesterday with the carriers.  They
 7   are close to having something that they can all agree to, and
 8   we're just waiting on that.  We hope to have that very quickly.
 9            The other thing that we are working on right now is
10   that Magistrate Wilson set today as a deadline to submit
11   objections to a protective order which will allow us to then
12   release all of -- pursuant to the protective order, all of the
13   applicants' and recipients' information to, you know, the
14   carriers and counsel and all that, so they will know whether or
15   not their client is a closed recipient or is an applicant.
16            And then we are in the process and hope to have set up
17   by next week a web site that will allow you to check fairly
18   quickly -- I don't know if it will necessarily be daily, but
19   fairly quickly to see, okay, my person here, I'm just trying to
20   settle this case.  Let me go look on the web site.  Okay, yes, he
21   closed, because there's some lag time obviously.
22            There's -- anticipate 90,000 closings by the end of the
23   year.  I don't know if they are going to make that goal or not.
24   There were 180,000 applications turned in before the deadline
25   this summer.  The state had set another deadline that, if you
```

```
 1    don't have your closing meeting, your preclosing meeting by the
 2    20th, then you would not be an applicant.
 3              There's some talk -- I don't know whether or not that
 4    date is going to hold.  There's some talk about the
 5    administration extending that deadline, but there's a lot of
 6    effort right now to try to at least determine what is the
 7    universe, who the applicants and recipients are as quick as
 8    possible to try to move the process along.
 9              THE COURT:  All right.  Let me just say this is my
10    first big hurricane meeting, so some of this is like gobbledygook
11    to me.  Does anybody have questions, smart or stupid questions
12    about this process besides me?
13              MS. JONES:  Jennifer Jones.  What we have done is
14    we've -- we came up with a formula --
15              THE COURT:  Thank you, Mr. Elliot.
16              MS. JONES:  -- to allocate the settlement, and it was
17    our understanding that that was what had to be approved by Road
18    Home, and we've been through that.  And now we just need to find
19    out what documents we need to sign.  So as I'm hearing what
20    you're saying, Frank, you're saying we're close to getting our
21    form ready and we're close to having a release?
22              MR. ELLIOT:  Yes.  I mean, I'll tell you our position
23    was -- the Attorney General's position was you didn't need to
24    have the state's authority.  It was between insured and insurer.
25    You settled, that's it.  The state is not involved in that
```

1   need the state's approval.  The only reason that the state has a
2   claim is because when you close you sign a right of subrogation
3   of assignment to the state, and the whole reason that all this is
4   happening is because -- and we've seen it.  I haven't been
5   involved in this court, but in the Eastern District, we have
6   seen, gotten phone calls, where you have people that are getting
7   substantial sums of money for the Road Home loan, like $100,000,
8   and they had a suit, and they are saying they don't want to
9   pursue that suit anymore, and you know, the state has a right to
10  seek that money.
11              What it's become is it's become a shifting of the
12  burden from the carriers, to the extent that they owe coverage,
13  to the taxpayers, and that's what's happened, and the state has a
14  right to recover that money.
15              THE COURT:  Would you comment on the issue about
16  authorization to sign releases.
17              MR. ELLIOT:  That's something we've been getting
18  involved in.  You know, up until, I'd say, fairly recently, you
19  know, I had not been involved in that issue.  Because of things
20  that have happened in the Eastern District, we have actually
21  tried to be much more proactive in working with defense counsel.
22              I met at length yesterday with State Farm
23  representatives in Orleans Parish, also, liaison counsel in Judge
24  Duval's court in relation to what we're looking at right now is
25  Mr. Bruno -- we mentioned Mr. Bruno's cases, sort of a test case

1   to try to get those done.  We are close to having those few
2   cases, I understand, just about done.  There's 21 the judge had
3   set for hearing.
4           So I'm hoping as we move forward we will have that
5   process, but there will be a process in place where it has been
6   made very clear, you know, the Attorney General has made it very
7   clear they want a process in place, and Mr. Rees, as I understand
8   it, has hired additional people and is training additional staff.
9   And the goal is to have a form that essentially someone like a
10  paralegal can look at, go through all the information there.
11  They either check it accepted, you know, denied, or I need
12  additional information.  That's where it's going.
13          THE COURT:  Okay, thank you.
14          MR. JOHNSON:  And I'm glad to hear Mr. Elliot say those
15  things, but I don't -- I did not hear who had the authority to
16  sign the releases.  I'm hearing it's still all in the process.
17          MR. ELLIOT:  I think Dan Rees has authority to sign
18  right now.  I mean, if you go to Dan, I mean, Dan has the
19  authority.
20          MR. JOHNSON:  Someone needs to tell Mr. Rees that.
21          THE COURT:  How long ago was this that happened?
22          MS. JONES:  This conversation was last week.
23          MR. JOHNSON:  Yes.
24          MS. JONES:  We asked him.
25          MR. JOHNSON:  Actually, it was -- although I was not at

1  the meeting, I certainly am apprised of meetings that go on in
2  the east, and from my understanding of the recent meetings with
3  Bruno in the last couple of days, he was given the releases to
4  sign, and he said he could not sign them.  So if he does have the
5  authority, someone needs to tell him, I think, and I don't mean
6  to be flippant, but he doesn't know he has it maybe.
7           MR. ELLIOT:  He has approved some of the settlements,
8  as I understand.  That's what I was told this morning.
9           MS. JONES:  He's approved our settlements, but we can't
10 get anybody to sign off and get the money.
11          THE COURT:  Let me just ask Mr. Elliot, would you
12 please check on that?
13          MR. ELLIOT:  Yes, I will.  And Your Honor, I would
14 encourage you to please contact judge --
15          THE COURT:  I will.
16          MR. ELLIOT:  I really don't know that much about the
17 existence of the court here.  I know Ms. Jones and Mr. Johnson
18 had cases, but I'll be glad to work to get copies of the
19 protocols that we're working on and also the release.  I mean, it
20 is State Farm that's working right now on the initial draft of a
21 release.
22          THE COURT:  Well, what I'd just like you to do is just
23 run interference here.  Contact Mr. Rees or whoever and just say,
24 look, you know, we're getting different stories here.  Either
25 there's a protocol in place or there's not.  And I understand

1   there's a deadline and this is maybe a work in progress and maybe
2   it will be another couple weeks before it's finalized, but at
3   least you can give my office and Mr. Johnson and, I guess, you
4   can let Ms. Jones know.
5           MR. JOHNSON:  Ms. Jones.
6           THE COURT:  Yeah, the -- what the situation is right
7   now.
8           MR. ELLIOT:  I will do that.
9           THE COURT:  Okay.  Yeah, and if we could -- today is
10  Thursday.  Can you do it by tomorrow?
11          MR. ELLIOT:  Sure.  I will tell you up until recently
12  there really was no true protocol, I mean, because I think -- and
13  I'm not going to try to tell you there was, because up until
14  fairly recently, it was one --
15          THE COURT:  Can you stand up?  The court reporter is
16  having trouble.
17          MR. ELLIOT:  There were only a handful of settlements
18  here and there, and so they were very sporadic, and there was not
19  much that they had to do.  And now of late, I'd say since the
20  anniversary of Katrina especially, you have seen a mass of cases
21  now trying to be settled, these global type settlements of a
22  couple hundred at a time.  And I don't think they are prepared to
23  deal with it.  I'm not going to try and tell you they were.  But
24  that's what we're trying to do is help establish something that
25  will enable this process to go forward.