UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

CIVIL ACTION

NO. 05-4182

PERTAINS TO: ROAD HOME
    Louisiana State, C.A. No. 07-5528

JUDGE DUVAL
MAG. WILKINSON

## ORDER AND REASONS

The referenced case, specifically, C.A. No. 07-5528, is a putative class action

against numerous insurance companies in which plaintiff, the State of Louisiana, acting

for itself and on behalf of some of its citizens, claims an interest in insurance proceeds

that have been or will be received by applicants for and recipients of Road Home

Program grants under their insurance policies.  The State claims this interest by virtue of

"*The Road Home* / <u>Limited</u> Subrogation / Assignment Agreement," a document signed

by all who receive funds from the Road Home Program.  The State asserts that the

Subrogation / Assignment Agreement grants it the right to review and approve or

disapprove settlements between Grant Recipients and their homeowners and flood

insurers.  The Subrogation / Assignment Agreement, which has been submitted to me in

connection with other matters in this consolidated litigation, provides in pertinent part:

In consideration of my/our receipt of funds under The Road Home program for Hurricane Katrina/Hurricane Rita victims (the "Program") being administered by the Office of Community Development, Division of Administration, State of Louisiana, <u>subject to the provisions below</u> I/we hereby assign to the State of Louisiana, Division of Administration, Office of Community Development (the "State"), to the extent of the grant proceeds awarded or to be awarded to me under the Program, all of my/our claims and future rights to reimbursement and all payments hereafter received or to be received by me/us (a) under any policy of casualty or property damage insurance or flood insurance on the residence, excluding contents ("Residence") described in my/our application for Homeowner's Assistance under the Program ("Policies"); . . . .
. . . .

If I/we hereafter receive any insurance payments for physical damage to the Residence (not including contents) caused by Hurricane Katrina or Hurricane Rita, I/we agree to promptly pay such amount to the State if that amount would have reduced the amount of my Program grant had I/we received such insurance payments prior to my receipt of grant proceeds. I/We hereby authorize and instruct my insurance carrier to issue any future payments for such damage jointly to me and to "La. Division of Administration/DRU". . . .

I/We agree that rights to insurance proceeds assigned to the State herein shall be paid from any insurance payments I/we may receive, whether through unconditional tender by the insurance carrier, through settlement, or through judgment adverse to the insurance company, with preference and priority over any other party entitled to any portion of such proceeds, up to the amount of my/our grant received under the Program for which the State has not been reimbursed from other sources. . . .

I/We hereby agree that the State's written consent shall be required to settle any claim which would result in the State's recovering less than one hundred (100%) percent of the amount of my/our grant received under the Program.  Request [sic] for such consent shall be directed to the Division of Administration, Office of Community Development, Legal Counsel for Disaster Recovery Unit.

Many Grant Recipients and various of the named insurance company defendants

have entered or wish to enter into settlement agreements to resolve the claims of the

2

Grant Recipients under insurance policies issued by the insurance company defendants. Asserting its rights under the Subrogation / Assignment Agreement and in connection with its review of these proposed settlements, the State has requested that certain information be provided to it by both the insureds and their insurers. The State's position has delayed the finalization of hundreds of proposed settlements of insurance claims arising from Hurricane Katrina, many of which are pending in this court and all of which appear to be subject to the claims the State has asserted in the referenced "Road Home" lawsuit.

The parties have attempted to develop a procedure to facilitate the Road Home Program settlement review process, with the laudable goal of finalizing hundreds of proposed insurance claim settlements. In furtherance of these efforts, the parties have drafted the attached Exhibits "A" and "B," which are forms designed to convey certain information to be submitted by insurers and insureds to the Road Home Program. The issue before the court arises because the insurer defendants will not participate in submitting this information to the State unless the information is subject to a stringent protective order. The State opposes entry of a protective order.

Specifically, the insurers filed a Motion of Defendants for Protective Order Governing Confidential Settlement Information Provided to the State in Connection with its Review of Insurance Settlements with Road Home Grant Recipients. Record Doc.

3

No. 10633.  At oral argument on the motion, I expressed reservations about subjecting

what is essentially a quasi-governmental function of the State with a substantial impact

on the use of public funds to overly secretive procedures.  At the same time, however,

both the court and all parties recognize the substantial public benefit that would result

from procedures that would facilitate the flow of insurance settlement funds into the post-

hurricane rebuilding effort.  Thus, I ordered the parties to try to craft a joint proposed

protective order or, if they could not agree on all terms, to provide me with a single form

of protective order that includes all provisions upon which they have agreed and with

highlighted inserts of those provisions that remain in dispute.  I granted the parties leave

to file supplemental memoranda regarding the motion.  Record Doc. No. 11279.

When the parties were unable to agree on a joint protective order, they provided

me with a form of a partially acceptable protective order, and separate proposals

reflecting substantial differences in their positions.  The insurance company defendants

filed a supplemental memorandum in support of their motion.  Record Doc. No. 11514.

The State of Louisiana filed a response in opposition to defendants' motion.  Record Doc.

No. 11592.  It continues to oppose entry of any protective order.

I also ordered the State, in its supplemental submission, to provide me with:  (1) a

list of the names of all persons, together with their job titles, whom the State anticipates

will require access to Exhibits "A" and "B" that are the subject of this motion for

4

purposes of determining whether the State will consent or not consent to proposed settlements; and (2) a statement as to whether the State agrees that Exhibits "A" and "B" will provide all information necessary for the State to make its determination whether it will or will not consent to the proposed settlements.  Record Doc. No. 11423.

In response to the first part of that order, the State provided some names, but asked the court to order that the State could provide in camera the names of "paraprofessionals" who will or may have such access.  Record Doc. No. 11592, at p. 3.  The State apparently fails to see the irony in its request to provide these names in camera only, while it opposes a protective order to guard other information.  The State has failed to provide any evidence, or even a reason, why in camera production of these names is necessary. Accordingly, the State's request for in camera production is DENIED.

As to the second part of that order, the State responds that it anticipates that it typically will need only the information provided in Exhibits "A" and "B" for its review process.  However, it contends that if the information submitted via these forms reveals a discrepancy with the information that was previously provided to the Road Home Program in a particular case, or if the information submitted reveals a trend that particular carriers or attorneys disproportionately allocate part of the insurance payments to coverages other than dwelling coverage, the State may seek additional information to demonstrate the reasonableness of those allocations.

Rule 26(c)(1) of the Federal Rules of Civil Procedure sets the standard for considering a motion for protective order.

> The court may, <u>for good cause,</u> issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
> (A) forbidding the disclosure or discovery;
> (B) specifying terms, including time and place, for the disclosure or discovery; . . .
> (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters;
> (E) designating the persons who may be present while the discovery is conducted; . . .
> (G) requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way . . . .

Fed. R. Civ. P. 26(c)(1) (emphasis added).

"Rule 26(c)'s requirement of a showing of good cause to support the issuance of a protective order indicates that the burden is upon the movant to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." <u>In re Terra Int'l</u>, 134 F.3d 302, 306 (5th Cir. 1998) (quotation omitted).

Rule 16(c) also encourages the court to

> consider and take appropriate action on the following matters: . . .
> (F) settling the case and using special procedures to assist in resolving the dispute when authorized by statute or local rule; . . .
> (L) adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems; . . . [and]

6

(P) facilitating in other ways the just, speedy, and inexpensive disposition
of the action.

Fed. R. Civ. P. 16(c)(2).

In addition, however, "there is no absolute privilege for trade secrets and similar confidential information." <u>Federal Open Mkt. Comm. v. Merrill</u>, 443 U.S. 340, 362 (1979). "By its terms [Rule 26(c)(1)(G)] requires [the movant] to first establish that the information sought is a trade secret and then demonstrate that its disclosure might be harmful." <u>ITT Electro-Optical Prods. Div. v. Electronic Tech. Corp.</u>, 161 F.R.D. 228, 230 (D. Mass. 1995); <u>accord</u> <u>Hill v. Eddie Bauer</u>, 242 F.R.D. 556, 561 (C.D. Cal. 2007) (citing <u>In re Remington Arms Co.</u>, 952 F.2d 1029, 1031-32 (8th Cir. 1991)).

In the peculiar circumstances presented by the existence and operation of the Road Home Program, the court must balance the competing interests involved in deciding whether to grant or deny the pending motion for protective order. One factor that favors granting a protective order is the strong public interest in expediting the flow of insurance funds to insureds (and/or the Road Home Program pursuant to its subrogation agreement) to aid in the recovery of the community affected by the devastation of Hurricane Katrina, which remains a challenge more than two and one-half years after the storm. Settlements are favored by the courts and should be encouraged and upheld whenever possible. <u>Courtney v. Andersen</u>, No. 07-20347, 2008 WL 280897, at *2 (5th Cir. Feb. 1, 2008); <u>Williams v. Phillips Petroleum Co.</u>, 23 F.3d 930, 935 (5th Cir. 1994).

Granting the requested protective order will encourage settlements of insurance claims. Without such an order, the insurance company defendants may be less likely to consummate voluntary settlements, and the current high volume of insurance coverage lawsuits arising out of Hurricane Katrina will continue to occupy the courts and the litigants, while the recovery process is adversely affected.

Another interest that weighs in favor of granting defendants' motion for protective order is the insurers' interest in avoiding possible competitive disadvantage from disclosing proprietary information to the State that might be further disclosed to competitors, adversaries and/or the media. The insurers argue that a protective order should apply to three categories of materials: (1) the personal and financial information of insureds, (2) compilations of the insurers' confidential business information, and (3) settlement agreements between an insurer and an insured.

The State does not dispute that the personal and financial information of Road Home grant applicants and recipients deserves protection, but it disagrees how best to protect that information. The State points out that the "Authorization to Release Information" form signed by each applicant not only allows the Road Home Program to use the information that applicants provide to assist in determining eligibility for and the

amount of any grant,[1] but the form also authorizes the Road Home Program to obtain

additional information from the applicant's insurers of the sort that will be provided on

Exhibits "A" and "B."   The State contends that, via this authorization, the insureds have

already waived the protection that their insurers seek, but the State has nonetheless

entered into a Voluntary Privacy Protocol (Record Doc. No. 11592, Plaintiff's Exh. 2),

which limits access to the information provided, and argues that no court-ordered

protection is necessary.

As to the insurers' compilations of information, the affidavits attached to the

supplemental memorandum in support of the insurers' motion seek to establish that

compilations of the information requested by Exhibits "A" and "B" qualify as trade

secrets, as defined by the Louisiana Uniform Trade Secrets Act:[2]

> "Trade secret" means information, including a formula, pattern,
> compilation, program, device, method, technique, or process, that:
> (a) derives independent economic value, actual or potential, from not being
> generally known to and not being readily ascertainable by proper means by
> other persons who can obtain economic value from its disclosure or use,

---

[1]The form also advises the applicant that such information "will not be used outside the agency except as required or permitted by law or with your written consent" and states that the requested information is authorized by 12 U.S.C. § 1701 et seq. or by 42 U.S.C. § 1452b. The latter statute was repealed in 1991.

[2]The court applies Louisiana substantive law in this diversity action. Triple Tee Golf, Inc. v. Nike, Inc., 485 F.3d 253, 261 (5th Cir. 2007).

(b) and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

La. Rev. Stat. § 51:1431(4).

The affidavits describe the strict measures that the insurers undertake to keep their proprietary information confidential. As to subparagraph (a) of the statute, the affidavits state that each insurer has proprietary interests in its compilations of information concerning its customers, insured properties, policies, claims and payments made. According to the affidavits, the insurers use these compilations to design, market, evaluate and improve their insurance products; cultivate and improve existing customer relationships; evaluate and improve relationships with insurance agents; develop underwriting policies, procedures and formulas; and make underwriting decisions. The affidavits state that an insurer's compiled information, if disclosed, could be used by a competitor to ascertain the insurer's underwriting and pricing practices; modify the competitor's own underwriting practices and allow it to make more informed and intelligent underwriting decisions; identify the insurer's customers, the kind of coverage to try to sell to the customer, and when and how to try to make such a sale; improve the design, desirability and economic performance of the competitor's insurance products and the marketing of those products to the insurer's customers; and identify ways to improve the competitor's claims handling, administration and adjustment practices to provide better customer service, more accurate valuations of property damage and

10

reduced costs. Thus, the affidavits assert, disclosure of an insurer's confidential business information would result in competitive disadvantage to the insurer.

The insurance company defendants also argue that publication in the media of information about their pre-litigation adjustment practices and payment amounts would be harmful to those carriers who are perceived as paying less on average, although the differences might be justified by the nature of the claims made and the different risk pools that each company insures. This argument is not persuasive. Public and news media interest concerning the insurers' post-hurricane adjusting, settlement and underwriting practices and the workings of the Road Home Program is already high. It is no exaggeration to state that the local news media present daily stories about these subjects.

Against this factual backdrop, I find that the competitive impacts postulated in the insurance companies' submissions are mostly speculative. The data that the insurers are asked to furnish on Exhibit "B"[3] is purely factual, mostly innocuous and, with the exception of identifiers such as claim numbers and policy numbers, implicate no strong competitive or proprietary interests. Nothing on either of the forms calls for interpretive or evaluative information concerning the insurer's practices. The fact that recipients of

---

[3]Exhibit "A" is to be prepared and signed by the grant applicant/recipient, while Exhibit "B" is to be prepared and signed by the insurer.

the data on these forms will interpret it however they see fit does not lead to the conclusion that the insurers' proprietary or competitive positions will be compromised in the absence of a protective order.  If State, media or competitor evaluations are negative, the insurers will be free to respond that the data can be interpreted in some other way that is more favorable to them.  I do not find that this argument constitutes good cause for a protective order at this time.

As to confidential settlement agreements between an insurer and an insured, which is the third category of information that the insurers seek to protect, the affidavits state that the insurers typically require a confidentiality provision when they settle a claim. "Typically" does not mean "always."  In my own experience of having presided over numerous settlement conferences in hundreds of damage claims in this court, I have observed that insurance companies often require a confidentiality provision, but that such a requirement is not imposed in an overwhelming majority of cases, as the affidavits imply.

The affidavits also speculate that disclosure of settlement information might impede future settlements of unrelated claims because a settlement might be construed as an admission of liability, when the insurer actually disputed liability.  The affidavits conjecture that disclosure would likely have an adverse effect on an insurer's ability to settle other lawsuits and on its competitive position with customers and potential

12

customers, because some people might come to erroneous conclusions about an insurer's claim handling practices based on incomplete information about settlements of particular claims, or because publicizing settlement amounts could create unreasonable expectations on the part of litigants and their attorneys, when their cases involve different circumstances. According to the insurers, disclosure of aggregate statistical data might be harmful by making an insurer who, on average, settles for a higher percentage of policy limits than other carriers the target of litigants trying to settle for a higher amount, although there may be valid reasons for such differences because of the different risk pools that each company insures. Moreover, the affidavits assert that disclosure of settlement information might give competitors and adversaries insight into the claim resolution, litigation and negotiation approach taken by the insurer.

In my experience, settlement agreements almost always state that the insurer does <u>not</u> admit liability. Thus, I am not persuaded that good cause exists for a protective order because some people might think, incorrectly and despite a written agreement to the contrary, that an insurer conceded liability by settling a particular case. Furthermore, in my experience, settlements are so highly individualized and so dependent on the specific facts and evidence which will be admitted in each case that it seems highly unlikely that most people could ascertain any significant competitive information from the disclosure of individual settlements. Perhaps an insurance expert could glean some competitive

information from such disclosures, but even that sort of conclusion would be merely a matter of opinion, and the insurers have not carried their evidentiary burden to show that this is so. I find that these considerations do <u>not</u> support granting a protective order.

In addition, the strong public interest in the transparency of the State's decision-making process, as the State evaluates applications for approval of the proposed settlements between insurers and their insureds, weighs in favor of denying the insurers' motion. The Road Home grants come from public money that is <u>not</u> intended as a subsidy to insurance companies, and the State's decisions on how it determines settlement approval requests, with its ultimate impact on public funds, is a matter of strong public interest.

The proposed settlements implicate substantial public interests. The State, by inserting itself into the settlement process and filing the instant class action against the insurance companies, has converted what would ordinarily be private contractual disputes between insurers and their insureds into matters that involve governmental decision-making. The core of the Road Home subrogation agreements and the settlement approval process is the State's attempt to recover public funds. In our democratic republic, such decisions cry out for transparency. <u>See generally</u> <u>News-Press v. United States Dep't of Homeland Sec.</u>, 489 F.3d 1173, 1190 (11th Cir. 2007) (The Eleventh Circuit balanced the public and private interests at stake and held that news media could

obtain from FEMA, pursuant to the Freedom of Information Act ("FOIA"), data concerning FEMA's disbursements of disaster relief following four hurricanes that hit Florida in 2004. "'The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.'") (quoting NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978); id. ("'FOIA is often explained as a means for citizens to know "what the Government is up to." This phrase should not be dismissed as a convenient formalism. It defines a structural necessity in a real democracy.'") (quoting National Archives & Records Admin. v. Favish, 541 U.S. 157, 171-72 (2004); id. at 1192 ("We easily conclude . . . that the asserted interest in learning whether FEMA is a good steward of (sometimes several billions of) taxpayer dollars in the wake of natural and other disasters is one which goes to 'the core purpose of the FOIA, which is contributing significantly to public understanding of the operations or activities of the government.'") (quoting United States Dep't of Defense v. Fed. Labor Relations Auth., 510 U.S. 487, 495 (1994)); see also Multi AG Media LLC v. Department of Agric., 515 F.3d 1224, 1232 (D.C. Cir. 2008) ("there is a special need for public scrutiny of agency action that distributes extensive amounts of public funds in the form of subsidies and other financial benefits") (citing and quoting Brock v. Pierce County, 476 U.S. 253, 262 (1986) ("'[T]he protection of the public fisc is a matter that is of interest to every citizen.'")). Although

the courts in the cited cases were invoking the policies behind the FOIA, the same concerns are equally vital when the case involves the disbursement of billions of dollars in public funds through the administration of the State of Louisiana to disaster victims.[4]

In the context of the magnitude of the disaster wrought in Louisiana by the hurricanes of 2005, the insurers engaged in large-scale adjusting of thousands of claims, while thousands of dissatisfied insureds filed lawsuits, a substantial number of which (at least in this court) allege bad faith adjusting practices by the insurers.  Given this context, the numerous individual disputes between insurer and their insureds implicate the public's interest in the post-hurricane recovery process, and those otherwise private disputes are imbued with a public interest.  Furthermore, if these cases came to trial in this court, the factual data to be submitted on Exhibits "A" and "B" would likely be introduced into evidence, along with the prior course of dealings between the insurer and its insured.  That evidence would likely become a public record of this court that probably would not be sealed.  A settlement process that involves a government agency making decisions based on the same facts and having a substantial impact on public funds should be no less accessible.

---

[4]The Road Home Program had disbursed $6.2 billion in awards as of March 28, 2008, according to its website.  http://www.road2la.org/newsroom/stats.htm (last visited April 7, 2008).

The Fifth Circuit recently relied on similar public concerns in a class action when it ruled against sealing the district court's record related to "internecine fee sharing disputes" between plaintiffs' attorneys. In re High Sulfur Content Gasoline Prods. Liab. Litig., 517 F.3d 220, 230 (5th Cir. 2008). Although the issues in that case differ from those in the instant case, there are sufficient parallels to make the following language from the Fifth Circuit relevant here.

> [A] district court has the discretion to seal a record, "but we think that this discretion should be used with care and exercised only where the justifications for doing so appear considerably stronger than those" presented by the Fee Committee. . . . Sealing the record protects no legitimate privacy interest that would overcome the public's right to be informed.
>
> On a broad public level, fee disputes, like other litigation with millions at stake, ought to be litigated openly. Attorneys' fees, after all, are not state secrets that will jeopardize national security if they are released to the public. As the Third Circuit has noted, "[p]ublic confidence [in our judicial system] cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from public view."

Id. (quoting In re EEOC, 709 F.2d 392, 402 n.7 (5th Cir. 1983); United States v. Cianfrani, 573 F.2d 835, 851 (3d Cir. 1978)).

Just as in High Sulfur Content Gasoline, high dollar amounts are at stake in the proposed settlements in the instant case, and the confidentiality of settlement agreements is no more "a matter of national security" than the confidentiality of attorneys' fee

disputes. Id. Even more importantly here, the money which the State has granted and/or will grant and which it seeks to recover out of the proposed settlements is public money, about which the public is intensely interested, and decisions about that money "ought not to be made behind closed doors and then announced in conclusive terms to the public." Id. These considerations trump any private interests in keeping settlement terms and the underlying information necessary for the State to evaluate them confidential. Pansy v. Borough of Stroudsburg, 23 F.3d 772, 785 (3rd Cir. 1994); Securities & Exchg. Comm'n v. Van Waeyenberghe, 990 F.2d 845, 848-49 (5th Cir. 1993); Jaufre v. Taylor, 351 F. Supp. 2d 514, 518 (E.D. La. 2005) (Vance, J.); Marcus v. St. Tammany Parish Sch. Bd., No. 95-3140, 1997 WL 313418, at *5 (E.D. La. June 9, 1997) (Clement, J.).

Public concerns are especially significant when considering whether to prevent disclosure of a settlement agreement that involves a government party. "The public's interest is particularly legitimate and important where . . . at least one of the parties to the action is a public entity or official." Pansy, 23 F.3d at 784. Moreover, "privacy interests are diminished when the party seeking protection is a public person subject to legitimate public scrutiny. '[T]he public has a substantial interest in the integrity or lack of integrity of those who serve them in public office.'" Id. at 787 (quoting United States v. Smith, 776 F.2d 1104, 1114 (3d Cir. 1985)).

A factor which a court should consider in conducting the good cause balancing test is whether a party benefitting from the order of

confidentiality is a public entity or official. Similarly, the district court should consider whether the case involves issues important to the public. If a settlement agreement involves issues or parties of a public nature, and involves matters of legitimate public concern, that should be a factor weighing against entering or maintaining an order of confidentiality.

Id. at 788 (citing Federal Trade Comm'n v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 412 (1st Cir. 1987)); accord Van Waeyenberghe, 990 F.2d at 848-49; Jaufre, 351 F. Supp. 2d at 518; Marcus, 1997 WL 313418, at *5.

Having considered all of these factors, I find that the insurance companies have not carried their evidentiary burden to show that good cause exists to protect Exhibits "A" and "B," when completed and submitted by insurers and insureds to the State's Road Home Program in connection with the settlement review process, from disclosure. In re Terra Int'l, 134 F.3d at 306. I further find that the public interest in facilitating settlement of insurance claims arising from Hurricane Katrina, while strong, is nonetheless countervailed by the equally strong public interest in the transparency of governmental decision-making regarding public funds.

I dislike reaching a conclusion that may, at least in the short run, delay settlements. I know, however, from my experience in numerous cases in this court, that many settlements involving Road Home grant recipients are in fact being processed and finalized, even in the absence of any protective order. It may be that the court will consider, upon a proper motion, imposing the procedure reflected in part by Exhibits "A"

and "B," either as a Rule 16 special settlement procedure or as injunctive or declaratory relief, but without the secrecy sought by the insurers. At this time, however, I must deal with the motion for protective order pending before me. Doing so, I find that the combination of factors discussed above has made the dispute at hand a matter of public interest, which is <u>not</u> outweighed by the insurers' limited interest in avoiding what at best appears to be a speculative competitive disadvantage.

Accordingly, the insurers' motion for a protective order is DENIED.

New Orleans, Louisiana, this ___21st___ day of April, 2008.


JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

CLERK TO NOTIFY:
Hon. Stanwood R. Duval, Jr.

## Request for Consent Form

**Instructions:** Please review and carefully respond to all of the following requested information on this Request for Consent Form. Once you have completely responded to all of the requested information, and the Form has been fully executed, please return the Form to:

Louisiana Division of Administration
Disaster Recovery Unit – Attention Subrogation
Post Office Box 94095
Baton Rouge LA 70804-9095

**(1) Recipient's/Applicant's Full Name:**
First: _____
Middle: _____
Last: _____   Suffix: _____

**(2) Co-Recipient's/Co-Applicant's Full Name:**
First: _____
Middle: _____
Last: _____   Suffix: _____

What is your Road Home Identification Number? _____
Have you closed on your Road Home grant application? _____ Yes _____ No
If you have not closed on your grant, do you have a closing date scheduled?
_____ Yes _____ No
If you answered "Yes", what is the date of your scheduled closing? _____

**(3) Address of Damaged Property (as listed on grant application):**
Street Address: _____
City: _____   State: _____   Zip: _____

**(4) Current Contact Information:**
Street Address: _____
City: _____   State: _____   Zip: _____
Phone : ( ) _____   Fax: ( ) _____
E-Mail: _____



**(5) Flood Insurance:**

Did you have flood insurance at the time of Hurricanes Katrina and/or Rita?

_____ Yes          _____ No

Did you make a claim? _____ Yes          _____ No

If you answered yes to making a claim, please answer the following:

Name of your Flood Insurance Company: _____

Policy Number: _____

(Please attach a copy of your Declaration page for the policy periods August 29, 2005, and/or September 24, 2005)

Claim Number: _____

Flood Insurance Agent's Name and Company Name: _____

_____

Street Address: _____

City: _____   State: _____   Zip: _____

Phone : ( ) _____   Fax: ( ) _____

Did you receive any funds from your flood insurer? _____ Yes _____ No

If you answered "Yes" to receiving funds from your flood insurer, please complete the following questions:

How much did you receive for the primary residence? _____

(The term "primary residence" refers to your primary home or dwelling, and excludes other structures such as fences, sheds, and detached garages).

How much did you receive for other structures? _____

How much did you receive for contents? _____

How much did you receive for alternative living expenses? _____

How much did you receive for any other expenses or property damage? _____

**(6) Homeowners Insurance:**

Name of Homeowners Insurance Company: _____

Homeowner's Insurance Agent's Name and Company Name: _____

_____

Street Address: _____

City: _____   State: _____   Zip: _____

Phone : ( ) _____   Fax: ( ) _____

Policy Number: _____

(Please attach a copy of your Declaration page for the policy periods August 29, 2005, and/or September 24, 2005)

Did you make a claim? _____ Yes          _____ No

If yes, what was your claim number? _____

If you answered yes to making a claim and you received any funds from your homeowner's insurer, please answer the following:

How much did you receive for the primary residence? _____

(The term "primary residence" refers to your primary home or dwelling, and excludes other structures such as fences, sheds, and detached garages).

How much did you receive for other structures? _____

How much did you receive for contents? _____

How much did you receive for alternative living expenses? _____

How much did you receive for any other expenses or property damage? _____

Have you settled your claim with your homeowners insurance company? _____ Yes _____ No

If yes, please answer the following :

What is the total amount of the settlement? _____

How much did or will you receive for the primary residence? _____

(The term "primary residence" refers to your primary home or dwelling, and excludes other structures such as fences, sheds, and detached garages).

How much did or will you receive for other structures? _____

How much did or will you receive for contents? _____

How much did or will you receive for alternative living expenses? _____

How much did or will you receive for any other expenses or property damage? _____

Please state the following information for any insurance company attorney or adjuster that negotiated the settlement:

Name and Company or Law Firm Name: _____

_____

Street Address: _____

City: _____ State: _____ Zip: _____

Phone : ( ) _____ Fax: ( ) _____

E-Mail: _____

**(7) Litigation:**

Do you have an attorney representing you on an insurance claim relating to any damages you might have sustained or incurred as a result of Hurricanes Katrina and/or Rita? _____ Yes _____ __ No

If yes, please state the following for your attorney's contact information:

Name of Attorney: _____

Name of Law Firm: _____

Street Address: _____ City:

_____ State: _____ Zip: _____

Phone : ( ) _____ Fax: ( ) _____

E-Mail: _____

(Please attach a copy of the retainer contract with your attorney and provide a summary of any costs or expenses associated with this lawsuit).

Have you filed a lawsuit regarding a hurricane insurance claim? _____ Yes _____ No
If yes, please provide identify the Court in which the lawsuit is filed and provide the case number:

_____
_____
(Please attach a copy of the first page of the lawsuit identified above)

What value did the insurer's adjuster assign for damages to your primary residence? _____
(Please attach a copy of the adjuster's report)

What value did your adjuster/expert assign for damages to your primary residence? _____
(Please attach a copy of the adjuster's/expert's report)

**(8) Mortgage Company:**

Did you have a mortgage on your primary residence at the time of the hurricane? _____ Yes
_____ No
If yes, please state the amount of the mortgage (Please include the applicable date for the balance and the Loan
Number): _____

Please state the name of the lender: _____
Please provide the name of a contact person, address and phone number for your lender: _____
_____
_____

If you did not have a mortgage on your primary residence at the time of the hurricane, was there any
loss payee(s) on your homeowners insurance policy? _____ Yes _____ No
If yes, please state the name of loss payee(s): _____
Please provide the address and phone number for loss payee(s): _____
_____
_____

**(9) SBA**
Have you received a SBA Loan? _____ Yes _____ No
Please provide the name of a contact person, address and phone number for your SBA loan (Please
include the Loan Number.): _____
_____

     I solemnly swear that the information contained in this Road Home Consent Form is true and correct under penalty of law and penalty of perjury. The information contained herein and the documents submitted as part of this consent request may be the basis for determining benefits under the Road Home Program, and that Undersigned acknowledge that Undersigned may be prosecuted by Federal, State and/or local authorities in the event that Homeowner(s) make or file false, misleading and/or incomplete statements and/or documents, and that the State of Louisiana may seek

remittance of settlement proceeds from the Undersigned in the event that the Undersigned make or file false, misleading and/or incomplete statements and/or documents.  Additionally, I understand that any incomplete responses may result in grounds for a deficiency rejection.  Finally, I understand that consent to settlement and agreement as to amount to be returned to the Road Home Program will only be evidenced by the written consent and approval of the Road Home Program.

_____          _____
_____Witness_____          Signature (Recipient/Applicant)

_____          _____
       Witness                                     Print Name (Recipient/Applicant)


_____          _____
_____Witness_____          Signature (Co-Recipient/Co-Applicant)

_____          _____
       Witness                                     Print Name (Co-Recipient/Co-Applicant)

_____          _____
_____Witness_____          Signature (Attorney)

_____          _____
       Witness                                     Print Name (Attorney)


Sworn to and subscribed before me the undersigned Notary Public on this _____ day of

_____, 2007.

                              _____
                              Notary Public

                              _____
                              (Print Name, Date Commission Expires and Bar Number)



_____
(For Official Use Only)

ROAD HOME CONSENT

_____   Request for consent denied.

Page 5 of 8

\_\_\_   Request for consent denied, because additional information is needed before consent may be granted.  (Please respond to the State's request for additional information, so that further review may be made and consent granted.)

\_\_\_   Request for consent granted.  The State of Louisiana, Division of Administration, Office of Community Development, as the assignee(s) and/or subrogee(s) of interests of the Recipient(s), as a Recipient(s) of a Road Home Program GRANT, in consideration of the receipt of the sum of $_____, paid by or on behalf of Recipient(s) does hereby RELEASE, ACQUIT, AND FOREVER DISCHARGE _____, (hereinafter referred to as "Insurer"), from any and all claims that the State may possess or allegedly possess or be entitled to by virtue of the execution of the Assignment and Subrogation Agreement made part of The Road Home Program Grant process, only, including contractual claims or any claims for damages, penalties, punitive damages and/or attorneys fees under any provision of state law, including but not exclusively La. Civ. Code art. 1997, La. R.S. 22:658 and/or 22:1220, arising out of or related to damages or losses caused by Hurricanes Katrina and/or Rita to the primary residence of the Road Home Recipient, against his/her Insurer under Policy Number _____.

This Release is entered into by the State with full reservation of all rights against Insurer, as identified and defined herein, other than those claims and rights expressly released above.  The State further enters this Release with full reservation of its rights to recover funds owed the State pursuant to any Assignment and Subrogation Agreement made part of The Road Home Program Grant process executed by any Road Home Program Recipient, including _____, from any flood insurance policy.  The State further reserves all right against the Recipient identified above, from any flood insurance policy not issued or administered by Insurer, and also reserves any rights that the State may have solely for recovery of Increased Cost of Compliance benefits under any flood insurance policy issued or administered by any insurer including the Insurer, as identified and defined herein.

Insurer is defined herein to include and any person or entity who sold or offered for sale Policy Number _____, independent program administrators agents, or agencies involved in the sale or offer for sale of said Policy, independent or contract claim adjusters, independent or contract engineers and engineering firms, together with any current and former agents, employees, officers, directors, attorneys, owners, shareholders, associated and affiliated companies, divisions, subsidiaries, predecessors, successors, and assigns of any of them in connection with any claim for damages or losses but only to the extent such claims are or could be asserted by Recipient(s), against Insurer under Policy Number \_\_\_\_ _____, and arising out or relating to claims for damages or losses from Hurricanes Katrina and/or Rita.

It is expressly acknowledged that payment by Insurer does not constitute and shall not operate as an admission of liability, validate the Assignment and Subrogation Agreement made part of The Road Home Program Grant process, or waive any of its defenses.

The insurance company or you should make the State portion of the settlement funds to payable to Louisiana Division of Administration – DRU" and mailed to

Louisiana Division of Administration
Disaster Recovery Unit – Attention Subrogation
Post Office Box 94095
Baton Rouge LA 70804-9095

Please include on the reference portion of the check the above referenced Road Home application number and include a copy of this correspondence with the check.

Approved by: _____

_____
Print Name and Title

_____

_____
Date

_____

RECIPIENT ACKNOWLEDGMENT

     I hereby authorize and irrevocably approve and agree to reimburse the Road Home the sum of _____ as set forth above in the Road Home Consent section.  Further, I authorize and irrevocably direct the insurance company listed in the Request for Consent Form to deduct the sum of _____, as set forth above in the Road Home Consent section, from the gross settlement of any insurance claim and to remit the same directly to the Road Home, all funds should be remitted to The Road Home Program, through the Louisiana Division of Administration, as provided herein.

_____  _____
Witness  Signature (Recipient/Applicant)

_____  _____
Witness  Print Name (Recipient/Applicant)

_____          _____
_____Witness_____Signature (Co-Recipient/Co-Applicant)


_____          _____
       Witness                              Print Name (Co-Recipient/Co-Applicant)


        Sworn to and subscribed before me the undersigned Notary Public on this _____ day of
_____, 2007.


                                   _____
                                   Notary Public


                                   _____
                                   (Print Name, Date Commission Expires and Bar Number)

Page 8 of 8

DRAFT 1/15/07

**SETTLEMENT COMMUNICATION PURSUANT TO
F.R.E. ART. 408 AND/OR LA. CODE OF EVIDENCE ART. 408**

| Insured Name: | |
|---|---|
| Insured Premises Address: | |

| Homeowner† Insurer: | | Flood Insurer†: | |
|---|---|---|---|
| Homeowner† Policy No.: | | Flood Policy No. †: | |
| Homeowner† Claim No: | | Flood Claim No.†: | |

|  | Flood Policy Information† | | | |
|---|---|---|---|---|
|  | Coverage A (Dwelling) | Coverage B (Other Structures) | Coverage C (Personal Property) | Coverage D (ALE) |
| Flood Insurer Limits: | $ | $ | $ | $ |
| Total Payments By Flood Insurer: | $ | $ | $ | $ |
| Additional Loss Payee: | Is there a mortgage company or other additional loss payee on the Flood Policy? Yes ____ No ____ If Yes, identify the name(s) of the additional loss payees: | | | |

|  | Homeowner† Policy Information | | | |
|---|---|---|---|---|
|  | Coverage A (Dwelling) | Coverage B (Other Structures) | Coverage C (Personal Property) | Coverage D (ALE) |
| Policy Limits: | $ | $ | $ | $ |
| Payments Made Prior to Final Settlement by HO† Insurer: | $ | $ | $ | $ |
| Proposed Final Settlement with HO† Insurer: | $ | $ | $ | $ |
| Additional Loss Payee: | Is there a mortgage company or other additional loss payee on the Homeowner Policy? Yes ____ No ____ If Yes, identify the name(s) of the additional loss payee: | | | |

The undersigned certifies that the above information is true and correct to the best of his/her knowledge:

Printed Name: _____
Company: _____
Title: _____
Date: _____

The insurance company does not, by providing this information, consent to any subrogation and/or assignment that may have been executed in favor of the State of Louisiana, and does not waive any rights or policy provisions or defenses it may have.  All rights, policy provisions, and defenses are expressly reserved.

†The term "Homeowner" and symbol "HO" refer generally to policies of insurance not issued pursuant to the NFIP.
‡ Information related to the Flood Policy and flood payments are only to be included where the Homeowner Insurer and the Flood Insurer company.



EXHIBIT
B