1               UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF LOUISIANA

3
    ****************************************************************
4
    IN RE:  KATRINA CANAL
5   BREACHES CONSOLIDATED
    LITIGATION
6
                            CIVIL ACTION 05-4182
7                           SECTION "K"(2)
                            NEW ORLEANS, LOUISIANA
8                           TUESDAY, MARCH 11, 2008, 9:00 A.M.
    PERTAINS TO:
9
    MRGO, *ROBINSON* (06-2268)
10

11  BARGE, IN THE MATTER OF THE
    COMPLAINT OF INGRAM BARGE
12  COMPANY, AS OWNER OF THE
    ING4727, PETITIONING FOR
13  EXONERATION FROM OR
    LIMITATION OF LIABILITY
14  (05-4237, 05-5531,
    05-5724, 06-5054,
15  06-5342, 06-6299,
    06-7516)
16
    ****************************************************************
17

18           TRANSCRIPT OF MOTIONS HEARING PROCEEDINGS
         HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
19                      UNITED STATES JUDGE

20

21  APPEARANCES:

22

23  FOR THE PLAINTIFFS:          O'DONNELL & ASSOCIATES
                                 PIERCE O'DONNELL, ESQUIRE
23                               550 SOUTH HOPE STREET
                                 SUITE 1000
24                               LOS ANGELES CA  90071

25

1                               GAINSBURGH BENJAMIN DAVID
                               MEUNIER & WARSHAUER
2                               BY:  GERALD E. MEUNIER, ESQUIRE
                               1100 POYDRAS STREET, SUITE 2800
3                               ENERGY CENTRE
                               NEW ORLEANS LA  70163
4

5                               BRUNO & BRUNO
                               BY:  JOSEPH M. BRUNO, ESQUIRE
6                               855 BARONNE STREET
                               NEW ORLEANS LA  70113
7

8                               MCKERNAN LAW FIRM
                               BY:  J. J. MCKERNAN, ESQUIRE
9                               8710 JEFFERSON HIGHWAY
                               BATON ROUGE LA  70809
10

11                              THE ANDRY LAW FIRM
                              BY:  JONATHAN B. ANDRY, ESQUIRE
12                             610 BARONNE STREET
                               NEW ORLEANS LA  70113
13

14                              LAW OFFICE OF ELWOOD STEVENS JR
                              BY:  ELWOOD STEVENS JR, ESQUIRE
15                             1205 VICTOR II BOULEVARD
                              MORGAN CITY LA  70381
16

17                              LEVIN PAPANTONIO THOMAS
                              MITCHELL ECHSNER & PROCTOR
18                             BY:  MATT SCHULTZ, ESQUIRE
                              316 S. BAYLEN STREET, SUITE 600
19                             PENSACOLA FL  32502

20
                              SMITH & FAWER
21                             BY:  STEPHEN M. WILES, ESQUIRE
                             201 ST. CHARLES AVENUE
22                             SUITE 3702
                             NEW ORLEANS LA  70170
23

24                              JESSE L. WIMBERLY, III
                              ATTORNEY AT LAW
25                             120 LISA LANE
                             MANDEVILLE LA  70448

```
 1                                        THE GILBERT FIRM
                                          BY:  ELISA T. GILBERT, ESQUIRE
 2                                             BRENDAN O'BRIEN, ESQUIRE
                                          325 EAST 57TH STREET
 3                                        NEW YORK NY  10022

 4
                                          BAKER DONELSON BEARMAN CALDWELL
 5                                        & BERKOWITZ (NEW ORLEANS)
                                          BY:  NYKA M. SCOTT, ESQUIRE
 6                                        201 ST. CHARLES AVENUE
                                          SUITE 3600
 7                                        NEW ORLEANS LA 70170

 8
                                          PATRICK J. SANDERS
 9                                        ATTORNEY AT LAW
                                          3123 RIDGELAKE DRIVE
10                                        SUITE B
                                          METAIRIE LA  70002
11

12                                        FAYARD & HONEYCUTT
                                          BY:  CALVIN FAYARD, JR, ESQUIRE
13                                        519 FLORIDA AVENUE SOUTHWEST
                                          DENHAM SPRINGS LA  70726
14

15                                        LAMBERT & NELSON
                                          BY:  HUGH P. LAMBERT, ESQUIRE
16                                             LINDA J. NELSON, ESQUIRE
                                          701 MAGAZINE STREET
17                                        NEW ORLEANS LA  70130

18
                                          CUMMINGS, CUMMINGS & DUDENHEFER
19                                        BY:  FRANK DUDENHEFER JR., ESQ.
                                          416 GRAVIER ST.
20                                        NEW ORLEANS LA  70130

21

22   FOR THE UNITED STATES
     OF AMERICA:                          DEPARTMENT OF JUSTICE
23                                        BY:  ROBIN D. SMITH, ESQUIRE
                                               KARA K. MILLER, ESQUIRE
24                                        TORTS BRANCH, CIVIL DIVISION
                                          BENJAMIN FRANKLIN STATION
25                                        P.O. BOX 888
                                          WASHINGTON, D.C. 20044
```

```
 1   FOR LAFARGE NORTH AMERICA,
     INC.:                            GORDON PROCTER
 2                                    BY:   JOHN D. ALDOCK, ESQUIRE
                                      RICHARD M. WYNER, ESQUIRE
 3                                    901 NEW YORK AVENUE N. W.
                                      WASHINGTON DC   20001
 4

 5                                    SUTTERFIELD & WEBB
                                      BY:   DANIEL A. WEBB, ESQUIRE
 6                                    650 POYDRAS STREET, SUITE 2715
                                      NEW ORLEANS LA   70130
 7

 8
     FOR LATTIMORE & ASSOCIATES:      DOMENGEAUX WRIGHT ROY & EDWARDS
 9                                    BY:   JAMES P. ROY, ESQUIRE
                                      556 JEFFERSON STREET
10                                    P. O. BOX 3668
                                      LAFAYETTE LA   70502
11

12
     FOR WASHINGTON GROUP
13   INTERNATIONAL, INC.:             STONE PIGMAN WALTHER WITTMANN
                                      BY:   WILLIAM D. TREEBY, ESQUIRE
14                                          HEATHER LONIAN, ESQUIRE
                                      546 CARONDELET STREET
15                                    NEW ORLEANS LA   70130

16

17   FOR THE BOARD OF COMMISSIONERS
     FOR THE ORLEANS LEVEE DISTRICT:  LABORDE & NEUNER
18                                    BY:   BEN L. MAYEAUX, ESQUIRE
                                      ONE PETROLEUM CENTER
19                                    1001 W. PINHOOK ROAD
                                      SUITE 200
20                                    LAFAYETTE LA   70505

21
                                      MCCRANIE SISTRUNK ANZELMO
22                                    HARDY MAXWELL & MCDANIEL
                                      BY:   THOMAS P. ANZELMO, ESQUIRE
23                                    3445 N. CAUSEWAY BOULEVARD
                                      SUITE 800
24                                    METAIRIE LA   70002

25
```

```
 1   FOR SEWERAGE & WATER BOARD
     OF NEW ORLEANS:                    CHRISTOVICH & KEARNEY
 2                                      CHARLES M. LANIER, JR., ESQUIRE
                                        PAN AMERICAN LIFE CENTER
 3                                      601 POYDRAS STREET
                                        SUITE 2300
 4                                      NEW ORLEANS LA 70130

 5

 6   ALSO APPEARING:
                                        ROBERT B. FISHER, JR., ESQUIRE
 7                                      PETER KEELEY, ESQUIRE
                                        CAYCE PETERSON, ESQUIRE
 8                                      KARL F. BUCHLER, ESQUIRE

 9
                                        MICHAEL GUTIERREZ, ESQUIRE
10                                      ASHLEY E. PHILEN ESQUIRE
                                        PHILIP L. GREGORY, ESQUIRE
11                                      GORDON GRANT, ESQUIRE

12
                                        PHILIP BROOKS, ESQUIRE
13                                      IRMA RANIER, ESQUIRE
                                        ELIZABETH GIGENHEIMER, ESQUIRE
14                                      ROBERT STEIN, ESQUIRE

15
                                        IVOR VAN HEERDEN
16                                      JENNIFER LABOURDETTE
                                        LILLIAN DAMPIOS
17                                      FRANK LUPO
                                        NICK MARZONI
18

19

20   OFFICIAL COURT REPORTER:     CATHY PEPPER, CCR, RPR, CRR
                                  500 POYDRAS STREET, ROOM B406
21                                NEW ORLEANS LA  70130
                                  (504) 589-7779
22
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
23   PRODUCED BY COMPUTER.

24

25
```

1                    **P-R-O-C-E-E-D-I-N-G-S**

2                    TUESDAY, MARCH 11, 2008

3                 M O R N I N G   S E S S I O N

4                    (COURT CALLED TO ORDER)

5

6

7          THE DEPUTY CLERK:  All rise, please.

8          THE COURT:  Good morning.

9          VOICES:  Good morning, Your Honor.

10         THE DEPUTY CLERK:  This is Civil Action 05-4182,

11   *In re Katrina Canal Breaches Consolidated Litigation* regarding

12   Document Numbers 7730, 10337, and 10378.

13         THE COURT:  Would the attorneys make their appearances.

14         MR. O'DONNELL:  Good morning, Your Honor,

15   Pierce O'Donnell will be arguing for the plaintiffs, opposing the

16   government's motion and advancing our motion.

17         THE COURT:  Thank you.

18         MR. SMITH:  Good morning, Your Honor.  Robin Smith for

19   the United States.  With me is Kara Miller.

20         THE COURT:  Thank you, sir.

21         MR. ALDOCK:  Good morning, Your Honor, John Aldock

22   appearing for Lafarge North America.

23         THE COURT:  Thank you, sir.

24              Maybe before we begin I can tell you what I think

25   would be most helpful to me.  I'm sure all of you have, as I did

1    when I prepared for oral argument as a real lawyer, I had a plan

2    of presentation understanding that the Court is going to ask

3    questions.  What I would prefer is this:  I've gotten a lot of

4    material, a lot of briefing.  I've read all of it.  Some of it

5    is, at least in the Court's mind, extraneous from the issues that

6    I have to decide.  Some of it is pertinent, and I go through, as

7    I'm sure most courts do or all courts, a distillation process to

8    try to reduce this to its quintessence to then be able to frame

9    the focal issue or issues.

10             Then I develop a series of questions in my mind

11   that go to the outer reaches of the logical paradigm and then try

12   to calibrate it to where we fine tune it.  And so the Socratic

13   method of oral argument assists the Court.

14             So what I'm going to do is, when whoever is up

15   first, I think you talked about it, whoever is up first, I think

16   we have the government first, whoever is up first, I'm going to

17   start off by asking a series of questions.  And I have a series

18   of questions for both of you or all of you.

19             Then, after those questions are answered, if you

20   feel like you need to tell me something else, do so.  I know I

21   gave you time limits, but because of the way I'm doing this, I'm

22   not going to be rigidly enforcing the time limits in a case of

23   this significance.

24             Especially since I'm preempting a lot of your,

25   shall we say, planned presentation because, frankly, I've read

1  these briefs and the briefs start, as eloquent as all of you are,

2  start being repetitive and we really start having variations of

3  the same theme and maybe a different note here or there, the

4  orchestration may be a little different but the lite motif is the

5  same, to get a little musical.  That's about as musical as I get.

6          But, at any rate, I thought this would help the

7  Court.  But at the same time, I don't want to take away anything

8  you may want to tell me after all these questions are over, so

9  I'm going to give you time to do that.  And by the way, the

10  questions are going to be geared, just to let you know, to

11  foreshadow, to test your logic on both sides.  That way the Court

12  might enhance its own.

13          So Mr. Smith, I guess you're first.  I hope that

14  knee is better.  I have empathy for knees.  I had three

15  operations myself, so I do, not to use a very hackneyed phrase,

16  feel your pain.

17          MR. SMITH:  Thank you, Your Honor.

18          THE COURT:  The first question I would like to ask you,

19  sir, is, do you contend that *Central Green* has overruled the

20  holding in *Graci*, specifically the holding in *Graci* which stated

21  702c confers immunity only for, "floods or floodwaters connected

22  with a flood control project."

23          MR. SMITH:  Your Honor, it does not explicitly overrule

24  *Graci* but I think the reasoning that is evident in *Central Green*

25  calls into question whether or not a nexus to a flood control

1  project is a requirement, a nexus between the floodwaters and the

2  flood control project.

3          Obviously, the facts in *Central Green* were that the

4  floodwaters that were at issue were the irrigation waters,

5  whichever they might have been, which was the nut that the Court

6  could not crack.

7          THE COURT:  Pistachio nuts are hard to crack.  Go ahead.

8          MR. SMITH:  But those waters were waters from a flood

9  control project.  So to the extent that the holding of a case

10  cannot be any broader than its facts, it's difficult to say that

11  by its terms, or by, you know, by the nature of the case that was

12  in front of the Court, the Court was determining that floodwaters

13  that had no connection whatsoever with the flood control project

14  would be immune under 702c.

15          THE COURT:  So if *Graci* is not overruled, do you agree,

16  and I understand you left that question open with other arguments

17  made before this Court, and I understand that, does the

18  negligence have to be in connection with the flood control

19  project?  Have to be in connection with the flood control project

20  or do only the floodwaters?  I think I know your answer to the

21  question, but I want to just frame it.

22          MR. SMITH:  Right, and that's obviously the two ways of

23  looking at *Graci*.  What did *Graci* decide?  And again, I think if

24  you look at the facts of that case, I think it's difficult to say

25  under the facts that were before the court in *Graci*, that it was

1  saying there had been to some connection between the negligent

2  acts and the flood control project.

3            And the reason I say that is because *Graci* was a

4  case that didn't involve a flood control project at all.  There

5  was no flood control project anywhere within the purview of the

6  case itself.

7            So for the same reason that we would concede that

8  *Central Green* would be limited by its facts, I think the Court

9  should look at *Graci* as not being restricted to that set of, that

10  formulation, if you will, of it's holding because I think what

11  the government has to confront is that there is a formulation of

12  what appears to be the holding in *Graci*, which says that 702c

13  does not apply to negligence that's unconnected with a flood

14  control project.

15            *Graci* doesn't exist in a vacuum.  It was a

16  Fifth Circuit precedent that the Fifth Circuit returned to in

17  *Florida East Coast Railway*, four years later, in 1975.  And when

18  the Fifth Circuit talked about *Graci*, it talked about *Graci* in

19  terms of floodwaters that had no connection to a flood control

20  project.  So that, that negligence language, while it's there in

21  the *Graci* opinion, seems to have sort of fallen by the wayside as

22  the Fifth Circuit has looked at what the essence of the *Graci*

23  holding was.  And, in fact, in *Florida East Coast Railway,* they

24  lumped it in with *Peterson,* another case which didn't involve a

25  flood control project.

1          THE COURT:  I'm familiar with *Peterson,* and it simply

2     involved an act by the government that caused flooding but did

3     not relate to a flood control project.

4          MR. SMITH:  An ice jam.  They broke it up.  They were

5     engineers but it wasn't the Corps of Engineers.  It was Air Force

6     engineers.

7          THE COURT:  Right.  So I understand your point is that

8     *Graci* doesn't enlighten us as to this specific issue very much

9     because at the time *Graci* was decided, there was no, the

10    floodwaters involved did not confront, did not compromise a flood

11    control project.

12         MR. SMITH:  That would be essentially our position with

13    respect to *Graci* in this case is that it's distinguishable.

14         THE COURT:  Going on from there, and really where I'm

15    going is to try to understand what nexus, if any, is necessary.

16    In essence, are the floodwaters themselves sufficient nexus

17    because of the statute or is there some other nexus required?

18              So the next question I have is a very hypothetical

19    question.  The Court's well aware of it.  It's an attempt to

20    construct an outer extremity paradigm.  If the government were

21    conducting an experiment offshore of Louisiana, and it regarded

22    nuclear testing, and I know the government doesn't do this,

23    hypothetically, but an error occurred in the nuclear testing, the

24    nuclear device wasn't far enough under the sea bed, exploded

25    prematurely, created a tsunami, overtopped a perfectly designed

1  and completed, FCP, acronym for flood control, is the government

2  immune from that damage under 702c?

3          MR. SMITH:  Yes, Your Honor.  I think so because if you

4  say that the conduct created a tsunami, a tsunami is just another

5  word, I think, at least a synonym for a great tidal wave.

6          THE COURT:  Right, exactly.

7          MR. SMITH:  Which washed over the protective flood

8  works.

9          THE COURT:  I could have said a tidal wave; I just like

10  tsunami.

11          MR. SMITH:  It would depend on the character of the

12  waters.  That would be the way I would analyze that hypothetical.

13  If that tsunami created a flood and those waters were

14  floodwaters, could properly be characterized, fairly be

15  characterized as floodwaters, then you would have damage caused

16  by floodwaters.

17          THE COURT:  What nexus did that experiment have at all

18  with the FCP?

19          MR. SMITH:  I would say that would be beyond the purview

20  of any conduct that would be related to a flood control project.

21  But I would distinguish that conduct from the conduct that's at

22  issue here.  Because the conduct that's at issue here is the

23  dredging of a waterway, right beside, it was before, but as it

24  turns out, when they authorized the hurricane protection system,

25  they said, Build the hurricane protection system beside the

1    waterway that, by the way, you're in the process of dredging.

2              So I see a nexus between the conduct here that I

3    don't see between the conduct in your hypothetical.

4         THE COURT:  In other words, if we're going to talk about

5    nexus, my hypothet is far more attenuated from a nexus standpoint

6    than the reality on the ground.

7         MR. SMITH:  Right, and I think one of the things that

8    you would have to look at is, you look at, if we're going to say

9    that the Fifth Circuit's prior cases in *Mocklin* and *Boudreau* and

10   *Kennedy* still have some efficacy after *Central Green*, you look at

11   the way they analyzed those cases, and they looked at seeing

12   whether there was some sufficient association between the conduct

13   that was at issue and the damages and flood control.

14             And they, you know, in one case, they found that

15   there was, in two cases they found that there was, and in

16   one case they found that there was not.

17        THE COURT:  That's where I'm leading up to in trying to

18   understand if a nexus is required.  And I understand you reserve,

19   as you answered the question initially, you think the text of the

20   statute, 702c, would say that these are floodwaters, the tsunami

21   waters or the tidal wave waters and therefore under the text of

22   the statute.

23             If a nexus is required, you say, Judge, this

24   hypothet is far more attenuated than the MRGO, vis-a-vis the FCP

25   here, which I'll call the LVP just because the other acronym was

1    a little cumbersome.

2            What about a more direct question?  And we'll get

3    off of these hypothets in a minute.  If a Navy bomber was flying

4    over the city and a bomb accidentally came out of the bomb bay,

5    destroyed the levee, again, would the government be immune?

6            MR. SMITH:  You know, I think this is a little bit like,

7    this is a little bit like *Boudreau*.  You know, *Boudreau* involved

8    the rescue of a stranded fisherman on the lake, and he was

9    injured during the rescue attempt, and the Court got into a

10   colloquy between the majority and the dissent as to whether or

11   not there was enough involvement of the floodwaters in causing

12   the injury.

13           And, Judge, I think, *Smith*, it was, argued that

14   there wasn't enough involvement of water in causing this injury.

15   But what's interesting in *Boudreau* is you can't decide whether,

16   you can't tell from the facts as they are stated in the opinion,

17   whether there were any floodwaters involved.  Obviously, this was

18   before *Central Green*, so they were in this concept of, Well, you

19   have a flood control project, so any old water will do, so to

20   speak.

21           But there is no clue in the facts as to was the

22   lake at flood stage when this occurred?  If it was at flood stage

23   when it occurred, I think you could say there were floodwaters

24   there.  Whether there was enough of a nexus between the

25   floodwaters and the injury is another question.  But I'm only

1   alluding to that because in Your Honor's hypothetical, you
2   haven't given me any facts as to the character of the waters.
3            In other words, if they drop a bomb and they
4   destroy a levee, but it's an ordinary sunny day in the middle of,
5   say, April, before hurricane season starts, and the waters are
6   not, there are no floodwaters involved is what I'm trying to say,
7   Your Honor, the conduct, whether it has, I think it's attenuated
8   like your tsunami hypothetical, but what you need to know is what
9   was the character of the waters.  If it's just a damage to a
10  flood control project that lets waters flow through a levee, you
11  know, do they become floodwaters when they inundate the city?
12  Perhaps they do.  But certainly its a different, makes a certain
13  difference if this occurs during a hurricane, for instance, and
14  maybe they are up there trying to get the parameters of the storm
15  and then they, you know, they destroy the levee during the storm.
16  Those would be floodwaters and then you might have a nexus,
17  sufficient nexus between the conduct and the flood.

18           THE COURT:  And that's where I'm going.  So in order to
19  invoke the protection of 702c immunity to show a nexus, if a
20  nexus is required, shouldn't the government have to demonstrate
21  they, in fact, tried to design a project to protect people from
22  the forces it was creating?

23           It looks to me the only forces it was concerned
24  about in 1965 were salinity and problems of navigation.  The
25  other thing I can find is that it discusses a funnel effect of

1  the MRGO in Exhibit 10, which is a rather lengthy exhibit.

2              Do you have any comments about that?

3          MR. SMITH:  I believe there is one note in there which

4  talks about the vast quantities of water that will be exchanged

5  between Lake Borgne and Lake Pontchartrain.

6          THE COURT:  I'm going to ask about that specifically,

7  but if you want to talk about it now --

8          MR. SMITH:  Your Honor asks if there was anything, and

9  it was talking specifically about it during hurricanes, so there

10 is some allusion to and some awareness of the fact that you are

11 creating a conduit, if you will, that can convey storm surge

12 during major events.

13             But they conclude, as I think the Court concluded

14 in *Graci* a number of years ago, that it really plays no role in

15 these events.  When you have a major hurricane that inundates the

16 wetlands and raises the water up above this level, the MRGO is a

17 *de minimis* factor, if any factor at all.

18         THE COURT:  I have some causation questions for your

19 worthy opponent.  I put him on notice.

20             Are there any documents you can point to that the

21 Corps took into consideration in the continuing, ongoing project

22 of the building of the Chalmette or GWII or the IHNC levees that

23 there would be any increase in the flow or force of the water of

24 the MRGO and/or the resulting destruction of the wetlands

25 surrounding it.

1           That's a long question, and if you need me to
2    repeat it, I will.  Maybe I read it too fast.  Would you like me
3    to read it again?
4           MR. SMITH:  Yes, if you would, please.
5           THE COURT:  Are there any documents that you can point
6    to that demonstrate that the Corp took into consideration in the
7    continuing, ongoing project of the building of the Chalmette GWII
8    or the IHNC levees that there would be any increase in the flow
9    or force of the water as a result of the MRGO and the resulting
10   destruction of the levees?
11          MR. SMITH:  And the answer to the question is no.  And
12   the reason the answer is no is because after Hurricane Betsy, the
13   Corps commissioned a study of the influence of the MRGO on
14   hurricane-induced storm surges.  And the result of that study
15   showed that during major hurricane events, the MRGO played no
16   role.
17          So for that reason, that's the
18   Bretschneider & Collins study, so for that reason, the Corps saw
19   no reason to take any steps to build larger levees or stronger
20   levees or put levees in different places or other control
21   features in different places to protect against the influence of
22   the MRGO.  It was studied, it was determined that the MRGO played
23   no role in major hurricane events.
24   That was the original thought when it was authorized,
25   Hurricane Betsy hit, there were claims that the MRGO played an

1    important role in that flood, the Corps studied it, the results

2    of the study indicated that it didn't play a role.  So the Corps

3    continued to build what Congress had authorized.  So you won't

4    find any documents that way, Your Honor.

5         THE COURT:  Thank you, sir.  It seems to me that we have

6    here two different projects subject to two different approaches

7    with respect to immunity.  You've got the LPV, which clearly has

8    702c immunity, as the Court has already held.

9         The MRGO standing alone is subject to the FTCA,

10   which, provided the plaintiffs can meet their burden and get past

11   the next wave of this, if they get past this from the DFE and

12   then get past proving liability and causation.

13        So we have the intersection of two separate

14   projects.  I'm asking you, you may have already alluded to this,

15   what case law do you have to support the proposition that 702c

16   immunity would trump the FTCA rubric, the defalcations by the

17   government with respect to the MRGO, other than your broad

18   reading of *Central Green* which we have discussed?

19        MR. SMITH:  I wouldn't view it as trumping, Your Honor.

20   I think these are two separate waivers of sovereign immunity.

21   Each needs to be construed on its own terms.  But I understand

22   that, so the way I would see it, Your Honor, frankly, would be

23   when you have floodwater damage, you really, it's kind of the way

24   the Court has approached it here:  You really need to look at

25   702c and evaluate whether the scope of that immunity that's

1  provided bars the action.  And if it does, you never get to 702c.

2           Let me get to Your Honor's question, I think to the

3  heart of Your Honor's question, which is, and if I'm

4  mischaracterizing it, tell me, because this is the way I

5  understand your question essentially to be saying, why should

6  702c immunize a conduct that occurs in a non-flood control

7  project like --

8           THE COURT:  You asked the question better than I did.

9           MR. SMITH:  I hope I have a good answer.

10          THE COURT:  I'm great at questions but the answer is a

11  little difficult, but go ahead.  And your answer is?

12          MR. SMITH:  I don't know if this, if this makes any

13  sense to Your Honor but this is the way I see it.  To escape

14  dismissal under 702c because they are challenging the conduct

15  that took place within the MRGO project, you really have to

16  atomize what a single government agency, in fact, I mean, the

17  facts could be different.  These could have been two separate

18  agencies doing two projects.  Here you have the very same

19  governmental agency digging, digging, digging, dredging a

20  waterway.  They are digging, they are digging this conduit.  At

21  the same time, right beside it, they are piling up dirt here,

22  they are piling up dirt here.  They are digging out dirt here and

23  piling up dirt here.

24           In fact, as Your Honor knows, I think, by now, some

25  of that dirt they dug up they actually piled up to build the

1    levees with.  But apart from that, it just seems to me that when

2    you view it, when you don't atomize the conduct but when you see

3    it as a whole and you see that this is a single entity, it's the

4    United States --

5         THE COURT:  You don't want us dealing with protons and

6    neutrons, you want us to deal with the entire atom.

7         MR. SMITH:  Exactly.

8         THE COURT:  Certainly not quarks, but, go ahead.

9         MR. MCKERNAN:  But just like protons and neutrons and

10   neutrinos are related, even though they are different --

11        THE COURT:  I knew we would get into quantum physics

12   here, but go ahead.  I understand your answer.

13        MR. SMITH:  I don't know anything about quantum physics,

14   but I think I remember something from high school that protons

15   and neutrons have some certain relationship to each other, which

16   is why they exist together in the atom, and I think that's

17   exactly why we have a good paradigm for what we have here.  We

18   have conduct that doesn't have a flood control purpose.

19             The plaintiffs constantly want to say, This was not

20   related to flood control.  But when you look at what they are

21   saying, what they are saying is, Well, it was related but it

22   didn't have a flood control purpose.  And because it didn't, it

23   wasn't flood control activity per se, the government shouldn't

24   have the benefit of 702c.

25             But that's not really in keeping with the Fifth

1    Circuit's cases.  For instance, in *Boudreau*, the rescue of a

2    stranded boater, what did that have to do with flood control?  It

3    really didn't have anything to do with flood control but they

4    viewed it broadly as part of the management of a flood control

5    project.

6            THE COURT:  I'm not sure, although maybe for the

7    different reasons, I'm not sure *Boudreau* would stand under

8    *Central Green* now, but that really gets into the character of the

9    waters.  And here, I think, clearly these appear to be

10   floodwaters, but I'll ask you a couple of questions about that

11   and we'll see what you --

12           MR. SMITH:  But my point, Your Honor, apart from any of

13   those other cases, is simply that there is a relationship.  It's

14   hard to deny that when you have the government attempting to

15   protect an area from flooding, from floodwaters, and so it's

16   trying to do that by building up structures at the same time it's

17   digging, it's digging a conduit to say that there is no, these

18   things are unrelated.  I mean, this is not your Navy fighter jet.

19   This is not your atomic explosion out in the Pacific.  This is

20   one agency working on a waterway project adjacent to a flood

21   control project.  And to me, just to describe what was going on

22   answers the question as to whether or not there was a sufficient

23   nexus between that conduct and flood control.

24           And, you know, the plaintiffs have said in their

25   complaint even, since 1958, you know, the Corps was on notice

1    that it was creating this funnel, this conduit for storm surge

2    and yet it did nothing.  I mean, warnings were given, but as I've

3    explained to Your Honor, the Corps examined that and looked at

4    the relationship and determined that the warnings were overheated

5    and not substantiated.

6         THE COURT:  The only thing that, and I'm sure there are

7    other things.  One of the things I noted in the record, this is

8    kind of an aside, is a citizen from New Orleans wrote the

9    vice-president and it was referred to the appropriate person in

10   the Corps, but that's the only, about the funnel effect.  I

11   thought that was interesting.  It has no bearing, very little

12   bearing on this case.

13        MR. SMITH:  Ironically, that is kind of the way these

14   things get answered.

15        THE COURT:  Apparently so.  I read a *Law Review* article

16   which you probably have read, admittedly, charged in one way, it

17   seems, by a young Pepperdine law student who went to Tulane, and

18   he talked about commercial water.  And the question I want to ask

19   you is that, could the Court consider some of the harm caused by

20   commercial water, which is used in a couple of the cases, that

21   is, water from the MRGO, as not being floodwaters?  In other

22   words, these are commercial waters.

23        MR. SMITH:  Whatever you think the character of the

24   waters in the MRGO were before August 28th is really the storm

25   surge was starting to roll in off the Gulf before the 29th, when

1    the levees broke.  But whatever the character of the waters in

2    the MRGO was prior to Hurricane Katrina moving across the Gulf of

3    Mexico and sending those waters surging out of their banks of the

4    MRGO, I think the problem with looking at the waters,

5    characterizing them as anything other than floodwaters is,

6    frankly, it's just not fair to the character of the waters that's

7    undeniable that overwhelmed levees and caused the damages in this

8    case.

9            There has been some, you know, comment about, Well,

10   the waters that were in the MRGO prior to Hurricane Katrina may

11   have caused damage to wetlands, but the plaintiffs here didn't

12   own the wetlands.  They are not suing for damage to wetlands.  If

13   Hurricane Katrina had come along, damage to wetlands could have

14   gone on for another 400 years and the plaintiff would never have

15   had a cause of action but for a hurricane-induced storm surge

16   that caused the waters that were in the MRGO, the waters, that

17   were in Lake Borgne, the waters that were in Lake Pontchartrain

18   to rise out of their banks and to overwhelm and batter and

19   destroy the flood control works that were erected to protect

20   Chalmette, New Orleans East, and the lower Ninth Ward.

21           THE COURT:  On a factual question, a little less

22   esoteric, I know there are questions whether they are levees or

23   earthen berms, but nonetheless the Court is regarding all of this

24   right now, just to let the plaintiffs know, and it wasn't clear

25   to me in the beginning, but it is more clear now that the entire

1    area we're talking about was in some way or another encircled by

2    some sort of another federal control project, at least that's the

3    way I'm looking at it.

4         MR. SMITH:  Whatever you call them.

5         THE COURT:  Yes.  Where are the levees, and I use the

6    term without any --

7         MR. SMITH:  Without any prejudice to the plaintiffs.

8         THE COURT:  Prejudice to either side.  That are part of

9    the LPV, in reference to MRGO, I saw some reference they were a

10   thousand feet back and then there is some parallel to it.  I was

11   a little confused about that.  Do you know the physical location

12   of the levees?

13        MR. SMITH:  They are not a thousand feet removed from

14   the waterway, Your Honor.  I don't know the exact distance.

15   There has been some, in fact, some shoreline protection on the

16   west or the south side of the MRGO to keep erosion from eating

17   away at the foundation of the levees on that side, so I don't

18   know the exact distance, but they are in relative proximity to

19   the waterway itself.

20        THE COURT:  Okay.  And then I'm looking at, and you can

21   refer to anything you want, and by the way, this is going to take

22   longer than originally contemplated, so I'm going to let you say

23   whatever you want to say, but I'm going to go through this with

24   the plaintiffs, and then you can rebut what the other said, and

25   I'm going to be a lot quieter.

1           There is something that appears at page 10 of the

2    1988 report.

3           MR. SMITH:   The MRGO recognizance report?

4           THE COURT:   Yeah.   "The MRGO is experiencing severe

5    erosion along its unleveed banks."   Is that part of the area?

6           MR. SMITH:   That would on the east or the north side of

7    the MRGO.   In other words, toward Lake Borgne, on the Lake Borgne

8    side essentially.

9           THE COURT:   There are no levees there because there are

10   no living persons to protect?

11          MR. SMITH:   This, I mean the issue of erosion we have

12   recognized as an issue.   I mean, it is an environmental issue.

13   It was recognized.   The situation the Corps was in there was not

14   really totally unlike the situation that Your Honor came to, I

15   don't want to say appreciate, that's the wrong word, with respect

16   to the canals, with respect to how you're going to protect

17   against flooding.   Are you going to do parallel protection or are

18   you going to put gates at the end?   And again, it all boiled down

19   to money and who has to pay for it.

20          And because the Corps' mandate was to keep the

21   waterway open at a certain depth, it had to do that in the most

22   cost-effective way, which was simply to keep dredging it when it

23   filled in.

24          There were thoughts that perhaps they could build

25   some shoreline protection on the other side to stop erosion, but

1   it was more costly.  That would have required a local sponsor to

2   foot the bill, and it was being studied even as Hurricane Katrina

3   hit, but nothing ever occurred prior to that time.

4          THE COURT:  And your opponent has made a point about

5   this, the fact that as found in the '88 report, again, that you

6   talked about, that the failure to armor the channel caused, "The

7   marshes along the north bank of the MRGO have been

8   especially hard hit by these forces and are disappearing at an

9   alarming rate because erosion is steadily widening the MRGO.  The

10  east bank along Lake Borgne is dangerously close to being

11  breached.  Once the bank is breached, the following will happen:

12  Sediment from Lake Borgne will flow into the channel resulting in

13  large increases in dredging costs to maintain the channel;

14  development to the southwest will be exposed to direct hurricane

15  attacks on Lake Borgne; the rich habitat around the area will be

16  converted to open water; and more marsh would be exposed to

17  higher salinity water."

18          And I guess, did the failure to armor, what about

19  the point of the failure to armor that your opponent says was

20  mandated in the original project?  One, you may want to talk

21  about --

22          MR. SMITH:  Well, it wasn't mandated.  I don't think

23  they've cited anything that, there is some conflation between

24  armoring and shoreline protection.  Armoring levees is one thing;

25  building shoreline protection is another.

1           There was, shoreline protection is something that's

2    put along the, like it sounds, along the edge of the shore to

3    keep wave wash from passing ships from continuing to wash away

4    the shore.  Armoring of levees refers to putting some sort of

5    protective layer over the levee itself.  It could be a cap of

6    clay.  It could be something as simple as grass which would

7    minimize the effects of erosion.  It could be concrete.  It could

8    be a combination of these things, but that's one thing.

9    Shoreline protection is another.

10           What's being alluded to there is I think

11   prospective.  In other words, they are viewing a potential hazard

12   that may result if this erosion continues.  Now, obviously, this

13   case, if we go to trial, is going to be about whether, in fact,

14   the danger that's referred to there was real or whether it was

15   just something that someone thought might occur.

16           THE COURT:  Right.  I understand.

17           MR. SMITH:  And so there was no, well, there was, there

18   was minimal, there was some shoreline protection that was

19   armoring, I wouldn't call it armoring but some shoreline

20   protection in a few places on the north side of the MRGO, but

21   certainly not the entire reach, what we call Reach 2 was not

22   protected on the north or the east side.

23           THE COURT:  The plaintiffs indicate you are not entitled

24   to flood control protection, excuse me.  You're not entitled to

25   immunity from the FCA because you defalcated in approximately

1   eight different mandates, and I think your response was in your

2   briefing, Well, I can.  I'm not sure you admit you did, but you

3   said, I can within the framework of the *Allison v Froehlke*.

4          MR. SMITH:  My first argument was simply that this was a

5   misconception, it's a misconception, the whole framework is

6   wrong.  In other words, what the plaintiff's argument is premised

7   on is the idea that everything that was in that district

8   engineer's report became law when Congress passed essentially a

9   one-sentence act, which said the project for hurricane protection

10  on Lake Pontchartrain was authorized.  That's all it said,

11  Substantially in accordance with the recommendations of the chief

12  of engineers.

13          So what the plaintiffs have tried to do is write

14  that substantially in accordance with, out of the act and say,

15  Well, every detail that was in that district engineer's report

16  had to be complied with or --

17          THE COURT:  Let me ask you a question:  Do you agree

18  with the concept that if you weren't substantially in accordance

19  with, you lose your immunity under the FCA?

20          MR. SMITH:  No.  I don't agree with that.  I don't think

21  that's --

22          THE COURT:  Well, frankly, to let everyone know, my main

23  focus in this case is going to be on the nexus issue.  But I'm

24  going to ask about the other issues, but that's my focus.

25          Hold on one second, Mr. Smith.  Excuse me.

 1              Let's get into some policy, although the Court

 2    realizes that the ultimate policy is going to be made by another

 3    court, as is appropriate.  But with me making the first decision,

 4    I need to understand the dynamics of the various policies that

 5    are involved here or talk about them, at least.

 6              Since some or all of the damage would have occurred

 7    regardless of the FCP, according to the plaintiffs' complaint, I

 8    realize it may be disputed, but that will get into, why would the

 9    expenditure of funds for an FCP protect the government from any

10    and all accidents completely unconnected with the FCP except by

11    the mere happenstance that it destroyed or compromised the FCP?

12    That's kind of a lengthy question, but do you understand what I'm

13    saying?

14          MR. SMITH:  Yes, and with all due respect, it sounds

15    like a loaded question because the answer seems to be embedded in

16    the wholly unrelated to --

17              THE COURT:  It's a leading question from the Court.

18          MR. SMITH:  And, the reason I have to say that is --

19              THE COURT:  You can object to the leading question and

20    then answer it.

21          MR. SMITH:  It's counter factual is what I'm trying to

22    suggest, Your Honor, to what we have here.

23              THE COURT:  Tell me why.

24          MR. SMITH:  Well, if I get the gist of it, the gist of

25    it is, again, you're going back to how close does the nexus have

1   to be between the challenged conduct and the flood control

2   project.  I thought, I didn't catch quite the beginning; there

3   was something about the damages.

4            THE COURT:  Well, the fact is, regardless of a

5   perfectly, although we have a lot in here about the imperfect

6   nature of the FCP, it's irrelevant to me insofar as this motion

7   is concerned.

8            MR. SMITH:  This motion is concerned.

9            THE COURT:  I'm assuming, based on what the plaintiff

10  says, although you argue about what the plaintiffs are saying

11  both ways, if this is a perfectly constructed FCP, but negligence

12  of the government from another source, would it cause damage

13  regardless of the FCP, some, then what's the policy to immunize

14  that action when the only, when it really doesn't relate to a

15  failure of the FCP?

16           MR. SMITH:  I understand.  And I think this gets to

17  heart of one of the arguments that plaintiffs were making, and I

18  think the amici we're making as well, which is, I agree with

19  Your Honor, I think whether or not the LPV was negligently

20  constructed or perfectly constructed is totally irrelevant to the

21  analysis of the application of 702c here.

22                Your Honor can assume that the levees were

23  perfectly constructed to the very, you know, iota that was

24  specified by Congress, and the question would be then, well, why

25  should you get immunity for this dredging of the MRGO?

1              And I think the answer to that has to be that when

2      the government builds a flood control project, people invest in

3      reliance on the protection that's implied by the presence of that

4      flood control system.

5              Over the 40 years since the LPV began to be

6      constructed, St. Bernard Parish experienced great expansion.  A

7      lot of people moved into the area.  And the same thing with

8      New Orleans East.  The government builds levees.  People invest

9      in that area.  When that flood control project fails, if there

10     are damages, even caused by extraneous conduct, having no conduct

11     connection whatsoever with that flood control project, the

12     damages that are going to result will be greater because of the

13     existence of that flood control project.

14             So there's the policy.  There is one policy reason

15     why even totally extraneous conduct that results in flooding

16     that's related to a flood control project should bring immunity

17     in the United States to bear.  Congress puts money into flood

18     control projects, and when it does that it wants to be sure that

19     it's not going to be incurring any greater liability as a result

20     of that flood control activity.

21             THE COURT:  Thank you, sir.

22             It appears to me that the focus on the MRGO, and

23     I've talked about this a little bit, solely had to do with

24     salinity and navigation issues as concerned the IHNC in

25     Lake Pontchartrain, and the solution was Seabrook lock to be paid

 1  out of MRGO funding which was never built.  So tell me, tell me

 2  why is the MRGO and the LPV intrinsically intertwined?

 3              MR. SMITH:  Because one is a waterway.  It's a

 4  source of water.  You know, the LPV was authorized to protect

 5  against hurricane floods.  And that's the language that's used in

 6  the act.  Hurricane floods.  The MRGO contained water.  I mean,

 7  it had water.  By itself, I think the experts can explicate this,

 8  but the water in the MRGO by itself is like a drop in the ocean,

 9  literally, compared to the water that's in the Gulf of Mexico

10  that was being driven toward New Orleans East by

11  Hurricane Katrina.

12              But the very fact that it's a waterway that is

13  subject to hurricane tides brings, creates a connection between

14  that conduct and the flood control project.  It was a threat,

15  whether or not the Corps built the Seabrook lock, whether the

16  Corps did any other, it was a potential source of hurricane

17  flooding.

18              The Corps recognized that a logical place to build

19  the levees was along the MRGO.  That would allow for maximum use

20  of the land that was available between the MRGO and the IHNC for

21  development.  Obviously this was before NEPA was passed.  Before

22  development of the wetlands became problematic.

23              But the very location, choice of location in the

24  LPV suggests that the Corps was not unaware that the MRGO, no

25  less than any other body of water, could be part of a hurricane

1   flood.

2          THE COURT:   I'm going to ask you two questions in one,

3   which I wouldn't let a lawyer do, but I think you can handle it

4   by the very expert way you've been handling the other questions.

5          One could argue that the purpose of the FCA, the

6   Flood Control Act, to immunize negligence that takes place inside

7   the boundaries of an FCP.  Do you have any case where the

8   negligence as alleged in this case was extrinsic, that is,

9   outside the entire boundary of the FCP?  Or am I going to be

10  lucky enough, which it looks like I probably am, as I've had in a

11  lot of these issues in a case that's certainly semi-first

12  impression, but go ahead, you can answer the questions.

13         MR. SMITH:   I'm not aware of a case that immunized

14  conduct that was not at least broadly part of a flood control

15  project.  I think one of the things in *Central Green* that's at

16  least interesting is that the conduct that was being challenged

17  was the design of the Madera Canal, which the petitioner, which

18  was *Central Green*, that is, would have been the tort below,

19  obviously the plaintiff in the trial court contended was an

20  irrigation canal, not a flood control project.  The United States

21  took the other point of view and said, Well, Madera Canal may be

22  for irrigation purposes but it's part of the Central Valley

23  Project.

24         And so the Central Valley Project exists for flood

25  control reasons and so because this canal, which is an irrigation

1  canal, is part of that, then we get immunity.

2          But I say it's interesting because the Supreme

3  Court basically only mentions it in a single sentence, what the

4  conduct at issue even is and it doesn't elaborate on it, doesn't

5  return to it ever again and seems to make no difference that

6  perhaps this construction of this canal had no flood control

7  purpose whatsoever.  It may have been related to irrigation.  But

8  what the Court wanted to focus on was, What were these waters

9  like?  You know, there was a flood one year, and did they get

10 these damages in the year that there was a flood, and if there

11 was, then notwithstanding the fact that this may have been the

12 construction of an irrigation canal, the damages may have been

13 caused by floodwaters.

14          So I think, you know, I began this morning by

15 conceding something that, unfortunately this is going to be

16 transcribed and people in my office may not be happy to hear that

17 I conceded that *Central Green* is limited by its facts, but I

18 think the teaching of *Central Green* suggests very strongly --

19          THE COURT:  Just as you argue *Graci* was limited by its

20 facts.

21          MR. SMITH:  Right.  But I think when you look at the

22 teaching of *Central Green*, you get a very strong emphasis that

23 conduct is not a part of the test.  They didn't send the case

24 back to examine whether the conduct had any relationship to flood

25 control or not.

1        The plaintiffs in, I think, the amici have said,
2   Well, there is a phrase in there, "and the purposes behind their
3   release."  But that's really only, as I would see it, a clue as
4   to how you analyze the character of the waters.  In other words,
5   were they being released for flood control purposes.

6        THE COURT:  In this instance, I agree with you that
7   there is a great word, recondite, it means hidden for those of
8   you who are not familiar with it, I find it, there may be
9   something in *Central Green* that to me, I've read it now enough
10  times, I don't want to ever read it again, but it's recondite.

11       MR. SMITH:  This is my last flood control case.  I'm
12  never taking another one of these in my life.

13       THE COURT:  But you certainly know it well.  And I
14  understand your point.

15       One of the things that I'm going to ask you, and
16  I'm about finished, you'll be happy to know, certainly we know
17  it's the law that the FCA was not repealed by the FTCA.  That's
18  the law.  If you're right in your argument, isn't that tantamount
19  to saying that the FCA in an earlier act repeals in part the
20  FTCA, which is enacted much later?

21       That may be a little metaphysical, but we have the
22  FTCA out there and we're saying, That conduct is immunized
23  because of the FCA enactment.  It's sort of the question where do
24  these two intersect and what's the policy, what are the policy
25  considerations of that?

1      MR. SMITH:  I really, honestly haven't looked at this,

2  Your Honor, and I'm not sure I have the right answer.  I think

3  the only, I know it's been looked at, a number of courts because

4  early on that was a live question.

5      THE COURT:  Right, and that's no longer a live question.

6      MR. SMITH:  Right.  And I haven't looked at it but I

7  thought that the way they analyzed it was whether the latter act,

8  in fact, repealed the former.

9      THE COURT:  They do.  They did.  And it didn't.  But I'm

10  wondering, certainly the former act shouldn't repeal the latter

11  act either.

12      MR. SMITH:  Well, I'll repair to *James*, Your Honor,

13  because I think there is something good in there.  The Supreme

14  Court quotes *Dalehite,* which is a venerable FTC case, which

15  broadly talks about, you know, the discretionary function

16  exception.

17      THE COURT:  I'm sure we'll be talking about it.  If you

18  don't survive this round, you'll be definitely talking about

19  that.

20      MR. SMITH:  Right.

21      THE COURT:  The plaintiff has an obstacle course to go

22  through, no question.

23      MR. SMITH:  But the Court doesn't cite it for, at least

24  explicitly, for discretionary function purposes.  It cites

25  Dalehite for the broad principal that waivers of sovereign

1    immunity are to be broadly construed, and exceptions are not to

2    be inferred.  And while you have two statutes here, you have a, I

3    think I said that backwards, but that's all right.  I think

4    Your Honor knows what I'm trying to say.

5             THE COURT:  Yes, I do.

6             MR. SMITH:  You have, in the FTCA, it's a limited waiver

7    of sovereign immunity.  It has its own exceptions as Your Honor

8    has pointed out.

9             THE COURT:  It does.

10            MR. SMITH:  And you also have the Flood Control Act,

11   which preserves on explicit terms the sovereign immunity for

12   certain types of conduct.  And I think the general principal is

13   that you look at these two things together, you see what

14   sovereign immunity has been preserved.  Where it's not clear, I

15   think you have to assume, under these principles that the

16   government has not waived sovereign immunity.

17            And that I think is really what's problematic here

18   for the plaintiffs.  They are asking this Court to read not one

19   but two nontextual limitations on the waiver of sovereign

20   immunity.  The first nontextual limitation on this waiver of

21   sovereign immunity is that it's not all floodwaters but it's only

22   floodwaters that a flood control project is unable to control or

23   floodwaters that are released for flood control purposes.  That's

24   not in the text.

25            While *James* does carve out those two categories,

1   *James* doesn't say that those are the only two categories of

2   floodwaters that would be protected.

3          The second limitation is the conduct limitation.

4   And while there's, you know, some basis for viewing a nexus

5   between the floodwaters and a flood control project, because the

6   floodwaters themselves are within the text.  So you've got at

7   least some sort of a hook to hang this flood control project

8   nexus with floodwaters on the text.

9          When you get into conduct, you're totally at sea

10  because there is nothing in the text of 702c that suggests that

11  conduct place any role in the analysis, and frankly, then you go

12  to *James* and *Central Green* and there is really nothing in either

13  of those cases that suggests.

14         And what I find so interesting is that while

15  *Central Green* was viewed, I think rightly by the lower courts as

16  having cut back on the breadth of 702c immunity, what's so

17  notable about *Central Green* is the way it cut back.  After *James*

18  was decided, the Courts of appeals, Judge Easterbrook in the

19  Seventh Circuit, Judge Boggs in the Sixth Circuit were agog at

20  how broad and how unlimited this immunity had to be.  Just any

21  old --

22         THE COURT:  Wholly unrelated.

23         MR. SMITH:  Right.  A walrus-sized pothole can swallow a

24  car.  And so the courts of appeals, as Judge Boggs and Cantrell,

25  came up with a bewildering array of tests to look at the conduct

1    to try to limit 702c.

2         Well, when *Central Green* came to the Supreme Court,

3    it noted in its opinion that there were at least three courts of

4    appeal that would have decided the case differently based upon

5    the fact that they required some nexus between the conduct and

6    the injury.

7         But did the Supreme Court take that cue from the

8    lower courts and say, Yes, this is the restriction.  Yes, you

9    know, no.  It didn't.  It totally ignored that and went right to

10   the character of the waters and said, Look, if you need a

11   restriction for 702c to make it limitable, to make it

12   comprehensible, look at the text in its floodwater damages.

13        And you know, if we go back in hindsight and we

14   apply floodwater damages to the test, so many of these cases just

15   fall away, *Boudreau* falls away, *Mocklin* falls away, *Kennedy* falls

16   away.  You don't need a conduct.  You don't need a conduct

17   element because what you need are floodwaters.

18        THE COURT:  I understand your argument.  Is there

19   anything else you want to, I'll give you a chance to come back

20   after.

21        MR. SMITH:  Thank you.

22        THE COURT:  Thank you.

23        Good morning, sir.

24        MR. O'DONNELL:  Good morning, Your Honor.  May I pass up

25   two notebooks?  There are some graphics I may refer to, depending

1   on the Court's questions.

2       THE COURT:  Yes.

3       MR. O'DONNELL:  Thank you.

4       THE COURT:  I'll get to my questions and then you can

5   follow up.

6       MR. O'DONNELL:  Well, I think there actually may be some

7   materials in there that may shed light on some of the questions

8   that you asked counsel but I am here to answer some of the

9   questions you want to ask me, Your Honor.  And good morning.

10  It's a pleasure to be here.

11      THE COURT:  My first question to you sort of begins

12  where your esteemed opponent ended.  The Court in *Central Green*

13  stated, "Accordingly the text of the statute directs us to

14  determine the scope of immunity conferred not by the character of

15  the federal project or the purposes, but by the character of the

16  waters that caused the relevant damage and the purposes behind

17  their release."

18          Question:  Do you admit that the waters that caused

19  the damage to your plaintiff are clearly floodwaters, and doesn't

20  the plain text of 702c for those jurists who are literally minded

21  state floodwaters?

22      MR. O'DONNELL:  It does.  Would you mind turning to

23  Tab 4 of the book I gave you.

24      THE COURT:  I would not.

25      MR. O'DONNELL:  I'm not prescient, but I did anticipate

1  this question, Your Honor.  I have outlined there the answer, my

2  answer to the question is a definitive no.  A literal

3  interpretation of flood or floodwaters at any place would take

4  care of your Navy bomber, your previous examples of the Navy

5  vessel hitting the Mississippi River levees, it would take care

6  of the ice jam in the Alaska river, indeed, if the GSA employee

7  downstairs took a forklift to your water main and it destroyed

8  that place downstairs called the Chow Down or whatever the

9  cafeteria is and went out into Poydras and knocked out all of

10 those hotels and businesses, literally they are floodwaters, not

11 connected to any flood project, not for any flood control

12 purposes.

13         The courts have said, I think it's *Graci,* but I'm

14 not sure, starting with *Graci* and moving on through the cases,

15 they've always required something more than just flood or

16 floodwaters.  There has to be something else involved.

17         That's because the legislative history is so fully

18 articulated in *James* by Justice Powell, made it very clear, and

19 I've pointed this out in every pleading I've filed on this issue

20 and I have in my two or three papers here, that the contract that

21 was made with America by the Congress was, If we build a flood

22 control project and it doesn't work, we complete it and it

23 doesn't work, we want to limit our exposure to what that thing

24 cost.  A flood control project, floodwaters.  So you need a

25 situation where there is something more than mere floodwaters.

1   You need some conduct in order to get immunity, Your Honor.  So I

2   think the answer is no.  And the fact that there are floodwaters

3   is the beginning, not end of the inquiry.

4           You've said, in our Motion to Dismiss *In re Katrina*

5   at page 695, there is very much, "This case is very much like

6   that found in *Central Green*."  You're talking about my case, our

7   case.  "While arguably the immediate cause of the damage was

8   indeed floodwaters, the causation for such floodwaters' force and

9   breadth are alleged to have been the defalcation of the

10  government with respect to the MRGO."

11          You've also said the mere fact that there are

12  waters that are floodwaters, that somehow they touch or come in

13  contact with the FCP does not mean that there is immunity.

14          And it's important that you understand, I'm sure

15  you do.  Our theory has nothing to do with the LPV.

16          THE COURT:  If I don't understand that by now, God

17  knows -- all I referenced was that a lot of the exhibits

18  reference the defalcation of it, and that may go to your mandate

19  or your --

20          MR. O'DONNELL:  All I was trying to show there, okay,

21  and I should have probably filed a negative environmental impact

22  statement.  We have alleged and we believe there is substantial

23  evidence in this record that would deny summary judgment to the

24  government, that there was negligence in three respects.  You've

25  said it, lack of armoring, the geometry of the funnel effect and

1   the loss of the wetlands, all known and foreseeable.

2          It's an independent tort, it's an independent act

3   of negligence outside of flood control conduct occurring before

4   the LPV was enacted and the project was built.

5          And what happened here is, I'm being very precise

6   because my record is very, you want to pinpoint, I tried to

7   pinpoint, there is three feet of excess floodwater we allege

8   caused by the MRGO.

9       THE COURT:  So now you're going to my last question but

10  I'll ask it now.  And I'm not sure how it relates to 702c

11  immunity necessarily, but it's something that vexes me.  In fact,

12  if you think a lot about this case, it will keep you up at night.

13  It seems to me that I'm going to have to hold that to the extent

14  that the flooding was caused by the failure of the LPV, there is

15  immunity for the government.

16      MR. O'DONNELL:  I respectfully disagree.  But I'll wait,

17  Your Honor.

18      THE COURT:  Well, you're going to lose on that one.  You

19  may disagree, because that would, because it would be reversed in

20  a heartbeat in my opinion.  But I want to hear what you say and I

21  think you're going to lose, you really have an uphill battle.

22  For me to say that it caused part of the damage, somehow they

23  don't have immunity.

24      MR. O'DONNELL:  No, no, no.  We agree, segregation,

25  *Central Green* opened the possibility of it.

1            THE COURT:  You.

2            MR. O'DONNELL:  I have a factual point on that.

3            THE COURT:  You may have a factual point on that but --

4            MR. O'DONNELL:  But I will wait on that.

5            THE COURT:  Okay.

6            MR. O'DONNELL:  I think failure is in the eye of the

7   beholder.

8            THE COURT:  If, without the surge from the MRGO, there

9   would have been six feet of water, hypothetically, in the homes

10  of your plaintiffs, of your six plaintiffs, and on the, and with

11  the surge there was nine feet, what the heck is the damage from

12  the MRGO?

13           MR. O'DONNELL:  Would you turn to Tab 6 for a moment

14  please, Your Honor.

15           THE COURT:  I'm jumping ahead of my question.  We'll get

16  back to my question.

17           MR. O'DONNELL:  This is great.  This is like dealing

18  with my three children, Your Honor, they all come at me from

19  different directions.  Let me answer that question very

20  specifically.  These three charts show what a difference three

21  feet makes and they're very simple --

22           THE COURT:  It's almost a song.

23           MR. O'DONNELL:  It does, Your Honor.  It's the IHNC

24  where the, there was overtopping and failure on both sides.  I

25  have Reach 1 and Reach 2.  And this is the essential point of the

1    negligence and the causation, Your Honor.

2         THE COURT:  Mr. Smith, do you have a copy?

3         MR. SMITH:  Yes, thank you.

4         MR. O'DONNELL:  Is this, because of the destruction of

5    the wetlands, and Dr. Robert Dalrymple, their expert in a related

6    case, Johns Hopkins, it doesn't get any better than that unless

7    it's Tulane, he says there was over a meter of excess surge

8    during Katrina because the wetlands were destroyed.  They have a

9    known buffering effect, about 2.7 miles of wetlands, cypress,

10   whatever, knocks down a foot of surge.

11        So he, himself said there was over three feet of

12   surge that attacked the Reach 1 levees, which is depicted in

13   Tab 3.  Actually, there is arrows from the ILIT report that show

14   you what they label as overtopping flow.  Liquid bulldozer.

15   Okay.  And if there had not been the MRGO in that area of

16   Lake Borgne and if there had not been a decimation of those

17   wetlands, tens of thousands of acres of wetlands that they knew

18   was going to happen, according to our allegations and our proof.

19        If you look at the first chart in Tab 6, the surge

20   would have been only 12 feet.  The surge was 15 feet.  And the

21   actual height was twelve-and-a-half.  You would have had no

22   overtopping.  That's the real culprit here is overtopping.  It

23   would not have occurred.

24        THE COURT:  That's where you disagreed with the premise

25   of my question about you don't need to segregate, you're telling

1   me.

2          MR. O'DONNELL:  In that regard.  I do, however, on

3   page 2, Reach 1, maybe.  There, the surge was 18.2 feet high, the

4   actual height was 15, and if it was only 15.2, there is 0.2 of a

5   surge --

6          THE COURT:  You're talking about overtopping, some of

7   these levees failed.

8          MR. O'DONNELL:  I'll get to that, Your Honor.  In

9   Reach 2, I show the same thing.  In much of Reach 2, the surge

10  without the MRGO three-foot addition would have been less than

11  the actual height.

12         THE COURT:  Again, I'm getting a little off of my major

13  focus, which is the nexus argument.  But go ahead, let's finish

14  this up.

15         MR. O'DONNELL:  I know this may actually lead into

16  nexus, Your Honor.  So the vast amount of damages here is

17  overtopping.  Okay.  And not the failure.  Reach, now, there was

18  failure.  Let's take the IHNC.  There is not much of a dispute

19  between my experts and the Corps' IPET report and ILIT.  And --

20         THE COURT:  I have an interesting conundrum because I

21  have lots of theories of liability before this Court under this

22  umbrella but your case, if it gets to trial, will be very

23  interesting, go ahead.

24         MR. O'DONNELL:  Your Honor, if you get to Tab 5, I have

25  actually summarized this for you.  All with record evidence, all

1   but one cite being the Corps' own expert, Dalrymple's report, his

2   depo, Varuso, their employee, or the IPET report.

3            And overtopping is what caused the catastrophic

4   flooding in every location.  Overtopping.  It's undisputed in

5   this record.  And it's overtopped because of the three feet of

6   excess surge caused by MRGO.  In 1947, an unknown hurricane, the

7   record shows, hit this vicinity and did not have catastrophic

8   flooding.  There was no MRGO.  There was still all that wonderful

9   cypress Tupelo swamp out there and there was no funnel from the

10  MRGO.

11           In '65, they had catastrophic flooding that was

12  much the same footprint as we had in 2005.  The only difference

13  was the MRGO.  That's science.  That's in the record.

14           But here, overtopping is critical.  Reach 2 is made

15  of earthen berms for the most part, and it overtopped first, and

16  the overtopping was catastrophic.

17           And then the liquid bulldozer, the water caused by

18  MRGO, it's a battering ram just like your Navy vessel hitting the

19  levees of the Mississippi River, knocked out substantial portions

20  of the MRGO Reach 2.  It also contributed to the overtopping and

21  the failure of the IHNC's east side, the two breaches on the

22  north and south of each side, flooding the Ninth Ward and part of

23  Chalmette.

24           The point I'm trying to make, Your Honor, is even

25  in the context of a failure, a breach, the three feet of excess

1  surge is a causative contributing factor.  It's the same as if
2  the Army Corps had gone out to Canarvon, I'm told, as they did in
3  1927 to save the city, and ba-boom, they blow up the levee.  It's
4  the same analysis.  It's an independent tort act of negligence.
5  I'll assume that was an act of negligence, although it was
6  authorized by the president of the United States, I've read.

7           So they do that.  My point is, I get to trial, I
8  get over this issue I believe merely because of overtopping.  If
9  the Court says, Well, Mr. O'Donnell, I think the liquid
10  bulldozer, I may have to allocate that might be immune, but I
11  agree with you that what you're saying about is non-immune,
12  that's the only point I'm making.  I'm not conceding that the
13  erosion caused by overtopping because of the excess three feet
14  but three feet made the dispositive difference here, and that's
15  our proof.

16           THE COURT:  Believe me, I understand your argument.

17           Let me ask you this:  You rely on *Graci,* and
18  counsel pointed out *Graci* is in a vacuum in the sense there was
19  its waters, the floodwaters there did not come into contact with
20  a FCP; therefore, what does *Graci* really teach us if we don't
21  have the same factual scenario?

22           MR. O'DONNELL:  It teaches us that it's not limited to
23  its facts.  It was, its doctrine is good today.  In fact, that
24  case has stood the test of time.  Indeed, I've pointed this out
25  you on several occasions, *James*, in footnote 2 cites approvingly

1  *Graci* and characterized it as follows:  "The federal government

2  contended that 702c granted immunity from damages caused by any

3  floodwaters, even those unconnected with flood control projects."

4          The Court, Fifth Circuit rejected this argument and

5  held that the provision conferred immunity only for floods or

6  floodwaters connected with the flood control project.  Page 602,

7  Note 2.

8      THE COURT:  Is it your position -- go ahead and finish

9  your thought.

10     MR. O'DONNELL:  My point is that, yes, there was no LPV

11 at the time, but my theory of liability is the same.  And our

12 case does not require that, it does not turn on the existence or

13 nonexistence of levees or their performance or failure.

14         Indeed, I would like you for one second to imagine

15 that the LPV was a speed bump.  As that tsunami, which it comes

16 across the denuded marsh lands and shoots at Reach 2, it

17 momentarily rises, overtops and keeps on going into the

18 population.  The LPV played no role.  It is not my claim that the

19 LPV or its failure played any role in the flooding of my clients.

20 To make the point, it might as well have not been there as it was

21 not in *Graci*.

22     THE COURT:  I understand the point.  Is it your

23 contention that any negligence by the government or anybody,

24 let's say the government because we're dealing with immunity,

25 that occurs outside of the parameters, as wide as you want to

1    make them, of the FCP is then the government is being sued to,

2    subject to being sued under the FTCA regardless of the impact it

3    has on the FCP; is that your position?

4         MR. O'DONNELL:  Yes, regardless of the impact on an FCP,

5    if I could qualify that.  The government contends, and I suspend

6    disbelief, and I'll be in Wonderland during this argument only,

7    that they build perfectly fine flood protection works along

8    Reach 2 and elsewhere.  I'll engage in that assumption for a

9    moment.  Okay.

10         We are not claiming otherwise with respect to this

11   case now or if I have the privilege of surviving however many

12   more hurdles there are in this --

13         THE COURT:  Legal gauntlet?

14         MR. O'DONNELL:  It's at least a pentathlon.  My guess is

15   it will be a decathlon when we finish.  But if we get to that

16   hopeful moment for the people of New Orleans and St. Bernard, I

17   think we're going to show that the levees played no part in my

18   clients' damages, that you can allocate and understand these

19   damages under Louisiana law, which is a concurrent causation

20   state.  And the but-for test doesn't apply here because to the

21   extent that there may be proof that some of the damages were

22   caused, say, by rainfall or the failure of a pump to work or even

23   from immune conduct by the government, maybe there was a

24   floodwall somewhere along Reach 1, let's say, and it failed and

25   you say, Well, that was a floodwall, Mr. O'Donnell, like the

1    17th Street Canal, you're going to have to segregate that damage

2    for me.  That would be the case, but I think otherwise in this

3    case, the LPV is irrelevant to my case; it might as well have not

4    been there.

5        THE COURT:  You know, Mr. Smith has eloquently argued

6    the text of the FCA.  It doesn't talk about conduct.  He's

7    saying, I'm writing things into the law.  The immunity is there

8    and it says, Floodwaters.  It doesn't say from where, what, they

9    are not qualified.  Where do I get the legal grist to feed your

10   mill, so to speak?

11       MR. O'DONNELL:  *Central Green*.  *Central Green* is clear

12   that we have to look not whether or not there was necessarily a

13   flood control project, but the character of the waters that

14   caused the relevant damages, and in that case, the purposes for

15   their release.

16       It is stipulated in *Central Green* in the opening

17   paragraphs of the opinion, Your Honor, that this Madera Canal at

18   the Central Valley Project had a flood control function.  In

19   fact, it primarily had one.  It also had an irrigation function.

20   And the problem in that case was the pistachio farmer's property

21   had been flooded.

22       THE COURT:  I'm familiar with the subterranean leaching

23   or actual floodwaters and then trying to figure out what was

24   what.

25       MR. O'DONNELL:  Flooding.  The Supreme Court says his

1  property was flooded.

2      THE COURT:  Wait.  Wasn't your client's property flooded

3  as well?

4      MR. O'DONNELL:  It was, but it's not automatic immunity

5  by virtue of the fact that you can invoke the talisman flood or

6  floodwaters.  That's what *Central Green* says unanimously.

7  Justice Stephens finally got the majority --

8      THE COURT:  Tell me how it says that unanimously.  I

9  need to understand that a little better.  The character of the

10  waters here are clearly floodwaters.  And in this case, you

11  may --

12      MR. O'DONNELL:  But you have to look at why they are

13  floodwaters.  You've said this in maybe all four of your --

14      THE COURT:  Getting back to the nexus.

15      MR. O'DONNELL:  Yes, I think you cannot escape the

16  nexus.  I think the nexus is the only way you can make this

17  statute not absurd.  And by the way, the only way you can

18  harmonize the Federal Torts Claim Act in 1946 and the

19  Flood Control Act of 1928, the only way we can harmonize it is to

20  say, Yes, negligence of a government employee that would

21  otherwise be negligent under Louisiana law will be negligent

22  unless it has a nexus or connection with a flood control project.

23      Here the MRGO, the design, construction, the

24  dredging, the repair, lack of repair and maintenance of the MRGO

25  has nothing to do with a flood control project.

1          THE COURT:  Now, Counsel said, Look, if they were going

2     on at the same time, they were right by each other, we built

3     levees along the MRGO, we even used the detritus or sludge or mud

4     from the MRGO to build the levees.  And you say, of course, they

5     are not related, not even cousins.  And he says they are

6     siblings.

7          MR. O'DONNELL:  I said their DNA doesn't match.

8          THE COURT:  Tell me why there is not a nexus.  In fact,

9     the MRGO is mentioned in the '65 report quite a bit.

10         MR. O'DONNELL:  Mentioned and ignored, but that's okay.

11    Let's go to Tab 7, if you don't mind.

12         THE COURT:  Okay.

13         MR. O'DONNELL:  In the middle of the page I have a

14    little bullet, not inextricably interconnected.  A sidewalk and a

15    street are next to each other.  They were built at the same time.

16    They are as adjacent as some stretches of Reach 2, most of

17    Reach 2 until it turns at Violet in this MRGO.  But no nobody

18    would say that a street is a sidewalk or a sidewalk is street.

19    Indeed, if you drove your car on the sidewalk, you would get a

20    citation.  If you walked in the middle of the street where there

21    wasn't a crosswalk, you would get a citation.

22              My point is a very simple one.  These two projects

23    have merely the coincidence or happenstance that for cost and

24    convenience they took the borrow pit from the dredging of MRGO

25    and used it to build the earthen berms.  They took, by

1    happenstance they took most of the alignment along Reach 2 until

2    they turn in Violet.  That happenstance does not convert this

3    MRGO, a concededly navigational project.

4              And I have to tell Your Honor, how many flip-flops,

5    about-faces does this Court and the plaintiffs have to sustain

6    from this government?  First MRGO was a flood control project.

7    Then when they tried to get their 1292(b) they said, Well, no, we

8    are not saying it's a flood control, we're not saying it's a part

9    of whatever.  Okay.  Now we have the new argument, the new

10   invention, it's inextricably intertwined.  There is no facts.  By

11   the way, you notice that wasn't one of their proposed statements

12   of facts which had evidentiary support.

13        THE COURT:  I did notice you pointed that out on more

14   than one occasion in the papers.

15        MR. O'DONNELL:  We spent a lot of time responding.  It's

16   long and it's detailed, but I tried to pinpoint all of the

17   citations that they make which either don't say what they say or

18   happily say what we say.

19             Many of their uncontested but irrelevant or as a

20   matter of law conceded I think, but I am sure the Court has been

21   through that.  The point I am making is, they don't offer any

22   evidence to support this assertion which appears only in their

23   brief.

24             Number 2, the fact that there is borrowing of the

25   materials from MRGO does not convert the MRGO into a flood

control project.  The rocks that came from Illinois to the extent
they put anything along the banks does not turn that quarry in
Illinois into a flood control project.

        THE COURT:  I agree.  Let me tell you, my concern is
this:  My concern was when I looked at all of this and these
documents, well, first, Mr. Smith's first argument, the text of
the statute.  Number 2, then we get into nexus, and one of my
interests was, did the LPV in its construction contemplate what
might be coming from the MRGO?  And I think that question --

        MR. O'DONNELL:  The answer is categorically no.  The
effects of Lake Pontchartrain --

        THE COURT:  I don't think Mr. Smith has disagreed with
you.

        MR. O'DONNELL:  Thank you.

        THE COURT:  But I think he still argues nexus for the
other reasons he's stated, and his principal argument and one
that really, when it all gets down to it, what does the FCA mean?
Excuse me, yeah, what does the FCA of 1928 mean as of 1936 when
it was amended?  What is it?

        MR. O'DONNELL:  It doesn't mean what the government
literally says it means because the Supreme Court of the
United States has twice said that.  This circuit has said it and
you've said it four times.  I think the last time you said it,
perhaps exasperated that you had to deal with it again, you said,
Until a higher court gives me different guidance, I'm not going

1    to accept the government's argument on the literal language.   So

2    I hope for a fifth time the Court will do that.   But lets move to

3    nexus.   I think that's the issue.

4              The legislative history, the construction of the

5    act to give it a nod so it doesn't have an absurd and draconian

6    effect, as Justice Stevens has been concerned about for a long

7    time, requires that we say there has to be some nexus.   The fact

8    that they are floodwaters, yes.   But why were they floodwaters?

9    The water out in Lake Borgne, that's a surge, okay, according to

10   our experts and a lot of the Court's own documents, which you

11   mentioned there would be a lot more to come if we get to a trial,

12   indicate that that three feet rises up, okay, and my chart very

13   simple, but with record cites on each of them, shows you that we

14   wouldn't have had an event in New Orleans.   We would have said,

15   Oh, my gosh, we had another one of those near misses, we had a

16   little flooding, a pump didn't work over here, 12 inches of

17   rainfall.   We would not have had catastrophic flooding.   And so

18   the nexus here is missing.   In other words, we're not saying, Oh,

19   my gosh, you didn't build the walls 22 feet high.   You would have

20   stopped any flooding.   We're not saying that you should have

21   built it out of something different.   We're not saying anything

22   about the project itself.

23             Number 2, you've mentioned in one of your opinions

24   about floodwaters emanating from the project.

25             THE COURT:   That was in the levee opinion because I was,

1    I knew that we were coming, let me just be candid.  I knew we had

2    this coming up and I wanted to make sure I gave everybody a

3    chance and didn't write you out in the levee opinion.  I remember

4    that phrase very well.

5         MR. O'DONNELL:  I read it with that thought in mind,

6    that there was still a level playing field.

7         THE COURT:  Yes.

8         MR. O'DONNELL:  The fact of the matter is, Your Honor,

9    these floodwaters did not emanate from the project.  There may be

10   some projects that actually exacerbate the flooding.  And there

11   is, you understand from engineering that can happen.  You build

12   it too narrow, you build it a certain way.  We're not complaining

13   of any of those things.  What we're saying is, You built the MRGO

14   wrong.  You were negligent and you knew that you had these three

15   problems that were going to add to the increased surge, okay, and

16   it did it.

17        And, you know, the death knell, which is a phrase

18   you used in your levee opinion, okay, is apropos here.  When they

19   build the LPV, okay, and do not take into account any of the

20   known effects of the MRGO, the death knell for St. Bernard,

21   New Orleans East and the lower Ninth Ward was sounded.

22        And it was sounded year after year for 40 years.

23   This record will overwhelm you, Your Honor, with what the Corps

24   knew and what the Corps consciously disregarded.  Not because

25   they were exercising a discretionary function but because they

1   just chose not to do it, despite the peril to the population and

2   property of this region.

3          Therefore, our claim in this case isn't, You should

4   have built it taller, you should have built it stronger, you

5   should have built it longer, you should have, should have, should

6   have.  That's not what this case is all about.

7          You've concluded that that's what the levee case

8   was about and you've applied the statute.  This is not my case.

9   I have the frigate.  I have the bomber.  I have the nuclear

10  explosion tsunami overwhelming these structures.  But these

11  structures, Your Honor, in our view, there is no nexus.  I'm not

12  complaining that our clients' damages have any relationship to

13  the LPV or its performance.

14      THE COURT:  One other question and then you can go on

15  for anything else you omitted.  What about the policy behind 702c

16  immunity?  Mr. Smith talked about that, and one of the things he

17  mentioned was people built, the levees are built and people

18  built.  Doesn't the fact that the Corps built the levees to

19  protect against flood waters mean it's protected from liability

20  since the purpose behind the immunity is that the government has

21  invested in this kind of object of flood protection, it should

22  not be made to pay when there is a flood that compromises the

23  levee?

24      MR. O'DONNELL:  Mr. Smith's argument reminded me of the

25  movie, one of my favorites, *The Field of Dreams*.

1            THE COURT:  Build it and they will come?

2            MR. O'DONNELL:  Yes, so I guess if you build a levee,

3    they will do housing and commercial development behind it.  That

4    may or may not be true, but it has nothing to do with what the

5    trade-off was in 1928 in Congress when they responded to the

6    crisis of the Great Flood of '27.

7            The government has not responded to my articulation

8    of the legislative history of that act, and the legislative

9    history is clear.  We're going to build these things.  We going

10   to build an integrated system because you need an integrated

11   system.

12           THE COURT:  Is Justice Scalia going to ultimately say,

13   Wait, who cares about the legislative history?  It just says

14   floodwaters.  But go ahead.

15           MR. O'DONNELL:  Well, he was with the unanimous opinion

16   of Justice Stevens in *Central Green*, so hope springs eternal if

17   we ever get to the Supreme Court.  But a foolish hobgoblin of

18   whatever, small minds.

19           The point is that that legislative history is

20   illuminating, and sometimes the Supreme Court and everybody said

21   we're not going to literally apply it.  But they said, Look, once

22   we build it --

23           THE COURT:  In *James,* they did go into it even though

24   they said it was not ambiguous as the Fifth Circuit said, so I --

25           MR. O'DONNELL:  They went into it because what they were

1    showing there was they wanted to establish the connection with a

2    flood control project or a flood control purpose.  That's why

3    *James* was in legislative history.  And that's what that history

4    shows.  What it shows is there was a contract.  Once we do this

5    thing, okay, and it's in place, it's complete.  My third argument

6    for summary judgment for us, and it fails, that's the limit of

7    our liability.  If the flood project fails because of

8    floodwaters, okay, that's it for us.  And I'm sorry, public, but

9    that's what we're going to do.  That's what that means.

10             That's not what's happening here.  What's happening

11   here is, they built it, it wasn't complete, they deviated

12   substantially in eight critical ways which I think destroys the

13   immunity for two other reasons.  But here --

14             THE COURT:  Your first argument is the best.

15             MR. O'DONNELL:  It is best, but hopefully the second two

16   will inform the Court about why nothing has happened since *Graci*.

17             THE COURT:  One of the questions I was going to ask you

18   about that, I think if you were in the process of building it and

19   a flood occurred and it wasn't complete, but I would certainly

20   think you would have immunity, if that's right and you may not

21   think it's right, then why wouldn't the lesser be included, the

22   greater be included in the lesser?

23             MR. O'DONNELL:  I guess is there is a continuum, Your

24   Honor.  If you're still thinking about it and doing design memos,

25   which they did for a long time, would you have immunity?  If you

1   had gone out and put stakes in the ground and say, Here's the

2   alignment, would you have immunity?

3            THE COURT:  I hate to compare this to something but --

4            MR. O'DONNELL:  You see it?

5            THE COURT:  Exactly.

6            MR. O'DONNELL:  Sounds like one of my colleagues

7   yesterday, Your Honor, we talked about this.

8            I understand that but I wanted to make that point

9   both as a separate argument for not getting immunity because

10  that's what the legislative history suggests to me.  If we get

11  the job done and then it doesn't work, we're not going to be held

12  liable.

13           But I have a second ground, which is there are

14  eight critical deviations from the Congressional mandate.  And it

15  is a mandate.  There is mandate which is the authorization to

16  build the standard project hurricane.  And it's not factually

17  disputed in this record, competently disputed that they didn't do

18  those eight things.

19           Now, the Corps says, Oh, but Mr. O'Donnell, we have

20  discretion to substantially deviate.  But there is two

21  limitations which they don't have a response for.

22           First, if you so deviate from the objectives of the

23  LPV that you don't provide a hurricane protection system, even at

24  that one and one hundred SPH level, you shouldn't get the

25  immunity.  And it's not rebutted in this record that they have

1    eviscerated the SPH criteria.  They didn't follow the orders of

2    their commander about using the proper SPH criteria that the

3    National Weather Service said.  They didn't follow the vertical

4    datum that the geodetic people told them to follow.  They didn't

5    armor.  They didn't do a lot things.

6              The other exception which applies here, and you

7    also have to follow any administrative or regulatory procedures

8    if you're going to deviate.  There is nothing in this record that

9    they ever had any environmental assessment, noticed the public.

10   In fact, I have evidence in this record that they lied to the

11   public about the protection.

12        THE COURT:  Is there a case where a flood control

13   project is not granted immunity because it didn't follow all of

14   the, I don't think there is such a case, is there?

15        MR. O'DONNELL:  No, Your Honor, I'm not aware of --

16        THE COURT:  In fact, the cases seem to indicate that the

17   Corps has some discretion to deviate.

18        MR. O'DONNELL:  They have discretion but it's not

19   boundless discretion.  And there is some point in which a

20   discretion becomes anarchy, and I think in this case they cross

21   that line easily at some point over the 40 years that they were

22   working on this project and they never got it to completion.

23             But I make a record on that point, but I think it

24   also sheds light on the policy issues here, Your Honor.  The

25   government should not be rewarded for its conduct here.  And the

1   conclusion of this case that there is no immunity because they

2   haven't shown the appropriate nexus in this case and because

3   floodwaters doesn't mean any old floodwaters, I think it is the

4   correct conclusion, and I think you can be comforted by the fact

5   that there are other substantial reasons that you don't need to

6   get to, I can see you don't need to get to them if we prevail on

7   the first point, would indicate that the Court could say, I don't

8   need to get to those points because I've already ruled on the

9   first issue here that plaintiffs have alleged that their conduct

10  is, that the conduct in question, the negligence and their

11  damages are unrelated to LPV.  It's unrelated to a flood control

12  project.

13          THE COURT:  Thank you, sir.  Anything else?  That's it?

14          MR. O'DONNELL:  Thank you.  One other point, Your Honor.

15  Mr. Bruno reminded me of this.  Besides the independent

16  negligence of what happened with the MRGO, its design,

17  construction, the wetlands, et cetera, we have alleged also that

18  there is an independent act of negligence with regard to a lock

19  expansion project, which would also preclude summary judgment.

20  That's on the east side of the IHNC.  They were going to create a

21  widening of the lock.  They were taking out debris.

22          THE COURT:  I'm well familiar with that.  It wasn't part

23  of your original complaint.  Have you amended it?

24          MR. O'DONNELL:  No, I may, Your Honor, but it's in

25  Dr. Bea's report and we put it in our proposed facts, and we may

1  very well be amending on that.  The government won't stipulate,

2  so I'll probably have to bring him in.

3            But there is a lot of expert disclosure and a lot

4  of documents have been disclosed on that, Your Honor.  But my

5  point is that that would be an independent basis beyond the MRGO

6  itself for that IHNC failure.

7            THE COURT:  I understand.  Mr. Aldock.

8            MR. ALDOCK:  Thank you, Your Honor, John Aldock for

9  Lafarge North America.  I should state at the outset, that our

10  complaint on these points is identical to the *Robinson* complaint,

11  and we stand or fall with the *Robinson* plaintiffs in this

12  argument.

13            Our position on 702 is slightly tweaked in terms of

14  the test from some of what we have heard today.  We, and indeed

15  the *Bell* amicus brief, the AT&T brief, have framed the test

16  slightly differently.  It does not affect any decision Your Honor

17  has made or indeed, but I think it is the right, it is the right

18  way to go.

19            First, the allegedly negligent conduct -- action

20  has to be undertaken as part of the flood control project.

21  That's the statement of the nexus.  The conduct has to be

22  undertaken as part of the flood control project.

23            And second, the damage has to be caused by floods

24  or floodwaters.

25            Now, where do we get that?  We get it directly out

1  of *Graci*.  And it seems to us that *Graci* stands for the doctrine

2  that it articulates.  Not once, not twice, but more than three

3  times *Graci* stated the test in terms of conduct.  And I quote,

4  first, the Court said, "The argument presented by the

5  United States that it was addressing was," *Graci* page 23,

6  "Section 3 of the Flood Control Act affords an absolute immunity

7  from liability for floodwater damage regardless whether the

8  negligence alleged was in connection with a flood project or a

9  navigation project."

10          Second, at page 26 of *Graci*, the Court said, "The

11  question then becomes whether it is reasonable to suppose that in

12  exchange for its entry into flood control projects, the

13  United States demanded complete immunity from liability for the

14  negligent and wrongful acts of its employees unconnected with

15  flood control projects."

16          Judge Heebe answered that it would not be

17  reasonable to so conclude.  Our analysis leads us to agree.  That

18  is the holding and the test of *Graci.*

19          But it did it again on page 27.  There the Court

20  held, "When as here the plaintiffs allege that they have suffered

21  floodwater damage as a result of the negligence of the

22  United States unconnected with any flood control project,

23  Section 3 of the FCA does not bar an action against the

24  United States under the Federal Tort Claims Act."

25          So we submit, *Graci* is on all fours.  *Graci*'s test

1   is articulated numerous times, and the government concedes *Graci*

2   has not been overruled.  And indeed the test in this circuit is

3   that for a district judge, it would have to be clear that the

4   circuit court has been overruled unequivocally by the Supreme

5   Court, and the government concedes that unequivocal is clearly

6   not in the cards here.

7           *James* did not overrule *Graci*.  *James* involved

8   negligent conduct.  The decision in *James* was how to warn of the

9   dangers from a flood control lake.  It was done in connection

10  with a flood control project.

11          We believe *James* repeated, cited with approval and

12  repeated the *Graci* test, but it surely didn't overrule it.  And

13  the issue is whether the negligent act was part of a flood

14  control project.

15          Now, if that's the test, then it's hard to see how

16  we get beyond *Graci*.  *Graci* decided this case.  They decided this

17  exact case.

18          THE COURT:  Well, not the exact case.  There was no LPV.

19  There was no floodwaters encountering the levee, and he didn't

20  have to battle the tension between the FTCA and the Flood Control

21  Act of 1928 as amended.

22          MR. ALDOCK:  We didn't have all of those things,

23  Your Honor, but 702c was never meant to retroactively immunize

24  the government.

25          THE COURT:  That was my question.

1          MR. ALDOCK:  For its prior actions that were not part of

2   flood control.  There is simply no support for the proposition

3   that they could do something later.

4          THE COURT:  Or prospectively.

5          MR. ALDOCK:  Or prospectively.  They can't come along

6   later and do something.  Your Honor has used lots of

7   hypotheticals.  There is one we've used in the briefs that makes

8   the point also.  If you assume the government builds a water

9   tower in the desert for drinking water and it collapses and

10  floods the town, no doubt no immunity there.  So they could fix

11  the tower, but they don't.  Instead, they build levees around the

12  tower, so now we have levees around the tower, and lo and behold,

13  the tower collapses again from the same negligence of before, and

14  floods everybody.  The original negligence, the defective tower,

15  is a substantial factor in the second flood, and therefore, 702

16  does not apply because the original negligence was unconnected to

17  a flood control project.

18          So it doesn't make any difference what they do

19  after the fact.  It has nothing to do with the test.  And their

20  issue, the government responds to Your Honor when Your Honor

21  really probed on that issue with the atomized example.  Well, if

22  you atomize it down, you know, we have this, and we had this, and

23  we had this, I take it, it seems to me the government's position

24  is not really nuclear physics and atomization, the government's

25  position is much closer to a much more basic proposition:  They

are using the smoosh proposition.  If you smoosh it all together
and you don't analyze it as a lawyer and you don't analyze it as
a court, yeah, it all looks like it's got some, they've got
levees, they got flood control.

But if you analyze it separately as we are bound to
do and as *Graci* did, they are separately funded projects, the
levees and the MRGO, they had separate rationales, they had
separate purposes, and they had no relationship in time.  So
smoosh is not the appropriate analyzation.  The appropriate
analyzation is to look at them on their facts just the way *Graci*
did.  And then we come out with, I think, the right answer.

Now, the government's claim is here that somehow we
should show that the government was negligent in building levees
and that somehow that bears on this.  But that is wrong as a
matter of tort law.

THE COURT:  Let me make sure I understand.  As I recall
in the briefing, there has been a lot of it, but in your case,
the government, I think, argued that your complaint may have been
pitched toward negligence which would then yield immunity.  And
you, I think, countered by saying, No, our pitch is like the
*Robinson* pitch.  You might clear that up for me.

MR. ALDOCK:  Your Honor, we amended our complaint and
repled.  And our Count 1 is identical to *Robinson,* and our
Count 2 talks about problems with the levee.

And we do that because we think, frankly, we're

1    entitled, we'll be happy with the segregated water.  We'll be
2    happy with all of the analysis that Mr. O'Donnell does, but we
3    think we're entitled to all of it.  And we think so for this
4    reason:  As a matter of tort law, as long as the government can
5    be held liable based on the particular conduct, the MRGO conduct,
6    it doesn't matter whether it was negligent or not negligent in
7    building the levees.

8            And if Your Honor looks, which we cite in our last
9    brief, in the briefing, the amicus brief in this very proceeding,
10   the Section 437 of the restatement of tort says that if you do a
11   negligent act and it's a substantial factor in causing harm, the
12   MRGO, the fact that you later did another act that was not
13   negligent and you did that other act to try to fix your prior
14   negligence, it does not stop you from being held liable for the
15   original act.  You're liable for the original act and you can't
16   get out of it.  Because after the fact, you try to do something
17   to fix it, whether you screw up the fix or you don't screw up the
18   fix, it either works or it doesn't.  And if it doesn't work, your
19   original negligence is in play and you're liable for the original
20   negligence.

21           And we think what that means is, even if the
22   government was not negligent in building the levees, which does
23   defy belief, it can still be held liable for its earlier
24   negligence and design in building of the MRGO.

25           And I think, Your Honor, for those reasons, it is

1    best that the test be stated in terms of *Graci*.  We think that's

2    what the Fifth Circuit did.  We think it's not been overruled,

3    and we think under that test and under other tests that could be

4    used, that's the best test of the nexus and if we use that test,

5    the result is clear.  Thank you.

6            THE COURT:  Thank you, sir.

7                Since Mr. Smith went first, I'm certainly going to

8    let him go now, and since he had the burden of going first, I'll

9    frankly let all of you talk until you're tired but within certain

10   limits, like maybe 20 more minutes, 30 more minutes because I

11   think we've covered things pretty well, but I'm going to let you

12   counter what's been said since you went first.  And then I'll let

13   them have another rebuttal, and if you want to have the last one,

14   I'll let you have it.

15           MR. SMITH:  I'll be brief, Your Honor.  I'm here to

16   answer questions.  This has been briefed up the wazoo.

17           THE COURT:  I know it has, and I want to compliment you

18   on your conciseness, by the way.

19           MR. SMITH:  Thank you, Your Honor.

20               I want to start with something that Your Honor

21   mentioned as not perhaps the plaintiffs' strongest argument but

22   the argument that, I just don't want it to be unrebutted that

23   somehow the Corps was not still in the process of building these

24   levees when Hurricane Katrina hit, that somehow they had stopped

25   designing levees and that this was just sitting there, nothing

1  going on.

2          Lafarge has submitted an exhibit which, I think,

3  frankly, I just came across this yesterday, rebuts the notion

4  that somehow the Corps had finished levee building and these

5  things were sitting out there in a state of incompletion.

6          It's Document 7742-4, which is Exhibit B.  It's the

7  GAO document, a Government Accountability Office document.

8          On page 10, page 10 as the document was filed, not

9  the internal pagination.  Talking about recent funding of the

10  history, funding history for the project.  And the GAO said,

11  "Appropriations have generally declined from about $15 to

12  $20 million annually in the earlier years to about $5 to

13  $7 million in the last three fiscal years.  While this may not be

14  unusual given the state of completion of the project," in other

15  words, it was close to being finished, "the Corps' project fact

16  sheet from May 2005 noted that the president's budget request for

17  fiscal years 2005 and 2006 in the appropriated amount for fiscal

18  year 2005 were insufficient to fund new construction contracts.

19  Among the construction efforts that could not be funded according

20  to the Corps were the following."  And the very first bullet

21  point is levee enlargements in all four parishes.

22          If this case ever gets to trial, Al Naomi, who was

23  the project manager for the Lake Pontchartrain project, will

24  testify that he was ready to build up those levees higher than

25  they already were because they knew they had settled, over time

 1  they settled because of the poor foundation conditions out there,

 2  but he could not let construction contracts for those levee

 3  enlargements because Congress was not appropriating the funds for

 4  him to do so.

 5          So the notion that somehow these were incomplete

 6  and therefore the government should not get immunity is just not

 7  supported by the record.

 8          But I want to conclude, Your Honor, unless

 9  something else comes up, this will be a conclusion because I

10  don't want to belabor the points that have been made, but

11  Mr. O'Donnell made a big issue about suppose three feet of storm

12  surge that was attributable solely to the MRGO.  We say that

13  that's just false.  It's not supported.  They cite one of our own

14  experts who really basically just made an offhanded comment in a

15  deposition on another subject matter and said he hadn't even

16  studied it himself.

17          The plaintiffs' own experts can't support a number

18  like that.  We asked them that in their own deposition, and they

19  say, Well, that's just a guess.  We don't really know.

20          But be that as it may, what I found most notable

21  about Mr. O'Donnell's presentation was that he made clear that it

22  was the failure of the levees that was the sine qua non of this

23  flood.  Although Mr. O'Donnell asserts that he's not suing for

24  the performance of the levees, for how they were built, his

25  theory of liability is that the MRGO caused the destruction of

1  the levees first by overtopping them, then by eroding them and

2  washing them away.  And that but for the failure of those levees,

3  there would not have been a flood.  There would have been some

4  rainwater that would have accumulated to a foot or two, but apart

5  from the failure of those levees, which as Your Honor, I think,

6  has rightly concluded, surrounded these areas, whether we call

7  them levees or not, and I understand Your Honor understands that

8  argument, it was the MRGO effect, according to plaintiffs'

9  theory, that caused the failure of the LPV in this case, and that

10 led to this flood.

11         That, Your Honor, is the nexus that we believe

12 requires 702c to be brought to bear in this case.  And we would

13 ask that the government's motion to dismiss be granted.

14         THE COURT:  Thank you, Mr. Smith.

15         Mr. O'Donnell.

16         MR. O'DONNELL:  We learned in law school that the

17 plaintiff is the master of the complaint and the Court has

18 acknowledged previously *In re Katrina* ruling that our theory has

19 been articulated.  I'll say it again:  Our primary theory of

20 liability is, and it's an allegation right now, I think I've

21 offered evidence to create the factual issue here that there was

22 three feet of extra surge because of the funnel and because of

23 the loss to the wetlands, point one.

24         That surge made the difference.  It overtopped.

25 Our first theory here is it overtopped.  That's not a failure.

1    The government has, in their own facts, said it performed as
2    expected.  It overtopped.  It's a speed bump.  It's not there.
3    I'm not talking about the failure of the levees in that regard.
4    And a substantial amount, maybe all of my clients' damages can be
5    attributed to the overtopping of the levees.

6              Because of the three feet, Your Honor, the
7    testimony of the experts is, it was earlier, more prolonged, and
8    more intense than it would have been.  And that three feet of
9    flooding leads to 15 to 20 feet of water in my clients' homes.
10   It's not that we're going to say three feet of the water is the
11   MRGO.  It's the three feet is the catastrophic.  It's the
12   linchpin, it's the trigger that causes it.

13             Secondly, there may be a factual dispute on whether
14   the liquid bulldozer, that ferocious surge created by the MRGO,
15   blew out the earthen berms or was a contributing factor in the
16   IHNC to the contributing failures.  That's a second proposition.
17   And the Court has to decide whether my claim, which is that it is
18   the same as the battering ram of the Navy frigate or the
19   dynamiting of the levee.  I don't think you can distinguish those
20   points, but at a minimum I get by summary judgment on the
21   overtopping basis because that's not a failure.  We're ignoring
22   it; it might as well not be there, Your Honor.

23             We filed a cross motion for summary adjudication.
24   And I'm not going to belabor or waste the Court's time on my
25   second and third propositions, but I think on this record the

1    Court could, if it agrees, continues, I believe to adhere to the

2    basic legal principles you have articulated in four decisions

3    already on the issue of 702c, that we not only defeat their

4    motion but we win our motion, and I think the Court understands

5    my point on that, that is there a parity, we've met them on those

6    issues.

7            The Court could decide that maybe there is factual

8    disputes about some aspect of nexus, but we believe there is a

9    clear category here relating to the three feet and the

10   overtopping, that's segregable from anything else that may have

11   caused damage to our client's property.  At least on that basis,

12   I think, we prevail on this case.

13           So I urge the Court either to grant, deny theirs

14   and grant my cross motion or find that there is factual dispute

15   for their motion.

16           Thank you very much for the time, Your Honor.

17           THE COURT:  Thank you.

18           Mr. Aldock, anything else?

19           MR. ALDOCK:  Nothing further, Your Honor.

20           THE COURT:  Mr. Smith, any last words?

21           MR. SMITH:  No, Your Honor.

22           THE COURT:  First I want to compliment all of you for

23   what I feel has been, from the Court's standpoint, an exceptional

24   oral argument, extremely prepared.  All of your clients should be

25   proud and this is why oral argument could be a lot of fun with

1  fine lawyers.  I thank you for it and have a good rest of the

2  week.

3          MR. SMITH:  Thank you.

4          MR. ALDOCK:  Thank you.

5          MR. BRUNO:  Thank you, Judge.

6          (WHEREUPON, at 10:51 a.m. the proceedings were

7  concluded.)

8                          *    *    *

9

10

11                   REPORTER'S CERTIFICATE

12

13      I, Cathy Pepper, Certified Realtime Reporter, Registered

14  Professional Reporter, Certified Court Reporter, Official Court

15  Reporter, United States District Court, Eastern District of

16  Louisiana, do hereby certify that the foregoing is a true and

17  correct transcript, to the best of my ability and understanding,

18  from the record of the proceedings in the above-entitled and

19  numbered matter.

20

21

22                          //s// Cathy Pepper

23                          Cathy Pepper, CCR, RPR, CRR

24                          Official Court Reporter

25                          United States District Court

## $

**$15** [1] - 71:11
**$20** [1] - 71:12

## '

**'27** [1] - 59:6
**'65** [2] - 47:11, 53:9
**'88** [1] - 26:5

## /

**//s** [1] - 76:22

## 0

**0.2** [1] - 46:4
**05-4182** [2] - 1:6, 6:10
**05-4237** [1] - 1:14
**05-5531** [1] - 1:14
**05-5724** [1] - 1:14
**06-2268** [1] - 1:9
**06-5054** [1] - 1:14
**06-5342** [1] - 1:15
**06-6299** [1] - 1:15
**06-7516** [1] - 1:15

## 1

**1** [5] - 44:25, 45:12,
46:3, 50:24, 68:23
**10** [4] - 16:1, 25:1,
71:8
**1000** [1] - 1:24
**1001** [1] - 4:19
**10022** [1] - 3:3
**10337** [1] - 6:12
**10378** [1] - 6:12
**10:51** [1] - 76:6
**11** [2] - 1:8, 6:2
**1100** [1] - 2:2
**12** [2] - 45:20, 56:16
**120** [1] - 2:25
**1205** [1] - 2:15
**1292(b** [1] - 54:7
**15** [3] - 45:20, 46:4,
74:9
**15.2** [1] - 46:4
**17th** [1] - 51:1
**18.2** [1] - 46:3
**1927** [1] - 48:3
**1928** [4] - 52:19,
55:18, 59:5, 66:21
**1936** [1] - 55:18
**1946** [1] - 52:18

**1947** [1] - 47:6
**1958** [1] - 21:25
**1965** [1] - 15:24
**1975** [1] - 10:17
**1988** [1] - 25:2

## 2

**2** [18] - 27:21, 44:25,
46:3, 46:9, 47:14,
47:20, 48:25, 49:7,
49:16, 50:8, 53:16,
53:17, 54:1, 54:24,
55:7, 56:23, 68:24
**2.7** [1] - 45:9
**20** [2] - 70:10, 74:9
**200** [1] - 4:19
**20001** [1] - 4:3
**20044** [1] - 3:25
**2005** [4] - 47:12,
71:16, 71:17, 71:18
**2006** [1] - 71:17
**2008** [2] - 1:8, 6:2
**201** [2] - 2:21, 3:6
**22** [1] - 56:19
**23** [1] - 65:5
**2300** [1] - 5:3
**26** [1] - 65:10
**27** [1] - 65:19
**2715** [1] - 4:6
**2800** [1] - 2:2
**28th** [1] - 22:24
**29th** [1] - 22:25

## 3

**3** [3] - 45:13, 65:6,
65:23
**30** [1] - 70:10
**3123** [1] - 3:9
**316** [1] - 2:18
**325** [1] - 3:2
**32502** [1] - 2:19
**3445** [1] - 4:23
**3600** [1] - 3:6
**3668** [1] - 4:10
**3702** [1] - 2:22

## 4

**4** [1] - 40:23
**40** [3] - 31:5, 57:22,
62:21
**400** [1] - 23:14
**416** [1] - 3:19
**437** [1] - 69:10

## 5

**5** [2] - 46:24, 71:12
**500** [1] - 5:20
**504** [1] - 5:21
**519** [1] - 3:13
**546** [1] - 4:14
**550** [1] - 1:23
**556** [1] - 4:9
**57TH** [1] - 3:2
**589-7779** [1] - 5:21

## 6

**6** [2] - 44:13, 45:19
**600** [1] - 2:18
**601** [1] - 5:3
**602** [1] - 49:9
**610** [1] - 2:12
**650** [1] - 4:6
**695** [1] - 42:5

## 7

**7** [2] - 53:11, 71:13
**70002** [2] - 3:10, 4:24
**701** [1] - 3:16
**70113** [2] - 2:6, 2:12
**70130** [6] - 3:17, 3:20,
4:6, 4:15, 5:4, 5:21
**70163** [1] - 2:3
**70170** [2] - 2:22, 3:7
**702** [2] - 64:13, 67:15
**702c** [25] - 8:21, 9:14,
10:12, 12:2, 13:20,
15:19, 18:8, 18:15,
18:25, 19:1, 19:6,
19:14, 20:24, 30:21,
38:10, 38:16, 39:1,
39:11, 40:20, 43:10,
49:2, 58:15, 66:23,
73:12, 75:3
**70381** [1] - 2:15
**70448** [1] - 2:25
**70502** [1] - 4:10
**70505** [1] - 4:20
**70726** [1] - 3:13
**70809** [1] - 2:9
**7730** [1] - 6:12
**7742-4** [1] - 71:6

## 8

**800** [1] - 4:23
**855** [1] - 2:6
**8710** [1] - 2:9
**888** [1] - 3:25

## 9

**90071** [1] - 1:24
**901** [1] - 4:3
**9:00** [1] - 1:8

## A

**a.m** [1] - 76:6
**A.M** [1] - 1:8
**ability** [1] - 76:17
**able** [1] - 7:8
**about-faces** [1] - 54:5
**above-entitled** [1] -
76:18
**absolute** [1] - 65:6
**absurd** [2] - 52:17,
56:5
**accept** [1] - 56:1
**accidentally** [1] - 14:4
**accidents** [1] - 29:10
**accordance** [3] -
28:11, 28:14, 28:18
**according** [5] - 29:7,
45:18, 56:9, 71:19,
73:8
**Accordingly** [1] -
40:13
**account** [1] - 57:19
**Accountability** [1] -
71:7
**accumulated** [1] -
73:4
**acknowledged** [1] -
73:18
**acres** [1] - 45:17
**acronym** [2] - 12:1,
13:25
**Act** [7] - 33:6, 37:10,
52:18, 52:19, 65:6,
65:24, 66:21
**act** [20] - 11:2, 28:9,
28:14, 32:6, 35:19,
36:7, 36:10, 36:11,
43:2, 48:4, 48:5,
56:5, 59:8, 63:18,
66:13, 69:11, 69:12,
69:13, 69:15
**Action** [1] - 6:10
**action** [5] - 19:1,
23:15, 30:14, 64:19,
65:23
**ACTION** [1] - 1:6
**actions** [1] - 67:1
**activity** [2] - 20:23,
31:20
**acts** [2] - 10:2, 65:14
**actual** [4] - 45:21,

46:4, 46:11, 51:23
**add** [1] - 57:15
**addition** [1] - 46:10
**addressing** [1] - 65:5
**adhere** [1] - 75:1
**adjacent** [2] - 21:20,
53:16
**adjudication** [1] -
74:23
**administrative** [1] -
62:7
**admit** [2] - 28:2, 40:18
**admittedly** [1] - 22:16
**advancing** [1] - 6:16
**affect** [1] - 64:16
**affords** [1] - 65:6
**agencies** [1] - 19:18
**agency** [3] - 19:16,
19:19, 21:20
**ago** [1] - 16:14
**agog** [1] - 38:19
**agree** [9] - 9:15,
28:17, 28:20, 30:18,
35:6, 43:24, 48:11,
55:4, 65:17
**agrees** [1] - 75:1
**ahead** [10] - 9:7,
19:11, 20:8, 20:12,
33:12, 44:15, 46:13,
46:23, 49:8, 59:14
**Air** [1] - 11:5
**AI** [1] - 71:22
**alarming** [1] - 26:9
**Alaska** [1] - 41:6
**ALDOCK** [9] - 4:2,
6:21, 64:8, 66:22,
67:1, 67:5, 68:22,
75:19, 76:4
**Aldock** [4] - 6:21,
64:7, 64:8, 75:18
**alignment** [2] - 54:1,
61:2
**allegation** [1] - 73:20
**allegations** [1] - 45:18
**allege** [2] - 43:7, 65:20
**alleged** [6] - 33:8,
42:9, 42:22, 63:9,
63:17, 65:8
**allegedly** [1] - 64:19
**Allison** [1] - 28:3
**allocate** [2] - 48:10,
50:18
**allow** [1] - 32:19
**alluded** [2] - 18:14,
27:10
**alluding** [1] - 15:1
**allusion** [1] - 16:10
**almost** [1] - 44:22
**alone** [1] - 18:9
**ALSO** [1] - 5:6

**ambiguous** [1] - 59:24
**amended** [4] - 55:19, 63:23, 66:21, 68:22
**amending** [1] - 64:1
**AMERICA** [2] - 3:22, 4:1
**America** [3] - 6:22, 41:21, 64:9
**AMERICAN** [1] - 5:2
**amici** [2] - 30:18, 35:1
**amicus** [2] - 64:15, 69:9
**amount** [3] - 46:16, 71:17, 74:4
**analysis** [5] - 30:21, 38:11, 48:4, 65:17, 69:2
**analyzation** [2] - 68:9, 68:10
**analyze** [5] - 12:12, 35:4, 68:2, 68:5
**analyzed** [2] - 13:11, 36:7
**anarchy** [1] - 62:20
**ANDRY** [2] - 2:11, 2:11
**ANGELES** [1] - 1:24
**annually** [1] - 71:12
**answer** [20] - 9:20, 17:11, 17:12, 19:9, 19:10, 19:11, 20:12, 29:15, 29:20, 31:1, 33:12, 36:2, 40:8, 41:1, 41:2, 42:2, 44:19, 55:10, 68:11, 70:16
**answered** [4] - 7:19, 13:19, 22:14, 60:16
**answers** [1] - 21:22
**anticipate** [1] - 40:25
**ANZELMO** [2] - 4:21, 4:22
**apart** [3] - 20:1, 21:12, 73:4
**appeal** [1] - 39:4
**appeals** [2] - 38:18, 38:24
**appear** [1] - 21:9
**APPEARANCES** [1] - 1:21
**appearances** [1] - 6:13
**APPEARING** [1] - 5:6
**appearing** [1] - 6:22
**application** [1] - 30:21
**applied** [1] - 58:8
**applies** [1] - 62:6
**apply** [5] - 10:13, 39:14, 50:20, 59:21, 67:16

**appreciate** [1] - 25:15
**approached** [1] - 18:24
**approaches** [1] - 18:6
**appropriate** [5] - 22:9, 29:3, 63:2, 68:9
**appropriated** [1] - 71:17
**appropriating** [1] - 72:3
**Appropriations** [1] - 71:11
**approval** [1] - 66:11
**approvingly** [1] - 48:25
**April** [1] - 15:5
**apropos** [1] - 57:18
**area** [7] - 21:15, 24:1, 25:5, 26:15, 31:7, 31:9, 45:15
**areas** [1] - 73:6
**arguably** [1] - 42:7
**argue** [3] - 30:10, 33:5, 34:19
**argued** [3] - 14:13, 51:5, 68:18
**argues** [1] - 55:15
**arguing** [1] - 6:15
**argument** [25] - 7:1, 7:13, 28:4, 28:6, 35:18, 39:18, 46:13, 48:16, 49:4, 50:6, 54:9, 55:6, 55:16, 56:1, 58:24, 60:5, 64:5, 70:21, 70:22, 73:8, 75:24, 75:25
**arguments** [2] - 9:16, 30:17
**armor** [4] - 26:6, 26:18, 26:19, 62:5
**armoring** [4] - 26:24, 27:19, 42:25
**Armoring** [2] - 26:24, 27:4
**Army** [1] - 48:2
**array** [1] - 38:25
**arrows** [1] - 45:13
**article** [1] - 22:15
**articulated** [4] - 41:18, 66:1, 73:19, 75:2
**articulates** [1] - 65:2
**articulation** [1] - 59:7
**AS** [1] - 1:12
**ASHLEY** [1] - 5:10
**aside** [1] - 22:8
**aspect** [1] - 75:8
**assertion** [1] - 54:22
**asserts** [1] - 72:23
**assessment** [1] - 62:9

**assists** [1] - 7:13
**ASSOCIATES** [2] - 1:22, 4:8
**association** [1] - 13:12
**assume** [4] - 30:22, 37:15, 48:5, 67:8
**assuming** [1] - 30:9
**assumption** [1] - 50:8
**AT** [2] - 2:24, 3:9
**AT&T** [1] - 64:15
**atom** [2] - 20:6, 20:16
**atomic** [1] - 21:19
**atomization** [1] - 67:24
**atomize** [3] - 19:16, 20:2, 67:22
**atomized** [1] - 67:21
**attacked** [1] - 26:15
**attacks** [1] - 26:15
**attempt** [2] - 11:19, 14:9
**attempting** [1] - 21:14
**attenuated** [3] - 13:5, 13:24, 15:7
**ATTORNEY** [2] - 2:24, 3:9
**attorneys** [1] - 6:13
**attributable** [1] - 72:12
**attributed** [1] - 74:5
**August** [1] - 22:24
**authorization** [1] - 61:15
**authorized** [6] - 12:24, 17:24, 18:3, 28:10, 32:4, 48:6
**automatic** [1] - 52:4
**available** [1] - 32:20
**AVENUE** [4] - 2:21, 3:6, 3:13, 4:3
**aware** [3] - 11:19, 33:13, 62:15
**awareness** [1] - 16:10

# B

**B406** [1] - 5:20
**ba** [1] - 48:3
**ba-boom** [1] - 48:3
**backwards** [1] - 37:3
**BAKER** [1] - 3:4
**bank** [3] - 26:7, 26:10, 26:11
**banks** [4] - 23:3, 23:18, 25:5, 55:2
**bar** [1] - 65:23
**BARGE** [2] - 1:11, 1:11

**BARONNE** [2] - 2:6, 2:12
**bars** [1] - 19:1
**based** [3] - 30:9, 39:4, 69:5
**basic** [2] - 67:25, 75:2
**basis** [4] - 38:4, 64:5, 74:21, 75:11
**BATON** [1] - 2:9
**batter** [1] - 23:18
**battering** [2] - 47:18, 74:18
**battle** [2] - 43:21, 66:20
**bay** [1] - 14:4
**BAYLEN** [1] - 2:18
**Bea's** [1] - 63:25
**bear** [2] - 31:17, 73:12
**bearing** [2] - 22:11, 22:12
**BEARMAN** [1] - 3:4
**bears** [1] - 68:14
**became** [2] - 28:8, 32:22
**become** [1] - 15:11
**becomes** [2] - 62:20, 65:11
**bed** [1] - 11:24
**BEFORE** [1] - 1:18
**began** [2] - 31:5, 34:14
**begin** [1] - 6:24
**beginning** [3] - 23:25, 30:2, 42:3
**begins** [1] - 40:11
**behind** [5] - 35:2, 40:16, 58:15, 58:20, 59:3
**behold** [1] - 67:12
**beholder** [1] - 44:7
**belabor** [2] - 72:10, 74:24
**belief** [1] - 69:23
**Bell** [1] - 64:15
**below** [1] - 33:18
**BEN** [1] - 4:18
**benefit** [1] - 20:24
**BENJAMIN** [2] - 2:1, 3:24
**BERKOWITZ** [1] - 3:5
**berms** [4] - 23:23, 47:15, 53:25, 74:15
**Bernard** [3] - 31:6, 50:16, 57:20
**beside** [3] - 12:23, 12:25, 19:21
**best** [5] - 60:14, 60:15, 70:1, 70:4, 76:17
**Betsy** [2] - 17:12,

17:25
**better** [4] - 8:14, 19:8, 45:6, 52:9
**between** [18] - 9:1, 10:1, 13:2, 13:3, 13:12, 14:10, 14:24, 15:17, 16:5, 21:23, 26:23, 30:1, 32:13, 32:20, 38:5, 39:5, 46:19, 66:20
**bewildering** [1] - 38:25
**beyond** [3] - 12:19, 64:5, 66:16
**big** [1] - 72:11
**bill** [1] - 26:2
**bit** [4] - 14:6, 14:7, 31:23, 53:9
**blew** [1] - 74:15
**blow** [1] - 48:3
**BOARD** [2] - 4:17, 5:1
**boater** [1] - 21:2
**body** [1] - 32:25
**Boggs** [2] - 38:19, 38:24
**boiled** [1] - 25:18
**bomb** [3] - 14:4, 15:3
**bomber** [3] - 14:3, 41:4, 58:9
**book** [1] - 40:23
**boom** [1] - 48:3
**Borgne** [9] - 16:5, 23:17, 25:7, 26:10, 26:12, 26:15, 45:16, 56:9
**borrow** [1] - 53:24
**borrowing** [1] - 54:24
**Boudreau** [7] - 13:9, 14:7, 14:15, 21:1, 21:7, 39:15
**BOULEVARD** [2] - 2:15, 4:23
**bound** [1] - 68:5
**boundaries** [1] - 33:7
**boundary** [1] - 33:9
**boundless** [1] - 62:19
**BOX** [2] - 3:25, 4:10
**BRANCH** [1] - 3:24
**breach** [1] - 47:25
**breached** [2] - 26:11
**BREACHES** [1] - 1:5
**Breaches** [1] - 6:11
**breaches** [1] - 47:21
**breadth** [2] - 38:16, 42:9
**BRENDAN** [1] - 3:2
**Bretschneider** [1] - 17:18
**brief** [6] - 54:23, 64:15, 69:9, 70:15

**briefed** [1] - 70:16
**briefing** [4] - 7:4, 28:2, 68:17, 69:9
**briefs** [3] - 8:1, 67:7
**bring** [2] - 31:16, 64:2
**brings** [1] - 32:13
**broad** [3] - 18:17, 36:25, 38:20
**broader** [1] - 9:10
**broadly** [4] - 21:4, 33:14, 36:15, 37:1
**broke** [2] - 11:4, 23:1
**BROOKS** [1] - 5:12
**brought** [1] - 73:12
**BRUNO** [4] - 2:5, 2:5, 76:5
**Bruno** [1] - 63:15
**BUCHLER** [1] - 5:8
**budget** [1] - 71:16
**buffering** [1] - 45:9
**Build** [2] - 12:25, 59:1
**build** [20] - 17:19, 18:3, 19:25, 25:24, 32:18, 41:21, 50:7, 53:4, 53:25, 56:19, 57:11, 57:12, 57:19, 59:2, 59:9, 59:10, 59:22, 61:16, 67:11, 71:24
**building** [11] - 16:22, 17:7, 21:16, 26:25, 60:18, 68:13, 69:7, 69:22, 69:24, 70:23, 71:4
**builds** [3] - 31:2, 31:8, 67:8
**built** [16] - 32:1, 32:15, 43:4, 53:2, 53:15, 56:21, 57:13, 58:4, 58:5, 58:17, 58:18, 60:11, 72:24
**bulldozer** [4] - 45:14, 47:17, 48:10, 74:14
**bullet** [2] - 53:14, 71:20
**bump** [2] - 49:15, 74:2
**burden** [2] - 18:10, 70:8
**businesses** [1] - 41:10
**but-for** [1] - 50:20
**BY** [21] - 2:2, 2:5, 2:8, 2:11, 2:14, 2:18, 2:21, 3:1, 3:5, 3:12, 3:15, 3:19, 3:23, 4:2, 4:5, 4:9, 4:13, 4:18, 4:22, 5:22, 5:23

## C

**CA** [1] - 1:24
**cafeteria** [1] - 41:9
**CALDWELL** [1] - 3:4
**calibrate** [1] - 7:12
**CALLED** [1] - 6:4
**CALVIN** [1] - 3:12
**CANAL** [1] - 1:4
**canal** [4] - 33:20, 33:25, 34:1, 34:6, 34:12
**Canal** [5] - 6:11, 33:17, 33:21, 51:1, 51:17
**canals** [1] - 25:16
**Canarvon** [1] - 48:2
**candid** [1] - 57:1
**cannot** [2] - 9:10, 52:15
**Cantrell** [1] - 38:24
**cap** [1] - 27:5
**car** [2] - 38:24, 53:19
**cards** [1] - 66:6
**care** [2] - 41:4, 41:5
**cares** [1] - 59:13
**CARONDELET** [1] - 4:14
**carve** [1] - 37:25
**case** [55] - 7:22, 9:9, 9:11, 9:24, 10:4, 10:6, 10:24, 11:13, 13:14, 13:16, 18:15, 22:12, 23:8, 27:13, 28:23, 33:7, 33:8, 33:11, 33:13, 34:23, 35:11, 36:14, 39:4, 42:5, 42:6, 42:7, 43:12, 45:6, 46:22, 48:24, 49:12, 50:11, 51:2, 51:3, 51:14, 51:20, 52:10, 58:3, 58:6, 58:7, 58:8, 62:12, 62:14, 62:20, 63:1, 63:2, 66:16, 66:17, 66:18, 68:17, 71:22, 73:9, 73:12, 75:12
**cases** [10] - 13:9, 13:11, 13:15, 21:1, 21:13, 22:20, 38:13, 39:14, 41:14, 62:16
**catastrophic** [6] - 47:3, 47:7, 47:11, 47:16, 56:17, 74:11
**catch** [1] - 30:2
**categorically** [1] - 55:10
**categories** [2] - 37:25,
38:1
**category** [1] - 75:9
**Cathy** [3] - 76:13, 76:22, 76:23
**CATHY** [1] - 5:20
**causation** [5] - 16:18, 18:12, 42:8, 45:1, 50:19
**causative** [1] - 48:1
**caused** [25] - 11:2, 12:15, 22:19, 23:7, 23:11, 23:16, 26:6, 31:10, 34:13, 40:16, 40:18, 43:8, 43:14, 43:22, 47:3, 47:6, 47:17, 48:13, 49:2, 50:22, 51:14, 64:23, 72:25, 73:9, 75:11
**causes** [1] - 74:12
**CAUSEWAY** [1] - 4:23
**causing** [3] - 14:11, 14:14, 69:11
**CAYCE** [1] - 5:7
**CCR** [2] - 5:20, 76:23
**CENTER** [2] - 4:18, 5:2
**Central** [29] - 8:19, 8:24, 9:3, 10:8, 13:10, 14:18, 18:18, 21:8, 33:15, 33:18, 33:22, 33:24, 34:17, 34:18, 34:22, 35:9, 38:12, 38:15, 38:17, 39:2, 40:12, 42:6, 43:25, 51:11, 51:16, 51:18, 52:6, 59:16
**CENTRE** [1] - 2:3
**certain** [6] - 15:12, 20:15, 25:21, 37:12, 57:12, 70:9
**Certainly** [1] - 20:8
**certainly** [8] - 15:12, 27:21, 33:11, 35:13, 35:16, 36:10, 60:19, 70:7
**CERTIFICATE** [1] - 76:11
**Certified** [2] - 76:13, 76:14
**certify** [1] - 76:16
**cetera** [1] - 63:17
**challenged** [2] - 30:1, 33:16
**challenging** [1] - 19:14
**Chalmette** [4] - 16:22, 17:7, 23:20, 47:23
**chance** [2] - 39:19, 57:3
**channel** [3] - 26:6,

26:12, 26:13
**character** [13] - 12:11, 15:2, 15:9, 21:8, 22:23, 23:1, 23:6, 35:4, 39:10, 40:14, 40:15, 51:13, 52:9
**characterized** [3] - 12:14, 12:15, 49:1
**characterizing** [1] - 23:5
**charged** [1] - 22:16
**CHARLES** [3] - 2:21, 3:6, 5:2
**chart** [2] - 45:19, 56:12
**charts** [1] - 44:20
**chief** [1] - 28:11
**children** [1] - 44:18
**choice** [1] - 32:23
**chose** [1] - 58:1
**Chow** [1] - 41:8
**CHRISTOVICH** [1] - 5:1
**Circuit** [9] - 10:16, 10:18, 10:22, 38:19, 49:4, 59:24, 70:2
**circuit** [2] - 55:22, 66:2, 66:4
**Circuit's** [2] - 13:9, 21:1
**citation** [2] - 53:20, 53:21
**citations** [1] - 54:17
**cite** [4] - 36:23, 47:1, 69:8, 72:13
**cited** [2] - 26:23, 66:11
**cites** [3] - 36:24, 48:25, 56:13
**citizen** [1] - 22:8
**CITY** [1] - 2:15
**city** [3] - 14:4, 15:11, 48:3
**CIVIL** [2] - 1:6, 3:24
**Civil** [1] - 6:10
**claim** [4] - 49:18, 58:3, 68:12, 74:17
**Claim** [1] - 52:18
**claiming** [1] - 50:10
**Claims** [1] - 65:24
**claims** [1] - 17:25
**clay** [1] - 27:6
**clear** [11] - 23:24, 23:25, 37:14, 41:18, 51:11, 59:9, 66:3, 68:21, 70:5, 72:21, 75:9
**clearly** [5] - 18:7, 21:9, 40:19, 52:10, 66:5
**CLERK** [2] - 6:7, 6:10
**client's** [2] - 52:2,

75:11
**clients** [2] - 49:19, 75:24
**clients'** [4] - 50:18, 58:12, 74:4, 74:9
**close** [3] - 26:10, 29:25, 71:15
**closer** [1] - 67:25
**clue** [2] - 14:21, 35:3
**Coast** [2] - 10:17, 10:23
**coincidence** [1] - 53:23
**collapses** [2] - 67:9, 67:13
**colleagues** [1] - 61:6
**Collins** [1] - 17:18
**colloquy** [1] - 14:10
**combination** [1] - 27:8
**comforted** [1] - 63:4
**coming** [3] - 55:9, 57:1, 57:2
**commander** [2] - 62:2
**comment** [2] - 23:9, 72:14
**comments** [1] - 16:2
**commercial** [4] - 22:18, 22:20, 22:22, 59:3
**commissioned** [1] - 17:13
**COMMISSIONERS** [1] - 4:17
**COMPANY** [1] - 1:12
**compare** [1] - 61:3
**compared** [1] - 32:9
**competently** [1] - 61:17
**complaining** [2] - 57:12, 58:12
**complaint** [8] - 21:25, 29:7, 63:23, 64:10, 68:18, 68:22, 73:17
**COMPLAINT** [1] - 1:11
**complete** [5] - 41:22, 60:5, 60:11, 60:19, 65:13
**completed** [1] - 12:1
**completely** [1] - 29:10
**completion** [2] - 62:22, 71:14
**complied** [1] - 28:16
**compliment** [2] - 70:17, 75:22
**comprehensible** [1] - 39:12
**compromise** [1] - 11:10
**compromised** [1] - 29:11

**compromises** [1] - 58:22
**COMPUTER** [1] - 5:23
**concede** [1] - 10:7
**conceded** [2] - 34:17, 54:20
**concededly** [1] - 54:3
**concedes** [2] - 66:1, 66:5
**conceding** [2] - 34:15, 48:12
**concept** [2] - 14:18, 28:18
**concern** [2] - 55:4, 55:5
**concerned** [5] - 15:23, 30:7, 30:8, 31:24, 56:6
**conciseness** [1] - 70:18
**conclude** [3] - 16:13, 65:17, 72:8
**concluded** [4] - 16:13, 58:7, 73:6, 76:7
**conclusion** [3] - 63:1, 63:4, 72:9
**concrete** [1] - 27:7
**concurrent** [1] - 50:19
**conditions** [1] - 72:1
**conduct** [47] - 12:4, 12:20, 12:21, 12:22, 13:2, 13:3, 13:12, 15:7, 15:17, 19:6, 19:14, 20:2, 20:18, 21:23, 30:1, 31:10, 31:15, 32:14, 33:14, 33:16, 34:4, 34:23, 34:24, 35:22, 37:12, 38:3, 38:9, 38:11, 38:25, 39:5, 39:16, 42:1, 43:3, 50:23, 51:6, 62:25, 63:9, 63:10, 64:19, 64:21, 65:3, 66:8, 69:5
**conducting** [1] - 11:21
**conduit** [4] - 16:11, 19:20, 21:17, 22:1
**conferred** [2] - 40:14, 49:5
**confers** [1] - 8:21
**conflation** [1] - 26:23
**confront** [2] - 10:11, 11:10
**confused** [1] - 24:11
**Congress** [7] - 18:3, 28:8, 30:24, 31:17, 41:21, 59:5, 72:3
**Congressional** [1] - 61:14
**connected** [3] - 8:21,

41:11, 49:6
**connection** [11] - 9:13, 9:18, 9:19, 10:1, 10:19, 31:11, 32:13, 52:22, 60:1, 65:8, 66:9
**consciously** [1] - 57:24
**consider** [1] - 22:19
**consideration** [2] - 16:21, 17:6
**considerations** [1] - 35:25
**CONSOLIDATED** [1] - 1:5
**Consolidated** [1] - 6:11
**constantly** [1] - 20:19
**construct** [1] - 11:20
**constructed** [5] - 30:11, 30:20, 30:23, 31:6
**construction** [9] - 34:6, 34:12, 52:23, 55:8, 56:4, 63:17, 71:18, 71:19, 72:2
**construed** [2] - 18:21, 37:1
**contact** [2] - 42:13, 48:19
**contained** [1] - 32:6
**contemplate** [1] - 55:8
**contemplated** [1] - 24:22
**contend** [1] - 8:19
**contended** [2] - 33:19, 49:2
**contends** [1] - 50:5
**contention** [1] - 49:23
**context** [1] - 47:25
**continued** [1] - 18:3
**continues** [2] - 27:12, 75:1
**continuing** [3] - 16:21, 17:7, 27:3
**continuum** [1] - 60:23
**contract** [2] - 41:20, 60:4
**contracts** [2] - 71:18, 72:2
**contributed** [1] - 47:20
**contributing** [3] - 48:1, 74:15, 74:16
**control** [85] - 8:22, 8:25, 9:2, 9:9, 9:13, 9:18, 9:19, 10:2, 10:4, 10:5, 10:14, 10:19, 10:25, 11:3, 11:11, 12:1, 12:20,

13:13, 14:19, 15:10, 17:20, 19:6, 20:18, 20:20, 20:22, 20:23, 21:2, 21:3, 21:4, 21:21, 21:23, 23:19, 24:2, 27:24, 30:1, 31:2, 31:4, 31:9, 31:11, 31:13, 31:16, 31:18, 31:20, 32:14, 33:14, 33:20, 33:25, 34:6, 34:25, 35:5, 35:11, 37:22, 37:23, 38:5, 38:7, 41:11, 41:22, 41:24, 43:3, 49:3, 49:6, 51:13, 51:18, 52:22, 52:25, 54:6, 54:8, 55:1, 55:3, 60:2, 62:12, 63:11, 64:20, 64:22, 65:12, 65:15, 65:22, 66:9, 66:10, 66:14, 67:2, 67:17, 68:4
**Control** [5] - 33:6, 37:10, 52:19, 65:6, 66:20
**conundrum** [1] - 46:20
**convenience** [1] - 53:24
**convert** [2] - 54:2, 54:25
**converted** [1] - 26:16
**convey** [1] - 16:11
**copy** [1] - 45:2
**Corp** [1] - 17:6
**Corps** [23] - 11:5, 16:21, 17:13, 17:18, 18:1, 18:2, 21:25, 22:3, 22:10, 25:13, 32:15, 32:16, 32:18, 32:24, 48:2, 57:23, 57:24, 58:18, 61:19, 62:17, 70:23, 71:4, 71:20
**Corps'** [4] - 25:20, 46:19, 47:1, 71:15
**correct** [2] - 63:4, 76:17
**cost** [3] - 25:22, 41:24, 53:23
**cost-effective** [1] - 25:22
**costly** [1] - 26:1
**costs** [1] - 26:13
**Counsel** [1] - 53:1
**counsel** [2] - 40:8, 48:18
**Count** [2] - 68:23, 68:24
**counter** [2] - 29:21,

70:12
**countered** [1] - 68:20
**couple** [2] - 21:10, 22:20
**course** [2] - 36:21, 53:4
**court** [6] - 9:25, 29:3, 33:19, 55:25, 66:4, 68:3
**COURT** [121] - 1:1, 5:20, 6:4, 6:8, 6:13, 6:17, 6:20, 6:23, 8:18, 9:7, 9:15, 11:1, 11:7, 11:14, 12:6, 12:9, 12:17, 13:4, 13:17, 15:18, 16:6, 16:18, 17:5, 18:5, 19:8, 19:10, 20:5, 20:8, 20:11, 21:6, 22:6, 22:15, 23:21, 24:5, 24:8, 24:20, 25:4, 25:9, 26:4, 27:16, 27:23, 28:17, 28:22, 29:17, 29:19, 29:23, 30:4, 30:9, 31:21, 33:2, 34:19, 35:6, 35:13, 36:5, 36:9, 36:17, 36:21, 37:5, 37:9, 38:22, 39:18, 39:22, 40:2, 40:4, 40:11, 40:24, 42:16, 43:9, 43:18, 44:1, 44:3, 44:5, 44:8, 44:15, 44:22, 45:2, 45:24, 46:6, 46:12, 46:20, 48:16, 49:8, 49:22, 50:13, 51:5, 51:22, 52:2, 52:8, 52:14, 53:1, 53:8, 53:12, 54:13, 55:4, 55:12, 55:15, 56:25, 57:7, 58:14, 59:1, 59:12, 59:23, 60:14, 60:17, 61:3, 61:5, 62:12, 62:16, 63:13, 63:22, 64:7, 66:18, 66:25, 67:4, 68:16, 70:6, 70:17, 73:14, 75:17, 75:20, 75:22
**Court** [52] - 7:2, 7:13, 8:7, 8:11, 9:5, 9:12, 9:17, 10:8, 14:9, 16:13, 18:8, 18:24, 22:19, 23:23, 29:1, 29:17, 34:3, 34:8, 36:14, 36:23, 37:18, 39:2, 39:7, 40:12, 46:21, 48:9, 49:4, 51:25, 54:5, 54:20,

55:21, 56:2, 59:17, 59:20, 60:16, 63:7, 65:4, 65:10, 65:19, 66:5, 73:17, 74:17, 75:1, 75:4, 75:7, 75:13, 76:14, 76:15, 76:24, 76:25
**Court's** [6] - 7:5, 11:19, 40:1, 56:10, 74:24, 75:23
**Courts** [1] - 38:18
**courts** [8] - 7:7, 36:3, 38:15, 38:24, 39:3, 39:8, 41:13
**cousins** [1] - 53:5
**covered** [1] - 70:11
**crack** [2] - 9:6, 9:7
**create** [2] - 63:20, 73:21
**created** [4] - 11:25, 12:4, 12:13, 74:14
**creates** [1] - 32:13
**creating** [3] - 15:22, 16:11, 22:1
**crisis** [1] - 59:6
**criteria** [2] - 62:1, 62:2
**critical** [3] - 47:14, 60:12, 61:14
**cross** [3] - 62:20, 74:23, 75:14
**crosswalk** [1] - 53:21
**CRR** [2] - 5:20, 76:23
**cue** [1] - 39:7
**culprit** [1] - 45:22
**cumbersome** [1] - 14:1
**CUMMINGS** [2] - 3:18
**cut** [2] - 38:16, 38:17
**cypress** [2] - 45:9, 47:9

### D

**D.C** [1] - 3:25
**Dalehite** [2] - 36:14, 36:25
**Dalrymple** [1] - 45:5
**Dalrymple's** [1] - 47:1
**damage** [19] - 12:2, 12:15, 15:9, 18:23, 23:11, 23:12, 23:13, 29:6, 30:12, 40:16, 40:19, 42:7, 43:22, 44:11, 51:1, 64:23, 65:7, 65:21, 75:11
**damages** [18] - 13:13, 23:7, 30:3, 31:10, 31:12, 34:10, 34:12, 39:12, 39:14, 46:16,

49:2, 50:18, 50:19, 50:21, 51:14, 58:12, 63:11, 74:4
**DAMPIOS** [1] - 5:16
**danger** [1] - 27:14
**dangerously** [1] - 26:10
**dangers** [1] - 66:9
**DANIEL** [1] - 4:5
**datum** [1] - 62:4
**DAVID** [1] - 2:1
**DC** [1] - 4:3
**de** [1] - 16:17
**deal** [2] - 20:6, 55:24
**dealing** [3] - 20:5, 44:17, 49:24
**death** [2] - 57:17, 57:20
**debris** [1] - 63:21
**decathlon** [1] - 50:15
**decide** [5] - 7:6, 9:23, 14:15, 74:17, 75:7
**decided** [5] - 11:9, 38:18, 39:4, 66:16
**decimation** [1] - 45:16
**decision** [3] - 29:3, 64:16, 66:8
**decisions** [1] - 75:2
**declined** [1] - 71:11
**defalcated** [1] - 27:25
**defalcation** [2] - 42:9, 42:18
**defalcations** [1] - 18:16
**defeat** [1] - 75:3
**defective** [1] - 67:14
**definitely** [1] - 36:18
**definitive** [1] - 41:2
**defy** [1] - 69:23
**demanded** [1] - 65:13
**demonstrate** [2] - 15:20, 17:6
**DENHAM** [1] - 3:13
**denuded** [1] - 49:16
**deny** [3] - 21:14, 42:23, 75:13
**DEPARTMENT** [1] - 3:22
**depicted** [1] - 45:12
**depo** [1] - 47:2
**deposition** [2] - 72:15, 72:18
**depth** [1] - 25:21
**DEPUTY** [2] - 6:7, 6:10
**describe** [1] - 21:21
**desert** [1] - 67:9
**design** [6] - 15:21, 33:17, 52:23, 60:24,

63:16, 69:24
**designed** [1] - 11:25
**designing** [1] - 70:25
**despite** [1] - 58:1
**destroy** [3] - 15:4, 15:15, 23:19
**destroyed** [4] - 14:5, 29:11, 41:7, 45:8
**destroys** [1] - 60:12
**destruction** [4] - 16:24, 17:10, 45:4, 72:25
**detail** [1] - 28:15
**detailed** [1] - 54:16
**determine** [1] - 40:14
**determined** [2] - 17:22, 22:4
**determining** [1] - 9:12
**detritus** [1] - 53:3
**develop** [1] - 7:10
**development** [4] - 26:14, 32:21, 32:22, 59:3
**deviate** [4] - 61:20, 61:22, 62:8, 62:17
**deviated** [1] - 60:11
**deviations** [1] - 61:14
**device** [1] - 11:24
**DFE** [1] - 18:11
**difference** [7] - 15:13, 34:5, 44:20, 47:12, 48:14, 67:18, 73:24
**different** [14] - 8:3, 8:4, 15:12, 17:20, 17:21, 18:6, 19:17, 20:10, 21:7, 28:1, 44:19, 55:25, 56:21
**differently** [2] - 39:4, 64:16
**difficult** [3] - 9:10, 9:24, 19:11
**digging** [3] - 19:19, 19:20, 19:22, 21:17
**direct** [3] - 14:2, 26:14
**directions** [1] - 44:19
**directly** [1] - 64:25
**directs** [1] - 40:13
**dirt** [5] - 19:21, 19:22, 19:23, 19:25
**disagree** [2] - 43:16, 43:19
**disagreed** [2] - 45:24, 55:12
**disappearing** [1] - 26:8
**disbelief** [1] - 50:6
**disclosed** [1] - 64:4
**disclosure** [1] - 64:3
**discretion** [5] - 61:20, 62:17, 62:18, 62:19,

62:20
**discretionary** [3] - 36:15, 36:24, 57:25
**discussed** [1] - 18:18
**discusses** [1] - 15:25
**dismiss** [1] - 73:13
**Dismiss** [1] - 42:4
**dismissal** [1] - 19:14
**dispositive** [1] - 48:14
**dispute** [3] - 46:18, 74:13, 75:14
**disputed** [2] - 29:8, 61:17
**disputes** [1] - 75:8
**disregarded** [1] - 57:24
**dissent** [1] - 14:10
**distance** [2] - 24:14, 24:18
**distillation** [1] - 7:7
**distinguish** [2] - 12:21, 74:19
**distinguishable** [1] - 11:13
**District** [3] - 76:15, 76:25
**district** [3] - 28:7, 28:15, 66:3
**DISTRICT** [3] - 1:1, 1:2, 4:17
**DIVISION** [1] - 3:24
**DNA** [1] - 53:7
**doctrine** [2] - 48:23, 65:1
**Document** [2] - 6:12, 71:6
**document** [2] - 71:7, 71:8
**documents** [6] - 16:20, 17:5, 18:4, 55:6, 56:10, 64:4
**DOMENGEAUX** [1] - 4:8
**done** [2] - 61:11, 66:9
**DONELSON** [1] - 3:4
**doubt** [1] - 67:10
**down** [4] - 25:18, 45:10, 55:17, 67:22
**Down** [1] - 41:8
**downstairs** [2] - 41:7, 41:8
**Dr** [2] - 45:5, 63:25
**draconian** [1] - 56:5
**Dreams** [1] - 58:25
**dredging** [8] - 12:23, 13:1, 19:19, 25:22, 26:13, 30:25, 52:24, 53:24
**drinking** [1] - 67:9
**DRIVE** [1] - 3:9

**driven** [1] - 32:10
**drop** [2] - 15:3, 32:8
**drove** [1] - 53:19
**DUDENHEFER** [2] - 3:18, 3:19
**due** [1] - 29:14
**dug** [1] - 19:25
**during** [8] - 14:9, 15:13, 15:15, 16:9, 16:12, 17:15, 45:8, 50:6
**DUVAL** [1] - 1:18
**dynamics** [1] - 29:4
**dynamiting** [1] - 74:19

# E

**early** [1] - 36:4
**earthen** [4] - 23:23, 47:15, 53:25, 74:15
**easily** [1] - 62:21
**EAST** [1] - 3:2
**East** [6] - 10:17, 10:23, 23:20, 31:8, 32:10, 57:21
**east** [2] - 25:6, 26:10, 27:22, 47:21, 63:20
**Easterbrook** [1] - 38:18
**Eastern** [1] - 76:15
**EASTERN** [1] - 1:2
**eating** [1] - 24:16
**ECHSNER** [1] - 2:17
**edge** [1] - 27:2
**EDWARDS** [1] - 4:8
**effect** [6] - 15:25, 22:10, 42:25, 45:9, 56:6, 73:8
**effective** [1] - 25:22
**effects** [2] - 27:7, 55:11, 57:20
**efficacy** [1] - 13:10
**efforts** [1] - 71:19
**eight** [4] - 28:1, 60:12, 61:14, 61:18
**either** [4] - 24:8, 36:11, 38:12, 54:17, 69:18, 75:13
**elaborate** [1] - 34:4
**element** [1] - 39:17
**ELISA** [1] - 3:1
**ELIZABETH** [1] - 5:13
**eloquent** [1] - 8:1
**eloquently** [1] - 51:5
**elsewhere** [1] - 50:8
**ELWOOD** [2] - 2:14, 2:14
**emanate** [1] - 57:9
**emanating** [1] - 56:24

**embedded** [1] - 29:15
**empathy** [1] - 8:14
**emphasis** [1] - 34:22
**employee** [3] - 41:6, 47:2, 52:20
**employees** [1] - 65:14
**enacted** [2] - 35:20, 43:4
**enactment** [1] - 35:23
**encircled** [1] - 24:1
**encountering** [1] - 66:19
**end** [2] - 25:18, 42:3
**ended** [1] - 40:12
**ENERGY** [1] - 2:3
**enforcing** [1] - 7:22
**engage** [1] - 50:8
**engineer's** [2] - 28:8, 28:15
**engineering** [1] - 57:11
**engineers** [3] - 11:5, 11:6, 28:12
**Engineers** [1] - 11:5
**enhance** [1] - 8:12
**enlargements** [2] - 71:21, 72:3
**enlighten** [1] - 11:8
**entire** [4] - 20:6, 23:25, 27:21, 33:9
**entitled** [5] - 27:23, 27:24, 69:1, 69:3, 76:18
**entity** [1] - 20:3
**entry** [1] - 65:12
**environmental** [3] - 25:12, 42:21, 62:9
**erected** [1] - 23:19
**eroding** [1] - 73:1
**erosion** [8] - 24:16, 25:5, 25:11, 25:25, 26:9, 27:7, 27:12, 48:13
**error** [1] - 11:23
**escape** [2] - 19:13, 52:15
**esoteric** [1] - 23:22
**especially** [1] - 26:8
**Especially** [1] - 7:24
**ESQ** [1] - 3:19
**ESQUIRE** [37] - 1:23, 2:2, 2:5, 2:8, 2:11, 2:14, 2:18, 2:21, 3:1, 3:2, 3:5, 3:12, 3:15, 3:16, 3:23, 3:23, 4:2, 4:2, 4:5, 4:9, 4:13, 4:14, 4:18, 4:22, 5:2, 5:6, 5:7, 5:7, 5:8, 5:9, 5:10, 5:10, 5:11, 5:12, 5:13, 5:13,

5:14
**essence** [2] - 10:22, 11:16
**essential** [1] - 44:25
**essentially** [4] - 11:12, 19:5, 25:8, 28:8
**establish** [1] - 60:1
**esteemed** [1] - 40:12
**et** [1] - 63:17
**eternal** [1] - 59:16
**evaluate** [1] - 18:25
**event** [1] - 56:14
**events** [4] - 16:12, 16:15, 17:15, 17:23
**evidence** [5] - 42:23, 46:25, 54:22, 62:10, 73:21
**evident** [1] - 8:24
**evidentiary** [1] - 54:12
**eviscerated** [1] - 62:1
**exacerbate** [1] - 57:10
**exact** [4] - 24:14, 24:18, 66:17, 66:18
**exactly** [2] - 12:6, 20:17
**Exactly** [2] - 20:7, 61:5
**examine** [1] - 34:24
**examined** [1] - 22:3
**example** [1] - 67:21
**examples** [1] - 41:4
**exasperated** [1] - 55:24
**except** [1] - 29:10
**exception** [2] - 36:16, 62:6
**exceptional** [1] - 75:23
**exceptions** [2] - 37:1, 37:7
**excess** [5] - 43:7, 45:7, 47:6, 47:25, 48:13
**exchange** [1] - 65:12
**exchanged** [1] - 16:4
**excuse** [1] - 27:24
**Excuse** [2] - 28:25, 55:18
**exercising** [1] - 57:25
**Exhibit** [2] - 16:1, 71:6
**exhibit** [2] - 16:1, 71:2
**exhibits** [1] - 42:17
**exist** [2] - 10:15, 20:16
**existence** [2] - 31:13, 49:12
**exists** [1] - 33:24
**EXONERATION** [1] - 1:13
**expansion** [2] - 31:6,

63:19
**expected** [1] - 74:2
**expenditure** [1] - 29:9
**experienced** [1] - 31:6
**experiencing** [1] - 25:4
**experiment** [2] - 11:21, 12:17
**expert** [4] - 33:4, 45:5, 47:1, 64:3
**experts** [6] - 32:7, 46:19, 56:10, 72:14, 72:17, 74:7
**explained** [1] - 22:3
**explicate** [1] - 32:7
**explicit** [1] - 37:11
**explicitly** [2] - 8:23, 36:24
**exploded** [1] - 11:24
**explosion** [2] - 21:19, 58:10
**exposed** [2] - 26:14, 26:16
**exposure** [1] - 41:23
**extent** [4] - 9:9, 43:13, 50:21, 55:1
**extra** [1] - 73:22
**extraneous** [3] - 7:5, 31:10, 31:15
**extremely** [1] - 75:24
**extremity** [1] - 11:20
**extrinsic** [1] - 33:8
**eye** [1] - 44:6

**F**

**faces** [1] - 54:5
**fact** [31] - 10:23, 15:21, 16:10, 19:16, 19:24, 24:15, 26:5, 27:13, 30:4, 32:12, 34:11, 36:8, 39:5, 42:2, 42:11, 43:11, 48:23, 51:19, 52:5, 53:8, 54:24, 56:7, 57:8, 58:18, 62:10, 62:16, 63:4, 67:19, 69:12, 69:16, 71:15
**factor** [6] - 16:17, 48:1, 67:15, 69:11, 74:15
**facts** [17] - 9:3, 9:10, 9:24, 9:25, 10:8, 14:16, 14:21, 15:2, 19:17, 34:17, 34:20, 48:23, 54:10, 54:12, 63:25, 68:10, 74:1
**factual** [9] - 23:21, 29:21, 44:2, 44:3,

48:21, 73:21, 74:13, 75:7, 75:14
**factually** [1] - 61:16
**failed** [2] - 46:7, 50:24
**fails** [3] - 31:9, 60:6, 60:7
**failure** [22] - 26:6, 26:18, 26:19, 30:15, 43:14, 44:6, 44:24, 46:17, 46:18, 47:21, 47:25, 49:13, 49:19, 50:22, 64:6, 72:22, 73:2, 73:5, 73:9, 73:25, 74:3, 74:21
**failures** [1] - 74:16
**fair** [1] - 23:6
**fairly** [1] - 12:14
**fall** [2] - 39:15, 64:11
**fallen** [1] - 10:21
**falls** [3] - 39:15
**false** [1] - 72:13
**familiar** [4] - 11:1, 35:8, 51:22, 63:22
**far** [3] - 11:24, 13:5, 13:24
**farmer's** [1] - 51:20
**fast** [1] - 17:2
**favorites** [1] - 58:25
**FAWER** [1] - 2:20
**FAYARD** [2] - 3:12, 3:12
**FCA** [10] - 27:25, 28:19, 33:5, 35:17, 35:19, 35:23, 51:6, 55:17, 55:18, 65:23
**FCP** [18] - 12:1, 12:18, 13:24, 29:7, 29:9, 29:10, 29:11, 30:6, 30:11, 30:13, 30:15, 33:7, 33:9, 42:13, 48:20, 50:1, 50:3, 50:4
**features** [1] - 17:21
**federal** [3] - 24:2, 40:15, 49:1
**Federal** [2] - 52:18, 65:24
**feed** [1] - 51:9
**feet** [24] - 24:10, 24:13, 43:7, 44:9, 44:11, 44:21, 45:11, 45:20, 46:3, 47:5, 47:25, 48:13, 48:14, 56:12, 56:19, 72:11, 73:22, 74:6, 74:8, 74:9, 74:10, 74:11, 75:9
**ferocious** [1] - 74:14
**few** [1] - 27:20
**field** [1] - 57:6

**Field** [1] - 58:25
**Fifth** [9] - 10:16, 10:18, 10:22, 13:9, 20:25, 49:4, 59:24, 70:2
**fifth** [1] - 56:2
**fighter** [1] - 21:18
**figure** [1] - 51:23
**filed** [4] - 41:19, 42:21, 71:8, 74:23
**filled** [1] - 25:23
**finally** [1] - 52:7
**fine** [3] - 7:12, 50:7, 76:1
**finish** [3] - 46:13, 49:8, 50:15
**finished** [3] - 35:16, 71:4, 71:15
**FIRM** [3] - 2:8, 2:11, 3:1
**first** [25] - 7:15, 7:16, 8:13, 8:18, 28:4, 29:3, 33:11, 37:20, 40:11, 45:19, 47:15, 55:6, 60:14, 63:7, 63:9, 65:4, 70:7, 70:8, 70:12, 71:20, 73:1, 73:25
**First** [4] - 54:6, 61:22, 64:19, 75:22
**fiscal** [3] - 71:13, 71:17
**FISHER** [1] - 5:6
**fisherman** [1] - 14:8
**fix** [5] - 67:10, 69:13, 69:17, 69:18
**FL** [1] - 2:19
**flip** [1] - 54:4
**flip-flops** [1] - 54:4
**flood** [106] - 8:22, 8:25, 9:2, 9:8, 9:13, 9:18, 9:19, 10:2, 10:4, 10:5, 10:13, 10:19, 10:25, 11:3, 11:10, 12:1, 12:7, 12:13, 12:20, 13:13, 14:19, 14:22, 15:10, 15:17, 18:1, 19:6, 20:18, 20:20, 20:22, 20:23, 21:2, 21:3, 21:4, 21:20, 21:23, 23:19, 27:24, 30:1, 31:2, 31:4, 31:9, 31:11, 31:13, 31:16, 31:17, 31:20, 32:14, 33:1, 33:14, 33:20, 33:24, 34:6, 34:9, 34:10, 34:24, 35:5, 35:11, 37:22, 37:23, 38:5, 38:7, 41:3,

41:11, 41:15, 41:21, 41:24, 43:3, 49:3, 49:6, 50:7, 51:13, 51:18, 52:5, 52:22, 52:25, 54:6, 54:8, 54:25, 55:3, 58:19, 58:21, 58:22, 60:2, 60:7, 60:19, 62:12, 63:11, 64:20, 64:22, 65:8, 65:12, 65:15, 65:22, 66:9, 66:10, 66:13, 67:2, 67:15, 67:17, 68:4, 72:23, 73:3, 73:10
**Flood** [6] - 33:6, 37:10, 52:19, 59:6, 65:6, 66:20
**flooded** [3] - 51:21, 52:1, 52:2
**flooding** [16] - 11:2, 21:15, 25:17, 31:15, 32:17, 43:14, 47:4, 47:8, 47:11, 47:22, 49:19, 56:16, 56:17, 56:20, 57:10, 74:9
**Flooding** [1] - 51:25
**floods** [7] - 8:21, 32:5, 32:6, 49:5, 64:23, 67:10, 67:14
**floodwall** [2] - 50:24, 50:25
**floodwater** [6] - 18:23, 39:12, 39:14, 43:7, 65:7, 65:21
**Floodwaters** [1] - 51:8
**floodwaters** [59] - 8:21, 9:1, 9:4, 9:12, 9:20, 10:19, 11:10, 11:16, 12:14, 12:15, 12:16, 13:20, 14:11, 14:17, 14:23, 14:25, 15:6, 15:11, 15:16, 21:10, 21:15, 22:21, 23:5, 34:13, 37:21, 37:22, 37:23, 38:2, 38:5, 38:6, 38:8, 39:17, 40:19, 40:21, 41:3, 41:10, 41:16, 41:24, 41:25, 42:2, 42:8, 42:12, 48:19, 49:3, 49:6, 51:23, 52:6, 52:10, 52:13, 56:8, 56:24, 57:9, 59:14, 60:8, 63:3, 64:24, 66:19
**floodwaters'** [1] - 42:8
**flops** [1] - 54:4
**FLORIDA** [1] - 3:13
**Florida** [2] - 10:17, 10:23

**flow** [5] - 15:10, 16:23, 17:8, 26:12, 45:14
**flying** [1] - 14:3
**focal** [1] - 7:9
**focus** [5] - 28:23, 28:24, 31:22, 34:8, 46:13
**follow** [6] - 40:5, 62:1, 62:3, 62:4, 62:7, 62:13
**following** [2] - 26:11, 71:20
**follows** [1] - 49:1
**foolish** [1] - 59:17
**foot** [4] - 26:2, 45:10, 46:10, 73:4
**footnote** [1] - 48:25
**footprint** [1] - 47:12
**FOR** [9] - 1:12, 1:22, 3:22, 4:1, 4:8, 4:12, 4:17, 4:17, 5:1
**Force** [1] - 11:5
**force** [3] - 16:23, 17:9, 42:8
**forces** [3] - 15:22, 15:23, 26:8
**foregoing** [1] - 76:16
**foreseeable** [1] - 43:1
**foreshadow** [1] - 8:11
**forklift** [1] - 41:7
**former** [2] - 36:8, 36:10
**formulation** [2] - 10:10, 10:11
**foundation** [2] - 24:17, 72:1
**four** [5] - 10:17, 52:13, 55:23, 71:21, 75:2
**fours** [1] - 65:25
**frame** [2] - 7:8, 9:21
**framed** [1] - 64:15
**framework** [2] - 28:3, 28:5
**FRANK** [2] - 3:19, 5:17
**FRANKLIN** [1] - 3:24
**frankly** [8] - 7:25, 18:22, 23:6, 28:22, 38:11, 68:25, 70:9, 71:3
**frigate** [2] - 58:9, 74:18
**Froehlke** [1] - 28:3
**FROM** [1] - 1:13
**front** [1] - 9:12
**FTC** [1] - 36:14
**FTCA** [8] - 18:9, 18:16, 35:17, 35:20, 35:22, 37:6, 50:2, 66:20
**fully** [1] - 41:17
**fun** [1] - 75:25

**function** [5] - 36:15, 36:24, 51:18, 51:19, 57:25
**fund** [1] - 71:18
**funded** [2] - 68:6, 71:19
**funding** [3] - 32:1, 71:9, 71:10
**funds** [2] - 29:9, 72:3
**funnel** [6] - 15:25, 22:1, 22:10, 42:25, 47:9, 73:22

## G

**GAINSBURGH** [1] - 2:1
**GAO** [2] - 71:7, 71:10
**gates** [1] - 25:18
**gauntlet** [1] - 50:13
**geared** [1] - 8:10
**general** [1] - 37:12
**generally** [1] - 71:11
**geodetic** [1] - 62:4
**geometry** [1] - 42:25
**GERALD** [1] - 2:2
**GIGENHEIMER** [1] - 5:13
**GILBERT** [2] - 3:1, 3:1
**gist** [1] - 29:24
**given** [3] - 15:2, 22:2, 71:14
**God** [1] - 42:16
**GORDON** [2] - 4:1, 5:11
**gosh** [2] - 56:15, 56:19
**government** [44] - 7:16, 10:11, 11:2, 11:20, 11:22, 12:1, 14:5, 15:20, 18:17, 19:16, 20:23, 21:14, 29:9, 30:12, 31:2, 31:8, 37:16, 42:10, 42:24, 43:15, 49:1, 50:5, 50:23, 52:20, 54:6, 55:20, 58:20, 59:7, 62:25, 64:1, 66:1, 66:5, 66:24, 67:8, 67:20, 68:13, 68:18, 69:4, 69:22, 72:6, 74:1
**Government** [1] - 71:7
**government's** [6] - 6:16, 56:1, 67:23, 67:24, 68:12, 73:13
**governmental** [1] - 19:19

**Graci** [43] - 8:20, 8:24, 9:15, 9:23, 9:25, 10:3, 10:9, 10:12, 10:15, 10:18, 10:21, 10:22, 11:8, 11:9, 11:13, 16:14, 34:19, 41:13, 41:14, 48:17, 48:18, 48:20, 49:1, 49:21, 60:16, 65:1, 65:3, 65:5, 65:10, 65:18, 65:25, 66:1, 66:7, 66:12, 66:16, 66:8, 68:10, 70:1
**Graci's** [1] - 65:25
**grant** [2] - 75:13, 75:14
**GRANT** [1] - 5:11
**granted** [3] - 49:2, 62:13, 73:13
**graphics** [1] - 39:25
**grass** [1] - 27:6
**GRAVIER** [1] - 3:19
**Great** [1] - 59:6
**great** [5] - 12:5, 19:10, 31:6, 35:7, 44:17
**greater** [3] - 31:12, 31:19, 60:22
**Green** [26] - 8:19, 8:24, 9:3, 10:8, 13:10, 14:18, 18:18, 21:8, 33:15, 33:18, 34:17, 34:18, 34:22, 35:9, 38:12, 38:15, 38:17, 39:2, 40:12, 42:6, 43:25, 51:11, 51:16, 52:6, 59:16
**GREGORY** [1] - 5:10
**grist** [1] - 51:9
**ground** [3] - 13:6, 61:1, 61:13
**GROUP** [1] - 4:12
**GSA** [1] - 41:6
**guess** [6] - 8:13, 26:18, 50:14, 59:2, 60:23, 72:19
**guidance** [1] - 55:25
**Gulf** [3] - 22:25, 23:2, 32:9
**GUTIERREZ** [1] - 5:9
**GWII** [2] - 16:22, 17:7

## H

**habitat** [1] - 26:15
**hackneyed** [1] - 8:15
**half** [1] - 45:21
**handle** [1] - 33:3
**handling** [1] - 33:4
**hang** [1] - 38:7

**happenstance** [4] - 29:11, 53:23, 54:1, 54:2
**happily** [1] - 54:18
**happy** [4] - 34:16, 35:16, 69:1, 69:2
**hard** [4] - 9:7, 21:14, 26:8, 66:15
**HARDY** [1] - 4:22
**harm** [2] - 22:19, 69:11
**harmonize** [2] - 52:18, 52:19
**hate** [1] - 61:3
**hazard** [1] - 27:11
**hear** [2] - 34:16, 43:20
**heard** [1] - 64:14
**HEARD** [1] - 1:18
**HEARING** [1] - 1:18
**heart** [2] - 19:3, 30:17
**heartbeat** [1] - 43:20
**HEATHER** [1] - 4:14
**heck** [1] - 44:11
**Heebe** [1] - 65:16
**HEERDEN** [1] - 5:15
**height** [3] - 45:21, 46:4, 46:11
**held** [7] - 18:8, 49:5, 61:11, 65:20, 69:5, 69:14, 69:23
**help** [1] - 8:6
**helpful** [1] - 6:25
**hereby** [1] - 76:16
**hidden** [1] - 35:7
**high** [3] - 20:14, 46:3, 56:19
**higher** [3] - 26:17, 55:25, 71:24
**HIGHWAY** [1] - 2:9
**himself** [2] - 45:11, 72:16
**hindsight** [1] - 39:13
**history** [11] - 41:17, 56:4, 59:8, 59:9, 59:13, 59:19, 60:3, 61:10, 71:10
**hit** [5] - 17:25, 26:3, 26:8, 47:7, 70:24
**hitting** [2] - 41:5, 47:18
**hobgoblin** [1] - 59:17
**hold** [1] - 43:13
**Hold** [1] - 28:25
**holding** [7] - 8:20, 9:9, 10:10, 10:12, 10:23, 65:18
**homes** [2] - 44:9, 74:9
**honestly** [1] - 36:1
**HONEYCUTT** [1] - 3:12

**Honor** [71] - 6:9, 6:14, 6:18, 6:21, 8:17, 8:23, 12:3, 15:7, 16:8, 18:4, 18:19, 18:22, 19:13, 19:24, 21:12, 22:3, 24:14, 25:14, 29:22, 30:19, 30:22, 36:2, 36:12, 37:4, 37:7, 39:24, 40:9, 41:1, 42:1, 43:17, 44:14, 44:18, 44:23, 45:1, 46:8, 46:16, 46:24, 47:24, 51:17, 54:4, 57:8, 57:23, 58:11, 60:24, 61:7, 62:15, 62:24, 63:14, 63:24, 64:4, 64:8, 64:16, 66:23, 67:6, 67:20, 68:22, 69:8, 69:25, 70:15, 70:19, 70:20, 72:8, 73:5, 73:7, 73:11, 74:6, 74:22, 75:16, 75:19, 75:21
**Honor's** [3] - 15:1, 19:2, 19:3
**HONORABLE** [1] - 1:18
**hook** [1] - 38:7
**HOPE** [1] - 1:23
**hope** [4] - 8:13, 19:9, 56:2, 59:16
**hopeful** [1] - 50:16
**hopefully** [1] - 60:15
**Hopkins** [1] - 45:6
**hotels** [1] - 41:10
**housing** [1] - 59:3
**HUGH** [1] - 3:15
**hundred** [1] - 61:24
**hurdles** [1] - 50:12
**hurricane** [18] - 12:24, 12:25, 15:5, 15:13, 16:15, 17:14, 17:15, 17:23, 23:15, 26:14, 28:9, 32:5, 32:13, 32:16, 32:25, 47:6, 61:16, 61:23
**Hurricane** [9] - 17:12, 17:25, 23:2, 23:10, 23:13, 26:2, 32:6, 32:11, 70:24
**hurricane-induced** [2] - 17:14, 23:15
**hurricanes** [1] - 16:9
**hypothet** [2] - 13:5, 13:24
**hypothetical** [5] - 11:18, 12:12, 13:3, 15:1, 15:8
**hypothetically** [2] -

11:23, 44:9
**hypotheticals** [1] - 67:7
**hypothets** [1] - 14:3

## I

**ice** [2] - 11:4, 41:6
**idea** [1] - 28:7
**identical** [2] - 64:10, 68:23
**ignored** [2] - 39:9, 53:10
**ignoring** [1] - 74:21
**IHNC** [9] - 16:22, 17:8, 31:24, 32:20, 44:23, 46:18, 63:20, 64:6, 74:16
**IHNC's** [1] - 47:21
**II** [1] - 2:15
**III** [1] - 2:24
**ILIT** [2] - 45:13, 46:19
**Illinois** [2] - 55:1, 55:3
**illuminating** [1] - 59:20
**imagine** [1] - 49:14
**immediate** [1] - 42:7
**immune** [6] - 9:14, 12:2, 14:5, 48:10, 48:11, 50:23
**immunity** [47] - 8:21, 15:19, 18:7, 18:8, 18:16, 18:20, 18:25, 27:25, 28:19, 30:25, 31:16, 34:1, 37:1, 37:7, 37:11, 37:14, 37:16, 37:20, 37:21, 38:16, 38:20, 40:14, 42:1, 42:13, 43:11, 43:15, 43:23, 49:2, 49:5, 49:24, 51:7, 52:4, 58:16, 58:20, 60:13, 60:20, 60:25, 61:2, 61:9, 61:25, 62:13, 63:1, 65:6, 65:13, 67:10, 68:19, 72:6
**immunize** [4] - 19:6, 30:13, 33:6, 66:23
**immunized** [2] - 33:13, 35:22
**impact** [3] - 42:21, 50:2, 50:4
**imperfect** [1] - 30:5
**implied** [1] - 31:3
**important** [2] - 18:1, 42:14
**impression** [1] - 33:12
**IN** [2] - 1:4, 1:11

**INC** [2] - 4:1, 4:13
**inches** [1] - 56:16
**included** [2] - 60:21, 60:22
**incomplete** [1] - 72:5
**incompletion** [1] - 71:5
**increase** [2] - 16:23, 17:8
**increased** [1] - 57:15
**increases** [1] - 26:13
**incurring** [1] - 31:19
**indeed** [5] - 41:6, 42:8, 64:14, 64:17, 66:2
**Indeed** [3] - 48:24, 49:14, 53:19
**independent** [6] - 43:2, 48:4, 63:15, 63:18, 64:5
**indicate** [4] - 27:23, 56:12, 62:16, 63:7
**indicated** [1] - 18:2
**induced** [2] - 17:14, 23:15
**inextricably** [2] - 53:14, 54:10
**inferred** [1] - 37:2
**influence** [2] - 17:13, 17:21
**inform** [1] - 60:16
**ING4727** [1] - 1:12
**INGRAM** [1] - 1:11
**injured** [1] - 14:9
**injury** [4] - 14:12, 14:14, 14:25, 39:6
**inquiry** [1] - 42:3
**inside** [1] - 33:6
**insofar** [1] - 30:6
**instance** [3] - 15:13, 21:1, 35:6
**Instead** [1] - 67:11
**insufficient** [1] - 71:18
**integrated** [2] - 59:10
**intense** [1] - 74:8
**interconnected** [1] - 53:14
**interesting** [7] - 14:15, 22:11, 33:16, 34:2, 38:14, 46:20, 46:23
**interests** [1] - 55:8
**internal** [1] - 71:9
**INTERNATIONAL** [1] - 4:13
**interpretation** [1] - 41:3
**intersect** [1] - 35:24
**intersection** [1] - 18:13
**intertwined** [2] - 32:2,

54:10
**intrinsically** [1] - 32:2
**inundate** [1] - 15:11
**inundates** [1] - 16:15
**invention** [1] - 54:10
**invest** [2] - 31:2, 31:8
**invested** [1] - 58:21
**invoke** [2] - 15:19, 52:5
**involve** [2] - 10:4, 10:24
**involved** [8] - 11:2, 11:10, 14:7, 14:17, 15:6, 29:5, 41:16, 66:7
**involvement** [2] - 14:11, 14:14
**iota** [1] - 30:23
**IPET** [2] - 46:19, 47:2
**IRMA** [1] - 5:13
**Ironically** [1] - 22:13
**irrelevant** [4] - 30:6, 30:20, 51:3, 54:19
**irrigation** [7] - 9:4, 33:20, 33:22, 33:25, 34:7, 34:12, 51:19
**issue** [21] - 7:9, 9:4, 11:8, 12:22, 13:13, 25:11, 25:12, 28:23, 34:4, 41:19, 48:8, 56:3, 63:9, 66:13, 67:20, 67:21, 72:11, 73:21, 75:3
**issues** [7] - 7:5, 7:9, 28:24, 31:24, 33:11, 62:24, 75:6
**itself** [7] - 10:6, 24:19, 27:5, 32:7, 32:8, 56:22, 64:6
**IVOR** [1] - 5:15

## J

**jam** [2] - 11:4, 41:6
**JAMES** [1] - 4:9
**James** [13] - 36:12, 37:25, 38:1, 38:12, 38:17, 41:18, 48:25, 59:23, 60:3, 66:7, 66:8, 66:11
**JEFFERSON** [2] - 2:9, 4:9
**JENNIFER** [1] - 5:16
**JESSE** [1] - 2:24
**jet** [1] - 21:18
**job** [1] - 61:11
**John** [2] - 6:21, 64:8
**JOHN** [1] - 4:2
**Johns** [1] - 45:6

**JONATHAN** [1] - 2:11
**JOSEPH** [1] - 2:5
**JR** [7] - 1:18, 2:14, 2:14, 3:12, 3:19, 5:2, 5:6
**Judge** [7] - 13:23, 14:13, 38:18, 38:19, 38:24, 65:16, 76:5
**JUDGE** [1] - 1:19
**judge** [1] - 66:3
**judgment** [4] - 42:23, 60:6, 63:19, 74:20
**jumping** [1] - 44:15
**jurists** [1] - 40:20
**JUSTICE** [1] - 3:22
**Justice** [5] - 41:18, 52:7, 56:6, 59:12, 59:16

## K

**K"(2** [1] - 1:7
**Kara** [1] - 6:19
**KARA** [1] - 3:23
**KARL** [1] - 5:8
**KATRINA** [1] - 1:4
**Katrina** [10] - 6:11, 23:2, 23:10, 23:13, 26:2, 32:11, 42:4, 45:8, 70:24, 73:18
**KEARNEY** [1] - 5:1
**KEELEY** [1] - 5:7
**keep** [5] - 24:16, 25:20, 25:22, 27:3, 43:12
**keeping** [1] - 20:25
**keeps** [1] - 49:17
**Kennedy** [2] - 13:10, 39:15
**kind** [5] - 18:23, 22:8, 22:13, 29:12, 58:21
**knee** [1] - 8:14
**knees** [1] - 8:14
**knell** [2] - 57:17, 57:20
**knocked** [2] - 41:9, 47:19
**knocks** [1] - 45:10
**known** [3] - 43:1, 45:9, 57:20
**knows** [3] - 19:24, 37:4, 42:17

## L

**LA** [19] - 2:3, 2:6, 2:9, 2:12, 2:15, 2:22, 2:25, 3:7, 3:10, 3:13, 3:17, 3:20, 4:6, 4:10,

4:15, 4:20, 4:24, 5:4, 5:21
**label** [1] - 45:14
**LABORDE** [1] - 4:17
**LABOURDETTE** [1] - 5:16
**lack** [2] - 42:25, 52:24
**LAFARGE** [1] - 4:1
**Lafarge** [3] - 6:22, 64:9, 71:2
**LAFAYETTE** [2] - 4:10, 4:20
**lake** [3] - 14:8, 14:22, 66:9
**Lake** [15] - 16:5, 23:17, 25:7, 26:10, 26:12, 26:15, 28:10, 31:25, 45:16, 55:11, 56:9, 71:23
**LAMBERT** [2] - 3:15, 3:15
**land** [1] - 32:20
**lands** [1] - 49:16
**LANE** [1] - 2:25
**language** [3] - 10:20, 32:5, 56:1
**LANIER** [1] - 5:2
**large** [1] - 26:13
**larger** [1] - 17:19
**last** [7] - 35:11, 43:9, 55:23, 69:8, 70:13, 71:13, 75:20
**latter** [2] - 36:7, 36:10
**LATTIMORE** [1] - 4:8
**LAW** [5] - 2:8, 2:11, 2:14, 2:24, 3:9
**law** [12] - 18:15, 22:17, 28:8, 35:17, 35:18, 50:19, 51:7, 52:21, 54:20, 68:15, 69:4, 73:16
**Law** [1] - 22:15
**lawyer** [3] - 7:1, 33:3, 68:2
**lawyers** [1] - 76:1
**layer** [1] - 27:5
**leaching** [1] - 51:22
**lead** [1] - 46:15
**leading** [3] - 13:17, 29:17, 29:19
**leads** [2] - 65:17, 74:9
**learned** [1] - 73:16
**least** [11] - 7:5, 12:5, 24:2, 29:5, 33:14, 33:16, 36:23, 38:7, 39:3, 50:14, 75:11
**led** [1] - 73:10
**left** [1] - 9:16
**Legal** [1] - 50:13
**legal** [2] - 51:9, 75:2

**legislative** [8] - 41:17, 56:4, 59:8, 59:13, 59:19, 60:3, 61:10
**lengthy** [2] - 16:1, 29:12
**less** [3] - 23:21, 32:25, 46:10
**lesser** [2] - 60:21, 60:22
**LEVEE** [1] - 4:17
**levee** [18] - 14:5, 15:4, 15:10, 15:15, 27:5, 48:3, 56:25, 57:3, 57:18, 58:7, 58:23, 59:2, 66:19, 68:24, 71:4, 71:21, 72:2, 74:19
**levees** [47] - 16:22, 17:8, 17:10, 17:19, 17:20, 20:1, 23:1, 23:7, 23:22, 24:5, 24:12, 24:17, 25:9, 26:24, 27:4, 30:22, 31:8, 32:19, 41:5, 45:12, 46:7, 47:19, 49:13, 50:17, 53:3, 53:4, 58:17, 58:18, 67:11, 67:12, 68:4, 68:7, 68:13, 69:7, 69:22, 70:24, 70:25, 71:24, 72:22, 72:24, 73:1, 73:2, 73:5, 73:7, 74:3, 74:5
**level** [3] - 16:16, 57:6, 61:24
**LEVIN** [1] - 2:17
**liability** [10] - 18:12, 31:19, 46:21, 49:11, 58:19, 60:7, 65:7, 65:13, 72:25, 73:20
**LIABILITY** [1] - 1:13
**liable** [6] - 61:12, 69:5, 69:14, 69:15, 69:19, 69:23
**lied** [1] - 62:10
**life** [1] - 35:12
**LIFE** [1] - 5:2
**light** [2] - 40:7, 62:24
**LILLIAN** [1] - 5:16
**limit** [3] - 39:1, 41:23, 60:6
**limitable** [1] - 39:11
**LIMITATION** [1] - 1:13
**limitation** [3] - 37:20, 38:3
**limitations** [2] - 37:19, 61:21
**limited** [5] - 10:8, 34:17, 34:19, 37:6, 48:22

**limits** [3] - 7:21, 7:22, 70:10
**linchpin** [1] - 74:12
**LINDA** [1] - 3:16
**line** [1] - 62:21
**Liquid** [1] - 45:14
**liquid** [3] - 47:17, 48:9, 74:14
**LISA** [1] - 2:25
**lite** [1] - 8:4
**literal** [2] - 41:2, 56:1
**literally** [5] - 32:9, 40:20, 41:10, 55:21, 59:21
**Litigation** [1] - 6:11
**LITIGATION** [1] - 1:5
**live** [2] - 36:4, 36:5
**living** [1] - 25:10
**lo** [1] - 67:12
**loaded** [1] - 29:15
**local** [1] - 26:1
**location** [2] - 24:11, 32:23, 47:4
**lock** [4] - 31:25, 32:15, 63:18, 63:21
**logic** [1] - 8:11
**logical** [2] - 7:11, 32:18
**LONIAN** [1] - 4:14
**Look** [3] - 39:10, 53:1, 59:21
**look** [15] - 9:24, 10:9, 13:8, 13:10, 18:24, 20:20, 34:21, 37:13, 38:25, 39:12, 45:19, 51:12, 52:12, 68:10
**looked** [7] - 10:22, 13:11, 22:3, 36:1, 36:3, 36:6, 55:5
**looking** [4] - 9:23, 23:4, 24:3, 24:20
**looks** [4] - 15:23, 33:10, 68:3, 69:8
**LOS** [1] - 1:24
**lose** [3] - 28:19, 43:18, 43:21
**loss** [2] - 43:1, 73:23
**Louisiana** [4] - 11:21, 50:19, 52:21, 76:16
**LOUISIANA** [2] - 1:2, 1:7
**lower** [4] - 23:20, 38:15, 39:8, 57:21
**LPV** [22] - 18:7, 24:9, 30:19, 31:5, 32:2, 32:4, 32:24, 42:15, 43:4, 43:14, 49:10, 49:15, 49:18, 49:19, 51:3, 55:8, 57:19, 58:13, 61:23, 63:11,

66:18, 73:9
**lucky** [1] - 33:10
**lumped** [1] - 10:24
**LUPO** [1] - 5:17
**LVP** [1] - 13:25

**M**

**Madera** [3] - 33:17, 33:21, 51:17
**MAGAZINE** [1] - 3:16
**main** [2] - 28:22, 41:7
**maintain** [1] - 26:13
**maintenance** [1] - 52:24
**major** [5] - 16:12, 16:15, 17:15, 17:23, 46:12
**majority** [2] - 14:10, 52:7
**management** [1] - 21:4
**manager** [1] - 71:23
**mandate** [5] - 25:20, 42:18, 61:14, 61:15
**mandated** [2] - 26:20, 26:22
**mandates** [1] - 28:1
**MANDEVILLE** [1] - 2:25
**MARCH** [2] - 1:8, 6:2
**marsh** [2] - 26:16, 49:16
**marshes** [1] - 26:7
**MARZONI** [1] - 5:17
**master** [1] - 73:17
**match** [1] - 53:7
**material** [1] - 7:4
**materials** [2] - 40:7, 54:25
**MATT** [1] - 2:18
**MATTER** [1] - 1:11
**matter** [7] - 54:20, 57:8, 68:15, 69:4, 69:6, 72:15, 76:19
**maximum** [1] - 32:19
**MAXWELL** [1] - 4:22
**MAYEAUX** [1] - 4:18
**MCCRANIE** [1] - 4:21
**MCDANIEL** [1] - 4:22
**MCKERNAN** [3] - 2:8, 2:8, 20:9
**mean** [12] - 19:16, 21:18, 22:2, 25:11, 25:12, 32:6, 42:13, 55:17, 55:18, 55:20, 58:19, 63:3
**means** [4] - 35:7, 55:21, 60:9, 69:21

**meant** [1] - 66:23
**MECHANICAL** [1] - 5:22
**meet** [1] - 18:10
**memos** [1] - 60:24
**mentioned** [5] - 53:9, 56:11, 56:23, 58:17, 70:21
**Mentioned** [1] - 53:10
**mentions** [1] - 34:3
**mere** [2] - 29:11, 41:25, 42:11
**merely** [2] - 48:8, 53:23
**met** [1] - 75:5
**METAIRIE** [2] - 3:10, 4:24
**metaphysical** [1] - 35:21
**meter** [1] - 45:7
**method** [1] - 7:13
**MEUNIER** [2] - 2:1, 2:2
**Mexico** [2] - 23:3, 32:9
**MICHAEL** [1] - 5:9
**middle** [3] - 15:4, 53:13, 53:20
**might** [9] - 8:12, 9:5, 15:16, 27:15, 48:10, 49:20, 51:3, 55:9, 68:21, 74:22
**miles** [1] - 45:9
**mill** [1] - 51:10
**MILLER** [1] - 3:23
**Miller** [1] - 6:19
**million** [2] - 71:12, 71:13
**mind** [5] - 7:5, 7:10, 40:22, 53:11, 57:5
**minded** [1] - 40:20
**minds** [1] - 59:18
**minimal** [1] - 27:18
**minimis** [1] - 16:17
**minimize** [1] - 27:7
**minimum** [1] - 74:20
**minute** [1] - 14:3
**minutes** [2] - 70:10
**mischaracterizing** [1] - 19:4
**misconception** [1] - 28:5
**misses** [1] - 56:15
**missing** [1] - 56:18
**Mississippi** [2] - 41:5, 47:19
**MITCHELL** [1] - 2:17
**Mocklin** [2] - 13:9, 39:15
**moment** [3] - 44:13,

50:9, 50:16
**momentarily** [1] - 49:17
**money** [2] - 25:19, 31:17
**MORGAN** [1] - 2:15
**morning** [9] - 6:8, 6:9, 6:14, 6:18, 6:21, 34:14, 39:23, 39:24, 40:9
**most** [6] - 6:25, 7:7, 25:21, 47:15, 53:16, 54:1, 72:20
**motif** [1] - 8:4
**motion** [10] - 6:16, 30:6, 30:8, 73:13, 74:23, 75:4, 75:14, 75:15
**Motion** [1] - 42:4
**MOTIONS** [1] - 1:18
**move** [1] - 56:2
**moved** [1] - 31:7
**movie** [1] - 58:25
**moving** [2] - 23:2, 41:14
**MR** [120] - 6:14, 6:18, 6:21, 8:17, 8:23, 9:8, 9:22, 11:4, 11:12, 12:3, 12:7, 12:11, 12:19, 13:7, 14:6, 16:3, 16:8, 17:4, 17:11, 18:19, 19:9, 19:12, 20:7, 20:9, 20:13, 21:12, 22:13, 22:23, 24:4, 24:7, 24:13, 25:3, 25:6, 25:11, 26:22, 27:17, 28:4, 28:20, 29:14, 29:18, 29:21, 29:24, 30:8, 30:16, 32:3, 33:13, 34:21, 35:11, 36:1, 36:6, 36:12, 36:20, 36:23, 37:6, 37:10, 38:23, 39:21, 39:24, 40:3, 40:6, 40:22, 40:25, 42:20, 43:16, 43:24, 44:2, 44:4, 44:6, 44:13, 44:17, 44:23, 45:3, 45:4, 46:2, 46:8, 46:15, 46:24, 48:22, 49:10, 50:4, 50:14, 51:11, 51:25, 52:4, 52:12, 52:15, 53:7, 53:10, 53:13, 54:15, 55:10, 55:14, 55:20, 57:5, 57:8, 58:24, 59:2, 59:15, 59:25, 60:15, 60:23, 61:4, 61:6, 62:15, 62:18,

63:14, 63:24, 64:8, 66:22, 67:1, 67:5, 68:22, 70:15, 70:19, 73:16, 75:19, 75:21, 76:3, 76:4, 76:5
**MRGO** [74] - 1:9, 13:24, 16:1, 16:16, 16:24, 17:9, 17:13, 17:15, 17:22, 17:25, 18:9, 18:17, 19:15, 22:21, 22:24, 23:2, 23:4, 23:10, 23:16, 24:9, 24:16, 25:3, 25:4, 25:7, 26:7, 26:9, 27:20, 30:25, 31:22, 32:1, 32:2, 32:6, 32:8, 32:19, 32:20, 32:24, 42:10, 43:8, 44:8, 44:12, 45:15, 46:10, 47:6, 47:8, 47:10, 47:13, 47:18, 47:20, 52:23, 52:24, 53:3, 53:4, 53:9, 53:17, 53:24, 54:3, 54:6, 54:25, 55:9, 57:13, 57:20, 63:16, 64:5, 68:7, 69:5, 69:12, 69:24, 72:12, 72:25, 73:8, 74:11, 74:14
**mud** [1] - 53:3
**musical** [2] - 8:5

## N

**Naomi** [1] - 71:22
**narrow** [1] - 57:12
**National** [1] - 62:3
**nature** [2] - 9:11, 30:6
**navigation** [3] - 15:24, 31:24, 65:9
**navigational** [1] - 54:3
**Navy** [6] - 14:3, 21:18, 41:4, 47:18, 74:18
**near** [1] - 56:15
**necessarily** [2] - 43:11, 51:12
**necessary** [1] - 11:15
**need** [17] - 7:20, 15:8, 17:1, 18:24, 29:4, 39:10, 39:16, 39:17, 41:24, 42:1, 45:25, 52:9, 59:10, 63:5, 63:6, 63:8
**needs** [1] - 18:21
**negative** [1] - 42:21
**negligence** [26] - 9:18, 10:13, 10:20, 30:11, 33:6, 33:8, 42:24,

43:3, 45:1, 48:4, 48:5, 49:23, 52:20, 63:10, 63:16, 63:18, 65:8, 65:21, 67:13, 67:14, 67:16, 68:19, 69:14, 69:19, 69:20, 69:24
**negligent** [14] - 10:1, 52:21, 57:14, 64:19, 65:14, 66:8, 66:13, 68:13, 69:6, 69:11, 69:13, 69:22
**negligently** [1] - 30:19
**NELSON** [2] - 3:15, 3:16
**NEPA** [1] - 32:21
**NEUNER** [1] - 4:17
**neutrinos** [1] - 20:10
**neutrons** [3] - 20:6, 20:9, 20:15
**never** [6] - 19:1, 23:14, 32:1, 35:12, 62:22, 66:23
**new** [3] - 54:9, 71:18
**NEW** [16] - 1:7, 2:3, 2:6, 2:12, 2:22, 3:3, 3:5, 3:7, 3:17, 3:20, 4:3, 4:6, 4:15, 5:1, 5:4, 5:21
**New** [7] - 22:8, 23:20, 31:8, 32:10, 50:16, 56:14, 57:21
**next** [3] - 11:18, 18:11, 53:15
**nexus** [40] - 8:25, 9:1, 11:15, 11:16, 11:17, 12:17, 13:2, 13:5, 13:18, 13:23, 14:24, 15:16, 15:17, 15:19, 15:20, 21:23, 28:23, 29:25, 38:4, 38:8, 39:5, 46:13, 46:16, 52:14, 52:16, 52:22, 53:8, 55:7, 55:15, 56:3, 56:7, 56:18, 58:11, 63:2, 64:21, 70:4, 73:11, 75:8
**NICK** [1] - 5:17
**night** [1] - 43:12
**nine** [1] - 44:11
**Ninth** [3] - 23:20, 47:22, 57:21
**nobody** [1] - 53:17
**non** [3] - 19:6, 48:11, 72:22
**non-flood** [1] - 19:6
**non-immune** [1] - 48:11
**nonetheless** [1] - 23:23

**nonexistence** [1] - 49:13
**nontextual** [2] - 37:19, 37:20
**North** [2] - 6:22, 64:9
**north** [5] - 25:6, 26:7, 27:20, 27:22, 47:22
**NORTH** [1] - 4:1
**notable** [2] - 38:17, 72:20
**Note** [1] - 49:7
**note** [2] - 8:3, 16:3
**notebooks** [1] - 39:25
**noted** [3] - 22:7, 39:3, 71:16
**Nothing** [1] - 75:19
**nothing** [11] - 22:2, 26:3, 38:10, 38:12, 42:15, 52:25, 59:4, 60:16, 62:8, 67:19, 70:25
**notice** [4] - 16:19, 21:25, 54:11, 54:13
**noticed** [1] - 62:9
**notion** [2] - 71:3, 72:5
**notwithstanding** [1] - 34:11
**nuclear** [5] - 11:22, 11:23, 11:24, 58:9, 67:24
**Number** [3] - 54:24, 55:7, 56:23
**number** [3] - 16:14, 36:3, 72:17
**numbered** [1] - 76:19
**Numbers** [1] - 6:12
**numerous** [1] - 66:1
**nut** [1] - 9:5
**nuts** [1] - 9:7
**NY** [1] - 3:3
**NYKA** [1] - 3:5

## O

**O'BRIEN** [1] - 3:2
**O'Donnell** [8] - 6:15, 48:9, 50:25, 61:19, 69:2, 72:11, 72:23, 73:15
**O'DONNELL** [53] - 1:22, 1:23, 6:14, 39:24, 40:3, 40:6, 40:22, 40:25, 42:20, 43:16, 43:24, 44:2, 44:4, 44:6, 44:13, 44:17, 44:23, 45:4, 46:2, 46:8, 46:15, 46:24, 48:22, 49:10, 50:4, 50:14, 51:11,

51:25, 52:4, 52:12, 52:15, 53:7, 53:10, 53:13, 54:15, 55:10, 55:14, 55:20, 57:5, 57:8, 58:24, 59:2, 59:15, 59:25, 60:15, 60:23, 61:4, 61:6, 62:15, 62:18, 63:14, 63:24, 73:16
**O'Donnell's** [1] - 72:21
**object** [2] - 29:19, 58:21
**objectives** [1] - 61:22
**obstacle** [1] - 36:21
**Obviously** [3] - 9:3, 14:17, 32:21
**obviously** [3] - 9:22, 27:12, 33:19
**occasion** [1] - 54:14
**occasions** [1] - 48:25
**occur** [1] - 27:15
**occurred** [7] - 11:23, 14:22, 14:23, 26:3, 29:6, 45:23, 60:19
**occurring** [1] - 43:3
**occurs** [3] - 15:13, 19:6, 49:25
**ocean** [1] - 32:8
**OF** [11] - 1:2, 1:11, 1:11, 1:12, 1:13, 1:18, 2:14, 3:22, 4:17, 5:1
**offer** [1] - 54:21
**offered** [1] - 73:21
**offhanded** [1] - 72:14
**Office** [1] - 71:7
**office** [1] - 34:16
**OFFICE** [1] - 2:14
**OFFICIAL** [1] - 5:20
**Official** [2] - 76:14, 76:24
**offshore** [1] - 11:21
**old** [3] - 14:19, 38:21, 63:3
**omitted** [1] - 58:15
**Once** [2] - 26:11, 60:4
**once** [2] - 59:21, 65:2
**ONE** [1] - 4:18
**One** [7] - 22:7, 26:20, 33:5, 35:15, 58:14, 60:17, 63:14
**one** [38] - 13:7, 13:14, 13:16, 16:3, 21:20, 22:16, 26:24, 27:8, 28:9, 28:25, 30:17, 31:14, 32:3, 33:2, 33:15, 34:9, 35:12, 37:18, 43:18, 47:1, 49:14, 51:19, 53:22,

54:11, 54:14, 55:7, 55:16, 56:15, 56:23, 58:16, 58:25, 61:6, 61:24, 67:7, 70:13, 72:13, 73:23
**one-sentence** [1] - 28:9
**ongoing** [2] - 16:21, 17:7
**open** [3] - 9:16, 25:21, 26:16
**opened** [1] - 43:25
**opening** [1] - 51:16
**operations** [1] - 8:15
**opinion** [9] - 10:21, 14:16, 39:3, 43:20, 51:17, 56:25, 57:3, 57:18, 59:15
**opinions** [1] - 56:23
**opponent** [4] - 16:19, 26:4, 26:19, 40:12
**opposing** [1] - 6:15
**OR** [1] - 1:13
**oral** [4] - 7:1, 7:13, 75:24, 75:25
**orchestration** [1] - 8:4
**order** [2] - 15:18, 42:1
**ORDER** [1] - 6:4
**orders** [1] - 62:1
**ordinary** [1] - 15:4
**original** [9] - 17:24, 26:20, 63:23, 67:14, 67:16, 69:15, 69:19
**originally** [1] - 24:22
**ORLEANS** [15] - 1:7, 2:3, 2:6, 2:12, 2:22, 3:5, 3:7, 3:17, 3:20, 4:6, 4:15, 4:17, 5:1, 5:4, 5:21
**Orleans** [7] - 22:8, 23:20, 31:8, 32:10, 50:16, 56:14, 57:21
**otherwise** [3] - 50:10, 51:2, 52:21
**outer** [2] - 7:11, 11:20
**outlined** [1] - 41:1
**outset** [1] - 64:9
**outside** [3] - 33:9, 43:3, 49:25
**overheated** [1] - 22:4
**overrule** [3] - 8:23, 66:7, 66:12
**overruled** [5] - 8:19, 9:15, 66:2, 66:4, 70:2
**overtopped** [6] - 11:25, 47:5, 47:15, 73:24, 73:25, 74:2
**overtopping** [16] - 44:24, 45:14, 45:22,

46:6, 46:17, 47:3, 47:14, 47:16, 47:20, 48:8, 48:13, 73:1, 74:5, 74:21, 75:10
**Overtopping** [1] - 47:4
**overtops** [1] - 49:17
**overwhelm** [2] - 23:18, 57:23
**overwhelmed** [1] - 23:7
**overwhelming** [1] - 58:10
**own** [10] - 8:12, 18:21, 23:12, 37:7, 47:1, 56:10, 72:13, 72:17, 72:18, 74:1
**OWNER** [1] - 1:12

## P

**P.O** [1] - 3:25
**Pacific** [1] - 21:19
**Page** [1] - 49:6
**page** [9] - 25:1, 42:5, 46:3, 53:13, 65:5, 65:10, 65:19, 71:8
**pagination** [1] - 71:9
**paid** [1] - 31:25
**pain** [1] - 8:16
**PAN** [1] - 5:2
**PAPANTONIO** [1] - 2:17
**papers** [2] - 41:20, 54:14
**paradigm** [3] - 7:11, 11:20, 20:17
**paragraphs** [1] - 51:17
**parallel** [2] - 24:10, 25:17
**parameters** [2] - 15:14, 49:25
**Parish** [1] - 31:6
**parishes** [1] - 71:21
**parity** [1] - 75:5
**part** [19] - 21:4, 24:8, 25:5, 32:25, 33:14, 33:22, 34:1, 34:23, 35:19, 43:22, 47:15, 47:22, 50:17, 54:8, 63:22, 64:20, 64:22, 66:13, 67:1
**particular** [1] - 69:5
**pass** [1] - 39:24
**passed** [2] - 28:8, 32:21
**passing** [1] - 27:3
**past** [3] - 18:10, 18:11, 18:12

**PATRICK** [1] - 3:8
**pay** [2] - 25:19, 58:22
**PENSACOLA** [1] - 2:19
**pentathlon** [1] - 50:14
**people** [8] - 15:21, 31:2, 31:7, 34:16, 50:16, 58:17, 62:4
**People** [1] - 31:8
**PEPPER** [1] - 5:20
**Pepper** [3] - 76:13, 76:22, 76:23
**Pepperdine** [1] - 22:17
**per** [1] - 20:23
**perfectly** [6] - 11:25, 30:5, 30:11, 30:20, 30:23, 50:7
**performance** [3] - 49:13, 58:13, 72:24
**performed** [1] - 74:1
**Perhaps** [1] - 15:12
**perhaps** [4] - 25:24, 34:6, 55:24, 70:21
**peril** [1] - 58:1
**person** [1] - 22:9
**persons** [1] - 25:10
**PERTAINS** [1] - 1:8
**pertinent** [1] - 7:6
**PETER** [1] - 5:7
**Peterson** [2] - 10:24, 11:1
**PETERSON** [1] - 5:7
**petitioner** [1] - 33:17
**PETITIONING** [1] - 1:12
**PETROLEUM** [1] - 4:18
**PHILEN** [1] - 5:10
**PHILIP** [2] - 5:10, 5:12
**phrase** [4] - 8:15, 35:2, 57:4, 57:17
**physical** [1] - 24:11
**physics** [3] - 20:11, 20:13, 67:24
**PIERCE** [1] - 1:23
**Pierce** [1] - 6:15
**PIGMAN** [1] - 4:13
**piled** [1] - 19:25
**piling** [3] - 19:21, 19:22, 19:23
**PINHOOK** [1] - 4:19
**pinpoint** [3] - 43:6, 43:7, 54:16
**Pistachio** [1] - 9:7
**pistachio** [1] - 51:20
**pit** [1] - 53:24
**pitch** [2] - 68:20, 68:21

**pitched** [1] - 68:19
**place** [7] - 19:15, 32:18, 33:6, 38:11, 41:3, 41:8, 60:5
**places** [3] - 17:20, 17:21, 27:20
**plain** [1] - 40:20
**plaintiff** [6] - 23:14, 30:9, 33:19, 36:21, 40:19, 73:17
**plaintiff's** [1] - 28:6
**plaintiffs** [20] - 6:15, 18:10, 20:19, 21:24, 23:11, 23:24, 24:7, 24:24, 27:23, 28:13, 30:10, 30:17, 35:1, 37:18, 44:10, 54:5, 63:9, 64:11, 65:20
**PLAINTIFFS** [1] - 1:22
**plaintiffs'** [4] - 29:7, 70:21, 72:17, 73:8
**plan** [1] - 7:1
**planned** [1] - 7:25
**play** [2] - 18:2, 69:19
**played** [6] - 17:15, 17:22, 17:25, 49:18, 49:19, 50:17
**playing** [1] - 57:6
**plays** [1] - 16:14
**pleading** [1] - 41:19
**pleasure** [1] - 40:10
**point** [31] - 11:7, 16:20, 17:5, 21:12, 26:4, 26:19, 33:21, 35:14, 44:2, 44:3, 44:25, 47:24, 48:7, 48:12, 49:10, 49:20, 49:22, 53:22, 54:21, 59:19, 61:8, 62:19, 62:21, 62:23, 63:7, 63:14, 64:5, 67:8, 71:21, 73:23, 75:5
**pointed** [5] - 37:8, 41:19, 48:18, 48:24, 54:13
**points** [4] - 63:8, 64:10, 72:10, 74:20
**policies** [1] - 29:4
**policy** [9] - 29:1, 29:2, 30:13, 31:14, 35:24, 58:15, 62:24
**Pontchartrain** [6] - 16:5, 23:17, 28:10, 31:25, 55:11, 71:23
**poor** [1] - 72:1
**population** [2] - 49:18, 58:1
**portions** [1] - 47:19
**position** [6] - 11:12, 49:8, 50:3, 64:13,

67:23, 67:25
**possibility** [1] - 43:25
**potential** [2] - 27:11, 32:16
**pothole** [1] - 38:23
**Powell** [1] - 41:18
**POYDRAS** [4] - 2:2, 4:6, 5:3, 5:20
**Poydras** [1] - 41:9
**precedent** [1] - 10:16
**precise** [1] - 43:5
**preclude** [1] - 63:19
**preempting** [1] - 7:24
**prefer** [1] - 7:3
**prejudice** [1] - 24:7
**Prejudice** [1] - 24:8
**prematurely** [1] - 11:25
**premise** [1] - 45:24
**premised** [1] - 28:6
**prepared** [2] - 7:1, 75:24
**prescient** [1] - 40:25
**presence** [1] - 31:3
**presentation** [3] - 7:2, 7:25, 72:21
**presented** [1] - 65:4
**preserved** [1] - 37:14
**preserves** [1] - 37:11
**president** [2] - 22:9, 48:6
**president's** [1] - 71:16
**pretty** [1] - 70:11
**prevail** [2] - 63:6, 75:12
**previous** [1] - 41:4
**previously** [1] - 73:18
**primarily** [1] - 51:19
**primary** [1] - 73:19
**principal** [2] - 36:25, 37:12, 55:16
**principles** [2] - 37:15, 75:2
**privilege** [1] - 50:11
**probed** [1] - 67:21
**problem** [2] - 23:4, 51:20
**problematic** [2] - 32:22, 37:17
**problems** [3] - 15:24, 57:15, 68:24
**procedures** [1] - 62:7
**proceeding** [1] - 69:9
**proceedings** [2] - 76:6, 76:18
**PROCEEDINGS** [3] - 1:18, 5:22, 6:1
**process** [4] - 7:7, 13:1, 60:18, 70:23

**PROCTER** [1] - 4:1
**PROCTOR** [1] - 2:17
**PRODUCED** [1] - 5:23
**Professional** [1] - 76:14
**project** [77] - 8:22, 9:1, 9:2, 9:9, 9:13, 9:19, 10:2, 10:4, 10:5, 10:14, 10:20, 10:25, 11:3, 11:11, 12:20, 14:19, 15:10, 15:21, 16:21, 17:7, 19:7, 19:15, 21:5, 21:20, 21:21, 24:2, 26:20, 28:9, 30:2, 31:2, 31:9, 31:11, 31:13, 31:16, 32:14, 33:15, 33:20, 37:22, 38:5, 38:7, 40:15, 41:11, 41:22, 41:24, 43:4, 49:6, 51:13, 52:22, 52:25, 54:3, 54:6, 55:1, 55:3, 56:22, 56:24, 57:9, 60:2, 60:7, 61:16, 62:13, 62:22, 63:12, 63:19, 64:20, 64:22, 65:8, 65:9, 65:22, 66:10, 66:14, 67:17, 71:10, 71:14, 71:15, 71:23
**Project** [3] - 33:23, 33:24, 51:18
**projects** [10] - 18:6, 18:14, 19:18, 31:18, 49:3, 53:22, 57:10, 65:12, 65:15, 68:6
**prolonged** [1] - 74:7
**proof** [3] - 45:18, 48:15, 50:21
**proper** [1] - 62:2
**properly** [1] - 12:14
**property** [5] - 51:20, 52:1, 52:2, 58:2, 75:11
**proposed** [2] - 54:11, 63:25
**proposition** [5] - 18:15, 67:2, 67:25, 68:1, 74:16
**propositions** [1] - 74:25
**prospective** [1] - 27:11
**prospectively** [2] - 67:4, 67:5
**protect** [9] - 15:21, 17:21, 21:15, 23:19, 25:10, 25:16, 29:9, 32:4, 58:19
**protected** [3] - 27:22,

38:2, 58:19
**protection** [19] - 12:24, 12:25, 15:19, 24:15, 25:17, 25:25, 26:24, 26:25, 27:1, 27:9, 27:18, 27:20, 27:24, 28:9, 31:3, 50:7, 58:21, 61:23, 62:11
**protective** [2] - 12:7, 27:5
**protons** [3] - 20:5, 20:9, 20:14
**proud** [1] - 75:25
**provide** [1] - 61:23
**provided** [2] - 18:10, 19:1
**proving** [1] - 18:12
**provision** [1] - 49:5
**proximity** [1] - 24:18
**public** [3] - 60:8, 62:9, 62:11
**pump** [2] - 50:22, 56:16
**purpose** [6] - 20:18, 20:22, 33:5, 34:7, 58:20, 60:2
**purposes** [10] - 33:22, 35:2, 35:5, 36:24, 37:23, 40:15, 40:16, 41:12, 51:14, 68:8
**purview** [2] - 10:5, 12:19
**put** [7] - 16:19, 17:20, 25:18, 27:2, 55:2, 61:1, 63:25
**puts** [1] - 31:17
**putting** [1] - 27:4

## Q

**qua** [1] - 72:22
**qualified** [1] - 51:9
**qualify** [1] - 50:5
**quantities** [1] - 16:4
**quantum** [2] - 20:11, 20:13
**quarks** [1] - 20:8
**quarry** [1] - 55:2
**questions** [20] - 7:3, 7:10, 7:17, 7:18, 7:19, 8:8, 8:10, 16:18, 19:10, 21:10, 23:22, 33:2, 33:4, 33:12, 40:1, 40:4, 40:7, 40:9, 60:17, 70:16
**quieter** [1] - 24:25
**quintessence** [1] - 7:8

**quite** [2] - 30:2, 53:9
**quote** [1] - 65:3
**quotes** [1] - 36:14

## R

**Railway** [2] - 10:17, 10:23
**rainfall** [2] - 50:22, 56:17
**rainwater** [1] - 73:4
**raises** [1] - 16:16
**ram** [2] - 47:18, 74:18
**RANIER** [1] - 5:13
**rate** [2] - 8:6, 26:9
**rather** [1] - 16:1
**rationales** [1] - 68:7
**RE** [1] - 1:4
**re** [3] - 6:11, 42:4, 73:18
**reach** [1] - 27:21
**Reach** [16] - 27:21, 44:25, 45:12, 46:3, 46:9, 46:17, 47:14, 47:20, 49:16, 50:8, 50:24, 53:16, 53:17, 54:1
**reaches** [1] - 7:11
**read** [7] - 7:4, 7:25, 17:2, 17:3, 22:15, 22:16, 35:9, 35:10, 37:18, 48:6, 57:5
**reading** [1] - 18:18
**ready** [1] - 71:24
**real** [3] - 7:1, 27:14, 45:22
**reality** [1] - 13:6
**realize** [1] - 29:8
**realizes** [1] - 29:2
**really** [23] - 8:2, 11:14, 16:14, 18:23, 18:24, 19:15, 20:25, 21:3, 21:8, 22:24, 25:14, 30:14, 35:3, 36:1, 37:17, 38:12, 43:21, 48:20, 55:17, 67:21, 67:24, 72:14, 72:19
**Realtime** [1] - 76:13
**reason** [9] - 10:3, 10:7, 17:12, 17:17, 17:18, 17:19, 29:18, 31:14, 69:4
**reasonable** [2] - 65:11, 65:17
**reasoning** [1] - 8:24
**reasons** [6] - 21:7, 33:25, 55:16, 60:13, 63:5, 69:25
**rebut** [1] - 24:24

**rebuts** [1] - 71:3
**rebuttal** [1] - 70:13
**rebutted** [1] - 61:25
**recent** [1] - 71:9
**recognizance** [1] - 25:3
**recognized** [3] - 25:12, 25:13, 32:18
**recommendations** [1] - 28:11
**recondite** [2] - 35:7, 35:10
**record** [17] - 22:7, 42:23, 43:6, 46:25, 47:5, 47:7, 47:13, 56:13, 57:23, 61:17, 61:25, 62:8, 62:10, 62:23, 72:7, 74:25, 76:18
**RECORDED** [1] - 5:22
**reduce** [1] - 7:8
**refer** [2] - 24:21, 39:25
**reference** [3] - 24:9, 42:18
**referenced** [1] - 42:17
**referred** [2] - 22:9, 27:14
**refers** [1] - 27:4
**regard** [3] - 46:2, 63:18, 74:3
**regarded** [1] - 11:21
**regarding** [2] - 6:11, 23:23
**regardless** [6] - 29:7, 30:4, 30:13, 50:2, 50:4, 65:7
**region** [1] - 58:2
**Registered** [1] - 76:13
**regulatory** [1] - 62:7
**rejected** [1] - 49:4
**relate** [2] - 11:3, 30:14
**related** [8] - 12:20, 20:10, 20:20, 20:21, 31:16, 34:7, 45:5, 53:5
**relates** [1] - 43:10
**relating** [1] - 75:9
**relationship** [6] - 20:15, 21:13, 22:4, 34:24, 58:12, 68:8
**relative** [1] - 24:18
**release** [3] - 35:3, 40:17, 51:15
**released** [2] - 35:5, 37:23
**relevant** [2] - 40:16, 51:14
**reliance** [1] - 31:3
**rely** [1] - 48:17
**remember** [2] - 20:14,

57:3
**reminded** [2] - 58:24, 63:15
**removed** [1] - 24:13
**repair** [3] - 36:12, 52:24
**repeal** [1] - 36:10
**repealed** [2] - 35:17, 36:8
**repeals** [1] - 35:19
**repeat** [1] - 17:2
**repeated** [2] - 66:11, 66:12
**repetitive** [1] - 8:2
**repled** [1] - 68:23
**report** [11] - 25:2, 25:3, 26:5, 28:8, 28:15, 45:13, 46:19, 47:1, 47:2, 53:9, 63:25
**Reporter** [2] - 76:13, 76:14, 76:15, 76:24
**REPORTER** [1] - 5:20
**REPORTER'S** [1] - 76:11
**request** [1] - 71:16
**require** [1] - 49:12
**required** [7] - 11:17, 13:18, 13:23, 15:20, 26:1, 39:5, 41:15
**requirement** [1] - 9:1
**requires** [2] - 56:7, 73:12
**rescue** [3] - 14:8, 14:9, 21:1
**reserve** [1] - 13:18
**respect** [8] - 11:13, 18:7, 18:17, 25:15, 25:16, 29:14, 42:10, 50:10
**respectfully** [1] - 43:16
**respects** [1] - 42:24
**responded** [2] - 59:5, 59:7
**responding** [1] - 54:15
**responds** [1] - 67:20
**response** [2] - 28:1, 61:21
**rest** [1] - 76:1
**restatement** [1] - 69:10
**restricted** [1] - 10:9
**restriction** [2] - 39:8, 39:11
**result** [7] - 17:9, 17:14, 27:12, 31:12, 31:19, 65:21, 70:5
**resulting** [3] - 16:24,

17:9, 26:12
**results** [2] - 18:1, 31:15
**retroactively** [1] - 66:23
**return** [1] - 34:5
**returned** [1] - 10:16
**reversed** [1] - 43:19
**Review** [1] - 22:15
**rewarded** [1] - 62:25
**rich** [1] - 26:15
**RICHARD** [1] - 4:2
**RIDGELAKE** [1] - 3:9
**rightly** [2] - 38:15, 73:6
**rigidly** [1] - 7:22
**rise** [2] - 6:7, 23:18
**rises** [2] - 49:17, 56:12
**River** [2] - 41:5, 47:19
**river** [1] - 41:6
**ROAD** [1] - 4:19
**Robert** [1] - 45:5
**ROBERT** [2] - 5:6, 5:14
**Robin** [1] - 6:18
**ROBIN** [1] - 3:23
**ROBINSON** [1] - 1:9
**Robinson** [4] - 64:10, 64:11, 68:21, 68:23
**rocks** [1] - 55:1
**role** [8] - 16:14, 17:16, 17:23, 18:1, 18:2, 38:11, 49:18, 49:19
**roll** [1] - 22:25
**ROOM** [1] - 5:20
**ROUGE** [1] - 2:9
**round** [1] - 36:18
**ROY** [2] - 4:8, 4:9
**RPR** [2] - 5:20, 76:23
**rubric** [1] - 18:16
**ruled** [1] - 63:8
**ruling** [1] - 73:18

## S

**salinity** [3] - 15:24, 26:17, 31:24
**SANDERS** [1] - 3:8
**save** [1] - 48:3
**saw** [2] - 17:18, 24:9
**Scalia** [1] - 59:12
**scenario** [1] - 48:21
**school** [2] - 20:14, 73:16
**SCHULTZ** [1] - 2:18
**science** [1] - 47:13
**scope** [2] - 18:25, 40:14
**SCOTT** [1] - 3:5

**screw** [2] - 69:17
**se** [1] - 20:23
**sea** [2] - 11:24, 38:9
**Seabrook** [2] - 31:25, 32:15
**season** [1] - 15:5
**Second** [1] - 65:10
**second** [9] - 28:25, 38:3, 49:14, 60:15, 61:13, 64:23, 67:15, 74:16, 74:25
**Secondly** [1] - 74:13
**SECTION** [1] - 1:7
**Section** [3] - 65:6, 65:23, 69:10
**Sediment** [1] - 26:12
**see** [12] - 13:2, 13:3, 18:22, 19:13, 20:2, 20:3, 21:11, 35:3, 37:13, 61:4, 63:6, 66:15
**seeing** [1] - 13:11
**seem** [1] - 62:16
**segregable** [1] - 75:10
**segregate** [2] - 45:25, 51:1
**segregated** [1] - 69:1
**segregation** [1] - 43:24
**semi** [1] - 33:11
**semi-first** [1] - 33:11
**send** [1] - 34:23
**sending** [1] - 23:3
**sense** [2] - 19:13, 48:18
**sentence** [2] - 28:9, 34:3
**separate** [6] - 18:13, 18:20, 19:17, 61:9, 68:7, 68:8
**separately** [2] - 68:5, 68:6
**series** [3] - 7:10, 7:17
**Service** [1] - 62:3
**set** [1] - 10:9
**settled** [2] - 71:25, 72:1
**Seventh** [1] - 38:19
**several** [1] - 48:25
**severe** [1] - 25:4
**SEWERAGE** [1] - 5:1
**shall** [1] - 7:25
**shed** [1] - 40:7
**sheds** [1] - 62:24
**sheet** [1] - 71:16
**ships** [1] - 27:3
**shoots** [1] - 49:16
**shore** [2] - 27:2, 27:4
**Shoreline** [1] - 27:9

**shoreline** [7] - 24:15, 25:25, 26:24, 26:25, 27:1, 27:18, 27:19
**show** [7] - 15:19, 42:20, 44:20, 45:13, 46:9, 50:17, 68:13
**showed** [1] - 17:15
**showing** [1] - 60:1
**shown** [1] - 63:2
**shows** [4] - 47:7, 56:13, 60:4
**siblings** [1] - 53:6
**side** [11] - 24:8, 24:16, 24:17, 25:6, 25:8, 25:25, 27:20, 27:22, 47:21, 47:22, 63:20
**sides** [2] - 8:11, 44:24
**sidewalk** [4] - 53:14, 53:18, 53:19
**significance** [1] - 7:23
**simple** [4] - 27:6, 44:21, 53:22, 56:13
**simply** [5] - 11:1, 21:13, 25:22, 28:4, 67:2
**sine** [1] - 72:22
**single** [3] - 19:16, 20:3, 34:3
**SISTRUNK** [1] - 4:21
**sitting** [2] - 70:25, 71:5
**situation** [3] - 25:13, 25:14, 41:25
**six** [2] - 44:9, 44:10
**Sixth** [1] - 38:19
**sized** [1] - 38:23
**slightly** [2] - 64:13, 64:16
**sludge** [1] - 53:3
**small** [1] - 59:18
**SMITH** [61] - 2:20, 3:23, 6:18, 8:17, 8:23, 9:8, 9:22, 11:4, 11:12, 12:3, 12:7, 12:11, 12:19, 13:7, 14:6, 16:3, 16:8, 17:4, 17:11, 18:19, 19:9, 19:12, 20:7, 20:13, 21:12, 22:13, 22:23, 24:4, 24:7, 24:13, 25:3, 25:6, 25:11, 26:22, 27:17, 28:4, 28:20, 29:14, 29:18, 29:21, 29:24, 30:8, 30:16, 32:3, 33:13, 34:21, 35:11, 36:1, 36:6, 36:12, 36:20, 36:23, 37:6, 37:10, 38:23, 39:21, 45:3, 70:15, 70:19,

75:21, 76:3
**Smith** [11] - 6:18, 8:13, 14:13, 28:25, 45:2, 51:5, 55:12, 58:16, 70:7, 73:14, 75:20
**Smith's** [2] - 55:6, 58:24
**smoosh** [3] - 68:1, 68:9
**Socratic** [1] - 7:12
**solely** [2] - 31:23, 72:12
**solution** [1] - 31:25
**someone** [1] - 27:15
**sometimes** [1] - 59:20
**somewhere** [1] - 50:24
**song** [1] - 44:22
**sorry** [1] - 60:8
**sort** [6] - 10:21, 24:2, 27:4, 35:23, 38:7, 40:11
**sounded** [2] - 57:21, 57:22
**sounds** [2] - 27:2, 29:14
**Sounds** [1] - 61:6
**source** [3] - 30:12, 32:4, 32:16
**SOUTH** [1] - 1:23
**south** [2] - 24:16, 47:22
**SOUTHWEST** [1] - 3:13
**southwest** [1] - 26:14
**sovereign** [8] - 18:20, 36:25, 37:7, 37:11, 37:14, 37:16, 37:19, 37:21
**specific** [1] - 11:8
**specifically** [4] - 8:20, 16:6, 16:9, 44:20
**specified** [1] - 30:24
**speed** [2] - 49:15, 74:2
**spent** [1] - 54:15
**SPH** [3] - 61:24, 62:1, 62:2
**sponsor** [1] - 26:1
**SPRINGS** [1] - 3:13
**springs** [1] - 59:16
**St** [3] - 31:6, 50:16, 57:20
**ST** [3] - 2:21, 3:6, 3:19
**stage** [2] - 14:22
**stakes** [1] - 61:1
**stand** [2] - 21:7, 64:11
**standard** [1] - 61:16
**standing** [1] - 18:9
**standpoint** [2] - 13:5, 75:23

**stands** [1] - 65:1
**STANWOOD** [1] - 1:18
**start** [5] - 7:17, 8:1, 8:2, 70:20
**starting** [2] - 22:25, 41:14
**starts** [1] - 15:5
**state** [5] - 40:21, 50:20, 64:9, 71:5, 71:14
**statement** [2] - 42:22, 64:21
**statements** [1] - 54:11
**States** [12] - 6:19, 20:4, 31:17, 33:20, 48:6, 55:22, 65:5, 65:13, 65:22, 65:24, 76:15, 76:25
**STATES** [3] - 1:1, 1:19, 3:22
**STATION** [1] - 3:24
**statute** [7] - 11:17, 13:20, 13:22, 40:13, 52:17, 55:7, 58:8
**statutes** [1] - 37:2
**steadily** [1] - 26:9
**STEIN** [1] - 5:14
**STENOGRAPHY** [1] - 5:22
**STEPHEN** [1] - 2:21
**Stephens** [1] - 52:7
**steps** [1] - 17:19
**Stevens** [2] - 56:6, 59:16
**STEVENS** [2] - 2:14, 2:14
**still** [7] - 13:10, 47:8, 55:15, 57:6, 60:24, 69:23, 70:23
**stipulate** [1] - 64:1
**stipulated** [1] - 51:16
**STONE** [1] - 4:13
**stood** [1] - 48:24
**stop** [2] - 25:25, 69:14
**stopped** [2] - 56:20, 70:24
**storm** [8] - 15:14, 15:15, 16:11, 17:14, 22:1, 22:24, 23:15, 72:11
**stranded** [2] - 14:8, 21:2
**STREET** [12] - 1:23, 2:2, 2:6, 2:12, 2:18, 3:2, 3:16, 4:6, 4:9, 4:14, 5:3, 5:20
**Street** [1] - 51:1
**street** [4] - 53:15, 53:18, 53:20
**stretches** [1] - 53:16

**strong** [1] - 34:22
**stronger** [2] - 17:19, 58:4
**strongest** [1] - 70:21
**strongly** [1] - 34:18
**structures** [3] - 21:16, 58:10, 58:11
**student** [1] - 22:17
**studied** [4] - 17:22, 18:1, 26:2, 72:16
**study** [4] - 17:13, 17:14, 17:18, 18:2
**subject** [5] - 18:6, 18:9, 32:13, 50:2, 72:15
**submit** [1] - 65:25
**submitted** [1] - 71:2
**substantial** [6] - 42:22, 47:19, 63:5, 67:15, 69:11, 74:4
**Substantially** [1] - 28:11
**substantially** [4] - 28:14, 28:18, 60:12, 61:20
**substantiated** [1] - 22:5
**subterranean** [1] - 51:22
**sued** [2] - 50:1, 50:2
**suffered** [1] - 65:20
**sufficient** [4] - 11:16, 13:12, 15:17, 21:22
**suggest** [1] - 29:22
**suggests** [5] - 32:24, 34:18, 38:10, 38:13, 61:10
**suing** [2] - 23:12, 72:23
**SUITE** [10] - 1:24, 2:2, 2:18, 2:22, 3:6, 3:10, 4:6, 4:19, 4:23, 5:3
**summarized** [1] - 46:25
**summary** [5] - 42:23, 60:6, 63:19, 74:20, 74:23
**sunny** [1] - 15:4
**support** [5] - 18:15, 54:12, 54:22, 67:2, 72:17
**supported** [2] - 72:7, 72:13
**suppose** [2] - 65:11, 72:11
**Supreme** [9] - 34:2, 36:13, 39:2, 39:7, 51:25, 55:21, 59:17, 59:20, 66:4
**surely** [1] - 66:12

**surge** [22] - 16:11, 22:1, 22:25, 23:15, 44:8, 44:11, 45:7, 45:10, 45:12, 45:19, 45:20, 46:3, 46:5, 46:9, 47:6, 48:1, 56:9, 57:15, 72:12, 73:22, 73:24, 74:14
**surges** [1] - 17:14
**surging** [1] - 23:3
**surrounded** [1] - 73:6
**surrounding** [1] - 16:25
**survive** [1] - 36:18
**surviving** [1] - 50:11
**suspend** [1] - 50:5
**sustain** [1] - 54:5
**SUTTERFIELD** [1] - 4:5
**swallow** [1] - 38:23
**swamp** [1] - 47:9
**synonym** [1] - 12:5
**system** [6] - 12:24, 12:25, 31:4, 59:10, 59:11, 61:23

**T**

**Tab** [6] - 40:23, 44:13, 45:13, 45:19, 46:24, 53:11
**talisman** [1] - 52:5
**talks** [3] - 16:4, 36:15, 68:24
**taller** [1] - 58:4
**tantamount** [1] - 35:18
**teach** [1] - 48:20
**teaches** [1] - 48:22
**teaching** [2] - 34:18, 34:22
**tens** [1] - 45:17
**tension** [1] - 66:20
**term** [1] - 24:6
**terms** [7] - 9:11, 10:19, 18:21, 37:11, 64:13, 65:3, 70:11
**test** [18] - 8:11, 34:23, 39:14, 48:24, 50:20, 64:14, 64:15, 65:3, 65:18, 65:25, 66:2, 66:12, 66:15, 67:19, 70:1, 70:3, 70:4
**testify** [1] - 71:24
**testimony** [1] - 74:7
**testing** [2] - 11:22, 11:23
**tests** [2] - 38:25, 70:3
**text** [11] - 13:19,

13:21, 37:24, 38:6, 38:8, 38:10, 39:12, 40:13, 40:20, 51:6, 55:6
**THE** [130] - 1:11, 1:12, 1:18, 1:22, 2:11, 3:1, 3:22, 4:17, 4:17, 6:7, 6:8, 6:10, 6:13, 6:17, 6:20, 6:23, 8:18, 9:7, 9:15, 11:1, 11:7, 11:14, 12:6, 12:9, 12:17, 13:4, 13:17, 15:18, 16:6, 16:18, 17:5, 18:5, 19:8, 19:10, 20:5, 20:8, 20:11, 21:6, 22:6, 22:15, 23:21, 24:5, 24:8, 24:20, 25:4, 25:9, 26:4, 27:16, 27:23, 28:17, 28:22, 29:17, 29:19, 29:23, 30:4, 30:9, 31:21, 33:2, 34:19, 35:6, 35:13, 36:5, 36:9, 36:17, 36:21, 37:5, 37:9, 38:22, 39:18, 39:22, 40:2, 40:4, 40:11, 40:24, 42:16, 43:9, 43:18, 44:1, 44:3, 44:5, 44:8, 44:15, 44:22, 45:2, 45:24, 46:6, 46:12, 46:20, 48:16, 49:8, 49:22, 50:13, 51:5, 51:22, 52:2, 52:8, 52:14, 53:1, 53:8, 53:12, 54:13, 55:4, 55:12, 55:15, 56:25, 57:7, 58:14, 59:1, 59:12, 59:23, 60:14, 60:17, 61:3, 61:5, 62:12, 62:16, 63:13, 63:22, 64:7, 66:18, 66:25, 67:4, 68:16, 70:6, 70:17, 73:14, 75:17, 75:20, 75:22
**theirs** [1] - 75:13
**theme** [1] - 8:3
**themselves** [2] - 11:16, 38:6
**theories** [1] - 46:21
**theory** [7] - 42:15, 49:11, 72:25, 73:9, 73:18, 73:19, 73:25
**therefore** [4] - 13:21, 48:20, 67:15, 72:6
**Therefore** [1] - 58:3
**they've** [3] - 26:23, 41:15, 68:3
**thinking** [1] - 60:24

**third** [1] - 60:5, 74:25
**THOMAS** [2] - 2:17, 4:22
**thoughts** [1] - 25:24
**thousand** [2] - 24:10, 24:13
**thousands** [1] - 45:17
**threat** [1] - 32:14
**three** [25] - 8:14, 39:3, 41:20, 42:24, 43:7, 44:18, 44:20, 45:11, 46:10, 47:5, 47:25, 48:13, 48:14, 56:12, 57:14, 65:2, 71:13, 72:11, 73:22, 74:6, 74:8, 74:10, 74:11, 75:9
**three-foot** [1] - 46:10
**tidal** [3] - 12:5, 12:9, 13:21
**tides** [1] - 32:13
**tired** [1] - 70:9
**TO** [2] - 1:8, 6:4
**today** [2] - 48:23, 64:14
**together** [3] - 20:16, 37:13, 68:1
**took** [8] - 16:21, 17:6, 19:15, 33:21, 41:7, 53:24, 53:25, 54:1
**tort** [6] - 33:18, 43:2, 48:4, 68:15, 69:4, 69:10
**Tort** [1] - 65:24
**Torts** [1] - 52:18
**TORTS** [1] - 3:24
**totally** [5] - 25:14, 30:20, 31:15, 38:9, 39:9
**touch** [1] - 42:12
**toward** [3] - 25:7, 32:10, 68:19
**tower** [6] - 67:9, 67:11, 67:12, 67:13, 67:14
**town** [1] - 67:10
**trade** [1] - 59:5
**trade-off** [1] - 59:5
**transcribed** [1] - 34:16
**transcript** [1] - 76:17
**TRANSCRIPT** [2] - 1:18, 5:22
**TREEBY** [1] - 4:13
**trial** [6] - 27:13, 33:19, 46:22, 48:7, 56:11, 71:22
**tried** [5] - 15:21, 28:13, 43:6, 54:7, 54:16

**trigger** [1] - 74:12
**true** [2] - 59:4, 76:16
**trump** [1] - 18:16
**trumping** [1] - 18:19
**try** [6] - 7:8, 7:11, 11:15, 39:1, 69:13, 69:16
**trying** [9] - 13:17, 15:6, 15:14, 21:16, 29:21, 37:4, 42:20, 47:24, 51:23
**tsunami** [9] - 11:25, 12:4, 12:10, 12:13, 13:20, 15:8, 49:15, 58:10
**TUESDAY** [2] - 1:8, 6:2
**Tulane** [2] - 22:17, 45:7
**tune** [1] - 7:12
**Tupelo** [1] - 47:9
**turn** [4] - 44:13, 49:12, 54:2, 55:2
**turning** [1] - 40:22
**turns** [2] - 12:24, 53:17
**tweaked** [1] - 64:13
**twelve** [1] - 45:21
**twelve-and-a-half** [1] - 45:21
**twice** [2] - 55:22, 65:2
**two** [23] - 9:22, 13:15, 18:6, 18:13, 18:20, 19:17, 19:18, 33:2, 35:24, 37:2, 37:13, 37:19, 37:25, 38:1, 39:25, 41:20, 47:21, 53:22, 60:13, 60:15, 61:20, 73:4
**types** [1] - 37:12

**U**

**ultimate** [1] - 29:2
**ultimately** [1] - 59:12
**umbrella** [1] - 46:22
**unable** [1] - 37:22
**unanimous** [1] - 59:15
**unanimously** [2] - 52:6, 52:8
**unaware** [1] - 32:24
**unconnected** [6] - 10:13, 29:10, 49:3, 65:14, 65:22, 67:16
**uncontested** [1] - 54:19
**undeniable** [1] - 23:7
**under** [16] - 9:14, 9:25, 11:24, 12:2, 13:21,

19:14, 21:7, 28:19, 37:15, 46:21, 50:2, 50:19, 52:21, 65:24, 70:3
**undertaken** [2] - 64:20, 64:22
**undisputed** [1] - 47:4
**unequivocal** [1] - 66:5
**unequivocally** [1] - 66:4
**unfortunately** [1] - 34:15
**UNITED** [3] - 1:1, 1:19, 3:22
**United** [12] - 6:19, 20:4, 31:17, 33:20, 48:6, 55:22, 65:5, 65:13, 65:22, 65:24, 76:15, 76:25
**unknown** [1] - 47:6
**unless** [3] - 45:6, 52:22, 72:8
**unleveed** [1] - 25:5
**unlike** [1] - 25:14
**unlimited** [1] - 38:20
**unrebutted** [1] - 70:22
**unrelated** [5] - 21:18, 29:16, 38:22, 63:11
**unusual** [1] - 71:14
**up** [27] - 7:14, 7:15, 7:16, 11:4, 13:17, 15:14, 16:16, 19:21, 19:22, 19:23, 19:25, 21:16, 38:25, 39:24, 40:5, 43:12, 46:14, 48:3, 56:12, 57:2, 68:21, 69:17, 70:16, 71:24, 72:9
**uphill** [1] - 43:21
**urge** [1] - 75:13

**V**

**vacuum** [2] - 10:15, 48:18
**Valley** [3] - 33:22, 33:24, 51:18
**VAN** [1] - 5:15
**variations** [1] - 8:2
**various** [1] - 29:4
**Varuso** [1] - 47:2
**vast** [2] - 16:4, 46:16
**venerable** [1] - 36:14
**vertical** [1] - 62:3
**vessel** [2] - 41:5, 47:18
**vexes** [1] - 43:11
**vice** [1] - 22:9
**vice-president** [1] -

22:9
**vicinity** [1] - 47:7
**VICTOR** [1] - 2:15
**view** [4] - 18:19, 20:2, 33:21, 58:11
**viewed** [2] - 21:4, 38:15
**viewing** [2] - 27:11, 38:4
**Violet** [2] - 53:17, 54:2
**virtue** [1] - 52:5
**vis** [2] - 13:24
**vis-a-vis** [1] - 13:24
**VOICES** [1] - 6:9

# W

**Wait** [2] - 52:2, 59:13
**wait** [2] - 43:16, 44:4
**waived** [1] - 37:16
**waiver** [3] - 37:6, 37:19, 37:20
**waivers** [2] - 18:20, 36:25
**walked** [1] - 53:20
**walls** [1] - 56:19
**walrus** [1] - 38:23
**walrus-sized** [1] - 38:23
**WALTHER** [1] - 4:13
**wants** [1] - 31:18
**Ward** [3] - 23:20, 47:22, 57:21
**warn** [1] - 66:8
**warnings** [2] - 22:2, 22:4
**WARSHAUER** [1] - 2:1
**wash** [2] - 27:3
**washed** [1] - 12:7
**washing** [1] - 73:2
**WASHINGTON** [3] - 3:25, 4:3, 4:12
**waste** [1] - 74:24
**WATER** [1] - 5:1
**water** [26] - 14:14, 14:19, 16:4, 16:16, 16:23, 17:9, 22:18, 22:20, 22:21, 26:16, 26:17, 32:4, 32:6, 32:7, 32:8, 32:9, 32:25, 41:7, 44:9, 47:17, 56:9, 67:8, 67:9, 69:1, 74:9, 74:10
**waters** [32] - 9:4, 9:8, 12:12, 12:13, 13:21, 15:2, 15:5, 15:9, 15:10, 21:9, 22:22, 22:24, 23:1, 23:3,

23:4, 23:6, 23:10, 23:16, 23:17, 34:8, 35:4, 39:10, 40:16, 40:18, 42:12, 48:19, 51:13, 52:10, 58:19
**waterway** [9] - 12:23, 13:1, 19:20, 21:20, 24:14, 24:19, 25:21, 32:3, 32:12
**wave** [5] - 12:5, 12:9, 13:21, 18:11, 27:3
**ways** [3] - 9:22, 30:11, 60:12
**wayside** [1] - 10:21
**wazoo** [1] - 70:16
**Weather** [1] - 62:3
**WEBB** [2] - 4:5, 4:5
**week** [1] - 76:2
**west** [1] - 24:16
**wetlands** [15] - 16:16, 16:24, 23:11, 23:12, 23:13, 32:22, 43:1, 45:5, 45:8, 45:9, 45:17, 63:17, 73:23
**whatsoever** [3] - 9:13, 31:11, 34:7
**WHEREUPON** [1] - 76:6
**whichever** [1] - 9:5
**whole** [2] - 20:3, 28:5
**Wholly** [1] - 38:22
**wholly** [1] - 29:16
**wide** [1] - 49:25
**widening** [2] - 26:9, 63:21
**WILES** [1] - 2:21
**WILLIAM** [1] - 4:13
**WIMBERLY** [1] - 2:24
**win** [1] - 75:4
**WITTMANN** [1] - 4:13
**wonderful** [1] - 47:8
**wondering** [1] - 36:10
**Wonderland** [1] - 50:6
**word** [3] - 12:5, 25:15, 35:7
**words** [10] - 13:4, 15:3, 22:22, 25:7, 27:11, 28:6, 35:4, 56:18, 71:15, 75:20
**works** [4] - 12:8, 23:19, 50:7, 69:18
**worthy** [1] - 16:19
**WRIGHT** [1] - 4:8
**write** [2] - 28:13, 57:3
**writing** [1] - 51:7
**wrongful** [1] - 65:14
**wrote** [1] - 22:8
**WYNER** [1] - 4:2

# Y

**year** [5] - 34:9, 34:10, 57:22, 71:18
**years** [9] - 10:17, 16:14, 23:14, 31:5, 57:22, 62:21, 71:12, 71:13, 71:17
**yesterday** [2] - 61:7, 71:3
**yield** [1] - 68:19
**YORK** [2] - 3:3, 4:3
**young** [1] - 22:17