## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| | * | and consolidated cases |
| PERTAINS TO: BARGE | * | |
| | * | SECTION "K" (2) |
| *Boutte v. Lafarge*        05-5531 | * | |
| *Mumford v. Ingram*        05-5724 | * | |
| *Lagarde v. Lafarge*       06-5342 | * | JUDGE |
| *Perry v. Ingram*          06-6299 | * | STANWOOD R. DUVAL, JR. |
| *Benoit v. Lafarge*        06-7516 | * | |
| *Parfait Family v. USA*    07-3500 | * | MAGISTRATE |
| *Lafarge v. USA*           07-5178 | * | JOSEPH C. WILKINSON, JR. |

## MEMORANDUM OF LAFARGE NORTH AMERICA INC.
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR PROTECTIVE ORDER
## AND DECLARATORY AND OTHER RELIEF

On September 8, 2005, LNA hired counsel to investigate media reports that the Barge ING 4727 may have caused the breach of an IHNC floodwall. LNA's counsel hired Centanni Investigative Agency ("Centanni") to assist in the investigation. Over the past years, Centanni has conducted interviews with numerous potential witnesses who lived in the Lower Ninth Ward, asking them for factual information as to the events of August 29, 2005. Recordings and transcripts of the interviews are contemporaneous recollections of events and, thus, highly probative evidence in both the Barge and MRGO cases. In particular, the interviews are important corroborative or impeachment evidence supporting the position of both LNA and the MRGO plaintiffs that the floodwall breach was caused by the government's negligence, not by the barge.

On April 21, 2008, the Court ordered LNA to produce the transcripts of all recorded interviews. [Rec. Doc. 12605.] The Court recognized that Louisiana law says the recordings were not illegal and that ABA Formal Opinion 01-422 says the recordings were not unethical.

But the Court ordered the transcripts disclosed because of the "inherent unfairness of allowing one party to use the tapes to further their case while preventing the other party from doing the same." *Id.* at 8 (citation omitted).  The Court also reasoned that disclosure of this evidence will promote the just disposition of this case. *Id.* at 12.

Having obtained an order requiring production of the interviews, plaintiffs' second motion [Doc. 11765] illogically seeks to prohibit their use and their consideration by the finder of fact.  Plaintiffs ask the Court to rewind history by erasing those contemporaneous interviews and to re-start the litigation clock, thereby limiting the parties and the fact-finder in the MRGO and Barge cases to witnesses who have been "prepped" by the Barge PSLC prior to giving their evidence.

That radical and draconian proposal should not be adopted.  First, it is based on mistaken assertion that the interview transcripts reveal ethics violations by LNA's counsel.  Plaintiffs argue that LRPC 4.3 was violated because the interviewers did not affirmatively tell witnesses they were working for LNA.  As a threshold matter, however, Rule 4.3 only applies to communications by lawyers.  Moreover, plaintiffs' argument relies on a superseded version of LRPC 4.3; the version that has been in effect throughout this case imposes no general affirmative duty to disclose the identity of one's client.  Plaintiffs alternatively argue that LRPC 4.3 was violated because certain witnesses were lied to or misled about the investigators' role.  Not only do plaintiffs fail to prove that for each interview, they fail to prove it for any.  In fact, the transcripts show that the interviewers did not lie, did not claim disinterest, did not tell anyone they were on their side, and if they learned someone was represented by counsel, they stopped the interview.

Moreover, the extreme "remedy" proposed by plaintiffs – the preclusion of highly probative evidence – is utterly unwarranted.  It is contrary to extensive precedent holding that a

party cannot obtain substantive litigation advantage by making ethics charges and that disciplinary rule violations are not addressed through an exclusionary rule.  It will grievously hinder the truth-finding function at the core of this case and the integrity of the litigation.  And it will not impair not only LNA's defense of these gargantuan claims, but also the MRGO plaintiffs' claims against the United States.   For all of these reasons, the appropriate course is to allow full use of the interviews, as appropriate to impeach or refresh recollection, and to let the fact-finder decide, in light of all of the circumstances, how much weight to give to the witnesses' original statements and how much to give to any subsequent testimony.

### INTRODUCTION

After allegations were made about the barge possibly breaching an IHNC floodwall, LNA, through counsel, retained investigators to identify and interview potential witnesses to events in the Lower Ninth Ward during Hurricane Katrina.  As the interview transcripts attached to plaintiffs' motion show, these investigators simply asked the witnesses for the truth about what they had seen and heard.

Plaintiffs now seek to conceal the truth from the fact-finder by moving to forbid the use of the interview transcripts.  The deposition of Sidney Williams, to which plaintiffs' motion devotes a great deal of attention, shows just how important this truth is.  LNA's investigator interviewed Mr. Williams on March 20, 2006.  The interviewer said that "what we're doing is investigating the – the levee breaches over there in the 9th Ward" and that "we're … just trying to find out what really happened out there."  [Pls. Ex. 2, at 2.]  Mr. Williams thereupon gave the following account:

- ► He saw water about to enter his home and evacuated to his attic and then his roof. *Id.* at 2.

- ► The water was into his attic before he got up onto his roof. *Id.*

3

►    He heard three booms <u>after</u> he reached the roof, <u>after</u> the water was up into his attic.  *Id.* at 2-3.

►    He did not see the barge for <u>another hour or more after that</u>, at which time it was already in the neighborhood and the water was high enough for the barge to float over the wall.  *Id.* at 3, 7-9, 12.

►    He does <u>not</u> believe that the barge broke the floodwall.  *Id.* at 8-12.

►    Based on his experience handling barges, empty barges "don't make that much noise" when they strike objects.  *Id.* at 4.

However, apparently after speaking to plaintiffs' counsel prior to his deposition, Mr. Williams testified that, immediately upon reaching his roof, he saw the barge knocking against the flood-wall, causing three loud booms, right before the levee failed.  [Ex. A hereto at 41, 47-50.]

It is vital to the basic purpose of this case – enabling the fact-finder to determine the <u>truth</u> – that it be permitted to consider Mr. Williams' original statement, not only his later, prepared testimony.  Excluding the original statement will not only deny the fact-finder the evidence it needs to do its job, but also cause LNA – and other litigants, including the MRGO plaintiffs – extraordinary prejudice, particularly given that Mr. Williams now claims to be an eyewitness to the barge itself.  Instead, the fact-finder should be permitted to hear both Mr. Williams' original statement and his later testimony and to weigh them for itself in light of all of the surrounding circumstances.

Moreover, plaintiffs' theory that LNA perpetrated a devious plan to "ambush" Mr. Williams is belied by the fact that LNA is the party that noticed Mr. Williams' deposition.  LNA did so expecting favorable testimony consistent with his prior statement:  that the sounds he heard were far too loud to have been caused by a barge, that the barge could not have breached the wall, and that he did not see the barge until well after the levee breach.  It was only because he vastly altered his account that LNA introduced the transcript of the account from his inter-

4

view.  As the transcript reveals, when Mr. Williams continued with his inconsistent testimony, the deposition was interrupted and the statement was produced.  That is no ambush.[1]

Having ordered disclosure of the transcripts on the ground that they should be available for use by all parties, the Court should not now eviscerate its ruling by prohibiting their use and thereby depriving the litigants, the citizens of New Orleans, and the fact-finder of vitally important evidence going directly to the truth of this case.

## ARGUMENT

**A.    LNA's Counsel Did Not Violate The Ethics Rules By Not Requiring The Interviewers To Affirmatively Disclose That They Were Working for LNA**

1.    <u>LNA's counsel did not violate LRPC 4.3</u>.  The ethics rule on which plaintiffs primarily rely is LRPC 4.3 ("Dealing with Unrepresented Person").  Plaintiffs argue that it was violated because (a) the witnesses were not told that the investigators were working for LNA; (b) some of the witnesses were lied to or misled; and (c) the investigators asked witnesses to turn over physical evidence without revealing that it would be sequestered.  Each of these arguments is either legally or factually mistaken.

As a threshold matter, LRPC 4.3 does not even apply to investigator interviews because the Rule's basic purpose is to address the expectations of persons dealing <u>with lawyers</u>.  See *Weider Sports Equip. Co. v. Fitness First, Inc.*, 912 F. Supp. 502, 511-12 (D. Utah 1996) (noting that "the expectations are those of the unrepresented person dealing with a lawyer" and that "[n]o unrepresented person is realistically likely to apply his or her expectations of lawyers to an investigator," but not finding it necessary to decide whether Rule 4.3 can ever apply to the

---

[1] Moreover, plaintiffs' "ambush" allegation is also inconsistent with their own actions in this case.  Mid-way through their earlier deposition of Arthur Murph, after he had testified regarding his recollection of the events of August 29, 2005, plaintiffs for the first time produced a transcript of a secretly-recorded telephone call between Mr. Murph and an attorney from whom Mr. Murph was seeking representation, and sought to use it in his deposition.

activities of a non-lawyer); ABA Formal Opinion 07-445 (Apr. 11, 2007) ("Rule 4.3 ... does not limit factual inquiries but requires both sides to refrain from giving legal advice ....").[2]  There is no basis to believe that any of the witnesses believed that the Centanni investigators were lawyers, and thus LRPC 4.3 does not apply to these interviews.

Moreover, LRPC 4.3 was not violated in any event:

a. <u>No general duty to disclose client</u>. Plaintiffs argue that LRPC 4.3 imposed a duty on LNA's counsel to instruct the investigators to affirmatively identify themselves as working for LNA. Plaintiffs' argument, however, relies on an outdated version of LRPC 4.3 that was repealed by the Supreme Court of Louisiana well before the events of this case took place. The old version of Rule 4.3 said that "[a] lawyer shall assume that an unrepresented person does not understand the lawyer's role in a matter and the lawyer shall carefully explain to the unrepresented person the lawyer's role in the matter." Both of the cases on which plaintiffs' motion relies – *Louisiana State Bar Ass'n v. Harrington*, 585 So. 2d 514, 517 (La. 1990), and *First Nat'l Bank of St. Bernard v. Assavedo*, 764 So.2d 162, 163 (La. App. 4th Cir. 2000) – were based on that language.

The current rule, in effect since 2004 and thus at all times during the interviews, states that "[i]n dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in a matter, the lawyer shall make reasonable efforts to correct the misunderstanding." The revision specifically removed the language that had required the lawyer to assume the witness's misunderstanding and to affirmatively disclose the lawyer's role in the case. Instead, the current version merely

---

[2] *See also Apple Corps Ltd. v. International Collectors Society*, 15 F. Supp. 2d 456, 476 (D.N.J. 1998) ("It is clear from the language of RPC 4.3 that it is limited to circumstances where an attorney is acting in his capacity as a lawyer.").

prohibits the lawyer from stating or implying that he or she is disinterested and imposes an affir-

mative duty of disclosure <u>only if</u> there is evidence that the witness is confused as to the lawyer's

role.  Plaintiffs' charge that LRPC 4.3 imposed an across-the-board duty on LNA's investigators

to inform each witness they were working for LNA is thus wrong as a matter of Louisiana law.[3]

   b. <u>No proof that witnesses were lied to or misled</u>.  Plaintiffs also charge that the

investigators lied to or misled some potential witnesses as to the identity of the investigators'

client.  That allegation, however, would have to be proven up an interview-by-interview basis,

since each conversation was different.  Any suggestion that there were across-by-board misrep-

resentations is disproved not only by the interview transcripts, but also by the attached declara-

tion of Wayne R. Centanni [Ex. B hereto].  Mr. Centanni declares that "[t]he intention of our

interviews was to have the witness relate his/her recollection of events surrounding Hurricane

Katrina.  We never coerced, lied, threatened, or misrepresented ourselves or any facts; we sought

to obtain information regarding the events, circumstances, and facts, surrounding the flooding of

the Ninth Ward.  We asked the persons to share the truth with us about what happened." [*Id.*

¶ 4.][4]  He also declares that the interviews were conducted in the same manner that he, and other

Louisiana investigators, consistently use for witness interviews for attorneys.  [*Id.* ¶¶ 2-3.]

   Plaintiffs' allegations of improper statements in particular interviews all fall flat:

   ▶ Plaintiffs assert [at ¶ 41] that the interviewers "posed as impartial investigators."

But plaintiffs do not quote <u>any</u> statements by the interviewers that they were impartial (or disin-

terested).  Instead, plaintiffs' assertion expressly rests [*id.*] solely on statements in some inter-

---

[3] Plaintiffs' reliance on *Midwest Motor Sports, Inc. v. Arctic Cat Sales, Inc.*, 144 F. Supp. 2d 1147 (D.S.D. 2001), is misplaced:  not only did it not apply Louisiana law, but that decision was affirmed on appeal only under Rule 4.2 without any mention of Rule 4.3.  See 347 F.3d 693 (8th Cir. 2003).

[4] As such, this case also does not raise the kinds of abusive circumstances that Louisiana cases such as *Harrington* were concerned about.  In that case, the lawyer made false statements of material fact to his client's adversary in an effort to intimidate her.  *See* 585 So. 2d at 516.

views to the effect that the investigators were trying to sort through different stories or rumors.

Nothing about such a statement states or implies that the interviewer is impartial or disinterested

– to the contrary, it plainly could be made by a party with a keen interest in the matter.

The same is true of the investigators' statement in some interviews that they were trying

to find out what happened during the hurricane.  [*E.g.*, Pls. Ex. 2 at 2.]  This statement that the

sole purpose of the call was to obtain factual information did not in any way state or imply that

the interviewer was disinterested in the matter.  See *In re Tyco Ltd. Sec. Litig.*, 2001 U.S. Dist.

LEXIS 819 (D.N.H. Jan. 30, 2001) (Rule 4.3 not violated where interviewers stated they were

investigators seeking information because "[t]here is nothing in that to suggest disinterest and it

does not constitute a misrepresentation").[5]

►     Plaintiffs assert [at ¶ 42] that the investigators "evaded direct questions about the

client."  That assertion is not borne out by the transcripts.  Instead, the few witnesses who asked

who the interviewer worked for – and were truthfully told, Centanni Investigative Agency – did

not ask who Centanni's client was.  [Pls. Ex. 25 at 9-10, Pls. Ex. 26 at 2-3.]

►     Plaintiffs assert [at ¶ 43] that the interviews "left some of the interviewees with

the impression that the interviewers were on their side."  On its face, this assertion is a patently

subjective characterization by plaintiffs' counsel.  Plaintiffs do not cite any statements by any

interviewers to any witnesses that they were "on their side."  Nor is that a fair reading of any of

the transcripts cited by plaintiffs [at ¶ 43 n.32], in which the interviewers did not say that they

were on the witnesses' side.

---

[5] Indeed, LRPC 4.3 cannot be construed to impose a duty of disclosure simply because an interviewer asks for the facts, because that is what interviewers do in every case and the Louisiana Supreme Court revised LRPC 4.3 specifically so that it is not triggered in all cases, but rather only where there are misstatements or evidence of witness confusion.

▶    Plaintiffs assert [at ¶ 44] that the investigators "lied to some putative class members" by saying they were "independent private investigators." But plaintiffs cite only two interviews in which this occurred, and in both instances, the interviewers made clear to the witnesses that they were "independent" in the sense that they were not with the Government – which was the truth, not a lie.  [Pls. Ex. 30 at 10; Pls. Ex. 24 at 2-3.]

▶    Plaintiffs assert [at ¶ 45] that one witness was told that his phone number was obtained from a form.  To the contrary, the interviewer specifically told the witness that he got the phone number from his caller ID.  [Pls. Ex. 33, at 3.]  Although the investigator made a misstatement on this point – about which plaintiffs complain – he corrected it immediately thereafter.  [Pls. Ex. 33, at 20.]  Thus, there was no deception.[6]

In sum, plaintiffs have failed to establish that <u>any</u> of the interviews, much less all of them, violated LRPC 4.3, even if that Rule had applied to them.

c.    <u>Physical evidence</u>.  Plaintiffs assert (at ¶ 47 and p. 17) that LNA violated LRPC 4.3 by asking witnesses for evidence that, supposedly, it would have been sequestered.  Not a shred of evidence supports that accusation.  LNA asked its investigators to look for any photos or video capturing the levee breaches (confident that any such pictures would show barge did not cause the levee breach).  To help locate any such videos or photos (as well as witnesses), the investigators posted signs in the neighborhood that read "Saw Levee Break?  Wanted:  Photos / Video / Witnesses.  Call Toll Free."  [Pls. Ex. 17.]

The investigators did not receive any photos or video from any resident of the Lower Ninth Ward, as is clear from Mr. Centanni's prior declaration [Rec. 11037-6; see also Ex. C hereto at ¶ 5].  Moreover, Centanni was not requesting anyone "to turn over irreplaceable

---

[6] See also Pls. Ex. 31 at 12-13 (telling witness that investigators got phone numbers through internet searches and from other witnesses).

physical evidence" that would have been "sequestered."  In short, plaintiffs' allegation is rank speculation, unsupported by any evidence and contrary to the public facts.

        2.     <u>LNA's counsel did not violate LRPC 4.2.</u>  LRPC 4.2(a) forbids communicating "about the subject of the representation with:  a person the lawyer knows to be represented by another lawyer in the matter."  This rule employs an actual knowledge standard – the lawyer must actually know that the witnesses is represented by counsel.  *See* LRPC 1.0(f) ("'knows' denotes actual knowledge of the fact in question").

        Plaintiffs have offered no evidence that LNA's investigators interviewed a single person that LNA, its counsel, or its investigators knew to be represented by counsel.  Indeed, as the transcript from the Ronald McGill interview (Pls. Ex. 22) shows, LNA's investigators immediately terminated interviews upon learning that a person was represented.  *See also* Centanni Decl. ¶ 6 ("if any witness advised us that he/she was represented by counsel, we stopped the interview").  Plaintiffs claim (at ¶ 25, p. 18) that LNA interviewed six individuals (out of 268 interviews) who were represented by counsel.[7]  Yet despite filing 42 exhibits in support of their motion, plaintiffs supply no evidence of when these people retained counsel.  In any event, they certainly have not provided evidence that LNA's investigators *knew* that any of these six individuals were represented when they interviewed them.[8]

        Plaintiffs also allege (at ¶ 27) that several people who were interviewed later became clients of Barge PSLC, but this is no violation of any rule.  In this regard, plaintiffs implicitly concede that the mere filing of a putative class action complaint did not turn all of the members

---

[7]  This includes Ronald McGill, whose interview was immediately terminated when LNA's investigators learned that he was represented by counsel.

[8]  Plaintiffs also allege (at ¶ 29) that LNA's "omits the dates of interviews . . . so that plaintiffs' counsel cannot determine whether Lafarge's counsel knowingly interviewed represented adverse parties."  But plaintiffs know the date of every interview taken of any person whom they represent.  LNA gave them a list of interviewees; they identified their clients; and LNA produced the transcripts, <u>which have the dates on them</u>.

of that hypothetical class into represented parties for purposes of the ethics rules. That point is confirmed by ABA Formal Opinion 07-445 (Apr. 11, 2007), which states that "putative class members are not represented parties for purposes of the Model Rules prior to certification of the class and the expiration of the opt-out period." See also, *e.g.*, *Kay Co. v. Equitable Production Co.*, 2007 U.S. Dist. LEXIS 70328 (S.D.W. Va. Sept. 21, 2007) (same). It is also confirmed by plaintiffs' knowledge and consent that LNA would continue interviews of putative class members who are not clients of the Barge PSLC to avoid the need for hundreds of depositions.

Nor can plaintiffs glean support from *In re Frank*, 2006 WL 1133871 (W.D. La. Apr. 25, 2006) (No. Misc. 06-04), or from Comment 8 to ABA Model Rule 4.2. In *Frank*, a lawyer claimed that he did not know that his client's co-defendant was represented by counsel. *Id.* at *2. The court found that the lawyer's testimony on this point was not credible. *Id.* Comment 8 to ABA Model Rule 4.2 explains: "The prohibition on communications with a represented person only applies in circumstances where the lawyer <u>knows</u> that the person is in fact represented in the matter to be discussed. This means that the lawyer has <u>actual knowledge</u> of the fact of the representation; but such actual knowledge may be inferred from the circumstances. *See* Rule 1.0(f). Thus, the lawyer cannot evade the requirement of obtaining the consent of counsel by closing eyes to the obvious" (emphasis added). In this case, the potential witnesses that LNA's investigators sought to interview were merely residents of the same neighborhood as the plaintiffs. It was <u>not</u> reasonable to expect (much less "infer[] from the circumstances") that <u>each</u> of these residents had retained counsel simply because they lived in that neighborhood.

      3.     <u>LNA's counsel did not violate LRPC 3.3(a)</u>. Plaintiffs' allegations that LNA's counsel violated LRPC 3.3 (candor toward the tribunal) are equally without basis.

a.      Plaintiffs allege that LNA did not turn over the list of people it had interviewed by February 15 "while intending to hide the information so as to ambush Sidney Williams in his [deposition]." This allegation is belied by the facts. Prior to LNA's filing of its motion to quash the Centanni Rule 30(b)(6) deposition, the parties reached an agreement whereby LNA would turn over a list of the residents interviewed by LNA's investigators, along with their contact information, by February 15, 2008. When LNA filed its motion to quash, it informed the Court that it would be turning over this list, as that mooted one of the deposition topics at issue. Counsel for LNA (Mr. Walker) met with plaintiffs' counsel (Mr. Gilbert) on Friday, February 15, 2008, to discuss several discovery-related topics to avoid the need for the Centanni deposition. LNA's counsel brought a copy of the list of interviewees to the meeting, intending to give it to plaintiffs' counsel as agreed. At the meeting, LNA's counsel advised Mr. Gilbert that he had inadvertently printed a copy of the list that had work product notations on it.[9] LNA's counsel did not turn over the copy of the list with work product protected notations on it but nonetheless allowed plaintiffs' counsel to examine the list and discussed its contents. Counsel proceeded to negotiate various discovery issues to avoid the deposition, and continued to send e-mails regarding these negotiations for the remainder of the day and into Saturday and Monday (Presidents Day). The physical turning over of the list (as already agreed) became secondary as counsel concentrated on the long list of conditions requested by plaintiffs to withdraw the Centanni deposition notice, on which there eventually was agreement on Monday. LNA counsel gave Mr. Gilbert the list on the following day, at the scheduled depositions.

The fact that LNA's counsel inadvertently brought the wrong copy of the list was neither an ethical violation nor part of a plot to ambush Mr. Williams at his deposition. While plaintiffs

---

[9] Specifically, the copy of the list had certain witnesses' names highlighted in yellow (showing as highlighted in gray when printed).

12

are all too willing to impute bad faith to LNA's counsel at every turn, their accusation simply is not logical. First, LNA's counsel allowed plaintiffs' counsel to examine the list, which had Mr. Williams' name on it, at the Friday lunch. At that time, Mr. Williams' deposition was calendared for the following Tuesday. Second, LNA had no reason to hide that it had interviewed Mr. Williams. Indeed, it was LNA that had noticed his deposition based on what he told LNA's investigator.

        b.      Plaintiffs also seek to make a LRPC 3.3 issue out of LNA's claim of work product protection for its witness interviews. There was no LRPC 3.3 violation in LNA's explicit and forthright assertion of work-product privilege. Although this Court has found that LNA's work-product protection for the transcripts of its recorded witness interviews has been vitiated, LNA's assertion of the privilege, especially given the ABA Opinion discussed in its prior briefing, was done in good faith and not unreasonable, much less unethical.

        4.      <u>LNA's counsel did not violate LRPC 3.4(a) or (d).</u> LRPC 3.4(a) prohibits "unlawfully obstruct[ing] another party's access to evidence." Plaintiffs cannot and do not identify any "unlawful" act by LNA's counsel. They merely try to recycle their alleged Rule 4.3 violation into an "unlawful obstruct[ion]" of their access to evidence, which is, in any event, not unlawful activity. Regardless, such claims must be supported by evidence and cannot rest solely on opposing counsel's contentions. *Galle v. Orleans Parish School Bd.*, 623 So. 2d 692 (La. App. 1993). Plaintiffs provide no evidence that they have in fact been obstructed from obtaining any evidence; they merely muse on the possibility of an egg-shell witness who is so irredeemably confused by having talked to one investigator that he or she would refuse to talk to plaintiffs' counsel. To date, plaintiffs have supplied this Court with no evidence that they have even

attempted to interview any of the people whom LNA interviewed, much less that they have been stymied in this effort.

Rule 3.4(d) makes it an ethical violation to "fail to make reasonably diligent effort[s] to comply with a legally proper discovery request by an opposing party." LNA made reasonably diligent efforts to respond to plaintiffs' discovery but asserted a work-product objection that it reasonably and in good faith believed to be valid. That this Court ultimately vitiated that protection does not make LNA's assertion of the protection prior to that time a violation of Rule 3.4(d).

     5.    <u>LNA's counsel did not violate LRPC 4.1 or 8.4(c)</u>. Rule 4.1(a) prohibits "mak[ing] a false statement of material fact or law to a third person"[10] and Rule 8.4(c) prohibits "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation." Plaintiffs baldly assert that LNA's counsel, through its investigators, materially misled or lied to interviewees. Plaintiffs level this allegation (at 20) without citing to a single statement that they believe violated these rules. In any event, as shown above, the interviews were not conducted through false statements or fraud.

**B.    Plaintiffs' Requested "Relief" – Preventing LNA From Presenting Probative Evidence to the Finder of Fact – is Both Deeply Inappropriate and Contrary to the April 21 Disclosure Order.**

Plaintiffs' motion fails for the additional reason that its requested "relief" is both legally inappropriate and contrary to this Court's order that the interview transcripts be produced.

---

[10] Rule 4.1(b) prohibits "fail[ure] to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6." Presumably even plaintiffs are not arguing that this provision is at issue.

1.    <u>Preclusion of Witness Statements is Unwarranted</u>.  Plaintiffs primarily seek an order barring LNA from using the interview recordings or transcripts.[11]  Such an order, which will grievously prejudice LNA's defense, is unwarranted for at least three separate reasons.

a.    Plaintiffs' assertion of ethics allegations in an effort to secure litigation advantage is fundamentally improper under Louisiana law.  In *First Nat'l Bank of St. Bernard v. Assavedo*, 764 So. 2d 162, 163 (La. App. 4th Cir. 2000), the court made clear that the disciplinary rules cannot be invoked by an adversary to gain advantage in litigation:

> The Rules are designated to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies.  They are not designed to be a basis for civil liability. <u>Furthermore, the purpose of the rules can be subverted when they are invoked by opposing parties as procedural weapons</u>. <u>The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule</u>.  Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.

*Id.* at 163-64 (emphasis added, citation omitted).[12]  Plaintiffs' reliance on LRPC 4.3 or any other disciplinary rule as a basis for the preclusion of factual evidence or for other litigation advantage is therefore misplaced.  The Louisiana disciplinary rules cannot be used for that purpose.

b.    The preclusion of probative evidence is a drastic sanction that has no possible application here.  As shown above, the statements at issue constitute highly probative factual evidence of the witnesses' recollections prior to any coaching or other preparation.  As such,

---

[11]  Specifically, an order barring LNA "from referring to the recordings or transcripts of surreptitiously recorded interviews in any depositions, any motions or attachments filed in Court as to discovery, liability or damages, or at trial ...."  [Pls. Mot. at 4.]

[12]  The court in *Assavedo* did not find it necessary to rule on this ground, however, since the contact in question had not violated the disciplinary rules in any event.

their use is essential to the very purpose of this litigation – to uncover the truth – and to the parties' (LNA's and the MRGO plaintiffs') ability to litigate the causation issues central to the massive liability claims that are being asserted in these cases. Mr. Williams' statement and subsequent testimony vividly exemplify this point: a fact-finder presented with Mr. Williams' testimony needs to know that he previously gave a different version in extensive and persuasive detail. LNA's ability to defend itself turns in part on being able to present that statement to the fact-finder. Nothing in the ethical allegations leveled by plaintiffs – even if they were right rather than wrong – would remotely justify severely prejudicing LNA's defense or subverting the fundamental truth-finding purpose at the core of these proceedings. Instead, the appropriate course is to present both the statement and the testimony to the fact-finder and to allow the fact-finder to evaluate them in light of their contents, the circumstances of their giving, and all of the other record evidence.

This point is underscored by the fact that the interviews are probative evidence in the entire *Katrina* litigation, not just the Barge cases that are a small part of that litigation. For example, the MRGO plaintiffs have sued the United States alleging that the breach of the IHNC floodwall wall was caused by the government's negligence, <u>not</u> the Barge. Preclusion of statements that the Barge did not cause the wall breach would therefore injure the MRGO plaintiffs as well as LNA. The Barge plaintiffs' motion therefore would undermine the integrity of the entire *Katrina* litigation, not just the Barge cases.

Numerous cases hold that the preclusion of evidence, or similar measures that would severely punish <u>the client</u>, are inappropriate remedies for an attorney's alleged violation of a disciplinary rule. *See Weider Sports Equip. Co.*, 912 F. Supp. at 510 ("An exclusionary policy frustrates truth and does not punish the ethical violation, but works against the client who may

16

have been wronged by the opposing party as far as the substantive claim is concerned. It leads to excessive quibbling, tactical maneuvering and possible frustration of justice."); *United States v. Scrushy*, 2004 U.S. Dist. LEXIS 30219, *13 (N.D. Ala. Mar. 3, 2004) ("violations of state rules of professional responsibility do not warrant the suppression or exclusion of admissible evidence in a federal proceeding") (citing *United States v. Lowery*, 166 F.3d 1119 (11th Cir. 1999)); *Calloway v. DST Systems, Inc.*, 2000 U.S. Dist. LEXIS 2635 (W.D. Mo. Feb. 28, 2000) ("any sanctions would needlessly punish plaintiff for his attorney's misdeeds, if any there were").[13]

Indeed, plaintiffs do not cite <u>any</u> case holding that the preclusion of probative evidence is an appropriate remedy for a (supposed) violation of Louisiana Rule 4.3. As far as LNA is aware, no Louisiana court and no court within the Fifth Circuit has ordered the preclusion of evidence as an appropriate remedy for a violation of LRPC 4.3. In the only case finding an attorney violated LRPC 4.3 (the old version), the court recognized the appropriate remedy was disciplinary. *See Harrington*, 585 So. 2d at 523-24.[14]

The only cases plaintiffs cite are far afield. *In re American Airlines, Inc.*, 972 F.2d 605, 611 (5th Cir. 1992), involved the disqualification of attorneys for conflict of interest. Such orders do not impose substantive punishment on the party to the case, nor, of course, do they involve the exclusion of evidence. And in *Douglas v. DynMcDermott Petroleum Operations*, 144 F.3d 364, 366 (5th Cir. 1998), the court examined an ethics issue to evaluate the *merits of*

---

[13] *See also Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 119, 126 (S.D.N.Y. 1999) ("Here, the remedy of preclusion would not serve the public interest or promote the goals of the disciplinary rules."); *Johnson v. Cadillac Plastic Group, Inc.*, 930 F. Supp. 1437, 1442 (D. Colo. 1996); *Plan Committee v. Driggs*, 217 B.R. 67, 72 (D. Md. 1998) ("The appropriate remedy for any ethical violation [of Rule 4.2] that occurred would be disciplinary action against [the attorney], not dismissal of the adversary proceeding, suppression of evidence, or disqualification of counsel."); *State v. McCoy*, 618 A.2d 384, 385 (N.J. Super. 1992) ("When evidence is obtained in violation of the Rules of Professional Conduct, the decisional law that is of guidance in this and other jurisdictions dictates in favor of admission.").

[14] Likewise, Louisiana cases under Rule 4.2 have issued <u>prospective</u> orders that barred <u>future</u> contacts with represented persons, not exclusionary orders. See *Joseph v. Entergy*, 972 So. 2d 1230 (La. App. 2007); *E.E.O.C. v. TIC-The Indus. Co.*, 2002 WL 31654977 (E.D. La. 2002) (Wilkinson, J.); *Woodard v. Nabors Offshore Corp.*, 2001 WL 13339 (E.D. La. 2001) (Wilkinson, J.).

the plaintiffs' claim in that case (i.e., to determine whether plaintiffs' disclosure of client confidences was protected activity under Title VII).[15]  Obviously, that case has no bearing here.  In short, the exclusion of probative evidence is wholly unsupported by applicable caselaw.[16]

      c.    The proposed preclusion order is also fundamentally at odds with the Court's April 21 disclosure order concerning these very same witness statements.  The Court ordered the transcripts disclosed based on authority that perceived the "inherent unfairness of allowing one party to use the tapes to further their case while preventing the other party from doing the same." [Rec. Doc. 12605 at 8.]  Thus, the April 21 order recognized that the appropriate action in light of the way in which the statements were obtained is to make the transcripts available for <u>use</u> by the parties.  The Court also reasoned that disclosure of this evidence will promote the just disposition of the litigation.  *Id.* at 12.  The April 21 order therefore recognized that truth-finding is enhanced by access to probative evidence.  Plaintiffs' preclusion order flies in the face of that basic principle and is directly contrary to the disclosure-and-use remedy adopted in the April 21 order.  For these reasons, the preclusion order should not be adopted by the Court.

      2.    <u>The Other Requested Elements are Also Unwarranted</u>.  The other elements that plaintiffs include in their proposed order are also inappropriate.

      a.    Plaintiffs ask for a declaration making seven "findings" as to LNA's conduct.  As a fundamental threshold matter, however, plaintiffs have not proved up any of the findings. Moreover, plaintiffs establish no procedural basis for this relief and fail to explain how it is necessary or proper in this case.  To the extent plaintiffs (mistakenly) allege disciplinary rule

---

[15]  In that case, an employer claimed that it had fired the plaintiff, an attorney, for violating client confidences while pursuing her Title VII claim, in contravention of the ethics rules, rather than in retaliation for her bringing Title VII claims, as plaintiff alleged.  *Douglas*, 144 F.3d at 372-73.

[16]  As noted above (fn. 3), *Midwest Motor* does not support plaintiffs not only because it did not involve Louisiana law, but also because it was affirmed on appeal only under Rule 4.2 without any mention of Rule 4.3.

violations, the appropriate forum for any such findings would be a disciplinary one, not a motion

seeking adversarial advantage in litigation.  To the extent plaintiffs (mistakenly) allege discovery

violations, the federal rules provide ample guidance on addressing discovery disputes.

      b.    Plaintiffs have no basis for their demand of witness fees and other costs as a

condition for resuming Mr. Williams' deposition.  Plaintiffs chose to terminate the deposition

without a legitimate basis for doing so under the federal rules.  Plaintiffs did not move, and still

have not moved, to terminate or limit the deposition and requested agreement for Mr. Williams

to return to Atlanta.  See, *e.g.*, F.R.C.P. 30(d)(3).  If LNA chooses to resume Mr. Williams'

deposition, any costs of doing so should not be imposed on LNA.

      c.    Plaintiffs' request that the deposition of any witness LNA interviewed be sus-

pended until 30 days after plaintiffs receive any recording and transcripts of those interviews is

unwarranted.  That request is unrelated to the ethics issues raised in this motion.  Moreover, there

is no reason for a 30-day delay.

### C.    LNA Did Not Give Inaccurate Discovery Responses In An Effort To Conceal The Witness Interviews.

      Plaintiffs seek to buttress their motion by claiming (at ¶¶ 5-9) that LNA gave inaccurate

discovery responses as part of a plot to conceal the existence of the witness interviews.  This

argument fails for three basic reasons:  plaintiffs were already well aware of the interviews,

LNA's discovery responses were accurate, and preclusion would be unwarranted in any event.

      1.    <u>Plaintiffs Were Not Deceived</u>.  As a threshold matter, plaintiffs' insinu-

ation that they were deceived by LNA's discovery responses is inaccurate because plaintiffs

were already fully aware that LNA was conducting witness interviews.  Plaintiffs knew that a

representative of LNA had posted signs in the Lower Ninth Ward looking for witnesses to the

levee breaks.  [Pls. Int. 17, at Pls. Ex. 7.]  LNA identified its investigators when plaintiffs asked

who had placed the signs. [LNA's Response to Int. 17, at Pls. Ex. 7.]  Second, prior to LNA's

merits discovery responses, plaintiffs wrote a letter to LNA about LNA's interviewing potential

witnesses in the Lower Ninth Ward after LNA first noticed depositions and listed these indivi-

duals on its witness list.  [Pls. Ex. 34.]  LNA responded to this letter on November 30, 2008,

expressly acknowledging that it was interviewing potential witnesses and asserting its rights to

do so [Pls. Ex. 35], and thereafter the Barge PSLC consented to continuing interviews.

      Given these facts, plaintiffs cannot now claim that LNA's assertion of work product pro-

tection in its responses misled them about the existence of these interviews or the fact that LNA

would have memorialized them.  Indeed, within three weeks after receiving LNA's discovery

responses, plaintiffs served a subpoena on Centanni Investigative Agency seeking the witness

interviews.  Rec. 10617.  Thus, the premise of plaintiffs' discovery argument – that they were

misled by LNA's responses into not knowing of the interviews – is just wrong.

      2.    <u>LNA's Discovery Responses were Accurate</u>.

      a.    *The Phase I discovery requests from 2006*.  Plaintiffs claim (at ¶5) that in Phase I

of the Limitation of Liability proceeding before Chief Judge Berrigan, LNA inaccurately denied

having obtained any witness statements.  This is untrue.  Interrogatory 26 asked for the identity

of witnesses LNA "contends have knowledge of the incident . . ."  The "incident" at issue was

solely the breakaway of ING 4727 from its moorings (since events taking place after the break-

away did not relate to the "privity or knowledge" issue to be tried in Phase I), and LNA express-

ly objected to the interrogatory to the extent it asked about events after the incident.  Likewise,

Phase I RFPs 11, 17, and 18 sought, respectively, "reports of the incident" (with reference to sev-

eral government agencies); "records which would reflect the time that the barge broke loose from

it's [sic] mooring"; and photographs of the barge's moorings or the course of the barge.  The

Lower Ninth Ward interviews are not responsive to those requests. Moreover, LNA's responses expressly asserted a work product objection for any documents created by LNA on or after September 8, 2005, which include the transcripts.

        b.    *The December 2007 discovery responses.*  LNA's responses to the merits and class discovery in December of 2007 were likewise proper. First, plaintiffs inaccurately state (at p. 2, ¶ 7) that they were misled because LNA "did not assert work-product privilege in its responses to [] discovery requests [RFPs 3, 6, 17A, 20, 21]." To the contrary, <u>each</u> of these responses explicitly included an objection for materials created "in anticipation of litigation by or for LNA and its attorneys that are protected by Fed. R. Civ. P. 26(b)(3)." LNA's response to RFP No. 3 also specifically objected to production of "statements" made by nonparties, including members of the putative class, and refused to produce any such statements on the basis of that Rule. Rule 26(b)(3) is the Federal Rules' codification of the work-product protection. If plaintiffs could not figure this out and therefore mistakenly believed that LNA had no responsive material, that is not a failure that can be laid at LNA's feet. Furthermore, as noted above, plaintiffs knew about the interviews, and therefore cannot now claim to have been misled by these discovery responses.

        Although the Court has since vitiated the work product protection for the transcripts, that does not make LNA's responses improper, much less misleading. LNA believed in good faith that it had a valid work product protection for its interview transcripts, and that reasonable belief was explicitly supported by the new ABA rule. In any case, LNA's assertion of the privilege did not mislead plaintiffs about the existence of interviews they knew to be occurring.

        Plaintiffs' complaint about LNA's response to RFP 30 is equally meritless. This request and the nearly identically-worded Interrogatory 22 both sought complaints or other communi-

cations to LNA as to certain topics "during the period August 28-29." LNA responded to RFP 30 requests that it was "aware of no complaints or communications responsive to this request during the period August 28-29, 2005" and responded to Interrogatory 22 with nearly identical language. [Ex. C hereto.]

The temporal limitation in LNA's response to both requests was clear, and plaintiffs understood what it meant. We know this because plaintiffs took issue with LNA's response to Interrogatory No. 22 specifically on the ground that they wanted LNA to answer regarding complaints made *at any time* regarding a barge or other object knocking or scraping against the floodwall on August 28-29, although that is not what their Interrogatory asked. In response, LNA provided an amended answer to Interrogatory No. 22 on February 1, 2008, identifying two people who had told LNA (through its investigative interviews) that they heard sounds of knocking or scraping. [Ex. D hereto.] For plaintiffs to say, given this history, that they were misled by LNA's response to RFP 30 is nonsense. They understood LNA's response and asked LNA to provide further information in the context of Interrogatory 22, which LNA did.

Plaintiffs also claim they were misled about the existence of witness interviews by LNA's responses to Class Certification RFPs 5-8. The requests were virtually identical in their terms, and LNA responded to each request in a similar fashion. LNA expressly asserted a work product objection to each of the requests. Regardless of whether some of that protection was ultimately vitiated, plaintiffs were not misled by its assertion.

Plaintiffs lastly complain about LNA's responses to Interrogatories 5 and 17. LNA did not conceal witness interviews or statements in its responses to those interrogatories. LNA advised plaintiffs it was asserting work product objections and, nonetheless, provided the identity of its investigator. If LNA's intent was to conceal, why would it supply the investigator's name?

22

Furthermore, it was in response to plaintiffs' request for further information in response to Interrogatory No. 5 that LNA ultimately agreed to provide a list of everyone it had interviewed.

                3.     <u>Preclusion Would be Improper</u>.  Not only were LNA's responses proper, but they would provide no basis for a preclusion order.  Plaintiffs claim (Mot. ¶ 1) to be moving for preclusion pursuant to Rule 26(c)(1)(B) and (D) and Rule 37(b)(2)(A)(ii).  The cited portions of Rule 26, however, authorize control over the manner and scope of <u>discovery</u>.  Neither of them authorizes preclusion of evidence.  Rule 37(b)(2)(A)(ii) is similarly inapplicable because it only authorizes relief when a party has failed to comply with a court order.  There is no order here.

**D.     LNA Made No Improper Redactions in the Transcripts**

        Finally, plaintiffs complain (at 5-6) about redactions in the transcripts that LNA has produced to them.  Because some of the transcripts contained interviews with more than one person, LNA redacted the interviews with other persons on the ground that plaintiffs are entitled under Rule 26(b)(3)(C) to only their own statements.  Thus, the redactions were not improper.  In any event, the Court has already ordered LNA to turn over all the transcripts, and thus the Court need not address these redactions.[17]

        Plaintiffs further accuse LNA of "unstated redactions."  Their evidence is a transcript that begins with the question "where were you living at the time of the storm?"  [Pls. Ex. 15.]  This is the complete transcript.  It starts with this question because the investigator inadvertently forgot

---

[17]  Plaintiffs say (at p. 6, ¶ 26) that LNA "has failed or refused, despite repeated requests, to produce the recordings of its counsel's [investigator's] interviews of Barge P.S.L.C. clients."  To the contrary, LNA's counsel have offered to make copies of those tapes available to the Barge PSLC at their expense and are working out final details for such production.

to turn on the tape recorder sooner.  [Centanni Dec. ¶ 7.]  Plaintiffs could have cleared up that confusion through a meet-and-confer or by simply asking LNA's counsel.[18]

## CONCLUSION

The Centanni interviewers asked witnesses for truthful factual information, and the resulting contemporaneous interview transcripts constitute vital impeachment or corroborative evidence in support of LNA's defenses as well as the MRGO plaintiffs' claims against the government.  The interviews were properly conducted and there was no violation of any rule.  The Barge plaintiffs are not entitled to keep the finder of fact from hearing both sides of the story – the version in the interview and the version following "preparation."  That is especially true because the integrity of the evidentiary record will affect not only LNA, but the MRGO plaintiffs and indeed the Court itself.  For all of these reasons, plaintiffs' motion to preclude the interviews from being used as evidence should be denied.

Respectfully submitted,

/s/ Derek A. Walker
Robert B. Fisher, Jr., T.A. (#5587)
Derek A. Walker (#13175)
Ivan M. Rodriguez (#22574)
**CHAFFE MCCALL, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2300
Telephone:  (504) 585-7000
Facsimile:  (504) 585-7075
Fisher@chaffe.com
Walker@chaffe.com

---

[18]  Plaintiffs also complain (at 6) that "the draft transcripts refer to other communications, which are not included in the draft transcripts."  Their example is an interview with Ernest Edwards (Pls. Ex. 25).  But the immediately pre-ceding exhibit to their motion is the transcript of the prior interview with Mr. Edwards (Pls. Ex. 24).

John D. Aldock
Richard M. Wyner
Mark S. Raffman
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4240

Daniel A. Webb (#13294)
**SUTTERFIELD & WEBB, LLC**
Poydras Center
650 Poydras Street, Suite 2715
New Orleans, LA 70130
Telephone:  (504) 598-2715

*Attorneys for Lafarge North America Inc.*

April 29, 2008

## Certificate of Service

I hereby certify that I have on this 29th day of April, 2008 served a copy of the foregoing

pleading on counsel for all parties to this proceeding, by electronic filing notification.

/s/ Derek A. Walker