# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION |
| | NO. 05-4182 |
| PERTAINS TO: *Robinson*  C.A. No.  06-2268     BARGE | SECTION "K"(2) |

## ORDER AND REASONS

Before the Court are:

1)  Defendant United States' Renewed Motion to Dismiss, or in the Alternative, for Summary Judgment ( Doc. 10378);

2)  Plaintiffs' Motion for Summary Adjudication Concerning Defendant United States' Second Affirmative Defense of Immunity Under 33 U.S.C. § 702 (Doc. 10337); and

3)  United States of America's Motion to Dismiss Lafarge North America Inc.'s Third-Party Complaints (Doc. 7730).

The first two motions have been lodged in *Robinson, et. al. v. United States,* which suit was filed pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* against the United States of America and the United States Army Corps of Engineers (referred to collectively as "the United States" or "the Corps") by six named plaintiffs[1] living in New Orleans East, St. Bernard Parish, and the Lower Ninth Ward.  These plaintiffs maintain that the negligent design, construction, maintenance and operation of the Mississippi River Gulf Outlet ("MRGO") caused the catastrophic flooding  which damaged their property. Thus, pursuant to the FTCA, they contend the United States is liable for their damages.

---

[1] Norman Robinson, Kent Lattimore, Lattimore & Associates, Tanya Smith, Anthony Franz, Jr. and Lucille Franz are the named plaintiffs.

The United States filed its instant motion based on section 3 of the Flood Control Act of 1928, 33 U.S.C. § 702c, (hereinafter "§ 702c"),[2] claiming that it is immune from suit because the Army Corps of Engineers ("the Corps") constructed the Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPV"),[3] a flood control project subject to the immunity granted under § 702c. The Government contends that since the waters which caused the damages to plaintiffs flowed over the levees, floodwalls and embankments constructed pursuant to this flood control project, it is free from any liability.  In opposition, plaintiffs have moved the Court to find specifically that § 702c is inapplicable to their damages because, *inter alia,* plaintiffs are not predicating defendant's liability on levee breaches or the failure, overtopping, or defective design, construction, operation or maintenance of other forms of flood protection works.

The third motion was filed in the Barge sub-category of this consolidated litigation. The Barge sub-category contains seven cases concerning damages caused by a barge which allegedly hit and damaged some portion of the Industrial Canal floodwall which action these plaintiffs maintain also caused flooding.   Plaintiffs have filed suit in admiralty against those entities who were in control of the barge.  One of the defendants in those suits, Lafarge North America, Inc.[4]

---

[2]A previous Motion to Dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6) was denied.  *In re Katrina Canal Breaches Consolidated Litigation*, 4471 F. Supp.2d 684 (E.D.La.2007) or (See Doc. 2994 as found on the Court's website at www.laed.uscourts.gov/Canal Case/CanalCases.htm ).

[3] A detailed description of the LPV can be found in the Court's previous ruling on § 702c immunity with respect to the outfall canals. *In re Katrina Canal Breaches Consolidated Litigation*, 533 F. Supp. 2d 615 (E.D. La. 2008) or see Doc. 10984 as found on the Court's website at www.laed.uscourts.gov/Canal Case/CanalCases.htm ). However, for purposes of this motion, the Court will examine the details of the planning of that portion of the LPV which was designed to protect persons living in New Orleans East, the Lower Ninth Ward and Chalmette.

[4] LNA is a facility on the Inter-Harbor Navigational Canal ("IHNC" or the "Industrial Canal") which had control over an empty Ingram barge which had been unloaded at the facility on August 27, 2005.  This barge either hit and/or floated over the floodwall protecting the Ninth Ward and eventually came to rest on the opposite side of that floodwall.  LNA seeks damages maintaining that storm surge caused by the MRGO caused these events to happen.

("LNA"), filed third-party complaints in these suits against the United States alleging in essence that the same defalcations[5] concerning the MRGO as alleged by the *Robinson* plaintiffs were the cause of the barge's actions.  The United States' motion seeks the dismissal of those allegations as well again based on § 702c immunity.  Thus, the analysis for the two motions brought by the United States are coterminous and will be treated as one herein.

These motions came for hearing in open court on March 11, 2008.  Having reviewed the pleadings, memoranda, exhibits, depositions and the relevant law, the Court finds for the reasons that follow that the motions filed by the United States seeking summary judgment based on § 702c immunity will be denied as this immunity does not attach to damages caused by the negligence of the United States that is extrinsic to a flood control project, and there are substantial questions of fact as to what damages can be so denominated.  For the same reason, the *Robinson* motion must be denied as there are substantial questions of material fact as to causation in that regard.

## I.  BACKGROUND

These motions put squarely at issue the tension between two federal projects and their respective legal parameters.  In order to analyze properly whether § 702c should apply to damages allegedly caused by the MRGO, a brief overview of each project's history and scope is required.  Each project served a different purpose. Ultimately, the actual relationship between the

---

[5]At oral argument held on March 11, 2008, counsel for LNA stated that its complaint on the issue addressed by the Government's motion in the BARGE matter is identical to the *Robinson* complaint and that they "stand or fall with the Robinson plaintiffs in this argument."  (Doc. 12770, Transcript of Oral Argument of March 11, 2008 at 64) ("Transcript").

two informs the decision as to whether §702c Flood Control Act immunity should apply to harms caused by a navigational channel.  The Court will begin with the MRGO.

### A.  MRGO

MRGO is a navigational channel that runs from the Gulf of Mexico alongside St. Bernard Parish and into the Industrial Canal in New Orleans.  Congress authorized it in 1956 as a 76-mile deep draft navigation channel connecting the Gulf of Mexico to the Port of New Orleans Inner Harbor Navigation Canal ("IHNC").  (PRF  No. 4).[6] The Corps designed, constructed, operated, and maintained the MRGO. (PRF No. 5).  "Construction of the channel involved the removal of 311 million cubic yards of soil and marshlands, an amount larger than that dredged in the construction of the Panama Canal.   Since its construction, the MRGO has eroded in places to an expanded width of 2,000 feet."  N. Carter & C.Stern, "Mississippi River Gulf Outlet (MRGO): Issues for Congress" at CRS-1 (Congressional Research Service August 4, 2006), http://www.ncseonline.org/NLE/CRSreports/06Sep/RL33597.pdf.  ("Issues for Congress").

Generally speaking, three segments or  "reaches" of the channel have been identified. Reach 1 is the six-mile connection between the junction of the Gulf Intracoastal Waterway ("GIWW")[7] and the MRGO terminus in the IHNC which runs as an east-west channel in New Orleans.  Reach 2 is a 70 mile segment running northwest to southeast dredged through the

---

[6]See Plaintiffs' Revised Statement of Undisputed Facts ("PRF")( Rec. Doc. 11031-8 ). The Court will use those statements that were deemed "uncontested" or "uncontested and irrelevant" by the United States with this annotation.  However, if the PRF is contested, the Court will so note.

[7]The GIWW is a portion of the Intracoastal Waterway located along the Gulf Coast which runs from Carrabelle, Florida to Brownsville, Texas that was completed in 1949.  Its purpose was to allow for shipping free from the threat of submarines during World War II.  The IHNC or the Industrial Canal connects the GIWW to the Mississippi River and its east side borders the Lower 9th Ward.

marsh beginning at the convergence with the GIWW and extending to Veret, Louisiana.  Reach 3 proceeds further south into the Gulf of Mexico. For purposes of this motion, the Court will focus on Reach 1 and 2. (See Joint Exhibit 82 below).

The outlet was intended to enable ships from ports east of the Mississippi River to head north for New Orleans at Breton Sound, many miles east of the river mouth, at a saving of sixty miles.  Ships thus passed from Breton Sound through the outlet into the IHNC and then into the Mississippi River.  The economic boom to the Port of New Orleans that was anticipated never materialized.  Instead, MRGO allegedly created conditions which would intensify the storm surge created by the winds of Hurricane Katrina adding three feet of additional water which plaintiffs maintain caused much or all of the catastrophic flooding of plaintiffs' property.



Figure 1: MR-GO Reach 1 and Reach 2 (USACE IPET 2007)

(Joint Exhibit 82).

### B.  MRGO'S ALLEGED EFFECTS

It is axiomatic that hurricanes produce storm surge–that is "water that is pushed toward the shore by the force of the winds swirling around the storm.  This advancing surge combines with the normal tides to create the hurricane storm tide, which can increase the mean water level 15 feet or more."[8]  Plaintiffs contend that because of the Corp's negligence in designing, construction, maintenance and operation of MRGO, it caused the surge during Hurricane Katrina to be 3 feet greater than it would have been otherwise.  Plaintiffs argue that the cause of that increase was that:  (1) the loss of the surrounding wetlands with the creation of MRGO; (2)  the failure of the Corps to armor the banks of the MRGO which caused further harm to those wetlands and (3) the  "funnel effect" created  the design of the MRGO and its relationship to other waterways surrounding the metropolitan New Orleans area. (Transcript at 42-43 and *Robinson* Complaint, ¶ 2 & 3).

### 1.        LOSS OF WETLANDS

Wetlands generally are recognized to reduce the intensity of storm surges as the wetlands act as a "sponge" creating friction slowing the wave and tidal action.  Plaintiffs maintain that because the Corps failed to take necessary precautions to protect the wetlands surrounding Lake Borgne when it cut this channel through the marsh, and its failure to "armor" MRGO's banks to prevent further erosion of the marsh, salt water intrusion and ship wakes caused the destruction of a substantial portion of that protective shield. With the virtual destruction of those wetlands, the intensity of the surge increased.  Apparently as early as 1966, Charles J. Bretschneider and J.

---

[8]See www.nhc.noaa.gov./HAW2/english/storm_surge.shtml

Ian Collins "made the first serious effort to integrate wetlands into a surge analysis, and

conducted an analysis of the degree of resistance to flow that a marsh might imposed, compared

to a deep channel. They concluded that the resistance would be more than three times greater for

flow over the marsh than through the channel."[9]

In "Issues for Congress" Carter and Stern reported:

> A 1999 Corps report estimated that a total of more than 20,000 acres of
> coastal wetlands were lost or converted due to construction of the channel and the
> placement of the spoil materials from its construction.  Since construction,
> another 3,400 acres of wetlands have been lost due to increased tides and salinity
> resulting from the MRGO.  Increased salinity also converted some wetlands from
> less saline to more saline habitats.  For example, in St. Bernard Parish, the MRGO
> caused 3,350 acres of freshwater/intermediate marshes and 8,000 acres of cypress
> swamps to convert to brackish marshes, and 19,170 acres of brackish marsh and
> swamp to saline marsh.  In addition to wetlands loss and conversion, shallow
> water habitat also was lost because of the MRGO; 4,800 acres of shallow-open
> water became deep-open water or disposal areas for dredged materials.

"Issues for Congress" at CRS-4-5.  Thus, there was apparently on-going destruction of wetlands

during the life of the MRGO, and the Corps was on notice of its effects on wetlands.

## 2.     STORM SURGE AND THE FUNNEL EFFECT

There are apparently two variables involved in the contention that MRGO created a

greater storm surge–the alleged "hurricane highway" of the channel and the "funnel effect"

caused by the convergence of the GIWW and MRGO in the proximity of Lake Borgne.

Plaintiffs contend that:

---

[9]Bretschneider and Collins, *Storm Surge Effects of the Mississippi River Gulf Outlet* (1966) as cited in Joint Exhibit 4, Team Louisiana Report at 245. However, as will be explained, *infra*, this same study authorized by the Corps concluded that the MRGO would have a minimal effect on storm surge. *See also* Joint Exhibit 91, Bretschneider and Collins, *Storm Surge Effects of the Mississippi River Gulf Outlet* (1966).

> MR-GO is a straight arrow pointed at Greater New Orleans with no barriers or
> other means to slow down storm-driven surges.  In addition, the MR-GO creates a
> funnel effect where the MR-GO intersects the Gulf Intracoastal Waterway
> ("GIWW"), furiously accelerating the power and force of the storm surge while
> channeling it directly into the Industrial Canal (also known as the Inner Harbor
> navigational Canal ("IHNC")).  This funnel effect caused the inundation of New
> Orleans East, St. Bernard Parish, and the Lower Ninth Ward.

*Robinson* Complaint, (Doc. 1, ¶3).   The Court will first examine the first described surge effect.


### a. REACH 2: MRGO,  HURRICANE BETSY AND STORM SURGE

During the construction of MRGO, the surge effects of its construction were not given

much discussion, and a physical model was never used to determine the hydraulic surge effects

of the MRGO.  While one was used to confirm other effects the channel might have (salinity in

particular), that model was never modified to determine the storm surge hydraulics of the

MRGO.  In 1959 General Design Memorandum ("GDM") by the Corps, cited in the Team

Louisiana Report, the following was stated:

> "The influence of the proposed channel on the water surface elevations of the
> existing lakes and streams connecting therewith inland as far as Highway No. 47
> (Paris Road) will be negligible. . . . Lake Borgne, with its large openings into
> Mississippi Sound and the Gulf, controls the elevation in all of the streams inside
> of Bayou La Loutre crossing, and the small additional area of the project channel
> will not have any material influence on the elevations produced by ordinary tides,
> including those from lesser storms.  For major storms and hurricanes when tides
> roll across the marsh many feet deep, as well as through the open water
> connections, the effect of the new channel will be of no consequence ( GDM 1B
> 1959, P. 3)"

(Exhibit 4, Team Louisiana at 223).  Thus, the authors of the Team Louisiana report conclude

that "[m]ore attention was paid in that GDM to the potential for storm wave propagation up the

MRGO (deemed negligible), but any serious analysis of the hydraulics would have to wait until

after Hurricane Betsy, when the channel was already a *fait accompli*." (Exhibit 4, Team

Louisiana at 234). Thus, there is evidence to suggest that at the time the MRGO was conceived, this type of "surge effect" was not a variable used in any kind of cost/benefit analysis employed in determining the efficacy of its being dredged.

On September 9, 1965, Hurricane Betsy made landfall over Grand Isle, Louisiana, due south of New Orleans, at nearly Category 5 strength. It moved up the Mississippi River which caused the river to rise ten feet at New Orleans. A storm surge moved into Lake Pontchartrain and overtopped and breached levees, flooding much of the city, including the 9th Ward.   Indeed it caused flooding in:

> New Orleans East, the Lower 9th Ward, parts of St. Bernard and in eastern parts of the Orleans Metro area. Flooding depths in parts of the lower 9th Ward, and in several neighborhoods west of the IHNC and south of the Gentilly ridge reached up to 8 feet. Flooding resulted from overtopping and breaches of levees and floodwalls along the IHNC and the GIWW, and the 40 Arpent Levee in St. Bernard (USACE 1965). Flooding in New Orleans and St. Bernard resulted from a surge that rose in Lake Borgne.

(Joint Exhibit 4, Team Louisiana at 240-41). As a result of this event, lawsuits were filed against the Corps based on the Corps' responsibility for the harm allegedly caused by MRGO. *See, e.g. Graci v. United States*, 301 F. Supp. 947 (E.D. La. 1969), *aff'd and remanded*, 456 F.2d 20 (5th Cir. 1971).

After Hurricane Betsy in 1965, the Corps then commissioned the aforementioned analysis of the role of the channel in storm surge conveyance which is cited in the Team Louisiana study as Bretschneider and Collins, *Storm Surge Effects of the Mississippi River Gulf Outlet* (1966). This document in its entirety is found as Joint Exhibit 93 (referred to hereafter as *"Storm Surge Effects"*).   Team Louisiana describes the study as follows:

They used early one-dimensional computer modeling techniques to evaluate "the effect, in the vicinity of the Inner Harbor Navigation Canal, due to rapidly and slowly rising surges . . . for four cases."  These cases were:

      I.        Existing levees with no MRGO
      II.      Existing levees with MRGO
      III.     Proposed levees with MRGO
      IV.     Proposed levees with no MRGO

The [LPV] was in the first year following authorization, so the hurricane levee on the MRGO spoil bank was still "proposed," although the 6 to 8 feet of spoil had some effect during Betsy.  The GIWW and MRGO were in place, but the "throat of the funnel was not as constrained as it is today.

(Joint Exhibit 4, Team Louisiana at 244).  Bretschneider and Collins, as cited in the Team

Louisiana Report, concluded with respect to the effects of the channel.

> "It is seen that the effect of the Mississippi River-Gulf Outlet is almost negligible for all large hurricanes accompanied by slow rising storm surges.  It may be expected that once in a while a storm may occur which has a somewhat freakish, more rapidly rising surge in which case the Gulf Outlet may have a very marked effect.  However, such a storm will not produce tides as high as the more critical hurricane tracks such as Betsy or the synthetic hurricanes."

(Joint Exhibit 4, Team Louisiana at 249-50).   With such an assessment in hand, the MRGO was

constructed without any consideration of its causing any "surge."

       After Katrina, the Corps' assessment did not change.  The Interagency Performance

Evaluation Task Force ("IPET") report, *Performance Evaluation of the New Orleans and*

*Southeast Louisiana Hurricane Protection System,* Final Report of IPET, March 26, 2007, which

was funded by the Corps, concluded:

> For significant storm events, the southeast trending MRGO channel has little influence on the water levels inside the IHNC. . . . Three previous studies have been performed to examine the influence of the southeast-trending section of the MRGO on storm surge propagation into the New Orleans vicinity.  This issue

10

was also examined as part of this study.  All studies have reached the same
conclusion.  For storm surges of a magnitude produced by Hurricane Katrina,
which overwhelmed the wetland system, the influence of the southeast -trending
MRGO channel on storm water levels is quite small.  For Katrina the influence
was only a few tenths of a foot at most in the IHNC and GIWW/MRGO channel
sections.  These small changes represent only a few percent of the surge
amplitude.  When the expansive wetland is inundated, the storm surge propagates
primarily through the water column over this much larger flooded area, and the
channels become a much smaller contributor, as a percentage, total water
movement.

(Joint Exhibit 20, IPET at IV-258).   This position, however, is not universally accepted and

hotly contested by plaintiffs.


### b.  REACH 1:  THE FUNNEL EFFECT

The "funnel effect" was succinctly explained in the Team Louisiana Report as follows:

The convergence of the two navigation channels [GIWW and MRGO], and the
levee systems built along their banks, created what has widely been described as a
'funnel,' with the mouth open to Lake Borgne on the east, that favors the
amplification of surges generate by cyclones tracking over the city or to the east.
The throat of this funnel is the 6 mile portion of the MRGO channel that was
constructed inside the original GIWW right of way.

(Exhibit 4, Team Louisiana, Chapter 7 at 235-36).

11



The map above presents a cartographical representation of this alleged "funnel.". (Exhibit 4,

Team Louisiana Report, at 46, Figure 26).

Team Louisiana's analysis of the Bretscneider and Collins study with respect to the

"funnel" is remarkable in that the funnel effect was apparently recognized by them.  Team

Louisiana opines:

> The most interesting analysis carried out by Bretschneider and Collins (1966),
> and the only part that withstands modern scrutiny, pertains to the effect of the
> levee alignments and channel in the vicinity of Reach 1 on surge in the IHNC.
> This was a simpler problem than the others that the consultants tackled, because it
> essentially reduced to one of channel and overbank conveyance in Reach 1.  They
> presented results for fast-, moderately fast-, and slow-rising hypothetical storm
> surges that attained an elevation in Breton Sound of 10 feet . . . for the four cases
> described earlier. . . . Bretschneider and Collins (1966) predicted that (1)
> changing the levee configuration and (2) including or excluding the MRGO
> channel would each affect surge transmission to the IHNC for all rates of surge
> development in the Lake Borgne estuary.

12

> For the most rapidly rising surge, the IHNC does not rise at all without the
> MRGO (Cases I and IV), because there is insufficient time for the surge to
> propagate up the estuary.  For the moderate rate of rise, the surge that reaches the
> INC without the MRGO has a lower peak elevation and a narrower peak
> signifying a shorter duration of high water conditions.  For the slow rising surge,
> the peak elevation in Lake Borgne is attained, or nearly attained, in the IHNC for
> all cases, after lags of varying duration, but the width of the peak is reduced
> without the MRGO (Cases I and IV).  The period above 8 feet, or the 80 percent
> exceedence interval, in the slow-rise scenario drops from 3.5 to 2.0 hours for the
> condition with and without the MRGO, respectively, with the new levees in place
> (Cases III and IV).  In all cases, the predicted effect of building the "proposed"
> levee system that now forms the throat of the funnel (Cases III and IV) is to
> hasten the onset of peak surge and to lengthen the period of highest water.

(Joint Exhibit 4, Team Louisiana at 249-50).   Nonetheless, no changes were made in the

design of MRGO even with these findings.

Post-Katrina there is arguably a consensus concerning the funnel effect.   The Corps'

funded IPET report states:

> The channel into IHNC from the GIWW has a very large influence on storm
> water levels. . . . From the perspective of storm surge propagation into the IHNC
> and the New Orleans Metropolitan area, the critical section of channel is the one
> where the GIWW and MRGO occupy the same channel [Reach 1].  It is through
> this connection that Lakes Pontchartrain and Borgne are hydraulically connected
> to one another via the IHNC.  A water level gradient is established within the
> IHNC and the GIWW/MRGO; the gradient is determined by the storm surge
> levels in both lakes.  The presence of an open channel is the key factor.  The
> hydraulic connectivity existed prior to construction of the MRGO, due to the
> presence of the GIWW channel.

(Joint Exhibit 20, IPET at IV-258).   As summarized  in their  "Issues for Congress" report,

Carter and Stern opined:

> In contrast to continuing differences of opinion regarding the role of the
> MRGO as a hurricane highway for moving water from the Gulf to the City, there
> is a degree of consensus on the channel's funnel effect at the intersection of
> Reach 1, Reach 2, and the GIWW.  The Berkeley, IPET, and Louisiana Working
> Group reports all noted that at the confluence of the MRGO and the GIWW, there
> was no barrier in place to prevent the channeling of the waters from Lake Borgne
> into the narrow confines of Reach 1.  As a result, Reach 1 hydraulically connected

> Lake Pontchartrain and Lake Borgne, and allowed the Lake Borgne waters to be pushed into the interior of New Orleans and toward Lake Pontchartrain (see Figure 3). This connectivity is shown to have both amplified surge level and velocity through the interior of the city, and raised the level of Lake Pontchartrain. As pressure on the levees through this area increase, structural failures along the IHNC and Lake Pontchartrain canals occurred.

"Issues for Congress" at CRS-7.

So in essence, a navigational waterway was created by the Corps in an attempt to improve the economic development of the Port of New Orleans. Prior to its construction and during its maintenance there was evidence that it could have a negative impact on the surrounding areas during a hurricane event. Regardless of any alleged negligence as it relates to the deleterious effects of MRGO, the United States maintains that because the LPV was constructed and existed adjacent to the MRGO, § 702c immunity must attach. Thus, the issue becomes whether the Corps took any steps in its design and construction of the levee system known as the LPV as it related to the MRGO such that a nexus between the two was created.

### C.  LPV AND ITS RELATIONSHIP TO THE MRGO

As this Court has previously noted,[10] on June 15, 1955, following a series of severe hurricanes, Congress authorized the Corps to study projects to protect areas along the eastern and southern coasts from hurricane storm surges.  Included as a subject for study was the area surrounding New Orleans, which came to be known as the Lake Pontchartrain and Vicinity Hurricane Protection Plan or "LPV".  (Joint Exhibit 26, HPDC, § 2.2 at 2-3 and 2.3.1 at 2-18) (See Public Law 84-71).

---

[10]*See* n.2, *infra.*

In  November of 1962, after seven years of study, an Interim Report produced the
"Barrier Plan." (Joint Exhibit 26, HPDC, § 2.2 at 2-4 and Joint Exhibit 10). Central to the
protection were tidal gates at Chef Menteur Pass and The Rigolets, which would be closed
during storms to hold back surges that otherwise would enter Lake Pontchartrain. *Id.*   These
plans did not include any kind of barrier that would take into account surge or water movement
from Lake Borgne or from the MRGO.   Nonetheless, other levees and floodwalls were included.
The Citrus area which is now known as New Orleans East would have a new low-level levee
along the lakefront, floodwalls at the IHNC, and levees and floodwalls along the GIWW. [11]   The
metro New Orleans area would have levee enlargement and floodwalls at the IHNC and the
Seabrook Lock at the mouth of the IHNC. (Joint Exhibit 26,  HPDC § 2.3.5 at 2-28 and Exhibit
79).  (See Appendix 1, Plate 3 from Exhibit 10, House Doc. 89-231 which shows the placement
of levees and locks contemplated by the report.)

As previously discussed, after Hurricane Betsy in 1965, the LPV, based on that interim
report, was passed by Congress on October 27, 1965 as the Flood Control Act of 1965, 29 Stat.
1073, 1077 ,(42 U.S.C.A. §1962d-5).[12]   It authorized the construction of those control structures,

---

[11]The Declaration of Alfred C. Naomi, who is the branch chief in the Protection and Restoration Office for
the New Orleans District, U.S. Army Corps fo Engineers', provides the specific authorization for each specific,
discrete portion of the LPV involved in the instant case.   (See Joint Exhibit 79).   The Citrus and New Orleans East
back levees were first authorized by the initial LPV authorization and constituted the "enlargement of the existing
levee extending from U.S. Highway 90 to the Gulf intracoastal waterway, thence westward along the waterway to
the Inner Harbor Canal, together with riprap slopes along the canal." (Exhibit 79, Declaration of Naomi, ¶ 8). In
1967 and 1971, further additions were made resulting in the construction of various flood control structures,
including enlarged levees extending for more than approximately 12 miles along the north bank of the GIWW. (*Id.*
at ¶10). Furthermore, apparently another four miles along the GIWW was approved in 1971.  It is unclear from the
affidavit where this addition was made or if these improvements were part of the same addition mentioned in ¶11.

[12]The authorization states:
  The project for hurricane-flood protection on Lake Pontchartrain, Louisiana, is hereby
  authorized substantially in accordance with the recommendations of the Chief of Engineers in
  House Document Numbered 231, Eighty-ninth Congress, except that the recommendations of the
  Secretary of the Army in that document shall apply with respect to the Seabrook Lock feature of

concrete floodwalls and levees intended to protect these areas from flooding as envisioned in the previously mentioned interim report.

A review of the Interim Report, which was prepared in November of 1962, as contained in Joint Exhibit 10, demonstrates that the focus of the Corps with respect to MRGO as it related to the LPV centered on (1) the increase in salinity levels to Lake Pontchartrain that MRGO could cause and (2) the effect of MRGO's tides on navigation.  In addition, there was some concern about the barriers themselves effect on fish and wildlife in the area.  (Exhibit 10 at 1-2, 80)[13]

_____

the project.  The estimated cost is $56,235,000.

[13] The report states:
The District and Division engineers find that the most suitable plan for protecting the partially developed areas bordering Lake Pontchartrain would consist of two parts: a levee and floodwall barrier along the southeast side of the areas to prevent entry of surges from Lake Borgne into the areas and Lake Pontchartrain; and new or enlarge levees along the south shore of Lake Pontchartrain, together with . . .The barrier would include a lock and flood gates in the Rigolets, a navigation gate and flood gates in Chef Menteur Pass and a multiple-purpose lock in the lakeward end of the Inner Harbor Canal.  . . . For the Chalmette area, the reporting officers find that the most suitable plan would consist of about 17.3 miles of new and enlarged levees extending generally along the southerly banks of the Gulf Intracoastal Waterway and the Mississippi River-Gulf Outlet channel to Bayou Dupre and thence westerly to the Mississippi River levee at Violet. . . The reporting officers further find that a lock is required in the Inner Harbor Navigation Canal near Seabrook to **prevent velocities hazardous to navigation in the canal, and increased salinity in Lake Pontchartrain**, which will occur upon completion of the Mississippi river-Gulf Outlet navigation **project, presently under construction.  It would serve a dual purpose in controlling tidal exchange into the lake and as an element in the hurricane surge-barrier.**
(emphasis added).
(Exhibit 10 at 1-2, ¶2).  This lock which was slated to be paid for through MRGO appropriations (Exhibit 10 at 67) never was built.
At page 80 of the report, the Corps further opines:
A related problem exists, in that observations during the construction of the Mississippi River-Gulf Outlet, supplemented by that current conditions in the Gulf Outlet and in the Inner Harbor Navigation Canal will be **hazardous to navigation** and will further and seriously impair the safety of structures along and across these waterways, particularly the existing major traffic bridge across the Inner Harbor Navigation Canal.  The Gulf Outlet will, by reason of its direct connection to the Gulf of Mexico, greatly **increase the salinity regimen** of the Lake Pontchartrain and in the area contiguous to the canal.  Provision of a low level lock at the lakeward terminus of the Inner Harbor Navigation Canal is necessary to alleviate the adverse effects on navigation an on the ecology of the area affected by the [MRGO].  Benefits of the existing project are sufficient to justify the additional authorization of the proposed lock.  **The lock required as a corrective measure for navigation can be readily incorporated in a plan for a hurricane barrier to a higher elevation.  The incremental cost of raising the lock walls and gates as necessary to complete the barrier and exclude hurricane surges from Lake Pontchartrain is properly a charge to**

Post-Betsy and post-LPV authorization, the afore-mentioned Bretschneider and Collins study was prepared in 1966.  Its purpose "on the basis of detailed studies of Hurricane Betsy and how it affected the New Orleans area," was to attempt "to evaluate the effects of the Gulf Outlet Channel on hurricane storm tides."  (Joint Exhibit 91, *Storm Surge Effects* at 1).  The objectives of the study were outlined as follows:

> The primary objective of this study was to determine surge elevations at key locations within the study area utilizing the best available techniques and data. Accurate surge predictions are required to support decisions required in the design of authorized levees and associated works.
>
> A secondary, though equally important, objective was the evaluation of the effects of the Mississippi River-Gulf Outlet Channel, spoil banks and associated works on the hurricane surge environment within the study area.

(Joint Exhibit 91, *Storm Surge Effects* at 1).  The study area consisted of "the area extending generally from the southern end of the Mississippi River-Gulf Outlet to the Inner Harbor Navigation Canal in New Orleans, Louisiana, and the adjacent area within confining levees."  *Id*. As a result of their findings, at a time when the a barrier approach was in full play, no mention or attempt to build a barrier to prevent surge from the MRGO at Reach I was engrafted onto the LPV plan.

Construction of the hurricane protection project began after the funds were received in 1966.  On January 31, 1967, the "Chalmette Area Plan" was approved and authorized by Public Law 89-298.  This memorandum provided the design for hurricane protection levees extending along the south bank of the MRGO from the IHNC to Bayou Lawler and from Bayou Lawler to

---

**the hurricane plan.**
(Exhibit 10 at 80).  It must be emphasized that this report was prepared prior to Hurricane Betsy and prior to the Bretschneider and Collins report.

the Mississippi River at Violet. (Exhibit 79, Naomi Affidavit, ¶ 6).  Design Memorandum 3,

Supplement 1, also known as the "Chalmette Extension" was approved on August 12, 1969 and

authorized by Public Law 89-298, provided protection to a large area by extending the levee

southward along the MRGO past Bayou Dupre to Verret and from there westerly to the

Mississippi River levee at Caernarvon.  (Exhibit 79, Naomi Affidavit, ¶7).  In that authorization,

it is noted that  "[t]he project levees will be constructed of hydraulic material obtained from the

Mississippi River and the MR-GO and from local borrow obtained form the flotation cut and the

existing back levee. . . ." *Id.*

 Construction in the Chalmette area began in 1968.  (Joint Exhibit No. 26, HPDC,, § 2.2

at 2-6). Then, with the passage of the National Environmental Policy Act of 1969 ("NEPA"), "

[the Corps] completed and submitted an environmental impact statement for the project."  (Joint

Exhibit 20, IPET at III-35).

The IPET report characterizes the subsequent history as follows:

> The adequacy of the environmental impact statement was challenged in
> court, and, on 30 December 1977, the U. S. District Court, Eastern District of
> Louisiana, enjoined the New Orleans District from constructing the barrier
> complexes, the New Orleans East levee system, and the Chalmette Area plan
> (which had since been extended southward along the MRGO) pending acceptance
> of a revised environmental impact statement.  The following March, the
> injunction was modified to allow the continuation of all project components, with
> the exception of the barrier complexes at the Rigolets and Chef Menteur Pass.

> In response to the court injunctions against the barrier complexes, the
> [Corps] initiated an effort to pursue a fast-track study to recommend a path
> forward for the project.  This effort culminated in a July 1984 reevaluation study
> of the Lake Pontchartrain, LA, and Vicinity [Hurricane Protection Plan].  The
> reevaluation study examined the continued feasibility of the barrier plan and the
> feasibility of providing hurricane protection solely by the means of raising and
> strengthening levees and floodwalls, more common (sic) known as High Level
> Plans.  The study concluded that a High Level Plan represented the feasible plan
> of protection for the study area from the Standard Project Hurricane–the most

18

> severe hurricane reasonable expected to occur from a combination of
> meteorological and hydrologic events characteristic of the area.  The plan
> recommended improved hurricane protection levee systems in Orleans Parish, St.
> Bernard Parish, and the east bank of Jefferson Parish; . . . .

(Joint Exhibit 20, IPET at III-35).

 In 1985, ten years after the lawsuit which changed the course of the approach to

hurricane protection was filed, the Chief of the Corps approved a post authorization change, and

the reevaluation report was submitted to Congress.  *Id.*  With this act, the Barrier Plan was

replaced with the High-Level Protection Plan.  However, it appears that this change had very

little impact on any of the levees involved in the *Robinson* or BARGE matter.

Even at this juncture, the Corps never re-evaluated or examined the effect of nearly 20

years of activity on the MRGO as it related to the High Level Plan and the decision to abandon

the Barrier Plan.  At oral argument, the following colloquy occurred between the undersigned

and Robin Smith, counsel for the United States:

> THE COURT:  Are there any documents that you can point to that
> demonstrate that the Corp took into consideration in the continuing, ongoing
> project of the building of the Chalmette GWII or the IHNC levees that there
> would be any increase in the flow or force of the water as a result of the MRGO
> and the resulting destruction of the levees?
>
> MR. SMITH:  And the answer to the question is no.  And the reason the
> answer is no is because after Hurricane Betsy, the Corps commissioned a study of
> the influence of the MRGO on hurricane-induced storm surges.  And the result of
> that study showed that during major hurricane events, the MRGO played no role.
>
> So for that reason, that's the Bretschneider and Collins study, so for that
> reason, the Corps saw no reason to take any steps to build larger levees or
> stronger levees or put levees in different places or other control features in
> different places to protect against the influence of the MRGO.  It was studied, it
> was determined that the MRGO played no role in major hurricane events.
>
> That was the original thought when it was authorized, Hurricane Betsy hit,
> there were claims that the MRGO played an important role in that flood, the

> Corps studied it, the results of the study indicated that it didn't play a role.  So the Corps continued to build what Congress had authorized.  So you won't find any documents that way, Your Honor.

(Transcript at 17-18).

While the United States argued eloquently at oral argument concerning how the Court should not split the atom of this area into the neutron of the MRGO and the protons of the LPV–a metaphor for their being inextricably linked together– the evidence of this interrelationship in the actual oversight of the two projects is insignificant. At best, the evidence that the Corps took into consideration the MRGO with respect to LPV is that:

1)   the effects of salinity and navigation hazards caused by the MRGO were contemplated in the 1962 Interim Report which became the LPV;

2)   the Seabrook Lock, which was to have been at the intersection of the IHNC and Lake Pontchartrain, was contemplated in the 1962 Interim Report, was to be funded through MRGO outlays, with additional height for storm surge to be added in the LPV outlays, and which was never funded or constructed; and

3)   spoils from the dredging of the MRGO were incorporated into the LPV levees apparently along Reach 2.

While reports concerning the erosion of the wetlands surrounding lake Borgne were received by the Corps, it does not appear that the Corps reacted to or brought these facts into consideration with respect to the LPV.

For instance, in the syllabus of a 1988 report, "Mississippi River-Gulf Outlet, St. Bernard Parish, Louisiana Reconnaissance Report on Channel Bank Erosion," it states:

> Since its completion in 1968, the top width of the channel increased from 650 feet to an average of 1,500 feet, in 1987, principally due to erosion. the channel banks have eroded beyond the existing channel right-of-way in several locations.  Much of the bank erosion is caused by wave-wash and drawdown from large displacement vessel traffic on the restrictive waterway.  Passage of these vessels causes very large quantities of water to be displaced from the channel into the adjacent marsh, followed by rapid return flow into the channel.  The

20

> tremendous forces exerted by these rapid and extreme water level fluctuations cause the relatively soft marsh adjacent to the channel to break up and be swept into the waterway. Between 1968 and 1987, bank erosion resulted in the loss of approximately 4,200 acres of highly productive marsh adjacent to the MRGO channel.
>
> Continued erosion threatens to produce large breaches in the rapidly dwindling marsh buffer between the navigation channel and the open waters of Lake Borgne and Breton Sound. Once the buffering marshes are lost, dredging frequency and quantity in the vicinity of the breach bank are will increase significantly. The navigation channel will be exposed to storms, currents, and less attenuated tidal action from the north and northeast. Attendant sedimentation and shoaling problems are expected to occur. Thus, without corrective action, the bank erosion problem will become a major channel maintenance problem in the future.

(Exhibit 9 at unnumbered page entitled "Syllabus"). Thus, focus of the study had to do with the cost of maintaining the channel. Nonetheless, the Court has not been made aware of any study or discussion of these same effects on the LPV. Indeed, at oral argument, it was made clear that the Corps after 1966 took no steps to re-evaluate the LPV to take into account the effects that MRGO had had on the surrounding wetlands and the effects on storm surge, in particular as it related to "the funnel effect." As such, this Court cannot find these two projects were or are "inexticably intertwined."

By February 2, 2004, in the Budget Justification for Fiscal Year 2005 filed by the Corps, it states that the New Orleans East Unit was 91% complete (expected completion to be determined, the New Orleans West Unit was 65% complete (expected completion to be determined) and the Chalmette Unit was 98% complete (expected completion to be determined). (Joint Exhibit 26, HDPC Appendix A at A-65). A picture of the LPV as it was configured at the time of Hurricane Katrina is encapsulated in the image below as found in the Independent Levee Investigation Team (Joint Exhibit 3 at 2-19).

With these facts in mind, the Court will now turn to the legal issues at hand.

21



Source: Graphic by Emmet Mayer IIIemayer@timespicayune.com (2005)

Figure 2.6: Map showing design flood stage elevations throughout the New Orleans region.

**II. Standard for Motion for Summary Judgment**

These motions were filed as Motions to Dismiss or, in the Alternative, Motions for Summary Judgment.  As the Court has relied on materials presented by the litigants that are outside of the pleadings, then the appropriate standard to employ is that implicated by a motion for summary judgment.  As stated in *United States v. Corpus,* 491 F.3d 205 (5th Cir. 2007):

> Summary judgment is proper when there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Facts are material if they might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All facts and inferences must be viewed in the light most favorable to the nonmoving party. *Armstrong v. Am. Home Shield Corp.,* 333 F.3d 566,  568 [(5th Cir. 2003)].

*Id.* at 209.

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, the burden shifts to the non-movant "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id*. at 322.   "[M]ere allegations or denials" will not defeat a well-supported motion for summary judgment.  Fed. R. Civ. P. 56(e). Rather, the non-movant must come forward with "specific facts" that establish an issue for trial. *Id*.

When deciding a motion for summary judgment, the Court must avoid a "trial on affidavits.  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are tasks for the trier-of-fact.  *Anderson*, 477 U.S. at 255. To that end, the Court must resolve disputes over material facts in the non-movant's favor. "The party opposing a motion for summary judgment, with evidence competent under Rule 56, is to be believed."  *Leonard v. Dixie Well Service & Supply, Inc*., 828 F.2d 291, 294 (5th Cir. 1987).

III.    **LEGAL ANALYSIS**

    A.    **THE UNITED STATES MOTIONS TO DISMISS, OR IN THE ALTERNATIVE MOTIONS FOR SUMMARY JUDGMENT**

        1.    **FEDERAL TORT CLAIM ACT AS PREVIOUSLY APPLIED TO MRGO**

These motions present the issue of whether the immunity granted under § 702c of the Flood Control Act of 1928 is so broad as to abrogate the waiver of immunity found in the FTCA for negligence on the part of the Government because the effects of the alleged negligence with respect to MRGO for which the United States can be held liable came into contact with a flood control project.  If there were virtually no nexus between the flood control project and the negligent event, other than the flood control project being impacted or destroyed by the event, is that sufficient to invoke § 702c immunity?   To answer this question, the Court will first examine the FTCA  as it has been applied to MRGO.

The FTCA provides a remedy to individuals where the acts of the Government cause harm under the appropriate circumstances.  As explained in *United States v. S.A. Empresa de Viacao Aera Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984):

> The Federal Tort Claims Act, 28 U.S.C. § 1346(b), authorizes suits against the United States for damages:
>
> > for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission  of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
>
> The Act further provides that the United States shall be liable with respect to tort claims "in the same manner and to the same extent as a private individual under like circumstances." [ 28 U.S.C. ] § 2674.

*Varig Airlines*, 467 U.S. at 807-08.  Congress did not waive the sovereign immunity of the United States in all respects.  For instance the discretionary function exception found in the second clause of 28 U.S.C. § 2680 provides that the FTCA does not apply to certain claims "based upon an acts or omission of an employee of the Government, exercising due care, in the execution of a statute" or "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government whether or not the discretion involved be abused."  28 U.S.C. § 2680.[14]

Another immunity that survived the passage of the FTCA is that found in § 702c; however the breadth of that immunity has been subject to significant discussion.  The Fifth Circuit squarely addressed whether it was so broad as to shield the United States from liability for the flooding which occurred in St Bernard Parish after Hurricane Betsy and which plaintiffs alleged was caused by MRGO.  The appellate court squarely held that § 702c was not so encompassing.  *Graci v. United States*, 301 F. Supp. 947, 949 (E.D.La. 1969), *aff'd*, 456 F. 2d 20 (5th Cir. 1971); *Graci v. United States* 435 F. Supp. 189, 192 (E.D.La. 1977).   However, at the time,  no flood control project had been constructed.

---

[14]The Court is well-aware that the United States shall raise this immunity in a subsequent motion which will present plaintiffs with a significant burden to overcome.

As noted in this Court's previous denial of the Governments' Rule 12(b)(1) Motion to

Dismiss, *In re Katrina Canal Breaches Consolidated Litigation* (*Robinson*), 471 F. Supp. 2d 684

(E.D. La. 2007),  the *Graci* district court on reconsideration stated:

> Section 3 [§702c] does represent a reasonable public policy determination to
> secure the government from liability for floodwater damage connected with flood
> control projects; but we hold that it should not be interpreted as a wholesale
> immunization from all liability for floodwater damage unconnected with flood
> control projects, and that insofar as 3 is to be interpreted, it stands on a less
> crucial basis and is superseded by the general waiver of immunity of the Federal
> Tort Claims Act.

*Graci v. United States*, 301 F. Supp. 947 (E.D. La. 1969). Thus, the district court in that case had

found that because the MRGO was not a flood control project, § 702c did not bar suits against

the United States for floodwater damage resulting from the Government's negligence

unconnected with flood control projects.

On appeal, the United States contended, as it does in the case before this Court,  *inter*

*alia,*[15] that § 702c "affords the Government an absolute immunity from liability for floodwater

damage regardless whether the negligence alleged was in connection with a flood control project

or a navigation aid project."  *Graci*, 456 F.2d at 23.  The Fifth Circuit rejected this argument

examining the history of § 702c immunity in this context. *Id*. at  25-26.

In affirming the lower court's decision, the appellate court relied on the seminal cases of

*National Manufacturing Co. v. United States*, 210 F.2d 263 (8th Cir. 1954) and *Clark v. United*

*States*, 218 F.2d 446 (9th Cir. 1954).  The court found that these cases:

> strongly support the view that the purpose of [§702c] was to place a limit on the
> amount of money that Congress would spend in connection with flood control
> programs.  Congress undoubtedly realized that the cost of extensive flood control

---

[15]Also at issue in that case was whether the Federal Tort Claims Act had in some manner repealed this grant
of immunity.  That issue was decided in the negative and was not raised as an issue in this case.

26

projects would be great and determined that those costs should not have added to them the floodwater damages that might occur in spite of federal flood control efforts.  [citations omitted].  As Judge Heebe expressed it, the "immunity from liability for floodwater damage arising in connection with flood control works was the condition upon which the government decided to enter into the area of nationwide flood control programs."  301 F. Supp. at 952.

*Graci*, 456 F2d at 25-26.

Thus, the Fifth Circuit focused on the precise question that is once again  put before this Court, this time in a motion for summary judgment:  "whether it is reasonable to suppose that in exchange for its entry into flood control projects the United States demanded complete immunity from liability for the negligent and wrongful acts of its employees *unconnected with flood control projects." Id.* at 26. Judge Minor Wisdom writing for the court  found unequivocally, concurring with Judge Heebe's district court opinion,  that  it "would not be reasonable to so conclude."   In support of this position, he relied on *Peterson v. Untied States*, 367 F.2d 271 (9th Cir. 1966), where certain vessels were damaged by the negligent dynamiting of an ice jam in the bend of the Chena River in Alaska by representatives of  the Army Corps of Engineers in an attempt to prevent flooding caused by an unusual spring run-off.  The vessel owners sought remuneration for damages caused thereby, and the Government contended that § 702c immunity attached since these actions were done solely to "prevent a threatened injury from a force of nature to the Ladd Air Force Base property and to the community of Fairbanks, Alaska." *Peterson v. United States*, 217 F. Supp. 867, 870 (D.C. Ala. 1963).

In *Peterson*, the district court granted the Government's motion to dismiss; however, the Ninth Circuit reversed.  While recognizing the purpose of §702c, the appellate court noted all of the cases where § 702c had been applied to insulate the United States from liability were

factually distinguishable.  The Fifth Circuit characterized the *Peterson* decision in *Graci* as follows:  "The difference between those cases and *Peterson* was that the decision to dynamite the ice-jam–the alleged act of negligence– was 'wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization.'"  *Graci,* 456 F.2d  at 26, *citing Peterson,* 367 F.2d at 275.

The Fifth Circuit then analyzed *Parks v. United States*, 370 F.2d 92 (2nd Cir. 1966) where the Second Circuit properly "affirmed a judgment of the district court dismissing on [§702c] grounds a complaint that the United States had negligently constructed, maintained and operated a flood control project and thus damaged the plaintiff's property." *Graci*, 456 F2d at 26.  Nonetheless, the Second Circuit noted that *Peterson* was distinguishable on its face as the flood damage there was "wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control." *Id.*

The Fifth Circuit found further support for its position in *Valley Cattle Co. v. United States*, 256 F. Supp. 12 (D. Hawaii 1966) where a court allowed recovery against the United States for floodwater damage caused by the Government's negligent maintenance of a stream and culverts again noting that the money expended thereon were not appropriated by Congress for flood control purposes.  *Id.*   Thus, the Fifth Circuit concluded, using Judge Heebe's words that it is impossible:

> to accept this immunity provision, reasonably related to
> government involvement in flood control programs, as an absolute
> insulation from liability for all wrongful acts in other situations,
> contrary to the express policy of the Federal Tort Claims Act that
> the government should be held liable for the wrongful acts of its
> employees in the same respect as private persons.

301 F. Supp. at 954.  Thus when, as here, the plaintiffs allege that they have suffered floodwater damage as a result of negligence of the United States

28

> unconnected with any flood control project, [§702c] does not bar an action
> against the United States under the Federal Tort Claims Act.

*Id.* at 27.

So, clearly, the Fifth Circuit has recognized that § 702c does not immunize a navigational channel where it is "unconnected with any flood control project." However, there is a permutation of the issue here; there is a flood control project which has failed, but the damages sought are not for the failure of the flood control project, but for the damages caused by a separate governmental endeavor. Specifically, plaintiffs maintain that an additional 3 feet of surge was create by MRGO and was the substantial cause of their injuries. The precise issued presented is whether § 702c prevents recovery for the defalcations that occurred outside of the flood control project simply because the result of those defalcations impact a flood control project. To answer this question the Court must once again look to *Central Green v. United States*, 531 U.S. 425 (2001) and apply its teachings to the issues at hand.

## 2.  SECTION 702c AND LESSONS FROM *CENTRAL GREEN*

This Court has examined *Central Green* and its predecessor*, United State v. James*, 478 U.S. 597 (1986), three times in the course of this litigation. The first decision as previously mentioned dealt with a motion to dismiss based on subject matter jurisdiction, *In re Katrina Canal Breaches Consolidate Litigation* (*Robinson)*, 471 F. Supp.2d 684 (E.D.La. 2007)*. The second opinion was in the Court's denial of Defendant United States' Motion to Certify Order and Reasons (R.D. 2994) For Interlocutory Appeal (Doc. 3842). The last discussion is contained in the Court's dismissal of plaintiffs' claims arising out of the failures of the outfall canals which were part of the LPV. *In re Katrina Canal Breaches Consolidate Litigation (LEVEE)*, 533 F.

Supp. 2d 615 (E.D.La. 2008).  The Court reiterates and incorporates those reasons in their totality.   Nonetheless, some of the specifics of these decisions bear repeating in the context of the issues presented by the United States' Motions to Dismiss.

## a. IMMUNITY BASED ON "FLOOD WATERS"

The United States has consistently argued that §702c immunizes it for any damages caused by any floodwaters, based on the "plain language" of the statute. It does so in these instant motions for a fourth time.  The Court again rejects this position for the reasons previously stated.  The Court has held and remains convinced that such a reading "ignores the fact that the immunity is grounded in the Flood Control Act of 1928."  *In re Katrina (LEVEE)*, 533 F. Supp. 2d at 634.

> The legislative history and case law interpreting § 702c supports the proposition that such a safeguard arises from the fact that the United States has undertaken the expense of flood control projects and should not be sought to bear the cost of their failures.  "Those [flood control] costs should not have added to them the floodwater damages that might occur in spite of federal flood control efforts." *Graci v. United States*, 456 F.2d 20, 25 (5th Cir. 1971) and cases cited therein. This Court has previously rejected the United States' contention that  it is immune from damages for any floodwater regardless of its source in its ruling on a motion to dismiss before as seen in *Robinson* and will continue to do so until otherwise guided by a higher court.  *In re Katrina Canal Breaches Consolidated Litigation*, 471 F. Fupp. 2d 684 (E.D.La. 2007).

*Id.*  This position is clearly supported by the *Graci* decisions.

**b.**     **§ 702c DOES NOT IMMUNIZE THE CORPS AS THE CHALLENGED CONDUCT WAS NOT RELATED TO FLOOD CONTROL**

The United States maintains in these motions that the MRGO and the LPV are "inextricably intertwined" and as such, § 702c immunity should apply.  It contends that plaintiffs' position that § 702c immunity attaches only to conduct intrinsic to the LPV and not to the extrinsic activities of designing, building, maintaining and operating the MRGO, does not allow plaintiffs to evade § 702c immunity.  The Government reasons that "the plain text of the statute makes no reference to "conduct" or "flood control" but instead bases immunity entirely on a causal relationship between "damage" and floods or flood waters."  (Doc. 10378, Defendant United States' Renewed Motion to Dismiss, or in the Alternative, for Summary Judgment, at 14).  Thus, the Government posits that regardless of the type of actions taken or failed to be taken by the Government with respect to a non-flood control project that might cause flooding to occur, once such flooding occurs over a flood control project, the United States is immune.  The Court's previous discussions concerning the teachings of *Central Green* have rejected such an argument.

Nonetheless, in the *LEVEE* decision, this Court examined the breadth of § 702c immunity in the context of the outfall canals and found it applicable.  As the Court stated there:

> In *Central Green,*  the Supreme Court squarely confronted *dicta* it had rendered in the first occasion it had to interpret § 702c, that being  *James*  which had "generated conflicting opinions among the Courts of Appeal."  *Id.* at 430.   In *James*, two suits were consolidated to determine whether §702c barred recovery for personal injuries to individuals allegedly caused by the negligence of the United States in its failure to warn of dangers from the release of flood waters from federal flood control projects.  The injuries at issue there were caused by "turbulent current generated by unwarned releases of waters from a reservoir after

31

the Army Corps of Engineers had determined that the waters were at "flood stage." *Central Green* 531 U.S. at 430  Thus, the fact that the injuries were caused by "flood waters" was undisputed.

In *James*, the Supreme Court stated in *dicta*:

> nor do the terms 'flood' and 'flood waters' create any uncertainty in the context of accidents such as the ones at issue in these cases. The Act concerns flood control projects designed to carry floodwaters.  *It is thus clear from § 702c's plain language that the terms 'flood ' and 'flood waters' apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control*, as well as to waters that such projects cannot control.  *Id.* at 605, 106 S. Ct. 3116 (emphasis added).

*Central Green*, 531 U.S. at 430 (emphasis provided).  From that statement, many courts focused on whether the damage related  in some manner to a flood control project  rather than whether it related to floods or flood waters.  The Supreme Court in *Central Green*, refined this dicta, and stated:

> In *James,* we held that the phrase "floods or flood waters" is not narrowly confined to those waters that a federal project is unable to control, and that it encompasses waters that are released for flood control purposes when reservoired waters are at flood stage.  That holding, however, is vastly different from the Ninth Circuit's reading of § 702c, under which immunity attaches simply because the Madera Canal is part of the Friant Division of the Central Valley Project, and flood control is one of the purposes served by that project.  The holding in *James* also differs from the less attenuated and more fact-specific proposition advanced by the Government, which would require us to take judicial notice of evidence that the Friant Division of the Central Valley Project and, indeed, the Madera Canal itself can and do serve flood control purposes.  We ultimately conclude that the judgment cannot be upheld under either rationale.

 *Id.* at 431.

In overturning the Ninth Circuit, the Supreme Court focused on the fact that the lower court had characterized "every drop of water that flows through that immense project as 'flood water' simply because flood control is among the purposes served by the project unnecessarily dilutes the language of the statute." *Id.* at 434.  It noted that the text of § 702c does not include the words "'flood control project'" and thus "the text of the statue directs us to determine the scope of the immunity conferred not by the character of the federal project or the purposes it serves, but by the character of the waters that cause the relevant

damage **and the purposes behind their release**." *Id.*  In the factual context of *Central Green*, this phrase is key.  Implicit in this case in light of the discussion of *James* is that the Court  rejected a facile approach to immunity, that is if the water, regardless of whether it is flood water or not, comes from a flood protection project, there is immunity.  Rather, the damaging water for which the Government is immune in *Central Green* is for flood waters, not other kinds of water,  that actually were being diverted in a flood control portion of the entire project.

The Supreme Court concluded:

> This case does raise a difficult issue because the property damage at issue was allegedly caused by continuous or repeated flows occurring over a period of years, rather than by a single, discrete incident.  It is relatively easy to determine that a particular release of water that has reached flood stage is "flood water" as in *James*, or that a release directed by a power company for the commercial purpose of generating electricity is not, as in *Henderson v. United States*, 965 F.2d 1488 (8th Cir. 1992).  It is, however, not such a simple matter when damage may have been caused over a period of time in part by flood waters and in part by the routine use of the canal when it contained little more than a trickle.  The fact that a serious flood did occur in the San Joaquin in 1977 creates the distinct possibility that flood waters may have surged down the Madera Canal and harmed petitioner's property.  For present purposes, we merely hold that it was error to grant the Government's motion for judgment on the pleadings and that it is the text of § 702c, as informed by our holding in *James*, rather than the broad dictum in that opinion, that governs the scope of immunity from liability for damage caused "by floods or flood water."  Accordingly in determining whether § 702c immunity attaches, courts should consider the character of the waters that cause the relevant damage rather than the relation between that damage and a flood control project.

*Id.* at 436-47.  While the Government seeks to read any connexity to a flood control project out of § 702c immunity, a fair reading of *Central Green* and its narrow holding in conjunction with *James* leaves this Court with the belief that §702c immunity arises where damage is caused by flood waters emanating from a flood control project.

*Id.* 533 F. Supp.  at 635-637.   However, the facts at issue with respect to the outfall canals made clear that Congress had acquiesced and had funded a program designed to protect New Orleans

from storm surge using the "High Level" plan as opposed to the "Barrier Plan" and that the design used failed miserably. The failure of the outfall canals were at the center of the discussion.

Here, however, it is not so clear. Plaintiffs here have presented sufficient evidence to create a substantial question of fact as to what precisely caused the damage to their property. They maintain that even if the flood control project had been built perfectly to specifications, that because of the surge created by the mistakes made with respect to MRGO, these damages would have happened. As the Court stated in its first opinion concerning this issue issued in *Robinson*,

> Furthermore, the Government's position ignores the fact that even the Supreme Court in *Central Green* opened the possibility of a segregation of damages–those for which the Government would be immune under § 702c and those for which immunity would not attach. Indeed, the Government even concurred with this reading at oral argument. (See Transcript of Hearing, October 27, 2006 at 33). For example, would the United States be immune for all damages if a navy vessel lost control and broke through a levee where the sole cause of the failure of that levee was the navy vessel's negligence? Thus, contrary to the Government's contention that *Central Green* broadens the immunity provided by § 702c, in reality *Central Green* requires the Court to identify *the cause of the damage* rather than case a decision on the mere fact that a flood control project was involved. *Central Green* does not directly answer the question of what nexus to a flood control project is required for floodwaters to trigger immunity.

*Robinson*, 417 F. Supp. 2d at 694-95. Thus, this Court has encapsulated the teachings of *Central Green* as providing this test for the application of § 702c immunity:

> In order for the United States to be immune from damages caused by water under its control or supervision (1) the water must have a nexus to a flood control project and (2) the water must be "flood waters." In *Central Green,* the court remanded the case to determine what amount of damage, in any was caused by water which was not "flood water." It involved a causation issue and did not broaden § 702c immunity. Clearly there are circumstances where the United States may be held liable for damage resulting from flood water caused by its acts of omission or commission.

34

(Rec. Doc. 6194 at 5).

In Central Green, all of the defalcations that occurred were in the confines of one project. Indeed, the United States conceded at oral argument that there is not a single reported case where the negligence for which the United States was found immune pursuant to § 702c occurred **<u>outside</u>** of the flood control project itself.[16]  Here, the negligence for which plaintiffs seek compensation is not for any negligence that occurred in the construction or maintenance of the flood control project.

In the case before this Court, there were two projects, with two different funding methods and two different concerns driving each.  The LPV sought to prevent flooding; the MRGO sought to promote deep draft shipping.  Where as here, the United States admits that after 1966 and the Bretschnieder and  Collins Report, the Corps did not ever take into consideration the MRGO with respect to storm surge or its effect on the LPV, how can § 702c immunize it for damages that were caused solely by defalcations concerning MRGO?  There is no innate difference between that Navy ship that hits the levee and the MRGO.  The levee was built and an independent actor–the ship–causes damages when it crashes through the levee at flood stage in New Orleans.  This logically has the same legal consequences as the Corps continuing to dredge a channel that created a dangerous hazard which manifested itself with an additional three feet of storm surge during  Hurricane Katrina.  Moreover it would be absurd to hold that flooding damage to property owners outside the confines of a flood control project

---

[16] In response to the question of whether there were any case "where the negligence as alleged in this case was extrinsic, that is outside the entire boundary of the FCP,"counsel for the United States stated, "I'm not aware of a case that immunized conduct that was **not at least broadly part of a flood control project."** (Transcript at 33.)

would have a viable claim and those within it do not when the negligent act was extrinsic from and not connected to the expenditure of funds to construct the flood control project.

The MRGO was a dynamic, on-going project which required dredging which occurred throughout its existence and for which its maintenance appears to be the Corps' primary focus. In addition, it allegedly provided a conduit for salt water intrusion which plaintiffs further destroyed the marsh.  All of these forces allegedly combined to decimate the wetlands surrounding Lake Borgne destroying the natural habitat; without that loss, plaintiffs contend that the storm surge would not have been that additional three feet.  Thus, had it been just the force of Katrina, without the force of man's negligence, plaintiffs maintain there would have been significantly less damage–that is to say localize flooding rather that than cataclysmic flooding that occurred.

There is no proof or any evidence that the Corps in designing the LPV ever took into consideration any of these changes that MRGO had wrought on the area.  As such, this Court is unable as a matter of law at this time find that § 702c immunity should lie.  The damages sought are for negligence that occurred extrinsic to the LPV, that is to say the LPV was not designed to prevent the storm surge that occurred.  The United States should not be immunized for a tort which occurred from an activity unrelated to a flood control project.  Taken to its logical conclusion, such a policy would yield absurd results.

The United States at oral argument contended that another policy reason for finding that §702c immunity encompasses any flooding is that once the Government builds a flood control project, as the line from *Field of Dreams* goes, "Build it and they will come."  The United States maintains that once Congress puts money into flood control projects, there is development and

36

building of communities (in this instance New Orleans East and St. Bernard) which would not have existed but for the construction of the LPV.  Thus, it should not incur this greater liability as a result of that flood control activity which allowed these communities to be built.  However, this policy reason ignores the fact that the damages alleged are caused not by the failure of the LPV but because of the negligence of the Corps in relationship to the MRGO.  The MRGO is subject to the FTCA and the immunities carved out of the FTCA like the Discretionary Function Exception which very well may shield the United States for its alleged negligence concerning the MRGO.  But that issue is for a later date.  Simply because the waters involved crossed a flood control project should not eliminate the remedies which Congress has fashioned for a navigational aid project that allegedly "went wrong."  Accordingly,

**IT IS ORDERED** that Defendant United States' Renewed Motion to Dismiss, or in the Alternative, for Summary Judgment (Doc. 10378) and United States of America's Motion to Dismiss Lafarge North America Inc.'s Third-Party Complaints (Doc. 7730) are **DENIED** to the extent that the United States may be held liable for damages caused by negligence which occurred extrinsic to the LPV.

> **B.     PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION
> CONCERNING DEFENDANT UNITED STATES' SECOND
> AFFIRMATIVE DEFENSE OF IMMUNITY UNDER 33 U.S.C. § 702c**

Plaintiffs filed their own motion for "summary adjudication" the Government's second affirmative defense (§ 702c) which the Court interprets to mean that they seek an "adjudication" that § 702c immunity is inapplicable to bar their causes of action.  They predicate their motion on the following three arguments:

(1)  Section 702c is inapplicable because Plaintiffs are not predicating Defendant's liability on levee breaches or the failure, overtopping, or defective design, construction, operation or maintenance of other forms of flood protection works.

(2) Section 702c in inapplicable here because it is undisputed that the flood control structures were not designed or constructed in accordance with the Congressional authorization of the LPV in the Flood Control Act of 1965, requiring the use of the Standard Project Hurricane design criteria for flood control structures.

(3) Section 702c is inapplicable here because it is undisputed that the Congressionally-mandated hurricane flood protection system ("HPS") was still substantially incomplete by the time of Hurricane Katrina, thereby not affording Greater New Orleans the level of hurricane protection mandated by Congress forty years earlier.

(Doc. 10337 Memorandum of Points and Authorities in Support of Motion for Summary Adjudication**).**

The Court has denied the United States' motions for summary judgment on the § 702c issue and has found that United States may be held liable for damages caused by negligence which occurred extrinsic to the LPV; however, there are far too many questions of material fact as to causation to adjudicate the United States is liable.

As to plaintiffs' contentions that § 702c is inapplicable because the flood control structures were not designed or constructed in accordance with the Congressional authorization of the LPV in the Flood Control Act of 1965 and because it is undisputed that the Congressionally-mandated hurricane flood protection system ("HPS") was still substantially incomplete by the time of Hurricane Katrina, the Court questions the legal support for such arguments, *see Allison v. Froehlke*, 470 F.2d 1123 (5th Cir. 1972) (congressional authorization for project to be completed "substantially in accordance with the recommendations of Chief of Engineers" allows for deviation) .  Furthermore, the concept of what constitutes "substantial"

38

completion" may be a red herring in the context of §702c immunity.  Moreover, the factual bases for these contentions are contested.  As such there are substantial questions of material fact which prevent such a finding.  Accordingly,

**IT IS ORDERED** that the Plaintiffs' Motion for Summary Adjudication Concerning Defendant United States' Second Affirmative Defense of Immunity Under 33 U.S.C. § 702 (Doc. 10337) is **GRANTED** insofar as the United States may be found liable for damages caused by its negligence that are extrinsic to the LPV and the Motion is **DENIED** in all other respects.

New Orleans, Louisiana, this __2nd__ day of May 2008.

_____
**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT COURT JUDGE**



APPENDIX 1

40