ARBITRATION PANEL
CONVENED UNDER LOUISIANA COUNSEL
FEE PAYMENT AGREEMENT

| | |
|---|---|
| IN RE: | ) |
| ATTORNEYS' FEE APPLICATION BY | ) |
| LOUISIANA PRIVATE | ) |
| OUTSIDE COUNSEL | ) |
| | ) |

## DECISION

This is the eighth arbitration before the Panel arbitrators established to award attorneys' fees to Private Outside Counsel in connection with the settlement of the attorney general Medicaid cases against the tobacco industry.

### Introduction

This arbitration proceeding awards attorneys' fees to Private Outside Counsel for the State of Louisiana pursuant to the Master Settlement Agreement ("MSA"). The MSA is the November 1998 global settlement of the Attorneys General litigation involving 46 states and a number of U.S. territories and Participating Tobacco Manufacturers. The Manufacturers who participated in the MSA agreed to substantial constraints on their conduct including restrictions on advertising and political lobbying. The Participating Manufacturers also agreed to pay billions of dollars in damages, in perpetuity. The total settlement proceeds (including Mississippi, Texas and Florida) total approximately $250 billion for the first 25 years of the settlements. The State of Louisiana's share in the financial proceeds of the MSA will exceed $4.6 billion. The Participating Manufacturers agreed to pay full reasonable attorneys' fees to Counsel representing the States over

STATE'S EXHIBIT

2

and above the settlement proceeds under the MSA. Private Outside Counsel for all of the Settling States and the Participating Manufacturers entered into Fee Pay Agreements to determine the fees.

### Louisiana Fee Payment Agreement

The process for determining the amount of the earned fee for Louisiana Private Outside Counsel was binding arbitration, the proceeding of which is the subject of this decision. The Louisiana Private Outside Counsel fee arbitration was heard by the selected Panel of Arbitrators on October 29 and 30, 1999, in Washington, D.C. In advance of the hearing, the Panel received submissions from Louisiana Private Outside Counsel and the Settling Companies. At the hearing, live testimony was presented from six witnesses for Private Outside Counsel and two witnesses for the Settling Companies. Additional testimony and evidence was taken in affidavit, video and document form. Pursuant to the MSA's mandate, the proceeding was closed to the public, as were the previous arbitrations.

The contract governing this proceeding, the Louisiana Fee Payment Agreement, charges the Panel with the responsibility of awarding Louisiana Private Outside Counsel "a full reasonable fee," taking into consideration the "totality of the circumstances."

Unlike most other states which retained Private Outside Counsel on a fixed contingent fee contract, the contract between Louisiana Private Outside Counsel and the State of Louisiana expressly relieves the State from paying attorneys' fees or costs in connection with this litigation, and thus contains no contingent fee percentage. It was understood from the beginning of the case that Louisiana Private Outside Counsel would not recover fees or expenses from the State. Louisiana

NYDOCS04/264277 1

3

Private Outside Counsel was responsible for all of the out-of-pocket expenses in order to prosecute this case, totaling more than $3.5 million.

In past arbitrations, this Panel has relied in part, but not in totality, upon the American Bar Association Rules of Professional Conduct Rule 1.5 and the factors discussed in the *Johnson* case to establish what constitutes a full, reasonable fee under the totality of the circumstances. The charge to the Panel is set forth in Section 14 of Exhibit O of the MSA. The Panel, for the purposes of this proceeding, looked in particular at four factors: effort, complexity, risk and achievement.

### Unique Role of Louisiana Private Outside Counsel

Louisiana Private Outside Counsel occupied a unique role in the collective national effort that brought about the national settlements, ultimately leading up to the MSA. As part of the overall national strategy, the Louisiana case was selected as the venue to pursue the more than 168 insurance companies which were the insurers for the Tobacco Manufacturers for the benefit of the entire nation. Louisiana Private Outside Counsel sacrificed a possible early trial date, and consequently, a chance to be situated similar to Mississippi, Texas, or Florida, in order to pursue the Insurance Carriers for the Tobacco Manufacturers. Identifying and pursuing liability insurance for the Tobacco Manufacturers allowed the national settlement negotiating team to increase the pressure to settle. Louisiana Private Outside Counsel single handedly pursued the insurance litigation for the entire national effort, with Attorney General Ieyoub chairing the national insurance committee of the Attorneys Generals.

4

### Early Involvement: "Collaboration was the Key"

Louisiana, through the efforts of Private Outside Counsel, was the second state to begin working on the Attorney General litigation. Mississippi Attorney General Mike Moore enrolled Louisiana Attorney General Richard Ieyoub as early as 1993 to assemble a trial team to commence this historic litigation project. Once called upon by Attorney General Mike Moore to consider joining the anti-tobacco litigation, Attorney General Richard Ieyoub promptly authorized Louisiana Private Outside Counsel to investigate a possible case and to initiate case preparation.

Louisiana was the sixth state to file, and was one of five states which brought about the Liggett I settlement. There was great risk to General Ieyoub and Louisiana Private Outside Counsel when Louisiana filed. At the time, General Ieyoub was the only Attorney General seeking national office. General Ieyoub felt that filing suit was the right thing to do since Louisiana has the highest number of smokers per capita in the nation and spends $400,000,000 a year on Medicaid costs.

General Ieyoub testified that it was absolutely necessary to assemble the best legal team to take on the tobacco industry. Louisiana Private Outside Counsel was the "best of the best" of Louisiana's plaintiffs lawyers. The evidence demonstrated that Louisiana Private Outside Counsel served as "the staff" on the tobacco case, and did 100% of the legal work. They became special assistant attorneys general, testified before the legislature, wrote speeches, and did whatever was necessary to serve General Ieyoub and the people of Louisiana. Louisiana Private Outside Counsel also paid all the expenses of litigation. General Ieyoub testified that the Louisiana Private Outside Counsel performed their legal duties magnificently, and the evidence supports that conclusion.

5

Louisiana Private Outside Counsel's efforts in early 1993 and 1994 forged the way for those states that filed lawsuits later. Louisiana Private Outside Counsel was involved in recruiting other states and counsel to join the anti-tobacco litigation. Louisiana Private Outside Counsel was also involved in much of the early legal work for all of the Attorneys General litigation including legal research, drafting of pleadings, drafting of discovery documents, and participating in many of the seminal liability and damage conferences. While participating in the work on the national effort, Louisiana Private Outside Counsel was also doing its own case preparation. By necessity -- brought on by the Tobacco Industry's lobbying and legislative efforts in an attempt to block General Ieyoub from bringing the suit, Louisiana Private Outside Counsel also became involved in lobbying and legislative efforts of their own. The legislative and political environment evolved which helped to form public opinion that would permit the filing and maintenance of the suit. The Louisiana Governor and other public officials were originally opposed to the filing of the suit, and the political and legislative efforts by Louisiana Private Outside Counsel were vital to the ultimate maintenance and eventual success of the case.

### The Relation Among Trial Pressure, Joint Effort, and Liggett I

Louisiana Private Outside Counsel's early involvement, planning, and recruiting of other states played a major role in assembling the Attorneys General into a unified force. Louisiana's early work and clinching the Liggett I settlement drew other states into the fray. "If one thing contributed to [success], it was the collaboration or the forming of alliances between the Mississippi lawyers and the Louisiana lawyers," testified General Moore.

6

### Liggett I: "Without Louisiana, there would be no Liggett I"

When the Liggett I settlement discussions began, Louisiana, because of its early preparation, was ready to file. The work enabling Louisiana to join Liggett I began years before Liggett I, not on the eve of Liggett I. Having begun preparations in 1993, Louisiana was uniquely situated to enter the settlement negotiations with Liggett in March 1996, when the settlement talks stalled and were breaking down. The settlement needed a fifth state -- that state was Louisiana, and this became the critical mass that produced the settlement. Louisiana's preparation and timely filing of its lawsuit helped to finalize the Liggett I settlement which this Panel has previously identified as "a landmark event in the litigation against the Tobacco Industry." This landmark settlement was truly a watershed event in this litigation against the Tobacco Industry, and Louisiana Private Outside Counsel was a critical part of that process.

Louisiana's preparation and joining the settlement at a crucial time was as important as being there from the start. Minnesota and Texas knew the risks of joining the Liggett I settlement, and refused to join. Louisiana thus deserves a significant share of credit for the settlement.

One must be reminded of the state of tobacco litigation in March 1996:

Mississippi's suit was under attack in March 1996 when the Governor of Mississippi sued to stop the litigation.

West Virginia's suit had failed.

Florida's suit had stalled over the question of the constitutionality of the Florida Medicaid Amendments.

Massachusetts was fighting a removal battle to federal court from state court.

Minnesota was mired in massive discovery disputes.

7

Other Attorneys General made public statements at the time as to why not to sue, for example: One state's Attorney General's task force concluded that the other Attorneys' General legal arguments were "at best weak and at worst bizarre." William H. Pryor, Jr. et al., *Report of the Task Force on Tobacco Litigation* 5, (Oct. 2, 1996). Another Attorney General stated: "Many of the legal theories being used in the lawsuits are untested and unproven." Bob Van Voris, *AGs' Claims Mere Smoke?* NAT'L L.J., Apr. 28, 1997, p. A1.

Louisiana Private Outside Counsel's early involvement and instrumental role in the Liggett I settlement added additional pressure to the national joint effort among the states. Louisiana's contribution helped make each state's trial-date a powerful force for settlement.

### Louisiana Private Outside Counsel Could Have Ignored Its National Role & Obtained an Early Trial Date

The reason an early trial was not reached in Louisiana was because of the imperatives of a national strategy, not an isolated local decision. Joint effort was the key to pressuring the industry and Louisiana never wavered from its joint effort tasks, even when it meant sacrificing its own trial date.

The Louisiana case proceeded rapidly through the state court system, defeating every motion raised by the Tobacco Manufacturers. As part of the national strategy, in March 1997, Louisiana launched a critical "second front" against Tobacco by suing directly 168 insurance companies which were the insurers of the tobacco industry. This could only have been done in Louisiana because of Louisiana's Direct action statute which permitted lawsuits against the insurers of the tobacco industry. Suing the insurance industry was done on behalf of the national effort -- at the request of the national effort attorneys general, in particular Mississippi Attorney General Mike

NYDOCS04/264277.1

8

Moore concurred in by Attorney General Ieyoub -- even though it meant a loss of an early trial date for Louisiana.

## The Threat of Combat with Tobacco's Insurance Carriers
### Added a New Form of Pressure

The direct action generated a new form of pressure -- the "second front," as Louisiana Private Outside Counsel called it. The tobacco industry did not want to have another extensive battle with its insurance carriers, and instead wisely sought peace with its carriers. If it had not, it would have faced litigation from its own insurers that vindicated the second front strategy. The industry's immediate decision was to extend the olive branch to the insurance industry.

A mountain of credible evidence was introduced by Louisiana Private Outside Counsel that demonstrated that multiple insurance actions against the tobacco industry was something that tobacco could not tolerate, because Louisiana Private Outside Counsel's direct action would cause tobacco to lose precious control of the insurance situation. Louisiana Private Outside Counsel introduced the record of tobacco industry behavior, insurance industry behavior, industry analysts, insurance experts, former Supreme Court Justices, and key negotiators to underscore their point of the danger to the industry of the insurance litigation.

### Insurance: "Increased Pressure to Settle" & "Drove the Numbers Up"

Louisiana sacrificed an early trial date in order to pursue insurance. For the benefit of the nation, Louisiana established what is reported to be tens of billions of dollars of insurance coverage. As Louisiana Private Outside Counsel simply and eloquently stated, "An asset is an asset." The Attorney General negotiators were educated by Louisiana Private Outside Counsel and knew to demand more money in the settlement talks because of this insurance asset. Evidence that

9

the negotiators for the Attorneys' General asked for more money because of insurance coverage went

unrefuted by the tobacco industry.

The testimony at the hearing established that:

Knowledge of insurance allows states to evaluate financial decisions under MSA.

Tobacco denied that insurance even existed in discovery responses.

Louisiana Private Outside Counsel added more in value with insurance than recovered by the state or Louisiana Private Outside Counsel in fees.

Opening a "second front" created a new pressure point for settlement.

When the insurers were brought into the case, tobacco sought peace with its insurers by extending the "olive branch."

Insurance had to be addressed as part of national settlements, and Louisiana was the only state to put the issue into play.

Provided vital information against risk of bankruptcy and created a safety net to ensure future payments.

The "end of vilification" included the end of the "second front."

Louisiana Private Outside Counsel participated in the settlement negotiations and proved why tobacco did not want insurance to participate as well.

The release of the insurers under the MSA proves that insurance was an asset that tobacco had to preserve and control; many other defendants (Tobacco Institute, Counsel for Tobacco Research, Parent companies, etc.) did not financially contribute to the settlement, but were still significant to the national effort.

Tobacco presented no evidence and only offered one attorney-witness to refute the massive evidence proving the insurance claim's significance in national settlements.

### Insurance Was Not a Blunder; Removal Is Not Dismissal

The industry alleged that Louisiana's insurance case was a massive "blunder" because it

allowed the entire case to be removed to federal court. But, the change of forum to federal court had

NYDOCS04/264277 1

10

no effect on Louisiana Private Outside Counsel's achievement in helping to shape the entire national effort. Nor did it affect Louisiana Private Outside Counsel's achievement in clinching Liggett I and all the consequences thereof. It strengthened the states' negotiating position. The efforts of Louisiana Private Outside Counsel allowed General Moore and Chief Negotiator Rice to negotiate with knowledge of the tobacco industry's full financial picture. Louisiana Private Outside Counsel's achievement of full disclosure of the insurance policies protected the performance of the MSA. The knowledge that Louisiana Private Outside Counsel supplied about insurance coverage allowed the states to evaluate tobacco's present and future financial difficulties.

## Insurance Proceeds: Louisiana Private Outside Counsel Paid their Own Way

Scope of Duty to Defend: In addition to the tens of billions of dollars in reported insurance coverage Louisiana Private Outside Counsel established under the policies, insurance companies must defend or pay the tobacco companies' defense costs if there is simply the *potential* for coverage.

The duty to defend a claim is much broader than the scope of coverage. For example, Maryland Casualty Company will: "defend any suit against the insured [RJ Reynolds] alleging such injury, sickness or disease or destruction and seeking damages on account thereof, *even if* such suit is groundless, false or fraudulent . . ." and defense costs "are payable by the Company *in addition to* the applicable limit of liability of this policy." The complaints filed by the states triggered the insurance companies' duty to defend. It is estimated that defense costs are $600 million a year.

Louisiana Private Outside Counsel provided expert opinion about the value of the duty to defend. For example, one expert opined:

11

"...I would expect that defense costs coverage could *greatly exceed* the limits of the policies." With the tobacco industry incurring $600 million a year in defense costs, the tobacco industries' insurance coverage, on defense costs alone, can be valued at billions *in present value money* even if there is only the *potential* for coverage.

Thus, Louisiana Private Outside Counsel, by fully disclosing insurance and informing the Attorneys General negotiators of it (while tobacco denied its existence), added more in value with insurance than even requested by Louisiana Private Outside Counsel in fees.

### Impact on Public Health Opinion and Public Opinion

Dr. David Burns, one of the nation's leading public health professionals and anti-smoking advocates, testified to Louisiana's critical role in the Attorney General litigation and Liggett I:

> "The prospect of this incredible public health advance disappearing was something that was almost more than I could contemplate and it was *only when Louisiana came in as a State that the settlement became possible* and that *therefore, we were able to get this kind of pubic health advance* put forward in the public."

Before the case settled, Louisiana's Governor was one of the harshest critics of the State's case. He voluntarily filed an affidavit early in the case, together with the State's Chief Public Health Officer to try and get the suit dismissed. After the case settled, the Louisiana Governor changed course and wrote Attorney General Ieyoub, praising the efforts of the Louisiana Private Outside Counsel:

> "...you and your legal team have done a tremendous service to the state of Louisiana in achieving a settlement agreement which will provide much needed financial resources to our state. You and your legal team are to be complemented on your role in initiating and pursuing legal procedures which were critical to the successful resolution of the case."
> *Exhibit A, Louisiana Fee Application*

NYDOCS04/264277 1

12

## Effort & Complexity

The Louisiana case was a most complex case; and involved the Napoleonic code, international treaties, more than 200 parties, foreign countries, hundreds of pleadings and millions of documents. The insurance-oriented litigation strategy in Louisiana required Louisiana Private Outside Counsel to face legal challenges unparalleled by any other trial team in any other state.

The addition of the Insurance Defendants to the Louisiana case required tremendous additional effort on the part of Louisiana Private Outside Counsel. While pursuing the suit against the Tobacco Manufacturers, as done in the other states, Louisiana Private Outside Counsel was also advancing the suit against 168 Insurance Defendants. The addition of the numerous defendants brought with it dozens of new lawyers and law firms which filed hundreds of pleadings and motions not raised in other cases. The mere administration of the Louisiana case was complex due to the sheer number of parties.

Additionally, Louisiana Private Outside Counsel was engaged in a forum battle with two of the insurance companies which called into question international treaties, the law of four different foreign countries, and brought the case into five different venues. And the insurance action led to a possible set back when the insurance companies removed the case to federal district court, and launched arbitration proceedings in London. What began as a state court action was now in the federal courts of the United States, and before the courts and arbitration panels in England and Ireland.

NYDOCS04/264277.1

13

Each of these requirements was in addition to, not in lieu of, the massive claims and discovery tasks associated with suing the Tobacco Manufacturers. Until the insurance companies removed the case to federal court, Louisiana Private Outside Counsel never lost a ruling to tobacco in the entire case. The Order denying remand from federal court was immediately appealed, by discretionary appeal, and set for decision when the case settled. The 13 Louisiana firms put forth substantial effort spending between 75,000 - 80,000 hours of work on case, plus the efforts of the national firms. All of this work stretching over some six years was all done on behalf of Attorney General Ieyoub and the state of Louisiana's Medicaide case against the tobacco industry.

### Role in Master Settlement Agreement Negotiations

Louisiana Private Outside Counsel also exerted tremendous effort participating in all of the national settlement negotiations. Louisiana Private Outside Counsel team members were an integral part of the national settlements beginning with Liggett I and ending with the MSA.

During the negotiations leading up to the proposed settlement of June 20, 1997, General Ieyoub served as the National Chairman of the insurance committee for the Attorneys General negotiating team. Louisiana Private Outside Counsel participated in the negotiations and provided the negotiating team with vital information on the insurance coverage available to the tobacco manufacturers.

14

## Risk: "A Special Package of Risks"

Louisiana Private Outside Counsel experienced a special package of risks in both the litigation and the right to compensation if successful in the litigation. Every early-filing state was confronted with the daunting task of pursuing a claim against the Tobacco Industry's unbroken record of litigation success. When Louisiana filed its lawsuit, only five other states preceded Louisiana's filing. Each of these five other states were all facing enormous litigation hurdles when Louisiana joined.

In the face of these enormous litigation risks, Louisiana Private Outside Counsel faced a second form of risk in pursuing the litigation. Under their contract with the State of Louisiana, Private Outside Counsel was not provided with a fixed contingent fee in the event of successful recovery, nor were they entitled to any type of hourly compensation or the right to recover their fees or expenses from the State. Absent some sort of settlement in which the Tobacco Industry would agree to pay Private Outside Counsel's fees, and Louisiana Private Outside Counsel faced the risk of no fee recovery, and no reimbursement for the $3.5 million in out-of-pocket expenses in prosecuting this claim.

The risks were massive. For example, in Louisiana, as opposed to arrangements in some other states:

> No concurrent hourly fee and expenses
>
> No special state enabling legislation
>
> No fixed contingent fee
>
> No ultimate recourse against state

15

Hostile government and political environment

Case actively opposed by Governor and Chief Public Health Officer

Through the tremendous effort of the Louisiana Private Outside Counsel, and in the face of enormous complexity and risk, they were able to make substantial achievements on both a state and national level.

### Full Reasonable Fee:  Considering "the Totality of the Circumstances"

As stated at the outset of this Decision, this Panel is charged with considering the "totality of the circumstances" under the American Bar Association *(Johnson)* factors and deciding upon a "full reasonable fee" under the evidence presented.  When the ABA factors are condensed down to the following four factors, Louisiana Private Outside Counsel ranks among the top in each category:

a)   Complexity; a most complex case.

b)   Risk; behind only Mississippi, Florida and Texas.

c)   Effort; perhaps the highest in MSA in terms of the total litigation effort.

d)   Achievement; early involvement, Liggett I, and insurance.

This Panel witnessed the caliber of work that Louisiana Private Outside Counsel was capable of during the course of this arbitration proceeding.  Undoubtedly, this level of work was employed in every aspect of the Louisiana case.  Louisiana Private Outside Counsel is truly a team of pioneers who deserve their fair share of fees.

16

Louisiana Private Outside Counsel was the second group of counsel to be involved in the Attorney General tobacco litigation. Their efforts in the early days helped to shape the entire national effort, which ultimately led up to the MSA.

Louisiana Private Outside Counsel was the fifth critical state in the Liggett I settlement because it was ready. Louisiana Private Outside Counsel was the second trial team that began working tobacco and had been preparing for two years. This may be the last Liggett I case to arbitrate, as West Virginia may not arbitrate. Due to the early work and its preparation, Louisiana Private Outside Counsel was prepared to help clinch the Liggett I settlement when negotiations faltered.

Louisiana Private Outside Counsel employed Louisiana's unique direct action statute -- as they often do in other appropriate cases, against both the tobacco industry and the insurance industry. Louisiana Private Outside Counsel pursued the insurance case for the entire country. The insurance action brought about another form of pressure to settle and added value to the settlement. This was proven with both documents and witnesses. One witness, Paul Hodges of Schroders in London, advised investors (in a report unrelated to this arbitration) in July 1999, that the stock of one tobacco company was undervalued because investors failed to take into consideration the "substantial insurance coverage" available to the tobacco companies. The amount of that coverage was valued in this arbitration at "tens of billions of dollars of insurance coverage for these claims." In the face of this compelling evidence, the tobacco industry offered no insurance witnesses.

17

Louisiana Private Outside Counsel played a significant role in the national litigation. The discovery of insurance for all of the Attorneys General helped increase the amount recovered under the national settlements. Armed with the knowledge of the insurance coverage, the negotiators for the Attorneys General demanded more money in the settlement based upon discovery of an asset that Tobacco always denied existed.

It was undisputed as part of these arbitration proceedings that insurance was an issue that had to be addressed as part of the national settlement negotiations. Louisiana Private Outside Counsel was the group that put that issue into play, forcing the Tobacco Industry to fight the litigation not only against the united front of the Attorneys General, but also against the massive Insurance Industry.

Our respected colleague Judge Charles Renfrew asserts that his conscience is "shocked" by the fee award of this panel to Louisiana Private Counsel. Further, Judge Renfrew claims that the fee award constitutes a "windfall" to Louisiana Private Counsel. We will not repeat the many reasons cited above that refute the claims of a "shocked" conscience or of a "windfall." However, we will respond to a few of Judge Renfrew's remarks.

First, the testimony either presented orally at the hearing or submitted in writing prior thereto regarding the level of a full reasonable fee for Louisiana Private Counsel included the unrefuted testimony of three former Louisiana Supreme Court Justices, the former Dean of the Tulane Law School, and a nationally recognized fee expert from NYU Law School. The

18

testimony also included a legal analysis of fee award levels of the mass of "megafund"[1] cases.

This testimony advocated a fee award far higher than the one the panel's majority awarded.

Clearly, it did not shock the conscience of these highly respected jurists and academicians, nor in

their view did it constitute a "windfall". Further, the awarded fee clearly should not shock the

conscience of the tobacco industry, who argued in a Position Paper Against the Medicaid

Litigation to the Louisiana Attorney General in 1994 that a reasonable fee for Louisiana counsel

who litigated against the tobacco industry was in the range of 30 to 40%. The percentage

awarded here to Louisiana Private Counsel – 12.5% – is far less than the usual and customary

contingency fee percentage in the state of Louisiana and, in fact, in all states in the country.

     The Position Paper Against the Medicaid Litigation to the Louisiana Attorney

General from the tobacco industry is worth quoting from, as follows:

> Louisiana law permits the use of outside attorneys to prosecute such cases.  If the
> state uses outside counsel, they will likely be paid on a contingency basis.   This
> means that the lawyer's fee will amount to 30-40 percent of any recovery.

---

[1]    Megafund cases refer to the cases reported since 1981 having recoveries in excess of $100 million. The mean average of fee awards in the megafund cases is 13.4%. See, *In re Agent Orange Product Liab. Litig.*, 818 F.2d 226 (2d Cir. 1987), *In re Baldwin-United Corp. Litig.* 1986 WL 12195 (S.D.N.Y.), *Bowling v. Pfizer, Inc.*,  922 F. Supp. 1261 (S.D Ohio 1996), *aff'd*, 102 F.3d 777 (6th Cir. 1996), *In re Combustion, Inc.*, 968 F. Supp. 1116 (W.D. La. 1997), *Conley v Sears, Roebuck & Co.*, 222 Bankr. Rep. 181 (D. Mass. 1998), *In re Copley Pharmaceutical, Inc.*,1 F. Supp.2d 1407 (D. Wyo. 1998), *Cosgrove v. Sullivan*, 759 F. Supp. 166 (S.D.N.Y. 1991), *In re Domestic Air Transp. Antitrust Litig.*,148 F.R.D. 297 (N.D. Ga. 1993), *Duhaime v John Hancock Mut. Life Ins. Co.*,989 F. Supp. 375 (D. Mass. 1997), *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998),*Local 56, United Food & Com'l Workers Union v. Campbell Soup Co.*, 954 F. Supp. 1000 (D.N.J. 1997), *McLendon v. Continental Group, Inc.*,872 F.Supp. 142 (D. N.J. 1994), *In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522 (D. Nev 1987), *In re NASDAQ Market-Makers Antitrust Litig.*,1998 WL 782020 (S D.N.Y.), *In re PaineWebber Ltd. Partnerships Litig.*, 999 F. Supp 719 (S.D.N.Y. 1998), *In re Prudential Ins. Co. of America Sales Practices Litig.*,148 F.3d 282 (3d Cir. 1998), *In re San Juan Dupont Plaza Hotel Fire Litigation*, 768 F Supp. 912 (D. P R. 1991), *In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D. La. 1993), *Sioux Nation of Indians v. United States*,650 F.2d 244 (Ct. Cl. 1981), *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 886 F. Supp. 445 (E.D. Pa. 1995), *Walco Investments, Inc. v. Thenen*, 975 F. Supp. 1468 (S.D. Fla. 1997)

19

Position Paper p. 2 (Slide 17 of Louisiana Outside Counsel Presentation).

The Position Paper cited above was part of intense efforts by the tobacco industry and its lawyers to stop the Louisiana State lawsuit. That effort was partially successful. For Louisiana is the only state in the country where not only the Governor but also the state's principal public health officer <u>opposed</u> the suit brought by the Attorney General. In fact, in an unprecedented action, the Secretary of the Louisiana Department of Health and Hospitals filed an affidavit in support of the industry's motion to dismiss - this in a state that ranks third in the number of smoking deaths in the nation.

If one's conscience were to be "shocked", as suggested by Judge Renfrew, it should be "shocked" by the actions of Louisiana's governor, elected and sworn to uphold the people's interest, and Louisiana's top public health officer, sworn to protect the health and well-being of the men, women and children of Louisiana. These two top state officials both actively opposed Attorney General Ieyoub's lawsuit against the tobacco industry. This action by the Governor and Secretary of Health and Hospitals of Louisiana is what truly "shocks" the conscience.

Now, of course, like all Monday morning quarterbacks looking back at the stunning and unprecedented victory, there is only applause for the lawyers' success from the governor and health officials of Louisiana and the nation. What further shocks one's conscience is this after-the-fact Monday morning quarterbacking and denigration of risk and effort following the greatest settlement in U.S. litigation history. Both the financial amounts to the states and their citizens, and more importantly, the public health benefits these private lawyers wrought are

NYDOCS04/264277 1

20

what is unprecedented in American legal history. These results bring credit upon the legal

profession, and the fact that the lawyers are being properly rewarded should also bring credit and

strengthen the concept of the "private attorney generals" suing on behalf of the public interest.

Judge Renfrew appropriately recognizes part of this equation in his Dissent when he writes:

> In dissenting however I do not disparage or denigrate the efforts of Louisiana
> outside counsel or the role of national counsel. They have undertaken their
> responsibilities at some risk, although not to the extent of the earlier cases. The
> local counsel are some of the outstanding plaintiff's trial lawyers in the state of
> Louisiana recognized at both the state and national levels. Their efforts did
> contribute to the ultimate settlement, and they should be compensated for those
> efforts, which assisted in arriving at the MSA. However, the amount of the
> compensation awarded here bears no such reasonable relationship to their
> contribution.

It is here where the majority of the panel disagrees with its learned minority

member. Indeed, Judge Renfrew suggests there may have been a loss of perspective by the

majority of the panel. But any loss of perspective is not by the majority of this Panel. Rather,

there is a monumental loss of perspective when one fails to see any connection between result

achieved - after all the tobacco industry settled -- and a "full reasonable fee...under the totality of

the circumstances."

It is thus true that there is no reported court case in awarding fees that even comes

close to a fraction of the $206 billion national settlement achieved in this case, and in Louisiana,

close to the $4,600,000,000 estimated award to the state and its citizens. But, it is safe to say, in

the future, this tobacco settlement with which we are dealing will be cited again and again - as a

credit to the legal profession. And the awards given by this panel to these private lawyers for

21

their achievements will be cited with like approval by a vast majority of the legal profession, and scholars.

Second, Judge Renfrew also suggests that this award may have been "grossed-up," somehow speculating that, if "grossed-up," "such a grossed-up award represents a permissible extreme." This speculation by Judge Renfrew of a "grossed up" award is incorrect. There was no grossed-up award. There was only an award that was consistent with the standard to which the Panel is held by the MSA - to award "full reasonable fees" to private counsel taking into account "the totality of the circumstances." The majority of this arbitration panel are fully aware of their charge and acted within its perimeters.

As was written in the very first disagreement among these three arbitrators in the Florida award - reasonable people may differ. We differ again here, but the majority stands with its award, backed by the overwhelming testimony and evidence introduced at the hearing and in the submissions of both parties which amply supports the award.

Third, Judge Renfrew laments what he perceives as a lack of consistent application of his preferred methodology. The preferred methodology of the Panel as charged by the MSA is not hours alone. Indeed, to look only at hours is ill concieved. Judge Renfrew takes the majority to task over a $7,000 per hour fee award for the lawyers who accomplished what they did in Louisiana. The New York Yankees are paying Derek Jeter $17,000,000 a year to play shortstop, and with a 162 game schedule, that breaks down to $104,938 an game. If each game is 3 hours long, then his hourly rate is about $35,000 an hour. This analysis with Shortstop Jeter is probably as relevant in determining a full reasonable fee as comparing the $7,000 an hour for the

22

Louisiana private counsel with the gross per capita income with which Judge Renfrew compares

the hourly rate. But if we want to reduce hourly rates analysis to an absurdity, we can start with

Derek Jeter -- a great shortstop, but the health benefits and financial benefits to a state and a

nation are hard to discern in his superb play.

      The charge of the MSA to the Panel is to award "a full reasonable fee... taking into

account the totality of the circumstances." We have set forth above the methodology used by the

majority to reach its award; it is consistent with prior awards of the Panel, and provides the

public and future private lawyers who appear before this panel sufficient guidance and the public

sufficient transparency.

      In the Massachusetts decision by Chairman Wells, and joined in by Judge

Renfrew, Chairman Wells stated:

> The difficulty of precise valuation of lawyers' services is, of course, not unique to
> this case, but is rather more often the rule than the exception. Perhaps, that is why
> courts have started with an attempt at mathematical precision using either lodestar
> or percentage of recovery methodology, but quickly leave precision behind to
> apply impressionistic multiples to a lodestar or similar increases or decreases to a
> percent of recovery as seen fit to the particular circumstances.
>
> In line with the dominant current judicial view, I believe that taking a percentage
> of the assumed recovery most fairly values the services of the lawyers. Given the
> views expressed above, that the amounts to be received under the MSA's
> allocation formulas by each of the settling states cannot simply be credited to that
> state's outside counsel, it may seem contradictory to use that amount in fixing the
> fee award. But given all of the options, I believe that using the assumed financial
> result as the starting place is the best available methodology. I stress, however,
> that the MSA allocated payment is only the starting place. The exact percentage to
> be applied is properly decided by a weighing of the factors enumerated in
> *Johnson*. But it is more judgment than science, taking fully into account through
> deliberate, thoughtful and careful consideration of all relevant factors and
> conditions. At the end, there is no substitute for common sense judgment.

23

Since that time there have been five additional states which have been arbitrated before this and another panel, including Louisiana. The Louisiana award follows the methodology outlined above, which, as noted above, was concurred in by Judge Renfrew, as a majority in Massachusetts, and dissented by arbitrator Harry Huge.

Finally, we would like to quote from the response to Judge Renfrew's first dissent, in the Florida arbitration award 13-months ago, when he first made the observation that he believed the award was detrimental to this arbitration process and to the legal system generally:

> These private lawyers using the nation's independent legal system have accomplished what no state or federal government or state or federal regulatory body has ever done. ... In the highest tradition of the legal profession, these Florida lawyers fulfilled their client's extraordinary vision.

So too have the Louisiana private counsel in this case for the state of Louisiana, Attorney General Ieyoub, and the citizens of Louisiana.

In the end, the Panel considered all relevant information submitted to it, reached a fair and just decision, and awarded a full reasonable fee under the totality of the circumstances for these Louisiana private counsel.

24

Based upon all the specific facts outlined herein, the results achieved and the totality of the circumstances, the Panel of Arbitrators designated in the Louisiana Fee Payment Agreement have determined to make a fee award of $575,000,000 to Louisiana Private Outside Counsel.


S/_____
John Calhoun Wells, Chairman


S/_____
Harry Huge, Esq.


Dissent:_____
Hon. Charles B. Renfrew


Dated: January __, 2000.

### Dissenting Statement By Charles B. Renfrew

I dissent. I do so reluctantly because I recognize that there is a great value in unanimity. Unanimity can also avoid extreme awards because consensus can often only be reached through compromise. However, I cannot join the majority in the award reached here because it shocks the conscience and constitutes a windfall to Louisiana outside counsel. It is inconsistent with prior awards made by other panels and is contrary to the controlling provisions of the Louisiana Fee-Payment Agreement ("LFPA").

This award fails to follow the precedents as to methodology which have been established by other panels. At the arbitration hearing, Louisiana outside counsel urged this Panel to calculate a fee based on a percentage of the monies that Louisiana stands to receive over the next 25 years as its allocation under the MSA. Indeed, as discussed below, Louisiana outside counsel went even further and urged clear error upon this Panel by asking that any such percentage fee be "grossed up" or inflated in order to take into account the fact that counsel's fee will be paid over time pursuant to the terms of the Louisiana Fee Payment Agreement. Ignoring the methodology used by prior panels in awarding fees, the majority appears to have been swayed by either or both of Louisiana outside counsel's urgings: instead of giving careful scrutiny to the actual efforts and contributions made by Louisiana outside counsel, as prior panels did, the majority focused solely or predominantly on the stream of future payments allocated to Louisiana under the MSA, arriving at a fee award that bears no reasonable relation to the hours spent, tasks performed or contributions made by Louisiana's outside counsel. This approach, in my view, does not treat like cases alike; rather than compensating counsel for the work they actually did, it adopts a largely arbitrary measure – a State's MSA allocation – as the benchmark for calculating fees.

The "recovery" by the State of Louisiana under the MSA is the result of the national settlement. The amount allocated to Louisiana was determined by a formula applied to all 46 settling states. The formula was based upon each state's Medicare expenditures, not the litigation results or litigation efforts of any particular state. Under these circumstances, it is necessary for the panel to determine how the state-specific efforts by outside counsel contributed to the national settlement, not merely to use the amount of the allocation to Louisiana, which was not based upon and does not reflect state-specific efforts.

Nor is it enough to rely just upon the contributions of national counsel, who led the negotiations which ultimately culminated in the MSA. Those coattails could carry all local counsel with them, without the examination of state-specific efforts made by local counsel which the LFPA contemplates. Without such an evaluation, it is not possible to distinguish, as we are required to do, between local counsel for a state with small Medicaid expenditures resulting in a small recovery but who made a significant contribution in their state litigation from local counsel for a state with a large recovery based upon its Medicaid expenditures who really did nothing of any significance to assist bringing about the MSA.

In the past, prior panels have used two methods to arrive at an award which makes this distinction. Under each method, local counsel were given an award based upon the lodestar method. In the Hawaii case, an additional multiplier was applied to take into account the contributions of national counsel. In the Illinois award, the lodestar was used to determine the value of the efforts of local counsel. The value of the contributions of national counsel was then expressed in terms of a percentage of the amount allocated to the State of Illinois under the MSA.

257445 v1

2

31-Jan-2008  02:14pm   From-

In both cases, the lodestar carefully analyzed the work performed by private counsel in the state case and evaluated its significance and contributions to the overall settlement of the tobacco litigation. The mere application of a percentage of the recovery, as apparently was done by the majority in the Louisiana case, fails to make the necessary distinction between the specific contributions by local counsel as required by the LFPA.

Thus the result reached by the majority here is not consistent with either of the approaches referred to above. The lack of a consistent approach or method raises questions of fairness to counsel in other cases. It deprives both the public and counsel who have cases yet to be heard of some predictability as to the awards which may be given. By carefully following established precedents, a "jurisprudence" of the panels' activities can be established, to the benefit of all. Transparency of and continuity as to the methods followed by the panels' in their proceedings will increase both the parties' and the public's confidence in these deliberations.

That the majority arrived at an award based upon a percentage of the recovery is surprising in this case. The agreement between the State of Louisiana and outside counsel did not provide for a percentage recovery. Under their contract, the only method by which outside counsel could be paid by the state was to seek an award from the Louisiana legislature at the conclusion of the case. Outside counsel suggested in their submission that they did not enter into a "traditional contingency fee contract" to avoid giving the tobacco industry "public relations ammunition they would not fail to exploit." However, that claim is not supported by the record. There was no far-sighted altruism involved here at all. The Louisiana Supreme Court has held that such a contingent fee contract with outside counsel is unenforceable under Louisiana law unless there is legislative approval of such a contract. For whatever reason, outside counsel did not enter such a contract or seek that required approval.

One of the difficulties in these arbitrations is the fact that the numbers involved are so large that they are numbing. The proposed national settlement of June 20, 1997 was for $368 billion. The MSA was for $206 billion. With numbers of this magnitude, it is difficult to maintain one's perspective. But it is essential for the panel to maintain its perspective so that the public does not conclude that these proceedings are simply a wealth transfer mechanism for the benefit of lawyers. This erodes not only public confidence in the arbitration process, but in the judicial system itself. The majority's award of over half a billion dollars ($575 million) represents approximately $6700 per hour for every hour spent by every lawyer in the case, experienced lawyer or raw associate.[1] This <u>hourly</u> rate represents over one-third of the <u>annual</u> per capita income in the United States for the year 1998.

I am unaware of any reported case where an award was made by a court based upon the factors listed in the *Code of Professional Responsibility* of the American Bar Association (which governs this proceeding, <u>see</u> Section 2 of the LFPA) which gave an award even a fraction of the hourly rate that the majority reached here.

Analysis of the very factors Louisiana outside counsel urge that this panel use in order to determine their fee clearly establishes that it is an extraordinary windfall. They urged the panel

---

[1] Louisiana outside counsel did not provide the panel with the hours they spent on the case. They estimated some 85,000 hours expended in the case, but failed to provide any supporting documentation. The absence of such supporting documentation is particularly startling in the case of the Louisiana local outside counsel. Section 14 of the LFPA clearly contemplates that hours will be reviewed in determining the amount of an award. It provides, "The panel shall not be <u>limited</u> to an hourly-rate or lodestar analysis in determining the amount of the Fee Award" (emphasis supplied). Moreover, under their agreement with the State of Louisiana, it is inconceivable that they would not have been required to produce their hours to the legislature had the case not been settled. Attorney General Ieyoub expected that a record of the hours would be kept. After the announcement of the MSA, his office announced that the Louisiana lawyers

to consider four factors – achievement, effort, complexity and risk. Their achievements fell in three major areas – early involvement in the tobacco litigation preceding filing of the Louisiana case, the Liggett I settlement and bringing the insurers of the tobacco manufacturers into their lawsuit.

A great deal of their submission discussed what they did in the Mississippi and other cases, as well as discussions with lawyers in other states as to the possibility of those states bringing suit against the tobacco industry. Under Section 2 of the LFPA this is not compensable because fees are restricted to their representation of the State of Louisiana in connection with action filed on behalf of the state on March 13, 1996, not for work engaged in connection with other cases. In this connection, it must be noted that some, but not all, of local counsel were counsel in the *Castano* case, a nationwide class action against the same defendants.

With respect to the Liggett I settlement, it has been described by many as a seminal event in the tobacco litigation. Those who negotiated that settlement are richly deserving of significant credit for their work. However, the record in this case makes it abundantly clear that while certain of Louisiana outside counsel actively participated in those negotiations (Don Barrett, the Ness Motley firm, and Leif Cabrezer), they did so as counsel for states other than Louisiana. These counsel were not authorized to act on behalf of the State of Louisiana until a week or ten days before the settlement was reached. Obviously, the earlier work performed on behalf of the other states cannot be a basis for determining compensation for the Louisiana counsel. Otherwise, the acts of national counsel would inure to the benefit of all of local counsel with whom they worked even though they had not represented the state that local counsel represented at the time they performed their services. Louisiana joined at the last moment in the Liggett I

---

would submit to the Panel "logs of billable hours and other evidence" of the time they devoted to

settlement, which had been negotiated for the preceding three or four months. This was not a major contribution. While it may have been true that Louisiana as the fifth state was necessary for the settlement to be finalized, the filing of the Louisiana action two days before the settlement agreement was signed does not of itself represent the type of achievement by Louisiana outside counsel for which they should be richly rewarded. Whatever credit should be given for Louisiana joining the Liggett I settlement belongs to the Attorney General, not to private counsel. While Louisiana outside counsel were able to file a complaint promptly and should be compensated for their ability to do so, they should receive no credit for the negotiation and drafting of the Liggett I settlement.

The major achievement claimed by Louisiana outside counsel was their joining 168 insurance companies as defendants in their litigation. I strongly disagree with the majority's views as to whether adding the insurance defendants aided in the ultimate settlement of the tobacco litigation. The undisputed facts demonstrate that this decision was a serious strategic error.

The essential claim as to the significance of joining the insurers of the tobacco companies is threefold. First, it subjected the tobacco companies to a "second front." Insurance companies would have to deny coverage on the grounds that there was fraud, misrepresentation and omission by the tobacco companies. In order to establish these defenses, they would bring to bear their enormous resources and work with the plaintiffs in attacking the tobacco industry. The second basis is that, in the event of bankruptcy of the settling defendants, the availability of insurance is a cushion that the states and their counsel will be paid the amounts under the Master Settlement Agreement. Third, joining the insurance companies increased the pressure upon the

the Louisiana case.

tobacco companies, brought them to the negotiating table and enabled the states to get a larger recovery.

Turning first to the "second front" claim. While the historical analogy is imaginative and provocative, it is totally inapplicable. It was not the discussion of the second front that put pressure on the Germans; it was the actual landing in Normandy that caused the diversion of troops from the eastern front, bringing relief to the Soviets. Here, there was no landing. There were no charges made by insurance companies against the tobacco industry. The most that happened was that there was a reservation of rights filed by one insurer as an affirmative defense: "The policies issued by Travelers are void *ab initio*, and Travelers has no liability under them, to the extent that any insured failed to disclose, concealed or misrepresented facts material to the issuance of the policies." There was no discovery conducted of the insurers, no documents were obtained, no depositions were taken, no interrogatories were answered. All that happened was that the insurance companies removed the entire case to federal court. The motion to remand was denied, and at the time of the MSA, the Louisiana case was in the least attractive forum for it, and the prospects for a reversal in the Court of Appeals were far from clear.

The significance of the unfavorable forum cannot be overstated. In their fee submission, Louisiana counsel stated, "Forum matters. Every trial lawyer knows this. Empirical evidence strongly confirms the importance of forum. Both cases removed from state to federal court, as was Louisiana's, and transferred cases are much less likely to end up wins for plaintiffs." (page 33) Yet, as a result of their strategic decision joining the insurance defendants, Louisiana counsel ended up in the most unfavorable forum with their case stayed for fourteen months. The so-called second front never took place.

Louisiana counsel also claimed that joining the insurance companies provided a cushion in the event that the settling defendants were unable to pay the state and their counsel. But Louisiana counsel added nothing in this respect. It is undisputed that in the event of bankruptcy, in marshalling the assets, a trustee in bankruptcy would look to the insurance policies and move against them if such a claim were possible. Louisiana counsel added nothing to what a bankruptcy trustee would have done. Moreover, assuming Louisiana counsel were correct and that their allegations made in their complaint against the tobacco companies were established, those very acts would defeat coverage, and there would be no cushion.

The majority also emphasized the insurance companies' duty to refund or pay for the settling defendants' "defense costs if there is simply the <u>potential</u> for coverage." Here, that potential never became a reality. The defense costs were never paid or even discussed. The award of attorney fees cannot be based upon speculation and conjecture. Louisiana counsel acknowledged in their submission: "The trial teams are to be awarded fees based on what they had accomplished and other factors related to fees, not on what they might have accomplished had the case not settled" (Submission, page 68). Yet their claim as to the value of adding the insurance companies to their case is nothing but the grossest of speculations. It is interesting to note that one of the lead local counsel, after the insurance policies had been turned over, commented that there was probably only one hundred to five hundred million dollars of coverage.

The final argument in support of the value of joining the insurance companies was that it brought increased pressure against the tobacco companies, causing them to come to the settlement table, and to arrive at the national settlement, giving the states a greater recovery.

However, there is no credible evidence to support such a contention or supposition. There is
nothing in the record to suggest that the presence of the insurance companies added any amount
to the settlement or created additional pressure which led to the MSA. There was no mention of
insurance in the MSA, except that Louisiana gave a release to the insurance companies it had
sued. According to the tobacco industry's negotiator with respect to insurance matters, it was
not a factor in the MSA negotiations. The June 20, 1997 settlement provided that the tobacco
companies retained control over their policies. If there was any recovery under them, 80% of the
proceeds, net expenses, would go to the states. In addition, although the plaintiffs had sought the
presence of lawyers from the insurance companies at the negotiations, they never participated in
any of the settlement discussions, either with respect to the June 20, 1997 settlement or the MSA.
Nor did the insurance companies pay one penny toward the settlement.

On balance, while there were great claims made for the strategic decision to join the
insurance companies, to continue the military metaphor, it really turned out to be their Waterloo.
The case was brought to a standstill in an unfavorable forum and stayed that way until the time
of the MSA. Perhaps the best evaluation of the strategy of Louisiana counsel to bring in the
insurance companies was made by the District Judge before whom their case was pending at the
time of the settlement. The judge in a statement to the press correcting Louisiana counsel's
misrepresentation of his decision stated the plaintiffs "shot themselves in the foot" and "gilded
the lily" when they brought the insurer into the suit.

Although Louisiana counsel now claim at this time when they seek hundreds of millions
of dollars as attorneys' fees from the settling defendants that joining the insurance companies
brought about increased pressure on the settling defendants, that is not what they said at the time

9

31-Jan-2000  02:11pm  From-

of the removal. One of Louisiana local counsel stated at that time, "It seriously jeopardizes our ability to do what Florida and Mississippi did: Force them to a courtroom and have an opportunity to settle." That counsel also said that "the ruling also potentially undermined Louisiana's share of a proposed $365.5 billion national settlement with cigarette companies . . . It calls into question Louisiana's share of the settlement . . . It leaves us in a bind. Our case is parked until this is resolved."

[Response page 36]

Nothing else took place in the Louisiana case. There were no depositions, no document production, no interrogatories served, no designation of exhibits or witnesses, no damages model. There was no trial date, although there was a claim that they could have had an early trial date, but gave it up to join the insurance industry. Had they obtained an early trial date, they would have been in a position similar to that of counsel for Texas and counsel for Florida. Instead, when faced with the decision, they made the wrong choice and must pay the price for their error.

The complexity of their case is unquestioned, but it was a complexity of their own doing which does not entitle them to extra compensation. It brought their case to a standstill until the time of the master settlement agreement. Extraordinary compensation such as that awarded by the majority is not appropriate for counsel who have made strategic errors.

Finally, as to the risk they undertook, Louisiana counsel assert they had more risk than counsel for any other state because of the time of filing, the absence of a contingent fee agreement, an unfavorable political environment and no enabling legislation. It is true that they were the sixth state to file on March 13, 1996, but they did so knowing the Liggett 1 settlement

had been reached. They also spread the risk. There were seventeen firms involved, significantly more than in any other state. The costs incurred in this case was some three and a half million dollars which averaged out to about $200,000 per firm. There was nowhere near the risk that was undertaken by the earlier states of Minnesota, Florida, Mississippi and Texas.

There was no expectation of a contingent fee because they did not have a contingent fee agreement with the state. Indeed, the best indication of what counsel expected was stated by one of their lead counsel - a former president of the American Trial Lawyers Association. After the announcement of the June 20, 1997 proposed resolution, he stated that he thought a fee award in the 3 to 5 percent range would be reasonable, but was unlikely to be approved.

The majority's award here of over 12 ½% of the allocated amount to the state of Louisiana far exceeds whatever expectations Louisiana and outside counsel may have had. It shocks the conscience and constitutes an extraordinary windfall to counsel.

Finally, I am concerned about a practice which has been repeated in the last few hearings by outside national counsel and which was repeated in the Louisiana hearing. Outside counsel urged the counsel to consider as part of the totality of the circumstances the panel should take into account in determining the amount of the award the fact that the award would be paid over a number of years. This argument was made even though counsel acknowledged that the panel could not take interest or inflation into account in establishing the amount of the award. In my opinion this argument, disingenuous although it may be, constitutes an invitation to error and should not be repeated.

The LFPA makes it very clear that "the Panel shall not consider – any Fee Award that already has been or yet may be awarded in connection with any other Tobacco Case." A prior panel also held that "Private Counsel for Texas, as well as any other fee award recipients,

therefore have no present right to be compensated for the effects of inflation or the time value of

the award." Yet this is exactly what counsel urged the Louisiana panel to do. While on its face

the majority's decision does not address this issue, counsel invited error at the hearing, which

may have had a subtle and perhaps subconscious effect on the majority. Outside counsel argued

that in order to award a 13.4 % attorney's fee to counsel based upon the nominal recovery of

Louisiana of 4.5 billion, one would have to "gross-up" the award to 28.8% of the nominal

recovery or an award of $1.3 billion dollars because of the delay in payment of the attorney's fee

award.

The suggestion of such a "gross-up" is inappropriate, and flies in the face of the above

prohibitions. It offers a backdrop against which an arbitrator might feel that such a grossed-up

award represents a permissible extreme and that something less would represent a middle

ground. Such a suggestion is improper and should not be repeated.

For the foregoing reasons, I must dissent. In dissenting however I do not disparage or

denigrate the efforts of Louisiana outside counsel or the role of national counsel. They have

undertaken their responsibilities at some risk, although not to the extent of the earlier cases. The

local counsel are some of the outstanding plaintiffs trial lawyers in the state of Louisiana

recognized at both the state and national levels. Their efforts did contribute to the ultimate

settlement, and they should be compensated for those efforts which assisted in arriving at the

MSA. However, the amount of the compensation awarded here bears no such reasonable

relationship to their contribution. An award in this case in excess of half a billion dollars is

grossly excessive, shocks the conscience and constitutes a windfall to counsel to the detriment of

this arbitration and to the legal system generally.

The majority cites my concurrence in the Massachusetts decision as supporting their position in this matter and as somehow inconsistent with the posotion I take in this dissent. However, they fail to point out that my concurrence in the Massachusetts decision stated:

> "I concur in the award. It is more than I would have awarded had I
> been the sole arbitrator. I join in the award because failure to reach
> resolution would have created uncertainty, and may have had a serious
> and potentially adverse impact, not only on the Massachusetts fee award,
> but also on the effective operation of the ongoing fee arbitration process
> and upon the Master Settlement Agreement itself."

That concurrence and the reasons for it does not support the decision the majority reaches here.

The panel must never forget the admonition that the "amount of the award should promote public confidence in the judicial system. It should not be viewed as a windfall to lawyers, but rather as just and reasonable compensation for the time spent, the delays encountered, the risks assumed, and the results obtained." McLendon v. Continental Group, Inc., 872 F.Supp. 142, 145 and 164 (DNJ 1994). The decision of the majority will undermine that public confidence.

_____

CHARLES B. RENFREW

5

## Louisiana Private Outside Counsel

Drew A. Ranier
Badon and Ranier
1318 Ryan Street
Lake Charles, LA 70601

Jonathan B. Andry
Andry & Andry
710 Carondelet Street
New Orleans, LA 70130

William B. Baggett
Baggett, McCall and Burgess
3004 Country Club Road
Lake Charles, LA 70605

Don Barrett
Barrett Law Offices
404 Court Square
Lexington, MS 39095

Raul R. Bencomo
Bencomo & Associates
One Poydras Plaza
639 Loyola Avenue, Suite 2110
New Orleans, LA 70113

Kenneth M. Carter
Carter & Cates
1100 Poydras Street, Suite 1230
New Orleans, LA 70163

Eulis Simien
Delphin & Simien, LLC
8923 Bluebonnet Blvd., Suite 200
Baton Rouge, LA 70810

Bob F. Wright
Domengeaux, Wright, Moroux & Roy
P. O. Box 3668
Lafayette, LA 70502

Paul Dué
Dué, Caballero, Perry, Price & Guidry
8201 Jefferson Highway
Baton Rouge, LA 70809

Russ M. Herman
Herman, Herman, Katz and Cotlar
820 O'Keefe Avenue
New Orleans, LA 70113-1116

Donald Kelly
Kelly, Townsend & Thomas
137 St. Denis Street
Natchitoches, LA 71457

Mr. Richard Heimann
Lieff, Cabraser, Heimann and Bernstein
275 Battery Street, 30th Floor
San Francisco, CA 94111

Walter J. Leger
Leger & Mestayer
600 Carondelet Street, 9th Floor
New Orleans, LA 70130

Jerry McKernan
McKernan Law Firm
8710 Jefferson Highway
Baton Rouge, LA 70809

Ronald L. Motley
Ness, Motley, Loadholt, Richardson &
Poole
Post Office Box 1137
Charleston, SC  29402

Michael St. Martin
St. Martin & Williams
4084 Highway 311
Houma, LA 70630

Richard F. Scruggs
Scruggs, Millette, Bozeman & Dent
P. O. Drawer 1425
Pascagoula, MS  39568