UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


CIVIL ACTION NO. 06-3774      SECTION "R"

JUDGE VANCE      MAGISTRATE #5 (CHASEZ)




**MERRYL D. WEISS, WIFE OF/AND
ROBERT U. WEISS, JR., M.D.**

Versus

**ALLSTATE INSURANCE COMPANY**





Rule 30(b)(6) deposition of **ALLSTATE

INSURANCE COMPANY, partially through corporate

representative PAUL H. TRACEY,** taken on Tuesday,

March 27, 2007, at the Offices of Barrasso, Usdin,

Kupperman, Freeman & Sarver, 909 Poydras Street,

Suite 1800, New Orleans, Louisiana 70112.




ORIGINAL

REPORTED BY:

TANIS WHITESTONE
CERTIFIED COURT REPORTER

```
 1   APPEARANCES:

 2
     REPRESENTING THE PLAINTIFFS, MERRYL D. WEISS AND ROBERT
 3   U. WEISS, JR., M.D.:
         RICHARD C. TRAHANT
 4       ATTORNEY AT LAW
         2908 HESSMER AVENUE
 5       METAIRIE, LOUISIANA 70002

 6

 7   REPRESENTING THE DEFENDANT, ALLSTATE INSURANCE COMPANY:
         BARRASSO, USDIN, KUPPERMAN, FREEMAN & SARVER
 8       (BY:   JUDY Y. BARRASSO, ESQ.)
         909 POYDRAS STREET, SUITE 1800
 9       NEW ORLEANS, LOUISIANA 70112

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2                                              PAGE

 3   Title           ....................      1

 4   Appearances:    ....................      2

 5   Index:          ....................      3

 6   Stipulations:   ....................      4

 7   Examination By:

 8          Mr. Trahant ..................      5

 9

10

11               E X H I B I T S

12

13   Exhibit No. 1   (Notice of Deposition) ....   6

14   Exhibit No. 2   (Subpoena) ...............      6

15

16

17

18

19

20

21

22

23

24

25
```

```
1          S T I P U L A T I O N

2              It is stipulated and agreed by and between

3    counsel for the parties that the Rule 30(b)(6)

4    deposition of ALLSTATE INSURANCE COMPANY, partially

5    through corporate representative PAUL H. TRACEY, is

6    hereby taken pursuant to the Federal Rules of Civil

7    Procedure and for discovery purposes, in accordance

8    with law, pursuant to notice, on March 27, 2007, at

9    the offices of Barrasso, Usdin, Kupperman, Freeman &

10   Sarver, 909 Poydras Street, Suite 1800, New Orleans,

11   Louisiana 70112;

12             That the formalities of sealing,

13   certification, and filing are hereby specifically

14   waived;

15             That the formalities of reading and

16   signing are specifically reserved;

17             That all objections, save those as to the

18   form of the question, are reserved until such time

19   as this deposition, or any part thereof, may be used

20   or sought to be used in evidence;

21             That TANIS WHITESTONE, Certified Court

22   Reporter, in and for the State of Louisiana,

23   officiated in administering the oath to the

24   above-named witness.

25                       * * * * *
```

```
 1                        PAUL H. TRACEY
 2           1025 CREEKSIDE RIDGE DRIVE, SUITE 100
 3                 ROSEVILLE, CALIFORNIA 95678,
 4        a witness named in the above stipulation,
 5           was examined and testified as follows:
 6               MS. BARRASSO:
 7                    We're going to reserve the right to
 8               read and sign.  Just for the record,
 9               Mr. Tracey is being offered pursuant to a
10               Rule 30(b)(6) Notice to Allstate in this
11               matter and he's being designated to
12               testify regarding topics three, six only
13               to the extent it's a general question not
14               claim specific, seven, eight, nine, and
15               ten, subject to the magistrate's
16               instructions.
17               MR. TRAHANT:
18                    Tell me the last part again.
19               MS. BARRASSO:
20                    It was ten was the topic we discussed
21               at the magistrate.  It was vague,
22               ambiguous, unintelligible, ridiculous --
23               You don't have to put all of that on.
24    EXAMINATION BY MR. TRAHANT:
25         Q    First of all, I want to do this on the
```

1   record.  I sincerely apologize to you I am running

2   late.  Unfortunately, it was out of my control.  And

3   I hate parking down here so that added about another

4   25 minutes.  In any event, you have my apologies.

5           Why don't you go ahead for the record and

6   state your full name and current office address.

7       A   My name is Paul Tracey, T-R-A-C-E-Y.  My

8   office address is Allstate Insurance Company, 1025

9   Creekside, one word, Ridge Drive, Suite 100,

10  Roseville, California 95678.

11          MR. TRAHANT:

12              Off the record.

13              (Discussion was held off record.)

14  BY MR. TRAHANT:

15      Q   Let's do this, the first thing I'm going

16  to do is attach a Notice of Deposition taken

17  pursuant to Rule 30(b)(6).  We'll attach that as No.

18  1.  Then as No. 2 we'll attach the 30(b)(6)

19  Subpoena, and in fairness, I think I just faxed the

20  notice over here this morning.

21          MS. BARRASSO:

22              Let's assume it's the same subpoena

23              and attachment that we have.

24          MR. TRAHANT:

25              We'll do those as one and two.

1  BY MR. TRAHANT:

2      Q    What is your current job title,

3  Mr. Tracey?

4      A    I am a field operations manager for

5  Allstate's CAT team.

6      Q    Do you know how many field operations

7  managers in the CAT team there are?

8      A    Yes.

9      Q    How many?

10     A    One.

11     Q    So you would be the national field

12 operations manager?

13     A    Correct.

14     Q    In your capacity as a field operations

15 manager, I would assume that you move around a lot?

16     A    A good deal, yes.

17     Q    Tell me as distinctly as you can what your

18 job duties are as the field operations manager.

19     A    I'm primarily responsible for developing

20 response plans and then executing those plans when

21 we do have a catastrophe.

22     Q    When you talk about developing response

23 plans, are you talking about any type of electronic,

24 digital, or written plan?

25     A    More from an operational level.  It's

1  more -- When I develop plans, it's how will we

2  respond to a major hurricane event, all of the

3  logistics involved in executing a plan like that.

4      Q    Was there any development of a response

5  plan specifically related to Hurricane Katrina?

6      A    Not specifically related to Hurricane

7  Katrina but to the extent it was a major hurricane,

8  yes.  But it wasn't a plan for Hurricane Katrina, it

9  was a plan for major hurricanes.

10      Q    Do you know when prior to August 29, 2005

11  you would have last revised or implemented that

12  plan?

13      A    The last revision would have been starting

14  in January of '05 up through the beginning of the

15  hurricane season in '05.

16      Q    So roughly mid to late May of '05?

17      A    Well, June 1 would be the start.

18      Q    Do you know where that response plan is

19  currently stored?

20      A    Yes.  It's stored on our intranet website.

21      Q    Let me ask it this way:  I would assume

22  that that is not a website available for public

23  view?

24      A    That's correct.

25      Q    Is it a coded website that you have to

```
 1    have an identification code to get into?
 2         A    Yes.  It's internal to Allstate employees.
 3         Q    When you say Allstate employees, are you
 4    talking about all employees of Allstate?
 5         A    Yes.  The response plan in and of itself
 6    is available to all Allstate employees.
 7         Q    What about the CAT adjustors who are not
 8    directly employed by Allstate?
 9         A    No, it's not available to them.
10         Q    I kind of jumped right into it with you.
11    Why don't you tell me a little bit about yourself in
12    terms of your educational background.
13         A    I had four years of college at DePaul
14    University.
15         Q    Did you graduate?
16         A    No, I did not.
17         Q    When would have been the last year that
18    you attended DePaul?
19         A    1992.
20         Q    Have you had any formal education beyond
21    your attendance at DePaul?
22         A    I've taken insurance courses towards CPCU.
23         Q    How long have you been with Allstate?
24         A    June will be 29 years.
25         Q    You don't look old enough to have worked
```

1   for any company for 29 years.

2        A    Thank you.  I'm glad that's on the record.

3        Q    My compliments always are.  Can you tell

4   me generally the manner in which you worked your way

5   up to the fields operations manager from entry level

6   to current?

7        A    I was an -- I came to Allstate as an auto

8   adjustor and then very quickly moved into property

9   adjustment area back in the very early eighties, if

10  not 1980 itself.  Within, my recollection, four to

11  five years, I went into the management and went

12  through several different management positions, both

13  locally in New Jersey where I started and then

14  moving on to home office and then eventually into

15  the CAT team.

16       Q    When did you move into the CAT team?

17       A    Initially it was in response to Hurricane

18  Andrew in 1992, although even before that I was an

19  adjustor that responded to CAT duty as an adjustor

20  even as early as Hurricane Alicia in 1983.  But in

21  the management positions, I started actually in 1992

22  with Hurricane Andrew.

23       Q    When you were doing the field operations

24  management after Hurricane Katrina, did you

25  physically move into the New Orleans area?

```
 1        A     I didn't move to the New Orleans area.
 2   The closest we could get at the time was Mobile,
 3   Alabama.  To this day, I still have a rental in
 4   Mobile.  I spend a great deal of time there.  It's
 5   actually become my second home.
 6        Q     Was there any point where you were
 7   operating out of any place in Southeast Louisiana?
 8             MS. BARRASSO:
 9                  You mean Mr. Tracey or Allstate?
10   BY MR. TRAHANT:
11        Q     Yeah, you for -- you personally as a
12   result of Katrina.
13        A     I visited here many, many times, but I
14   wasn't residing here overnight.
15        Q     I want you to take a look at the
16   attachment to the subpoena.  I want to run through
17   very quickly the topics for which you've been
18   designated as the corporate representative of
19   Allstate to testify today.  No. 3 says "Plaintiffs
20   would like to depose the individual or individuals
21   employed by Allstate Insurance Company who is most
22   knowledgeable regarding general instructions to
23   claims personnel for the issues resulting from
24   Hurricane Katrina."
25             MS. BARRASSO:
```

1              Let me just note that we've objected

2         to the topic as written to the extent it's

3         calling for the "most knowledgeable

4         person."  That's not required by the rules

5         and the magistrate did agree.

6  BY MR. TRAHANT:

7     Q    Is there anyone who would have more

8  knowledge on that topic than you?

9     A    I'm not aware of anybody.  That doesn't

10 mean somebody doesn't exist but I'm not aware of

11 anyone.

12    Q    No. 5, "Plaintiffs would like to depose

13 the individuals employed by Allstate Insurance

14 Company who is most knowledgeable regarding the

15 McDill demand letter dated May 9, 2006, and

16 addressed to Edward Liddy."

17         MS. BARRASSO:

18              That's not one of his topics.  It was

19         six.

20         MR. TRAHANT:

21              I thought you said five.  I wrote

22         down five too.  One of us was wrong and it

23         was probably me.

24 BY MR. TRAHANT:

25    Q    No. 6, Mr. Tracey, deals with claims in

1   which there is nothing left of the home except for a

2   slab.

3           A       Uh-huh.

4           Q       You would be comfortable testifying on

5   behalf of Allstate in that regard?

6           A       Yes.

7           Q       No. 7 is regarding amounts paid to Rimkus

8   Consulting Group, Inc. for work done on behalf of

9   Allstate Insurance Company and/or Allstate Indemnity

10  Company resulting from Hurricanes Katrina and Rita.

11  Do you have any independent knowledge or any

12  documents with you for which to answer questions

13  pertaining to that topic?

14          A       I have independent knowledge, but I don't

15  have documents with me.

16          Q       Do you know approximately as a result of

17  Hurricane Katrina how much Allstate paid Rimkus?

18          A       I have knowledge of Katrina and Rita

19  together.

20          Q       Why don't you tell me what that is.

21          A       It's approximately $1.75 million for all

22  of the assignments.

23          Q       Were you involved in any negotiation

24  between Rimkus and Allstate wherein Allstate

25  attempted to get an exclusivity contract with Rimkus

1    to do hurricane work?

2            MS. BARRASSO:

3                  Object to the form.

4            THE WITNESS:

5                  I'm not aware of that, no.

6    BY MR. TRAHANT:

7        Q    In terms of No. 8, I think No. 8 we're

8    essentially dealing with the same issue as No. 7 but

9    instead of Rimkus, this time it's Pilot Catastrophe

10   Services.

11       A    Yes.

12       Q    Do you know as a result of -- and if you

13   have to deal with Katrina and Rita mixed -- do you

14   know as you sit how much Pilot was paid by Allstate?

15       A    Specifically for any particular year or

16   cumulative total?

17       Q    Cumulative total.

18       A    For 2005, just Katrina, we paid Pilot in

19   2005 for Katrina approximately $145 million.   Then

20   in 2006 for Katrina, about $255 million.   For Rita

21   in 2005, it was about $30 million.   In 2006,

22   $55 million.

23       Q    Do you have those numbers or any estimate

24   for '07 yet?

25       A    No, I do not.

1    Q    Correct me if I'm wrong, in terms of Pilot

2   in Louisiana, it's my understanding that Pilot was

3   only doing work for Allstate as a result of Katrina

4   is; that correct?

5    A    I don't know that.  I know they do work

6   for other companies.  Obviously they were primary to

7   Allstate, but whether they worked for other

8   companies in Louisiana or not, I'm not sure.

9    Q    Under No. 9, the request was with respect

10   to Allstate's relationship with Pilot.  We're going

11   to talk about that some but let me ask you primarily

12   was there a contract between Allstate and Pilot

13   resulting from Katrina?

14    A    Not resulting from Katrina.  There was an

15   existing contract between Pilot and Allstate that's

16   been in effect for quite some time.

17    Q    Is it your testimony that the work done in

18   Louisiana on behalf of Allstate by Pilot was

19   conducted pursuant to that already existent

20   contract?

21    A    Yes.

22    Q    No. 10, and I'm going to try and think of

23   a way to better articulate what I'm asking for.

24   Insofar as general files that are not related to any

25   particular Allstate insured, do you have any

1    knowledge of those files as they relate to Hurricane

2    Katrina?

3             **MS. BARRASSO:**

4                  I'm going to object to the form.

5    **BY MR. TRAHANT:**

6        Q    The existence first.

7        A    I'm not quite sure exactly what you mean

8    by files.

9        Q    In other words, I think we can probably

10   agree that Allstate has done a significant amount of

11   research of weather data; is that fair?

12       A    Allstate has not, no.

13       Q    Allstate doesn't have in its possession

14   weather data material that's been provided outside

15   of specific claims?

16       A    We have weather data, certainly, but that

17   is not -- wasn't developed by Allstate.

18       Q    Who was it developed by?

19       A    A wind engineer by the name of Peter.  His

20   name will come to me.

21       Q    We can move on.  You've been through this

22   before.  If at any time you remember something, like

23   Peter's last name --

24       A    Vicari.

25       Q    V-I-C-A-R-I?

```
 1        A      I think so.
 2        Q      Now, what I'm trying to determine -- as I
 3   said, I may not be articulating it very well --
 4   things such as weather data, engineering data,
 5   anything that you know of which would be in a
 6   category outside of a particular insured's claims
 7   file, can you think offhand in addition to
 8   Mr. Vicari's weather data of anything else provided
 9   to Allstate specifically relative to Hurricane
10   Katrina?
11        A      Besides the Vicari data, even engineering
12   there's not anything that is categorized a file that
13   wouldn't be pertinent to a specific claim.  Weather
14   data is the only thing I can think of at the moment.
15        Q      Part of what's been produced to me in
16   discovery in this litigation, and it's all Bates
17   stamp numbered and we're going to talk about that,
18   specifically there's a document that begins with
19   "Frequently Asked Questions -- Hurricane Claim
20   Handling" which starts at Bates stamp page 897 and
21   which goes through Bates stamp 1065.  Have you
22   reviewed those documents at all?
23        A      I believe I know which document -- I would
24   have to refresh my memory but I believe I know which
25   document you're talking about.
```

1           MR. TRAHANT:

2                Off the record.

3                (Discussion was held off record.)

4    BY MR. TRAHANT:

5       Q    You can take a look through there for

6    purposes of identifying.

7       A    Any particular place to start?

8       Q    I really just want you to flip through

9    there and tell me if that set of documents which

10   I've referenced by Bates stamp numbers looks to you

11   like the claims practices and procedures relative to

12   Hurricane Katrina.

13          MS. BARRASSO:

14               Let him look through it but there is

15               some stuff in there that is not Hurricane

16               Katrina.

17          MR. TRAHANT:

18               Right.

19          THE WITNESS:

20               I don't know that I would

21               categorize -- Is it okay to talk about

22               while I'm flipping through?

23   BY MR. TRAHANT:

24      Q    Sure.

25      A    I don't know if I would categorize them as

1   policies, practices, and procedures.  What these

2   documents represent are communications that are sent

3   out to agents or first notice of loss people or

4   people who man inquiry phones so that when customers

5   call in, either an agent or an inquiry center or

6   reporting of a loss, if they have questions, that

7   they can relate to the most frequently asked

8   questions, as an example, so there's a continuity in

9   the messaging that we're giving back to the

10  customers.  So they're not necessarily policies,

11  practices, and procedures as much as they are

12  communication bullet points.

13          There's also several iterations of --

14  there's some repetitiveness in the same documents as

15  they evolve.

16      Q    I guess probably the easiest thing for me

17  to do once you finish going through there is to ask

18  if, in fact, you're familiar with all of these

19  documents you just reviewed?

20      A    Yes.  Just to clarify my last statement,

21  there are actually -- within these documents, there

22  are documents that are of policies, practices, and

23  procedures as relates to Hurricane Katrina.

24      Q    I apologize because I knew that.  If I

25  phrased it such that it sounded like they were all

```
 1   policies, practices, and procedures, I apologize.
 2       A    Okay.
 3       Q    In terms of your designation as a
 4   corporate representative to talk about the various
 5   topics we're going to talk about, do you know who
 6   made the designation of you?
 7       A    Who specifically, no, I don't.
 8            MS. BARRASSO:
 9                 Off the record.
10                 (Discussion was held off record.)
11   BY MR. TRAHANT:
12       Q    Do you have, Mr. Tracey, now that you're
13   involved as a corporate representative, at least for
14   discovery purposes in the Weiss claim, a superior to
15   whom you report at Allstate?
16            MS. BARRASSO:
17                 Let me object to the form.  I'm not
18            sure what you're asking.
19            THE WITNESS:
20                 I'm not quite sure.  I have a
21            superior but it doesn't relate to
22            necessarily my testimony as --
23   BY MR. TRAHANT:
24       Q    Why don't you tell me first who your
25   superior is.
```

1    A    My boss is Less Mertins, M-E-R-T-I-N-S.

2    Q    What is Mr. Mertins' job title?

3    A    He is a field claims director.

4    Q    Is there anyone either -- I used the word

5 superior and that may have been a bad choice of

6 words -- or laterally or anyone at Allstate, and I

7 don't know want to know what you talked to any of

8 the lawyers about obviously, but is there anybody

9 that you've been in consultation with on the Weiss

10 claim?

11   A    No.

12   Q    So any contact that you would have had

13 with respect to being the corporate

14 representative -- and again I don't want to know

15 what you talked about -- has been through Allstate's

16 lawyers?

17   A    Correct.

18   Q    That was the same scenario in terms of

19 being the corporate rep in the Tomlinson case?

20   A    Yes.

21   Q    Have you reviewed any documents --

22   **MS. BARRASSO:**

23       Can I back up one second.  You might

24       want to clarify something.  Let me ask you

25       this, your question -- because I think

1          he's talked to people to gather

2          information.

3        MR. TRAHANT:

4            Yeah, I would like to know that.

5        MS. BARRASSO:

6            I think there was a disconnect.

7   BY MR. TRAHANT:

8     Q    Let me ask you this way:  Before sitting

9   down today, obviously you've done some review of

10  this specific file, although I appreciate it and I'm

11  not going to ask you about particulars on the Weiss

12  claim, but could you tell me what documents you've

13  reviewed in preparation to be Allstate's corporate

14  representative for discovery purposes on the topics

15  we've identified?

16    A    I'm trying to think of what I reviewed.  I

17  reviewed some of our financial records to determine

18  the amounts paid to Pilot -- or actually, I

19  didn't -- To be more specific, I talked to people

20  within our finance department on the CAT team to

21  ascertain amounts paid to both Pilot and Rimkus.

22           I spoke to a colleague regarding

23  engineering to just refresh my recollection on some

24  of the engineering pieces.  I reviewed some of my --

25  Prior to today, I reviewed some of my own personal

1    notes regarding engineering, again to refresh my

2    recollection.   I reviewed the 30(b)(6) attachment A.

3    I think that's about it.   I reviewed the Pilot

4    contract, things of that nature.

5         Q    You referenced engineering pieces.   What

6    were you referring to?

7         A    Basically the engineering protocols, what

8    I refer to as the engineering protocols, the

9    engineering report format, just again to refresh my

10   memory.

11        Q    We're going to take a look at that, but so

12   we're on the same page and referring to the same

13   thing, you're talking about those -- it's the

14   Allstate Engineering Protocol and it's got the

15   enumerated questions that the engineers are to fill

16   out?   To be fair, let me let you take a look at it.

17             For the record, Mr. Tracey, if you could

18   identify the Bates stamp.   We've been referring in

19   depositions to the documents you're looking at as

20   the big binder because in my simple mind, I can't

21   call it anything but a big binder.

22        A    The Bates stamp is 0240.

23             MS. BARRASSO:

24                  This is part of which document?

25             MR. TRAHANT:

1              Let's go off the record for a second.

2              (Discussion was held off record.)

3    BY MR. TRAHANT:

4         Q    The page that I've directed the witness to

5    is page 240, which is actually at the top, page

6    eight of the February 1, 2006 Rimkus report relative

7    to the Weiss claim.

8              Do you recognize the format of that,

9    Mr. Tracey, as the Allstate Insurance Company

10   engineering protocol checklist for evaluating

11   hurricane damage?

12        A    Yes, I do.

13        Q    Now, it's my understanding, and correct me

14   if I'm wrong, that when you look through the few

15   pages, I don't know exactly how many, starting at

16   page 240 --

17        A    Through 242.

18        Q    -- that there was, essentially, a template

19   in the way it's set forth on here.  Is that the

20   engineering protocol is in non-bolded letters and

21   then it looks like what the Rimkus folks would have

22   done was fill in their section with the bolded type;

23   is that right?

24        A    It appears that way, yes.

25        Q    Was that formatted as a template?

1    A    Basically the checklist itself or the

2  protocol checklist was -- I'm trying to think of the

3  right way to describe it.  It was the engineering

4  community's collection, if you will, or agreement of

5  things that would be needed to fully evaluate a

6  site, an engineering assignment.

7    Q    Who developed the format for that?

8    A    I believe it was, my recollection at least

9  anyway, it was a combination of the engineers that

10 were responding to Hurricane Katrina and Rita,

11 primarily Hurricane Katrina, providing information

12 to Allstate on the elements that would be required

13 to do a full and accurate evaluation.  Then we took

14 that information, developed essentially the format

15 that you see and then gave that back to the

16 engineers to see if that was an agreement that that

17 was a proper format.

18   Q    Two questions I have, and the first one

19 I'll ask is when you say the engineers gave the

20 feedback and then you referred to the "we" developed

21 this, do you recall what engineering firm?

22   A    It's quite a while back.  I know Rimkus

23 was certainly one, Compton was certainly another

24 engineer, Wys-Jenny.

25   Q    How do you spell that?

```
 1        A     I think it's W-Y-S, J-E-N-N-Y, I believe
 2   Rimkus, Wys-Jenny, Compton, Haag.  I can't remember
 3   the others.
 4        Q     Do you recall who it was within Allstate
 5   who actually drafted that protocol?
 6        A     I don't.  I don't recall who actually
 7   drafted it.
 8        Q     I'm assuming that you had to give approval
 9   for that protocol to be disseminated to the
10   engineers?
11        A     Did I approve it, no.  I wasn't the one
12   who approved it, but I was a part of the discussion.
13        Q     Do you know who approved it?
14        A     I don't.
15        Q     Do you know how I would find out who
16   approved that engineering protocol?
17        A     Off the top of my head, I don't.
18        Q     The first bullet point in that protocol
19   requires, and I'm paraphrasing because I don't have
20   the document in front of me, requires that the
21   engineer signing and stamping the report actually
22   make a physical inspection of the property and
23   supervise all work.  Is that fairly accurate?
24        A     That's correct.
25        Q     That was important to Allstate, at least
```

1   from your perspective, that the engineer who makes

2   the decision actually go to that property, inspect

3   the property, and supervise the work of the field

4   engineers; is that fair?

5       A    Yes, that's correct.

6       Q    Putting aside the Weiss claim, are you

7   aware that there are situations where field

8   engineers are not supervised and reports were

9   stamped by individuals who never went to the

10  property before stamping the report?

11          MS. BARRASSO:

12              Object to the form.  Assuming facts

13          not in evidence.

14          THE WITNESS:

15              I would have to ask what your

16          definition of supervise is, I assume.

17  BY MR. TRAHANT:

18      Q    When I say supervise, I'm referring to the

19  Louisiana Engineering Standards on responsible

20  charge, which requires supervision of all work by

21  non-licensed engineers.  I guess my question is more

22  fundamental than that.  The situation, as you were

23  part of the collaborative effort to get this

24  engineering protocol in place so that engineers

25  working on behalf of Allstate could use it, was that

```
 1    the first requirement was that the engineer signing
 2    and stamping the report, it was important from
 3    Allstate's perspective that that engineer actually
 4    physically inspect that property.  Correct?
 5         A    Yes, to physically inspect the property.
 6         Q    And that protocol, and from your
 7    involvement as one who helped develop that protocol,
 8    certainly would require that the engineer stamping
 9    the report make that inspection before he made his
10    conclusions and stamped the report.  Correct?
11         A    Well, in drafting this or being a part of
12    the drafting of this, it was my desire -- I think it
13    was our desire to make sure that, number one, the
14    engineer signing the report visited the site, no
15    doubt, and supervised the individual doing the work
16    to the extent that the calculations were correct,
17    that it was complete, that the report itself was
18    complete, that all of the elements of the protocol
19    were actually handled and handled correctly, and
20    that the engineer would sign off on all of that.  In
21    my view, that's what supervision means.
22         Q    What you didn't want to have happen was
23    for field engineers to go out, do an inspection,
24    write, revise, and finalize a report, and then the
25    stamping and signing Louisiana licensed professional
```

1   engineer comes in without going to the property,

2   changes those conclusions without ever seeing the

3   property and stamping it.  That is not what was

4   intended with respect to that first bullet point in

5   that engineering protocol, was it?

6       A    Well, I'm not -- It sounds to me like

7   you're making an assumption.  I can't make an

8   assumption that that's what occurred.

9       Q    I'm not asking you to.  What I'm asking

10  you is that is not what you wanted to occur in

11  developing that engineering protocol; isn't that

12  fair?

13          MS. BARRASSO:

14              Let me object to the form.

15  BY MR. TRAHANT:

16      Q    As a sophisticated corporate citizen,

17  Allstate would prefer for the engineer stamping the

18  report to have actually gone out to the property to

19  draw his conclusions that he puts in that final

20  report.  Correct?

21      A    We would expect the engineer to go out and

22  make an inspection of that property, correct.

23      Q    Before he stamps the report.  Correct?

24      A    Well, the protocol doesn't say before he

25  signs the report.

1      Q      I'm not asking you to part the words in
2    the report.  What I'm asking you, Mr. Tracey, as one
3    of the individuals who collaborated in the creation
4    of this engineering protocol, that's what you would
5    have expected a responsible, licensed Louisiana
6    engineer to do.  And when I reference that, I mean
7    going and inspecting the property before you draw
8    conclusions and put a professional engineer's stamp
9    on it.  Correct?

10     A      Well, what I would expect is that when I
11   receive the final report that is signed by the P.E.
12   that all of that would have been done.  In other
13   words, when I receive a final report, the P.E. has
14   signed off on it, I would expect at that point that
15   the inspection had been done, the property had been
16   inspected and the P.E. had signed off.  I would
17   expect that when I get the final report.

18     Q      But what you don't want to have happen --
19   I'm just trying to get you to agree with me on
20   something that seems, to me, to be common sense.

21               MS. BARRASSO:

22                   Object to the form.

23   BY MR. TRAHANT:

24     Q      I want to know to you if it is, that an
25   engineer inspecting a property and stamping a

```
 1   report, it would be more prudent for that engineer
 2   to go inspect the property before he stamps the
 3   report as opposed to after stamping and submitting
 4   the report.  Correct?
 5              MS. BARRASSO:
 6                   Object to the form.
 7              THE WITNESS:
 8                   I don't know that I completely agree
 9              with that.  Again, I would want to make
10              sure that if I'm receiving the report and
11              I'm basing a decision on that report, that
12              all of those things have happened, but
13              whether it happens -- whether the
14              signature occurs prior to that, I would
15              assume that the engineer signing a report
16              is signing that they agree with the
17              conclusions made in that report.
18                   I would prefer that they do that
19              prior to but as long as when I get the
20              report that all of those things have been
21              completed, then I would be satisfied with
22              that.
23   BY MR. TRAHANT:
24        Q    You would be satisfied with a visit to the
25   property by the stamping engineer, let's say, twelve
```

```
 1    days after he's already stamped and submitted the
 2    report?
 3        A    I would be satisfied if that occurred
 4    prior to me getting the final report.
 5        Q    Okay.  Can you answer my question as to
 6    whether it would be more prudent for the engineer,
 7    from your perspective in conformity with that
 8    protocol, to inspect the property before he actually
 9    stamps the report?
10        A    It would be my preference if he did, yes.
11        Q    You haven't read any of the depositions in
12    this case?
13        A    I read through -- I forgot to mention
14    that.  I did read through half of one deposition.
15        Q    Do you know whose deposition it was?
16        A    It was the adjustor.
17        Q    Mr. Wells?
18        A    Mr. Wells.
19        Q    What I'm trying to stay away from is
20    talking about particular facts of the Weiss claim
21    because I know you haven't been designated for that.
22    Is that the only part of the deposition you've read
23    as you sit?
24        A    Only about the first half of it, yes.
25        Q    Did you ask to take a look at that?
```

| 1 | A      No, I didn't. |
|---|---|

1        A      No, I didn't.

2        Q      Before we get into some of the other

3    topics I wanted to ask you, the other gentleman who

4    has been identified in response to the other

5    sections of the corporate deposition notice is a Dan

6    Murphy.  Do you know who Mr. Murphy is?

7        A      I don't know him, no.

8        Q      I'm assuming you haven't spoken to

9    Mr. Murphy about this?

10       A      No, I have not.

11       Q      That saves you a lot of time.  Are you

12   aware of a claims manual that addresses how Allstate

13   adjustors are to handle property damage claims aside

14   from hurricane claims?

15       A      Of how they are to handle property damage

16   claims, you mean -- I'm aware of our CPPP manual,

17   ours claims, policies, practices, and procedures

18   manual.

19       Q      You referred to it a very quickly.

20       A      CPPP, claims, policies, practices, and

21   procedures.

22       Q      Is it your testimony that the CPPP manual

23   has sections in there on how to address the

24   adjustment of property damage claims?

25       A      My recollection is that manual is more

```
 1   about, I don't want to say logistical, but more
 2   specific to at what point does a more complex loss
 3   be referred to home office, how subrogation is to be
 4   handled.  It's more about -- It's not specifically
 5   how one goes about reviewing or inspecting a
 6   property.  It's more about complex-type losses
 7   involving large fire losses and the logistics of
 8   moving that file to different approval points.
 9        Q    Would you have knowledge beyond
10   catastrophe claims or the area of catastrophe claims
11   about any claims manual that would give directives
12   to Allstate adjustors on how to adjust property
13   damage claims?
14        A    In addition to or besides the CPPP manual?
15        Q    Yes.
16        A    There is an instruction manual that is
17   used to teach adjustors, instruct adjustors on how
18   to use our estimating system.
19        Q    What is that called?
20        A    I believe it's called the Integra Claims
21   Manual.  I think that's the term.  I think that's
22   the right title.
23        Q    That's an Allstate publication as opposed
24   to an Integra Claims Manual?
25        A    It's been so long.  It might be a
```

```
 1  combination of both.  I don't know if it was written
 2  specifically by Allstate or whether it was a
 3  combination of materials from MSB or Integra Claims
 4  and Allstate.  I don't recall.
 5            MR. TRAHANT:
 6                 Can we stop for a minute.
 7                 (Brief recess taken.)
 8  BY MR. TRAHANT:
 9       Q    I'm probably going to jump around on you
10  some.  We'll be moving back and forth from topic to
11  topic.  Do you know if currently in terms of
12  catastrophe prone areas, New Orleans for example, if
13  it's Allstate's intention to stop writing or stop
14  renewing existing policies?
15            MS. BARRASSO:
16                 Let me just object.  That's beyond
17            the scope of this deposition.  It's
18            nowhere in these topics and he's not been
19            designated to talk about that, and it has
20            nothing to do with this lawsuit, but more
21            importantly, it's not --
22            MR. TRAHANT:
23                 I think it has plenty to do with the
24            lawsuit, but I might agree with you on the
25            first part of it.
```

1    BY MR. TRAHANT:

2        Q    I'm going to switch books on you.  I

3    wanted to ask you a question that's probably the

4    first document in there beyond the title page.  Just

5    to kind of get my bearings, what we're referring to

6    is this Catastrophe Response Q&A, which is

7    Allstate-Weiss 909.  When it says "This document is

8    for internal use only by corporate relations and CAT

9    team employees only," is that referring to Allstate

10   employees or is it referring to Allstate employees

11   as well as, for example, Pilot employees?

12       A    It wouldn't be Pilot.  The purpose or the

13   objective of this document is for Allstate

14   individuals or Allstate employees and agents, and

15   corporate relations for that matter, when receiving

16   questions or inquiries from either the media, the

17   public, anybody that might call in an Allstate

18   facility or call in to an Allstate facility on any

19   of these topics that there would be continuity in

20   that response.

21            Essentially, one could call anywhere in

22   the United States and ask a question because people

23   are spread all over the United States.  Somebody

24   could call in to an office in some other state and

25   we want to make sure that they knew how to respond

1   to that inquiry.

2       Q    Flip for me to page 911 of that document.

3   Question four where it says revised -- some of

4   these, I'm assuming, were work in progress -- it

5   says "revised," and then in bold "How is Allstate

6   handling homes that have disappeared as a result of

7   Hurricanes Katrina and Rita?"  Is it fair to say

8   that you're talking about what's come to be called

9   slab cases?

10      A    Correct.

11      Q    Can you tell, Mr. Tracey, by looking at

12  that document at what point in time this would have

13  been Allstate's response?

14      A    I don't know what the revision date of

15  this one is.  Just judging from the table of

16  contents, if that's a complete document, this would

17  have been -- I don't know the exact date, but it

18  would not be the last iteration of this because

19  there's one that has an even greater extended index.

20      Q    Do you know when the most recent iteration

21  of that would have been?

22      A    I believe it was around December of 2006,

23  if I remember correctly.

24      Q    Do you recall if the section on page 911,

25  question four, regarding homes that have

```
1    disappeared, if that had evolved any?

2        A    I don't think it would have evolved, no.

3        Q    Let me ask you this question, and this

4    kind of reverts to what we were talking about

5    earlier with the engineers:  In terms of the field

6    engineers who did inspections in this case, Allstate

7    wanted qualified people to do that work.  Correct?

8        A    Correct.

9        Q    Certainly, the people doing the field

10   inspections would have had some kind of training,

11   education, or certification in engineering.

12   Correct?

13            MS. BARRASSO:

14                I'm just going to object to lack of

15            foundation.

16   BY MR. TRAHANT:

17       Q    That's correct, isn't it?

18       A    To the extent we ask the P.E. to sign off

19   on that, it would be the P.E.'s responsibility to

20   make sure those people are qualified.

21       Q    Is there any particular reason in this

22   question four -- and I'm not going to read the

23   answer to you -- but is there any particular reason

24   it doesn't mention anything about engineering in

25   here when the house is gone?
```

```
 1        A      Reading this, my response would be that we
 2    wouldn't necessarily use the word engineering here
 3    because that might imply that in every instance we
 4    would use an engineer, and in some instances that
 5    may not necessarily be the case.  Just to follow
 6    that line of thinking, if someone were to call in
 7    and have this question and we indicated that you're
 8    going to have an engineer, that would create an
 9    expectation that they would, in fact, have an
10    engineer when that may not be necessary.
11        Q      This indicates that Allstate employees are
12    trained to handle and have great experience in
13    handling the types of claims where the home has
14    disappeared.  Correct?
15        A      Yes.
16        Q      But certainly in most cases where the
17    structure is gone, it's not going to be the Allstate
18    employee who makes the call as to how that house
19    disappeared.  Correct?
20        A      In most cases, that is correct.
21        Q      In most case, it's going to be an
22    engineer?
23        A      It's going to be an engineer.  Well, it's
24    going to be a combination of a lot of different
25    factors.  It's going to be a combination of the
```

1  adjustor's observations, whatever evidence is there

2  at the scene, whatever evidence the adjustor can

3  document.  Then certainly if the adjustor can't make

4  a determination, which in many of these cases they

5  couldn't, they would have to then rely upon the

6  engineer.

7       Q    In the part of the deposition of Mr. Wells

8  that you read, did you read anything about any diary

9  entries that Allstate made before the engineer went

10 out?

11      A    Yes, I do recall -- I don't remember the

12 specific entry, but I did read about some diary

13 entries, some questions that were asked of him.

14      Q    Do you remember the reference to the diary

15 entry that said this house was destroyed by wind and

16 that --

17           MS. BARRASSO:

18                Let me object.  Go ahead and finish.

19           MR. TRAHANT:

20                I'm only asking because he testified

21                that he read part of it.

22 BY MR. TRAHANT:

23      Q    Do you remember that reference?

24           MS. BARRASSO:

25                I'm just going to object.  My

```
 1                    objection is mischaracterizing the
 2                    testimony, and, two, it is beyond the
 3                    scope of this deposition.
 4   BY MR. TRAHANT:
 5         Q    Can you answer it?
 6         A    I don't remember the specific reference.
 7         Q    You would agree with me, Mr. Tracey, that
 8   in these slab cases, more often than not Allstate
 9   accepts pretty much as gospel the conclusion of the
10   engineer?
11         A    No, I would not agree with that.
12         Q    Tell me why.
13         A    Because it's our practice, if you will, to
14   consider all evidence.  There are a number of
15   instances that I can think of where an engineer -- a
16   very good engineer report may be silent on a
17   specific piece of -- they may not describe something
18   that the adjustor felt was, in fact, wind damage and
19   the adjustor would then -- we would then go ahead
20   and pay for that.
21              So my point is, not one piece of evidence
22   is gospel.  Not just what the adjustor said, not
23   just what the engineer, but it's all of the evidence
24   for that particular claim.
25         Q    So it's fair to say you disagree with my
```

1   statement there that the engineer report would be

2   gospel in determining whether the origin was wind or

3   storm surge?

4       A    I would not refer to it as gospel.

5       Q    Have you considered in either instructions

6   to claims personnel -- when we're talking about

7   this, and this is under topic three, I'm assuming

8   we're in agreement that that also encompasses the

9   use of engineers; is that fair?

10      A    Yes.

11      Q    Was there any consideration in developing

12  any of the guidelines for the CAT adjustors or for

13  the engineers any reference to neighboring

14  properties?

15      A    Yes.

16      Q    Tell me what you recall about that.

17      A    We ask adjustors to make observations.

18  Again, the scenario that I'm referring to is slab

19  claims.  We would ask the adjustors to take a survey

20  of the -- in fact, this is adjustors or engineers

21  for that matter -- to survey the loss location and

22  make observations, notes, diagrams if necessary,

23  certainly photographic evidence of the site itself,

24  the topography, the relationship to the coastal

25  areas or bodies of water, make note of trees and

1    shrubs near buildings, all looking for pieces of

2    evidence, evidence of wind, evidence of water

3    damage, of anything that might be a factor in

4    determining what the causation is.

5         Q    Did you or anyone that you worked with on

6    any of these guidelines anticipate a situation where

7    you might have two houses next door to one another,

8    two slab cases, and one engineer says wind and one

9    engineer says storm surge?

10        A    Did we anticipate it?

11        Q    Yes.

12        A    I don't know that we would categorize it

13   as anticipate but certainly it wouldn't surprise me

14   if that were correct.

15        Q    What we were just talking about,

16   considering neighboring properties, would it be fair

17   to say that the adjustor is allowed to consider

18   payment of a neighboring claim under a wind

19   policy --

20             MS. BARRASSO:

21                  Objection --

22   BY MR. TRAHANT:

23        Q    -- as part of a basis for paying a claim?

24             MS. BARRASSO:

25                  Let me object to the form.

```
 1   BY MR. TRAHANT:

 2       Q    You can answer it.

 3       A    Actually, that would not be one of the

 4   considerations.  Whether something was covered on a

 5   neighboring property is not evidence of -- evidence

 6   that I just described.  It's not physical evidence

 7   that is representative of wind or water damage.

 8   That's a decision made at some other property based

 9   on the characteristics of that property.

10       Q    I guess what I'm asking is this:  You go

11   out as a CAT adjustor and hire an engineer because

12   you have a few neighboring slab cases, you go to

13   that property, you retain an engineer -- when I say

14   you, I'm talking about the CAT adjustor -- retain an

15   engineer and you find out that the property next

16   door had an engineering report that was in direct

17   conflict with the one that you're adjusting, as a

18   CAT adjustor, are you allowed to consider the

19   neighboring engineering report if, in fact, they

20   were retained by Allstate?

21       A    No.

22       Q    Do you know whether or not, Mr. Tracey --

23   we're still on topic three -- in instructions to

24   claims personnel, if any of the claims personnel

25   were telling Allstate insureds that accepting any
```

```
 1   money under your flood policy cannot and will not
 2   affect your ability to make a wind claim?
 3               MS. BARRASSO:
 4                    I'm going to object to the form.
 5               Second, I don't see how that relates to
 6               instructions they gave claims personnel.
 7               MR. TRAHANT:
 8                    That's what I'm asking.
 9               THE WITNESS:
10                    Could you rephrase the question or
11               restate the question.
12   BY MR. TRAHANT:
13        Q    Were there any instructions given to
14   claims personnel as to how to inform Allstate
15   insureds on making dual claims, flood and wind?
16        A    Just so I make sure I understand your
17   question, did we instruct our adjustors to make any
18   reference or to -- Maybe I can answer it this way:
19   We didn't give any instructions to them in that
20   regard because it wouldn't have any -- I mean, the
21   two policies stand on their own.  So making a wind
22   claim would not jeopardize someone making a flood
23   claim or vice versa.
24        Q    You wouldn't refer to somebody who made
25   both claims and collected under their flood policy
```

```
 1   and continued to make a claim under their homeowners
 2   policy, you wouldn't call them a flip-flopper, would
 3   you?
 4              MS. BARRASSO:
 5                   Let me just object to the question.
 6                   Now you're asking about pleadings that we
 7                   have filed.
 8              MR. TRAHANT:
 9                   I'm asking him in his opinion.
10              MS. BARRASSO:
11                   That doesn't have anything it do with
12                   instructions given to claims personnel.
13                   It's an improper question in a 30(b)(6)
14                   deposition.
15              MR. TRAHANT:
16                   It's an improper characterization of
17                   my clients.
18              MS. BARRASSO:
19                   Okay.  Well, you can write that to
20                   the court but it has nothing to do with
21                   this deposition.
22   BY MR. TRAHANT:
23        Q    But I do want to ask you that and I want
24   to make this clear that from your testimony, the
25   Allstate adjustors or the Pilot adjustors, or
```

```
1    whoever is adjusting the claim on behalf of
2    Allstate, was conveying to insureds, as you just
3    testified, that your claim under your wind policy
4    and your claim under your flood policy are
5    independent of one another; is that correct?
6        A    They are independent of one another, that
7    is correct.
8        Q    Making a claim and collecting under the
9    NIFP policy doesn't affect your ability to make a
10   claim under the wind policy.  Correct?
11       A    It does not affect your ability, no.
12       Q    Do you know who Thomas Wilson is?
13       A    Yes, I do.  If we're talking about the
14   same Thomas Wilson.
15       Q    At Allstate.
16       A    Yes.
17       Q    That he is the president and CEO now?
18       A    That is correct.
19       Q    Are you aware of any comments that he's
20   made relative to slab cases wherein he said that
21   Allstate handled those cases differently than State
22   Farm?
23       A    No, I'm not aware of that.
24       Q    It's fair to say, Mr. Tracey, as you sit
25   here, you haven't been through the Weiss claim file?
```

1     A     That's correct.

2     Q     The extent of which you know about this

3 case in terms of reviewing documents is reading part

4 of Mike Wells' deposition?

5     A     That's correct.

6     Q     Do you have any knowledge of the facts of

7 the Weiss case?

8     A     I couldn't really determine exactly what

9 was going on just reading his testimony.  I know

10 it's a slab claim obviously.

11    Q     In your capacity as the --

12    A     Field operations manager?

13    Q     That's the one.  Were you overseeing both

14 flood and homeowners claims?

15    A     Yes.

16    Q     In that claims process, did Allstate have

17 a goal on turnaround time on --

18    A     For which?

19    Q     On a slab case, for example.

20    A     A goal on turnaround time?

21    Q     Sure.  To determine origin of loss and

22 make payment.

23          MS. BARRASSO:

24               Object to the form.

25 BY MR. TRAHANT:

1      Q      You can answer it.  Turnaround time

2   meaning from the time the claim comes in until the

3   time there's some payment made.

4      A      Our objective was to handle each claim as

5   promptly as we possibly could.  That said, given the

6   situation and capacity issues that were created by

7   Katrina followed by Rita followed by Wilma, it did

8   create situations where as quick as possible

9   sometimes was a lot longer than any of us would

10  like.

11     Q      So there was no goal?

12     A      There was no time goal, other than as

13  quickly as we possibly could.

14     Q      I want you to take a look, if you would,

15  it's Bates stamped No. 942.  Before we begin talking

16  about this, if you look down where it says "engineer

17  inquiry, it says "A new option has been added to the

18  CAT customer inquiry form titled 'Engineering

19  Inquiry.'"  What exactly does that mean?

20     A      Let me make sure I read the whole thing.

21  My recollection is that what this was designed to --

22  what the objective of this was, this engineering

23  inquiry, if a customer called in or inquired about

24  the status of their engineer report, as opposed to

25  some individual call center trying to resolve or

1    trying to handle that, that it would be directed

2    into the group that we had coordinating engineer

3    reports and so forth. The reason being is we wanted

4    to make sure that any communication to or from an

5    engineer was done through the proper channels and

6    documented properly.

7        Q    Is that, for example, the Alacrity System?

8        A    Exactly. Now, for clarification, this is

9    not the Alacrity System. This NCT engineer at

10   Allstate is basically just a mailbox destination to

11   get it to the department that actually coordinates

12   the Alacrity.

13       Q    Is there an engineering department within

14   Allstate?

15       A    It's not an engineering department. It's

16   a large loss unit that coordinates these

17   unrepairables or slab claims.

18       Q    Do you know who Jason Morgan is?

19       A    I know the name.

20       Q    Just so that we're in agreement, there is

21   actually no engineering department within Allstate?

22       A    There's no engineering department, no. We

23   don't have any engineers.

24           MR. TRAHANT:

25               Off the record.

```
 1               (Discussion was held off record.)

 2   BY MR. TRAHANT:

 3        Q    On this page 942, Mr. Tracey, up and about

 4   the middle of the page, a little bit lower, "If the

 5   insured obtains a report from an engineer he or she

 6   has hired, that report can be used; however,

 7   Allstate may determine that an additional report

 8   from one of its retained firms is needed."  Does

 9   that mean it was Allstate's practice after Katrina

10   to consider the results of the engineering report

11   supplied to Allstate by the homeowner?

12        A    Yes, it could.

13        Q    Would that carry more weight if that

14   engineer has done a considerable amount of Allstate

15   work?

16               MS. BARRASSO:

17                    Object to the form.

18               THE WITNESS:

19                    No.

20   BY MR. TRAHANT:

21        Q    I want you to take a look, if you would,

22   Mr. Tracey, at page 944.  If you go four paragraphs

23   down, it says "The NFIP has also allowed similar

24   expedited process for what they term slab-only

25   structures; however, the NCT will conduct an
```

1    inspection in these types of losses to ensure that

2    any possible wind damage is determined and handled

3    accordingly."  First of all, what is NCT?

4        A    National CAT team.  That would be us.

5        Q    Is that a reference to an inspection aside

6    from the engineer's inspection?

7        A    Yes.  What that's referring to is --

8    Basically what it's saying is although there is an

9    expedited handling process that is agreed to by the

10   NFIP, by the flood program, we took the position

11   that we wanted to inspect as many of those as

12   possible to make sure that if there was in fact --

13   if we can determine there was, in fact, wind damage

14   to that house that we pay for that wind damage under

15   the Allstate policy.

16       Q    But on a slab case, there's really no way

17   to tell the extent of the wind damage.  Correct?

18            MS. BARRASSO:

19                 Object to the form.

20   BY MR. TRAHANT:

21       Q    I mean, if the structure is gone --

22       A    Well, I think there is.

23       Q    Tell me how.

24       A    Again, through collecting the evidence.

25   All of the evidence would be, again, the

```
 1   observations made by the adjustor.  In a slab case,
 2   specifically, there's nothing left except a slab,
 3   the engineers would typically look at weather data
 4   as it relates to that location.  They would look at
 5   other evidence around the property, the location,
 6   the relationship to bodies of water, those kinds of
 7   things that I mentioned before.  Then what's really
 8   important is -- well, it's all important -- but the
 9   building itself, what was the type of construction,
10   what type of roof system did it have, and if, in
11   fact, wind occurred prior to flood, what was the
12   wind speed at that given location and given the
13   building's construction, what would the likelihood
14   of damage have been and what would have likely been
15   the extent of damage given that wind speed at that
16   location.
17        Q     You would agree with me that at that point
18   all anybody is doing is educated guessing.  Correct?
19             MS. BARRASSO:
20                  Object to the form.
21   BY MR. TRAHANT:
22        Q     You can answer.
23        A     It's a highly sophisticated educated
24   guess, but yes.
25        Q     Because you can't take a structure that's
```

```
 1   gone and say okay, here's the type of structure it
 2   was, now we know pretty well what the wind damage
 3   was to the structure even though it's gone.
 4   Correct?
 5       A     But there is an awful lot of historical
 6   information on building structures, and given the
 7   code, when it was built and what code was used when
 8   that building was constructed, what wind would do.
 9   In other words, what's the wind load for that type
10   of structure.  There's a lot of history on that.
11       Q     I understand what you're saying, and I
12   think we're probably thinking of the Saffir-Simpson
13   and Fujita scales.
14       A     I'm thinking more in terms of residential
15   construction engineering.
16       Q     I guess the question I'm trying to get you
17   to answer and I'm probably, once again, not
18   articulating it very well, is for each individual
19   structure, you really don't know if it's gone down
20   to a slab what the extent of the wind damage was
21   because there could be so many variables, maybe an
22   offset in the roof from the brick that would expose
23   the structure to more wind damage than the book says
24   it should be exposed to.  Do you understand what I'm
25   saying?
```

1      A    I do.  But one thing that we would know is

2  what the wind speed was at that location.  There are

3  very few building characteristics that are going

4  make that wind speed greater.  There's a lot of

5  characteristics that can reduce the amount of wind

6  drag and wind load on a building; another building

7  that's close in proximity or trees.  But once the

8  wind speed is known, that's pretty much the top end.

9  If you're making assumptions based on that top wind

10  speed, I think that's a pretty safe -- I think it's

11  a pretty reasonable way to determine what might have

12  been damaged.

13      Q    One of the issues that's come up in this

14  case, and I want to ask you this based on that

15  testimony, is consideration of structures that

16  extend higher in the air, you would agree, are more

17  susceptible to higher winds?

18      A    Certainly.

19          MS. BARRASSO:

20              Let me object.  Now you're going

21              beyond the topics that he's here to talk

22              about.

23  BY MR. TRAHANT:

24      Q    Okay.  You answered the question.  Again,

25  on page 944, the NCT inspection we're talking about,

```
 1   is that what Mike Wells actually did, or is there a
 2   further inspection process from the national CAT
 3   team aside from the adjustor going out and doing an
 4   inspection?
 5              MS. BARRASSO:
 6                   I'm going to object.  Again, you're
 7              asking him about what happened on a
 8              specific claim.  He's not going to talk
 9              about that.
10   BY MR. TRAHANT:
11        Q    I'm not asking you on the Weiss claim.
12   Let me rephrase my question.  I'll make it less
13   specific.  What I'm asking you is the NCT inspection
14   reference, that page 944, is that an inspection in
15   addition to the adjustor going out and initially
16   inspecting the property?
17        A    No.  But just to clarify, the NFIP
18   expedited process that they refer to here is a very,
19   very -- relatively speaking, it's a very small
20   geographic area.  What this is saying to me is that
21   for that area where the federal government has told
22   us you don't have to inspect that property, we took
23   the position, to the extent it's possible, we're
24   going to still inspect it to make sure there isn't
25   wind damage that we should be paying for.  That's
```

1   only in that area where the expedited process had

2   been approved.

3       Q    Is that a process that occurs once the

4   determination is made that it's primarily a flood

5   event?

6       A    The NFIP -- That expedited process only

7   related to buildings that were, in fact, flooded.  I

8   think the way they defined it is there were areas,

9   very specific ZIP codes, that fell into that

10  expedited process.  Typically, it was buildings that

11  had a foot or more of water for three or more days,

12  sort of like Orleans Parish as an example.

13      Q    I understand.  Do you know, in talking

14  about the general claims practice, what percentage

15  of Allstate claims used the same adjustor for both

16  wind and flood?

17      A    Relatively small.  I don't know the exact

18  percentage but just because of the capacity issues,

19  it was very difficult to make that happen.

20      Q    When you say make that happen, you're

21  talking about one adjustor doing both?

22      A    One adjustor for both.  In fact, the NFIP

23  waived that requirement because of the capacity

24  issues.

25      Q    Tell me which requirement they waived.

1      **A**      The NFIP typically requires a single

2    adjustor when there is a combination of wind and

3    water or wind and flood, but because of the

4    uniqueness of this situation, very early on they

5    waived that requirement.

6              **MS. BARRASSO:**

7                   Can we take a quick bathroom break?

8              **MR. TRAHANT:**

9                   Yes.

10                  (Brief recess taken.)

11   BY MR. TRAHANT:

12     **Q**      The Inquiry Calls Job Aid on page 970, is

13   that relative to the engineering?

14     **A**      It's really relative to any inquiry call

15   that comes in on any claim.

16     **Q**      What does that do?  I see a CCA/CAT/Forms.

17     **A**      That's a web-based form that as an inquiry

18   call comes in, you can, through a series of

19   drop-down boxes, you can select what type of inquiry

20   call it is and where it needs to be directed.

21   Basically, it's a way of categorizing inquiry calls

22   that come in and route them to the most efficient

23   place for that inquiry to be answered.

24     **Q**      I wanted to confirm something else.  It's

25   at page 991.  Just to confirm this for me real

1    quick, under additional living expense two weeks

2    civil authority, that's what we've commonly referred

3    to as prohibitive use; is that right?

4         A    I don't typically use that term, but I'm

5    sure we're talking about the civil authorities have

6    asked you to relocate, then, yes, we would pay up to

7    two weeks.

8         Q    It was Allstate's position that there was

9    no deductible applied for that particular coverage?

10        A    That's correct.

11        Q    On the slab cases, was there any

12   particular consideration on slab cases regarding

13   ALE, the additional living expenses?

14        A    The additional living expenses, aside from

15   two weeks civil authority additional living, there

16   would have to be -- our investigation would have to

17   determine that there was -- that the house was

18   unlivable or untenable as a result of a covered

19   loss.  Just the fact that there was wind damage

20   would not necessarily render the house untenable but

21   you couldn't live there because --

22        Q    Uninhabitable?

23        A    Yes, because of the covered loss.

24        Q    Turn, if you would, to page 1005.  The

25   Agent Communication Engineering Reports, who was

```
 1    that particular segment designed for?

 2        A    For Allstate agents.

 3        Q    Was this something that was provided to

 4    agencies via e-mail, or do you know?

 5        A    I'm sure it was e-mail, yes.  It was

 6    probably part of a communication package.  It may

 7    have even been a part of this -- I'm guessing at

 8    that.  I shouldn't guess.  It would have been

 9    communicated to the agents through their e-mail.

10        Q    If you go to the second bullet point, it

11    says "Allstate has selected the engineers to perform

12    this work and they have been through the

13    certification process."  What was the certification

14    process?

15        A    The certification process to make sure

16    that there's a criminal background check on all the

17    engineers that would be providing or actually

18    visiting sites and providing work to Allstate, that

19    they have the proper amount of insurance, that if

20    they are to be licensed by the state that they are,

21    in fact, licensed.  I think I mentioned criminal

22    background check, that there are no complaints

23    against them with the state, with the licensing

24    bureau, things of that nature.

25        Q    Did that certification process at all take
```

```
 1   into consideration their qualifications?
 2       A    To the extent that their qualifications
 3   led to licensure, yes.
 4       Q    What about the field engineers, the
 5   guys --
 6       A    That was the responsibility of the
 7   licensed engineer.
 8       Q    Where it says "All of the engineers are
 9   following established protocols," that's something
10   Allstate hoped was happening.  Correct?
11       A    Correct.
12       Q    If you look -- For the record, this is
13   within the Staff Operational Guide, Allstate
14   National Catastrophe Team, is this an Allstate
15   document or is this a Pilot document?
16       A    This is an Allstate document.
17       Q    If you flip to page 1014, there's a
18   section in the middle on engineers.  What are those
19   acronyms FPL/FM?
20       A    Field performance -- I'm sorry.  Front
21   line performance leader is FPL, basically a unit
22   manager, and FM is field manager.
23       Q    So the way the protocol worked was that
24   the adjustor would go through either the front
25   line --
```

 1        A      -- performance leader.

 2        Q      -- or the field manager in order to

 3   request an evaluation by an engineer?

 4        A      Correct.  Just to be specific, if it

 5   was -- this is the Staff Operational Guide.  The

 6   Pilot operational guide basically is the same

 7   document, but for the Pilot adjustors, the

 8   difference is -- the documents are almost identical

 9   except the difference is the Pilot adjustors don't

10   have an FPL because they're contingent workers, they

11   are not staff people.  So they would still get their

12   authority from the field manager but they don't have

13   an FPL.  So that's the designation there, or the

14   distinction rather.

15        Q      So they had FM as opposed to the FPL?

16        A      Correct.

17        Q      You're educating me here.  On page 1023,

18   there's a document entitled "Loss Causation

19   Inspection."  It says "total pending inspection in

20   ten days."  What does this pertain to?

21        A      Very early on, and I guess this is not

22   dated unfortunately, but very early on during the

23   two-week civil authority period, because there were

24   so many areas that we could not get into, I had a

25   concern that people were going to run into a

1  situation where they would run out of their two-week

2  civil authority money and we've yet to be able to

3  determine whether there are, in fact, damages that

4  would trigger the standard ALE provision.  Again,

5  the difference being the two-week civil authority is

6  they get the two weeks as opposed to there has to be

7  damage caused by a covered loss to trigger the ALE.

8          So we put this together to try to expedite

9  the inspection process specifically and solely to

10 make the determination of was there a covered loss

11 that caused the house to be unlivable.

12     Q    Obviously, because of the sheer volume,

13 that wasn't routinely done, that inspection within

14 ten days?

15     A    Actually, this inspection was -- well, it

16 wasn't completed in ten days.  That was our goal,

17 but we did a pretty fair job -- This isn't the

18 evaluation of the loss, this is just related to ALE.

19 This isn't the inspection to determine amount of

20 structural loss, this is strictly to determine did

21 we owe ALE.

22          Basically, the whole objective of this was

23 if someone is entitled to additional living expense

24 that we were able to get that resolved for them up

25 front.

```
 1        Q     Turn to page 1025, if you would.  I want
 2   to ask you -- You already talked about the CPPP.  It
 3   says "The following practices in conjunction with
 4   company materials such as the CPPP, Claim Security,
 5   CSC, Roof and Fire Manuals are meant to provide a
 6   uniformed base for promoting consistent claim
 7   handling."  What is Claim Security?
 8        A     Claim Security is just all of the security
 9   measures that are part of the financials, if you
10   will, of the claim.  In other words, are there
11   proper authorities, did someone sign -- It's a
12   series of financial protocols to maintain the
13   security of Allstate.
14        Q     Is that a separate document?
15        A     I believe it's an entirely separate
16   manual.  It's really not related.  I don't know why
17   it says it in here.  Again, just to clarify, this
18   waiver process was not created for Katrina.
19        Q     Right.  It says October 31 of '03, but I'm
20   just trying to identify the different --
21        A     Documents?
22        Q     Yes.
23        A     The Claim Security is a separate document
24   all together.  To be honest with you, I'm not even
25   really all that familiar with it in the work that I
```

1   do.   CSC is call center.   I'm trying to remember

2   what that acronym stands for.   The Roof and Fire

3   Manuals are Roof and Fire process guides that are

4   really -- The roof process does come into play in

5   CAT certainly, but the fire manuals are for fire

6   loss, non-CAT fire losses.   That really doesn't come

7   into play for catastrophe at all.   I'm answering a

8   question you're not asking.

9        Q    I was going to wait for you to do that.

10  More information is always better than less.

11            MS. BARRASSO:

12                 Depends on what side of the table

13            you're on.

14  BY MR. TRAHANT:

15       Q    The waiver process on the next page, I

16  want you to tell me what these acronyms mean.   It

17  says each property MCO.

18       A    Market claim office.

19       Q    MOI/MOS?

20       A    Method of inspection/method of settlement.

21       Q    Then if you flip to page 1030, it says

22  "Use CES for requirements for evaluation purposes."

23  Do you know what that stands for?

24       A    Contents Estimating System.

25       Q    What is that?

```
 1        A     Contents Estimating System is a mechanized

 2   estimating system that Allstate staff adjustors use

 3   for evaluating contents losses.

 4        Q     Was that CES used in Katrina?

 5        A     No, it wasn't.

 6        Q     Can you tell by looking at page 1047 -- I

 7   don't want you to tell me what it is, but can you

 8   tell me the general nature of what was redacted

 9   there, or do you know by looking at that?

10        A     I don't know by looking at it.  That is

11   the CPPP manual.

12             MS. BARRASSO:

13                  I'm thinking it might have pertained

14                  to automobiles or stuff like that and not

15                  property damage.

16             THE WITNESS:

17                  It may be.

18   BY MR. TRAHANT:

19        Q     So when we get into the section beginning

20   on page 1047 -- it will probably be easier for you

21   to look at the documents I have -- that's what we

22   were talking about earlier, the CPPP as it pertains

23   to regular practices Allstate property damage

24   claims; is that correct?

25        A     Correct.
```

```
 1        Q     If you turn to page 1052, down in section
 2   2.0, Home Office, "Subsequent correspondence of a
 3   routine nature will be directed to the claims
 4   adjustor handling the file and/or the FPL."  I know
 5   what that is now.  "Subsequent correspondence of a
 6   special nature or of a particular importance will be
 7   directed to" --
 8        A     The FPE is the -- I'm assuming that's your
 9   question.
10        Q     Yes.
11        A     The FPE is a field process expert, but in
12   CAT terms, that would be the FM, field manager.  MCM
13   would be the market claim manager.  The PCPS would
14   be the property claims process specialist, and the
15   CFD would be the claims field director.
16        Q     Very good.  I don't have a whole lot more
17   for you but I want to check and make sure I'm not
18   leaving anything out.
19              On the software, which I haven't had an
20   opportunity to look at yet, was the unit pricing the
21   same for the flood software as for the homeowners
22   software?
23              MS. BARRASSO:
24                   Can you explain what you mean by unit
25                   pricing?
```

1    BY MR. TRAHANT:

2        Q    Let's take, for example, Sheetrock.  The

3    software used by Allstate in adjusting these claims,

4    wind claims, NFIP claims, was the unit pricing for

5    Sheetrock the same?

6        A    Yes.  Just to clarify just a little bit

7    more, the estimating system doesn't use unit cost.

8    It's a component-based system.  Basically, it's

9    material and labor.  It's not a unit cost.  In other

10   words, it's not "X" dollars per foot for drywall.

11   It's the drywall, the labor to install the drywall,

12   to tape and float it.  It's all component-based.

13       Q    Walk me through that again.

14       A    Unit cost, for example, is very

15   simplistic -- I shouldn't say very simplistic --

16   it's the drywall is installed at "X" dollars per

17   square foot to install drywall.  That's a unit cost

18   approach.  Our system is component-based so it's the

19   material for the Sheetrock, it's the labor to

20   install the Sheetrock, the labor to tape and float,

21   and everything, all of the other components that are

22   related to installing that Sheetrock.

23       Q    Is that the same on both flood estimating

24   and wind estimating?

25       A    Yes.

1    Q    Who is the ranking individual in the

2  catastrophe section of Allstate?

3    A    I'm not sure I understand your question.

4    Q    In other words, you're somewhat in a

5  different section being in the CAT part of Allstate.

6  Correct?

7    A    Uh-huh.

8    Q    Who is the highest ranking person in the

9  CAT division or CAT section?

10   A    Less Mertins.

11   Q    You report directly to him?

12   A    Yes.

13       **MR. TRAHANT:**

14           Mr. Tracey, I thank you for your

15           time, and, again, I apologize for being

16           late.   Thanks.

17                     *  *  *

18   (Whereupon at 4:54 p.m. the deposition concluded.)

19                     *  *  *

20

21

22

23

24

25

1                    **REPORTER'S PAGE**

2

3            I, Tanis Whitestone, Certified Court

4    Reporter, in and for the State of Louisiana, the

5    officer, as defined in Rule 28 of the Federal Rules

6    of Civil Procedure and/or Article 1434(B) of the

7    Louisiana Code of Civil Procedure, before whom this

8    sworn testimony was taken, do hereby state on the

9    record;

10           That due to the interaction and the

11   spontaneous discourse of this proceeding dashes (--)

12   have been used to indicate pauses, changes in

13   thought, and/or talk-overs; that same is the proper

14   method for a court reporter's transcription of

15   proceeding, and that the dashes (--) do not indicate

16   that words or phrases have been left out of this

17   transcript;

18           That any words and/or names which could

19   not be verified through reference material have been

20   denoted with the phrase "(

OFFICIAL SEAL
TANIS WHITESTONE
Certified Court Reporter
In and for the State of Louisiana
Certificate Number 99009
Certificate expires 12-31-07

22                    Tanis Whitestone, CCR

23

24

25

C E R T I F I C A T E

I, Tanis Whitestone, Certified Court Reporter (Certificate #99009) in and for State of Louisiana, do hereby certify that PAUL H. TRACEY, after having been duly sworn to testify to the truth, the whole truth, and nothing but the truth, did testify as hereinbefore set forth in the foregoing pages;

That the testimony was reported by me in shorthand and transcribed by means of computer-aided transcription, and is a true and correct transcript, to the best of my ability and understanding, at the time of the production of said transcript;

That I cannot, however, certify or attest to the accuracy or validity of any copy not produced under my direct supervision or control and, further, do not lend certification to any such copies unless they bear my original signature and stamp;

That I am not of Counsel, not related to counsel nor the parties hereto and in no way interested in the outcome this.

OFFICIAL SEAL
TANIS WHITESTONE
Certified Court Reporter
In and for the State of Louisiana
Certificate Number 99009
Certificate expires 12-31-07

TANIS WHITESTONE
CERTIFIED COURT REPORTER
STATE OF LOUISIANA
* * *

1

2        W I T N E S S ' S   C E R T I F I C A T E

3

4            I, PAUL H. TRACEY, do hereby certify that

5    I have read or have had read to me the foregoing

6    testimony, and it is true and correct to the best of

7    my ability and understanding.

8

9    (Please check one of the following)

10        I AM RETURNING THE TRANSCRIPT:

11            ___   Without corrections

12            ___   With corrections and/or additions

13   attached hereto.

14

15

16                        _____
                          PAUL H. TRACEY
17

18

19

20

21

22

23   REPORTED BY:
     TANIS WHITESTONE, CCR
24

25

| | |
|---|---|
| 1 | PLEASE RETURN AS SOON AS POSSIBLE |
| 2 | To:  PAUL H. TRACEY |
| 3 | Date:  March 30, 2007 |
| 4 | RE:  Deposition taken on March 27, 2007 |
| 5 | Enclosed you will find the transcript of your |
| 6 | deposition which I am sending for you to read and sign.  Please do not make corrections or mark on the |
| 7 | typewritten transcript.  Any changes or corrections are to be made on the correction sheet provided. |
| 8 | EXAMPLE: |
| 9 | Page 20   Line 7  "write" should be "right" |
| 10 | Please sign the Witness's Certificate which is enclosed and indicate in the space provided whether |
| 11 | any corrections were made. |
| 12 | A pre-addressed envelope is included; however, postage must be affixed before mailing the Witness's |
| 13 | Certificate, Correction Sheet, and the transcript back to our office. |
| 14 | As stated in Article 1445 of the Code of Civil |
| 15 | Procedure, if this transcript is not returned within thirty (30) days of submission to you, this deposition |
| 16 | may then be used as fully as though signed. |
| 17 | Please attend to this matter promptly.  Your cooperation is sincerely appreciated. |
| 18 | |
| 19 | TANIS WHITESTONE, CCR |
| 20 | |
| 21 | CC:  RICHARD C. TRAHANT, ESQ. JUDY Y. BARRASSO, ESQ. |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

```
1           C O R R E C T I O N   S H E E T

2    PAGE           LINE              DESCRIPTION

3    _____      _____      _____

4    _____      _____      _____

5    _____      _____      _____

6    _____      _____      _____

7    _____      _____      _____

8    _____      _____      _____

9    _____      _____      _____

10   _____      _____      _____

11   _____      _____      _____

12   _____      _____      _____

13   _____      _____      _____

14   _____      _____      _____

15   _____      _____      _____

16   _____      _____      _____

17   _____      _____      _____

18   _____      _____      _____

19                    USDC   EDOL

20         NO. 06-3774    DIV.""      SECT. R

21
          MERRYL & ROBERT U. WEISS, JR., M.D.
22                      VERSUS
          ALLSTATE INSURANCE COMPANY
23

24    DEPO OF PAUL H. TRACEY TAKEN ON 3/27/07.

25     REPORTED BY TANIS WHITESTONE, CCR
```

*SERPAS & ASSOCIATES, LLC*
*A Professional Court Reporting Firm*
*(800) 526-8720*