# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| IN RE: KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| PERTAINS TO: BARGE | * | and consolidated cases |
| | * | |
| | * | SECTION "K" (2) |
| *Boutte v. Lafarge* 05-5531 | * | |
| *Mumford v. Ingram* 05-5724 | * | |
| *Lagarde v. Lafarge* 06-5342 | * | JUDGE |
| *Perry v. Ingram* 06-6299 | * | STANWOOD R. DUVAL, JR. |
| *Benoit v. Lafarge* 06-7516 | * | |
| *Parfait Family v. USA* 07-3500 | * | MAG. |
| *Lafarge v. USA* 07-5178 | * | JOSEPH C. WILKINSON, JR. |
| | * | |

## BARGE PLAINTIFFS' OPPOSITION TO LAFARGE NORTH AMERICA, INC.'S MOTION FOR PROTECTIVE ORDER ON PLAINTIFFS' SECOND RULE 30(B)(6) NOTICE

Lafarge seeks a protective order barring plaintiffs from ever conducting Lafarge's Fed. R. Civ. P 30(b)(6) deposition in this matter. Lafarge urges fallacies and misinformation rather than any legitimate basis for derogation from the Federal Rules and Case Management Orders in this litigation, all of which afford plaintiffs the right to depose the organization, in accord with undersigneds' obligations to clients and the putative class. The reasons for denial of Lafarge's motion will be addressed generally, as many of Lafarge's flawed grounds recur throughout their motion, followed by specific response to Lafarge's objections to proposed 30(b)(6) topics, in roughly the same form and fashion as Lafarge structures its arguments.

## BACKGROUND

The *Mumford, Boutte, Perry, Parfait, Lagarde and Benoit* plaintiffs, now consolidated in the Barge track of this matter, originally brought class and individual actions for damages against Ingram Barge Company, Lafarge North America, their insurers, and others, beginning at roughly the same time that Ingram brought suit for limitation or exoneration.   These damages actions were consolidated with Ingram's limitation action in Section "C" of this Court, in which consolidated matters Your Honor was the Magistrate to whom they were allotted.[1]   As Your Honor is aware, a phased litigation schedule was ordered, whereby Phase I concerned only whether limitation petitioners had privity or knowledge of putative acts of negligence or unseaworthiness, and Phase II addressed whether limitation petitioners were actually negligent, or their vessels unseaworthy, as to acts, omissions or conditions of which they were found in Phase I to have had privity or knowledge.[2]   All discovery and prosecution of damages claims against Lafarge - such areas of inquiry and proof as Lafarge's negligence, fault for the breakaway, floodwall breach causation, and damages - were, in practical effect, stayed until the limitation action reached a phase wherein these matters would be addressed.   Lafarge was a nonparty to both of the limitation action phases completed in that matter, and was therefore not subject to any discovery as to matters outside of Ingram's, Domino's or Unique's privity or knowledge, their negligence, or their vessels' unseaworthiness.

Lafarge vociferously and repeatedly made known in open court, in pleadings, in depositions, and in discussion with the Court and counsel, its objections to any discovery, proceeding, or evidence that might tend to implicate Lafarge in any negligent acts, or which remotely concerned

---

[1] *In Re Ingram Barge Company, etc*., USDC EDLA Civil Action No. 05-4419.
[2] USDC EDLA Civil Action 05-4419, Record Docs. 210 and 740.

causation or damages.[3] Lafarge sought and obtained a protective order during Phase I of the limitation action which restricted the present Barge plaintiffs to Fed. R. Civ. P. 30(b)(6) topics bearing only upon the judicially sanctioned areas of inquiry relevant to liability of petitioners in limitation.[4]  This formerly-precluded inquiry is now appropriate in deposing Lafarge in its current status as a defendant organization whose negligence and contentions are now at issue.

By contrast, in the limitation action, Lafarge was a nonparty, not subject to inquiry tending to establish Lafarge's liability.   This differing context afforded only the claimants in limitation the right to depose Lafarge, and only to the extent that Ingram's privity or knowledge was implicated. Moreover, the permissible scope of inquiry excluded the torts alleged against Lafarge - its duties, its breaches, causation and damages - and afforded no ability to examine Lafarge's defenses.   In practice and effect, only the claimants in limitation have deposed Lafarge, cursorily, and only under strict scope limitations.  The putative class that now exists - not a proper party to a limitation action - was not afforded any discovery against Lafarge.

Presumably, later phases in *In Re Ingram Barge* would have addressed class certification, Lafarge's negligence, the cause(s) of the IHNC floodwall breaches, the cause(s), sources, extent and nature of flooding, and the damages sustained by whatever individuals or class were deemed rightful plaintiffs in the suit, and matters inherent to these areas of inquiry.   Presumably, discovery would have been scheduled and ordered as to these matters.  The limitation action and damages claims

---

[3] USDC EDLA Civil Action 05-4419, Record Doc. 187, LNA Objection To Perpetuation Of Witness Testimony As Exceeding Phase I scope, Record Doc. 291, LNA's Mot Prot Order Re Proposed Phase I 30(b)(6), Record Docs. 527 and 565, Lafarge's Motion To Limit Scope Of Phase I Trial Testimony, Record Docs. 653, 673, LNA's Motion To Quash Earl Smith Trial Subpoena As Outside Scope Of Privity Or Knowledge, Record Docs. 659, 679, 684, LNA Motion To Strike Proposed Phase I Findings Of Fact And Conclusions Of Law.  See also Record Doc. 740 Defining Phase II Issues, and Record Doc. 753, LNA's Motion for Clarification of Phase II Limitations on Discovery and Proof.

[4] USDC EDLA Civil Action 05-4419, Record Docs. 291, 317.

consolidated therewith did not progress to that point, as Ingram was exonerated, and Domino/Unique's liability limited.

In September 2007, the damages suits against Ingram, Lafarge and others were deconsolidated from Ingram's, Domino's and Unique's limitation actions, transferred to Section "K," designated the Barge track, and consolidated within the *In Re Katrina Canal Breaches Consolidated Litigation* umbrella, in which Your Honor is Magistrate. The Barge Plaintiffs are a small number of individuals who are seeking to represent a putative class consisting not only of the claimants in limitation, but also of tens of thousands of other individuals and businesses who were not party to the limitation action. Lafarge has not yet been deposed as a party defendant. The Case Management Orders governing this litigation require Lafarge to produce witnesses for deposition.

## ARGUMENT

"It is very unusual for a Court to prohibit the taking of a deposition altogether, and absent extraordinary circumstances, such an order would likely be in error." *Salter v. Upjohn Company*, 593 F.2d 649, 651 (5th Cir. 1979); *Boston Edison Co. v. United States*, 75 Fed.Cl. 557 (2007); Wright & Miller, Federal Practice and Procedure, sect. 2037 (1970). Rule 30(b)(6) clearly states that a party may name as the deponent a public or private corporation and describe with reasonable particularity the matters on which examination is requested. F.R.C.P Rule 30(b)(6). Fed. R. Civ. P. 30(b)(6). "Once served with a Rule 30(b)(6) notice, the corporation is compelled to comply, and it may be ordered to designate witnesses if it fails to do so." *United States v. J.M. Taylor*, 166 F.R.D. 356, 360 (M.D. N.C. 1996). A decision handed down last month squarely rejects the central premises of Lafarge's motion. *State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.*, __ F.Supp.2d __, 2008 WL 1977522 (E.D. Pa. May 7, 2008) (No. CIV.A.03-6516), quoted with approval an earlier bench ruling, stating at p. *2:

Now, oral discovery should not simply seek to obtain orally that which a party has produced in writing. So, we are not going to validate depositions in which somebody is asked to simply regurgitate that which has already been produced in writing. However, a *party who has received written production is entitled to explanations of the information produced, including how the information was gathered, by whom, whether or not the party adopts that information, where the information came from, whether there is some additional information.* So, for example, [counsel for StateFarm] gave us a number of answers which seemed to be reasonable, but [counsel] is not StateFarm. He is a lawyer, and I think the parties are entitled to have those answers over record, and also to be able to determine whether there is some additional information, or to explain the information that has been provided.

(Emphasis in original.)

Fed. R. Civ. P. 26(b)(1) states in pertinent part that, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense — including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter."  Plaintiffs proposed deposition is well within these guidelines.  Rule 26(b) is liberally interpreted to permit wide-ranging discovery of information even though the information may not be admissible at the trial. *Jones v. Commander, Kansas Army Ammunitions Plant*, 147 F.R.D. 248, 250 (D. Kan. 1993). Federal Rule of Civil Procedure 26(c) governs the granting of a protective order. A protective order should be granted when the moving party establishes "good cause" for the order and "justice requires [a protective order] to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. . . ." Fed. R. Civ. P. 26(c). However, before a protective order issues, the moving party must show a particular and specific need for the protective order, as opposed to making stereotyped or conclusory statements. *Skellerup Indus. Ltd. v. City of Los Angeles*, 163 F.R.D. 598, 600 (C.D. Cal. 1995); *Gray v. First Winthrop Corp.*, 133 F.R.D. 39, 40 (N.D. Cal. 1990).

For ease of reference, plaintiffs' Opposition generally discusses Lafarge's points in the order in which Lafarge made them.

First, Lafarge's argument repeatedly refers to the proposed deposition as the "second" of its kind.  Fed. R. Civ. P. 30 states in pertinent part that, "[a] party may, by oral questions, depose any person, including a party, without leave of court except as provided in Rule 30(a)(2). . . . FRCP 30(a)(1).  A party must obtain leave of court, and the court must grant leave to the extent consistent with Rule 26(b)(2) isf "(A) if the parties have not stipulated to the deposition and . . .  (ii) the deponent has already been deposed *in the case*."  FRCP 30(a)(2)(A)(ii) (emphasis added).  Leave is not required here, as Lafarge has never been deposed in this case.  There are too many differences between a limited-scope limitations proceeding in which claims against Lafarge were stayed, and this case, for them to be considered the same case.

The proposed deposition would be the first in the damages claim against Lafarge, the first in *In Re Katrina Canal Breaches Consolidated Litigation*, the first to exhaustively examine proof of Lafarge's negligence and purported defenses, the first to examine their claims of *force majeure*, the first to permit testimony as to documents still being produced and designated by Lafarge for its use in trial of this matter, the first to permit inquiry into floodwall breach causation and Lafarge's countervailing claims about the MRGO and storm surge, the first to examine Lafarge's contentions about the movements of ING 4727 in the IHNC, and about the floodwall collapse, the first deposition to examine Lafarge concerning its current knowledge of eye and ear witnesses, the first to examine Lafarge as to facts and evidence Lafarge will offer concerning the nature, sources, scope, extent and timing of damages, the first to address class certification issues, the first to examine Lafarge's and their attorney's dealings with Mr. Arthur Murph, and the first to afford opportunity to inquire as to whether Lafarge North America's immediate post-suit reacquisition of its publicly traded stock for merger through a dummy corporation with its privately owned sibling corporation.

The Fed. R. Civ. P. 30(b)(6) notice and deposition on behalf of Claimants-In-Limitation in

Civil Action 05-4419 is irrelevant to those proposed in this, the Katrina litigation.  As explained above, the topics of inquiry were limited by the Court and by Lafarge.  Group A counsel in the limitation action took care to tread lightly as to topics tending to elicit proof of Lafarge's negligence, proceeding only to the extent needed to demonstrate limitation petitioners' privity or knowledge of their own negligence and their vessels' unseaworthiness.[5]  Plaintiffs should not be deprived of a legitimate discovery device in this action against Lafarge, effectively penalizing them for careful adherence to the Court's and Lafarge's wishes in the limitations action.

Second, not only is *In Re Katrina Canal Breaches Consolidated Litigation* entirely separate and legally distinct from *In Re Ingram Barge Company, etc*., but the parties to the proposed deposition - Lafarge and the Barge Plaintiffs - are not the same, and do not have the same legal status as those parties to Lafarge's 30(b)(6) deposition in Phase I.  There, the deponent, Lafarge, was a nonparty.  During Phases I and II of the limitation proceeding, the litigation against Lafarge was held in abeyance.  Here, Lafarge is a party defendant, against whom proceedings have been underway only since September 2007.  The limitation action deposition was conducted by the claimants in limitation, those persons named in answer to Ingram's petition for limitation, not by the Barge Plaintiffs and their proposed class.[6]  The proposed deposition of Lafarge will be the first of unlimited scope as to any topic, and the first by persons other than claimants-in-limitation.

Third, Lafarge insists that document production is at an end and that, therefore, the deposition

---

[5] 05-44190, Record Doc. 295, reflecting claimants' recognition of the limitations, Record Docs. 317 and 521, the Court's orders restricting the Phase I discovery, including the 30(b)(6) of Lafarge North America.

[6] 05-4419, Record Doc. 128 is an Order striking class allegations in the limitation action. 05-4419,  Record Docs. 11, 17, 65, 111, 119, 226, 235, 237, 242, 243, 246, 248, list claimants in limitation, while Doc. 261 denotes tolling of the monition period.  For comparison, a list of persons having retained undesigned in this action is attached as **Exhibit 1**.  Additional named plaintiffs in this matter are included in the *Benoit, Boutte, Lagarde, Perry* and *Parfait* matters. As Barge Plaintiffs' Motion for Class Certification demonstrates, 05-4182, Record Doc. 13166, pp. 11, 22 - 24, the putative class includes over 40,000 individuals and 1500 businesses.

cannot go forward.  Lafarge has misread the deposition notice as calling for document production, which it does not, and relies on that misreading to argue that the organizational deposition "seeks to circumvent quantity and time limitations."  The argument is not well taken for three reasons: (1) as just stated, plaintiffs have not sought document production under FRCP 30(b); (2) the Federal Rules of Civil Procedure and Case Management Orders do not treat written discovery and depositions as cumulative, but as progressive means of movement toward trial, both the Rules and CMO's affording written discovery *and* organizational depositions by their clear terms; and (3) although plaintiffs have not yet sought it, the Case Management Orders permit additional discovery with leave of Court for good cause shown.[7]  Plaintiffs are thus entitled to examine Lafarge concerning such matters.  Lafarge offers no legitimate basis for its absolution from this normal and legally sanctioned discovery device.

Fourth, Lafarge claims that because Lafarge responded to written discovery, it need not provide testimony about any of the matters that were addressed in written discovery.  The Federal Rules include no such protection.  See *State Farm Mutual Automobile Ins. v. New Horizont*, quoted on p. 5 above.  A deposition offers the opportunity for such dialogue with the witness, for refinement of the broad responses typical of written discovery, the opportunity for depth and specificity not afforded by written discovery, and the ability to test the validity of written responses.  A deposition offers the least burdensome and oppressive means of inquiry after written discovery, as opposed to hundreds of additional written questions containing subparts instructing the respondent to answer certain parts depending upon other answers.  To devise such a pattern of questions would be unduly burdensome, as would reading and responding to them. But for the admonishment that discovery must be conducted in the manner least burdensome or oppressive, there is no requirement that a

---

[7] If the Court rejects our arguments and deems such a request necessary, plaintiffs request leave of the Court to take the deposition.

litigant forgo one discovery device simply because he or she has taken avail of another.  By this flawed  reasoning, Lafarge has no right to conduct any depositions of putative class members because undersigned have already described in writing the testimony expected of these persons.

Fifth, Lafarge has all but adopted the MRGO and *Robinson* plaintiffs' allegations against the United States and local government entities.[8]  Lafarge's causation defense  is clearly equivalent to the claims in MRGO and *Robinson*.  Plaintiffs must conduct discovery of Lafarge as to all of the alternative causation theories that they seek to prove through their own efforts, and/or the efforts of MRGO and Robinson plaintiffs, whose proof they might adopt or advocate in either this or the consolidated MRGO or Robinson matters.  Plaintiffs are entitled to know what of the MRGO and Robinson plaintiffs' proof Lafarge will adopt, share or offer, and to evaluate any chance that such proof by one such aligned party will benefit the other, to the detriment in either event of the Barge Plaintiffs.   In the same vein, Barge plaintiffs must evaluate Lafarge's alternate causation defense in light of potential findings in a bench trial against the government, versus a jury trial against Lafarge.

Sixth, given the above, given the time elapsed since the Rule 30(b)(6) deposition of Lafarge in the limitation action, and given the fact that a wealth of information now exists that did not during Phase I of the limitation proceedings, what the Barge Plaintiffs propose is a deposition vastly different in topic and scope from that in Phase I, when many matters were not only irrelevant to the Phase I and II issues, but were not even developed enough to afford meaningful efforts at discovery. WRIGHT, MILLER & MARCUS, 8A FEDERAL PRACTICE AND PROCEDURE § 2104 (2008). "Second depositions may be justified in light of disclosure or discovery after the first eposition." MOORE'S FEDERAL PRACTICE § 30.05[1][c] (2003) (footnote omitted). Under Rule 26(b)(2), Fed. R. Civ.

---

[8] 05-4419, Record Docs. 37, 40,  202, Lafarge's Answers and Cross Claims alleging government failures with respect to design, construction, maintenance, funnel effect, storm surge, etc.  See also complaints in *Robinson* and MRGO.

P., an unlimited-scope deposition is plainly proper and not cumulative, and these qualities are enhanced by the availability of discovery materials not previously available.

## Plaintiffs' Proposed Stipulation

On June 2, 2008, plaintiffs proposed a reasonable stipulation to Lafarge, to narrow the issues presented by its Motion.[9]  In it, plaintiffs recognized that the discovery topics were framed before this Court's May 14, 2008, Order on work-product privilege assertions, that plaintiffs have appealed parts of that Order, and that no purpose would be served by further litigation of the same types of work-product privilege assertions until the appeal has been decided or after Judge Duval decides the appeal or any other matter involving the scope of work-product privilege in this action.  In this regard, plaintiffs intend to file shortly a motion to bar Lafarge and its privies from further unconsented contacts with putative class members, based on abuses and on Lafarge's thefts of clocks and watches from the dwellings, structures, and property of putative class members, and in connection with that motion will seek a declaration that the crime-fraud exception to privilege applies to Centanni's work and communications in this case. That motion should also be filed and determined before revisiting work-product privilege questions in connection with discovery. Accordingly, plaintiff proposed the following:

All topics listed would be suspended to the extent, and only to the extent, that:

(a) They involve the activities of Centanni Investigative Services, Inc.;

(b) They involve matters as to which the court has held that work-product privilege is applicable; or

---

[9]  A copy of the letter transmitting the proposal, and a copy of the proposed Consent Order implementing it, are attached hereto as Exhibit __.

(c) They involve matters for which defendant LaFarge has asserted work-

product privilege and which are similar to the matters as to which the court has

held that work-product privilege is applicable.

The parties would proceed with the discovery now on the narrowed topics. With respect

to any narrowed topic as to which defendant is asserting a work-product privilege not

already ruled upon by the court or similar to a matter on which the court has held that

work-product privilege is applicable, plaintiffs may elicit some nonprivileged information

from the witness that will help plaintiffs assess whether to challenge the assertion of

privilege, but will not enquire into the substance of the matters defendant asserts as

privileged until the matter has been first presented to the court and ruled upon.

Defendant Lafarge has rejected this proposal. Plaintiffs nevertheless believe that this proposed

resolution is a reasonable and efficient manner of proceeding, and request the Court to order its

implementation.

### Specific Proposed 30(b)(6) Topics[10]

Lafarge seeks to analogize topics in the Phase I deposition to those proposed currently in this

action. The Order in response to Lafarge's Phase I Motion for Protective Order clearly delineates

which topics were permitted, which were prohibited, and which were modified by the Court. USDC

EDLA Civil Action 05-4419, Record Doc. 317.

**Proposed Topic 1** addresses Lafarge's negligent conduct in failing to prepare for the

hurricane. By contrast, Lafarge's deposition in Phase I of the limitation action did not address

nonparty-Lafarge's negligence in itself, but only insofar as Lafarge's conduct may have afforded

privity or knowledge to petitioners in limitation, thereby giving rise to petitioners' own negligence,

---

[10] Please see Exhibit 1 to Lafarge's motion for wording of each proposed FRCP 30(b)(6) topic in this litigation.

and not Lafarge's.  The inquiry was by no means exhaustive, because the negligence at issue was not Lafarge's, but Ingram's, Domino's and Unique's.

**Proposed Topic 2** concerns the breakaway itself, in light of Lafarge's present knowledge, continued investigation, and in light of Lafarge's *force majeure* defense (i.e., that the MRGO or other storm surge, so-called funnel effect, or wind, or waves, etc...) made the breakaway unavoidable.[11] These were not topics open to discovery during Phases I or II.  Clearly, plaintiffs are entitled to examine Lafarge's claims in these regards, to discover facts, and to refine understanding of Lafarge's contentions.

Lafarge argues that plaintiffs need to have challenged Lafarge's Answer to Interrogatory No. 25 to obtain standing to depose Lafarge concerning the breakaway, but has not cited any authority to that effect.  Plaintiffs know of no law or jurisprudence articulating any such requirement.  Moreover,  Plaintiffs do not need Lafarge to interpret their proof or allegations, but merely to be forthcoming with them so that plaintiffs can understand the evidence, its sources,  its reliability, and its foundation.  Obtaining such information in a deposition would enable plaintiffs to assess possible objections to admission in advance of trial, and shorten the trial.

**Proposed Topic 3** enables plaintiffs to examine Lafarge concerning documents Lafarge *now* possesses or of which Lafarge has knowledge concerning the breakaway and causes of the IHNC floodwall breaches, none of which were topics within the scope of the limitation action.  It represents a legitimate effort to obtain facts, wholly sanctioned by Rule 26 and Rule 30.

Plaintiffs do not need Lafarge to interpret the evidence, but merely to be forthcoming with them so that plaintiffs can understand the evidence, its sources,  its reliability, and its foundation. Obtaining such information in a deposition would enable plaintiffs to assess possible objections to

---

[11] 05-4419, Record Docs. 37 and 40, Lafarge's Answers.

admission in advance of trial, and shorten the trial.

**Proposed Topic 4** concerns Lafarge's own statements regarding the breakaway and/or floodwall breaches, and is especially poignant in light of the fact that just yesterday Lafarge identified for the first time the previously-produced statements of Earl Smith and Edward Bush as the only written statements it made to the Coast Guard. Plaintiffs are entitled to explore the information in these statements and find out about any oral statements, particularly Lafarge's role in the Coast Guard's erroneous impression that steel cable was used to moor Barge ING 4727 instead of the nylon rope that all parties to this action admit was used. Lafarge's statements to others are fair fuel for examination as to matters beyond the scope of Ingram, et al's limitation claims.

**Proposed Topic 5** is suspended pending resolution of the appeal from the denial of plaintiffs' Motion for Protective Order or the resolution of any other matter involving the scope of work-product privilege.

**Proposed Topic 5** (second, mislabeled No. 5) and Topic 6: Again, ING 4727's movements in the IHNC, and whether it broke the floodwall, were never permissible topics during the limitation action in which Lafarge was deposed. A wealth of information and contentions now exist, which plaintiffs have a right to discover, and about which plaintiffs have the right to examine Lafarge.

**Proposed Topic 7:** A five barge tier of Bunge barges moored next to the tier containing ING 4727 appears to have shifted during the storm, although none of the Bunge barges broke away or crashed through the floodwall.[12] Plaintiffs seek facts concerning the shifting Bunge barges, and their mooring methods that kept them at the dock. These areas of inquiry are relevant to the causes of the breakaway, and Lafarge's *force majeure* defense.[13]

---

[12] Please see **Exhibit 2**, a photo of the five barge tier.

[13] For example, if the breakaway of 4727 was unavoidable by reasonable means, as Lafarge claims, then why did other barges at their facility remain berthed? *Force majeure* would

As to **Proposed Topic 8,** Lafarge would have the plaintiffs and trier of fact rely solely upon its dockworker's testimony as to what Lafarge knew in advance of a "funnel effect" or projected MRGO storm surge, a matter of vigorous public debate long before Katrina. Lafarge claims the surge caused an unavoidable accident. Plaintiffs seek to discover what the corporation knew, not its mere dock employee, whether Lafarge was concerned, and if so, what, if anything, the corporation did respecting these concerns.

Lafarge posits that questions concerning construction activity on the eastern IHNC batture - **Proposed Topic 9** - would have been proper during the Phases of the limitation action limited to questions of privity or knowledge, and negligence or unseaworthiness. Clearly, such inquiry was outside the scope of the limitation action. There is no doubt that Lafarge and the Court would not have been inclined to permit discussion of WGI's or other contractors' activities during the Ingram limitation action. Further, Lafarge lists as a trial witness a representative of McElwee, a subcontractor in the IHNC lock expansion project begun by WGI.[14] Plaintiffs seek to discover what facts Lafarge knows and what it will allege in trial concerning any purported involvement of construction on the eastern IHNC batture as a cause of the floodwall breaches.

**Proposed Topic 10** does not seek production via this proposed deposition of any photos, etc. after September 8, 2005, but only inquiry as to those of which Lafarge is now aware showing locations and things on August 28 and 29, 2005. Such materials might demonstrate the reasons and manner in which ING 4727 broke away, while other barges stayed in place, or might show ING 4727 within the Canal, or as it transited the eastern IHNC floodwall, all evidence that, presumably, the

---

have acted equally upon all of the barges at the same location were there not reasonable means of restraining them. This defense is contained in Lafarge's Answers, 05-4419, Record Docs. 37 and 40.

[14] USDC EDLA 05-4182, Record Doc. 13217, Entry No. 19.

Trial Court would want as evidence.  Lafarge has misconstrued the topic as requiring production of work product, but the date limitation in the request shows that no work-product privilege is available.

Proposed Topic 11 seeks the identities of witnesses to ING 4727's movements from the LNA dock to its resting place in the Lower Ninth Ward, and whether new or old, is key to the Trial Court's ability to administer justice, and plaintiffs' ability to obtain it.  If Lafarge knows of witnesses, it should disclose this knowledge.  If Lafarge does not know of any beyond its prior discovery responses, its corporate representative is free to state as much in testimony.

Proposed Topic 12 involves essentially the same matters as Proposed Topic 11, and can be handled in the same way.

Proposed Topics 13 and 14 are suspended pending resolution of the appeal from the denial of plaintiffs' Motion for Protective Order or the resolution of any other matter involving the scope of work-product privilege.

Proposed Topic 15 is suspended as to the clocks and timepieces Lafarge has produced for inspection, and which remain available to be inspected by experts.  Lafarge employed investigators who posted signs asking for photographs and videos.[15]  Plaintiffs have a right to inspect and make use of any such irreplaceable physical evidence.

Proposed Topic 16: The Murph Settlement.  Ingram Barge ING 4727 landed on several Lower Ninth Ward homes after crashing through the south breach of the eastern Industrial Canal floodwall.  One, at 1739 Jourdan Avenue, belonged to Arthur Murph and his wife Jeanne Murph.  Mr. Murph was home during the storm, outside at the time the barge broke through the floodwall.  Lafarge soon thereafter, through its attorneys at Chaffe McCall, proposed settlement whereby

---

[15] A photograph of one of Lafarge's investigators' signs is attached hereto as Exhibit 3.

Lafarge would take ownership of 1739 Jourdan Avenue and fund the purchase of a new home for Mr. and Mrs. Murph.  They made no contact, and no such overtures or offers to the owners of any other homes on which the barge landed, i.e. Marenthia Lagarde, a named plaintiff in this matter.  All of these other homeowners had evacuated, and saw nothing of the barge during the storm.  By contrast, as Mr. Murph initially stated to an attorney he consulted on one occasion, he heard the barge scraping against the eastern IHNC floodwall, followed by a loud, booming crash, and the barge breaking through the floodwall, causing the south breach.[16]

Eventually, Mr. Murph and Lafarge entered into a purported settlement agreement containing a harsh confidentiality provision penalizing Mr. Murph upon revelation of the settlement.[17]  An Act of Sale took place in which Mr. Murph was made owner of a new home on Berkley Drive in Algiers.[18]  Oddly, though it was a full price cash sale without any financing, without any promissory note, Lafarge and its attorneys had Mr. Murph grant a collateral mortgage, pledging the new home, purportedly as an incentive for Mr. Murph to uphold the confidentiality agreement.  The mortgage does not clearly identify the mortgagee, but based upon the Murph settlement, it is believed to be Lafarge, New Jourdan, or a company that appears not to have come into existence - New Berkley, LLC.  Mr. Murph revealed in a recent deposition that at no time that he signed numerous documents pertinent to the settlement, including a purported Affidavit containing Lafarge's version of his observations during the storm, and the collateral mortgage ancillary to the sale, did he understand the contents, have benefit of counsel, or any explanation by Lafarge or its attorneys of his rights, or the meaning of the documents he was signing.  He revealed in his deposition that he understood

---

[16] **Exhibit 4**, statement of Arthur Murph, redacted of information subject to confidentiality agreement in the settlement.  Please see p. 7, where Mr. Murph exclaims, "probably, my ass."

[17] **In Globo Exhibit 5**, Murph settlement, with attachments.

[18] **In Globo Exhibit 6**, 105 Berkley Drive Act of Sale and attachments.

virtually nothing of the contents and legal effects of all that Lafarge and Chaffe, McCall placed before him for signature.  He revealed in his deposition that he did not know whether giving testimony there would jeopardize the purported settlement.[19]

Instrumental in the settlement were Chaffe McCall attorneys Harry Holladay, and, upon information and belief, Robert Fisher.  Mr. Fisher and Chaffe McCall represent Lafarge in this lawsuit.  Also instrumental was New Jourdan, LLC, a company created to serve as a conduit for funds used to purchase the home.[20]  These funds were provided to New Jourdan via a Chaffe McCall check, which was then converted to a Crescent Bank and Trust cashier's check for the Act of Sale.[21] New Jourdan's agent for service is Daniel Webb, counsel in this matter for Lafarge's insurer New York Marine.  It's mailing address and domicile address are the same as Mr. Webb's service address. Mr. Holladay's name appears on numerous documents for reasons unknown, including the Berkley Drive Act of Sale, as counsel for Lafarge, which was not a party to the Act of Sale. His was a constant presence throughout these proceedings.

Both Mr. Holladay and Mr. Fisher are said to have had various communications with Mr. and Mrs. Murph long after the sale, the result of which is said to be the Murph Family's fear that they would lose their new home to Lafarge for one or more reasons.  The first results from Mr. Murph's understanding, until recently advised otherwise by counsel, that revelation of his observations during the storm might be a violation of the confidentiality provision, and that he could lose his house.  Mr. Murph hid in his home while plaintiffs tried over the course of weeks to subpoena him for deposition.  Undersigned asked counsel for Lafarge to advise Mr. Murph that his deposition testimony would not constitute a breach, but counsel did not comply.  Nor did Lafarge or their

---

[19] Pertinent extracts of his deposition are attached as **In Globo Exhibit 7**.

[20] **In Globo Exhibit 8**, New Jourdan, LLC organizational documents and Rule 45 return.

[21] **In Globo Exhibit 9**, Crescent Bank and Trust Rule 45 return.

counsel grant Mr. Murph permission to testify or speak of these matters pursuant to language in the confidentiality agreement stating that such permission would not be unreasonably refused.[22]  In fact, Mr. Murph declined to complete his deposition on the first date it was set, until he could consult counsel for advice as to whether his testimony would violate the confidentiality agreement.  Counsel for Lafarge would not clarify for Mr. Murph that he might testify.[23]

The second reason for Mr. Murph's fear resulted from various phone calls made to the Murph Family, upon information and belief by Messrs. Holladay and/or Fisher, long after the Act of Sale took place and Mr. and Mrs. Murph had settled into their new Berkely Drive home.  A condition of the settlement was that Lafarge would take ownership of the damaged 1739 Jourdan Avenue property.  However, when Mr. and Mrs. Murph originally bought the Jourdan Avenue property in early 2005 from Shirley Priestly, deceased, the Murphs were twelve thousand dollars ($12,000.00) short at closing.[24]  Ms. Priestly accepted a second mortgage and financed this shortfall.  Lafarge did not know this at the time of the Murph settlement.  According to Jennifer Fernandez, Shirley Priestly's daughter, Mrs. Murph would call in a panic, stating that Chaffe McCall was calling and exerting tremendous emotional stress over the second mortgage.[25]  She expressed great fear that they would lose the new house.  Ms. Fernandez' cell

phone records reveal several calls from Chaffe McCall (504-585-7000) during this period.[26]

The amount of the settlement, disclosure of which was denied by the Court, is well outside

---

[22] See Confidentiality language in **Exhibit 5**.

[23] See **Exhibit 7**, extracts of Deposition of Arthur Murph.

[24] **In Globo Exhibit 10**, the 1739 Jourdan Act of Sale from Priestly, with attachments.

[25] It is anticipated that the upcoming deposition of Mrs. Murph will bear this out. Ms. Fernandez was personally interviewed by undersigned concerning this matter, but is now hospitalized, dying of cancer, and cannot provide an affidavit to this effect.

[26] **Exhibit 11**, Jennifer Fernandez' phone records.  504-585-7000 is Chaffe, McCall's phone number.

the scope of the proposed inquiry.[27]  Plaintiffs suspect a pattern of oppression, threats, and attempted sequestration and intimidation of a witness whom Lafarge, its insurers, and their attorneys perceived as a danger to their claims that the barge floated through an existing breach.  In fact,  Plaintiffs suspect a pattern of secrecy concerning the existence of the settlement, and exploitation of Mr. Murph's lack of legal counsel to induce or coerce him to endorse Lafarge's conduct described above. Plaintiffs perceive great need to investigate further for the benefit of the trier of fact, and in the interests of justice.  *Undersigned are not at all concerned with how much money was involved, but with the conduct of Lafarge and its attorneys toward Mr. and Mrs. Murph, and its potential effects.* The information is discoverable for these purposes. *Westside-Marrero Jeep Eagle, Inc. v. Chrysler Corp., Inc.*, 1998 WL 186705 (E.D. La. April 17, 1998) (No. CIV. A. 97-3012) (attached); *DIRECTV, Inc. v. Puccinelli*, 224 F.R.D. 677, 686-87 (D. Kan. 2004).[28]

**Proposed Topic 17** concerns the essential elements of the torts plaintiffs allege against Lafarge, Lafarge's defenses, and Lafarge's position concerning class action status.[29]  Fed. R. Civ. P. 26(b)(1) specifically affords discovery of such matters, and is to be liberally implemented.  The Case Management Orders governing this case similarly instruct that discovery be conducted now. Again, written discovery responses do not preclude oral examination and testimony as to these matters, nor does any law deny plaintiffs the right to examine Lafarge concerning their responses. Again, undersigned do not need Lafarge to explain their tactics or strategies, just to disclose all of their allegations and proof.  This differs little from this Court's recent Order requiring that the Barge Plaintiffs supplement their response to Lafarge's written discovery directed to the plaintiffs' trial plan.

---

[27] Property records are publicly available, and at least show the price of the house.
[28] Copy attached as **Exhibit 15.**

[29] Lafarge denies in its Answers that this matter is amenable to class status.

**Proposed Topic 18:** Two months after answering the Barge Plaintiffs' 2005 class action lawsuit, amended in early 2006 to add Lafarge and its insurers, it's P and I Club, American Steamship Owners Mutual Protection and Indemnity Company (The American Club), commenced a declaratory action in the Southern District of New York seeking to exclude coverage of ING 4727, claiming that ING 4727 was not included in the schedule of covered vessels, nor included by operation of policy language affording omnibus coverage to vessels not named in the schedule.[30] The American Club did not provide notice of these defenses, except to plead in their Answers vague references to and adoption of policy terms, conditions and exclusions.[31] The American Club commenced action with no notice to undersigned or the putative class. While Judge Duval has decided that the litigation of coverage issues should proceed in the first instance in New York, plaintiffs need the information sought for two reasons. First, discovery responses by Lafarge in New York may bear directly on the issues in this litigation, and may contain useful admissions or denials. Second, plaintiffs need information on the defenses to coverage in order to understand the situation and to be prepared to urge this Court whether to accept or reject, in plaintiffs' direct action against the American Club, the ultimate decision in New York.

Plaintiffs are exploring potential remedies in order to resolve the coverage dispute. Coverage promotes settlement, and would mitigate what Lafarge's counsel, John Aldock, has referred to on the record of this action as a death sentence for Lafarge North America in the form of a civil judgment.

**Proposed Topic 19** is suspended, pending resolution of the appeal or of any order on the

---

[30] USDC SDNY Civil Action No. 06 CV 3123 (CSH).
[31] 05-4419, Record Docs. 108, 123,137, and 155 are some of The American Club's Answers, and returns of summons, reflecting dates upon which they were impleaded in this matter, and The Club's failure to fully describe the coverage defense.

scope of work-product privilege, as to the activities of Centanni Investigative Services: Lafarge has produced numerous documents and things described by Topic 19, but their origins, identification, chain of custody, contents, etc., are not apparent.  Plaintiffs seek to examine Lafarge as to these matters bearing on the reliability, completeness and veracity of what Lafarge has produced thus far.

**Proposed Topics 20 and 21**: Lafarge has produced its policies in accord with this Court's order.  However, plaintiffs seek to examine the company concerning the origins, development, implementation, promulgation, purposes and enforcement of these policies.

**Proposed Topic 23:**  Plaintiffs have recently amended their Proposed 30(b)(6) notice to include this new topic.  Lafarge North America, Inc., the largest construction materials supplier in the United States, is a subsidiary of The Lafarge Group, an international conglomerate based in France.  At the time of Katrina, and when this suit was filed, Lafarge North America, Inc. was publicly traded on the New York Stock Exchange.  Its majority shareholder was Lafarge, SA, a French subsidiary of The Lafarge Group.  Beginning just after this suit was commenced,  Lafarge North America reacquired all of its public stock, which appears to have been transferred to Lafarge, SA, and then a merger effected between Lafarge North America,  Lafarge, SA and Efalar, Inc., another wholly owned subsidiary of Lafarge, SA formed in February 2006.[32]  The decision in *Rice, et al v. Lafarge North America, Inc., et al*, Circuit Court for Montgomery County, Maryland, Civil Action No. 268974-V and consolidated cases, a class action in which that court held that Lafarge, et al violated its duties to its shareholders, explains some of these transactions.[33]  The question arises whether Lafarge North America satisfies legal criteria for disregard of the corporate identity,

---

[32] **In Globo Exhibit 12**, various filings made by Lafarge to the Securities and Exchange Commission.

[33] **Exhibit 13**, opinion in *Rice, et al v. Lafarge North America, Inc., et al,* submitted for informational purposes only.  Note: Plaintiffs here do not adopt the court's analysis and calculation of class action attorneys' fees.

commonly known as piercing the corporate veil.   *Raspino v. JRL Enterprises, Inc.*, 2002 WL 465179 (E.D. La. March 25, 2002) (No. CIV.A. 01-1720) (attached), criticized plaintiff's counsel for delay in conducting pretrial discovery relevant to piercing the corporate veil, but held that the remaining month before trial would be sufficient for such discovery.   A copy is submitted as Exhibit **14.**

## CONCLUSION

Undersigned do not propose abandonment of any discovery accomplished in *In Re Ingram Barge, etc.*, and do not suggest that Lafarge not be held to responses they made in that action. Despite Lafarge's representations, the fact remains that this discovery occurred in an entirely different matter - one in which Lafarge was not a party, one in which the scope of discovery excluded the key elements of this, the Katrina litigation, and one in which Lafarge was subject to discovery only by the claimants in limitation, not the putative class currently before this Court.   Lafarge North America, Inc. fails to provide support for its motion.   It has not established good cause for a protective order, or that justice requires such an order to protect Lafarge from annoyance, embarrassment, oppression, or undue burden or expense.

Respectfully submitted,

/s/ Brian A. Gilbert,
Brian A. Gilbert, Esq.(21297)
LAW OFFICE OF BRIAN A. GILBERT, P.L.C.
821 Baronne Street
New Orleans, Louisiana 70113
        Telephone: (504) 885-7700
        Telephone: (504) 581-6180
        Facsimile: (504) 581-4336

e-mail: bgilbert@briangilbertlaw.com

/s/ Lawrence D. Wiedemann,
Lawrence D. Wiedemann.(13457)
Karl Wiedemann (18502)
Karen Wiedemann (21151)
WIEDEMANN & WIEDEMANN
821 Baronne Street
New Orleans, Louisiana 70113
        Telephone: (504) 581-6180
        Facsimile: (504) 581-4336
        e-mail: lawrence@wiedemannlaw.com,
        karl@wiedemannlaw.com, karen@wiedemannlaw.com,

/s/ Patrick J. Sanders
Patrick J. Sanders (18741)
3316 Ridgelake Drive
Suite 100
Metairie, LA 70002
Telephone: 504-834-0646
e-mail: pistols42@aol.com

/s/ Richard T. Seymour
Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C.  20036-4129
Voice: 202-862-4320
Cell:   202-549-1454
        Facsimile:  800-805-1065 and 202-828-4130
        e-mail: rick@rickseymourlaw.net

/s/ Lawrence A. Wilson
Lawrence A. Wilson (N.Y.S.B.A. 2487908)
David W. Drucker (N.Y.S.B.A. #1981562)
Wilson, Grochow, Druker & Nolet
Woolworth Building
233 Broadway, 5th Floor
New York, NY 10279-0003
Telephone: (212) 608-4400
Facsimile: (212) 227-5159
e-mail: lwilson@wgdnlaw1.com, ddruker@wgdnlaw1.com

/s/ Alan L. Fuchsberg
Alan L. Fuchsberg, Esq.(N.Y.S.B.A. #1755966)

Leslie Kelmachter, Esq.(N.Y.S.B.A. #1795723)
The Jacob D. Fuchsberg Law Firm
500 Fifth Avenue
45th Floor
New York, NY 10110-0002
Telephone: 212-869-3500 ext. 235
Facsimile:  212-398-1532
  e-mail: a.fuchsberg@fuchsberg.com,
  l.kelmachter@fuchsberg.com


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing document has been served upon counsel of record, by United States Mail, postage prepaid and properly addressed, facsimile, and/or ECF upload, this 3 day of June, 2008.

  \s\Brian A. Gilbert