IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

| | | |
|---|---|---|
| DENNIS RICE, On behalf of Himself and All Others Similarly Situated, | * | Civil No. 268974-V (Consolidated with Case Nos. |
| | * | 269216-V, 270403-V, 270404-V, 270405-V, 270406-V, 270407-V, |
| Plaintiff, | * | 270408-V and 270409-V |
| vs. | * | |
| | * | Business and Technology Court Judge Michael D. Mason |
| LAFARGE NORTH AMERICA, INC., *et al*., | * | |
| Defendants. | * | |

_____

| | | |
|---|---|---|
| SHELDON and ESTHER SCHWARTZ, On Behalf of Themselves and All Others Similarly Situated, | * | Civil No. 270410-V |
| | * | Business and Technology Court Judge Michael D. Mason |
| Plaintiffs, | * | |
| vs. | * | |
| LAFARGE NORTH AMERICA, INC., *et al*. | * | |
| Defendants. | * | |

## OPINION AND ORDER

The underlying claims in the above-captioned class actions having been settled, the settlement having been approved by the Court, this matter now comes before the Court upon the Plaintiffs' motion for an award of attorneys' fees and reimbursement of expenses and the Defendants' opposition thereto.  Upon consideration of the Plaintiffs' motion, the Defendants' memorandum of law in opposition to the Plaintiffs' motion, the Plaintiffs' reply, and the arguments of counsel, for reasons set forth below, the Court shall grant the Plaintiffs' motion

and enter an award of attorneys' fees in the amount of $4,716,408.00 and reimbursement of expenses in the amount of $90,173.06.

## FACTS

### A. The Parties.

Lafarge North America, Inc. (LNA) is a public corporation organized and existing under the laws of the State of Maryland. LNA is North America's largest supplier of construction materials such as cement and related products. LNA's shares are traded on the New York Stock Exchange.

Lafarge SA (LSA) is one of the largest manufacturers and suppliers of building materials in the world. LSA is a foreign company organized under the laws of France. Its shares also trade on the New York Stock Exchange. Prior to the takeover, which is the subject of the instant litigation, LSA was also the majority shareholder of LNA, owning 53.2 percent of the outstanding shares of LNA.

Efalar is a Delaware corporation, a subsidiary of LSA. It was formed by LSA for the purpose of acquiring the minority shares of LNA.

Lafarge Canada, Inc. (LCI) is a major subsidiary of LNA, which LNA uses to distribute building materials throughout Canada. The shareholders of LCI hold Exchangeable Preference Shares (EPS) which can be exchanged at the option of the holder for shares of LNA on a one-to-one ratio.

The individual Defendants are various members of the Board of LNA, who have substantial economic ties to LSA. Many now serve, or in the recent past have served, on the Board of LSA, or held other management positions with that company.

The Plaintiffs herein are various individual and institutional minority shareholders of the stock of LNA.  They have brought claims individually and on behalf of the class of shareholders similarly situated.

**B. The Tender Offer.**

On or about February 6, 2006, LSA announced publicly that it intended to acquire all of the outstanding shares of LNA, (46.8%) for cash at $75 per share.  The total value of the transaction was estimated to be worth $3 Billion Dollars.  The announcement was reported in a number of news services, including Reuters.  The tender offer was subject to the non-waivable condition that a majority of the minority stockholders of the common shares and EPS tender their shares for purchase and the waivable condition that 90 percent of those shares be tendered which would permit LSA to complete a short form merger.  Their tender offer represented one of the largest corporate going private transactions in North America in 2006.

In response to that announcement, the Plaintiffs herein filed ten separate complaints. The first filed, Jasinover v. LaFarge North America, Inc., et al., Case No. 270403, was filed the same day as the announcement, February 6, 2006, in the Circuit Court for Baltimore County (Case No. 24C-06-001584).  Two additional actions, Obstfeld v. LaFarge North America, Inc., et al., Civil No. 270404 (formerly Baltimore City Circuit Court Case No. 24C-06-001604) and Rice v. LaFarge North America, Inc., et al., Civil No. 268974, were filed the day following the announcement, February 7, 2006.  With the exception of two (Janesch v. Marshall Cohen, et al., Civil No. 270409 and Schwartz v. LaFarge North America, et al., Civil No. 270410), all remaining actions were filed within ten days of the announcement.  All actions were eventually transferred to the Circuit Court for Montgomery County, Maryland

and, with the exception of Schwartz v. LaFarge North America, Inc., et al. (brought on behalf of the holders of EPS shares in LCI), were consolidated under the caption Rice v. LaFarge North America, et al., Civil No. 268974.  Pursuant to the Order of consolidation, Faruqi & Faruqi, LLP.; Gardy & Notis, LLP; Barrack, Rodos & Bacine; and Wolf Popper LLP were appointed Lead Counsel and Powers & Frost LLP were appointed Liaison Counsel.

Each of the Plaintiffs sought to bring their action on behalf of themselves and on behalf of all stockholders of the company who were similarly situated.  The earliest Complaint, Jasinover v. Lafarge North America, alleged that the offer of $75 per share for the outstanding shares was "grossly inadequate" representing only a 16.7 percent premium over the stock's closing price the last trading day before the offer was announced.[1]  Further, they alleged that the offer did not adequately value the company in light of its recent financial performance as announced on February 1, 2006.  Alleging conflicts of interest, the Plaintiffs claimed that the individual Defendants were violating the fiduciary duties owed to the minority shareholders.  Accordingly, they sought to enjoin consummation of the offer or, in the alternative, that the Defendants be ordered to abide by their fiduciary duties and/or for damages.

The Plaintiff, Harold Obstfeld, (Civil No. 270404) in his Complaint filed February 7, 2006, alleged that LSA had timed its offer to take advantage of recent weakness in LNA's share price.  He alleged that because of LSA's control of LNA's Board, the Board could not be expected to discharge its fiduciary duties to the public shareholders.  Additionally, because LSA owned a majority of the shares, no third party suitor was likely to emerge.  This

---

[1] On Friday, February 3, 2006, the stock closed at $64.25 per share.  (Defendants' Opposition, McGuckian Affidavit, Ex. G)  Hereafter all references to exhibits filed as part of the McGuckian Affidavit incorporated by reference into Defendants' Memorandum of Law in Opposition to the Plaintiffs' Motion for Fees will simply be referred to as McGuckian, Ex. ___.

combination gave LSA the power to acquire the company on terms contrary to the best interest of the minority shareholders and that was a breach of LSA's fiduciary duty to those shareholders.  Additionally, he alleged the individual Defendants breached their fiduciary duty by not taking adequate measures to protect the public shareholders.  Finally, he alleged LSA had breached its fiduciary duty by using its knowledge about the affairs of LNA and its control of LNA for its own benefit.

Similarly, Plaintiff Dennis Rice (Civil No. 268974), who filed his Complaint on February 7, 2006 seeking relief on behalf of himself and shareholders similarly situated, alleged that the individual Defendants, members of LNA's Board, were conflicted. Specifically, that Bertrand Collomb was Chairman of the Board of LNA and Chairman of the Board of LSA.  Bernard Kasriel was Vice-Chairman of LNA's Board and Vice-Chairman of LSA's Board.  Bruno Lafont, a Director of LNA, was also the Chief Executive Officer of LSA.  Robert Murdock was a Director of both companies.  John Redfern, who was a Director of LNA, was Chairman of Lafarge Canada.  Michael Rose, a Director of LNA, was also the Chief Operating Officer and Co-President of LSA.  Rice alleged that as a result of LSA's majority stake in LNA and the overlapping Boards, LSA exercised majority control over LNA.  As a result, Rice alleged that LSA owed a fiduciary duty to the Plaintiff and the other public stockholders of LNA.  He alleged that LSA and the individual Defendants breached their fiduciary duty to the Plaintiffs by participating on both sides of the transaction, the tender offer.  Further, because they controlled LNA and possessed LNA's confidential financial information, it was inherently unfair to pursue this transaction which benefited them at the expense of the remaining public shareholders.  Generally, he alleged that the $75 tender offer was inadequate and that LSA's offer, as the majority shareholder, had the effect of

capping the market for LNA stock below market value.  Therefore, the class members were

being deprived of their right to obtain the highest value for the company.  Accordingly, he

asked for injunctive relief and, in the alternative, damages.  The remaining Complaints

contain similar allegations of a general nature.

On February 8, 2006, the Board of Directors of LNA announced the appointment of a

Special Committee (SC) comprised of the directors independent of LSA to consider the tender

offer and to make a recommendation to the minority shareholders.  The LNA Special

Committee hired Merrill Lynch and later the Blackstone Group as financial advisors.

Similarly, the Board of Directors of LaFarge Canada appointed a Special Committee of

disinterested directors.  LCI's Special Committee also retained Merrill Lynch as its financial

advisor and Oglivy Renault LLP as its legal advisor.

On February 14, 2006, Plaintiff Alan Kahn filed his Complaint in Montgomery

County (Civil No. 269216) through his attorneys, Power & Frost, LLP.  The following day

they filed a motion to consolidate their case with the Rice case and for appointment of Faruqi

& Faruqi, LLP and Gordy & Notis as co-lead counsel and Powers & Frost, LLP as liaison

counsel.

On February 16, 2006, the Rice and Kahn Plaintiffs filed a motion for expedited

discovery.  On February 17, 2006, the Defendants filed motions to dismiss certain of the

actions previously filed, including those filed by the Rice and Kahn Plaintiffs.  On

February 21, 2006, the Defendants filed an opposition to the motion for expedited discovery.

On February 22, 2006, following a hearing before the Court, the motion for expedited

discovery was denied without prejudice to renew it after the SC completed its work.  The

motion for the consolidation of the two Montgomery County cases was granted.  Immediately

thereafter, those Plaintiffs sought to consolidate their cases with those filed in Baltimore. Ultimately, on March 31, 2006, the Baltimore cases were transferred to Montgomery County and consolidated with the Rice and Kahn cases.

On February 21, 2006, LSA, formally commenced its tender offer for the shares of LNA. The initial offer was scheduled to expire on March 20, 2006. Along with announcing the formal tender offer, LSA filed its formal tender offer statement, Schedule TO (TO), with the Securities and Exchange Commission (SEC). The initial tender offer was $75 per share, subject to the conditions previously noted.

Following the filing of the TO, on February 27, 2006, various Plaintiffs filed Amended Complaints. The Amended Complaints added allegations that the Defendants breached their duties to the Plaintiffs by making inadequate disclosures in the TO filed February 21, 2006. Specifically, LSA failed to disclose that the representation that $75 per share was fair did not take into consideration LNA's most recent financial projections. They failed to disclose any discounted cash flow analysis for LNA, a standard measure used by valuation professionals to determine present value for a company. Finally, they failed to provide complete information regarding the fees to be paid to their financial advisors.

On March 6, 2006, the Special Committee announced it was as yet unable to take a position on the tender offer and asked shareholders to defer any decision. The same day, LSA announced it was extending the expiration date of the offer to April 3, 2006.

The following day, March 7, 2006, the Plaintiffs sent a preliminary financial analysis prepared by their experts, Financial Markets Analysis, LLC (FMA), to counsel for the Special Committee and LSA. The analysis showed a value range for the stock from a low of $84 to a high of $93.07. (Affidavit of Robert M. Kornreich in Support of Plaintiffs' Motion for An

Award of Attorney Fees and Reimbursement of Expenses, Ex. A, p. 143/1-3).[2]  The

information was discussed at the meeting of the Special Committee on March 16, 2006.

*supra.*

On March 24, 2006, the Special Committee announced that $75 was inadequate and

recommended the minority shareholders not tender their shares.  As of that date, LNA's

closing price on the New York Stock Exchange was $83.81 per share.  (McGuckian, Ex. G).

In response, LSA issued a press release the same day noting that the Special Committee had

no power to stop the transaction and that a negative recommendation was not unusual.  LSA

noted that the offer was being made directly to the minority shareholders of LNA and it was

they who would determine whether or not the offer was acceptable.  They noted that the $75

per share offer represented a 16.7 percent premium over the stock's closing price on

February 3, 2006 and a 31 percent premium over the average stock closing price for the three

month period prior to the announcement of the offer.  They asserted that they continued to

believe that the offer was full and fair and that it remained open until April 3, 2006.

(Kornreich, Ex. Q).

On March 27, 2006, Lafarge Canada's Special Committee made a similar

recommendation.

On March 29, 2006, the Plaintiffs filed a request for a TRO and preliminary injunction

to enjoin the Defendants from completing the tender offer.  On March 31, 2006, counsel for

the Defendants and counsel for various Plaintiffs appeared before the Court for a hearing on

the Plaintiffs' request for a TRO.  At the conclusion of the hearing, mindful that the SC had

recommended against accepting the initial offer, the Court denied the request for a TRO

stating:

---

[2] Hereafter, Kornreich Ex. ___.

8

> Given the volume of the pleadings, quite frankly, with respect to the likelihood of success, you know, it would be very difficult to intelligently sort that out with any precision. I mean, clearly you have something to talk about based upon the facts as plead, in that I concede. But I'm more focused on the issue of the irreparable harm.
>
> And the irreparable harm that you cite, as far as the Court is concerned, is speculative in nature. In addition to which, I think you have an adequate remedy at law in the event that the breach has occurred. So for that reason, the TRO is denied.

Kornreich, Ex. S, p. 68, l. 4-14.

On April 4, 2006, LSA announced that it would extend its offer to April 28, 2006 and increase the offer price to $82 per share. Following that announcement, LSA and the Special Committee engaged in a series of discussions. As a result of initial discussions through their respective advisors, it was agreed that Bruno Lafont, the Chief Executive Officer of LSA, would have direct discussions with Marshall Cohen, the Chairman of the Special Committee, to see whether they could agree upon a mutually acceptable price. As a result of a discussion that took place on April 20, Mr. Cohen agreed to present to the Special Committee a proposed offer price of $85.50. Mr. Lafont agreed that if the Special Committee would support that price, he would convene LSA's Board of Directors to consider increasing the offer price to $85.50. However, Mr. Lafont stated that would represent LSA's best and final offer.

Following the amended offer of April 4, 2006, counsel for the Plaintiffs presented counsel for LSA a written demand that LSA further increase the offer. On April 12, 2006, the Rice Plaintiffs filed a second consolidated class action complaint challenging the amended offer of $82 per share. On April 21, 2006, the class Plaintiffs filed a renewed motion to enjoin the amended offer. In the renewed motion, they alleged that the minority shareholders

were being forced to make an investment decision with inadequate disclosures.  In light of the higher offer, they asserted that the class members now faced the prospect of irreparable harm.

As Lafont was engaged in direct discussions with Cohen, counsel for LSA began settlement discussions with counsel for the Plaintiffs.  On April 21, 2006, Defendants' counsel apprised Plaintiffs' counsel of the discussions between Mr. Cohen and Mr. Lafont and made an offer to Plaintiffs' counsel to settle the litigation based on the increase in the price to $85.50 per share.  They also stated that the settlement of the class actions would be a factor in LSA's decision about whether to increase the offer to $85.50 per share.  (Plaintiffs' Motion, p. 16, 17; Ex. cited therein).

On April 22, 2006, after speaking to their financial advisors, Plaintiffs' counsel notified Defendants' counsel that they were prepared to conditionally accept $85.50 per share subject to the review of certain LNA documents and the favorable recommendation of the LNA Special Committee.  On the morning of Sunday, April 23, 2006, after negotiating a confidentiality agreement, Plaintiffs' financial analysts were permitted to review the LNA documents.  These contained non-public documents relating to LNA internal projections, forecasts and budget.  Following that review, late on the evening of the 23rd, as a result of discussions involving counsel for the Defendants, counsel for the Special Committee, and counsel for the class action Plaintiffs, a settlement agreement was reached in principal subject to certain conditions, including Court approval.  As part of the settlement, it was agreed that certain of the Defendants would pay any fees and expenses awarded by the Court to Plaintiffs and their counsel in addition to, rather than out of, the monies payable to the shareholders under the final offer.

On the early morning hours of April 24, 2006 EST, LSA's Board met in Paris and approved the increase in the tender offer to $85.50 per share.  This represented a total of $3.5 Billion Dollars for the outstanding shares of LNA.  The final offer represented an aggregate increase of $128 Million Dollars from the most recent offer of $82 per share.  It represented an aggregate increase of $383 Million Dollars from the original tender offer of $75 per share.

On May 12, 2006, the tender offer was completed.  This resulted in LSA owning approximately 93 percent of all outstanding shares of LNA.  On May 16, 2006, LSA concluded a short form merger with LNA.

During the period April 23 to August 17, 2006, the parties engaged in and completed the confirmatory discovery to which Plaintiffs were entitled under the agreement.  Thereupon, they entered into a stipulation wherein the Defendants acknowledged that the efforts and positions taken by the Plaintiffs during the course of litigation were a factor in the increase to the Final Offer.

In paragraph 3 of the "Stipulation of Settlement," counsel for LSA and LNA on behalf of the parties recite the following acknowledgement:

> While believing that the original terms of the Offer were fair and reasonable, LSA acknowledges that the desirability of addressing the claims asserted in the Actions, Plaintiffs' Lead Counsel's prosecution efforts, the positions advocated by Plaintiffs' Lead Counsel and the financial advisor to the Rice Lead Counsel (the "Class Positions"), the discussions and negotiations conducted pertaining to the Settlement, and the desirability of addressing the Class' claims were factors that contributed to the decision by LSA to increase the financial consideration in the Final Offer.  Furthermore, the Class Positions were among the factors taken into consideration by the LNA Special Committee and the LCI Special Committee and their advisors in connection with their determination to recommend to the Class members that they accept, and tender into, the Final Offer.

11

Kornreich, Ex. V, Stipulation, ¶ 3.

As well, LSA acknowledged in Amendment 10 to its Schedule TO that the settlement of the class action claims was a factor in LSA's decision to increase the final offer to $85.50 per share.

On August 25, 2006, the Court entered an Order preliminarily approving the settlement.  As part of the preliminary approval, the Court required that notice be given to all affected shareholders of the settlement and its terms.  Among the notice provisions given to the affected shareholders was the notice that Plaintiffs' counsel would seek an award of attorney's fees of up to $15 Million Dollars and that class members had the right to object to the settlement or any portion thereof.  In response to the notice, a single objection was received.  The shareholder did not object to the terms of the settlement, only that he was being forced to cash out.  On November 16, 2006, the Court entered a final Order approving the settlement.

As contemplated by the settlement, subsequent to the final approval, Plaintiffs' counsel submitted their petition for fees on January 4, 2007.  The Defendants filed their opposition thereto on January 25, 2007, to which the Plaintiffs filed a reply on February 2, 2007.  Following the hearing before the Court on February 8, 2007, the Court took the matter under advisement to consider the many arguments of counsel.

## THE PARTIES' ARGUMENTS

### I.  Plaintiffs' Motion.

The Plaintiffs move the Court for an award of attorneys' fees in the amount of $12 Million Dollars and reimbursement of expenses in the amount of $90,173.06.  The sums are to

be paid by certain of the Defendants in the event any such fees are awarded by the Court. Preliminarily, the Plaintiffs note that all members of the class were given notice of the proposed settlement, including that counsel would apply for fees up to $15 Million Dollars and reimbursement of expenses up to $300,000.  Notwithstanding that 28,600 notices were distributed to members of the class, no member filed an objection to the fees.

   Plaintiffs assert they are entitled to an award of fees under the common fund doctrine. "Maryland courts have long recognized the doctrine that when a representative plaintiff successfully establishes a common fund in which others have a beneficial interest, plaintiffs' counsel is entitled to an award of attorneys' fees out of a common fund."  (citations omitted) (Plaintiffs' Motion, p. 23)  They argue Plaintiffs' litigation efforts on behalf of the class conferred a substantial monetary benefit on all members of the class.  The litigation caused LSA to increase its tender offer from the initial offer of $75 per share to an intermediate offer of $82 per share, to a final offer of $85.50 per share, an aggregate increase of $383 Million Dollars for the members of the class.  The benefit conferred upon the class from the intermediate offer to the final offer alone amounted to $128 Million Dollars.  The fee that they seek represents 3 percent of the entire benefit conferred, 9 percent as measured against the benefit conferred by the increase from $82 to $85.50 per share.  This is an exceedingly reasonable fee in their view.

   The Plaintiffs assert that their efforts were a significant factor in creating this benefit for the class.  Apart from being a cause in fact of the benefit, Plaintiffs note that courts in other jurisdictions, including Delaware, have held that there is a rebuttable presumption that there is a causal link between the lawsuit and the benefit conferred upon the class when the Defendants take the action resulting in the benefit after the commencement of the litigation.

Recognizing Maryland has not addressed this issue to date, they note "Because of the well recognized experience of Delaware Courts in presiding over corporate transactional cases similar to this one, Maryland Courts often look to the well-developed law of the Delaware Courts as persuasive authority in adjudicating similar cases."  (citations omitted) (Plaintiffs' Motion, p. 25, n. 27)

Among the actions that Plaintiffs maintain "in fact" caused the initial increase in the tender offer to $82 per share was their pursuit of a temporary restraining order, and the public disclosures attendant to the prosecution of that motion.  It was only two business days after the Court denied the motion stating that the Plaintiffs had "something to talk about" and a remedy in damages available that LSA raised their offer to $82 per share.  With respect to the second increase, Plaintiffs' counsel actively participated in the negotiations that led directly to that increase.  Further, the Defendants in the Stipulation of Settlement expressly acknowledged their efforts were a "**factor**" in LSA's decision to increase the offer to $85.50 per share, the final offer, and the SC's decision to recommend acceptance of it.  While the Plaintiffs concede they were not the sole cause of the price increase, and the Special Committee deserves much credit for it, the fact they were not the sole cause does not negate the presumption of causation under Delaware law citing *In re Infinity Broad. Corp. S'holders Litig.*, 802 A.2d 285 (Del. 2002).

Apart from their entitlement to a fee, they assert the fee requested is reasonable. Citing *United Cable TV of Balt. v. Burch*, 354 Md. 658 (1999), they argue that "reasonableness" should be determined **"Based Upon a Percentage of the Benefit Conferred with a 'Lodestar cross-check.' "**  (Plaintiffs' Motion, p. 35)  According to their review of cases from other states and the federal courts, this is the method most often used by

courts to calculate attorneys' fees in a common fund case.  Courts considering common fund

cases have become increasingly critical of the pure Lodestar approach because it is a time-

consuming process and that method provides an incentive to the attorneys to drag the case out

and bill more hours than is necessary.  "[V]irtually every federal court of appeals has joined

the Supreme Court in affirmatively endorsing the percentage of recovery method as an

appropriate method for determining an amount of attorneys' fees in common fund cases."

(citations omitted) (Plaintiffs' Memo., p. 37).  "Where the Lodestar fee is used 'as a mere

cross-check' to the percentage method of determining reasonable attorney's fees, 'the hours

documented by counsel need not be exhaustively scrutinized by the district court.' "  *In re

World Comm. Sec. Litig.*, 388 F.Supp. 2d 319, 355 (S.D.N.Y. 2005) (citation omitted)[3]

The percentage recovery method applied to their petition in Plaintiffs' view results in a

finding of reasonableness.  Whether viewed as 3 percent of the aggregate increase from $75 to

$85.50, or 9 percent of the aggregate increase from $82 and $85.50, the percentage is

consistent with, if not well below, percentages found to be reasonable by courts across the

country in similar types of cases.  Numerous examples are provided.  (See Plaintiffs' Motion,

p. 40-44).  Plaintiffs suggest *In re Digex S'holders Litig.*, 789 A.2d 1176, (Del. Ch. 2000), a

shared credit case is particularly instructive.  Therein, the court approved a $12.3 Million

Dollar fee to plaintiffs' counsel representing approximately 7.5 percent of the settlement fund

($165 Million Dollars).

They suggest the Lodestar cross-check provides additional evidence that the fee

requested is reasonable.  Attached to the petition are declarations from numerous plaintiffs'

---

[3] The Court is mindful that *World Comm.* and many other cases cited by the parties involve actions under the
Private Securities Litigation Reform Act (PSLRA) which expressly "… limits any award of attorney's fees and
expenses to 'a reasonable percentage' of any recovery."  *In re Royal Ahold N.V. Securities & ERISA Litigation,*
461 F.Supp. 2d 383, 385 (D.Md. 2006) (citation omitted).  Although the instant motion is not brought under the
PSLRA, the Court finds the opinions of the Courts in these cases to be instructive.

counsel, attaching exhibits, evidencing that counsel spent approximately 4,489 hours in the investigation and prosecution of the claims.  The hourly rate for each of the attorneys, and paralegals, is provided.  Based upon the applicable rates, the hours equal a Lodestar fee of $2,358,204.

The fees requested in this case are approximately five times the Lodestar amount, that is, represent a Lodestar multiplier of 5.  (Plaintiffs' Motion, p. 45)  Again, with citation to numerous cases around the country, Plaintiffs note that a Lodestar multiplier of 5 is typical of fee awards in complex class actions such as this one.  The reasons a multiplier is generally warranted can be seen from a review of many of the cases cited.  Those factors significantly overlap with the considerations set forth in Rule 1.5 (a) of the Maryland Rules of Professional Conduct.  They include, among others, the complexity of the issues involved, the risk assumed, the benefit obtained by the class, the ability and experience of counsel, the expedited nature of the litigation and the contingent nature of the fee.  In Plaintiffs' view, particularly considering the benefit achieved and the fees typically awarded in similar cases, a Lodestar multiplier of 5 is reasonable.

For all of these reasons, they assert that the fees requested are due and reasonable and should be awarded by the Court.

## II.  Defendants' Opposition.

The Defendants argue that the Plaintiffs' petition should be denied because for the common fund doctrine to apply, Plaintiffs must establish (a) the existence of a fund, (b) that their claims were meritorious when filed, and (c) that their efforts were a cause of a benefit to the members of the class, that is the creation of the fund.  Here, the Plaintiffs are unable to

establish any of these elements.  Citing *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876 (Del. 1980); *Wittman vs. Crooke*, 120 Md. App. 369 (1998).  (Defendants' Opp., p. 14).

Defendants point out the tender offer has closed and all monies have been disbursed to the non-affiliated shareholders.  Therefore, the Court has no jurisdiction over any *res* from which a fee could be awarded.  (Defendants' Opp., p. 15)  Citing *Christianson v. Kiewit-Murdock Inv. Corp.*, 815 F.2d 206 (2d Cir. 1987).  They assert that to now order the Defendants to pay attorneys' fees to the Plaintiffs would be tantamount to the Court imposing a tax upon the corporation without any legal basis.  (Opp., p. 16)

The Defendants maintain that this position is not inconsistent with the Stipulation of Settlement wherein they agreed to pay any amount awarded by the Court.  That agreement was expressly qualified by the right to assert any and all objections that Defendants might have to the award of such fees.  The right to object was not limited to simply contesting the reasonableness of the award.

Assuming a fund exists, Plaintiffs' counsel are nevertheless not entitled to a fee because their claims were not meritorious when filed.  With citation to numerous authorities from other jurisdictions, Defendants assert an essential element of the common fund doctrine "… requires counsel to demonstrate that the claims asserted would have survived a motion to dismiss and that Plaintiffs possessed 'provable facts which showed that (their) action had reasonable hope of success.' " (internal citations omitted)  (Opp., p. 18)  Here, they maintain Plaintiffs cannot meet that burden.  Observing that the gravamen of the Plaintiffs' claims was that the directors of LNA had breached fiduciary duties owed to the minority stockholders, Defendants assert that under Maryland law corporate directors owe their fiduciary duties to the corporation, not the shareholders.

Apart from the claims against the directors of LNA, Defendants assert the claims against LSA and its agent, Efalar, were not meritorious.  The Plaintiffs could not establish personal jurisdiction over LSA, a foreign corporation.  Efalar was an agent of LSA and owed no duty to the Plaintiffs.  LSA, the majority shareholder of LNA, owed no duty to LNA's minority shareholders under Maryland law.  (Opp., p. 22)

The Defendants argue that even under Delaware law, a majority shareholder owes no duty to the minority shareholders in a "non-coercive" tender offer.  With citation to numerous Delaware cases, the Defendants assert that the tender offer herein was non-coercive as a matter of law because it included a non-waivable majority of the minority provision and was conditioned on obtaining over 90 percent of the outstanding shares, coupled with a promise that any second step merger would be at the same price as the tender offer.  Concerning the disclosure claims, they argue Maryland does not impose a duty to disclose on a majority stockholder flowing to minority stockholders.  Assuming such a duty existed, there were no actionable omissions under the facts plead herein.

Finally, Defendants assert that the Plaintiffs' litigation was not a cause in fact of any increase in the tender offer.  Plaintiffs enjoyed no litigation victories.  Their motion for expedited discovery, accompanied by a five page memorandum, filed on February 16, 2006 was denied on February 22, 2006.  On March 29, 2006, after the Special Committee had already recommended against the $75 per share tender offer, Plaintiffs filed a motion for temporary restraining order and preliminary injunction.  Two days later on March 31st, the Court denied that motion.  Their renewed motion for temporary restraining order and preliminary injunction filed on April 21, 2006 was never ruled on and came after LSA and the Special Committee had already agreed in principle upon a final tender offer price of $85.50.

The Special Committee gave final approval to that share price two days later on April 23, 2006.  LSA gave their approval on the early morning hours of April 24, 2006.

In the Defendants' view, Plaintiffs' motion relies entirely upon the universally rejected argument, ***post hoc, ergo proctor hoc***.[4]  Such an argument in a case of this nature is particularly absurd because "in virtually every successful tender offer, the acquiring company increases its initial offer price.  That is the nature of any bargaining process."  (Opp., p. 26)  In support, counsel cites to an article by Elliott J. Weiss and Lawrence J. White, "File Early, Then Free Ride:  How Delaware Law (Mis)Shapes Shareholder Class Actions,"  57 Vand. L. Rev. 1797 (2004).  (McGuckian, Ex. E)  In Defendants' view, Plaintiffs' counsel are attempting to "free ride" on the efforts of the Special Committee to negotiate the **inevitably** higher price.  (Defendants' Opp., p. 26, 27; citing *In re Cox Communications, Inc., S'holders Litig.*, 879 A.2d 604, 622 (Del. Ch. 2005))

Defendants deny that the language in the Memorandum of Understanding (MOU) and the Stipulation of Settlement (Stipulation) entitles the Plaintiffs to any fees.  The language of the Stipulation was carefully chosen.  The use of the phrases "were factors that contributed to" and "were taken into consideration" when referring to the Plaintiffs' claims as they related to decisions made by LSA and the Special Committee reflects only that those matters were **considered**, not that they were given any **weight**.  In their view, a causal connection can only be established if the factors are given weight.

The Defendants assert that the evidence in the record demonstrates that particularly as it related to the initial increase from $75 to $82, the Plaintiffs' efforts had zero impact.  In their view, there can be no doubt that the workings of the marketplace alone caused the initial offer to increase from $75 to $82.  The market price of LNA's stock jumped to over $82 the

---

[4] "After this, therefore, because of this."

very day LSA announced the offer and before any lawsuits were filed.  Except for the drop of less than a point on February 13 and 14, 2006, the stock never retreated below $82 before an agreement was reached on April 23, 2006.  As of that date, the stock was trading at $84.88. (McGuckian, Ex. G)

The Defendants further note that to the extent counsel are seeking recovery under the "corporate benefit" doctrine, an extension of the common fund doctrine recognized by Delaware and certain Federal courts, Maryland has never recognized that doctrine.  The corporate benefit doctrine extends the common fund doctrine to cases where a non-pecuniary benefit is created for the corporation, in which event no fund is established.

Finally, defense counsel argue that assuming the Plaintiffs could establish any entitlement to an award of fees, the fee requested herein is unreasonable.  Even assuming the Plaintiffs' efforts were a cause of an increase in the tender offer, those efforts cannot be separated from the efforts of the Special Committee.  It would be impossible to calculate how much of the benefit was created by Plaintiffs and how much was created by the Special Committee.  Under such circumstances, the Defendants assert a "percentage of the fund" is an unreasonable approach to determine a reasonable fee.  The only appropriate methodology is the pure Lodestar approach.  Further, regardless which method is used, citing *United Cable TV of Baltimore v. Burch*, 354 Md. 658 (1999), the Court must examine and determine the fee to be reasonable under Rule 1.5(a) of the Maryland Rules of Professional Conduct.

Under that Rule, the Defendants assert, at best, a modest fee is warranted.  Most of the litigation involved forum shopping and jockeying for the lead counsel position and little involved litigating the substance of the claims.  There was nothing novel or difficult about the issues raised in the case.  Not one of Plaintiffs' motions was granted.  The only disclosure

benefits that they obtained were minor clerical corrections.  Given the minimal substantive work, it is unlikely that this employment precluded Plaintiffs' counsel from accepting employment in other cases.  Comparing the fees requested to fees customarily charged, based upon the total number of hours claimed in this case, the average hourly fee if the total award were granted would be $2,670 per hour.  Although the fee was contingent, given the nature of this transaction, Plaintiffs' counsel took no risk and seek a "free ride" on the work of the Special Committee and the natural dynamics of the marketplace.

For all of the above reasons, they argue the petition for attorneys' fees herein should be denied or at most a modest fee should be awarded.

## ANALYSIS

### A.  The fund.

As noted, the Plaintiffs seek an award of fees under the common fund doctrine.  The Defendants suggest there is no fund from which the Court can make an award, and therefore, the doctrine does not apply.

As part of the settlement of Plaintiffs' claims, the Defendants in the Stipulation of Settlement expressly agreed to pay any amount awarded by the Court in connection with the Plaintiffs' petition for attorneys' fees.  The agreement to pay these fees directly benefited the Defendants.  By eliminating any necessity that the "fund" (resulting from the increase in the price per share under the tender offer) be held pending a determination of the amount of attorneys' fees, the Defendants were able to proceed without delay to close on the tender offer and conclude the merger.  Under those circumstances, the pecuniary benefit to the corporation is not measured simply by the increase in the aggregate amount of the tender offer, whether

$383 Million Dollars or $169 Million Dollars, but rather the aggregate increase is $383 Million Dollars or $169 Million Dollars plus "X," "X" being equal to the unliquidated amount of attorneys' fees payable to Plaintiffs' counsel.  In the Court's view, that portion of the fund, "X," although unliquidated, remains available for distribution pursuant to an order of the Court.

The Defendants' reliance upon *Christianson v. Kiewit-Murdock Inv. Corp.*, 815 F.2d. 206 (2d Cir. 1987) is misplaced.  The facts therein are inopposite.  There, plaintiffs, holders of certain stock in Continental Group, Inc. (Continental) brought suit against the Kiewit Corp. (Kiewit) and others to compel Kiewit to purchase their stock.  Continental had been merged into a subsidiary of Kiewit, KMI Continental, Incorporated (KMI).  Under the terms of the agreement, most stockholders in Continental received cash for their stock.  The plaintiffs, and other stockholders similarly situated, received stock in KMI in lieu of cash.  The plaintiffs argued that the new stock in KMI was worth less than their old stock and sought an order compelling Kiewit to purchase their stock for cash.  While the suit was pending, the defendants issued a cash tender offer for all stock held by persons in the plaintiffs' class.

Although the new tender offer was for less per share than the plaintiffs were seeking, they filed a motion to dismiss their complaint as moot, contending that the tender offer was substantially the same as the relief they had sought.  At the same time, they filed a motion seeking attorney's fees.  The District Court granted their motion to dismiss but denied the motion for attorney's fees.  In response to their argument that they were entitled to fees under the common fund doctrine, the Court found no fund had been created.  Unlike the instant case, the defendants did not enter into any settlement agreement and did not, pursuant to any such agreement, agree to be responsible for any fees the Court might award.

### B.  Meritorious Claims.

The Defendants assert that the Plaintiffs must establish that their claims were meritorious when filed, citing *Allied Artists Pictures Corp. v. Barron*, 413 A.2d 876 (Del. 1980) and *Wittman v. Crooke*, 120 Md. App. 369 (1998).  While the Plaintiffs maintain their claims were meritorious when filed, they dispute the need to establish that fact.  The facts of both cases relied upon by Defendants are distinguishable from the instant case.

In *Allied Artists*, judgment was entered in favor of the defendant corporation and against the plaintiff upon motion for summary judgment.  Thereafter, the plaintiff noted an appeal.  The plaintiff had filed an action challenging the elections of certain directors to Allied's Board.  While the case was on appeal, Allied and two other corporations merged into a new corporation, Allied Artists of Delaware, Inc.  As a result of the merger, Allied's former board of directors was dissolved.  In light of that action, the Court *sua sponte* dismissed the appeal as moot.  Following the dismissal of the appeal, counsel for the plaintiff urged the Court of Chancery in Delaware to award the plaintiff counsel fees notwithstanding the entry of judgment in favor of the defendant and dismissal of the appeal.  While the Court did hold the plaintiff must demonstrate their claims were meritorious when filed to be entitled to recover attorneys' fees, the case involved a losing plaintiff.

Similarly, in *Wittman v. Crooke*, 120 Md. App. 369 (1998), the Court granted the defendant's successive motions to dismiss the plaintiff's complaint and amended complaints. Notwithstanding that the plaintiff's complaint and amended complaints were dismissed, plaintiff sought an award of attorney's fees.  The plaintiff, who owned 300 shares of Baltimore Gas & Electric (BGE), asserted that one or more of her complaints had triggered certain curative proxy disclosures issued in connection with BGE's planned merger with

Pepco.  The trial court denied the petition for fees finding that the complaints were not meritorious when filed.  The plaintiff appealed.  Citing *Allied Artists Pictures Corp. v. Barron*, the Court of Special Appeals then set forth "The standards applied to determine whether a **losing** plaintiff is entitled to attorney's fees from a defendant…."  (emphasis added) *Wittman*, at 379.

Both of the cited cases involved losing plaintiffs.  One lost on motion for summary judgment, the other on a motion to dismiss.  Ultimately, their claims were dismissed as moot without reaching any settlement agreement with the defendants.

In the instant case, while the Court had denied an initial motion for a temporary restraining order, all other claims for relief, including a renewed request for a temporary restraining order, were pending before the Court at the time that the parties entered into the settlement agreement.  The Plaintiffs' claims were subsequently dismissed pursuant to that settlement agreement wherein the Defendants acknowledged that the Plaintiffs' actions were a factor that they considered in increasing the final tender offer.  Under the circumstances, the Plaintiffs herein cannot fairly be described as losing.

While the law of Maryland requires a losing plaintiff to establish that their suit was meritorious when filed before an award of fees may be made, the law does not require that that standard be applied to a plaintiff who dismisses his claim pursuant to a settlement agreement with the defendant.  Where the defendant enters into a settlement agreement, reason and logic suggest the defendant believed plaintiff's claims had some merit.  Under such circumstances, the Court should not have to devote substantial resources to deciding whether the defendant was correct.

In their reply brief, Plaintiffs cite *Savoie v. Merchants Bank*, 84 F.3d 52 (2d Cir. 1996), noting that the Court of Appeals for the 2nd Circuit has declined to impose the requirement that the claim be meritorious when filed even in a mootness situation.  The Court explained:

> In deciding motions to dismiss for failure to state a claim under the federal securities laws, courts regularly resolve far-reaching and complex questions of law.  In a case that has become moot, the parties do not have the same incentive to fully litigate the issues and develop the record, because the only real-world consequences remaining are matters collateral to the merits of the suit.  Accordingly, we do not consider it advisable to decide difficult questions involving the securities laws in cases that have become moot.  Rather than undertake a detailed assessment of the complaint, we focus on whether the lawsuit played a substantial role in the defendant's decision to take corrective action.

> (internal citations omitted) (*Savoie*, at 57)

A case cited by Defendants for a different proposition, *Cox Communications, Inc., S'holders Litig.*, 879 A.2d 604 (Del. Ch. 2005) is also of interest on this subject.  Although not directly on point because the party objecting to the request for attorney's fees had no financial interest at stake, the court's rationale in declining to apply the "meritorious when filed" test of *Allied Artists* is instructive:

> One can easily imagine situations when it is highly debatable whether a complaint would survive a motion to dismiss and the uncertainty of that proposition is what drove a favorable settlement for the class.  To have an objector come forward and concede that the settlement was favorable but contest the fee under *Dann* would be inequitable and serve no proper purpose.  And think of what it would require of the court- replicating the intensive rigor of a formal Rule 12(b)(6) opinion-but in a situation when the party asking for that effort has nothing at stake.

> This is not to go to the other extreme and to say that the objectors have no standing to comment on the requested fee at all.  They, of course, do.  Stockholders have a cognizable interest in the integrity of the representative litigation process and in ensuring that it functions in a manner that generates benefits for its intended beneficiaries, and not windfalls to attorneys.

> This interest, however, is protected in two other ways that are sufficient. Most important, of course, is the requirement that the court examine the substantive fairness of a proposed settlement itself.  This judicial duty polices misconduct at the expense of class members, although it is not without its imperfections.  The other related procedure is the court's consideration of what fee to award.  In Delaware, the most important factor that drives the court's award of fees is the court's assessment of the benefit that the plaintiffs have created.  In effect, this second protection that objectors seek through *Dann,* but with improved nuance.

Even where the objector has a financial stake, when the parties to the litigation have entered into a settlement agreement, the Court finds there is much merit to this argument.

The requirement that a plaintiff's claim be meritorious when filed is inextricably linked with the requirement that a plaintiff's claim be a cause of the benefit to the corporation. As explained in *Cox*, the requirement that the complaint be meritorious when filed results from the Delaware court-created presumption that when a defendant takes an action subsequent to the filing of a lawsuit, that action was caused by the filing of the suit.  The *Cox* Court citing to *Chrysler v. Dann*, 223 A.2d 384 (Del. 1966), described the reason for creation of the presumption, and the related requirement that in the mootness context, the claim be meritorious when filed:

> The difficulty in (the mootness) context is determining whether the action that the defendants took really resulted in any proximate way to the pendency of the derivative action.
>
> In those circumstances, Dann formulated a method by which the Courts could distinguish between those situations where the plaintiffs deserved a fee for producing a benefit by their litigation efforts and those where they did not. … To that end, when defendants voluntarily took action that satisfied the demand for relief in a lawsuit, it was thought necessary to presume that the defendants took that action in part because of the lawsuit, because only the defendants would know their true motivation.  But use of that presumption in isolation threatened to encourage meritless suits, and thus threaten the countervailing policy interest in avoiding burdening stockholders and the public with the cost of complaints filed 'for the sole purpose

of obtaining counsel fees.'  To balance these objectives, Dann said, our courts require that the plaintiff seeking a fee award must meet the following test before availing itself of the presumption that its action caused a fee-generating benefit:

> To justify an allowance of fees, the action in which they are sought must have had merit at the time it was filed.

Logic and reason suggest that where the plaintiff and the defendant enter into a settlement agreement, causation in fact is much more likely, as well as apparent.  Therefore, the need to prove the claim is meritorious when filed is substantially reduced.  Numerous courts, however, have expressed a concern about collusion between counsel at the expense of the litigants in such situations.  The concern expressed is that where the cost of the attorney's fees is passed on to the members of the class, counsel for the defendants have little or no reason to contest plaintiffs' claim that their lawsuit was a cause of the defendants' subsequent action.  Accordingly, notwithstanding such an acknowledgement in a settlement agreement, the courts should scrutinize these agreements.  Where the defendants agree to be directly responsible for such fees, the likelihood of them entering into such a collusive agreement is also substantially reduced.  The Defendants herein are contesting the Plaintiffs' petition for fees with great vigor.  Under the circumstances, the Court finds Defendants' acknowledgment in the settlement agreement that the Plaintiffs' actions were a factor in arriving at the final tender offer should be taken at face value, and Plaintiffs are not required to prove that which Defendants have impliedly conceded.

On a final note, the Plaintiffs in their Reply point out that at least as it relates to LSA, the Defendant asserts that the claim should be dismissed because of lack of jurisdiction. Before the Court could rule on the motion to dismiss on those grounds, the Plaintiffs would be entitled to take discovery on that issue.  If the Court is required to determine whether the

Plaintiffs' complaint can survive a motion to dismiss, this would require the Court notwithstanding the settlement to permit the parties to engage in additional discovery, and no doubt the litigation attendant thereto, on the limited issue of jurisdiction. This seems an unnecessary and unwise use of limited judicial resources.

For all of the above reasons, the Court shall not apply the "meritorious when filed" requirement to the motion for fees filed herein.

### C.  Causation.

In claiming that the litigation was a cause of the benefit created for the corporation, the Plaintiffs rely heavily upon the causal presumption recognized by the Courts of Delaware and other states.  "Courts have recognized that where a benefit to a class is conferred by defendants after commencement of litigation seeking said benefit, there is a rebuttable presumption that there is a causal link between the lawsuit and the subsequently conferred benefit."  (Plaintiffs' Motion, p. 25)  The reason for the presumption having been discussed above, the Court shall not repeat it here.

The Plaintiffs argue that the Defendants have not met their burden to rebut the presumption.  Particularly as it relates to the increase from $75 to $82, Plaintiffs acknowledge that credit for that result must be shared with the SC.  The increase in the tender offer to $82 did not come until the SC had recommended against the shareholders tendering their shares in response to the initial offer of $75.  Plaintiffs suggest, however, that since the tender offer and subsequent merger were not conditioned upon a favorable recommendation from the SC that they were, in fact, a toothless tiger.  It was only the Plaintiffs' litigation which gave the SC real leverage.

28

They point to the fact that the increase to $82 came only two business days after their motion for a temporary restraining order was heard.  Even though it was denied, the Court did so based only upon a failure to demonstrate "irreparable harm" finding that if Plaintiffs were harmed, they would have a claim for damages.  The Court went on to say "… Clearly you have something to talk about based upon the facts as plead.  In that, I concede."  (Kornreich, Ex. S, p. 68).  It must be noted, however, that statement followed the Court's disclaimer that given the volume of pleadings and their recent arrival it would "be very difficult to intelligently" address the "likelihood of success" requirement "with any precision."  *supra.* Apart from the TRO, the Plaintiffs suggest that their other contributions consisted of placing information in the public domain detailing the nature of their complaints and obtaining an expert financial analysis of the tender offer which they shared with the Special Committee and LSA.

With respect to the second increase in the tender offer from $82 to $85.50, in addition to the presumption of causation, the Plaintiffs assert they were directly involved in the negotiations leading to that increase.  Also, the Defendants acknowledge in the Stipulation the Plaintiffs were a factor in arriving at the "Final Offer."  The Court notes that only the "Final Offer" is mentioned in paragraph three of the Stipulation.  No reference is made to the intermediate offer of $82.  Presumably the Defendants intended thereby only to give the Plaintiffs limited credit for the increase from $82 to $85.50 and not for the earlier increase.

Relying upon *In re Infinity Broad. Corp. S'holders Litig.*, 802 A.2d 285 (Del. 2002), Plaintiffs argue that there is no requirement that they were the sole cause of the benefit conferred on the corporation.  Even though the SC may be entitled to some, perhaps even

significant, credit for the ultimate result, to the extent that the Plaintiffs were a cause of the benefit, they are entitled to compensation.  This fact is not really disputed by the Defendants.

As discussed earlier, the Defendants maintain the only thing the Plaintiffs can establish is a temporal relationship and the Court should reject their ***post hoc, ergo propter hoc*** argument on causation.  Opp., at p. 24.  Defendants assert that if that argument is adopted in this case, then "in every successful going private transaction" like the instant one, the Court will be required to award Plaintiffs' counsel fees regardless of how frivolous the complaint.  Opp., at p. 25.  In their view, Plaintiffs' counsel are attempting to "free ride" on the work of the Special Committee and the normal course that tender offers take.  In support of that argument, they cite Elliott J. Weiss and Lawrence J. White, "File Early, Then Free Ride: How Delaware Law (Mis)Shapes Shareholder Class Actions."  57 Vand. L.R. 1797 (2004).

The Weiss-White article is based upon a study of "all merger-related class actions filed in Delaware Chancery Court with respect to mergers announced between July 1, 1999 and December 31, 2001."  *Id.,* at 1806.  The study was further limited to mergers involving at least $100 Million Dollars.  (Fn. 31)  The authors' analysis of those cases lead them to conclude that "Delaware law relating to mergers and class actions created a litigation environment that was rife for opportunistic behavior by the plaintiffs' bar; that plaintiffs' attorneys generally responded by behaving opportunistically; and that Delaware's courts did not effectively protect corporations or their shareholders from the resulting litigation-related agency costs."  *Id*., at 1806.

The authors additionally suggest that particularly in sales of control involving alleged conflicts of interest "Delaware law promotes a … transactional dynamic" which "effectively discourages the potential acquirer from initially placing its best offer on the table."  *Id*. at

1817, 1818.  In their view, whether the transaction is one involving a controlling shareholder or management buyout (MBO), it is generally understood that the company to be acquired will appoint a special negotiating committee (SNC).  Regardless of "whether the SNC actually bargains vigorously on behalf of the public shareholders or only goes through the motions, evidence that the SNC succeeded in negotiating a higher price will make it much more likely that a court will find that the SNC met its fiduciary obligation, and that the price to which it agreed was entirely fair.  Consequently, the price agreed to by the SNC in most (if not all) squeeze-outs and MBO's will be higher than the price initially offered, regardless of whether any given SNC was an effective advocate for the interest of the target public shareholders."  *Id*. at 1818.

The authors reasonably assume that Plaintiffs' counsel practicing in Delaware are well aware of this transactional dynamic.  That dynamic combined with the presumption, under Delaware law, that any action taken by the Defendants subsequent to the filing of a lawsuit was caused by the lawsuit, provides strong incentive for attorneys to rush to court to file "boiler plate" lawsuits alleging conflicts of interest, breaches of fiduciary duty and unfair offer prices.  In almost every case, Plaintiffs' counsel can reasonably anticipate that the final price recommended by the SNC will be higher than the original offer price, and they will be entitled to a percentage of the increase, the benefit, as their fee.  Further, by simply supplying the SNC with copies of the complaint and a financial analysis by Plaintiffs' experts, they can buttress their claim that they are entitled at least some credit for the ultimate price agreed to by the SNC.

The authors' analysis of the sale of control cases during the three year period suggested to them that the law had fostered an unhealthy symbiotic relationship among

counsel for the parties.  In their view, "Delaware law gives plaintiffs' attorneys strong incentives to sign a memorandum of understanding ("MOU") regarding their acquiescence in whatever deal an SNC has negotiated, so long as (a) that deal involves a price greater than the price originally offered, and (b) defendants acknowledge in the MOU that plaintiffs' attorneys' efforts 'contributed' to the price increase."  *supra*.  With such an MOU in hand, the SNC and defendant can have a high degree of confidence that the settlement will be approved.  At the same time, plaintiffs' counsel can have a high degree of confidence that they will receive a substantial fee award.

In their study, the authors found "[E]very settlement that we examined in a case where plaintiffs' attorneys agreed to the fairness of the increased price that had been negotiated by an SNC included such an acknowledgement by the defendants."  *Id*., at 1819, fn. 79.  Conversely, the authors observe that Delaware law discourages plaintiffs' counsel from challenging an increased price agreed to by the SNC.  Because of the burdens imposed under Delaware law, such challenge would require the plaintiffs' attorneys to incur substantial costs with little assurance of victory.

There were 564 mergers between 1999 and 2001 where the target company was a publicly traded Delaware company and the value of the transaction exceeded $100 Million Dollars.  Of the 564 mergers, 104 were challenged.  *Id.*, at 1823.   Those that drew challenges tended to be larger, involve all cash offers, and potential conflict situations.  Of the 104 challenged mergers, 48 were settled, 54 were dismissed and 2 were pending as of publication. *Id.*, at 1827.

The authors found some characteristics of the litigation were notable and provided support for their conclusions.  One of the most striking facts was the speed with which the

plaintiffs filed their complaints.  In 74 percent of the challenged cases, the complaint was filed within one business day.  In 80 percent of the cases, the complaints were filed within two business days.  Each challenged transaction drew an average of 5 separate lawsuits.  This suggested to the authors that the lawsuits were being filed by counsel with little or no investigation and little consultation with or input from the client.  *Id*. at 1827, 1828.

Of the 54 dismissed cases, 51 were dismissed voluntarily before the courts addressed the merits of the claims.  Few of those involved significant litigation efforts beyond the filing of the complaint and amended complaints.  Of the 48 settlements, the monetary recoveries averaged a 15.6 percent price improvement over the initial offering price.  The median was 12.6 percent.  Where an SNC was involved, plaintiffs' counsel rarely claimed a major share of the credit for the improvement and in **none** of the cases in the study did counsel challenge the price agreed to by the SNC.  *Id*. at 1828.

For settlements that involved no monetary recovery, the average legal fees awarded were $492 per hour with a median fee of $472 per hour.  For settlements that involved monetary recovery, the average fee was equal to $1,800 per hour.  The median fee was equal to $1,240 per hour.  *Id*. at 1830.  Since claims involving a non-pecuniary benefit can be just as difficult, just as important to the class, and just as hard fought, this enormous disparity in what is deemed to be a "reasonable fee" in the two types of cases suggests perhaps too much weight is given to the size of the recovery in pecuniary benefit cases.

The authors also found that for the 31 settlements where a monetary recovery was achieved, the average aggregate fee as a percentage of the total recovery was 4.6 percent.  The fees ranged from .01 percent to 29.6 percent.  The median fee was 1.9 percent.  Also importantly, the fee as a percentage of the total value of the transaction was on average .19

percent with a range of .005 percent to 1.36 percent.  The median was .12 percent.  *Id*. at 1831.  While the fees are typically substantial as viewed by counsel, as a percentage of the total value of the transaction, the cost is relatively trivial.  Therefore, defendants may be tempted to buy their way out of frivolous lawsuits.

The authors did note that cases involving tender offers by a controlling shareholder, such as the instant one, tended to result in more substantive litigation because the law concerning such transactions was relatively unsettled during the period studied.  *Id.*, at 1841.  The authors also acknowledge that their analysis does not definitively answer the question of whether the lawsuits they studied actually produced improvements in the terms of the merger or involved no more than "fee riding" by plaintiffs' attorneys on the efforts of the SNC's.  *Id.*, at 1851.

As a result of their analysis and findings, the authors make a number of suggestions.  In their view, the most important of those is that the "Delaware courts should begin to review far more rigorously requests for attorneys' fee awards."  *Id.*, at 1860.  As part of that review, they argue two changes are **essential**.  First, the presumption that any benefit realized after a lawsuit was filed was caused by the suit should be reconsidered by the Delaware Supreme Court.  The best solution they suggest would be for the Court to eliminate the presumption.  The second essential change is that the Court take into consideration the litigation dynamic demonstrated by the study and where counsel appear to be "free riding" on the efforts of others, award little if anything to them for their efforts.  *Id.*, at 1860.

The results of this study persuade the Court that certain aspects of Delaware's law create a strong incentive for attorneys to race to the courthouse to file lawsuits that may or may not have merit and for some attorneys to attempt to "free ride" on the efforts of others, in

particular, special committees.  The largest incentive is provided by the presumption under Delaware law that all actions undertaken by the Defendants after the suit was filed were caused by the filing of the lawsuit.  While the presumption serves a valuable public purpose, discussed earlier herein, the Court believes that the concerns raised by Professors Weiss and White need to be addressed, at least in cases involving tender offers.

In light of the above, the Court shall adopt and apply a modified version of Delaware's presumption of causation.  Under Delaware law, the presumption that the defendants' action was caused by the earlier filed suit is a rebuttable presumption.  In a case of this nature involving a tender offer for stock of a publicly traded corporation, the Court holds that the Defendants can rebut the presumption as a matter of law to the extent that the increase in the offer price reflects an increase in the price for shares of the target company measured at the end of the second business day[5] following the announcement of the tender offer.  To the extent the increased offer price exceeded the share price at the end of the second day, the excess still would be presumed to have been caused by the Plaintiffs' efforts.

As it applies to the facts of this case, LSA announced its initial tender offer of $75 per share on February 6, 2006.  Prior to the announcement, the stock was trading at $64.25 per share.  Following the announcement, the price per share jumped to $82.14 at the close of trading on Monday, February 6, 2006, and at $82.15 per share on Tuesday, February 7, 2006. (McGuckian, Ex. G)  Under the rule adopted by this Court, by establishing that the price of the stock jumped to over $82 per share by the close of business on February 7, 2006, the Defendants have rebutted the presumption that the filing of Plaintiffs' lawsuits caused them to

---

[5] Depending on the time of day a transaction was announced, a single day in some cases might not reflect the market's assessment of the merits of the transaction.  Therefore, the court opted for two days to allow the market time to assess the economic merits of the transaction.

increase the tender offer to $82.  Therefore, the burden of proof falls upon the Plaintiffs to establish upon the evidence that their efforts were, in fact, a cause of the increase to $82.

In the Court's view, such a refinement preserves the public policy interest served by the presumption but addresses the concerns raised by Professors Weiss and White by taking into consideration the realities of the marketplace.  The market in which these stocks are bought and sold is extremely sophisticated.  The large investment houses, representing institutional investors, have the resources to rapidly analyze, disseminate and take action in response to significant events.  Two days will allow the market sufficient time to analyze and react to the economics of the proposed transaction.  The two day hiatus will also reduce the incentive for plaintiffs' attorneys to rush to the courthouse with boilerplate complaints.  By diminishing the ability of counsel to "free ride" on the natural forces of the market and the work of the special committees, it will increase the incentive to file only meritorious cases.

In the present situation, the market's reaction to LSA's announcement as reflected by the closing share price on February 6, 2006, could not have been caused by any action on the part of the Plaintiffs.  Rather it reflected the market's assessment of the economic value of the proposed transaction.  With the exception of possibly one suit almost certainly filed after hours on February 6, none of the suits were filed until February 7, 2006.  Having arrived at that price level, the stock remained at $82 or higher except for two days where it traded briefly at $81.62 and then rose to $81.94 the following day.  On April 4, 2006, when LSA announced that it would raise the tender offer to $82 per share, the stock was trading in the market at $85.18.

In addition, the increase did not occur until after the Special Committee had recommended against the initial offer of $75.  As described by Professors Weiss and White, in

cases involving a special committee, the first offer is rarely the real price that the tenderer is prepared to pay.  The tenderer increases the offer after the committee has been appointed in part as a mechanism to demonstrate to the Court down the road that the special committee acted responsibly on behalf of the shareholders.

There is no evidence from which the Court can reasonably conclude that the disclosure of the information contained in the lawsuits filed herein, the unsuccessful litigation efforts, and the sharing of the Plaintiffs' expert's financial analysis with the Special Committee and counsel for LSA had any impact on the Defendants' decision to raise the share price to $82. Accordingly, with respect to the initial increase, the Court finds that the Plaintiffs have not met their burden of establishing that that increase was a cause of their efforts and therefore are not entitled to claim a fee from that portion of the fund under the common fund doctrine.

With respect to the Defendant's decision to increase the offer from $82 to $85.50, the Court holds that the Plaintiff is entitled to the presumption recognized under Delaware law that their efforts were a cause of the Defendants' actions.  The Court further finds, particularly in light of Plaintiffs' counsel's direct participation in the negotiations leading to the final offer, as well as the Defendants' acknowledgement in the Stipulation of Settlement, that the Defendants have failed to rebut that presumption.  Even absent such a presumption, in light of the above evidence, the Court finds the Plaintiffs have established their efforts were a cause of the increase from $82 to $85.50.  Accordingly, the Court finds that the Plaintiffs are entitled to recover attorneys' fees as a result of the benefit created for the members of the class resulting from the increase in the share price from $82 to $85.50 per share, an aggregate increase of $128 Million Dollars.

**D.  Reasonableness of the fees.**

The Plaintiffs seek fees in the amount of $12 Million Dollars and costs in the amount of $90,172.06.  They argue that their fee request is an "eminently fair and reasonable" fee award.  (Plaintiffs' Motion, p. 5.)  They assert that the appropriate method for the Court to use in determining the reasonableness of the fees is a blended approach, measuring the fee first as a percentage of the common fund and then using a Lodestar cross-check.

The Defendants argue that because it is impossible in this case to determine how much of the benefit is attributable to the Plaintiffs and how much is attributable to the Special Committee, a pure Lodestar analysis must be undertaken.  The Court disagrees.  The percentage of the benefit with a Lodestar cross-check is frequently used by the Courts in shared credit cases and is the appropriate method to be used in this case.  In *United Cable TV of Balt. vs. Burch*, 354 Md. 658, at 687 (1999), the Court of Appeals approved a similar approach noting that the employment of such methodology was within the discretion of the Court.

Using the blended approach, Plaintiffs argue that a fee of $12 Million Dollars representing only 9 percent of the benefit, is, if anything, below the percentage typically awarded by courts in similar cases involving shared credit.  (See Plaintiffs' Motion, p. 41, 44).  One of the cases they rely upon most heavily is *In re Digex S'holders Litig.*, 789 A.2d 1176 (Del. Ch. 2000).  There Chancellor William Chandler approved a $12.3 Million Dollar fee in a shared credit case representing approximately 7.5 percent of the $165 Million  Dollar fund.  The plaintiffs' attorneys in *Digex* were seeking fees in the amount of $24.75 Million Dollars.  They had invested in the case approximately 4,150 hours.  Based upon their hourly rates, this equaled to a Lodestar fee of approximately $1.4 Million Dollars.  They also had expended

approximately $580,000 in costs.  Chancellor Chandler noted that in similar cases the fee as a percentage of the fund averaged approximately 15 percent.  As the size of the fund increased, the fees as a percentage of the fund tended to decrease.  In mega fund cases, cases in which the fund exceeded $100 Million Dollars, the range of fees as a percentage of the fund was generally 3 to 7 percent.

In granting a fee of $12.3 Million Dollars, Chancellor Chandler agreed that it was an extraordinary fee.  Except for one other, it was the highest fee he had ever awarded.  Nevertheless, he felt it was warranted because of the extraordinary result that counsel had achieved, a result that had been accomplished with speed and efficiency.  The transcript of the fee hearing in that case reveals that Plaintiffs' counsel was unusually creative in finding a way to generate the $164 Million Dollar benefit for the shareholders in that case.  Although opposing the full fee request, the Special Committee agreed Plaintiffs' counsel should receive a fee of $8.25 Million Dollars which was equivalent to an hourly rate of $2,000.  (Kornreich, Ex. X, p. 130).  Chancellor Chandler also observed that the total benefit created for the corporation in that case was approximately $450 Million Dollars.  Counsel were seeking partial credit for only $164 Million Dollars of that total.  Further, of the $12.3 Million Dollar award, $580,000 included costs awarded, so that actual fees awarded amounted to $11.72 Million Dollars, 7.1 percent of the $164 Million Dollar fund.

In explaining his reasons for the size of the award, Chancellor Chandler refers to "… the table of settlements and fee awards that is referenced in the Third Circuit's recent *Cendant* Opinion,[6] where the court … indicated that in mega fund recoveries …the typical common fund percentage awarded is in the range of anywhere from 3 to 7 percent."  (Kornreich, Ex. X, p. 145-146).

---

[6] *In Re:  Cendant Corporation Prides Litig*., 245 F3d. 722 (2001).

In the case of *In re Cendant Prides Litig.*, 243 F.3d 722 (2001), the Third Circuit

Court of Appeals observed that the fees awarded in the mega fund cases they found ranged

from 2.8 percent to 36 percent of the total settlement fund.  They produced a chart of their

findings showing the case, the amount of the settlement, and the fee expressed as a percentage

of the recovery and, where available, the Lodestar multiplier:

| CASE | Settlement | Fees as % of Recovery | Lodestar Multiplier |
|---|---|---|---|
| *In re Cendant Corp. PRIDES Litig.*, 51 F.Supp.2d 537 (D.N.J. 1999) | $341.5 million | 5.7% ($19.3 mil.) | 7-10 |
| The instant case under review here. | | | |
| *In re Cendant Corp. Litig.*, 109 F.Supp.2d 285 (D.N.J.2000) | $3.16 billion | 8.275% ($262 mil.) | 32.7 |
| *In re Auction Houses Antitrust Litig.*, 2001 WL 170792 (S.D.N.Y. Feb. 22, 2001) | $512 million | 5.2% ($27 mil.) | Inf. not available |
| *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 2000 WL 1622741 (E.D.Pa. October 23, 2000) | $100 million | 12% | Inf. not available |
| *In re Prudential*, 106 F.Supp.2d 721 (D.N.J.2000) [FN23] | $1.8 billion | 5% ($90 mil.) | 2.13 |

| | Settlement | | Lodestar Multiplier |
|---|---|---|---|
| *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D.Pa.2000) | $111 million | 30% | 2.7 |

| CASE | Settlement | Fees as % of Recovery | Lodestar Multiplier |
|---|---|---|---|
| *Shaw v. Toshiba America Inf. Sys., Inc.*, 91 F.Supp.2d 942 (E.D.Tex. 2000) | $2.1 billion | 7% ($147 mil.) | Inf. not available |
| *In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393 (S.D.N.Y.1999) | $116 million | 27.5% ($32 mil.) | 2.5 |
| *Kurzweil v. Philip Morris Co.*, 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123.8 million | 30% ($37.1 mil.) | 2.46 |
| *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403 (S.D.Tex.1999) | $190 million | 25% | 1.35 |
| *In re Copley Pharm., Inc.*, 1 F.Supp.2d 1407 (D.Wyo.1998) | $150 million | 13% ($19.5 mil.) | 2 |
| *In re PaineWebber Ltd. P'ships Litig.*, 999 F.Supp. 719 (S.D.N.Y.1998) | $200 million | 13% ($25.9 mil.) | 1.4 |
| *Walco Investments, Inc. v. Thenen*, 975 F.Supp. 1468 (S.D.Fla.1997) | $141 million | 15% ($21 mil.) | 1.8 |

| CASE | Settlement | Fees as % of Recovery | Lodestar Multiplier |
|---|---|---|---|
| *In re Combustion Inc.*, 968 F.Supp. 1116 (W.D.La.1997) | $127 million | 36% | 2.99 |
| *Local 56, United Food & Commercial Workers Union v. Campbell Soup Co.*, 954 F.Supp. 1000 (D.N.J.1997) | $114.5 million | 2.8% ($3 mil.) | 2.39 |
| *Bowling v. Pfizer, Inc.*, 922 F.Supp. 1261 (S.D.Ohio 1996), *aff'd* 102 F.3d 777 (6th Cir.1996) | $102.5 million | 10% ($10.2 mil.) | Inf. not available |
| *In re Domestic Air Transportation Antitrust Litig.*, 148 F.R.D. 297 (N.D.Ga.1993) | $305 million | 5.25% ($14.3 mil.) | Inf. not available |
| *In re MGM Grand Hotel Fire Litig.*, 660 F.Supp. 522 (D.Nev.1987) | $205 million | 7% | 1-2.95 |

In *Cendant*, the trial judge had awarded a fee of $19.3 Million Dollars, representing 5.7 percent of the fund.  While based upon a review of the chart at first glance the award seemed reasonable, the Third Circuit opined that reasonableness could not be determined based solely upon the percentage.  Instead, the court had to examine the fee "through the seven factor lens of *Gunter*."  243 F.3d 722, at 738.

In *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000), the court identified seven factors that the courts should look at, among others, in analyzing whether a fee request based upon the percentage of the award is reasonable.  They are:

(1)  The size of the fund created and the number of persons benefited;

(2)  The presence or absence of substantial objections by the members of the class to the settlement terms and/or fees requested by counsel;

(3)  The skill and efficiency of the attorneys involved;

(4)  The complexity and duration of the litigation;

(5)  The risk of non-payment;

(6)  The amount of time devoted to the case by Plaintiffs' counsel; and

(7)  The awards in similar cases.

The *Cendant* Court then applied those factors to the cases listed on their chart (excluding *In re Cendant Corp. Litig.,* 109 F.Supp. 285 (D. N.J. 2000) which was pending appeal before another panel on the Third Circuit).  The case of *In re Orthopaedic Bone Screw*, they noted, was a hard fought legal battle involving substantial discovery (1.5 million pages of documents) and 2,000 pretrial orders.  *In re Icon Office Solutions, Inc.* involved the expenditure of 45,000 attorney hours plus $3 Million in expenses and substantial legal obstacles.  *Shaw vs. Toshiba* required the attorneys to work 24 hours a day, 7 days per week, for an extended period of time.  Discovery involved approximately 2 million documents, many of which required translation.  Extensive travel was also required because the Defendants' headquarters was in Japan.  *In re Sumitomo Copper Litigation* involved 43,000 hours of attorney time and 11 million pages of documents.  There were numerous legal and factual complexities involved in the case.  *Kurzweil v. Philip Morris Co.* was the first

successful tobacco litigation.  Discovery included millions of documents and the review of

tens of thousands of deposition transcripts.  In addition, the case was once dismissed.  *In re*

*Copley Pharmacy* involved extensive discovery including approximately 125,000 pages of

documents.  It also involved the depositions of approximately 100 witnesses, a 42 day trial,

and required the expenditure of approximately 48,794 attorney hours.  *In re Paine Webber*

*Ltd. Partnerships Litig.* involved two years of litigation and approximately 70,000 attorney

hours.  *Walco Investments, Inc.* involved four years of exceedingly complex litigation.  *In re*

*Combustion, Inc.* involved 11 years of litigation, approximately 50,000 attorney hours.  There

were 160 complaints and 1,922 motions with 1,000 memoranda filed.  There were 285

depositions and 90 hearings.  *In re Domestic Air Transportation* involved an extremely high

risk of recovery because the Defendant was in a precarious financial position.  There were

substantial procedural hurdles to maintaining the action.  *In re MGM Grand Hotel Fire Litig.*

involved 1,400 depositions.  As well, the attorneys had recovered over 6,000 objects from the

fire site.

     After completing that review, the Court held that when viewed through the *Gunter*

seven factor lens, the trial judge's fee award of 5.7 percent was excessive.

> Indeed, in case after case, the same factors reoccur:  complex
> and/or novel legal issues, extensive discovery, acrimonious
> litigation, and tens of thousands of hours spent on the case by
> class counsel.  Because none of these factors which increase
> the complexity of class litigation was present here, it makes
> sense that the fee awarded in this case should be far lower than
> those awarded in the charted cases, which fees ranged from
> 2.8% to 36% of the total settlement.

> 243 F.3d 722, 741.

In addition to using the *Gunter* factors, the Court analyzed the fee award using a Lodestar crosscheck.  The Court noted that the fee awarded represented a Lodestar multiplier that was a minimum of 7.  The multipliers in the cases it had charted ranged from 1.35 to 2.99 percent.  Although the top of the range for the Lodestar multipliers in their chart was 2.99, the Court acknowledged that "multiples ranging from 1 to 4 are frequently awarded in common fund cases when the Lodestar method is applied."  243 F.3d. 722, 742.  (citations omitted).  On remand, they strongly suggested that the Lodestar multiplier should not exceed 3, and that a lower multiplier might be appropriate.

In the recent case of *In re Royal Ahold NV Securities and ERISA Litigation*, 461 F.Supp. 2d 383 (2006), cited by Plaintiffs, Judge Blake approved a fee of $130 Million Dollars which represented 12 percent of a $1.1 Billion Dollar cash settlement representing a 2.57 Lodestar multiplier.  416 F.Supp. 2d. 385.  Judge Blake used a similar analysis as the *Cendant* Court, but instead of the *Gunter* factors, used a 12 factor test adopted by the Fourth Circuit in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226, n. 28 (4th Cir. 1978):

> FN5.  The factors include:
>
> (1)  time and labor expended;
> (2)  novelty and difficulty of the questions raised;
> (3)  skill required to properly perform the legal services;
> (4)  attorney's opportunity costs in pressing the litigation;
> (5)  customary fee for like work;
> (6)  attorney's expectations at the outset of litigation;
> (7)  time limitations imposed by the client or circumstances;
> (8)  amount in controversy and results obtained;
> (9)  experience, reputation, and ability of the attorney;
> (10) undesirability of the case within the legal community
>        in which the suit arose;
> (11) nature and length of the professional relationship
>        between the attorney and client;
> (12) fee awards in similar cases.
>
> 461 F. Supp. 2d. 383, 385, fn. 5.

In the case of *In re Digex, Inc. S'holders Litig.* Consol. C.A. No. 18336, Chandler, C. (Apr. 6, 2001), Chancellor Chandler engaged in a similar analysis using the *Sugarland* factors.  (Kornreich Aff., Ex. X, p. 139, 140).

> Those aptly named "*Sugarland*" factors include:
> 1)  the benefits achieved in the action; 2) the efforts of counsel and the time spent in connection with the case; 3) the contingent nature of the case; 4) the difficulty of the litigation; and 5) the standing and ability of counsel.
>
> *In re Cox Communications, Inc. S'holders Litig.*, 879 A.2d 604, 640 (Del.Ch. 2005)

While different courts use different tests, the factors are similar.  The Court will use the Fourth Circuit *Barber* factors which closely track the Maryland Rule 1.5(a) factors.

Applying the *Barber* factors to the present case, the Court concludes that the fee requested in this case is excessive.  The total hours devoted to this case are represented by Plaintiffs' counsel to be 4,489 hours.  This results in a Lodestar fee of $2,358,204.  A fee of $12 Million Dollars would equate to a Lodestar multiplier of 5.1.  In determining the reasonableness of this request, the Court considers the following:

1.  The time and labor extended.

As already noted, the Plaintiffs' claim 4,489 attorney hours.  Those hours are at the lowest end of the spectrum of the hours expended by counsel on the cases listed in *Cendant's* table.  The Court also notes that there was little discovery, few, if any, depositions, and few court hearings.  The total time from the filing of the suit to achieving a settlement in principle was approximately 2 ½ months.

2.  Novelty and difficulty of the questions raised.

To the extent that there were novel and difficult issues presented by the facts of this case, they are not among the issues that counsel was called upon to litigate before arriving at a settlement in the case.  The issues presented on the motion for expedited discovery and for TRO were relatively straightforward.

3.  Skill required to properly perform legal services.

It is not disputed that counsel for the Plaintiffs are extremely competent and possess the necessary skills to represent the Plaintiffs herein.

4.  The attorneys' opportunity costs in pressing the litigation.

Most of the firms involved were substantial firms.  Their acceptance of representation of these Plaintiffs did not require them to forego the opportunity to represent other clients.  Plaintiffs in their Reply concede this factor does not weigh significantly in their favor.

5.  Customary fee for like work.

From a review of cases from around the nation, it appears to the Court that a Lodestar multiplier of 5.1 is unwarranted in a case such as this, which has not involved extensive litigation, extensive discovery or extensive time.  A comparison of this case to others the Court has reviewed, particularly those cited by the Third Circuit in *Cendant*, persuades the Court that the appropriate Lodestar multiplier for this fee award is 2.  In using this multiplier, the Court is mindful that the hours claimed have not been subjected to any discovery or scrutiny by Defendants or the Court and hours for paralegals are included along with hours for the attorneys.  While the Court believes that paralegal hours should be included in a Lodestar analysis, under a pure Lodestar analysis such hours are not generally compensable.

6.  Attorneys expectations at the outset of the litigation.

Given the nature of the transaction involved here, and the body of law developed by the Courts of Delaware, as discussed herein, the Court finds that the attorneys reasonably anticipated that LSA's tender offer would be successfully concluded at an increased offer. Further, provided that Plaintiffs acquiesced to the increased offer, with the recommendation of the Special Committee, counsel would be almost guaranteed a substantial recovery. While the Court recognizes that Delaware law does not control in this case, Maryland's law on many of these issues is not fully developed and the Maryland courts frequently look to Delaware for guidance. Accordingly, counsel had reason to believe that Maryland would follow Delaware's lead.

7.  Time limitations imposed by the client or circumstances.

The Court recognizes that this type of litigation required counsel to work around the clock at times. However, the litigation was short lived, and this factor is considered in applying a Lodestar multiplier.

8.  The amount in controversy and results obtained.

Certainly, measured by the size of the recovery, an excellent result was achieved. However, when compared to the results achieved in similar cases, the result achieved in this case, measured as the percentage increase of the initial offer, is less impressive.  According to the Weiss-White study, the average increase in the offers studied was 15.6 percent with a median of 12.6 percent.  (Weiss-White, p. 1829)  The increase here from the initial offer of $75 to $85.50 per share represents a 14 percent increase.

9.  Experience, reputation and ability of the attorneys.

Again, their experience, reputation and ability are unquestioned.  Counsel are experienced, able and enjoy excellent reputations.

10.  The undesirability of the case within the legal community in which the suit arose.

The opposite is the case here.  Numerous attorneys vied for the opportunity to be Lead Counsel for the Plaintiffs herein.

11.  The nature and length of the professional relationship between the attorney and the client.

Here, with the exception of one or two of the firms, there was no longstanding relationship with the clients.

12.  Fee awards in similar cases.

The attorney hours claimed herein multiplied by the applicable hourly rate represents a Lodestar fee of $2,358,204.  Using a multiplier of 2, results in a fee award of $4,716,408.  Viewed as a percentage of the benefit achieved by counsel, $128 Million Dollars, that represents 3.7 percent.  This falls within the range of fees awarded by the Courts in the mega fund cases analyzed by the Third Circuit, 2.8 percent to 36 percent.  *Cendant*, 243 F.3d 722, 738.  It is also within the 3 – 7 percent range that Chancellor Chandler opined was typical for mega fund cases in *Digex*.  (Kornreich, Ex. X, p. 146).  While it is at the low end of the spectrum, most of the cases resulting in higher awards involved "… complex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel."  *Cendant*, 243 F3d 722, 741.  This case did not.

Counsel also suggest to the Court that the fact that the fee was contingent, a factor under Rule 1.5(a)(8), suggests a substantial fee is appropriate.  To a large extent, this factor is addressed when looking at counsel's expectations upon undertaking the litigation.  Here, as Professors Weiss and White make clear, given the nature of the transaction, the law generally applicable and the natural forces of the market, counsel were almost guaranteed a substantial

fee for their efforts in this case.  Since the contingent nature of the fee in this case represented slight risk that counsel's efforts would go unrewarded, the Court does not give it the weight it would be entitled to in riskier cases, such as, for example, where plaintiff sought to challenge a transaction even after a special committee recommended in favor of it.

Finally, Plaintiffs make much of the fact here that no member of the class raised an objection even when told counsel might seek a fee of $15 Million Dollars.  In this case, the shareholders had no financial incentive to object.  The Defendants, not the members of the class, will bear the full expense of any award of fees.  Under the circumstances, the fact that no objections were raised is of little or no significance.

Upon the Plaintiffs' petition for fees herein, the Court shall order that the Defendants pay the Plaintiffs' attorneys' fees in the sum of $4,716,408.  This equals approximately 3.7 percent of the $128 Million Dollar fund resulting in part from the Plaintiffs' efforts as found by the Court.  In addition thereto, the Court finding they are reasonable in their entirety, the Defendants shall pay to the Plaintiffs for reimbursement of expenses $90,173.06 for a total award of $4,806,581.06.

IT IS SO ORDERED this _____ day of April, 2007.


_____
MICHAEL D. MASON, JUDGE
Circuit Court for Montgomery County, MD.


50

`

It was unwaivably conditioned on garnering the approval of the majority shareholders. Additionally, it was conditioned on sufficient shares being tendered, such that upon consummation, LSA would own at least 90 percent of the outstanding LNA shares, coupled with the promise that any second step merger would be at the same price as the tender offer. The Defendants allege that these features made the offer non-coercive as a matter of law. Defendants' Opp., p. 6.  The Defendants also note that by this time the market presuming that a higher offer would be made was already trading above $82 per share.  Following the commencement of the formal tender offer, numerous Plaintiffs filed amended complaints. The original offer was set to expire March 20, 2006.  On that same day, LSA extended the expiration date of the offer to April 3, 2006.