1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF LOUISIANA

3

4   IN RE: KATRINA CANAL BREACHES   * CIVIL ACTION

5                                   * NO. 05-4182

6   PERTAINS TO: BARGES             * Consolidated

7                                   * SECTION "K(2)"

8   Boutte v. Lafarge        05-5531 *

9   Mumford v. Ingram        05-5724 * JUDGE DUVAL

10  Lagarde v. Lafarge       06-5342 *

11  Perry v. Ingram          06-6299 * MAG. WILKINSON

12  Benoit v. Lafarge        06-7516 *

13  Parfait Family v. USA    07-3500 *   ORIGINAL

14  Lafarge v. USA           07-5178 *

15  *   *   *   *   *   *   *   *   *   *   *

16

17            (V O L U M E   I)

18        Deposition of ARTHUR LEE MURPH, JR.,

19  given at the Law Offices of Bruno & Bruno, 855

20  Baronne St., New Orleans, LA 70113, on December

21  17th, 2007.

22

23  REPORTED BY:

24        JOSEPH A. FAIRBANKS, JR., CCR, RPR

25        CERTIFIED COURT REPORTER #75005

JOHNS, PENDLETON & ASSOCIATES, INC.
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993
619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

```
 1   EXAMINATION BY MR. WIEDEMANN:

 2        Q.    Mr. Murph, let me show you what

 3   purports to be a copy of a statement --

 4             MR. WALKER:

 5                 Let me make an objection for the

 6             record.  First of all, it's not a copy

 7             of a statement, it's excerpts of a

 8             statement.  We have no idea who

 9             transcribed it or under what

10             circumstances, and we object to the

11             fact that it was only provided to us

12             now.  We've just made copies and

13             haven't really had a chance to review

14             it.

15             MR. WIEDEMANN:

16                 We also have a transcription of

17             the statement.

18             MR. SANDERS:

19                 Verbal.

20             MR. WALKER:

21                 So you have something more than

22             the excerpts; is that what you're

23             saying?

24             MR. GILBERT:

25                 Let me just state for the record
```

1        that this is excerpts intended not to

2        offend without knowing the terms of

3        any confidentiality agreements between

4        Mr. Murph and Lafarge, if any.

5   MS. BERTAUT:

6        Well, I'm going to --

7   MR. WALKER:

8        Who made the determination that

9        it was not offensive or a breach of

10       confidentiality agreement between

11       Mr. Murph, Lafarge and --

12   MR. GILBERT:

13       This is not my deposition.

14   MR. HAYCRAFT:

15       Whose is it?

16   MR. GILBERT:

17       I don't have to answer that

18       question who made the determination.

19   MS. BERTAUT:

20       Well --

21   MR. WALKER:

22       Well, you just made a

23       representation on the record.

24   MR. GILBERT:

25       It's by way of explanation as to

1          why it's excerpts.  If it's a legally

2          sufficient explanation for you, that's

3          good.  If it satisfies your curiosity,

4          then that's good, too.

5          MR. WALKER:

6              What I'm asking, if you can

7          answer, is did you create this or was

8          it created by whoever provided it to

9          you?

10         MR. GILBERT:

11             I'm going to assert the right to

12         withhold attorney work product.  I'm

13         on the record here in a deposition,

14         and that's not an appropriate question

15         of a non deponent.

16         MR. WALKER:

17             My objection stands.  And it's

18         not only with respect to the potential

19         breach of the confidentiality

20         agreement between Mr. Murph and

21         Lafarge.

22         MS. BERTAUT:

23             I join in the objection.  If

24         you're going to show the witness a

25         statement that he's alleged to have

**JOHNS, PENDLETON & ASSOCIATES, INC.**

CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101             619 JEFFERSON HIGHWAY, SUITE 2G
METAIRIE, LA 70005                  BATON ROUGE, LA 70806
PHONE (504) 219-1993                   (225) 922-4527

1　　made here, I think it's incumbent upon

2　　you to show the gentleman the complete

3　　statement that he made and not these

4　　bits and pieces.  And you're

5　　apparently attempting to refresh his

6　　recollection, and I think the witness

7　　is entitled to a complete copy of

8　　whatever it is he said that day.  So I

9　　have a problem with you showing the

10　　witness this statement.

11　　MR. GILBERT:

12　　　　Right.  Well, we believe this is

13　　sufficient to refresh his recollection

14　　concerning matters that are relevant

15　　in this deposition.

16　　MS. BERTAUT:

17　　　　I understand that.  I still note

18　　the objection.

19　　MR. GILBERT:

20　　　　This is not his deposition

21　　testimony.  This is just simply a

22　　memorialization of something he said

23　　earlier.

24　　MS. BERTAUT:

25　　　　I understand that.  But under the

1      rules, if you're going to show the

2      witness a statement to refresh his

3      recollection, he's entitled to a

4      complete copy of the statement.

5      MR. SANDERS:

6          Let's move on.

7      MR. WIEDEMANN:

8          Let the record reflect that all

9      counsel has a copy of the statement.

10     MR. WEBB:

11         Let the record reflect that all

12     counsel do not have copies of the

13     statement.  They have copies of the

14     excerpts, Mr. Wiedemann.  If you're

15     going to say it, say I correctly,

16     please.

17     MR. SANDERS:

18         Let's move on.

19     MR. WIEDEMANN:

20         All counsel have been furnished a

21     copy of the excerpts of Statement of

22     Arthur Murph, including Mr. Webb,

23     prior to showing the statement to the

24     witness.

25     MR. WALKER:

**JOHNS, PENDLETON & ASSOCIATES, INC.**

CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

```
 1              Sorry, Larry, but we want to make
 2        another objection or statement for the
 3        record, and that is that we don't --
 4        as I said earlier, I don't know the
 5        circumstances under which this
 6        purported statement was given, but if
 7        it was with respect to a potential or
 8        actual representation that Mr. Murph
 9        was obtaining from Mr. Guidry or
10        anybody at that firm, it gets into
11        aspects of attorney/client privilege
12        which Mr. Murph has not waived, and I
13        don't see that he has consulted any
14        counsel present with respect to that
15        potential waiver and a knowing waiver
16        on his part of the protections that
17        he's afforded.
18        MR. GILBERT:
19              And Lafarge doesn't have standing
20        to assert that privilege.  There's no
21        privity between Mr. Murph and Lafarge.
22        MR. WEBB:
23              Counsel you're dead wrong.  All
24        the members of the bar have a
25        responsibility to uphold the code of
```

**JOHNS, PENDLETON & ASSOCIATES, INC.**
CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101          619 JEFFERSON HIGHWAY, SUITE 2G
METAIRIE, LA 70005                    BATON ROUGE, LA 70806
PHONE (504) 219-1993                  (225) 922-4527

75

```
 1        professional responsibility.  And if
 2        Mr. Guidry did violate the
 3        attorney/client privilege, then we're
 4        all duty bound to report that to the
 5        Office of Disciplinary Counsel, which
 6        I intend to do.
 7        MR. SANDERS:
 8             Okay.  It's out.  Let's go
 9        forward.
10        MR. WIEDEMANN:
11             Okay.  Let's get on with it.
12        Y'all finished?
13        MR. WALKER:
14             Yeah.  But my statement has
15        something to do beyond that, and that
16        is that you're going to ask Mr. Murph
17        questions regarding a statement which
18        he's going to respond to under oath,
19        and he think he has the right to
20        consult the attorney who provided you
21        this to determine whether he should,
22        knowingly, and if he does, that he
23        does so knowingly, waive or
24        potentially waive an attorney/client
25        privilege.
```

JOHNS, PENDLETON & ASSOCIATES, INC.
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993
619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

```
 1            MR. GILBERT:
 2                He's never been deprived of that
 3            right.  He's been free to consult that
 4            attorney at any time he wants, and as
 5            far as way know he has.  We don't know
 6            whether he has or hasn't.
 7            MR. WIEDEMANN:
 8                Okay.  Y'all finished?
 9    EXAMINATION BY MR. WIEDEMANN:
10        Q.   Mr. Murph, you have in front of you a
11    excerpt of a Statement of Arthur Murph taken on
12    January 25th, 2006, by Richard J. Guidry (RJG).
13        A.   Uh-huh.
14        Q.   Do you recall giving a statement to
15    Mr. Guidry?
16        A.   I don't think I need to talk about
17    this until and unless I talk to my attorney and
18    see if it's okay to for me to say anything else
19    about this here.
20        Q.   Who is your attorney?
21        A.   Mr -- my memory ain't that good.  I
22    got a card in my pocket.  What's that name
23    that's on there?  (Tendering.)
24        Q.   It's --
25            MR. WIEDEMANN:
```

**JOHNS, PENDLETON & ASSOCIATES, INC.**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

1              He has given me a card that says

2          Richard J. Richthofen, Jr., 303 South

3          Broad Street, New Orleans 70119.

4      A.    Uh-huh.

5  EXAMINATION BY MR. WIEDEMANN:

6      Q.    My question, Mr. Murph, is not about

7  the statement itself.  Do you recall giving a

8  statement?

9      A.    No.

10     Q.    Do you recall having your statement

11 transcribed on a machine?

12     A.    No.

13     Q.    Do you recall ever going to the office

14 of Richard J. Guidry or the office of the

15 Cochran Firm?

16     A.    No.

17     Q.    You are going to speak to your

18 attorney about this statement?

19     A.    Right.

20     Q.    You understand that your deposition in

21 regard to the statement will have to be, that

22 part of the deposition, rescheduled at a later

23 time once you have talked to the attorney.  You

24 understand that?

25     A.    That's fine.

1     Q.   Okay.  And that you will probably
2  receive another subpoena to appear for another
3  deposition, which will be related to the
4  statement, assuming your attorney has no
5  objection or doesn't have a legitimate
6  objection.  You understand that?
7     A.   Right.  Yes.
8     Q.   Okay.  Mr. Murph, following Hurricane
9  Katrina, did you meet with any attorneys other
10  than the ones that we've mentioned concerning
11  the damage to your property?
12     A.   I'm going to have to check on that
13  with my lawyer, too.
14     Q.   You're going to check with your
15  lawyer --
16     A.   Right.
17     Q.   -- concerning meeting with attorneys
18  after the hurricane?
19     A.   Yes.
20     Q.   Did you at some point in time
21  following the hurricane make some financial
22  arrangement or settlement with any companies
23  regarding your house?
24     A.   No.  I've been compensated for my
25  losses.

1    Q.    By whom?

2    A.    I have to talk with my lawyer about

3    that, too.

4    Q.    So you don't want to talk about --

5    A.    No.

6    Q.    Wait let me just put it on the record.

7    You don't want to talk about who compensated

8    you for your home following the accident?

9    A.    No.

10    Q.    Following the hurricane, I should say.

11    A.    Right.

12    Q.    So we'll be clear, you don't want to

13    talk about meeting with attorneys following the

14    hurricane concerning your property damage or

15    your claim.  Is that correct?

16    A.    Yes.

17    Q.    You don't want to talk about whether

18    you received any settlement funds from the

19    damage to your house or to yourself following

20    the hurricane.

21    A.    Right.

22    Q.    And you don't want to talk about the

23    statement that I have shown you, or the

24    excerpts of a statement, dated January 25,

25    2006, is that correct?

1      A.    Yes.

2      Q.    Those are three things that you are

3   going to check with your attorney to determine

4   whether or not you can answer questions

5   concerning those inquiries.

6      A.    Right.

7      Q.    And your attorney is going to be the

8   attorney that you gave me the card from?

9      A.    Yes.

10      Q.    And you are going to get an opinion

11   from the attorney, is that correct?

12      A.    Yes.

13      Q.    And when do you expect you will talk

14   to him, what time frame are we talking about?

15   A week, two weeks?

16      A.    I'm going to try to get in touch with

17   him today.

18      Q.    Okay.  Well, I just want to give you

19   some leeway, because I know you got to work and

20   whatever.

21      A.    Right.

22      Q.    But would two weeks be a sufficient

23   time for you to --

24      A.    I think so.

25      Q.    Okay -- to get an opinion from him.

1      A.    Right.

2      Q.    Concerning those three aspects.

3      A.    Yes.

4      Q.    Okay.  Has anyone -- any attorney told

5  you not to testify in this case?

6      A.    I'm going to have to talk with my

7  attorney on that, too.

8      Q.    So you're going to have to talk to him

9  about that.  That's the fourth thing.

10     A.    Right.

11     Q.    About whether any attorney instructed

12 you not to answer questions concerning your

13 property or the other -- the four areas of

14 inquiry we talked about.

15     A.    Right.

16     Q.    Okay.  Did you at some time sign an

17 agreement with anybody, a confidentiality

18 agreement, not to discuss what happened to you,

19 your family or your property in Hurricane

20 Katrina?

21     A.    That's the fifth thing.

22     Q.    Okay.  So you're not going to talk

23 about any confidentiality agreement.

24     A.    No.

25     Q.    Okay.  Now, Mr. Murph, you purchased

1  you had transacted before or after Hurricane

2  Katrina?

3      A.   We talked -- you'll be able to talk

4  with him when I get back with him.

5      Q.   Well, what I want to know is, when you

6  got the subpoena that you knew you were coming

7  here to talk under oath about Hurricane Katrina

8  and how it affected you and what you knew, did

9  you discuss that with your attorney?

10     A.   Yes.

11     Q.   Did he tell you not to appear here and

12 not to testify?

13     A.   No, he didn't.

14     Q.   Did he say that you should assert any

15 kind of privilege?

16     A.   (Shakes head negatively.)

17     Q.   Huh?

18     A.   No.

19     Q.   So before coming here today, even

20 though you talked to your attorney, you were

21 not advised not to assert any privilege that

22 you might have here.

23     A.   He said if I had any problem with

24 anything and any questions, to tell them to get

25 with my attorney, and that's what I'm doing.

JOHNS, PENDLETON & ASSOCIATES, INC.
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993
619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

86

1      Q.    Did you talk to any other attorneys in

2   the last sixty days regarding this matter?

3      A.    No.

4      Q.    So the only attorney that you've

5   talked to in the last sixty days was the

6   attorney whose card you showed us earlier?

7      A.    Right.

8      Q.    And that is -- that's been your

9   attorney since Hurricane Katrina?

10     A.    You'll have to talk with him about

11  that.

12     Q.    Huh?

13     A.    That's been my attorney.

14     Q.    Okay.

15     MR. GILBERT:

16            Is anybody going to traverse on

17         anything that's been done already?

18     MS. BERTAUT:

19            I have a question.  Is that what

20         you're asking?

21     MR. GILBERT:

22            Yes.

23     MS. BERTAUT:

24            Uh-huh.

25     MR. WIEDEMANN:

**JOHNS, PENDLETON & ASSOCIATES, INC.**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993
619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

1    Q.   No.   Other than your lawyer who

2   represents you, have you met with any lawyers

3   in this -- who are now in this room prior to

4   today?

5    A.   I'm going to have to -- I can't answer

6   that.

7    Q.   You can't answer that because that's

8   something you want to talk to your lawyer

9   about?

10    A.   Right.

11    Q.   And I'm sorry.  I may have

12   misunderstood.  What is the name of the lawyer

13   you're going to check with?

14    A.   I can't get his name out right but you

15   can read his card.  He got one of them funny

16   names.  First name Richard.

17    Q.   Richard Richthofen?

18    A.   Yes.

19    Q.   Do you have any pictures of your house

20   after the damage done in the storm?

21    A.   No.

22    Q.   Did you have any insurance on your

23   house?

24    A.   Which one?

25    Q.   1739 Jourdan.

**JOHNS, PENDLETON & ASSOCIATES, INC.**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993
619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4    IN RE: KATRINA CANAL BREACHES   * CIVIL ACTION

5                                    * NO. 05-4182

6    PERTAINS TO: BARGES             * Consolidated

7                                    * SECTION "K(2)"

8    Boutte v. Lafarge        05-5531 *

9    Mumford v. Ingram        05-5724 * JUDGE DUVAL

10   Lagarde v. Lafarge       06-5342 *

11   Perry v. Ingram          06-6299 * MAG. WILKINSON

12   Benoit v. Lafarge        06-7516 *

13   Parfait Family v. USA    07-3500 *

14   Lafarge v. USA           07-5178 *

15   *   *   *   *   *   *   *   *   *   *

16

17              (V O L U M E   II)

18        Deposition of ARTHUR LEE MURPH, JR.,

19   given at Chaffe McCall, L.L.P., 2300 Energy

20   Centre, 1100 Poydras Street, New Orleans,

21   Louisiana 70163-2300, on January 29th, 2007.

22

23   REPORTED BY:

24        JOSEPH A. FAIRBANKS, JR., CCR, RPR

25        CERTIFIED COURT REPORTER #75005

JOHNS, PENDLETON & ASSOCIATES, INC.
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101          619 JEFFERSON HIGHWAY, SUITE 2G
METAIRIE, LA 70005                    BATON ROUGE, LA 70806
PHONE (504) 219-1993                  (225) 922-4527

1      MR. WALKER:

2          Okay.  Secondly, with respect to

3      a waiver, Lafarge does of the agree to

4      waive any of the terms of the

5      confidential agreement nor the

6      settlement agreement.  The redacted

7      settlement agreement has been

8      produced, the document speaks for

9      itself, and Lafarge does not waive the

10     terms of that document.

11     MR. GILBERT:

12         All right.  And I'm going to join

13     in Mr. Richthofen 's request, and I'm

14     going to specifically, for the record,

15     cite to the language in the

16     confidentiality portion of the

17     agreement which says that the Murphs

18     agreed that in the event they should

19     be compelled by legal process, and I

20     believe that would include a subpoena,

21     to reveal the terms of this receipt

22     and release and settlement agreement,

23     they shall first obtain the written

24     permission of Lafarge North America,

25     Inc., New Jourdan, LLC., and New

1       Berkley, LLC, which permission shall

2       not be unreasonably withheld.  Now, if

3       there are representatives here of

4       these entities and there is no reason

5       to withhold that, I would join in

6       Mr. Richthofen 's request that

7       Mr. Murph be allowed to speak about

8       the terms of the settlement.

9       MR. WALKER:

10          Well, again, on behalf of

11      Lafarge, Lafarge will not waive the

12      confidentiality terms of the agreement

13      to allow Mr. Murph to discuss the

14      terms of the agreement.  The agreement

15      speaks for itself as unredacted, Judge

16      Wilkinson has a complete and

17      unredacted version, and he can make a

18      determination beyond any that can be

19      made here today if you wish the bring

20      the matter up to the judge, other than

21      to have Mr. Murph and Lafarge will

22      acknowledge the existence of this

23      agreement.  Other than that, the terms

24      and conditions and other items that

25      are not self-evident from the document

1      itself we do not waive.  As far as New

2      Jourdan and Berkeley, we do not

3      represent them.

4      MR. GILBERT:

5            Okay.  We acknowledge our

6      understanding of what you've just said

7      and we do reserve rights to bring this

8      matter and any other matters ancillary

9      to this to the Court 's attention to

10     be addressed on the merits, if

11     necessary.

12           And what I'm going to do now is

13     I'm going to ask, if there are any

14     other entities here who are parties to

15     the settlement agreement, if they will

16     give their consent.  If there are any

17     other representatives of any of the

18     other entities that are parties to

19     this agreement, I'm asking if they

20     would speak up for the record and

21     either give their consent or refuse.

22     MR. WALKER:

23           Specifically, which entities?

24     MR. GILBERT:

25           Let the record reflect that

**JOHNS, PENDLETON & ASSOCIATES, INC.**

CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

1          there's utter silence in the room

2          right now and that no other

3          representative of any other entity

4          that has responded to our request.

5     MR. WALKER:

6          Specifically, you're talking

7     about New Jourdan and Berkley.

8     MR. GILBERT:

9          New Jourdan, Berkley -- there are

10    a number of entities that are named in

11    this settlement agreement as to whom

12    there's purportedly been a settlement

13    with the Murph family.

14    MR. WALKER:

15         I think for clarity of the record

16    you should name them, because I don't

17    think your characterization is

18    necessarily correct.  So New Jourdan,

19    New Berkley, and what other entities

20    are you referring to?

21    MR. GILBERT:

22         On Page 4 of the settlement

23    agreement there is an agreement that

24    the Murphs agreed to indemnify and

25    hold harmless New Jourdan, LLC and its

**JOHNS, PENDLETON & ASSOCIATES, INC.**
CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101          619 JEFFERSON HIGHWAY, SUITE 2G
METAIRIE, LA 70005                         BATON ROUGE, LA 70806
PHONE (504) 219-1993                         (225) 922-4527

1          assignee and well as any other

2          released party as defined in Section 2

3          below.  And in Section 2.1, there's

4          language whereby the Murphs do release

5          and forever discharge Lafarge North

6          America, Ingram Barge Company, New

7          Jourdan, LLC, New Berkley, LLC, their

8          assigns, representatives, insurers, et

9          cetera.

10              And so I'm asking today if there

11         are any other entities that are party

12         to this agreement who will give

13         permission.

14     MR. WEBB:

15              Counsel, I'm Dan Webb.  I do not

16         represent New Jourdan, LLC.  I

17         represent New York Marine General

18         Insurance Company.  With respect to

19         New Jourdan, LLC, this is the first

20         request that it is aware of, and I can

21         pass it on to its principals, but I

22         have no idea what position its

23         principals would take.

24     MR. GILBERT:

25              Who are the principals of New

1          Jourdan, LLC?

2          MR. WEBB:

3              Don't know.

4          MR. GILBERT:

5              Well, let's go for forward and

6          let's see what we can accomplish.

7     EXAMINATION BY MR. GILBERT:

8        Q.   Mr. Murph, I introduced myself a few

9     minutes ago.  My name is Bryan Gilbert.  I

10    represent residents of the Lower Ninth Ward,

11    parts of St. Bernard Parish in a lawsuit that's

12    been filed against companies that might be

13    responsible for a barge breaking the Industrial

14    Canal floodwall and causing flooding.  Those

15    allegations are not proven, but it is what we

16    allege.

17              You began your deposition

18    December 17th, 2007, if you recall, and there

19    are a few reasons for bringing you here today.

20    By way of explanation, let me just say it's to

21    clarify some matters that we began to talk

22    about in that earlier session, to speak about

23    some matters that you were unsure whether you

24    could talk about without first getting advice

25    of counsel, and to continue the deposition into

1      Q.    Okay.  You didn't have to pay the

2   bills for that Nextel phone, did you?

3      A.    No.

4      Q.    You don't have copies of those bills,

5   do you?

6      A.    No.

7      Q.    Okay.  Do you remember last time we

8   had asked you if you remembered giving a

9   statement?

10      A.    Yes.

11           MR. WALKER:

12                Objection.

13   EXAMINATION BY MR. GILBERT:

14      Q.    Do you remember giving a statement?

15      A.    No.

16      Q.    Okay.  Have you had a chance to read

17   over the statement?

18      A.    Yes.

19      Q.    Does it reflect your observations as

20   to the topics the statement deals with?

21           MR. WALKER:

22                Objection.  There's no testimony

23           that Mr. Murph has reviewed the

24           statement.  If you're referring to the

25           redacted version, which is

```
 1              objectionable on numerous grounds,

 2              then make sure you clarify for the

 3              record that you're referring to the

 4              redacted version.

 5              MR. GILBERT:

 6                   I'm showing this to counsel, a

 7              multi-paged document entitled Excerpts

 8              of Statement of Arthur Murph taken

 9              January 25th, 2006 by RJG.

10              (Tendering.)

11    EXAMINATION BY MR. GILBERT:

12        Q.    Have you seen this document?

13        A.    Yes.

14        Q.    Have you had a chance to look through

15    it?

16        A.    Yes.

17        Q.    Okay.  Does it help to refresh your

18    memory?

19              MR. WALKER:

20                   Objection.

21        A.    Somewhat.

22    EXAMINATION BY MR. GILBERT:

23        Q.    Okay.  I want to direct you to Page 4

24    of the excerpts.

25              MR. WALKER:
```

JOHNS, PENDLETON & ASSOCIATES, INC.

CERTIFIED COURT REPORTERS

315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

```
 1              Well, let me note an objection to
 2         the use of a redacted statement.
 3         Mr. Murph is entitled to review the
 4         statement.  And any use of a redacted
 5         statement is unfair to Mr. Murph and
 6         inappropriate, and we will object and
 7         we will stop the deposition and ask
 8         Judge Wilkinson to rule on the
 9         inappropriate use of the statement to
10         attempt to refresh a witness'
11         recollection under circumstances where
12         the witness has made no statement that
13         he requires any refreshing of his
14         recollection, and therefore, without
15         the need to refresh recollection the
16         use of a statement is incorrect and
17         inappropriate.
18    MR. GILBERT:
19              All right.  Let me clarify.  Is
20         it Lafarge's position that it would be
21         appropriate to use the complete
22         version of this statement in this
23         deposition?
24    MR. WALKER:
25              We're not taking a position one
```

```
 1        way or the other on that.  We're
 2        telling you that the use of a redacted
 3        statement is inappropriate,
 4        particularly where the witness has
 5        made no statement that he requires any
 6        refreshing of his recollection as to
 7        his prior testimony under oath.
 8   MR. GILBERT:
 9             And I'm just going to respond to
10        that by clarifying my understanding.
11        And it's not my deposition, but my
12        understanding that the statement has
13        been redacted to the extent necessary
14        so as to not violate the terms of the
15        confidentiality agreement that Lafarge
16        a few minutes ago asserted that it
17        would not waive or give permission to
18        Mr. Murph to deviate from.
19   MR. WALKER:
20             That's immaterial because the
21        statement is subject to privilege.  It
22        was given by Mr. Murph, as you the
23        barge plaintiffs state in answers to
24        interrogatories, to his attorney, an
25        attorney with whom he has certain
```

**JOHNS, PENDLETON & ASSOCIATES, INC.**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993
619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

```
 1              protections and privileges to which

 2              he's entitled.  Therefore, the use of

 3              that statement is incorrect.

 4    EXAMINATION BY MR. GILBERT:

 5        Q.    Mr. Murph, do you have any objection

 6    to --

 7              MR. WEBB:

 8                   And further, on behalf of New

 9              York Marine, I'm going to reiterate

10              the position that I took at the

11              earlier part of this deposition, that

12              if you proceed forward with this I

13              fully intend to report the attorney

14              who took the statement and has

15              breached the attorney/client

16              privilege, and possibly others, to the

17              Office of Disciplinary Counsel.

18              MR. RICHTHOFEN:

19                   For clarity, to my knowledge

20              Mr. Murph has not asserted a breach of

21              confidentiality, which would be his

22              right to do with all respect to

23              counsel.  And I don't know that

24              Mr. Murph has.  In my conversations

25              with him, he has not, in fact, as of
```

1      yet done that.  And furthermore, in

2      speaking with Mr. Murph, it's my

3      position -- in speaking with him, and

4      in assisting him to speak before the

5      individuals here, that Mr. Murph has

6      read over the said statement and has

7      indicated to me, as I'm sure he will

8      to you, that it is consistent with

9      that which he has already testified to

10     and that the events are fairly

11     consistent with what he said happened.

12     MR. WALKER:

13         When you say the statement, you

14     mean the redacted version.

15     MR. RICHTHOFEN:

16         That is correct, sir.  The

17     statement that counsel is arguing

18     about here today.

19     MR. WALKER:

20         So he stands by his prior

21     deposition and sees nothing

22     inconsistent in the redacted

23     statement.  Is that what he's told

24     you?

25     MS. BERTAUT:

1              I'm going to object.

2         MR. GILBERT:

3              Yeah.  Objection.  Objection.

4    EXAMINATION BY MR. WALKER:

5         Q.   Is that what he's told you?

6         MS. BERTAUT:

7              I have an objection to make

8         before the question is answered,

9         Derek.  We're here for a continuation

10        deposition.  First of all, Lafarge and

11        Lafarge's insurer has no standing to

12        assert an attorney/client privilege of

13        the witness.  The witness is

14        represented by counsel, so Lafarge and

15        their insurers or any other party here

16        has no right to assert any privilege

17        that's between Mr. Murph and his

18        counsel of record, and he should be

19        allowed to state whatever privilege he

20        wants at that time.  Secondly, this

21        isn't -- this is inappropriate

22        questioning.  Mr. Walker is not

23        questioning the witness now, or the

24        witness' lawyer.  We should proceed

25        with the deposition.  I understand

1     it's an excerpt of the statement, but

2     so is the settlement agreement.  So we

3     don't have full documents of either of

4     these things.  We've brought this

5     gentleman back who's not a party to

6     this litigation, and we've got a room

7     full of lawyers.  Talk about

8     annoyance, harassment of the other

9     parties here, let this independent

10    witness give the testimony that he

11    knows to be true and let's move on.

12    Y'all went to make -- you want to make

13    challenges to Disciplinary Counsel,

14    Mr. Webb?  This is the second time

15    you've alleged that.  Please go ahead

16    and do it, but let's get this witness

17    in and out of here, tell his story and

18    move on, because now this is

19    harassment of the rest of us sitting

20    in the room.

21    MR. WALKER:

22         So you had an objection?

23    MS. BERTAUT:

24         I have an objection, that's

25    correct, to Lafarge interrupting the

```
 1            witness asserting privileges that they
 2            know they have no right to make.
 3            MR. WEBB:
 4                 Counsel, I am by no stretch of
 5            the imagination attempting to assert a
 6            privilege.  What I'm staying, as an
 7            officer of the court, is that I see
 8            what is an apparent breach of an
 9            attorney/client relationship, and as
10            such, not only myself, but you,
11            counselor, are duty bound to so
12            report.
13            MS. BERTAUT:
14                 Thank you, Mr. Webb.  I
15            appreciate the tutorial.
16            MR. GILBERT:
17                 May I ask the witness a question
18            now?
19            MR. WEBB:
20                 Certainly.
21      EXAMINATION BY MR. GILBERT:
22         Q.   You've read over these excerpts of
23      your statement.
24         A.   Yes.
25         Q.   Is there anything confidential in
```

1    here?

2         A.    I don't know who wrote that thing or

3    where it come about from, but some of that

4    stuff I don't know nothing about.

5         Q.    Is there anything confidential in

6    here?

7         A.    Not to me.

8         Q.    Okay.

9         MR. GILBERT:

10              Then I think that your objection

11              is obviated now.

12   EXAMINATION BY MR. GILBERT:

13        Q.    You testified in the earlier

14   deposition, earlier part of the deposition,

15   that before you went to the Hyatt you went and

16   peered over the floodwall to see how high the

17   levee was.

18              Do you remember saying that?

19        A.    Yes.

20        Q.    Okay.  Did you go look after you came

21   back from the Hyatt, also?

22        A.    No.

23        Q.    Okay.  So you only went and looked

24   that one time?

25        A.    Right.

1   first time you went up, you didn't chop a hole,

2   right?

3        A.    Yeah.

4        Q.    You chopped a hole the first time you

5   went up?

6        A.    Yes.

7        Q.    And then you came down a couple times

8   to see what was going on inside the house?

9        A.    Yes.

10       Q.    All right.  Let's go back to when

11  you're in the driveway.  Okay?  When you're

12  going to hook up the generator and get it

13  started.

14       A.    Right.

15       Q.    That's when things started getting

16  hairy, right?

17       A.    Yes.

18       Q.    All right.  You testified that you

19  heard a scraping sound coming from the

20  direction of the canal.

21       A.    Yes.

22       Q.    Okay.  And in your statement --

23  excerpts of your statement on Page 5, which I'm

24  going to show you, I'm just going to ask you to

25  just take a look at the line that I'm pointing

1    to and just read that so that everyone knows

2    what you're looking at.

3        A.    I heard a big boom scraping sound, you

4    know, and it was just -- I don't know what's

5    this noise thing they got here.

6        Q.    Wait.  Could you say it louder so I

7    can --

8        A.    I heard a big scraping sound and, you

9    know, and it was just a -- I say it was -- what

10   the hell is this?

11           (Whereupon the deponent conferred with

12   counsel off the record.)

13       A.    I say what the hell is this?  And then

14   I heard a big -- that's me and the dog outside

15   on the garage.

16   EXAMINATION BY MR. GILBERT:

17       Q.    All right.  I'm going to ask you to go

18   to the next line which I'm pointing at and let

19   you read out loud so that everybody else can

20   follow along.  Read it in a loud voice so

21   everybody can hear you.

22           MR. WALKER:

23               Just to be clear on my prior

24           objection, since I've made several --

25           MR. GILBERT:

1           It's continuing.

2      MR. WALKER:

3           -- no, since there is no

4      testimony by Mr. Murph that anything

5      he stated in his prior deposition is

6      inconsistent with what's in this

7      statement, or that he had any

8      misrecollection or has any reason to

9      refresh his recollection, the use of a

10     statement to refresh his recollection

11     is improper.

12     MR. GILBERT:

13          Thank you.

14 EXAMINATION BY MR. GILBERT:

15     Q.   You ran read that.

16     A.   So I headed toward the garage.  I

17 leave the front of the house to see what's

18 going -- what the noise was.  By that time I

19 got midway in the driveway, I heard a big boom

20 sound.  And, you know, boom.  And I saw -- now

21 what the hell is this?  And I started walking a

22 little bit quicker towards the front because --

23 the front of my driveway.  It's a long

24 driveway.  My garage is in the backyard by the

25 apartment, you know.  And we heard the sound in

1    the back.

2        Q.    Okay.   Can you explain what you mean

3    when you say a big boom sound.

4        A.    Just a noise.

5        Q.    Well, I mean, I can make a noise

6    rapping on the table.   Would you call that a

7    boom?

8        A.    No.

9        Q.    Could you describe the boom sound?

10       A.    It just was a boom -- with the wind

11   blowing and everything, it just was a loud

12   noise.

13       Q.    Okay.   Was it a high pitched noise, a

14   low pitched noise?   What can you remember?   Why

15   don't you tell me everything about the noise

16   that you can remember.

17       A.    It was just a noise, a loud noise

18   outside.

19       Q.    Could you feel the noise?

20       A.    I wasn't feeling anything.   I was

21   trying to get out of there.

22       Q.    Do you know -- did you notice whether

23   or not the noise echoed?

24       A.    No.

25       Q.    No, you did not notice?

1    A.   I don't know if the noise echoed or
2  not.
3    Q.   Okay.  If you had to say how loud the
4  noise was by comparing it to any other noise
5  you've ever heard in your life, how loud would
6  you say the boom was?
7    A.   About as loud a noise it was making
8  when the wind was blowing.
9    Q.   As loud a noise as the wind?
10   A.   Yeah.
11   Q.   But did it sound like wind?
12   A.   No, it didn't sound like no wind, it
13  sound like a loud noise.
14   Q.   Okay.  How many times did you hear
15  that noise?
16   A.   Just that once when I was going up
17  towards -- going up the driveway.
18   Q.   Okay.  What happened immediately after
19  that?
20   A.   The water came.
21   Q.   Okay.  And is that the water that you
22  testified earlier was coming from the right
23  side of your house?
24   A.   Right.
25   Q.   Okay.  Okay.  You said that you had

1   unh-unh.  I talked to people, but I didn't get

2   no interviews.

3        Q.   Joyce is the neighbor that lived just

4   to the right of you, correct?

5        A.   To the left.

6        Q.   Lived to the left of you?

7        A.   Yes.

8        Q.   Is that where you swam to?

9        A.   Yes.

10       Q.   You don't know who Joyce 's phone

11   provider is, do you?

12       A.   No.

13       Q.   Do you know where that barge came

14   from?

15       A.   Out the canal, I guess.

16       Q.   Did you see it come out the canal?

17       A.   No.

18       Q.   Do you think that boom you heard had

19   anything to do with the barge?

20       A.   I don't know if it had or it hadn't.

21   I can't say.  I didn't see it.

22       Q.   Mr. Murph, when was the first time

23   that you saw this document that we've referred

24   to as Excerpts of Statement of Arthur Murph?

25       A.   In my lawyer's office.

```
1              document is self-evidencing it -- the

2              best evidence of its own terms, that

3              he would refer to that, that anyone

4              who has a copy of that produced in

5              discovery could refer to that for

6              questions regarding the actual terms

7              and conditions, it's in the document,

8              and so not to prejudice Mr. Murph and

9              his confidentiality agreement with

10             Lafarge.

11             MR. GILBERT:

12                  Okay.

13   EXAMINATION BY MR. GILBERT:

14        Q.   Let me ask you this:  Where were you

15   when you signed this document?

16        A.   In this building.

17        Q.   Who was present?

18        A.   A couple or few people.

19        Q.   Who?  What are the names?

20        A.   Oh, I can't remember their names.

21        Q.   Are they people that are here today?

22        A.   Yes.

23        Q.   Can you indicate which ones they are?

24        A.   The two right here. (Indicating.)

25        Q.   Okay.  You just pointed to Derek
```

```
 1    Walker.   Who else did you just point to?
 2        A.    And the man sitting to his left.
 3        Q.    The man wearing a red patterned tie
 4    with a pen in his hand; Robert Fisher?
 5        A.    No.   I said to his left.
 6              MR. WALKER:
 7                    Why don't you just have them
 8              raise their hand or something.
 9              MR. GILBERT:
10                    Okay.   Well, I mean, if the
11              attorneys would agree to raise their
12              hands if they were present, if they're
13              the attorneys that Mr. Murph is
14              talking about right now, let the
15              record reflect who was present.
16                    All right.   Nobody is
17              volunteering any information.
18    EXAMINATION BY MR. GILBERT:
19        Q.    Mr. Murph --
20              MS. BERTAUT:
21                    Wait.   Mr. Fisher just raised his
22              hand.
23              MR. GILBERT:
24                    Okay.   Let the record reflect
25              Mr. Fisher raised his hand.
```

1      Q.    But you settled with them.

2      A.    Yes.

3      Q.    Okay.  Do you know why New Jourdan 's

4    name is on here?  On this release agreement?

5      A.    No.

6      Q.    Do you know why New Berkley is on this

7    release agreement?

8      A.    No.

9      Q.    Do you know why Ingram is on this

10   release agreement?

11     A.    No.

12     Q.    The agreement shows that you signed it

13   on February 9th, 2006.  Did you know on that

14   date of a lawsuit going on against any of these

15   companies?

16     A.    No.

17     Q.    The date you signed this, that wasn't

18   the first time you met with Mr. Walker and Mr.

19   Fisher, correct?

20     A.    I think it is.

21     Q.    But had you spoken with them before?

22     A.    I may have, I don't know.

23     Q.    Did any lawyers for Lafarge give you

24   any advice?

25     A.    No.

1     Q.    Did any lawyer give you any advice
2   concerning this agreement?
3     A.    No.
4     Q.    What about Mrs. Murph, did she go get
5   advice from any lawyer concerning this
6   agreement?
7     A.    She may have.  I don't know.
8     Q.    Did any lawyer ever explain to you
9   what every one of these paragraphs and
10  sentences meant in this agreement and what --
11  how it might affect your rights by signing it?
12    A.    I don't know.  They may have.
13    Q.    They may have, but you don't remember?
14    A.    I don't remember.
15    Q.    Did you tell Lafarge or any of their
16  attorneys or anybody acting on behalf of
17  Lafarge or Ingram or any of the parties that
18  you settled with, did you tell them what you
19  wanted this settlement to say?
20    A.    No.
21    Q.    Did anybody acting on your behalf tell
22  them what you wanted this settlement to say?
23    A.    No.
24    Q.    Did you get to look at this before you
25  signed it --

1        A.    Yes.

2        Q.    -- or just that day?

3        A.    Yes.

4        Q.    How soon before -- when did you get to

5   see a copy of it before signing it?  How long

6   before you signed it?

7        A.    The same day.

8        Q.    The same day?  Did you take it to a

9   lawyer that day and say, hey, what do you think

10  about this?

11       A.    No.

12       Q.    Why not?

13       A.    For what?

14       Q.    Well -- so I interpret your answer to

15  mean that you didn't think that there was any

16  reason to see a lawyer.

17       A.    No.

18       Q.    Is that correct?

19       A.    Yes.

20       Q.    Did you trust that the lawyers that

21  were putting this together were going to

22  protect you?

23       A.    I don't know.

24       Q.    You don't know whether you did?

25       A.    No.

```
 1          (Whereupon the deponent conferred with
 2     counsel off the record.)
 3        A.   I don't know.  I can't remember.
 4     EXAMINATION BY MR. GILBERT:
 5        Q.   Do you remember if y'all did that on
 6     the same day?
 7        A.   I can't remember.
 8        Q.   Okay.  When you did the Act of Sale on
 9     105 Berkley, did you get a chance to read
10     through everything that you were signing?
11        A.   I'm pretty sure I did.
12        Q.   Did you have an attorney advise you?
13        A.   No.
14        Q.   I see -- I'm going to ask you to jump
15     forward one page into the document called Cash
16     Sale, and I see where it says witnesses, that
17     Harry Holladay was present.
18        A.   (Nods affirmatively.)
19        Q.   Do you recall Mr. Holladay?
20        A.   I think so.
21        Q.   Do you know why he was there?
22        A.   I don't know.
23        Q.   Do you know what he had to do with
24     this sale?
25        A.   Not really.
```

**JOHNS, PENDLETON & ASSOCIATES, INC.**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993
619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

1       Q.    Because you had already settled with

2    Lafarge at that point, hadn't you?

3       A.    I don't think I can --

4             (Whereupon the deponent conferred with

5    counsel off the record.)

6       A.    I don't remember.

7    EXAMINATION BY MR. GILBERT:

8       Q.    Do you know what reason he had for

9    being there?

10      A.    Not really.

11      Q.    Okay.  Did you have any conversations

12   with him?

13      A.    I don't know.  I may have.

14      Q.    But you don't remember?

15      A.    No.

16      Q.    All right.  Let me go back to 1(a) and

17   show you again the check at the top.

18            Do you know whether that was used to

19   pay for the house?  105 Berkley?

20      A.    I don't know.

21      Q.    Do you pay notes on 105 Berkley?

22      A.    No.

23      Q.    Is there a promissory note on 105

24   Berkley?

25      A.    I don't know.

1    Q.    You don't know?

2    A.    No.

3    Q.    Did you sign any agreement that you

4    were going to make payments on 105 Berkley?

5    A.    I can't answer that.

6    Q.    You can't answer that?

7    A.    (Nods affirmatively.)

8    Q.    Okay.  Do you own 105 Berkley

9    outright?

10   A.    I may.

11   Q.    Did you borrow any money to pay for

12   105 Berkley?

13   A.    No.

14   Q.    Did you go to any bank or any lender

15   to get money for 105 Berkley?

16   A.    No.

17   Q.    Do you know what a collateral mortgage

18   is?

19   A.    No.

20   Q.    All right.  Let me show you -- I've

21   given this to you as it was produced to me.

22   There's, four pages in, a document called Act

23   of Collateral Mortgage.

24         Do you see that?

25   A.    Yes.

1        Q.   Okay.   Is that your signature on Page

2    4 of the Act of Collateral Mortgage?

3        A.   Yes.

4        Q.   Okay.   And is that your wife's

5    signature?

6        A.   Yes.

7        Q.   Okay.   You see at the bottom it says

8    intervenor, and you see Harry Holladay?

9        A.   Yes.

10       Q.   What does that mean to you?

11       A.   I don't know.

12       Q.   Do you know why he signed this?

13       A.   No.

14       Q.   Do you know what this collateral

15   mortgage says?

16       A.   No.   What?

17       Q.   I'm asking if you know.

18       A.   No.

19       Q.   Do you know if this collateral

20   mortgage has any effect on 105 Berkley Drive?

21       A.   No.

22       Q.   Do you know if this collateral

23   mortgage has any effect on the settlement that

24   you reached?

25       A.   No.

JOHNS, PENDLETON & ASSOCIATES, INC.
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993
619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

```
 1        Q.    Did anybody tell you that it did?

 2        A.    No.

 3        Q.    Did anybody ever tell you that you

 4   could not testify in this case?

 5        A.    No.

 6        Q.    Did anybody tell you that as part of

 7   the confidentiality agreement that you couldn't

 8   tell people what you saw on August 29th?

 9        A.    Nobody -- nope.

10        Q.    I'm sorry?

11        A.    Nope.

12        Q.    Okay.  So have you understood all

13   along that you have been free to discuss what

14   your eyes and ears told you as you were just

15   going through your life on August 29th during

16   the storm?

17        A.    Yes.

18        Q.    Okay.  Let me ask you why at the last

19   deposition were there certain topics that you

20   wouldn't testify about?

21        A.    What topics?

22        Q.    About your statement, about meetings

23   with attorneys after the storm, about the

24   settlement, and, um -- let me just go to

25   Page 81 of the prior deposition, and I'm just
```

1    going to show it to you, and I'll read it at

2    the same time.

3              "Did you at some time sign an

4    agreement with anybody, a confidentiality

5    agreement not to discuss what happened to you,

6    your family or your property in Hurricane

7    Katrina?"

8              And then you say, "That's the fifth

9    thing."  And I think what we mean is that's the

10   fifth thing you need to ask your attorney

11   whether you can testify about.

12             Had anyone told you that you couldn't

13   discuss what happened to you?

14        A.   No.

15        Q.   Okay.  Do you read any part of this

16   settlement document to prohibit you from

17   talking about what happened when you were at

18   your house on August 29th?

19        A.   Everybody know what happened.  I told

20   y'all just a while ago.

21        Q.   Okay.  But my question is whether you

22   have ever been under the impression that this

23   stops you from talking about it.

24        A.   No.

25        Q.   Okay.

```
 1   And that's the Prudential Gardner Buy/Sell
 2   Agreement with a fax cover from Jane Hicks, and
 3   it looks like a couple of internal documents
 4   from TJ Real Estate Services, which is True
 5   Title.
 6           (Exhibit 3(a) was marked for
 7   identification and is attached hereto.)
 8   EXAMINATION BY MR. GILBERT:
 9       Q.   All right.  Before I forget,
10   Mr. Murph, on the last page of the agreement,
11   the settlement agreement, there's a document
12   called an affidavit which I'm showing to you
13   which is marked as LNA000705.
14           Is that your signature on it?
15       A.   Yes.
16       Q.   Did you tell anybody what to say in
17   this affidavit?
18       A.   No.
19       Q.   You didn't dictate something to
20   somebody and say, these are my words, put them
21   in an affidavit?
22       A.   No.
23       Q.   How did you come to sign this
24   affidavit?
25       A.   It's part of the settlement agreement.
```

1       Q.    Okay.  Did you raise your hand and "I

2  swear under oath" and all that?

3       A.    I don't remember.  No, I don't know.

4  I can't remember if I did or didn't.

5       Q.    All right.  We're going to attach the

6  entirety of the settlement agreement, which is

7  LNA694 through 705 --

8              MR. RICHTHOFEN:

9                   Which is a redacted --

10             MR. GILBERT:

11                  -- which is a redacted copy of

12             it, because that's all we got, as

13             4(a).

14             (Exhibit 4(a) was marked for

15  identification and is attached hereto.)

16  EXAMINATION BY MR. GILBERT:

17       Q.    What happened to 1739 Jourdan Avenue?

18  Do you still own that?

19             (Whereupon the deponent conferred with

20  counsel off the record.)

21       A.    No.

22  EXAMINATION BY MR. GILBERT:

23       Q.    Who owns that now?

24       A.    I don't know.

25       Q.    How did it come to be that you don't

1    this correctly:  At no time before you signed

2    what has been identified as the agreement with

3    Lafarge, which is 4(a), at no time before you

4    signed that document did you have an attorney

5    representing your interests review that

6    document, is that correct?

7         A.    No.

8         Q.    When you signed the document that's

9    identified as 4(a)--

10        A.    Right.

11        Q.    -- you said it was in this building.

12   Is that right?

13        A.    Right.

14        Q.    Was that signing of the document

15   videotaped?

16        A.    I don't think.

17        Q.    And prior to arriving at the building

18   on the day that you signed the document

19   identified as 4(a), you had never been shown a

20   copy of the document --

21        A.    No.

22        Q.    -- prior to that time.

23             And similarly, when you signed the

24   papers dealing with Berkley which are

25   identified as 2(a), the Act of Sale and the

1    Collateral Mortgage, had you ever had those

2    documents looked at by a lawyer before you

3    signed them?

4        A.   No.

5        Q.   Are you making any sort of payments on

6    a note for Berkley?

7        A.   No.

8        Q.   Were you aware that you have a

9    mortgage on -- that obligates you on the public

10   records for Berkley?

11       A.   No.

12       Q.   Is this the first time you're learning

13   of that, sir?

14       A.   Yes.

15       Q.   Why do you believe that you do not

16   currently own Jourdan Avenue -- what is it,

17   1739 Jourdan Avenue?

18       A.   Yes.

19       Q.   Yes.   Why do you believe that you

20   don't currently own it or that you may not

21   currently own that property?

22       A.   Well, I don't know.

23       Q.   Well, let's see.   At the time Katrina

24   hit, you were the owner of the property, is

25   that right?

1     Q.   Did any of the lawyers present explain

2  to you what duties you may have been taking on

3  by signing those papers?

4     A.   No.

5     Q.   When you spoke to Lafarge prior to

6  signing papers, did you ever tell them that you

7  were personally in the house at the time that

8  the barge came to rest on your home?

9     A.   I may have.

10     Q.   Do you know a lawyer by the name of

11  Pat Hand?

12     A.   Who?

13     Q.   Patrick Hand.

14     A.   No.

15     Q.   What is the status of any insurance

16  claim on Jourdan Avenue; did you make a claim

17  on Jourdan Avenue against your insurer?

18     A.   I think, maybe.

19     Q.   Has that been paid off?

20     A.   I think so.

21     Q.   As a result of just coming today and

22  the last time you were here, is it your

23  understanding that you have promised not to

24  disclose or reveal certain events that happened

25  to you on account of the money or settlement

JOHNS, PENDLETON & ASSOCIATES, INC.
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993
619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

```
 1                    I understand.
 2          MR. WALKER:
 3              Which he's already answered for
 4          Mr. Gilbert twice.
 5          MR. RICHTHOFEN:
 6              I'm sorry.  Just for clarity, for
 7          my client 's safety, I just want to
 8          make sure he understood that and that
 9          was the answer that was being given to
10          you.
11   EXAMINATION BY MS. BERTAUT:
12      Q.  Are you concerned that should you
13   break the agreement or violate the terms of the
14   agreement that you or your family might be at
15   risk financially?
16          MR. RICHTHOFEN:
17              You can answer that.
18      A.  I don't know.
19          MR. RICHTHOFEN:
20              No, you can answer that honestly.
21          THE WITNESS:
22              I don't understand what she's
23          saying.
24          MR. WALKER:
25              It's all right.  A lot of us
```

**JOHNS, PENDLETON & ASSOCIATES, INC.**
CERTIFIED COURT REPORTERS
315 METAIRIE ROAD, SUITE 101
METAIRIE, LA 70005
PHONE (504) 219-1993

619 JEFFERSON HIGHWAY, SUITE 2G
BATON ROUGE, LA 70806
(225) 922-4527

```
 1              don't understand what she's saying
 2              either.  You can say that.
 3    EXAMINATION BY MS. BERTAUT:
 4         Q.    You don't know?  Is that what your
 5    answer is?
 6         A.    That's what I said, yes.
 7         Q.    Do you have any concerns that if
 8    Lafarge believes that you broke the terms of
 9    the agreement that your house on Berkley might
10    be foreclosed on or lost?
11         A.    Somewhat.  Yes.
12         Q.    Was there ever a time when you
13    believed that Lafarge was responsible for the
14    damage to your house?
15         A.    Only because I saw the barge.
16         Q.    Do you still believe that to be true?
17         A.    Yeah.  It was on the house.
18         Q.    How about Ingram; was there ever a
19    time when you believed Ingram Barge was
20    responsible for the damage to your house?
21         A.    I didn't really care who was
22    responsible, I just wanted to be compensated
23    for my house.
24         Q.    I understand that.  But my question,
25    Mr. Murph, is was there ever a time when you
```