## Page 1

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES   * CIVIL ACTION
                                * NO. 05-4182
PERTAINS TO: BARGES             * Consolidated
                                * SECTION "K(2)"
Boutte v. Lafarge        05-5531 *
Mumford v. Ingram        05-5724 * JUDGE DUVAL
Lagarde v. Lafarge       06-5342 *
Perry v. Ingram          06-6299 * MAG. WILKINSON
Benoit v. Lafarge        06-7516 *
Parfait Family v. USA    07-3500 *
Lafarge v. USA           07-5178 *
   *   *   *   *   *   *   *   *

              (V O L U M E   I)
        Deposition of ARTHUR LEE MURPH, JR.,
given at the Law Offices of Bruno & Bruno, 855
Baronne St., New Orleans, LA 70113, on December
17th, 2007.

REPORTED BY:
     JOSEPH A. FAIRBANKS, JR., CCR, RPR
     CERTIFIED COURT REPORTER #75005
```

## Page 2

```
APPEARANCES:
REPRESENTING THE PLAINTIFFS:
     BRUNO & BRUNO
     (BY: JOSEPH M. BRUNO, ESQUIRE)
     855 Baronne Street
     New Orleans, Louisiana 70113
     504-525-1335
- and -
     WIEDEMANN & WIEDEMANN
     (BY: LAWRENCE D. WIEDEMANN, ESQUIRE)
     821 Baronne Street
     New Orleans, Louisiana 70113
     504-581-6180
- and -
     BRIAN A. GILBERT, P.L.C.
     (BY: BRIAN A. GILBERT, ESQUIRE)
     821 Baronne Street
     New Orleans, Louisiana 70113
     504-885-7700
- and -
     LAW OFFICE OF PATRICK J. SANDERS
     (BY: PATRICK J. SANDERS, ESQUIRE)
     3123 Ridgelake Drive, Suite B
     Metairie, Louisiana 70002
     504-834-0646
```

## Page 3

```
REPRESENTING THE AMERICAN CLUB:
     MONTGOMERY, BARNETT, BROWN, READ,
     HAMMOND & MINTZ, L.L.P.
     (BY: PHILIP S. BROOKS, JR., ESQUIRE)
     3200 Energy Centre
     1100 Poydras Street
     New Orleans, Louisiana 70163
     504-585-3200

REPRESENTING WASHINGTON GROUP INTERNATIONAL:
     STONE PIGMAN WALTHER WITTMANN, L.L.C.
     (BY: CARMELITE M. BERTAUT, ESQUIRE)
     (BY: HEATHER LONIAN, ESQUIRE)
     546 Carondelet Street
     New Orleans, Louisiana 70130
     504-581-3200

REPRESENTING LAFARGE NORTH AMERICA:
     CHAFFE, McCALL, L.L.P.
     (BY: DEREK A. WALKER, ESQUIRE)
     (BY: ROBERT B. FISHER, JR., ESQUIRE)
     2300 Energy Centre
     1100 Poydras Street
     New Orleans, Louisiana 70163-2300
     504-585-7000
```

## Page 4

```
- and -
     GOODWIN PROCTOR, L.L.P.
     (BY: MARK S. RAFFMAN, ESQUIRE)
     (BY: JOHN D. ALDOCK, ESQUIRE)
     901 New York Avenue, NW
     Washington, D.C. 20001
     202-346-4000

REPRESENTING NEW YORK MARINE & GENERAL
INSURANCE COMPANY:
     SUTTERFIELD & WEBB
     (BY: DANIEL A. WEBB, ESQUIRE)
     650 Poydras Street, Suite 2715
     New Orleans, Louisiana 70130
     504-598-2715

REPRESENTING ZITO:
     MOULEDOUX, BLAND, LEGRAND & BRACKETT,
     L.L.C.
     (BY: WILLIAM C. EMORY, ESQUIRE)
     701 Poydras Street, Suite 4250
     New Orleans, Louisiana 70130
     504-595-3000
```

**EXHIBIT A** (tabbies)

Page 13

1  Q. Okay. You purchased that when?
2  A. Oh, I don't know, a couple of years
3  ago.
4  Q. After Hurricane Katrina?
5  A. Yes.
6  Q. Can you tell us your Social Security
7  number?
8  A. 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.
9  Q. Prior to living at the Berkley Street
10 address which I understand you purchased after
11 Hurricane Katrina -- is that correct?
12 A. Yes.
13 Q. Where did you live before that?
14 A. On Jourdan Avenue.
15 Q. And what the address on Jourdan
16 Avenue?
17 A. Um -- damn, I can't even remember the
18 address. Um --
19 Q. 1739? Does that ring a bell?
20 A. That's it.
21 Q. Okay. And how long did you live at
22 1739 Jourdan?
23 A. Maybe ten years or so, I don't know.
24 I can't remember.
25 Q. Did you own that house at Jourdan

Page 14

1  Avenue?
2  A. Yes.
3  Q. All right. And could you describe the
4  house for me? By that, I mean was it a single,
5  one-story house?
6  A. It was a one-story.
7  Q. Was it on a slab?
8  A. Yes.
9  Q. And you purchased it ten years --
10 approximately ten years before Hurricane
11 Katrina?
12 A. Somewhere along there.
13 Q. And by whom were you employed at the
14 time of the hurricane?
15 A. Brice Building Company.
16 Q. What was your job capacity?
17 A. A carpenter.
18 Q. And how long had you been employed by
19 them? Approximately.
20 A. About twelve years.
21 Q. Okay. Who are you employed by now?
22 A. Same people.
23 Q. Same people? So you've been employed
24 with -- twelve years before Hurricane Katrina,
25 and you're still employed by them?

Page 15

1  A. Yep.
2  Q. In the capacity as a carpenter?
3  A. Carpenter foreman now.
4  Q. Carpenter foreman? Where are they
5  located?
6  A. They're on, um -- Causeway Boulevard.
7  Executive Tower, 301 Causeway.
8  Q. Is your wife employed?
9  A. Not right now.
10 Q. Was she employed at the time of the
11 hurricane?
12 A. Yes.
13 Q. Where at?
14 A. She worked for Dr. Fisherman.
15 Q. Dr. Fishman?
16 A. Uh-huh.
17 Q. As a receptionist or a nurse or --
18 A. She was a nurse.
19 Q. She's a graduate nurse?
20 A. Yep.
21 Q. Do you know from where? Where did she
22 study nursing?
23 A. In Wisconsin.
24 Q. Okay. Are you originally from New
25 Orleans?

Page 16

1  A. No.
2  Q. Where is your home originally?
3  A. Tallulah, Louisiana.
4  Q. And your wife is from Wisconsin?
5  A. Madison.
6  Q. All right. Did y'all meet here in New
7  Orleans or --
8  A. Yes.
9  Q. She was nursing here?
10 A. Yes.
11 Q. Okay. And how long have y'all been
12 married?
13 A. Probably about six, seven years.
14 We've been together for thirty.
15 Q. You are married now six or seven
16 years?
17 A. (Nods affirmatively.)
18 Q. But you've been together --
19 A. It might be longer than that, I don't
20 know.
21 Q. -- approximately thirty years?
22 A. Yes.
23 Q. What is your educational background;
24 how far did you go in school?
25 A. 11th grade.

Page 57

1  Q. Did it eventually come into the attic?
2  A. Yes.
3  Q. And how high are the ceilings in your
4  house?
5  A. Eight foot.
6  Q. So at some point in time the water had
7  risen in your house to the ceiling?
8  A. It "ris" to the ceiling, yes, it did.
9  Q. Do you recall what time that was?
10 A. Shoot, I don't know.
11 Q. Do you recall, as you were in the
12 attic, as the water rose to the ceiling, did
13 you get on the roof?
14 A. No. I just looked out.
15 Q. Looking out of the attic?
16 A. Out the roof. Out the hole.
17 Q. What could you see when you looked out
18 the hole?
19 A. The water was higher. It was up to
20 the edge of the roof.
21 Q. As you got looking out the roof from
22 the attic?
23 A. Right.
24 Q. So how high would that be?
25 A. The water was about eight feet, I

Page 58

1  guess.
2  Q. At that point in time?
3  A. Right.
4  Q. How long after you had seen the water
5  coming down the driveway --
6  A. Oh, I don't know. But -- I don't
7  know. I guess a few hours or so, I don't know.
8  Q. Okay. So when you looked out of the
9  attic hole that you had cut --
10 A. Right.
11 Q. -- you could see the water up to your
12 roof level?
13 A. Right.
14 Q. Which would be eight feet?
15 A. Right. Or better.
16 Q. Or better? And you were looking -- as
17 you were looking out of the hole, you were
18 looking in what direction?
19 A. To the left side of the house.
20 Q. Would that be where the levee is or --
21 A. No, that would be to where the
22 driveway is.
23 Q. Okay. Could you see the wall from
24 where you were?
25 A. What wall?

Page 59

1  Q. The wall along the Industrial Canal.
2  A. I don't know. I didn't look that way.
3  Q. Okay. Did you at some point in time
4  get out of the house?
5  A. Yeah.
6  Q. How?
7  A. Swam.
8  Q. Swam to where?
9  A. Next door.
10 Q. And was that a two-story house?
11 A. Yes.
12 Q. And do you know what time you swam to
13 the other house?
14 A. No.
15 Q. When you swam over there, why did you
16 swim over to the other house? Was that because
17 it was a higher house, or what was the reason?
18 A. No, because I saw a barge on the front
19 of the house.
20 Q. When did you see a barge in the front
21 of the house?
22 A. When I turned around and looked and I
23 seen this wall, I didn't know what it was at
24 first.
25 Q. And where was the barge when you first

Page 60

1  saw it?
2  A. On the front of the house.
3  Q. In the front of your house?
4  A. Right.
5  Q. When you saw the barge, was it -- had
6  it hit your house?
7  A. It was on it.
8  Q. It was on your house?
9  A. Right.
10 Q. On what part of your house?
11 A. The front.
12 Q. Did you hear it when it hit the house
13 before?
14 A. No.
15 Q. When you got up and looked out the
16 attic, did you see the barge?
17 A. I saw it then.
18 Q. Uh-huh. And what did you see where
19 the barge had come from, could you see?
20 A. No. The wind was blowing hard.
21 Q. Okay. All right. And the barge was
22 on the front of your house?
23 A. Right.
24 Q. Okay. And then what happened?
25 A. I tied an extension cord around me and

Page 61

1  jumped in the water and swam next door.
2     Q.  Okay.  So the reason you swam out from
3  your house was because of the barge?
4     A.  Yeah.
5     Q.  Was the barge -- it was on top of your
6  house?  Was it moving?
7     A.  I don't know if it was moving or not.
8  It was just there.
9     Q.  Was it daylight when you saw it?
10    A.  No, it was dark.
11    Q.  Okay.  Did you see the barge before it
12 was on your house?
13    A.  No.
14    Q.  Did you see it at any time after it
15 was on your house?
16       MR. WALKER:
17          Objection, vague as to time.
18 EXAMINATION BY MR. WIEDEMANN:
19    Q.  You said you saw it -- when you were
20 looking out the roof you saw it on part of your
21 house.
22    A.  Right.
23       MR. WALKER:
24          Objection, asked and answered.
25 EXAMINATION BY MR. WIEDEMANN:

Page 62

1     Q.  What part of your house was it on?
2     A.  The front.
3     Q.  That would be -- had it intruded into
4  your house in any way?
5     A.  I don't know right then.
6     Q.  Okay.  All right.  And had you heard
7  the barge -- other than the scraping, banging
8  that you heard, had you heard it after that?
9        MR. WALKER:
10          Objection, asked and answered.
11 EXAMINATION BY MR. WIEDEMANN:
12    Q.  Go ahead.  Did you hear anything after
13 that?
14    A.  No.
15    Q.  Was the first time that you saw the
16 barge when you looked out of the roof?
17    A.  Right.
18       MR. WALKER:
19          Objection, asked and answered
20          three times.
21 EXAMINATION BY MR. WIEDEMANN:
22    Q.  You don't know what time that was.
23       MR. WALKER:
24          Objection, asked and answered.
25    A.  No.

Page 63

1  EXAMINATION BY MR. WIEDEMANN:
2     Q.  And after you saw it, you put a cord
3  around yourself?
4     A.  Yes.
5     Q.  And you swam --
6     A.  Next door.
7     Q.  Next door?  Is that across the street
8  or next door?
9     A.  Next door, right on the side of my
10 house.
11    Q.  To the right of you?
12    A.  To the left.
13    Q.  Left?  And whose house was that?
14    A.  Um -- I can't think of her name.  It
15 was one of my friends that she was renting.
16    Q.  Was renting the house next door?
17    A.  Yes.
18    Q.  You can't think of their name.
19    A.  No.
20    Q.  How many people were there in the
21 house next door?
22    A.  Four.
23    Q.  And do you know any of their names at
24 this point in time?
25    A.  I can't think of them people name.  I

Page 64

1  never did deal with them.
2     Q.  Okay.  So they were renting next door
3  to you.
4     A.  Right.
5     Q.  And you knew them before then, before
6  the hurricane.
7     A.  Yeah.
8     Q.  Okay.
9     A.  Just found your neighbors.
10    Q.  And you went there because of what
11 reason?
12    A.  The water was higher than my house.
13    Q.  Okay.  And what was the purpose of the
14 cord you put on?
15    A.  The water was moving fast, I didn't
16 want to get washed out in the canal.
17    Q.  Did you have -- did you have the cord
18 attached to something?
19    A.  To the roof.  To the rafters on the
20 inside the roof.
21    Q.  Okay.  So you had enough cord to
22 enable you to get --
23    A.  A hundred foot.
24    Q.  -- to get to your neighbor's house?
25    A.  Yes.

Page 65

```
 1        MR. WALKER:
 2            Let me pose an objection here,
 3        Larry. You mischaracterized his
 4        testimony. In answer to your
 5        questions earlier, he said he did not
 6        know what the scraping sound was from,
 7        and you characterized your question
 8        now as it was from the barge, which is
 9        a mischaracterization of his
10        testimony.
11   EXAMINATION BY MR. WIEDEMANN:
12     Q. When you got to the -- swam to your
13   neighbor's house, did you -- how did you get
14   into the house?
15     A. Through a window on the top floor.
16     Q. On the second floor?
17     A. Right.
18     Q. And there were people there?
19     A. Yes.
20     Q. How many?
21     A. Four.
22     Q. Okay. And did you talk to them about
23   what had happened at that point in time?
24     A. What you mean?
25     Q. Well, I mean, you had heard these
```

Page 66

```
 1   noises and you swam over to their house, there
 2   was water rising. Did you all talk about what
 3   was going on?
 4     A. Yeah.
 5     Q. Huh?
 6     A. Yeah.
 7     Q. Did y'all talk about what was the
 8   probable cause of what happened?
 9     A. No.
10        MR. WALKER:
11            Objection.
12   EXAMINATION BY MR. WIEDEMANN:
13     Q. Did they give you any information that
14   you didn't already have?
15     A. No. He just asked me how I got there.
16     Q. And how long did you stay in the house
17   next door?
18     A. Until we got rescued.
19     Q. And how were you rescued?
20     A. A friend come down the street with a
21   boat and picked us up.
22     Q. And who was that?
23     A. I can't think of his name. He's just
24   a fellow in the neighborhood with a boat.
25     Q. Okay. And when was that? It was
```

Page 67

```
 1   daylight?
 2     A. It was the day after -- it was after
 3   the hurricane.
 4     Q. Was it the next day on the 29th?
 5     A. Yes.
 6     Q. Do you remember what time it was?
 7     A. No.
 8     Q. Now, did you at any time hear -- after
 9   you heard this scraping, banging sound, did you
10   hear any other sounds other than that before
11   you saw the water coming?
12     A. Nothing but the wind blowing hard.
13     Q. Okay. Did you hear -- before the
14   water came down your driveway, did you hear a
15   boom, like a boom or an explosion like?
16     A. I don't think I heard -- I don't
17   believe.
18     Q. Okay.
19        MR. WIEDEMANN:
20            Can we take a break for just a
21        minute?
22        (Off the record.)
23   EXAMINATION BY MR. WIEDEMANN:
24     Q. Mr. Murph, I know that these events
25   took place back in 2005 and your memory is
```

Page 68

```
 1   maybe not as good as we would expect, or -- it
 2   wouldn't be any better for me, either, but did
 3   you -- at some point in time were you
 4   represented by the Cochran firm in your
 5   personal case?
 6     A. I wasn't represented by nobody that I
 7   know of.
 8     Q. Were you represented by Mr. Joe
 9   Guidry?
10     A. I don't even know no Joe Guidry.
11     Q. Did you give a statement to the
12   Cochran firm or Mr. Joe Guidry about the events
13   leading up to the hurricane?
14     A. Not that I can remember.
15     Q. Let me show you a transcription of a
16   statement taken on January 25th, 2006.
17        MR. WALKER:
18            Do you have copies for all of us?
19        MR. SANDERS:
20            No.
21        MR. WALKER:
22            Can we make copies?
23        MR. WIEDEMANN:
24            Sure.
25        (Off the record.)
```

Page 73

1  rules, if you're going to show the
2  witness a statement to refresh his
3  recollection, he's entitled to a
4  complete copy of the statement.
5  MR. SANDERS:
6      Let's move on.
7  MR. WIEDEMANN:
8      Let the record reflect that all
9  counsel has a copy of the statement.
10 MR. WEBB:
11     Let the record reflect that all
12 counsel do not have copies of the
13 statement. They have copies of the
14 excerpts, Mr. Wiedemann. If you're
15 going to say it, say I correctly,
16 please.
17 MR. SANDERS:
18     Let's move on.
19 MR. WIEDEMANN:
20     All counsel have been furnished a
21 copy of the excerpts of Statement of
22 Arthur Murph, including Mr. Webb,
23 prior to showing the statement to the
24 witness.
25 MR. WALKER:

Page 74

1      Sorry, Larry, but we want to make
2  another objection or statement for the
3  record, and that is that we don't --
4  as I said earlier, I don't know the
5  circumstances under which this
6  purported statement was given, but if
7  it was with respect to a potential or
8  actual representation that Mr. Murph
9  was obtaining from Mr. Guidry or
10 anybody at that firm, it gets into
11 aspects of attorney/client privilege
12 which Mr. Murph has not waived, and I
13 don't see that he has consulted any
14 counsel present with respect to that
15 potential waiver and a knowing waiver
16 on his part of the protections that
17 he's afforded.
18 MR. GILBERT:
19     And Lafarge doesn't have standing
20 to assert that privilege. There's no
21 privity between Mr. Murph and Lafarge.
22 MR. WEBB:
23     Counsel you're dead wrong. All
24 the members of the bar have a
25 responsibility to uphold the code of

Page 75

1  professional responsibility. And if
2  Mr. Guidry did violate the
3  attorney/client privilege, then we're
4  all duty bound to report that to the
5  Office of Disciplinary Counsel, which
6  I intend to do.
7  MR. SANDERS:
8      Okay. It's out. Let's go
9  forward.
10 MR. WIEDEMANN:
11     Okay. Let's get on with it.
12 Y'all finished?
13 MR. WALKER:
14     Yeah. But my statement has
15 something to do beyond that, and that
16 is that you're going to ask Mr. Murph
17 questions regarding a statement which
18 he's going to respond to under oath,
19 and he think he has the right to
20 consult the attorney who provided you
21 this to determine whether he should,
22 knowingly, and if he does, that he
23 does so knowingly, waive or
24 potentially waive an attorney/client
25 privilege.

Page 76

1  MR. GILBERT:
2      He's never been deprived of that
3  right. He's been free to consult that
4  attorney at any time he wants, and as
5  far as way know he has. We don't know
6  whether he has or hasn't.
7  MR. WIEDEMANN:
8      Okay. Y'all finished?
9  EXAMINATION BY MR. WIEDEMANN:
10 Q. Mr. Murph, you have in front of you a
11 excerpt of a Statement of Arthur Murph taken on
12 January 25th, 2006, by Richard J. Guidry (RJG).
13 A. Uh-huh.
14 Q. Do you recall giving a statement to
15 Mr. Guidry?
16 A. I don't think I need to talk about
17 this until and unless I talk to my attorney and
18 see if it's okay to for me to say anything else
19 about this here.
20 Q. Who is your attorney?
21 A. Mr -- my memory ain't that good. I
22 got a card in my pocket. What's that name
23 that's on there? (Tendering.)
24 Q. It's --
25 MR. WIEDEMANN:

Page 175

1  Q. You can answer.
2  A. No.
3  Q. You don't recall the phone calls?
4  A. No.
5  Q. Do you recall that phone calls even
6  occurred?
7  A. Yeah.
8  Q. Okay. What phone were you on when
9  those phone calls happened?
10      MR. WALKER:
11         Asked and answered.
12 EXAMINATION BY MR. GILBERT:
13 Q. Were you on a cellphone?
14 A. Yes.
15 Q. Do you still have that cellphone?
16 A. No.
17 Q. Do you remember the cellphone number
18 of that phone?
19      MR. WALKER:
20         Asked and answered.
21 A. No.
22 EXAMINATION BY MR. GILBERT:
23 Q. Do you recall what provider you had?
24 A. It wasn't my phone.
25 Q. Whose phone was it?

Page 176

1  A. It was the neighbor's phone.
2  Q. The neighbor's phone? And so when you
3  spoke -- is it Jeanne or Jeanie?
4  A. Jeanie.
5  Q. When you spoke with Jeanie that
6  evening, each time you spoke with her you were
7  on the neighbor's phone?
8  A. I can't remember.
9  Q. Okay. Did you speak to her at all on
10 your own phone that evening?
11 A. Yes.
12 Q. Okay. And that would have been the
13 cellphone or a land line?
14 A. Cellphone.
15 Q. Okay. Do you remember the service
16 provider you used to use?
17 A. Nextel.
18 Q. Nextel? Was that a phone provided to
19 you through work or was that something you
20 subscribed to?
21 A. Yes.
22 Q. Through work?
23 A. Yes.
24 Q. And that's Brice Construction?
25 A. Yes.

Page 177

1  Q. Okay. You didn't have to pay the
2  bills for that Nextel phone, did you?
3  A. No.
4  Q. You don't have copies of those bills,
5  do you?
6  A. No.
7  Q. Okay. Do you remember last time we
8  had asked you if you remembered giving a
9  statement?
10 A. Yes.
11     MR. WALKER:
12        Objection.
13 EXAMINATION BY MR. GILBERT:
14 Q. Do you remember giving a statement?
15 A. No.
16 Q. Okay. Have you had a chance to read
17 over the statement?
18 A. Yes.
19 Q. Does it reflect your observations as
20 to the topics the statement deals with?
21     MR. WALKER:
22        Objection. There's no testimony
23     that Mr. Murph has reviewed the
24     statement. If you're referring to the
25     redacted version, which is

Page 178

1  objectionable on numerous grounds,
2  then make sure you clarify for the
3  record that you're referring to the
4  redacted version.
5      MR. GILBERT:
6         I'm showing this to counsel, a
7      multi-paged document entitled Excerpts
8      of Statement of Arthur Murph taken
9      January 25th, 2006 by RJG.
10        (Tendering.)
11 EXAMINATION BY MR. GILBERT:
12 Q. Have you seen this document?
13 A. Yes.
14 Q. Have you had a chance to look through
15 it?
16 A. Yes.
17 Q. Okay. Does it help to refresh your
18 memory?
19     MR. WALKER:
20        Objection.
21 A. Somewhat.
22 EXAMINATION BY MR. GILBERT:
23 Q. Okay. I want to direct you to Page 4
24 of the excerpts.
25     MR. WALKER:

Page 195

1  looking out the hole?
2      A.  Yes.
3      Q.  Okay. When you chopped the hole, that
4  was before or after the boom?
5      A.  That was before the boom.
6      Q.  What did the floodwall look like
7  before the boom?
8      A.  It was a regular wall.
9      Q.  How much water was there before the
10 boom?
11     A.  Just rainwater.
12     Q.  Were you scared?
13     A.  Yep.
14     Q.  Have you ever been in the military?
15     A.  Yes.
16     Q.  Did you ever serve overseas?
17     A.  Yes.
18     Q.  During combat?
19     A.  Yes.
20     Q.  Where?
21     A.  Vietnam.
22     Q.  I'll show you on Page 12 of your
23 statement -- I'll show you -- indicate a
24 paragraph around just beyond the middle of the
25 page where you said, I'm a Vietnam veteran and,

Page 196

1  look, I was not scared in Nam.
2         Is that true, you weren't scared then?
3      A.  Not like the storm I wasn't.
4      Q.  Okay. We all know you saw the barge
5  on your house.
6      A.  Right.
7      Q.  Did you see the barge moving at any
8  time?
9      A.  No.
10     Q.  Did you see it knock down any other
11 houses?
12     A.  No.
13     Q.  Did anybody tell you whether or not it
14 knocked down any other houses?
15     A.  No.
16     Q.  At some point did you climb up on the
17 barge?
18     A.  Yes.
19     Q.  When did you do that?
20     A.  The next day, after the storm.
21     Q.  What did you do when you were up
22 there?
23     A.  Wrote my name on it.
24     Q.  Okay. Did you write your phone number
25 or any other information?

Page 197

1      A.  No. Just my name.
2      Q.  And it said just Arthur Murph?
3      A.  Arthur L. Murph.
4      Q.  Okay. Why did you do that?
5      A.  So they know I been on it.
6      Q.  What did you use to write with?
7      A.  A nail.
8      Q.  A nail?
9      A.  Yep.
10     Q.  Okay. Can you describe what condition
11 the barge was in when you were standing on it?
12     A.  It was a regular barge. It was in --
13 just barge condition, I guess. It wasn't bent
14 up. It's steel.
15     Q.  Did you look down in it?
16     A.  Yes.
17     Q.  What did you see?
18     A.  Some gray stuff.
19     Q.  How much gray stuff?
20     A.  Not much, whatever was left in there I
21 guess they couldn't get out.
22     Q.  Did you ever call 911?
23     A.  Yes.
24     Q.  What phone did you use?
25     A.  My neighbor's.

Page 198

1      Q.  Their land line or their cellphone?
2      A.  Cellphone.
3      Q.  Did you ever use your phone to call
4  911?
5      A.  I might have. I don't know if my
6  phone was working then, but I called 911 off a
7  phone. I can't remember which one.
8      Q.  Do you know your neighbor's name?
9      A.  Joyce.
10     Q.  What's Joyce's last name?
11     A.  I don't know.
12     Q.  Do you know of any photographs of the
13 barge touching your house?
14     A.  Do what?
15     Q.  Do you know if there are any
16 photographs of the barge touching your house?
17     A.  Probably so.
18     Q.  Do you know who took them?
19     A.  Probably everybody that was in the
20 area.
21     Q.  Do you have any?
22     A.  No.
23     Q.  Did you get interviewed by any news
24 crew or anything like that?
25     A.  I didn't get interviewed -- no,

Page 203

1  document is self-evidencing it -- the
2  best evidence of its own terms, that
3  he would refer to that, that anyone
4  who has a copy of that produced in
5  discovery could refer to that for
6  questions regarding the actual terms
7  and conditions, it's in the document,
8  and so not to prejudice Mr. Murph and
9  his confidentiality agreement with
10 Lafarge.
11     MR. GILBERT:
12         Okay.
13 EXAMINATION BY MR. GILBERT:
14   Q. Let me ask you this: Where were you
15 when you signed this document?
16   A. In this building.
17   Q. Who was present?
18   A. A couple or few people.
19   Q. Who? What are the names?
20   A. Oh, I can't remember their names.
21   Q. Are they people that are here today?
22   A. Yes.
23   Q. Can you indicate which ones they are?
24   A. The two right here. (Indicating.)
25   Q. Okay. You just pointed to Derek

Page 204

1  Walker. Who else did you just point to?
2    A. And the man sitting to his left.
3    Q. The man wearing a red patterned tie
4  with a pen in his hand; Robert Fisher?
5    A. No. I said to his left.
6      MR. WALKER:
7          Why don't you just have them
8      raise their hand or something.
9      MR. GILBERT:
10         Okay. Well, I mean, if the
11     attorneys would agree to raise their
12     hands if they were present, if they're
13     the attorneys that Mr. Murph is
14     talking about right now, let the
15     record reflect who was present.
16         All right. Nobody is
17     volunteering any information.
18 EXAMINATION BY MR. GILBERT:
19   Q. Mr. Murph --
20     MS. BERTAUT:
21         Wait. Mr. Fisher just raised his
22     hand.
23     MR. GILBERT:
24         Okay. Let the record reflect
25     Mr. Fisher raised his hand.

Page 205

1  EXAMINATION BY MR. GILBERT:
2    Q. Were there any other persons present
3  when you signed this agreement?
4    A. Yes.
5    Q. Who?
6    A. (Indicating.)
7    Q. Well, Mr. Walker, Mr. Fisher --
8    A. That's it.
9    Q. Just those two?
10   A. That's all I can remember.
11   Q. So it was just those two and you --
12     MR. RICHTHOFEN:
13         You need to clarify. Speak
14     louder so he can hear you. If you can
15     remember, try to tell him how many
16     people were there.
17   A. That's all I can remember, those two
18 right now.
19 EXAMINATION BY MR. GILBERT:
20   Q. Okay. Was your wife present?
21   A. Yes.
22   Q. Was somebody named Parker Harrison
23 present?
24   A. If they signed that paper, they was.
25   Q. Do you have any independent

Page 206

1  recollection of that person being there?
2    A. Yes. If they signed that paper they
3  was there.
4    Q. Okay. So everybody who signed the
5  paper was there?
6    A. Was there. Uh-huh.
7    Q. That's a yes?
8    A. Yes.
9    Q. Okay. All right. Let me ask you
10 some -- all right. You say that the
11 document -- it says what it says and everybody
12 sees it and all, and what it says to me is that
13 it's a settlement agreement with Lafarge.
14     Is that correct; is that your
15 understanding of it?
16   A. Yes.
17   Q. How did this settlement come about?
18 And by that I mean how did you come into
19 contact with Lafarge?
20   A. The barge.
21   Q. Okay. Did you call them? Did they
22 call you? Did you go visit them? Did they go
23 visit you? That's the sort of question I'm
24 asking.
25   A. I called.

Page 207

1   Q. You called them?
2   A. Yes.
3   Q. You did personally?
4   A. Yes.
5   Q. Do you know the number that you
6   called?
7   A. No.
8   Q. Do you know what office at Lafarge you
9   called?
10  A. No.
11  Q. Did you call Lafarge locally, did you
12  call Lafarge at one of their national
13  headquarters or what did you do?
14  A. I can't remember.
15  Q. Okay. How did you get the number for
16  Lafarge?
17  A. Off the barge. I took the barge
18  Number and I --
19  Q. How did you get the phone number for
20  Lafarge?
21  A. Out the telephone book.
22  Q. Okay. You say you got the number off
23  the barge. You mean the Number ING 4727?
24  A. Yes.
25  Q. Okay. Did you know what ING 4727

Page 208

1   meant at that time?
2   A. No.
3   Q. Okay. Was Lafarge the first call you
4   made to talk about what had happened?
5   A. No. I can't remember who.
6   Q. I'm sorry?
7   A. I called a couple numbers. I was
8   searching for it.
9   Q. Okay. And both those numbers you
10  called, that was Lafarge, or was it some other
11  company?
12  A. Like I say, I was searching for who
13  the barge was for.
14  Q. Did you ever call Ingram?
15  A. I may have.
16  Q. But you don't remember for certain?
17  A. No.
18  Q. Okay. Who did you speak with at
19  Lafarge?
20  A. I can't remember that name.
21  Q. Did the person come speak with you
22  personally, or was it only on the telephone?
23  A. Only on the phone.
24  Q. Did Lafarge send you any letters,
25  anything in the mail?

Page 209

1   A. No.
2   Q. Okay. Do you know when it was that
3   you made that call to Lafarge, how long after
4   the storm?
5   A. I guess a couple of weeks, a couple of
6   days, I don't know, I can't remember.
7   Q. Do you remember where you were when
8   you made that call? Were you in New Orleans?
9   A. No.
10  Q. Where were you?
11  A. Pineville.
12  Q. Pineville?
13  A. Yeah.
14  Q. Okay. What did you tell them when you
15  made that call?
16  A. I just asked them if they miss a
17  barge.
18  Q. Did you tell them what had happened?
19  A. Yes.
20  Q. What did you tell them?
21  A. It's on my house.
22  Q. Did you tell them how it got there?
23  A. I don't know how it got there. I know
24  it was on my house.
25  Q. But did you tell them any --

Page 210

1   A. No.
2   Q. -- version of how it got there?
3   A. Just asked them if they're missing a
4   barge.
5   Q. And what did they tell you?
6   A. They're missing a few barges.
7   Q. Okay. All right. So after you had
8   that conversation -- what else took place
9   during that conversation that you can remember?
10  A. Nothing. We talked back and forth.
11  Q. Okay. What did they say to you?
12  A. They didn't say anything. We just
13  talked.
14  Q. Do you know if they made a recording
15  of that conversation?
16  A. I have no idea.
17  Q. Did they ask you if they could?
18  A. I can't remember that.
19  Q. Okay. What's the next time you spoke
20  with somebody from any of the companies about
21  the barge?
22  A. I guess the date that's on that paper.
23  Q. On this paper in my hand, the receipt
24  and release?
25  A. I guess. Right.

Page 215

1   you recognize the attorney who just looked up?
2   He's looking at me right now.
3       A.  If his name Daniel Webb, yeah.
4       Q.  Yeah?  When have you spoken with him
5   before?
6       A.  I never spoke with him at all I don't
7   think.
8       Q.  Okay.  But you recognize him?
9       A.  Yeah, from the last deposition.
10      Q.  Okay.  Anytime before then have you
11  seen him?
12      A.  No.
13      Q.  Okay.  Who did you settle with?
14      A.  The people that's on that paper.
15      Q.  Did you understand that at the time?
16      A.  Yes.
17      Q.  Did you understand that you were
18  settling with Lafarge and with Ingram and with
19  their insurers and with New Jourdan and New
20  Berkley?
21      A.  If that's what they got on that paper.
22      Q.  Did you understand that at the time?
23      A.  If I signed it, I must have.
24      Q.  But you don't know who New Jourdan is?
25      A.  I don't know who New Jourdan is.

Page 216

1       Q.  But you settled with them.
2       A.  Yes.
3       Q.  Okay.  Do you know why New Jourdan's
4   name is on here?  On this release agreement?
5       A.  No.
6       Q.  Do you know why New Berkley is on this
7   release agreement?
8       A.  No.
9       Q.  Do you know why Ingram is on this
10  release agreement?
11      A.  No.
12      Q.  The agreement shows that you signed it
13  on February 9th, 2006.  Did you know on that
14  date of a lawsuit going on against any of these
15  companies?
16      A.  No.
17      Q.  The date you signed this, that wasn't
18  the first time you met with Mr. Walker and Mr.
19  Fisher, correct?
20      A.  I think it is.
21      Q.  But had you spoken with them before?
22      A.  I may have, I don't know.
23      Q.  Did any lawyers for Lafarge give you
24  any advice?
25      A.  No.

Page 217

1       Q.  Did any lawyer give you any advice
2   concerning this agreement?
3       A.  No.
4       Q.  What about Mrs. Murph, did she go get
5   advice from any lawyer concerning this
6   agreement?
7       A.  She may have.  I don't know.
8       Q.  Did any lawyer ever explain to you
9   what every one of these paragraphs and
10  sentences meant in this agreement and what --
11  how it might affect your rights by signing it?
12      A.  I don't know.  They may have.
13      Q.  They may have, but you don't remember?
14      A.  I don't remember.
15      Q.  Did you tell Lafarge or any of their
16  attorneys or anybody acting on behalf of
17  Lafarge or Ingram or any of the parties that
18  you settled with, did you tell them what you
19  wanted this settlement to say?
20      A.  No.
21      Q.  Did anybody acting on your behalf tell
22  them what you wanted this settlement to say?
23      A.  No.
24      Q.  Did you get to look at this before you
25  signed it --

Page 218

1       A.  Yes.
2       Q.  -- or just that day?
3       A.  Yes.
4       Q.  How soon before -- when did you get to
5   see a copy of it before signing it?  How long
6   before you signed it?
7       A.  The same day.
8       Q.  The same day?  Did you take it to a
9   lawyer that day and say, hey, what do you think
10  about this?
11      A.  No.
12      Q.  Why not?
13      A.  For what?
14      Q.  Well -- so I interpret your answer to
15  mean that you didn't think that there was any
16  reason to see a lawyer.
17      A.  No.
18      Q.  Is that correct?
19      A.  Yes.
20      Q.  Did you trust that the lawyers that
21  were putting this together were going to
22  protect you?
23      A.  I don't know.
24      Q.  You don't know whether you did?
25      A.  No.

Page 255

1   A. Right.
2   Q. Then you go up into the attic. Is
3   that right?
4   A. Right.
5   Q. Had you already cut a hole? Was the
6   hole already there?
7   A. No, it wasn't no hole there. I put
8   the hole there.
9   Q. Right. But had you already put it
10  there at that point?
11  A. Before the boom? No.
12  Q. No. You put it there after the boom?
13  A. Right.
14  Q. Okay. Did the boom sound to you like
15  the sound of a barge crashing into a floodwall?
16  A. I don't know how a barge sound
17  crashing into a floodwall.
18  Q. Okay. Did you get the impression that
19  that's what it was?
20      MR. WALKER:
21          Objection. Asked and answered.
22  A. No.
23  EXAMINATION BY MR. GILBERT:
24  Q. Huh?
25  A. No.

Page 256

1   Q. What impression did you have?
2   A. I didn't have no impression. I just
3   heard a noise and I saw the water and I ran in
4   the garage.
5   Q. Okay. About what time was it when you
6   heard the boom?
7   A. I don't know.
8   Q. You don't know?
9   A. No.
10  Q. Was it dark?
11  A. Yes.
12  Q. How long after you heard the boom did
13  it get light?
14  A. The next day.
15  Q. Well, but how long? About how long?
16  A. Oh. I don't know how long that was.
17  Q. I'm sorry?
18  A. I don't know.
19  Q. Was it an hour?
20  A. No.
21  Q. Was it less, more?
22  A. It was the next -- it was more.
23  Q. It was more than an hour?
24  A. Yes.
25  Q. Okay. How many booms did you hear?

Page 257

1   A. Just a bunch of noise I heard. It
2   didn't really sound like a boom, it was just --
3   Q. Well, how many booms did you hear that
4   night? That morning, that night?
5       MR. WALKER:
6           Objection. Asked and answered.
7   A. I didn't heard no -- it's just a big
8   scraping sound. I just said like a boom, but
9   it just was a loud noise.
10  EXAMINATION BY MR. GILBERT:
11  Q. All right. Could we gather up the
12  exhibits so I could see what I've got?
13      (Off the record.)
14      MR. GILBERT:
15          All right. We're going to label
16  the excerpts of the statement as 8(a).
17      (Exhibit 8(a) was marked for
18  identification and is attached hereto.)
19      MR. GILBERT:
20          Y'all want to have a break? You
21  want to eat lunch?
22      MR. WALKER:
23          Do you have more questions?
24      MR. GILBERT:
25          I don't think. I think we're

Page 258

1   going to tender. Reserve rights but
2   we're going to tender.
3       MS. BERTAUT:
4           I have a few.
5       MR. WALKER:
6           We can go as far as we can. I
7   don't know when they'll bring the
8   food.
9   EXAMINATION BY MR. RICHTHOFEN:
10  Q. Mr. Murph, this is the second time
11  you've been here, correct?
12  A. Yes.
13  Q. This is just for clarity, for the
14  record. There are about fifteen individuals
15  around the table, at least?
16  A. About.
17  Q. Does how does being here with this
18  many people with ties and starched shirts on
19  make you feel?
20  A. Uncomfortable.
21  Q. Uh-huh. Are you nervous?
22  A. A little bit.
23  Q. All right. Has anyone told you how to
24  testify here today?
25  A. No.

Page 259

1   Q. Has everything you said been an honest
2   answer to the questions presented to you, as
3   much as you could answer?
4   A. Yes.
5   Q. Okay.
6   EXAMINATION BY MS. BERTAUT:
7   Q. Mr. Murph, my name is Carmelite
8   Bertaut. We talked the last time --
9   A. Right.
10  Q. -- you were here, on the other
11  deposition.
12      Let me just see if I can understand.
13  At the time Katrina hit, you and your family
14  were living at 1739 Jourdan Avenue?
15  A. Yes.
16  Q. And you are now on Berkley Drive?
17  A. Yes.
18  Q. Do you recall that you paid
19  approximately $93,000 for the house on Jourdan
20  Avenue when you purchased it?
21  A. I can't remember.
22  Q. Okay. Do you know what you paid for
23  the house on Berkley?
24      (Whereupon the deponent conferred with
25  counsel off the record.)

Page 260

1   EXAMINATION BY MS. BERTAUT:
2   Q. Let ask it this way: If the public
3   records show that you paid $230,000 for the
4   house on Berkley, does that sound about right?
5   A. Possibly.
6   Q. And if the public records show that
7   you and your wife paid approximately $93,400
8   for the house on Jordan Avenue, does that sound
9   about right?
10  A. Probably.
11  Q. Okay. Berkley is a newer house; is
12  that right?
13  A. Yes.
14  Q. Than Jourdan was.
15  A. Right.
16  Q. Is Berkley a bigger house than
17  Jourdan?
18  A. Yes.
19  Q. Okay. So -- and you moved from a
20  smaller, older house for which you paid $93,400
21  to a larger house that was valued at $230,000
22  since the storm. Is that right?
23  A. Yes.
24  Q. And you signed papers to purchase the
25  Berkley property on the same day that you

Page 261

1   signed a settlement agreement with Lafarge, is
2   that right?
3       MR. RICHTHOFEN:
4           If you remember the date.
5   A. I can't remember the date but it's
6   something like that.
7   EXAMINATION BY MS. BERTAUT:
8   Q. Okay. Are you still paying any notes
9   on Jourdan Avenue, any mortgage payments?
10  A. No.
11  Q. When did you quit paying mortgage
12  payments on Jourdan Avenue?
13  A. After the storm.
14  Q. Was it about the time that you bought
15  Berkley?
16  A. Probably.
17  Q. Are you paying any property tax on
18  Jourdan Avenue?
19  A. No.
20  Q. Do you maintain the property on
21  Jourdan Avenue?
22  A. There ain't no property.
23  Q. Well, do you cut grass or --
24  A. No.
25  Q. When did you acquire the North Roman

Page 262

1   property that's behind Jourdan?
2   A. Um -- I can't remember what date it
3   was.
4   Q. Okay. Did you get that from the
5   Priestlys?
6   A. No.
7   Q. That was a separate deal?
8   A. Yes.
9   Q. Was there any structure on the North
10  Roman property?
11  A. No.
12  Q. Okay. There never was in the time you
13  owned it?
14  A. No.
15  Q. Did you acquire the North Roman
16  property after you acquired Jourdan from the
17  Priestlys?
18  A. Yes.
19  Q. Do you know who you purchased the
20  North Roman property from?
21  A. The City of New Orleans.
22  Q. Was that through a tax sale or
23  something?
24  A. I can't -- I don't know -- really know
25  how we did that, but --

Page 283

1  Q. All right. How long after the
2  scraping was that that you went and did the
3  hole?
4     MR. WALKER:
5       Objection. Asked and answered?
6  A. After the water. After I saw the
7  water.
8  EXAMINATION BY MR. GILBERT:
9  Q. Do you know how much time went by?
10 A. No.
11 Q. Okay. Did you meet with any attorneys
12 today other than Mr. Richthofen --
13 A. No.
14 Q. -- to prepare for giving testimony?
15 A. No.
16 Q. You didn't meet with any of the
17 attorneys from Lafarge?
18 A. No.
19 Q. Okay. All right. That's it.
20    MR. GILBERT:
21       That's all. I mean, you know --
22 reserving the right to reexamine if
23 anybody else goes. But I guess we
24 take a break now?
25    MR. RICHTHOFEN:

Page 284

1       But before the break, real quick,
2  I would request that if Mr. Murph
3  is -- if anyone has taken a statement
4  from Mr. Murph with regards to these
5  proceedings, I request that I be
6  furnished a copy of that.
7     MR. GILBERT:
8       Call for production.
9     MR. RICHTHOFEN:
10      Do I have to file that with --
11    MR. WALKER:
12      I didn't hear what you said.
13    MR. GILBERT:
14      Just call for production.
15    MR. RICHTHOFEN:
16      I just -- well, whatever it's
17 called. If I need to file with
18 court -- I would request that if
19 Mr. Murph has made a statement to
20 anyone here, because we have a copy of
21 a statement, you know, a redacted
22 statement, and under the
23 confidentiality agreement, if he's
24 made a statement to anyone -- if
25 anyone here has taken a statement from

Page 285

1  Mr. Murph that I be furnished a copy
2  of that statement, please.
3     MR. WALKER:
4       Anybody else have any questions?
5  EXAMINATION BY MR. WALKER:
6  Q. I just have a couple, Mr. Murph. And
7  if we can get out before lunch you don't have
8  to come back.
9       Do you remember I took your deposition
10 on December 17th, '07, a couple of weeks ago?
11 A. I can't remember.
12 Q. Well, you remember in this room, you
13 were here with a bunch of us and I asked you
14 questions?
15 A. Right.
16 Q. Maybe that wasn't the right date.
17    MR. WIEDEMANN:
18      It wasn't in this room. It was
19 in Bruno's office.
20    MR. WALKER:
21      Sorry. You're right.
22 EXAMINATION BY MR. WALKER:
23 Q. In Mr. Bruno's office.
24 A. Right.
25 Q. A lot of attorneys asked you

Page 286

1  questions?
2  A. Yes.
3  Q. And you remember you were under
4  oath --
5  A. Yes.
6  Q. -- like you were today?
7  A. Right.
8  Q. And you promised to tell the truth
9  then, and if you didn't remember anything you'd
10 say you didn't remember, and we told you not to
11 guess?
12 A. Yes.
13 Q. You remember all that?
14 A. Yes.
15 Q. Did you tell the truth that day?
16 A. Yes.
17 Q. Did you give us your best recollection
18 of the events of Katrina and how you lived them
19 and what you saw and what you heard?
20 A. Yes.
21 Q. And how about today, did you give us
22 your best recollection?
23 A. As best as I know.
24 Q. And the first time we took your
25 deposition you didn't need any statement to

Page 287

1  refresh your memory, did you?
2     A.  No.
3     Q.  You remembered things just based on
4  your memory, didn't you?
5     A.  Right.
6     Q.  And the redacted statement you've been
7  shown prior to today's deposition didn't
8  refresh your memory any better than you had it
9  the first time we took your deposition, did it?
10    A.  No.
11    Q.  So you didn't need that statement to
12 give your testimony truthfully, did you?
13    A.  No.
14    Q.  And you don't remember giving the full
15 statement, do you?
16    A.  No, I don't.
17    Q.  You don't remember what attorney you
18 gave it to or --
19    A.  No.
20    Q.  -- whether he was black or white or
21 where it happened?
22    A.  I have no idea where that come from.
23    Q.  Did you ever give this attorney, and I
24 understand it's a difficult question because
25 you don't remember who it was, any authority to

Page 288

1  release the statement?
2     A.  I ain't had nothing to give to him for
3  the release.
4     Q.  So you don't remember him calling you
5  or you calling him or there being any exchange
6  between you where you gave him permission to
7  release the statement that you might have given
8  him.
9     A.  No.
10    Q.  And you haven't been shown the
11 statement in its entirety without any omissions
12 or deletions, have you?
13    A.  This statement right here?  I got one
14 from my lawyer.
15    Q.  This same piece of paper.
16    A.  This same piece of paper.
17    Q.  You've never seen the complete version
18 that you signed --
19    A.  No.
20    Q.  -- that doesn't have the omissions.
21    A.  No.
22       (Whereupon the deponent conferred with
23 counsel off the record.)
24    MR. RICHTHOFEN:
25       Say that.

Page 289

1       (Whereupon the deponent conferred
2  with counsel off the record.)
3  EXAMINATION BY MR. WALKER:
4     Q.  That's all I have.  Thank you, Mr.
5  Murph.
6     MR. GILBERT:
7        Let me just follow-up.
8  EXAMINATION BY MR. GILBERT:
9     Q.  You looked at the statement before
10 giving this deposition, right?
11    A.  Right.
12    Q.  Did it help you remember things?
13    A.  No.
14    Q.  No?  Okay.
15 EXAMINATION BY MR. RICHTHOFEN:
16    Q.  Did you ever sign a version of this
17 statement?
18    A.  I don't think.  I can't remember
19 signing one.
20    Q.  So do you recall giving this
21 statement?
22    A.  No.
23    Q.  Do you recall hiring any attorney to
24 represent you with regards to the barge and the
25 floodwall breach?

Page 290

1     A.  No.
2     Q.  Okay.  All right.
3     MR. WALKER:
4        Thank you, Mr. Murph.