```
 1
 2                 UNITED STATES DISTRICT COURT
 3                 EASTERN DISTRICT OF LOUISIANA
 4
 5
 6   IN RE: KATRINA CANAL BREACHES      CIVIL ACTION NO. 05-4182
     Consolidated Litigation
 7                                      NEW ORLEANS, LOUISIANA
     ****************************        WEDNESDAY, FEBRUARY 27, 2008
 8                                      11:00 A.M.
     PERTAINS TO: MRGO                  SECTION "K"(2)
 9
10
        HEARING ON MOTIONS TO QUASH SUBPOENAS (DOC. 10623), and/or
11            MOTION FOR PROTECTIVE ORDER (DOC. 10927)
           BEFORE THE HONORABLE JOSEPH C. WILKINSON, JR.
12          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
13
     A P P E A R A N C E S:
14
     FOR THE PLAINTIFFS:         LAW OFFICES OF JOSEPH M. BRUNO
15                               By: Scott Joanen, Esq.
                                     Joseph M. Bruno, Esq.
16                               855 Baronne Street
                                 New Orleans, Louisiana 70113
17
18
19
     FOR THE WASHINGTON GROUP    STONE, PIGMAN, WALTHER, WITTMANN, &
20   INTERNATIONAL, INC.:        HUTCHINSON
                                 By: William D. Treeby, Esq.
21                               546 Carondelet Street
                                 New Orleans, Louisiana 70130
22                               (504) 581-3200
                                          And
23                               JONES, DAY
                                 By: Shannon M. Kasley, Esq.
24                               51 Louisiana Avenue, N.W.
                                 Washington, D.C. 20001
25                               (202) 879-3939
```

1

2

3

**APPEARANCES CONTINUED:**

4

5

6

7

8

9

10

11   ICF, FOR EMERGENCY          JONES, WALKER, WAECHTER, POITEVENT,
     MANAGEMENT SERVICES, INC.:  CARRERE & DENEGRE, LLP
12                               By: Pauline F. Hardin, Esq.
                                 Capital One Building
13                               201 St. Charles Avenue
                                 New Orleans, Louisiana 70170
14                               (504) 582-8000

15

16

17

18

19

20

21

22   REPORTED BY:                VICTOR D. Di GIORGIO, CCR
                                 OFFICIAL COURT REPORTER
23                               500 Poydras Street, Room HB-406
                                 New Orleans, Louisiana  70130
24                               (504) 589-7782

25

Proceedings recorded by mechanical stenography.

1    Transcript produced by computer aided transcription.

2                    **P-R-O-C-E-E-D-I-N-G-S**

3                (WEDNESDAY, FEBRUARY 27, 2008)

4             (11:00 A.M.   -   MORNING SESSION)

5                    (COURT CALLED TO ORDER)

6           The DEPUTY CLERK:  All rise.

7           THE COURT:  Good morning.

8           Be seated, please.

9           The last matter is in re:  Katrina Canal Breaches

10   consolidated litigation.

11          I have two motions to quash subpoenas issued by

12   Washington Group International to the Louisiana Office of

13   Community Development concerning some Road Home program

14   documents.

15          Counsel make your appearances.

16          MR. JOANEN:  Good morning, Your Honor.  Scott Joanen On

17   behalf of the Plaintiffs, PLC with Joseph Bruno's office.

18          THE COURT:  Good morning.

19          MR. TREEBY:  And William B. Treeby.  Stone, Pigman, for

20   Washington Group International.

21          Shannon Kasley of Jones, Day who's admitted Pro Hac

22   Vice, who will be arguing against the motion

23          THE COURT:  How do you spell Mr. Kasley's last name?

24          MR. KASLEY:  Good morning, Your Honor.  It's Kasley,

25   K-A-S-L-E-Y.  I'm from Jones, Day.

1          MR. BRUNO:  And, judge, I'm just here.

2          THE COURT:   As usual, Mr. Bruno is just here.

3          MR. BRUNO:  I saw something on a transcript where you

4    said he's just here.

5          THE COURT:  That's right.  Now, he says it every time

6    he's here, he's just here.

7          Okay.  Proceed:

8          MR. JOANEN:  Good morning, Your Honor, we have brought

9    two motions to quash primarily --

10         THE COURT:  Listen, the first thing I would like to get

11   out of the way, before you go into your substantive argument, is

12   the argument that this motion shouldn't properly be here, so I

13   would like to hear from them first, because I think the subpoena

14   is weird, and I want to know why you did it this way.

15         MR. KASLEY:  Certainly, Your Honor.

16         THE COURT:  And by weird, it's issued out of the Middle

17   District of Louisiana, despite the fact that this Court has

18   state wide subpoena power with a return place of across the

19   street from this courthouse.  Now, why would somebody have a

20   subpoena issued out of the Middle District of Louisiana with a

21   return across the street from this Courthouse when this Court

22   clearly has subpoena power that reaches to Baton Rouge?  And the

23   State is a party in this consolidated litigation.

24         MR. KALSLEY:  Well, Your Honor, actually we believe

25   that we've issued the subpoena properly under Rule 45.  The

1  subpoena needs to issue from the district in which the documents

2  are sought.

3           THE COURT:  Why is that?

4           MR. KASLEY:  That's our reading of Rule 45, and we

5  think that that's fairly settled.  I mean, that's why we

6  subpoenaed the documents in other jurisdictions.

7           THE COURT:  Why do you make the production then across

8  the street?

9           MR. KALSLEY:  Well, the reason we have identified Mr.

10 Treeby's office --

11          THE COURT: Here's what Rules 45(a)(2)(c) says, "A

12 subpoena must issue as follows:  For production or inspection is

13 from subpoena commanding a person's attendance from the Court

14 for the district where the production or inspection is to be

15 made".  So you issued a subpoena commanding that the production

16 be made across the street.

17          MR. KALSLEY:  Well, maybe that's where the confusion

18 is, Your Honor.  The way we read that is -- and the way we've

19 done all of our subpoenas is, we read --

20          THE COURT:  I don't blame you from issuing a subpoena

21 out of the Northern District of California to people who are in

22 the Northern District of California where this Court has no

23 subpoena power, but this Court has subpoena power that reaches

24 statewide.

25          MR. KASLEY:  That wasn't our understanding, Your Honor.

1          THE COURT:   Are there any Louisiana lawyers present?

2          Does anybody doubt that this Court has state wide

3     subpoena power?

4                         (NO RESPONSE)

5          THE COURT:   No.  No nobody does then.  So right off

6     the bat I tell you, that when I get the devotion of this kind of

7     time to an argument that this is the wrong court to hear this

8     and it's based on what Rule 45 says about the issuing court

9     being the proper place to quash the subpoena, it makes me wonder

10    about the motivation of people who have a subpoena like this

11    issued out of the Middle District of Louisiana when it could

12    easily have been issued out of this Court, particularly if you

13    wanted the production made across the street, which is what the

14    subpoena says.  So I'm wondering what your motivation was in

15    doing it this way.

16         MR. KASLEY:  We had no --

17         THE COURT:   And if you truly object to this Court

18    ruling on this motion, so that you want to make me have these

19    folks go to Baton Rouge to re-file their motion to quash so that

20    somebody in the Middle District can look at it and say, you

21    know, I'm going to transfer this down to New Orleans.  I mean,

22    is that what you really want to go through that circuit?

23         MR. KALSLEY:  No, we wouldn't, Your Honor, but we would

24    have liked to avoid motion practice entirely, but we weren't

25    given the opportunity to do that.  We do not believe that we

1  issued the subpoena improperly.

2  THE COURT:  I'm not saying that you issued it

3  improperly, okay.  Certainly, the Court in the Middle District

4  of Louisiana has the power to issue a subpoena to somebody who

5  resides in the Middle District of Louisiana.  I'm saying that

6  you issued it oddly.  Is that your motivation for doing so is

7  being questioned.

8  MR. KALSLEY:  Okay.  Well, I'll address the question on

9  motivation.

10  We would certainly have gone to Baton Rouge to review

11  the documents if that's what the Louisiana Office of Community

12  Development asked us to do.  By identifying Mr. Treeby's office

13  as the place for production all we were trying to do was

14  identify for them the person that they should contact just like

15  we've done out in the Norther District of California, as Your

16  Honor has alluded to, and if the lawyers for the LOCD asked us

17  to come to Baton Rouge, we would have gone to Baton Rouge.  If

18  they said we'll send you the documents in New Orleans at Mr.

19  Treeby's office, that would have been fine by us.  We did not

20  have any hidden motivation or ulterior motive to issue the

21  subpoenas the way we did, it was just our understanding of the

22  way we were supposed to do it and the way we've done it, quite

23  frankly, for all of the subpoenas we've issued.

24  THE COURT:  You've issued other subpoenas out of the

25  Western District of Louisiana and the Middle District of

1  Louisiana?

2          MR. KASLEY:  Middle District, yes, Your Honor.

3          THE COURT:   For folks who were in Louisiana?

4          MR. KASLEY:  Yes, we have.  On registered agents, Your

5  Honor.

6          Several of the corporations that are outside of

7  Louisiana have registered agents in Baton Rouge and that's how

8  we did it, and the same process that I just described occurred.

9  We received a phone call that said either come to us or we'll

10  send it to you.  Quite frankly, Your Honor, we weren't trying to

11  hide the ball or make this more difficult particularly for the

12  Court.  We were trying to identify who they should contact here

13  in New Orleans.

14          THE COURT:   Okay.  Thank you, Mr. Kasley.

15          All right, Mr. Joanen.

16          MR. JOANEN:  Your Honor, those initial concerns were

17  the first ones that we saw as well because clearly the Rule

18  would have allow for the issuance of subpoena in this district

19  and this Court, you, in particular probably has the most

20  knowledge of the discovery disputes and the process of discovery

21  that has taken place in this Court.  If defense counsel believes

22  that this Court has the appropriate authority to administer a

23  subpoena, then I suggest they consent to this Court's authority

24  to oversee this discovery dispute.  Likewise, I'd like to bring

25  up to the Court, that they noticed this subpoena through a

1   document in the pacer system, therefore, it seems to me that

2   we're submitting to the jurisdiction of this Court to administer

3   this discovery dispute.

4          THE COURT:   They are required to file their subpoenas

5   in the record of this Court by the case management order just as

6   they were required to try to explore ways to minimize litigation

7   discovery disputes in multiple forms, and I would have thought

8   that that kind of exploration would have led somebody to issue

9   subpoenas to people in Louisiana from this Court so that this

10  issue about who has authority to review a discovery dispute,

11  which was inevitable, would not have to first jump through the

12  procedural hoops that the objection filed by the Washington

13  group now presents, but, you know, I guess hopes are frequently

14  dashed.

15         MR. JOANEN:   And, Your Honor, they're not willing to

16  consent.  I certainly believe that this Court does have

17  authority to administer this because under Rule 45, the Court

18  does have some authority.  Now, if the Court were to find that

19  we have to go to the Middle District of Louisiana that seems to

20  be so much more to ask of the parties and of the judges up

21  there, as you brought up.  Clearly the judges up there don't

22  know this material as well as you do.  You are the Judge who

23  should best decipher the discovery dispute.

24         MR. KASLEY:   Your Honor, we'll consent to you

25  considering these options.

1    THE COURT:    You withdraw your argument about the

2   Court's lack of authority to address this question under Rule

3   45?  Well, that's good, because I've got authority anyway under

4   Rule 26, and if I had to go through all of the machinations that

5   are necessary to do that just to reject an argument that you

6   spent, you know, page after page in your briefs arguing, it

7   would be a real waste of time, which I have already wasted any

8   way, so I'm just venting here.

9    MR. KASLEY:  Understood, Your Honor, and I will address

10   Rule 26 as well.

11    THE COURT:    Let's get to the real crux of this

12   question.

13    MR. JOANEN:  Yes, Your Honor.

14    THE COURT:  Which for me is (a) the relevance of these

15   materials, and, (b), the burden of their production, as it

16   relates to the benefit of their production to this case, okay.

17    Now, as I understand the briefing, and it was

18   preciously thin on this key issue of relevance, the relevance

19   that the Washington group argues is present is a relevance of

20   these materials to its defense of setoff.  In other words, they

21   seem to argue, and I'll let them clarify this when they stand

22   up, that in the event that the Washington group is found to be

23   liable it has a right to setoff the amount of any liability that

24   a jury finds by the amount that the plaintiffs or class members

25   have received in the form of Road Home grants, right?  Is that

1    basically it?

2         MR. KASLEY:   There are other arguments we offer, Your

3    Honor, with respect to relevance, and I can address them after

4    Mr. Joanen's finished, if you'd like.

5         THE COURT:   Well, go ahead.   You address the relevance

6    first.

7         MR. JOANEN:   Your Honor, that's particularly why we

8    brought the two separate motions.   One on behalf the putative

9    class.   The other on behalf of those named plaintiffs.   The ones

10   that are on the putative class, obviously the class hadn't even

11   been established yet, and so for the MRGO, PLC to first

12   determine who's gone to Road Home is the first issue.   As Your

13   Honor knows, that's another very dynamic issue that we're

14   dealing with to know who is actually falling under that portion.

15        THE COURT:   Do you know how many named plaintiffs that

16   are in the various MRGO cases,

17        MR. JOANEN:   Your Honor, the names of the defendants

18   that we brought up were the ones that identified as the ones who

19   are --

20        THE COURT:   Named plaintiffs.   Do you know how many

21   named plaintiffs there are?   In other words, if no class is

22   certified, we still have cases filed on behalf of individuals.

23        MR. JOANEN:   Yes.

24        THE COURT:   That still have to go forward.   And the

25   question is how many named plaintiffs are there in the MRGO

1  cases?

2          MR. JOANEN:  There were five on the MRGO PLC that were

3  deposed by the --

4          MR. BRUNO:  No, there are thousands.  There are

5  thousands.

6          THE COURT:   How do you get thousands?

7          MR. BRUNO:  Because, Judge, when the anniversary came

8  in August I know that there were individual claims brought by

9  folks making the maritime claim, and I think that disks were

10  attached.  I think the reason why you may not be counting them

11  is because you're counting the name of the plaintiff it says E-T

12  A-L and it makes reference to a disk which contains literally

13  50,000.

14          THE COURT:  Is the Washington group a defendant on

15  those?  Because I know, for example, Mr. Becnel filed a case

16  that's got hundreds of thousands of names in it, and the only

17  defendant is the United States.

18          MR. BRUNO:  You are correct.  You are correct.

19          THE COURT:  Let me get to the end of this.  Let me get

20  to the end of this if I can.  Although, if there's additional

21  grounds for relevance, maybe we should discuss that, all right.

22          Here's my understanding of what's going on right now,

23  okay.

24          Under the existing case management order, which is

25  probably going to be changed shortly, probably.  You know, I

1   don't know what Judge Duval's going to do, but we talked about

2   this yesterday and there's pending motions for status

3   conferences and to redo the scheduling orders and he's certainly

4   going to hear from you all about that, sometime in the near

5   future, I don't know when.  But, you know, I have to deal with

6   what I've got now, okay.  This is how I understand what I've got

7   now.

8           Discovery, at this point, is limited to what we call

9   the common liability issues, okay.  And there's no discovery

10  going on as to damages.  I've permitted damages discovery to

11  some extent in connection with the class certification question

12  for the reasons that I've already setout in other materials.  I

13  can see how, given your setoff defense, although, you know, if

14  you want to talk about that, too, I'm not sure you've got a

15  setoff defense after the long discussion I heard from Dan Reese

16  the other day about what the State thinks its rights are, okay.

17          MR. BRUNO:  Undetermined.

18          THE COURT:  Undetermined is a very diplomatic way of

19  saying it.

20          MR. BRUNO:  This is discovery.

21          THE COURT:  This is discovery, okay.

22          I can see how obtaining information about Road Home

23  grants from persons who've sued the Washington group would be

24  relevant to your setoff defense, but that's not every single

25  person who has applied for and received Road Home grants in the

1   Ninth Ward and St. Bernard Parish.   That kind of information

2   might become relevant if a class is ever certified, but, you

3   know, in terms of the relevance of these materials to what we

4   have now, which is discovery that's supposed to be about the

5   liability issues, I don't see the relevance.   This is such a

6   massive undertaking.   This is such a massive undertaking to get

7   and review all of these documents that I'm not ready to ge

8   there.

9           MR. TREEBY:   I don't want to steal Mr. Kasley's

10  thunder, but, in fact, what we've asked for and we had an

11  understanding with the counsel who's in the Court today, and

12  it's evidenced in some e-mails that were attached to memoranda,

13  we just want two class reps files, and what we want to see in

14  them, and we're not interested in the privacy information, we're

15  just wanting to see in them what kind of positions they took and

16  it will relate to more than just damages.

17          THE COURT:   Listen to this guy.   His thunder is being

18  stolen.

19          MR. TREEBY:   And all we want to see is what's there so

20  we can make a determination of what might be relevant.

21          THE COURT:   Is that the current request that we have,

22  to see the two?

23          MR. TREEBY:   Yes.

24          THE COURT:   To see two.

25          MR. TREEBY:   Two.

1              THE COURT:    And who are they?

2              THE TREEBY:    The two class reps in our area of the

3     MRGO.

4              THE COURT:    And what are their names?

5              MR. KASLEY:    Dean Armstrong, and Ethel Mae Coats, Your

6     Honor.

7              THE COURT:    All right.

8              MS. KASLEY:    Your Honor, may I address the relevance on

9     this point?

10             THE COURT:    Yes, go ahead.   I'm sorry.   Everybody sit

11    down.   Everybody relax.

12             MR. KASLEY:    Your Honor, we set this forth on page 10

13    of our opposition brief.   We thought that this might be a

14    particular concern to you.

15             We believe that there could be relevant information

16    contained in these files and statements made particularly by the

17    class reps, who, as Your Honor knows, have agreed in connection

18    with becoming a class Rep to be subject to discovery.   Now

19    arguably it can go to class cert, but it also can go to the

20    issue of common liability, and that is any other statements

21    insurance or otherwise that conflict with -- I'm sorry.   I'll

22    start over.   Any statements that they've made and anything that

23    they've submitted to the Road Home, whether it be in the

24    application in correspondence that's in the file or any other

25    statement that they would make in the file about how their

```
 1    property was damaged.  If it's vandalism, that's liability, Your
 2    Honor, that goes to causation.
 3              THE COURT:   I understand.
 4              MR. KASLEY:  And then importantly in terms of whether
 5    or not those statements conflict with any other statements
 6    they've made, whether it to be to their insurance company,
 7    whether it was under oath when they did their deposition for the
 8    first round of class cert that we did where we saw Form 95s that
 9    conflicted with other forms.
10              THE COURT:  Okay.  All right.  Listen, I know what I
11    want to do now.
12              MR. KASLEY:  Okay.
13              THE COURT:  Your request is limited to the files of
14    these two people.
15              MR. KASLEY:  Ethel Mae Coats and Jeannine Armstrong,
16    Your Honor.
17              THE COURT:  And they are the movants, right, Mr.
18    Joanen?
19              MR. JOANEN:  Yes, Your Honor.
20              MR. KASLEY:  In one of the motions.
21              THE COURT:  Is there a representive of the Office of
22    Community Development present?
23              Oh, look who it is.
24              MS. HARDIN:  Hi, Judge.
25              THE COURT:  It's Pauline Hardin, well known to this
```

1    Court.

2           Did you go over to the dark side?  You work for the

3    State now?

4           MS. HARDIN:  No.  No, I don't represent OCD, but I do

5    represent ICF Emergency Management, Services, Inc., which is the

6    contractor for the Road Home program.  ITF contracts with OCD.

7           ICF actually has the documents or at least the bulk of

8    the documents.  OCD asked us if documents have to be produced

9    for ITF to produce them, so that's why I'm here because we're

10   the actually the laboring oar in this.

11          THE COURT:  I see.  Okay.  All right.  This is a

12   question which requires only a yes or no answer.  Have you seen

13   the files of Miss -- is it Mr. And Mrs. Armstrong?

14          MR. KASLEY:  I believe we just asked for Mrs.

15   Armstrong, Jeannine Armstrong, Your Honor.

16          THE COURT:  And Ms. Coats?

17          MS. HARDIN:  I have them.  I have not carefully

18   reviewed them, no.

19          THE COURT:  Are they thick?

20          MS. HARDIN:  They're a good size.

21          THE COURT:  All right.

22          MS. HARDIN:  They're a number of inches, probably four

23   or five inches each and some of these files are much bigger than

24   that.

25          THE COURT:  I want to review them in camera to satisfy

myself that they're relevant to what we have on the table right

now, okay.  I can see, based upon what Mr. Kasley submitted,

despite my deep involvement in the Road Home program, I've never

seen a file, okay.  In connection with this motion, I want to

see these two files.  I want to review them in camera.  I want

to satisfy myself, first of all, that they're relevant to

liability issues.

MR. TREEBY:  What about class cert?

THE COURT:  And/or class cert, which are the only

things we have as far as I'm concerned, although this may change

in coming weeks, that are ripe for discovery, but I've got to

deal with what I've got now.  Judge Duval's in charge.  If he

changes things in a couple of weeks, then he changes things.  I

want to see for myself what kind of personal information is in

these files, because I've heard a lot about what's in these

files, I want to see it now, and here's an opportunity for me to

see something, then I'll be able to determine relevancy.  If

it's was just these two files that we're talking about, which

frankly, when you came out here I was going to -- you know, my

interest -- because the request looked mega broad -- my interest

was in shrinking them down to something that is truly relevant

and then figuring out a way to protect that which must be

protected.  So if all we're talking about are these two files

I'd like for you to produce them to me in camera, I'd like to

study them, and then rule.  If they're relevant to class

1  certification or liability issues, then I'll order them produced

2  subject to some kind of protective order that may require the

3  redaction of like personal data identifiers.  You know, I need

4  to see what's in these, because I can see there must have some

5  confidential information in them.

6            MS. HARDIN:  They do, Your Honor, they have --

7            THE COURT:  And don't we have a protective order in

8  this case that would already be sufficient?

9            MR. KASLEY:  We offered to be bound by that.  We were

10 attempting to work that out on January 15th, when this first

11 motion was filed.

12           THE COURT:  Is the Master Protective order not

13 sufficient to deal with this?

14           MS. HARDIN:  I didn't get the impression that it was,

15 Your Honor.

16           Let me tell you a little bit about what happened in

17 case this goes any further.

18           We got this subpoena and OCD asked us to try to respond

19 to it.  It requests, I would say, 40 to 50,000 applicant files

20 which would have basically shut down the Road Home program if we

21 would have done that, because it's not just getting their files,

22 they wanted all communications, so if there's e-mails or

23 anything --

24           THE COURT:  The subpoenas were very broad.

25           MS. HARDIN:  It was humongous.  So anyway, I called

1    counsel and we agreed that we would produce two files.  However,

2    the State ordered me to notify counsel for those two people

3    because of privacy issues.

4         THE COURT:  And that's you, Bruno?  Mr. Joanen?

5         MR. JOANEN:  Yes, Your Honor.

6         MR. BRUNO:  Yes, Your Honor.

7         THE COURT:  You guys, apart from your position as

8    liaison counsel, are these your clients?

9         MR. JOANEN:  They are, Your Honor.

10        MS. HARDIN:  So the State was concerned about privacy

11   issues and confidentiality issues because the document --

12        THE COURT:  I know all about the State's concerns in

13   this regard.

14        MS. HARDIN:   Right.  And we talked to Mr. Reese, and

15   so that's when I contacted these gentlemen, and they did

16   whatever was appropriate.  So we just want to be certain that

17   the Court understands we've got the two files, we'll certainly

18   give them to the Court.  If they come back and they want, 40,

19   50, 60,000 files we're going to be here with a motion to quash.

20        THE COURT:   Okay.  Now, who on the Washington group

21   side, if I decide that these files are produceable, who needs to

22   see them for your purposes at this time?

23        MR. TREEBY:  At this time, Your Honor --

24        THE COURT:  Counsel of record, certainly.

25        MR. TREEBY:  Counsel of record.

 1          THE COURT:  Okay.

 2          MR. TREEBY:  And perhaps, depending on what is there,

 3   perhaps our experts, depending if they say something about

 4   causation, those experts.

 5          THE COURT:  You've already identified those experts,

 6   right?

 7          .MR TREEBY:  Right.  And possibly the class cert

 8   experts who have been identified, or one or more of them that

 9   have been identified.

10          THE COURT:  Okay.  Now, why doesn't the present

11   protective order, the Master Protective Order, why is it not

12   something that we could --

13          MR. JOANEN:  Unfortunately, I don't the protective

14   order covers these issues at all.  The protective order relates

15   to --

16          THE COURT:  I have to admit it's been awhile since I

17   looked at that thing.

18          MR. JOANEN:  It's mostly the defense materials.  I

19   don't think it even addresses the plaintiffs material.

20          And let me just remind Your Honor and Mr. Treeby.

21          First of all, we are under an order to -- I think it's

22   today -- to file a supplemental and amending complaint in MRGO,

23   and in that supplemental and amending complaint we will be

24   shrinking the geography of that we would suggest is an area what

25   the Washington group is liable for the inundation.

1          THE COURT:  Is that shrunken area, is that something

2    that Judge Duval asked you to do in connection with the class

3    certification?

4          MR. JOANEN:  Well, he ordered me to amend to add some

5    stuff on the levy side and so forth, and while I'm doing it I

6    promised Bill this sometime ago, but the point I'm making to you

7    is this, that we had originally alleged that the Washington

8    group was responsible for flooding Lower Ninth and St. Bernard.

9    We are reducing that geography down to Paris Road.

10         MR TREEBY:  Both of these people are in that area.

11         MR. JOANEN:  That's my fine.

12         THE COURT:  That's my question.  Does That shrinkage,

13   does that knock out the Armstrongs and Ms. Coats?

14         MR. JONAEN:  It knocks out a whole bunch of the

15   40,000, is my point.

16         THE COURT:  But we're passed the 40,000 right now.  The

17   40,000 are not going to be --

18         MR. JOANEN:  And I don't know what they're talking

19   about offset, that we have no collateral source.  That's off the

20   chart, and you have read the subrogation agreement.  The

21   subrogation agreement gives to the State the ownership of this

22   claim against them.

23         THE COURT:  I think this is what Mr. Treeby meant,

24   okay.  I may believe that down the line based strictly on what I

25   heard Mr. Reese say, and I don't think it was on the record, I

1    think it was a status conference, that down the line his offset

2    defense, if everything Mr. Reese said turns out to be so under

3    the Stafford Act and regulations, and God knows what else, it

4    maybe that his offset defense gets dismissed, okay.  But it's

5    not dismissed until it's dismissed.  If it's in the case, he's

6    got a defense.

7            MR. JOANEN:  But there's no defense.  There's no

8    collateral source in Louisiana.  I don't know what he's talking

9    about.  There's no offset for anything.

10           THE COURT:  I understand what you're saying, all right.

11   It's in the case.  It's in his answer, okay.  It's a defense.

12   It's a defense.  It's in the case until it's not in the case.

13   If you don't think he has a ground for asserting that defense,

14   then there are ways to get out of the case, okay, but until it's

15   out of the case it's in the case.

16           Don't tell Judge Duval I suggested that, all right.

17           MR. JOANEN:  I won't, I promise that.

18           THE COURT:  He's got enough motions.

19           MR. TREEBY:  It's a really a waste of time for these

20   files.  You could look at them and see if it has any material in

21   them.

22           THE COURT:  Before you do that, let's do this:  When

23   can you produce the two files for me for an in camera review?

24           MS. HARDIN:  By tomorrow.

25           THE COURT:  We'll you give until Monday, which is March

1  3rd to produce the files in camera, okay.  I'm going to review

2  them.  I'm going to make a determination as to relevance, and

3  also what might be in them that's private information,

4  confidential information, okay.  I need some input from you all

5  as to whether the existing protective order is sufficient to

6  protect whatever information that might be in there that's

7  protectable.

8          Look, if it's personal data identifiers, Mr. Treeby, I

9  might just say redact it, social security numbers, bank

10  accounts.  I don't know what's in these files.  If it's that

11  kind of information, you don't need any of that, and I might

12  just say before they're produced -- and who is the exact

13  producing entity again, Ms. Hardin?

14          MS. HARDIN:  I guess it will be ICF, Emergency

15  Management Services.

16          MR. JOANEN:  I think actually it's the Office of

17  Community Development who actually has the records.  You would

18  be the contractor.

19          MS. HARDIN:  Right.

20          THE COURT:  So it's Louisiana Office of Community

21  Development through its contractor.

22          MS. HARDIN:  Right.  Through its contractor.

23          THE COURT:  Okay.

24          MR. TREEBY:  I was under the impression that the

25  protective order does protect the privacy concerns, but I'm not

1   sure, it's right there.  We can look at and we will comment on

2   it.

3           THE COURT:  Just take a look at it.

4           MR. JOANEN:  Well, Judge, you know, my only comment

5   here is I have been fighting with Mr. Treeby now for six months

6   to get a 30(b)(6) deposition of his client, and I have been

7   listening to him telling me about the thousands of documents and

8   about the relevance issues, and I have to say that when it

9   comes, my concern is this business of relevance for the

10  plaintiff versus the defendant.

11          Last night I listened to a speech by Arthur Miller on

12  the new role of the court with regard to discovery issues.  It's

13  no longer an issue of whether it leads to discoverable

14  information, it about the management issues.  I'm more concerned

15  about the management issues.  I think the business of relevancy

16  has to rise to the level that it's actually going to get us

17  somewhere, and the reason I say that is because we're talking

18  about so many pieces of paper.  I have it in my office now.  I

19  don't even know what a terabyte is.

20          THE COURT:  Listen, I can stop you, because I agree

21  with you, All right.  Now, I have been saying this for 10

22  years, okay.  You're right.  The discovery standard is a

23  two-part thing now.  It's not just a question of relevance.

24  It's a question of what Professor Miller said on a panel that he

25  and I sat on together about eight years ago, okay.  It's a

```
1    question of cost benefit analysis, too.  But you've got to pick
2    one thing at a time, so the first thing you've got to do is to
3    decide if it's relevant, and that's what I'm going to look at.
4    If it's relevant, then you move onto part two, which is the cost
5    benefit analysis.
6          MR TREEBY:  And we were very much aware of that.
7          THE COURT:  So now I hear if we were going to stand
8    here and argue about 50,000 Road Home files, the answer was
9    going to be I don't really care if they're relevant because once
10   I get to part two you lose.
11         MR. KASLEY:  We understood that, Your Honor.
12         THE COURT:  But now we're not talking about 40,000
13   files any more, so the cost benefit analysis changes.
14         Look, I've heard that speech from Professor Miller
15   myself five or six times.  I heard him personally.  He sat down
16   an isle from me and said it.  I think I was the only person who
17   agreed with him.  I understand all of that, and that's why each
18   time we get one of these, where the subpoena starts out so
19   broad.
20         MR. TREEBY:  Like Joe's.
21         MR. BRUNO:  Six months before I came to see you, I
22   worked it out, unlike my worthy opponent today.
23         THE COURT:  Mr. Treeby didn't event the overly broad
24   subpoena, nor does he have a patent on it, but the speech is
25   right.  The speech that you heard is right, and typically what
```

1    happens is with these discovery disputes, it starts out this

2    broad.  The discovery process now under the rules is a

3    negotiation almost, and we make the lawyers negotiate first

4    because the Court really is in the worst position to determine

5    cost benefit analysis, in the first instance at least.

6            MR. JOANEN:  Judge, I guess what I'm trying to say is

7    you're absolutely correct.  The traffic, the cost benefit

8    analysis for two may seem to be easy, no brainer, but if you

9    give it to them for Mr. A and B, how do you not give it to them

10   for the other 40,000?

11           THE COURT:   Well, I wasn't going to give it to them

12   for the other 40,000, because the other 40,000 --

13           MR. JOANEN:    In the future.

14           THE COURT:  We can't talk about the future.  The future

15   is uncertain.  There ain't no 40,000 plaintiffs in any of these

16   cases with claims against WGI.  There aren't any.  There aren't

17   40,000.  There may never be 40,000.  There may never be a class

18   certified in this case, okay.  However, if a class is never

19   certified, there's some number of people.  Mr. Treeby thinks

20   it's 200.  That sounds about right to me, okay.  We still have

21   claims against WGI.  If they hang in there, and the case against

22   WGI is not dismissed on some motion, it's going to have to go to

23   trial.  When it goes to trial they're going to have this setoff

24   argument, among other things, that maybe relevant in the trial,

25   okay.  If I had to predict the future, and I said I don't want

1   to talk about the future, because the future is very

2   interesting,  all right.  They're going to lose that, but not

3   for another couple of years.  Right now the defense is in there,

4   and I'm telling you, Mr. Treeby, the State thinks that if these

5   people recover anything from you they're getting a piece of it,

6   that's what they think.

7          MR TREEBY:  That's their claim and they haven't made it

8   yet.

9          THE COURT:  That's right, but it's coming.  All right.

10  So this is what we're going to do, an in camera review of these

11  two files, the Armstrongs and Ms. Coats.  You're going to

12  deliver them to me by Monday.  If you can, by Monday confer, the

13  three lawyers here.  You get involved in this, too, Ms. Hardin.

14  You're getting paid for this, right?

15         MS. HARDIN:  Yes.

16         THE COURT:  Good.  See if the exiting protective order

17  would be sufficient.  If I decide to do this, and I said the

18  production is subject to the protective order, that's sufficient

19  to satisfy the privacy concern.  If it's not, write me a joint

20  letter that says where you stand.  Now, what I would do, if any

21  of it gets produce is basically limit it to purposes of this

22  litigation, limit it's access to counsel of record and the

23  experts.  Require that anybody who sees any of it to file an

24  affidavit to submit to the jurisdiction of the Court for

25  enforcement purposes, and that's about all I can think of off

1   the top of my head.

2          MR. TREEBY:  I hope we can use that one.  If we can't

3   we, we'll come up with one that tries to comply with the local

4   court rules on those subjects.

5          THE COURT:  All right.  Simple.

6          MR. JOANEN:  Thank you.

7          MS. HARDIN:  Thank you, Your Honor.

8          MR. TREEBY:  Thank you.

9          THE COURT:  In the future, I would appreciate it,

10  although this is not a Court order.  If subpoenas need to be

11  sent out and if somebody or some entity within Louisiana, this

12  court that's has authority to issue that kind of subpoena.  You

13  make the return place someplace that's convenient for the

14  subpoenaed party.  If it's Baton Rouge, it's Baton Rouge, but,

15  you know, this jurisdictional argument, I mean, I don't see any

16  reason why this should be brought up, because I know what would

17  happen.  If you filed this in Baton Rouge, they'd send it down

18  here the next today.

19         MR. KASLEY:  We don't believe they would, Judge.  The

20  Northern District of California didn't.

21         MR. JOANEN:  Which I think is a problem.  I think it's

22  unfair, Judge, because who knows more about this case than you,

23  yet they want to go forum shopping.

24         MR. KASLEY:  That's not forum shopping, Your Honor.

25         MR. JOANEN:  They could concede to have --

1          MR TREEBY:  If Your Honor please, we consented -- the

2    argument that we consented to it.  On the other hand --

3          THE COURT:  I've already told you I can see why it had

4    to be done in the Northern District of California, I can see

5    that, okay, and I didn't say that the Northern District of

6    California would send it here.  I said that the Middle District

7    of Louisiana would.

8          MR. TREEBY:  I think there was an attempt to be

9    consistent, Your Honor, and that's probably what led to this,

10   but we've consented to Your Honor handling this, so that's

11   really not an issue at this point, and we will keep in mind what

12   you said.

13         THE COURT:  But seriously, you've got to subpoena

14   somebody in Texas, we'll issue it from the appropriate court in

15   Texas, because we can't issue subpoenas from here to Texas, but

16   Baton Rouge is 88 miles away or 86 from here.

17         MR TREEBY:  I understand Your Honor's position.  It's

18   not that there was an illegal subpoena.

19         THE COURT:  The subpoena was not illegal.  The subpoena

20   was properly issued, it was just odd.  And so let's avoid oddity

21   in the future.

22         MR. TREEBY:  Thank you, Your Honor.

23         MR. KASLEY:  Thanks, Your Honor.

24         MR. JOANEN:  Thanks, Judge.

25         THE COURT:  Thank you.

1          Nothing further on the docket.

2          MS. HARDIN:  Thank you, Your Honor.

3          THE COURT:  Court's in recess.

4          *        *        *        *        *        *

5                    **C E R T I F I C A T E**

6

7

8          I, Victor D. Di Giorgio, Official United States Court

9    Reporter in and for the Eastern District of Louisiana, do hereby

10   certify that the foregoing proceedings were taken down by me in

11   shorthand at the time and place aforesaid, transcribed under my

12   personal direction and supervision, and that the preceding pages

13   represent a true and correct transcription, to the best of my

14   ability and understanding.

15

16

17

18                         S/Victor D. Di Giorgio
                           Victor D. Di Giorgio, CCR
19                         Official U.S. Court Reporter

20

21

22

23

24

25