UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| NORMAN ROBINSON, KENT LATTIMORE, LATTIMORE & ASSOCIATES, TANYA SMITH, ANTHONY FRANZ, JR., and LUCILLE FRANZ, INDIVIDUALLY | CIVIL ACTION<br><br>NUMBER: 06-2268<br><br>SECTION: "K" (2) |
|         Plaintiffs, | |
|    v. | |
| THE UNITED STATES OF AMERICA, and THE UNITED STATES ARMY CORPS OF ENGINEERS | |
|         Defendants. | |

## FIRST AMENDED COMPLAINT FOR DAMAGES CAUSED BY THE DESIGN, CONSTRUCTION, OPERATION, AND MAINTENANCE OF THE MISSISSIPPI RIVER GULF OUTLET

Plaintiffs NORMAN ROBINSON, KENT LATTIMORE, LATTIMORE & ASSOCIATES, TANYA SMITH, ANTHONY FRANZ, JR., and LUCILLE FRANZ, INDIVIDUALLY, and for their Complaint, with respect state the following:

## INTRODUCTION

1.    This action results from one of the most predictable and preventable catastrophes in American history—the tragic devastation of homes and lives during Hurricane Katrina—

caused by the United States Army Corps of Engineers' negligent design, construction, maintenance, and operation of the Mississippi River Gulf Outlet ("MR-GO").  The epic destructive forces of the MR-GO during Hurricane Katrina—and the drowning of the Lower Ninth Ward, New Orleans East, and St. Bernard Parish ("Greater New Orleans")—were foreseeable consequences of two fatally defective conditions known by the United States Army Corps of Engineers ("Army Corps") for decades:  (1) the destruction of the marshlands surrounding the MR-GO that intensified a huge east-west storm surge resulting in the inundation of much of New Orleans; and (2) the funnel effect stemming from the MR-GO's faulty design that accelerated the force and strength of the storm surge to lethal proportions.  Absent the exacerbating effect of the MR-GO, aptly nicknamed the "Hurricane Highway," Katrina would have been an endurable event in New Orleans' history rather than the obliterating force that destroyed lives and businesses, displaced thousands of people, and devastated much of a great American city known for its historic grace and beauty.  Plaintiffs—who have lost homes, possessions, businesses, and loved ones—bring this case against the United States Government and its division, the Army Corps, seeking just compensation for their unfathomable losses and hoping to rebuild their lives from what remains.

2.      The MR-GO runs from the Gulf of Mexico alongside St. Bernard and into the Industrial Canal in New Orleans.  From its conception over 40 years ago, the MR-GO was riddled with inherent problems that worsened steadily over the years due to the Army Corps' neglect.  First, the design, construction, operation, and maintenance of the MR-GO eradicated thousands of acres of ecologically-sensitive marshland which provided a valuable natural barrier to storm surges.  Such destruction of the MR-GO marshland greatly exacerbated an east-west

storm surge during Hurricane Katrina by leaving the surrounding area vulnerable and unprotected to the ravages of the storm.

3.      Second, the Army Corps was well aware of—but did nothing to correct—the faulty design of the MR-GO, described in 2002 as "a shotgun pointed straight at New Orleans, should a major hurricane approach from that angle."  The MR-GO is a straight arrow pointed at Greater New Orleans with no barriers or other means to slow down storm-driven surges.  In addition, the MR-GO creates a funnel effect where the MR-GO intersects the Gulf Intracoastal Waterway ("GIWW"), furiously accelerating the power and force of the storm surge while channeling it directly into the Industrial Canal (also known as the Inner Harbor Navigational Canal ("IHNC")).  This funnel effect caused the inundation of New Orleans East, St. Bernard Parish, and the Lower Ninth Ward.

4.      Since 1958, the Army Corps was on written notice that the MR-GO posed a serious threat to human life and property in Greater New Orleans.  Despite repeated warnings from knowledgeable experts and public officials over the next 47 years before Katrina, the Army Corps did nothing to mitigate or prevent the very calamity that occurred during Katrina.  This lawsuit seeks to expose this egregious legacy of our government's dereliction of duty, not only to compensate Plaintiffs, but to prevent such a travesty from ever occurring again.

5.      The Federal Tort Claims Act ("FTCA") places the United States in the same shoes as a private defendant and authorizes Plaintiffs to recover damages based on the Army Corps' faulty design, construction, repair, and maintenance of the MR-GO.  Such negligent acts on the part of the Army Corps were substantial factors in causing the flooding of Greater New Orleans.  Katrina and its devastating aftermath were clearly foreseeable and foreseen events to the Army Corps.  Indeed, the Army Corps' reckless disregard for the effects of its negligent acts

with regard to the MR-GO may well be the paradigmatic example of an FTCA action against the United States for federal employees' negligent acts.

6.      The Plaintiffs' losses were suffered as a direct result of the Defendants' breach of their legal duty to adequately design, construct, maintain, and operate the MR-GO.  The United States and the Army Corps are responsible for these losses and should compensate those citizens, including Plaintiffs, whom they have wrongfully injured.  Compensation cannot come too soon. Accordingly, Plaintiffs seek expedited discovery and the soonest possible trial of this action.

## JURISDICTION

7.      This Court maintains subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (Federal Question), 28 U.S.C. § 1346(b) (Defendant United States), and 28 U.S.C. § 2671, *et seq*. (Federal Tort Claims Act), and, alternatively, Maritime and Admiralty law.

## VENUE

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Defendants' negligent and wrongful actions occurred in the Eastern District of Louisiana, a substantial part of the events and omissions giving rise to this action occurred in the Eastern District of Louisiana, Plaintiffs all reside in the Eastern District of Louisiana, and the damages to Plaintiffs occurred within the Eastern District of Louisiana.

## PARTIES

### Plaintiffs

9.      Five individuals and a business bring this legal action.  The locations of their residences and business are depicted on the map below.



Source:  R.B. Seed, et al., *Preliminary Report on the Performance of the New Orleans Levee System in Hurricane Katrina on August 29, 2005*, Report No. UCB/CITRIS-05/01, at 1-10, Figure 1.4 (2005).

       10.     NORMAN ROBINSON, an individual, is an adult who owned and resided in a house located in an area known as "New Orleans East" at 6965 Mayo Boulevard, New Orleans in Orleans Parish, Louisiana, which was destroyed by floodwaters from the MR-GO on August 29 and 30, 2005.  On or about October 24, 2005, Mr. Robinson presented a claim to the Army Corps and the United States for damages arising out of the incident described above.  By April 24, 2006, six months later, the Army Corps had neither accepted nor rejected this claim and, pursuant to 28 U.S.C. § 2675(a), Mr. Robinson elects to consider such failure to act as a final denial of the claim.

11.     Mr. Robinson lived with his wife Monica, and together, they were helping to raise their granddaughter, who lived with them part-time before Katrina.  Mr. Robinson is a respected television news anchor and his home was conveniently located close to the offices of television station WDSU-TV, where he worked in New Orleans.  As a news anchor, Mr. Robinson made his living reporting about the community where he lived, and he had worked hard for many years to be able to pay off the mortgage on his home.

12.     On August 29 and 30, 2005, Mr. Robinson's life was torn apart.  For many days following the storm, Mr. Robinson was unable to return home to survey the damage.  Due to the storm damage, his front door was swollen, and he had to have it broken down in order to enter his once beautiful home.  The sight he encountered left him speechless.  Murky, stagnant water was everywhere, and an inch or more of mold covered his furniture.  The flooding destroyed the first floor of his home, and the entire house suffered severe structural damage.  All of his possessions were destroyed by the floodwaters flowing from the MR-GO.  Mr. Robinson—who has no permanent residence and has been forced to relocate to a rented residence in a different location—has lost irreplaceable belongings such as photographs and personal records.  Moreover, Mr. Robinson and his wife can no longer assist in raising their granddaughter who had to relocate to Houston, Texas, change schools, and lose contact with all of her friends in New Orleans.  They miss their granddaughter terribly and have suffered extreme grief and mental anguish due to the flooding caused by the MR-GO.

13.     KENT LATTIMORE, an individual, is an adult who owned and resided in a house trailer located at 2100 Marcelle Drive in St. Bernard Parish, Louisiana, which was destroyed by floodwater from the MR-GO on August 29 and 30, 2005.  On or about October 24, 2005, Mr. Lattimore presented a claim to the Army Corps and the United States for damages

arising out of the incidents described in this complaint.  By April 24, 2006, six months later, the Army Corps had neither accepted nor rejected this claim and, pursuant to 28 U.S.C. § 2675(a), Mr. Lattimore elects to consider such failure to act as a final denial of the claim.

14.     LATTIMORE & ASSOCIATES, a real estate appraisal business incorporated under the laws of Louisiana since 1992, was located at 9117 West St. Bernard Highway in St. Bernard Parish, Louisiana and was destroyed by floodwater from the MR-GO on August 29 and 30, 2005.  On or about October 24, 2005, Lattimore & Associates presented a claim to the Army Corps and the United States for damages arising out of the incidents described above.  By April 24, 2006, six months later, the Army Corps had neither accepted nor rejected this claim and, pursuant to 28 U.S.C. § 2675(a), Lattimore & Associates elects to consider such failure to act as a final denial of the claim.

15.     Mr. Lattimore, in his own words, had "a very good situation" before Hurricane Katrina, living in a comfortable trailer home adjacent to his prospering real estate appraisal business.  On August 29 and 30, 2005, Mr. Lattimore's life dramatically changed for the worse.  On those dates, his property was completely destroyed by floodwaters that came from the MR-GO.  The loss of Mr. Lattimore's residence and worldly possessions, including irreplaceable items such as photographs and personal records, left him grief-stricken and emotionally devastated.

16.     For Mr. Lattimore before Katrina, a life filled with hard work seemed to have brought him just rewards, and the "American Dream" had become a tangible reality.  Mr. Lattimore was the owner and chief operating officer of his rapidly-growing real estate appraisal business, Plaintiff Lattimore & Associates.  His keen business acumen and friendly manner had produced a burgeoning clientele, and Lattimore & Associates, which was still in its growth

phase, was constantly getting inquiries from new banks and mortgage companies.  Just before

Katrina, Lattimore & Associates had four employees and was looking to hire more to assist with

performing approximately 80 to 100 appraisals per month at $350 per appraisal, as well as more

complex appraisals of multi-family dwellings for $450 to $500 per appraisal.  The gross revenue

of Lattimore & Associates before Katrina was between $350,000 and $420,000 year.

17.     On August 29 and 30, 2005, Lattimore & Associates was flooded with water from

the MR-GO, which ruined all of the business' computers, phone system, credit card machines,

camera equipment, software applications, and furniture such as expensive map cabinets.  The

business, shut down as of August 29, has not reopened since due to lack of facilities to operate its

business.  It will take years, if ever, to rebuild Lattimore & Associates to the business it was

before MR-GO floodwaters ruined it.  As a result of MR-GO flooding, Lattimore & Associates

generates no income.  Lattimore & Associates has been deprived of at least $6 million in lost

revenue.

18.     TANYA SMITH, an individual, is an adult who owned and resided in a house

located at 3920 Despaux Drive in Chalmette within St. Bernard Parish, Louisiana.  On or about

October 24, 2005, Ms. Smith presented a claim to the Army Corps and the United States for

damages arising out of the incident described above.  By April 24, 2006, six months later, the

Army Corps had neither accepted nor rejected this claim and, pursuant to 28 U.S.C. § 2675(a),

Ms. Smith elects to consider such failure to act as a final denial of the claim.

19.     Ms. Smith resided in her home located at 3920 Despaux Drive in Chalmette,

Louisiana in St. Bernard Parish.  Her house was her pride and joy since she had it designed and

custom built.  The hefty mortgage she paid monthly seemed a worthwhile and necessary expense

for a stable future for herself and her two young sons.  Her neighborhood was nice and

comfortable before Katrina, and her home was close to Louisiana State University's Health Services Center where she was studying to become a nurse/anesthesiologist.  She also had a good job as a registered nurse specializing in the care of premature infants.  Ms. Smith's children were attending St. Mark's Catholic School in Chalmette.  St. Bernard Parish was not only their home, it was the only "world" they knew.

20.     On August 29 and 30, 2005, Ms. Smith and her family's lives were shattered. MR-GO destroyed their beautiful family home and all of their worldly possessions.  The hospital where Ms. Smith worked was shut down following the storm, and she has been unable to find another comparable job.  Ms. Smith and her sons are now living in a small apartment, paying $975 a month in rent plus the remaining mortgage of over $1,000 a month for her destroyed home.  Times are tough.  Her sons have been forced to change schools three times and have lost contact with all of their friends.  Ms. Smith and her sons lost everything but their lives, including irreplaceable items such as photographs of Ms. Smith's beloved deceased husband and father to her eldest son, as well as personal records.  Ms. Smith states that she "does not know what normal is any more."  Ms. Smith and her sons now struggle for survival in what remains of their shattered lives.

21.     LUCILLE FRANZ, an individual, is an adult who owned and resided in a house located in the Lower Ninth Ward at 5926 St. Claude Avenue in Orleans Parish, Louisiana, which was destroyed by the MR-GO on August 29 and 30, 2005.  On or about October 24, 2005, Ms. Franz presented a claim to the Army Corps and the United States for damages arising out of the incident described above.  By April 24, 2006, six months later, the Army Corps had neither accepted nor rejected this claim and, pursuant to 28 U.S.C. § 2675(a), Ms. Franz elects to consider such failure to act as a final denial of the claim.

22.     ANTHONY FRANZ, JR., an individual and husband of Lucille Franz, is an adult who owned and resided in a house located in the Lower Ninth Ward at 5926 St. Claude Avenue in Orleans Parish, Louisiana, which was destroyed by the MR-GO on August 29 and 30, 2005. On or about October 24, 2005, Mr. Franz presented a claim to the Army Corps and the United States for damages arising out of the incident described above.  By April 24, 2006, six months later, the Army Corps had neither accepted nor rejected this claim and, pursuant to 28 U.S.C. § 2675(a), Mr. Franz elects to consider such failure to act as a final denial of the claim.

23.     Anthony Franz, Jr. at age 77, and his wife, Lucille, at age 72, shared the dream of a comfortable retirement.  After a lifetime of hard work, they had paid off the mortgage on the multi-plex where they lived.  Their plan to have a working retirement, managing and renting their five unit multi-plex, reflected their strong sense of responsibility and work ethic.  The Franz couple had just installed a new roof and made electricity and plumbing repairs as well as other improvements.  Mr. and Mrs. Franz, who are extremely family-oriented, were also renting the unit adjacent to their own to their adult son, who helped with their care and provided companionship and emotional support.  Mr. and Mrs. Franz had ample room for their treasured family heirlooms, including pictures of their beloved children and grandchildren.  They also shared a close relationship to Mrs. Franz' sister, Rosemary David, who, at age 78, lived in a nearby nursing home.

24.     On August 29 and 30, 2005, the Franz' lives changed forever when the MR-GO floodwaters extinguished the life of a loved one, destroyed property and possessions acquired over a lifetime of hard work, undermined the comfort and security of their long-time neighborhood, and shattered their dream of self-sufficiency during their retirement.

(a)   Mr. and Mrs. Franz faced many tragic losses during the storm, but the greatest was the death of Mrs. Franz' sister, Rosemary Davis, who drowned not long after her 78th birthday in the now infamous St. Rita's Nursing Home, where so many abandoned elderly died during and after the storm from flooding caused by the MR-GO.  Mrs. Davis never had a chance. She drowned in her wheelchair under a table in the nursing home.  Suffering extreme grief and loss, Mrs. Franz is unable to sleep, haunted by the recurring flashbacks of her beloved sister's horrible death.

(b)   The Franz' son, who lived in the adjacent apartment, also came dangerously close to losing his life when he chose to stay to protect his family's multi-plex rather than evacuate with the storm's onset.  With the storm in full force and water rising to his chest, he had no choice but to evacuate in order to save his life.  He shot his own dog before he left his family's multi-plex so that it would not suffer the storm alone.

25.     In addition to the emotional devastation caused by the flooding, Mr. and Mrs. Franz face financial uncertainty rather than a secure retirement.  Now, they live in Jefferson Parish and pay monthly rent for a small apartment rather than collecting rents from their own tenants.  They have lost their multi-plex, which is torn apart on one side and filled with mold, as well as all of their worldly possessions.  Many of the items they lost were irreplaceable, including family heirlooms, photographs, and personal records.  At this stage in their lives, they have no employment and are not in a position to rebuild their multi-plex.  Their house was not covered by any type of insurance, and they have literally lost everything.  Mrs. Franz, who has overcome many difficult obstacles in her 72 years, describes this as "the worse thing that could happen—a nightmare."

**Defendants**

26.     The UNITED STATES OF AMERICA is a sovereign government amenable to suit for civil liability in accordance with the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*.

27.     The UNITED STATES ARMY CORPS OF ENGINEERS is a division of the United States Government under the direct jurisdiction of the Department of the Army.

## FACTUAL ALLEGATIONS

**Katrina And The Devastation Caused by Defendants' Acts and Omissions**

28.     On August 28, 2005, Hurricane Katrina hit the Gulf Coast with cruel and devastating force.  Though the hurricane was one of the most ferocious ever seen, it largely spared Greater New Orleans, which fortunately lay in Katrina's rapidly deteriorating western eyewall.  The result was that Katrina laid waste to virtually everything in its path along the Mississippi Gulf Coast but in New Orleans and St. Bernard, Katrina's winds did not even register as a Category 3 on the Saffir-Simpson scale.  The winds barely reached 100 miles per hour.

29.     If the MR-GO had been properly designed, constructed, operated, and maintained, today Katrina would be a footnote in the archives of the city—another hurricane that caused some sporadic flooding in some areas but no wide scale inundation of the region.  Combined with the deadly defects of the MR-GO, however, the storm has earned its rank as one of the most devastating catastrophes in the history of the United States.  New Orleans, for all its splendid past, lies largely in ruins.

30.     MR-GO was not properly designed, constructed, and maintained.  As a result of the inundation, more than 1,100 men, women and children lost their lives, and several thousand

people remain missing.  Several hundred thousand residents have been displaced, and at least

160,000 homes have been destroyed or rendered uninhabitable.  The preliminary estimate of

property damages alone exceeds $100 billion. The toll in human misery—especially among the

most vulnerable poor, children, elderly, and infirm—is incalculable.

31.    A thriving metropolis of 470,000 before the storm, historic New Orleans—more

resembling a ghost town than the nation's 35th largest city—has become a struggling, divided

community that now is home to barely 100,000 people.  With its tax base virtually destroyed,

public utilities in disarray, citizens fleeing the city, hospitals closed, only a fraction of its 117

public schools reopened, police and fire facilities severely compromised, sewage and water

systems inoperable, a critical shortage of safe and affordable housing, and countless businesses

closed, New Orleans teeters on the brink of bankruptcy.

32.    A few miles east of downtown New Orleans, St. Bernard Parish has been

similarly ravaged and remains uninhabitable.  Only four out of 26,000 homes survived the raging

floodwaters and winds.  Of 70,000 residents before Katrina, only 7,000 remain—and they must

live in temporary housing.

33.    The Plaintiffs in this case resided in New Orleans East, the Lower Ninth Ward,

and St. Bernard Parish.  Their suffering—and that of their many neighbors—was not caused by

Hurricane Katrina alone.  More than anything else, their suffering may be laid directly at the feet

of the United States of America and the Army Corps who erred epically in designing,

constructing, operating, and maintaining the MR-GO during the past half century.

**The MR-GO: A Navigation Project Gone Terribly Wrong**

34.    Congress approved the construction of the MR-GO and charged the Army Corps

with its design, construction, operation, and maintenance.  From the outset, as described below,

13

the MR-GO project—a vision of increased prosperity, trade and industry gone sour—was riddled

with serious problems that the Army Corps either ignored entirely or dealt with in a cursory and

negligent manner.



Source: Interagency Performance Evaluation Task Force, Army Corps of Engineers, *Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System*, at V-61, Figure V-49 (2006).

      35.    As depicted above, the MR-GO is a navigable waterway constructed under the

authority of Public Law 455, 84th Congress, 2nd Session, approved March 29, 1956,

substantially in accordance with the recommendations of the Army Corps' Chief of Engineers as

contained in House Document 245, 82nd Congress, 1st Session.

      36.    A deep-water channel constructed by the Army Corps in the late 1950s and early

1960s at an estimated cost of $88 million, the MR-GO channel is approximately 76 miles long,

including 46 miles of land cut, and runs generally on a northwest direction from Breton Sound in the Gulf of Mexico through the parishes of St. Bernard and Plaquemines to New Orleans, connecting with the Gulf Intracoastal Waterway ("GIWW") and the Industrial Canal.  The outlet enables ships from ports east of the Mississippi River to head north for New Orleans at Breton Sound, many miles east of the river mouth, at a savings of sixty miles.  It also provides a navigable alternative to the sometimes unnavigable Mississippi River.

    37.    The MR-GO was authorized to a depth of 36 feet, a surface width of 650 feet, and a bottom width of 500 feet.  The Army Corps altered the original route, redirecting the MR-GO toward Breton Sound instead of Chandeleur Sound.

    38.    The main purpose of MR-GO was to provide a navigable waterway for vessels of all types, including boats for shrimping, oystering, oil service and recreation and even ocean-going ships requiring access to various docks on the Industrial Canal.

    39.    The United States Government has acknowledged that the purpose of the MR-GO is that of a "navigation aid," as opposed to a flood control project.  *See Graci v. United States*, 301 F. Supp. 947, 949 (E.D. La. 1969) ("*Graci I*").  Consequently, this action is not barred by any of the immunity provisions of the Mississippi Flood Control Act of 1928, *as amended*, 33 U.S.C. § 702a *et seq*.

    40.    The fact that the Army Corps constructed the MR-GO as an aid to navigation (distinguished from a flood control project) pursuant to a legislative mandate of the U.S. Congress was determined as a finding of fact in the prior case referenced in the preceding paragraph involving the MR-GO.  *See Graci v. United States*, 435 F. Supp. 189, 192 (E.D. La. 1977) ("*Graci IV*").  That finding is binding on the Army Corps in this lawsuit.

41.     A 1951 report submitted by the Army Corps to the House of Representatives concerning the proposed MR-GO reflects the purely commercial interests driving this project, while excluding any discussion of flood control purposes.  Specifically, Paragraphs 56 and 57 of the report stated:

> Major expansion of seagoing commerce in postwar years is
>
> expected by local interests, estimates of increase range from 50
>
> percent suggested by shipping interests . . . to 200 percent of
>
> previous peak years suggested by economists . . . .  The United
>
> States Maritime Commission noted that . . . [the project's benefits]
>
> include (a) savings in sailing time and attendant transportation
>
> costs; (b) reduction in hazards to navigation on the river and
>
> passes; (c) savings in port costs, including land transportation,
>
> pilotage, stevedoring, and maintenance charges on terminal
>
> wharves; enhancement of land values; and savings in cost and
>
> maintenance of Federal projects.

H.R. Doc. No. 245, 82-245 at ¶¶ 56, 57 (1st Sess. 1951).

42.     Finally approved in House of Representatives Bill No. 6309, the MR-GO authorizing legislation was signed into law by President Dwight D. Eisenhower on March 29, 1956.  Contemporaneous comments during the Senate debate focus on the project's potential commercial benefits, while again omitting any reference to flood control.  Louisiana Senator Allen Ellender stated on the Senate floor:

> Mr. President, order No. 1600, H.R. 6309, which was reported
>
> March 7 from the Senate Committee on Public Works, authorizes

16

the construction of the so-called Mississippi River Gulf Outlet, a
70 mile tidewater channel which would provide the port of New
Orleans with an alternate route to the Gulf of Mexico.

* * *

Mr. President, New Orleans is the natural outlet, the natural
gateway, for goods flowing from and into the 24 States of the
Mississippi Valley.  Linked to the other States of our Nation by a
network of highways and railroads, the Mississippi River is the
great artery through which the blood of commerce is pumped into
the heartland of America.

Congressional Record, U.S. Senate, 5022, 5027 (March 19, 1956) (Statement of Senator Allen
Ellender).

43.     Completed forty years ago under the supervision and control of the Army Corps,
the MR-GO has been a colossal failure on multiple levels from the start.  During past hurricanes,
as well as Katrina, the MR-GO contributed greatly to the storm surge effect by channeling and
accelerating water into both Orleans and St. Bernard Parishes.  As the waterway's use
diminished, its potential to cause catastrophic damage to Greater New Orleans intensified.  The
Army Corps was keenly aware of the MR-GO's increasingly dangerous tendencies, but did
nothing to remedy the problem.

### The MR-GO's Faulty Design and Construction

44.     The MR-GO navigation channel was designed and constructed under the auspices
of the Army Corps.  As authorized, the plan provided for construction of a ship channel 36 feet
deep and 500 feet wide (bottom width).  The navigation channel was to extend from the

Industrial Canal in eastern New Orleans approximately 6 miles eastward coincident with the GIWW.  The channel was then to veer to the southeast as a new land and water cut approximately 60 miles to Chandeleur Island.  From Chandeleur Island, the project channel was to increase gradually to a bottom width of 600 feet and a depth of 38 feet in the Gulf of Mexico. Prospective jetties were to be provided at the channel entrance.

45.     Construction of the deep draft channel was initiated in March 1958.  An interim channel 36 by 250 feet (bottom width) was opened to traffic in July 1963.  Enlargement to project dimensions was completed in January 1968.  As part of this enlargement, the turning basin at the intersection of MR-GO with the Industrial Canal; a high level bridge at Paris Road; and jetties extending from the seaward end of the land cut to the six-foot contour in Chandeleur Sound were all completed.

46.     Under the authority of the Army Corps' Chief of Engineers, the project was modified in August 1969.  As a mitigation measure, the project modification provided for protecting a portion of the foreshore lying between the Lake Pontchartrain and Vicinity Hurricane Protection Project levees and the MR-GO.  This included six miles along the north bank of the MR-GO in the reach which is part of the GIWW and 18 miles along the south shore of the MR-GO.

47.     Foreshore protection along the north bank of MR-GO and for the 13 miles along the south bank from Bayou Bienvenue to the end of the leveed reach, as authorized by the August 1969 project modification, has been completed.  Foreshore protection on the south bank from Bayou Bienvenue to the Industrial Canal was indefinitely deferred.

48.     Of the 66 miles of waterway between Breton Island and the Industrial Canal, approximately 25 miles pass through the shallow bay of Breton Sound.  About 41 miles are

through land and water area.  Along the south/southwest shore of the MR-GO, the 18 miles of embankments have been provided as foreshore protection.  A dredged material disposal area approximately 0.5 miles wide extends along the remaining 23 miles of the MR-GO south bank.

49.     The MR-GO's design was flawed in several respects, at least two of which proved critical in contributing to the drowning of Greater New Orleans: (1) the Army Corps failed to take account of the waterway's inherent and known capability of serving as a funnel or conduit for rapidly-accelerated, storm-driven surges which would magnify the storm surge's force against levees and spoilbanks in New Orleans and St. Bernard Parish; and (2) the Army Corps failed to "armor" levees on both banks of the MR-GO.

50.      Equally important, in the design and construction of the waterway, the Army Corps failed to account for the devastation of the wetlands that the MR-GO, by its design, would facilitate.  In a vicious cycle, destruction of the surrounding wetlands not only altered adversely storm surge dynamics with respect to hurricanes such as Katrina, but denuded a critical natural buffer against storm surge, thereby exacerbating the funnel effect created by the MR-GO's design.

**Faulty Maintenance of the MR-GO**

51.     The Army Corps is responsible for the maintenance of the MR-GO.  This ongoing responsibility included dredging the bottom of the waterway to remove deposited soil and silt and to retain its originally designed 36-foot depth.  Silting has been a major problem for the MR-GO.  In fact, the first ship to navigate the MR-GO in March 1957 ran aground and was stuck for two days.

52.     The Army Corps knew, or in the exercise of reasonable care and discretion should have known, that proper dredging of the MR-GO would ameliorate the "funneling effect" of the

19

waterway, thereby diminishing the lethal threat to residents and businesses in Orleans and St. Bernard Parishes during hurricanes such as Katrina.

53.     Notwithstanding that dredging is a critical safety requirement for the MR-GO, the Army Corps negligently failed to maintain the MR-GO and failed to properly dredge the canal, all to the harm and detriment of each of the Plaintiffs.  Specifically, the Army Corps' negligent maintenance dredging significantly widened the MR-GO in many areas beyond its authorized width.  This widening of the MR-GO weakened, undermined, compromised, impaired, and otherwise damaged the spoilbanks, levees, and/or floodwalls along Reach 2 as it exacerbated the settling and subsidence of the uncompacted hydraulic soil used to construct these purported flood control measures.  As a result, the settling and subsidence of this soil reduced the height of and destabilized the spoilbanks, levees, and/or floodwalls along the MR-GO, which helped cause their catastrophic failure and/or overtopping during Katrina.  Ultimately, in November 2005, dredging of the MR-GO was suspended indefinitely due to alleged lack of funding and controversy about the waterway's future.

54.     As alleged above, the negligent design of the MR-GO invited destruction of the surrounding wetlands.  The Army Corps' ongoing negligent maintenance of the MR-GO, however, ensured it.

55.     For decades, there has been massive and widely publicized damage to the environment due to the MR-GO, particularly the incalculable loss of precious wetlands that act effectively as nature's "surge buster" during hurricanes—a phenomenon known for decades by the Army Corps.  The loss of thousands of acres of marshlands due to the MR-GO contributed significantly to the drowning of Greater New Orleans, including each of the Plaintiffs' respective properties.  In a "NOVA" series episode entitled *Hurricane Katrina*, *Storm That Drowned A*

*City*, which aired on the Public Broadcasting System on November 22, 2005, Professor Ivan van Heerden of Louisiana State University stated: "The ultimate key to Louisiana's survival and reducing the impacts of surges is to restore our coastal wetlands. These wetlands knock down the surge and they also reduce wind energy as the storms pass over them."

56.     Forty-three miles of the MR-GO fall within a "landcut" through low-lying marshland, most of which traverses the ecologically sensitive wetlands of St. Bernard Parish. Even the Army Corps—in its *MR-GO Bank Erosion Reconnaissance Report* ("*Corps Erosion Report*") published in 1988—was forced to admit that the MR-GO has accelerated the "loss of marshes, ridges, bayous, ponds, aquatic grass beds and shorelines needed for the Lake Borgne, Lake Pontchartrain and Breton Sound statuaries." In that same *Corps Erosion Report*—published almost two decades ago—the Army Corps characterized MR-GO as one of the eight areas in south Louisiana where "erosion stabilization measures are urgently needed."

57.     Over 65,000 acres of hurricane buffering acres of wetlands—over 101 square miles—have been obliterated or impaired because of the MR-GO. More than 27,000 acres of wetlands have been destroyed since the opening of the MR-GO, while some 38,000 more acres have undergone serious change in habitat. The banks of the MR-GO have eroded so extensively that the width of the channel has grown nearly threefold from 650 to more than 2,000 feet, sharply increasing its potential to serve as a conduit of wind-driven water surges during hurricanes. As illustrated below in a March 2006 *Times-Picayune* graphic, that is precisely what happened during Katrina.



58.     The northeast shore juncture of the MR-GO and the GIWW is particularly

susceptible to erosion induced by saltwater intrusion and the force of waves from passing

vessels.  Yet this critical area has never received adequate protective stabilization measures.

Erosion on the northeast shore of the MR-GO between 1965 and 1981 ranged from 100 feet to

600 feet of direct shoreline recession, with rates of erosion measured between 6 to 26 feet per

year; and the volume of erosion is calculated at 9,333,000 cubic yards during this period or

583,000 cubic yards per year.

59.     Six years before Katrina, the *Times-Picayune* summarized a widely held view of

MR-GO's legacy:

> But the [MR-GO] has not fulfilled its earlier promise of bringing
> port-related development along it in St. Bernard parish.  It has
> instead become an environmental and economic disaster.  Its
> original width was to be 500 feet, but it has eroded in some places
> to 2,000 feet.  It has changed the salinity of the marsh, leading to
> further erosion and ruining oyster beds.  *But worse it has
> threatened lives, acting as a pathway for hurricane storm surges
> and even surges from storms short of hurricane force.*

Editorial, "Light at the End of the Channel," *Times-Picayune*, June 1, 1999, at B-6

(emphasis added).

60.     After its completion in 1965, use of the MR-GO steadily increased until 1978.  At

its peak in 1978, 9.4 million tons of cargo and other goods were transported.  After 1978, its

utilization began to taper off steadily.  Shipping fleets were replaced with larger vessels with

drafts too deep for MR-GO, and several terminals along the Industrial Canal were closed.  By

2004, only 226 deepwater ships passed through the channel—an average of slightly more than

four ships per week.  These ships carried only 1.3 million tons of cargo, roughly equal to tonnage

figures when the channel opened in 1963.  At the time Katrina struck, the MR-GO had become a

seldom used relic, serving no important purpose but retaining its potential for causing

devastating floods due to the Army Corps' refusal to acknowledge its serious design flaws and to

properly maintain the waterway.

### The Drowning Of New Orleans East, The Lower Ninth Ward, And St. Bernard Parish Was Foreseeable And Foreseen

61.     In 1988, the Army Corps—in its *Corps Erosion Report*—warned specifically of

the grave perils to human life and property if no immediate remedial action were taken with

regard to the MR-GO:

> The unleveed banks of the MR-GO will continue to erode in the
> absence of remedial action.  Currently, banks of the unleveed
> reaches are retreating at rates from five to over 40 feet per year.
> The average rate of retreat of the north bank in the 41-mile land cut
> portion of the waterway is about 15 feet per year.  Failure to reduce
> bank will result in a significant increase in the required
> maintenance dredging of the waterway in the future.  Annual
> average maintenance dredging requirements are projected to
> increase six-fold within the next 15 years (by the year 2002).  The
> dredged material disposal area located on the MR-GO south bank
> between mile 23 and mile 27 could be exhausted by year 2017.

*Corps Erosion Report*, *supra*, at 30-31.

62.     MR-GO has been correctly characterized by Matthew Brown of the *Times-Picayune* as "the most potent symbol of all that was wrong in earlier efforts to tame Louisiana's marshlands"—natural protection which stood for centuries as a protective bulwark for Greater New Orleans against hurricanes and their storm surge.  A prescient forewarning of the MR-GO's imminent dangers came from proponents of the outlet's closing.  In June 2002, the critics described MR-GO as "a shotgun pointed straight at New Orleans, should a major hurricane approach from that angle."  The MR-GO's checkered history of protests, studies, models, and controversy—all detailing in one way or another the system's susceptibilities for disaster—dates as far back as 1958.

**The Army Corps Ignored Warnings of Vast Ecological Damage in 1958**

63.     In April 1958, the United States Department of Interior, through its Branch of River Basins Office in Vicksburg, Mississippi and at the request of the District Engineer for New Orleans, prepared a draft preliminary report for the Army Corps pursuant to the Wildlife Coordination Act of 1946, that predicted vast ecological damage from the MR-GO.  In the opening section of this report, entitled *An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and*

*Wildlife Studies* (the "*Fish & Wildlife Report*") the authors noted, with respect to plans for the

MR-GO project:

> The U.S. Fish and Wildlife Service initiated preliminary studies on the project in 1957.  Secretary Seaton, Department of the Interior, in a letter of September 23, 1957, informed the Secretary of the Army that the project is of great concern to fish and wildlife conservationists, including the commercial fishing industry.  The Secretary noted *the project plans had not been investigated by fish and wildlife conservation agencies, as contemplated in the Wildlife Coordination Act of August 14, 1946* (60 Stat. 1080), and requested the Corps of Engineers to bring all phases of project planning into balance.

*Fish & Wildlife Report* at 1 (emphasis added).

      64.    Despite not having been given a sufficient opportunity to study the MR-GO

project by the Army Corps before construction began, the *Fish & Wildlife Report* contained

numerous observations concerning the negative impact that the MR-GO waterway would have

on the surrounding marsh eco-system.  First, the document states:

> Wildlife is frequently referred to as a produce (sic) of edges; *this area is an edge of magnificent proportion*.  The marsh and estuarine area associated with the distributaries of the Mississippi River is about 70 miles wide and extends for about 150 miles along the coast.  The climate is favorable, with a long growing season and abundant rainfall.  This, coupled with other physiographic conditions, permits a biological succession which results *in an inconceivably large supply of living plants and animal organisms* – the fundamental food supply of our fresh and salt water food fishes, turtles, alligators, shrimp, oysters, fur-bearing animals, ducks, and other birds.  *These in the aggregate constitute perhaps the densest and richest wild fauna in the world*, considered both from the commercial and recreational values.

*Id*. at 8 (emphasis added).

      65.    The *Fish & Wildlife Report* then described the extreme sensitivity of coastal

marshland to salinity levels, commenting:

> *The critical factors of circulation patterns and salinity* are easily recognizable here . . . *Also of spectacular importance are the hydrological* aspects which maintain a brackish vegetative environ highly suitable to waterfowl and fur animals. This flora has a narrow salinity range; therefore, desirable production must result from *exacting conditions*. . . . With the proposed channel, certain quantitative changes are apparent. The 36-foot-deep cut will result in direct changes of salinity conditions adjacent to the canal. Being a sea level channel, some drainage or reduction and/or increase in water levels in certain areas must be anticipated.

*Id.* at 16 (emphasis added).

66.     The *Fish & Wildlife Report* further observed the harmful effects of MR-GO on existing water circulation patterns:

> *[T]he effect of the cut and the spoil upon existing water circulation patterns*, if considered only from the physical aspects, *appears consequential*. A bisecting cut and spoilage through the center of the marsh, Chandeleur Sound and Island chain will interrupt the net circulation of waters flowing at right angles to the channel alignment. It is entirely probable that *both the direct and indirect effect of this change will be hydrographically manifested throughout the tentatively established appraisal area*.

*Id.* at 17 (emphasis added).

67.     As for the MR-GO's effect on subsurface soil and "turbidity," a cloudy condition in water due to suspended silt or organic matter, the *Fish & Wildlife Report* noted:

> Direct burial by sedimentation of oyster bottoms, nursery grounds, and vegetative areas is a self-explanatory physical feature easily observed from dredging operation in other estuarine areas. . . . Turbidity, whether temporary or permanent, because of associated hydrological complexities is more difficult to predict. The usual condition, however, is for temporary turbidity to have adverse short-lived effects on submerged vegetation over an extensive area. *It is therefore probable that construction or continuous maintenance operations would produce a temporary turbidity type for sufficient duration to accrue long-term damaging ecological changes*.

*Id.* at 18 (emphasis added).

68.     The *Fish & Wildlife Report* further cautioned that MR-GO could destroy the vegetation in the marshland areas:

> It is conceivable also that a *permanent turbidity type would prevent reestablishment of destroyed animal and vegetation zones in certain areas*.  Hydraulic dredging, in particular, tends to separate bottom soils into individual particles which have a long suspension duration.  Certain clays and organic soil particles produce a serious and persistent turbidity unless flocculated [the creation of soil lumps or masses] by sea salts. There is a risk that flocculation will result in the establishment of false bottoms or ooze areas, destroying present bottom productive potential and creating the continuous hazard of turbid conditions by only minor water agitation  . . . .  Any turbidty resulting in a plant kill can have further indirect effects by loss of the important mechanical and chemical stabilizing effects that plants provide against bottom agitation.

*Id*. at 18 (emphasis added).

69.     Finally, under the section of the *Fish & Wildlife Report* entitled "Need for Further Study," the authors reported:  "Having established conditions that are responsible for the production of fish and wildlife, methods will have to be devised for determining changes in production that will result from construction of the project."  *Id.* at 19.  Plaintiffs are informed and believe and, based thereon, allege that the Army Corps never gave the Department of Interior the opportunity to conduct such additional testing, but rather continued with the construction of the MR-GO.

70.     In 1958, it was well known by the Army Corps and others that the wetlands served as nature's protective buffer against storm-driven water surges threatening New Orleans and its environs.

**The Army Corps Ignored Repeated and Pointed Warnings About
The MR-GO's Threat to Greater New Orleans**

71.     In addition to the *Fish & Wildlife Report*, a review of the record indicates that long before Katrina's deadly landfall, the Army Corps was aware of numerous and pointed warnings, predictions, and studies about the MR-GO serving as a deadly "hurricane highway." The following are representative of the Army Corps' notice that it was designing, constructing, operating, and/or maintaining a navigable waterway of enormous potential for severe widespread flooding of Greater New Orleans.

**April 1958**:  The St. Bernard Police Jury passed a resolution opposing the MR-GO channel, stating that "[d]uring the times of hurricane conditions the existence of the channel will be an enormous danger to the heavily populated areas of the parish."

**September 1965**:  Hurricane Betsy destroyed St. Bernard Parish and the Lower Ninth Ward.  Residents blamed flooding on the MR-GO but the Army Corps insisted the channel was not responsible.

**1970**:  Louisiana coastal scientist, Sherwood Gagliano, warned the Army Corps that the disappearing wetlands just east of MR-GO would intensify storm surges and create "deathtraps."

**1972**:  Data from the National Oceanic and Atmospheric Administration documented the urgent need to raise levee heights in anticipation of strong hurricanes, but the Army Corps ignored the findings.

**1979**:  The National Weather Service issued a report detailing the need for stronger storm estimates.  If the report's standards had been implemented, MR-GO's flood protection system would have been altered to withstand a storm surge height of 30 feet.

**September 1998**:  Hurricane Georges hit New Orleans, filling the MR-GO channel with silt and thereby reducing its depth to just 25 feet and contributing to sporadic flooding.  Local

residents again called for the closing of MR-GO, but the Army Corps began dredging immediately and ultimately spent $42 million on the process.

**October 1998**:  National Hurricane Center Director Jerry Jarrell depicted a nightmare scenario concerning a Category 4 or 5 hurricane that, after destroying islands in the Caribbean and parts of Florida, intensifies over the Gulf of Mexico and "assail[s] New Orleans with a storm surge that overwhelms the city's levee system."

**Fall 1998**:  The St. Bernard Parish Council unanimously adopted a resolution to close MR-GO because it constituted a threat to public health and safety.

**December 1998**:  The Army Corps acknowledged MR-GO's shortcomings and adopted a coastal restoration plan calling for the canal's eventual closure.  Bending under Congressional pressure, however, the Army Corps balked at closing down the MR-GO, instead initiating a re-evaluation study to gauge the environmental and economic implications of closing the channel or keeping it open.

**2001:**  In his critically-acclaimed book, *Holding Back The Sea: The Struggle for American's Natural Legacy on the Gulf Coast* (Harper Collins), Christopher Hallowell warned that "erosion from ships and storms has gouged it [the MR-GO] 2,000 feet wide and made it a freeway to New Orleans for any hurricane that happens to come from the right direction . . . . The surrounding marsh, now vulnerable to storms and salt water, has all but died as a result, along with 40,000 acres of mature cypress trees.  Now, storm surges can invade the marsh through the straight arrow channel and smash into New Orleans."

**October 2001:**  *Scientific American* magazine published an article entitled "Drowning New Orleans" that predicted "[a] major hurricane could swamp New Orleans under 20 feet of water, killing thousands.  Human activities along the Mississippi River have dramatically

29

increased the risk, and now only massive reengineering of southeastern Louisiana can save the city."

**June 2002**:  The Army Corps acknowledged their own safety estimates of MR-GO—created in the 1960s with tools that are low-tech and unsophisticated by modern standards—are antiquated and unreliable.   Local engineer Lee Butler estimated the risk of MR-GO overtopping in St. Bernard Parish may be double the Army Corps' original estimates.   In addition, the Army Corps agreed that MR-GO is a "weak spot" and more likely to be affected by a hurricane storm surge than other areas because of its proximity to the Gulf of Mexico.

**July 2004**:  Hurricane Pam—a federally-funded hurricane simulation drill—prophetically concluded that surges from a Category 3 hurricane would be "funneled" by MR-GO, flooding surrounding areas and killing tens of thousands of people in Greater New Orleans.

**July 2004**:  Louisiana Representative W.J. Tauzin testified in support of funding for the Louisiana coastal restoration project, stating:  "We'll be faced someday with thousands of our citizens drowned and killed, people drowned like rats in the city of New Orleans . . .  [O]ur paradise is about to be lost."

**October 2004**:  The Louisiana Legislature passed a resolution urging closure of the MR-GO and immediate implementation of remedial measures to address the risk posed by the MR-GO and "more drastic tidal surges and more prolonged flooding as a result of tropical storms and hurricane."

**October 2004**:  *National Geographic* published an article entitled "The Incredible Shrinking Bayou" that stated "[e]ven the Red Cross no longer opens hurricane shelters in New Orleans claiming the risk to its workers is too great."

**May 2005**:  A hydrodynamic model from Louisiana State University's Hurricane Center further exposed MR-GO as a "superhighway for storm surge" and predicted that a "funnel" created by MR-GO would amplify storm surges by 20 to 40 percent.

72.     Of all these prescient warnings, the prognostication about the MR-GO's "funneling" effect on a hurricane-generated storm surge proved to be deadly accurate.  The Louisiana State University's Hurricane Center presented hurricane scenarios to the Army Corps in May 2005, predicting devastating flooding as a result of MR-GO's design.  According to civil engineers from the Hurricane Center, if MR-GO had not been defectively designed and constructed, a modeled storm surge, similar to that experienced with Katrina, would have resulted in minimal levee overtopping and occasional flooding—but not a disaster on a Biblical scale largely submerging an entire city.  A civil engineer from the Hurricane Center was quoted in a *Times-Picayune* article published on October 24, 2005, stating that without the funnel effect, "you would have had maybe 2 to 3 feet of flooding at the max, but not everybody's house underwater.  It's still flooding, but one is significant and one is catastrophic."

73.     As was predicted long before Katrina, the MR-GO amplified Katrina's surge speed and force, much as the nozzle of a water hose funnels a wide flow of water into a bottleneck, creating a vastly accelerated and more forceful jet from an otherwise slow and limpid flow of water.  Predictably, then, the MR-GO significantly intensified Katrina's surge height and velocity, contributing to the scouring that undermined the spoilbanks and levees along the MR-GO and the Industrial Canal.

**MR-GO Was A Substantial Factor In Causing The Flooding**

74.     Eyewitness accounts as well as scientific studies indicate that the MR-GO contributed significantly to the drowning of large portions of Greater New Orleans.  The flawed

design, poor construction, and inadequate repair and maintenance of the MR-GO—as well as the resulting destruction of the protective adjoining wetlands—was a substantial factor in causing the flooding.  Indeed, but for the Army Corps' negligence, most or all of the severe flooding of the Plaintiffs' neighborhoods would not have occurred.

75.     In November 2005, an in-depth field investigation—funded by the National Science Foundation and performed by prestigious teams from the University of California at Berkeley and the American Society of Civil Engineers—concluded that the MR-GO was a prime culprit in Katrina's unprecedented inundation of the city.  As illustrated below, the MR-GO's "funneling" effect resulted in widespread overtopping of the earthen levees which in turn undermined soil stability on the "land-side" of the levee and contributed to their ultimate collapse.



Source:  *Times-Picayune*, Dec. 8, 2005, available at http://www.nola.com/katrina/graphics/.

76.     Faced with mounting evidence concerning MR-GO's prominent role in the flooding of the Lower Ninth Ward, New Orleans East, and St. Bernard Parish, the Army Corps reluctantly acknowledged—at least initially—the possibility that MR-GO's design exacerbated Katrina's storm surge and subsequent flooding.  John Paul Woodley Jr., the assistant Army secretary who oversees the Army Corps, responded to statements concerning MR-GO's

contribution to the Katrina tragedy with:  "I've heard those concerns, and I wouldn't discount them."

77.     The Army Corps' own investigators have stated that overtopping led to many of the levee breaches that caused the most serious flooding during Katrina, including large sections of the MR-GO levees that sent floodwaters rushing into St. Bernard Parish, as well as sections of the GIWW levee that flooded homes in East New Orleans and the Lower Ninth Ward.

78.     This overtopping would have been prevented if the Army Corps had implemented a well-known process called "armoring" on the MR-GO's banks.  Armoring involves putting a water-resistant layer, such as concrete or grass-protecting synthetic blankets, on the surface of a levee or bank to guard against two threats:  (1) the pounding by waves from wind-driven storm surge that can dislodge soil or vegetation and cause the levees to collapse; and (2) the overtopping by the surge or waves that, as the water rushes down the land-side levee slope, erode soil on the land-ward side, again leading to eventual soil instability and collapse.

79.     With proper armoring of the MR-GO, the structures would have remained intact, and flooding in those areas would have been greatly reduced from catastrophic to inconvenient. Flooding from overtopping lasts only as long as the storm surge is higher than the levees, usually only for a few hours.  When a levee collapses, however, flooding continues until the surge retreats to sea level—a matter of days.  In November 2005, the American Society of Civil Engineers team, in an early report on Katrina, found the lack of armoring a "fundamental flaw" in the system that must be corrected in any future designs.

80.     The Army Corps has admitted to MR-GO's funneling effect during Hurricane Katrina.  The Army Corps has maintained that the design and function of New Orleans' floodwalls were adequate.  In fact, in a September 21, 2005 *New York Times* article, Al Naomi,

senior project manager for Army Corps, stated in defense of the floodwalls: "*The floodwalls have functioned over the years very successfully and without incident.  The design works. It has worked in other locales. And will likely continue to be used as long as you do not subject it to pressures that it was not designed to handle*."  (Emphasis added).  Therefore, according to the Army Corps, it was the fact that the floodwalls were subjected "to pressures [they were] not designed to handle" that caused them to fail and caused the resulting flooding.  The increased "pressure" triggering the collapse of so much of the levee system is directly attributable to the storm surge acceleration produced by the MR-GO.

81.    Viewing the MR-GO as two discrete sections helps to explain the MR-GO's powerful impact on the levees:

- **Reach 1:**  the east-west oriented section running between the Industrial Canal and the confluence of the GIWW and MR-GO near Paris Road Bridge.  It is through this critical section that Lake Pontchartrain and Lake Borgne—in the words of one recent study commissioned by the Army Corps—are "hydraulically connected to one another via the IHNC [Industrial Canal]."

- **Reach 2:**  the much longer southeast-northwest section extending from just east of the Paris Road Bridge down through Breton Sound into the Gulf of Mexico.

82.    The Army Corps interconnected Reach 1 of MR-GO with the GIWW in 1957, thereby joining together the well-known storm surge potentials of Lake Borgne and Lake Pontchartrain within the Industrial Canal.  During Katrina, the resultant, powerful combined stream surged from this junction and overwhelmed the levees along Reach 1 and the Industrial Canal.

83.     Even the Army Corps' own commissioned evaluation on the Louisiana hurricane protection system—by The Interagency Performance Evaluation Task Force ("IPET")—recently found that the majority of the flooding of the Lower Ninth Ward and St. Bernard Parish resulted from overtopping and two breaches along the Industrial Canal and Reach 1 of MR-GO. Significantly, these are precisely the locations that experts predicted would be overcome by MR-GO's deadly storm surge "funneling effect."  Moreover, an urgent recommendation from IPET is a telling admission about the serious, continuing threat of the Reach 1 surge to public health and safety.  The Army Corps' consulting experts state unequivocally:  "Flow through the Reach 1 channel must be dramatically reduced or eliminated, either by a permanent closure or some type of structure that temporarily serves to eliminate this hydraulic connectivity."

84.     Besides a defective design and no armoring on its fragile banks, the MR-GO contributed to the flooding of Plaintiffs' neighborhoods by vastly accelerating the destruction of the coastal habitat protecting Greater New Orleans.  In 1988, the *Corps Erosion Report* specifically analyzed MR-GO's impact on bank erosion in St. Bernard Parish.  The report recognized the marshland between Lake Borgne and St. Bernard Parish acted as a natural buffer to hurricane storm surge.  The Army Corps acknowledged that between 1968 and 1987, severe bank erosion—caused mostly by human-induced channelization and shipping traffic—resulted in approximately 4,200 acres of "highly productive marsh adjacent to MR-GO" to vanish.

85.     Today, the marshlands—nature's sturdy barrier against storm surge from hurricanes—have been largely destroyed by the MR-GO.  Each mile of marshland absorbs a significant amount of storm surge.  The destruction of that bulwark by the Army Corps altered storm surge dynamics in Lake Borgne and compromised the area's natural ability to mitigate the

destructive power of storm surge, thus further exacerbating the MR-GO's already perilous "funneling" effect.

86.     As the 1988 *Corps Erosion Report* detailed, there was a need to study potential benefits of completely closing MR-GO.  Indeed, the Army Corps' Lower Mississippi Valley Division ("LMVD") suggested prophetically:

> [A complete closure]…will control all future channel maintenance problems by controlling bank erosion, prevent[] the associated biological resources problem…[and] *reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up [MR-GO]* . . . .

LMVD Comments to the *Corps Erosion Report*, at 1 (emphasis added).  The Army Corps ignored its own predictions to the peril of Plaintiffs and tens of thousands of their neighbors.

87.     As the reports and testimony of Army Corps officials noted above demonstrate, MR-GO's funneling effect was well known to the Army Corps from past hurricanes, scientific studies, and a simulated "Hurricane Pam" conducted a year earlier.  In a "NOVA" series episode entitled *Hurricane Katrina*, *Storm That Drowned A City*, which aired on the Public Broadcasting System on November 22, 2005, Professor Ivor van Heerden of Louisiana State University, stated "[a]t the Hurricane Pam exercise we had a number of [federal government] officials who, basically scoffed at us."

**MR-GO's Deadly Role In Katrina Was Foreseeable And Foreseen**

88.     Katrina and its devastating aftermath were clearly foreseeable and foreseen events to the Army Corps.  Indeed, its engineers had actual notice from the outset of constructing MR-GO that its design would only exacerbate a hurricane's power and destructive effect.  Unfortunately, such notice was recklessly ignored.

89.    What cannot be ignored, however, is the untold loss of life, property, and businesses—and at least a generation of broken lives and shattered dreams—caused by the federal government's failure to protect its citizens from the known perils of its own creation.

## COUNT ONE

### Negligence

90.    Plaintiffs incorporate and hereby reallege all preceding paragraphs as if fully set forth herein and further alleges as follows:.

91.    At all relevant times, Defendant United States, through Defendant Army Corps, was responsible for the design, construction, operation, maintenance, upkeep, and repair of the MR-GO pursuant to authorization provided by the United States Congress in the River and Harbor Act of March 29, 1956.

92.    The Defendants owed a duty to Plaintiffs and others to refrain from negligent acts and omissions in carrying out their responsibilities described in the above paragraph.

93.    The Defendants breached that duty by negligently designing, constructing, operating, maintaining, and repairing the MR-GO as described throughout this Complaint.

94.    The Defendants' breach of their duties foreseeably and proximately caused, and was a substantial contributing factor in, the widespread destruction and damage suffered by residents of New Orleans East, the Lower Ninth Ward, and St. Bernard Parish, specifically including the damages suffered by Plaintiffs to this action as described above.

95.    Congress charged the Army Corps with the task of the design, construction, operation, maintenance, and repair of MR-GO, and the Army Corps compliance with this Congressional mandate did not involve acts of a discretionary function.  Moreover, the Army Corps had an obligation to design, construct, operate, maintain, and repair the channel in such a

way as to avoid having it pose a threat to residents like Plaintiffs and serve as a "hurricane highway" for surge water directed at Orleans and St. Bernard Parishes.

96.     Each Plaintiff has complied with all conditions precedent to this action.

97.     The Defendants may be sued pursuant to the FTCA for their negligence in the design, construction, operation, maintenance, and repair of the MR-GO.

98.     The MR-GO was built as an aid to navigation, not as, or in connection with, a flood control project, and Congressional directives provided no authorization for construction of flood control works in coordination with construction of the MR-GO as was admitted by Defendants and determined by the Fifth Circuit in *Graci v. United States*, 456 F.2d 20 (5th Cir. 1971).

99.     Neither Defendant is immune from civil liability under the Mississippi Flood Control Act of 1928, *as amended*, 33 U.S.C. § 702a for negligence in the design, construction, operation, maintenance, and repair of MR-GO.

100.    The Defendants' negligence was such that the United States, if a private person, would be liable to Plaintiffs in accordance with the law of the place where the act or omission occurred—in this case Louisiana.

101.    The United States was the grantee of the right of way, designer, builder, and maintainer of the MR-GO and as such assumed a standard of care with relationship to damages caused by the works to neighboring lands and individuals.

102.    The breaches and failures of the spoilbanks, floodwalls, and/or levees along the MR-GO and the Industrial Canal, and the resulting inundation of New Orleans East, the Lower Ninth Ward, and St. Bernard Parish, were directly and proximately caused by the Army Corps' negligence in the design, construction, operation, repair, and maintenance of the MR-GO, and

the design, construction, operation, repair, and maintenance of the MR-GO was a substantial contributing factor to same.

103.    The Defendants knew or should have known that their acts and omissions would proximately cause the damages suffered by each Plaintiff.

104.    As a direct and proximate result of the Defendants' negligence, Plaintiff NORMAN ROBINSON suffered damages including the following: loss of property, immovable and movable; diminution of property value; loss of income; costs of relocation; loss of business opportunities; grief, mental anguish, inconvenience, and loss of the capacity to enjoy life; and costs of suit.

105.    As a direct and proximate result of the Defendants' negligence, Plaintiff KENT LATTIMORE suffered damages including the following: loss of property, immovable and movable; diminution of property value; loss of income; costs of relocation; loss of business; loss of business opportunities, customers and goodwill; loss of business revenues and profits; grief, mental anguish, inconvenience, and loss of the capacity to enjoy life; and costs of suit.

106.    As a direct and proximate result of the Defendants' negligence, Plaintiff LATTIMORE & ASSOCIATES suffered damages including the following:  loss of property, immovable and movable; diminution of property value; loss of income; costs of relocation; loss of business; loss of business opportunities, customers and goodwill; loss of business revenues and profits; and costs of suit.

107.    As a direct and proximate result of the Defendants' negligence, Plaintiff TANYA SMITH suffered damages including the following: loss of property, immovable and movable; diminution of property value; loss of income; costs of relocation; loss of business opportunities; grief, mental anguish, inconvenience, and loss of the capacity to enjoy life; and costs of suit.

108.     As a direct and proximate result of the Defendants' negligence, Plaintiffs ANTHONY FRANZ, JR., and LUCILLE FRANZ, each suffered damages including the following: loss of property, immovable and movable; diminution of property value; loss of income; costs of relocation; loss of business opportunities; grief, mental anguish, inconvenience, and loss of the capacity to enjoy life; and costs of suit.

## COUNT TWO

### Strict Liability

109.     Plaintiffs incorporate and hereby reallege all preceding paragraphs and further allege in addition to Count One, or in the alternative thereto, as follows:

110.     The Defendants had, at all relevant times, the care, custody, and control, and thus the *garde* of the MR-GO.

111.     During previous storms and hurricanes and during Hurricane Katrina, the MR-GO contributed greatly to the storm surge effect by channeling and accelerating water into both Orleans and St. Bernard Parishes. This channeling and acceleration flaw was exacerbated, and thus Plaintiffs' damages were increased, by the erosion of wetlands adjacent to the MR-GO and the lack of armor on the MR-GO's banks.

112.     Having the *garde* of the MR-GO, the Defendants are strictly liable for the damages occasioned by the vices and/or defects in the MR-GO in accordance with Louisiana Civil Code article 2317, *et seq.* Such vices and/or defects include but are not limited to the funneling/channeling effect of the MR-GO, the erosion of the surrounding wetlands, and the lack of armoring on the MR-GO's banks, all of which has been described in this Complaint.

113.     Each such vice and/or defect, and all of them, caused Plaintiffs' respective damages described in this complaint.

114.    The Defendants knew, or in the exercise of reasonable care should have known, of the vices and/or defects in the MR-GO that caused Plaintiffs' damages, and further in the exercise of reasonable care by the Army Corps, said damages could have been prevented.

## COUNT THREE

### Negligent Supervision and Vicarious Liability

115.    Plaintiffs incorporate and hereby reallege all preceding paragraphs and further allege, upon information and belief, that their injuries were directly and legally caused, in part, by the negligence of the Defendant United States, through Defendant Army Corps, in overseeing and supervising the work of a third party contractor, the Washington International Group, Inc. ("Washington Group"), as herein alleged.

116.    The River and Harbor Act of 1956 and the Water Resources Development Acts of 1986 and 1996 authorized the IHNC/Industrial Canal Lock Replacement Project ("IHNC Lock Expansion Program"), which was intended to expand and deepen an existing lock located on or in the IHNC/Industrial Canal ("IHNC Lock").  The IHNC Lock Expansion Program was part of the original Congressional authorization of the MR-GO in March 1956.  At no time was the IHNC Lock or the IHNC Lock Expansion Program part of, or related to, in any way, the Lake Pontchartrain and Vicinity Hurricane Protection Plan, or another other flood protection program, plan, scheme or project.  Instead, the IHNC Lock and the IHNC Lock Expansion Program served to facilitate navigation and the passage of shipping through the IHNC/Industrial Canal.

117.    Defendant Army Corps hired the Washington Group as a Government contractor to level and clear abandoned industrial sites along the eastern side of the IHNC/Industrial Canal between the canal and adjacent flood walls in order to clear acreage for the excavation of a new canal that would temporarily be used by ship traffic while the new system of larger locks was

constructed.  The initial phases of this work included demolition and site preparation of what was

referred to as the East Bank Industrial Area—a 32-acre site located between Florida Avenue and

Claiborne Avenue and extending from the IHNC/Industrial Canal to the floodwall.

118.    The Washington Group's tasks included, but were not limited to, the removal of

wharfage, salvage, debris, and other materials from the IHNC/Industrial Canal and/or its banks.

More specifically, the Washington Group's scope of work included, but was not limited to:

(a) demolition of abandoned industrial structures on the east side of the IHNC/Industrial Canal;

(b) removal of underground structures described as "extensive excavation and subsurface

activity"; (c) abatement of vegetation, including numerous oak trees; (d) removal of canal side

obstructions; (e) removal of the Jordan Street wharf, including the removal of a concrete deck

and support pilings to a depth of 36 feet below mean water level; (f) removal of all electrical,

sewer, gas, water, and telephone facilities on the site, including the Boland sewer lift station;

(g) "bank removal" involving the "vibratory extraction" of bulkheads along the edge of the

IHNC/Industrial Canal; (h) removal of more than fifty structures and more than forty concrete

slabs; (i) grid trenching of the entire East Bank Industrial Area; (j) removal of ten sunken or

partially sunken barges; (k) removal of barges that served as building foundations; (l) removal of

an estimated 3,000 pilings at the site, both on land and in the canal, by use of a "vibratory

extractor" (to a depth of 30 feet for land-based pilings and 40-50 feet for canal/water based

pilings); (m) grading and hydro-mulching the site; and (n) other such work to be determined

prior to trial.

119.    Plaintiffs allege on information and belief that in performing its work for

Defendant Army Corps in connection with the IHNC Lock Expansion Program, the Washington

Group weakened, damaged, diminished, impaired, compromised, or otherwise undermined the

strength or integrity of the levee and/or flood wall along the eastern shoreline of the
IHNC/Industrial Canal, abutting the Lower Ninth Ward of Orleans Parish, causing
underseepage-induced erosion and other damage to the levee and/or flood wall(s), and ultimately
causing and/or contributing to its/their catastrophic failure and overtopping during and after
Hurricane Katrina on or about August 29, 2005.

      120.    Defendant Army Corps is liable and responsible for the actions of the Washington
Group, and for its negligent failure to adequately monitor, oversee, supervise, check or inspect
the work of the Washington Group in connection with the IHNC Lock Expansion Program in
that: (a) Defendant Army Corps knew or should have known that the Washington Group's work
was causing, and caused, damage to the levee and/or flood wall structures adjacent to the
IHNC/Industrial Canal, but was negligent because it did nothing to prevent the damage or
remediate the damage once it was discovered by either the Army Corps or the Washington
Group; (b) the Army Corps negligently failed to insure that the Washington Group followed and
complied with the Army Corps' guidelines, specifications, policies, regulations, or practices,
and/or professionally acceptable engineering and construction practices while performing its
work in connection with the IHNC Lock Expansion Program; (c) both Defendant Army Corps
and the Washington Group negligently failed to notice the damage caused by the Washington
Group's work, and the Washington Group negligently failed to notify the Army Corps of the
damage it has caused once such damage was uncovered; (d) the Army Corps negligently failed to
adequately train, inform, or caution the Washington Group about the potential damage to the
levee and/or flood wall system that could result from conducting its work in an improper, unsafe,
or haphazard manner, or in any manner that failed to comport or comply with Army Corps
guidelines, specifications, policies, regulations, or practices, and/or in any manner that failed to

comply with professionally acceptable engineering and construction practices; (e) the Army Corps negligently failed to adequately evaluate the potential for damage to, and the damage, actually inflicted on, the levee and/or flood wall structure caused by the work of the Washington Group; (f) the Army Corps negligently failed to correct, repair, or in any way remediate the damage caused by the Washington Group to the levee and/or floodwall system; (g) the Army Corps negligently failed to discharge its duty to maintain the strength and integrity of the levee and/or flood wall system of the IHNC/Industrial Canal; (h) the Army Corps negligently allowed the work of the Washington Group to substantially degrade the strength, integrity and performance of the levee and/or floodwall system to such an extent that during and/or immediately following Hurricane Katrina, this degradation coupled with an accelerated/enhanced hurricane surge propelled up Reach 2 of the MR-GO and then through Reach 1 of the MR-GO (the combined MR-GO/GIWW canal), caused massive inundation and flooding of the Orleans Parish East Bank area and portions of St. Bernard Parish; and (8) the Army Corps engaged in other related acts of negligence to be determined prior to time of trial.

     121.    The Defendants owed a duty to Plaintiffs and others to refrain from negligent acts and omissions in carrying out their responsibilities alleged herein, and Defendants breached that duty as herein alleged.

     122.    The Defendants' breach of their duties foreseeably and proximately caused, and was a substantial contributing factor in, the widespread destruction and damage suffered by residents of New Orleans East, the Lower Ninth Ward, and St. Bernard Parish, specifically including the damages suffered by Plaintiffs to this action as described above.

123.     Each Plaintiff has complied with all conditions precedent to this action, including those mandated under the Federal Torts Claims Act, and Defendants may therefore be sued for their negligent acts herein described.

124.     The Defendants' negligence was such that the United States, if a private person, would be liable to Plaintiffs in accordance with the law of the place where the act or omission occurred—in this case Louisiana – and Defendants knew or should have known that their acts and omissions would proximately cause the damages suffered by each Plaintiff.

125.     In addition to their own direct liability for their failure to supervise the Washington Group, Defendants are vicariously liable for the negligent acts or omissions of the Washington Group.

126.     As a direct and proximate result of the Defendants' negligence, Plaintiffs NORMAN ROBINSON suffered damages including the following: loss of property, immovable and movable; diminution of property value; loss of income; costs of relocation; loss of business opportunities; grief, mental anguish, inconvenience, and loss of the capacity to enjoy life; and costs of suit.

127.     As a direct and proximate result of the Defendants' negligence, Plaintiff KENT LATTIMORE suffered damages including the following: loss of property, immovable and movable; diminution of property value; loss of income; costs of relocation; loss of business; loss of business opportunities, customers and goodwill; loss of business revenues and profits; grief, mental anguish, inconvenience, and loss of the capacity to enjoy life; and costs of suit.

128.     As a direct and proximate result of the Defendants' negligence, Plaintiff LATTIMORE & ASSOCIATES suffered damages including the following:  loss of property, immovable and movable; diminution of property value; loss of income; costs of relocation; loss

of business; loss of business opportunities, customers and goodwill; loss of business revenues and profits; and costs of suit.

129.     As a direct and proximate result of the Defendants' negligence, Plaintiff TANYA SMITH suffered damages including the following: loss of property, immovable and movable; diminution of property value; loss of income; costs of relocation; loss of business opportunities; grief, mental anguish, inconvenience, and loss of the capacity to enjoy life; and costs of suit.

130.     As a direct and proximate result of the Defendants' negligence, Plaintiffs ANTHONY FRANZ, JR., and LUCILLE FRANZ, each suffered damages including the following: loss of property, immovable and movable; diminution of property value; loss of income; costs of relocation; loss of business opportunities; grief, mental anguish, inconvenience, and loss of the capacity to enjoy life; and costs of suit.

131.     WHEREFORE, each Plaintiff prays that Defendants, jointly and severally, be served with a copy of this Complaint and citation and that after all due proceedings are had, there be a judgment rendered in favor of each Plaintiff against Defendants in an amount that will adequately compensate each Plaintiff for the damages each suffered.


Dated:  June 13, 2008                          Respectfully submitted,

        :                                      **O'Donnell & Associates PC**


                                               By:/s/ Pierce O'Donnell
                                                   Pierce O'Donnell (*pro hac vice*)
                                               550 South Hope Street, Suite 1000
                                               Los Angeles, California 90071-2627
                                               Telephone: (213) 347-0290
                                               Facsimile:  (213) 347-0299
                                               Attorneys for Plaintiffs

**The Andry Law Firm, LLC**


By:/s/ Jonathan B. Andry
    Jonathan B. Andry (LSBA No. 20081)
610 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 586-8899
Facsimile:  (504) 585-1788
Attorneys for Plaintiffs




**Law Offices of Joseph M. Bruno**


By:/s/ Joseph M. Bruno
   Joseph M. Bruno (LSBA No. 3604)
   855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493
Attorneys for Plaintiffs

**Domengeaux Wright Roy & Edwards LLC**


By:/s/ James P. Roy
   Bob F. Wright (LSBA No. 13691)
   James P. Roy (LSBA No. 11511)
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, Louisiana 70502-3668
Telephone: (337) 233-3033
Facsimile:  (337) 233-2796
Attorneys for Plaintiffs

**Fayard & Honeycutt**


By:/s/ Calvin C. Fayard, Jr.
   Calvin C. Fayard, Jr. (LSBA No. 5486)
   Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193

Facsimile:  (225) 664-6925
Attorneys for Plaintiffs

**Girardi & Keese**


By:/s/ Thomas V. Girardi
    Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile:  (213) 481-1554
Attorneys for Plaintiffs

**Levin, Papantonio, Thomas, Mitchell
Echsner & Proctor, P.A.**


By:/s/ Matt Schultz
    Clay Mitchell (*pro hac vice*)
    Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123
Attorneys for Plaintiffs

**McKernan Law Firm**


By:/s/ Joseph Jerry McKernan
    Joseph Jerry McKernan (LSBA No.
    10027)
    John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202
Attorneys for Plaintiffs

**Rainier Gayle & Elliot LLC**


By:/s/ Drew Rainier
    Drew Rainier (LSBA No. 8320)
    N. Frank Elliot III (LSBA No. 23054)
1419 Ryan Street

P.O. Box 1890
Lake Charles, Louisiana 70602
Telephone: (337) 494-7171
Facsimile:  (337) 494-7218
Attorneys for Plaintiffs