EXHIBIT 2

From: Scott Joanen [scott@jbrunolaw.com]
Sent: Tuesday, June 17, 2008 1:59 PM
To: Smith, Robin (CIV); Stone, Richard (CIV)
Cc: Joe Bruno
Subject: Katrina-Corps MRGO 30(b)(6)

Attachments: Corps MRGO.final.draft.pdf

Robin,

In keeping with our discussion last Friday, June 13, 2008, and subsequent emails, I amended the language for items relating to the Re-Evaluation report. You will see that the only change is my substitution of the word Reconnaisance to Re-Evaluation. I then just cut and pasted then Exhibit A & B onto the Notice. This version should be the one we rely upon for our future "meet and confer" discussions. Likewise, in anticipation of your opposition to the Rule to Show Cause, I will attach this version to our reply.

As you know, we simply want to get deposition dates set in a timely fashion. I hope that my efforts in breaking the topics into definable eras allays your concerns about one 30(b)(6) witness being responsible for knowledge about 50 years worth Corps conduct. Although there is duplication of items of inquiry, I have tried to develop this in a manner that has no redundancy. All items are reasonably calculated to lead to discoverable information, and shouldn't be unduly burdensome in the manner set forth. No doubt, this conclusion will ultimately be decided by the man in the robe; but I believe there ought to be a number of "eras" that can be addressed with quick dates.

Please contact me at your earliest convenience to discuss getting some dates on the board.


Scott Joanen
The Law Office of Joseph M. Bruno, APLC
855 Baronne Street
New Orleans, LA, 70113
Telephone: (504) 525-1335
Toll Free: 1-800-966-1335
Facsimile: (504) 561-6775
Email: scott@jbrunolaw.com

The information contained in this electronic message is attorney privileged and confidential information intended only for the use of the owner of the email address listed as the recipient of this message. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, or copying of this communication is strictly prohibited. If you have recieved this transmission in error, please immediately notify us by telephone at (504) 525-1335.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | NUMBER: 05-4182 "K"(2) |
| | * | JUDGE DUVAL |
| | * | MAG. WILKINSON |
| | * | |
| | * | |
| PERTAINS TO: MRGO, Robinson | * | |
| (No. 06-2268) | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## NOTICE OF VIDEO-TAPED FEDERAL RULE 30(b)(6) DEPOSITION

**TO:**   To all Defendants and their respective counsel,

>          Through Defense Liaison Attorney of Record:
>          Ralph S. Hubbard III
>          Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
>          601 Poydras St., Suite 2775
>          New Orleans, Louisiana 70130-6041

   PLEASE TAKE NOTICE that Plaintiffs, Norman Robinson, Kent Lattimore, Lattimore & Associates, Tanya Smith, Anthony Franz, Jr., and Lucielle Franz, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, will take the video-taped deposition upon oral examination of the **UNITED STATES OF AMERICA, BY AND THROUGH THE UNITED STATES ARMY CORPS OF ENGINEERS** (hereinafter the "Corps"), concerning the matters as set forth on Exhibit A and B attached hereto.

   This deposition will take place on **??????** commencing at 8:00 a.m. at the Army Corps's New Orleans District Headquarters, 7400 Leake Ave., New Orleans, La 70118-3651. The deposition will continue from day to day thereafter, weekends and holidays excluded until complete. The

depositions will be taken before a Notary Public or some other officer authorized to administer oaths under the law. You are invited to attend and examine the witnesses if you so desire.

The **UNITED STATES OF AMERICA, BY AND THROUGH THE UNITED STATES ARMY CORPS OF ENGINEERS** is requested to designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and to set forth, for each person designated, the matters on which the person will testify.

Plaintiffs reserve the right to record the deposition stenographically, as well as by videotape, audiotape, live note, and will be transcribed. The deposition is being taken for the purposes of discovery, for use at trial, or for such other purposes as are permitted under the Federal Rules of Civil Procedure.

The deposition will be upon oral examination before an officer authorized to administer oaths and will be recorded by videotape, audiotape, stenographic recording, live note and will be transcribed.

In connection with and pursuant to Fed. Rule of Civil Procedure 30(b)(5), the deponent is requested to designate and produce for inspection and copying documents responsive to this Notice five (5) business days prior to the deposition as identified on Exhibit "B."

**DEFINITIONS**

1.  "You" and its various forms such as "your" and "yourself" shall mean the person subject to this notice and/or subpoena and/or request for production and all present and former agents, employees, representatives, attorneys, custodian of records, and all other persons acting on behalf of such person, including, but not limited to, deponent, its divisions, parents, subsidiaries, related companies or corporations, predecessors, successors, and all present and former officers, directors, agents, employees, representatives, and attorneys, and all other persons acting or purporting to act on behalf of deponent.

2.  "Documents" shall mean or refer to all written or graphic matter of every kind of description, however, produced or reproduced, whether draft or final, original or reproduction, and all tangible things within the scope of Federal Rule of Civil

Procedure 30(b)(6), specifically including, but not limited to: writings, graphs, charts, photographs, satellite and/or radar imagery, telephone records, data compilations (from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form), letters, correspondence, e-mail communications, memoranda, minutes, notes, contracts, agreements, books, diaries, time sheets, laboratory books, logs, bulletins, circular, notices, rules, regulations, prospects, directions, teletype messages, inter-office communications, intra-office communications, reports, company worksheets, credit files, evidence of indebtedness, negotiable instruments, telegrams, mailgrams, books, news releases, newspapers, magazines, advertisements, periodicals, pamphlets, sketches, drawings, statements, reports, articles of incorporation, by-laws, directives, minutes of meetings, balance sheets, income and loss statements, profit and loss statements, inventories, operating budgets, accounting worksheets, financial accounts, bills, vouchers, bank checks, proposals, offers, orders, acknowledgments, receipts, invoices, checks, working papers, telephone messages (whether written or recorded), notebooks, post cards, evaluations, recommendations, annual reports, confirmations, leases, analyses, feasibility or market studies, disbursement requests or orders, charts, graphs, indices, projections, forms, data sheets, data processing discs, or readable computer-produced interpretations thereof, booklets, articles, manuals, speeches, stenographic notes, maps, studies, tests, surveys, cables, tape and disc recordings (both audio and video), blueprints, containers, cartons, package labels, slides, audit reports, tender offers or invitations, personal interviews, and summaries, abstracts, compilations or paraphrases of any of the foregoing, or material similar to any of the foregoing, however denominated, which are in the possession, custody or control of the party upon whom this subpoena and/or request for production of documents is served or to which said party can obtain access. The subpoena and/or request for production of documents calls for originals, unless otherwise specified, and for all copies when originals are not available. If a document has been prepared in several copies, or additional copies have been made and the copies are not identified (or by reason of subsequent modification of the copy by additions or notations, or other modifications, are no longer identical), each non-identical copy is a separate "document."

3.  With respect to the production of any documents which are claimed to be privileged, a statement shall be provided by the attorneys for the respondent setting forth as to each such documents (and, where applicable, each attachment thereto):

   a.  the name of the sender, if any, of the documents;
   b.  the name of the author of the document;
   c.  the name of the person, if any, to whom the document and copies were sent;
   d.  the date of the document;
   e.  the date on which the document was received by those having possession of the document;
   f.  a description of the nature and the subject matter of the document;
   g.  the statute, rule or decision which is claimed to give rise to the

privilege;

h.   the last-known custodian of the document and the present location of the document;

i.   attachments to the document;

j.   the number of pages comprising the document;

k.   whether the document is handwritten, typewritten or otherwise prepared; and

l.   any other information which is useful in identifying or is necessary to identify the document.

4.   Whenever appropriate, the singular form of the word shall be interpreted in the plural and vice versa.

5.   All words and phrases shall be construed as masculine, feminine, or neutral gender according to the context.

6.   "And" as well as "or" shall be construed either disjunctively as necessary to bring within the scope of the subpoena and/or request for production of documents any matters which might otherwise be construed to be outside of the scope of the subpoena and/or request for production of documents.

7.   "Identify" with regard to a natural person, means to provide the name, last known address, last known telephone number; whether ever employed by you, and if so, dates of employment, descriptions and/ or title of each position held, and the reasons for termination; and, current employer and/or last known employer and position held.

"Identify," *with regard to a corporation*, means to provide the name of the entity along with its primary business address and telephone number.

"Identify," *with regard to documents or other inanimate objects*, means to provide the date, author, address, number of pages, subject matter, custodian of the document, and location of the document.

8.   a.   The term "IPET" means Interagency Performance Evaluation Task Force.

b.   The term "IPET Report" means the Final Report of the Interagency Performance Evaluation Task Force, *Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System*, all volumes, dated March 26, 2007.

9.   a.   The term "TLA" means Team Louisiana, a team of Louisiana-based academic and private sector experts that was commissioned in October 2005 by the Louisiana Department of Transportation and Development to assemble to "collect forensic data related to the failure of the hurricane protection structure systems around greater New Orleans that occurred during passage of Hurricane Katrina on the morning of 29 August 2005.

b.      The term "TLA Report" means the Final Report of Team Louisiana, *The Failure of the New Orleans Hurricane protection structure System during Hurricane Katrina*, dated December 18, 2006.

10.     a.      The term "ILIT" means Independent Hurricane protection structure Investigation Team, a team of experts led by the University of California at Berkeley.

b.      The term "ILIT Report" means the Final Report of the Independent Hurricane protection structure Investigation Team, *Investigation of the Performance of the New Orleans Hurricane protection systems in Hurricane Katrina on August 29, 2005*, dated July 31, 2006.

11.     The terms "IHNC" and "Industrial Canal" mean the Inner Harbor Navigation Canal a/k/a the "Industrial Canal," a deep draft navigation canal which connects Lake Pontchartrain, the Mississippi River, and Reach 1 of the MRGO.

12.     The term "GIWW" means the Gulf Intracoastal Waterway.  The GIWW is the portion of the Intracoastal Waterway located along the Gulf Coast of the United States. It is a navigable inland waterway that provides a shallow draft channel with a controlling depth of 12 ft, and was primarily designed for barge transportation.  For the purposes of this litigation, GIWW means the reach between the Mississippi River to the west and the Pearl River to the east.

13.     a.      The term "MR-GO" or "MRGO" means the Mississippi River Gulf Outlet Canal, a 76 mile deep draft navigation channel that extends southeast from the Inner Harbor Navigation Canal at the Port of New Orleans to the deep water in the Gulf of Mexico along St. Bernard and Orleans Parishes. The MR-GO has three distinct sections that are described as "Reaches" herein.

b.      The term "Reach 1 of the MR-GO" means the east-western trend of the MR-GO between the IHNC and Paris Road, until it splits into the GIWW to the northeast and "Reach 2 of the MR-GO" to the southeast.  Reach 1 of the MR-GO runs on the same alignment with the GIWW and is located entirely in Orleans Parish.

c.      The term "Reach 1 Extension" means the segment of the MRGO that is located in the IHNC between the IHNC Lock to the south, and Lake Pontchartrain to the north.

d.      The term "Reach 2 of the MR-GO" means the southeastern land cut segment of the MRGO from Paris Road to the open waters of the Gulf of Mexico that runs through the marshes of St. Bernard Parish along Lake Borgne.

14.     "17th Street Canal," "London Avenue Canal," "Orleans Avenue Canal," and "IHNC" means the entirety of the canal systems associated with the 17th Street Canal, London Avenue Canal, Orleans Avenue Canal and IHNC, and unless otherwise noted, is not limited to any specific breach location.

15.     The term "LVP" or "LPVHPP" means the Lake Pontchartrain, and Vicinity, Hurricane Protection Project, as authorized by the Flood Control Act of 1965 (P.L. 89-298, 79 Stat. 1073, 1077 (October 27, 1965)), and in accordance with the Recommendations of the Chief of Engineers in House Document 231, 89th Congress.

16.     The term "IHNC Lock Replacement Project" means the project authorized by the River and Harbor Act of 1956 and the Water Resources Development Acts of 1986 and 1996 designed to enlarge and deepen the IHNC Lock that connects the IHNC with the Mississippi River.

17.     The term "Corps" means the United States Department of the Army, the United States Army Corps of Engineers, the Mississippi Valley Division of the United States Army Corps of Engineers, the New Orleans District of the United States Army Corps of Engineers, or any other Division or District of the United States Army Corps of Engineers.

18.     The term "Public Works Project" or "Civil Works Project" means a Congressionally authorized public works project that is designed, constructed, maintained, and/or administered by the U.S. Army Corps of Engineers.

19.     The term "Congressionally authorized" means a Public or Civil Works Project, as administered by the Corps that was authorized by the United States Congress.

20.     The term "Chief of Engineers" means the Chief of Engineers commanding the U.S. Army Corps of Engineers.

21.     The term "TERC" means Total Environmental Remediation Contract, the master contract relative to the site remediation/clearing project on the East Bank Industrial Area pursuant to the IHNC Lock Replacement Project, and any and all related agreements to this master contract.

22.     The term "EBIA" means East Bank Industrial Area, the area on the East Bank of the IHNC between North Claiborne and Florida Avenues in New Orleans that was remediated/cleared pursuant to the IHNC Lock Replacement Project, as defined herein.

23.     The term "Flood Control Project" or "Flood Control Structure" means any structure supposed to withhold water from entering populated areas, whether or not those structures technically present a flood control project or flood control structure pursuant to the U.S. Army Corps of Engineers engineer regulations and manuals.

24.  The term "Hurricane Protection Project" or "Hurricane Protection Structure" means any structure supposed to withhold water from entering populated areas, whether or not those structures technically present a hurricane protection project or hurricane protection structure pursuant to the U.S. Army Corps of Engineers engineer regulations and manuals.

25.  The term "WGII" means Washington Group International Inc., or Morrison Knudsen Corporation.

**THIS DEPOSITION IS NOT FOR RECORDS ONLY.**

Dated: June 13, 2008

**Respectfully Submitted,**

**APPROVED PLAINTIFFS' LIAISON COUNSEL**

_____

JOSEPH M. BRUNO (La. Bar # 3604)
PLAINTIFFS' LIAISON COUNSEL
Law Offices of Joseph M. Bruno
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@jbrunolaw.com

**MR-GO PLAINTIFFS' SUB-GROUP LITIGATION COMMITTEE**
s/ James Parkerson Roy
JAMES PARKERSON ROY (La. Bar # 11511)
MR-GO PSLC LIAISON COUNSEL
Domengeaux Wright Roy & Edwards LLC
P.O.Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796
Email: jimr@wrightroy.com

For

MR-GO PLAINTIFFS' SUB-GROUP LITIGATION COMMITTEE
Jonathan Andry
Clay Mitchell
Pierce O'Donnell
James Parkerson Roy

## **CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the above and foregoing Notice of Deposition upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission this 13th day of June, 2008.

        /s/ Joseph M. Bruno
_____

Joseph M. Bruno

**"EXHIBIT "A""**

Please produce, pursuant to Federal Rule 30(b)(6), the person(s) most knowledgeable of the following areas:

**PRE-HURRICANE BETSY**

1.  Any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to The 1957 Tidewater Advisory Committee Report, dated September 3, 1957.

2.  The Army Corps's procedure for obtaining congressional authorization for the MRGO, including decisions on when to advise Congress of any changes in environmental conditions and impacts related to or by projects that are proposed and or are ongoing over time, including anticipated maintenance dredging and repair of the MR-GO.

3.  The Army Corps' analyses and/or evaluations of any modifications to the MR-GO deemed necessary to meet any changed physical and/or environmental condition(s)

4.  The Army Corps' budget, appropriations, proposals, and requests for funding associated with the construction and maintenance of the MR-GO, including but not limited to, all supporting documentation and submissions to Congress.

5.  Final Environmental Impact Statements responsive to comments received from Federal, State or local agencies and/or the public regarding environmental impact(s) of the MR-GO and/or any and all maintenance and operation activities of same.

6.  The Army Corps' exploration of alternative actions designed to avoid or minimize perceived adverse impacts and to evaluate the long- and short- range implications to the environment surrounding the MR-GO and/or any and all maintenance and operation activities relating to same.

7.  The Army Corps' consultation(s) with concerned environmental groups, or any other concerned third party, for revisions of Corps' methods and procedures for assessing the environmental impact(s) of the MR-GO and any related opportunities for public comment.

8.  The Right of Way for the MRGO and any changes to the Right of Way, up to the period of time the construction of the Lake Pontchartrain and Vicinity Hurricane Protection Project was commenced.

9.  Evaluations by the Corps regarding wetlands or marshland and their relationship to the design, construction, operation, maintenance, dredging of any part or parts of the MR-GO, individually or collectively, including, but not limited to any loss, destruction, diminution or contraction of such wetlands or marshland.

10.   Evaluations by the Corps regarding lunar tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.

11.   Evaluations by the Corps regarding storm related tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.

12.   Evaluations by the Corps regarding the alleged potential for the MR-GO to serve as a conduit and/or "funnel" for hurricane-generated storm surge.

13.   Evaluations by the Corps regarding erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.

14.   Evaluations by the Corps regarding requests by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.

15.   Evaluations by the Corps regarding "storm surges" within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW and their relationship to the design, construction, operations, maintenance, dredging, or existence of part or parts of the MR-GO, individually or collectively.

16.   Evaluations by the Corps relative to any effects on tidal, lunar, or storm related surges or water levels stemming from, or related to, the confluence of the MR-GO and the GIWW, including, but not limited to, any such effects stemming solely from the connection of the two waterways, or any effects related to, or caused by, any structures, of any kind, constructed within a 40 mile radius from the connection of the MR-GO and the GIWW and also constructed adjacent to either the MR-GO and the GIWW;

17.   Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature which the Army Corps believed existed in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO;

18.   Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO which were reported to the Army Corps, or of which the Army Corps was informed, whether or not the Army Corps agreed with such reporting or information, or whether or not the Army Corps believed such defects existed

19.     Any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to any claim, assertion, protest, and/or communication by the State of Louisiana and/or St. Bernard Parish and/or any agency or political subdivisions thereof, concerning the MR-GO's deleterious and/or negative impact and effect on the wetlands fronting Greater New Orleans.

20.     Any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps concerning a change in hydrology associated with and/or caused by the digging and/or dredging of the MR-GO.

21.     The design, construction, operation, maintenance, or modification of the Inner Harbor Navigation Canal (IHNC), also known as the Industrial Canal as it relates to the development and implementation of the MRGO.

22.     The design, construction, operation and maintenance of the Mississippi River-Gulf Outlet (MR-GO), including, but not limited to, the following topic areas:

   a.     Any coordination or communication between either the United States Department of the Army, the United States Army Corps of Engineers, or the New Orleans District of the United States Army Corps of Engineers, on the one hand, and either (1) the United States Department of Interior; (2) any subdivision of the United States Department of Interior, including the United States Fish and Wildlife Service; (3) any agency or political subdivision of the State of Louisiana; or (4) any other local interest or political entity, including, but not limited to, any commission associated or connected with the Port of New Orleans, on the other hand, concerning or related to (5) any investigation or reconnaissance conducted in connection with the submission of House Doc. No. 245 to the United States Congress; (6) the preparation, compilation or drafting of any design memoranda related to the Mississippi River-Gulf Outlet; or (7) the construction of the Mississippi River-Gulf Outlet.

   b.     The design, construction, maintenance, operation and contents of any "spoil bank" constructed during, or in connection with, the construction or operation of the MR-GO.  For purposes of this notice of deposition, the term "spoil bank" shall refer to any location created, designated, demarcated, constructed or otherwise maintained for the receipt or deposit of earthen material "dredged" or otherwise excavated in connection with the construction, operating or maintenance of the MR-GO.

   c.     The dredging methods or techniques used in connection with the construction, operation or maintenance of the Mississippi River-Gulf Outlet.

## THE CHALMETTE PLAN & EXTENSION ERA (1965 - 1968)

23.     The standards and criteria for the construction of levees between 1965 and the
        present, including, but not limited to, (1) written standards, manuals or guidelines
        maintained or published by the United States Army Corps of Engineers during this
        time period, and (2) any and all changes, modifications, or amendments to such
        written standards, manuals or guidelines

24.     The design, construction, operation and maintenance of the Citrus Back Levee, New
        Orleans East Levee, or the New Orleans East Back Levee, including, but not limited
        to the following:

        a.      Any and all reports investigations, notes, memoranda, compliance,
                transferals,or all other actions taken by either the United States
                Department of the Army, the United States Army Corps of Engineers, or
                the New Orleans District of the United States Army Corps of Engineers
                to comply with, or ensure compliance by any third party with, 33 C.F.R.
                §§ 208.10, 209.300, 209.330, or any other relevant or applicable, statute,
                regulation, policy, or practice.

25.     The design, construction, operation and maintenance of (a) any earthen structures
        which Defendants claim to be levees within the area commonly known as "Reach 1"
        of the Mississippi River-Gulf Outlet (MR-GO) otherwise defined as that portion of
        the combined MR-GO/Gulf Intracoastal Waterway (GIWW) extending from the
        juncture of the combined MR-GO/GIWW with the Inner Harbor Navigation Canal
        (IHNC or Industrial Canal) to the point at which the MR-GO diverges from the
        GIWW; and (b) any earthen structures which Defendants claim to be levees along,
        or adjacent to, any segment of "Reach 2" of the Mississippi River-Gulf Outlet
        (MR-GO), defined as that portion of the MR-GO extending from the point at which
        the MR-GO intersects with, joins, or diverges from the Gulf Intracoastal Waterway
        southeast to the Gulf of Mexico, including, put not limited to the following:

        a.      Any and all reports investigations, notes, memoranda, compliance,
                transferals, or all other actions taken by either the United States Department
                of the Army, the United States Army Corps of Engineers, or the New Orleans
                District of the United States Army Corps of Engineers to comply with, or
                ensure compliance by any third party with, 33 C.F.R. §§ 208.10, 209.300,
                209.330, or any other relevant or applicable, statute, regulation, policy, or
                practice.

26.     Any environmental assessments, analyses, studies, reports and/or findings of no
        significant impact with regard to the maintenance, operations, dredging and/or repair
        of the MR-GO.

27.     The ownership of lands on which the hurricane protection structures are built.

28.     The ownership of land between the MRGO hurricane protection structure and the 40
        Arpent Canal.

29.     Evaluations by the Corps regarding wetlands or marshland and their relationship to  the design, construction, operation, maintenance, dredging  of any part or parts of the MR-GO, individually or collectively, including, but not limited to any loss, destruction, diminution or contraction of such wetlands or marshland.

30.     Evaluations by the Corps regarding lunar tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.

31.     Evaluations by the Corps regarding storm related tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.

32.     Evaluations by the Corps regarding the alleged potential for the MR-GO to serve as a conduit and/or "funnel" for hurricane-generated storm surge.

33.     Evaluations by the Corps regarding erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.

34.     Evaluations by the Corps regarding requests by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.

35.     Evaluations by the Corps regarding "storm surges" within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW and their relationship to the design, construction, operations, maintenance, dredging, or existence of part or parts of the MR-GO, individually or collectively.

36.     Evaluations by the Corps relative to any effects on tidal, lunar, or storm related surges or water levels stemming from, or related to, the confluence of the MR-GO and the GIWW, including, but not limited to, any such effects stemming solely from the connection of the two waterways, or any effects related to, or caused by, any structures, of any kind, constructed within a 40 mile radius from the connection of the MR-GO and the GIWW and also constructed adjacent to either the MR-GO and the GIWW;

37.     Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature which the Army Corps believed existed in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO;

38.     Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO which were reported to the Army Corps, or of which the Army Corps was informed, whether or not the Army Corps agreed with such reporting or information, or whether or not the Army Corps believed such defects existed

## THE FORESHORE PROTECTION PLAN ERA (APRIL, 1968-NOV, 1976)

39.     The Army Corps's procedure and decision making process for obtaining congressional authorization for the foreshore protection along the MRGO, including decisions on when to advise Congress of any changes in environmental conditions and impacts related to or by projects that are proposed and or are ongoing over time, including anticipated maintenance and repair.

40.     The Army Corps' analyses and/or evaluations of any modifications to the MR-GO deemed necessary to meet any changed physical and/or environmental condition(s).

41.     The Army Corps' budget, appropriations, proposals, and requests for funding associated with the construction of foreshore protection and maintenance of the MR-GO, including but not limited to, all supporting documentation and submissions to Congress.

42.     Final Environmental Impact Statements responsive to comments received from Federal, State or local agencies and/or the public regarding environmental impact(s) of the MR-GO and/or any and all maintenance and operation activities of same.

43.     The Army Corps' exploration of alternative actions designed to avoid or minimize perceived adverse impacts and to evaluate the long- and short- range implications to the environment surrounding the MR-GO and/or any and all maintenance and operation activities relating to same.

44.     The Army Corps' consultation(s) with concerned environmental groups, or any other concerned third party, for revisions of Corps' methods and procedures for assessing the environmental impact(s) of the MR-GO and any related opportunities for public comment.

45.     Evaluations by the Corps regarding wetlands or marshland and their relationship to the design, construction, operation, maintenance, dredging of any part or parts of the MR-GO, individually or collectively, including, but not limited to any loss, destruction, diminution or contraction of such wetlands or marshland.

46.   Evaluations by the Corps regarding lunar tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.

47.   Evaluations by the Corps regarding storm related tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.

48.   Evaluations by the Corps regarding the alleged potential for the MR-GO to serve as a conduit and/or "funnel" for hurricane-generated storm surge.

49.   Evaluations by the Corps regarding erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.

50.   Evaluations by the Corps regarding requests by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.

51.   Evaluations by the Corps regarding "storm surges" within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW and their relationship to the design, construction, operations, maintenance, dredging, or existence of part or parts of the MR-GO, individually or collectively.

52.   Evaluations by the Corps relative to any effects on tidal, lunar, or storm related surges or water levels stemming from, or related to, the confluence of the MR-GO and the GIWW, including, but not limited to, any such effects stemming solely from the connection of the two waterways, or any effects related to, or caused by, any structures, of any kind, constructed within a 40 mile radius from the connection of the MR-GO and the GIWW and also constructed adjacent to either the MR-GO and the GIWW;

53.   Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature which the Army Corps believed existed in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO;

54.   Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO which were reported to the Army Corps, or of which the Army Corps was informed, whether or not the Army Corps agreed with such reporting or information, or whether or not the Army Corps believed such defects existed.

55.     **Any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to any claim, assertion, protest, and/or communication by the State of Louisiana and/or St. Bernard Parish and/or any agency or political subdivisions thereof, concerning the MR-GO's deleterious and/or negative impact and effect on the wetlands fronting Greater New Orleans.**

56.     **Any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps concerning a change in hydrology associated with and/or caused by the digging and/or dredging of the MR-GO.**

57.     The Army Corps's procedure for creating, drafting, filing, and/or reporting Environmental Impact Statements and Supplemental Environmental Reports or Supplemental Impact Statements for the MR-GO.

58.     The Army Corps's procedures for segmenting ongoing projects for the purposes of obtaining coordinated agency input on environmental impact and analyses of changes in the conditions of the environment surrounding the MR-GO caused by its maintenance and operation.

59.     The Army Corps's procedures for obtaining coordinated interdisciplinary input for evaluating any environmental impacts of projects and continued maintenance of projects to assess the potential environmental impact for Environmental Assessments and/or Environmental Impact Statements and/or Findings of No Significant Impact.

60.     The Army Corps's internal engineering regulations concerning the MR-GO and its operation and maintenance, including but not limited to, dredging and other operations and the applicable Federal Regulations and any cross reference(s) or "keys" to the corresponding CFR provision(s).

## THE BANK DE-STABILIZATION ERA (1976 - 1988)

61.     Any environmental assessments, analyses, studies, reports and/or findings of no significant impact with regard to the maintenance, operations, dredging and/or repair of the MR-GO.

62.     **Evaluations by the Corps regarding wetlands or marshland and their relationship to the design, construction, operation, maintenance, dredging of any part or parts of the MR-GO, individually or collectively, including, but not limited to any loss, destruction, diminution or contraction of such wetlands or marshland.**

63.     **Evaluations by the Corps regarding lunar tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.**

64. **Evaluations by the Corps regarding storm related tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.**

65. **Evaluations by the Corps regarding the alleged potential for the MR-GO to serve as a conduit and/or "funnel" for hurricane-generated storm surge.**

66. **Evaluations by the Corps regarding erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.**

67. **Evaluations by the Corps regarding requests by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.**

68. **Evaluations by the Corps regarding "storm surges" within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW and their relationship to the design, construction, operations, maintenance, dredging, or existence of part or parts of the MR-GO, individually or collectively.**

69. **Evaluations by the Corps relative to any effects on tidal, lunar, or storm related surges or water levels stemming from, or related to, the confluence of the MR-GO and the GIWW, including, but not limited to, any such effects stemming solely from the connection of the two waterways, or any effects related to, or caused by, any structures, of any kind, constructed within a 40 mile radius from the connection of the MR-GO and the GIWW and also constructed adjacent to either the MR-GO and the GIWW;**

70. **Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature which the Army Corps believed existed in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO;**

71. **Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO which were reported to the Army Corps, or of which the Army Corps was informed, whether or not the Army Corps agreed with such reporting or information, or whether or not the Army Corps believed such defects existed.**

72. Evaluations by the Corps concerning erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO and any responsive measures.

73.     Evaluations by the Corps relative to any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to the request by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.

**74.     The Army Corps' analyses and/or evaluations of any modifications to the MR-GO deemed necessary to meet any changed physical and/or environmental condition(s)**

**75.     The Army Corps' budget appropriations proposals and requests for funding associated with any construction and maintenance of the MR-GO, including but not limited to, all supporting documentation and submissions to Congress.**

**76.     Final Environmental Impact Statements responsive to comments received from Federal State or local agencies and/or the public regarding environmental impact(s) of the MR-GO and/or any and all maintenance and operation activities of same.**

**77.     The Army Corps' exploration of alternative actions designed to avoid or minimize perceived adverse impacts and to evaluate the long- and short- range implications to the environment surrounding the MR-GO and/or any and all maintenance and operation activities relating to same.**

**78.     The Army Corps' consultation(s) with the Council on Environmental Quality for revisions of Corps' methods and procedures for assessing the environmental impact(s) of the MR-GO and any related opportunities for public comment.**

79.     The Army Corps' procedures for Congressional Authorization of Civil Works Projects, including decisions on when and how to seek approval for modifications in plans that spanned over time.

80.     How decisions to file Environmental Impact Statements and Supplemental Approvals were made.

81.     The SER process regarding complicity with perceived governemnt standards and regulations and how that differed from the process of obtaining Environmental Assessments and FONSIs.

## THE RECONNAISANCE REPORT OF 1988 ERA (1988-1994)

82.     The efforts by the US Corps of Engineers to understand the impact of the MRGO on the environment, relative to the Reconnaissance Report; including but not limited to, bank erosion, increased salinity, as well as impacts on potential for MRGO to exacerbate storm surge.

83.     The decision to initiate a Reconnaissance Report.

84.        The drafting of the Reconnaissance Report

85.        Any and all efforts by the US Corps of Engineers to address the impact of the MRGO on the environment relative to the Reconnaissance Report, including but not limited to, bank erosion, increased salinity, as well as impacts on potential for MRGO to exacerbate storm surge.

86.        Communications with Congress regarding the US Corps of Engineers efforts to understand the impact of the MRGO on the environment relative to the Reconnaissance Report, and any subsequent communications regarding the scope of work anticipated relative to the Reconnaissance Report, the finanial needs of those works, and the results of the works either undertaken or deferred

87.        Any relationship between the design, construction, operations, maintenance, dredging, or existence any part or parts of the MR-GO, individually or collectively, and "storm surges" within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf due to rain storms, tropical storms, hurricanes, or any other weather related phenomena;

**88.        Any environmental assessments, analyses, studies, reports and/or findings of no significant impact with regard to the maintenance, operations, dredging and/or repair of the MR-GO.**

**89.        Evaluations by the Corps relative to any relationship between the design, construction, operation, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively, and any wetlands or marshland adjacent to, or abutting, any part of the southern coast of the State of Louisiana, including, but not limited to any loss, destruction, diminution or contraction of such wetlands or marshland.**

**90.        Evaluations by the Corps relative to any relationship between the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively, and lunar tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf.**

**91.        Evaluations by the Corps relative to any relationship between the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively, and storm related tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf due to rain storms, tropical storms, hurricanes, or any other weather related phenomena.**

92.     Evaluations by the Corps relative to any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to the alleged potential for the MR-GO to serve as a conduit and/or "funnel" for hurricane-generated storm surge.

93.     Evaluations by the Corps relative to any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps concerning erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.

94.     Evaluations by the Corps relative to any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to the request by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.

95.     Evaluations by the Corps relative to any relationship between the design, construction, operations, maintenance, dredging, or existence any part or parts of the MR-GO, individually or collectively, and "storm surges" within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf due to rain storms, tropical storms, hurricanes, or any other weather related phenomena.

96.     Evaluations by the Corps relative to any effects on tidal, lunar, or storm related surges or water levels stemming from, or related to, the confluence of the MR-GO and the GIWW, including, but not limited to, any such effects stemming solely from the connection of the two waterways, or any effects related to, or caused by, any structures, of any kind, constructed within a 40 mile radius from the connection of the MR-GO and the GIWW and also constructed adjacent to either the MR-GO and the GIWW;

97.     Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature which the Army Corps believed existed in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO;

98.     Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO which were reported to the Army Corps, or of which the Army Corps was informed, whether or not the Army Corps agreed with such reporting or information, or whether or not the Army Corps believed such defects existed.

99.       **Any effects on tidal, lunar, or storm related surges or water levels stemming from, or related to, the confluence of the MR-GO and the GIWW, including, but not limited to, any such effects stemming solely from the connection of the two waterways, or any effects related to, or caused by, any structures, of any kind, constructed within a 40 mile radius from the connection of the MR-GO and the GIWW and also constructed adjacent to either the MR-GO and the GIWW;**

100.      Any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature which the Army Corps believed existed in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO;

101.      Any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO which were reported to the Army Corps, or of which the Army Corps was informed, whether or not the Army Corps agreed with such reporting or information, or whether or not the Army Corps believed such defects existed

102.      The Army Corps's procedure for creating, drafting, filing, and/or reporting Environmental Impact Statements and Supplemental Environmental Reports or Supplemental Impact Statements for the MR-GO.

103.      **The Army Corps's procedures for segmenting ongoing projects for the purposes of obtaining coordinated agency input on environmental impact and analyses of changes in the conditions of the environment surrounding the MR-GO caused by its maintenance and operation.**

104.      **The Army Corps's procedures for obtaining coordinated interdisciplinary input for evaluating any environmental impacts of projects and continued maintenance of projects to assess the potential environmental impact for Environmental Assessments and/or Environmental Impact Statements and/or Findings of No Significant Impact.**

105.      **The Army Corps's internal engineering regulations concerning the MR-GO and its operation and maintenance, including but not limited to, dredging and other operations and the applicable Federal Regulations and any cross reference(s) or "keys" to the corresponding CFR provision(s).**

**THE RECONNAISANCE REPORT OF 1994 ERA**

106.     The efforts by the US Corps of Engineers to understand the impact of
         the MRGO on the environment, relative to the Reconnaissance Report;
         including but not limited to, bank erosion, increased salinity, as well as
         impacts on potential for MRGO to exacerbate storm surge.

107.     The decision to initiate a Reconnaissance Report.

108.     The drafting of the Reconnaissance Report

109.     Any and all efforts by the US Corps of Engineers to address the impact
         of the MRGO on the environment relative to the Reconnaissance Report,
         including but not limited to, bank erosion, increased salinity, as well as
         impacts on potential for MRGO to exacerbate storm surge.

110.     Communications with Congress regarding the US Corps of Engineers
         efforts to understand the impact of the MRGO on the environment
         relative to the Reconnaissance Report, and any subsequent
         communications regarding the scope of work anticipated relative to the
         Reconnaissance Report, the finanial needs of those works, and the
         results of the works either undertaken or deferred

111.     Evaluations by the Corps regarding wetlands or marshland and their
         relationship to  the design, construction, operation, maintenance,
         dredging  of any part or parts of the MR-GO, individually or
         collectively, including, but not limited to any loss, destruction,
         diminution or contraction of such wetlands or marshland.

112.     Evaluations by the Corps regarding lunar tides within the MR-GO, Lake
         Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and
         their relationship to the design, construction, operations, maintenance,
         dredging, or existence of any part or parts of the MR-GO, individually
         or collectively.

113.     Evaluations by the Corps regarding storm related tides within the MR-
         GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the
         Gulf and their relationship to the design, construction, operations,
         maintenance, dredging, or existence of any part or parts of the MR-GO,
         individually or collectively.

114.     Evaluations by the Corps regarding the alleged potential for the MR-GO
         to serve as a conduit and/or "funnel" for hurricane-generated storm
         surge.

115.        Evaluations by the Corps regarding erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.

116.        Evaluations by the Corps regarding requests by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.

117.        Evaluations by the Corps regarding "storm surges" within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW and their relationship to the design, construction, operations, maintenance, dredging, or existence of part or parts of the MR-GO, individually or collectively.

118.        Evaluations by the Corps relative to any effects on tidal, lunar, or storm related surges or water levels stemming from, or related to, the confluence of the MR-GO and the GIWW, including, but not limited to, any such effects stemming solely from the connection of the two waterways, or any effects related to, or caused by, any structures, of any kind, constructed within a 40 mile radius from the connection of the MR-GO and the GIWW and also constructed adjacent to either the MR-GO and the GIWW;

119.        Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature which the Army Corps believed existed in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO;

120.        Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO which were reported to the Army Corps, or of which the Army Corps was informed, whether or not the Army Corps agreed with such reporting or information, or whether or not the Army Corps believed such defects existed.

121.        Evaluations by the Corps relative to any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps concerning erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.

122.        Evaluations by the Corps relative to any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to the request by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.

123.     The Army Corps's procedure for creating, drafting, filing, and/or reporting Environmental Impact Statements and Supplemental Environmental Reports or Supplemental Impact Statements for the MR-GO.

124.     The Army Corps's procedures for segmenting ongoing projects for the purposes of obtaining coordinated agency input on environmental impact and analyses of changes in the conditions of the environment surrounding the MR-GO caused by its maintenance and operation.

125.     The Army Corps's procedures for obtaining coordinated interdisciplinary input for evaluating any environmental impacts of projects and continued maintenance of projects to assess the potential environmental impact for Environmental Assessments and/or Environmental Impact Statements and/or Findings of No Significant Impact.

126.     The Army Corps's internal engineering regulations concerning the MR-GO and its operation and maintenance, including but not limited to, dredging and other operations and the applicable Federal Regulations and any cross reference(s) or "keys" to the corresponding CFR provision(s).


**THE RE-EVALUATION REPORT ERA BEGINNING 1999**

127.     The efforts by the US Corps of Engineers to understand the impact of the MRGO on the environment, relative to the Re-Evaluation Report; including but not limited to, bank erosion, increased salinity, as well as impacts on potential for MRGO to exacerbate storm surge.

128.     The decision to initiate a Re-Evaluation Report.

129.     The drafting of the Re-Evaluation Report.

130.     Any and all efforts by the US Corps of Engineers to address the impact of the MRGO on the environment relative to the Re-Evaluation Report, including but not limited to, bank erosion, increased salinity, as well as impacts on potential for MRGO to exacerbate storm surge.

131.     Communications with Congress regarding the US Corps of Engineers efforts to understand the impact of the MRGO on the environment relative to the Re-Evaluation Report, and any subsequent communications regarding the scope of work anticipated relative to the Re-Evaluation Report, the finanial needs of those works, and the results of the works either undertaken or deferred

132.    Evaluations by the Corps regarding wetlands or marshland and their relationship to the design, construction, operation, maintenance, dredging of any part or parts of the MR-GO, individually or collectively, including, but not limited to any loss, destruction, diminution or contraction of such wetlands or marshland.

133.    Evaluations by the Corps regarding lunar tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.

134.    Evaluations by the Corps regarding storm related tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.

135.    Evaluations by the Corps regarding the alleged potential for the MR-GO to serve as a conduit and/or "funnel" for hurricane-generated storm surge.

136.    Evaluations by the Corps regarding erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.

137.    Evaluations by the Corps regarding requests by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.

138.    Evaluations by the Corps regarding "storm surges" within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW and their relationship to the design, construction, operations, maintenance, dredging, or existence of part or parts of the MR-GO, individually or collectively.

139.    Evaluations by the Corps relative to any effects on tidal, lunar, or storm related surges or water levels stemming from, or related to, the confluence of the MR-GO and the GIWW, including, but not limited to, any such effects stemming solely from the connection of the two waterways, or any effects related to, or caused by, any structures, of any kind, constructed within a 40 mile radius from the connection of the MR-GO and the GIWW and also constructed adjacent to either the MR-GO and the GIWW;

140.      **Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature which the Army Corps believed existed in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO;**

141.      **Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO which were reported to the Army Corps, or of which the Army Corps was informed, whether or not the Army Corps agreed with such reporting or information, or whether or not the Army Corps believed such defects existed.**

142.      **Evaluations by the Corps relative to any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps concerning erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.**

143.      **Evaluations by the Corps relative to any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to the request by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.**

144.      The drafting, creation, analyses, results, and/or findings of the *Report of the Environmental Sub-Committee to the MRGO Technical Committee*, March 16, 2000. *See* Exhibit "A" at NED-188-000001511-1630.

145.      Any measures, actions, further analyses, studies, reports, recommendations, and/or communications with Congress commenced and/or undertaken by the Army Corps in response to the *Report of the Environmental Sub-Committee to the MRGO Technical Committee*.

146.      The drafting, creation, analyses, results, and/or findings of the *Habitat Impacts of the Construction of the MRGO*, December 1999, prepared by the New Orleans District Corps of Engineers. *See* Exhibit "A" at NED-188-000001556-1591.

147.      Any measures, actions, further analyses, studies, reports, recommendations, and/or communications with Congress commenced or undertaken by the Army Corps in response to the *Habitat Impacts of the Construction of the MRGO*.

148.     The analyses, studies, reports, and decision making concerning the Army Corps's conceptual plan to construct a MR-GO/GIWW surge barrier as detailed in the Army Corps's Greater New Orleans Hurricane and Storm Damage Risk Reduction System 100-Year Design Map downloaded from http://www.mvn.usace.army.mil/hps/100yr_design_map.html.

149.     The analyses, studies, reports, and decision making concerning the Army Corps's conceptual plan to construct flood protection along Reach 2 of the MR-GO ("Upper St. Bernard Levee" and "Lower St. Bernard Levee") ranging in height from 26.5 feet to 29 feet as detailed in the Army Corps's Greater New Orleans Hurricane and Storm Damage Risk Reduction System 100-Year Design Map downloaded from http://www.mvn.usace.army.mil/hps/100yr_design_map.html.

150.     The analyses, studies, reports, and decision making concerning the Army Corps's conceptual plan to construct the "Seabrook Surge Barrier" at the northern end of the IHNC as detailed in the Army Corps's Greater New Orleans Hurricane and Storm Damage Risk Reduction System 100-Year Design Map downloaded from http://www.mvn.usace.army.mil/hps/100yr_design_map.html.

151.     All scientific research and studies relative to the effects of wetlands and/or swamps on hurricane storm surge water levels/elevations, from 1950 to the present, such as the study entitled "Morgan City and Vicinity, Louisiana," Letter from the Secretary of the Army, House Doc. No. 167, 89th Congress.

152.     All scientific research and studies relative to the effects of wetlands and/or swamps on hurricane generated waves.

153.     All scientific research and studies relative to the effects of hurricane generated waves on earthen levees.

154.     **The Army Corps' procedures for Congressional Authorization of Civil Works Projects, including decisions on when and how to seek approval for modifications in plans that spanned over time.**

155.     **How decisions to file Environmental Impact Statements and Supplemental Approvals were made.**

156.     **The SER process regarding complicity with perceived governemnt standards and regulations and how that differed from the process of obtaining Environmental Assessments and FONSIs.**

157.     **The Army Corps's procedure for creating, drafting, filing, and/or reporting Environmental Impact Statements and Supplemental Environmental Reports or Supplemental Impact Statements for the MR-GO.**

158.     **The Army Corps's procedures for segmenting ongoing projects for the purposes of obtaining coordinated agency input on environmental impact and analyses of changes in the conditions of the environment surrounding the MR-GO caused by its maintenance and operation.**

159.     **The Army Corps's procedures for obtaining coordinated interdisciplinary input for evaluating any environmental impacts of projects and continued maintenance of projects to assess the potential environmental impact for Environmental Assessments and/or Environmental Impact Statements and/or Findings of No Significant Impact.**

160.     **The Army Corps's internal engineering regulations concerning the MR-GO and its operation and maintenance, including but not limited to, dredging and other operations and the applicable Federal Regulations and any cross reference(s) or "keys" to the corresponding CFR provision(s).**

## THE CLOSURE OF THE MRGO ERA

161.     Studies and evaluations regarding the closure of MRGO, who had authority to initiate the studies and subsequent procedures.

162.     The performance of the flood control structures along the MRGO during Hurricane Katrina, in that they performed as designed, providing protection until overtopping occured and then became vulnerable to catstrophic breaching.

163.     The performance of the flood control structures along the GIWW during Hurricane Katrina.

164.     The performance of the flood control structures along the IHNC during Hurricane Katrina, in that they performed as designed, providing protection until overtopping occured and then became vulnerable to catstrophic breaching.

## II.

## EXHIBIT "B"

1.     Any and all documents relative to Paragraphs 1 -164 of Exhibit "A."