UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES  * | | CIVIL ACTION |
| CONSOLIDATED LITIGATION   * | | NUMBER: 05-4182 "K"(2) |
| * | | JUDGE DUVAL |
| * | | MAG. WILKINSON |
| * | | |
| * | | |
| PERTAINS TO: MRGO, Robinson   * | | |
| (No. 06-2268)   * | | |

*************************************************************************

## REPLY TO DEFENDANT UNITED STATES' OPPOSITION TO PLAINTIFFS' "RULE TO SHOW" AND MOTION FOR PROTECTIVE ORDER (DOC. NO.13560)

**NOW INTO COURT**, through undersigned counsel, come Plaintiffs Norman Robinson, Kent Lattimore, Lattimore & Associates, Tanya Smith, Anthony Franz, Jr., and Lucielle Franz, who in reply to the defendant United States' Opposition to Plaintiffs' "Rule to Show Cause" and Motion for Protective Order of, do state as follows:

I.

PATTERN AND PRACTICE

The instant dispute is the result of an ongoing pattern of dilatory conduct by the United States that has consistently impeded the orderly flow of discovery.  The United States's recalcitrant conduct began with its responses to written discovery that were laden with superflous objections and no substantive responses.  The United States consitently avoided any fact witnesses to crucial events in its' Interrogatories, and engaged in verbal gamesmanship in its Responses to Requests for Production of Documents.

In these responses, the United States uniformly responded that the information sought

was "publicly available and, therefore, obtainable from some source that is more convenient, less burdensome, and less expensive. Fed.R.Civ. P. 26(b)(2)(C)(I), often refering Plaintiffs to the website containing the IPET report and other documentation that may be relevant to this request. See https://ipet.wes.army.mil/." Once these responses were produced, the United States further asserted that the opinions of IPET are "not necessarily the official opinion of the United States Army Corps of Engineers." Clearly, the United States was disingenuous when it refered Plaintiffs to a "responsive" document while still denying that it is the official opinion of that party.

As a result, the United States had produced no documents or things in response to any of the 100 production requests.  Finally, the Goverment produced information on hard drives in the form of a "data dump" with no organizational structure associated with the files.  Approximately four hundred (400) gigabytes were contained on the drives, but the sheer volume of the material rendered the production virtually useless without an organizational structure.[1]  This issue was ultimately resolved after substantial efforts by the MRGO PSLC; but now the Government has produced between ten (10) and fifteen (15) terabytes[2] of information on hard drives that it asserts are responsive to Plaintiffs' discovery requests, with no indication of how they are responsive or what relevance they have to specific discovery requests.

In essence, the United States has produced a monstrous haystack that it claims is its' response to Plaintiffs' Request for Production of Documents.  Once a needle is found by the

---

[1] To put this into perspective, with a gigabyte (Gig) comprising 1,000,000,000 bytes, one hundred gigabytes equals a library floor of academic journals. Based on a LexisNexis estimate, this unorganized production was the equivalent of eighty million (80,000,000) pages of information torn out of their binders and tossed onto the floor.

[2] A terabyte consists of one thousand twenty four (1,024) gigabytes. As a result, the United States has produced between 100 to 150 academic library *floors* of documents.

Plaintiffs, the United States claims that the needle cannot be relied upon as having much evidentiary value. So when the Plaintiffs attempt to develop evidentiary value to the needle through testimonial evidence, the United States says Plaintiffs aren't entitled to establish the evidentiary value of the Corps's own documents because tehy are from too long ago.

While coming to grips with this elephantine document production, the Plaintiffs have commenced the taking of depositions of individual Corps employees percieved to be the most informed of pertinent issues relative to the litigation. These depositions have allowed some insight into the machinations of the Corps's bureaucratic structure; but very little specific knowledge of pertinent issues can be rendered from these individuals.[3] In addition, Plaintiffs developed several Rule 30(b)(6) deposition notices regarding the design, construction, and maintenance of the MRGO. These were immediately rejected by counsel for the United States as being overly broad, despite efforts to reach some amicable resolution to the issue. The response of opposing counsel has generally been there is no way that one witness can be prepared for questions regarding a project that has spanned over fifty (50) years; what the Court should read into this is that the Corps has such a segmented bureaucratic structure that the left hand often doesn't know what the right hand is doing.

Now, Plaintiffs have undergone substantial efforts to allay the concerns about the overbreadth of the previous notices, yet the Government still complains. It is for this reason that Plaintiffs seek relief from the Court. In an effort to finally resolve the outstanding deposition discovery, the Plaintiffs have attached as Exhibit "A" a listing of the remaining fact depositions

---

[3] By example, nearly every inquiry to the individual deponents regarding hydrology was deferred to a former employee, Nancy Powell. Upon her deposition, she declined that she had the knowledge that the others asserted would be gained from her.

sought. Plaintiffs ask the Court to set any date on the calendar in which the United States is to appear or produce a witness and the Plaintiffs will be there.

## II.

## REASONABLENESS OF AREAS OF INQUIRY OF THE 30(B)(6) NOTICE

<u>Federal Rules of Civil Procedure</u>, Rule 26 sets forth in pertinent part:

> **(b) Discovery Scope and Limits.**
>
> **(1)** *Scope in General.* Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense--including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)( c).
>
> **(2)** *Limitations on Frequency and Extent.*
>
> **(C)** *When Required.* On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:
>
> **(i)** the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> **(ii)** the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> **(iii)** the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

It is well settled that the scope of discovery is broad and encompasses any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978); Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Counsel for the Plaintiffs have undertaken extra-ordinary efforts to develop specific areas of inquiry in the Rule 30(b)(6) deposition notice that relate directly to the conduct of the Corps as complained of by the Plaintiffs.

Pursuant to F.R.C.P., Rule 30(b)(6), once noticed the governmental deponent has "an affirmative duty to make available persons who will be able to 'give complete, knowledgeable and binding answers' on its behalf." Dairyland Power Coop. v. United States, 79 Fed.Cl. 709, 714 (2007) (quoting Reilly v. NatWest Mkts. Group, Inc., 181 F.3d 253, 268 (2d Cir.1999)). The deponent also has "an affirmative duty to produce a representative who can answer questions that are both within the scope of the matters described in the notice and are 'known or reasonably available' to the corporation." King v. Pratt & Whitney, 161 F.R.D. 475, 476 (S.D.Fla.1995) (quoting FRCP 30(b)(6)), *aff'd,* 213 F.3d 646 (11th Cir.2000). In this regard, RCFC 30(b)(6) "sets a high burden of knowledge, but only regarding the noticed topics, no more and no less." Payless Shoesource Worldwide, Inc. v. Target Corp., 2008 WL 973118 (D.Kan. Apr.8, 2008). Within this framework, Plaintiffs have developed areas of inquiry that relate to specific "eras."

As exhibited after Katrina, a tremendous amount of inquiry results from a catastrophe. Such defining moments provide a clear delineation of time to establish "eras." The MRGO project spans many years, but the conduct of the Corps complained of by the Plaintiffs led to a cumulative result. For example, wetlands and marsh existant in St. Bernard Parish up to 1956 (and factored into the Standard Project Hurricane calculations to develop the levee heights) have

consistently degraded from 1956 until the time of the storm, resulting in the loss of thousands of acres of hurricane buffer. Each step of the Corps's administration of the MRGO reveals events that contributed to this cumulative event. By reviewing the Corps's conduct by "eras," it is possible to forensically examine the sequential events that resulted in the cumulative effect of the MRGO on the hurricane buffer by August 29, 2005.

With this background in mind, efforts to focus on particular eras became the most plausible way to allay the concerns of the United States regarding the need for expansive inquiry into specific influences on the MRGO. By bracketing major events in the history of the administration of the MRGO, Plaintiffs were able to limit inquiry to a specific time period. Clearly, many items of inquiry are duplicative of prior items; but by focusing the inquiry onto a specific time frame of the Corps's administration, the inquiry is not redundant. To make the process that much easier, Plaintiffs highlighted the items of inquiry that had been specified for prior eras.

The use of "eras" allows the United States to focus on each specific period of time. Clearly this process works because the United States has conceded that it will produce a witness for the period defined as the "Re-Evaluation Era of 1999." Perhaps there is no one left at the Corps that has any knowledge of any events that took place before 1999, but the conduct of the Corps complained of by the Plaintiffs both pre-dates and includes that era. By law, Plaintiffs are entitled to a discovery response pursuant to F.R.C.P., Rule 30.

To focus on the example selected by the Corps to which it takes issue:

> "Evaluations by the Corps regarding lunar tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively."

This area of inquiry is set forth in all "eras."  It is well known by every fisherman catching speckled trout at the Seabrook Bridge where the Industrial Canal meets Lake Pontchartrain that the bite is on during the right lunar phase because the salt water is moving with the tide. Plaintiffs counsel want to know if and how the movement of salt water was considered during the design phase, and ultimately whether the effects were considered.  If it was considered, but any individual with specific knowledge from that "era" is no longer with us, then the inability of the Corps to provide specific responses would go to the weight of the evidence adduced at trial through documentation, not the admissibility.  Likewise for the following era; or maybe the Corps didn't consider it all, for whatever reason.  But Plaintiffs are entitled to know that they can prepare for trial confident that the presentation of its theory at trial, if based solely upon Corps documents from an early "era," cannot be obliterated by the surprise witness.

      Clearly, the United States's argument that the deposition notice requires testimony for the entire lifetime of the project is misplaced.  Great efforts have been made to develop relevant inquiry that specifies with reasonable particularity the items of inquiry that are specific to a distinct time frame.  Counsel for the United States indicates that it may not be able to locate a witness knowledgable of events from the older eras.  That is understandable, and an affidavit or testimony to that effect may be acceptable; however, it is unacceptable for the United States to avoid deposition inquiry and require Plaintiffs to rely on the early documents as being self evident, with the possibility that the United States pull an old-timer out of cold storage to show up at trial and "rebut testimony elicited at trial by Plaintiffs."

      Finally, the United States complains of the language utilized by Plaintiffs in their items of inquiry.  However, it is the peculiar nature and administration of the MRGO that requires this language.  The use of the terms "individually or collectively" was intentionally utilized to

understand the effects of the disjointed approached to maintenance and other projects employed by the Corps.[4] The prior example regarding lunar tides is instructive.

The area of Reach 2 of the MRGO just northeast of Meraux, La. has a narrow sliver of land separating the MRGO from Lake Borne, with an opening connecting the two bodies of water hydraulically. Because salt water is denser than fresh water, the dredging of the MRGO near this opening could easily lead to increased salt water intrusion and marsh degradation. Likewise, the dredging of Reach 3, which extends into the open water of the Gulf, could likewise have a different yet equally harmful effect via salt water intrusion. Plaintiffs are entitled to know whether the Corps considered either of these two examples, either individually or in conjunction, and the resultant cumulative effect for a particular "era. If this case was as simple as a camp owner in Shell Beach having his camp slough into the water due to the degradation of the marsh, the United States's objection might be well taken. But that is no the case here, fifty (50) years of mismanagment by the Corps led to the devastation and annihalation of entire regions of the metropolitan area. Plaintiffs are entitled to analyze the sequential effects of the Corps's management of the MRGO.

Likewise, the United States complains that a number of the items of inquiry are overly broad due to the use of the phrase "including but not limited to." This qualify language was designed and intended to clarify the scope of inquiry while still maintaining reasonable latitude by the questioning attorney. By way of example, an item of inquiry from the Foreshore Protection Plan Era (April, 1968 - Nov.. 1976) is illustrative:

---

[4] The MRGO segments are designated simultaneously by reaches, mile markers, and its intersection with bayous.

> 41. The Army Corps' budget, appropriations, proposals, and requests for funding associated with the construction of foreshore protection and maintenance of the MR-GO, including but not limited to, all supporting documentation and submissions to Congress.

This item of inquiry is as follows: The Army Corps' budget, appropriations, proposals, and requests for funding associated with the construction of foreshore protection and maintenance of the MR-GO (during that "era"). Based upon the responses of the deponent, the questioning attorney may want to ask: "what did you tell Congress the money was for, and what supporting documentation did you present?". Obviously, any language selected by the drafter can be met with dissention regarding its precision. However, Plaintiffs are entitled to inquire about the information provided to Congress to obtain public funds that were utilized on the MRGO, and the above language was deemed to be reasonably precise enough to meet that end.

Plaintiffs do not concede that the United States's reliance on Reed v. Bennet[5] is well taken. The items of inquiry in the present case provide the United States with sufficient notice of the area of inquiry that will be pursued such that it can identify appropriate deponents and ensure that they are prepared for the deposition. However, in an effort to further allay the concerns of the United States, the Plaintiffs will re-word each item of inquiry that includes that term to eliminate it. As such, that objection should now be considered moot. Emon v. State Farm Mutual Automobile Insurance Company, 2007 WL 216138 (E.D.Mich., 2007).

---

[5] 193 F.R.D. 689 (U.S.D.C., Kansas).

### III.

### THE UNITED STATES HAS FAILED TO MEET ITS BURDEN OF PROOF TO ESTABLISH ENTITLEMENT TO A PROTECTIVE ORDER

F.R.C.P., Rule 26( c) provides in pertinent part:

> "Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. . . . "

"Good cause" within the meaning of Rule 26( c) contemplates a "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." General Dynamics Corp. v. Selb Mfg. Co., 481 F.2d 1204, 1212 (C.A.Mo.1973), certiorari denied, 94 S.Ct. 926, 414 U.S. 1162, 39 L.Ed.2d 116.  The party requesting a protective order must make a "specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one." In re PE Corp. Sec. Litig., 221 F.R.D. 20, 26 (D.Conn.2003); Brittain v. Stroh Brewery Co., 136 F.R.D. 408, 412 (M.D.N.C.1991); Gulf Oil v. Bernard, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).  The United States has failed to elicit any demonstrable fact that would necessitate a protective order.

The deposition notice discussed by the United States that willproceed in the near future is separate and distinct from the one presently at issue.  From the outset, two discovery paths have been utilized: the first related to the East Bank Industrial Area ("EBIA") that also involved the Washington Group *(MRGO class action)*; the second related to the MRGO proper (*Robinson*) and the Corps's administration of the MRGO.  To date, neither deposition has gone forward, but

the United States has at least provided a date for the EBIA deposition.

Quite telling, the EBIA project commenced in the late 1990's, and the United States can produce a deponent. The United States has likewise agreed that it will produce a witness for the "Re-Evaluation Era of 1999." Plaintiffs cannot speculate why the United States has no witnesses available to discuss issues relative to the MRGO from more than ten years ago, but the Court should not condone the United States's evasive efforts to avoid responding to areas of reasonable inquiry by granting a protective order without any good cause being shown.

## IV.

## CONCLUSION

**WHEREFORE**, Plaintiffs Norman Robinson, Kent Lattimore, Lattimore & Associates, Tanya Smith, Anthony Franz, Jr., and Lucielle Franz pray that the defendant United States of America be ordered to appear and show cause, if it can, why it should not be ordered to participate in good faith to complete discovery.

**Respectfully Submitted,**

**APPROVED PLAINTIFFS LIAISON COUNSEL**

  /s/  Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
PLAINTIFFS LIAISON COUNSEL
Law Offices of Joseph M. Bruno
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@jbrunolaw.com

**O'Donnell & Associates P.C.**
By: s/ Pierce O'Donnell
Pierce O'Donnell (*pro hac vice*)
550 S. Hope St., Suite 1000
Los Angeles, California 90071
Phone: (213) 347-0290
Fax: (213) 347-0298

**The Andry Law Firm, LLC**
By: s/ Jonathan B. Andry
Jonathan B. Andry (LSBA No. 20081)
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 586-8899
Facsimile: (504) 585-1788

**Law Offices of Joseph M. Bruno**
Joseph M. Bruno (LSBA No. 3604)
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile: (504) 581-1493

**Domengeaux Wright Roy & Edwards LLC**
Bob F. Wright (LSBA No. 13691)
James P. Roy (LSBA No. 11511)
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, Louisiana 70502-3668
Telephone: (337) 233-3033
Facsimile: (337) 233-2796

**Fayard & Honeycutt**
Calvin C. Fayard, Jr. (LSBA No. 5486)
Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193
Facsimile: (225) 664-6925

**Girardi & Keese**
Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile: (213) 481-1554

**Ranier, Gayle & Elliot, LLC**
N. Frank Elliot III
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337) 494-7218

**Levin, Papantonio, Thomas, Mitchell Echsner & Proctor, P.A.**
Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile: (850) 436-6123

**McKernan Law Firm**
Joseph Jerry McKernan (LSBA No. 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile: (225) 926-1202

**Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC**
Gerald E. Meunier (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile: (504) 528-9973

**Law Office of Elwood C. Stevens, Jr., a Professional Law Corporation**
Elwood C. Stevens, Jr. (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile: (985) 385-4861

**Cotchett, Pitre, Simon & McCarthy**
Joseph W. Cotchett (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**
Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: (504) 525-9522

**Salas & Co., LC**
Camilo K. Salas, III (LSBA No. 11657)
650 Poydras Street, Suite 1650
New Orleans, LA 70130
Telephone: (504) 799-3080
Facsimile: (504) 799-3085
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

_____I hereby certify that I have served a copy of the above and foregoing upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission this 19th day of June, 2008.

　　　/s/ Joseph M. Bruno　　
　　　　Joseph M. Bruno