## "EXHIBIT "A"

Please produce, pursuant to Federal Rule 30(b)(6), the person(s) most knowledgeable of the following areas:

## PRE-HURRICANE BETSY

1. Any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to The 1957 Tidewater Advisory Committee Report, dated September 3, 1957.

2. The Army Corps's procedure for obtaining congressional authorization for the MRGO, including decisions on when to advise Congress of damage to the environment or other deleterious effects caused by the design, construction of maintenance of the MRGO and when to advise of the need for capital improvementys that will mitigate or stop the damage or deleterious effects.

3. The Army Corps' analyses and/or evaluations of any modifications to the MR-GO deemed necessary to address damage to the environment or other deleterious effects caused by the MRGO.

4. The Army Corps' budget, appropriations, proposals, and requests for funding associated with the construction and maintenance of the MR-GO, including all supporting documentation and submissions to Congress.

5. Final Environmental Impact Statements responsive to comments received from Federal, State or local agencies and/or the public regarding environmental impact(s) of the MR-GO and/or any and all maintenance and operation activities of same.

6. The Army Corps' exploration of alternative actions designed to avoid or minimize perceived adverse impacts and to evaluate the long- and short- range implications to the environment surrounding the MR-GO and/or any and all maintenance and operation activities relating to same.

7. The Army Corps' consultation(s) with concerned environmental groups, or any other concerned third party, for revisions of Corps' methods and procedures for assessing the environmental impact(s) of the MR-GO and any related opportunities for public comment.

8. The Right of Way for the MRGO and any changes to the Right of Way, up to the period of time the construction of the Lake Pontchartrain and Vicinity Hurricane Protection Project was commenced.

9. Evaluations by the Corps regarding wetlands or marshland and their relationship to the design, construction, operation, maintenance, dredging of any part or parts of the MR-GO, individually or collectively, including any loss, destruction, diminution or

contraction of such wetlands or marshland.

10.    Evaluations by the Corps regarding lunar tides within the MR-GO, Lake Borgne,
       Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the
       design, construction, operations, maintenance, dredging, or existence of any part or
       parts of the MR-GO, individually or collectively.

11.    Evaluations by the Corps regarding storm related tides within the MR-GO, Lake
       Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship
       to the design, construction, operations, maintenance, dredging, or existence of any
       part or parts of the MR-GO, individually or collectively.

12.    Evaluations by the Corps regarding the alleged potential for the MR-GO to serve as
       a conduit and/or "funnel" for hurricane-generated storm surge.

13.    Evaluations by the Corps regarding erosion of the banks of the MR-GO from the
       wave wash of vessels traversing the MR-GO.

14.    Evaluations by the Corps regarding requests by St. Bernard Parish to lower the speed
       limit of vessels on the MR-GO.

15.    Evaluations by the Corps regarding "storm surges" within the MR-GO, Lake Borgne,
       Lake Pontchartrain, the IHNC, the GIWW and their relationship to the design,
       construction, operations, maintenance, dredging, or existence of part or parts of the
       MR-GO, individually or collectively.

16.    Evaluations by the Corps relative to any effects on tidal, lunar, or storm related
       surges or water levels stemming from, or related to, the confluence of the MR-GO
       and the GIWW, including such effects stemming solely from the connection of the
       two waterways, or any effects related to, or caused by, any structures, of any kind,
       constructed within a 40 mile radius from the connection of the MR-GO and the
       GIWW and also constructed adjacent to either the MR-GO and the GIWW;

17.    Evaluations by the Corps relative to any and all other defects, inadequacies, or
       conditions posing a potential risk to public health, safety, or property (including what
       is sometimes referred to as the "funnel" effect) of whatever nature which the Army
       Corps believed existed in connection with, or as a result of, the design, construction,
       maintenance or operation of the MR-GO;

18.    Evaluations by the Corps relative to any and all other defects, inadequacies, or
       conditions posing a potential risk to public health, safety, or property (including what
       is sometimes referred to as the "funnel" effect) of whatever nature in connection
       with, or as a result of, the design, construction, maintenance or operation of the MR-
       GO which were reported to the Army Corps, or of which the Army Corps was
       informed, whether or not the Army Corps agreed with such reporting or information,
       or whether or not the Army Corps believed such defects existed.

19.     Any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to any claim, assertion, protest, and/or communication by the State of Louisiana and/or St. Bernard Parish and/or any agency or political subdivisions thereof, concerning the MR-GO's deleterious and/or negative impact and effect on the wetlands fronting Greater New Orleans.

20.     Any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps concerning a change in hydrology associated with and/or caused by the digging and/or dredging of the MR-GO.

21.     The design, construction, operation, maintenance, or modification of the Inner Harbor Navigation Canal (IHNC), also known as the Industrial Canal as it relates to the development and implementation of the MRGO.

22.     The design, construction, operation and maintenance of the Mississippi River-Gulf Outlet (MR-GO), including the following topic areas:

a.      Any coordination or communication between either the United States Department of the Army, the United States Army Corps of Engineers, or the New Orleans District of the United States Army Corps of Engineers, on the one hand, and either (1) the United States Department of Interior; (2) any subdivision of the United States Department of Interior, including the United States Fish and Wildlife Service; (3) any agency or political subdivision of the State of Louisiana; or (4) any other local interest or political entity, including, but not limited to, any commission associated or connected with the Port of New Orleans, on the other hand, concerning or related to (5) any investigation or reconnaissance conducted in connection with the submission of House Doc. No. 245 to the United States Congress; (6) the preparation, compilation or drafting of any design memoranda related to the Mississippi River-Gulf Outlet; or (7) the construction of the Mississippi River-Gulf Outlet.

b.      The design, construction, maintenance, operation and contents of any "spoil bank" constructed during, or in connection with, the construction or operation of the MR-GO. For purposes of this notice of deposition, the term "spoil bank" shall refer to any location created, designated, demarcated, constructed or otherwise maintained for the receipt or deposit of earthen material "dredged" or otherwise excavated in connection with the construction, operating or maintenance of the MR-GO.

c.      The dredging methods or techniques used in connection with the construction, operation or maintenance of the Mississippi River-Gulf Outlet.

**THE CHALMETTE PLAN & EXTENSION ERA (1965 - 1968)**

23.   The standards and criteria for the construction of levees between 1965 and the present, including: (1) written standards, manuals or guidelines maintained or published by the United States Army Corps of Engineers during this time period, and (2) any and all changes, modifications, or amendments to such written standards, manuals or guidelines

24.   The design, construction, operation and maintenance of the Citrus Back Levee, New Orleans East Levee, or the New Orleans East Back Levee, including the following:

   a.   Any and all reports investigations, notes, memoranda, compliance, transferals,or all other actions taken by either the United States Department of the Army, the United States Army Corps of Engineers, or the New Orleans District of the United States Army Corps of Engineers to comply with, or ensure compliance by any third party with, 33 C.F.R. §§ 208.10, 209.300, 209.330, or any other relevant or applicable, statute, regulation, policy, or practice.

25.   The design, construction, operation and maintenance of (a) any earthen structures which Defendants claim to be levees within the area commonly known as "Reach 1" of the Mississippi River-Gulf Outlet (MR-GO) otherwise defined as that portion of the combined MR-GO/Gulf Intracoastal Waterway (GIWW) extending from the juncture of the combined MR-GO/GIWW with the Inner Harbor Navigation Canal (IHNC or Industrial Canal) to the point at which the MR-GO diverges from the GIWW; and (b) any earthen structures which Defendants claim to be levees along, or adjacent to, any segment of "Reach 2" of the Mississippi River-Gulf Outlet (MR-GO), defined as that portion of the MR-GO extending from the point at which the MR-GO intersects with, joins, or diverges from the Gulf Intracoastal Waterway southeast to the Gulf of Mexico, including, the following:

   a.   Any and all reports investigations, notes, memoranda, compliance, transferals, or all other actions taken by either the United States Department of the Army, the United States Army Corps of Engineers, or the New Orleans District of the United States Army Corps of Engineers to comply with, or ensure compliance by any third party with, 33 C.F.R. §§ 208.10, 209.300, 209.330, or any other relevant or applicable, statute, regulation, policy, or practice.

26.   Any environmental assessments, analyses, studies, reports and/or findings of no significant impact with regard to the maintenance, operations, dredging and/or repair of the MR-GO.

27.   The ownership of lands on which the hurricane protection structures are built.

28.    The ownership of land between the MRGO hurricane protection structure and the 40 Arpent Canal.

29.    **Evaluations by the Corps regarding wetlands or marshland and their relationship to the design, construction, operation, maintenance, dredging of any part or parts of the MR-GO, individually or collectively, including any loss, destruction, diminution or contraction of such wetlands or marshland.**

30.    **Evaluations by the Corps regarding lunar tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.**

31.    **Evaluations by the Corps regarding storm related tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.**

32.    **Evaluations by the Corps regarding the alleged potential for the MR-GO to serve as a conduit and/or "funnel" for hurricane-generated storm surge.**

33.    **Evaluations by the Corps regarding erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.**

34.    **Evaluations by the Corps regarding requests by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.**

35.    **Evaluations by the Corps regarding "storm surges" within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW and their relationship to the design, construction, operations, maintenance, dredging, or existence of part or parts of the MR-GO, individually or collectively.**

36.    **Evaluations by the Corps relative to any effects on tidal, lunar, or storm related surges or water levels stemming from, or related to, the confluence of the MR-GO and the GIWW, including any such effects stemming solely from the connection of the two waterways, or any effects related to, or caused by, any structures, of any kind, constructed within a 40 mile radius from the connection of the MR-GO and the GIWW and also constructed adjacent to either the MR-GO and the GIWW;**

37.    **Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature which the Army Corps believed existed in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO;**

38.  Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO which were reported to the Army Corps, or of which the Army Corps was informed, whether or not the Army Corps agreed with such reporting or information, or whether or not the Army Corps believed such defects existed

## THE FORESHORE PROTECTION PLAN ERA (APRIL, 1968-NOV, 1976)

39.  The Army Corps's procedure and decision making process for obtaining congressional authorization for the foreshore protection along the MRGO, including decisions on when to advise Congress of any changes in environmental conditions and impacts related to or by projects that are proposed and or are ongoing over time, including anticipated maintenance and repair.

40.  The Army Corps' analyses and/or evaluations of any modifications to the MR-GO deemed necessary to meet any changed physical and/or environmental condition(s).

41.  The Army Corps' budget, appropriations, proposals, and requests for funding associated with the construction of foreshore protection and maintenance of the MR-GO, including all supporting documentation and submissions to Congress.

42.  Final Environmental Impact Statements responsive to comments received from Federal, State or local agencies and/or the public regarding environmental impact(s) of the MR-GO and/or any and all maintenance and operation activities of same.

43.  The Army Corps' exploration of alternative actions designed to avoid or minimize perceived adverse impacts and to evaluate the long- and short- range implications to the environment surrounding the MR-GO and/or any and all maintenance and operation activities relating to same.

44.  The Army Corps' consultation(s) with concerned environmental groups, or any other concerned third party, for revisions of Corps' methods and procedures for assessing the environmental impact(s) of the MR-GO and any related opportunities for public comment.

45.  Evaluations by the Corps regarding wetlands or marshland and their relationship to the design, construction, operation, maintenance, dredging of any part or parts of the MR-GO, individually or collectively, including any loss, destruction, diminution or contraction of such wetlands or marshland.

46.    Evaluations by the Corps regarding lunar tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.

47.    Evaluations by the Corps regarding storm related tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.

48.    Evaluations by the Corps regarding the alleged potential for the MR-GO to serve as a conduit and/or "funnel" for hurricane-generated storm surge.

49.    Evaluations by the Corps regarding erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.

50.    Evaluations by the Corps regarding requests by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.

51.    Evaluations by the Corps regarding "storm surges" within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW and their relationship to the design, construction, operations, maintenance, dredging, or existence of part or parts of the MR-GO, individually or collectively.

52.    Evaluations by the Corps relative to any effects on tidal, lunar, or storm related surges or water levels stemming from, or related to, the confluence of the MR-GO and the GIWW, including any effects stemming solely from the connection of the two waterways, or any effects related to, or caused by, any structures, of any kind, constructed within a 40 mile radius from the connection of the MR-GO and the GIWW and also constructed adjacent to either the MR-GO and the GIWW;

53.    Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature which the Army Corps believed existed in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO;

54.    Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO which were reported to the Army Corps, or of which the Army Corps was informed, whether or not the Army Corps agreed with such reporting or information, or whether or not the Army Corps believed such defects existed.

55. **Any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to any claim, assertion, protest, and/or communication by the State of Louisiana and/or St. Bernard Parish and/or any agency or political subdivisions thereof, concerning the MR-GO's deleterious and/or negative impact and effect on the wetlands fronting Greater New Orleans.**

56. **Any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps concerning a change in hydrology associated with and/or caused by the digging and/or dredging of the MR-GO.**

57. The Army Corps's procedure for creating, drafting, filing, and/or reporting Environmental Impact Statements and Supplemental Environmental Reports or Supplemental Impact Statements for the MR-GO.

58. The Army Corps's procedures for segmenting ongoing projects for the purposes of obtaining coordinated agency input on environmental impact and analyses of changes in the conditions of the environment surrounding the MR-GO caused by its maintenance and operation.

59. The Army Corps's procedures for obtaining coordinated interdisciplinary input for evaluating any environmental impacts of projects and continued maintenance of projects to assess the potential environmental impact for Environmental Assessments and/or Environmental Impact Statements and/or Findings of No Significant Impact.

60. The Army Corps's internal engineering regulations concerning the MR-GO and its operation and maintenance, including dredging and other operations and the applicable Federal Regulations and any cross reference(s) or "keys" to the corresponding CFR provision(s).

## THE BANK DE-STABILIZATION ERA (1976 - 1988)

61. Any environmental assessments, analyses, studies, reports and/or findings of no significant impact with regard to the maintenance, operations, dredging and/or repair of the MR-GO.

62. **Evaluations by the Corps regarding wetlands or marshland and their relationship to the design, construction, operation, maintenance, dredging of any part or parts of the MR-GO, individually or collectively, including any loss, destruction, diminution or contraction of such wetlands or marshland.**

63. **Evaluations by the Corps regarding lunar tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.**

64.  Evaluations by the Corps regarding storm related tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.

65.  Evaluations by the Corps regarding the alleged potential for the MR-GO to serve as a conduit and/or "funnel" for hurricane-generated storm surge.

66.  Evaluations by the Corps regarding erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.

67.  Evaluations by the Corps regarding requests by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.

68.  Evaluations by the Corps regarding "storm surges" within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW and their relationship to the design, construction, operations, maintenance, dredging, or existence of part or parts of the MR-GO, individually or collectively.

69.  Evaluations by the Corps relative to any effects on tidal, lunar, or storm related surges or water levels stemming from, or related to, the confluence of the MR-GO and the GIWW, including any such effects stemming solely from the connection of the two waterways, or any effects related to, or caused by, any structures, of any kind, constructed within a 40 mile radius from the connection of the MR-GO and the GIWW and also constructed adjacent to either the MR-GO and the GIWW;

70.  Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature which the Army Corps believed existed in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO;

71.  Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO which were reported to the Army Corps, or of which the Army Corps was informed, whether or not the Army Corps agreed with such reporting or information, or whether or not the Army Corps believed such defects existed.

72.  Evaluations by the Corps concerning erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO and any responsive measures.

73.   Evaluations by the Corps relative to any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to the request by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.

74.   **The Army Corps' analyses and/or evaluations of any modifications to the MR-GO deemed necessary to meet any changed physical and/or environmental condition(s)**

75.   **The Army Corps' budget appropriations proposals and requests for funding associated with any construction and maintenance of the MR-GO, including all supporting documentation and submissions to Congress.**

76.   **Final Environmental Impact Statements responsive to comments received from Federal State or local agencies and/or the public regarding environmental impact(s) of the MR-GO and/or any and all maintenance and operation activities of same.**

77.   **The Army Corps' exploration of alternative actions designed to avoid or minimize perceived adverse impacts and to evaluate the long- and short- range implications to the environment surrounding the MR-GO and/or any and all maintenance and operation activities relating to same.**

78.   **The Army Corps' consultation(s) with the Council on Environmental Quality for revisions of Corps' methods and procedures for assessing the environmental impact(s) of the MR-GO and any related opportunities for public comment.**

79.   The Army Corps' procedures for Congressional Authorization of Civil Works Projects, including decisions on when and how to seek approval for modifications in plans that spanned over time.

80.   How decisions to file Environmental Impact Statements and Supplemental Approvals were made.

81.   The SER process regarding complicity with perceived governemnt standards and regulations and how that differed from the process of obtaining Environmental Assessments and FONSIs.

## THE RECONNAISANCE REPORT OF 1988 ERA (1988-1994)

82.   The efforts by the US Corps of Engineers to understand the impact of the MRGO on the environment, relative to the Reconnaissance Report; including but not limited to, bank erosion, increased salinity, as well as impacts on potential for MRGO to exacerbate storm surge.

83.   The decision to initiate a Reconnaissance Report.

84.      The drafting of the Reconnaissance Report

85.      Any and all efforts by the US Corps of Engineers to address the impact of the MRGO on the environment relative to the Reconnaissance Report, including bank erosion, increased salinity, as well as impacts on potential for MRGO to exacerbate storm surge.

86.      Communications with Congress regarding the US Corps of Engineers efforts to understand the impact of the MRGO on the environment relative to the Reconnaissance Report, and any subsequent communications regarding the scope of work anticipated relative to the Reconnaissance Report, the finanial needs of those works, and the results of the works either undertaken or deferred

87.      Any relationship between the design, construction, operations, maintenance, dredging, or existence any part or parts of the MR-GO, individually or collectively, and "storm surges" within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf due to rain storms, tropical storms, hurricanes, or any other weather related phenomena;

88.      **Any environmental assessments, analyses, studies, reports and/or findings of no significant impact with regard to the maintenance, operations, dredging and/or repair of the MR-GO.**

89.      **Evaluations by the Corps relative to any relationship between the design, construction, operation, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively, and any wetlands or marshland adjacent to, or abutting, any part of the southern coast of the State of Louisiana, including any loss, destruction, diminution or contraction of such wetlands or marshland.**

90.      **Evaluations by the Corps relative to any relationship between the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively, and lunar tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf.**

91.      **Evaluations by the Corps relative to any relationship between the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively, and storm related tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf due to rain storms, tropical storms, hurricanes, or any other weather related phenomena.**

92.      **Evaluations by the Corps relative to any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to the alleged potential for the MR-GO to serve as a conduit and/or "funnel" for hurricane-generated storm surge.**

93.     Evaluations by the Corps relative to any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps concerning erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.

94.     Evaluations by the Corps relative to any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to the request by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.

95.     Evaluations by the Corps relative to any relationship between the design, construction, operations, maintenance, dredging, or existence any part or parts of the MR-GO, individually or collectively, and "storm surges" within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf due to rain storms, tropical storms, hurricanes, or any other weather related phenomena.

96.     Evaluations by the Corps relative to any effects on tidal, lunar, or storm related surges or water levels stemming from, or related to, the confluence of the MR-GO and the GIWW, including any such effects stemming solely from the connection of the two waterways, or any effects related to, or caused by, any structures, of any kind, constructed within a 40 mile radius from the connection of the MR-GO and the GIWW and also constructed adjacent to either the MR-GO and the GIWW;

97.     Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature which the Army Corps believed existed in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO;

98.     Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO which were reported to the Army Corps, or of which the Army Corps was informed, whether or not the Army Corps agreed with such reporting or information, or whether or not the Army Corps believed such defects existed.

99.   **Any effects on tidal, lunar, or storm related surges or water levels stemming from, or related to, the confluence of the MR-GO and the GIWW, including any such effects stemming solely from the connection of the two waterways, or any effects related to, or caused by, any structures, of any kind, constructed within a 40 mile radius from the connection of the MR-GO and the GIWW and also constructed adjacent to either the MR-GO and the GIWW;**

100.   Any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature which the Army Corps believed existed in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO;

101.   Any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO which were reported to the Army Corps, or of which the Army Corps was informed, whether or not the Army Corps agreed with such reporting or information, or whether or not the Army Corps believed such defects existed

102.   The Army Corps's procedure for creating, drafting, filing, and/or reporting Environmental Impact Statements and Supplemental Environmental Reports or Supplemental Impact Statements for the MR-GO.

103.   **The Army Corps's procedures for segmenting ongoing projects for the purposes of obtaining coordinated agency input on environmental impact and analyses of changes in the conditions of the environment surrounding the MR-GO caused by its maintenance and operation.**

104.   **The Army Corps's procedures for obtaining coordinated interdisciplinary input for evaluating any environmental impacts of projects and continued maintenance of projects to assess the potential environmental impact for Environmental Assessments and/or Environmental Impact Statements and/or Findings of No Significant Impact.**

105.   **The Army Corps's internal engineering regulations concerning the MR-GO and its operation and maintenance, including but not limited to, dredging and other operations and the applicable Federal Regulations and any cross reference(s) or "keys" to the corresponding CFR provision(s).**

**THE RECONNAISANCE REPORT OF 1994 ERA**

106.     The efforts by the US Corps of Engineers to understand the impact of the MRGO on the environment, relative to the Reconnaissance Report; including bank erosion, increased salinity, as well as impacts on potential for MRGO to exacerbate storm surge.

107.     The decision to initiate a Reconnaissance Report.

108.     The drafting of the Reconnaissance Report

109.     Any and all efforts by the US Corps of Engineers to address the impact of the MRGO on the environment relative to the Reconnaissance Report, including bank erosion, increased salinity, as well as impacts on potential for MRGO to exacerbate storm surge.

110.     Communications with Congress regarding the US Corps of Engineers efforts to understand the impact of the MRGO on the environment relative to the Reconnaissance Report, and any subsequent communications regarding the scope of work anticipated relative to the Reconnaissance Report, the finanial needs of those works, and the results of the works either undertaken or deferred

111.     Evaluations by the Corps regarding wetlands or marshland and their relationship to the design, construction, operation, maintenance, dredging of any part or parts of the MR-GO, individually or collectively, including any loss, destruction, diminution or contraction of such wetlands or marshland.

112.     Evaluations by the Corps regarding lunar tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.

113.     Evaluations by the Corps regarding storm related tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.

114.     Evaluations by the Corps regarding the alleged potential for the MR-GO to serve as a conduit and/or "funnel" for hurricane-generated storm surge.

115.     Evaluations by the Corps regarding erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.

116.     Evaluations by the Corps regarding requests by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.

117.     Evaluations by the Corps regarding "storm surges" within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW and their relationship to the design, construction, operations, maintenance, dredging, or existence of part or parts of the MR-GO, individually or collectively.

118.     Evaluations by the Corps relative to any effects on tidal, lunar, or storm related surges or water levels stemming from, or related to, the confluence of the MR-GO and the GIWW, including any such effects stemming solely from the connection of the two waterways, or any effects related to, or caused by, any structures, of any kind, constructed within a 40 mile radius from the connection of the MR-GO and the GIWW and also constructed adjacent to either the MR-GO and the GIWW;

119.     Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature which the Army Corps believed existed in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO;

120.     Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO which were reported to the Army Corps, or of which the Army Corps was informed, whether or not the Army Corps agreed with such reporting or information, or whether or not the Army Corps believed such defects existed.

121.     Evaluations by the Corps relative to any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps concerning erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.

122.     Evaluations by the Corps relative to any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to the request by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.

123.     The Army Corps's procedure for creating, drafting, filing, and/or reporting Environmental Impact Statements and Supplemental Environmental Reports or Supplemental Impact Statements for the MR-GO.

124.    The Army Corps's procedures for segmenting ongoing projects for the purposes of obtaining coordinated agency input on environmental impact and analyses of changes in the conditions of the environment surrounding the MR-GO caused by its maintenance and operation.

125.    The Army Corps's procedures for obtaining coordinated interdisciplinary input for evaluating any environmental impacts of projects and continued maintenance of projects to assess the potential environmental impact for Environmental Assessments and/or Environmental Impact Statements and/or Findings of No Significant Impact.

126.    The Army Corps's internal engineering regulations concerning the MR-GO and its operation and maintenance, including but not limited to, dredging and other operations and the applicable Federal Regulations and any cross reference(s) or "keys" to the corresponding CFR provision(s).

## THE RE-EVALUATION REPORT ERA BEGINNING 1999

127.    The efforts by the US Corps of Engineers to understand the impact of the MRGO on the environment, relative to the Re-Evaluation Report; including bank erosion, increased salinity, as well as impacts on potential for MRGO to exacerbate storm surge.

128.    The decision to initiate a Re-Evaluation Report.

129.    The drafting of the Re-Evaluation Report.

130.    Any and all efforts by the US Corps of Engineers to address the impact of the MRGO on the environment relative to the Re-Evaluation Report, including bank erosion, increased salinity, as well as impacts on potential for MRGO to exacerbate storm surge.

131.    Communications with Congress regarding the US Corps of Engineers efforts to understand the impact of the MRGO on the environment relative to the Re-Evaluation Report, and any subsequent communications regarding the scope of work anticipated relative to the Re-Evaluation Report, the finanial needs of those works, and the results of the works either undertaken or deferred

132.    Evaluations by the Corps regarding wetlands or marshland and their relationship to  the design, construction, operation, maintenance, dredging  of any part or parts of the MR-GO, individually or collectively, including any loss, destruction, diminution or contraction of such wetlands or marshland.

133.    Evaluations by the Corps regarding lunar tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.

134.    Evaluations by the Corps regarding storm related tides within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW, or the Gulf and their relationship to the design, construction, operations, maintenance, dredging, or existence of any part or parts of the MR-GO, individually or collectively.

135.    Evaluations by the Corps regarding the alleged potential for the MR-GO to serve as a conduit and/or "funnel" for hurricane-generated storm surge.

136.    Evaluations by the Corps regarding erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.

137.    Evaluations by the Corps regarding requests by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.

138.    Evaluations by the Corps regarding "storm surges" within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW and their relationship to the design, construction, operations, maintenance, dredging, or existence of part or parts of the MR-GO, individually or collectively.

139.    Evaluations by the Corps relative to any effects on tidal, lunar, or storm related surges or water levels stemming from, or related to, the confluence of the MR-GO and the GIWW, including any such effects stemming solely from the connection of the two waterways, or any effects related to, or caused by, any structures, of any kind, constructed within a 40 mile radius from the connection of the MR-GO and the GIWW and also constructed adjacent to either the MR-GO and the GIWW;

140.    Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature which the Army Corps believed existed in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO.

141.    **Evaluations by the Corps relative to any and all other defects, inadequacies, or conditions posing a potential risk to public health, safety, or property (including what is sometimes referred to as the "funnel" effect) of whatever nature in connection with, or as a result of, the design, construction, maintenance or operation of the MR-GO which were reported to the Army Corps, or of which the Army Corps was informed, whether or not the Army Corps agreed with such reporting or information, or whether or not the Army Corps believed such defects existed.**

142.    **Evaluations by the Corps relative to any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps concerning erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO.**

143.    **Evaluations by the Corps relative to any measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to the request by St. Bernard Parish to lower the speed limit of vessels on the MR-GO.**

144.    The drafting, creation, analyses, results, and/or findings of the *Report of the Environmental Sub-Committee to the MRGO Technical Committee*, March 16, 2000. *See* Exhibit "A" at NED-188-000001511-1630.

145.    Any measures, actions, further analyses, studies, reports, recommendations, and/or communications with Congress commenced and/or undertaken by the Army Corps in response to the *Report of the Environmental Sub-Committee to the MRGO Technical Committee.*

146.    The drafting, creation, analyses, results, and/or findings of the *Habitat Impacts of the Construction of the MRGO*, December 1999, prepared by the New Orleans District Corps of Engineers. *See* Exhibit "A" at NED-188-000001556-1591.

147.    Any measures, actions, further analyses, studies, reports, recommendations, and/or communications with Congress commenced or undertaken by the Army Corps in response to the *Habitat Impacts of the Construction of the MRGO.*

148.    The analyses, studies, reports, and decision making concerning the Army Corps's conceptual plan to construct a MR-GO/GIWW surge barrier as detailed in the Army Corps's Greater New Orleans Hurricane and Storm Damage Risk Reduction System 100-Year Design Map downloaded from http://www.mvn.usace.army.mil/hps/100yr_design_map.html.

149.    The analyses, studies, reports, and decision making concerning the Army Corps's conceptual plan to construct flood protection along Reach 2 of the MR-GO ("Upper St. Bernard Levee" and "Lower St. Bernard Levee") ranging in height from 26.5 feet to 29 feet as detailed in the Army Corps's Greater New Orleans Hurricane and Storm Damage Risk Reduction System 1 0 0 - Y e a r   D e s i g n   M a p   d o w n l o a d e d   f r o m http://www.mvn.usace.army.mil/hps/100yr_design_map.html.

150.    The analyses, studies, reports, and decision making concerning the Army Corps's conceptual plan to construct the "Seabrook Surge Barrier" at the northern end of the IHNC as detailed in the Army Corps's Greater New Orleans Hurricane and Storm Damage Risk Reduction System 100-Year D e s i g n   M a p   d o w n l o a d e d   f r o m http://www.mvn.usace.army.mil/hps/100yr_design_map.html.

151.    All scientific research and studies relative to the effects of wetlands and/or swamps on hurricane storm surge water levels/elevations, from 1950 to the present, such as the study entitled "Morgan City and Vicinity, Louisiana," Letter from the Secretary of the Army, House Doc. No. 167, 89th Congress.

152.    All scientific research and studies relative to the effects of wetlands and/or swamps on hurricane generated waves.

153.    All scientific research and studies relative to the effects of hurricane generated waves on earthen levees.

**154.    The Army Corps' procedures for Congressional Authorization of Civil Works Projects, including decisions on when and how to seek approval for modifications in plans that spanned over time.**

**155.    How decisions to file Environmental Impact Statements and Supplemental Approvals were made.**

**156.    The SER process regarding complicity with perceived governemnt standards and regulations and how that differed from the process of obtaining Environmental Assessments and FONSIs.**

**157.    The Army Corps's procedure for creating, drafting, filing, and/or reporting Environmental Impact Statements and Supplemental Environmental Reports or Supplemental Impact Statements for the MR-GO.**

**158.    The Army Corps's procedures for segmenting ongoing projects for the purposes of obtaining coordinated agency input on environmental impact and analyses of changes in the conditions of the environment surrounding the MR-GO caused by its maintenance and operation.**

159.    The Army Corps's procedures for obtaining coordinated interdisciplinary input for evaluating any environmental impacts of projects and continued maintenance of projects to assess the potential environmental impact for Environmental Assessments and/or Environmental Impact Statements and/or Findings of No Significant Impact.

160.    The Army Corps's internal engineering regulations concerning the MR-GO and its operation and maintenance, including but not limited to, dredging and other operations and the applicable Federal Regulations and any cross reference(s) or "keys" to the corresponding CFR provision(s).

## THE CLOSURE OF THE MRGO ERA

161.    Studies and evaluations regarding the closure of MRGO, who had authority to initiate the studies and subsequent procedures.

162.    The performance of the flood control structures along the MRGO during Hurricane Katrina, in that they performed as designed, providing protection until overtopping occured and then became vulnerable to catstrophic breaching.

163.    The performance of the flood control structures along the GIWW during Hurricane Katrina.

164.    The performance of the flood control structures along the IHNC during Hurricane Katrina, in that they performed as designed, providing protection until overtopping occured and then became vulnerable to catstrophic breaching.

165.    The project awarded to the Shaw Group regarding the development of a levee/gate system at the MRGO/GIWW intersection.

166.    The four-page report entitled "Mississippi River-Gulf Outlet, PM-R Proposal for Gaining National Environmental Policy Act Compliance for the Operation and Maintenance Program," (NOP-019-000000207), dated April 11, 2005.

167.    All version and iterations of the report entitled "Mississippi River-Gulf Outlet, PM-R Proposal for Gaining National Environmental Policy Act Compliance for the Operation and Maintenance Program," (NOP-019-000000207), dated April 11, 2005.

168.     All documents commenting on, concerning, or addressing the report entitled "Mississippi River-Gulf Outlet, PM-R Proposal for Gaining National Environmental Policy Act Compliance for the Operation and Maintenance Program," (NOP-019-000000207), dated April 11, 2005, attached hereto as Exhibit B.