### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| PERTAINS TO:  BARGE | * | and consolidated cases |
| | * | |
| | * | SECTION "K"  (2) |
| *Boutte v. Lafarge* 05-5531 | * | |
| *Mumford v. Ingram* 05-5724 | * | |
| *Lagarde v. Lafarge* 06-5342 | * | JUDGE |
| *Perry v. Ingram* 06-6299 | * | STANWOOD R. DUVAL, JR. |
| *Benoit v. Lafarge* 06-7516 | * | |
| *Parfait Family v. USA* 07-3500 | * | MAG. JOSEPH C. WILKINSON, JR. |
| *Lafarge v. USA* 07-5178 | * | |
| | * | |

# BARGE PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PROTECTIVE ORDER BARRING DEFENDANT LAFARGE NORTH AMERICA AND ITS COUNSEL FROM HAVING ANY *EX PARTE* CONTACT WITH ANY MEMBER OF THE PUTATIVE CLASS THE BARGE P.S.L.C. SEEKS TO REPRESENT, WITHOUT THE CONSENT OF THE BARGE P.S.L.C. OR THE PERMISSION OF THE COURT, FOR DECLARATORY RELIEF, AND FOR OTHER APPROPRIATE RELIEF

### Table of Contents

A.  The Factual Basis for this Motion.........................................................................................ii

    1.  Lafarge's Unlawful Entry into Putative Class Members' Dwellings and Structures, Unlawful Entry onto their Property, and Theft of Clocks and Watches............................ 1

    2.  Defendant's Unconsented Contacts Have Been Abusive to Class Members .................... 5

B.  The Louisiana Criminal Provisions Involved ...................................................................... 14

C.  Plaintiffs' Pending Appeal from the Denial of Plaintiff's Motion for a Protective Order ... 14

D.  Lafarge's Responsibility for Centanni's Actions................................................................. 17

E.  Counsel for Plaintiffs Have At Least a Constructive Attorney-Client Relationship with Putative Class Members....................................................................................................... 17

F.  Lafarge and its Counsel Should Be Barred from Any Further Contacts with Putative Class Members Without the Consent of the Barge P.S.L.C. or an Order of this Court Authorizing the Contact ........................................................................................................................... 19

G.   In the Event of an Evidentiary Hearing and Discovery into These Matters, the Crime-Fraud
     Exception Voids Any Attorney-Client Privilege or Work-Product Privilege As to These
     Matters ................................................................................................................................. 21
H.   Conclusion ........................................................................................................................... 23

## Table of Authorities

### 1. Cases

*741 Knuth v. Erie-Crawford Diary [sic] Cooperative Association*,
     463 F.2d 470 (3d Cir. 1972) ...................................................................................18

*American Pipe & Construction Co. v. Utah*,
     414 U.S. 538 (1974).................................................................................................17

*Crown, Cork & Seal Co. v. Parker*,
     462 U.S. 345 (1983).................................................................................................17

*Gulf Oil Co. v. Bernard*,
     452 U.S. 89 (1981)...................................................................................................19

*In re Grand Jury Subpoena*,
     419 F.3d 329 (5th Cir. 2005) ..............................................................................23, 24

*Morisky v. Public Service Electric & Gas Co.*,
     191 F.R.D. 419 (D. N.J. 2000)................................................................................18

*United Airlines v. McDonald*,
     432 U.S. 385 (1977).................................................................................................17

*United States v. Dyer*,
     722 F.2d 174 (5th Cir. 1983) ...................................................................................23

*United States v. Edwards*,
     303 F.3d 606 (5th Cir. 2002), *cert. denied*, 537 U.S. 1192 (2003)............................23

*U.S. E.E.O.C. v. TIC-The Industrial Co.*,
     2002 WL 31654977, 90 Fair Empl. Prac. Cas. (BNA)737 .........................................18

## 2. **Statutes and Rules**

La. Rev. Stat. § 14:62. ....................................................................................................14

La. Rev. Stat. § 14:62.5. .................................................................................................14

La. Rev. Stat. § 14:62.7 ..................................................................................................14

La. Rev. Stat. § 14:63. ....................................................................................................14

La. Rev. Stat. § 14:67. ....................................................................................................14

Rule 23(d), Fed. R. Civ. Pro. ..........................................................................................19

Rule 26(b)(3), Fed. R. Civ. Pro........................................................................................17

Local Civil Rule 23(D) ...................................................................................................20

## 3. **Treatises**

FEDERAL JUDICIAL CENTER, MANUAL FOR COMPLEX LITIGATION (THIRD), §30.24 ..........18

Hazard, Jr., Geoffrey C., and Hodes, W. William, 2 THE LAW OF LAWYERING, 3D ED.
(Aspen Law & Business, New York, 2001) § 38.4 .........................................................17

5 NEWBERG ON CLASS ACTIONS, 3D ED. (West Group 1992), §15.14 ..............................18

5 NEWBERG ON CLASS ACTIONS, 3D ED. (West Group 1992), §24.99 ..............................17

iii

A.      **The Factual Basis for this Motion**[1]

      1.      **Lafarge's Unlawful Entry into Putative Class Members' Dwellings and Structures, Unlawful Entry onto their Property, and Theft of Clocks and Watches**

1.   Lafarge North America, Inc. ("Lafarge") stole clocks and watches from class members because it intended to use the time shown on the clocks and watches as evidence of the time the flood waters reached the clock or watch in question.  Lafarge's January 22, 2008, Third Supplemental Preliminary Exhibit List (Doc. # 10703) stated: "27. Photos of stopped clocks and stopped clocks. [Sic.]"[2]

2.   During a meet-and-confer on Friday, February 15, 2008, counsel for Lafarge represented to Barge Plaintiffs' Liaison Counsel that it had not obtained physical items such as photographs from interviewees, but had taken clocks or other time pieces from the class area by rummaging through wreckage for them or taking them from the ground.[3]

3.   In the late afternoon of February 18, 2008, Barge P.S.L.C. Counsel sent a draft stipulation to Lafarge, requesting it to stipulate in writing the following, among other matters:

      That Lafarge represents that it, and/or Centanni Investigative, has additionally obtained by rummaging through wreckage and/or other means of retrieval in the Lower Ninth Ward a number of time pieces. That said time pieces are not the property of Lafarge or Centanni. That the Barge PSLC may inspect and photograph time pieces and conduct related activities within the scope of the Federal Rules, and additionally, plaintiffs reserve all rights to seek return of their property, upon verified identification of same.

Lafarge did not agree to this proposed stipulation.

4.   On February 20, 2008, Lafarge's Fourth Supplemental Preliminary Exhibit List (Doc. #

---

[1] A list of exhibits is attached as Barge Plaintiffs' Exhibit 1

[2] A copy of Lafarge North America's January 22, 2008, Third Supplemental Exhibit List (Doc. # 10703) is attached as Barge Plaintiffs' Exhibit 2.

[3] Barge Plaintiffs' Exhibit 7, the July 8, 2008, Declaration of Brian A. Gilbert, Barge Plaintiffs' Liaison Counsel, ¶ 1, pp. 1-2.

11321) dropped Lafarge's previously proposed exhibit on stopped clocks.[4]  There is no assurance that this exhibit might not be added to the list as easily as it was taken off.

5.   On February 22, 2008, Lafarge provided Barge P.S.L.C. counsel with an opportunity to see and photograph the stolen clocks and watches, and provided a list of "Timepieces Collected"[5] showing the addresses near the spots where they were taken.  The list is attached as Barge Plaintiffs' Exhibit 3.

6.   Pursuant to the requests of Barge P.S.L.C. counsel,[6] on March 4, 2008, Lafarge produced to plaintiff a list titled "Timepieces Recovered," showing the specific locations, floor levels, and walls from which the clocks and watches were taken, and the dates on which they were taken.[7]  The list is attached as Barge Plaintiffs' Exhibit 7.

7.   Barge Plaintiffs' Exhibit 7 shows that numerous clocks and watches were taken from inside the dwellings or structures used by class members as their homes or places of business.  For example, the first item on Lafarge's list of "Timepieces Recovered," Barge Plaintiffs' Exhibit 4, shows that an electric clock was taken from the second-story wall of the dwelling or structure at 2619 Forstall Street.  A picture of this clock is attached to the Motion as Barge Plaintiffs' Exhibit 8.  The picture shows that Lafarge represented the clock was taken on October 26, 2005.  A copy of the Orleans Parish tax record for 2619 Forstall Street, showing that it is a dwelling, is attached hereto as Barge Plaintiffs' Exhibit 9.

---

[4] A copy of Lafarge North America's February 20, 2008, Fourth Supplemental Exhibit List is attached to this Motion as Barge Plaintiffs' Exhibit 5.

[5] The list of "Timepieces Collected" produced by Lafarge on February 22, 2008, is attached as Barge Plaintiffs' Exhibit 3.

[6] Barge Plaintiffs' Exhibit 7, June 10, 2008, Declaration of Brian A. Gilbert, ¶ 5, p. 2; Barge Plaintiffs' Exhibit 6, June 10, 2008, Declaration of Richard T. Seymour, ¶ 1, p. 1.

[7] A copy of the list provided is attached to the Motion as Barge Plaintiffs' Exhibit 7.

2

8.  The fourth item on Lafarge's list shows that an Acu-Rite battery-operated clock was taken from the first-floor wall of the dwelling or structure at 1728 Deslonde Street.  Barge Plaintiffs' Exhibit 6 shows that Lafarge says the clock was taken on October 20, 2005.  A picture of this clock is attached to the Motion as Barge Plaintiffs' Exhibit 10.  A copy of the Orleans Parish tax record for 1728 Deslonde Street, showing that it is a dwelling, is attached hereto as Barge Plaintiffs' Exhibit 11.

9.  The sixth item on Lafarge's list shows that another battery-operated clock was taken from the wall of the first floor at the same address.  A picture of this clock is attached to the Motion as Barge Plaintiffs' Exhibit 12.  The picture shows that Lafarge represents the clock was taken on October 20, 2005.

10. The ninth item on Lafarge's list is a Gray Ingraham battery-operated clock taken from the wall of the first floor at 2030 Deslonde Street.  A picture of this clock is attached to the Motion as Barge Plaintiffs' Exhibit 13.  The picture shows that Lafarge represents the clock was taken on October 26, 2005.  A copy of the Orleans Parish tax record for 2030 Deslonde Street, showing that it is a dwelling, is attached hereto as Barge Plaintiffs' Exhibit 14.

11. The tenth item on Lafarge's list is a decorative battery-operated clock with sunflowers and ladybugs taken from the wall of the second floor at 2607 Andry Street.  A picture of this clock is attached to the Motion as Barge Plaintiffs' Exhibit 15.  The picture show that Lafarge represents the clock was taken on November 12, 2005.  Orleans Parish tax records do not show a 2607 Andry Street address, showing that it is a dwelling, is attached to the Motion as Barge Plaintiffs' Exhibit 16.

12. Lafarge even stole a grandfather clock.  The 31st item on Lafarge's "Timepieces Recovered" list, Barge Plaintiffs' Exhibit 7, is a "Large grandfather clock (with pendulum and chimes)," described as having been taken from the wall of the second floor of 2607 Andry Street.

Two clocks were listed as having been taken from that address, clocks 10 and 31. Lafarge did not produce the grandfather clock for inspection and photographing.  Instead, Lafarge produced a Clock 31 that was an Ingraham wall clock.  The appearance of the real Clock 31 is similar to the description for Clock 33 on the same list, and plainly not a grandfather clock with pendulum and chimes. Plaintiffs' photograph of "Clock 31" is attached to the Motion as Barge Plaintiffs' Exhibit 17.  The label states that it was taken from 2408 Forstall Street on Oct. 29, 2005.   Lafarge's "Timepieces Collected" list, Barge Plaintiffs' Exhibit 6, agrees with the information on the label of Clock 31.  A copy of the Orleans Parish tax record for 2408 Forstall Street, showing that it is a dwelling, is attached to the Motion as Barge Plaintiffs' Exhibit 18.

13. The 35th item on Lafarge's "Timepieces Recovered" list, Barge Plaintiffs' Exhibit 7, is a watch shown as having been taken from the first-floor kitchen wall at 5005 N. Rocheblave and bearing the date of the 29th.  This is the 33rd item on Lafarge's "Timepieces Collected" list, Barge Plaintiffs' Exhibit 6, which shows it as having been taken on October 21, 2005.  A picture of this watch is attached to the Motion as Barge Plaintiffs' Exhibit 19.  It conforms to the information on Lafarge's "Timepieces Collected" list, Barge Plaintiffs' Exhibit 6.   A copy of the Orleans Parish tax record for 5005 N. Rocheblave, showing that it also is a dwelling, is attached to the Motion as Barge Plaintiffs' Exhibit 19.

14. Lafarge's lists comprising Barge Plaintiffs' Exhibits 6 and 7 show that similar details could be provided for numerous other clocks and watches.  Lafarge repeatedly took clocks and watches from homes and yards.

15. Governor Blanco of Louisiana proclaimed an emergency on August 26, 2005.  A copy of the proclamation is attached as Barge Plaintiffs' Exhibit 21.

16. Mayor Nagin of New Orleans proclaimed a Hurricane Emergency proclamation on Saturday, August 27, 2005.  He issued a mandatory evacuation order on Sunday, August 28, 2005. He issued a second mandatory evacuation and emergency order on September 6, 2005.  A copy of these proclamations and orders is attached as Barge Plaintiffs' Exhibit 22.

## 2.    Defendant's Unconsented Contacts Have Been Abusive to Class Members

17. Defendant Lafarge North America, Inc., has contacted and interviewed hundreds of putative Barge class members over the objection of the Barge P.S.L.C.[8]  More than a hundred interviews were surreptitiously tape-recorded.

18. For purposes of this appeal, Barge Plaintiffs accept the Magistrate Judge's description— based on the 29 Centanni interviews Lafarge had by then produced, of the *modus operandi* of defendant Lafarge North America, Inc. ("LNA"), and the agent of its counsel, Centanni Investigative Services, in the secret tape-recording of witnesses at pp. 6-8 of the May 14, 2008, Order and Reasons on Motions (Doc. # 13149):

> The following examples, drawn from the witness interviews attached to plaintiffs' motion for protective order, illustrate the dangers and problems associated with such secret tape-recordings that are touched upon in the cases cited in my previous order.  As a general practice, Lafarge's investigator who conducted most of the interviews identified himself to the witnesses only by name and by stating that he worked for an investigative agency. If pressed by the witness for further identification, he would name the agency, which he sometimes vaguely characterized as "independent." Although asked to identify himself and given the opportunity to respond honestly, the investigator carefully refrained from ever stating that the agency had been retained by Lafarge, a defendant in several civil actions in this court whose interests were potentially adverse to the interviewees. While the investigator's statements were not literally false, they were evasive and misleading in what they omitted. As the law of fraud teaches, a material omission can be just as misleading as an affirmative misrepresentation. See, e.g., conversation between investigator Robert Garcia ("RG") and Ernest Edwards ("EE") (also known as "All Night Shorty") on December 19, 2005, Plaintiff's

---

[8] Barge Plaintiffs' Exhibit 23 hereto is a list of the 269 putative class members interviewed by Centanni investigators employed by counsel for defendant Lafarge.  The two entries for Robert Green involve different people.

Exh. 24, Record Doc. No. 11765-26, at pp. 2-3 ("EE: . . . . Who you investigating for, though? Who are you working for? RG: I'm working for Centanni. We're an independent investigative agency. . . . And, uh, we don't work for the government or nothing like that."); conversation between Garcia and Michael Reed on December 7, 2005, Plaintiff's Exh. 30, Record Doc. No. 11765-32, at p. 10 (same); conversation between Garcia and Edwards on February 9, 2006, Plaintiff's Exh. 25, Record Doc. No. 11765-27, at pp. 9-10 (identifying Centanni Investigative Agency without any additional information); conversation between Garcia and Robert L. Green, Sr. on November 23, 2005, Plaintiff's Exh. 26, Record Doc. No. 11765-28, at pp. 2-3 (same).

One interviewee, "All Night Shorty," asked twice whether Garcia was taking down what he said and Garcia responded that he was writing it down. Plaintiff's Exh. 24, Record Doc. No. 11765-26, at pp. 15-16, 20. Again, while this may have been a true statement, it also presented an opportunity, which was not taken, to respond honestly and to tell the witness the full truth, that the conversation was being tape-recorded. The witness may well have consented to the recording, but we will never know.

"All Night Shorty" also asked Garcia, "Is we gonna hear any results of this conversation? Is we gonna get anybody to speak for us behind this? RG: Uh, I'm not sure. EE: Okay. RG: I'm just . . . I'm a private investigator and what we do is just collect the information." Plaintiff's Exh. 24, Record Doc. No. 11765-26, at p. 41 (emphasis added). Clearly, the witness wanted to know from Garcia if he and other flood victims were going to be helped by this conversation or, as plaintiffs put it in their memorandum in support of their motion for protective order, whether the interviewer was "on their side." Garcia's response was again evasive and misleading by omission of the material information, clearly being sought by the witness, that he and his agency were working for Lafarge, whose interests were potentially adverse to those of the flood victims.

As I previously stated in my order granting plaintiffs' motion to compel, the "'extremely mild remedy of discovery'" does not interfere with the rights of the parties or their counsel to interview witnesses, except when it is done secretly without the consent of the interviewee, in which case the tapes are discoverable. . . .

19. The additional transcripts produced to plaintiffs on May 21, 2008, show in addition that there was a very concerted plan and effort to avoid providing information about the true purpose of the interviews, and about the fact Lafarge's counsel's investigators were acting on behalf of an entity opposed to the interests of the interviewees.  The Centanni interview of Kerry Watson involved a dogged effort by Mr. or Ms. Watson to find out who Centanni was working for.  While revealing that Centanni worked for lawyers, Mr. Garcia refused to say who the lawyers were, or which side they

6

worked for, or with whom they were associated, although all of these were asked.  All he said was that he would talk with the lawyers about what to reveal.[9]

20. The additional transcripts produced to plaintiffs on May 21, 2008, show in addition that the investigators sometimes did not merely engage in indirection or resort to non-response to conceal that they were working for defense counsel, but affirmatively lied to putative class members about the purpose of their interviews to create a false impression of even-handedness and disinterest in any outcome:

a. Wayne R. Centanni himself affirmatively lied to Dorothy Ellis on November 14, 2005,  saying that he was "not connected with anybody":[10]

b. Mr. Centanni affirmatively repeated his lie to Byron LaFrance in the same interview;[11]

---

[9] Barge Plaintiffs' Exhibit 24 to this Motion, Draft Transcript of the Dec. 28, 2005, Centanni Interview with Kerry Watson, Bates-numbered LNA 3565-77, at p. 10, LNA 3574.  The short interview is attached in its entirety.  This statement was obtained eight and a half months before Lafarge denied having any statements—without invoking work-product privilege—in its September 18, 2006, Responses to Plaintiff's Second Set of Interrogatories 26 (and cross-referenced responses to Interrogatories 1, 2, and 3) and Responses to Requests for Production 11, 17, and 18 in C.A. No. 05-04419, Section C.

[10] Barge Plaintiffs' Exhibit 25 to this Motion, Excerpts from the Nov. 14, 2005, Draft Transcript of Centanni Interview with August LaFrance, Byron LaFrance, and Dorothy Ellis, Bates-numbered LNA 2269-2305, states during the part of the interview that was with Dorothy Ellis on p. 24, LNA 2292:

DE: Yeah, but who—who you connected with?
WRC: Ma'am we're- we're just doing an independent investigation—I'm not connected with anybody—to find out when this levee broke.
DE: Oh.

This statement was obtained nine and a half months before Lafarge denied having any statements.

[11] *Id.*, Barge Plaintiffs' Exhibit 25 to this Motion, Excerpts from the Draft Transcript of the Nov. 14, 2005, Centanni Interview with August LaFrance, Byron LaFrance, and Dorothy Ellis, Bates-numbered LNA 2269-2305, states during the part of the interview that was with Byron LaFrance, pp. 24-25, LNA 2292-93:

BL Who are you with, sir?

c.  Centanni investigator Robert Garcia affirmatively lied to Roderick Pyatt by

telling Mr. Pyatt that he was independent, affirmatively lied to Mr. Pyatt by stating that he

had no idea who the end user was, and affirmatively lied to Mr. Pyatt by stating that the

end product was as likely to be used for a book as for a lawsuit;[12]

---

WRC: Well who is this?
BL: This is—this is my—I'm the son of the—of my—of August LaFrance.
WRC: This must be, uh, Mike, uh, Kevin?
BL: No, this is Byron.
WRC: Brian. Yeah, I explained to—to these individuals that—and you were one of the men that you are the brother to your—that's your father LaFrance—France, right?
BL: Yeah. Uh, I'm the youngest son.
WRC: Yeah, I'm not with any—any person—any organization. We're doing an independent investigation to determine when the, uh...
Person in Background: *(unintelligible) trying to get his name...*
WRC: .. .levee broke, the times it broke...
Person in Background: *(unintelligible) where Michael Knight can call him.*
WRC: ...by talking to people that went on their roofs or were taken of by boats, et cetera.
This statement was obtained nine and a half months before Lafarge denied having any statements.
[12] Plaintiffs' Exhibit 26 to this Motion, Excerpts from the Draft Transcript of the May 30, 2006, Centanni Interview with Roderick Pyatt, Bates-numbered LNA 4021-32, states on pp. 10-11, LNA 4030-31:
RP: Who are you with?
RG: Well, we're working independently. We don't know. We're just
RP: For who? For who?
RG: I'm sorry sir?
RP: For who?
RG: Uh, independently right now.
RP: Who are you working for?
RG: Uh, myself.
RP: Who's this for? Who is this compilation going to?
RG: Uh, we're not—I'm not—
RP: Who's the end user?
RG: I'm not sure yet, sir. I just, uh, collect all the information.
RP: You're being evasive.
RG: I'm sorry, sir?
RG: Well, I'm just—I just collect the information and then—
RP: Who do you think it's going to?
RG: I'm sorry, sir?

d.   Centanni investigator Kathleen Nolan affirmatively lied to Andrea Adams and told Ms. Adams that Ms. Nolan was not personally involved in the class action lawsuit and affirmatively lied and told Ms. Adams that she did not know if the agency was involved;[13]

e.   Centanni investigator Robert Garcia affirmatively lied to Linda Ambrose and told her he did not know who was going to get the information collected, further affirmatively lied and said he did not know if  it would ever get to court, stated correctly

---

RP: Who do you think it's going to?

RG: I'm not sure whether this is going to be used somewhere on down the line, possibly to write a book or possibly for any type of lawsuits that may arise. I'm not sure, sir.

RP: Okay. All right. Anything else you need to know?

This statement was obtained three and a half months before Lafarge denied having any statements.

[13] Barge Plaintiffs' Exhibit 27 to this Motion, Excerpts from the Draft Transcript of the July 10, 2006, Centanni Interview with Andrea Adams, Bates-numbered LNA 3854-80, pp. 13-14, LNA 3866-67, states:

AA: What—what y'all looking for people for?

KN: We're just—we're not really looking for anything. We're just trying to find what happened, you know, just like everybody else. We want to know exactly what happened, so we're not trying to, you know, find out anything in particular. We're just talking to people who were there.

AA: Mm-hm.

KN: 'Cause, urn, you know, so many people have such—so many stories.

AA: So what y'all gonna do when you find out what happened?

KN: I'm not doing anything personally with it. I just, you know, we just kind of report what we talk about and, but I'm not doing anything personally with it. We're just trying to find out what happened, you know.

AA: So who you work for?

KN: I just work for an investigative agency.

AA: And they're just trying to find out what happened?

KN: Yeah. We're just trying to find out-

AA: Well, I know there's a class action lawsuit or something, right?

KN: Uh, I'm not involved with that personally, but, um, I think there is.

AA: The agency?

KN: l don't know about—about all that. l mean, we don't—we don't get to, you know, we're at the lo—I'm at the low—low end of the totem pole so I basically am just kind of talking to people.

AA: Oh, okay.

This statement was obtained two months before Lafarge denied having any statements.

9

that Centanni was not working for plaintiffs' attorneys in the class action and tried to create

the impression that Centanni was not involved in the class action;[14]

      f.  Centanni investigator Bart Molay affirmatively lied to Rosa Ray and told her

that he did not know the purpose of the interviews, after twice telling her he was being

honest with her;[15]

---

[14] Barge Plaintiffs' Exhibit 28 to this Motion, Excerpts from the July 12, 2006, Draft Transcript of Centanni Interview with Linda Ambrose, Bates-numbered LNA 1621-1641, p. 20, LNA 1640, states:

      LA: So, who is trying—who else is—who is it that you're working for that's trying to get the story—the in-depth story that probably won't ever come out?
      RG: Yeah, well we don't know—we don't know what, you know...
      LA: I know.
      RG: ...what will come of it or anything if it—it may go, uh, eventually to, uh, court or—or something like that.
      LA: Or some attorney has it?
      RG: Yeah.
      LA: With the class action suit?
      RG: No, it's not, uh, we're not—we're not working with—with like a plaintiff attorney or anything...
      LA: Oh.
      RG: .. .like that for a class-action lawsuit, but we're just working for attorneys that are just investigating it right now.
      LA: Oh.
      RG: Trying to—trying to figure out exactly what occurred and, uh, just trying to figure out the truth.
      LA: I know. All right then. Well I'll give him the information and, uh, for him to, uh, give you a call.
This statement was obtained two months before Lafarge denied having any statements.

[15] Barge Plaintiffs' Exhibit 29 to this Motion, Excerpts from the Nov. 27, 2006, Draft Transcript of Centanni Interview with Sir Anthony Brooks, Bates-numbered LNA 1835-74, states during the part of the interview that was ending with Sir Brooks and starting with Rosa Ray, on pp. 38-39, LNA 1872-73:

      SB: And who—who you—who you with again, mister Molo?
      BM: I'm with a comp—I'm wi—I'm call—I'm with a company called Centanni, C-E-N-T-A-N-N-I.
      RR: *[In background} Okay, and what do y 'all do?*

g.  Centanni investigator Robert Garcia affirmatively lied to Eugene Costello, Jr.,

telling him that he was an independent investigator and that he did not know the purpose of

the investigation other than to find out facts;[16]

---

BM: We're basically—we're contacting 9th Ward residents that stayed during the storm to find out what they observed and what they saw, trying to get a timeline on when things happened as far as the water starting to come, when y'all lost power...

SB: Man, they had all types of alligators and sharks in the water.

RR: Mister Molay?

BM: Yes, ma'am?

RR: But what is the purpose of y'all's research? What are y'all using it for?

BM: I—to be honest with you we're—I'm collecting these stories—we're just trying to—we're trying to get a timeline to try to find out, uh, concerning the levee breaches and, uh, the power outages in the area. Trying to talk to neighbors in the area to find out timelines on things, the people that stayed, to find out what they observed.

RR: Okay. And the timeline? What are y'all gonna use this for?

BM: I—to be honest with you, I'm not sure. They didn't tell me that. They just asked me to con—read some news articles, which is where I got, uh, Sir Anthony's information from.  They asked me to contact people from news articles and news stories that—that were already interviewed, uh, from—like that were evacuated to Houston and they just asked me to talk to people and just document, you know, write—give a little small report of what—what y'all told me and what they gonna—what they gonna use

RR: Okay, and Centanni... What's the purpose of your company?

BM: What's the purpose of my company?

RR: Yeah.

BM: I—I just told you. Just basically we're trying to find out what the people who lived in the 9th Ward area observed.

RR: Okay, investigation for, uh, you know, what went on, right?

BM: Right. Basically just trying to find out what went on. Yes rna'am.

RR: Okay, uh.

BM: For the people that stayed. You know, what they saw, what they observed, get their story.

[16]  Barge Plaintiffs' Exhibit 30 to this Motion, the Nov. 4, 2006, Draft Transcript of Centanni Interview with Eugene Costello, Jr., Bates-numbered LNA 1972-90, stated on p. 15, LNA 1986:

RG: Okay. Okay. Well I appreciate it, and anything else you can think of or?

EC: No. What—what they investigating for?

RG: We're just investigating to find out what happened. Uh, I'm like a independent investigator.

EC: Mm-hm.

The transcript continues on p. 17, LNA 1988:

11

h. Centanni investigator Robert Garcia affirmatively lied to Carl Butler, told Mr.

Butler that he was an independent investigator, and raised the idea that there was a crack in

the levee that caused a failure and that the barge simply floated through after the failure,

and changed the subject when Mr. Butler insisted the barge broke the floodwall;[17]

---

RG: Oh, okay. Well if you ever—if you ever, uh, run into anybody that might have seen something or heard anything, uh, just let us know. And if you think of anything else, I'd appreciate you giving us a call.

EC: Yeah, I mean, uh, who—who—who benefits from the investigation? I mean, who asked y'all to investigate? I mean, it must...

RG: We're just—we're just going out—just talking to people and—and just—just trying to find out what happened.

EC: Okay. What they—what they think something was wrong from ... ?

RG: Well I don't—I don't know. That's—that's why we're trying to figure out what happened. Just trying to figure out the truth.

[17] Barge Plaintiffs' Exhibit 31 to this Motion, the Dec. 14, 2005, Excerpts from the Draft Transcript of Centanni Interview with Carl Butler, Bates-numbered LNA 1894-1923, stated on pp. 9-11, LNA 1902-04:

CB: And what's—what's your name?

RG: My name is Robert Garcia.

CB: Okay. And who are you an investigator with?

RG: Uh, Centanni.

CB: Who is that?

RG: Uh, that's a independent investigative agency.

CB: Okay.

RG: And, uh, we're just—we're ... Since we're here we've heard all kinds of rumors and...

CB: Right. Right.

RG: ... and all kinds of...

CB: Different things, huh?

RG: And I'm sure that you've heard the same things about...

CB: Right. Right. Well let me ask you this here. What—what are they gonna do about that barge that bust through there?

RG: I don't—I don't know what they gonna do with that.

CB: But I mean that has to be considered a part of the problem.

RG: Well, when I spoke with, uh, with Glen, he had told me that, uh, that—that when the water... I think he had told me that—that the water was... There was some kind of crack in the levee.

CB: Uh-huh. In the levee?

12

21. By contrast, Centanni investigator Robert Garcia told the truth when asked about his role by a Louisiana National Guardsman with a business in Mobile who was not potentially involved in the class action.[18]

---

RG: Yeah, that you had seen and then, uh, and then, uh, and then the barge got sucked in by the rushing water.

CB: No. No. No.

RG: Okay.

CB: No. Look. Glen was gone. I was there. You understand? Look. That barge was on the other side of the channel. You understand what I'm saying?

RG: On?

CB: It was on the Poland Street side.

RG: Okay.

CB: And that barge broke loose and broke through that—through that wall.

RG: Okay. So do you think... ?

CB: And...

RG: Go ahead. I'm sorry.

CB: What you said?

RG: I was just trying to, uh, figure out... Are you... Where she was at in the twenty one hundred block of Deslonde...

CB: Okay. That's about—that's about the, uh, that's about the—the fifteen, sixteen hundred block of, uh, Jourdan.

This statement was obtained ten months before Lafarge denied having any statements.

[18]   Barge Plaintiffs' Exhibit 32 to this Motion, Excerpts from the Draft Transcript of the April 18, 2007, Centanni Interview with Nathan Blaesing, Bates-numbered LNA 3821-38, stated on p. 3, LNA 3823:

NB: Well, who is your, uh, who—who's the person that is actually wanting this investigation performed?

RG: Uh, this is—we work for, uh, Centanni.

NB: Uh, no, who's your, uh, who's your client?

RG: Uh, it's an attorney for, uh, for the—I didn't know if you- in the Lower 9th Ward are there was a barge that was present, uh.

NB: Yeah. That—that, uh, either caused the breach or—or came in afterwards?

RG: Yeah. And we're—we're working for, uh, the, uh, owner—not the owner of the barge company, uh, but the—the, uh, company that was leasing the barge from, uh, Ingram Barge Company.

NB: Okay.

RG: And so we—they've asked us to contact people in regards to that to—to give us their accounts of what they saw when they were out there.  Uh, what the weather conditions were like and, uh, and figure out, you know, uh, what—what caused the levee breaks.

13

**B.**     **The Louisiana Criminal Provisions Involved**

The text of Rev. Stat. § 14:62.5, defining the felony offense of looting, is set forth as Exhibit 33.

The text of Rev. Stat. § 14:62.7, defining the felony offense of unauthorized entry of a dwelling during an emergency or disaster, is set forth as Exhibit 34.

The text of Rev. Stat. § 14:62, defining the felony offense of simple burglary, is set forth as Exhibit 35.

The text of Rev. Stat. § 14:63, defining the offense of criminal trespass, is set forth as Exhibit 36.

The text of Rev. Stat. § 14:67, defining the offense of theft, is set forth as Exhibit 37.

**C.**     **Plaintiffs' Pending Appeal from the Denial of Plaintiff's Motion for a Protective Order**

Barge Plaintiffs' March 25, 2008, Motion for a Protective Order as to the Surreptitious Recordings of Witness Interviews by Counsel for Lafarge North America, Inc., through their Agent Centanni Investigative Services, Inc., for Lafarge's Concealment of the Interviews and Other Misconduct, and for Declaratory and Other Relief (Doc. # 11765), are incorporated by reference herein.  Defendant's Opposition is Doc. # 12831.  Magistrate Judge Wilkinson found that this conduct was improper, in his April 21, 2008, Order granting in part and denying in part Barge Plaintiffs' Motion to Compel Discovery (Doc. # 12605).  Plaintiffs moved for reconsideration.  (Doc. # 13098.) Lafarge's Opposition is Doc. # 13093.  Magistrate Judge Wilkinson denied reconsideration of this Order, and denied plaintiffs' Motion to Protective Order, in the May 14, 2008, Order and Reasons. (Doc. # 13149).  Plaintiffs appealed the denial of the Motion for Protective Order and one other matter.  (Doc. # 13347.)

14

The Motion at bar is related to these matters.  Lafarge's counsel through Centanni violated Louisiana RPC 4.2 and 4.3 in their contacts with class members, in that they knew they were dealing with persons of adverse interest, knew there was a high likelihood they would be communicating with represented persons of adverse interest, took no steps to ensure they would not be communicating with represented persons of adverse interest, and failed to make the disclosures required by Louisiana RPC 4.3.

In addition, Lafarge's counsel through Centanni falsely posed as impartial investigators, evaded direct questions from class members about who the investigators represented, Lafarge's counsel's approach to these interviews through Centanni left some of the interviewees with the impression that the interviewers were on their side, lied to some putative class members and Barge clients by telling them that Centanni interviewers were "independent private investigators," thereby concealing the true role and function of the interviews.

The actions of Lafarge's counsel through Centanni could mislead interviewees into thinking there was no need to speak with anyone else, such as counsel attempting to protect their interests. Further, Lafarge's counsel through Centanni asked at least one interviewee for photographs, without revealing that if they were turned over they would be sequestered away from counsel trying to protect their interests.

Lafarge attempted to conceal these interviews by providing false and deceptive discovery responses, and then by claiming a work-product privilege it should have known did not exist.

Lafarge performed the above actions with the intent of prejudicing the rights of putative class members by springing the secret tape recordings on them to impeach them at their depositions or at trial, without providing advance notice or copies of the recordings so that the transcripts could be

15

checked in advance for accuracy.

Magistrate Judge Wilkinson has already determined some of the above matters.  Specifically, his April 21, 2008, Order (Doc. # 12605) granting in part and denying in part Barge Plaintiffs' Motion to Compel Discovery, found:

> a.  "Lafarge admits that its investigators, who took the recorded statements by telephone, did not tell the interviewees that they were being recorded."  (Order at p. 5);
>
> b.  "The transcripts also reveal, and Lafarge does not deny, that the investigators identified themselves  only as working for Centanni Investigative Agency, and did not state that they were working for Lafarge or the barge interests, or for attorneys for those parties."  (Order at pp. 5-6.);
>
> c.  "Although private investigators, not lawyers, conducted the surreptitious tape recording of these statements, the investigators were working as an extension of counsel of record in this case and the work of the investigators directly benefitted counsel."  (Order at p. 9; emphasis in original.)
>
> d.  That "Lafarge's investigators did nothing illegal by recording the interviewees without their knowledge."  (Order at p. 7.)
>
> e.  That "this court disapproves of the secret tape-recording of witnesses and finds that the investigators' conduct in surreptitiously taping conversations vitiates the qualified protection of Rule 26(b)(3)."  *Id.*;

That the secret tape-recording of witnesses places them at an unfair disadvantage, may prejudice them, and violates the attorney's duty of candor.  (Order at pp. 7-9)

**D.      Lafarge's Responsibility for Centanni's Actions**

Lafarge has previously admitted to this Court that its counsel retained Centanni to perform

factual investigations, has admitted that the acts of Centanni were performed as agents of its counsel,

and has argued that Centanni's work product is therefore entitled to the privilege for trial preparation

materials under Rule 26(b)(3), Fed. R. Civ. Pro.[19]

**E.      Counsel for Plaintiffs Have At Least a Constructive Attorney-Client Relationship with Putative Class Members**

Counsel for plaintiffs cannot be considered legal strangers to the members of a putative class

prior to certification.  The Complaint that they frame defines the putative class, and tolls the period of

limitations for all members of that putative class.[20]  For these reasons, some commentators have

concluded that there is at least a constructive attorney-client relationship between counsel for

plaintiffs and members of the putative class.  Geoffrey C. Hazard, Jr., and W. William Hodes state in

2 THE LAW OF LAWYERING, 3D ED. (Aspen Law & Business, New York, 2001) § 38.4 at pp. 38–6 and

38–7:

> For certain purposes the unnamed class members should be regarded as clients of the

---

[19] "January xx, 2008" "Declaration of Mark S. Raffman Pursuant to Fed. R. Civ. P. 26(b)(5)," Barge Plaintiffs' Exhibit 38 hereto, ¶ 8; Excerpts from January 31, 2008, Lafarge Objections to Rule 45 Subpoena to Centanni Investigative Agency, Barge Plaintiffs' Exhibit 39 hereto; Lafarge Memorandum in Support of its Motion to Quash Subpoena, Barge Plaintiffs' Exhibit 40 hereto; Lafarge's Privilege Log dated February 20, 2008, Barge Plaintiffs' Exhibit 41 hereto.

[20] The ordinary rule is that the filing of a putative class action tolls the period of limitations for class members to file motions for leave to intervene in the class action, and that the time remains tolled until and unless the court denies class certification. *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974).  If review of the denial of class certification is sought, tolling may continue until the final decision on appeal.  *E.g.*, *United Airlines v. McDonald*, 432 U.S. 385 (1977).  Tolling may support either intervention into the former putative class action or the filing of a new action, and tolling applies to an EEOC notice of right to file suit as well as to other deadlines.  *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983).  These are just the general outlines of a complex field of law. See generally Herbert Newberg and Alba Conte, 5 NEWBERG ON CLASS ACTIONS, 3D ED., § 24.99 (West Group, 1992).

17

> lawyer representing the class from the inception of the suit, even before certification by the court as a proper class action.  For example, most authorities rightly assume that the lawyer acts in a fiduciary capacity toward these people, and thus owes them duties of loyalty and care, even though he is still seeking formal authority to proceed on their behalf.

Herbert Newberg and Alba Conte discuss pre-certification communications by the class opponent with putative class members in 5 NEWBERG ON CLASS ACTIONS, 3D ED. (West Group 1992), §15.14. They say generally that such communications are permitted "as long as they do not infringe on what some courts have characterized as the constructive attorney-client relationship that exists between counsel for class representatives and the members of the class."  (Footnote omitted.)  The MANUAL FOR COMPLEX LITIGATION (THIRD) stated in §30.24 (Other Communications) at 260-61, and in its footnote 741:

> Although no formal attorney-client relationship exists between class counsel and the putative members of the class prior to class certification, there is at least an incipient fiduciary relationship between class counsel and the class he or she is seeking to represent.[741]

_____

[741] Knuth v. Erie-Crawford Diary [sic] Coop. Ass'n, 463 F.2d 470 (3d. [sic] Cir. 1972).  See Newberg & Conte, *supra* note 662, § 15.14 (some courts have stated that constructive attorney-client relationship exists between putative class members and class counsel prior to certification); Thomas A. Dickerson, Class Actions: The Law of 50 States § 4.06 [2] (1994) ("members of the purported class . . . are deemed represented by counsel for the class representatives as of the time the complaint is filed with the court").

*Contra*: *Morisky v. Public Service Electric & Gas Co.*, 191 F.R.D. 419, 424 (D. N.J. 2000).  There is no corresponding passage in the Fourth Edition.

This Court has recognized that in some situations even the EEOC might have a constructive attorney-client relationship with at least the named Title VII charging parties for whom it was seeking relief even though the government does not "represent" claimants in the traditional sense.  *U.S. E.E.O.C. v. TIC-The Industrial Co.*, 2002 WL 31654977, 90 Fair Empl.Prac.Cas. (BNA) 737 (E.D.

La. Nov. 21, 2002) (No. CIV.A. 01-1776).[21]  Indeed, the Court required the defendant in that case to

make specific disclosures to the claimants *not* constructively represented by the EEOC, of a type that

Lafarge and its counsel failed or refused to make in this case:

> However, the court instructs defendant that, in its contacts with potential claimants, it must inform the claimants that the EEOC has brought this action; summarize the claims in the action; advise the claimants that they may, but are not required to, join in the action; and tell them that they may contact the EEOC for additional information.

*Id.* at p. *6.

### F.     Lafarge and its Counsel Should Be Barred from Any Further Contacts with Putative Class Members Without the Consent of the Barge P.S.L.C. or an Order of this Court Authorizing the Contact

Rule 23(d), Fed. R. Civ. Pro., authorizes the Court to issue orders in the conduct of class

actions, including orders restricting the rights of the parties.  In *Gulf Oil Co. v. Bernard*, 452 U.S. 89,

100 (1981), the Supreme Court held: "Because of the potential for abuse, a district court has both the

duty and the broad authority to exercise control over a class action and to enter appropriate orders

governing the conduct of counsel and parties."  The Court went on to hold that:

> an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties.  Only such a determination can ensure that the court is furthering, rather than hindering, the policies embodied in the Federal Rules of Civil Procedure, especially Rule 23.  In addition, such a weighing—identifying the potential abuses being addressed—should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances.

*Id.* at 101-02.

---

[21] A copy is attached for ease of reference as Barge Plaintiffs' Exhibit 42.

19

Local Civil Rule 23(D)[22] requires the type of balancing discussed in *Bernard*.  Barge Plaintiffs have made the required particularized showing of the abuses that have occurred, have specified the form of the remedy sought, and have set forth the specific findings they seek and the bases on which the Court may make such findings.  To the extent that the Court desires an evidentiary hearing, plaintiffs request a reasonable time within which to take discovery on the issues on which the Court desires a hearing.

Lafarge's rights to investigate the case can be protected by deposing any putative class members in the presence of the Barge P.S.L.C.

Lafarge's conduct here has been so extreme that plaintiffs have been unable to find any case matching these facts.  However, there can be little question that Lafarge's pattern of secretly recording interviews with putative class members for the purpose of ambushing them at depositions or trial, performed in an unethical manner by depriving class members of the protections required by

---

[22] Local Civil Rule 23(D) provides:

D.   1. Whenever a party or counsel desires to prohibit another party or counsel from communicating concerning such action with any potential or actual class member not a formal party to the action, he or she shall apply in writing to the court for such an order. In such application, the parties must set forth with particularity the abuses they fear will result from such communication, along with the form of remedy they believe would be appropriate to prevent frustration of the policies of Rule 23.

2. The court will not enter an order prohibiting communication with members of the class in the absence of a clear record (and when necessary, an evidentiary hearing) reflecting:

a. specific findings regarding the abuse the court seeks to prevent;

b. the need for such an order, weighing the abuse sought to be corrected and the effect it will have on the right of a party to proceed pursuant to Rule 23 without interference.

3. Any attorney who communicates with the class shall preserve and retain in his or her files, until the final conclusion of the action, a copy of all communications which he or she

the ethical rules, its misleading them into thinking they need not contact anyone else such as class counsel, and its patterns of serious criminal activity, materially abused the rights of class members and undermined the functioning of this litigation.  Lafarge and its counsel have shown they cannot be trusted to avoid overreaching, and they should not be allowed further opportunities to abuse putative class members.

        **G.**      **Plaintiffs' Right to Discovery**

On this record, plaintiffs are entitled to discovery on Lafarge's entire course of dealing with putative class members.  There is evidence of a clear program of deceptive and misleading statements to class members in the interviews conducted by Centanni, there is evidence that Lafarge tried to steer their recollections in a manner favorable to it, Lafarge clearly denied having any statements months after it started collecting them and waived work product privilege by failing to make that objection, and the program culminated in repeated criminal conduct.  Plaintiffs do not know if there were other ways in which the rights of the putative class have been infringed upon, and are entitled to find out.

Plaintiffs also need to know the names and involvement of each participant in this criminal scheme because it will have a bearing on their credibility if called as a witness at trial.

Finally, given the above-documented problems in defendant's recordkeeping of the stolen clocks and watches, plaintiffs need discovery of all documents discussing the scheme, or the stolen clocks and watches, in order to be certain of the origin of each stolen timepiece.

        **H.**      **In the Event of an Evidentiary Hearing and Discovery into These Matters, the Crime-Fraud Exception Voids Any Attorney-Client Privilege or Work-Product Privilege As to These Matters**

Lafarge continues in possession of the clocks and watches it stole from class members, and the

_____

has sent to any members of the class or potential class.

possibility still exists that it will make use of the information it unlawfully gained. Lafarge has informed the Barge P.S.L.C. that it intends to continue to contact putative class members. Lafarge's misleading conduct can also be expected to continue in any such future contacts.

Barge plaintiffs seek a narrow determination that Lafarge's communications with its counsel, and the work product of counsel and Centanni Investigative Services with respect to their program of contacts with putative class members and their property, the details of the thefts of clocks and watches and their intended use, and all internal or external communications between or among Centanni, Lafarge, and its counsel, and between any of them and third parties, on these subjects are unprotected. "Where a client seeks to use an attorney to further a continuing or future crime or fraud the broader public interest in the administration of justice is being frustrated, not promoted. Thus, where the government makes a prima facie showing that the attorney-client relationship was intended to further continuing or future criminal or fraudulent activity, the privilege does not exist." *United States v. Dyer*, 722 F.2d 174, 177 (5th Cir. 1983). "Under the crime-fraud exception to the attorney-client privilege, the privilege can be overcome 'where communication or work product is intended 'to further continuing or future criminal or fraudulent activity.''" *United States v. Edwards*, 303 F.3d 606, 618 (5th Cir. 2002), *cert. denied*, 537 U.S. 1192 (2003).

Plaintiffs have made a *prima facie* showing adequate to support a reasonable belief by a reasonable person. *In re Grand Jury Subpoena*, 419 F.3d 329, 335-36 (5th Cir. 2005). It shows that "the client intended to further a future or ongoing crime or fraud." *Id.* at 336 n.7.

Plaintiffs are not seeking the abrogation of all attorney-client and work-product privilege, but only a narrow abrogation as to communications involving Lafarge's, its counsel's, and Centanni's entire program of dealing with putative class members and their property—from the solicitation of

22

evidence to the interviews to the trespasses and thefts of clocks and watches—and with the details of the criminal scheme and the uses of its fruits.  This is not the type of overly broad destruction of privilege disapproved in *In re Grand Jury Subpoena*, 419 F.3d at 338-47.

Lafarge's entry with Centanni into a pattern of criminal conduct, to the detriment of class members, takes this case far out of the norm of civil litigation.  Plaintiffs should have the right to explore the full range of that pattern.

## I.      Conclusion

WHEREFORE, Barge plaintiffs pray that their Motion be granted.

Respectfully submitted,

/s/ Brian A. Gilbert
Brian A. Gilbert, Esq. (21297)
LAW OFFICE OF BRIAN A. GILBERT, P.L.C.
821 Baronne Street
New Orleans, Louisiana 70113
            Telephone: (504) 885-7700
            Telephone: (504) 581-6180
            Facsimile: (504) 581-4336
            e-mail: bgilbert@briangilbertlaw.com

/s/ Lawrence D. Wiedemann,
Lawrence D. Wiedemann.(13457)
Karl Wiedemann (18502)
Karen Wiedemann (21151)
WIEDEMANN & WIEDEMANN
821 Baronne Street
New Orleans, Louisiana 70113
            Telephone: (504) 581-6180
            Facsimile: (504) 581-4336
            e-mail: lawrence@wiedemannlaw.com,
            karl@wiedemannlaw.com, karen@wiedemannlaw.com,

/s/ Patrick J. Sanders
Patrick J. Sanders (18741)
3316 Ridgelake Drive
Suite 100
Metairie, LA 70002
Telephone: 504-834-0646
e-mail: pistols42@aol.com

/s/ Richard T. Seymour
Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C.  20036-4129
Voice: 202-862-4320
Cell:    202-549-1454
           Facsimile:  800-805-1065 and 202-828-4130
           e-mail: rick@rickseymourlaw.net,

/s/ Lawrence A. Wilson
Lawrence A. Wilson (N.Y.S.B.A. 2487908)
David W. Drucker (N.Y.S.B.A. #1981562)
Wilson, Grochow, Druker & Nolet
Woolworth Building
233 Broadway, 5th Floor
New York, NY 10279-0003
Telephone: (212) 608-4400
Facsimile: (212) 227-5159
e-mail: lwilson@wgdnlaw1.com, ddruker@wgdnlaw1.com

/s/ Alan L. Fuchsberg
Alan L. Fuchsberg, Esq.(N.Y.S.B.A. #1755966)
Leslie Kelmachter, Esq.(N.Y.S.B.A. #1795723)
The Jacob D. Fuchsberg Law Firm
500 Fifth Avenue
45th Floor
New York, NY 10110-0002
Telephone: 212-869-3500 ext. 235
Facsimile:  212-398-1532
           e-mail: a.fuchsberg@fuchsberg.com,
           l.kelmachter@fuchsberg.com

Dated: July 15, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing document has been served upon

counsel of record, by ECF upload, this 15th day of July, 2008.

<u>/s/ Richard T. Seymour</u>
Richard T. Seymour
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C.  20036-4129
Voice: 202-862-4320
Cell:   202-549-1454
Facsimile:  800-805-1065 and 202-828-4130
e-mail: rick@rickseymourlaw.net

25