85cPameC

1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   AMERICAN STEAMSHIP OWNERS
    MUTUAL PROTECTION and
4   INDEMNITY ASSOCIATION, INC.,,

5                Plaintiff,

6        v.                          06 Civ. 3123 (CSH)

7   LA FARGE NORTH AMERICA, INC.,
    et al.,,

8                Defendants.

9   ------------------------------x

10                              New York, N.Y.
                                May 12, 2008
11                              2:15 p.m.

12  Before:

13              HON. CHARLES S. HAIGHT,

14                              District Judge

15                  APPEARANCES

16  THACHER PROFFITT & WOOD, LLP
        Attorneys for Plaintiff
17  BY:  JOHN M. WOODS,
    BY:  ALAN KAUFMAN
18
    HILL RIVKINS & HAYDEN LLP
19      Attorneys for Defendant LaFarge
    BY:  ROBERT G. CLYNE
20  BY:  JOHN J. SULLIVAN
    BY:  CAROLINE MAES
21

22

23

24

25



85cPameC

1    APPEARANCES (continued)
     NICOLETTI HORNIG & SWEENEY
2         Attorneys for Northern Assurance & American Home
     BY:   JOHN A.V. NICOLETTI
3    BY:   NOOSHIN NAMAZI

4    BROWN, GAVALAS & FROMM LLP
          Attorneys for New York Marine & General Insurance Co.
5    BY:   DAVID H. FROMM,
     BY:   MICHAEL NAUGHTON
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

85cPameC

1              (In chambers)

2              THE COURT:: On the record, please.

3              This is a status conference with respect to three

4    cases that this Court has regarded as related to each other, as

5    that phrase is used in the rules of this court, for the

6    assignment of cases to the judges.

7              Those cases are, and I will identify them for the

8    present only by docket number, 05 Civil 9612, 06 Civil 3123, 08

9    Civil 3289.

10             It is useful to observe, I think, that those three

11   cases are bound together at present only by virtue of the

12   assignment rules of the court, that they are within the context

13   of that rule related cases.

14             One of the issues that surfaces from the most recent

15   and brisk exchange of correspondence between counsel is

16   whether, and to what extent, the cases should be consolidated.

17   That brings us into the area of Rule 24, and eventually, not

18   this afternoon, but eventually, it is clear that the Court will

19   have to adjudicate whether these cases should be consolidated

20   at all, or consolidated solely for purpose of pretrial

21   discovery, or consolidated for all purposes.

22             That issue is out there and we may talk to it a little

23   later on, when it comes to scheduling matters.  But it is not

24   before us this afternoon.

25             We are meeting here in chambers in a relatively

85cPameC

1   informal setting rather than the courtroom because, as the

2   result of renovations across the street, judges are sharing

3   their courtrooms.  And it is better for my colleague that we

4   conduct this hearing up here in chambers, which is a pleasant

5   enough place.

6        We have no formal notice of appearance for the

7   assistance of the court reporter, and we are come to that as

8   the first order of business.  We do not have such a document

9   prepared because my deputy court clerk is in Cancun and my

10  secretary is Aruba.

11       I am not making a social or intuitional point when I

12  say that, I am simply reciting the facts and explaining why it

13  is that now, in the absence of a notice of appearance form,

14  which ordinarily the court clerk would prepare, what I am going

15  to do is to ask you, for the benefit of our reporter, to

16  identify yourselves, tell her and us, myself and my two law

17  clerks, what your name or names are and who it is that you

18  represent.

19       And I want you to make these identifications for the

20  record in a particular order.  First, the attorneys for the New

21  York Marine and General Insurance Company which, for the

22  balance of the proceeding I will refer to as NYMAGIC.  Second,

23  counsel for LaFarge, who, in all these cases, regards itself as

24  the insured, although with less than perfect results thus far.

25       Third, counsel for the American Club, I am using

85cPameC

1    shorthand now.  And, fourth, counsel for Northern Assurance and

2    American Home Assurance.  Known collectively, and perhaps to be

3    referred to during this proceeding, as the excess insurers.

4            Following that order, will counsel kindly identify

5    themselves to the reporter and to the three of us as well.

6            MR. FROMM:  David Fromm, Brown, Gavalas & Fromm.

7            And we represent NYMAGIC in the 05 Civil 9612 action.

8            MR. CLYNE:  Robert Clyne.  And we have with us today a

9    Belgium intern, Caroline Maes, just observing the proceedings.

10   We are with the firm of Hill Rivkins & Hayden, representing

11   LaFarge North America.

12           MR. WOODS:  John Woods, I am with the firm of Thacher

13   Proffitt & Wood.  We represent American Steamship Owners Mutual

14   P & I Association.  Which is party to two of the actions, 06

15   Civ. 3123 and 08 Civ. 3289.

16           THE COURT:  And an entity also known as the American

17   Club.

18           MR. WOODS:  Thank you, your Honor.

19           MR. NICOLETTI:  I am John Nicoletti.  I'm with the

20   firm of Nicoletti Hornig & Sweeney.  To my left is my partner,

21   Ms. Nooshin Namzai.  We represent Northern Assurance and

22   American Home, the excess insurance.

23           THE COURT::  It would be useful if counsel have

24   business cards with them.  And I would be astonished if they

25   did not, to simply pass them on to the court reporter.  And

85cPameC

1    this might be the right time to do that.

2            The first order that I will make is that counsel order

3    the transcript of this proceeding.  I don't need daily copy,

4    but I do want it on an expedited basis.  And the four firms, on

5    behalf of their clients, who have just identified themselves,

6    will divide the cost of that transcript in equal one-quarter

7    shares.  I will not make that charge a taxable cost in the

8    litigation, so each of the clients will bear one-quarter of the

9    reporter's charge as a cost of litigation without recourse.

10           Now, let me give you one or two preliminary thoughts

11   that I have had reading the letters as they have come in.  And

12   most recently the helpful summations of what the issues

13   presently are that are contained in the letters of counsel, May

14   9 and May 12, in preparation for this hearing.

15           No one should read anything much into what I am about

16   to say as to how the various issues may be resolved.  My only

17   purpose is to give you some preliminary thoughts which may be

18   of assistance to you in fashioning your statements and

19   arguments and positions.

20           And those preliminary views in no particular order are

21   as follows:

22           First, if someone came down from Mars with no

23   particular knowledge of American maritime insurance matters,

24   and asked the question, is LaFarge insured for this incident?

25   And had been shown the considerable stack of insurance policies

85cPameC

1   that are in effect, the martian would have thought, yes,

2   they're insured, they have insurance protection, somehow they

3   must have, look at all these policies.

4           But as happens from time to time, and as operates to

5   give judges things to do, insurance companies on occasion

6   demonstrate a higher degree of happiness enjoyed in receiving

7   premiums then they do in paying out claims.  And so here are

8   arrayed before us all, a considerable number of primary and

9   excess insurance policies and companies.  And yet the sense I

10  get is that LaFarge, the purported insured, is incurring very

11  significant amounts of expense arising out of the Hurricane

12  Katrina disaster.  And is receiving very limited protection and

13  payments from the various underwriters who are involved.

14          I am not saying it should be any different than it is.

15  But what I am saying is, that one of the important aspects of

16  these cases, that I want us all to explore this afternoon, is

17  whether or not there is some way of expediting some aspects of

18  these issues that will permit LaFarge to know, sooner rather

19  than later, whether they are going to get any meaningful

20  financial assistance from the several insurance companies which

21  regard them as their insureds, or not.

22          And subsumed within that proposition is the one that

23  is, if LaFarge has an entitlement to being paid more money on

24  some or all of these policies than have been paid to date, then

25  I think the proper way to govern the case is to arrive at that

85cPameC

1   conclusion sooner rather than later.

2       So that a great deal of time does not go by with an

3   insured paying out sums, vast sums, which on a proper

4   construction of the policies, it should not have paid out.

5       I stress again, I am not tipping my hand in any way,

6   but I am trying to get us all to focus on procedural machinery

7   or vehicles which may assist me, I am looking for your help in

8   this case, to arrive at decisions which are going to have to be

9   made eventually.  But from the point of view of economic

10  hardship, should be placed in a position where the Court can

11  resolve them sooner rather than later, if possible.

12      Now, as an example of that, the first case filed was

13  the 05 Civil 9612 case, NYMAGIC versus LaFarge.  That was a

14  rather than narrow action posing a rather narrow issue.

15      It is the small acorn from which the cement oak has

16  grown.  But it was the first action.

17      And as I understand it, all NYMAGIC was saying was,

18  LaFarge is our insured, we do not deny that they are our

19  insured, within, of course, the limits of the policy.  And we

20  do not dispute that we are obliged to pay some litigation

21  expenses, attorneys, expert fees.

22      But NYMAGIC said to the Court in its first complaint,

23  LaFarge is going to various cities and hiring the finest

24  lawyers in various cities, and running up huge and unnecessary

25  legal bills, and we shouldn't have to pay that.  And we ask for

85cPameC

1    a declaration that is so.

2              If I misapprehend anyone's theory of the case, a time

3    will come when you can certainly correct me on it.  And it

4    won't be the first time.

5              What the American Club says, in its case, and this is

6    the second filed case, bearing docket number 06 Civil 3123, is

7    that we are a mutual club, we issued a P and I, or protection

8    and indemnity policy to LaFarge.  There were certain rules and

9    regulations and schedules and premiums to be paid, and while

10   what happened when the barge -- someone contribute the barge's

11   name and number.  What barge was it?

12             MR. WOODS:  ING 4727.

13             THE COURT:  When the barge ING 4727 -- thank you,

14   Mr. Woods -- broke loose, events occurred and damages were

15   inflicted, which puts LaFarge in need of protection and

16   indemnity, to put it mildly.  Protection, I understand to mean

17   in this context, paying for counsel and other expenses that

18   might arise.  Indemnity is indemnity for liability.  And

19   liability, of course, has not yet been established.

20             But the position that the club takes, as I understand

21   it is, that there is no coverage extended by the club, the

22   American Club, to LaFarge.

23             They ask the Court to declare that there is no

24   coverage.

25             Why does the American Club say that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

85cPameC

1          It says that, according to the first paragraph of its

2   complaint, because, one, the barge ING 4727 was never insured

3   by the club.  LaFarge may think it was, but the American Club

4   says no, that barge was never insured by this club.

5          The club says to LaFarge, you are a member, we

6   recognize you, we know who you are, we've done business with

7   you in the past, but as far as this barge is concerned, the

8   author of all our woes, there is no coverage under the club.

9          Because, first, the club never insured that vessel.

10  And, second, reading again from page one of the complaint,

11  quote, even if the barge had been insured pursuant to LaFarge's

12  certificate of entry in the club, coverage is excluded pursuant

13  to the terms of the club's rules, unquote.

14          Now, that is a second and discrete issue.

15          The first issue, as I tried to summarize it, in

16  NYMAGIC's first case was, is NYMAGIC obliged under the policy

17  it gave to LaFarge, to pay the bills of the 17 best law firms

18  in 17 fine cities -- I'm exaggerating a bit, but that's the

19  point.

20          This issue, the issue posed by the club's action, is

21  whether there is coverage under the club's policy at all.

22  Policy that -- withdrawn -- coverage that LaFarge can take

23  advantage of.

24          And the club says no, there wasn't any.  And LaFarge

25  says, yes, there was.

85cPameC

1     One theme that seems to be reasserted in the

2   correspondence, and here the excess underwriters have something

3   to say, is that from the point of view of governing the case,

4   from the point of view of getting answers sooner rather than

5   later, from the point of view of narrowing this litigation, and

6   because at expense of it, which are all objectives that I favor

7   in principle, a case can be made for giving priority to and

8   resolving as quickly as possible, the American Club's

9   declaratory judgment action.

10     Because, so this line of argument runs, if the

11   American Club succeeds on its declaratory judgment, and is held

12   not to cover LaFarge for this incident, then certain

13   circumstances in respect for coverage further down the line

14   involving excess policies, and so forth, necessarily follow.

15     And so conversely, if coverage is found to exist by

16   the Court under the American Club policy, then other

17   consequences arise, which involve not just LaFarge and the

18   club, but the other insurance companies too, NYMAGIC and the

19   so-called excess underwriters.

20     And it is in the context of that aspect of the case

21   that I learned from the letters, that NYMAGIC, apparently, is

22   not only the prime underwriter, but also a lead excess

23   underwriter.

24     In my experience, at least, that's a little unusual.

25   You have a prime liability underwriter, and the prime liability

85cPameC

1    underwriter is a little apprehensive of the amount of risk it's

2    taken on -- no, withdrawn, I am getting into the field of

3    reinsurance, so we are not quite there yet.

4            But insureds can take out basic policies and then

5    excess policies.

6            And so the sense I get is that NYMAGIC has two hats,

7    it is the primary underwriter, it is also mixed up in the

8    excess coverage somehow or other.  And the question that arises

9    is whether a reasonably prompt resolution of the American

10   Club's action would affect NYMAGIC's position, either as

11   primary underwriter or an excess underwriter to the extent that

12   NYMAGIC is an excess underwriter, in addition to being the

13   primary underwriter.

14           I know that Northern Assurance and American Home

15   Insurance are excess insurers.  And that's the only hat they

16   wear.

17           Now, I am going to throw the floor open to counsel

18   now.  You have all listened to these reflections on my part

19   with great patience, not that you had any choice in the matter,

20   but what I have tried to do is identify the particular aspects

21   of the case that I want you to address.

22           What it seems to me, it is part of my job to prevent,

23   is fascinating litigation going on and on and generating reams

24   of paper and high legal bills, and taking a lot of time, and

25   not resolving some of the questions which, if they can be

85cPameC

1    resolved sooner rather than later, should be, for the sake not

2    of counsel or for the Court, but for the sake of the litigants

3    whose servants we all are in our different ways.

4            What I am going to do is follow the same order that

5    you identified yourselves in.  And what I am going to invite

6    you to do is simply reflect on what I have said, and reflect on

7    what undoubtedly you gave some thought over the weekend to

8    saying to yourself, what I invite you to tell me is where, from

9    the point of your client's interests, you think you are now and

10   where you think the case ought to go next.  And how you think

11   we ought to get there.

12           If, for example, on the first little issue that

13   started all of this, an effort to resolve the multi-city legal

14   representation question, cannot be made the subject of a trial

15   on stipulated facts, and I can't compel you to stipulate.  And

16   if you cannot stipulate, then we will have to set it down for a

17   more formal resolution, in which case I want to know whether

18   more discovery is necessary or ready to go on that in the

19   context of cross-motions for summary judgment, perhaps.

20           But now I really will stop talking, and I invite

21   counsel for NYMAGIC first to respond to me in any way you think

22   appropriate, reflecting upon what you have been thinking about

23   and the things I said to you by way of preliminary.

24           MR. FROMM:  Thank you, your Honor, I am David Fromm

25   and I represent NYMAGIC.

85cPameC

1          The reason we wrote letters to your Honor was to

2     expedite the resolution, the attorney's fees' resolution in the

3     NYMAGIC matter.

4          I think I started the ball rolling, if you will, with

5     the first letter that, I guess, over a month ago.  And our

6     concern was that the schedule that we had agreed with LaFarge

7     to expedite this case and get the issue resolved was not being

8     met.  And we didn't feel we were getting cooperation by LaFarge

9     to get the stipulated fact done and then move on.

10         In my letters that I wrote to the Court I tried not to

11    cast any aspersions on anybody.  And I just ask the Court for

12    its assistance in getting this motion, stipulated facts done,

13    and a motions schedule set and getting the issue resolved.

14         And I was very careful to write what I would call a

15    vanilla letter, without accusing anybody.

16         So I was a little disappointed, I saw the letter that

17    that LaFarge sent, I guess this morning, to your Honor.  But be

18    that as it may, they have had what I thought was basically the

19    final version of the stipulated facts since April 9.  They

20    haven't communicated with us with respect to those.  They asked

21    for more documents, we gave them more documents.  I am trying

22    to -- and then tried to find out what they -- what other

23    information they intend to submit if they are going to go

24    beyond the stipulated facts which, quite frankly, wasn't my

25    understanding, but be that as it may, and they have been sort

85cPameC

1    of coy with me in not really telling me where they are going,

2    and what they are going to do.  I would like to have some idea,

3    because if we are going to do a simultaneous exchange, that

4    would be helpful.  And I certainly don't want to have to do a

5    simultaneous exchange and then come to the Court and say, hey,

6    I want discovery, all this extraneous stuff is coming in that

7    we didn't have a chance to have discovery on.

8            I haven't gotten an answer on that.  That is why I

9    wrote to your Honor.

10           We still want to resolve it on stipulated facts.  I

11   guess we -- I don't know where we are anymore, because we --

12   they sent us a redraft on, I guess on the 7th of April, with

13   some minor changes of the stipulated facts.  We came back with

14   very minor changes.  And there has been no communication since

15   that, with respect to the stipulated facts.

16           The deadline your Honor set in your letter, the

17   endorsed letter, the February 20th letter, the February 29th

18   endorsement, those dates passed.  We tried to agree on some

19   other dates with them, those dates, for all intents and

20   purposes, passed.

21           So I guess I am asking for some help on getting this

22   thing moving.  And I can't make them agree to stipulated facts,

23   I can't make them respond.  I encouraged them since April 9.

24   But that is where we are, your Honor.

25           THE COURT:  Is that all that you are presently looking

85cPameC

1    for, Mr. Fromm?

2          MR. FROMM:  I was looking for three things, getting

3    the stipulated facts finalized, and the Court's assistance in

4    that.  Getting some indication of the nature and extent of the

5    submissions they are going to submit to the Court.  I am

6    hearing they might want live testimony, who from, what this

7    would be about.  And the scheduling order.

8          Those are the three things I put in my first letter,

9    my last letter.  That would satisfy my client.

10         THE COURT:  And everything that you've said relates to

11   the narrow but discrete issue of paying attorney's fees, isn't

12   that right?

13         MR. FROMM:  Yes, your Honor.

14         THE COURT:  So all of the storm clouds that are

15   boiling on the horizon with respect to excess this and excess

16   that, some of the other issues that I summarized, that are

17   reflected in the pleadings and the other two cases, from where

18   you presently sit right now, you are not concerned about those

19   right now.  What you are looking for this afternoon is some way

20   to move the ball down the field on the first issue which came

21   before the Court, the attorney's fees questions, right?

22         MR. FROMM:  That's correct.  My client would like that

23   issue resolved.

24         THE COURT:  Of course your client also has something

25   of an interest in the second action, the American Club's

85cPameC

1    position that you are not covered.  You have an interest in

2    that case, do you not?

3             MR. FROMM:  Yes.  Of course my client would be, I'm

4    sure my client would be happy if there was American Club

5    coverage.

6             THE COURT:  But as far as that aspect of the case is

7    concerned, correct me if I am wrong, that is working its way

8    along in the usual course, is it not?

9             MR. FROMM:  I assume so.  I know Mr. Clyne is

10   litigating for coverage, Mr. Woods is litigating against

11   coverage, and they are both fine attorneys, and I am sure they

12   will resolve the issue.

13            THE COURT:  That's right.  But that really does not

14   affect NYMAGIC.

15            MR. FROMM:  Only the outcome.

16            THE COURT:  The outcome might down the line.

17            MR. FROMM:  Correct.

18            THE COURT:  Okay, well, then, good, you have spoken

19   your piece and that's very useful.

20            Let me hear, then, from you, Mr. Clyne.  And I would

21   like you first to address what Mr. Fromm said on the stipulated

22   facts question.  But then expand your presentation, if you

23   would, and tell me about any other aspect of these

24   presently-related cases again -- choosing my words carefully --

25   that makes LaFarge concerned.  And tell me, and make this a

85cPameC

1    global answer, embrace all aspects of the action.

2           Do you feel presently aggrieved?  What should I do, if

3    anything, to make your client feel better, from your point of

4    view, what should the Court be doing?

5           MR. CLYNE:  Thank you, your Honor.

6           I think it is fair to say that among all the counsel

7    here, LaFarge would like to see these matters resolved probably

8    quicker than anyone else, any of the insured's clients.

9           As you know, they have been paying legal fees in New

10   Orleans for over two and a half years now.  And in terms of, if

11   I could just mention the, and I know your Honor was

12   exaggerating about the number of law firms, but I did want to

13   verify the record here, that when Goodwin Proctor was retained

14   early on in the case, New Orleans counsel was displaced because

15   of the hurricane, and as you know, Holland & Knight was brought

16   in to do an investigation.  Very shortly after that

17   investigation, Holland & Knight was dismissed from the case.

18          So we are not talking about three law firms or five

19   law firms, we are talking about two law firms, a local counsel

20   and a larger firm.

21          And then NYMAGIC decided to hire another firm in New

22   Orleans to assist LaFarge.  So I just sort of wanted to make

23   that clear.

24          THE COURT:  That's a very fair point.  And I should

25   put on the record now, yes, of course, it was a wild

85cPameC

1   exaggeration, one might say a cheap shot, I couldn't resist.

2   But I do understand the true facts, and I want you to feel

3   better having said what you said, and having heard what I said.

4   Do you feel better now?

5          MR. CLYNE:  Yes, your Honor.

6          THE COURT:  Good.

7          MR. CLYNE:  In terms of the stipulation and NYMAGIC, I

8   respectfully disagree with Mr. Fromm.

9          We had some very severe difficulty in trying to get a

10  stipulation put together.  We were disappointed that NYMAGIC

11  would not agree to certain basic facts, certain things that are

12  reality in the New Orleans litigation, in the Eastern District

13  of Louisiana, certain docket entries as to the number of

14  parties involved.

15         A very important part of this case, from LaFarge's

16  perspective, is the complexity of the litigation in New

17  Orleans.  And the amount of things that the lawyers have to do

18  in those proceedings.

19         We, in the early days of this stipulation exercise,

20  gave Mr. Fromm a very extensive list of proposed stipulated

21  facts.  And the idea was that we were going to go back and

22  forth and see what we were going to stipulate to and not

23  stipulate to.

24         And I have to say that I believe that 90 percent of

25  what we put before them, they would not agree to.  Not because

85cPameC

1    they didn't know it was not true, but because they simply did

2    not want to agree to it.  Which put us in a very difficult

3    position.  That forces us to have to put the evidence to the

4    Court in another manner.  That's why we have had a little bit

5    of a back and forth about what this written submission, the

6    form it should take.

7              I never understood this written submission to be just

8    the stipulated facts and a brief, because if that's the case,

9    one side can simply control what's put before the Court, and we

10   are not going to get a fair hearing, if one side can just

11   simply disagree to any of the stipulated facts that are

12   important to the case.

13             My understanding, back when your Honor first suggested

14   this two years ago, and I think the fair way to go is that this

15   was not a summary judgment motion per se but a written

16   submission.  Each side puts in what they want to put in,

17   supported as they see it supported, and then your Honor decides

18   what to accept and what not to accept.  That this would be sort

19   of a trial on submission.  And that's the way that I understood

20   it to be.

21             Many of the facts regarding what is happening in New

22   Orleans, we need, if NYMAGIC is not going to stipulate to it,

23   we need to put it in by way of affidavit, by way of a document,

24   the docket sheet, or things of that nature.

25             THE COURT:  How do disputed facts of that nature bear

85cPameC

1    upon the obligation of NYMAGIC to pay for the kinds of legal

2    assistance that LaFarge thinks its insurance company should be

3    paying for?

4         MR. CLYNE:  Well, your Honor, I believe that the

5    complexity of the case in New Orleans, and the amount of the

6    exposure should have some bearing on the quality of counsel

7    that's involved.

8         THE COURT:  So a solo practitioner wouldn't do and,

9    perhaps, not even one law firm would do?

10        I put that question to you because I was trying to

11   figure out if we do it the hard way, and we don't get a

12   stipulation of facts, and there has to be a resolution of this

13   particular issue on a more formal and elaborate record.

14        It didn't seem to me appropriate that I should be

15   finding particular facts that arise out of this catastrophic

16   event.  Instead, I would be asked to consider the complexity of

17   those facts, whatever their ultimate resolution might be,

18   within the context of what kind of legal protection does

19   LaFarge need to adequately defend itself in such a case.

20        Is that what it comes down to?

21        MR. CLYNE:  Understood, your Honor.  But if there is

22   a -- if there are 500 plaintiffs, or say 5000 plaintiffs, which

23   is more like it, in the New Orleans action, that are suing

24   LaFarge, and NYMAGIC won't stipulate to that, I have some

25   difficulty if the Court is going to say, I am not going -- I am

85cPameC

1    not going to accept that evidence.

2         There are certain facts here, even on a summary

3    judgment motion, I think a Court accept facts put in by a

4    party.  The question is whether there is a genuine issue of

5    material fact, a genuine dispute.

6         So all I am saying is that there are undisputed facts,

7    your Honor, that they simply will not stipulate to, that we

8    need to put before the Court.  And if we do that by way of

9    stipulation, or we do it through an evidentiary hearing, or if

10   we do it through a trial --

11        THE COURT:  -- or use of the rule which would allow me

12   to judicially notice facts like, for example, 5263 claims have

13   been filed.

14        MR. CLYNE:  Understood.  That's one example I am

15   using, and I understand that fact.  But there are many, many

16   facts involved that we believe there is absolutely no dispute

17   about, they are just not going to agree to.

18        And I have some real difficulty in putting the case

19   before you in writing if, and I am not saying this is true, but

20   if the sky is blue, and they won't stipulate to it, we can't

21   get that into the case.  That's a problem for us.

22        So I think there is a little bit of a cooperation

23   issue that we have from our end.  And I also strongly disagree

24   that we've -- that we have been the ones that have been

25   delaying this.

85cPameC

1          Our clients do not want this delayed, they want an

2    adjudication as soon as possible.

3          And we were actually waiting for information from them

4    that would allow us to stipulate the facts that they proposed

5    in the stipulation.

6          I don't want to get into casting aspersions either,

7    but I think it is very wrong for them to say that they have

8    been waiting since April 9 to hear from us.

9          THE COURT:  I don't think it is necessary to probably

10   extend the record on this aspect of the case.  I read the

11   letters you both sent.  I really didn't expect either one of

12   you to show up this afternoon to plead guilty to your

13   adversary's indictment.

14         MR. FROMM:  I didn't indict him in my letters, he

15   indicted me.

16         MR. CLYNE:  I believe in some of the letters you wrote

17   you blamed certain things on us.  You did it here today too.

18         THE COURT:  This will not profit any of us.

19         My sense of this aspect of the case is that sometimes

20   the presentation of a factual issue to a Court on the basis of

21   a stipulated record and stipulated facts, and just an exchange

22   of briefs, can work.  When it does work, it is a time saver.

23         It is relatively rare.  And I suspect the principal

24   reason for that is, is that people in a litigation mode, either

25   acting themselves as counsel or bound by their client's

85cPameC

1   instruction, find it difficult to stipulate all the facts.   And

2   sometimes when they do, and the result comes out, then one side

3   or the other, the losing party, repents of that.

4          And as happened to me last year on a case where the

5   parties agreed to stipulate the facts and the exhibits, and it

6   all came in.   And I took it, they waived jury, so I took it as

7   a bench trial on stipulated facts and records, and wrote

8   findings of fact and conclusions of law under the rule, entered

9   judgment, somebody won and somebody lost.   And the person who

10  lost said, well, wait a minute, you should have let my client

11  come and be deposed, or appear before you and tell his tale.

12  All I had was his deposition to go by.

13         And the argument was, good heavens, if we knew you

14  would have gone off that way, we would have asked to have him

15  testify.

16         And I concluded it was too late to say that.

17         And it went to the Court of Appeals.   And the Court of

18  Appeals agreed with that and said, parties don't have to

19  stipulate to facts.   And to this kind of expedited trial

20  procedure.   But if they do, they are bound by their bargain.

21         So the appeal was rejected.

22         But implicit in that analysis, is the reality that the

23  parties must stipulate.   They must agree.   And the trial court

24  can not compel litigants to stipulate or agree.   So it doesn't

25  profit any of us to suggest why or for what reason or as a

85cPameC

1   result of whose attitude there has not been a stipulation.

2         It doesn't sound as if there is going to be one.

3         And that leads to the question that I will ask both

4   you and Mr. Fromm to address.

5         Let's just assume that the effort which I think is

6   worth making, fails, and it is not going to be dealt with on a

7   stipulated basis.  Then they will have to be another way of

8   resolving the issue, probably an evidentiary trial or cross

9   motions on summary judgment with affidavits, which may indicate

10  the need for an evidentiary hearing or not, as the case may be.

11        But I will keep the ball with you for a while, Mr.

12  Clyne.

13        Assuming there just isn't going to be that resolution

14  on stipulated facts, stipulated records, what happens next?

15  What's plan B in your view?

16        MR. CLYNE:  Well, again, your Honor, I thought this

17  was going to be a written submission, the parties would submit

18  what they felt would be relevant.  If that is not the case, I

19  don't see how summary judgment works.  Because we have an issue

20  here of the reasonableness of attorney's fees, really a factual

21  inquiry for the Court to make.

22        THE COURT:  I see.  And it arises -- it arises out of

23  NYMAGIC's declaratory judgment action, does it not?  That's why

24  we are having this discussion.

25        MR. CLYNE:  Yes.

85cPameC

1      THE COURT:  Would that be jury or nonjury?

2      MR. CLYNE:  I don't know if we ordered a jury.

3      MR. FROMM:  I don't think it is a jury.

4      THE COURT::  There is no jury demand?

5      MR. FROMM:  It is a maritime.

6      MR. SULLIVAN:  I am not sure, your Honor, but I do

7  believe we, in our counterclaim with you, also pled diversity.

8      MR. FROMM:  Your Honor, if I may, I thought we were

9  close on the stipulated facts.

10      I don't have an objection if they want to put in a

11  declaration, or whatever -- a declaration that puts in the

12  docket sheet, of whatever their litigation down in New Orleans,

13  I don't have an objection if they want to put a list of all the

14  plaintiffs in the case attached to the declaration.  My

15  objection is when I saw the stipulated facts when first

16  proposed with 187 paragraphs, it read like their brief that

17  they are going to submit to it Court, how many plaintiffs there

18  are with $7 claims in New Orleans is also irrelevant.

19      So I don't have an objection.

20      I thought we're real close on the stipulated facts.

21  And, quite frankly, you know, that's why I wrote to the Court.

22  But if it can be resolved that way, my client would like it

23  resolved that way.

24      THE COURT:  I certainly would.  I'll do it anyway.

25      MR. FROMM:  I don't know that they would.

85cPameC

1          MR. CLYNE:  Your Honor, when they cut out 90 percent

2     of what we wanted in the stipulated facts, and they said we are

3     close, I don't understand that.

4          Again, I am assuming your Honor has had cases where

5     it's been submitted, the trial has been submitted on the

6     written record.

7          THE COURT:  Yes.  Sure.

8          MR. CLYNE:  And that's sort of what I thought we were

9     doing here.  Maybe I am completely wrong about that.  But I

10    thought that we were making a written submission of the case.

11    And not being limited only to what we could stipulate to it in

12    terms of, and a brief.

13         THE COURT:  Well, I can tell you what procedure I

14    expect you to follow.  And maybe that's something that I can

15    make one more effort at.

16         What I can't do is to say with respect to a crucial

17    break in that structure, which must be made the subject of a

18    stipulated agreement of fact by the parties, I cannot compel

19    you to agree, that's up to you.  That's not up to me.

20         Now, the sense I have from what you said to each other

21    is, that it might very well be advisable for both of you to

22    think this through again, and see if it is not possible to

23    agree on a set of papers which would constitute a trial to the

24    Court on a stipulated record and briefs of counsel.  You are

25    entitled to put in briefs of counsel.  And clearly you don't

85cPameC

1   have to stipulate to the wisdom of each other's briefs.   It is

2   the question of whether you can give me or agree among

3   yourselves upon a factual record from which you can argue and I

4   can decide.

5           If that can be worked out, it is going to be a

6   time-saver.   And this is something I would like to achieve in

7   this case, for the reasons previously stated.

8           I am not sure, Mr. Clyne, that the contention that

9   they're turning down or not happy with 90 percent of what we

10  want to put in.   The concept, it seems to me, is not so much

11  quantitative as it is qualitative.

12          It does seem to me that in a situation where liability

13  issues are going to be resolved in the Eastern District of

14  Louisiana, in the context of the limitation proceeding or

15  direct action, or whatever, there really shouldn't be any

16  dispute.   And if there is, it should be resolved by judicial

17  notice of the magnitude and complexity of the litigation to the

18  extent that that is probative of the reasonableness of the

19  legal fees that LaFarge wants to incur and wants the

20  underwriters to pay for.

21          It is not that clear to me yet that we ought to just

22  give up on this process.

23          What do you mean, Mr. Fromm?

24          MR. FROMM:   I want to go forward.   I want to go

25  forward with the submission and get a decision.   And that's

85cPameC

1    what my client wants.

2        THE COURT:  And I should think your client should want

3    that too, badly, Mr. Clyne.

4        MR. CLYNE:  Absolutely, your Honor.  But we want to

5    make sure that the right record gets before the Court.

6        MR. FROMM:  Your Honor, I would have no objection, I

7    am not going to stipulate to facts that look like they are

8    facts of their opening brief, which is what I felt they were.

9    But, for example, I think we can go with the stipulated facts

10   that we sent you on the 9th, they were very minor changes from

11   what you proposed, after our go-arounds.  And then we can

12   stipulate, you know, you want to put in the docket sheet and

13   you could put in every pleading that's down in Louisiana, for

14   all I care, if that's what you want to do, and then make your

15   arguments from there.  And then put in the bills that we all

16   have exchanged of Goodwin Proctor and Chappy McCall.  I guess

17   we sent you Sadderfield & Webbs.  And put all that in the mix

18   and that's -- that will be fine with us.

19       MR. CLYNE:  If I could have Mr. Sullivan talk, because

20   he has been dealing extensively with this issue.

21       THE COURT:  Sure.

22       MR. SULLIVAN:  What he just said is actually, sounds

23   to me like maybe they are willing to restore a good portion of

24   that which they took out.  In our initial draft, proposed

25   stipulated facts, among other things, listed all the parties,

85cPameC

1   not all the plaintiffs, because the list of the plaintiffs, you

2   can't even print it out from the docket sheet because you would

3   run out of paper.  The only way to view the docket sheet is to

4   go online and do it.

5          But what we were able to do was synthesize the listing

6   of the defendants and the third-party defendants in the

7   consolidated action.  We listed them in the stipulation, they

8   wouldn't agree to.

9          So Now he is indicating that perhaps he would be

10  agreeable to something of that fact effect.

11         MR. FROMM:  What I said, I will state it for the third

12  time, I am not going to agree to stipulated facts that look

13  like your opening brief.  If you want to submit a declaration,

14  or you want us to just agree that here is the docket sheet

15  which lists all the parties, here is the pleadings, if you want

16  to put together the pleadings, we will agree those are the

17  pleadings, those are the docket sheets.

18         I am not going to let you characterize that in

19  stipulated facts, which is what I felt you were trying to do.

20         So I am willing to make it simple.  You want to submit

21  those raw documents and then argue from those documents in your

22  brief that the Court make the determination, that's fine.  But

23  I am not going to stipulate to the arguments that you are

24  deriving from documents.

25         MR. SULLIVAN:  It is somewhat deceptive to say that

85cPameC

1    what they weren't willing to agree to were argumentative facts.

2    Because there were just listings of parties, expert witnesses,

3    damage claims, et cetera.  That they wouldn't agree to.

4             THE COURT:  I am in no position to judge that.

5             MR. SULLIVAN:  I understand that completely.

6             What I am trying say is, we do think it could be

7    worked out.  But from our perspective, there can't just be a

8    blanket response that we are not going to agree to a series of

9    things.  Perhaps what we need is to try to put a draft

10   together.  When he says on April 9 that we were close, we were

11   close because we had given, and were under the conception,

12   perhaps the misconception from the Court's perspective, that we

13   would be permitted to supplement the stipulation with other

14   documents and, perhaps, declarations that really can't be

15   disputed as to the nature of the case down in New Orleans.

16            So when they say we were very close on April 9, we

17   were very close only because, from our side, we said, fine, you

18   are not willing to go this route, we will agree that this will

19   be the stipulation.  And then our thinking was, we are going to

20   supplement that stipulation with this additional information.

21            Perhaps at this point in time we should look to

22   supplement the stipulation if Mr. Fromm is indicating that he

23   is going to, perhaps, consent to more facts that can be gleaned

24   from the docket sheet and from the bills.

25            MR. FROMM:  Why don't we just put in the documents and

85cPameC

1    the bills.  And then you can characterize them anyway you want

2    in your brief.  I am not going to --

3              MR. CLYNE:  -- your Honor, if I may.

4              I think we need a little bit of time to try to sort

5    this out with Mr. Fromm.

6              THE COURT:  I sense the possibility that you may be

7    able to do that.  What is it, that wonderful expression,

8    discuss among yourselves.

9              And I think that I would not suggest that if it seems

10   that you were divided beyond any hope of salvation or

11   redemption.  But from the point of view of moving the case

12   along, I continue to favor this sort of stipulated, agreed,

13   whatever phrase you want to use.  I think we all know what we

14   are talking about.

15             And I think that when you exchange drafts, which are

16   not entirely satisfactory to each other, and then begin to

17   write letters to each other about how their drafts are not

18   satisfactory to you, sometimes the dialogue escalates or

19   reaches a place which is not entirely productive.

20             I would urge you to leave this place and go on talking

21   a bit more.  I think it is a good idea.  And there is enough

22   talent in this room to make it come to pass.

23             And I have trouble understanding why it should not be

24   possible, because the reasonableness of LaFarge's retention of

25   counsel, and the resulting obligation of the underwriters to

85cPameC

1   pay for some of it, or all of it, really should not require the

2   Court to do what the Louisiana court's going to have to do, and

3   that is go to an ultimate and final resolution of merits

4   issues.

5          Here is this awful thing that happened, here are these

6   claims, what is reasonable conduct for legal representation on

7   the part of a company like LaFarge, given all of the

8   circumstances which apply upon the reasonableness of their

9   retention.

10          It shouldn't be too hard to lay that record before me.

11          So I am going to ask you to do that.  And I expect to

12   hear from you in two weeks' time and tell me how you are doing.

13          Now, if during this session on that particular aspect

14   of the case, we do not achieve peace breaking out, then we will

15   have to resolve it some other way.

16          But I am not going to ask you to address that.  I

17   think it would be counterproductive to ask you to do that.

18          I command and direct you two weeks from today, which

19   will be May 26, to send me status letters, with copies to each

20   other, of course, and say either it's all been resolved and the

21   stipulated record is in the mail, or it hasn't, and here is

22   why.  And you can point fingers at each other if you wish.

23          But, if that's the kind of letter you write me, and I

24   hope it won't be, then I want you each to give me specific

25   suggestions of what happens next to resolve this.  What do you

85cPameC

1    need to put it in shape for final resolution and is discovery

2    necessary.  And, in short, what is Plan B, if Plan A doesn't

3    succeed.  What will the war look like if peace cannot be

4    declared.

5         You see what I need from you?

6         Okay, let me have those not later than May 26.

7         All right, I don't think we can say anything more

8    useful about this subject.

9         We will continue with you, Mr. Clyne, because I would

10   like you to say whatever is in your mind about American Club.

11   And you can make that quite brief, if, as I think one of the

12   letters suggests, I am not quite sure which, the second of the

13   three actions, the American Club's declaratory action for

14   noncoverage against your client LaFarge, if that's working its

15   way along through the litigation pipeline in an orderly way,

16   and we don't need to get into that at all this afternoon, and

17   just let that sort of motion practice litigation proceed, fine.

18        Anything you would like to speak to on that aspect of

19   the case?

20        MR. CLYNE:  Yes, your Honor.

21        First, let me say that LaFarge, again, would like to

22   see all these actions dealt with as soon as possible.

23        And I might add that with respect to the NYMAGIC

24   action, it could quickly become, not quickly, but at some point

25   it is going to become mute because in between the expert fees

85cPameC

1    that they are paying now, and their own attorney that they've

2    appointed, they've expended somewhere in the area of three and

3    a half million dollars on this $5 million policy.

4         THE COURT:  That leads to a question that I wanted to

5    ask you, arising out of the fact that NYMAGIC, as I understand

6    it, is both the primary underwriter and in some way excess, but

7    is that $5 million policy limitation applicable to both their

8    primary responsibility and their responsibility as excess?

9         MR. CLYNE:  No, your Honor.  There is a $5 million

10   layer that NYMAGIC is the sole insurer on.  And then there is

11   an excess layer of $45 million that Mr. Fromm's client,

12   NYMAGIC, and Mr. Nicoletti's clients, and following excess

13   underwriters.

14        THE COURT:  I see.  So NYMAGIC's potential exposure is

15   five million for primary, and they're well on their way to

16   exhausting that, followed by 50 million --

17        MR. CLYNE:  -- right.

18        THE COURT:  -- excess --

19        MR. NICOLETTI:  -- 45 million.

20        THE COURT:  -- 45 million.

21        How do your folks come in to it?

22        MR. NICOLETTI:  The excess policy is subscribed by

23   three underwriters, NYMAGIC, American Home and Northern

24   Insurance.

25        NYMAGIC, I believe, has 40 percent -- they have 40

85cPameC

1    percent of the 45 million.  My clients have 60 percent of the

2    45 million.  And although NYMAGIC is the lead underwriter per

3    clause, they have consented to the activity of the followers to

4    resolve their rights.

5            And if I just may make one further comment.

6            Mr. Clyne makes a very good point, he says the primary

7    policy had a $5 million limit which, based on my records, 3.7

8    million has been expended.  1.3 million remains.

9            If the NYMAGIC declaratory judgment action is resolved

10   more favorably to LaFarge, there is an automatic call on our

11   policy, close to $8 million, LaFarge has spent $10 million.

12           That's why we have an immediate interest in the

13   outcome of both the underlying NYMAGIC declaratory judgment

14   action and the club action, because either we sit 45 million

15   excess of five, or I sit 45 million excess of 45 billion.

16           THE COURT:  That makes perfect sense, because if there

17   ever there was a case which conceptually would involve the

18   concept of excess liability, it is Hurricane Katrina.

19           But back to you, Mr. Clyne, we are now in the context

20   of the club and LaFarge --

21           MR. CLYNE:   -- but if I could just make a correction.

22   I don't believe that Mr. Nicoletti's numbers are correct.  But

23   I think he is citing a 2004 policy.  And, in fact, the schedule

24   of insurance that he attached to your letter is, I believe, is

25   a 2004 schedule.

85cPameC

1          There is a 2005 policy in which NYMAGIC is the sole

2    underwriter on the primary layer and five million and 50

3    percent on the excess.

4          MR. NICOLETTI:   Let me correct that.

5          We did an investigation into this, and subsequent to

6    the '04 policy there was a further negotiation amongst the

7    broker, on behalf of LaFarge, and the three underwriters,

8    whereby American Home was asked to move from 25 percent to 35

9    percent with will all insured's being at 25.   In fact we pled

10   that in our particular pleading.   And we verified that three

11   ways from Sunday, simply because American Home's additional ten

12   percent meant an additional 4.5 million in liability.

13         So I can assure the Court, we did our due diligence on

14   this.   And NYMAGIC has only 40 percent on that excess policy.

15         Let me explain one further point.   Even if the $5

16   million is paid, doesn't make the entire action moot, because

17   there is a difference in the -- difference, in our opinions,

18   concerning how that 45 million is paid.

19         LaFarge takes the position they can spend that money

20   any way they wish on defense, because of an ultimate debt loss

21   provision.

22         Our position is, we follow NYMAGIC's method of paying

23   the underlying defense costs, and that NYMAGIC doesn't have the

24   right to unreasonably incur costs and charge it to our excess

25   policy.

85cPameC

1          THE COURT:  Fascinating.  I'm not sure how relevant it
2     is to the particular issues this afternoon.
3          I want to drag you back, Mr. Clyne, lead you back,
4     better word, to the litigation ongoing now between the American
5     Club and its declaratory action.  My sense of that is, that is,
6     it is working its way along the litigation pipeline.
7          I understand, and to a certain extent share with your
8     desire to move things along quickly, with respect to that
9     particular aspect of the case, American Club against LaFarge on
10    the issue of coverage or not, under the American Club policy,
11    do you suggest any fast-forward buttons the Court can push?  Or
12    are we just marching along the litigation developing as it does
13    in the usual course?
14         MR. CLYNE:  I am not sure how to fast forward that,
15    your Honor.  Fact discovery is now completed.  We've addressed
16    that.  We have a scheduling order and we should be ready for
17    trial very soon in that case.
18         It is a very large litigation, and there was some fact
19    discovery that needs to be done, we completed that now.  And I
20    think that that case is on track.
21         THE COURT:  Is on track.  And when you say on track,
22    is it your perception, and next I will hear from Mr. Woods, the
23    resolution of that case is, could not appropriately be by
24    summary disposition, it would have to be by trial?  Is that
25    right?  Or, and I don't mean to suggest the answer to you one

85cPameC

1   way or the other, factual discovery having been completed or

2   almost completed and so forth, in your view, is that the sort

3   of case which might be amenable to summary disposition under

4   Rule 56?

5           MR. CLYNE:  It's possible.  I believe the club is

6   going to make that motion sooner rather than later.

7           THE COURT::  If they do, you will probably resist it,

8   won't you?

9           MR. CLYNE:  We will resist it.

10          THE COURT:  But would you then cross move with the

11  perception that it is appropriate for summary disposition, it's

12  just you should win.

13          MR. CLYNE:  We might, your Honor, but I would like to

14  go through the expert phase of discovery before we do that.

15          THE COURT:  A careful answer.

16          Mr. Woods, we come to you.

17          MR. CLYNE:  Your Honor, could I just say one more

18  thing?

19          Your initial question in the beginning was, how could

20  this move along the fastest possible way, to get my client some

21  money.

22          And I believe the way that could be done is to resolve

23  this issue with NYMAGIC, because there is a

24  selection-of-counsel clause in the primary policy.  There is no

25  such clause in the excess policy.  And that's not to say that

85cPameC

1   there is not an issue there of reasonableness of attorneys'

2   fees.  But there is no selection-of-counsel clause that gives

3   them the right choose the counsel.

4          And I think that if we get a decision here sooner

5   rather than later, on NYMAGIC's responsibilities to indemnify

6   LaFarge for cost, it follows along, any excess underwriters

7   will be bound by that result as well

8          THE COURT:  Okay, that's a useful contribution.

9          MR. NICOLETTI:  May I be heard on that issue?

10         THE COURT:  Not quite yet.

11         Mr. Woods, it is your turn.  Speak as globally as you

12  like.

13         What would you like to see me do?  What would you like

14  to see me refrain from doing?  Where do you think we ought to

15  go next and how will we get there?

16         MR. WOODS:  Thank you, your Honor.

17         Let me go back to the beginning of our conference

18  here.  We talked about a martian who came down and looked at

19  all the policies, and what that martian might think as to

20  whether there was coverage or not.

21         And I want to point out that there are three policies

22  involved here.  And two of the three admit that they cover.  So

23  the martian would be right to think that there was coverage

24  there somewhere.  Two out of the threes do cover, and those are

25  the two policies we have been talking about up to now that

85cPameC

1    NYMAGIC participates in, both the excess and the primary.   And
2    they provide $50 million of coverage for LaFarge.   There is
3    plenty of protection there.

4            The only issue is as to the reasonableness of the
5    defense clauses.   I appreciate it.   And that is what they are
6    now thrashing out between themselves.   And hopefully will be
7    resolved soon.

8            But the $50 million in coverage under that -- under
9    those two policies is not enough possibly for indemnity of
10   LaFarge.

11           THE COURT:   And when you say those two policies, which
12   two policies are you talking about?

13           MR. WOODS:   I am referring to the $5 million primary
14   insured 100 percent by NYMAGIC, and the 45 million in excess
15   coverage that sits above that, which is insured by the three
16   insurers, including NYMAGIC and Mr. Nicoletti's two clients.

17           THE COURT:   But not American Club in any way?

18           MR. WOODS:   No.

19           THE COURT::   Tell me about American Club.

20           MR. WOODS:   Okay.   LaFarge made the claim on the club,
21   quite frankly, looking for a deep pocket here for the indemnity
22   side.   They made a claim on the club with respect to a vessel,
23   that's the barge ING 4727, which was not entered on the
24   schedule of vessels insured under LaFarge's certificate of
25   entry with the American Club.   And it is a vessel that is not

85cPameC

1    their vessel, they don't own it, they never chartered it.   And

2    the club never insured it.

3            They're looking for coverage under a chartered barge's

4    clause in the policy that would allow LaFarge, and did allow

5    LaFarge, to declare certain vessels, vessels that were

6    chartered by them, in which they obtained certain interests to

7    be insured by the club, but in the club's view, the breadth of

8    that chartered barge's clause is not wide enough to include the

9    ING 4727.

10            THE COURT:: Mr. Clyne has a contrary view on that.

11    And this is the issue that is going along being developed under

12    the litigation plan that we have for that particular case.

13    Isn't that so?

14            MR. WOODS:  That's exactly right, your Honor.  And we

15    are well along on that, I am pleased to say.  As Mr. Clyne has

16    pointed out, discovery has now closed, the deadline for fact

17    discovery has passed, we are now into the expert phase.  And

18    within two weeks we will be producing our expert report

19    followed by Mr. Clyne.  We are proceeding along the third

20    amended civil case management plan that your Honor signed back

21    on March 13.

22            THE COURT:  Have you any perception, when all that's

23    over, all the fact discovery has been taken, all the expert

24    discovery has been taken, all discovery has been taken, have

25    you any view, and I am not expressing, pressing you to express

85cPameC

1   one or not, whether or not at that stage, it would perhaps be

2   appropriate to summary disposition as opposed to a full plenary

3   trial?

4              MR. WOODS:   I have given that matter some thought,

5   your Honor.   And I believe that perhaps the best way for us to

6   proceed on this would be for Mr. Clyne and I to sit down and to

7   try to number one, agree on as many stipulated facts as we can.

8   And I think we will agree on most of the pertinent facts.

9              And then, perhaps, to try to shorten the litigation

10  process by perhaps submitting direct testimony to your Honor in

11  the form of witness statements, which would require then only

12  perhaps cross-examination of witnesses.

13             I think there are too many factual issues for us to

14  put a stipulated record before your Honor.

15             And I would reserve the right to make a Rule 56

16  motion.   However, I am probably leaning towards the view at

17  this point that it might be preferable, since I believe there

18  will be very few issues in dispute between us, to try to put a

19  complete record before your Honor in one fashion or another

20  from which you could make a decision on the basis of both

21  predominantly written material, but perhaps some live testimony

22  as well.

23             THE COURT:   Of this aspect of the case?  American Club

24  against LaFarge?

25             MR. WOODS:   Yes.

85cPameC

1      THE COURT:  Are you rising up the possibility of a

2  trial on stipulated facts?  I am not batting a thousand on that

3  so far in this case.

4      MR. WOODS:  No, as I said, I don't think we are going

5  to reach agreement on all of the necessary facts, to put a

6  stipulated record before you.  But the amount of testimony from

7  live witnesses I think can be drastically reduced.  There

8  aren't a lot of witnesses in this case.  A couple from each

9  side, from each party.

10      And then importantly, there is the testimony of the

11  broker in the case, who is a third party and not a party to the

12  case, whose employer is not a party to the case, and who,

13  therefore, will most likely be subpoenaed, and will have to

14  give testimony before you.  It is a very important witness.

15      But we feel with limited number of live witnesses, and

16  which I hope will be a largely stipulated factual record, we

17  can get this case before you and ready for your decision in

18  relatively short order, following the conclusion of the expert

19  discover.

20      THE COURT:  Is there a jury demand in this case or

21  not?

22      MR. WOODS:  There is a jury demand, your Honor.  And I

23  did want to bring that up, we are in the process of putting

24  finishing touches to strike that jury demand.  We think it

25  appropriate in this case for it to be a bench trial.

85cPameC

1      THE COURT:  So I gather that the jury was demanded by

2  LaFarge?

3      MR. WOODS:  Correct, your Honor.  In their answer they

4  demanded a jury.  We did not, in the original complaint, which

5  invoked Rule 9(h) admiralty jurisdiction of the Court.  But

6  also mentioned that there was a federal jurisdiction also on

7  diversity.

8      THE COURT:  If Mr. Woods moves to strike your jury

9  demand, will you oppose that motion?

10      MR. CLYNE:  We will oppose it.

11      THE COURT:  Okay.  So a threshold issue that emerges

12  is whether or not a jury is properly demanded in this case by

13  the defendant.

14      That's a question which has day-to-day meaning if, but

15  only if, it is not appropriate for summary disposition.

16      But as I listen to both of you express somewhat

17  differently, it doesn't sound as if either one of you, are of

18  the view that it would be appropriate for summary disposition.

19  And I am not saying it should be, I am just trying to get a

20  better handle for the case, you know, where we go next and how

21  we get there.

22      Would it be fair to say, Mr. Clyne, that you share

23  Mr. Woods's doubt that at the end of all discovery, fact and

24  expert, this would be an appropriate case for summary judgment

25  motions under Rule 56?

85cPameC

1      MR. CLYNE:  Yes, your Honor.

2      THE COURT::  And so say you both?

3      MR. WOODS:  I believe so, your Honor.

4      THE COURT:  Yeah, right.

5          So then it is going to be a plenary trial, and it will

6  either be jury or nonjury.  And whether -- if it is nonjury

7  that might have an impact on the precise form in which the

8  proof can be put in.  Whereas, if it is jury, it is not all

9  that easy to do that.  You read a jury a deposition as their

10  eyes glaze over.

11      MR. WOODS:  Right.  We think a fairly straight-forward

12  issue.  We are hoping that the motion to strike the jury will

13  be successful.

14      THE COURT:  I wonder if that might not be a useful

15  fast-forward button to push, Mr. Woods.  It is not going to go

16  directly to who wins and who loses, but when you look at the

17  whole picture, anything that can be done to clarify certain

18  collateral questions, which might have an impact upon how the

19  case reaches that point where it can be ultimately disposed of,

20  might be useful.

21      MR. WOODS:  Well, as I said, we are putting the

22  finishing touches on that brief, and we expect to have it filed

23  with the clerk very shortly.

24      THE COURT:  What does that mean, very shortly mean?

25      MR. WOODS:  Within the week, your Honor.

85cPameC

1      THE COURT:  Then I would not pressure you to do it any

2  more quickly than that.

3      And, Mr. Clyne, you will just oppose it in the period

4  of time specified by the rules, and let me know if you need

5  more time.

6      MR. CLYNE:  Yes, your Honor.

7      THE COURT::  He may dissuade you entirely.

8      MR. CLYNE:  It is apparently a hot issue, your Honor.

9  Certiorari has just been denied by the Supreme Court.  But this

10  issue has been percolating in the circuits of, whether there is

11  a right to a jury trial.

12      THE COURT:  It is a very interesting issue, and a lot

13  hangs on it.

14      MR. CLYNE:  Independent basis of jurisdiction --

15      THE COURT:  -- what was --

16      MR. CLYNE:  -- that decides that.

17      THE COURT::  It is a question of some significance.

18      All right, then I will look forward to that motion.

19      But it seems to me, Mr. Woods, that you probably

20  helped me all you can with respect to where we go next in the

21  American Club case against LaFarge.

22      You are going to try to knock his jury out of the

23  saddle, things are going along, neither one of you feel that it

24  would probably be appropriate for summary disposition.  And

25  that being the case, I would like to resolve the jury or

85cPameC

1    nonjury, do that sooner rather than later, use that phrase.  I

2    think it will help us.  Okay, I will look forward to those

3    papers.

4              All right, anyone else like a little break now?

5              I think we will take a ten-minute recess, you can stay

6    there or filter outside.  And then I will be able to give you

7    my undivided attention.

8              (Recess)

9              Mr. Nicoletti, it is your turn.  If you could command

10   my every word and action, what would you have me do and why?

11             MR. NICOLETTI:  Well, let me approach it back to

12   NYMAGIC.

13             NYMAGIC, as Mr. Clyne now wants to interject the

14   excess policy into any outcome or decision, I believe we need

15   to intervene on that case, to protect the interest of the

16   excess assurers, and to assist NYMAGIC in its primary arguments

17   under the policy.

18             THE COURT:  You mean Mr. Fromm's little old case about

19   paying for the one word offer.

20             MR. NICOLETTI:  That's correct.

21             The reason being, as Mr. Clyne did indicate, 3.7

22   million of the 5 million is gone, they spent 10 million.  We

23   follow that policy absent the American Club's reluctance to

24   pay, my underwriters will get a call for a million dollars.

25             That excess policy was not an issue in the present

49

85cPameC

1   pleadings of the NYMAGIC declaratory judgment action.   As long

2   as that was the case I was content to have the excess rights

3   developed in our own separate DJ action we recently filed.

4        But if he is going to bring the excess into that, or

5   in some way attempt to use NYMAGIC's DJ action as a springboard

6   to my excess policy, then we would like to intervene in that to

7   protect our interests.

8        THE COURT:  Well, you say uses a springboard.  But if

9   I am following the math, it is just a matter of time.

10       MR. NICOLETTI:  That's correct.

11       THE COURT:  It is like the Iraq war, every week it is

12  another quarter of a million dollars.  And before too much

13  longer -- what I am suggesting is the policy, the limits of the

14  NYMAGIC policy, are going to be exceeded no matter what the

15  Court does.

16       MR. NICOLETTI:  That is correct.  But it depends upon

17  how much it will be exceeded by, simply because it is our

18  position, as it is with NYMAGIC's, position that LaFarge does

19  not have the right to spend whatever it deem fit to defend

20  itself.

21       The underwriters are the ones who sold them that

22  coverage, they sold it with particular terms and conditions.

23  That's what governs what reasonable expenses should be paid for

24  defense costs.

25       Although this may be a huge case down in Louisiana, I

85cPameC

1    don't view this any differently then any claim with the amount

2    of claim in excess of policy limits.  Underwriter sends a

3    letter to the insured and advises that the amounts in excess,

4    the primary limits or total limits, they invite them to bring

5    counsel to the table to assist at their own expense.

6            In this case they jumped the gun, they brought their

7    own counsel in and want underwriters to pay from dollar one.

8    No matter what that amount be.

9            And that's contrary to the policy terms.

10           If you look at the primary policy, the only person it

11   has a right to name counsel, with the consent of LaFarge, is

12   NYMAGIC.

13           So to me the real issue is, did LaFarge unreasonably

14   withhold its consent to the selection of counsel by NYMAGIC,

15   and/or reasonably reject the five other counsel NYMAGIC

16   proffered to them.

17           To me that's the threshold issue.

18           And then the reasonable amount of attorneys fees.

19           THE COURT:  And as time goes by, and bills mount up,

20   you begin to perceive from the point of view of the excess

21   insurers, the need or the desirability to intervene in that

22   action to protect the interests of the excess insurers.  Is

23   that so?

24           MR. NICOLETTI:  That's correct.

25           THE COURT:  Would you perceive that to be intervention

85cPameC

1   as a right under subsection A, or permissive intervention under

2   subsection B?  Or have you not yet analyzed it that carefully?

3        MR. NICOLETTI:  We have not.  But I think it would be

4   as a matter of right, simply because they have not raised it in

5   their pleadings.  Had they raised the excess policy in their

6   pleadings, whether the complaint or particularly the answer, I

7   think that might focus more on the former as opposed to the

8   permissive.

9        THE COURT:  Well, are you declaring before us all your

10  intention to move to intervene in that action?

11       MR. NICOLETTI:  The answer to that question is subject

12  to what they put at issue in the NYMAGIC DJ.

13       Presently excess is not involved, so I will not

14  intervene.  If the stipulated facts involved excess, then I

15  would request intervention.

16       THE COURT:  Then let me ask you this, American Club

17  wants to get out, not pay anything.  LaFarge wants to keep them

18  in.  How does the resolution of that particular action

19  implicate the interests of the excess insurers?

20       Do you see what I am asking?

21       MR. NICOLETTI:  Absolutely.  That is my primary focus,

22  is the American Club.  I have excess policies.  I have two -- I

23  have multiple policies scheduled as being primary to my excess

24  policy.  Two of those policies is the NYMAGIC and the American

25  Club's policy they are my underlying.

85cPameC

1          Now, how are we involved with the primary action

2     between the club and LaFarge?

3          Very simply.

4          If the club is found to cover, based upon our analysis

5     of the other insurance clause, particularly since their

6     scheduling by underlying, we pay only after they pay.  So to me

7     the club action is the primary action.

8          THE COURT:  And when you say we pay only after they

9     pay, who is they?  LaFarge?

10          MR. NICOLETTI:  I'm sorry, no.  Excess underwriters

11     only pay after LaFarge pays -- I'm sorry, after the club pays,

12     if there is coverage under the club rules.  But there is an

13     alternative that I have to address also.

14          Based upon our policy language, if your Honor would

15     find the club does not cover because of, one, failure to report

16     on the part of LaFarge, or failure to show them an indemnity

17     contract, as Mr. Woods has alleged in his declaratory judgment

18     complaint, I have a warranty of maintaining underlying

19     insurance.

20          I would argue that you must maintain all of the

21     insurances, but you must maintain those that are relevant to

22     triggering my coverage if you find at a particular claim.

23          If you find that LaFarge failed to maintain the

24     coverage due to inadvertent error in reporting, or submission

25     of documents, based upon the language of my underlying

85cPameC

1    warranty, LaFarge then becomes a self-insured for the amount of

2    the club limit.  I pay after that self-insured retention has

3    been exhausted.

4              So we are intermixed in the club case in two fashions.

5    Coverage, if there is a coverage finding, we follow the club.

6    If there is no coverage finding because of an error, LaFarge

7    becomes our SIR instead of the club.

8              We are so intermittently involved, that we have a

9    motion, we are going to file it within the next seven days,

10   seeking to consolidate.

11             THE COURT::  Consolidate what?

12             MR. NICOLETTI:  Our excess action with American Club

13   versus LaFarge.

14             THE COURT:  I see.  I understand factual discovery is

15   closed.  But I do understand everyone admits there probably is

16   going to be a trial.  And with the outside possibility of a

17   jury trial.  That will not occur for at least four to six

18   months, based upon knowing how litigants are.

19             If we are given access to their pretrial discovery, I

20   can tell this Court within two weeks if I need additional

21   discovery.  And if I do, I will outline it in particular.  And

22   I promise the Court I will finish it in less than 45 days, if

23   not 30.  I will appoint my experts within that same time frame.

24   And I will participate in their expert discovery, so that we

25   can expedite this matter to trial.

85cPameC

1          THE COURT::   And that assumes that your motion to

2    consolidate your action with the action between the American

3    Club and LaFarge succeeded.

4          You have in mind making that motion.  You are going to

5    make that pretty quickly, is that right?

6          MR. NICOLETTI:   I happen to have the brief in my

7    briefcase right now, to correct this week, if I can get to it.

8          My point being is, we've analyzed this issue.  We have

9    absolute right to intervene because of the commonality of

10   issues of law and fact.  The only question is, will we delay

11   the trial of the American Club versus LaFarge action by that

12   consolidation.

13         THE COURT:   Well, you just said you have an absolute

14   right to intervene.  That would -- if correct --

15         MR. NICOLETTI:   -- consolidate, I'm sorry.  But for

16   your discretion as to whether or not we would delay the trial.

17         THE COURT:   You have an absolute right to move for

18   consolidation.

19         MR. NICOLETTI:   That's correct.

20         THE COURT:   Then it is your discretion and reviewable

21   for abuse.

22         But as far as intervention is concerned, you are

23   contemplating that, you are inclined to think -- withdrawn.

24         Play that one for me again, Mr. Nicoletti, intervene

25   in what?

85cPameC

1              MR. NICOLETTI:  If we have to intervene in NYMAGIC,

2    but move for consolidation with the American Club versus

3    LaFarge.

4              THE COURT:  This is why I ordered a transcript.  I

5    never would have remembered all of that.

6              MR. NICOLETTI:  And because part of the consolidation

7    requirements are that we not delay the trial, to assist you in

8    your discretion, I have laid out a schedule where that action

9    can continue while we catch up to speed, and expedite our own

10   discovery, if any is necessary.

11             THE COURT:  So it would be an intended motion to

12   exclude the brief, is in your briefcase, to consolidate the

13   excess insurer's action with American Club against LaFarge, to

14   consolidate.

15             MR. NICOLETTI:  That's correct.

16             THE COURT:  Those two actions.  For all purposes?

17             MR. NICOLETTI:  For all purposes.

18             THE COURT:  Let me look across the room on that.

19             Here is a threat or a promise, depending on how you

20   look at it, and it will be addressed to American Club and to

21   LaFarge.

22             Mr. Woods, you have any sort of curbstone reactions as

23   to how you feel about that?

24             MR. WOODS:  We would vociferously object.

25             THE COURT:  Not just object, but vociferously object.

85cPameC

1          MR. WOODS:  Vociferously object.  I want to make that
2    clear on the record.
3          That would not suit American Club, I will let Mr.
4    Clyne speak for himself, but I guess it will not suit LaFarge
5    either.
6          Just taking it on its face, the two causes of action
7    that the excess following underwriters have raised against the
8    American Club are, number one, that that the club owes LaFarge
9    a duty of indemnity in defense under their policy.  In other
10   words, that the club covers LaFarge.
11         That's the exact issue we've now been litigating for
12   two years with LaFarge, and are close to putting before you and
13   resolving.
14         THE COURT:  Well, with respect, I don't need to hear
15   the argument in opposition.  I don't think it is proper for a
16   trial judge to say to counsel, you cannot make a motion that
17   you want to make, you may lose it.  But counsel has the right
18   to make it.  I was just getting a calendar, and you are going
19   to oppose it.
20         How about you, Mr. Clyne?
21         MR. CLYNE:  We will oppose it too, your Honor, and
22   cross move to dismiss the claims against LaFarge.  We believe
23   that the reading of that clause that Mr. Nicoletti mentioned in
24   the excess policy, maintenance of the underlying insurance, is
25   our obligation.  So have P and I insurance, which we did.  And

85cPameC

1    is not in dispute.

2            THE COURT:  I think it was in one of your most recent

3    letters that I read, an intention to move to dismiss the excess

4    insurer's complaint.  Or was it only part of the claims and not

5    all of them?

6            MR. CLYNE:  Well, it was the claims -- the first cause

7    of action is against the American Club seeking a declaration as

8    to coverage.  And Mr. Woods will be dealing with that.

9            Second, third and fourth causes of action deal with

10   LaFarge.  And the principal claim is that if there is no

11   coverage, we are self-insured, for $2 billion.

12           We disagree and we think your Honor can decide that

13   simply on the reading of the clause, the undisputed facts in

14   the case.

15           THE COURT:  So when Mr. Nicoletti hits you with his

16   motion to consolidate, you will oppose that motion and cross

17   move.

18           MR. CLYNE:  To dismiss.

19           THE COURT:  To dismiss.

20           MR. CLYNE:  Right.

21           THE COURT:  The claims asserted by the excess insurers

22   against LaFarge.

23           MR. CLYNE:  Right.

24           THE COURT:  So then there will be cross-motions and

25   the usual briefs in support and replies and so forth.

85cPameC

1    And, well, that's going to happen pretty soon.

2    And I don't need to make any scheduling order about

3    that.   One of the things I wanted to test with you all during

4    this session, was what kind of contemplated motions were out

5    there, and what sort of schedule, if any, should I give you.

6    Well, I am getting a better idea of what kinds of

7    motions are out there.   But I think you are so close to making

8    them, or about to make them, you don't need any scheduling

9    order from me.   I will simply say to anyone whose is

10   contemplating making a motion, go ahead and make it, make it as

11   expeditiously as you can.

12   I never thought that it was proper for a trial judge

13   to require counsel to obtain his or her permission to make a

14   motion of the sort which the rules provide parties can make.

15   So go ahead.

16   I got some motions coming my way.   One is the one

17   we've just been speaking about that Mr. Nicoletti is going to

18   make.

19   Were we speaking at an earlier time of some other

20   motion that someone is making?   Refresh my recollection on

21   that.   You were going to do something about that.

22   MR. WOODS:   Yes, your Honor, on behalf of the club, I

23   guess we'll make it a cross-motion as well now if Mr. Nicoletti

24   makes his motion, to stay the action by the excess following

25   underwriters pending resolution of the issues in our

85cPameC

1   declaratory judgment action.

2           THE COURT:  That's what I was thinking of.  And it

3   seems to me that from a procedural point of view, as a

4   procedural vehicle, a cross-motion in response to his motion to

5   consolidate, that would fit very neatly, it seems to me.

6           MR. WOODS:  I would think so as well, your Honor.

7           THE COURT:  All right.  So why don't you do that?

8   Okay.

9           Now, Mr. Nicoletti, would you like to unburden

10  yourself in any other way?

11          MR. NICOLETTI:  Well, I would like to burden myself a

12  little more this way.

13          I would like the Court to order the production of all

14  discovery had in the club and LaFarge action.  We are willing

15  to sign the stipulation of confidentiality as written and

16  agreed by Mr. Woods and by Mr. Clyne.

17          In that way we won't be wasting any time.  In the

18  event you grant my motion, I will have the discovery.

19          THE COURT:  Okay.

20          MR. NICOLETTI:  Which is of no great burden, since it

21  is only a copying job.

22          THE COURT:  What you just suggested, assumes that you

23  are going to win your motion to consolidate.  Isn't that so?

24  Isn't it a way of implementing that motion if you win?

25          MR. NICOLETTI:  Not at all.  I am trying to expedite

85cPameC

1    discovery in my own case.  And that's a matter in which to do

2    it.

3            And since it is merely a copying job for both

4    gentlemen, or their staffs, as opposed to they themselves

5    having to be involved with it, it is really no burden on them

6    to produce that material to me, which would be required

7    subsequent to a Rule 26(f) conference in any event.

8            MR. CLYNE:  Once again, we are making a motion to

9    dismiss that action.  So it is sort of putting the cart before

10   the horse.

11           MR. WOODS:  Similarly we are making a motion to stay.

12   On top of that, it is not just a simple copying job.  There are

13   other issues that may arise there, as to their entitlement, for

14   instance, to see some of the documentation, to see some of the

15   confidential documents.  We may have some problems to producing

16   it to third parties to our contract.

17           THE COURT:  I think I am not going to give you that

18   sort of relief this afternoon, Mr. Nicoletti.  Generally

19   speaking, I think it is better.  There are some exceptions to

20   the rule, but generally I think it is better if there is a

21   substantive motion which might do away with the litigation or

22   stay it.  I think it is better to hold discovery in abeyance

23   and see what comes of it.

24           So I think you ought to fire away on your

25   consolidation motion.  And then when the cross motions are

85cPameC

1    filed and decided, and you are still standing, then you can

2    come back and tell me about discovery matters.

3              MR. NICOLETTI:  Well, if I am still standing, your

4    Honor, and assuming that you consolidate it, I will remind the

5    Court that I requested the expedited discovery as a means of

6    satisfying your discretionary role in the motion to

7    consolidate.

8              THE COURT::  Yes, that would be a fair thing for you

9    to do.  But just to avoid the risk if I forget, put it in your

10   motion papers originally for a consolidation.

11             MR. NICOLETTI:  I will.  I will put together what we

12   are willing to do.

13             THE COURT:  Yes.  What you are willing to do if I'm

14   willing the do the other.  Okay.

15             That's a fair point for you to make, because it is

16   broadly discretionary as far as the trial judge is concerned.

17             So give me every little straw of discretion you hope

18   me to weave into the brick of relief that I grant you.

19             But you are going to have cross-motions coming at you.

20   And it will be very interesting.

21             All right, this has been wonderfully helpful for me.

22             I will receive any other business that should fairly

23   or usefully come before the meeting.  I think I have.

24             Have we run through the questions we have?

25             THE LAW CLERK:  Yes.

85cPameC

1          THE COURT:  I'd be glad to hear anything else that

2     anyone wants to say as long as it has some discernable

3     relationship to the case.

4          Going once.  Going twice.

5          We're adjourned.

6          Get your motion papers in, I'll look forward to them.

7     And then you will be hearing from me as quickly as you can.

8          I think this has been very useful.  Remember, please,

9     to order up the transcript, expedited.  Split the costs four

10    ways and everything is reserved on everything.

11

12                              o0o

13

14

15

16

17

18

19

20

21

22

23

24

25