UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * * | |
| CONSOLIDATED LITIGATION | * * | CIVIL ACTION |
| | * | NO. 05-4182 |
| | * | and consolidated cases |
| PERTAINS TO: BARGE | * * | SECTION "K" (2) |
| *Boutte v. Lafarge*         05-5531 | * | |
| *Mumford v. Ingram*      05-5724 | * | |
| *Lagarde v. Lafarge*       06-5342 | * | JUDGE |
| *Perry v. Ingram*            06-6299 | * | STANWOOD R. DUVAL, JR. |
| *Benoit v. Lafarge*         06-7516 | * | |
| *Parfait Family v. USA*   07-3500 | * * | MAGISTRATE JOSEPH C. WILKINSON, JR. |
| | * | |

**REPLY MEMORANDUM ON BEHALF OF LAFARGE NORTH AMERICA PURSUANT TO MINUTE ENTRY OF JULY 1, 2008**

**PRELIMINARY STATEMENT**

Lafarge North America Inc. ("LNA"), pursuant to the Court's July 1, 2008, Minute Entry, responds to the Barge Plaintiffs' Memorandum dated July 14, 2008. LNA does not oppose the application of the Barge Plaintiffs that this Court adjudicate their claims against the American Steamship Owners Mutual Protection & Indemnity Association, Inc. ("the American Club"). To

1149065-1                                                                1

the contrary, LNA vigorously fought to have the American Club's declaratory judgment action transferred from the Southern District of New York to this court.

Nevertheless, LNA takes issue with the Barge Plaintiffs' casting of unnecessary and untrue aspersions against LNA that can only reflect an attempt to prejudice the Court against LNA. Those false allegations themselves are entirely irrelevant and therefore add nothing to the issues currently before the Court.

### SUMMARY OF LNA'S POSITION ON THE COURT'S INQUIRIES

Setting aside the Barge Plaintiffs' far-fetched allegations concerning LNA, which are unrelated to the issue at hand, LNA's responses to the Court's questions as framed in its Minute Order (Rec. Doc. 13701) may be summarized as follows:

1. "Efficacy and need [to] adjudicate coverage issues." LNA does not oppose the Barge Plaintiffs' proposal that they be permitted to file a motion for summary judgment against the American Club, and agrees that such adjudication may promote judicial economy.

2. "Effect of issue preclusion." LNA agrees with the plaintiffs that the New York court's ruling will have no preclusive effect on plaintiffs' claims in this Court.

3. "Efficacy of referring this matter to the MDL panel." LNA agrees that the matter should not be referred to the MDL panel.

4. "Whether plaintiffs intend to pursue only the American Club in this matter." Plaintiffs' motion does not suggest they intend to continue pursuing claims against the three other carriers whom they have sued (NYMAGIC, IMU, and AHC). The deadline for adding other parties has long since expired, and all facts referenced in plaintiffs' brief were a matter of public knowledge before that deadline expired. Thus it appears the American Club is the only direct defendant whom plaintiffs are pursuing in this Court.

## **BACKGROUND FACTS OF THE CLAIM**

The litigation in New York is a direct result of a blatant attempt by the American Club to preempt and circumvent this Court's adjudication of coverage. In its race to judgment the American Club filed its declaratory judgment complaint prematurely and in violation of the Club's own rules. Until that point , and contrary to the suggestions of the Barge Plaintiffs, LNA had pursued its claim vigorously with the American Club. LNA sought indemnification for defense costs and any potential liability it might have resulting from this litigation from September 2005 through the date the American Club filed its declaratory judgment complaint. Curiously, the Barge Plaintiffs' memorandum omits the course of conduct by the American Club that facilitated its declaratory judgment action (ie., denying LNA the opportunity to satisfy the conditions precedent to the filing of suit against the American Club for breach of the policy of Protection & Indemnity insurance).

**The Club's Improper Handling of LNA's Claim**

The following chronology in relation to LNA's claim is undisputed and is relevant to this Court's consideration of the matter at hand. LNA promptly notified the American Club upon discovery of the breakaway of barge ING 4727. The American Club responded on September 23, 2005, with a letter denying coverage based on the Club's inappropriately narrow view that barge ING 4727 was not entered with the Club. Throughout the fall and winter of 2005 LNA attempted to resolve the coverage issue, to no avail, through discussions and meetings with Club representatives.

Given the impasse in discussions with American Club, and in compliance with Rule 1.4.43 of the Rules of the American Club (which requires all disputes to be submitted to the Club's Board of Directors for resolution as a predicate to any legal action), LNA wrote to the

Club's Managers[1] in early March 2006 to once again layout the legal and factual predicate for its claim for coverage and to request that the claim be adjudicated by the Board. The head of claims for the Club's Managers disingenuously replied in writing that LNA's request was too late to place the claim on the agenda of the upcoming March meeting and that LNA's claim could not be considered until the Board Meeting of June 2006.[2] Club Rule 1.4.43 also provides that no litigation can be commenced by a member (<u>i.e.</u>, LNA) until the claim has been ruled on by the Club's Board of Directors or until three months without a decision have passed. Consequently, LNA was hamstrung and unable to commence suit while it was waiting for its claim to be heard by the American Club's Board.

While delaying LNA from placing its claim before the Board, which would have allowed LNA to satisfy a condition precedent to filing suit against the American Club for breach of the policy, the Club was surreptitiously moving forward with its denial and near simultaneous filing of the New York declaratory judgment action. On Friday April 21, 2006, the Club's outside counsel sent a letter to LNA's counsel advising that LNA's claim was being denied, without the Managers' submission of LNA's claim to the Board, despite the requirements of the Club Rules. On Monday, April 24, 2006, the next business day, the American Club filed its declaratory judgment complaint in the Southern District of New York. The American Club's complaint and accompanying civil cover sheet both were dated April 21, 2006, the same date as the denial letter. By filing its declaratory judgment action instead of placing the disputed LNA claim

---

[1] Shipowners' Claims Bureau ("SCB") is designated in the American Club Rules as the Managers of the American Club and handles all claims and underwriting functions for the Club.

[2] SCB's CEO, who also serves as the Secretary for the Club's Board, testified during his deposition in the New York action that he could not recall having been advised that LNA had made a request for Board consideration of its claim, and certainly could not recall advising anyone that the agenda for the March 2006 Board meeting could not accommodate LNA's claim. This testimony strongly suggests that the Club's head of claims engaged in bad faith by misrepresenting whether the Board could hear LNA's claim in March 2006.

before the Club's Board, the Club violated its own rules and succeeded in denying LNA access to the Board. Thus, only through unfair play was the American Club able to "win" the race to the courthouse.[3]

LNA responded to the Club's complaint with a motion under 28 U.S.C. § 1404(a) to transfer the case to this Court or, in the alternative, to stay the New York matter pending the outcome of this case. LNA's motion addressed all of the factors relevant to transfer and was argued vigorously. The primary basis for LNA's motion was indeed the first-filed rule, as some of the Barge Plaintiffs had filed direct action complaints against the American Club as early as two months before the Club commenced its action in the Southern District of New York.

Judge Haight of the Southern District of New York denied LNA's motion, holding that it was within his discretion to refrain from applying the first-filed rule because there was "a showing of balance of convenience or special circumstances giving priority to the second case." 474 F. Supp. 2d 474, 481 (S.D.N.Y. 2007). In large part, Judge Haight concluded that the center of the insurance litigation was not clearly in New Orleans (*Id.* at 483-85), and that the coverage case could be resolved more quickly in New York than in New Orleans (*Id.* at 488-89). Accordingly, he determined that effect of the first-filed rule was outweighed by what he considered to be the close period of time between the filing of the direct action complaints and the American Club's filing, as well as the likelihood of a lengthy litigation process in New Orleans. At the time the Barge track was in Judge Berrigan's Court and neither the parties nor the Court were attempting to move it forward.

---

[3] Technically, the American Club did not win the race, as direct action cases had already been filed. However, the American Club attempted to press the New York action while delaying adjudication of the direct action claims in New Orleans. In addition, by suing LNA in New York, the Club was able to pretermit any opportunity LNA might otherwise have had to pursue its own claims in New Orleans, to the extent the filing of the direct action might have provided an opening for it to do so.

The Barge Plaintiffs state, "Lafarge allowed the adverse ruling in the Southern District of New York to stand without challenge" (Memorandum at 5), as if to imply that LNA should have sought to overturn the decision. The Barge Plaintiffs' suggestion overlooks that, short of the drastic remedy of mandamus, LNA had few avenues, if any, available to have Judge Haight's decision reviewed. Because the denial of the motion to transfer was an interlocutory order from which no right of appeal lay under 28 U.S.C. § 1292(a), LNA would have had to obtain leave to appeal from both Judge Haight and the Second Circuit, an application that is granted extremely rarely. A motion to reargue was technically available, but because Judge Haight did not clearly overlook any governing authority or facts, such a motion would have had little chance of success. LNA unquestionably was disappointed with Judge Haight's ruling, but challenging it would have been a useless expenditure of judicial and LNA's resources.

The Plaintiffs improperly suggest that LNA deceptively failed to advise them about the American Club's denial of coverage. Not only were the American Club's coverage position and declaratory judgment action common knowledge among counsel in New Orleans, but the Barge Plaintiffs' contention overlooks that their discovery demands never requested information about the status of coverage with the American Club, only the identity of the insurer and policy, requests with which LNA duly complied. Because of Judge Haight's ruling and the fact that the Rules of the American Club contained a forum selection clause requiring any suit by LNA to be filed in the Southern District of New York, LNA was prohibited from cross claiming against the Club in this action, and could only counterclaim in the New York action. Of course, LNA had

no control over the manner and extent to which the American Club laid out its grounds for denial before this Court.[4]

The Barge Plaintiffs accuse the American Club of misleading Judge Haight by stating in its opposition that LNA was a publicly traded corporation, when LNA's French parent had recently taken the corporation private and de-listed it from the New York Stock Exchange. This corporate transaction was first announced to the public in early 2006, and had been a matter of public record, public scrutiny, and public filings throughout the early part of that year.[5] Thus the pendency and existence of this transaction was not some nefarious "secret" despite plaintiffs' attempts to portray it as such.[6] Regardless of whether the Club's representations were accurate or inaccurate, LNA does not believe that the representation played any significant role in persuading Judge Haight to deny the transfer motion, as Judge Haight clearly was more concerned with the nature of the litigation before his court and before this Court, and concluded that judicial efficiency warranted his retention of the case.

The American Club did, however, make troubling representations to Judge Haight concerning the issues it expected to litigate in the New York action and the scope of discovery, much of which certainly turned out to be untrue. The American Club represented to Judge Haight that the New York action presented a straightforward case of insurance policy interpretation, and that discovery would be limited to LNA's entry into the Club and the facts surrounding the drafting of LNA's Certificate of Entry with the Club, under which LNA has

---

[4] The Amended Answer of the American Club does not interpose coverage defenses; rather the Club merely invokes the terms and conditions of the policy (ie., the Certificate of Entry and Club Rules).

[5] See, e.g., Jerry Knight, "French Parent Targets Huge But Little-Known Lafarge North America," *Washington Post*, February 13, 2006 (Exhibit 1 hereto).

[6] Indeed, if the transaction had any relevance at all to this litigation – which it does not – then plaintiffs could and should have addressed in early 2006, when it was announced.

claimed coverage. The Club argued that the locus of the operative facts, witnesses and documents was New York rather than New Orleans. Among other things, it stated that "the need for testimony from any Ingram representative is highly unlikely". It concluded by stating that "[t]he events occurring in New Orleans are simply not germane to any aspect of the issue of the coverage afforded by the Club." (Opposition Memorandum at 13). However, a significant amount of the discovery the American Club eventually sought from LNA concerned LNA's operations in New Orleans and other evidence unrelated to LNA's entry into the Club or the negotiation of the language in LNA's Certificate of Entry. For example, the Club subpoenaed Ingram and took the deposition of an Ingram witness in Nashville, while requesting from LNA "[a]ll transportation agreements entered into between Lafarge and Ingram from February 1, 1999, through March 31, 2006". (Club's Second Request for Production of Documents to Lafarge, dated December 27, 2007). With regard to LNA's New Orleans operations, the Club requested "[a]ll documents evidencing vessel activity at the New Orleans Facility from January 1, 1999 to present including, but not limited to, the names of vessels that arrived at the facility . . ." as well as "[a]ll communications or documents concerning the Katrina claims which relate to Lafarge's allegations that it is entitled to coverage from the Club for these claims." (Club's First Request for Production of Documents to Lafarge, dated June 15, 2007). The Club also served LNA with interrogatories requesting that LNA identify "the person or persons with the most knowledge concerning the vessels that docked at the New Orleans facility from 1999 to present", and "each and every person with knowledge of Lafarge's alleged acquisition of am insurable interest in the ING 4727". These demands required LNA to produce a tremendous quantity of documents from New Orleans, including all documents LNA had produced in the Barge Litigation, and to identify numerous witnesses located in New Orleans and/or germane to New

Orleans operations (including, ultimately, deposition testimony), thus demonstrating the obviously strong connection between New Orleans and coverage issues.

**The Coverage Case Is Ripe for Summary Judgment**

Discovery in the New York action is largely finished, subject only to the completion of the depositions of each side's expert. Whether the coverage case proceeds in New York or this Court, the discovery LNA and the American Club have exchanged confirms that, in the unlikely event the Barge Plaintiffs can establish liability on the part of LNA for the breach of the IHNC levee, any such liability would be within the coverage afforded to LNA under its membership with the American Club.

The terms and conditions of LNA's coverage with the American Club are set out in the American Club Rules and LNA's Certificate of Entry. The Chartered Barges clause of the Certificate of Entry provides in pertinent part as follows:

> If Lafarge Corporation et al. acquires *an insurable interest* in any vessel in addition to or in substitution of those set forth herein, through purchase, charter, lease or otherwise, such insurance as is afforded hereunder to any similar vessel *shall automatically cover such additional vessel* effective from the date and time the Assured acquires an insurable interest in such additional vessel. (Emphasis added).

Under the Chartered Barges clause, LNA automatically becomes covered for any vessel in which it acquires an insurable interest. The only conditions related to this automatic coverage are that the vessel be "in addition to or substitution" for vessels identified in the Certificate, and that LNA acquire its interest "through purchase, charter, lease or *otherwise*" (emphasis added). LNA maintains that its use of ING 4727 was certainly in addition to or substitution of its use of the barges listed in the Certificate, as it used the barge at issue for the same purpose that it used the listed barges—to transport cement from one facility to another. In addition, it acquired its insurable interest by way of purchase, charter, lease or otherwise—Ingram supplied ING 4727 to

LNA under a Transportation Agreement under which materials were moved from LNA's Joppa facility to its New Orleans facility.

The American Club has indicated that the term "or otherwise" should be read so narrowly as to limit its application only to those types of commercial arrangements that are identical to a charter or lease. The Club further argues that the Transportation Agreement is not similar to a charter or lease because the contract states that it is not to be construed as a charter, lease or hiring of any barge and that Ingram is at all times an independent contractor. However, the terms of the Transportation Agreement are clearly for <u>commercial</u> purposes and have no bearing on insurance coverage. The Club's perfunctory reliance on this language in the Transportation Agreement indicates that it seeks to read the term "or otherwise" entirely out of the Certificate of Entry, by limiting its application solely to vessels that LNA has chartered or leased. Because the rules of contract interpretation require that all terms in a contract be given meaning, the omnibus term "or otherwise" cannot be ignored as the American Club has sought to do.

The Certificate of Entry therefore must necessarily cover situations where LNA acquired an insurable interest other than as a charterer or lessee. The Barge Plaintiffs maintain that LNA had assumed responsibility for the shifting and safety of the barge, particularly once it became clear that the barge would not be retrieved by Zito, the fleet to which it would have been taken. Moreover, the broad insuring clause of Club Rules provides coverage well beyond the liability of just a vessel owner, as set out in Class I, Rule 2: "Risks and Losses Covered", and would certainly cover LNA for the claims alleged in this case:

> Each Member of the Association shall be indemnified in connection with each vessel entered in the Association for Protection and Indemnity insurance against any loss, damage or expense which the Member shall become liable to pay by reason of the fact that the Member is the owner (or operator, manager, charterer, mortgagee, trustee, receiver or agent, as the case may be) of the insured vessel, subject to the provisions of these Rules and to all limitations stated . . .

There is no question that LNA had an insurable interest in ING 4727. The definition of an insurable interest in relation to a marine policy is broad, and generally renders any pecuniary interest or risk of loss in marine property insurable. Under a liability policy, a carrier or bailee has an insurable interest in the property in its care as long as it can be held liable for the loss of that property.

LNA, as the shipper in the "Transportation Agreement" between LNA and Ingram, was a user of the barge over a certain period of time including movements of the barge for which LNA was responsible, giving it an insurable interest through "charter, lease or otherwise." A person has an insurable interest "where he stands in any legal or equitable relation to the adventure or to any insurable property at risk therein, in consequence of which he may benefit by the safety or due arrival of insurable property, or may be prejudiced by its loss, or by damage thereto, or by detention thereof, or may incur liability in respect thereof." [7] As evidenced by the allegations in the case at bar, LNA's interest in and use of the barge has exposed it to liabilities that may result from the loss of the barge, damage allegedly caused by the barge, and the damage claims by the plaintiffs herein.

The Club's narrow reading of the chartered barges clause disregards this rule of law. It also overlooks several sections of the Club Rules, wherein insurance is provided even when the Member's role is not limited to that of an owner, charterer or lessee, such as Rule 2's very broad insuring clause. The limited service provided in the Transportation Agreement leaves sufficient responsibility for barges to LNA to be akin to a lease or charter. That contract is a commercial agreement, like a charter or lease, that grants LNA use of barges to transport cargo and allows it

---

[7] Force, Robert, *Admiralty and Maritime Law* (Federal Judicial Center 2004), p. 184, wherein the writer states that this definition, of insurable interest, as set forth in the British Marine Insurance Act, is "an appropriate statement of U. S. law."

to handle barges itself outside of the Agreement. Aside from the agreement, the circumstances at LNA's terminal as Hurricane Katrina approached imposed obligations upon LNA to handle the barge in a manner similar to that of a charterer, lessee and/or bailee. In light of the approaching storm and the fact that the barge had not been and would likely not be retrieved by Zito, LNA had to take the steps necessary to secure the barge, including hiring a tug to shift its location so that it would not be against LNA's dock. Accordingly, the undisputed evidence adduced to date establishes LNA's right to coverage under the American Club policy.

## QUESTIONS POSED IN THE COURT'S MINUTE ENTRY OF JULY 1, 2008

**Issue Preclusion by a Ruling from New York**

As LNA argued to Judge Haight in New York, a ruling in favor of the American Club in New York will not preclude the Barge Plaintiffs from maintaining their direct action claims. Collateral estoppel has consistently been held to require that, before a party can be estopped, it must be a party to the earlier proceedings or have a minimum level of privity with a prior party, which does not apply in this case. LNA and the Barge Plaintiffs are unquestionably and vigorously adverse and not in privity with each other. Judge Haight did not reach any determination as to the extent of the collateral estoppel effect of any rulings he might issue, but rather only acknowledged the unsettled nature of the Fifth Circuit's jurisprudence in this area. He did indicate that a ruling by him might have persuasive effect on this Court, but went no further. Instead, he acknowledged the risk of inconsistent outcomes between his court and this Court, but concluded that the Club's right to a prompt determination of coverage outweighed this risk, a consideration now diminished by the Club's extensive discovery efforts in New York.

Consistent with its argument before Judge Haight in the motion to transfer, LNA essentially agrees with the analysis the Barge Plaintiffs have set out on the issue of collateral estoppel. The Barge Plaintiffs are not parties to the New York proceedings and will undoubtedly argue in a later proceeding in this Court that they were not in privity with LNA or any other party in New York. Moreover, to the extent the direct action statute requires the Barge Plaintiffs' claims to be decided under Louisiana law, LNA does not take issue with plaintiffs' concern that a decision by Judge Haight under a different body of law might not be consistent with the direct action statute.

**Status of Claims Against Other Insurer-Defendants**

The Barge Plaintiffs mention in their memorandum the possibility of exploring Commercial General Liability and Bumbershoot coverages. However, the time for impleader of other insurers has long since expired. In particular, the deadline for adding new parties to this litigation was July 17, 2006. Rec. Doc. 199 in No. 05-4419 and consolidated cases. As of that date, LNA had produced all insurance policies that it believed provide coverage for the August 28-29 occurrence in response to plaintiffs' discovery requests. Also as of that date, the corporate share repurchase transaction referenced in plaintiffs' brief was – and had for months been – a matter of public record and scrutiny. Thus, if plaintiffs believed that this transaction made it "necessary to explore the existence of other coverages of LNA," they could have addressed that necessity in a timely manner. At this stage, more than two years have passed since the deadline to add new parties, and LNA submits that the Barge plaintiffs will not be permitted to go back and add new parties now based on arguments that should have been made, if at all, more than two years ago.

Inexplicably, the Barge Plaintiffs do not mention their pursuit of LNA's other marine liability insurers that are already party to these proceedings. The Plaintiffs have filed direct action complaints against NYMAGIC, IMU and AHAC. Apparently the plaintiffs have determined that they will no longer pursue direct action complaints on the coverage afforded by these carriers. If that is the case, the insurance coverage litigation in this Court would potentially be much less complex than the litigation in New York. The New York litigation involving these carriers has recently been complicated by new arguments raised by certain insurers regarding the existence of coverage.

NYMAGIC issued a primary marine liabilities policy to LNA with a limit of $5 million, which includes defense costs within its coverage limits. NYMAGIC, IMU and AHAC issued an excess marine liabilities policy, on which NYMAGIC is designated as the lead insurer, whose decisions on coverage are binding on IMU and AHAC. This Excess Policy purports to be excess to both the NYMAGIC primary policy and the American Club coverage. LNA maintains, however, that the Excess Policy provides coverage as soon as the NYMAGIC primary policy limit is exhausted, regardless of whether the Barge Plaintiffs' claims implicate the protection and indemnity risks of the American Club policy. The policy limit on the Excess Policy is $45 million.

The status of coverage to LNA on these marine policies is unsettled. LNA has been sued in New York by all of its marine liability insurers, each declaratory judgment complaint seeking different scopes of limitation on coverage. Aside from the American Club's complaint for complete exoneration from coverage for liability and defense costs, LNA has been sued on both its primary marine liabilities policy with NYMAGIC and its excess marine liability policy with

NYMAGIC, IMU and AHAC.  All three declaratory judgment cases are assigned to Judge Haight.

On the primary policy, NYMAGIC has sought a declaration that it is not obligated to indemnify LNA for certain defense costs in the proceedings before this Court that it has not pre-approved.  NYMAGIC has been paying certain costs associated with LNA's defense, the sum of which is quickly approaching the policy limit of $5 million.

On the excess policy, IMU and AHAC have filed a declaratory judgment complaint against both LNA and the American Club, arguing, among other things, that the American Club policy obligates the Club to cover LNA for the claims asserted in these proceedings, and that coverage on the Excess Policy does not begin until the limits of the American Club coverage are exhausted.  The complaint of IMU and AHAC also contains a claim that LNA is self-insured for the amounts of the American Club coverage in the event the American Club coverage does not apply due to a failure by LNA to fully maintain that coverage, before the Excess Policy applies.  Despite being named as the leader on the Excess Policy, with sole authority on coverage decisions, NYMAGIC was not originally a party to the declaratory judgment action filed by IMU and AHAC.  However, it has recently filed a motion to intervene in that action, including in its papers a proposed intervenor complaint that essentially duplicates the claims asserted by IMU and AHAC.  LNA maintains that the complaint on the Excess Policy is itself a breach of the Excess Policy, which cannot be remedied by NYMAGIC's intervention.  To the contrary, NYMAGIC has already accepted coverage on the Excess Policy upon exhaustion of the primary policy, subject to a meritless disclaimer related to the reimbursement of LNA's defense costs.  Because IMU and AHAC are bound to follow NYMAGIC's decision to accept coverage, they are not entitled to any declaratory judgment relief of their own.

Discovery has progressed in the NYMAGIC and American Club actions, but not in the Excess Policy action. Discovery is complete in the American Club action, with the exception of the depositions of the expert witness for each side. The NYMAGIC case is proceeding to disposition on document discovery only, and has been delayed only by the recent filing by IMU and AHAC on the Excess Policy. The Excess Policy case has been the subject of extensive motion practice, including: a motion by IMU and AHAC to consolidate with the American Club case; a motion by LNA to dismiss the declaratory judgment complaint on subject matter jurisdiction and discretionary grounds, which has been joined by the American Club; a motion by the American Club to stay; and a motion by IMU and AHAC for summary judgment. Some of the motions are fully submitted, while briefing remains on the summary judgment motion. Judge Haight has not heard argument on any of the motions.

**Possible Referral to the MDL Panel**

LNA agrees with the Barge Plaintiffs that referring the insurance coverage disputes to the MDL Panel is not in the parties' best interests. This could only serve to delay the matter. Furthermore, any decision by an MDL Panel would still not be conclusive, and would simply place the parties in the identical position they are in today – with a non-binding selection of either the Eastern District of Louisiana or the Southern District of New York. Instead, LNA is prepared to proceed with the coverage disputes before whichever court is prepared to hear the case first, whether it be this Court or the Southern District of New York. Given that discovery is essentially complete in the American Club case, LNA is prepared to proceed toward disposition, through summary judgment and/or trial. On the other hand, LNA will not oppose the application of the Barge Plaintiffs to place dispositive motions before this Court, as the discovery conducted in the New York action has prepared LNA to proceed in either venue and because a decision by

the Southern District of New York will not have collateral estoppel effect and will not bar the direct action by the plaintiffs, while a decision by this court will be binding on plaintiffs and on the Club and, at the very least, may aid the resolution of LNA's coverage claims.

## CONCLUSION

Lafarge North America, for the foregoing reasons, does not oppose the application of the Barge Plaintiffs that this Court adjudicate their claims against the American Steamship Owners Mutual Protection & Indemnity Association, Inc.

        Respectfully submitted,

        **CHAFFE McCALL, L.L.P.**

        /s/ Derek A. Walker
        Robert B. Fisher, Jr., T.A. (# 5587)
        Derek A. Walker (#13175)
        Ivan M. Rodriguez (#22574)
        2300 Energy Centre
        1100 Poydras Street
        New Orleans, LA 70163-2300
        Telephone: (504) 585-7000

        John D. Aldock
        Mark S. Raffman
        **GOODWIN PROCTER LLP**
        901 New York Avenue, NW
        Washington, DC 20001
        Tel.: (202) 346-4240

        **ATTORNEYS FOR**
        **LAFARGE NORTH AMERICA INC.**

## Certificate of Service

I do hereby certify that I have on this 28th day of July, 2008 served a copy of the foregoing pleading on counsel for all parties to this proceeding by electronic filing notification.

        /s/ Derek A. Walker
        Derek A. Walker