UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION<br>NUMBER:  05-4182 "K"(2)<br>JUDGE DUVAL<br>MAG. WILKINSON |
| PERTAINS TO:  *Robinson*<br>(No. 06-2268) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE UNITED STATES OF
AMERICA'S MOTION TO DISMISS COUNTS TWO AND THREE
OF THE AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

I.   ARGUMENT ..................................................................................................... 1

   A.  The Motion to Dismiss Count Two–Strict Liability Under Article 2317 ....................... 1

   B.  The Motion to Dismiss Count Three–Negligent Supervision and Vicarious Liability ..... 3

     1.  The Administrative Claim Requirement ..................................................... 3

      a.  Plaintiffs Need Not Articulate Every Conceivable Basis of Liability ................... 3

      b.  The *Robinson* Plaintiffs' Form 95s ............................................................ 5

      c.  The Army Corps Has Not Investigated Plaintiffs' Claims On The Merits ............. 7

      d.  The Plaintiffs' Timely Filing Of Amended Form 95s Would Serve No Useful
        Purpose And Would Delay Trial ............................................................ 9

     2.  The Statute of Limitations Does Not Bar Plaintiffs' Claims–Count Three Is Timely
      ............................................................................................................ 10

      a.  The Plaintiffs Presented Their Claim Within Two Years of Accrual ................... 10

      b.  The Plaintiffs Filed Suit Within Six Months of Denial ........................................ 12

     3.  Count Three Is Not Barred By the Discretionary Function Exception As A Matter of
      Law ................................................................................................... 14

      a.  The Army Corps Retained and Controlled WGI's Work on the Lock Expansion
        Project Including Safety Regulation Compliance ................................................. 14

      b.  The Army Corps Ignored Its Own Engineering Manuals and Training Guidelines
        That Mandated Specific Action, Thus Rendering The Discretionary Function
        Exception Inapplicable .......................................................................... 16

      c.  Neither The Army Corps Nor WGI Exercised Policy Judgment Protected Under
        The Discretionary Function Exception ............................................................ 22

     4.  Count Three Alleges Specific Facts Concerning the Army Corps's Negligence And
      Should Not Be Dismissed Based On Any Failure to State A Claim ............................ 23

II.  CONCLUSION ..................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*3 Eagles Aviation, Inc. v. Rousseau*
2005 WL 236201 (E.D. La. 2005) ............................................................................. 15

*Adams v. United States*
615 F.2d 284 (5th Cir. 1980) .......................................................................... 4, 5, 8, 11

*Alabama Electric Cooperative, Inc. v. United States*
769 F.2d 1523 (11th Cir. 1985) ......................................................................... 23, 26

*Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*
1998 WL 113935 (E.D. La. 1998) ............................................................................. 19

*Bell Atlantic Corp. v. Twombly*
27 S.Ct. 1955 (2007) ................................................................................................. 27

*Berkovitz v. United States*
486 U.S. 531 (1988) ................................................................................................... 19

*Bethel v. United States, ex rel. Veterans Admin. Medical Center of Denver, Colorado*
495 F.Supp.2d 1121 (D. Colo. 2007) .......................................................................... 6

*Brown v. United States*
838 F.2d 1157 (11th Cir. 1988) .................................................................... 5, 10, 11

*Burchfield v. United States*
168 F.3d 1252 (11th Cir. 1999) ................................................................................... 5

*Burmaster v. Plaquemines Parish Government*
982 So.2d 795 (La. 5/21/08) ....................................................................................... 2

*Camozzi v. Roland/Miller and Hope Consulting Group*
866 F.2d 287 (9th Cir. 1989) .................................................................................... 17

*Celestine v Union Oil*
652 So.2d 1299 (La. 1995) .......................................................................................... 2

*Commercial Union Ins. Co. v. United States*
1998 WL 637379, *4 (E.D. La. 1998) ...................................................................... 13

*Cope v. Scott*
45 F.3d 445 (D.C. Cir. 1995) .................................................................................... 25

*Dalehite v United States*
346 U.S. 15 (1953) ................................................................................................. 1

*Duff v. United States*
999 F.2d 1280 (8th Cir. 1993) ............................................................................. 17

*Dynamic Images Technologies, Inc., v. United States*
221 F.3d 34 (1st Cir. 2000) ......................................................................... 6, 8, 13

*Executive Jet Aviation, Inc. v. United States*
507 F2d 508 (6th Cir. 1974) ............................................................................... 12

*F.D.I.C. v. Conner*
20 F.3d 1376 (5th Cir. 1994) .............................................................................. 14

*Fonseca v Marlin Marine Corp.*
410 So.2d 674 (La. 1981) ..................................................................................... 2

*In re Katrina Canal Breaches Consol. Litig.*
471 F. Supp. 2d 684 (E.D. La. 2007) ........................................................... Passim

*Laird v. Nelms*
406 U.S. 797 (1972) ............................................................................................. 1

*Lasyone v. Kansas City Southern R.R.*
786 So.2d 682 (La. 2001) ..................................................................................... 3

*Layton v. United States*
984 F.2d 1496 (8th Cir. 1993) ....................................................................... 17, 19

*Marlys Bear Medicine v. United States*
241 F.3d 1208 (9th Cir. 2001) ........................................................................... 25

*McMichael v. United States*
751 F.2d 303 (8th Cir. 1985) ............................................................................. 17

*Rise v. United States*
630 F.2d 1068 (5th Cir. 1980) ....................................................................... 3, 11

*Rooney v. United States*
634 F.2d 1238 (9th Cir. 1980) ............................................................................. 4

*Strohm v United States*
2007 WL 3120704 (D. Kan. 2007) ....................................................................... 6

*Tindall v United States*

901 F.2d 53 (5th Cir. 1990) ................................................................................................ 1

*Travelers Ins. Co. v. Brown*
338 F.2d 229 (5th Cir. 1964) ............................................................................................ 14

*Trentadue v. United States*
397 F.3d 840 (10th Cir. 2005) ......................................................................................... 11

*United States v. Gaubert*
499 U.S. 315 (1991)......................................................................................................... 20

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*
467 U.S. 797 (1984)......................................................................................................... 18

*Whisnant v. United States*
400 F.3d 1177 (9th Cir. 2005) ......................................................................................... 26

*Williams v. United States*
405 F.2d 234 (5th Cir. 1968) ..................................................................................... 14, 15

*Williams v. United States*
693 F.2d 555 (5th Cir. 1982) ........................................................................................ 4, 9

**Statutes**

28 U.S.C. § 2675(a) ........................................................................................................... 3

28 U.S.C. § 2680(a) ......................................................................................................... 23

28 U.S.C. § 2401(b) ......................................................................................................... 10

28 U.S.C. §2675(a) ............................................................................................................ 3

Federal Practice and Procedure § 448 (Wright ed. 1960)............................................... 13

Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) ................................................... 1

La. Civ.Code arts. 2317 and 2317.1.................................................................................. 2

Louisiana Tort Law § 14-2, at 330-32 (1996)................................................................... 2

**Other Authorities**

S.Rep.No. 1327, 89th Cong. 2d Sess ................................................................................ 3

**MAY IT PLEASE THE COURT:**

Pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), Defendant United States of America has filed a Motion to Dismiss Counts Two and Three of the Plaintiffs' Amended Complaint.  For the reasons set forth below, the motion should be denied.

## I.    ARGUMENT

### A.    The Motion to Dismiss Count Two–Strict Liability Under Article 2317

The United States seeks dismissal of Count Two of the Amended Complaint—the Strict Liability allegation.  The United States cites a litany of cases establishing that the Federal Tort Claims Act ("FTCA") precludes imposing liability without negligence, misfeasance, or nonfeasance.  In other words, pursuant to the FTCA, the United States cannot be subjected to liability without fault.  *See, e.g.*, *Dalehite v United States*, 346 U.S. 15, 45 (1953); *Laird v. Nelms*, 406 U.S. 797, 798 (1972); *Tindall v United States*, 901 F.2d 53, 55 n.3 (5th Cir. 1990). What the Government fails to understand, however, is that while Count Two may be entitled "Strict Liability" it does not seek to impose liability upon the United States without fault by merely asserting the Government's ownership or custody of a defective facility that caused damage.

Under Louisiana law, the Civil Code article delineating the law of what is commonly referred to as "strict liability" is found at LSA–C.C. art. 2317.  The article, "Acts of others and of things in custody," states:

> We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.  This, however, is to be understood with the following modifications.

LSA-C.C. art. 2317 (Thomson/West, 2008).

1

Prior to 1996, this article imposed strict liability, or liability without fault, based upon status as owner or custodian rather than on personal fault.  *See Celestine v Union Oil*, 652 So.2d 1299, 1303 (La. 1995); *See also*, *Fonseca v Marlin Marine Corp.,* 410 So.2d 674, 679 (La. 1981).   In 1996, however, the Louisiana Legislature enacted LSA–C.C. art. 2317.1 entitled "Damage caused by ruin, vice, or defect in things" which is understood to be one of the modifications as mentioned in the last sentence of Article 2317.  Article 2317.1 states:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, *only upon a showing that he knew or, in the exercise of reasonable care, should have known* of the ruin, vice, or defect which caused the damage, *that the damage could have been prevented by the exercise of reasonable care*, and that he *failed to exercise such reasonable care*.  Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitor in an appropriate case.

LSA-C.C. art. 2317.1 (Thomson/West, 2008) (emphasis added).

With the addition of article 2317.1 as a modification to article 2317, the Legislature has fashioned a reasonable care standard, thus imposing a requirement of fault and thereby eliminating "strict" liability as a cause of action.[1]   While Plaintiffs may not have a cause of action for liability without fault against the Government, a cause of action does exist under Louisiana Civil Code articles 2317 and 2317.1.[2]   The motion to dismiss Count Two should therefore be denied.

---

[1] *See e.g., Burmaster v. Plaquemines Parish Government,* 982 So.2d 795, 799 n.1, 2007-2432 (La. 5/21/08) ("Although the plaintiff alleged that PPG is "strictly liable" under La. Civ.Code arts. 2317 and 2317.1, inter alia, this court has recognized that, with its adoption of La. Civ.Code art. 2317.1 to require knowledge or constructive knowledge, "the Legislature effectively eliminated strict liability under Article 2317, turning it into a negligence claim." *Lasyone v. Kansas City Southern R.R.*, 00-2628, p. 6 (La. 2001), 786 So.2d 682, 689 n. 9 (*quoting* Frank L. Maraist & Thomas C. Galligan, *Louisiana Tort Law* § 14-2, at 330-32 (1996)).  *Thus, plaintiff's claims under La. Civ.Code arts. 2317 and 2317.1 are not technically strict liability claims.*") (Emphasis added).

[2] Plaintiffs need not allege liability under Article 2317.1 because the basis for the cause of action,

**B.**     **The Motion to Dismiss Count Three–Negligent Supervision and Vicarious Liability**

The Government next asserts that Count Three must be dismissed as a matter of law because the claim is barred (1) by the FTCA's administrative claim requirement, (2) by the statute of limitations, and (3) by the discretionary function exception.  Each of the Government's arguments lack merit, and the motion to dismiss Count Three should be denied.

**1. The Administrative Claim Requirement**

a.  Plaintiffs Need Not Articulate Every Conceivable Basis of Liability

There is no dispute that presenting an administrative claim to the agency responsible for the alleged injury is a jurisdictional prerequisite to filing suit under the FTCA.  28 U.S.C. §2675(a).  The statutory purpose of this requirement is "'to ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States.'"  *Rise v. United States*, 630 F.2d 1068, 1071 (5th Cir. 1980) quoting S.Rep.No. 1327, 89th Cong. 2d Sess. reprinted in U.S. Code Cong. & Ad. News (1966) pp. 2515-16.

Under §2675(a), a sufficient notice requires only that the claimant "'(1) give[] the agency written notice of his or her claim sufficient to enable the agency to investigate and (2) places a value on his or her claim.'"  *Williams v. United States*, 693 F.2d 555, 557 (5th Cir. 1982) quoting *Adams v. United States*, 615 F.2d 284, 289 (5th Cir. 1980), *clarified,* 622 F.2d 197 (1980); *see also Rooney v. United States*, 634 F.2d 1238, 1242 (9th Cir. 1980) (administrative requirement satisfied when claim provides notification of an incident and injury, adequately identifies the claimant, is filed by the claimant or authorized agent, and states a claim for damages in a sum certain.).

---

even after the enactment of that Article, is still Article 2317.  Article 2317.1 merely sets forth the

The Government nonetheless asserts that the FTCA's notice requirements have not been satisfied because the six named Plaintiffs' administrative claim Form 95s failed to state that their alleged damages might have been caused by work performed on the EBIA.  This position is untenable for several reasons.

First, this interpretation would require an unrealistic clairvoyance necessitating that the Plaintiffs—before any fact discovery or expert investigation—advance all possible causes of action and legal theories in its administrative claim.  This inequitable "Catch–22" simply does not comport with the purpose of the FTCA's notice requirement.

Because the amount of information needed in a Form 95 is "minimal" (*Adams*, 615 F.2d at 289), a claimant need not provide the agency "with a preview of his or her lawsuit by reciting every conceivable theory of recovery or every factual detail that might be relevant." *Burchfield v. United States*, 168 F.3d 1252, 1255 (11th Cir. 1999).  Indeed, "compelling a claimant to advance all possible causes of action and legal theories is 'overly technical' and may frustrate the purpose of the section 2675(a) notice requirement." *Brown v. United States*, 838 F.2d 1157, 1160-61 (11th Cir. 1988) (citation omitted.)

In fact, in *Adams v. United States*, the 5th Circuit made plain the *agency's* obligation after receipt of a Form 95 to undertake an investigation of the causes of a claimant's damages:

> In promulgating section 2675, Congress, therefore, did not seek to allow federal agencies unilaterally to shift the burden of investigation to private claimants while retaining only the responsibility of evaluating the information supplied by the claimant:  "This procedure (of filing claims with the appropriate federal agency) would make it possible for the claim first to be considered by the agency whose employee's activity allegedly caused the damage.  *That agency would have the best information concerning the activity which gave rise to the claim.*"

*Adams*, 615 F.2d at 290 n.9 quoting S. Rep. at 7, reprinted in U.S. Code Cong. & Admin. News (1966) at p. 2517 (emphasis added).

---

reasonable care standard that must be met order for Plaintiffs to prevail.

Second, adequate notice does not require that the plaintiff set forth every conceivable legal theory or cause of action that could potentially be brought in relation to an injury described in the claim. *See Strohm v United States,* 2007 WL 3120704, *4 (D. Kan. 2007) citing *Bethel v. United States, ex rel. Veterans Admin. Medical Center of Denver, Colorado*, 495 F.Supp.2d 1121, 1124-25 (D. Colo. 2007). Thus, "as long as the language of an administrative claim serves due notice *that the agency should investigate the possibility of particular (potentially tortious) conduct and includes a specification of the damages sought*, it fulfills the notice-of-claim requirement." *Dynamic Images Technologies, Inc., v. United States,* 221 F.3d 34, 40 (1st Cir. 2000) *citing Santiago-Ramirez v. Secretary of the Dept. of Defense*, 984 F.2d 16, 20 (1st Cir. 1993) (emphasis added).

Third, the Government agency is mandated to investigate not only the theories of liability detailed in the Form 95, but also any other related theories of liability not expressly mentioned. *Rise*, 630 F.2d at 1071 ("[I]f the government's investigation of [plaintiff's] claim should have revealed theories of liability *other than those specifically enumerated therein*, those theories can properly be considered part of the claim.") (emphasis added); *see also Adams*, 615 F.2d at 292. The obverse is not true, however, as the plaintiff need not furnish an exhaustive itemization of any and all possible causes of her damages.

b. The *Robinson* Plaintiffs' Form 95s

For the Government to suggest that the absence of mention of the EBIA in these six Form 95s leaves it without notice of the EBIA as a possible source of the injury—and thus prevents it from thoroughly investigating its liability—is absurd. The six named *Robinson* Plaintiffs' Form 95s, while not expressly mentioning WGI's negligent work along the EBIA on the IHNC, do provide sufficient information for the Army Corps—the agency charged with investigating the

5

claims—to investigate WGI's work as a potential cause of the IHNC's catastrophic failure.  For example, Plaintiffs' Form 95, files less than two months after Hurricane Katrina, states that "[t]he geographic area in which the Class of Claimant damage occurred, is bordered on the south and southwest by the Mississippi River, on the west by *the Inner Harbor Navigation Canal (IHNC)* and the Industrial Canal. . . . All of the individual/entities residing in this area experienced extensive property damage, business loss and related mental anguish. . . ." Defendant's Exhibit A at 6 (Doc. No. 13653-3) (emphasis added); *see also* "Map Depicting Class of Claimants" at 12.  In addition, the Form 95s described the Plaintiffs' basic legal theory of negligence–the MRGO's role in causing the destructive surge that adversely impacted the IHNC's floodwalls:

> The MRGO originates in Breton Sound and runs in a northwesterly direction to the confluence with it and the [GIWW], where the two bodies of water merge and *flow into the Inner Harbor Navigational Canal/Industrial Canal*. . . .  [T]he USACE had negligently maintained the MRGO which has allowed the area to become more than 2000 feet wide which *allows it to carry a tidal surge into the geographic area occupied by the class of claimants*. . . .

Defendant's Exhibit A at 6-7 (emphasis added).

Accepting the Government's argument, Plaintiffs would have had to detail every conceivable theory of liability in their Form 95—even theories based upon facts that were indisputably unknown to them at the time of filing in October 2005.  While the MRGO's role in causing Plaintiffs' damages was clearly alleged, the WGI's subterraneous work along the EBIA in the IHNC was not evident to Plaintiffs, their counsel, or their experts until after extensive on site field investigation and expert analysis.  The dispositive factors here are that the Army Corps was put on explicit notice of "the possibility of particular (potentially tortious) conduct" and "a specification of the damages sought."  *Dynamic Images Tech., Inc.*, *supra,* 221 F.3d at 40.

The Government wants to create an impossible "gotcha" where a claimant would be required to give notice of all possible legal theories and facts before the claimant has any opportunity to conduct meaningful factual and expert discovery or the Government itself conducts an investigation of its alleged negligence.  Not surprisingly, courts have not held plaintiffs to this impossible Draconian standard, instead making it clear that the administrative claim requirement is "not intended to bar cases involving difficult issues from federal court by turning their difficulty against the claimant."  *Adams*, 615 F.2d at 291; *see also Speer v. United States*, 512 F. Supp. 670, 674-75 (D.C. Tex. 1981) ("Plaintiff's original claim provided the VA with sufficient information to conduct a full investigation and to put the Defendant on notice of the possibility of issues related to the alleged over prescription of Etrafon.").  Similarly, in our case "[s]ince at the time of the original claim Plaintiff[s] [were] unaware of facts relating to the alleged negligence by the [Army Corps], the Defendant's interpretation of the Act would result in an unjustified elevation of form over substance and would convert this remedial Act into a 'trap for the unwary claimant.'"  *Speer*, 512 F. Supp. at 674-75 quoting *Sky Harbor Air Service v. United States*, 348 F.Supp. 594, 596 (D.C. Neb. 1972).[3]

c.  The Army Corps Has Not Investigated Plaintiffs' Claims On The Merits

The purpose of the FTCA obligation to file an administrative claim is to allow the federal agency the opportunity to investigate and value the claim.  *Williams*, *supra*, 693 F.2d at 557, *see*

---

[3] The Government would have the Court believe that it can look strictly at the six *Robinson* Form 95s, while ignoring the other 400,000 plus form 95s that have been filed for injuries arising from the inundation of Orleans and St. Bernard Parishes.  Those Form 95s by and large state claims against the Government for the MRGO and its impact on the failure of hurricane protection levees and hurricane walls designed to protect Greater New Orleans.  This is sufficient to place the Government on notice of a claim due to the inundation of the New Orleans metropolitan area and to allow the Government to investigate whatever theories are stated as well as any other related theories not expressly mentioned.  This fact is borne out of the Army Corps's sponsored investigation by IPET focused in part on the failure of the IHNC floodwalls.  *See* IPET Report at Vol. V, "The Performance -- Levees and Floodwalls" at V-67-74.

*also Rise*, 630 F.2d at 1071.  The law presumes that the agency will in fact conduct a good faith investigation and make a reasoned determination of its merits.  *See Adams*, 615 F.2d at 290 ("'[Agencies] now investigate all accidents involving their employees, prepare litigation reports on all tort cases, suggest Government defenses to claims, and, at the request of the Department of Justice, comment on all settlement offers presented to the Department. . . .'") quoting S. Rep. at 8, reprinted in  U.S. Code Cong. & Admin. News at p. 2519 (1966)

In the case of nearly half a million administrative claims filed in the wake of Hurricane Katrina, the Army Corps has not satisfied its duty under the FTCA to give each claim individualized, conscientious consideration.  In a recent report, the Army Engineers have admitted that they have not performed any diligent investigation of the tens of thousands of Hurricane Katrina claims.  "The DOJ, USARCS, and ASACE have not settled or denied any Katrina-related administrative claims.  USACS and USACE . . . have indicated that they do not intend to settle or deny any Katrina-related administrative claim prior to lapse of the statutory six-month period."  Exhibit 1, FY 2007 United States Army Annual Financial Statements—Restated Civil Works Financials at 55.

In other words, other than logging the claims into a computer database, they have not been evaluated on the merits.  Instead, the Government has applied a uniform policy of *ignoring* the claims of hundreds of thousands of residents whose lives, homes, businesses, schools, and churches have been destroyed by the alleged negligence of the Army Corps.  Compounding the tragedy of the worst engineering disaster in American history, the Government has stonewalled the victims' pleas for just compensation.

How unjust it would be to dismiss the *Robinson* Plaintiffs' claims when they have not received any legitimate evaluation.  In other words, no matter what claims were filed with the

Army Corps (including the EBIA theory), they would not have been investigated, but instead denied with a blanket rejection. Any dismissal on these facts would not be merely the triumph of formalism over substance -- it would reward the Army Corps for its violation of the FTCA.

               d. <u>The Plaintiffs' Timely Filing Of Amended Form 95s Would Serve No Useful Purpose And Would Delay Trial</u>

Even though Plaintiffs' Form 95 contains facts sufficient to direct the Government's investigation into their claims, the Government still asks this Court to compel Plaintiffs to engage in the empty gesture of filing an amended Form 95 that expressly mentions WGI's work along the EBIA. In *Brown v. United States*, the 11th Circuit, addressing a similar situation, emphatically rejected any such requirement:

> In this case, the claim filed by Charlie Brown provided the VA with the facts necessary to conduct a full investigation of the underlying circumstances. Requiring the appellee to exhaust the administrative claim procedure again *would serve no useful purpose*. It is *unlikely* that the agency would conduct a second investigation or *otherwise act any differently*.

*Brown v. United States*, 838 F.2d 1157, 1161 and nn. 7-8 (11th Cir. 1988) (emphasis added).

The United States cannot seriously contend that the Plaintiffs' timely filing of a second Form 95—modified only to expressly reference WGI's negligent work on the EBIA—would serve any "useful purpose" or that the United States would "otherwise act any differently" than it has with Plaintiffs' original Form 95s. *See* Defendant's Exh. B (Doc. 13653-5). Rather, the United States would have Plaintiffs file a second Form 95–and wait six months–essentially up until the brink of trial in January 2009–before Plaintiffs could include the Count Three allegations in their Amended Complaint. Of course, at that time, the Government would move to sever the EBIA claim, arguing that it had not had an adequate opportunity to conduct discovery and prepare expert testimony. The Court should not condone such gamesmanship.

The purpose of forcing an individual to file a Form 95 prior to commencing an action in court is to give that particular Government agency an opportunity to consider the causes of the claimant's injuries, offer settlement and raise defenses. *Adams*, 615 F. 2d at 289; *Rise*, 630 F.2d 1071; *see also Trentadue v. United States*, 397 F.3d 840, 852 (10th Cir. 2005). There is no reasonable argument that the United States can advance about how its ability to settle claims or raise relevant defenses could be hampered by permitting Plaintiffs to forgo a second administrative claim. This is particularly true here because the Army Corps will not investigate the claim in good faith and will allow six months to pass without any response. Moreover, no settlement talks have ever occurred, and the Government has raised every conceivable affirmative defense related to Count Three in its Answer to the original Complaint.

The cases relied upon by Defendant are all plainly distinguishable. The claimants in those cases all had the relevant facts and events available to them *before* they filed their administrative claims. None of the cases cited involved any "large [or] factually unusual claim." *Executive Jet Aviation, Inc. v. United States*, 507 F2d 508, 515 (6th Cir. 1974). Nor was there, as here, a record conclusively demonstrating the futility of requiring Plaintiffs to make a ritualistic filing stating the obvious to an agency obdurately determined to refuse even to consider the claim. Accordingly, Plaintiffs urge this Court to deny Defendant's motion to dismiss.

    **2.**    **The Statute of Limitations Does Not Bar Plaintiffs' Claims–Count Three Is Timely**

    a. The Plaintiffs Presented Their Claim Within Two Years of Accrual

The FTCA provides that a tort claim against the United States "shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after . . . the final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b). In arguing that Count Three is

untimely, the Government presents two arguments. First, the Government asserts that the Plaintiffs' EBIA claims were not presented to the Army Corps within two years after they accrued. Alternatively, Defendant argues that even if they were timely presented, the Amended Complaint raising these allegations was not filed within six months after denial by the Army Corps. The Government's arguments fail on both counts.

The presentment argument has been adequately addressed in the Administrative Claims sections of this brief. The Plaintiffs' "administrative claim serve[d] due notice that the agency should investigate the possibility of particular (potentially tortious) conduct and include[d] a specification of the damages sought, [thus] fulfill[ing] the notice-of-claim requirement." *Dynamic Images Technologies, Inc., supra.,* 221 F.3d at 40. If the Army Corps received due notice of the claim with the filing of the Forms 95s, there can be no argument that the Plaintiffs failed to present the claim within the FTCA's mandated two years of accrual.

The Government is confusing "claims" with "theories of liability." Defendant suggests that because the EBIA allegations were not explicitly mentioned in the Form 95s that there has been a failure to "present" a claim. The Government misses the critical issue here: the EBIA allegations are not the claim here. Instead, the claim is the inundation of the Parishes of Orleans and St. Bernard and the resulting damages from the flooding, and the EBIA allegations are a theory of liability for that claim.

For all of the same reasons that the Government has received timely notice of the Plaintiffs' claims, those claims have been timely presented as well. Indeed, "[a] claim is deemed presented when it is received by the federal agency, and it *notifies that agency of the incident and the amount of damages*." *Commercial Union Ins. Co. v. United States*, 1998 WL 637379, *4

11

(E.D. La. 1998) (emphasis added).  Since the Government has received timely notice of the claim, the claim presentment requirement has also been met.

### b.  The Plaintiffs Filed Suit Within Six Months of Denial

Because the Government was presented with the notice of the claim within the statutory two year period, the Government next argues that the EBIA "claims" were not sued upon within six months after denial, and thus are barred by the statute of limitations.  Again, the Government is confusing claims with theories of liability.  Thus, the question to be answered is whether setting forth the newly discovered EBIA theory of liability in the Amended Complaint relates back to the timely filed original Complaint.  It clearly does.

This issue must be resolved in the context of the longstanding policy that Rule 15 is liberally construed to permit amendments to pleadings.  *Williams v. United States*, 405 F.2d 234, 236 (5th Cir. 1968).   Likewise, "[t]here is no mechanical test to determine whether an amendment relates back.  *F.D.I.C. v. Conner*, 20 F.3d 1376, 1386 (5th Cir. 1994).  Under settled 5th Circuit jurisprudence, Plaintiffs' addition of the EBIA claim in Count Three relates back to the original complaint.

> The Federal rule on the 'relation back' of amendments to pleadings, as embodied in Federal Rule 15(c), is permissive.  As long as the amended complaint refers to the same transaction or occurrence that formed the basis for the original complaint and the defendant was put on notice of the claim by the first complaint, there will be no bar to amendment; *even new defendants and new theories of recovery will be allowed*.

*Williams*, 405 F.2d at 237 quoting *Travelers Ins. Co. v. Brown*, 338 F.2d 229, 234 (5th Cir. 1964) (emphasis added).

In is indisputable that the EBIA claim arises out of the "same transaction or occurrence" alleged in the original complaint—the flooding of Plaintiffs' homes and communities caused by the defects in the MRGO and the failure of the floodwalls along the IHNC.  *See* Complaint at

¶¶28-33, 44-60, 90-108. The Complaint clearly put the Army Corps on notice of this damages claim. The fact that the Amended Complaint—filed after fact discovery and expert investigation—articulates "new theories of recovery" is not a bar to the Amended Complaint relating back to the timely-filed original Complaint.

There can be no conceivable prejudice to the Government by allowing this amendment in light of the Government's actual knowledge of this theory for at least one year before the Amended Complaint was filed.[4] "The doctrine of relation back under Rule 15(c) is liberally applied today in the Federal Courts, especially if no disadvantage will accrue to the opposing party." *Williams*, 405 F.2d at 236 citing 1A Barron & Holtzoff, Federal Practice and Procedure § 448 (Wright ed. 1960). Rule 15(c) is "based on the idea that *a party who is notified of litigation concerning a given transaction or occurrence is entitled to no more protection from statutes of limitations than one who is informed of the precise legal description of the rights sought to be enforced.*" *Williams, supra,* 405 F.2d at 236 quoting 3 Moore, Federal Practice P15.15(2) at 1021 (emphasis added); *see also 3 Eagles Aviation, Inc. v. Rousseau*, 2005 WL 236201, *2 (E.D. La. 2005).

In sum, the Government was timely notified of the claim and all that has been added by the amendment are newly discovered facts regarding the EBIA. The Government can hardly claim to be disadvantaged by the amendment, especially in light of the fact that it was the Government's duty to conduct a reasonable investigation into whatever theories were stated as well as any other related theories not expressly mentioned. The Government cannot now claim its own ostrich-like failure to fulfill its duty under the FTCA.

---

[4] No later than April 2007, the Government received Dr. Bob Bea's expert report outlining his research to date on the EBIA theory for the collapse of the floodwalls on the eastern side of the IHNC. *See* Exhibit 18, Bea Decl., April 16, 2007 at ¶¶ 22-25.

3. **Count Three Is Not Barred By the Discretionary Function Exception As A Matter of Law**

The DFE argument is premature.  The Court and parties have agreed that comprehensive motions for summary judgment will be filed on this issue, fully briefed, and argued.  It makes no sense—and is a waste of the Court's and the parties' resources—to approach the DFE issue in a piecemeal fashion.  The Government will have ample opportunity to advance its argument as to all of the Plaintiffs' claims for relief.  For this reason alone, any determination of the DFE as it applies to Count Three should be deferred to a later determination of all the DFE issues.

The Government makes a perfunctory argument—reminiscent of its analysis in its first motion to dismiss denied on February 2, 2007—that Count Three is barred by the DFE.  This argument must be rejected because a (1) claim for negligent supervision of a government contractor is not as a matter of law barred by the DFE, (2) the motion is a poorly disguised motion for summary judgment entitling Plaintiffs to complete discovery, and (3) there are substantial issues of disputed fact even on this incomplete record.  As the Court did in denying the Defendant's initial motion to dismiss on DFE grounds, this motion as to Count Three should be similarly denied.  *See In re Katrina Canal Breaches Consol. Litig.*, 471 F. Supp. 2d 684, 705-06 (E.D. La. 2007)

a. The Army Corps Retained and Controlled WGI's Work on the Lock Expansion Project Including Safety Regulation Compliance

The Government contends that the DFE applies because any decision regarding supervision of independent contractors is wholly a policy decision.  Motion at 12.  Whatever may be the validity of that general principle, this contention misstates the law applicable to the EBIA situation.

14

Specifically, discretionary function immunity is not available when the Government agency itself retains responsibility for and controls the project's safety and fails to meet those safety regulations. *Duff v. United States*, 999 F.2d 1280, 1282 (8th Cir. 1993) (finding DFE applies only when "a government agency[] delegat[es] 'primary responsibility for safety to its contractors'. . . .") quoting *Layton v. United States*, 984 F.2d 1496, 1502-03 (8th Cir. 1993); *see also Camozzi v. Roland/Miller and Hope Consulting Group*, 866 F.2d 287, 291 (9th Cir. 1989), *McMichael v. United States*, 751 F.2d 303, 306 (8th Cir. 1985).

Here, the DFE clearly does not apply to the Government's supervision of WGI because the Government retained and exercised control over the Lock Expansion Project's safety and failed to adhere to certain of its own safety regulations and specifications. There is undisputed testimony from the Army Corps's witness, Alvin Joseph Clouatre, that the agency maintained close supervision over and controlled WGI's work on the Lock Expansion Project and EBIA by providing WGI with on-site safety inspectors on a daily basis who were expected to draft daily Quality Assurance Reports. Exhibit 2, Alvin Joseph Clouatre Deposition ("Clouatre Depo.") at 46:9-49:2; 60:10-18; 115:5-116:5; 152:12-153:17; see also Exhibit 3 at 2; and Exhibits 4-6. Mr. Clouatre was also charged with the continuous inspection of both WGI's work and any work that WGI subcontracted out to other contractors. Exhibit 2, Clouatre Depo. at 54:2-57:5; 140:9-13. Mr. Clouatre also attended weekly meetings with other Army Corps employees, WGI contractors and WGI subcontractors. *Id.* at 63:14-64:16. Moreover, Jim Montegut, the Army Corps's ranking engineer on the Lock Expansion Project, was on site "every day all day." *Id.* at 59:25-60:9. Accordingly, the Army Corps's own witness conclusively renders inapplicable the DFE for the Army Corps's alleged negligent supervision of WGI's work on the Lock Expansion Project.

15

The Government's reliance on *Varig Airlines* is misplaced because *Varig Airlines* is plainly distinguishable from the facts surrounding the Government's intimate, daily involvement with the Lock Expansion Project. *Varig Airlines* arose out of an airplane accident caused by a design defect in an aircraft. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 797-98 (1984). In balancing safety and cost considerations, the FAA placed primary testing and inspection responsibility on the manufacturers and only spot-checked the manufacturers' submissions of test results. *Id.* at 819-20. In finding the discretionary function immunity barred plaintiff's claims, the Supreme Court found determinative the FAA's decision to remain largely aloof from overseeing compliance with specifications and safety requirements and instead placing primary safety responsibility with the manufacturers with the FAA only spot-checking the manufacturers' work. *Id.*

Similarly, the 8th Circuit in *Layton v. United States* found that the DFE barred plaintiff's claims because the United States Forest Service did not supervise compliance with each and every safety requirement of its contractors, but rather relied on spot-checking by its employees. *Layton v. United States*, 984 F.2d 1496, 1502-03 (8th Cir. 1993).

In stark contrast, the Army Corps here was involved "every day all day" with WGI and WGI's subcontractors by constantly monitoring and reporting on relevant safety issues associated with the Lock Expansion Project and the EBIA. Accordingly, the DFE provides no shield for its negligent supervision of WGI for its work on the Lock Expansion Project.

        b.    <u>The Army Corps Ignored Its Own Engineering Manuals and Training Guidelines That Mandated Specific Action, Thus Rendering The Discretionary Function Exception Inapplicable</u>

The DFE does not apply here for a second reason: the Army Corps violated its own regulations governing the challenged activity. Where a specific statute, regulation, or policy

16

"specifically prescribes a course of action for an employee to follow…the employee has no

rightful option but to adhere to the directive." *Berkovitz v. United States*, 486 U.S. 531, 536

(1988); *see also Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*, 1998 WL 113935, *3 (E.D.

La. 1998) citing *United States v. Gaubert*, 499 U.S. 315, 322 (1991). Here, the Army Corps

employees had no discretion to ignore these requirements. *See In re Katrina Canal Breaches*

*Consol. Litig.*, 471 F. Supp. 2d at 697 (if an employee violates a mandatory regulation, there will

be no shelter from the liability because there is no room for choice).

As noted in Dr. Bob Bea's Technical Report IV, *Review of USACE Excavation and*

*Backfill Guidelines and Practices Near Flood Control Structures* (July 11, 2008) (Exhibit 7), the

Army Corps had several relevant engineering manuals that mandated specific activity and

conduct for its work and WGI's work on the Lock Expansion Project.[3]  Specifically, these

engineering standards mandate that any foundation condition that may impact the seepage

potential under a levee must be evaluated.  As detailed by Plaintiffs' expert, all relevant and

applicable Army Corps's "guidelines pertaining to flood protection systems require seepage

analyses be performed as part of the design." Bea Technical Report Vol. IV at 2.[4]  There is no

---

[3] (1) Engineering and Design, Retaining and Flood Walls, EM 1110-2-2502, Army Corps of
Engineers, September 29, 1989 ("1989 Flood Wall Manual") (Exhibit 8);

(2) Engineering and Design, Seepage Analysis and Control for Dams, EM 1110-2-1901, Army
Corps of Engineers, April 30, 1993a ("1993 Seepage Analysis Manual") (Exhibit 9);

(3) Engineering and Design, Design of Sheet Pile Walls, EM 1110-2-2504, Army Corps of
Engineers, March 31, 1994 ("1994 Sheet Pile Manual") (Exhibit 10); and

(4) Engineering and Design, Design and Construction of Levees, EM 1110-2-1913, Army Corps
of Engineers, April 30, 2000 ("2000 Levee Manual") (Exhibit 11)

[4] Dr. Bea's investigation also revealed that the Army Corps's Kansas City District has guidelines
specific to construction activities near existing flood protection structures that, if applicable, are
further evidence of the Army Corps's violation of an express directive.  *See* Bea Technical
Report IV at 9-11.  Plaintiffs' investigation into whether the New Orleans District has a similar

evidence that any such mandatory seepage investigation was ever performed. Critically, it was the existence of underseepage that helped cause the IHNC floodwall along the EBIA to fail and inundate the Lower 9th Ward and portions of St. Bernard Parish. Exhibit 17, Bea Decl. No. II, IHNC Forensic Studies (July 11, 2008) at 55-56, ¶¶55-56; 70, ¶76; 108 ¶11. The following are excerpts from the relevant Army Corps engineering manuals detailing the requirement for seepage analysis for projects like the Lock Expansion Project:

1. *Engineering and Design, Retaining and Flood Walls, EM 1110-2-2502, Department of the Army, September 29, 1989*

General Considerations. Water-retaining structures are subject to through-seepage, underseepage, and seepage around their sides or ends. *Seepage control is a primary consideration of flood wall design.* Uncontrolled seepage may result in water pressures and uplift forces on the wall base in excess of design assumptions and consequent structural instability. . . . *Seepage control entails the design of measures to ensure that seepage pressures and velocities are maintained below tolerable values.* . . .

Exhibit 8, 1989 Flood Wall Manual at 7-3 (emphasis added).

g. Basements and other Excavations. *The seepage aspects and the foundation stability of walls* which have had basements excavated on either side of and adjacent to the wall since the original design and construction were completed *should be investigated.*

*Id.* at 7-25 (emphasis added).

2. *Engineering and Design, Seepage Analysis and Control for Dams, EM 1110-2-1901, April 30, 1993a*

General. All dams on earth foundations are subject to underseepage. *Seepage control in earth foundations is necessary to prevent excessive uplift pressures and piping through the foundation.* . . . The purpose of the project, i.e., long-term storage, flood control, hydropower, etc., may impose limitations on the allowable quantity of seepage. . . .

Exhibit 9, 1993 Seepage Analysis Manual at 9-1 (emphasis added).

---

manual -- or whether the Kansas City District's manual contains a Army Corps policy relevant for all districts -- is ongoing.

3.  *Engineering and Design, Design of Sheet Pile Walls, EM 1110-2-2504, March 31, 1994*

Where seepage occurs, the differential water pressure is dissipated by vertical flow beneath the sheet pile wall.  *This distribution of the unbalanced water pressure can be obtained from a seepage analysis.  The analysis should consider the permeability of the surrounding soil as well as the effectiveness of any drains if present*.  Techniques of *seepage analysis* applicable to sheet pile wall design include flow nets, line of creep method, and method of fragments.   These simplified techniques may or may not yield conservative results.  Therefore, *it is the designer's responsibility to decide whether the final design should be based on a more rigorous analysis*, such as finite element method. . . .   In pervious material the effects of upward seepage can cause piping of material away from the wall or, in extreme cases, causes the soil to liquefy.

Exhibit 10, 1994 Sheet Pile Manual at 4-6 (emphasis added).

4.  *Engineering and Design, Design and Construction of Levees, EM 1110-2-1913, April 30, 2000*

Without control, *underseepage in pervious foundations beneath levees* may result in (a) excessive hydrostatic pressures beneath an impervious top stratum on the landside, (b) sand boils, and (c) piping beneath the levee itself.  Underseepage problems are most acute when a pervious substratum underlies a levee and extends both landward and riverward of the levee and where a relatively thin top stratum exists on the landside of the levee.

Exhibit 11, 2000 Levee Manual at 5-1 (emphasis added).

*General*.   The installation of pipes or other structures within the levee or foundation probably *requires the greatest care and the closest supervision and inspection of any aspect of levee construction*.  Most failures of levee systems have initiated at the soil-structure interface and therefore *every effort must be made to ensure that these areas are not susceptible to piping*.  Of overriding importance is good compaction of the backfill material along the structure.

*b. Pipes crossing through or beneath levees*
Pipes crossing beneath levees also require *special considerations*.  Such crossings should be designed by qualified geotechnical engineers. . . .   Penetration through the top stratum of fine-grained materials may concentrate seepage at those locations.

*Id*. at 8-7 to 8-8 (emphasis added).

Accordingly, the Army Corps's own engineering standards required that a thorough

"seepage analysis" be conducted in light of the excavation and other related potentially

19

destabilizing activities occurring in the EBIA immediately adjacent to the IHNC floodwalls. Mindful that "seepage control is a primary consideration of flood wall design," prevention of this problem was the agency "designer's responsibility," and the Army Corps officials on site were obligated to exercise "the greatest care and the closest supervision and inspection of any aspect of levee construction."  Above all, "every effort" had to be expended to prevent underseepage and piping that would cause—as in fact Dr. Bea has concluded happened here—the  instability of levee walls and resulting breaching of the floodwalls.

The situation here is identical to the Army Corps's failure to follow its specific technical standards for channel stabilization projects in major alluvial waters in *Alabama Electric Cooperative, Inc. v. United States,* 769 F.2d 1523, 1525-26 (11th Cir. 1985).  (DFE did not apply where Army Corps officials testified that they did not design the defective dike consistent with its own guidelines but instead admitted that "the design was basically 'eyeballed' using 'rules of thumb.'").

Despite these mandates detailed in the Army Corps's engineering manuals, there has been no evidence reviewed to date demonstrating that any of these underseepage evaluations were completed as part of the Lock Replacement Project.  Exhibit 7, Bea Technical Report Vol. IV at 21.  Because of the Army Corps's failure to adhere to the directives detailed in its own relevant engineering manuals, the discretionary function exception should not apply.

5. *Earthwork Quality Verification Training Course*

The Army Corps's failure to implement mandated underseepage analyses for the Lock Replacement Project is further underscored by its own Earthwork Quality Verification Training Course ("Earthwork Training Course").  The Earthwork Training Manual details the critical need for underseepage and groundwater analysis and control by stating "[p]erhaps no single feature of

an earthwork project deserves as much attention during construction as the drainage system." Exhibit 12, Earthwork Training Course at VI.1.1.  The reason why such underseepage analysis is mandated is because a failure to implement such analysis can result in catastrophic consequences.  *Id*.  And because issues concerning underseepage are subterraneous, it is an issue that the Army Corps "must" consider in the planning process of projects like the Lock Expansion Project.  Exhibit 13, Deposition of Melvin McElwee at 59:20-61:10; 64:16-66:15.

Despite the mandate that underseepage analyses must be considered in the planning stages of the Lock Expansion Project, WGI's statements of work concerning the Lock Expansion Project do not make any mention of such an analyses ever occurring.  Exhibit 14, WGI000001-217.  WGI 30(b)(6) witness, Stephen Roe, testified that the Army Corps never told WGI that underseepage "was an issue to be considered when working around a flood control project." Exhibit 15, Stephen Roe Deposition at 122:5-11.  WGI never assigned a geotechnical engineer to work on the Lock Expansion Project because the Army Corps was responsible for geotechnical concerns.  Exhibit 16, WGI 30(b)(6) witness, Phillip Staggs Deposition at 53:11-15; 59:19-61:16.  Ultimately, WGI's specifications for work on the Lock Expansion Project did not even consider the issue of underseepage.  *Id*. at 168:10-169:25.  In addition, neither Plaintiffs' counsel nor their experts have located any underseepage analyses performed by the Army Corps or WGI during their investigation of the Lock Replacement Project.  Exhibit 7, Bea Technical Report Vol. IV at 21.  Accordingly, the Army Corps should not be afforded discretionary function immunity for its failure to perform mandatory underseepage analyses in constructing the Lock Expansion Project.

      c.   Neither The Army Corps Nor WGI Exercised Policy Judgment Protected Under The Discretionary Function Exception

Since the first prong of the DFE has not bee established by the Government,[5] that is the end of the analysis. *Berkovitz*, 486 U.S. at 536. Even if this Court determines that there were no regulations or other directives that mandated specific conduct by the Army Corps or WGI, the Government cannot satisfy the second prong of the discretionary function exception. Under *Berkovitz*, the Court must determine the nature of the Army Corps's conduct and protect "only governmental actions and decisions based on considerations of public policy." *Berkovitz*, 486 U.S. at 536-37. Objective scientific principles, however, are not subject to policy judgment. *See In re Katrina Canal Breaches Consol. Litig.*, 471 F. Supp. 2d at 701-03 citing *Cope v. Scott*, 45 F.3d 445, 452 (D.C. Cir. 1995) and *Bear Medicine*, 241 F.3d at 1217.

In this case, Dr. Bea's Technical Report Volume IV details four separate Army Corps manuals that contain objective scientific principles to be applied to projects like the Lock Expansion Project. None of these objective scientific principles, however, were followed by the Army Corps or WGI during the Lock Expansion Project. Bea Technical Report Vol. IV at 3, 21. Therefore, the Army Corps cannot contend that its failure to adhere to objective scientific principles was based on any social, political, or economic policy, and as result the discretionary function exception should not apply.

In addition, courts have often recognized that professional judgments concerning safety are "rarely considered to be susceptible to social, economic, or political policy." *Whisnant v. United States*, 400 F.3d 1177, 1181-82 (9th Cir. 2005). Plaintiffs, here, contend that the Army Corps had several engineering manuals that clearly established safety requirements for

---

[5] The Government bears the burden of proving that the DFE applies. *See Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1213 (9th Cir. 2001).

evaluating potential seepage impacts that projects like the Lock Expansion Project could have on the nearby flood control structures.  However, the Army Corps negligently failed to undertake any of these safety precautions.  As a result, the Army Corps cannot be afforded discretionary function immunity.

Moreover, discovery concerning the Lock Replacement Project has not revealed that the Army Corps based its failure to perform the requisite underseepage analysis on any purported policy decision.  "'[W]here the Corps makes a social, economic or political policy decision concerning the design of a particular project, that decision is excepted from judicial review under §2680(a). *In the absence of such a policy decision, the Corps' design decisions are subject to judicial review under the state law tort standards that would normally govern an action for engineering malpractice*.'" *In re Katrina Canal Breaches Consol. Litig.*, 471 F. Supp. 2d at 705 (emphasis in original) quoting *Alabama Elec. Coop., Inc. v. United States,* 769 F.2d 1523, 1536-37 (11th Cir.1985).

Lastly, it cannot be said that every decision made throughout the history of the Lock Expansion Project were all based on policy considerations.  This project spanned almost a decade and numerous factual questions remain regarding the manner of decisions made by the Army Corps.  *See In re Katrina Canal Breaches Consol. Litig.*, 471 F. Supp. 2d at 699. Plaintiffs intend to have these questions answered through additional depositions of relevant Army Corps and WGI witnesses.

### 4. Count Three Alleges Specific Facts Concerning the Army Corps's Negligence And Should Not Be Dismissed Based On Any Failure to State A Claim

The Government next argues that Count Three of the Amended Complaint should be dismissed to the extent that it relies on acts of negligence not yet identified by the Plaintiffs. This argument is advanced in response to the Plaintiffs' allegation in paragraph 120 of the

Amended Complaint wherein Plaintiffs state that "the Army Corps engaged in other acts of negligence to be determined prior to [the] time of trial."  What the Government fails to mention is that this allegation is the last sentence of a one and a half page allegation.  Included in paragraph 120 and preceding the statement complained of by the Government, are eight allegations (subparts (a)–(g)) wherein Plaintiffs make specific factual allegations regarding the Army Corps's negligence *vis s vis* the actions of WGI.  The final sentence alleging "other acts of negligence to be determined" is intended to place the Government on notice that as discovery proceeds additional facts may come to light to support the claim of the Army Corps's liability for its failure to monitor, oversee, supervise, check, or inspect the work of WGI.

"Federal Rule of Civil Procedure 8(a)(2) requires 'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964 (2007) (citation omitted).  Clearly, paragraph 120 read in its entirety meets this standard as its states the claim as being the negligence of the Government for its failure to monitor, oversee, supervise, check, or inspect the work of WGI.  After stating the claim, the Plaintiffs set forth in subparts (a) through (g) specific factual allegations known to them at the time of the pleading to support that claim.  The final subpart wherein Plaintiffs state that "the Army Corps engaged in other acts of negligence to be determined prior to [the] time of trial" merely suggests that as discovery proceeds, the plaintiffs may learn more to support the claim of negligence.  This basis for the Government's motion to dismiss therefore should be denied.

## II.      CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss should be denied.

Dated: July 31, 2008                                        Respectfully submitted,


**O'Donnell & Associates P.C.**

By: s/ Pierce O'Donnell

Pierce O'Donnell (*pro hac vice*)
550 S. Hope St., Suite 1000
Los Angeles, California 90071
Phone:  (213) 347-0290
Fax:  (213) 347-0298


**Law Offices of Joseph M. Bruno**
By: s/ Joseph M. Bruno
Joseph M. Bruno (LSBA No. 3604)
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

**The Andry Law Firm, LLC**                    **Domengeaux Wright Roy & Edwards LLC**
By: s/ Jonathan B. Andry                          Bob F. Wright (LSBA No. 13691)
Jonathan B. Andry (LSBA No. 20081)      James P. Roy (LSBA No. 11511)
610 Baronne Street                                556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113                P.O. Box 3668
Telephone: (504) 586-8899                     Lafayette, Louisiana 70502-3668
Facsimile:  (504) 585-1788                     Telephone: (337) 233-3033
                                                          Facsimile:  (337) 233-2796

**Fayard & Honeycutt**                             **Girardi & Keese**
Calvin C. Fayard, Jr. (LSBA No. 5486)    Thomas V. Girardi (*pro hac vice*)
Blayne Honeycutt (LSBA No. 18264)        1126 Wilshire Boulevard
519 Florida Avenue, S.W.                         Los Angeles, CA 90017
Denham Springs, Louisiana 70726           Telephone: (213) 489-5330
Telephone: (225) 664-4193                      Facsimile:  (213) 481-1554
Facsimile:  (225) 664-6925

**Ranier, Gayle & Elliot, LLC**                 **Levin,   Papantonio,   Thomas,   Mitchell**
N. Frank Elliot III                                    **Echsner & Proctor, P.A.**
1419 Ryan Street                                      Clay Mitchell (*pro hac vice*)

25

Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337).494.7218

Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123

**McKernan Law Firm**
Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202

**Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC**
Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Law Office of Elwood C. Stevens, Jr., a Professional Law Corporation**
Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Cotchett, Pitre, Simon & McCarthy**
Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**
Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Robinson, Calcagnie & Robinson, Inc.**
Mark Robinson (Cal State Bar No. 54426
620 Newport Center Drive – 7th Floor
Newport Beach, CA 92660
1-888-701-1288

## <u>CERTIFICATE OF SERVICE</u>

I, Pierce O'Donnell, hereby certify that on July 31, 2008, I caused to be served

**<u>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE UNITED STATES OF</u>**

**<u>AMERICA'S MOTION TO DISMISS COUNTS TWO AND THREE</u>**

**<u>OF THE AMENDED COMPLAINT</u>**, upon Defendants' counsel, Robin D. Smith, George

Carter, Keith Liddle, and Richard Stone by ECF and email at robin.doyle.smith@usdoj.gov;

george.carter@usdoj.gov, keith.liddle@usdoj.gov, and richard.stone@usdoj.gov.

<u>/s/ Pierce O'Donnell</u>