UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES        CIVIL ACTION
CONSOLIDATED LITIGATION              NO. 05-4182 K2
                                     JUDGE DUVAL
PERTAINS TO:  MRGO AND ROBINSON
              (No. 06-2268)

        Deposition of ALVIN JOSEPH CLOUATRE, III, given at the U.S. Army Corps of Engineers New Orleans District offices, 7400 Leake Avenue, New Orleans, Louisiana 70118-3651, on June 20th, 2008.

REPORTED BY:
        JOSEPH A. FAIRBANKS, JR., CCR, RPR
        CERTIFIED COURT REPORTER #75005

Page 1

1  APPEARANCES:
2  REPRESENTING THE PLAINTIFFS:
3      BRUNO & BRUNO
4      (BY:  JOSEPH M. BRUNO, ESQUIRE)
5      (BY:  SCOTT JOANEN, ESQUIRE)
6      855 Baronne Street
7      New Orleans, Louisiana 70113
8      504-525-1335
9  - and -
10     LAMBERT AND NELSON
11     (BY:  CAYCE PETERSON, ESQUIRE)
12     701 Magazine Street
13     New Orleans, Louisiana 70130
14     504-581-1750
15
16 REPRESENTING THE UNITED STATES OF AMERICA:
17     UNITED STATES DEPARTMENT OF JUSTICE,
18     TORTS BRANCH, CIVIL DIVISION
19     (BY:  RICHARD STONE, ESQUIRE)
20     (BY:  TAHEERAH K. EL-AMIN, ESQUIRE)
21     P.O. Box 888
22     Benjamin Franklin Station
23     Washington, D.C. 20044
24     202-616-4289
25

Page 2

1  REPRESENTING THE U.S. ARMY CORPS OF ENGINEERS:
2      CORPS OF ENGINEERS, OFFICE OF COUNSEL
3      (BY:  JENNIFER LABOURDETTE, ESQUIRE)
4      7400 Leake Avenue
5      New Orleans, Louisiana 70118-3651
6      504-862-2843
7
8  ALSO PRESENT:
9      DEBRA S. CLAYMAN, ESQ.
10     KASSIE HARGIS, ESQ.
11     ROBERT FISHER, ESQ.
12     PHILIP WATSON, ESQ.
13
14 PRESENT VIA I-DEP:
15     BRENDAN R. O'BRIEN, ESQ.
16     CHRIS ALFIERI, ESQ.
17
18 VIDEOGRAPHER:
19     KARL STIEGMAN (DEPO-VUE)
20
21
22
23
24
25

Page 3

1           E X A M I N A T I O N   I N D E X
2
3  EXAMINATION BY:                            PAGE
4
5  MR. JOANEN  ................................7
6  MS. CLAYMAN  ..............................166
7            E X H I B I T   I N D E X
8
9  EXHIBIT NO.                                PAGE
10 Exhibit 1    ...............................19
11 Exhibit 2    ...............................19
12 Exhibit 3    ...............................71
13 Exhibit 4    ...............................73
14 Exhibit 5    ...............................84
15 Exhibit 6    ...............................87
16 Exhibit 7    ...............................89
17 Exhibit 8    ...............................94
18 Exhibit 9    ...............................95
19 Exhibit 10   ...............................99
20 Exhibit 11   ..............................105
21 Exhibit 12   ..............................106
22 Exhibit 13   ..............................107
23 Exhibit 14   ..............................108
24 Exhibit 15   ..............................109
25 Exhibit 16   ..............................110

Page 4

```
 1  or not, but I did work on a remediation
 2  project. It was a Superfund project.
 3     Q.  And which one was that?
 4     A.  Bayou Bonfouca.
 5     Q.  That was a creosote plant up there?
 6     A.  Yes.
 7     Q.  Is that waterway safe now to swim in
 8  and all?
 9     A.  Um -- I don't know. I mean --
10     Q.  Would you swim in it?
11     A.  Probably not.
12     Q.  I ask because I saw people catching
13  fish in there the other day.
14        (Off the record.)
15  EXAMINATION BY MR. JOANEN:
16     Q.  The Bayou Bonfouca remediation
17  project, was Morrison Knudsen which later
18  became known as Washington Group International
19  involved in that remediation?
20     A.  Bayou Bonfouca?
21     Q.  Yeah.
22     A.  No.
23     Q.  Who was involved in that, if you know?
24     A.  I believe it was IT and OHM was a
25  joint venture.
```
Page 45

```
 1     Q.  What was your first -- do you know --
 2  I will use the term Task Order 26. Do you know
 3  when I'm talking about when I say that?
 4     A.  Yeah. If I remember correctly, Task
 5  Order 26 was the work -- the remediation and
 6  the demolition at IHNC. Is that correct?
 7     Q.  Yes. That's correct.
 8     A.  Yeah.
 9     Q.  What was your first involvement with
10  that project?
11     A.  It was -- my position was a project
12  inspector and we were doing demolition work.
13     Q.  Do you recall what year it was you
14  first started working there?
15     A.  It was around '01. 2001.
16     Q.  In preparation for your deposition
17  today did you review any documents?
18     A.  I looked at a couple of documents
19  yesterday.
20     Q.  And what did you look at?
21     A.  Um -- one was a Q --
22        MS. EL-AMIN:
23           Objection. Are you asking him
24        specific documents he looked at?
25        MR. JOANEN:
```
Page 46

```
 1        Yes.
 2        MS. EL-AMIN:
 3           Okay.
 4  EXAMINATION BY MR. JOANEN:
 5     Q.  What documents did you look at?
 6     A.  I believe one was a QA assessment. It
 7  was a report, um -- done of -- someone in
 8  construction division comes out to the project
 9  site and reviews your contract files and your
10  reports, your quality of work.
11     Q.  Do you recall who prepared that
12  document?
13     A.  I believe it was Roger Gonzales.
14     Q.  He was with the Corps?
15     A.  Yes.
16     Q.  Do you remember the date of that
17  report -- assessment?
18     A.  Not exactly, no.
19     Q.  Was it in the early part of the
20  project or the latter part of the project?
21     A.  I really don't remember.
22     Q.  Do you recall that QA assessment when
23  it was generated, or do you only remember it
24  now after reviewing it yesterday?
25     A.  I only remembered it when I looked at
```
Page 47

```
 1  it yesterday.
 2     Q.  Other than the QA assessment, what
 3  other documents did you look at in preparation
 4  for this deposition?
 5     A.  I don't remember what I looked at. I
 6  think I glanced at a QA log that I had done,
 7  but I never really read it as to the content of
 8  it.
 9     Q.  And what is a QA log?
10     A.  I think I'd explained it earlier.
11  It's a report I would prepare daily on the
12  construction activities.
13     Q.  Is that your daily reports?
14     A.  Yes.
15     Q.  How many daily reports did you look
16  at?
17     A.  I believe it was just one.
18     Q.  Do you remember the date of that daily
19  report?
20     A.  No.
21     Q.  Do you remember the contents of that
22  daily report?
23     A.  No.
24     Q.  Do you know why it was you looked at
25  that daily report as opposed to hundreds of
```
Page 48

12 (Pages 45 to 48)

**Page 49**

1  others?
2      A.  No.
3      Q.  Who provided those documents to you to
4  review?
5      A.  Um -- Taheerah.
6      Q.  Was there anyone else you met with in
7  preparation for this deposition other than
8  Taheerah?
9      A.  Taheerah and --
10         THE WITNESS:
11             Sorry.  Your name?
12     A.  Richard, and Jennifer.
13 EXAMINATION BY MR. JOANEN:
14     Q.  Anyone else?
15     A.  No.
16     Q.  Have you met with -- before yesterday,
17 had you met with anyone in preparation for a
18 deposition regarding the East Bank Industrial
19 Area Task Order 26?
20     A.  No.
21     Q.  When did you first find out that you
22 were going to be deposed in this?
23     A.  Through an E-mail, um -- I think -- I
24 can't remember, it was either late, very late
25 May or early -- the first part of June.  I

**Page 50**

1  think it was late May.
2      Q.  And what were your thoughts once you
3  found out that you were potentially going to be
4  deposed?
5          MS. EL-AMIN:
6              Objection.
7          MR. JOANEN:
8              The basis?
9          MS. EL-AMIN:
10             I'm sorry -- I lost my train of
11         thought.
12         MR. JOANEN:
13             I'm simply asking what his
14         thoughts were.  I'm not asking for
15         anything that went on with the
16         communication between you and him.
17         MS. EL-AMIN:
18             Okay.
19 EXAMINATION BY MR. JOANEN:
20     Q.  What were your thoughts when you found
21 out that you were going do be deposed?
22     A.  Just wasn't something I was looking
23 forward to.
24     Q.  Once you found out that you were going
25 to be deposed, did you look at any personal

**Page 51**

1  notes or any other notations --
2      A.  No, because when I first found out I
3  didn't even know what I was being deposed over.
4      Q.  Since receiving that E-mail, have you
5  reviewed any documents to refresh your
6  recollection about the events that took place
7  at the East Bank Industrial Area?
8      A.  None.
9      Q.  So as you sit here today, you have
10 reviewed only two documents, the quality
11 assessment documents and the QA -- one
12 particular QA log?
13     A.  Those are the only took I looked at.
14 I wouldn't say I reviewed them because I really
15 didn't read them.
16     Q.  Did you review or read anything --
17     A.  Nothing.
18     Q.  -- in preparation for this deposition
19 today?
20     A.  Sorry.  Nothing.
21     Q.  Thank you.  Were you involved with the
22 East Bank Industrial Area during any part of
23 the design phase?
24     A.  No.
25     Q.  In preparation for your

**Page 52**

1  responsibilities as the construction inspector
2  for that East Bank Industrial Area project,
3  what documents did you review or would you have
4  typically reviewed?
5      A.  During the course of that project?
6      Q.  During the course of that project,
7  yes.
8      A.  Um -- on this particular contract, the
9  way it was set up, the contractor Washington
10 Group, um -- they provided the work plans and
11 the scope of work for the work to be done.  So
12 those were the plans that I reviewed, and any
13 drawings that might be associated with those
14 plans.  And that became what that I verified
15 that the contractor was doing.  So that was in
16 the sense the plans and specifications on the
17 project.
18     Q.  At the project you worked on in Bayou
19 Bonfouca, was that project one where the plans
20 and specifications were generated by the
21 contractor?
22     A.  I think so.
23     Q.  Other than the Task Order 26 project
24 and the Bayou Bonfouca project, were there any
25 other projects that you were associated with in

13 (Pages 49 to 52)

```
 1  which the plans and specifications were
 2  generated by the contractor?
 3      A.  I think that was it.
 4      Q.  And again, that Bayou Bonfouca project
 5  was a hazardous -- HTRW project, which is a
 6  hazardous toxic remedial waste?
 7      A.  Yes.  I believe that was it.
 8      Q.  Do you still have those documents that
 9  you reviewed yesterday in your possession?
10      A.  I never did have them in my
11  possession.  No, I don't.
12      Q.  Who had them?
13      A.  Counsel.
14          MR. JOANEN:
15              We'll ask for production of those
16          documents.
17          MS. EL-AMIN:
18              They've already been produced.
19          MR. JOANEN:
20              Can you identify them, the
21          numbers?
22          MS. EL-AMIN:
23              I'll get that you to later.
24          MR. JOANEN:
25              Okay.
                                            Page 53
```

```
 1  EXAMINATION BY MR. JOANEN:
 2      Q.  Just so I'm clear, the only two
 3  projects you were involved with as a project
 4  inspector in which the plans and specifications
 5  were provided by the contractor were the Bayou
 6  Bonfouca and Task Order 26, is that correct?
 7      A.  Yes.  That's correct.  And I'm saying
 8  Bob Bonfouca.  That's my best recollection that
 9  they developed the plans.  And I'm sure that on
10  Washington Group, that contract, that's how it
11  was done.
12      Q.  When you say sure of that, why is
13  that?
14      A.  Just because it was more recent I can
15  recall it specifically.
16      Q.  And so you worked with the project
17  work plans?
18      A.  Sorry.
19      Q.  You looked at the project work plans
20  for that?
21      A.  Yes.
22      Q.  And what other documents do you think
23  you would have looked at?
24      A.  I would have looked at, um -- the
25  safety manual.
                                            Page 54
```

```
 1      Q.  Anything else?
 2      A.  Um -- just -- if Washington would have
 3  amended, you know, the work plans or anything
 4  like that, sometimes something would come in,
 5  you know, after the initial work plan, I would
 6  have incorporated that into the work plans and
 7  looked at that, as well.
 8      Q.  Was it your understanding that the
 9  project work plan was going to be a stand-alone
10  document?
11      A.  All I know is that that's what I was
12  to look at to do my job.
13      Q.  What was your understanding of what
14  your job was on that project?
15      A.  Um -- as a project inspector on that
16  project, I was to ensure that the contractor
17  performed the work according to the work plan
18  requirements, performed the work safely
19  according to the Corps' safety requirements,
20  and also because it was a, um -- I'm not sure
21  if this is the right term, but I think it was a
22  cost-plus type of project, well, um -- we just
23  ensured that, um -- that the contractor was
24  working efficiently with their equipment and
25  personnel on hand, that it wasn't -- which is
                                            Page 55
```

```
 1  different from a fixed-price contract that we
 2  look for, we just make sure that they're not
 3  milking it.
 4      Q.  Would you, as the inspector, have any
 5  involvement with subcontractors of the general
 6  contractor?
 7      A.  My involvement would be the monitor
 8  their work.
 9      Q.  Do you recall the subcontractors on
10  that, the major subcontractors; for example,
11  Hamps Construction?
12      A.  Hamps Construction was involved with
13  the demolition.
14      Q.  Envirocon?
15      A.  Envirocon.
16      Q.  Did you have any interaction with
17  either Hamps Construction or Envirocon?
18      A.  Again, my interaction would be to
19  monitor the work and --
20      Q.  In monitoring the work, would you be
21  involved with evaluating whether they're
22  working efficiently?
23      A.  With -- if I remember correctly, with
24  the subcontractor they were awarded a contract
25  from Washington more like on a fixed-price type
                                            Page 56
```

```
 1  of situation, so I didn't quite look at it the
 2  same as the -- from the milking it aspect, I
 3  looked at it just to ensure that they were
 4  doing the work according to the work plan
 5  requirements.
 6      Q.  If you saw that something was
 7  proceeding not in compliance with the work
 8  plans, as you understood them to be, what would
 9  you do?
10      A.  I would notify the, um -- QC
11  representative who was more my direct point of
12  contact with the contractor, and, um -- and/or
13  the -- and also my supervisor Jim -- not
14  really -- he's not really my supervisor, but in
15  the chain of command, he's my first point of
16  contact with the Corps was Jim Montegut.
17      Q.  Did you have any involvement while on
18  that WGI project with a guy named Weatherly?
19      A.  John Weatherly, if I remember
20  correctly, was the contracting officer, and he
21  would come out periodically from Oklahoma, if I
22  remember right.
23      Q.  Tulsa?
24      A.  Tulsa, yes.  And he would come out to
25  the project periodically, and my interaction
                                        Page 57
```

```
 1  was more social than work-related.
 2      Q.  Did you ever send any reports to him
 3  directly?
 4      A.  No.
 5      Q.  Would you ever, in the course of your
 6  inspection duties, evaluate whether more money
 7  was needed for the project or be involved with
 8  requests for more money?
 9      A.  No.
10      Q.  While on the project, did you have
11  interaction with a guy named Guillory?
12      A.  Lee Guillory, yes.
13      Q.  What was that interaction?
14      A.  Lee was the construction division --
15  our construction division manager I think is
16  his position and, um -- he would come out to
17  the project.  Again, he more -- he mostly dealt
18  with Jim Montegut, so the work aspects that I
19  dealt with him on it would be more like he
20  would just come out and was trying to get
21  updated on status and stuff like that.  That
22  was more or less my interaction with Lee.
23      Q.  Was Montegut the ranking individual
24  for the Corps at the project in the field?
25      A.  In the field, yes.
                                        Page 58
```

```
 1      Q.  Would he be there on a daily basis?
 2      A.  Yes.
 3      Q.  At the time, which is while you were
 4  there, 2001 until -- how long were you on that
 5  project?
 6      A.  I believe it was around a year and
 7  half, maybe slightly under that.
 8      Q.  And why did your term with them end?
 9      A.  Um -- I had gotten promoted to a
10  GS-11, which GS-10 is the first step, and,
11  um -- before I was going to take my new
12  position over, they wanted me to stay on the
13  project for a while longer.  I don't know if
14  that had to do with that project itself or just
15  where I was going.
16      Q.  What was the next project you went to?
17      A.  Well, I started working, actually, in
18  the area office as opposed to -- even though I
19  worked for the area office on the Washington
20  project, my office got located in the area
21  office which is up here at the district, and I
22  was working under a team leader and was working
23  as a project engineer over projects, dredging
24  projects.
25      Q.  During the time period while you were
                                        Page 59
```

```
 1  with the WGI project, which is 2001 to
 2  approximately 2003, and Montegut, was he the
 3  ranking individual in the field that entire
 4  time?
 5      A.  Yes.
 6      Q.  Was he assigned only to that project
 7  or was he handling a number of projects?
 8      A.  As far as I know, it was just that
 9  project.  He was there every day all day.
10      Q.  When you prepared your daily logs, who
11  would they have been addressed to?
12      A.  I believe we addressed them to the
13  area engineer, to the chief of construction.  I
14  don't remember who the -- if there's a third
15  person on there who we addressed them to, but
16  that's the two main places that I'm familiar
17  with where they go.  And also we keep a copy in
18  the field.
19      Q.  Is that standard that those
20  individuals would be the ones receiving that
21  documentation, or is this something unique to
22  this particular contract?
23      A.  Well, to my understanding, the area
24  engineer doesn't probably get all copies of the
25  reports in his hand.  I think they're going to
                                        Page 60
```

```
 1  the area office files.
 2     Q.  And who -- on that WGI project, who
 3  would have been the chief contractor, chief
 4  construction contractor?  Is that the term you
 5  use?
 6     A.  Yeah.  Chief of construction.
 7     Q.  Chief of construction?
 8     A.  At the time?  I think it was Jim
 9  Miles.
10     Q.  And where was he located, here in the
11  New Orleans District or at a different area?
12     A.  He was located here in the New Orleans
13  District at the time.
14     Q.  The area engineer, was that the New
15  Orleans District area or a different area?
16     A.  New Orleans area engineer.
17     Q.  Do you recall who that would have
18  been?
19     A.  Dom El Guezabal.
20     Q.  How do you spell last name?
21     A.  E-L, G-U-E-Z-B-A-L?  Might be an A
22  between the Z and the B, I'm not sure.
23         D-O-M.  Domingo I think is his first
24  name.
25     Q.  Did you have any interaction with an
                                          Page 61
```

```
 1  individual by the name of George Bacuta while
 2  at this project?
 3     A.  No.
 4     Q.  Any interaction with a guy by the last
 5  name Dicharry who I understand is retired now?
 6     A.  No.
 7     Q.  How about an individual by the last
 8  name Grieshaber?
 9     A.  No.
10     Q.  Did you ever go up to Tulsa --
11     A.  No.
12     Q.  -- in relationship to your involvement
13  with this project?
14     A.  No, I did not.
15     Q.  Prior to this project, had you ever
16  had any interaction with Mr. Weatherly?
17     A.  No.
18     Q.  During this two-year period you were
19  with the project, did you discuss this project
20  or your involvement in any way with anyone
21  associated with the hurricane protection
22  project division?  The levee division.
23     A.  With the levee division, as I know it
24  with engineering division, no.  I'm not sure
25  what you mean by levee division, actually.
                                          Page 62
```

```
 1     Q.  Anyone who would have been responsible
 2  for the maintenance and supervision of the
 3  levee.
 4     A.  Maintenance and supervision of the
 5  levee.  I don't know what that means exactly.
 6  Maintenance of the levee after its construction
 7  is usually turned over to the local levee
 8  district.  I had no interaction with them.
 9     Q.  Okay.  Did you have any interaction
10  with anyone from the geotechnical department
11  within the engineering and construction
12  division?
13     A.  No.
14     Q.  I know from some of the records that I
15  have, and we'll probably go through them in a
16  little bit, that you attended some meetings
17  that included both Corps individuals, WGI
18  individuals and some other subcontractors of
19  WGI.
20         Do you recall any of those
21  specifically?
22     A.  I don't recall any specific meeting.
23  I recall having meetings.  We would have weekly
24  status meetings.  Um --
25     Q.  What day were those weekly status
                                          Page 63
```

```
 1  meetings held?
 2     A.  I don't remember.  Once a week, as
 3  best I recall.  I don't remember the date.
 4     Q.  Was there a particular date and time
 5  set or would they just try to marshal everybody
 6  together at a certain time when they could?
 7     A.  I think we tried to do it on a certain
 8  day and time as best we could.
 9     Q.  Was there an agenda for the weekly
10  meeting that would be published so when
11  everybody walked in they passed it out and said
12  this is what we're going to talk about today?
13     A.  I don't recall that specifically, but
14  there probably was.  I remember that we had
15  some papers that we went off of and went item
16  by item just down the list.
17     Q.  I know that there are some meetings in
18  which minutes were taken.  Do you know whether
19  at all the meetings you attended minutes were
20  taken?
21     A.  I don't know.  I don't recall that.
22     Q.  On a lot of the meeting minutes I
23  believe the name Sarah Alvey is indicated as a
24  person that was taking them?
25     A.  Yeah.  Sarah Alvey was I believe the
                                          Page 64
```

16 (Pages 61 to 64)

**Page 113**

1 contractor with comments in approval or
2 disapproval or partial approval form. I'm not
3 sure who else was in the chain here to review
4 this.
5    Q.  So it's possible, and the reason I've
6 asked the question, when you look at this and
7 it's just Jim Montegut signing disapproved, he
8 might not necessarily even be making that
9 determination, he could just be the one signing
10 off on what was vetted by people with other
11 knowledge than him, correct?
12    A.  Very possible.
13       MS. EL-AMIN:
14          Objection to the hypothetical.
15 EXAMINATION BY MR. JOANEN:
16    Q.  With that type of process and
17 procedure, what type of documentation is
18 generated to show who would have -- if it was
19 done, if it was reviewed by someone other than
20 just Jim Montegut, what would you call the
21 document that would indicate who reviewed and
22 signed off on it as approved, disapproved or
23 disapproved with some --
24    A.  Limitation?  I don't know the form
25 number if there's a form number, but the

**Page 114**

1 process would be to go to review to the
2 appropriate office who would be reviewing that
3 if it was outside of construction division, and
4 they would send their comments back.  It's
5 typically some type of form.  You know, I don't
6 know if it was done E-mail or not.  I have no
7 idea because it wasn't part of that process.
8    Q.  It indicates this what appears to be
9 the sequence of operations for the lift station
10 removal.  I'm just going by what would be
11 perhaps a final plan where they indicate they
12 drive the sheet piles around the perimeter to
13 60 feet.  Were you involved in any way with
14 making the determination that 60 feet was
15 appropriate?
16    A.  No, I was not.
17    Q.  Do you know, in your experience as an
18 inspector, why they would go down to 60 feet as
19 opposed to 55 or 65?
20    A.  No, I don't know why.  I would imagine
21 that typically that's determined by an
22 engineer.
23    Q.  Do you know of your own knowledge
24 whether Mr. Montegut has professional
25 expertise in underseepage and Artesian heads

**Page 115**

1 and how they relate to levees and other
2 protection structures?
3    A.  I don't know one way or the other
4 whether he has it or not, the expertise.
5    Q.  I'll show you what I'll mark as
6 Exhibit 17.  This is, I believe, one of your QA
7 daily reports.  It's WGI 8583 through 8585.
8 I'll let you look at that.
9       (Exhibit 17 was marked for
10 identification and is attached hereto.)
11    A.  Okay.
12 EXAMINATION BY MR. JOANEN:
13    Q.  Did you generate that document?
14    A.  It appears that I did.  I see it's not
15 signed, but my name is on the bottom of it --
16 typed in on the bottom of it.  It looks kind of
17 like my writing.
18    Q.  Would that be a typical document that
19 you would create as your daily log?
20    A.  Yes.
21    Q.  And the information contained in there
22 is, I guess to the best of your ability, an
23 accurate depiction of what happened on that
24 day?
25    A.  Yes.

**Page 116**

1    Q.  And that's the information that would
2 be provided to the various people supervising
3 the project above you to understand what was
4 happening?
5    A.  Yes.
6    Q.  It indicates, if you turn to the
7 second page when you talk about the scope of
8 the work that they were removing the cofferdam
9 from the sewer lift station area?
10    A.  From what I can determine from this,
11 it looks like they were in the process of
12 removing the pilings inside and were
13 backfilling up as they were coming up.  That's
14 what it kind of reads -- how it reads to me.
15    Q.  But they're -- the 60-foot sheet pile
16 that was put down there to make the cofferdam,
17 that was removed as that lift station project
18 was completed, is that correct?  In essence,
19 they weren't left there.
20    A.  Right.  Yeah.  I believe they were
21 removed.
22    Q.  Because I've read some reports, not
23 particularly here, where if they can't get the
24 sheet pile up they just cut it off at a certain
25 spot.

1  ladder up to it or whatever.
2     Q.  And was there anything about the fence
3  that would prevent people from getting over it?
4  Did it have barbed-wire across it?
5     A.  I don't remember that.  I really
6  don't.  Sorry.
7     Q.  No need to apologize.
8         That was a chain-link fence?
9     A.  I'm pretty sure it was, yeah.
10    Q.  Do you remember how tall it was?
11    A.  No.
12    Q.  I'll show you number Exhibit 21 is WGI
13 8595 to 8597.  Again, this is a daily log.
14 It's going to indicate that sheet piling was
15 removed.  I'm just going to ask you to look at
16 that and tell me if that refreshes your
17 recollection as to whether sheet pile was
18 removed from the cofferdam.
19        (Exhibit 21 was marked for
20 identification and is attached hereto.)
21    A.  Okay.
22 EXAMINATION BY MR. JOANEN:
23    Q.  Have you had a chance to review that?
24    A.  Yes.
25    Q.  What's the dates of that document?
Page 137

1     A.  10 to 12 November, 2001.
2     Q.  And does that refresh your
3  recollection regarding the removal of sheet
4  pile from the cofferdam?
5     A.  Somewhat.  Somewhat.
6     Q.  The fact that it was removed and laid
7  on the side, would that indicate that it was
8  taken out?
9     A.  Yes.
10    Q.  If the entire sheet could not have
11 been taken out -- I know at some point it said
12 the sheet pile may have reached down to fifty
13 feet or so.
14    A.  Uh-huh.
15    Q.  If the entire amount wasn't able to
16 take place, it had to be cut off, would that
17 have been noted in your quality log -- quality
18 assurance log?
19    A.  I would normally note something like
20 that, yes.
21    Q.  Would that be something that would
22 require additional payment to WGI by the Corps
23 because maybe the work was more than was
24 originally intended?
25    A.  No.  Well, first of all, the work that
Page 138

1  was performed here was performed by a
2  subcontractor.  And typically, their work was
3  not time and materials or cost plus, it was a
4  fixed price type subcontract.  So that wouldn't
5  have any difference on costing more money to
6  the government by Washington Group.
7     Q.  If the subcontractor felt that they
8  had to do more work than originally they had
9  planned, they would take that up with WGI to
10 get more money?
11    A.  Yes.
12    Q.  Would there be -- if WGI played
13 hardball with them and said we're just not
14 giving it to you, would they file some type of
15 lien like you would have, say, like in a
16 construction project building a house?
17    A.  If, um -- if Washington didn't agree
18 that they had a claim for more money --
19    Q.  Uh-huh.
20    A.  -- then they could file a claim with,
21 um -- I guess Washington is the way it would
22 work.  Typically -- I haven't been involved
23 with many claims at all, but typically, I
24 believe if a subcontractor has a claim they
25 claim the prime, and then the prime would claim
Page 139

1  the government if they want to get reimbursed
2  for that, or they would fight it out with their
3  subcontractor.
4     Q.  As the inspector for that project, if
5  any of that took place would that have funneled
6  through you in some sort?
7     A.  I'm sure I would have known about it
8  but I don't recall that happening.
9     Q.  If there were issues that WGI had with
10 the quality of work that its subcontractors
11 were doing, would that be something you would
12 have been involved with?
13    A.  Yes.
14    Q.  And how would you have been involved
15 with that?  Would you have attended the
16 meetings that it was discussed?
17    A.  Probably not in a meeting between them
18 and their subcontractor.  We would have only
19 attended a meeting probably if we would have
20 called for a meeting involving this work or if
21 they would invited us.  But typically they have
22 their in-house meetings with their own
23 subcontractors on things of this nature.
24    Q.  If there were a process taking place
25 during a project that you weren't satisfied
Page 140

```
 1  individuals for the Corps would have been in
 2  the field to attend that meeting?
 3     A.  Normally -- for the Corps?  The
 4  project inspector, project engineer --
 5     Q.  That would be you?
 6     A.  Well, no, I wasn't the project
 7  engineer on this project.  I was the inspector.
 8     Q.  So you would have been there?
 9     A.  I would have been there.
10     Q.  Montegut is the engineer?
11     A.  Montegut would have been there,
12  Ariatti, and Lee Guillory attended I believe
13  some of the preparatories.
14     Q.  At the excavation dealing with the
15  wedding cake structure and the sewer lift
16  station, when they're talking about how deep
17  they're going, do you recall whether there was
18  any discussion about ground water flow?
19     A.  I don't recall.
20     Q.  Do you recall whether there was any
21  discussion about the interruption of ground
22  water flow with the sheet pile depth?
23     A.  I don't remember.
24     Q.  Do you remember whether there was any
25  concern voiced by anyone with the Corps to WGI
                                        Page 149
```

```
 1  or one of the subcontractors doing the deep dig
 2  to say, you're going down a certain depth, we
 3  want to keep an eye on the floodwall over
 4  there?
 5     A.  I don't recall.
 6     Q.  Based upon your knowledge of the
 7  people when were present at that on behalf of
 8  the Corps, would anyone there have had the
 9  experience or knowledge to catch the
10  discrepancy of the reported 25-foot sheet pile
11  depth and the actual sheet pile depth of 8
12  feet?
13         MS. EL-AMIN:
14             Objection to form.
15             You can answer.
16     A.  You want to repeat it again?  I'm
17  sorry.
18         (Whereupon the previous question was
19  read back.)
20  EXAMINATION BY MR. JOANEN:
21     Q.  I'm asking about your knowledge of
22  those people there.
23     A.  It's possible, but I don't know.  I
24  don't know for sure.
25     Q.  If someone had caught the discrepancy
                                        Page 150
```

```
 1  and said there's only an 8-foot sheet pile
 2  depth there, you may think there's a 25-foot
 3  sheet pile depth there, what would the steps
 4  have been by either the project engineer or
 5  Mr. Guillory to address that discrepancy?
 6         MS. EL-AMIN:
 7             Objection to form.
 8     A.  My best guess is that they would have
 9  alerted probably Washington Group so they could
10  talk to their engineering consultant, as well
11  as I would think we would talk to engineering
12  division here at the Corps.
13  EXAMINATION BY MR. JOANEN:
14     Q.  Is it possible that since no one said
15  anything about the discrepancy at these
16  preparatory meeting phases that the people who
17  were at the preparatory meetings phases of the
18  wedding cake structure and the sewer lift
19  station didn't know what the actual depth of
20  the sheet pile was?
21         MS. EL-AMIN:
22             Object to form.
23     A.  I don't know.  I don't know.
24  EXAMINATION BY MR. JOANEN:
25     Q.  Knowing full well the importance of
                                        Page 151
```

```
 1  seepage and underseepage and Artesian heads,
 2  would that be the type of thing that would be
 3  considered at these types of meetings, the
 4  preparatory meeting for the wedding cake
 5  structure and the sewer lift station?
 6     A.  If it's a known issue, yes.
 7     Q.  The inverse being true, if it's not a
 8  known issue it's not brought up, right?
 9     A.  Right.
10         (Brief recess.)
11  EXAMINATION BY MR. JOANEN:
12     Q.  You had mentioned previously that part
13  of your job description as the inspector was to
14  assure safety on the job site.
15         You recall that?
16     A.  Yes.
17     Q.  Can you give me some examples of what
18  type of things you'd be looking for as the
19  inspector?
20     A.  Yes.  Um -- we would be looking at the
21  equipment on site and we would be making sure
22  the equipment, as it comes on the job site or
23  before putting it into use, meets the safety
24  requirements and the Corps' safety manual.  We
25  do equipment inspection sheets on each piece of
                                        Page 152
```

**Page 153**

1  equipment. In fact, the contractor does the
2  actual inspections and we witness the
3  inspections. We try to witness 100 percent
4  but, you know, we don't always. But it does
5  fall back on the contractor's responsibility to
6  do this.
7       We ensure that the contractor's
8  operating safely. We ensure that they're
9  wearing the proper protective equipment. Um --
10 we ensure that the particular phase of work has
11 the activity hazard analysis which applies to
12 that work. The contractor develops this, as
13 well. And he states, you know, what's going to
14 take place, what are the hazards involved in
15 this work, and what are the proactive ways to
16 do this work safely. And we ensure that he
17 follows up on how he does that.
18    Q.  That involves the slips, trips and
19 falls events?
20    A.  Yes.
21    Q.  In the activity hazard analysis, where
22 is that specified, is that in the Corps' safety
23 manual?
24    A.  Yes.
25    Q.  In the Corps' safety manual, does that

**Page 154**

1  also specify that fences are going to be built
2  around the perimeter?
3     A.  I think it does say something in there
4  about fences. But typically, the fences come
5  more from the contract specs or, you know, that
6  they are to be installed and where they are to
7  be installed, and usually shown located on the
8  drawings where they are to be installed. So
9  yeah, I think it does say something in the
10 safety manual. But that's typically spelled
11 out in each contract.
12    Q.  And you said that all the projects
13 that you've been associated with, they have
14 built fences around the project?
15    A.  Not all of them. It depends on --
16 where applicable. You might have miles of
17 levee and you can't.
18    Q.  So when they're doing work out on the
19 MRGO levee, would they put fences out there?
20 Probably not, huh?
21    A.  No. And also, the fences I guess
22 really are around where like the office
23 compounds are going to be and parking areas are
24 going to be, and it's to protect the property
25 there.

**Page 155**

1     Q.  From theft, things of that nature?
2     A.  Yes.
3     Q.  And vandalism?
4     A.  Yes. And in the case of an
5  environmental job, I would think steps would
6  probably be taken to keep people from harming
7  themselves environmentally.
8     Q.  With this type of project -- this was
9  an environmental job; is that correct?
10    A.  It was an environmental remediation
11 and a demolition job, I guess.
12    Q.  Is it common that the Corps would
13 utilize environmental resources to handle
14 demolition projects?
15    A.  I'm not sure I understand.
16 Environmental resources? What do you mean by
17 that?
18    Q.  The monies, the funds, the utilization
19 of the individuals with that expertise to
20 handle what was a demolition job? I mean, you
21 don't need someone who's an expert in arsenic
22 to knock a building down, necessarily.
23    A.  Right.
24    Q.  Maybe you do, I don't know. But is it
25 common in your practice, in your experience,

**Page 156**

1  that the Corps would utilize those resources
2  for a project like this?
3     A.  Yes.
4     Q.  And why is that?
5     A.  Well, environmental is a little out of
6  the realm of the construction of a levee
7  project or, you know, building a floodwall or a
8  pump station. So I believe that we used the
9  Tulsa District to administer the contract
10 because they had something set up for this, for
11 TERC contracts. I believe they had an avenue
12 to award the contracts. So I would imagine up
13 in Tulsa there's, you know, some expertise up
14 there involving environmental stuff.
15    Q.  Well, and of course it then begs the
16 question, if you take someone who's an expert
17 in the environmental stuff may not necessarily
18 be an expert in protection of hurricane levees.
19    A.  It's possible.
20    Q.  And so that's why I ask why the
21 interaction here, in your experience.
22    A.  Sorry. The interaction what now?
23    Q.  That's why I'm asking about the
24 interaction. Do you know whether the Tulsa
25 District was interacting with anyone down here

39 (Pages 153 to 156)