## DECLARATION OF DR. ROBERT GLENN BEA

Robert G. Bea, under penalty of perjury, states as follows:

1.       This declaration is submitted to address: (a) failure of the East side levee and sheet pile supported floodwall (flood protection structure) which was intended to provide protection from flooding developed in the Inner Harbor Navigation Canal (IHNC) adjacent to the Lower 9th Ward during hurricane Katrina, (b) association of the failure with project site development (for expansion of the INHC locks) and remedial action (to remove contaminants and debris) of the IHNC East Bank Industrial Area (EBIA) performed by the Washington Group International, Inc. (WGI) in behalf of the U.S. Army Corps of Engineers (USACE).

2.       My declaration is divided into several sections. Section I provides an overview of my qualifications to serve as an expert on the issues associated with the failure of the flood protection structure adjacent to the Lower 9th Ward during hurricane Katrina. Section II provides a summary of the results of engineering forensic studies into the causes of the failure of the flood protection structure adjacent to the Lower 9th Ward during hurricane Katrina. Section III provides a summary of what I have been able to learn about how the work conducted by WGI in behalf of the USACE could have contributed to the failure of the flood protection structure adjacent to the Lower 9th Ward during hurricane Katrina.

Robinson Opposition to Motion to Dismiss                    EXHIBIT000019

## I. QUALIFICATIONS

3.      I have devoted the past two decades of my professional career to research associated with the catastrophic failure of engineered systems (e.g. BP Texas City refinery, NASA Columbia shuttle, Exxon Valdez oil tanker, Occidental Petroleum Piper Alpha oil and gas production platform). This work has focused primarily on the complex interactions of engineering and organizational – institutional mechanics associated with catastrophic failures.   The primary objective of this work has been development, validation, and application of advanced methods for Risk Assessment and Management (RAM) of complex engineered systems during their life-cycles (concept development through decommissioning). This work has been built on my three previous decades of experience with the design, construction, operation, maintenance, and decommissioning of major engineered systems around the world.

4.      Of particular importance to my testimony is the work I have performed since August 29, 2005 to investigate the failure of the flood protection system for the greater New Orleans area during hurricane Katrina. During the past 20 months, I have spent more than 3,500 pro bono hours assisting in the forensic engineering studies of the breaches and gaps in the hurricane flood protection system that led to the catastrophic flooding of the greater New Orleans area. This work has involved multiple field studies in the greater New Orleans area, interviews of people with extensive knowledge of the history of the New Orleans flood protection system (how it was designed, constructed, operated, and maintained), and review of the primary investigations and studies that have documented this failure.  I was a co-leader of the Independent Levee Investigation Team (ILIT) that conducted a 10-month intensive forensic study of this failure. I co-authored the report titled *Investigation of the Performance*

*of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005*
(http://www.ce.berkeley.edu/~new_orleans/, November 2005 Preliminary Report, May 2006
Draft Final Report, July 2006 Final Report). I have authored and co-authored seven
professional conference and journal papers that have documented this forensic work. I have
provided testimony to several Congressional committees and staff members who have
conducted investigations into the background for this failure.

5.      I am a professor in the Department of Civil and Environmental Engineering,
and associate director of the Center for Catastrophic Risk Management, University of
California, Berkeley. I have held this position since January of 1989. My current
responsibilities include teaching at the graduate and undergraduate levels, research, and
university, professional and public service. Prior to that, for seven years I held the position of
Vice President and Senior International Consultant at PMB - Bechtel's Ocean Engineering
Division located in San Francisco, California.

6.      My educational background includes an Associate of Arts degree from
Jacksonville University, Bachelor of Civil Engineering and Master of Engineering from the
University of Florida, and a Doctor of Philosophy from the University of Western Australia. I
have done graduate and postgraduate work at Tulane University, Rice University, Texas
A&M University, Bakersfield College, the University of Houston, the Technical University
of Norway, and the University of Western Australia.

7.      Attached hereto as Exhibit 1 is my curriculum vita. This is attached to
support my competency to attest to the matters stated herein. I began my career in 1954 as
an engineer-in-training for the U.S. Army Corps of Engineers. I was assigned to the southern
Florida Flood Control District and worked on engineering and construction of flood

protection facilities in the areas around Lake Okeechobee and the Everglades. In 1960, I was employed by Shell Oil Company as a coastal - offshore civil engineer. During my career with Shell Oil Company, Shell Development Company and Royal Dutch Shell Company, I worked in exploration, drilling, production, refining, transportation, engineering, construction, operations, and research.

In 1965, I was Chief Offshore Civil Engineer and Manager of the Central Engineering Division for Shell Oil Company located in New Orleans. It was during that year my family lost our home in New Orleans East (Pines Village) including all of our belongings due to flooding from breaches in the levees along the IHNC and Inter-Coastal WaterWay (ICWW) that developed as a result of hurricane Betsy. At this time, I was leading engineering teams working on development of risk and reliability based criteria for design and requalification of offshore platforms and pipelines subjected to hurricanes in the vicinity of the Mississippi River Delta and elsewhere in the Gulf of Mexico.

In 1977, I was appointed vice president and chief engineer of an international consulting engineering and contracting company (Woodward-Clyde Ocean Services now URS Corporation) that provided coastal and offshore engineering services including hurricane forecasting, development of design criteria, and engineering flood protection facilities for refineries and chemical processing plants along the Gulf coast. In 1981, I founded the Ocean Engineering Services Division of PMB and became vice president and senior international consultant for PMB – Bechtel. I joined the faculty of the University of California Berkeley in 1989.

I have published more than 350 technical papers in refereed journals and conferences and a similar number of technical papers, reports, and book chapters in non-refereed publications.

I have been recognized by the National Academy of Engineering, the International Energy Center, the Academy of Management, the American Society of Civil Engineers (ASCE) and American Society of Mechanical Engineers (ASME) for my pioneering contributions to development of advanced methods for risk assessment and management including human, organizational, and institutional factors. I am a registered professional civil, structural, and geotechnical engineer in seven states (Louisiana, Texas, Florida, California, Washington, Oregon, Alaska).

## II. FAILURE OF THE FLOOD PROTECTION STRUCTURE ADJACENT TO THE LOWER 9TH WARD

8.     The purpose of my affidavit is to discuss the key issues associated with the failure (breaches) of the levee, flood wall, and supporting sheet piling (flood protection structure) on the East side of the INHC adjacent to the Lower 9th Ward.  I first arrived at the site of the breaches on September 24, 2005.  Since that time, I have participated in multiple field studies of these breach sites and other breaches in this immediate area (e.g. West side of IHNC). These studies have included review of the evaluations of analyses of the breaches performed by the U.S. Army Corps of Engineers Interagency Performance Task Force (IPET, *Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System*, Draft Final Report, 1 June 2006, and partial Final Report, 26 March 2007), Team Louisiana (*The Failure of the New Orleans Levee System during Hurricane Katrina*, February 2007), the National Institute of Standards and Technology (NIST, *Performance of Physical Structures in Hurricane Katrina and Hurricane Rita: A Reconnaissance Report,* June 2006), the American Society of Civil Engineers (ASCE, External Review Panel Review Reports 1 – 3, 2006 ), and the National Academy of Engineers – National Research Council

(NAE/NRC, Committee on New Orleans Regional Hurricane Protection Projects Reports 1 – 3, 2006). I have performed studies of the history of activities, decisions and trade-offs that provided the background for this failure ("Reliability Assessment & Management Lessons from Hurricane Katrina," *Proceedings Offshore Mechanics and Arctic Engineering Conferenc*e, June 2007; "Investigation of the Performance of the New Orleans Regional Flood Protection Systems during Hurricane Katrina: Lessons Learned," *Proceedings of Geo-Denver 2007*, ASCE, February 2007; "Reinventing Flood Control," *Tulane Law Review*, December 2006). I have help perform detailed engineering analyses of the development of the breaches on the east side of the IHNC adjacent to the Lower 9th Ward ("Investigation of Levee Performance in Hurricane Katrina: The Inner Harbor Navigation Channel," *Proceedings of Geo-Denver 2007*, ASCE, February 2007)  and the sites of the other major breaches that developed in the New Orleans flood protection system during hurricane Katrina ("Investigation of Levee Performance in Hurricane Katrina: The New Orleans Drainage Canals," *Proceedings of Geo-Denver 2007*, ASCE, February 2007, "Validity and Reliability of Forensic Engineering Methods and Processes," *Proceedings of 4th Forensic Congress*, ASCE, 2006).

9.      In summary, it is my conclusion based on my experience and the forensic engineering studies of the two breaches that resulted in the catastrophic flooding of the Lower 9th Ward and adjacent areas that failure of the flood protection structure (levee, floodwall, supporting sheet piles) was due primarily to multiple flaws and defects embedded in the flood protection structure during its life-cycle.  These flaws and defects included those developed during the concept development (e.g. failure to recognize I-wall tension gap), design (e.g. failure to properly evaluate soil conditions and characteristics), construction (e.g.

failure to drive sheet piling to depths sufficient to prevent excessive water intrusion), operation (e.g. failure to provide adequate safe-guards to adjacent flood protection structure during IHNC EBA activities), and maintenance (e.g. failure to respond to early warnings of potential for excessive seepage). Hurricane Katrina provided a test of this flood protection structure and it performed miserably.

The information made available by WGI and reviewed by the author clearly indicates a high degree of correlation of the site remediation work conducted by WGI at the EBIA sites and the two breach locations in the flood protection structure adjacent to the Lower 9th Ward. This remediation work (removal of soils, formation of cavities, vibrations) very probably had important effects on the soils relied upon to provide stability and protection for the flood protection structure. Removal and disturbance of the surface soils overlying the permeable sub-soils (marsh layers) would have facilitated the under seepage discussed in this declaration. In addition, removal of the soils on the canal side of the floodwall would have reduced the lateral stability of the flood protection structure.

10. The IHNC sits at the heart of the three main populated regions of New Orleans. As shown in Figure 1, a number of breaches developed along the IHNC during Hurricane Katrina, contributing to the flooding of all three of the most heavily populated protected areas in this event. This declaration addresses the two breach locations on the East side of the IHNC adjacent to the Lower 9th Ward (Figure 2).



Figure 1. Map showing principal features of the protected areas in the New Orleans area



Figure 2. Two breach locations on the IHNC adjacent to the Lower 9th Ward (IPET Draft Final Report, Appendix 11, 2006)

These two breaches will be identified as the North breach (approximately 200 feet wide, south of Florida Avenue) and South breach (approximately 1,000 feet wide, north of North Clairborne Avenue).

Early the morning of 29 August 2005, the water level in the IHNC began to rise as a result of the effects of the hurricane Katrina surge developed in Lake Borgne and its hydraulic connectivity with the ICWW and the Mississippi River Gulf Outlet (MRGO) (Figure 3).



Figure 3. Katrina hydrograph for IHNC (IPET Draft Final Report, Appendix 11, 2006)

The unusual drop in the water level at about 5 AM is believed to have been associated with breaches at the intersection of the CSX railroad at the I 10 overpass and a major levee breach into the Desire area of Orleans Metro on the west bank of the IHNC near France Road. According to IPET, this is the time the north breach developed into the Lower 9th Ward. The

ILIT and Team Louisiana data and analyses indicate that this breach developed several hours later. The water level staff gage and digital pictures at the IHNC lock located just to the south of North Claiborne Avenue (closed to prevent surge in river from entering) indicate that there was not a significant drop in the water level at 5 am and that the water level continued to rise to a peak of about 14 feet at 9 AM. With the elevations of the flood protection structure at about 12.5 feet, the walls would have been overtopped by the surge developed in the IHNC in this area from about 7 AM to about 10 AM.

11.    As the water level in the INHC increased during hurricane Katrina, the water reached the top of the earth levee (approximate elevation 6 to 7 feet, about 12 AM) on the east side and rose up the concrete floodwall (Figure 4). The land elevation on the east side outside the I-wall alignment is higher than the land behind the levee, having been built-up with materials dredged from the IHNC to form the EBIA.  This bench extends 100 to 200 feet west of the I-wall alignment at an elevation of zero to about 2 feet. Due to the USACE decision regarding the reference elevation for construction of the I-walls, everything was built 2 to 3 feet too low (top of wall elevations 12 to 13 feet).



Figure 4. As-built drawings for I-wall installation on the east bank of the IHNC adjacent to the Lower 9th Ward.

12. Maps dating back to the early 1800s (Figure 5) show that this section of this flood protection structure was built on top of buried swamp deposits which were comprised of soft, weak organic sediments that contained clays and silts.



Figure 5. Map of the City of New Orleans (1829, from Historic New Orleans Collection)

A centerline geologic section of the east bank of the IHNC (Figure 6) shows the north and south breaches to be underlain by primarily gray clays with occasional plastic silt strata. There are two significant marsh (swamp) deposits in the upper foundation soils.



Figure 6. East bank of IHNC geologic section showing south and north breaches (IPET Draft Final Report, Appendix 11, 2006)

A geologic cross section through the south breach (Figure 7) shows the marsh layers are variably interbedded layers of organic clays and peats, with large variations in permeability. The lateral permeability of these marsh layers is very high and there is a well-established history of under-seepage problems along this levee frontage (ILIT report, 2006).



Figure 7. Geologic cross section through the south breach (CH – high plasticity clays, ML – silts, CL – low plasticity clays)

As shown in this figure, the sheet pile curtain supporting the concrete floodwall is very short and fails to cut off flow through the second (main) marsh layer.

13. At the site of both breaches, as the water level continued to rise the concrete floodwall and supporting sheet pilling leaned toward the protected side. Due to the levee crown (top) elevation (below water level at this time) and levee cross-section, water intruded into a gap that developed between the sheet piling and supporting soils on the canal side (Figure 8). This allowed substantial increases in the water lateral pressures acting on the floodwall – sheet piling – soil levee system. In addition, the leaning floodwall and sheet piling effectively cut the supporting levee in half substantially reducing its lateral capacity.



Figure 8. Deformed mesh finite element model of south breach (surge elevation of 13.5 feet)

14. At the same time, transient flow analyses showed that the rising storm surge in the IHNC was effectively transmitted to the inboard side levee toe area (Figure 9). Based on the ILIT analyses, by about 8 AM, approximately 75% to 90% of the steady state flow surge-induced pore pressures reached the foundation soils beneath the inboard toe of the levee (Figure 10). It is important to note that these flow analyses did not include the dramatically shortened flow path caused by the gap formed behind the floodwall. Abundant evidence of

flood side cracking and sinkhole formation on the protected side was found in the surviving I-wall segment between the north and south breaches (Team Louisiana, 2007). These under seepage effects would have had extremely important effects on the soil strengths and resistance to lateral and vertical forces.



Figure 9. Pressure contours (pounds per square foot) for the south breach (surge at 14 feet).



Figure 10. Pore water pressure generation for the south breach at top of lower marsh layer

The IPET study did not analyze the potential effects of under seepage: "Piping and erosion from under seepage is unlikely because the I-walls were founded in a clay levee fill, a marsh layer made up of organics, clay and silt, and a clay layer. Because of the thickness, the low permeability of these materials, and the relatively short duration of the storm, this failure mode was considered not likely and was eliminated as a possible mode of failure" (IPET, 2006). Both the NAE/NRC and ASCE IPET oversight and review committees criticized the IPET lack of recognition and treatment of under base seepage effects in their analyses of the breaches that developed in the flood protection system during hurricane Katrina.

15.     As noted earlier, (due to their lower than authorized elevation and the surge water conducted into the IHNC by the ICWW and MRGO) from about 7 AM to 10AM, the floodwalls would have been overtopped. Because no protection (armoring) had been provided for the levee behind the floodwalls (e.g. splash pads), as the water overtopped the floodwalls, trenches were eroded behind the floodwalls (Figure 11). This led to removal of substantial portions of the levee and consequently reduced the lateral capacity of the flood protection structure.

15



Figure 11. Surge overtopping scour trench developed behind I-wall at south breach (IPET Draft Final Report, Appendix 11, 2006)

Analyses performed by the author indicate that sections of the I-wall could have failed due to removal of the lateral support caused by erosion of the deep trenches (5 to 6 feet) formed behind the supporting sheet piles. These analyses and conclusions have been corroborated by Gordon Boutwell (Flooding Evaluation Tank T-250-2, Murphy Oil Facility, Meraux, LA, Expert Report, August 2006) and NIST (2006).

16.     As the water continued to rise in the INHC, under the increased lateral pressures, the soil levee supporting the floodwall and sheet piling deformed laterally and differentially. The floodwall had vertical 'water stops' that separated the individual panels that comprised the concrete floodwall (expansion – settlement joints). Significant wall movement was found in the wall sections adjacent to the north breach. However, no such movement was evident adjacent to the south breach. As the flood protection structure deformed laterally under the water pressure, it is likely in the breach sections that the vertical water stops separating adjacent sections of the concrete flood wall opened sufficiently to all

water to jet through the openings and erode the soils on the protected side of the levee. This behavior was photographed as the breach at the 17th Street Canal developed (Kardon, Bea, Williamson, "Validity and Reliability of Forensic Engineering Methods and Processes," *Proceedings 4th Forensic Congress*, ASCE, 2006; IPET Report 2006). This could help explain the report given by IPET that eyewitnesses indicated that water in the 9th Ward near Florida Avenue was accumulating as early as 5 AM when the water level in the IHNC was still well below the top of the floodwall.

17.     Lateral translational instability was apparently involved at both north and south breaches. Inspections of the flood protection structure north and south of the northern breach indicated significant movements had occurred in the adjacent sections of the flood protection structure. There was no such indication south of the southern breach. Both limit equilibrium analyses and finite element analyses that included the presence of the gap that opened on the outboard side of the sheet pile curtain effectively cut the levee embankment in half and included the effects of under seepage indicated that the failures occurred when the water level reached an elevation between 13 and 14 feet (7 AM to 9 AM).   Although different in some details, Team Louisiana arrived at similar conclusions.

18.     However, the IPET analyses (2006) reached somewhat different conclusions for both north and south sites. IPET attributed the north breach to a deep, semi-rotational failure through the soft gray clays of the foundation, and at an early time (well before 6 AM with water level at about 11 feet) in order to explain the eyewitness observations cited earlier. This would indicate an 'unexpected' failure. As noted, the eyewitness reports of water accumulation at the levee toe could be explained as resulting from water flowing through the water stops. IPET stability analyses of the south breach resulted in computer factors of safety

larger than unity with the water level at the top of the wall and a crack behind the wall, indicating that the walls at those locations would have remained stable if none of the soil supporting the wall had been removed by erosion. As noted, IPET choose not to investigate the effects of under seepage and hence the effects were not included in their analyses.

19.     Additional evidence for the nature of the under seepage potential at these two sites was provided by an impressive "crevasse splay" (local term for fan shaped under seepage erosion features, ILIT 2006). This crevasse splay developed at the outboard side of the interim repair section at the south breach (Figure 12). This crevasse splay occurred at the relatively low reverse-flow gradients as the inboard area continued to drain after it had already been largely unwatered by pumping after initial drainage through open breaches. This crevasse splay undermined the otherwise continuous outboard side toe fill blanket along this frontage. The location of this crevasse splay, coincident with the location of the south breach failure provides strong support for the presence of a foundation stratum of very high lateral permeability at this location.



Figure 12. Crevasse splay induced by reverse flow beneath the interim repair embankment

20.     The conclusions reached by the engineering forensic analyses are in substantial agreement; the flood protection structure adjacent to the Lower 9th Ward did not perform acceptably or as intended in the original design. If the flood protection structure had been built and maintained to the intended elevation, then no significant overtopping would have occurred. With no overtopping, there would not have been any erosion of the supporting soils behind the floodwall. If the potential for formation of a water filled gap between the flood wall and its supporting sheet piling and the adjacent soils had been recognized, then the lateral stability performance would have not been compromised. Similarly, if the potential for under seepage had been recognized and the seepage prevented, then the lateral stability performance would not been further compromised.

### III. HISTORY OF THE FLOOD PROTECTION STRUCTURE ADJACENT TO THE LOWER 9TH WARD

21.     Since the founding of New Orleans by the French in 1718, a navigation channel between the Mississippi River and Lake Pontchartrain had been proposed. This would allow intercoastal commerce to connect with river and seaborne commerce. The Port Authority of New Orleans (established 1896) recognized that the problem with establishing a water link was the fluctuating flow of the river and the difference in the elevations of the river and Lake Pontchatrain. Thus, locks would be needed to control the flow between the river and the lake.

In 1914 the Port Authority received authorization from the state legislature to locate and construct a deep-water canal. The proposed canal would be 5.3 miles long and up to 1,600 feet wide, located just downstream of the Army's riverfront supply center (about 2 miles downriver and parallel to Elysian Fields Avenue).

Construction of the IHNC was started in 1918 with the excavation necessarily proceeding from the lake toward the river. Excavation work started with construction of parallel dikes on either side of the canal so hydraulic fill could be placed behind the dikes. Draglines were employed to scoop out the more resistant soils dragging it up onto the dikes which were gradually built up to become permanent protective levees. Buried cypress stumps slowed progress by jamming the suction dredges and stalling the dragline buckets. From the outset, contractors battled the problems with stability of the canal slopes, as water and the soft soils constantly slid back into the excavation.

The canal excavation was completed in 1919 and work then shifted to the lock structure located 2,000 feet from the Mississippi River at the south end of the canal. The lock structure was completed during 1923.

Upon completion, the Port Authority set about developing piers, docks and quays along the INHC to increase cargo handling. The Port Authority also made available adjacent lands for use by industries. Much of the area on the west side of the IHNC was built during World War II. The eastern side was developed after the early 1950s.



Figure 13. IHNC 1964 (USACE photograph)

The gulf coast portion of the ICWW is a protected shipping channel between Port Isabel, Texas and Apalachee Bay Florida. In 1944, under the USACE authorization, the ICWW was rerouted to pass thorough the southern part of the IHNC and tie in with the Mississippi River. The MRGO and its tie-in with the ICWW were completed in the 1960s.

Thus, the IHNC became intimately connected with the Gulf of Mexico through the ICWW and MRGO.

The effectiveness of this intimate connection was demonstrated during hurricane Betsy in September 1965 when both sides of the IHNC experienced breaks (Figure 14). 6,560 homes and 40 businesses were flooded in water up to 7 feet deep on the west side of the IHNC. The east side of the IHNC also failed, flooding the present Lower 9th Ward in water up to 9 feet deep (Figure 15).



Figure 14. Hurricane Betsy flood inundation map (USACE, 1965)



Figure 15. Flooding east of IHNC following hurricane Betsy (vicinity of Lower 9th Ward, USACE photograph)

The USACE report on hurricane Betsy (1965) states that both internal levee failures and overtopping along the IHNC occurred on both the west and east sides. No details concerning the mechanisms of failure were provided. Following hurricane Betsy, the IHNC levees were heightened using steel sheet piles and concrete I-walls in the 1980s and 90s.

22.     By the late 1990s work was underway to expand the IHNC locks to relieve shipping congestion and allow further expansion of the Port of New Orleans. Congress authorized the study for the lock enlargement / replacement in 1956. The proposed new locks would require a bypass channel that would be constructed at the East Bank Industrial Area (EBIA). The EBIA is located in the Lower 9th Ward, west of the floodwall and east of the IHNC, between Florida Avenue and Claiborne Avenue. Available documentation indicates that the USACE purchased the EBIA site from the Port of New Orleans in order to proceed with the bypass channel construction (WGI, "Project Work Plan, Project Site Development and Remedial Action of East Bank Industrial Area, Inner Harbor Navigation Canal Lock

Replacement Project," report to USACE, New Orleans District, 2000). WGI began working at the job site in January 2001.

The EBIA consists of 32 acres of former industrial sites previously leased from the Port of New Orleans to private owners. The EBIA consisted of six facilities named for their former occupants. These included (starting at the south) the International Tank Terminal, Saucer Marine, Mayer Yacht – Distributors Oil, Indian Towing, McDonough Marine, and Boland Marine. Available information indicates that the two Lower 9th Ward breach sites were located entirely in the Saucer Marine Service property (south breach site, used primarily for ship building operations) and Boland Marine property (north breach site, used primarily for ship repairs, storage, office space, painting operations, and steel fabrication).

At one time, underground storage tanks were located at both the Boland property and the Saucer property. These tanks were reported to have been removed. The State of Louisiana listed Boland Marine as an unspecified hazardous waste generator. In 1991, an anonymous employee contacted the Louisiana Department of Environmental Quality and reported that the company had buried drums containing hazardous waste onsite.

The EBIA had a long history spanning more than 4 decades of industrial use by marine service and petroleum distribution companies. Purportedly, tenants contaminated the property as a result of their industrial operations. Also of particular significance at the EBIA was the active placement of construction materials (concrete rubble) and solid wastes (barges, metal turnings, concrete blocks) to protect the properties from the effects of ship wakes. These two activities had two primary impacts derived from the existence of hazardous constituents that could negatively affect: 1) the environment at the time of construction, and 2) construction of the bypass channel.

To ameliorate these potential negative effects, the USACE New Orleans district contracted with WGI to characterize and remediate the EBIA's environmental contamination and identify and remove construction materials likely to interfere with bypass channel construction.

23. For remediation, the specifications required the canal bank be excavated to a depth four feet below the existing grade and fifteen feet from the edge of the water onto land. When possible, the work was done during low tide to facilitate visual observation of the work. When work was completed, the landside of these excavations became the 'new' shoreline. It is reported by WGI ("Technical Completion Report," 2005) that in the majority of cases the canal bank was excavated as required to a depth of four feet, additional observations of contamination prompted excavations to a deep as nine feet. The records provided by WGI indicate that a total of 12,259 tons of contaminated soils were removed from the Boland site and 35,636 tons of contaminated soils were removed from the Saucer site.

24. In addition to removal of canal-side soils that had previously provided stability and protection to the flood protection structure, numerous underground storage tanks and debris were removed. At the Saucer site, large underground storage tanks had to be removed. In addition, a buried railroad tank car required construction of a cofferdam so that the tank car could be filled with air, floated free, lifted and transported from the site. At the northern Boland site, a wharf extended along most of the IHNC. Following removal of the wharf materials, the piles comprising the foundation were pulled and transported from the site.

Twelve abandoned barges were located on the EBIA site. Conditions of the barges ranged from beached to completely sunken (embedded into the bottom). Ten of the barges were removed from the southern Saucer site and two barges from the northern Boland site.

The effects of these site remediation activities clearly could have extended well below the soil excavation levels cited earlier. Removal of barges, piles, and underground storage tanks could easily have reached to elevations of minus 10 feet to 20 feet; thus intersecting the underlying marsh deposits (Figures 6 and 7).

WGI completed its work, removed its equipment, and demobilized from the job site in May 2005.

25. The information reviewed by the author provided by WGI has been limited. Time has not permitted review of the large number of documents provided by WGI. Other pertinent documents referenced in the two WGI reports have not been obtained or reviewed.

The information that is available clearly indicates a high degree of correlation with the site remediation work conducted by WGI at the EBIA sites and the breach locations in the flood protection structure adjacent to the Lower 9th Ward. This remediation work (removal of soils, formation of cavities, vibrations) very probably had important effects on the soils relied upon to provide stability and protection for the flood protection structure (Figure 16). Removal and disturbance of the surface soils overlying the permeable subsoils (marsh layers) would have facilitated the under seepage discussed earlier in this declaration. In addition, removal of the soils on the canal side of the floodwall would have reduced the lateral stability of the flood protection structure.



Figure 16. Comparison of the as-built I-wall levee profile with pre-construction surveys at south and north breaches (Team Louisiana, 2007)

## IV. CONCLUSION

26.     Based on the foregoing developments, it is my expert opinion that an important contributor to the failure of the flood protection structure adjacent to the Lower 9th Ward potentially was caused by underseepage exacerbated by WGI EBIA site remediation activities.

I declare under the penalty of perjury under the laws of the United States of American that the foregoing is true and correct.

Executed on April 16, 2006, in Moraga, California.

_____

Robert Bea, Ph.D, PE