**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| ———————————————————————— | § | JUDGE DUVAL |
| | § | MAG. WILKINSON |
| PERTAINS TO: MRGO, *Robinson* (06-2268) | § | |
| ———————————————————————— | § | |

**REPLY MEMORANDUM**
**IN SUPPORT OF THE UNITED STATES OF AMERICA'S MOTION**
**TO DISMISS COUNTS TWO AND THREE OF THE AMENDED COMPLAINT**

Recognizing that the Court lacks jurisdiction over the subject matter of the claims set forth in Counts Two and Three of the amended complaint, the United States filed a straightforward motion seeking their dismissal.  In response, Plaintiffs submitted a lengthy memorandum accompanied by 18 exhibits and supplemented by a 25-page "amicus" brief ostensibly filed on behalf of the MRGO Plaintiffs' Litigation Sub-Committee, which happens to consist of the very same attorneys who represent Plaintiffs.  Yet despite their voluminous response, Plaintiffs cannot escape four irrefutable truths that require the dismissal of Counts Two and Three:

1.    Plaintiffs may not assert a strict liability claim against the United States—a point Plaintiffs now concede. *See* Pls.' Opp'n (Doc. 14246) at 2 (conceding that "Plaintiffs [do] not have a cause of action for liability without fault against the Government").

2.     Plaintiffs' administrative claims made no mention of Washington Group International, Inc. ("WGI"), the East Bank Industrial Area ("EBIA"), or the Corps of Engineers's supervision of WGI's work at the EBIA—also a point Plaintiffs now concede. *See id.* at 5 (conceding that the administrative claims do not "expressly mention[] WGI's negligent work along the EBIA on the IHNC").

3.     The  negligent supervision claim in Count Three arises from conduct different from that described in the original complaint—a fact already determined by this Court. *See* June 8, 2008 Minute Order (Doc. 13438-3) at 2 (observing that "the issue of liability for any damages arising from the EBIA was not raised in the initial Complaint").

4.     Supervision of a contractor's work, including the degree of oversight to exercise, is inherently a discretionary function.

## I.     Count Two Must Be Dismissed Because Claims of Strict Liability Are Not Cognizable Under the FTCA.

Count Two of the amended complaint is entitled "Strict Liability."  In the body of that count, in paragraph 112, Plaintiffs allege that the United States is "*strictly liable* for the damages occasioned by the vices and/or defects in the MR-GO."  Pls.' Am. Compl. (Doc. 13527-2) ¶ 112 (emphasis added).

In its motion to dismiss, the United States cited several decisions from the Supreme Court and the Fifth Circuit which conclusively establish that strict liability claims cannot be maintained against the United States under the FTCA.  *See* Mot. to Dismiss (Doc. 13653-2) at 4-5.  Unable to refute this authoritative body of law, Plaintiffs, in their opposition to dismissal, retreat from their own pleading and assert that, notwithstanding the title of Count Two and the very language of paragraph 112, they did not intend to assert a strict liability claim against the United States. *See* Pls.' Opp'n at 1.  In a last-ditch effort to save Count Two, Plaintiffs argue that the Court

2

should treat Count Two as a simple negligence claim brought pursuant to article 2317.1 of the Louisiana Civil Code. *See id.* at 1-2.

Given Plaintiffs' abandonment of their strict liability claim, the Court should dismiss Count Two, which, after all, is entitled "Strict Liability" and plainly alleges that the United States is "strictly liable." Further, the Court should reject Plaintiffs' invitation to ignore the "strict liability" language of Count Two and treat it instead as a claim for negligence. Plaintiffs already have a claim for negligence in Count One, and that count alleges that the United States negligently maintained the MRGO in a dangerous condition. In attempting to avoid dismissal of Count Two by inviting the Court to convert it to a claim of negligence, Plaintiffs would transform Count Two into a claim entirely duplicative of Count One. For this reason, Count Two should be dismissed rather than construed as Plaintiffs have suggested. Because Count Two sets forth a claim of strict liability rather than negligence, Count Two must be dismissed for lack of subject matter jurisdiction.

## II.     Count Three Must Be Dismissed Because Plaintiffs Failed to Present an Administrative Claim Based on the Corps's Supervision of WGI.

In its motion, the United States showed that Plaintiffs' administrative claims failed to mention WGI, the EBIA, or any other fact that would have demonstrated Plaintiffs' intent to pursue the negligent supervision claim expressed in Count Three. In response, Plaintiffs concede this fact. *See* Pls.' Opp'n at 5 (conceding that Plaintiffs' administrative claims do not "expressly

mention[] WGI's negligent work along the EBIA on the IHNC").[1]   Still, Plaintiffs advance several unavailing arguments in defense of Count Three.

First, Plaintiffs argue that "adequate notice does not require that the plaintiff set forth every conceivable legal theory or cause of action that could potentially be brought."  Pls.' Opp'n at 5.  While this statement of law is correct, it does not pertain to the deficiency in Plaintiffs' administrative claims that the United States identified in its motion.  The deficiency in Plaintiffs' administrative claims is not that they failed to describe a particular *legal theory* but that they failed to describe the *conduct* out of which Count Three arises.  *See* Mot. to Dismiss at 7-8.

Count Three asserts that the United States failed to properly supervise work performed by WGI at the EBIA, and that this work resulted in the weakening of the adjacent floodwalls and caused them to collapse during Hurricane Katrina.  *See, e.g.*, Pls.' Am. Compl. ¶ 120 (alleging that "Defendant Army Corps knew or should have known that [WGI's] work was causing, or caused, damage to the levee and/or flood wall structures adjacent to the IHNC/Industrial Canal, but was negligent because it did nothing to prevent the damage or remediate the damage once it was discovered either by the Army Corps or [WGI]").  Yet, as Plaintiffs now concede in their response, their administrative claims made no mention of WGI, the EBIA, or the United States' supervision of WGI's work.  These omissions compel the conclusion that Plaintiffs'

---

[1]  In a half-hearted effort to demonstrate compliance with the administrative claim requirement, Plaintiffs point to the fact that their administrative claims did make one mention of the IHNC.  *See* Pls.' Opp'n at 6.  That mention, however, came in the context of defining the geographic boundaries of the potential class of plaintiffs, and cannot fairly be said to have put the United States on notice that Plaintiffs would pursue a claim for negligent supervision of work performed at the IHNC by WGI.

4

administrative claims failed to provide "facts sufficient to allow [their] claim[s] to be investigated." *Portillo v. United States*, No. 93-8275, 1994 WL 395174, at *4 (5th Cir. June 30, 1994) (quoting *Cook v. United States*, 978 F.2d 164, 166 (5th Cir. 1992)).

This deficiency in Plaintiffs' administrative claims renders them similar to the administrative claim at issue in *Portillo*—a binding decision from the Fifth Circuit that the United States discussed in its memorandum, *see* Motion to Dismiss at 6-7, but which Plaintiffs ignored in their response. In *Portillo*, the Fifth Circuit affirmed the dismissal of a claim relating to a hospital's negligent administration of anesthesia because the administrative claim presented facts relating only to the hospital's monitoring of the plaintiff after the surgery. *Portillo*, 1994 WL 395174, at *4. Importantly, the Fifth Circuit recognized that "an administrative claim must specifically delineate *facts* that put the government on notice *of each potential basis for relief*." *Id.* (citing *Bush v. United States*, 703 F.2d 491, 494 (11th Cir. 1983)) (emphasis added). As *Portillo* makes plain, the "facts" that provide notice of "each potential basis for relief" consist of the acts and omissions of alleged negligence. Delineating some of those facts does not put the government on notice that it should ferret out and investigate every other possible act or omission that might possibly have caused harm. If it did, *Portillo* would have been decided differently.

The question is not whether Plaintiffs' administrative claim delineated every *legal theory* that they would later assert in a lawsuit, but whether it delineated the *conduct* that would form the basis for the relief they would ultimately seek. Even a cursory review of the administrative claim reveals that the "potential bases of relief" were the acts and omissions of the Corps in designing, constructing, operating, and maintaining the MRGO. Plaintiffs' admitted failure to include any facts about the EBIA or the Lock Replacement Project in their administrative claims

renders those claims inadequate to support the relief sought in Count Three.  In the absence of an administrative claim delineating the facts that form the basis of Count Three, it must be dismissed for lack of subject matter jurisdiction.

Plaintiffs nevertheless argue that their failure to provide adequate notice should be excused because at the time they filed their administrative claims, they could not have known of the effect of WGI's work on the structural integrity of the adjacent floodwalls.  Specifically, Plaintiffs argue that "WGI's subterraneous work along the EBIA in the IHNC was not evident to Plaintiffs, their counsel, or their experts until after extensive on site field investigation and expert analysis."  Pls.' Opp'n at 6.[2]

The premise of this argument is demonstrably false.  Plaintiffs presented their administrative claims on October 24, 2005.  *Four days earlier*, on October 20, 2005, six other persons filed a lawsuit alleging, among other things, that WGI's work at the EBIA contributed to the injuries they suffered from Hurricane Katrina.  *See* Compl. in *Vodanovich v. Boh Bros.*, 05-cv-05237 (Doc. 1), at 9-10 (alleging that WGI's "use of heavy vehicles and/or other heavy construction equipment along the Industrial Canal between the flood wall and the canal damaged the levee and/or flood wall caused and/or contributed [to] the above-mentioned breach in the levee and/or flood wall").  Incredibly, that complaint was signed by *Joseph M. Bruno*—the same Joseph M. Bruno who signed Plaintiffs' response memorandum claiming that on October 24, 2005, he had no knowledge of WGI's work along the EBIA.  *See* Pls.' Opp'n at 25.  Obviously,

_____

[2]Plaintiffs filed their administrative claims less than two months after Hurricane Katrina. Under the FTCA, Plaintiffs had two years from the date of their injuries to investigate the causes of their injuries and to present their administrative claims.  Even after presentment, Plaintiffs could have amended their claims at any time prior to their denial.  As it happened, Plaintiffs' claims were not denied until after Plaintiffs had filed suit.

the Court must reject Plaintiffs' false assertion that neither they nor their counsel could have known about the effect of the work performed by WGI at the EBIA when they presented their administrative claims.

Plaintiffs further argue that their failure to provide adequate notice should be excused because the United States would not have considered their claims even if they had been made. *See* Pls.' Opp'n at 7-9.  This argument—that compliance with the administrative claim requirement would have been futile—must also be rejected.  *See, e.g.*, *Indus. Constructors Corp. v. U.S. Bureau of Reclam.*, 15 F.3d 963, 967 (10th Cir. 1994) ("A plaintiff's claim that administrative remedies were not pursued because pursuit would have been futile does not excuse this jurisdictional requirement."); *Nero v. Cherokee Nation of Okla.*, 892 F.2d 1457, 1463 (10th Cir. 1989) ("Plaintiffs contend that they did not pursue their administrative remedies because they believed doing so would be futile.  However, bringing an administrative claim is a jurisdictional prerequisite to suit, imposed by Congress, which the courts have no power to waive."); *Manko v. United States*, 830 F.2d 831, 840 (8th Cir. 1987) ("Neither § 2401(b) nor § 2675(a) [of Title 28] contains an exception for futile claims, and it would disrupt Congress's administrative-claims procedure for a court to carve out such an exception.").

Finally, Plaintiffs falsely assert that the United States has taken the position that they be compelled "to engage in the empty gesture of filing an amended Form 95 that expressly mentions WGI's work along the EBIA."  *See* Pls.' Opp'n at 9; *id*. ("[T]he United States would have Plaintiffs file a second Form 95—and wait six months—essentially up until the brink of trial in January 2009—before Plaintiffs could include Count Three allegations in their Amended Complaint.").  Contrary to Plaintiffs' assertion, the United States did not file its motion for the

purpose of delay or to induce Plaintiffs to "file a second Form 95."  The motion did not assert or imply that Plaintiffs' claims could be revived or brought within the jurisdiction of this Court by presenting additional or amended administrative claims.  New claims would be untimely because more than two years have passed since they accrued.  28 U.S.C. § 2401(b).  The existing administrative claims cannot be amended because (1) Plaintiffs have filed suit and (2) their administrative claims have been denied.  *See* 28 C.F.R. § 14.2(c) (providing that a claim may be amended only prior to final agency action or commencement of lawsuit); *Woirhaye v. United States*, 609 F.2d 1303, 1305 (9th Cir. 1979).  Inasmuch as the time for presenting or amending administrative claims has expired, Plaintiffs' failure to do so with respect to the negligent supervision claim expressed in Count Three requires that Count Three be dismissed.

III.    **Count Three Is Barred by the Statute of Limitations Because It Does Not Relate Back to the Original Complaint or to the Bea Declaration, Which Itself Was Untimely.**

Citing to *FDIC v. Conner*, 20 F.3d 1376 (5th Cir. 1994), Plaintiffs first argue that their newly asserted negligent supervision claim relates back to their original complaint.  While the Fifth Circuit in *Conner* described the test for determining whether a new claim relates back, the proper application of that test provides no relief for Plaintiffs here.  According to the Fifth Circuit in *Conner*, "[i]f a plaintiff attempts to interject entirely different conduct or different transactions or occurrences into a case, then relation back is not allowed."  *Id.* at 1385.  "Conversely, if a plaintiff seeks to correct a technical difficulty, state a new legal theory of relief, or amplify the facts alleged in the prior complaint, then relation back is allowed."  *Id.* at 1386.  Count Three does not relate back because it "interject[s] entirely different conduct" into this case.  *Id.* at 1385.  Count Three is based on work performed by WGI at the EBIA.  This conduct is not

8

in the original complaint, which was based entirely on the design, construction, and maintenance of the MRGO.

The *Conner* test presents an obvious problem for Plaintiffs, especially given this Court's previous determination that "the issue of liability for any damages arising from the EBIA was not raised in the initial Complaint."  *See* June 8, 2008 Minute Order at 2.[3]  Plaintiffs unsuccessfully attempt to escape the proper application of *Conner* by focusing on the damages they have suffered.  But focusing on the damages does not remedy the problem, which is that Count Three "interject[s] entirely different conduct" into the case.  Neither the work of WGI nor the United States' supervision of that work was a part of this case before it was interjected into the case by the amended complaint.  It is simply untrue, as Plaintiffs argue, that "the EBIA claim arises out of the 'same transaction or occurrence' alleged in the original complaint."  Pls.' Opp'n at 12.

Oddly—given Plaintiffs' extensive briefing on the application *vel non* of 33 U.S.C. § 702c to this case—Plaintiffs identify the "transaction or occurrence" as "the flooding of Plaintiffs' homes and communities caused by the defects in the MRGO *and the failure of the floodwalls along the IHNC.*"  *Id.*  (emphasis added).  Plaintiffs have been engaged in a lengthy campaign to convince the Court that they are *not* suing for the failure of the LPV floodwalls along the IHNC or anywhere else.  The contrary suggestion in this context, arguing that Count Three relates back to the original complaint because the complaint alleged that their damage was "caused by . . . the failure of the floodwalls along the IHNC," shows the futility of Plaintiffs' argument (and the flaw in their prior arguments against application of Flood Control Act immunity).

---

[3]  Tellingly, Plaintiffs do not address this finding by the Court in their response papers.

The original complaint concerned the design, construction, and maintenance of the MRGO, while newly added Count Three concerns the remediation work performed by WGI at the EBIA, and the supervision of that work by the United States.[4]  Clearly, Count Three does not set forth a different legal theory based on the facts in the original complaint—it sets forth a new claim based on entirely different conduct.  Consequently, there is no relation back.  *See, e.g.*, *In re Coastal Plains*, 179 F.3d 197, 216 (5th Cir. 1999); *McGregor v. La. State Univ. Bd. of Supers.*, 3 F.3d 850, 864 (5th Cir. 1993); *Holmes v. Greyhound Lines, Inc.*, 757 F.2d 1563, 1566 (5th Cir. 1985).[5]

Plaintiffs' second argument is that Count Three is timely because it relates back to the April 15, 2007 declaration of Robert Bea.  That declaration drew a connection between WGI's work and the failure of the IHNC floodwall.  Plaintiffs therefore assert that the Bea declaration provided notice of their EBIA claim "at least one year before the Amended Complaint was filed."  *See* Pls.' Opp'n at 13 & n.4.  This argument fails for several reasons.

First, Count Three would be untimely even if it did relate back to the Bea declaration: the declaration was not executed until more than six months after the denial of Plaintiffs'

---

[4]  A more detailed description of the differences between these two claims can be found in the memorandum submitted by the United States with its motion.  *See* Mot. to Dismiss at 11-12.

[5]  Plaintiffs' response memorandum fails to discuss any of these cases, all of which were cited by the United States in its memorandum.  The case Plaintiffs principally rely on, *Williams v. United States*, 405 F.2d 234 (5th Cir. 1968), is readily distinguishable.  There, a mother brought suit on behalf of her son who had been injured by an Army explosive device.  *Id.* at 235.  After the statute of limitations had expired, the mother sought to assert a claim "in her own right for recovery for loss of services as allowed to a parent by Georgia law."  *Id.*  The court held that the mother's claim related back to the one asserted earlier on behalf of her son, because the original claim "stated fully" the "operational set of facts."  *Id.* at 239.  Indeed, the conduct at issue in both claims was identical, which is certainly not the case here.

10

administrative claims.  *Compare* Mot. to Dismiss Ex. B (Doc. 13653-5) (denial dated May 18, 2006) *with* Pls.' Opp'n at 13 n.4 (Bea decl. executed Apr. 15, 2007).  If the negligent supervision claim had been asserted on April 15, 2007, rather than on June 13, 2008, it nevertheless would have been "forever barred."  *See* 28 U.S.C. § 2401(b).

Second, Count Three is untimely because it does not relate back to the Bea declaration. Federal Rule of Civil Procedure 15(c) provides for relation back to pleadings.  The rules do not provide for relation back to documents that are not pleadings.  Because Dr. Bea's declaration quite obviously is not a pleading, the negligent supervision claim does not relate back to it.  *See, e.g.*, *Bank Brussels Lambert v. Chase Manhattan Bank*, No. 93 Civ. 5298, 1999 WL 672302, at *2 (S.D.N.Y. Aug. 27, 1999) (rejecting argument that relation back applied because defendant had "been put on notice of [new] claims . . . through discovery or other pretrial proceedings, or from its own files"); *Constr. Interior Sys., Inc. v. Donohoe Cos.,* 813 F. Supp. 29, 37 (D.D.C. 1992) (informal notice of new claim does not suffice); *Holdridge v. Heyer-Schulte Corp.*, 440 F. Supp. 1088, 1094 (N.D.N.Y. 1977) (notice provided by answers to interrogatories and memorandum of law did not provide basis for relation back); *Bennett Funding Group, Inc. v. Cowen & Co.*, 275 B.R. 447, 451 (Bankr. N.D.N.Y. 2001) ("[i]nformation provided by the parties in papers subsequently filed with the Court generally is not to be considered in its determination of whether there has been adequate notice" for relation back).

Finally, the Bea declaration did not provide notice that *these* Plaintiffs in *this* action intended to assert a claim of negligent supervision of WGI.  The *Robinson* Plaintiffs did not provide the declaration to the United States.  The declaration was provided by *other* plaintiffs in *different* cases on a *different* track—the MRGO track.  There is just no way the United States

could have discerned from the submission of the declaration by other plaintiffs that *these* Plaintiffs intended to pursue a negligent supervision claim related to the EBIA *in this case*.

Because Plaintiffs failed to timely amend their pleading to assert their new claim, Count Three must be dismissed with prejudice.

## IV. Count Three Is Barred By The Discretionary Function Exception Because Supervision of a Contractor's Work Is Inherently a Discretionary Function.

In their opposition papers, Plaintiffs do not quarrel with the body of case law that applies the discretionary function exception to claims of negligent supervision. They do not discuss any of the cases cited by the United States—not even *Guile v. United States*, in which the Fifth Circuit held that "[s]upervision of a contractor's work, including the degree of oversight to exercise, is inherently a discretionary function." 422 F.3d 221, 231 (5th Cir. 2005). Moreover, the two principal cases on which Plaintiffs rely, *Duff v. United States*, 999 F.2d 1280 (8th Cir. 1993), and *Layton v. United States*, 984 F.2d 1496 (8th Cir. 1993), are cases in which the exception was held to bar claims of negligent supervision.

Because this rule of law is so well established, Plaintiffs attempt to avoid it in four ways. First, they argue that it would be "premature" to consider whether the exception bars Count Three and ask that this threshold question of subject matter jurisdiction be deferred. *See* Pls.' Opp'n at 14. Second, they argue that the exception does not apply "because the Government retained and exercised control over the Lock Expansion Project's safety." *Id.* at 15. Third, they argue that the exception does not apply because "the Government . . . failed to adhere to certain of its own safety regulations and specifications." *Id.*; *accord id.* at 16. Finally, they argue that the exception does not apply because the Corps's conduct was based entirely on "objective

12

scientific principles" that "are not subject to policy judgment." *Id.* at 22.  None of these arguments has merit.

There is no judicial economy in postponing application of the discretionary function exception to Count Three.  Claims of negligent supervision fall squarely within the exception.  When the face of a claim reveals that the Court's subject matter jurisdiction does not extend to it, neither the Court nor the parties are well served by postponing dismissal.  If Count Three is promptly dismissed, the parties can devote their attention to litigating the remaining counts—no small task in a case of this magnitude.  The Court's burden is lightened as well.

Plaintiffs assert without elaboration or further development that "there are substantial issues of disputed fact," *id.* at 14, implying that this is a reason why application of the exception should be postponed.  They do not substantiate this assertion because they cannot.  The present motion is based solely on the well-pled allegations of the First Amended Complaint, and none of the facts established by Plaintiffs' exhibits is in dispute.  As Plaintiffs themselves note, the deposition testimony on which they rely is "undisputed."  *Id.* at 15.  Plaintiffs cannot create a factual dispute by mischaracterizing what witnesses have said.  The only dispute concerns the legal import of the deposition testimony, not whether the testimony was true.  Legal disputes can be resolved by the Court on a motion to dismiss.  Certainly the parties disagree about whether the discretionary function exception applies to the undisputed facts, but this is no reason for postponing a decision on the pending motion.

Plaintiffs' second argument also fails.  For the United States' to lose immunity for the Corps's supervision of WGI, the Corps would have had to control WGI's work, not merely inspect it.  "Courts applying the FTCA have consistently held that a government's right to inspect

13

the work of a contractor and to stop work that does not conform to the terms of the contract does not constitute control over the contractor's employees." *Brooks v. A.R. & S. Enters., Inc.*, 622 F.2d 8, 12 (1st Cir. 1980) (citations omitted). "The right to inspect does not nullify the general rule that the government is not liable for torts of independent contractors." *Id.* The Corps's on-site inspector, Alvin Clouatre, explained his job in these terms:

> [A]s a project inspector on that project, I was to ensure that the contractor performed the work according to the work plan requirements, performed the work safely according to the Corps' safety requirements, and also because it was a . . . I think it was a cost-plus type of project . . . we just ensured that . . . the contractor was working efficiently with their equipment and personnel on hand . . . we just make sure that they're not milking it.

Pls.' Opp'n Ex. 2 (Doc. 14246-3, Clouatre Dep.) at 55:15-56:3.  Mr. Clouatre did not even exercise the limited control of stopping WGI's work.  When asked what he would do if he "saw that something was proceeding not in compliance with the work plans, as [he] understood them to be," the inspector replied that he would notify his supervisor.  *Id.* at 57:6-16.  He also made it clear that he was not able to inspect every activity of the contractor and that the ultimate responsibility for the work, including the safety of the work, resided with WGI:  "In fact, the contractor does the actual [safety] inspections and we witness the inspections. We try to witness 100 percent but, you know, we don't always. But it does fall back on the contractor's

14

responsibility to do this."[6]  *Id.* at 153:1-6.  The alleged negligent supervision of WGI's work as set forth in Count Three is therefore barred by the discretionary function exception.

Plaintiffs' third argument is that the discretionary function exception does not apply because the Corps did not follow its engineer manuals and training guidelines.  Pls.' Opp'n at 16. In support of this argument, they cite six provisions from four manuals.  *See id.* at 18-19; *cf.* PSLC Opp'n (Doc. 14247-3) at 15-18 (arguing that two engineer regulations were not followed). The prime flaw in Plaintiffs' argument is that none of the manuals or guidelines (or regulations cited by the PSLC) pertains to supervision of contractors.  The cited manuals and guidelines provide guidance for the performance of a variety of tasks.  But they do not address contractor supervision, much less prescribe a specific course to follow in performing that function.

Plaintiffs' mistake here is the same as that of the plaintiffs in *Kirchmann v. United States*, 8 F.3d 1273 (8th Cir. 1993).  At issue was the disposal of hazardous waste that contaminated groundwater.  The plaintiffs claimed that the United States was responsible because of the Air Force's alleged negligent supervision of the contractor who disposed of the toxic substance.  *See id.* at 1274.  In an attempt to render the discretionary function exception inapplicable, the Kirchmanns "cite[d] six sections of various federal regulations that they contend[ed] were binding upon the Air Force in its supervision of the disposal of" the hazardous waste.  *Id.* at 1276.  The problem with the Kirchmann's argument was that "[n]one [of the regulations] deals

_____

[6]Not only was safety ultimately the responsibility of the contractor, but it is also clear that Mr. Clouatre is referring to site safety, not the possible impact of WGI's work on the safety of Lower Ninth Ward properties.  *See id.* at 152:20-24 ("[W]e would be looking at the equipment on site and we would be making sure the equipment, as it comes on the job site or before putting it into use, meets the safety requirements and the Corps' safety manual.").  For this reason alone, Plaintiffs' attempt to show that the Corps retained responsibility for the supposed impact of WGI's work on the LPV floodwall fails.

with how the Air Force should either supervise contractors or ensure that contractors follow federal or state laws in disposing of hazardous waste." *Id.*  The Court of Appeals therefore affirmed the district court's application of the discretionary function exception to the negligent supervision claim:  "Where no statute or regulation controls the government's monitoring of a contractor's work, the extent of monitoring required or actually accomplished is necessarily a question of judgment, or discretion, for the government." *Id.*

Plaintiffs quote provisions from manuals pertinent to various engineering tasks—flood wall design, seepage analysis and control for dams, sheet-pile wall design, and levee design and construction.  They do not cite or quote any manual or regulation that eliminated the Corps's discretion as to the methods or extent of its supervision of WGI.  Therefore the Corps's monitoring of WGI's work was "necessarily a question of judgment, or discretion, for the government." *Id.*

Even if the provisions relied on by Plaintiffs were pertinent to the challenged conduct, they would not render the discretionary function inapplicable.  The cited regulations provide general guidance; they do not eliminate judgment or discretion.  "[E]ven though a statute or regulation imposes a general duty on a government agency, the discretionary function exception may still apply if the agency retains sufficient discretion in fulfilling that duty." *Cohen v. United States*, 151 F.3d 1338, 1342 (11th Cir. 1998); *see also Terbush v. United States*, 516 F.3d 1125, 1137 (9th Cir. 2008) (agency guidance requiring that "[a]ll accidents should be investigated" was discretionary because it directed that "the extent of investigations shall reflect the seriousness of the accident or of the potential for reoccurrence"); *Guile*, 422 F.3d at 231 n.12 (stating that a "Patient's Bill of Rights" that set forth "a patient's right to care and treatment 'in a safe

16

environment' . . .  does not sufficiently prescribe any particular course of action that it would

remove the government's discretion"); *Bolduc v. United States*, 402 F.3d 50, 61 (1st Cir. 2005)

("Where no specific action is required within a category of conduct and the government actors in

question have latitude to make decisions and choose among alternative courses of action, the

conduct is discretionary."); *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1175 (9th Cir.

2002) (explaining that FAA order requiring analysis of "'pertinent technical data' necessarily

involve[d] a judgment call" because it did not "dictate the nature or extent of the data, nor . . .

mandate any particular method of analysis").  Conduct is discretionary unless "a 'federal statute,

regulation, or policy specifically prescribes a course of action for an employee to follow.'"

*United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz v. United States*,

486 U.S. 531, 536 (1988)).  Agency guidance such as that cited by Plaintiffs does not eliminate

discretion, because it describes general courses of action, analyses, and decisions for engineers to

make depending on the nature and circumstances of the project being undertaken.

In *Garcia v. U.S. Air Force*, — F.3d — , No. 07-2106, 2008 WL 2736661 (10th Cir.

July 15, 2008), the court held that mandatory agency guidance did not remove discretion because

the policies and procedures set forth in an agency field manual were insufficiently specific.

Tenants in Air Force Base housing alleged that the Air Force negligently failed to identify a leak

in a roof, which allowed toxic mold to grow, resulting in personal injury.  The district court

granted summary judgment for the United States, holding that the Air Force's conduct fell within

the discretionary function exception.  *Id.* at *1.  On appeal the plaintiffs argued that the

challenged conduct was not discretionary because the Air Force failed to conduct periodic roof

inspections in accordance with an Air Force civil engineer field guide.  The field guide described

how to establish and conduct a roof management program. *Id.* at *4-5.  Even though compliance

with the field guide was mandatory, its instructions did not eliminate discretion because the guide

was "silent with respect to when roof inspections [were] to occur," *id.* at *5, and did not

"mandate compliance with any specific roof inspection procedures," *id.* at *6.[7]  The Court of

Appeals also concluded that the agency guidance for monitoring the Air Force's housing

maintenance contractor was "not sufficiently specific to establish government liability," because

Air Force inspectors were allowed to reduce their monitoring based on their confidence in the

contractor's quality control program.  *See id.*

Plaintiffs assert that "the Army Corps's own engineering standards required that a

thorough 'seepage analysis' be conducted in light of the excavation and other potentially

destabilizing activities occurring in the EBIA . . . ."  Pls.' Opp'n at 19-20.  But not one of the

quoted provisions actually says this.  Instead, they contain general admonitions:  "[s]eepage

control is a primary consideration;" "seepage aspects . . . should be investigated;" "[s]eepage

control . . . is necessary;" "seepage analysis . . . should consider the permeability of surrounding

soil;" "[w]ithout control, underseepage in pervious foundations beneath levees may result in . . .

excessive hydrostatic pressures."  *Id.* at 18-19 (emphasis omitted).  Reading all of these

admonitions together (as Plaintiffs obviously intend be done, despite the disparate activities that

---

[7]Many of the specific references cited by the *Garcia* plaintiffs were inapplicable because
they applied to low-slope roofs, and not the pitched roofs which were at issue in the case.  *See id.*
at *5.  The same mistake is made by Plaintiffs here in citing to provisions that apply to the design
and construction of levees, the design of sheet pile walls, the design of retaining and flood walls,
and the design of dams.  Such activities are not at issue.  *Cf. Terbush*, 516 F.3d at 1137 ("[The
plaintiffs'] assertion that the park safety officer was required to be involved in the inspection of
any incidents of rockfall activity glosses over both the fact that the Glacier Point Apron is not a
'facility,' an 'operation,' or a 'workplace,' and the fact that the May 1999 rockfall was not an
'employee accident[]/incident[]' in the language of the guidelines.").

the manuals address) leaves one with the distinct impression that seepage control is an important

consideration when levees, flood walls, dams, and sheet pile walls are being designed. But not

one of these manuals directs "that a thorough 'seepage analysis' be conducted" as part of an

environmental remediation such as that accomplished by WGI. Indeed, whether the specific

work being performed by WGI would warrant a seepage analysis is itself a decision requiring the

exercise of judgment. Robert Bea may think that a seepage analysis should have been performed,

and Melvin McElwee may believe that underseepage "is an issue that the Army Corps 'must'

consider in the planning process of projects like the Lock Expansion Project," *id.* at 21, but these

opinions only underscore that whether to conduct such analyses (and whether to require that

contractors perform them) is a matter of judgment, not a course of conduct specified by any

statute, regulation, or agency manual.

Plaintiffs' fourth and final argument is equally wide of the mark. They argue that the

discretionary function exception does not apply because "[o]bjective scientific principles . . . are

not subject to policy judgment." *Id.* at 22. So stated—without qualification, as a hard and fast

rule—this assertion is unquestionably false. "Objective scientific principles" must often be

applied in ways that serve public policies and interests. "David A. Boyle, a United States Marine

helicopter copilot, was killed when the CH-53D helicopter in which he was flying crashed off the

coast of Virginia Beach, Virginia, during a training exercise. Although Boyle survived the

impact of the crash, he was unable to escape from the helicopter and drowned," allegedly because

the copilot's emergency escape hatch "opened out instead of in (and was therefore ineffective in

a submerged craft because of water pressure)." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 502-

503 (1988). His father sued the manufacturer that built the helicopter for the United States, and

19

he prevailed at trial.  *Id.* at 503.  The manufacturer appealed, and the Court of Appeals reversed,

holding, *inter alia,* that the manufacturer "could not be held liable for the allegedly defective

design of the escape hatch because, on the evidence presented, it satisfied the requirements of the

'military contractor defense.'"  *Id.*

In the Supreme Court, the copilot's father "contend[ed] that there is no justification in

federal law for shielding Government contractors from liability for design defects in military

equipment."  *Id.*  At the heart of the case lay the conflict between "the state-imposed duty of care

that is the asserted basis of the contractor's liability (specifically, the duty to equip helicopters

with the sort of escape-hatch mechanism petitioner claims was necessary)" and the "precisely

contrary . . . duty imposed by the Government contract (the duty to manufacture and deliver

helicopters with the sort of escape-hatch mechanism shown by the specifications)."  *Id.* at 509.

The Supreme Court found "the limiting principle to identify those situations in which a

'significant conflict' with federal policy or interests does arise" (and in which state law must

therefore be displaced) in 28 U.S.C. § 1346(b).  *Id.* at 509-10.  The Court reasoned that "the

selection of the appropriate design for military equipment to be used by our Armed Forces is

assuredly a discretionary function within the meaning of this provision.  It often *involves not

merely engineering analysis but judgment* as to the balancing of many technical, military, and

even social considerations, including specifically the trade-off between greater safety and greater

combat effectiveness."  *Id.* at 511 (emphasis added).  In so formulating the government

contractor defense, the Supreme Court recognized that engineering analyses, like other scientific

analyses, may well be driven and informed by social, economic, political, and military policies.

Accordingly, when acts and omissions of government employees are susceptible to such

influences, they are protected by the discretionary function exception even if they involve engineering analyses and principles. *See Gaubert*, 499 U.S. at 324 ("When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agen''s acts are grounded in policy when exercising that discretion."); *Dalehite v. United States*, 346 U.S. 15, 40 (1953) (holding that decision to bag combustible fertilizer at high temperatures was within exception); *Baldassaro v. United States*, 64 F.3d 206, 211 (5th Cir. 1995) ("[S]hip design decisions for vessels . . . including *inter alia* whether to install detachable sea rails on vessels . . . involve the weighing of competing policy considerations that the discretionary function exception protects from judicial scrutiny.").

It is clear beyond peradventure that social, political, and economic policies could have informed the Corps's evaluation of the potential impact of the Lock Expansion Project on nearby flood control structures. What "safety precautions" were warranted in view of the risk of injury and loss that would result from hurricane-induced flooding could not be determined by engineering principles applied in a vacuum. How much underseepage was tolerable was a decision informed by the costs of increasing protection and the risks of providing inadequate protection. Plaintiffs therefore err in asserting that such decisions did not fall within the discretionary function exception.

More fundamentally, however, Plaintiffs' argument is misdirected because it is aimed at an alleged "failure to perform the requisite underseepage analysis." Pls.' Opp'n at 23. Count Three alleges negligent supervision, a discretionary function that may or may not involve "[o]bjective scientific principles." "If arguably based on policy considerations, both negligence

in supervising a contractor and the failure to supervise a contractor at all are included in the decisions protected by the discretionary function exception." *Kirchmann*, 8 F.3d at 1277.

> When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind.  Decisions as to the manner of enforcing regulations directly affect the feasibility and practicality of the Government's regulatory program; such decisions require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding.

*United States v. Varig Airlines*, 467 U.S. 797, 819-820 (1984).

Because Mr. Clouatre described the public interest of protecting the public fisc as the driving force behind his inspections, it is clear that the second prong of the discretionary function exception test is met.  In his own words, he "just made sure that they're not milking it" and "that they were doing the work according to the work plan requirements."  Pls.' Opp'n Ex. B at 55:15-57:5.  Making sure that the Corps got an honest effort from WGI and that the contractor did what it told the Corps it was going to do was surely aimed at "the accomplishment of [the Corps's] policy objectives."  *Varig Airlines*, 467 U.S. at 820.  Accordingly, Count Three, which alleges that the Corps negligently supervised WGI, must be dismissed for lack of subject matter jurisdiction.

**V.     To The Extent Plaintiffs Seek To Recover Based On Yet Unidentified Acts Of Alleged Negligence, Count Three Fails To State A Claim.**

Finally, Plaintiffs' response does nothing to salvage the allegation in paragraph 120 of the amended complaint that the United States "engaged in other related acts of negligence to be determined prior to time of trial."  *See* Pls.' Am. Compl. ¶ 120.  Plaintiffs argue that this vague allegation should be allowed to stand because "as discovery proceeds, the plaintiffs may learn

more to support the claim of negligence." *See* Pls.' Opp'n at 24.  The Court should reject this argument for two reasons.

First, Plaintiffs will not "learn more" to support their claim "as discovery proceeds" because discovery closed in this case on July 14, 2008.  *See* June 8, 2008 Minute Order at 3.

Second, Plaintiffs are not permitted to plead a "placeholder" for some to-be-determined cause of action to be sprung on the United States at a later date.  "Rule 15 is the sole authority governing a party's right to amend its complaint," *RTC v. Miramon*, Civ. A. No. 92-2672, 1992 WL 373635, at *1 (E.D. La. Dec. 9, 1992), and Plaintiffs may not "reserve" that right by stating that they might allege additional claims later, *see, e.g., id.* (striking allegation that reserved right to amend upon the discovery of additional facts).

## CONCLUSION

The Court should dismiss Counts Two and Three of the amended complaint.

Respectfully Submitted,

GREGORY G. KATSAS
Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR.
Assistant Director, Torts Branch

 s/ Robin D. Smith
Robin D. Smith
Senior Trial Counsel, Torts Branch, Civil Division
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 616-4400 / (202) 616-5200 (Fax)
Attorneys for the United States

 s/ Jeffrey P. Ehrlich
Jeffrey P. Ehrlich
Trial Attorney, Torts Branch, Civil Division
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 616-4400 / (202) 616-5200 (Fax)
Attorneys for the United States

## <u>CERTIFICATE OF SERVICE</u>

I,  Jeffrey P. Ehrlich, hereby certify that on August 13, 2008, I served a true copy of the

Reply Memorandum in Support of the United States of America's Motion to Dismiss upon all

parties by ECF.


                              s/    Jeffrey P.  Ehrlich_____