RECEIVED
U.S. DISTRICT COURT
EAST DISTRICT OF LA

2007 AUG 29  AM 11: 17

LORETTA G. WHYTE
     CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO. **07-5016**

SECT. K MAG. 2

| | |
|---|---|
| UNIVERSAL HEALTH SERVICES, INC., | SECTION_____ |
| VERSUS | JUDGE_____ |
| UNITED STATES OF AMERICA, WASHINGTON GROUP INTERNATIONAL, INC., BOARD OF COMMISSIONERS OF THE ORLEANS LEVEE DISTRICT, AND BOARD OF COMMISSIONERS OF THE LAKE BORGNE BASIN LEVEE DISTRICT, BOARD OF COMMISSIONERS OF THE EAST JEFFERSON LEVEE DISTRICT, SEWERAGE AND WATER BOARD OF NEW ORLEANS, ST. PAUL FIRE & MARINE INSURANCE COMPANY, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, BOARD OF COMMISSIONER FOR THE PORT OF NEW ORLEANS, CSX CORPORATION, CSX TRANSPORTATION, INC., & THE PUBLIC BELT RAILROAD COMMISSION FOR THE CITY OF NEW ORLEANS | MAGISTRATE_____ |

*************************************************************************

1


EXHIBIT 5(a)

## COMPLAINT FOR DAMAGES

NOW COMES Plaintiff Universal Health Services, Inc. ("UHS"), who submits this Complaint for Damages.

1.

## INTRODUCTION

This Complaint arises out of catastrophic failures of, and deficiencies in, the hurricane protection system surrounding the Parish of Orleans, State of Louisiana, which occurred on and after August 29, 2005. These failures and deficiencies caused and substantially contributed to the inundation of approximately 80% of the New Orleans metropolitan area, causing extensive harm and loss of life and destroying or rendering uninhabitable approximately 160,000 residences and buildings.

2.

UHS owned properties located in Orleans Parish and St. Bernard Parish on or about August 29, 2005 when the New Orleans levee system failed. The failure of the New Orleans levee system, the horrific result of man-made acts, caused extensive damage to UHS's properties and contents, among other damages, discussed *infra*.

3.

UHS, through its affiliates and subsidiaries, operates acute care hospitals, behavioral health centers, ambulatory surgery centers and radiation oncology centers in 24 states, including Louisiana.

2

4.

Before August 29, 2005, UHS was a significant employer in the health care sector in greater New Orleans through its ownership and operation of four hospitals in greater New Orleans. Those hospitals were Chalmette Medical Center, 801 Virtue Street and 9001 Patricia Street, Chalmette, LA; Pendleton Methodist Hospital, 5620 Read Boulevard, New Orleans, LA; Lakeland Medical Center, 6000 Bullard Avenue, New Orleans, LA and River Oaks Hospital, 1525 River Oaks Road West, New Orleans, LA. These hospitals served the health care needs of residents of greater New Orleans and provided employment to thousands of New Orleans area residents, including highly skilled doctors, nurses and other medical professionals. All of these hospitals were damaged by Hurricane Katrina ("Katrina"), and all of them, save for River Oaks, have been shut down since August 29, 2005. All of the hospitals are collectively referred to in this Complaint as the "Property."

## I. PARTIES

### Plaintiff

5.

Plaintiff UHS is a healthcare services provider that is organized and existing under the laws of the State of Delaware, with its principal place of business at 367 South Gulph Road, King of Prussia, Pennsylvania 19406-0958. On or about March 1, 2007, UHS presented claims to the United States Army Corps of Engineers (the "Corps") for damages arising out of the failure of the New Orleans levee and floodwall system, including the Mississippi Gulf River Outlet, pursuant to the Federal Tort Claims Act, 28 U.S.C. §2671, *et seq*. The Corps acknowledged receipt of UHS's claim and assigned claim number 07N15T0229251. *See* Exhibit A, *in globo*. On or about March 1, 2007, UHS also presented claims to the Corps for damages arising out of the failure of the New

Orleans levee and floodwall system, including the Mississippi Gulf River Outlet, pursuant to the Suits in Admiralty Act, 46 U.S.C. §30901-18, the Public Vessels Act, 46 U.S.C. §46-31101-13, the Admiralty Extension Act, 46 U.S.C. §30101, and the general maritime law of the United States. The Corps acknowledged receipt of UHS's claims and assigned the claim numbers 07N15T0229239. *See* Exhibit B, *in globo*. Six months have elapsed since the presentation of UHS's claim, and the United States Army Corps of Engineers has failed to act by either accepting or rejecting UHS's claim. Thus, such failure must presumably be considered a denial of UHS's claim.

## Defendants

6.

The United States of America ("USA") is a sovereign government amenable to suit for civil liability in accordance with the FTCA, 28 U.S.C. § 2671 *et seq.*, and/or admiralty and maritime law, and/or the Constitution and Laws of the United States, and/or the Constitution and Laws of the State of Louisiana, as plead herein. USA is the proper named party defendant for negligent or delictual actions or inactions of the United States Army Corps of Engineers ("the Corps"), a division of the United States Government under the direct jurisdiction of the Department of the Army.

7.

Washington Group International, Inc. ("Washington Group"), a non-Louisiana corporation, authorized to do and doing business in the State of Louisiana and in the Parish of Orleans, with its domicile in the State of Ohio, its principal place of business in the State of Idaho, and its Louisiana principal place of business in Baton Rouge, Louisiana.

4

8.

The Board of Commissioners of the Orleans Levee District ("Orleans"), a local governmental entity responsible for the creation, maintenance, and inspection of certain levees/floodwalls and/or spoil banks and water protection areas in Orleans Parish with its domicile in New Orleans, Louisiana.

9.

The Board of Commissioners of the Lake Borgne Basin Levee District ("Lake Borgne"), a local governmental entity responsible for the creation, maintenance and inspection of certain levees/floodwalls and/or spoil banks and water protection areas in St. Bernard Parish with its domicile in Violet, Louisiana.

10.

St. Paul Fire & Marine Insurance Company ("St. Paul"), a foreign insurance company, authorized to do and doing business within the State of Louisiana, which at all times relevant herein had in full force and effect a policy or policies of liability insurance, under the terms, provisions and conditions of which it assumed liability for the acts and/or negligence of its insureds, Orleans and Lake Borgne, and against which UHS asserts its claim under the Louisiana Direct Action Statute, La. R.S. 22:655.

11.

Defendant Sewerage and Water Board of New Orleans ("SWB") is a political subdivision of the State of Louisiana created by Louisiana Revised Statute §33:4071 *et seq.*, amenable to suit, and domiciled in the Parish of Orleans, State of Louisiana.

5

12.

Defendant Board of Commissioners of the East Jefferson Levee District ("EJLD") is a political subdivision of the State of Louisiana created by Louisiana Revised Statute §38:291, amenable to suit, and domiciled in the Parish of Jefferson, State of Louisiana.

13.

Defendant National Union Fire Insurance Company of Pittsburgh ("National Union") is a foreign insurance company authorized to do and doing business within the State of Louisiana. At all times relevant hereto, National Union had in full force and effect a policy of liability insurance, under the terms, provisions, and conditions of which is assumed liability for the acts and/or negligence of its insured, the Board of Commissioners of the East Jefferson Levee District, and is therefore liable to UHS, and UHS asserts its claims under the Louisiana Direct Action Statute, LSA-R.S. 22:655.

14.

Defendant The Board of Commissioners of the Port of New Orleans ("PNO") is a local government entity created by Louisiana Revised Statute §34:1, amenable to suit, and domiciled in the Parish of Orleans, State of Louisiana.

15.

Defendant CSX Corporation ("CSX") is a foreign corporation doing business in the Parish of Orleans, State of Louisiana.

16.

Defendant CSX Transportation, Inc. ("CSX") is a foreign corporation doing business in the Parish of Orleans, State of Louisiana.

17.

Defendant Public Belt Railroad Commission for the City of New Orleans ("PBR") is an entity amenable to suit and domiciled in the Parish of Orleans, State of Louisiana.

18.

UHS avers that this matter is timely to all Defendants and is within the applicable statute of limitations as there is a related class action proceeding pending in this Court in the matter captioned *In re Katrina Canal Breaches Litigation*, No. 05-4182(K)(2) (Ref: LEVEE). As the United States Supreme Court recognized in *Crown, Cork, & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983), "'the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.'" *Id.* at 353-54 (quoting *American Pipe & Constr. Co. v. Utah*, 454 U.S. 538, 554 (1974)).

## II. JURISDICTION

19.

This court maintains subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1346(b) (Defendant United States), and 28 U.S.C. § 2671, *et seq.* (Federal Tort Claims Act), violations of laws of the United States, including, but not limited to, 33 U.S.C. § 1251, *et seq.* and 16 U.S.C. § 1451 *et seq.* and, alternatively, for violation of the Constitution and Laws of the State of Louisiana as well as the Constitution and Laws of the United States.

20.

UHS has presented to the Corps the written, administrative claims required by the provisions of 28 U.S.C. §2671, *et seq* (Federal Tort Claims Act) and in all respects has complied with the

provisions of this statute. As discussed *supra*, a period of at least six months has elapsed since the filing of each of UHS's written, administrative claim.

21.

Alternatively, UHS avers jurisdiction is proper pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). Additionally, and in the alternative, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1367, in as much as this Court has supplemental jurisdiction over all state law claims herein arising out of the same case or controversy.

22.

Alternatively, UHS pleads admiralty and maritime jurisdiction and causes of action under the Admiralty Extension Act, 46 U.S.C. § 30101, the Suits in Admiralty Act, 46 U.S.C. §§ 30901-18, and the Public Vessels Act, 46 U.S.C. §§ 31101-13. UHS has presented to the Corps the written, administrative claim required by the provisions of 46 U.S.C. § 30101 (Admiralty Extension Act). A period of at least six months has elapsed since the filing of UHS's written, administrative claim.

### III. VENUE

23.

Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Defendants' negligent and wrongful actions occurred in the Eastern District of Louisiana, a substantial part of the events and omissions giving rise to this action occurred in the Eastern District of Louisiana, on or about August 29, 2005, UHS had its principle place of business in the Eastern District of Louisiana, and damages to UHS occurred within the Eastern District of Louisiana.

8

## IV. WAIVER OF SOVEREIGN IMMUNITY

24.

The United States of America and the Corps waived their sovereign immunity in connection with the claims asserted in this suit by the enactment of the Federal Tort Claims Act, 28 U.S.C. § 2671 ("FTCA"). While UHS believes that all of its claims against the Corps are derived from the FTCA applying the tort and other laws of the State of Louisiana, out of an abundance of caution, UHS alternatively pleads admiralty and maritime jurisdiction and causes of action under the Admiralty Extension Act, 46 U.S.C. § 30101, the Suits in Admiralty Act, 46 U.S.C. § 30901-18, and/ or the Public Vessels Act, 46 U.S.C. § 31101-13.

25.

Furthermore, the United States Court of Appeals for the Fifth Circuit has already held that the Flood Control Act of 1928, 33 U.S.C. § 702(c) does not immunize the United States of America for its maritime activities related to the MR-GO. *Graci v. United States*, 456 F.2d 20 (5th Cir. 1971). UHS further alleges that the United States and the Corps have waived their immunity under the Water Pollution Act.

## V. FACTUAL BACKGROUND REGARDING THE 17TH STREET CANAL

### A. The History of the 17th Street Canal

26.

The canal known today as the "17th Street Canal" forms a significant portion of the boundary between Orleans Parish, Louisiana and Jefferson Parish, Louisiana. Historically, the 17th Street Canal has also been known as the "Metairie Outlet Canal," the "Metairie Outfall Canal," the "Metairie Relief Canal," and the "Upperline Canal."

27.

The 17th Street Canal originated at the start of the 1850's as a canal dug through swampy ground to provide a right-of-way. It was located where the Jefferson and Lake Pontchartrain Railway was built. The railway connected the town once called Carrollton with a shipping port on Lake Pontchartrain in the area today know as Bucktown. Figure 1 depicts the current location of the 17th Street Canal.

### Figure 1



Figure 4. Map showing detailed geometry and features of the New Orleans metropolitan area.

28.

In 1858, a secondary canal was built, connecting the original canal to the river side of the Metairie Ridge. This spur canal was situated alongside a projected street numbered "17th Street,"

10

and, thus, the canal became known as the "17th Street Canal." The term "17th Street Canal" eventually referred to the original, larger canal to which this spur canal connected.

29.

The community of Bucktown, where the northern end of the 17th Street Canal enters Lake Pontchartrain, was founded more than one hundred years ago as a group of fishing and hunting camps along the canal and Lake Pontchartrain. The earliest structures were wooden huts raised on stilts, and the canal served as a harbor and a mode of transportation for fishing boats.

30.

More substantial development in this area occurred during the mid-19th century with the construction of a commercial wharf and a resort called "Lakeport." Steamboats docked at the entrance to the New Basin Canal (now Pontchartrain Boulevard) and at the terminus of the Jefferson and Lake Pontchartrain Railway (presently Bucktown).

31.

The SWB took over the operation of the 17th Street Canal at the end of the 19th century. The canal was re-dredged in 1897, and again in 1929. In 1913, the SWB completed the construction of Pumping Station No. 6, which drained a large portion of New Orleans through the canal. Until recent years, the 17th Street Canal was home to a fleet of approximately one hundred shrimp boats. The fleet previously had a lease agreement with the defendant SWB.

32.

The 17th Street Canal historically is, and at all times pertinent herein has been, a navigable waterway in New Orleans that flows into Lake Pontchartrain.

### B. The 17th Street Canal Dredging Project

33.

On July 15, 1974, the SWB initiated a project to improve drainage through the 17th Street Canal. Initially, this project called for the dredging of 2.4 miles of the canal from Pump Station No. 6 to Lake Pontchartrain to remove sediment from the canal bottom and to reshape the canal cross-section for the improvement of flow and the pump capacity of Pump Station No. 6. The removal of approximately 85,000 cubic yards of bottom sediment was anticipated.

34.

Because dredging projects in navigable waters of the United States require a Department of the Army permit pursuant to the River & Harbors Act, the SWB filed an application with the Corps for a "Permit to Discharge or Work in Navigable Waters and their Tributaries." The Operations Division of the Corps is responsible for the issuance of permits to dredge navigable waterways. Hence, the issuance of the dredging permit for the 17th Street Canal was the province of the Corps' Operating Division, and not, for example, the Corps' Engineering Division, which is responsible for flood control.

35.

The permit approval process required the SWB to also obtain approval from, among others, the Louisiana Department of Public Works. In August of 1974, the Louisiana Department of Public Works responded to the 17th Street Canal dredge permit application by stating it could not complete

a review of the application because the applicant (SWB) **had no soil data substantiating the stability or integrity of the canal's levees**.

36.

On May 23, 1977, the Corps returned the dredging application with no action because the SWB had failed to furnish information requested by, among others, the Louisiana Department of Public Works.

37.

In 1978, the SWB retained a civil engineering firm, Modjeski and Masters, Inc. ("M&M") to provide a plan for the design and implementation of the dredging project. On August 23, 1979, M&M submitted a second dredging permit application on behalf of the SWB. On December 29, 1980, M&M re-submitted the dredging permit application after environmental concerns were raised relative to the disposal of the dredged material in Lake Pontchartrain and on the banks of the canal.

38.

On January 28, 1981, M&M, in response to inquiries about the impact of the dredging on existing levees, issued the Corps with a memorandum addressing the stability of the existing levees and sheet pile wall along the canal. M&M's memorandum indicated that at three of the six test locations, the factors of safety **fell below the required values set by the Corps.** The handwritten report specifically stated that **"two locations yielded low factors of safety due to ... the existence of very soft clays..."**

39.

On March 5, 1981, the Corps issued an internal memorandum addressing the soil stability analyses provided by M&M which acknowledged that, in connection with the proposed dredging of

13

the canal, safety factors were substantially below the minimum 1.30 factor of safety, requiring that the project be redesigned. The specific location of the canal's levee system to which this internal memorandum referred coincides with the area where the 17th Street Canal breached during Hurricane Katrina.

40.

On March 31, 1981, the Corps held a public hearing regarding the 17th Street Canal dredging permit application. Discussions took place regarding whether raising the existing sheet pile wall along the canal, as opposed to dredging to deepen the canal, would provide a greater cross-section and greater pump capacity. The consulting engineer representing M&M voiced his concerns about widening the canals and stated that **not only were the levees already in violation of the Corps's engineering standards for levee stability, but that dredging attempts to remove material adjacent to the levees would only worsen the stability problem**.

41.

On April 20, 1981, in response to concerns that the proposed dredging of the 17th Street Canal would negatively impact the existing canal levee, M&M announced a preliminary plan to install sheet pile walls with concrete caps prior to any dredging or excavation. The sheet pile walls were to be of a sufficient height to meet all applicable flood protection criteria. An internal Corps memorandum dated June 16, 1981, based on a review of this proposal by M&M, acknowledged that a number of levee and flood wall stability problems were likely to occur should the SWB dredging be granted.

42.

An internal memorandum from the Corps' Engineering Division to the Corps' Operations Division, dated February 12, 1982, noted the existence of a stability problem in the 17th Street Canal at a location where excavation would directly tap the sands underlying the levee. The memorandum suggested that a stability analysis be performed for the land side of the canal, incorporating effects of seepage to determine what corrective action might be needed. Sands underlay the entire 2.4 miles of the 17th Street Canal, from Pumping Station No. 6 to Lake Pontchartrain, and the stability problem recognized in this memorandum, therefore, cannot be confined to any one section of the canal.

43.

On August 23, 1982, Eustis Engineering Company ("Eustis") provided M&M with a more comprehensive subsoil investigation report, which in pertinent part recognized that measures "should be taken" because of "the possibility of a blow-out during extreme high water in the canal." The report also identified "preventive measures," including, "the installation of a seepage cutoff through the levee crown, installation of pressure relief wells near the land side toe of the levee, and sealing the canal bottom." Eustis's recommendations were restricted to only specific areas of the canal, however, and not to the entire canal levee system. On November 30, 1982, M&M furnished the Corps with copies of Eustis's soil investigation report.

44.

On February 22, 1983, the Chief of the Corps' Engineering Division advised the SWB that the Corps believed "the installation of relief wells would be an appropriate way to provide the necessary assurance against uplift" of the 17th Street Canal's sheet piles.

45.

15

On May 9, 1983, M&M submitted on behalf of the SWB a new permit application for the 17th Street Drainage Canal Improvement Project. This application was to supersede the application for Phase I, submitted on December 29, 1980, and Phase II, submitted on April 20, 1981, by combining the two phases into one project with the project limits being Pump Station No. 6 on the south and 370.0 feet north of the Bucktown Pedestrian Bridge. The project now envisioned the **removal of 470,000 cubic yards** of canal bottom whereas the original plan called for the removal of 85,000 cubic yards.

46.

On July 27, 1983, Eustis submitted a revised soil stability report, which both confirmed the potential for a blow-out at the land side toe of the levee and extended the area of concern to the pumping station. In this report, Eustis recommended dredging a test section in the 17th Street Canal to study the hydrostatic uplift pressure.

47.

From November 29 to December 16, 1983, a test section was dug just south of Interstate 10. Six piezometers were installed on the Jefferson Parish side of the 17th Street Canal to closely monitor changes in the hydrostatic pressures before, during, and after completion of the excavation. Eustis submitted a report on the test dredging to the Corps on January 17, 1984. The report concluded that the piezometers monitored no relevant changes upon the dredging of the test section. The report further concluded that the possibility of a blow-out during high water conditions in the canal was probably slight. However, the piezometer study of the test section did not account for the pre-existing, permeable soils of the canal, and therefore, the study's conclusions as to stability and permeability were unreliable.

48.

On June 13, 1984, the Corps issued a permit to "dredge to enlarge and maintain an area and install and maintain flood walls and mooring structures, in the 17th Street Canal (Metairie Relief Canal) from Pumping Station No. 6 to a point about 400 feet north of the Bucktown Pedestrian Bridge..." The "Statement of Findings" issued with the permit stated that factors considered in issuing the permit included, *inter alia*, "navigation," both present and prospective flood heights and flood plain use, and "other public interests."

49.

The dredging project was ultimately divided into the following phases: Phase I from Pump Station No. 6 to Interstate 10; Phase II-A from Interstate 10 to Hammond Highway - Orleans side; Phase II-B from Interstate 10 to Hammond Highway - Jefferson side; and Phase III from Hammond Highway to Lake Pontchartrain.

50.

Phase I was completed June 1, 1984. However, because the SWB and the OLD could not reach an agreement with EJLD regarding Phase II of the Project, an extension of the permit work was granted by the Corps on February 20, 1987.

51.

On April 24, 1987, the Corps created a drawing with a sheet pile design that indicated that the sheet pile tips were located 16 feet lower than the bottom of the 17th Street Canal. Even as the Operations Division of the Corps was addressing the SWB permit, therefore, the defendant's Engineering Division was addressing levee wall design that might incorporate the sheet piles that were permitted under the dredging project.

52.

On August 11, 1988, the SWB issued the work order for Phase III of the dredging project, and the job was completed on December 6, 1989. The work order for Phase II-A of the dredging project, which included the installation of the sheet piles on the Orleans Parish side of the canal, was issued on July 4, 1990, and the job was completed on January 10, 1992 by Boh Bros. Construction Co., Inc.

53.

The dredging activity conducted in the 17th Street Canal pursuant to the SWB permit was specified contractually to entail "bucket dredging" from a series of flex-float barges in the canal. The barges constituted vessels in navigation for the time period during which the dredging occurred.

### C. The Construction of 17th Street Canal Concrete Monoliths

54.

Without any congressional authorization or re-authorization, the Corps unilaterally deviated from a congressionally authorized "Barrier Plan," which called for the installation of floodgates at the mouth of the 17th Street Canal (at Lake Pontchartrain). Defendants SWB and OLD objected to the installation of these floodgates. The Corps thereafter proposed a "Parallel Protection Plan" for the 17th Street Canal, which called for increasing the height of the flood barriers on the east and west banks of the canal. This plan was part of an overall "High Level Plan," which replaced the "Barrier Plan" even though this change was not authorized by Congress.

55.

In connection with the "High Level Plan," the Corps considered three options — levees, T-walls, and I-walls. The Corps rejected the use of levees and T-walls because such construction was

purportedly not economically justified. Instead, under the auspices of the Corps acting in connection with the OLD, the 17th Street Canal's flood walls were constructed with an "I-wall" design, which called for the construction of a concrete monolith on top of the existing sheet pile (in place from the dredging project). Figure 2, on the next page, depicts the differences in the design of the I-walls, T-walls, and levees.

### Figure 2



Figure 3.   General schematic of major hurricane protection structures used in New Orleans and vicinity