56.

The U.S. Army Corps of Engineers Manual on Engineering, Design and Construction of Levees, dated April 30, 2000, states that for stability reasons, flood walls utilizing the "I-wall" design rarely exceed seven (7) feet above ground surface and that an inverted "T-wall" design is used when walls higher than seven feet are required. <u>Nonetheless, the I-walls on the 17th Street Canal were built in concrete sections that rise eleven (11) feet above the ground</u>.

57.

Further, upon information and belief, Eustis performed a soil analysis in 1981, which entailed borings along the 17th Street Canal's levee. The borings revealed alternating layers of soft clay and black humus or peat — a soft, spongy soil comprised of decaying trees and other organic material — located fifteen to twenty-one feet below sea level. This layer of humus and peat substantially reduced the strength of the soil, particularly its strength in resisting lateral pressure and its ability to support the levee and flood walls under pressure from water.

58.

However, despite Eustis's findings regarding the weak soil, the Corps elected to build the walls of the 17th Street Canal with steel sheet piling driven to a depth that was seventeen (17) feet below sea level — either above or in the middle of the layers of weak soil. To make matters worse, the soil adjacent to the 17th Street Canal levee subsided significantly after construction of the levee and flood wall, greatly reducing the amount of support that the land behind the levee provided against the pressure of waters.



59.

Then, in 1993, C.R. Pittman Construction Company, Inc. ("Pittman") was retained for the construction of the concrete monoliths atop the steel sheet pile wall along the 17th Street Canal. Pittman reported to the Corps that it was encountering major problems — specifically, the sheet pile walls and concrete monoliths were beginning to lean towards the canal side as the soil foundation was not of sufficient strength, rigidity and stability. Despite these concerns and problems, however, the Corps allowed the construction of the I-walls to continue, and Pittman built the concrete monoliths on top of the sheet pile driven into the unstable soil.

60.

Altogether, Defendants either failed to account for the soil and flood wall stability problems associated with the 17th Street Canal or proceeded with the engineering, design, and construction of the 17th Street Canal despite such problems. As the result of Defendants' combined negligence, the 17th Street Canal failed during Hurricane Katrina, inundating the surrounding area and causing extensive damage to UHS's Property.

## VI. FACTUAL BACKGROUND REGARDING THE LONDON AVENUE CANAL

61.

The London Avenue Canal was constructed in the first half of the 19th century through an area that was mostly swampland and later became part of the City of New Orleans. The canal originally served a dual purpose of commerce and drainage, *i.e.*, it both permitted small boat traffic from Lake Pontchartrain to a section of New Orleans and provided for swamp drainage. Figure 1, *supra*, shows the location of the London Avenue Canal.

21

62.

The London Avenue Canal historically is, and at all times pertinent herein has been, a navigable waterway within the meaning of the general maritime law.

63.

The Corps, in coordination with the OLD and SWB, was responsible for the design and construction of the London Avenue Canal's levee system.

64.

A major project to upgrade the flood walls and bridges along the London Avenue Canal began in the early 1980's. The Corps had previously proposed placing a floodgate at the hurricane levees where the London Avenue Canal entered Lake Pontchartrain to provide protection from storm surge. The OLD and SWB, however, objected to this plan and instead favored building and raising the height of the parallel flood walls and levee structures along each side of the canal (the aforementioned "Parallel Protection Plan"). By 1991, the Corps, OLD and SWB had decided to proceed with this latter plan.

65.

The resulting flood walls along the London Avenue Canal were constructed atop earthen levees with an "I-wall" design consisting of steel sheet pilings driven into the compacted dirt atop the levee with reinforcing steel rods threaded through the top of the piling. Concrete was poured to encapsulate the top of the pilings and form the wall. The wall is composed of individual concrete slab sections (monoliths) that are linked together by rubbery gaskets (water stops) intended to prevent water from flowing between the monoliths and to allow the concrete to expand and contract.

22

66.

**The entirety of the London Avenue Canal is constructed over beach sands of the Pine Island trend.** The sands are located approximately 13 to 15 feet below the crowns of the I-wall levees of the canal, but are deeper at the vicinity where the northern breach occurred during Hurricane Katrina (station 113 to 118). The sand is covered with a veneer of peaty swamp deposits.

67.

Two key considerations in constructing an I-wall atop an earthen levee are 1) the composition of the soil into which the sheet piles will be driven and upon which the I-walls will rest and 2) the depth of the sheet piles based on the composition of the soil.

68.

Soil borings of the levee at the site of the London Avenue Canal south breach, which contributed to the catastrophe giving rise to this litigation, showed a layer of sand at a depth of 10 to 15 feet below sea level. Similar to the conditions at the south breach, soil borings of the levee at the site of London Avenue Canal north breach showed a layer of sand at a depth of 12 feet below sea level, as well as a layer of peat — a highly porous material that shrinks when dry and expands when wet, creating highly unstable soil conditions. Despite this layer of unstable sand, the sheet piles supporting the flood wall monoliths of the London Avenue Canal were driven to a depth of 14 feet below sea level. **Thus, the bottom of the sheet piles fell within a layer of sand.**

69.

As discussed *supra*, the flood walls along the London Avenue Canal are constructed with an "I-wall" design. The U.S. Army Corps of Engineers Manual on Engineering, Design and Construction of Levees dated April 30, 2000 states that, for stability reasons, flood walls utilizing

the "I-wall" design rarely exceed seven (7) feet above ground surface and that an inverted "T-wall" design is used when walls higher than seven feet are required. **<u>Nonetheless, the flood walls at the breach sites of the London Avenue Canal, although built with an "I-wall" design, have concrete sections that rise to eleven (11) feet above ground surface</u>**.

70.

Altogether, Defendants either failed to account for the soil and flood wall stability problems associated with the London Avenue Canal or proceeded with the engineering, design, and construction of the London Avenue Canal despite such problems. As the result of Defendants' combined negligence, the London Avenue Canal failed during Hurricane Katrina, inundating the surrounding area and causing extensive damage to UHS's Property

## VII. FACTUAL BACKGROUND REGARDING THE ORLEANS AVENUE CANAL

71.

The Orleans Avenue Canal is a canal located in Orleans Parish and is connected on its north end to Lake Pontchartrain and on its south end with the SWB's Pumping Station No. 7. Figure 1, *supra*, shows the location of the Orleans Avenue Canal.

72.

The levee and floodwall protection system along the Orleans Canal was incomplete at the time Hurricane Katrina struck the New Orleans area. Specifically, the embankment fronting the pump station, which is about four hundred feet long, is six feet lower than the floodwalls along the canal. That is, the floodwalls in this area are simply missing. As a result, the levee and floodwall protection system designed and constructed by Defendants was incomplete and did not provide

adequate flood protection for the surrounding area, causing extensive water damage to UHS's Property.

## VIII. FACTUAL BACKGROUND REGARDING HURRICANE KATRINA AND THE FAILURE OF THE 17TH STREET, LONDON AVENUE, AND ORLEANS AVENUE CANALS

73.

Hurricane Katrina made landfall at 6:10 a.m. near Buras, Louisiana, on the morning of Monday, August 29, 2005 with estimated maximum winds of 117 mph.

74.

On August 29, 2005, a major breach of 17th Street Canal occurred on the Orleans Parish side of the canal between 9:00 a.m. and 9:15 a.m. The breach rapidly scoured to depths below mean sea level, allowing lake and canal water to flow through the Orleans Parish bank of the canal well after the storm surge had subsided.

75.

The flooding as a result of the breach of the 17th Street Canal was totally catastrophic, and caused extensive damage to UHS's A Properties.

76.

Upon information and belief, water began to enter the Gentilly area east of the London Avenue Canal between 7:00 and 8:00 a.m. on August 29, 2005, pouring through a 200-foot wide breach in the levee/flood wall on the east side of the London Avenue Canal, just north of the Mirabeau Avenue bridge. This breach is referred to as the "south breach" of the London Avenue Canal levee.

77.

The water from the south breach of the London Avenue Canal initially inundated the Gentilly area of New Orleans, an area bounded on the west by the London Avenue Canal, on the south by Gentilly Boulevard (the Metairie/Gentilly Ridge), on the east by the Inner Harbor Navigational Canal (the Industrial Canal) and on the north by Lake Pontchartrain. This water eventually combined with flood waters from other levee breaches inundating other parts of New Orleans, including UHS's A Properties.

78.

Upon information and belief, water began to enter the Gentilly area west of the London Avenue Canal sometime before 9:00 a.m. on August 29, 2005, pouring through a 400-foot wide breach in the levee/flood wall on the west side of the London Avenue Canal, just south of the Robert E. Lee Bridge. This is referred to as the "north breach" of the London Avenue Canal levee.

79.

The water from the north breach of the London Avenue Canal initially inundated the Gentilly area of the city bounded on the west by Bayou St. John, on the north by Lake Pontchartrain, on the east by the London Avenue Canal, and along the southeastern side on a line drawn along Chef Menteur Highway to Gentilly Boulevard to Broad Street where it intersects with Orleans Avenue and then northwest along Orleans Avenue to Bayou St. John. This water eventually combined with flood waters from other levee breaches, inundating other parts of New Orleans, including UHS's Property.

80.

Upon information and belief, at approximately 9:00 a.m. on August 29, 2005, as a result of Defendants' inadequate design and construction of the floodwalls along the Orleans Avenue Canal,

the embankment fronting the pump station at the foot of the canal was overtopped and left unprotected by missing floodwalls, causing significant water damage to the surrounding area.

81.

Notably, the storm surge associated with Hurricane Katrina did not overtop the flood walls at the sites of the 17th Street, London Avenue, and Orleans Avenue Canals. Indeed, the hurricane did not exceed the designed parameters for these canals. Thus, none of the flood wall breaches in question would have occurred as a result of Hurricane Katrina alone. Rather, these breaches occurred solely as a result of Defendants' faulty and negligent engineering, design, construction, and maintenance of the 17th Street, London Avenue, and Orleans Avenue Canals.

## IX. FACTUAL BACKGROUND REGARDING THE WEST BREACH OF THE INNER HARBOR NAVIGATIONAL CANAL ("INDUSTRIAL CANAL")

82.

In July 1914, New Orleans received authorization from the State Legislature to located and construct a deep water canal between the Mississippi River and Lake Pontchartrain. Dredging of the Inner Harbor Navigation Canal ("IHNC" or "Industrial Canal") began on June 6, 1918. Excavation work initiated with the construction of parallel dikes on either side of the canal. The more resistant clay materials that were excavated were dragged up onto the dikes and were gradually built up to become permanent protective levees.

83.

From the onset, contractors battled problems with slope stability when constructing the Industrial Canal, as the soft oozy soils constantly slid back into the excavation. Essentially, the

levees and floodwalls along the Industrial Canal were built on a layer of organic marsh and peat with very soft clays. Fifteen feet below the top of the embankment is a layer of soft clay with silt and sand, very weak material. The Corps was aware of these problems.

84.

During construction, the Port Authority decided to increase the size of the channel to a minimum depth of 30 feet at low water, with a minimum bottom width of 150 feet and a minimum channel width of 300 feet, roughly double the original design. When new wharves were constructed, the bottom width was increased to 300 feet, with a minimum canal width of 500 feet near piers and slips, and 600 feet adjacent to quays. The canal excavation was completed in September 1919. The lock structure was completed on January 29, 1923. At that time, the water level in the IHNC was controlled by the tides in Lake Pontchartrain.

85.

In 1947, a back protection levee adjacent to the IHNC was overtopped at Tennessee Street during a hurricane, spilling ten feet of water into the eastern section of New Orleans. Fortunately, the levee did not collapse, the area was undeveloped, and the flooded properties were quickly remediated.

86.

The IHNC historically is, and at all times pertinent has been, a navigable waterway in New Orleans.

87.

The deficiencies in the construction of the Industrial Canal led to breaches on the west side of the canal during Hurricane Katrina, where a three hundred foot section of an I-wall failed at a

railroad yard, and a seventy-foot section of levee comprised of a sandy "shell" fill was scoured and blew out, causing extensive damage to UHS's Property.

88.

The City of New Orleans is the sole owner of the New Orleans Public Railroad Commission, a non-profit switching railroad which operates switches and terminal services for over 100 miles of track in New Orleans.

89.

On or about September 11, 2004, a New Orleans Public Railroad Train derailment caused a thirty-two and a half foot wide gap in Floodgate W-30, which is part of the floodwall system situated immediately west of the Industrial Canal.

90.

On December 14, 2004, PBR paid OLD $427,387.96, the full estimated cost of the reconstruction of Floodgate W-30, but, on information and belief, both PBR and OLD failed to assure these repairs were made prior to the August 2005 catastrophe giving rise to this action, resulting in extensive damage to UHS's Property.

91.

Further, upon information and belief, CSX designed and constructed a railroad crossing at or near the Industrial Canal's flood protection structures. In doing so, CSX utilized highly erodible, lightweight, and/or porous materials, including, but not limited to, "shell sand" and gravel, which caused CSX's structure to be significantly weaker than the surrounding flood protection structures. Upon information and belief, CSX also failed to install a "sheet pile cutoff" or similar device to

29

prevent or limit erosion of its structure. Indeed, CSX could have prevented the failure of its structure at a minimal cost by installing concrete "sheet pads" or other erosion protection devices at the base of the I-walls of the Industrial Canal.

92.

PNO has the full and exclusive right, jurisdiction, power and authority to govern the Port of New Orleans and is responsible for the maintenance of it wharves, terminals, marshaling yards, cranes, and all transportation and infrastructure affecting the regulation of commerce. The Industrial Canal is connected to the Port of New Orleans and is within the jurisdiction and control of PNO.

93.

Upon information and belief, PNO never tested whether the design, construction, and/or maintenance of the structures of the Industrial Canal were adequate, proper, and compliant with the requisite standards. PNO's failure to ensure the adequacy of the design, composition, construction, and maintenance of the Industrial Canal's levees and floodwalls contributed to the breach of the Industrial Canal on the west side, which caused extensive damage to UHS's Property.

## X. FACTUAL BACKGROUND REGARDING THE IPET REPORT

94.

The Corps has conceded that the failure of the New Orleans levee system, including the failure of the 17th Street, London Avenue, and Orleans Avenue Canals, was caused by the inadequate design, planning, and construction of the system's levees and floodwalls. Following Hurricane Katrina, the Corps undertook a massive investigation of the reason for the levee and flood wall failures. This investigation was coordinated by the Interagency Performance Evaluation Taskforce ("IPET"). On March 26, 2007, IPET issued its Interim Final and Final Reports concerning the

Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System ("IPET Report").

95.

IPET was created by the Chief of Engineers, U.S. Army Corps of Engineers to evaluate the New Orleans hurricane protection system in light of Hurricane Katrina. IPET consisted of government, academic, and private sector scientists and engineers with extensive experience in the field of civil engineering. The report was consistently peer reviewed prior to publication.

96.

The IPET Report provides extensive background regarding the construction of the hurricane protection system and reveals that, almost from the start, construction was based on inaccurate assumptions and calculations. IPET found that deficiencies existed throughout the levee system, which was constructed at an elevation below design specifications.

97.

Overall, IPET summed up its analysis of the hurricane protection system with the concession that its performance was compromised by the incompleteness of the system, the inconsistency in levels of protection, and the lack of redundancy. Volume I of the IPET Report made the following overall conclusions regarding the failure of the levees:

- Flood control structures in the region were authorized and designed relative to a water level datum (mean sea level), but constructed relative to a geodectic vertical datum *incorrectly assumed to be equivalent to the water level datum. This resulted, in the case of the outfall canals, in structures built approximately 1 to 2 ft below the intended elevation.*

- Sections of the system were built below specified design elevations due to the *use of an inaccurate relationship between the geodectic datum and mean sea level datum.*

31

- Coupled with the *use of average values* obtained from widely spaced samples in a geology with highly variable conditions, the structure was left *with a marginal factor of safety*.

- The structures were constructed on weak and compressible soils.

- The hurricane protection in New Orleans was designed and developed in a piecemeal fashion, resulting in inconsistent levels of protection.

- *Four breaches*, all in the outfall canals and all involving I-walls, *occurred before water levels reached the top of the floodwalls. All were caused by foundation failures* induced by the formation of a gap along the canal side of the floodwall. . . . *This failure mechanism*, in particular the gap formation, *was not considered in the original design of the structures.*

- The maintained condition of the levees was an additional negative factor in the performance of the system.

## XI. NEGLIGENT AND INHERENTLY DANGEROUS DESIGN CRITERIA AND REGULATORY VIOLATION BY CORPS CONCERNING THE LAKE PONTCHARTRAIN PROJECT

98.

Most of the levee and/or I-Wall structures that surround the New Orleans metropolitan area were constructed, in part, under the authority of the "Lake Pontchartrain, Louisiana and Vicinity, Hurricane Protection Project" (hereinafter referred to as "Lake Pontchartrain Project"). Congress first authorized construction of the Lake Pontchartrain Project in the Flood Control Act of 1965 to provide hurricane protection to areas around Lake Pontchartrain. The Corps was responsible for project design and construction.

1.  Standard Project Hurricane

99.

The overall design criterion of the Lake Pontchartrain Project mandated by Congress was to protect the area from "the most severe combination of meteorological conditions considered characteristic for the region." The Corps expected these conditions to occur once in 200 to 300 years, and they were deemed to be equivalent with the "Standard Project Hurricane" ("SPH"). However, the Corps based its overall design specifications on the 1959 Weather Bureau 1-in-100 year SPH, which was contradictory to Congress' mandate to protect against a 1-in-200 year to a 1-in-300 year hurricane.

100.

The 1959 SPH was known by the Corps to be obsolete by 1972, just as construction of initial parts of the Lake Pontchartrain Project and the floodwalls along the IHNC was getting underway. The 1959 SPH specification of maximum sustained wind speeds of 107 mph was increased by the National Weather Service to 129 mph. An increase of 20 percent in maximum winds results in up to a 40 percent elevation of maximum surge elevation. In 1979, the National Oceanic and Atmospheric Administration ("NOAA") raised the maximum sustained winds again to 140 mph, a category 4 hurricane (Technical Report NWS 23), which further exacerbated the Corps' design deficiencies. In 1981, the Office of the Chief of Engineers in Washington issued Engineering Regulation RR 1110-1453. The regulation provides direction for the development of SPH and Probable Maximum Hurricane wind fields along the Gulf and east coast of the United States. The regulation states specifically:

33

5. Requirements. ER 1110-2-1453 provides direction on the selection of the level of protection to be afforded by Corps flood damage prevention projects in urban areas. All field operating activities having Civil Works responsibilities are required to use the National Oceanic and Atmospheric Administration (NOAA) Technical Report NWS 23 for specifying meteorological criteria for SPH and PMH wind fields along the gulf and east costs of the United States.

Notwithstanding these events and the history of the area to date, the Corps negligently failed to consider any alteration of the project to strengthen the protection from flooding and in failing to do so negligently or intentionally violated this regulation. In ignoring this order to revise all SPH-based analysis to reflect the new understanding of threat, the Corps elected to base its designs for the Lake Pontchartrain Project on the 1959 SPH. Such negligence or intentional act in violation of law significantly increased the flooding risk to the Greater New Orleans area from hurricane storm surge.

## 2. Negligent and Inherently Dangerous Design Criteria-the Elevation Datum

101.

In addition to the application of the wrong SPH, the Corps elected to base the overall design specifications on the wrong elevation datum. The Corps applied the National Geodetic Vertical Datum of 1929 ("NGVD29") even though it was aware of the fact that NGVD29 was not any longer equal to – and interchangeable with – local mean sea level ("LMSL"). LMSL was the only relevant datum for superimposition of hurricane surge and wave height from a 1950's era oceanographic analysis. However, when the Corps' adopted design specifications for the Lake Pontchartrain Project in 1965, zero NGVD29 was already between 1.3 and 1.6 feet below LMSL at different parts of the system, and, thus, the floodwalls crowns were constructed lower by this margin. This design flaw was continued with the use by the Corps of the outdated NGVD29 adjustment for elevation control

34

up to the time of Katrina. As a result, no provision was made to account for the 3 to 4 feet/century subsidence rates characteristic of the Greater New Orleans metropolitan area even though this rate was known or should have been known by the Corps at the time of congressional authorization of the Lake Pontchartrain Project.

102.

Crown elevation deficiencies ranging up to 6 feet at the time Katrina struck resulted in prolonged overtopping of floodwalls and levees along IHNC that otherwise would have been overtopped only briefly, if at all. Prolonged overtopping led to catastrophic breaches into the greater New Orleans area east of the IHNC in New Orleans East and the Lower Ninth Ward of Orleans Parish, as well as in St. Bernard Parish.

### 3. Negligent and Inherently Dangerous Design Criteria-the Barrier Plan

103.

The original and only project design authorized by Congress, known as the "Barrier Plan," included a series of levees along the lakefront, concrete floodwalls along the IHNC, and control structures, including barriers and flood control gates located at the Rigolets, Chef Menteur Pass, and Seabrook at the northern end of the IHNC. These structures were intended to prevent storm surges from entering Lake Pontchartrain and the IHNC via the MR-GO's confluence with GIWW, all thus protecting from overflowing the levees along the lakefront and the floodwalls along the IHNC and other areas.

104.

The Barrier Plan was selected by the Corps and authorized by Congress over another alternative, known as the "High-Level Plan," which excluded the barriers and flood control gates at

35