# EXHIBIT 3

*Rev. 7/13/04*

# TRANSPORTATION AGREEMENT

| Carrier: INGRAM BARGE COMPANY | Shipper: LAFARGE NORTH AMERICA | |
|---|---|---|
| 13 Executive Drive, Suite 8 | *Contact Address:* | *Billing Address (if different):* |
| Fairview Heights, IL 62208-1342 | 600 SW Jefferson Street, Suite 302 | 2500 Portland Road |
| | Lee's Summit, MO 64063 | Grand Chain, IL 62941 |
| Attn: J. E. (Gene) Shiver<br>Sales Manager | Attn: Mr. Jay Darlington<br>Traffic Coordinator Barge | Attn: Rachael Burnett<br>Barge Scheduler |
| Telephone: 618-628-3099 | Telephone: 816-251-2115 | Telephone: 618-543-3902 |
| E-Mail: shiverg@ingrambarge.com | E-Mail: jay.darlington@lafarge-na.com | E-Mail: rachael.burnett@lafarge-na.com |
| Facsimile: 618-628-3494 | Facsimile: 816-347-1884 | Facsimile: 618-543-3959 |
| Carrier's Contract No: 35443 | Shipper's Contract No: | Shipper's Contract No: |
| Carrier's Job No: 15070574 | Shipper's Customer No: | Shipper's Customer No: 10661 |

This Agreement is made as of **December 14, 2004** by and between Carrier and Shipper (each as identified above) and is for the transportation of dry cargo by barge under the terms and conditions of Parts I and II as contained in this Agreement. In the event of a conflict, the provisions of Part I shall prevail over those contained in Part II to the extent of such conflict.

## PART I

1. Loading Date(s): January 1, 2005 through December 31, 2005
2. Equipment: Fiber-Lift Covered Barges ONLY. All cover handling expense for the account of Shipper.
3. Cargo: Cement
4. Cargo Value: $300.00 per net ton or actual invoice value, whichever is less
5. Number of Net Tons: Approximately 160,000 net tons. Refer to Appendix I for projected monthly shipping schedule.
6. Origin(s): Joppa, IL (Lafarge)   OH 953.2 T
7. Destination(s): New Orleans, LA (Lafarge-France Road Wharf)   GIWE 8.0 T3
8. Base Freight Rate(s): $12,700 Flat Rate Per Barge
9. Free Time: Six days all-purpose to load and unload each barge, including Sundays and holidays that occur within the freetime period. (Refer to Part II, Section 28)
10. Demurrage Rate: $185.00 per barge per day
11. Minimums: Not applicable, due to flat rates per barge.
12. Fuel Protection: Beginning January 1, 2005, the base freight rate(s) listed herein shall be subject to escalation during the term of this Agreement in the event of an increase in the cost of fuel above $.90 per gallon. If the actual average cost of fuel to Carrier for the second month immediately preceding the month of shipment rises above the specified cost per gallon, Carrier shall have the right to escalate the freight rate(s) on the first of every month during the term of this Agreement in accordance with the following formula:

$$[\text{Base Freight Rate} \times 30\% \times \frac{\text{Actual Fuel Cost} - \text{Fuel Protection Cost}}{\text{Fuel Protection Cost}}] + \text{Base Freight Rate} = \text{Adjusted Freight Rate}$$

As an example, Carrier's actual fuel cost for the month of November 2004 would determine the January 2005 rate(s). In no event will the adjusted freight rate(s) ever be lower than the base freight rate(s).

13. Cleaning Allowance: $800.00 maximum per barge account Carrier (refer to Part II, Section 31)
14. Special Provisions: Refer to Part II

In witness whereof, the parties have executed this Agreement as of the date first written above.

Accepted:

Carrier: **INGRAM BARGE COMPANY**    Shipper: **LAFARGE NORTH AMERICA**

Signature: *[signature]*    Signature: *[signature]*

By: J. E. (Gene) Shiver – Sales Manager    By: Frank Lazarowicz – Transportation Manager River Region

 Carrier's Contract No. 35443     APPENDIX I     Carrier's Job No. 15070574

| Projected Monthly Shipping Schedule: | Monthly Breakdown of Projected Volume ||||
|---|---|---|---|---|
| | January | 19,500 | July | 10,500 |
| | February | 18,000 | August | 9,000 |
| | March | 17,500 | September | 10,500 |
| | April | 9,000 | October | 15,500 |
| | May | 12,000 | November | 19,500 |
| | June | 10,500 | December | 7,500 |

Carrier Representative's Initials:            Shipper Representative's Initials:

Rev. 7/13/04

(INGRAM)  Carrier's Contract No. 35443      PART II      Carrier's Job No. 15070574

15. **Cargo Description:** Prior to loading, Shipper will notify Carrier of the generic name of the cargo to be transported pursuant to this Agreement. In addition, Shipper will, if requested by the Carrier, provide Material Safety Data Sheets (MSDS). Further, the Shipper shall notify the Carrier of the cargo classification under U. S. Coast Guard regulations and any other applicable regulations. In the event of Shipper's improper or incomplete description of the cargo or failure to disclose all necessary information about the cargo which results in any expense, loss, damage, and/or penalty to the Carrier, Shipper agrees to reimburse Carrier for such expense, loss, damage, and/or penalty.

16. **Tonnage:** Wherever used in this Agreement, the term "ton" shall mean a net ton of 2,000 pounds avoirdupois.

17. **Cargo Insurance:** Carrier will, at its own expense, obtain and keep in full force and effect during the term of this Agreement, or any extension thereof, Cargo Insurance on the full value of all cargo transported under this Agreement. Carrier may, at its own risk, elect to self-insure the cargo. Cargo is insured up to the value stated in Part I, or the actual value of the cargo, whichever is less. In no case will the Carrier be responsible for any amount exceeding $700 per net ton.

18. **Weights:** Freight charges shall be calculated on the basis of loaded weights at origin. Carrier shall not assume any responsibility to weigh the cargo at origin or destination.

    Within 72 hours after completion of loading, Shipper shall submit to Carrier a written report descriptive of the cargo and the weight thereof per barge.

    If the actual weight of cargo cannot be ascertained upon completion of loading, estimated weights may be used for billing which shall be adjusted to out-turn weights at destination, if available, and applicable charges determined accordingly. If facilities for determining weight at destination are not available, the barge will be gauged before unloading, at Shipper's expense, and the weight thus ascertained will be used in determining the applicable charges.

    Carrier may require proof of scale or gauged weights.

19. **Minimum Weights:** The freight due from Shipper will be based on the actual tons loaded subject to the minimum weights specified in Part I.

    However, if the capacity of the barge (or draft if so specified by the Carrier) will not allow the Shipper to load to the minimum level specified, then the charges will be based on the actual tons loaded or the tons that could have been loaded at the specified draft according to Carrier's draft tables, whichever is greater.

20. **Loading Requirements:** Shipper shall load a barge to the draft specified by Carrier. Shipper shall be governed by Carrier's instructions regarding the height of load, the tonnage of the cargo, the draft of the barge, and such other instructions as Carrier may deem necessary for safe transportation where variable waterway conditions and anticipated weather conditions make such precautions desirable. Shipper shall be subject to any demurrage charges that may accrue due to the detention of any barge occasioned by non-compliance with Carrier's loading requirements specified herein. The Shipper shall load the barge so that the cargo is evenly distributed throughout the hopper hold; the Shipper shall not "center load" or "end load" a barge.

21. **Transport of Barges:** A barge loaded with Shipper's cargo will move only at the convenience of the Carrier, and either singly or with one or more other craft. Carrier will have the right to shift or interchange the tow from one to another towing vessel as frequently as it may find it convenient to do so, or to procure towage from any other vessel not owned or operated by the Carrier; to tie off the tow at any point and for any purpose; and to deviate from its route, and visit any port whether or not on said route, and in any order. Carrier is not bound to transport any barges containing Shipper's cargo in time for any particular market.

    If, due to operating conditions, it is necessary in the judgment of the Carrier to delay the movement of barges while in transit, Carrier reserves the right to do so. Carrier makes no representation as to the time which will elapse between the acceptance of this Agreement until placement at origin, nor between departure of the barge from origin and arrival of the barge at destination; and under no circumstances shall Carrier be liable for any loss, damage, or expense incurred by Shipper or others by reason of delay.

22. **Inaccessible Points:** Carrier will not place barges for loading, nor pick up loaded barges, when the shipments are destined to ports or points which are inaccessible because of an actual or anticipated, temporary or permanent condition that adversely affects the navigability of a waterway to be traversed by barge between origin and destination. If shipment has been accepted or is re-consigned for transportation to a port or point which subsequently becomes inaccessible because of a condition that adversely affects the navigability of a waterway to be traversed between origin and destination, the Carrier shall be privileged to tender delivery of such shipment at an accessible intermediate point nearest to consigned destination, in which event freight charges shall be adjusted in accordance with the transportation service actually rendered on the basis of the rate applicable for the movement to the original destination. In the determination of the inaccessibility of a destination port, the type and draft of propelling vessel, the type of barge, the loaded draft of barge, and necessity of returning empty barge, among other considerations, shall govern. Carrier's determination in this regard shall be final. In the event that operating conditions, including ice, prevents or delays the delivery of a barge, the Carrier will place the barge at a point short of the point of interruption and the barge will be subject to demurrage.

23. **Accessorial Charges:** Except as otherwise provided, the Carrier will not be liable for the following accessorial charges: ballasting, cleaning, demurrage, dockage, drayage, elevation, loading or unloading of cargo, opening or closing of barge hatch covers, removal or replacement of barge covers, sheddage, stacking or restacking of barge covers, switching tollage, wharfage, or any other terminal expense at either origin or destination.

24. **Shifting:** Rates stated herein will include only one shift of barges into and one shift out of loading and unloading facilities by Carrier at origin and/or destination. Any additional shifting of barges to accommodate loading or unloading will be for Shipper's account.

    When Shipper arranges for shifts to be made without expense to Carrier, Shipper shall assume full responsibility for safety of barge and cargo thereof during such shifts, and further, Shipper shall reimburse Carrier in full for any damage or loss which may occur during such movements.

25. **Diversions, Re-Consignments, Holding in Transit, Stop-Offs for Partial Unloads**

    A barge may be diverted, re-consigned, held in transit to await orders, or stopped-off for partial unloads only with the consent of Carrier, which may be withheld for any reason. The cost, terms, and conditions of any agreement for re-consignment, diversion, holding in transit for orders, or partial stop-offs, must be confirmed in writing by all parties prior to Carrier's taking the requested action.

    Any barge that is stopped to permit a partial discharge will not be allowed any additional free time. All time incurred during a partial stop will be charged at the demurrage rate.

26. **Payment of Freight:** Upon loading, the entire amount of the freight charge will become earned and due and payable to Carrier in cash and without discount, even though the barge or cargo is lost or not lost, damaged or not damaged, in whole or in part, at any stage of the voyage. The Carrier does not have to deliver the Cargo until all freight and demurrage due hereunder have been paid by Shipper. The actual date of loading, not placement date nor requested date, shall govern as to what freight rate shall be invoiced.

    Interest at a rate of two percent (2%) per month (or any fraction thereof) or the maximum interest rate allowed by law, shall accrue on any payment obligations hereunder that are past due until such payment obligations are satisfied in full together with said interest. If any agency or attorney is employed to assist in the collection of such payment obligation, then the delinquent party also shall be required to pay such agency/attorney's reasonable fees relating to such collection. Carrier has the right to defer placement of any barge and/or delivery of the cargo if Shipper's payment obligations are past due until such time as all amounts due Carrier are paid in full.

    Unless specified elsewhere, and notwithstanding the above, Shipper may be granted credit by Carrier's Credit Manager, in which case the monies owed must be paid by the Shipper within 30 days from the date of the invoice or within the number of days specified by Carrier's Credit Manager. The Carrier's Credit Manager has complete discretion as to whether or not credit is to be extended to Shipper, the amount of credit to be granted to Shipper, and the payment due date from the Shipper, and the form of payment. Shipper is to comply with all reasonable requests for financial information by Carrier's Credit Manager in order to establish Shipper's credit. The Carrier's Credit Manager may change or cancel the extension and amount of credit and the payment due date or the form of the payment at the Credit Manager's sole discretion and at any time.

27. **Lien:** Carrier will have a lien upon all cargo for any freight or demurrage due hereunder, which lien will survive the delivery of such cargo.

28. **Demurrage and Free Time:** The free time to be allowed is to be that which is specified in Part I. No free time will be allowed on empty barges placed upon Shipper's request for placement if, subsequent to placement, such order is cancelled.

    After the period of free time has expired, the demurrage charges specified under this agreement will be made for each day, including Saturdays, Sundays, and National Holidays, until the barge is released to the Carrier.

    Except as otherwise provided, time will be computed for the total period barge is in Shipper's possession for loading or for unloading and will begin as of the first 7:00 a.m. after barge is actually or constructively placed for loading or for unloading and will run until Carrier has been notified in writing that barge has completed loading or unloading and is available for pick up. The written release must be received by Carrier by 11:00 a.m. CST (Nashville time) or the barge will not be considered as having been released by 7:00 a.m. In computing time, days will consist of 24 hours running from 7:00 a.m. until the next 7:00 a.m. A fraction of a day will be considered as one day.

Carrier Representative's Initials: _____    Shipper Representative's Initials: _____

Rev. 7/13/04

 Carrier's Contract No. 35443     PART II     Carrier's Job No. 15070574

When Carrier, for its convenience, places a barge for loading prior to date specified by Shipper, time will run from the first 7:00 a.m. of the date specified by Shipper or from 7:00 a.m. of the date when actual loading began, whichever occurs sooner.

Actual placement is made by Carrier when barge is placed for loading or unloading at docks or wharves specified by Shipper or at a nearby fleet selected by Carrier, whichever occurs first.

Except as otherwise provided for herein, if Carrier is prevented from making actual placement by any cause over which it has no control, such barge is subject to constructive placement. Constructive placement will be made by Carrier when actual placement is not possible.

Constructive placement consists of placing or holding a barge at a point of Carrier's or Shipper's choice near the specified actual delivery point. Notice of such placement will be given to Shipper. In making any subsequent placement, no free time in addition to that provided will be allowed by Carrier.

If holidays are excluded from Free Time, the following are the holidays to be recognized:

| New Year's Day | Memorial Day | Independence Day | Labor Day |
| Easter Sunday | Thanksgiving Day | Christmas Day | |

If the holiday (except for Easter) falls on a Sunday, the following Monday shall be considered as the holiday.

If a barge is on demurrage and the shipper requests a reconsignment, the barge will remain on demurrage, even during transit, until the barge is released back to the Carrier.

In the event that delivery of a barge involves a destination beyond the lake front entrance to Lake Michigan, the barge will be placed in a fleet of Carrier's choosing on the Illinois River Waterway and free time and demurrage shall commence upon placement in the fleet. Adverse weather conditions which delay transit and barge delivery to destinations on Lake Michigan will not be considered Force Majeure events. It is the Shipper's responsibility to notify the loading/unloading terminal of the barge placement in the Illinois River Waterway fleet.

29. **Fuel Protection**: Unless otherwise addressed in this Agreement, the freight rate shall not be subject to escalation during the term of this Agreement except in the event of an increase in the cost of fuel above the cost per gallon specified in Part I. If the actual average cost of fuel to Carrier for the second month immediately preceding the month of shipment rises above the specified cost per gallon, Carrier shall have the right to escalate the freight rate on the first of every month during the term of this Agreement in accordance with the following formula:

$$\left(\text{Base Rate} \times 30\% \times \frac{\text{Actual Fuel Cost} - \text{Fuel Protection Cost}}{\text{Fuel Protection Cost}}\right) + \text{Base Freight Rate} = \text{Adjusted Freight Rate}$$

As an example, the actual fuel cost for the month of October would determine the December rates. In no event will the adjusted freight rate ever be lower than the base freight rate.

30. **Ratability**: Unless modified in Part I, Shipper shall ship in approximately equal monthly increments and approximately equal weekly increments within each month. Should the Shipper fail to ship ratably as described above, Carrier has the right to adjust its obligation to provide barges for the remainder of this Agreement. Barges not loaded ratably within a week or within a month cannot be carried forward to the following week or month, unless Carrier agrees to do so. Further, Carrier will not be obligated to supply a number of barges in any one month that is greater than the actual number of barges shipped in the prior months under this Agreement.

31. **Cleaning**: Carrier shall absorb cleaning costs up to amount specified in Part I to remove cargo left in the hopper by shipper. All cleaning costs above the stipulated allowance are for the account of the Shipper. Shipper shall remove all dunnage, if any, at its sole expense.

If any cargo or debris is spilled or deposited on the exterior of the barge (including working surfaces, such as gunnels, covers, or decks) at either loading and unloading points, Shipper is responsible for all costs associated with cleaning the exterior of the barge.

Carrier may refuse to pick up or move a barge if an abnormal amount of cargo is left in the hopper or if cargo or debris is left or spilled on the barge if, in the Carrier's sole judgment, the cargo or debris left aboard represents a safety hazard to its crew or to other parties who may come in contact with the barge. The Carrier will require the Shipper to clean or remove all abnormal amounts of cargo left on board or to remove the cargo or debris that represents a safety hazard prior to movement. In such case, if the movement of a barge is delayed while the barge is being cleaned by the Shipper, then the Shipper shall be liable to the Carrier for the days consumed at the then applicable demurrage rate. Further, if the Carrier arranges to have a barge cleaned due to abnormal amounts of cargo left in the hopper or if cargo or debris is left or spilled on the barge, the Shipper shall be liable to the Carrier for the days consumed at the then applicable demurrage rate.

32. **Unloading**: It shall be the obligation of Shipper, or its consignee, to unload and remove the cargo from the barge, including any cargo or debris spilled on the working surfaces, promptly upon arrival of the barge at its destination. If the cargo is not so unloaded and removed, then the Carrier, at its option, shall be entitled to remove, sell or otherwise dispose of the cargo.

33. **Distribution of Cargo**: Shipper shall be required to distribute cargo in each barge so as to ensure an even draft. If a barge is not loaded to ensure an even draft, Carrier reserves the right to refuse to accept the barge for transport. If Carrier refuses to accept any barge, Shipper must, at its expense, have the cargo redistributed to meet Carrier's requirements. In addition, the barge will be subject to demurrage charges, from the time and date of placement until the barge is accepted for transportation by Carrier.

34. **Possession of the Barge during Loading/Unloading**: Carrier shall deliver an empty or loaded barge to a loading/unloading facility designated by Shipper for loading or unloading. Shipper shall assume the duty and responsibility for the safety of each barge in its possession. For the purposes of this Agreement, "possession" shall begin when Carrier delivers an empty or loaded barge for loading or unloading to the landing designated by Shipper and shall end when the barge is removed by Carrier or its agent(s). Shipper shall be responsible for the safekeeping of Carrier's barge delivered to a landing regardless of whether Shipper owns or operates the landing. During possession, any barge delivered to a landing designated by Shipper shall be held without charge to Carrier.

35. **Safe Berth**: Shipper warrants the barge shall have a safe berth of not less than nine (9) feet of draft. The barge shall not be permitted, at any time, to touch bottom while in the Shipper's control.

36. **Mooring**: Shipper warrants that barges will be safely and adequately moored free of wharfage, dockage, port and harbor charges at the loading and unloading points and that barges will have warning lights properly displayed as required by applicable U.S. Coast Guard and U.S. Army Corps of Engineers regulations and permits. While barges are in the care and custody of Shipper, or its agents, all U.S. Coast Guard and U.S. Army Corps of Engineers regulations will be complied with, and in the event that Carrier should in any manner be held responsible for Shipper's, or its agents acts or omissions in compliance with the mooring requirements herein provided, then Shipper agrees to indemnify and save harmless Carrier from all such responsibility and liability.

37. **Request for Placement**: Shipper must send Carrier a written request for placement with a specific date for loading and the designated origin for loading. Carrier requires a minimum of 14 days notice for any loading; should Shipper fail to supply 14 days advance notice of a loading, Carrier has the right to adjust its obligation to provide barges for loading.

38. **Change in Loading Date or Origin**: Any change by the Shipper in the requested loading date or designated origin given to the Carrier which is in excess of five (5) working days prior to the previously requested loading date will be accepted by Carrier without charge. Any change by the Shipper in the requested loading date or origin given to the Carrier on less than five (5) working days notice may subject the Shipper to charges (including but not limited to free days may be assessed, additional shifting or fleeting charges may be billed, barge cleaning, or cover handling).

39. **Acceptance**: Carrier will tender barges which are in a condition suitable for the cargo to be carried. Loading of the barges will constitute Shipper's acceptance of the condition and suitability of the barges for the intended cargo.

40. **Release**: Carrier shall not be liable for lost profits or other incidental or consequential damages under any circumstances. Nothing contained herein shall render Carrier responsible for the differences in the inturn weight and the outturn weight of cargo from barges safely delivered and unloaded.

41. **Failure to Accept / Failure to Place**: If either Shipper or Carrier, for reasons other than Force Majeure, determines that it will be unable to accept or place barges on the requested Load Date or within the term of this Agreement, it shall be their duty to advise the other party at once; whereupon it shall be the other party's duty at once to elect to cancel the unplaced barge or to extend the placement time. In the case of cancellation, the other party shall have the right to buy or sell, as the case may be, the respective freight and the party unable to accept or place shall reimburse the other party for any loss sustained in such purchase or sale provided same is made at the prevailing market price.

42. **Choice of Law**: This Agreement shall be governed by the laws of the State of Tennessee, both as to interpretation and performance, and all disputes that arise under this Agreement shall be resolved in accordance with Tennessee law.

43. **General Average**: In the event of accident, danger, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, Carrier is not responsible, by statute, contract, or otherwise, the cargo, Shipper, and the consignee, and other parties having an interest in the cargo, jointly and severally, will contribute in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred in respect of the cargo. General average, if any, will be adjusted, stated, and settled at such port or place in the United States as may be selected by Carrier, and will be settled in accordance with the York/Antwerp Rules of 1974.

Carrier Representative's Initials: _____      Shipper Representative's Initials: _____

<mark>Case 2:05-cv-04182-SRD-JCW Document 14524-4 Filed 08/18/08 Page 6 of 6</mark>

Rev. 7/13/04

**Carrier's Contract No. 35443**  **PART II**  **Carrier's Job No. 15070574**

44. **Force Majeure:** Performance under this Contract by Shipper and Carrier shall be excused to the extent such performance is prevented by Force Majeure, provided the party declaring Force Majeure gives written notice of such condition to the other party within seventy-two (72) hours after commencement of the Force Majeure condition. The term "Force Majeure" shall include acts of God or the elements, acts of a public enemy, insurrections, riots, strikes, labor disputes, fires, explosions, floods, accidents of navigation, ice, high or low water, embargoes, acts or orders of civil or military authorities, lock delays or closings, fuel shortages, or other causes beyond the reasonable control of the party declaring Force Majeure. Such excuse from performance shall continue until the Force Majeure ceases to exist. A party declaring Force Majeure shall make reasonable efforts to eliminate or resolve the condition, recognizing, however, that the settlement of any strike or other labor dispute shall be solely within the discretion of that party. A declaration of Force Majeure by Shipper does not excuse payment of demurrage for a barge on demurrage status. When a Force Majeure is declared on a barge with remaining free time, free time shall continue to run; upon expiration of free time the barge will be placed in a demurrage status even if the Force Majeure event continues to exist. Any shortfall in cargo deliveries resulting from force majeure shall not be made up except by mutual consent of the Shipper and the Carrier.

45. **New Taxes:** There will be added to the freight rate the amount of any new or increased Federal, State, or local taxes (except net income taxes) that may hereafter be charged to and paid by Carrier on account of the transportation services rendered hereunder, including the amount of any user charge, tax, or wharfage, port, harbor, or dockage fee imposed, levied, or collected for the use of the inland waterway system or of the locks and dams in said waterway system, wharfs, ports, or the use of the harbors and docks by Carrier while engaged in the transportation services rendered hereunder, or upon fuel used in performing such services.

46. **Subcontracts:** Nothing herein shall prevent Carrier from subcontracting for any of the services provided by Carrier hereunder but Carrier will remain liable to Shipper for the proper performance of all of Carrier's obligations hereunder.

47. **Mitigation:** If all or any part of the cargo is discovered to be damaged while subject to this Agreement, Carrier, in its sole discretion, in order to minimize the damage, may sell the Cargo at public or private sale to the best advantage. In such event, Carrier shall, where practicable, provide Shipper and any known consignee with notice of the proposed sale. The proceeds of any sale made under this section shall be applied by Carrier to the payment of freight, demurrage, storage, and any other charges and the expense of notice, advertisement, sale and other necessary expense of caring for and maintaining the Cargo, and the balance, if any, shall be paid to Shipper or consignee.

48. **Claims:** As condition precedent to recovery, claims must be filed in writing with Carrier within nine (9) months of delivery of the Cargo, or, in case of failure to make delivery, then within nine (9) months after a reasonable time for delivery has elapsed. Suits shall be instituted against Carrier only within two (2) years and one (1) day from the day when notice in writing is given by the Carrier to the claimant that the Carrier has disallowed the claim or any part or parts thereof specified in the notice.

49. **Default:** No default of either party in the performance of any of its covenants or obligations hereunder, which, except for this provision, would be the legal basis for rescission or termination of this Contract by the other party hereto, shall give rise or result in such a right unless and until the party committing such default shall fail to correct the default within thirty (30) days after written notice of such default is given to such defaulting party by the non-defaulting party. Notwithstanding anything in this Contract to the contrary, there shall be no cure period for any payment default and each party shall have each and every other right afforded it under law against the defaulting party.

50. **Notices:** All notices, consents, determinations, instructions and communications provided for herein shall be validly given, made or served, if in writing and delivered personally, or by telegram, facsimile, electronic mail, overnight delivery or recognized courier service or sent by registered or certified mail, postage prepaid, to Shipper and Carrier at their respective addresses listed at the beginning of this Contract, or as the parties may otherwise direct in writing. Any notice, consent, determination, instruction, approval, or other communication hereunder shall be deemed given and effective as of the date of delivery in person or by courier, or as set forth on the return receipt or facsimile confirmation.

51. **Independent Contractor:** Nothing contained in this Contract shall be construed as a contract by Shipper for the chartering, hiring or leasing of any barge, towboat or other equipment of Carrier to be provided hereunder; nor shall any of the agents, servants, subcontractors or employees of Carrier be regarded as employees of Shipper, it being understood that Carrier is in all respects an independent contractor and that Shipper shall exercise no control over the operation of any barge, towboat or other equipment of Carrier or over Carrier's agent, servants, subcontractors or employees.

52. **Changes in Operation:** In the event Carrier's operating costs specifically related to the equipment, facilities, supplies, or services to be used or provided by Carrier under this Agreement are increased due to any law, rule, ordinance, regulation, restriction, directive, order, notice, advisory or interpretation, hereafter promulgated by any federal, state, or local authority, or any agency or division thereof, or any industry group advisory thereto, or any court, which is generally applicable to all barge carriers similarly situated, and such increased costs are not reimbursed to Carrier under any other provision of this Agreement, then Shipper shall reimburse Carrier monthly, following receipt of billing for the entire amount of such increase in operating costs that is fairly attributable to the services performed for Shipper under this Agreement.

53. **Miscellaneous:**

    A. **Conflict:** In the event any of the terms of the Shipper's confirmation differ or conflict with any provision of this Agreement, then the terms set forth in this Agreement shall prevail.
    B. **Assignment:** Shipper shall not be permitted to assign or otherwise dispose of all or any part of its rights or obligations hereunder without first obtaining the written consent of Carrier. Such consent shall not unreasonably be withheld, provided that any such permitted assignment or other disposition shall not relieve Shipper of its obligation under this Agreement.
    C. **No Waiver:** The failure of Shipper or Carrier to insist upon strict performance of any of the provisions of this Agreement in one or more instances or the failure of Shipper or Carrier to exercise any of its rights hereunder in one or more instances shall not be construed as a waiver of any such provisions or the relinquishment of any such rights, but the same shall continue and remain in full force and effect.
    D. **Binding Effect:** This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee and shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns, subject to the restrictions or assignability herein contained.
    E. **Headings; Terms:** Section headings in the Agreement are included merely for the convenience of reference and shall not be construed as part of the governing terms of this Agreement. The term "barge" herein shall mean both the singular and the plural as intended by the parties depending on the number of barges subject to this Agreement.
    F. **Integration; Execution:** This Agreement sets forth the entire understanding between the parties hereto as to the subject matter and no amendment hereto shall be valid unless made in writing and duly signed by the parties hereto. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original hereof, and all counterparts collectively are to be deemed but one instrument. Whether or not Shipper executes this agreement in the acceptance space provided hereon, loading of a barge shall constitute an acceptance of all the terms and conditions of the Agreement.

**Carrier Representative's Initials:**    **Shipper Representative's Initials:** ___