# IN THE UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| IN RE: KATRINA CANAL | * | |
| BREACHES | | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| | * | and consolidated cases |
| PERTAINS TO: BARGE | * | |
| | * | SECTION "K" (2) |
| *Boutte v. Lafarge*     05-5531 | * | |
| *Mumford v. Ingram*     05-5724 | * | |
| *Lagarde v. Lafarge*     06-5342 | * | JUDGE |
| *Perry v. Ingram*     06-6299 | * | STANWOOD R. DUVAL, JR. |
| *Benoit v. Lafarge*     06-7516 | * | |
| *Parfait Family v. USA*     07-3500 | * | MAGISTRATE |
| *Lafarge v. USA*     07-5178 | * | JOSEPH C. WILKINSON, JR. |
| | * | |

### MEMORANDUM OF LAFARGE NORTH AMERICA INC. IN OPPOSITION TO PLAINTIFFS' MOTION FOR PROTECTIVE ORDER BARRING *EX PARTE* CONTACT WITH PUTATIVE CLASS MEMBERS AND FOR OTHER DECLARATORY RELIEF

This is the third time that plaintiffs have asked this Court to break Lafarge North America Inc.'s core work product privilege for the factual investigation it has conducted to defend itself in these cases.  Once again, the motion's primary basis is that the Centanni investigators failed to disclose their association with LNA.  This Court has already twice held (1) that that failure has been fully remedied by the production of the recorded interview transcripts, and (2) that there is no basis for eviscerating LNA's work product privilege for the remainder of its investigation.  Nothing in plaintiffs' new motion, which simply presents more transcripts to the same effect, warrants revisiting, much less reversing, those prior rulings.

Plaintiffs' new motion lobs in a new argument that the Court should abrogate LNA's work product privilege for its investigation under the "crime-fraud" exception because the investigators supposedly committed a crime in collecting and preserving timepieces.  This argument fails for numerous reasons:  it was waived when plaintiffs failed to raise it in their earlier motions seeking the same relief; Centanni committed no crime ; the crime-fraud exception would be inapplicable in any event; and the collection of the timepieces is wholly unrelated to the witness interviews whose privilege plaintiffs seek to abrogate.

Plaintiffs' new motion also seeks an order barring LNA from contacting fact witnesses who may be putative class members or, in the alternative, requiring that plaintiffs' counsel be present at any future interviews.  Courts have repeatedly held that a party to litigation has both a legitimate need and a constitutional right to seek factual information from putative class members, and hence that such communications cannot be barred or impeded except in extraordinary circumstances.  Because plaintiffs fail even to begin to establish the high level of cause required to implement such a draconian remedy, this portion of plaintiffs' new motion should be denied as well.

## PROCEDURAL HISTORY

As the Court is aware, this is plaintiffs' third motion seeking to break LNA's privileges for its factual investigation based on the witness interviews conducted on behalf of LNA by the Centanni Investigative Agency ("Centanni").

Plaintiffs' first motion, filed on March 5, 2008, was based on transcripts of recorded telephone interviews with various plaintiffs.  Doc. 11578.  The Court held that the investigators' failure to disclose both (1) their relationship to LNA and (2) that the conversations were being recorded vitiated the work-product protection for those recorded conversations, and ordered LNA to produce transcripts of all recorded conversations.  Doc. 12605.  Apart from ordering pro-

duction of the transcripts, however, the Court upheld LNA's work product protection for the remainder of its investigation. *Id*. at 13.

Plaintiffs' second motion, filed on March 25, 2008, was again based on Centanni's interviews of fact witnesses. Doc. 11765. Plaintiffs argued, as they do again here, that "Lafarge's counsel through Centanni were required to inform interviewee residents of the Lower Ninth Ward and putative class members that it was acting on behalf of counsel for Lafarge North America …." Doc. 11765-2 ¶ 38. Plaintiffs also alleged, as they do here, that "Lafarge's counsel through Centanni frequently described themselves as if they were impartial investigators trying to sort through different stories and rumors." *Id*. ¶ 41 (citation omitted). And plaintiffs alleged, as they do here, that Centanni "attempted to evade direct questions about the investigator's real client … and for whom they were working." *Id.* ¶ 42. The thrust of plaintiffs' motion was that, through Centanni, LNA and its counsel had violated Rules 4.2 and 4.3 of the Louisiana Rules of Professional Conduct in connection with these contacts with putative class members. *Id.* ¶¶ 34-37. Plaintiffs' second motion expressly sought an order requiring the production of LNA's work product and attorney client communications related to its communications with putative class members – the very same relief plaintiffs now seek in the current motion.

The Court denied plaintiffs' second motion, as well as plaintiffs' motion to reconsider the Court's earlier refusal to require LNA to turn over other work-product materials besides the transcripts, in an order dated May 14, 2008. Doc. 13149. In denying plaintiffs' motion for reconsideration, the Court held that plaintiffs had waived any arguments for abrogating LNA's privilege for its investigation materials that plaintiffs had not raised in their first motion. *Id.* at 1-5. In denying plaintiffs' second motion, the Court held that LNA's counsel had not violated LRPC

Rules 4.2 and 4.3.  The Court found that "Plaintiffs' summaries of the facts in their memoran-

dum are hyperbolic and strained interpretations of the actual contents of their exhibits."  *Id.* at

11.  The Court further held that Centanni's failure to disclose its relationship to LNA has already

been fully remedied:

> Although the investigators in the instant case failed to identify
> themselves as working for an attorney, the court has already
> remedied that failure by ordering all of the recorded statements
> produced.  The investigators in the instant case did not "state or
> imply" that they were disinterested, they made no misrepresen-
> tations when they stated that they worked for a private investiga-
> tive agency and they did not deliberately foster any "impression
> that the interviewers were on [the interviewees'] side," as alleged
> by plaintiffs.

*Id.* at 14 (quoting Doc. 11765-2 at 11).  Thus, the Court ruled that plaintiffs were

"overreach[ing]" in asking for "notes made by defendants' investigators."  *Id.* at 17.[1]

## ARGUMENT

I.   **PLAINTIFFS' MOTION PROVIDES NO BASIS FOR THIS COURT TO
     REVERSE ITS RULINGS DENYING PLAINTIFFS' REQUESTS TO
     ABROGATE LNA'S ATTORNEY-CLIENT AND WORK-PRODUCT
     PRIVILEGES**

### A.   **The Additional Interview Transcripts Provide No Basis To Abrogate
         LNA's Privileges For Its Investigation**

Plaintiffs' new motion, just like their two earlier motions, quotes from transcripts of Cen-

tanni's recorded telephone conversations, complains that Centanni failed to disclose or misrepre-

sented its relationship to LNA, and argues that this constituted a violation by LNA's counsel of

LRPC 4.2 or 4.3.  This Court has already held that Centanni's failure to disclose its relationship

to LNA does not establish any ethical violation by LNA's counsel and has in any event been

---

[1]  Plaintiffs have appealed both of these rulings to Judge Duval.  Doc. 13347.

4

remedied by disclosure of the interview transcripts.  Doc. 12605.  Plaintiffs' new motion fails to establish any reason to revisit, much less reverse, those rulings.

As set forth above, plaintiffs' first and second motions both quoted extensively from numerous transcripts of Centanni's recorded telephone interviews for the proposition that Centanni had misrepresented or hidden its association with LNA when talking to witnesses, and asserted that the Court should abrogate LNA's privileges for its entire defense investigation as a remedy (or punishment) for Centanni's conduct.  Plaintiffs' first motion argued that "Centanni did not inform the telephone interviewees that they were being recorded, and failed to fully identify themselves and their role vis-à-vis Lafarge" (Doc. 11578-2 at 7) and that "Centanni … is evasive and not at all forthcoming when specifically asked by interviewees for identification" (*id.* at 10).  Likewise, plaintiffs' second motion argued that "Centanni lied to some putative class members and Barge clients, telling them that Centanni interviewers were 'independent private investigators,'" that "some of the interviewees [were left] with the impression that the interviewers were on their side," and that "Centanni attempted to evade direct questions about the investigator's real client."  Doc. 11765 ¶¶ 42-44.

Upon reviewing the transcripts, this Court held that its order requiring LNA to produce all of the interview transcripts "provides an adequate remedy for the only ethical infringement that plaintiffs have proved, i.e., the surreptitious tape recordings of putative class members by Lafarge's investigators without identifying themselves as working for an attorney."  Doc. 13149 at 11 (citing Doc. 12605).  The Court also rejected plaintiffs' argument that Centanni's statements amounted to a violation by LNA's counsel of LRPC 4.2 or 4.3.  *Id.* at 15.  The Court further held that "Plaintiffs overreach when they seek any notes made by defendant's

investigators of the investigators' conversations with witnesses, whether the conversations were recorded or not." *Id*. at 17.

Plaintiffs' new motion simply makes the very same arguments based on some additional transcripts of Centanni witness interviews. For example, plaintiffs cite to an interview of Kerry Watson (Pls.' Br. ¶ 19) and contend that "Mr. Garcia [the Centanni investigator] refused to say who the lawyers were, or which side they worked for." The transcript shows that Mr. Garcia (1) identified himself as working for lawyers, (2) specifically ensured that Mr. Watson was not represented by counsel, and (3) repeatedly emphasized that all he was doing was trying to found out the truth as to what happened. Pls.' Ex. 24 at 7-10. Likewise, plaintiffs cite to additional transcripts where the investigators stated that they worked for an independent agency. Pls.' Br. ¶¶ 20(a), (b), (c), (g), (h). That is precisely the same substance that this Court already addressed in the two earlier motions. As such, the new motion provides no basis for the Court to change its repeated rulings that plaintiffs are not entitled to abrogate LNA's privileges for its defense investigation.

Moreover, plaintiffs overstate the contents of the transcripts – just as the Court found they did in their earlier motion. Doc. 13149 at 11. For example, plaintiffs contend (Pls.' Br. ¶ 20(e)) that Mr. Garcia falsely told Linda Ambrose that he did not know who was going to get the information and did not know if it would ever get to court. Actually, what Mr. Garcia said was that while he did not know what would come of the information, it may eventually go to court. Pls.' Ex. 28 at 20. He also affirmatively told her that he was working for attorneys who were investigating the matter, that they were not the plaintiffs' class action attorneys, and that they were just trying to figure out exactly what happened. *Id.* Plaintiffs also argue (Pls.' Br. ¶ 20(f)) that Mr. Bart Molay falsely told Rosa Ray that he did not know the purpose of the

interviews.  To the contrary, Mr. Molay told Ms. Ray that his purpose was to "document … give a little small report of what … y'all told me" and that he was trying "find out what went on."  Pls.' Ex. 29 at 38-39.[2]

In short, just as in the many transcripts reviewed in connection with the two earlier motions, the additional transcripts cited in plaintiffs' new motion show, at most, that the Centanni interviewers failed to reveal their association to LNA but accurately stated that they were simply trying to collect factual information in order to help determine what happened during Hurricane Katrina.  Not only are the new transcripts substantively the same as the ones cited in plaintiffs' earlier motions, but so are plaintiffs' arguments.  Just as in their prior motion, plaintiffs argue that "Lafarge's counsel through Centanni violated Louisiana RPC 4.2 and 4.3," that "Lafarge's counsel through Centanni falsely posed as impartial investigators, evaded direct questions from [putative] class members;" and "lied to some putative class members and Barge clients by telling them that Centanni interviewers were 'independent private investigators….'"  Pls.' Br. at 15.  As set forth above, this Court has already held that it has fully remedied the only impropriety shown by the transcripts and that plaintiffs have not established any basis to strip LNA of its core privileges for the investigation it has undertaken to defend itself against the massive liability claims in these lawsuits.[3]  For these reasons, plaintiffs' demand to abrogate LNA's privileges should be denied.

---

[2]  Plaintiffs make the same argument with respect to Mr. Garcia's interview of Carl Butler (¶ 20(h)).  In that interview, Mr. Garcia truthfully answered the question "What do you need that [the address of Mr. Butler's temporary residence in Houston] for?" by explaining, "Everybody that we talk to we're just trying to get all [of] their information."  Pls.' Ex. 31 at 8.

[3]  Because plaintiffs' new motion simply repeats arguments that this Court has already rejected, LNA will not repeat herein all of its substantive responses to plaintiffs' arguments that are contained in LNA's responses to plaintiffs' earlier motions.  If the Court were to conclude to re-examine plaintiffs' arguments on their merits, LNA hereby incorporates those prior memoranda by reference herein.  For example, LNA has demonstrated why its and its agents' conduct did not violate any ethical rules.  Doc. 12831 at 7-14.

**B.    Plaintiffs' Belated and Meritless "Crime-Fraud" Argument Provides No Basis To Break LNA's Privileges For Its Investigation**

*1.    The Facts Concerning Centanni's Preservation of Timepieces from the Lower Ninth Ward.*

Separate from its witness interviews, Centanni's investigation also involved the preservation of relevant evidence.  As part of its investigation under the direction of LNA's counsel, Centanni recovered mechanical and battery operated clocks that could be used to show the height of the water level at the time they became waterlogged and stopped functioning.  Second Supplemental Declaration of Wayne Centanni ¶ 2, attached hereto as exhibit 1 ("Centanni Decl.").  In addition to documenting this evidence, Centanni also preserved the clocks so that they could be used later in the litigation.  Centanni Decl. ¶ 9.  In September 2005, there was much concern that the entire Lower Ninth Ward, already in a state of major devastation, would be demolished and that this important evidence would be lost.  Centanni Decl. ¶ 3.

Centanni was not alone in its recovery of timepieces following Hurricane Katrina.  Other investigators recovered or photographed clocks in the Lower Ninth Ward (and other parts of New Orleans) as well.  For example, the major independent post-Katrina investigations used timepieces from the Lower Ninth Ward and elsewhere in New Orleans to determine when the water level rose.[4]  Plaintiffs' expert Melvin Spinks has also relied on information from recovered timepieces in developing his expert opinions.

Law enforcement authorities authorized Centanni's investigators' access to the Lower

---

LNA has also demonstrated that plaintiffs are not entitled to discovery on their allegations (Doc. 12550 at 5-8) and are not entitled to any further forms of so-called relief (Doc. 12831 at 15-19).

[4]  *See* Ivor L. van Heerden, *et al.* "Initial Assessment Of The New Orleans' Flooding Event During The Passage Of Hurricane Katrina" at 1 (explaining that "[s]topped battery-operated and mechanical hand-dial clocks were observed in flooded homes") (available at www.publichealth.hurricane.lsu.edu); *see also* Interagency Performance Evaluation Team Report ("IPET") Volume IV at IV-165 (available at https://ipet.wes.army.mil).

Ninth Ward. Centanni Decl. ¶ 4. In October 2005, both the New Orleans Police Department and the National Guard were restricting access to the Lower Ninth Ward. Centanni investigators told these authorities that they represented LNA and that they needed to enter the neighborhood to investigate. On multiple occasions, these authorities allowed Centanni's investigators to enter and investigate in the Lower Ninth Ward even while the general public was restricted. Throughout its investigation there, the authorities observed Centanni's activities and did not interrupt them. *Id.* ¶ 6. At no time did Centanni, its agents, or counsel ever intend to steal these timepieces or otherwise violate any law of the state of Louisiana or City of New Orleans. *Id.* ¶ 10.

Centanni catalogued and collected 36 clocks and watches in the Lower Ninth Ward during October and November 2005. Centanni Decl. ¶¶ 2, 4-5. Centanni photographed two grandfather clocks because they were too large to collect.[5] Currently, all of the recovered timepieces are being stored in a climate-controlled warehouse in New Orleans. *Id.* ¶ 8. Centanni and LNA's counsel both remain ready and willing to return these clocks to their owners. At no time has any there been any intent to possess these clocks permanently. Indeed, when plaintiffs' counsel requested to view the actual timepieces, arrangements were made for counsel to view them at counsel's agreement. Gilbert Decl. ¶¶ 3-4; Seymour Decl. ¶¶ 1-3. The parties further agreed that plaintiffs would be permitted to view them again at any point in the future. *Id.*

Centanni's preservation of these materials has proved prescient. Many, if not most of the residences from which these clocks were removed have been demolished. Centanni Decl. ¶ 3. Any additional remaining evidentiary items in those homes were discarded, destroyed, or moved before LNA, plaintiffs, or any other party in this litigation could make use of them. Plaintiffs

---

[5] Thus, plaintiffs are wrong when they assert that "Lafarge even stole a grandfather clock." Pls.' Br. ¶ 12. Plaintiffs in fact know this to be untrue: plaintiffs' counsel inspected the clocks collected by Centanni on February 22, 2008. Gilbert Decl. ¶¶ 3-4; Seymour Decl. ¶¶ 1-3.

have included evidence of Centanni-recovered timepieces in their own exhibit list.  Rec. Doc. 14598.

> 2.    *Plaintiffs Have Waived Their New Crime-Fraud Argument.*

As a threshold matter, it is too late for plaintiffs to argue that LNA's privileges for its investigation should be abrogated based on the crime-fraud exception.  As recounted above, this is plaintiffs' third motion seeking to abrogate those privileges.  Plaintiffs failed to raise this argument in either of their earlier motions, even though they were known and available to plaintiffs at the time of the prior motions.  Plaintiffs inspected the timepieces on February 22, 2008, and everything plaintiffs cite in their recitation of facts about the timepieces was known to them before they filed either of the prior motions in March 2008.

The Court has already held that plaintiffs cannot raise arguments seeking to defeat LNA's attorney-client and work product privileges that were not raised in plaintiffs' first motion on the subject.  *See* Doc. 13149 at 4-5 ("plaintiffs waived their argument about their alleged substantial need for the materials and inability to obtain substantial equivalents by failing to raise it in their motion to compel").  Because this argument was available to plaintiffs when they filed their earlier motions, and because plaintiffs failed to raise it, the Court should hold that this argument has been waived and refuse to address it on the merits.

> 3.    *In Any Event, The Crime-Fraud Exception Does Not Apply Here.*

Plaintiffs' crime-fraud argument for breaking LNA's privileges is patently meritless in any event.  The crime-fraud exception may nullify the attorney-client privilege when the client seeks advice from the attorney to further a crime or fraud.  *In re Grand Jury Subpoena*, 220 F.3d 406, 408-409 (5th Cir. 2000).  For the crime-fraud exception to apply, the plaintiffs must first "(1) make an independent *prima facie* case that a crime [or fraud] has been committed, and (2) then demonstrate that the privileged information bears a relationship to the alleged crime or

fraud." *Southern Scrap Material Co. v. Fleming*, 2003 WL 21474479, *2 (E.D. La. June 18, 2003) (citing *United States v. Zolin*, 491 U.S. 554, 564, 570 (1989); *Ward v. Succession of Freeman*, 854 F.2d 780, 790 (5th Cir.1988)).

As we now show, the crime-fraud exception does not apply here for several reasons. First, no crime occurred. Second, even if a crime had occurred, the exception applies only when a *client* retains legal counsel to shield its unlawful or fraudulent conduct; plaintiffs allege the opposite. Finally, even if the crime-fraud exception did apply, it would provide no basis for abrogating LNA's privileges for Centanni's witness interviews.

(a)   <u>No Crime Occurred</u>

Plaintiffs' assertion (at 14) that Centanni's preservation of timepieces constituted a crime is absurd on its face. Pls.' Br. at 14. Plaintiffs rattle of a list of criminal laws without any explanation as to why or how Centanni violated them. Moreover, no one can genuinely believe that an investigative agency's collection and preservation of timepieces for evidentiary purposes from abandoned, flooded properties constitutes "looting," "theft," "burglary," or "criminal trespass."[6] Unlike someone acting with criminal intent or purpose, Centanni painstakingly documented the clocks and their place of origin, wrapped them to prevent further deterioration, and provided a list of them to LNA's counsel and to plaintiffs' counsel. Centanni Decl. ¶¶ 2,8. Moreover, the Centanni investigators received permission from the authorities restricting entry into the Lower Ninth Ward to enter the neighborhood on multiple occasions. Centanni proceeded to conduct its investigation, which did include entry into homes under the watchful

---

[6] Moreover, another of the supposed crimes cited by plaintiffs (at 14), "unauthorized entry of a dwelling during an emergency or disaster," did not even exist in 2005 when the timepieces were collected. It did not take effect until August 15, 2006. *See* 2006 La. Acts No. 199 § 1 (2006).

surveillance of the same authorities who allowed them access to the neighborhood.  Centanni Decl. ¶¶ 4,6.

In the weeks following Hurricane Katrina, moreover, many groups of investigators and researchers were scouring the Lower Ninth Ward for relevant physical information.  As noted above, the IPET and ILIT investigators also recovered or photographed timepieces inside dwellings.  Reports documenting these activities have been in the public domain for years and no one has ever alleged that those individuals responsible for observing and collecting clocks were engaged in looting, theft, burglary, or criminal trespass.  Plaintiffs' trumped-up assertion of such a crime, in support of their trumped-up crime-fraud exception argument, is frivolous.

> (b) The Crime-Fraud Exception Applies Only To Crimes Committed Or Intended By The Client, Not The Client's Attorneys or the Attorneys' Agents

Even if a crime had occurred (which it did not, as just demonstrated), plaintiffs misapply the crime-fraud exception.  The exception vitiates attorney-client privilege and work product protection when the *client* seeks assistance from an attorney in furtherance of a crime or fraud.  It does not apply, however, when a client does not intend to commit a crime but – without its knowledge – its agents and attorney engage in unlawful behavior.  Plaintiffs do not allege and cannot show that LNA itself made any communications "for the purpose of getting advice for the commission of a … crime."  *Zolin*, 491 U.S. at 563 (citation omitted).

The crime-fraud exception is concerned not with the intention of an attorney or his agents, but with the intention of an attorney's client.  *See In re Grand Jury Subpoena*, 419 F.3d 329, 335 (5th Cir. 2005).[7]  Here, plaintiffs do not allege that LNA itself had any intent to break

---

[7]  *See also United States v. Calvert*, 523 F.2d 895, 909 (8th Cir. 1975) ("it is the client's purpose that is controlling").

any law or commit any fraud.[8]  Instead, LNA hired its attorneys to investigate the claims pending against it and asked only that they defend LNA vigorously.  As part of that defense, counsel hired Centanni.  At no point did Centanni receive instructions related to this preservation of evidence from LNA itself.  Centanni Decl. ¶ 11.  Like the rest of its investigation, Centanni worked independently using its own skills, instincts, and knowledge of the law and did not receive instructions from anyone that it should break any law to preserve relevant evidence.  Even assuming (wrongly) the existence of a crime in the retrieval of the timepieces, it would not support invocation of the crime-fraud exception.  *See State v. Fodor*, 880 P.2d 662, 670 (Ariz. Ct. App. 1994) (crime-fraud exception did not apply to attorney's attempt to use fraud to benefit his unwitting client); 24 Wright & Miller: Federal Prac. & Proc. § 5501 (exception does not apply when an attorney intends to use a crime or fraud to benefit otherwise innocent client); 3 Weinstein's Fed. Evid. § 503.31[3] (2008) (same).

(c)   The Privileged Information Plaintiffs Seek Is Unrelated To The Supposed Crimes

Finally, plaintiffs' invocation of a crime-fraud exception relating to the clocks is a transparent pretext to try to obtain LNA's work product notes of its witness interviews.  Obviously, Centanni's collection and preservation of the timepieces has no relationship whatsoever to the "remedy" that plaintiffs seek – namely, an order abrogating LNA's core privileges for its witness interviews – in plaintiffs' words, for "Lafarge's entire course of dealing with putative class members"  Pls.' Br. at 21.  This missing link is yet another reason why plaintiffs' crime-fraud argument is utterly meritless, since the only materials to which the crime-fraud exception would apply are those that plaintiffs can show "reasonably relate to the fraudulent [or criminal] activ-

---

[8]  Indeed, in prior motions plaintiffs stated repeatedly that Centanni worked at the direction of LNA's counsel, not LNA.  (*See* Rec. Doc. 11765-2 ¶ 33 n.23) (citing Decl. of Mark Raffman, Esq).

ity." *In re Grand Jury Subpoena*, 419 F.3d at 346 (citations omitted).  Thus, if the exception applied here (which it does not), its application would be limited to communications regarding the collection of timepieces.

Without belaboring the point, the collection of timepieces was demonstrably separate from interviews of putative class members.  Not one of the dozens of interview transcripts submitted by the plaintiffs involves the collection of a timepiece.  Indeed, the fundamental thrust of plaintiffs' allegations of criminal conduct is that Centanni retrieved the timepieces when putative class members were not present.  Centanni collected a majority of the timepieces in September and October 2005, before putative class members had returned to the neighborhood.  Centanni Decl. ¶ 5.[9]  Simply put, these two facets of Centanni's investigation are entirely unrelated.  Thus, the crime-fraud exception could never constitute a basis to require production of privileged or protected materials pertaining to interviews of putative class members, and plaintiffs' pretextual gambit must fail.[10]

## II.   PLAINTIFFS HAVE NOT ESTABLISHED A BASIS TO BAR OR LIMIT LNA'S EFFORTS TO GATHER FACTUAL INFORMATION FROM PUTATIVE CLASS MEMBERS

Based on the same interview transcripts, plaintiffs' new motion also seeks to prohibit

---

[9]  Centanni did interview "George" at 2241 Deslonde Street, an address where a timepiece was also found.  George stated however, that he did not live there and was just collecting things for residents of the property.  Centanni Decl. ¶ 12.

[10]  Plaintiffs advance other patently meritless arguments in their effort to pierce LNA's work product protection.  For instance, they argue (at 21) that "Lafarge clearly denied having any statements months after it started collecting them and waived work product privilege by failing to make that objection."  To the contrary, this Court expressly ruled that these same discovery responses "interposed work product objections and responded to the questions asked," and that plaintiffs' arguments to the contrary constituted "*misrepresentations of LNA's discovery responses*."  Doc. 13149 at 18 (emphasis added).  Plaintiffs repeat their canards about LNA's discovery responses without once acknowledging that the Court addressed and rejected them.  Another pretextual argument involves plaintiffs' assertion (at 21) that they require discovery to remedy supposed "problems in defendant's recordkeeping" regarding timepieces.  To the contrary, plaintiffs' counsel have inspected and reviewed all the timepieces and have received information on the provenance of each one.

LNA from any further contacts with putative class members without the consent of plaintiffs' counsel.  As we now show, this demand is both untimely and substantively meritless.

A.   **Plaintiffs' Request to Prohibit LNA From Contacting Putative Class Members is Untimely**

As documented above, plaintiffs have previously filed two motions based on the Centanni interview transcripts.  Those motions requested that LNA's privileges be abrogated and that the transcripts be excluded from evidence.

Now, plaintiffs seek a new form of "relief" based on the Centanni interviews – namely, an order barring LNA from conducting witness interviews absent plaintiffs' counsel's consent. That demand comes too late.  The law does not allow a party to file sequential motions seeking different forms of relief based on the same supposed conduct.  That is especially true where, as here, months have gone by since plaintiffs filed their earlier motions.  Moreover, by bringing these demands in a piecemeal fashion, plaintiffs have caused significant resources to be squandered.  Accordingly, the Court should hold that plaintiffs have waived their new claim for different relief based on the same supposed conduct.

B.   **Plaintiffs Make No Showing of Abuse Warranting A Ban On Communications**

Extensive caselaw recognizes that a party to litigation has both a legitimate need and a constitutional right to contact putative class members and that such contacts may be restricted only where necessary to remedy an established record of serious abuse.  Plaintiffs have not begun to satisfy those very high requirements for their proposed draconian order.

The seminal Supreme Court case on contact with potential class members prior to a decision on class certification is *Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981).  In *Gulf Oil*, the Supreme Court recognized that parties have legitimate needs to communicate with putative class members, including "to obtain information about the merits of the case."  *Id*. at 101.  Indeed,

bans on such communications involve "serious restraints on expression" protected by the First Amendment.  *Id*. at 104.[11]  For that reason, "an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id*. at 101.  In addition, even where that high evidentiary standard is satisfied, "such a weighing – identifying the potential abuses being addressed – should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances."  *Id*. at 102.

Consistent with *Gulf Oil*, courts repeatedly allow parties to communicate with putative class members in an effort to learn relevant information.  For example, in *McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 295, 299 (D. Mass. 2004), the court held that communications with putative class members to ascertain the relevant facts do not constitute abusive conduct and will not support a limitation order.  The court noted that the defendant "had represented that it seeks to conduct the interviews so that it can realistically assess the scope of and nature of the case brought against it" and flatly held that "[t]here is nothing inherently wrong with that."  *Id.* at 299. *See also Bell v. Addus Healthcare*, 2007 U.S. Dist. LEXIS 69221, at *7 (W.D. Wash. Sept. 19, 2007) (refusing to restrict defendant's communications with putative class members and holding that a defendant "has a right to fully investigate the case"); *Burt v. Manville Sales Corp.*, 116 F.R.D. 276, 278-79 (D. Colo. 1987) (permitting contact for the purpose of developing claims against employer-defendant); *EEOC v. Singer Controls Co. of America, Appliance & Auto. Div.*, 80 F.R.D. 76 (N.D. Ohio 1978).

---

[11]  See also *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1449 n.9 (9th Cir. 1984) (first amendment interests limit restrictions on pre-certification contact except in situations where "the substantive evil [is] extremely serious") (quoting *Landmark Comm'ns, Inc. v. Virginia*, 435 U.S. 829, 845 (1978)); *Gates v. Cook*, 234 F.3d 221, 227 n.4 (5th Cir. 2000) (citing *Gulf Oil*, 452 U.S. at 104).

These authorities require denial of plaintiffs' effort to impede LNA's ability to contact potential fact witnesses who may be putative class members.  As those cases recognize, LNA has both a legitimate need and a First Amendment right to communicate with putative class members in order to investigate the facts underlying these lawsuits.  That is all that Centanni has done in the communications at issue – to ask for factual information as to what happened.  As courts have repeatedly held, there is nothing improper or coercive in doing so.  This is particularly true because LNA faces substantial liability in these matters and thus has a strong need to interview as many witnesses as it can prior to trial.  Further, given plaintiffs' broad putative class definitions, a limit on communications with putative class members would effectively prevent LNA from communicating with all relevant fact witnesses.  This would be especially inappropriate because those individuals have not elected to sue LNA, but instead likely attribute any fault and cause for any injuries to the United States.  Finally, an order requiring LNA to communicate with putative class members only through formal depositions would also require massive numbers of pointless depositions at enormous costs to all parties and to the witnesses themselves – and is wholly unsupported by any precedent.  For all of these reasons, an order forbidding or restricting LNA's representatives from speaking with potential witnesses would be extraordinarily harsh and prejudicial and would be contrary to extensive authority.

Plaintiffs' complaint that Centanni failed to identify itself does not begin to rise to the level of abusive conduct deemed necessary to justify any restriction on communications.  As noted above, the Court has already held that that failure has been fully remedied by the order requiring production of the interview transcripts.  Moreover, under the caselaw, the kind of abusive conduct that may justify an order limiting communications consists of "communications that coerce prospective class members into excluding themselves from the litigation; communi-

cations that contain false, misleading or confusing statements; and communications that under-

mine cooperation with or confidence in class counsel." *Kay Co. v. Equitable Production Co.*,

246 F.R.D. 260 (S.D.W.Va. 2007) (holding that claims that defendants merely communicated a

settlement offer to a putative class member did not provide the basis for a limitation).  Indeed, in

the few cases where a party's contact warranted an outright ban, the conduct precipitating a ban

involved coercion of class members and was far more egregious than what is alleged to have

occurred here.  For example, in *Hampton Hardware, Inc v. Cotter & Co.,* 156 F.R.D. 630 (N.D.

Tex. 1994), a defendant was prohibited from contacting putative class members after repeatedly

warning them not to join the class action.  Other cases likewise refused to impose an outright ban

because defendants had not "strong-armed" putative plaintiffs but merely informed them of the

suit,[12] and because plaintiffs failed to "prove any instances of targeted letters or announcements

designed to threaten or intimidate potential class members if they were to join the litigation."[13]

As noted above, plaintiffs make no allegation, and there is no evidence, that Centanni engaged in

any sort of similar conduct. [14]

---

[12]  *Garcia v. Pilgrim's Pride Corp.*, 2006 U.S. Dist. LEXIS 47479, *5 (E.D. Pa. July 13, 2006).

[13]  *Lee v. American Airlines, Inc.*, 2002 U.S. Dist. LEXIS 2232 (N.D. Tex. Feb. 12, 2002); *see also* 5 Alba
Conte & Herbert Newberg, Newberg on Class Actions (2002) § 15:14 ("The only possible concern with
unlimited communication would be if the defendants sought to directly lobby the prospective members of
the class action concerning their possible participation in the class action"); *Turner v. Murphy Oil USA,
Inc.*, No. 05-4206 (E.D. La. Nov. 14, 2005) (citing *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193,
1204 n. 22 (11th Cir. 1985)).  *Turner* explains that *Kleiner* implemented a ban after the defendant
"demanded" to its customers that they opt out of the class.  *Id.* at *5.

[14]  In fact, it is plaintiffs' counsel who have improperly been engaged in seeking to communicate misin-
formation to putative class members.  For example, the website of Khorrami Pollard & Abir, LLP, a firm
that recently entered an appearance on behalf of plaintiffs, inaccurately states that "With winds upwards
of 150 M.P.H., the barge broke through the concrete and steel floodwall, creating an extremely powerful
surge of water that overwhelmed the residential area just behind …."  Attached as exhibit 2 hereto.  *See
also* www.bargecase.com (inaccurately telling potential class members how to calculate potential
damages and purportedly stating other inaccurate "facts").

Not only are the requirements for an order not satisfied, but plaintiffs' proposed ban on communications absent their consent would be wholly unjustified in any event.  In *In re School Asbestos Litig.*, 842 F.2d 671, 684 (3d Cir. 1988), for example, the court upheld an order requiring defendants to identify themselves to putative class members but reversed a ban on communications.  The defendants' conduct there was far worse than anything alleged here because, in addition to failing to disclose their identities (the conduct alleged here), those defendants were actively misleading putative class members regarding underlying facts central to the litigation (conduct not alleged here).  See also *Turner v. Murphy Oil USA, Inc.*, No. 05-4206 (E.D. La. Nov. 14, 2005) (despite finding abusive conduct far beyond that alleged here, only requiring disclosure in connection with future communications).

### C.    The Rules of Professional Conduct Allow Precertification Communications With Putative Class Members.

Plaintiffs assert that they effectively have a "constructive" attorney-client relationship with putative class members that provides a basis for barring LNA from communicating with them.  That is wrong as a matter of law.  To the contrary, the Rules of Professional Conduct provide that putative class members are not represented parties for these purposes and that the parties to the case may freely communicate with them prior to class certification.  Indeed, on April 11, 2007, the American Bar Association's Standing Committee on Ethics and Professional Responsibility issued Formal Opinion 07-455, captioned *Contact by Counsel with Putative Class Members Prior to Class Certification* (attached as Ex. 3).  The Opinion specifically holds that:

> Both plaintiffs' counsel and defense counsel have legitimate need to reach out to potential class members regarding the facts that are the subject of the potential class action, including information that may be relevant to whether or not a class should be certified.  With respect to such contacts, Rule 4.3, which concerns lawyers dealing with unrepresented persons, does not limit factual inquiries but requires both sides to refrain from giving legal advice other than advice to engage counsel, if warranted.

*Id.* at 5-6.  The Opinion further holds that "[a] client-lawyer relationship with a potential member of the class does not begin until the class is certified and the time for opting out by a potential member of the class has expired. …  Therefore, putative class members are not represented parties for purposes of the Model Rules prior to certification of the class and the expiration of the opt-out period."  *Id.* at 3.  In short, as a recent decision observes, the ABA has now formally determined that "communication between the defendant and putative class members does not violate Model Rule 4.2."  *Kay Co.*, 2007 U.S. Dist. LEXIS 70328, at *12.

Plaintiffs' effort to assemble contrary authority is unsuccessful.  Pls.' Br. at 17-18.  For example, plaintiffs rely on an outdated edition of a treatise; the current version no longer contains the language plaintiffs cite.[15]  In any event, even beyond the ABA Opinion, the authority is clear that "prior to certification, only those class members with whom the lawyer maintains a personal client-lawyer relationship are clients."  Restatement (Third) Law Governing Lawyers § 99, cmt. L; *see also Parks v. Eastwood Ins. Servs., Inc.*, 235 F. Supp. 2d 1082, 1083-84 (C.D. Cal. 2002); *EEOC v. Dana Corp.*, 202 F. Supp. 2d 827, 830 (N.D. Ind. 2002); *Hammond v. City of Junction City*, 167 F. Supp. 2d 1271, 1286 (D. Kan. 2001)).  As such, there is no ethical bar to LNA's communication with putative class members.

## CONCLUSION

The Court should deny plaintiffs' new motion in its entirety.

Respectfully submitted,

/s/ Derek A. Walker
Robert B. Fisher, Jr., T.A. (#5587)
Derek A. Walker (#13175)
**CHAFFE MCCALL, L.L.P.**

---

[15]  Plaintiffs cite to language from the third edition of the Manual for Complex Litigation, but that language no longer appears in the fourth edition.

2300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2300
Telephone:  (504) 585-7000
Facsimile:  (504) 585-7075
Fisher@chaffe.com
Walker@chaffe.com

John D. Aldock
Richard M. Wyner
Mark S. Raffman
**GOODWIN PROCTER LLP**
901 New York Avenue, NW
Washington, DC 20001
Telephone:  (202) 346-4240

Daniel A. Webb (#13294)
**SUTTERFIELD & WEBB, LLC**
Poydras Center
650 Poydras Street, Suite 2715
New Orleans, LA 70130
Telephone:  (504) 598-2715

***Attorneys for Lafarge North America Inc.***

Certificate of Service

I do hereby certify that I have on this 26th day of August, 2008 served a copy of the foregoing pleading on counsel for all parties to this proceeding by electronic filing notification.

/s/ Derek A. Walker