```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2

 3   ****************************************************************
 4   IN RE:  KATRINA CANAL
     BREACHES CONSOLIDATED
 5   LITIGATION
 6                                   CIVIL ACTION 05-4182
                                     SECTION "K"(2)
 7                                   NEW ORLEANS, LOUISIANA
                                     THURSDAY, OCTOBER 18, 2007, 8:30 A.M.
 8
 9   ****************************************************************
10
             TRANSCRIPT OF MOTIONS HEARING PROCEEDINGS
11       HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
                   UNITED STATES DISTRICT JUDGE
12
13
     APPEARANCES:
14
15   FOR THE PLAINTIFFS:           BRUNO & BRUNO
                                   BY:  JOSEPH M. BRUNO, ESQ.
16                                 855 BARONNE STREET
                                   NEW ORLEANS, LA 70113
17
18                                 GAINSBURGH BENJAMIN DAVID
                                   MEUNIER AND WARSHAUER
19                                 BY:  GERALD E. MEUNIER, ESQ.
                                        KARA M. HADICAN, ESQ.
20                                 2800 ENERGY CENTRE
                                   1100 POYDRAS STREET, SUITE 2800
21                                 NEW ORLEANS, LOUISIANA  70163
22
                                   JACOBS & SARRAT
23                                 BY:  DARLEEN M. JACOBS, ESQ.
                                   823 ST. LOUIS STREET
24                                 NEW ORLEANS, LA 70112
25
```

EXHIBIT A

Page 14

1  economic forecasting, state and local tax policy, economic
2  valuation, energy economics, and all these and related fields
3  including tax assessment practices.
4       Dr. Richardson is an expert in property tax
5  assessment methodology. Dr. Richardson has prepared an analysis
6  of the impact of Hurricane Katrina on the New Orleans economy and
7  ways to accelerate its recovery for the Financial Services
8  Roundtable. He also testified before the committee on financial
9  services of the U.S. House of Representatives regarding housing
10 issues and the New Orleans recovery.
11      For the last two years, much of Dr. Richardson's
12 time, not 10 to 25 hours, has been spent analyzing the impact of
13 the storm on Louisiana's economy and monitoring its recovery,
14 including specifically the real estate and housing market and its
15 recovery.
16      We would offer at this point documents and pieces
17 of evidence that Your Honor already has, and I think we already
18 have jointly agreed to defendants' written transcript as
19 Defendant Exhibit 1, the written transcript of Dr. Kilpatrick's
20 testimony, and as Defendants' Exhibit 2, the two DVDs, parts one
21 and two, of his live testimony.
22      THE COURT: I assume there is no objection. Let them be
23 admitted into evidence.
24      MR. MEUNIER: No objection.
25      MR. TREEBY: Thank you, Your Honor.

Page 15

1       THE COURT: Mr. Treeby, just one question. I'm sure the
2  other side will give their view. Is it your understanding that
3  Dr. Kilpatrick, if he's allowed to opine, will opine only on
4  residential properties, homeowners rather than commercial or on
5  rental property?
6       MR. TREEBY: That was the impression I got from his
7  testimony. Perhaps Mr. Marple or Mr. Zwain could speak more
8  authoritatively. Am I right on that? I believe that's that's
9  correct.
10      THE COURT: At least what your impression is.
11      MR. ZWAIN: My impression was he wasn't clear, but it's
12 going to be limited to residential.
13      THE COURT: It certainly wasn't clear to me, but that's
14 the conclusion that I came to.
15      MR. TREEBY: That was the basis for my statement that I
16 thought it was.
17      THE COURT: I noticed you said that, but at least the
18 results of the depositions, but if the plaintiffs want to clear
19 that up, they may. Thank you, sir. I say the plaintiffs,
20 certainly the plaintiffs in the germane case.
21      MR. MEUNIER: Good morning, Your Honor, may it please
22 the Court, Jerry Meunier for the plaintiffs in Levee and MRGO.
23 Due to the combined fault of the defendants in this litigation,
24 plaintiffs in the proposed class areas have suffered a flood
25 disaster which in scope and impact is unprecedented in our

Page 16

1  history.
2       As we stand here today, well over 300,000
3  administrative claims for damages due to flooding have been filed
4  against the Corps of Engineers, and it's reasonable to infer that
5  by the time all owner-related, owner-asserted claims of real
6  property damage are identified in this case, it will be necessary
7  in this consolidated litigation to assess such damages to as many
8  as 170,000 individual properties. One of the defendants'
9  experts, Michael Truax, has reported in this case that there were
10 more than 66,000 residential properties alone in the MRGO class
11 area alone, as of August 29, 2005.
12      Your Honor, not even the defendants' experts can
13 estimate how long it would take or how much it would cost to
14 quantify these total property flood damages by conducting
15 individual property-by-property appraisals. But if Mr. Truax is
16 correct that an average house appraisal takes about a half day,
17 and if the property that is to be appraised this way number as
18 many as 170,000, the Court can readily see that few in this room
19 are likely to still be participating in this case when the final
20 property is appraised this way. As for costs, Dr. Kilpatrick has
21 estimated in his deposition testimony that the total charges for
22 a property-by-property appraisal of this magnitude could well be
23 in the range of $60 million.
24      Under these circumstances, the plaintiffs turn to
25 Rule 23 as offering not just a superior but, as a practical

Page 17

1  matter, perhaps the only device through which to address and
2  resolve this common element of real property, flood damage, and,
3  through our expert, Dr. James Kilpatrick, Judge, we turn to
4  established methodologies for mass appraisal and loss-in-value
5  modeling to greatly facilitate the tasks by which individual
6  claims of property damage due to flooding can be resolved and
7  addressed in the case whether through settlement or trial.
8       Now, the qualifications of Dr. Kilpatrick under the
9  Federal Rules of Evidence 702 are not at issue and, in any event,
10 would be difficult to dispute. In Turner v. Murphy Oil,
11 Judge Fallon, in denying the defendant's motions to strike
12 Dr. Kilpatrick's testimony, found that his expertise was clear,
13 and there, as here, Dr. Kilpatrick's proposal is to use that
14 expertise to address on a class-wide basis the diminution in real
15 property value associated with an environmental catastrophe.
16      In fact, as the Court knows, the geographical area
17 of St. Bernard Parish that was affected by the oil spill in
18 Murphy falls completely within the MRGO class area affected by
19 flooding in this case. In addition, Dr. Kilpatrick has furnished
20 with his CV, Attachment 3 to his deposition, a seven-page list of
21 prior cases in which he has been accepted as a testifying expert,
22 including numerous instances in which he has testified for
23 plaintiffs in support of class certification proposing to use
24 mass appraisal techniques and modeling to address property
25 devaluation due to the stigma of various types of environmental

Page 18

1  catastrophe.
2          As was the case in Murphy Oil, Your Honor,
3  Dr. Kilpatrick's opinion for class certification purposes is
4  this: "That mass appraisal and loss-in-value modeling can
5  reliably and efficiently establish on a class-wide basis two
6  critical components that are important to the resolution of real
7  property damage due to flooding.
8          "The first component will be the establishment of
9  preKatrina property values. This is done through automated
10 valuation modeling, or AVMs. AVMs are computer models which use
11 large-scale databases as opposed to relying on individual
12 evaluation of units and then apply a mathematical treatment of
13 the data to achieve market value estimates for the properties in
14 question.
15         "The acceptance of such mass appraisal methodology,
16 as noted by both Dr. Kilpatrick in this case and by Judge Fallon
17 in Murphy Oil, is reflected in the fact that the Uniform
18 Standards For Professional Appraisals Practice, USPAP, contain a
19 specific provision, Rule 6, governing mass appraisals. AVMs are
20 used not only by tax assessors throughout the country but they
21 are used by the two federal government mortgage lenders,
22 Fannie Mae and Freddie Mac. In fact, AVMs, as an alternative to
23 individual property appraisals, are being used with increasing
24 frequency in the mortgage lending industry.
25         "The second mass appraisal component proposed by

Page 19

1  Dr. Kilpatrick will utilize hedonic price modeling to evaluate
2  the postKatrina loss in real property value expressed as a
3  percentage loss or diminution in value."
4          THE COURT: I assume someone will give a little glossary
5  to the Court, eventually maybe today, taking hedonic as an
6  example, the class modeling. It's interesting jargon. Of
7  course, the Court is certainly familiar with the origin of
8  hedonism and its relation, but this doesn't seem to be much about
9  such pleasure. I'm sure the word somehow relates to the original
10 intent, but maybe someone can explain it to me.
11         MR. MEUNIER: Some may find this analysis pleasurable
12 but not all. I will say, Judge, that the definitions I'm
13 reciting are taken from the testimony of Dr. Vandell, who will
14 testify in person.
15         THE COURT: I've read it. I know it's a commonly used
16 term in this area. I would just like a little refinement of the
17 definition.
18         MR. MEUNIER: According to Dr. Vandell, hedonic modeling
19 is a recognized technique whereby the value or utility of a
20 property is assumed to be associated with certain characteristics
21 of the property. For example, pertinent to this case, freedom
22 from the risk of a recurrent flood, and the model, through a
23 statistical regression analysis of collected data, seeks to
24 valuate the contribution of that characteristic to the overall
25 value of the property.

Page 20

1          Dr. Kilpatrick has indicated that such models are
2  inherently flexible once the data is collected and sorted,
3  allowing for the percentage loss in value that's attributable to
4  the characteristics in question to be calculated not only on a
5  subclass basis but, if necessary, on a neighborhood or even
6  house-type basis.
7          Now, the defendants' contention that Dr. Kilpatrick
8  has not been sufficiently specific in articulating the data he
9  will use, the modeling methodology he will employ or the approach
10 he will take once the empirical data is collected is simply
11 belied by the record and specifically by both the affidavit
12 report and deposition testimony of Dr. Kilpatrick, which
13 constitute the record.
14         Now, I can give you page cites as I go through this
15 list, Judge. Dr. Kilpatrick brought to this case, and I have
16 given to the defendants --
17         THE COURT: I have to just let you know, we've read the
18 briefs well, and I have notes of page cites, and in the bench
19 memo we have certain page cites that I think your side pointed
20 out to us that you already support. Go ahead.
21         MR. MEUNIER: I can provide these cites to you and will
22 do so for the record if I need to, but from his deposition we
23 know this: Dr. Kilpatrick has brought to this case, he's given
24 to the defendants in disc format data on more than 28,000
25 properties in St. Bernard Parish, including characteristics such

Page 21

1  house size, lot size, and the number of bedrooms, perhaps, all of
2  which data he collected in the Murphy Oil case just a year ago
3  and proposes to use in this case.
4          He's also referenced data in the greater
5  New Orleans area gathered from Urban Land Institute, the
6  Brookings Institute, and The Whitehouse PostKatrina Study. He's
7  testified that he will not have to create a new hedonic model or
8  stigma model for this case because he and his firm already have
9  created and published, both for litigation and nonlitigation
10 purposes, over a dozen stigma models, and he will apply one of
11 those peer-reviewed models, once the empirical data gathered
12 properly informed the selection of the most suitable model to
13 use.
14         He's testified that he will calibrate any such
15 hedonic model using control areas as proposed and provided for in
16 Rule 6 of USPAP, and he specifically says he will refer to actual
17 postKatrina sales transactions in unaffected areas, areas not
18 affected by the flood, to treat or to test the accuracy of the
19 model. He's advised that the diminution of value component will
20 capture anticipated repair costs, but he's also said that he will
21 perform a sampling or survey of actual repair costs to test the
22 validity of the model's market value observations.
23         He has anticipated what he believes the components
24 of the stigma effect will be in this case, namely, the risk of
25 the recurrence of another posthurricane flood and the postKatrina

Page 22

1  loss of various community services and any other factors the
2  model shows which can be influenced negatively and cause an
3  influence on property value as a result of flooding.
4       He has indicated he will test the class area
5  housing market for equilibrium as a predicate to his hedonic
6  modeling analysis of postKatrina values. He has said he will
7  recommend so survey research technique in connection with hedonic
8  modeling, but he does not intend to use a willingness to pay
9  contingent value survey in the case; rather, his survey research
10 will focus on explaining the pricing phenomenon revealed by the
11 model in the affected areas.
12      THE COURT: There was a great deal of testimony and
13 questioning in the deposition about contingent value, et cetera.
14      MR. MEUNIER: Your Honor, one of the problems is that
15 what Dr. Kilpatrick has done is articulated peer-reviewed
16 established methodologies to use in the case. We think that's
17 sufficient for Daubert purposes. Now, the defendants insist on
18 knowing what the outcome would be once he gathers data. What
19 will the specific model end up looking like in the final
20 analysis?
21      The model he brings is peer-reviewed methodology,
22 but the data informs what the outcome is, and I think that's one
23 of the tensions in this debate is how specific this witness has
24 to be in advance of a class cert hearing with respect to outcome.
25      THE COURT: I'm sure everybody understands that if I

Page 23

1  were to allow this testimony, which certainly is not a foregone
2  conclusion because we have to hear from you today, but in the
3  event I would, it's going to be that everyone understands there
4  will be another Daubert hearing. If Dr. Kilpatrick gets past
5  this one, there will be another one on the actual report that he
6  renders, if he is allowed to render a report.
7       MR. MEUNIER: Fair enough.
8       THE COURT: I'm sure everybody understands that. This
9  is not fair, because then there would be a report again and is
10 that report trustworthy, reliable, et cetera, so we're going to
11 have another one of these if you get past this one. I'm sure
12 everybody understands it.
13      MR. MEUNIER: Fine, Your Honor.
14      Finally, and putting it in context and what is the
15 relevance, what does the Daubert fit for this testimony, I think
16 it's clear. It's not just commonality. It's primarily the
17 superiority criteria of Rule 23 because Dr. Kilpatrick has
18 testified that the total cost of his mass appraisal approach in
19 this case will be no more than a million dollars and take between
20 3 and 12 months, mere fractions of the time and costs associated
21 with the individualized, house-by-house, property-by-property
22 appraisal approach, which is what the defendants say is
23 necessary.
24      Finally, and very briefly, Your Honor, although we
25 feel that the mass appraisal and hedonic price and hedonic

Page 24

1  modeling methodologies at issue are peer reviewed, testable for
2  acceptable rates of error, generally accepted in the real estate
3  industry so that Dr. Kilpatrick's proposed approach passes even
4  the most traditional Daubert analysis, we believe that
5  Judge Fallon nonetheless got it right in Murphy Oil by applying a
6  lessened Daubert standard for class cert purposes. The
7  Fifth Circuit authority that is relied upon by the defendants,
8  the Bell case, held that a plaintiff at a class cert hearing
9  could not rely simply on pleading allegations and that the
10 district judge did not abuse discretion in finding a plaintiff
11 expert report unreliable and inadmissible under Daubert.
12      The In re IPO case rejected this fundamentally
13 flawed standard in favor of what they called a need for, quote,
14 "definitive assessment of the Rule 23 factors," whatever that
15 means in terms of Daubert. But these cases acknowledges that
16 some Daubert analysis is needed in a class cert hearing certainly
17 is not a refutation of the prudent approach taken by Judge Fallon
18 in Murphy Oil where he expressly held that this same expert,
19 Dr. Kilpatrick's statements of generalized, generally accepted
20 methodology was sufficient and relevant for class cert
21 purposes.
22      The defendants' complaint in that case, in
23 Murphy Oil, like here, about the lack of specific data and the
24 research and the lack of a foundation for the application of the
25 model, went to the weight that the Court might choose to give to

Page 25

1  the expert opinion and, moreover, should and could be addressed
2  through cross-examination and argument at the hearing.
3       Remember in Daubert itself, the landmark case, the
4  Court, "Said none of this is meant to do away with the
5  traditional tools of adversary sorting out of facts,
6  cross-examination, arguments about the weight to be given.
7       Judge, simply put, you, as a discretionary Rule 23
8  fact finder, need not be a traditional, rigid gatekeeper, in
9  order to protect yourself against that which you should not hear
10 for some fear that on hearing it, you will be unable to fairly
11 decide the issues for class certification. It's absurd.
12      We submit, therefore, that the defendants' motion
13 in this case warrants the same denial as their motion -- as the
14 defendants' motion to strike Dr. Kilpatrick's testimony in
15 Murphy Oil.
16      THE COURT: Just one question. So you contend that
17 Dr. Kilpatrick's testimony and report relates to, insofar as
18 class certification is concerned, superiority.
19      MR. MEUNIER: Commonality.
20      THE COURT: And to commonality. Both commonality as set
21 forth in Rule 23 and then 23(b)(3) commonality, which is,
22 frankly, the respective for all class action plaintiffs in
23 federal court.
24      MR. MEUNIER: Commonality comes in in Rule 23, as you
25 know, on an existence level and on a predominance level.

Page 26

1  THE COURT: We're talking about predominance primarily.
2  MR. MEUNIER: These defendants are not going to stand up
3  here and tell you that real property damage due to flooding is
4  not a common issue that exists.
5  THE COURT: I know that the main interest is going to be
6  on 23(b)(3).
7  MR. MEUNIER: So I think Dr. Kilpatrick's proposed
8  testimony is relevant to the predominance factor, namely, that
9  there is common way, a class-wide way to approach, facilitate,
10 and ultimately resolve that common issue and to the superiority
11 of doing it through mass appraisal versus individual appraisal.
12 MR. TREEBY: Your Honor, could I please hear from
13 Mr. Meunier about the question that you asked.
14 THE COURT: I'm sorry, commercial and rent.
15 MR. MEUNIER: No, rent, clearly not, Your Honor. I
16 think we're talking only about diminution in the value of real
17 property. Now, you know, loss of revenue or loss of income
18 associated with a property would not, as I appreciate it, be the
19 subject of a modeling. It's the loss of market value.
20 THE COURT: We may have a loss of market value of a
21 building that happens to be commercial but not any other
22 component of the loss.
23 MR. MEUNIER: Correct.
24 THE COURT: That's fine. I understand.
25     Okay. Are we ready to proceed? Thank you for

Page 27

1  your opening statements. They were very well done.
2  MR. MARPLE: My name is Bill Marple of Jones Day Dallas.
3  We call Professor Vandell.
4      Your Honor, as a preliminary matter, we're offering
5  Professor Vandell's current CV as Defendant's Exhibit 3, and I
6  don't believe the other side has anything. Where should I put
7  this?
8  THE COURT: You can place it right there and the clerk
9  will get it.
10 MR. MEUNIER: No objection, Your Honor. We do note that
11 Dr. Kirkpatrick's CV, et cetera, is all in the record, as well as
12 an attachment to his submitted deposition.
13 THE COURT: Let it be admitted.
14     I will do the swearing in since our courtroom
15 deputy is in absentia. I hope it counts just as much. Oh, here
16 she is. I will let the professional do it.
17 THE DEPUTY CLERK: Would you please raise your right
18 hand. Do you solemnly swear that the testimony which you are
19 about to give will be the truth, the whole truth and nothing but
20 the truth, so help you God?
21 THE WITNESS: I do.
22     KERRY DEAN VANDELL
23 was called as a witness and, after being first duly sworn by the
24 Clerk, was examined and testified on his oath as follows:
25 THE DEPUTY CLERK: Please be seated. I need you to

Page 28

1  state your name and also spell it for the record.
2  THE WITNESS: Kerrie Dean Vandell, K-E-R-R-Y, DEA-N,
3  V-A-N-D-E-L-L. All one word.
4  THE DEPUTY CLERK: Thank you.
5      VOIR DIRE EXAMINATION
6  BY MR. MARPLE:
7  Q. Dr. Vandell, what's your occupation?
8  A. I'm a Professor of Finance and Director of the Center for
9  Real Estate at the Paul Merage School of Business at the
10 University of California at Irvine.
11 Q. What's your educational background?
12 A. I have undergraduate and Master's degrees in Mechanical
13 Engineering from Rice University. I have a Master of City and
14 Regional Planning from Harvard University and a Ph.D. in Urban
15 Studies and Planning from MIT.
16 Q. What is your teaching experience?
17 A. I've been in academia for -- since 1976. I guess that's
18 over 30 years. And I've taught virtually every course taught in
19 the real estate economics and finance curriculum during that
20 period of time.
21 Q. And you currently teach?
22 A. Yes. I do.
23 Q. And what areas do you teach now?
24 A. The current courses I teach, I teach an introductory real
25 estate course at the graduate level, and I'm teaching a graduate

Page 29

1  course on mortgage-backed securities.
2  Q. And have you taught real estate appraisal in the course of
3  your teaching duties over the years?
4  A. Yes. A number of times I've taught undergraduate and
5  graduate real estate appraisal courses.
6  Q. And briefly tell us the teaching positions that you've held
7  during the last many years.
8  A. I began my career as an Assistant Professor of Real Estate
9  at the Edwin L. Cox School of Business at SMU in 1976. I held
10 that position until 1989, when I went to the University of
11 Wisconsin-Madison. While I was at SMU, for two separate periods
12 of time during sabbaticals or leaves, I was a visiting faculty
13 member at Harvard University for one year and at the University
14 of California at Berkeley for another year.
15     In 1989, I was recruited to come in as the new
16 Chairman of the Department of Real Estate and Urban Land
17 Economics at the School of Business at the University of --
18 University of Wisconsin at Madison, and I also became Director of
19 the Center for Urban Land Economics Research at Madison. I
20 taught at Madison for 17 years before arriving at the University
21 of California at Irvine last year.
22     And during the time that I was at Madison, on two
23 separate occasions I was visiting faculty member at the Chinese
24 University of Hong Kong and at Hong Kong University. And also
25 during a sabbatical period before I came to UC-Irvine, during

REPORTER'S CERTIFICATE

   I, Cathy Pepper, Certified Realtime Reporter, Registered Professional Reporter, Certified Court Reporter, Official Court Reporter, United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.



Cathy Pepper, CCR, RPR, CRR

Official Court Reporter

United States District Court