1           UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF LOUISIANA

3

4

5

6  IN RE:  KATRINA CANAL BREACHES  *   Docket 05-CV-4182-K
           CONSOLIDATED LITIGATION  *
                                    *   New Orleans, Louisiana
7  * * * * * * * * * * * * * * * *  *
                                    *   September 12, 2008
8  PERTAINS TO:  MRGO               *
                                    *   10:30 a.m.
9    *Robinson*, 06-CV-2268         *
                                    *
10  * * * * * * * * * * * * * * * *  *

11

12          TRANSCRIPT OF PROCEEDINGS BEFORE THE
            HONORABLE STANWOOD R. DUVAL JR.
13          UNITED STATES DISTRICT JUDGE

14
   APPEARANCES:
15

16  For the Plaintiffs:        O'Donnell & Associates
                               BY:  PIERCE O'DONNELL, ESQ.
17                             550 South Hope Street, Suite 1000
                               Los Angeles, California 90071
18

19  For the Plaintiffs:        Law Offices of Joseph M. Bruno
                               BY:  JOSEPH M. BRUNO, ESQ.
20                             855 Baronne Street
                               New Orleans, Louisiana 70113
21

22  For the United States:     U.S. Department of Justice
                               Torts Branch, Civil Division
23                             BY:  ROBIN D. SMITH, ESQ.
                                    JEFFREY P. EHRLICH, ESQ.
24                             Benjamin Franklin Station
                               P.O. Box 888
25                             Washington, DC 20044

```
1   Official Court Reporter:      Toni Doyle Tusa, CCR, FCRR
                                  500 Poydras Street, B-406
2                                 New Orleans, Louisiana 70130
                                  (504) 589-7778
3

4

5

6

7
    Proceedings recorded by mechanical stenography, transcript
8   produced by computer.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PROCEEDINGS**

**(September 12, 2008)**

**THE DEPUTY CLERK:**  All rise.

**THE COURT:**  Please be seated.  Good morning.

**THE DEPUTY CLERK:**  This is Civil Action 05-4182,
In Re: Katrina Canal Breaches Litigation.

**THE COURT:**  Well, we have a motion.  You are probably
accustomed to my prefatory comments.  These will be relatively
brief.

I have read all of your documents and the cases.
I'm sure that plaintiff is perspicacious enough to realize that
as a result of my ruling -- which I am certain they disagree
with -- that under Rule 8 the WGI issue, I'll call it, at the
IHNC was not -- by my likes, at least -- within the scope of
the original complaint, even liberally construed, and that the
plaintiff is behind at this point in this argument.

Certainly, I will listen to you, understanding
that it's not the Court's concern whether this is an
astonishingly good claim or a tragically bad claim.  It's
simply a question of whether:

(1)  The Form 95 filed in this case is
sufficient;

(2)  If so, does it relate back;

(3)  Does the discretionary function apply.
With that, I yield to counsel.

1          **MR. O'DONNELL:**  Since I'm losing, can I go first?

2          **MR. SMITH:**  Your Honor, it's our motion.

3          **THE COURT:**  If it's your motion, you should go first.

4          **MR. SMITH:**  Thank you, Your Honor.

5          **MR. O'DONNELL:**  I didn't want him to get any further

6    ahead.

7          **THE COURT:**  I know that we have the attempt to amend,

8    so it's really your motion to, in essence, say that the

9    amendment should not occur.

10         **MR. SMITH:**  Something like that, Your Honor.  I would

11   like to introduce Jeff Ehrlich, who is here with me today.  If

12   it pleases Your Honor, we would like to split our argument.

13   Mr. Ehrlich will address the first two arguments that

14   Your Honor has outlined, and then I will handle the

15   discretionary function exception argument.

16         **THE COURT:**  All right.  I know that's something you

17   are well familiar with.

18         **MR. SMITH:**  Thank you, Your Honor.

19         **MR. EHRLICH:**  Good morning, Your Honor.  My name is

20   Jeff Ehrlich.

21         **THE COURT:**  It's really a motion to dismiss, I

22   understand, since the complaint, in fact, has been amended.

23         **MR. EHRLICH:**  Yes.  Your Honor allowed amendment and,

24   in response, we filed a motion to dismiss addressing the three

25   issues that you mentioned.

1    My name is Jeff Ehrlich.  I'm a trial attorney

2 with the Department of Justice, and I work with Mr. Smith and

3 other lawyers on this case.  It's nice to meet Your Honor.

4    Your Honor, I will begin with the administrative

5 claim argument, the first that you mentioned when we began this

6 morning.  Let's be clear on what the standard is.  We know from

7 the Fifth Circuit cases *Portillo* and *Cook* that, in an

8 administrative claim, plaintiffs must specifically delineate

9 facts, put the agency on notice of each potential basis for

10 relief.  I know Your Honor has looked at the administrative

11 claim that the plaintiffs submitted --

12    **THE COURT:**  I have.

13    **MR. EHRLICH:**  -- and it talks a lot about the MRGO.

14 In fact, it repeatedly uses the phrase that the United States

15 or the Corps was negligent in the *design*, *construction*, and

16 *maintenance* of the MRGO and that, as a result of that, the

17 plaintiffs suffered tremendous damages.  In the course of the

18 eight or nine pages of the administrative claim, those words

19 and those phrases are repeated several times with respect to

20 each claimant.  It's clear that the administrative claim is

21 focused on that conduct, conduct that is associated with the

22 design, construction, and maintenance of the MRGO, and

23 plaintiffs concede that in their opposition papers.  They don't

24 challenge that.

25    They acknowledge that their administrative claim

1   made no explicit mention of the EBIA, which is what their new

2   count is about.  Count 3 is based on conduct related to an

3   environmental remediation project that took place at the

4   East Bank Industrial Area.  The allegations there are that the

5   United States negligently supervised its contractor, Washington

6   Group International, and that work performed by Washington

7   Group -- which included digging holes, frankly, in the dirt,

8   removing toxic materials and even larger structures that were

9   environmentally dangerous -- weakened the floodwalls of the

10  IHNC and resulted in the flood.

11          **THE COURT:**  You do agree that the case law, in

12  reference to a Form 95, doesn't require the plaintiff to set

13  out every theory of the case; and, in essence, it simply must

14  give the government a sufficient notice to investigate the harm

15  that occurred?  Do you agree with that?

16          **MR. EHRLICH:**  That's right, Your Honor, but we need

17  to be careful about what the law is there because in their

18  papers they say, "Look, we are not required to reveal every

19  legal theory, and that's what the government is demanding."

20  They are right, they are not required to reveal every legal

21  theory, but that's not what the government is demanding.

22              It's not a question of them having to reveal

23  every legal theory.  It's a question of whether they have given

24  us the facts on which their legal theories are based.  So, you

25  know, this isn't a case where they brought a battery claim and

 1   now they want to add intentional infliction of emotional

 2   distress based on the same physical act of one person to

 3   another.  We are talking about different conduct that occurred

 4   at different times, in different places, involving different

 5   parties:  The design, the construction, the maintenance of the

 6   MRGO, on the one hand, that took place last century; and the

 7   EBIA remediation project that took place much more recently,

 8   where WGI was the government's contractor there.  The question

 9   there is whether the government was negligent in its

10   supervision of WGI.

11                   We are not faulting them for not disclosing

12   every legal theory.  We are faulting them for disclosing

13   conduct on which their claim is based.  *Cook* and *Portillo*

14   specifically require plaintiffs or claimants to reveal the

15   factual basis for every potential basis for relief.  This is a

16   new basis for relief that they are saying.  It's different than

17   Count 1 of the original complaint and of the amended complaint

18   which carried forward.  It's a new theory, but it's based on

19   new facts.

20            **THE COURT:**  In essence, you're saying that if it's a

21   theory that the damage wasn't only caused by the errors and

22   omissions and all of the litany of the things stated reference

23   to MRGO, it's a different factual basis for the damage that is

24   separate and apart from the MRGO?  Is that your understanding?

25            **MR. EHRLICH:**  That's correct.  A big part of the EBIA

 1  case is whether Washington Group International dug to a certain

 2  level that it caused underseepage or did something to damage

 3  the floodwalls at the EBIA.  It has nothing to do with how the

 4  United States in the 1950s designed and constructed the MRGO.

 5          **THE COURT:**  Or maintained the MRGO?  What about

 6  maintaining the MRGO?

 7          **MR. EHRLICH:**  Well, part of the original claim has to

 8  do with the way the MRGO was dredged over the years and whether

 9  that was done properly or in a way that caused a funnel.

10  There's that whole theory of the case.

11          **THE COURT:**  Do you see any connexity at all or any

12  argument that this project would in any way relate to the

13  maintenance of the MRGO?

14          **MR. EHRLICH:**  No, Your Honor.  This project was an

15  environmental remediation project done on the banks of the

16  IHNC, which even when plaintiffs defined the MRGO in their

17  claim -- their administrative claim defines the MRGO, and it

18  doesn't define it to include the IHNC or the land adjacent to

19  the IHNC, where these environmental mistakes were made over the

20  years, that the United States then had to come in and clean up

21  around the year 2000.  It's just different conduct.

22          **THE COURT:**  I saw an oblique reference to this,

23  Counsel.  If I interrupt you, maybe make a note so you can go

24  back to where you were.

25          **MR. EHRLICH:**  Sure.

1          **THE COURT:**  It was a bit oblique to me, but one of

2    the things I was considering was what would I do -- I always do

3    this -- if I were arguing the plaintiffs' side.  One of the

4    things I thought of -- the thought may come up against a brick

5    wall, but I'll talk to you about it -- is I didn't see a lot of

6    discussion of the case law where, if you received notice of the

7    alleged defalcation of the government reference the WGI project

8    from another claimant, would there be some imputation of that

9    notice in this case.

10          One of the things that concerned me was, though,

11   because there was the denial in this claim, that the six

12   months -- I think they had to file suit by November 2006, as I

13   recall.  I had it written here somewhere, I think.  11-18-06.

14   This may be a total rabbit trail, but just for full discussion:

15   When did the government first receive a Form 95 reference the

16   WGI from anyone?

17          **MR. EHRLICH:**  I can't answer that question,

18   Your Honor.  I haven't looked at the Form 95s that the

19   government received from other plaintiffs, but I understand

20   Your Honor's concern and I can address that hypothetically.

21          **THE COURT:**  Go ahead.

22          **MR. EHRLICH:**  Your Honor had a case, the *Green*

23   case --

24          **THE COURT:**  Yes, I did.  I reversed myself a little

25   bit on that.

1      **MR. EHRLICH:**  I remember.  Well, better to reverse

2   yourself than --

3      **THE COURT:**  Yes, yes, yes.  It still has a red flag

4   on Westlaw.

5      **MR. EHRLICH:**  Right, right.  None of us like those.

6         Judge, this is a different sort of case than

7   that.  This isn't a situation where the government was aware

8   that these *Robinson* plaintiffs were going to assert this claim.

9   So even if some other claimant in the MRGO track now may have

10  submitted a Form 95 saying, "Hey, look, you had a problem at

11  the EBIA," that would not suffice under the statute or the case

12  law for putting the government on notice that these claimants

13  have a claim.

14     **THE COURT:**  I did not see any case to that effect.

15     **MR. EHRLICH:**  There's no case to that effect because

16  Congress has required each plaintiff to exhaust his or her

17  administrative claim.  To be honest, the first time we knew

18  that these plaintiffs were asserting this claim in this case

19  was when they approached us with their desire to amend the

20  complaint and, you know, we opposed that.

21        They withdrew their motion for leave to amend I

22  think in recognition of what we said in our papers there.

23  Among the points we made were futility, and I think they

24  recognized they had a problem.  In a subsequent conference,

25  Your Honor said that to them, but you allowed them to amend the

1   complaint.

2           **THE COURT:**  To get it squarely before us.

3           **MR. EHRLICH:**  Now it's squarely before us.  So now

4   the rubber meets the road and we have to deal with this.  It's

5   a statutory scheme that Congress set up in waiving the

6   government's immunity and it pertains to each plaintiff.  So

7   the plaintiffs here can't say, "Oh, well, someone else told you

8   about the EBIA claim."  That doesn't satisfy the statute.  So I

9   hope that addressed your question.

10          **THE COURT:**  Yes, it does.  I did do -- not thorough,

11  but some research on that issue, just because I would do it on

12  each side to be as thorough as I could.  I didn't see any case

13  cited to that effect nor did I find one.  That doesn't mean

14  they don't exist.  I was just curious of the facts, just for

15  the record, and we may not know when the government first

16  received a Form 95 on -- we will call it the EBIA claim.  I've

17  been referring to it as the WGI issue.  It's the same thing.

18          **MR. EHRLICH:**  I can't answer that question, but I can

19  tell you -- and I think this is really what matters, when did

20  we receive it from these plaintiffs.  We didn't receive it when

21  they submitted their claim.  We didn't receive it until they

22  amended their complaint, and by then the time had passed.

23              I do want to respond briefly to a couple of the

24  arguments that plaintiffs have made.  I think they recognize

25  that they have a problem because they offered certain excuses

1  for their failure to exhaust their administrative claim, the

2  first of which was, "Well, there was no way we could have known

3  about this at the time we submitted our administrative claim."

4  In fact, I remember this line perfectly because it really

5  struck me with something that I found after.  They say,

6  "There's no way that we or our counsel could have known that

7  there was a problem at the EBIA at the time we filed our

8  administrative claim."

9           Now, I divert for a second because there's a

10  quick point to make, which is that claimants have two years to

11  file administrative claims.  So there was no reason they had to

12  do it within the two months that they did except, of course,

13  they wanted to get into court quickly.  I think that has a lot

14  to do with who is going to be the plaintiffs' counsel in a

15  lawsuit like this.

16           We know that that's not true because other

17  people filed a lawsuit against WGI around four days before

18  their administrative claims were submitted in the *Vidacovich*

19  case, a case brought by Mr. Bruno.  At that time Mr. Bruno, on

20  behalf of other people, was able to assert a claim related to

21  the EBIA.  That just shows that, putting aside the fact that he

22  knows it subjectively, it was objectively possible for someone

23  to learn that they may have a claim related to the EBIA.  These

24  plaintiffs, for whatever reason, didn't include that in their

25  notice of claim to the government, so they're out.

1          The second argument that they make is a futility

2   argument.  They say, "Well, you know, you weren't looking at

3   all these claims anyway, so the fact that we didn't include it,

4   we didn't exhaust our administrative claim, doesn't matter."

5   As Your Honor knows from reading our papers, we cited several

6   cases that talk about how futility is not a defense to a

7   failure to exhaust.  It's a congressional requirement.  It's a

8   statute that, for better or worse, courts can't excuse

9   noncompliance.  We cited several cases that held that, and

10  there are a lot more that we didn't include.  So, Your Honor,

11  their failure to exhaust their administrative claims are

12  independently fatal here, and Count 3 has to be dismissed for

13  that reason.

14          I would like to address the statute of

15  limitations argument.  If Your Honor has no other questions, I

16  can move on.

17          **THE COURT:**  I don't.

18          **MR. EHRLICH:**  I begin with what Your Honor began

19  with.  It was three months ago now when you examined their

20  original complaint and you concluded the following:

21          "Given the broadest reading to the complaint,

22  the Court finds that, indeed, the issue of liability for any

23  damages arising from the EBIA was not raised in the initial

24  complaint."

25          We obviously highlighted this in our papers.

1      **THE COURT:**  You did.

2      **MR. EHRLICH:**  I don't think that should come as a

3  surprise to anyone.

4      **THE COURT:**  No.

5      **MR. EHRLICH:**  Interestingly, the plaintiffs didn't

6  discuss it in their response.  Their opposition papers make no

7  reference to this finding by the Court.  Perhaps it's the

8  head-in-the-sand approach, but the fact is it's there that

9  Your Honor has found that the original complaint does not

10  contain facts to support a claim related to the EBIA or WGI, as

11  you call it.

12          So now we look at *relation back*.  The plaintiffs

13  cite to a case, *Conner*, and I think the standard from *Conner* is

14  a fine articulation of what the *relation back* standard is here

15  in the Fifth Circuit:

16          "If a plaintiff attempts to interject entirely

17  different conduct or different transactions or occurrences into

18  a case, then *relation back* is not allowed.  Conversely, if a

19  plaintiff seeks to correct a technical difficulty, state a new

20  legal theory of relief, or amplify the facts alleged in a prior

21  complaint, then *relation back* is allowed."

22          The situation we have here is plaintiffs have

23  added Count 3.  Count 3 interjects different conduct into this

24  case.  Before Count 3, the work that WGI performed at the EBIA

25  was not a part of this case.  The quality of the United States'

1   supervision of that work was not a part of this case.  That is

2   conduct that is new by virtue of Count 3, and Your Honor has

3   already found that.

4            The plaintiffs know that Count 3 is not

5   supported by the original complaint and so they have made,

6   again, certain arguments to try to avoid their *relation back*

7   problem.  The one thing that they point to is they say, "Well,

8   look, we gave you the Bea declaration," that they talk about,

9   "a year before we sought to amend.  So you knew it from the Bea

10  declaration because Dr. Bea talks about EBIA in part of his

11  very lengthy declaration and so, there, you knew about it.  It

12  relates back to the Bea declaration.  That was more than a year

13  ago, so our problem is solved."

14           There are a couple problems with that argument.

15  The first -- and I think the most fundamental -- is that the

16  Bea declaration itself, even if it could somehow serve as a

17  basis for a *relation back* argument, is untimely because the Bea

18  declaration wasn't provided until more than six months after

19  the administrative claim was denied.  So under the statute,

20  even if you found, okay, the Bea declaration, it relates back

21  to that, the plaintiffs' claims would be, in the words of the

22  statute, *forever barred*.

23           The second problem they have is that the Bea

24  declaration, of course, is not a pleading.  Rule 15(c), the

25  *relation back* rule, speaks to the pleadings, whether it relates

```
 1   back to the original pleading.  A declaration is not a
 2   pleading.
 3                 Finally, Your Honor, the Bea declaration -- and
 4   this is, I guess, similar to whatever Form 95s might have been
 5   submitted by other folks or lawsuits filed by other plaintiffs.
 6   The Bea declaration was provided in another case by different
 7   plaintiffs in the MRGO track, so you have other people in a
 8   different case on a different track.  So even if it were timely
 9   and even if it were a pleading, it still wouldn't have given us
10   notice that these plaintiffs were going to bring this claim in
11   this case.  So the statute of limitations is an independent bar
12   to the plaintiffs' claims today.
13                 I have nothing further.  I would like to save a
14   little bit of time for rebuttal on these two issues, if
15   Your Honor permits.
16                 THE COURT:  You certainly may.
17                 MR. EHRLICH:  Thank you.
18                 MR. SMITH:  May it please the Court.  Your Honor,
19   Robin Smith for the United States.
20                 Count 3 of the amended complaint should be
21   dismissed for an entirely separate and independent reason in
22   addition to the reasons that Mr. Ehrlich has discussed.  We are
23   in the position here where we have three separate and
24   independent grounds to justify granting the government's
25   motion.
```

1    The discretionary function exception, as
2  Your Honor knows, has a two-part test.  The first part of the
3  test is whether or not the challenged conduct is a matter of
4  judgment or choice, involves judgment or choice for an
5  employee.  It doesn't involve judgment or choice if there is a
6  statute, regulation, or a policy that prescribes a specific
7  course of action for employees to follow.
8    The second part of the test is that, assuming
9  there is an element of judgment or choice involved in the
10  challenged conduct, that that judgment is grounded in
11  considerations of policy.  The case law is uniform that claims
12  of negligent supervision are barred by the discretionary
13  function exception.  They are paradigmatic examples of an area
14  in which the government has to exercise judgment about the
15  degree to which it's going to supervise its contractor and the
16  ways in which it's going to supervise its contractor.  The
17  exercise of that judgment and choice is grounded in the
18  policies of how best to accomplish the agency's mission.
19    The Corps of Engineers, as a routine manner,
20  uses contractors to execute its projects.  The Corps seldom
21  goes out and does its own spadework, so to speak.  It has
22  chosen to use private industry to perform these tasks, and then
23  the Corps monitors and supervises the work that they are
24  conducting.
25    Fundamentally, this involves policy because in

1    this case, as in many cases, there are a number of projects

2    that are going on simultaneously that impinge upon one another.

3    In this case the claims here are made that this work at the

4    EBIA was going to have some deleterious impact upon the

5    Lake Pontchartrain vicinity floodwall, which was adjacent to

6    the work project.

7              Plaintiffs would make this out to be a case of

8    black and white, whether or not to allow WGI to do certain

9    things was just a pure matter of engineering judgment, but in

10   reality there are varying degrees of safety involved in any

11   project.  If you are looking at whether, for instance, in this

12   case, as the plaintiffs allege, by allowing excavations to a

13   certain depth, water could seep through the soils and

14   destabilize the levees, there's a range of values that

15   engineers have to look at in considering that.

16             But even if you assume that all engineers could

17   agree about the degree to which that underseepage might affect

18   that structure as an engineering matter, the Corps would be

19   empowered to make policy decisions about whether the

20   precautions that would be necessary to be taken would be

21   justified by the expense of taking those precautions and the

22   time delays that might be associated with taking those

23   precautions.

24             Here we are dealing with a project, the

25   Lock Replacement Project, which has been going on for decades.

1    It's been slowed by a number of considerations.  Environmental

2    considerations have slowed it down, and for decades the Corps

3    has been trying to put a new lock in place.  It's been the

4    considered judgment of Congress that a lock is necessary for

5    purposes of commerce, to allow the larger ships to pass in and

6    out of the Industrial Canal.

7              So when the Corps hires an engineering firm to

8    come in and do a project, the engineering firm can decide, as a

9    technical matter, whether or not their work is going to impinge

10   on the floodwalls, for instance, or how much delay will be

11   entailed in doing further studies, but the Corps is empowered

12   to look at that information and to weigh that information

13   against its impact on the overall work that's going on.  So to

14   say that the discretionary function exception is purely

15   technical, doesn't involve any policy considerations, is simply

16   not true when you look at the broader picture here.

17             **THE COURT:**  Mr. Smith, there's one thing that I was

18   curious about, if we even get to this issue, and I'm sure we

19   are going to hear from the other side eloquently.  The way the

20   complaint is pitched as amended, relating to vicarious

21   liability -- that is, in essence, liability for failure to

22   supervise -- there are a lot of cases, and you are right, in

23   favor of the government.

24             There may be some allegations in there, if we

25   ever get to them, which relate to the acts of the government

1   itself separate and apart from supervision, which I look at it

2   a little differently.  I have to parse through that and

3   determine the discretionary function exception vis-à-vis those

4   acts that relate not necessarily strictly to supervision, but

5   things the government maybe should have done, they didn't do

6   it, whether they were, in fact, rooted in policy or not.

7               Then there's the negligent supervision claim,

8   which is the primary claim, which I understand the case law --

9   unless there's control or something in the contract where the

10  government says, "We are responsible for safety.  We are

11  responsible for this," you are on pretty firm ground there.  I

12  didn't see any contractual provision pointed out.  I'm really

13  talking about something that may not arise, but I'm interested

14  in your thoughts on the allegations that seem to, as I looked

15  at them, maybe be a little separate and apart from strictly

16  negligent supervision.

17          MR. SMITH:  Well, Your Honor, certainly the

18  plaintiffs make their pitch that way.  Maybe not the plaintiffs

19  themselves, but the amicus come in and, oddly enough, it's the

20  amicus that tells Your Honor that we have misconstrued the

21  *Robinson* plaintiffs' complaint, not the *Robinson* plaintiffs

22  themselves who come into the court and tell the Court that

23  their complaint has been misconstrued, which seems a bit odd.

24  I would suggest, Your Honor, that that's -- Your Honor

25  obviously will be the one to decide this, but I'm not sure

1    that's a fair reading of the complaint.

2              Again, in this case, in this instance, as with

3    the arguments about the administrative claim, I think what's

4    instructive is to compare the complaint in *Robinson* with the

5    MRGO complaint.  Clearly, the *Robinson* complaint is modeled on

6    the MRGO complaint and yet structurally it's not the same.

7    Here we have a claim that's entitled "Negligent Supervision,"

8    and within that claim there's a paragraph that indicates a

9    number of ways in which the United States didn't adequately

10   supervise WGI.

11             Now, faced with a motion to dismiss on negligent

12   supervision -- which the law, as they recognize, is adverse to

13   them now -- now they want to pull those out and say, "Oh, no,

14   we didn't have just a negligent supervision claim.  We were

15   claiming that the Corps itself did a lot of things wrong at

16   that site."  That's obviously a matter of construction.

17   Your Honor will decide that.

18             Let me say this because I think we did address

19   that in our opposition.  They maintain that the Corps was

20   supposed to conduct an evaluation of the safety of these

21   excavations, the Corps itself was supposed to do that, or were

22   supposed to ensure that WGI did that.  The best they can do, in

23   trying to substantiate that there was a mandatory and specific

24   prescribed course, is to cite from manuals that talk about

25   designing levees, that talk about designing floodwalls, even

1    ones that talk about building dams.  None of those things were

2    going on here.  The Corps wasn't engaged in dam building.  It

3    wasn't engaged in levee construction or floodwall design.  The

4    Corps was engaged in site remediation.

5                    In fact, beyond that criticism of the

6    plaintiffs' claim, if you look at the specific conduct --

7    assuming that they did apply, if you look at those manuals

8    themselves, all you can derive from that is that the Corps

9    recognized that, in a number of situations, it's very important

10   to do this sort of analysis.  Underseepage is a very important

11   thing, but none of them prescribe -- none of them would have

12   removed discretion in this circumstance and mandated -- because

13   that's what the plaintiffs have to prove, *mandated* -- that this

14   sort of analysis be undertaken in this situation.  It simply

15   cannot be derived.  Again, this isn't a factual dispute,

16   Your Honor.  This is a matter of legal construction of what

17   those things say.

18                    The plaintiffs also raise the issue --

19   Your Honor touched on it -- of control, and they cite some

20   cases in which other courts have commented on, as an abstract

21   legal principle, that when the government comes in and takes

22   control of a contractor's work, then the government does become

23   responsible for what that contractor does.  The only evidence

24   that they adduce is some deposition excerpts of Mr. Alvin

25   Clouatre.  When you read those excerpts, they don't show that

1    sort of control in this instance.

2         **THE COURT:**  You would probably regard it as

3    monitoring rather than control.

4         **MR. SMITH:**  Mr. Clouatre said point-blank, you know,

5    "WGI is responsible for doing their own safety inspections.  We

6    try to see all of them, but we don't always do it.  The bottom

7    line is it's their responsibility to do it.  We try to make

8    sure that it's done."

9              Again, this goes to why this is discretionary

10   function because, you know, if the Corps wanted to be there

11   every time and do it themselves, they could be there every time

12   and do it themselves.  That's not the way they decided to do

13   their work.  They decided to delegate this responsibility to

14   WGI and then to monitor it to the extent that they think is

15   necessary.  If that means that sometimes they are not there

16   when a safety inspection is done, that's within their judgment

17   and choice whether or not to be there or not.  They may have

18   other things that they think are more important to do that day.

19              What I would say, Your Honor, in this procedural

20   context is it's not a factual dispute.  There's no factual

21   dispute here.  The plaintiffs aren't asserting that the

22   evidence is false and that there's conflicting evidence here.

23   The plaintiffs have put some evidence in front of the Court and

24   have said it establishes this legal proposition.  All we are

25   saying is we don't dispute that evidence.  Take the evidence.

1   It's in front of the Court properly.  Apply the law, and you

2   will see that this is not the Corps taking over control of

3   WGI's work.  So, because it's a legal matter, the Court can

4   resolve this in this posture and can dismiss this part of the

5   complaint.

6           **THE COURT:**  Thank you, sir.

7           **MR. SMITH:**  Thank you, Your Honor.

8           **THE COURT:**  I didn't ask either of you if you had

9   trouble getting here, but obviously you got here.

10          **MR. O'DONNELL:**  This is my third time to appear

11  before you.  All these times they have been ostensibly motions

12  to dismiss.  The second was a motion for summary judgment.  The

13  Court knows the standard better than I do.  I have read a lot

14  of your Katrina cases and pretty much the standard paragraph or

15  two, Your Honor, on *Montez* and the applicability of *Montez*.

16          I'm going to go in reverse order.  I'm going to

17  talk briefly about discretionary function, why you shouldn't

18  reach it after you deny the motion to dismiss on the Form 95

19  and statute of limitations.  My favorite song is *Climb Every*

20  *Mountain*, so I'm going to do my best, if I could, Your Honor.

21          We know that, on a 12(b)(1), you can't start

22  slipping into a 12(b)(6) or, God help us, in a Rule 56.  My

23  first point would be this motion is premature.  If we survive

24  this gauntlet of procedural thicket, as one of the cases says,

25  which claimants are not supposed to have to endure or prepare

1    their case in advance of a Form 95 -- which I will get to in a

2    moment -- the government and I are both going to tee up

3    discretionary function later this year on a complete record.

4                    I think the best thing to do here, discretion

5    and valor and all that, is just defer the matter.  However, on

6    a 12(b)(1), as you did in the first *Robinson* motion to dismiss,

7    you said, look, there are two prongs here.

8                    First, was there any room for choice?

9    *Berkovitz*.  We have the Fish and Wildlife Coordination Act

10   still, and it's even better than I think it was two years ago.

11   There's a disputed fact there, which you found in the first

12   motion to dismiss on this same issue.  We also claim and we

13   have cited mandatory safety regulations, which qualify under

14   the first prong of discretionary function.  There was no room

15   for choice.  They can't delegate their safety concerns.

16                    One of the tragedies of the Army Corps, many

17   observers have found, is they don't do engineering work, and

18   maybe the word *engineering* is out of the Corps.  They delegate

19   it.  They don't get a pass under the law for that.  I have

20   cited *Duff, Layton*, and other cases on page 15 of my brief in

21   opposition that says you do not get a pass for that.

22                    Secondly, is it grounded in political, economic,

23   and social policy, a true quicksand and quagmire for the

24   judiciary and for litigants?  The simple answer is:  Safety

25   always trumps finance.  You said that.  You cited the key cases

1   in *Robinson*, you cited it in the levee decision, and we are all

2   familiar with those.  This is as formidable a challenge on a

3   12(b)(1) for the government of the United States today as it

4   was in *Robinson* two years ago.

5           **THE COURT:**  I'm thinking about, Mr. O'Donnell -- not

6   to belabor this particular issue, but in the context of the --

7           Mr. Treeby, I'm not picking on your client.

8   It's just easier for me to say "WGI" than "the EBIA."

9           In the context of that, the discretionary

10  function exception is a bit winnowed to a specific issue, that

11  is, the government's responsibility for any alleged

12  defalcations, acts of omission or co-mission on the part of the

13  WGI.

14          **MR. O'DONNELL:**  Correct.

15          **THE COURT:**  I'm wondering, under those circumstances,

16  why wouldn't --

17          **MR. O'DONNELL:**  We have alleged, also, direct

18  liability and we highlight in italics --

19          **THE COURT:**  That's why I raised it.

20          **MR. O'DONNELL:**  I don't think they get a pass on that

21  because they really haven't addressed it.  Everything I said

22  about Prong 1 and 2, it applies certainly to that area, which

23  is akin to the maintenance and design of the MRGO in my

24  Count 1.

25          On supervision, eventually you're going to have

1    to decide a disputed issue of fact, which means I think we get

2    by on *Montez* and 12(b)(1) because we say these regulations and

3    this contract, fairly read, did not delegate to WGI the

4    ultimate control and responsibility for safety.  They did not

5    delegate it.  I don't know how Mr. Smith can read the

6    regulations that I highlighted in my brief which talk

7    extensively about "piping," "underseepage," "be careful,"

8    "caveat," "this is really bad," "this really is bad for

9    floodwalls" -- I mean, they knew it.

10                  They had to do certain tests.  They have had

11   certain quality control tests.  They had to inspect.  I say,

12   under those circumstances, I raised significant trible issues

13   of fact on that very issue and you can't have -- I love Robin

14   Smith and he is a very fine lawyer, but his say-so doesn't do

15   it and a claim in a brief and a reply doesn't do it.

16                  We have raised a factual issue on who had the

17   ultimate responsibility for safety and did the contract, which

18   incorporates many of these requirements, mandate certain

19   specific acts which were not done.  So I think we have raised

20   that issue, and I think the better part of valor here is to

21   defer that.  The better course of decision on the Form 95, the

22   statute of limitations, is also to deny the motion.

23                  I'm going to take a couple of minutes to be

24   patient on the case law and the facts.  Here are the facts that

25   are before you on a 12(b)(1).  I'm going to borrow a little bit

1  from your first *Robinson* decision.

2  MRGO was authorized in 1956, after years of

3  study, by the River and Harbor Act.  Point 2, the Lock

4  Replacement Project at the IHNC has been in the eyes of the

5  Congress and the Corps since that authorization in 1956.  The

6  EBIA activities were part and parcel of what is actually the

7  MRGO project.  The lock replacement is a MRGO project, handled

8  under that act, subsequently funded under that act, and that's

9  what it was all about.

10  That is a startling, important fact in this case

11  because you have talked about the numerosity of decisions made

12  by the Corps and the fact that it is not a simple one-time,

13  isolated project.  Its history spans more than 50 years and

14  innumerable congressional reports and authorization bills.  The

15  Lock Replacement Project -- a long time in the coming,

16  Your Honor -- is one of those aspects of the MRGO.

17  The Lock Replacement Project was done -- I

18  didn't know this -- on a small strip of land between the

19  eastern perimeter of the channel, which had old wharves, a

20  stretch of land, and then there's a floodwall.  I used to think

21  it was done behind the floodwall.  No.  If you think about

22  destabilization, it was done between the water channel and the

23  floodwall itself.

24  **THE COURT:**  I have looked at the photographs.

25  **MR. O'DONNELL:**  Yes.  So when you hear me talk --

1   Mr. Bruno is going to talk more, for discretionary function,

2   about the regulations and the contract and the sensitivity of

3   the Corps to vibration and excavation and filling in the proper

4   soil compaction, all that.

5                     There's a real concern because you have a body

6   of water, you have a small strip of land which you are

7   excavating, and you know the facts in this case.  It's eerie.

8   The two failures on the north and south side of the east

9   floodwalls of the IHNC coincide precisely with the excavation

10  activities at issue in this case.  The government investigated

11  this.  I'm going to get to that in a minute.  I submitted

12  something yesterday afternoon.

13           **THE COURT:**  I've seen it, as well as I could digest

14  it.

15           **MR. O'DONNELL:**  No, I told Robin don't read it.  I'm

16  an English major -- he wasn't an engineer -- for one purpose.

17           **THE COURT:**  I got the gist, let me put it that way.

18           **MR. O'DONNELL:**  The government looked at this issue,

19  and they have their own take on it.

20           **THE COURT:**  You have Berkeley and IPET.  I

21  understand.

22           **MR. O'DONNELL:**  Being from California, you know where

23  I come out on that issue.

24                     The point of the matter is that we are talking

25  about some very important, sensitive work that was done at the

1   site, technical work, engineering work.  We allege that they

2   didn't follow the requirements of the contract, and the Corps

3   didn't do a proper job in supervising and didn't undertake

4   properly its own direct responsibilities as the safety

5   considerations.

6           Mr. Andry, Jon Andry, is the father of the

7   *Robinson* case, for better or worse, as we will see some day.

8   He filed the six administrative claims that are attached to the

9   government's motion to dismiss.  Mr. Andry did the only three

10  things you have to do, and I'm going to get into the case law,

11  my cases and their cases.

12          He first described the incident.  The

13  floodwaters emanating from MRGO caused, No. 2, injury -- "It

14  destroyed my house and my worldly possessions" -- and, No. 3,

15  they claimed a specific amount.  The plaintiffs at issue here

16  are the Franzs, and they said their damages were $450,000.

17          **THE COURT:**  Let me ask you this, Mr. O'Donnell.  I've

18  been in court here with all of you quite a bit.  We have talked

19  about "not about levee failures," "not the MRGO," "that's why

20  the Flood Control Act doesn't apply," "Our theory of the case

21  is the funnel, the surge, the wetlands, the maintenance."

22  That's been the *liet motif*, and not about the failure of a

23  levee --

24          **MR. O'DONNELL:**  Correct.

25          **THE COURT:**  -- not on the MRGO.  So it's a bit of a

1    stretch.

2            **MR. O'DONNELL:**  No, it isn't, Your Honor.

3            **THE COURT:**  Tell me why because right now it is to

4    the guy who is deciding.

5            **MR. O'DONNELL:**  I'm going to remind the author of the

6    Coast Guard cutter analogy.  The MRGO is an independent

7    negligent series of acts which like the Coast Guard cutter

8    hitting the Mississippi River levee --

9            **THE COURT:**  Had this been caused by a Coast Guard

10   cutter and you attempted to amend now, I'm not sure that I

11   would allow that because it's quite attenuated from the facts

12   you laid out.  The refrain that I've been hearing, "This is a

13   different theory," for instance, how does this interplay with

14   your basic theory that this would have happened regardless of

15   the levees?

16           **MR. O'DONNELL:**  There can be more than one cause,

17   legal cause.

18           **THE COURT:**  No question, there can be.  This is the

19   first time I've heard about this cause in this case.

20           **MR. O'DONNELL:**  It is.  I concede that.  The three

21   causes of the failure there -- two, at least.  One is the MRGO

22   and the funnel effect and the increase.  Two is this excavation

23   work, at least at these two sites independent, but done by the

24   Corps as part of the MRGO-authorized project, the Lock

25   Replacement Project.  Three, it's the 800-pound guerilla in

1    this case, "Maybe the levees were defective."  The government
2    says they weren't, and I'm not claiming they were.  I'm not
3    going to cite that as a third cause.  You can have multiple
4    causes.
5                So I think I'm consistent, Your Honor.  The EBIA
6    work is like the MRGO.  It's an independent, separate cause
7    that destabilized the situation there, so I don't think I'm
8    inconsistent.  It's additional and it's supplemental.  I still
9    like my main theory of the case.  I hope to go to trial on
10   that.
11             THE COURT:  Oh, no, I understand that.  Oh, no, I
12   understand.  Why would they have investigated the EBIA when
13   they got Mr. Andry's clients' Form 95?
14             MR. O'DONNELL:  I'll answer that now because I'm
15   supposed to answer it now.
16             THE COURT:  Well, go ahead.  I didn't --
17             MR. O'DONNELL:  No, no, no, no.  I'll answer it now.
18   One of the key undeniable facts is this is the worst
19   engineering disaster in American history.  It precipitated at
20   least --
21             THE COURT:  I think we can agree on that.
22             MR. O'DONNELL:  It precipitated five investigations,
23   but the IPET was the core zone and they spent $22 million.
24   While you can dispute some parts of the report, some of them
25   are very, very capably done -- my experts say that -- and they

 1   did good work.  They stumbled on very quickly the fact that --
 2   they didn't stumble on it.  The people who lived there could
 3   tell you and they knew it.  They had breaches on the north and
 4   south end of the eastern perimeter of the IHNC.  They spent a
 5   lot of time investigating it.  They did both a chapter and a
 6   technical report on it.  I doubt they did that because anybody
 7   filed a Form 95.
 8            Now, Mr. Bruno filed a bunch of Form 95s that
 9   talk about the failure of the levee there.  Mr. Andry knew the
10   *Graci* case because his father and uncle actually tried that
11   case, so he was careful not to use the words *floodwall*s or
12   *levee*s in his Form 95.  The fact of the matter is the
13   government did investigate it.
14            There is nothing in our Form 95 -- I'll be clear
15   as a bell about this -- that mentions WGI, EBIA.  The
16   Industrial Canal is mentioned in a descriptive of the MRGO.
17   Here's the key:  The *Speer* case.  I cite the *Speer* case, and
18   I'm going to jump right to it.  In the *Speer* case, 512 F. Supp.
19   670, the Northern District of Texas in 1981 had the following
20   situation:
21            A gentleman who was a VA patient committed
22   suicide and the widow brought suit.  Her Form 95 only said, "VA
23   psychiatrist committed malpractice," and she gave a couple of
24   reasons.  She filed an amended complaint that said, "Oh, the VA
25   pharmacist negligently dispensed prescription drugs to my

1   husband."

2                   On a motion to dismiss, the court denied the

3   government's motion.  Every single critical principle --

4   Your Honor, *Adams* is a controlling case in this circuit,

5   *Williams* is a controlling case, and I have cited all those.

6   They first said the original notice gave the VA information

7   about an accident, an incident, an injury, and amount of claim

8   "so that it could investigate the claim," and I'm going to

9   stop.  I have cited *Burchfield*, *Adams*, a bunch of cases --

10             THE COURT:  Both of you cited *Burchfield*.

11             MR. O'DONNELL:  I like my part better.

12             THE COURT:  I read your part and theirs.

13             MR. O'DONNELL:  Well, you know, foolish consistency

14   and all that, but the truth of the matter is all the Form 95 is

15   supposed to do is trigger an investigative process.

16             THE COURT:  Then how do you distinguish the *Portillo*

17   case?

18             MR. O'DONNELL:  I just think *Portillo* is a situation

19   which is unfortunate.  I think there are some bad results in

20   the case law, but I don't think *Portillo* undercuts the *Adams* or

21   *Williams* cases in this circuit.

22                   Let's look again at *Speer* very carefully.  The

23   first thing the court says is, look, all the Form 95 had to do

24   was to get them to start investigating.  Now, the government

25   doesn't like the fact that they are not actually

1  conscientiously reviewing 489,000 claim forms, they are logging
2  them into a computer, and I can understand that.  That's a
3  fact, not an excuse.
4          The second thing the court held in *Speer* I think
5  should be controlling for Your Honor.  He said the plaintiff
6  cannot be expected to be Houdini or a clairvoyant.  From
7  page 675 of the decision, 512 F. Supp. 675, and I quote:
8          "Since at the time of the original claim
9  plaintiff was unaware of facts relating to the alleged
10  negligence of the VA pharmacy, the defendant's interpretation
11  of the act would result in an unjustified triumph of form over
12  substance and would convert this remedial act into a trap for
13  the unwary claimant."
14          Your Honor, Jon Andry, I have learned, is a fine
15  lawyer.  He claims he is the mayor of the Chalmatians, and I
16  don't know what that means, but I will tell you one thing.  He
17  is not a clairvoyant.  There is no way he could have been
18  expected on October 13, literally six weeks after Katrina, to
19  have known this.  He filed his claim, filed his suit --
20  actually, you know, he is a rarity.  His claims were actually
21  denied.
22      **THE COURT:**  I did note that, which of course
23  unfortunately -- well, only because of the statute of
24  limitations, that could have some ramifications, but yes, I did
25  know that.

1          **MR. O'DONNELL:**  I just want to be straight with the

2    Court that's a fact.  I think it may have been denied after

3    suit was filed, but nonetheless it was denied.

4          **THE COURT:**  No, no, no, not this suit.  I simply mean

5    when we get to the *relation back* issue, but go ahead.

6          **MR. O'DONNELL:**  I understand that, Your Honor.

7          I think *Speer* should be controlling.  *Speer*

8    captures the law of the Fifth Circuit, the law of the

9    Eleventh Circuit, the law of all of the circuits, Your Honor.

10         **THE COURT:**  Let me read you something from *Burchfield*

11   and then have you comment on it because I think it's only fair.

12   Let me make sure it's *Burchfield*.

13         It is.  For the record, *Burchfield* is an

14   Eleventh Circuit case, 168 F.3d 1252, decided in 1999.  I'm

15   reading from page 1256.

16         "Our holding does not mean that agency

17   investigations must go beyond the scope of the matters alleged

18   in administrative claims.  Section 2675(a) does not require an

19   agency to undertake an independent search for injuries or

20   theories of liability that are not closely related to the

21   matters described in the claim," citing a case which held that

22   a contract readjustment claim alleging misconduct by a

23   whistleblower did not give notice of allegations of misconduct

24   by a government official.  They go through a litany of cases.

25   "Nor does our interpretation of the statute mean that an agency

1    will be on notice of all the facts contained in voluminous

2    records presented by a claimant if the claimant has not pointed

3    to specific sources of injury."

4                     I know you are familiar with that.  It's a

5    jurisdictional issue here.  I want to be very careful about

6    this because it's jurisdictional.  I'm talking about Form 95.

7    That's the jurisdictional issue.  I've got to be able to make

8    some kind of fair pathway -- intellectually, legally, and

9    factually -- where the Corps by this notice, reference the

10   MRGO, would have been put on notice to investigate this other

11   issue.  I am, as you know, concerned about that.

12                     You were citing *Speer*.

13             MR. O'DONNELL:  *Burchfield* says that, but --

14             THE COURT:  I know *Burchfield* did find for the

15   plaintiff.  I'm aware of that.

16             MR. O'DONNELL:  Yes, and *Speer* did too.  It's a very

17   simple question because I think *relation back* rises and falls,

18   frankly, on this issue --

19             THE COURT:  I agree.

20             MR. O'DONNELL:  -- because if my incident/injury is

21   the same as the act, occurrence, or transaction --

22             THE COURT:  The test is very close.

23             MR. O'DONNELL:  Well, I don't think your decision is

24   foreclosed by your earlier conclusion on the --

25             THE COURT:  I was going to ask you about that.

1          **MR. O'DONNELL:**  I've got a lot of questions to

2    answer, but I'll answer it.  I don't think so.  Let me get to

3    that first.  I don't think so at all because we didn't allege

4    EBIA or WGI in the original complaint.  We alleged flooding

5    caused by the MRGO.

6                So if this is a new set of facts, okay, that

7    doesn't preclude under the case law -- especially the *Adams*

8    case I'm going to quote to you in a moment that I think trumps

9    *Burchfield*.  First of all, it's our circuit.  It's the

10   Fifth Circuit, 1980.  It's still the law, as I understand it.

11               So I think that the fact that we have a

12   *relation back* question is:  What does it relate back to?  What

13   is the transaction, act, or occurrence here?  If it's narrowly

14   defined as merely the EBIA work, I lose, because you have

15   already made that determination.  If, however, because it

16   really relates to the same thing as incident, injury, or

17   accident under Form 95 -- and, frankly, it does.  Mr. Andry,

18   filed this lawsuit a day or two after the six months expired,

19   and it's essentially a larger elaboration of what we said in

20   the Form 95, the floodwaters emanating from MRGO.  We have

21   elaborated on that in discovery.

22               The fact of the matter is that, if you agree

23   with my fundamental contention that we gave enough notice to

24   the government and that the injury or the incident or the

25   accident or the act or the transaction that should have

1    triggered the investigation -- and, by the way, they did

2    investigate.  It's a felicitous fact, I think, for me here.

3    That should take care of the matter.

4              *Adams* tells us you only have to do two things:

5    Give us notice of your claim sufficient for the agency to begin

6    an investigation and place a dollar value on it.  We contend --

7    and that *Burchfield* is not the law of this circuit -- that

8    there is a duty to investigate.

9              *Adams* is worth spending some time on.  The

10   Fifth Circuit rejected any suggestion that claimants may be

11   required to prepare the government's case or to prove their

12   cases to a government claims officer, page 288.  They then went

13   to the legislative history.  It says all that Congress required

14   is only the giving of notice of an accident within a fixed

15   time, page 289.  Here's the critical observation after that.

16   We're dealing with Section 2675, Your Honor.

17             "In promulgating Section 2675, Congress,

18   therefore, did not seek to allow federal agencies unilaterally

19   to shift the burden of investigation to private claimants while

20   retaining only the responsibility of evaluating the information

21   supplied by the claimant....That agency would have the best

22   information concerning the activity which gave rise to the

23   claim."

24             We have a unique situation here.  We have a

25   cataclysm.  We have a catastrophe.  The Corps has admitted and

1   IPET has found that there was catastrophic failure of the levee
2   system.  We are saying that they investigated that not because
3   of Jon Andry's claim form.  They did it.  And not because of
4   the 489,000 other ones or the -- I don't know how many Joe
5   Bruno filed.  He will talk about that in a moment.  They
6   investigated.  So the very purpose of the 2675 claim form was
7   satisfied here, and there's certainly no prejudice to the
8   government.  They're still in denial on the WGI issue.
9                   Finally, the Fifth Circuit concluded in *Adams*,
10  "Agencies were not intended to bar cases involving difficult
11  issues from federal court by turning their difficulty against
12  the claimants."
13                  Your Honor, it may be jurisdictional, but you're
14  still sitting in equity when you have to make these tough
15  calls.  The *Adams* case itself, plus *Williams*, which reaffirms
16  the *Adams* case, and *Rooney -- Williams* talks about take a
17  pragmatic view of this issue, Your Honor.  The Fifth Circuit
18  says let's not look at this woodenly.  2675 is not supposed to
19  be a trap for the unweary.  It's not supposed to be an engine
20  of injustice.  It's not supposed to be a thicket of
21  technicalities, as one court said.  It's not supposed to be the
22  place where plaintiffs' claims go to die because of a *gotcha*.
23  Mr. Andry was incapable, did not know, nor should he have
24  known, about the WGI claim when he filed his Form 95s less than
25  two months after Katrina.

1           If the Court agrees with me and the *Speer* case

2    and the spirit of *Adams* and progeny in this circuit, you will

3    deny this motion, Your Honor, because in the final analysis all

4    2675 required was to give fair notice.  Mr. Andry gave fair

5    notice of the fact that there had been a flood, that the homes

6    and property of these plaintiffs had been destroyed, and that

7    the floodwaters emanated from the MRGO, which, of course,

8    includes the IHNC.  While not technically MRGO, it is part of

9    the MRGO authorization, the Lock Replacement Project.  I think

10   that's all he was required to do.

11          To rule in favor of the government, you would

12   have to first, I think, reject what is the spirit, if not the

13   letter, of the decision of the law in this circuit.  Secondly,

14   you would have to also ignore your colleague's decision in the

15   Northern District of Texas in *Speer*.

16          How could any claimant ever bring a claim when

17   they don't have a lot of money, they don't have engineers, they

18   haven't been able to conduct their own investigation, and the

19   keys to the kingdom to unlock what really happened, say, in

20   Katrina lie in the files and in the hearts and minds of the

21   Army Corps of Engineers?  I urge Your Honor to deny this and

22   let's tee up the WGI case for trial.

23          Finally, I think I made my point on

24   *relation back*.  I think that you agree with me on this.

25          **THE COURT:**  Yes, I do.

1    **MR. O'DONNELL:**  We should hopefully avoid a dismissal

2    on that ground.  I appreciate the opportunity to argue,

3    Your Honor.

4         **THE COURT:**  Thank you, sir.

5         **MR. BRUNO:**  You have been patient through many

6    minutes of argument.  I think it's very important for us to

7    step back for a moment and remember why we are here.  This is

8    the In Re: Katrina Consolidated Litigation.  The whole notion

9    was:  How do we manage this litigation?  There are 487,000

10   Form 95s.  There are class actions pending.

11        Let's remember, Judge, that while the name of

12   the person is *Mrs. Franz*, we all know -- Robin knows, all these

13   people know -- we weren't trying the case of Mrs. Franz.  The

14   whole goal of this exercise was to get the issues before

15   Your Honor to get them resolved, get an opinion, as Robin has

16   said a thousand times to me, so he could take it up.  Let's not

17   lose sight of that.

18        **THE COURT:**  I would love to be able to do that, but

19   again, as I said before, everything is meaningless to me except

20   the law on the first issue, the law relating to the Form 95s.

21        **MR. BRUNO:**  Exactly, Judge.

22        **THE COURT:**  What I want to do, what I would like to

23   do, what might be best for management -- my oath is first to

24   apply the law as I see it.  This is a jurisdictional issue, so

25   it might go up.  If I'm wrong, guess what?  We have wasted a

1    gigantic amount of time on this case.

2              **MR. BRUNO:**  Judge, that's fine, but that's not my

3    point.  My point is this.  My point is different.  My point is

4    that there is no law -- not a single case out there, zero,

5    none -- which discusses what happens when you have 487,000

6    Form 95s.  Every case that we cite and every case that the

7    government cites regards one guy, one little plaintiff with one

8    little claim, with one allegation of neglect.  There is no law

9    on this subject.

10             Now, the government says -- let's back up.  All

11   right.  So what is the true import of what the government is

12   saying?  The true import is, "Oh, my goodness.  We didn't know

13   we were supposed to investigate that."  That's what they are

14   saying.

15             Yes, I know it has jurisdictional consequences,

16   but let's go to the heart of the argument.  "We didn't have a

17   chance to X."  Is that true?  Is it a true and fair statement?

18   That's the question.  Under all the analyses presented in all

19   the decisions for the one little plaintiff guy, that's the true

20   analysis.  Did they have an opportunity to be put on notice of

21   what it was that they were supposed to investigate?  No one --

22   no court, no judge, no court of appeal, no Supreme Court -- has

23   addressed that issue.

24             Now, where are we?  Shortly after the hurricane,

25   we filed our lawsuits.  We thought to ourselves, "Well, you

1   know, we recognize that the Corps hides behind an immunity.
2   Fine.  I'm a lawyer.  I'm an advocate.  Is there any other
3   possible theory?"
4           Well, so you go and you look.  Now, you know you
5   only have one year within which to accomplish this.  You don't
6   have a lot of facts.  In fact, we had no power, no water, no
7   office for three months of that one year.
8           So we went on line and we said, "Let's see if we
9   can identify any contractor who did any work not only at the
10  Lower Nine, but at the 17th Street Canal."  Of course, I'm not
11  going to retread that water.  The assumption was, "Well, you
12  know, you have a levee.  You have a levee that fell down.
13  Maybe these contractors did some work.  I have to investigate.
14  I have a limited amount of time."
15          We found not only Washington Group, we found 10
16  or 15 other contractors, you will remember.  After due
17  diligence and when we had a chance to actually get into it, we
18  dismissed them all.  We had the preemption issue, you remember.
19  We had had issue after issue after issue.
20          **MR. BRUNO:**  I do remember.
21          **THE COURT:**  The last one standing was Washington
22  Group at the Lower Nine.  We still didn't, I have to tell you,
23  have a great understanding of what they did or didn't do, but
24  we knew we didn't have a preemption defense.  The work was
25  completed within almost a month of the hurricane, and there was

1    a whole lot of activity that occurred next to that levee.

2                    Now, we have the IPET, a $26 million

3    investigative report.  Did they investigate?  They sure did.

4    Did they look at underseepage?  No, they didn't.  What does

5    that mean?  Well, they didn't do it, but now they have done it.

6    Why did they do it?  They did it because of us.

7                    Now, the fact is that they have done the

8    investigation.  The fact is that they have been on notice of

9    this claim for well over a year and a half.  So with regard to

10   this whole notion -- again, analyzing what it is these cases

11   truly talk about and remembering, Judge, that what we all have

12   to agree and admit to is this:

13                    This is not a game where the first Form 95 was

14   evaluated.  Okay.  It doesn't work.  Toss it out.  Let's go to

15   the next one.  Toss it out.  Oh, this one works.  Let's try

16   this case.  This one doesn't work.  Can't try that case.  This

17   one works.  Let's try that case.  That's not what is going on

18   here.  That was never the intent of the Form 95.

19                    My Form 95s say, "We are making a claim because

20   the Corps broke the levee," period.  That's what mine say, and

21   they have about 300,000 of those.  So they know that the claim

22   is generally, "You guys did something to break that levee."  So

23   in my view they have all the notice that anybody could possibly

24   need in order to investigate the claim.

25                    THE COURT:  If you're going to impute notice -- which

1   assuming that I disagree with Mr. O'Donnell and agree with

2   Mr. Smith and his able associate that the Form 95 wouldn't put

3   them on notice, but maybe another Form 95 did, it becomes

4   important that -- and assuming there's any law out there, which

5   I haven't seen any, and I'm reluctant to make any up.

6           **MR. BRUNO:**  Judge, I'm not perfect, and I'm probably

7   not the best guy to talk about the law, I'm told.

8           **THE COURT:**  Assuming there was, that notice would

9   have had to have been, it seems to me, before November 18,

10  2006 --

11          **MR. BRUNO:**  That's right.

12          **THE COURT:**  -- on the time line of the *Robinson* case

13  because that's the law.  Law sometimes stands in the way of

14  really good facts.

15          **MR. BRUNO:**  I respectfully suggest, Your Honor, there

16  is no law that suggests this peculiar --

17          **THE COURT:**  Wait, wait, wait.  You don't understand

18  what I'm saying.  Even if I were to allow inputted notice, if

19  that imputed notice was after the deadline, which was

20  November 18, 2006, then it would seem to me that that would

21  be --

22          **MR. BRUNO:**  Maybe you misunderstand.  I am not

23  suggesting --

24          **THE COURT:**  The administrative claim was denied

25  May 18, 2006, in this case, and so the deadline for filing

1   would be November 18, 2006.

2          **MR. BRUNO:**  Right.  I don't mean to suggest, Judge,

3   that because they may have had notice of the precise EBIA

4   claim --

5          **THE COURT:**  Give me some law.  This is a court.

6   True, equity is involved, but you need to understand this Judge

7   that equity alone will never win.  *Never win.*  Law must win.

8   Mr. O'Donnell gave me some.  I understand the situation.  You

9   need to tell me why, if you are arguing, the Form 95 filed in

10  this case would put them on notice or, two, why other Form 95s

11  would, in fact, legally impute, legally somehow breathe life

12  into this one.

13         **MR. BRUNO:**  My only point is, Judge, that it doesn't

14  make a lot of sense to use cases which discuss a single

15  plaintiff and have that be the determinant of what and how we

16  address this situation, which is remarkably different.  We have

17  400,000 forms.

18         **THE COURT:**  I understand.

19         **MR. BRUNO:**  We have lots of forms which say levee

20  break.  They are out there.  There's no doubt about it.  So one

21  has to ask one's self, "What is really the import of the law

22  that the government cites?  What have they missed?  What

23  jurisdictional hurdle has really not been jumped over by the

24  plaintiff?"  I just put it to you that this plaintiff has

25  jumped over all the hurdles that this plaintiff needs to do

1    because --

2            **THE COURT:**  Why couldn't the plaintiff file an

3    amended Form 95 --

4            **MR. BRUNO:**  I can find no case which suggests that --

5            **THE COURT:**  -- a supplemental Form 95?

6            **MR. BRUNO:**  There's no case out there which suggests

7    that you have to supplement your Form 95, especially when they

8    tell you that "We are not going to pay the claim."

9            **THE COURT:**  You don't have to supplement it.  Are you

10   saying the plaintiff was aware of the EBIA issue before

11   November 18, 2006?

12           **MR. BRUNO:**  My point is there is no law which

13   suggests that the plaintiff had to be aware.  What the

14   plaintiff had to know was that he had damage, and he has to

15   know who he is complaining about, and he has to give the person

16   against whom he is claiming some idea of what his complaint is.

17           **THE COURT:**  He could say, "I was flooded and,

18   whatever caused it, I want money"?  I don't think that's going

19   to do it.

20           **MR. BRUNO:**  Well, Judge, these are the facts.  The

21   facts are that there is an I-wall -- or there was an I-wall,

22   it's now a T-wall -- along the eastern bank of the Industrial

23   Canal.  The sheet-pile tip elevation is at negative 8.  The

24   government, after they spent $26 million, concluded that all of

25   the levees that broke save four -- all of them -- performed as

1    designed.  In other words, there are no defects in any of these

2    levees; that the water was higher than the design height and

3    the water went over the top, scoured the back side, and they

4    fell down.

5            Now, they say that's a well-designed and

6    perfectly designed levee.  We agree with them.  They say that

7    there's one site where there was a foundation problem and that

8    was at the northern breach.  Now, just think for a moment.  You

9    have got an I-wall of a certain height and you have two

10   breaches along that same I-wall, one on the north and one on

11   the south.

12           What we learned was that there was a hole next

13   to the north breach and a hole next to the south breach.  We

14   also learned through deposition testimony, not through anybody

15   telling us anything, that the Corps of Engineers itself has a

16   policy and procedure which is mandatory, not discretionary -- I

17   repeat, *mandatory* -- that requires that any time anybody digs a

18   hole near a flood protection structure the Corps of Engineers

19   is required to undertake an engineering analysis of the hole.

20           **THE COURT:**  Like I said earlier, you may have --

21   again, let's assume this is the most sensational claim in the

22   history of claims.  I still have to find that the Form 95 was

23   sufficient.

24           **MR. BRUNO:**  Exactly.  I'm just giving you the

25   background.  I'm also getting into the discretionary

1   function --

2           **THE COURT:**  Because you realize I've been hearing for

3   years, "We are not talking about levees, Judge, in this case."

4                   "So why would the government be investigating in

5   this case?"

6                   "Yeah, you may have heard about it in other

7   cases," and I understand your argument.

8           **MR. BRUNO:**  I'm not talking about levees either.  I'm

9   talking about holes.

10          **THE COURT:**  Whatever.  We have been saying forget it.

11  All we have been talking about in this case is that "Judge, the

12  theory of the case is all of this would have happened if the

13  levees were perfect:  Holes, breaks, breaches, etc."

14          **MR. BRUNO:**  Right.

15          **THE COURT:**  So you understand that this is new.  It's

16  new to this case.  *To this case.*  The question is, under the

17  law that I must follow -- Mr. O'Donnell has given me some cases

18  to ponder about, under the law, I must determine first Form 95

19  *relation back*, which I think I'm close.  I agree with

20  Mr. O'Donnell, I'll get past probably *relation back* if I get

21  past Form 95, and then we get into discretionary function.

22          **MR. BRUNO:**  That's fine.  Really, I'm really

23  addressing --

24          **THE COURT:**  If this were a perfect world, I would

25  like to get this off, sure, but guess what?  I'm not the lawyer

1   for the government.  I'm the Judge.

2          **MR. BRUNO:**  I'm with you.  Frankly, as I say, I

3   merely point out -- and I have already said this -- that there

4   is no law, in my view, which addresses this particular issue.

5   It's just not there.  That allows you the room to -- allows a

6   little bit more latitude than you think you may have because

7   this is not the normal scenario.  This is not John Doe who

8   claims that he fell into a pothole on his way to the

9   courthouse.

10         **THE COURT:**  I do understand your point.

11         **MR. BRUNO:**  Now, let me move to discretionary

12   function.  What I was really getting into was an analysis of

13   the facts of the case so that you could understand

14   discretionary function.

15              What troubles me about this whole notion of

16   discretionary function is the government comes in here and

17   paints this lovely abstract portrait of what this thing is, but

18   they never want to talk to you about what it is that they had

19   the discretion to do or not to do.  I want to tell you

20   precisely what it is about which we claim.

21              Now, there's this wall, there's these two holes,

22   and remarkably the two levee breaks occur right near those two

23   holes.  Remember, now, the IPET report says the reason why the

24   walls fell down is the water went over the top, scoured the

25   back side, and they fell over.  Well, the water that went over

1    the top went over the entire length of the wall.  The amount of
2    water that went over the top was the same for the entire length
3    of the wall, but it only failed in two places.  Remarkably,
4    there are holes near those two breaks.
5                    Now, the 30(b)(6) witness, meaning the Corps,
6    testified that the only way you have a problem with a hole is
7    if you don't put the right backfill material in it.  That's
8    30(b)(6).  Done.  30(b)(6) witness Grieshaber on Friday says on
9    page 88:
10                "Question:  And it's not discretionary; it's
11           mandatory that you do something.  Right?
12                "Answer:  Correct."
13                It gets worse.
14                "Answer:  So this was a designed hole?
15                "Question:  Yes.
16                "Answer:  In other words -- so then the Corps of
17           Engineers designed the hole?
18                "Question:  No.
19                "Answer:  Well, I'm asking.
20                "Question:  They didn't.
21                "Answer:  Okay.  So it wasn't designed by the Corps
22           of Engineers?
23                "Question:  No, it was not.
24                "Answer:  Was the excavation of that hole done as a
25           part of the contract and had to be submitted to the Corps

1      of Engineers?

2            "Question:  Yes.

3            "Answer:  So if it was submitted to the Corps of

4      Engineers "-- which it was -- "the Corps of Engineers

5      looked over that submittal to make sure that hole had no

6      impact on the floodwall."

7                  Not only does the Corps admit under oath that

8  they had an obligation -- not discretionary, mandatory -- to

9  evaluate the hole, this guy says they did it.  They did it.

10                 So we take the deposition on Monday,

11  continuation of the 30(b)(6) deposition.  So it's still

12  Mr. Corps of Engineers, who is under oath, swearing to these

13  answers.  I asked him, "Did you do it?" at page 154.

14                 He says, "One, I'm not aware of these

15  requirements that we have to evaluate holes," interestingly

16  enough.  I won't go there.  He also says, "We didn't do it."

17                 "We didn't do it."

18                 So when Mr. Smith stands before you and says,

19  "Well, you have these vague regulations and, you know, you are

20  really not talking about discretionary" -- forget about it,

21  Your Honor.  The sworn testimony, not of a lowly Corps

22  employee, 30(b)(6) testimony says, "In fact, we were required

23  to evaluate the holes.  We understood what happens if you put

24  the wrong material in those holes," and they did put the wrong

25  material in the holes.  Why?  Because they didn't do the

1   evaluation that they were supposed to do, that they said they

2   were required -- mandated -- to do, and they didn't do it.

3               Discretionary function -- the reason I have to

4   bring the depositions today is because this is supposed to be

5   on the pleadings, but it always sort of turns into a summary

6   judgment.  So I would like to offer and introduce into evidence

7   the 30(b)(6) depositions of Lee Guillory and John Grieshaber in

8   connection with our opposition.

9          **THE COURT:**  Any objections?

10         **MR. SMITH:**  No, Your Honor.

11         **THE COURT:**  Let it be admitted.

12         **MR. BRUNO:**  Finally, Judge, the thing most

13  interesting to me is safety is not delegable, but here's my

14  favorite line:  "For the U.S. to lose immunity for the Corps'

15  supervision of WGI, the Corps would have to have controlled

16  WGI's work."  That's their position.

17              You are going to get a motion for summary

18  judgment from Mr. Treeby in two weeks where he says, "You need

19  to dismiss me because the Corps controlled me, and I had no

20  room but to respond to the specifications that they gave me."

21  Talk about a question of fact.

22              There's no way on earth that, at this point in

23  time, Your Honor, any discretionary function

24  allegation/suggestion is proper before this Court and cannot be

25  granted.  I respectfully suggest, Your Honor, that for all of

1    the reasons cited by my learned colleague and myself that this
2    motion be denied.
3              THE COURT:  Thank you, sir.  Just one second please.
4                   After we complete the oral argument, do all of
5    you have just a few minutes to discuss potential issues with
6    the trial --
7              MR. SMITH:  Yes, Your Honor.
8              MR. O'DONNELL:  Yes, Your Honor.
9              THE COURT:  -- that is, the time of trial?
10             MR. O'DONNELL:  Yes, Your Honor.
11             MR. SMITH:  Yes, Your Honor.
12             MR. EHRLICH:  Good morning again, Judge.  I just want
13   to respond to a few of the points made because there were some
14   very important revelations made here today, beginning with
15   Mr. O'Donnell's colloquy with you, when you were talking about
16   the different causes of the plaintiffs' damages, and
17   Mr. O'Donnell and Your Honor agreed they were proceeding on
18   different causes and you agreed that that's permissible.  The
19   problem here is that the different causes are based on
20   different facts.
21                  They have this theory that there was a funnel
22   effect and now another theory that there was work done at the
23   EBIA that damaged the floodwalls.  To be sure, those are
24   different causes of what was one injury, but they are based on
25   different conduct, and that's a problem when that conduct can't

1    be found in the administrative claim that the plaintiff has
2    presented.
3                    They say, "Well, look, you investigated this.
4    You have an IPET.  Ultimately, you investigated this whole EBIA
5    area."  That's not the test that Congress has imposed on
6    claimants.
7                    They say there's no law.  Well, there is a law.
8    It's a statute, 2675, and it requires each plaintiff to have
9    exhausted his or her administrative claim.  We may not have a
10   lot of cases where it's applied in a situation where there's
11   lots of people who are hurt similarly, but we have a case here
12   where there are six plaintiffs who didn't satisfy that statute.
13          THE COURT:  As I understand it, certainly there is a
14   case, a rather large one, where if I don't allow it here this
15   issue will be met head-on.  These are six plaintiffs, I think
16   two or three who may be affected by the EBIA issue, but there
17   is a case, that is, the MRGO class action --
18          MR. EHRLICH:  Right.  Of course.
19          THE COURT:  -- and individually filed claims which
20   relate to this that specifically plead this issue.
21          MR. EHRLICH:  I believe so.  As I said before,
22   Your Honor, I haven't looked --
23          THE COURT:  I mean, eventually we are going to get to
24   it.  We may not get to it in this case.  Whether that's the
25   most efficient way to do it or not, that's not up to me at this

 1   point.

 2            **MR. EHRLICH:**  No.  Congress has sort of tied your

 3   hands with that.  There may be more efficient ways to deal with

 4   all of this, but Congress has required that a plaintiff exhaust

 5   his or her administrative claims, and that didn't happen here.

 6            Also, Your Honor, we heard about Mr. Andry as

 7   the drafter of this administrative claims and another, I think,

 8   very telling statement.  The plaintiffs' lawyers were concerned

 9   about the immunity that the United States has and the Flood

10   Control immunity, so they crafted a claim that used terms and

11   phrases in a way to avoid the Flood Control immunity.  So they

12   cleverly talk about a storm surge and the design and the

13   construction and the degradation of the wetlands and how this

14   caused a funnel and the waters emanated from the MRGO.

15            Mr. Bruno got up here and said, "The claims I

16   filed, I said, 'Hey, there was a flood.  The floodwalls are

17   broken.  These folks were flooded.'"  Well, if these

18   administrative claims by these plaintiffs had said, "There was

19   a breach at the IHNC and it flooded my property in St. Bernard

20   Parish," or New Orleans East, we would have a different story.

21            So Mr. O'Donnell says, "Well, what's a plaintiff

22   to do, a poor, little ol' plaintiff?"  You know what he has to

23   do?  He has to say what happened to him.  If he had filed an

24   administrative claim and he said, "The floodwall breached and

25   the water came in and it flooded my house," we would have a

1    very different story here, but we don't.  Instead, we have a
2    claim that very specifically points to another cause than the
3    one that the plaintiffs seek to proceed on in Count 3.
4              They point left and say it was the MRGO, and
5    then they plead right and say it was the EBIA.  It amounts to
6    misdirection.  It's worse than being vague, it's misdirection.
7    They point to a specific reason and then they seek to assert
8    Count 3 based on a different reason, different facts, and that
9    just doesn't work.  Congress is clear that each plaintiff must
10   submit an administrative claim.
11             I don't discuss a lot the district court case
12   from the Western District of Texas, but I do know what *Portillo*
13   and *Cook* say, and I do know that those cases bind Your Honor.
14   *Cook* says that plaintiffs must provide facts sufficient to
15   allow the claim to be investigated.  *Portillo* says that the
16   claim must specifically delineate facts that put the government
17   on notice of each potential basis for relief.  I know that the
18   administrative claims that we have here from these six
19   plaintiffs, they do not do that.
20             The point, "Well, how could we have done this?
21   Mr. Andry is not clairvoyant," clairvoyance isn't required.
22   You don't have two months or even one year, as Mr. Bruno said.
23   You have two years to file an administrative claims, to let the
24   dust settle and say, okay, just what happened to me, and then
25   put that in an administrative claim and put the agency on

1   notice.

2                   For whatever reason, this was done much more

3   quickly than that, but we know that other people were able to

4   submit administrative claims that made reference to the

5   flooding and that breach of floodwalls.  We also know that

6   folks were able to sue WGI based on what happened at the EBIA.

7   So whether Mr. Andry was aware of it or not doesn't matter.  It

8   was out there.  People could understand what happened to them.

9   There were people in this community that understood that the

10  floodwall of the IHNC gave way and water came into St. Bernard

11  Parish and they were harmed.  So you don't need clairvoyance to

12  comply with the rule that Congress has imposed.

13                  The last point I want to address, Your Honor,

14  because I think you were being led by Mr. O'Donnell to a very

15  dangerous place, and that's this idea that rules --

16          **THE COURT:**  You mean Mr. O'Donnell is a Pied Piper

17  that's going to make a judicial lemming fall off a cliff?

18          **MR. EHRLICH:**  I wasn't worried about it, but I did

19  think I sensed that you agreed with him.

20          **THE COURT:**  I have Pied Pipers on both sides and

21  cliffs on both sides.  Fortunately, the Fifth Circuit is there

22  to save me.  Go ahead.

23          **MR. EHRLICH:**  It's on this *relation back* argument,

24  Judge, and I think you expressed some agreement that the

25  *relation back* issue rises and falls with the administrative

1    claim and there are different tests.

2         **THE COURT:**  There are different tests.  But, Counsel,

3    let me say that I think the *relation back* test is less

4    stringent than this one, sir.  He is going to win on that one

5    if he wins on this.  You can take that one up to the

6    Fifth Circuit if I happen to rule against you on the other,

7    which I probably won't, just to let you know.  I'm going to

8    look at your cases again.  I have them here.

9         **MR. EHRLICH:**  If I could just touch upon that, I

10   think a better analogy to the test that's required for the

11   administrative claim requirement is whether amendment would

12   have been required at all, whether the original complaint --

13        **THE COURT:**  I understand your Rule 8 argument.  I

14   understand that about the transaction, etc., but I'm saying if

15   he wins the 95.

16        **MR. EHRLICH:**  In either case, all Your Honor has to

17   do is you have to look at the claim and compare it to Count 3

18   and then you have to look, on the other question, at the

19   complaint.

20        **THE COURT:**  I've done all of that.  I've already done

21   it.  I know where I am.  Thank you.

22        **MR. EHRLICH:**  Thanks, Judge.

23        **MR. O'DONNELL:**  Can I have 30 seconds, Your Honor?

24        **MR. SMITH:**  Your Honor, I would like to address --

25        **MR. O'DONNELL:**  I'm sorry.

1      **MR. SMITH:**  We really would like to have the last

2   word on our motion sometime.

3      **THE COURT:**  You will have the last word.  In fact,

4   I'm about to have the last word.  I've read all of this.  I

5   doubt if you are going to enlighten me.

6      **MR. O'DONNELL:**  I will save my point for the status

7   conference.

8      **MR. BRUNO:**  You can have the last word for me.

9      **MR. SMITH:**  I get your point, Your Honor.  I'm going

10  to be very brief.  Plaintiffs obviously realize that the law is

11  very bad for them here and they have begged Your Honor -- I

12  don't think that's quite too strong a word -- to look at the

13  equities here and to be generous with them because they did the

14  best they could.  Mr. Andry is standup guy, and Mr. O'Donnell

15  praised him as a good lawyer.  I know that's true.

16             I was here at the beginning of this litigation,

17  Your Honor, all those years ago.  I sat right over here.

18  Your Honor will remember that very first day.  Every chair in

19  this courtroom was filled with lawyers, and they were lined up

20  and down the walls all the way to the front of the room.

21             Mr. Fayard came up and, of course, as Your Honor

22  was trying to plot the way through this massive litigation,

23  Mr. Fayard took the podium and said that he had a lawyer here

24  from California that he wanted to introduce to the Court and

25  his name was Pierce O'Donnell.

1    Mr. O'Donnell came to this podium and he told
2  the Court forcefully that they had been investigating this
3  since the very day that the flood occurred, and that they had
4  been doing deep discovery into all the things that had gone on
5  and that they had this test case that they were prepared to
6  file.  It wasn't even filed at that point yet, Your Honor, but
7  they were chomping at the bit to get this filed.  When the six
8  months expired, they were going to be presenting this case, and
9  they wanted Your Honor to take this case as the test case to go
10 in front of all the other cases in this litigation.
11    Then they did what they said; they filed it as
12 soon as the six months ran.  With it they filed a motion and
13 said, "Don't give the government 60 days to answer, Your Honor.
14 Give them 10 days.  They only need 10 days.  We are ready to go
15 to trial in 60 days."  Here we are, two and a half years later,
16 and now they are saying, "Judge, give us a break.  We didn't
17 know about the EBIA way back then and we couldn't have known
18 about it.  Maybe we didn't cite it in there, but it's close
19 enough.  Give us a break."
20    Your Honor, the law says that when that's not
21 part of the administrative claim and when they don't amend that
22 in a timely fashion, then that can't be a part of this
23 litigation.  So, for that reason alone, Your Honor has to grant
24 the government's motion and dismiss these cases.
25    **THE COURT:**  Thank you, Mr. Smith.

1          The Court will take the matter under advisement.

2    The written opinion will be done hopefully with alacrity.  It

3    will be done with as much alacrity as possible.

4          **MR. O'DONNELL:**  Can we talk about the trial?

5          **THE COURT:**  Yes.

6          **MR. O'DONNELL:**  Mr. Smith gave me a great segue.  We

7    were going to have a trial at one point, and then our expert

8    work took longer than expected and we moved from September, I

9    think, October -- maybe we stopped at October, and we quickly

10   went to inauguration day, coincidentally, January 20, 2009.

11   I'm sure that was a coincidence.  Now, Mr. Bruno and I have had

12   discussions with Mr. Smith, and we understand the government

13   needs some additional time for their expert reports.  We

14   understand that.

15         Causation is probably the central point in this

16   case, and I think we all understand that.  I think I'll

17   persuade you there was a duty, and I hope I will persuade you

18   there was a breach of duty.  I think it's going to fall on the

19   issue of causation.

20         Our concern here is the Court -- I understand

21   you do Katrina and everything else, too, and it's a massive,

22   groaning docket.  We would like to get a stationary target

23   first for the Court and secondly for us.  Most of my life is

24   this case, and Mr. Smith and the government have other

25   responsibilities.

1          It's likely we are not going to have a

2    resolution until we are approaching the fourth year of Katrina,

3    so my effort to get this case tried in a short period of time

4    has been thwarted by understandable forces.  We didn't take two

5    years to investigate.  We filed I think the day after the six

6    months expired.  We want a trial.  We want a test decision.  I

7    think the Court wants a complete record.

8          **THE COURT:**  You did.  April 25, 2006.

9          **MR. SMITH:**  We filed it the day after.  I want to get

10   back to -- the famous Clinton aphorism in the '92 election was,

11   "It's the economy, stupid."  From our point of view, this case

12   is about the MRGO.  We felt obligated as counsel to bring the

13   amended complaint, and you're going to make your decision on

14   that.

15         Assuming we get past the last hurdle, which I'm

16   increasingly confident we should -- hopefully discretionary

17   function, but that motion is coming some day.  I may have a

18   cross motion on that.  We will tee it up.  If we survive that,

19   I think we are going to go to trial.

20         **THE COURT:**  Right, we will.

21         **MR. O'DONNELL:**  Because if a causation summary

22   judgment is brought, that's a one-sentence -- quintessentially,

23   an issue of fact, Your Honor.  It should be denied.  So if they

24   bring that motion, we will deal with that as well.

25         We want to go to trial.  We want to know when

1    that trial is.  We hope the Court says this is the last

2    continuance.  We are not saying Mr. Smith is not entitled to

3    more time.  We all want a complete record.  It's the due

4    process for the litigants.

5                 I must say -- I'm not trying to be emotional --

6    there's a lot of people that got hurt here.  If we are right

7    about the MRGO and you rule in our favor and we survive our

8    appeals, there may be a Congress and a new President who does

9    something else like the Grand Teton dam, like the Sierra Grande

10   fire, like the swine flu, and like 9/11, where they went the

11   administrative route instead of the litigation route.  Hope

12   springs eternal, but a trial in MRGO is essential.  Thank you,

13   Your Honor.

14            MR. BRUNO:  Just to add on that point, Judge, the

15   facts of life are -- I wasn't trying to suggest that --

16            THE COURT:  I guess we need to hear what Mr. Smith is

17   going to say.  You don't know how much I want to do this.

18            MR. BRUNO:  Mr. Franz is one person.  We can still

19   try and should try the EBIA claims in *Robinson* against this

20   government because, even if that one plaintiff fails, you will

21   have a full record, you will have full evidence, and you will

22   have a determination, which will be with regard to 400,000

23   people.

24            THE COURT:  I'm not arguing the case right now.

25   That's done, Mr. Bruno.  We are talking about a trial date.  *A*

*trial date.*  You can say that until the cows come home.

Without law, you lose.

        Go ahead.

        **MR. SMITH:**  Yes, Your Honor.  I mentioned on the phone a couple of weeks ago that we are running behind and nothing has really changed since then.  We are not farther behind than we were then.  We are having difficulties, but they are not anything unexpected.

        The supercomputers that do this modeling are the same supercomputers they use to model these hurricanes that are coming ashore.  So when the Corps decides which order things are going to get done, the project for this litigation is not more important than Hurricane Gustave or Hurricane Ike, so our things sit in a cue waiting to run on a supercomputer.  We need probably six weeks, Your Honor.  I know that where that throws us is right towards Christmas on this.

        **THE COURT:**  May I ask you this?  The trial date is when?

        **MR. SMITH:**  January 20.

        **THE COURT:**  When you say Christmas, the six weeks --

        **MR. SMITH:**  For our expert reports, Your Honor.

        **THE COURT:**  I said the last one was the last setting, but I would like to say it and mean it this time.  Let me throw out a trial date.  I've looked at our calendar.  Our calendar has been so screwed up by this case, frankly, I can't begin to

```
 1   tell you because we do have other customers, although you are
 2   some of our favorite customers.
 3            MR. O'DONNELL:  Repeat customers.
 4            THE COURT:  All of you.  I enjoy it, I really do.
 5                  April 19, how does that fit with the guys and
 6   ladies who -- April 20, I've been told.
 7            MR. SMITH:  Yes, Your Honor.  We can do that.
 8            MR. O'DONNELL:  That sounds fine with us, Your Honor.
 9   May I suggest that Mr. Smith and I --
10            THE COURT:  Maybe you can file a motion.
11            MR. SMITH:  Yes.  We'll try to get a schedule
12   together with them.
13            MR. O'DONNELL:  We'll work backwards from that for
14   all the deadlines.
15            THE COURT:  Is that all right?
16            MR. O'DONNELL:  Yes, absolutely.
17            THE COURT:  Frankly, I'm going to try it.  If we
18   don't have all the discovery --
19            MR. SMITH:  Your Honor, I hate to hear you say that.
20   I've got some dispositive motions coming.  The plaintiffs want
21   to get to a trial.  I want this case to be dismissed.
22            THE COURT:  You're right.  Let me say I'm going to
23   try it then if I don't grant Mr. Smith's dispositive motions.
24            MR. SMITH:  Thank you, Your Honor.  I appreciate
25   that.
```

1          **MR. O'DONNELL:**  Well, for planning purposes, we are
2   happy with that date, Your Honor.  We'll see how things come
3   out.  Thank you.
4          **THE COURT:**  You-all will file something, but we will
5   put that on our calendar.
6          **MR. O'DONNELL:**  We'll agree on the 30(b)(6).
7          **THE COURT:**  We'll try to get this decision out pretty
8   quick so you-all know where you are on this.  I understand what
9   you're saying.  I will have to look at this.  Thank you all
10  very much.  Have a safe trip back.  Court is adjourned.
11         **THE DEPUTY CLERK:**  All rise.
12         (WHEREUPON the Court was in recess.)
13                              * * *
14                          <u>CERTIFICATE</u>
15         I, Toni Doyle Tusa, CCR, FCRR, Official Court
16  Reporter for the United States District Court, Eastern District
17  of Louisiana, do hereby certify that the foregoing is a true
18  and correct transcript, to the best of my ability and
19  understanding, from the record of the proceedings in the
20  above-entitled and numbered matter.
21
22
23                         <u>/s Toni Doyle Tusa</u>
                            Toni Doyle Tusa, CCR, FCRR
24                          Official Court Reporter
25