UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES                    CIVIL ACTION
        CONSOLIDATED LITIGATION
                                                 NO. 05-4182

PERTAINS TO: BARGE                               SECTION "K" (2)

Boutte v. Lafarge            05-5531
Mumford v. Ingram            05-5724
Lagarde v. Lafarge           06-5342
Perry v. Ingram              06-6299
Benoit v. Lafarge            06-7516
Parfait Family v. USA        07-3500
Lafarge v. USA               07-5178

## ORDER AND REASONS ON MOTION

Pending before me is the Barge Plaintiffs Subgroup Litigation Committee's

("PSLC") Motion for Protective Order Barring Defendant Lafarge North America and Its

Counsel from Having any Ex Parte Contact with any Member of the Putative Class the

Barge P.S.L.C. Seeks to Represent, Without the Consent of the Barge P.S.L.C. or the

Permission of the Court, for Declaratory Relief, and for Other Appropriate Relief.  Record

Doc. No. 13839.  Defendant Lafarge North America Inc. ("Lafarge") filed a timely

memorandum in opposition to plaintiffs' motion.  Record Doc. No. 14628.

The PSLC contends that Lafarge and its counsel, acting through Centanni Investigative Agency's investigators, entered private property belonging to putative class members after Hurricane Katrina and took a variety of stopped clocks and watches from the properties without the owners' permission.  Plaintiffs argue that this conduct constituted criminal trespass, looting, unauthorized entry of a dwelling during an emergency or disaster, theft and simple burglary.  Lafarge has given the PSLC two  lists of the timepieces, sorted in order by the time shown on each stopped timepiece, along with the dates, addresses and specific locations within or outside the residences from which the timepieces were taken.  Centanni's investigators labeled, preserved and stored the timepieces as they were collected, and Lafarge has provided the PSLC with the opportunity to inspect and photograph the timepieces.

The PSLC further contends that, in addition to tape-recording interviews with some putative class members without revealing the recordation (which this court has already disapproved and ruled vitiated Lafarge's work product protection as to the recorded statements), Centanni's investigators either evaded questions about whom they represented or affirmatively lied about their employment by Lafarge during some interviews.  Plaintiffs speculate that some putative class members might have been misled by investigators into thinking that they need not speak with anyone else, such as an attorney, to protect their own interests.  They also contend that the investigators'

2

contacts with putative class members on behalf of Lafarge's attorneys amounted to the attorneys' violation of Louisiana Rules of Professional Conduct 4.2 and 4.3.

Plaintiffs seek a protective order to prevent any future contact between Lafarge and putative class members.  They also seek an order, under the crime-fraud exception to the attorney-client privilege and work product doctrine, allowing them to discover (1) "Lafarge's entire course of dealing with putative class members," including (2) the protected details of witness interviews, (3) the names and involvement of each participant in the allegedly criminal conduct, (4) all documents concerning the conduct and the stopped timepieces, and (5) all communications between Lafarge, its counsel, Centanni's investigators and/or third parties, and any work product documents, concerning the allegedly criminal conduct.  Plaintiffs' memorandum, Record Doc. No. 13839-2, at p. 21. For the following reasons, **IT IS ORDERED** that plaintiffs' motion is **GRANTED IN PART AND DENIED IN PART**, as follows.

## <u>ANALYSIS</u>

I.    <u>FUTURE CONTACTS WITH PUTATIVE CLASS MEMBERS</u>

Fed. R. Civ. P. 26(c)(1) sets the standard for granting a motion for protective order.  "A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . .  The court may, <u>for good cause</u>, issue an order to protect a party or person from annoyance, embarrassment, oppression, or

3

undue burden or expense . . . ." Fed. R. Civ. P. 26(c)(1) (emphasis added). "Rule 26(c)'s requirement of a showing of good cause to support the issuance of a protective order indicates that '[t]he burden is upon the movant to show the necessity of its issuance, which contemplates a <u>particular and specific demonstration of fact</u> as distinguished from stereotyped and conclusory statements.'" <u>In re Terra Int'l</u>, 134 F.3d 302, 306 (5th Cir. 1998) (quoting <u>United States v. Garrett</u>, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978); citing 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, <u>Federal Practice and Procedure</u> § 2035, at 483-86 (2d ed. 1994)) (hereinafter "Wright & Miller") (emphasis added) .

Plaintiffs have failed to carry their burden to show good cause to justify the extremely broad protective order that they seek concerning Lafarge's communications with putative class members. First, the court has already ruled, when considering prior motions by the PSLC concerning these same interviews, that the conduct of Lafarge's counsel, acting through Centanni, in interviewing putative class members without disclosing either the surreptitious tape recording or the identity of Centanni's client did not violate Louisiana Rules of Professional Conduct 4.2 and 4.3, although the surreptitious tape recording has been disapproved and remedied for other reasons. The additional interview transcripts that plaintiffs provide with their current motion are simply more of the same and do not support any different result concerning this motion.

4

The transcripts make it clear that Centanni's investigators avoided giving any impression that they were affiliated with any attorneys or party working on behalf of flood victims. However, the interviewers emphasized that they were only seeking the facts concerning what each witness had observed, and they did not in any way try to influence the interviewees concerning the instant litigation. The court cannot find, based on these transcripts, that any putative class members were likely to be coerced or misled into thinking that they need not speak with an attorney to protect their own interests.

Second, the PSLC has no attorney-client relationship with putative class members that would automatically preclude Lafarge's counsel from speaking to those persons in the future. Although the PSLC "owe[s] some general fiduciary duties to unnamed putative class members, . . . the existence of such a fiduciary duty does not create an inviolate attorney-client relationship with each and every member of the putative class." In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1239, 1245-46 (N.D. Cal. 2000) (emphasis added); accord In re Community Bank, 418 F.3d 277, 313 (3d Cir. 2005) (citing Greenfield v. Villager Indus., Inc., 483 F.2d 824, 832 (3d Cir. 1973); Cobell v. Norton, 212 F.R.D. 14, 17 (D.D.C. 2002); Morisky v. Public Serv. Elec. & Gas Co., 191 F.R.D. 419, 424 (D.N.J. 2000); In re Shell Oil Ref., 152 F.R.D. 526, 528 (E.D. La. 1989); 5 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 15:16 (4th ed. 2002)); accord Manual on Complex Litigation § 30.24 (3d ed.). Before a class has been certified,

"only the named plaintiffs are clients of the [plaintiffs' law] firm at this stage. Therefore, [the firm] cannot assert the attorney-client privilege with respect to . . . [un]named plaintiffs because only clients can claim this privilege." <u>Morisky</u>, 191 F.R.D. at 424; <u>see also</u> Joseph M. McLaughlin, 2 <u>McLaughlin on Class Actions</u> § 11:1 & cases cited at nn. 1-3 (3d ed.) (The majority rule is that, while named plaintiffs are clients of class counsel before certification, absent class members are <u>not</u> represented parties. Thus, neither the ethical rules governing communications with represented parties nor the attorney-client privilege are applicable and a defendant ordinarily may direct non-coercive, non-abusive communications to putative class members.).

The ABA Committee on Ethics and Professional Responsibility recently issued a Formal Opinion on this topic, stating that the Model Rules of Professional Conduct generally do not prohibit counsel for either plaintiff or defendant from communicating with putative class members.

> Before the class has been certified by a court, the lawyer for plaintiff will represent one or more persons with whom a client-lawyer relationship clearly has been established. As to persons who are potential members of a class if it is certified, however, no client-lawyer relationship has been established. A client-lawyer relationship with a potential member of the class does not begin until the class has been certified and the time for opting out by a potential member of the class has expired. If the client has neither a consensual relationship with the lawyer nor a legal substitute for consent, there is no representation. Therefore, putative class members are not represented parties for purposes of the Model Rules prior to certification of the class and the expiration of the opt-out period.

ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 07-445, at 3 (2007) (attached to defendant's opposition memorandum, Defendant's Exh. 3).

Furthermore, although the court has the power and the duty under Fed. R. Civ. P. 23(d)(1)(C) to restrict abusive communications by the parties with class members to protect the fairness of the proceedings, the United States Supreme Court held in <u>Gulf Oil Co. v. Bernard</u>, 452 U.S. 89, 101 (1981), that a blanket prior restraint on contacts between a party and putative class members before any class has been certified is <u>not</u> warranted. Even when a party has made or threatened to make seriously misleading communications to putative class members,

> an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties. . . . Only such a determination can ensure that the court is furthering, rather than hindering, the policies embodied in the Federal Rules of Civil Procedure, especially Rule 23. . . . In addition, such a weighing–identifying the potential abuses being addressed–should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances.
>
> "[T]o the extent that the district court is empowered . . . to restrict certain communications in order to prevent frustration of the policies of Rule 23, it may not exercise the power without a specific record showing by the moving party of the particular abuses by which it is threatened. Moreover, the district court must find that the showing provides a satisfactory basis for relief and that the relief sought would be consistent with the policies of Rule 23 giving explicit consideration to the narrowest possible relief which would protect the respective parties."

Id. at 101-02 (quoting Coles v. Marsh, 560 F.2d 186, 189 (3d Cir. 1977)) (footnotes

omitted).  Although Gulf Oil Co. involved contact by plaintiff's counsel with putative

class members, district and appellate courts have also applied the decision to contacts by

defendants and their counsel with the putative class.  Cox Nuclear Med. v. Gold Cup

Coffee Servs., Inc., 214 F.R.D. 696, 697 (S.D. Ala. 2003) (citing cases).

> Applying this standard requires that I first determine whether a
> limitation on the defendants' communication with putative class members
> is necessary.  In order for the moving party to show that a limitation is
> necessary, "[t]wo kinds of proof are required.  First, the movant must show
> that a particular form of communication has occurred or is threatened to
> occur.  Second, the movant must show that the particular form of
> communication at issue is abusive in that it threatens the proper functioning
> of the litigation."

The Kay Co., LLC v. Equitable Prod. Co., 246 F.R.D. 260, 262 (S.D. W. Va. 2007)

(quoting Cox Nuclear Med., 214 F.R.D. at 697-98).

Plaintiffs have satisfied the first prong by showing that Lafarge has communicated

with putative class members through Centanni and has indicated its intent to continue to

interview such persons as fact witnesses until a class is certified.  However, "it is not

enough that a potentially coercive situation exists. . . .  While actual harm does not have

to be shown, there must be some evidence that justifies an interference with defendant's

speech.  The Court cannot issue an order without evidence that a potential for serious

abuse exists."  Basco v. Wal-Mart Stores, Inc., No. 00-3184, 2002 WL 272384, at *3

8

(E.D. La. Feb. 25, 2002) (Roby, M.J.) (citing <u>Gulf Oil Co.</u>, 452 U.S. at 101; <u>Burrell v. Crown Cent. Petroleum, Inc.</u>, 176 F.R.D. 239, 244 (E.D. Tex. 1997)).

The evidence provided by the PSLC shows that Centanni's investigators emphasized to their interviewees that they were seeking the facts.  The transcripts also show that the investigators did not try to influence the interviewees concerning the instant litigation or the putative plaintiffs' legal rights.  "Absent any specific evidence that the communication is abusive, a limitation is inappropriate."  <u>The Kay Co.</u>, 246 F.R.D. at 260; <u>see also</u> <u>In re School Asbestos Litig.</u>, 842 F.2d 671, 682-84 (3rd Cir. 1988) (condemning defendants' efforts to influence class members through misleading communications; affirming district court order requiring defendants to make affirmative disclosures in any future communications to class members, but vacating court's order as too broad to extent it applied to all of defendants' public communications); <u>Garcia v. Pilgrim's Pride Corp.</u>, No. 06-710, 2006 WL 1983174, at *2 (E.D. Pa. July 13, 2006) (denying "motion for a total ban on unwritten communications and . . . that all written communication be approved by the court" when "[t]here has been absolutely no evidence adduced that counsel has provided any misleading information or strong-armed anyone"); <u>McLaughlin v. Liberty Mut. Ins. Co.</u>, 224 F.R.D. 295, 299 (D. Mass. 2004) (defendant "represented that it seeks to conduct the interviews so that it can realistically assess the scope and nature of the case brought against it.  There is nothing inherently

wrong with that."); Payne v. Goodyear Tire & Rubber Co., 207 F.R.D. 16, 21-22 (D. Mass. 2002) ("the record here contains no evidence allowing the inference that Goodyear is either pressuring plaintiffs to opt out of the litigation or covertly robbing plaintiffs of their opportunity to participate in the instant litigation:  the record does not establish any communication with potential plaintiffs concerning litigation at all"); Lester v. Percudani, No. 01-1182, 2002 WL 1460763, at * (M.D. Pa. Apr. 18, 2002) (denying motion for protective order prohibiting defense counsel's unauthorized communication with class members absent showing of some misleading communication).

An outright ban on communications with putative class members, or a requirement that Lafarge only be permitted to interview or depose them in the presence of the PSLC, would be excessive on this record.  However, in previous orders, I have stated my disapproval of the Centanni investigators' evasions, particularly as to the identity of their client, while taking witness statements.  In addition, the questionable conduct of the Centanni investigators concerning their "collection" of the personal property of putative class members is discussed below.  While actual, serious abuse in these interviews sufficient to prohibit any interviews has not been proven, the potential for abuse exists, given the track record of the Centanni investigators, as Lafarge and its agents continue to interview putative class members concerning the facts of the case.  That potential is not as strong as in some of the cases in which contacts have been barred altogether, such

as when the defendant is the employer of putative class members and the potential for improper influence may be inherent in the employment relationship.  See, e.g., Equal Employment Opportunity Comm'n v. Morgan Stanley & Co., 206 F. Supp. 2d 559,  561 (S.D.N.Y. 2002) (citing cases).

Accordingly, I will grant plaintiffs' motion to the following limited extent:  IT IS ORDERED that Lafarge, its attorneys, investigators or any other agents, whenever they contact a putative class member, must inform the person, in writing, that this action is pending; summarize the claims in the action; advise the putative class members that they may, but are not required to, join in the action; and tell them that they may contact the PSLC for additional information.  Lafarge, its attorneys and its investigators may discuss with  putative class members only the facts of the case and must not attempt to influence them in any way about joining this action or bringing a separate action.  For every such future contact, Lafarge must give to the PSLC and file in the record a notice stating the names and addresses of the person who made the contact and the person who was contacted, and a certificate from the person who made the contact that he or she has complied with this order.  The motion is otherwise denied insofar as it seeks to impose a complete prohibition on witness interviews or to place additional limits on Lafarge's communications with putative class members.

II.   UNAUTHORIZED TAKING OF TIMEPIECES

The PSLC argues that Lafarge's attorneys, through Centanni's investigators, committed criminal trespass, looting, unauthorized entry of a dwelling during an emergency or disaster, theft and/or simple burglary.  The PSLC contends that, under the crime-fraud exception, the commission of any of these crimes vitiates Lafarge's attorney-client privilege and work product protection concerning "Lafarge's entire course of dealing with putative class members." Plaintiffs' memorandum, Record Doc. No. 13839-2, at p. 21.  The PSLC  seeks the protected details of Lafarge's witness interviews, the names and involvement of each participant in the allegedly criminal conduct, all documents concerning the conduct and the stopped timepieces, and all communications between Lafarge, its counsel, the Centanni Agency and/or third parties, and any work product documents, concerning the allegedly criminal conduct.

For the following reasons, I find that the PSLC has shown good cause for a protective order that abrogates Lafarge's attorney-client privilege and work product protection, but limited to all communications, portions of witness statements and tangible things concerning Lafarge's unauthorized taking of the timepieces, and the motion is granted to that extent.  The PSLC's motion is denied to the extent that it seeks full disclosure of the entirety of all aspects of Lafarge's witness interviews beyond the taking of the timepieces.

Lafarge has submitted the declaration under penalty of perjury of Wayne R. Centanni, the president of Centanni Investigative Agency.  Centanni declares that his firm's investigators "collected" all but one of the 36 clocks and watches that were taken from the private property of putative class members during October and November 2005, when access to the Lower Ninth Ward of New Orleans was restricted by the local government.  He avers that the investigators "received permission from the New Orleans Police Department, the Louisiana National Guard and other law enforcement authorities to enter the Lower Ninth Ward."  He states that the investigators photographed two grandfather clocks that were too large to take and that they collected one additional clock in March 2006.  He declares that the investigators collected the stopped timepieces because of concern that they would be lost or destroyed by subsequent flooding and/or demolition if they were not preserved, and he states that many of the properties from which the timepieces were collected were later demolished.  Centanni further states that law enforcement authorities observed the investigators collecting the timepieces and did not interrupt them.  He affirms that the timepieces are being preserved and stored so that they can be used in this litigation.  He declares that he and his investigators did not intend to steal or possess the timepieces permanently, and that they "intend to return them to their owners as warranted and instructed by counsel."  He states that no one at Lafarge ever gave him or his investigators any instructions concerning the timepieces.  Finally,

13

he avers that none of the interviews that his investigators conducted were contemporaneous with the collection of the timepieces.  Record Doc. No. 14628-2, Supplemental Declaration of Wayne R. Centanni; Record Doc. No. 14268-3, Exh. 1 to Centanni's declaration, list of "Timepieces Collected" with dates and addresses of collection; see also Plaintiff's Exh. 4, Record Doc. No. 13839-6, expanded list of "Timepieces Recovered" with specific locations of timepieces at each address.

I find that the conduct of Centanni's investigators, directed by Lafarge's attorneys, in entering the homes of evacuated victims of the Hurricane Katrina levee failures and removing their personal property without the owners' permission or the express warrant of any governmental authority was outrageous, offensive, unwarranted and arguably criminal.  The lists of timepieces provided by Lafarge make clear that the investigators did not merely pick up timepieces from outdoor areas where the timepieces had washed up after the flood and ownership could not reasonably be ascertained.  Rather, the investigators entered private residences, without permission of the owners of the property or any grant of governmental authority, and removed most of the timepieces from interior walls.  See Record Doc. No. 13839-6, Plaintiff's Exh. 4, list of "Timepieces Recovered" (e.g., Item No. 1, timepiece taken from wall of second floor of two-story structure at 2619 Forstall St.; Item No. 4, timepiece taken from wall of one-story residence at 1728 Deslonde St.; Item No. 10, timepiece taken from wall of second floor of two-story

14

residence at 2607 Andry St.; Item No. 35, wristwatch found hanging on kitchen wall on first floor of one-story residence at 2241 Deslonde St.). This is unacceptable conduct, which this court does <u>not</u> condone and emphatically disapproves, for the following reasons.

First, this conduct derogates from the fundamental right of Americans to be secure, especially in their homes, from unauthorized entry and taking of their property.

> [I]t is beyond dispute that the home is entitled to special protection as the center of the private lives of our people. We have, after all, lived our whole national history with an understanding of the ancient adage that a man's home is his castle to the point that the poorest man may in his cottage bid defiance to all the forces of the Crown. Disputed permission [to enter] is thus no match for this central value of the Fourth Amendment . . . .

<u>Georgia v. Randolph</u>, 547 U.S. 103, 115 (2006) (citing U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .")) (quotations, brackets and additional citations omitted). Although the Fourth Amendment applies solely to government conduct, the Louisiana criminal statutes cited by the PSLC codify this fundamental right and make it enforceable against private persons by providing law enforcement power and criminal penalties for violations of the statutes.

In this regard, Centanni's declaration under penalty of perjury is evasive and deficient in key respects. "[P]ermission from . . . law enforcement authorities to enter the

Lower Ninth Ward of New Orleans" is <u>not</u> permission to enter the private residences of citizens in that neighborhood or to "collect" their private property.  Record Doc. No. 14628-2, Centanni declaration at ¶ 4.  The fact that "[l]aw enforcement authorities . . . observed . . . our collection of timepieces . . . [but] did not interrupt our activities" in no way constitutes permission or authority to invade private property rights.  <u>Id.</u>  The fact that the timepieces were taken and stored "so that they can be used later in this litigation" is not such an important or inviolate motive that it overrides fundamental private property rights.  <u>Id.</u> at ¶ 9.  The assertion that "[n]o one from Lafarge . . . ever provided [the investigators] with any instructions related to our observation, preservation and/or collection of timepieces" does not mean that Lafarge's attorneys, under whose direction the investigators worked, can be excused from responsibility for the unacceptable conduct of investigators whom the attorneys hired and supervised, and from whom they received information and evidence the investigators collected.  <u>Id.</u> at ¶ 11.

Second, the conduct is offensive to the court because the Federal Rules of Civil Procedure provide mechanisms by which Lafarge and its attorneys, who are officers of the court, could and should have sought judicial authority before invading private property without the owners' permission.  Rule 27 allows a person "who expects to be a party to an action cognizable in a United States court but cannot presently bring it or cause it to be brought" to petition the court to perpetuate testimony by taking pre-

litigation depositions. Fed. R. Civ. P. 27(a)(1)(A). When granting such a petition, "the court may issue orders like those authorized by" Rule 34. Fed. R. Civ. P. 27(a)(3). Rule 34 provides procedures concerning "Producing Documents, Electronically Stored Information, and Tangible Things, or Entering onto Land, for Inspection and Other Purposes," Fed. R. Civ. P. 34, and therefore would apply to Lafarge's pre-litigation desire to enter and inspect property that belongs to others, <u>not</u> Lafarge or its investigators.

The following chronology demonstrates that Lafarge could have availed itself of Rules 27 and 34. A barge owned by Ingram Barge Company was moored at Lafarge's terminal in the Industrial Canal before Hurricane Katrina. The barge broke free and went through the levee breach into the Lower Ninth Ward during the hurricane on August 28 or 29, 2005, where it allegedly caused the damages that are the subject of these consolidated actions.

Although this court's building in New Orleans was closed from the date the hurricane made landfall until November 1, 2005, the court was operating out of and accepting pleadings in the federal courthouses in Baton Rouge, Houma and Lafayette, Louisiana, soon after Hurricane Katrina had passed. On September 26, 2005, a class action complaint was filed against Ingram Barge in this court for damages allegedly caused by the barge. <u>Parfait Family et al. v. United States et al.</u>, C.A. No. 05-4237,

17

Record Doc. No. 1.  Ingram Barge filed its limitation proceeding on September 29, 2005, alleging that the barge was located at a terminal of one of its customers  and "was in the care, custody and control of others" when it left its moorings.  In re Ingram Barge Company, C.A. No. 05-4419, Record Doc. No. 1.  The Parfait Family plaintiffs filed a third-party complaint against Lafarge in the limitation action on November 3, 2005, C.A. No. 05-4419, Record Doc. No. 12, and filed an amended complaint to add Lafarge as a defendant in their class action on November 15, 2005.  C.A. No. 05-4237, Record Doc. No. 17.

The investigators collected all but one of the timepieces between October 20 and November 12, 2005, with the last one taken on March 9, 2006.  Lafarge reasonably should have known that it was a potential litigant no later than September 29, 2005 when Ingram Barge filed its limitation petition.  That was three weeks before the investigators, under the control of Lafarge's attorneys, took the first stopped clocks from private homes of citizens residing in the Lower Ninth Ward, without their knowledge or permission. Centanni states in his declaration that the reason they collected the timepieces was for potential use in this litigation.  Furthermore, Lafarge became a defendant in the Parfait Family action on November 3, 2005, nine days before the investigators finished their initial round of collecting and four months before they took the last clock.  As a named defendant, Lafarge could have, and should have, used the court's processes to obtain a

18

protective order, seek entry onto land and production of the timepieces, or issue subpoenas duces tecum for the timepieces.  Lafarge's unilateral conduct, through its attorneys and investigators, violated its discovery obligations.  Such abusive conduct is remediable through Rules 37 and 26(c).

"A trial court enjoys wide discretion in determining the scope and effect of discovery."  Sanders v. Shell Oil Co., 678 F.2d 614, 618 (5th Cir. 2000).  The listing in Rule 26(c)(1) of the types of protective orders that the court may issue "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" is nonexclusive.  "Thus a court may be as inventive as the necessities of a particular case require in order to achieve the benign purposes of the rule."  8 Wright & Miller, § 2036 at p. 489; accord Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 179 F.R.D. 77, 80 (D. Conn. 1998); see Sanders, 678 F.2d at 618 (prohibiting plaintiffs from communicating material contained in documents that plaintiffs had purloined from Shell and relieving Shell from obligation to respond to plaintiffs' request for admissions).

A party need not violate a court order before the court can act under Rule 37 to remedy the party's violations of its discovery obligations.  Quela v. Payco-Gen. Am. Creditas, Inc., No. 99 C 1904, 2000 WL 656681, at *6 (N.D. Ill. May 18, 2000) (citing Brandt v. Vulcan, Inc., 30 F.3d 752, 756 n.7 (7th Cir. 1994); Halas v. Consumer Servs.,

Inc., 16 F.3d 161, 164 (7th Cir. 1994); <u>Metropolitan Life Ins. Co. v. Cammon</u>, No. 88 C

5549, 1989 WL 153558, at *3 (N.D. Ill. Nov. 7, 1989)).

> [A]lthough there has been no specific court order, we believe such an order is not required to provide notice that parties must not engage in such abusive litigation practices as coercing witness testimony, lying to the court, and tampering with the integrity of the judicial system.  Because all litigants are presumed to know that contumacious conduct of this sort is absolutely unacceptable, we can properly consider the sanctions available under Rule 37.

<u>Id.</u> (citing <u>United States v. Golden Elevator, Inc</u>., 27 F.3d 301, 302 (7th Cir. 1994)

("Lawyers and litigants who decide that they will play by rules of their own invention

will find that the game cannot be won."); <u>Hal Commodity Cycles Mgmt. v. Kirsh</u>, 825

F.2d 1136, 1139 (7th Cir. 1987) ("The Federal Rules of Civil Procedure, as well as local

rules of court, give ample notice to litigants of how to properly conduct themselves."));

<u>see also</u> <u>Residential Funding Corp. v. DeGeorge Fin. Grp.</u>, 306 F.3d 99, 106-07 (2d Cir.

2002) (citing <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 43 (1991); <u>DLC Mgmt. Corp. v.

Town of Hyde Park</u>, 163 F.3d 124, 135-36 (2d Cir. 1998) ("Even in the absence of a

discovery order, a court may impose sanctions on a party for misconduct in discovery

under its inherent power to manage its own affairs."); <u>Reilly v. Natwest Markets Grp.

Inc.</u>, 181 F.3d 253, 267 (2d Cir. 1999) ("Whether exercising its inherent power, or acting

pursuant to Rule 37, a district court has wide discretion in sanctioning a party for

discovery abuses.")).

Although a court should ordinarily rely on the Federal Rules as the basis for sanctions when parties or their agents engage in bad faith conduct, Natural Gas Pipeline Co. v. Energy Gathering, Inc., 2 F.3d 1397, 1410 (5th Cir. 1993), it is well established that "federal courts enjoy a zone of implied power incident to their judicial duty, and that this inherent power is governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs." F.D.I.C. v. Maxxam, Inc., 523 F.3d 566, 590 (5th Cir. 2008) (quotation and citation omitted). "When a party's deplorable conduct is not effectively sanctionable pursuant to an existing rule or statute, it is appropriate for a district court to rely on its inherent power to impose sanctions." Carroll v. The Jaques Admiralty Law Firm, P.C., 110 F.3d 290, 292 (5th Cir. 1997) (citing Chambers, 501 U.S. at 50; Natural Gas Pipeline Co., 2 F.3d at 1406). "The purpose of the inherent power is to control the litigation before . . . [the court]. . . . [A] district court may sanction parties for conduct that occurs in portions of the court proceeding that are not part of the trial itself . . . when a party engages in bad-faith conduct which is in direct defiance of the sanctioning court." F.D.I.C., 523 F.3d at 591 (quotation and citations omitted) (emphasis in original).

Thus, federal courts have severely sanctioned litigants and/or their attorneys[1] who have engaged in bad faith behavior, even when some of the behavior occurred before the party was involved in the litigation.  See, e.g., Chambers, 501 U.S. at 36-41 (defendant and his attorney, knowing that plaintiff intended to file suit for specific performance of a contract, committed pre-litigation fraudulent acts); Jackson v. Microsoft Corp., 78 Fed. Appx. 588, 2003 WL 22359615 (9th Cir. 2003) (before leaving his employment at Microsoft, plaintiff either himself stole or paid a co-employee to take defendant's confidential and privileged documents, and plaintiff produced altered documents in discovery in attempt to conceal their source); Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc., No. 1:04-CV-1015-JOF, 2007 WL 2479290, at *1-2 (N.D. Ga. Aug. 28, 2007) (defendant intercepted attorney-client privileged e-mails from opponent before and after lawsuit was filed).

---

[1]Concerning attorney conduct, the Fifth Circuit has stated:
> The inherent power to sanction bad faith conduct must extend to reach individuals and conduct not directly addressed by other mechanisms.  Although it is unclear whether the inherent power to sanction discovery abuses extends to abuses committed by non-parties, there is no doubt that this power may be applied to attorneys in the case.  The inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it.

Natural Gas Pipeline Co., 2 F.3d at 1411 (citations and quotation omitted); see also Roadway Express, Inc. v. Piper, 447 U.S. 752, 766 (1980) ("The power of a court over members of its bar is at least as great as its authority over litigants.").

In the instant case, Lafarge not only could have anticipated that litigation was reasonably foreseeable, but actually did foresee it and began to acquire potentially relevant evidence weeks before it was formally named as a defendant.  It did so by entering the private residences of individual citizens without permission or authority, and taking their private possessions for its own use in this litigation, without even attempting to obtain authority by use of the court's available Rules and processes.

Furthermore, the crime-fraud exception may nullify a party's attorney-client privilege and work product protection when the privileged "communication or work product is intended to further continuing or future criminal or fraudulent activity."  In re Grand Jury Subpoena, 419 F.3d 329, 335 (5th Cir. 2005) (quotation and citation omitted). The party seeking to overcome the privilege "bears the burden of establishing a prima facie case that the attorney-client relationship was intended to further criminal or fraudulent activity."  Id. (quotation and citation omitted).

The burden of establishing a prima facie case of crime for this purpose in the civil discovery context is not great and is certainly less than the standard that a district attorney or other prosecutor would use in pursuing criminal charges.  There is no evidence that any criminal charges have been filed against any of the investigators, but it is not necessary for purposes of the instant motion either that such charges be brought or that the PSLC "come forward with proof sufficient to establish the essential elements

of a crime or fraud beyond a reasonable doubt, since the crime-fraud exception does not require a <u>completed</u> crime or fraud but only that the client have consulted the attorney in an <u>effort</u> to complete one." <u>In re Grand Jury Proceedings</u>, 87 F.3d 377, 381 (9th Cir. 1996) (citing <u>In re Grand Jury Subpoena Duces Tecum</u>, 731 F.2d 1032, 1039 (2d Cir. 1984)); <u>accord</u> <u>In re Napster, Inc. Copyright Litig.</u>, 479 F.3d 1078, 1090 (9th Cir. 2007); <u>In re Grand Jury Investigation</u>, 445 F.3d 266, 279 (3d Cir. 2006); <u>In re Public Defender Serv.</u>, 831 A.2d 890, 910 (D.C. 2003).

"To make the necessary prima facie showing for the application of the crime-fraud exception here, [the PSLC] must produce evidence 'such as will suffice until contradicted and overcome by other evidence . . . [or, in other words,] a case which has proceeded upon sufficient proof to that stage where it will support [a] finding <u>if evidence to the contrary is disregarded</u>.'" <u>Id.</u> (quoting <u>In re Grand Jury Proceedings</u>, 641 F.2d 199, 203 (5th Cir. 1981) (internally quoting <u>Black's Law Dictionary</u>)) (emphasis added); <u>see also</u> <u>Southern Scrap Mat'l Co. v. Fleming</u>, No. 01-2554, 2003 WL 21474479, at *2 (E.D. La. June 18, 2003) (Knowles, M.J.) ("Tests enunciated by [other] Circuits are comparable and provide that the [proponent of the exception] must show (1) evidence that, <u>if believed by a trier of fact</u>, would establish that fraud [or crime] was ongoing or planned at the time the documents were created, and (2) the communications were made in furtherance thereof.") (citing <u>In re Grand Jury Proceedings</u>, 183 F.3d 71, 78 n.6 (1st Cir. 1999);

24

Haines v. Liggett Group, Inc., 975 F.2d 81, 95-96 (3d Cir. 1992); In re Grand Jury

Investigation, 842 F .2d 1223, 1226 (11th Cir. 1987); In re Sealed Case, 676 F.2d 793,

815 (D.C. Cir. 1982)) (emphasis added).

The crime of unauthorized entry of a dwelling during an emergency or disaster,

which the PSLC has cited, did not exist when the Centanni investigators collected the

timepieces between October 20, 2005 and March 9, 2006.[2] However, the record evidence

is sufficient to establish a prima facie case that the investigators, under the control of

Lafarge's attorneys, may have committed simple burglary, theft, criminal trespass and/or

looting (crimes cited by the PSLC) or unauthorized entry of an inhabited dwelling (a

crime that the PSLC did not cite but which was in effect when the takings occurred).

A prima facie case of simple burglary or theft requires proof of criminal intent.

See La. Rev. Stat. § 14:62 ("Simple burglary is the unauthorized entering of any

dwelling, vehicle, watercraft, or other structure, movable or immovable, or any cemetery,

with the intent to commit a felony or any theft therein . . . ."); id. § 14:67 ("Theft is the

misappropriation or taking of anything of value which belongs to another, . . . without

---

[2] The statute creating this crime, La. Rev. Stat. § 14:62.7, was enacted on June 2, 2006. 2006
La. Acts No. 199 § 1 (2006). Statutes do not operate retroactively absent an express statement by
the Legislature. La. Rev. Stat. § 1:2; State v. Collins, 370 So.2d 533 (La. 1979). Section 14:62.7
contains no such statement. Therefore, while this new statute clearly expresses the displeasure of
the Louisiana Legislature with conduct such as that in which the Centanni investigators and others
engaged in the immediate aftermath of Hurricane Katrina, the investigators could not have violated
this particular statute.

the consent of the other to the misappropriation or . . . .  An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential."). Lafarge's investigators admittedly entered into homes intentionally and took something of value without the consent of the owners of the buildings or the timepieces. Their intent to keep the timepieces permanently could be inferred from their actions, which includes having kept the timepieces for almost three years without any attempt to locate or notify the rightful owners.  Centanni's declaration that his investigators did not intend to keep the timepieces permanently may be disregarded, according to the well established Fifth Circuit law cited above.  His denial of such an intent would certainly be a defense, but would be subject to a credibility determination by the factfinder.  At this stage, that credibility fact dispute is inadequate to defeat the inference of criminal intent necessary to establish a prima facie case of simple burglary or theft.

The crimes of simple burglary (quoted above), unauthorized entry of an inhabited dwelling, looting and criminal trespass also require proof of a lack of authority to enter the property.  Unauthorized entry of an inhabited dwelling is defined as "the intentional entry by a person without authorization into any inhabited dwelling or other structure belonging to another and used in whole or in part as a home or place of abode by a person."  Id. § 14:62.3(A).

26

Looting is the intentional entry by a person without authorization into any dwelling or other structure belonging to another and used in whole or in part as a home or place of abode by a person, or any structure belonging to another and used in whole or in part as a place of business, or any vehicle, watercraft, building, plant, establishment, or other structure, movable or immovable, in which normal security of property is not present by virtue of a hurricane, flood, fire, act of God, or force majeure of any kind, or by virtue of a riot, mob, or other human agency, and the obtaining or exerting control over or damaging or removing property of the owner.

Id. § 14:62.5.

Criminal trespass is defined as follows:

A.  No person shall enter any structure, watercraft, or movable owned by another without express, legal, or implied authorization.
B.  No person shall enter upon immovable property owned by another without express, legal, or implied authorization. . . .
D.  It shall be an affirmative defense to a prosecution for a violation of Subsection A, B, or C of this Section, that the accused had express, legal, or implied authority to be in the movable or on the immovable property.

Id. § 14:63.

Lafarge argues that its investigators had legal authorization to enter the various properties from law enforcement authorities in the Lower Ninth Ward and that the same authorities did not prevent the investigators from taking the timepieces.  This argument is not supported by Centanni's declaration or any other evidence.  Centanni does not aver that any law enforcement officer gave the investigators permission to enter homes and remove personal property that they did not own from immovable property that they did not own.  As discussed above, Centanni's declaration is evasive and deficient concerning

27

the permission they received from law enforcement authorities "to enter the Lower Ninth Ward of New Orleans" and the fact that "[l]aw enforcement authorities . . . observed . . . our collection of timepieces . . . [but] did not interrupt our activities." This does <u>not</u> constitute permission to enter the private residences of citizens in that neighborhood or to "collect" their private property.  This is <u>not</u> a case of first responders attempting to preserve life or property during an emergency, which would be a public safety interest that might rival the private property rights that the investigators violated in this instance. A civil litigant's mere desire to preserve evidence for a lawsuit cannot trump the fundamental, legal and constitutional rights of persons to be secure in their property from unauthorized entry and taking of property, even if that property has been damaged in the course of a disaster.

Centanni declares that "[n]o one from Lafarge North America, Inc. has ever provided [him or his investigators] with any instructions related to our observation, preservation and/or collection of timepieces."  Record Doc. No. 14628-2, Centanni declaration at ¶ 11.  Lafarge therefore argues that, even if the investigators committed a crime, the PSLC has not shown that <u>Lafarge itself</u> made any communication to its attorneys in furtherance of the crime.  Making no finding at this time concerning the credibility of Centanni's statement, it suffices that "[i]n applying [the crime-fraud] exception to the doctrine of privilege, it is the client's purpose which is controlling . . . ."

United States v. Neal, 27 F.3d 1035, 1048-49 (5th Cir. 1994) (quotation omitted); see also United States v. Ballard, 779 F.2d 287, 292 (5th Cir. 1986) (the crime-fraud exception attaches "when the lawyer becomes either the accomplice or the unwitting tool in a continuing or planned wrongful act").

I find that this argument, which is disingenuous at best, does not defeat the crime-fraud exception. Centanni states that his investigators took the timepieces "out of a concern that they would be lost or destroyed" and that they "are storing the timepieces so that they can be used later in this litigation." Record Doc. No. 14628-2, Centanni declaration at ¶¶ 3, 9. The only entity who would benefit by such use is Lafarge–not its attorneys or investigators, who would have no motive to act except in Lafarge's interest. Either Lafarge, its attorneys or its investigators are paying for the continued storage of the timepieces. Certainly, Lafarge arranged for the PSLC attorneys to inspect them. Lafarge has neither repudiated the actions of its attorneys and investigators in taking and keeping the timepieces, nor has it made any effort to return the timepieces to their owners. If Lafarge did not direct the misappropriations when they occurred almost three years ago, it has at least ratified its agents' actions in doing so. Florida v. Stokes, 944 So. 2d 598, 602 (La. App. 1st Cir. 2006); North Am. Specialty Ins. Co. v. Employers Reinsurance Corp., 857 So. 2d 606, 609-10 (La. App. 1st Cir. 2003).

Having carried its burden to show a prima facie case that a crime was committed, the PSLC must "demonstrate that the privileged information bears a relationship to the alleged crime or fraud." Southern Scrap Mat'l Co., 2003 WL 21474479, at *2. Lafarge is correct that the crime-fraud exception would not vitiate its attorney-client privilege or work product protection as to "Lafarge's entire course of dealing with putative class members," which the PSLC seeks. See In re Grand Jury Subpoena, 419 F.3d at 343 ("[T]he proper reach of the crime-fraud exception . . . does not extend to all communications made in the course of the attorney-client relationship, but rather is limited to those communications and documents in furtherance of the contemplated or ongoing criminal or fraudulent conduct."). Thus, I find that the exception applies only to those communications and work product dealing with the investigators' entry onto the property of others and the collection, preservation and storage of the timepieces.

Even if the crime-fraud exception did not apply, I find that Lafarge has effectively waived its attorney-client privilege and work product protection concerning the timepieces for basically the same reasons that I previously found that Lafarge's surreptitious tape recording of witness interviews vitiates these protections as to those interviews. See Record Doc. No. 12605, at pp. 6-12. In short, like the secret tape recording of witness statements, unauthorized entry into people's homes and the taking of their personal possessions without permission is unacceptable conduct. Regardless

30

of the circumstances, the conduct of Lafarge's investigators, who had been hired by and working in conjunction with its attorneys, in invading people's homes and taking their possessions, of whatever value, without notice to or permission from either the owners or the court, cannot be condoned by this court.  Other ways to preserve evidence, short of purloining it, including obtaining a court order permitting inspection, photographing or videotaping the timepieces in place, dictating an audio recording or writing a detailed description of the items while they remained on the property, were available.  Centanni states in his declaration that the investigators photographed two grandfather clocks that were too large to take, so clearly photography was a viable option.

In the context of recordings of fact events, several district courts have observed that, whether

> surreptitious or not, the real value of the recording is not in impeaching a witness, but in the facts and issues determined by the recording. . . .  [I]t has been noted that not only may those surveilled or recorded be tempted to alter the truth, but also those conducting the surveillance or recording [may be tempted].  A party manufacturing evidence will likely produce it in a fashion presenting his or her case in a most favorable light.  Unfavorable evidence may well not be gathered or [may be] conveniently lost or discarded.

Pro Billiards Tour Assoc., Inc. v. R.J. Reynolds Tobacco Co., 187 F.R.D. 229, 232 (M.D.N.C. 1999); accord Gray v. Oracle Corp., No. 2:05-CV-534TS, 2006 WL 1472748, at *2-3 (D. Utah May 24, 2006); Mason v. T.K. Stanley, Inc., 229 F.R.D. 533, 536 (S.D.

Miss. 2005); Jerolimo v. Physicians for Women, P.C., 238 F.R.D. 354, 357 (D. Conn. 2006); Stamps v. Encore Receivable Mgmt., Inc., 232 F.R.D. 419, 423 (N.D. Ga. 2005). The presence of this temptation may undermine the truth-seeking function when the party who "manufactured" the evidence intends to use it at trial to prove the truth of its case. Pro Billiards Tour Assoc., 187 F.R.D. at 232.

The same problem is presented in the instant case. Although the Centanni investigators did not "manufacture" the timepieces, they chose which ones to take and to preserve. Lafarge will use the timepieces at trial if it believes that they will support its theory of the case. Lafarge's waiver of its attorney-client privilege and work product doctrine, limited to this conduct, means that plaintiffs can know the circumstances, criteria, objectives and instructions surrounding the investigators' choices of the stopped timepieces selected for taking, which will aid a factfinder in determining the weight to assign to the evidence.

For all of the foregoing reasons, the court enters the following protective order:

(1) IT IS ORDERED that Lafarge, at its own expense, must continue to preserve, protect and store the timepieces and must make every effort to return each and every one of them to their rightful owners as soon as possible, as provided herein. Lafarge's obligations in this regard will continue in effect until each and every taken piece of private property is returned to its rightful owner, or until otherwise ordered by this court.

(2)  IT IS FURTHER ORDERED that Lafarge, at its own expense and no later than October 22, 2008, must identify and locate the owner of each misappropriated timepiece and provide actual notice, in writing, to the owner that Lafarge has taken that person's personal property and is under a court order to return it.  The notice must state that, if the owner wants to recover the timepiece from Lafarge, the owner should contact the PSLC and provide it with an affidavit or other evidence concerning the person's ownership of the timepiece and the person's current address.  Proof of service of that notice must be filed in this court record no later than October 22, 2008.  As to any timepiece owner who requests action, the PSLC must then move for a court order on behalf of the owner to have the timepiece returned to its owner.  The motion must be noticed for hearing before me, so that any party may contest the assertion of ownership. The PSLC should attach to its motion, in addition to the owner's affidavit sufficient to establish ownership, a statement concerning any attorney's fees and other costs incurred by the PSLC and/or the owner arising from the deprivation of the owner's personal property and/or in connection with the motion.  If the motion is granted, the court will order Lafarge and/or its attorneys to pay such reasonable attorney's fees and costs immediately.

(3) IT IS FURTHER ORDERED that Lafarge has waived its attorney-client privilege, work product protection and/or any other privilege concerning the protected

details of witness interviews insofar as the interviews relate to the misappropriated timepieces; the identity and involvement of each participant in the allegedly criminal conduct; all documents concerning the allegedly criminal conduct and the timepieces; and all communications between Lafarge, its counsel, Centanni's investigators and/or third parties, and any work product documents, concerning the entry of private residences and the taking of timepieces.  Accordingly, no later than October 22, 2008, Lafarge must provide to the PSLC the names and addresses of each participant in the collection of the timepieces; all documents concerning that conduct and the stopped timepieces, including portions of witness statements relating to the timepieces; and all communications between or among Lafarge, its counsel, Centanni Investigative Agency and/or third parties, and any formerly work product documents, concerning the timepieces.

New Orleans, Louisiana, this 22nd day of September, 2008.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE