UNITED  STATES  DISTRICT  COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, Robinson (06-2268) | § | |
| | § | |

DEFENDANT UNITED STATES' MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT

The United States has moved for a summary judgment on Plaintiffs' claim that the

negligent "operation and maintenance" of the Mississippi River-Gulf Outlet caused Plaintiffs'

alleged damage.  Plaintiffs allege that the dredging of the MRGO and the absence of

adequate bank stabilization caused the flooding of their properties.  They theorize that those

acts and omissions allowed the channel to widen, weakening the levees and causing

wetlands to deteriorate.  First Amended Complaint ¶¶ 53, 84 (Record Doc. 13527-2)

[hereinafter FAC].  They assert that the widening of the channel and the loss of wetlands

"intensified"and "accelerated" storm surge, "triggering the collapse of so much of the levee

system."  Id. ¶¶ 1, 80.

The Court should grant a summary judgment on this part of Plaintiffs' claim because they have failed to identify sufficient facts to sustain their allegation that the collapse of the levees and the flood that followed were caused by the negligent "operation and maintenance" of the MRGO.  Plaintiffs' experts used computers to simulate the surge that the hurricane would have produced if the MRGO had been perfectly maintained and "operated" throughout its 50 year existence, with no impact whatsoever on neighboring wetlands.  They also simulated the surge produced by the hurricane.  By comparing the two, they ironically discovered that perfect "operation and maintenance" of the MRGO would have increased surge by an inch or two at the critical MRGO Reach 2 levee.

Plaintiffs' experts went on to report that perfect "operation and maintenance" (defined as keeping the waterway at its design dimensions, with no impact on wetlands) would have reduced the largest significant waves at the Reach 2 levee from about seven feet to six.  Crucially, however, Plaintiffs' experts did not analyze whether the smaller waves would have resulted in less breaching or flooding than occurred during the storm.  Because they did not analyze the flooding that would have occurred in a "no negligence" scenario—i.e., what would have happened "but for" the alleged negligence—Plaintiffs cannot identify sufficient facts to sustain their claim that the negligent "operation and maintenance" of the MRGO caused their alleged damage.  Without the assistance of expert opinion, the finder of fact cannot determine where, when, and how extensively the Reach 2 levee would have breached if the surge had been a bit lower and the waves slightly higher.

The silence of Plaintiffs' experts as to the breaching and flooding that would have occurred if the MRGO had been perfectly operated and maintained is fatal to the so-called "negligent operation and maintenance" part of their case. Plaintiffs' experts have produced their final reports, and those reports contain complete statements of all opinions the witnesses will express and the bases and reasons for them. Fed. R. Civ. P. 26(a)(2)(B). At this stage of the litigation, a summary judgment in favor of the United States should be entered because Plaintiffs have failed to identify sufficient facts to sustain this part of their claim.[1]

---

[1]If this motion is granted and the pending motion to dismiss Counts Two and Three is granted, all that will be left is the so-called "negligent design and construction" part of the case. That part of the case, however, is patently barred by 28 U.S.C. § 2680(a), and a motion to dismiss or, in the alternative, for summary judgment is being prepared to dispose of it.

UNCONTESTED FACTS[2]

On the morning of August 29, 2005, Hurricane Katrina struck southeast Louisiana and triggered what would become one of the worst natural disasters ever to befall an American city.  Undisputed Fact No. 1.  The storm overtopped levees and floodwalls throughout southeast Louisiana.  UF2.  The storm also caused the levees and floodwalls in the New Orleans area to fail or breach in more than 50 locations.  UF3.  Water rushed into New Orleans and flooded over 80 percent of the city—more than ten feet deep in some neighborhoods.  UF4.  Flooding of the city of New Orleans was caused by several sources (or causes):  breaches, overtopping (of the levees and flood control structures), and rainfall.  UF5.

Plaintiffs' experts used computers to model not only the surge that Hurricane Katrina produced but also the surge that the hurricane would have produced if the topography of the Lake Borgne region had been different than it was when the storm struck.  They simulated the surge in a total of six scenarios.  UF6.  Three are of note.  First, they simulated the surge

---

[2]Every fact under this heading comes directly (verbatim, in most instances) from the reports of Plaintiffs' experts.  The citations here are to Defendant's Statement of Uncontested Facts, which is being filed contemporaneously with this motion and sets forth full citations to the reports.   Inasmuch as Plaintiffs' experts were employed by Plaintiffs to investigate and analyze the Hurricane Katrina flood, their reports are admissions of Plaintiffs and not subject to dispute by them.  See Collins v. Wayne Corp., 621 F.2d 777, 781-82 (5th Cir. 1980); Samaritan Health Ctr. v. Simplicity Health Care Plan, 459 F. Supp. 2d 786, 799 (E.D. Wis. 2006); Steel Coils, Inc. v. M/V Lake Marion, 2001 WL 1191055, at *2 (E.D. La. Oct. 5, 2001) (Vance, J.); cf. Webster v. Offshore Food Serv. Inc., 434 F.2d 1191, 1193-94 (5th Cir. 1970) (expert testimony on causation can support motion for summary judgment).  For the sole purpose of showing that Plaintiffs have not carried their burden of proving causation, Defendant does not contest these facts or the conclusions of Plaintiffs' experts.  Should this motion for partial summary judgment be denied, however, Defendant will contest many of these facts and the conclusions reached by Plaintiffs' experts and will show that some of them are so flawed as to be inadmissible as evidence.

that developed across the land and seascape that actually existed on August 29, 2005— the "Katrina Real Run" scenario. UF7. Second, they simulated the surge that would have developed if there had been no MRGO when the storm struck and the wetlands had been in pristine condition—the "No MRGO" scenario. UF8. Third, they simulated the surge that would have developed if the MRGO had been at its design dimensions (depth and width) and the wetlands pristine—the "MRGO as Designed" scenario. UF9.

Plaintiffs' experts compared the storm surge in the "MRGO as Designed" scenario to the surge in the "Katrina Real Run" scenario and concluded that the surges were "almost similar." UF10. Their models showed that the surge at the MRGO Reach 2 levee in the "MRGO as Designed" scenario would have been slightly (less than 2.4 inches) higher. UF11. At the Reach 1 levees and the IHNC floodwalls the simulated "MRGO as Designed" surge was lower by five and six inches respectively. UF12.

Plaintiffs' experts also modeled the waves that were produced by the storm, and they modeled the waves that would have been produced in the "MRGO as Designed" scenario. UF13. They concluded that the "significant" wave height on the MRGO Reach 2 levee in the "MRGO as Designed" scenario would have been "roughly" one foot lower than the height in the "Katrina Real Run" scenario. UF14.

Plaintiffs' experts modeled erosion and breach development in only two scenarios—the "Katrina Real Run" scenario and the "No MRGO" scenario. UF15. Consequently, they simulated the flow of water through breaches into the St. Bernard and New Orleans East polders in only those two scenarios. UF16. They did not model the effect

of surge and waves on levees and floodwalls in the "MRGO as Designed" scenario—the "no negligence" scenario—nor did they simulate flooding in the "MRGO as Designed" scenario. UF17.

Based on a simulation of the flow of water in the "Katrina Real Run" scenario, Plaintiffs' experts concluded that overtopping and breaching were the main causes of flooding in New Orleans East.  UF18.  On the same basis they also concluded that "the main causes for the flooding of the populated area inside the St. Bernard bowl [we]re the breaches in the IHNC and MRGO."  UF19.  The overtopping of the MRGO levee during Hurricane Katrina was not even enough to fill the wetlands basin between the MRGO and the 40-Arpent levee up to the crest elevation of the 40-Arpent levee.  UF20.

## STANDARD OF REVIEW

"Rule 56 is a means of disposing of meretricious disputes and serves the 'very mission' attributed to it by the Advisory Committee: 'to pierce the pleadings and to assess the proof to see whether there is a genuine issue for trial.'"  Prof'l Managers., Inc. v. Fawer, Brian, Hardy & Zatzkis, 799 F.2d 218, 222-23 (5th Cir. 1986) (footnotes omitted).

"A party against whom relief is sought may move at any time . . . for summary judgment on all or part of the claim," and summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(b), (c). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Green v. United States, Civ. No. 02-616, 2003 WL 22909075, at *2 (E.D. La. Dec. 4, 2003) (Duval, J.). If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). "[S]ummary judgment is appropriate in any case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'" Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting Armstrong v. City of Dallas, 997 F.2d 62 (5th Cir.1993)).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant "need not negate the elements of the nonmovant's case." Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005).

> Once the movant meets this burden, the burden shifts to the non-movant "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." [Celotex Corp., 477 U.S.] at 322. "[M]ere allegations or denials" will not defeat a well-supported motion for summary judgment. Fed. R. Civ. P. 56(e). Rather, the non-movant must come forward with "specific facts"that establish an issue for trial. Id.

Green, 2003 WL 22909075, at *2.

Moreover, a "more lenient standard for summary judgment" exists in nonjury cases such as this one. U.S. Fid. & Guar. Co. v. Planters Bank & Trust Co., 77 F.3d 863, 865 (5th

Cir. 1996).  "[A]t the summary judgment stage a judge in a bench trial has the limited

discretion to decide that the same evidence, presented to him or her as trier of fact in a

plenary trial, could not possibly lead to a different result." Id. at 866 (citing Nunez v.

Superior Oil Co., 572 F.2d 1119, 1124 (5th Cir.1978)).  "'If a decision is to be reached by the

court, and there are no issues of witness credibility, the court may conclude on the basis of

the affidavits, depositions, and stipulations before it, that there are no genuine issues of

material fact, even though decision may depend on inferences to be drawn from what has

been incontrovertibly proved.'"  Id. (quoting Nunez).  This is true even if the court's legal

"conclusion is deemed 'factual' or involves a 'mixed question of fact and law.' . . . The judge,

as trier of fact, is in a position to and ought to draw his inferences without resort to the

expense of trial."  Nunez, 572 F.2d at 1124 (citations omitted).


## ARGUMENT

### SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE THERE IS NO EVIDENCE THAT THE EXPANSION OF THE MRGO AND THE LOSS OF ADJACENT WETLANDS CAUSED PLAINTIFFS' ALLEGED FLOOD DAMAGE.

Summary judgment should be granted because there is no genuine dispute as to any

fact material to the averment that the "operation and maintenance" of the MRGO caused

Plaintiffs' alleged damage.  FAC ¶¶ 1, 102.  Proving causation is Plaintiffs' burden, and

Plaintiffs must therefore prove that the alleged negligent dredging of the MRGO and the

failure to prevent the waterway from widening and diminishing nearby wetlands caused

their alleged damage.  See Audler v. CBC Innovis, Inc., 519 F.3d 239, 249 (5th Cir. 2008);

Burmaster v. Plaquemines Parish Gov't, 982 So.2d 795, 808 (La. 2008); Matthieu v. Imperial

Toy Corp., 646 So. 2d 318, 322 (La. 1994); cf. 28 U.S.C. § 1346(b) ("law of the place where the

act or omission occurred" determines FTCA liability); Cleveland v. United States, 457 F.3d

397, 403 (5th Cir. 2006) (law of state where claim arose determines liability).  To prove

"causation in fact" Plaintiffs must demonstrate that the alleged negligent operation and

maintenance were substantial factors in bringing about the alleged damage and that "but for"

the widening of the waterway and the loss of wetlands the alleged damage would have been

less or would not have occurred at all.  See Westchester Fire Ins. Co. v. Haspel-Kansas Inv.

P'ship, 342 F.3d 416, 420-21 (5th Cir. 2003); Bonin v. Ferrellgas, Inc., 877 So. 2d 89, 94 (La.

2004); Roberts v. Benoit, 605 So. 2d 1032, 1042 (La. 1992); Fowler v. Roberts, 556 So. 2d 1, 5

& n.6 (La. 1990).

 Put differently, the widening of the waterway and the loss of wetlands were

causes-in-fact if they were "necessary antecedents" of Plaintiffs' damage.  If the alleged

damage "would have occurred irrespective of the negligence of the [defendant], then his

negligence was not a substantial factor or cause-in-fact."  Dixie Drive It Yourself Sys. v.

Amer. Bev. Co., 137 So. 2d 298, 302 (La. 1962); see also In re Air Crash Disaster Near New

Orleans, 764 F.2d 1084, 1092 (5th Cir. 1985); Rodgers v. Missouri Pac. Ry. Co., 405 So. 2d

571, 574 (La. Ct. App. 1981); Yates v. Brown, 344 So. 2d 37, 39 (La. Ct. App. 1977; Muse v.

East Texas Grocery Co., 11 So. 2d 250, 253 (La. Ct. App. 1942).  "A counter-factual

hypothesis is recommended as a step in determining cause-in-fact. That is, assuming that the

conduct of the tortfeasor was 'corrected,' is it probable that the plaintiff would still have

sustained the damages complained of.  If so, then defendant's substandard conduct was not a cause-in-fact."  Boteler v. Rivera, 700 So. 2d 913, 916 (La. Ct. App. 1997) (internal citation omitted); see also Craig v. Burch, 228 So. 2d 723, 729 (La. Ct. App. 1969).

To understand the surge generated by Hurricane Katrina, Plaintiffs' experts studied six scenarios in which the hurricane's forces were brought to bear on six topographic models of the Lake Borgne region.  L. De Wit et al., Flow Modeling New Orleans– Mississippi River Gulf Outlet 4-5 (Final Report) (June 23, 2008) (Ex. 1) [hereinafter Katrina Surge Report]. Two of those scenarios are essential to an understanding of the hydraulic effects of the widening of the MRGO and the loss of wetlands.  Those scenarios are Plaintiffs' Scenario 1, which they have dubbed the "Katrina Real Run" scenario, and Plaintiffs' Scenario 3, which can be dubbed the "MRGO as Designed" scenario.  The "Katrina Real Run" scenario "simulate[s] the actual Katrina event with the topography and geomorphology as present in early August 2005 including the MRGO channel (Reach 1 and 2); the MRGO levees and the highly degraded wetlands."  Id. at 4.  "Scenario 1 is the 'Katrina real run.' . . . Here the model is run to as precisely as possible mimic the physical environment immediately prior to Hurricane Katrina's landfall, and the actual Katrina storm."  Id. at 7.  The "MRGO as Designed" scenario (Plaintiffs' Scenario 3) "reflects the 1958 healthy wetlands with a MRGO maintained at authorized dimensions (depth and width MRGO as designed, pre-Katrina levees along MRGO)."  Id. at 5; accord id. at 64.  The "MRGO as Designed" scenario is therefore the "counter-factual hypothesis," in which the Corps's alleged negligent conduct is

"corrected" by eliminating any widening of the waterway and restoring the wetlands to their pre-MRGO state.

Plaintiffs' experts concluded that no substantial change in surge was obtained by "correcting" the conditions that allegedly resulted from the Corps's operation and maintenance of the MRGO:

> The hydrographs for Scenario 1 and Scenario 3 are almost similar; however some small differences are visible.  At Lake Borne (MRGO Reach 2 and GIWW@ NOE Back Levee) the surge peak [in] the Scenario 3 hydrograph is a tiny bit higher (increase <0.2 ft) than Scenario 1.  Reason is the reduced size of the MRGO in Scenario 3 which reduces the transport capacity of water away from the peak surge at Lake Borgne.  At the MRGO Reach 1 and the IHNC this mechanism is also visible, but now works the other way.  The peak surges are reduced in Scenario 3 at the MRGO Reach 1 (reduction up to 0.4 feet) and in the IHNC (reduction up to 0.5 feet).

Id. at 90.  In short, Plaintiffs' own experts concluded that the loss of wetlands and the widening of the MRGO decreased surge at the most critical location, the Reach 2 levee, while increasing it in others by five or six inches.  The extreme similarity between the "Katrina Real Run" surge and the "MRGO as Designed" surge can be seen in the hydrographs that appear as Figure 2.38 in the Katrina Surge Report.  See id. at 92-97.  As the report notes, the dotted red line that depicts the "MRGO as Designed" (Scenario 3) surge cannot even be seen in most of the hydrographs because it "lies under" the solid blue line that depicts the Scenario 1 ("real run") surge.  Id. at 92-97.  At most locations, the surge rose and fell at

virtually the same times and rates in both scenarios.  The differences are too slight to be depicted.[3]  See id.

Plaintiffs' experts also modeled the "Katrina Real Run" waves and the "MRGO as Designed" waves.  See C. Gautier et al., Wave Modeling New Orleans—Mississippi River Gulf Outlet 8 (Final Report) (July 9, 2008) (Ex. 3).  They concluded that the widening of the waterway and the loss of wetlands increased the largest significant wave height at the MRGO Reach 2 levee by about 12 inches and allowed the larger waves to strike a wider area of the levee.  See id. App. E at 35.  But for the alleged negligence, the largest waves would have been about six feet high instead of seven.  Id.

Remarkably, Plaintiffs' experts expressed no opinion as to whether the minimally lower surge and slightly larger waves in the "MRGO as Designed" scenario would have made

---

[3]At oral argument in March of this year Plaintiffs' counsel asserted that the MRGO caused three feet of additional surge.  See Mar. 11, 2008, hearing transcript (Ex. 2) at 43-48, 56, 73-75 [hereinafter Hrg. Trans.]; cf. id. at 72 (rebuttal by Defendant's counsel, pointing out that Plaintiffs' counsel's assertion was "just false. It's not supported. . . . The plaintiffs' own experts can't support a number like that. We asked them that in their own deposition, and they say, Well, that's just a guess. We don't really know.").   Plaintiffs' own experts have now issued their reports in which they opine that the overtopping of the MRGO Reach 2 levee would not have caused any flooding, much less this catastrophe.  See UF 9.

Even though Plaintiffs knew that their experts could not support their wild assertions about the MRGO amplifying storm surge, they trumpeted them because it was expedient in opposing Defendant's motion for summary judgment based on 33 U.S.C. § 702c.  At the hearing on the motion, Plaintiffs' counsel asserted that "overtopping is what caused the catastrophic flooding in every location.  Overtopping.  It's undisputed in this record.  And it's overtopped because of the three feet of excess surge caused by MRGO."  Hrg. Trans. at 47; see also id. at 48 ("My point is, I get to trial, I get over this issue . . . merely because of overtopping. . . . [T]hree feet made the dispositive difference here, and that's our proof.").

any difference in the breaching of the MRGO Reach 2 levee.  See Robert Bea & Rune

Storesund, Technical Report No. I:  Analyses of Breaching of MR-GO Reach 2 EBSBs During

Hurricane Katrina & The 'Neutral' MR-GO Hurricane Katrina Conditions, at 46-47 (June 11,

2008) (noting that they did not evaluate effects of 1958 conditions on wave-induced erosion

of levees) (Ex. 4) [hereinafter Bea Technical Report I].  In the absence of such an analysis

Plaintiffs' experts could not, and therefore did not, model the flooding that would have

occurred in the "MRGO as Designed" scenario (Plaintiffs' Scenario 3).  There is therefore

insufficient evidence to lead a rational trier of fact to conclude that "the collapse of so much

of the levee system," FAC ¶ 80, would have been significantly reduced, delayed, or

prevented by careful operation and maintenance of the MRGO.  Without breach modeling,

no rational trier of fact could conclude that Plaintiffs' properties would have escaped

flooding if the waterway had remained unchanged and the wetlands undiminished

throughout the 50-year span of the MRGO.

       The need for expert opinion testimony as to the flooding that would have occurred in

the "MRGO as Designed" scenario is clear.  No layman has a sufficient understanding of the

onset, the rates, or the duration of erosion of the various levees that surrounded Plaintiffs'

properties under hypothetical hydrodynamic loading.  No layman has the ability to

determine the quantities of water that would flow through hypothetical levee breaches or to

determine where floodwaters would go and to what elevations they would rise.  "Expert

testimony is required to prove causation if the matter does not fall within the realm of

ordinary experience and lay comprehension."  Menick v. City of Menasha, 547 N.W.2d 778,

782 (Wis. Ct. App. 1996) (citation omitted); accord Dushane v. Benedict, 120 U.S. 630, 647 (1887); Lewis v. Washington Metro. Area Transit Auth., 19 F.3d 677, 678-79 (D.C. Cir. 1994); see also Aetna Life Ins Co v. France, 91 U.S. 510, 514-515 (1875); Wills v. Amerada Hess Corp, 379 F.3d 32, 46 (2d Cir. 2004); Moody v. Maine Cent. R.R., 823 F.3d 693, 695-96 (1st Cir. 1987); Cannet v. Franklynn Pest Control Co., 985 So. 2d 270, 276 (La. Ct. App. 2008); W. Page Keeton et al., Prosser and Keeton on Torts § 41, at 269 (5th ed. 1984) ("Where the conclusion is not one within common knowledge, expert testimony may provide a sufficient basis for it, but in the absence of such testimony it may not be drawn.").

Plaintiffs' failure to adduce evidence of what would have happened "but for" the alleged negligent operation and maintenance of the MRGO is fatal to that part of their case. It is well established as a matter of Louisiana law that complex causal connections whose existence, if any, is beyond the ability of lay persons to assess must be established by expert testimony.  See Caboni v. Gen'l Motors Corp., 398 F.3d 357, 361 (5th Cir. 2005) (applying La. law) (whether failure of air bag to deploy "enhanced" plaintiff's injuries "'is not a part of the everyday experience of the consuming public," and therefore "jurors would need expert testimony to evaluate this issue'"); Pfiffner v. Correa, 643 So. 2d 1228, 1234 (La. 1994) (causal connection between patient's death and delay in diagnosis and treatment of complex medical condition "is simply beyond the province of lay persons to assess" and therefore must be established through expert testimony); Batiste v. Gen'l Motors Corp., 802 So. 2d 686, 690 (La. Ct. App. 2001) (plaintiff must introduce expert testimony to prove that failure of airbag to deploy caused injuries "[b]ecause matters of longitudinal deceleration and threshold of

deployment are technical matters beyond the expertise of the lay plaintiff"); cf. Morgan v.

Gaylord Container Corp., 30 F.3d 586, (5th Cir. 1994) (applying La. law) (gaps in expert

testimony cannot be filled by judge or jury "by relying on background knowledge and

'common sense'" because testimony left "unanswered questions of engineering and design

that are of sufficient complexity to be beyond the expertise of the average judge and juror");

Gleason v. City of Shreveport, 393 So. 2d 827, 829-30 (La. Ct. App. 1981) (testimony of civil

engineers that vegetation growing in drainage ditches impeded flow of water was

insufficient to establish causation because experts could not "calculate with any degree of

certainty the extent to which the overgrown vegetation or debris in the ditches contributed

to" plaintiffs' alleged flood damage).

When experts fail to analyze an accident fully—especially when they fail to analyze

what would have occurred "but for" the alleged negligent conduct—plaintiffs cannot

establish causation.  Six-year-old Terrance Jones was injured at the intersection of Calhoun

and Chester streets in Shreveport when the bicycle he was riding collided with an

automobile that entered the intersection as the boy was attempting to turn right from

Calhoun onto Chester and overshot the intersection.  The driver claimed that foliage at the

corner of the intersection prevented him from seeing the boy until it was too late to avoid

the collision.  The child's parents brought suit against the driver, his insurer, the owners of

the corner property, and against the city of Shreveport because the intersection was not

controlled by either stop or yield signs or a traffic signal.  Jones v. Hawkins, 731 So. 2d 216,

217 (La. 1999).

The liability of the driver, his insurer, and the property owners was tried to a jury, and the city's liability was tried to the court.  The jury returned a verdict for the driver, his insurer, and the property owners, and the judge found for the city on the ground that it did not have notice of the lack of traffic signs or a signal.  The plaintiffs appealed the findings of no liability.  Id.  The court of appeal reversed as to the property owners and the city, finding that the city had imputed and constructive knowledge of the presence of the foliage and that the property owners knew or should have known that the foliage posed a danger to persons passing through the intersection.  Finding also that the boy's parents were contributorily negligent, the court apportioned fault among the plaintiffs, the property owners, and the city.  Id. at 218.

In the supreme court on the writ of certiorari, the court of appeal's imposition of liability on the city was reversed.  Pertinent here is the supreme court's holding that the plaintiffs had failed to prove that the foliage caused the accident.  The only evidence that the plaintiffs presented on the issue of whether the foliage caused the accident was the testimony of an expert, who opined that the foliage prevented both the boy and the driver from seeing each other until they were both in the intersection.  Id. at 220.  That testimony was not sufficient to establish causation, however, because the expert did not "testify as to what would have happened if the foliage had not been there."  Id.  And because the expert did not study the scenario in which the negligent conduct was "corrected" by removal of the foliage, the evidence did "not indicate that the accident more probably than not could have been avoided if the foliage had not been present."  Id.  "No evidence was presented to show

that the additional vision allowed by the removal of the foliage would more probably than not avoided this chain of events." Id. at 221. Without any evidence that "but for" the negligence the collision would have been avoided, the plaintiffs could not carry their burden of proving causation.

The flood at issue in this case involves issues of causation far more complex than those raised by the collision in which six-year-old Terrance Jones was injured. Plaintiffs' expert Robert Bea produced a 196-page report featuring more than 165 charts, tables, graphs, photographs, and illustrations to explain the basis of his opinions as to the breaching that occurred during the storm (Plaintiffs' Scenario 1, the "Katrina Real Run"). See generally Robert Bea, Declaration No. I: Engineering Forensic Studies of Performance of the Man-made Features Bordering the Reach 2 of the Mississippi River-Gulf Outlet (MR-GO) During Hurricane Katrina (July 11, 2008) [hereinafter Bea Declaration I] (Ex. 14; full copy of report). He produced a 163-page report featuring not fewer than 110 charts, tables, graphs, photographs, and illustrations to set forth his opinions as to the breaching that would have occurred if the MRGO had never been built (Plaintiffs' Scenario 2C, "No MRGO"). See generally Robert Bea, Declaration No. III: Engineering Forensic Studies of Performance of the Man-made Features Bordering the Reach 2 of the Mississippi River-Gulf Outlet (MR-GO) During Hurricane Katrina (July 11, 2008) [hereinafter Bea Declaration III] (Ex. 15; full copy of report). The professor also produced a 252-page technical report to detail his analyses and compare the breaching during those two scenarios. See generally Bea Technical Report I (Ex. 13; full copy of report). No such comparison of Scenarios 1 ("Katrina Real

Run") and 3 ("MRGO as Designed") was made.  Professor Bea expressed no opinion as to the breaching that would have occurred if the MRGO had been operated and maintained with the utmost care.

Plaintiffs' flood modelers produced six reports that, with appendices, total 477 pages. Their reports include hundreds of graphs, charts, maps, and other graphics illustrating the flow of water in the Lake Borgne region.  And while they produced an entire report devoted to modeling the flooding that would have occurred in the "No MRGO" scenario and comparing that flooding to the flooding in the "Katrina Real Run" scenario, they did not model the flooding that would have occurred in the "Katrina as Designed" scenario.  See generally M. Kok et al., Polder Simulations for Greater New Orleans:  the Neutral MRGO Scenario (July 9, 2008) (Ex. 17; full copy of report).

All told, Professor Bea, who modeled breaching, and the Dutch experts, who modeled surge and flooding, produced fifteen reports totaling nearly 2,000 pages.  Yet not one of those reports includes a study of how the levees would have performed during Hurricane Katrina if the MRGO had been at its design dimensions and the wetlands had been in pristine condition.  Not one report describes what parts of the Lower Ninth Ward, St. Bernard Parish, and New Orleans East would have been flooded and to what elevations if the MRGO had been operated and maintained without any impact on wetlands or the adjacent levees.  This crucial omission was not an oversight.  Professor Bea expressly recognized that Scenario 3 was designed "to calculate hydrodynamics in the Lake Borgne/MR-GO region assuming that the MR-GO navigation channel was constructed and the original wetlands/marshes were in

perfect condition, with no reduction in spatial extents from the documented 1956 wetland/marsh conditions."  Bea Technical Report I, at 46-47 (Ex. 4); see also Bea Declaration I, ¶¶ 36-37, at 42 (Scenario 3 "provide[s] insights into the affects [sic] of the MR-GO design, construction, operation, and maintenance parameters important to the performance characteristics of the" levees) (Ex. 5); Bea Declaration III, ¶¶ 61-62, at 50 (same) (Ex. 6).

The astounding silence as to any breach or flood modeling in a "no negligence" scenario brings to mind "the curious incident of the dog in the night-time," to which Holmes drew Inspector Gregory's attention in "The Silver Blaze."[4]  Plaintiffs' experts performed elaborate tests, created elegant models, and produced elephantine reports detailing their opinions as to the breaching and flooding that occurred in two scenarios:  the "Katrina Real Run" scenario, which simulates what happened during the storm, and the "No MRGO" scenario, which simulates what would have happened if the MRGO had never been built. They did not use their elaborate tests and elegant models to show what would have occurred if the MRGO, following construction, had been perfectly maintained and operated, with absolutely no impact on the wetlands.  Just as the dog that did not bark was the key to Holmes's case, Plaintiffs' silence as to the flood that would have occurred in a "no negligence" scenario is the key to this one.

---

[4]Arthur Conan Doyle, The Adventures and Memoirs of Sherlock Holmes 272 (Modern Library 2002).

Even though a comparison of the "Katrina Real Run" scenario and the "MRGO as Designed" scenario was necessary to ascertain whether breaching (and, hence, flooding) was affected by the widening of the channel and the loss of wetlands prior to Hurricane Katrina, not one of Plaintiffs' experts reported performing the analyses necessary to such a comparison.  Plaintiffs therefore cannot carry their burden of proving that the alleged negligent operation and maintenance of the MRGO caused their alleged damage.[5]

---

[5]Plaintiffs' failure to adduce sufficient evidence of causation comes as no surprise.  See Graci v. United States, 435 F. Supp. 189, 196 (E.D. La. 1977) (concluding as a matter of law that "plaintiffs [have not] shown by a preponderance of the evidence any causal connection between the MRGO and any damages").

CONCLUSION

For these reasons, the United States' motion for partial summary judgment should be granted.

Respectfully Submitted,

GREGORY G. KATSAS
Assistant Attorney General

THOMAS DUPREE
Deputy Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR
Assistant Director, Torts Branch

 s/ Robin D. Smith
ROBIN D. SMITH
Senior Trial Counsel
JOHN A. WOODCOCK
Trial Attorney, Torts Branch, Civil Division
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 616-4289 / (202) 616-5200 (Fax)
Attorneys for the Defendant United States