# Exhibit 2

```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF LOUISIANA

 3
   ****************************************************************
 4
   IN RE:  KATRINA CANAL
 5 BREACHES CONSOLIDATED
   LITIGATION
 6
                                    CIVIL ACTION 05-4182
 7                                  SECTION "K"(2)
                                    NEW ORLEANS, LOUISIANA
 8                                  TUESDAY, MARCH 11, 2008, 9:00 A.M.
   PERTAINS TO:
 9
   MRGO, ROBINSON (06-2268)
10

11 BARGE, IN THE MATTER OF THE
   COMPLAINT OF INGRAM BARGE
12 COMPANY, AS OWNER OF THE
   ING4727, PETITIONING FOR
13 EXONERATION FROM OR
   LIMITATION OF LIABILITY
14 (05-4237, 05-5531,
   05-5724, 06-5054,
15 06-5342, 06-6299,
   06-7516)
16
   ****************************************************************
17

18          TRANSCRIPT OF MOTIONS HEARING PROCEEDINGS
        HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
19                      UNITED STATES JUDGE

20

21 APPEARANCES:

22
   FOR THE PLAINTIFFS:              O'DONNELL & ASSOCIATES
23                                  PIERCE O'DONNELL, ESQUIRE
                                    550 SOUTH HOPE STREET
24                                  SUITE 1000
                                    LOS ANGELES CA   90071
25
```

 1  You need some conduct in order to get immunity, Your Honor.  So I
 2  think the answer is no.  And the fact that there are floodwaters
 3  is the beginning, not end of the inquiry.
 4              You've said, in our Motion to Dismiss *In re Katrina*
 5  at page 695, there is very much, "This case is very much like
 6  that found in *Central Green*."  You're talking about my case, our
 7  case.  "While arguably the immediate cause of the damage was
 8  indeed floodwaters, the causation for such floodwaters' force and
 9  breadth are alleged to have been the defalcation of the
10  government with respect to the MRGO."
11              You've also said the mere fact that there are
12  waters that are floodwaters, that somehow they touch or come in
13  contact with the FCP does not mean that there is immunity.
14              And it's important that you understand, I'm sure
15  you do.  Our theory has nothing to do with the LPV.
16              THE COURT:  If I don't understand that by now, God
17  knows -- all I referenced was that a lot of the exhibits
18  reference the defalcation of it, and that may go to your mandate
19  or your --
20              MR. O'DONNELL:  All I was trying to show there, okay,
21  and I should have probably filed a negative environmental impact
22  statement.  We have alleged and we believe there is substantial
23  evidence in this record that would deny summary judgment to the
24  government, that there was negligence in three respects.  You've
25  said it, lack of armoring, the geometry of the funnel effect and

1  the loss of the wetlands, all known and foreseeable.
2              It's an independent tort, it's an independent act
3  of negligence outside of flood control conduct occurring before
4  the LPV was enacted and the project was built.
5              And what happened here is, I'm being very precise
6  because my record is very, you want to pinpoint, I tried to
7  pinpoint, there is three feet of excess floodwater we allege
8  caused by the MRGO.
9              THE COURT:  So now you're going to my last question but
10 I'll ask it now.  And I'm not sure how it relates to 702c
11 immunity necessarily, but it's something that vexes me.  In fact,
12 if you think a lot about this case, it will keep you up at night.
13 It seems to me that I'm going to have to hold that to the extent
14 that the flooding was caused by the failure of the LPV, there is
15 immunity for the government.
16             MR. O'DONNELL:  I respectfully disagree.  But I'll wait,
17 Your Honor.
18             THE COURT:  Well, you're going to lose on that one.  You
19 may disagree, because that would, because it would be reversed in
20 a heartbeat in my opinion.  But I want to hear what you say and I
21 think you're going to lose, you really have an uphill battle.
22 For me to say that it caused part of the damage, somehow they
23 don't have immunity.
24             MR. O'DONNELL:  No, no, no.  We agree, segregation,
25 *Central Green* opened the possibility of it.

```
 1              THE COURT:  You.
 2              MR. O'DONNELL:  I have a factual point on that.
 3              THE COURT:  You may have a factual point on that but --
 4              MR. O'DONNELL:  But I will wait on that.
 5              THE COURT:  Okay.
 6              MR. O'DONNELL:  I think failure is in the eye of the
 7    beholder.
 8              THE COURT:  If, without the surge from the MRGO, there
 9    would have been six feet of water, hypothetically, in the homes
10    of your plaintiffs, of your six plaintiffs, and on the, and with
11    the surge there was nine feet, what the heck is the damage from
12    the MRGO?
13              MR. O'DONNELL:  Would you turn to Tab 6 for a moment
14    please, Your Honor.
15              THE COURT:  I'm jumping ahead of my question.  We'll get
16    back to my question.
17              MR. O'DONNELL:  This is great.  This is like dealing
18    with my three children, Your Honor, they all come at me from
19    different directions.  Let me answer that question very
20    specifically.  These three charts show what a difference three
21    feet makes and they're very simple --
22              THE COURT:  It's almost a song.
23              MR. O'DONNELL:  It does, Your Honor.  It's the IHNC
24    where the, there was overtopping and failure on both sides.  I
25    have Reach 1 and Reach 2.  And this is the essential point of the
```

1  negligence and the causation, Your Honor.
2           THE COURT:  Mr. Smith, do you have a copy?
3           MR. SMITH:  Yes, thank you.
4           MR. O'DONNELL:  Is this, because of the destruction of
5  the wetlands, and Dr. Robert Dalrymple, their expert in a related
6  case, Johns Hopkins, it doesn't get any better than that unless
7  it's Tulane, he says there was over a meter of excess surge
8  during Katrina because the wetlands were destroyed.  They have a
9  known buffering effect, about 2.7 miles of wetlands, cypress,
10 whatever, knocks down a foot of surge.
11          So he, himself said there was over three feet of
12 surge that attacked the Reach 1 levees, which is depicted in
13 Tab 3.  Actually, there is arrows from the ILIT report that show
14 you what they label as overtopping flow.  Liquid bulldozer.
15 Okay.  And if there had not been the MRGO in that area of
16 Lake Borgne and if there had not been a decimation of those
17 wetlands, tens of thousands of acres of wetlands that they knew
18 was going to happen, according to our allegations and our proof.
19          If you look at the first chart in Tab 6, the surge
20 would have been only 12 feet.  The surge was 15 feet.  And the
21 actual height was twelve-and-a-half.  You would have had no
22 overtopping.  That's the real culprit here is overtopping.  It
23 would not have occurred.
24          THE COURT:  That's where you disagreed with the premise
25 of my question about you don't need to segregate, you're telling

1  me.

2             MR. O'DONNELL:  In that regard.  I do, however, on
3  page 2, Reach 1, maybe.  There, the surge was 18.2 feet high, the
4  actual height was 15, and if it was only 15.2, there is 0.2 of a
5  surge --

6             THE COURT:  You're talking about overtopping, some of
7  these levees failed.

8             MR. O'DONNELL:  I'll get to that, Your Honor.  In
9  Reach 2, I show the same thing.  In much of Reach 2, the surge
10 without the MRGO three-foot addition would have been less than
11 the actual height.

12            THE COURT:  Again, I'm getting a little off of my major
13 focus, which is the nexus argument.  But go ahead, let's finish
14 this up.

15            MR. O'DONNELL:  I know this may actually lead into
16 nexus, Your Honor.  So the vast amount of damages here is
17 overtopping.  Okay.  And not the failure.  Reach, now, there was
18 failure.  Let's take the IHNC.  There is not much of a dispute
19 between my experts and the Corps' IPET report and ILIT.  And --

20            THE COURT:  I have an interesting conundrum because I
21 have lots of theories of liability before this Court under this
22 umbrella but your case, if it gets to trial, will be very
23 interesting, go ahead.

24            MR. O'DONNELL:  Your Honor, if you get to Tab 5, I have
25 actually summarized this for you.  All with record evidence, all

1  but one cite being the Corps' own expert, Dalrymple's report, his
2  depo, Varuso, their employee, or the IPET report.
3           And overtopping is what caused the catastrophic
4  flooding in every location.  Overtopping.  It's undisputed in
5  this record.  And it's overtopped because of the three feet of
6  excess surge caused by MRGO.  In 1947, an unknown hurricane, the
7  record shows, hit this vicinity and did not have catastrophic
8  flooding.  There was no MRGO.  There was still all that wonderful
9  cypress Tupelo swamp out there and there was no funnel from the
10 MRGO.
11          In '65, they had catastrophic flooding that was
12 much the same footprint as we had in 2005.  The only difference
13 was the MRGO.  That's science.  That's in the record.
14          But here, overtopping is critical.  Reach 2 is made
15 of earthen berms for the most part, and it overtopped first, and
16 the overtopping was catastrophic.
17          And then the liquid bulldozer, the water caused by
18 MRGO, it's a battering ram just like your Navy vessel hitting the
19 levees of the Mississippi River, knocked out substantial portions
20 of the MRGO Reach 2.  It also contributed to the overtopping and
21 the failure of the IHNC's east side, the two breaches on the
22 north and south of each side, flooding the Ninth Ward and part of
23 Chalmette.
24          The point I'm trying to make, Your Honor, is even
25 in the context of a failure, a breach, the three feet of excess

1  surge is a causative contributing factor.  It's the same as if
2  the Army Corps had gone out to Canarvon, I'm told, as they did in
3  1927 to save the city, and ba-boom, they blow up the levee.  It's
4  the same analysis.  It's an independent tort act of negligence.
5  I'll assume that was an act of negligence, although it was
6  authorized by the president of the United States, I've read.
7           So they do that.  My point is, I get to trial, I
8  get over this issue I believe merely because of overtopping.  If
9  the Court says, Well, Mr. O'Donnell, I think the liquid
10 bulldozer, I may have to allocate that might be immune, but I
11 agree with you that what you're saying about is non-immune,
12 that's the only point I'm making.  I'm not conceding that the
13 erosion caused by overtopping because of the excess three feet
14 but three feet made the dispositive difference here, and that's
15 our proof.
16          THE COURT:  Believe me, I understand your argument.
17          Let me ask you this:  You rely on *Graci,* and
18 counsel pointed out *Graci* is in a vacuum in the sense there was
19 its waters, the floodwaters there did not come into contact with
20 a FCP; therefore, what does *Graci* really teach us if we don't
21 have the same factual scenario?
22          MR. O'DONNELL:  It teaches us that it's not limited to
23 its facts.  It was, its doctrine is good today.  In fact, that
24 case has stood the test of time.  Indeed, I've pointed this out
25 you on several occasions, *James*, in footnote 2 cites approvingly

1  *Graci* and characterized it as follows: "The federal government
2  contended that 702c granted immunity from damages caused by any
3  floodwaters, even those unconnected with flood control projects."
4  The Court, Fifth Circuit rejected this argument and
5  held that the provision conferred immunity only for floods or
6  floodwaters connected with the flood control project. Page 602,
7  Note 2.
8  THE COURT: Is it your position -- go ahead and finish
9  your thought.
10  MR. O'DONNELL: My point is that, yes, there was no LPV
11  at the time, but my theory of liability is the same. And our
12  case does not require that, it does not turn on the existence or
13  nonexistence of levees or their performance or failure.
14  Indeed, I would like you for one second to imagine
15  that the LPV was a speed bump. As that tsunami, which it comes
16  across the denuded marsh lands and shoots at Reach 2, it
17  momentarily rises, overtops and keeps on going into the
18  population. The LPV played no role. It is not my claim that the
19  LPV or its failure played any role in the flooding of my clients.
20  To make the point, it might as well have not been there as it was
21  not in *Graci*.
22  THE COURT: I understand the point. Is it your
23  contention that any negligence by the government or anybody,
24  let's say the government because we're dealing with immunity,
25  that occurs outside of the parameters, as wide as you want to

     1  control project.  The rocks that came from Illinois to the extent
     2  they put anything along the banks does not turn that quarry in
     3  Illinois into a flood control project.
     4          THE COURT:  I agree.  Let me tell you, my concern is
     5  this:  My concern was when I looked at all of this and these
     6  documents, well, first, Mr. Smith's first argument, the text of
     7  the statute.  Number 2, then we get into nexus, and one of my
     8  interests was, did the LPV in its construction contemplate what
     9  might be coming from the MRGO?  And I think that question --
    10          MR. O'DONNELL:  The answer is categorically no.  The
    11  effects of Lake Pontchartrain --
    12          THE COURT:  I don't think Mr. Smith has disagreed with
    13  you.
    14          MR. O'DONNELL:  Thank you.
    15          THE COURT:  But I think he still argues nexus for the
    16  other reasons he's stated, and his principal argument and one
    17  that really, when it all gets down to it, what does the FCA mean?
    18  Excuse me, yeah, what does the FCA of 1928 mean as of 1936 when
    19  it was amended?  What is it?
    20          MR. O'DONNELL:  It doesn't mean what the government
    21  literally says it means because the Supreme Court of the
    22  United States has twice said that.  This circuit has said it and
    23  you've said it four times.  I think the last time you said it,
    24  perhaps exasperated that you had to deal with it again, you said,
    25  Until a higher court gives me different guidance, I'm not going

1  to accept the government's argument on the literal language.  So
2  I hope for a fifth time the Court will do that.  But lets move to
3  nexus.  I think that's the issue.
4              The legislative history, the construction of the
5  act to give it a nod so it doesn't have an absurd and draconian
6  effect, as Justice Stevens has been concerned about for a long
7  time, requires that we say there has to be some nexus.  The fact
8  that they are floodwaters, yes.  But why were they floodwaters?
9  The water out in Lake Borgne, that's a surge, okay, according to
10 our experts and a lot of the Court's own documents, which you
11 mentioned there would be a lot more to come if we get to a trial,
12 indicate that that three feet rises up, okay, and my chart very
13 simple, but with record cites on each of them, shows you that we
14 wouldn't have had an event in New Orleans.  We would have said,
15 Oh, my gosh, we had another one of those near misses, we had a
16 little flooding, a pump didn't work over here, 12 inches of
17 rainfall.  We would not have had catastrophic flooding.  And so
18 the nexus here is missing.  In other words, we're not saying, Oh,
19 my gosh, you didn't build the walls 22 feet high.  You would have
20 stopped any flooding.  We're not saying that you should have
21 built it out of something different.  We're not saying anything
22 about the project itself.
23             Number 2, you've mentioned in one of your opinions
24 about floodwaters emanating from the project.
25        THE COURT:  That was in the levee opinion because I was,

1   I knew that we were coming, let me just be candid.  I knew we had
2   this coming up and I wanted to make sure I gave everybody a
3   chance and didn't write you out in the levee opinion.  I remember
4   that phrase very well.
5            MR. O'DONNELL:  I read it with that thought in mind,
6   that there was still a level playing field.
7            THE COURT:  Yes.
8            MR. O'DONNELL:  The fact of the matter is, Your Honor,
9   these floodwaters did not emanate from the project.  There may be
10  some projects that actually exacerbate the flooding.  And there
11  is, you understand from engineering that can happen.  You build
12  it too narrow, you build it a certain way.  We're not complaining
13  of any of those things.  What we're saying is, You built the MRGO
14  wrong.  You were negligent and you knew that you had these three
15  problems that were going to add to the increased surge, okay, and
16  it did it.
17            And, you know, the death knell, which is a phrase
18  you used in your levee opinion, okay, is apropos here.  When they
19  build the LPV, okay, and do not take into account any of the
20  known effects of the MRGO, the death knell for St. Bernard,
21  New Orleans East and the lower Ninth Ward was sounded.
22            And it was sounded year after year for 40 years.
23  This record will overwhelm you, Your Honor, with what the Corps
24  knew and what the Corps consciously disregarded.  Not because
25  they were exercising a discretionary function but because they

1  going on.

2               Lafarge has submitted an exhibit which, I think,
3  frankly, I just came across this yesterday, rebuts the notion
4  that somehow the Corps had finished levee building and these
5  things were sitting out there in a state of incompletion.

6               It's Document 7742-4, which is Exhibit B.  It's the
7  GAO document, a Government Accountability Office document.

8               On page 10, page 10 as the document was filed, not
9  the internal pagination.  Talking about recent funding of the
10 history, funding history for the project.  And the GAO said,
11 "Appropriations have generally declined from about $15 to
12 $20 million annually in the earlier years to about $5 to
13 $7 million in the last three fiscal years.  While this may not be
14 unusual given the state of completion of the project," in other
15 words, it was close to being finished, "the Corps' project fact
16 sheet from May 2005 noted that the president's budget request for
17 fiscal years 2005 and 2006 in the appropriated amount for fiscal
18 year 2005 were insufficient to fund new construction contracts.
19 Among the construction efforts that could not be funded according
20 to the Corps were the following."  And the very first bullet
21 point is levee enlargements in all four parishes.

22              If this case ever gets to trial, Al Naomi, who was
23 the project manager for the Lake Pontchartrain project, will
24 testify that he was ready to build up those levees higher than
25 they already were because they knew they had settled, over time

1   they settled because of the poor foundation conditions out there,
2   but he could not let construction contracts for those levee
3   enlargements because Congress was not appropriating the funds for
4   him to do so.
5              So the notion that somehow these were incomplete
6   and therefore the government should not get immunity is just not
7   supported by the record.
8              But I want to conclude, Your Honor, unless
9   something else comes up, this will be a conclusion because I
10  don't want to belabor the points that have been made, but
11  Mr. O'Donnell made a big issue about suppose three feet of storm
12  surge that was attributable solely to the MRGO.  We say that
13  that's just false.  It's not supported.  They cite one of our own
14  experts who really basically just made an offhanded comment in a
15  deposition on another subject matter and said he hadn't even
16  studied it himself.
17             The plaintiffs' own experts can't support a number
18  like that.  We asked them that in their own deposition, and they
19  say, Well, that's just a guess.  We don't really know.
20             But be that as it may, what I found most notable
21  about Mr. O'Donnell's presentation was that he made clear that it
22  was the failure of the levees that was the sine qua non of this
23  flood.  Although Mr. O'Donnell asserts that he's not suing for
24  the performance of the levees, for how they were built, his
25  theory of liability is that the MRGO caused the destruction of

1  the levees first by overtopping them, then by eroding them and
2  washing them away.  And that but for the failure of those levees,
3  there would not have been a flood.  There would have been some
4  rainwater that would have accumulated to a foot or two, but apart
5  from the failure of those levees, which as Your Honor, I think,
6  has rightly concluded, surrounded these areas, whether we call
7  them levees or not, and I understand Your Honor understands that
8  argument, it was the MRGO effect, according to plaintiffs'
9  theory, that caused the failure of the LPV in this case, and that
10 led to this flood.
11            That, Your Honor, is the nexus that we believe
12 requires 702c to be brought to bear in this case.  And we would
13 ask that the government's motion to dismiss be granted.
14            THE COURT:  Thank you, Mr. Smith.
15            Mr. O'Donnell.
16            MR. O'DONNELL:  We learned in law school that the
17 plaintiff is the master of the complaint and the Court has
18 acknowledged previously *In re Katrina* ruling that our theory has
19 been articulated.  I'll say it again:  Our primary theory of
20 liability is, and it's an allegation right now, I think I've
21 offered evidence to create the factual issue here that there was
22 three feet of extra surge because of the funnel and because of
23 the loss to the wetlands, point one.
24            That surge made the difference.  It overtopped.
25 Our first theory here is it overtopped.  That's not a failure.

1  The government has, in their own facts, said it performed as
2  expected.  It overtopped.  It's a speed bump.  It's not there.
3  I'm not talking about the failure of the levees in that regard.
4  And a substantial amount, maybe all of my clients' damages can be
5  attributed to the overtopping of the levees.
6              Because of the three feet, Your Honor, the
7  testimony of the experts is, it was earlier, more prolonged, and
8  more intense than it would have been.  And that three feet of
9  flooding leads to 15 to 20 feet of water in my clients' homes.
10 It's not that we're going to say three feet of the water is the
11 MRGO.  It's the three feet is the catastrophic.  It's the
12 linchpin, it's the trigger that causes it.
13             Secondly, there may be a factual dispute on whether
14 the liquid bulldozer, that ferocious surge created by the MRGO,
15 blew out the earthen berms or was a contributing factor in the
16 IHNC to the contributing failures.  That's a second proposition.
17 And the Court has to decide whether my claim, which is that it is
18 the same as the battering ram of the Navy frigate or the
19 dynamiting of the levee.  I don't think you can distinguish those
20 points, but at a minimum I get by summary judgment on the
21 overtopping basis because that's not a failure.  We're ignoring
22 it; it might as well not be there, Your Honor.
23             We filed a cross motion for summary adjudication.
24 And I'm not going to belabor or waste the Court's time on my
25 second and third propositions, but I think on this record the

1  Court could, if it agrees, continues, I believe to adhere to the
2  basic legal principles you have articulated in four decisions
3  already on the issue of 702c, that we not only defeat their
4  motion but we win our motion, and I think the Court understands
5  my point on that, that is there a parity, we've met them on those
6  issues.
7       The Court could decide that maybe there is factual
8  disputes about some aspect of nexus, but we believe there is a
9  clear category here relating to the three feet and the
10 overtopping, that's segregable from anything else that may have
11 caused damage to our client's property.  At least on that basis,
12 I think, we prevail on this case.
13       So I urge the Court either to grant, deny theirs
14 and grant my cross motion or find that there is factual dispute
15 for their motion.
16       Thank you very much for the time, Your Honor.
17       THE COURT:  Thank you.
18       Mr. Aldock, anything else?
19       MR. ALDOCK:  Nothing further, Your Honor.
20       THE COURT:  Mr. Smith, any last words?
21       MR. SMITH:  No, Your Honor.
22       THE COURT:  First I want to compliment all of you for
23 what I feel has been, from the Court's standpoint, an exceptional
24 oral argument, extremely prepared.  All of your clients should be
25 proud and this is why oral argument could be a lot of fun with

```
 1  fine lawyers.  I thank you for it and have a good rest of the
 2  week.
 3              MR. SMITH:  Thank you.
 4              MR. ALDOCK:  Thank you.
 5              MR. BRUNO:  Thank you, Judge.
 6              (WHEREUPON, at 10:51 a.m. the proceedings were
 7  concluded.)
 8                              *   *   *
 9
10
11                       REPORTER'S CERTIFICATE
12
13      I, Cathy Pepper, Certified Realtime Reporter, Registered
14  Professional Reporter, Certified Court Reporter, Official Court
15  Reporter, United States District Court, Eastern District of
16  Louisiana, do hereby certify that the foregoing is a true and
17  correct transcript, to the best of my ability and understanding,
18  from the record of the proceedings in the above-entitled and
19  numbered matter.
20
21
22                              //s// *Cathy Pepper*
23                              Cathy Pepper, CCR, RPR, CRR
24                              Official Court Reporter
25                              United States District Court
```