# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

**In re:  KATRINA CANAL BREACHES**
**CONSOLIDATED LITIGATION**


**PERTAINS TO:  BARGE**


*Boutte v. Lafarge*            05-5531
*Mumford v. Ingram*            05-5724
*Lagarde v. Lafarge*           06-5342
*Perry v. Ingram*              06-6299
*Benoit v. Lafarge*            06-7516
*Parfait Family v. USA*        07-3500
*Lafarge v. USA*               07-5178

CIVIL ACTION

Case No.:  05-4182
and consolidated cases

SECTION "K" (2)

Hon. Stanwood R. Duval, Jr.
Magistrate Judge Joseph C. Wilkinson, Jr.


# MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO CERTIFY A CLASS AND POTENTIAL SUBCLASSES, TO APPOINT CLASS COUNSEL, AND TO PRELIMINARILY APPROVE PLAINTIFFS' PROPOSED TRIAL PLAN

## TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

ARGUMENT .................................................................................................................4

II.   THE PROCEDURAL REQUIREMENTS FOR CERTIFICATION ...........................4

   A.   Certification Of The Proposed Plaintiff Class Will Promote The Well-Established
        Policies Favoring Efficient Claim Resolution And Promotion Of The Safety Of
        The Public At Large ........................................................................................4

   B.   The Legal Standards Governing Certification Of Class Actions ..........................7

III.  THE PROPOSED CLASS READILY SATISFIES ALL REQUIREMENTS FOR
      CERTIFICATION OF THE CLAIMS STATED IN THE PROPOSED SEVENTH
      AMENDED COMPLAINT ........................................................................................8

   A.   The Class Is Ascertainable And The Members Thereof Are So Numerous That
        Joinder Is Impracticable ..................................................................................8

        1.   The Class Is Precisely Defined ..................................................................8

        2.   The Class Is So Numerous That Individual Actions Are Impracticable .....12

   B.   Common Issues Of Law And Fact Predominate Over Individual Issues ............14

        1.   Because All Class Members Were Injured by a Singular Common Event,
             Numerous Issues of Law and Fact Necessarily Exit that Will Commonly
             Affect All Members of the Putative Class ..................................................17

        2.   Common Issues Predominate Within The Meaning Of Rule 23(B)(3), As
             Disallowance Of Individual Trials By The More Than 40,000 Persons And
             Entities That Comprise The Putative Class Is Warranted By A Sufficient
             Gain In Efficiency ...................................................................................33

   C.   Plaintiffs' Claims Are Typical Of The Plaintiff Class' Claims ..........................38

   D.   The Representative Plaintiffs And Their Counsel Will Fairly And Adequately
        Represent The Class ......................................................................................41



1.      Plaintiffs Propose Khorrami, Pollard & Abir LLP, the Law Office of Brian
        A. Gilbert P.L.C., Wiedemann & Wiedemann, the Law Office of Richard T.
        Seymour, P.L.L.C., and  Patrick J. Sanders, Esq. As Class Counsel ........ 41

2.      Plaintiffs, As They Have Already Done, Will Fairly, Vigorously And
        Adequately Represent The Interests Of The Class .................................. 45

    E.   Class-Action Treatment Is Superior To Individual Actions ............................. 45

IV.  CONCLUSION ......................................................................................... 49



## **TABLE OF AUTHORITIES**

**FEDERAL AUTHORITY**

*Alberto N. v. Gilbert*,
    2000 U.S. Dist. LEXIS 22723 (E.D. Tex. Aug. 17, 2000)................................................. 12

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997) .......................................................................................................... 5

*Ancar v. Murphy Oil, U.S.A., Inc.*,
    2008 U.S. Dist. LEXIS 68490 (E.D. La. July 25, 2008) .................................................... 37

*Anselmi v. Penrod Drilling Co.*,
    813 F. Supp. 436 (W.D.La. 1993) ............................................................................... 37, 38

*Bell Atl. Corp. v. AT&T Corp.,*
    339 F.3d 294 (5th Cir. 2003)...................................................................................3, 35, 48

*Broussard v. Parish of Orleans*,
    2001 U.S. Dist. LEXIS 11941 (E.D. La. Aug. 2, 2001).................................................... 15

*Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*,
    377 F.2d 724 (5th Cir. 1967) ........................................................................................... 29

*Bunge Corp. v. M/V Furness Bridge*,
    558 F.2d 790 (5th Cir. 1977).................................................................................... 29, 30

*Canal Barge Co. v. Torco Oil Co.*,
    220 F.3d 370 (5th Cir. La. 2000) .................................................................................. 17, 18

*Caridad v. Metro-North Commuter R.R.*,
    191 F.3d 283 (2nd Cir. 1999) ........................................................................................... 8

*Castano v. American Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) ...................................................................................... 6, 48

*Consolidated Aluminum Corp. v. C.F. Bean Corp.*,
   833 F.2d 65 (5th Cir. La. 1987)............................................................... 17, 33

*De Bremaecker v. Short*,
   433 F.2d 733 (5th Cir. 1970) ................................................................. 8

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974) ................................................................................ 8

*Harrison v. Flota Mercante Grancolombiana, S. A.*,
   577 F.2d 968 (5th Cir. 1978) ................................................................. 33

*In re Am. Commer. Lines, LLC*,
   2002 U.S. Dist. LEXIS 10116 (E.D. La. May 28, 2002) ................................... 12

*In re Complaint of Clearsky Shipping Corp.*,
   1998 U.S. Dist. LEXIS 13842 (E.D. La. Aug. 27, 1998)................................... 37

*In re Educ. Testing Serv. Praxis Principles of Learning & Teaching*,
   2006 U.S. Dist. LEXIS 9726 (E.D. La. Mar. 13, 2006) .................................... 14

*In re Katrina Canal Breaches Consol. Litig.*,
   2007 U.S. Dist. LEXIS 82887 (E.D. La. Nov. 1, 2007)...................................... 36

*In re Mid-South Towing Co.*,
   418 F.3d 526 (5th Cir. 2005) ................................................................. 30

*In re Monumental Life Ins. Co.*,
   365 F.3d 408 (5th Cir. 2004)............................................................... 8, 12

*In re Vioxx Prods. Liab. Litig.*,
   239 F.R.D. 450 (E.D. La. 2006) ............................................................. 5

*James v. City of Dallas*,
   254 F.3d 551 (5th Cir. 2001) ................................................................. 14, 38

*Jenkins v. Raymark Indus.*,
   782 F.2d 468 (5th Cir. 1986) .......................................................... passim

*McGuire v. International Paper Co.*,
   1994 U.S. Dist. LEXIS 4783 (S.D. Miss. Feb. 18, 1994) .......................... 16, 35

*Moser v. Texas Trailer Corp.*,
   623 F.2d 1006 (5th Cir. 1980) ............................................................. 30



*Mullen v. Treasure Chest Casino,*
  *L.L.C.*, 186 F.3d 620 (5th Cir. 1999) ................................................................. passim

*Pederson v. Louisiana State Univ.*,
  213 F.3d 858 (5th Cir. 2000) ........................................................................... 12

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993) ............................................................................ 12

*Steering Comm. v. Exxon Mobil Corp.*,
  461 F.3d 598 (5th Cir. 2006) ...................................................................... passim

*Thomas v. Express Boat Co.*,
  759 F.2d 444 (5th Cir. 1985) ........................................................................... 30

*Turner v. Murphy Oil USA, Inc.*,
  234 F.R.D. 597 (E.D. La. 2006) ................................................................. passim

*Vizena v. Union Pac. R.R. Co.*,
  360 F.3d 496 (5th Cir. 2004) ............................................................................ 7

*Watson v. Shell Oil Co.*,
  979 F.2d 1014 (5th Cir. 1992) .................................................................... passim

*Zeidman v. J. Ray McDermott & Co., Inc.*,
  651 F.2d 1030 (5th Cir. 1981) ......................................................................... 12

**STATE AUTHORITY**

*Roberts v. Benoit*,
  605 So. 2d 1032 (La. 1991) .............................................................................. 33

**RULES**

Fed. R. Civ. P. 23 .............................................................................................. passim

**TREATISES**

*1 Newberg*, § 3.5 (4th ed. 2008) ...................................................................... 12

*2 Newberg*, §4.25 (4th ed. 2008) ...................................................................... 15

*2 Newberg*, §4.31 (4th ed. 2008) ...................................................................... 47

*2 Newberg*, § 4:29 (4th ed. 2008) ...................................................................... 46

v



*2 Newberg, § 4:30* (4th ed. 2008) ........................................................................... 46

*2 Newberg, § 4:32* (4th ed. 2008) ........................................................................... 47

*5 Newberg § 17:5* (4th ed., 2008) ............................................................................ 5



<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      INTRODUCTION**

Plaintiffs *Ethel Mae Coleman Mumford*, *Josephine Long Richardson*, *Jimmie Donnell Harris*, *Michael Joseph Riche*, *Bob* & *Dianne Glaser* (as owners of Holiday Jewelers), *Herman & Aida Koch* (as owners of residential rental property), and *Arcola Sutton* (hereinafter "Plaintiffs") hereby seek class certification of a single claim of maritime law negligence against Defendants *Lafarge North America, Inc.* ("Lafarge"), *Joseph C. Domino, Inc.* ("Domino"), *Unique Towing, Inc.* ("Unique"), *Zito Fleeting, LLC* and *Zito Fleeting, Inc.* ("Zito") (collectively "Defendants") on behalf of a class of persons and business entities that sustained injuries as the result of the breaches in the East wall of the Industrial Canal that occurred on Monday, August 29, 2005.

Adjudication of this claim using the class action device is particularly appropriate due to the "singular" nature of the event upon which this action is based, and is perhaps a necessary and suitable tool for this Court's efficient management of the more than 40,000 persons and business entities that were subsequently injured.  Indeed, the facts surrounding the breach of the East wall of the Industrial Canal are uniform as to each and every member of the proposed Class, and as such, class treatment permits litigation of identical legal theories, based on identical evidence, on behalf of all such persons/entities similarly affected.  A summary of these common facts are as follows:

On August 26, 2005, days before Hurricane Katrina made landfall, Ingram Barge Company delivered Barge ING 4727, a 200 foot hopper barge carrying a load of cement (hereinafter the "Barge" or "ING 4727") to a facility owned by Lafarge North America, and located along the Industrial Canal.  Due to the urgent need for the cement cargo, Lafarge accepted charge of ING 4727, and on Saturday, August 27, 2005 proceeded to empty its contents.  While Lafarge purports to have placed a call that day to Zito Towing to remove ING 4727 from the Lafarge facility, Lafarge itself acknowledges that, at the time the call was placed, Lafarge believed it would likely be ignored.

That day, in anticipation of Katrina's arrival, Lafarge then proceeded to moor the now



1

empty ING 4727 directly to the dock at the Lafarge facility.  Another fully loaded barge was then moored directly to the outside of ING 4727 with only three single-part two-inch nylon ropes.  Prior to LaFarge employees evacuating the facility at approximately 1:00 p.m., a call was made to have Joseph Domino/Unique send a tugboat to flip ING 4727 to the outside position due to concerns that the "empty" ING 4727 – which sat about 8 feet higher than the full barge to which it was moored – would cause damage to the dock.  At approximately 2:25 p.m., tugboat Regina H arrived at the LaFarge facility, untied the rope lines that affixed barge ING 4727 to the dock, and without untying any of the three single-part rope lines joining ING 4727 to the full barge, repositioned both barges so that ING 4727 was facing the outside of the dock.  No changes were made to the rigging that affixed the empty barge ING 4727 to the full barge.

In the early morning hours of August 29, 2005, barge ING 4727, unsheltered and exposed to Katrina's high winds, broke free of its moorings to the loaded barge.  Thereafter, at approximately 4:00 a.m., the Chief Operator of Pump Station No. 5 (a facility near the Florida Avenue Bridge) observed a portion of the floodwall located at the Northern end of the East wall of the Industrial Canal give way, and saw a large mass that appeared to be a barge protruding though the toppled section of the floodwall.  At approximately 5:30 a.m., a second breach occurred at the Southern end of the East wall of the Industrial Canal.  Numerous residents heard the "booming" of the empty barge banging against the floodwall prior to the South Breach, and an eyewitness who saw the breach observed the barge come through the wall at the time the breach occurred, coming to rest some 180 feet on the inside of the floodwall.

As a result of the breaches to the East wall of the Industrial Canal, a massive, sudden, powerful surge of water blasted eastward through the area, allowing mere seconds for many to scramble to their rooftops, drowning many others, and turning a seemingly endless expanse of residential and commercial properties into a decimated wasteland.  The floodwater, which was as high as ten feet in some areas, traveled east into St. Bernard Parish, eventually merging with the waters from the Chalmette area East of Paris Road at about 9:10 a.m.

KP&A

KHORRAMI POLLARD & ABIR LLP

Regarding the claims arising from these events, each of the seven named Plaintiffs are typical of the more than 40,000 persons and entities that comprise the putative class. They, like the class as a whole, (1) owned property, a business and/or resided within the region east of Paris Road, and (2) sustained damage as a result of the same singular event affecting the class region – the breach of the East wall of the Industrial Canal. Moreover, these Plaintiffs, as they have already demonstrated through their participation in this litigation to date, are dedicated to fairly, vigorously and adequately representing the interests of the Class. To do so, they have retained a team of competent counsel who are not only experienced in class action and maritime litigation, but are willing and able to dedicate the time, resources and effort to see this litigation through to its conclusion.

Most importantly, common issues predominate over individual issues. As the loss of each putative class member flows from a single, identical event – the breach of the East wall of the Industrial Canal by the breakaway of Barge ING 4727 – issues of duty, breach, and proximate (legal) cause will necessarily be identical for the approximately 43,065 persons and entities that comprise the putative class. Thus, the benefit conferred by common adjudication these issues far outweighs the burdens of adjudicating any individualized issues of damage and causation.

The Fifth Circuit has repeatedly concluded that the individualized nature of causation and damages frequently encountered in "common event" type mass tort actions is **not** a barrier to class adjudication, and that such issues can and should be managed by way of bifurcated proceedings if possible, to enjoy the benefits of class adjudication. *See Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. La. 1992); *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 623 (5th Cir. 1999); *Bell Atl. Corp. v. AT&T Corp.,* 339 F.3d 294, 307, n. 16 (5th Cir. 2003); *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603-04 (5th Cir. 2006). Here, under Plaintiffs proposed trial plan, filed concurrently herewith, issues relating to causation and damages will be effectively managed through separate trial phases.

Even then, it is important to note that litigation of causation and damages in this action can and will be effectively managed. Causation for most class members will be adjudicated on

3

a common basis, as each Defendants' conduct relating to the breach of the floodwall that caused the resulting flooding will be identical for every member of the Class.  In addition, Plaintiffs propose that adjudication of property related damages (which are the primary damages alleged in this action) can and should be established by way of "mass appraisal" – an accepted and superior method of property valuation which, like the class mechanism itself, utilizes common factors across the class to generate consistent assessments of damage. Finally, it is important to note that, similar to *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 607 n.6 (E.D. La. 2006), claims relating to physical and emotional injury, as well as damages relating to wrongful death, will not constitute a significant part of this action, as the overwhelming majority of Class members evacuated the New Orleans area in anticipation of Hurricane Katrina.

In short, the standardization of the Class' claims due to the "singular" nature of the event upon which this action is based renders the instant action a prime candidate for class adjudication.  Based thereon, Plaintiffs respectfully request that the Court grant certification of the proposed class under Fed. R. Civ. P. 23(b)(3).  Plaintiffs further request that the Court appoint Khorrami, Pollard & Abir LLP, the Law Office of Brian A. Gilbert P.L.C., Wiedemann & Wiedemann, the Law Office of Richard T. Seymour, P.L.L.C., and  Patrick J. Sanders, Esq. as Class Counsel under Rule 23(g).

## ARGUMENT

**II.    THE PROCEDURAL REQUIREMENTS FOR CERTIFICATION**

**A.    CERTIFICATION OF THE PROPOSED PLAINTIFF CLASS WILL PROMOTE THE WELL-ESTABLISHED POLICIES FAVORING EFFICIENT CLAIM RESOLUTION AND PROMOTION OF THE SAFETY OF THE PUBLIC AT LARGE**

In this action, utilization of the class device approaches absolute necessity, as it provides the only workable framework for this Court to efficiently manage the hundreds of thousands of claims presently comprising the *In re Katrina Litigation*.  In terms of the *Barge*

4



*Cases*, certification of the proposed plaintiff class will promote the well-established policies favoring efficient claim resolution, especially considering that the claims of the more than 40,000 putative class members that comprise the *Barge Cases* all arise from the same catastrophic event.

While in years past some courts have been hesitant to certify mass tort actions due to concerns over individualized causation and damages issues , "[m]any courts are now abandoning their historical reluctance to certify mass tort class actions in light of what is often an overwhelming need to create an orderly, efficient means for adjudicating hundreds or thousands of related claims." *See* 5 Newberg on Class Actions § 17:5 (4th ed., 2008) (hereinafter "Newberg").  "Despite early skepticism, mass accident, or single-situs torts, have generally been susceptible to class certification." *See In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 462 (E.D. La. 2006).  This trend has been acknowledged by the U.S. Supreme Court, which not only noted that mass tort claims arising from a "common disaster" may satisfy Rule 23(b)(3) requirements, but that "district courts, since the late 1970s, have been certifying such cases in increasing number." *See Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997).

The Fifth Circuit has upheld certification of several mass tort actions, including actions arising out of a "common disaster" like the instant action.  *See Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir., 1992) (upholding district court's certification of a class under Rule 23(b)(3) comprised of a class exceeding 18,000 persons suffering property damages and personal injuries "as a result of the explosion at the Shell Oil  Refinery in Norco, Louisiana"); *Jenkins v. Raymark Indus.*, 782 F.2d 468 (5th Cir. 1986) (upholding district court's certification of a class under Rule 23(b)(3) to resolve the "state of the art" defense on behalf of "all plaintiffs with asbestos-related personal injury actions pending in the Eastern District on December 31, 1984."); *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620 (5th Cir., 1999) (upholding district court's certification of a class under Rule 23(b)(3) comprised of "all members of the crew of the M/V Treasure Chest Casino who have been stricken with occupational respiratory illness caused by or exacerbated by the defective ventilation system in

5

place aboard the vessel.").  And while Defendants will likely cite to various authority asserting that individualized issues of causation and damages inherent to mass tort claims renders certification of such cases inappropriate, the Fifth Circuit has concluded that such authority can have no application to litigation where, as is the case here, the class seeks to recover for injuries arising from a "common disaster" based on "identical theories":

> "Brown & Root also points to *Yandle v. PPG Industries, Inc.*, 65 F.R.D. 566 (E.D. Tex. 1974) and the Advisory Committee note to Fed. R. Civ. P. 23(b)(3) in support of its proposition that, because mass tort cases often present disparate issues, they are generally inappropriate for class action litigation. These authorities have no application to the instant litigation in which many people suffered injury resulting from a common disaster and seek recovery on identical theories."

*See Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 n. 37 (5th Cir., 1992)

Indeed, the fact that mass tort actions present individualized issues of causation and damage is an insufficient basis to preclude certification under Rule 23(b)(3) when the action arises out of a "common event."  The Fifth Circuit has repeatedly concluded that individualized issues inherent in "common event" type mass tort actions are to be managed by way of a bifurcated trial plan, wherein the court adjudicates common issues of liability on a class-wide basis in the initial trial phase and reserves adjudication of questions relating to causation and damages for separate trial phases.[1]  This was specifically acknowledged by the Court in *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620 (5th Cir., 1999):

> [U]nlike the "Frankenstein's monster" feared in *Castano*, 84 F.3d at 745 n.19, this class is akin to other bifurcated class actions this Court has approved. *See Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992) (finding no abuse in the district court's certification of a bifurcated class action arising from an oil refinery explosion where liability and punitive damages would be resolved

---

[1] In *Watson*, the Court noted that the district court's certification of a class accompanied by a four-phase trial plan, wherein liability was to be determined under the first phase, was a "previously approved … mass tort case procedure in *Jenkins v. Raymark Inds., Inc*, 782 F.2d 468 (5th Cir. 1986)."  In *Turner v. Murphy Oil USA, Inc.,* 234 F.R.D. 597, 607 (E.D. La. 2006), the district court reasoned that "Murphy's liability would be appropriate for class treatment" as "[t]he presence or degree of injury or damage is an issue of quantum that may be dealt with individually in a bifurcated proceeding, if necessary."  Conversely, in *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603-604 (5th Cir., 2006), the Court reasoned that although "[t]his court has … approved mass tort or mass accident class actions when the district court was able to rely on a manageable trial plan--including bifurcation and/or subclasses--proposed by counsel" the Court was unable to "consider whether bifurcation or subclasses would remedy Appellants' difficulties in this case, because Appellants' counsel never proposed either."



commonly and injury, causation, and actual damages would be resolved individually); *Jenkins*, 782 F.2d 468 (finding no abuse of discretion in district court's certification of a bifurcated class action where asbestos producers' "state of the art defense" as well as product identification, product defectiveness, negligence, and punitive damages would be resolved commonly and causation, actual damages, and comparative fault would tried individually); *Hernandez v. Motor Vessel Skyward*, 61 F.R.D. 558 (S.D. Fla. 1973), aff'd, 507 F.2d 1278, 1279 (5th Cir. 1975) (unpublished) (certifying bifurcated class action on behalf of 350 passengers who were fed contaminated food aboard cruise ship where negligence would be tried commonly and causation and damages would be tried individually).

*See Mullen*, 186 F.3d at 628.

Because this case involves claims of more than 40,000 individuals and entities alleging injury arising from a single event –the breach of the East wall of the Industrial Canal by the breakaway of Barge ING 4727 – litigation of these claims by use of the class device presents the most efficient means for this Court to manage claims which comprise a very significant portion of its *In Re Katrina Litigation* docket.

## B. THE LEGAL STANDARDS GOVERNING CERTIFICATION OF CLASS ACTIONS

To certify a case as a class action under Rule 23(b)(3), the moving party bears the burden of establishing each of the four requirements of FRCP, Rule 23(a), and the two additional requirements found in Rule 23(b)(3).  *See Mullen*, 186 F.3d at 623;  *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 603 (E.D. La. 2006).  "Thus, read in combination, Rule 23(a) and 23(b)(3) provide six requirements for a group of claims to be certified as a class action -- numerosity, commonality, typicality, adequacy, predominance, and superiority."  *See Turner*, 234 F.R.D. at 603.

While the Court should conduct a rigorous analysis to determine whether these prerequisites have been met, and enjoys broad discretion to certify a class, the Court's discretion must be exercised within the framework of Rule 23.  *See Vizena v. Union Pac. R.R. Co.*, 360 F.3d 496, 502 (5th Cir. 2004) ("We will reverse a district court's decision to certify a class only upon a showing that the court abused its discretion, or that it applied incorrect legal standards in reaching its decision.").  "There is nothing in either the language or history of

7

Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. . ." *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).  Instead, the Court must determine if the plaintiffs have proffered evidence to meet each of the requirements of Rule 23.  No weighing of competing evidence is appropriate at this stage of the litigation [*Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 293 (2nd Cir. 1999)], and doing so is an abuse of discretion. *Eisen*, 417 U.S. at 178.

As explained below, Plaintiffs have met their burden as to all six prerequisites for certification under Rule 23(b)(3).  As such, certification of the proposed class is warranted.

## III.   THE PROPOSED CLASS READILY SATISFIES ALL REQUIREMENTS FOR CERTIFICATION OF THE CLAIMS STATED IN THE PROPOSED SEVENTH AMENDED COMPLAINT

### A.   THE CLASS IS ASCERTAINABLE AND THE MEMBERS THEREOF ARE SO NUMEROUS THAT JOINDER IS IMPRACTICABLE

#### 1.   The Class Is Precisely Defined

Plaintiffs have undertaken significant effort to frame a proposed class definition that will allow the Court to determine with precision those claimants who are a part of the class in a manner that is "merits" neutral.

"One of the unwritten requirements of Rule 23 is that the class to be certified must be 'adequately defined and clearly ascertainable.'"  *See Turner*, 234 F.R.D. at 611 (citing *De Bremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)).  "A precise definition is essential to identify those entitled to notice and those bound by a judgment."  *See Turner*, 234 F.R.D. at 611 (citing *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004)).  A class definition is sufficiently ascertainable if, by use of "objective" terms, characteristics and/or criteria, an individual may be identified as being a member of the class without resort to resolving the merits of the claim. *See 2 Newberg*, § 6.14, p. 6-61 (4th. ed., 2008).



Here, as provided in the proposed Seventh Amended Complaint, Plaintiffs ask this

Court to certify a class consisting of the following general group of claimants:[2]

> All persons and/or entities who/which, on August 29, 2005, were residents of, or owned properties or businesses in, the following geographic area: the Industrial Canal floodwall on the West, Paris Road on the East, the Mississippi River on the South, and, on the North, the Public Belt or other Railway adjacent to and immediately north of Florida Avenue and the east-west channel or canal (Florida Walk Canal and Forty Arpent Canal) extending from the aforementioned railway to Paris Road.[3]

Plaintiffs also propose the following two Sub-Class Definitions:

> **PERSONAL/REAL PROPERTY CLAIM SUB-CLASS** (SUB-CLASS ONE): All persons who are members of the Class and who sustained personal or real property loss and/or damages as a result of the flooding that began on Monday, August 29, 2005.

> **BUSINESS CLAIM SUBCLASS** (SUB-CLASS TWO): All businesses and/or the owners of such businesses, where the businesses (1) were located in the defined class area, and (2) sustained loss and/or damages related to flooding that began on Monday, August 29, 2005.

For purposes of clarity, the Named Plaintiffs identify several Categories of persons that are

members of the Class having damages that will likely entail some level of individualized

inquiry:

> **ZONE OF DANGER PROPERTY CLAIM CATEGORY** (Category One), comprised of persons suffering consequential emotional harm that is defined as all persons who (1) are members of the Class, and (2) who sustained personal or real property loss and/or damage as a result of the flooding that began on Monday, August 29, 2005, and (3) at that time they sustained such personal or real property loss and/or damages were physically present in the defined class area.

> **PERSONAL INJURY CATEGORY** (Category Two), is comprised of persons who (1) are members of the Class, (2) were, at the time of flooding on August 29, 2005, present in the defined class area, and (3) sustained personal injuries as a result of flooding that began on Monday, August 29, 2005.

---

[2] Excluded from the Class are any persons who are directors, officers and/or employees of any Defendants or their affiliates, and the immediate family members thereof, as well as all attorneys for the Class and any employees of the attorneys or their firms.

[3] The proposed class area consists of the following Census Tracts and parts of Census Tracts: a. In Orleans Parish, Census tracts 7.01, 7.02, 8, 9.01, 9.02, 9.03, and 9.04;2 and b. In St. Bernard Parish, Census tracts 303, 304, 305, 306.1, 306.2, 306.3, and the portions of Census tracts 307 and 308 that lie West of Paris Road. *See Declaration of Rick Seymour* (*"Seymour Dec."*), at ¶4-11; Exhs.A through D.



**WRONGFUL DEATH CATEGORY** (Category Three), is comprised of persons who (1) are members of the Class, and (2) who have a claim for wrongful death related to the flooding that began on Monday, August 29, 2005.

As an initial point, Plaintiffs' proposed class region that defines Plaintiffs' proposed Class was derived largely from objective criteria. The proposed "geographic area" is based on three natural boundaries on the one hand, and on the other, a distinct Eastern boundary proposed by expert, Melvin G. Spinks, P.E. (CivilTech Engineering, Inc.).

In terms of the three natural boundaries, Plaintiffs request that the Court take judicial notice of the fact that any flooding resulting from the North and South Breaches in the East wall of the Industrial Canal would necessarily be confined **(1)** on the _West_ by the Industrial Canal, **(2)** on the _North_ by the Public Belt or other Railway adjacent to and immediately north of Florida Avenue, and the east-west channel or canal extending from the aforesaid railway to Paris Road (Florida Walk Canal and Forty Arpent Canal), and (3) on the _South_ by the Mississippi River. _See Plaintiffs' Request for Judicial Notice_, at 1-5 (filed concurrently herewith).

In terms of the proposed Eastern boundary, Plaintiffs' expert, Melvin Spinks, has concluded that Paris Road is the most natural boundary for several reasons. First, "[a] ridge line exists immediately west of Paris Road that parallels Paris Road" that "is approximately 4 to 6 feet higher in elevation than the surrounding areas" and as such, the "Floodwaters that entered from the breaches along the IHNC are generally contained west of this ridge." _See Declaration of Shawn Khorrami_ ("_Khorrami Dec._")_,_ Exh. 1 (Spinks Report, at 15-16). Second, Mr. Spinks concludes, based on numerous factors, that the flow of water from the Industrial Canal breaches was moving in a eastern direction well beyond Paris Road, indicating that the initial flooding of areas on the West side of Paris Road was due to water from Industrial Canal breaches. _See id._ Exh. 1 (Spinks Report, at 22-23, 29). Based thereon, Paris Road is, if anything, a conservative geographic demarcation for the Eastern Class boundary.

Plaintiffs' proposed class definition also meets all of the requisite standards for properly drafted class definitions.

KP&A

KHORRAMI POLLARD & ABIR LLP

First, the proposed class is objectively ascertainable. All class members who comprise the plaintiff class may be identified by the fact they either resided, owned property or owned businesses within the distinct geographic area on August 29, 2005 – the date on which flooding from breaches of the East wall of the Industrial Canal occurred. Thus, each member of the Class will be able to determine if he or she is a class member simply by reading the definition.

Second, the proposed class is merits neutral, as adjudication of Defendants' liability is not required to determine class membership. Whether a person or an entity sustained damage may be determined separate and apart from the issue of whether Defendants were the cause of any damage suffered.

Third, the proposed plaintiff class is precise. Persons or entities that did not reside, own property or own a business within the distinct geographic "class area" on August 29, 2005 are, by definition,excluded from the plaintiff class. Conversely, any individual/entity that does not opt out of the action will be deemed a member of the putative class as to claims for injuries, loss, and/or damages stemming from the flooding of the East wall of the Industrial Canal on August 29, 2005.

Significantly, Plaintiffs' proposed class definition embodies all of the features of the defined class that was certified by Judge Fallon in *Turner*, 234 F.R.D. at 611-616:

> IT IS FURTHER ORDERED that, pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, a Class consisting the following persons shall be certified, which Class the Court finds is adequately defined and clearly ascertainable:
>
>> All persons and/or entitles who/which have sustained injuries, loss, and/or damages as a result of the September 2005 spill of crude oil and any other related substances from a storage tank located on Defendant Murphy Oil USA, Inc. 's property in Meraux, Louisiana, and who/which on August 29, 2005, were residents of, or owned properties or businesses in, the following area: Beginning north, from the 40 Arpent Canal with its intersection in the west at Paris Road in Chalmette, Louisiana, and traveling along Paris Road in a southerly direction to its intersection with St. Bernard Highway, then heading east from this intersection along St. Bernard Highway to Jacob Drive, then heading north along Jacob Drive to the intersection with East Judge Perez Drive, then heading east along East Judge Perez Drive to its intersection with Mary Ann Drive, then heading north along Mary Ann Drive to the 40 Arpent Canal.

*See Turner* at, 234 F.R.D. at 615-16.



In light of the forgoing, as well as on the basis of the opinions of Melvin Spinks submitted herewith, the Court should find that the proposed class is adequately defined and clearly ascertainable.[4]

2.      The Class Is So Numerous That Individual Actions Are Impracticable

In order to satisfy the numerosity requirement under FRCP 23(a)(1), plaintiffs must demonstrate that the class is "so numerous that joinder of all members is impracticable." *See* Fed. R. Civ. P. 23(a)(1).  In the mass tort context, "[n]umerosity is not usually a problem because, by definition, the cases involve large numbers of victims." *See 5 Newberg,* 17.8 (4th ed. 2008). "'Although the number of members of any proposed class is not determinative of whether joinder is impracticable' the Fifth Circuit has generally set the threshold of 100 to 150 people as satisfying the numerosity requirement." *See Turner*, 234 F.R.D. at 604.[5]

To establish class size, "'a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members…'" *See Pederson v. Louisiana State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000).  However, "[i]t is not necessary that the plaintiffs identify the exact number of class members involved; courts have often used common sense assumptions to support a finding of numerosity."  *Alberto N. v. Gilbert*, 2000 U.S. Dist. LEXIS 22723 (E.D. Tex. Aug. 17, 2000), citing *Zeidman v. J. Ray McDermott & Co., Inc*., 651 F.2d 1030, 1039 (5th Cir. 1981).  In evaluating impracticability, the Court may consider various factors, including geographical dispersion of the class, the ease with which class members may be identified, and the nature of the action [*Zeidman v. J. Ray McDermott &*

---

[4] Of course, any defect in the class definition is not a basis, in and of itself, to decline certification.  *See Turner*, 234 F.R.D. at 611. "District courts are permitted to limit or modify class definitions to provide the necessary precision" and "should not dismiss the action simply because the complaint seeks to define the class too broadly." *See In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 n.7 (5th Cir. 2004)  (*citing Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993)).

[5] Generally, a class size of 40 or more raises a presumption that the class is sufficiently large to render joinder impracticable. See *In re Am. Commer. Lines, LLC*, 2002 U.S. Dist. LEXIS 10116 (E.D. La. May 28, 2002);  *1 Newberg, § 3.5* (4th ed. 2008) (suggesting that any class consisting of more than forty members "should raise a presumption that joinder is impracticable").



KP&A
KHORRAMI POLLARD & ABIR LLP

*Co.*, 651 F.2d 1030, 1038 (5th Cir, 1981)], and may consider direct evidence or draw conclusions by inference.  *See e.g. Mullen*, 186 F.3d at 625 ("Notwithstanding the lack of any direct evidence, the district court reasonably inferred from the nature of the putative class members' employment that some of them would be geographically dispersed").

Here, based on the geographic size of the "class area" and the degree of destruction alone, it is reasonable to conclude that the proposed class will contain many thousands of putative members.  These inferences may be confirmed by examining objective data derived from official governmental records.

For example, based on 2000 U.S. Census Report data, there are approximately 41,907 putative class members who were "residents" of the geographic region comprising the "class area."  *See Seymour Dec.,* at ¶9-11; Exhs. A-D (U.S. Bureau of the Census, Table QT-H3, "Household Population and Household Type by Tenure: 2000 Data Set: Census 2000 Summary File 4 (SF 4)).  Within this area, 2000 U.S. Census data also reflects that there were approximately 16,086 residential units [*See id.,* at ¶ 9-10], while 2002 Economic Census Report data reflects that there were approximately 1,158 distinct business units.  *See id.,* at ¶ 12-17; Exhs.F-G.   That property damage or destruction affected thousands is supported by Congress' *Final Report on Katrina*, which concluded that many thousands of the "suddenly homeless" were reported to have been dispersed among more than 44 states within a month of Katrina.  *See Khorrami Dec.,* Exh. 2 (Congressional Reports: H. Rpt. 109-377, at page 311).

The number of putative class members with personal injury related damages is sufficiently numerous but will constitute a small percentage of the Class.  Based on the Congressional testimony of Kathleen Blanco, former Governor of Louisiana, and Colonel Jeff Smith (then Deputy Director, Louisiana Office of Homeland Security and Emergency Preparedness), between 90%[6] and 92%[7] of the New Orleans parish populations were evacuated

---

[6] *See Khorrami Dec.,* Exh. 4 [Statement of Colonel Jeff Smith, <u>Hurricane Katrina: Hearing on the Preparedness and Response by the State of Louisiana Before a Select Committee</u> (Dec. 14, 2005) ("We estimate that over one million people, or approximately 90% of the affected parishes' populations, evacuate in about a forty hour period.");  *See also* Exh. 2 [*Congressional Final Report re Evacuation, H.R. Rep. No. 109-377 at 102*].

[7] *See Khorrami Dec.,* Exh. 5 [Statement of Gov. Kathleen Blanco, <u>Hurricane Katrina:</u>


KHORRAMI POLLARD & ABIR LLP

to safety prior to Katrina.  *See Khorrami Dec.,* at Exhs. 4 and 5.   To that end, the class of individuals with personal injury or emotional injury related damages could be, at the highest estimate, about 10% of the 41,907 putative "resident" class members – or 4,190 individuals. Of this number, a fraction will involve claims pertaining to wrongful death.  Official "Katrina Deceased Victims Reports" reflect that approximately 683 individuals who resided in either Orleans or St. Bernard Parishes subsequently perished.[8] *See Khorrami Dec.,* Exh. 3.

Based on the foregoing, there is no reasonable dispute that Plaintiffs necessarily satisfy the element of numerosity.

### B.    COMMON ISSUES OF LAW AND FACT PREDOMINATE OVER INDIVIDUAL ISSUES

"Commonality" under Rule 23(a)(2) requires only a minimal showing that "there are questions of law or fact common to the class" [*See* Fed. Rules. Civ. Proc. R. 23(a)(2)*; James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001)], whereas the "predominance" requirement of Rule 23(b)(3) elevates a plaintiff's burden to demonstrate that such "questions of law or fact common to class members *predominate* over any questions affecting only individual members."  *See* Fed. Rules Civ. Proc. R. 23(b)(3).  Due to the overlapping quality of these elements, Courts generally consider both elements together.[9]

---

Hearing on the Preparedness and Response by the State of Louisiana Before a Select Committee (Dec. 14, 2005) ("I am proud that we rapidly moved over 1.2 million people – some 92% of the population – to safety without gridlock or undue delay prior to Katrina.").

[8]  This number is likely overinclusive, as the proposed Class area, while including parts of both Orleans and St. Bernard Parishes, does not encompass both Parishes in their entirety.

[9] Commonality "ordinarily is considered in connection with the Rule 23(b)(3) predominance inquiry because the court usually can find at least one issue that can be said to be 'common' under the liberal wording of Rule 23(a)(2)."  *See Broussard v. Parish of Orleans*, 2001 U.S. Dist. LEXIS 11941, 11-12 (E.D. La. Aug. 2, 2001). For this reason, courts acknowledge that "commonality" under Rule 23(a)(2) is not significant in the context of Rule 23(b)(3) certification due to the "predominance" test.  *See e.g. In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 2006 U.S. Dist. LEXIS 9726, 9-10 (E.D. La. Mar. 13, 2006).



KHORRAMI POLLARD & ABIR LLP

"To demonstrate commonality, plaintiffs must allege that there exist 'questions of law or fact common to the class.'" *Broussard v. Parish of Orleans*, 2001 U.S. Dist. LEXIS 11941 (E.D. La. Aug. 2, 2001). "The test for commonality is not demanding and is met 'where there is at least **one** issue, the resolution of which will affect all or a significant number of the putative class members.'" *See Mullen*, 186 F.3d at 625. To that end, commonality will necessarily always be met in mass tort cases arising out of a singular event. *See e.g. Turner*, 234 F.R.D. at 604 ("That requirement is clearly met in this case, which involves a single accident.").

However, the element of "predominance" is more exacting. When evaluating whether common issues of law and fact "predominate" under Rule 23(b)(3), the Court must "examine each of Plaintiffs' claims individually, as the Court must determine how these claims would be tried." *See Turner*, 234 F.R.D. at 606 . The court's focus in this regard is to determine "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *See Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 601-602 (5th Cir., 2006). Boiled to its essence, the predominance "requirement of Fed. R. Civ. P. 23(b)(3) is intended to ensure that the disallowance of individual trials is warranted by a sufficient gain in efficiency." *See Watson*, 979 F.2d at 1022.

"In the context of mass tort litigation, … a class issue predominates if it constitutes a significant part of the individual cases." *See Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022-1023 (5th Cir. La. 1992); *Jenkins v. Raymark Indus.*, 782 F.2d 468, 472 (5th Cir., 1986); *Mullen*, 186 F.3d at 626. This determination does **not** entail a numerical tabulation of common issues versus individual issues. *See Mullen*, 186 F.3d at 626; *2 Newberg, § 4.25* (4th ed. 2008). In fact, "[a] single common issue may be the overriding one in the litigation, despite the fact the suit also entails numerous remaining individual questions." *See 2 Newberg, § 4.25* (4th ed. 2008); *See e.g. Jenkins v. Raymark Inds., Inc,* 782 F.2d 468 (5th Cir. 1986). Instead, in the mass tort context, courts generally focus on whether the benefit conferred by adjudicating common issues of liability in the initial trial phase outweighs the burdens of adjudicating

KP&A
KHORRAMI POLLARD & ABIR LLP

individualized damage and causation issues to be tried in subsequent phases of the bifurcated trial plan.  *See Mullen*, 186 F.3d at 626; *Watson*, 979 F.2d at 1022-23.

For example, in *Mullen*, 186 F.3d 620 (5th Cir.,1999), the Court reasoned that predominance existed by virtue of the fact that **(1)** the common issues of the defendant's negligence to be tried in phase one were "not only significant but also pivotal" to each class member's claims, and **(2)** individualized issues relating to causation, damages, and comparative negligence to be tried in phase two were likely to be manageable insofar as all class members were claiming to be injured "from the same defective ventilation system over the same general period of time."  *See Mullen*, 186 F.3d at 626.  Similarly, in *Watson*, 979 F.2d 1014 (5th Cir., 1992), the Court reasoned that "[t]he class issues to be determined by the Phase 1 jury form integral elements of the claims asserted by each of the more than 18,000 plaintiffs" and as such, "[t]here can be no serious contention that the district court abused its discretion in determining that these issues predominate for the purpose of class certification."  *See Watson*, 979 F.2d at 1022-1023.

Conversely, predominance in mass tort cases has failed where issues of liability do not turn on a common event [*McGuire v. International Paper Co.*, 1994 U.S. Dist. LEXIS 4783 (S.D. Miss. Feb. 18, 1994) ("The present action does not turn on a single act committed by the defendant that affects all class members identically, such as an explosion, a single toxic spill, or an air crash" but "[r]ather,... concern an alleged course of conduct extending over a number of years, during which class members supposedly claim that they have been affected in different ways and at different times.")], or where plaintiff's counsel fail to undertake efforts to demonstrate to the Court that individualized issues are manageable.  *See e.g. Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603-604 (5th Cir., 2006) (reasoning that while "[t]his court has likewise approved mass tort or mass accident class actions when the district court was able to rely on a manageable trial plan--including bifurcation and/or subclasses--proposed by counsel…We need not now consider whether bifurcation or subclasses would remedy Appellants' difficulties in this case, because Appellants' counsel never proposed either.").

Here, Plaintiffs seek to certify a single claim for negligence on behalf of the approximately 43,065 persons and entities that comprise the putative class, based on injuries arising from a singular common event – the breach of the East wall of the Industrial Canal by the breakaway of Barge ING 4727.   As Plaintiffs' proposed negligence claim is predicated upon the conduct of Defendants in precipitating this singular damaging event, numerous issues of law and fact exist that will commonly affect all members of the putative class.  Moreover, because those common issues will constitute a "significant part of the individual cases" – encompassing the elements of duty, breach and legal causation – sufficient cohesiveness exists to ensure that disallowance of individual trials by the approximately 43,065 persons and entities that comprise the putative class is warranted by a sufficient gain in efficiency.

For these reasons, as set forth in detail below, this Court should find that commonality under Rule 23(a)(2) and predominance under Rule 23(b)(3) have been met.

1.    <u>Because All Class Members Were Injured by a Singular Common Event, Numerous Issues of Law and Fact Necessarily Exit that Will Commonly Affect All Members of the Putative Class</u>

Plaintiffs easily satisfy the requirement of "commonality" under Rule 23(a)(2); Plaintiffs and the approximately 43,065 persons and entities that comprise the putative Class allege injury based on a singular common event – the breach of the East wall of the Industrial Canal by the breakaway of Barge ING 4727.   Thus, Plaintiffs' Class Complaint, which alleges a single "claim for relief" based on common-law negligence,[10] is predicated on a common nucleus involving a multitude of legal and factual issues that are identical to each and every member of the putative Class.   Such common issues include the following:

---

[10] "The analysis of a maritime tort is guided by general principles of negligence law." *See Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. La. 1987). "To establish maritime negligence, a plaintiff must 'demonstrate that there was [1] a duty owed by the defendant to the plaintiff, [2] breach of that duty, [3] injury sustained by [the] plaintiff, and [4] a causal connection between the defendant's conduct and the plaintiff's injury.'" *See Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. La. 2000).



**First**, numerous legal issues common to the Class exist as to whether Defendants owed a "duty of care" concerning Barge ING 4727,[11] including the following:

- Whether Defendants owed members of the Class a common-law duty of reasonable care concerning Barge ING 4727, and if so, what was the nature and scope of that duty;

- Whether 33 CFR § 6.14-2 created a duty of care in Defendants regarding the mooring of Barge ING 4727 on the dates in question, and if so, what was the nature and scope of that duty;

- Whether 33 CFR § 6.19-1 created a duty of care in Defendants to protect and secure Barge ING 4727 and the surrounding levies, and if so, what was the nature and scope of that duty; AND

- Whether 33 CFR § 162.75 (b)(3)(ii) created a duty of care in Defendants regarding the mooring of Barge ING 4727 on the dates in question, and if so, what was the nature and scope of that duty.

As the alleged breach of the East wall of the Industrial Canal by the breakaway of Barge ING 4727 is an issue that is common to all members of the defined Class, issues relating to whether Defendants maintained a duty of care as to Barge ING 4727 can (and should) be resolved as to all class members on a common basis. In resolving these issues, it is anticipated that Counsel for both sides will provide the Court briefing affecting all Class members so that the Court may render its legal determination as to whether a duty was owed to members of the proposed Class.

**Second**, there exist numerous common issues of fact with regard to each Defendant's conduct relating to Barge ING 4727 at the time in question, and whether such conduct constituted "breach" of the duty of care owed to the Class.[12] Such common factual issues include:

- Whether Defendant refused and/or failed to remove the loaded Barge ING 4727 from the Lafarge North America facility on the Industrial Canal on Friday,

---

[11] "Whether a defendant owes a plaintiff a legal duty is a question of law." *See Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. La. 2000). "[T]he determination of whether a party owes a duty to another depends on a variety of factors, 'most notably the foreseeability of the harm suffered by the complaining party.'" *See id*. at 377.

[12] "Whether a defendant has breached a duty owed is a question of fact." *See Florida Fuels v. Citgo Petroleum Corp.*, 6 F.3d 330, 333 (5th Cir. La. 1993).



August 26, 2005, and thereafter prior to its unloading, and if so, whether this was a breach of Defendant's duty of care owed to members of the Class;

Plaintiffs will establish the fact of Defendant Lafarge's above stated conduct by way of common evidence, including:  *See Khorrami Dec., Exh. 6* [Earl Smith Depo., at 40:12 to 42:4, 57:19 to 60:17 (Lafarge Maintenance Supervisor testifying that Lafarge kept Barge ING 4727 to unload its contents, as Lafarge had a shortage of H-cement, the type of cement loaded on ING 4727)].

Moreover, Plaintiffs will establish that such conduct by Defendant breached the applicable standard of care by way of common evidence as well, including:  *See Khorrami Dec., Exh.* 7 [(Report of Donald Green, USCG (Retired), at 8 ("Lafarge failed to adhere to the recommendations of Annex C by failing to determine the special needs and intentions of vessels moored at the facility, failing to determine whether vessels desiring to remain moored at the facility during the hurricane would be allowed to do so and failing to notify the vessel master, vessel agent, and the COTP of the facilities decision.")].

- Whether Defendant unloaded and unballasted Barge ING 4727 on Friday and Saturday, August 26 and 27, 2005, and if so, whether this was a breach of Defendant's duty of care owed to members of the Class;

Plaintiffs will establish the fact of Defendant Lafarge's above stated conduct by way of common evidence, including:  *See Khorrami Dec., Exh.* 6 [Smith Depo., at 40:12 to 41:12, 56:25 to 57:18 (testifying that ING 4727 was completely unloaded between 9:00 am and 10:00 am on August 27, 2005)]; *Exh.* 8 [Edward Busch Depo., at 34: 1-6 (Lafarge North America Assistant Terminal Manager testifying that Barge ING 4727 was finished, released and ready to be picked up at around 9:00 am on August 27, 2005)].

Moreover, Plaintiffs will establish that such conduct by Defendant breached the applicable standard of care by way of common evidence as well, including:  *See Khorrami Dec., Exh.* 7 (Report of Donald Green, USCG (Retired), at 7 (concluding that "the height difference between the two barges was about 6 feet" and "[t]his mooring arrangement, in my opinion, is totally inadequate to prevent a breakaway during hurricane force winds.")].



- Whether Defendant failed to remove or cause the removal of the unloaded Barge ING 4727 from the Lafarge North America facility on the Industrial Canal on Saturday, August 27, 2005, and thereafter prior to the advent of Hurricane Katrina on August 29, 2005, and if so, whether this was a breach of Defendant's duty of care owed to members of the Class;

Plaintiffs will establish the fact of Defendant Lafarge's above stated conduct by way of common evidence, including:  *See Khorrami Dec., Exh.* 8 [Busch Depo., at 36:15-40:11 (testifying that he (1) left a voicemail with Zito towing to request a pick-up of ING 4727 on August 27, 2005, (2) that he did not expect the barge to be picked up prior to the storm, and (3) that he did not attempt a second call to Zito after leaving the voicemail, or attempt to contact Zito by another method of communication)];  *Exh.* 10 [Raymond Grabert Depo., at 70:11-71:1 (Captain of the REGINA H tugboat testifying (1) that there was nothing that would have prevented him from removing Barge ING 4727 from the canal and take it to a fleeting operation, and (2) that if Lafarge had asked him, he would have done it.)].

Moreover, Plaintiffs will establish that such conduct by Defendant breached the applicable standard of care by way of common evidence as well, including:  *See Khorrami Dec., Exh.* 7 [(Report of Donald Green, USCG (Retired), at 8 ("It is my opinion that Lafarge's failure to order Joseph C. Domino, Inc., …to remove the *ING 4727* from the facility and tow it to a fleet in the Mississippi River rather than top the two barges around could and would have prevented this breakaway.")].

- Whether Defendant failed to reballast the unloaded Barge ING 4727 at the Lafarge North America facility on the Industrial Canal on Saturday, August 27, 2005, and thereafter prior to the advent of Hurricane Katrina on August 29, 2005, and if so, whether this was a breach of Defendant's duty of care owed to members of the Class;

Plaintiffs will establish the fact of Defendant Lafarge's above stated conduct by way of common evidence, including:  *See Khorrami Dec., Exh. 6* [Smith Depo., at 65:14-18; 71:1-78:11 (testifying that the empty Barge ING 4727 was moored against a full barge, and that the empty Barge sat about 8 feet above the full barge)].

Moreover, Plaintiffs will establish that such conduct by Defendant breached the applicable standard of care by way of common evidence as well, including:  *See Khorrami*



KHORRAMI POLLARD & ABIR LLP

*Dec., Exh.* 7 [Report of Donald Green, USCG (Retired), at 7 (concluding that "the height difference between the two barges was about 6 feet" and that "[t]his mooring arrangement, in my opinion, is totally inadequate to prevent a breakaway during hurricane force winds.")].

- Whether Defendants moored an empty high barge to a loaded low barge at the Lafarge North America facility on the Industrial Canal on Saturday, August 27, 2005, and thereafter prior to the advent of Hurricane Katrina on August 29, 2005, and if so, whether this was a breach of Defendant's duty of care owed to members of the Class;

Plaintiffs will establish the fact of Defendant Lafarge's and/or Defendant Unique/Domino's above stated conduct by way of common evidence, including: *See Khorrami Dec., Exh. 6* [Smith Depo., at 65:14-18; 71:1-78:11 (testifying that the empty Barge ING 4727 was moored against a full barge, and that the empty Barge sat about 8 feet above the full barge)]; *Exh. 10* [Eric Thigpen Depo., at 16:23 to 37:17 (Deckhand on the REGINA H tugboat testifying that the empty Barge ING 4727 was moored against a full barge)].

Moreover, Plaintiffs will establish that such conduct by Defendants breached the applicable standard of care by way of common evidence as well, including: *See Khorrami Dec., Exh.* 7 [Report of Donald Green, USCG (Retired), at 7 (concluding that "the height difference between the two barges was about 6 feet" and that "[t]his mooring arrangement, in my opinion, is totally inadequate to prevent a breakaway during hurricane force winds.")]; *Exh. 13* [Report of Donald Green (January 17, 2007), USCG (Retired), at 11 (concluding that Unique Towing/Domino failed to ensure ING 4727 was adequately moored to withstand hurricane winds, and moreover, failed to ensure that the barge was safe at the facility)].

- Whether Defendants switched the unloaded Barge ING 4727 on Saturday, August 27, 2005, from inboard of a loaded barge that could act as a sea anchor even if the barges broke away from the Lafarge North America facility on the Industrial Canal, and if so, whether this was a breach of Defendant's duty of care owed to members of the Class;

Plaintiffs will establish the fact of Defendant Lafarge's and/or Unique/Domino's above stated conduct by way of common evidence, including: *See Khorrami Dec., Exh. 8* [Busch Depo., at 58:19-66:8 (testifying that he called Domino/Unique to have a tug come and move the empty Barge ING 4727, which was moored to a full barge, to the outside of the dock, but

21

was not there when tugboat arrived);  *Exh. 6* [Smith Depo., at 76:3-83:8 (testifying that Domino/Unique was called to switch the empty Barge ING 4727 to the outside position of the full barge to which it was moored due to concerns the empty Barge, which was sitting high, would damage the dock)];  *Exh. 10* [Thigpen Depo., at 16:23 to 37:17 (testifying that the empty Barge ING 4727, which was moored a full barge and facing the dock when he arrived, was untied from the dock and rotated – withithout untying  the full barge – to face the outside of the dock)];  *Exh. 9* [Grabert Depo., at 43:21 ("[the dispatcher] gave me the barge numbers and told me there was an empty on the dock with a load on the outside.  I would go there and flip the two around, and tie the load back to the dock.");   *Exh. 11* [David Castaing Depo., at 21:1 to 23:9 (Dispatcher for Joseph C. Domino, Inc., a Marine Towing Brokerage, testifying that "[Edward Busch] wanted us to just top around the two barges.")].

Moreover, Plaintiffs will establish that such conduct by Defendants breached the applicable standard of care by way of common evidence as well, including:  *See Khorrami Dec., Exh.* 7 [Report of Donald Green, USCG (Retired), at 7 ("it is my opinion that the decision to top around the barges, placing the empty ING 4727 on the outboard side of the tier, was imprudent, unseamanlike, and unnecessarily exposed the empty ING 4727 to the likelihood of breaking way from its moorings.")];  *Exh. 13* [Report of Donald Green (January 17, 2007), USCG (Retired), at 11 (concluding that Unique Towing/Domino failed to ensure ING 4727 was adequately moored to withstand hurricane winds, and moreover, failed to ensure that the barge was safe at the facility)].

- Whether Defendant failed to moor or cable Barge ING 4727 directly to the shore as provided in the Lafarge North America Hurricane Preparation Checklist, and if so, whether this was a breach of Defendant's duty of care owed to members of the Class;

Plaintiffs will establish the fact of Defendant Lafarge's above stated conduct by way of common evidence, including:  *See Khorrami Dec., Exh. 8* [Busch Depo., at 68:11-70:9 (testifying that he prepared the Lafarge Hurricane Checklist in 2002 or 2003, including the requirement that barges be moored to the dock by cables, that the checklist was still in effect at the time in question)];   *Exh. 6* [Smith Depo., at 84:21-94:25, 110:12 to 111:21 (testifying he

was aware of Lafarge Hurricane Checklist requiring barges to be cabled to shore, and that ING 4727 was secured with rope to the adjoining barges and the dock on the day in question)]; *Exh. 10* [Thigpen Depo., at 16:23-37:17 (testifying that he repositioned ING 4727 outboard of the loaded barge, leaving it moored to only the adjoining loaded barge with rope)].

Moreover, Plaintiffs will establish that such conduct by Defendant breached the applicable standard of care by way of common evidence as well, including:  *See Khorrami Dec., Exh. 7* [Report of Donald Green, at  7 ("Lafarge North America, Inc. violated their own published 'Hurricane Preparation Checklist' by not cabling the barges to shore.")].

- Whether Defendants moored Barge ING 4727 to the loaded barge using only three single-part nylon lines, and thus to the dock of the Lafarge North America facility on the Industrial Canal, in violation of U.S. Coast Guard standards for hurricane preparation and good seamanship, and if so, whether this was a breach of Defendant's duty of care owed to members of the Class;

Plaintiffs will establish the fact of Defendant Lafarge's and/or Defendant Unique/Domino's above stated conduct by way of common evidence, including:  *See Khorrami Dec., Exh. 6* [Smith Depo., at 72:7-9, 110:12-111:21 (testifying that when he left the Lafarge facility Barge ING 4727 was secured with three rope lines to the adjoining barges, and secured with three lines to the dock)];  *Exh. 10* [Thigpen Depo., at 16:23 to 37:17 (testifying that he helped reposition ING 4727 outboard of the loaded barge, where it was moored to the adjoining barge with two-inch rope)];  *Exh. 9* [Grabert Depo., at 47:11-48:10 (testifying that there were 3 single-part lines securing Barge ING 4727 to the adjoining barge)].

Moreover, Plaintiffs will establish that such conduct by Defendants breached the applicable standard of care by way of common evidence as well, including: *See Khorrami Dec., Exh. 7* [Report of Donald Green, at  7 ("that the two barges were moored together with 3 one-part 2-inch polypropylene mooring lines … in my opinion, is totally inadequate to prevent a breakaway during hurricane force winds.")]; *Exh.* 13 [Report of Donald Green (January 17, 2007), USCG (Retired), at 10 (concluding that it was the duty and responsibility of Unique Towing/Domino to ensure that the barges were secured in such a manner, i.e. doubled up mooring lines, to withstand the expected hurricane force winds and tides of Hurricane Katrina, which they did not do. )].

- Whether Defendants failed to provide sufficient mooring lines to moor barges securely to docks in conformance with U.S. Coast Guard standards for hurricane preparation and good seamanship, and if so, whether this was a breach of Defendant's duty of care owed to members of the Class;

Plaintiffs will establish the fact of Defendant Lafarge's and/or Defendant Unique/Domino's above stated conduct by way of common evidence, including:  *See Khorrami Dec., Exh. 6* [Smith Depo., at 72:7 to 73:12 (testifying that any additional lines would have been on the dock)];  *Exh. 11* [David Castaing Depo., 18:18-23:9 (Joseph Domino Dispatcher testifying that tugs do not carry additional lines for purposes of mooring, and that Edward Busch did not request that additional lines be brought to further secure the barges)];  *Exh. 10* [Thigpen Depo., at 14:24 to 16:19 (testifying that (1) he walked all over looking for additional lines, (2) found only a single line, as all other available lines were too short to use, and (3) used the sole available line to tie the loaded barge to the dock)].

Moreover, Plaintiffs will establish that such conduct by Defendants breached the applicable standard of care by way of common evidence as well, including:  *See Khorrami Dec., Exh. 7* [Report of Donald Green, at  8 ("It is my opinion that Lafarge failed to ensure that the *ING 4727* and *ING 4745* had sufficient rigging and or mooring lines to secure the two barges together at the Lafarge dock facility.")];  *Exh.* 13 [Report of Donald Green (January 17, 2007), USCG (Retired), at 10 ("It is my opinion that the owners and or operators of the *REGINA H* failed to ensure that the vessel had sufficient rigging and or mooring lines to secure the two barges, *ING 4727* and *ING 4745,* to the Lafarge dock facility.")].

- Whether Defendant failed to arrange in advance that tugboats could use whatever additional lines were available on tugboats and necessary to moor barges securely to docks in conformance with U.S. Coast Guard standards for hurricane preparation and good seamanship, with payment for the lines to be made subsequently, and if so, whether this was a breach of Defendant's duty of care owed to members of the Class;

Plaintiffs will establish the fact of Defendant Lafarge's above stated conduct by way of common evidence, including:  *See Khorrami Dec., Exh. 11* [Castaing Depo., 18:18-23:9 (Domino Dispatcher testifying that tugs do not carry additional lines for purposes of mooring, and that Edward Busch did not request that additional lines be brought to further secure the

barges)];  *Exh. 12* [McNeill Depo, at 65:23-68:5 (President and Dispatcher of Joseph C. Domino testifying that if Lafarge had requested special mooring, it could have been provided)]

Moreover, Plaintiffs will establish that such conduct by Defendant breached the applicable standard of care by way of common evidence as well, including:  *See Khorrami Dec., Exh. 7* [Report of Donald Green, at 8 (concluding that "Lafarge's failure to order Joseph C. Domino, Inc., to provide additional rigging" was a breach of Lafarge's duty of care to secure the Barge in preparation for hurricane force winds) ].

- Whether Defendants failed to implement safety measures of Port Condition Whiskey X-Ray Yankee Zulu in conformance with U.S. Coast Guard standards for hurricane preparation and good seamanship, and if so, whether this was a breach of Defendant's duty of care owed to members of the Class;

Plaintiffs will establish the fact of Defendant Lafarge's and/or Defendant Unique/Domino's above stated conduct by way of common evidence, including:  *See Khorrami Dec., Exh. 10* [Thigpen Depo., at 16:23 to 37:17, 44:4:13 (testifying that he helped reposition ING 4727 outboard of the loaded barge, where it was moored to the adjoining barge with two-inch rope, and that such rope was one part)];  *Exh. 9* [Grabert Depo., at 47:11-48:10 (testifying that there were three one-part lines securing Barge ING 4727 to the adjoining barge when he arrived)]..

Moreover, Plaintiffs will establish that such conduct by Defendants breached the applicable standard of care by way of common evidence as well, including:  *See Khorrami Dec., Exh. 7* [Report of Donald Green, at 8 ("It is my opinion that Lafarge failed to adhere to the recommendations of the Coast Guard Sector New Orleans Hurricane plan, particularly Appendix 2 requiring that mooring lines be doubled up and that special attention be given to barges moored in the proximity of bridges")];  *Exh. 13* [Report of Donald Green (January 17, 2007), USCG (Retired), at 10 (concluding that it was the duty and responsibility of Unique Towing/Domino to ensure that the barges were secured in such a manner, i.e. doubled up mooring lines, to withstand the expected hurricane force winds and tides of Hurricane Katrina, which they did not do. )].

- Whether Defendants failed to communicate with the Commander of the Port and/or the vessel owner concerning their intentions that Barge ING 4727 would



remain moored at the Lafarge North America facility on the Industrial Canal during Hurricane Katrina, in violation of the U.S. Coast Guard standards for hurricane preparation and good seamanship, and if so, whether this was a breach of Defendant's duty of care owed to members of the Class;

Plaintiffs will establish the fact of Defendant Lafarge's and/or Defendant Zito's above stated conduct by way of common evidence, including:  *See Khorrami Dec., Exh. 8* [Busch Depo., at 36:15-40:11 (testifying that he (1) left a voicemail with Zito towing to request a pick-up of ING 4727 on August 27, 2005, (2) that he did not expect the barge to be picked up prior to the storm, and (3) that he did not attempt a second call to Zito after leaving the voicemail, or attempt to contact Zito by another method of communication)];  *Exh.* 9 [Grabert Depo., at 70:11-71:1; 81:17-23 (Captain of the REGINA H tugboat testifying (1) that there was nothing that would have prevented him from removing Barge ING 4727 from the canal and take it to a fleeting operation, (2) that if Lafarge had asked him, he would have done it, and (3) that he at no point communicated with Lafarge on his cell phone.)].

Moreover, Plaintiffs will establish that such conduct by Defendants breached the applicable standard of care by way of common evidence as well, including: *See Khorrami Dec., Exh. 7* [Report of Donald Green, at 8 ("It is my opinion that Lafarge failed to adhere to the recommendations of the Coast Guard Sector New Orleans Hurricane Plan…[by] failing to notify the vessel master, vessel agent, and the COTP of the facilities decision" and that "[h]ad such notification taken place, it is clear that the vessel master, vessel, and the COTP would have been apprised that the ING 4727 was released for pick-up and moored with only 3 single part lines" and "would have resulted in the vessel being moved and/or properly secured thus preventing the breakaway.")].

- Whether Defendants failed to inspect all moorings among Barge ING 4727, the loaded barge next to it, and the dock at the Lafarge North America facility on the Industrial Canal, to ensure that Barge ING 4727 was securely moored to the dock at the Lafarge North America facility on the Industrial Canal and/or other barges securely moored to this dock, in conformance with U.S. Coast Guard standards for hurricane preparation, and if so, whether this was a breach of Defendant's duty of care owed to members of the Class;

26

Plaintiffs will establish the fact of Defendant Lafarge's and/or Defendant Unique/Domino's above stated conduct by way of common evidence, including: *See Khorrami Dec., Exh. 8* [Busch Depo., at 48:17-50:1, 65:24-66:8 (testifying that (1) he left the Lafarge facility between 12:30 p.m. and 1:00 p.m., prior to tugboat Regina H arriving at the Lafarge facility to flip the string of barges so that the empty Barge was away from the dock, and (2) that he had left the Lafarge facility before the towing company had arrived, and did not oversee, supervise, or inspect whether it was done properly)]; *Exh. 6* [Smith Depo., at 17:17-19, 117:20-118:9 (testifying that (1) he left the Lafarge facility between 12:00 p.m. and 1:00 p.m., and (2) that he had already left and was not at the facility when the boats were topped around tugboat Regina H)]; *Exh. 14* [VanderMuelen Depo., at 137:17-24 (Lafarge Area Distribution Manager, testifying that the Lafarge facility was eventually abandoned); *Exh. 9* [Grabert Depo, at 46:5-17; 48:21-49:12 (testifying that (1) when tugboat Regina H arrived at the Lafarge facility at 14:25 (2:25 p.m.) there were no Lafarge employees present , (2) that he did not personally look to see exactly how the Barge ING 4727 was tied to the loaded barge)].

Moreover, Plaintiffs will establish that such conduct by Defendant breached the applicable standard of care by way of common evidence as well, including: *See Khorrami Dec., Exh. 7* [Report of Donald Green, at 7-8 (all opinions stated therein)]; *See also Exh.* 13 [Report of Donald Green (January 17, 2007), USCG (Retired), at 10, 11 (concluding that (1) it was the duty and responsibility of Unique Towing/Domino to ensure that the barges were secured in such a manner, i.e. doubled up mooring lines, to withstand the expected hurricane force winds and tides of Hurricane Katrina, which they did not do, and (2) that Unique Towing/Domino failed to ensure ING 4727 was adequately moored to withstand hurricane winds, and moreover, failed to ensure that the barge was safe at the facility )].

- Whether Defendants failed to implement Congressional statutes and regulations, and/or for failure to implement United States Coast Guard standards of maritime care and recommendations contained in the Sector New Orleans Hurricane Plan, with respect to communications, mooring, and hurricane planning as to vessels intended to remain in the Industrial Canal or affected areas during hurricanes such as Hurricane Katrina, and if so, whether this was a breach of Defendant's duty of care owed to members of the Class; AND

Plaintiffs will establish the fact of Defendants above stated conduct by way of common evidence, including: *See Khorrami Dec., Exh's* 6, 8-12, and 14 above.

Moreover, Plaintiffs will establish that such conduct by Defendants breached the applicable standard of care by way of common evidence as well, including: *See Khorrami Dec., Exh. 7* [Report of Donald Green, at 8 (concluding that Defendant (1) "violated the provisions of 33 CFR 162.75 (b)(3)(ii) … for their failure to ensure that the *ING 4727* was adequately moored to withstand the anticipated hurricane force winds of Hurricane Katrina" (2) "violated the provisions of 33 CFR 6.19 … for their failure to ensure that the *ING 4727* was secure and safe at the Lafarge facility" (3) failed to adhere to the recommendations of the Coast Guard Sector New Orleans Hurricane plan, particularly Appendix 2 requiring that mooring lines be doubled up and that special attention be given to barges moored in the proximity of bridges" and (4) "failed to adhere to the recommendations of Annex C by failing to determine the special needs and intentions of vessels moored at the facility, failing to determine whether vessels desiring to remain moored at the facility during the hurricane would be allowed to do so and failing to notify the vessel master, vessel agent, and the COTP of the facilities decision.")]; *See also Exh.* 13 [Report of Donald Green (January 17, 2007), USCG (Retired), at 11 (concluding that Unique Towing/Domino failed to ensure ING 4727 was adequately moored to withstand hurricane winds, and moreover, failed to ensure that the barge was safe at the facility)].

- Whether Defendants abandoned the Lafarge facility on the Industrial Canal on Saturday, August 27, 2005, despite their knowledge that the unloaded Barge ING 4727 was at the facility, improperly moored and that Hurricane Katrina was forecast to affect New Orleans severely, and if so, whether this was a breach of Defendant's duty of care owed to members of the Class.

Plaintiffs will establish the fact of Defendant Lafarge's and/or Unique/Domino's above stated conduct by way of common evidence, including: *See Khorrami Dec., Exh. 8* [Busch Depo., at 48:17-50:1, 65:24-66:8 (testifying that (1) he left the Lafarge facility between 12:30 p.m. and 1:00 p.m., prior to tugboat Regina H arriving at the Lafarge facility to flip the string of barges so that the empty Barge was away from the dock, and (2) that he had left the Lafarge facility before the towing company had arrived, and did not oversee, supervise, or inspect

28

whether it was done properly)];  *Exh. 6* [Smith Depo., at 17:17-19, 117:20-118:9 (testifying that (1) he left the Lafarge facility between 12:00 p.m. and 1:00 p.m., and (2) that he had already left and was not at the facility when the boats were topped around tugboat Regina H)]; *Exh. 14* [VanderMuelen Depo., at 137:17-24 (Lafarge Area Distribution Manager, testifying that the Lafarge facility was eventually abandoned)];  *Exh. 9* [Grabert Depo, at 46:5-17 (testifying that tugboat Regina H arrived at the Lafarge facility at 14:25 (2:25 p.m.) and there were no employees at the facility)].

Moreover, Plaintiffs will establish that such conduct by Defendants breached the applicable standard of care by way of common evidence as well, including:  *See Khorrami Dec., Exh. 7* [Report of Donald Green, at 7-8 (all opinions stated therein)];  *See also Exh.* 13 [Report of Donald Green (January 17, 2007), USCG (Retired), at 10, 11 (concluding that (1) it was the duty and responsibility of Unique Towing/Domino to ensure that the barges were secured in such a manner, i.e. doubled up mooring lines, to withstand the expected hurricane force winds and tides of Hurricane Katrina, which they did not do, and (2) that Unique Towing/Domino failed to ensure ING 4727 was adequately moored to withstand hurricane winds, and moreover, failed to ensure that the barge was safe at the facility )].

Thus, as such factual issues relating to whether Defendant breached a duty of care as to Barge ING 4727 are not only identical to all members of the proposed class, but will be established based on common evidence, such issues can (and properly should) be resolved as to all class members on a common basis.

**Third,** there exist additional common factual and/or legal issues relating to whether Plaintiffs and the Class are entitled to legal presumptions regarding Defendants' negligence.[13] These issues, which are common to all members of the class, include:

---

[13] "It is well established that there is a presumption of fault against a moving vessel that strikes a stationary object, such as a dock or navigational aid."  *See Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 794 (5th Cir. 1977); *In re TT Boat Corp.*, 1999 U.S. Dist. LEXIS 5627, 25 (E.D. La. 1999).  "The presumption suffices to make a prima facie case of negligence against the moving vessel"  [*See Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir. 1967)], and shifts the burden to the moving vessel to "show that it was without fault or that the collision was occasioned by fault of the stationary object or was the result of inevitable accident."  *See Bunge Corp.*, 558 F.2d at 795.


KP&A
KHORRAMI POLLARD & ABIR LLP

- Whether Barge ING 4727 is a "moving vessel" within the meaning of the Louisiana (drifting vessel) and Pennsylvania (violation of statute) rules;

- Whether the levee is a "stationary object" within the meaning of the Louisiana rule;

- Whether Barge ING 4727 struck the levee.

If the presumption applies, this will shift the burden to Defendant negate all of the above stated factual issues, as the presumption shifts the burden to Defendant to "exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required" to rebut such presumptions.[14]

Because these legal and factual issues are identical to all members of the proposed class, and will be established as to all class members based on identical legal principles and proof, they can (and properly should) be resolved as to all class members on a common basis.

**Fourth**, common factual issues exist as to whether Defendants' conduct was the cause-in-fact of the breaches to the East wall of the Industrial Canal,[15] including:

- Whether the actions of Defendants caused and/or contributed to the breakaway of Barge ING 4727 from the Lafarge North America facility on the Industrial Canal on Monday, August 29, 2005;

Plaintiffs will establish that Defendants' conduct was the cause-in-fact of the breakaway of Barge ING 4727 based on evidence that is common to all members of the Class, including the evidence described above.

- Whether the breakaway of Barge ING 4727 from the Lafarge North America facility caused, was a cause of, and/or contributed to the North Breach in the East wall of the Industrial Canal on Monday, August 29, 2005;

---

[14] If the presumption of negligence applies, the moving vessels burden is "heavy" and is necessarily factually intensive, as the moving vessel "must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required." *See Bunge Corp.*, 558 F.2d at 795.

[15] Causation has "sub-elements of: (a) cause in fact and (b) proximate or legal cause." *In re Mid-South Towing Co.*, 418 F.3d 526, 532 (5th Cir. 2005). Thus, "[a] defendant's actions must be the cause in fact of a plaintiff's injuries in order for the plaintiff to be able to recover." *Moser v. Texas Trailer Corp.*, 623 F.2d 1006, 1013 (5th Cir. 1980). The showing required is "something more than 'but for' causation, and the negligence must be a 'substantial factor' in the injury." *See Thomas v. Express Boat Co.*, 759 F.2d 444, 448 (5th Cir. 1985).



Plaintiffs will establish that the breakaway of Barge ING 4727 was the cause-in-fact of the North Breach in the East wall of the Industrial Canal based on evidence that is common to all members of the Class, including:  *See Khorrami Dec., Exh. 15* [William Villavasso, Jr. Depo., at 63:22-64:24 (Chief Operator of Pump Station No. 5, a facility near the Florida Avenue Bridge, testifying to hearing boom, a portion of the floodwall giving way, and what appeared to be a barge protruding though the North end of the floodwall);   *Exh. 16* [Report of Gennaro G. Marino, Ph.D., PE, at 12-13 (concluding that "[p]resent analyses and evidentiary data indicate that the impact force of the ING 4727 barge likely reduced the safety factor below one and cause failure of the wall at the north … breach locations.")].

- Whether the breakaway of Barge ING 4727 from the Lafarge North America facility caused, was a cause of, and/or contributed to the South Breach in the East wall of the Industrial Canal on Monday, August 29, 2005;

Plaintiffs will establish that the breakaway of Barge ING 4727 was the cause-in-fact of the South Breach in the East wall of the Industrial Canal based on evidence that is common to all members of the Class, including:  *See Khorrami Dec., Exh. 17* [Terry Adams Depo., at 25:4- 27:4 (Mr. Adams, an eyewitness who lived less than half a block from the Industrial Canal, observed and heard the barge contacting and floating through the floodwall at the location of the South Breach, stating "I heard something that sounded like a bang.  When I heard the bang, I seen the barge come floating through.  After the barge came through the water came through, like the water must have rose about 12 feet in seconds".)];  *Exh. 18* [Arthur Murph Statement (witness who lived at 1739 Jordan Avenue, heard a "big boom" and observed a barge)];  *Exh. 20* [Carolyn Berryhill Depo., at 33, 105 (witness who lived at 2604 Deslonde Street, heard a grinding sound)];[16]  *Exh. 16* [Report of Marino, at 12 (concluding that "[p]resent analyses and evidentiary data indicate that the impact force of the ING 4727 barge likely reduced the safety factor below one and cause failure of the wall at the … south breach locations.")].

---

[16] Nine other fact witnesses have been deposed in this action who will testify at trial as to the same,.  Plaintiffs will produce such evidence upon the request of the Court.

31



- Whether the Breaches in the East wall of the Industrial Canal on Monday, August 29, 2005 was a cause of, and/or contributed to the flooding of the class area, and if so, to what degree;

Plaintiffs will establish that the breaches in the East wall of the Industrial Canal  was the cause-in-fact of the flooding of the class area on Monday, August 29, 2005 based on evidence that is common to all members of the Class, including:  *See Khorrami Dec., Exh. 7* [Report of Melvin Spinks, PE, at 29 (concluding that: **(1)** the IHNC north breach occurred at or before 4:00 a.m. and the IHNC south breach occurred at or before 5:30 a.m. on Monday, August 29, 2005, prior to the storm surge overtopping the IHNC floodwall crest elevation, **(2)** that the Lower Ninth Ward began flooding before 4:30 a.m. on Monday morning, moving east into the St. Bernard Parish, eventually merging with the waters from the Chalmette area East of Paris Road at about 9:10 a.m., **(3)** that the flooded areas in the Lower Ninth Ward and St. Bernard Parish were from the floodwaters of the IHNC and eventually merged with the floodwaters from MRGO East of Paris Road, AND **(4)** Water levels for the Lower Ninth Ward and St. Bernard Parish peaked at about 10.5 to 11.2 feet at noon)];

- Whether the flooding of the class area on Monday, August 29, 2005 caused, was a substantial cause of, and/or contributed to injury to the buildings, personal property, business property other than buildings, earnings, income, physical or emotional distress, or bodies of class members, or caused their deaths;

While the issue of whether the flooding of the class area was the cause-in-fact of injuries is an issue that is common to the class, Plaintiffs anticipate that resolution of this issue will entail some individualized inquiry.  However, such individualized inquiry will be limited, for reasons discussed below.

In sum, as numerous factual issues relating to whether Defendant was the cause in fact of flooding of the class area are not only identical to all members of the proposed class, but will be established based on identical evidence, such issues can (and properly should) be resolved as to all class members on a common basis.  **Fifth**, common legal issues exist concerning whether Defendant's conduct should be deemed the "legal cause" (proximate cause) of the injuries to Plaintiff and members of the Class.  Proximate cause entails a legal determination made by the Court, common to all members of the proposed Class, concerning

the scope of Defendants' duties,[17] including:

- Whether the scope of Defendants' duty of reasonable care under the common law encompassed the risk of harm to the Plaintiffs?

- Whether the scope of Defendants' duty under 33 CFR § 6.14-2 regarding the mooring of Barge ING 4727 encompassed the risk of harm to the Plaintiffs?

- Whether the scope of Defendants' duty under 33 CFR § 6.19-1 to protect and secure Barge ING 4727 and the surrounding levies encompassed the risk of harm to the Plaintiffs?

- Whether the scope of Defendants' duty under 33 CFR § 162.75(b)(3)(ii) as to the mooring of Barge ING 4727 encompassed the risk of harm to the Plaintiffs?

In resolving these issues, it is anticipated that Counsel for both sides will provide the Court briefing so that the Court may render its legal determination as to whether a Defendant's duty of care extended to cover the injuries alleged. As these legal issues are identical to all members of the proposed class, such issues can (and properly should) be resolved as to all class members on a common basis.

> 2.      Common Issues Predominate Within The Meaning Of Rule 23(B)(3), As Disallowance Of Individual Trials By The More Than 40,000 Persons And Entities That Comprise The Putative Class Is Warranted By A Sufficient Gain In Efficiency

Common issues of duty, breach, cause-in-fact, and legal cause provide an opportunity for massive efficiency gains via class adjudication. The benefit in efficiency that will be conferred by common adjudication of these issues that are common to the approximately 43,065 persons and entities that comprise the putative class far outweighs the burden posed by

---

[17] "Proximate cause analysis, which involves policy considerations of remoteness and limitation of liability, need only be considered after cause-in-fact has been established." *See Harrison v. Flota Mercante Grancolombiana, S. A.*, 577 F.2d 968, 983 (5th Cir. 1978). Under general tort principles, proximate cause "is ultimately a question of policy as to whether the particular risk falls within the scope of the duty" and "asks 'whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this manner.'" *See Roberts v. Benoit*, 605 So. 2d 1032, 1044-45 (La. 1991). Under maritime law, "[t]he task of defining the proper reach or thrust of a rule in its policy aspects is one that must be undertaken by the court in each case as it arises" and "[f]oreseeability obviously marks the limits placed on a defendant's duty...." *See Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d at 67.


KHORRAMI POLLARD & ABIR LLP

adjudicating any individualized damage and causation issues.  For several reasons, the common issues in this case "constitute a significant part of the individual cases," and as such, common issues necessarily must be deemed to predominate within the meaning of rule 23(b)(3).

      **First**, the loss of each putative class member flows from a single event common event – the breach of the East wall of the Industrial Canal by the breakaway of Barge ING 4727.  Just the adjudication of common issues of liability in "single event" mass tort cases has been deemed to constitute a sufficiently "significant part of the individual cases" for purposes of satisfying predominance, especially where individualized issues relating to causation and damage are managed through the use of a bifurcated trial plan.  *See Mullen*, 186 F.3d at 626; *Watson*, 979 F.2d at 1022-23; *Turner*, 234 F.R.D. at 607.

      **Second**, this action relies upon the same remedial theory to address Defendants' conduct (i.e. common law negligence), which, as discussed above, will turn on evidence and legal determinations that in most cases are identical to the class as a whole.  In fact, elements relating to duty, breach and legal causation will be resolved in identical fashion for every class member.  As was held in *Turner*, 234 F.R.D. at 607, a case alleging class-wide injury based on a common "Katrina" related event, these negligence elements constitute the "predominant issues in the negligence inquiry":

> Under this framework, the Court must determine whether individual trials would be required to prove any or all of the above elements. The majority of these elements focus solely on Murphy Oil's alleged conduct -- whether Murphy owed a duty to Plaintiffs, whether that duty was breached, and whether Murphy's duty encompassed the risk of harm to the Plaintiffs (elements 1, 2, and 4).  There will be some individualized inquiry regarding whether there is oil on a particular plaintiff's property, and whether that oil is crude oil from Murphy's refinery (elements 3 and 5). However, the predominant issues in the negligence inquiry will be centered on the scope of Murphy's duty, if any, to the Plaintiffs. The remaining issues of whether there is crude oil on a plaintiff's property, and how much oil, do not require the type of extensive individualized proof that would preclude class treatment of the negligence claim. Under the negligence inquiry, all a plaintiff would have to prove to satisfy the elements is that either her person or her property came into contact with Murphy crude oil in the affected area. Moreover, if res ipsa loquitur or negligence per se is applicable, a plaintiff would not need to show individualized aspects of damage to establish Murphy's liability.

*See Turner*, 234 F.R.D. at 607.



KHORRAMI POLLARD & ABIR LLP

**Third**, any individualized issues relating to causation will be manageable.  As explained above, individualized issues of fact will be minimal because the overwhelming majority of the factual issues relating to cause-in-fact are not only common to the class, but will be resolved based on identical evidence. Similarly, issues relating to legal cause (which is a policy determination regarding the scope of Defendants' liability) will require a legal determination that can, and should, be determined in a single forum to ensure consistency as to the class as a whole.

Moreover, based on the "singular" nature of the event at issue, this case does not suffer from the type of problematic individualized causation issues that typically flow from long term "exposure" cases.  *Compare McGuire v. International Paper Co.*, 1994 U.S. Dist. LEXIS 4783 (S.D. Miss. Feb. 18, 1994) ("The present action does not turn on a single act committed by the defendant that affects all class members identically, such as an explosion, a single toxic spill, or an air crash" but "[r]ather,... concern an alleged course of conduct extending over a number of years, during which class members supposedly claim that they have been affected in different ways and at different times."); *with Watson* , 979 F.2d at 1023(reasoning that certification was appropriate insofar as refinery explosion that formed the basis of the action "differs markedly from toxic tort cases such as Jenkins, Fibreboard, and Tetracycline, in which numerous plaintiffs suffer varying types of injury at different times and through different causal mechanisms,  thereby creating many separate issues.").

**Finally**, any individualized issues relating to damages are manageable.  As the Class is comprised of persons and entities residing within the Class area – the majority of whom evacuated prior to Katrina – the predominant damage sought by the Class necessarily will necessarily be damage to property (real, business and personal), which will be established on a class-wide basis with mass appraisal/valuation techniques.  Under Plaintiffs' proposed trial plan (*filed concurrently herewith*), any individualized damage issues would be adjudicated in a separate, bifurcated, trial phase.  "The Fifth Circuit has repeatedly upheld the decisions of district courts to bifurcate class action trials into liability and damages phases."  *See e.g.* *Turner*, 234 F.R.D. at 606 (*citing Mullen*, 186 F.3d at 628); *See also Bell Atl. Corp. v. AT&T*

*Corp.,* 339 F.3d 294, 307, n. 16 (5th Cir., 2003); *Steering Comm.*, 461 F.3d at 603-04 .  Indeed, "[t]he courts' ability to sever the damages portion of a class action suit from the liability portion is the principal reason why variations among class members in the amount of damages suffered frequently does not defeat predominance."  *See Bell Atl. Corp.*, 339 F.3d at 307 n.16.

Adjudication of property damage is particularly suitable for class resolution, as property damages are a form of "[s]pecial damages … which have a 'ready market value,' such that the amount of the damages theoretically may be determined with relative certainty…." *See McGee v. ACandS, Inc.*, 933 So. 2d 770, 774 (2006).  To establish the "market value" of property damages here, Plaintiffs rely on the testimony of expert, John Kilpatrick (Ph.D., MRICS, Real Estate Appraiser and Consultant), who proposes valuation of loss by way of "mass appraisal."  *See Khorrami Dec*., Exh. 21 [Expert Report of John Kilpatrick].  As this Court has acknowledged "mass appraisal is an accepted methodology" that "is a recognized standard under Rule 6 of the Uniform Standards of Professional Appraisal Practice ("USPAP) and has been accepted in this district in another case arising out of Hurricane Katrina…."  *See In re Katrina Canal Breaches Consol. Litig.,* 2007 U.S. Dist. LEXIS 82887, 275 (E.D. La. Nov. 1, 2007). (citing *Turner v. Murphy Oil US*, 2006 U.S. Dist. LEXIS 985 (E.D.La. Jan. 12, 2006)).

Under the mass valuation methodology proposed by Plaintiffs, data related to properties in the class area will be collected by Dr. Kilpatrick. [18]  That data would include information such as lot size, building size, previously assessed value, sale prices before and after the breach and flood event, flood depth data, topographical data, and so forth.  The assembled data is then analyzed using econometric methods to create a valuation formula.  When data for a particular property is entered into the valuation formula, the value of the property after the breach and flood event will result.  This value will then be compared to the property value immediately prior to the flooding event to determine the loss in value resulting from the breach and flood event.  *See Khorrami Dec*., Exh. 21 [Expert Report of John Kilpatrick].

---

[18] Significant portions of the data set have already been collected by Dr. Kilpatrick.


KP&A
KHORRAMI POLLARD & ABIR LLP

In terms of physical and emotional injuries, this case is directly analogous to *Turner v. Murphy Oil USA, Inc.* – another class action case arising out of events relating to Hurricane Katrina.  In that case, the Court found that issues relating to personal injury and mental anguish damage were manageable based on the great factual similarities between the plaintiffs' claims, including (1) that the majority of class members had evacuated prior to Katrina, and as such, were out of the area when the spill occurred, and (2) that those alleging personal injury and/or emotional distress claims based such claims on the same event – exposure to crude oil. *See Turner*, 234 F.R.D. at 607 n. 6.[19]

Here, adjudication of physical injuries and/or emotional anguish damages caused as a result of the breach in the East wall of the Industrial Canal will be manageable for the same reason identified by the Court in *Turner*:

First, like *Turner,* the overwhelming majority of class members evacuated prior to Katrina, and as such, the number of "potential" class members claiming personal injury and/or generalized emotional anguish damages as a result of the breach should be relatively small.[20] As discussed above, official records place the number of residents that did not evacuate at approximately 10%, the pool of potential claimants will likely be capped at approximately 4,190 individuals (i.e. 10% of the estimated 41,907 persons who comprise the putative class).

---

[19] On this basis, the instant action is distinguishable from *Ancar v. Murphy Oil, U.S.A., Inc.*, 2008 U.S. Dist. LEXIS 68490, 25-26 (E.D. La. July 25, 2008), and is much more akin to *Turner*.

[20] It is obvious that persons who evacuated New Orleans prior to Katrina would not have sustained a physical injury by the event in question.  This is also true as to emotional distress, since recovery of emotional anguish in the absence of an accompanying physical injury requires the claimant establish a physical and temporal "proximity" to the injury causing event. While "[t]raditionally, neither the general maritime law nor the Jones Act recognized a right to recover damages for negligent infliction of emotional distress unaccompanied by some physical contact or injury [,] … [m]ore recently, courts have broadened the rule to permit recovery by an individual who was in the 'zone of danger' of a physical impact and suffered emotional trauma as a result."  *See In re Complaint of Clearsky Shipping Corp.*, 1998 U.S. Dist. LEXIS 13842, at 10 (E.D. La. Aug. 27, 1998) (citing *Anselmi v. Penrod Drilling Co*., 813 F. Supp. 436 (W.D.La. 1993).  "The zone of danger theory preserves traditional tort doctrines of negligence, legal causation, and forseeable risks and, by doing so, it sustains the common law's ability to deal with frivolous claims."  *See Anselmi v. Penrod Drilling Corp.*, 813 F. Supp. 436, 443 (E.D. La. 1993).



KHORRAMI POLLARD & ABIR LLP

This number will include the approximately 683 who subsequently perished, resulting in potential claims for wrongful death.

Second, of those having personal injury and/or emotional distress claims, such claims would be based on the same event – the subsequent breach in the East wall of the Industrial Canal. Therefore, like *Turner*, it is possible to group class members by common injury "type" and/or "experience" for purposes of managing the adjudication of class members' individual physical and emotional injury claims.[21]

Thus, like *Turner*, "personal injury and mental anguish damages will not form a significant portion of the Plaintiffs' claims, which further supports a finding of predominance…." *See Turner*, 234 F.R.D. at 607 n. 6.

In sum, the benefit conferred by class wide adjudication of the above stated common issues of duty, breach, cause-in-fact, and legal cause far outweighs the burdens of adjudicating individualized issues relating to causation and damage. As such common issues "constitute a significant part of the individual cases," common issues necessarily predominate within the meaning of Rule 23(b)(3).

### C.      PLAINTIFFS' CLAIMS ARE TYPICAL OF THE PLAINTIFF CLASS' CLAIMS

"[T]he test for typicality is not demanding." *See James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir., 2001). Typicality "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent" [*James*, 254 F.3d at 571], and is met where claims arise from "a similar course of conduct, or the same legal theory." *See Turner* , 234 F.R.D. at 605. "Typicality does not require that the claims of the class are identical…" and is not defeated based on "differences in the types of damages." *See*

---

[21] This is even true as to emotional distress which, in the absence of physical injury, requires the claimant establish that claimant establish the reasonableness of such injuries in relation to others similarly affected. *See Anselmi*, 813 F. Supp. at 442 (holding that "the plaintiff must also establish that his emotional injuries were a reasonably foreseeable consequence of the defendant's alleged negligence" and that "[o]ne fairly reliable measure of foreseeability is the effect the explosion had on other crewmembers.").



*Turner*, 234 F.R.D. 597, 605 (E.D. La. 2006).  "If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality."  *See James*, 254 F.3d at 571.  To that end, typicality will generally be met in mass tort cases arising out of a singular event.  *See e.g. Turner*, 234 F.R.D. at 605 (reasoning that typicality was met because "the consolidated cases involve a single accident, and central issues of fact and law are shared among the group of Plaintiffs in the affected area.").

Here, the claims of each of the seven named Plaintiffs are typical of the claims of the approximately 43,065 persons and entities that comprise the putative class, since (1) like the class as a whole, each named Plaintiff was a resident situated within the class region, and (2) each named Plaintiff claims to have sustained damage as the result of the same singular event affecting the class region – the breach of the East wall of the Industrial Canal by the breakaway of Barge ING 4727:

Plaintiff ***Ethel Mae Coleman Mumford*** resided within the class region at 4829 Burgundy, New Orleans, LA 70117.  *See Khorrami Dec.,* Exh. 22 [Mumford Deposition (August 5, 2008), at 44:25].  Plaintiff Mumford claims to have sustained damage as the result of said the breach of the East wall of the Industrial Canal, including damage to residential (Id. at 146:6 to 152:19), business (Id. at 123:6 to126:10), rental (Id. at 78:23 to 80:24, 87:7 to 103:20) and personal property (Id. at 136:3 to 137:11, 202:14 to 204:18).

Plaintiff ***Josephine Long Richardson*** resided within the class region at 1321 Egania Street, New Orleans, LA 70117.  *See Khorrami Dec.,* Exh. 23 [Richardson Deposition (August 11, 2008), at 28:2-11].  Plaintiff Richardson, whose husband was physically present in the class area at the time of the breach of the East wall of the Industrial Canal, and subsequently drowned in the attic of their home, claims to have sustained damage as the result of said the breach of the East wall of the Industrial Canal, including damage to residential (Id. at 125:8 to 134:20) and personal property (Id. at 162:13 to 166:4), as well as damages relating to the wrongful death of her husband (Id. at 86:11 to 95:3).

Plaintiff ***Jimmie Donnell Harris*** resided within the class region at 924 Lamanche Street, New Orleans, LA 70117.  *See Khorrami Dec.,* Exh. 24 [Harris Deposition (August 4,


KHORRAMI POLLARD & ABIR LLP

2008),  at 28:20-22].  Plaintiff Harris claims to have sustained damage as the result of said the breach of the East wall of the Industrial Canal, including damage to residential (Id. at 77:1 to 81:6) and personal property (Id. at 90:22 to 104:19).

Plaintiff ***Michael Joseph Riche*** owned rental property within the class region at 128-130 W. Phillip Court, Chalmette, Louisiana, 70043.  *See Khorrami Dec.,* Exh. 25 [(Riche Deposition (August 6, 2008),  at 49:16 to 51:15)].  Plaintiff Riche also operated a business within the class region at 8825-27 W. Judge Perez Drive, Chalmette, Louisiana, 70043 (Id. at 42:15 to 45:12).  Plaintiff Riche claims to have sustained damage as the result of said the breach of the East wall of the Industrial Canal, including damage to rental (Id. at 93:21 to 96:23) and business property (Id. at  84:13 to 93:20).

Plaintiff ***Jacob Robert Glaser*** owned business property within the class region, a retail jewelry business located at 8400 W. Judge Perez Drive, Chalmette, Louisiana 70043.  *See Khorrami Dec.,* Exh. 26 [Glaser Deposition (August 7, 2008), at 30:21 to 32:8].  Plaintiff Glaser claims to have sustained damage as the result of said the breach of the East wall of the Industrial Canal, including damage to business property (Id. at 78:10 to 85:20).

Plaintiff ***Herman Koch*** owned several rental property within the class region, including properties located at 3409-11 Shangri La Street, Chalmette, Louisiana, 70043 [*See Khorrami Dec.,* Exh. 27 (Koch Depo, at 68:17 to 75:11)], 3619 Shangri La Street, Chalmette, Louisiana, 70043 (Id. at 78:9 to 82:9), 6317-19 Douglass Street, New Orleans, Louisiana 70117 (Id. at 82:10 to 96:19), 6035-37 Burgundy Street, New Orleans, Louisiana 70117 (Id. at 96:20 to 104:19), and 8547 Deerfield, Chalmette, Louisiana 70043 (Id. at 56:13 to 68:5).  *See also* Koch Deposition (August 8, 2008),  at 19:14-24 (listing all properties).  Plaintiff Koch claims to have sustained damage as the result of said the breach of the East wall of the Industrial Canal, including damage to personal property (Id. at 176:15 to 178:1) as well as rental properties. (Id. at 124:5-127:21, 149:18 to 152:2, 159:23-162:5, 164:10 to 165:19, 170:10 to 173:6).

Plaintiff **Arcola Sutton**, owned residential property located at 2523 Jourdan Avenue, New Orleans, Louisiana 70117 and rental property at 2523 ½ Jourdan Avenue.  *See Sutton Dec*, at ¶2.  Mrs. Sutton, who was unable to evacuate, was present in the Class area on the


KHORRAMI POLLARD & ABIR LLP

morning of August 29, 2005, and was evacuated from her roof by helicopter on August 30, 2005. *See id.* at ¶4. Plaintiff Sutton claims to have sustained damage as the result of said breach of the East wall of the Industrial Canal, including physical injury and emotional distress, and damage to real, personal and rental property. *See id.* .

Thus, as each named Plaintiff was a resident situated within the class region, and sustained damage as the result of the same singular event, the requirements of Rule 23(a)(3) have been met.

### D.  THE REPRESENTATIVE PLAINTIFFS AND THEIR COUNSEL WILL FAIRLY AND ADEQUATELY REPRESENT THE CLASS

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." *See* Fed. R. Civ. P. 23(a)(4). "The 'adequacy' requirement looks at both the class representatives and their counsel." *See Jenkins v. Raymark Indus.*, 782 F.2d 468, 472 (5th Cir. Tex. 1986). In terms of the class representatives, the court should evaluate "whether the class representatives have interests antagonistic to the unnamed class members" and "[inquire] into the class representatives' willingness to take an active role in the litigation and to protect the interests of absentees." *See Turner*, 234 F.R.D. at 605. "Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." *See Mullen*, 186 F.3d 620, 625-26. In terms of class counsel, the court's focus is whether class counsel have experience in similar litigation. *See id.*, at 625; *Jenkins*, 782 F.2d at 472.

1.  Plaintiffs Propose Khorrami, Pollard & Abir LLP, the Law Office of Brian A. Gilbert P.L.C., Wiedemann & Wiedemann, the Law Office of Richard T. Seymour, P.L.L.C., and  Patrick J. Sanders, Esq. As Class Counsel

Federal Rule of Civil Procedure 23(g) requires that the district court appoint class counsel for any class that is certified. Fed. R. Civ. P. 23(g)(1)(A). The attorney(s) appointed to

41



serve as class counsel "must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In appointing class counsel, the Rule lists four factors that the Court must consider: (1) the work counsel has done in identifying or investigating potential claims in the action, (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, (3) counsel's knowledge of the applicable law, and (4) the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g).

Here, Plaintiffs' counsel consists of a team of distinct law firms, comprised of Khorrami, Pollard & Abir LLP, the Law Office of Brian A. Gilbert P.L.C., Wiedemann & Wiedemann, the Law Office of Richard T. Seymour, P.L.L.C., and Patrick J. Sanders, Esq. Designation of each of these distinct law firms ensures that each of the above factors are met, and thereon, Plaintiffs propose that each firm be appointed as co-class counsel in this matter. As set forth in their accompanying declarations, each of these firms brings its own significant and specialized experience to the table to ensure that the interests of the class are both fairly and adequately represented in this action. Such experience may be summarized as follows:

*Khorrami Pollard & Abir LLP* ("KPA"), while relatively new to this action, brings to the table extensive experience in terms of both mass tort and class action litigation. *See Khorrami Dec.,* at ¶ 30-35. KPA has litigated both mass tort and class action cases for clients throughout the United States, including cases against large companies such as Yahoo, Papa John's Pizza, Coca-Cola, McDonalds, GlaxoSmithKline, Eli Lilly, Merck and many more. *Id.* at ¶ 30-34. KPA, which is employs nearly 20 attorneys and 70 administrative employees, is uniquely suited to assist in the complexities of this litigation. *Id. at ¶ 26.* Since joining the instant litigation, KPA has dedicated significant resources to this litigation to research, investigate and identify the potential claims in this action, and has undertaken significant effort to prepare such claims for presentation to this Court through this Motion. *Id. at ¶ 36-37.* The expenditure of such resources (which includes both a financial component and dedication of manpower) is a testament to KPA's commitment to the overall interest of the putative class, which commitment shall continue as this litigation progresses. *Id. at ¶ 38.*

The *Law Office of Brian A. Gilbert P.L.C.*, a local New Orleans solo practice, has been involved with this litigation since its inception.  *See Gilbert Dec.,* at 3.  Brian A Gilbert brings to the table significant experience in maritime and personal injury litigation, both of which are material issues here.  *Id. at 2-3.*  Mr. Gilbert is one the three attorneys who originally commenced the Mumford action, which is the lead suit in the Barge Litigation Umbrella, and he was appointed interim co-class counsel in 2006.  *Id. at 2-3.*  Mr. Gilbert is appointed Barge Plaintiffs' Liaison to the Preliminary Master Committee, and has performed all duties attendant therewith, including but not limited to law and motion practice, conducting discovery, obtaining experts, client acquisition and contacts and court appearances and presentation on the record, as well as supervision of a staff wholly dedicated to this litigation. *Id. at 3-4.*  The expenditure of such resources (which includes both a financial component and dedication of time) is a testament to Brian Gilbert's commitment to Plaintiffs and the overall interest of the putative class, which commitment shall continue as this litigation progresses.  *Id. at 4-5.*

*Wiedemann & Wiedemann LLC* ("W&W") is a New Orleans based firm specializing in representing plaintiffs in personal injury actions in State and Federal Courts. *See Wiedemann Dec.,* at ¶2.  Lawrence D. Wiedemann, and the attorneys who work with him, has been representing individuals in the southeastern United States for over 53 years, and has obtained successful results against companies such as Halliburton, Brown & Root, Nabors Drilling, TODCO, Rowan, State Farm, Progressive, and GEICO. As suggested by the list above, W&W has extensive experience in Maritime litigation. *Id. at ¶3 .*  W&W has also been involved in many class actions and/or mass torts, including actions involving the Continental Grain Elevator explosion, the American Sugar explosion, the M/V Frosta/ Luling Ferry collision, the Monsanto Train derailment, the Eunice train derailment, and the Gaylord disaster in Bogalusa. *Id. at ¶4.*  W&W has also spearheaded class action suits against the New Orleans Aviation Board and the New Orleans Real Estate Board.  *Id. at ¶4.*  With regard to the instant litigation, W&W has been involved in all aspects since the case was filed. W&W has dedicated significant financial resources and manpower to the prosecution of this case, and as residents

KP&A
KHORRAMI POLLARD & ABIR LLP

of New Orleans, lend a perspective which will prove invaluable to the representation of the putative class.  *Id. at ¶5.*

    The *Law Office of Richard T. Seymour, P.L.L.C.* brings to the table significant experience in large scale plaintiff class actions.  *See Seymour Dec.,* at ¶18.  Prior to forming his own practice, Mr. Seymour worked at the U.S. Commission on Civil Rights; the Washington Research Project; the Lawyers' Committee for Civil Rights Under Law; and Lieff, Cabraser, Heimann & Bernstein, LLP.  *Id. at ¶19.*  Over his distinguished career, Mr. Seymour has obtained more than $41 million dollars in judgments and settlements against large companies such as Miller Brewing Co. and Federal, State, and local government agencies such as the Mississippi State Employment Service.  *Id. at ¶20-22.*  In the instant action, Mr. Seymour has invested a substantial amount of time, effort and expense in the prosecution of this litigation, chiefly with respect to discovery, expert issues, class certification, and defendant Lafarge's conduct with respect to class members.  He is committed to continuing to do so in representing the interest of the putative class.  *Id. at ¶24-25.*

    Patrick Sanders has been practicing law for over 20 years, and was one of the three attorneys to initiate the Mumford action.  *See Sanders Dec.,* at ¶2.  Past experience includes representation of maritime companies and involvement with class action matters involving the River City Casino pursuant to the Worker Adjustment and Retraining Act, the Louisiana Lottery Corporation and breast Implant Litigation.  *See* id. at ¶3.  Further, Mr. Sanders, as general counsel to several companies, has overseen, investigated and/or prosecuted multimillion dollar litigation involving patents, including "337" proceedings, antidumping actions before the International Trade Commission/ Department of Commerce and numerous other litigations in state and federal courts.  *Id. at ¶4.*  For the past 3 years, Mr. Sanders has worked as Interim Class Counsel on behalf of claimants against Lafarge North America Inc. and Ingram Barge Company, devoting substantial time to the investigation and prosecution of the instant matter as well as the limitation action filed by Ingram Barge company.  *Id. at ¶5.* In connection therewith, Mr. Sanders has taken and attended numerous depositions and invested substantial amounts of time and funds in the prosecution of the cases.  *Id. at ¶6.* Further, Mr.

KP&A

KHORRAMI POLLARD & ABIR LLP

Sanders, along with other interim class counsel represent approximately 4,000 individual clients who are also members of the putative Class. *Id. at ¶7.*

        2.       <u>Plaintiffs, As They Have Already Done, Will Fairly, Vigorously And Adequately Represent The Interests Of The Class</u>

Plaintiffs will adequately represent the class. As demonstrated above, each of the named Plaintiffs were residents of the proposed Class area at the time in question and, like other members of the proposed Class, sustained damage as the result of said the breach of the East wall of the Industrial Canal. Thus, the proposed class representatives collectively have claims for all of the types of damage that would be claimed by members of the putative class. As the interests of these named Plaintiffs are coextensive of other members of the proposed class, their personal interests do not conflict in any manner with the interests of the members of the class they seek to represent as they all seek similar relief. *See Declarations of Mumford, Richardson, Harris, Riche, Glaser, Koch* and *Sutton* (filed concurrently herewith). Further, each class representative has a strong interest in this case and has demonstrated a willingness to take an active role in the litigation and to protect the interests of absentees. *See id.*

In sum, Plaintiffs and their counsel have demonstrated, and will continue to demonstrate, that the interests of the class will be fairly and adequately protected. To this end, adequacy of representation under Rule 23(a)(4) has been met.

**E.      CLASS-ACTION TREATMENT IS SUPERIOR TO INDIVIDUAL ACTIONS**

Plaintiffs also satisfy the requirement of "superiority" under Rule 23(b)(3). Rule 23(b)(3) requires that class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." *See* Fed. R. Civ. P. 23(b)(3). By its express terms, the focus of superiority is both "fairness" and "efficiency." To aid the Court in making this determination, Rule 23(b)(3) provides four factors, which include: "[1] the class members' interest in individually controlling their separate actions, [2] the extent and nature of existing



litigation by class members concerning the same claims, [3] the desirability of concentrating the litigation in the particular forum, and [4] the likely difficulties in class management." *See Turner*, 234 F.R.D. at 610.

The **<u>first</u>** factor – which relates to the class members' interest in individually controlling their separate actions – "refers to the interests of most or all class members, rather than the interests of a few individual members." *See 2 Newberg, § 4:29* (4th ed. 2008).   "When a small segment of class members has a strong interest in individual litigation, that interest may be served by opting out of the suit…." *See id*.

Here, there are no known issues cutting across class lines that would require each member of the proposed class to individually litigate his or her own case.  Defendants likely will claim that the potential size of each class member's individual claim presents such a common interest.  However, such grounds have been deemed insufficient where, as is the case here, certification is pursued for purposes of efficiently litigating common issues that are identical across the class, including issues pertaining to Defendant's liability.  *See Newberg, § 4.29*  ("courts have held that the existence of large individual claims that are sufficient for individual suits is no bar to a class when the advantages of unitary adjudication exist to determine the defendant's liability").  Indeed, numerous mass tort actions have been certified where damages to the class were substantial.  See e.g. *Watson*, 979 F.2d 1014;  *Turner*, 234 F.R.D. 597.

The **<u>second</u>** factor, which relates to the extent and nature of existing litigation by class members concerning the same claims, requires the Court to factor existing litigation into its "fairness" and "efficiency" analysis.  The existence of similar litigation can cut both ways – on the one hand, "the existence of other suits by class members may suggest an interest in individual litigation" while "[o]n the other hand, the existence of other suits may indicate that a class action is needed." *See 2 Newberg, § 4:30* (4th ed. 2008), p. 4-121.  "A class action will ordinarily be superior to repetitive individual suits."  *See id*.

KP&A
KHORRAMI POLLARD & ABIR LLP

Here, as discussed above, the proposed Class includes approximately 43,065 individuals and entities, over 4,000 of which have already retained Plaintiffs' Counsel.[22] Because the claims of each Class member arise from the same catastrophic event, and will require adjudication of the same issues with identical evidence, adjudication of these issues on a class-wide basis will promote the well-established policies favoring efficient claim resolution. *See e.g. Watson*, 979 F.2d at 1023 (class mechanism was deemed superior where "[t]he class issues to be determined by the Phase 1 jury form integral elements of the claims asserted by each of the more than 18,000 plaintiffs" and "after the Phase 1 resolution, only causation and damages will remain in each plaintiff's claim....").

The **third** factor, which relates to the desirability of concentrating the litigation in the particular forum, requires "consideration of the forum selected...." *Turner, 234 F.R.D. at 610.* "In the class action context, the desirability of concentrating claims in a particular forum is relevant only when other litigation has already been commenced elsewhere." *2 Newberg, § 4.31* (4th ed. 2008),  This element has no practical weight in the instant action, as all Katrina related cases are presently venued before this Court, and the instant action is a unique proposed class brought against a unique set of Defendants.

The **fourth** factor requires that the court consider whether there will be any difficulties in the management of a class.  Typically, the court's focus will center on the manageability of litigating individualized issues.  However, even if difficulties exist, "[i]t is only when such difficulties make a class action less fair and efficient than some other method … that a class action is improper." *See 2 Newberg, § 4:32* (4th ed. 2008), p. 4-125.

For several reasons, this action will not present unique management issues that are distinct from other mass tort actions which have been deemed suitable for class adjudication.

First, as Plaintiffs seek damages based on a single maritime law claim for negligence involving identical legal theories, this case does not present varied and divergent legal questions that would tend to rendered class adjudication problematic.  *See e.g. Castano v.*

---

[22] The retention of counsel most directly evidences the desire of putative class members to ensure that their rights will be protected.



*American Tobacco Co.*, 84 F.3d 734, 747 (5th Cir. 1996) (finding superiority lacking based on "problems [that] include difficult choice of law determinations, subclassing of eight claims with variations in state law, Erie guesses ….").  Indeed, class adjudication of negligence was deemed superior in another mass tort action arising out events relating to Katrina for the reason that the primary legal issues presented therein were common to the class.  *See Turner*, 234 F.R.D. at 606-07.

Moreover, based on the "singular" nature of the event at issue, this matter does not suffer from the type of problematic, individualized causation issues that have precluded certification in mass tort chemical "exposure" type actions.  *See e.g. Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir., 2006); *Castano*, 84 F.3d 734 .  As discussed above, the overwhelming bulk of issues relating to cause-in-fact will turn on evidence common to the class, and issues of legal causation concerning the scope of Defendant's duty will entail a legal determination that can, and should, be rendered identically to all members of the class.

Additionally, while the instant action will include some individualized issues relating to causation and damages, these issues are limited and well within the range of similar mass tort actions which have been certified.  *Watson*, 979 F.2d at 1023;  *Turner*, 234 F.R.D. at 605.  To aid in managing these issues, Plaintiffs have proposed a trifurcated trial plan in a form that has been repeatedly been accepted by the Fifth Circuit.  *See Jenkins*, 782 F.2d 468; *Watson*, 979 F.2d 1023; *Mullen*, 186 F.3d at 627; *Bell Atl. Corp.,* 339 F.3d at 307, n. 16; *Steering Comm.*, 461 F.3d at 603-04.  The trial plan provides for three distinct phases:

- A liability phase that will resolve the questions of duties and breaches common to all class members, and whether any breach of duty was sufficiently reckless and egregious to justify the imposition of punitive damages;

- A Class causation and damages phase that will assess damages in the areas of property and business loss and determine aggregate and apportioned punitive damages related to Class damages, if any; and,

- A final trial phase that will resolve the residual cases of individual claimants in groups selected and organized for maximum efficiency.

48



Thus, like other mass tort cases that have been certified, such a phased trial plan will "promote judicial economy and avoid the wasteful, duplicative litigation which would inevitably result if these cases were tried individually." *Mullen*, 186 F.3d at 627.

In sum, the benefits that Rule 23(b)(3) certification will provide to both the litigants and the Court in the management of this litigation is significant, providing the necessary framework for this Court to efficiently manage the thousands of claims of members of proposed Class.

IV.     **CONCLUSION**

Based on the foregoing, as each of the four (4) elements of Rule 23(a) and both of the elements of Rule 23(b)(3) have been met, the instant action presents a prime candidate for class adjudication.  Plaintiffs respectfully request that the Court grant certification of the proposed class under Rule 23(b)(3).  Plaintiffs further request that the Court, pursuant to its authority under Rule 23(g), appoint Khorrami, Pollard & Abir LLP, the Law Office of Brian A. Gilbert P.L.C., Wiedemann & Wiedemann, the Law Office of Richard T. Seymour, P.L.L.C., and  Patrick J. Sanders, Esq. as Class Counsel.  Plaintiffs further request that the Court approve Plaintiffs' Proposed Trial Plan.

Dated: September 29, 2008                    Respectfully submitted,


By: _____

SHAWN KHORRAMI  (CA Bar #180411)
DYLAN POLLARD  (CA Bar #180306)
MATT BAILEY  (CA Bar #218685)
H. SCOTT LEVIANT  (CA Bar #200834)
444 S. Flower St., Thirty-Third Floor
Los Angeles, California 90071
Telephone:     (213) 596-6000
Facsimile:     (213) 596-6010
skhorrami@kpalawyers.com
dpollard@kpalawyers.com
hsleviant@kpalawyers.com
mbailey@kpalawyers.com



/s/  Brian Gilbert
Brian A. Gilbert, Esq.(21297)
LAW OFFICE OF BRIAN A. GILBERT, P.L.C.
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 885-7700
Telephone: (504) 581-6180
Facsimile: (504) 581-4336
bgilbert@briangilbertlaw.com


/s/  Lawrence D. Wiedemann
Lawrence D. Wiedemann.(13457)
Karl Wiedemann (18502)
Karen Wiedemann (21151)
WIEDEMANN & WIEDEMANN
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 581-6180
Facsimile: (504) 581-4336
lawrence@wiedemannlaw.com
karl@wiedemannlaw.com
karen@wiedemannlaw.com


/s/  Patrick J. Sanders
Patrick J. Sanders (18741)
3316 Ridgelake Drive
Suite 100
Metairie, LA 70002
Telephone: 504-834-0646
pistols42@aol.com


/s/  Richard T. Seymour
Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C.  20036-4129
Voice: 202-862-4320
Cell:   202-549-1454
Facsimile:  800-805-1065 and 202-828-4130
rick@rickseymourlaw.net

*Attorneys for Barge Plaintiffs*

50

