UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: **KATRINA CANAL BREACHES CONSOLIDATED LITIGATION** | CIVIL ACTION |
| | Case No.: 05-4182 and consolidated cases |
| **PERTAINS TO: BARGE** | SECTION "K" (2) |
| *Boutte v. Lafarge*        05-5531<br>*Mumford v. Ingram*   05-5724<br>*Lagarde v. Lafarge*     06-5342<br>*Perry v. Ingram*           06-6299<br>*Benoit v. Lafarge*        06-7516<br>*Parfait Family v. USA* 07-3500<br>*Lafarge v. USA*           07-5178 | Hon. Stanwood R. Duval, Jr.<br>Magistrate Judge Joseph C. Wilkinson, Jr. |

# BARGE PLAINTIFFS' PROPOSED CLASS ACTION TRIAL PLAN IN SUPPORT OF PLAINTIFFS' MOTION TO CERTIFY A CLASS

**MAY IT PLEASE THE COURT:**

   The Barge Plaintiffs' Subgroup Litigation Committee, through Barge Plaintiffs' Liaison Counsel, respectfully submits the following Proposed Trial Plan in Support of Barge Plaintiffs' Motion for Class Certification.

**BARGE PLAINTIFFS' PROPOSED CLASS ACTION TRIAL PLAN**

I.     INTRODUCTORY STATEMENT

     The Fifth Circuit has repeatedly endorsed the use of trial plans as a means of facilitating class action management.  Such plans have been approved by the Fifth Circuit in mass tort class actions:  "This court has likewise approved mass tort or mass accident class actions when the district court was able to rely on a manageable trial plan—including bifurcation and/or subclasses—proposed by counsel." *Steering Comm. v. Exxon Mobil Corp*., 461 F.3d 598, 603 (5th Cir. 2006), citing *Watson v. Shell Oil Co*., 979 F.2d 1014 (5th Cir. 1992).  In fact, describing trial plans as "endorsed" by the Fifth Circuit does not do its position adequate justice.  The Fifth Circuit considers it essential to present a class action trial management plan in conjunction with any motion for class certification whenever it is necessary to apprise the trial court of specific case management solutions:  "Although Appellants' counsel during oral argument to this court briefly suggested subclasses or bifurcation as a remedy for the obstacles preventing a finding of predominance in this case, the record does not reflect that counsel made such a proposal to the district court." *Steering Comm. v. Exxon Mobil Corp*., *supra*, 461 F.3d at 603.

     Nevertheless, trial plans are not *mandatory*.  The Fifth Circuit has, instead, simply directed trial courts to consider how a trial of any alleged causes of action would proceed: "We did not hold in *Robinson*, however, that the submission of a trial plan was a prerequisite for a finding of superiority.  Instead, we stated that '[a] court must consider "how a trial on the alleged causes of action would be tried."' 387 F.3d at 425 (quoting *Castano v. Am. Tobacco Co*., 84 F.3d 734 (5th Cir. 1996))." *Feder v. Elec. Data Sys. Corp*., 429 F.3d 125, 139 (5th Cir. 2005).  Because, in this matter, Plaintiffs believe that it will assist the Court to schedule and manage a trial that proceeds in distinct phases, Plaintiffs submit this Proposed Class Action Trial Plan for consideration in connection with Plaintiffs' Motion for Class Certification. Plaintiffs ask this Court to approve this Trial Plan, or any variation or revision thereof that this Court deems appropriate.

II. THE PROPOSED CLASS ACTION TRIAL PLAN

Plaintiffs propose that the trial of this class action proceed in three distinct phases:

- A liability phase that will resolve the questions of duties and breaches common to all class members, and whether any breach of duty was sufficiently reckless or egregious to justify the imposition of punitive damages;
- A Class causation and damages phase that will assess damages in the areas of property and business loss and determine aggregate and apportioned punitive damages related to Class damages, if any; and,
- A final trial phase that will resolve the residual cases of individual claimants in groups selected and organized for maximum efficiency.

Plaintiffs discuss the three phases in greater detail below.

A. TRIAL PHASE ONE: LIAIBILITY ISSUES COMMON TO ALL CLASS MEMBERS

Plaintiffs propose that the first phase of trial focus exclusively on one overarching question: whether the negligence of Defendants resulted in Barge ING 4727 breaking free of its moorings at Lafarge's France Road facility and breaching the Industrial Canal in two places. This ultimate question, a question of liability, is the linchpin question around which this entire case turns. Because of the significance of the liability question, Plaintiffs recommend that the Court and Parties first focus their efforts and resources on resolving this question.

A similar proposal for initially determining common liability issues has been approved by the Fifth Circuit in a mass tort class action:

> Under the court's plan, the liability issues common to all class members will be tried together in an initial trial phase. Those common issues include whether the employees of the Casino are seamen within the meaning of the Jones Act, whether the Casino is a vessel within the meaning of the Jones Act, whether the Casino was rendered unseaworthy by the air quality aboard, and whether Treasure Chest was negligent in relation to the Casino's ventilation system. If the class prevails on the common liability issues in phase one, the issues affecting only individual class members will be tried in a second phase in waves of approximately five class members at a time. These limited issues include causation, damages, and comparative negligence.

3

*Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 623 (5th Cir. La. 1999). In *Mullen*, the Fifth Circuit noted that when negligence is the pivotal question for both class claims and any individual claims or issues, it is appropriate and desirable to focus on the negligence question first, turning to the remaining issues in the case only after negligence is decided in the affirmative:

> The common issues in this case, especially negligence and seaworthiness, are not only significant but also pivotal. They will undoubtedly require the parties to produce extensive evidence regarding the Casino's air ventilation system, as well as testimony concerning Treasure Chest's knowledge of, and response to, the Casino employees' respiratory problems and complaints. The phase-one jury will have the difficult task of determining whether the air quality aboard the Casino resulted from a negligent breach of Treasure Chest's duty to its employees or rendered the Casino unseaworthy. If Treasure Chest prevails on those two issues alone, they will prevail in the case.

*Mullen*, *supra*, 186 F.3d at 626.

In this matter, the claims of all class members turn on whether harm resulted from negligence related to Barge ING 4727, irrespective of whether those claims are asserted by the class or an individual, are amenable to class-wide damage modeling or individualized proof. As in *Mullen*, if Defendants prevail during the liability phase, "they will prevail in the case." *Ibid*.

More than simply a logic approach to case management, the proposed trifurcated trial plan is the most efficient way to approach the trial of this matter. Commenting on such efficiency gains, the Fifth Circuit said:

> The bifurcated-trial plan, the court found, would "promote judicial economy and avoid the wasteful, duplicative litigation which would inevitably result if these cases were tried individually."

*Mullen*, *supra*, 186 F.3d at 627. Similarly, a four-phase trial plan that also incorporated a punitive damage assessment mechanism was approved by the Fifth Circuit as an appropriately efficient plan for trial management:

> The commonality requirement of Fed. R. Civ. P. 23(b)(3) is intended to ensure that the disallowance of individual trials is warranted by a sufficient gain in efficiency. Rule 23(b)(3) accordingly requires that "resolution of the common questions affect all or a substantial number of the class members." The commonality requirement focuses on the common issues relevant to claims by or against the class members; it does not require that all issues be common to all parties. In the litigation at bar the claims of all plaintiffs require resolution of Shell's liability for punitive damages and of Brown & Root's liability for

4

>negligence, both arising out of the same event. That the plaintiffs assert different theories against Shell and Brown & Root does not obviate the commonality of issues.

*Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 (5th Cir. 1992).[1] And another District Court in the Eastern District approved a bifurcated trial plan testing liability first in another class action related to Hurricane Katrina:

>On March 3, 2006, the Court adopted a trial plan for this class action, bifurcating the trial into two different phases (Rec. Doc. 257). Phase One would address common issues of liability and general causation; Phase Two would consist of successive trials on specific causation and compensatory damages. However, Phase Two would only take place if a jury found Murphy liable in whole or in part in Phase One.

*Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 837 (E.D. La. 2007).

The Phase One trial of liability issues common to all class members will, within the confines of a single proceeding, determine whether the balance of claims held by roughly 45,000 claimants (putative class members) will continue or extinguish with a finding of non-liability. The efficiency of this approach cannot be understated, and the alternative is nearly

---

[1] *Watson* considered and approved a four-phase trial plan that included both class and individualized issues:

>After extensive briefing by the parties, the district court issued orders detailing a four-phase plan for trial. In Phase 1 a jury would determine common issues of liability. If the jury found punitive damage liability it would then perform the Phase 2 function and determine compensatory damages in 20 fully-tried sample plaintiff cases. Based on the findings in these cases, the jury would then establish the ratio of punitive damages to compensatory damages for each class member. If the jury finds no punitive damage liability in Phase 1, Phase 2 is to be omitted.

*Watson v. Shell Oil Co.*, 979 F.2d 1014, 1017-1018.

>In Phase 3, a different jury is to resolve issues unique to each plaintiff's compensatory damage claims, e.g. injury, causation, and quantum. Phase 3 calls for trials in waves of five, scheduled according to a format based upon factors, including location of the injured person or property at the time of the explosion and extent and nature of the damages. The district court anticipates that "after several waves are tried, a reasonable judgment value for each category of claims would emerge so as to facilitate settlements." In Phase 4 the district court is to compute, review, and award punitive damages, if any are established in Phase 1, for the plaintiffs awarded compensatory damages.

*Watson v. Shell Oil Co.*, 979 F.2d 1014, 1018.

5

unthinkable. Phased class treatment avoids the quagmire that would engulf any Court hearing tens of thousands of fully separate and individualized actions.

> B.     TRIAL PHASE TWO: DAMAGE AND CAUSATION ISSUES COMMON TO THE CLASS AND/OR SUBCLASS MEMBERS

Assuming that Phase One (the liability determination) is decided favorably for the Class, Plaintiff propose that the Court next then address the determination and calculation of those damages awardable to the Class or any sub-Class or category of Class member.

      1.     <u>Causation</u>

Under general maritime principles, causation has "sub-elements of: (a) cause in fact and (b) proximate or legal cause." *In re Mid-South Towing Co.*, 418 F.3d 526, 532 (5th Cir., 2005).

          a)     *Cause in Fact*

First, "[a] defendant's actions must be the cause in fact of a plaintiff's injuries in order for the plaintiff to be able to recover." *Moser v. Texas Trailer Corp.*, 623 F.2d 1006, 1013 (5th Cir., 1980). The showing required is "something more than 'but for' causation, and the negligence must be a 'substantial factor' in the injury." *See Thomas v. Express Boat Co.*, 759 F.2d 444, 448 (5th Cir., 1985).

Here, Plaintiffs anticipate that cause in fact will involve the five primary issues:

- Whether the actions of Defendants caused and/or contributed to the breakaway of Barge ING 4727 from the Lafarge North America facility on the Industrial Canal on Monday, August 29, 2005;

- Whether the breakaway of Barge ING 4727 from the Lafarge North America facility caused, was a cause of, and/or contributed to the North Breach in the East wall of the Industrial Canal on Monday, August 29, 2005;

- Whether the breakaway of Barge ING 4727 from the Lafarge North America facility caused, was a cause of, and/or contributed to the South Breach in the East wall of the Industrial Canal on Monday, August 29, 2005;

- Whether the Breaches in the East wall of the Industrial Canal on Monday, August 29, 2005 was a cause of, and/or contributed to the flooding of the class area, and if so, to what degree;

6

- Whether the flooding of the class area on Monday, August 29, 2005 caused, was a substantial cause of, and/or contributed to injury to the buildings, personal property, business property other than buildings, earnings, income, physical or emotional distress, or bodies of class members, or caused their deaths.

Plaintiffs contend that each of the issues leading up to whether the flooding of the class area was the cause-in-fact of injuries are issues common to the class that will turn largely on identical evidence. While the issue of whether the flooding of the class area was the cause-in-fact of some of the individual injuries will entail some individualized inquiry, such individualized inquiry will be limited and manageable as described in Part II.C., *infra*. Generally, however, the individualize inquiries will be limited and manageable because (1) liability will have been established for all individual claimants, (2) groupings of similar claimants will accelerate proceedings, (3) resolutions of the first rounds of individual claims will foster settlement of those that follow, and (4) the total number of likely individual claimants will be at least an order of magnitude smaller than the number of individual claimants that the Court would encounter if the class certification device is not used, as intended, to manage matters like this action.

With respect to the Subclasses in particular, it is probable that class-wide proof will be sufficient to establish cause in fact, which will relegate individual cause in fact issues to the comparatively smaller collection of individual claimants that come forward.

### b) Proximate (Legal) Cause

"Proximate cause analysis, which involves policy considerations of remoteness and limitation of liability, need only be considered after cause-in-fact has been established." *See Harrison v. Flota Mercante Grancolombiana, S. A.*, 577 F.2d 968, 983 (5th Cir., 1978). Under general tort principles, proximate cause "is ultimately a question of policy as to whether the particular risk falls within the scope of the duty" and "asks 'whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this manner.'" *See Roberts v. Benoit*, 605 So. 2d 1032, 1044-45 (La. 1991). Under maritime law, "[t]he task of defining the proper reach or thrust of a rule in its policy aspects is one that must be undertaken by the court in each case as it arises" and "[f]oreseeability

obviously marks the limits placed on a defendant's duty…." *See Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir., 1987).

Proximate cause entails a legal determination made by the Court, common to all members of the proposed Class, concerning the scope of Defendants' duties, including:

- Whether the scope of Defendants' duty of reasonable care under the common law encompassed the risk of harm to the Plaintiffs?

- Whether the scope of Defendants' duty under 33 CFR § 6.14-2 regarding the mooring of Barge ING 4727 encompassed the risk of harm to the Plaintiffs?

- Whether the scope of Defendants' duty under 33 CFR § 6.19-1 to protect and secure Barge ING 4727 and the surrounding levies encompassed the risk of harm to the Plaintiffs?

- Whether the scope of Defendants' duty under 33 CFR § 162.75(b)(3)(ii) as to the mooring of Barge ING 4727 encompassed the risk of harm to the Plaintiffs?

As these legal issues are identical to all members of the proposed class, such issues can (and properly should) be resolved as to all class members on a common basis. In resolving these issues, it is anticipated that Counsel for both sides will provide the Court briefing so that the Court may render its legal determination as to whether a Defendant's duty of care extended to cover the injuries alleged.

    2.  <u>Damages</u>

Generally, compensatory damage are "damages 'designed to place the plaintiff in the position in which he would have been if the tort had not been committed'" and are "divided into the broad categories of special damages and general damages." *See Wainwright v. Fontenot*, 774 So. 2d 70, 74 (La. Oct. 17, 2000). "Special damages are those which have a 'ready market value,' such that the amount of the damages theoretically may be determined with relative certainty," such as lost wages or property damage. *See McGee v. ACandS, Inc.*, 933 So. 2d 770, 774 (La. July 10, 2006). Conversely, "[g]eneral damages are those which may not be fixed with pecuniary exactitude[,]" such as "mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style…." *See Kaiser v. Hardin*, 953 So. 2d 802, 808 (La. Apr. 11, 2007). "The

assessment of 'quantum,' or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review.'"  *See Wainwright v. Fontenot*, 774 So. 2d 70, 74 (La. Oct. 17, 2000).

To prevent individualized damage issues from destroying predominance, including issues  presented by general damages, a district court can seek to manage such issues by way of separate bifurcated proceeding [*See Bell Atl. Corp. v. AT&T Corp.,* 339 F.3d 294, 307, n. 16 (5th Cir. Tex. 2003); *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603-04 (5th Cir. La. 2006); *Turner*, 234 F.R.D. 597, 607 (E.D. La. 2006) ("The presence or degree of injury or damage is an issue of quantum that may be dealt with individually in a bifurcated proceeding, if necessary.");], and enjoys wide discretion in doing so.  *See Watson*, *supra*, 979 F.2d at 1023 ("In light of the massive proportions of this litigation, and the need to reduce the systemic burden it will impose, we cannot conclude that the district court abused its discretion in fashioning this class-litigation format.").  Indeed, "[t]he courts' ability to sever the damages portion of a class action suit from the liability portion is the principal reason why variations among class members in the amount of damages suffered frequently does not defeat predominance."  *See Bell Atl. Corp.*, 339 F.3d at 307 n.16.

a)   *Class-wide Calculations Of Damage To Real Property*

Plaintiffs propose that it is reasonable, fair and desirable to assess real property damage, in the form of value loss, through a mass appraisal mechanism designed specifically for the class region.  Valuation of widespread property damages by way of "mass appraisal" complements class adjudication, especially insofar as appraisal standards of care require a "uniformity" that is best accomplished by way of appraising similar properties by uniform, objective criteria.  Mass appraisal, a statistical method wherein common property factors are assessed across class lines to create a mathematical model generating values for all properties in the class, results in appraisals of individualized property that is uniform in its approach across thousands of properties and is superior form a cost and efficiency standpoint to conducting isolated appraisals on an individualized basis.

In terms of valuation of property, "mass appraisal is an accepted methodology." *See In re Katrina Canal Breaches Consol. Litig*., 2007 U.S. Dist. LEXIS 82887, 275 (E.D. La. Nov. 1, 2007). "[I]t is a recognized standard under Rule 6 of the Uniform Standards of Professional Appraisal Practice ("USPAP") and has been accepted in this district in another case arising out of Hurricane Katrina…." *See id*., citing *Turner v. Murphy Oil US*, 2006 U.S. Dist. LEXIS 985, 2006 WL 91364 (E.D.La. Jan. 12, 2006).

To establish that "market value" of property damage may be determined on a class wide basis, Plaintiffs rely on the testimony of expert, John Kilpatrick (Ph.D., MRICS, Real Estate Appraiser and Consultant). Mr. Kilpatrick attests that the issue of class-wide property damages is appropriate for class certification purposes because there are numerous questions of fact with respect to damages and causes of damages that are common to the members of the class and that predominate over any questions affecting only individual members. (Kilpatrick Dec. at 3-4). Moreover, Mr. Kilpatrick attests that adjudicating property damage on an individual basis, without reference to the patterns of damages across the proposed class area, would result in haphazard and inconsistent damages estimates as well as increased administrative costs of valuing the properties and damages. (Kilpatrick Dec. at 4). Individualized property valuations would be more subject to errors arising from the limitations or variations in data, and personal judgments of various appraisers and their appraisal methods. (Kilpatrick Dec. at 4). As such, holistic, market-wide analytical methods are necessary to understand the economic and property value issues in the affected areas. (Kilpatrick Dec., at 2, 4). In that regard, damaged property values can best be analyzed on a class-wide basis using mass appraisal methodology, which avoids the chaos of individualized damage computations by coupling objective factors with common facts. (Kilpatrick Dec., at 5, 7).

With the destruction of many public and private records, this mass appraisal methodology bypasses the difficulties and costs associated with locating, assembling, and analyzing individualized data to value properties.(Kilpatrick Dec. at 5). Thereby, the mass appraisal method would include obtaining and sifting through tax assessor files, multiple listing services data on properties listed and sold, aerial photography, insurance records, and

other sources. (Kilpatrick Dec. 5, 11.) Aside from the mass collection of data, this method assesses patterns of damage more accurately and feasibly by considering the affected area as a whole, correlating damages for each property in relation to area wide mapping of the flood effect, creating a pattern of damages to help ensure consistency. (*Id.*) Additionally, this mapping method would ensure that the Court accurately determines causation, as there are observable gradients of damage in areas of the class, which would be lost in an individualized assessment. (Kilpatrick Dec. at 6).

Kilpatrick's appraisal method further accounts for the minority of unique properties within the class zone. Although similar issues of law and fact will be considered in their appraisal, larger properties, such as the Exxon Mobile Refinery, and Domino Sugar's property would be valued by an individual conventional appraisal method. (Kilpatrick Dec. at 10). As these are a small minority of the properties in the area, they would not affect mass appraisal of the remainder of the class, but would rather be evaluated more consistently with each other. (*Id.*)

### b)   Class-wide Calculation Of Damage To Businesses

For this assessment, the damages determination would be based on the business values before and after the event. (Kilpatrick Dec. at 18). Under either the asset approach, market, or income approach, accurate reflections of business value within the class area can be determined. (Kilpatrick Dec. at 19). The asset approach determines value by examining assets against liabilities; the market approach compares the value of these business to other similar ones; and the income approach uses a discounting method to determine business values based on their past income tax returns. (*See Id.*) Such models could categorize damages based on retail space, industrial space, office space, and restaurant space, which could be easily analyzed using the mass appraisal method. (*See Id.*) Moreover, in the event that information can not be obtained, the usage of indirect methods, such as data from the Bureau of Economic Analysis or Form R-4310, may be utilized in determining accurate valuations for specific types of businesses found within the class. (*See Id.*)

### c) *Class-wide Calculation Of Damage To Personal Property*

The mass appraisal methodology put forth by Kilpatrick also proposes a class-based method for estimating damage to personal property on a class-wide basis. Such mass appraisal model would include conducting individual surveys as a sampling, in order to derive statistical variables which could then be utilized in a mass appraisal methodology. (Kilpatrick Dec. at 21). To the extent possible, the data collected would track that assemble for real property mass valuation, with few distinctions. After consideration of such factors, one possibility of appraisal may include taking a percentage of structure value, as an accurate reflection of the amount of personal property owned and damaged. (*Id*.) The percentage value estimation technique is established as an accepted practice for calculating personal property loss within the insurance industry. With this structuring, once property values before the storm are projected by the mass valuation model, the personal property damages could be easily estimated on the class wide basis. (*Id*.) Adjustments would be made for depth of flooding throughout the class zone, providing even greater accuracy in determination of personal property damage at different locations within the class. (Kilpatrick Dec. at 22).

Plaintiffs propose that Phase Two proceed with some planned time gap after Phase One, which will permit the Parties to test, challenge and refine if necessary Plaintiffs' mass valuation damage model prior to its presentation at trial.

## C.  TRIAL PHASE THREE:  GROUPS OF INDIVIDUAL CLAIMANT TRIALS AND CLASS MEMBER OPT-OUT TRIALS

After Phase One, the class liability issues, and Phase Two, determination of all class-wide damages, any individual issues and claims will be resolved in tiers of trial conducted as part of Phase Three. The trial of Phase Three will include specific preparatory work to limit the drain on resources created by the trial of some individual claims or issues:

- First, Plaintiffs propose that, as part of any Notice of Pendency of Class Action (the Class Notice), or in a separate Notice issued soon thereafter, the Class be

> advised that any persons (1) asserting claims requiring individual showings (such as wrongful death claims or certain personal injury claims or (2) opting out of the Class in favor of the right to proceed individually must indicate through affirmative submission to the Court, by a cut-off date certain, their intent to press such claims.

- Second, as part of any submission by persons intending to proceed individually, certain data will be collected, including the nature of the claim or claims, the type of damage suffered, and the location within the class area where that person was injured (where applicable).

- Third, once those persons are identified, they can be sorted into groups and managed in that fashion for greater efficiency in the implementation of Phase Three.

Of those having personal injury and/or emotional distress claims, such claims would be based on the same event – the subsequent breach in the East wall of the Industrial Canal. Therefore, like *Turner*, it is possible to group class members by common injury "type" and/or "experience" for purposes of managing the adjudication of class members' individual physical and emotional injury claims. This is even true as to emotional distress which, in the absence of physical injury, requires the claimant establish that claimant establish the reasonableness of such injuries in relation to others similarly affected. *See Anselmi v. Penrod Drilling Co.*, 813 F. Supp. 436, 442 (W.D.La. 1993) (holding that "the plaintiff must also establish that his emotional injuries were a reasonably foreseeable consequence of the defendant's alleged negligence" and that "[o]ne fairly reliable measure of foreseeability is the effect the explosion had on other crewmembers.").

Thus, like *Turner*, "personal injury and mental anguish damages will not form a significant portion of the Plaintiffs' claims, which further supports a finding of predominance…." *See Turner*, 234 F.R.D. at 607 n. 6. Liability will have been established, and the only issue left for determination will be any individual causation and damage issues. These residual issues can be presented as mini-trials, through the use of time-saving devices

13

like Narrative Statements to establish prima facie elements, followed by fair but constrained cross-examinations.  Done properly, these mini-trials could, in almost every instance, take less than two hours per individual claimant.  Fifteen to twenty such cases could be resolved in a week.  As scores of individual cases resolve, counsel will necessarily move towards settlements for groups of cases with comparable risk and value attributes.

The wrongful death actions, while requiring more time to resolve in trials than simple person injury claims, will number far fewer.  The maximum number of such cases lies somewhere in the several hundreds, perhaps 500.  Not all decedents will have family members able to see such actions filed.  Of those that do, some will simply decline to bring an individual suit, opting, instead to either receive class benefits only or avoid participation entirely.  It is not unrealistic to estimate the number of wrongful death claims as falling with the 50 to 250 range.  Moreover, the wrongful death claims will still benefit from the settled class issue of liability.  And once these actions begin to resolve, the same move towards settlements for groups of cases with comparable risk and value attributes will naturally occur.

Although statistical data collected after Hurricane Katrina suggests that as many as 4,000 individuals might have remained in the class area during the hurricane, and several hundred persons may have died in the class area, it is reasonable to assume, based on the observed response rates in class actions, that even if the viable individual claims tended towards the highest possible estimates, a much smaller number of those persons would choose to come forward and seek individual benefits greater than those available to them as their share of any class damage award.  When realistic estimates of individual claims are used, the likely number of claimants seeking individual recoveries is commensurately lowered.  In the end, the Court may have to manage just hundreds of individual cases, not tens of thousands.  Compared to the alternative, such an outcome is eminently desirable on efficiency grounds.

III.   CONCLUDING REMARKS

While the ultimate resolution of this matter will not pass without challenges to overcome and diligent work to accomplish, the trial of this matter as a class action is orders of

magnitude more efficient than litigating tens of thousands of individual claims.  Like the *Mullen* Court aptly noted, this case will not create the "Frankenstein's monster" case feared in *Castano*:

> [U]nlike the "Frankenstein's monster" feared in Castano, 84 F.3d at 745 n.19, this class is akin to other bifurcated class actions this Court has approved. See Watson v. Shell Oil Co., 979 F.2d 1014 (5th Cir. 1992) (finding no abuse in the district court's certification of a bifurcated class action arising from an oil refinery explosion where liability and punitive damages would be resolved commonly and injury, causation, and actual damages would be resolved individually); Jenkins, 782 F.2d 468 (finding no abuse of discretion in district court's certification of a bifurcated class action where asbestos producers' "state of the art defense" as well as product identification, product defectiveness, negligence, and punitive damages would be resolved commonly and causation, actual damages, and comparative fault would tried individually); Hernandez v. Motor Vessel Skyward, 61 F.R.D. 558 (S.D. Fla. 1973), aff'd, 507 F.2d 1278, 1279 (5th Cir. 1975) (unpublished) (certifying bifurcated class action on behalf of 350 passengers who were fed contaminated food aboard cruise ship where negligence would be tried commonly and causation and damages would be tried individually).

*Mullen*, *supra*, 186 F.3d at 628.  Instead, the management of this matter through the procedural device of Fed. R. Civ. P. 23(b) will streamline tens of thousands of cases that would clog this Court's docket for many years.

Dated: September 29, 2008                         Respectfully submitted,

By: _/s/ H. S. Leviant_____
SHAWN KHORRAMI  (CA Bar #180411)
DYLAN POLLARD  (CA Bar #180306)
H. SCOTT LEVIANT  (CA Bar #200834)
MATT BAILEY  (CA Bar #218685)
444 S. Flower St., Thirty-Third Floor
Los Angeles, California 90071
Telephone:   (213) 596-6000
Facsimile:   (213) 596-6010
skhorrami@kpalawyers.com
dpollard@kpalawyers.com
hsleviant@kpalawyers.com
mbailey@kpalawyers.com

      /s/  Brian Gilbert
Brian A. Gilbert, Esq.(21297)
LAW OFFICE OF BRIAN A. GILBERT, P.L.C.
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 885-7700
Telephone: (504) 581-6180
Facsimile: (504) 581-4336
bgilbert@briangilbertlaw.com


      /s/  Lawrence D. Wiedemann
Lawrence D. Wiedemann.(13457)
Karl Wiedemann (18502)
Karen Wiedemann (21151)
WIEDEMANN & WIEDEMANN
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 581-6180
Facsimile: (504) 581-4336
lawrence@wiedemannlaw.com
karl@wiedemannlaw.com
karen@wiedemannlaw.com


      /s/  Patrick J. Sanders
Patrick J. Sanders (18741)
3316 Ridgelake Drive
Suite 100
Metairie, LA 70002
Telephone: 504-834-0646
pistols42@aol.com


      /s/  Richard T. Seymour
Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C.  20036-4129
Voice: 202-862-4320
Cell:    202-549-1454
Facsimile:  800-805-1065 and 202-828-4130
rick@rickseymourlaw.net

*Attorneys for Barge Plaintiffs*

## **CERTIFICATE OF SERVICE**

    I do hereby certify that I have on this 29th day of September 2008 served a copy of the foregoing pleading on counsel for all parties to this proceeding, by electronic filing notification.

_____
H. Scott Leviant