# EXHIBIT 2
# PART 1

# A FAILURE
## OF INITIATIVE

**Final Report of the Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina**

**U.S. House of Representatives**





# A FAILURE
## OF INITIATIVE

**Final Report of the Select Bipartisan Committee to Investigate
the Preparation for and Response to Hurricane Katrina**

BARGE 000065

Union Calendar No. 00

109th Congress
*2nd Session*



Report
000-000

# A FAILURE OF INITIATIVE

## Final Report of the Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina

Report by the

Select Bipartisan Committee

to Investigate the Preparation

for and Response

to Hurricane Katrina



Available via the World Wide Web: http://www.gpoaccess.gov/congress/index.html

February 15, 2006. — Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
Keeping America Informed I www.gpo.gov
WASHINGTON 2006

23950 PDF

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov  Phone: toll free (866) 512-1800;  DC area (202) 512-1800
Fax: (202) 512-2250 Mail: Stop SSOP, Washington, DC  20402-0001

BARGE 000088

COVER PHOTO: FEMA, BACKGROUND PHOTO: NASA

SELECT BIPARTISAN COMMITTEE
TO INVESTIGATE THE PREPARATION FOR AND RESPONSE
TO HURRICANE KATRINA

**TOM DAVIS, (VA) Chairman**

HAROLD ROGERS (KY)

CHRISTOPHER SHAYS (CT)

HENRY BONILLA (TX)

STEVE BUYER (IN)

SUE MYRICK (NC)

MAC THORNBERRY (TX)

KAY GRANGER (TX)

CHARLES W. "CHIP" PICKERING (MS)

BILL SHUSTER (PA)

JEFF MILLER (FL)

Members who participated at the invitation of the Select Committee

CHARLIE MELANCON (LA)

GENE TAYLOR (MS)

WILLIAM J. JEFFERSON (LA)

CYNTHIA MCKINNEY (GA)

SHELIA JACKSON-LEE (TX)

---

### STAFF DESIGNATIONS

| | | | |
|---|---|---|---|
| David L. Marin | Staff Director | Wimberly Fair | Professional Staff |
| J. Keith Ausbrook | Special Counsel | Chuck Turner | Special Investigator |
| Michael Geffroy | Deputy Special Counsel | Robert White | Press Secretary |
| Lawrence J. Halloran | Deputy Special Counsel | Drew Crockett | Art Editor |
| Robert Borden | Senior Associate Special Counsel | Teresa Austin | Chief Clerk |
| Daniel Mathews | Senior Professional Staff | Amy Laudeman | Deputy Clerk |
| Arthur Wu | Senior Professional Staff | Robin Butler | Administrative Officer/Financial Administrator |
| Thomas E. Hawley | Senior Professional Staff | Michael Sazonov | Staff Assistant |
| Grace A. Washbourne | Senior Professional Staff | Pat DeQuattro | Coast Guard Fellow |
| Kim Kotlar | Senior Professional Staff | Justin Swick | Law Clerk |
| Anne Marie Turner | Associate Special Counsel | Elizabeth Ryan | Law Clerk |
| Charles M. Phillips | Associate Special Counsel | Stephen L. Caldwell | GAO Detailee |
| Steve Castor | Assistant Special Counsel | Bill MacBlane | GAO Detailee |
| Kim Baronof | Professional Staff | Brooke Bennett | Research Assistant |
| Risa Salsburg | Professional Staff | Jay O'Callahan | Research Assistant |
| Susie Schulte | Professional Staff | Michael Arkush | Editorial Assistant |
| Shalley Kim | Professional Staff | Margaret Peterlin | Speaker's Designee |

BARGE 000067   A FAILURE OF INITIATIVE

LETTER OF TRANSMITTAL

HOUSE OF REPRESENTATIVES,
*Washington, DC, February 15, 2006.*

Hon. J. Dennis Hastert,
*Speaker of the House of Representatives,*
*Washington, DC.*

Dear Mr. Speaker: By direction of the Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, I submit herewith the committee's report to the 109th Congress.

Tom Davis,
*Chairman.*

BARGE 000069

A FAILURE OF INITIATIVE

"Pandemonium did not reign. It poured."

JOHN KENDRICK BANGS
American author and satirist


"Five frogs are sitting on a log. Four decide to jump off.
How many are left?
Answer: five.
Why? Because there's a difference between deciding and doing."

MARK L. FELDMAN and MICHAEL F. SPRATT
American businessmen
*Five Frogs on a Log*


"Don't find a fault. Find a remedy."

HENRY FORD
American automobile manufacturer


"Hurricane Katrina was a force of Nature.
What we've done after it is an Act of God."

Banner hanging in Harrison County, MS, Emergency Operations Center


In-i-tia-tive, *n.*
The power or ability to begin or follow through energetically with a plan or task;
enterprise and determination.



BARGE 000071

# TABLE OF CONTENTS

| | |
|---|---|
| **Preface** | ix |
| **Executive Summary of Findings** | 1 |
| **Investigation Overview** | 7 |
| **Background** | 29 |
| **Pre-landfall Preparation and Katrina's Impact** | 59 |
| **Hurricane Pam** | 81 |
| **Levees** | 87 |
| **Evacuation** | 103 |
| **The National Framework for Emergency Management** | 131 |
| **FEMA Preparedness** | 151 |
| **Communications** | 163 |
| **Command and Control** | 183 |
| **The Military** | 201 |
| **Law Enforcement** | 241 |
| **Medical Care** | 267 |
| **Shelter and Housing** | 311 |
| **Logistics and Contracting** | 319 |
| **Charitable Organizations** | 343 |
| **Conclusion** | 359 |

| | |
|---|---|
| **Appendix** | |
| 1  Glossary of Acronyms | 365 |
| 2  HSOC Spot Report | 374 |
| 3  White House Document Review | 376 |
| 4  Emergency Grants to States | 380 |
| 5  Key Federal Law Enforcement Activities | 397 |
| 6  GAO Report | 417 |
| 7  DHS Response to GAO Report | 426 |
| 8  McKinney Supplement | 435 |

BARGE 000073
A FAILURE OF INITIATIVE

# PREFACE

On September 15, 2005, the House of Representatives approved H. Res. 437, which created the Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina ("the Select Committee").

According to the resolution, the Committee was charged with conducting "a full and complete investigation and study and to report its findings to the House not later than February 15, 2006, regarding— (1) the development, coordination, and execution by local, State, and Federal authorities of emergency response plans and other activities in preparation for Hurricane Katrina; and (2) the local, State, and Federal government response to Hurricane Katrina."

The Committee presents the report narrative and the findings that stem from it to the U.S. House of Representatives and the American people for their consideration. Members of the Select Committee agree unanimously with the report and its findings. Other Members of Congress who participated in the Select Committee's hearings and investigation but were not official members of the Select Committee, while concurring with a majority of the report's findings, have presented additional views as well, which we offer herein on their behalf.

First and foremost, this report is issued with our continued thoughts and prayers for Katrina's victims. Their families. Their friends. The loss of life, of property, of livelihoods and dreams has been enormous. And we salute all Americans who have stepped up to the plate to help in any way they can.

---

It has been said civilization is a race between education and catastrophe. With Katrina, we have had the catastrophe, and we are racing inexorably toward the next. Americans want to know: what have we learned?

Two months before the Committee was established, former Speaker of the House Newt Gingrich testified before a Government Reform subcommittee about the need to move the government to an "entrepreneurial" model and away from its current "bureaucratic" model, so that we can get government to move with Information Age speed and effectiveness.

"*Implementing* policy effectively," Speaker Gingrich said, "is ultimately as important as *making* the right policy."

The Select Committee first convened on September 22, 2005, understanding, like Speaker Gingrich, that a policy that cannot be implemented effectively is no policy at all.

The Select Committee was created because, in the tragic aftermath of Katrina, America was again confronted with the vast divide between policy creation and policy implementation. With the life-and-death difference between theory and practice.

The Select Committee has spent much of the past five months examining the aftermath of this catastrophic disaster. It has become increasingly clear that local, state, and federal government agencies failed to meet the needs of the residents of Louisiana, Mississippi, and Alabama. It has been our job to figure out why, and to make sure we are better prepared for the future.

Our mandate was clear: gather facts about the preparation for and response to Katrina, at all levels of government.

Investigate aggressively, follow the facts wherever they may lead, and find out what went right and what went wrong. Ask why coordination and information sharing between local, state, and federal governments was so dismal.

- Why situational awareness was so foggy, for so long.
- Why *all* residents, especially the most helpless, were not evacuated more quickly.
- Why supplies and equipment and support were so slow in arriving.
- Why so much taxpayer money aimed at better preparing and protecting the Gulf coast was left on the table, unspent or, in some cases, misspent.
- Why the adequacy of preparation and response seemed to vary significantly from state to state, county to county, town to town.
- Why unsubstantiated rumors and uncritically repeated press reports – at times fueled by top officials – were able to delay, disrupt, and diminish the response.
- And why government at all levels failed to react more effectively to a storm that was predicted with unprecedented timeliness and accuracy.

We agreed early on that the task before us was too important for carping. This was not about politics. Katrina did not distinguish between Republicans and Democrats.

This was about getting the information we need to chart a new and better course for emergency preparation and response. The American people want the facts, and they've been watching. They alone will judge whether our review has been thorough and fair. Our final exam is this report.

Our report marks the culmination of 9 public hearings, scores of interviews and briefings, and the review of more than 500,000 pages of documents.

Our investigation revealed that Katrina was a national failure, an abdication of the most solemn obligation to provide for the common welfare. At every level – individual, corporate, philanthropic, and governmental – we failed to meet the challenge that was Katrina. In this cautionary tale, all the little pigs built houses of straw.

Of all we found along the timeline running from the fictional Hurricane Pam to the tragically real devastation along the Gulf coast, this conclusion stands out: A National Response Plan is not enough.

What's needed is a National Action Plan. Not a plan that says Washington will do everything, but one that says, when all else fails, the federal government must do something, whether it's formally requested or not. Not even the perfect bureaucratic storm of flaws and failures can wash away the fundamental governmental responsibility to protect public health and safety.

Still, no political storm surge from Katrina should be allowed to breach the sovereign boundaries between localities, states, and the federal government. Our system of federalism wisely relies on those closest to the people to meet immediate needs. But faith in federalism alone cannot sanctify a dysfunctional system in which DHS and FEMA simply wait for requests for aid that state and local officials may be unable or unwilling to convey. In this instance, blinding lack of situational awareness and disjointed decision making needlessly compounded and prolonged Katrina's horror.

In many respects, our report is a litany of mistakes, misjudgments, lapses, and absurdities all cascading together, blinding us to what was coming and hobbling any collective effort to respond.

This is not to say there were not many, many heroes, or that some aspects of the preparation and response were not, by any standard, successful. We found many examples of astounding individual initiative that saved lives and stand in stark contrast to the larger institutional failures. Nor do we mean to focus on assigning individual blame. Obtaining a full accounting and identifying lessons learned does not require finger pointing, instinctively tempting as that may be.

There was also an element of simple bad luck with Katrina that aggravated the inadequate response. The hurricane arrived over a weekend, at the end of the month. People on fixed incomes had little money for gas or food or lodging, making them more likely to remain in place and wait for their next check. Communicating via television or radio with families enmeshed in their weekend routines was difficult at best, as was finding drivers and other needed volunteers.

Over the past several months, we have become more than familiar with the disaster declaration process outlined in the Stafford Act. We understand the goals, structure and mechanisms of the National Response Plan. We've digested the alphabet soup of "coordinating elements" established by the Plan: the HSOC (Homeland Security Operations Center) and RRCC (Regional Response Coordination Center); JFOs (Joint Field Offices) and PFOs (Principal Federal Officials); the IIMG (Interagency Incident Management Group); and much more.

But the American people don't care about acronyms or organizational charts. They want to know who was supposed to do what, when, and whether the job got done. And if it didn't get done, they want to know how we are going to make sure it does the next time.

This report is a story about the National Response Plan, and how its 15 Emergency Support Functions (ESFs) were implemented with Katrina. We offer details on how well the ESFs were followed. Where there were problems, we've asked why. Where even flawless execution led to unacceptable results, we've returned to questioning the underlying plan.

We should be clear about the limitations of our investigation and the parameters of this report. We focused on the preparation for and response to Katrina, for the most part paring down the timeline to one week before and two weeks after the storm. We did not, at

least intentionally, delve into important, longer-term rebuilding and recovery issues that will continue to have a central place on the congressional agenda for months and years to come. In many areas — housing, education, health, contracting — "response" bleeds into "recovery," and the distinctions we've made are admittedly difficult and somewhat arbitrary.

Further, this report is only a summary of our work. We are hopeful that – indeed, certain that – more information will arise. The Select Committee has constrained its narrative and findings to those that can shed the most light, make the biggest difference, and trigger the most obvious near-term actions. Readers will note that we focus considerable attention on a handful of "key events" – evacuation plans and the execution of them; conditions and events at the Superdome, Convention Center, and highways; nursing homes and hospitals – as a means of illustrating what went right and wrong in countless other locales.

What this Select Committee has done is not rocket science.

We've gathered facts and established timelines based on some fairly rudimentary but important questions posed to the right people in both the public and private sectors.

- What did you need and what did you get?
- Where were you in the days and hours right before, during, and after the storm?
- Who were you talking to?
- What were you doing?
- Does that match what you were *supposed* to be doing? Why or why not?

In other words, the Select Committee has matched what was *supposed* to happen under federal, state, and local plans against what *actually* happened.

Our findings emerged from this process of matching.

Too often there were too many cooks in the kitchen, and because of that the response to Katrina was at times overdone, at times underdone. Too often, because everybody was in charge, nobody was in charge.

Many government officials continue to stubbornly resist recognizing that fundamental changes in disaster management are needed. This report illustrates that we have to stop waiting for the disaster that fits our response plan and instead design a scalable capacity to meet whatever Mother Nature throws at us. It's not enough to say, "We wouldn't be here if the levees had not failed." The levees *did* fail, and government and other organizations failed in turn – in many, many ways.

It remains difficult to understand how government could respond so ineffectively to a disaster that was anticipated for years, and for which specific dire warnings had been issued for days. This crisis was not only predictable, it was predicted.

If this is what happens when we have advance warning, we shudder to imagine the consequences when we do not. Four and a half years after 9/11, America is still not ready for prime time.

This is particularly distressing because we know we remain at risk for terrorist attacks, and because the 2006 hurricane season is right around the corner. With this report we hope to do our part to enhance preparation and response.

With Katrina, there was no shortage of plans. There were plans, but there was not enough plan-*ning*.

Government failed because it did not learn from past experiences, or because lessons thought to be learned were somehow not implemented. **If 9/11 was a failure of imagination, then Katrina was a failure of initiative. It was a failure of leadership.**

Tom Davis
Harold Rogers
Christopher Shays
Henry Bonilla
Steve Buyer
Sue Myrick
Mac Thornberry
Kay Granger
Charles W. "Chip" Pickering
Bill Shuster
Jeff Miller



# EXECUTIVE SUMMARY
# OF FINDINGS

The Select Committee identified failures at all levels of government that significantly undermined and detracted from the heroic efforts of first responders, private individuals and organizations, faith-based groups, and others.

The institutional and individual failures we have identified became all the more clear when compared to the heroic efforts of those who acted decisively. Those who didn't flinch, who took matters into their own hands when bureaucratic inertia was causing death, injury, and suffering. Those whose exceptional initiative saved time and money and lives.

We salute the exceptions to the rule, or, more accurately, the exceptions that proved the rule. People like Mike Ford, the owner of three nursing homes who wisely chose to evacuate his patients in Plaquemines Parish before Katrina hit, due in large part to his close and long-standing working relationship with Jesse St. Amant, Director of the Plaquemines Office of Emergency Preparedness.

People like Dr. Gregory Henderson, a pathologist who showed that not all looting represented lawlessness when, with the aid of New Orleans police officers, he raided pharmacies for needed medication and supplies and set up ad hoc clinics in downtown hotels before moving on to the Convention Center.

But these acts of leadership were too few and far between. And no one heard about or learned from them until it was too late.

The preparation for and response to Hurricane Katrina show we are still an analog government in a digital age. We must recognize that we are woefully incapable of storing, moving, and accessing information – especially in times of crisis.

Many of the problems we have identified can be categorized as "information gaps" – or at least problems with information-related implications, or failures to act decisively because information was sketchy at best. Better information would have been an optimal weapon against Katrina. Information sent to the right people at the right place at the right time. Information moved within agencies, across departments, and between jurisdictions of

government as well. Seamlessly. Securely. Efficiently.

Unfortunately, no government does these things well, especially big governments.

The federal government is the largest purchaser of information technology in the world, by far. One would think we could share information by now. But Katrina again proved we cannot.

We reflect on the 9/11 Commission's finding that "the most important failure was one of imagination." The Select Committee believes Katrina was primarily a failure of initiative. But there is, of course, a nexus between the two. Both imagination and initiative – in other words, *leadership* – require good information. And a coordinated process for sharing it. And a willingness to use information – however imperfect or incomplete – to fuel action.

With Katrina, the reasons reliable information did not reach more people more quickly are many, and these reasons provide the foundation for our findings.

In essence, we found that while a national emergency management system that relies on state and local governments to identify needs and request resources is adequate for most disasters, a catastrophic disaster like Katrina can and did overwhelm most aspects of the system for an initial period of time. No one anticipated the degree and scope of the destruction the storm would cause, even though many could and should have.

The failure of local, state, and federal governments to respond more effectively to Katrina — which had been predicted in theory for many years, and forecast with startling accuracy for five days — demonstrates that whatever improvements have been made to our capacity to respond to natural or man-made disasters, four and half years after 9/11, we are still not fully prepared. Local first responders were largely overwhelmed and unable to perform their duties, and the National Response Plan did not adequately provide a way for federal assets to quickly supplement or, if necessary, supplant first responders.

The failure of initiative was also a failure of agility. Response plans at all levels of government lacked flexibility and adaptability. Inflexible procedures often

delayed the response. Officials at all levels seemed to be waiting for the disaster that fit their plans, rather than planning and building scalable capacities to meet whatever Mother Nature threw at them. We again encountered the risk-averse culture that pervades big government, and again recognized the need for organizations as agile and responsive as the 21st century world in which we live.

One-size-fits-all plans proved impervious to clear warnings of extraordinary peril. Category 5 needs elicited a Category 1 response. Ours was a response that could not adequately accept civilian and international generosity, and one for which the Congress, through inadequate oversight and accounting of state and local use of federal funds, must accept some blame.

**In crafting our findings, we did not guide the facts. We let the facts guide us. The Select Committee's report elaborates on the following findings, which are summarized in part here, in the order in which they appear:**

## The accuracy and timeliness of National Weather Service and National Hurricane Center forecasts prevented further loss of life

## The Hurricane Pam exercise reflected regognition by all levels of government of the dangers of a category 4 or 5 hurricane striking New Orleans

- Implementation of lessons learned from Hurricane Pam was incomplete.

## Levees protecting New Orleans were not built for the most severe hurricanes

- Responsibilities for levee operations and maintenance were diffuse.

- The lack of a warning system for breaches and other factors delayed repairs to the levees.

- The ultimate cause of the levee failures is under investigation, and results to be determined.

## The failure of complete evacuations led to preventable deaths, great suffering, and further delays in relief

- Evacuations of general populations went relatively well in all three states.

- Despite adequate warning 56 hours before landfall, Governor Blanco and Mayor Nagin delayed ordering a mandatory evacuation in New Orleans until 19 hours before landfall.

- The failure to order timely mandatory evacuations, Mayor Nagin's decision to shelter but not evacuate the remaining population, and decisions of individuals led to an incomplete evacuation.

- The incomplete pre-landfall evacuation led to deaths, thousands of dangerous rescues, and horrible conditions for those who remained.

- Federal, state, and local officials' failure to anticipate the post-landfall conditions delayed post-landfall evacuation and support.

## Critical elements of the National Response Plan were executed late, ineffectively, or not at all

- It does not appear the President received adequate advice and counsel from a senior disaster professional.

- Given the well-known consequences of a major hurricane striking New Orleans, the Secretary should have designated an Incident of National Significance no later than Saturday, two days prior to landfall, when the National Weather Service predicted New Orleans would be struck by a Category 4 or 5 hurricane and President Bush declared a federal emergency.

- The Secretary should have convened the Interagency Incident Management Group on Saturday, two days prior to landfall, or earlier to analyze Katrina's potential consequences and anticipate what the federal response would need to accomplish.

- The Secretary should have designated the Principal Federal Official on Saturday, two days prior to landfall, from the roster of PFOs who had successfully

completed the required training, unlike then-FEMA Director Michael Brown. Considerable confusion was caused by the Secretary's PFO decisions.

- A proactive federal response, or push system, is not a new concept, but it is rarely utilized.

- The Secretary should have invoked the Catastrophic Incident Annex to direct the federal response posture to fully switch from a reactive to proactive mode of operations.

- Absent the Secretary's invocation of the Catastrophic Incident Annex, the federal response evolved into a push system over several days.

- The Homeland Security Operations Center failed to provide valuable situational information to the White House and key operational officials during the disaster.

- The White House failed to de-conflict varying damage assessments and discounted information that ultimately proved accurate.

- Federal agencies, including DHS, had varying degrees of unfamiliarity with their roles and responsibilities under the National Response Plan and National Incident Management System.

- Once activated, the Emergency Management Assistance Compact enabled an unprecedented level of mutual aid assistance to reach the disaster area in a timely and effective manner.

- Earlier presidential involvement might have resulted in a more effective response.

## DHS and the states were not prepared for this catastrophic event

- While a majority of state and local preparedness grants are required to have a terrorism purpose, this does not preclude a dual use application.

- Despite extensive preparedness initiatives, DHS was not prepared to respond to the catastrophic effects of Hurricane Katrina.

- DHS and FEMA lacked adequate trained and experienced staff for the Katrina response.

- The readiness of FEMA's national emergency response teams was inadequate and reduced the effectiveness of the federal response.

## Massive communications damage and a failure to adequately plan for alternatives impaired response efforts, command and control, and situational awareness

- Massive inoperability had the biggest effect on communications, limiting command and control, situational awareness, and federal, state, and local officials' ability to address unsubstantiated media reports.

- Some local and state responders prepared for communications losses but still experienced problems, while others were caught unprepared.

- The National Communication System met many of the challenges posed by Hurricane Katrina, enabling critical communication during the response, but gaps in the system did result in delayed response and inadequate delivery of relief supplies.

## Command and control was impaired at all levels, delaying relief

- Lack of communications and situational awareness paralyzed command and control.

- A lack of personnel, training, and funding also weakened command and control.

- Ineffective command and control delayed many relief efforts.

## The military played an invaluable role, but coordination was lacking

- The National Response Plan's Catastrophic Incident Annex as written would have delayed the active duty military response, even if it had been implemented.

- DOD/DHS coordination was not effective during Hurricane Katrina.

- DOD, FEMA, and the state of Louisiana had difficulty coordinating with each other, which slowed the response.

- National Guard and DOD response operations were comprehensive, but perceived as slow.

- The Coast Guard's response saved many lives, but coordination with other responders could improve.

- The Army Corps of Engineers provided critical resources to Katrina victims, but pre-landfall contracts were not adequate.

- DOD has not yet incorporated or implemented lessons learned from joint exercises in military assistance to civil authorities that would have allowed for a more effective response to Katrina.

- The lack of integration of National Guard and active duty forces hampered the military response.

- Northern Command does not have adequate insight into state response capabilities or adequate interface with governors, which contributed to a lack of mutual understanding and trust during the Katrina response.

- Even DOD lacked situational awareness of post-landfall conditions, which contributed to a slower response.

- DOD lacked an information sharing protocol that would have enhanced joint situational awareness and communications between all military components.

- Joint Task Force Katrina command staff lacked joint training, which contributed to the lack of coordination between active duty components.

- Joint Task Force Katrina, the National Guard, Louisiana, and Mississippi lacked needed communications equipment and the interoperability required for seamless on-the-ground coordination.

- EMAC processing, pre-arranged state compacts, and Guard equipment packages need improvement.

- Equipment, personnel, and training shortfalls affected the National Guard response.

- Search and rescue operations were a tremendous success, but coordination and integration between the military services, the National Guard, the Coast Guard, and other rescue organizations was lacking.

## The collapse of local law enforcement and lack of effective public communications led to civil unrest and further delayed relief

- A variety of conditions led to lawlessness and violence in hurricane stricken areas.

- The New Orleans Police Department was ill-prepared for continuity of operations and lost almost all effectiveness.

- The lack of a government public communications strategy and media hype of violence exacerbated public concerns and further delayed relief.

- EMAC and military assistance were critical for restoring law and order.

- Federal law enforcement agencies were also critical to restoring law and order and coordinating activities.

## Medical care and evacuations suffered from a lack of advance preparations, inadequate communications, and difficulties coordinating efforts

- Deployment of medical personnel was reactive, not proactive.

- Poor planning and pre-positioning of medical supplies and equipment led to delays and shortages.

- New Orleans was unprepared to provide evacuations and medical care for its special needs population and dialysis patients, and Louisiana officials lacked a common definition of "special needs."

- Most hospital and Veterans Affairs Medical Center emergency plans did not offer concrete guidance about if or when evacuations should take place.

- New Orleans hospitals, Veterans Affairs Medical Center, and medical first responders were not adequately prepared for a full evacuation of medical facilities.

- The government did not effectively coordinate private air transport capabilities for the evacuation of medical patients.

- Hospital and Veterans Affairs Medical Center emergency plans did not adequately prepare for communication needs.

- Following Hurricane Katrina, New Orleans Veterans Affairs Medical Center and hospitals' inability to communicate impeded their ability to ask for help.

- Medical responders did not have adequate communications equipment or operability.

- Evacuation decisions for New Orleans nursing homes were subjective and, in one case, led to preventable deaths.

- Lack of electronic patient medical records contributed to difficulties and delays in medical treatment of evacuees.

- Top officials at the Department at Health and Human Services and the National Disaster Medical System do not share a common understanding of who controls the National Disaster Medical System under Emergency Support Function-8.

- Lack of coordination led to delays in recovering dead bodies.

- Deployment confusion, uncertainty about mission assignments, and government red tape delayed medical care.

## Long-standing weaknesses and the magnitude of the disaster overwhelmed FEMA's ability to provide emergency shelter and temporary housing

- Relocation plans did not adequately provide for shelter. Housing plans were haphazard and inadequate.

- State and local governments made inappropriate selections of shelters of last resort. The lack of a regional database of shelters contributed to an inefficient and ineffective evacuation and sheltering process.

- There was inappropriate delay in getting people out of shelters and into temporary housing – delays that officials should have foreseen due to manufacturing limitations.

- FEMA failed to take advantage of the Department of Housing and Urban Development's expertise in large-scale housing challenges.

## FEMA logistics and contracting systems did not support a targeted, massive, and sustained provision of commodities

- FEMA management lacked situational awareness of existing requirements and of resources in the supply chain. An overwhelmed logistics system made it challenging to get supplies, equipment, and personnel where and when needed.

- Procedures for requesting federal assistance raised numerous concerns.

- The failure at all levels to enter into advance contracts led to chaos and the potential for waste and fraud as acquisitions were made in haste.

- Before Katrina, FEMA suffered from a lack of sufficiently trained procurement professionals. DHS procurement continues to be decentralized and lacking a uniform approach, and its procurement office was understaffed given the volume and dollar value of work.

- Ambiguous statutory guidance regarding local contractor participation led to ongoing disputes over procuring debris removal and other services.

- Attracting emergency contractors and corporate support could prove challenging given the scrutiny that companies have endured.

## Contributions by charitable organizations assisted many in need, but the American Red Cross and others faced challenges due to the size of the mission, inadequate logistics capacity, and a disorganized shelter process



"*We were abandoned. City officials did nothing to protect us. We were told to go to the Superdome, the Convention Center, the interstate bridge for safety. We did this more than once. In fact, we tried them all for every day over a week. We saw buses, helicopters and FEMA trucks, but no one stopped to help us. We never felt so cut off in all our lives. When you feel like this you do one of two things, you either give up or go into survival mode. We chose the latter. This is how we made it. We slept next to dead bodies, we slept on streets at least four times next to human feces and urine. There was garbage everywhere in the city. Panic and fear had taken over.*"

PATRICIA THOMPSON
New Orleans Citizen and Evacuee
Select Committee Hearing, December 6, 2005[1]

# INVESTIGATION OVERVIEW

When Hurricane Katrina made landfall near the Louisiana-Mississippi border on the morning of August 29, 2005, it set in motion a series of events that exposed vast numbers of Americans to extraordinary suffering. Not only would Katrina become the most expensive natural disaster in U.S. history, it would also prove to be one of the deadliest.

From the marshes of Louisiana's Plaquemines Parish to the urban center of New Orleans to the coastal communities of Mississippi and Alabama, Katrina cut an enormous swath of physical destruction, environmental devastation, and human suffering.

With the overtopping and breaching of the New Orleans levees, the vast majority of the city became submerged, requiring the emergency evacuation of tens of thousands of residents who had not left prior to the storm. Lifted off roofs by helicopters or carried to safety in boats, they were taken to the Superdome, the Convention Center, a piece of high ground known as the Cloverleaf, or any other dry spot in the city.

At these locations, they were subjected to unbearable conditions: limited light, air, and sewage facilities in the Superdome, the blistering heat of the sun, and in many cases limited food and water. They feared for their safety and survival — and the survival of their city.

"You had people living where people aren't supposed to live," said Dr. Juliette Saussy, Director of New Orleans Emergency Medical Services, referring to the dire situations in the Superdome and Convention Center. "In general, people were just trying to survive. Some people acted badly. But most just wanted something to eat and drink, and wanted to feel safe."[2]

At least 1,100 Louisianans died as a result of Katrina.

Mississippians have understandably felt slighted that the devastation to their state has received less national public attention than New Orleans. Mississippi experienced a different storm than Louisiana — in essence, a massive, blender-like storm surge versus the New Orleans flooding caused by breached and overtopped levees.

By the end of the day on August 29, due largely to a storm surge that reached 34 feet in the western parts of the state — and extended inland as far as 10 miles — more than half of Mississippi was without power and had suffered serious wind and water damage. In addition to the surge, high winds and tornadoes left thousands of homes damaged and destroyed, and as many as 66,000 Mississippians were displaced from their homes.



FEMA



STAFF PHOTO

*"It was the in and out of the surge that killed us. The out, in particular. It carried everything away."*

Katrina completely flattened entire neighborhoods in communities such as Waveland, Bay St. Louis, and Pass Christian, but its damage was not limited to those who lived closest to the Gulf of Mexico. Even well inland, there is no debate over whether homes may be habitable or not. They just aren't there anymore. In these towns, brick walkways and front porches lead up to . . . nothing. Just a concrete slab where a house used to stand.

The storm careened upwards through the entire state with hurricane force winds and tornados, reaching Jackson, the state capital, and its northern most counties, and transforming 28,000 square miles — or 60 percent of the state — into a catastrophic disaster area. By the time the storm had passed, at least 230 people were dead and nearly 200,000 people were displaced from their homes. Agricultural, forestry, gaming, and poultry industries were severely damaged. Department of Homeland Security (DHS) reports estimate Veterinary Medical Assistant Teams disposed of over three million chickens that were destroyed by the storm.



STAFF PHOTO

While winds upon landfall were not as powerful as those of Hurricane Camille in 1969, Katrina was in many ways the "perfect storm" for coastal Mississippi. The combination of high winds, extraordinarily low barometric pressure, and arrival during a high tide resulted in a storm surge nearly twice that of Camille's. Wind-whipped water flooded towns not only from the south, but from the north — not just from the Gulf, but from the bayous.

This was not a tsunami-like, single wave of destruction. This was a sustained, ever-growing high tide, one that kept coming for hours. And when the water did roar back toward the Gulf, it took everything with it — furniture, pool tables, refrigerators, 30-foot boats, countless household items. Everything that was once inside was suddenly outside.

"Even the very accurate forecasts didn't capture the magnitude and devastation," said Eddie Favre, Mayor of Bay St. Louis. "It was the in and out of the surge that killed us. The out, in particular. It carried everything away."[3]

"Our infrastructure was devastated," Gulfport Mayor Brent Warr said. "The water came in, blew off manhole covers, then receded and caused a vacuum, sucking gators and DVD players and lots and lots of sand into water and sewer pipes. You couldn't have backed a truck up to a manhole cover and dumped it in more effectively."[4]

Out on his converted shrimp boat on the evening following Katrina's landfall, Rep. Gene Taylor, whose home was destroyed, recalls seeing complete and utter devastation on the ground and a telling sight in the air. "Birds were so tired all they could do was hold their wings out and soar on the wind," he said. "Our seagulls, if I had to guess, ended up in Arkansas."[5]

Very little wildlife remains evident in the storm-ravaged areas. National Guardsman stationed in Louisiana said they rarely see any pelicans or alligators any more. There are few shrimp boats working the Gulf, and elected officials in Mississippi guess it will take two years for the state's oyster industry to begin to recover.

Areas presumed to be flood-proof, like the Diamondhead community — built after Hurricane Camille, miles north Bay of St. Louis — suffered flood damage.

Wind shifts "caused a lot of areas considered safe to be flooded, like the town of DeLisle, where my district director's brother lives," Taylor said on a tour bus with Select Committee Members in January. "His house was pancaked. When he came home and tried to crawl in to see what he could salvage, he ended up face to face with an alligator. He ended up shooting the thing. People got mad because they were hungry and he let the alligator rot in his front yard."[6]

While only two hurricane-related deaths were reported in Alabama, Katrina caused significant damage along its coast with a wave surge of 13.5 feet, exceeding the 100-year flood level of 12 feet, despite the fact that the state did not suffer a direct hit from the hurricane. Bayou La Batre and Dauphin Island received the brunt of the storm in Alabama, losing 800 and 200 homes, respectively. The storm caused wind damage as far north as Tuscaloosa County. Mobile Bay spilled into downtown and flooded large sections of the city, destroying hundreds of homes. The sheer power of the storm dislodged a nearby oil drilling platform, which became caught under the U.S. Highway 98 bridge.

The overall toll from the devastation is still being tallied. At the time this report was issued, more than 3,000 people from storm-affected states remained unaccounted for.

During the most recent fact-finding trip to the Gulf coast in late January 2006, Members and staff of the Select Committee were shocked by the level of devastation and slow pace of cleanup. So many towns, cities, and parishes remain almost entirely empty.

A throbbing metropolis of 470,000 before the storm, New Orleans had become at the time of our writing a struggling city that is home to barely 100,000 people—although officials say that figure almost doubles for now during the daytime, when contractors and employees come into the city to work.

Significant portions of the city and region remain uninhabitable. In St. Bernard Parish, a few miles east of downtown New Orleans, only four houses did not suffer catastrophic damage from wind, rain, or the sudden flood that resulted from the breaking of the levees of the Mississippi River-Gulf Outlet Canal (MR-GO). The parish, once home to nearly 70,000 people, has seen its population dip to about 7,000, with nearly all of those people living in temporary housing.

In all of the affected communities, the local economies remain on the brink of disaster, fearful of another punch that would surely be the knockout blow. In Mississippi, Hancock County lost 64 percent of its real property value. In Bay St. Louis and Waveland, the figure is estimated to be closer to 90 percent.

## Investigative context: an overview

It's been said that experience is the best teacher. The unfortunate thing is that the learning process is sometimes such a painful one.

This report is the result of a five-month journey by the Select Committee to gather information from all those who learned painful lessons during Katrina. It examines how well local, state, and federal officials worked with each other and with private entities to alleviate the suffering of so many of our fellow citizens.

In crafting an investigative plan, the Select Committee faced and overcame several challenges. We had to appoint Members quickly and rely on other committees to detail staff to the Select Committee. We had to move quickly, while memories and evidence were fresh. We had to gather as much information as we could while leaving time to write and design a consensus report before our February 15, 2006 deadline. We had to remain focused on our prescribed "right-before-and-right-after-the-storm" timeframe, despite significant interest in longer-term issues and challenges. Like juggling with knives, we had to keep multiple investigative elements in play simultaneously — preparing for and holding high-profile public hearings; requesting, receiving, and reviewing documents; and conducting interviews and briefings.

And all this had to be done in a less-than-ideal political atmosphere.



The Select Committee remains grateful to those Democrats who chose to participate in our investigation in defiance of their leadership's decision not to appoint Members officially to the panel. The refusal by the Minority Leader was self-defeating, given that the Select Committee's composition and minority subpoena authority would have given the Democrats more clout than they enjoy on any standing committee of the House.

Despite this strategy, the Select Committee's review and the creation of this report have been bipartisan endeavors in spirit and in fact.

On September 15, before the Select Committee was established by a bipartisan House vote, the Government Reform Committee held a hearing on the early lessons learned from Katrina. At that hearing, the Committee's Ranking Member, Rep. Henry Waxman, said there were "two steps we should take right away."[7]

First, he said, we should request basic documents from the agencies. And second, he said, "We need to hear from Michael Brown and Michael Chertoff. These are the two government officials most responsible for the inadequate response, and the Committee should call them to testify without delay."[8]

The Select Committee did not delay. We met and exceeded those goals. While many who so urgently called on Congress to swiftly investigate refused to participate and instead prejudged our efforts, we investigated aggressively what went wrong and what went right.



AP PHOTO/DENNIS COOK

The Select Committee continuously invited any and all interested Democrats to join our hearings, giving them full and equal opportunity to make statements and question witnesses and help guide the direction of our inquiry, including identifying and inviting witnesses. Five Democratic members did just that: Representative Charlie Melancon, Representative Gene Taylor, Representative Bill Jefferson, Representative Cynthia McKinney, and Representative Sheila Jackson Lee. Document requests submitted to federal, state, and local agencies were signed by both Chairman Davis and Rep. Melancon.



STAFF PHOTO

In addition to direct member participation, Democratic Members and staff were assigned to travel with Republican Members and staff to the affected locales, and Rep. Waxman's top Government Reform Committee investigative staff assisted Democratic participants. Finally, Democratic members were repeatedly invited to offer narrative text and findings for inclusion in this report.

The Select Committee, beyond extending these courtesies, remained focused on the job of Congress. In our system of checks and balances, the Congress has both the duty and the obligation to ask tough questions. We did not believe it was appropriate to outsource our congressional oversight responsibility. The American people did not want us to punt. They wanted answers, and they wanted them quickly. If there is a consensus down the road to establish an outside commission, which some purportedly wanted, so be it. The two were not and are not mutually exclusive. However, a commission will take months to set up, and an eternity to finish its work. We needed to begin immediately, while evidence and memories were fresh.

News reports and other statements suggested many Democrats felt the same. For example, Bloomberg News reported in November that "Some House Democrats Want [a] Larger Role in Katrina Investigation."[9] In that report,

Rep. Gene Taylor said, "It's really important that we're there. I certainly wish more of my colleagues who are interested in this would participate . . . . Mr. Davis, to his credit, has been extremely fair."

Rep. Maxine Waters, who had told Chairman Davis she wanted to participate but later said she could not, told Bloomberg, "I feel a certain void and a great absence from these discussions. I was hoping that our leaders could a find a way . . . so we could participate."[10]

Rep. Neil Abercrombie said he unsuccessfully expressed interest in serving on the committee. "The position of Ms. Pelosi and the leadership is pretty clear," he said. "I have a different view."[11]



STAFF PHOTO

Democrats who did buck their leadership have acknowledged both the value of their participation and the eagerness of the Select Committee to have them participate. Rep. Cynthia McKinney expressed her regret about the Democrats' failure to officially appoint Members to the Committee while thanking Chairman Davis for convening a hearing on December 6th featuring testimony from African-American residents and evacuees:

I would like to thank you, Mr. Chairman, for allowing us to have this day. Because were it left up to — I will get in trouble now. But were it left up to the Democratic leadership, we would not have had this day, because we wouldn't be here. The Democratic leadership has instructed us to boycott this panel…. So I would like to thank my Chairman for giving us the opportunity to invite people who don't have the opportunity to come and testify before Congress…. We are here to serve all of the people of this country, and too rarely do we hear from all of the people.[12]

Regardless of who did or did not participate in our investigation, the Select Committee had a job to do, and we were determined to do it right.

## Hearing chronology: an overview

The Select Committee held nine hearings over the course of approximately three months. Select Committee Members and staff simultaneously conducted scores of interviews and received dozens of briefings from local, state, and federal officials; non-governmental organizations; private companies and individuals who provided or offered external support after Katrina; and hurricane victims. Select Committee Members and staff traveled numerous times to the Gulf Coast. The Select Committee also requested and received more than 500,000 pages of documents from a wide array of sources.

The information gleaned from our investigation is provided in detailed, narrative form in subsequent chapters. What follows here is a brief synopsis of the topics, questions, and themes raised at each of our hearings:

**"Predicting Hurricanes:
What We Knew About Katrina and When"**
September 22, 2005 Select Committee hearing

The Select Committee began at a logical place: a hearing to establish a record of who was told what, and when, about the nature of the hurricane in the days immediately before the storm. We explored the timeline of Katrina progressing from a tropical depression to a major hurricane, and asked when warnings were issued to the public and to federal, state, and local officials. We reaffirmed what we already suspected — at least two federal agencies passed Katrina's test with flying colors: the National Weather Service (NWS) and the National Hurricane Center.

Many who escaped the storm's wrath owe their lives to these agencies' accuracy. This hearing provided a backdrop for the remainder of our inquiry. We repeatedly tried to determine how government could respond so ineffectively to a disaster that was so accurately forecast.

How accurately?

- Storm-track projections released to the public **56 hours** before Katrina came ashore were off by **only 15 miles.** The average 48-hour error is 160 miles, and the average 24-hour error is 85 miles.
- The Hurricane Center's predicted strength for Katrina at landfall, **two days before** the storm hit, was off the mark by only 10 miles per hour.

*We repeatedly tried to determine how government could respond so ineffectively to a disaster that was so accurately forecast.*

- NWS Director Max Mayfield personally spoke by telephone with the governors of Mississippi and Louisiana and the mayor of New Orleans two days prior to landfall to warn them of what was coming. He also gave daily pre-storm video briefings to federal officials in Washington, including top Federal Emergency Management Agency (FEMA) and DHS brass.

- The day before Katrina hit, the NWS office in Slidell, Louisiana issued a warning saying, "MOST OF THE AREA WILL BE UNINHABITABLE FOR WEEKS…PERHAPS LONGER…HUMAN SUFFERING INCREDIBLE BY MODERN STANDARDS."

The Select Committee determined — despite more recently revised reports that Katrina was actually a strong Category 3 storm at landfall, not a Category 4 — that Katrina's strength and the potential disaster it could bring were made clear well in advance through briefings and formal advisories. Inadequate response could not be blamed on lack of advance warning.



AP PHOTO/ANDY NEWMAN

**"Hurricane Katrina: The Role of the Federal Emergency Management Agency"**
September 27, 2005 Select Committee hearing

This hearing featuring former FEMA Director Michael Brown attempted to construct a timeline of what FEMA did and did not do before, during, and after Katrina made landfall.

Fair or not, by the time of this hearing, FEMA in general and Brown in particular had become the symbol of all that went wrong with the government's response to Katrina.

By the September 27 hearing date, with the emergence of Hurricane Rita, the Select Committee had the ability to compare and contrast disaster response actions after the two storms. While Rita was predicted to be a very different



AP PHOTO/DENNIS COOK

storm from Katrina — a mere size Large compared to a size XXXL, and a storm that struck a far less densely populated area — it was immediately clear that governments at all levels did things differently this time around.

More supplies were stockpiled on the ground *prior* to Rita's arrival. The federal government declared Rita an "incident of national significance" *two days before* landfall, triggering our most thorough response, and named a federal officer in charge. These steps occurred *two days after* Katrina. Ten thousand National Guardsmen were called to Texas in advance of Rita; Louisiana summoned 1,500



before Katrina. Search and Rescue operations were far better coordinated.

Even if a little rough around the edges, the massive pre-storm evacuation of Houston and surrounding locales showed improved foresight from state and local officials — and how lives can be saved when people pay attention to a coordinated message from their government.

We also attempted to clarify FEMA's role in disaster response. We were faced with the problematic reality that many Americans — and perhaps even some state and local officials — falsely viewed FEMA as some sort of national fire and rescue team. An important task for the Select Committee moving forward was defining what FEMA is — what it can and cannot do based on what it is actually charged with doing by statute.

We noted that FEMA is **not** a first responder agency with the resources to assume principal responsibility for overwhelmed state and local governments during a disaster. This is the real world, not the reel world. There is no Tommy Lee Jones character that comes in and takes charge of…well…*everything*.

But we also attempted to contextualize that discussion. In other words, before getting to what FEMA cannot do, we wanted to understand what they simply did not do. Just because they are not "first responders" does not mean they should be a second thought.

We explored the possible causes of FEMA's inadequate response, which are covered exhaustively in subsequent chapters. Among those discussed at the hearing: Inadequacies in the Stafford Act. Organizational or budgetary or grant-making shortcomings. State and local governments that didn't know how to ask for help, or simply didn't. A bureaucratic mindset that now emphasizes terrorism to the exclusion of natural disaster planning. We looked at these possibilities, and more.

We also examined why FEMA seemed unable to implement lessons that should have been learned well in advance of Katrina. There were the lessons of previous hurricanes. Further, FEMA officials participated in the now-widely-known exercise called Hurricane Pam in July 2004, an exercise that predicted with eerie similarity Katrina's impact on New Orleans, including an evacuation of a million people, overflowing levees, and the destruction of hundreds of thousands of buildings.

### "Hurricane Katrina: The Role of the Department of Homeland Security"
October 19, 2005 Select Committee hearing



Although by this date FEMA and Michael Brown had received the most attention from Members of Congress, state and local officials, and the news media in Katrina's wake, the Select Committee sought to recognize that DHS and Secretary Michael Chertoff have primary responsibility for managing the national response to a catastrophic disaster, according to the National Response Plan (NRP).

Therefore, three weeks after hearing from Michael Brown, we turned to his boss, the man who ultimately fired him.

We needed to find out if Michael Brown had it right when he testified that FEMA had been under-funded and under-staffed, that it had become "emaciated," and that Congress had undermined FEMA's effectiveness when the agency was folded into DHS.

Michael Brown testified that he asked the Department for funding to implement the lessons learned from the Hurricane Pam exercise and that those funds were denied. He also testified about brain drain, diminished financial resources, and "assessments" of $70 to $80 million by DHS for department-wide programs. He said he had written memos to Secretary Ridge and Secretary Chertoff regarding the inadequacy of FEMA's resources. We asked Secretary Chertoff about those assertions.

We also sought to establish the Department's role and responsibilities in a disaster. What resources can the Secretary bring to bear? What triggers the decision to

deploy those resources? During Katrina, how personally involved was Secretary Chertoff in seeking, authorizing, or deploying specific resources?

Under the National Response Plan, the DHS Secretary is the federal official charged with declaring an Incident of National Significance. Part of that declaration entails naming a Principal Federal Official (PFO), to manage the response.

The government's pre-landfall decision to declare an Incident of National Significance with Rita suggested awareness that the call came too late with Katrina. And, based on some of Brown's emails, we knew that he *resented* being named the PFO by the Secretary. We needed to ask Secretary Chertoff what he thought about that, and what those comments said about the underlying NRP.

Finally, we asked Secretary Chertoff what we asked all officials during our investigation: Where were you in the days and hours right before, during, and after the hurricane? What were you doing? Who were you talking to?

New York University Professor Paul Light wrote shortly after Katrina that, "Mr. Chertoff is just about the only official in Washington who can say 'I told you so' about FEMA," based on some of the reforms he outlined in July 2005 in his Second Stage Review. We asked Secretary Chertoff if he believed FEMA's response to Katrina would have been better if the reforms had been in place on August 29.

**"Hurricane Katrina: Preparedness and Response by the Department of Defense, the Coast Guard, and the National Guard of Louisiana, Mississippi, and Alabama"**
October 27, 2005 Select Committee hearing



STAFF PHOTO

At this hearing we examined Department of Defense responsibilities, procedures, and coordination with the Department of Homeland Security in the event of a catastrophic disaster.

We looked at the roles of the National Guard and U.S. Northern Command in disaster response as the operational arms of DOD and the states, and we reviewed the role of

the Coast Guard, a unique national asset with both military capabilities and domestic law enforcement authorities.

We sought to establish a timeline of the military's actions — what they were asked to do, when they were asked, and whether the jobs actually got done.

We acknowledged the heroic efforts that DOD, National Guard, and Coast Guard personnel made, efforts that saved many, many lives. The mobilization was massive and, at least once the call went out, swift and effective.

But we also discussed problems with the military response. The Select Committee believed even some of the successes occurred despite less-than-optimal planning, and too often officers were planning in a crisis environment.

There were problems: With situational awareness and damage assessments. With coordinating search and rescue operations. With the effective use of Defense Coordinating Officers by FEMA. With an early and persistent disconnect between DOD and state and local authorities. With inadequate telecommunications that prevented effective coordination. And, once again, with failing to learn as much as possible from previous disasters.

While we continued to emphasize that local first responders are best suited for handling local emergencies, the recurring question was: What happens when first responders are overwhelmed, as they clearly were in Katrina?

As a result, we asked whether DOD anticipated these circumstances, what preparations were made, and what actions were taken with regard to the National Response Plan's "Catastrophic Incident Annex" — the annex that authorizes federal agencies to act when state and local capacity even to know what they need is compromised by the sheer size of the calamity.

Our hearing came amid growing debate over an expanded military role in future disasters. President Bush prompted the discussion in a nationally televised address from New Orleans on September 15, saying, "It is now clear that a challenge on this scale requires greater federal authority and a broader role for the armed forces — the institution of our government most capable of massive logistical operations on a moment's notice."

Two witnesses — Paul McHale, Assistant Secretary of Defense for Homeland Defense, and Admiral Timothy J. Keating, Commander, North American Aerospace Defense Command and U.S. Northern Command — had indicated prior to the hearing that DOD was considering

training and equipping an active duty force specifically for disaster response.

Those remarks led to some confusion over specifics, and even to some outright opposition.

On October 13, the National Governors Association issued a statement reasserting their authority. "Governors are responsible for the safety and welfare of their citizens and are in the best position to coordinate all resources to prepare for, respond to, and recover from disasters," the association wrote.

An October 21 statement by Assistant to the President for Homeland Security Advisor Frances Townsend, who is leading President Bush's examination of the federal response to Katrina, also spawned negative reactions from state officials. Townsend reportedly said she was considering whether there is "a narrow band of cases" in which the President should seize control when a disaster strikes.[13] A spokesperson for Louisiana Gov. Kathleen Babineaux Blanco responded by saying she could not think of an instance in which the President should be able to unilaterally take control. "We don't believe Katrina was the time, and I don't know what another time would be," Denise Bottcher told the Times-Picayune.[14]

The Select Committee, therefore, began addressing this basic tension. On the one hand, we heard understandable caution from our Members and witnesses against over-reacting to Katrina with sweeping changes to laws or processes, caution against deviating too wildly from the locals-as-first-responders paradigm. None of us believed the best lesson to be learned from Katrina was that all answers can be found in Washington.

On the other hand, the call for increasing the military's role in domestic affairs is easy to grasp. Who else can respond the way the military can? Who else can stand up when others have fallen?

This tension was reflected in the National Response Plan *before* Katrina. The Catastrophic Incident Annex assumes that local response capabilities may be "insufficient," as they will be "quickly overwhelmed." But the NRP plan states federal resources will only be integrated into the response effort *upon a request by state and local authorities* and assumes state and local officials will be able to do the integrating themselves.

The Select Committee was left wondering if the plan as written tried to have its cake and eat it too. How can we rely on the overwhelmed to acknowledge they are



MS NATIONAL GUARD

overwhelmed, and then expect them to direct and manage the process of coming to their rescue?

We agreed we needed a closer evaluation of existing procedures for DOD under the National Response Plan, paying particular attention to DOD's role when first responders are wiped out or otherwise incapable of providing the initial response.

We agreed that Incidents of National Significance require a response on a national scale. But we also agreed the devil is in the details. We cannot expect the Marines to swoop in with MREs every time a storm hits. We train soldiers to fight wars. You can't kill a storm.

So what is the threshold? When can or should the Stafford Act's assumption that states will be able to "pull" needed federal resources to meet their needs give way to the operational imperative that federal agencies "push" assets to those who need them? What would spur the kind of enhanced or heightened military role that some have been promoting in the aftermath of Katrina? When would we pull that trigger? And finally, would it have made a difference in the response to Katrina?

The fact is, military resources are not infinite. It seems the kind of standing humanitarian force that would be needed to provide this sort of immediate assistance at a moment's notice would either threaten readiness or require an expansion of the active force and a significant boost in how well they are equipped.

Legal questions also arose. Were we talking about statutory changes? Should we revisit Posse Comitatus, the 127-year-old law that bars federal troops from

## Do we need a larger DOD role — or just a smarter one?

assuming domestic law enforcement duties? Did Katrina demonstrate a need for a new exception to Posse Comitatus, one to be utilized after major disasters?

The Select Committee ultimately refocused the discussion by simplifying the question: Do we need a larger DOD role — *or just a smarter one?*

The Select Committee tried hard to acknowledge at this hearing what an incredible job the Coast Guard did, and recognize the National Guard's clear sense of urgency. We noted for the record that Northern Command had prepared for this storm, deploying Defense Coordinating Officers to the three states before landfall and placing units on alert.

But we also had to recognize that it was unclear how much "real" support was in place before the storm arrived, and that Secretary McHale himself had acknowledged prior to our hearing the DOD response was too slow.[15]

**"Hurricane Katrina: The Federal Government's Use of Contractors to Prepare and Respond"**
November 2, 2005 Select Committee hearing

Local, state, and federal governments rely heavily on contractor support to prepare for and response to disasters. This hearing examined the contracts in place prior to Katrina's landfall, and procurement planning efforts that took place in anticipation of a large-scale catastrophic event. We also reviewed the rationale and process for awarding disaster relief and recovery contracts in the immediate aftermath of Katrina.

The Select Committee asked about the internal controls in place to ensure that federal acquisition laws were followed; the terms and performance of Katrina relief contracts; and the ways in which the management and oversight of disaster-related contracting can be strengthened.

A great deal of taxpayer money went out the door to private firms to help prepare for and respond to Katrina. Part of our job was to ask whether it's been money well spent. And part of that inquiry was asking what contracts should have been in place **before** the storm arrived, based on what everyone knew — or should have known — would be needed.



STAFF PHOTO

Was the contracting system up to the task? Were we able to get what we needed, when and where we needed it? By any measure, this was an enormous storm, described as one of "Biblical" proportions. In the face of the massive destruction caused by Katrina, acquisition personnel acted to meet pressing humanitarian needs, contacting firms in an effort to provide immediate relief to survivors and to protect life and property. And thankfully, many firms responded.



FEMA

It is true that several companies were called into action on a sole-source basis under acquisition provisions that allow the government to acquire urgently needed goods and services in emergency situations. It's also true that, contrary to many media reports, some of the immediate response efforts were provided through *existing* contracts that had been previously awarded through full and open competition.

Nevertheless, concerns were raised with respect to how FEMA awarded contracts in Katrina's immediate aftermath and regarding what contract vehicles were in place before landfall. These were legitimate concerns that affect not only our findings relative to the preparation for and response to Katrina, but also how well prepared we'll be the next time — and how willing contractors will be to step up to the plate the next time they're called.

The indirect result of inefficient contracting and misdirected, even baseless charges against contractors could be a government left with more than it can manage in-house.

In the weeks following Katrina, more than 80 percent of the $1.5 billion in initial contracts awarded by FEMA were awarded on a sole-source basis or pursuant to limited competition. Many of the contracts awarded were incomplete and included open-ended or vague terms. In addition, numerous news reports questioned the terms of disaster relief agreements made in haste.

Under the Stafford Act, prime contractors are to give preference to local subcontractors, but reports indicated that not enough local businesses were being hired. Questions were also raised about the Corps of Engineers' use of a limited competition to award contracts for debris removal and clean up.

Undoubtedly, FEMA before Katrina suffered from something Congress has grappled with government-wide for many years: a lack of sufficiently trained procurement professionals.

Prior to Hurricane Katrina, the DHS Office of Inspector General (IG) had repeatedly cited the lack of consistent contract management for large, complex, high-cost procurement programs. DHS procurement continues to be decentralized and lacking a uniform approach. DHS has seven legacy procurement offices that continue to serve DHS components, including FEMA. Notably, FEMA was not reporting or tracking procurements undertaken by disaster field offices, and the procurement office remains to this day understaffed given the volume and dollar value of its work.

The Chief Procurement Officer (CPO) had established an eighth office called the Office of Procurement Operations to meet the procurement needs of the rest of DHS. After Katrina, however, the CPO reassigned its staff to assist FEMA's procurement office.

At this hearing, we learned errors were made in the contracting process before and after Katrina. The contract oversight process is not always pretty, and decisions made under life-and-death pressure are not always as lucid as those made under less complicated conditions. But there are lessons to be learned about efficient and effective contracting, even from this, hopefully, once in a lifetime event.

That there were and will be disagreements with contractors over pricing and payment schedules should come as no surprise to anyone familiar with the administration of complex contracts in difficult circumstances.

The good news is, DHS has begun establishing a rigorous oversight process for each and every federal contract related to Katrina. Now the process needs to be fully implemented.

Shortly after the emergency needs arose, DHS's Chief Procurement Officer asked the DHS Inspector General's Office to begin overseeing the acquisition process. The DHS IG assigned 60 auditors, investigators, and inspectors and planned to hire thirty additional oversight personnel. The staff is reviewing the award and administration of all major contracts, including those awarded in the initial efforts, and will monitor all contracting activities as the government develops its requirements and as the selection and award process continues to unfold.

*Undoubtedly, FEMA before Katrina suffered from something Congress has grappled with government-wide for many years: a lack of sufficiently trained procurement professionals.*

To further ensure that any payments made to contractors are proper and reasonable, FEMA engaged the Defense Contract Audit Agency to help monitor and oversee any payments made — and pledged not to pay on *any* vouchers until each one is audited and cleared.

The Select Committee has no patience with waste, fraud, or abuse. We expect that any such instances that are proven will result in harsh punishment for the perpetrators. We also expect that, as the conditions on the ground have improved, the next generation of contracts have been and will be awarded and administered in accordance with standard acquisition procedures.

Emergency procedures are for emergencies only.

FEMA said it continues to revisit non-competitive arrangements made immediately after the storm.

**"Hurricane Katrina: Preparedness and Response by the State of Alabama"**
November 9, 2005 Select Committee hearing
**"Hurricane Katrina: Preparedness and Response by the State of Mississippi"**
December 7, 2005 Select Committee hearing
**"Hurricane Katrina: Preparation and Response by the State of Louisiana"**
December 14, 2005 Select Committee hearing

The three state-focused hearings we held were arguably the most important in terms of fact-gathering. After all, we understood that in the event of an emergency, state and local government officials bear primary responsibilities under both the National Response Plan and their own laws and directives. Throughout federal, state and local planning documents the general principle is for all incidents to be handled at the lowest possible organizational and

jurisdictional level. Police, fire, public health and medical, emergency management, and other personnel are responsible for incident management at the local level. For federally declared emergencies or major disasters, DHS provides operational and/or resource coordination for federal support to on-scene incident command structures.

Our goal was to better understand the responsibilities and actions of state and local officials before, during, and after Hurricane Katrina made landfall. We explored state laws, policies, procedures, and how state and local officials interfaced with DHS and FEMA when they confronted Katrina — and how DHS interfaced with them.

The National Response Plan and the National Incident Management System were crafted to provide the framework and template, respectively, for the federal government to work with state and local authorities to prepare for and respond to crises. In turn, states, localities, tribal governments, and nongovernmental organizations are asked to align their plans and procedures with federal guidelines and procedures.

Did this coordinated alignment occur? By the time of these hearings, we knew in large part it had not. We sought to understand, from a state and local perspective, why.

**"Hurricane Katrina: Voices from Inside the Storm"**
December 6, 2005 Select Committee hearing

In mid-November, Rep. Cynthia McKinney asked Select Committee Chairman Tom Davis to focus a hearing on the "African-American voice" related to Hurricane Katrina.

With that request in mind, and having already planned a hearing featuring testimony from storm victims, the Select Committee sought to better understand the experiences of Gulf coast residents, including those forced


AP PHOTO/SUSAN WALSH


AP PHOTO/HARAZ N. GHANBARI


AP PHOTO/SUSAN WALSH



AP PHOTO/SUSAN WALSH

this very carefully," aide Johnny Anderson wrote in an e-mail. "We are getting enough bad national press on race relations."[16] E-mails from aides to former FEMA Director Michael Brown reflected similar concerns about public relations

to evacuate, during the catastrophe. Only by hearing from those most directly affected by Katrina could we determine where, how, and why the government response at all levels was so terribly inadequate.

There was little question that Katrina had sparked renewed debate about race, class, and institutional approaches toward vulnerable population groups in the United States. In the aftermath of the storm, a wide array of media reports, public statements, and polls underscored this reality.

In his September 15 speech to the nation, President Bush touched on the issue. "As all of us saw on television, there is also some deep, persistent poverty in this region as well. And that poverty has roots in a history of racial discrimination, which cut off generations from the opportunity of America," the President said.

Since then the debate had become increasingly heated. In media interviews, Jesse Jackson compared New Orleans' shelters to the hold of a slave ship, and Louis Farrakhan suggested New Orleans' levees were intentionally blown up to destroy primarily African-American neighborhoods.

While not all the commentary has necessarily been constructive, substantiated, or fair, the Select Committee believed the issue warranted further discussion, especially within the context of understanding the experiences of those caught inside the storm, and in hopes of making sure the governmental response is more effective the next time.

We knew from government e-mails and other documents that officials were almost immediately sensitive to public perceptions of race as a factor in the inadequate response. An aide to Louisiana Governor Blanco cautioned colleagues about how to respond to a request from Rep. Maxine Waters, an African-American, for security escorts in New Orleans shortly after the storm. "Please handle

and racial politics. And Alabama officials discussed similar sensitivities about a proposal to conduct background checks on out-of-state evacuees being housed in state parks.

A CNN-Gallup poll from September 8 to 11 reported 60 percent of African-Americans, but only 12 percent of whites, believed race was a factor in the slow response to Katrina. Another poll by the Pew Research Center found that 7 in 10 blacks believed the disaster showed that racial inequality remains a major problem in America. A majority of whites disagreed.

A November survey of 46 Katrina evacuees published by the Natural Hazards Center at the University of Colorado-Boulder concluded that "issues of race and class were central to evacuation experiences."[17] For many, the evacuation process was complicated by age, mental or physical disability, the need to care for dependents, or material possessions they were trying to take with them.

The *Washington Post*, the Kaiser Family Foundation, and Harvard University also conducted face-to-face interviews with 680 randomly selected adult evacuees residing in Houston.[18] When asked, "Has your experience made you feel like the government cares about people like you, or has it made you feel like the government doesn't care?" 61 percent reported they felt the government doesn't care. Additionally, the evacuees suggested an intersection between race and class: 68 percent of respondents thought the federal government would have responded more quickly if more people trapped in the floodwaters were "wealthier and white rather than poorer and black."

At an early November forum at Emerson College, Louis Elisa — a former regional director for the Federal Emergency Management Agency under President Clinton — reportedly suggested that race *had to be* a factor in the



STAFF PHOTO

*"If you get conflicting information from people you're not sure of, then inaction may be, from your perspective, the most prudent form of action."*

inadequate response. "I am telling you, as a professional, that you could not have had a mistake of this nature…if something else was not afoot," the Boston Globe quoted Elisa.[19]

Whether or not one believed racist charges were well-founded (and clearly a majority of our members did not), the Select Committee agreed it should recognize and discuss the socioeconomic and racial backdrop against which Katrina unfolded.

As the Brookings Institution reported in October, New Orleans, which once had economically and demographically diverse neighborhoods, had grown extremely segregated by both race and income by the time of the storm. "As a result," Brookings concluded, "blacks and whites were living in quite literally different worlds before the storm hit."[20]

At the very least, the Select Committee determined it should further explore at this hearing how socioeconomic factors contributed to the experiences of those directly affected by the storm. The UC-Boulder survey found that "almost all interviewees described the evacuation process as disorderly and disorganized, with minimal communication about where evacuees were heading and when the next transportation would arrive. This created a state of uncertainty and insecurity…. [P]redominantly working-class African-Americans did not evacuate because they did not have the financial resources to do so."[21]

The Select Committee sought to learn more about whether government messages to Gulf coast residents regarding the dangers of the coming hurricane could have been presented in a more effective manner, a question which also carried racial and socioeconomic implications.

"If you don't hear the message from someone you trust, you tend to be skeptical," Margaret Sims, vice president of the Joint Center for Political and Economic Studies, told Public Relations Strategist magazine. "If you get conflicting information from people you're not sure

of, then inaction may be, from your perspective, the most prudent form of action."[22]

The same magazine article noted that disaster response may have been hampered by not taking the "circumstances" of area residents fully into account. "The people creating the verbal or image measures don't take into account access or physical barriers to opportunities in certain communities," said Linda Aldoory, director of the Center for Risk Communication Research at the University of Maryland. "With Katrina, people knew the importance of storm warnings and the need to evacuate, but didn't have the physical access to do so."[23]

In other words, the Select Committee agreed it should examine to what extent response inadequacies stemmed from the messengers — and the message. We wanted to further explore the possibility that different people may hear different things when their elected officials are telling them to evacuate.

## Document request, production, and review: an overview

Within a week of its September 15, 2005 creation, the Select Committee held its first hearing. By the end of the month, Chairman Davis and Rep. Charlie Melancon, on behalf of the Select Committee and in cooperation with the Senate Committee on Homeland Security and Governmental Affairs, had submitted 19 official and comprehensive requests for documents to relevant federal agencies and state governments.

By the beginning of January 2006, 67 formal requests for documents had been issued by the Select Committee and the Senate Committee to 29 federal agencies as well as the governments of Alabama, Mississippi, and Louisiana and their subdivisions.

In response to those formal requests and numerous other staff requests, the Select Committee received hundreds of thousands of documents.

The responses by the federal agencies and state governments inundated the Select Committee. A constant stream of boxes containing responsive documents arrived daily at the Select Committee's door. Select Committee staff worked around the clock to organize and review this stream of documents. Aggressive follow-up by the Select Committee, detailed below, ensured the document production was responsive to the Select Committee's requests.

To fulfill its mission, the Select Committee needed to do more than hold hearings. We requested and received more than half a million pages of documents from governmental organizations at all levels: federal, state, and local. The information gleaned from these documents played a critical role in helping the Select Committee paint a picture of what happened and why.



STAFF PHOTO

Below is a brief overview of what was requested and what was received. Most of the governmental organizations complied with our requests in a timely and complete fashion. Efforts by others to comply unfortunately were neither timely nor complete. This is discussed below as well.

In September 2005, the Senate committee, chaired by Senator Susan Collins, began its Katrina investigation. In many cases, the two committees desired the same or similar information. To facilitate both investigations, and to eliminate waste and unnecessary duplication of efforts, the Select Committee simply asked to receive all documents requested by the Senate.

## Federal

The Select Committee sent request letters to all 15 cabinet-level departments as well as many independent federal deparments including: the Environmental Protection Agency (EPA), the United States Postal Service (USPS), the Agency for International Development (AID), the Tennessee Valley Authority (TVA), the Small Business Administration (SBA), the Social Security Administration (SSA), the Federal Communications Commission (FCC), the Nuclear Regulatory Commission (NRC), the Office of Personnel Management (OPM), and the National Aeronautics and Space Administration (NASA). We also requested information from the White House and the Office of the Vice President.

In particular, the Select Committee requested extensive information from the Department of Homeland Security, particularly from two of its constituent agencies, FEMA and the U.S. Coast Guard. We requested documents and communications from before August 23 related to the threat posed by a hurricane striking New Orleans or the Gulf Coast, mitigation measures or projects, emergency preparations, or emergency responses. We also sought documents and communications from between August 23 and August 29 related to the threat posed by Hurricane Katrina, mitigation measures or projects, emergency preparations, or emergency responses. And we requested documents and communications from between August 29 and September 15 related to the impact of Hurricane Katrina, mitigation measures or projects, emergency preparations, or emergency responses.

In addition, we requested information about the different elements of DHS and individuals holding key positions. We wanted to know the different roles and responsibilities of those components, as well as the actions they took before, during, and after Katrina. We asked for information regarding the activation of the National Response Plan and National Incident Management System, and any discussions about the use of the armed forces. We also requested relevant communications, specifically any requests for assistance, communications with local and state authorities, and communications that revealed any plans to prepare for the hurricane, or communications that demonstrated possible vulnerabilities to a hurricane. We also wanted any documents containing authorities, regulations, plans, and

procedures of the agency, weather reports, information about medical response assets, and information about DHS and FEMA funding and budgeting.

We requested an employee directory and organization chart for FEMA, as well as the individuals in key position during the hurricane in the affected regions. We asked for documents referring to risks posed by hurricanes or flooding of New Orleans, and documents indicating whether officials knew of those risks. We also requested documents and communications regarding the levee system in New Orleans, including plans, risk assessments, and knowledge of the levees' failure, particularly documents and communications with the Army Corps of Engineers.

We sought documents and names of key individuals related to the Hurricane Pam exercise, and information about FEMA's chain of command during the storm and FEMA's authorities, plans, and policies relevant to Hurricane Katrina. In addition, we requested after-action reports for past hurricanes; information about the activation of the National Response Plan; qualifications of key FEMA personnel; and contributions of contractors and subcontractors.

Finally, we requested a description of the Coast Guard's role with respect to the National Response Plan and other domestic emergencies, specifically Hurricane Katrina. We wanted to know what components will act, who they will cooperate with, and in what capacity. We also requested information about search and rescue, such as command structures, regulations, and assets available. We also requested details about when the Coast Guard learned of certain key information before, during, and after Katrina.

DHS responded to most of these requests from the Select Committee, including requests addressed to Secretary Chertoff, Acting Undersecretary Paulison, and Assistant Secretary Robert Stephan. The Department produced in total well over 200,000 pages of documents including: (1) Briefing books, reports and communication from the Secretary's office; (2) Communications from the Deputy Secretary's office; (3) E-mails from Undersecretary Brown's office; (4) E-mails from FEMA personnel involved in planning and response efforts; (5) the National Response Plan, Hurricane plans, New Orleans and Mobile area plans, Incident Action Plans, Operation Manuals and planning worksheets, and Katrina specific plans; (6) Mission assignments, task requests and logs, action requests, tracking reports, and situation reports; (7) tasking logs and

requests; (8) briefings; (9) grant program documents; (10) planned shipments; resource tracking reports, commodity maps, and staging areas; (11) audits; (12) Katrina maps and graphics; and (13) organizational charts.

The Select Committee sent specific requests to the Department of Defense as well. We sent request letters to the Office of the Secretary of Defense, the National Guard Bureau, the U.S. Army Corps of Engineers, North American Air Defense Command (NORAD), and Northern Command (NORTHCOM).

Specifically, we requested documents and communications from before August 23 by officials of the Department of Defense or any constituent agencies related to the threat posed by a hurricane striking New Orleans or the Gulf coast, mitigation measures or projects, emergency preparations, or emergency responses. We requested documents and communications from between August 23 and August 29, by officials of the Department of Defense or any constituent elements related to the threat posed by Hurricane Katrina, mitigation measures or projects, emergency preparations, or emergency responses. And, we requested documents and communications, including internal communications from between August 29 and September 15 by officials of the Department of Defense or any DOD elements related to the impact of Hurricane Katrina, mitigation measures or projects, emergency preparations, or emergency responses.

We also requested information about DOD's role and legal authority with respect to domestic emergencies and Hurricane Katrina. We wanted organizational charts, after-action reports, and plans with respect to national catastrophes. We requested information about DOD and the events of Hurricane Katrina, such as any guidance provided by the Secretary of Defense before landfall, the preparations made, specific actions taken, and personnel involved. We asked for information about Joint Task Force Katrina and on actions taken during Hurricane Katrina, specifically those of active duty troops and National Guard units; requests for assistance; and information on DOD's chain of command during the incident.

The Select Committee initially received responses from the Department of Defense on behalf of Secretary Rumsfeld that only partially complied with the various requests. On November 18, the Select Committee received a production from the Department containing: execution orders; requests for forces; correspondence regarding National Guard authorization; daily update briefings; and



daily executive summaries. On December 14, the Select Committee received further production containing the Joint Staff Director of Operations' (J-3) Redacted Timeline, outlining the Department's response actions to Hurricane Katrina and the Joint Task Force Katrina Commander's Assessment Briefings.

In further response to the letter requests, on December 22 the Select Committee received: the Assistant Secretary for Defense for Homeland Defense's Smart Book; responses to Senate interrogatories of September 28; National Guard and Northcom timelines; Execute and Deployment orders; NORTHCOM teleconference minutes; Captain Rick Snyder's, XO USS Bataan, Lessons Learned Package; Vice Admiral Fitzgerald's e-mails, timelines, and notes; 2nd Fleet Lessons Learned; Records of Annual Hurricane exercises; memo to Admiral Starling regarding Naval assets in the region; information regarding helicopter assets; Rear Admiral Kilkenny's Lessons Learned brief to the Chief of Naval Operations; Northcom requests for forces; Northcom deployment orders; Northcom timeline; and twice-daily Joint Operations Center emails.

In addition the Department produced: Joint Forces Command (JFCOM) timeline and logs of verbal orders; JFCOM Standard Operating Procedures; Unified Command Plan; TOPOFF exercise paperwork;

Commander Fleet Forces command general requirement for Humanitarian Response/Disaster Relief; National Guard Bureau Readiness Documents; National Guard Bureau Senior Leadership Questions; and Katrina effects on National Guard Bureau readiness.

Despite these significant productions, Chairman Davis was concerned that the communications of senior Defense Department officials — a priority in the first request to the Department — had not been produced. Consequently, after discussions with Rep. Melancon, he issued a subpoena to the Department of Defense on December 14. The subpoena required the production of the correspondence of senior DOD officials related to Hurricane Katrina.

On December 22, the Select Committee received documents responsive to the subpoena, including official correspondence from Assistant Secretary Paul McHale, Principal Deputy Assistant Secretary Peter Verga, Admiral Keating, Lieutenant General Honoré, Lieutenant General Blum, and Colonel John Jordan. On December 30, the Select Committee received more documents responsive to the subpoena, including DOD official correspondence from Secretary Rumsfeld, Acting Deputy Secretary England, Colonel Daskevich, Brigadier General Scherling, Colonel Roberson, Colonel Chavez, Colonel Young,

Admiral Keating, and Principal Deputy Assistant Secretary Verga. On January 13, the Select Committee received further submissions of correspondence from Department officials including, Brigadier General Graham, Major General Young. And on January 17, the Select Committee received the emails of Major General Grass and Lieutenant General Vaughn.

The Select Committee also requested information from the White House. Specifically, the Select Committee requested documents and communications from before August 23 related to the threat posed by a hurricane striking New Orleans or the Gulf coast, mitigation measures or projects, emergency preparations, or emergency responses. We requested documents and communications from between August 23 and August 29 related to the threat posed by Hurricane Katrina, mitigation measures or projects, emergency preparations, or emergency responses. And we requested documents and communications from between August 29 and September 15 related to the impact of Hurricane Katrina, mitigation measures or projects, emergency preparations, or emergency responses. Initially, the White House produced more than 4,000 documents in response to these requests; however, the Select Committee was not satisfied with this initial production of documents.

In a December 6 letter, William Kelly, White House Deputy Counsel, said the September 30 and December 1 requests were too broad and asked the Select Committee to narrow the request. In response, the Select Committee insisted on briefings by senior administration officials and the production of certain items, including e-mails and documents from the White House Situation Room. As a result of our demands, a briefing was provided and more than 12,000 pages of documents from the Executive Office of the President on the response to Hurricane Katrina were delivered on December 16. The Select Committee made similar requests to the Vice President's office, which responded with almost 6,000 pages of documents.

While the Select Committee was disappointed and frustrated by the slow pace and general resistance to producing the requested documents by the White House and the Department of Defense, at the end of the day, the Select Committee believes it received enough information through documents, briefings, and interviews to understand the actions and decisions of those entities, and reach sound findings on them, without implicating executive privilege.

That's what this was about: obtaining sufficient information. Getting the documents and testimony we needed to make sure Americans are better prepared the next time. Ultimately, our public criticism of the Administration's slow pace did the job. At our insistence, the White House provided Deputy Assistant to the President for Homeland Security Ken Rapuano for a briefing with staff and Members. With the President in Texas, Homeland Security Advisor Frances Townsend out of the country, and Chief of Staff Andrew Card in Maine at the time of the storm, Rapuano offered the best view of White House knowledge and actions right before and right after Katrina. In fact, his briefing included more acknowledgements of institutional failure than any we had received previously.

The agreement with the White House gave us an opportunity to understand the White House role in Katrina while keeping the Select Committee on a parallel track with the Senate, which had not pursued White House subpoenas, and had not even subpoenaed DOD. A subpoena for White House documents would have simply derailed and delayed our inquiry, with the likelihood of a lengthy and unproductive court battle over executive privilege to follow.

# State

The Select Committee sent request letters to governmental components in the three states hit hardest by Hurricane Katrina: Alabama, Louisiana, and Mississippi. In each state, we requested information from both the office of the governor and the state's respective agency in charge of homeland security or emergency management.

Specifically, the Select Committee asked each state's governor's office for documents or communications, including internal communications, received, prepared, or sent up to the date of September 15 by state officials related to the threat posed by a hurricane, mitigation measures or projects, emergency preparations, or emergency responses. Also, for each state's office in charge of homeland security or emergency management, the Select Committee requested: information about that organization, including organization charts; the agency's responsibilities with respect to emergencies; regulations and procedures; after action reports for past hurricanes; past requests for federal grants; budgets for the agencies;

contractors and subcontractors that assisted with Katrina; a detailed chronology of events and actions taken during, before, and after the hurricane; key state personnel involved with Katrina; and all communications to and from the agencies relevant to the disaster.

The Select Committee also requested any state, county, and local emergency plans, and the identity of state and local agencies involved in those plans. Finally, the Select Committee asked for documents from the past five years that evaluate the threats posed by hurricanes and any information about exercises to prepare for hurricanes.

The Select Committee sent request letters to the Alabama Department of Homeland Security (ADHS), as well as the office of Governor Bob Riley. The State of Alabama answered all questions and replied to all requests. The state provided the Alabama Emergency Management Plan, 26 different situation reports, the Governor's proclamations, a timeline, and four Incident Action Plans. The state also provided communications such as a MOU with Mississippi, Alabama county emergency management standards, and state emergency procedures. In answering the Select Committee's questions, the state provided organization charts, key personnel, the roles and responsibilities of ADHS and the Alabama Emergency Management Agency (AEMA), state and county emergency plans and the state and local agencies involved in the response to Katrina. The state also provided risk assessments and after action reports and information on exercises to prepare for disasters. Alabama also provided information on budgets for the past five years. The state also provided timelines, a list of actions taken by state agencies in response to Katrina and a complete set of AEMA internal communications and action tracking system (EM 2000) messages.

The Select Committee sent requests to both the Louisiana Office of Homeland Security and Emergency Preparedness (LOHSEP) and to the office of Governor Kathleen Blanco. After asking for a 90 day extension on October 26 due to the need to address immediate hurricane relief, the Governor fully responded on December 1 with tens of thousands of documents on their response and preparation for Hurricane Katrina including: an overview of the Governor's actions, Executive Orders and declarations, emergency preparedness plans, the LA Citizen Awareness and Disaster Evacuation Guide, official correspondence, organization charts, notes and internal communications. Included was the response of the Acting Deputy Director of LOHSEP based on "the best available information" in that agency's possession at that time, including specific responses to the committee's questions in the original Senate Committee letter.

The Louisiana Attorney General's Office responded with additional information on January 11 and also informed us there would be a slight delay in sending two CDs containing e-mails of the Louisiana National Guard due to technical problems. Those CDs arrived February 2.

The Select Committee sent request letters to both the Mississippi Emergency Management Agency (MEMA) and the Office of Governor Haley Barber. MEMA provided organization charts, and a listing of key personnel. MEMA produced state plans including the MS Comprehensive Emergency Management Plan (CEMP Vol. II), Contra-Flow Plan of August 2005, as well as many inter-agency state plans such as plans from Louisiana, transportation evacuation plans, and parish/city plans. MEMA provided risk assessments for hurricanes, floods, surges, and economic impacts. MEMA also included all Emergency Operations Center (EOC) maps of the state and local jurisdictions. MEMA provided information on plans and training exercises such as Hurricane Pam and Lifesaver 2004. Other items provided: timeline of events and communications such as director briefs, news releases, media advisories, MEMA situation reports, Incident Action Plans, EM 2000 messages, and mission assignments.

---

The documents produced by all three states and the federal government allowed the Select Committee to gain important insights into the workings of government entities stressed to the breaking point by a terrible disaster. They helped reveal the true nature of the relationship of state emergency management operations to the system of federal emergency management support. These documents allowed the Select Committee to reach conclusions about what worked well and what did not. Those conclusions will help improve preparation and response for the next disaster, protect the public, save lives, and reduce suffering. We don't pretend to have the entire universe of information related to the preparation for and response to Katrina. But we had more than enough to do our job. ∎

1  *Hearing on Hurricane Katrina: Voices from inside the Storm Before Select Comm.,* (Dec. 6, 2005), at 28 (statement of Patricia Thompson) [hereinafter *Dec. 6, 2005 Select Comm. Hearing*].

2  Interview by Select Comm. Staff with Juliette Saussy, Director, New Orleans Emergency Medical Services, in New Orleans, LA (Jan. 19, 2006).

3  Interview by Select Comm. Staff with Eddie Favre, Mayor of Bay St. Louis, in Waveland, MS (Jan. 20, 2006).

4  Interview by Select Comm. Staff with Brent Warr, Mayor of Gulfport, in Waveland, MS (Jan. 20, 2006).

5  Rep. Gene Taylor, comments to Select Comm. Members and Staff during bus tour of coastal MS (Jan. 20, 2006).

6  Rep. Gene Taylor, comments to Select Comm. Members and Staff during bus tour of coastal MS (Jan. 20, 2006).

7  *Hearing on Back to the Drawing Board: A First Look at Lessons Learned from Katrina before House Gov't Reform Committee,* 109th Cong. (Sept. 15, 2005), at 11 (statement of Rep. Henry A. Waxman) [hereinafter *Sept. 15, 2005 Gov't Reform Hearing*].

8  *Sept. 15, 2005 Gov't Reform Hearing* at 12 (statement of Rep. Henry A. Waxman).

9  Nicholas Johnston, *Some House Democrats Want Larger Role in Katrina Investigation,* BLOOMBERG, Nov. 2, 2005.

10  *Id.*

11  *Id.*

12  *Hearing on Hurricane Katrina: Voice from Inside the Storm Before the Select Comm.,* 109th Cong. (Dec. 6, 2005).

13  Bill Walsh, *Plan would let president take control in disasters; Proposal may be seen as slap at Blanco,* TIMES-PICAYUNE (New Orleans), Oct. 22, 2005 [hereinafter *Plan Article*].

14  *Plan Article.*

15  *See, e.g.,* George C. Wilson, *Suiting Up for the Next Katrina,* CONGRESS DAILY, Oct. 17, 2005, at 5.

16  E-mail correspondence from Johnny Anderson, aide to Gov. of LA, to other aides (Sept. 2, 2005) (11:56 p.m.).

17  John Barnshaw, *Continuing Significance of Race and Class among Houston Hurricane Katrina Evacuees,* NATURAL HAZARDS OBSERVER (Natural Hazards Center), Nov. 2005, at 2.

18  Wash. Post Kaiser Family Foundation, and Harvard University, *Survey of Hurricane Katrina evacuees* (2005).

19  Christine MacDonald, *Months After Katrina, a Local Storm Surge on Race and Class,* BOSTON GLOBE, Nov. 6, 2005, at 4.

20  Brookings Institution Metropolitan Policy Program, *New Orleans after the Storm: Lessons Learned from the Past, a Plan for the Future,* (Oct. 2005), at 6.

21  John Barnshaw, *Continuing Significance of Race and Class among Houston Hurricane Katrina Evacuees,* NATURAL HAZARDS OBSERVER (Natural Hazards Center), Nov. 2005, at 3.

22  Alison Stateman, *Time for a Change? What Hurricane Katrina Revealed About Race and Class in America,* PUBLIC RELATIONS STRATEGIST, Oct. 1, 2005, at 8 (hereinafter *Strategist Article*).

23  *Strategist Article.*

BARGE 000104



*"The devastation along the Gulf Coast from Hurricane Katrina is like nothing I have witnessed before. It is catastrophic. Words cannot convey the physical destruction and personal suffering in that part of the nation."*

Dr. Max Mayfield
Director, National Hurricane Center
Select Committee hearing, September 22, 2005

# BACKGROUND

This report is a story about federal, state, and local emergency response plans, and how they were or were not implemented before and after Katrina. Where there were problems, we asked why. Where even flawless execution led to unacceptable results, we returned to questioning the underlying plans.

What this Select Committee has done is not rocket science. We've gathered facts and established timelines based on some fairly rudimentary but important questions posed to the right people in both the public and private sectors. What did you need and what did you get? Where were you in the days and hours right before, during, and after the storm? Who were you talking to? What were you doing? Does that match what you were *supposed* to be doing? Why or why not?

In other words, the Select Committee has matched what was *supposed to happen* under federal, state, and local plans against what *actually happened*. Our findings emerged from this process of matching. In this lengthy Background chapter, we beg your indulgence. We know that most readers do not care about acronyms or organizational charts, about authorities and capabilities or the concepts of "push" versus "pull." We know you simply want to know who was supposed to do what, when, and whether the job got done. And if it didn't get done, you want to know how we are going to make sure it does the next time.

We provide this background on the framework for emergency management to set the stage for the story we will tell. To understand the *failure of initiative*, we need to first explain the tools that were available to so many.

## National framework for emergency management

### General role of FEMA, creation of DHS, and FEMA's absorption into the department

The Federal Emergency Management Agency (FEMA) was established in 1979 in an effort to consolidate many of the federal policies related to the management of emergencies, including **preparedness, mitigation, disaster response, and recovery**.[1] Prior to FEMA's creation, through a mix of legislation and executive decisions, responsibility for federal emergency assistance as well as the types of assistance and eligibility underwent numerous changes. For example, administrative responsibility for assistance was shifted among a variety of federal departments, agencies, and the White House. In addition, the kinds of assistance the federal government provided and the types of organizations eligible were increased a number of times by, for example, adding provisions for disaster relief to small businesses and agricultural producers. By the late 1970s, these authorities and administrative changes had "developed into a complex mix of federal emergency management missions" with which state, local, and federal officials were dissatisfied, characterizing the situation as an inefficient maze of federal policies and responsible administrative entities.[2]

In 1978, following the incident at Three Mile Island, President Carter proposed reorganizing many of the emergency operational and coordination functions that had become dispersed throughout the federal government. In a reorganization plan submitted to Congress, the President proposed creating FEMA to administer many of the federal policies related to disasters, doing so based on a number of key principles:[3]

- Federal authorities to anticipate, prepare for, and respond to major civil emergencies should be supervised by one official responsible to the President and given attention by other federal officials at the highest levels;
- An effective civil defense system requires the most efficient use of all available resources (later embodied in the "all hazards" approach, through which civil defense capabilities would be available for any disaster, regardless of cause);
- Whenever possible, emergency responsibilities should be extensions of the regular missions of federal, state, and local agencies (later embodied in federal response plans through which FEMA coordinates and plans the assistance other federal agencies provide rather than providing the assistance directly);
- Federal intervention should be minimized by emphasizing hazard mitigation and state and local preparedness; and,

■ Federal hazard mitigation activities should be closely linked with emergency preparedness and response functions.

The President's reorganization plan took effect in April 1979 through two executive orders which created FEMA and assigned the various responsibilities previously dispersed throughout a number of other agencies.[4] These included, among others, the coordination of civil defense, civil emergency planning, and federal disaster relief;



FEMA

federal disaster preparedness; federal flood insurance authorities; dam safety; natural and nuclear disaster warning systems; and, coordination of preparedness and planning to reduce the consequences of major terrorist incidents.[5] To meet these responsibilities, FEMA focused on (1) enhancing the capability of state and local governments to respond to disasters; (2) coordinating with other federal agencies that provide resources to respond to disasters; (3) giving federal assistance directly to citizens recovering from disasters; (4) granting financial assistance to state and local governments; and, (5) providing leadership for hazard mitigation through grants, flood plain management, and other activities.[6]

### FEMA's transfer to the Department of Homeland Security and role in disaster response

In 2002, Congress created the Department of Homeland Security (DHS) and placed FEMA within the new department. Specifically, the Homeland Security Act of 2002 (HSA) established in DHS the Emergency Preparedness and Response (EPR) Directorate, placing FEMA (except for its terrorism preparedness functions) into EPR along with a number of additional entities and functions.[7] For example, EPR also assumed responsibility for the Department of Health and Human Services' Office of Emergency Preparedness, which manages the National Disaster Medical System, a network of federal, state, local, private sector, and civilian volunteer medical and support personnel who augment local medical providers during disasters.[8] In addition to these functional responsibilities, the HSA assigned to EPR responsibility for:[9]

*Providing federal assistance in response to requests of the states (or local governments via the states) is often referred to as a "pull" system.*

■ promoting the effectiveness of emergency responders;
■ supporting the Nuclear Incident Response Team (NIRT) through standards, training exercises, and funding;
■ managing, overseeing, and coordinating federal response resources;
■ aiding disaster recovery;
■ creating an intergovernmental national incident management system;
■ consolidating existing federal response plans into one plan;
■ ensuring emergency responders have interoperative communications technology;
■ developing a coordinated strategy for public health-related activities; and
■ using private sector resources.

## Federal vs. state and local roles

### Pull vs. push system

The federal government responds to most natural disasters when the affected state(s) requests help because the disaster is of such severity and magnitude that an effective response is beyond the capabilities of the state and local governments.[10] This system in use for most disasters — providing federal assistance in response to requests of the states (or local governments via the states) — is often referred to as a "pull" system in that it relies on states to know what they need and to be able to request it from the federal government.[11]

In practice, states may make these requests before disasters strike because of the near certainty that federal assistance will be necessary after such an event (e.g., with hurricanes) or, afterwards, once they have conducted preliminary damage assessments and determined that their response capabilities are overwhelmed. In either case, the resources the federal government provides in any disaster response are intended to supplement state

and local government resources devoted to the ongoing disaster relief and recovery effort.[12]

In certain instances, however, the federal response may also be considered a "push" system, in which federal assistance is provided and/or moved into the affected area prior to a disaster or without waiting for specific requests from the state or local governments.[13] As discussed below, DHS's National Response Plan includes a component — the Catastrophic Incident Annex — that outlines the kinds of events that can cause damage so massive that first responders, local governments, and state governments are unable to request — or "pull" — federal assistance in the immediate aftermath of the incident, creating a situation in which "pushing" the federal resources might be necessary.

### EMAC system to supplement state and local capabilities

Prior, or in addition, to seeking assistance from the federal governments, states are set up to help each other when disasters or emergencies overwhelm their capacity. States do so through participation in the Emergency Management Assistance Compact (EMAC), an interstate mutual aid agreement among member states to provide assistance after disasters overwhelm the affected state's capacity. Congress approved the creation of EMAC in 1996, building on the earlier efforts of the Southern Regional Emergency Compact that Florida and 16 other states created in 1993 after experiencing dissatisfaction with the state and federal response to Hurricane Andrew in 1992.[14] EMAC provides the legal structure for states to request assistance from one another as well as a menu of resources, such as temporary shelters and cargo aircraft, which may be available from other member states. Importantly, this assistance can, and often does, come from participating states' National Guards.[15] The National Emergency Management Association, the professional association of state emergency managers, administers the compact.[16]

# Federal authorities and capabilities

When an incident overwhelms, or is likely to overwhelm, state and local resources, the Stafford Act authorizes the President, in response to a request from the governor of the affected state, to issue two types of declarations— emergency or major disaster.

## Emergency declaration

The Stafford Act defines an emergency as "any occasion or instance for which, in the determination of the President, federal assistance is needed to supplement state and local efforts and capabilities to save lives and to protect property and public health and safety, or to lessen or avert the threat of a catastrophe in any part of the United States."[17] An emergency declaration is more limited in scope than a major disaster declaration; generally, federal assistance and funding for emergencies are provided to meet a specific need or to help prevent a major disaster from occurring.[18] Emergency assistance under such a declaration may include: grants to state and local governments for debris removal; direct assistance (grants) to individuals and households for temporary housing and other needs; and, assistance to states in distributing medicine and food.[19]

## Major disaster declaration

A major disaster can result from a hurricane, earthquake, flood, tornado or other incident that clearly overwhelms the ability of state or local governments to respond on their own. A presidential declaration of a major disaster usually occurs after local and state governments have responded with their own resources (such as the National Guard), conducted damage assessments to determine losses and recovery needs, and determined that the disaster is of such severity and magnitude that an effective response is beyond

*In certain instances, the federal response may be considered a "push" system, in which federal assistance is provided into the affected area prior to a disaster or without waiting for specific requests from the state or local governments.*

the capabilities of the state and local governments.[20] Such a declaration sets into motion federal assistance to and support of state and local response efforts as well as long-term federal recovery programs.[21]

## Principles of the National Response Plan and the National Incident Management System

Broadly speaking, the overall structure for the federal response to most disasters consists of the National Response Plan and National Incident Management System. The President issued Homeland Security Presidential Directive (HSPD)-5 in February 2003, directing DHS to develop a new plan for responding to emergencies (regardless of cause). Specifically, HSPD-5 required DHS to establish a single, comprehensive approach to the management of emergency events, whether the result of terrorist attacks or large-scale natural or accidental disasters.[22] According to DHS, the intent of this plan is to align federal coordination structures, capabilities, and resources into a unified, all-discipline, and all-hazards approach to domestic incident management.[23]

To implement HSPD-5, DHS developed the National Incident Management System (NIMS) and the National Response Plan (NRP). In short, the NRP defines what needs to be done in a large-scale emergency event and the NIMS defines how to manage it:

- The NRP describes the structure and mechanisms for coordinating federal support during emergencies (or exercising direct federal authority).[24] It uses the framework of the NIMS to integrate federal government domestic prevention, protection, response, and recovery plans into a single operational plan for all hazards and all emergency response disciplines. The NRP describes operational procedures for federal support to state, local, and tribal emergency managers and defines situations in which federal authorities are to provide support and when federal authorities are to assume control. The NRP organizes capabilities, staffing, and equipment resources in terms of functions that are most likely to be needed during emergencies, such as communications or urban search and rescue, and spells out common processes and administrative requirements for executing the plan. DHS issued the NRP in December 2004 and used it for the first time in the preparation for and response to Hurricane Katrina.

- NIMS consists of six major components of a systems approach to domestic incident management: command and management, preparedness, resource management, communications and information management, supporting technologies, and ongoing management and maintenance. According to DHS, NIMS "aligns the patchwork of federal special-purpose incident management and emergency response plans into an effective and efficient structure."[25] To do so, it defines the roles and responsibilities of federal, state, and local first responders during emergencies and establishes a core set of concepts, principles, terminology, and organizational processes to enable effective, efficient, and collaborative emergency event management at all levels. The concepts, principles, and processes underlying the NIMS are intended to improve the ability of different jurisdictions and first-responder disciplines to work together in various areas, such as command and communications.[26] NIMS, according to DHS, is based on an "appropriate balance of flexibility and standardization." It allows government and private entities to use an adjustable national framework to work together managing domestic incidents, no matter their cause, size, location, or complexity and, while doing so, provides a set of standardized organizational structures to improve interoperability among jurisdictions.[27] Beginning in federal fiscal year 2005, state and local governments were required to adopt NIMS in order to receive federal (DHS) preparedness grants or contracts.[28]

The NRP consists of 5 components:[29]

1. The *base plan* describes the overall structure and processes of a national approach to domestic incident management that integrates the efforts and resources of federal, state, local, tribal, private-sector, and non-governmental organizations. It includes planning assumptions (e.g., state and local capabilities may be overwhelmed), roles and responsibilities, a concept of operations, incident management actions, and instructions for maintaining and periodically updating the plan.

2. *Appendices* provide relevant, detailed supporting



FEMA

information, such as statutory authorities and a compendium of national interagency plans.

3. *Support Annexes* provide guidance and describe the functional processes and administrative requirements for meeting various plan objectives, such as logistics management and coordination with the private sector (including representatives of critical infrastructure resources).

4. *Emergency Support Annexes* spell out in detail the missions, policies, structures, and responsibilities of federal agencies for coordinating resource and programmatic support to state, local, and tribal governments as well as other federal agencies. Each Emergency Support Function (ESF) has a coordinator with ongoing responsibilities throughout the incident as well as one or more primary agencies responsible for accomplishing the ESF mission. Most ESFs also have support agencies responsible for assisting the primary agency or agencies.

5. *Incident Annexes* address contingency or hazard situations requiring specialized application of the NRP for seven different types of incidents: biological;

catastrophic; cyber; food and agriculture; nuclear/radiological; oil and hazardous materials; and, terrorism.

## Emergency Support Functions

The ESFs are the primary vehicle through which DHS directly responds to disasters and coordinates the direct responses of other federal agencies as well as groups like the American Red Cross (Red Cross).[30] For each of the 15 ESFs, DHS identifies a primary federal agency (or, in one case, a lead organization, the Red Cross. For most ESFs, DHS also identifies one or more support agencies. Primary agencies' responsibilities include orchestrating federal support for their ESF, managing mission assignments and coordinating with state agencies, and executing contracts and procuring goods and services as needed. Support agencies' responsibilities include conducting operations at the request of DHS or the ESF primary agency, assisting with situation (or damage) assessments, and participating in training or other exercises having to do with their prevention, response, and recovery activities.[31]

The 15 ESFs, their overall purpose, primary and support agencies are as follows:

| Emergency Support Function | Purpose | Primary Agency | Support Agencies |
|---|---|---|---|
| 1—transportation[32] | To support DHS, other federal agencies, state, and local responders requiring transportation. | U.S. Department of Transportation | Agriculture (Forest Service); DOD; U.S. Army Corps of Engineers; DHS; Interior |
| 2—communications[33] | To ensure the provision of federal communications support to federal, state, local, private sector response efforts during an Incident of National Significance; supplement the National Plan for Telecommunications Support in Non-wartime Emergencies (NTSP). | DHS/Information Analysis and Infrastructure Protection/National Communications System | Agriculture (Forest Service); Interior; FEMA |
| 3—public works and engineering[34] | To coordinate and organize the capabilities and resources of the federal government to facilitate the delivery of services, technical assistance, engineering expertise, construction management, and other support relative to the condition of (or damage to) public works infrastructure and facilities. | DOD/U.S. Army Corps of Engineers (during response); FEMA (during recovery) | USDA; HHS; Interior; EPA; American Red Cross |
| 4—firefighting[35] | To detect and suppress fires resulting from an Incident of National Significance by providing personnel, equipment, and supplies in support of state, local, and tribal agencies involved in firefighting operations. | Department of Agriculture/ Forest Service | Commerce; DOD; U.S. Army Corps of Engineers; DHS |
| 5—emergency management[36] | To support the overall activities of the federal government for domestic incident management by providing the core management and administrative support functions in support of the NRCC, RRCC, and JFO[37] operations; ESF 5 is the "support ESF for all federal departments and agencies…from prevention to response and recovery." | FEMA | None |
| 6—mass care, housing, and human services[38] | To support the state, regional, local and tribal government and non-governmental efforts to address the nonmedical mass care, housing, and human services needs of individuals affected by Incidents of National Significance. Mass care includes organizing feeding operations and coordinating bulk distribution of emergency relief items; housing involves providing short- and long-term assistance with housing needs; and, human services includes counseling and identifying support for special needs populations. | FEMA American Red Cross | Agriculture (Food and Nutrition Service; Forest Service); U.S. Army Corps of Engineers; DHS/National Disaster Medical System; Interior |
| 7—resource support[39] | To assist DHS and supporting federal, state, and local agencies prior to, during, and after incidents of national significance with emergency relief supplies, facility space, office equipment, office supplies, telecommunications and others services. | GSA | DHS |
| 8—public health and medical services[40] | To provide coordinated federal assistance to supplement state and local resources in response to public health and medical care needs for incidents of national significance. Federal support can consist of assessment of public health needs, public health surveillance, medical care personnel, and medical equipment and supplies. | HHS | DOD; U.S. Army Corps of Engineers; DHS; DOT; American Red Cross |

| Emergency Support Function | Purpose | Primary Agency | Support Agencies |
|---|---|---|---|
| 9—urban search and rescue[41] | To rapidly deploy the National Urban Search and Rescue (US&R) response system to provide specialized life-saving assistance to state and local authorities during an incident of national significance. US&R activities include locating and extracting victims and providing onsite medical assistance. | FEMA | Agriculture (Forest Service); DOD; U.S. Army Corps of Engineers; DHS/ U.S. Coast Guard; DHS/ Border and Transportation Security Directorate; DOT; U.S. AID |
| 10—oil and hazardous materials response[42] | To provide a coordinated response to actual or potential oil and hazardous materials discharges or releases during incidents of national significance. ESF 10 operates by placing the mechanisms of the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) within the broader NRP coordination structure. The NCP describes the National Response System—an organized network of agencies, programs, and resources with authorities and responsibilities in oil and hazardous materials response. | EPA DHS/U.S. Coast Guard[43] | Commerce/NOAA |
| 11—agriculture and natural resources[44] | To support state, local tribal and other federal agencies' efforts to (1) address the provision of nutrition assistance, including determining needs, obtaining appropriate food supplies, and arranging for delivery of the supplies; (2) control and eradication of disease outbreaks and plant infestations; (3) assurance of food safety and security; and (4) protection of natural and cultural resources and historic (NCH) properties. | Department of Agriculture Department of the Interior (NCH properties) | DOD; American Red Cross |
| 12—energy[45] | To restore damaged energy systems and components during a potential or actual Incident of National Significance; collect, evaluate, and share information on energy system damage and estimations on the impact of energy system outages within affected areas. | Department of Energy | Agriculture/Rural Utilities Service; Commerce/NOAA; U.S. Army Corps of Engineers; DHS; Interior; Department of Labor; Department of State; EPA; Nuclear Regulatory Commission; Tennessee Valley Authority (TVA) |
| 13—public safety and security[46] | To provide via federal to federal support or federal support to state and local authorities a mechanism for coordinating and providing non-investigative/ non-criminal law enforcement, public safety, and security capabilities and resources. | DHS Department of Justice | Agriculture (Forest Service); DHS/Border and Transportation Security Directorate; DHS/Customs and Border Protection; DHS/ Immigration and Customs Enforcement; Interior |
| 14—long-term community recovery and mitigation[47] | To provide a framework for federal support to enable community recovery from the long-term consequences of an Incident of National Significance. | Agriculture Commerce DHS/FEMA HUD Treasury SBA | Commerce; U.S. Army Corps of Engineers; Department of Energy; HHS; DHS; Interior; Department of Labor; DOT; EPA; TVA; American Red Cross |
| 15—external affairs[48] | To provide accurate, coordinated, and timely information to affected audiences, including governments, media, the private sector, and the local populace. | FEMA | Commerce/NOAA; Department of Justice; Corporation for National and Community Service |

## Catastrophic disasters and incidents of National Significance (INS)

Recognizing that certain disasters are so different in terms of size, scope, and damage that they require a response above and beyond the normal procedures for "emergencies" and "major disasters," DHS defines and has distinct plans for the federal response to "catastrophic" disasters.[49] Specifically, DHS defines a catastrophic event as:

> Any natural or manmade incident, including terrorism, that results in extraordinary levels of mass casualties, damage, or disruption severely affecting the population, infrastructure, environment, economy, national morale, and/or government functions. A catastrophic event could result in sustained national impacts over a prolonged period of time; almost immediately exceeds resources normally available to state, local, tribal and private-sector authorities in the impacted area; and significantly interrupts governmental operations and emergency services to such an extent that national security could be threatened.[50]

Using this definition, DHS makes a number of assumptions about the scenarios that will unfold before, during, and after a catastrophic disaster and attempts to structure the federal response to address those assumptions (and their ramifications). DHS assumes:[51]

- A catastrophic incident results in large numbers of casualties and/or displaced persons;
- The incident may cause significant disruption of the area's critical infrastructure, including transportation, telecommunications, and public health and medical systems;
- Response activities may have to begin without the benefit of a detailed or complete situation and needs assessment because a detailed, credible operating picture may not be possible for 24 to 48 hours or longer after the incident;

- The federal government may have to mobilize and deploy assets before local and state governments request them via normal protocols because timely federal support may be necessary to save lives, prevent suffering, and mitigate severe damage; and,
- Large numbers of people may be left temporarily or permanently homeless and require temporary or longer-term interim housing.

Consequently, in anticipation of or soon after a catastrophic incident, DHS is expected to rapidly — and proactively — provide critical resources to assist and augment the ongoing state and local responses. To do so, when the Secretary of DHS declares a disaster to be "catastrophic," the department also implements the Catastrophic Incident Annex of the National Response Plan.[52] DHS characterizes this annex as establishing the context and overarching strategy for implementing and coordinating an accelerated, proactive national response to certain catastrophic disasters. When this annex is implemented, all federal agencies and others with responsibilities under the Emergency Support Functions (ESFs) of the National Response Plan are supposed to immediately begin operations. Specifically, DHS expects the federal government and others will need to provide expedited help in one or more of the following areas:[53]

- Mass care (shelter, food, emergency first aid, etc.), housing, and human services;
- Urban search and rescue, such as locating, extricating, and providing onsite medical treatment;
- Decontamination in incidents involving weapons of mass destruction;
- Public health and medical support;
- Medical equipment and supplies;
- Casualty and fatality management and transportation for deceased, injured, or exposed victims; and,
- Public information when state and local public communications channels are overwhelmed.

*When the Secretary of DHS declares a disaster to be "catastrophic," the Department implements the Catastrophic Incident Annex of the National Response Plan.*

*All catastrophic incidents are "incidents of national significance."*

Because of fundamental and time-critical differences in catastrophic disasters, FEMA has established protocols to pre-identify and rapidly deploy  essential resources. Among other things, FEMA assumes the demands of responding to a catastrophic disaster may mean it has to expedite or even temporarily suspend normal operating procedures for state and local governments to request assistance, doing so proactively rather than in response to things like specific requests based on detailed damage assessments.[54] For catastrophic incidents, DHS is supposed to activate and deploy DHS-managed teams, equipment caches, and other resources in order to accelerate the timely provision of critically skilled resources and capabilities.[55] These can include medical and search and rescue teams, transportable shelters, and preventive and therapeutic pharmaceutical caches that may be necessary to save lives and contain damage.

## Incidents of National Significance

DHS defines incidents of national significance (INS) as "those high-impact events that require a coordinated and effective response by an appropriate combination of federal, state, local, tribal, private-sector, and nongovernmental entities in order to save lives, minimize damage, and provide the basis for long-term community recovery and mitigation activities." All catastrophic incidents are also "incidents of national significance."[56] DHS bases this definition of an INS on criteria drawn from HSPD-5:[57]

- ◼ A federal department or agency acting under its own authority has requested the assistance of the Secretary of Homeland Security;
- ◼ The resources of state and local authorities are overwhelmed and federal assistance has been requested by the appropriate state and local authorities in response to major disaster declarations under the Stafford Act or catastrophic incidents (as defined by DHS, above);
- ◼ More than one federal department or agency has become substantially involved in responding to an incident, for example, in response to credible threats or warnings of imminent terrorist attacks; and,
- ◼ The President directs the Secretary of Homeland Security to assume responsibility for managing a domestic incident.

## Managing the federal response to emergencies and disasters and implementing the National Response Plan

To respond to a disaster or a potential situation that is likely to require a federal response, DHS (on its own or acting via FEMA) uses existing homeland security monitoring operations; creates or activates operational components to manage the federal response; and, designates one or more officials to coordinate. The operational components DHS uses or which can be activated (or take on situation-specific duties) include the Homeland Security Operations Center (HSOC), the Interagency Incident Management Group (IIMG), a National or Regional Coordination Center (NRCC or RRCC), Emergency Response Teams (an Advance Element, ERT-A; and a National team, ERT-N), and, the Joint Field Office (JFO), which can have one or two high-level officials directing and coordinating the federal response.

## Homeland Security Operations Center

The Homeland Security Operations Center, which represents over 35 agencies, including state and local law enforcement as well as federal intelligence agencies, is always in operation. It provides situational awareness, and monitors conditions in the United States, and, in conjunction with the DHS Office of Information Analysis, issues advisories and bulletins concerning specific threats to the nation.[58] The HSOC continually monitors potential major disasters and emergencies and, when such an event occurs (or is likely) provides primary situational awareness to the Secretary and the White House. Depending on the nature of the incident and the response it demands, the HSOC may activate the Interagency Incident Management Group (IIMG).[59]

## Interagency Incident Management Group

DHS is supposed to convene the IIMG when it declares a situation to be an Incident of National Significance. In addition, DHS should convene the IIMG when it determines there is a need to do so in response to incidents such as major disasters, a heightened threat situation, or, high-profile, large-scale events that present

high-risk targets, such as National Special Security Events (NSSEs).[60] The IIMG is comprised of senior representatives from other DHS agencies, other federal departments and agencies, and non-governmental organizations, such as the American Red Cross, as needed. When activated, the IIMG (1) maintains strategic situational awareness of threat assessments and ongoing incident-related operations and activities; (2) provides decision-making support for incident-related prevention, preparedness, response, and recovery efforts; (3) synthesizes key intelligence, frames issues, and makes recommendations with respect to policy, operational courses of action, and resource allocation; (4) anticipates evolving federal resource and operational requirements; and, (5) maintains ongoing coordination with the Principal Federal Official (PFO) and the Joint Field Office (JFO) Coordination Group.[61]

### Regional Response Coordination Center, National Response Coordination Center

For most major disasters, incidents, or emergencies, DHS (via FEMA) establishes a Regional Response Coordination Center (RRCC) using staff from regional offices. The RRCC coordinates the initial regional and field activities, such as deployment of advance teams of FEMA and other agencies' staff, and implements local federal program support until a multi-agency coordination center can be established. Depending on the scope and impact of the event, DHS (via FEMA) may also establish a National Response Coordination Center (NRCC) comprised of ESF representatives and FEMA support staff to carry out initial activation and mission assignment operations from FEMA headquarters. The NRCC supports the operations of the RRCC.[62]

### Emergency Response Team-Advance Element, National Emergency Response Team

FEMA's Emergency Response Team (ERT) is the principal interagency group that staffs the multi-agency coordination center where federal, state, and local officials coordinate and direct response and recovery operations.[63] Each FEMA region maintains an ERT ready to deploy in response to threats or incidents. Before a disaster or incident (when there is warning) or soon thereafter,

the RRCC typically deploys an Emergency Response Team-Advance Element (ERT-A) to the affected area(s). The ERT-A conducts preliminary damage and needs assessments and begins coordinating with the state as well as any federal resources that may be part of the initial deployment. For large-scale, high-impact events or when FEMA otherwise determines it is needed, FEMA also deploys a National Emergency Response Team (ERT-N), which is a national-level field response team. FEMA currently has 2 ERT-Ns.

### Joint Field Office

The Joint Field Office (JFO) is a multiagency coordination center that FEMA establishes locally to serve as the central point for coordinating and directing the efforts of the federal, state, and local officials involved in the response effort.[64] Often, FEMA establishes the JFO at the state's emergency operations center or other locations from which the affected state is directing response efforts. For a Stafford Act emergency or major disaster declaration, the President must designate a Federal Coordinating Officer (FCO) to direct all federal assistance in the disaster area.[65]



*The Joint Field Office (JFO) is a multiagency coordination center that FEMA establishes locally to serve as the central point for coordinating and directing the efforts of the federal, state, and local officials involved in the response effort.*

During an incident of national significance, which may or may not involve a Stafford Act declaration,[66] the Secretary of DHS may designate a Principal Federal Official (PFO) to act as the secretary's representative in overseeing and executing incident management responsibilities.

The FCO is responsible for managing and coordinating federal assistance in response to declared disasters and emergencies. The FCO has the authority under the Stafford Act to request and direct federal agencies to use their authorities and resources to support or conduct response and recovery operations. The FCO provides overall coordination for the federal components of the JFO and works in partnership and support of the state officials to determine and meet state and local needs for assistance.[67]

The PFO is the primary point of contact and source of situational awareness for the Secretary of DHS for incidents of national significance. The PFO is expected to facilitate federal support to the unified command structure that is set up in conjunction with state and local officials. Also, PFOs coordinate the overall federal incident management and assistance activities throughout all of the phases of emergency management—prevention, preparedness, response, and recovery. In carrying out this coordination role, the PFO does not have direct authority over the FCO or other federal and state officials.[68]

## The Role of DOD, the National Guard, and the U.S. Coast Guard

The Department of Defense (DOD) makes a distinction between "homeland security" and "homeland defense" in defining mission responsibilities. Whereas homeland security refers to a concerted *national* effort to secure the homeland from threats and violence, including terrorism, homeland defense refers to *military* protection of United States territory, domestic population, and critical defense infrastructure against external threats and aggression. In the context of homeland security, DOD operates only in support of a civilian-led federal agency, referred to as Civil Support (CS). In the area of homeland defense (HD), however, DOD is the lead agency. The Assistant Secretary of Defense for Homeland Defense (ASDHD) is charged with leading the Department's activities in homeland defense, and serves as DOD's interagency liaison.[69]

| Military Support to Civil Authorities | | |
|---|---|---|
| **Natural Disasters** | **Special Events** | **Manmade Disaster** |
| Severe Weather | Olympics | CBRNE-CM |
| Firefighting | Summits | Terrorist Incident |
| Earthquakes | World Fair | Oil Spill |

CBRNE-CM  chemical, biological, radiological, nuclear, and high-yield explosives-consequence management

JOINT PUBLICATIONS 3-26 HOMELAND SECURITY

Under the National Response Plan (NRP)[70] and the recently released DOD Joint Doctrine on Homeland Security[71] Military Support to Civil Authorities (MSCA) is normally provided only when local, state and other federal resources are overwhelmed and the Lead Federal Agency (LFA) responding to an incident or natural disaster requests assistance. This is a fundamental principle of DOD's approach to civil support: "[I]t is generally a resource of last resort."[72]

An exception is in cases of *immediate response authority*, a scenario entailing imminently serious conditions resulting from any civil emergency or attack requiring immediate action, where local military commanders may take such actions as necessary to save lives, prevent human suffering, and mitigate great property damage.[73]

The federal military role described in the NRP and the MSCA is apart from National Guard resources available to governors of affected states. Governors may utilize their own National Guard units, as well as other National Guard units made available by state EMAC compacts. In most circumstances, National Guard troops fall under the command of the Governor and the state Adjutant General, and they follow state emergency procedures.

When in state active duty status, the National Guard remains under the command of the governor, not DOD. The National Guard can also be "federalized" by the President to be placed under the command of DOD. As discussed below, a governor may also seek "Title 32 status" for the National Guard, which leaves the governor and the state Adjutant General in command, but provides federal funding and benefits.[74]

## Natural disasters and man-made disasters

In the event of a natural disaster or emergency the NRP stipulates that DOD may be asked to provide assistance to DHS and FEMA in an attempt to save lives, protect

property, and lessen the threat of catastrophe in the United States. When disasters occur and a military response is anticipated, DHS/FEMA will request a Defense Coordinating Officer (DCO) to serve as the single DOD point of contact within the disaster area. The DCO will be the operational contact to the designated combatant commander and designated Joint Task Force (JTF) commander.[75]

In situations when a disaster is anticipated and DOD wants to be forward leaning, Northern Command has designated a DCO prior to a DHS/FEMA request. This is done informally and is intended to allow the DCO to integrate into the state emergency operations center (EOC) as early as possible to begin assessing the needs of the affected area. This has been done in the absence of a Presidential directive and before state authorities have made specific requests for DOD support via FEMA. Additionally, the doctrine of immediate response is a DOD directive which allows deployment of some DOD resources prior to receiving formal requests from the lead federal agency.[76]

## Northern Command

Within the DOD Joint Staff, civil support responsibilities reside with the Joint Director of Military Support. Northern Command (NORTHCOM) is the DOD coordinating command for domestic terrorist and natural disaster incidents. Northern Command carries out civil support missions with forces assigned as required from all the armed services, typically through the creation of a joint task force.[77] NORTHCOM has a permanently assigned Joint Interagency Coordination Group, comprised of liaison officers from other DOD components and other federal agencies, including the Department of Homeland Security.

As discussed above, unless there is specific direction from the President, requests for military assistance must originate from a lead federal agency. Typically, this falls to FEMA in natural disasters. Requests are submitted to the Office of the Secretary of Defense (OSD), where they are evaluated by the Assistant Secretary of Defense for Homeland Defense (ASDHD) according to the following criteria: legality, readiness, lethality, risk, cost, and appropriateness.[78]

Once the requests are approved by OSD, they are forwarded to the Joint Director of Military Support within the Joint Staff, who in turn provides the appropriate orders to Northern Command. A Defense Coordinating Officer is designated and deployed to the area of incident.

When the size of the response is of a greater scale, a joint task force will be created, with the DCO normally serving as task force commander. The DCO then serves as the single point of contact for DOD resources, but does not have operational control of the U.S. Army Corps of Engineers or National Guard personnel operating in state active duty or Title 32 status.[79]

The process for requesting DOD active duty forces has several layers of review. Requests for DOD assistance are to be generated at the state level. These go from the state to FEMA's Federal Coordinating Officer, who in turn requests assistance from the DCO. The DCO passes these requests on to the joint task force, which routes it through NORTHCOM to the Office of the Secretary of Defense Executive Secretariat, to the Joint Directorate of Military Support.[80]

At each stage, the requirement is validated to ensure that the request can be met and that it is legal to provide the requested assests. Once vetted, the request is tasked to the services and coordinated with Joint Forces Command and forces or resources are then allocated to the joint task force, which in turn gets the support down to the user level by way of the DCO. This process is in place not only to satisfy DOD internal requirements, but to ensure maximum coordination with both FEMA and state governments.

## National Guard Bureau

The National Guard is the nation's first military responder to events within the United States. Governors historically rely on the Guard to assist civilian authorities during times of natural or manmade disasters. In particular, the National Guard is a major asset in responding to any catastrophic incident within the United States. The National Guard is a reserve component of the Departments of the Army and the Air Force, at times, called in to support federal operations. The National Guard is also a force for each state, deploying for state duty status under the control of the governor. Only the National Guard has the unique dual mission of providing forces at both the state and federal levels and is the only service that abides by two oaths-of-office, one to the governor and one to the President of the United States.[81]



FEMA

The governor has command and control of the National Guard, either in state active duty or Title 32 status, unless units are federalized.[82] If federalized under Title 10, the Guard falls under the command and control of the President. While on state active duty status, the Guard's mission is to serve its state or territory during times of crisis, disaster, civil disturbance or other threats to life and property as directed by the governor. They are funded by state dollars and are entitled to state benefits and compensation. Under Title 32 status, the National Guard is trained and resourced to support federal war-fighting operations, yet remains under control of the governor, while supported by federal funds with Secretary of Defense approval.[83]

During Hurricane Katrina, the governors of Alabama, Mississippi, and Louisiana requested that all National Guard forces deployed to their states operate under Title 32 status. This request was granted retroactively to August 29 by the Secretary of Defense. Under Title 32, the governors were in command of all National Guard assets and actions during Hurricane Katrina.[84]

The National Guard may also be called up by a governor at his or her own initiative, paid by the state, to respond to a state emergency or protect state facilities. Many states do not have the fiscal resources to use the National Guard extensively in this manner.

The National Guard Bureau (NGB) is the home of the leadership of the National Guard, headed by a Chief, who is supported by the Director of Army National Guard and the Director of the Air National Guard.[85] These positions, filled by military Guard personnel, are Title 10 positions. The current chief of the National Guard Bureau is Lieutenant General H. Steven Blum, and although he is

the senior Guard officer, he does not command National Guard forces. Lieutenant General Daniel James, III is the Director of the Air National Guard and Lieutenant General Clyde A. Vaughn is Director of the Army National Guard.

Under the National Response Plan, the role of the National Guard Bureau is not defined. However, in roughly 50 percent of the states and territories, the Adjutant General also serves as the state's senior emergency management official, responsible for coordinating and integrating all response agencies.[86] The National Guard Bureau and the National Guard of the individual states and territories work on a daily basis with local, state, and federal civilian agencies in various communities in all of the states and territories.

## United States Coast Guard



U.S. COAST GUARD

The Coast Guard is a military, multi-mission, maritime service within the Department of Homeland Security and one of the nation's five armed services. Since its founding as the Revenue Cutter Service in 1790, the Coast Guard has provided maritime safety and security capabilities, and is renowned worldwide for it search and rescue (SAR) capabilities, whether near the shore or hundreds of miles at sea. Title 14 of the United States Code requires the Coast Guard to develop, establish, maintain and operate rescue facilities for the promotion of safety on, under and over the high seas and waters subject to the jurisdiction of the United States.

Additionally, with the passage of the Maritime Transportation Security Act (MTSA) in 2002, the Coast Guard was given added responsibilities for the enforcement of port safety, security, and marine environmental regulations including the protection and security of vessels, harbors, and waterfront facilities, deepwater ports and waterways safety.[87]

The Coast Guard has a longstanding history in the Gulf of Mexico region. The current Eighth Coast Guard District, headquartered in New Orleans, covers all or part of 26 states throughout the Gulf coast and heartland of America. It stretches from the Appalachian Mountains and Chattahoochee River in the east to the Rocky Mountains in the west, and from the U.S.-Mexico border and the Gulf of Mexico to the Canadian border in North Dakota, which

includes 15,490 miles of coastline and 10,300 miles of inland navigable waterways.[88]

Within the Coast Guard's District boundaries, the operational Coast Guard is organized into Sectors which oversee response, prevention, and logistics units, and coordinate Coast Guard operations within the Sector's geographic boundaries. The areas most affected by Hurricane Katrina are those that fall within the boundaries of Sector New Orleans and Sector Mobile, Alabama.

## Private authorities and capabilities — role of the American Red Cross

The American Red Cross (Red Cross) is the only nongovernmental organization with lead agency responsibilities under the NRP. The Red Cross is an independent, non-governmental organization (NGO)[89] that operates as a nonprofit, tax-exempt, charitable institution pursuant to a charter granted by the United States Congress.[90] It has the legal status of a "federal instrumentality" due to its charter requirements to carry out responsibilities delegated by the federal government. Among those responsibilities are:

> to perform all duties incumbent upon a national society in accordance with the spirit and conditions of the Geneva Conventions to which the United States is a signatory, to provide family communications and other forms of assistance to members of the U.S. military, and to maintain a system of domestic and international disaster relief, including mandated responsibilities under the Federal Response Plan coordinated by the Federal Emergency Management Agency (FEMA).[91]

The Red Cross is not a federal agency, nor does it receive federal funding on a regular basis to carry out its services and programs.[92] It receives financial support from voluntary public contributions and from cost-recovery charges for some services.[93] Its stated mission is to "provide relief to victims of disasters and help people prevent, prepare for, and respond to emergencies."[94]

To meet its mandated responsibilities under the NRP, the Red Cross functions as an ESF primary organization in coordinating the use of mass care resources in a presidentially declared disaster or emergency.[95] As the lead agency for ESF #6, dealing with Mass Care, Housing and Human Services, the Red Cross assumes the role of providing food, shelter, emergency first aid, disaster welfare information and bulk distribution of emergency relief items.[96] ESF #6 includes three primary functions: Mass Care, Housing, and Human Services:[97]

- Mass Care involves the coordination of nonmedical care services to include sheltering of victims, organizing feeding operations, providing emergency first aid at designated sites, collecting and providing information on victims to family members, and coordinating bulk distribution of emergency relief items.
- Housing involves the provision of assistance for short- and long-term housing needs of victims.
- Human Services include providing victim-related recovery efforts such as counseling, identifying support for persons with special needs, expediting processing of new Federal benefits claims, assisting in collecting crime victim compensation for acts of terrorism, and expediting mail services in affected areas.

### Function 1: Mass Care

- The NRP describes the Mass Care function as comprised of six elements: coordination, shelter, feeding, emergency first aid, Disaster Welfare Information ("DWI"), and bulk distribution.[98]
- The coordination element relates to assisting victims obtain various forms of available federal assistance, as well as gathering information about shelters and food kitchens for victims.
- The shelter element includes the use of pre-identified shelters, creating temporary facilities capable of housing victims, and coordination of obtaining shelters outside of the immediate incident area.
- The feeding element includes a variety of food distribution sites, from mobile food carts, to kitchens, to bulk distribution of food.
- The emergency first-aid element consists of assisting victims with the most basic first-aid needs, as well as, coordinating the referral of victims to local hospitals, if needed, and other appropriate medical treatment options.
- The Disaster Welfare Information ("DWI") element provides for family connectedness services. It aims

to re-connect families displaced or separated by the incident, as well as assist victims of the incident to connect with family or friends located outside the area of the incident.

- The bulk distribution element provides emergency relief items, principally ice, water and food, at specific sites to meet the urgent needs of victims within the affected area.

## Function 2: Housing

The housing function addresses both the short and long-term housing needs of victims affected by an incident.[99] It is effectuated through programs designed to meet the individualized needs of victims and includes a variety of options, including provision of temporary housing, rental assistance, or financial assistance for the repair or replacement of original residences.

## Function 3: Human Services

The human services function implements programs and services to assist victims restore their livelihoods.[100] It acts as a broad-based, multipurpose effort to support divergent needs such as re-routing of mail, assistance with processing federal benefits-related paperwork, assuring the provision of necessary mental health services, and providing other important, sometimes victim-specific services. The wide range of services may include support for victims with disabilities and victims who do not speak English.

With its shelters, feeding kitchens, and blood distribution capabilities, the Red Cross has long played an important role in assisting those affected by natural disasters — especially hurricanes. Due to the frequency of hurricanes in the United States, the Red Cross has developed an expertise in deploying its resources and operational capabilities to help those affected by hurricanes. In its 23-page *Tropical Storm and Hurricane Action Plan*, ("Hurricane Plan") the Red Cross outlines its systematic approach to preparing for and responding to tropical storms and hurricanes.[101] "The objective of this plan is to enable the Red Cross to be ready to deliver immediate services and assistance needed by those threatened and affected by such storms at an appropriate scope and scale," the report says.[102]

Additionally, as the NRP-model to disaster planning takes shape, the Red Cross' preparation regime is being bolstered with a Standard Operating Procedure Document for ESF #6.[103] Although not formally adopted and still in the draft stage, the document identifies the procedures, protocols, information flows and organizational relationships for the activation, implementation and operation of the Red Cross' responsibilities under ESF #6. There is also an interim Shelter Operations Management Tool Kit, which provides Red Cross chapters and shelter managers with resources to plan, open, operate, and close shelters.[104]

Adhering to the concept of all disasters being local, the Red Cross relies on its field chapters to act as first responders in opening shelters and providing for the feeding of those in need.[105] The first 48 hours of a disaster are usually handled by the local Red Cross chapters, and thereafter by national-level support, as both the federal government (FEMA), and the Red Cross National Headquarters, begin to reach the affected area.[106] The national Red Cross is structured to provide relief (mostly shelter and feeding) from days two through 30 of a disaster.[107] The local chapter ultimately is supported by its service area, of which there are eight in the United States, followed by support from the National Headquarters in Washington, D.C.[108]



For disasters such as hurricanes, the Red Cross' actions prior to landfall typically begin with activating the chapter response plans in all of the areas threatened by the storm.[109] Simultaneously, the jurisdictional service areas move into the Service Area Major Disaster Response Structure ("Disaster Response Structure"). At this time the service areas establish their contacts with the affected state's emergency operations center ("EOC"). This often involves positioning a Red Cross official at the state EOC. The service area then begins deploying resources to the threatened areas as called for under the chapters' planning requirements. Also, at this pre-landfall time, a disaster relief operations headquarters is established.[110]

During the pre-landfall stage, the local chapter is to focus on several key activities: sheltering, feeding, public information, fundraising and maintaining contact with government officials, specifically emergency management officials.[111] While the chapter response operation is arming itself with the necessary resources, the service areas shift into their Disaster Response Structure. The service area personnel are responsible for implementing the necessary facility arrangements so that storm victims can be sheltered and fed. The service area also deploys additional personnel to the chapter regions. Once the Disaster Response Structure is opened, the national headquarters shifts its Disaster Operations Center into hurricane response mode.[112] At this point, personnel from Headquarters' Preparedness and Response division are able to monitor developments and deploy additional resources as necessary.

Following landfall of a hurricane, the affected chapters continue their focus on the key activities of sheltering, feeding, disaster assessment, providing public information and liaising with government officials.[113] After the shelters and feeding kitchens are opened, the chapters expand their role to include bulk distribution of supplies. Supplies include toiletries packages, clothing and blankets, and as the storm passes, clean-up supply packs, including mops, rakes, trash bags, and cleaning supplies to assist storm victims clean their residences and neighborhoods.[114]

As the impact of the disaster becomes better understood, a Disaster Relief Operation Headquarters is established in the region. The operations headquarters is activated, meaning operational oversight and direction of Red Cross relief activities is transferred to the on-site

headquarters.[115] As the disaster headquarters staffs up, the service area's role decreases.

Outside of the affected region, other service areas and the national headquarters remain poised to assist as necessary. The main opportunities for other service areas involve shifting resources, such as cots, blankets, and other warehoused supplies, to the affected region. Personnel at national headquarters monitor events in the field and leverage relationships with national agreements with suppliers, partner groups and agencies.[116]

## Service area major Disaster Response Structure

Upon the approach of a threatening hurricane, "the service area reconfigures its structure, priorities and actions to provide support, guidance and resource assistance to its threatened chapters."[117] The Disaster Response Structure, led by a response manager, is comprised of four departments or cells. These are the planning cell, forward headquarters cell, information and resource management cell, and the service area response operations.[118]

## Planning cell

The planning cell is focused on ensuring adequate services and logistics support. "The planning cell develops an anticipated service delivery plan and deploys the forward headquarters cell, which enables the relief operation to begin service delivery immediately after the storm makes landfall."[119] The planning cell is tasked with determining the necessary scope of Red Cross service delivery, an estimated budget and the estimated length of time needed to serve the affected area.[120] The planning cell is the heart of decision making as it relates to what people need, where they need it, and, based on a damage assessment, how long will services be necessary.

## Response manager

The response manager oversees the disaster response. The manager's responsibilities include ensuring adequate levels of staffing throughout the response organization, conducting staff meetings with the Disaster Response team, leading conference calls with the affected chapters, ensuring that adequate reports are compiled for coordination with state and federal emergency

*In most situations, emergency management in the U.S. envisions a process of escalation up from the local level as incidents grow or as it becomes known that an incident has overwhelmed local and state capabilities.*

management officials, and assuring the sufficient movement of assets, both human and material, to the affected region.[121]

## Forward headquarters cell

The forward headquarters cell is "the deployed unit of the planning cell."[122] Its most important task is to establish a relief operation headquarters and to receive Red Cross personnel, both paid Red Cross employees and volunteers, and material resources.[123] Essentially this group serves as the advance team prior to the opening of a headquarters operation near the affected area.

## Information and resource management cell

The information and resource management cell is a tactical team that concentrates on gathering information and supporting the local chapters in the evacuation of people.[124] While the Red Cross does not physically transport evacuees, it is often the recipient of a large percentage of evacuees, as shelters are established. This group establishes reporting requirements, coordinates data gathering (such as shelter tallies), monitors the inbound flow of resources to shelters, helps acquire vehicles, and handles all issues related to the immediate deployment of resources, including maintaining computer systems, managing supply warehouses, and ensuring all invoices are properly processed.[125]

## Service area response operations

The day-to-day paid operations staff of the service area coordinate fundraising and communications and provide the institutional knowledge of the affected area.[126] Armed with the right data, and knowledge of the area, the information and resources management cell can help provide essential services to those in need.[127]

## State, local, and private authorities and capabilities

### Typical local and state emergency management responsibilities

Whether the response is coming from local or state officials—or both—most emergency management agencies and government plans assume it may take 24 to 72 hours to get assistance to individuals, particularly those who remain in affected areas. Consequently, successful emergency management can, in part, depend on individuals' willingness to evacuate to places where more immediate assistance may be available (when time and circumstances permit) and/or their preparedness to survive independently for the 24 to 72 hours that responders expect it will take to first deliver assistance.

Nonetheless, as discussed elsewhere in this report, primary responsibility for the first response to any potential or imminent incident or disaster begins — and often stays — at the local and state levels. In most situations, emergency management in the U.S. envisions a process of escalation up from the local level as incidents grow or as it becomes known that an incident has overwhelmed local and state capabilities.[128]

### Local emergency management

First responders — local fire, police, and emergency medical personnel who respond to all manner of incidents such as earthquakes, storms, and floods — have the lead responsibility for carrying out emergency management efforts. Their role is to prevent, protect against, respond to, and assist in the recovery from emergencies, including natural disasters. Typically, first responders are trained and equipped to arrive first at the scene of an incident and take action immediately, including entering the scene, setting up a command center, evacuating those at the scene, tending to the injured, redirecting traffic, and removing debris.[129]

Local governments — cities, towns, counties or parishes — and the officials who lead them are responsible for developing the emergency operations and response plans by which their communities respond to disasters and other emergencies, including terrorist attacks. Local emergency management directors are also generally responsible for providing training to prepare for disaster response and they seek assistance from their state emergency management agencies when the situation exceeds or exhausts local capabilities.[130] In many states, they may also negotiate and enter into mutual aid agreements with other jurisdictions to share resources when, for example, nearby jurisdictions are unaffected by the emergency and are able to provide some assistance.[131]

Particularly relevant to the preparation for Hurricane Katrina, local officials have significant responsibilities for either setting evacuation laws and policies or working with their state government to enforce state laws pertaining to evacuations.[132] According to the National Response Plan, depending on the terms of the state or local laws, local officials have "extraordinary powers" to, among other things, order evacuations. In addition, local officials may suspend local laws and order curfews.[133]

## State emergency management

As the state's chief executive, the governor is responsible for the public safety and welfare of the state's citizens and generally has wide-ranging emergency management responsibilities, including requesting federal assistance when it becomes clear the state's capabilities will be insufficient or have been exhausted. Governors are responsible for coordinating state resources to address the full range of actions necessary to prevent, prepare for, and respond to incidents such as natural disasters.

Upon their declaration of an emergency or disaster, governors typically assume a variety of emergency powers, including authority to control access to an affected area and provide temporary shelter. Also, in most cases, states generally authorize their governors to order and enforce the evacuation of residents in disaster and emergency situations. The federal government generally defers to the states to enact laws dealing with evacuation, with local officials—as mentioned earlier—typically responsible for working with state officials to enforce those laws.[134]

Governors also serve as the commanders-in-chief of their state military forces,[135] specifically, the National Guard

*Governors are responsible for coordinating state resources to address the full range of actions necessary to prevent, prepare for, and respond to incidents such as natural disasters.*

when in state active duty or Title 32 status.[136] In state active duty — to which governors can call the Guard in response to disasters and other emergencies — National Guard personnel operate under the control of the governor, are paid according to state law, and can perform typical disaster relief tasks, such as search and rescue, debris removal, and law enforcement. Most governors have the authority to implement mutual aid agreements with other states to share resources with one another during disasters or emergencies when, for example, others (particularly nearby states) are unaffected by the emergency and able to provide assistance.[137] Most states request and provide this assistance through the EMAC.

State emergency management agencies —reporting to their respective governors — have primary responsibility for their states' disaster mitigation, preparedness, response, and recovery activities. These agencies typically coordinate with other state agencies as well as local emergency response departments to plan for and respond to potential or imminent disasters or emergencies. Among other things, state emergency management agencies are responsible for developing state emergency response plans, administering federal grant funding, and, coordinating with local and federal agencies to provide training and other emergency response-related activities.[138] Some states, such as Louisiana and Mississippi, spell out specific tasks or preparatory steps emergency management agencies must take to meet their responsibilities.

For example, Louisiana requires that its Office of Homeland Security and Emergency Preparedness determine requirements for food, clothing, and other necessities and procure and pre-position these supplies in the event of an emergency.[139] Similarly, Mississippi requires its emergency management agency to determine needs for equipment and supplies and plan and procure those items as well.[140]

46 BARGE 000123 A FAILURE OF INITIATIVE

# Specific state and local emergency management and homeland security laws and roles and responsibilities—Alabama, Mississippi, Louisiana, and the city of New Orleans

## Alabama

### Governing statutes

Two Alabama statutes address how the state prepares for and responds to emergencies and disasters: the Alabama Emergency Management Act of 1955 (EMA) and the Alabama Homeland Security Act of 2003 (HSA). The EMA authorizes the state to prepare for and manage disasters and emergencies. It also authorizes the state to make grants to local governments to assist their emergency management activities and improve preparedness. The HSA established a state Department of Homeland Security (and other entities) to coordinate and undertake state homeland security preparedness, planning, and response activities.[141]

### Roles and responsibilities

State documents detail the specific options and steps available to the chief executive, including an analysis of gubernatorial prerogatives, including:[142]



STATE OF ALABAMA

First and foremost, the governor must understand and accept the fact that he/she is the primary person responsible for response and crisis management within his/her state. All citizens look to their governor as the person ultimately responsible. That is not to take away from the local responsibility of mayors, city councils, and county commissions, but, in truth and fact, "the buck stops at the governor." Secondly, although the governor must be the leader of his/her state, the governor must also be prepared to delegate.

This statement may seem rather simplistic since every governor in the United States is confronted with so many governmental and administrative decisions, on a daily basis, that they obviously need to be able to delegate. On the other hand, in the case of an emergency catastrophe situation, the number of issues that arise are exponentially greater than ordinary day-to-day issues of government, they are unusual, sometimes technical in nature, they require instantaneous decisions, as opposed to general governmental issues which commonly allow for consideration and even collaboration among advisors and affected entities. In these regards, in order to delegate, it is extremely important that the governor has surrounded himself/herself with an outstanding group of cabinet officials who are not only qualified but who are both qualified and capable of responding in emergency situations. This is most particularly true of the adjutant general of the state's National Guard, the director of the state's Department of Homeland Security, and the office of the director of the state's office of Emergency Management. Obviously each of these positions is a key appointment for every governor, but when confronted with a catastrophic emergency, the importance of the quality and qualifications of the persons holding these positions becomes extraordinarily important. Thirdly, an emergency operations center and a communications system which are capable of and designed to operate under emergency conditions become a key element of the governor's ability to communicate, manage, and lead through the crisis. Finally, there must be pre-planning ("emergency operations plan") that sets out clearly policies, procedures, and responsibilities that will be required to meet all known emergency catastrophe situations. These must be coordinated with local emergency management officials and local government officials.[143]

 Consistent with the National Response Plan and the practices of other states, in Alabama responsibility for emergency preparedness and response begins at the local level and escalates as the emergency exceeds the capabilities of each level of government. The state's Emergency Operations Plan (EOP) spells this out, specifying that, "When a disaster is imminent or has occurred, local governments have the primary

responsibility and will respond to preserve life and property. . . . When disaster conditions appear likely to exceed the combined capabilities of a local jurisdiction and mutual aid compact signatories, local governments will request the support of the state.… If the capabilities (financial or operational) of state government are exceeded, the governor can request federal disaster emergency assistance."[144]

Alabama's statutes authorize and direct local governments to establish emergency management organizations (agencies), appoint directors for these organizations, and confer police officer powers on their officials. In addition, local directors of emergency management may develop mutual aid agreements with public or private agencies (such as nearby counties) for emergency aid and assistance during disasters and emergencies.[145] These local directors and some of their personnel must, if they choose to receive state funding, meet state-set performance and competence standards for their positions.[146]

Alabama's statutes outline specific responsibilities of the state's Emergency Management Agency as well as its Department of Homeland Security. The state EMA has overall responsibility for preparing for and managing disasters and emergencies. Its director is appointed by the governor and also serves as an assistant director for the state's Department of Homeland Security.[147] To meet its obligations, the state EMA promulgates a statewide Emergency Operations Plan with policy and guidance for state and local disaster mitigation, preparedness, response, and recovery operations.[148] The plan also outlines state and local government responsibilities in relation to federal disaster assistance programs under the Stafford Act.[149]

Alabama's Director of Homeland Security, also appointed by the governor, heads the state's Department of Homeland Security and has overall responsibility for the state's homeland security preparedness and response activities. Specific state Department of Homeland Security responsibilities include: receiving and disseminating federal intelligence; planning and executing simulations; ensuring cooperation among public officials and the private sector; coordinating receipt and distribution of homeland security funding; and coordinating state strategy and standards for homeland security efforts.[150]

## Mississippi

### Governing statutes

The Mississippi Emergency Management Law outlines the specific responsibilities of key state entities and emergency responders and provides for the coordination of emergency preparedness, response, recovery and mitigation activities among state agencies, local and federal governments, and the private sector.[151] The law establishes the Mississippi Emergency Management Agency (MEMA); confers emergency powers on the governor, MEMA, municipal and county governments; and, authorizes the establishment of the Mississippi Emergency Operations Plan (MEOP).[152]

### Roles and responsibilities

Consistent with the National Response Plan and the practices of other states, in Mississippi responsibility for emergency preparedness and response begins at the local level and escalates as the emergency exceeds the capabilities of each level of government. Among other things, Mississippi's governing statute spells out that "state policy for responding to disasters is to support local emergency response efforts," but it also recognizes that catastrophic disasters can overwhelm local resources and that, as a result, the state "must be capable of providing effective, coordinated, and timely support to communities and the public."[153]

The state's statute authorizes (but does not direct) counties and municipalities to create emergency management organizations, which are in turn authorized to do the various things necessary to handle emergency management functions in a disaster.[154] Local governments are also authorized to enter into mutual aid agreements within the state (for example, with nearby counties) for emergency aid and assistance during disasters and emergencies.[155] If a disaster or emergency "exceeds the capability of local resources and personnel, state resources may be made available through coordination" with MEMA. Local authorities are mandated to "recognize the severity and magnitude" of the emergency by (1) declaring a local emergency, (2) utilizing the localities own resources and (3) designating one capable person to make requests to MEMA for additional resources.[156]



FEMA

The governor of Mississippi is granted broad powers to deal with a natural disaster and may assume direct operational control over all state emergency management functions.[157] For example, the governor is authorized to "determine needs for food, clothing or other necessities in the event of attack, natural, man-made or technological disasters and to procure supplies, medicines, materials, and equipment." As commander-in-chief of the state militia, the governor may order the Mississippi National Guard into active state service.[158]

The MEMA director, appointed by the governor, is responsible for, among other things: working with the governor to prepare and implement an emergency management plan that is coordinated with federal and state plans to the fullest extent possible; adopting standards and requirements for local emergency management plans; determining needs for equipment and supplies; planning for and procuring supplies, medicine and equipment; and, assisting political subdivisions with the creation of urban search and rescue teams. In addition, the MEMA director is authorized to create mobile support units to reinforce disaster organizations in stricken areas. MEMA's director also serves as a liaison to the emergency management agencies of other states and the federal government.[159]

## Louisiana

### Governing statutes

The Louisiana Homeland Security and Emergency Assistance and Disaster Act outlines the specific responsibilities of key state entities and emergency responders and provides for the coordination of activities among state agencies and local and federal governments. The law establishes the Louisiana Office of Homeland Security and Emergency Preparedness (LOHSEP), confers emergency powers on the governor and parish and municipal governments, and requires the establishment of the Louisiana Emergency Management Plan (EOP).[160]

## Roles and responsibilities

In Louisiana, parish and municipal governments' chief executives by law have overall responsibility for the direction and control of emergency and disaster operations and are assisted by a local homeland security and emergency preparedness director.[161] Their responsibilities include the development and implementation of emergency management programs to provide for rapid and effective action to "direct, mobilize, staff, train and coordinate use of local resources."[162]

Louisiana's governor has overall responsibility for emergency management in the state and is assisted in these duties by the LOHSEP director in meeting dangers to the state and people presented by emergencies or disasters. The governor is authorized, for example, to declare a disaster or emergency if he or she finds that one has occurred (or the threat is imminent) and coordinate delivery of all emergency services (public, volunteer, and private) during a natural disaster.[163] By making a disaster or emergency declaration, the governor activates the state's emergency response and recovery program (which is under the command of the LOHSEP director). This authorizes the governor to, among other things: (1) utilize all available resources of the state government and of each political subdivision of the state as reasonably necessary to cope with the disaster or emergency; (2) direct and compel the evacuation of all or part of the population from any stricken or threatened areas within the state if deemed necessary for the preservation of life; and, (3) prescribe routes, modes of transportation, and destination in connection with evacuation.[164]



FEMA

The LOHSEP, within the Military Department and under the authority of the governor and the adjutant general, is responsible for emergency preparedness and homeland security in the state.[165] The LOHSEP prepares and maintains a homeland security and state emergency operations plan (EOP), which establishes the policies and structure for the state's management of emergencies and disasters. The EOP prescribes the phases of emergencies and disasters—preparedness, response, recovery and prevention (mitigation)—and outlines the

roles and responsibilities of the state's Emergency Support Functions (ESFs), which mirror those in the National Response Plan. The EOP is an all-hazards plan, assigning responsibilities for actions the state will take to provide for the safety and welfare of its citizens against the threat of natural and man-made emergencies and disasters. The EOP is designed to coordinate closely with the federal National Response Plan as well as parish Emergency Operations Plans.[166]

## New Orleans

The City of New Orleans Comprehensive Emergency Management Plan ("New Orleans Plan") is consistent with the State of Louisiana Emergency Management Plan. The plan reflects the principle that "City government bears the initial responsibility for disaster response and relief."[167] It is therefore the Mayor of the City of New Orleans who must initiate, execute, and direct the operations during any emergency or disaster affecting the City of New Orleans.[168]



FEMA

According to the New Orleans Plan, "[i]f it becomes clearly evident that local resources are inadequate to fully manage the effects of an emergency or disaster, the Mayor may request state and/or federal assistance through [LOHSEP].[169] The New Orleans Office of Emergency Preparedness ("NOOEP") will coordinate with the LOHSEP to assure the most effective management of such assistance."[170]

The plan also says, "The authority to order the evacuation of residents threatened by an approaching hurricane is conferred to the Governor by Louisiana statute."[171] But this power "is also delegated to each political subdivision of the State by Executive Order."[172] "This authority empowers the chief elected official of New Orleans, the Mayor of New Orleans, to order the evacuation of the parish residents threatened by an approaching hurricane,"[173] according to the plan.

For example, New Orleans Mayor Ray Nagin, according to the plan, is responsible for giving the order for a mandatory evacuation and supervising the actual evacuation of the population. The city's Office of

Emergency Preparedness "must coordinate with the state on elements of evacuation" and "assist in directing the transportation of evacuees to staging areas."[174]

The New Orleans Plan states, "The safe evacuation of threatened populations . . . is one of the principle reasons for developing a Comprehensive Emergency Management Plan."[175] The city's evacuation plan states, "The city of New Orleans will utilize all available resources to quickly and safely evacuate threatened areas."[176]

The plan also directs "[s]pecial arrangements will be made to evacuate persons unable to transport themselves or who require specific life saving assistance. Additional personnel will be recruited to assist in evacuation procedures as needed."[177] The evacuation plan further warns that "[i]f an evacuation order is issued without the mechanisms needed to disseminate the information to the affected persons, then we face the possibility of having large numbers of people either stranded and left to the mercy of the storm, or left in areas impacted by toxic materials."[178]

# Threats and vulnerabilities related to hurricanes

## General threats — frequency of hurricanes and vulnerable coastal areas in the U.S.

Hurricanes threaten the United States, particularly the coastal areas along the Gulf of Mexico and Atlantic Ocean, virtually every year. While Florida is the state most frequently hit, other states — particularly Texas, Louisiana, and North Carolina — have frequently been struck by hurricanes, according to the records of the National Hurricane Center (NHC).[179] The coastal areas of these and other states are among the most vulnerable to storm surge, which carries the greatest potential for loss of life in a hurricane. Storm surge is the water that swirling hurricane force winds push toward the shore as the storm advances. Combined with normal tides, this can increase the average water level by 15 feet or more.[180]

Flooding is also a serious threat to lives and property in a hurricane. The NHC reports that, although storm surge has the greatest potential to take lives, in the last 30 years, more people have died from hurricane-induced inland

flooding.[181] Tornadoes can also add to the destructive power of a hurricane. While not all hurricanes produce them, according to the NHC, studies have shown that more than half of the hurricanes that reach landfall produce at least one tornado.

## Specific vulnerabilities of New Orleans—inherent vulnerability to flooding

Metropolitan New Orleans is built on subsiding swampland on the delta of the Mississippi River, which makes the city inherently vulnerable to flooding.[182] The City of New Orleans is shaped like a bowl, with an average elevation of 6 feet below sea level.[183] Some elevations are as high as 12 feet above sea level, and some elevation are as low as 9 feet below sea level.[184] The Mississippi River, which flows through the middle of New Orleans, is on average 14 feet above sea level, and Lake Ponchartrain, which establishes the northern border of New Orleans, is on average one foot above sea level.[185]

New Orleans and its surrounding areas have experienced numerous floods from both the Mississippi River and hurricanes.[186] A major flood on the Mississippi River completely inundated New Orleans in 1927, and others following severe rainstorms damaged parts of the city in 1979 and 1995.[187] Several hurricanes have hit New Orleans, including Hurricane Betsy in 1965, Hurricane Camille in 1969, Hurricane Georges in 1998, and Hurricane Lilli in 2002.[188] The greatest threat from hurricanes is not wind, but storm-surge, which accounts for most of the damage and deaths caused by hurricanes.[189]

## Levees designed, built to address vulnerabilities

After Hurricane Betsy in 1965, federal and state governments proposed a number of flood control projects to deal with the threat of hurricanes and the flooding they might cause in New Orleans.[190] These included a series of control structures, concrete floodwalls, and levees along Lake Pontchartrain and several other waterways.[191] One of the major projects is formally called the Lake Pontchartrain and Vicinity, Louisiana Hurricane Protection Project.[192] This project included levees along



the Lake Pontchartrain lakefront, the 17th Street Canal, the London Avenue Canal, the Orleans Avenue Canal, the Intercoastal waterway, the Industrial Canal, the Mississippi River Gulf Outlet, and others.[193] Although the project was federally authorized, it was a joint federal, state, and local effort with shared costs.[194]

1   Exec. Order 12,148, 44 Fed. Reg. 43239, 3 C.F.R. at 412, (1979 Comp.).

2   *See* Keith Bea, Cong. Res. Serv., Order No. RL 33064, *Organization and Mission of the Emergency Preparedness and Response Directorate:  Issues and Options for the 109th Congress*, App. B:  Evolution of Federal Emergency Authorities (Sept. 7, 2005) [hereinafter Bea, *Organizational Mission*].

3   *See Id.* at App. B; U.S. Gov't Accountability Off., Pub. No. GAO/T-RCED-93-46, *Disaster Management:  Recent Disasters Demonstrate the Need to Improve the Nation's Response Strategy* (May 25, 1993) [hereinafter GAO, *Recent Disasters*].

4   *See* Keith Bea, Cong. Res. Serv., Order No. RL 31670, *Transfer of FEMA to the Department of Homeland Security: Issues for Congressional Oversight*, App. A: Summary of FEMA Authorities (Dec. 17, 2002) [hereinafter Bea, *Transfer of FEMA*].

5   *See* U.S. Gov't Accountability Off., Pub. No. GAO/RCED-93-186, *Disaster Management: Improving the Nation's Response to Catastrophic Disasters* (July 23, 1993) [hereinafter Bea, *Disaster Management*].

6   *See* Bea, *Transfer of FEMA*; GAO, *Disaster Management*.

7   Homeland Security Act of 2002, Pub. L. No. 107-296, Title V, 116 Stat. 2135 (2002).

8   *See* Bea, *Organization and Mission*; Federal Emergency Mgmt. Agency [hereinafter FEMA], News Release, *National Disaster Medical System* (Apr. 21, 2004) *available at* http://www.fema.gov/news/newsrelease.fema?id=11927 (last visited Jan. 21, 2006).

9   *See* Bea, *Transfer of FEMA*.

10  *See* FEMA, *A Guide to the Disaster Declaration Process* (undated) *available at* http://www.fema.gov/pdf/rrr/dec_proc.pdf (last visited Jan. 21, 2006).

11  Interviews by Select Comm. Staff with City of New Orleans officials in New Orleans, LA (Nov. 3-10, 2005) [hereinafter Select Comm. New Orleans Interviews].

12  *See* Elizabeth B. Bazan, Cong. Res. Serv., Order No. RL 33090, *Robert T. Stafford Disaster Relief and Emergency Assistance Act:  Legal Requirements for Federal and State Roles in Declarations of an Emergency or a Major Disaster* (Sept. 16, 2005).

13  Select Comm. New Orleans Interviews.

14  Keith Bea, Cong. Res. Serv., Order No. RS 21227, *The Emergency Management Assistance Compact (EMAC):  An Overview*, 2 (Feb. 4, 2005).

15  *See Id.* at 1-5.

16  *See Id.* at 1-2.; http://www.emacweb.org (last visited Jan. 21, 2006).

17  Robert T. Stafford Disaster Relief and Emergency Assistance Act [hereinafter Stafford Act] 42 U.S.C. § 5122(1) (2005).

18  *See* FEMA, *The Disaster Process and Disaster Aid Programs*, (Apr. 4, 2005) *available at* http://www.fema.gov/library/dproc.shtm (last visited Jan. 22, 2006) [hereinafter, FEMA, *Disaster Process*].

19  Keith Bea, Cong. Res. Serv., Order No. RL 33053, *Federal Stafford Act Disaster Assistance: Presidential Declarations, Eligible Activities, and Funding*, 3-4 (Sept. 27, 2005).

20  *See* FEMA, *Disaster Process* (FEMA allows that, when an obviously severe or catastrophic event occurs, Governors may request a major disaster declaration prior to conducting a damage assessment).

21  *See* FEMA, *Disaster Process* (Specifically, FEMA provides three categories of disaster assistance:  (1) individual assistance; (2) public assistance; and (3) hazard mitigation assistance.  Individual assistance is a combined FEMA-State program that provides money and services to people in the affected area whose property has been damaged or destroyed and whose losses are not covered by insurance. Individual assistance from FEMA can consist of funds to rent temporary housing, grants to repair damage that is not covered by insurance, and grants for "necessary and serious needs" such as medical or funeral expenses. Individual assistance can also include federally subsidized loans from the U.S. Small Business Administration (SBA) to repair or replace homes, personal property or businesses that sustained damages not covered by insurance); *See* FEMA, *Disaster Process* at 4 (Public assistance funds, through grants or SBA loans, the repair, restoration, reconstruction or replacement of public facilities or infrastructure damaged or destroyed by a disaster. Eligible recipients include state and local governments and certain private nonprofit organizations, such as educational, medical, rehabilitation or permanent custodial care facilities.  Recipients may use their public assistance funds for projects such as debris removal and repair of road systems, bridges, and/or water control facilities); *See* FEMA, *Disaster Process* at 4-5 (Hazard mitigation assistance supports measures to reduce or eliminate long-term risk to people and property from natural hazards and their effects.  For eligible projects, the federal government pays up to 75 percent of the costs with states providing a 25 percent match.  Eligible mitigation measures under this program include buying or relocating property located in high hazard areas (such as flood plains); elevating flood-prone structures; and, seismic rehabilitation of existing structures).

22  *See* Directive on Management of Domestic Incidents, 39 WEEKLY COMP. PRES. DOC. 10 280 (Feb. 28, 2003) (Known as Homeland Security Presidential Directive/HSPD-5).

23  *See* U.S. Dep't of Homeland Security, *National Response Plan* (Dec. 2004) at i [hereinafter *NRP*].

24  *See* U.S. Gov't Accountability Off., Pub. No. GAO-05-652, *Homeland Security:  DHS' Efforts to Enhance First Responders' All-Hazards Capabilities Continue to Evolve*, 11-12 (July 11, 2005) [hereinafter GAO: *DHS' Efforts to Enhance Capabilities*].

25  *See NRP* at 1.

26  *See Id.* at 11.

27  DHS, *National Incident Management System*, 2 (Mar. 1, 2004 ) *available at* http://www.dhs.gov/interweb/assetlibrary/NIMS-90-web.pdf (last visited Jan. 22, 2006).

28  *Id.* at ix, 1-4.

29  *See NRP* at xi-xiii.

30  *Id.* at 11.

31  *See Id.* at ESF-i-iv.

32  *Id.* at ESF#1-1-5.

33  *Id.* at ESF#2-1-12.

34  *Id.* at ESF#3-1-8.

35  *Id.* at ESF#4-1-5.

36  *Id.* at ESF#5-1-5.

37  National Response Coordination Center (NRCC); Regional Response Coordination Center (RRCC); Joint Field Office (JFO).

38  *NRP* at ESF#6-1-8.

39  *Id.* at ESF#7-1-6.

40  *Id.* at ESF#8-1-13.

41  *Id.* at ESF#9-1-7.

42  *Id.* at ESF#10-1-13.

43  *See Id.* (Depending on whether an incident affects the inland or coastal zone, either EPA or DHS/USCG serves as the primary agency for ESF 10 actions.  For incidents affecting both, EPA is the primary agency with DHS/USCG serving as the deputy).

44  *Id.* at ESF#11-1-12.

45  *Id.* at ESF#12-1-6.

46  *Id.* at ESF#13-1-9.

47  *Id.* at ESF#14-1-6.

48  *Id.* at ESF#15-1-5.

49  *See* GAO, *Recent Disasters* (The notion that FEMA distinguishes "catastrophic" disasters from other incidents and makes specific plans for a different, proactive response to them builds on its experiences, problems, and lessons learned in past disasters, particularly Hurricane Andrew in south Florida in 1992.  In that disaster, FEMA was too reactive—waiting for state and local governments to identify what they needed and then ask for it—when the hurricane had clearly overwhelmed the ability of state, local, and voluntary agencies to adequately provide victims with essential services, such as food and water, within 12 to 24 hours. Summarizing its review of FEMA's response to Hurricane Andrew, GAO described the [then] federal strategy for responding to such disasters as deficient because it lacked provisions for the federal government to (1) immediately, comprehensively assess damages and the resulting needs of disaster victims and (2) provide food, shelter, and other essential services when victims' needs outstripped what state, local and voluntary agencies could themselves provide).

50  *Id.* at 43.

51  *NRP* at CAT-3.

52  *See Id.* at CAT-1-3 (According to the catastrophic incident annex, DHS is developing a "more detailed and operationally specific NRP Catastrophic Incident Supplement" (CIS) to this annex.  The supplement will be designated "For Official Use Only" and published independently of the NRP base plan and annexes.  As of November 2005, DHS had not yet published the CIS);  See Letter from Henry A. Waxman and Charlie Melancon, Members of Congress, to Michael Chertoff, Secretary of Homeland Security, Nov. 1, 2005 (on file with the Select Comm.) *available at* http://www.democrats.reform.house.gov/Documents/20051101103226-17173.pdf (last visited Jan. 22, 2006).

53  *See NRP* at CAT-2 -4.

54  *See Id.* at CAT-3 -5.

55  *See Id.* at CAT-1.

56  *Id.* at CAT-1.

57  *Id.* at 3-4.

58  *See* DHS, *Fact Sheet: Homeland Security Operations Center (HSOC)* (July 8, 2004) *available at* http://www.dhs.gov/dhspublic/display?theme=30 &content=3813 (last visited Jan. 22, 2006) [hereinafter HSOC Fact Sheet]. (Specifically, participants in the HSOC include the FBI, U.S. Coast Guard, Postal Inspection Service, CIA, U.S. Secret Service, DC Metropolitan Police Department, Defense Intelligence Agency, Federal Protective Service, New York Police Department, National Security Agency, Customs and Border Protection (DHS), Los Angeles Police Department, Immigration Customs Enforcement (DHS), U.S. Department of Energy, U.S. Environmental Protection Agency, Drug Enforcement Agency, U.S. Department of Interior (U.S. Park Police), U.S. Federal Air Marshal Service, Alcohol, Tobacco, and Firearms, U.S. Department of Defense, U.S. Department of State, U.S. Department of Transportation, U.S. Department of Veterans Affairs, National Capitol Region, Transportation Security Administration, National Geospatial Intelligence Agency, U.S. Department of Health and Human Services, FEMA, National Oceanic Atmospheric Administration, Public Affairs (DHS), State and Local Coordination Office, Science and Technology Directorate, Geo-spatial Mapping Office, Information Analysis Office, and the Infrastructure Protection Office).

59  *NRP* at 24; *HSOC Fact Sheet.*

60  See *NRP* at 70 (A National Special Security Event (NSSE) is a designated event that, by virtue of its political, economic, social, or religious significance, may be the target of terrorism or other criminal activity).

61  *See Id.* at 22-23; *HSOC Fact Sheet.*

62  *NRP* at 27-28, 91.

63  *Id.* at 27-28, 40; Interview by Select Comm. staff with Michael Lowder, Deputy Director, Response Division, FEMA, in Washington, DC (Jan. 5, 2006).

64  *NRP* at 28, 68.

65  Stafford Act at § 5143(a).

66  *NRP* at 4, 7.

67  *Id.* at 34.

68  *Id.* at 33-34.

69  Joint Chiefs of Staff, Department of Defense, Joint Publication 3-26, *Homeland Security* [hereinafter Joint Chiefs, *Homeland Security*], (Aug. 2, 2005) at IV-4, *available at* http://www.dtic.mil/doctrine/jel/new_pubs/jp3_26.pdf (last visited Jan. 22, 2006).

70  *NRP* at 42.

71  Joint Chiefs, *Homeland Security* at IV-1.

72  Steven Bowman et al., Cong. Res. Serv., Order No. RL 33095, *Hurricane Katrina: DOD Disaster Response* at 2 (Sep. 19, 2005). [Hereinafter *Katrina: DOD Response*]

73  Department of Defense, Directive 3025.1, *Military Support to Civil Authorities* (Jan. 15, 1993).

74  32 U.S.C. § 901 (2005).

75  Joint Chiefs, *Homeland Security* at vii, IV-10-IV-15; NRP at 37.

76  Bowman, *Katrina: DOD Response* at 3, 4.

77  Civil support for incidents in Hawaii and the Pacific territories is provided by U.S. Pacific Command.

78  Joint Chiefs, *Homeland Security* at IV-12; Bowman, *Katrina: DOD Response* at 3, 4.

79  Bowman, *Katrina: DOD Response* at 3, 4.

80  Joint Chiefs, *Homeland Security* at IV-10-12.

81  Lt. Gen. H. Steven Blum, Chief, National Guard Bureau, *Types of Duty*, 1 (undated) (on file with the Select Comm., No. MMTF 00415-05).

82  *Id.*

83  *Id.*

84  Letter from Bob Riley, Governor of Alabama, to Donald Rumsfeld,  Secretary of Defense (Sept. 2, 2005) (on file with the Select Comm.); Letter from Haley Barbour, Governor of Mississippi, to Donald Rumsfeld, Secretary of Defense (Sept. 4, 2005) (on file with the Select Comm.); Letter from Kathleen Babineaux Blanco, Governor of Louisiana, to Donald Rumsfeld, Secretary of Defense (Sept. 5, 2005) (on file with the Select Comm.); Memorandum from Gordon England, Deputy Secretary of Defense to Secretary of the Army and Acting Secretary of the Air Force (Sept. 7, 2005) (authorizing Title 32 status for Katrina Disaaster Relief activities, on file with the Select Comm.).

85  Departments of the Army and the Air Force, Headquarters, Army Regulation 130-5 AFMD 10, *Organization and Functions of the National Guard Bureau* (Dec. 30, 2001).

86  *Hearing on Hurricane Katrina: Preparedness and Response by the Department of Defense, the Coast Guard, and the National Guard of Louisiana, Mississippi, and Alabama before Select Comm.,* [hereinafter *Oct. 27, 2005 Select Comm. Hearing*] 109th Cong. (Oct. 27, 2005) (written response to questions for the record of Lt. Gen. H. Steven Blum).

87  Chris Doane & Joe DiRenzo III, *Protecting Our Ports: A Coast Guard Operational Commander's Perspective of the Maritime Transportation Security Act of 2002 in* 2004 U.S. COAST GUARD: THE SHIELD OF FREEDOM, 124 (2004).

88  District Eight, U.S. Coast Guard, *District Eight Facts, available at* http://www.uscg.mil/d8/d8facts.htm (last visited Jan. 26, 2006).

89  *See* Debra Spar and James Dail, E*ssays: The Democratic Accountability of Non-Governmental Organizations: Of Measurement and Mission: Accounting for Performance in Non-Governmental Organizations*, 3 Chi. J. Int'l L. 171, 180 note 1 ("Strictly defined, NGO stands for "non-governmental organization" and would thus include any group that does not fall under the purview of the government. Taken to the extreme, this would include private companies, religious congregations, and trade unions. For the most part, however, the term NGO is used to refer to organizations that (1) are tax exempt, (2) have a decisionmaking body separate from the government, (3) consist, at least in part, of volunteers and donations, (4) have a charter or mandate within a specific development arena, and (5) consist of a formal organization (in other words, are registered as organizations)".

90  36 U.S.C. § 300101 (2005).

91  American Red Cross Museum, *History: The Federal Charter of the American Red Cross, available at* http://www.redcross.org/museum/history/ charter.asp (last visited Jan. 22, 2006).

92  *Id.*

93  *Id.*

94  American Red Cross, *2004 Corporate Annual Report, Introduction*, 4, *available at* http://www.redcross.org/pubs/#report (last visited Jan. 23, 2006).

95  NRP at 3.

96  *Id.* at 12, ESF #6-5.

97  *Id.* at ESF #6-5.

98  *Id.* at 2

99  *Id.* at ESF #6-3.

100  *Id.*

101  American Red Cross, *Tropical Storm and Hurricane Action Plan*, 1 (undated) [hereinafter American Red Cross, *Storm Action Plan*].

102  *Id.*

103  American Red Cross, *American Red Cross Responsibilities Under the Federal Response Plan* (Aug. 2001) (Internal Red Cross planning document on file with the Select Comm.).

104  American Red Cross, *Interim Shelter Operations Management Toolkit*, iii (Sept. 2005) (It is not clear to what extent this document was utilized in the Red Cross's response to Hurricane Katrina).

105  American Red Cross *Storm Action Plan* at 2 ("The chapters serving the affected area provide the initial incident response in their respective communities, report their activities and assessments and are augmented by human and material resources and guidance, in a coordinated manner, from the service area or national headquarters").

106  Interview by Select Comm. staff with Joseph C. Becker, Sr. Vice Pres., Preparedness and Response, American Red Cross in Wash., D.C. (Oct. 14, 2005) [hereinafter Oct. 14, 2000 Red Cross Interview].

107  *Id.*

108  American Red Cross, *Storm Action Plan* at 20 (chart entitled, "Hurricane Response Plan Routine Business Model Structure").

109  *Id.* at 3.

110  *Id.* at 3

111  *Id.* at 4.

112  *Id.* at 5.

113  *Id.*

114  Oct. 14, 2000 Red Cross Interview.

115  American Red Cross *Storm Action Plan* at 3.

116  *Id.* at 7.

117  *Id.* at 9.

118  *Id.* at 9-18.

119  *Id.*

120  *Id.* at 9.

121  *Id.* at 9.

122  *Id.* at 12.

[123] *Id.*

[124] *Id.*

[125] *Id.* at 15.

[126] *Id.* at 16.

[127] *Id.*

[128] *See NRP* at 6 (incidents typically managed at the lowest possible level),  8 (roles of local chief executive officer and governor), 15 (concept of operations); FEMA *supra* note 10; DHS *supra* note 27 at ("most incidents are managed locally"); Bazan *supra* note 12 (summary—federal resources supplement state and local).

[129] *See* GAO: *DHS' Efforts to Enhance Capabilities* at 7-8.

[130] Keith Bea, et al., Cong. Res. Serv., Order No. RL 32287, *Emergency Management and Homeland Security Statutory Authorities in the States, District of Columbia, and Insular Areas: A Summary*, 6 (Mar. 17, 2004) [hereinafter Bea, *Statutory Authorities*].

[131] *See* Emergency Management Assistance Compact, *Intrastate Mutual Aid Legislation, available at* http://www.emacweb.org/?150 (last visited Jan. 23, 2006) (for a list of states that have intrastate mutual assistance compacts).

[132] *See* Keith Bea, Cong. Res. Serv., Order No. RS 22235, *Disaster Evacuation and Displacement Policy: Issues for Congress*, 1-2 (Sept. 2, 2005) [hereinafter Bea, *Disaster Evacuation Policy*].

[133] *NRP* at 8.

[134] *See* Bea, *Disaster Evacuation Policy* 132 at 1-2.

[135] *See* Bea, *Statutory Authorities* at 4.

[136] *See* Bowman *Katrina: DOD Response* at 7-8.

[137] *See* Bea, *Statutory Authorities* at 10.

[138] *Id.* at 5-6.

[139] *See* Keith Bea, Cong. Res. Serv., Order No. RL 32678, *Louisiana Emergency Management and Homeland Security Authorities Summarized* (Sept. 2, 2005) [hereinafter Bea, *Louisiana Authorities*].

[140] *See* Keith Bea, Cong. Res. Serv., Order No. RL 32316, *Mississippi Emergency Management and Homeland Security Authorities Summarized* (Sept. 2, 2005) [hereinafter Bea, *Mississippi Authorities*].

[141] *See* Keith Bea, Cong. Res. Serv., Order No. RD 21777, *Alabama Emergency Management and Homeland Security Statutory Authorities Summarized*, 1-5 (Sept. 2, 2005)  [hereinafter Bea, *Alabama Authorities*] (a third statute, the Emergency Interim Succession Act, applies when continuity of government operations come into question and provides for the succession of powers for legislators and officers of political subdivisions).

[142] *State Chief Executives Emergency Response: Hurricanes & Other Disaster Emergencies: State Of Alabama Experience* (on file with the Select Comm., Nos. 000659AL-000666AL).

[143] *Id.*

[144] Preparedness Division Technological Hazards Branch, *State of Alabama, State of Alabama Emergency Operations Plan* [hereinafter *AL Emergency Operations Plan*] 4-5 (Oct. 1, 2000).

[145] *Id.* at 2-3.

[146] Interview by Select Comm. Staff with Bruce Baughman, Director, State of Alabama Emergency Management Agency, in AL (Oct. 11-12, 2005).

[147] *See* Bea, *Alabama Authorities,* at 2.

[148] *See AL Emergency Operations Plan.*

[149] *Id.* at 1.

[150] *See* Bea, *Alabama Authorities* at 2.

[151] Miss. Code Ann. §§ 33-15-11 to 33-15-53 (2004).

[152] *Id.*

[153] *Id.* at § 33-15-2.

[154] *See* Bea, *Mississippi Authorities,* at 2.

[155] *Id.* at 5.

[156] The Disaster Improvement Grant Program Plans Sec., *Miss. Emergency Mgmt. Agency, Miss. Emergency Operations Plan, Volume II Miss. Comprehensive Emergency Mgmt. Plan,* p. Basic-2 (May 14, 199) (change log updated through Feb. 2003).

[157] Miss. Code Ann. § 33-15-11 (2004).

[158] *See* Bea, *Mississippi Authorities* at 1; Bea, *Alabama Authorities* at 4.

[159] *See* Bea, *Mississippi Authorities* at 2-3; Miss. Code Ann. § 33-15-7 (2004).

[160] *See* Bea, *Louisiana Authorities* at 1-3.

[161] Office of Homeland Security and Emergency Preparedness, State of Louisiana, *Emergency Operations Plan,* 7 (April 2005) [hereinafter *LA Emergency Operations Plan*].

[162] *Id.* at 7.

[163] *Id.* at 9.

[164] Louisiana Homeland Security and Emergency Assistance and Disaster Act , LA. REV. STAT. ANN. § 724 D (2003).

[165] *Id.* at §§ 724-725.

[166] *LA Emergency Operations Plan* at 1.

[167] Office of Emergency Preparedness, City of New Orleans, *Comprehensive Emergency Management Plan,* (2004) at 7 [hereinafter *N.O. Emergency Management Plan*].

[168] *Id.* at 4.

[169] *Id.*

[170] *Id.*

[171] *Id.* at 51.

[172] *Id.*

[173] *Id.*

174 *Id.* at 54.

175 *Id.* at 48.

176 *Id.* at 50.

177 *Id.*

178 *N.O. Emergency Management Plan* at 45.

179 *See* Eric S. Blake, et.al., Tropical Prediction Center, U.S. Dep't of Commerce, NOAA Technical Memorandum NWS TPC-4, *The Deadliest Costliest, and Most Intense U.S. Tropical Cyclones from 1851 to 2004 (and Other Frequently Requested Hurricane Facts* Aug. 2005) *available at* http://www.nhc.noaa.gov/paststate.shtml (last visited Jan. 24, 2006).

180 *See* National Hurricane Center, *Hurricane Preparedness: Storm Surge, available at* http://www.nhc.noaa.gov/HAW2/english/storm_surge.shtml (last visited Jan. 24, 2006).

181 *See* National Hurricane Center, *Hurricane Preparedness: Inland Flooding, available at* http://www.nhc.noaa.gov/HAW2/english/inland_flood. shtml (last visited Jan. 24, 2006).

182 Anu Mittal, U.S. Gov't Accountability Off., Pub. No. GAO-05-1050T, *Testimony Before the Subcommittee on Energy and Water Development, Committee on Appropriations, House of Representatives, Army Corps of Engineers: Lake Pontchartrain and Vicinity Hurricane Protection Project,* 2 (Sept. 28, 2005); R.B. Seed, et al., U. of Calif. At Berkely and Am. Soc'y of Civil Engineers, Rept. No. UCB/CITRIS – 05/01, *Preliminary Report on the Performance of the New Orleans Levee System in Hurricane Katrina on August 29, 2005,* 1-4 (Nov. 2, 2005) (support for subsidence); IEM, Inc., IEM/TEC04-070 r5, Southeast Louisiana Catastrophic Hurricane Functional Plan, 5 (Jan. 5, 2005) [hereinafter IEM, *Southeast Louisiana Hurricane Plan*] (support for "bowl" topography "Hurricane Pam").

183 IEM, *Southeast Louisiana Hurricane Plan* at 5; *Hearing on Hurricane Katrina: Who's In Charge of the New Orleans Levees? Before Senate Comm. on Homeland Security and Governmental Affairs* [*Dec. 15, 2005 Senate Hearing*], 109th Cong. (Dec. 15, 2005) (written statement of Max. L. Hearn, Executive Director, Orleans Levee District) at 1.

184 New Orleans District, U.S. Army Corps of Engineers, *Un-Watering Plan Greater Metropolitan Area, New Orleans, Louisiana,* 1 (Aug. 18, 2000) (While we use the term "sea level," the technical measurement used by the Corps is National Geodetic Vertical Datum (NGVD) which was developed by observing the mean sea level height at various locations around North America).

185 New Orleans District, U.S. Army Corps of Engineers, *NGVD Datum Plane* (Apr. 15, 2005) *available at* http://www.mvn.usace.army.mil/pao/ response/NGVD.asp (last visited Jan. 25, 2006).

186 Mittal, *Testimony* at 2.

187 See FEMA, Disasters: Louisiana Severe Storm, Flooding Declared May 10, 1995, *available at* http://www.fema.gov/news/event.fema?id=2250 (last visited Jan. 25, 2006).

188 Mittal, *Testimony* at 2.

189 Richard D. Knabb, et al., National Hurricane Center, Dep't of Commerce, *Tropical Cyclone Report: Hurricane Katrina 23-20 August 2005,* 11, (Dec. 20, 2005); Mittal, *Testimony* at 2.

190 *Dec. 15, 2005 Senate Hearing* (written statement of Max. L. Hearn, Executive Director, Orleans Levee District at 2); R.B. Seed, et. al. at 1-3.

191 Mittal, *Testimony* at 2.

192 Flood Control Act of 1965. Pub. L. No. 89-298, § 204, 79 Stat. 103, 1077 (1965) (The Flood Control Act of 1965 authorized this project).

193 *Dec. 15, 2005 Senate Hearing* (written statement of Col. Richard P. Wagenaar) at 1-2; Mittal, *Testimony* 182 at 3; The Industrial Canal is also known as the Inner Harbor Navigation Canal.

194 Interview by Select Comm. Staff with David Pezza, U.S. Army Corps of Engineers, (Dec. 9, 2005); Mittal, *Testimony* at 3.



*"Preparing for an event like Hurricane Katrina or any natural disaster, we should never feel like we are completely prepared. We can always do better."*

Robert R. Latham Jr.
Executive Director,
Mississippi Emergency Management Agency
Select Committee hearing, December 7, 2005

# PRE-LANDFALL PREPARATION AND KATRINA'S IMPACT

As Hurricane Katrina entered the Gulf of Mexico, Gulf coast states and the federal government prepared for landfall in the region.

## Pre-landfall preparation by FEMA

The Federal Emergency Management Agency (FEMA) positioned an unprecedented number of resources in affected areas prior to Katrina's landfall. Indeed, FEMA's efforts far exceeded any previous operation in the agency's history. A staggering total of 11,322,000 liters of water, 18,960,000 pounds of ice, 5,997,312 meals ready to eat (MREs), and 17 truckloads of tarps were staged at various strategic locations in and near the Gulf region prior to Katrina's landfall.[1] FEMA also pre-positioned 18 disaster medical teams, medical supplies and equipment, and nine urban search and rescue task forces (US&R) and incident support teams.[2] Rapid Needs Assessment Teams also were deployed to Louisiana on the Saturday before landfall.[3] In Louisiana alone, on August 28, a total of 36 trucks of water (18,000 liters per truck) and 15 trucks of MREs (21,888 per truck) were pre-staged at Camp Beauregard.[4]

FEMA's Hurricane Liaison Team, which consists of FEMA, the National Weather Service, and state and local emergency management officials and is tasked with coordinating closely with FEMA Headquarters staff by phone and video conferencing systems, was activated and deployed to the National Hurricane Center on August 24 in anticipation of Hurricane Katrina's making landfall.[5] FEMA's Mobile Emergency Response Support detachments were pre-positioned in Louisiana, Mississippi, and Alabama to provide emergency satellite communications capability.[6] According to former FEMA Director Michael Brown, prior to landfall, FEMA reached out to other agencies for assistance, such as the Department of Defense (DOD) for potential movement of strategic airlift support.[7]

By 10 a.m. on Monday, August 29, the morning Katrina made landfall, 31 teams from the National Disaster Medical System (NDMS) had been deployed to staging areas in Anniston, Alabama; Memphis, Tennessee; Houston, Dallas; and New Orleans, including 23 Disaster Medical Assistance Teams.[8] The teams, trained to handle trauma, pediatrics, surgery, and mental health problems, brought truckloads of medical equipment and supplies with them. By September 1, 72 hours after landfall, FEMA had deployed more than 57 NDMS teams and 28 US&R teams with nearly 1,800 personnel to save lives and render medical assistance. FEMA had also supplied generators and thousands of cots and blankets.[9]

## Pre-landfall preparation in Mississippi

Preparations for Hurricane Katrina in Mississippi involved an array of actions, including county and state preparedness and disaster response training in the months leading up to the storm; the establishment of local, state, and federal command structures by way of emergency proclamations; activation of emergency operations centers (EOCs); evacuations, many of them mandatory, of the areas and types of homes most in danger from a hurricane; and, the opening of emergency shelters to which those evacuating could flee. Preparation by the military in Mississippi largely took place through activation of the state's National Guard and some initial requests for Emergency Management Assistance Compact (EMAC) assistance with security, engineering support, and helicopters.

Following a request from Governor Haley Barbour, on Sunday, August 28, President Bush issued an emergency declaration for Mississippi.[10] Following a further request from Barbour, on Monday, August 29, President Bush declared a major disaster in Mississippi.[11]

## Disaster preparedness training — Mississippi

For several years, Mississippi's Emergency Management Agency (MEMA) has been using federal emergency preparedness grant funds to improve its counties' abilities to prepare for and respond to disasters. In 2000, 43 of Mississippi's 82 counties had active county emergency management programs; MEMA used DHS emergency

management performance grant funds, including a $1.3 million allocation in fiscal year 2005, to increase this to 79 active county programs in 2005.[12] In addition, the MEMA reported that, as of early 2005, over 1,200 first responders had received training in the National Incident Management System (NIMS).[13]

During the summer of 2005, the director of MEMA, Robert Latham, his key staff, and most of Mississippi's county emergency management directors underwent training in NIMS and the NIMS Incident Command System (ICS).[14] At approximately the same time, the FEMA officials who would later lead the federal response in Mississippi (Bill Carwile and Robert Fenton) also participated in extensive ICS training. Fenton was described by Carwile as having been involved for a long time in developing training for subjects such as the ICS and as an expert in how to adapt it for large scale operations, such as the response to Katrina. Carwile and Latham said they believe their training in the ICS and the ability it gave them to quickly establish a unified command were positive elements of the state's preparation for and response to Katrina.

## Establishment of command structures in Mississippi

Mississippi issued its first Hurricane Katrina situation report on August 23 and, through Thursday, August 25, continued monitoring the storm.[15] According to this situation report, during these three days, MEMA conducted executive planning sessions to develop an EOC activation timeline as well as plans for protective actions and a proactive response.[16] It also established contact with a FEMA logistics cell and began encouraging the public to prepare for the storm.

On Friday, August 26, Mississippi activated its National Guard, and MEMA activated its EOC on Saturday, August 27.[17] At that time, it also deployed County Liaisons to six counties (Jackson, Harrison, Hancock, Pearl River, Stone, and George) and activated its State Emergency Response Team (SERT) for deployment to Camp Shelby the next day, August 28. The SERT established forward operations at Camp Shelby at 3 p.m. on August 28. According to the MEMA Director's brief, as of about 7 p.m. on August 28, 18 counties and 11 cities and towns had issued local emergency proclamations; by early morning of August 29, this had increased to 41 counties and 61 cities and towns.[18]

FEMA's liaison arrived at the state's EOC on Saturday, August 27. FEMA's Emergency Response Team-A (ERT-A) arrived the same day, August 27, when the state activated its EOC.[19] On August 28, MEMA reported that FEMA was deploying resources to a Regional Mobilization Center in Selma, Alabama, and that FEMA's ERT-A would be able to supply large quantities of water and ice to the hardest hit areas.[20]

## Evacuations in Mississippi

Although the governor could order mandatory evacuations, longstanding practice in Mississippi rests that authority with local governments.[21] However, the state is generally included in any discussions about evacuation orders because, once a city or county chooses to make such an order, state responsibilities for managing traffic (including contra flow) and opening shelters can come into play.[22] In preparing for Hurricane Katrina, the state worked through the MEMA liaisons it dispatched to the counties along or near the Gulf coast as well as a representative it had stationed in Louisiana's EOC (because of contra flow agreements between Mississippi and Louisiana that provide for evacuations out of southeast Louisiana through Mississippi).



AP PHOTO/ROGELIO SOLIS

## Emergency shelters—Mississippi

On August 27, MEMA urged Mississippi's coastal counties not to open local shelters in order to encourage people to evacuate north.[23] MEMA described coastal county shelters as an option of "last resort." On Sunday, August 28, MEMA reported that Red Cross shelters were open and on standby in the coastal counties.

Mississippi began opening shelters as early as August 28. MEMA reported 51 shelters open with 475 persons registered at that time and 36 additional shelters available on standby as needed.[24] In addition, MEMA indicated the Jackson Coliseum had been open as a shelter (and individuals were authorized to bring pets) and three special needs shelters had been established.[25] According to the Director's brief, also on August 28, MEMA reported the Red Cross had begun opening shelters that morning, bringing the total available shelters to 68 prior to the opening of the Jackson Coliseum.[26]

By August 29, just prior to landfall, MEMA reported 57 shelters were open with 7,610 persons registered in them. An additional 31 shelters were available on standby to open based on need.[27] The Jackson Coliseum opened as expected the day before and by early morning August 29 was reported by MEMA to be at capacity. Similarly, all Red Cross central Mississippi shelters were reported to be full as of 4:30 a.m. on August 29.[28] Two additional special needs shelters opened, bringing their total to five.[29]

## Military preparation in Mississippi

Military preparation in Mississippi began as early as August 26 when, as noted earlier, the Governor activated the state's National Guard.[30] Mississippi's National Guard has over 12,000 troops, with Army and Air National Guard components, both under the direction of the Adjutant General (TAG), Major General Harold A. Cross.[31] Throughout the preparation and response to Katrina, Mississippi's Guard reported to and received taskings (or mission assignments) from MEMA.[32] The Mississippi National Guard has an Operations Plan, (OPLAN MSSTAD) on top of MEMA's Comprehensive Emergency Management Plan, that was used during Hurricane Katrina.[33] Refined and updated in an order issued to Mississippi Guard on June 1, 2005, this operations plan was validated during Hurricane Dennis, July 7 to 10, 2005.[34]

On August 27, Mississippi's Guard accelerated its preparations by alerting state emergency personnel to assemble for hurricane operations on the Mississippi Gulf coast under Joint Task Force Magnolia.[35] In doing so, Mississippi's National Guard assembled and pre-positioned at all three coastal county EOCs its special "hurricane strike" squads; each squad consisted of 10 military police (MPs), 15 engineers and five trucks.[36] In addition, the Guard placed on alert the following units from throughout the state:

| |
|---|
| 223rd EN BN – Camp McCain, MS (Grenada, MS) |
| 890th EN BN – Home Station Armories (located in the coastal region) |
| 112th MP BN – Camp Shelby, MS (Hattiesburg, MS) |
| 367th MAINT. CO – Home Station (Philadelphia, MS) |
| 1687th TRANS CO – Home Station (Southaven, MS) |
| 1387th QM WATER - Home Station (Leland, MS) |
| 210th FINANCE – Home Station (Jackson, MS) |
| 172nd AW – Home Station (Jackson, MS) |
| 186th ARW – Home Station (Meridian, MS)[37] |

Cross noted that these assets "were sufficient for a Category II storm, but as Katrina approached the Gulf coast on August 28, it became apparent that additional forces from outside the state would be required."[38] As a result, that afternoon, he initiated requests for assistance via the EMAC. The first such request, relayed to the on-site National Guard Bureau Liaison Officers (LNO) was for an additional MP Battalion, two more Engineering Battalions, and 3 CH-37 helicopters.[39] That same day, August 28, the National Guard Bureau Joint Operations Center in Washington, D.C., sent LNOs to Mississippi, with the first going to Mississippi's Joint Force Headquarters, followed by officers sent to the three coastal county EOCs and to MEMA's Operations Cell to facilitate out of state National Guard assets.[40]

In addition, Cross established at Gulfport a Forward Operations Center that eventually combined state and federal (including active duty) logistics support personnel.[41] In response to questions regarding the Guard's preparations, including the EMAC assistance it received, Cross said, "This greatly assisted in the command and control and situational awareness of all operations. As forces flowed into the state, more liaison teams were established in each county EOC that had Guard operations

in that county. This was a very efficient system since the National Guard headquarters was linked directly with each county for coordination of relief efforts."[42]

The Guard's preparation in Mississippi was not, unfortunately, without incident. Prior to the storm's landfall, Sgt. Joshua Russell, Detachment 1, Company A, 89th Engineers, was killed when attempting to rescue an elderly couple in Harrison County.[43]

## Pre-landfall preparation in Alabama

Final preparation for Katrina in Alabama began in earnest four days prior to landfall when it became evident the path of the storm pointed towards the Gulf coast. Three days prior to landfall, the Governor's staff participated in frequent videoconference calls with personnel from FEMA, the National Hurricane Center, including its director Max Mayfield, senior staff at the White House, and senior staff from the Governors' offices from Louisiana and Mississippi.[44] The Governor's staff indicated they were satisfied with the federal support they received and that Max Mayfield's briefings were particularly valuable.[45]

In Alabama's southernmost counties, Baldwin and Mobile, preparations began five days before the storm, when they started regular consultations with the National Hurricane Center, the State of Alabama Emergency Management Agency, and the National Weather Service in Mobile to discuss the storm's likely path and strength.[46] Information was then disseminated to all local officials and first responders and staff prepared to activate the EOCs.[47]

On August 28, 2005, Governor Riley wrote to President Bush, asking that he "declare an emergency disaster declaration for the State of Alabama as a result of Hurricane Katrina beginning on August 28, 2005 and continuing."[48] That same day President Bush "declared an emergency . . . for the State of Alabama."[49]

The next day, Monday, August 29, Riley wrote to President Bush again, this time asking him to "declare an expedited major disaster . . . as a result of Hurricane Katrina beginning on August 28, 2005 and continuing."[50] That same day, President Bush issued a major disaster declaration for Alabama."[51]

## Establishment of command structures in Alabama

On Friday, August 26, Riley declared a state of emergency to handle what was then thought would be a surge of evacuees from the Florida panhandle. The state went into what they call Level II response and expected to receive 10 to 15 percent of Florida's evacuees.[52] A Level II response activates the Alabama EOC on a 24-hour basis, and all relevant agencies are activated and necessary personnel are assigned to staff the EOC.

One day later, on Saturday, August 27, a Level I response was activated.[53] The EOC was operating in full force, with desks staffed for each ESF. A FEMA Emergency Response Team - Advance (ERT-A) was on site late in the day. An ERT-A team is a small FEMA contingent with capabilities for planning, operations, communications, and logistics. A total of five to eight people from the Atlanta-based FEMA region IV were on site at the EOC. The Alabama Emergency Management Agency (AEMA) expressed some frustration with FEMA's late arrival. AEMA officials believed that had FEMA been on site sooner with a larger contingent, Alabama may have been able to acquire needed resources and commodities more quickly.

President Bush spoke to Riley on Saturday, August 27, two days prior to landfall, to ensure the Governor had everything he needed. The Governor's staff indicated they felt they were better prepared for Katrina than they were for Hurricanes Dennis and Ivan.[54] In addition to implementing many of the lessons learned from previous hurricanes, the Governor's staff believes one key element of the state's response to Katrina was the state's proactive communications strategy.

On Friday, August 26, as the storm gathered in the Gulf, the Governor personally visited all of the counties in the Gulf, holding numerous press conferences to urge local residents to evacuate pursuant to the mandatory evacuation orders.[55] In Alabama, the failure to obey a mandatory evacuation order is a misdemeanor enforced by county or municipal police.[56]

The Alabama EOC is divided into five clusters of desks, and each desk is equipped with computers, telephony and other management tools.[57] The five clusters are:

- emergency services (ESF #s 1, 2, 3, 4, 9, 13)
- human services (ESF #s 6, 8, 11)
- infrastructure and support (ESF #s 10, 12)
- operations support (ESF #s 14, 15) and
- information and planning (ESF #s 5, 7).

There is a station for each ESF function and stations for all of the involved agencies, federal and state, including FEMA, EMAC, Army Corps of Engineers, National Guard, Alabama State Police, among others.[58]



AP PHOTO/DAVE MARTIN

One of the tools Alabama uses to respond to local disaster needs is the EM-2000 incident log, a Lotus Notes-based system which captures, in log book fashion, emergency events and requests from each of the 67 counties.[59] Each activity or request logged into the system gets assigned to one of the desks in the EOC for attention. If a report comes in regarding individuals who are trapped and in need of rescue, the event will be assigned to the personnel in the emergency services cluster. Multi-ESF teams involving state police (ESF #13), transportation (ESF #1), and urban search and rescue (ESF #9) huddle to coordinate the optimal response. Events can be reported and tracked by ESF, by status, by county, and by a number of other custom data elements. Documents related to information requests, as opposed to action requests, are later scanned and attached. The EM-2000 data files appear to serve as the central universe of actions and documents related to the state's response to the storm.

Applying the lessons learned from Hurricane Ivan, the state upgraded the tracking system used to determine hospital bed vacancies, giving state officials real-time visibility of surge capacity and making it possible to better direct those with special medical needs to appropriate sites.[60] The state health office also has the capability to conduct daily conference calls with county health staff to assess status and needs. Health officials staff their own emergency operations center, linked by computer and phone to the main state EOC in Clanton.

## Evacuations in Alabama

Even before any evacuations began, AEMA and state transportation officials participated in the FEMA regional Evacuation Liaison Team conference calls, during which emergency managers from Florida, Louisiana, and Mississippi shared information on the status of evacuation routes, road closures, traffic volumes, hotel availability, and other interstate implications of significant population migrations in the region.[61]

On the morning of August 29, Shelby County, Alabama, posted a message on the statewide EM2000 system saying the "Shelby County Humane Society will house animals during the emergency. Can house small animals as well as farm animals for a short duration."[62] More than 50 pets were evacuated from Mississippi and brought to Maxwell Air Force Base, where they were taken in by families on the base until the pet owners could be located.[63]

## Pre-landfall preparation in Louisiana

On Saturday, August 27, Louisiana Governor Blanco wrote to President Bush, requesting that he "declare an emergency for the State of Louisiana due to Hurricane Katrina for the time period beginning August 26, 2005, and continuing."[64] Later that same day, President Bush declared an emergency for the state of Louisiana.[65] William Lokey was named Federal Coordinating Officer.[66]

On Sunday, August 28, in recognition of the potential catastrophic impact of Hurricane Katrina, Blanco asked President Bush, prior to landfall, to "declare an expedited major disaster for the State of Louisiana as Hurricane Katrina, a Category V Hurricane approaches our coast . . . beginning on August 28, 2005 and continuing."[67] The next day, President Bush declared a major disaster for Louisiana.[68]

## Establishment of command and safeguarding of assets

The State of Louisiana took a number of steps to prepare for the arrival of Hurricane Katrina, including getting the EOC up and running with its full staff complement by the afternoon of Friday, August 26.[69] The EOC conducted communications checks with all the state agencies and parishes on Thursday, August 25 – four days before landfall.[70]

The state EOC then began holding regular conference calls with all state agencies, key parishes, federal agencies, other states, and the Red Cross to coordinate pre-landfall activities among all the different authorities.[71] These calls began at 5:00 p.m. on Friday, August 26, with five calls on Saturday, four calls on Sunday, and a final call Monday morning as the storm hit but before communications went out. In addition, several state agencies moved key assets northward, stockpiled critical supplies, positioned teams to do post-landfall damage assessments, or otherwise prepared for the hurricane.[72] The Louisiana Department of Fish and Wildlife coordinated with the Louisiana National Guard in advance to get boats placed on trailers and pre-positioned at Jackson Barracks in New Orleans in anticipation of flooding and the need for waterborne search and rescue.[73]

There were also preparations at the parish level. As noted, the parishes participated in conference calls with the state. Plaquemines Parish, one of the southern parishes most exposed to the storm, parked vehicles on high ground, gathered administrative records and moved them north, transferred prisoners to upstate facilities, and set up an emergency command post in a local high school.[74] Jefferson Parish, part of metropolitan New Orleans, also took a number of preparatory steps. According to Emergency Management Director Walter Maestri, they implemented their "Doomsday Plan" to hunker down in their EOC with a skeleton crew to minimize the number of people exposed to the hurricane's damage.

The Louisiana National Guard (LANG) and other state agencies went on alert and began staging personnel and equipment.[75] By Saturday, August 28, the day prior to landfall, the LANG had pre-positioned 9,792 MREs and 13,440 liters of water at the Superdome, the "shelter of last resort." The state also had positioned teams north, out

of harm's way, prior to landfall, and the first requests for EMAC teams were issued as well.

On Saturday, August 28, the New Orleans Regional Transit Authority (RTA) fueled up its fleet based at its Eastern New Orleans facility and moved buses not providing service to higher ground on a wharf near downtown New Orleans.[76] Buses that were providing regular service were also eventually moved to the wharf as well.

## Evacuations in Louisiana

The state was actively involved in executing the Southeast Louisiana evacuation plan, with the Department of Transportation and Development and the Louisiana State Police working to manage traffic and implement "contraflow" — making all highway lanes outbound to maximize traffic flow and minimize traffic jams.[77] The Governor was personally involved in monitoring contraflow, which ran from Saturday at about 4:00 p.m. to Sunday at about 6:00 p.m.[78]

State officials coordinated the contraflow with the states of Mississippi and Texas, since Louisiana interstates fed into these states.[79] In a conference call at 6:30 a.m. Saturday morning, it was recommended that the evacuation plan for southeast Louisiana be implemented.[80] The state began staging assets necessary to execute an evacuation, including alerting and activating National Guard troops, pre-deploying traffic cones and barriers to key locations, and coordinating plans among all of the parishes.[81] Some parishes had already begun evacuation proceedings. By 6:00 p.m. on Sunday, August 28, traffic was light, so contraflow was halted, but residents could still evacuate on the outbound lanes once the highways were returned to their normal configuration.[82]

Up to 1.2 million Louisiana residents followed the evacuation orders and evacuated themselves in their private vehicles.[83] However, it later became apparent that thousands of residents, particularly in New Orleans, did not evacuate or seek shelter, but remained in their homes.

The parishes began declaring evacuations on Saturday, August 27 at 9:00 a.m. These declarations had been coordinated among the state and parishes in advance as part of Louisiana's emergency evacuation plan, which calls for the most southern parishes to evacuate first so that, as



AP PHOTO/CHERYL GERBER

they drive north, they do not encounter traffic bottlenecks in New Orleans or Baton Rouge.[84] While some parishes (e.g., Plaquemines and St. Charles) began the process with "mandatory" evacuation orders, most parishes began with "recommended" evacuation orders and upgraded these to "mandatory" orders later on Saturday or Sunday.[85] Some of the parishes farther north (e.g., St. Tammany, Tangipahoa) declared mandatory evacuation orders only for residents living in low lying areas or manufactured homes.[86]

Some parishes also asked nongovernmental organizations to help evacuate those residents that did not have their own vehicles. Both New Orleans and Jefferson Parish have a program called "Brother's Keeper" run by the parishes in conjunction with local churches and the Red Cross. According to Maestri, the parish had a phone bank in the EOC manned by volunteers that help take the calls and match up riders with drivers once the evacuation was announced.[87] By Sunday evening, most of the parishes reported empty streets and had declared dusk-to-dawn curfews.[88]

## Emergency shelters in Louisiana

Louisiana also set up shelters as part of its evacuation plan. A "Sheltering Task Force" led by the Department of Social Services and the Department of Health and Hospitals, coordinated its activities with the state EOC and parishes through the aforementioned conference calls.[89] Specific shelters were designated along the main evacuation routes, including both general population shelters and special needs shelters.[90] These efforts were coordinated with both Mississippi and Texas, which set up shelters once Louisiana shelters began to fill.[91]

Several parishes also established "shelters of last resort" for residents that could not evacuate or had delayed leaving. Parish officials Ebbert and Maestri told Select Committee staff they purposefully designate these shelters at the last minute so people will not use them as an excuse to avoid evacuation.[92] New Orleans, which had already designated the Superdome as a shelter for the special needs population, also designated that facility as a "shelter of last resort" on Sunday, August 28.[93] The Louisiana National Guard pre-positioned 9,792 MREs and 13,440 liters of water at the Superdome.[94] Also in New Orleans, the RTA began running special service from 12 sites across the city to take riders to the Superdome.[95] The RTA also ran at least 10 paratransit vehicles to the Superdome and then on to the Baton Rouge area for "special needs" citizens; each of these vehicles made at least two trips.[96] All service ceased at approximately 7:00 p.m. Sunday night, approximately 11 hours before Katrina was due to make landfall and as conditions worsened.[97] Jefferson Parish also designated four facilities as "shelters of last resort."[98] According to Maestri, unlike the Superdome, these locations in Jefferson Parish did not have any prepositioned medical personnel or supplies but they did have pre-positioned food and water.

## Pre-landfall preparations by DOD, the National Guard, U.S. Army Corps of Engineers, and U.S. Coast Guard

### DOD

In preparation for the last part of the 2005 hurricane season, the Secretary of Defense approved a standing order on August 19 that allowed the commander, U.S. Northern Command, to use military installations and

deploy Defense Coordinating Officers (DCO) as needed to coordinate directly in support of FEMA in affected states. As the force provider to Northern Command, the U.S. Joint Forces Command issued general instructions on August 20 on how it would task units in support of any Northern Command requests to support FEMA.[99]

On August 23, Northern Command began tracking the tropical depression that became Hurricane Katrina. On August 24, the Office of the Secretary of Defense (OSD), Northern Command, and the National Guard Bureau participated in a teleconference with FEMA on what would be needed to respond to Katrina. Joint Forces Command issued a warning order to military services to be ready to support requests for assistance. Northern Command issued a similar warning order on August 25, the day Katrina struck Florida as a category 1 storm.[100]

On August 26, Northern Command issued an execute order, setting initial DOD relief actions into motion. The initial response was focused on Florida, but DCOs were also activated for Georgia, Alabama, and Mississippi.[101]

On August 27, Northern Command received its first mission assignment from FEMA, to provide Barksdale Air Force Base in Louisiana as a federal operational staging area. The same day, the Corps of Engineers positioned teams and supplies in Alabama, Louisiana, and Mississippi. In New Orleans, the commander of the Corps' New Orleans District evacuated most of his staff to alternate locations to be ready to respond when the storm passed. Other active military units ordered similar evacuations of personnel and equipment. In addition, the Louisiana National Guard aviation officer requested helicopter support from the National Guard Bureau, and support was coordinated through the EMAC.[102]

On August 28, DCOs were deployed to Mississippi and Louisiana. Northern Command took several additional steps to organize military assets that might be needed, including deployment of Joint Task Force-Forward (eventually Joint Task Force-Katrina) to Camp Shelby, Mississippi and a general alert to DOD assets potentially needed, particularly aviation assets.[103]

On the day Katrina made landfall, August 29, the Deputy Secretary of Defense led an 8:30 a.m. meeting to get damage assessment for DOD facilities and review resources that might be required from DOD to support hurricane relief. The Secretary of Defense was briefed on DOD's readiness and Northern Command issued several more alerts in anticipation of requests for assistance.[104]

## National Guard

At the beginning of each hurricane season, National Guard Bureau (NGB) personnel participate in an interagency conference to assess potential response shortfalls and identify potential solutions that could be resolved through EMAC requests.[105] NGB planners conducted this EMAC conference in the spring of 2005 with participants from Alabama, Arkansas, Florida, Georgia, Louisiana, Maryland, Michigan, Mississippi, North Carolina, New York, and South Carolina. The Joint Staff J3 Joint Director of Military Support (JDOMS) also participated. The participants in these conferences believe that EMAC is capable of providing most military capabilities needed by states for hurricane disaster relief operations.

The role of the NGB grew in preparation for Guard response to Hurricane Katrina. On August 24, it issued an executive order calling on its Joint Staff to provide proactive planning and staffing support to states potentially affected by then-tropical storm Katrina. NGB Liaison Teams (LNOs) were sent to Alabama, Mississippi, and Louisiana.[106] On Wednesday, August 24, the first teleconference between NORTHCOM, the Joint Staff, Guard Headquarters, and FEMA was held to discuss DOD support to federal authorities.

The Joint Operations Center at the NGB geared up as the operations center for Katrina response.[107] The heads of the Army and Air National Guard also use this center for coordination of effort. During Hurricane Katrina preparation and response, the Joint Operations Center provided daily intelligence updates, logs of current operations, daily teleconferences, and coordination with states on logistical assistance; maintained communications with states and other agencies; and, coordinated Guard aviation assets.

On August 25, the NGB began hosting daily teleconferences with the operations officers of the Gulf states' Adjutant Generals. The Adjutant Generals reported their preparations to respond, and were asked if they needed out of state assistance.[108] Some of them had already contacted or were contacted by other nearby states to arrange for assistance via the EMAC in the form of personnel and equipment that might be needed.[109]

On Sunday, August 28, reports into NGB by state Adjutant Generals indicated that 4,444 Army National Guard and 932 Air National Guard in Florida, Alabama,

Mississippi, and Louisiana were ready to respond. Both General Bennett C. Landreneau of Louisiana and Cross of Mississippi requested additional aircraft from EMAC via NGB.[110] Consequently, these requests were considered state-to-state requests for assistance, not federal requests involving FEMA or OSD, even though NGB facilitated the assistance. On Monday, August 29, NGB noted that 65 Army National Guard aircraft were in position in Florida, Alabama, Texas, Louisiana, and Mississippi.

## Louisiana National Guard

The Louisiana National Guard is an integral part of managing emergencies in the state. The Adjutant General, Landreneau, wears two hats, as he is head of both the National Guard and the Louisiana Office of Homeland Security and Emergency Preparedness (LOHSEP).[111] The National Guard plays a significant role in emergency command and control because of the dual role of the Adjutant General. Also, many of the personnel who staff the state's EOC are guardsmen.

On Friday, August 26, Blanco authorized the mobilization of 2,000 Louisiana guardsmen.[112] The next day, Landrenau called an additional 2,000 to active duty.[113] By the end of the day on Saturday, 3,085 Louisiana National Guard troops had been fully activated. Coordination also began with other states for additional aviation assets for search and rescue and EMAC support, if needed.



AP PHOTO/DAVE MARTIN

**Before Katrina hit, Louisiana National Guard soldiers screen residents entering the Superdome.**

The Louisiana National Guard participated in a number of preparation missions, including law enforcement, traffic control, shelter support and security, and securing operations at the Superdome.[114] Many guardsmen were also embedded with state and parish officials and later used their radios to help these officials reestablish some minimal level of communications.[115] Before Katrina hit, guardsmen provided support for general purpose shelters and special needs shelters by providing medical personnel.[116]

## Alabama National Guard

The Alabama National Guard has 13,200 troops, with Army and Air National Guard components falling under its Adjutant General, Major General Mark Bowen.[117] The Adjutant General is also a member of the Governor's Cabinet, but is not dual-hatted as the emergency response coordinator. Although he participates in the state's EOC, Bowen's chain of command is a direct line to the governor. The Alabama Guard has developed and is organized around mission-oriented joint force packages, (i.e., hurricanes, snow and ice storms). Task forces typically include security forces, engineers, medical, communications, special operations forces, logistics and a command and control cell. Alabama also has a voluntary state militia that is administered by the National Guard. They are used to augment the Guard force and have approximately 2,000 to 3,000 members.

During the Alabama National Guard's preparation phase, which began six days before Katrina hit, Guard assets monitored the storm track and began discussions with the NGB.[118] By August 26, Riley ordered 3,000 Alabama National Guard soldiers and airmen to state active duty and requested Secretary of Defense approval of 180 days of military duty.[119] Approval was granted by DOD on September 7 and was retroactive to August 29.[120]

Two days before the storm, a National Guard liaison officer was dispatched to the state EOC in Clanton.[121] On August 28, two National Guard Task Forces were formed, gathered pre-positioned supplies (food, water, ice, gas) from Maxwell Air Force Base, and equipment, including generators,

fuel trucks, and aviation assets.[122] Guard assets also began deployment to assist Mobile and Baldwin County Emergency Management activities.[123]

## Mississippi National Guard

The Mississippi National Guard has 12,041 troops, with Army and Air National Guard components falling under Adjutant Major General Harold A. Cross.[124] The Adjutant General reports directly to the Governor, but is not dual-hatted as the state emergency management officer. Mississippi's emergency response is handled by the state's emergency management agency, MEMA.

On August 28, 2005, the Mississippi National Guard alerted state emergency personnel to assemble for hurricane operations on the Mississippi Gulf coast under Joint Task Force Magnolia.[125] National Guard special "hurricane strike" squads were pre-positioned at all three coastal county EOCs. Recommended but voluntary evacuation of civilians brought bumper-to-bumper traffic along Highway 49 northbound, from the beach in Gulfport to Jackson. By Sunday evening, numerous mandatory evacuation orders were in effect, and Mississippi National Guard Soldiers took shelter at Camp Shelby, 62 miles north of the predicted landfall area. These Guard personnel moved south after the storm had passed to begin assisting with response and recovery efforts.

## U.S. Army Corps of Engineers

The Army Corps of Engineers (USACE), another active duty military unit, provided substantial resources to prepare for and respond to Hurricane Katrina. Under the National Response Plan, the USACE, as the lead federal agency for public works and engineering (ESF #3), provides relief and response support to FEMA.[126] To meet these responsibilities, USACE has pre-awarded competitively bid contracts for all of these functions to allow quick deployment of resources prior to and immediately after an event.[127] These pre-awarded contracts are part of USACE's Advanced Contracting Initiative (ACI), which has been in place for about six years.

USACE took a number of preparatory steps in anticipation of the hurricane season in general and for Hurricane Katrina specifically.[128] Over the summer, the USACE New Orleans District participated in an annual

hurricane preparedness exercise conducted by the regional headquarters. In July 2005 the district sponsored a hurricane preparedness conference for federal, state, and local emergency managers.

In addition, USACE had equipment and supplies, including those needed to repair levees, pre-positioned in various locations along the Gulf of Mexico.[129] When Katrina approached, the New Orleans District monitored the situation and evacuated most staff, establishing a temporary district headquarters in Vicksburg, Mississippi. The district commander and eight staff remained in New Orleans, retreating to a bunker designed to withstand a category 5 hurricane. Their objective was to monitor the levee system, stay in contact with local officials, and provide post-storm assessments to the USACE chain of command.

## U.S. Coast Guard

Well before arriving in the Gulf of Mexico, Hurricane Katrina was closely watched by Coast Guard officials as the storm approached and eventually passed through southern Florida. By Thursday, August 25, the Seventh Coast Guard District, based in Miami, had prepared for Katrina's arrival by partially evacuating Coast Guard boats, aircraft, and personnel, and closely monitoring Katrina's progress across the Florida peninsula.[130] As Katrina cleared the Seventh District, the Eighth District was busy executing hurricane plans in anticipation of Katrina's arrival.[131]

On August 27, the Eighth Coast Guard District's Incident Management Team (IMT), based in New Orleans, relocated to St. Louis in accordance with Coast Guard hurricane plans.[132] The Eighth District set heightened readiness for all units, ordered the evacuations of personnel and dependents from units along the Gulf coast in the anticipated impact zone, and closed the entrance to the lower Mississippi river to all commercial maritime traffic.

On August 28, the Coast Guard activated personnel to support air and swift boat operations under ESF-1, and positioned liaison officers at FEMA regions IV and VI, and to state EOCs in Florida, Louisiana and Mississippi.[133]

The Coast Guard's computer hub in New Orleans dropped off-line, resulting in no computer or internet connectivity to all coastal ports within the Eighth District. Coast Guard units resorted to using phone and fax machines to communicate.

The Eighth District Commander requested additional Coast Guard air assets and personnel to support rescue and recovery operations.[134] Coast Guard aircraft and crews from Louisiana, Alabama, Florida, New Jersey, Massachusetts, North Carolina, Georgia, and Texas were pre-staged to provide rapid support.[135] Eighth District Commander Rear Admiral Robert Duncan contacted Blanco to discuss damage assessments and response efforts.[136]

Sector New Orleans operations and critical communications personnel evacuated to Alexandria, Louisiana. Non-essential Coast Guard personnel and dependents in the New Orleans area evacuated to the Naval Air Station in Meridian, Mississippi.[137] Coast Guard helicopters originally located in New Orleans relocated to Houston and Lake Charles, Louisiana to avoid Katrina's path, and prepared to begin rescue operations. All Coast Guard cutters and small boats relocated to safe locations, or traveled out to sea to avoid the storm.

In Mississippi, a Coast Guard Incident Management Team was established in Meridian.[138] Duncan contacted Barbour to discuss damage assessments and response efforts. Non-essential personnel and dependents from the Gulfport and Lockport areas relocated to Naval Air Station Meridian.[139] In Alabama, helicopters from Aviation Training Center Mobile deployed to Shreveport and Jacksonville for storm avoidance, and prepared to respond. Also, a Transportable Multi-mission Communications Center was pre-staged at Sector Mobile to provide temporary communication support. Non-essential Coast Guard personnel and dependents relocated to Maxwell Air Force Base.[140]

On August 29, the day Katrina made landfall, the Sector New Orleans Incident Management Team was established in Alexandria, LA.[141] Outside of the forecasted area of impact, Coast Guard Disaster Assistance Teams from Ohio, Kentucky, St. Louis, Pittsburgh, and Miami were pre-positioned to the region to respond as soon as conditions permitted.

During normal conditions, there are 15 helicopters assigned within the Eighth Coast Guard District, along with four fixed-wing aircraft and 16 cutters. Within 12 hours of Hurricane Katrina making landfall, the Coast Guard assigned 29 helicopters, eight fixed-wing aircraft, and 24 cutters to the area to support rescue operations.[142]

## Pre-landfall preparations by the American Red Cross

The Red Cross' Gulf coast-area preparation was far along two days before Katrina made landfall in the Gulf coast. As of 2:00 p.m. on August 27, Carol Hall of the Red Cross reported to the White House and the Department of Homeland Security, among other governmental organizations that it "has every resource at its disposal on alert/moving in anticipation of this event to include personnel, equipment, and materials."[143] According to Hall, key aspects of this preparation included:

- Chapters across the region opened shelters in support of evacuations in all states.
- 275,000 HeaterMeals were staged in Baton Rouge, LA.
- 225,000 HeaterMeals were staged in Montgomery, AL.
- 15 sites were identified to bring in big kitchens with the support of Southern Baptists to provide 300,000-meals-per-day feeding capability.
- All 14 Disaster Field Supply Center warehouses loaded supplies, including 50,000 cots, 100,000 blankets, comfort and clean-up kits.
- All vehicles in the Red Cross fleet across the country were placed on alert for possible deployment and were dispatched to staging areas.
- All 8 Emergency Communications Response Vehicles (ECRVs) deployed to staging areas.
- Red Cross staff deployed to NRCC, Region VI RRCC, Region IV RRCC, ERT-As and other ESF #6 posts.



AP PHOTO/STEVE COLEMAN

Red Cross volunteers unload supplies in preparation for Katrina.

By August 28, the Red Cross started to understand the magnitude of Katrina. One of its Disaster Operations Reports remarked, if Katrina makes landfall at its current pressure, "it will be the most intense storm to hit the US mainland."[144] On the same day it was reported, "For the first time ever, an ESF6 coordination center will be set up tomorrow at American Red Cross national headquarters to coordinate the deliver [sic] mass care services with our governmental and non-governmental organization partners."[145]

As Katrina made landfall on August 29, the Red Cross was fully staffing all of the relevant state and federal EOCs, including Alabama, Louisiana, Florida, Mississippi, Georgia, South Carolina, Tennessee, FEMA Regions IV and VI's RRCC, FEMA's NRCC, as well as ERT-A teams in Florida, Alabama, Mississippi, and Louisiana.[146] Sites for 25 kitchens to feed as many as 500,000 people were identified and pre-staged.[147]

# Trajectory and impact of Hurricane Katrina

# Finding: The accuracy and timeliness of National Weather Service and National Hurricane Center forecasts prevented further loss of life

## Timeline of Hurricane Katrina and NWS Warnings to Federal, State and Local Officials

At 5:00 p.m. Eastern Daylight Time (EDT) (4:00 Central Daylight Time (CDT), the National Weather Service (NWS) reported that Katrina's projected path had shifted 150 miles to the west (toward Mississippi) and projected that Katrina would make landfall as a category 4 storm.[148] By 10:00 p.m. CDT that same night, the NWS projected that landfall was most likely at Buras, Louisiana, 65 miles south-east of New Orleans.[149] NWS proved extremely accurate; the final landfall location was only 20 miles off from Friday's forecast.[150] Since meteorological conditions that affect the track and intensity of the storm were relatively stable, NWS was especially certain of the accuracy of its prediction, even 56 hours from landfall.

At 10:00 a.m. CDT, on Saturday, August 27, the National Hurricane Center (NHC) issued a hurricane watch for southeast Louisiana, including New Orleans, which was extended to Mississippi and Alabama later that afternoon.[151] Later that evening, between 7:30 and 8:00 p.m. CDT, 35 hours before landfall, Max Mayfield, the director of the NHC called state officials in Louisiana, Mississippi, and Alabama to inform them of the storm's intensity and its potential to be devastating and catastrophic.[152] At Governor Blanco's urging, Mayfield also called Ray Nagin.[153]

Despite media reports indicating Mayfield encouraged Nagin to immediately order a mandatory evacuation, Mayfield "just told [officials] the nature of the storm [and that he] probably said to the Mayor that he was going to have some very difficult decisions ahead of him."[154] Similarly, Mayfield said that the "purpose of [his] calls there to the Governors of Louisiana and Mississippi was really just to make absolutely sure that they understood how serious the situation was . . . ."[155]

In public advisories issued at 10:00 p.m. CDT Saturday, 32 hours before prior to landfall, NHC warned of storm surge forecasts.[156] At 7:00 a.m. on Sunday, August 28, NWS advisories characterized Katrina as a "potentially catastrophic" storm.[157] Additionally, at 4:00 p.m. CDT on Sunday, the storm surge was predicted to be 18 to 22 feet, and locally as high as 28 feet with "large and battering" waves on top of the surge, meaning "some levees in the greater New Orleans area could be overtopped."[158]

Although it was reported that Mayfield cautioned the levees would be breached, no such warning was issued. "What I indicated in my briefings to emergency managers and to the media was the possibility that some levees in the greater New Orleans area could be overtopped, depending on the details of Katrina's track and intensity," Mayfield said.[159]

Also on Sunday, August 28, the NWS office in Slidell, Louisiana, which is responsible for the New Orleans area, issued warnings saying, "most of the area will be uninhabitable for weeks…perhaps longer" and predicting "human suffering incredible by modern standards."[160] Ultimately, NWS and NHC proved remarkably accurate in capturing Katrina's eventual wrath and destruction.

It is important to note, the hurricane risk to New Orleans and the surrounding areas was well-recognized and predicted by forecasters long before Hurricane Katrina. "The 33 years that I've been at the Hurricane Center we have



always been saying — the directors before me and I have always said — that the greatest potential for the nightmare scenarios, in the Gulf of Mexico anyway, is that New Orleans and southeast Louisiana area," Mayfield said.[161]

The NWS and NHC are not without critics though. AccuWeather Inc., a private weather service company, has said the public should have received earlier warnings that Gulf coast residents, and New Orleans residents in particular, were directly in Katrina's path.[162] AccuWeather issued a forecast predicting the target of Katrina's landfall nearly 12 hours before the NHC issued its first warning, and argued the extra time could have aided evacuation of the region.[163]

Responding to this criticism, Mayfield said premature evacuation can lead too large of an area to evacuate, causing unnecessary traffic and congestion on the roads.[164] As Mayfield testified, "the mission here of the National Hurricane Center and then the National Weather Service, is to provide the best forecast that we possibly can, and then the emergency managers at the local and state levels will use that, then they will call for evacuations."[165]

Ultimately, as Mayfield tried to convey, NHC and NWS can only forecast, issue warnings, and provide timely information to the state and local decision-makers who determine who and when to evacuate. The timeliness and accuracy of the forecasts saved lives. No government can blame inadequate response or lack of advanced warning.

# Katrina makes landfall

Hurricane Katrina made landfall at Buras, Louisiana on the southeast corner of Louisiana, at 6:10 a.m. CDT, on Monday, August 29.[166] Katrina had maximum sustained winds of 121 mph and was unusually large, measuring approximately 400 miles across. Its eye was at least 30 miles wide. Though it had weakened from a category 5 to a strong category 3 storm by landfall, the damage and loss of life from the storm was staggering, with effects extending from Louisiana through Mississippi, Alabama, Georgia, and the Florida panhandle.[167] The three states most directly affected — Alabama, Mississippi, and Louisiana — each suffered significant damage, with NHC noting that many of the most severely affected areas along the Gulf coast could take years to completely rebuild.[168]

## Alabama — impact of Hurricane Katrina

Though Alabama was not where Hurricane Katrina made landfall, damages there were substantial. According to the NHC, "despite being more distant from the eye of Katrina, the storm surge over Dauphin Island, Alabama destroyed or damaged dozens of beachfront homes and cut a new canal through the island's western end."[169] Two deaths were reported during Hurricane Katrina in Alabama. However, these deaths were the result of an auto accident and unrelated to the Hurricane.[170]

Katrina caused significant damage along its coast with a wave surge of 13.5 feet, exceeding the 100-year flood level of 12 feet.[171] Bayou La Batre and (as noted above) Dauphin Island received the brunt of the storm in Alabama, losing 800 and 200 homes, respectively.[172] The storm caused wind damage as far north as Tuscaloosa County. Mobile Bay spilled into downtown and flooded large sections of the city, destroying hundreds of homes. The sheer power of the storm dislodged a nearby oil drilling platform, which became caught under the U.S. Highway 98 bridge.[173]

As of early January 2006, federal assistance to Alabama had exceeded $500 million.[174] Specifically, FEMA reported





FEMA

that, to date, it had provided $117 million in assistance to individuals and families (for housing and rental assistance) and $348 million for public assistance, crisis counseling, disaster unemployment assistance, and various mission assignments to other federal agencies during the disaster response. The public assistance funds were provided for, among other things, infrastructure costs, debris removal, and road and bridge repair. The costs for mission assignments to other federal agencies included the use of military aircraft for rapid needs assessments, shipments of ice (280 truckloads), water (186 truckloads), MREs (103 truckloads), generators (11 truckloads), cots (27 truckloads), and blankets (32 truckloads). The Small Business Administration (SBA) has approved over $68 million in loans to homeowners, renters, and businesses.

## Mississippi — impact of Hurricane Katrina

In reporting casualty and damage statistics for Hurricane Katrina, NHC noted that "the storm surge of Katrina struck the Mississippi coastline with such ferocity that entire coastal communities were obliterated, some left with little more than the foundations upon which homes, businesses, government facilities, and other historical buildings once stood."[175] According to the NHC, the Hancock County EOC recorded a storm surge of as high as 27 feet; this surge likely penetrated at least six miles inland in many portions of the Mississippi coast and up to 12 miles inland along bays and rivers.[176] Even in areas that may have been spared the destruction of the storm surge, hurricane force winds wreaked havoc—according to Pearl River County EMA Director Bobby Strahan, for example, his EOC (one county inland) twice registered wind speeds of 135 miles per hour.[177]

All told, at least 231 Mississippians died during Hurricane Katrina.[178] In the three coastal counties alone,

66,000 may have been displaced from their homes due to flooding and/or structural damage to their homes.[179] At peak levels on August 31, Mississippi's power companies reported 958,000 customers were without power and that over 19,000 households were still powerless as of the end of September.[180]

Damages to Mississippi's economy were also substantial—the state's agricultural, forestry, gaming, maritime, and poultry industries all suffered extensive damages.[181] For example, the state reported that its two biggest crops—poultry and forestry—were very hard hit, with at least two years' worth of timber destroyed (worth $1.3 billion) and the value of the poultry industry dropping by six percent due to hurricane damage (including the estimated loss of 8 million birds and damage to 2,400 of the state's 9,000 poultry houses, 300 of which were totally devastated).[182] The state's dairy industry suffered losses estimated to exceed $6 million, and 20 percent of the expected rice and corn harvests may have been lost.[183]

The costs and volume of response and clean-up activity in Mississippi reflect the enormous damage Katrina left behind. For example, a month and a half after landfall, the state reported the total cost of assistance it received via EMAC was over $327 million ($176 million in civilian costs and $151 million in National Guard expenses).[184]

According to the National Emergency Management Association (NEMA, which administers the EMAC[185]), commonly requested resources included firefighters, search and rescue personnel, HAZMAT personnel, emergency medical technicians, state police, sheriffs, fish and wildlife personnel, corrections personnel, livestock inspectors, bridge inspectors, airport maintenance personnel,



FEMA



AP PHOTO/ROB CARR

ambulances, medical doctors, registered nurses and National Guard Troops.[186] In total, at least 33 states aided the law enforcement response effort in Mississippi through the EMAC.[187]

Federal costs in Mississippi have also been substantial.[188] FEMA reports that, as of January 4, 2006 it had disbursed in Mississippi just over $1 billion in assistance via its Individuals and Households Program and obligated to the state and local governments $666 million in public assistance to repair things like roads and bridges. SBA, FEMA reports, has approved home, business, and economic injury loans totaling over $529 million. USACE has installed nearly 50,000 temporary roofs through its Operation Blue Roof program (making that effort 99 percent complete) and, in addition to the efforts of local governments and contractors, removed more than 23 million cubic yards of debris. While just over 30,000 FEMA travel trailers and mobile homes are now occupied in Mississippi, four shelters housing 759 people remained open at year's end.

## Louisiana — impact of Hurricane Katrina

On August 28, at 10 a.m. CDT, the NWS field office in New Orleans issued a bulletin predicting catastrophic damage to New Orleans, including partial destruction of half of the well-constructed houses in the city, severe damage to most industrial buildings rendering them inoperable, the creation of a huge debris field of trees, telephone poles, cars, and collapsed buildings, and a lack of clean water.[189] As previously noted, NWS predicted the impact on Louisiana would be a human suffering incredible by modern standards." Unfortunately, much of what the NWS predicted came to pass.

With intense gale-force winds and massive storm surge, the effect of Hurricane Katrina on Southeast Louisiana was indeed catastrophic. After 11:00 a.m. CDT on August 29, several sections of the levee-system in New Orleans breached, and 80 percent of the city was under water at peak flooding, which in some places was 20 feet deep. The extensive flooding left many residents stranded long after

*NWS predicted Karina could "make human suffering incredible by modern standards."*



AP PHOTO/DAVID J. PHILLIP

Hurricane Katrina had passed, unable to leave their homes. Stranded survivors dotted the tops of houses citywide. Flooding in the 9th Ward sent residents onto rooftops seeking aid. Many others were trapped inside attics, unable to escape. Some chopped their way to their roofs with hatchets and sledge hammers, which residents had been urged to keep in their attics in case of such events. Clean water was unavailable and power outages were expected to last for weeks.

Katrina took approximately 1,100 lives in Louisiana, most due to the widespread storm surge-induced flooding and its aftermath in the New Orleans area.[190] Fatalities included some of those widely seen on the media — bodies at refuge centers, such as an old woman in a wheelchair who had been covered with a cloth, and a man dead on the interstate. In addition to flooding, contaminated water also caused deaths—on September 6, *E. coli* was detected in the water supply and, according to the Centers for Disease Control and Prevention (CDC), five people died from bacterial infections caused by the toxic waters.[191]



AP PHOTO/ERIC GAY

The economic and environmental ramifications of Katrina have been widespread and could in some respects be long-lasting due to effects on large population and



AP PHOTO/CHRISTOPHER MORRIS/VII

tourism centers, the oil and gas industry, and transportation. The hurricane severely damaged or destroyed workplaces in New Orleans and other heavily populated areas of the northern Gulf coast, resulting in thousands of lost jobs and millions of dollars in lost tax revenues for the affected communities.[192] All told, 41 of Louisiana's 64 parishes suffered serious damage.[193] Thousands of homes and businesses throughout entire neighborhoods in the New Orleans metropolitan area were destroyed by the flood. Strong winds also caused damage in the New Orleans area, including downtown, where windows in some high rise buildings were blown out and the roof of the Louisiana Superdome partially peeled away.

As of mid-January, 2006, the federal costs FEMA reported for Louisiana were enormous. Specifically, FEMA said it had provided $4 billion directly to Katrina victims for financial and housing assistance through its Individuals and Housing Program, an amount it projected will eventually grow to a total of $7.7 billion (including costs from Hurricane Rita in late September 2005).[194] FEMA had paid out an additional $3.1 billion in housing assistance to victims of Katrina and Rita and projected it will pay $17 billion in claims under the National Flood Insurance Program to policyholders in Louisiana.

Likewise, loan activity in the wake of Hurricanes Katrina and Rita has been substantial. FEMA has approved $539 million in Community Disaster Loans in Louisiana for essential public services in hard-hit communities, including a $120 million loan to the city of New Orleans, and SBA has approved $1.3 billion in loans to homeowners and renters and $252 million in disaster assistance loans to businesses.[195] ■

1  Federal Emergency Management Agency (FEMA), Commodity status by site as of Aug. 28, 2005, (10:00 a.m.).

2  Press Conference with Officials from the Department of Homeland Security, Justice Department, Defense Department, the National Guard Bureau, U.S. Coast Guard and FEMA, CNN, et al, Sept. 1, 2005 [hereinafter *DHS Press Conference*], *available at* http://www.dhs.gov/dhspublic/display?theme=43&content=4779&print=true (last visited Jan. 25, 2005).

3  Interview by Select Comm. Staff with Bill Lokey, FEMA Federal Coordinating Officer, in Washington, DC (Dec. 2, 2005) [hereinafter *Lokey Interview*].

4  Federal Emergency Management Agency, Commodity status by site as of Aug. 28, 2005 (10:00 a.m.).

5  *Hearing on Hurricane Katrina: The Role of the Federal Emergency Management Agency Before Select Comm.*, 109th Cong. (Sept. 27, 2005) at 54-55 (statement of Michael Brown) [hereinafter *Sept. 27, 2005 Select Comm. Hearing*].

6  *Id.*, at 63-64 (statement of Michael Brown).

7  *Id.*, at 34 (statement of Michael Brown).

8  Press Release, FEMA, Assistance Continues To Areas Impacted By Hurricane Katrina (Press Release No. HQ-05-175) (Aug. 29, 2005), *available at* http://www.fema.gov/news/newsrelease_print.fema?id=18471 (last visited Jan. 26, 2006).

9  Press Release, Dept. Homeland Security, United States Government Response to the Aftermath of Hurricane Katrina (Sept. 1, 2005), *available at* http://www.dhs.gov/dhspublic/display?theme=43&content=4777&print=true (last visited Jan. 26, 2006).

10  Letter from Haley Barbour, Governor of Mississippi, to George W. Bush, President of the United States (Aug. 27, 2005); Mississippi, Emergency and Related Determinations (FEMA-3213-EM), 70 Fed. Reg. 53,229 (Aug. 28, 2005).

11  Letter from Haley Barbour, Governor of Mississippi, to George W. Bush, President of the United States (Aug. 28, 2005); Mississippi, Major Disaster and Related Determinations (FEMA-1604-DR), 70 Fed. Reg. 72,549 (Aug. 28, 2005, as amended Dec. 20, 2005).

12  Mississippi Emergency Management Agency, Status of Emergency Management Capability (Feb. 01, 2005).

13  *See*, DHS, *National Incident Management System*, 2 (Mar. 1, 2004), at ix, 1-4, 7, *available at* http://www.dhs.gov/interweb/assetlibrary/NIMS-90-web.pdf (last visited Jan. 22, 2006) [hereinafter *NIMS*]. NIMS was developed by the Department of Homeland Security to implement HSPD-5, which directed DHS to develop a new national plan for managing emergencies. NIMS defines the roles and responsibilities of federal, state, and local first responders during emergencies and establishes a core set of concepts, principles, terminology, and organizational processes to enable effective, efficient, and collaborative emergency event management at all levels. The concepts, principles, and processes underlying the NIMS are intended to improve the ability of different jurisdictions and first-responder disciplines to work together in various areas, such as command and communications. DHS describes the NIMS ICS as the "standardized incident organizational structure for the management of all [domestic] incidents." The ICS provides a common organizational structure for the immediate response to emergencies and involves the coordination of personnel and equipment on-site at an incident.

14  *Hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi, Before Select Comm.* 109th Cong. (2005), at 3 (written statement of William L. Carwile) [hereinafter *Dec. 7, 2005 Select Comm. Hearing*]; *see also, Dec. 7, 2005 Select Comm. Hearing*, at 39-40 (statement of William L. Carwile); *see also, Dec. 7, 2005 Select Comm. Hearing*, at 33-34 (statement of Robert R. Latham, Jr.).

15  *Dec. 7, 2005 Select Comm. Hearing*, at 5 (written statement of Robert R. Latham, Jr.).

16  *See generally*, Mississippi Emergency Management Agency, *Preparedness and Response Timeline—Hurricane Katrina* [hereinafter *MS Timeline*].

17  *MS Timeline*, at 1-2.

18  Mississippi Emergency Management Agency, Director's Brief as of 1900 hours, Aug. 28, 2005 (MEMA -0010688) (Aug. 28, 2005), at 3.

19  *Dec. 7, 2005 Select Comm. Hearing*, at 2 (written statement of William L. Carwile).

20  *Id.*, at 6 (statement of Robert R. Latham, Jr.).

21  *Id*, at 64-65 (statement of Haley Barbour).

22  *Id.*, at 2 (written statement of Robert R. Latham, Jr.).

23  *MEMA Timeline*, at 2.

24  *Id.*, at 3.

25  Mississippi Emergency Management Agency, Director's Brief as of 0430 hours, Aug. 29, 2005 (MEMA -0010696) (Aug. 29, 2005), at 1.

26  Mississippi Emergency Management Agency, Director's Brief as of 1900 hours, Aug. 28, 2005 (MEMA -0010688) (Aug. 28, 2005), at 3.

27  Mississippi Emergency Management Agency, Director's Brief as of 0430 hours, Aug. 29, 2005 (MEMA -0010696) (Aug. 29, 2005), at 1.

28  Mississippi Emergency Management Agency, Director's Brief as of 0502 hours, Aug. 29, 2005 (MEMA -0010700) (Aug. 29, 2005), at 2.

29  *Id.*, at 2.

30  *Hearing on Hurricane Katrina: Preparedness and Response by the Department of Defense, the Coast Guard, and the National Guard of Louisiana, Mississippi, and Alabama before Select Comm.*, 109th Cong. (2005), at 22-23 (statement of Harold A. Cross), [hereinafter *Oct. 27, 2005 Select Comm. Hearing*]; *see also,* E-mail correspondence from LTC Rodney Neudecker, Mississippi Sr. Army Advisor Guard, to Lt. General Russel Honoré, Commander, Joint Task Force Katrina  (Aug. 27, 2005; 3:50 p.m.).

31  Interview by Select Comm. with Major General Harold A. Cross, Adjutant General (TAG), in Jackson, MS (Oct. 12, 2005) [hereinafter *Cross Interview*].

32  E-mail correspondence from Colonel Penn, Defense Co-ordination Office for Mississippi, to Lt. General Russel Honoré, Commander, Joint Task Force Katrina (Aug. 30, 2005; 7:47 a.m.); *see also* Mississippi National Guard Joint Force Headquarters, *Operation Secure Magnolia, Hurricane Katrina Aug. 26-Present; see also,* E-mail correspondence from LTC Rodney Neudecker, Mississippi Sr. Army Advisor Guard, to Lt. General Russel L. Honoré, Commander, Joint Task Force Katrina (Aug. 28, 2005; 11:26 a.m.); *see generally,* Mississippi Emergency Management Agency, Hurricane Situation Report #24 (Sept. 1, 2005; 00:35 a.m.).

33  *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Major General Harold A Cross).

34  *Id.*

35  *Id.*

36  *Id.*

37  *Id.*

38 *Id.*

39 *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Major General Harold A Cross); *see also,* E-mail correspondence from LTC Rodney Neudecker, Mississippi Sr. Army Advisor Guard, to Lt. General Russel L. Honoré, Commander, Joint Task Force Katrina (Aug. 28, 2005; 11:26 a.m.); *see also,* E-mail correspondence from LTC Rodney Neudecker, Mississippi Sr. Army Advisor Guard, to Lt. General Russel L. Honoré; *see also,* Commander, Joint Task Force Katrina (Aug. 28, 2005; 4:42 a.m.).

40 E-mail correspondence from LTC Rodney Neudecker, Mississippi Sr. Army Advisor Guard, to Lt. General Russel L. Honoré , Commander, Joint Task Force Katrina (Aug. 28, 2005; 11:26 a.m.); E-mail correspondence from Lt. Col. Rodney Neudecker, Mississippi Sr. Army Advisor Guard, to Lt. General Russell L. Honoré; *see also,* Commander, Joint Task Force Katrina (Aug. 28, 2005; 4:42 a.m.).

41 E-mail correspondence from Lt. Col. Rodney Neudecker, Mississippi Sr. Army Advisor Guard, to Lt. General Russel L. Honoré, Commander, Joint Task Force Katrina (Aug. 28, 2005; 11:26 a.m.); E-mail correspondence from LTC Rodney Neudecker, Mississippi Sr. Army Advisor Guard, to Lt. General Russel L. Honoré; *see also,* Commander, Joint Task Force Katrina (Aug. 28, 2005; 4:42 a.m.).

42 *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Major General Harold A Cross).

43 *Oct. 27, 2005 Select Comm. Hearing,* at 26 (statement of Major General Harold A. Cross).

44 *See generally,* Daily Video Teleconferences amongst officials dated Aug. 25 – Sept. 4, 2005 [hereinafter "Daily VTC"]. State and local officials from each of the impacted areas met daily with officials from, among other agencies, FEMA, and the National Hurricane Center.

45 Interview by Select Comm. Staff with Toby Roth, Chief of Staff to Governor Barbour, and Dave Stewart, Policy Advisor to Governor Barbour, in Montgomery, AL (Oct. 12, 2005) [hereinafter *Roth / Stewart Interview*].

46 FEMA, Chronology and Time Line, (DHS-FEMA-070-0001256).

47 *Hearing on Hurricane Katrina: Preparedness and Response by the State of Alabama Before Select Comm.,* 109th Cong. (2005), at 86 (statement Leigh Ann Ryals) [hereinafter Nov. 9, 2005 Select Comm. Hearing]; *see also, Nov. 9, 2005 Hearing,* at 93 (statement Walter Dickerson).

48 Letter from Bob Riley, Governor of Alabama, to George W. Bush, President of the United States (Aug. 28, 2005).

49 Letter from George W. Bush, President of the United States to Bob Riley, Governor of Alabama (Aug. 29, 2005).

50 Letter from Bob Riley, Governor of Alabama, to George W. Bush, President of the United States (Aug. 28, 2005).

51 *See,* Letter from George W. Bush, President of the United States to Bob Riley, Governor of Alabama (Aug. 29, 2005); *see,* Alabama; Major Disaster and Related Determinations, 70 Fed. Reg. 71,540-71,541 (Aug. 29, 2005, as amended Nov. 29, 2005).

52 Level I being the highest (a declared disaster) and Level IV being the lowest (daily operating level). The AL EOP is in the process of being revised. The State of Alabama, with a view to being NRP and NIMS compliant, has reversed its ordering of the activation levels, i.e., Level I is now Level IV. *See,* E-mail correspondence from Bill Filter, Alabama Emergency Management Agency, Operations Department, to Select Comm. Staff (Nov. 8, 2005).

53 Interview by Select Comm. Staff with Charles Williams, Division Chief of Preparedness and Tim Payne, Branch Chief Emergency Management Program Coordinate, in Clanton, AL (Oct. 11, 2005) [hereinafter *Williams / Payne Interview*].

54 *Williams / Payne Interview; see also, Roth / Stewart Interview.*

55 *Roth / Stewart Interview.*

56 *See,* ALA. CODE §§ 31-9-6 (4); 31-9-8 (4); 31-9-14 and 31-9-15 (2005).

57 *William / Payne Interview.*

58 *Id.*

59 EM2000 messages from Aug. 23 through Sept. 15 were provided to the Select Comm. *See generally,* EM/2000 Tracker System Message Database (Aug. 23 – Sept. 15, 2005).

60 Interview by Select Comm. Staff with Dr. Donald E. Williamson, MD, Alabama State Health Director, in Montgomery, AL (Oct. 12, 2005) [hereinafter *Williamson Interview*].

61 Meeting Summaries, FEMA Regional Emergency Liaison Team Conference Calls (Aug. 28, 2005 – Sept. 02, 2005).

62 Alabama Emergency Management Agency, EM/2000 Tracker System Message 05-1839, (Aug. 29, 2005) (Doc. No. 002771AL). The AEMA Situation Report (SitRep) #8 also contained the following: "The Department has a list of 15 facilities across the state that will house animals evacuated because of the hurricane. The list, along with contact information and type of animal is posted on the Department website as well as on the EM2000. Some of these facilities will house small animals such as dogs and cats; however, most only house horses. The total number of animals that can be accommodated is over 2,000. Late this morning it was reported that just under 100 horses were being sheltered." Alabama Emergency Management Agency / Emergency Operation Center, Situation Report #8 (Doc. No. 000235AL) (Sept. 1, 2005).

63 Alabama Emergency Management Agency / Emergency Operation Center, Situation Report #12 (Doc. No. 000312AL) (Sept. 5, 2005).

64 Letter from Kathleen Babineaux Blanco, Governor of LA, to George W. Bush, President of the United States (Aug. 27, 2005).

65 Louisiana: Emergency and Related Determinations, 70 Fed. Reg. 53,238 (Aug. 27, 2005, as amended Sept. 7, 2005).

66 Louisiana: Emergency and Related Determinations, 70 Fed. Reg. 53,238 (Aug. 27, 2005, as amended Sept. 7, 2005).

67 Letter from Kathleen Babineaux Blanco, Governor of LA, to George W. Bush, President of the United States (Aug. 28, 2005).

68 Louisiana; Major Disaster and Related Determinations, 70 Fed. Reg. 72, 458 (Aug. 29, 2005, as amended Dec. 5, 2005).

69 Interview by Select Comm. Staff with LTC William Doran, Chief, Operations Division, LA Office of Homeland Security and Emergency Preparedness (LOHSEP), in Baton Rouge, LA (Nov. 7, 2005) [hereinafter *Doran Interview*]; *see* Interview by Select Comm. Staff with Jim Ballou, Operations Division, LA Office of Homeland Security and Emergency Preparedness (LOHSEP), in Baton Rouge, LA (Nov. 7, 2005) [hereinafter *Ballou Interview*].

70 Interview by Select Comm. Staff with Rex McDonald, Information Technology and Communications Director, Department of Public Safety and Corrections, in Baton Rouge, LA (Nov. 7, 2005) [hereinafter *McDonald Interview*].

71 Audio recordings of Hurricane Katrina Conference Calls, LA State Emergency Operations Center (Aug 26-28, 2005).

72 *See* Ballou Interview; *see also,* Doran Interview.

73 Interview by Select Comm. Staff with General Joseph B. Veillon, Louisiana National Guard Commander for Task Force Minnow, in New Orleans, LA (Nov. 3, 2005) [hereinafter *Veillon Interview*].

74 Interview by Select Comm. Staff with Dr. Walter Maestri, Emergency Manager for Jefferson Parish, in New Orleans, LA (Nov. 8, 2005) [hereinafter *Maestri Interview*].

75  *Superdome Personnel, MREs, and Water from 28 Aug. – 3 Sept.*, Table: provided by staff from LA Governor Blanco's office (Dec. 2005).

76  *Hearing on Rebuilding Highway and Transit Infrastructure on the Gulf Coast following Hurricane Katrina: State and Local Officials Before the House Subcommittee on Highways, Transit and Pipelines*, 109th Cong. (Oct. 27, 2005), at 1 (statement by William J. DeVille) [hereinafter *Oct. 27, 2005 T&I Hearing*].

77  Audio recordings of Hurricane Katrina Conference Calls, LA State Emergency Operations Center (Aug. 26-28, 2005).

78  *Id.*

79  Audio recordings of Hurricane Katrina Conference Calls, LA State Emergency Operations Center (Aug. 26-29, 2005).

80  *Id.*

81  *Id.*

82  *Id.*

83  Interview by Select Comm. Staff with Andy Kopplin, Chief of Staff to Governor Blanco, in Baton Rouge, LA (Nov. 6, 2005) [hereinafter *Kopplin Interview*].

84  Audio recordings of Hurricane Katrina Conference Calls, LA State Emergency Operations Center (Aug. 26-28, 2005).

85  *Id.*

86  *Id.*

87  *Maestri Interview.*

88  Audio recordings of Hurricane Katrina Conference Calls, LA State Emergency Operations Center (Aug. 26-29, 2005).

89  *Id.*

90  *Id.*

91  *Id.*

92  Interview by Select Comm. Staff with Terry Ebbert, Director of Homeland Security for the City of New Orleans, in New Orleans, LA (Nov. 9, 2005) [hereinafter *Ebbert Interview*]; *see also, Maestri Interview.*

93  Audio recordings of Hurricane Katrina Conference Calls, Louisiana State Emergency Operations Center (Aug. 26-29, 2005).

94  Table: Superdome Personnel, MREs, and Water from 28 Aug. – 3 Sept., provided by staff from Louisiana Governor Blanco's office (Dec. 2005).

95  *Oct. 27, 2005 T&I Hearing* (statement of William DeVille).

96  *Id.*

97  *Id.*

98  *Maestri Interview.*

99  E-mail correspondence from Chairman, Joint Chiefs of Staff, to Department of Defense, et al (Aug. 19, 2005).  This subject of this e-mail was a "Severe Weather Execute Order (EXORD) for DOD Support to Federal Emergency Management Agency (FEMA)."

100  Department of Defense OASD HD, Hurricane Katrina/Rita/Ophelia Interim Timeline (Aug. – Sept. 2005) (Nov. 2, 2005), at 2 [hereinafter *DOD Timeline*]; *see also, Oct. 27, 2005 Select Comm. Hearing*, at 3 (written statement by Timothy J. Keating).

101  *DOD Timeline*, at 2.

102  *Id.*, at 2-3.

103  *DOD Timeline*, at 3; *see* Col. Kranepuhl – Chief Operations, US Army, 1A Commander's Hurricane Assessment (Aug. 29, 2005), First US Army (Doc No. MMTF 00346-05) (Aug. 29, 2005); *see also*, Col. Kranepuhl – Chief Operations, US Army, 1A Commander's Hurricane Assessment (Aug. 30, 2005), First US Army (Doc No. MMTF 00349-05) (Aug. 30, 2005).

104  *DOD Timeline*, at 4.

105  *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of LTG H. Steven Blum).

106  United States National Guard, Hurricane Katrina: National Guard After Action Review (Dec. 21, 2005), at 1.

107  Interview by Select Comm. Staff with General H Steven Blum, Chief, National Guard, in Arlington, VA, (Oct. 19, 2005) [hereinafter *Blum Interview*]; *see also*, Interview by Select Comm. Staff with LT General Daniel James, III, Director of Air National Guard, in Arlington, VA, (Oct. 19, 2005) [hereinafter *James Interview*; *see also*, Interview by Select Comm. Staff with LT General Clyde A. Vaughn, Director of Army National Guard, in Arlington, VA, (Oct. 19, 2005) [hereinafter *Vaughn Interview*].

108  United States National Guard, Hurricane Katrina: National Guard After Action Review (Dec. 21, 2005), at 1; *see also*, Blum Interview; *see also*, James Interview; *see also*, Vaughn Interview.

109  *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of General Landreneau; *see also*, Interview by Select Comm. Staff with Major General Cross, State Adjutant General of MS, in Jackson, MS (Oct. 12, 2005) [hereinafter *Cross Interview*].

110  United States National Guard, Hurricane Katrina: National Guard After Action Review (Dec. 21, 2005), at 10.

111  *See*, Interview by Select Comm. Staff with Scott Wells, Field Officer, FEMA [hereinafter *Wells Interview*], in Baton Rouge, LA (Nov. 9, 2005); *see also*, Interview by Select Comm. Staff with Stephen Dabadie, Chief of Staff to LA Adjutant General Landrenau, LA National Guard, in Baton Rouge, LA (Nov. 4, 2005) [hereinafter *Dabadie Interview*].

112  Louisiana Nat'l Guard, *Overview of Significant Events Hurricane Katrina*, at 4 (Dec. 7, 2005) [hereinafter *LANG Overview*].

113  *Id.*, at 5.

114  *See*, Dabadie Interview; *see also*, Interview by Select Comm.. Staff with Gordon Nelson, LA Dep't of Transportation and Development, in Baton Rouge, LA, Nov. 4, 2005 [hereinafter *Nelson Interview*].

115  Interview by Select Comm. Staff with Jiff Hingle, Plaquemines Parish Sherriff, in New Orleans, LA (Nov. 7, 2005).

116  *Nelson Interview.*

117  Interview by Select Comm. Staff with Mark Bowen, Adjutant General, AL National Guard, in Montgomery, AL, Oct. 12, 2005 [hereinafter *Bowen Interview*].

118  Alabama National Guard, AL National Guard Katrina Response Notebook, 4-1.

119  *Bowen Interview.*

120  *Id.*

121  Alabama National Guard, AL National Guard Katrina Response Notebook, 4-1.

122  *Bowen Interview.*

123 *Id.*

124 *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of General Harold A. Cross).

125 *Id.*

126 Briefing to Select Comm. Staff with US Army Corps of Engineers, in Washington, D.C. (Oct. 28, 2005), at 7 [hereinafter *ACE Briefing*]; *see also, Hearing on Hurricane Katrina: The Role of Federal Agency Contracting in Disaster Preparedness Before Select Comm.*, 109th Cong. (Nov. 2, 2005), at 1-2 (written statement of Col. Norbert Doyle) [hereinafter *Nov. 2, 2005 Select Comm. Hearing*].

127 Briefing to Select Comm. to Invest. the Preparation for and Response to Hurricane Katrina Staff with US Army Corps of Engineers, in Washington, DC (Oct. 28, 2005), at 7 [hereinafter *ACE Briefing*]; *see also, Hearing on Hurricane Katrina: The Role of Federal Agency Contracting in Disaster Preparedness Before Select Comm.*, 109th Cong. (Nov. 2, 2005), at 1-2 (written statement of Colonel Norbert Doyle) [hereinafter *Nov. 2, 2005 Select Comm. Hearing*].

128 *Hurricane Katrina: Who's In Charge of the New Orleans Levees? Before Senate Committee on Homeland Security and Governmental Affairs*, 109th Cong. (Dec. 15, 2005), at 4 (statement of USACE/Col Wagenaar) [hereinafter *Dec. 15, 2005 Senate Hearing*].

129 *Dec. 8, 2005 Senate Hearing*, at 4 (statement of USACE/Col Wagenaar).

130 United States Coast Guard, Coast Guard Atlantic Area situation report, 270024Z (Doc. No. DHS-USCG-0002-0000006) (Aug. 26, 2005; 8:24 p.m. EDT) . Note: the Atlantic Area is the Portsmouth, Virginia Command. Note: this report was created at 0024 Zulu Time. Zulu Time is the same as Greenwich Mean Time (GMT). During the summer months, the time in Portsmouth is GMT -4 hours.

131 United States Coast Guard, Coast Guard Atlantic Area situation report, 270024Z (Doc. No. DHS-USCG-0002-0000006) (Aug. 26, 2005; 8:24 p.m. EDT).

132 United States Coast Guard, Coast Guard District Eight situation report, 271638Z (Doc. No. DHS-USCG-0002-0000003) (Aug. 27, 11:38 AM CDT). Note: District Eight is the New Orleans, Louisiana Command, which was relocated to St. Louis, Missouri during Hurricane Katrina. Note: This report was created at 1638 Zulu Time. Zulu Time is the same as Greenwich Mean Time (GMT). During the summer months, the time in St. Louis is GMT -5 hours.

133 United States Coast Guard, Coast Guard District Eight situation report, 290413Z (Doc. No. DHS-USCG-0001-0004044) (Aug. 28, 11:13 p.m. CDT).

134 United States Coast Guard, Coast Guard Atlantic Area situation report, 290413Z (Doc. No. DHS-USCG-0001-0004044) (Aug. 29, 2005; 12:13 a.m. EDT).

135 United States Coast Guard, Coast Guard District Eight situation report, 290413Z (Doc. No. DHS-USCG-0001-0004044) (Aug. 28, 2005; 11:13 p.m. EDT).

136 United States Coast Guard, Coast Guard District Eight situation report, 290413Z (Doc. No. DHS-USCG-0001-0004044) (Aug. 28, 2005; 11:13 p.m. EDT).

137 United States Coast Guard, Coast Guard District Eight situation report, 281534Z (Doc. No. DHS-USCG-0002-0000008) (Aug. 28, 2005; 10:34 a.m. CDT).

138 *See generally, Hurricane Katrina: Always Ready': The Coast Guard's Response to Hurricane Katrina Before Senate Committee on Homeland Security and Governmental Affairs*, 109th Cong. (Nov. 9, 2005) (statement of Rear Admiral Robert Duncan) [hereinafter *Nov. 9, 2005 Senate Hearing*].

139 United States Coast Guard, Coast Guard Atlantic Area situation report, 290900Z (Doc. No. DHS-USCG-0001-0004053) (Aug. 29, 2005; 05:00 a.m. EDT).

140 United States Coast Guard, Coast Guard District Eight situation report, 281534Z (Doc. No. DHS-USCG-0002-0000008) (Aug. 28, 2005; 10:34 a.m. CDT).

141 United States Coast Guard, Coast Guard District Eight situation report, 291541Z (Doc. No. DHS-USCG-0001-0004058) (Aug. 29, 2005; 10:41 a.m. CDT).

142 Briefing to Select Comm. Staff with Coast Guard regarding Response and Recovery Operations and Authorities, in Washington, D.C. (Oct. 27, 2005).

143 E-mail correspondence from Carol Hall, American Red Cross, to Kirstjen M. Nielsen, et al, (Doc. No. WHK-16197) (Aug. 28, 2005; 2:48 p.m.).

144 American Red Cross, Disaster Operations Summary Report #7, Aug. 28, 2005; update as of 5:00 pm, at 2.

145 *Id.*, at 3.

146 American Red Cross, Disaster Operations Summary Report #9, Aug. 28, 2005; update as of 3:00 p.m. at 3.

147 American Red Cross, Disaster Operations Summary Report #9, Aug. 28, 2005; update as of 3:00 p.m. at 2.

148 National Hurricane Center, Nat'l Weather Serv., *Hurricane Katrina Discussion No. 14*, (Aug. 26, 2005) (5:00 p.m. EDT).

149 National Hurricane Center, Nat'l Weather Serv., *Hurricane Katrina Probabilities No. 15*, (Aug. 26, 2005) (11:00 p.m. EDT).

150 *Hearing on Hurricane Katrina: Predicting Hurricanes: What We Knew About Katrina and When Before Select Comm.*, 109th Cong. (Sept. 22, 2005), [Hereinafter *Sept. 22, 2005 Select Comm. Hearing*] (statement of Max Mayfield).

151 *Id.*, at 3 (written statement of Max Mayfield).

152 *Id.*, at 5 (statement of Max Mayfield).

153 *Id.*, at 51-52 (statement of Max Mayfield).

154 *Id.*, at 52 (statement of Max Mayfield)

155 *Id.*, at 51 (statement of Max Mayfield).

156 *Id.*, at 3 (written statement of Max Mayfield).

157 *Id.*, at 59-60 (statement of Max Mayfield)

158 *Id.*, at 3 (written statement of Max Mayfield).

159 *Id.*

160 Public Advisory, National Weather Center (New Orleans, LA), Urgent Weather Message: Devastating damage expected (Aug. 28, 2005; 10:11 a.m. CDT).

161 John Pain, *Federal Forecasters Got Hurricane Right*, ASSOC. PRESS, Sept. 16, 2005.

162 *Id.*

163 *Id.*

[164] *Id.*

[165] *Sept. 22, 2005 Select Comm. Hearing*, at 47 (statement of Max Mayfield).

[166] *Id.*, at 12 (written statement of Max Mayfield) (reporting that Katrina made landfall as a Category 4 storm with 140 mph winds.  The NHC's final report on Katrina, released Dec. 20, revised this information.  Regardless, "it was the costliest and one of the five deadliest hurricanes to ever strike the United States," the NHC report said); Richard D. Knabb, et al, National Hurricane Center, *Tropical Cyclone Report, Hurricane Katrina, 23-30 Aug. 2005*, at 1 (Dec. 20, 2005) [hereinafter *NHC Katrina Report*].

[167] *NHC Katrina Report*, at 3, 7-9.

[168] *Id.*, at 11.

[169] *Id.*

[170] EM 2000 Message no. 05-1878, (Bates no. AL002716); *Nov. 7, 2005 Select Comm. Hearing*, at 30 (statement of Governor Bob Riley).

[171] Garry Mitchell, *Katrina's painful blow to coast Alabama's top story in 2005*, ASSOC. PRESS, Dec. 24, 2005.

[172] *Id.*

[173] Alabama Emergency Management Agency / Emergency Operation Center, Situation Report #5 (Doc. No. 000205AL) (Aug. 30, 2005); *see also*, Kathleen Koch, *Katrina Drenches Mobile*, CNN, Aug. 30, 2005.

[174] Federal Emergency Management Agency, *Katrina Disaster Aid to Alabama Surpasses $516 Million*, (FEMA Release No. 1605-162) (Jan. 17, 2006) *available at*, http://www.fema.gov/news/newsrelease.fema?id=22538 [last visited Jan. 26, 2006].

[175] *NHC Katrina Report*, at 11.

[176] *Id.*, at 3, 7-9.  Wind speed estimates calculated using KTS to mph converter at http://www.disastercenter.com/convert.htm.

[177] Interview by Select Comm. Staff with Bobby Strahan, Director, River County EMA, in Washington, D.C. (Nov. 29, 2005) [hereinafter *Strahan Interview*].

[178] Interview with Robert Latham, Director, MS Emergency Management Agency, in Washington, D.C. (Jan, 2006) [hereinafter *Latham Interview*].

[179] Virginia W. Mason, Congressional Research Service, (CRS Publication RL33141) *Hurricane Katrina Social-Demographic Characteristics of Impacted Areas*, (Nov. 4, 2005), at 2.

[180] *See*, Mississippi Emergency Management Agency, Hurricane Situation Report #22 (Aug. 31, 2005; *see*, 12:00 p.m.); FEMA-MEMA, Joint Field Office Situation Report SITREP 30 / FEMA-1604-DR-MS (Sept. 25, 2005 07:00 a.m. – Sept., 26, 2005 06:59 a.m.

[181] *NHC Katrina Report*, at 11.

[182] *See* Press Release, State's agriculture exceeds $6 billion, MS State Univ., Office of Agricultural Communications, Dec 15. 2005, *available at* http://msucares.com/news/print/agnews/an05/051215all.html [last visited Jan. 26, 2006]; *see also*, Press Release, Timber industry salvages profits, MS State Univ., Office of Agricultural Communications, Dec 15. 2005, *available at* http://msucares.com/news/print/agnews/an05/051215forest.html [last visited Jan. 26, 2006]; *see also*, Press release, Katrina leaves damaged crops, fuel frustrations, MS State Univ., Office of Agricultural Communications, Dec 15. 2005, *available at* http://msucares.com/news/print/cropreport/crop05/050902.html [last visited Jan. 26, 2006]; *see also*, Press release. Katrina drops poultry's estimated farm value, MS State Univ., Office of Agricultural Communications, Dec 15. 2005, *available at* http://msucares.com/news/print/agnews/an05/051215poultry.html [last visited Jan. 26, 2006].

[183] *See* Press Release, State's agriculture exceeds $6 billion, MS State Univ., Office of Agricultural Communications, Dec 15. 2005, available at http://msucares.com/news/print/agnews/an05/051215all.html [last visited Jan. 26, 2006]; *see also*, Press Release, Timber industry salvages profits, MS State Univ., Office of Agricultural Communications, Dec 15. 2005, *available at* http://msucares.com/news/print/agnews/an05/051215forest.html [last visited Jan. 26, 2006]; *see also*, Press release, Katrina leaves damaged crops, fuel frustrations, MS State Univ., Office of Agricultural Communications, Dec 15. 2005, *available at* http://msucares.com/news/print/cropreport/crop05/050902.html [last visited Jan. 26, 2006]; *see also*, Press release. Katrina drops poultry's estimated farm value, MS State Univ., Office of Agricultural Communications, Dec 15. 2005, *available at* http://msucares.com/news/print/agnews/an05/051215poultry.html [last visited Jan. 26, 2006].

[184] Mississippi EMAC, Cost Tracker as of Oct. 10, 2005 (Oct. 11, 2005).

[185] *See*, Keith Bea, *The Emergency Management Assistance Compact (EMAC): An Overview* (Jan. 5, 2006) (CRS Publication RS21227), at 1-2.

[186] *See*, *Emergency Management Assistance Compact (EMAC)*, EMAC Request, MS: Katrina (unaudited draft), Nov. 3, 2005 [hereinafter *EMAC Requests*].

[187] *See*, EMAC Requests.

[188] *See* Federal Emergency Management Agency, Weekly Katrina Response Update for Mississippi, Jan. 6, 2006, (FEMA Release No. 1604-202) (Jan. 17, 2006), *available at* http://www.fema.gov/news/newsrelease.fema?id=22242 [last visited Jan. 26, 2006].

[189] Public Advisory, National Weather Center (New Orleans, LA), Urgent Weather Message: Devastating damage expected (Aug. 28, 2005; 10:11 a.m. CDT).

[190] *NHC Katrina Report*, at 10-11.

[191] Fox News, *Five Deaths Linked to Polluted Flood Water*, Sept. 7, 2005, *available at* http://www.foxnews.com/story/0,2933,168630,00.html [last visited Jan. 26, 2006].

[192] *See*, Hearing After the Hurricanes: Impact on the Fiscal Year 2007 Budget, Before House Budget Comm. 109th Cong. (Oct. 6, 2005) (statement by Douglas Holtz-Eakin).

[193] *Dec. 14, 2005 Select. Comm. Hearing*, at 44 (statement of Kathleen Babineaux Blanco).

[194] *See* FEMA, By the Numbers: Recovery update in Louisiana, (FEMA Release No. 1603-294) (Jan. 17, 2006),  *available at*, http://www.fema.gov/news/newsrelease.fema?id=22551 [last visited Jan. 26, 2006].

[195] *See* FEMA, By the Numbers: Recovery update in Louisiana, (FEMA Release No. 1603-294) (Jan. 17, 2006), *available at*, http://www.fema.gov/news/newsrelease.fema?id=22551 [last visited Jan. 26, 2006].



*"[Hurricane Exercise] Pam was so very prescient. And yet Katrina highlighted many, many weaknesses that either were not anticipated by Pam, or were lessons learned but not heeded.*

*"That's probably the most painful thing about Katrina, and the tragic loss of life: the foreseeability of it all."*

Chairman Tom Davis
Select Committee Hearing, December 14, 2005

# HURRICANE PAM

**The Hurricane Pam exercise reflected recognition by all levels of government of the dangers of a catastrophic hurricane striking New Orleans**

One of the key planning and preparedness steps many of the local, state, and federal officials involved in the response to Katrina in Louisiana took part in was the July 2004 exercise commonly known as "Hurricane Pam." FEMA funded and participated in this disaster simulation exercise in which a fictional, strong category three — with qualities of a category four — hurricane named Pam hit the New Orleans area. Emergency officials from 50 parish, state, federal, and volunteer organizations faced this scenario during the five-day exercise held at the Louisiana State Emergency Operations Center in Baton Rouge.[1]

The purpose of the exercise was to help officials develop joint response plans for a catastrophic hurricane in Louisiana. While many found the Pam exercise to be useful in executing a better response to Katrina, the exercise also highlighted lessons learned that were not implemented and did not anticipate certain weaknesses that Katrina exposed.

The Hurricane Pam scenario focused on 13 parishes in southeast Louisiana — Ascension, Assumption, Jefferson, Lafourche, Orleans, Plaquemines, St. Bernard, St. Charles, St. James, St. John, St. Tammany, Tangipahoa, and Terrebonne. Representatives from outside the primary parishes, including officials from Mississippi's Emergency Management Agency (EMA), participated because hurricane evacuation and sheltering involve communities throughout Louisiana and into Arkansas, Mississippi, and Texas.[2]

The Hurricane Pam exercise scenario was prescient. The virtual storm brought sustained winds of 120 mph, up to 20 inches of rain in parts of Southeast Louisiana, and storm surges that topped the levees and flooded the New Orleans area. The exercise assumed that:[3]

- 300,000 people would not evacuate in advance;
- 500,000 to 600,000 buildings would be destroyed;
- Phone and sewer services would be knocked out and chemical plants would be flooded;
- 97 percent of all communications would be down;
- About 175,000 people would be injured, 200,000 would become sick, and more than 60,000 would be killed;
- About 1,000 shelters would be needed for evacuees;
- Boats and helicopters would be needed for thousands of rescues because many residents would be stranded by floodwaters;
- A catastrophic flood would leave swaths of southeast Louisiana uninhabitable for more than a year.

The Pam simulation was designed and run by a private contractor, Baton Rouge-based Innovative Emergency Management Inc. (IEM). FEMA issued the Request for Proposal in 2004 asking for speedy execution of the catastrophic planning project. IEM was awarded the contract for more than a half million dollars in May 2004 and was told by FEMA it had 53 days to mount the exercise. As it can take up to eight months to write an emergency plan, 6 to 12 months to train on the plan, and about one year to issue the report, Pam was clearly a different type of plan in scope, execution, and timing. According to IEM President Madhu Beriwal, Hurricane Pam was a "planning exercise" designed to develop usable information in a much shorter timeframe.[4] FEMA and Louisiana officials accelerated the planning process because of the overwhelming consensus that a category five hurricane hitting New Orleans was one of the most likely and devastating disaster scenarios our nation faced, Beriwal explained.

This effort was part of FEMA's larger initiative for conducting catastrophic disaster planning, in which it chose 25 disaster scenarios based on priority of risk. A hurricane hitting New Orleans was picked as the first scenario to be studied. According to Beriwal, "We were still fairly early in the process" of developing a formal response plan for New Orleans when Katrina made landfall.[5]

In July of 2004, IEM held its first workshop. The initial eight day workshop had over 300 participants from federal, regional, and local agencies. The first three days were dedicated to establishing the specifics of the disaster

scenario and pre-landfall planning, the remaining five days to post-landfall logistics.

Officials were presented with a hurricane scenario designed by Louisiana State University (LSU) researchers. Ivor Van Heerden, an LSU professor who used computer modeling to help create a realistic hurricane, said, "It was a slow moving category three storm, something that could quite easily happen, and designed so that it totally flooded the city, so that the participants could try to understand the full impacts of a flooded New Orleans."[6] Indeed, experts involved in the Hurricane Pam exercise were struck by the similarity of the simulation to the actual destructive conditions wrought by Katrina. According to Beriwal, Pam's slow-moving category three "made it virtually equal in force and devastation to Katrina's category four based on its surge and wind capacity."[7] And, of course, Katrina itself was later recategorized as a strong category 3.[8]

During the Pam simulation, participants broke into groups and devised responses as the disaster scenario unfolded. The workshop focused on issues ranging from search and rescue and temporary sheltering to unwatering, debris removal, and medical care. Not all issues, however, were covered in the workshop. Beriwal said while issues related to security and communications were on the agenda, the development of a plan to coordinate the displacement of school children took precedence.[9] Beriwal also said the issue of pre-landfall evacuation was not addressed, although Exercise Pam did make the basic presumption that the state and locals were responsible for pre-landfall evacuations. Apparently FEMA directed IEM to emphasize post-landfall and recovery issues in the Pam exercise as pre-landfall evacuation had always been a focal point in prior emergency disaster planning sessions.[10]

The Southeast Louisiana Catastrophic Hurricane Plan was the product of these series of workshops. The Plan was "designed to be the first step toward producing a comprehensive hurricane response plan, jointly approved and implemented by federal, state, and city officials."[11] By January 2005, IEM sent a draft planning document to the state and localities based on the planning derived from the July workshop. The delivery of the draft was expedited to give the Southeast Louisiana emergency management planners time to prepare for the 2005 hurricane season. Indeed, IEM scurried to make the plan available at this early date so officials could use it and *translate* it into individual detailed operational plans.[12] Beriwal noted

the plan was not meant to provide operational detail but rather was designed to provide general guidance, a sort of "to do list" for state and localities.[13] Beriwal further characterized the exercise as a "work in progress." She described IEM's role as "facilitator and assessors of consequences."[14]

The plan itself outlines 15 subjects that emergency managers should address during and after a catastrophic storm hitting New Orleans. The report is detailed in certain respects. It includes diagrams for makeshift loading docks to distribute water, ice, and food to storm victims — color-coded to show where pallets, traffic cones, and trash bins would be placed. Yet in other places the report is less specific; it does not identify, for example, what hospitals or airports would be used.

Numerous action plans ranging from debris removal, to sheltering, to search and rescue were developed. For example, state transportation officials took the lessons learned from the Pam exercise and previous hurricanes and revised the state's contraflow plan.[15] The revisions included making adjustments to traffic lights, cessation of construction, and greater coordination with the private sector. State officials reported that Hurricane Pam greatly improved the state's contraflow evacuation plan.[16] In fact, federal, state, and local officials across the board agreed the contra flow plan was a success story of Katrina's emergency response. Over 1.2 million were evacuated in the 48 hours prior to landfall.[17]

As part of the Pam exercise, planners also identified lead and support agencies for search and rescue and established a command structure that would include four areas with up to 800 searchers. For example, "[t]he search and rescue group developed a transportation plan for getting stranded residents out of harm's way."[18] "The medical care group reviewed and enhanced existing plans."[19] "The medical action plan included patient movement details and identified probable locations, such as state university campuses, where individuals would receive care and then be transported to hospitals, special needs shelters or regular shelters as necessary."[20]

Workshops subsequent to the initial five-day Hurricane Pam exercise were held in November 2004 and August 2005. A second Hurricane Pam Exercise was planned for the summer of 2005, but did not take place, apparently due to lack of funding.[21] Agencies had anticipated expanding on aspects of response and recovery that were not explored in the 2004 exercise.[22]

# Finding: Implementation of lessons learned from Hurricane Pam was incomplete

While state and local officials turned some lessons from the Hurricane Pam exercise into improvements of their emergency plans, other important changes were not made. State health officials said the exercise had helped them better prepare for evacuation of hospital patients and special needs people.[23] Since Pam was a catastrophic hurricane with flooding of New Orleans, it required them to consider the issue of evacuating New Orleans hospitals and the Superdome's special needs shelter.[24] Subsequent to the exercise, medical officials held planning sessions focused on post-landfall care and evacuation. The contingency plan for the medical component was almost complete when Katrina made landfall.[25] Officials said although the plan was not yet finalized, it proved invaluable to the response effort.[26]

Further, in the aftermath of Katrina, varying opinions have surfaced as to the roles and responsibilities established during the Hurricane Pam exercise. Some state and parish officials said they saw Pam as a "contract" of what the various parties were going to do, and the federal government did not do the things it had committed to doing.[27] According to Dr. Walter Maestri, the Jefferson Parish Director of Emergency Management, he understood that FEMA may not provide help until 48-72 hours later—but then he expected help.[28] That is, once the state cleared the roads, he anticipated that FEMA trucks would arrive with large quantities of water, food, and ice. Although these were the parish's planning assumptions, he said FEMA did not get substantial relief to the parish until 11 days after landfall.[29] Dr. Maestri also said the Hurricane Pam documentation makes it clear what FEMA was supposed to do, but FEMA did not do those things.[30]

Beriwal said, however, the plan derived from the Pam exercise was intended as a "bridging document" designed to serve as a guide and roadmap to be used by emergency operational officials at the state and local level. In other words, it was up to state and local officials to take the Plan and turn it into more detailed individual operational plans.[31]

Yet, according to Scott Wells, Deputy Federal Coordinating Officer from FEMA, there were several Hurricane Pam Exercise "to do" items state or local governments did not complete.[32] For example, the state was supposed to develop more detailed concepts and plans in several areas: (1) search and rescue, (2) rapid assessment teams, (3) medical evacuation, (4) sheltering and temporary housing, (5) commodity distribution, and (6) debris removal.[33] The state's previous Louisiana Office of Homeland Security and Emergency Preparedness Deputy Director had laid these six areas out as priorities for the state to work on.[34] In Wells's view, the only one of these where the state made some progress was medical evacuation.[35]

Wells also said, however, that the need to shelter special needs people in the Superdome showed the state and city had not taken steps (which they had agreed to do after the Pam Exercise) to coordinate the movement and sheltering of these people further north, away from the Gulf.[36] As a result of the exercise and subsequent planning workshops, the state was supposed to develop "hasty plans" to address all these areas.[37] He said although he had tried to get state officials to focus on these hasty plans just before landfall, they would not do so.[38] According to Wells, the state had also agreed to learn and exercise a unified command through the incident command system.[39] Wells said the state did not do so, which led to major command and control problems during Katrina.[40]

# Conclusion

Hurricane Katrina highlighted many weaknesses that either were not anticipated by the Pam exercise or perhaps were lessons learned but simply not implemented. For example, Hurricane Pam has been criticized for its emphasis on managing the aftermath of the catastrophe and not creating initiatives that would diminish the magnitude of the catastrophe. Indeed, much of the recrimination over the Hurricane Katrina response came because government authorities apparently failed to have a plan in place to assist in evacuating individuals without transportation. Nor did they appear to have an adequate sheltering plan in place. With Hurricane Pam's striking resemblance to Katrina in force and devastation, many have been left wondering at the failure to anticipate, and plan for, these essentials. Is a plan that leaves 300,000 in a flooded city and results in 60,000 deaths acceptable? ■

[1]  Press Release, Fed. Emer. Mgmt. Agency (FEMA), *Hurricane Pam Exercise Concludes* (July 23, 2004), *available at* http://www.fema.gov/news/ newsrelease.fema?id=13051 (last visited Jan. 12, 2006) [hereinafter July 23, 2004 FEMA Press Release].

[2]  *Id.*

[3]  Ron Fournier and Ted Bridis, *Katrina What Planners Feared; Hurricane Simulation Predicted 61,290 Dead*, AP, Sept. 10, 2005 [hereinafter Sept. 10, 2005 Fournier Article]; David R. Baker, *Hard Times in Big Easy Efforts Intensify to Evaluate Living, Recover Dead*, SF CHRONICLE, Sept. 9, 2005.

[4]  Interview by Select Comm. staff with Madhu Beriwal, IEM, Inc., in Wash., DC (Jan. 6, 2006) [hereinafter Beriwal Interview].

[5]  John McQuaid, *'Hurricane Pam' Exercise Offered glimpse of Katrina Misery*, TIMES-PICAYUNE (New Orleans), Sept. 9, 2005.

[6]  *Id.*

[7]  Beriwal Interview.

[8]  Associated Press, *Hurricane Katrina Was Weaker Than First Thought At Landfall*, USA TODAY, Dec. 20, 2005, *available at* http://www.usatoday. com/weather/hurricane/2005-12-20-katrina-strength_x.htm.

[9]  Beriwal Interview.

[10]  *Id.*

[11]  Sept. 10, 2005 Fournier Article.

[12]  Beriwal Interview.

[13]  *Id.*

[14]  *Id.*

[15]  Interview by Select Comm. staff with Gordon Nelson, LA Dep't of Trans., in Baton Rouge, LA (Nov. 4, 2005).

[16]  *Id.*

[17]  *Hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana Before Select Comm.*, 109th Cong. (Dec. 14, 2005), at 77 (statement of Kathleen Babineaux Blanco, Governor of LA).

[18]  July 23, 2004 FEMA Press Release.

[19]  *Id.*

[20]  *Id.*

[21]  Beriwal Interview.

[22]  Interview by Select Comm. Staff with Jeff Smith, State Coordinating Officer, LA. Office of Homeland Sec. and Emerg. Preparedness, in Baton Rouge, LA (Nov 7, 2005).

[23]  Interview by Select Comm. Staff with Jimmy Guidry, Med. Dir., LA Dept. Health and Hospitals, in Baton Rouge, LA (Nov. 7, 2005).

[24]  *Id.*

[25]  *Id.*

[26]  *Id.*

[27]  Interview by Select Comm. Staff with Walter Maestri, Dir. of Emer. Mgmt., Jefferson Parish, in New Orleans, LA (Nov. 8, 2005).

[28]  *Id.*

[29]  *Id.*

[30]  *Id.*

[31]  Beriwal Interview.

[32]  Interview with  Select Comm. Staff, Scott Wells, Dep. Fed. Coordinating Officer, in Baton Rouge, LA (Nov. 9, 2005).

[33]  *Id.*

[34]  *Id.*

[35]  *Id.*

[36]  *Id.*

[37]  *Id.*

[38]  *Id.*

[39]  *Id.*

[40]  *Id.*



*"What happened to us this year, however, can only be described as a catastrophe of Biblical proportions. We in Louisiana know hurricanes and hurricanes know us. We would not be here today if the levees had not failed."*

Kathleen Babineaux Blanco
Governor, State of Louisiana
Select Committee Hearing, December 14, 2005

# LEVEES

## Summary

The levees protecting New Orleans were not built to survive the most severe hurricanes. It was a well-known and repeatedly documented fact that a severe hurricane could lead to overtopping or breaching of the levees and flooding of the metropolitan area. In fact, for years the U.S. Army Corps of Engineers (USACE) has had a written plan for unwatering (i.e., draining) New Orleans in such a contingency. This well-known threat was the motivation for FEMA to sponsor the "Hurricane Pam" exercise. The potential for Katrina to be "the Big One" and breach the levees was also the key reason for the National Weather Service, Governor of Louisiana, and Mayor of New Orleans to issue such dire warnings.

Once construction of the levees was completed by USACE, the responsibilities for operating and maintaining the levees were split among many local organizations, which is the standard cooperation agreement for carrying out flood control projects nationwide. The costs of constructing these projects are shared, with operation and maintenance being a 100 percent local responsibility. These include levee boards in each parish, as well as separate water and sewer boards. The number of organizations involved, and disagreements among them, makes accountability diffuse and creates potential gaps and weaknesses in parts of the flood protection system. In one case, improvements to levee strength which may have mitigated or prevented some of the critical breaches that flooded downtown New Orleans were rejected by the competing local organizations. There also appear to have been lapses in both maintenance and inspections of selected levees, including those that breached. Also, prior to Hurricane Katrina, residents along those same levees reported they were leaking, another potential lapse in maintenance.

Despite the well-known importance of the levees, and the consequences of failure, the local levee boards responsible for maintaining and operating the levees did not have any warning system in place. While federal regulations require that they monitor levees during periods of potential flooding, the requirement is impractical to implement during a hurricane. In addition to no warning system, the loss of communications and

situational awareness, and only sporadic reports of flooding from a variety of sources, made it difficult to confirm that there were breaches in the levees and then to assess the damage. These factors, as well as physical difficulties of getting to the breach sites, combined to delay repair of the levee breaches.

The ultimate causes of the levee breaches, and subsequent flooding of New Orleans, are yet to be determined. At least four forensic investigations are under way to examine scientific evidence and determine the reasons for levee breaches. These include investigations by USACE's Engineer Research and Development Center, the National Science Foundation (NSF), the American Society of Civil Engineers (ASCE), and Louisiana State University (LSU). Possible causes include (1) the design was not appropriate for the purpose, (2) the storm exceeded levee design standards, (3) the levees were not actually built to the original design standards, (4) the levees were not properly maintained, or (5) a combination of these and other factors.

## Finding: Levees protecting New Orleans were not built for the most severe hurricanes

### New Orleans is protected from flooding by a system of levees

As noted in the BACKGROUND chapter, hurricanes threaten the Gulf coast every year, and New Orleans is particularly vulnerable because of its location and topography.[1] The majority of the metropolitan area is below sea level. Over the years, the city has continued to sink, due to drainage, subsidence, and compaction of the soils.[2] As an example of previous damage, Hurricane Betsy brought extensive destruction to New Orleans when it made landfall in Louisiana in September, 1965.[3] Unfortunately, many of the descriptions and



NWS

photos from Hurricane Betsy sound and look familiar to our nation as it considers the damage from Hurricane Katrina, forty years later. According to USACE's after action report on Hurricane Betsy…

- She left in her wake a path of devastation unparalleled by any other storm in the recorded history of Louisiana.[4]
- Betsy inundated over 5,000 square miles in Louisiana, including highly populated urban areas in Orleans and St. Bernard Parishes.[5]
- Extensive flooding was caused by overtopping and breaching of existing protection levees in Orleans, Plaquemines, and St. Bernard Parishes.[6]

- As Betsy's winds and tidal surge rolled inland, entire buildings were swept away from their foundations and floated as far as 10 miles away.[7]
- Betsy left 81 dead, over 17,600 injured, and caused the evacuation of 250,000 to storm shelters.[8]
- Betsy left thousands homeless in south Louisiana. Returning refugees often found only a pile of debris where their homes had stood just days before.[9]
- Betsy left numerous towns in south Louisiana with no means of communication.[10]

After Hurricane Betsy in 1965, federal and state governments proposed a number of flood control projects to deal with the threat of hurricanes and the flooding they



might cause in New Orleans.[11] These included a series of control structures, concrete floodwalls, and levees along Lake Ponchartrain and several other waterways.[12] One of the major projects is formally called the Lake Ponchartrain and Vicinity, Louisiana Hurricane Protection Project.[13] This project included levees along the Lake Ponchartrain lakefront, the 17th Street Canal, the London Avenue Canal, the Orleans Avenue Canal, the Intercoastal waterway, the Industrial Canal,[14] the Mississippi River Gulf Outlet, and other areas.[15] Although the project was federally authorized, it was a joint federal, state, and local effort with shared costs.[16]

## Levees were designed for a "standard" hurricane, not the most severe hurricanes

The levees protecting New Orleans were not designed to withstand the most severe hurricanes. According to USACE's plans for unwatering New Orleans, "the hurricane protection system is not designed for the largest storms and as a result, the metropolitan area is vulnerable to flooding from hurricane storm surges."[17] USACE originally designed the levees around New Orleans to protect against a hurricane intensity that might occur once every 200-300 years.[18] This protection level was used by USACE, in consultation with the U.S. Weather Bureau,[19] to develop specific criteria for a "standard project hurricane."[20] The "standard project hurricane" is a statistical compilation of many combined hurricane parameters or characteristics intended to simulate a natural hurricane occurrence in southeast Louisiana. The standard project hurricane was used not only for the Lake Ponchartrain project, but also nationwide for all hurricane protection projects where the loss of human life is possible.[21] According to USACE, the "standard project hurricane" was used to design the New Orleans levees and is roughly equivalent to a fast moving, or "moderate," category 3 hurricane.[22] However, there is no direct comparison of the "standard project hurricane" to a specific category on the Saffir-Simpson Hurricane Scale—which did not exist when the levees were designed.[23] As shown in the table below, the "standard project hurricane" is equivalent to a hurricane with category 2 winds, category 3 storm surge, and category 4 barometric pressure.[24]

**Table 1:**
**Comparison of "Standard Project Hurricane" with Saffir Simpson Scale**

| | "Standard project hurricane" | Saffir-Simpson category 2 hurricane | Saffir-Simpson category 3 hurricane | Saffir-Simpson category 4 hurricane |
|---|---|---|---|---|
| Central pressure (1) | 27.6 Hg | 28.50-28.91 Hg | 27.91-28.47 Hg | 27.17-27.88 Hg |
| Wind speed (2) | 100 mph | 96-110 mph | 111-130 mph | 131-155 mph |
| Radius of maximum winds (3) | 30 miles | N/A | N/A | N/A |
| Average forward speed (3) | 6 knots | N/A | N/A | N/A |
| Storm surge | 11.2-13 feet (4) | 6-8 feet | 9-12 feet | 13-18 feet |

Source: GAO analysis of USACE and NOAA data.[25]

Table Notes: The shaded areas indicate those parameters with the closest match between the standard project hurricane and the Saffir-Simpson Scale.

(1) Central pressure is measured in inches of mercury (Hg) or millibars.

(2) Wind speed for the standard project hurricane was measured as the maximum 5-minute average wind speed. The Saffir-Simpson Scale uses the maximum 1-minute average wind speed, a lower threshold.

(3) USACE estimated the radius of maximum winds and the average forward speed for a standard project hurricane, and the Saffir-Simpson Scale does not take either of these parameters into account.

(4) The standard project hurricane calculated maximum surge heights for different geographic areas within the Lake Ponchartrain area. The maximum surge height for the South Shore of Lake Ponchartrain—where the 17th Street, London Avenue, and Industrial Canals are located—was estimated at 11.2 feet.

In addition, there is no "standard" hurricane — the actual forces that levees need to withstand are a function of several factors. According to the preliminary NSF study, "the actual wind, wave and storm surge loadings imposed at any location within the overall flood protection system are a function of location relative to the storm, wind speed and direction, orientation of levees, local bodies of water, channel configurations, offshore contours, vegetative cover, etc. They also vary over time, as the storm moves through the region."[26] Similarly, USACE documents indicate that "[o]vertopping will depend upon the intensity of the storm, the track that the center or "eye" of the storm follows and the speed at which it travels along the track."[27]

Although the Lake Ponchartrain project is named a hurricane "protection" project, a number of factors other than saving lives and property are included in the design of such projects. For example, in addition to protecting urban and community lives and health, the design of such projects must include environmental and economic effects, and ensure that benefits of the completed project outweigh its cost of construction.[28] In discussing the design of the Lake Ponchartrain project in a 1978 hearing, USACE District Commander for New Orleans, Colonel

Early Rush, stated "Even though economists may, and in this case did, favor protection to a lower scale to produce a higher ratio of benefits to projected costs, the threat of loss of human life mandated using the standard project hurricane."[29]

## Potential for Katrina to breach levees was well-known, leading to urgent warnings

Even with its hurricane protection system, it was common knowledge that New Orleans was susceptible to hurricane-caused flooding.[30] The risks of a major hurricane and flooding in New Orleans had been covered in the general media — by Scientific American (October 2001) and National Geographic (October 2004) — as well as in emergency management literature.[31] A recent article in the Natural Hazards Observer stated:

> When Hurricane Katrina came ashore on August 29, she ended decades of anticipation. There were few hazards in the United States more studied by scientists and engineers and there was ample warning that a strong storm could cause the City of New Orleans to flood.[32]

Emergency planners in the local area were particularly knowledgeable about this potentiality. A November 2004 article in Natural Hazards Observer — written by Shirley Laska, of the Center for Hazards Assessment, Response and Technology, at the University of New Orleans — laid out the hypothetical case that Hurricane Ivan had hit New Orleans. The article cites a fictional situation that is now all too real to the nation.[33]

> New Orleans was spared, this time, but had it not been, Hurricane Ivan would have… caused the levees between the lake and the city to overtop and fill the city "bowl" with water from lake levee to river levee, in some places as deep as 20 feet… Recent evacuation surveys show that two thirds of non-evacuees with the means to evacuate chose not to leave because they felt safe in their homes. Other non-evacuees with means relied on cultural traditions of not leaving or were discouraged by negative experiences with past evacuations. Should this disaster become a reality, it would undoubtedly be one of the greatest disasters, if not *the* greatest,

to hit the United States, with estimated costs exceeding 100 billion dollars. Survivors would have to endure conditions never before experienced in a North American disaster. Hurricane Ivan had the potential to make the unthinkable a reality. Next time New Orleans may not be so fortunate.[34]

Because of the well-known potential for flooding, USACE has had a plan for several years for draining New Orleans — *Unwatering Plan, Greater Metropolitan Area, New Orleans, Louisiana*, dated August 18, 2000. This plan provides details on the hurricane protection system and describes methods to get the water out after catastrophic flooding from a hurricane. The premise of the plan is that a category 4 or 5 hurricane may produce storm surge water levels of sufficient height to overtop the existing protection system.[35] The plan lays out a series of scenarios that could occur, and suggests appropriate emergency responses to unwater the area.[36] For example, in one case…

> There is catastrophic flooding due to complete overtopping of the levees and floodwalls and inundation of the protected area. There will be extensive and severe erosion of levees and perhaps complete breaches. Due to the high water levels, all of the pumping stations will probably be flooded with major damages . . . . The levee districts and drainage departments may be dysfunctional to some degree.[37]

In more recent years, well before Hurricane Katrina, questions were raised about the ability of the Lake Ponchartrain project to withstand more powerful hurricanes than the "standard project hurricane," such as a category 4 or 5 hurricane. USACE had discussed undertaking a study of modifications needed to increase the strength of the existing levees, but no formal study was undertaken.[38]

As discussed earlier in the HURRICANE PAM chapter, FEMA sponsored the "Hurricane Pam" exercise to look at the response to and recovery from a catastrophic hurricane hitting New Orleans and flooding the city. In that scenario, "It was a slow moving Category three storm, something that could quite easily happen, and [the exercise scenario was] designed so that it totally flooded the city, so that the

participants could try to understand the full impacts of a flooded New Orleans" according to Ivor Van Heerden, the LSU professor who used computer modeling to help create a realistic hurricane for the exercise.[39] Again, the key reason for that exercise was the well-known potential for levee failure and catastrophic flooding in the metropolitan area.

As Katrina turned and began its track toward New Orleans, the potential for the levees overtopping or breaching and flooding New Orleans resulted in a number of dire warnings from federal, state, and local officials. As also discussed in the EVACUATION chapter, the National Weather Service issued a warning on Sunday, August 28, stating that Katrina was "a most powerful hurricane with unprecedented strength," that "devastating damage" was expected, that "most of the area will be uninhabitable for weeks," and that there will be "human suffering incredible by modern standards."[40] Governor Blanco also made dire predictions, stating in several interviews on Saturday and Sunday that flooding in New Orleans was a major concern. On Saturday at approximately 8:00 p.m., she appeared on CNN and said that in New Orleans "[t]he storm surge could bring in 15 to 20 feet of water. [People in the city of New Orleans] will not survive that if indeed that happens."[41] Similarly, in a news conference on Sunday morning, Mayor Nagin said, "The storm surge most likely will topple our levee system."[42]

# Finding: Responsibilities for levee operations and maintenance were diffuse

## USACE oversees design and construction then turns levees over to local sponsors

Several organizations are responsible for building, operating, and maintaining the levees surrounding metropolitan New Orleans. USACE generally contracts to design and build the levees.[43] After construction, USACE turns the levees over to a local sponsor.[44] USACE regulations state that once a local sponsor has accepted a project, USACE may no longer expend federal funds on construction or improvements. This prohibition does not include repair after a flood. Federally authorized flood control projects, such as the Lake Ponchartrain project, are eligible for 100 percent federal rehabilitation if damaged

by a flood.[45] The Mississippi River levees are the exception to the arrangement just described. USACE operates and maintains these levees. These levees generally withstood Hurricane Katrina, except for a breach south of New Orleans in Plaquemines Parish—the parish that took the full force of Hurricane Katrina at landfall.[46]

The local sponsor has a number of responsibilities. In accepting responsibilities for operations, maintenance, repair, and rehabilitation, the local sponsor signs a contract (called a Cooperation Agreement) agreeing to meet specific standards of performance.[47] This agreement makes the local sponsor responsible for liability for that levee.[48] For most of the levees surrounding New Orleans, the Louisiana Department of Transportation and Development was the state entity that originally sponsored the construction. After construction, the state turned over control to local sponsors.[49] These local sponsors accepted completed units of the project from 1977 to 1987, depending on when the specific units were completed.[50] The local sponsors are responsible for operation, maintenance, repair, and rehabilitation of the levees when the construction of the project, or a project unit, is complete.[51]

## Local sponsors do not have control over all factors that could affect their parts of the levee system

The local sponsors include a variety of separate local organizations. For example, different parts of the Lake Ponchartrain and Vicinity, Louisiana Hurricane Protection Project, were turned over to four different local sponsors — to include the Orleans, East Jefferson, Lake Borgne, and Ponchartrain levee districts.[52] In addition, there are separate water and sewer districts that are responsible for maintaining pumping stations.[53] The USACE unwatering plan notes these arrangements by stating that, among other factors, "the political boundaries with internal local levees have resulted in this series of loops or bowls of low lying ground encircled by levees and floodwalls. Each of these areas is served by its own drainage collection and pumping stations."[54]

The different local organizations involved had the effect of diffusing responsibility and creating potential weaknesses. For example, levee breaches and distress were repeatedly noted at transition sections, where different organizations were responsible for different pieces and

thus two different levee or wall systems joined together. According to USACE, "[a]t sections where infrastructure elements were designed and maintained by multiple authorities, and their multiple protection elements came together, the weakest (or lowest) segment or element controlled the overall performance."[55] Similarly, a scientist working on the NFS study, Raymond Seed, stated there needs to be better coordination of these transition sites.[56] Peter Nicholson, head of an ASCE team investigating the levees, said in response to a question of whether transition sections mattered:

> Well, certainly we find that each individual organization will do as they see fit, and when the two sections of the flood control system operated or owned, designed, maintained by each of those different organizations come together, they may be in two different manners. They may have two different heights. They may be two different materials.[57]

The different organizations also have different agendas, and sometimes these can thwart efforts to improve the safety of the overall system. Seed also provided an example where USACE had suggested improvements to the strength of the system that were rejected by the competing organizations. According to Seed:

> No one is in charge. You have got multiple agencies, multiple organizations, some of whom aren't on speaking terms with each other, sharing responsibilities for public safety. The Corps of Engineers had asked to put flood gates into the three canals, which nominally might have mitigated and prevented the three main breaches that did so much destruction downtown. But they weren't able to do that because, unique to New Orleans, the Reclamation Districts who are responsible for maintaining the levees are separate from the Water and Sewage District, which does the pumping. Ordinarily, the Reclamation District does the dewatering pumping, which is separate from the water system. These guys don't get along.[58]

## While required inspections of levees were done, some deficiencies in maintenance were not fully addressed

Both USACE and the local sponsors have ongoing responsibility to inspect the levees. Annual inspections are done both independently by USACE and jointly with the local sponsor.[59] In addition, federal regulations require local sponsors to ensure that flood control structures are operating as intended and to continuously patrol the structure to ensure no conditions exist that might endanger it.[60]

Records reflect that both USACE and the local sponsors kept up with their responsibilities to inspect the levees. According to USACE, in June 2005, it conducted an inspection of the levee system jointly with the state and local sponsors.[61] In addition, GAO reviewed USACE's inspection reports from 2001 to 2004 for all completed project units of the Lake Ponchartrain project. These reports indicated the levees were inspected each year and had received "acceptable" ratings.[62]

However, both the NSF-funded investigators and USACE officials cited instances where brush and even trees were growing along the 17th Street and London Avenue canals levees, which is not allowed under the established standards for levee protection.[63] Thus, although the records reflect that inspections were conducted and the levees received acceptable ratings, the records appear to be incomplete or inaccurate. In other words, they failed to reflect the tree growth, and of course, neither USACE nor the local sponsor had taken corrective actions to remove the trees.

In addition, there was apparently seepage from one canal before Hurricane Katrina, indicating problems had developed in the levee after construction. Specifically, residents of New Orleans who live along the 17th Street Canal said water was leaking from the canal and seeping into their yards months before Hurricane Katrina caused the levee system to collapse. The leaks, they said, occurred within several hundred feet of the levee that later failed.[64] National Public Radio, which reported the story, said:

> State and federal investigators say that a leak may have been an early warning sign that the soil beneath the levee was unstable and help explain why it collapsed. They also say if authorities had investigated and found that a leak was

undermining the levee, they could have shored it up and prevented the catastrophic breach.[65]

National Public Radio also reported that work orders confirm that the Sewerage and Water Board had visited the location of the seepage a number of times. However, both USACE and the Orleans Levee District, with shared responsibilities for inspecting the levees, reported that they had not received any reports of seepage at the site.[66]

# Finding: The lack of a warning system for breaches and other factors delayed repairs to levees

## Actual levee breaches caused catastrophic flooding in New Orleans

Katrina made landfall as an "extraordinarily powerful" hurricane.[67] Katrina was expected to be a category 4 or 5 storm, although a recent updated analysis from the National Weather Service concluded it made landfall at the upper end of a category 3 hurricane (with estimated maximum sustained winds of 110 knots) near Buras, Louisiana.[68] While Katrina had weakened from its peak intensity of category 5, it remained a very large hurricane — the extent of tropical-force and hurricane-force winds were as large as predicted when Katrina was at maximum intensity.[69] Due to Katrina's large size, it is possible that sustained winds of category 4 strength briefly affected the extreme southeastern tip of Louisiana.[70] However, the sustained winds over all of metropolitan New Orleans and Lake Ponchartrain likely remained weaker than category 3 strength.[71]

The storm surge, not the winds, is the most destructive part of a hurricane,[72] and Katrina produced a massive storm surge. A precise measurement of Katrina's storm surge in the New Orleans area is difficult to measure, in part because of the widespread failures of tide gauges. However, various efforts are under way to make a definitive determination, particularly near the levees.[73] While the surge varied by location, some preliminary estimates are that the storm surge off Lake Borgne, which abuts New Orleans, was approximately 18-25 feet.[74]

One of the highest credible reports of storm surge came from the Hancock County, Mississippi, emergency operations center, where the storm surge was 27 feet.[75] One reason for the large size of the storm surge was that Katrina, although making landfall as a strong category 3, had already generated large northward propagating swells when it was a category 4 and 5 hurricane during the 24 hours before landfall.[76] One of the instrument buoys



located south of Dauphin Island, Alabama, measured a wave height of 55 feet — which matches the largest significant wave height ever measured by such a buoy.[77]

Because the eye of Katrina passed just slightly to the east of New Orleans, the hurricane threw unusually severe wind loads and storm surges on the flood protection systems.[78] The surge overtopped large sections of the levees during the morning of August 29 east of New Orleans, in Orleans and St. Bernard Parish, and it also pushed water up the Intercoastal waterway and into the Industrial Canal. The water rise in Lake Ponchartrain strained the floodwalls along the canals adjacent to its southern shore, including the 17th Street Canal and the London Avenue Canal.[79] Breaches along all of these canals led to flooding of 80 percent of New Orleans to depths up to 20 feet.[80] The flooding of central New Orleans led to the most widespread and costly damage of the hurricane. It also led to the difficulties encountered by emergency responders that are documented elsewhere in this report.

### The lack of warning systems and degraded communications prevented situational awareness of the breaches in the levees, and delayed repairs

Despite the well-known importance of the levees, and the consequences of failure, the local levee boards responsible for maintaining and operating the levees do not have any warning system in place.[81] Federal regulations require local sponsors to ensure that flood control structures are operating as intended and to continuously patrol the structure *during flood periods* to ensure that no conditions exist that might endanger it.[82] However, it would be impractical to monitor the levees during a hurricane. The Executive Director of the Orleans Levee District, Max Hearn, stated:

> As the hurricane approached, and as water levels began to rise, District employees monitored the water levels and patrolled the flood control system. As weather conditions deteriorated and became unsafe, the District's employees were pulled into sheltered areas to ride out the storm.[83]

Again, with the large number of local organizations involved, it was not always clear who would be responsible for monitoring the levees and sounding the alarm if there was a breach. According to one scientist,

"If the lines of responsibility and who is in charge aren't clear, it is very hard to decide who needs to be issuing warnings and public notices…."[84]

Given that Hurricane Katrina led to the loss of power and severely degraded communications, as discussed in the COMMUNICATIONS and COMMAND AND CONTROL chapters, it is not clear that any warning system would have survived or have been effective. In the absence of communications that would have provided situational awareness, there were many rumors of flooding and its causes that had to be confirmed before assessment teams and repair teams could be dispatched. There were many sources of these reports of flooding.

■ Monday August 29, at 6:00 a.m., floodwaters began flowing into Jackson Barracks, according to Louisiana National Guard officers. Jackson Barracks is near the Orleans Parish – St. Bernard Parish line, and the floodwaters were determined later to be from the Industrial Canal breach. By late Monday morning, the floodwaters were 8-10 feet deep at Jackson Barracks, requiring the Louisiana National Guard to abandon their operations center and re-establish it at the Superdome.[85]

■ Monday, August 29, at 7:30 a.m., the state Emergency Operations center (EOC) received reports of flooding in the last conference call before communications were lost. Jefferson Parish relayed unconfirmed reports of significant flooding in the east bank. New Orleans reported extensive flooding in the east and on the lake front. St. Bernard Parish reported "overtopping" of the Industrial Canal and 3 feet of water in Arabi. When the State Coordinating Officer (SCO) Jeff Smith asked if those flooding rumors were confirmed, the parish deputy sheriff said they were confirmed and noted that his building was surrounded by white caps. Smith also stated he was aware of 3-4 feet of floodwaters at Jackson Barracks.[86]

■ Monday, August 29, morning (exact time unknown), USACE district commander first heard sporadic reports about levee overtopping and breaches.[87] The sources of these early reports included local radio stations and a USACE employee reporting overtopping at the Industrial Canal.[88] Later that day, the USACE district commander issued a situation report, noting flooding



with 4-5 feet of water in Kenner (Jefferson Parish); flooding with 10 feet of water in Arabi (St. Bernard Parish); and water coming into Lakeview (New Orleans) from the 17th Street Canal. The report also said that there was a one-block section of the Industrial Canal that had breached.[89]

▪ Monday, very late evening (exact time unknown), off duty police officers began calling their police stations from their residences to report flooding near the 17th Street and London Avenue Canals, according to the New Orleans Police Department. Deputy Chief Lonnie Swain said that these reports were the department's first knowledge that flooding was moving into central New Orleans — they had been aware of flooding in East New Orleans (from Lake Ponchartrain) and the Lower Ninth Ward (from the Industrial Canal).[90]

Beyond these reports known to the National Guard, the EOC, and the New Orleans Police Department, USACE was trying to determine the detailed status of the levee system. However, the USACE district commander in New Orleans also suffered from a lack of communications capabilities.[91] As noted earlier, there is no early warning system for levee breaches in New Orleans.[92] On Monday at about 3:00 p.m., the commander and a team ventured out to conduct early assessments of the situation. They were unable to conduct a thorough review because of the high winds, debris, and flooding. Although they had to return to the bunker, it was clear to them at that point that New Orleans had suffered catastrophic flooding and they began to review plans for unwatering New Orleans.[93]

On Tuesday, August 30, at about 9:00 a.m., the USACE district commander was able to get a helicopter and see the extent of the flooding from the air.[94] The USACE district office began to develop more detailed plans for repairing the levees after the airborne reconnaissance on August 30.[95] USACE has authority to provide a variety of emergency response actions when levees fail or are damaged.[96] Any repairs to federally constructed levees are funded 100 percent by the federal government.[97]

There were also physical barriers that made assessments and repair difficult. Specifically, emergency repair operations to close some of the breaches were seriously hampered by lack of access roads. USACE regulations generally require access roads on top of levees to allow for inspections, maintenance, and flood-fighting operations,

and most USACE levees built in the United States meet this requirement.[98] However, in New Orleans, exceptions were made to these regulations because of its highly urban nature. Access roads were foregone when it was decided to use I-walls in the levee crowns to minimize right-of-ways into surrounding neighborhoods.[99] When Hurricane Katrina led to the breaches in the levees, the lack of access roads atop the levees resulted in very significant increases in time and cost to repair the damaged areas.

Poor communications, difficulties in doing assessments, and physical barriers all served to delay efforts to repair the levees. Levee repairs did not begin until Wednesday, when USACE began marshalling resources — such as contractors, materials, and equipment — at the 17th Street Canal site.[100] The Louisiana National Guard was also involved in these early efforts to conduct emergency repairs of the 17th Street Canal. That afternoon, USACE began dropping 3,000 pound sandbags into the breach.[101] The next day contractors started delivering sand, gravel, and rock to the breach site on a newly-built access road. At both the 17th Street Canal and the London Avenue Canal, Army Chinook and Blackhawk helicopters dropped 7,000 pound sandbags—an average of 600 per day—into the breaches. One breach took over 2,000 sandbags before engineers could see the bags under the water surface. According to one witness before the Select Committee, the need for sand was so great that USACE broke into a local business and "took" $580,000 worth of sand.[102] One week later, the 17th Street Canal breach was closed.[103]

Once the levee repairs were underway, USACE turned its attention to unwatering New Orleans and other flooded areas.[104] Since at least 2000, USACE has had a detailed plan for unwatering greater New Orleans in

the event of flooding. These unwatering plans were also discussed in the "Hurricane Pam" exercise (discussed previously).[105] The exercise assumed the levees did not breach, however there was flooding due to overtopping which inundated New Orleans with at least 10 feet of water. The purpose of the USACE unwatering mission was to remove water from flooded areas (New Orleans), seal off canals from Lake Ponchartrain, repair breaches, create a series of deliberate breaches in the levee system (to help drain them), and pump out final excess with existing and temporary pumps.[106]

Through an emergency contracting process, USACE contacted four companies to complete the unwatering activities and, according to USACE, only one company—Shaw Environmental of Baton Rouge—could respond in a timely manner.[107] Projections made prior to Hurricane Katrina that it would take nine weeks to unwater New Orleans proved unfounded.[108] On October 11 (43 days after Katrina landfall) USACE reported that all floodwaters had been removed from the city of New Orleans.[109]

# Finding: Ultimate cause of levee failures is under investigation, results to be determined

## Several investigations are under way to assess causes of levee failure

There are at least four ongoing "forensic" investigations to determine the cause of the levee breaches around New Orleans. These are being done by USACE's Engineer Research and Development Center; the Center for the Study of Public Health Impacts of Hurricanes, LSU; the National Science Foundation, and ASCE. Each of these investigations has somewhat similar charters and overlapping membership.[110]

■ Interagency Performance Evacuation Task Force (IPET). The USACE Chief Engineer appointed the IPET, headed by the Engineer Research and Development Center, to examine and analyze data in a variety of areas (e.g., Geodetic Reference Datum, Storm and Surge Wave Modeling, Hydrodynamic Forces). At the request of the Secretary of Defense, the results will be analyzed independently by ASCE and the National Research Council.[111]

■ Louisiana State University (LSU). The Hurricane Center was appointed by the State of Louisiana to lead the state's forensic investigation of the Hurricane Katrina levee failures. The investigation team includes engineers and coastal scientists conducting analysis of the storm surge levels, levee construction, and levee failures.[112]

■ National Science Foundation (NSF). NSF assembled a Levee Investigation Team consisting of leading national and international experts in major disasters.[113] Participating teams of scientists are from the University of California, Berkeley; the Geo-Institute of ASCE; the Coasts, Oceans, Ports and Rivers Institute of ASCE; and the Hurricane Research Center of LSU.[114]

■ American Society of Civil Engineers (ASCE). ASCE assembled an independent team of experts, consisting of professional engineers with a wide range of geotechnical engineering expertise in the study, safety, and inspection of dams and levees. The purpose of the team is to collect data and make observations to determine why certain sections of the levee system failed and others did not.[115]

## Preliminary results suggest some levees did not withstand forces they were designed to withstand

Some of the investigators testified or released reports on their preliminary findings. For example, at a November 2, 2005, Senate Hearing, witnesses included Paul Mlakar, of IPET; Ivor Van Heerden, of LSU; Raymond Seed of the University of California, Berkeley, representing the NSF; and Peter Nicholson of the University of Hawaii, representing the ASCE.[116] These witnesses (except Mlakar) testified on the preliminary findings from their investigations. In addition, the NSF and ASCE investigators released a joint interim report, with initial findings, at that hearing.[117] A month after the Senate Hearing, IPET released an interim report with a summary of its field observations, which generally concurred with the NSF/ASCE interim report.[118] In evaluating the causes of levee and floodwall failure, these preliminary reports indicated the impact of the hurricane, and thus the potential causes of the breaches, varied by location.[119]

According to preliminary information from NSF, ASCE, and LSU, most of the levees and floodwall breaches on the east side of New Orleans were caused by overtopping,

as the storm surge rose over the tops of the levees and/or their floodwalls and produced erosion that subsequently led to breaches.[120] A variety of factors led to overtopping of the Industrial Canal and the Mississippi River Gulf Outlet (MR-GO). An LSU Scientist, Hassan Madhriqui, said that MR-GO worked as a funnel which increased the height of the storm surge and "caused floodwaters to stack up several feet higher than elsewhere in the metro area and sharply increased the surge's speed as it rushed through the MR-GO and into the Industrial Canal."[121] The overtopping eroded the backside of the canals, scoured out the foundations, and led to their collapse and thus major flooding of adjacent neighborhoods. According to Seed, "A majority of them [levee breaches] were the result of overtopping, and that simply means that the hurricane was bigger than the levees were built to take…."[122]

In contrast, there was little or no overtopping along most of the levees in the vicinity of Lake Ponchartrain. The only breach along Lake Ponchartrain was in New Orleans East, which was probably due to overtopping. But in the drainage canals that feed into Lake Ponchartrain — the 17th Street and London Avenue Canal — there was no overtopping, and the failures were likely caused by weaknesses in the foundation soil underlying the levees, the weakness in the soils used to construct the earthen levee embankments themselves, or weaknesses caused by vegetation growing along the levees. These were the most costly breaches, leading to widespread flooding of central New Orleans — to include the downtown area and several large residential neighborhoods.[123] According to Van Heerden of LSU, "the surge in Lake Ponchartrain wasn't that of a category 3 storm, nor did it exceed the design criteria of the standard project hurricane."[124] Nicholson of ASCE concurred with this assessment, adding, "If the levees [on Lake Ponchartrain] had done what they were designed to do, a lot of the flooding of New Orleans would not have occurred, and a lot of the suffering that occurred as a result of the flooding would not have occurred."[125]

However, these findings are preliminary.[126] Most of the investigations will not issue their final reports until the spring or summer of 2006. For example, the USACE IPET report is scheduled to be completed in June 2006.[127] Possible causes of the levee breaches include a design not appropriate for the actual application (indicating a shared deficiency), storm conditions simply too overwhelming for the designed levees to withstand (indicating an act of nature); levee walls not secured deeply enough into the soil or otherwise improperly constructed (indicating a USACE deficiency); improper maintenance of the levees (indicating a local deficiency); or a combination of factors.

## Conclusion

Hundreds of miles of levees were constructed to defend metropolitan New Orleans against storm events. These levees were not designed to protect New Orleans from a category 4 or 5 monster hurricane, and all the key players knew this. The original specifications of the levees offered protection that was limited to withstanding the forces of a moderate hurricane. Once constructed, the levees were turned over to local control, leaving the USACE to make detailed plans to drain New Orleans should it be flooded.



The local sponsors — a patchwork quilt of levee and water and sewer boards —were responsible only for their own piece of levee. It seems no federal, state, or local entity watched over the integrity of the whole system, which might have mitigated to some degree the effects of the hurricane. When Hurricane Katrina came, some of the levees breached — as many had predicted they would — and most of New Orleans flooded to create untold misery.

The forces that destroyed the levees also destroyed the ability to quickly assess damage and make repairs. The reasons for the levee failures appear to be some combination of nature's wrath (the storm was just too large) and man's folly (an assumption that the design, construction, and maintenance of the levees would be flawless). While there was no failure to predict the inevitability and consequences of a monster hurricane — Katrina in this case — there was a *failure of initiative* to get beyond design and organizational compromises to improve the level of protection afforded. ∎

1   *See* Eric S. Blake, et al., Tropical Prediction Center, U.S. Dep't of Commerce, NOAA Technical Memorandum NWS TPC-4, *The Deadliest Costliest, and Most Intense U.S. Tropical Cyclones from 1851 to 2004* (and Other Frequently Requested Hurricane Facts, (Aug. 2005) *available at* http://www.nhc.noaa.gov/paststate.shtml (last visited Jan. 24, 2006); Anu Mittal, U.S. Gov't Accountability Off., Pub. No. GAO-05-1050T, *Testimony Before the Subcommittee on Energy and Water Development, Committee on Appropriations, House of Representatives, Army Corps of Engineers: Lake Pontchartrain and Vicinity Hurricane Protection Project* [hereinafter GAO *Hurricane Protection Project*], at 2 (Sept. 28, 2005); R.B. Seed, et al., U. of Calif. at Berkely and Am. Soc'y of Civil Engineers, Rept. No. UCB/CITRIS – 05/01, *Preliminary Report on the Performance of the New Orleans Levee System in Hurricane Katrina on August 29, 2005* [hereinafter *Report on Levee Performance*], at 1-4 (Nov. 2, 2005) (support for subsidence); IEM, Inc., IEM/TEC04-070 r5, *Southeast LA Catastrophic Hurricane Functional Plan [SE LA Functional Hurricane Plan]*, at 5 (Jan. 5, 2005).

2   U.S Army Engineer District, New Orleans, *Un-watering Plan Greater Metropolitan Area, New Orleans, LA* [hereinafter *Un-Watering Plan*], at 1 (Aug. 18, 2000).

3   New Orleans District, U.S. Army Corps of Engineers, *Hurricane Betsy, September 8-11, 1965: After Action Report*, 1-5 (July 1966) (Included as App. E in *Un-Watering Plan*).

4   *Id.* at 2.

5   *Id.* at 4.

6   *Id.* at 32.

7   *Id.* at 24.

8   *Id.* at 5.

9   *Id.* at 29.

10  *Id.* at 26.

11  *Hearing on Hurricane Katrina: Who's In Charge of the New Orleans Levees? Before U.S. Senate Committee on Homeland Security and Governmental Affairs* [hereinafter *Senate Hearing: Who's in Charge of Levees*], 109th Cong. (Dec. 15, 2005) at 2 (written statement of Max. L. Hearn, Executive Director, Orleans Levee District); *Report on Levee Performance*, at 1-3.

12  GAO *Hurricane Protection Project*, at 2.

13  Flood Control Act of 1965. Pub. L. No. 89-298, § 204, 79 Stat. 103, 1077 (1965) (The Flood Control Act of 1965 authorized this project).

14  The Industrial Canal is also known as the Inner Harbor Navigation Canal.

15  *Senate Hearing: Who's in Charge of Levees*, at 1-2 (written statement of Col. Richard P. Wagenaar, Commander and District Engineer, New Orleans District, U.S. Army Corps of Engineers); GAO *Hurricane Protection Project*, at 3.

16  Interview by Select Comm. Staff with David Pezza [hereinafter Pezza Interview], U.S. Army Corps of Engineers (Dec. 9, 2005); GAO *Hurricane Protection Project*, at 3.

17  *Un-Watering Plan*, at 1.

18  GAO *Hurricane Protection Project*, at 4; U.S. Army Corps of Engineers, Release No. PA-05-08, *News Release: U.S. Army Corps of Engineers Hurricane Relief Support and Levee Repair*, (Sept. 3, 2005) (hurricane protection projects were designed to withstand forces of a hurricane that has a 0.5 percent chance of occurrence in any given year).

19  The U.S. Weather Service is now the National Weather Service.

20  GAO *Hurricane Protection Project*, at 4-5.

21  *Hearing on Hurricane Protection Plan for Lake Pontchartrain and Vicinity Before the House Comm. on Public Works and Transportation Subcommittee on Water Resources* [hereinafter *1978 Hearing on Protection Plan for Lake Pontchartrain*], 95th Congress, 45 at 16, (Jan. 5, 1978) ( statement of Col. Early Rush, District Engineer, US Army Engineer District, New Orleans) (When USACE designs flood protection projects, it models forces that were expected from the most severe combination of meteorological conditions reasonably characteristic of the region approaching from different paths.  This is one of the reasons why, there is a great deal of variability among the heights of the different parts of the flood protection system).

22  USACE *News Release: Levee Repair*; GAO *Hurricane Protection Project*, at 1, 4; Anu K. Mittal, U.S. Gov't Accountability Office, Pub. No. GAO-06-322T, *Testimony Before the Committee on Homeland Security and Governmental Affairs, U.S. Senate: Hurricane Protection: Statutory and Regulatory Framework for Levee Maintenance and Emergency Response for the Lake Pontchartrain Project* [hereinafter GAO *Hurricane Protection: Statutory Framework*], at 2 (Dec. 15, 2005); *Un-Watering Plan*, at  3.

23  GAO *Hurricane Protection: Statutory Framework*, at 4-5.

24  *Id.*

25  *Id.* at 5.

26  *Report on Levee Performance*, at 1-3, 1-4.

27  *Un-Watering Plan*, at 6.

28  U.S. Water Resources Council, *Economic and Environmental Principals for Water and Related Land Resources Implementation Studies*, at iv, vi, 12 (Mar. 10, 1983) (These guidelines apply to USACE, among other agencies, and require calculations of impact on (a) national economic development, (b) environmental quality, (c) regional economic impact, and (d) other social effects.  The last category includes "urban and community impacts: life, health, safety" and others).

29  *1978 Hearing on Protection Plan for Lake Pontchartrain*, at 16 (statement of Col. Early Rush).

30  *See* Eric Lipton, *White House Was Told Hurricane Posed Danger*, N.Y. TIMES, Jan. 24, 2006, at A6.

31  William L. Waugh, Jr., *The Disaster That Was Katrina*, NATURAL HAZARDS OBSERVER, Vol. XXX No. 2, Nov. 2005, at 7-8.

32  *Id.*

33  Shirley Laska, *What if Hurricane Ivan Had Not Missed New Orleans?*,  NATURAL HAZARDS OBSERVER, Vol. XXIX No. 2, Nov. 2004, at 5-6.

34  *Id.*

35  *Un-Watering Plan*, at 1.

36  *Id.* at 7.

37  *Id.*

38  GAO *Hurricane Protection Project*, at 8.

39 Bob Marshall, *Hurricane Pam Exercise Offered Glimpse of Katrina Misery*, TIMES PICAYUNE (New Orleans) Sept. 9, 2005.

40 National Weather Service, New Orleans, LA, Urgent - *Weather Message, …Devastating Damage Expected…*, 10:11 AM CDT (Aug. 28, 2005).

41 Interview of Kathleen Babineaux Blanco, Governor of LA, CNN Saturday Night, (Aug. 28, 2005) (8:00 p.m. ET).

42 Press Conference by C. Ray Nagin, Mayor of New Orleans, and Kathleen Babineaux Blanco, Governor of LA, MSNBC, et al, Aug. 28, 2005.

43 Pezza Interview; *Senate Hearing: Who's in Charge of Levees*, at 2 (written statement of Director Hearn); *Report on Levee Performance*, at 6-1; GAO *Hurricane Protection Project*, at 3.

44 Pezza Interview; *Senate Hearing: Who's in Charge of Levees*, at 2 (written statement of Director Hearn); *Report on Levee Performance*, at 6-1; GAO *Hurricane Protection Project*, at 3.

45 33 U.S.C. §701t (2005) (They are eligible as long as they are active in USACE's Rehabilitation Inspection Program.  To be eligible, they have to pass annual inspections by USACE, which was the case for the Lake Ponchartrain project).

46 Pezza Interview.

47 Pezza Interview; *Senate Hearing: Who's in Charge of Levees*, at 3 (written statement of Director Hearn); GAO *Hurricane Protection: Statutory Framework*, at 6.

48 *Hearing on Hurricane Katrina: Why Did the Levees Fail? Before U.S. Senate Committee on Homeland Security and Governmental Affairs* [hereinafter *Senate Hearing: Why Did Levees Fail*], 109th Cong. (Nov. 2, 2005) (statement of Raymond B. Seed, Professor of Civil and Environmental Engineering, University of California, Berkley)

49 *Senate Hearing: Who's in Charge of Levees* (written statement of Col. Wagenaar at 2); GAO *Hurricane Protection: Statutory Framework*, at 6.

50 Pezza Interview; GAO *Hurricane Protection: Statutory Framework*, at 8.

51 Pezza Interview; GAO *Hurricane Protection: Statutory Framework*, at 9.

52 *Senate Hearing: Who's in Charge of Levees* (written statement of Col. Wagenaar at 2); GAO *Hurricane Protection: Statutory Framework*, at 6.

53 *Senate Hearing: Why Did Levees Fail* (statement of R.B. Seed).

54 *Un-Watering Plan*, at 4.

55 Interagency Performance Evaluation Task Force, *Interim Report to Task Force Gaurdian, Summary of Field Observations Relevant to Flood Protection in New Orleans* [hereinafter *Interim Report on Flood Protection in New Orleans*], LA, at 7 (Dec. 5, 2005).

56 *Senate Hearing: Why Did Levees Fail* (statement of R.B. Seed).

57 *Senate Hearing: Why Did Levees Fail* (statement of  Peter Nicholson, Associate Professor, Civil and Environmental Engineering, University of Hawaii).

58 *Senate Hearing: Why Did Levees Fail* (statement of R.B. Seed).

59 Pezza Interview; *Senate Hearing: Who's in Charge of Levees*, at 3 (written statement of Director Hearn).

60 Pezza Interview; GAO *Hurricane Protection: Statutory Framework*, at 9.

61 *Senate Hearing: Who's in Charge of Levees*, at 2 (written statement of Col. Wagenaar).

62 GAO *Hurricane Protection: Statutory Framework*, at 10.

63 Pezza Interview; *Report on Levee Performance*, at 2-2.

64 Frank Langfitt, *Residents Say Levee Leaked Months Before Katrina National Public Radio*, NATIONAL PUBLIC RADIO, MORNING EDITION (Nov. 22, 2005), *available at* http://www.npr.org/templates/story/story.php?storyId=5022074 (last visited Feb. 1, 2005).

65 *Id.*

66 *Id.*

67 Richard D. Knabb, et al., National Hurricane Center, Dep't of Commerce, *Tropical Cyclone Report: Hurricane Katrina 23-30 August 2005* [hereinafter NHC: *Hurricane Katrina*], at 1, (Dec. 20, 2005).

68 *Id.* at 1.

69 *Id.*

70 *Id.* at 7.

71 *Id.* at 8.

72 *Id.* at 11; GAO Hurricane Protection Project, at 2.

73 NHC: *Hurricane Katrina*, at 8.

74 *Report on Levee Performance*, at 1-4.

75 NHC: *Hurricane Katrina*, at 8.

76 *Id.* at 9.

77 *Id.*

78 *Report on Levee Performance*, at 1-2; NHC: *Hurricane Katrina*, at 9 (Additional support that the surge severely strained the levee system).

79 NHC: *Hurricane Katrina*, at 9.

80 *Id.*

81 Pezza Interview.

82 GAO *Hurricane Protection: Statutory Framework*, at 9.

83 *Senate Hearing: Who's in Charge of Levees*, at 4 (written statement of Director Hearn).

84 *Senate Hearing: Why Did Levees Fail* (statement of R.B. Seed).

85 Interview by Select Comm. Staff  with General Joseph B. Veillon, Assistant Adjutant General for Air,  LA Air Nat'l Guard in Baton Rouge, LA (Nov. 3, 2005).

86 Audio recordings of Hurricane Katrina Conference Calls, LA State Emergency Operations Center (Aug. 26-29, 2005).

87 *Senate Hearing: Who's in Charge of Levees*, at 4 (written statement of  Col. Wagenaar).

88 *Id.* at 5.

89 Richard P. Wagenaar, Col., New Orleans District, U.S. Army Corps of Engineers, *Situation report: Event Hurricane Katrina*, (Aug. 29, 2005).

90 Interview by Select Comm. Staff with Lonnie Swain, Deputy Police Superintendent, New Orleans Police Dep't, in New Orleans, LA, (Nov. 9, 2005).

91 *Senate Hearing: Who's in Charge of Levees* (written statement of Col. Wagenaar).

92 Pezza Interview.

93 *Senate Hearing: Who's in Charge of Levees* (written statement of Col. Wagenaar).

94 *Id.* at 5.

95 *Id.* at 6.

96 Flood Control Act of 1941 § 5, 33 U.S.C. § 701n (2005) (Authorizes USACE to conduct emergency operations and rehabilitation activities when levees fail or are damaged and allows USACE to provide emergency operations to include technical assistance and direct assistance— providing sandbags and pumps, emergency contracting, and levee reinforcement. USACE administrative policies, guidance, and operating procedures for natural disaster preparedness, response, and recovery activities are set out in 33 C.F.R. Part 203 (2005).); *see Senate Hearing: Who's in Charge of Levees*, at 3 (written statement of Col. Wagenaar); also GAO *Hurricane Protection: Statutory Framework*, at 14-15.

97 GAO *Hurricane Protection: Statutory Framework*, at 10.

98 U.S. Army Corps of Engineers, Manual No. 1110-2-1913, *Engineering and Design: Design and Construction of Levees*, 8-9 (Apr. 30, 2000).

99 *See Interim Report on Flood Protection in New Orleans*, at 12-13.

100 Lieutenant Colonel Pease, U.S. Army Corps of Engineers, US Army Corps of Engineers Support to Hurricane Katrina Response, (Aug. 31, 2005).

101 *Id.*

102 *Hearing on Hurricane Katrina: Voices from Inside the Storm Before Select Comm.*, 109th Cong., (Dec. 6, 2005) (statement of Harry Alford, President, National Black Chamber of Commerce).

103 *Senate Hearing: Who's in Charge of Levees* (written statement of Col. Wagenaar).

104 *Id.*

105 *See Un-Watering Plan; SE LA Functional Hurricane Plan*, at 6-7.

106 *U.S. Army Corps of Engineers, USACE/ESF#3: Hurricane Season 2005*, at 23 (Oct. 28, 2005) (on file with the Select Comm.).

107 *Hearing on Hurricane Katrina: The Federal Government's Use of Contractors to Prepare and Respond Before the Select Comm.*, 109th Cong., (Nov. 2, 2005) (written statement of Norbert Doyle, Col., Principal Assistant Responsible For Contracting (Acting), U.S. Army Corps Of Engineers).

108 Shirley Laska, *What if Hurricane Ivan Had Not Missed New Orleans?*, NATURAL HAZARDS OBSERVER, Vol. XXIX No. 2, Nov. 2004, at 6.

109 NHC: *Hurricane Katrina*, at 9; *see* SE LA Functional Hurricane Plan, at 6.

110 *Senate Hearing: Why Did Levees Fail* (statement of Sen. Susan M. Collins, Chairman).

111 *Senate Hearing: Why Did Levees Fail* (written statement of Paul F. Mlakar, Ph.D., P.E., Senior Research Scientist, U.S. Army Research and Development Center).

112 Louisiana State U. Hurricane Center, *Newsbriefs*, http://hurricane.lsu.edu/newsbriefs.htm (last visited Jan. 29, 2006).

113 *Senate Hearing: Why Did Levees Fail* (statement of Peter Nicholson).

114 *Senate Hearing: Why Did Levees Fail* (statement of R.B. Seed).

115 *Report on Levee Performance*, at 1-1.

116 *See Senate Hearing: Why Did Levees Fail.*

117 *Senate Hearing: Why Did Levees Fail* (statement of Sen. Collins).

118 *See Interim Report on Flood Protection in New Orleans.*

119 *Report on Levee Performance*, at v; *Senate Hearing: Why Did Levees Fail* (written statement of Paul F. Mlakar).

120 *Report on Levee Performance*, at iv; *Senate Hearing: Why Did Levees Fail* (statement of Ivor L. van Heerden, Ph.D., Deputy Director, LA State U. Hurricane Center).

121 *Report on Levee Performance*, at 1-5; Matthew Brown, *Katrina may mean MR-GO has to go*, TIMES-PICAYUNE (New Orleans), Oct. 24, 2005, at 1; *Senate Hearing: Why Did Levees Fail* (statement of Ivor L. van Heerden).

122 *Senate Hearing: Why Did Levees Fail* (statement of R.B. Seed).

123 *Report on Levee Performance*, at 1-5; *Senate Hearing: Why Did Levees Fail* (written statement of Paul F. Mlakar) and (statement of Ivor L. van Heerden).

124 *Senate Hearing: Why Did Levees Fail* (statement of Ivor L. van Heerden).

125 *Senate Hearing: Why Did Levees Fail* (statement of Peter Nicholson).

126 *Report on Levee Performance*, at cover, v.

127 U.S. Army Corps of Engineers, Release No. PA-05-18, *News Release: Interagency Performance Evaluation Task Force – Testing Report on Sheet Pile Foundation Lengths in New Orleans Levees*, (Dec. 9, 2005).



*"At the local level, I think the biggest failure was leadership didn't take into account the fact that poor residents had no way of evacuating. I also think Governor Blanco should have called for a mandatory evacuation sooner and that Mayor Nagin should have coordinated better with Amtrak."*

Terrol Williams
New Orleans Citizen and Evacuee
Select Committee Hearing, December 6, 2005

*"We estimate that over 1 million people, or approximately 90 percent of the affected parishes' populations, evacuate[d] in about a 40-hour period. I don't know of any other evacuation that has occurred with that many people under these circumstances with that high of percentage of people being evacuated in that short of a time period."*

Colonel (Ret.) Jeff Smith
Deputy Director, Louisiana Office of Homeland Security
and Emergency Preparedness
Select Committee Hearing, December 14, 2005

# EVACUATION

## Failure of complete evacuations led to preventable deaths, great suffering, and further delays in relief

### Summary

Evacuation is a critical part of emergency preparation for a hurricane. Such preparation includes both detailed evacuation planning and implementation of the evacuation plan in potentially affected areas once a hurricane is projected to make landfall. The states of Alabama, Mississippi, and Louisiana, and many of their localities (e.g., New Orleans) have hurricane evacuation plans and years of experience implementing them.

In Alabama and Mississippi, the state or localities declared mandatory evacuations as Hurricane Katrina approached, and implementation of their evacuation plans went relatively well. In Louisiana, the state and local implementation of evacuation plans for the general population also went well, resulting in one of the largest emergency evacuations in history.

Two of Louisiana's most populous localities, New Orleans and Jefferson Parish, declared mandatory evacuations late or not at all. While the definition of "mandatory" evacuation and the associated obligations and liabilities that local governments assume are still being debated, early designation of the evacuation of New Orleans as mandatory could have increased the number of people that left, resulting in a more complete evacuation, saving lives, and reducing suffering. New Orleans city officials, who were responsible for executing an evacuation plan and who had the authority to commandeer resources to assist in the evacuation, failed to evacuate or assist in the evacuation of more than 70,000 individuals who did not leave either before the announcement of the mandatory evacuation or before the storm hit. Those who did not evacuate included many who did not have their own means of transportation. Despite the declaration of a mandatory evacuation on Sunday before landfall, New Orleans officials still did not completely evacuate the population. Instead, they opened the Superdome as a "shelter of last resort" for these individuals.

Problems sheltering this population, beyond emergency planners' general preference for evacuation, were exacerbated by inadequate preparations for a large population at the Superdome. For those with medical or special needs, New Orleans and other institutions also failed to evacuate them, but instead sheltered them — a decision that also had negative consequences and is discussed in detail in the MEDICAL CARE chapter. Those individuals in all states who had the means to evacuate, but did not do so, must also share the blame for the incomplete evacuation and the difficulties that followed.

The failure of a more complete evacuation led to catastrophic circumstances when Katrina made landfall, particularly in New Orleans where the force of the hurricane breached the levee system in multiple locations throughout the metropolitan area. As the resulting floodwaters spread through low lying urban areas,



AP PHOTO/DAVE MARTIN



AP PHOTO/DAVID J. PHILLIP POOL

thousands of people who were trapped in their homes climbed to their roofs or fled into flooded streets. Fortunately, thousands of these people were saved by a massive and heroic search and rescue effort. But many were not as fortunate, and hundreds of people died in their homes or other locations, presumably from drowning. Those who were in the Superdome, or those that found shelter and high ground at other locations, suffered horrible conditions. The floodwaters, which had been anticipated and even predicted from a large hurricane such as Katrina, furthered the misery and delayed the immediate relief of the remaining population.

The incomplete evacuation and floodwaters also required a post hurricane evacuation, for which federal, state, and city officials had not prepared. Because of a lack of preparations, planning had to be accomplished in emergency circumstances, where communications and situational awareness were in short supply. Requirements for buses kept growing as a lack of willing drivers and diversions of buses continued to delay the evacuation of the Superdome and other locations. Finally, the combination of more buses and supplemental airlifts resulted in a complete evacuation of New Orleans.

## Finding: Evacuations of general populations went relatively well in all three states

### Evacuation is a critical part of emergency preparation for a hurricane

Because of the destructive forces of hurricanes, evacuation planning is very important. Preparation for an approaching hurricane includes both detailed evacuation planning and implementation of that plan in potentially affected areas once a hurricane is projected to make landfall. Federal Emergency Management Agency (FEMA) officials told

Select Committee staff that emergency planners prefer evacuation to sheltering people within affected areas because the sheltered population is subject to the most intense dangers of the storm and because it may be a slow and difficult operation to get relief personnel and supplies back into hurricane ravaged areas.

The state of Louisiana has an evacuation plan, which was revised following Hurricane Ivan in 2004. The evacuation for that storm had caused massive traffic jams leading out of New Orleans. Those traffic jams were



AP PHOTO/BILL HABER

the result of the southernmost parishes trying to evacuate at the same time as Orleans and Jefferson Parishes, the two most populous parishes. The new plan called for a staged evacuation with the southernmost parishes evacuating first, followed by Lower Orleans and Jefferson Parishes, and then Upper Orleans and Jefferson Parishes, facilitated by the implementation of contraflow (one-way outbound traffic) on the highways leading out of New Orleans.[1]

In addition to the Louisiana state plan, local governments have emergency evacuation plans. The City of New Orleans Comprehensive Emergency Management Plan ("New Orleans Plan") provides: "The authority to order the evacuation of residents threatened by an approaching hurricane is conferred to the Governor by Louisiana statute."[2]  But this power "is also delegated to each political subdivision of the State by Executive Order."[3]

The New Orleans Plan further explains: "This authority empowers the chief elected official of New Orleans, the Mayor of New Orleans, to order the evacuation of the parish residents threatened by an approaching hurricane."[4] Under this authority, the Mayor of New Orleans is responsible for giving the order for a mandatory evacuation and supervising the actual evacuation of his population. The Mayor's Office of Emergency Preparedness must "[c]oordinate with the State . . . on elements of evacuation"

and "[a]ssist in directing the transportation of evacuees to staging areas."[5]

The importance of evacuations is expressed in the New Orleans Plan: "The safe evacuation of threatened populations . . . is one of the principle reasons for developing a Comprehensive Emergency Management Plan."[6]  In furtherance of that goal, "[t]he city of New Orleans will utilize all available resources to quickly and safely evacuate threatened areas."[7]

Mississippi also has a state evacuation plan, one that takes account of local plans because of the key role that counties play in declaring evacuations. According to the testimony of the Director of the Mississippi Emergency Management Agency (MEMA), Robert Latham, the authority to make decisions about mandatory evacuations in Mississippi rests with local governments.[8] However, the state is generally included in any discussions about evacuation orders because, once a city or county chooses to make such an order, state responsibilities for managing traffic (including contraflow) and opening shelters can come into play.[9] In preparing for Hurricane Katrina, the Mississippi officials worked through the MEMA liaisons it dispatched to the counties along or near the Gulf Coast as well as a representative it had stationed in Louisiana's emergency operations center (because of contraflow agreements between Mississippi and Louisiana that provide for evacuations out of southeast Louisiana through Mississippi).[10]

Alabama also has an evacuation plan and recently revised it. Lessons learned during Alabama's response to Hurricanes Ivan and Dennis helped refine the state's actions as Katrina neared. Having been criticized for triggering evacuations that turned out to be unnecessary, Alabama officials practiced to reduce the time required to reverse traffic flows on the major routes and encouraged



AP PHOTO/JOHN DAVID MERCER, POOL

county and local officials to define smaller evacuation zones within their jurisdictions to better target evacuation actions. According to Governor Riley:

> On Katrina there was an evacuation plan that was a little more moderate than I had hoped for, and we convinced everyone in the room to expand it. The time before, as I said earlier, we got some criticism because we may have expanded it too much. We have gone back and built a zone type process. But we take all of the local team, because you have to have local buy-in because it won't work if you don't.[11]

Alabama state and county officials testified that one of their difficulties in planning evacuations is that Army Corps of Engineers data used as the basis for evacuation plans and models is outdated. According to Alabama Emergency Management Agency (AEMA) Director Bruce Baughman:

> The two coastal counties have had studies done by the [Army] Corps of Engineers. Those studies were about five years old. In the case of Mobile County, the data did not include the windfields. So it doesn't give you complete information when you are trying to make decisions on clearance times …. [I]t is based upon dated information. Baldwin County has grown by leaps and bounds so that you have got a higher population. And not only that, before Labor Day, you have got probably 100,000 people … as far as outside individuals that are tourists down in that area, and that is not computed into your clearance



AP PHOTO/CHERYL GERBER

times. What we have done is we have taken the data that is available that is between 22 and 24 hour clearance times for those two counties, and generally we allow 26 to 28 hour clearance times. But that is a best guess. What we need to do is based upon some real time data, so other studies need to be done in that particular area. That used to be funded out of the Hurricane Preparedness Program, and those studies are lagging way behind.[12]

## Mississippi declared mandatory evacuations which generally went well

Mississippi evacuations were generally mandatory and went relatively well. Five Mississippi counties — Hancock, Jackson, Harrison, Stone, and Pearl River — issued mandatory evacuation orders on or before August 28 for specific areas or zones of their counties and/or those living in mobile homes.[13] For example, Harrison County first issued a mandatory evacuation order for its zones A and B, which include all of its Gulf-front and low-lying areas, at 10 a.m. on August 28; it strongly advised, but did not mandate, that residents in its highest elevations (zone C) evacuate the county.[14] According to Governor Haley Barbour, he has the authority to usurp county officials' decisions — that is, order a mandatory evacuation if they have not — but he chose not to do so because county



STATE OF MISSISSIPPI

officials are closer to the situation than he is.[15]

During the evacuation, Mississippi Department of Transportation personnel collected and reported traffic flow information along evacuation routes, including areas where contraflow was in place for those evacuating Louisiana. At 7 p.m. on August 28, traffic counts were "consistently high" and the contraflow areas showed a continuous increase in traffic.[16] According to traffic counts, by 11 p.m. that evening, traffic along the evacuation/contraflow routes had decreased substantially.[17]

Rep. Gene Taylor asserted, however, that evacuation planning ought to include providing people with gasoline, especially at the end of the month:

> The other thing that I find interesting is that in all these scenarios that I'm sure you've thought out, did FEMA bother to realize that it is the 28th of the month, a lot of people live on fixed income, be it a Social Security check or a retirement check, they've already made their necessary purchase for the month. What they couldn't envision is having to fill up their gas tank one more time, at almost 3 bucks a gallon just to get the heck out of there. What I think no one is really focused on is a heck of a lot of people who stayed behind were people with limited means.[18]

Former Undersecretary Brown strongly opposed the suggestion that FEMA should have supplied gasoline:

> Congressman, FEMA is not there to supply gasoline, transportation; it is not the role of the federal government to supply five gallons of gas for every individual to put in a car to go somewhere. I personally believe that is a horrible path to go down. And while my heart goes out to people on fixed incomes, it is primarily a Sate and local responsibility.[19]

Whether providing gasoline should be a federal or state and local responsibility, there may very well have been victims of Hurricane Katrina who did not evacuate because at the end of the month they had run out of money for gasoline and found no other way to get gasoline or evacute.

## Alabama mandatory evacuations also went relatively well

Alabama began implementing the evacuation early, and its evacuation also went well. Even before any Alabama evacuations began, AEMA and state transportation officials participated in the FEMA regional Evacuation Liaison Team conference calls during which emergency managers from Florida, Louisiana, and Mississippi shared information on the status of evacuation routes, road closures, traffic volumes, hotel availability, and other interstate implications of significant population migrations in the region.[20]

As it became clear Katrina would have a significant impact on the Alabama coast, Baldwin County emergency management officials called for a voluntary evacuation of all coastal, flood-prone, and low lying areas at 5 p.m. on Saturday, August 27.[21] State emergency management officials asked the Governor to declare a mandatory evacuation for threatened areas of Baldwin and Mobile Counties on Sunday, August 28.[22] According to the announcement released by the Governor's office, "In Baldwin County, the order calls for the evacuation of those on Plash Island, the Fort Morgan peninsula, and all areas south of Fort Morgan Road for Gulf Shores. The order also calls for the evacuation of those living in Perdido Key and south of Perdido Beach Boulevard. Those in all low lying and flood-prone areas south of I-10 in Baldwin County and those living along the Mobile Bay Area and other water inlets also fall under the evacuation order."[23] Governor Riley testified:

> . . . [W]e made it voluntary 36 hours out, and then shortly thereafter we made it mandatory. As it comes closer, as the cone begins to funnel in and we have a higher likelihood that it is going to happen, we make it mandatory. We ask people to leave. We do everything we can to encourage them to leave. But, again, the limiting factor is the amount of time. The difference between trying to evacuate our beaches before Labor Day and after Labor Day is like daylight and dark, because we have so many more vacationers there. And then when you layer on top of that the number of people that will be coming out of the Florida panhandle that will come through Alabama, if we don't start it three days early, you just physically do not have the capacity to take care of it.[24]



STATE OF LOUISIANA

Alabama did not implement reverse lane strategies (i.e., contraflow) in response to Hurricane Katrina, as road closures were limited and traffic volume never warranted it. The state reported 118,900 applications for evacuation assistance by Alabama residents, of which 23,853 were by out of state residents.[25]

## Louisiana evacuation of general population was very successful

The Louisiana evacuation for the general population, including contraflow, worked very well. Governor Kathleen Babineaux Blanco and other state officials labeled the implementation of this evacuation as "masterful" and as one of the most successful emergency evacuations in history.[26]  Based on National Weather Service reports of Katrina's "dramatic shift" toward Louisiana on Friday, the state had less time than planned to prepare for contraflow and had to implement it in a compressed timeframe.[27]

Nevertheless, the contraflow planning and implementation went smoothly. The state effectively used conference calls to coordinate among the parishes. Some parishes declared some level of evacuation for the entire parish as early as Saturday morning, August 27, at 9:00 a.m. These were generally the lower parishes (LaFourche, Plaquemines, St. Bernard, and St. Charles), which was consistent with the Louisiana state plan for getting these populations to evacuate ahead of the metropolitan New Orleans population.

The parishes generally started with the declaration of a "recommended" evacuation and changed these to a "mandatory" evacuation as Katrina got closer. The state also coordinated closely with Mississippi and Texas on traffic and/or sheltering issues. For example, Friday afternoon Blanco called Barbour to coordinate that portion of the contraflow plan that involved highways leading out of Louisiana into Mississippi, and Governor Barbour agreed to the contraflow plan.[28]

# Finding: Despite adequate warning 56 hours before landfall, Governor Blanco and Mayor Nagin delayed ordering a mandatory evacuation in New Orleans until 19 hours before landfall

## Terms for voluntary and mandatory evacuations lack clear definitions

A wide variety of terms were used to describe the levels of evacuation orders, indicating a lack of clarity and a potential point of confusion for the resident population. For example, the different parishes used a wide variety of terms to describe the level of evacuation imposed before declaring a mandatory evacuation. These terms included a "precautionary" evacuation, a "voluntary" evacuation, a "recommended" evacuation, a "highly recommended" evacuation, and a "highly suggested" evacuation.[29] It appeared many of these officials were bending over backward to avoid using the term mandatory.

Throughout our discussions in all three states, Select Committee staff were unable to find a clear and consistent definition of mandatory evacuation. However, there was a consensus among almost all officials in all three states that even under a mandatory evacuation, authorities would not forcibly remove someone from their home. For example, in the case of Louisiana, both Blanco and LOHSEP Deputy Director Colonel Jeff Smith emphatically rejected the idea that people could be forcibly removed from their homes even under a mandatory evacuation order. Blanco said, "Well, in the United States of America you don't force people [out of their homes], you urge them."[30]  Smith said: "It is America. You can't force people on to buses; you can't go into their houses at gunpoint and leave [sic]."[31]

Under Alabama state law, a mandatory evacuation declaration by the Governor is required before counties can take certain actions to ensure maximum compliance with local orders by those at risk.[32] But, regarding the practical meaning and effect of "mandatory" versus "voluntary" evacuations, Riley said:

> We probably need to come up with a better definition of what mandatory is. We call it a

mandatory evacuation because everyone else calls it a mandatory evacuation. But do we arrest anyone? No. Do we send people door to door? Absolutely. We have a phone system, that they can explain to you in just a moment, where we have an automated system that calls every resident, asks them to leave, advises them with a phone message of how important it is. We keep doing it until we get in touch with everyone. Do you ever get to the point that everyone is going to leave? I don't think so.[33]

Nevertheless, it is clear to the Select Committee that declaring a mandatory evacuation delivers a more powerful statement to the public than declaring a voluntary or similarly worded evacuation. A mandatory evacuation implies that individuals do not have a choice, that the government will not be able to protect them and provide relief if they remain, and it generally conveys a higher level of urgency.

## Federal, state, and local officials recognized the potential for catastrophe and flooding and communicated that potential among themselves and to the public

Regardless of the various terms used for evacuations, federal officials fully informed Blanco and New Orleans Mayor C. Ray Nagin about the threat to New Orleans. On the evening of August 27, National Hurricane Center Director Max Mayfield called Blanco and later spoke to Nagin about the power of Hurricane Katrina.[34] Also on Sunday, President Bush called Blanco to express his concern for the people of New Orleans and the dangers they faced and urged a mandatory evacuation.[35] On Sunday, the Slidell Office of the National Weather Service, issued a very strongly worded warning at approximately 10:00 a.m.:

> Devastating damage expected . . . Hurricane Katrina . . . a most powerful hurricane with unprecedented strength . . . rivaling the intensity of Hurricane Camille of 1969… Most of the area will be uninhabitable for weeks . . . perhaps longer.  At least half of well constructed homes will have roof and wall failure. All gabled roofs will fail . . . leaving those homes severely damaged or destroyed… Water shortages will make human suffering incredible by modern standards.[36]



AP PHOTO/ANDY NEWMAN

State and local officials also urged the public to evacuate by foretelling the potentially catastrophic consequences. For example, beginning on Saturday, August 27, Blanco publicly urged citizens to evacuate the city, expressing her concern for the strength of the levees against at least a Category 4 storm.[37] In several interviews on Saturday and Sunday, Blanco stated that flooding in New Orleans was a major concern. On Saturday at approximately 8:00 p.m., she appeared on CNN and said that in New Orleans "[t]he storm surge could bring in 15 to 20 feet of water. [People in the city of New Orleans] will not survive that if indeed that happens."[38] In the Sunday morning papers, it was reported that she had said the water levels could reach as high as 20 feet.[39] In a television interview on Sunday, Blanco was asked if the 15 foot levees could survive the storm, and she replied: "I don't think anything can tolerate a storm surge of 15-20 feet."[40]

In a Fox News interview on Sunday, Nagin was very specific about the threat. He said whether the levees would hold was the "big question."[41] He said he hoped people who stayed in the French Quarter would go up to their homes' second or third story and bring something to chop through their roofs.[42] He expressed his worry that "[the levees] have never truly been tested the way they're getting ready to be tested. If there's a breach and if they start to fail, it probably will create somewhat of a domino effect which would pour even more water into the city."[43]

Blanco's staff also called ministers on Saturday to urge them to tell their congregations to get out.[44] And apparently, the Mayor and his staff did similar things.[45] But these steps were clearly insufficient.

## The declarations of a "mandatory" evacuation were delayed or never made in metropolitan New Orleans

Neither Blanco nor Nagin, however, ordered a mandatory evacuation until Sunday morning. According to the Saturday newspapers, Nagin said "he will make a decision

about evacuations and other emergency procedures [Saturday] about noon."[46] At a news conference on Saturday, Nagin announced: "Ladies and Gentlemen, this is not a test. This is the real deal."[47] But as late as Saturday afternoon, according to news reports, Nagin was consulting city lawyers about legal liability to the city's businesses for lost revenue from evacuating customers.[48]

In addition, despite express authority to commandeer resources and enforce or facilitate the evacuation of the City of New Orleans and despite recognition of the probability that Hurricane Katrina would cause breaches of the levees and flooding of the city, Blanco and Nagin did not exercise those authorities by declaring a mandatory evacuation and enforcing it or using state and city resources to facilitate the evacuation of those who could not or would not, absent extraordinary measures and assistance, evacuate. This extraordinary storm required extraordinary measures, which the Governor and Mayor did not take.

Finally, on Sunday morning at around 11:00 a.m. central time — 19 hours before projected landfall, Nagin announced the issuance of a mandatory evacuation order.[49] According to the New Orleans Plan, that gave the Mayor the authority to "direct and compel, by any necessary and reasonable force, the evacuation of all or part of the population from any stricken or threatened area within the City if he deems this action necessary for the preservation of life, or for disaster mitigation, response, or recovery."[50] As previously noted, the New Orleans Plan also recognizes that "[t]he safe evacuation of threatened populations when endangered by a major catastrophic event is one of the principle reasons for developing a Comprehensive Emergency Management Plan" and that "[s]pecial arrangements will be made to evacuate persons unable to transport themselves or who require special life saving assistance."[51]

In a joint news conference on Sunday morning, Blanco and Nagin continued to express their concerns and explain the reason for the Mayor's issuing a mandatory evacuation order. Their comments raise the question as to why, given the severity of the predicted catastrophe, the mandatory evacuation was not ordered sooner.

Mayor Nagin: Ladies and gentlemen, I wish I had better news for you. **But we are facing a storm that most of us have feared.** I do not want to create panic. But I do want the citizens to understand that

this is very serious, and it's of the highest nature. And that's why we are taking this unprecedented move.

**The storm is now a Cat 5, a Category 5, as I appreciate it, with sustained winds of 150 miles an hour, with wind gusts of 190 miles per hour.**

**The storm surge most likely will topple our levee system.** So we are preparing to deal with that also. So that's why we're ordering a mandatory evacuation . . . .

. . . .

This is a once in probably a lifetime event. The city of New Orleans has never seen a hurricane of this strength to hit it almost directly, which is what they're projecting right now.[52]

During the press conference Blanco stated:

I want to reiterate what the mayor has said. This is a very dangerous time. **Just before we walked into this room, President Bush called and told me to share with all of you that he is very concerned about the citizens. He is concerned about the impact that this hurricane would have on our people. And he asked me to please ensure that there would be a mandatory evacuation of New Orleans.**

The leaders at the highest ranks of our nation have recognized the destructive forces and the possible awesome danger that we are in. **And I just want to say, we need to get as many people out as possible.** The shelters will end up probably without electricity or with minimum electricity from generators in the end. **There may be intense flooding that will be not in our control, which would be ultimately the most dangerous situation that many of our people could face.**

Waters could be as high as 15 to 20 feet. That is what the Miami National Weather Service, the National Hurricane Center, has shared with us. That would probably be ultimately the worst situation. We're hoping that it does not happen that way. We need to pray, of course, very strongly, that the

hurricane force would diminish. But just remember, even if it diminishes to 1, there were six people lost in Florida when it was a Category 1 hurricane. So there's still imminent danger. There seems to be no real relief in sight, and it has been startling to see how accurate the path was predicted, and how it is following the predicted path.

So we have no reason to believe right now that it will alter its path.

Hopefully, you know, it could move just a little bit in one direction or another and not keep New Orleans in its sights. But we don't know that that would happen. That would be — we would be blessed if that happened.[53]

Jefferson Parish — the other major component of metropolitan New Orleans — never did declare a mandatory evacuation, except for the lower parts of the parish on the Gulf Coast. In a conference call among parish officials, Jefferson Parish President Aaron Broussard said he did not have the "resources to enforce" a mandatory evacuation.[54] Resource or enforcement issues, however, were not raised by any of the other parishes that declared mandatory evacuations. In addition, no one requested that the state or federal government provide resources to supplement those of the parish to implement a more complete evacuation.


STATE OF LOUISIANA

# Finding: The failure to order timely mandatory evacuations, Mayor Nagin's decision to shelter but not evacuate the remaining population, and decisions of individuals led to incomplete evacuation

## Earlier mandatory evacuation could have helped get more people out

While the Mayor and the Governor recognized the dangers and expressed them to the public, they did not implement evacuation procedures for all of the citizens of New Orleans that reflected the seriousness of the threat. The results demonstrate the flaw of the evacuation — tens of thousands of citizens did not get out of harm's way.

Specifically, the failure to order a mandatory evacuation until Sunday, the decision to enforce that order by "asking" people who had not evacuated to go to checkpoints for bus service, and then using that bus service to take people only as far as the Superdome did not reflect the publicly stated recognition that Hurricane Katrina would "most likely topple [the] levee system" and result in "intense flooding" and "waters as high as 15 or 20 feet," rendering large portions of the city uninhabitable.[55] As a result, more than 70,000 people remained in the City to be rescued after the storm.[56]

While Blanco, Nagin, and Broussard, and leaders from other parishes carefully managed the phased contraflow evacuation, that only facilitated the evacuation of those who had the means to evacuate the city. Nagin testified that, on Saturday, August 27, he "called for a strong voluntary evacuation, urging all citizens that were able to evacuate the city."[57] Although Nagin was rightly proud of the achievement of the contraflow evacuation of the region, he also conceded that "it probably wasn't as good as we — all of our citizens needed."[58]

Some citizens of New Orleans believed that a mandatory evacuation should have been called earlier and that the government needed to assist people to evacuate. New Orleans citizen and evacuee Doreen Keeler testified, "If a mandatory evacuation [order] would have been called sooner, it would have been easier to move seniors



AP PHOTO/MARI DARR-WELCH

out of the area and many lives would have been saved."[59] She further testified that "[g]oing to [senior citizens] with, yo, this is a mandatory evacuation, you do not have a choice, you have to leave, I feel would definitely help me to get my senior citizens out without waiting as long as I did in order to leave. And I think that if by some miracle there was any type of evacuation plan available, it could have been put into play earlier if a mandatory evacuation had been called."[60]

New Orleans citizen and community leader Dyan French asked: "Why would you get in the public media and ask a city, where 80 percent of its citizens ride public transit, to evacuate? What [were] they supposed to do? Fly?"[61] New Orleans citizen and evacuee Terrol Williams observed, "I think, unfortunately, a lot of the destruction that we saw, that persons were unable to safely evacuate, was because they were basically poor,"[62] which was echoed by Doreen Keeler: "They suffered through it because they had no way of getting out."[63]

New Orleans citizen and evacuee Leah Hodges complained that "[t]he stray animals from the animal shelter, most of whom would have been euthanized, were

evacuated 2 days before the storm, and the people were left to die. Buses that could have gotten our people, who otherwise could not get out, were left to flood, and people were left to die."[64] And Barbara Arnwine, Executive Director for the Lawyers Committee for Civil Rights, testified: "We know that people were not able to evacuate because some people just didn't own cars."[65]

In contrast to New Orleans, officials in adjoining Plaquemines Parish cited their early declaration of a mandatory evacuation as the key to achieving a high evacuation rate. Plaquemines Parish President Benny Rousselle (according to Plaquemines Parish Sheriff Jiff Hingle) declared a mandatory evacuation on television at 9:00 a.m. on Saturday, August 27.[66] Sheriff's deputies started working the intersections to turn off traffic lights and expedite outbound traffic.[67] On Sunday, August 28, Placquemines Parish Sheriff's deputies went door-to-door to warn people to evacuate and to identify those who needed help doing so.[68] Hingle said these efforts resulted in Plaquemines Parish having an evacuation rate of 97 to 98 percent, which helped account for the small number of fatalities there — only three.[69]

## The shelter of last resort for those who could not or would not evacuate was inadequate

A critical part of evacuation planning is accounting for those who cannot evacuate on their own, including those without access to private transportation. State and local emergency operations plans task transportation agencies with primary responsibility to assemble buses and other resources to operate this response function. For example, Alabama's Mobile County EOP states: "The principle mode of transportation during an emergency situation will be private vehicles. There will be citizens in Mobile County that do not have private vehicles nor are able to obtain transportation. These people will be looking to the City and County government to provide this emergency transportation. The Mobile County Emergency Management Agency has been given the responsibility of managing and coordinating this task."[70] An annex to the Baldwin and Mobile County plans is more explicit:

> Evacuation preparedness plans consider all persons who do not have access to a private vehicle and therefore would have to rely on public transportation for evacuation. Local governments

attempt to arrange for adequate resources to meet the demand for public transportation. Planning for adequate special needs emergency transportation for residents in private homes is usually the responsibility of local emergency management officials, while transportation for those in health-related facilities is the responsibility of the individual facilities. Although detailed information concerning residents of private homes may be difficult to obtain, each local government is developing procedures for maintaining an up-to-date roster of persons likely to need special assistance. Non-ambulatory patients will require transportation that can easily accommodate wheelchairs, stretchers, and, possibly, life-sustaining equipment. Lack of resources for these needs could result in critical evacuation delays and increased hazards for the evacuees. The Special Needs population for each county changes from year to year and requires public cooperation and assistance to maintain an up-to-date listing.[71]



AP PHOTO/DAVID J. PHILLIP

A FAILURE OF INITIATIVE



Similarly, the New Orleans Plan specifically addresses the issue of those without access to transportation. The plan states that "[s]pecial arrangements will be made to evacuate persons unable to transport themselves…. Additional personnel will be recruited to assist in evacuation procedures as needed."[72] The New Orleans Plan further warns that "[i]f an evacuation order is issued without the mechanisms needed to disseminate the information to the affected persons, then we face the possibility of having large numbers of people either stranded and left to the mercy of the storm, or left in areas impacted by toxic materials."[73]

Specifically, the New Orleans Plan provides that "[t]ransportation will be provided to those persons requiring public transportation from the area," placing the Regional Transit Authority as the lead agency for transportation, supported by multiple federal, state, and local agencies, including the Orleans Parish School Board, New Orleans Equipment Maintenance Division, Louisiana Department of Transportation, Louisiana National Guard, Port of New Orleans, U.S. Coast Guard, New Orleans Public Belt Railroad, and Amtrak.[74] The tasks allotted to the RTA include: "plac[ing] vehicles on alert to be utilized if needed[,] [p]osition[ing] supervisors and dispatch[ing] evacuation buses [and i]f warranted by scope of evacuation, implement[ing] additional service."[75] The New Orleans Plan expressly acknowledges that "[a]pproximately 100,000 Citizens of New Orleans do not have means of personal transportation."[76] Following the mandatory evacuation order, city officials sent the police and fire department through the city "asking" people to go to checkpoints where buses circulating through the city would pick them up — but only to take them to the Superdome which had been opened as a refuge of last resort that day.[77]

Despite the New Orleans Plan's acknowledgement that there are people who cannot evacuate by themselves, the city did not make arrangements for their evacuation. Instead, city officials decided to shelter them in New Orleans. As stated previously, emergency planners prefer evacuation to sheltering, because the sheltered population is subject to the most intense dangers of the storm. Evacuation is also favored because it may be slow and difficult to get relief personnel and supplies back into hurricane ravaged areas.

In addition, New Orleans preparations for sheltering these individuals were woefully inadequate. On Sunday morning, New Orleans officials, instead of working to move individuals out of New Orleans and out of harm's way, were drafting a plan to seize private facilities to create additional "refuges of last resort."[78] Ultimately, city officials designated only the Superdome as such a refuge.

As will be discussed later in this chapter, the Superdome proved to be inadequate for the crowds that had to take refuge there. Only at the last minute did the City ask for food and water and medical personnel for the Superdome. As discussed in the MEDICAL CARE chapter, some of the federal medical assistance teams were called in so late they did not make it to the Superdome before landfall. On Sunday morning, the New Orleans Director of Homeland Security, Terry Ebbert, predicted "nightmare" conditions in the Superdome.[79]

## Individuals share the blame for incomplete evacuation

The role of the individual was also an important factor in metropolitan New Orleans' incomplete evacuation. In Louisiana, state and parish officials said that it is generally the individual's responsibility to evacuate or identify themselves as having special needs if they need help. State and parish officials noted varying degrees of cooperation with evacuations among the individuals in the general

population. They said many residents evacuate early on their own, even before an evacuation is declared. These individuals watch the weather reports when a hurricane is in the Gulf and make their own informed choices.

*Some residents play "hurricane roulette."*

Officials know from experience, however, that some percentage (from 10-25 percent) will not evacuate. The Governor and other state officials said some residents play "hurricane roulette."[80] That is, against the advice of the authorities, they stay and take the risk that the hurricane will hit somewhere else or that they will be lucky and relatively unaffected.

Select Committee staff heard similar comments in Mississippi. Testimony from county emergency management officials as well as Mississippi's governor indicated that "hurricane fatigue" as well as the expense of repeatedly evacuating when storms threaten may have caused some to not heed the mandatory evacuation orders. For example, Barbour testified that various areas in the state had undergone mandatory evacuations for Hurricane Ivan in 2004 and Hurricane Dennis earlier in 2005, but in both instances the storms ultimately made landfall farther east, sparing Mississippi.[81]

Both state and parish officials in Louisiana said the older population, some of whom might be classified as special needs, make up a substantial portion of those playing "hurricane roulette." They said there are a few reasons for this. First, many of the older residents had experience "sitting out" earlier hurricanes such as Betsy (1965) or Camille (1969) and reasoned they could "sit out" Katrina. Second, some of them were just "set in their ways" and would not listen to others' advice, even that of their own adult children, to evacuate. In addition, Katrina was originally headed for the Florida Panhandle, and its turn to the west caught many residents by surprise. Finally, it was the end of the month, when people did not have money for gas to evacuate.[82]

Regardless of their reasons for not evacuating, those that had the means to evacuate and did not do so must share some of the blame. Many of these people paid for

their poor choices with their lives — as rising floodwaters drown them in their homes. Others who stayed, but could have left, suffered the less severe consequences of walking through floodwaters to crowded shelters or other high ground. These individuals suffered in horrible conditions — some with shelter and food and water and some without any of these — while they awaited evacuation, which they could have done for themselves earlier.

## Finding: The incomplete pre-landfall evacuation led to deaths, thousands of dangerous rescues, and horrible conditions for those who remained



AP PHOTO/PAUL SANCYA

Failure of complete evacuation resulted in hundreds of deaths and severe suffering for thousands

Contrary to Blanco's claim that "[t]he word 'mandatory' doesn't mean any more than us getting up, saying, get out[,]"[83] the delay in calling a mandatory evacuation and not enforcing or facilitating that evacuation had real consequences for the city and for the protection of

*"Hurricane Fatigue" — May have caused some people to not heed the mandatory evacuation orders.*

ordinary people. As noted above, many residents believed that an earlier declaration of a mandatory evacuation would have helped get more people out. The President of the Louisiana Nursing Home Association also told Select Committee staff that at least one nursing home had been unable to evacuate its patients prelandfall because it could not find bus drivers by the time the mandatory evacuation order was issued.[84]

While these warnings were sufficient to motivate more than a million citizens to evacuate using the state's revised, well-planned and executed, phased contraflow evacuation plan, more than 70,000 people did not evacuate.[85] Those who did not evacuate were exposed first to the dangers of drowning in the flood waters after the breach of the levees and then to deprivation of food, water, and shelter as they awaited rescue from other locations.

The anticipated flooding of New Orleans, unfortunately, occurred in an environment where a population of more than 70,000 had not evacuated, with thousands of these people remaining in their homes. Hundreds of these people died as floodwaters enveloped low lying neighborhoods in waters above the roof lines.[86]  In tours of the affected areas, Select Committee staff noted the debris lines from the floodwaters were halfway up the roof of many single-story houses in St. Bernard Parish. The parish Director of Homeland Security and Emergency Preparedness Larry Ingargiola told Select Committee staff that during the storm, he had answered emergency cell phone calls from desperate people trapped in their attics, who had no way to escape the rising floodwaters.[87]



AP PHOTO/DAVE MARTIN

As stated before, many of these deaths were the result of hurricane roulette — individuals making decisions not to evacuate, or, for the poor population and those who procrastinated, not to seek shelter in the Superdome or other refuges of last resort in other parishes. As discussed in the MEDICAL CARE chapter,, there were also many deaths among those in medical and nursing home facilities.

An analysis of these deaths indicates that the flooding had a broad impact across all neighborhoods in New Orleans and the immediate surrounding parishes. The Knight Ridder news organization, using preliminary data from the Louisiana Department of Health and Hospitals, reviewed the location, ethnicity, sex and age of the victims. The results of their analysis were published in the Baton Rouge *Advocate* newspaper on December 30, 2005.[88] According to the analysis, "[t]he bodies of at least 588 people were recovered in neighborhoods that engineers say would have remained largely dry land had the [levees] not given way. . . ."[89] However, according to Orleans Parish coroner Dr. Frank Minyard, "[t]he cause of death for many will never be known because their bodies were too badly decomposed by the time they were recovered."[90] Dr. Minyard, however, did estimate that 20 percent of Katrina's New Orleans victims drowned,[91] and scores of others died of other causes awaiting rescue, trapped by floodwaters. Similarly, St. Bernard Parish Coroner, Dr. Bryan Bertucci, is cited as saying that most of the parish's 123 victims drowned in their homes.[92]

The analysis found that the victims of Hurricane Katrina were roughly proportionate to the pre-landfall population (based on census data) in terms of ethnicity, sex, and wealth. In terms of ethnicity, the dead in New Orleans were 62 percent black, compared to 66 percent for the total parish population.[93] The dead in St. Bernard Parish were 92 percent white, compared to 88 percent of the total parish population.[94] The percentage of the dead by sex was approximately the same as the overall population.[95] In terms of wealth, the analysis found that the percentage of dead bodies found in poorer New Orleans and St. Bernard Parish neighborhoods—as measured by poverty rates and median household incomes—was roughly equivalent to their percentage in the overall population.[96]



STATE OF LOUISIANA

The finding about wealthier residents comports with statements by Louisiana First Assistant Attorney General Nicholas Gachassin, Jr. who said that many New Orleans area residents with the wealth and the means to evacuate and who decided not to do so paid for that decision with their lives.[97] Gachassin said that there were approximately 250,000 vehicles left in New Orleans, which he said demonstrated that there were many people with the means to leave the city who chose not to do so.[98] Similarly, the *Advocate* article stated that "at many of the addresses where the dead were found, their cars remained in their driveways, flood-ruined symbols of fatal miscalculation."[99]



KNIGHT RIDDER WASHINGTON

### Failure of complete evacuations required heroic search and rescue efforts

The fortunate ones — among those who had stayed in their homes — were those that were able to climb to their roofs or flee into flooded streets. Many of these individuals had to use tools or other objects to chop through their roofs to escape the rising floodwaters. Thousands of these people were saved by a massive and heroic search and rescue effort. The U.S. Coast Guard alone reported that it rescued more than 33,000.[100] The Louisiana National Guard reported initial rescues of more than 25,000.[101] These people were pulled out of the floodwaters into boats or plucked from roofs into helicopters operated by a wide array of government

agencies, non-governmental organizations, and citizen volunteers. State rescuers included personnel from the Department of Wildlife and Fisheries, local police, and the National Guard.[102] Federal rescue personnel included the Coast Guard, the Department of Defense, and several law enforcement agencies. All 28 of FEMA's Urban Search and Rescue teams (who come from a variety of states and local governments across the nation) were also involved in the rescues. The chapters on THE MILITARY and LAW ENFORCEMENT have more details on the search and rescue efforts by the military and law enforcement, respectively.



STATE OF LOUISIANA

The massive search and rescue effort, while necessary under the circumstances, distracted emergency managers and diverted key assets from other critical missions. According to National Guard officials involved in search and rescue, the entire focus of Monday and Tuesday was on saving lives; that was the Governor's top priority.[103] While the Select Committee does not question Blanco's urgency and priority on saving lives *after* the flooding took place, the same urgency and priority on a more complete evacuation of New Orleans *before* the flooding would have saved lives. If there had been a more complete evacuation, the number of flood victims requiring search and rescue would have been greatly reduced. This would have allowed federal, state, and local emergency response officials to focus earlier on re-establishing communications and situational awareness, and moving commodities into hard hit parishes beyond New Orleans. Many of the helicopters used for search and rescue could have been utilized for these tasks.

## Those in shelters or on high ground suffered through horrible conditions

Those who escaped to shelters or high ground suffered horrible conditions at a number of locations including the Superdome, the Convention Center, and the Cloverleaf, where they arrived through a number of different means. Some had walked or driven before landfall, some had walked after the floodwaters reached their homes, and some had been dropped off by search and rescue boats or helicopters. Each of the locations had their own miserable conditions.

New Orleans opened the Superdome as a "refuge of last resort."[104] As such, it was set up to allow people to survive a storm passing over; it was not intended to house, feed, and water thousands of people for several days. A cadre of more than 200 New Orleans Police and the Louisiana National Guard searched all people entering the Superdome for weapons and contraband.[105] In addition, FEMA and the National Guard had prepositioned food and water in the Superdome, and some additional food and water was trucked in at the last minute.[106] Some of the people arriving had listened to the Mayor's suggestion and had brought a three day supply of food and water, sleeping bags, and clothes. Those who came to the Superdome after the flooding brought nothing but the clothes on their backs.

The conditions in the Superdome soon deteriorated. The initial calm situation Sunday night changed early Monday morning when the dome's roof opened up and the building lost power. While the Superdome was still structurally sound, the hole in the roof scared people; it made noise and water started coming in.[107] The National Guard had to suddenly move thousands of people from the field up into the seating sections.[108] Later, after the flooding, the power went out across the city.

Without power, the only lighting in the Superdome was emergency lighting that ran off the emergency generator. This was not the same as full lighting, and with no power, the air conditioning was also not working. Related to the power outage, the water system went out, causing the toilets to back up, creating an awful stench that grew progressively worse as the days wore on.

Many people could not stand the heat and smell and gathered outside on the surrounding walkway area, which thus became very crowded. Although the situation was bad and deteriorating, there was never a shortage of food and water; they were distributed twice a day at first and continuously later.[109] In general, people were hot, it smelled, and they were anxious to leave. This deteriorating situation led to the increasing urgency among officials and the population to evacuate the Superdome.[110]

Conditions were also unbearable in the Convention Center. The Select Committee was unable to determine exactly when the Convention Center became a shelter and when officials became aware of the deteriorating



AP PHOTO/RON HAVIV/VII



AP PHOTO/DAVID J. PHILLIP

People initially went to the Convention Center after the breaches of the levees late Monday night or early Tuesday morning. As the floodwaters rose, people left their homes and headed for higher ground. The Convention Center is near the Mississippi River levee, one of the higher elevations in New Orleans. The National Guard estimated that there were 19,000 people there.[114] Conditions in the Convention Center were notably worse than the Superdome in several ways. Like the Superdome, the Convention Center had no electrical power, no lighting, no air conditioning, and no functioning toilets. But unlike the Superdome, the Convention Center had no authorities or security on hand, no weapon screening, no food and no water.[115]



AP PHOTO/ERIC GAY



AP PHOTO/ERIC GAY

conditions there. None of the officials who spoke with the Select Committee staff were willing to take responsibility for the operation of the Convention Center as a "shelter," and none claimed that they knew about the situation until Wednesday morning or afternoon, August 31.

While these officials stated that the Convention Center was never designated as a shelter like the Superdome, Mayor Nagin's testimony suggested that the city had sanctioned that location. In his prepared statement, the mayor stated that "[t]he swelling crowd at the Superdome and the number of people needing shelter required us to open the Convention Center as another refuge."[111] Brown was widely criticized for saying on Thursday night that he only found out that afternoon about the people at the Convention Center.[112] Late that same night, however, the city of New Orleans finally requested that the National Guard secure and evacuate the Convention Center in conjunction with the New Orleans Police Department the next day.[113]

Other high ground spots became spontaneous gathering points with miserable conditions. Many people went to these locations on their own, because their houses were flooded and they were looking for dry land. In addition, many people were dropped off at these sites by rescuers. Because of initial emphasis on saving lives, people were just dumped off there by helicopters or boats without any initial concerns for providing them with food or water.

Unlike the Superdome or the Convention Center, there was no shelter from the sweltering sun. Specific locations

where evacuees found themselves included the Cloverleaf (where two highways met), the Industrial Canal levees, the Mississippi River levees, and Broad Street levees. These locations had generally not been manned with security personnel such as police, nor had there been any plans to supply them with food, water, or medical treatment.



FEMA

The "Cloverleaf" on the interstate was one of the worst locations. The site was being used for medical triage and evacuation, so there was initially some food and water there, at least for the medical patients. However, additional people arrived on their own or by the helicopters or boats that rescued them from the water. The supply of food and water was not sufficient for the crowd, which eventually grew to 6,000-7,000 people.[116]

## Flooding further hampered relief efforts for those not initially evacuating

Efforts to provide relief to those stranded at the Superdome, Convention Center, the Cloverleaf, and other positions of high ground were stymied by the floodwaters. Simple tasks, such as trucking food and water to these locations, were complicated by flooded highways that necessitated the use of high clearance vehicles or long detours. Some of these sites were very difficult to supply or evacuate later because they were "islands" completely surrounded by water. As mentioned in the COMMUNICATIONS and the COMMAND AND CONTROL chapters, the lack of communications, situational awareness, command and control, and effective logistics systems further hampered efforts to identify many of these locations and coordinate relief. The floodwaters also complicated efforts to conduct a post landfall evacuation, as discussed in the next section.

# Finding: Federal, state, and local officials' failure to anticipate the post-landfall conditions delayed post-landfall evacuation and support

## Federal, state, and local officials had not prepared for post landfall evacuation despite predictions of extensive flooding

While these victims endured horrendous conditions, hundreds of city buses and school buses that could have been used for evacuation sat useless, flooded or without drivers. Nagin testified that the school buses belong to the New Orleans school district and, to his credit, he is now considering a cooperative agreement with the school district to move the school buses out of the area for the next storm.[117] Nagin also testified that the RTA buses were "always staged, or have been staged, in an area that has been high and dry throughout every storm that has ever hit the City of New Orleans; and we expected the same for this event. Unfortunately, those buses flooded also because 80 percent of the city went under water."[118] He testified that he had had trouble getting drivers even for the 20 buses that had taken residents to the Superdome prelandfall "because most [drivers] had evacuated" and that the National Guard was not available to drive buses.[119]



FEMA



By the time Hurricane Katrina made landfall at 6:10 a.m. central time on Monday, August 29, approximately 10-12,000 people were sheltered in the Superdome.[120] The massive flooding led to urgent search and rescue operations throughout the city and in other parishes as well. Those search and rescue operations moved tens of thousands of people off of their roofs and out of the flood waters to shelter or high ground. As the flood waters rose, people also self-evacuated from the city to the Superdome, the Convention Center, and other high ground around the city.

As previously noted, the Governor and the Mayor were well aware of the probability of levee breaches and flooding in New Orleans following a Category 4 or 5 hurricane. Federal officials were also aware of that probability. When Brown was asked by Select Committee Member Congressman Hal Rogers: "Was it known by you and others that the flood wall around New Orleans was only rated to take a category 3 hurricane,"[121] he replied, "Yes. That was a fact that came out in [the Hurricane Pam Exercise] that the levees may or may not hold, that the storm surge may or may not top them, they could top — the storm surge could top the levees without breaking and they could top and also break the levees. So we knew both of those were potential."[122] As Vice Mayor of Newport News, Virginia, and city planner Charles Allen testified before the Select Committee: "[I]t is clear from information in the news that the U.S. Government, in the form of the U.S. Weather Service [sic], the Federal Emergency Management Agency, and the U.S. Corps of Engineers [sic] understood the magnitude of this storm."[123]

### Planning for the post landfall evacuation had to be done in emergency environment

Despite the advance knowledge of extensive flooding, the first task order for buses by the federal government to evacuate New Orleans post landfall was not issued until 1:30 a.m. on Wednesday, August 31.[124] Although Blanco claims that Brown told her that he had 500 buses standing by and that she was concerned when those buses did not materialize sooner,[125] the Select Committee found no other evidence that any such buses were, in fact, "standing by" or that Brown had made such a statement to Blanco.

Developing a plan to evacuate the Superdome and other locations after the flooding was a complicated endeavor. That planning included determining the number of buses needed, accessible routes to the Superdome and other locations, security needs, and the ultimate destination of those evacuated. This planning occurred in a highly degraded environment that included limited communications that prevented a full understanding of the scope of the needs and even the visibility of deployed resources. Repeatedly, during the daily video teleconferences, state and federal officials expressed their frustrations with the level of communications.[126]

In assessing the needs for the Superdome alone, Homeland Security Operations Center (HSOC) Spot Report Number 30, prepared at 2:00 a.m. on Wednesday, August 31, (even after the federal task order for buses) reflects that (1) there are 12-15,000 people at the Superdome, (2) the water is not rising as rapidly as previously feared, (3) the loss of electricity does not appear imminent, (3) the intention was to begin evacuations that day and continue them over the next few days, (4) alternate shelters have not been identified, and (5) two days of food and water is on hand.[127] According to that document, neither the means of egress to the buses for the Superdome population nor the alternative location to which they would be evacuated had been determined.[128] Options for egress from the Superdome included walking once the State Police can verify a route, constructing temporary bridging, "construct[ing] a sandbag dyke to allow for walk[ing] out," "us[ing] DOD landing craft to shuttle . . . to buses," and using helicopters for short flights to buses.[129] Alternative shelters included "stadiums in the State college system but other options are possible."[130]  As we now know, many of the buses took people to the Astrodome in Houston. But as of Wednesday morning, FEMA officials were still concerned that Blanco had not spoken to Texas Governor Rick Perry to confirm that part of the plan.[131]

The planning process for the post-landfall evacuation did not really begin until Tuesday, August 30. Blanco testified that she did not realize the full consequences of the levee breaches until Tuesday morning, when she was able to travel to New Orleans and see the effects of the flooding for those sheltered in the Superdome.[132] At the noon video teleconference, Smith asks only that

[Y]ou realize what's going on and the sense of urgency here needs to be ratcheted up. Everybody is being fully cooperative, but in the deployment of some of these Federal assets, especially transportation for the evacuation effort that we're trying to coordinate, we don't need anything to slow that down. The push of the resources and so forth to date has not been an issue, but we don't need to let it become an issues [sic] because we're going to literally have tens of thousands of people that we've got to push these supplies too [sic].[133]

Later that day and into the evening, FEMA official Phil Parr and others sheltered in the Superdome, apparently unaware of the evacuation planning at the EOC, began their own planning to evacuate the Superdome as they observed the rising waters around the building and realized that people would not be able to walk out of the dome and return home.[134] According to Parr, the team inside the Superdome devised a plan involving the use of helicopters to airlift people away from the Superdome. They concluded that they needed at least nine helicopters, of which the Louisiana National Guard had three.[135]



FEMA

They communicated this plan to the FEMA Regional Response Center (FEMA RRC) in Denton, Texas and got initial approval for it, with the RRC searching for the assets to implement it.[136] They believed their plan would have been able to move virtually all of the evacuees from the Superdome at that time in about 30 hours.[137] The next day, Parr learned that Commander of Joint Task Force Katrina Lt. General Russel L. Honoré had stopped that plan as he came to Louisiana to lead Joint Task Force Katrina.[138]

At the same time, there remained some doubt about the consequences of the levee breaches. General Don Riley of the Army Corps of Engineers reported at the noon video teleconference on Tuesday, August 30, that "[t]he lake [Pontchartrain] level may recede quickly enough before we can get anything in there [to fill the breach] and then we can turn that pump station on with the city and turn that water around and pump it back into the lake.[139] FEMA  Federal Coordinating Officer (FCO) Bill Lokey discussed at the same video teleconference that they were "developing the distribution plan [for commodities] that we can get them out to the communities as the water does recede in some areas . . . ."[140]  The FEMA Acting Director for Response during Hurricane Katrina, Ed Buikema, also said that on Tuesday and Wednesday, August 30 and 31, there was still some hope that the breaches in the levees could be repaired quickly.[141]

By the Wednesday, noon video teleconference, the numbers at the Superdome had swollen to approximately 23,000.[142]  Reggie Johnson from the U.S. Department of Transportation reported that there were 455 buses under contract and "it looks like we've got about 200 that are currently in place, with the remainder that should be coming in on a staggered basis."[143]  The next day, Johnson reported:

120 buses . . . departed for [the] Houston Astrodome last night. And there are 300 buses in the New Orleans area. You may not see those because actually they're staging at what's called the Poker Palace Texaco refueling site, and that's in a place in Louisiana, and I understand that they are drawing down from that site. They're bringing in about 40 buses at a time. There are 155 buses that were requested, and they are en route and should arrive at the truck stop by midnight tonight. We have not received any other requests . . . .[144]

Blanco also attempted to deploy state resources. She issued an executive order on August 31 to commandeer school buses to assist in the evacuation.[145] While these buses could handle short trips (such as to the airport or other local shelters), they were not appropriate for long trips, such as the trip to Houston.

### Lack of willing drivers and diversions of buses further delayed Superdome evacuation

But even as the buses were arriving there were further delays. There was evidence that drivers refused to drive into New Orleans because of perceived security problems.[146] Although the state had found 100 school buses, the drivers, according to Smith, "are little old ladies, and I don't blame them, they don't want to go and drive in and do evacuations."[147] He added that 100 military police had just arrived at Belle Chasse Naval Air Station right across from the Superdome and that two Chinooks with National Guard MPs were arriving.[148]

*Although the state had found 100 school buses, the drivers, according to Smith, "are little old ladies, and I don't blame them, they don't want to go and drive in and do evacuations."*

In addition, there were concerns that drivers had to meet the requirements for limiting hours of service between rests. In that same video teleconference, Smith reported that the Governor would waive the commercial drivers license requirements.[149] DOT's Johnson advised that he would "coordinate with the bus companies to ensure that we can start doubling up on the drivers."[150] Smith responded to this report by advising that they were about to run out of buses and that he had just made a new request for 500 buses.[151]

Finally, the buses for the Superdome did not always get to the Superdome. Parr said that the Governor diverted some buses from the Superdome to other locations like the Cloverleaf and other high ground where, unlike the Superdome, there was no food, water, or shelter.[152] Buikema agreed that buses that were intended for the

Superdome actually picked people up off the highway and filled up before getting to the Superdome.[153]

Strangely, the video teleconference transcripts never refer to evacuating the Convention Center. At one point, Smith seems to recognize that the evacuation problem is broader than the Superdome, when he says on September 1, "I would ask you to quit referring to evacuation from the Superdome, but maybe an evacuation from the greater New Orleans area from the Superdome."[154]

### The insatiable demand for more buses was a constant source of frustration

On September 2, Smith expressed substantial frustration with the number of available buses: "I've got 2500 people on Algiers Point right now, which is not right in the downtown area, that we could be sending missions to and getting off. Those people have been on levees for a day and a half. Get us the transportation assets with drivers, and we'll start making that happen quicker and more effectively, and I told you all that yesterday.[155] But by September 2, DOT's Johnson reported that of apparently 1,100 buses in the system, "800 of those buses . . . are actually operating throughout."[156] Despite having 1,100 buses operating, DOT recognized at that time that it "appears that what we're going to have to do is increase the amount of buses from the 1,100 to an additional 5-600 buses for their operation."[157] But DOT had no "visibility of how many buses [were] right now within the state of Louisiana and getting close to staging areas."[158] Louisiana National Guard General Graham, who was coordinating the bus evacuation for the state reported that there were 40 commercial buses "on the ground."[159]

Despite the large number of buses deployed, there were still not enough. Some delays were inherent in the system. DOT's Johnson related that buses were delayed at "chokepoints" at their destinations where it takes three to four hours to unload at times.[160] And Graham reported that buses would be held up to allow drivers to rest: "Many bus drivers have driven a long way and must rest prior to driving."[161] These factors alone could not have accounted for the shortage. More likely, the degraded environment prevented Smith and other federal officials from realizing the full scope of the need for evacuation by bus that even 1,100 buses could not satisfy.

## Airlift operations supplemented evacuations by the buses

The effort to evacuate New Orleans was greatly facilitated by the establishment of an air evacuation component at the New Orleans International Airport. This activity required significant coordination regarding obtaining aircraft and crews, passenger screening, security (crowd control), air traffic control, passenger boarding, availability of passengers for departure, and itinerary management. According to Air Transport Association (ATA) officials, late Thursday, September 1, Deputy Secretary Michael Jackson called the ATA President Jim May and said they had 25,000 people who needed to be evacuated.[162] That night, airplanes from Washington, D.C. were in transit to New Orleans.[163] Friday morning, planes started arriving with Transportation Security Administration (TSA) officials, flight crews, volunteers, and supplies. Planes were loaded around the clock from that weekend through most of the following week. A total of 13,000 evacuees were moved using 129 airplanes.[164]

Despite their overall success, airlift operations needed to feed into an overall management system. There were times when the military and the private carriers were duplicating efforts. Moreover, the coordination of all the parts was complex. For example, there were no pre-existing contracts in place for air support.[165] Landstar asked carriers like Delta, Jet Blue, Spirit, and approximately a dozen commercial airlines for help.[166] These airlines provided planes ("hot spares" or back-up planes) flight crews, and additional staff, asking at most for jet fuel reimbursement. In the future airlines may be interested in entering into a Civil Reserve Air Fleet (CRAF) program (a contractual program where civil airlines

augment military operations during a crisis in exchange for Defense Department business).

# Conclusion

None of this had to happen. The potential effects of a Category 4 or 5 storm were predictable and were in fact predicted. Declarations of mandatory evacuations — declarations that



could have resulted in a more complete evacuation — were delayed or not done at all. New Orleans' decision to shelter instead of evacuate the population, as well as individuals' reluctance to leave, further resulted in an incomplete evacuation. The thousands of people left in New Orleans suffered death or had to be rescued to await an evacuation that should have already occurred before landfall.



Regarding the post landfall evacuation, neither the New Orleans Plan nor the state's Emergency Plan expressly provided for the protection of vital transportation assets to evacuate the City after flooding. State and local officials also failed to prepare for such an eventuality, regardless of the plans. Nor did the expert federal agency anticipate the needs of the state and city to bring to bear immediate relief. As DHS Secretary Chertoff observed, planning was not what it should be at DHS.[167] Despite years of recognition of the threat that was to materialize in Hurricane Katrina, no one — not the federal government, not the state government, and not the local government — seems to have planned for an evacuation of the city from flooding through breached levees.  Having failed to anticipate these needs, poor communications that hampered situational awareness, hours of service limits, security needs, and logistical problems further delayed the deployment of buses to evacuate the city. ■



1   State of LA and U.S. Dep't of Homeland Security, <u>Louisiana Citizen Awareness & Disaster Evacuation Guide</u> [hereinafter *LA Evacuation Flyer*]; *see also*, State of LA, <u>Emergency Operations Plan</u>, (Apr. 2005) [hereinafter *LA State Plan*]; <u>Supplement 1A: Emergency Operations Plan: Southeast Louisiana Hurricane Evacuation and Sheltering Plan</u> (Rev. Jan. 2000) [hereinafter *LA State Evacuation Plan*].

2   City of New Orleans, <u>Comprehensive Emergency Management Plan</u>, (2004) at 51 [hereinafter *New Orleans Plan*].

3   *Id.*

4   *Id.*

5   *Id.* at 54.

6   *Id.* at 48.

7   *Id.* at 50.

8   *Hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi Before Select Comm.*, 109th Cong. (2005) at 63-64 (statements by Haley Barbour, Governor of MS, and Robert R. Latham, Jr., Exec. Dir., MS EMA) [hereinafter *Dec. 7, 2005 Select Comm. Hearing*].

9   *Id.*

10   *Id.* at 34 (statement of Robert R. Latham, Jr., Exec. Dir., MS EMA).

11   *Hearing on Hurricane Katrina: Preparedness and Response by the State of Alabama Before Select Comm.*, 109th Cong. (2005) at 46 (statement of Bob Riley, Governor of AL) [hereinafter *Nov. 9, 2005 Select Comm. Hearing*].

12   *Id.* at 122-123 (statement of Bruce Baughman, Dir., AEMA).

13   Director's Brief, Director of MS Emergency Management Agency, Brief as of 1900 hours, Aug. 28, 2005 (MEMA -0010688) (Aug. 28, 2005) at 3.

14   *Dec. 7, 2005 Select Comm. Hearing* at 2 (written statement of Brent Warr); *see also id.* at 157 (statement of Benjamin J. Spraggins, Dir., Harrison County EMA).

15   *Id.* at 64, 74 (statement of Haley Barbour).

16   Director's Brief, Director of Mississippi Emergency Management Agency, Brief as of 1900 hours, Aug. 28, 2005 (MEMA -0010688) (Aug. 28, 2005) at 3.

17   *See generally*, Director's Brief, Director of Mississippi Emergency Management Agency, Brief as of 0430 hours, Aug. 29, 2005 (MEMA -0010696) (Aug. 29, 2005).

18   September 27 hearing at 68-9.

19   *Id.* at 70.

20   Meeting Summaries, FEMA Regional Emergency Liaison Team Conference Calls (Aug. 28, 2005 – Sept. 02, 2005).

21   Baldwin County, AL, Hurricane Katrina Time Line of Events (Doc. No. 002553AL). The notation on the Time Line reads "volunteer evacuation" which Select Comm. Staff interpreted as a "voluntary evacuation."

22   Memo to Files, Alabama Emergency Management Agency EM/2000 Tracker System message 05-1675, (Aug. 28, 2005). Two days before the request for a mandatory evacuation in Alabama, AEMA officials had already requested transportation assistance for purposes of coordinating evacuation traffic flow out of Florida. Memo to Files, Alabama Emergency Management Agency EM/2000 Tracker System message 05-1611, (created Aug. 26, 2005; completed Aug. 28, 2005).

23   Press Release, Office of Gov. of AL, Governor Riley Orders Evacuation for Parts of Mobile and Baldwin Counties (Doc. No. 002580AL); Press Release, Office of Gov. of AL, Governor Riley Orders Evacuation for Parts of Mobile and Baldwin Counties (Aug. 28, 2005), *available at* http://www.governorpress.alabama.gov/pr/pr-2005-08-28-02-katrina_evac_order.asp [last visited Jan 21, 2006].

24   *Nov. 9, 2005 Select Comm. Hearing* at 28 (statement of Bob Riley).

25   Memo to Files, Evacuee Population Presently in AL by County as of 9/28/05, AL Emergency Management Agency (Oct. 10, 2005) (Doc. No. 002576AL).

26   *Hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana Before Select Comm.*,109th Cong. (2005) at 67 (statement of Kathleen Babineaux Blanco) (Blanco: "I am very happy to talk about our evacuation process, because it is the one thing that we did masterfully.") [hereinafter *Dec. 14, 2005 Select Comm. Hearing*]; *id.*, at 94 (statement of Kathleen Babineaux Blanco, Governor of LA) (Chairman Davis: "This was the most successful evacuation you ever had, right?" Blanco: "Absolutely without a doubt.").

27   *Id.* at 68-69 (statement of Jeff Smith, State Coordinating Officer and Deputy Dir., LA Office of Homeland Security and Emergency Preparedness).

28   *Dec. 7, 2005 Select Comm. Hearing* at 61 (statement of Haley Barbour).

29   *See* Audio recordings of Hurricane Katrina Conference Calls, Louisiana State Emergency Operations Center (Aug. 26-28, 2005).

30   *Dec. 14, 2005 Select Comm. Hearing* at 138 (statement of Kathleen Babineaux Blanco).

31   *Id.* at 88 (statement of Jeff Smith). However, despite this insistence that forcing people out of their homes prelandfall was not an option, it was apparently still a very live option post landfall and may have been carried out, even if not ordered. *See* E-mail correspondence from John Jordan, Military Assistant to then FEMA Director Michael Brown, to Michael Brown, et al. (Sept. 4, 2005) (10:33 a.m.) ("Appears state is reluctant to execute a true mandatory evacuation – i.e., forced if necessary. Therefore, State is pushing for shelters (includes all life support) in [New Orleans] to house citizens that will not leave voluntarily."); *see* E-mail correspondence from John Jordan, Military Assistant to then FEMA Director Michael Brown, to Michael Brown, et al. (Sept. 5, 2005) (9:13 a.m.) ("Governor Blanco has decided not to force any evacuations in New Orleans. Resident are still encouraged to evacuate. Buses were sent through NO on previously in deified evac routes today and no additional residents would board buses for voluntary evacuation. It appears that the evacuation phase of operations is winding down, or may be completed. Since FEMA did not anticipate reversal of decision for mandatory evacuation, crisis-action planning is now underway to provide this support."); *see* E-mail correspondence from John Jordan, Military Assistant to then FEMA Director Michael Brown, to Michael Brown, et al. (Sept. 5, 2005) (10:04 a.m.) ("Evacuations are slowing to a trickle."); *see* E-mail correspondence from John Jordan, Military Assistant to then FEMA Director Michael Brown, to Michael Brown, et al. (Sept. 6, 2005) (11:17 a.m.) ("Decision by Governor Blanco to not force any evacuations in New Orleans remains in place. Mayor of New Orleans is not forcing evacuations in NO and is not prohibiting residents from returning. Residents are still strongly encouraged to evacuate. . . . [S]ince NO is not being fully evacuated, requirements exist to provide all commodities to the remaining population."). *See also Hearing on Hurricane Katrina: Voices from inside the Storm Before Select*

*Comm.*, 109th Cong. (2005) at 18 (statement of Terrol Williams) ("I was [in my mother's home] for about a week until September 8th or so, at which point a rescue crew comprised of State and local police as well as armed military officers forced me to evacuate. They arrived in a truck and two tanks and confiscated my weapons. I didn't resist them, and the officers weren't rough with me . . . . The rescue team took me to the Convention Center . . . . and from there I was immediately taken by helicopter to the airport. The next morning I was put on a Delta 757 airplane. . . . Passengers weren't told where they were going until after the plane had taken off.") [hereinafter *Dec. 6, 2005 Select Comm. Hearing*].

32  *See* ALA. CODE §§ 31-9-6 (4); 31-9-8 (4); 31-9-14 and 31-9-15 (2005).

33  *Id.* at 22 (statement of Bob Riley).

34  *Dec. 14, 2005 Select Comm. Hearing* at 65 (statement of Hal Rogers) ("Saturday evening at 7:30, Max Mayfield, the head of the National Hurricane Warning Center, personally, for the second time in his 36-year career, personally, called the mayor [of New Orleans] and the [Louisiana] Governor, all the Governors, by phone to reiterate the severity of this upcoming storm. 8 p.m., Mayfield telephones Mayor Nagin."); *see also id.* at 72 (statement of Kathleen Babineaux Blanco) ("On Saturday morning, indeed, Max Mayfield didn't call until – in fact he didn't call until Saturday night.").

35  Press Conference by C. Ray Nagin, Mayor of New Orleans, and Kathleen Babineaux Blanco, Governor of LA, et al. Aug. 28, 2005 (Blanco: "Just before we walked into this room, President Bush called . . . and asked me to please ensure that there would be a mandatory evacuation of New Orleans.") [hereinafter Nagin-Blanco Press Conference].

36  Public Advisory, National Weather Center (New Orleans, LA), Urgent Weather Message: Devastating damage expected (Aug. 28, 2005; 10:11 a.m. CDT).

37  Interview of Kathleen Babineaux Blanco, CNN Saturday Night, (Aug. 28, 2005) (8:00 p.m. ET) (Blanco: "We are very concerned about the people in the City of New Orleans and some of the people in the region as well, who have not actually gotten the message. They went to bed last night thinking the hurricane was going to Florida. And some have just gotten busy in their day and not gotten – you know, had any media contact, and don't even know this is happening. So, we're hoping that by tonight, that they're watching you and getting the message that it's a real threat. It's very serious. We want them to get out of town.").

38  *Id.*

39  Gordon Russell, *Ground Zero*, TIMES-PIC. (New Orleans), Aug. 29, 2005 at 1.

40  Interview of Kathleen Babineaux Blanco, ABC News Good Morning America, (Aug. 28, 2005).

41  Interview of C. Ray Nagin, At Large with Geraldo Rivera, Fox News Channel, (Aug. 28, 2005) (10:00 p.m. ET).

42  *Id.*

43  *Id.*

44  *Dec. 14, 2005 Select Comm. Hearing*, at 74 (statement of Kathleen Babineaux Blanco).

45  *Id.*

46  Mark Schleifstein, *Katrina Puts End to Lull*, TIMES-PIC. (New Orleans) Aug. 27, 2005 at 1.

47  Bruce Nolan, *Katrina Takes Aim*, TIMES-PIC. (New Orleans) Aug. 28, 2005 at 1.

48  *Id.*

49  Nagin-Blanco Press Conference.

50  *New Orleans Plan* at 12.

51  *Id.* at 48, 50.

52  Nagin-Blanco Press Conference (emphasis supplied).

53  *Id.* (emphasis supplied).

54  Audio recordings of Hurricane Katrina Conference Calls, Louisiana State Emergency Operations Center (Aug. 28, 2005) (12:00 p.m.) (statement of Aaron Broussard).

55  Nagin-Blanco Press Conference.

56  *Dec. 14, 2005 Select Comm. Hearing* (written statement of Jeff Smith). This figure was arrived at based upon the reported number of individuals evacuated by officials from New Orleans.

57  *Id.* at 162 (statement of C. Ray Nagin).

58  *Id.*

59  *Dec. 6, 2005 Select Comm. Hearing* at 23 (statement of Doreen Keeler).

60  *Id.* 90 (statement of Doreen Keeler).

61  *Id.* at 49-50 (statement of Dyan French).

62  *Id.* at 61 (statement of Terrol Williams).

63  *Id.* (statement of Doreen Keeler).

64  *Id.* at 64 (statement of Leah Hodges).

65  *Id.* at 137-138 (statement of Barbara Arnwine).

66  Interview by Select Comm. Staff with Sherriff Hingle, Plaquemines Parish Sherriff, in New Orleans, LA (Nov. 7, 2005).

67  *Id.*

68  *Id.*

69  *Id.*

70  Mobile County, AL, *Comprehensive Emergency Operations Plan*, Mobile County Emergency Mgmt. Agency (July 1, 2004), at ESF1-11.

71  Baldwin County, *Emergency Operations Plan, Annex O: "Alabama Hurricane Evacuation Study, Technical Data Report for Mobile and Baldwin Counties"* (May 2001).

72  *New Orleans Plan* at 50.

73  *Id.* at 45.

74  *Id.* at 50, 24.

75  *Id.* at 54.

76  *Id.* at 55.

77 *Dec. 14, 2005 Select Comm. Hearing* at 172 (statement of Terry Ebbert, Dir. of Homeland Security, City of New Orleans).

78 *See* Audio recordings of Hurricane Katrina Conference Calls, LA State Emergency Operations Center (Aug. 26-28, 2005).

79 *Id.* (statement of Terry Ebbert).

80 *Dec. 14, 2005 Select Comm. Hearing* at 73 (statement of Kathleen Babineaux Blanco).

81 *Dec. 7, 2005 Select Comm. Hearing* at 62 (statement of Haley Barbour).

82 *Hearing on Hurricane Katrina: The Role of the Federal Emergency Management Agency Before Select Comm.*, 109th Cong. (Sept. 27, 2005) at 67-69 (statements of Michael Brown and Gene Taylor) [hereinafter *Sept. 27, 2005 Select Comm. Hearing*].

83 *Dec. 14, 2005 Select Comm. Hearing* at 74 (statement of Kathleen Babineaux Blanco).

84 Interview by Select Comm. Staff with Joseph Donchesse (Pres., LA Nursing Home Assoc.) in Baton Rouge, LA (Nov. 10, 2005).

85 *See generally Dec. 14, 2005 Select Comm. Hearing* (written statement of Jeff Smith).

86 John Simerman, *Breaches took toll: N.O. ruin greatly increased*, ADVOCATE (Baton Rouge) Dec. 31, 2005 at 1A, 8A [hereinafter *Breaches Article*].

87 Interview by Select Comm. Staff with Larry Ingargiola, St. Bernard Parish Director of Homeland Security and Emergency Prepaedness, in St. Bernard Parish, LA (Nov. 3, 2005).

88 *Breaches Article*, 1A; *see also*, Knight Ridder Tribune News, *Most Katrina Victims Older; many white*, ADVOCATE (Baton Rouge) Dec. 30, 2005 at 9A [hereinafter *Analysis Article*].

89 *Breaches Article* at 1A.

90 *Breaches Article* at 8A.

91 *Id.*

92 *Id.*

93 *Analysis Article* at 9A.

94 *Id.*

95 *Id.*

96 *Id.* ("The comparison showed that 42 percent of the bodies found in Orleans and St. Bernard parishes were recovered in neighborhoods with poverty rates higher than 30 percent. That's only slightly higher than the 39 percent of residents who lived in such neighborhoods, according to the census data. Similarly, 31 percent of the bodies turned up in areas with poverty rates below 15 percent, where 30 percent of the population lived. The median household income in neighborhoods where Katrina victims were recovered was about $27,000 a year, just under the $29,000 median for the overall area. One-fourth of Katrina deaths fell in census tracts with median incomes above $35,300. One-fourth of the area's pre-storm population lived in tracts with median incomes above $37,000.")

97 Interview by Select Comm. Staff with Nicholas Gachassin, Jr., First Assistant Attorney General, LA Department of Justice, in Baton Rouge, LA (Nov. 6, 2005).

98 *Id.*

99 *Analysis Article* at A3.

100 *Hearing on Hurricane Katrina: Preparedness and Response by the Department of Defense, the Coast Guard, and the National Guard of Louisiana, Mississippi, and Alabama Before Select Comm.*, 109th Cong. (2005), at 2 (written statement of R. Dennis Sirois), [hereinafter *Oct. 27, 2005 Select Comm. Hearing*]; *see also id.* at 37 (statement of R. Dennis Siros).

101 LA Nat. Guard, *Overview of Significant Events Hurricane Katrina* at 23-24 (Dec. 7, 2005) [hereinafter *LANG Overview*].

102 *Dec. 14, 2005 Select Comm. Hearing* (written statement of Jeff Smith).

103 *See* Interview by Select Comm. Staff with General Brod Veillon, LA National Guard Commander for Task Force Minnow, in New Orleans, LA (Nov. 3, 2005); *see also* Interview by Select Comm. Staff with Colonel Barry Keeling, LA National Guard Commander of Task Force Eagle, in New Orleans, LA (Nov. 3, 2005).

104 Nagin-Blanco Press Conference (Nagin: "At noon today, the Superdome will then be opened up as a refuge of last resort, where we will start to take citizens that cannot evacuate.").

105 *LANG Overview* at 6.

106 *See* Interview by Select Comm. Staff with Jacques Thibodeaux (LtC, LA Nat'l Guard) in New Orleans (Nov. 3, 2005) [hereinafter Thibodeaux Interview]; *see* Interview by Select Comm. Staff with Mark Mouton (Col, LA Nat'l Guard) in New Orleans, LA (Nov. 3, 2005) [hereinafter Mouton Interview]; Interview by Select Comm. Staff with Scott Wells (Field Officer, FEMA) in Baton Rouge, LA (Nov. 9, 2005) [hereinafter Wells Interview]; *see also* E-mail correspondence from David Passey (Dep't Homeland Security) to Cindy Taylor (Dep't Homeland Security), et al. (Aug. 28, 2005) (Doc. No. DHS 007265) ("Seven trucks (5 water and 2 MREs) are less than 2 hours away from the Superdome.").

107 Thibodeaux Interview; Mouton Interview.

108 *Id.*

109 *Id.*

110 *Id.*

111 *Dec. 14, 2005 Select Comm. Hearing* at 3 (written statement of C. Ray Nagin).

112 *See FEMA Chief Mike Brown* (NPR: All Things Considered broadcast, Sept. 5, 2005) (playing audio clip from CNN interview by Paula Zahn, CNN anchor, and Michael Brown, FEMA Director:

"Mr. MICHAEL BROWN (FEMA Director): We just learned about that today. And so I have directed that we have all available resources to get to that Convention Center to make certain that they have the food and water. And I'll tell you...

Ms. PAULA ZAHN (CNN): But, sir, you're not telling me that you just...

Mr. BROWN: ...also—and I will tell you...

Ms. ZAHN: ...learned that the folks at the Convention Center didn't have food and water until today are you?

Mr. BROWN: Paula, the federal government did not even know about the Convention Center people until today [Thursday, Sept. 2,

2005]."); *see NBC Today Show* (NBC television broadcast Sept. 10, 2005) (New Orleans co-host, Lester Holt: "That's right Campbell. If you'll recall, Michael Brown, the head of FEMA, acknowledged it was about 24 hours after those first TV reports of people holed up here [the New Orleans Convention Center] without food, in need of water, that he found out about it. That opened him up to a lot of criticism."); *see*, Editorial Opinion, *Bush: First the Head of FEMA; Would you trust your safety to Michael Brown?*, DAILY NEWS (Phila.), Sept. 7, 2005, at 17 ("Here was a clueless bureaucrat [Mr. Brown] who didn't seem to believe the horror stories coming out of the New Orleans convention center."); *see*, *Leadership: Some tragedy avoidable*, CHARLESTON GAZ. (W. Va.), Sept. 3, 2005, at 4A ("FEMA Director Michael Brown admitted that he did not know until Thursday that thousands of people had been stranded at the New Orleans Convention Center for days without water of foods, as well as in the Superdome. How could he not know? Anyone listening to local radio knew.").

[113] LA Nat. Guard, *Timeline of Significant Events Hurricane Katrina*, at 7 (Dec. 7, 2005) [hereinafter *LANG Timeline*].

[114] Thibodeaux Interview; Mouton Interview; *LANG Overview* at 23-24.

[115] Thibodeaux Interview; Mouton Interview.

[116] Interview by Select Comm. Staff with Gordon Mitchell (LA State Police) in Baton Rouge, LA (Nov. 4, 2005).

[117] *Dec. 14, 2005 Select Comm. Hearing* at 200, 202 (statement of C. Ray Nagin). It is important to remember, however, that the school district is already a support agency for transportation under the New Orleans Plan.

[118] *Id.* at 201 (statement of C. Ray Nagin). There was evidence that a portion of the RTA bus fleet was saved by being moved to the wharf by the Mississippi River. Email from Leo Bosner to Linda Mammett-Morgan, et. al., transmitting Final Version DHS 0230 Situation Report input for Sept. 2, 2005, Doc. No. DHS-FEMA-0051-03122-03151, at 03128 (Sept. 02, 2005). According to RTA General Manager William DeVille, 197 of the RTA's 372 buses were destroyed. *Hearing on Rebuilding Highway and Transit Infrastructure on the Gulf Coast following Hurricane Katrina: State and Local Officials Before House Subcomm. on Highways, Transit and Pipelines of the Comm. on Transportation and Infrastructure,* 109th Cong. (2005) (statement of William J. DeVille). Whether the buses were available or not, no drivers were apparently available.

[119] *Dec. 14, 2005 Select Comm. Hearing* at 201 (statement of C. Ray Nagin).

[120] Thibodeaux Interview; Mouton Interview.

[121] *Sept. 27, 2005 Select Comm. Hearing* at 57 (statement of Rep. Hal Rogers).

[122] *Id.* at 58 (statement of Michael Brown).

[123] *Dec. 6, 2005 Select Comm. Hearing* at 107 (statement of Charles Allen).

[124] E-mail correspondence from Tony Robinson, Response and Recover Division Director, FEMA, to Jeff Smith, Col. Dep. Dir. LA Off. of Homeland Security and Emergency Preparedness, (Sept. 15, 2005).

[125] *Dec. 14, 2005 Select Comm. Hearing* at 131 (statement of Kathleen Babineaux Blanco).

[126] *See generally* Daily Video Teleconferences amongst officials dated Aug. 25 – Sept. 4, 2005 [hereinafter "Daily VTC"]. State and local officials from each of the impacted areas met daily with officials from, among other agencies, FEMA, and the National Hurricane Center.

[127] Memorandum of Spot Report regarding FEMA Co-ordination Calls, Doc. No. DHS-FEMA-00510001220–21 (Aug. 31, 2005).

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] E-mail correspondence from Gary Jones, FEMA, to Edward Buikema, FEMA Acting Director for Response during Hurricane Katrina, (Aug. 31, 2005) ("Jack Colley just advised me that Gov Perry has not received a call from Gov Blanco regarding this plan [to move LA evacuees to the Houston Astro Dome]. Jack said he heard that she was going to make the call early this morning, again this has not happened.").

[132] *Dec. 14, 2005 Select Comm. Hearing* at 155-156 (statement of Kathleen Babineaux Blanco) (Chairman Davis: "One last question, when did you realize that the tens of thousands of people in the Superdome would have to be evacuated out of New Orleans . . . .?" Blanco: "I recognized it on Tuesday [Aug. 30], when I was able to do – well, I knew about it before, but I had, you know, with my own eyes, made an evaluation.").

[133] Daily VTC (Aug. 30, 2005) at 10.

[134] Interview by Select Comm. Staff with Phil Parr, Dep. Fed. Coord Officer, FEMA in Washington, DC (Dec. 8, 2005) [hereinafter "Parr Interview"]; *see generally Dec. 14, 2005 Select Comm. Hearing* (statement of Phil Parr).

[135] Parr Interview.

[136] *Id.*

[137] *Id.*

[138] *Id.*

[139] Daily VTC (Aug. 30, 2005) at 11-12.

[140] *Id.* at 14 (emphasis supplied).

[141] Interview by Select Comm. Staff with Edward Buikema, FEMA acting Director for Response during Hurricane Katrina, in Washington, DC (Jan. 6, 2006) [hereinafter "Buikema Interview"].

[142] Daily VTC (Aug. 31, 2005) at 3.

[143] *Id.* at 26.

[144] Daily VTC (Sept. 1. 2005) at 9.

[145] Executive Order, Louisiana Governor Kathleen Babineaux Blanco, Emergency Evacuation by Buses, Exec. Order No. KBB 2005-31 (Aug. 31, 2005).

[146] E-mail correspondence from Miles Bruder, LA State Official, to "All Gov. Staff" regarding co-ordination of bus service (Aug. 31, 2005).

[147] Daily VTC (Sept. 1, 2005) at 8.

[148] *Id.*

[149] *Id.*; Executive Order, Louisiana Governor Kathleen Babineaux Blanco, Emergency Evacuation by Buses, Exec. Order No. KBB 2005-25 (Sept. 2, 2005). Note, this differs from the Executive Order issued on Aug. 31, 2005, in that it waves the commercial drivers license requirement for bus drivers.

[150] VTC (Sept. 1, 2005) at 9.

[151] *Id.* at 11.

[152] Parr Interview.

[153] Buikema Interview.

[154] VTC (Sept. 1, 2005) at 14.

[155] *See generally, Id.* Daily VTC (Sept. 2, 2005).

[156] *Id.* at 4-5.

[157] *Id.* at 5.

[158] *Id.* at 5-6.

[159] *Id.* at 3.

[160] *Id.* at 5.

[161] *Id.* at 3.

[162] Interview by Select Comm. Staff with Jim McVaney, Director of Government Relations for Air Transport Association, in Washington, DC (Oct. 24, 2005).

[163] *Id.*

[164] *Id.*

[165] *Id.*

[166] *Id.*

[167] *Hearing on Hurricane Katrina: The Role of the Department of Homeland Security Before Select Comm.*, 109th Cong. (Oct. 19, 2005) at 48 (statement of Michael Chertoff); *see also* H. R. Conf. Rep. No. 105-297, at 127 (1997) (appropriating $500,000 for a "comprehensive analysis and plan of all evacuation alternatives for the New Orleans metropolitan area"); *see also* H.R. Conf. Rep. No. 106-379, at 151 (1999) (directing FEMA to develop an evacuation plan for the New Orl eans area). Whatever plans resulted from these federal directives, they were clearly inadequate.

BARGE 000206



*"The one-two combination of a catastrophic hurricane and massive flood overwhelmed the normal disaster relief system. Some things worked well.  But there were shortcomings that we must urgently address.*

*"This tragedy has emphasized how critical it is that we ensure our planning and response capabilities perform with seamless integrity and efficiency in any type of disaster situation – even one of cataclysmic nature."*

Michael Chertoff
Secretary, U.S. Department of Homeland Security
Select Committee Hearing, October 19, 2005

# NATIONAL FRAMEWORK

## Critical elements of the national response plan were executed late, ineffectively, or not at all

### Summary

Similar to the troubled national responses to Hurricanes Hugo and Andrew in 1989 and 1992 respectively, the federal government failed to recognize the magnitude of the situation presented by Hurricane Katrina prior to landfall, adequately project future needs, fully engage the President, and respond in a proactive and timely manner. While the Federal Emergency Management System had evolved since Andrew to include a developed protocol for responding proactively to catastrophic disasters, important aspects of the National Response Plan were poorly executed, which contributed to the inadequate federal response to Hurricane Katrina.

With the creation of the Department of Homeland Security (DHS) and the development of the National Response Plan (NRP), an additional layer of management and response authority was placed between the President and FEMA, and additional response coordinating structures were established.[1] The Secretary of Homeland Security became the President's principal disaster advisor responsible for enabling the President to effectively utilize his authority under the Stafford Act to direct all federal agencies, particularly the Department of Defense (DOD), to respond in a coordinated and expeditious fashion. As part of these changes, critical response decision points were assigned to the Secretary of Homeland Security.[2] Secretary Chertoff executed these responsibilities late, ineffectively, or not at all. These secretarial authorities include:

- The designation of an incident of national significance (INS);
- The authority to convene the Interagency Incident Management Group (IIMG);
- The designation of the principal federal official (PFO); and

- The invocation of the national response plan's catastrophic incident annex (NRP-CIA).

There was plenty of advance warning by the National Weather Service, and the consequences of a category 4 hurricane striking New Orleans were well-documented. Fifty-six hours prior to landfall, Hurricane Katrina presented an extremely high probability threat that 75 percent of New Orleans would be flooded, tens of thousands of residents may be killed, hundreds of thousands trapped in flood waters up to 20 feet, hundreds of thousands of homes and other structures destroyed, a million people evacuated from their homes, and the greater New Orleans area would be rendered uninhabitable for several months or years.[3] An August 28 report by the department's National Infrastructure Simulation and Analysis Center concluded: "Any storm rated Category 4 or greater . . . will likely lead to severe flooding and/or levee breaching, leaving the New Orleans metro area submerged for weeks or months."[4]

Under these conditions it seems reasonable to expect the criteria for designating an INS would have been met, the appointment of a PFO would be necessary to coordinate an unprecedented federal response, the IIMG would be convened to provide strategic guidance and recommendations to the Secretary and the President, and the NRP-CIA would be invoked to shift the federal response posture from a reactive to proactive mode in order to save lives and accelerate assistance to overwhelmed state and local systems. According to a recent letter submitted by DHS (see Appendix 7) in response to the preliminary observations of the Comptroller General (see Appendix 6), DHS viewed the NRP-CIA as applicable only to no-notice or short-notice events. And the Select Committee acknowledges that the State of Louisiana expressed its satisfaction with the supplies and that former FEMA Director Michael Brown directed that commodities be "jammed up" the supply chain.

While the NRP-CIA may be particularly applicable to a no-notice event, the Annex itself reflects only that a catastrophic incident may occur with little or no warning.

And the pre-positioning of supplies to the satisfaction of state and local authorities, while an appropriate measure for a disaster without catastophic consequences, was clearly not sufficient for the catastrophic consquences of Hurricane Katrina.

Instead, absent a catastrophic disaster designation from Chertoff, federal response officials in the field eventually made the difficult decisions to bypass established procedures and provide assistance without waiting for appropriate requests from the states or for clear direction from Washington. These decisions to switch from a "pull" to a "push" system were made individually, over several days, and in an uncoordinated fashion as circumstances required. The federal government stumbled into a proactive response during the first several days after Hurricane Katrina made landfall, as opposed to the Secretary making a clear and decisive choice to respond proactively at the beginning of the disaster. The White House Homeland Security Council (HSC), situated at the apex of the policy coordination framework for DHS issues, itself failed to proactively de-conflict varying damage assessments. One example included an eyewitness account of a levee breach supplied by a FEMA official at 7:00 p.m. on August 29. The White House did not consider this assessment confirmed for 11 more hours, when, after 6:00 a.m. the next morning, it received a Homeland Security Operations Center (HSOC) Situation Report confirming the breach.

The catastrophic nature of Katrina confirmed once again that the standard "reactive" nature of federal assistance, while appropriate for most disasters, does not work during disasters of this scale. When local and state governments are functionally overwhelmed or incapacitated, the federal government must be prepared to respond proactively. It will need to anticipate state and local requirements, move commodities and assets into the area on its own initiative, and shore up or even help reconstitute critical state and local emergency management and response structures.

The need for assistance is extreme during the initial period of a catastrophic hurricane, yet the ability of state and local responders to meet that need is limited. That is why it is so important for the federal government, particularly DOD resources, to respond proactively and fill that gap as quickly as possible. Because it takes several days to mobilize federal resources, critical decisions must be made as early as possible so that massive assistance can

surge into the area during the first two days, not several days or weeks later. The CIA-NRP was drafted to meet this specific and well known requirement, yet Chertoff never invoked it for Katrina.

In contrast, the Emergency Management Assistance Compact (EMAC), a critical part of the national emergency management framework, successfully provided unprecedented levels of response and recovery personnel and assets to the Gulf coast in record time following Hurricane Katrina. EMAC is designed by statute to be adaptable and scaleable to meet the changing needs of each event. EMAC was widely praised for its quick and effective process for putting vital resources into every aspect of the response.

## Finding: It does not appear the president received adequate advice and counsel from a senior disaster professional

Although the Select Committee's access to White House documents, communications, and staff was not as comprehensive as we had hoped, the information we did receive suggests the President could have received better disaster advice and counsel.

The Stafford Act places the federal government's disaster response authorities with the President. Similar to military matters, the President is the commander in chief of federal disaster response. Yet, unlike the military, which provides the Chairman of the Joint Chiefs of Staff as the President's primary professional military advisor, the President does not have regular access to a senior disaster professional to advise him during disasters or on disaster response issues. The President lacks this resource even though catastrophic disasters may strike with little or no warning and require early Presidential involvement to reduce the loss of life, human suffering, and extensive property damage.[5]

Under the Homeland Security Act, the Secretary of Homeland Security reports to the President and is the department's top disaster official; yet emergency management is just one of the Secretary's many responsibilities.[6] According to Chertoff's testimony before the Select Committee, he is not a hurricane expert, nor does he have much experience with disasters.[7]

However, according to White House and FEMA documents, it appears the White House took several steps to improve the flow of information and strategic advice into the President. For example, HSC staff solicited regular situation reports from almost every federal agency for the White House situation room. The HSC commenced 24-hour operations the morning Katrina hit New Orleans.[8] In addition, White House officials attempted to pressure the HSOC to convene the IIMG on the Saturday before Katrina made landfall.[9]

The IIMG consists of high level officials from all the major federal agencies, and it is intended to assess the magnitude of crisis situations, project future requirements for federal assistance, develop plans for meeting those requirements, recommend to the Secretary and the President appropriate courses of action, and provide strategic advice.[10] The Secretary did not convene the IIMG until three days later, roughly 36 hours after landfall.[11]

Within the emergency management community, there are a handful of potential catastrophes that keep disaster professionals awake at night. Perhaps the most troubling

*Comments such as those the President made about not expecting the levees to breach do not appear to be consistent with the advice and counsel one would expect to have been provided by a senior disaster professional.*

of these has been a category 3 or larger storm striking New Orleans because of its high likelihood of occurrence, the extreme vulnerability of the city to long term flooding, and the difficulty of evacuating a large urban population over limited evacuation routes. As a result, this scenario has been studied, planned, and exercised perhaps more than any other potential catastrophic disaster in the country. A senior disaster professional would be well aware of the consequences of such a storm, recognize the challenges of responding to such a disaster, and appreciate the need for timely and proactive federal assistance.

Comments such as those the President made about not expecting the levees to breach do not appear to be consistent with the advice and counsel one would expect to have been provided by a senior disaster professional. Furthermore, it seems reasonable to expect delays in recognizing the need for and then requesting DOD mission assignments may have been avoided if the President had been advised of the need for early presidential involvement.

## Finding: Given the well-known consequences of a major hurricane hitting New Orleans, the Secretary should have designated an incident of national significance no later than Saturday, two days prior to landfall, when the National Weather Service predicted New Orleans would be struck by a Category 4 or 5 hurricane and President Bush declared a Federal Emergency

The consequences of a major hurricane, defined as a category 4 or greater storm, striking New Orleans were well-known within Louisiana, the emergency management community, and DHS.[12] FEMA officials selected New Orleans as the first project for its catastrophic disaster preparedness program precisely because of its high probability of occurrence and horrific consequences.[13] The New Orleans levee system was designed to withstand, in



AP PHOTO/SUSAN WALSH

essence, a category 3 storm. Anything larger would exceed the levees' design capacity and likely cause catastrophic flooding of the city. FEMA's Hurricane Pam exercise predicted the storm would inundate 75 percent of the city up to 20 feet and cause 60,000 deaths.[14]

Two days before landfall the National Weather Service predicted Katrina would strike New Orleans as a category 4 or 5 hurricane. The governors of Louisiana and Mississippi declared state emergencies and the President issued an emergency declaration for Louisiana. At this point in time, it was extremely likely FEMA's worst case hurricane scenario was about to unfold. Chertoff should have declared an INS in recognition of the severity of the situation and to allow for the immediate convening of the IIMG, designation of the PFO, and invocation of the NRP-CIA.

## Finding: The Secretary should have convened the IIMG on Saturday, two days prior to landfall, or earlier to analyze Katrina's potential consequences and anticipate what the federal response would need to accomplish

The purpose of the IIMG is to anticipate evolving requirements and provide strategic recommendations or courses of action for the Secretary and President to consider as part of a national response to a major incident. The IIMG replaces the Catastrophic Disaster Response Group from the old Federal Response Plan and was created to fill an important operational planning gap. During a major incident, the NRP expects the response organization to be focused on the current and subsequent 24-hour operational period and unable to assess the overall disaster situation, project future needs, and develop effective plans to protect life and property. The NRP utilizes the IIMG, a group of experienced high level professionals with agency decision making authority, to look at the big picture, anticipate what will be needed several days in advance, and develop plans to fulfill those requirements. Those plans can then be provided to the operational commanders and implemented in a timely manner.[15]

*The "single biggest failure" of the federal response was that it failed to recognize the likely consequences of the approaching storm and mobilize federal assets for a post-storm evacuation of the flooded city. If it had, then federal assistance would have arrived several days earlier.*

The authority to convene the IIMG is the Secretary's,[16] yet Chertoff did not execute that authority early enough for the IIMG to perform this function during the critical pre-landfall period and initial days of the disaster. According to an e-mail between top FEMA officials on Sunday, the day before landfall, White House officials were pressuring the head of the HSOC, Matthew Broderick, to convene the IIMG.[17] Because the Secretary did not activate the IIMG until roughly 36 hours after landfall, despite the White House pressure, we will never know what the IIMG would have done, given the hurricane forecast and well-known consequences of a category 4 storm, in anticipation that the New Orleans levees would likely breach and force the rescue and evacuation of tens of thousands of victims from the flooded city.

If Chertoff had convened the IIMG, then perhaps on the Saturday or Sunday before landfall, when FEMA officials were deploying emergency response teams and moving tons of commodities into the surrounding region, the IIMG would have begun to accelerate DOD's involvement, develop plans to evacuate the Superdome, and pre-stage buses and boats outside the region for immediate deployment after the storm passed. Instead, the FEMA operational teams did not begin planning these critical actions until three days later, Tuesday evening, and the buses and boats did not arrive in large quantities until Thursday.[18]

According to Colonel Jeff Smith, Deputy Director for Emergency Preparedness with the Louisiana Office of Homeland Security and Emergency Preparedness



FEMA

(LOHSEP), the "single biggest failure" of the federal response was that it failed to recognize the likely consequences of the approaching storm and mobilize federal assets for a post-storm evacuation of the flooded city. If it had, then federal assistance would have arrived several days earlier.[19]

By not convening the IIMG prior to landfall, the Secretary robbed himself and the President of the opportunity to receive professional advice and strategic options for proactively addressing the unfolding catastrophic disaster. The threat stream presented by Katrina was clear days before landfall, the potential consequences were well-known, and important tools for dealing with the situation were available yet not utilized.

## Finding: The Secretary should have designated the Principal Federal Official on Saturday, two days prior to landfall, from the roster of PFOs who had successfully completed the required PFO training, unlike FEMA Director Michael Brown. Considerable confusion was caused by the Secretary's PFO decisions

According to the NRP, "the PFO is personally designated by the Secretary of Homeland Security to facilitate federal support to the established Incident Command System (ICS) Unified Command structure and to coordinate overall federal incident management."[20] During large multi-state disasters such as Katrina, the PFO's role becomes particularly important for providing a coordinated federal response, as the FCOs appointed by the President for each state only control operations within their respective states. The Secretary should have begun this coordination earlier and appointed a PFO on Saturday.

The Secretary's eventual designation of Brown as PFO on Tuesday evening was highly unusual and elicited a concerned and confused reaction from Brown.[21] In order to prepare PFO-designates to fulfill the responsibilities and functions of the PFO, the department conducts a formal training program, and maintains a roster of individuals approved and qualified to serve as a PFO. The NRP requires that "[u]nless extenuating circumstances dictate otherwise, all PFO-designates should satisfactorily complete this training program prior to performing PFO-related responsibilities."[22]

According to DHS officials, Brown had not taken the required PFO training program and was not on the approved PFO roster.[23] Coast Guard Admiral Thad Allen had successfully completed the training program, as had all of the other individuals designated by the Secretary to serve as PFO for past INS designations and National Special Security Events.[24] It is unclear why Chertoff deviated from the requirements of the NRP and designated an untrained individual to serve as PFO for such a catastrophic disaster.

### There was confusion over the role and authority of the PFO

The Secretary was confused about the role and authority of the PFO. According to Chertoff's testimony, he designated Brown PFO because Brown was his "battlefield commander."[25] Yet, the NRP specifically states, "The PFO does not direct or replace the incident command structure established at the incident, nor does the PFO have directive authority over the SFLEO [Senior Federal Law Enforcement Officer], FCO [Federal Coordinating Officer], or other federal and state officials."[26] Furthermore, the Stafford Act places all emergency response authorities with

*Brown had not taken the required PFO training program and was not on the approved PFO roster.*

the President and requires that the President designate a FCO for each disaster or emergency declaration.[27] As a result, the legal authority to "command the battlefield," as the Secretary put it, resides with the FCO, not the PFO.

The apparent confusion over the authority and role of the PFO does not seem to have been recognized until almost two weeks after Chertoff selected Allen to replace Brown as PFO. It was at that time that the unprecedented decision was made to appoint Allen the FCO for Louisiana, Mississippi, and Alabama *in addition* to PFO. This step was necessary because DHS eventually recognized Allen, as the PFO only, did not have the legal authority to commit the expenditure of federal funds or direct federal agencies under delegated authority from the President.[28] As described above, only the FCO has that authority. This confused and unprecedented series of actions by the department prompted the resignation and departure of Bill Carwile, one of FEMA's most well respected FCOs, who was serving as FCO in Mississippi.[29]

# Finding: A proactive federal response, or push system, is not a new concept, but it is rarely utilized

## What is a push system?

In response to most disasters, the federal government provides assistance in response to state requests. This reactive approach is often referred to as a "pull" system in that it relies on states knowing what they need and being able to request it from the federal government.[30] States may make these requests either before disasters strike because of the near certainty that federal assistance will be necessary after such an event, *e.g.*, with hurricanes, or afterwards, once they have conducted preliminary damage assessments and determined their response capabilities are overwhelmed.

Unlike the bulk of the disasters requiring FEMA's response, catastrophic disasters require the federal response to be more proactive. This proactive response is referred to as a "push" system, in which federal assistance is provided and moved into the affected area prior to a disaster or without waiting for specific requests from the state or local governments.[31]

Implementing a push system—a proactive federal response—does not require federalization of the disaster or the usurping of state authority. Although a push system is a proactive response by the federal government, it still requires notification and full coordination with the state. The coordination process, however, should not delay or impede the rapid mobilization and deployment of these critical federal resources.[32]

A proactive response, or push system, is nothing new. In 1992, the nation's management of catastrophic disasters was intensely criticized after Hurricane Andrew leveled much of South Florida and Hurricane Iniki destroyed much of the Hawaiian island of Kauai.[33] In particular, a 1993 GAO report points to the slow delivery of services vital to disaster victims as a major flaw in the response to Hurricane Andrew in South Florida.[34] The report then contrasts this with the more effective response to Hurricane Iniki in Hawaii, where FEMA implemented a push system and sent supplies to the island of Kauai before local officials requested them.[35] This occurred despite being implemented in an ad hoc manner—rather than as part of an orderly, planned response to catastrophic disasters.[36] Furthermore, the long-standing authority for a proactive federal response resides in the Stafford Act. The current plan for how to utilize that authority is the NRP-CIA.

## The pre-positioning of assets and commodities is a distinct action from the push or pull of those assets

The federal government will often pre-position life-saving and life-sustaining disaster equipment and supplies prior to landfall of a hurricane as close to a potential disaster site as possible. This pre-positioning of supplies can substantially shorten response time and delivery of initial critical disaster supplies to the field.

Although part of a proactive response, this pre-positioning of disaster supplies and assets is not in and of itself a push of commodities. Once assets are pre-positioned to go into the field, they still need to be mobilized and deployed into the field either proactively by pushing the commodities to the state or reactively by waiting for a request from the state.

## Operational procedures for a push are not well exercised, practiced, or utilized

The majority of declared disasters are not catastrophic. Because of this, the pull system is most commonly used during disasters and training exercises and, therefore, is more familiar to disaster response personnel. In fact, the NRP-CIA has never been appropriately exercised.[37] As a result, federal personnel have little experience or comfort with instituting a proactive response.

Additionally, if the Homeland Security Secretary does not invoke the NRP-CIA, federal personnel have no clear instruction to switch from a reactive approach to a proactive approach. Without this clear direction, federal personnel can be uncomfortable pushing resources into the state because of the inherent risks, such as complicating the disaster response by diverting needed resources from other areas or wasting millions of dollars in a duplication of effort.

## Finding: The Secretary should have invoked the Catastrophic Incident Annex (NRP-CIA) to direct the federal response posture to fully switch from a reactive to a proactive mode of operations

Perhaps the single most important question the Select Committee has struggled to answer is why the federal response did not adequately anticipate the consequences of Katrina striking New Orleans and, prior to landfall, begin to develop plans and move boats and buses into the area to rescue and evacuate tens of thousand of victims from a flooded city. At least part of the answer lies in the Secretary's failure to invoke the NRP-CIA, to clearly and forcefully instruct everyone involved with the federal response to be proactive, anticipate future requirements, develop plans to fulfill them, and execute those plans without waiting for formal requests from overwhelmed state and local response officials.

The NRP-CIA was specifically written for a disaster such as Katrina. According to the NRP:[38]

- A catastrophic incident results in large numbers of casualties and displaced persons.
- The incident may cause significant disruption to the area's critical infrastructure.
- A credible operating picture may not be achievable for 24 to 48 hours or longer. As a result, response activities must begin without the benefit of a complete needs assessment.
- Federal support must be provided in a timely manner to save lives, prevent human suffering, and mitigate severe damage. This may require mobilizing and deploying assets before they are requested via normal NRP protocols.
- Large-scale evacuations, organized or self-directed may occur.
- Large numbers of people may be left homeless and may require prolonged temporary housing.

It is clear the consequences of Hurricane Katrina exceeded all of these criteria and required a proactive response. According to the NRP, "Upon recognition that a catastrophic incident condition (e.g. involving mass casualties and/or mass evacuation) exists, the Secretary of DHS immediately designates the event an INS and begins, potentially in advance of a formal Presidential disaster declaration, implementation of the NRP-CIA."[39] On Monday evening, when DHS received reports the levees had breached in multiple locations, it should have been clear to the department the nation's worst case hurricane scenario had occurred and a proactive federal response was required.[40] Chertoff never invoked the NRP-CIA.

Smith, LOHSEP Deputy Director for Emergency Preparedness, believed, "the biggest single failure of the federal response was the Department of Homeland Security's failure to recognize that Katrina was a catastrophic event and implement the catastrophic incident annex to the National Response Plan…Had DHS recognized Katrina for the event that it was, a truly catastrophic event, had DHS implemented the catastrophic incident annex to the NRP, Louisiana should have had a significant number of federal troops and federal assets, days prior to their actual arrival. . . . Instead federal troops did not arrive in number until Saturday, after the evacuations of the Superdome, Convention Center and cloverleaf were complete."[41]

# Finding: Absent the Secretary's invocation of the NRP-CIA, the federal response evolved into a push system over several days

Even though Chertoff never invoked the catastrophic annex, federal officials in the field began, in an ad hoc fashion, to switch from a pull response to a push system because of the operational demands of the situation. The switch was uncoordinated but widespread by the end of the first week. This has occurred in previous disasters. As previously mentioned, the response to Hurricane Iniki in Hawaii implemented an ad hoc push system as FEMA sent supplies to the island of Kauai before local officials requested them.[42] Similarly, the response to Katrina evolved into an ad hoc push system, even though the NRP-CIA was not invoked.

The following Mississippi and Louisiana examples illustrate the switch to a push response and several other important principles of effective emergency management. First, they demonstrate the importance of having qualified and experienced professionals in charge of operations. Second, these officials need to have the authority to commit resources as they see fit without waiting to seek approval from above. And, third, federal officials need to have good working relationships with their state counterparts. In the first example, Carwile had been the FCO in Florida during the 2004 hurricane season and developed a close relationship with the Florida Director of Emergency Management Craig Fugate. It is clear from e-mails and numerous staff interviews that Carwile did not hesitate to authorize and Fugate provided any and all assistance to Mississippi without formal requests from Mississippi authorities.[43]

On August 30, FEMA worked with Florida officials to push response assets into Mississippi. In an e-mail to Brown and Carwile, Fugate informed them Florida was pushing search and rescue teams into Mississippi. He noted the EMAC paperwork was not keeping up with the need, so they were working off of verbal requests. Specifically, he wrote, "To both of you, you need it, you got it from [F]lorida. [T]he paper work (sic) can follow."[44]

On Thursday, September 1, Carwile and Fugate continued to push resources into Mississippi without clear mission requests:

[5:42 a.m. e-mail from Fugate to Carwile]

> I'm out of water and ice from my stocks. I've directed Mike DeLorenzo [with the Florida Division of Emergency Management] to start purchasing and shipping product into the coastal Mississippi Counties. Not sure I have an EMAC mission, but our folks on the ground have concerns if they run out.
> Not sure how much and when, but will try to keep you updated on progress. If this works, will continue until told to stop.
>
> So far we have only been shipping water and ice. No food or baby products.
>
> Craig
> ─────────────────────
> Craig Fugate, Director
> Florida Division of Emergency Management

[10:26 a.m. reply from Carwile to Fugate]

> Craig:
>
> You are doing the right thing. Thanks. Know Robert [Robert Latham, Director of the Mississippi Emergency Management Agency] would concur. Will police up paperwork later – you have my guarantee.
>
> Food is also critical. Need MRE [meals ready to eat] and/or heater meals if you have any. Water, ice, food in eastern counties should be your priority. Recommend Allen coordinate with MGen Cross (TAG, MS) for integration into their distribution system.
>
> Also, know FL is providing law enforcement. Need all you can send. Public safety major concern (looting, etc.). Have used Dixie Co. body bags (250) got more?
>
> Thanks, old friend, Bill

In Louisiana, FEMA response personnel tried on a number of occasions to push commodities and assets into the field. In cases where it was clear there was a need for life-saving and life-sustaining commodities but no clear state distribution system set up, FEMA acted proactively to provide assistance. For example, Louisiana FCO Bill Lokey noted there were situations where stranded individuals were not in immediate danger, but needed food and water. When FEMA gained access to several helicopters, FEMA began ferrying food and water to people stranded on high ground even though there was no formal request by the state to perform this function. In addition, FEMA contracted with over 100 ambulances to transport hospital evacuees. This mission was not requested by the state, but FEMA responded proactively because the situation demanded immediate action.[45]

Although there are numerous examples of a push system being implemented at times, there were also a number of times when state or local officials expressed frustration that requests for assistance were not processed because they did not follow the formal request process. For example, according to Louisiana and FEMA officials, state and local officials verbally requested specific assets or commodities during conference calls that were never fulfilled.[46] In these cases no immediate action was taken because FEMA officials assumed the state would follow up the verbal requests with official written requests. If the catastrophic annex had been invoked, then perhaps FEMA would have expected requests outside the normal process and acted on them.

## Finding: The Homeland Security Operations Center failed to provide valuable situational information to the White House and key operational officials during the disaster

During Hurricane Katrina, the roles and responsibilities of the HSOC were unclear. One of the primary roles performed by the HSOC is to maintain an accurate picture of events as an incident unfolds by gathering and integrating information from multiple sources, including the National Response Coordination Center (NRCC), the Coast Guard, and other DHS elements.[47] Specifically, the NRP has designated the HSOC as the national-level hub for information sharing management during domestic incidents. The HSOC provides primary situational awareness to the Secretary, the IIMG, and the White House.

Perhaps the single most important piece of information during Katrina was confirmation of the levee breaches in New Orleans. Beyond the importance of the information itself, the implications of the information determined whether or not Katrina would be just another bad storm in New Orleans or the nation's worst-case hurricane disaster. Because DHS failed to anticipate the likely consequences of the storm and procure the buses, boats, and aircraft that were ultimately necessary to evacuate the flooded city prior to Katrina's landfall, the next critical decision point of the federal response became



FEMA

*On Monday evening the HSOC failed to conclude levees breached in New Orleans despite a FEMA eyewitness report and the presence of numerous Coast Guard air assets over New Orleans, which had the ability to communicate to most anywhere in the country.*



FEMA

confirmation of the levee breaches. If the levees breached and flooded a large portion of the city, then the flooded city would have to be completely evacuated.[48] Any delay in confirming the breaches would result in a delay in the post-landfall evacuation of the city.

On Monday evening the HSOC failed to conclude that levees had breached in New Orleans despite a FEMA eyewitness report and the presence of numerous Coast Guard air assets over New Orleans, which had the ability to communicate to almost anywhere in the country. According to the commander of the Coast Guard's Air Station New Orleans, Captain Bruce Jones, there were nine Coast Guard helicopters, including the helicopter he piloted, operating over New Orleans by Monday evening, and Rear Admiral Duncan was flown over the city in a Coast Guard Falcon aircraft to assess the situation.[49]

In addition, a Coast Guard C-130 from Clearwater, Florida arrived over the city Monday evening after it heard the radio chatter from the rescue helicopter operations and diverted from its mission to reconnoiter the status of off shore oil rigs. The C-130 was able to communicate with all of the helicopters, and it could patch some communications through to the Coast Guard's division eight headquarters temporarily established in St. Louis. The division headquarters could then patch those communications through to a landline and reach almost any destination from there. The one important exception was calling into Baton Rouge, which was not possible.[50]

According to Marty Bahamonde, a FEMA External Affairs official, and the Coast Guard, he was flown over New Orleans early Monday evening for the specific purpose of providing situational awareness to Brown and DHS headquarters.[51] Captain Frank M. Paskewich said his unit took Bahamonde up in the helicopter because they were under the impression he had a direct line of communication into the White House. They thought Bahamonde could get the information regarding the status of the levees and flooding in the city to Washington faster than they could through the Coast Guard chain of command.[52] Bahamonde's observations were received in the HSOC a few hours after his over flight and became a Monday 10:30 p.m. HSOC spot report that was sent to the White House situation room shortly after midnight.[53] This spot report can be found in **Appendix 2**. However, it is not clear if the other Coast Guard observations, including Duncan's reconnaissance flight, reached the HSOC on Monday evening or at all.

Because the HSOC failed to confirm the levee breaches on Monday, the first federal decision to procure buses was made by Deputy FCO Phil Parr, who was at the Superdome, on Tuesday when he saw the water reaching the Superdome and realized it would become an island and have to be evacuated. At that point he began to develop an evacuation plan and requested hundreds of buses.[54]

The HSOC's role is not only to provide situational awareness and policy advice to top officials within DHS, but also to provide situational information and address lower level coordination issues. Yet, interviews suggest that while information was flowing upwards to the HSOC and onto the Secretary, it was less clear what valuable information was flowing down to key officials on the ground during the disaster. Edward Buikema, FEMA's former Acting Director of Response, and Mike Lowder, Deputy Director of Response, both stated that while situational reports were continually flowing up the ladder from FEMA headquarters to the HSOC, no information was flowing back down from the HSOC to the NRCC.[55]

## Finding: The White House failed to de-conflict varying damage assessments and discounted information that ultimately proved accurate

In response to document requests to White House Chief of Staff Andrew Card[56] and the Office of the Vice President,[57] the Select Committee received and reviewed 22,830 pages of Katrina-related documents.[58] Of this production, 16,482 pages were from staff of

the President's Homeland Security Council Prevention, Preparedness and Response (PPR) directorate, headed by Kirstjen Nielsen. The remaining 6,348 pages were produced by the Office of the Vice President.

Homeland Security Council (HSC) staff received a continuous paper flow in the hours and days before Katrina made landfall and after. Of the 16,482 pages produced, almost all of the documents are repeated numerous times. The most commonly found documents include:

> HSOC Situation Reports
> HSOC Spot Reports
> Louisiana Office of Emergency Preparedness Situation Reports
> Mississippi Emergency Management Agency Situation Reports
> Alabama Emergency Management Agency Situation Reports
> E-mails from DHS Watch Officer to White House HSC Staff
> FEMA executive briefing slides
> FEMA Hurricane Liaison Team (HLT) Advisories
> FEMA National Situation Reports
> FEMA Regional Situation Reports
> DOE Energy Reports from Office of Electricity Delivery and Energy Reliability
> DOT Situation Reports
> Federal Highway Administration (FHWA) Status Reports
> Talking Points from both DHS and the White House
> National Disaster Medical System (NDMS) Reports
> Coast Guard briefing materials
> National Guard briefing materials
> Pipeline Situation Reports
> FAA Emergency Operations Division Reports
> HHS Operations Center Situation Reports
> HUD briefing materials
> White House Press Office materials, and
> Red Cross Disaster Operations Summary Reports

The HSC was situated at the apex of the policy coordination framework for responding to Hurricane Katrina.[59] A HSC chart has Chertoff, and the IIMG through the Secretary, seemingly reporting into the HSC. As the coordinator of policy, it would seem to follow that HSC was directly involved in the Katrina response:

## Hurricane Katrina
**Policy Coordination Framework for Response**



Not really, according to Deputy Homeland Security Advisor Ken Rapuano, who twice briefed Select Committee members and staff. "We don't do operations at the White House," Rapuano said on January 27. "We're a transit site for information. DHS is the operating agency for response, and we were working closely with them . . . . At the time we believed we were fully supporting the [federal, state, and local response] requirements. Now we know differently."[60]

As discussed previously in the Investigation Overview chapter, the Select Committee grew frustrated by the White House's slow response to requests for information and documents. On the one hand, it is true the Rapuano briefings the Select Committee ultimately received in lieu of more complete document production offered a wide array of acknowledged failures and lessons learned. On the other, the White House's decision to withhold documents and communications raising concerns about executive privilege, leaves the Select Committee no choice but to find, based on the information we have received, that a *failure of initiative* plagued the White House as well.

## Failure to resolve conflicts in information and the "fog of war," not a lack of information, caused confusion

The White House did not suffer from a lack of information. At 1:47 a.m. on August 29, before Katrina made landfall, DHS forwarded an infrastructure advisory to the White House Situation Room and HSC staff indicating the risks associated with a potential levee

breach.[61] The report advised a severe storm surge would likely lead to severe flooding, leaving New Orleans under water for weeks or months.[62] The report further estimated an economic impact of $7 to $10 billion.[63] Detailed diagrams of the New Orleans levee system arrived at the White House at 12:14 p.m. on Sunday, August 28.[64]

After Katrina made landfall and the levees failed, the White House continued to receive a substantial information flow. At 2:20 p.m. on August 29, a HSOC report stated some Louisiana parishes had eight to 10 feet of water and an unspecified number of Louisiana and Mississippi residents were stranded in flooded areas.[65] In a 6:00 p.m. HSOC report, the White House was advised extensive flooding in New Orleans could take months to reverse through the dewatering process.[66] At 12:02 a.m. on August 30, the White House received the Bahamonde spot report in which it was reported he observed a quarter-mile breach in the levee near the 17th Street Canal. Bahamonde also reported free-flowing water emptying into the city, Orleans Parish "under water," homes completely underwater, hundreds of people on roofs and balconies, and bodies floating in the flood waters.[67]

While Bahamonde's report was detailed in a 10:30 p.m. HSOC spot report, that report was not e-mailed to or received by the White House Situation Room until shortly after midnight on August 30.[68] Even then, according to Rapuano, White House officials did not believe they had confirmation of any levee breaches, since an earlier Army Corps of Engineers' report had not confirmed them and because "this was just Marty's observation, and it's difficult to distinguish between a [levee] overtopping and a breach."[69]

Bahamonde has testified, however, that he was certain the levee was breached.

At approximately 11 a.m. [Monday, August 29], the worst possible news came into the EOC. I stood there and listened to the first report of the levee break at the 17th Street Canal. I do not know who made the report but they were very specific about the location of the break and the size. And then they added it was "very bad." I continued to provide regular updates to FEMA Headquarters throughout the day as the situation unfolded.

At approximately 5 p.m., I rushed over to the Superdome because I had been notified that a Coast Guard helicopter was able to take me for a short flyover so that I could assess the situation in the city and plan for Under Secretary Brown's visit the next day. My initial flyover lasted about 10 minutes and even in that short time I was able to see that approximately 80 percent of the city was under water, and I confirmed the 17th Street Canal levee break. I was struck by how accurate the 11 a.m. call was about the levee.[70]

After his helicopter over flight at about 7:00 p.m., Bahamonde said he called Brown and explained what he saw.[71] "I picked up the phone and I called Under Secretary Brown directly and I began a 10-, 15-minute conversation that explained everything that I have already explained in my statement."[72] Brown listened to Bahamonde's report and did not ask any questions.[73] "All he said was, 'Thank you. I am now going to call the White House.'"[74]

White House officials did not consider the breaches confirmed until roughly 6:30 a.m. the next morning, upon receipt of an updated situation report from DHS, Rapuano said.[75] "Confirmation of a full breach would not have changed anything we would have done," Rapuano said. "We weren't going to repair the levees overnight, and search and rescue was already operating in full gear, regardless."[76]

*Determining the status of the levees could have spurred earlier evacuation for that population, which might have been facilitated by White House involvement.*

But confirmation of the breach of the levees could have had practical implications for White House involvement in the response. Flooding from breaches and flooding from overtopping have different consequences. Overtopping flooding will stop as the waters recede; flooding through a breach will continue, as it did, through the breach until the water in the city is at the same level as the water in the lake. The latter flooding could drive more of the population that stayed behind from their homes, necessitating greater needs for evacuating that

population. When President Bush was concerned that Governor Blanco had not ordered the evacuation of New Orleans, he called her on Sunday morning to urge such an evacuation.[77] Similarly White House involvement could have spurred earlier evacuation post-landfall for those trapped by the floods from the breached levees.

Further, White House officials clearly were able to identify and locate resources for the relief effort when they had sufficient information to know what was needed. Maggie Grant, Special Assistant to the President for Intergovernmental Affairs, played a key role in coordinating shelter for 15,000 in Arkansas with Arkansas Governor Mike Huckabee and in coordinating shelter for thousands of others in Georgia and Alabama.[78]

Regardless of what the White House did or did not, or could or could not, do with the information at its disposal, it appears clear officials charged with reviewing that information failed to de-conflict it. Among the primary tasks of the HSOC and HSC is to shuttle and synthesize information. Yet both appeared to discount information that ultimately proved accurate, and failed to provide decision-makers, up to and including the President, with timely information.

Brown testified that he spoke with White House officials as many as "thirty times."[79] He said he had no trouble getting through to senior decision makers: "I had no problem picking up the phone and getting hold of Chertoff or Andy Card or Joe Hagin, or the President; I don't have those problems." Brown told *The New York Times* he advised both Chertoff and a White House official, either Chief of Staff Andrew Card or Card's deputy, Joe Hagin, on Monday evening, August 29, "I am having a horrible time. I can't get a unified command established."[80] On Tuesday, August 30, he said he called to ask the White House to "take over" the Katrina response.[81] In his testimony, Brown said that this was offered to Blanco.

> One of the things that I was trying to do was to assist the Governor in any way that I could in the decision-making process, in trying to help her manage what was going on. And one of my suggestions was that, you know, that we could federalize this disaster and take over the National Guard and run the operation through that National Guard. And I — I do not know whether she considered it or not, but I know that she came back to me and rejected that.[82]

*Rapuano acknowledged at both briefings that "the fog of war" affected both the quality and quantity of information that reached the White House.*

Neither Rapuano nor anyone else at the White House would confirm these accounts. Rapuano would only say he "was not aware that Brown called the White House asking us to take over."[83]

Rapuano acknowledged at both briefings that "the fog of war" affected both the quality and quantity of information that reached the White House.[84] The Select Committee also believes, in the absence of any information to the contrary from the White House, that the President's Homeland Security team did not effectively substantiate, analyze, and act on the information at its disposal.

Listed in **Appendix 3** are examples of documents that flowed to the White House over the days right before and after Katrina made landfall, August 27 through September 3. The items logged do not reflect the entire information flow to the White House, or all documents provided to the Select Committee. Rather, they are meant to illustrate the type and range of information known to the White House suggesting Katrina and the subsequent flooding was not a standard emergency event. Yet the enormity of Katrina seemed not to have been fully understood by the White House until at least Tuesday, August 30.

# Finding: Federal agencies, including DHS, had varying degrees of unfamiliarity with their roles and responsibilities under the NRP and National Incident Management System (NIMS)

It has become clear the response to Katrina was not unified and coordination among local, state, and federal authorities failed in several areas. The NRP and NIMS serve as a pre-established unified command structure for response to such a catastrophic incident. In order to seamlessly execute the NRP, each agency needs to develop effective operating procedures essential to satisfying that agency's roles and responsibilities under the NRP and NIMS.

Some agencies had well developed standard operating procedures while others had none at all. The U.S. Army Corps of Engineers and the Department of Transportation had previously developed significant operating procedures that covered agency responsibilities under the NRP.[85] Both agencies had used these operating procedures during training exercises to ensure an understanding of operating procedures prior to real time application.[86] These agencies executed their responsibilities under the NRP fairly well. Other agencies lack sufficient operating procedures for their responsibilities under the NRP. Many, when asked for operating procedures, referred to related sections of the NRP. Since the NRP is not an operational plan, this led to problems with execution of Emergency Support Function (ESF) responsibilities.[87]

While DOD, the Department of Health and Human Services (HHS), and the Coast Guard performed admirably in many respects, there were problems adequately coordinating their activities with other federal, state, and local agencies through the NRP structure.



AP PHOTO/ERIC GAY

For example, DOD by-passed the NRP mandated unified command, taking requests from the states directly, absent the necessary input and coordination by FEMA. This was apparent in the evacuation of the Superdome. Parr completed a plan to evacuate the Superdome Wednesday morning with the support of the Louisiana National Guard. Shortly before implementation of the plan, Parr was informed of the decision by General Honoré of Northern Command to proceed with a different evacuation plan. Unknown to Parr, Blanco had requested DOD's involvement in the evacuation the day before. The Governor's request was made outside the

unified command and without the knowledge of FEMA officials, resulting in a duplication of efforts and a delay in the evacuation. Additionally, Parr stated that the actual evacuation under Honoré's plan resulted in an additional 24 hour delay to evacuees.[88]

In another case, HHS activated the National Disaster Medical System without prior notice or consultation with Alabama, thereby removing 200 beds from the inventory the state believed on hand, and to which state officials were still directing patients. Likewise, Coast Guard search and rescue operations were bringing survivors from Mississippi unannounced to already full hospitals until Alabama sent its own personnel forward to help triage cases and coordinate the direction of Coast Guard flights. This resulted in confusion over available hospital beds for victims through the Gulf coast and delay in the medical response.[89]

Additional failures to adhere to the NRP were apparent in the lack of communication between the NRCC and the HSOC, which disrupted the overall information flow and situational awareness.

## Finding: Once activated, the Emergency Management Assistance Compact (EMAC) enabled an unprecedented level of mutual aid assistance to reach the disaster area in a timely and effective manner

EMAC provided invaluable interstate mutual aid in support of Hurricane Katrina by deploying more than 67,891 personnel (19,481 civilians and 48,477 National Guard) to Louisiana and Mississippi.[90] EMAC facilitated mutual assistance from 48 states, the District of Columbia, the Virgin Islands and Puerto Rico.

In support of Hurricane Katrina, more than 2,188 resource requests (missions) were filled.[91] Record numbers of National Guard troops, local responders, and health/medical personnel were deployed through the compact. EMAC also works in cooperation with the federal government by co-locating personnel, when requested, in the NRCC or Regional Response Coordination Center

*Not only did senior DHS officials fail to acknowledge the scale of the impending disaster, they were ill prepared due to their lack of experience and knowledge of the required roles and responsibilities prescribed by the NRP.*

(RRCC) in order to share information on EMAC activities in the affected states, monitor the availability of needed resources being offered by assisting states, and facilitate overall emergency response and recovery activities.

Through state statute, EMAC addresses the legal issues of liability, workers compensation, reimbursement, and professional licensure—prior to a disaster or emergency when resource needs and timing are critical.[92] State and territory members must pre-designate personnel with the authority to request and commit resources. Standard operating procedures exist for compact members and training and exercise of state personnel is required. While formalized protocols are in place, EMAC is designed to be adaptable and scaleable to meet the changing needs of each event.

Following each large scale activation of the compact, a review and evaluation of the response is conducted and standard operating procedures revised and updated to reflect lessons learned and best practices. For example, lessons learned from the 2004 Florida hurricanes led to an overhaul of some operational procedures related to mobilization and deployment of resources, an enhanced automation system to provide more accurate data and electronic tracking of resources, and a new standardized EMAC training curriculum and updated operations manual.[93] These enhancements were either in progress or completed prior to Hurricane Katrina.

In Mississippi, EMAC assistance was considered a success. The assistance in Mississippi included help from other states' security agencies (such as their state police) as well as various states' National Guards (troops and hard assets).[94] (See the MILITARY chapter for more detail.)

Louisiana state officials also viewed EMAC assistance as very successful. One state official said there were almost 900 EMAC agreements for assistance. Although the EMAC response from surrounding states varied, state officials applauded EMAC for successfully getting law enforcement manpower assistance. According to state police officers

Ralph Mitchell and Joseph Booth, Arkansas, Tennessee, New Jersey, and California all sent law enforcement officers through EMAC.[95]

FEMA officials also noted the general success of EMAC. Because of the magnitude of the disaster, however, Louisiana was unable to handle all of the EMAC requests, requiring FEMA to become more involved in the process than normal. In particular, FCO Scott Wells noted some state offers of assistance through FEMA were rejected by Louisiana. He said these offers were rejected by SCO Smith because of concerns about the costs to the state.[96]

## Finding: Earlier presidential involvement might have resulted in a more effective response

Similar to other large scale disasters, the catastrophic nature of Katrina required early presidential involvement to direct federal agencies in a massive coordinated response. In practice, it takes presidential action to quickly deploy the logistical capability of the military to meet the tremendous food, shelter, and medical needs of large affected populations. According to the Government Accountability Office's (GAO) review of hurricanes Hugo (1989, SC and NC), Andrew (1992, FL and LA), and Iniki (1992, HI):

> Often, when a catastrophic disaster leaves a gap between what volunteers can provide and the needs of disaster victims, DOD is the only organization capable of providing, transporting, and distributing sufficient quantities of the items needed to fill that gap. . . . While we clearly see a major role for DOD in providing mass care, we do not advocate turning over the entire disaster response, relief, and recovery operations to the military.[97]

*Similar to other large scale disasters, the catastrophic nature of Katrina required early presidential involvement to direct federal agencies in a massive coordinated response.*

Instead, the GAO recommended increased presidential involvement in the disaster and an improved process for FEMA to request DOD assistance as the solution for enabling DOD to provide relief during the critical first few days of a catastrophic disaster.[98] The Stafford Act authorizes the President, not the director of FEMA or the Homeland Security Secretary, to direct federal agencies to save lives and protect property and support state and local response efforts.[99] While the Stafford Act requires the President to delegate *the coordination* of response efforts to a federal coordinating officer (FCO), the law does not give the FCO *command* authority over other federal agencies. As a result, the FCO is not in a position to direct the operations of large departments such as DOD. Only the President appears able to promptly engage active duty military forces and achieve a unity of effort among all the federal agencies responding to a catastrophic disaster.

During Hurricane Katrina this problem was apparent in FEMA's and DHS' inability to promptly task major mission assignments to DOD. For example, FEMA did not approach DOD about taking over the logistics mission until Thursday, September 1, according to staff interviews with senior FEMA officials.[100] In response, Colonel Chavez with the Assistant Secretary for Homeland Defense Paul McHale instructed FEMA that the request had to go to Secretary of Defense Donald Rumsfeld.[101] Although details and

planning still needed to take place, the Secretary of Defense supported approval of the request on Friday, and Principal Deputy Assistant Secretary of Defense Pete Verga approved execution orders on Saturday, September 3.[102] Out of this request, according to McHale, DOD found additional mission assignments that it could undertake and proposed them to FEMA. Seven other mission assignments were negotiated and approved over the next few days with senior DHS officials, including Deputy Secretary Michael Jackson and the Director of Operations Coordination Brigadier General Matthew Broderick (USMC-Ret).[103] But by the time all of these missions were assigned, it was one week since Katrina had made landfall.[104]

## Conclusion

Hurricane Katrina exposed numerous deficiencies in the existing national framework for emergency management, including specific mistakes that delayed an appropriate federal response. Confusion accompanied the implementation of the NRP, resulting in key elements of the plan executed late, ineffectively, or not at all. Not only did senior DHS officials fail to acknowledge the scale of the impending disaster, they were ill prepared due to their lack of experience and knowledge of the required roles and responsibilities prescribed by the NRP. The Secretary of DHS failed to declare an INS, convene the IIMG, and properly designate the PFO in a timely manner. The White House failed to de-conflict varying damage assessments and discounted FEMA-supplied eyewitness information that ultimately proved accurate. Furthermore, the government was limited to a reactive response due to failure to activate the NRP-CIA. Despite failures of the system, portions of the national framework were successful, including EMAC, which proved invaluable in providing necessary levels of mutual aid assistance. ■

*Although the Select Committee's access to White House documents, communications, and staff was not as comprehensive as we had hoped, the information we did receive suggests the President could have received better disaster advice and counsel.*

1   Homeland Security Act of 2002, Pub. L. No. 107-296, Title V, 116 Stat. 2135 (2002) [hereinafter Homeland Security Act].

2   Dep't of Homeland Security, *National Response Plan*, (Dec. 2004) [hereinafter *NRP*].

3   State of Louisiana, *Southeast Louisiana Hurricane Planning Project*, (Sept. 5, 2005) [hereinafter *Southeast LA Planning Project*].

4   E-mail correspondence from Stephen York, Department of Homeland Security, to Andrew Akers, Homeland Security Operations Center (HSOC), Senior Watch Officer, et al. (Aug. 28, 2005) (11:59 AM) [hereinafter Aug. 28, 2005 York E-mail]; http://www.cnn.com/2006/POLITICS/01/24/katrina.levees.ap/ (last visited Jan. 28, 2006).

5   *1993 GAO Report.*

6   Homeland Security Act.

7   *Hearing on Hurricane Katrina: The Role of the Department of Homeland Security Before Select Comm.*, 109th Cong. (Oct. 19, 2005) (written statement of Michael Chertoff, Secretary of Homeland Security) [hereinafter *Oct. 19, 2005 Select Comm. Hearing*].

8   *See* E-mail correspondence from Kirstjen Nielson, White House Homeland Security Council, to Tom Ryder, Department of Energy (Aug. 29, 2005) (10:58 a.m.).

9   E-mail correspondence from Michael Lowder, Deputy Director of Response, FEMA, to Patrick Rhode, FEMA, et al. (Aug. 28, 2005) (7:48 p.m.) [hereinafter Aug. 28, 2005 Lowder E-mail].

10  *NRP* at 22.

11  *Briefing for Select Comm. Staff by the White House in Washington, DC* (Dec. 13, 2005).

12  Aug. 28, 2005 York E-mail; E-mail correspondence from Andrew Akers, DHS, to Paul Perkins, HSOC, et al. (Aug. 29, 2005) (1:47 p.m.) [hereinafter Aug. 29, 2005 Akers E-mail].

13  Interview by Select Comm. Staff with Madhu Beriwal, Pres., Innovative Emergency Management in Washington, DC (Jan. 6, 2005).

14  *Southeast LA Planning Project.*

15  *NRP* at 22-23.

16  *Id.* at 22.

17  Aug. 28, 2005 Lowder E-mail.

18  *Hearing on Hurricane Katrina: Perspectives of FEMA's Operations Professionals Before the Senate Comm. on Homeland Security and Governmental Affairs,* 109th Cong. (Dec. 8, 2005) at 70-73 (testimony of Philip Parr, Deputy Federal Coordinating Officer, FEMA Joint Field Office, Austin, TX) [hereinafter *Dec. 8, 2005 Senate Comm. Hearing*].

19  *Hearing on Hurricane Katrina: Preparedness and Response by the State of LA Before Select Comm.*, 109th Cong. (Dec. 14, 2005) at 18 (statement of Colonel Jeff Smith) [hereinafter *Dec. 14, 2005 Select Comm. Hearing*].

20  *NRP* at 33.

21  *See* E-mail correspondence from Ken Hill, Executive Secretary, DHS to Michael Jackson, Deputy Secretary, DHS, et al., (Aug. 30, 2005) (8:22 p.m.); E-mail correspondence from Michael Brown, Undersecretary for Emergency Preparedness and Response to Sharon Worthy, Special Assistant, DHS (Aug. 30, 2005) (11:00 p.m.).

22  *NRP* at 34.

23  *Jan. 6, 2006 Buikema Interview.*

24  *Id.*

25  Oct. 19, 2005 Select Comm. Hearing, (written statement of Michael Chertoff).

26  *NRP* at 33.

27  Stafford Act, §§ 5143, 5170(a)-(b), 5192.

28  *NRP* at 33-34.

29  *Jan. 6, 2006 Buikema Interview.*

30  Interviews by Select Comm. Staff with New Orleans officials in New Orleans, LA (Nov. 3-10, 2005).

31  *Id.*

32  *NRP* at 342.

33  *1993 GAO Report* at 3.

34  *Id.*

35  *Id.* at 7.

36  *May 25, 1993 Senate Armed Forces Comm. Hearing* (Statement of J. Dexter Peach).

37  Interview by Select Comm. Staff with Bill Lokey, Federal Contracting Officer for LA, FEMA , in Washington, DC ( Jan. 23, 2006) [hereinafter *Jan. 23, 2006 Lokey Interview*].

38  *NRP* at Catastrophic Incident Annex.

39  *Id.* at CAT-4.

40  DHS HSOC Spot Report of Marty Bahamonte, *Regional Director, External Affairs, Region One, FEMA (Aug. 29, 2005)* [hereinafter *Aug. 29, 2005 HSOC Spot Report*]; Interview by Select Comm. with Bruce Jones, Captain, Coast Guard New Orleans Air Commander in Washington, DC (Jan. 10, 2006).

41  *Dec. 14, 2005 Select Comm. Hearing* at 18 (testimony of Colonel Jeff Smith).

42  *1993 GAO Report* at 7.

43  E-mail correspondence from William Carwile, DHS, to Craig Fugate, Director, Florida Division of Emergency Management (Aug. 30, 2005).

44  *Id.*

45  *Jan. 23, 2006 Lokey Interview.*

46  Interviews by Select Comm. Staff with FEMA and Louisiana officials in New Orleans, LA (Nov. 3-10, 2005).

47  *NRP.*

48  *Southeast LA Planning Project.*

49  *Briefing for Select Comm. Staff by U.S. Coast Guard in Washington, DC (Jan. 10, 2006)* [hereinafter *Jan. 10, 2006 Coast Guard Briefing*].

50  *Id.*

51  *Hearing on Hurricane Katrina in New Orleans: a Flooded City, a Chaotic Response Before the Senate Committee on Homeland Security and Governmental Affairs,* 109th Cong. (Oct. 20, 2005) at 9-13 (testimony of Marty Bahamonde, Regional Director, External Affairs, Region One, FEMA) [hereinafter *Oct. 20, 2005 Senate Comm. Hearing*]; *Jan. 10, 2006 Coast Guard Briefing.*

52  *Jan. 10, 2006 Coast Guard Briefing.*

53  E-mail correspondence from Michael Inzer, HSOC, to Bethany Nichols, et al. (Aug. 30, 2005) (12:02 PM) [hereinafter Aug. 30, 2005 Inzer E-mail]; *Aug. 29, 2005 HSOC Spot Report.*

54  Interviews by Select Comm. Staff with FEMA and Louisiana officials in New Orleans, LA (Nov. 3-10, 2005); *Dec. 8, 2005 Senate Comm. Hearing* at 70-73 (testimony of Philip Parr).

55  *Jan. 6, 2006 Buikema Interview.*

56  Letters from Select Comm. to Andrew H. Card, Jr., White House Chief of Staff, Sept. 30, Oct. 13, and Dec. 1, 2005.

57  Letters from Select Comm. to I. Lewis Libby, Jr., then Chief of Staff to the Vice President, Oct. 13, 2005, and to David S. Addington, Counsel to the Vice President, Oct. 4 and Dec. 7, 2005.

58  The Executive Office of the President produced 16,482 pages of documents and the Office of the Vice President produced 6,348 pages of documents.

59  *Hurricane Katrina – Policy Coordination Framework for Response,* Office of the Vice President document supplied to the Select Comm.

60  Briefing for Select Comm. Staff by the White House in Washington, D.C. (Jan. 27, 2006) [hereinafter *Jan. 26, 2006 White House Briefing*].

61  Aug. 28, 2005 York E-mail.

62  Aug. 29, 2005 Akers E-mail; DHS National Infrastructure Simulation & Analysis Center, *Fast Analysis Report (Update to Reflect Category 5 Status) to DHS IP on Hurricane Katrina, Gulf Coast* (Aug. 28, 2005).

63  *Id.* at 1.

64  E-mail correspondence from Stephen York, DHS, to Andrew Akers, HSOC SWO, et al. (Aug. 28, 2005) (12:14 PM); Homeland Security Operations Center, *Diagrams of New Orleans Levee Systems and Scenarios.*

65  E-mail correspondence from Insung Lee, HSOC, to Frank DiFalco, et al. (Aug. 29, 2005) (2:20 PM). HSOC report received at the White House Aug. 29, 2005 at 2:20 PM.

66  E-mail correspondence from Tom Holz, to Bethany Nichols, et al. (Aug. 29, 2005 (6:13 PM); HSOC, *Hurricane Katrina SITREP #7.* HSOC report received at the White House, Aug. 29, 2005 at 6:13 PM.

67  Aug. 30, 2005 Inzer E-mail; *Aug. 29, 2005 HSOC Spot Report.*

68  *Id.*

69  *Jan. 27, 2006 White House Briefing.*

70  *Oct. 20, 2005 Senate Comm. Hearing* (testimony of Marty Bahamonde, Regional Director, External Affairs, Region One, FEMA).

71  *Id.* at 27.

72  *Id.*

73  *Id* at 28.

74  *Id.*

75  *Jan. 27, 2006 White House Briefing.*

76  *Id.*

77  *Id.*

78  Daily Video Teleconference amongst officials dated Sept. 2, 2005 [hereinafter Sept. 2, 2005 Daily Video Teleconference].

79  *Hearing on Hurricane Katrina: The Role of the Federal Emergency Management Agency Before Select Comm.,* 109th Cong. (Sept. 27, 2005) at 213 (testimony of Michael Brown, then Director of FEMA) [hereinafter *Sept. 27, 2005 Select Comm. Hearing*].

80  David D. Kirkpatrick and Scott Shane, "Ex-FEMA Chief Tells of Frustration and Chaos," *The New York Times,* Sept. 15, 2005, A1.

81  *Id.*

82  *Sept. 27, 2005 Select Comm. Hearing* at 104.

83  Sept. 2, 2005 Daily Video Teleconference.

84  *Jan. 26, 2006 White House Briefing.*

85  U.S. Army Corps of Engineers, *ESF #3 Field Guide* (June 2001).

86  Briefing for Select Comm. Staff by Department of Transportation in Washington, DC on Oct. 31, 2005; Interview by Select Comm. Staff with U.S. Army Corps of Engineers in Washington, DC on Oct. 28, 2005.

87  *NRP* at 5.

88  *Dec. 8, 2005 Senate Comm. Hearing* at 70-72 (testimony of Philip Parr).

89  Interviews by Select Comm. Staff with Alabama Officials in Clanton and Montgomery, AL on October 11-12, 2005.

90  Beverly Bell, NEMA, "EMAC Strides in 2005 Set a Precedent for Future," (Jan. 30, 2006) http://www.mema.org/newsletterwork/temamain. html.

91  Interviews by Select Comm. Staff with Louisiana Officials in New Orleans, LA (Nov. 3-10, 2005).

92  *See* Emacweb.org.

93  Interviews by Select Comm. Staff with Louisiana Officials in New Orleans, LA (Nov. 3-10, 2005).

94  *Hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi Before Select Comm.,* 109th Cong. (Dec.7, 2005) at 2 (statement of Haley Barbour, Governor, State of Mississippi).

95  Interviews by Select Comm. Staff with FEMA Officials in New Orleans, LA (Nov. 3-10, 2005).

96  *Id.*

97  *Hearing on Disaster Management: Recent Disasters Demonstrate the Need to Improve the Nation's Response Strategy Before the Subcomm. On Nuclear Deterrence, Arms Control and Defense Intelligence of the Senate Comm. on Armed Forces,* 103rd Cong. (May 25, 1993) at 11-12 (statement of J. Dexter Peach, Assistant Comptroller General) [hereinafter *May 25, 1993 Senate Armed Forces Comm. Hearing*].

[98] U.S. Gov't Accountability Off., Pub. No. GAO/RCED-93-186, *Disaster Management: Improving the Nation's Response to Catastrophic Disasters*, 2 (Jul. 1993) [hereinafter *1993 GAO Report*].

[99] Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5170(a)-(b), 5192 (2005) [hereinafter Stafford Act].

[100] *See* Interview by Select Comm. Staff with Edward Buikema, former Acting Director of Response, FEMA [hereinafter Jan. 6, 2006 Buikema Interview], in Washington, DC (Jan. 6, 2006).

[101] E-mail correspondence from Col. Richard Chavez, Senior Military Advisor for Civil Support, to Thomas Kuster, CIV, OSD-Policy (Sept. 2, 2005) (9:38 AM).

[102] DOD and FEMA, *MOD 8 to EXORD for DOD Support to FEMA for Hurricane Katrina*, on file with the Select Comm., No. MMTF 00028-05.

[103] Correspondence from Paul McHale, Assistant Secretary of Defense for Homeland Defense, to Chairman Davis (Jan. 25, 2006).

[104] *Jan. 6, 2006 Buikema Interview.*



*"FEMA pushed forward with everything it had in order to help the states respond after landfall …Every single team, every single program of FEMA, was pushed to its limit to respond to Hurricane Katrina."*

Michael D. Brown
Former FEMA Director, Select Committee Hearing,
September 27, 2005

# FEMA PREPAREDNESS

## DHS and the states were not prepared for this catastrophic event

### Summary

It is clear the federal government in general and the Department of Homeland Security (DHS) in particular were not prepared to respond to the catastrophic effects of Hurricane Katrina. There is also evidence, however, that in some respects, FEMA's response was greater than it has ever been, suggesting the truly catastrophic nature of Hurricane Katrina overwhelmed a federal response capability that under less catastrophic circumstances would have succeeded.

Nevertheless, DHS' actual and perceived weaknesses in response to Katrina revived discussion of the value of incorporation of FEMA into DHS. Many experts and Members of Congress debated the policy and operational ramifications of bringing FEMA into DHS during consideration of the Homeland Security Act of 2002 (HSA).

The HSA transferred FEMA functions, personnel, resources, and authorities to the DHS Emergency Preparedness and Response (EP&R) Directorate. The emergency management community has complained since 2003 that FEMA was being systematically dismantled, stripped of authority and resources, and suffering from low morale, in part because of the Department's focus on terrorism. Others have said that FEMA's placement in DHS enabled the Secretary of Homeland Security to augment FEMA's resources with other DHS personnel and assets, all within an integrated command structure.

The cycle of emergency management begins with preparedness and mitigation, flows into response, and ends with recovery. The four cornerstones to comprehensive emergency management — preparedness, response, recovery, and mitigation — are interdependent and all vital to successful emergency management.

Preparedness encompasses those pre-disaster activities that develop and maintain an ability to respond rapidly and effectively to emergencies and disasters. All levels of government need to be prepared to respond to disasters. International Association of Emergency Managers President Dewayne West described preparedness as "what emergency managers do every day in order to be able to respond."[1] Emergency management officials at different levels of the government expressed concerns that distancing preparedness efforts from response, recovery, and mitigation operations could result in an ineffective and uncoordinated response.[2]

Following Hurricane Katrina, emergency management professionals in the Gulf coast region have questioned whether DHS and state preparedness for catastrophic events has declined over the past years due to organizational changes within DHS and a shift in programmatic priorities. In particular, the decline in preparedness has been seen as a result of the separation of the preparedness function from FEMA, the drain of long-term professional staff along with their institutional knowledge and expertise, and the diminished readiness of FEMA's national emergency response teams.

In the Gulf coast region, emergency managers expressed the view that FEMA's disaster response capabilities had declined since its inclusion in DHS, in part due to subsequent organizational changes within DHS and FEMA. The emergency management community has suggested that FEMA's readiness for a large disaster has declined despite extensive preparedness initiatives within the federal government, pointing to the separation of preparedness functions from response, recovery, and mitigation.



FEMA

Additionally, the tremendous damage and scale of Hurricane Katrina placed extraordinary demands on the federal response system and exceeded the capabilities and readiness of DHS and FEMA in a number of important areas, particularly in the area of staffing. The response to Hurricane Katrina required large numbers of qualified personnel at a time when FEMA's professional ranks had declined. FEMA response officials in both Mississippi and Louisiana testified that the department's inability to field sufficient numbers of qualified personnel had a major impact on federal response operations. In addition, FEMA had lost, since 2002, a number of its top disaster specialists, senior leaders, and experienced personnel, described as "FEMA brain drain." Many emergency management professionals had predicted this 'drain' would have a negative impact on the federal government's ability to manage disasters of all types.

In addition, emergency management professionals said the degraded readiness of FEMA's national emergency response teams reduced the effectiveness of the federal response to Hurricane Katrina. The diminished readiness of the national emergency response teams has been attributed to a lack of funding for training exercises and equipment. Emergency management professionals note the need for trained people, who have experience working together with their federal colleagues and state counterparts prior to a disaster, as a part of national emergency response teams. Emergency responders should not meet each other for the first time right before or after a major catastrophe. A decline in the readiness of these teams along with appropriate staffing added to an ineffective response.

## Finding: While a majority of state and local preparedness grants are required to have a terrorism purpose, this does not preclude a dual use application

The "all hazard" versus "just terrorism" debate plays out in the interpretation of permissible uses for homeland security grant funding and efforts to make equipment purchases and exercise scenarios fit terrorism-related criteria while still being of some general use in day-to-day emergency response. For example, funding to exercise response capabilities for WMD-related scenarios might be used to test evacuation planning and other "all hazard" response functions, with the WMD element little more than pretext.

This concern is evident at the local level. Alabama conducts or participates in approximately 50 training exercises each year ranging from "table top," classroom-like discussions to full scale exercises involving all members of the emergency management community, including federal, state, and local officials. According to Alabama officials, federal DHS funding restrictions dictate that almost all of these exercises involve a terrorism-based threat or scenario, despite the fact that all emergencies largely involve the same set of procedures — evacuations, loss of power, communications difficulties, need for shelter, food, and water, and inter-governmental coordination.[3]



State officials also voiced a concern that in the post-9/11 environment undue emphasis is placed on terrorism-based hazards.[4] Alabama's hazard risk profile includes terrorism, but state emergency management officials believe natural disasters pose a much more likely, perhaps inevitable, risk.[5] Although lately, hurricanes have hit the state with some regularity, Alabama is susceptible to a wide variety of other natural disasters, including earthquakes, tornadoes, floods, and droughts. With nuclear facilities located within the state, Alabama Emergency Management Agency (AEMA) officials are also on alert for nuclear-related emergencies. Special plans and precautions have also been funded to prepare for risks posed by an Army chemical weapons storage and incineration facility.[6]

According to Colonel Terry Ebbert, the Director of Homeland Security & Public Safety for the City of New Orleans, DHS' all hazards focus is unsubstantiated.

[T]he Office of Domestic Preparedness restricted any use of grant funding for preparing, equipping, training, and exercising to enhance the preparedness of first responders operating in

a potential WMD environment. Most allowable expenditures under the UASI program remain closely linked to the WMD threat to the exclusion of many other forms of enhanced readiness.[7]

When Ebbert submitted a request to purchase a number of inexpensive, flat-bottomed, aluminum boats to equip his fire and police departments, with the intent of having them available to rescue people trapped by flooding, the request was denied. Ebbert concluded that the rules on what is permitted and reimbursable are unaltered while the newly stated focus on an "all hazards" approach to preparedness remains "elusive."[8] Ebbert recommended that "existing limitations imposed on the availability of Federal preparedness funding should be broadened."[9]

DHS officials are particularly sensitive to the charge that the agency has stopped state and local governments from purchasing equipment not exclusively suited to terrorism preparedness. Former Office of Domestic Preparedness (ODP) Director Suzanne Mencer stressed the dual use capability of many grants: "The grants don't prohibit a city from buying equipment for use in a natural disaster if it can also be used in a terrorist attack."[10] Mencer said some locals see the WMD wording and think it prohibits items, such as radios, that could also be used in a natural disaster: "They can still meet their needs in almost all instances if they look at the broader picture and not [just] the wording in the grant."[11] When asked about state and local complaints in Alabama and elsewhere, former director of ODP's Preparedness Programs Division, Tim Beres, noted that in fiscal 2004, grants paid for more than $1 billion worth of dual-use equipment, including $925 million for interoperable communications equipment and $140 million in chemical protection suits.[12]

DHS continues to develop and refine its guidelines to states and localities, in accordance with Presidential Directives, which require grants to be used in support of catastrophic events regardless of their cause.[13] Although a July 2005 Government Accountability Office (GAO) report found many state preparedness officials and local first responders believed DHS planners focused excessively on anti-terrorism criteria in their grant, training, and exercise programs, the auditors concluded that 30 of the 36 essential capabilities first responders need to

fulfill the critical tasks generated by the department's 15 catastrophic emergency planning scenarios would apply to both terrorist and non-terrorist incidents.[14] The GAO auditors concluded that DHS planning supported an all hazards approach.[15] Indeed, according to GAO auditors, in response to state and local complaints that DHS required too much emphasis on terrorism-related activities, DHS increasingly promoted flexibility to allow greater dual usage within the grant program requirements for fiscal year 2005.

DHS' growing dual use flexibility is reflected in its most recent grant guidelines. Specifically, the FY2006 guidance points out the numerous dual-use target capabilities (identified in the National Preparedness Goal) to be attained through DHS grant funding.[16] The guidance further states:

> [f]unding remains primarily focused on enhancing capabilities to prevent, protect against, respond to, or recover from CBRNE [Chemical, Biological, Radiological, Nuclear and Conventional Explosives], agriculture, and cyber terrorism incidents. However, in light of several major new national planning priorities, which address such issues as pandemic influenza and the aftermath of Hurricane Katrina, the allowable scope of SHSP [State Homeland Security Program] activities include catastrophic events, provided that these activities also build capabilities that relate to terrorism.[17]

## Finding: Despite extensive preparedness initiatives, DHS was not prepared to respond to the catastrophic effects of Hurricane Katrina

As a result of various changes within DHS and FEMA, the emergency management community suggested FEMA's preparedness and readiness for a large disaster would decline despite extensive preparedness initiatives within the federal government. For example, during an April 2005 House Subcommittee hearing on DHS preparedness efforts, Dave Liebersbach, then President of the National Emergency Management Association (NEMA), expressed

his fear that DHS' de-emphasis of hazards other than terrorism would result in FEMA's inability to respond to a major disaster:[18]

> My concern is we are not going to be able to maintain [capabilities]. I honestly believe . . . that if the hurricane scenario of September 2004 that occurred in the Southeastern U.S., [happens] five years from now, we will fail the way we are going, because the success of that response, of that hurricane season, was based on the programs that had come before . . . . As we are moving forward, that legacy is going to drop if we don't pay attention to dealing with that.[19]

Similar issues were raised during the establishment of the department by various first responder professional associations and think tanks, Members of Congress from both political parties, the Government Accountability Office, and the Congressional Research Service.[20]



WHITE HOUSE

One of the primary reasons for creating FEMA in 1979 was to closely link preparedness, response, and mitigation within one organization.[21] During consideration of the Homeland Security Act in 2002, the President proposed that all terrorism preparedness functions be consolidated into FEMA's Office of National Preparedness and be managed within the Emergency Preparedness and Response Directorate (EP&R) of the proposed department.

The intention was to provide a one-stop shop for state and local governments and achieve a unified approach to disaster response. Instead Congress opted to split preparedness functions between the Office of Domestic Preparedness (ODP), which was to be transferred to DHS from the Justice Department, and EP&R (or FEMA).[22] The goal was to place terrorism preparedness in an organization, ODP, with a strong law enforcement background and relationship with that community.

In late 2003, the debate over the need for a one-stop shop for first responder grants and to unite preparedness with the other functions of comprehensive emergency management continued. When DHS Secretary Tom Ridge proposed to transfer most state and local grant programs to ODP, the emergency management community again cautioned the capabilities of state and local governments and FEMA to respond to all disasters would suffer.[23] Ridge and his aides "believed FEMA should be a response and recovery agency, not a preparedness agency. In an age of terrorism, they argued, preparedness needed a law enforcement component, to prevent and protect as well as get ready to respond."[24]

The proposal prompted then FEMA Director Michael Brown to urge Ridge not to further distance preparedness from response as it "can result in an ineffective and uncoordinated response . . . [would] shatter agency morale and would completely disconnect the Department's response functions from the responders and governments they are supposed to support."[25] Brown was overruled and the programs were transferred to ODP, which was then incorporated into the newly created Office of State and Local Government Coordination and Preparedness (SLGCP).

The controversy over how to manage disaster preparedness increased with incoming Secretary Michael Chertoff's Second Stage Review. Chertoff argued the federal government's preparedness efforts needed to be enhanced, particularly for catastrophic disasters, and that could be best achieved by consolidating the department's preparedness functions into a new Preparedness Directorate. In a letter opposing the move, NEMA criticized the department's "total lack of focus on natural-hazards preparedness" and argued that separating preparedness from response and recovery would break emergency management's cycle of continuous improvement and result in disjointed and ineffective response operations.[26]

While Brown agreed with the need to increase catastrophic planning (FEMA had originally proposed the catastrophic preparedness program that funded the Hurricane Pam process), he strongly disagreed with Chertoff's recommended solution of removing FEMA's remaining preparedness functions and transferring them to ODP, which would then be elevated to a Preparedness Directorate. Instead, Brown drafted a 13-page memo to Chertoff urging the consolidation of all preparedness functions into the Emergency Preparedness & Response Directorate, as originally proposed by President Bush, in order to "ensure that capabilities and procedures trained will be identical to the capabilities and procedures



FEMA

*"These recent organizational changes have divided what was intended to be one, all-hazards preparedness mission into two artificially separate preparedness categories of terrorism and natural disasters."*

actually applied during a real event."[27] As Brown described it, "These recent organizational changes [the transfer of several FEMA preparedness programs to ODP in Secretary Tom Ridge's reorganization plan of September 2003] have divided what was intended to be one, all-hazards preparedness mission into two artificially separate preparedness categories of terrorism and natural disasters."[28]

Some experts do, however, endorse the consolidation of preparedness efforts. Last December, the Center for Strategic and International Studies and the Heritage Foundation released a joint study called "DHS 2.0," in which the authors suggested adding a new undersecretary for preparedness with direct access to the secretary.[29] Such a move, they said, would speed preparedness decisions past layers of bureaucracy. And in a September 1, 2005 *Washington Post* article, at the height of the Katrina response effort, Paul C. Light, an authority on government operations at New York University, also endorsed Chertoff's proposed reforms.[30]

In a December 7, 2005 report entitled "The Truth About FEMA: Analysis and Proposals," Heritage Foundation homeland security expert James Carafano and the Hudson Institute's Richard Weitz argued that Chertoff's proposed reorganization would address many of the shortfalls created by placing FEMA within DHS.[31] At the same time, they said it would preserve the advantages of having most major federal disaster-related preparedness and response activities, for both man-made and natural

disasters, concentrated in one department.[32] The authors pointed out that in the event of large-scale disasters, FEMA could be reinforced by other assets from within DHS.[33]

In testimony before the Select Committee, Chertoff explained his rationale for integrating the Department's existing preparedness efforts in to a single directorate for Preparedness:

> Preparedness is not just about response and recovery — rather, it must draw on the full spectrum — from prevention through protection to response. Our preparedness directorate will rely on the expertise of FEMA, but it will also integrate the experience of the Coast Guard, our Infrastructure Protection division, our intelligence units, and our other operational assets . . . FEMA will become a direct report to the Secretary, allowing it to focus on response and recovery while partnering with the new preparedness directorate to increase our overall capabilities . . . FEMA must also continue to function as an all-hazards agency, leveraging entities within the preparedness directorate, including Infrastructure Protection, the Office of Domestic Preparedness, and State and Local Government Coordination.[34]

Although many in the emergency management community opposed Chertoff's preparedness consolidation, many first responder groups support it. For example, in a press release issued immediately following the release of Chertoff's Second Stage Review, the International Association of Fire Chiefs applauded the proposal, particularly the creation of a Preparedness Directorate.[35]

## Finding: DHS and FEMA lacked adequate trained and experienced staff for the Katrina response

Brown's memorandum also identified budget cuts and organizational changes he believed were harming FEMA's ability to perform its statutory responsibility of leading the federal government's response to all disasters, including terrorist attacks. For example, Brown claimed

FEMA's operational budget baseline (for non-Stafford Act disaster funding) had been permanently reduced by 14.8 percent since joining DHS in 2003. In addition to the permanent baseline reduction, he claimed FEMA lost $80 million and $90 million in fiscal years 2003 and 2004 respectively from its operating budget.[36] Brown argued these budget reductions were preventing FEMA officials from maintaining adequate levels of trained and ready staff.

Brown also said FEMA no longer managed numerous functions that were essential to meeting its statutory responsibilities, and therefore did not have the tools to successfully accomplish its mission. For example, the National Response Plan is a fundamental element of coordinating the federal government's response to disasters. Given FEMA's response mission, the Homeland Security Act of 2002 specifically assigned FEMA responsibility for "consolidating existing Federal Government emergency response plans into a single, coordinated national response plan."[37] However, instead of assigning this function to the organization responsible for executing the plan during a disaster (i.e. FEMA), the department initially assigned it to the Transportation Security Administration, which then relied on an outside contractor.

When some in the first responder community reacted negatively to the contractor's draft plan, the department transferred the NRP's development to another area of the department, the Integration Staff within the Secretary's office. The resulting plan made a number of departures from the existing Federal Response Plan, including the introduction of the Incident of National Significance (INS), the Principal Federal Official (PFO), the Interagency Incident Management Group (IIMG), the Homeland Security Operations Center (HSOC), and the Catastrophic Incident Annex (NRP-CIA).[38] The emergency management community expressed concerns about each of these newly created structures, which ultimately proved problematic or experienced difficulties achieving their intended purposes during the response to Hurricane Katrina.

Brown also identified what he believed were the most important goals for achieving FEMA's mission of leading the federal government's response to disasters. Several of the issues he identified for improvement proved to be critical problem areas in the Katrina response. The requirements he identified in March 2005 included the following:[39]

1. Improve logistics capability and asset visibility.
2. Implement a comprehensive and integrated multi-year catastrophic planning strategy.[40]
3. Establish a National Incident Management System Integration Center to improve command and control capabilities at the federal, state, and local levels.
4. Recruit, train, credential, deploy and retain a disaster workforce with the appropriate skill mix and management structure to support the operational requirements of all disaster related functions.
5. Ensure appropriate numbers, skills, and grades of employees to support current and long-term mission needs.

Senior DHS and Office of Management and Budget officials vigorously dispute the claim that FEMA's budget has been cut at all. They argue that any transfers from the FEMA budget reflect the transfer of functions carried out by DHS for FEMA, start up costs of the Department, and the use of unobligated funds. According to Andrew Maner, Chief Financial Officer for DHS, the core of the budget adjustments cannot be classified as permanent reductions to FEMA's base budget, as Brown claims.[41] For example, Maner said the transfer of $30.6 million was a transfer of unobligated balances from the 2002 Olympic Games to help fund the start-up of the new Department. The transfer of such unobligated balances was authorized by Congress in H.J. Res. 124, which became law on November 23, 2002 (P.L. 107-294), to pay for "the salaries and expenses associated with the initiation of the Department."[42] Also, Maner noted the $28 million transfer to ODP reflects efforts to complete the transfer of funds accompanying former FEMA functions that have been assumed by other DHS entities.[43]

Regardless of the impact, if any, of these budget adjustments on FEMA capabilities, the tremendous damage and scale of Hurricane Katrina placed extraordinary demands on the federal response system and exceeded the capabilities and readiness of DHS and FEMA in a number of important areas, including staffing. Hurricane Katrina consisted of three separate major disaster declarations, three separate statewide field operations, two directly-affected FEMA regional operations, and the full activation of national level resources such as the National Response Coordination Center (NRCC), the HSOC, and the IIMG. In addition, most FEMA regional offices were actively supporting

Katrina operations or assisting their regions receive Gulf Coast evacuees. These operations required large numbers of qualified personnel from what had become a relatively small agency of approximately 2,500 positions.



AP PHOTO/JOHN BAZEMORE

*Ultimately, FEMA officials turned to federal agencies like the U.S. Forest Service and city firefighters from across the country to staff FEMA positions in the state.*

FEMA response officials in both Mississippi and Louisiana testified that the department's inability to field sufficient numbers of qualified personnel had a major impact on federal response operations.[44] The Federal Coordinating Officer (FCO) in Mississippi, Bill Carwile, described how managing the personnel shortfall was perhaps his most difficult challenge. While he was able to deploy division supervisors to the coastal counties, he needed similar qualified employees for the devastated cities of Gulfport, Biloxi, and Pascagoula. Ultimately, FEMA officials turned to federal agencies like the U.S. Forest Service and city firefighters from across the country to staff FEMA positions in the state.

Despite those measures, Carwile stated, "We never had sufficient personnel to meet requirements."[45] According

to Scott Wells, Deputy FCO for Louisiana, a 90-person FEMA regional office "is woefully inadequate" to perform its two primary disaster functions, operating a regional response coordination center and deploying people to staff emergency response teams in the field.[46] "You cannot do both. Pick one," he said.[47] Wells added, "We had enough staff for our advance team to do maybe half of what we needed to do for a day shift….We did not have the people. We did not have the expertise. We did not have the operational training folks that we needed to do our mission."[48]

In addition to having an inadequate number of qualified personnel, FEMA had lost a number of its top disaster specialists, senior leaders, and most experienced personnel. Both critics and supporters of FEMA's merger with DHS have acknowledged "FEMA brain drain" in recent years and its negative impact on the federal government's ability to manage disasters of all types.[49] Since 2003, for example, the three directors of FEMA's preparedness, response, and recovery divisions had left the agency, and departures and retirements thinned FEMA's ranks of experienced professionals. At the time Hurricane Katrina struck, FEMA had about 500 vacancies and eight out of its ten regional directors were working in an acting capacity.[50]

At least two factors account for FEMA's loss of seasoned veterans. First, like other government agencies, many of FEMA's long-term professionals are reaching retirement age.[51] And second, job satisfaction was second to last in 2005, according to the Partnership for Public Service, a nonprofit group that promotes careers in federal government.[52] Regardless of the reasons for the exodus, Brown and senior DHS officials were unable to maintain their ranks of disaster professionals, through employee retention, development, or recruitment, and this failure hindered the response to Hurricane Katrina.[53]

The disastrous effect of this manpower shortage was compounded in Hurricane Katrina by the difficulty of getting federal workers where they needed to be because of security concerns. In Louisiana, media reports and rumors of violence and general lawlessness delayed the deployment and placement of federal response workers. The Governor's Chief of Staff Andy Kopplin said there were approximately 1,000 FEMA employees deployed and on their way to New Orleans Wednesday, August 31, 2005, many of whom turned back due to security concerns.[54]

# Finding: The readiness of FEMA's National Emergency response teams was inadequate and reduced the effectiveness of the federal response

One of the most critical links in the federal response system is the team of FEMA personnel that deploys to a disaster site to establish a unified command with state officials and directs federal operations. These national emergency response teams are the conduits through which federal disaster assistance is requested by and delivered to a state. They are intended to be on call and deploy at a moment's notice, since many disasters provide no advance warning. In prior years, according to Carwile, "We were then able to build a team to about 125 individuals, hand picked, from around the country, and we were able to routinely exercise that team because we had the funding in place to do so on the plan, against several scenarios."[55] The team had a robust operational plan, was sent to the Winter Olympics in Salt Lake City, and received dedicated satellite communications equipment. It appeared to be a well-equipped, well-trained team at a high state of readiness.[56]

Carwile testified that by 2004, the readiness of FEMA's emergency response teams had plummeted dramatically.[57] Funding for the teams dried up after 2002. They lost their dedicated communications equipment. Teams were split up into ever smaller units. Team training and exercises ceased.

In a June 30, 2004 memorandum, FEMA's top disaster response operators, the cadre of Federal Coordinating Officers, warned then FEMA Director Brown that the national emergency response teams were unprepared because no funding was available for training exercises or equipment.[58] In a few short years, FEMA's emergency response teams had been reduced to names on a roster. It appears no actions were taken to address the problems identified in the memorandum.

Asked whether or not implementing the recommendations would have made a difference in Katrina, Carwile responded, "I felt very fortunate because many of my colleagues with me in Mississippi had been with me on a national team in years past. It was kind of coincidental . . . but I can't help but believe that trained and ready teams, people who have worked together, would not have made some difference in a positive way."[59] Wells described the situation in Louisiana in this way: "We need to really train together as a team. We need to work as a team. What you have with this National Response Plan in the field is we have no unity of command."[60]

The requirement for trained people, who have experience working together with their federal colleagues and their state counterparts, is a constant theme of federal, state, and local emergency professionals. Numerous officials and operators, from state and FEMA directors to local emergency managers told the same story: if members of the state and federal emergency response teams are meeting one another for the first time at the operations center, then you should not expect a well-coordinated response.[61]

# Conclusion

For years emergency management professionals have been warning that FEMA's preparedness has eroded. Many believe this erosion is a result of the separation of the preparedness function from FEMA, the drain of long-term professional staff along with their institutional knowledge and expertise, and the inadequate readiness of FEMA's national emergency response teams. The combination of these staffing, training, and organizational structures made FEMA's inadequate performance in the face of a disaster the size of Katrina all but inevitable. ■

1   International Ass'n of Emergency Managers, *Press Release: IAEM Announces Recommendations for Improved Emergency Response,* (Oct. 25, 2005) (on file with Select Comm.).

2   *Hearing on The National Preparedness System: What are we preparing for? Before the House Comm. on Transportation and Infrastructure, Subcommittee on Economic Development, Public Buildings, and Emergency Management,* 109th Cong. (Apr. 14, 2005) at 61-62 (statement of Dave Liebersbach, Pres., Nat'l Emergency Mgmt. Assoc.) [hereinafter *Apr. 14 Preparing Hearing*]; Memorandum from Michael Brown, Dir., FEMA to Michael Chertoff, Sec'y, Dept. of Homeland Sec. (March 2005) [hereinafter March 2005 Brown Memo]; Interview by Select Comm. Staff with Ed Buikema, Dir., Response Div., FEMA, in Wash., D.C. (Jan. 6, 2006).

3   *Hearing on Hurricane Katrina: Preparedness and Response by the State of Alabama Before Select Comm.,* 109th Cong. (Nov. 9, 2005) at 75 (statement of Bruce Baughman, Dir., Ala. State Emergency Mgmt. Agency) [hereinafter *Nov. 9, 2005, Select Comm. Hearing*].

4   Interview by Select Comm. Staff with senior AL emergency management officials, in Clanton, AL (Oct. 11, 2005).

5   *Id.*

6   *Nov. 9, 2005 Select Comm. Hearing* at 75 (statement of Bruce Baughman, Dir., Ala. State Emergency Mgmt. Agency).

7   *Hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana Before Select Comm.,* 109th Cong. (Dec. 14, 2005) at 174 (written statement of Col. (Ret.) Terry Ebbert, Dir., Homeland Sec. for New Orleans) [hereinafter statement of Terry Ebbert] [hereinafter *Dec. 14, 2005 Select Comm. Hearing*].

8   *Dec. 14, 2005 Select Comm. Hearing* at 174 (statement of Terry Ebbert).

9   *Id.* at 174-75 (statement of Terry Ebbert).

10  Shane Harris, *Federal Emphasis on Terrorist Threat Frustrates Local Disaster Response Officials,* NAT'L JOURNAL, Oct. 20, 2005, at 4, *available at* http://www.govexec.com/dailyfed/1005/102005nj1.htm (last visited Jan. 26, 2006).

11  *Id.*

12  *Id.*

13  Directive on Management of Domestic Incidents, 39 WEEKLY COMP. PRES. DOC. 10 280 (Feb. 28, 2003) (Known as Homeland Security Presidential Directive/HSPD-5); Directive on Management of National Preparedness, 39 WEEKLY COMP. PRES. DOC. 1822 (Dec. 17, 2003) (Known as Homeland Security Presidential Directive/HSPD-8).

14  Government Accountabillity Office [hereinafter GAO], Pub. No. GAO-05-652, *Homeland Security: DHS' Efforts to Enhance First Responders' All Hazards Capabilities Continue to Evolve* (July 2005) 26-30.

15  *Id.* at 39-41.

16  Dep't of Homeland Sec., *FY 2006 Homeland Security Grant Program: Program Guidance and Application Kit,* (Dec. 2005). Those capabilities include planning, community preparedness and participation, communications, critical infrastructure protection, on-site incident management, citizen protection: evacuation and in-place protection, emergency operations center management, critical resource logistics and distribution, urban search and rescue, volunteer management, emergency public information and warning, responder safety and health, triage and pre-hospital treatment, public safety and security response, medical surge; medical supplies management and distribution, environmental health, mass prophylaxis, mass care, firefighting operations and support, hazardous material response, structural damage assessment and mitigation, economic and community recovery, restoration of lifelines. *Id.*

17  *Id.*

18  *Apr. 14 Preparing Hearing* at 90 (statement of Dave Liebersbach, Pres., Nat'l Emergency Mgmt. Ass'n).

19  *Id.*

20  GAO, GAO-03-119, *High-Risk Series: An Update* (Jan. 2003); Congressional Research Service [hereinafter CRS], Rep. No. 31670, *Transfer of FEMA to the Department of Homeland Security: Issues for Congressional Oversight* [hereinafter CRS Rep. No. 31670] at 5 (Dec. 17, 2002).

21  Exec. Order No. 12,127, 3 C.F.R. 1979 (1979); Exec. Order No 12,148, 44 Fed. Reg. 43239 (1979).

22  CRS Rep. No. 31670 at 5 (2002).

23  March 2005 Brown Memo; Letter from Michael Brown, Dir., FEMA to Tom Ridge, Sec'y, Dep't of Homeland Sec. (Sept. 15, 2003); National Emergency Mgmt Ass'n, *Priority Congressional Issues: 2004 Mid Year Conference,* (Feb. 10-13, 2004).

24  Spencer S. Hsu and Julie Tate, *Brown's Turf Wars Sapped FEMA's Strength,* WASH. POST., Dec. 22, 2005.

25  Letter from Michael Brown, Dir., FEMA to Tom Ridge, Sec'y, Dep't of Homeland Sec. (Sept. 15, 2003).

26  Letter from David Liebersbach, Pres., Nat'l Emergency Mgmt. Ass'n to Honorable Don Young and Honorable James Oberstar (July 27, 2005).

27  March 2005 Brown Memo.

28  March 2005 Brown Memo.

29  James J. Carafano and David Heyman, THE HERITAGE FOUND., *DHS 2.0: Rethinking the Dep't of Homeland Sec.,* Dec. 13, 2004, at 14.

30  Paul C. Light, *Katrina's Lesson in Readiness,* WASH. POST, Sept. 1, 2005 at A29.

31  James Carafano, Ph.D., and Richard Weitz, Ph.D., THE HERITAGE FOUND., *The Truth About FEMA: Analysis and Proposals,* Dec. 7, 2005.

32  *Id.*

33  *Id.*

34  *Hearing on Hurricane Katrina: The Role of the Department of Homeland Security Before Select Comm.,* 109th Cong. (Oct. 19, 2005) at 4-5 (written statement of Michael Chertoff, Sec'y, Dep't of Homeland Sec.).

35  Press Release, Int'l Assoc. of Fire Chiefs, *Secretary Chertoff Announces Reorganization, Plans for DHS* (Aug. 1, 2005) (on file with Select Comm.).

36  March 2005 Brown Memo.

37  Homeland Sec. Act of 2002, Pub. L. No 107-296, 116 Stat. 2135 (2002).

38  U.S. Dep't of Homeland Sec., *Nat'l Response Plan* (Dec. 2004).

39  March 2005 Brown Memo.

40  Briefing for Select Comm. Staff with Madhu Beriwal, Pres., Innovative Emergency Mgmt., in Wash., D.C. (Jan. 6, 2006) (discussing how funding for FEMA staff to participate in subsequent Hurricane Pam implementation workshops had been cut).

41  Briefing for  Select Comm. Staff with Andrew Maner, Chief Fin. Officer, Dep't of Homeland Sec., in Wash., D.C. (Jan. 18, 2006) [hereinafter Briefing with Andrew Maner].

42 Briefing with Andrew Maner; FEMA, *Reductions to FEMA Base*, FY 2003-2005 (Jan. 18, 2006) (on file with Select Comm.).

43 According to OMB data, a total of 448 employees (full-time equivalents, or FTEs) were transferred from FEMA to various DHS offices in 2003:
   • 42 FTEs were transferred from FEMA's salaries and expenses budget account to DHS's Departmental Operations account;
   • 206 FTEs were transferred from FEMA's Working Capital Fund to DHS's Working Capital Fund; and
   • 200 FTEs were transferred from FEMA's Office of Inspector General to DHS's Office of Inspector General. (GAO, GAO-04-329R, *Transfer of Budgetary Resources to the Dep't of Homeland Sec. (DHS)*, at 22 (Apr. 30, 2004) (on file with Select. Comm)).

And since the establishment of the Department, the following programs have been transferred from FEMA to other Departmental entities (OMB, Funding Chart (Oct. 4, 2005) (on file with Select Comm.):
• Emergency Management Performance Grants
• National Strategic Stockpile
• Citizen Corps
• Other grants for emergency management
• Inspector General
• FIRE Act Grants
• First Responder Grants
• Metropolitan Medical Response System grants

Moreover, according to information provided to the Select Comm. by DHS, the funding transfers that Brown referenced in his testimony Before the Select Comm. break down as follows (Briefing with Andrew Maner; FEMA, *Reductions to FEMA Base, FY 2003-2005* (Jan. 18, 2006) (on file with Select Comm.)):

FY 2003 –
• Unobligated balances from FY 2002 – $30.6 million (*Id.*) (DHS start-up costs)
• FY 2003 appropriations – $12 million (DHS start-up costs) (Of the $12 million in FY 2003 appropriations, $10 million had been allocated for Salaries and Expenses for preparedness functions and $2 million had been allocated for the programs of another management account – Emergency Management Planning and Assistance.)
• Transfer of Office for National Preparedness functions to Office of Domestic Preparedness/Bureau of Transportation Security - $10.6 million
• Transfer to the Transportation Security Administration to fund a shortfall from the Liberty Shield Supplemental – $5.5 million
• Transfer to the DHS Office of Inspector General for audits and investigations of the Disaster Relief Fund – $21.4 million

FY 2004 –
• FEMA share of DHS e-government initiatives (mostly to maintain DisasterHelp.gov website) – $2.6 million
• FEMA share of other DHS central services – $2.8 million
• Transfer to Inspector General for audits and investigations of the Disaster Relief Fund – $22 million
• National preparedness functions transferred to ODP – $28 million
• General reduction to base funding for Departmental management – $34 million

FY 2005 –
• Reduction for management cost savings realized from efficiencies attributable to the creation of DHS – $11.7 million
• $18,501 million for Working Capital Fund

44 *Hearing on Hurricane Katrina Response and Initial Recovery Operations: Mississippi Before Select Comm.*, 109th Cong. (Dec. 7, 2005) at 7 (written statement of William Carwile, former FEMA Fed. Coordinating Officer, State of Miss.) [hereinafter *Dec. 7, 2005 Select Comm. Hearing*]; *Hearing on Hurricane Katrina: Perspectives of FEMA's Operational Professionals before the Senate Committee on Homeland Security and Governmental Affairs*, 109th Cong. (Dec. 8, 2005) at 57-58 (statement of Scott Wells, Deputy, FEMA Fed. Coordinating Officer, State of LA) [hereinafter *Perspectives of FEMA Hearing*].

45 *Dec. 7, 2005 Select Comm. Hearing* at 7 (written statement of William Carwile, former FEMA Fed. Coordinating Officer, State of Miss.).

46 *Perspectives of FEMA Hearing* at 57 (statement of Scott Wells, Deputy, FEMA Fed. Coordinating Officer, State of LA) [hereinafter statement of Scott Wells].

47 *Id.*

48 *Id.* at 57-58.

49 Spencer Hsu, *Leaders Lacking Disaster Experience,* WASH. POST, Sept. 9, 2005 at A1.

50 Interview by Select Comm. Staff with William Lokey, FEMA Fed. Coordinating Officer in Wash., D.C. (Jan. 26, 2006); FEMA Regions I, II, III, IV, V, VI, VIII, and IX with Acting Directors; *See, e.g.,* Region VIII Acting Director, *available at* http://www.fema.gov/about/bios/maurstad.shtm (last visited Jan. 30, 2006).

51 Justin Rood, *FEMA's Decline: An Agency's Slow Slide From Grace,* GOVERNMENT EXECUTIVE (Oct.1, 2005).

52 www.ourpublicservice.org/usr_doc/2003-rankings.pdf (last visited Jan. 28, 2006).

53 *Id.*

54 Interview by Select Comm. Staff with Andy Kopplin, Chief of Staff, Office of the Governor of LA, in New Orleans, LA (Nov. 6, 2005).

55 *Perspectives of FEMA Hearing* at 60 (statement of William Carwile, former FEMA Fed. Coordinating Officer, State of Miss.) [hereinafter statement of William Carwile].

56 *Id.* at 60.

57 *Id.* at 65-68.

58 *Id.* at 59 (statement of Senator Joseph Lieberman).

59 *Id.*. at 67 (statement of William Carwile).

60 *Id.* at 58 (statement of Scott Wells).

61 *See id.* at 67 (statement of William Carwile).



*"The sheer force of Hurricane Katrina disabled many of the communications systems that state and local authorities and first responders rely upon to communicate with each other and with FEMA. This was not an issue of interoperability, but of basic operability, resulting from wind, flooding, loss of power, and other damage to infrastructure."*

Michael Chertoff
Secretary, U.S. Department of Homeland Security
Select Committee Hearing, October 19, 2005

# COMMUNICATIONS

## Massive communications damage and a failure to adequately plan for alternatives impaired response efforts, command and control, and situational awareness

### Summary

Massive inoperability—failed, destroyed, or incompatible communications systems—was the biggest communications problem in the response to Katrina. It was predicted and planned for by some, while others experienced problems with their operations or were caught relatively unprepared. The loss of power and the failure of multiple levels of government to take the initiative to adequately prepare for its effect on communications hindered the response effort by compromising situational awareness and command and control operations, particularly in New Orleans and along the Mississippi Gulf coast. The Federal Emergency Management Agency (FEMA) could have pre-positioned mobile communications in New Orleans but did not because it believed that it should first be *asked* to do so by local authorities. In turn, poor situational awareness, and its resulting effect on command and control, contributed to the negative effects of inaccurate or unsubstantiated media reports because public officials lacked the facts to address what the media reported. To deal with the loss of power, some state and local governments had redundant communications and other means to communicate, such as satellite phones, which were invaluable. But they also experienced certain problems due to technical difficulties, high winds, and exceptionally high demand that at times overtaxed their capacity.

Where communications were operable or soon were restored, long debated and unresolved issues with interoperability among federal, state, and local communications systems complicated the efforts of first responders and government officials to work together in managing the response to Katrina. In recent years, local and state governments in each of the affected states have received several million dollars in federal funding to address communication interoperability issues. Despite

claims of an "austere fiscal environment,"[1] at each level of government, internal debate, parochial interests, and a general lack of prioritization and coordination between affected jurisdictions regarding the formation and implementation of interoperable communications policies and plans severely hindered the rescue, response, and recovery efforts at all levels of government.

## Finding: Massive inoperability had the biggest effect on communications, limiting command and control, situational awareness, and federal, state, and local officials' ability to address unsubstantiated and inaccurate media reports

Massive inoperability was the biggest communications problem in the response to Katrina. By all accounts, destruction to regional communications companies' facilities and the power systems on which they depend was extraordinary. For example:



A downed communications tower, Plaquemines Parish, LA.

■ More than three million customer telephone lines were knocked down in Louisiana, Mississippi, and Alabama.[2] As of September 28, 2005, over 260,000 customer lines remained out of service, including

238,000 in Louisiana and 22,000 in Mississippi.

- The entire communications infrastructure on the Mississippi Gulf coast was destroyed.
- Significant damage was inflicted both on the wire line switching centers that route calls and on the lines used to connect buildings and customers to the network.
- Thirty-eight 911 call centers went down. Thirty days after landfall, two call centers in Louisiana remained out of service.
- Two telephone company switches in New Orleans responsible for routing 911 calls for the surrounding parishes were knocked out by flooding, resulting in one of the most significant losses of capacity in and around New Orleans.
- Local wireless networks also sustained considerable damage, with up to 2,000 cell sites out of service.[3] A month after landfall, approximately 820 cell sites remained out of service, the majority within New Orleans and other areas of Louisiana.[4]
- Over 20 million telephone calls did not go through the day after the hurricane.
- 37 of 41 broadcast radio stations in New Orleans and surrounding areas were knocked off the air (2 AM and 2 FM stations continued to broadcast).

After surviving Hurricane Katrina's initial blow, the radio communications system for the New Orleans police and fire departments dissolved as its radio towers lost their backup power generators in the ensuing flood.[5] The New Orleans Police Department's communications system failed and was inoperative for three days following the hurricane. At one point, hundreds of New Orleans first responders were trying to communicate on only two radio channels on a backup system, forcing them to wait for an opening in the communications traffic to transmit or receive critical information. The New Orleans Police Department headquarters, and six of the eight police districts' buildings were out of commission due to flooding, limiting (or precluding) their ability to establish command and control by performing basic law enforcement functions because their communications were destroyed.

The Louisiana State Police reported the devastation caused by the storm "severely hampered the ability of emergency responders operating on the state system to communicate with other emergency services personnel." The State Police currently operate a statewide analog

*Six of the eight police districts' buildings were out of commission due to flooding, limiting (or precluding) their ability to establish command and control by performing basic law enforcement functions because their communications were destroyed.*

wireless communications system originally installed for voice communications and last upgraded in 1996. It is used by about 70 agencies with a total of over 10,000 subscribers. Its infrastructure consists of 46 tower sites and 28 dispatch consoles. In a report issued December 7, 2005, the State Police reported, in addition to the effect it had on the state's system, storm damage to communications systems the local governments maintained was "severe and debilitating," further restricting communications between emergency responders. The equipment at its 46 towers depends on electricity and, when that was lost, keeping them running was nearly impossible once it became necessary to refuel the generators operating them because debris and flood waters hampered their refueling efforts.[6]

Mississippi experienced problems similar to the other affected Gulf states. Most of its state and first responder communications capabilities were inoperable during and in the immediate aftermath of the storm, forcing the various responders to rely on satellite phones and radios (which experienced their own problems due to wind damage and interference). According to Mississippi Emergency Management Agency (MEMA) Director Robert Latham, the entire communications infrastructure of the state's Gulf coast was destroyed by Hurricane Katrina, systems elsewhere across the state were inoperable, and those systems that were working were overloaded, resulting in delays processing local governments' requests for assistance. As a result, often the only communications capability present in Mississippi — for both MEMA as well as the affected counties — was through satellite phones and radios, which operate by connecting to satellites rather than routing calls through land-line or

cellular towers.[7] FEMA, for its part, deployed a Mobile Emergency Response Support detachment (MERS)[8] to the state Emergency Operations Center (EOC) in Jackson, Mississippi, to provide satellite communications systems for its operations in the Gulf coast counties. However, despite the presence of MERS and hand-held satellite phones in all of the affected counties' EOCs, the Federal Coordinating Officer for Mississippi, Bill Carwile, testified that communications capabilities were far short of what was needed to be effective.[9]

The majority of site problems were due to lack of power. Some sites had T-1 (high speed data) telephone land-line problems, but the design of the system generally allows access to more than one site in the area, so the radio/telephone calls were routed from the secondary tower site. This created some delays in accessing the system, but was not a critical factor. Cellular telephone service was generally available throughout Alabama's affected areas, but several tower sites were overloaded or not fully operational after Katrina made landfall. This was not a major problem because the Alabama Emergency Management Agency (AEMA) does not consider cellular telephone service a primary source of communications during emergency response. Instead, AEMA has a cache of pre-programmed Southern LINC radios that are activated during disasters, programmed with specific groups for users (such as Mutual Aid, Logistics, Emergency Management Assistance Compact (EMAC), Staging, etc.) and have telephone capability. There were approximately 115 LINC portable units activated and delivered for use in the field for this disaster.

## The importance of power, fuel, and communications to disaster response and situational awareness

The near total failure of regional communications degraded situational awareness and exacerbated problems with agency coordination, command and control, logistics, and search and rescue operations. Reliable communications are critical to the preparation for and response to a catastrophic event because of the effect they have on establishing command and control and maintaining situational awareness.[10] Without functioning communications systems, first responders and government officials cannot establish meaningful command and control, nor can they develop the situational awareness

necessary to know how and where to direct their response and recovery efforts. Similarly, without the ability to call for help, citizens cannot seek emergency assistance, alert responders or others to their whereabouts and needs, or receive updates or instructions from officials.

Katrina interoperability problems were masked to some degree by the larger and more serious breakdown of operability resulting from the destruction of facilities or power outages. Restoring phone service requires more than waiting for the flood waters to recede and restoring power. While many cables may be salvageable, the electronics that pass the signals across those lines will need to be replaced. As noted by Jim Gerace of Verizon Wireless: "It's essentially analogous to putting a PC in your bathtub. It's not going to work once it dries."[11]

In Louisiana, the winds and flooding degraded the quality of available communications, reducing most communications to the limited number of available satellite phones. Additionally, the communications infrastructure that remained intact was soon overwhelmed by the heavy communications traffic during the response.[12] FEMA officials reported "there were no status reports coming into the EOC Monday."[13] Deputy Federal Coordinating Officer Scott Wells stated that if the Coast Guard was doing flyovers of New Orleans, those reports did not get to the EOC on Monday.[14] Additionally, failed communications affected responders' ability to share information up and down the chain of command. According to Louisiana officials, "Two or three days after the storm, state police were running into division commanders in the New Orleans Police Department who reported that they had not talked to anyone above their rank since the storm."[15]

The Alabama communications infrastructure fared better than in Mississippi and Louisiana. The AEMA has various communications capabilities, with redundant backups, to ensure it maintains a high level of connectivity throughout the state. The EOC had equipment and trained personnel to communicate over all types of communications networks, including satellite, 800 MHz digital phone service, amateur radio, and others. AEMA staff viewed communications systems and capabilities during Katrina as strengths, although the goal of true interoperability within and among county emergency response and law enforcement agencies remains elusive to this day.[16] The state has little ability to

mandate what types of communications technology each county procures. AEMA makes recommendations, but with so many different counties all with communications equipment in various stages of their life cycle, the EOC must be able to process all types of communications. The AEMA integrates these systems with various bridging technologies. Several attempts have been made in the past to build a state-wide/state-owned system, but lack of funding has prevented construction of this system. Nevertheless, state and county emergency management officials concluded their communications capacity functioned reasonably well during their response to Hurricane Katrina.[17]



Power is the most dominant factor for any telecommunications system[18] and hurricanes virtually always knock out the power, even if only for a short period of time. Very often these power outages can last for several days or more following powerful storms. For Hurricane Katrina, the Department of Homeland Security (DHS) was aware the power outages caused by the storm could go on for weeks after the storm, possibly longer. On August 28, the DHS National Infrastructure Simulation and Analysis Center issued and provided to the White House (among others) a "Fast Analysis Report" predicting the storm's likely impact on the Gulf coast area based on conditions as of August 27 when Katrina was still a Category 5 storm. In the report, DHS made a number of predictions about the storm's impact on power supplies, including:

- Electric power loss is likely to affect over 2.6 million customers;

- Restoring power could take more than 2 weeks for most of the affected areas **excluding New Orleans and the coastal areas** and may be hampered by flooding or other obstacles;

- The New Orleans region could have power outages lasting 16 weeks if excessive flooding occurs, disabling existing pumping stations up to 10 weeks and entailing power repairs that may take up to 6 weeks to complete.[19]

As predicted, the affected states all suffered severe damage to their power and communications infrastructures. During Hurricane Katrina, the City of New Orleans lost two primary tower sites and had to evacuate the police and fire communications centers because of flooding. Associated with the loss of the communications centers was the loss of all 911 capabilities and the federally funded New Orleans Maritime Interoperable Committee's (NOMIC) interoperable bridging capability. Colonel Terry Ebbert, the Homeland Security Director for New Orleans, testified "Over 2,000 police, fire, and Emergency Medical Services (EMS) personnel were forced to communicate in a single channel mode, between radios, utilizing only three mutual aid frequencies."[20]

The government's ability to communicate depends upon the viability of the commercial network's infrastructure. Ninety percent of communications assets are privately owned and operated.[21] Verizon Wireless serves the Gulf coast with two major switching stations in Baton Rouge and Covington, Louisiana. These serve as the links between cell phone antennae scattered throughout the region and the rest of the global network. While the stations themselves remained operational during and after landfall, the Covington facility lost connectivity with the cell towers due to two breaks in the connecting fiber-optic ring run by BellSouth.[22] Normally, a fiber-optic link provides redundancy: if one link is cut, information can still travel along the other route. Katrina, however, knocked out both sources because of physical damage to the fiber-optic cable. In one case, the fiber-optic cable that transported calls and internet traffic to and from New Orleans and ran along the Lake Pontchartrain Causeway was severed. Additionally, at least 20 cell towers went down due to either power loss or flooding. Verizon Wireless installed backup generators at many of the towers, but not at all, reportedly, due to local zoning restrictions.[23] Refueling remote generators also proved

difficult if not impossible. Verizon Wireless reported a number of its generators were stolen, one of Nextel's fuel trucks was stopped at gunpoint and its fuel taken for other purposes while en route to refuel cell tower generators, and the Mississippi State Police redirected a fuel truck carrying fuel designated for a cell tower generator to fuel generators at Gulfport Memorial Hospital.[24]

Other power and telecommunications companies



FEMA

reported similar problems due to exhausted fuel supplies, disruption of natural gas supply lines, or refueling difficulties due to flooding or security concerns. BellSouth reported that on September 1, 112 of its central offices were running on emergency generators, an additional 17 were completely down, and an additional 32 had no connectivity to the backbone network.[25] These central offices served as 911 tandems, and when they went down, they created outages of 911 service in as many as 13 Louisiana parishes.[26] In Gulfport, Mississippi, company officers at Alabama Power and Southern Nuclear's Watson Electric Generating Plant watched as a 30-foot storm surge rose 20 feet within the plant and flooded the 50-kilowatt backup generator that normally would have started when the power failed. The nerve center for the region's power company had no backup power to supply to the community.[27]

The loss of power — a common and altogether expected result of a hurricane — need not mean an affected area has no communications capability until the utility companies are able to restore normal electricity service. A well-planned and robust emergency communications system should be sustainable at reasonable levels of operation even after electrical power

is lost.[28] Resources to sustain operations include backup generators and fuel, redundant systems, self-healing networks, access to multiple technologies, common radio frequencies for wireless communications, sufficient spectrum bandwidth to support communications needs, and the proper equipment and infrastructure to make it all work.[29] Regular land-line telephone connections can function after local power is lost if central switches maintain power and lines are not damaged; telephone switches can usually operate until their backup generators run out of fuel or are knocked out by flooding. Similarly, cell towers carrying commercial phone service and public safety radio communications can continue to function with back-up power, usually batteries.

## Destruction to communications capability hindered command and control and severely limited situational awareness

**"It sounds like it can happen again. How many local governments have a communications plan when everything fails?"**

REPRESENTATIVE TAMMY BALDWIN (D-WI), query during hearing, U.S. House of Representatives, Sept. 7, 2005

In myriad ways, the vast destruction to the communications infrastructures, particularly those in Mississippi and Louisiana, negatively affected first responders and local and state governments' attempts to establish command and control. It also limited — and sometimes precluded



AP PHOTO/RIC FRANCIS

With communications knocked out, police relied on two-way radios.

— them from achieving and maintaining situational awareness. In New Orleans and along the Gulf coast, the National Guard and first responders were forced to rely on paper relays or face-to-face communications to convey critical information between emergency operation centers and the field.[30] This drastically slowed the pace at which

those in the EOCs became aware of situations throughout their respective areas of responsibility. It delayed the delivery of direct assistance where it was most needed, and it hindered the ability to forward requests to state or federal agencies that might have been able to help. In the Louisiana state EOC, the communications problems were so severe that state officers could not reliably communicate with local officials, others in the state government, or federal officials, exacerbating the already severe problems with situational awareness.

On Tuesday, August 30, FEMA Deputy Federal Coordinating Officer Phillip E. Parr traveled by helicopter to the New Orleans Superdome.[31] His mission there was threefold: (1) form a unified command with the state as represented by the Louisiana National Guard, and the City of New Orleans; (2) maintain visibility of commodities ordered; and (3) build out a base from which FEMA teams could be formed to locate and assist in the hardest hit parishes. But according to Parr his ability to accomplish those goals were hindered by the lack of appropriate communications as mentioned in his statement: "To accomplish these goals we were to meet a Mobile Emergency Operations and Communications Vehicle and use that as a base of operations and communication. Due to extensive flooding in the city our communications vehicle was unable to enter the Dome and this severely hampered our operations."[32]

First responders' ability throughout the Gulf coast to communicate across a broad range (or distance) and gain control of an incident was compromised when power was lost and many had only their mobile (cellular) phones available. Because these phones run on batteries, they lose power the longer first responders have to use them in lieu of other means and, as a result, have shorter and shorter ranges over which they can operate as their batteries run down.

In Mississippi, Major General Harold A. Cross, the state's Adjutant General, told Select Committee staff the National Guard forward operating units on the coast were unable to establish and maintain meaningful communications with MEMA or Governor Barbour for the first 48 hours following landfall.[33] As a result, their initial activities were based on executing pre-landfall assignments and reacting to events on the ground as they found them. They acted with initiative. Exacerbating the situation, and unknown to Cross, the company providing

the satellite service to his phones (Mobile Venture Satellites) had not informed the Guard it had changed the contact numbers on two of the Guard's satellite phones. As a result, no one attempting to reach these phones — one with the Guard's Director of Military Assistance, Lieutenant Colonel Lee Smithson (the officer responsible for coordination of the Guard's materials and assets during the response and recovery effort), and another at the Stennis Space Center commodities distribution center — could get through. The Guard did not learn of the change until two days into the response when the state National Guard's Assistant Adjutant General, Gen. Playnt, finally spoke with Smithson to ask why he was not answering his satellite phone. Smithson contacted the satellite phone company, and was only then informed of the number change.[34] Because of this failure to notify the Guard of two number changes, those who needed to reach two of the most important people or places involved in the response did not have the correct numbers to do so. This contributed to the problems and delays experienced during commodity coordination and distribution efforts experienced in Mississippi.[35] These types of problems are further discussed in the COMMAND AND CONTROL chapter.

## FEMA pre-positioned communications assets, but not in New Orleans, where the need became exceptionally critical

FEMA partially anticipated the communications infrastructure, particularly the parts dependent on electric power, would be needed in the Gulf coast and pre-positioned with each of the three states' EOCs a MERS detachment.[36] MERS detachments are designed to



FEMA

provide rapid multi-media communications, information processing, logistics, and operational support to federal, state, and local agencies during catastrophic emergencies and disasters. They do so, in part, by providing mobile telecommunications, operational support, life support, and power generation for on-site disaster management; this includes satellite, telephone, and video hook-ups.[37]

Former FEMA Director Michael Brown testified, in hindsight, FEMA should have pre-positioned a MERS detachment in New Orleans. Brown stated:

> In terms of communications, one of the things that I didn't mention in the litany of things that we prepositioned is something called our MERS unit, our Mobile Emergency Response System [sic]. Those are vehicles that are command and control units that have satellite hook-ups, telephone hook-ups, video hook-ups; enable us to do communications. I prepositioned those in all three states so that we would have communications wherever we needed it. I eventually sent one of those command units — in fact, it's one of the largest ones we have, called Red October — I eventually sent one of those into New Orleans for Mayor Nagin to use.
>
> In retrospect, I wish I'd done that four days earlier. Had I done it four days earlier, though, guess what? It probably wouldn't have gotten there. So I'm now second-guessing myself, and perhaps I should have prepositioned it there before Katrina made landfall. But again, that's not the role of the federal government; that's Mike Brown Monday morning quarterbacking, having seen everything that took place and trying to figure out, okay, now seeing everything that did not work in Louisiana, if I had known that beforehand, what could I have done?[38]

As a result, one of the federal assets that might have allowed FEMA and the local and state governments to work around the damage to the communications systems and sooner gain situational awareness about conditions in New Orleans was not present. Arguably, this instance of a failure of initiative — leaving a MERS detachment outside of the city — exacerbated the degree to which the massive damage to the local communications infrastructure delayed the ability of FEMA to learn of or confirm events on the ground in New Orleans and act accordingly.

**"Communications and coordination was lacking, preplanning was lacking. We were not prepared for this."**

WILLIAM M. LOKEY, FEMA Federal Coordinating Officer in Louisiana, testimony before U.S. Senate, Jan. 30, 2006

Poor situational awareness and its resulting effect on command and control contributed to the negative effects of inaccurate media reports because public officials lacked access to the facts to address media reports. Throughout the early days of the response, media reports from New Orleans featured rampant looting, gunfire, crime, and lawlessness, including murders and alleged sexual assaults at the Superdome and Convention Center. Few of these reports were substantiated, and those that were—such as the gunfire—were later understood to be actually coming from individuals trapped and trying to attract the attention of rescuers in helicopters.

Officials on the ground in New Orleans interviewed by Select Committee staff stated the media greatly exaggerated reports of crime and lawlessness and that the reports from the Convention Center and Superdome were generally unsubstantiated. Of the six deaths in the Superdome, none were crime-related (five were due to medical reasons and one was a suicide).[39] In some cases, the media's coverage of its own performance - well after the fact - showed many of these reports from the early days after Katrina were false. In December, *ReasonOnline* reported that:

> On September 1, 72 hours after Hurricane Katrina ripped through New Orleans, the Associated Press news wire flashed a nightmare of a story: "Katrina Evacuation Halted Amid Gunfire…Shots Are Fired at Military Helicopter."
>
> The article flew across the globe via at least 150 news outlets, from India to Turkey to Spain. Within 24 hours commentators on every major American television news network had helped turn the helicopter sniper image into the disaster's enduring symbol of dysfunctional urbanites too depraved to be saved.
>
> Like many early horror stories about ultra-violent New Orleans natives, whether in their home city or in far-flung temporary shelters, the A.P. article turned out to be false. Evacuation

from the city of New Orleans was never "halted," according to officials from the Coast Guard, FEMA, and the Louisiana National Guard. The only helicopter airlifts stopped were those by a single private company, Acadian Ambulance, from a single location: the Superdome. And Acadian officials, who had one of the only functional communications systems in all of New Orleans during those first days, were taking every opportunity to lobby for a massive military response.

More important, there has been no official confirmation that a single military helicopter over New Orleans—let alone a National Guard Chinook in the pre-dawn hours of September 1—was fired upon.

The Air Force, to which the Air National Guard reports, also has no record of helicopter sniping. "We investigated one incident and it turned out to have been shooting on the ground, not at the helicopter," Air Force Maj. Mike Young told The New York Times on September 29.

Aside from the local National Guard, the other government agency with scores of helicopters over New Orleans was the U.S. Coast Guard, which rescued more than 33,000 people. "Coast Guard helicopters," says spokeswoman Jolie Shifflet, "were not fired on during Hurricane Katrina rescue operations."

[But] the basic premise of the article that introduced the New Orleans helicopter sniper to a global audience was dead wrong, just like so many other widely disseminated Katrina nightmares. No 7-year-old rape victim with a slit throat was ever found, even though the atrocity was reported in scores of newspapers. The Convention Center freezer was not stacked with 30 or 40 dead bodies, nor was the Superdome a live-in morgue.[40]

*Media reporting made the crowds in the Superdome anxious and scared away truck drivers carrying critical commodities.*

**"[The] National Guard have landed in the city of New Orleans. These troops are fresh back from Iraq, well trained, experienced, battle-tested and under my orders to restore order in the streets. They have M-16s and they are locked and loaded. These troops know how to shoot and kill and they are more than willing to do so if necessary and I expect they will."**

GOVERNOR KATHLEEN B. BLANCO

According to officials on the ground in New Orleans interviewed by Select Committee staff, and subsequent media reports, erroneous or exaggerated reporting of conditions in New Orleans created anxiety and fear among those sheltering at the Superdome and Convention Center, delayed some critical elements of the response effort, and discouraged some residents in dry neighborhoods from evacuating the city. Media reports described how BellSouth evacuated its personnel from their Emergency Operations Center near the Superdome under armed escort due to security concerns. Reportedly, company officials worried about the center being targeted by unruly individuals.

Gary Ludgood, vice president for integrated network planning and implementation for BellSouth, stated, "[W]e chose to evacuate our employees before anything happened."[41] Officials interviewed by Select Committee staff said some of the media reporting made the crowds in the Superdome anxious and scared away truck drivers carrying critical commodities; these same officials indicated some residents of the city in areas not flooded were reluctant to evacuate because of these reports, choosing instead to stay behind to protect their belongings. *ReasonOnline* reported on the effect of radio broadcasts containing erroneous reports:[42]



AP PHOTO/ERIC GAY

The information vacuum in the Superdome was especially dangerous. Cell phones didn't work, the arena's public address system wouldn't run on generator power, and the law enforcement on hand was reduced to talking to the 20,000 evacuees

using bullhorns and a lot of legwork. "A lot of them had AM radios, and they would listen to news reports that talked about the dead bodies at the Superdome, and the murders in the bathrooms of the Superdome, and the babies being raped at the Superdome," Bush [Maj. Ed Bush, public affairs officer for the Louisiana Air National Guard] says, "and it would create terrible panic. I would have to try and convince them that no, it wasn't happening."

The reports of rampant lawlessness, especially the persistent urban legend of shooting at helicopters, definitely delayed some emergency and law enforcement responses. Reports abounded, from places like Andover, Massachusetts, of localities refusing to send their firefighters because of "people shooting at helicopters." The National Guard refused to approach the Convention Center until September 2, 100 hours after the hurricane, because "we waited until we had enough force in place to do an overwhelming force," Lieutenant General H. Steven Blum, Chief of the National Guard Bureau, told reporters on September 3.

"One of my good friends, Col. Jacques Thibodeaux, led that security effort," [Maj.] Bush says. "They said, 'Jacques, you gotta get down here and sweep this thing.' He said he was braced for anything. And he encountered nothing—other than a whole lot of people clapping and cheering and so glad that they were here."

**"I certainly saw fights, but I saw worse fights at a Cubs game. The people never turned into these animals. They are been cheated out of being thought of as these tough people who looked out for each other. We had more babies born [in the Superdome] than we had deaths."**

MAJOR ED BUSH, LA National Guard

Mississippi government officials echoed these concerns: "Even drivers coming in to Mississippi were dissuaded by the media reports in New Orleans. A lot of them ended up demanding military escorts. They'd call and say 'we've been hijacked or we ran out of gas on Highway 49 or 59. When help arrived they'd admit that wasn't the case, that they just wanted an escort. Obviously this situation impeded 'just in time' logistics,'"[43] Ebbert said.

**"We were going to protect the lives of our residents. It's impossible to know what happened unless you were here. At the time, you don't know what to believe, but you don't want to be in a place to find out if what you heard is true."**

RONNIE HARRIS, Mayor, Gretna, LA

Without sufficient working communications capability to get better situational awareness, the local, state, and federal officials directing the response in New Orleans had too little factual information to address — and, if need be, rebut — what the media were reporting. This allowed terrible situations — the evacuees' fear and anxiety in the Superdome and Convention Center — to continue longer than they should have and, as noted, delayed response efforts by, for example, causing the National Guard to wait to assemble enough force to deal with security problems at the Convention Center that turned out to be overstated. For further discussions of exaggerated media reports, see the LAW ENFORCEMENT chapter.


AP PHOTO/ERIC GAY

# Finding: Some local and state responders prepared for communications losses but still experienced problems, while others were caught unprepared

Though the loss of power and damages to the Gulf coast area's communications infrastructure were massive, some of the local and state responders had taken the steps necessary to ensure that they had some communications capability in the immediate aftermath of Hurricane Katrina. The AEMA had various communications capabilities, all with redundant backups, to ensure that

it maintained a high level of connectivity throughout the state. AEMA officials considered their communications redundancy to be one area that worked well in their response to Katrina.[44] Southern LINC, the company whose network Alabama uses as its primary radio system, had a representative on site at the state EOC during this period that provided outage updates (as noted earlier, the AEMA has a cache of pre-programmed LINC radios that it activates during disasters and which also provide telephone capability).

In Mississippi, Gulf coast county governments had taken steps (including using DHS preparedness grant funds) to ensure some communications capability would likely survive a disaster. For example, despite the catastrophic damage suffered by the Gulf coast, Harrison County's Enhanced Digital Access Communication Systems (EDACS)[45] remained operational at nearly 100 percent capacity during and after Katrina's landfall. One interoperability success story from Mississippi was that although the Harrison County EDACS was not capable of linking to FEMA or to the MEMA EOC in Jackson, Mississippi, it was capable of linking with similar systems utilized by the Florida State Police and the Florida Fish & Wildlife Agency who arrived in Mississippi shortly after Katrina's landfall. These Florida state agencies were able to quickly reprogram their EDACS radios to communicate over the county's network. Within two weeks of landfall, the Harrison County EDACS system was able to expand to allow first responder communications within the adjoining Jackson and Hancock counties.[46]

MEMA Director Latham testified that Mississippi had satellite radios permanently mounted in the three coastal counties (Harrison, Hancock, and Jackson) and that 30 other counties also had these radios.[47] All MEMA personnel had access to a mobile satellite radio for communications throughout the state. This proved fortunate because often the only communications capability in Mississippi after the storm—for both MEMA and the affected counties—was through satellite phones and radios, which operate by connecting to satellites rather than routing calls through land-based lines or cellular towers.[48] The Harrison County EOC was only able to use its cellular communications system for approximately 12 hours until the battery on the cell tower died. They were unable to use the satellite system at the Harrison County EOC because it was damaged during the storm. Additionally, and currently, MEMA has a mobile

operations unit, which it can deploy to disaster areas and allows communication across all bands.[49] Despite problems the satellite systems experienced (discussed below), Latham noted they did allow the state to learn vital information it needed about conditions in the counties and their assistance needs.[50]

Unlike the three coastal counties, Pearl River County fared better at maintaining communications capability during and after the storm. Pearl River County had two satellite phones in its emergency operations center. According to its Emergency Management Director, Bobby Strahan, these worked throughout the response but did prove problematic early on because it took a long time for any calls to go through.[51] In addition, Strahan reported the county has four high band repeater systems strategically placed throughout the county which allow all of its first responders (including police, fire, and EMS) as well as its schools to communicate. All of these systems' locations had generator backup systems which functioned properly during Katrina. In addition, Pearl River County was able to sustain communications within the county and, to a limited extent, with portions of adjacent Hancock County because it had used DHS grant funds to buy a mobile communications center (trailer) that allowed it to communicate with agencies throughout the county as well as with MEMA's mobile operations unit.[52]

*In Louisiana, most of the parishes did not have satellite phones because they chose to discontinue the service after the state stopped paying the monthly fees for the phones.*

Others were caught relatively unprepared to deal with the communications problems that resulted from the hurricane's damage or found their existing capabilities were insufficient. In Louisiana, most of the parishes did not have satellite phones (as their counterparts in Mississippi did) because they chose to discontinue the service after the state stopped paying the monthly fees for the phones. In 1999, the state began using federal funding to provide each parish emergency management office with

a satellite telephone and paid the $65.00 monthly fee, but it discontinued doing so for the parishes in August 2004. As a result, all but three parishes—Orleans, Plaquemines, and Jefferson—discontinued their satellite phone service.[53] Larry Ingargiola, Director, Office of Homeland Security and Emergency Management, St. Bernard Parish, told Select Committee staff the parish returned the satellite phones when the state stopped paying the monthly service fee. After Katrina hit, the state sent the phones back to St. Bernard because there was no other means of communication available to the parish.[54]

The failure of 911 call centers in New Orleans also illustrates how others were unprepared to deal with communications problems. Identifying where calls to a 911 call center will be routed if it is rendered inoperable is a basic preparation for Public Safety Answering Points (PSAPs) such as 911 call centers.[55] Although the technology to switch calls to 911 to an alternative location exists,[56] many 911 call centers in Louisiana did not have protocols in place to identify where their calls should go and had not arranged for any rerouting. As a result, numerous calls to 911 in the immediate aftermath — especially as the floodwaters in New Orleans were rising — simply dropped.[57]

In Mississippi, MEMA Director Latham testified the state found it did not have enough satellite radios when only its satellite systems were operable.[58] As a result, during its response to Katrina, MEMA purchased additional portable satellite phones for its State Emergency Response Team (in the future, Mississippi indicated these additional phones can be issued to local authorities as a redundant system in disasters).[59] Some Mississippi responders also found their satellite communications capabilities were not sufficiently capable of withstanding high winds. Specifically, though they generally remained operable and the state relied on them during its response to Katrina, Mississippi's satellite communications capabilities suffered because the hurricane force winds—at times sustained over 130 miles per hour—shifted the antennas in each of the coastal counties, causing satellite communications there to fail because the antennas were no longer properly targeted. As a result, for several days, these counties lost their ability to communicate with the state EOC in Jackson or FEMA about their needs for assistance or the status of any commodities requests they had made before the storm.[60] Because of the lessons it learned from the

damage to its satellite systems in Katrina, Mississippi is investigating for future use in its counties' EOCs the omni-directional antennas it has in place on all of its state EMA and Department of Wildlife, Fisheries, and Parks vehicles. According to Latham, these antennas would not be affected by strong winds and would allow constant communications.[61]

Responders in Louisiana similarly experienced certain problems that can plague satellite-based communications. Specifically, satellite phones are technically capable of transmitting calls virtually anywhere on earth, but they may have trouble doing so when the user is inside a building or when the weather is cloudy. According to the Louisiana State Police report, "heavy cloud coverage and system inundation" limited the effectiveness of the portable satellite phones delivered to several troop headquarters in the affected areas.[62] Even when weather conditions permit smooth transmissions of signals for satellite communications, this is meaningless if the caller does not know how to use the satellite phone, or the phone does not work at all. As Mayor Nagin noted during Congressional testimony, "I have a huge box of satellite phones that did not work."[63]

For the systems that were functioning after the storm as well as those that were eventually restored, problems with interoperability further exacerbated rescue efforts. As Colonel Ebbert testified, "[T]here was no voice radio contact with surrounding parishes or state and federal agencies. Lives were put at risk and it created a direct operational impact on their ability to maintain control of the rapidly deteriorating situation within the city, carry out rescue efforts and control the evacuation of those people who had failed to heed the call for evacuation."[64]

## Despite hundreds of millions in federal funding for technology and communications, the absence of true communication interoperability within and between affected jurisdictions severely hindered rescue and response efforts at all levels of government

Many in the industry, media, and government have long focused on the problem of "interoperability." FEMA officials claimed they did not know for days about the thousands of people at the New Orleans Convention Center, first responders in helicopters could not talk

to crews patrolling in boats, and National Guard Commanders in Louisiana and Mississippi had to use runners to relay orders.

**"We've got runners running from commander to commander. In other words, we're going to the sound of gunfire, as we used to say in the Revolutionary War."**

MAJOR GENERAL HAROLD A. CROSS, Adjutant General, Mississippi National Guard



Interoperability for public safety communication is defined as the ability to share information via voice, data, on-demand, in real-time, when needed and as authorized. The public safety community expects this level of interoperability will be available using equipment from multiple manufacturers, be transparent to the user, require little or no special knowledge of the system, and not be dependent on common frequency assignments.[65] A Conference of Mayors 2004 survey of 192 cities showed 44 percent reported an accident within the preceding year in which the lack of interoperable communications made response difficult; 49 percent of cities are not interoperable with state police; 60 percent are not interoperable with their state emergency operation centers; and 83 percent are not interoperable with the federal law enforcement agencies.[66]

Communications — particularly wireless communications — enable all other functions in any disaster relief operation along with the sensors to inform officials and first responders what is happening and share the information and the ability to command and control those functions and information. These are all mission-critical functions. Hurricane Katrina was no exception. Without effective communications, every operation will suffer debilitating inefficiencies, some leading to ineffectiveness.[67] Too many public safety personnel cannot communicate by radio because their equipment is still incompatible or the frequencies they're assigned are different. They operate on 10 different frequency bands and run communication systems that are often proprietary and too often 30 or more years old. Over 90 percent of the nation's public safety wireless infrastructure is financed, owned, operated, and maintained by the more than 60,000 individual local jurisdictions, police, fire and emergency medical services that serve the public.[68]

Louisiana government officials have long been cognizant of the interoperability problem among the state and parish first responders.[69] Despite longstanding and sizable federal interoperability grants to multiple Louisiana jurisdictions, coordinated planning had barely progressed when Katrina hit.[70] Although some New Orleans and Louisiana state officials attribute the lack of true interoperability for first responders in the region to financial limitations,[71] this explanation flies in the face of the massive amounts of federal grants to Louisiana.[72] State and local governments were responsible for designing and coordinating their efforts, and they failed to make meaningful progress despite knowledge of the problem for years and the expenditure of millions in federal funds.

Since 2001, the federal government has given $8.6 billion to states for equipment, first responder training, and disaster exercises. In 2005, DHS gave the states $2.1 billion, of which $925 million was allocated for communications upgrades.[73] In Louisiana alone, since fiscal year 1999, the federal government allocated over $135 million for preparedness, of which more than $108 million was awarded to local governments, and nearly $27 million to the state. Of these funds, nearly $107 million was dedicated to equipment purchases and the remaining $28 million was allocated for planning, training, exercises and administrative costs. Since 1999, approximately $16 million has been spent on interoperability.[74] In addition to these funds, Alabama, Mississippi, and Louisiana are also the recipients of federal grants for law enforcement agencies via the Justice Department's Community Oriented Policing Services (COPS) Office.[75]

■ Alabama received $24,770,274 from FY2003 to FY2005 under the COPS Interoperability Communications, Law Enforcement Technology, Universal Hiring Program (UHP), COPS in Schools (CIS), and Homeland Security Overtime (HSOP) grant programs;

*There was no voice radio contact with surrounding parishes or state and federal agencies. Lives were put at risk.*

Col.Terry Ebbert, New Orleans Director of Homeland Security and Public Safety

- Louisiana received $23,495,114 from FY2003 to FY2005 under the COPS Interoperability Communications, Law Enforcement Technology, UHP, CIS, Regional Community Policing Institute (RCPI) and Homeland Security Overtime (HSOP) grant programs; and,

- Mississippi received $7,003,688 from FY2003 to FY2005 under the COPS Law Enforcement Technology, UHP, CIS, and HSOP grant programs.[76]

More specifically, the COPS Interoperable Communications Grant Program provides funding to local communities to help them develop effective interoperable communications systems for public safety and emergency service providers. The grant program funds projects that explore the use of equipment and technology to increase interoperability and data sharing amongst law enforcement, fire departments, and emergency medical services. From 2003-2005, the COPS program awarded over $242 million to 63 agencies across the nation to address the need to ensure interoperable communications. In 2003, for example, the City of New Orleans received a COPS grant for interoperable communications technology in the amount of $5,510,412; in 2004, the City of Shreveport and the Birmingham, Alabama Police Department received COPS grants for interoperable communications technology in the amounts of $2,998,901 and $5,625,000, respectively; and in 2005, the City of Baton Rouge Police Department and the Police Department in Mobile, Alabama received COPS grants for interoperable communications technology in the amounts of $5,999,184, and $3,000,000, respectively.[77]

The $5,510,412 COPS interoperability grant awarded to the City of New Orleans in September 2003 initially was approved for one project. A year and a half later, however, the city requested approval to modify its original plan,

and in May 2005, the COPS program office approved a new plan to build upon the Jefferson Parish 800 MHz radio system, and link four parishes (Orleans, Jefferson, St. Bernard and Plaquemines) together. As of September 2005, the City had spent only $275,428 of the $5,510,412 originally awarded in 2003.[78]

**"Technology is at the center of this, but most of the components required to achieve interoperability in the near-term already exist. However, it requires agreements, planning, and governance arrangements across jurisdictions."**

DAVID BOYD, Deputy Director, Office Systems Engineering & Development, DHS Testimony before U.S. Senate Sept. 29, 2005

Despite these awards (and other federal grants described in detail in Appendix 4 of this report), officials in Louisiana claim "austere financial circumstances" prevented the completion of the interoperability modifications of its communications system. New Orleans designed and purchased its M/A-Com 800 MHz radio communications system in 1992. The Louisiana State Police updated a different Motorola 800 MHz radio communications system in 1996, and while the two systems are capable of communicating, this requires special integration modifications to each system, and only is attempted, typically, for large events such as the 2002 Super Bowl held in New Orleans.[79] Under normal circumstances, the City's system is linked to the state's system via a traditional T1 landline. As Greg Meffert, the New Orleans Chief Information Officer told Select Committee staff, the two systems' interoperable capabilities are based on faulty assumptions. If the T1 lines are damaged, this destroys the connection between the systems.[80] This is exactly what happened during Katrina. The city's system went down after the system's generators were flooded or damaged by flying debris. As noted by Ebbert in his testimony before the Select Committee, "there was no voice radio contact with surrounding parishes or state and federal agencies. Lives were put at risk and it created a direct operational impact on their ability to maintain control of the rapidly deteriorating situation within the city, carry out rescue efforts and control the evacuation of those people who had failed to heed the call for evacuation."[81]

# Finding: The National Communications System met many of the challenges posed by Hurricane Katrina, enabling critical communication during the response, but gaps in the system did result in delayed response and inadequate delivery of relief supplies

The federal government's use of the National Communications System (NCS) prior to, during, and after Katrina's landfall to coordinate assets and personnel proved effective, but like the efforts of the Gulf states, it too was overwhelmed by the magnitude of the damage left in Katrina's wake.

Following the Cuban Missile Crisis, President Kennedy established the National Communications System by a Presidential Memorandum on August 21, 1963.[82] On April 3, 1984, President Ronald Reagan signed Executive Order 12472, which broadened the NCS' national security and emergency preparedness capabilities and superseded President Kennedy's original 1963 memorandum. The NCS expanded from its original six members to an interagency group of 23 federal departments and agencies, and began coordinating and planning NS/EP telecommunications for the federal government under all circumstances, including crisis or emergency, attack, recovery, and reconstruction. As mandated by

the Executive Order, the NCS also includes an industry component called the National Coordinating Center for Telecommunications (NCC), a joint industry-government body within the NCS. The operational mission of the NCC is coordination of restoring and reinstituting national security and emergency preparedness communications in an emergency situation. During Hurricane Katrina, the NCC operated a 24-hour watch center and conducted daily analysis and situational monitoring of ongoing events, and coordination of government and industry response capabilities.[83]

In addition to the Executive Order, the NCS has a specific communications role in the National Response Plan (NRP). Specifically, the NCS is the lead agency responsible for the communications component of Emergency Support Function 2 (ESF 2), which "ensures the provision of Federal communications to Federal, State, local, tribal and private-sector response efforts during an Incident of National Significance." In support of ESF 2, the NCC is tasked to function as a central point of coordination and information sharing among communications infrastructure operators.

To facilitate coordination of industry and government operations during an emergency, the NCS maintains and operates several priority service programs, which help ensure critical calls are completed in the event of congestion damage to the national commercial communications infrastructure. They include the Government Emergency Telecommunications Service (GETS), which provides authorized users a higher rate of call completion during periods of outages or congestion resulting from disasters. During and after Hurricane Katrina, the NCS issued 1,000 new GETS access code numbers to first responders and emergency recovery officials in the affected states. Between August 28 and September 9, the GETS system was utilized to make over 35,000 calls.[84] The NCS also operates a wireless counterpart to GETS, the Wireless Priority Service (WPS) program. It provides priority treatment for calls made during periods of wireless network congestion by emergency response personnel with national security and emergency preparedness responsibilities. During Katrina, the NCS enabled and distributed over 4,000 WPS cellular phones.[85]



FEMA

In Gulfport, MS., video conferencing was used to coordinate disaster aid.

The NCS operates the Telecommunications Service Priority (TSP) program, which establishes a regulatory, administrative and operational framework for restoring and provisioning priority communications services. Through this program, service vendors are authorized to give priority to restoration and provision of service to those with TSP assignments. Following Hurricane Katrina, the NCS completed more than 1,500 TSP assignments helping to restore emergency response capabilities in the Gulf states.[86]

The NCS also maintains the Shared Resources High Frequency Radio Program (SHARES), which provides a single, interagency, voluntary message handling system using over 250 High Frequency (HF) radio frequencies when other communications are unavailable. A network of government, military, and Military Affiliate Radio Service (MARS) radio stations (an organized network of Amateur Radio stations affiliated with the different branches of the armed services to provide volunteer communications), and more than 90 federal, state, and private industry organizations participate in the SHARES program. Within days following Katrina's landfall, the NCS coordinated participation by 431 SHARES stations across the nation and assisted first responders conducting search and rescue missions by relaying information to appropriate government agencies; relayed logistical and operational information between FEMA's EOCs in Georgia, Mississippi, and Louisiana; relayed health and welfare messages between volunteer agencies in Georgia and the national headquarters of the American Red Cross in Washington, DC; established radio contact with deployed U.S. Navy ships detailed to New Orleans; and provided frequency coordination between federal agencies, Louisiana and Mississippi's EOCs, and the Civil Air Patrol.[87]

Additionally, the NCS coordinated the frequencies used by the nearly 1,000 Amateur Radio Emergency Services (ARES) volunteers across the nation who served in the Katrina stricken area providing communications for government agencies, the Red Cross and the Salvation Army. Emergency communications were conducted not only by voice, but also by high-speed data transmissions using state-of-the art digital communications software known as WinLink. In Mississippi, FEMA dispatched Amateur Radio operators to hospitals, evacuation centers, and county EOCs to send emergency messaging 24 hours

*FEMA dispatched Amateur Radio operators to hospitals, evacuation centers, and county Emergency Operations Centers to send emergency messaging 24 hours per day.*

per day. According to Bay St. Louis Mayor Edward A. "Eddie" Favre, amateur radio operators were especially helpful in maintaining situational awareness and relaying Red Cross messages to and from the Hancock County EOC.[88] At airports in Texas and Louisiana, radio amateurs tracked evacuees and notified families of their whereabouts. The Red Cross deployed amateur radio volunteers at its 250 shelter and feeding stations, principally in Mississippi, Alabama, and Florida.[89] The Salvation Army operates its own Amateur Radio communications system using Amateur radio volunteers, known as SATERN. During the Hurricane Katrina response and recovery effort, SATERN joined forces with the SHARES program and received over 48,000 requests for emergency communications assistance utilizing federal frequencies made available via the SHARES program.[90]

Following landfall, the NCS activated the SHARES network on August 29, and worked with The U.S. Northern Command (NORTHCOM) to identify and deploy communications assets, and by September 2, all NCS ESF 2 systems were in place to receive communications requests from the affected region. The NCS dispatched satellite communications vans to various locations, including New Orleans City Hall, the Louisiana State Police headquarters in Baton Rouge, the New Orleans Airport, and the Louisiana National Guard in Jefferson Parish; dispatched AT&T and MCI cellular communication vans to the state EOCs in Mississippi and Louisiana; and identified and delivered satellite handsets to first responders in all three affected states. Additionally, the NCS designed and installed a new E-911 system in Plaquemines Parish, and provided an interim digital Land Mobile Radio system to the eight parishes surrounding New Orleans.[91]

Like all levels of government, the NCS was not able to address all aspects of the damage to the communications

infrastructure of the Gulf states. Although the NCS performed several important functions prior to and during the response efforts, the "historical magnitude of Hurricane Katrina stressed the processes and procedures of the NCS and required ESF 2 to perform functions . . . which it [had] never done before."[92]

## Conclusion

The extent of destruction and damage to the communications infrastructure and services caused by Katrina exceeded that of any other natural disaster experienced by the Gulf coast states. Simply put, Katrina's devastation overwhelmed government resources at all levels. The loss of power and the failure of various levels of government to adequately prepare for the ensuing and inevitable loss of communications hindered the response effort by compromising situational awareness and command and control operations.

Despite the devastation left by Katrina, this needn't have been the case. Catastrophic disasters may have some unpredictable consequences, but losing power and the dependent communications systems after a hurricane should not be one of them. The parish officials in Louisiana who declined to spend $65 per month for satellite phones showed a failure of initiative when they gave up those assets. Why such a "penny wise-pound foolish" decision was allowed to stand defies explanation. The same satellite phones that were given up by some of the parishes eventually were returned to them after Katrina's landfall because they had no other means of communicating with those bringing help to people in need. Similarly, those in the 911 call centers who could not reroute calls for help showed a failure of initiative by not taking the steps necessary to ensure calls to them were not in vain, simply because predictable things — power losses and flooding — happened after a hurricane.

*Catastrophic disasters may have some unpredictable consequences, but losing power and the dependent communications systems after a hurricane should not be one of them.*

Issues with interoperability have existed for years. Government officials and emergency service agencies are well aware of the need to establish and maintain robust emergency communications systems. Modern day National Guard units should not have to rely upon runners to relay messages. Governors should be able to communicate with their generals. Police commanders should be able to communicate with their officers in the street. Despite knowledge of interoperability problems and the seriousness of the consequences of failure to address them, and because of often parochial desires for duplicative, expensive, and diverse stand alone communications systems, officials responsible for providing for public safety spent millions on other priorities.

Disasters start and end at the local level. If first responders want interoperability with their counterparts in the future, their leaders need to communicate. Federal authorities need to establish standards. State and local officials need to take the initiative to make responsible use of federal, state and local funding to develop communications systems that can grow with their communities. These officials need to fulfill the public trust given to them. They need to lead. ■

1   *Hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana Before Select Comm.*, 109th Cong. (Dec. 14, 2005) at 3 (written statement of Col. Terry Ebbert, USMC (ret), Director of Homeland Security & Public Safety, City of New Orleans) [hereinafter *Dec. 14, 2005 Select Comm. Hearing*].

2   *Hearing on Ensuring Operability During Catastrophic Events Before the Comm. on Homeland Security Subcomm. on Emergency Preparedness, Science, and Technology*, 109th Cong. (Oct. 26, 2005) at 1 (written statement of Dr. Peter M. Fonash, Deputy Manager, National Communications System, DHS) [hereinafter *Oct. 26, 2005 Comm. on Homeland Security Hearing*].

3   *Id.* at 6.

4   *Hearing on Public Safety Communications from 9/11 to Katrina: Critical Public Policy Lessons Before the Comm. on Energy and Commerce, Subcomm. on Telecommunications and the Internet*, 109th Cong. (Sept. 29, 2005) at 3 (written statement of Kevin J. Martin, Chairman, Federal Communications Commission) [hereinafter *Sept. 29, 2005 Energy & Commerce Comm. Hearing*].

5   Matthew Fordahl, *Communication Breakdown: From 9/11 to Katrina*, ASSOC. PRESS, Sept. 13, 2005.

6   LA State Police, *Louisiana Totally Interoperable Environment* at 2-3 (Dec. 7, 2005).

7   *Hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi Before Select Comm.*, 109th Cong. (Dec. 7, 2005) at 3-4 (statement of Robert R. Latham, Jr., Executive Director, Mississippi Emergency Management Agency) [hereinafter *Dec. 7, 2005 Select Comm. Hearing*].

8   *See* http://www.fema.gov/rrr/mers01.shtm (last visited Jan. 26, 2006).

9   *Dec. 7, 2005 Select Comm. Hearing* at 7 (statement of William L. Carwile, III, former Federal Coordinating Officer, Hurricane Katrina Response and Initial Recovery Operations: Mississippi).

10  Command and control are two key aspects of emergency management involving unity of command and effort among local, state, and federal authorities as well as an accepted chain of command. (*See* DHS *National Response Plan*, (Dec. 2004) at 1 [hereinafter *NRP*].) Situational awareness simply refers to the extent to which the various responders—local, state, or federal officials, for example—have accurate, reasonably reliable information about conditions in the affected area and can use that information to guide their response efforts.

11  Stephen Lawson, *Cell carriers tackle Katrina damage*, IDG NEWS, (San Fran.), Sept. 1, 2005.

12  Interviews by Select Comm. Staff with FEMA, Louisiana state and local officials in New Orleans, LA (Nov. 3-10, 2005).

13  Interviews by Select Comm. Staff with FEMA officials, New Orleans, LA (Nov. 9-10, 2005).

14  Interviews by Select Comm. Staff with Scott Wells, FEMA, in New Orleans, LA (Nov. 9, 2005).

15  Interview by Select Comm. Staff with Gordon Mitchell and Ralph "Joey" Booth, Louisiana State Police in Baton Rouge, LA (Nov. 9, 2005).

16  Interviews by Select Comm. Staff with Jerry McRay, Branch Chief, Information Technology Systems, Alabama Emergency Management Agency EOC officials in Clanton, AL (Oct. 11, 2005).

17  Interviews by Select Comm. Staff with Alabama Emergency management Agency EOC officials in Clanton, AL (Oct. 11, 2005).

18  *Hearing on Communications in a Disaster Before the Senate Comm. on Commerce, Science & Transportation*, 109th Cong. (Sept. 22, 2005) (statement of Hossein Eslambolchi, President, AT&T Global Networking Technology Services and AT&T Labs) [hereinafter *Sept. 22, 2005 Senate Commerce Comm. Hearing*].

19  DHS National Infrastructure Simulation and Analysis Center, *Fast Analysis Report (Update to Reflect Category 5 Status) to DHS IP on Hurricane Katrina, Gulf coast* at 1-2 (Aug. 28, 2005) (emphasis supplied).

20  *Dec. 14, 2005 Select Comm. Hearing* at 3 (written statement of Col. Terry Ebbert).

21  *Hearing on Hurricane Katrina Before the Comm. on Energy & Commerce*, 109th Cong. (Sept. 7, 2005) (statement of Kenneth P. Moran, Acting Director, Office of Homeland Security Enforcement Bureau, Federal Communications Commission).

22  Joab Jackson, *Telecom infrastructure was no match for Katrina*, WASH. TECH., Nov. 7, 2005 [hereinafter *Telecom Infrastructure Article*].

23  *Id.*

24  Interview (telephone) by Select Comm. Staff with Anthony Melone, Vice President of Network Operations Support, Verizon Wireless (Jan. 27, 2006); *See also*, E-mail correspondence from Hans Leutenegger to Anthony Melone and Select Comm. Staff (Jan. 30, 2006) (9:45 a.m.).

25  BellSouth *Press Release* (Sept. 2, 2005). Prior to Katrina, BellSouth Corporation served 1.9 million lines in Louisiana. Approximately 1.03 million lines (54.2%) were initially affected. In Mississippi, approximately 438,000 (39.8%) were affected, and in Alabama 93,000 (5.5%) of the state's 1.7 million lines were effected. By Sept. 2, approximately 144,000 remained out of services in New Orleans due to long term displacement. BellSouth News Release, Sept. 2, 2005.

26  *Hearing on Communications Interoperability Before the Senate Comm. on Commerce, Science & Transportation*, 109th Cong. (Sept. 29, 2005) at 5-6 (written statement of Chief Willis Carter, First Vice President of the Assoc. of Public Safety Communications Officials-Int' and Chief of Communications, Shreveport Fire Department, Shreveport, LA) [hereinafter *Sept. 29, 2005 Senate Commerce Comm. Hearing*].

27  Julia Harwell Segars, *Katrina's Wrath*, OPTIMIZE, Oct. 2005.

28  Congressional Research Service Report RL32594, *Public Safety Communications Policy*, by Linda K. Moore (Updated Jan. 5, 2006).

29  *Id.*

30  Interview by Select Comm. Staff with Major General Harold A. Cross, Adjutant General, Mississippi National Guard in Jackson, MS (Oct. 13, 2005).

31  *Hearing on Hurricane Katrina: Perspectives of FEMA's Operations Professionals Before the Senate Comm. on Homeland Security and Governmental Affairs*, 109th Cong. (Dec. 8, 2005) at 3 (statement of Phillip E. Parr, Deputy Federal Coordinating Officer, FEMA Joint Field Office, Austin, TX) [hereinafter *Dec. 8, 2005 Senate Homeland Security and Governmental Affairs Comm. Hearing*].

32  *Id.*

33  Interview by Select Comm. Staff with Maj. Gen. Harold A. Cross, Adjutant Gen., Mississippi National Guard at Jackson, MS (Oct. 13, 2005).

34  Interview by Select Comm. Staff with Lt. Col. Lee Smithson, Mississippi National Guard, in Gulfport, MS (Jan. 19, 2006).

35  *Id.*

36  *See* http://www.fema.gov/rrr/mers01.shtm (last visited Jan. 26, 2006).

37  *Id.*

38 *Hearing on Hurricane Katrina: The Role of the Federal Emergency Management Agency Before Select Comm.*, 109th Cong. (Sept. 27, 2005) at 32-33 (statement of Michael D. Brown, former Dir., FEMA) [hereinafter *Sept. 27, 2005 Select Comm. Hearing*].

39 Interview by Select Comm. Staff with Colonel Mark Mouton and Lieutenant General Jacques Thibideaux, Louisiana National Guard, in New Orleans, LA (Nov. 3, 2005).

40 Matt Welch, T*hey Shoot Helicopters, Don't They? How journalists spread rumors during Katrina*, REASON ONLINE, Dec. 2005, *available at* http://www.reason.com/0512/co.mw.they.shtml, (last visited Jan. 25, 2006) [hereinafter *Media Rumors Article*].

41 *Telecom Infrastructure Article*.

42 *Media Rumors Article*.

43 Briefing for Select Comm. Members and Staff by Mayor Favre, Bay St. Louis, MS, in Hancock County, MS (Jan. 20, 2006).

44 Interview by Select Comm. Staff with Bruce Baughman, Dir., State of Alabama Emergency Management Agency, in Clanton, AL (Oct. 11, 2005).

45 This simulcast trunked radio system consisting of three 20 channel sites and two 10 channel sites was installed in 2003 to serve law enforcement, fire, emergency medical, emergency management, and public utility services in Harrison County, which includes the cities Gulfport and Biloxi, MS.

46 E-mail correspondence from Benjamin J. Spraggins, Dir., Harrison County Emergency Management Agency, to Select Comm. Staff (Feb. 1, 2006) (2:53 p.m.).

47 *Dec. 7, 2005 Select Comm. Hearing* at 56 (statement of Robert R. Latham, Jr.).

48 *Id.* at 3-4.

49 *Id.* at 7 (statement of Bobby Strahan, MCEM, Director, Pearl River County Emergency Management Agency).

50 *Id.* at 97 (statement of Robert R. Latham, Jr.).

51 Interview (telephone) by Select Comm. Staff with Bobby Strahan, MCEM, Director, Pearl River County Emergency Management Agency (Nov. 29, 2005).

52 *Id.*; *Dec. 7, 2005 Select Comm. Hearing* at 2, 7-8 (statement of Bobby Strahan).

53 Interview by Select Comm. Staff with Matt Farlow, Information Technology Divisions Chief, LA Office of Homeland Security and Emergency Preparedness (Nov. 4, 2005).

54 Briefing for Select Comm. Staff by Larry Ingargiola, Director, Office of Homeland Security and Emergency Management, St. Bernard Parish, in St. Bernard Parish, LA (Nov. 3, 2005).

55 *Sept. 22, 2005 Senate Commerce Comm. Hearing* (written statement of Kevin J. Martin).

56 *Id.*

57 *Id.*

58 *Dec. 7, 2005 Select Comm. Hearing* at 35 (written statement of Robert R. Latham, Jr.).

59 *Id.*

60 *Id.* at 1 (written statement of Benjamin J. Spraggins; *Id.* at 4 (written statement of Robert R. Latham, Jr).

61 *Id.* at 4 (written statement of Robert R. Latham, Jr).

62 LA State Police Report, *Louisiana Totally Interoperable Environment* at 3 (Dec. 7, 2005).

63 *Hearing on Hurricane Katrina: Hurricane Katrina Evacuations Before the Senate Comm. on Homeland Security and Gov't Affairs*, 109th Cong. (Feb. 1, 2006) (testimony of C. Ray Nagin, Mayor of New Orleans, LA).

64 *Dec. 14, 2005 Select Comm. Hearing* (written statement of Col. Terry Ebbert).

65 *Sept. 29, 2005 Senate Commerce Comm. Hearing* at 1 (written statement of Dereck Orr, Program Manager of Public Safety Communications, Nat'l Institute of Standards and Technology).

66 *Sept. 22, 2005 Senate Commerce Comm. Hearing* at 5 (statement of Sen. Rockefeller).

67 *Oct. 26, 2005 Comm. on Homeland Security Hearing* (written testimony of Dr. Linton Wells II, Acting Ass't Sec'y of Defense, Networks and Information Integration, and DOD Chief Information Officer).

68 *Sept. 29, 2005 Senate Commerce Comm. Hearing* at 2 (written statement of David Boyd, Deputy Director, Office Systems Engineering & Development, DHS).

69 Correspondence from Colonel Henry L. Whitehorn, Superintendent, LA State Police, to Select Comm. (Dec. 29, 2005) [hereinafter Col. Whitehorn correspondence].

70 *Dec. 14, 2005 Select Comm. Hearing* at 3 (written statement of Col. Terry Ebbert).

71 Louisiana State officials claim for "Louisiana to achieve true interoperability, the initial acquisition cost infrastructure and equipment is $552,680, 423" thus rendering "the achievement of true interoperability at the state level virtually impossible." *See also* Col. Whitehorn correspondence.

72 *Dec. 14, 2005 Select Comm. Hearing* at 3-4 (written statement of Col. Terry Ebbert); Col. Whitehorn correspondence.

73 Matthew Fordahl, *U.S. Lacks Unified Emergency Radio System*, ASSOC. PRESS, Sept. 13, 2005 [hereinafter *Radio System Article*].

74 Col. Whitehorn correspondence.

75 The COPS Office was created by Title I of the Violent Crime Control and Law Enforcement Act of 1994 (P.L. 103-322). The mission of the COPS Office is to advance community policing in all jurisdictions across the United States. The COPS Office awards grants to state, local and tribal law enforcement agencies throughout the United States so they can hire and train law enforcement officers to participate in community policing, purchase and deploy new crime-fighting technologies, and develop and test new and innovative policing strategies.

76 Congressional Research Service Memo, FEMA Hazard Mitigation, *COPS and ODP Grants Awarded in Alabama, Louisiana and Mississippi in Fiscal Years 2003-2005* (Dec. 21, 2005).

77 *Id.*

78 Interview (telephone) by Select Comm. Staff with Gilbert Moore, COPS Program External Affairs Office (Sept. 27, 2005).

79 *Radio System Article*.

80 Interview by Select Comm. Staff with Gregg Meffert, Chief Information Officer, City of New Orleans, in Wash., DC (Oct. 18, 2005).

81  *Dec. 14, 2005 Select Comm. Hearing* at 3 (written statement of Col. Terry Ebbert).

82  The NCS began in 1962 after the Cuban missile crisis when communications problems among the United States, the Union of Soviet Socialist Republics, the North Atlantic Treaty Organization, and foreign heads of state threatened to complicate the crisis further. After the crisis, President John F. Kennedy ordered an investigation of national security communications, and the National Security Council (NSC) formed an interdepartmental committee to examine the communications networks and institute changes. This interdepartmental committee recommended the formation of a single unified communications system to serve the President, Department of Defense, diplomatic and intelligence activities, and civilian leaders in order to provide better communications support to critical government functions during emergencies. The NCS mandate included linking, improving, and extending the communications facilities and components of various federal agencies, focusing on interconnectivity and survivability. *See* NCS website: http://www.ncs.gov/faq.html (last visited Jan. 31, 2006).

83  *Oct. 26, 2005 Homeland Security Comm. Hearing* at 3 (written statement of Dr. Peter M. Fonash).

84  Interview by Select Comm. Staff with Dr. Peter M. Fonash, in Wash., DC (Jan. 27, 2006).

85  *Oct. 26, 2005 Homeland Security Comm. Hearing* at 3 (written statement of Dr. Peter M. Fonash).

86  *Id.*

87  *Id.* at 4.

88  Briefing for Select Comm. Staff by Edward A. Favre, Mayor, Bay St. Louis, MS, in Bay St. Louis, MS (Oct. 13, 2005).

89  *Hearing on Back to the Drawing Board: A First Look at Lessons Learned from Katrina Before the Government Reform Comm.*, 109th Cong. (Sept. 15, 2005), at 257-58 (written statement of Jim Haynie, President, National Association for Amateur Radio).

90  *Sept. 29, 2005 Energy & Commerce Comm. Hearing* (written statement of Harold Kramer, Chief Operating Officer, American Radio Relay League).

91  *Oct. 26, 2005 Comm. on Homeland Security Hearing* at 9 (written statement of Dr. Peter M. Fonash).

92  *Id.* at 7.



AP PHOTO/STEVEN SENNE

*"Natural disasters will always be chaotic situations. But with proper planning and preparation, it is possible to respond quickly to restore order and begin recovery efforts."*

Bob Riley
Governor, State of Alabama
Select Committee hearing, November 9, 2005

# COMMAND AND CONTROL

## Command and Control was impaired at all levels, delaying relief

### Summary

Command and control are key aspects of emergency management, and the federal government has taken several steps, most notably developing an Incident Command System (ICS), to promote unity of command among local, state, and federal authorities. However, during and immediately after Hurricane Katrina made landfall, there were lapses in command and control within each level of government, and between the three levels of government.



Local governments' command and control was often paralyzed by the complete destruction of their entire emergency management infrastructure. While state command and control facilities (such as the Emergency Operations Centers (EOCs)) were generally intact after the storm, the magnitude of the storm and a variety of operational factors impaired their unity of command. The federal government also struggled to maintain unity of command across different agencies and within individual agencies. These problems exacerbated the challenges of coordinating across all levels of government and prevented overall unity of command.

One of the factors that impaired command and control was the lack of communications and situational awareness. While the reasons for these deficiencies were detailed previously (see the COMMUNICATIONS chapter), their impact was to paralyze normal command and control mechanisms. Local governments in many locations in Louisiana and Mississippi lost all communications capabilities for some period. This prevented them from communicating their situation and needs to the state level.

The state EOC in Louisiana experienced its own communications problems. State officials in the EOC could not reliably communicate with local officials, other state officials, or federal officials. Similarly, the federal government lost some communications, and initial efforts to bring in supplemental capabilities to improve command and control were unsuccessful. Other key factors that impaired command and control can be traced to a lack of sufficient qualified personnel, inadequate training, and limited funding.

The lack of effective command and control, and its impact on unity of command, degraded the relief efforts. Delays and otherwise poor assistance efforts caused by a lack of command and control are documented in this and other chapters. They include:



- delayed and duplicative efforts to plan for and carry out post landfall evacuations at the Superdome;
- uncoordinated search and rescue efforts that resulted in residents being left for days without food and water;
- separate military commands for the National Guard and Department of Defense (DOD) active duty troops;
- confusion over deliveries of commodities because some officials diverted trucks and supplies without coordination with others;

■ lack of clarity as to who was assisting hospitals to evacuate; and

■ the collapse of the New Orleans Police Department and its ability to maintain law and order.

# Finding: Command and Control was impaired at all levels of government

## Command and control are key aspects of emergency management

Command and control are key aspects of emergency management, and the federal government has taken several steps to promote unity of command among local, state, and federal authorities. For example, the National Incident Management System (NIMS) was developed in 2004 to enable all responders, regardless of jurisdictions or discipline, to effectively and efficiently work together. The NIMS "provides a nationwide template enabling federal, state, local, and tribal governments and private-sector and nongovernmental organizations to work together effectively and efficiently to prevent, prepare for, respond to, and recover from domestic incidents regardless of cause, size, or complexity."[1]

In addition, NIMS incorporated the ICS, which has been in existence since the early 1970s. ICS is the standardizing scalable concept designed to provide for an integrated and organized structure while eliminating jurisdictional boundaries.[2] The National Response Plan (NRP) calls for the implementation of NIMS and the ICS upon activation of the NRP to ensure maximum flexibility of operation during the situation at hand.[3]

Optimal levels of coordination occur when there is unity of command, unity of effort, and an accepted chain of command. Unity of effort encompasses the concept that all parties to a mission should be focused upon the same agreed-to objectives and should work together to achieve them. Unity of command is the concept that an individual has only one superior to whom he or she is directly responsible, creating a clear line of supervision and command and control.

Chain of command furthers the concept of unity of command, creating a line of authority from the lowest ranking individual to those in command, establishing a highly effective and efficient system. It requires that orders are given only to those directly below an individual in the chain of command and orders are received from only those directly superior in the chain of command. Those at the appropriate level in the chain of command can then, as authorized, coordinate their activities with peers in their partner organizations.

## Many local governments lost command centers or otherwise could not establish unity of command

Achieving unity of command — with local, state, and federal authorities all acting together seamlessly to plan and conduct emergency operations — is often a challenge during a major disaster. It was particularly so when Hurricane Katrina made landfall. Local



STAFF PHOTO

governments' command and control was often paralyzed by the complete destruction of their entire emergency management infrastructure.

In Alabama, local counties had the least problems with command and control. Because Katrina turned to the west and hit Mississippi and Louisiana the hardest, Alabama counties were able to maintain their emergency management infrastructure. Both Baldwin and Mobile counties still had operating EOCs and generally were able to stay in contact with the state EOC.[4]



STAFF PHOTO

In Mississippi, there was a massive storm surge that destroyed government facilities, making it very difficult for the local communities to establish command and control. According to FEMA's Federal Coordinating Officer (FCO) for Mississippi, Bill Carwile, much of the emergency management and public safety infrastructure was destroyed in the coastal counties.[5] Mayor of Waveland Tommy Longo said the city staged at various points around the city some of the resources it expected to need to respond to the storm's damage, and it also staged some of these resources about 10 miles north of the city as a backup in the event of a catastrophic event.[6] Despite the city's preparations, the hurricane destroyed these resources. The storm decimated all of Waveland's public buildings, severely limiting its ability to provide command and control and to mount a response to the storm.[7]

Similarly, Hancock County lost its EOC—the location from which it expected to provide command and control for the county's response to the storm—because of severe flooding early on in the hurricane.[8] Pearl River County also lost its EOC in the early hours of the storm due to wind and water damage that knocked out its emergency backup generator and caused other damage, making the center inoperable.[9]

In Louisiana, there was a similar level of destruction to the basic emergency management infrastructure at the parish level. Many of the parish EOCs and public safety facilities were wiped out or flooded.[10] While Jefferson Parish was hard hit, it was in better shape to respond because it had protected its EOC. Jefferson Parish Emergency Manager Dr. Walter Maestri explained the EOC was in a hardened facility — an old incinerator with cement walls — with the command center, living quarters, and emergency generator all on upper floors.[11] While the EOC suffered immediate problems with communications being down, and it eventually had a shortage of fuel for its generator, it was able to keep operating at some level.[12]

Lack of command and control was particularly a problem in New Orleans. The authorities in the city lost their command and control facilities after the levee breaches and subsequent flooding. The city abandoned

its EOC when City Hall was flooded and the emergency generator was flooded, cutting out power.[13] As discussed in more detail in the LAW ENFORCEMENT chapter, the New Orleans Police Department headquarters and district stations were flooded, crippling command and control for that department.[14] Similarly, the Louisiana National Guard, with headquarters at Jackson Barracks in New Orleans, lost its command and control due to flooding and had to abandon its operations center and re-establish it in an elevated parking structure at the Superdome.[15] According to Lieutenant General H. Steven Blum, Chief of the National Guard Bureau, "…Jackson Barracks flooded at the most inopportune time, and he [Major General Landreneau—the Louisiana Adjutant General] had to relocate in the middle of trying to gain situational awareness and coordinate the response."[16] Thus, in New Orleans, for at least some period of time, emergency managers, the police, and the military lost command and control over their own personnel and lost unity of command with the other local, state, and federal agencies that needed to be involved in the relief efforts.

Even where there was still some infrastructure in place and communications were less of a problem, local command and control suffered from lack of clarity. The most notable example of this was at the Superdome in New Orleans. Although there were both National Guard and New Orleans Police Department officials on site to physically establish a unified command and personally talk to each other face to face, there was no consensus on who was in charge. Louisiana National Guard officers who ran security operations at the Superdome, Colonel Mark Mouton and LtC. Jacques Thibodeaux said the New Orleans Police Department had the lead for command and control.[17] They stated that the National Guard was there in support of the police.[18]

These statements directly conflict with New Orleans Police Department comments that the National Guard had the lead for command and control at the Superdome. Deputy Chief Lonnie Swain, the senior New Orleans Police Department officer at the Superdome, said the National Guard always had the lead for command and control at the Superdome and the police were there in support of the military.[19] In support of this position, New Orleans officials said the Superdome was a state facility, so a state agency (the National Guard) would naturally be in charge.[20]

One FEMA official, Deputy FCO Scott Wells, also said there was no clear unity of command at the Superdome.