# EXHIBIT 2
# PART 2

He said he arrived there on Wednesday, August 31, and when he tried to contact the leadership at the location to coordinate FEMA activities, he found "nobody in charge, and no unified command."[21] For example, he said there was no organization or structure to collect requests, prioritize them, and pass them on to the next appropriate echelon. He described the conditions as "chaotic" and said there appeared to be no one planning the next steps.[22]

The Cloverleaf was another location in New Orleans where the command and control structure was unclear. Louisiana State Police officials Ralph Mitchell and Joseph Booth stated that one government agency (they did not know which one) set up a medical triage and treatment center at the Cloverleaf on Wednesday, August 31.[23] Crowds grew there as people came to the dry land on their own accord or were dropped off by the helicopters or boats that rescued them from the water.

On Thursday, September 1, medical patients were evacuated, but the rest of the crowd grew to about 6,000-7,000 people. By Thursday afternoon and evening, the crowd started getting restless. At one time, there were 60 state police officers there, in addition to National Guard troops. The two officials — who had been on site — said they did not know who was in charge of command and control or which agency had set up the medical triage center there in the first place.[24] Later on Thursday night and Friday morning, some relief came from FEMA and the National Guard, and the Cloverleaf was completely cleared by Saturday, September 3.[25]

The Convention Center, discussed in more detail in the EVACUATION chapter, suffered from no official presence at all. There was not even an attempt to establish command and control there until the rescue mission arrived on Friday, September 2 (four days after landfall).[26]



AP PHOTO/DAVID J. PHILLIP

While there may have been some type of command structures set up at both the Superdome and the Cloverleaf, they do not appear to have been effective. The fact that the senior officials who were stationed at or visiting these locations disagreed on who was in charge, could not find out who was in charge, or did not know who was in charge, shows there was a significant lapse in command and control and demonstrates there was little unity of command at these locations in New Orleans.

## State government unity of command was impaired by the magnitude of Katrina and other operational factors

While state command and control facilities (such as their EOCs) were generally intact after landfall, the magnitude of the storm and a variety of operational factors impaired their unity of command.

Again, Alabama encountered the fewest command and control problems because it was least affected by Katrina. According to Alabama Emergency Management Agency (EMA) Director Bruce Baughman, the state EOC was up and running, with effective command and control throughout the hurricane and its aftermath. Unlike Louisiana (discussed below) where the parishes and EOC lost use of their emergency management software, Alabama used its software effectively. The software, known as "EM 2000," was used by county EOCs to send requests for assistance and by the state EOC to task appropriate state or federal agencies and to track the status.[27] Select Committee staff were able to review the EM 2000 database and confirm the system was effectively used to track and close out many of the local requests.

Many examples demonstrate the effectiveness of Alabama's EOC and the EM 2000 system. On August 29 at 9:30 p.m. the Mobile Police Department requested vehicles for search and rescue operations. This task was marked complete in the EM 2000 database in a little over one hour at 10:41 p.m.[28] Earlier on August 29, Baughman ordered 40 truck loads of ice and 40 truck loads of water from Lipsey Water. This task was marked complete by 2:00 p.m. the next day.[29] At 6:41 p.m. on August 29, Baldwin County EMA requested, through EM 2000, five generators for use at water wells. This task was marked complete at 9:16 am the next morning.[30]

When some FEMA requests were made, however, they were not immediately addressed. On August 29, Mobile



County EMA Director Walter Dickerson requested two FEMA operations personnel and two FEMA logistics personnel to augment his staff. This need was not addressed until September 21.[31] Similarly, on August 30, when Monroe County requested shelter supplies from FEMA, it had to wait for six days for the task to be closed. 150 cots were needed in addition to a self-contained shower and bath trailer.[32]

The Select Committee encountered severe disagreements about whether the State of Louisiana maintained effective unity of command. Some FEMA officials were very critical of Louisiana's command and control. Michael Brown, Director of FEMA during Katrina, called the state of Louisiana "dysfunctional" and said it did not have unity of command.[33] Brown cited this as one of the main reasons for delays in relief efforts in Louisiana and New Orleans.[34]

In addition, Wells said there was no unity of command in the EOC. Wells was particularly critical of the state for not practicing unity of command with the federal government's planning and coordination efforts.[35] Wells said state officials were "preoccupied with the evacuation" and would not participate in critical pre-landfall "hasty" planning in other areas such as (1) search and rescue, (2) rapid assessment teams, (3) medical evacuation, (4) sheltering and temporary housing, (5) commodity distribution, and (6) debris removal.[36]

According to Wells, these "hasty plans" would have helped guide the course of activities for the first couple of days after landfall, when situational awareness was weak and before more deliberate planning could take place.[37] FEMA went ahead and developed the hasty plans, but without the benefit of state EOC personnel participating. He said such state personnel should have participated because they had expertise in state and local conditions and capabilities.[38]

The only exception to this was the commodity distribution hasty plan. Wells said that was the only plan the state worked with FEMA to develop before landfall.[39] As another example, Wells cited the incident (covered in more detail in the MILITARY chapter) where the Louisiana Adjutant General requested DOD active duty forces directly without going through or even notifying FEMA.[40] Instead of practicing unity of command, Wells said the state bypassed FEMA for federal assistance, then later complained FEMA did not know what was going on, and that FEMA could not coordinate the federal effort.[41]

Other FEMA officials were not as harsh in their criticisms of Louisiana. Bill Lokey, the FEMA FCO in the state EOC, said there was at least a minimum level of command and control and unity of command, to the extent the various parties were working together to set common priorities for common objectives.[42] Lokey attributed any lack of unity of command and control to a variety of operational factors (detailed below) and the catastrophic nature of the event.[43]

Similarly, another FEMA official who was in the EOC and in New Orleans, Deputy FCO Phil Parr, said some level of chaos occurs in any disaster, so it was not particularly unusual that the EOC seemed chaotic under the circumstances.[44] As discussed in the next section, Lokey and Parr both stated that not only was the state government overwhelmed by the magnitude of the disaster, but the federal government was overwhelmed as well.[45]

Louisiana state officials, including State Coordinating Officer (SCO) Jeff Smith, countered FEMA criticisms by saying the EOC was fully functional.[46] Smith said it was always clear who was in charge at the EOC: the SCO.

*Michael Brown, Director of FEMA during Katrina, called the state of Louisiana "dysfunctional" and said it did not have unity of command.*

He also maintained the EOC and the state did maintain unity of command.[47] In response to then-FEMA Director Brown's comment that he arrived at the EOC and could not figure out who was in charge, Smith said that such comments were "just plain bull."[48] Smith stated — and Lokey concurred — that the SCO and FCO worked closely together throughout the crisis.[49] Smith also provided the Select Committee with a photo taken during the crisis of Lokey and Smith together in the EOC.[50] According to Smith, "if FEMA Director Michael Brown had wanted to find out who was in charge of the EOC, all he had to do was find his FEMA FCO, because I was standing right next to him."[51]

The Select Committee attempted to make an independent determination of the effectiveness of command and control in the EOC by listening to conference calls between the EOC and parishes.[52] Based on a review of pre-landfall conference calls, the EOC appeared to be organized and unified to the limited extent this could be determined through these calls.[53] For example, the SCO was clearly in charge of coordinating state and parish activities and managing all discussions and decisions in an orderly and logical fashion.[54] Participation in the calls was very broad, to include multiple state agencies, more than a dozen key parishes, federal agencies, other states, and the American Red Cross. In addition, every organization got its opportunity to talk, and there was time for each organization to ask questions. It appeared pre-landfall decisions and issues were fully vetted among the participants. However, these conference calls do not cover the period just after landfall — the most critical and challenging time for establishing and maintaining command and control.[55]

Despite the disagreements over the degree of effective command and control in the state EOC, federal and state officials both cited several operational factors that made unity of command difficult to maintain. Among the most significant factors were a lack of communications and situational awareness and a lack of sufficient qualified personnel, inadequate training, and limited funding. These are described later in this chapter as separate findings. The other operational factors impairing command and control in the state EOC, described by a number of federal and state officials, included the following:

- **Katrina's late turn toward Louisiana:** State officials indicated that Katrina had taken a "dramatic shift" toward Louisiana on Friday (August 26). They said they were not fully aware of the situation until Saturday and were therefore not as prepared as they otherwise would have been.[56]

- **Overwhelming number of requests:** The size of Katrina and the destruction she wrought was immense, including the flooding of New Orleans and subsequent problems with security and the post-landfall evacuation. All of these circumstances led to an overwhelming number of requests for assistance.[57]

- **Overcrowding in the EOC:** The EOC building and main room were very crowded by the large contingent of state and federal officials. [58] The EOC main room has a capacity of about 50 people, but there were about 200 people. The EOC building as a whole was also overcrowded with about 750-1,000 people in it. There were only 12 Emergency Support Function (ESF) rooms for 15 ESFs. State officials cited the size of the current Joint Field Office (JFO) (in an old department store with thousands of staff) as an indication of the amount of physical space and number of people needed to run an operation the size of Katrina.[59]

- **EOC Information Technology was overloaded:** The Information Technology system was overloaded by the number of additional computers logged in and the volume of information processed. This was slowing down and destabilizing the system, and officials had to add two servers in the middle of the response.[60]

- **Deviation from normal procedures:** Due to the overwhelming number of requests and degraded



STATE OF LOUISIANA

*FEMA should have been more sympathetic and provided more assistance when it was clear Louisiana was overwhelmed by the size of Katrina's devastation.*

communications, officials had to deviate from normal procedures for requesting assistance.[61] The federal government contributed to this problem by also deviating from normal procedures. Specifically, other federal agencies tasked FEMA directly rather than putting requests to the parishes in the first place so they could go through the normal process (e.g., from the parish to the state and then to FEMA to be mission-assigned to other federal agencies.)[62]

- **Freelancing by other federal, state, and local agencies:** State officials said, and a FEMA official confirmed, that federal agencies were "freelancing," or just showing up without coordinating with the appropriate authorities at FEMA or the state. They would bypass the command structure and just appear in the EOC.[63] In addition, several freelancers showed up from other state and local agencies, again, without coordinating with the appropriate authorities. They too would just appear in the EOC not knowing what to do.[64]

- **Visits by politicians and celebrities:** Several elected officials from the state and national levels showed up in the EOC. While they just wanted to see what was going on and were trying to help, their presence distracted the EOC personnel.[65] There were similar visits by celebrities such as Oprah Winfrey and Sean Penn.[66] Most visits by elected officials and celebrities had large media crews covering them, further distracting the EOC personnel from their more urgent tasks.[67]

State officials who directed operations in the EOC — Col. William Doran and Mr. Jim Ballou — noted that with all of these operational factors, it would be easy for an outsider to conclude the EOC was a chaotic place.[68] In response to criticism from FEMA's Michael Brown, these two state officials (as well as the SCO Smith) said some level of confusion was to be expected in the EOC under the circumstances. They said FEMA should have been more sympathetic and provided more assistance when it was clear Louisiana was overwhelmed by the size of Katrina's devastation.[69]

## Federal government also lacked unity of command across and within agencies

Like the states, the federal government also struggled to maintain unity of command across and within agencies. According to Louisiana SCO Smith, the federal government did not follow its own plan, the NRP, which calls for a unified command. In his prepared statement before the Select Committee, Smith stated "[a]nyone who was there, anyone who chose to look, would realize that there were literally three separate Federal commands."[70] Smith's statement goes on to describe these three separate command structures:

- FCO and Joint Field Office (JFO): This was the unified joint command with the FCO (Lokey) and SCO (Smith) located initially at the state EOC, then moved to the Joint Field Office (in the old department store) once that was established.[71] The FCO, by doctrine, is the individual that is supposed to be in charge of all federal response operations, and only the FCO has the authority to obligate federal funds.[72]

- Principal Federal Official (PFO): Smith said that "[t]he Primary *[sic] Federal Officer (PFO)* by doctrine is not supposed to be an operational person directly involved in response activities . . . . The PFO in Katrina went operational and began directing and guiding response operations and to a large degree left out the Federal Coordinating Officer (FCO).[73] This was inconsistent with the NRP: "The PFO cell was operating on its own, communicating directly with the Governor, communicating directly with the Mayor of New Orleans and a myriad of other local elected officials," Smith said.[74]

- Joint Task Force Katrina: This command was intended to serve DOD active duty forces. According to Smith, "[w]henever the task force commander of Hurricane Katrina, General Honoré, came onto the scene, he was also operating independently with little regard whatsoever for the Joint Field Office, which should have been the only unified command."[75]

The Select Committee found ample evidence supporting the view that the federal government did not have a unified command. For example, FEMA officials Lokey and Wells supported Smith's position, saying the PFO was not supposed to have an operational role and

*Lokey said the federal government and particularly FEMA, were overwhelmed. Overwhelmed organizations cannot achieve unity of command.*

was not supposed to bypass the FCO.[76] They stated the initial PFO, Michael Brown, followed protocol. However, the second PFO, Coast Guard Admiral Thad Allen, immediately began directing operations and established a separate command in New Orleans, set apart from the SCO and FCO in the Joint Field Office. Both FEMA officials said Allen's direction of operations as a PFO exceeded his authorities as enumerated in the Stafford Act.[77]

Eventually Allen was appointed FCO in addition to PFO.[78] As Smith noted, "DHS in essence acknowledges that there was a problem …when DHS appointed the PFO as the FCO as well. DHS discovered the PFO did not have the authority to obligate money. Only the FCO has authority to obligate money."[79] This issue also arose in an April 2005 national level exercise sponsored by DHS called TOPOFF 3, where there was confusion over the different roles and responsibilities performed by the PFO and FCO.[80] The PFO issue is also discussed in detail in the NATIONAL FRAMEWORK chapter.

FEMA officials also acknowledged that DOD frequently acted on its own, outside the established unified command. Lokey said Honoré was directing activities from his JTF Katrina command ship (the USS Iwo Jima, docked pier-side in Orleans) without coordinating with the FCO at the state EOC and later the Joint Field Office.[81] He said Honoré, like the PFO was coordinating directly with local parishes and was accepting taskings from them, which violated established federal protocols.[82] Requests for assistance are supposed to go from the local level, to the state SCO, then to the FEMA FCO, and if appropriate, then to the Defense Coordinating Officer for DOD support.[83] Some may forgive Honoré for bypassing this process because it was broken and therefore unworkable after Katrina (as we discuss in the NATIONAL FRAMEWORK chapter). In fact, Lokey praised Honoré for "doing what had to be done to get things moving."[84] However, one of the results of Honoré's *modus operandi* of acting independently was further impairing FEMA's ability to maintain unity of command across the federal government. Assistant Secretary of Defense Paul McHale testified that "[m]ilitary command and control was workable, but not unified."[85] Additional difficulties between FEMA and DOD are discussed in the MILITARY chapter.

In addition to the problems with establishing and maintaining a unified command with DOD, FEMA struggled to establish a unified command with other organizations within DHS. According to Wells, the Coast Guard did not fuse their command in the search and rescue operation with the state and FEMA. Wells stated that for "the U.S. Coast Guard, who had junior officer representation but no authority to direct search and rescue air operations, all operations were directed by senior Coast Guard officers from another location. These officers refused to meet and conduct joint search and rescue operations with FEMA and state agencies."[86] Captain Bruce Jones, the Coast Guard officer in charge of air operations, commented that airborne search and rescue was sufficiently coordinated between the Louisiana National Guard's Task Force Eagle at the Superdome and the Coast Guard's air operations center at Belle Chasse Naval Air Station and that having two incident commands was an effective way to divide the work load.[87] Regardless of the positive outcome of saving lives, there was not unity of command across the function of search and rescue.

In addition to its problems coordinating with other federal agencies, FEMA had problems coordinating its own activities. Because most communications systems were impaired, Lokey could not talk directly with his advance team leader in New Orleans, Parr.[88] Thus, they were unable to coordinate their activities. As another example, Lokey and his staff in the EOC did not know another FEMA official, Marty Bahamonde, was in New Orleans during and immediately after landfall until they were informed by FEMA headquarters on late Monday, August 29. Before that time, they did not even know Bahamonde was there or what his function was.[89] More generally, Lokey said the federal government and particularly FEMA, were overwhelmed.[90] Overwhelmed organizations cannot achieve unity of command.

Louisiana EOC conference calls provide additional evidence there was a lack of coordination within FEMA.[91]



Once emergency communications were restored and the Louisiana EOC restarted its conference calls with the

parishes on September 9, it was clear FEMA activities were not well-coordinated. The September 9 call recorded a discussion in which Smith stated FEMA's "right hand is not always knowing what the left hand is doing."[92]

Parish officials agreed with this assessment and provided several examples. They noted the local FEMA representatives (situated in the parish EOCs) were working hard to resolve their problems, but that "other FEMA people just keep showing up."[93] The call indicates some FEMA officials were making commitments to various local elected officials, without coordinating with the FEMA FCO, the state EOC, or the parish EOC. One parish official said this situation was "creating downright chaos."[94]

Temporary housing was cited as a particular area where FEMA coordination was unacceptable to the state and parishes. According to Smith, a FEMA regional housing team was not coordinating with the JFO. Smith said he "blew his top" that morning because these FEMA regional officials were bypassing the state and parish EOC process in planning for temporary housing. FEMA needs to have appropriate state and parish representatives involved in any FEMA discussions of temporary housing, he said. Smith told the parishes the FEMA FCO needs to "ride herd" on the FEMA regional housing group so they follow established procedures.[95]

# Finding: Lack of communications and situational awareness paralyzed command and control

## Localities, without communications, could not participate in unified command

One of the key factors that impaired command and control was the lack of communications and situational awareness. While the reasons for these deficiencies were detailed previously (see the COMMUNICATIONS chapter), their impact was to paralyze normal command and control mechanisms. Many local governments in Mississippi and Louisiana lost all communications capabilities for some period. This prevented them from communicating their situation to the state level.

Alabama, as noted before in this chapter and the COMMUNICATIONS CHAPTER, experienced relatively few communications problems. Federal and state



FEMA

officials alike concluded their communications capacity functioned well during their response to Katrina.[96] The Alabama EMA has various communications redundancy programs to ensure that it maintains a high level of connectedness throughout the state. The EOC has equipment and trained personnel to communicate over all types of communications networks, including satellite, 800 MHz digital phone service, amateur radio, and others. Communications systems and capabilities are viewed by AEMA staff as a strength, and during Katrina, this redundancy proved effective. That said, the goal of true interoperability within and among county emergency response and law enforcement agencies remains elusive since each county has its own authority and timetable to procure communications technology.[97]

In Mississippi, most land-based communications systems, including cellular phones, were inoperable. According to Mississippi's EMA Director, Robert Latham, voice and data systems statewide were also inoperable.[98] As a result, often the only communications capability present in Mississippi — for both the state EMA as well as the affected counties — was through satellite phones and



STAFF PHOTO

radios, which operate by connecting to satellites rather than routing calls through land-based lines or cellular towers. Despite FEMA efforts to bring in additional communications capabilities to the affected counties' EOCs, Carwile reported that communications capabilities were far short of what was needed to be effective.[99]

To illustrate the problem in Louisiana, the EOC uses conference calls as a way to provide command and control and ensure unity of effort among the state and effected parishes. However, after the conference call during landfall on Monday morning, August 29, the parishes lost their communications capabilities and were unable to convene another conference call until 11 days later, on Friday, September 9.[100] Even then, the participants in the conference call noted that it was still hard to make regular phone calls.[101]

### State of Louisiana officials lost local input to unified command, and were unreachable for coordinating activities

The state EOC in Louisiana experienced its own communications problems, with officials in the EOC unable to communicate reliably with local officials, other state officials, or federal officials.[102] In one conference call, Smith noted that part of the problem was the state EOC had not been wired for the volume of communications required for a major catastrophe.[103] Many e-mails noted the difficulty of communicating with the state EOC. As one example, a U.S. Northern Command (NORTHCOM) e-mail that laid out the procedures for requesting DOD assistance through the Defense Coordinating Officer in the EOC also emphasized the EOC telephone appeared to be continuously busy.[104]

### Federal government also lost communications and failed in initial efforts to improve command and control

Similarly, the federal government lost some communications, and initial efforts to bring in supplemental capabilities to improve command and control were unsuccessful. For example, FEMA has a mobile command and control suite, named Red October, which is housed in an oversized tractor trailer.[105] Lokey and his staff said during Hurricane Katrina, Red October

was pre-deployed to Shreveport, in northern Louisiana, to keep it out of harm's way but also to allow rapid movement into Baton Rouge or New Orleans after the hurricane passed.[106] Red October, once deployed and opened up, had a command and control suite with about 30 work stations and robust communications.

As the situation unfolded in New Orleans, and the flooding destroyed much of the command and control capability of the city, FEMA officials decided to move Red October to New Orleans to provide on-site command and control to its advance team and to help connect with New Orleans and National Guard authorities at the Superdome.[107] However, while some tractor trailers were able to get into the flooded city, Red October was unable to do so because of its oversized dimensions. Other FEMA communications vehicles, such as the Mobile Emergency Response Support detachments, noted in the COMMUNICATIONS chapter, were not capable of driving through the floodwaters without damaging their sensitive electronic equipment. Therefore, FEMA was unable to use these to restore command and control with its forward team in New Orleans, led by Parr.[108]

# Finding: A lack of personnel, training, and funding also weakened command and control

### A lack of sufficient personnel hindered command and control

The lack of trained, professional personnel at both the state and federal level greatly hindered the response. According to FEMA, the Louisiana Office of Homeland Security and Emergency Preparedness (LOHSEP) had an inadequate staff, both in numbers and training. "There were too few professional staff" provided by the state, according to Wells.[109] The FCO Operations Chief, Tony Robinson, agreed, saying the EOC had only 40 full-time trained staff, leaving only 20 staff to operate in 12 hour shifts.[110] Twenty people were far too few to run the EOC during a large disaster and the state should have developed a surge capacity, Robinson said.[111]

Wells said LOHSEP's supplemental staff were inadequately trained, and LOHSEP relied too heavily on the Louisiana National Guard troops to work the EOC.[112]

He characterized the guardsmen as well meaning but not trained to be professional emergency managers.[113] Wells cited this as one of reasons the state EOC personnel did not understand the unified command under the ICS.[114] Robinson also said the ability to effectively operate decreased as the state's cadre of professional emergency managers was augmented by these inexperienced guardsmen.[115] FEMA was also significantly short on available trained staff to send into the field.[116] Finally, Wells stated that "[w]e did not have the people. We did not have the expertise. We did not have the operational training folks that we needed to do our mission."[117]

### A lack of training also hindered command and control

In Louisiana the lack of adequately trained personnel was also a major impediment to utilizing ICS and achieving effective command and control over state and federal resources. Wells said the state personnel lacked overall discipline, lacked clear control lines of authority, lacked a clearly understood command structure, and lacked consistency in operational procedures.[118] "If people don't understand ICS, we can't do ICS. And if we can't do ICS, we cannot manage disasters," he stated in testimony before the Senate.[119]

Valuable time and resources were expended to provide on-the-job training in ICS to state personnel assigned to the emergency operations center in Baton Rouge.[120] Wells noted that state officials hired a consultant to teach their EOC staff about ICS after landfall.[121] Specifically, the state hired former FEMA Director James Lee Witt as a consultant, and one of Witt's staff (a former FCO) was training the state staff in the EOC on Tuesday and Wednesday, August 30 and 31.[122] Wells said it was ridiculous to try to teach unified command after the hurricane had hit when everyone in the EOC should have already known it by then; at that point, it was too late, and the training created additional confusion in the EOC, Wells said.[123]

In Mississippi, ICS issues were less of a problem. According to Carwile, "[t]here had been training previous to Hurricane Katrina by the Mississippi Emergency Management Agency on down to the county emergency managers. So, it worked well."[124]

### Inadequate funding cited as reason for inadequate personnel and training

As addressed more fully in the FEMA PREPAREDNESS chapter, the lack of adequate staff and insufficient training are directly attributable to limited funding for FEMA operations. For example, the funding for training exercises is, and has been deficient. This is evident in the lack of coordination of FEMA staff. According to Carwile, training funding for national emergency response teams dried up in 2003.[125] Teams sent to the Gulf coast never had an opportunity to train together beforehand. Prior to activation, the teams were nothing more than names on rosters. This contributed greatly to the inefficient and timely delays in the initial federal response. Senator Joe Lieberman described the training and funding issues as "a FEMA disaster waiting to happen because we weren't giving [FEMA] the resources to get ready for this."[126]

*Senator Joe Lieberman described the training and funding issues as "a FEMA disaster waiting to happen because we weren't giving [FEMA] the resources to get ready for this."*

## Finding: Ineffective command and control delayed many relief efforts

The lack of effective command and control, and its impact on unity of command, degraded the relief efforts. Moreover, the problems experienced individually by the local, state, and federal governments exacerbated the challenges of coordinating across all levels of government and prevented overall unity of command.

The evacuation of the Superdome provided one of the clearest examples of how ineffective command and control and the lack of unity of command hindered urgently needed relief. It was planned multiple times by different parties. On the day after Katrina's landfall, Parr worked with the Louisiana National Guard to devise a



plan for evacuating the Superdome through the use of Chinook and Blackhawk helicopters.[127] After working through most the night, the plan was ready for execution Wednesday morning. Parr and the Louisiana National Guard officer working with him estimated it would take 30 hours to completely evacuate the Superdome. However, earlier that day Blanco had instructed Landreneau of the Guard to contact Honoré of Northern Command to arrange for active duty military support of response operations in Louisiana.[128]

This request was made outside the unified command and without the knowledge of FEMA and Parr. During the early morning hours of Wednesday, Landreneau instructed Louisiana National Guard officials at the Superdome to cease planning for the evacuation as Honoré would be "taking charge" of the evacuation project, thus bypassing the unified command and requirements that state requests to federal agencies go through FEMA to further coordinate and limit duplication.[129] Parr said this resulted in the

evacuation of the Superdome population 24 hours later than would have occurred under the joint National Guard / FEMA plan put together at the Superdome.[130]

Other delays and poor assistance efforts caused by a lack of command and control, mainly in Louisiana, include:

■ Search and Rescue. Search and Rescue efforts were uncoordinated. During the critical first days after Katrina and the flooding, there was no unity of command between the various local, state, and federal agencies participating in search and rescue efforts. While heroic efforts by these agencies immediately saved lives, there was little coordination of where the victims should be or actually were taken. This resulted in victims being left in shelters or out in the open on high ground for days without food and water. For more details, see the EVACUATION chapter.

*"All levels of government have "a fundamental lack of understanding for the principals and protocols set forth in the NRP and NIMS."*

■ Military Support. Much of the military support was also uncoordinated. The Louisiana National Guard and DOD active duty forces, under Joint Task Force Katrina, were under separate commands. Federal attempts to bring them under the same command were rejected by the Governor. This resulted in delays in the arrival of DOD active duty troops—troops that provided a robust reservoir of manpower and a wide array of capabilities. For more details, see the MILITARY chapter.

■ Medical Evacuations. There was confusion over which agencies or personnel were supposed to assist with hospital evacuations. Hospitals reported that Army and FEMA officials came and surveyed the situation and never returned despite saying that they would. This resulted in delays in evacuating patients, with sometimes fatal consequences. For more details, see the MEDICAL CARE chapter.

■ Lawlessness in New Orleans. The New Orleans Police Department, in addition to losing hundreds of its personnel who did not report to duty, lost command and control over those that still reported to work. This resulted in delays in determining where problems were, dispatching officers to those locations, and otherwise planning and prioritizing operations to restore law and order. For more details, see the LAW ENFORCEMENT chapter.

## Conclusion

In responding to Hurricane Katrina, elements of federal, state, and local governments lacked command, lacked control, and certainly lacked unity. Some of the reasons for this can be traced back to the magnitude of the storm, which destroyed the communications systems that are so vital to effective command and control. In addition, the magnitude of the storm created so much damage across such a wide area that it overwhelmed agencies and

individuals who were struggling to mount an organized response.

But some of the lapses in command and control can be traced back to agencies and individuals demonstrating a *failure of initiative* to better protect their command and control facilities, better clarify command and control relationships on location, and better follow established protocols for ensuring unity of command. This problem of not following protocols is summed up well in a recent DHS-IG report on an exercise involving federal, state, and local governments: all levels of government have "a fundamental lack of understanding for the principals and protocols set forth in the NRP and NIMS."[131]

Finally, to some degree, lapses in command and control can be traced to a lack of sufficient qualified personnel, inadequate training, and limited funding. In total, these factors paralyzed command and control, leading to an agonizingly disjointed and slow response to the disaster. ■

[1]  U.S. Dep't of Homeland Security, *National Response Plan*, (Dec. 2004) at 1 [hereinafter *NRP*].

[2]  *Id.* at 66.

[3]  *Id.* at 1.

[4]  *See* Interview by Select Comm. Staff with Leigh Anne Ryals, Emergency Manager, Baldwin County [hereinafter Ryals Interview], in Washington, DC, via telephone from AL (Oct. 25, 2005); *see* Interview by Select Comm. Staff with Walter Dickerson, Emergency Manager, Mobile County [hereinafter Dickerson Interview], in Washington, D.C., via telephone from AL (Oct. 25, 2005).

[5]  *Hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi Before Select Comm.*, 109th Cong. (Dec. 7, 2005) at 5 (written statement of William L. Carwile) [hereinafter *Dec. 7, 2005 Select Comm. Hearing*].

[6]  *Id.* at 125-127 (statement of Steve Longo).

[7]  *Id.*

[8]  Interview by Select Comm. Staff with Hootie Adams, Director, Emergency Management for Hancock County, MS, in Hancock County, MS (Oct. 14, 2005).

[9]  Interview by Select Comm. Staff with Bobby Strahan, Director, Pearl River County Emergency Management Agency, in Washington, D.C., via telephone from MS (Nov. 29, 2005).

[10]  Interview by Select Comm. Staff with Jeff Smith, Deputy Director, LA Office of Homeland Security and Emergency Preparedness [hereinafter Smith Interview], in Baton Rouge, LA (Nov. 7, 2005).

[11]  Interview by Select Comm. Staff with Dr. Walter Maestri, Emergency Manager for Jefferson Parish, in New Orleans, LA (Nov. 8, 2005).

[12]  *Id.*

[13]  *See* Interview by Select Comm. Staff with Rex Macdonald, Information and Technology and Communications Director, Department of Public Safety and Corrections [hereinafter Macdonald Interview], in Baton Rouge, LA (Nov. 7, 2005); *see also* Interview by Select Comm. Staff with Terry Ebbert, Director of Homeland Security for the City of New Orleans [hereinafter Ebbert Interview], in New Orleans, LA (Nov. 9, 2005).

[14]  Macdonald Interview; *see also* Ebbert Interview.

[15]  *See* Interview by Select Comm. Staff with Jacques Thibodeaux, LtC, LA Nat'l Guard [hereinafter Thibodeaux Interview], in New Orleans, LA (Nov. 3, 2005); *see* Interview by Select Comm. Staff with Mark Mouton, Col, LA Nat'l Guard [hereinafter Mouton Interview], in New Orleans, LA (Nov. 3, 2005).

[16]  *Hearing on Hurricane Katrina: Preparedness and Response by the Department of Defense, the Coast Guard, and the National Guard of Louisiana, Mississippi, and Alabama Before Select Comm.*, 109th Cong. (Oct. 27, 2005) at 194 (statement of H. Steven Blum) [hereinafter *Oct. 27, 2005 Select Comm. Hearing*].

[17]  *See* Thibodeaux Interview; Mouton Interview.

[18]  *Id.*

[19]  Interview by Select Comm. Staff with Lonnie Swain, Deputy Chief New Orleans Police Department [hereinafter Swain Interview], in New Orleans, LA (Nov. 9, 2005).

[20]  Ebbert Interview.

[21]  Interview by Select Comm. Staff with Scott Wells, Deputy Fed. Cordinating Officer, FEMA [hereinafter Wells Interview], in Baton Rouge, LA (Nov. 9, 2005).

[22]  *Id.*

[23]  Interview by Select Comm. Staff with Ralph Mitchell, LA State Police [hereinafter Nov. 4, 2005 Mitchell Interview], in Baton Rouge, LA (Nov. 4, 2005); *see also* Interview by Select Comm. Staff with Joseph Booth, LA State Police [hereinafter Booth Interview], in Baton Rouge, LA (Nov. 4, 2005).

[24]  Mitchell Interview; *see also* Booth Interview.

[25]  *Id.*

[26]  *See* Thibodeaux Interview; Swain Interview.

[27]  *See* Interview by Select Comm. Staff with Bruce Baughman, Director, AL Emergency Management Agency [hereinafter Baughman Interview], in Clancy, AL (Oct. 11, 2005); *see also*, Interview by Select Comm. Staff with David Tranter, General Counsel for AL Emergency Management Agency [hereinafter Tranter Interview], Clanton, AL (Oct. 11, 2005).

[28]  AL Emergency Management Agency EM/2000 Tracker System message  05-1992, (Aug. 29, 2005) (Doc. No. AL 002567).

[29]  AL Emergency Management Agency EM/2000 Tracker System message  05-1969, (Aug. 30, 2005) (Doc. No. AL 002600).

[30]  AL Emergency Management Agency EM/2000 Tracker System message  05-1948, (Aug. 30, 2005) (Doc. No. AL 002625).

[31]  AL Emergency Management Agency EM/2000 Tracker System message  05-1974, (Sept. 21, 2005) (Doc. No. AL 002593).

[32]  AL Emergency Management Agency EM/2000 Tracker System message  05-2096, (Sept. 5, 2005) (Doc. No. AL 002444).

[33]  *Hearing on Hurricane Katrina: The Role of the Federal Emergency Management Agency before Select Comm.*, 109th Cong. (Sept. 27, 2005) at 32, 157 (statement of Michael Brown) [hereinafter *Sept. 27, 2005 Select Comm. Hearing*].

[34]  *Id.*

[35]  Wells Interview.

[36]  *Id.*

[37]  *Id.*

[38]  *Id.*

[39]  *Id.*

[40]  *Id.*

[41]  *Id.*

[42]  Interview by Select Comm. Staff with Bill Lokey, FEMA Federal Coordinating Officer [hereinafter Lokey Interview], in Washington, DC (Dec. 2, 2005); *see also Hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana Before Select Comm.*, 109th Cong. (Dec. 14, 2005), at 229-230 (statement of Bill Lokey) [hereinafter *Dec. 14, 2005 Select Comm. Hearing*].

43 Lokey Interview; *see also Dec. 14, 2005 Select Comm. Hearing* at 229-230 (statement of Bill Lokey).

44 Interview by Select Comm. Staff with Phil Parr, Dep. Fed. Coordinating Officer, FEMA [hereinafter Parr Interview], in Washington, DC (Dec. 6, 2005).

45 Lokey Interview; *see also Dec. 14, 2005 Select Comm. Hearing* at 196 (statement of Phil Parr).

46 *See* Interview by Select Comm. Staff with LTC William Doran, Chief, Operations Division, LA Office of Homeland Security and Emergency Preparedness (LOHSEP) [hereinafter Doran Interview]; *see* Interview by Select Comm. Staff with Jim Ballou, Operations Division, LA Office of Homeland Security and Emergency Preparedness (LOHSEP) [hereinafter Ballou Interview], in Baton Rouge, LA (Nov. 7, 2005); *see also* Smith Interview.

47 Smith Interview.

48 *Id.*

49 Smith Interview; *see also* Lokey Interview.

50 *Dec. 14, 2005 Select Comm. Hearing,* Appendix: Photo Presentation Slide 26 (written statement of Jeff Smith).

51 Smith Interview.

52 *See generally* Audio recordings of Hurricane Katrina Conference Calls, Louisiana State Emergency Operations Center (Aug. 26 – Sept. 9, 2005).

53 *Id.*

54 *Id.*

55 *Id.*

56 *See* Doran Interview; Ballou Interview.

57 *Id. see also* Lokey Interview; *see also* Parr Interview.

58 *Id.*

59 *Id.*

60 *See* Doran Interview; Ballou Interview; *see also* Parr Interview.

61 *See* Doran Interview; Ballou Interview; *see also* Lokey Interview; Parr Interview.

62 *See* Doran Interview; Ballou Interview; *see also* Parr Interview.

63 *See* Doran Interview; Ballou Interview; *see also* Lokey Interview; Parr Interview.

64 *See* Doran Interview; Ballou Interview; *see also* Parr Interview.

65 *See* Doran Interview; Ballou Interview; *see also* Lokey Interview; Parr Interview.

66 Nicole Bode, *Sean Penn Gets into Rescue Act,* DAILY NEWS (N.Y.) (Sept. 8, 2005) at 6; Ryan Parry, *150 Hurricane Brits Missing,* MIRROR (London) (Sept. 5, 2005) at 1, 4 ("Last night [Sept. 04] TV's Oprah Winfrey arrived in New Orleans with 33 supply trucks.").

67 *See* Doran Interview; Ballou Interview; *see also* Parr Interview.

68 *See* Doran Interview; Ballou Interview; *see also* Lokey Interview; Parr Interview; Smith Interview.

69 *See* Doran Interview; Ballou Interview; *see also* Smith Interview.

70 *Dec. 14, 2005 Select Comm. Hearing* at 16 (written statement of Jeff Smith).

71 *Id.*

72 *Id.*

73 *Id.*

74 *Id.*

75 *Id.*

76 Lokey Interview; *see also* Wells Interview.

77 *Id.*

78 Smith Interview.

79 *Dec. 14, 2005 Select Comm. Hearing* at 16 (written statement of Jeff Smith).

80 Office of Inspector General, Dep't of Homeland Security, *A Review of the Top Officials 3 Exercise* (Rpt. No. OIG-06-07) at 1, 12 (Nov. 2005) [hereinafter *DHS IG Report*].

81 Lokey Interview; Office of the Assistant Secretary of Defense: Legislative Affairs, DOD Support for Hurricane Katrina Relief: Executive Summary Mon., Sept. 12, 2005 as of 0700 (Sept. 12, 2005).

82 Lokey Interview.

83 *Id.*

84 *Id.*

85 *Oct. 27, 2005 Select Comm. Hearing* at 134 (statement of Paul McHale).

86 *Hearing on Hurricane Katrina: Perspectives of FEMA's Operational Professionals Before Senate Comm. on Homeland Security and Governmental Affairs,* 109th Cong. (Dec. 8, 2005) at 45 (statement of Scott Wells) [hereinafter *Dec. 8, 2005 Senate Hearing*].

87 Interview by Select Comm. Staff with Bruce Jones, Captain, Coast Guard, in Washington, D.C. via telephone from New Orleans, LA (Jan. 10, 2006).

88 Lokey Interview; *see also* Parr Interview.

89 *Id.*

90 Lokey Interview.

91 *See* Audio recordings of Hurricane Katrina Conference Calls, LA State Emergency Operations Center (Aug. 26 – Sept. 9, 2005).

92 *Id.*

93 *Id.*

94 *Id.* It was not possible to determine exactly which parish official made this statement.

95 *See* Audio recordings of Hurricane Katrina Conference Calls, LA State Emergency Operations Center (Sept. 9, 2005).

96 *See generally* Ryals Interview; *see also* Dickerson Interview; Baughman Interview; Tranter Interview.

97 Baughman Interview; *see also* Tranter Interview.

98 *Dec. 7, 2005 Select Comm. Hearing* at 34 (statement of Robert R. Latham, Jr.).

99  *Id.* at 7 (written statement of William L. Carwile).
100  *See* Audio recordings of Hurricane Katrina Conference Calls, LA State Emergency Operations Center (Aug. 26 – Sept. 9, 2005).
101  *See* Audio recordings of Hurricane Katrina Conference Calls, LA State Emergency Operations Center (Sept. 9, 2005).
102  Macdonald Interview.
103  *See* Audio recordings of Hurricane Katrina Conference Calls, LA State Emergency Operations Center (Sept. 9, 2005).
104  E-mail correspondence from Clair Blong (DHS/FEMA NORAD USNORTCOM IC) to FEMA-NRCC and FEMA-HSOC Staff (Sept. 01, 2005 7:51 p.m.), citing e-mail correspondence from Nanette Nadeau (DAF NORAD USNORTHCOM), to Clair Blong, Sept. 01, 2005 (Doc No. DHS-FEMA-0028-0000685).
105  Lokey Interview; *see also* Parr Interview.
106  *Id.*
107  *Id.* It is not clear which FEMA official ultimately approved this decision.
108  Lokey Interview; *see also* Parr Interview.
109  *Dec. 7, 2005 Select Comm. Hearing* at 5 (written statement of William L. Carwile).
110  Interview by Select Comm. Staff with Tony Robinson, FEMA JFO Operation [hereinafter Robinson Interview], in Baton Rouge, LA (Nov. 10, 2005).
111  Robinson Interview.
112  Wells Interview.
113  *Id.*
114  *Id.*
115  Robinson Interview.
116  Wells Interview.
117  *Dec. 8, 2005 Senate Hearing* at 58 (statement of Scott Wells).
118  Wells Interview.
119  *Dec. 8, 2005 Senate Hearing* at 46 (statement of Scott Wells).
120  Wells Interview.
121  *Dec. 8, 2005 Senate Hearing* at 46 (statement of Scott Wells).
122  Wells Interview.
123  *Id.*
124  *Dec. 8, 2005 Senate Hearing* at 48 (statement of William L. Carwile).
125  *Id.*
126  *Dec. 8, 2005 Senate Hearing* at 61 (statement of Senator Joseph Lieberman).
127  Parr Interview.
128  *Id.*
129  *Id.*
130  *Dec. 8, 2005 Senate Hearing* at 70-72 (statement of Phil Parr).
131  *DHS IG Report* at 1, 12.

BARGE000276



*"In the early hours of Hurricane Katrina, and without regard to their own safety, and in many cases, knowing their own homes were probably destroyed, these great citizens of Louisiana began to go out, by helicopter and boat, to begin the massive search and rescue operations.*

*"Pulling residents from rooftops, out of attics, and directly from the water, the men and women of the Louisiana National Guard were there, saving thousands of lives …"*

Major General Bennett C. Landreneau
The Adjutant General, State of Louisiana
Select Committee hearing, October 27, 2005

# THE MILITARY

## The military played an invaluable role, but coordination was lacking

### Summary

The active and reserve components of the United States armed forces have a long and proud history of providing essential aid to the civilian populace of this country in the aftermath of natural disasters. There are several reasons the nation continues to rely on the military to perform this role. One is that the military is able to provide essential, life saving services more quickly and more comprehensively than any other entity when local and state response capabilities are overwhelmed, including the ability to provide helicopter and boat rescue, shelter, food, water, and medical support. Importantly, much of this capability is vested with the National Guard, and is thus an asset under the control of the governor of each respective state or territory and the District of Columbia.

As robust as the military capability is, there are limitations, many of which are highlighted in the specific findings below. The most important limit to the military's ability to manage domestic disaster response is the nation's traditional reliance on local control to handle incident response. The federal government, with the Department of Defense (DOD) serving as part of the federal response team, takes its directions from state and local leaders. Since that is our nation's tradition, DOD does not plan to be the lead agency in any disaster situation and expects to assist as local authorities request and direct. Furthermore, DOD lacks the detailed knowledge of local conditions essential to effective relief operations.

Even so, the element of the U.S. military with the longest tradition of service — the militia, now called the National Guard — is a particularly valuable asset to each state, territory, and the District of Columbia. Units can be called to active duty by the order of the governor and serve as the state's chief executive directs. Thus, the National Guard is responsive and will possess knowledge of local conditions. In contrast, the processes by which active military forces are brought to a region are lengthy and burdensome. When they arrive, these forces will not have detailed local knowledge and will be prohibited by law



NATIONAL GUARD

from performing law enforcement functions. In addition, there will be two distinct military chains of command — one for federal troops and one for National Guard troops under state command.

This dual chain of command structure, lengthy federal troop activation system, and, in the case of Katrina, devastated local authorities, contributed to a poorly coordinated federal response to Katrina. It would not be possible to anticipate all problems and prevent all the difficulties that ensued from a storm of this magnitude, but better planning, more robust exercises, and better engagement between active forces and the National Guard both before and during disaster response would have helped prevent human suffering. Two new organizations created after September 11, 2001, the Department of Homeland Security (DHS) and DOD's Northern Command, are integral parts of this process, and the growing pains were evident to the Select Committee. Northern Command is charged with managing the federal military response to disasters and DHS is in charge of the overall federal effort. Northern Command has taken strides, but needs better integration with FEMA and with the National Guard effort at disasters and emergencies. Clearly, more needs to be done.

Even though there were problems, the military played an invaluable role in helping the citizens of Louisiana, Alabama, and Mississippi respond to the devastation of Katrina and saved countless lives. Indeed, as Assistant Secretary of Defense for Homeland Defense Paul McHale testified:

"The Department of Defense's response to the catastrophic effects of Hurricane Katrina was the largest military deployment within the United States since the Civil War."[1]



NATIONAL GUARD

There is no doubt DOD resources improved the national response to Katrina. Although trained and equipped for war fighting, there is enough commonality of expertise and equipment that made for a significant military contribution to the majority of Emergency Support Functions (ESFs) of the National Response Plan. DOD is the only federal department with supporting responsibilities in each of the fifteen ESFs.[2]

The Hurricane Katrina response also reinforced the National Response Plan's designation of the National Guard as the military's first responders to a domestic crisis.

"In contrast to Hurricane Andrew (1992) in which National Guard forces constituted 24% of the military response, National Guard forces represented more than 70% of the military force for Hurricane Katrina."[3]

### Number of National Guard and active Duty Personnel in Joint Operational Area of Hurricane Katrina

| Date | National Guard | Active Duty |
|------|---------------|-------------|
| August 26 | 2,505 | n/a |
| August 27 | 2,633 | n/a |
| August 28 | 4,091 | n/a |
| August 29 | 7,522 | n/a |
| August 30 | 8, 573 | 1,000 |
| August 31 | 11,003 | 2,000 |
| September 1 | 13,113 | 3,000 |
| September 2 | 16,928 | 4,011 |
| September 3 | 22,624 | 4,631 |
| September 4 | 30,188 | 10,952 |
| September 5 | 32,760 | 15,204 |
| September 6 | 42,990 | 17,417 |
| September 7 | 45,420 | 18,342 |
| September 8 | 48,560 | 19,749 |
| September 9 | 50,116 | 21,408 |
| September 10 | 50,116 | 21,168 |
| September 11 | 48,045 | 22,028 |
| September 12 | 48,280 | 22,670 |
| September 13 | 45,791 | 22,232 |
| September 14 | 45,063 | 18,690 |

SOURCE: NORTHERN COMMAND TIMELINE

Despite the immediacy of required action, confusion created by multi-intergovernmental agency activities and dual military responses, the men and women of the armed services came when they were called. And whether on the ground, in the air, or on the water, they worked extremely hard to save and offer aid to the victims of Hurricane Katrina.

There are a number of specific areas where better coordination mechanisms could have greatly improved the execution of military support during Hurricane Katrina. The protocols associated with sharing essential information, the coordinated movement of personnel and equipment, and prior joint planning and training are vital to an effective and comprehensive response.

## Finding: The National Response Plan's Catastrophic Incident Annex as written would have delayed the active duty military response, even if it had been implemented

The National Response Plan (NRP) creates confusion about federal active duty military involvement due to unresolved tension between the possible need for active duty military assistance when state and local officials are overwhelmed, and the presumption that a governor will use his or her understanding of the situation on the ground to decide whether and when to ask for active duty military support.

A foundational assumption of the NRP's Catastrophic Incident Annex (CIA) is that local and surrounding jurisdictions' response capabilities may be insufficient as they could be quickly overwhelmed by an event. Despite this guiding assumption, NRP-CIA policy assumes that state/local incident command authorities will be able to integrate federal resources into the response effort. The NRP-CIA fails to reflect whether in a catastrophic incident, DHS should rely upon the same principle — the presence of local and state first responders for the first 48-72 hours of an emergency — as the non-catastrophic incident portion of the NRP. This failure would have delayed the federal military response and prevented full integration of the National Guard and active duty missions, even if the NRC - CIA had been involved.

Whether there exists an effective local and state response for the first 48-72 hours of a disaster is a critical element in determining the need for and extent of military involvement. Some point out that in cases of a major catastrophe, the President through the Stafford Act can designate and deploy federal resources without following NRP procedures. This view does not address if the NRP procedures in place in the event of a major catastrophe — whether or not the President chooses to federalize the response — are sound.



LOUISIANA NATIONAL GUARD

Recognizing that federal resources might be required to augment overwhelmed state and local response efforts, the NRP-CIA establishes protocols to pre-identify and rapidly deploy essential resources that are urgently needed to save lives and contain incidents. Under the NRP-CIA, normal procedures for a number of the Emergency Support Functions (ESF) may be expedited or streamlined to address urgent requirements. These include: medical teams, urban search and rescue teams, transportable shelter, medical and equipment caches, and communications gear. Standard procedures regarding requests for assistance may be, under extreme circumstances, temporarily suspended.

One of the planning assumptions of the NRP-CIA is that a detailed and credible common operating picture may not be achievable for 24 to 48 hours after the incident. As a result, the NRP-CIA calls for response activities to begin without the benefit of a complete situation and critical needs assessment. Moreover, under this Annex, notification and full coordination with states should not delay or impede the rapid mobilization and deployment of critical federal resources.

## Finding: DOD/DHS coordination was not effective during Hurricane Katrina

The Department of Homeland Security and the Department of Defense share responsibility for ensuring the security and safety of America. Since the establishment of DHS after 9/11, both departments have sought to define their roles and responsibilities.

McHale testified at a recent congressional hearing that he was the Defense Department's principal liaison with DHS.[4] A memorandum of understanding between DHS and DOD assigns 64 DOD personnel to DHS to fill critical specialties, principally in the areas of communications and intelligence. There is also a Homeland Defense Coordination Office at DHS headquarters, as well as around-the-clock DOD presence in the DHS Homeland Security Operations Center.

Despite these efforts to integrate operations, gaps remained in DOD/DHS coordination. During a BRAC Commission hearing conducted August 11, 2005, a commissioner asked Peter F. Verga, Principal Deputy Assistant Secretary of Defense (Homeland Defense), of the existence of any document issued by DHS that would help DOD determine the requirements for military assistance to civilian authorities. Verga replied: "To my knowledge, no such document exists."[5]

On August 30, an e-mail generated in the Office of the Secretary of Defense (OSD) indicated concern about the flow of information between DOD and FEMA and a lack of understanding of what was an official request for assistance and what was not.[6] Another e-mail from DHS to DOD on this day indicated Secretary Chertoff was requesting updated information on the levees in New Orleans, shelter information, and search

*Communications between DOD and DHS, and in particularly FEMA, during the immediate week after landfall, reflect a lack of information sharing, near panic, and problems with process.*

and rescue missions DOD was performing. The OSD response expressed wonder at why DHS was asking for this information, as FEMA had not yet even generated requests for these missions for DOD.[7] Communications between DOD and DHS, during the immediate week after landfall, reflect a lack of information sharing, near panic, and problems with process.[8] As time went on, and FEMA and DOD worked out Requests for Assistance (RFAs), and communications and information sharing did improve.[9]

These problems are indicative of a dispute between DOD and DHS that still lingers. DOD maintains it honored all FEMA requests for assistance in the relief effort, refusing no missions.[10] FEMA officials insist that notwithstanding the official paper trail, DOD effectively refused some missions in the informal coordination process that preceded an official FEMA request.[11] Therefore, when DOD thought a mission was inappropriate, FEMA simply did not request the assistance from DOD.

The reliance of FEMA on DOD during the Hurricane Katrina response, although not anticipated in scope, became at its most basic, a takeover of FEMA's responsibilities as the logistics manager for the federal response. According to Secretary McHale:

> During Katrina, the federal military remained under FEMA's control. It meant that the Defense Department, which had the resources to appraise the situation and prioritize its missions more quickly than could FEMA, actually drafted its own requests for assistance and sent them to FEMA, which copied them and sent them back to the Department of Defense for action.[12]

## Finding: DOD, FEMA and the State of Louisiana had diffculty coordinating with each other, which slowed the response

The process for requesting DOD active duty forces has several layers of review and is understandably not well understood or familiar to state officials who rarely would need to request DOD support. Even though state officials do not routinely work with DOD, requests for

DOD assistance are generated at the state level. These go from the state to FEMA's Federal Coordinating Officer (FCO), who in turn requests assistance from the Defense Coordinating Officer (DCO). The DCO passes these requests on to the joint task force, which routes them through Northern Command to the Office of the Secretary of Defense Executive Secretariat, to the Joint Directorate of Military Support on the Joint Staff. At each stage, the request is validated to ensure it can be met and that it is legal to provide the assistance. Once vetted, the request is tasked to the services and coordinated with Joint Forces Command, and forces or resources are then allocated to the joint task force, which in turn gets the support down to the user level by way of the DCO. This process is in place not only to satisfy DOD internal requirements, but to ensure maximum coordination with both FEMA and the state.

DOD's process for receiving, approving, and executing missions was called bureaucratic by Louisiana officials.[13] Despite the multiple layers of paperwork requirements described above, the Select Committee could not definitively determine the origin of the request for DOD to provide active duty forces. Louisiana officials said their Adjutant General made the request directly of General Russel L. Honoré — without coordinating the request through FEMA — the established process to request all federal assistance.[14] This request outside of normal channels may reflect frustration with the bureaucratic process.

Current FEMA FCO Scott Wells told Select Committee staff this direct state request to DOD was indicative of Louisiana not having a unified command during Katrina and created coordination problems during the response and recovery efforts.[15] Without a unified command, the system for requests for assistance was difficult. This difficulty was compounded by the scarcity of telephone



NATIONAL GUARD

communication capability remaining in Louisiana, resulting in a communications chokepoint at the EOC in Baton Rouge where the telephone was continuously busy.

Prior to the arrival of Honoré, senior FEMA officials were unable to get visibility on their requests. For example, former Undersecretary for Emergency Preparedness and Response and FEMA Director, Michael Brown, testified that he did not know what happened to some of his requests for assistance.[16]

While DOD officials testified in October that DOD was "leaning forward" and taking quick action prior to Katrina's landfall, FEMA officials said the DOD process appeared cumbersome.[17] Louisiana Governor Blanco's Chief of Staff Andy Kopplin said DOD was, in his opinion, slow and overly bureaucratic.[18] It appears that although DOD may have been doing the best it could with the system it had, Hurricane Katrina was of such magnitude that more rapid response was necessary. Although acknowledging that General Honoré operated outside normal FEMA-led channels, FEMA FCO William Lokey praised him for getting things done that Louisiana and FEMA could not.[19]

## Finding: National Guard and DOD response operations were comprehensive, but perceived as slow

### National Guard response

"I am particularly proud of the timeliness and magnitude of the National Guard's efforts in advance of Hurricane Katrina and our response in its immediate aftermath. National Guard forces were in the water and on the streets of New Orleans rescuing people within four hours of Katrina's passing. More than 9,700 National Guard Soldiers and Airmen were in New Orleans by the thirtieth of August. The National Guard deployed over 30,000 additional troops within 96 hours of the passing of the storm."[20] **Lieutenant General H Steven Blum, Chief, National Guard Bureau**

When reports on the catastrophic damage in Louisiana and Mississippi began to flow in, the National Guard Bureau did not hesitate to act. The NGB took

responsibility for coordinating the flow of Guard resources and personnel from all 50 states to speed up the process and increase efficient use of resources as requirements from coastal states grew beyond their ability to coordinate individual state-to-state compacts.[21] The NGB Joint Operations Center (NGBJOC) worked closely with the Army National Guard Crisis Response Cell and the Air National Guard Crisis Action Team to source and move these forces into the Gulf Coast.

Initially, this operated via a "push" methodology with supporting states pushing available forces based on requirements identified by the Adjutants General in the supported states.[22] As situational awareness improved, this gradually transitioned to a "pull" process whereby supported states submitted requests for forces through the NGBJOC to be sourced by the supporting states.

NGB operated its Joint Operations Center around the clock to coordinate all National Guard actions associated with information sharing between Office of the Secretary of Defense, the Army and the Air Force, Northern Command, state emergency operations centers, and other DOD liaison officers. This coordination supported National Guard response activities in the affected states.[23] One of the challenges of Katrina for the Department of Defense was the lack of protocols set by Northern Command for information flow between the separate DOD entities.[24]



On Tuesday, August 30, state Adjutants General reported the following troop deployments to the NGB: 5,149 to Louisiana, 2,826 to Mississippi, 1,066 to Alabama, and 753 to Florida for a total of 9,794.[25] At this time, Louisiana and Mississippi were supplemented



NATIONAL GUARD

by Guardsmen from nine other states. In position and responding were 64 Army National Guard aircraft, that reported 186 search and rescue missions performed, 1,017 patients moved, 1,910 evacuees, 91 cargo movements, and 29 food and water movements.

On August 31, at 7:21 a.m., Lieutenant General Blum and Army National Guard Director Lieutenant General Clyde A. Vaughn placed a phone call to Louisiana State Adjutant General Landreneau.[26] The following is a record of their conversation:

**General Blum:** Benny, how are things going?
**General Landreneau:** Sir, we've had a difficult night.
**General Blum:** What do you need?
**General Landreneau:** We need 5K soldiers to help out. The armory is flooded. My command and control is at the Superdome. We have a lot of undesirables here trying to cause trouble.
**General Vaughn:** Hey Benny, can we drive to the Superdome?
**General Landreneau:** No sir, we are cut off by the rising water, along with the armory.
**General Vaughn:** Where do you want us to send the incoming soldiers?
**General Landreneau:** Sir, send them to the intersection of Interstate 310 and State 10.
**General Blum:** Benny, when's the last time you got any sleep?
**General Landreneau:** Well sir, I think two days ago.
**General Blum:** Listen, you need to get some rest, you sound exhausted.
**General Landreneau:** I'll try Sir, but every time I lay down someone gets me up for a little emergency.
**General Blum:** Try and get some rest, this is an ongoing effort and we need your energy.
**General Vaughn:** Benny, we're going to push help so be ready.[27]

On Wednesday, August 31, Blum set up a teleconference with all state Adjutants General at noon to coordinate "full capabilities of National Guard to be deployed as rapidly as possible to save life and limb."[28] Every state Adjutant General reported their Guard forces deploying or available for deployment.[29]

On Thursday, September 1 at 11:30 a.m., Secretary of Defense Rumsfeld and Blum met with President Bush to discuss the National Guard response.[30] At this briefing, the President agreed with Rumsfeld that the National Guard was responding effectively to the disaster and chose not to federalize Guard troops.[31] At 1:15 p.m., Blum was asked to be part of a DHS press conference with Chertoff and McHale, to discuss federal assistance to the Gulf. At 5:30 p.m., after coordinating with McHale and Rumsfeld, Blum departed for Belle Chasse, Louisiana, and immediately met with Louisiana State Adjutant General Landreneau at the Superdome. Later that evening, Blum met with Governor Kathleen Blanco to discuss troop and resource requirements in Louisiana.[32]

Also during this time, federal officials considered ways to structure a unified command. According to Deputy Homeland Security Advisor Ken Rapuano, federal officials discussed with Blanco federalizing the National Guard.[33] President Bush ultimately offered Blanco a "Memorandum of Agreement Concerning Authorization, Consent and Use of Dual Status Commander for JTF Katrina," making Honoré, as commander of Joint Task Force Katrina, a member of the Louisiana National Guard.[34] An excerpt from a DOD letter drafted for Governor Blanco to President Bush explained how the command would have been structured under the proposal:

In order to enhance Federal and State efforts, and if you grant permission, I would like to appoint the Regular Army officer commanding the Federal Joint Task Force Katrina to be an officer in the Louisiana National Guard. I would assign him to command the National Guard forces under my command.[35]

Thus, President Bush's proposal would not have put National Guard troops under federal control. Rather, the proposal would have put Honoré under Blanco's command in the chain-of-command over National Guard troops in Louisiana. In this proposal, Honoré would

have served in two capacities — first, as the commander of federal troops ultimately answering to the President, and second, as the commander of the Louisiana National Guard, answering to Blanco. This proposal was intended to establish a single command for all military operations in Louisiana.

Blanco wrote to President Bush on September 3, declining this proposal. The Governor only agreed to the importance of creating a single military commander for federal forces that "could enhance the contribution of over 25 National Guard states currently being commanded by the Louisiana State Adjutant General."[36] As a result, federal troops remained under one command — Honoré and Northern Command, while the National Guard remained under the separate command of Landreneau and the Governor.

Administrative matters proved to be a challenge as well for National Guard troops deploying under Emergency Management Assistant Compacts (EMAC) with various states. Since these forces were activated in state-to-state agreements they were on state active duty and subject to the rules and entitlements authorized by their respective home states. This plethora of statuses made administration problematic for the National Guard, and led to a request that these forces be activated under Title 32 of the U.S. Code. This federal status permits uniform administration while allowing continued command and control by the Governor.[37] Numerous state Adjutants General suggested the National Guard Bureau request that guard troops be activated under Title 32.[38] In response, the National Guard Bureau strongly advocated for the use of Title 32:

> not only because it allowed Governors to retain control, but because it was the right thing to do for the soldiers and airmen. Each state has a different way of handling pay and benefits under State Active Duty. We had soldiers and airmen operating under 54 different payroll systems and receiving different benefits such as medical care and disability coverage. Our forces needed the protection provided by DOD entitlements.[39]

Between September 2 and September 5, the governors of Alabama, Mississippi, and Louisiana sent letters to the Secretary of Defense asking for all National Guard assets to be put under Title 32.[40] Blum then discussed putting the Guard on Title 32 status with McHale and together, they submitted a formal Title 32 request to Rumsfeld.[41] On September 7, Deputy Secretary of Defense Gordon England approved Title 32 status retroactive to August 29.[42]

On September 8, the NGB noted 50 States, two territories, and the District of Columbia had contributed forces in support of operations in Louisiana and Mississippi. National Guard forces reached peak deployment numbers for Katrina relief with over 50,000 personnel mobilized on this day.[43]

## Army National Guard

> "Four hours after landfall, Army National Guard helicopters are performing rescue missions, with 65 helicopters positioned in Florida, Texas, Louisiana, Mississippi and Alabama." **Northcom Timeline: Hurricane Katrina 1/3/06**[44]

The Army National Guard contributed heavily to the Katrina response, including the primary priority of search and rescue, evacuation, and commodity distribution. Distribution of water, ice, and food from military stockpiles in the days immediately following landfall was done at both designated and undesignated distribution sites. The 

Army Guard also provided much needed military transportation, helped clear debris from roads and residences, and provided assistance to law enforcement.[45] Unlike their active duty counterparts, the National Guard is not restricted from performing law enforcement duties under federal law, and thus rendered considerable assistance to civilian law enforcement efforts.[46] According to the daily log of Mississippi National Guard activities prepared for the Select Committee, the majority of the mission requests were for security, a mission that would only increase in the weeks following landfall.[47]

The following chart contains the number of Army National Guard present in the Gulf States.

| Date | Number of Army Guard Personnel In Katrina Joint Operational Area |
|---|---|
| August 26 | 922 |
| August 27 | 1,701 |
| August 28 | 4,444 |
| August 29 | 6,908 |
| August 30 | 9,668 |
| August 31 | 10,428 |
| September 1 | 14,284 |
| September 2 | 18,678 |
| September 3 | 24,548 |
| September 4 | 29,588 |
| September 5 | 33,608 |
| September 6 | 38,093 |
| September 7 | 39,736 |
| September 8 | 40,667 |
| September 9 | 42,164 |
| September 10 | 42,257 |
| September 11 | 42,264 |
| September 12 | 41,530 |
| September 13 | 40,928 |
| September 14 | 41,119 |
| September 15 | 38,831 |

NATIONAL GUARD BUREAU AFTER ACTION REVIEW OBSERVATIONS TIMELINE, 12/21/05

## Air National Guard

August 30: "The Air National Guard launches its first Air National Guard JTF-Katrina mission. A C-17 crew assigned to the 172nd Fighter Wing, Mississippi ANG flew its first sortie in support of Hurricane recovery. The mission lasted for 3 days. They airlifted 85 civilians from Gulfport."

***Northcom Katrina Timeline 12/22/05***



NATIONAL GUARD

The Director of the Air National Guard Lieutenant General Daniel James III, told the Select Committee the efforts of the Air National Guard during Hurricane Katrina represented "the largest military airlift operation supporting disaster relief in the United States."[48]

But the Air National Guard brought more than evacuation, rescue, and airlift capabilities to the response. The Air National Guard also has an emergency medical capability. ANG medics treated over 13,000 patients by September 19.[49] Expeditionary Medical Support (EMEDS) units provided medical personnel and equipment to support up to 10 major trauma surgeries without re-supply.[50] The Air National Guard also has a large civil engineering capability in its Rapid Engineer Deployable Operational Repair Squadron Engineer (RED HORSE) Squadrons.

| Date | Number of Air Guard Personnel In Katrina Joint Operational Area (includes Air Guard in transit from outside wings transporting personnel, supplies and equipment) |
|---|---|
| August 26 | 8 |
| August 27 | 932 |
| August 28 | 932 |
| August 29 | 933 |
| August 30 | 956 |
| August 31 | 960 |
| September 1 | 972 |
| September 2 | 2,464 |
| September 3 | 3,998 |
| September 4 | 4,596 |
| September 5 | 6,613 |
| September 6 | 5,770 |
| September 7 | 5,952 |
| September 8 | 5,735 |
| September 9 | 4,347 |
| September 10 | 4,581 |
| September 11 | 4,125 |
| September 12 | 4,109 |
| September 13 | 4,112 |
| September 14 | 3,477 |
| September 15 | 3,512 |

NATIONAL GUARD BUREAU AFTER ACTION REVIEW OBSERVATIONS TIMELINE, 12/21/05

Some of the highlights of ANG activity in the first few days following landfall include:

| August 29 | Aero-medical Evacuation Squadron positioned to respond in Mississippi 50 ANG medical personnel at Naval Air Station New Orleans |
|---|---|
| August 30 | The ANG launches its first Air National Guard JTF Katrina mission. A C-17 crew assigned to the 172nd FW, Mississippi ANG flew its first sortie in support of Hurricane recovery. The mission lasted for three days. |

They airlifted 85 civilians from Gulfport. All ANG Airlift and Tanker units put on alert and places all air crew on Title 32 status

Texas ANG starts reconnaissance, activates search and rescue personnel and security forces to Louisiana

ANG establishes Tanker Airlift Control Center

August 31 — ANG sources a NORTHCOM request for ANG Combat Weather Team to New Orleans

ANG reports 700 ANG Civil Engineer and 350 Red Horse personnel available

Tennessee and Oklahoma ANG help evacuate 143 patients from the New Orleans Veterans Hospital

The 259th ATCS Louisiana Air National Guard deploys their MSN-7 Mobile Control Tower to the Superdome[51]

September 1 — First Air Force, composed of ANG wings across the country, is tasked to lead for planning, orchestrating and overseeing all Air Force support to Joint Task Force Katrina.[52] Gulfport, Mississippi is designated the main operating base for sustained ANG Hurricane relief efforts, including evacuation.

ANG Expeditionary Medical Support (EMEDS) units, civil engineering units arrive in Mississippi and New Orleans

On this day ANG Para-rescuemen are credited with 48 air saves and 250 boat saves in New Orleans. ANG Combat Controllers provide air movement for 750 helicopter sorties where 3,000 people are evacuated. From September 1 through 9, ANG from Alaska and Oregon pushed through 3,169 military and civilian helicopter sorties at multiple landing zones in New Orleans. ANG aircraft and crew would fly 2,542 sorties, airlifting 21,874 people and 11,110 pounds of cargo in support of hurricane relief.[53]

September 2 — 149th Air National Guard Surgical Team established field hospital in parking lot adjacent to New Orleans Convention Center.[54]

The National Guards of other states also played key roles in the Hurricane Katrina response. Through Emergency Management Assistance Compacts (EMAC), Louisiana and Mississippi were able to request and receive assistance from scores of states from across the country. While the EMAC process is a direct state-to-state relationship, both FEMA and the National Guard Bureau participated in negotiations to facilitate the identification and procurement of specific types of assistance from other states. There was a consensus among federal, state, and local officials that EMAC worked well. These troops served in Title 32 status, and were therefore commanded by the respective Governors of Louisiana and Mississippi and paid with federal funds.

## Louisiana

The Louisiana National Guard conducted roving patrols, manned checkpoints, and supported the New Orleans Police Department in the parishes. The Army National Guard also secured key infrastructure sites, including levees,[55] and provided support for general purpose shelters and special needs shelters with medical personnel. One of the Guard's largest missions was to provide security and other support at the Superdome. Approximately 250 Guardsmen were at the Superdome,  searching entrants for weapons, providing them with food, water, and medical attention, and attempting to maintain law and order.

After Katrina hit, the National Guard was deeply involved in search and rescue operations to save people after the levees breached and many areas flooded.[56] Their role included both helicopter and boat sorties to rescue people from roofs and floodwaters and take them to

high ground. They were also part of the more deliberate post-flood activities to go house to house and search for survivors and victims.

The National Guard also had a law enforcement mission beyond the shelters (e.g., the Superdome) to help restore law and order through street patrols and other activities in support of the overtaxed New Orleans Police Department.[57] One of the National Guard's law enforcement missions was to secure the Convention Center and generally maintain order there as occupants were evacuated. They provided food, water, and medical treatment, and searched evacuees as they boarded buses. Because the National Guard was never federalized, they could fully participate in all law enforcement missions.



NATIONAL GUARD

Finally, the National Guard played a key role in logistics and transportation, using their high-clearance vehicles and helicopters to ferry personnel and supplies into and out of flooded areas.[58] For example, they transported and distributed food into the Superdome and supported the evacuation of its occupants.

The Louisiana National Guard received much assistance from many states across the country through EMAC.[59] Examples of the specific deployments included 2,426 infantry from Pennsylvania, 1,016 military police from Puerto Rico, 580 security troops from Michigan, 500 support troops from Arkansas, 535 security troops from Massachusetts, 350 security forces from Tennessee, 315 transportation and logistics troops from Alabama, 310 maintenance troops from Illinois, 250 air traffic controllers from Texas, and 221 truckers from South Carolina. In total, Louisiana made 451 EMAC requests, and 29,502 National Guard troops responded from other states to undertake these missions.

## Alabama

The Alabama National Guard headquarters began monitoring Hurricane Katrina on August 23 and actively engaged in discussions with the National Guard Bureau on August 25. When Katrina became a Category 3

hurricane on August 27, the Alabama Guard increased staff at the state emergency operations center. EOCs along the Alabama Coast for the 20th Special Forces Group, 711th Signal Battalion, and 16th Theater Support Command were opened and manned. When FEMA designated Maxwell Air Force Base as a federal staging area for supplies, the Alabama National Guard sent troops there to help prepare for distribution.[60] Governor Riley declared a state of emergency on August 28, which formally activated the state National Guard.[61]

On August 29, the Alabama Emergency Management Agency (AEMA) received requests for commodities from Mobile, Baldwin, Butler, and Washington counties, and the Alabama Guard took control of all recovery and relief operations in coastal Alabama to include county distribution points. When AEMA requested special boat teams for search and rescue, and security, the Alabama National Guard responded. The Guard also performed damage assessment tasks. The Alabama National Guard had developed mission specific force packages for emergencies like hurricanes, snow and ice storms, and chemical and biological attacks. These force packages include security forces, engineers, medical, communications and logistical equipment, and trained personnel.[62]

The Alabama National Guard deployed approximately 750 soldiers and airmen within Alabama, but also provided 2,000 soldiers to locations in Mississippi and Louisiana in response to immediate EMAC requests for support on August 29 and 30.[63]

## Mississippi

On August 29, in the rear area operations center in Jackson, it was recorded that the Mississippi National Guard had activated 2,736 Army National Guard soldiers, and 1,003 Air National Guard members to provide security, search and rescue, and debris removal operations.[64]

In his testimony before the Select Committee, Mississippi Adjutant General, Harold A. Cross, made the following observations:

> During and immediately after landfall,
> National Guard search and rescue operations
> began on the Gulf Coast. My personnel night



NATIONAL GUARD MAP - 06 SEP 05

MISSISSIPPI NATIONAL GUARD

EMAC agreements negotiated with 40 states creating a division-sized force within 96 hours eliminated need for Title 10 forces. The first out of state National Guard units to arrive in Mississippi were units from Alabama. 483 soldiers arrived on 30 August with an additional 359 soldiers arriving on 31 August. This Alabama National Guard Force consisted of combat engineers, military police, security forces, and communications assets. Their quick response was due to the fact that the Alabama National Guard was already postured to respond to Katrina in the event it impacted Alabama. The personal relationship between the adjutants general of the two states allowed for the rapid response of forces.[68]

ground reconnaissance on the 29th and aerial reconnaissance early the next morning clearly revealed a disaster of unprecedented proportion all along the Gulf Coast of Mississippi and significant damage as far as one hundred and fifty miles inland. After reporting this initial surveillance to Governor Barbour, I immediately directed my rear operations center to activate all remaining available Mississippi National Guardsmen and to execute the movement of pre-planned assistance from other states. In addition, I requested assistance through the National Guard Bureau from other states, up to division sized strength. Accordingly, the 4,533 Mississippi National Guard soldiers and airmen were ultimately augmented by 11,839 National Guard personnel from 36 states under EMAC agreements.[65]

The Mississippi National Guard personnel on standby at Camp Shelby moved forward after the storm had passed to a scene of unbelievable destruction. Hurricane Katrina was by all accounts the worst storm in nearly a century, but Cross was prepared.[66] As soon as the storm abated somewhat, Mississippi National Guard personnel deployed from Camp Shelby into the devastated Mississippi coast to provide security, search and rescue and debris removal operations.[67] Even so, Cross recognized his own resources would be insufficient to assist along the whole coast of the state and he needed help from the National Guard of other states. In that regard, General Cross said:

MISSISSIPPI NATIONAL GUARD

DAILY RECAP

| DATE | MBARNG | MSANG | TOTAL MSNG | OUT OF STATE | TOTAL DAILY SUPPORT |
|------|--------|-------|------------|--------------|---------------------|

SOURCE: MISSISSIPPI NATIONAL GUARD

As of: 10/11/2005.20

The initial requests for assistance from Cross were through personal relationships with other State Adjutant Generals.[69] General Blum, held a video teleconference on August 31 to solicit assistance from each of the 54 states and territories for both Louisiana and Mississippi. States responded rapidly to the urgent need and decided to worry about the authorizing paperwork later. In most cases, EMAC documentation followed after individual states provided the assets requested by Louisiana or Mississippi.[70] As noted earlier, all National Guard troops were retroactively placed in Title 32 status on September 7 by Deputy Secretary of Defense England.[71]

## Out of state National Guard support in Mississippi through EMAC process

| State | National Guard Assistance |
|---|---|
| Alabama | 1,500 Security Forces, 7 Tactical planners and engineers, 2- CH47s with crew for S and R, 2-UH60s with crew for S and R, 300 Sleeping Bags and 80 cots, Engineering Brigade, MP Battalion, 1,450 personnel for TF, 37 personnel from Air Refueling Wing, CBCS Communications support, Ministry Team, Ground Safety Manager, EMEDS personnel |
| Arizona | Family Assistance Personnel, Medical support |
| Arkansas | 100 soldiers, MP Company, 25 Heavy Trucks with 75 soldiers |
| California | Fire Team, Aircraft Maintenance personnel, medical support personnel |
| Colorado | MP Company, 50 Signal company personnel |
| Delaware | MP Security Company, 100 personnel to assist command and control, EMEDS personnel |
| Florida | 4-UH60s, rescue teams, infantry battalion, 50 ambulances with crew, 15 cooks, OH-58 with crew, logistics aides, safety personnel, aircraft maintainers |
| Georgia | 2- UH1s, 2 CH47s with crew, 1,500 Task Force personnel, Fire Vehicle, Cable/Copper Repair personnel |
| Idaho | Refuelers |
| Illinois | Security Forces, EMEDS personnel, public health personnel |
| Indiana | 2,300 soldiers, 40 tankers |
| Iowa | Medical Support Battalion |
| Kansas | Air Refueling personnel, Emergency Medical teams, Guard Fire Fighters, Ministry Team, Internist, 25 EMEDs personnel and supplies |
| Kentucky | 50 Heavy trucks with 150 soldiers, 24 person refueling team, food service personnel, Medical Preventative Medicine personnel, communications and LNO personnel |
| Kentucky | Water Purification Equipment with Operators, Ministry Team, medical personnel |
| Maine | Preventative Medicine Team, Cable repair personnel, Security personnel |
| Maryland | MP Security Company, 104 Personnel for S and R and ice and water distribution |
| Massachusetts | Medical Officers |
| Michigan | MP Security Company, construction engineers, EMEDS personnel |
| Minnesota | Ministry Teams, Mental Stress Team, medical support |
| Missouri | 2-C130 Aircraft with Crew, medical personnel |
| Montana | Public Affairs Team |
| Nebraska | Security Forces, Priest, Ground Safety Manager, ARW personnel |
| New Hampshire | EMEDS personnel, bioenvironmental personnel |
| New Jersey | Medical Support Personnel, bioenvironmental personnel |
| New York | 8 UH6s, 2 CH7, 6 UH1 and 130 personnel, Rabbi, EMEDS personnel |
| North Dakota | Water Purification Equipment with Operators, 72 personnel from fighter wing |
| Ohio | 119 soldiers for debris removal, etc., 1,300 Task Force soldiers, aviation assets, generators, 3 OH-58 with crew, aircraft maintenance personnel, food service personnel, EIS Management Team, tactical support personnel, EMEDS personnel, Air wing personnel |
| Oklahoma | 25 personnel/Air Mobility, Fire Vehicle, Medical Support personnel |
| Oregon | Chief of Safety, Medics, EMEDS personnel |
| Pennsylvania | SatCom with personnel, AVC ATS Company, Food Services, Medical Support Personnel, EMEDS personnel |
| Puerto Rico | Air wing personnel |
| Rhode Island | Units to load and unload aircraft |
| South Carolina | Bioenvironmental Engineer |
| Tennessee | ATS Co. with Tower, TTCS, 3 MP Security Companies, fixed wing support teams, engineering battalion, logistics control cell, Mobile Emergency Operations Center, EIS Teams, 26 personnel from air refueling wing, aviation assets, Forklift loader, Fire Vehicle, EIS Management Team, EIS Repair Team, 26 Security personnel |
| Utah | Ministry Teams |
| Vermont | Bioenvironmental personnel |
| Virginia | 447 Light Infantry for security and recovery, EMEDs personnel |
| West Virginia | Airlift Wing support |

| Wisconsin | EMEDs personnel |
|---|---|
| Wyoming | Medical Support, Bioenvironmental Engineer |

MISSISSIPPI EMAC COST TRACKER DATED OCTOBER 10, 2005

Cross also coordinated closely with all other state entities involved, including the Mississippi Department of Public Safety, in order to maintain a coordinated law enforcement effort. Cross noted that coordination between Guard engineering companies with various utility companies to clear roads and restore electricity and phone services was instrumental in getting power restored to the majority of coastal counties well in advance of projections.[72]



The National Guard provided immediate and continued support to the people of Mississippi during Hurricane Katrina.[73] National Guard accomplishments included: 3,900 miles of roads cleared of fallen trees and debris; 1.2 million meals ready to eat (MRE) and 1 million gallons of water delivered via air (over 2,000 missions); 39 million pounds of ice, 56.4 million gallons of water, and 2.7 million MREs distributed to central distribution points in 37 counties; 200 presence patrols and more than 600 search and rescue missions conducted; law enforcement assistance provided, resulting in 72 arrests; aircraft logged over 1,995 hours and delivered 2.57 million pounds of cargo. Emergency medical assistance from the Air National Guard assisted hundreds of Mississippi citizens.

## Department of Defense response

The day after Katrina made landfall, England led an early roundtable session to get damage assessments for DOD facilities and review resources that may be required of DOD to support hurricane relief.[74] The Secretary of Defense was briefed on DOD's response and Northern Command issued several more alerts in anticipation of requests for assistance.

While Honoré arrived on Wednesday, August 31, as the commander of the newly established Joint Task Force Katrina to supervise federal military operations, the first active duty Navy and Air Force personnel arrived in Louisiana late Thursday, September 1, and active duty Army personnel started to arrive early Friday, September 2.[75] These active duty personnel helped the Louisiana National Guard and the New Orleans Police Department (NOPD) control the crowds during the evacuation of the Superdome, maintain law and order in the streets, and eventually conduct secondary searches, going door to door looking for survivors or bodies and assisting those who had not yet escaped.



The support provided by DOD was invaluable, according to a wide variety of officials.[76] DOD active duty forces were involved in search and rescue, but generally after the initial rescues from roofs by helicopters and boats. They were involved in the more deliberate search activities where mixed teams, to include National Guard, law enforcement, Coast Guard, and DOD worked together going house to house and searching for hold-outs and dead bodies.[77]

DOD also took over FEMA's logistics distribution functions. According to FEMA Acting Director for Response during Hurricane Katrina, Edward G. Buikema, FEMA initially approached DOD about this mission on Thursday, September 1.[78] On that date, Colonel Richard Chavez informed FEMA Acting Director of Operations Ken Burris the request "would require a Secretary DHS [sic] to Secretary DoD call to initiate and significant General Counsel input."[79] The formal Mission Assignment was prepared the next day at 6:15 p.m.[80] and by 7:41 p.m., McHale informed DHS Deputy Secretary Michael P. Jackson that "SecDef agreed to support your RFA for broad logistics support" and that DOD was "working on the specific language — and a planning staff to implement it."[81] Execution of the mission apparently began the next day, September 3, according to written orders signed by Principal Deputy Secretary of Defense for Homeland Defense Pete Verga.[82]



AP PHOTO/DAVID J. PHILLIP

In the same e-mail to Jackson, McHale also said, "We may actually be able to do more than you have requested."[83] This apparently led to further meetings and, according to McHale, an additional seven approved mission assignments on Monday, September 5.[84]

Although Buikema and his FEMA colleague Deputy Director of Response Michael Lowder expressed their view that DOD acted slowly on the logistics request,[85] the record reflects a prompt decision, followed by final resolution of details involving a billion dollar mission assignment. FEMA officials' perception of a slow response from DOD reflected that they were (1) unaware of the planning already under way (as reflected in McHale's e-mail) before final details were resolved and (2) possibly an unrealistic expectation that acceptance of such a massive mission would result in immediate action. This was not, however, just a single airlift of needed supplies — it was "planning and execution for the procurement, transportation and distribution of ice, water, food, fuel and medical supplies in support of the Katrina disaster in Louisiana and Mississippi."[86]

This is not to say that all went smoothly with DOD support. For example, DOD apparently refused to allow the shipment of MREs on FEMA-provided transportation.[87] The Defense Logistics Agency (DLA) apparently claimed DLA could only ship MREs on "DOD approved carriers" and DLA "would arrange transportation within the next 24-48 hours." The September 4 e-mail lamenting this problem ended: "SEND MRE'S NOW."

## Finding: The Coast Guard's response saved many lives, but coordination with other responders could improve

On August 29, the day Katrina made landfall, the U.S. Coast Guard Sector New Orleans Incident Management Team was stood up in Alexandria, Louisiana.[88] Outside of the forecasted area of impact, Coast Guard Disaster Assistance Teams from Ohio, Kentucky, St. Louis, Pittsburgh, and Miami were pre-positioned to the region to respond as soon as conditions permitted.

During normal conditions, there are 15 helicopters assigned within the Eighth Coast Guard District, along with four fixed-wing aircraft and 16 cutters.[89] Within hours of Hurricane Katrina's passing, the Coast Guard surged 31 cutters, 76 aircraft, 131 small boats, and over 4,000 personnel into the affected areas.

The first Coast Guard rescue occurred within a few hours after the storm made landfall.[90] An HH-65 helicopter working out of the Coast Guard's Air Station New Orleans located at Naval Air Station Bell Chasse rescued two adults and one infant, operating in 60-knot winds.

On August 30, all pre-positioned Coast Guard aircraft began conducting search and rescue missions, damage over-flight assessments, and logistical support, and the medium endurance cutter DECISIVE arrived offshore to conduct damage assessment of oil platforms.[91]

To maximize the number of missions that could be flown, all of the helicopters refueled at Air Station New Orleans, which was also in charge of Coast Guard air asset coordination.[92] When crew changes were to occur, the Mobile-based aircraft would return to Mobile. Tasking orders, such as directing a helicopter to pick up a particular group of people, were provided when the aircraft was located at a base, as well as any time communications were possible. Nevertheless, specific tasking orders were not necessary in the initial days after the storm because of the large volume of survivors throughout the region. Helicopters were able to rescue people without needing instructions.

### Search and Rescue Communications

Communications were limited in many respects. Vital communications infrastructure was destroyed by the storm, and it was not possible for the Aviation Training



NATIONAL GUARD

Center or Air Station New Orleans to communicate directly with the operations centers in the rescue area, nor could the Emergency Operation Center (EOC) in Baton Rouge be contacted.[93] When aircraft left their base in Mobile, communication was limited to aircraft-to-aircraft transmissions; pilots were unable to speak with the Aviation Training Center.[94] When aircraft flew over New Orleans, communication was possible with Task Force Eagle (the National Guard command center for air operations at the Superdome) and occasionally with Air Station New Orleans.[95] Air Station New Orleans lost all power and telephone lines were inoperable.[96] When power was restored, however, it was intermittent at times and continued to limit communications.[97] By 5:00 p.m. on the first day of rescue operations, communication became more difficult because of the large volume of radio traffic in the area.[98] Boats were able to communicate via limited range low-level radios, but these did not afford continuous coverage for airborne assets.[99] On Monday August 29, a Coast Guard C-130 arrived to provide communications assistance; it could occasionally patch air communication to land lines (if operational) in St. Louis, Missouri and Alexandria, Louisiana (where Sector New Orleans had set up operations).[100]

For the first three days, no air traffic control was available, and pilots relied solely on internal pilot-to-pilot communications and standardization of training to maintain order in the airspace.[101] The Coast Guard practice of standardization allowed for easy communication between pilots who had never flown together before, and this proved to be critical to the success of search and rescue missions in the first days without air traffic control. A U.S. Customs and Border Protection P-3 aircraft arrived four days after landfall to provide air traffic control and ground communication.

On the day of the storm, helicopter crews monitored weather reports to determine locations in the region where the weather would permit them to begin rescue flight operations.[102] Subsequently, crews proceeded to areas located at the edge of the storm.[103] The first rescue occurred in 60-knot winds in Port Sulphur, Louisiana at approximately 3:00 p.m.[104] One helicopter flew to Air Station New Orleans to drop off three personnel to clear the field of debris, activate the generators, and permit operations to resume at that location, while others conducted rescues in Grand Isle, Louisiana and St. Bernard Parish, Louisiana.[105] At approximately 5:00 p.m., Coast Guard helicopters from Mobile and Houston began rescuing people in New Orleans.[106] At that time, the Coast Guard only rescued people from immediate danger and brought them to higher ground because of the tens of thousands of people in immediate danger and the limited fuel capacity of each helicopter.[107] In the case of people with medical conditions which required treatment, helicopters transported them to the Louis Armstrong New Orleans International Airport (New Orleans Airport).[108] Central drop-off locations were not set up until the next day, when large areas that were dry and close to operations were able to be identified.[109]

## Conduct of Coast Guard search and rescue operations

Upon the completion of each mission and arrival on the ground at either the Mobile or New Orleans Air Stations, pilots briefed the Operations Commander on their missions, including the number of people rescued.[110] Given the time constraints of performing rescues, the Coast Guard did not record the names of those rescued, nor the locations where they were deposited.[111] While the immediate life saving measures taken by the Coast Guard crews were laudable, the failure to systemically communicate the location of the rescued citizens to local authorities resulted in some rescued persons being effectively stranded, lacking food, water, and shelter for extended periods. There was no way to confirm whether survivors would remain in these locations, and specific information concerning a number of those rescued was communicated to other entities (EOCs and other Coast Guard stations) whenever communications were possible.[112]

Within 24 hours of the storm, surface operations (boats) were conducted out of Zephyr Field (a local professional baseball stadium). According to the Coast Guard, a unified command for surface operations was established at Zephyr Field with the Coast Guard, FEMA,

*While the immediate life saving measures taken by the Coast Guard crews were laudable, the failure to systemically communicate the location of the rescued citizens to local authorities resulted in some rescued persons being effectively stranded, lacking food, water, and shelter for extended periods.*



STATE OF LOUISIANA

and the Louisiana Department of Wildlife and Fisheries.[113] A Coast Guard officer dispatched vessels. Crews returned to the site for food and rest.

On the second day of operations, August 30, drop off locations were chosen by helicopter pilots and established at the Superdome, Lakefront Airport, the "Cloverleaf" (an area along I-10), the University of New Orleans, Zephyr Field, and New Orleans Airport.[114] This information was communicated to the FEMA representative at Zephyr Field, who coordinated resources to assist survivors at each location. Notwithstanding this effort to coordinate, the hand-off was not effective, leaving many "rescued" persons without sustenance or shelter for extended periods. In addition, as larger numbers of survivors were placed at each location, requests were made for larger Department of Defense and National Guard helicopters, including MH-53s (from the USS Bataan) and CH-47s to shuttle them from dry land islands to locations accessible by bus for further evacuation; the helicopters began arriving on the same date.

On August 31, a Coast Guard liaison officer arrived at Task Force Eagle (the National Guard command center for air operations) at the Superdome.[115] The National Guard also received rescue requests at this site, and tasking orders would be passed to Coast Guard helicopters that arrived at that location.

The first heavy lift aircraft to arrive at the New Orleans Airport was a Coast Guard C-130.[116] It brought water and food to the area on approximately August 31, which was subsequently forwarded to Zephyr Field, the Superdome, and Air Station New Orleans to be distributed by helicopters on their return flights to flooded areas. The Coast Guard initiated this effort because it recognized that victims placed on higher ground "islands" had not yet been completely evacuated and required water and food, as temperatures during the day were nearing one hundred degrees. Once again, the effort was laudable but fell short of the need, as some evacuees remained in distress.

On the afternoon of September 1, additional communications were re-established when Coast Guard Cutter SPENCER arrived on-scene in New Orleans.[117] SPENCER took tactical control of Coast Guard surface forces in New Orleans and, on September 2 established a Vessel Traffic System (VTS) to control marine vessel traffic in the area. The SPENCER's communications capabilities include satellite, medium frequency, high frequency, and very high frequency voice and data communications (surface – to - surface communications, and surface - to - air voice and data links).

On September 2 and 3, Joint Field Operations (JFOs) were established.[118] In Louisiana, however, there were Coast Guard and urban search and rescue personnel at



AP PHOTO/DAVID J. PHILLIP, POOL



the state EOC in Baton Rouge before the formalized JFO was established. A cadre of Coast Guard personnel from Port Arthur, and others, who had been evacuated from New Orleans, was already in the EOC handling search and rescue coordination.

By September 20, the Coast Guard had organized and coordinated the rescue or evacuation of 33,544 people.[119] At the height of Katrina operations, over 33 percent of Coast Guard aircraft were deployed to the affected region.[120] Despite coordination difficulties, the Coast Guard's efforts were heroic and saved countless lives.

# Finding: The Army Corps of Engineers provided critical resources to Katrina victims, but pre-landfall contracts were not adequate

The Army Corps of Engineers ("USACE" or "Corps"), another active duty military unit, provided critical resources to respond to Hurricane Katrina. The Corps provided relief and response support to FEMA in accordance with the National Response Plan as the lead federal agency for public works and engineering (Emergency Support Function #3). Some of the Corps' specific missions related to Hurricane Katrina included providing water and ice to regional warehouses, providing emergency power, providing emergency roof repair, and removing debris.

During Katrina and the aftermath, USACE provided 112 million liters of water, 232 million pounds of ice, installation of about 900 large generators, repairs to 170,000 roofs, and removal of a million cubic yards of debris.[121] USACE had pre-awarded competitively bid contracts for all of these functions to allow quick deployment of resources prior to and immediately after an event.[122] These pre-awarded contracts are part of USACE's Advanced Contracting Initiative (ACI) which has been in place for six years.

Due to the magnitude of the destruction, USACE pre-awarded contracts for roofing repair and debris removal were not adequate, and additional contracts were advertised and awarded using shortened but competitive procedures.[123] In addition, FEMA tasked USACE to provide structural safety evaluations of low-rise and non-public buildings in New Orleans and other locations. To date, USACE has completed assessments of 47,800 of an estimated 80,000 to 100,000 units.[124] Given the large number of uninhabitable or unusable buildings, FEMA has recently tasked USACE with demolition of buildings.[125] To date, USACE is still developing estimates and conducting planning for the demolition mission.

# Finding: The Department of Defense has not yet incorporated or implemented lessons learned from joint exercises in military assistance to civil authorities that would have allowed for a more effective response to Katrina

The Department of Defense participates in several command and control exercises involving responses to domestic emergencies, ranging from the combatant command level to the national level.[126] In the past these have included Northern Command exercises UNIFIED DEFENSE (2003,2004), ARDENT SENTRY (2005), DETERMINED PROMISE (2003, 2004), VIGILANT SHIELD (2005), DILIGENT ENDEAVOR (2003), DILIGENT WARRIOR (2004), NORTHERN EDGE (2003), SCARLET SHIELD (2004), DARK PORTAL (2004) and TOPOFF (2003, 2005). Many of these exercise scenarios were designed to overwhelm local and state assets to evoke a response under the National Response Plan, including the employment of DOD assets.

Hurricane Katrina was a test of the recently established (post - 9/11) United States Northern Command, and its ability to oversee and coordinate the largest use of active duty and Guard military in a domestic action in recent

history. Although Northern Command has conducted numerous exercises with the National Guard in state and local exercises, the lessons learned during these events were not consistently applied to the military response to Katrina.

NORAD/NORTHCOM ARDENT SENTRY 05 was a combined exercise with TOPOFF 3, conducted April 4-9, 2005.[127] The overall goal of this exercise was to conduct a joint service and interagency exercise that would provide realistic training opportunities for all agencies in incident management. Canadian forces also participated as part of the North American Aerospace Defense Command (NORAD). Another objective was to plan, deploy, and employ DOD forces in support of civilian authorities' operations in accordance with the National Response Plan and DOD policy. The lessons learned during this exercise offered a preview of problems that would surface again during the Katrina response. Some of Northern Command's recommendations for improvement were as follows:

> Conduct strategic effects-based planning between DOD and DHS for each Incident Annex in the National Response Plan.

> Investigate requirement for integrated "National Strategic Communications Plan" in coordination with interagency partners.

> Develop national capability to electronically produce, staff, validate, approve and track mission accomplishment of mission assignments.

> Determine requirements for a "National Common Operating Picture" in coordination with DHS, Department of Justice, and other Federal agencies.[128]

TOPOFF 2 also contained findings that, if corrected, would have enhanced the federal response to Katrina.[129] From uncertainty between federal and state roles to the lack of robust and efficient local emergency communications and the need to improve data collection from military agencies, TOPOFF 2 findings are telling predictors of some of the challenges the military faced.

Northern Command predicted in its ARDENT SENTRY/TOPOFF 3 Master Executive Summary, that "this exercise success is due in part to scenario constraints that could provide a false sense of security and lack of incentive to initiate or aggressively participate in the integrated

regionally-based planning that is so essential."[130] Just over four months later, Katrina struck.

After Katrina, DOD officials reflected on the value of prior exercises. McHale commented that government training exercises "have not been sufficiently challenging."[131] Other Pentagon officials noted that in many cases, top officials, from Cabinet-level secretaries and generals to governors and mayors, do not participate and these simulations do not last long enough.[132] The Government Accountability Office, in a November 29 briefing also noted key players are not always involved in drills, the lessons from previous training and exercises are not retained, and the training and exercises are more targeted at terrorist events than natural disasters.[133]

The lack of implementation of lessons learned and the training necessary to learn them resulted in less than optimal response by all military components. Oxford Analytica took the following view:

> After Katrina made landfall, the NORTHCOM-led military support mission suffered many of the same planning failures, unclear lines of authority, communication breakdowns, and shortages of critical resources that were experienced by the civilian agencies, such as the Department of Homeland Security.[134]

## Finding: The lack of integration of National Guard and active duty forces hampered the military response

"Title 10 versus 32 versus 14…again."[135]
**Coast Guard Vice Admiral Jim Hull, NORTHCOM**

"Advance planning between active-duty personnel and the Guard is vital – in contrast to the cooperation that . . . unfolded during Katrina 'on the fly' – albeit by 'superb leaders'."[136] **Washington Post, October 13, 2005, quoting Assistant Secretary of Defense Paul McHale**

In a speech on October 21, McHale indicated planning by the National Guard was not well integrated with the



NATIONAL GUARD

overall military, and the Joint Staff did not have a grasp of the National Guard's plans.[137] Interestingly, a September 14 e-mail originating in the Joint Chiefs of Staff (JCS) offices commended the Bureau's efforts to provide operational information to JCS.[138] McHale stated that National Guard plans were not well integrated with overall DOD plans. The Joint Staff acknowledged that the NGB was providing timely and accurate reports, but Northern Command was apparently more focused on active operations and therefore did not have a well informed view of the significant National Guard effort in the region. The Joint Staff e-mail went on to say that Northern Command's briefings are too active duty focused and lack unity of effort.[139] In the same speech, McHale said DOD did not understand how to integrate with the plans of the National Guard.[140] The reverse was also true, despite past lessons learned.

In the TOPOFF 3 exercise in April 2005, it was clear the National Guard and the National Guard Bureau would be part of a large scale emergency response. The New Jersey National Guard noted that "although TOPOFF 3 began as an exercise with minimal National Guard involvement, it quickly evolved into one that heavily relied upon Guard participation, and identified a need early on for assistance from the National Guard Bureau."[141]

At the time of Katrina landfall, however, the National Guard did not have adequate knowledge of DOD planning guidance developed at Northern Command, including concept of operations plans and functional plans for military support to civilian authorities.[142] The National Guard After Action Report on TOPOFF 3 found that numerous members of the Guard operational leadership did not have adequate knowledge of these plans.[143]

At an after action meeting of state Adjutants General, the Adjutants General agreed coordination between active duty and National Guard in the response operation needed to be improved. According to the meeting report, "There was a lack of coordination of Joint Task Force Katrina operation with the National Guard Headquarters in the supported states."[144]

The National Guard Bureau also reported lines of command, control, and communications lacked clear definition and coordination between federal military forces and National Guard forces operating under state control, resulting in duplicate efforts. For example, elements of the 82nd Airborne Division moved into a sector already being patrolled by the National Guard.[145] The meeting report also stated:

> Federal troops often arrived prior to being requested and without good prior coordination. This resulted in confusion and often placed a strain on an already overburdened disaster response system. A specific case in point was the Marine Corps amphibious units which landed in Mississippi without transportation, requiring National Guard transportation assets to move them to New Orleans increasing the burden on an already stretched support system.[146]

The National Guard 38th Infantry Division, composed of smaller Guard units from many states, reported they never formally coordinated with Northern Command.[147] Members of the 82nd Airborne Division, the first active duty personnel to arrival in New Orleans on September 3, had a similar experience. In a September 9 e-mail, a soldier in the 82nd indicated coordination of evacuation efforts in New Orleans was very poor.[148]

> We're conducting boat patrols using Coast Guard boats but coordination is very difficult . . . . National Guard seems to move in and out of sectors doing what they want then just leaving without telling anyone . . . . And this is in 4 days of operations.[149]

Despite the lack of integration in Washington, D.C. and in Louisiana, active and reserve forces worked well together in Mississippi. Notably, the Governor of Mississippi did not request active duty military assistance, relying instead on Mississippi and other National Guard personnel provided through EMAC.

However, in the DOD effort to lean forward, Honoré contacted Cross immediately to offer any help needed, and remained in contact with him daily in person or on the phone.[150] On September 3, Northern Command and JTF Katrina received confirmation from the Secretary of Defense that JTF Katrina was to assume responsibility for logistical operations in Mississippi and Louisiana in response to FEMA's request.[151] All DOD operations in the state of Mississippi were conducted with Cross' consent.[152]

One of the most important roles played by DOD in Mississippi was the delivery of military stocks of food and water that started to arrive in Gulfport on September 1. In his testimony before the Committee, Cross noted:



NATIONAL GUARD

> By the end of the second day after landfall, my intelligence reports indicated that the previously assumed flow of food and water was severely restricted. Many pre-planned distribution points were inaccessible and many hundreds of people were stranded by flood waters, blocked roadways or lack of fuel for transportation. These desperate civilians were primarily observed by aerial reconnaissance in Hancock County. Upon realization that food and water was not going to arrive by normal means in time, I offered an immediate airlift of food and water utilizing our helicopters and our rations and immediately requested through US NORTHCOM an emergency airlift of military stocks of MRE's. Within a day, massive amounts of MRE's began arriving at Gulfport just in time to be disseminated to prevent starvation. Almost 1.7 million MRE's were flown in to my position thanks to the quick reaction of Lieutenant General Joe Inge of Northern Command.[153]

Air Force personnel and aircraft from the 920th Rescue Wing and 347th Rescue Wing, as well as Special Operations Command aircraft arrived at the Jackson Air National Guard Base the day after landfall, and along with

National Guard, performed search and rescue mission in the first days.[154]

The USS Bataan, the USS Truman, the USS Whidbey Island, and other vessels supported Navy and Marine Corps operations in Mississippi, delivering personnel, equipment, and commodities.[155] The USS Bataan had six helicopters, one land craft, extensive logistics supplies, and trauma medical capabilities that were used for search and rescue in both Mississippi and Louisiana.[156] According to a September 1 e-mail from Colonel Damon Penn, Mississippi's Defense Coordinator, a total of 19 active duty and National Guard teams were conducting search and rescue missions on the Mississippi coast.[157]

The Naval Construction Battalion Center at Gulfport was severely damaged during Katrina, and although most of the 800 "Seabees" were evacuated before the hurricane struck, remaining personnel and other Seabees deployed by the Navy helped with Hurricane Katrina recovery operations.[158] Gulfport-based Seabees, who linked up with the National Guard at their Joint Operations Center in Gulfport, coordinated with the National Guard to clear roads and assisted in removing debris.[159] The Seabees also set up logistics centers to distribute food and water and provide emergency medical services.[160] Two active-duty Seabee battalions from Port Hueneme, California, their subordinate detachments from both coasts, and Reserve Seabee volunteers joined those already in Gulfport, Mississippi, forming a total Seabee force of about 3,000 sailors by September 9.[161] The Seabees were also joined by 100 Mexican Marines and 215 Canadian Navy personnel who helped them work on FEMA temporary housing sites, nursing home repair, and repairs to public buildings, schools and construction sites.[162]



NATIONAL GUARD

On September 5, 1,000 Marines from the I Marine Expeditionary Force (MEF), Camp Pendleton, California, arrived at Biloxi, and 1,000 Marines from the II MEF Camp Lejeune, North Carolina, arrived at Stennis Space Center.[163] These Marine units, commanded by Marine Corps Reserve Major General Douglas V. Odell, Jr., assisted in the transportation of large amounts of commodities, as well as providing personnel and

equipment to assist in recovery operations in Hancock County as directed by Cross.[164] "Without concern for service lines and or 'Title of Authority,' [Major General] Odell accepted the mission and executed all requirements, until directed by his higher headquarters to move to New Orleans," Cross said.[165]

On September 8, the USNS Comfort arrived in Pascagoula to offer medical assistance and facilities.[166] Four days later, the Northern Command suggested to the Joint Chiefs of Staff that the Comfort be withdrawn because there was "very limited usage;" estimated at "fewer than a dozen patients."[167]

According to Cross' response to questions by the Select Committee, the Mississippi National Guard maintained a very good relationship with DOD forces. "Active duty units that responded always took a subordinate, support role and these units coordinated directly with the Mississippi National Guard Forward Operations Center."[168]

In Louisiana, airborne search and rescue was another area where National Guard and DOD integration was lacking. As noted in the National Guard Bureau's After Action Report, National Guard and DOD active duty (as well as other) helicopters were conducting rescue missions over New Orleans with no preplanning for command and control. The different helicopters had different radios and used different frequencies, creating a dangerous situation for mid-air collisions in an area with little or no air traffic control.[169] Beyond the safety issue, National Guard and DOD active duty assets operated under their own tasking orders, which sometimes led to duplication.[170] Search and rescue coordination problems are discussed in more detail later in this chapter.

Another Louisiana example illustrating integration problems is the area of communication. The 35th Infantry Division, a National Guard unit, arrived at Belle Chasse Naval Air Station on September 6, and the 82nd Airborne Division, a DOD active duty unit, was to provide them with some communications support. Specifically, the 35th Infantry Division had forwarded its frequency and network requirements and the 82nd Airborne Division was to provide frequency management support – providing specific frequencies to use. However, after the arrival of the 35th, there was still confusion over what frequencies to use because many systems were already using the assigned frequency. The 35th Infantry Division did not have the proper equipment to de-conflict the

frequency use, and could not obtain it until September 12, almost a week later.[171] For more information on communication difficulties during Hurricane Katrina, see chapter on COMMUNICATIONS.

## Finding: Northern Command does not have adequate insight into state response capabilities or adequate interface with governors, which contributed to a lack of mutual understanding and trust during the Katrina response

"There must be a strong agreement between state and federal leadership as to the operational objectives. State concerns about maintaining sovereignty must be respected."[172] **General H Steven Blum, Chief, National Guard Bureau**

"Admiral Keating, who heads US NORTHCOM, a newly created military body overseeing homeland defense, has told lawmakers that active-duty forces should be given complete authority for responding to catastrophic disasters. . . . The head of the Washington State National Guard, General Timothy Lowenberg, suggested in emails to colleagues that Admiral Keating's suggestion amounted to a "policy of domestic regime change."[173] **Wall Street Journal, December 8, 2005**

On Friday, September 1, the President offered to place Honoré under the joint command of Northern Command and Governor Blanco. Under this proposal, Honoré would have commanded both active duty U.S. military forces and the Louisiana National Guard, subject to the command of the Governor with respect to the Guard and Northern Command with respect to the federal active duty troops. Governor Blanco declined this offer, leaving Honoré and Northern Command in charge of the federal active troops and Landrenau and Blanco in charge of the Louisiana National Guard.

The Governors of the Gulf states chose not to relinquish command of the National Guard units in their respective states. While better coordination of the military

effort may have resulted if one commander were in charge of all aspects of military support, the Governor had confidence in Landreneau and saw no need for an added layer of command.

The Department of Defense was eager to assist the Gulf states. The establishment of JTF Katrina to coordinate the military response and the command's desire to help made state sovereignty an issue during the Katrina response.[174] Florida, Alabama, and Mississippi declined active duty military assistance, but active duty units pre-positioning at active duty bases in Mississippi operated smoothly with the Mississippi National Guard. Therefore, the issue of federalism played out in Louisiana. Resolving this issue may have slowed the active duty military response and contributed to tension in the state-federal relationship. In the end, there was a dual military response to Hurricane Katrina in Louisiana. Honoré commanded the active duty military response, and Landreneau commanded the Louisiana National Guard response.

The failure of DOD, governors, and other state officials to actively participate in joint planning for emergencies, both natural and man-made, that occurred within Northern Command's area of responsibility contributed to the tension. There were too few "civilian authorities" in DOD's military assistance to civilian authority planning. As Northern Command lamented it did not have adequate insight into the states, the Gulf governors also lacked insight into the operations of Northern Command.

In Northern Command's Master Exercise Summary Report on ARDENT SENTRY/TOPOFF 3, concern was expressed that Northern Command "does not have adequate insight into state response capabilities (responders, medical systems, National Guard, etc.) and other federal capabilities (contracts, FEMA, DHHS, etc). . . . This lack of understanding could contribute to off-target planning for potential active duty DoD roles and missions."[175]

DOD understands the different capabilities of Transportation Command, Forces Command, 1st Army, 5th Army, the Air Force, the Marine Corps, the Navy and role and capabilities of Joint Forces Command, Northern Command and Joint Task Force Katrina, but the Governor of Louisiana did not. In a September 19 interview with Gannett News Service, Blanco commented on the difficulties of communicating her request for troops. She said others asked, "Did you ask for this; did you ask for that[?] It got to be a very difficult little game," she said.[176]

## DOD and DHS have not adequately defined what is required for military assistance to civilian authorities during large disasters.

One cause of this misunderstanding is that DOD and DHS have not adequately defined what is required for military assistance to civilian authorities during large disasters. According to McHale, "It has never been the plan, nor has the Department of Defense been trained, resourced and equipped to provide a first responder capability."[177]

According to a September 2003 report to Congress on DOD's role in supporting homeland security missions:

> [The] Chairman [of the] Joint Chiefs of Staff, **maintains visibility** of National Guard assets performing homeland security missions. . . . Moreover, NORTHCOM and PACOM must have **insight** into state-controlled National Guard operations to facilitate coordination between Title 10 and Title 32 or State Active Duty military operations, which might be occurring in the same area, at the same time, towards a common goal. [emphasis added][178]

Honoré was not familiar with emergency operational procedures and personnel within the Katrina states. According to Blum, granting him a state commission without the knowledge and understanding of the state's operational environment would not necessarily have added anything to the response.[179] The Gulf coast governors, with their close relationships to state Adjutants General and common experiences with past emergencies, shared that view.[180]

Admiral Keating, the Commander of Northern Command has acknowledged that there are advantages to having a National Guard officer in command of homeland response:

> The advantages of using a N[ational] G[uard] officer during a disaster are: (1) the overwhelming majority of forces that respond to disasters are/will



NATIONAL GUARD

be National Guard who will usually be on the scene in a state active duty status before DOD is requested to respond; (2) the NG is familiar with the local area and the local culture; (3) the NG usually has close ties with first responders such as local and state law enforcement, fire departments, etc.; and (4) the local community knows and relies upon the NG because they are part of the community. . . . NG personnel are more likely to have more experience working with local responders than the active component. A disadvantage of using a NG officer is: NG commanders might not be familiar with federal capabilities brought to the table, especially those from Navy and Marines.[181]

Some of the Adjutants General from the Gulf states and around the country believe the much needed integration, trust, and increased understanding by state officials of what constitutes joint military assistance would improve if Northern Command were a National Guard Command, led by an experienced National Guard officer.[182]

Northern Command's mission is to "deter, prevent, and defeat threats and aggression aimed at the United States."[183] It also has a mission to "provide defense support of civil authorities."[184] During a national emergency within the United States, NORTHCOM requires policies and procedures for interaction with state officials. The absence of these policies hampered the Katrina response.

The Select Committee does not believe there is a simple answer to improving state and federal integration. Local control and state sovereignty are important principles rooted in the nation's birth that cannot be discarded merely to achieve more efficient joint military operations on American soil.

## Finding: Even DOD lacked situational awareness of post-landfall conditions, which contributed to a slower response

The Department of Defense has significant assets for the collection of intelligence, as well as communications and satellite equipment needed in all military operations. These assets are at the very heart of conducting comprehensive and directed military operations around the world, and were not optimally used during the Katrina response. For example, the Select Committee found little evidence that DOD satellite imagery was used to great advantage to target relief to the hardest hit areas, nor was information resulting from DOD aerial damage assessment flights properly disseminated. Lack of a unified data collection system among DOD military and civilian personnel also forced the Department to rely on other sources.

Department of Defense documents indicated an unusual reliance on news reports to obtain information on what was happening on the ground in the days immediately following landfall. It appeared the Department also relied on the press for initial damage assessment in New Orleans. Reliance on often unsubstantiated press stories appeared to make DOD reactive instead of a leading participant in the response.

*Department of Defense documents indicated an unusual reliance on news reports to obtain information on what was happening on the ground in the days immediately following landfall.*

DOD e-mail and JTF Katrina Commander's Assessments cited press as the source of the information on looting, the situation at the Superdome, other shelters, and the New Orleans Hyatt.[185] E-mail from private sources to Honoré and McHale about people needing to be rescued at Xavier University and the Salvation Army Building in New Orleans were acted on. In the Xavier case, Honoré dispatched a reconnaissance team based on this



information.[186] An e-mail dated August 30 from a colonel from the National Guard Bureau noted that Northern Command, First Army, and Fifth Army commanders could not make contact with the Louisiana State Adjutant General.[187]

Keating stated that the biggest challenge for Northern Command was "gaining and maintaining situational awareness as to the catastrophic disaster."[188] This also came as no surprise to McHale, who commented that "early situational awareness was poor, a problem that should have been corrected following identical damage assessment challenges during Hurricane Andrew."[189]

## Finding: DOD lacked an information sharing protocol that would have enhanced joint situational awareness and communications between all military components

According to a National Guard assessment, JTF Katrina "had limited visibility on in-transit forces" being deployed. There was no system in place to track all active duty or Guard "forces and material from ports of embarkation" through distribution.[190] For example, an August 29 e-mail generated in the Office of the Secretary of Defense indicated concern over a Navy ship that announced its deployment without legal authority or Secretary of Defense approval.[191]

Information flowing up from the National Guard state headquarters or the National Guard Bureau also did not always make its way to the JTF Katrina commander. An August 31 e-mail confirmed that 1st Army and 5th Army headquarters could not communicate directly with the Louisiana Defense Coordinating Officer, which prevented the JTF Katrina commander from knowing what Guard assets were streaming into New Orleans at the time. On September 1, a general officer at NORTHCOM complained he had not been getting e-mail from the DCOs for two days.[192]

The Office of the Assistant Secretary of Defense for Homeland Defense also had problems keeping track of what DOD capabilities were being utilized and what tasks had been performed for the Homeland Defense Secretary. In a September 4 e-mail, some questions posed were:

How many MREs have been made available by DoD? . .
What is the # of hospital beds on USN ships?. . .
What is the status of aerial surveillance capability? . . .
What is [the] status of the New Orleans Police Department?
How linked up is the Guard with NOPD?[193]

There was also a request: "Need a daily DoD roll-up matrix: What we're doing, Who's doing it, [and w]hat's the progress?[194]

During the TOPOFF 3 and ARDENT SENTRY 05 exercises, NORTHCOM learned that

. . . the ground rules for the channel of communications between USNORTHCOM, NGB J[oint] O[perations] C[enter] and State National Guard JOCs is largely undefined. There is not an agreement that delineates reporting responsibilities for force readiness and disaster response planning. Needed is a framework and an agreed on channel of communications to ensure the flow of information between USNORTHCOM, NGB and State National Guard JOCs is timely and complete.[195]

Yet, during Katrina, the National Guard Bureau learned NORTHCOM did not standardize reporting guidelines.[196] E-mails, logs, and daily briefings indicated a great flow of information between DOD component headquarters and the National Guard Bureau. There also appeared to be numerous mechanisms to assist in integrating federal and state operations. These included the establishment of a National Guard desk at the National Military Command Center, Guard representation in the Northern Command Joint Operations Center, web portals, daily conference calls, and e-mail situation updates to key leaders.[197] However the Select Committee could find no

reporting requirements for sharing important information between DOD entities. Blum, however, noted that "these efforts, while effective, cannot be expected to overcome the inability of forces on the ground to effectively share information."[198]

## Finding: Joint Task Force Katrina command staff lacked joint training, which contributed to the lack of coordination between active duty components

Hurricane Katrina required the Army, Air Force, Navy, and Marine Corps to work together in an emergency mission in the continental United States. Although skilled and trained in war-fighting missions abroad, conducting joint missions in this country, quickly, and under tremendous public pressure, posed integration challenges. One of the findings in an after action report from the Department of the Navy stated: "Service cultural issues seemed to dominate in a negative fashion."[199]

> The core element of the JTF is formed by the 1st Army Staff. There is a perception that JTF is in essence, an Army T[ask] F[orce], with joint augmentation and that this disposition colors their decision making processes and view of the conduct of operations. . . . In a crisis, organizations play to their strengths and [tend] to disregard unfamiliar capabilities or concepts.[200]

Retired Coast Guard Vice Admiral Jim Hull was asked by Northern Command to assess the command's Katrina response. Hull's observations were critical of JTF Katrina, noting that the capabilities of 1st Army headquarters, which formed the nucleus of JTF Katrina, "was not organized or resourced to operate as a Joint Task Force."[201] Specific challenges ranged from inexperienced personnel to lack of communications and equipment. "The JTF is an ad-hoc organization doing the best it can without the resources necessary to make it an optimal enabler," he said. Hull noted that as Honoré made command decisions away from his headquarters, his staff was not always informed. "We track General Honoré's location by watching CNN," JTF Katrina staff said.



AP PHOTO/BILL HABER

The Department of the Navy Emergency Preparedness Liaison Officer Program in a September 12 After Action Report listed key problems within JTF Katrina:

> Joint Doctrine was largely ignored. In the melee of the first few days where lives literally hung in the balance, perhaps this was a necessary course of action. However, as the Active Duty Force began to develop, the JTF Katrina headquarters never transitioned from the very tactical mindset of life saving to the operational mindset of sustaining and enabling a Joint Force. Since the Forward Command Element (General Honoré) was unable to communicate, they became embroiled and distracted with the tactical and were unable to focus on even the most basic of operational issues…. Other units who were responding from outside the area to integrate with what was called a "Joint" task force expected certain doctrinal norms which materialized very slowly or not at all.[202]

The report also remarked that since the JTF did not establish a commander for all land components, 1st Army, 5th Army, and the Marine Corps were unclear on JTF Katrina expectations, causing confusion and lack of coordination between land forces in New Orleans.[203] The effects of the difficulties with creating and sustaining a truly joint effort were visible on the ground in Louisiana, especially during later evacuation efforts, and the patrolling of New Orleans parishes.

# Finding: Joint task force Katrina, the National Guard, Louisiana, and Mississippi lacked needed communications equipment and the interoperability required for seamless on the ground coordination

Reliable communications were the exception in the aftermath of Katrina. Even Honoré experienced communications problems. Honoré moved into Camp Shelby before he had the communications equipment necessary to support JTF Katrina.[204] Honoré's staff was frustrated at the lack of communications equipment. According to a Navy after action report, "At this stage it is believed that when the commander leaves Camp Shelby in the morning and returns in the evening, the staff's only access to communicate with him is through a borrowed Nextel cell phone and his Blackberry.[205] The Navy reported the USS IWO JIMA did have task force-capable communications equipment during the first ten days of the storm that would have been of great help to General Honoré.[206]

Blum also noted that "one critical area where we lack integration is in interoperable communications. National Guard units do not have the equipment necessary to effectively share information with Title 10 forces. This caused significant challenges on the ground that then bubbled up the chains."[207]

At the time of Katrina, Northern Command had yet to establish standardized communications architecture or to identify the system and information requirements to be used during homeland response operations.[208] Oxford Analytica reported:

> Since September 11, emergency response planners have recognized that during a major disaster, local communications systems would be disrupted or disabled, and communication between federal, state, and local officials is a particularly weak link in coordinating emergency response. Katrina showed that little has been accomplished to fix this disconnect. Within the military, the National Guard was hindered by a shortage of communications equipment. These shortcomings suggest that the Pentagon does not assign homeland defense a sufficiently high priority.[209]

The loss of communications infrastructure in Mississippi and Louisiana due to hurricane forces caused a great deal of confusion for days following landfall. Communication outages that occurred in state emergency offices also caused problems in situational awareness. The state Adjutant General of Mississippi on the Gulf coast could not reach the Mississippi Emergency Management Agency in Jackson until two days after landfall.[210] When cell phones and towers were destroyed or lost power, states were not equipped with backup communications capabilities even with Guard forces. According to Cross:

> One of the biggest lessons learned was the need to adequate, redundant communications systems with an emphasis on satellite backhaul capability in the event of cellular and landline failure. Obviously, this type of equipment requires resourcing. The Mississippi National Guard received $29,100 for fiscal year 2005 for Military Support to Civil Authorities. $8,000 of this amount was applied to pay the satellite phone service bill for the seven satellite phones currently on hand. In order for the Mississippi National Guard to be prepared to respond to catastrophic events, it must be funded accordingly.[211]

The Louisiana National Guard also experienced problems with lost or weak communications infrastructure.[212] Immediately after Hurricane Katrina passed, the Industrial Canal levee broke, flooding the National Guard headquarters at Jackson Barracks. The Guard had to abandon its headquarters operations center and establish a new one, including new communications connections, at the Superdome. Re-establishing these communications was greatly facilitated by the arrival of the state's Weapons of Mass Destruction (WMD) Civil Support Team (CST) and its emergency communications suite.

However, the National Guard in Louisiana was also plagued by problems with the state's 800 MegaHertz public safety radio system, which it shares with the state's law enforcement and other public safety agencies. State officials said this system was about 11 years old and

limited to 48 channels.[213] They said it was not designed to handle thousands of calls, so the volume of calls after Hurricane Katrina overloaded the system. In addition, one of the state's three 800 MegaHerz relay towers, the Buras tower in Plaquemines Parish, was toppled by the hurricane, which further degraded the capacity of the system.[214] Louisiana National Guard officials cited the weaknesses in this system as one of the reasons they had problems communicating with the state's Emergency Operations Center in Baton Rouge.[215]

The National Guard Bureau confirmed that its liaison teams should also be deployed with significant mobile communications.[216] The Louisiana NGB Liaison Officer was equipped with a satellite phone, which was critical during the first days of response.[217]

# Finding: EMAC processing, pre-arranged state compacts, and Guard equipment packages need improvement

Although there was a consensus among federal, state, and local officials that Emergency Mutual Assistant Compacts worked very well, the current EMAC approval process is cumbersome, and therefore not fast or suited to a large scale emergency. While initial Adjutant General to Adjutant General coordination allowed for rapid deployment of National Guard forces during Katrina, the sheer size of the emergency pointed out weaknesses in the current system.

As key communications infrastructure was taken out, the ability to negotiate state-to-state compacts became difficult, if not impossible. In the hours immediately following landfall, when it was needed most, offers of assistance from states all over the country were delayed in the EMAC process, as other states' invaluable assets were not immediately visible to the states affected.

The National Guard Bureau stepped in to help the Gulf state Adjutants General prior to landfall, and increased its management of requests for National Guard forces throughout the response, but some states still used the standard EMAC process through the National Coordinating Committee (NCC). As both the National

*The current EMAC approval process is cumbersome, and therefore not fast or suited to a large scale emergency.*

Guard Bureau and the NCC tried to anticipate requests, this dual track approach for requesting troops caused confusion and duplicated efforts. Better coordination between the NGB and the NCC was needed.[218]

In addition, not all National Guard personnel are trained in the EMAC process. Louisiana National Guard officers seemed to lack the knowledge and experience necessary to manage the tremendous surge of requests for assistance, as well as field offers from other states under EMAC. This inexperience was one of the reasons the National Guard Bureau played an unusually large role in the EMAC process.[219]

More familiarity with the EMAC procedures and assets by Northern Command and other federal forces would also have enhanced joint response efforts and given them a better appreciation of National Guard capabilities.[220]

# Finding: Equipment, personnel, and training shortfalls affected the National Guard response

## Needed equipment and manpower

The Army National Guard relied heavily on its aviation units and found that helicopter hoist-equipped aircraft resulted in immediate and successful search and rescue operations. Current Army doctrine, however, does not provide sufficient numbers of hoist-equipped aircraft to its Guard counterpart, nor stage them regionally to support responses to events of significant size.[221] For example, the Mississippi National Guard needed more airlift and helicopters immediately. Cross suggested pre-arranged state compacts for hurricane assets, especially search and rescue aviation assets, would make these assets more readily available and not run the risk they could not be obtained through EMAC requests.[222]

The Air National Guard also relied heavily on its airlift capabilities during Hurricane Katrina. The Air National Guard flew 351 missions with C-130s between August 30 and September 6.[223] Air National Guard personnel reported that:

> The C-130 is the ANG work horse, moving equipment for the National Guard such as CST's, EMEDS, and civil engineering equipment into areas with moderate to heavy infrastructure damage…the Guard can't have enough of them for responding to major homeland emergencies…they are essential.[224]

> New aircraft like the C-17 are better suited to carry over-size equipment such as the Rapid Engineer Deployable Operational Repair Squadron Engineer (RED HORSE) Squadrons, but the limited number of C-17s in inventory require its use to take care of war fighting requirements overseas. This 404-person mobile construction squadron does it all: rapid damage assessment, repair, contingency heavy construction operations such as roads and ramps.[225] Red Horse Squadrons were invaluable during Katrina.[226]

At the time of Katrina's landfall, Northern Command had not yet articulated specific requirements or capabilities that National Guard forces need during major homeland disasters.[227] Without established formal requirements, the equipment deemed necessary for the National Guard to assist civilian authorities in Katrina had not been purchased by the Department of the Army and the Department of the Air Force. The military departments only establish units and procure equipment for which formal mission requirements have been validated, like Title 10 warfighting missions abroad. Northern Command has yet to determine — with or without input from DHS — which specific military assets should be dedicated to provide military assistance to civilian authorities, in part because DHS has not articulated the requirement to DOD in any formal manner.[228] Therefore, at the present time, DOD does not require the purchase of equipment specifically for homeland defense or military assistance to civilian authorities for the National Guard.

Attempts to rent needed equipment were complicated by the great demand for heavy machinery created by the storm. Cross noted that contractors responding to other federal, state, and local requests for assistance leased the same type of equipment sought by the National Guard, leaving little available for National Guard use.[229]



NATIONAL GUARD

In a National Guard After Action Review dated September 2005, it was strongly recommended that the Department of Defense "identify the Continental United States mission as a valid requirement and equip it as a valid tasking."[230]

> "I was there. I saw what needed to be done. They were the fastest, best capable, most appropriate force to get there in the time allowed. And that's what it's all about." **General Blum**[231]

Hurricane Katrina required significant National Guard manpower, and quickly. With the current level of 457,000 personnel in the National Guard, the Katrina response demonstrated the Guard response was not hindered by the deployment of Guard troops to support the War on Terrorism. According to Blum, although National Guard from the affected states were deployed overseas, Guardsmen from surrounding, and then other states quickly supplemented the effort.[232] At landfall, over 40 percent of the Mississippi Guard, some 4,200 troops, were deployed overseas. Fortunately, critical engineering units and military police units were home.[233] In Louisiana, Blanco asked for the immediate return of Louisiana National Guard troops from Iraq, but the National Guard Bureau was satisfied it could provide sufficient troops from other states to meet the needs of Louisiana more quickly than trying to extract Louisiana troops from combat operations in Iraq.[234] The Joint Staff and Center for Army Lessons Learned were very impressed at the ability of the Guard to mobilize and move a Corps worth of personnel and equipment in four days.[235]

Nonetheless, organizational challenges surfaced in this rapid deployment. The National Guard forces flowing

                              A FAILURE OF INITIATIVE

into the staging areas at Alexandria, Louisiana, and to the Naval Air Station New Orleans at Belle Chasse arrived so quickly that the number of Guardsmen assigned to process and task these units was too small.[236] The capabilities of each unit were not readily known by the logistics personnel tasking officers, causing further delays.

A lack of well defined personnel and equipment packages by the Department of Defense to support civilian authorities in large disasters degraded instant tasking of units deployed to Louisiana.[237] General DOD development of regional strike forces composed of various National Guard units would have done a great deal to mitigate the effects of a large natural disaster or other catastrophic event: "Hurricane equipment packages for the Guard should be developed by the Department of Defense to help them provide more adequate assistance to civilian authorities in the future, Cross said."[238]

### Current law hindered some congressionally mandated National Guard Civil Support Teams' response

Congress established WMD Civil Support Teams (CSTs) to deploy rapidly to assist local incident commanders in determining the nature and extent of an attack or incident; provide expert technical advice on WMD response operations; and help identify and support the arrival of follow-on state and federal military response assets.[239] The first 10 teams were funded as part of the National Defense Appropriations Act for FY 1999. Each team consists of 22 highly skilled, full-time National Guard members who are federally resourced, trained, and exercised in chemical, biological, and nuclear specialties, and skilled in reconnaissance, medical support, logistics, administration, communications, air liaison, and security.[240]

In these capacities, especially the use of their communications vehicles, the National Guard CSTs proved invaluable to the Katrina response. On September 2, a JTF Katrina official relayed a report from the National Guard Bureau that CSTs from Connecticut, North Carolina, Nebraska, Utah, Arkansas, West Virginia, Indiana, Kansas, Alabama, and the District of Columbia were en route to the Gulf Coast.[241]

During Katrina, there was confusion regarding the legal aspects of CST deployment, as some states interpreted the law to mean they were only authorized to be used for WMD incidents, and only in their states.[242] This

interpretation delayed deployment of these vehicles to Mississippi. Lieutenant Colonel Smithson of the Mississippi National Guard said, "CSTs saved the day, I just wish they were here sooner."[243] Clarifying that they are available for use beyond WMD events would have greatly enhanced states abilities to react quickly to the Katrina disaster. [244]

### Guard personnel categories caused confusion

Multiple types of duty status of National Guard personnel presented some legal challenges in the proper employment of forces.[245] State military lawyers interpreted laws, regulations, and policies pertaining to the various statuses and units of assignment very differently, which caused unnecessary delays. Delays in the Title 32 approval process, previously identified, added to the difficulty. The National Guard Bureau May 23, 2005 after action report on TOPOFF 3 found:

> As highlighted in Operation Winter Freeze, [the Democratic National Convention, the Republican National Convention] and [the] G-8 summit, and further during Ardent Sentry 05 events, the T[itle] 10/ T[itle] 32 approval process must be standardized. Current process is lengthy, largely undefined, and requires excessive time periods for approval.[246]

E-mails from various state Adjutants General began to arrive at the National Guard Bureau immediately after landfall inquiring about changing all Guard response to Title 32.[247] The National Guard Bureau agreed with these suggestions and began to actively discuss this status change with the Department of Defense.[248] On September 2, 4 and 5 respectively, Governor Riley of Alabama, Governor Barbour of Mississippi, and Governor Blanco of Louisiana wrote to the Secretary of Defense to formally ask that all National Guard personnel responding in their states be put on Title 32, Chapter 9, a new operational section of Title 32 that allows for the National Guard to perform homeland missions under governor control.[249]

The Select Committee believes the Guard response in Katrina would have been more effective had the decision to place National Guard troops in Title 32 status been made earlier by the governors, the National Guard Bureau, and the Secretary of Defense.

*The Select Committee believes the Guard response in Katrina would have been more effective had the decision to place National Guard troops in Title 32 status been made earlier by the governors, the National Guard Bureau, and the Secretary of Defense.*

## Lack of unified DOD support for enhanced Guard resources under Title 32

A September 10 NGB e-mail to Blum indicated frustration at the lack of understanding by the Army and Air Force and some DOD offices of Title 32 and the resources that were to flow to the National Guard of states participating in the Katrina response.[250] Currently, there are no clear directives for the use of Title 32 National Guard homeland missions, so the confusion was not unexpected. The e-mail indicates, however, that some officials in DOD did not totally embrace the use of Title 32 during the Katrina response. The e-mail stated specifically that the Principal Deputy Assistant Secretary of Defense for Reserve Affairs, Craig Duehring, expressed that Title 32 would only apply to the three affected states; that Service Secretaries must get approval from the Deputy Secretary of Personnel and Readiness before issuing any orders; and that the Office of Reserve Affairs will "run this" and have a matrix of needed information that will be required before any consideration is given to funding of Guard activities. Even though the Deputy Secretary of Defense approved use of Title 32 on September 7, uncertainty within the Pentagon on Title 32 parameters, required the National Guard Bureau to ensure Title 32 status for those states who had rushed in to help.[251]

## Lack of training for Military Assistance to Law Enforcement (MSCLEA)

Before the storm, the Louisiana National Guard opened the Superdome for evacuees with a minimal number of staff, many of whom were not military police or formally trained for crowd control operations. On Monday night, August 29, when an increased number of Louisiana National Guard arrived at the Superdome, they found many Guard personnel working at checkpoints alone, with no hand held radios, and unarmed. Though the crowd was generally peaceful, even when the plumbing

failed, these soldiers were in a volatile situation they were not trained to handle.[252] An Army National Guard after action report dated December 21 found these Guard personnel were not properly trained to respond to areas where there are a large number of civilians, resulting in risk to their safety and the safety of others.[253] McHale indicated the Pentagon is interested in enhanced training for National Guard in this homeland role. "I think we will be looking at formalizing the training, equipment and deployment capability associated with National Guard military police units," McHale said.[254]

## Finding: Search and rescue operations were a temendous success, but coordination and integration between the military services, the National Guard, the Coast Guard, and other local, state, and federal rescue organizations was lacking

"During the first four days, no single organization or agency was in charge of providing a coordinated effort for rescue operations."[255] **Admiral Timothy Keating, Commander, NORTHERN COMMAND**



NATIONAL GUARD

Urban search and rescue operations are multi-agency in nature and no standardized federal system currently exists to effectively integrate operations. The lack of a coordination mechanism and standardized processes led to duplication of effort in some locations

BARGE000307   A FAILURE OF INITIATIVE

and a lack of response in others. Each military entity relied on its own airspace coordinators during the first critical days, which also contributed to a lack of awareness of who was doing what.

In New Orleans, the Louisiana National Guard and the U.S. Coast Guard maintained separate tactical operations centers for airborne search and rescue missions. The National Guard had its tactical operations center with Task Force Eagle at the Superdome, and the Coast Guard had its tactical operations center at Belle Chasse Naval Air Station. The two entities divided up areas and ran separate operations.

Because of the urgent emphasis on getting victims to high ground, the drop-off points were not well coordinated. While some were dropped off at the Superdome (which provided shelter, food, and water), others were dropped off at the Convention Center (which provided only shelter), and others were dropped off on freeway overpasses or levees (with nothing at all). The philosophy at that point was to save first, then worry later about providing other relief.[256] This situation resulted in people being saved from the floodwaters, but then suffering — some for days — in sweltering conditions with or without food and water. ■

1   *Hearing on Hurricane Katrina: Preparedness and Response by the Department of Defense, the Coast Guard, and the National Guard of Louisiana, Mississippi, and Alabama Before Select Comm.*, 109th Cong. (Oct. 27, 2005) (written statement of Paul McHale, Assistant Secretary of Defense for Homeland Defense at 4) [hereinafter *Oct. 27, 2005 Select Comm. Hearing*].

2   *Id.* at 8.

3   *Id.* at 6.

4   *Joint Hearing on Role of the Military and National Guard in Disaster Responses Before the House Armed Services Subcommittee on Terrorism, Unconventional Threats and Capabilities and the House Homeland Security Subcommittee on Emergency Preparedness, Science, and Technology*, 109th Cong. (Nov. 9, 2005) at 7 (written statement of Paul McHale, Assistant Secretary of Defense for Homeland Defense) [hereinafter *Nov. 9, 2005 Joint Armed Services and Homeland Hearing*].

5   *Hearing Before Base Realignment and Closure Commission* (Aug. 11, 2005) at 34 (statements of Harold Gehman, 2005 BRAC Commissioner, and Peter Verga, Principal Deputy Assistant Secretary of Defense for Homeland Defense) [hereinafter *Aug. 11, 2005 BRAC Commission Hearing*].

6   E-mail correspondence from Col. Richard Chavez, Senior Military Advisor for Civil Support to Anthony Capra, Office of Assistant Secretary of Defense for Homeland Defense, et al., (Aug. 30, 2005) (12:18 p.m.)

7   E-mail correspondence from InSung Oaks Lee, Senior Watch Officer, Department of Homeland Security [hereinafter DHS] to Homeland Security Operations Center [hereinafter HSOC] Federal Emergency Management Agency [hereinafter FEMA] mailing list, et al. (Aug. 30, 2005) (10:43 a.m.).

8   *See generally* E-mail correspondence from Anthony Capra, OASD Homeland Defense, Department of Defense [hereinafter DOD] Desk to Michael Ritchie, Office of the Secretary of Defense, Policy, (Aug.  29, 2005) (12:15 p.m.); E-mail correspondence from Anthony Capra, OASD Homeland Defense Desk, DOD Desk to DOD HD Coordination Group, et al. (Aug. 30, 2005) (10:54 a.m..); E-mail correspondence from Col. Richard Chavez, Senior Military Advisor for Civil Support, DOD to Anthony Capra, OASD Homeland Defense Desk, DOD Desk, et al. (Aug. 30, 2005) (12:18 p.m.); E-mail correspondence from Anthony Capra, OASD Homeland Defense Desk, DOD Desk to Col. Richard Chavez, Senior Military Advisor for Civil Support, DOD (Aug.  30, 2005) (11:36 a.m.); *see also* E-mail correspondence between DOD HSOC and FEMA HSOC (Sept. 3-4, 2005).

9   *See generally* E-mail correspondence between policy staff of Office of Secretary for Defense (Sept, 5, 2005).

10   *Oct. 27, 2005 Select Comm. Hearing* at 10 (written statement of Adm. Timothy Keating, Commander, North American Aerospace Defense Command [hereinafter NORAD] and U.S. Northern Command [hereinafter NORTHCOM]).

11   *See Hearing on Hurricane Katrina: The Role of the Federal Emergency Management Agency Before Select Comm.*, 109th Cong. at 34-35, 162 (Sept. 27, 2005) (statement of Michael Brown, Former Director, FEMA) [hereinafter *Sept. 27, 2005 Select Comm. Hearing*].

12   Mark Sappenfield, *Battle Brews Over a Bigger Military Role*, CHRISTIAN SCI. MONITOR, Dec. 13, 2005 at 3.

13   Interview by Select Comm. Staff with Andrew Kopplin, Chief of Staff to Gov. Kathleen Blanco, State of LA [hereinafter Kopplin Interview] in Baton Rouge, LA (Nov. 6, 2005); Interview by Select Comm. Staff with Jeff Smith, LA State Coordinating Officer, in Baton Rouge, LA (Nov. 7, 2005).

14   Kopplin Interview; Interview by Select Comm. Staff with Col. Stephen Dabadie, Chief of Staff to Maj. Gen. Bennett C. Landreneau, The Adjutant General, State of LA [hereinafter Dabadie Interview] in Baton Rouge, LA (Nov. 4, 2005).

15   Interview by Select Comm. Staff with Scott Wells, Deputy Federal Coordinating Officer, FEMA, in Baton Rouge, LA [hereinafter Wells Interview] (Nov. 9, 2005).

16   *Sept. 27, 2005 Select Comm. Hearing* at 34-35, 84, 109, 112, 113, 126, 161 (statement of Michael Brown, Former Director, FEMA).

17   *See Oct. 27, 2005 Select Comm. Hearing* at 127 (statement of Adm. Timothy Keating, Commander, NORAD-NORTHCOM and statement of Paul McHale, Assistant Secretary of Defense for Homeland Defense); Interview by Select Comm. Staff with Bill Lokey, Federal Coordinating Officer for LA, FEMA in Washington, DC [hereinafter Lokey Interview] (Dec. 2, 2005); Wells Interview.

18   Kopplin Interview.

19   Lokey Interview.

20   *Nov. 9, 2005 Joint Armed Services and Homeland Hearing* (written statement of Lt. Gen. H. Steven Blum, Chief, National Guard Bureau [hereinafter NGB] at 2-3).

21   Interview by Select Comm. Staff with Lt. Gen. Steven Blum, Chief, NGB, Lt. Gen. Daniel James, III, Director, Air National Guard, and Lt. Gen. Clyde A. Vaughn, United States Army, Director, Army National Guard [hereinafter Blum, James, and Vaughn Interview] in Arlington, VA (Dec. 19, 2005).

22   *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Lt. Gen. Steven Blum, Chief, NGB).

23   *See* NGB, *Hurricane Katrina, National Guard After Action Review Observations, National Guard Timeline*, at 17 [hereinafter *National Guard Timeline as of Dec. 21, 2005*] (Dec. 21, 2005).

24   Interview by Select Comm. Staff with Brig. Gen. Pete Aylward, NGB, Liaison Officer assigned to Lt. Gen. Russell Honoré, First US Army, Commanding General, in Arlington, VA (Jan. 5, 2006); Memorandum from Acting Deputy Secretary of Defense Gordon England for Secretaries of the Military Departments, Chairman of the Joint Chiefs of Staff, Undersecretaries of Defense, Commander, United States Northern Command, Assistant Secretaries of Defense, and General Counsel, DOD (Sept. 9, 2005).

25   See National Guard Timeline as of Dec. 21, 2005 at 13.

26   Director of Army National Guard, *DARNG Katrina* [hereinafter Dec. 19, 2005 Army National Guard Binder] (Dec. 19, 2005).

27   *Id.*

28   *See* Dec. 19, 2005 Army National Guard Binder; National Guard Timeline as of Dec. 21, 2005 at 14; E-mail correspondence from Lt. Gen. Steven Blum, Chief, NGB to National Guard Adjutants General, et al. (Aug. 31, 2005) (10:01 a.m.).

29 Blum, James, Vaughn Interview; E-mail correspondence from Maj. Gen. Francis Vavala, The Adjutant General, State of Delaware, to Lt. Gen. Steven Blum, Chief, NGB, (Aug. 31, 2005) (11:45 a.m.); E-mail correspondence from Lt. Gen. Clyde A. Vaughn, Director, Army National Guard (Sept. 1, 2005) (10:43 a.m.); E-mail correspondence from Maj. Gen. Douglas Burnett, The Adjutant General, State of Florida, to Lt. Gen. Steven Blum, Chief, NGB, (Sept. 4, 2005) (7:21 p.m.); E-mail correspondence from Lt. Col. Chuck Larcom, Senior Army Advisor, Rhode Island, to Lt. Gen. Russell Honoré, First US Army, Commanding General (Sept. 1, 2005) (11:19 a.m.); E-mail correspondence from Lt. Gen. Steven Blum, Chief, NGB to National Guard Adjutants General, et al. (Aug. 31, 2005) (10:01 a.m.). E-mail correspondence from NGB Chief  to all Adjutant Generals regarding deployment coordination for Hurricane Katrina Relief (Aug. 31, 2005).

30 National Guard Timeline as of Dec. 21, 2005 at 17.

31 *See* Blum, James, Vaughn Interview; National Guard Timeline as of Dec. 21, 2005; Nicole Gaouette et al., *Government's Response Plan Proves to be a Disaster*, STAMFORD ADVOCATE, Sept. 15, 2005 at A1.

32 National Guard Timeline as of Dec. 21, 2005 at 17.

33 10 U.S.C. § 333 (2005).

34 E-mail correspondence from Jon Sims, DOD Office of General Counsel to Paul McHale, Assistant Secretary for Defense for Homeland Defense (attached Memorandum of Agreement Concerning Authorization, Consent, and Use of Dual Status Commander for JTF Katrina) (Sept. 2, 2005) (11:45 p.m.).

35 Draft Letter from Governor Kathleen Blanco, State of LA, to President George W. Bush (Sept. 3, 2005).

36 Letter from Governor Kathleen Blanco, State of LA, to President George W. Bush (Sept. 3, 2005).

37 Letter from Governor Bob Riley, State of Alabama, to Donald Rumsfeld, Secretary of Defense (Sept. 2, 2005) [hereinafter Sept. 2, 2005 Letter from Gov. Riley to Sec. Rumsfeld]; Letter from Governor Haley Barbour, State of MS to Donald Rumsfeld, Secretary of Defense (Sept. 4, 2005) [hereinafter Sept. 4, 2005 Letter from Gov. Barbour to Sec. Rumsfeld]; Letter from Governor Kathleen Blanco, State of LA, to Donald Rumsfeld, Secretary of Defense (Sept. 5, 2005) [hereinafter Sept. 5, 2005 Letter from Gov. Blanco to Sec. Rumsfeld].

38 E-mail correspondence from Maj. Gen. Gus Hargett, The Adjutant General, State of Tennessee (Sept. 2, 2005) (6:07 p.m.); E-mail correspondence from Maj. Gen. David Poythress, The Adjutant General, State of Georgia (Sept. 2, 2005) (4:35 p.m.); E-mail correspondence from Maj. Gen. Mason Whitney, The Adjutant General, State of Colorado (Sept. 2, 2005) (17:28 p.m.).

39 *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Lt. Gen. Steven Blum, Chief, NGB).

40 Sept. 2, 2005 Letter from Gov. Riley to Sec. Rumsfeld; Sept. 4, 2005 Letter from Gov. Barbour to Sec. Rumsfeld; Sept. 5, 2005 Letter from Gov. Blanco to Sec. Rumsfeld.

41 Dec. 19, 2005 Blum, James, Vaughn Interview; National Guard Timeline as of Dec. 21, 2005 at 24.

42 Memorandum from Gordon England, Deputy Secretary of Defense, to Francis Harvey, Secretary of the Army, and Acting Secretary of the Air Force (Sept. 7, 2005).

43 National Guard Timeline as of Dec. 21, 2005 at 29.

44 *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Adm. Timothy Keating, Commander, NORAD-NORTHCOM).

45 *See* NGB, *Chief's Battle Update Brief Covers 04 1400 September 2005*, (Sept. 4, 2005); NGB, *Chiefs Battle Update Brief Covers 01 September 2005*, (Sept. 1, 2005).

46 *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Lt. Gen. Steven Blum, Chief, NGB); Steve Bowman, Lawrence Kapp, and Amy Belasco, Hurricane Katrina: DOD Disaster Response, CRS Report for Congress, RL33095 at 10 (Sept. 19, 2005).

47 *See* Mississippi National Guard, *Hurricane Katrina August 2005-November 2005* [hereinafter "Mississippi National Guard Daily Logs"].

48 Blum, James, and Vaughn Interview.

49 Air National Guard, *NGAUS ANG Breakout*, Lt. Gen. Daniel James, III, Director, Air National Guard [hereinafter Sept. 19, 2005 NGAUS ANG Breakout] (Sept. 19, 2005).

50 U.S. Air Force, *Expeditionary Medical Support*, Office of the Air Force Surgeon General, Air Force Medical Evaluation Support Activity at 5.

51 National Guard Timeline as of Dec. 21, 2005 at 14-15.

52 E-mail correspondence from Maj. Gen. Scott Mayes, 1st Air Force, Command and Control, to Adm. Timothy Keating, Commander, NORAD-NORTHCOM, et al. (Aug. 30, 2005) (2:40 p.m.).

53 National Guard Timeline as of Dec. 21, 2005; Army National Guard Aviation, *Hurricane Katrina – Aviation Support* (Aug. 29, 2005) (attached to E-mail correspondence from Maj. Karl Konzelman, NGB to Lt. Gen. Russell Honoré, First US Army, Commanding General, et al. (Aug. 30, 2005) (10:32 a.m.)); Sept. 19, 2005 NGAUS ANG Breakout.

54 E-mail correspondence from Fletcher Thornton, Joint Operations Center, HQ, First U.S. Army (Sept. 2, 2005).

55 *See* NGB, *Chief's Battle Update Brief, Covers 04 1400 September 2005*; Louisiana National Guard, *Overview, Hurricane Recovery, Focus of Effort*.

56 Interview by Select Comm. Staff with Col. Barry Keeling, Commander of Task Force Eagle, LA National Guard, [hereinafter Keeling Interview] in New Orleans, LA (Nov. 3, 2005); Interview by Select Comm. Staff with General Brod Veillon, Commander of Task Force Minnow, LA National Guard, [hereinafter Veillon Interview] in New Orleans, LA (Nov. 3, 2005).

57 Interview by Select Comm. Staff with Lt. Col. Jacques Thibodeaux, LA National Guard [hereinafter Thibodeaux Interview], in New Orleans, LA (Nov. 3, 2005); Dabadie Interview.

58 *Id.*

59 Email correspondence from Angela Copple, EMAC Coordinator, National Emergency Management Association regarding numbers of personnel assisting by State (Nov. 3, 2005) (2:49 p.m.).

60 Alabama National Guard, *Hurricane Katrina Binder*, at Tab 1, p. 3-4, and Tab 4.

61 Governor Bob Riley, State of AL, Press Release: *Governor Riley Declares State of Emergency Due to Approaching Hurricane, Requests Federal Assistance*, Aug. 28, 2005.

62 Alabama National Guard, Hurricane Katrina Binder, at Tab 1 at p. 6, and Tab 4.

63 *Id.* at Tab 4.

64 Briefing Memorandum prepared for *Hearing on Hurricane Katrina: Preparedness and Response by the State of MS Before Select Comm.*, 109th Cong. (Dec. 7, 2005) [hereinafter *Dec. 7, 2005 Select Comm. Hearing Briefing Memorandum*].

65 *Oct. 27, 2005 Select Comm. Hearing* at 3-4 (written submission of Maj. Gen. Harold A. Cross, The Adjutant General, State of MS).

66  *See Id.*
67  *Dec. 7, 2005 Select Comm. Hearing Briefing Memorandum.*
68  Mississippi Nat. Guard Joint Force Headquarters, Joint Task Force Magnolia, *Operation Secure Magnolia, Hurricane Katrina August 26-Present* [hereinafter Operation Secure Magnolia Presentation]; *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Maj. Gen. Harold A. Cross, The Adjutant General, State of MS).
69  *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Maj. Gen. Harold A. Cross, The Adjutant General, State of MS).
70  Dec. 19, 2005 Army National Guard Binder.
71  Memorandum from Acting Deputy Secretary of Defense Gordon England for Chairman of the Joint Chiefs of Staff, Undersecretary of Defense (Comptroller), Undersecretary of Defense for Personnel and Readiness, General Counsel, DOD, Assistant Secretary of Defense for Homeland Defense, Chief, NGB (Sept. 7, 2005).
72  *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Maj. Gen. Harold A. Cross, The Adjutant General, State of MS).
73  Operation Secure Magnolia Presentation.
74  *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Adm. Timothy Keating, Commander, NORAD-NORTHCOM).
75  *Id.*
76  Dabadie Interview; Interview by Select Comm. Staff with Jiff Hingle, Sheriff, Plaquemines Parish, in New Orleans, LA (Nov. 8, 2005); Interview by Select Comm. Staff with Terry Ebbert, Homeland Security Director of New Orleans, in New Orleans, LA [hereinafter Ebbert Interview] (Nov. 9, 2005); Lokey Interview.
77  Thibodeaux Interview; Ebbert Interview.
78  Interview by Select Comm. Staff with Ed Buikema, Response and Recovery Directorate, FEMA, [hereinafter Buikema Interview] in Washington, DC (Jan. 6, 2006).
79  E-mail correspondence from Col. Richard Chavez, USAF, Senior Military Advisor for Civil Support, to Thomas Kuster, Office of the Secretary of Defense, Policy, et al. (Sept. 2, 2005) (9:38 a.m.).
80  Letter from Paul McHale, Assistant Secretary of Defense for Homeland Defense to the Honorable Tom Davis, Chairman, Select Comm. (Jan. 25, 2006).
81  E-mail correspondence from Paul McHale, Assistant Secretary of Defense for Homeland Defense to Michael Jackson, Deputy Secretary, DHS (Sept. 2, 2005) (7:41 p.m.).
82  DOD, MOD 8 to EXORD for DOD Support to FEMA for Hurricane Katrina, signed by Peter Verga, Principal Deputy Assistant Secretary of Defense for Homeland Defense (Sept. 3, 2005).
83  E-mail correspondence from Paul McHale, Assistant Secretary of Defense for Homeland Defense to Michael Jackson, Deputy Secretary, DHS (Sept. 2, 2005) (7:41 p.m.).
84  Letter from Paul McHale, Assistant Secretary of Defense for Homeland Defense to the Honorable Tom Davis, Chairman, Select Comm. (Jan. 25, 2006).
85  Buikema Interview; Interview by Select Comm. Staff with Michael Lowder, Director of Response Division, FEMA, in Washington, DC (Jan. 5, 2006).
86  DOD, MOD 8 to EXORD for DOD Support to FEMA for Hurricane Katrina, signed by Peter Verga, Principal Deputy Assistant Secretary of Defense for Homeland Defense (Sept. 3, 2005); *See also* E-mail correspondence from Paul McHale, Assistant Secretary of Defense for Homeland Defense to Michael Jackson, Deputy Secretary, DHS (Sept. 2, 2005) (7:41 p.m.).
87  E-mail correspondence from Richard Harrington to Linda Sabatini, et al. (Sept. 4, 2005) (3:32 p.m.).
88  E-mail correspondence from Coast Guard Headquarters regarding District Eight situation Report (Sept. 7, 2005) (9:44 p.m.).
89  Briefing for Select Comm. Staff on Response and Recovery Operations and Authorities with Coast Guard Officials (Oct. 27, 2005).
90  *Id.*
91  E-mail correspondence from Coast Guard Headquarters regarding District Eight situation Report (Sept. 7, 2005) (9:44 p.m.).
92  Briefing for Select Comm. Staff on Response and Recovery Operations and Authorities with Captain Jones, Coast Guard [hereinafter Jan. 10, 2006 Jones Briefing] (Jan. 10, 2006).
93  Briefing for Select Comm. Staff on Response and Recovery Operations and Authorities with Coast Guard Officials (Nov. 21, 2005).
94  *Id.*
95  Jan. 10, 2006 Jones Briefing.
96  *Id.*
97  *Id.*
98  *Id.*
99  Briefing for Select Comm. Staff on Response and Recovery Operations and Authorities with Coast Guard Officials (Nov. 29, 2005).
100  Jan. 10, 2006 Jones Briefing.
101  *Id.*
102  *Id.*
103  *Id.*
104  Briefing for Select Comm. Staff on Response and Recovery Operations and Authorities with Coast Guard Officials (Oct. 27, 2005).
105  *Id.*
106  *Id.*
107  Briefing for Select Comm. Staff on Response and Recovery Operations and Authorities with Coast Guard Officials (Nov. 21, 2005).
108  Briefing for Select Comm. Staff on Response and Recovery Operations and Authorities with Coast Guard Officials (Nov. 29, 2005).
109  Jan. 10, 2006 Jones Briefing.

[110] Briefing for Select Comm. Staff on Response and Recovery Operations and Authorities with Coast Guard Officials (Nov. 21, 2005).

[111] Briefing for Select Comm. Staff on Response and Recovery Operations and Authorities with Coast Guard Officials (Nov. 29, 2005).

[112] Id.

[113] Jan. 10, 2006 Jones Briefing.

[114] Id.

[115] Id.

[116] Id.

[117] Briefing for Select Comm. Staff on Response and Recovery Operations and Authorities with Coast Guard Officials (Jan. 3, 2006).

[118] Id.

[119] Briefing for Select Comm. Staff on Response and Recovery Operations and Authorities with Coast Guard Officials (Oct. 27, 2005).

[120] *Oct. 27, 2005 Select Comm. Hearing* at 4 (written statement of Rear Adm. Dennis Sirois, Assistant Commandant for Operations, U.S. Coast Guard).

[121] Briefing for Select Comm. Staff on 2005 Hurricane Season with Bill Irwin, U.S. Army Corp. of Engineers (Dec. 9, 2005).

[122] *Hearing on Hurricane Katrina: The Federal Government's Use of Contractors to Prepare and Respond Before Select Comm.* [hereinafter *Nov. 2, 2005 Hearing on Contractors*], 109th Cong. (Nov. 2, 2005) at 1 (written statement of Col. Norbert Doyle, Principal Assistant Responsible for Contracting (Acting), U.S. Army Corps of Engineers).

[123] Id.

[124] U.S. Army Corps of Engineers, *USACE/ESF#3: Hurricane Season 2005*, 23 (Oct. 28, 2005) (on file with the Select Comm.).

[125] *Nov. 2, 2005 Hearing on Contractors* (written statement of Col. Norbert Doyle).

[126] *Nov. 9, 2005 Joint Armed Services and Homeland Hearing* at 7 (written statement of Paul McHale, Assistant Secretary of Defense for Homeland Defense).

[127] NORAD-NORTHCOM, *Master Exercise Summary Report ARDENT SENTRY 2005* at 1, 2, 5, 7 [hereinafter *July 29, 2005 Master Exercise Summary Report*] (July 29, 2005).

[128] *Id.* at 1-2.

[129] DHS, *TOPOFF Exercise Series: TOPOFF 2 After Action Summary Report* (Dec. 19, 2003).

[130] *July 29, 2005 Master Exercise Summary Report* at 10-11.

[131] Tom Bowman, *Reviews Fault U.S. Disaster Response Plans; Relief Plans Lack Needed Detail, Military Officials Say*, THE BALTIMORE SUN, (Washington, DC), Oct. 24, 2005 at 4A.

[132] Id.

[133] Briefing for Select Comm. Staff on Hurricane Katrina: Themes from Initial Field Work in Four States by Government Accountability Office in Washington, DC (Nov. 29, 2005).

[134] *United States: Pentagon Expands Homeland Security Role*, OXFORD ANALYTICA, (Oct. 12, 2005); *available at* http://www.oxan.com.

[135] NORTHCOM, *VADM Hull's In-Brief* at 12.

[136] Ann Scott Tyson, *Pentagon Plans to Beef Up Domestic Rapid-Response Forces*, WASHINGTON POST, (Washington, DC), Oct. 13, 2005 at 4.

[137] Pam Zubeck, *NorthCom Official Lists Katrina Lessons*, COLORADO SPRINGS GAZETTE, (College Park, MD) Oct. 22, 2005 at A6 [hereinafter Oct. 22, 2005 NorthCom Article].

[138] E-mail correspondence from Brig. Gen Terry Scherling, USAF, Deputy Director for Anti-Terrorism and Homeland Defense to Lt. Gen. Steven Blum, Chief, NGB, et al. (Sept. 14, 2005) (4:12 p.m.).

[139] Id.

[140] *See* Oct. 22, 2005 NorthCom Article.

[141] Memorandum from Maj. Robert K. Bryan, New Jersey Army National Guard to Joint Force Headquarter, New Jersey National Guard (Apr. 25, 2005).

[142] Oct. 22, 2005 NorthCom Article; *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Lt. Gen. H. Steven Blum).

[143] *See* NGB, *National Guard Bureau Contribution to NORTHCOM Ardent Sentry 05 Executive Summary*, at 9 (May 23, 2005); *see also* Oct. 22, 2005 NorthCom Article.

[144] NGB, *National Guard After Action Review, Hurricane Response, September 2005* at 203 [hereinafter Dec. 21, 2005 NGB After Action Review] (Dec. 21, 2005).

[145] Id.

[146] *Id.* at 191-192.

[147] *Id.* at 244.

[148] E-mail correspondence from Andrew Poppas to Lt. Col. Manley Alford, Hurricane Katrina, Crisis Action Team (Sept. 8, 2005) (2:51 p.m.).

[149] Id.

[150] Oct. 27, 2005 Select Comm. Hearing (written response to questions for the record of Maj. Gen. Harold A. Cross, The Adjutant General, State of MS).

[151] E-mail correspondence from Brig. Gen. Michael Ferriter to Lt. Gen. Robert Wagner et al. (Sept. 3, 2005) (2:08 p.m.).

[152] Oct. 27, 2005 Select Comm. Hearing (written response to questions for the record of Maj. Gen. Harold A. Cross, The Adjutant General, State of MS).

[153] Id. at 4-5.

[154] NORTHCOM, *News Release: U.S. Northern Command Support to Hurricane Katrina Disaster Relief*, (Peterson AFB, Colorado) Aug. 31, 2005.

[155] See generally E-mail correspondence from Col. Damon Penn, Defense Coordinating Officer to Lt. Gen. Russell Honoré, First US Army, Commanding General, et al. (Sept. 5, 2005) (7:43 p.m.); E-mail correspondence from Adm. Michael Mullen to Adm. Timothy Keating, Commander, NORAD-NORTHCOM, et al. (Sept. 12, 2005) (4:14 p.m.); DOD, Office of Public Affairs, *DoD Update: Sept 5, 2005-Katrina-OASD (HD) executive summary* (Sept. 5, 2005).

[156] *See* JTF-Katrina, *JTF-Katrina Commander's Assessment*, (Sept. 5, 2005); DOD, Office of Public Affairs, *DoD Update: Aug. 31, 2005-Hurricane Katrina* (Aug. 31, 2005); *DoD Support to Katrina to Hurricane KATRINA, OASD (HD) Executive Summary* (Dec. 16, 2005); E-mail correspondence from Cdr. J.N. Massello, USN, Crew Chief, D Crew, USNORTHCOM Operations Center regarding USNORTHCOM Operations (Sept. 2, 2005) (6:59 a.m.).

[157] *See* E-mail correspondence from Col. Damon Penn, Defense Coordinating Officer to Lt. Gen. Russell Honoré, First US Army, Commanding General, et al. (Sept. 1, 2005) (2:14 p.m.).

[158] OPNAV Battle Watch, *Katrina Damage Installations*, (Aug. 31, 2005).

[159] *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Maj. Gen. Harold A. Cross, The Adjutant General, State of MS).

[160] *See* OPNAV Battle Watch, *Katrina Damage Installations*, (Aug. 31, 2005); Navy Office of Information, *Navy Seabee Katrina Relief Effort Fact Sheet*, NAVY NEWSSTAND, Sept. 19, 2005.

[161] OPNAV Battle Watch, *Katrina Damage Installations*, (Aug. 31, 2005); Daryl Smith, 1st Naval Construction Division Public Affairs, *Seabee Hurricane Recovery Force to Reach 3,000*, NAVY NEWSSTAND, Sept. 2, 2005.

[162] OPNAV Battle Watch, *Katrina Damage Installations*, (Aug. 31, 2005); Navy Office of Information, *Navy Seabee Katrina Relief Effort Fact Sheet*, NAVY NEWSSTAND, Sept. 19, 2005.

[163] DOD, Office of Public Affairs, *DoD Update: Sept 5, 2005-Katrina-OASD (HD) executive summary* (Sept. 5, 2005).

[164] *See* JTF-Katrina, *JTF-Katrina Commander's Assessment*, (Sept. 5, 2005); *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Maj. Gen. Harold A. Cross, The Adjutant General, State of Mississippi); E-mail correspondence from Maj. Gen. Rich Rowe, Director Operations, J3 NORTHCOM to Adm. Timothy Keating, Commander, NORAD-NORTHCOM, et al. (Sept. 3, 2005) (11:15 p.m.).

[165] *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Maj. Gen. Harold A. Cross, The Adjutant General, State of MS).

[166] *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Adm. Timothy Keating, Commander, NORAD-NORTHCOM).

[167] E-mail correspondence from Maj. Gen. Rich Rowe, Director Operations, J3 NORTHCOM to Lt. Gen. James Conway, Joint Chiefs of Staff, J3, et al. (Sept. 11, 2005) (5:20 p.m.).

[168] *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Maj. Gen. Harold A. Cross, The Adjutant General, State of MS).

[169] Dec. 21, 2005 NGB After Action Review at 90.

[170] *Id.* at 151.

[171] *Id.* at 104-105.

[172] *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Lt. Gen. H Steven Blum).

[173] Robert Block and Amy Schatz, *Local and Federal Authorities Battle to Control Disaster Relief*, WALL STREET JOURNAL (Marco Island, FL) at 1, Dec. 8, 2005.

[174] *See Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Maj. Gen. Harold A. Cross, The Adjutant General, State of MS); *Hearing on Hurricane Katrina: Preparedness and Response by the State of Alabama Before Select Comm.*, 109th Cong. (Nov. 9, 2005) (written statement of Governor Bob Riley, State of Alabama); Robert Block and Amy Schatz, *Local and Federal Authorities Battle to Control Disaster Relief*, WALL STREET JOURNAL (Marco Island, FL) at 1, Dec. 8, 2005.

[175] July 29, 2005 Master Exercise Summary Report at 27.

[176] John Hill, *Blanco: National Guard 'saved the day,'* GANNETT NEWS SERVICE (Baton Rouge, LA), Sept. 19, 2005.

[177] Caitlin Harrington, *Pentagon Rethinking Role of Military in Disaster Response*, CQ HOMELAND SECURITY, Sept. 20, 2005.

[178] DOD, Report to Congress on The Role of the Department of Defense in Supporting Homeland Security at 15 (Sept. 2003).

[179] *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Lt. Gen. H Steven Blum).

[180] *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Maj. Gen. Harold A. Cross, The Adjutant General, State of MS); *Oct. 27, 2005 Select Comm. Hearing* (written statement of Maj. Gen. C. Mark Bowen, The Adjutant General, State of Alabama).

[181] *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Adm. Timothy Keating, Commander, NORAD-NORTHCOM).

[182] Interview by Select Comm. Staff with Maj. Gen. Harold A. Cross, The Adjutants General, State of MS (Jan. 6, 2006); interview by Select Comm. Staff with State Adjutants General at Air Nat'l Guard Senior Leadership Conference, Dec. 13-14, 2005.

[183] NORTHCOM, *Who We Are – Mission, available at* http://www.northcom.mil/index.cfm?fuseaction=s.who_mission.

[184] *Id.*

[185] E-mail correspondence from Anthony Capra to POL DoD HD Coordination Group (Aug. 29, 2005) (1:55 p.m.); E-mail correspondence from Phil Dalton, Battle Captain, HQ First Army, to Lt. Gen. Russell Honoré, First US Army, Commanding General, et al. (Aug. 29, 2005) (2:29 p.m.); E-mail correspondence from Phil Dalton, Battle Captain, HQ First Army, to Lt. Gen. Russell Honoré, First US Army, Commanding General, et al. (Aug. 29, 2005) (2:36 p.m.); JTF Katrina Commanders Assessments (Daily) (Aug. 31-Sept. 2, 2005).

[186] E-mail from Lt. Gen. Russell Honoré, First US Army, Commanding General to Col. James Hickey, Chief of Staff, First US Army (Sept. 1, 2005) (1:55 p.m.).

[187] E-mail correspondence from Col. William Harrison, FORSCOM G3 AVN, to Col. Paul Kelly, NGB (Aug. 30, 2005) (10:35 p.m.).

[188] *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Adm. Timothy Keating, Commander, NORAD-NORTHCOM).

[189] Mark Mazzetti, *Military Sees Limits to Role in U.S. Disasters*, LOS ANGELES TIMES (Washington), Oct. 13, 2005 at A11.

[190] Dec. 21, 2005 NGB After Action Review at 168.

[191] E-mail correspondence from Michael Ritchie, Office of the Secretary of Defense, Policy to Anthony Capra, OASD Homeland Defense, DOD Desk (Aug. 29, 2005) (1:14 p.m.).

[192] E-mail correspondence from Col. William Harrison, FORSCOM G3 AVN, to Col. Paul Kelly, NGB (Aug. 30, 2005) (10:35 p.m.); E-mail correspondence from Maj. Gen. Rich Rowe, Director Operations, J3 NORTHCOM to Lt. Gen. Russell Honoré, First US Army, Commanding General, et al. (Sept. 1, 2005) (10:21 a.m.).

[193] E-mail correspondence from Col. Mark Scraba, Senior Military Assistant to the Assistant Secretary of Defense for Homeland Defense, to Paul McHale, Assistant Secretary of Defense for Homeland Defense, et al. (Sept. 4, 2005) (2:25 p.m.).

[194] *Id.*

[195] July 29, 2005 Master Exercise Summary Report.

[196] Dec. 21, 2005 NGB After Action Review at 147.

[197] *See* DOD Official E-mails: Lt. Gen. Steven Blum, Chief, NGB at MMTF 00415-05; DOD Official E-mails: Paul McHale, Assistant Secretary of Defense for Homeland Defense at MMTF 00418-05.

[198] *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Lt. Gen. H Steven Blum).

[199] Department of the Navy, Navy Emergency Preparedness Liaison Officer Program at First Army Memorandum to Commander, First Army, After Action Report and Lessons Learned at 14 (Sept. 12, 2005).

[200] *Id.* at 11.

[201] NORTHCOM, *VADM Hull's In-Brief* at 12.

[202] Department of the Navy, Navy Emergency Preparedness Liaison Officer Program at First Army Memorandum to Commander, First Army, *After Action Report and Lessons Learned* at 7 (Sept. 12, 2005).

[203] *Id.*

[204] NORTHCOM, *VADM Hull's In-Brief* at 12.

[205] Department of the Navy, Navy Emergency Preparedness Liaison Officer Program at First Army Memorandum to Commander, First Army, *After Action Report and Lessons Learned* at 9 (Sept. 12, 2005).

[206] *Id.* at 14-15.

[207] *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Lt. Gen. H Steven Blum).

[208] *Id.*

[209] *United States: Pentagon Expands Homeland Security Role*, OXFORD ANALYTICA, (Oct. 12, 2005); *available at* http://www.oxan.com.

[210] Interview by Select Comm. Staff with Maj. Gen. Harold A. Cross, The Adjutant General, State of MS, in MS (Oct. 12, 2006).

[211] *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Maj. Gen. Harold A. Cross, Adjutant General, State of Ms).

[212] Veillon Interview; Dabadie Interview.

[213] Interview by Select Comm. Staff with Matt Farlow, Division Chief, Information Technology Division, Louisiana Office of Homeland Security and Emergency Preparedness, [hereinafter Farlow Interview] in Baton Rouge, LA (Nov. 4, 2005); Interview by Select Comm. Staff with Rex McDonald, Information Technology and Communications Director, Louisiana Department of Public Safety and Corrections, [hereinafter McDonald Interview] in Baton Rouge, LA (Nov. 7, 2005).

[214] Farlow Interview; McDonald Interview.

[215] Veillon Interview; Dabadie Interview.

[216] Dec. 21, 2005 NGB After Action Review at 71.

[217] *Id.* at 166.

[218] *Id.* at 146.

[219] *Id.* at 5, 7, 70, 137, 177-178, 251, 260, 262.

[220] *Id.* at 137.

[221] *Id.* at 67.

[222] Operation Secure Magnolia Presentation; *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Maj. Gen. Harold A. Cross, The Adjutant General, State of MS).

[223] Air National Guard, *ANG C-130 Support for Hurricane Relief Missions.*

[224] Briefing for Select Comm. Staff by NGB Staff in Washington, DC (Jan. 11, 2006).

[225] U.S. Air Force, Headquarters Air Force Civil Engineer Support Agency, Office of Public Affairs, *Fact Sheet: United States Air Force Red Horse Squadrons;* Briefing for Select Comm. Staff by NGB Staff in Washington, DC (Jan. 11, 2006).

[226] Briefing for Select Comm. Staff by NGB Staff in Washington, DC (Jan. 11, 2006).

[227] *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Adm. Timothy Keating, Commander, NORAD-NORTHCOM); DOD, *Strategy for Homeland Defense and Civil Support*, Washington, DC (June 2005).

[228] Aug. 11, 2005 BRAC Commission Hearing  (statement of Peter Verga, Principal Deputy Assistant Secretary of Defense for Homeland Defense).

[229] *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Maj. Gen. Harold A. Cross, Adjutant General, State of MS).

[230] Dec. 21, 2005 NGB After Action Review at 215.

[231] Eric Lipton, et al., *Political Issues Snarled Plans for Troop Aid*, NEW YORK TIMES (Washington), (Sept. 9, 2005).

[232] Dec. 19, 2005 Blum, James, Vaughn Interview.

[233] Operation Secure Magnolia Presentation.

[234] Letter from Governor Kathleen Blanco, State of LA, to President George W. Bush (Sept. 2, 2005).

[235] *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Lt. Gen. H Steven Blum).

[236] Dec. 21, 2005 NGB After Action Review at 87-88.

[237] *Id.*

[238] Interview by Select Comm. Staff with Maj. Gen. Harold A. Cross, The Adjutant General, State of MS (Jan. 6, 2006).

[239] DOD, Office of Assistant Secretary of Defense for Public Affairs, *DOD Announces Plans for 17 New WMD Civil Support Teams* (Jan. 13, 2000).

[240] *Id.;* Gerry Gilmore, *Guard-Staffed WMD Civil Support Teams Slated for Increase*, AMERICAN FORCES INFORMATION SERVICE  (Washington), Jan. 20, 2004; Donna Miles, *Guard Civil Support Teams Provide WMD Expertise to Communities*, AIR FORCE NEWS (Camp Robinson, AR), (May 26, 2005).

[241] E-mail correspondence from Ronald Jones, Chief, WMD Division to 1A JOC WMD, et al. (Sept. 2, 2005) (11:21 a.m.).

[242] Dec. 21, 2005 NGB After Action Review at 196.

[243] *Id.*

[244] *Id.*

[245] Dec. 21, 2005 NGB After Action Review at 64; E-mail correspondence from Lt. Gen. Clyde A. Vaughn, Director, Army National Guard to Brig. Gen. Frank Grass, Deputy Director, Army National Guard (Sept. 11, 2005) (6:35 a.m.).

[246] NGB, *National Guard Bureau Contribution to NORTHCOM Ardent Sentry 05 Executive Summary* at 8 (May 23, 2005).

[247] *See* E-mail correspondence from Maj. Gen. Gus Hargett, The Adjutant General, State of Tennessee (Sept. 2, 2005) (6:07 p.m.); E-mail correspondence from Maj. Gen. David Poythress, The Adjutant General, State of Georgia (Sept. 2, 2005) (4:35 p.m.); E-mail correspondence from Maj. Gen. Mason Whitney, The Adjutant General, State of Colorado (Sept. 2, 2005) (17:28 p.m.).

[248] Dec. 19, 2005 Blum, James, Vaughn Interview.

[249] Sept. 2, 2005 Letter from Gov. Riley to Sec. Rumsfeld; Sept. 4, 2005 Letter from Gov. Barbour to Sec. Rumsfeld; Sept. 5, 2005 Letter from Gov. Blanco to Sec. Rumsfeld.

[250] E-mail from Col. Kelly McKeague, NGB, to Lt. Gen. Steven Blum, Chief, NGB, et al. (Sept. 10, 2005) (8:03 a.m.).

[251] *Id.*; E-mail correspondence from Lt. Gen. Clyde A. Vaughn, Director, Army National Guard to Brig. Gen. Frank Grass, Deputy Director, Army National Guard (Sept. 11, 2005) (6:35 a.m.).

[252] Dec. 21, 2005 NGB After Action Review at 91.

[253] *See Id.*

[254] Caitlin Harrington, *Pentagon Rethinking Role of Military in Disaster Response*, CQ HOMELAND SECURITY, Sept. 20, 2005.

[255] *Oct. 27, 2005 Select Comm. Hearing* (written response to questions for the record of Adm. Timothy Keating, Commander, NORAD-NORTHCOM).

[256] Veillon Interview; Keeling Interview.

BARGE000316



AP PHOTO/ERIC GAY

*"The members of the public safety community aggressively moved into areas immediately after the storm passed and saved many lives and brought order. This was a very difficult mission as much of the public safety infrastructure, police and sheriff's stations, patrol cars, and communications had been destroyed in the coastal communities."*

WILLIAM L. CARWILE, III
Hurricane Katrina Federal Coordination Officer for Mississippi
Select Committee hearing, December 7, 2005

# LAW ENFORCEMENT

## The collapse of law enforcement and the lack of effective public communications led to civil unrest and further delayed relief

### Summary

A wide variety of conditions led to lawlessness and violence in areas hit by Hurricane Katrina. Lack of food, water, and electricity. Uncertainty about evacuations. Even the loss of hope. Looting occurred in several locations. In some cases, people looted stores for their survival and to diminish suffering, taking items such as food, water, clothing, flashlights, batteries, and camping supplies. At least some police departments were involved in breaking into stores and commandeering supplies needed for their departments, as well as those needed for feeding people in shelters before state or federal assistance arrived. One New Orleans physician said police helped him break into a pharmacy to get needed medications and supplies. In other cases, people looted for purely criminal purposes, apparently taking items for personal use or resale that would not be needed or were useless without electricity (e.g., televisions).

General unrest and lawlessness arose in crowded areas where people were uncertain about their survival, or rescue, or prospects for evacuation. In some areas, the collapse or absence of law enforcement exacerbated the level of lawlessness and violence. Several police departments lost dispatch and communication



AP PHOTO/ERIC GAY

capabilities, police vehicles, administrative functions such as booking, and jails to confine arrested suspects. Tremendous additional burdens were imposed on the police, like search and rescue operations, that took priority over normal police functions. The extent of crime and lawlessness is difficult to determine, partly because of the loss of police record keeping during the disaster and partly because of unsubstantiated reporting by the media.

The breakdown of law enforcement was particularly notable in New Orleans. Despite the well-known threat from flooding, the New Orleans Police Department had not taken basic steps to protect its resources and ensure continuity of operations. For



AP PHOTO/ERIC GAY

example, communications nodes, evidence rooms, and even emergency generators were housed in lower floors susceptible to flooding. When the levees broke and the floodwaters overtook police headquarters and district offices, the department lost its command and control and communications functions. Police vehicles believed to be moved out of harm's way were lost to the floodwaters. Hundreds of New Orleans Police Department officers went missing — some for legitimate reasons and some not — at a time they were needed most. This left the city unable to provide enough manpower and other resources to maintain law and order at shelters and on the streets.

Looting broke out in the downtown section of the city, particularly along Canal Street. There were also reports, currently under investigation by the Louisiana Attorney General, that New Orleans police officers were involved in stealing vehicles from a car dealership. Even when police were present to restore law and order, they did not have the resources to arrest, book, and detain suspects. Other parts of the city, according to witnesses, were relatively calm despite the lack of law enforcement personnel.

Public communications is a key aspect of emergency management, and this function has its own emergency support function in the NRP. In Louisiana, and particularly

New Orleans, the federal, state, and local governments did not appear to have a public communications strategy to utilize the media. This problem was particularly severe in the area of law enforcement and crime. While the media played a positive role in many aspects — such as providing situational awareness to government authorities — it also played a negative role in the often unsubstantiated reporting of crime and lawlessness, undermining the accuracy and value of that awareness.



AP PHOTO/LM OTERO

New Orleans Mayor Ray Nagin and Police Chief Eddie Compass

Media reports of violence often gave credence to rumors that were either false or highly exaggerated. Public officials did not have a strategy to get ahead of the "information curve" to use the media to the public's advantage and help quell rumors. In fact, Mayor Ray Nagin and the Chief of Police repeated rumors of rampant criminality to the national media, contributing to the exaggerated image of utter lawlessness. Many of these reports, particularly of unchecked violence in the Superdome, appear to have been unsubstantiated. Nevertheless, the hyped media coverage of violence and lawlessness, legitimized by New Orleans authorities, served to delay relief efforts by scaring away truck and bus drivers, increasing the anxiety of those in shelters, and generally increasing the resources that needed to be dedicated to security.

Law and order were eventually restored as local law enforcement officers were removed from search and rescue, reassigned to law enforcement missions, and supplemented first by state National Guard troops, then by other state and local police through the Emergency Management Assistance Compact (EMAC) process. The National Guard played a substantial role in providing security and restoring law and order. The Louisiana National Guard was deployed before landfall, and provided security at the Superdome that helped maintain order there. Once looting broke out in New Orleans, guardsmen also patrolled the streets to restore law and order.

The Alabama National Guard was also deployed before landfall, providing a security task force for Mobile and Baldwin counties. National Guards from other states sent units through the EMAC process to perform security or law enforcement duties. For example, Arkansas provided 310 guardsmen from a military police company to provide security in Mississippi.

While not immediately deployed, Department of Defense (DOD) active duty forces also played a role in restoring and maintaining law and order. For example, the U.S. Army's 82nd Airborne arrived in New Orleans on September 3 (five days after landfall) and, according to the city's Director of Homeland Security, had a "calming effect" on the populace by their mere presence on the street. Precautions were taken to prevent DOD active duty forces from direct law enforcement missions, thereby avoiding Posse Comitatus issues.

Civilian law enforcement agencies from other states and localities also provided personnel through the EMAC process to supplement beleaguered state and local police. For example, South Carolina provided 118 law enforcement personnel with equipment to Mississippi.

Federal law enforcement agencies also played a major role in restoring law and order after Hurricane Katrina. Specific agencies included the U.S. Attorney's Office, the Federal Bureau of Investigation (FBI), the Drug Enforcement Agency (DEA), the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the U.S. Marshal Service (USMS), the U.S. Secret Service, U.S. Customs and Border Protection, the U.S. Border Patrol, U.S. Immigration and Customs Enforcement, and the Federal Air Marshal Service (FAMS). The first priority for most of these agencies was implementing continuity of operations plans — locating their people, securing their workplaces and sensitive information, getting supplemental manpower from other field offices, and otherwise fully restoring their mission capabilities. These federal agencies then turned to assisting state and local law enforcement agencies.

These agencies brought a wide array of capabilities and tactical teams to help restore and maintain law and order. Most of the federal personnel were deputized as state law enforcement officials, so they could fully partner with local police by participating in patrols, investigating crimes, and arresting suspects. The FBI deployed its Critical Incident Response Group and ATF deployed one of its Special Response Teams. ATF located and inspected federal firearms and explosives licensees to determine if their facilities were secure. USMS assisted with evacuating prisoners from flooded jails into federal facilities. FAMS provided security at the New Orleans Airport.

Federal agencies also helped establish interagency and intergovernmental mechanisms — such as common credentialing and a Law Enforcement Coordination Center — to coordinate the activities of the multitude of federal, state, and local law enforcement agencies. Finally, these federal agencies provided equipment, supplies, and other resources to local law enforcement agencies to help them start rebuilding their capabilities.

# Finding: A variety of conditions led to lawlessness and violence in hurricane stricken areas

## Several conditions led to lawlessness and looting

A wide variety of conditions led to lawlessness and violence in areas hit by Hurricane Katrina. Bobby Strahan, Pearl River County Emergency Management Agency Director, said the lack of critical commodities for those residents who did not evacuate (or returned quickly) and crowds seeking shelter at a limited number of facilities with generators may have been behind some of the post-landfall requests for security and law enforcement assistance.[1] According to Strahan, Pearl River experienced some looting and other crimes in the immediate aftermath of the storm. Once the county was able to secure and distribute limited amounts of food, ice, and water (what it could gather on its own plus assistance from the state of Florida), these security problems largely dissipated.

Similarly, those who did not evacuate (or returned quickly) may have contributed to significant security challenges at some of Mississippi's healthcare facilities in the affected areas. According Dr. Brian Amy, the State Health Officer of Mississippi, most of those facilities had generators and a limited power supply.[2] This caused them to quickly attract the attention of displaced residents, who were drawn to the lights and the possibility they might seek shelter there, and created what Amy termed an "overflow" situation resulting in security issues at the facilities.[3] In Louisiana, officials cited the lack of food, water, electricity, and uncertainty about evacuations as reasons for lawlessness and looting.[4] Even Governor Kathleen Blanco said she sympathized with people who looted stores to survive.[5]

Looting occurred in several locations. Mississippi experienced some looting, armed robbery, and crowd control problems immediately after the storm.[6] Security-related requests the state received from local officials included: (1) nighttime military police (MP) security at pharmacy and drug dispensing operations in several coastal cities; (2) help with security issues at an understaffed shelter that was about to receive evacuees from New Orleans; (3) law enforcement personnel to deal with reported theft and carjacking threats at a medical center in Biloxi; and (4) additional National Guard protection to deal with looters at the South Mississippi Regional Center in Long Beach.[7]

In Louisiana, state police officials said looting was most concentrated in the New Orleans area.[8] However, major looting was generally limited to the Canal Street area and ended by Tuesday, August 30. According to these officials, in some cases people looted stores for their survival, taking items such as food, water, clothing, flashlights, batteries, and camping supplies. In other cases, people looted for criminal purposes, apparently taking items for



their personal use or resale that would not be needed or were useless without electricity (e.g., televisions). Once most perpetrators realized they had no way to transport their loot and no place to store it, they often abandoned it. State police officials said several blocks away from the looting area, many large electronic items and appliances were found abandoned in their original boxes.

At least some police departments were involved in breaking into stores and taking supplies. Plaquemines Parish Sheriff Jiff Hingle said his officers broke into stores and commandeered food, water, and medicine.[9] Some of these items were needed to sustain the sheriff's office and other emergency personnel. Most of the items taken,

AP PHOTO/DAVE MARTIN



CHRISTIAN SCIENCE MONITOR/ANDY NELSON

however, were food and medical items for the growing population at the parish's designated shelter of last resort. The shelter had been originally set up to house the police, other emergency workers, and those with special needs. However, after landfall, the shelter became crowded with additional evacuees or people rescued by boat. Eventually the numbers increased to about 400, and since state and federal relief was slow in arriving, the sheriff's officers commandeered needed items. The sheriff said he later contacted the stores and asked for forgiveness, which was granted under the circumstances.

In Alabama, there were almost no reports of lawlessness, looting, or other crimes. Officials said this was because Hurricane Katrina did not hit Alabama as hard as it hit the other states.[10] In addition, Alabama's law enforcement infrastructure was not as severely damaged and remained functional in the immediate aftermath of the hurricane.

## General unrest and violence occurred in crowded areas

General unrest and lawlessness arose primarily in crowded areas where people were uncertain about their survival, or rescue, or prospects for evacuation. For example, local officials in Mississippi asked the state to send National Guard soldiers to provide security and crowd control at a Red Cross shelter because of "chaotic conditions" and the shelter director's belief that help was needed to prevent "potential behavioral problems."[11] Some of the most notorious locations for unrest were in New Orleans, at the Superdome, the Convention Center, and the Cloverleaf, as discussed in the EVACUATION chapter. The conditions at the Superdome, as described in a National Guard report, illustrate the desperation felt by the crowd inside:

> The water pressure declined steadily over the first several days and failed to provide toilet function on or about Wednesday the 31st of August. Unfortunately, many of the toilets had overflowed by then and foot traffic distributed fecal material and urine throughout the facility…The warm temperature, combined with the floodwaters on the lower level, rotting food and other refuse, human and animal (pets) waste material, and the aroma of unwashed humans, produced an increasingly noxious smell in the place.[12]

Louisiana National Guard personnel said a lack of hope was also a factor in the Superdome with the crowd becoming restless and, in isolated incidents, violent.[13] These people had lost their homes and belongings, had to suffer unbearable conditions, and were uncertain about their future. Exacerbating the problem were continuing delays in getting buses to evacuate the Superdome, as discussed in the EVACUATION chapter. After people had been told for several days they would be evacuated the next day, the buses did not arrive in large numbers, and people did not see any progress.

## The collapse or absence of law enforcement exacerbated lawlessness

In some areas, the collapse or absence of law enforcement exacerbated the level of lawlessness and violence. For example, several police departments lost their dispatch and communication functions, police vehicles, administrative functions such as booking, and jails to confine arrested suspects. Tremendous additional burdens were imposed on the police — such as search and rescue — that took priority over normal police missions.



AP PHOTO/DAVE MARTIN

BARGE000321

A FAILURE OF INITIATIVE

In Mississippi, massive damage to police and sheriff cars and stations, emergency response vehicles, and emergency operations centers made it very difficult to maintain law and order. According to William Carwile, the FEMA Federal Coordinating Officer for Mississippi, much of this public safety infrastructure was destroyed in the coastal counties.[14] Mayor Thomas Longo of Waveland said the city staged at various points around the area some of the resources it expected to need to respond to the storm's damage, including dump trucks and front-end loaders.[15] Waveland also staged some of these resources about 10 miles north of the city as a backup in the event of a catastrophe. Nonetheless, despite those preparations, the hurricane destroyed the resources Waveland had staged north of the city as well as much of what remained in the city itself. Waveland lost all of its police cars (in addition to other emergency vehicles), and the storm destroyed all of Waveland's public buildings, severely limiting its ability to mount a response to the storm.[16]



FEMA-provided temporary buildings out of which Waveland's city government, including its police department, is now operating.

Also in Mississippi, Hancock County lost its emergency operations center — the location from which it expected to manage the county's response to the storm — to severe flooding soon after the hurricane hit.[17] Pearl River County lost its emergency operations center in the early hours of the storm due to wind and water damage that knocked out its emergency backup generator and caused other damage, making the center inoperable.[18] These losses degraded the ability to maintain law and order.

In Louisiana, there were similar losses of law enforcement infrastructure, in both rural and urban areas, that weakened the law enforcement community's ability to function. The lack of preparation and almost total loss of police capabilities in New Orleans are addressed in the next finding.

Plaquemines Parish, in contrast to New Orleans, appeared to take many precautions before Katrina made landfall. According to Plaquemines Parish Sheriff Jiff Hingle, all police vehicles were moved and parked on high ground.[19] Only one or two vehicles were slightly damaged when flying debris cracked their windows. Before landfall, the sheriff's office gathered all administrative records, loaded them into U-Haul trailers, and moved them to safe locations in the north. In addition, Plaquemines Parish evacuated all its prisoners in advance to upstate facilities.

After landfall, the Plaquemines Parish sheriff's office was immediately able to conduct search and rescue missions, along with some embedded Louisiana National Guard and Coast Guard personnel who had radios.[20] The sheriff reported no major law enforcement issues, in part because his office could function immediately after the storm.

The full extent of crime and lawlessness is difficult to determine, partly because of the loss of police record keeping during the disaster, and partly because of unsubstantiated reporting by the media (discussed below).

# Finding: The New Orleans Police Department was ill prepared for continuity of operations and lost almost all effectiveness

## New Orleans Police Department had not prepared for flooding

The collapse of law enforcement was particularly notable in New Orleans. Despite the well-known threat from flooding, the New Orleans Police Department had not taken some basic steps to protect its resources and ensure continuity of operations. For example, communications nodes, evidence rooms, and even emergency generators were housed in lower floors that were susceptible to flooding.

In 2004, the police department reportedly produced an "elaborate hurricane plan" which was issued to all commanders.[21] But, according to a reporter who was present during Katrina and reviewed police operations, it "stayed on their bookshelves," and the department never ran "exercises to familiarize officers with the plan."[22] Few officers the reporter spoke with even knew the plan existed.[23]

*As an institution… the New Orleans Police Department disintegrated with the first drop of floodwater.*

When the levees broke, the floodwaters overtook police headquarters and district offices. As a result, the department lost its command and control and communications functions. The dispatch and 911 call center ceased to function. Most police vehicles had not been moved out of harm's way and were lost to the floodwaters. The flooding created impassable roads which prevented the New Orleans Police Department from using their few remaining vehicles in most parts of the city. This left officers to patrol without any communications or transportation. With no command and control or guidance, there was no unified command or clear priorities within the department. One reporter who was on the scene wrote that "As an institution… the New Orleans Police Department disintegrated with the first drop of floodwater."[24]

### Missing police officers led to a law enforcement manpower shortage

Further, hundreds of New Orleans Police Department officers went missing — some for understandable reasons and some not — at a time they were needed the most. This left the city unable to provide enough manpower and other resources to maintain law and order at shelters and on the streets.

All New Orleans Police Department officers are required to reside within the city limits, so a majority of the city's officers were personally affected by Katrina.[25] Whether it was damage to their homes or the health and safety of family members, many New Orleans Police Department officers, like members of the general public, were trapped in their homes and needed to be rescued during the critical days and hours after the levees failed and the flood waters rose.

Dereliction of duty by New Orleans Police Officers factored significantly into the department's inability to marshal an effective response. Original reports indicated that up to 320 officers (of its 1,750-officer force) resigned, were terminated, or are under investigation for abandoning their duties.[26] However, on December 14, Mayor Nagin testified that as of that date, 133 officers had been terminated or resigned after Hurricane Katrina, and said many of the original reports did not account for nearly 100 officers who were trapped or stranded on rooftops and unable to report to duty for that reason.[27] Regardless, the New Orleans Police force was severely depleted.

As a result, many residents were unable to obtain police assistance. Calls for help to the city's 911 system went unanswered.[28]

Some of the officers were also apparently involved in criminal activities. Officials from the Louisiana Attorney General's office said they are investigating thefts of luxury vehicles from a car dealership allegedly perpetrated by New Orleans Police Department officers.[29] The dealership, Sewell Cadillac Chevrolet, reported that several police officers had absconded with several brand new Cadillac Escalades.[30]

The Louisiana State Police provided relatively quick assistance. Although the New Orleans Police Department had lost its command and control capabilities, the Louisiana State Police operated under its own broad law enforcement statutory mandate. Thus, state police were able to move into the affected area quickly. As the significance of Katrina became evident, state police ceased other law enforcement activities to focus on New Orleans' needs.



AP PHOTO/RON HAVIV/VII



FEMA

Police had limited resources to stop looting in downtown New Orleans

Given the situation, police had limited resources with which to stop the looting.[31] And even when police were present to restore law and order, they did not have the resources to arrest, book, and detain suspects. One major problem was the loss of the booking and jail systems. Booking and jailing are done not by the New Orleans Police Department, but by the parish criminal sheriff. Sheriffs in each parish are constitutional positions independent from the parish president or mayor or police. The sheriff's booking offices and jails were flooded and therefore useless. While criminals, such as looters, could be apprehended by law enforcement officers, there was nowhere to book them or jail them. Many people originally apprehended for looting were just let go.



AP PHOTO/DAVID J. PHILLIP

# Finding: Lack of a government public communications strategy and media hype of violence exacerbated public concerns and further delayed relief

Governments appeared to lack any public communications strategy and media and public officials fed rumors

Public communications is a key aspect of emergency management, and this function has its own emergency support function in the NRP. In Louisiana, and particularly New Orleans, the federal, state, and local governments did not appear to have a public communications strategy to deal with the media. This problem was particularly severe in the area of law enforcement and crime.

The media played a positive role in Hurricane Katrina in many aspects — such as providing situational awareness to government authorities and the public. And many media reports of violence were substantiated and responsibly reported. For example, MSNBC provided live coverage of looters, including police officers, ransacking a local Wal-Mart in New Orleans.[32]

However, other media reports were based on rumors that were either false or highly exaggerated, undermining the value of the situational awareness being provided. CNN reported repeatedly on September 1, for example, that evacuations at the Superdome were suspended because "someone fired a shot at a helicopter."[33] State and local officials later said much of the "rampant shooting" reported was actually from trapped individuals who were firing weapons into the air to attract rescuers.[34]

According to state officials, rumors and reports of people shooting at helicopters were difficult to substantiate at the time.[35] But in the end, there were no bullet holes found in any helicopters. Again, people firing into the air may have been the origin of this rumor. Other reports of people shooting at helicopters taking patients to hospitals were never verified, nor were stories of two babies found with their throats slit in Convention Center bathrooms or of the man who heard a rape victim scream, ran outside for help, and was shot and killed by troops.[36]

State law enforcement officials expressed frustration over media reports of crime.[37] Many of these officials

said the media greatly exaggerated reports of crime and lawlessness. They said any reports from the Superdome and Convention Center were generally difficult to substantiate. Few crime victims ever came forward to the police. Without an official complaint, victim, or eye witness, it was nearly impossible for the police to assess the credibility of rumors or conduct an investigation. On September 1, during a FEMA videoconference call, FEMA Federal Coordinating Officer, William Lokey, stated that "media reports and what we are getting from on-scene were contradictory and we [did not] have a clear picture of what exactly went on."[38]

Managing the spread of false or highly exaggerated rumors proved difficult – and consequential — for officials on the ground. On September 1, Colonel Jeff Smith, Deputy Director, Louisiana Office of Homeland Security and Emergency Preparedness, told public officials that "the rumor control on this thing is going to be key… [s]ome of the things you hear, some of it has probably partial basis in fact, but there's a lot of exaggeration going on there."[39] False media reports impeded the relief effort and affected decisions on where to direct resources. When asked whether exaggerated media reports impeded rescue efforts, Colonel Terry J. Ebbert, Director of Homeland Security, City of New Orleans, responded "absolutely."[40] Mayor Nagin testified that "dealing with the realities of all the multiplicity of challenges that we had, managing rumors, was the thing that we spent way too much time doing."[41]



AP PHOTO/DENNIS COOK

At the strategic level, public officials did not have a strategy to get ahead of the "information curve" to use the media to the public's advantage and quell rumors. On the contrary, Mayor Nagin and the New Orleans Chief of Police repeated unsubstantiated rumors before the national media, creating an exaggerated image of utter lawlessness.

- New Orleans Mayor Ray Nagin told Oprah Winfrey that "hundreds of armed gang members" were raping women and committing murder in the Superdome. The occupants, he said, were "in an almost animalistic state…in that frickin' Superdome for five days watching dead bodies, watching hooligans killing people, raping people."[42] Many news outlets also covered Nagin's claim that the city's death toll would top 10,000.[43]

- Police Superintendent Eddie Compass went further, and told Oprah, "We had little babies in there getting raped." Compass was also reported as saying officers were shot at inside the convention center but couldn't return fire "because of the families." He said officers caught 30 suspects by rushing at muzzle flashes.[44]

Many of these media reports, particularly of rampant violence in the Superdome, appear to be completely unsubstantiated. National Guard officials who were on the scene believe these reports were highly exaggerated.[45] Lieutenant General H. Steven Blum, Chief of the National Guard Bureau, stated "the media is not supposed to be inciting an insurrection. It is not supposed to be advertising and hyping lawlessness."[46] National Guard officials said there were numerous reports and rumors of rape or assault, but guardsmen and police could not find any witness, victim, or anyone willing to report the crime firsthand. Only two arrests were made by the police. Of the six deaths in the Superdome, none were crime-related. Guard officials said there were only 50 weapons found among the 25,000 to 30,000 people searched as they entered the Superdome. According to the Guard and police, the people in the Superdome were very unhappy and anxious, but they were never out of control. The exaggerated media reports of violence (which some of the evacuees had picked up on their transistor radios) served to further evacuees' anxiety, pushing some close to the boiling point.

Like the Superdome, there were media reports of violence and lawlessness in the Convention Center. For example, the *Times-Picayune* reported that Guard troops found 30 to 40 decomposing bodies piled in a freezer at the Convention Center.[47] But again, these reports were generally uncorroborated. There were only four dead bodies recovered from the Convention Center.[48] The National Guard officials that secured the site said they encountered no lawlessness or any resistance when

they moved in to clear out the Convention Center. As an indication of the generally peaceful intentions of the crowd, they reported there were only 13 weapons found among the 19,000 people searched before they boarded the buses.

NOPD Captain Jeff Winn said, however, he made several approaches to the Convention Center during those first few days and saw muzzle flashes.[49] He also suggested crime went unreported because of the continuing danger in the Convention Center, the lack of law enforcement resources to investigate and detain suspects, and the dispersal of witnesses when the evacuation of the facility was complete.[50] He also reported he saw a body with puncture wounds.[51]

### Exaggerated media reports of crime further delayed relief efforts

The hyped media coverage of violence and lawlessness, legitimized by New Orleans authorities, served to delay relief efforts by scaring away truck and bus drivers, increasing the anxiety of those in shelters, and generally increasing the resources needed for security. With regard to the impact of the media reports on the hurricane recovery, Lieutenant General Blum, Chief of the National Guard Bureau, testified:

> They [the media reports] also prevented truck drivers coming in with the most needed supplies, water, food, ice, shelter, medicine. They were afraid to come in. They had to be escorted in by National Guard convoys, which took other manpower away from the relief efforts to go help get the commercial truckers that the civilian organizations had contracted to come in and help the people. They delayed the exact commodities from getting to the people that they were complaining weren't getting the commodities.[52]

State officials reported the hysterical and uncontrolled media images led to much confusion.[53] As the broadcast media reports became widely seen and heard, the Superdome population became increasingly agitated. Reports of truck drivers and FEMA employees turning around due to security concerns did not help the situation. First Assistant Attorney General Nicholas Gachassin said

> *1,000 FEMA employees set to arrive in New Orleans on Wednesday, August 31, turned back due to security concerns.*

those in lesser affected neighborhoods were afraid to evacuate as looting fears prompted them to stay at their residences.[54] Similarly, the Governor's Chief of Staff Andy Kopplin reported that 1,000 FEMA employees set to arrive in New Orleans on Wednesday, August 31, turned back due to security concerns.[55] In repeating unsubstantiated rumors of mayhem, news reporters unwittingly helped slow an already slow response and further wound an already wounded population.

# Finding: EMAC and military assistance were critical for restoring law and order

### The Emergency Management Assistance Compact (EMAC), the state to state assistance compact, facilitated the deployment of resources to the hardest hit regions

The Emergency Management Assistance Compact (EMAC) is a mutual aid agreement and partnership between states to provide resources to one another during times of emergency.[56] EMAC offers state to state assistance during governor-declared states of emergency.[57] Ratified by Congress in 1996, 49 states and the District of Columbia have enacted legislation to become members of EMAC.[58]

EMAC is administered by the National Emergency Management Association (NEMA).[59] NEMA provides the day to day managerial support and technical infrastructure for EMAC operations and training programs. EMAC works as follows:[60]

1. Governor declares a state of emergency.
2. A representative from the state emergency management agency notifies the EMAC National Coordinating Group.
3. Affected state requests an EMAC team to be

deployed to its emergency operations center. This EMAC team is called an "A-Team."

4. A-Team arrives at state emergency operations center and begins coordinating state-wide EMAC resource requests. These resource requests are broadcast to all members of the compact soliciting assistance.

5. States willing to assist respond to the broadcast and coordinate with the A-Team the specifics of the transaction, including costs. The A-Team helps the affected state choose from available resources.

6. Formal requisitions are finalized specifying, as precisely as possible, the resources that will be made available and their costs.

7. Resources are sent to the affected states.

8. Responding state submits reimbursement request.

9. Affected state reimburses responding state.

EMAC is executed by eight components:[61]

1. Requesting state – EMAC state, operating under a governor declared emergency, requests assistance.

2. Assisting state – EMAC state, responds to a request for assistance.

3. Authorized representative – state official empowered to request assistance or commit state resources in response to a request.

4. Designated Contact – EMAC subject matter expert within each member state.

5. National Coordination Group (NCG) – national EMAC group during non-emergencies. The NCG stands ready to activate EMAC as emergencies develop.

6. National Coordinating Team (NCT) – when the Department of Homeland Security and FEMA activate their National Response Coordination Center (NRCC) to coordinate the federal response and recovery operations during emergencies, EMAC deploys a NCT to serve at the NRCC in Washington, D.C. From the NRCC, the NCT coordinates EMAC's national response.

7. Regional Coordinating Team (RCT) – If FEMA activates a Regional Response Coordination Center (RRCC) a parallel EMAC RCT is deployed. From the RRCC, the RCT coordinates deployed EMAC components responding throughout the affected region.

8. Other member states – during times of emergencies EMAC members are charged with monitoring the situation and to stand ready to assist as appropriate.

In supporting the response to Hurricane Katrina, a two-person EMAC A-Team was deployed to Baton Rouge, Louisiana on Sunday, August 28.[62] Jeff Smith was identified as the Louisiana state EMAC coordinator.[63] In Mississippi, Bill Brown, Operations Branch Chief, Mississippi Emergency Management Agency, coordinated EMAC.[64] On August 29, the A-Team was increased to four people, and shortly thereafter the team increased to eight members in Louisiana and nine members in Mississippi.[65] Through EMAC, a sizable contingent was deployed to assist Louisiana and Mississippi in the aftermath of Katrina.[66]

In Louisiana, 27,727 personnel were deployed through EMAC by September 13, and during the same time frame, in Mississippi, 18,247 people deployed.[67] There were 680 requests for assistance in Louisiana and 723 in Mississippi.[68] The total estimated cost for Louisiana is $201.8 million and for Mississippi, $314.1 million.[69] EMAC's total Katrina response involved processing 1,403 requests for assistance and 46,288 personnel deployments for a total estimated cost of $515.9 million.[70] The most commonly requested resources included: firefighters, search and rescue personnel, HAZMAT personnel, emergency medical technicians, state police, sheriffs, fish and wildlife personnel, corrections personnel, livestock inspectors, bridge inspectors, airport maintenance personnel, ambulances, medical doctors, registered nurses, and National Guard troops.[71]

EMAC officials have acknowledged a significant population of "self-deployed" personnel, a large majority of which were local and state police officers who deployed to the scene, in what is believed to be a spontaneous response to media reports of lawlessness in southeastern Louisiana.[72] Due to the *ad hoc* nature of these "self-deployed" officers, specific figures are not known. As the ranks of EMAC deployed law enforcement officials and officially deployed federal law enforcement officials continued to grow in the region, the number of "self-deployed" personnel is believed to have declined rapidly.

Without an official deployment, the "self-deployed" personnel were acting without proper authority, without liability protection, and without eligibility for expense reimbursement.

## National Guard played a key role in restoring and maintaining law and order

Law and order were eventually restored as local law enforcement officers were supplemented, first by state military troops. The National Guard played a substantial role in providing security and restoring law and order. The Louisiana National Guard was deployed before landfall, and provided security at the Superdome that helped maintain order there. Once looting broke out in New Orleans, they also patrolled the streets. The Mississippi National Guard was vital to restoring order and providing



AP PHOTO/RON HAVIV/VII

security in the aftermath of the storm. According to Carwile, for example, a "massive National Guard presence" helped quell problems with isolated looting in the western affected counties (Pearl River and Hancock) within 2 days after the storm.[73] The Alabama National Guard was also deployed before landfall, providing a security task force for Mobile and Baldwin Counties.

National Guards from other states also sent units through the EMAC process to perform security or law enforcement duties. In Mississippi, nearly 11,000 troops from 19 other states' National Guards joined more than 4,500 Mississippi National Guard troops in missions related to law enforcement (as well as other missions) by September 10, 12 days after landfall.[74] For example, Arkansas provided 310 guardsmen from a military police company to provide security in Mississippi.[75]

Similarly, the Louisiana National Guard's security forces were supplemented by thousands of guardsmen from other states. Through EMAC, Louisiana was able to request and receive assistance from scores of states from across the country. Examples of the larger deployments included 2,426 infantry from Pennsylvania, 1,016 military police from Puerto Rico, 580 security troops from Michigan, 500 support troops from Arkansas,

535 security troops from Massachusetts, and 350 security troops from Tennessee.

Assistant Secretary of Defense Paul McHale, in his testimony before the Select Committee, provided details on the extent of assistance provided by the National Guard. He stated that "when violence erupted in New Orleans, the National Guard Bureau coordinated the deployment of 4,200 National Guard MPs, 1,400 each day every day for 3 days in a row, a law enforcement presence nearly three times of the size of the New Orleans Police Department."[76]

There was a general consensus among federal, state, and local officials that EMAC worked very well for National Guard troops. Regarding military alone, by November 3, for Louisiana, there were a total of 451 EMAC requests and 29,502 Guardsmen who came from other states. Many of these out-of-state Guardsmen performed security and law enforcement functions and, like the Louisiana National Guard, operated under the Louisiana governor's Title 32 authority.

## DOD active duty forces played an important, but less active, role in maintaining law and order

While they were not immediately deployed, DOD active duty forces also played a role in restoring and maintaining law and order. For example, the U.S. Army's 82nd Airborne arrived in New Orleans on September 3 (five days after landfall) and, according to the city's Director of Homeland Security, had a "calming effect" by their mere presence on the street. Precautions were taken to prevent DOD active duty forces from direct law enforcement missions, thereby avoiding Posse Comitatus issues. For more details on the use of the military, see the MILITARY chapter.



AP PHOTO/DAVID MARTIN

**Law enforcement personnel from other states also played a key role in restoring and maintaining law and order.**

Civilian law enforcement agencies from other states and localities also provided personnel through the EMAC process to supplement beleaguered state and local police. In Mississippi, local, state, and FEMA officials noted that assistance from Florida's law enforcement and emergency management agencies (as well as law enforcement from other states), plus the delivery of commodities Florida pre-positioned in the panhandle, were key to providing security and restoring order in southern Mississippi after landfall.[77]

Florida, in particular, was instrumental in the early days and received high praise from Mississippi officials for the manner in which that state's teams provided security, established an incident command structure in the coastal counties, and conducted some of the first search and rescue missions the night after the storm.[78] As noted earlier, Florida helped alleviate some of Mississippi's security problems by sending into the state some of the commodities it had pre-positioned in the panhandle region in anticipation of the hurricane striking farther east than it eventually did. Florida's supplies of food, water, and ice helped relieve the situation in Mississippi.[79]

While Florida and Alabama were among the first states to provide Mississippi with law enforcement assistance, they were not alone. Mississippi received assistance from Arkansas, South Carolina, and Georgia's state police or other state law enforcement agencies.[80] For example, South Carolina provided 118 law enforcement personnel with equipment to Mississippi.[81]

Louisiana also benefited from a very large influx of law enforcement personnel from other states. Like their counterparts in Mississippi, local, state, and federal officials involved in Louisiana's response to Katrina said EMAC was critical to restoring law and order.

The EMAC process was not always smooth. For example, a sheriff from Michigan and a sheriff from Alabama were at the Louisiana border but could not assist because no EMAC request had been made.[82] The Jefferson Parish Sheriff had apparently not made a request through the state EOC for the assistance — a requirement for providing law enforcement assistance through EMAC.[83]

Also, as late as September 2, EMAC requests simply had not been made. According to Josh Filler, the Director of DHS' Office of State and Local Government Coordination, on the September 2 video teleconference:

> My office has received numerous phone calls from law enforcement organizations across the country — major city police chiefs, national sheriffs — who want to help, but we have encouraged them not to self-deploy to New Orleans or to Louisiana, but to work through the system, but they are saying that their States are not receiving requests for assistance.[84]

# Finding: Federal law enforcement agencies were also critical to restoring law and order and coordinating activities

**The first priority for federal law enforcement agencies was to implement their continuity of operations plans and locate their affected personnel**

Prior to August 30, federal law enforcement worked to prepare their coastal offices for Katrina's landfall. Immediately after the hurricane, these law enforcement agencies implemented their continuity of operations plans and began the process of locating personnel living in the affected areas.

On August 26, the Federal Bureau of Investigation's (FBI) Jackson Field Office notified its Resident Agencies in Hattiesburg, Pascagoula, and Gulfport to implement their hurricane plans.[85] Hurricane shutters were installed, vehicles were secured, computers were bagged, and safes were locked. The traditional FBI operations of the Jackson Field Office were moved to its Oxford Resident Agency, in northern Mississippi.[86] FBI air assets and personnel who remained on the coast were utilized to determine the damage and security of the Mississippi offices.[87]

Within 12 hours after the hurricane subsided, the Jackson Field Office was in contact with all of its personnel.[88] The Jackson Field Office established a Command Post at Keesler Air Force Base in Biloxi. On August 29, the Special Agent-in-Charge (SAC) of New

Orleans surveyed the damage to the New Orleans Field Office.[89] Sixty percent of the top floor was uncovered. Due to the sensitivity of documents housed in the Field Office, the SAC and the four agents remained at the building. The SAC ordered the move of the New Orleans Division to the Louisiana State Police headquarters in Baton Rouge.[90] All FBI personnel living in Louisiana were accounted for by September 4.[91]

On August 23, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) began Hurricane Katrina preparations.[92] ATF headquarters coordinated with Field Divisions in Houston, New Orleans (which includes the state of Mississippi), Nashville (which includes the state of Alabama), Tampa, and Miami.[93] Headquarters ordered the evacuation of ATF personnel in New Orleans and Mississippi prior to the hurricane, and a list was comprised of personnel who chose to stay on the coast.[94] All ATF personnel leaving the affected area were instructed to contact their supervisors after the storm. Due to the damage to the ATF facilities, a continuity of operations site was activated on August 30 in Mandeville, Louisiana.[95]

On the same day, ATF began contacting all ATF personnel living in the affected area.[96] The New Orleans Division Office was relocated to Shreveport, where it resumed responsibility over Louisiana and Mississippi.[97] The Biloxi Field Office was relocated to a public safety compound behind the Harrison County Sheriff's Department.[98] The Mobile Field Office was moved to Brookley Air Force Base, an inactive base in the Mobile area.[99] ATF established a Critical Incident Management Response Team in Baton Rouge to coordinate ATF operations.[100]

On August 26, in anticipation of Katrina's landfall, the New Orleans Field Division Special Agent-in-Charge ordered the Drug Enforcement Administration's (DEA) Field Division closed and all DEA personnel were asked to evacuate the area.[101] The New Orleans Field Division and the Gulfport Resident Office were severely damaged by the hurricane.[102] DEA established teams responsible for locating all Field Division personnel following the storm.[103] On August 31, command centers were established at the Baton Rouge District Office and in Mobile. DEA headquarters chose the Office of Aviation in Addison, Texas to serve as a logistical command center for the field divisions throughout the country. On September 1, the New Orleans Field Division established an operations center at a high school in Mandeville,

Louisiana, to house firearms and sensitive items from the New Orleans Field Office.[104]

On August 29, the United States Marshals Service (USMS) activated an Emergency Operations Center in Washington, D.C. in preparation for Hurricane Katrina.[105] USMS also placed four Operational Management Teams (OMT) on standby. Following Katrina, the OMTs began accounting for all USMS personnel in Louisiana, Mississippi, and Alabama.[106] Operational Medical Personnel were also deployed to the coast to assist USMS personnel.[107] OMT created a command post in Pineville, Louisiana and Jackson, Mississippi. On August 30, USMS deployed personnel and surveillance planes to survey the hurricane damage to USMS facilities.

Prior to landfall, U.S. Immigration and Customs Enforcement (ICE) pre-deployed Federal Protective Service (FPS) personnel located in Texas.[108] FPS was able to move into the affected area the day after the hurricane to assist FEMA. ICE's Gulfport office sustained no major damage and due to backup generators, was utilized as a staging site and provided assistance to ICE employees affected by the hurricane, as well as other state and local law enforcement.[109] From landfall until September 2, ICE's New Orleans field office worked to account for ICE personnel assigned to the New Orleans, Lake Charles, Lafayette, Baton Rouge, and Gulfport offices and obtain needed supplies.

On August 26 and 27, U.S. Customs and Border Patrol (CBP) ordered the ports of Mobile and New Orleans, and the Hammond Louisiana Air and Marine Branch to activate their hurricane preparedness plans.[110] CBP moved its air assets to Shreveport and Dallas. CBP's Mission Critical Team relocated from New Orleans to Shreveport and on August 29 began to locate CBP personnel living in the affected area.[111] CBP created a Forward Deployed Operations Command Center at the air hanger in Hammond to coordinate all CBP missions.[112] By September 4, all CBP employees were located.[113]

While the Federal Air Marshal Service (FAMS) did not need to implement a continuity of operations plan for a specific office, they are responsible for meeting their nationwide primary mission, while coordinating in preparation for severe weather and flight disruptions.[114] In anticipation of these disruptions due to Katrina, FAMS began monitoring the hurricane's track the week of August 21.[115]

From August 26 to August 29, Federal Bureau of Prisons (BOP) personnel from the Office of Emergency Preparedness, in Washington, D.C. and BOP's South Central Regional Office in Dallas monitored Hurricane Katrina's path.[116] The Office of Emergency Preparedness is responsible for coordinating the evacuation and for supporting corrections institutions in the areas affected by the hurricane. On August 30, BOP opened a command center to help the Louisiana Department of Public Safety and Corrections with transporting inmates out of the New Orleans area.[117]



AP PHOTO/RIC FRANCIS

### While working to reconstitute themselves, federal law enforcement agencies supplemented state and local law enforcement with forces and supplies

While surveying office damage and locating personnel, federal law enforcement worked to assist state and local law enforcement with additional forces and supplies. While it is impossible to account for every federal law enforcement agent or officer who responded to requests for assistance by state and local law enforcement, or even by hurricane victims, there were specific assets brought to bear by federal law enforcement that should be highlighted to illustrate the degree of coordination with entities outside the federal government.

On August 30, FBI headquarter officials put their Field Offices on alert that additional personnel were needed in the affected area.[118] Ten Special Weapons and Tactics (SWAT) agents from the Houston Division were deployed to New Orleans to assist the New Orleans Police Department (NOPD) SWAT.[119] These agents brought a boat that enabled them to transport personnel

and supplies. On September 1, the Critical Incident Response Group deployed agents from the Dallas, Atlanta, Baltimore, and Houston SWAT teams and Hostage Rescue Teams (HRT) to continue to help NOPD control its affected area.[120] The Violent Gang Task Force from the New Orleans Division worked out of the Gretna Police Department.[121] Over 30 more agents coordinated with NOPD to back up NOPD SWAT, FBI SWAT, and HRT Special Agents.[122]

The FBI Command Post at Keesler Air Force Base in Biloxi, Mississippi communicated with the Mississippi Bureau of Criminal Investigations, the Mississippi Highway Patrol, the Homeland Security Director for the State of Mississippi, and local police and sheriffs to respond to requests for assistance.[123] The FBI was able to create a Virtual Command Center for the Law Enforcement On-Line Internet site.[124] All law enforcement nationwide were able to log onto the website and receive daily situation reports regarding FBI relief efforts.[125]



AP PHOTO/ANN HEISENFELT

The first group of ATF personnel detailed to the affected area arrived on September 2.[126] Thirty-four members of Special Response Teams (SRT), tactical teams specifically trained to handle high risk law enforcement and civil unrest, from the Dallas and Detroit Field Offices and seven SRT support staff were deployed to Algiers, Louisiana.[127] The SRT members were sent to New Orleans to assist the NOPD, whose SWAT teams were down to 25 percent capacity.[128] On September 6 and 7, 10 ATF agents were deployed to Biloxi, and 30 ATF agents were deployed to Gulfport.[129] These agents performed investigative roles, as well as assisting local police with firearms-related calls.[130]



From August 30 to September 12, 251 DEA Temporary Duty agents reported from Miami, Atlanta, St. Louis, Houston and Dallas to provide law enforcement and search and rescue support in New Orleans.[131] On September 4, DEA deployed personnel from the Atlanta Field Division, as well as the Houston Mobile Enforcement Team (MET), self-contained, specially trained teams of eight to twelve agents that specialize in law enforcement missions involving violence.[132] These agents were then joined by the Charlotte MET on September 5, and the Miami MET on September 7. The METs helped state and local departments in conducting routine law enforcement tasks, including patrols as well as search and rescue missions.

On September 1, five USMS Marshals from the Training Academy in Glynco, Georgia were deployed to provide security at the Biloxi Airport.[133] USMS deployed an additional four Marshals to the airport on September 3. USMS supported NOPD by working with the 1st and 5th districts in New Orleans and responded to backlogged 911 calls. In addition, USMS redirected NOPD National Crime Information Center traffic to the USMS Communications Center. USMS deployed more personnel to Mississippi on September 5 to help local police and sheriff departments.[134] They provided security for 11 search and rescue teams, operated a missing persons task force and a task force to locate sex offenders, and protected the Mississippi gulf coast's fuel depot in Collins.

On September 2, ICE began its support of local law enforcement in New Orleans' 4th District.[135] The 4th District was still populated at that time, as it had not taken on water. The New Orleans Special Response Team (SRT), ICE's tactical team, was in the city on September 1. SRT teams from Chicago and San Antonio, consisting of 12 to 18 members, arrived the afternoon and evening of September 2. By midnight of September 2, there were over 100 ICE agents in New Orleans preparing to assist in the response to the hurricane.

Throughout the week, ICE agents were tasked with patrols and shifts with local law enforcement, worked to curtail looting, assisted with evacuations, and followed up on the approximately 6,000 911 calls made during and after the hurricane.[136] ICE's Tampa Field Office provided three inflatable Zodiac boats that helped ICE personnel assist with transportation for fire departments and medical personnel and respond to rescue calls. ICE agents and logistical teams assisted the Mississippi Highway Patrol, county sheriffs, and city police forces in Mississippi with patrols, rescues, and searches.[137]



On the morning of August 30, the Border Patrol's Tactical Unit pre-deployment site survey team left for the affected area.[138] This deployment was pursuant to a request for CBP to assist in evacuating the Superdome and for riot control. However, the agents also worked other law enforcement functions and relief operations, such as distributing water, assisting with minor medical care, and



helping evacuees onto buses and helicopters. CBP had 100 agents, along with CBP vehicles, emergency equipment, and lifesaving supplies in Louisiana by September 1.[139] On September 2, Border Patrol agents were sent to provide security at the Louisiana State University Hospital, which served as the regional triage center. Border Patrol agents were also deployed to the New Orleans Airport to assist with crowd control and security.

A day after Katrina made landfall, FAMS responded to reports of deteriorating conditions at Louis Armstrong New Orleans International Airport.[140] The airport was starting to receive evacuees and was therefore becoming a shelter. As a response, FAMS sent personnel – drawing from its Houston Field Office – to the airport to assist as necessary.[141] Conditions at the airport continued to deteriorate as thousands of displaced persons sought refuge there.[142] There was no food, water, restroom facilities, or security. Consequently, when FAMS personnel began to arrive, they needed to help restore order.[143] On September 1, FAMS began initial deployment, including 54 from the Houston Field Office, arriving in-person by car. Also by late evening, evacuation flights out of the airport were fully operational. By September 2, FAMS personnel at the airport expanded their mission to include interim law enforcement activities as well as all necessary activities to operate the airport.[144]

On September 3, the Secret Service was asked by NOPD and the Louisiana State Police to take control of the credentialing process for state and local law enforcement in the New Orleans area.[145] The need for secure credentials for NOPD was a primary concern, as many police officers had lost their official identification badges during the hurricane.[146]

On September 5, the Louisiana Department of Public Safety and Corrections requested that BOP provide 1,000 beds and transportation for Louisiana state inmates.[147] BOP, along with USMS transferred 964 inmates to the United States Penitentiary Coleman-II, Florida.[148] From August 30 to September 7, BOP transported approximately 2,500 inmates or detainees in Louisiana to facilities outside of New Orleans.[149] In addition, BOP provided clothing, food, and water from Texas correctional institutions to the Louisiana State Police headquarters in Baton Rouge.[150]

## Obtaining peace officer status presented problems for some federal law enforcement entities responding to the hurricane

The process for federal law enforcement being deputized or sworn in as a peace officer under state law in Louisiana and Mississippi proved cumbersome for some entities. The general concern was that in the process of assisting state or local law enforcement, or victims of the hurricane, federal law enforcement officers might find it necessary to make arrests outside of their federal jurisdiction. Due to the lack of an across-the-board policy on how to deal with federal law enforcement during a state of emergency, some federal law enforcement entities were required to seek advice from their individual Office of the General Counsel on how to proceed. The process was more difficult in Louisiana, where it became necessary to fly in representatives from the Louisiana Office of the Attorney General to the affected area to swear in the law enforcement officers or agents in person. Still other federal law enforcement agents were deputized by the Louisiana State Police.

Under Louisiana law, FBI agents have qualified immunity that protects them when responding to felonies committed in their presence or when assisting state officers.[151] However, FBI agents did not specifically have peace officer status when responding to Hurricane Katrina



AP PHOTO/JOHN HEISENFELT

in Louisiana.[152] Governor Blanco granted the Louisiana Office of Attorney General authority to deputize FBI agents, and all FBI agents deployed to Louisiana were deputized by a representative of the office.

FBI agents deployed to Mississippi did not receive peace officer status until September 9, when Governor Barbour wrote a letter to all state and federal law enforcement officers.[153] The letter granted federal law enforcement officers working in cooperation with local law enforcement "the authority to bear arms, make arrests and to make searches and seizures, in addition to any other power, duty, right and privilege as afforded forces of the State of Mississippi."[154]

Prior to ATF agents being deployed to the affected area, DOJ examined the capabilities of ATF agents in assisting state and locals with law enforcement functions.[155] ATF agents are not afforded automatic peace officer status in the states of Louisiana and Mississippi. As ATF agents conducted their core statutorily required mission, DOJ determined ATF agents did not need to receive peace officer status.

Pursuant to federal statute, USMS "may exercise the same powers which a sheriff of the State my exercise . . . ."[156] USMS received further state law enforcement powers when the Director of USMS received an order from U.S. Attorney General Alberto Gonzales requesting the Director to "take all necessary and appropriate steps within available resources to provide the assistance" to Mississippi.[157]

The Louisiana Attorney General's Office coordinated the peace officer status for ICE agents deployed to Louisiana.[158] ICE agents were required to fill out paperwork and were sworn in by the Louisiana State Police every time a new rotation of ICE agents arrived in Kenner, Louisiana. ICE agents were sworn in as peace officers in Mississippi by the Hancock Sheriff's Department.

Border patrol agents were deputized by the state of Louisiana with law enforcement status on September 2.[159] Agents were not sworn in as peace officers in Mississippi.[160] On September 3, CBP's Office of Chief Counsel determined that CBP officers and Border Patrol agents could make arrests for state crimes in Louisiana, Mississippi, Alabama, Florida, and Texas, if the officer or agent was acting in his or her official capacity.[161]

On September 3, Louisiana began to deputize FAMS personnel as Louisiana State Police Officers, giving them full authority to enforce local and state laws.[162]

## Emergency Support Function #13 (ESF-13) of the National Response Plan

DOJ, along with the Department of Homeland Security (DHS), is responsible for the Emergency Support Function #13 (ESF-13) of the National Response Plan.[163] ESF-13 covers Public Safety and Security and tasks DOJ and DHS with integrating federal non-investigative/non-criminal law enforcement public safety and security capabilities and resources to "support the full range of incident management activities with potential or actual Incidents of National Significance." The Office of the Deputy Attorney General and the Office of Legal Counsel assist in coordinating DOJ's ESF-13 responsibilities. The Bureau of Alcohol, Tobacco, Firearms and Explosives is responsible for DOJ's day-to-day actions with respect to ESF-13.

After the hurricane, ESF-13 requests were processed through the Law Enforcement Coordination Center (LECC) in Baton Rouge, because the LECC had working knowledge of the available regional resources.[164] The LECC determined whether the request could be met under ESF-13. The LECC (1) confirmed the requestor could not perform the mission, (2) determined whether the request was valid for ESF-13, (3) determined whether there were available federal law enforcement resources; and (4) approved or declined the request. The LECC then forwarded the approved request to Washington, D.C. Each requested agency coordinated with FEMA to establish funding.

## Federal law enforcement coordination required communication between the U.S. Department of Justice, U.S. Department of Homeland Security, and the governors of the affected states

The Attorney General of the United States may "appoint officials . . . to detect and prosecute crimes against the United States."[165] The Attorney General may also approve the request of a state governor for federal law enforcement assistance if the Attorney General concludes that such "assistance is necessary to provide an adequate response to a law enforcement emergency."[166]

DOJ also has the authority under the Stafford Act to provide for non-operational assistance. In the case of a major disaster or an emergency, the President may direct the Department to "utilize its authorities and resources granted to it under Federal law (including personnel, equipment,

supplies, facilities, and managerial, technical and advisory services) in support of State and local efforts."[167]

On Friday, September 2, Gonzales sent a memorandum to the heads of DOJ's law enforcement agencies, asking each agency to continue coordinating with state and local law enforcement.[168] The Attorney General specifically requested that: (1) the Federal Bureau of Investigation continue to deploy agents and tactical assets, (2) the Drug Enforcement Administration prepare to deploy its Mobile Enforcement Teams, (3) the Bureau of Alcohol, Tobacco, Firearms and Explosives establish a Violent Crime Impact Team in Baton Rouge, Louisiana, and (4) the United States Marshals Service conduct prisoner transport operations and provide court security.

On September 3, Gonzales received a letter from Mississippi Governor Barbour requesting the "deployment of Deputy U.S. Marshals to the State of Mississippi in support of law enforcement requirements created by the effects of Hurricane Katrina."[169] The same day, Gonzales responded in writing to Barbour that his request was approved, and an order authorizing the Director of the U.S. Marshals Service to "take all necessary and appropriate steps within available resources to provide the assistance so requested by [Governor Barbour]" was issued.[170]

The same day, Gonzales received a letter from Blanco requesting the deployment of the USMS and/or other Department of Justice personnel to the area affected by Hurricane Katrina.[171] On September 4, Gonzales responded in writing to Blanco that her request was approved, and an order authorizing the Deputy Attorney General to "take all necessary and appropriate steps within available resources to provide the assistance so requested by [Governor Blanco]" was issued.[172]

On September 6, Gonzales and DHS Secretary Michael Chertoff received a letter from Blanco requesting "the deployment of Immigration and Customs Enforcement officers, Customs and Border Protection personnel and/or other Department of Homeland Security personnel . . . in support of the law enforcement challenges created by the effects of Hurricane Katrina."[173] Gonzales responded in writing to Governor Blanco on September 7, saying that after consulting with DHS, he approved Blanco's request and deployed the appropriate law enforcement personnel.[174] Chertoff also responded to Blanco on September 7, stating that DHS law enforcement would "continue to provide assistance" with state and local authorities in Louisiana.[175]

**The Law Enforcement Coordination Center in Baton Rouge, Louisiana coordinated the efforts of all federal law enforcement in the greater New Orleans area and assisted the New Orleans Police Department in reorganization**

During the first week following the hurricane, local, state, and federal law enforcement working in New Orleans began daily 9:00 a.m. meetings at the Harrah's Casino in downtown New Orleans.[176] These meetings enabled the law enforcement entities to meet face to face and coordinate critical missions. The New Orleans Police Department (NOPD) District Captain for each city district attended the meetings, along with the Bureau of Alcohol, Tobacco, Firearms, and Explosive (ATF), the Drug Enforcement Agency (DEA), the Federal Bureau of Investigations (FBI), and U.S. Immigration and Customs Enforcement (ICE).

Michael J. Vanacore, Director of International Affairs ICE, and Michael Wolf, Special Agent-In-Charge for the FBI's Critical Incident Response Group, were detailed by their respective agencies to Baton Rouge to coordinate the federal law enforcement response to Hurricane Katrina in Louisiana.[177] The two men were designated as Co-Senior



AP PHOTO/DAVE MARTIN

*During the first week following the hurricane, local, state, and federal law enforcement working in New Orleans began daily 9:00 a.m. meetings at the Harrah's Casino in downtown New Orleans.*

BARGE000335

Federal Law Enforcement Officers (SFLEO) and stood up the Law Enforcement Coordination Center (LECC) at LSP headquarters in Baton Rouge.[178]

Vanacore arrived at the Louisiana State Police (LSP) headquarters in Baton Rouge on Sunday, September 4.[179] At the time, Vanacore understood his role was to work with the ICE New Orleans Agent-in-Charge, Michael Holt, and report to ICE headquarters in Washington, D.C. on ICE's mission in the area affected by the hurricane. Late that evening, Vanacore was informed of the decision to designate him SFLEO. He was instructed he would share SFLEO responsibilities with Wolf. Wolf arrived in Baton Rouge on Monday, September 5. The same day, Vanacore reviewed an unsigned letter designating him and Wolf as SFLEO.

Vanacore and Wolf had their first meeting late on September 5.[180] On September 6, it was clear to Vanacore and Wolf they needed an operations center to coordinate federal law enforcement efforts in New Orleans.[181] The center was then designated the LECC. The LECC did not have command and control over the federal law enforcement missions. Rather it served as the point of contact for all federal law enforcement in the greater New Orleans area. The missions of the LECC were to coordinate efforts to reestablish the NOPD and efforts of all law enforcement agencies' deployed resources to the New Orleans area. According to Vanacore, the main mission of the LECC was to ensure officer safety.[182]

On September 6, officials from the LECC, including Vanacore, met with the Mayor of New Orleans, the City of New Orleans Homeland Security Director and counsel for the Mayor.[183] Officials also met with the NOPD precinct captains.[184] Vanacore reported the Mayor's office and NOPD were "very helpful" and worked well with the LECC.[185] The LECC had little communication with the Louisiana Governor's Office, but Vanacore and Wolf both said interaction with the Governor's office was not necessary to achieve LECC's goals.[186]

Wolf brought additional FBI agents with him to Baton Rouge, as well as a Blue Whale Command, the FBI's mobile command station, specially equipped with office and communication equipment.[187] Vanacore stated the mobile command center was invaluable to standing up the LECC.[188] By September 7, the LECC was gathering and centralizing information, to ensure there were not duplicate law enforcement missions.[189]

The LECC divided the federal law enforcement entities by New Orleans police districts.[190] Each federal law enforcement agency was responsible for coordinating with the precinct captain of the district.[191]

The LECC also began daily 8:00 a.m. meetings with representatives from state and federal law enforcement.[192] ICE, FBI, DEA, ATF, USMS, U.S. Customs and Border Protection, including the Border Patrol, the National Guard, the U.S. Attorney's Office from New Orleans and Baton Rouge, the Office of the Louisiana Attorney General, LSP, NOPD, and the New Orleans Fire Department were all represented at the meetings. The City of New Orleans Homeland Security Director also attended the daily meetings. In addition, the U.S. Secret Service, the Sheriff's Association, and the Federal Air Marshals participated on a limited basis. CBP and FBI provided helicopters to transport attendees to and from New Orleans and the LECC for the meetings.[193]

The daily meetings commenced with Wolf reporting the number of arrests and incidents from the prior day.[194] There was then a roll call of all attendees to report their force numbers. Vanacore summarized the daily events on his blackberry and communicated to Jon Clark at ICE headquarters in Washington, D.C. Wolf communicated with FBI Headquarters.[195]

As the LECC worked from Baton Rouge, it became apparent to Vanacore and Wolf that in order to achieve its goals, the LECC needed to be located in New Orleans.[196] On September 9, the LECC and NOPD moved into the Royal Sonesta Hotel on Bourbon Street.[197] The LECC and NOPD each had a conference room and an additional room was used to receive incoming 911 telephone calls.[198]

The LECC worked with NOPD to assist in "standing up" the police department. There were eight NOPD district offices in New Orleans.[199] Four were rendered useless due to insufficient power, and four were flooded. LECC acquired air conditioning compressors and generators for the district offices that needed power. Temporary office spaces were procured to replace the flooded offices. The evidence and property rooms for the NOPD were under water and contained mold. The LECC assisted NOPD with procuring contractors to recover and process the evidence and property, and clean NOPD headquarters.

As a result of stolen uniforms, destroyed homes, and displaced New Orleans police officers, NOPD was patrolling the city without proper uniforms.[200] The LECC was able to procure temporary battle dress uniforms off



AP PHOTO/ERIC GAY

the Federal Supply Schedule maintained by the General Services Administrations (GSA) for acquisitions by federal agencies. By using GSA for the uniforms, the NOPD did not have to utilize its local procurement process, which would have required three separate bids before purchasing new uniforms.

In addition, the LECC located photographers to create credentials for LECC and NOPD guards and officials at the Royal Sonesta.[201] LECC provided lights and generators to assist 15 police checks points. Supplies were provided for crime scene processing, including gloves and masks to protect police from mold.

Both Vanacore and Wolf reported the LECC had a positive working relationship with NOPD and that the department was receptive to LECC's assistance.[202]

## Conclusion

First the levees were breached––and then law and order. As Katrina left people scrambling for food, for water, for supplies – for survival  —  lawlessness and violence, both real and imagined, spread, creating yet another problem for authorities who were burdened enough already.

How did this happen? For starters, the lack of basic necessities for residents who did not evacuate, or went back to their homes too quickly, contributed. As we saw in Pearl River County, once there were sufficient amounts of food, ice, and water, order was restored. Another problem was the uncertainty about evacuations. Confusion reigned, especially in places like the Superdome and the Convention Center, where conditions were terrible, nerves frayed, people desperate.

Compounding these difficulties was the collapse or absence of law enforcement. The police, in some cases, were unable to function or were diverting their attention to search and rescue operations. The New Orleans Police Department had known of the threat that could arise from flooding, yet failed to properly protect its resources or come close to continuity of operations. There was also a dereliction of duty by some New Orleans officers when, of course, their presence was needed most.

The federal, state, and local governments also lost another battle, this one with the media. Rumors spread, as fast as the fear. Some turned out to be true, but many did not, resulting in exaggerated reports that scared away truck and bus drivers who could have furnished people with much-needed supplies. Authorities needed to be on top of this situation, not a victim of it.

Fortunately, the National Guard in all three affected states were able to help out overburdened local authorities. About 20 other states added support, an effort that prevented a dire situation from being much worse. DOD active duty forces also came through, their mere presence serving to reduce tensions. Federal law enforcement agencies played an important role, as well, with additional forces and supplies.

For an exhaustive account of all federal law enforcement actions in response to Hurricane Katrina from August 23 to September 12, 2005, please see Appendix 5. ■

1   Interview by Select Comm. Staff with Bobby Strahan, Dir. Pearl River County Emergency Mgmt. Agency, State of Miss., in Wash., D.C. (Nov. 29, 2005) [hereinafter Interview with Bobby Strahan].

2   *Hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi Before Select Comm.*, 109th Cong. (Dec. 7, 2005) at 11 (statement of Dr. Brian Amy, State Health Officer, Miss. Dep't of Health) [hereinafter *Dec. 7, 2005 Select Comm. Hearing*].

3   *Id.*

4   Interview by Select Comm. Staff with Maj. Ralph D. Mitchell, Jr., Region 1 Commander, La. State Police and LtC. Joseph Booth, Deputy Superintendent, La. State Police, in Baton Rouge, LA (Nov. 9, 2005) [hereinafter Interview with Mitchell and Booth].

5   *Hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana Before Select Comm.*, 109th Cong. (Dec. 14, 2005) at 103 (statement of Governor Kathleen Blanco, State of LA) [hereinafter *Dec. 14, 2005 Select Comm. Hearing*].

6   EM2000 Messages, Nos. MEMA-0011924, MEMA-0012244, MEMA-001228, MEMA-0012312, MEMA-0013022 (on file with Select Comm.).

7   *Id.*

8   Interview with Mitchell and Booth.

9   Interview by Select Comm. Staff with Jiff Hingle, Sheriff, Plaquemines Parish, LA, in New Orleans, LA (Nov. 8, 2005) [hereinafter Interview with Jiff Hingle].

10   Interview by Select Comm. Staff with David Tranter, Deputy Attorney Gen. and Gen. Counsel, State of AL Emergency Mgmt. Agency, in Clanton, AL (Oct. 11, 2005).

11   EM2000 Messages, No. MEMA-0011924 (on file with Select Comm.).

12   Tiger Team Katrina Report, LA Nat'l Guard at 27 (Nov. 2, 2005) (on file with Select. Comm.).

13   Interview by Select Comm. Staff with LtC. Jacques Thibodeaux and Col. Mark Mouton, LA Nat'l Guard, in New Orleans, LA (Nov. 3, 2005) [hereinafter Interview with Thibodeaux and Mouton].

14   *Dec. 7, 2005 Select Comm. Hearing* at 5 (Statement of William L. Carwile, former FEMA Fed. Coordinating Officer).

15   *Id.* at 125-26 (Statement of Mayor Tommy Longo, Waveland, Miss.).

16   *Id.* at 125-27 (Statement of Mayor Tommy Longo, Waveland, Miss.).

17   Interview by Select Comm. Staff with Hancock County Emergency Operations Ctr. personnel, in Hancock County, Miss. (Oct. 11-14, 2005).

18   Interview with Bobby Strahan.

19   Interview with Jiff Hingle.

20   *Id.*

21   Dan Baum, *Deluged, When Katrina Hit, Where Were the Police?*, THE NEW YORKER, Jan. 9, 2006 at 54 [hereinafter Deluged Article].

22   *Id.*

23   *Id.*

24   *Id.* at 52.

25   Interview by Select Comm. Staff with Lonnie Swain, Deputy Chief, New Orleans Police Dep't, in New Orleans, LA (Nov. 9, 2005) [hereinafter Interview with Lonnie Swain].

26   Interview with Mitchell and Booth.

27   *Dec. 14, 2005 Select Comm. Hearing* at 226 (statement of C. Ray Nagin, Mayor, City of New Orleans, LA).

28   Interview with Mitchell and Booth.

29   Interview by Select Comm. Staff with Thomas Enright, Assistant Attorney Gen., Public Prot. Div., LA Dep't of Justice, in New Orleans, LA (Nov. 8, 2005) [hereinafter Interview with Thomas Enright].

30   Deluged Article at 54.

31   Interview with Lonnie Swain.

32   *Stealing for Salvation*, (MSNBC Television News Broadcast, Aug. 31, 2005).

33   Robert E. Pierre and Ann Gerhart, *News of Pandemonium May Have Slowed Aid*, WASH. POST, Oct. 5, 2005 [hereinafter Pandemonium Article].

34   Interview with Thibodeaux and Mouton; Interview by Select Comm. Staff with Terry Ebbert, Dir., Homeland Sec., City of New Orleans, in New Orleans, LA (Nov. 9, 2005) [hereinafter Interview with Terry Ebbert].

35   Interview with Thibodeaux and Mouton; Interview with Terry Ebbert; Interview by Select Comm. Staff with Nicholas Gachassin, First Assistant Attorney Gen., LA Dep't of Justice, in Baton Rouge, LA (Nov. 6, 2005) [hereinafter Interview with Nicholas Gachassin].

36   David Carr, *More Horrible Than Truth: News Reports*, N.Y. TIMES, Sept. 19, 2005 [hereinafter Carr Article].

37   Interview with Nicholas Gachassin; Interview with Thomas Enright.

38   Daily Video Teleconferences among officials dated Aug. 25 – Sep. 4, 2005 at 15 [hereinafter Daily VTC]. State and local officials from each of the impacted areas met daily with officials from, among other agencies, FEMA, and Nat'l Hurricane Center.

39   *Id.* at 6.

40   *Dec. 14, 2005 Select Comm. Hearing* at 214 (Statement of Terry Ebbert).

41   *Id.* at 226 (Statement of Mayor Ray Nagin, City of New Orleans, LA).

42   Carr Article; Susannah Rosenblatt and James Rainey, *Katrina Takes Toll on Truth, News Accuracy*, L.A. TIMES, Sept. 27, 2005; Beth Gillin, *Katrina Spawned Rumors*; Media Ran with Them, PHILA. INQUIRER, Sept. 28, 2005.

43   *Id.*

44   *Id.*

45   Interview with Thibedeaux and Mouton.

46   *Hearing on Hurricane Katrina: Preparedness and Response by the Department of Defense, the Coast Guard, and the National Guard of Louisiana, Mississippi, and Alabama Before Select Comm.*, 109th Cong. (Oct. 27, 2005) at 196 (statement of Lt. Gen. H Steven Blum, Chief of the Nat'l Guard Bureau) [hereinafter *Oct. 27, 2005 Select Comm. Hearing*].

47   Pandemonium Article.

48   Interview with Thibodeaux and Mouton.

49   Telephone Interview by Select Comm. Staff with Capt. Jeff Winn, New Orleans Police Dep't., New Orleans, LA, in Wash., D.C. (Jan. 26, 2006).

50   *Id.*

51   *Id.*

52   *Oct. 27, 2005 Select Comm. Hearing*, at 196-97 (statement of Lt. Gen. H Steven Blum, Chief of the Nat'l Guard Bureau).

53   Interview with Thibodeaux and Mouton; Interview with Nicholas Gachassin; Interview with Terry Ebbert.

54   Interview with Nicholas Gachassin.

55   Interview by Select Comm. Staff with Andy Kopplin, Chief of Staff, Office of the Governor of LA, in New Orleans, LA (Nov. 6, 2005).

56   EMAC Operations Manual (Oct. 2005) [hereinafter EMAC Ops Manual]; Telephone Interview by Select Comm. Staff with EMAC personnel, in Wash., D.C. (Dec. 13, 2005) [hereinafter Telephone Interview with EMAC]; EMAC website: What Is EMAC. www.emacweb.org/?9 (last visited Jan. 26, 2006).

57   EMAC Ops Manual; Telephone Interview with EMAC; EMAC website: What Is EMAC. www.emacweb.org/?9 (last visited Jan. 26, 2006).

58   Emergency Management Assistance Compact, Pub. L. No. 104-321, 110 Stat. 3877 (1996). Hawaii has not ratified EMAC. (E-mail correspondence from EMAC personnel to Select Comm. Staff (Dec. 13, 2005) (5:14 p.m.)).

59   EMAC Ops Manual.

60   EMAC website: How Does EMAC Work. www.emacweb.org/?142 (last visited Jan. 26, 2006).

61   *Id.*

62   Telephonic Interview with EMAC.

63   *Id.*

64   *Id.*

65   *Id.*

66   *Id.*

67   E-mail correspondence from EMAC personnel to Select Comm. Staff (Dec. 19, 2005) (5:25 p.m.).

68   Presentation Materials prepared by EMAC personnel, EMAC Responses to Hurricanes Katrina and Rita (Oct. 4, 2005).

69   *Id.*

70   *Id.*

71   Master Log of EMAC Requisitions (unaudited draft).

72   Telephone Interview with EMAC.

73   *Dec. 7, 2005 Select Comm. Hearing* at 5 (Statement of William L. Carwile, former FEMA Fed. Coordinating Officer); Interview by Select Comm. Staff with William Carwile, former FEMA Fed. Coordinating Officer, in Wash., D.C. (Dec. 6, 2005).

74   Hurricane Situation Report 54, Miss. Emergency Management Agency (Sept. 10, 2005 at 1500 hours); updated Miss. Guard numbers from Miss. Nat'l Guard Daily Recap (Oct. 11, 2005).

75   EMAC Assistance to Miss., Nat'l Emergency Mgmt. Ass'n (Nov. 3, 2005).

76   *Oct. 27, 2005 Select Comm. Hearing* at 133 (statement of Paul McHale, Assistant Sec'y of Def. for Homeland Def.).

77   *Dec. 7, 2005 Select Comm. Hearing* at 111 (statement of William L. Carwile, former FEMA Fed. Coordinating Officer).

78   Interview by Select Comm. Staff with Col. Marvin E. Curtis, Jr., Assistant Comm'r, Dep't of Public Safety, State of Miss., in Jackson, Miss. (Oct. 2005).

79   *Dec. 7, 2005 Select Comm. Hearing* at 111 (statement of William L. Carwile, former FEMA Fed. Coordinating Officer) ("[I]n addition to the relief we got from the things that Mississippi brought to bear, the state of Florida which prepositionalized things up at the Panhandle, they bought us time too, because it would have been much worse had it not been for the things we got from Florida.").

80   Hurricane Situation Reports, Miss. Emergency Mgmt. Agency (Sept. 2, 2005 at 1200 hours; Sept. 6, 2005 at 0200 hours); *Dec. 7, 2005 Select Comm. Hearing* at 2 (Statement of Governor Haley Barbour, State of Miss.).

81   EMAC Assistance to Miss., Nat'l Emergency Mgmt. Ass'n (Nov. 3, 2005).

82   E-mail correspondence from Patrick Rhode to Casey Long and Brooks Altshuler (Sept. 2, 2005) (6:46 p.m.).

83   *Id.*

84   Daily VTC, at 9 (Sept. 2, 2005).

85   Telephone Interview by Select Comm. Staff with Federal Bureau of Investigation [hereinafter FBI] personnel, in Wash., D.C. (Dec. 15, 2005) [hereinafter Dec. 15 Telephone Interview with FBI]; The Jackson Field Div. covers the entire state of Miss. and has 10 Resident Agencies located in: Southaven, Oxford, Tupelo, Columbus, Greenville, Meridian, Hattiesburg, Macomb, Gulfport, and Pascagoula (E-mail correspondence from FBI personnel to Select Comm. Staff (Dec. 5, 2005) (6:10 p.m.)) [hereinafter Dec. 5 E-mail from FBI].

86   Dec. 15 Telephone Interview with FBI.

87   Interview by Select Comm. Staff with FBI personnel, in Wash., D.C. (Nov. 28, 2005) [hereinafter Nov. 28 Interview with FBI]; Dec. 15 Telephone Interview with FBI.

88   Dec. 15 Telephone Interview with FBI.

89   Nov. 28 Interview with FBI.

90   Dec. 5 E-mail from FBI.

91   Telephone Interview by Select Comm. Staff with FBI personnel (Jan. 27, 2006).

92   Bureau of Alcohol, Tobacco, Firearms and Explosives [hereinafter ATF] Summary of Significant Activity (Nov. 18, 2005) [hereinafter ATF Summary of Significant Activity].

93   ATF Summary of Significant Activity; Interview by Select Comm. Staff with ATF personnel, in Wash., D.C. (Nov. 29, 2005) [hereinafter Interview with ATF].

94   Interview with ATF.

95   ATF Summary of Significant Activity.

96   *Id.*

97   Interview with ATF; E-mail correspondence from ATF personnel to Select Comm. Staff (Dec. 7, 2005) (11:47 a.m.) [hereinafter E-mail from ATF]. The office in Shreveport oversaw the administrative functions of the Shreveport, Little Rock, Jackson, and Oxford, Miss. Field Offices.

(E-mail from ATF).

98   Interview with ATF.

99   E-mail from ATF.

100  Interview with ATF; Telephone Interview by Select Comm. Staff with ATF personnel, in Wash., D.C. (Dec. 1, 2005).

101  Response from the U.S. Dep't of Justice, to Chairman Tom Davis, Select Comm., and Charlie Melancon, U.S. Congressman (Nov. 23, 2005) [hereinafter Nov. 23 Dep't of Justice Response].

102  Hurricane Katrina Drug Enforcement Agency [hereinafter DEA] COOP Assessment (DAG000000223) (Jan. 26, 2006).

103  Nov. 23 Dep't of Justice Response.

104  Nov. 23 Dep't of Justice Response; Interview by Select Comm. Staff with DEA, in Wash., D.C. (Nov. 28, 2005).

105  Nov. 23 Dep't of Justice Response.

106  Response from the U.S. Dep't of Justice, to Chairman Tom Davis, Select Comm., and Charlie Melancon, U.S. Congressman (Dec. 8, 2005) [hereinafter Dec. 8 Dep't of Justice Response]; Interview by Select Comm. Staff with U.S. Marshal Service [hereinafter USMS] personnel, in Wash., D.C. (Dec. 8, 2005) [hereinafter Interview with USMS]. An Operational Mgmt. Team (OMT) oversees USMS' national response. There are OMTs located throughout the United States. A Chief Deputy, the highest ranking career Marshal in the district is in charge of the OMT. Each OMT has a core group of eight personnel. (Interview with USMS).

107  Dec. 8 Dep't of Justice Response.

108  Interview by Select Comm. Staff with U.S. Immigration and Customs Enforcement [hereinafter ICE] in Wash., D.C. (Nov. 16, 2005) [hereinafter Nov. 16 Interview with Interview with ICE].

109  Interview by Select Comm. Staff with ICE personnel, in Wash., D.C. (Dec. 2, 2005) [hereinafter Dec. 2 Interview with ICE].

110  U.S. Customs and Border Prot. [hereinafter CBP] Timeline Aug. 24-Aug. 30 (Dec. 8, 2005) [hereinafter CBP Timeline Aug. 24-Aug. 30]; CBP Hurricane Katrina Support and Operations PowerPoint (Sept. 20, 2005).

111  CBP Timeline Aug. 24-Aug. 30.

112  Interview by Select Comm. Staff with CBP personnel, in Wash., D.C. (Dec. 6, 2005) [hereinafter Interview with CBP]; CBP Timeline Aug. 30-Sept. 13 (Dec. 21, 2005) [hereinafter CBP Timeline Aug. 30-Sept. 13].

113  E-mail correspondence to Select Comm. Staff from CBP personnel (Jan. 26, 2006) (1:35 p.m.).

114  Fed. Air Marshal Serv. [hereinafter FAMS] Timeline prepared for Select Comm. Staff (Nov. 29, 2005) [hereinafter FAMS Timeline].

115  Interview by Select Comm. Staff with FAMS personnel, in Wash., D.C. (Nov. 29, 2005) [hereinafter Interview with FAMS]; FAMS Timeline.

116  Interview by Select Comm. Staff with Fed. Bureau of Prisons [hereinafter BOP] personnel, in Wash., D.C. (Dec. 5, 2005) [hereinafter Interview with BOP]; Dec. 8 Dep't of Justice Response.

117  Dec. 8 Dep't of Justice Response.

118  Nov. 28 Interview with FBI.

119  Nov. 23 Dep't of Justice Response.

120  Telephone Interview by Select Comm. Staff with FBI personnel (Jan. 27, 2006) [hereinafter Jan. 27 Telephone Interview with FBI]; Nov. 23 Dep't of Justice Response.

121  Nov. 23 Dep't of Justice Response. There are four Rapid Deployment teams located in: New York City, Wash., D.C., Los Angeles, and Miami. The teams are comprised of 160 people with different specialties. They are equipped to respond and be self sufficient for seven days on their own. (Telephone Interview by Select Comm. Staff with FBI personnel, in Wash., D.C. (Dec. 5, 2005) [hereinafter Dec. 5 Telephone Interview with FBI]).

122  Nov. 23 Dep't of Justice Response.

123  Dec. 15 Telephone Interview with FBI.

124  Nov. 23 Dep't of Justice Response. The Law Enforcement On-Line Internet site is not available to the general public. Law enforcement entities from around the country must have a password to access the FBI's information. (Dec. 5 E-mail from FBI).

125  Dec. 5 Telephone Interview with FBI.

126  ATF Summary of Significant Activity.

127  ATF Summary of Significant Activity; Interview with ATF.

128  Interview with ATF.

129  ATF Summary of Significant Activity.

130  ATF Summary of Significant Activity; Interview with ATF.

131  Response from U.S. Dep't of Justice, to Chairman Tom Davis, Select Comm., and Charlie Melancon, U.S. Congressman (Dec. 21, 2005). The day by day breakdown is as follows: Aug. 30 (24), Aug. 31 (17), Sept. 1 (32), Sept. 2 (16), Sept. 3 (33), Sept. 4 (38), Sept. 5 (11), Sept. 6 (13), Sept. 7 (39), Sept. 8 (10), Sept. 9 (6), Sept. 10 (5), Sept. 11 (4), Sept. 12 (4). (*Id.*).

132  Nov. 23 Dep't of Justice Response.

133  Dec. 8 Dep't of Justice Response.

134  *Id.* Police Dep'ts included: Pass Christian Police Dep't, Gulfport Police Dep't, Biloxi Police Dep't, Long Beach Police Dep't, and Harrison County Sheriff's Dep't.

135  Dec. 2 Interview with ICE.

136  *Id.*

137  Dec. 2 Interview with ICE; E-mail correspondence from Ronald R. Grimes, DHS to Gerald Garren, et al, (Sept. 6, 2005) (5:27 p.m.). Miss. entities assisted by ICE: Miss. Highway Patrol, Gulfport Police Dep't, Harrison County Sheriffs Office, Waveland Police Dep't, Bay St. Louis Police Dep't, Long Beach Police Dep't, Pass Christian Police Dep't, Hancock County Sheriffs Office, and Jackson County Sheriffs Office. (*Id.*; Dec. 2 Interview with ICE).

138  CBP Timeline Aug. 24-Aug. 30.

139  CBP Timeline Aug. 30-Sept. 13.

140  Interview with FAMS.

141  FAMS Timeline.

142  Interview with FAMS.

143  FAMS Timeline.

144  Interview with FAMS. This included, meeting arriving buses, helicopters, trucks, and ambulances; canvassing evacuees for information on those left behind in New Orleans; handwriting manifests for the New Orleans International Airport departing flights; pre-screening and loading passengers; crowd control; baggage handling; air traffic control; operating heavy equipment to facilitate blocking and dispatching aircraft; hand-carrying hundreds of sick, injured and elderly passengers on to departing aircraft; working with FEMA triage personnel to carry patients on stretchers for medical evaluation; delivering patients to the "Expected to Die" and morgue holding areas; and assisting in other medical emergencies. (Id.).

145  Additional Info. Relating To Secret Service [hereinafter USSS] Contributions Toward Response and Recovery Efforts Associated With Hurricane Katrina (Dec. 5, 2005) [hereinafter Dec. 5 Additional Info. Relating to USSS]; Additional Info. Relating To USSS Contributions Toward Response and Recovery Efforts Associated With Hurricane Katrina (Dec. 7, 2005).

146  Dec. 5 Additional Info. Relating to USSS.

147  Dec. 8 Dep't of Justice Response.

148  Interview with BOP; Dec. 8 Dep't of Justice Response.

149  Dec. 8 Dep't of Justice Response. A total of 54 BOP personnel were responsible for the transportation. These personnel were detailed from the Federal Correction Complex (FCC) in Beaumont, TX; FCC Forrest City, Arkansas; FCC Yazoo City, MS; FCC Oakdale, LA; the United States Penitentiary in Pollock, LA; the Federal Detention Center in Houston, TX. (Id.).

150  Dec. 8 Dep't of Justice Response; Interview with BOP.

151  Dec. 5 Telephone Interview with FBI; Dec. 5 E-mail from FBI (citing LA. REV. STAT. ANN. § 9:2793.1 (2005)).

152  Dec. 5 E-mail from FBI.

153  Dec. 5 E-mail from FBI; Dec. 5 Telephone Interview with FBI; Letter from Haley Barbour, Governor, State of Miss., to all state and local law enforcement officers (Sept. 9, 2005) [hereinafter Sept. 9 Governor Barbour letter]. The Governor's request was made under the Emergency Law Enforcement Assistance provisions of the Justice Assistant Act of 1984, 42 U.S.C. §§ 10501-10513, which authorizes the U.S. Dep't of Justice to provide law enforcement assistance to a state. (Id.).

154  Dec. 5 E-mail from FBI (citing order issued pursuant to MISS. CODE ANN. § 33-15-1 (2005)); Sept. 9 Governor Barbour letter. The Governor's request was made under the Miss. Emergency Mgmt. Law § 33-15-11(10). (Id.).

155  Interview with ATF.

156  28 U.S.C. § 564 (2005).

157  Order No. 2778-2005 from Alberto R. Gonzales, U.S. Attorney Gen. to USMS, Dir., Sept. 3, 2005 [hereinafter Gonzales Order to Dir. USMS].

158  Dec. 2 Interview with ICE.

159  CBP Timeline Aug. 30-Sept. 13.

160  Interview with CBP.

161  CBP Timeline Aug. 30-Sept. 13.

162  FAMS Timeline.

163  Nov. 23 Dep't of Justice Response.

164  E-mail correspondence from Bill Mercer to Bill Mercer (ODAG) (Sept. 8, 2005) (6:04 p.m.).

165  Nov. 23 Dep't of Justice Response (citing 28 U.S.C. § 533).

166  Nov. 23 Dep't of Justice Response (citing 42 U.S.C. § 10501).

167  Id.

168  Memorandum from Alberto R. Gonzales, U.S. Attorney Gen., to Heads of Fed. Law Enforcement Agencies (Sept. 2, 2005).

169  Letter from Haley Barbour, Governor, State of Miss., to Alberto R. Gonzales, U.S. Attorney Gen. (Sept. 3, 2005). The Governor's request was made under the Emergency Law Enforcement Assistance provisions of the Justice Assistant Act of 1984, 42 U.S.C. §§ 10501-10513, which authorizes the U.S. Dep't of Justice to provide law enforcement assistance to a state. (Id.).

170  Letter from Alberto R. Gonzales, U.S. Attorney Gen., to Haley Barbour, Governor, State of Miss. (Sept. 3, 2005); Gonzales Order to Dir. USMS.

171  Letter from Kathleen Blanco, Governor, State of LA, to Alberto R. Gonzales, U.S. Attorney Gen. (Sept. 3, 2005). The Governor's request was made under the Emergency Law Enforcement Assistance provisions of the Justice Assistant Act of 1984, 42 U.S.C. §§ 10501-10503, which authorizes the U.S. Dep't of Justice to provide law enforcement assistance to a state. (Id.).

172  Letter from Alberto R. Gonzales, U.S. Attorney Gen., to Kathleen Blanco, Governor, State of LA (Sept. 4, 2005); Order No. 2779-2005 from Alberto R. Gonzales, U.S. Attorney Gen. to Deputy Attorney Gen. (Sept. 4, 2005).

173  Letter from Kathleen Blanco, Governor, State of LA, to Alberto R. Gonzales, U.S. Attorney Gen. and Michael Chertoff, Sec'y, Dep't of Homeland Sec. (Sept. 6, 2005). The Governor's request was made under the Emergency Law Enforcement Assistance provisions of the Justice Assistant Act of 1984, 42 U.S.C. §§ 10501-10503, which authorizes the U.S. Dep't of Justice to provide law enforcement assistance to a state. (Id.).

174  Letter from Alberto R. Gonzales, U.S. Attorney Gen., to Kathleen Blanco, Governor, State of LA (Sept. 7, 2005).

175  Letter from Michael Chertoff, Sec'y, Dep't. of Homeland Sec., to Kathleen Blanco, Governor, State of LA (Sept. 7, 2005).

176  Dec. 2 Interview with ICE.

177  Nov. 16 Interview with ICE; Dec. 2 Interview with ICE; Interview by Select Comm. Staff with FBI personnel, in Washington, D.C. (Dec. 6, 2005) [hereinafter Dec. 6 Interview with FBI].

178  Dec. 2 Interview with ICE; Nov. 23 Dep't of Justice Response.

179  Dec. 2 Interview with ICE.

180  Id.

181  Dec. 2 Interview with ICE; Dec. 6 Interview with FBI.

182  Dec. 2 Interview with ICE.

183  Id.

184  Dec. 2 Interview with ICE; Dec. 6 Interview with FBI.

185  Dec. 2 Interview with ICE.

186  Dec. 2 Interview with ICE; Dec. 6 Interview with FBI.

187 Nov. 28 Interview with FBI; Dec. 2 Interview with ICE.

188 Dec. 2 Interview with ICE.

189 Dec. 2 Interview with ICE; Dec. 6 Interview with FBI.

190 *Id.*

191 Dec. 2 Interview with ICE; Dec. 6 Interview with FBI; Dec. 5 E-mail from FBI. The assignments were as follows: District 1: ATF/ DEA, District 2: FBI/Border Patrol's Tactical Units (BORTAC), District 3: Federal Protective Service, District 4: ICE, District 5: USMS/DEA/BORTAC, District 6: FBI/ATF, District 7: FBI/DEA/BORTACT, and District 8: ATF. (Dec. 5 E-mail from FBI).

192 Dec. 2 Interview with ICE; Dec. 6 Interview with FBI.

193 Dec. 2 Interview with ICE.

194 *Id.*

195 Dec. 6 Interview with FBI.

196 Dec. 2 Interview with ICE; Dec. 6 Interview with FBI.

197 Dec. 2 Interview with ICE; Dec. 6 Interview with FBI; Dec. 5 E-mail from FBI.

198 Dec. 6 Interview with FBI.

199 *Id.*

200 *Id.*

201 *Id.*

202 Dec. 2 Interview with ICE; Dec. 6 Interview with FBI.



*"It's like being in a Third World country.*

*We're trying to work without power.*

*Everyone knows we're all in this together.*

*We're just trying to stay alive."*

Mitch Handrich
Registered Nurse Manager at Charity Hospital[1]

# MEDICAL CARE

## Medical care and evacuations suffered from a lack of advance preparations, inadequate communications, and difficulties coordinating efforts

### Summary

Public health preparedness and medical assistance are critical components to any disaster response plan

Hurricane Katrina tested the nation's planning and preparedness for a major public health threat and highlighted the importance of strong cooperation and partnerships among health agencies at all levels of government. The threat of any type of disaster emphasizes the need for planning and practice. Public health preparedness and medical assistance are critical components to any disaster response plan — the faster the health community responds, the more quickly control strategies can be developed and appropriate treatments can be identified. And the faster human suffering is diminished.

The annual hurricane season is a continuous challenge to public health infrastructures and a strain on resources. As seen in the preparation for and response to Katrina, medical personnel, supplies, and equipment were in constant need in the Gulf coast region. Despite deficiencies in coordination, communication, and capacity, public health and medical support services effectively treated a massive and overwhelming evacuee population. Federalized teams of medical first responders were deployed to the affected region to provide assistance. Millions of dollars worth of medical supplies and assets were consumed. Some Department of Health and Human Services (HHS) assets, like the Federal Medical Shelters, had never been used or tested prior to Katrina but were deployed and were, for the most part, considered effective.

Despite difficulties, the medical assistance and response to Hurricane Katrina was a success. Thousands of lives were saved because of the hard work and enduring efforts of public health officials and medical volunteers. Poor planning and preparedness, however, were also too big a part of the story, resulting in delays and shortages of resources, and loss of life in the region.

This chapter outlines what medical personnel and supplies were pre-positioned, and deployed post-landfall, to the affected area and how those assets were utilized. It explains the plans in place prior to Hurricane Katrina for health care facilities and shelters. The findings in this chapter conclude several deficiencies in public health and medical response plans exist at all levels of government and within medical care facilities. Ultimately, better planning and initiative would have resulted in a more proactive, coordinated, efficient, and effective response.

### Personnel

HHS and the Department of Homeland Security (DHS) have the capabilities to mobilize and deploy teams of medical personnel to disaster areas. HHS controls the Public Health Service Commissioned Corps, the Medical Reserves Corps, and personnel from its agencies such as the Centers for Disease Control and Prevention (CDC), National Institutes of Health, Substance Abuse and Mental Health Services Administration, and the Food and Drug Administration. DHS, specifically FEMA, has direct control over the National Disaster Medical System (NDMS), which supplies and organizes teams of medical personnel in each state who stand ready to deploy at any moment. Unfortunately, limited numbers of personnel were pre-positioned prior to landfall, and most deployments were delayed until after the storm hit and the magnitude of devastation was realized.



FEMA

## Supplies

In addition to medical personnel, HHS, FEMA, and the Department of Defense (DOD) have medical supplies at their disposal to respond to a public health emergency. HHS has control over the Strategic National Stockpile (SNS), a national repository of pharmaceuticals and medical supplies. NDMS personnel teams are always accompanied by large caches of supplies and drugs. DOD has a mobile medical unit capability as well. Limited amounts of supplies, however, were staged in the region prior to landfall. Several officials argued the magnitude of the storm's devastation could not have been predicted, and the amount of supplies needed was unknown until the fog cleared. Despite that argument, more supplies and personnel could have been pre-positioned prior to landfall.



AP PHOTO/BILL HABER

Evacuation plans, communication, and coordination must be executed well for effective response

During the days following Hurricane Katrina, around the clock media coverage of patients and staff trapped in New Orleans hospitals inundated television screens across the country. The nation watched in horror. How long would it take for evacuations to begin? And why had these hospitals not evacuated before the storm?

The Select Committee focused part of its medical investigation on these questions, as well as the overarching issues of impaired communications and lack of coordination. The Select Committee acknowledges this chapter does not tell the story of every hospital devastated by Hurricane Katrina. Nor does it include every detail of the communications and coordination difficulties which impeded the medical response.

Rather, this chapter provides findings based on an in-depth examination of specific plans in place before the storm, and a timeline of events that *actually* took place after the storm. Similarly, the Select Committee recognizes this section of the report focuses on the evacuations of New Orleans medical facilities in particular. Because New Orleans hospitals and facilities experienced the most complete failure of equipment and communications, and because the need to evacuate New Orleans hospital patients was so extreme, the Select Committee chose these institutions as its focal point.

## Evacuations

As it stands, Louisiana hospitals and nursing homes are responsible for having and implementing their own emergency evacuation plans. The Louisiana Hospital Association (LHA) does not provide specific emergency response or evacuation guidance and said, with respect to protecting patients and staff, the primary priority for all hospitals is to "shelter in place" versus evacuate. Hospitals are, however, expected to comply with requirements set forth by the Joint Commission on Accreditation of Healthcare Organizations.[2]

The majority of hospital CEOs, as well as state and local medical personnel with whom the Select Committee met, cited time and money as two key factors influencing their decision about whether to evacuate patients from a shelter or medical facility prior to a hurricane. Time is critical given that the majority of hospital and Department of Veterans Affairs Medical Center (VAMC) plans call for evacuation decisions to be made anywhere from 36 to 72 hours in advance of a hurricane's projected landfall — hospitalized patients require a significant amount of time and staff to be moved safely. In the case of Hurricane Katrina, the then Methodist Hospital CEO, Larry Graham, said when he realized Hurricane Katrina was going to hit New Orleans, there simply was not enough time to evacuate patients.

The second much-discussed factor, cost, is perhaps even more critical to the decision. Expenses for evacuating a hospital are astronomical, and in the case of for-profit hospitals, these costs are not reimbursable by FEMA. In

*Time is critical given that the majority of hospital and Department of Veterans Affairs Medical Center (VAMC) plans call for evacuation decisions to be made anywhere from 36 to 72 hours in advance of a hurricane's projected landfall*

most cases hospitals say that given their cost/risk analyses, it makes the most economic sense to ride out a storm and protect patients within the hospital rather than evacuate them. For example, going to Code Grey alone (without factoring in evacuation expenses), costs Louisiana State University's hospitals $600,000 per day.[3] Many members of the New Orleans medical community likewise made the point, had Hurricane Katrina not resulted in such catastrophic flooding, their facilities would have been prepared, and their decision not to evacuate patients would have been the most prudent course of action. With the factors of time and money in mind, this chapter seeks to understand evacuation plans in place prior to Katrina, and preparedness levels of hospitals and the government to fully evacuate New Orleans medical facilities.

## Communication and Coordination

Medical responders and coordinating officers from the government, hospitals, and private entities, cited non-existent or limited communication capabilities as a primary obstacle to their response. Emergency plans in place prior to Hurricane Katrina did not prevent oversights and confusion in procedures for ensuring functional and sufficient communications equipment in the event of a disaster. A comparison of the VAMC plans for Louisiana, Mississippi, and Alabama, for example, demonstrates they are not standardized — some pieces of VAMCs' communications plans do clearly outline the who, what, where, and when of keeping communication systems operating, while other VAMC plans leave many questions unanswered. Most VAMC and hospital emergency plans, reviewed by Select Committee staff do not have one separate section devoted to communications preparation.

The LHA and its hospitals rely on multiple phone service providers, and all LHA hospitals rely on an emergency two-way radio such as Hospital Emergency Area Radio (HEAR) or 800 MHz radio.[4] This chapter describes how VAMC and hospital emergency plans address emergency communications and equipment, as well as exactly how such plans and equipment failed medical responders when they most needed it.

One of the most common and pervasive themes in the response to Hurricane Katrina has been a systematic failure of communications at the local, state, and federal levels — a failure that hindered initiative. The accounts of New Orleans medical facilities and special needs shelters are no exception, underscoring how failed communications with the outside threatened the safety of medical staff and the lives of their patients. It was difficult to ascertain a clear timeline of communication capabilities and failures for medical first responders and personnel. Institutions did not have time to collect information for hourly or even daily reports of how communication equipment and systems were working or not. Medical responders and personnel simply did not have adequate communications capabilities immediately following the hurricane. The majority of cell phones were rendered inoperable because they could not be recharged. Satellite communications were unreliable, and the distribution of satellite phones appeared insufficient.

Government agencies also encountered problems with coordination due to red tape and general confusion over mission assignments, deployments, and command structure. On a large scale, command structure presented problems when HHS, the coordinating agency for Emergency Support Function 8 (ESF-8), and NDMS, the system that houses most of the resources needed for a medical response, did not share an understanding of who controlled NDMS during the emergency. Confusion resulted when these two entities were operating separately, albeit with efforts to coordinate with each other. On a smaller scale, e-mails from first responders and medical personnel immediately following the storm reflect coordination problems. Misunderstandings about deployment orders and mission assignments resulted in streams of e-mails expressing uncertainties and frustrations.

## ESF-8 Background

HHS is the "principal agency for protecting the health of all Americans and providing essential human services, especially for those who are least able to help

themselves."[5] As such, HHS plays a role in the emergency management process. Under the National Response Plan (NRP), ESF-8 provides for the federal government to augment state and local resources and assist in response. Upon activation, ESF-8 "provides the mechanism for coordinated federal assistance to supplement state, local, and tribal resources in response to public health and medical care needs (to include veterinary and/or animal health issues when appropriate) for potential or actual Incidents of National Significance and/or during a developing potential health and medical situation."[6]

The Assistant Secretary for Public Health Emergency Preparedness serves on behalf of the Secretary to coordinate the HHS preparation for, response to, and efforts to prevent public health and medical emergencies or disasters. ESF-8 is tasked with the assessment of public health and medical needs, including behavioral health, conducting public health surveillance, and the provision and deployment of medical care personnel and medical equipment and supplies.[7]

As the designated primary agency for ESF-8, HHS is responsible for:

- Orchestrating federal support within their functional area for an affected state;
- Providing staff for the operations functions at fixed and field facilities;
- Notifying and requesting assistance from support agencies;
- Managing mission assignments and coordinating with support agencies, as well as appropriate state agencies;
- Working with appropriate private-sector organizations to maximize use of all available resources;
- Supporting and keeping other ESFs and organizational elements informed of ESF operational priorities and activities;
- Executing contracts and procuring goods and services as needed;
- Ensuring financial and property accountability for ESF activities;
- Planning for short-term and long-term incident management and recovery operations; and
- Maintaining trained personnel to support interagency emergency response and support teams.[8]

While HHS has a number of internal assets to supplement state, local, and tribal government entities, the NRP lists a number of additional external assets for HHS to use in coordinating the federal response. Support agencies under ESF-8 include DHS (FEMA and NDMS), DOD, VA, and the Department of Transportation (DOT).

## Finding: Deployment of medical personnel was reactive, not proactive

### Federalized teams were deployed and provided assistance in several locations after landfall

Thousands of people in the Gulf region were treated and hundreds of lives were saved due to the services provided by medical personnel in response to Hurricane Katrina. However, with few medical personnel teams pre-positioned prior to landfall, public health officials scrambled to mobilize and deploy personnel teams after the storm hit the Gulf coast. As a result, medical assistance in some areas was unnecessarily delayed by hours, even days. Personnel and supplies are readily available to decision-makers. With a few exceptions, the deployment of medical personnel was reactive, not proactive as most assets were not utilized until after the need was apparent. Ultimately, public health and medical support services were effectively but inefficiently delivered. Below is a comprehensive assessment of when and where medical personnel were deployed in the Gulf coast region to provide medical treatment and care.



FEMA



## NDMS

FEMA is home to the NDMS. The mission of NDMS is to maintain a national capability to deliver quality medical care to the victims and responders of a domestic disaster.[9] NDMS has medical, mortuary, and veterinarian assistance teams located around the country. These specialized teams include:

- 45 Disaster Medical Assistance Teams (DMATs), groups of professional and paraprofessional medical personnel capable of providing medical care following disasters;
- 11 Disaster Mortuary Operational Response Teams (DMORTs), which consist of private citizens with specialized training and experience to help in the recovery, identification and processing of deceased victims;
- Four National Medical Response Teams, to deal with the medical consequences of incidents potentially involving chemical, biological or nuclear materials;
- National Pharmacy Response Teams and National Nurse Response Teams, which include pharmacists and nurses to assist in mass-dispensing of medications during disasters along with mass vaccination campaigns.
- Five Veterinary Medical Assistance Teams, clinical veterinarians, pathologists, animal health technicians, microbiologists and others who assist animal disaster victims and provide care to search dogs; and
- Three International Medical Surgical Response Teams, highly specialized teams, trained and equipped to establish free standing field surgical facilities anywhere in the world.[10]

Fully operational DMATs have the ability to triage and treat up to 250 patients per day for up to three days without resupply.[11] Within four hours of alert status, DMATs should be able to field a full 35-person roster. Within six hours after activation, DMATs should be deployment ready.[12]

Before Hurricane Katrina made landfall, NDMS only staged nine of its 45 DMATs in the Gulf coast region.[13] Three DMATs and a Management Support Team were pre-positioned in each of the following locations: Anniston, Alabama, Memphis, Tennessee, and Houston, Texas. According to FEMA officials, the Superdome in New Orleans was the first NDMS assignment because it was a designated special needs shelter.[14] DMAT Oklahoma 1 (OK-1 DMAT) was pre-staged in Houston, Texas on August 27 in anticipation of the storm. OK-1 DMAT efforts will be discussed more thoroughly in a later section of this chapter. In addition to OK-1 DMAT, other teams at the Superdome included NM-1, CA-6, and RI-1.

WA-1 DMAT from Washington was one of the few teams activated and deployed prior to landfall. It was staged in Houston and was poised to move to its mission assignment post-landfall, which ended up being Louis Armstrong International Airport in New Orleans (New Orleans Airport).[15]

FEMA activated OR-2 DMAT from Oregon on August 30 and immediately began treating patients when the team arrived at the New Orleans Airport on the afternoon of September 1.[16] As previously mentioned, every DMAT includes a large cache of medical supplies and equipment. It is much easier to move personnel than supplies. Although the OR-2 DMAT's cache left Portland on August 31, it took almost five days for the three trucks of supplies to reach the airport.

By August 31, three DMATs, WA-1, CA-4, and TX-4, had arrived at the New Orleans Airport, where evacuated patients were being received.[17] Eventually, eight DMATs would be stationed there to help provide medical care during the patient movement



operations in New Orleans.[18] The medical treatment provided and specific actions taken by the DMATs operating at the airport will be discussed in a later section of this chapter.

With Mississippi's hospital infrastructure decimated after Hurricane Katrina, nine DMATs and seven DMAT Strike Teams were sent to the state to provide medical care and augment the remaining functioning hospitals.[19] Mississippi's State Health Officer, Dr. Brian W. Amy, testified that, "through coordination with the National Disaster Medical System, we positioned DMAT teams at every affected hospital and Strike teams at overflow hospitals in the affected areas. Of the 17,649 reported injuries, DMAT teams treated 15,500 patients in the initial days after landfall."[20]



In general, at most locations DMATs were deployed, the teams were met with overwhelming demand for patient assessment and treatment. Many of the teams operated under extreme fatigue with limited medical supplies, inadequate amounts of food and water, intermittent electricity, and no air-conditioning.

DMORTs, teams of private citizens with specialized training and experience to help in the recovery, identification and processing of deceased victims, were sent to the Gulf coast to assist in the recovery process of dead bodies. A standard DMORT team is comprised of 31 medical and forensic volunteer personnel with specific training in victim identification, mortuary services, and forensic pathology and anthropology methods. DMORTs include a combination of medical examiners, coroners, pathologists, forensic anthropologists, medical records, fingerprint technicians, forensic odentologists, dental assistants, radiologists, funeral directors, mental health professionals, and support personnel.[21] Fully operational DMORTs should be able to deploy within 24 hours of notification.

With only two Portable Morgue Units (PMU) in NDMS, one was sent to Louisiana and the other to Mississippi. PMUs are equipped to support DMORT services when no local morgue facilities are available. Each is manned by four DMORTs. FEMA did not have enough DMORTs and was forced to contract for additional personnel. HHS worked closely with DMORTs and FEMA by embedding Public Health Service (PHS) personnel in each team. A PHS senior officer and mental health officer were assigned to assist each DMORT.[22]

On Thursday, September 1, 27 Region II DMORTs prepared to leave for Anniston, Alabama, a site designated as the eastern staging point for the DMORT response.[23] On Monday, September 5, one week after landfall, HHS Assistant Secretary for Public Health Emergency Preparedness Stewart Simonson requested "ample mobile mortuary services throughout the affected region."[24] An order for 200 mobile mortuary trucks was issued, with 130 designated to Louisiana and 70 to be delivered to Mississippi.[25] By the next day, mortuary services were being established in St. Gabriel, Louisiana with 96 personnel.[26] FEMA and Louisiana collaborated on drafting a body recovery plan which required the approval of then FEMA Director Michael Brown and Louisiana's newly appointed state medical examiner.[27] In Mississippi, mortuary services were established at the Naval Air Station in Gulfport. By September 6, one DMORT had set up facilities there.



## U.S. Public Health Service Commissioned Corps

The U.S. Public Health Service Commissioned Corps, one of the seven uniformed services of the United States, is comprised of highly-trained and mobile health professionals who carry out programs to promote good health, understand and prevent disease and injury, assure safe and effective drugs and medical devices, deliver health services to federal beneficiaries, and supply health expertise in time of war or other national or international emergencies.

*1,000 PHS Commissioned Corps Officers had been deployed to the region in support of the Hurricane Katrina medical response, making it the largest response in Corps history.*

All Corps officers on deployment rosters were notified by the U.S. Surgeon General's office via e-mail on Saturday, August 27 that Hurricane Katrina could be a catastrophic event creating the need for medical assistance in the Gulf coast after landfall.[28] At the time of the e-mail, there was "no assessment of what will be needed at this point, but they will potentially ask the feds for medical, mental health, and pharmaceutical support, as well as EHOs, environmental and civil engineers to support the obvious needs for water, waste water and sewer, as well as infrastructure problems."[29] Commissioned Corps officers were asked to stand by and prepare for deployment as public health needs became apparent.

According to a briefing with U.S. Surgeon General, Vice Admiral Richard H. Carmona, PHS had pre-positioned 38 officers on Sunday, August 28 in Baton Rouge, Louisiana and Biloxi, Mississippi.[30] It was originally planned for the PHS officers to be stationed in New Orleans, but they were unable to get there before Hurricane Katrina made landfall. PHS officers were on the ground in New Orleans by late Monday, August 29.

Carmona suggested coordination with PHS, FEMA, and NDMS was difficult. HHS had trouble with tracking DMAT mission assignments and with staffing and communication. Despite the assignment of a Commissioned Corps officer liaison to FEMA to coordinate medical activities, coordination between the two agencies was lacking.[31]

PHS helped reestablish a public health infrastructure for some communities in the Gulf coast region. For example, when New Orleans Mayor Ray Nagin laid-off a majority of the city's public health employees, PHS helped to fill the gaps. "Public health services were never federalized—PHS just provided a federal presence. But the federal presence was absolutely stabilizing," Carmona said.[32]

By September 9, more than 1,000 PHS Commissioned Corps officers had been deployed to the region in support of the Hurricane Katrina medical response, making it the largest response in Corps history. More officers were deployed in response to Katrina than after 9/11 and the anthrax postal incident in 2001.[33] Commissioned Corps officers supplemented several medical response assignments. They worked side-by-side with the DMATs at the New Orleans Airport; staffed the Federal Medical

Shelters at several locations in the Gulf coast; assisted with CDC activities; accompanied SNS assets; and helped provide mental health services to the affected region. In general, PHS is a valuable operational asset to HHS and was a critical component to the medical response to Hurricane Katrina. However, despite having the capability to mobilize Commissioned Corps officers at anytime, PHS failed to deploy a significant number of officers to the region prior to landfall.

## Centers for Disease Control and Prevention

The CDC is a component of HHS that assists in carrying out its responsibilities for protecting the health and safety of all Americans and for providing essential human services, especially for those people who are least able to help themselves.[34] CDC controls the SNS, large quantities of medicine and medical supplies to protect the American public if there is a health emergency severe enough to cause local supplies to run out.

Before Hurricane Katrina made landfall, CDC activated the Emergency Operations Center (EOC) on August 25.[35] CDC personnel were on the ground in Louisiana with a Technical Advisory Response Unit (TARU) which accompanies SNS supplies.[36] In anticipation of the need to provide emergency medical services, 27 pallets[37] of medical supplies were pre-positioned on the ground prior to landfall.[38] On Sunday, August 28, these items were pulled from SNS with the mission assignment for some supplies to be delivered to the Superdome in New Orleans.[39] CDC also staffed and readied 12 teams of 20 people each to be deployed once the request from states for help was received.

CDC was responsible for deploying personnel and SNS assets, assisting state and local public health authorities with communicating food and water safety information, conducting disease surveillance, providing immunizations to displaced residents, and helping reestablish public health services in affected areas. Immediately following the hurricane, CDC's biggest concern was the risk of food-borne and water-borne illnesses.[40] CDC worked with the Louisiana Office of Public Health to assess reports on an outbreak of cholera and partnered with

the Environmental Protection Agency and local health departments to assess environmental risks of toxins and chemicals in the water and air. CDC also worked with DOD to provide mosquito-control resources in most of the affected areas. Teams were deployed to both Louisiana and Mississippi on a mosquito spray mission.

CDC provided access to Influenza, Tetanus-Diptheria, Hepatitis A, and Hepatitis B vaccines to areas that were lacking them by coordinating the delivery, distribution, and administration of over three million doses of vaccine, with one million of the doses obtained from SNS.[41] When New Orleans lost its public health department due to layoffs, CDC sent over 100 medical personnel to help reestablish services, conduct surveillance, and improve communication.[42]

### HHS Credentialed Volunteer Health Professionals

HHS designed a system that assists state and locals in verifying the credentials of volunteer healthcare workers. While stimulating the creation of over 900 medical teams, it also created confusion at the state level. Overall though, HHS was successful in mobilizing and credentialing medical professionals who volunteered in the Gulf coast following Hurricane Katrina. PHS set up a Katrina database to credential and verify medical professionals.



With the help of private companies, such as Kaiser Permanente, over 3,400 volunteers were processed and over 1,000 volunteers were deployed.[43] The database was linked to state databases and a national databank, allowing PHS to use existing information to help verify credentials. HHS also established a website (https://volunteer.hhs.gov) and toll-free number (1-866-KATMEDI) to help identify health care professionals and relief personnel to assist in Katrina relief efforts.[44]

The Medical Reserve Corps has a medical volunteer database where medical volunteers are pre-credentialed

and can be activated within 24 hours. Carmona oversees this database as well as the response of the volunteers HHS calls upon. HHS was able to link its database to state databases in order to confirm volunteer credentials. Both HHS and Carmona stressed the importance of volunteers linking up with pre-existing rescue teams rather than acting independently. The Surgeon General's office likewise had generated a separate database for people who wanted to volunteer supplies or equipment.

Setting up a mechanism to allow individual medical personnel to volunteer was a useful tool initiated by HHS. The database was such a success that by September 3, an internal e-mail from HHS indicated "VOLUNTEERS SHOULD NO LONGER BE REFERRED TO KATRINARECOVERY@HHS.GOV, they should be directed to the https://volunteer.ccrf.hhs.gov/ and instructed to complete a volunteer application."[45] These credentialed volunteers heavily supplemented medical services in the Gulf coast region and were an important part of the medical response.

### Substance Abuse and Mental Health Services Administration

As part of the public health and medical response, the Substance Abuse and Mental Health Services Administration (SAMHSA) mobilized personnel to support state mental health program directors in their efforts to conduct needs assessments, provide services, support ongoing administrative operations, access financial assistance and prepare for long-term assistance.[46] SAMHSA deployed Disaster Technical Assistance Center teams to provide information and supplement state and local disaster response planning, review disaster plans, conduct literature reviews, and offer mental health support services.[47] On Wednesday, September 7, SAMHSA created a "Crisis Hotline" to provide victims with 24 hour access to counseling and mental health resources.[48] Additionally, on Tuesday, September 13, HHS Secretary Micheal O. Leavitt announced $600,000 in emergency grants to Louisiana, Alabama, Texas, and Mississippi to ensure mental health assessment and crisis counseling are available in areas affected by Hurricane Katrina.[49] The states have used the money to support clinical assessments and provide psychiatric and nursing services, medications, brief interventions, crisis case management, and short-term residential support.

# Finding: Poor planning and pre-positioning of medical supplies and equipment led to delays and shortages

Equipment and supplies were in heavy demand immediately following the hurricane and could not be quickly replenished by state, local, and federal resources. As detailed in other sections of this report, most shelters, hospitals, and flooded areas were without electricity and adequate supplies of potable water and food for days after Katrina made landfall. With only nominal amounts of medical supplies pre-positioned by FEMA and HHS, a great deal of medical provisions had to be supplied after Katrina made landfall. In areas like New Orleans, it took days to respond to the catastrophe and deliver medical supplies to the Superdome and Convention Center.

The delays were a result of poor planning. Obviously, supplies should be protected during the storm and staged in safe and secure locations for easy access post-landfall. Despite being unable to predict the magnitude of devastation from the storm, more supplies and equipment should have been pre-positioned and accessible to state and local officials immediately following landfall. Below is a detailed assessment of the different medical supplies and equipment that were provided to the Gulf coast in response to Hurricane Katrina.

## States were heavily dependent on CDC/SNS for medical supplies

### SNS 12-Hour Push Packages

As previously stated, the SNS is a national repository of antibiotics, chemical antidotes, antitoxins, life-support medications, IV administration, airway maintenance supplies, and medical/surgical items.[50] The SNS has 12-hour Push Packages (Push Packs), caches of pharmaceuticals, antidotes, and medical supplies designed to provide response to a public health emergency within 12 hours. CDC estimates that each Push Pack costs $6 million, weighs almost 50 tons, and includes over 100 different kinds of supplies.[51] Push Packs are configured to be immediately loaded onto either trucks or commercial aircraft for the most rapid transportation. A Boeing 747 aircraft or seven tractor trailers are needed to move a

single Push Pack. A TARU accompanies the Push Pack to coordinate with state and local officials and ensure SNS assets are efficiently received and distributed upon arrival at the site.[52] TARU is simply a team of technical advisors to supervise the transfer of Push Pack contents to the receiving state.



Push Packs can be deployed at the request of a governor and independently of the NRP. Mississippi was the only state to request a Push Pack from CDC. The Push Pack arrived in Mississippi on Friday, September 2, four days after Katrina passed through the state.[53] As Amy testified, "within 12 hours of a call and my official request, eight tractor-trailers rolled into Mississippi loaded with medical supplies for affected Mississippi hospitals."[54] Push Packs were originally designed to respond to a bioterrorist attack, so they included items that were not relevant to treating the medical needs of Katrina evacuees. As a result, some of the Push Pack materials went unused. For this reason, CDC informed state and local officials they could request supplies and materials from SNS without requesting a full Push Pack.[55] Although Mississippi was the only state to request a Push Pack, other states still tapped resources and supplies from SNS. CDC figured out a way early on to prevent the waste of resources and ensure the most appropriate medical supplies were being allocated and delivered.

Also, CDC began to move towards more focused deliveries from existing inventories outside of SNS and acquired materials from private partners, as thousands of critical supplies were needed.[56] The Director for the Coordinating Office for Terrorism Preparedness and Emergency Response at CDC, Dr. Richard Besser, suggested creating Push Packs for major public health disruptions other than bioterrorism. This could ensure the

most appropriate medical supplies and equipment arrive to the affected area first and would also prevent the waste of supplies that are not relevant to certain public health emergencies.[57]

## Temporary medical operations staging areas were assembled and utilized

### Federal Medical Shelters

Federal Medical Shelters (FMS) were a new component to the HHS hurricane response introduced following Katrina's landfall. These are rapidly deployed, minimal care medical kits capable of housing, triaging, and holding displaced patients. Each FMS is a 250-bed emergency shelter with a pharmaceutical suite, designed to provide care to patients for three days before the need to re-supply and re-stock materials.[58] An FMS is usually set up in a large space like an airport hanger or gymnasium with some provisions supplied by the SNS. FMS facilities are not designed for comprehensive community care needs; they are designed to offer last-resort care and support during situations in which normal, day-to-day operations are disrupted. FMS were developed to both augment hospitals and serve as quarantine stations.



FEMA

Under the orders of Simonson, FMS began readying supplies and personnel on August 27, and one FMS was sent to Camp Beauregard, Louisiana on August 28.[59] From there, the FMS continued on to Louisiana State University (LSU) in Baton Rouge, and on the evening of Tuesday, August 30, the FMS at LSU began operations staffed by PHS commissioned Corps officers. FMS were also staged at Fort Polk Army Base in central Louisiana, Eglin Air Force Base near Pensacola, Florida, the Naval Air Station in Meridian, Mississippi, and the Mississippi Air National Guard Station in Jackson, Mississippi.[60] Additionally, the New Orleans Airport was the site of an FMS and helped provide acute medical care to evacuated patients from surrounding hospitals and the Superdome. The National Institutes of Health in Bethesda, Maryland set up a critical care facility for the sickest patients evacuated from the Gulf coast region.[61]

Essentially, these shelters were used to augment hospitals in the Gulf coast and help with the surge capacity of Katrina evacuees. Although Simonson thought the shelters were under-utilized in response to Katrina, he believed the exercise proved FMS are a valuable asset to be used in future public health emergencies. Despite this, only one was pre-positioned while most were readied and deployed in the days following landfall. Precious time was wasted because public health officials lacked initiative.

Prior to Katrina, FMS was only an idea on paper and had never been put into practice. The temporary medical shelters had never been tested in simulated drills or exercises, so it was initially unclear how FMS would perform and if their use would be effective.[62] Simonson said he believed HHS held two exercises to test FMS last year. He did not believe them to have been extensive or to have simulated disaster-like conditions.[63] The tests were held simply to time setup of facilities and processes. Despite the opportunity to truly test FMS at two federally mandated exercises, one in April 2005 and the other held in 2003, HHS did not seize the opportunity to assess and evaluate them.[64]

### Expeditionary Medical Support Systems

The Air National Guard also supplied medical personnel and equipment to the Gulf coast region in response to Hurricane Katrina. Similar to FMS, Expeditionary Medical Support System's (EMEDS) mission is to provide front line, field hospital care in the event of a catastrophe or terrorist attack where local facilities are too overwhelmed to adequately treat patients.[65] EMEDS operate and function like brick and mortar hospitals and have operating rooms, dental, pharmacy and lab services, intensive care units, and other facilities and equipment. These mobile hospitals have a 25-bed capacity and can be set up and ready to receive patients within 24 hours.[66] Traditionally, EMEDS are primarily for military personnel but, in response to Katrina, EMEDS were utilized to provide medical treatment to thousands of civilian victims.



STATE OF LOUISIANA

On Thursday, September 1, the Air Force deployed an EMEDS to provide medical assistance at the New Orleans Airport. Upon arrival, the EMEDS team set up and began



assisting the DMATs who had already established a make-shift facility.[67] At the New Orleans Airport EMEDS teams helped other government agencies and civilian medical teams provide treatment and health care to those individuals transported to the airport. EMEDS teams also assisted with aeromedical evacuations. According to Colonel Richard Bachman, who directed the Air Force's medical assistance in the Gulf region, "the EMEDS is to set up rapidly, treat, stabilize, and then air evacuate people out. It's a 25-bed hospital, but we took care of 2,500 people in two days, so the number of beds is essentially irrelevant, because we weren't holding them and providing long-term treatment….We never practiced hospital care in an airport terminal without tents or [having] equipment being overwhelmed by thousands of patients in the dark without air conditioning."[68] Despite the unfavorable conditions, EMEDS and other medical personnel stationed at the airport completed an enormous patient movement operation in a very brief window of time.

The Air Guard set up an additional mobile military hospital at the Convention Center to take the place of Charity Hospital and provide medical services to military personnel while other facilities are out of commission.[69] The Mississippi Air National Guard established an EMEDS to augment services of the badly damaged Hancock County Medical Center.[70] The EMEDS was set up in the parking lot of that medical center and treated 47 patients before it was demobilized in late September.

## State Mobile Hospital Units

As one of the few self-contained mobile hospitals in the U.S., the Carolina MED-1 mobile hospital was federalized and deployed to Waveland, Mississippi. Carolina MED-1 has complete emergency room and operating room capabilities with 100 hospitals beds and functions exactly like a brick and mortar hospital.[71] It was staffed by a team of volunteers from the Carolina Medical Center, PHS officers, and other medical volunteers. Waveland was completely decimated by Katrina and was in desperate need of medical facilities and personnel to treat residents. In total, Carolina MED-1 treated almost 5,000 patients and is considered one of the success stories of the medical response to Hurricane Katrina. Amy described Carolina MED-1 as an "invaluable asset to Mississippi's most hard hit area in Hancock County."[72]

On Friday, September 2, Simonson wrote an e-mail asking the state of Nevada to transport its mobile medical facility (NV-1) to the New Orleans Airport.[73] He intended NV-1 to serve as a federalized hospital facility to provide medical care. Upon arrival at the airport, though, NV-1 was told its assets were no longer needed and was eventually directed to Gulfport, Mississippi where it was set up with support staff from the Nevada Hospital Association, PHS officers, and volunteer health professionals.[74] When asked why he waited until September 2 to order NV-1 to New Orleans, Simonson recalled there was some confusion as to whether Mississippi had already requested use of NV-1.[75] Simonson said ultimately NV-1 was used in Mississippi and that it was difficult to initially assess where assets were needed most.[76] In total, NV-1 saw almost 500 patients by the end of September. Both of these mobile hospitals were considered extremely valuable assets to the public health response after Hurricane Katrina.

## Finding: New Orleans was unprepared to provide evacuations and medical care for its special needs population and dialysis patients and Louisiana officials lacked a common definition of "special needs"

### Defining "Special Needs"

New Orleans has the largest special needs population in Louisiana. But the Louisiana Medical Director and State Health Officer, Dr. Jimmy Guidry, and the Director of the New Orleans Health Department, Dr. Kevin Stephens, never offered a clear or consistent definition of "special needs." According to Guidry, special needs people are



FEMA

defined as not requiring hospital care, but not appropriate for a general population shelter either.[77] Stephens, on the other hand, indicated the state has a list outlining what criteria constitute a special needs patient. Among the most important, Stephens said, a patient with special needs is someone who requires intermittent electricity to sustain life.[78]

In fact, the list to which Stephens referred says the state of Louisiana has one set of criteria for classifying special needs persons, while Jefferson Parish has another.[79] The state defines Category I special needs persons as "patients who are acutely ill and need to be admitted to a hospital as a patient during an emergency evacuation of the area." Jefferson Parish classifies Category I special needs people as "patients who do not yet need to be admitted, but whose condition will probably deteriorate during an evacuation." These patients are to be taken to a trauma hospital. Aside from Jefferson Parish having a definition of Category I special needs that differs from the state's definition, confusion also arises in determining whether Jefferson Parish's criteria for Category II special needs people also applies to Louisiana. Category II is for "patients with limited needs and assistance who require special needs sheltering during an emergency evacuation of the area. These will be sent to non-trauma hospitals." Again, it is unclear whether this category is specific to Jefferson Parish or if it applies to the entire state.

Additionally, the Office of Emergency Preparedness (OEP) Director for Plaquemines Parish, Jesse St. Amant, was adamant that nursing home patients are considered "special needs patients."[80] Neither Guidry nor Stephens concurred, and nursing home patients are not listed within Louisiana or Jefferson Parish's special needs categories.[81]

Stephens stated New Orleans does not keep a list to identify special needs persons in advance of an emergency.[82] St. Amant, however, keeps a database of Plaquemines Parish's special needs patient population and interviews each patient about specific requirements for transportation, medications, and other special needs. He has pre-arranged contracts to address these needs and operates on an annual budget of approximately $300,000.[83] Stephens said New Orleans uses statistics from the health care community (such as the number of patients on dialysis) to reach its estimate that New Orleans has 1,000 special needs persons. Interestingly, a September 6 EOC Report indicated the state estimated *dialysis patients alone* were greater than this figure, saying the "State projects approximately 1,200 dialysis patients."[84] Additionally, the emergency coordinator in Jefferson Parish, which is an adjacent suburb of equivalent population to New Orleans, said they have a potential of 45,000 special needs patients—41,000 more patients than the estimate given by Stephens. [85]

## Sheltering and Evacuating Special Needs Patients

State officials from the Governor's Office, the Department of Health and Hospitals (DHH), and the Department of Transportation and Development said all parishes, New Orleans included, were responsible for managing special needs evacuations.[86] New Orleans designated the Superdome as a special needs shelter, and Stephens said New Orleans' plan focuses on transporting special needs people from their homes to the Superdome. Special needs patients were to be collected throughout neighborhoods, using Rapid Transit Administration buses, and taken to the Superdome — despite the fact New Orleans does not keep a list of such patients.[87]



AP PHOTO/ERIC GAY

Guidry says the state bused 200 special needs people from the Superdome to LSU hospitals in Baton Rouge on Sunday before landfall.[88] According to state officials, the New Orleans plan never called for the use of school buses for evacuation, so in their opinion, criticisms about school buses lined up underwater and unused are unfair. Additionally, state officials say New Orleans never requested state assistance or buses to help with this effort (even though Guidry indicated the state did, in fact, assist in this manner).[89]

At the federal level, FEMA Deputy Federal Coordinating Officer Scott Wells said he interpreted special needs to be anyone needing assistance, whether they were impoverished or medically disabled.[90] To his knowledge, the state and the parishes made no significant attempts to evacuate special needs persons, although he indicated there may have been efforts to shelter them. The need to shelter special needs people in the Superdome showed the state and city had not taken steps (to which they had agreed during the Hurricane Pam exercise) to coordinate the movement and sheltering of these people farther north, away from the Gulf, Wells said.[91] The requirement for medical evacuations after the storm was an indication the pre-landfall evacuation was not successful.

Parish officials outside New Orleans also described their efforts to identify and evacuate special needs patients. According to the Plaquemines Parish sheriff, before the start of hurricane season, the parish solicits people to register if they have special needs for evacuation.[92] For Katrina, school buses were used to pick up and move these special needs registrants to a shelter in Belle Chasse, Louisiana. According to the Jefferson Parish emergency management director, their emergency operations plan also includes provisions for special needs people. The parish conducts a triage by telephone to determine which people with special needs require shelter within a parish hospital. Those who qualify are given a password for admittance. For Hurricane Katrina, there were 12,000 such people identified and sheltered.[93]

## Dialysis Patients

Although dialysis patients were part of his definition of special needs persons, Stephens initially acknowledged the Superdome did not have the personnel, facilities, or supplies to provide dialysis.[94] Nor did it have food appropriate for diabetics. He said although dialysis patients were discouraged from going to the Superdome for this reason, several went anyway. Stephens further stated dialysis patients were among the first patients evacuated by helicopter.

In a subsequent meeting, however, Stephens gave completely different information. He said New Orleans has an evacuation plan specifically designed for dialysis patients so they know the medical facility to which they are assigned during an emergency.[95] He contradicted his early statement (dialysis patients *were* present in the Superdome) when he told the Select Committee the city's evacuation planning worked virtually perfectly, and no dialysis patients went to the Superdome. To his knowledge, Stephens said all dialysis patients were evacuated to their pre-assigned medical facilities. Of interest, the definition of Category II special needs persons, mentioned above for Jefferson Parish and possibly the entire state, includes "kidney dialysis" patients.[96]

## The Superdome

Although Louisiana owns the Superdome, New Orleans runs it with assistance provided by the state, the Department of Health and Hospitals, and the Department of Social Services when needed.[97] The city is also responsible for drafting and implementing a plan for its use during an emergency.



AP PHOTO/BILL HABER

Since 1998, New Orleans has used the Superdome to shelter citizens with special needs during hurricanes.[98] For Hurricane Isadore in 2002, supplies were pre-staged, and the facility was staffed for 400 patients. Despite these preparations, though, only 27 special needs patients were identified and treated. During Hurricane Ivan, in September 2004, the Superdome was again opened as a special needs shelter and received just 32 patients.[99] The small number of special needs patients at the Superdome during these two hurricanes gave New Orleans officials a false indication of how many patients to expect for Hurricane Katrina. As a result, the city was ill-prepared.

*The Superdome only contained enough personnel and supplies to care for approximately 1,000 people.*

The city's plans call for the Superdome to house only special needs patients — not the general public.[100] For Hurricane Katrina, the special needs area was established in the southeast and southwest quadrant ballrooms, where some supplies were pre-positioned.[101] According to Superdome and Sports Arena General Manager Glen Menard, the Superdome's only "pre-positioned" supplies were goods leftover from a July event which the city requested remain in place.[102] Menard also said he placed two refrigerators and power generators in the southeast and southwest quadrants of the Superdome, which were designated as the medical care areas.

By the Sunday before landfall, over 400 special needs patients were evacuated to Baton Rouge using 10 para-transport vans and three city buses.[103] For the 8,000-10,000 people who remained in the Superdome, there were federal, state civilian, National Guard, and city medical personnel to provide care. But this contingent proved too small to provide care for the multitude of people who eventually sought refuge there. After the flooding, but before evacuation of the Superdome, it is estimated 23,000 people were sheltered there.[104]

As the crowd grew, it became increasingly difficult for the facility to care for special needs patients — the Superdome only contained enough personnel and supplies to care for approximately 1,000 people.[105] Section 132, next to the Superdome's First Aid Station, was used for evacuees in need of general medical attention.[106] With severe overcrowding of evacuees and flooding from roof leaks, the rest of the crowd was moved to elevated bleachers. Menard said eventually the special needs patients were further evacuated from the Superdome to the Sports Arena.

DMAT OK-1 departed from LSU to the Superdome on the evening of August 29.[107] Upon arrival, the National Guard told DMAT OK-1 it wasn't needed inside, redirecting the team to the Sports Arena, which is attached to the Superdome by two open-air walkways. DMAT OK-1 finally set up operations at the Sports Arena late that night and began receiving patients the morning

of August 30. The establishment of this DMAT came 36 hours after FEMA reported serious medical problems in the Superdome, including 400 people with special needs, 45 to 50 patients in need of hospitalization, and the rapid depletion of supplies.[108]

Evacuations finally began on August 31, and medical workers prepared records for their patients. In the end, though, those records were lost in the confusion. Evacuation of the Superdome concluded on September 3. Six people died in the Superdome—five for medical reasons and one from suicide.

## Convention Center

Similar to the Superdome, the Ernest N. Morial Convention Center (Convention Center) is the property of the state of Louisiana. However, the Convention Center was never intended to serve as a shelter of any kind — special needs or otherwise — so there were no medical capabilities in place prior to the storm.[109] When asked by the media about conditions at the Convention Center, Brown said, "(W)e learned about that (Thursday), so I have directed that we have all available resources to get that convention center to make sure that they have food and water and medical care that they need."[110]  The



AP PHOTO/ERIC GAY

Convention Center General Manager Warren Reuther, however, does not recall the provision of any medical assistance for the evacuees at his facility.[111]

Reuther is an appointee of Governor Kathleen Babineaux Blanco and says his responsibilities are to oversee the Convention Center and protect its assets.[112] Despite the fact the Convention Center was not intended as a shelter, evacuees seeking dry land arrived there, and upon finding the glass entry doors locked, broke in. Reuther estimates between 18,000 and 25,000, perhaps even 30,000 people, eventually gathered at the center.

During the storm, Reuther and approximately half a dozen of his public safety staff remained in place, attempting in vain to maintain order as evacuees filled almost every area of the building.[113] The Convention Center was quickly overwhelmed, running on reduced emergency power until all power was lost when fuel ran out on the night of August 30. Public bathrooms became overloaded, and problems were compounded by loss of water pressure. Hallways became the de-facto toilets. Walk-in refrigerators were emptied on the floor, and many evacuees began bringing their own food and alcohol into the building. Almost 32,000 chairs were broken or lost, 90,000 square yards of carpeting were destroyed, and the facility's infrastructure was damaged. Gunshots were reportedly heard, and Reuther and his staff were forced to hide from the crowds.

Evacuations at the Convention Center began Friday, September 2 and continued until Sunday, September 4. Despite Reuther's assertion medical assistance never arrived, a DOD e-mail indicated medical teams were established and operating at the Convention Center on Saturday, September 3.[114] Medical needs were unclear because of poor communication and situational awareness. The number of evacuees continued to increase at the Convention Center as evacuations at the Superdome concluded. People left at the Superdome were directed to the Convention Center, where they would later be evacuated. Throughout the ordeal, Reuther saw no deliveries of food, water, or other supplies. At one point, he called Blanco but received no answer. He also never saw Nagin throughout the ordeal.[115]



AP PHOTO/ERIC GAY

## A Doctor's First-hand Account

Dr. Gregory Henderson is a Tulane University and Vanderbilt University School of Medicine graduate. He lives in New Orleans and is the Associate Chairman of the Ochsner Clinic Foundation Department of Pathology and Laboratory Medicine. He was set to begin his new job at Ochsner on September 1.[116]

Henderson happened to be attending a physician leader retreat for Ochsner staff on Friday, August 26 and Saturday, August 27, at the Ritz-Carlton hotel on Canal Street when the meeting was cut short because of the impending landfall of Hurricane Katrina.[117] He evacuated his family to Jackson, Mississippi and chose to stay at the hotel so he could remain close to their home.

By the morning of Tuesday, August 30, the Ritz-Carlton was surrounded by three to five feet of water and Canal Street was flooding.[118] There was a hotel announcement that anyone who needed medical care should report to the hotel's French Quarter Bar. Fortunately there was another medical conference involving medical specialists (seven physicians, a physician's assistant, and pharmacists) taking place at the hotel. The impromptu medical team had already started to organize a list of medicines and supplies they might need. Looking outside and talking to the police, he realized looting was occurring outside the hotel, and it appeared the looters were armed. Henderson, along with a family practice physician, pharmacist, and two officers from the New Orleans Police Department (NOPD), waded across Canal Street through waist-high water to the Walgreens pharmacy across the street. They were able to break into the pharmacy and began stuffing insulin, drugs, and medical supplies into plastic garbage bags. There was a confrontation with the looters, who were held back at gunpoint by the officers. Henderson was able to carry three bags of supplies back to the hotel.

He set up a make-shift clinic at the hotel for the next 24 hours. The majority of the patients were seeking prescription refills, a lot of which he did not have.[119] He subsequently opened another "clinic" when NOPD moved their operational headquarters and command and control center from the Ritz-Carlton to the Sheraton hotel across the street.

He was told by NOPD that Tulane, University, and Charity Hospitals were taking on water and basically inoperable and was asked by an NOPD captain if he could stay and take care of several hundred police officers who had set up camp at the Sheraton.[120] Henderson was dispatched with a team of armed officers and took additional supplies, including insulin, from a second Walgreens pharmacy. Many patients Henderson treated had "generalized anxiety disorders, not unexpected as most of the police had lost homes and some had lost family members and yet still were on the job." There

were also many cases of hypertension and diabetes. "I remember thinking it seems like the majority of the NOPD were hypertensive and type II diabetic. I took a lot of blood pressures, listened to a lot of hearts, and refilled a lot of beta-blocker, calcium channel blocker, and diuretic prescriptions. I cleaned and dressed a lot of superficial wounds. I gave a lot of insulin shots," he said.

Henderson had forgotten to take rubbing alcohol and used Wild Turkey bourbon to sterilize the injection sites.[121] He also distributed the antibiotic, Cipro, and treated several skin rashes which were so severe some police officers had to walk around in underwear. He believed the severe contact dermatitis may have resulted from exposure to toxins in the water. Katrina Rash, they began calling it.

In the meantime, police officers told him stories of rapes and murders at the Convention Center, but because of the lack of communications, they were essentially unable to do anything about it or even confirm the rumors.[122] On September 1, under NOPD escort, Henderson went to his new office at the Ochsner Clinic to collect additional medical supplies.



AP PHOTO/ERIC GAY

On the way back to the Sheraton, he asked an NOPD captain to drive by the Convention Center.[123] There, he saw "thousands upon thousands of people collected on the boulevard in front of the convention center. There were the infants to the elderly in wheelchairs. There were many elderly lying on sheets and blankets on the median. There were screaming men, women, and children and dazed quiet and confused men, women, and children. Most were African-American, but many were white." The NOPD captain was minimally armed and refused to let Henderson get out of the car, but promised to bring him back with armed escort.

Henderson, accompanied by Officer Mark Mornay, returned to the Convention Center where he treated dehydrated infants, mothers, and "hundreds" of elderly confined to wheelchairs.[124] One woman in a wheelchair had deep epidermal ulcerations and two gangrenous toes, and there was nothing he could do for her. He saw three children have seizures because they ran out of medication. He saw and treated a severe asthma attack by only coaching the child's breathing. He saw diabetics who had been without insulin, oral hypo-glycemics, and dialysis for days. Mornay told Henderson he could not be responsible for his safety after dark, so they returned to the Sheraton.

## Finding: Most hospital and VAMC Emergency Plans did not offer concrete guidance about if or when evacuations should take place

The South Central VA Health Care Network (VISN 16) outlines preparedness and response procedures in the event of a hurricane in its Emergency Management Program Standard Operating Procedure NO. 10N16-1.[125] This section provides the Network Director's Office, as well as the Emergency Operating Centers, with much leeway regarding the assignment of specific responsibility to personnel. Facilities threatened by a hurricane are instructed to "contact their home healthcare patients, especially those that are oxygen or ventilator dependent, and PBHC to determine if they intend to evacuate of (sic) come to the facility." Additionally, "Threaten (sic) HCSs/VAMCs will be required to evaluate all patients and determine patients that can be moved to other facilities along with special needs (oxygen/suction/ventilator/IV/ etc.) requirements by either ground or air transportation."

A VAMC is instructed to have made final evacuation decisions within 36 to 48 hours prior to landfall.[126] The number of patients evacuated should depend on how much threat the hurricane poses to the facility. If the VAMC does decide to evacuate patients, the evacuations should be completed 24-hours prior to a hurricane's landfall.

The VAMC Biloxi, Mississippi Emergency Plan addresses hurricane evacuation protocol more methodically but still gives confusing directions regarding if or when the facility should be evacuated in anticipation

of a hurricane's landfall. Also absent is specific information about evacuation transportation.

The plan begins by stating, "The basic planning tenet for hurricanes includes a total evacuation of the Gulfport Division."[127] The VA health care system is instructed to work in "close cooperation" with "Alabama and Mississippi to provide evacuation vehicles and facilities for use prior to storm strike."

When a hurricane enters the Gulf of Mexico and/or is 96 hours or less away from landfall, "the Gulfport Division will be evacuated entirely."[128] When a hurricane is within 72 hours of making landfall, the facility is instructed to prepare for evacuations on short notice. When a "storm/hurricane enters the Gulfport (sic) of Mexico and is 48 hours or less away from landfall at Biloxi/Gulfport," the plan indicates the VAMC Director and the VISN 16 Director are to determine when evacuations will begin. The plan notes, however, "Evacuation may not be required and is not automatic." If the directors do choose to evacuate, all patients must be moved when the storm is "24 hours or less away from landfall at Biloxi/Gulfport."

Chapter I of the VAMC New Orleans Emergency Management Plan outlines procedures for total evacuation of patients and staff.[129] The plan indicates the evacuation procedures in this section "will be used for any situation requiring internal transfer of patients or total evacuation of patients from the Medical Center," so while not clearly stated, it appears this plan should be used in the event of a hurricane.

VAMC patients and staff are directed to evacuate to the ground level. While this plan is more detailed than the VAMC Biloxi plan, it does not account for potential flooding whereby the street exit and the ground floor of the parking garage would be inaccessible.[130] In terms of exactly *how* to evacuate, the plan states, "Exact evacuation procedures to be followed will be dictated by the nature of the disaster and the extent of damage to the Medical Center buildings."

If a full-scale evacuation is necessary, the plan says patients "may be transferred to the VA Medical Center, Alexandria, LA.[131] Transportation of patients to outside facilities will be accomplished by means of commercially owned buses, ambulance services, government lease vehicles or any other means available from outside sources (i.e., National Guard, City of New Orleans)." The plan does not include more detailed information

on which services to call upon first or what, if any, transportation agreements have already been made. Likewise, there is no indication of which hospitals should be used in such an emergency if the hospitals in the immediate surrounding area are not operational.

Chapter III states when a Hurricane Watch is established, the VAMC Chief of Staff should coordinate the "relocation of specialty care patients to other facilities if necessary."[132] Beyond this call for initial coordination with "other facilities," there is no outline for when or specifically how to evacuate patients. Additionally, the plan calls for the evacuation plan from Chapter I be used in the event of flooding. Again, the five previously-described pages outlining evacuation procedures in Chapter I do not provide guidance on steps to take in the event of flooding.

The Emergency Management Manual for the Medical Center of Louisiana at New Orleans (MCLNO) covers both University and Charity Hospitals.[133] The manual says the Emergency Management Program Coordinator is responsible for developing, implementing, and monitoring all aspects of the emergency program. The manual provides summary information about evacuation procedures during an emergency, but like the VAMC plans, does not provide concrete information on whether facilities should evacuate in anticipation of a hurricane.

The MCLNO plan states if the CEO (or the designee) so decides, "patients shall be evacuated to an area of safety by whatever means are available. Formal agreements will be in place with ambulance services and neighboring facilities to transfer patients as necessary. All personnel will be trained in evacuation procedures."[134] The reader is then directed to reference the Emergency Management Evacuation Policy, Reference #1026, for LSU's ambulance contract, transfer, and vendor agreements. (The Select Committee was not provided with a copy of the Emergency Management Evacuation Policy.)

The plan devotes an entire section to evacuation procedures and provides step-by-step instructions to specific personnel.[135] For a total facility evacuation, it says, "Formal agreements will be made for the following…" and goes on to list ambulance contract agreements, transfer agreements, and vendor agreements for special needs. Decisions regarding the transfer of patients to other facilities may be made as early as 96 hours in advance of a potential hurricane. By 72 hours prior to potential landfall, the plan calls for decisions to be made regarding transfers.

*People were trapped inside hospitals, with a banner hanging from Charity Hospital that read, "Stop the lying and get us the hell out of here."*

Methodist Hospital uses the Hurricane Preparedness Plan established by the New Orleans Office of Emergency Preparedness.[136] This plan suggests hospitals may begin evacuation preparations when there is a slow-moving Category 3, a Category 4, or a Category 5 hurricane within 72 hours of landfall (and is predicted to make landfall within 100 miles of New Orleans). The CEO or his designee has the authority to call for evacuation. Actual evacuations may begin up to 60 hours in advance. At 60 hours, the plan says, "Make arrangements for at least two flat-bottom type boats in the event of severe flooding conditions" and to fuel vehicles to capacity. The announcement of total or partial evacuation is called, if applicable, no later than 24 hours in advance. The Director of Facility Services, 12 hours prior to landfall, is to "ensure emergency vehicles and boats are in position and ready for immediate use."

There is also a section of the overall Hurricane Preparedness Plan devoted entirely to evacuations (The Hurricane Evacuation Plan) which states, "…evacuation from the Hospital will be a 'last resort' measure and will be carried out only when a mandatory evacuation is directed by the appropriate authority, or when a situation arises which places patients and staff unquestionably in harm's way. The threat of a direct strike by a major hurricane certainly creates such a situation, and evacuation may be necessary to protect the safety of patients and attending staff."[137]

If evacuation takes place prior to a hurricane, Methodist has written transfer agreements with two hospitals outside the major hurricane danger zone.[138] This section provides the contact information for Lifeguard Transportation Service, Inc. and Acadian Ambulance and Air Med Services — the two companies with whom the hospital has written transportation agreements. If these services are overwhelmed, the plan instructs the hospital to call the New Orleans Office of Emergency Preparedness.

As illustrated by these plans, hospitals and VAMCs lacked sufficient guidance for if and when they should evacuate their patients in anticipation of a hurricane. They also did not follow the limited guidance they did have.

## Finding: New Orleans hospitals, VAMC, and medical first responders were not adequately prepared for a full evacuation of medical facilities

After New Orleans flooded, city medical centers needed to be evacuated. On September 2, *Good Morning America* showed the desperation of people trapped inside hospitals, reporting on a banner hanging from Charity Hospital that read, "Stop the lying and get us the hell out of here."[139] Flood waters prevented hospitals from receiving supplies or personnel, and some private hospitals, such as Methodist, say medical supplies and fuel tanks being airlifted to them by their corporate headquarters were being intercepted by FEMA.[140] Many hospital emergency power generators were located at ground level or lower (often below sea level) and were subject to flooding. To make matters worse, fuel pumps were often placed at ground level, and fuel storage tanks (with limited fuel capacity) were frequently below ground level.[141] Three acute care hospitals in the New Orleans area remained operational, four maintained some limited function, and 21 were not operational, closed, or evacuated. In hospitals that lost power like Methodist, pulmonary ventilator systems and other medical equipment requiring electricity became inoperable. Patients requiring ventilators were sustained by hand pumps.[142]



State and FEMA urban search and rescue teams were sent to help the hospitals evacuate, but they were intercepted by people trapped in the floodwaters and on rooftops.[143] While Guidry said hospital evacuations were a huge logistical success

AP PHOTO/BILL HABER

— they evacuated 12,000 patients by Saturday, September 3 — they did not seem like a huge success to the many patients awaiting rescue.

## Hospital and VAMC Evacuation: Their Stories and Timelines of Events

Evacuations from VAMCs for Hurricane Katrina have received mostly favorable attention, particularly in comparison to the evacuation difficulties encountered by other New Orleans hospitals and shelters. "We had people on ventilators, we had liver patients, ambulatory patients, and every patient that we evacuated from every one of our facilities made it through this evacuation," VA Secretary R. James Nicholson said.[144]

On Monday, August 29, the VAMC Biloxi domiciliary patients and nine members of the medical staff were evacuated to VAMC Tuscaloosa, leaving 904 patients, staff, and family members sheltered in VAMC Biloxi.[145]



VAMC Gulfport patients were transferred to other facilities before the storm made landfall. VAMC New Orleans did not mass evacuate prior to the storm, and during the two days that followed, August 30 and 31, its evacuation plans were activated. Five five-ton trucks were used in cooperation with DOD's air transport staff and HHS to evacuate 98 patients to the New Orleans Airport on September 1. From there, the patients were flown to the Houston, Jackson, and Alexandria VAMCs. At this time, efforts were also underway to evacuate the remaining 94 patients and 367 staff and family members at VAMC New Orleans. By Friday, September 2, all patients, staff, and family members were evacuated from VAMC New Orleans.

Donald Smithburg, CEO of LSU Health Sciences Center/Health Care Services Division, and approximately 20 members of his staff provided a detailed account of the evacuation of their facilities, Charity Hospital (Charity) and University Hospital (University).[146] Smithburg went to Baton Rouge to staff the state EOC on the Saturday before the storm, and on Sunday at 7:00 a.m., he activated

Code Grey but decided against calling for evacuation.

At 5:30 a.m. on Monday morning, University lost electrical power. Charity followed, losing power at 8:00 a.m.[147] Both hospitals began using their emergency generators just two to three minutes after the power failures. Charity's generators and electrical equipment were located in the basement, and LSU officials said they knew Charity would probably lose emergency power if severe flooding occurred. The waters continued rising over the course of Monday, and late that night, Charity lost its emergency generators. Unlike Charity, University's emergency generator and electrical equipment were housed on the second floor, considered high enough to avoid flooding and low enough to avoid wind damage. University lost emergency power anyway, and both hospitals were left in darkness and without the means to care for their patients.

On Tuesday, August 30, Louisiana Wildlife and Fisheries evacuated nine of the 17 Intensive Care Unit (ICU) patients at University and four from the Charity campus.[148] Evacuation efforts were suspended, however, due to reports of gunfire and impending nightfall. On Wednesday, August 3, at 3:00 a.m., LSU received a request from the state OEP to prepare a patient roster. Officials were told patients should be triaged to red, yellow, and green status (red, critical; green, stable), and LSU staff gathered the necessary information manually. Later that morning, the state OEP notified them via the HEAR system to prepare for evacuation, but evacuation aid never arrived. At 11:00 a.m., Charity was notified its evacuation was to begin in 30 minutes, but by 4:00 p.m., they were still awaiting word from the National Guard regarding potential evacuation. That evening, the hospitals were notified the water level was too high for evacuation via the National Guard's five-ton trucks.

Further complications arose on Thursday, August 31 when LSU was told evacuation orders were on hold due to rumors of violence and potential harm to rescue workers.[149] An e-mail between HHS employees that morning confirms this: "Patient evacuation has been hampered by security issues on patient movement. It is unsafe for patient movement to continue without security provided."[150] LSU was told evacuations would resume after the arrival of federal troops. Smithburg said the Coast Guard and National Guard were evacuating people in the most immediate danger, so LSU was not a top priority.



FEMA

Evacuations for University and Charity patients and staff began on Friday, September 1 at 8:00 a.m. and noon, respectively. The U.S. Coast Guard arrived by helicopter. Patient evacuations were facilitated by the Coast Guard, Louisiana and Florida Wildlife and Fisheries, NOPD, and state police. HHS e-mails that morning also indicate, "today's priorities are Charity and University Hospitals."

A total of 167 patients were evacuated from University and approximately 200 from Charity.[151] LSU indicated that all of these patients were sent with paper records and three patients died due to the storm; two were ventilator patients who died on the roof of the hospital during evacuations.

Larry Graham, CEO for Pendleton Memorial Methodist Hospital (Methodist), monitored the storm on his own and stated he received no calls from the city or state government.[152] On Friday at 5:00 p.m., he believed the storm would miss New Orleans, but on Saturday, he realized there was going to be a problem. He began contacting all hospitals with which Methodist had transfer agreements, but none would admit patients due to concerns about how the storm might affect them. All of Methodist's agreements are with hospitals in Louisiana or Mississippi because all patient transport is handled via ground ambulance. He likewise indicated Methodist is a "for-profit" hospital, meaning it does not receive FEMA funding and is responsible for the costs of airlifting patients. Even with such funding, however, Graham is not sure evacuation measures are practical. In anticipation of Hurricane Ivan, Methodist evacuated over 30 ICU patients over a total of 45 hours. However by Saturday, August 27, Methodist did not have time for an evacuation of this scale.

Methodist housed a total of 750 people during Hurricane Katrina, including 130 patients.[153] Twenty-eight were ICU patients with 12 patients on ventilators, and 16 were dialysis patients. Chalmette Medical Center (Chalmette), Methodist's sister hospital located 12 miles away, evacuated its six ICU patients to Methodist. The remaining people at Methodist were staff, family, and people who had sought shelter in the hospital from the storm.

Like University and Charity, Methodist's emergency generators failed after the storm.[154] The generators were located on the roof, but the fuel pumps had flooded. Graham cut power in all areas that were deemed "not critical," and they hand-ventilated patients requiring oxygen. The next day, they began hand-carrying fuel to the generators. Chalmette's generators were located on ground level. At the time, however, Tim Coffey, the then CEO of Chalmette, believed the facility was sound.

On Sunday, August 28, ambulances were supposed to be en route to the hospital, but Graham said they were commandeered by government officials.[155] Methodist's parent company, Universal Health Services, Inc. (UHS), located in King of Prussia, Pennsylvania, was sending the hospital supplies, including fuel and water, via helicopter. The supplies never arrived because, as Methodist and UHS believe, FEMA intercepted the cargo. Army officers and FEMA officials arrived on Tuesday, and Graham informed them he needed assistance with evacuations. The officials assured him they would return but never did. Throughout the ordeal, Methodist had the assistance of 12 National Guardsmen as well as police forces that stayed for security reasons. Post-Katrina evacuations started taking place on Wednesday, August 31 because Methodist's corporate office contracted with private companies. The difficulties the hospital encountered were still enormous, though, as a September 2 e-mail from a Methodist doctor to HHS staff indicates:

> "Contrary to what has been reported on the news, Methodist Hospital, including Albert and Maxine Barrocas have not been evacuated, and the details are grisly. FEMA has been intercepting supplies sent to the hospital, and patient and staff evacuations have essentially ceased.
>
> If anyone can help bring attention to this problem, please help us. Below are some facts related to us by the staff at the hospital during one of the few occasions we have been able to talk to them.

- 600 People in hospital
- 13 patients on gurneys
- Staff is dehydrating
- FEMA is DIVERTING support being sent in by UHS (owners of hospital) away from the hospital

■ Temperature is 110 degrees with humidity

■ NO fuel left to operate th!!e hospital tower (sic)

■ NO communication with National Guard to coordinate evacuation of patients

■ Having to feed 500+ non-patient refugees — they are very close to rioting for the balance of food water and supplies

■ NO power, NO communication

■ Everything is manual — no xray — running out of supplies

■ Patients are on the 2nd floor and 3rd floor — having to carry patients up the stairs and helicopters didn't come back

■ Without power, the ventilator dependant patients are being manually bagged in 1 hour shifts by staff

■ Refusing to take gurney patients

■ FEMA is commandeering all supplies and all private efforts to get supplies including fuel, food, water

■ Governor is misrepresenting what is going on

■ Snakes in hospital

■ Rashes on staff from water

■ Losing nurses as result of dehydration

■ Need FEMA to land on roof and prove what they are saying is correct

■ No security—uprising for f!!ood, water and supplies (sic)

■ Governor did not allow for the evacuation of hospitals and now won't help

■ Uprising of refugees"[156]

Graham said the evacuations at Methodist were completed late on Friday, September 2.[157] He also stressed that mid-way through the evacuation, he learned patients who were triaged to the New Orleans Airport were not receiving adequate care. He began withholding patients who were supposed to be taken to the airport because Methodist was in a position to provide them with better care. He cited this as a primary "critical issue" — the evacuation of patients to locations unable to provide medical care. Coffey added that Chalmette doctors who went to the New Orleans Airport to offer their services were turned away by DMATs who said they were not credentialed in the NDMS physician database.

On September 20, an official from Tenet Healthcare (Tenet), Memorial Hospital's (Memorial) parent company, told CNN the National Guard evacuated some patients from Memorial before the flooding began on Tuesday, August 30.[158] The next morning, Wednesday, Tenet reported to CNN that it asked New Orleans local authorities for assistance in evacuating critically ill patients but was told it would have to hire private companies. Later that day, Tenet says local authorities and good samaritans provided limited assistance with evacuations by boat. On Thursday, helicopters hired by Tenet airlifted approximately 400 patients, employees, and evacuees from Memorial to another Tenet-owned hospital in Slidell, Louisiana. Tenet indicated flights were suspended overnight after reports of sniper fire, but evacuations resumed, and were completed, by the end of the day on Friday, September 2.

## Louis Armstrong International Airport

### The medical operation at the New Orleans Airport was chaotic due to lack of planning, preparedness, and resources

After patients were evacuated from medical facilities, most were taken to the New Orleans Airport, which served as a hospital for the sick, a refuge for thousands, and the hub of medical evacuations and airlifts.[159] There were two separate missions at the airport. The first was attending to the medial needs of evacuees and the second was processing evacuees not needing medical attention. According to OR-2 DMAT, evacuees who needed medical treatment were triaged, treated, and prepared for transports. People not requiring medical



AP PHOTO/RON HAVIV/VII

care were processed and prepared for transport to shelters in other states by commercial aircraft. In total, over 21,000 displaced persons not requiring medical care were evacuated.

"Overnight, we turned New Orleans' airport into the busiest helicopter base in the entire world. At any given time, there were at least eight to 10 helos off-loading on the tarmac, each filled with 10 to 40 survivors at a time, with 10 circling to land . . . It was a non-stop, never-ending, 24-hour-a-day operation," said Dr. Hemant Vankawala, a member of the Dallas DMAT deployed to the New Orleans Airport.[160]



Medical patients arrived by truck, bus, ambulance, and helicopter with little or no information or records about their conditions. The medical personnel at the New Orleans Airport were challenged by the sheer number of patients and the lack of information about patient medical histories. By August 31, three DMATs had arrived at the airport.[161] Eventually, eight DMATs would be stationed at the New Orleans Airport to help provide care during patient movement operations in New Orleans.[162] The Air Force also deployed an EMEDS team, on Thursday, September 1, to augment the medical assistance operation in place at the airport.[163] These EMEDS teams also assisted with aeromedical evacuations.

An OR-2 DMAT after-action report described medical facilities established in the upper and lower levels of the west terminal of the airport.[164] These facilities were supplied and staffed by DMATs and PHS officers. The flow of patients was constant, and it is estimated the entire medical operation at the New Orleans Airport treated approximately 3,000 patients who were eventually evacuated by military aircraft to other facilities. Some DMATs believe the number was much greater — as high as 6,000 to 8,000 patients.[165]

Despite the treatment and evacuation of thousands, the medical operation at the New Orleans Airport was chaotic due to lack of planning, preparedness, and resources.

FEMA officials did not conduct an adequate assessment of the situation before deploying DMATs. Upon arrival, many teams were confused about where to place assets and how to integrate into the existing operation. Many DMATs arrived before their cache of supplies, limiting their ability to do their work. According to Vankawala, medical personnel were operating with a limited amount of supplies and a generator with only partial power. "All we could do was provide the barest amount of comfort care. We watched many, many people die. We practiced medical triage at its most basic — black tagging the sickest people and culling them from the masses so that they could die in a separate area," Vankawala said.[166]



*"We practiced medical triage at its most basic — black tagging the sickest people and culling them from the masses so that they could die in a separate area," Vankawala said.*

TX-1 and TX-4 DMATs, which were among the first to arrive, had equipment that was not updated and could not link together other critical equipment, such as ventilators.[167] Similarly, one team member from OR-2 DMAT observed "five different models/brands of glucose monitors, all using their own proprietary test strips that weren't interchangeable. The CA-4 cache, which was current, arrived later and supplemented these caches."[168]

OR-2 DMAT reached the conclusion that, "there didn't appear to be a clear plan for dealing with the approximately 25,000 evacuees who arrived at the airport.

There was insufficient food, water, and sanitation."[169] One team member said evacuees were being taken from a dehumanizing experience (flooding and rescue) and placed into an equally dehumanizing environment at the New Orleans Airport.



AP PHOTO/UNIVERSITY OF ALABAMA AT BIRMINGHAM, STEVE WOOD

## Finding: The Government did not effectively coordinate private air transport capabilities for the evacuation of medical patients

The Association of Air Medical Services (AAMS), comprised of 300 mostly private air transportation providers, represents 85 percent of all hospital transport capabilities.[170] In coordination with the Center for Transportation Injury Research, AAMS has a database called the Atlas and Database of Air Medical Services (ADAMS)— a web-based, interactive database listing these air medical services (rotary and fixed wing aircraft) and receiving hospitals. The database is updated annually, funded by the Federal Highway Administration, and receives technical support from the National Highway Traffic Safety Administration. In response to Hurricane Katrina, there was only one governmental request for access to ADAMS.[171]

Nevertheless, AAMS companies provided support for medical evacuations of both hospitals and nursing homes in Hurricane Katrina's aftermath. They were not used for pre-landfall evacuations and provided most of their resources without official contracts with hospitals.[172] Authorities were slow to establish a system for filtering evacuation requests. Confusion and indecision about evacuations led to delays.

AAMS said FEMA did not help their efforts.[173] On the morning of August 30, FEMA tasked Carla Brawley, a Department of Transportation contractor, to find and secure air medical resources.[174] Brawley contacted Acadian Air Ambulance (Acadian) flight coordinator, Mike Sonnier, to request resources. Acadian is the largest air ambulance provider in Louisiana. An AAMS after-action report stated,

> "According to Mr. Sonnier, sometime later that morning the National Guard Air Boss (name unknown) contacted Mr. Sonnier at Acadian and

tasked him to serve as his civilian equivalent. Mr. Sonnier and Acadian air ambulance was then tasked with coordinating missions into and out of New Orleans airspace, coordinating requests for air evacuations from many of the New Orleans area hospitals, and also serving as the main contact between civilian providers and the lone FAA contracting officer that was tasked for this job by the Department of Transportation for FEMA."

By the end of the day, approximately 50 medical helicopters and 13 fixed-wing aircraft were in New Orleans.[175] While the first air evacuation took five hours, coordinators were in place to expedite the process on Wednesday. Over the next 96 hours, approximately 2,000 air medical evacuations were coordinated through AAMS members.[176] Acadian estimates it was responsible for 800 of these evacuations.[177] AAMS members accomplished these evacuations despite difficulties in communication and coordination. Poor use of assets and lack of coordination prevented additional evacuations. AAMS estimates it could have been able to move up to 7,000 patients if a better system had been in place.[178] "The first 72 hours was chaos," said one AAMS member.[179]

The majority of requests came directly from hospitals, such as Tulane University Hospital and Charity Hospital, because they were not receiving help through the Emergency Management Assistance Compact (EMAC).[180] On August 29, Hospital Corporation of America Division President Dave Smith requested AirHeart Air Ambulance of Sacred Heart Health System help with evacuations of Tulane. Smith said fuel for the generators was running low and floodwaters were approaching the facility.[181]

The following morning, Tuesday, Tulane University Hospital requested assistance with transporting "two specialty pediatric patients" from New Orleans to Little

Rock, Arkansas.[182] The Arkansas Children's Hospital and its affiliate, Angel One Transport, responded along with other children's hospitals.[183] Fixed wing aircraft were provided by two hospitals in Texas: Texas Children's Hospital in Houston and Cook Children's Hospital in Fort Worth, and Mercy Children's Hospital in Kansas City, Missouri. Additionally, Miami Children's Hospital provided a helicopter to assist with the evacuation of "13 critically ill PICU (Pediatric Intensive Care Unit) patients and family members." Tulane also directly contacted Florida-based Air Methods Lifenet Division that same day for evacuation assistance. In addition to these requests, personal networking also proved valuable in the absence of formal agreements. On August 31, a doctor who lived in Hawaii and had attended Tulane University, contacted a colleague at Tulane University Hospital. Together, these two doctors coordinated the assistance of Hawaii Air Ambulance. AAMS donated helipad coordinators to aid in efficiency and were able to evacuate 200 patients by noon on Friday, September 2.[184]

Compared to New Orleans, AAMS involvement in Mississippi was markedly different. Air Methods Lifenet Division summarized their experience in Mississippi by saying, "During the entire Katrina experience in Mississippi, there was no federal command and control or coordination of resources across the whole area. Attempts to coordinate with FEMA rescue operation center in Jackson, Mississippi were rebuffed by federal officials there who stated clearly that all air evacuations in Mississippi, medical and USAR, had been federalized. And that no civilian medical aircraft were needed."[185]

John Dickerson, the FEMA EOC representative in Mississippi, declined offers from one AAMS agency to provide 25 helicopters to Mississippi. The Mississippi EOC had requested support, through EMAC, from Florida air transport agencies.[186] Johnny Delgado, program manager of Baptist Health South Florida, Baptist Health Air Transport, and a Board Member of AAMS, had a crew and was ready to fulfill the request. They were en route to Gulfport, the meeting point for air medical evacuation support agencies, but were turned back. Dickerson told them because the response was now federal, private agencies are not allowed to assist. However, a different AAMS company dealt with the Mississippi EOC directly and was able to provide support to the state.[187]

# Finding: Hospital and VAMC Emergency Plans did not adequately prepare for communication needs

The Biloxi, Mississippi VAMC Emergency Plan states when a hurricane is in the Gulf of Mexico and is 24 hours or less away from landfall, the Facilities Management Services (FMS) "will distribute emergency communications equipment. The facility's HF/VHF radios will be ready to be set up in the Director's Conference Room."[188] This part of the emergency plan does not, however, indicate which FMS team member is responsible for the distribution, including what specific equipment is to be distributed and to whom. Instead, the plan says FMS should develop its own Service Supplemental Hurricane Plan (SSHP) to address these issues.

The SSHP lists communication preparations and available equipment.[189] In addition to providing emergency communications equipment, the FMS is responsible for ensuring there are adequate linens, the Recreation Hall is set up as an employee shelter, and evacuation services are in place. VAMC Biloxi says its FMS team typically includes four to six people (two or three craftsman and two or three housekeepers) to handle this wide range of operations.[190]

The plan also lists the VAMC's communications capabilities but does not mention satellite phones discussed previously in the SSHP. It relies "primarily upon the use of telephones" and focuses on a telephone system designed exclusively for internal communications.[191] Two-way radios are designated for specific personnel, but the plan recognizes limits to radio capabilities, stating, "The limited number of radios and single voice transmission, however, combine to impose several restrictions." The radios are intended as back-up to the inter-office telephone system. The VAMC plan relies on landline telephones and the Hospital Emergency Area Radio (HEAR) Network System to communicate with the Emergency Medical Services (EMS) and outside world.

The VAMC New Orleans Emergency Management Plan also depends on the HEAR Network System for communication with area hospitals and ambulances.[192] The Chief of Police Services is to maintain a "pool" of Motorola radios, the exact number of which is not specified but will be used upon activation of the

emergency plan. Radios should be distributed to 11 staff members, all of whom are designated in the plan. The plan also indicates radios will operate for about eight hours before needing to be charged and provides the frequency at which these radios operate. The failure response section does not mention potential power failures, and in turn, the inability to recharge the radios. Additionally, no section of the plan addresses when the two-way radios should be distributed in preparation for the storm. In fact, the Hurricane section of the plan fails to mention radios or refer the reader to the communications chapter.

The Veterans Health Information Systems and Technology Architecture (VISTA) Contingency Plan cites hurricanes as a "high probability" threat.[193] A telecommunications contingency plan included within the VISTA plan lists responsibilities and procedures for personnel in charge of communications during a telephone system failure. This plan indicates hand-held radios and/or cell phones will be used if landlines do not work and details who distributes the radios as well as who or what areas receives them. A total of 26 areas within VMAC New Orleans are to be provided with two-way radios (one radio per area), but there is no indication of how these radios should stay charged in the event power is lost. Additionally, "a cache of cellular phones are maintained by CIM Service Line Director . . . . " The exact number is not specified, but the plan states eight areas are "designated as first priority to receive cellular telephones." As with the two-way radios, there is no planning for how to keep these cellular phones charged in the event that power is lost.

Charity and University use the Emergency Management Manual for the Medical Center of Louisiana at New Orleans.[194] The hospitals depend on two-way radios, cell phones, HEAR Radio, HRSO Radio, 800MZ Radio, and HAM Radio links for internal and external communications backup.

Methodist's Disaster and Emergency Preparedness Plan charges the Hurricane Preparedness Control Center with establishing and maintaining emergency communications.[195] The control center is assigned special telephone extensions as well as backup telephone numbers in case landlines fail. HEAR radio equipment, including the backup system, should be tested when a storm is more than 72 hours away. At 72 hours, the director of Facility Services is to designate the radio

operator's availability and "ensure operator adequately (sic) trained." At 60 hours before landfall, battery supplies are checked. When the storm is 24 hours from landfall, the director of Facility Services provides the maintenance supervisor with a two-way radio unit. When the storm is 12 hours away, the director of Facility Services should "position emergency equipment supplies and prepare for immediate operations" and conduct a "final check of the emergency power system." He or she is also supposed to ensure the radio operator is on duty and has contact on the HEAR system.

Methodist's plan takes into account the potential for flooding as a result of a Category 3, Category 4, or Category 5 hurricane stating, "Flooding conditions to some extent can almost certainly be expected to accompany a hurricane.[196] Several recent studies and surveys by hurricane forecasting experts indicate that the entire New Orleans area is extremely vulnerable to "catastrophic flooding" as a result of a major storm." If flooding is predicted or reported, the CEO is instructed to shut down telephone communications equipment and reassign communications attendants to the Control Center.[197] As such, all communications would obviously be lost.

These hospital and VAMC emergency plans lack a clear communications section, often leaving unanswered questions about what communications capabilities are in place, who is responsible for the equipment, and how to respond if power is lost. As a result, Gulf coast medical facilities were left without appropriate equipment or a proper understanding of how to implement an effective emergency communications plan.

# Finding: Following Hurricane Katrina, the inability of VAMC New Orleans and hospitals to communicate impeded their ability to ask for help

Hospital executives said in Katrina's aftermath, hospital emergency area radio HEAR systems simply did not work.[198] Cell phones worked occasionally and allowed them to get in touch with the Louisiana Hospital Association, which in turn contacted the OEP on their behalf. The primary source of information was

*Hospital executives said in Katrina's aftermath, hospital emergency area radio system (HEAR) simply did not work.*

television.[199] In an interview with CNN on September 30, Dr. Albert Barrocas, a physician at Methodist, said, "We were trapped, communications was a big issue. The fact that we could not bring family and patients together, a lot of them were separated. The majority were separated. We did not even know where these people were going to."[200]

The Director of VA Veterans Integrated Service Network 16 (VISN 16), Robert Lynch, tells a similar story. "There was no plan in Biloxi and New Orleans. Hard-working people did a lot of workarounds with a lot of creativity. We're going to learn from that," he said.[201] VISN 16 lost communications through its telephone landlines, operated by Sprint, during the storm. Lynch indicated that satellite phones worked sporadically and only when outside. In Biloxi, reports indicate only one cellular tower remained, and cell phone users could only make calls — not receive them. The VA worked around the communication failures by establishing a schedule for employees to be outside with satellite phones.[202]

Smithburg said that on Sunday at 7:00 a.m., the hospital set up an incident command center in its board room for communications.[203] The following day, the hospital went to Code Grey, and HAM operators arrived at the hospital. LSU had a point of contact at the OEP, but after the storm, LSU couldn't receive information from the OEP or FEMA. On Monday, August 29, Smithburg reported that Nextel and cell phone service were temporarily lost on the University campus, and text messaging was "intermittent."

Smithburg cited inadequate Health Resources and Services Administration grant funding as the primary reason for communication failure and said the LHA receives the federal grant money and allots it to Louisiana hospitals.[204] While the grants were helpful for supplying Motorola phones and a HAM network, he believes the funding for LSU was disproportionately small in comparison to its needs and patient load.

In the days following Hurricane Katrina, Gulf coast hospitals and VAMCs were responsible for hundreds of patients, some of whom were in critical condition. Without necessary communications capabilities, these facilities were almost completely isolated from first responders and the outside world. Incapacitated and without supplies, many struggled to provide care and keep patients alive until help arrived.

# Finding: Medical responders did not have adequate communications equipment or operability

*Inadequate communications and situational awareness among and within federal agencies contributed to a diminished understanding of the health needs of affected populations*

On October 20, Stephens told the *Associated Press*, "Anything that could go wrong in communications went wrong."[205] Interviews with health officials and countless e-mails from ESF-8 agency personnel support his statement. Immediately following Hurricane Katrina, cell phones and landlines were not working, blackberries were not dependable (and in some cases, unavailable), and satellite telephone capabilities were not sufficient.

In preparation for Hurricane Katrina, Stephens oversaw the placement of an incident command trailer inside the Superdome.[206] Immediately following the storm, he said landlines, the only mode of communication for his team, worked just five to 10 percent of the time. By Wednesday, cell phones began working intermittently but not enough to meet their communication needs, and despite his initial preparations, Stephens said these communication failures "weren't anticipated at all."

Colonel Kenneth K. Knight, Chief of the Air Force Medical Operations Center presented a timeline that showed similar difficulties — its communication systems were inoperable until September 1.[207] On this date, the Air Force medical response timeline says there were, "Few working landlines and cell phone success [was] spotty." It was not until four days after the storm, on September 2, the "cell phone network [was] improving."

Likewise, Colonel Falk, an Air National Guard Surgeon, cited communications as the number one area needing

improvement.[208] Both the Air National Guard and Army National Guard experienced almost a total failure in communications. The Army satellite system was not working, and personal cell phones (service provided by Verizon) were the only means of contact. Likewise, the National Guard Bureau's "After Action Review" indicates communication failures adversely affected situational awareness. It states, "Lack of situational awareness was caused largely by the loss of communications. The lack of communications and difficulties with interoperability of equipment between forces as well as between the military and civilian leadership also hampered the rapid generation of EMAC requests. Poor communications also resulted in a lack of visibility of available assets in nearby states."[209]

National Guard Bureau Chief Lieutenant General Steven Blum indicated many guardsmen were equipped with outdated radios, and it was impossible for them to communicate with the Army's 82nd Airborne Division and 1st Calvary Division. "You don't want two units operating in the same area, doing the same function, that can't coordinate their efforts because they don't have the communications equipment," Blum said.[210]

The Deputy Assistant Secretary of HHS, Office of Public Health Emergency Preparedness, Dr. Robert Blitzer, said communications were initially a big problem.[211] The command center used land lines and cell phones, and Blitzer also ordered a mobile communications center, which was deployed from Washington, D.C. to Atlanta and then to Baton Rouge. Blitzer had not needed to deploy the mobile communications center for the previous four hurricanes that hit Florida. HHS Principal Deputy Assistant Secretary for Public Health and Emergency Preparedness, Dr. Gerald Parker, knew of just one satellite phone, located on the command bus, and said all SERT leaders "probably" had one.[212] Simonson said he thought there were two satellite phones per SERT, but for every satellite phone call that was successful, there were probably six failed attempts.[213]

Communication failures also affected NDMS. NDMS Chief Jack Beall said not only did his staff not have enough equipment, the operability of the equipment they had was "in and out."[214] Satellite phones worked only when trucks containing the satellite equipment were pointing in the right direction. But as Beall said, "When you have people dying, there's no time to mess with satellite phones." Overall, his Nextel cell phone was his

best option for communicating, but when he or his staff worked in the Superdome, it was "total blackout." Efforts to remedy this problem began on September 3, with NDMS working to reach agreements with private cellular companies for the provision of "communications on wheels."[215]

OR-2 DMAT also cited communications as a key obstacle — particularly the operability of cell phones and interoperability of radios inside the New Orleans Airport.[216] "There is an over reliance on cellular phones for communications. The cellular infrastructure was severely damaged during Katrina and cell phone service was initially unavailable . . . . ," OR-2 DMAT reported. Radios also proved insufficient — the JT-1000 radios provided for the team could not contact radios in distant areas of the airport. Similarly, the team had no communication with security personnel via radio until the Forest Service provided Bendex King radios.

The breakdowns in communication experienced by government officials are illustrated in ESF-8 agency personnel e-mails. These e-mails show correspondence was almost non-existent until August 31, and difficulties sending and receiving messages persisted well into the first week of September. On August 31, a SERT member e-mailed the EOC and said, "My BB doesn't work at all, any communications with me will have to be through cell."[217] In Mississippi, a September 3 e-mail from the Gulfport Field Command Center indicates, "No phones or power as of now. Cells sometimes, Nextel service best. T-mobile not good for BBs at this area but do work other locations."[218] On September 5, a week after the storm, e-mails indicate that communications had not significantly improved. A CDC employee wrote the EOC saying, "Our folks in the field only have access to blackberry now. (The phone lines are going in and out and faxes are very difficult to send)."[219]

Much attention has been paid to lack of operability and the inability of first responders to connect with each other through the equipment they had. Some responders, however, were having difficulties just getting the equipment itself. A SERT team member on her way to Baton Rouge e-mailed HHS officials on September 5 saying she needed a cell phone and blackberry. A response from an HHS official states, "We do not issue Blackberry's to individuals for deployments (and we don't have any anyway), we have also exhausted our total cache of phones, so we have absolutely nothing to issue. If things


AP PHOTO/MARI DARR-WELCH

change, I will advise you."[220] Likewise, the OR-2 DMAT report says there were an insufficient number of Motorola JF-1000 radios for their convoy, and other teams who did not have access to radios at all "encountered safety-related issues due to a lack of communications." The radios and satellite phones inside the FEMA trucks were also of no use to DMAT teams, as they had not been programmed.[221]

From lack of equipment, to inoperability, to failure to program satellite phones, communications proved to be one of the greatest obstacles to the Hurricane Katrina medical response. Critical time was wasted. And energy that should have been spent treating patients was instead spent on repeated, and often times unsuccessful, attempts to communicate.

## Finding: Evacuation decisions for New Orleans nursing homes were subjective and, in one case, led to preventable deaths

"We see where there are gaping holes in our system. It has become clear that no one was evaluating these plans in any real sense. The system provides no check and balance."

—*Louisiana State Representative Nita Hutter*[222]

Like its hospitals, Louisiana's nursing homes (all privately owned, with the exception of two) are responsible for having their own evacuation plans.[223] These plans are required to be updated annually, and before the start of hurricane season each year, DHH sends a reminder letter. DHH also checks to ensure every Louisiana nursing home submits a plan; however, media reports indicate DHH cited only one nursing home in the past year for submitting an inadequate plan.[224]

Most plans encourage patients' families to help with evacuations, and several southeast Louisiana nursing homes have agreements with nursing homes in northern Louisiana for the transfer of residents after evacuations.[225] The statewide occupancy of Louisiana nursing homes is roughly 70 percent, which allows evacuated nursing homes to find bed space elsewhere. Before Hurricane Katrina's landfall, 19 nursing homes evacuated their residents. After the flooding in New Orleans, an additional

32 nursing homes evacuated. One nursing home, Saint Rita's, did not evacuate at all, and 35 residents died. Overall, it is estimated that 215 people died in New Orleans nursing homes and hospitals as a result of Katrina and failed evacuations.[226]

## Three Louisiana Nursing Homes

Michael Ford is CEO and owner of three nursing homes in the New Orleans area — Riverbend Nursing and Rehabilitation Center (Riverbend), located in Plaquemines Parish, Metairie Health Care Center (Metairie), located in Jefferson Parish, and Waldon Health Care Center (Waldon), also located in Jefferson Parish.[227] Combined, these nursing homes house close to 360 patients. Ford is also the Vice President of the New Orleans region of the Louisiana Nursing Home Association (LNHA) and is a member of the Plaquemines OEP. According to Ford, all nursing homes' emergency plans must be approved by the state. Riverbend's emergency plan calls for the establishment of a pre-determined evacuation site, usually in a church gym in Kentwood, Louisiana, for both staff and patients. Ford has evacuated his nursing home patients once before, in anticipation of Hurricane Ivan, using an 18-wheel flat bed trailer equipped with air conditioning and a generator. The experience was trying, with the patients sitting "on a bus for eight hours to go one hundred miles," but he also says it gave him and his staff experience for Hurricane Katrina.

Ford received notice of the mandatory evacuation for Plaquemines Parish on the Saturday before Katrina made landfall. Jesse St. Amant, the OEP Director for Plaquemines Parish, declared the evacuation at 9:00 a.m. on August 27 and said, "If they don't leave, I tell 'em they're going to die in place."[228] Despite the difficulties moving patients for Hurricane Ivan, Ford listened to St. Amant and evacuated his nursing home in Plaquemines. Evacuation of Riverbend to the church in Kentwood was assisted by approximately 25 church volunteers, who

*"If they don't leave, I tell 'em they're going to die in place."*

moved patients by carrying them on mattresses. Ford eventually relocated all but 50 of his patients to a wing he rented at Kentwood Manor Nursing Home. The rest were taken to one of Ford's other two nursing homes in Jefferson Parish. It took almost six weeks to find accommodations and move everyone.[229]

Ford decided against evacuating Metairie, thinking it would withstand the storm. Subsequent flooding, however, forced him to evacuate 115 patients.[230] Using Wildlife and Fishery department boats and a Louisiana Army National Guard two and a half ton truck, patients were taken to higher ground on the interstate. Buses from the New Orleans' EOC collected some patients on the evening of August 29 and took them to a staging area in Baton Rouge, Louisiana. Ford had some pre-existing contracts for housing his patients elsewhere, but he moved them to the first available locations — all of which were in Louisiana. By mid November, patients from Metairie were moved to the Waldon facility (which was not evacuated for Katrina), where they remain today.

## St. Rita's Nursing Home

The night before landfall, Ford had a phone conversation with Mabel Mangano, who co-owns St. Rita's Nursing Home with her husband. "I'm staying," she told him.[231] Media reports indicate the Manganos were so confident about the safety of St. Rita's, they invited staff, friends, and relatives to use it as a shelter.[232]

The Manganos and their 78 patients remained in the nursing home throughout the storm, and like many in



New Orleans, thought they were safe after the hurricane passed.[233] But the floodwaters began to rise — eight to nine feet in 30 minutes — and the Mangano's grandson swam out and brought back a boat. They began putting patients on mattresses floating like rafts.

On September 13, the Manganos were charged with 34 counts of negligent homicide.[234] Attorney General Charles Foti's September 14 press release stated the "charges stem from Mable Mangano and Salvador Mangano, Sr.'s alleged failure to evacuate St. Rita's Nursing Home, contrary to the facility's own evacuation plan and in violation of the St. Bernard Parish's mandatory evacuation. Additionally, subsequent to the mandatory evacuation order, authorities offered to send two buses and drivers to evacuate residents from the facility and the Manganos allegedly declined this offer."[235]

The News-Star, a Monroe, Louisiana newspaper, says despite these charges, "the Manganos did not abandon St. Rita's during the flooding. Nor did they seal the fate of their elderly residents by strapping them to their beds before leaving, as was widely reported. They worked alongside their staff and a few Good Samaritans during the frantic rescue effort . . . . "[236] Parish residents may soon be the judge.

## Finding: Lack of electronic patient medical records contributed to difficulties and delays in medical treatment of evacuees

Although HHS partnered with the AMA to establish a website allowing physicians and pharmacists to electronically access the prescription records of patients affected by Katrina, few patients or health care providers had access to medical records or a common medical record system

As Hurricane Katrina tore through the Gulf coast region, it destroyed millions of pages of paper files and patient medical records in doctor offices, clinics and hospitals. Thousands of patients displaced from the region by the storm lacked medical records and were forced to depend on memory and knowledge of their medical history, allergies, and other important information.



AP PHOTO/DON RYAN

Kindred Hospital in New Orleans was one of the few facilities in the Gulf coast with electronic patient medical records. When Kindred evacuated 54 patients following Katrina, the hospital was able to send patients' medical records electronically to other Kindred operated facilities in Baton Rouge and Houston where the patients had been transferred.[237] Additionally, Kindred was able to print and mail hard copies of a patient's electronic medical history for those who were evacuated to non-Kindred facilities.[238]

Eighty pediatric cancer patients from the Gulf coast were evacuated to St. Jude Children's Research Hospital (St. Jude) in Memphis, Tennessee.[239] The hospital was tasked with tracking down oncologists who fled flooded New Orleans with treatment records to ensure appropriate treatment for the pediatric patients. Additionally, doctors at St. Jude were forced to rely heavily on parents' recollection and notes of their children's treatments. "I honestly feel quite comfortable that the worst-case scenario is we delayed treatment" for some children, Dr. Joseph Mirro said. But there was "a lot of flying by the seat of your pants to get it right."[240]

According to Stephens, all medical files and documentation made regarding the treatment and medical attention provided to evacuees in the Superdome were lost.[241] This contrasts sharply with how patients' medical information was handled at the Astrodome in Houston. Thousands of the evacuees at the Superdome and Convention Center were transferred to the Astrodome without any paper or medical files. Volunteers in Houston were tasked with documenting patient information and registering evacuees to create new electronic medical records. The Harris County Hospital District created a large clinic in the Astrodome, which included 80 computer terminals to aid in registering patients and recording their medical history and information.[242] By September 9, records had been created for approximately 8,000 Katrina evacuees.[243]

Additionally, the American Medical Association (AMA), National Community Pharmacists Association (NCPA), and several other organizations collaborated to launch the KatrinaHealth.org prescription medication network in September. The network is a secure online service to help physicians and authorized healthcare providers access medication and dosage information for Katrina evacuees.[244] The network allows and authorizes physicians and pharmacies to provide prescription refills, or prescribe new medications.[245] It facilitates coordinated care and helps to avoid potential medical errors by providing access to patient information. The AMA provides physician credentialing while NCPA provides authentification of pharmacists and pharmacies.[246]

Because the VA has developed an electronic patient record system for its facilities, electronic records for over 50,000 New Orleans VAMC patients were downloaded to tapes and transferred to the VAMC in Houston.[247] The Houston VAMC was able to reconfigure and restore them after the New Orleans VAMC evacuation. The records chief for the South-Central VA Healthcare Network said, "Every single thing on that computer was saved."[248]

Hurricane Katrina showed that physicians are often our "second" responders. They, too, need the support of sophisticated IT systems, enabling them to respond to a crisis quickly and retrieve and share critical records and

*"I honestly feel quite comfortable that the worst-case scenario is we delayed treatment" for some children, Mirro said. But there was "a lot of flying by the seat of your pants to get it right."*

information. The emerging public health threats of the 21st Century require the seamless flow of information at all levels of government. The need for better integration of IT into the healthcare industry was highlighted by thousands of Katrina evacuees with no medical patient records.

HHS has made recent efforts to support digital health recovery for the Gulf coast. In November, HHS announced partnerships with the Southern Governors' Association and DHH to accelerate electronic health records in Gulf states to create accessible, accurate medical records and medical information.[249] These partnerships will help physicians, medical practices, and hospitals rebuild medical records for their patients as they return to the region. However, National Coordinator for Health Information Technology, Dr. David Brailer, said, "Making patient data accessible to authorized physicians, whether it is following a hurricane or as part of routine care, remains a challenge that must be addressed."[250]

## Finding: Top officials at HHS and NDMS do not share a common understanding of who controls NDMS under ESF-8

On a larger scale, the command structure between HHS and the NDMS was problematic. ESF-8 is implemented by the Assistant Secretary for Public Health Emergency Preparedness at HHS; however, NDMS is housed and operates under FEMA (DHS) authority. For Hurricane Katrina, NDMS was activated by FEMA on August 25.[251] According to the FEMA Office of General Counsel, activation of NDMS would certainly have "stood up" ESF-8.[252] However, there is no evidence of action under ESF-8 until August 27, when HHS first convened conference calls.[253] During a natural disaster or public health emergency, HHS and NDMS communication and coordination is essential for an effective response.

According to Simonson, coordinating the public health response under ESF-8 was "a strain without operational control and logistical support."[254] He says the relocation of NDMS left HHS with few operational assets. Despite HHS responsibility for coordinating the federal response to public health emergencies, HHS only

has PHS Commissioned Corps, SNS, and other smaller functions under its command. Unlike NDMS, none of HHS remaining assets are configured for a quick response. Instead, HHS assets are meant to sustain existing medical services and infrastructures. Simonson also indicated that without direct control over NDMS assets, the efficiency and effectiveness of ESF-8 is crippled. With modest operational assets, Simonson noted HHS lacked situational awareness, saying, "HHS lost its field network to FEMA when NDMS was moved to DHS."[255]

As executor of ESF-8, Simonson attempted to coordinate the pre-positioning of medical assets prior to Katrina's landfall.[256] He spoke directly to Stephens on Saturday, August 27 and Sunday, August 28 to ask what supplies the Superdome needed. As a result of those conversations, Simonson called then Acting Director of the Response Division Edward G. Buikema at FEMA to "aggressively advocate" DMATs, water, ice, and MREs be positioned in the Superdome prior to landfall. Simonson believed it would have been much easier to task NDMS if those assets had been under his direct control. When asked about attempts at coordination between the two agencies, Simonson said NDMS participated in ESF-8 conference calls, but despite its participation, acted as an asset of FEMA without coordinating mission assignments with him.

An e-mail from a U.S. Army Corps of Engineers Liaison at DOD, Mark Roupas, to Assistant Secretary for Defense for Homeland Defense Paul McHale on August 29, however, suggests Simonson did have a say in NDMS' activation. Roupas says: " . . . . DHHS is trying to decide which health care approach is better: 1) activate NDMS and move the patients out of the state or 2) move medical beds and personnel into the affected area and treat there. DHHS medical planners are meeting with Mr. Simonson at 6pm to discuss and decide which course of action to accept. If the decision is to move the patients via NDMS, then DHHS will activate the NDMS system. If the decision is to treat intrastate, then we should expect a formal RFA for -500 beds and personnel support."[257] This e-mail begs the question: how was the primary coordinator of medical response unaware that FEMA had activated NDMS on August 25?

Simonson believes ESF-8 should be more "clearly articulated."[258] He also believes the relocation of NDMS to DHS in 2003 undermined NDMS effectiveness.

Since its transfer, funding for NDMS has been stagnant, with millions of dollars being siphoned off to support "unidentified services."[259] NDMS has lost two-thirds of its staff since 2003. "There is room for substantial improvement in coordination between NDMS and the rest of ESF-8. Either ESF-8 should be directly responsible for NDMS or ESF-8 should be moved to where NDMS is located," Simonson said.[260]

Beall disagreed and told a much different story about the coordination between NDMS and HHS.[261] He said HHS has the authority to move NDMS and its assets under ESF-8 and that, to his knowledge, NDMS did not deploy any assets, with the exception of pre-positioning, without a direct order from HHS. He said HHS and NDMS were in close coordination throughout the operation, and that any coordination issues were more likely a result of internal difficulties within HHS — not between HHS and NDMS. He believes NDMS relocation to FEMA allows the system to "lean forward" more than it could under HHS.

How these two senior officials view the coordination and authorities for HHS and NDMS speaks for itself. Without a clear understanding of who has functional jurisdiction over NDMS, coordination of the system and all of its assets was certain to result in failures.

The OR-2 DMAT report illustrates command structure confusion, and general coordination problems, between NDMS and the DMAT teams it managed at the New Orleans Airport. OR-2 DMAT members reported a number of command-related issues, including:

- ICS/NIMIS (or any form of an organized internal command and control structure) was not implemented by FEMA/NDMS at the airport. (Some attempts to use ICS were made by FEMA/NDMS following the arrival of a Forest Service overhead team, but were generally not that effective.)
- There was no formalized unified command established between the many participating agencies until late in the response.
- No safety officer was initially appointed at the command level (in a very unsafe environment).
- Roles, responsibilities, and reporting structure of the two MSTs (Baton Rouge and Airport) were never clearly articulated. It was unclear what role the PHS representative at the airport had.

- Liaisons with military and civilian entities participating in relief efforts at the airport were never established.
- There did not appear to be any initial interfacing at a management level with knowledgeable local medical providers, public health officials, and local emergency providers.
- There appeared to be a lack of communications between the Airport MST and Baton Rouge MST as well as NDMS headquarters.
- Information was not being effectively communicated to the DMATs from either of the MSTs.
- There was considerable friction between DMATs and the MSTs. An 'us and them' attitude was prevalent.
- Only one fulltime FEMA/NDMS employee was present at the airport MST (arriving after operations had started). All other Airport MST staff were taken from onsite DMATs, reducing the number of team personnel for patient treatment and operations support.
- Inexperienced leaders were placed in an overwhelming and chaotic environment that caused their effectiveness to rapidly deteriorate.
- Management decisions that were being made were not based on the best interests of the patients.
- There was inadequate equipment available to produce the copies and paperwork FEMA was requiring.[262]

The OR-2 DMAT report further states, "FEMA/NDMS operations at the airport were extremely disorganized compared to parallel military and Forest Service operations." Tensions between FEMA/NDMS and DMATs is an ongoing problem and "continues to compromise the efficiency of operations due to a lack of trust between both parties."[263]

Beall agreed there was tension and speculated DMAT members are accustomed to being in control of their environments and are not used to taking orders from federal officials.[264] He also said most of the FEMA NDMS officials deployed during Katrina and giving orders to DMATs were unseasoned and their inexperience contributed to the friction.

Historically, the mission of DMATs was to rapidly deploy and set up self-supporting field hospitals and provide medical care within the first 72 hours after a disaster before the arrival of other federal assets.[265] Alternatively, FEMA has historically operated under the assumption that state and local officials are the first line of defense during the initial 72 hours following a disaster until a federal response can

be coordinated. The NDMS response to Katrina suggests that FEMA was unable to support the historical rapid-deployment capability of NDMS.[266]

# Finding: Lack of coordination led to delays in recovering dead bodies

The lack of coordination among agencies also contributed to delayed recovery of dead bodies in the Gulf coast region. According to ESF-8, HHS is responsible for victim identification and mortuary services. HHS has authority to ask DHS and DOD to assist in providing victim identification and mortuary services; establishing temporary morgue facilities; performing victim identification by fingerprint, forensic dental, and/or forensic pathology and anthropology methods; and processing, preparation, and disposition of remains.[267] The most experienced personnel in this area are a part of NDMS under the authority of FEMA and DHS. DOD also has significant expertise in mortuary affairs and mass fatality management.

Despite having this authority, HHS was slow to respond and coordinate efforts with DOD and DHS. On Sunday, September 4, DOD sent an e-mail to DHS recognizing the need to assist overwhelmed state and local authorities in victim identification. The e-mail provided a brief analysis of the situation in the Gulf coast region and said, "If this analysis is correct, it's not if, but when and how DOD will be asked to assist in the mortuary affairs response."[268] The e-mail further says DOD has developed "potential plans on what kind of requirements will be needed and how DOD can provide response support. Currently we have identified the potential missions of search and recovery, remains transport to establish human remains collection points, and assistance with DNA capture analysis."[269] The e-mail recommends a meeting between DHS, HHS, FEMA, and DMORT to discuss coordination among agencies and the commercial sector. It is unclear if and when this meeting took place. What is clear, however, is DOD essentially took the lead in coordinating an operational mortuary affairs plan, which was originally the responsibility of HHS.

Following the e-mail from DOD, HHS personnel recognized the need for an "integrated ESF-8 response" and devising a "coordinated way to collect and share information."[270] When asked why it took an e-mail from DOD six days after Katrina's landfall, Simonson

responded, "HHS was not involved in discussions with actual body recovery. FEMA, DOD, and Kenyon International Emergency Services (Kenyon), a mortuary services contractor, were in discussions for recovery services and it was unclear who was in charge of the recovery effort."[271] ESF-8 is not responsible for recovering bodies but is responsible for mortuary services. As a result, HHS "had to wait for certain discussions to be made before going ahead with specific decisions. Everyone was frustrated with how slow the initial discussions were going."[272] Before HHS can coordinate victim identification and other mortuary services, FEMA, DOD, and state officials must have a recovery plan in place.

Body recovery was no less confused. For days, bodies went uncollected as state and federal officials remained indecisive on a body recovery plan. With state and local officials utterly overwhelmed by the disaster, they were initially more focused on rescuing Katrina's survivors than recovering dead bodies. By September 5, inaction was causing frustration. "Number 1 issue is body collection," Army Colonel John J. Jordan, military assistant to Brown at FEMA, wrote in an e-mail that day.[273] Jordan continued, "This issue must be addressed, and frankly, there is operations paralysis at this point. FEMA is pushing State to see what they want to do, and indications are that Governor is involved in some of the decisions, especially regarding interment." A week later, Blanco publicly blamed FEMA for the delay and its inability to sign a contract with Kenyon for body collection services.[274] Kenyon later signed a contract with the state.[275]

One week after landfall, on September 5, Simonson requested "ample mobile mortuary services throughout the affected region."[276] An order for 200 mobile mortuary trucks was issued with 130 designated to Louisiana and 70 to be delivered to Mississippi.[277] By the next day mortuary services were being established in St. Gabriel, Louisiana with 96 personnel.[278] FEMA and Louisiana collaborated on drafting a body recovery plan which required the approval of Brown, and the Louisiana "newly appointed" state medical examiner.[279] In Mississippi, mortuary services were established at the Naval Air Station in Gulfport. By September 6, one DMORT had set up facilities at the Naval Air Station. Body recovery was an enormous task that took several months to complete. Each home in the affected area was inspected twice for bodies. Mortuary services continue in the region as remains are identified and returned to families.

# Finding: Deployment confusion, uncertainty about mission assigments, and government red tape delayed medical care

**"Coordinating all of those agencies isn't a simple thing and [is] very difficult to practice. We sit down and do tabletop exercises where we go over who's going to do what, but a disaster of this magnitude is something that is very difficult to simulate or really practice. So, we rely on really well-trained, capable people that can adapt and adjust to whatever the situation is to get the job done."**

— *Colonel Richard Bachmann, U.S. Air Force*[280]

In the wake of Katrina, first responders worked tirelessly — days and nights in miserable conditions — to provide medical care to thousands of hurricane victims. The coordination of these medical personnel, supplies, and equipment proved to be a daunting task. At one point, a frustrated member of the CDC Division of Emergency Operations wrote: "The approval process for a bottle of aspirin seems to be the same as for a 500 bed hospital."[281] From confusion about mission assignments and deployments, to broader misunderstandings about command structure, coordination was undoubtedly an obstacle to the Gulf coast medical response. Coordination efforts were impeded, and in turn, these impediments adversely affected the overall medical response.

## Deployment Assignments

Hundreds of e-mails were sent from medical first responders to government officials expressing confusion and frustration over their deployment orders. On Friday, September 2, a PHS officer in Oregon sent an e-mail saying, "I've got supervisory approval and have had my bags packed and ready in the trunk of my car to leave at a moment's notice since Tuesday. Is there anything further you can tell me?"[282] On September 5, a Food and Drug Administration employee e-mailed the PHS coordinating officer saying,

"I'm deploying tomorrow. I don't have any information about the mission and whether my role has changed from the original (FMCS MST 4 – there has been some issues with travel and just got my itinerary tonight so not sure if those issues were due to a change in assignment). I've gotten a phone call from a member of my team looking for direction and I don't know what to tell him. Please provide any information you can."[283]

Another PHS officer wrote, "Once again, sorry to bother you. However, what is the status of this mission? From the email I received earlier this week things were supposed to happen in 24-72hrs. At your earliest convenience, could I please get an update on this?"[284]

There was also confusion within government ranks regarding who had the authority to deploy officers and what officers had already been approved for deployment.[285] An internal PHS e-mail sent September 1 stated,

"We are receiving reports from one Warden indicating that many of his staff are deployed. The problem is they are not on our Master list that we have been providing to OFRD. Can you provide me your latest deployed roster identifying the BOP officer/assets. I am thinking maybe these officers are on August or September rosters???"[286]

An August 30 e-mail from the chief of the Coast Guard medical division said,

"I apologize for the confusion of the rosters with CG officers that were released earlier. It appears that all PHS officers were required to go to a website and register yesterday AM per the attached email. Many officers did this without knowing that registering automatically noted agency approval for a CCRF mission. I attempted to register without the agency approval box clicked in order to provide CG comments. The website only allowed submission with this box clicked positive . . . kind of a Catch-22."[287] A member of OFRD wrote FEMA saying, "This officer is stationed in AR and is not on our list of officers deployed. Who deployed him?"[288]

There was also limited visibility between agencies. An e-mail from a CDC employee to HHS/OS staff and CDC staff on September 9 stated, "Since OSHA is Labor Dept we have no visibility on their deployments at this time…could be they will link up with NIOSH team when



FEMA

they all arrive, but we may well not know anything."[289] This correspondence reflects the absence of updated and accurate lists of who was available for deployment, who was not available, and who had already been deployed.

## Mission Assignments

As late as September 22, evidence of confusion remained about who was in charge of what aspects of the response. An HHS incident manager wrote, ". . . . it appears that the POC for the 250 ambulances is no longer the State EMS Director Terry Bavousett, but has changed to the three names below. Please get your representative at the JFO to address this ASAP or the ambulances will end up at Reliant Park instead of the locations that Terry Bavousett has requested."[290] The FEMA liaison to CDC wrote, "I might be the only one — I doubt it — but I'm really confused with the structure within CDC/DEOC for this operation. Can you send out a team structure list of team leads as well as their DEOC schedule?"[291]

Clarity about missions was also lacking in the medical response to Hurricane Katrina—as evidenced by the lack of planning for the United States Navy Ship (USNS) Comfort. The USNS Comfort is a medical treatment facility with a primary mission of supporting medical needs for the military and serve as hospital facilities as part of a humanitarian effort.[292] It has a 1,000 bed capacity with 80 beds designated for an intensive care unit and 12 operating rooms. The Select Committee received varying cost estimates for operating costs for the USNS Comfort. According to the U.S. Northern Command, operating costs for the USNS Comfort are roughly $82,910 per day underway and $29,155 a day pier side.[293] However, a *Philadelphia Inquirer* article states, "When on full operational status, the daily costs exceeds $700,000 a day, according to the Navy."[294]

Originally destined for New Orleans to provide medical care to storm victims, the Comfort was redirected on September 9. "The Comfort is now headed for Pascagoula, Miss due to the lack of a medical mission in NO. Do not have anticipated arrival at that site, but SOC will advise when they get the information. Decision has been made that two cruise ships will now be used to house state workers."[295] That same night, clarification about a mission assignment was never received. An e-mail exchange between HHS employees states, "USNS comfort docked today in Pascagoula. I listened in to most of the conference call and nobody could seem to think of a mission for them. State Health Dpt was clear that they had nothing at this time."[296]

Additionally, the redirection of 250 ambulances required a significant number of approvals. An HHS incident manager wrote, "I have just been informed by FEMA HQ that Jack Colley or Dr. Sanchez the originators of the request will need to approve the change in the location of the delivery of the ambulances. Would you please contact your representatives at the JFO and ask that they confirm the location change with Reliant Stadium to the two staging areas noted in your e-mail with either the ESF# 7&8 representatives. GSA will then confirm back to you the delivery locations and times."[297]

## Government Red Tape

Bureaucratic red tape also stood in the way of the medical response. The OR-2 DMAT report states, "The team was activated on the afternoon of Tuesday, August 30, and given instructions to be in Houston the next day, August 31. Because of the policy of making individual travel arrangements (see below), the last team member arrived in Houston shortly after midnight on September 1. The team departed for Baton Rouge in rental SUVs and vans at 5:00 a.m. on September 1. During the drive, team commanders had several phone conversations with other teams at the New Orleans Airport who stated the team was urgently needed due to the large number of patients. Instead of heading directly to the airport, the team was requested to first stage at LSU. After staging for nearly two hours, the team received an escort to the New Orleans Airport, arriving at approximately 3:30 p.m. Roughly 48 hours had elapsed since the activation order and the team arriving at the incident."[298] The report further says that because team members were deployed individually, their medical response was delayed.

On September 2, the Special Assistant to the Assistant Secretary of Defense for International Security Affairs, Jon G. Ferko, wrote McHale saying Blanco was withholding medical supplies until she received President Bush's word Louisiana would be reimbursed. The e-mail to McHale says:

> Sir,
> Some information that I thought you should know:
>
> My brother is on the ground at the health and human services command center in Baton Rouge. He says the situation is 'grave' — and his team are working desparately to save lives without medical supplies – he said he doesn't even have a bandaid.
>
> His team spoke with the Governor of LA and she refuses to release ANY amount of funds for supplies until POTUS assures her of reimbursement. The team down there does not know who to work through to release funds – and this is the federal command team.
>
> I felt that you should have this info – my brother actually called home in tears because they can't do anything to stop the loss of life….[299]



AP PHOTO/BILL HABER

# Conclusion

The numbers do not lie. Thousands of lives were saved, a tribute to the medical professionals and volunteers who worked around the clock under enormously grueling conditions. Yet, there is another, more sobering realization that can't be ignored either. Those numbers could — should — have been even greater. It wasn't a lack of effort that hindered their success. It was a lack of planning, lack of initiative, and lack of response.

There were not, for example, nearly enough medical personnel teams in position prior to landfall, which led to unnecessary delays in getting the right equipment and supplies to the right people. FEMA and HHS needed to plan for the worst. Instead, they scrambled for supplies in an effort that was often times uncoordinated. In too many cases, it was too late. Clearly New Orleans residents with "special needs" paid a disproportionate price. Neither the Louisiana Medical Director and State Health Officer, nor the Director of the New Orleans Health Department,

could clearly define the "special needs" population, much less adequately provide for it.

From the storm's impending landfall through the flooding of New Orleans, confusion grew over if, and when, hospital, VAMC, and nursing home evacuations should occur. Time was rushing by, lives were in jeopardy, and even when evacuations were finally deemed necessary, these institutions were not prepared to do it efficiently. One possible solution would have been better utilization of private firms to aid in evacuations. It was the answer in a few instances, but it could have been the answer in so many more. In all, an estimated 215 people died in New Orleans nursing homes and hospitals as a result of Katrina and failed evacuations.

Compounding problems for medical responders was poor communication and coordination. So poor, in fact, that at times, the only way to receive information was through television. And the lack of access to medical records, or a common, electronic medical record system, led to delays in treating evacuees. Suffering was also prolonged as attempts at coordination, within and between government agencies, proved frustrating and inadequate. Confusion arose over mission assignments and command structure. Medical officers and volunteers had little information about their deployment orders, many waiting for days with their bags packed and ready. And while some medical teams waited, without equipment or supplies to care for patients, state and federal officials squabbled over reimbursement.

Thousands of American men and women selflessly gave their time, money, and expertise to save lives. Unfortunately, lack of preparation, reticence to act, and confusion over coordination are all part of the story as well. Though there was the will, the medical response to Hurricane Katrina showed there wasn't always a way. The initiative of men like Mike Ford and Jesse St. Amant was the exception to the rule. ■

1   Adam Nossiter, *It's Like Being in a Third World Country: Hospitals in flood zone struggle to save lives*, ASSOC. PRESS (New Orleans, LA), Aug. 31, 2005.

2   Interview by Select Comm. Staff with LA Hosp. Ass'n, in Baton Rouge, LA (Nov. 10, 2005) [hereinafter Nov. 10 Interview with LA Hosp. Ass'n].

3   Interview by Select Comm. Staff with LA State Univ. [hereinafter LSU] Health Care Services Div., in New Orleans, LA (Jan. 19, 2006). "Code Grey" refers to the section of the hospital's emergency management plan that prepares the hospital for extremely severe weather. (*Id.*)

4   Nov. 10 Interview with LA Hosp. Ass'n.

5   HHS: What We Do *at* http://www.hhs.gov/about/whatwedo.html/ (last visited Jan. 27, 2006).

6   U.S. Dep't of Homeland Sec., *National Response Plan*, (Dec. 2004), at ESF # 8 – Public Health and Med. Services Annex [hereinafter *NRP*].

7   *Id.*

8   *Id.* at ESF-iii.

9   Welcome to NDMS *at* http://ndms.dhhs.gov/ (last visited Jan. 27, 2006).

10   Press Release, Fed. Emergency Mgmt. Agency [hereinafter FEMA], NDMS Serves The Needs Of Hurricane Victims (Dec. 8, 2005) [hereinafter Dec. 8 FEMA Press Release].

11   Interview by Select Comm. Staff with FEMA and Nat'l Disaster Med. Sys. [hereinafter NDMS] (Nov. 30, 2005) [hereinafter Interview with FEMA and NDMS].

12   Disaster Medical Assistance Team (DMAT) Basic *at* http://www.fema.gov/preparedness/resources/health_med/dmat_basic.htm (last visited Jan. 5, 2006).

13   Interview with FEMA and NDMS.

14   *Id.*

15   *Id.*

16   After Action Report from OR-2 Disaster Med. Assistance Team [hereinafter DMAT] (Sept. 25, 2005) *available at*, http://www.democrats.reform. house.gov/story.asp?ID=984 (last visited Jan. 28, 2006) [hereinafter Sept. 25, OR-2 DMAT After Action Report].

17   Interview with FEMA and NDMS.

18   Press Release, FEMA, NDMS Demobilizes After Serving The Needs Of Hurricane Victims (Dec. 30, 2005).

19   U.S. Dep't of Health and Human Services [hereinafter HHS] and Miss. Dep't of Health [hereinafter MDH], *Hurricane Katrina Medical Support/ Demobilization/Transition Plan for the State of Mississippi*, (Jan. 2006), at 3.

20   *Hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi Before Select Comm.*, 109th Cong. (Dec. 7, 2005), at 2 (written statement of Dr. Brian W. Amy, Miss. State Health Officer) [hereinafter Dr. Brian Amy written statement].

21   "Disaster Mortuary Operational Response Team (DMORT)," *at* http://www.fema.gov/preparedness/resources/health_med/dmort.htm (last visited Jan. 5, 2006).

22   Interview by Select Comm. Staff with Vice Admiral Richard H. Carmona, U.S. Surgeon Gen., in Wash., DC (Nov. 22, 2005) [hereinafter Interview with Surgeon Gen. Carmona].

23   E-mail correspondence from Cliff Oldfield, Commander of DMORT Region II, to Barbara Butcher, Officer of Chief Medical Examiner, NYC et al. (Sept. 1, 2005) (2:27 p.m.).

24   E-mail correspondence from Keith Holtermann, Incident Manager ESF#8 7P-7A Watch, HHS, to EST-ESF08-A, et al. (Sept. 5, 2005) (9:46 p.m.).

25   *Id.*

26   E-mail correspondence from Keith Holtermann, Incident Manager ESF#8 7P-7A Watch, HHS, to Robert Blitzer, et al. (Sept. 6, 2005) (6:35 a.m.).

27   *Id.*

28   E-mail correspondence from John Mallos (OS) on behalf of CCRF-Response (OPHS), to CCRF-Response (OPHS) (Aug. 27, 2005) (6:02 p.m.).

29   *Id.*

30   Interview with Surgeon Gen. Carmona.

31   *Id.*

32   *Id.*

33   E-mail correspondence from Marc Wolfson (HHS/OS) to ASPA, et al., (Sept. 8, 2005) (12:06 p.m.).

34   About CDC: Home Page *at* http://www.cdc.gov/about/default.htm (last visited Jan. 27, 2006).

35   Interview by Select Comm. Staff with Dr. Richard E. Besser, Dir. of Coordinating Office for Terrorism Preparedness Emergency Response, Ctrs. for Disease Control and Prevention [hereinafter CDC], in Wash., DC (Nov. 17, 2005) [hereinafter Interview with CDC].

36   *Id.*

37   Press Release, HHS, HHS Supports Medical Response to Hurricane Katrina (Dec. 30, 2005). A pallet includes: "basic first aid material (such as bandages, pads, ice paks, etc.), blankets and patient clothing, suture kits, sterile gloves, stethoscopes, blood pressure measuring kits, and portable oxygen tanks." (*Id.*).

38   Interview with CDC.

39   E-mail correspondence from KC Decker, HHS/OS, to Andrew Stevermer, et al., (Aug. 28, 2005) (5:51 p.m.).

40   Interview with CDC.

41   *Id.*

42   *Id.*

43   Interview with Surgeon Gen. Carmona.

44   Press Release, HHS, HHS Releases Website and Toll Free Number for Deployment by Health Care Professionals (Sept. 3, 2005).

45   E-mail correspondence from Lakeisha Jones, HHS/OS, to Lakeisha Jones, et al., (Sept. 3, 2005) (6:02 p.m.).

46   Press Release, HHS, HHS Designates First Medical Shelters and Provides Vital Medical Supplies and Medical Assistance (Sept. 2, 2005) [hereinafter HHS Designates First Medical Shelters Release].

47   About SAMHSA DTAC *at* http://www.mentalhealth.samhsa.gov/dtac/about.asp (last visited Jan. 27, 2006).

48  Press Release, HHS, Crisis Hotline Available for Victims of Hurricane Katrina (Sept. 7, 2005).

49  Press Release, HHS, HHS Awards $600,000 in Emergency Mental Health Grants to Four States Devastated by Hurricane Katrina (Sept. 13, 2005).

50  Strategic National Stockpile, *at* http://www.bt.cdc.gov/stockpile/ (last visited Jan. 7, 2006) [hereinafter Strategic Nat'l Stockpile website].

51  Interview with CDC.

52  Strategic Nat'l Stockpile website (last visited Jan. 7, 2006).

53  HHS Designates First Medical Shelters Release; E-mail correspondence from Stewart Simonson, Assistant Sec'y, Office of Public Health Emergency Preparedness, HHS, to MOL, HHS/OS, et al. (Sept. 2, 2005) (12:28 a.m.).

54  Dr. Brian Amy written statement, at 5.

55  Interview with CDC.

56  *Id.*

57  *Id.*

58  *Id.*

59  Interview by Select Comm. Staff with Stewart Simonson, Assistant Sec'y, Office of Public Health Emergency Preparedness, HHS, in Wash., DC (Jan. 20, 2006) [hereinafter Interview with HHS].

60  Press Release, Am. Soc'y of Health-Sys. Pharmacists, Medical Shelters Provide Care to Hurricane Victims (Sept. 2, 2005) [hereinafter ASHP Press Release].

61  Delthia Ricks, *Outfitting Makeshift Hospitals: Medical Supplies are Being Sent from National Stockpile to Set Up Dozens of Temporary Centers*, Newsday.com, Sept. 6, 2005, *available at* www.newsday.com.

62  Interview with HHS.

63  *Id.*

64  ASHP Press Release.

65  News from The Adjutant General's Dep't *at* http://www.kansas.gov/ksadjutantgeneral/News%20Releases/2005/05-079.htm (last visited Jan. 7, 2006).

66  Master Sgt. Bob Haskell, *Air Guard Response to Katrina's Challenges*, THE OFFICER, Nov. 2005. [hereinafter Air Guard Response Article].

67  Sandra Basu, *DoD Provides Care to Spell Hurricane Relief*, U.S. Medicine, Inc, Oct. 2005, *available at* www.usmedicine.com [hereinafter DOD Provides Care Article].

68  *Id.*

69  Air Guard Response Article; Interview by Select Comm. Staff with Warren Reuther, Gen. Manager, Ernest N. Morial Convention Ctr. in New Orleans, LA (Dec. 20, 2005) [hereinafter Interview with Warren Reuther].

70  E-mail correspondence from Matthew Payne, HHS/OS to Robert Blitzer, HHS/OS, et al. (Sept. 28, 2005) (2:02 p.m.) [hereinafter Sept. 28 Matthew Payne E-mail].

71  *Id.*

72  Dr. Brian Amy written statement, at 5.

73  E-mail correspondence from Stewart Simonson, Assistant Sec'y, Office of Public Health Emergency Preparedness, HHS, to Dep't of Public Safety personnel, State of Nevada, (Sept. 2, 2005) (6:08 p.m.).

74  Sept. 28 Matthew Payne E-mail.

75  Interview with HHS.

76  *Id.*

77  Interview by Select Comm. Staff with Dr. Jimmy Guidry, Med. Dir., Dep't of Health and Hosps., State of LA, in New Orleans, LA (Dec. 19, 2005) [hereinafter Dec. 19 Interview with Dr. Guidry].

78  Interview by Select Comm. Staff with Dr. Kevin Stephens, Dir., New Orleans Health Dep't., in New Orleans, LA (Dec. 19, 2005) [hereinafter Dec. 19 Interview with Dr. Stephens].

79  City of New Orleans Office of Emergency Preparedness, *Annex 1A La. Office of Homeland Sec. and Emergency Preparedness Shelter Operations Plan* (Revised July 2000) [hereinafter City of New Orleans Office of Emergency Preparedness].

80  Interview by Select Comm. Staff with Michael Ford, Vice President, New Orleans Region, LA Nursing Home Ass'n, Michella Ford, Facility Services Dir., Riverbend Nursing and Rehabilitation Ctr., and Jesse St. Amant, Dir., Emergency Preparedness, Office of Homeland Sec., Plaquemines Parish Gov't, in New Orleans, LA (Jan. 19, 2006) [hereinafter Jan. 19 Interview with Michael Ford, et al.].

81  City of New Orleans Office of Emergency Preparedness.

82  Nov. 9 Interview with Dr. Stephens.

83  Jan. 19 Interview with Michael Ford, et al.

84  E-mail correspondence from Lakeisha Jones, OS, to John Babb, OS, et al. (Sept. 6, 2005) (7:31 a.m.).

85  Interview by Select Comm. staff with Walter Maestri, Dir. of Emer. Mgmt., Jefferson Parish, in New Orleans, LA (Nov. 8, 2005).

86  Interview by Select Comm. Staff with Dr. Jimmy Guidry, Med. Dir., Dep't of Health and Hosps., State of LA, in Baton Rouge, LA (Nov. 7, 2005) [hereinafter Nov. 7 Interview with Dr. Guidry].

87  Nov. 9 Interview with Dr. Stephens.

88  Nov. 7 Interview with Dr. Guidry.

89  Interview by Select Comm. Staff with Gordon Nelson, Assistant Secretary for Operations, Dep't of Transp. and Dev. in Baton Rouge, LA (Nov. 4, 2005); Hurricane Katrina: Preparedness and Response by the State of Louisiana Before Select Comm., 109th Cong. (Dec. 14, 2005) at 242 (statement Ray Nagin, Mayor, City of New Orleans) [hereinafter Dec. 14 Select Comm. Hearing].

90  Interview by Select Comm. Staff with Scott Wells, Deputy Fed. Coordinating Officer, FEMA, in Baton Rouge, LA (Nov. 9, 2005).

91  *Id.*

92  Interview by Select Comm. Staff with Jiff Hingle, Sheriff, Plaquemines Parish, LA, in New Orleans, LA (Nov. 7, 2005) [hereinafter Interview with Sheriff of Plaquemines Parish, LA].

93  *Id.*

[94] Nov. 9 Interview with Dr. Stephens.

[95] Dec. 19 Interview with Dr. Stephens.

[96] City of New Orleans Office of Emergency Preparedness.

[97] Dec. 19 Interview with Dr. Guidry.

[98] Interview by Select Comm. Staff with Glen Menard, Gen. Manager, New Orleans Superdome and Sports Arena, in New Orleans, LA, (Dec. 19, 2005) [hereinafter Dec. 19 Interview with Glen Menard].

[99] Dec. 19 Interview with Dr. Stephens.

[100] Dec. 19 Interview with Dr. Guidry.

[101] Dec. 19 Interview with Glen Menard; Dec. 19 Interview with Dr. Stephens.

[102] Dec. 19 Interview with Glen Menard.

[103] Dec. 19 Interview with Dr. Stephens.

[104] *See generally,* Daily Video Teleconferences among officials dated Aug. 25 - Sept. 4, 2005 [hereinafter *Daily VTC*]. State and local officials from each of the affected areas met daily with officials from, among other agencies, FEMA, and the Nat'l Hurricane Ctr.

[105] Dec. 19 Interview with Glen Menard.

[106] Telephonic Interview by Select Comm. Staff with Glen Menard, Gen. Manager of the New Orleans Superdome and the Sports Arena, in Wash., DC (Jan. 27, 2006).

[107] Interview with FEMA and NDMS.

[108] Larry Margasak, *Government Prepares for Next Big Disaster,* ASSOC. PRESS, Jan. 1, 2006.

[109] Interview with Warren Reuther.

[110] *The Big Disconnect on New Orleans,* CNN.com, Sept. 2, 2005, *available at* http://www.cnn.com/2005/US/09/02/katrina.response/ (last visited Jan. 30, 2006).

[111] Interview with Warren Reuther.

[112] *Id.*

[113] *Id.*

[114] E-mail correspondence from John J. Jordan, COL, U.S. Army to John Yingling, et al. (Sept. 3, 2005) (8:53 a.m.).

[115] Interview with Warren Reuther.

[116] Interview by Select Comm. Staff with Dr. Gregory S. Henderson, M.D., PhD., Ochsner Clinic Found., in New Orleans, LA (Jan. 19, 2006).

[117] *Id.*

[118] *Id.*

[119] *Id.*

[120] *Id.*

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] Dep't of Veterans Affairs, S. Cent. VA Health Care Network (VISN 16) Emergency Mgmt. Program Standard Operating Procedure, NO. 10N16-1 (Sept. 30, 2004) [hereinafter Sept. 30 Veterans Affairs Document].

[126] *Id.*

[127] Veterans Affairs Med. Ctr., Biloxi, State of Miss., *Miss. Emergency Plan (Section A)* (2005), at A-5 [Biloxi Veterans Affairs Med. Ctr. Plan].

[128] *Id.* at A-7.

[129] Veterans Affairs Med. Ctr., City of New Orleans, State of La., *Emergency Mgmt. Plan,* at I-1 [New Orleans Veterans Affairs Med. Ctr. Plan].

[130] *Id.* at I-7.

[131] *Id.* at I-10.

[132] *Id.* at III-6.

[133] Med. Ctr. of LA at New Orleans (MCLNO), *the Emergency Management Manual* (2005) [hereinafter MCLNO Plan].

[134] *Id.*

[135] *Id.*

[136] New Orleans Office of Emergency Preparedness, *Hurricane Preparedness Plan,* used by Pendleton Methodist Hosp. (2003), at 9 [New Orleans Hosp. Hurricane Plan].

[137] *Id.* at 1.

[138] *Id.* at 3.

[139] *Hospital Cries Out for Help New Orleans Charity Hospital* (*Good Morning America* television broadcast, Sept. 2, 2005).

[140] Interview by Select Comm. Staff with Larry Graham, former CEO, Pendleton Methodist Hosp. in New Orleans, LA (Dec.19, 2005) [hereinafter Interview with Larry Graham].

[141] Nov. 10 Interview with LA Hosp. Ass'n.

[142] Interview with Larry Graham.

[143] Nov. 7 Interview with Dr. Guidry.

[144] Elizabeth White, *Veterans Affairs' Hurricane Efforts Heralded,* ASSOC. PRESS, Sept. 9, 2005.

[145] Briefing for Select Comm. Staff by Dep't of Veterans Affairs, in Wash., DC (Nov. 4, 2005); Press Release, Dep't of Veterans Affairs, VA Evacuates Patients from Hurricane Area (Sept. 2, 2005).

[146] Interview by Select Comm. Staff with Donald Smithburg, CEO, LSU Health Sciences Ctr./Healthcare Services Div., in New Orleans, LA (Dec. 19, 2005) [hereinafter Dec. 19 LSU Interview].

[147] *Id.*

[148] *Id.*

[149] *Id.*

[150] E-mail correspondence from KC Decker, HHS/OS to Erin Fowler, HHS/OS (Sept. 1, 2005) (9:06 a.m.).

[151] Dec. 19 LSU Interview.

[152] Interview with Larry Graham.

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] Email correspondence from Jennifer Young, HHS/OS to Alex Azar and Stewart Simonson, HHS/OS (Sept. 2, 2005) (10:50 a.m.).

[157] Interview with Larry Graham.

[158] *CNN NewsNight with Aaron Brown* (CNN Television Broadcast, Sept. 20, 2005).

[159] Sept. 25, OR-2 DMAT After Action Report.

[160] Hemant Vankawala, *A Doctor's Message from Katrina's Front Lines,* (National Public Radio, Sept. 2005), *available at* www.npr.org (last visited Jan. 30, 2006) [hereinafter *A Doctor's Message,* Hemant Vankawala].

[161] Interview with FEMA and NDMS.

[162] Dec. 8 FEMA Press Release.

[163] DOD Provides Care Article.

[164] Sept. 25, OR-2 DMAT After Action Report.

[165] *Id.*

[166] *A Doctor's Message,* Hemant Vankawala.

[167] Sept. 25, OR-2 DMAT After Action Report.

[168] *Id.*

[169] *Id.*

[170] Briefing for Select Comm. Staff with the Assoc. of Air Med. Services personnel in Wash., DC (Oct. 18, 2005) [hereinafter Briefing with Air Med. personnel]; Assoc. of Air Med. Services, Air Medical Community Response to Hurricane Katrina Disaster: Hospital Evacuation and Patient Relocation by Helicopter and Fixed Wing Aircraft Report (Jan. 9, 2006) [hereinafter Air Med. Report].

[171] *Id.*

[172] Briefing with Air Med. personnel.

[173] *Id.*

[174] Briefing with Air Med. personnel; Air Med. Report.

[175] *Id.*

[176] Briefing with Air Med. personnel.

[177] Air Med. Report.

[178] Briefing with Air Med. personnel.

[179] Briefing with Air Med. personnel.

[180] Briefing with Air Med. personnel; Air Med. Report.

[181] *Id.*

[182] Air Med. Report.

[183] *Id.*

[184] Briefing with Air Med. personnel; Air Med. Report.

[185] Air Med. Report.

[186] Briefing with Air Med. personnel; Air Med. Report.

[187] Briefing with Air Med. personnel.

[188] Biloxi Veterans Affairs Med. Ctr. Plan.

[189] Biloxi Veterans Affairs Med. Ctr. Plan (SSHP Appendix).

[190] *Id.*

[191] *Id.*

[192] New Orleans Veterans Affairs Med. Ctr. Plan.

[193] *Id.*

[194] MCLNO Plan.

[195] New Orleans Hosp. Hurricane Plan.

[196] *Id.*

[197] *Id.*

[198] Interview with Larry Graham.

[199] *Id.*

[200] *American Morning* (CNN Television Broadcast, Sept. 30, 2005).

[201] Stephen Losey, *Katrina Response Marred by Communication Failures,* FED. TIMES (Oct. 3, 2005) [hereinafter Communications Failures Article].

[202] Communications Failures Article.

[203] Dec. 19 LSU Interview.

[204] *Id.*

[205] Randolph Schmid, *Lack of Disease Outbreak Following Katrina 'Amazing,' to Health Director,* ASSOC. PRESS (Oct. 20, 2005).

[206] Dec. 19 Interview with Dr. Stephens.

[207] Interview by Select Comm. Staff with COL Kenneth Knight, Chief, Air Force Med. Operations Ctr., in Wash., DC (Oct. 13, 2005).

[208] Interview by Select Comm. Staff with COL Faulk, Air Nat'l Guard Surgeon, in Wash., DC (Oct. 7, 2005).

[209] National Guard Bureau, [*Hurricane Katrina: After Action Review Observations*] (undated).

[210] Communications Failures Article.

                                      A FAILURE OF INITIATIVE

[211] Interview by Select Comm. Staff with Dr. Robert Blitzer, Deputy Assistant Sec'y, Office of Public Health Emergency Preparedness, in Wash., DC (Oct. 10, 2005).

[212] Interview by Select Comm. Staff with Dr. Gerald Parker, Principal Deputy Assistant Sec'y, Office of Public Health Emergency Preparedness, in Wash., DC (Oct. 10, 2005).

[213] Interview with HHS.

[214] Interview by Select Comm. Staff with Jack Beall, Chief, Nat'l Disaster Med. System, in Wash., DC (Jan. 23, 2006) [hereinafter Jan. 23 Interview with Jack Beall].

[215] *Id.*

[216] Sept. 25, OR-2 DMAT After Action Report.

[217] E-mail correspondence from Mark Hansey to EOC IST (Aug. 31, 2005) (3:12 a.m.).

[218] E-mail correspondence from Ron Burger to EOC Report (Sept. 5, 2005) (7:41 a.m.).

[219] E-mail correspondence from Edwin Shanley, CDC Liaison, to EOC Report (Sept. 5, 2005) (3:34 p.m.).

[220] E-mail correspondence from Robert Lavender, HHS/OS, to HHS personnel (Sept. 5, 2005) (3:24 p.m.).

[221] Sept. 25, OR-2 DMAT After Action Report.

[222] Roma Khanna, *Nursing Homes Left Residents With Weak Safety Net*, HOUSTON CHRONICLE (Dec. 11, 2005) [hereinafter Nursing Homes Article].

[223] Nov. 7 Interview with Dr. Guidry.

[224] Nursing Homes Article.

[225] *Id.*; Jan. 19 Interview with Michael Ford, et al.; Nov. 10 Interview with LA Hosp. Ass'n.

[226] *Katrina: New Orleans DA to Investigate Hospital Deaths*, NAT'L J. GROUP, AMERICAN HEALTH LINE (Jan. 18, 2006).

[227] Jan. 19 Interview with Michael Ford, et al.

[228] Jan. 19 Interview with Michael Ford, et al; Plaquemines Parish Gov't, *Phase 1 Mandatory Evacuation Notice* (Aug. 27, 2005) (9:00 a.m.).

[229] Jan. 19 Interview with Michael Ford, et al.

[230] *Id.*

[231] *Id.*

[232] *Reports Show Staff Tried to Save Lives at St. Rita's*, NEWS-STAR, Monroe, LA (Nov. 29, 2005), at 1A [hereinafter St. Rita's Article].

[233] Jan. 19 Interview with Michael Ford, et al.

[234] Press Release, Office of Attorney General, State of LA, Nursing Homes Owners Surrender to Medicaid Fraud Control Unit Investigators (Sept. 13, 2005).

[235] *Id.*

[236] St. Rita's Article.

[237] Marianne Kolbasuk McGee, *Storm Shows Benefit, Failures of Technology*, INFO. WEEK, (Sept. 12, 2005) [hereinafter Failures of Technology Article].

[238] *Id.*

[239] Lauran Neergaard, *Katrina Highlights Need for Computerized Medical Records*, ASSOC. PRESS (Sept. 13, 2005) [hereinafter Need for Computerized Medical Records Article].

[240] *Id.*

[241] Dec. 19 Interview with Dr. Stephens.

[242] Failures of Technology Article.

[243] *Id.*

[244] *"Katrina Health,"* available at www.katrinahealth.org (last visited Jan. 20, 2006).

[245] *Id.*

[246] *Id.*

[247] Need for Computerized Medical Records Article.

[248] *Id.*

[249] Press Release, HHS, HHS Enters Into Agreements to Support Digital Health Recovery for the Gulf Coast (Nov. 17, 2005).

[250] *Id.*

[251] Interview with FEMA and NDMS.

[252] E-mail correspondence from Pamela Williams, DHS, to Jay Lerner (Jan. 27, 2005) (6:41 p.m.).

[253] Interview with HHS.

[254] *Id.*

[255] *Id.*

[256] *Id.*

[257] E-mail correspondence from Mark Roupas, USACE Liaison to Paul McHale, HON, OSD (Aug. 29, 2005) (5:54 p.m.).

[258] Interview with HHS.

[259] Minority Staff Of House Comm. On Gov't Reform, Special Investigations Div., 109th Cong., *Report On The Decline Of The National Disaster Medical System* (2005).

[260] Interview with HHS.

[261] Jan. 23 Interview with Jack Beall.

[262] Sept. 25, OR-2 DMAT After Action Report.

[263] *Id.*

[264] Jan. 23 Interview with Jack Beall.

[265] Congressional Research Service [hereinafter CRS], Rep. No. 33096, at 5 (Oct. 4, 2002).

[266] *Id.* at 24.

[267] *NRP* at ESF#8.

268 E-mail Correspondence from John Nesler, Dep't of Def. [hereinafter DOD] to Millard Bell, DHS (Sept. 4, 2005) (12:56 p.m.).

269 *Id.*

270 *Id.*

271 Interview with HHS.

272 *Id.*

273 E-mail correspondence from John Jordan, U.S. Army to Army, DHS, and NORTHCOM personnel (Sept. 5, 2005) (10:03 a.m.).

274 Lara Jakes Jordan, *Slow Removal of Katrina Bodies Caused by Louisiana Governor's Indecision,* Memos Say, ASSOC. PRESS (Oct. 27, 2005).

275 *Id.*

276 E-mail correspondence from Keith Holtermann, Incident Manager, HHS/SOC to FEMA and HHS personnel (Sept. 5, 2005) (9:46 p.m.).

277 *Id.*

278 E-mail correspondence from Keith Holtermann, Incident Manager, HHS/SOC to Robert Blitzer, HHS/OS and other personnel (Sept. 6, 2005) (6:35 a.m.).

279 *Id.*

280 DOD Provides Care Article.

281 E-mail correspondence from Phil Navin, Div. of Emergency Operations, CDC to EOC Report and personnel (Aug. 30 2005) (8:00 p.m.).

282 E-mail correspondence from Andy Hunt, Commander, USPHS to John Mallos, BSN, RN, LCDR, USPHS, OSG (Sept. 2, 2005) (1:06 p.m.).

283 E-mail correspondence from David Elder, FDA to John Mallos, BSN, RN, LCDR, USPHS, OSG (Sept. 4, 2005) (11:17 p.m.).

284 E-mail correspondence from John Mallos, BSN, RN, LCDR, USPHS, OSG to Kurt Kesteloot, Environmental Engineer, USPHS (Sept. 4, 2005) (6:18 p.m.).

285 E-mail correspondence from John Mallos, BSN, RN, LCDR, USPHS, OSG to tsblumen@CHEQNET.NET (Sept 1, 2005) (7:58 p.m.).

286 E-mail correspondence from Nick Makrides, BOP GOV to John Mallos, USPHS (Sept. 1, 2005) (8:32 a.m.).

287 E-mail correspondence from Mark Tedaesco, USCG/USPHS to John Mallos, USPHS, OSG (Aug. 30, 2005) (5:12 p.m.).

288 E-mail correspondence from John Mallos, BSN, RN, LCDR, USPHS, OSG to FEMA and HHS personnel (Sept. 5, 2005) (7:01 a.m.).

289 E-mail correspondence from Robert Blitzer, OS to OS staff (Sept. 9, 2005) (10:35 a.m.).

290 E-mail correspondence from Keith Holtermann, Incident Manager, HHS/SOC to HHS personnel (Sept 22, 2005) (2:48 a.m.).

291 E-mail correspondence from Edwin Shanley, CDC Liaison to Debra Townes, CDC (Sept 7, 2005) (8:35 p.m.).

292 http://www.comfort.navy.mil (last visited Jan. 26, 2006).

293 Response from U.S.N. Command to Select Comm. Staff (Oct. 26, 2005).

294 Henry J. Holcomb, *Rerouted: Sen. Lott of Miss. Steps into Divert Hospital Ship,* PHILA. INQUIRER, Sept. 10, 2005, at A01.

295 E-mail correspondence from Bruce Burney, CDC to CDC personnel (Sept. 9, 2005) (7:41 a.m.).

296 E-mail correspondence from Gregory Banner, HHS/OS to KC Decker, HHS/OS (Sept. 9, 2005) (10:39 p.m.).

297 E-mail correspondence from Keith Holtermann, Incident Manager, HHS/SOC to HHS and TX personnel (Sept. 22, 2005) (12:44 a.m.).

298 Sept. 25, OR-2 DMAT After Action Report.

299 E-mail correspondence from Jon Ferko, Special Assistant to Paul McHale (Sept. 2, 2005) (1:27 p.m.).



*"We were then lured to the so-called evacuation points. This was several days after the hurricane had struck. The city was flooded … They loaded us onto military trucks after they told us they would take us to shelters where our basic needs would be met."*

*"We were in a wide open space along the interstate and under the Highway 10 causeway. The overpass provided little shade, however … It was early September and still extremely hot. Our skin blistered. My mother's skin is still not fully healed."*

Leah Hodges
New Orleans Citizen and Evacuee
Select Committee Hearing, December 6, 2005

# SHELTER AND HOUSING

## Long-standing weaknesses and the magnitude of the disaster overwhelmed FEMA's ability to provide emergency shelter and temporary housing

*"Scooter: Please see below. The trailer idea is worse than I originally thought. Per the data below, the last batch of the trailers that we are now purchasing will be coming off the production line in approximately 3.5 years."*

E-mail from Neil S. Patel, Staff Secretary to the Vice President, to Charles P. Durkin, Personal Aide to the Vice President, (apparently destined for Chief of Staff J. Lewis "Scooter" Libby, Jr.), September 9, 2005



AP PHOTO/BILL HABER

## Summary

Like food and water, shelter is a basic human need. Hurricane Katrina transformed thousands of people's lives into a battle for survival — and, for some, finding adequate shelter proved at least as difficult as finding something to eat or drink.

Katrina, of course, was a powerful storm that hit vulnerable areas, requiring more than traditional solutions for immediate shelter and, later, temporary housing. Louisiana and Mississippi immediately were faced with thousands and thousands of the suddenly homeless, without the ability to provide emergency shelter or longer-term housing for all of them. Within a month, 44 states had played a role in sheltering the evacuees from Hurricanes Katrina and Rita.

But it is clear state and local governments in the areas most affected by the hurricanes were not adequately prepared. They failed to learn important lessons from the Hurricane Pam exercise, and lacked the necessary information about temporary housing. Shelters of last resort, designed for people to take refuge in the immediate hours before and after landfall (such as the Superdome), were not of sufficient capacity. Instead, the Superdome, itself located in a floodplain, had to bear a burden for

which it was not prepared. The New Orleans Convention Centre, never planned as a shelter, became one out of sheer necessity and improvisation.

There was no comprehensive database of available shelters, which only complicated relief efforts. There were also delays in getting people out of shelters and into temporary housing. And FEMA's strategy of ordering 200,000 trailers and mobile homes shortly after the storm was blind to the nation's manufacturing capacity of 6,000 units per month.

Housing issues remain a tremendous concern for residents of the Gulf coast affected by Hurricane Katrina. Local elected officials in both Louisiana and Mississippi remain disappointed in FEMA's pace in setting up temporary housing. Debate over how long rental assistance will continue rages on. The question of where to build, or re-build, in the Gulf coast is the subject of great debate, both locally and nationally, as is who will pay for it. However, the long-term housing challenges in the Gulf coast are beyond the scope of the Select Committee's inquiry and are not covered in this report. Our charge was to examine the immediate response, not the recovery. We are certain the longer-term issues will continue to be discussed by others in Congress.

# Finding: Relocation plans did not adequately provide for shelter. Housing plans were haphazard and inadequate

## Shelter needs overwhelmed state and local governments

Initially, Hurricane Katrina displaced more than a million Gulf coast residents. As in most natural disasters, some evacuees only needed short-term shelter and were able to return home after the immediate crisis passed. However, because of the magnitude of the storm, hundreds of thousands remained displaced — for days, weeks, even months. Many are homeless today.

For example, Louisiana had 563 American Red Cross or state emergency shelters with a peak population of 146,292 in the early days following Hurricane Katrina's landfall.[1] Additionally, Louisiana had 10 special needs shelters that housed 2,480 persons.[2] In Mississippi, initial damage estimates projected 120,000 individuals needing emergency temporary housing.[3] A month after the storm, 44 states and the District of Columbia have been given emergency declarations to cover expenses related to sheltering evacuees forced from their homes by Hurricanes Katrina and Rita.[4]

In a catastrophic event like Katrina, many evacuees may be displaced for a longer than normal period of time or may permanently lose their housing. As FEMA and state officials learned from the Hurricane Pam exercise, temporary housing was an area of weakness.[5] Deputy FCO Scott Wells noted there were several follow-up items from the Hurricane Pam Exercise that state and local governments failed to execute, including developing more detailed concepts and plans on sheltering and temporary housing.[6] Similarly, Alabama state and local government plans lack information about temporary housing.[7]



FEMA

# Finding: State and local governments made inappropriate selections of shelters of last resort. The lack of a regional database of shelters contributed to an inefficient and ineffective evacuation and sheltering process

The evacuation of millions of people prior to Hurricane Katrina's landfall created an urgent need to identify, and direct people to, suitable shelters. Officials had worried about the high number of people who would ignore hurricane evacuation orders in coastal areas.[8] Indeed, thousands of people in New Orleans did not obey the mandatory evacuation order. Shelters of last resort — places for persons to be protected from the high winds, storm surge, and heavy rains, but with little or no water or food — were needed for those who did not or could not evacuate the area.

A shelter of last resort is intended to provide the best available survival protection for the duration of the hurricane only.[9] In Louisiana, emergency operations plans required shelters of last resort to be located outside of the floodplain, or have the ability to locate on floors elevated above flood potential, and have a hurricane wind resistant structure.[10] The Superdome was used as a shelter of last resort even though it was located in a floodplain. In addition, the Superdome roof suffered extensive wind damage, demonstrating that it was not a hurricane wind resistant structure.

Many residents who took refuge in the Superdome found conditions there unbearable. Some tried to leave, only to find themselves trapped by the floodwaters that surrounded the hulking structure. Cleo Fisher, an 86-year-old resident of Bywater, told a local newspaper that he left the dome to try to get some heart medications.[11] He didn't

*Evacuees tend to go to the most convenient and familiar shelter they can find, even though it may be inadequate.*

get far — and, in fact, had to be rescued after he fell into the nearby water — but he did not want to return inside, either.[12]

"It's worse than being in prison in there," he said. "They don't have nothing for me."

Even some of the police officers and military personnel charged with keeping order inside the dome became frustrated with the lack of organization.

"This plan," said one police officer, "was no plan."[13]

Although some local emergency plans call for the identification of local shelters, in a multi-state disaster, a compilation of available shelters in the region may be more appropriate. Government officials did not have a comprehensive database from which to identify suitable and available shelters; therefore, identification of alternate shelter locations was done on an ad hoc basis.[14] Because of the lack of a database of shelters, local, state, and federal officials have had a difficult time identifying the numbers and locations of displaced individuals.[15] This lack of information has complicated the relief effort, and led to the inefficient use of shelter resources.

The lack of a comprehensive means for tracking evacuees has exacerbated difficulties in reuniting family members and in determining accurate counts of people

so as to more accurately provide for their needs.[16] Out of human nature, evacuees tend to go to the most convenient and familiar shelter they can find, even though it may be inadequate. A database could be a helpful resource for planning and providing emergency public information. Similar initiatives have been proposed previously during the Cold War as part of civil defense, such as Crisis Relocation Planning.[17]

## Finding: There was inappropriate delay in getting people out of shelters and into temporary housing — delays that officials should have foreseen due to manufacturing limitations

Dr. Gavin Smith told a congressional committee that "[w]ithout the rapid provision of temporary and permanent housing solutions, recovery will be slowed or fail to occur in a manner that meets the needs of disaster victims . . .."[18] Although temporary housing efforts in the wake of Katrina have far exceeded any previous effort, individuals remained in shelters for unacceptably long periods of time. Temporary housing efforts have fallen short of meeting demand. Federal, state, and local agencies failed to implement a successful program to shelter and place many evacuees in temporary housing.

FEMA established a Housing Area Command to oversee all temporary housing operations across Louisiana, Mississippi, and Alabama.[19] Although this group began identifying available land prior to landfall, temporary housing efforts suffered from delays. A Mississippi recovery official hailed FEMA for "the fastest deployment of temporary housing units to a disaster-stricken area since the program was established," but also noted the effort has not been good enough.[20] Specifically, he noted that operational and long-term planning and inter-organizational coordination remains unrealized, and the current approach is not sufficient to address the needs of communities and states following a catastrophic disaster like Hurricane Katrina.[21]

Due to the massive need for temporary housing, the federal government put together a plan that included a combination of old and new housing strategies, including housing people in trailers and on cruise ships.[22]



FEMA

*Housing still falls short of the overwhelming need. There are still delays in getting evacuees into trailers once they are delivered, due to among other things infrastructure, zoning and environmental issues.*

Additionally, FEMA used hotels to serve as temporary emergency lodging, utilizing 85,000 rooms nationwide at the program's peak.[23] However, state and local officials complained of poor coordination by FEMA on these temporary housing solutions.[24] Immediately following the storm, FEMA contracted with cruise ships to provide transitional housing for hurricane victims close to the disaster area.[25] Many evacuees rejected this option, something that perhaps could have been avoided if there had been better coordination beforehand. Many individuals felt they needed to focus on finding jobs and obtaining permanent housing.[26]

Although FEMA began strategic housing planning before Katrina's landfall, and the private sector mobilized quickly to fill FEMA's manufactured housing demand, many issues also have plagued the relocation into this form of temporary housing. Mississippi Federal Coordinating Officer (FCO) William Carwile testified that over 24,000 travel trailers and mobile homes had been occupied in Mississippi.[27] FEMA logistics has reported that nine trains a week have been carrying approximately 90 trailers per train into the Gulf region. And, on January 11, 2006, FEMA announced that nearly 62,000 travel trailers and mobile homes were serving as temporary homes for Hurricane Katrina and Rita victims.[28] This number nearly tripled the number of units used following all of last year's Florida hurricanes and far outnumbered any housing mission in FEMA's history.[29]

Despite this commendable effort, housing still falls short of the overwhelming need. There are still delays in getting evacuees into trailers once they are delivered, due to among other things infrastructure, zoning, and environmental issues.[30] In Mississippi, the lack of working utilities for private sites and environmental and zoning issues with group sites have delayed the installation of travel trailers and mobile homes.[31]

FEMA's strategy of ordering 200,000 trailers and mobile homes shortly after the storm was blind to the nation's manufacturing capacity of 6,000 units per month. On Friday, September 9, staff to the Vice President and Office of Management and Budget (OMB) officials ratcheted up

concerns about FEMA's decision to rely on trailers and mobile homes to house displaced residents.[32] Special Assistant to the Vice President Marie Fishpaw wrote in an e-mail to Patel:

> FEMA have (sic) set up arrangements to order 200,000 units of trailers (and mobile homes) and committed up to $500 million to do so. They want to get 30,000 units (79% of the existing market) soon. FEMA plans to order another 100,000 units. OMB and OVP staff remain skeptical about this strategy. The nation can produce 6,000 units per month. There is probably some capacity for expansion (possibly by about 10%) to meet increased demand, but we don't know how much. That means most of these units won't be available for months. Further, some states, including Louisiana, are balking at the idea of large (25,000 units, as proposed by FEMA) trailer parks. We got all this info from OMB career staff.[33]

That message was then forwarded, apparently intended for then Chief of Staff to the Vice President, "I Lewis Libby, Jr.: "Please see below. The trailer idea is worse than I originally thought. Per the data below, the last batch of the trailers that we are now purchasing will be coming off the production line in approximately 3.5 years."[34]

## Finding: FEMA Failed to Take Advantage of HUD's Expertise in Large-scale Housing Challenges

FEMA has been working in partnership with the U.S. Department of Agriculture (USDA), the Department of Veterans Affairs (VA), and the Department of Housing and Urban Development (HUD) to meet the challenge of finding and securing sufficient rental assets to meet the huge demands created by mass evacuations. By early



STAFF PHOTO

to be eligible for additional rental assistance, use of a voucher system similar to the one administered by HUD could have prevented this mistake.

In this case, FEMA failed to take full advantage of HUD's expertise and perspective on large-scale housing challenges, such as the agency's experience with voucher programs. HUD and public housing authorities have the expertise and infrastructure to help non-HUD clients during disasters.

December 2005, 5,000 displaced families had been placed in federal housing of some sort.[35] USDA has offered units from their own inventory, placing 974 families from Louisiana alone.[36]

Additionally, FEMA has concluded an inter-agency agreement with the VA to rent unused VA housing units to evacuees, and FEMA is pursuing a similar arrangement with Fannie Mae.[37] On September 12, 2005, FEMA signed an Interagency Agreement with HUD.[38] This agreement identified and made available 5,600 HUD single-family homes.[39] Hundreds of disaster victims have made these homes their temporary residences, including 207 families in Texas.[40]

FEMA and HUD have also partnered on the Katrina Disaster Housing Assistance Program (KDHAP), a transitional housing assistance program funded by FEMA and administered by HUD and the network of public housing authorities. Through KDHAP, HUD is providing vouchers to evacuees previously receiving public housing assistance, as well as evacuees who were homeless prior to the hurricane.[41] By December 2005, nearly 15,000 families received rental assistance through KDHAP.[42]

In contrast, FEMA has used direct payments to evacuees to provide rental assistance to more than 500,000 applicants, totaling more than $1.2 billion.[43] Unfortunately, many displaced households received their initial rental assistance before receiving mailed guidance and did not use this assistance for housing, but instead used it to meet other disaster-related needs.[44] Although FEMA has shown flexibility by allowing those individuals

## Conclusion

Despite this Herculean effort, state officials feel there has been a lack of coordination within the interagency community causing delay in relocating and housing people.[45] Although the federal government has shown some ingenuity in coming up with unique solutions such as lodging on cruise ships, and orchestrated the largest mobilization of temporary housing units in history, both of these solutions have proven inadequate.

Carwile, the Mississippi FCO, noted the need for taking a new look at housing solutions:

> In Mississippi, while temporary housing has been provided in numbers far exceeding any previous effort, this success is obscured by the overwhelming need and an exceptionally long period of time that people remain in shelters. New methodologies must be examined and implemented to take care of Americans in need of humane housing while in a catastrophic event.[46]

The devastation caused by Hurricane Katrina was heartbreaking enough for the people who lost their homes. Sadly, however, the days and weeks and months that followed provided little relief. The government plans for their shelter were far from adequate. ∎

1   *Hearing on Housing Options in the Aftermath of Hurricanes Katrina and Rita Before the Comm. on Financial Services Subcomm. on Housing and Community Opportunity*, 109th Cong. (Jan. 13-14, 2006) at 3 (written testimony of Scott Wells, Federal Coordinating Officer for LA, FEMA) [hereinafter *Jan. 13-14, 2006 Financial Services Comm. Hearing*].

2   *Id.*

3   *Id.* (written testimony of James N. Russo, Federal Coordinating Officer for MS, FEMA) at 3.

4   FEMA, *2005 Federal Disaster Declarations*, http://www.fema.gov/news/disasters.fema?year=2005 (last visited Jan.12, 2006).

5   Interviews by Select Comm. Staff with FEMA and Louisiana State officials in New Orleans, LA (Nov. 3-10, 2005).

6   Interviews by Select Comm. Staff with FEMA officials in New Orleans, LA (Nov. 3-10, 2005).

7   Alabama Emergency Management Agency, *State of AL Emergency Operations Plan*, Oct. 1, 2000.

8   Timothy R. Brown, *Miss. Governor Declares State of Emergency as Katrina Nears*, LEDGER-ENQUIRER, Columbus, GA, Aug. 27, 2005.

9   State of LA Emergency Operations Plan Supplement 1B, *Southwest LA Hurricane Evacuation and Sheltering Plan,* (July 2000) at VI-1.

10  State of LA Emergency Operations Plan Supplement 1C: *Louisiana Shelter Operations Plan*, (July 2000).

11  Gordon Russell, *Refuges Find Dome An Intolerable Refuge*, NEW ORLEANS TIMES-PICAYUNE, Sept. 1, 2005, 5.

12  *Id.*

13  *Id.*

14  *DHS HSOC SPOT Report prepared by Matthew Thompson, NRCC* (Aug. 31, 2005).

15  Jan Moller, *La. seeks help compiling evacuee shelter database*, NEW ORLEANS TIMES-PICAYUNE, Sept. 10, 2005, A-7.

16  Shankar Vedantam and Dean Starkman, *Lack of Cohesion Bedevils Recovery*, WASHINGTON POST, Sept. 18, 2005, A01.

17  B. Wayne Blanchard, FEMA, *American Civil Defense 1945-1984:  The Evolution of Programs and Policies*, (National Emergency Center Monograph Series Vol. 2, No. 2, 1985) at 19-20.

18  *Jan. 13-14, 2006 Financial Services Comm. Hearing* (written testimony of Dr. Gavin Smith, Director, Office of Recovery and Renewal, Office of Gov. Barbour) at 2.

19  FEMA News Release, *FEMA Contracts to Provide Housing Relief for Displaced Hurricane Victims*, Sept. 8, 2005.

20  *Jan. 13-14, 2006 Financial Services Comm. Hearing* (written testimony of  Gavin Smith) at 1.

21  *Id.*

22  Rick Weiss, *Victims' Next Homes: Cruise Ships, Trailers*, WASHINGTON POST, Sept. 5, 2005, A15.

23  *Jan. 13-14, 2006 Financial Services Comm. Hearing* (written testimony of Scott Wells) at 4.

24  Audio recordings of Hurricane Conference Calls, LA State Emergency Operations Center (Aug. 26-28, 2005, Sept. 9, 2005).

25  FEMA, News Release, *Temporary Housing for Hurricane Katrina Evacuees Includes Cruise Ships, FEMA Reports*, Sept. 4, 2005.

26  Shankar Vedantam and Dean Starkman, *Lack of Cohesion Bedevils Recovery*, WASHINGTON POST, Sept. 18, 2005.

27  *Hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi Before Select Comm.*, 109th Cong. (Dec. 7, 2005) at 8 (written testimony of William L. Carwile, III, former Federal Coordinating Officer, Hurricane Katrina Response and Initial Recovery Operations: MS).

28  FEMA, *By the Numbers: FEMA Recovery Update for Hurricanes Katrina & Rita*, Jan. 11, 2006.

29  *Id.*

30  *Interview by Select Comm. Staff with Gary Moore, Director of Logistics, FEMA, in Washington, DC (Jan. 9, 2006).*

31  *Jan.13-14, 2006 Financial Services Comm. Hearing* (written testimony of James N. Russo) at 7.

32  *See* Aimee Curl, *Federal-Local Conflicts Keep Victims Out of FEMA Trailers*, FEDERAL TIMES, Jan. 16, 2006.

33  E-mail correspondence from Marie Fishpaw, Special Assistant to the Vice President, to Neil Patel, Staff Secretary to the Vice President, (Sept. 9, 2005) (1:41 p.m.).

34  E-mail correspondence from Neil Patel to Charles Durkin, (Sept. 9, 2005) (1:49 p.m.).

35  *Hearing on Housing Options in the Aftermath of Hurricanes Katrina and Rita Before the Comm. on Financial Services Subcomm. on Housing and Community Opportunity*, 109th Cong. (Dec. 8, 2005) at 12 (written testimony of David Garratt, Acting Director, Recovery Division, EMA) [hereinafter *Dec. 8, 2005 Financial Services Comm. Hearing*].

36  *Id.* at 12.

37  *Id.*

38  *Id.* (written testimony of Brian Montgomery, Assistant Secretary for Office of Housing/Federal Housing Commissioner, HUD) at 4.

39  *Id.*

40  *Id.* (written testimony of David Garratt) at 13.

41  *Id.* at 13-14.

42  *Id.* (written testimony of Brian Montgomery) at 6.

43  *Id.* (written testimony of David Garratt) at 6.

44  *Id.* at 6-7.

45  *Jan.13-14, 2006 Financial Services Comm. Hearing* (written testimony of Gavin Smith) at 1.

46  *Hearing on Hurricane Katrina: Perspectives of FEMA's Operational Professionals, Before the Senate Committee on Homeland Security and Governmental Affairs*, 109th Cong. (Dec. 8, 2005) at 37 (testimony of William L. Carwile, III, former Federal Coordinating Officer, Hurricane Katrina Response and Initial Recovery Operations: MS).

BARGE000394



*"[O]ne of the lessons that we need to learn from this catastrophic event is that we do need to get better about marshaling those assets and moving them around. I will tell you up front, FEMA has a logistics problem, we have a problem understanding all the time. I can point out where our stuff is and I can point out where it's supposed to go to; I can't always tell you that it actually got there."*

Michael D. Brown
Former FEMA Director
Select Committee Hearing, September 27, 2005

# LOGISTICS AND CONTRACTING

## FEMA logistics and contracting systems did not support a targeted, massive, and sustained provision of commodities

Katrina overwhelmed the Federal Emergency Management Agency (FEMA) management and overloaded its logistics system. Response and relief personnel had little visibility into available federal assets and resources. The process for requesting assistance could not support the volume of requests, and the technology supporting that process proved inadequate. Federal, state, and local officials requested assistance outside existing channels with little coordination and communication. "[M]anagement by crisis would be the best way I could put it," said Kip Holden, Mayor of East Baton Rouge Parish.[1]

By September 9, Congress had passed legislation providing over $63 billion to the Department of Homeland Security (DHS) for disaster relief.[2] The circumstances and urgent needs created by Hurricane Katrina provided significant opportunity for fraud and mismanagement, and the DHS Office of Inspector General (OIG) estimates the cost to recover from the storm and rebuild the affected areas could exceed $200 billion.[3]

As of November 30, 2005, $19.3 billion has been obligated to needs resulting from Hurricane Katrina.[4] The funds have been used to relieve the immediate suffering of individuals and families, clear debris, reimburse federal agencies for the costs of technical and direct assistance, and support federal operations such as search and rescue, and delivery of consumables. The $19 billion has been obligated as follows:

- $8 billion for human service needs including unemployment compensation, personal needs that are not met by insurance, and temporary housing (including vouchers for hotel/motel rooms and mobile homes);
- $2.2 billion for debris removal, public building repair and replacement, and damage inspections;
- $4.4 billion for technical and direct assistance provided by federal agencies;
- $14.7 million for inspections and hazard mitigation; and,
- $4.7 billion for administrative expenses, almost $3 billion of which has been obligated for mission assignment operations undertaken by other federal agencies at the direction of the federal officer responsible for coordinating response activities.[5]

Despite this outpouring of funds, procurement officials struggled to balance the competing and conflicting demands of local and elected officials. On October 21, New Orleans Mayor Ray Nagin complained about the time-consuming amount of federal oversight accompanying the federal dollars going to contracts and local governments. He said

> [t]he money is sitting in the doggone bank. . . . We can't use it, and as soon as they gave us the money, they sent a team of auditors and said, 'If you spend this money, we'll be watching you real close. . . .' So we're gun shy about how we use this money . . . .[6]

and

> [w]e just got these huge multinational companies that are using the shield of, 'We've got to work quick,' [rather than] trying to find local contractors.[7]

The Government Accountability Office (GAO) is undertaking a review of Katrina relief contracting

*"[Hurricane Katrina] was beyond the capacity of the state and local governments, and it was beyond the capacity of FEMA. It was the largest natural disaster ever to strike the United States — 92,000 square miles. Logistics were falling apart."*



FEMA

activities. GAO's review includes acquisition planning, communication of responsibilities between various entities, contract management, and the use of emergency acquisition authorities. GAO briefed the Select Commitee on their review efforts, which will complement the findings of this report.

## Finding: FEMA management lacked situational awareness of existing requirements and of resources in the supply chain. An overwhelmed logistics system made it challenging to get supplies, equipment, and personnel where and when needed

When President Bush authorized a federal emergency declaration for Mississippi and Alabama on Sunday, August 28, in response to these states' requests, then-FEMA Director Michael Brown said he began to "predeploy all the assets [including] the medical teams, the urban search and rescue teams, the emergency response, the management teams, the rapid needs assessment teams, prepositioning the water, the Meals Ready to Eat, the ice, the tarps."[8] However, given that landfall occurred on Monday, August 29, this was too late to begin the pre-deployment process.

FEMA leadership acknowledged this lack of planning. "[Hurricane Katrina] was beyond the capacity of the state and local governments, and it was beyond the capacity of FEMA," said Brown. "It was the largest natural disaster ever to strike the United States — 92,000 square miles. Logistics were falling apart."[9] When FEMA did arrive, representatives sometimes were empty-handed. "[W]hen FEMA finally did show up, everybody was angry because that is all they had was a Web site and a flier. They didn't have any real resources that they could give," reported Senator Pryor following visits and conversations with victims.[10]

Brown's testimony outlined some of the resources FEMA had in place. Prior to landfall FEMA had 14 trailer loads of Meals Ready to Eat ("MREs") at Camp Beauregard, Louisiana, four trailers in Moffit, 42 in Forth Worth, 15 trailer loads in Fullersville, 75 at two locations in Atlanta, three in Cumberland, Maryland, 15 in Charlotte, North Carolina, six in Eastover, South Carolina, 46 in Palmetto, Georgia, 15 in Homestead, Florida, at the airbase, 10 in Meridian, and two at the Superdome.[11]

Some suggested these resources should have been more readily available. Rep. Chip Pickering said "[most MREs] were [prepositioned] across the region, only a few in Meridian and a few in New Orleans, and that should have been closer, I think, to the storm."[12] Rep. Gene Taylor pointed out the provisions were too far away from the FEMA team, questioning

> [w]hat part of the FEMA plan envisioned that the first responders in Hancock County and in much of the Mississippi Gulf Coast would have to loot the local grocery store and loot the local Wal-Mart in order to feed themselves, would have to loot the local Wal-Mart in order to have a change of clothes? What part of your plan was that?[13]

Brown, however, strongly rejected the contention of having relief items in the immediate impacted areas, saying expectations must be realistic:

> [T]he last thing I'm going to do is to put equipment or manpower in place where they themselves become victims and then cannot assist the people they are there to assist. You cannot, you cannot physically — I don't think you can do it statutorily or any other way — say to any victim in this country that the minute you come out of your

abode, your home, your shelter, whatever it is, that the Federal Government is going to be there with a meal ready to eat for you. That is an unreasonable expectation. So what we do is we preposition those supplies so that we can move them in and help them. And that's why the FEMA plan, that's why the basic emergency management system says you should, as an individual, take personal responsibility and be prepared to be on your own for perhaps up to 2 or 3 days. If Congress expects the Federal Government to be able to supply every individual food and water immediately following a catastrophe or a disaster, then this committee in Congress needs to have a serious public policy debate about what the role of FEMA and the Federal Government is in disasters.[14]

According to the Director of the Mississippi Emergency Management Agency (MEMA), Robert Latham, the federal logistics system failed in the days immediately following Hurricane Katrina, leaving state officials without adequate supplies of food, water, and ice for emergency shelters.[15] FEMA representatives working with MEMA requested 450 trucks of water and ice, and 50 trucks of MREs. When less than 15 percent of the requested supplies arrived, state emergency responders were forced to purchase the commodities on the commercial market or obtain supplies from neighboring states.[16]

Mississippi officials had to deal with shortages of commodities for the first nine to ten days after landfall.[17] Fortunately, Mississippi officials had purchased supplies for Hurricane Dennis (July 2005) that were not used. Similarly,



Florida officials had pre-positioned considerable resources to be used in the Florida Panhandle,[18] which, until Friday, August 26, was where Katrina was projected to make landfall. Commodities were provided by Governor Bush to Mississippi Governor Haley Barbour under the Emergency Management Assistance Compact (EMAC) and offered some relief to the victims in Mississippi's coastal counties.[19]

*FEMA has a logistics problem, we have a problem understanding all the time. I can point out where our stuff is and I can point out where it's supposed to go to; I can't always tell you that it actually got there.*

Federal Coordinating Officer (FCO) Bill Carwile speculated the shortages were the result of an overly centralized logistics system overwhelmed by the requirements of the three large disasters: Hurricanes Dennis, Katrina, and Rita. Mississippi officials asked permission to purchase (on their own) commodities from elsewhere to supplement those being provided by the centralized system. Carwile said he was authorized by FEMA Director Michael Brown to make these purchases.[20]

According to the Director of the Alabama Emergency Management Agency (AEMA), Bruce Baughman, a better contracting process for essentials and commodities is needed.[21] In the days before Katrina made landfall, when officials submitted commodity requirements for Alabama for items such as water, ice, MREs, these requests were unilaterally reduced by FEMA officials – often so reflexively that it appeared to be part of standard FEMA procedure. Baughman said their initial requests were carefully and precisely tailored to meet the actual needs of Alabama. Tim Payne, AEMA Branch Chief and Emergency Management Program Coordinator, said in advance of Katrina, their needs assessment concluded Alabama would require 100 trucks of water and 100 trucks of ice.[22] In response to this request, FEMA made available only 17 trucks of water and 16 trucks of ice.

Frequently during the Alabama response to Katrina, FEMA did not follow through with AEMA's requests for supplies and emergency support.[23] It appeared FEMA did not have the ability to track commodities within its own logistics system. To defend against commodity shortfalls in future emergencies, Alabama recently issued a Request for Proposals for key commodities and materials needed for an effective emergency response.[24] Baughman suggested having standing contracts in place and supplies

*FEMA's logistics program is broken and needs to be fixed.*



FEMA

at the ready so the states would not again fall victim to an inadequate FEMA response or supply shortages due to other market competitors in times of crisis.[25] Payne identified 12 categories of items that need to be on hand to effectively deal with an emergency.[26]

According to Brown, "one of the lessons that we need to learn from this catastrophic event is that we do need to get better about marshaling those assets and moving them around. I will tell you up front, FEMA has a logistics problem, we have a problem understanding all the time. I can point out where our stuff is and I can point out where it's supposed to go to; I can't always tell you that it actually got there."[27]

These problems are not new, however. FEMA's "bureaucratic slowness" in securing long-term housing and loans, removing debris, and getting basic assistance and reimbursement were "'huge problems that have been very frustrating," stated Florida Governor Jeb Bush before the House Homeland Security Committee.[28] Getting one truckload of ice from Atlanta to Florida in 2004 took a series of separate contracts that caused needless delays. "'FEMA's logistics program is broken and needs to be fixed. . . . I can say with certainty that federalizing emergency response to catastrophic events would be a disaster as bad as Hurricane Katrina," Governor Jeb Bush testified. "If you federalize, all the innovation, creativity and knowledge at the local level would subside.'"[29]

It should be noted FEMA used existing resources, procedures, and staff to organize and conduct a massive civil logistics operation beyond any this country has seen before. Over 11,000 trucks of water, ice, and meals were moved into the disaster region during the month after landfall. This is more than three times the number of trucks used during all hurricanes in 2004.[30] FEMA tried, but Katrina's magnitude exposed significant weakness and inefficiencies in the process.

## Finding: Procedures for requesting federal assistance raised numerous concerns

Requests for federal assistance go through a standard process. Local government officials submit their requests to the state, and, if state officials cannot meet the request, they forward appropriate requests to federal officials.[31] In Louisiana, state and local emergency management officials manage requests for assistance during disasters using specially-designed commercial software called "E-Team."[32] E-Team is a web-based system and can be accessed from any computer with internet connectivity. According to Matt Farlow of Louisiana Office of Homeland Security and Emergency Preparedness (LOHSEP) Information Technology Division, Louisiana has used E-Team since 2000 and LOHSEP personnel are well-experienced in its use.[33] In addition to using E-Team to register and track parish requests, the Louisiana Emergency Operations Center (EOC) also uses it to send out e-mail alerts and notifications to parishes.

The parish-to-state process is much the same as the state-to-federal process. The parishes declare emergencies and request assistance from the state.[34] The parishes register their requests for assistance with the state directly via the internet with E-Team. However, according to state officials, not all parish officials know how to use E-Team well: "They don't know all the bells and whistles."[35] Parish officials can also register requests to the state by telephone or radio. If the parish communicates a request outside E-Team, by voice, e-mail, or fax communications, then the state EOC officials enter that request into E-Team.

The state receives the parish requests for assistance and determines whether the requests can be met from a nearby parish or with state resources.[36] If so, LOHSEP tasks that mission to another state agency. The state can also request assistance from nearby states through the EMAC.[37] When a state makes an EMAC request to another state, it is undertaking an obligation to pay that state for that assistance.[38] FEMA has a mechanism to later reimburse appropriate costs to the requesting state, which the state can use to repay the sending state. Finally, if the state cannot meet the request from its own or other state resources, the state can prioritize the various requests and pass them on to

FEMA officials. The state is supposed to make such requests after it has already reviewed its own capabilities.

FEMA officials determine whether to accept or reject the state request.[39] This determination is documented. A request might be rejected for a number of reasons, such as not being appropriate, a state getting the resources from elsewhere, or a state canceling a request while FEMA officials are considering it. In some cases, a state request might be made verbally to expedite assistance, but FEMA officials expect the paperwork to soon follow. The paperwork from the state certifies that the state will pay its share of the requested assistance.

Once FEMA accepts the request and agrees to meet it, officials use a system called NEMIS (National Emergency Management Information System).[40] FEMA does not use E-Team. NEMIS is used by FEMA officials to track the request within the federal government and all requests FEMA officials accept are entered into this system. FEMA can meet the request from its own resources and capabilities, from other federal agencies, or from private contractors. If FEMA officials task another federal agency with the request, that is known as a "Mission Assignment" (or MA), whereby the task is assigned to the other agency.

Mission Assignments to another federal agency could also be passed on to a private contractor. This is done because some agencies have more expertise and experience in contracting for certain types of items. For example, the U.S. Army Corps of Engineers (USACE) contracts for debris removal.[41] Some federal agencies, including FEMA, have pre-existing contracts that can be modified quickly to add additional items. NEMIS is used to track the request and completion of the mission, as well as to track spending and reimbursement later by FEMA officials.[42]



AP PHOTO/MORRY GESH

### In Louisiana there was widespread confusion about the process for obtaining federal assistance. In addition, the catastrophic nature of the disaster overwhelmed the existing procedures and systems

Louisiana state and parish officials said degraded communications and the effective loss of parish E-Team software forced them to deviate from normal procedures for requesting federal assistance.[43] These problems also made it difficult for the state EOC to check on the status of specific tasks assigned to state agencies. State officials complained about FEMA's non-automated process that made tracking status difficult. State officials also noted they had included FEMA on their E-Team license, but during Katrina the FEMA staff assigned to the EOC were not familiar with the E-Team system. This had not been the case in earlier hurricanes, when FEMA staff assigned to the EOC knew how to use E-Team.[44] State officials also complained about weaknesses in tracking the transportation and estimating arrival of FEMA-contracted commodities. FEMA officials have acknowledged these weaknesses.[45] Further, state officials said the federal government contributed to the problem when other federal agencies tasked FEMA directly rather than having requests go from parish to state to FEMA and then onto appropriate federal agencies.[46] According to Governor Blanco's chief of staff, Andy Kopplin, the governor had to go beyond the normal LOHSEP and FEMA process because these processes were too bureaucratic and impracticable.[47]

Parish officials were universally critical of FEMA for providing relief commodities late.[48] There were clearly misunderstandings of what constituted an official request for assistance. The Jefferson Parish Emergency Manager, Walter Maestri, said he directly communicated his needs before landfall in a conference call to the EOC, where FEMA personnel were present.[49] In his view, this constituted a request for assistance. However, both the State Coordinating Officer (SCO) and the FCO said while the purpose of these conference calls was to share information, they were not considered valid ways for a parish to make a request.[50]

New Orleans Director of Homeland Security, Col. Terry Ebbert, also said the existing systems for requesting assistance does not work during a catastrophic disaster.[51] The system assumes the parish knows what it wants,

*New Orleans Director of Homeland Security, Terry Ebbert, was "shocked" to hear FEMA Director Michael Brown say the local parishes never got FEMA commodities because they never asked for them. In his opinion, FEMA officials should have known what was needed from their own experience.*

the state knows what it wants, and both have the communications capabilities to make requests of FEMA. Ebbert said the current system is a "pull" system in which parishes must make requests to pull an item from the state and federal government. However, the parishes were too overwhelmed and their communications were too degraded to allow this to work. In a catastrophic disaster, FEMA needs a "push" system in which FEMA officials anticipate needs (e.g., for food, water, medical supplies, ice, tarps, generators) and push the commodities to the parishes without receiving the request. Under such disaster circumstances, it would be better to have too much of something than too little; the excess items can always be shipped elsewhere or stored for the next disaster.[52]

As such, Ebbert was "shocked" to hear FEMA Director Michael Brown say the local parishes never got FEMA commodities because they never asked for them.[53] In his opinion, FEMA officials should have known what was needed from their own experience. Similarly, Governor Blanco's chief of staff, Andy Kopplin, said the state had to go beyond both LOHSEP's and FEMA's bureaucratic processes for requesting and providing assistance.[54]

However, parish officials also acknowledged their emergency managers were overwhelmed. Plaquemines Parish Sheriff Jiff Hingle said his parish emergency manager was completely overwhelmed and unable to cope with the situation.[55] Hingle found he and the parish president had to make all requests for assistance through other channels because the normal system was not functional.

FEMA officials Scott Wells and Tony Robinson put much of the blame on the state, saying the standard request for assistance process was not working because the state was incapable of analyzing and prioritizing requests.[56] Wells and Robinson said many of the requests from parishes came up through channels to the EOC, but state officials appeared "overwhelmed" and they "lost control." The EOC did not attempt to prioritize such requests, did not try to

figure out if the requests could be met from state resources, and did not go through EMAC channels to see if other nearby states could provide the assistance. The EOC just passed the unfiltered requests on to FEMA officials. Wells said the FCO staff did a quick analysis of parish E-Team requests the EOC was passing on unfiltered to FEMA, and found many inappropriate items, such as writing tablets. According to Wells, these requests were inappropriate because the state should not be relying on FEMA for basic items that are otherwise easily obtainable.

Parishes were frustrated by the degraded communications and their desperate need for assistance. Robinson said while the parishes were still able to communicate requests to the EOC (via radio or other means), they were not able to use E-Team.[57] The EOC was not systematically entering the requests into E-Team, so the state could not track or check the status later, which led to many parishes becoming frustrated. The parishes probably blamed FEMA officials for any delays in getting assistance because they had communicated their requests and assumed the EOC had duly registered these requests and passed them on to FEMA officials. Many of the highly publicized parish requests for commodities such as for food and water assistance may have never even reached FEMA officials.

Some confusion arose because states and not the parishes are supposed to make requests to FEMA.[58] It was Louisiana's responsibility to take these parish requests, combine them with similar requests, determine whether the state could meet them, prioritize them, and, if appropriate, make requests to FEMA. That process, where the state enters the request into its E-Team system, allowing formal registry and tracking of status and completion, is the only way to provide an orderly processing of requests. Using verbal requests, without documenting them in a formal process, leads to chaos, particularly in a large disaster where there are hundreds

or thousands of local requests for assistance. If the parish is unable to use E-Team because of communications or power difficulties, the state EOC (which, in fact, retained power during the hurricane and its aftermath) could have still entered them into E-Team. Then the state should perform its review, and, if appropriate, pass the request on to FEMA. It was the state's job, not FEMA's, to take down any parish requests from conference calls and enter them into the system. FEMA officials saw these conference calls serving the function of information sharing and situational awareness, not substitutes for the parish-to-state and state-to-federal formal request process.

## Interoperability between state and federal automated systems

FEMA FCO staff said there is no automatic or electronic interface between state systems (such as E-Team) and the FEMA system (NEMIS).[59] Both systems, if used correctly, have independent capabilities to track requests for assistance and determine their status. The two systems meet in the EOC, where the E-Team requests are converted into NEMIS. However, there is no way for the state EOC officials to use E-Team to track the status of their request in NEMIS, nor any way for the federal FCO officials to use NEMIS to check information on the E-Team requests originating at the local level.

According to FEMA officials involved in the response to Hurricane Katrina, the breakdown of a unified command

structure at the state EOC level hampered FEMA's ability to meet state and local requests for commodities.[60] Without a unified command, some state and local officials began submitting commodity requests outside FEMA's normal logistics channels. FEMA, in turn, started fulfilling such requests on an "ad-hoc" basis before these requests were properly authorized or logged into its logistics system.[61] When supply requests and subsequent supply distributions were not logged, FEMA could not accurately keep track of the resources it staged at regional facilities.[62] As a result, supplies and equipment were delivered not according to specifications, delivered late, or not delivered at all, and priority needs were not met.

In his testimony before the Select Committee, Brown acknowledged these logistical problems and the need for a better tracking system. He said if

> [y]ou don't have a unified command, [you] kind of go into an ad hoc mode. So we hear that, for example, County X is requesting five truckloads of Meals Ready to Eat, so we will then figure out that, okay, we have got four available, so we are just going to ship four into that county . . . .[63]

Then, "[another county] may send in a legitimate request for five trailer loads [and] you think they are still there because no one has yet entered in the [trailers] that have gone out."[64]



*FEMA*

*When supply requests and subsequent supply distributions were not logged, FEMA could not accurately keep track of the resources it staged at regional facilities. As a result, supplies and equipment were delivered not according to specifications, delivered late, or not delivered at all, and priority needs were not met.*

## Management lapse

According to Holden, lack of "knowledge and understanding by many agencies paralyzed the efforts" to provide an orderly and efficient response, and required paperwork also "hindered immediate action and deployment of people and materials to assist in rescue and recovery efforts."[65] Pre-positioned federal assets critical to the operations of hospitals were never received. Resources from the Strategic National Stockpile, despite requests, were never locally deployed due to bureaucratic red tape.[66]

According to Carwile, "[i]n any operation, particularly in a chaotic environment, there needs to be a balance between 'going outside the system' and following a plan and a procedure."[67] Carwile suggested "there needs to be a well-disciplined, systematic approach based on a solid plan that is sufficiently flexible for a variety of situations. Experienced personnel know where the pitfalls are and can make decisions where flexibility is required. Doctrine, policies, training, and exercises should be developed that meet the needs of a trained and ready workforce."[68]



FEMA

Even Brown experienced bureaucratic frustrations. Rather than have FEMA's food provision efforts oriented almost exclusively toward securing MREs, Brown sought to devise an arrangement in which distributors or retailers would deliver meals or groceries, like those that would ordinarily be conveyed to typical commercial outlets, directly to shelters. Brown testified he came to believe

> we were too focused on meals ready to eat. The issue was food, not the MREs. So we came up with what we thought was this brilliant idea that we would utilize Wal-Mart or some grocery

distribution system because they are accustomed to going to these 7-Elevens, [and other] convenience stores, to replenish them all the time . . . . [69]

Brown said FEMA started "trying to do a contract to do that very thing [but] ran into a bureaucratic wall [so much that] I finally had to scream at some people on the phone, [']just make it happen, I don't care, just do the contract and make it happen.[']"[70]

According to Carwile, over the past four years, there has been no operational doctrine developed by FEMA. He said, as a consequence

> [t]here is no clear understanding of the responsibilities of each level (Washington, the Regions, and deployed Emergency Response Teams) and how they are to interact. This lack of operational doctrine results in unacceptable levels of overlap, double and triple ordering of resources, and long video teleconferences and conference calls [which can] disrupt field operations."[71]

Carwile believes "well-understood and defined operational methodologies based on doctrine would minimize the need for lengthy conferences and would achieve other efficiencies."[72]

Alabama officials said FEMA officials lacked management skills.[73] Nobody with FEMA seemed to know what assets existed and how to marshal them, they said. FEMA does not have a robust lessons learned/after action program to assist in the refining and reorganizing of processes. Instead, FEMA seemed to move from one emergency to the next without incorporating any formal reviews.

Alabama officials recommended FEMA adapt its training requirements to allow states to use monies targeted for state training exercises for after-action reviews of actual emergency-related operations.[74] One official echoed the thoughts of many AEMA personnel when he said the state was better prepared for Katrina by virtue of its experiences with previous hurricanes within the last year, notably Dennis (July 2005) and Ivan (September 2004).[75]

Carwile suggested the logistics supply system was overly centralized and recommended allowing the state to contract with private entities to provide logistical support and commodities distribution services, with the federal share of costs reimbursed by FEMA.[76]

Select Committee Members stated and Brown agreed FEMA should develop a formal planning and logistics process similar to that developed by the Department of Defense (DOD).[77] Some officials have suggested the DOD simply assume a larger role in logistics, or even take control outright.[78] Although recognizing the value of DOD assistance, Brown indicated DOD involvement would not be appropriate for smaller events. "I think that the Army can help FEMA in that regard," Brown said. "I would rather see it remain within FEMA because logistics is something that you need in every disaster, the smallest one that FEMA might be involved in to the largest; and I don't want to see us utilize the military in all of those."[79]

However, According to Carwile

[t]he factors contributing to the slow delivery of commodities should be examined and addressed for future disasters. Possible solutions [include] much better planning between State and Federal emergency management logisticians and operations personnel, the assistance and advice of DOD strategic logistics planners, and much more robust private sector partnerships, e.g., the US Army LOGCAP or USAF AFCAP programs. It is also possible for states to enter into their own contractual agreements with the private sector for procurement and delivery of response commodities. The federal share is reimbursable by FEMA and Florida routinely enters into such agreements.[80]

Rep. Bill Shuster pointed out the private sector provides the best relief model and, while government agencies such as the DOD are excellent with logistics, "[s]ome of our private companies . . . are even better and our military learns from [these companies because they] know exactly what's in a truck. They know exactly where it's moving."[81]

For their part, private sector firms expressed the need for a get-it-done-and-ask-questions-later mentality. The director of Business Continuity Global Security for Wal-Mart said "[f]lexibility in our plans, flexibility in our structure, and flexibility of our Associates is paramount to success."[82] Southern Company's plans provide "for flexible and decentralized authority to make decisions as close as possible to the disaster."[83] They demonstrated creativity in helping restore fuel service to Chevron pumps, in helping expand their communications system

to assist other companies, and in the way they used their "family services plan" to provide emergency services to employees.[84]

Starwood hotels worked to engineer a way to pump water into the hotels, knowing the city's water system wouldn't be up and running for some time.[85] They also contracted at the last minute for security to protect their hotels from looting. IBM provided services to governmental and non-governmental organizations as needed on the ground.[86] These services ranged from temporary housing to websites and missing persons registries including the CNN Safe List, which it hosted.[87]

## FEMA's Information Technology Systems are unable to support large-scale logistical challenges

The technology used to manage FEMA's logistics system may be partly to blame. FEMA's Logistics Information Management System III (LIMS III) is used to manage the agency's inventory of equipment and supplies.[88] A recent DHS OIG report found FEMA's computers were overwhelmed during the 2004 hurricane season, which hindered disaster-recovery efforts, delayed emergency supply shipments, and put emergency-response personnel at risk.[89] The report found during August and September 2004, when four hurricanes struck Florida, the IT system could not track essential commodities such as ice, water, and tents.[90]

According to the report, LIMS III is not integrated with other FEMA IT systems such as the database used to identify and deploy personnel to disaster sites.[91] Nor can it share information across federal, state, and local agencies. LIMS III was designed, however, to track "accountable property" such as bar-coded cellular phones and pagers, not "bulk commodities."[92] Although LIMS III contains information on the quantity and location of emergency supplies, it does not indicate when they will be shipped or when they should arrive.[93] In Florida, emergency personnel tracked items on spreadsheets and spent hours calling trucking companies to determine the status of goods in transit.[94]

Brown received this DHS report several weeks before Hurricane Katrina, but he and FEMA Chief Information Officer Barry West rejected the OIG's findings, calling the report's characterizations "inaccurate."[95] According to a FEMA spokesperson, "[FEMA's] [l]ogistics-support systems

have presented us with some concerns over the past 18 months, and we are addressing this."[96]

During Katrina relief efforts, FEMA tested a system using global-positioning technology to track trucks transporting commodities.[97] FEMA also is installing an intranet-based electronic document system to replace paper documents and improve data sharing among agency officials via an intranet.

The DHS Emergency Preparedness and Response Directorate, which FEMA was part of, established an enterprise architecture office in 2003 and hired a chief enterprise architect in 2004 to develop a system to tie in the directorate's system with the rest of DHS.[98] Of the Katrina federal aid package, $4.6 billion is designated for FEMA logistics, search and rescue, and emergency supplies.[99]

## Private sector fills void

Several tractor-trailers were strategically located throughout the region by various officials and organizations to collect local contributions, which were then sent to a warehouse for collection and distribution.[100] When the first of 14 packed trailer loads arrived, volunteers unloaded the first two and quickly realized much more assistance was needed to efficiently process the donations and prepare them for distribution.[101] A clear plan for the organized collection, sorting, storing and distributing of such a large volume of goods was not in place, however.



Local officials turned to the private sector. "Once we started seeing that we were going to have this enormous influx of material, we knew that there was no one better in the world for distribution and collection than Wal-Mart Corporation. So we made some calls. And they immediately sent down some folks. And they showed us how to arrange a warehouse and they made it spin like a top," according to the Mayor of Fayetteville, Arkansas, Dan Coody.[102]

Several companies had existing disaster plans which eased the challenges they faced. Southern Company has a separate plan for each category of hurricane, and each year they conduct a major disaster simulation.[103] Before the storm hit, Southern Company had already pre-positioned trailers, caterers, laundry facilities, and 11,000 people for their response. Starwood developed a crisis management plan which "structures preparedness and response at the Corporate, Division, and Hotel levels" and defines responsibilities for each level of employee.[104] Wal-Mart keeps an Emergency Operating Center up and running 24 hours a day, every day of the year.[105] As one IBM executive noted "[a]dvanced planning of people, tools, and technology . . . is vital and important."[106] IBM had its Crisis Response Team on the ground four days in advance of Katrina, which worked with FEMA, the states, and private entities, providing a list of the services they could provide.

## Ad Hoc response

In Fayetteville, Arkansas, individuals who had traveled there to stay with family or friends began to stop by the distribution center "in search of financial aid, food, clothes and other assistance," recalled Coody.[107] Officials had not anticipated receiving evacuees at the distribution center and were not sure how to respond. They had heard stories of survivors being bounced from place to place or from town to town, so they took it upon themselves to find answers, information, and assistance for everyone who needed it.

Officials and volunteers pulled boxes off pallets and made food and clothes available to these displaced individuals.[108] They moved all relief agencies into the distribution center offices to make a one-stop location where evacuees could get various types of assistance and support, and set up a "store" where people could shop for what they needed, free of charge.[109]

In addition, relief supplies were shipped from the Fayetteville distribution facility to the Salvation Army staging warehouse in Corsicana, Texas.[110] It was eventually

destined to aid the stricken areas of Louisiana and Mississippi. Many of these shipments were sponsored by local businesses and churches and were arranged by making direct contact with community members in the affected areas. Fayetteville officials also learned many rural areas were not receiving adequate support and were still in desperate need of various items that were in stock. This spurred officials to focus their large-scale distribution efforts on rural Louisiana.



FEMA

Coody testified while Fayetteville had food, water, wheelchairs, baby supplies and many other items on pallets and ready to go, communicating and coordinating the movement of supplies to these areas was a challenge.[111] He said the distribution center had not received "any communications from the State or Federal level about the needs in these areas."[112]

Although Fayetteville officials wanted to send goods where they were needed, arranging transportation also proved to be a problem. Nonetheless, Coody recounted some success in arranging deliveries including that they

asked J.B. Hunt and other trucking firms, ['c]an you please donate your time and some drivers to load up this trailer that we have . . . ready to go and take it to a particular town in Louisiana?[']" And they said, [']sure['], . . . .[113]

In another instance, Bogalusa, Mississippi had requested water and baby food from Fayetteville. Coincidentally, a truck arrived from Kansas City, and the driver announced, "I have got a load of baby food and water and I am [being] told to get off the road because I am overloaded."[114] The mayor said

[as soon as] we saw what we had, we gave him a map and we said, ['t]his is where you need to go,['] and we sent [the items] on their way. As they pulled into Bogalusa and off-loaded food [—] baby food, adult food [—] and everything else, people started opening packages and eating food directly off the truck because they had not had any food in three days.[115]

Coody reported the realization that Fayetteville had the necessary supplies in stock previously but had "no knowledge" or "no real infrastructure to get it there" was disturbing, and "it broke our hearts."[116]

## Finding: The failure at all levels to enter into advance contracts led to chaos and the potential for waste and fraud as acquisitions were made in haste

Concerns have been raised with respect to how FEMA awarded its contracts in the immediate aftermath of Hurricane Katrina and regarding the contract vehicles it had in place before landfall.[117] In the weeks following Katrina, more than 80 percent of FEMA's $1.5 billion in contracts were awarded on a sole-source basis or pursuant to limited competition.[118] Many of the contracts awarded were incomplete and included open-ended or vague terms. In addition, numerous news reports have questioned the terms of disaster relief agreements made in such haste. Questions have also been raised about USACE's awarding of contracts with limited competition for debris removal and clean up.[119]

In the face of the massive destruction caused by Katrina, acquisition personnel acted to meet pressing humanitarian needs, contacting firms in an effort to provide immediate relief to survivors and to protect life and property. Many of these firms were called into action on a sole-source basis under acquisition provisions that allow the government to acquire urgently needed goods and services in emergency situations. These firms provided emergency housing and shelter for victims and emergency personnel, to start debris cleanup, and to secure property from further damage.



AP PHOTO/CHRISTOPHER MORRIS/VII

The Shaw Group Inc., Bechtel National Inc., CH2M Hill, and Dewberry Technologies were engaged by FEMA to provide emergency housing and shelter for victims, to start the cleanup of hazardous waste, and begin restoration of the transportation infrastructure. Before Katrina struck, however, FEMA had only one contract in place relevant to the Katrina response for temporary housing. Immediately after the disaster, USACE competitively awarded contracts for debris removal to ACI/AshBritt, Inc., Environmental Chemical Corp., Central Environmental Services, and Phillips & Jordan, Inc. through an emergency competition, which resulted in the submission of 22 proposals.[120]

FEMA executed few, if any, written contracts during what officials called "the real nightmare emergency" (Aug. 29-Sept. 15).[121] The circumstances surrounding their contract awards made it difficult for FEMA to understand fully the contract specifics. FEMA simply instructed companies to begin work and submit vouchers for payment. FEMA used this method for the acquisition of food, ice, buses, and other supplies. This could raise issues of enforceability, which will need to be resolved when written contracts are issued.

FEMA's contracting practices were described by state and local officials as "problematic."[122] Louisiana officials cited lack of FEMA oversight and management in the awarding of contracts. Further, state officials suggested there were no performance-based standards under the contracts and suggested under "time and materials" contracts, the longer the contractor takes to perform the necessary service, the more money the firm stands to make.

Rep. Jefferson also conveyed complaints from Louisiana officials about FEMA's failure to contract out the mortuary and body recovery effort.[123] This was a particularly sensitive issue because New Orleans Mayor Ray Nagin was predicting thousands of casualties.[124] State officials reported FEMA implemented a contract with Kenyon International in the immediate aftermath of the hurricane. According to officials, Kenyon was not given the support it needed from FEMA to meet its objectives and ended up pulling out of the contract. Ultimately, Louisiana contracted with Kenyon directly.[125]

When asked whether FEMA had contracts in place for disaster-related supplies, including tarps, ice, generators, and temporary shelters, Brown equivocated, stating they had some contracts in place for provision of MREs, water, ice, temporary housing, and some of the trailers. In other cases, however, FEMA had to "start buying off the street to meet the demand."[126]

By the end of September, it was reported that 80 percent of the contracts — and half of the $3.2 billion spent — had been awarded without full and open competition.[127] The agency awarded 60 percent of its contracts without full competition in October 2005, 68 percent in November 2005, and 50 percent in the first half of December.[128]

The Select Committee heard testimony from representative companies that contracted with FEMA and USACE to provide immediate response and recovery requirements to the federal government. Carnival Cruise Lines provided temporary housing; The Shaw Group provided, among other services, "blue roof" emergency tarps to cover storm-damaged homes; Landstar System provided transportation support, including trucks for supplies and busses for evacuees; AshBritt provided debris removal services; Innotech provided emergency packaged meals.[129]

## Typical contracting issues

The experiences of The Shaw Group are typical of the issues raised by contractors in the aftermath of Katrina. The company is a $3+ billion company with 20,000 employees worldwide. According to company officials, Shaw performed $800 million in federal work last year, and contracts for Hurricane Katrina and Rita relief have been the firm's biggest undertaking.[130] Shaw was originally awarded two separate $100 million contracts: the first by the USACE and the second by FEMA. Shaw

is participating in competitive procurements for FEMA requirements which, originally, were awarded on a sole-source basis. USACE contracts (including blue roof and rapid response contracts) were awarded on a non-competitive basis.[131] Overall, most of Shaw's business comes from USACE ($300 million), followed by DOD, DOE, and the EPA.

The Friday before the storm, the Shaw Group was asked by another firm to conduct damage assessments and inspections.[132] They were also contacted by FEMA and the USACE to begin work. They established a command center in Baton Rouge run by a retired general who served as the point of contact for all requests. FEMA placed a contract specialist within Shaw's operations to help with compliance and other issues. Officials were unsure if other companies were offered FEMA assistance as well but said they offered to provide Shaw personnel at FEMA.



FEMA

According to company officials, Shaw's existing blue roof contract uses the highest number of workers from the impacted areas of any firm project.[133] Last year, Shaw took Louisiana contractors to Florida, which made preparations and response for this event easier. Their rapid response contract has expanded over the years and was activated by the USACE. Shaw was not successful in a bid for a debris removal contract.

Shaw officials raised several concerns, which were typical of the issues raised by several contracting firms:[134]

■ *Liability*—Shaw officials expressed concern that the federal government might hold them liable for environmental issues arising from pumping contaminated water out of the city.

■ *Changing Requirements*—FEMA tasked Shaw with securing temporary housing, which the company began doing, before FEMA officials changed their minds. Although they did not lose money, the company did lose time and goodwill.

■ *Contract Signing and Follow-through*—Shaw officials had problems getting contracts signed by the appropriate agency officials. Although all the contracts have since been signed, payments from FEMA remain slow. Because Shaw's subcontractors are generally small businesses with tight cash flow, they cannot wait long for payment. Shaw also had to turn down certain projects because it had no indication from FEMA that it would be paid. The Stafford Act requires that the federal government give preference, if practicable, to local businesses.[135] However, this was largely not done and, according to Shaw officials, some local companies have since gone out of business. For example, debris removal contracts were given to Minnesota, California, and Florida firms.

■ *Conflicts of Interest*—Shaw officials continue to struggle with the propriety of working for FEMA and for the parishes. Officials indicated complications could arise if FEMA hires them to asses a situation, and then a parish hires them for rebuilding using FEMA money.

■ *Bonding*—Shaw officials did not know what the bonding requirements were for Katrina recovery work. However, they noted few small subcontractors are bonded to levels necessary to enable them to perform major contracts.

## Oversight and proposed reforms to address outstanding issues

Although some emergency awards were made on a sole-source basis, they do not constitute the majority of those awarded in support of the relief efforts. Nevertheless, FEMA recognized the need to revisit non-competitive contracts issued quickly immediately after the storm.[136]

Shortly after emergency needs arose, DHS's Chief Procurement Officer (CPO) requested the OIG to begin overseeing FEMA's acquisition process.[137] The DHS-IG assigned 60 auditors, investigators, and inspectors

and hired additional oversight personnel. DHS-IG staff reviewed the award and administration of all major contracts, including those awarded in the initial efforts, and the implementation of the expanded use of government purchase cards.[138] The staff are continuing to monitor all contracting activities as the government develops its requirements and as the selection and award process unfolds. In addition, 13 different agency OIGs have committed hundreds of professionals to the combined oversight effort, with a significant part of the oversight provided by DOD, the various service audit agencies, and criminal investigative organizations.[139]

To ensure that any payments made to contractors are proper and reasonable, FEMA has engaged the Defense Contract Audit Agency (DCAA) to help it monitor and oversee payments made and has pledged not to pay on any vouchers until each one is first audited and cleared.[140] In addition, DHS's CPO met with each of the large Katrina contractors to impress upon them the need to ensure all charges are contractually allowable, fair, and reasonable. Finally, the GAO has sent a team to the Gulf coast area to provide an overall accounting of funds across the government and evaluate what worked well and what went wrong at the federal, state and local levels.

FEMA has indicated it will revisit non-competitive arrangements made immediately after the storm.[141] In addition, on September 16, FEMA instituted its Phase II plan. Under this arrangement, competitive procurements for relief efforts will be reconstituted and revitalized.[142] DHS officials indicated FEMA would formalize the original emergency agreements to establish clearly the terms and prices and then review all the requirements and decide whether any particular contract needs to be completed in the short term. If there is a continuing need for the requirement, the initial contract will be left in place only long enough for a competition to be held. The competitively awarded contracts will then replace the original arrangement. FEMA officials plan to ensure as much of the work as possible goes to local small firms.[143]

Procurement officials acknowledged the initial contracting response was poor, with little planning and inadequate resources.[144] However, these same officials stated the procurement system had sufficient flexibility to meet the challenge posed by Katrina.

## Finding: Before Katrina, FEMA suffered from a lack of sufficiently trained procurement professionals. DHS procurement continues to be decentralized and lacking a uniform approach, and its procurement office was understaffed given the volume and dollar value of work

FEMA's grossly understaffed acquisition unit was not ready for the Katrina disaster.[145] FEMA had 55 acquisition slots, and procurement officials think it should have had a minimum of 172.[146] Further, only 36 of the 55 slots were actually occupied. FEMA is one of the DHS agencies that are not under the control of the DHS chief procurement officer, thus the FEMA acquisition office reported to Michael Brown. As of the time of the interview, FEMA was relying upon staff from the central acquisition office, comprised of 60 acquisition personnel and led by a member of the Senior Executive Service. Regardless, the office was understaffed.[147]

Prior to Hurricane Katrina, the OIG had repeatedly cited as a major challenge the lack of consistent contract management for large, complex, high-cost procurement programs.[148] DHS procurement continues to be decentralized and lacking a uniform approach.[149] DHS has seven legacy procurement offices that continue to serve DHS components, including FEMA.[150] Notably, FEMA has not been reporting or tracking procurements undertaken by its disaster field offices, and its procurement office remains understaffed given the volume and dollar value of work. The CPO recently had established an eighth office called the Office of Procurement Operations to meet the procurement needs of the rest of DHS.[151]

*FEMA had 55 acquisition slots, and procurement officials think it should have had a minimum of 172. Further, only 36 of the 55 slots were actually occupied.*

Louisiana officials also noted a shift during the Katrina recovery of the personnel FEMA placed in charge of contracting and logistical decisions.[152] Instead of relying on FEMA's regional personnel, with whom the state is accustomed to working in the aftermath of a disaster, FEMA sent headquarters officials to the affected areas to make key contracting and logistical decisions, causing the process to become more bureaucratic. For example, adding individuals to FEMA's Individual Assistance Program has been problematic, according to local officials.[153]

In the past, the FCO from Region VI was able to add individuals in the field. With Katrina, however, state officials had to send the request to FEMA headquarters, which has become, some say, "gridlocked."[154] Further, as previously mentioned, Louisiana state and local officials also criticized FEMA contracting.[155] They said the focus seems to be shifting from the local FCO to FEMA headquarters and becoming more bureaucratic in the process.

## Finding: Ambiguous statutory guidance regarding local contractor participation led to ongoing disputes over procuring debris removal and other services[156]

Under the Stafford Act,[157] federal contracts with private firms for debris clearance, distribution of supplies, reconstruction, and other activities must give preference, to the extent feasible and practicable, to organizations, firms, and individuals from the area affected by the disaster or emergency.[158] However, there is no statutory guarantee that, after a major disaster or emergency, recovery and reconstruction work will be awarded to businesses, organizations, and individuals, regardless of where they are from.

The award of federal contracts for disaster or emergency assistance activities are, in general, governed by the standard competitive bidding statutes that apply to all government contracting activities. The Stafford Act, however, contains a "local preference" provision, which can be implemented by the inclusion in a solicitation of a clause creating a price preference for local firms or by a set-aside that only permits local firm to compete.[159] The implementation is at the discretion of the contracting officer. Significantly, the Stafford Act local preference is not a guarantee that local firms will be awarded recovery contracts.[160]

Similarly, prime contractors are often required to give preference to local subcontractors.[161] USACE Acting Principal Assistant Responsible for Contracting, Colonel Norbert Doyle, suggested there is some uncertainty as to the geographical preferences allowed and required by the Stafford Act.[162] Another official testified that different laws are necessary,[163] and stated "[the Stafford Act is] like bringing a donkey to the Kentucky Derby."[164]

Numerous public officials have complained about the small number of local firms given relief contracts, particularly with regard to debris removal. AshBritt, the Florida-based prime contractor for debris removal in Mississippi, was awarded a contract in early September by USACE.[165] According to AshBritt official Randy Perkins, the company was one of 22 firms that bid for USACE debris removal contracts. AshBritt won the Louisiana and Mississippi debris removal contracts, making the firm the only contractor for that job in those states. AshBritt was notified of the award 72 hours after the RFP was advertised.

The debris removal contracts have a $150 million ceiling at $30 million per year, and were intended by USACE to get work underway as soon as possible, with the agency reassessing the requests later.[166] USACE's delay in issuing RFPs was understandable given the disaster, according to Perkins.[167] He stated, it costs "hundreds of thousands of dollars to keep pre-existing contracts in



FEMA

place, and firms receive no funding for this upkeep, which represents a free insurance policy for USACE," and few companies can secure the bond necessary to perform such a large-scale project.[168]

AshBritt official Perkins says he encountered political "fallout" from local officials because the company is not based in Mississippi or Louisiana.[169] The Select Committee was not able to substantiate his allegation, however. Perkins also discussed recieving mixed messages from local officials and "officials in D.C." While state officials told him "just get the debris out," he indicated officials in D.C. sent the message to "hire local workers." Although the company's contract with the government does not require it to hire local workers, Perkins says local contractors recieve 80 percent of AshBritt's payments to sub-contractors.[170] Although this percentage seems to differ from data provided in USACE progress reports, the Select Committee was not able to substantiate the actual level of debris removal work provided by the local sub-contracting community.

Brown suggested the scale of the disaster and the complexity of the response require a large firm's expertise:

> Debris is a huge issue. Debris is one of those issues that is fraught with local politics. It's fraught with fraud, waste and abuse [and] in cleaning up debris in a situation like Katrina, you really have to have experts overseeing that global perspective because you have hazardous waste. You have the whole issue of private property versus public property . . . . So I would caution us about going down a path that says we're going to have all locals do it. I know, in my subdivision, the local garbage folks are very adept at picking up my trash twice a week, and they're pretty good about hauling out debris after a storm or something. But in the kind of debris removal we're talking about in Mississippi, Alabama and Florida from last year and this year, you really need to have a substantial company overseeing that, to not only protect the taxpayers, but to make sure it's done right.[171]

Later Brown said, "in a small town that's hit by a tornado and you have to clean up 45 blocks, city blocks, that's one thing. Here, where you're cleaning up entire cities, it's a different issue. So I would just caution that we approach that systematically."[172]

Even if this point is conceded, it appears that, despite the Stafford Act's preference provision, only a fraction of the money being spent in Mississippi is going to subcontractors based there, according to press reports citing documents from FEMA and USACE: [173]

- Of approximately $3.1 billion FEMA had awarded by Nov. 4, only $52.4 million, or about 1.7 percent, had gone to Mississippi firms.

- Of the $476 million that has been spent by the Corps of Engineers in Mississippi as of Nov. 2, about 28.5 percent has gone to Mississippi companies through direct contracts and subcontracts.

- Of the $164 million AshBritt has been paid so far by the Corps, only about $30 million, about 18 percent, has made it to Mississippi subcontractors.

However, Perkins said AshBritt has far exceeded its contractual requirements for hiring local, small, and minority-owned businesses.[174] "People don't understand that the general administrative costs are very high. It takes a lot to manage one of these projects," according to Perkins. "We have a tremendous amount of quality control people and logistical support and we need to pay for their housing."[175] He said the data released by USACE do not reflect the involvement of Mississippi businesses because there are several major contractors from the state that he called "team members," who are helping the company administer the overall contract. He said AshBritt also has provided "hundreds" of administrative jobs to Mississippians.

## Use of local firms

Some have suggested FEMA's policies need to be changed to have local contractors in Gulf states ready to begin recovery work well before hurricane season.[176] For instance, instead of hiring the USACE to manage debris removal, states susceptible to hurricanes could prepare lists of businesses who meet federal standards to remove debris or haul trailers, thereby enabling local governments to award their own contracts. Local governments are more likely to go with local contractors and local governments have been able to get the job done more quickly and cheaply.[177]

As of December 2005, of the nearly $8 billion expended by all direct contracts with the federal government, only five cents of every dollar reached Mississippi prime contractors.[178] Expenditure rates show DHS (including FEMA) has spent $4,150,359,361, with 3.5 cents for every dollar contracted directly to Mississippi businesses. A January 23, 2006 USACE report reported USACE awarded over $2.3 billion in Katrina contracts with 3.54 percent of total contract dollars going to Mississippi businesses.

Rep. Pickering noted

> Congress wrote the Stafford Act to maximize the impact of federal dollars by giving preference to local contractors, strengthening the damaged economy and providing jobs to communities and victims of the disaster. . . . Mississippians have the ability, capacity and personal incentive to do this work. We want to rebuild and restore our home state, and these federal contracts will help our economy more through local contractors than sending the money to out-of-state corporations.[179]

Current federal policy discourages local governments from assuming responsibility for debris removal.[180] Local officials are responsible for a cost share of 10 to 25 percent (depending on the magnitude of the disaster) if they use their own contracts. However, if USACE contractors are used, the reimbursement for the life of the debris removal effort is 100 percent with no cost share. Communities removing their own debris have been notified they will incur a 10 percent cost share beginning March 16, 2006.[181]

Additionally, the specter of a federal audit can be very intimidating for local officials, especially for rural communities and those that have incurred major damage. Risk can be avoided by simply signing on with USACE, even if it is more costly and offers less control. For example, USACE is removing debris in Waveland, Mississippi and other locations at a reported cost of approximately $23 per cubic yard.[182] Nearby Gulfport hired its own contractor at $14.95 per cubic yard[183] and appears to be making faster progress.[184] Gulfport's action is particularly bold given their significant loss of ad valorem tax base. Finally, the $8.05 per cubic yard margin is particularly substantial given the 40 million cubic yard debris removal requirement in Mississippi alone.

Ambiguities regarding the implementation of local contractor preference under the Stafford Act should be resolved. In addition, clear, unambiguous remedies and penalties for failure to meet such statutorily mandated preferences may need to be considered.

## FEMA response to local participation issue

In response to these concerns, FEMA plans a two-pronged approach.[185] First, FEMA will competitively award multiple five-year technical assistance contracts to small disadvantaged businesses for recovery work in the Gulf states, with evaluation preferences keyed to the location of both the prime contractor and subcontractors in the affected areas. Second, FEMA plans a full and open competition for multiple five-year contracts to provide technical assistance support on a national basis for disaster response and recovery. Under this competition, FEMA will require that these prime contractors meet significant small business subcontracting goals, including the preference for local businesses as provided under the Stafford Act.

Through this strategy, FEMA hopes to provide a diverse group of companies the opportunity to contract with FEMA for the Gulf coast hurricane recovery by adding prime contracting opportunities for small disadvantaged businesses with a geographic preference for those located in the Gulf states.[186] The national competition approach is intended to preserve subcontracting goals and opportunities for small and disadvantaged businesses as part of all prime contracts for future disasters. Both strategies will emphasize the importance of using local businesses, a critical piece of a successful economic recovery in a disaster-ravaged area. Select Committee staff did not receive detailed information on what efforts, if any, USACE is planning for its long-term Katrina-related acquisitions.

In addition, DHS representative Larry Orluskie said FEMA is changing some of its policies.[187] Recently, FEMA announced it will set aside $1.5 billion under 15 contracts worth up to $100 million apiece.[188] Acting FEMA Director David Paulison stated that priority would be given to local contractors on the five-year contracts for trailer maintenance.[189] Orluskie also cited the rebidding of several large, prime contracts as evidence that the agency is trying to be as transparent as possible in its contracting

process.[190] Regarding the $100 million contracts held by Bechtel, Fluor, Shaw, and CH2M Hill, agency officials said the requests have been completed and will be awarded again in February 2006.[191]

Nevertheless, Carwile testified "[t]he Public Assistance program provided under Section 406 of the Stafford Act is far too cumbersome and time consuming in terms of getting funds through the states down to the impacted communities" and "could be totally revamped . . . ." He said "[t]he program is one of the most difficult and contentious aspects of disaster recovery," and "the entire issue of Federal reimbursement for debris removal should be addressed in a comprehensive manner."[192]

## Finding: Attracting emergency contractors and corporate support could prove challenging given the scrutiny that companies have endured

When federal agency resources were overwhelmed and existing contractors unable to meet the huge demands created by the storm, federal officials turned to the private sector for assistance. In an effort to meet pressing needs by any means possible, federal officials looked to alternative sources for food, transportation, and housing. Many of the firms approached by agency officials had never contracted previously with the federal government. Housing was one resource in short supply. Officials considered a variety of options to shelter victims and first responders, and approached a number of cruise ship operators.

According to Carnival Cruise Lines representatives, on Wednesday, August 24, federal officials contacted the company regarding chartering ships.[193] Carnival found this

unusual given that the firm had never served as a federal contractor. "[W]e were watching just the total devastation, and we felt very strongly that it was a situation where we were in a position to help, and we very much wanted to help," stated Terry Thorton, a Carnival Vice President.[194]

The Military Sealift Command informed Carnival the RFP was being issued. Carnival indicated it wanted to "help" and responded to the RFP.[195] Thirteen ships were potentially available from Carnival and others. Four ships ultimately met the RFP requirements (which included a requirement for medical and pharmaceutical facilities), three belonging to Carnival. Carnival received the RFP at 9 a.m. Friday, and the initial response was due two hours later at 11 a.m. Carnival offered three ships, and negotiated all day with "best and final" offers provided at 9 p.m.

Carnival based its bid on projected cruise revenue for six months out, and agreed it would reduce the final bill and provide a refund if, after an internal audit by an independent accounting firm, it was found Carnival earned more than it would have in the cruise market.[196] To make the ships available, Carnival canceled approximately 100,000 existing reservations for which travel agent fees still had to be paid. Carnival makes its profit from ticket sales and "add-ons" (drinks, shore excursions, etc.) and not in the "time charter" business, which is a comprehensive package of food, beverages, and activities. In addition, it incorporated taxes into its offer,



which will be refunded if it is determined it does not owe taxes under U.S. law.[197]

Despite these provisions, numerous public officials and press reports have criticized the arrangement. Attention focused on the ships when FEMA revealed it intended to use them to house first responders. At the time, housing for first responders was in short supply, and FEMA sought out a variety of options. "I'm not sure that everyone on this panel would have made the same choice that FEMA made, but this was FEMA's choice as to how they wanted to house people . . . . And you've simply said, [']if you want us to do this, here's what the circumstances are,['] and FEMA said, [']that's okay with us,['] and we accept that," stated Rep. Jefferson.[198] When appreciation was expressed by Select Committee Members for Carnival's assistance, Carnival officials replied, "[t]hank you. Because honestly, that's one of the few times that we've really been thanked for the effort . . . ."[199]

The intense public scrutiny could limit the willingness of private sector companies to offer assistance during future disasters. Several firms expressed the view that the challenges associated with emergency contracting may not be worth the trouble. Finally, unfounded negative publicity harms company reputations. Public sector missions divert company assets from primary missions and could raise questions about whether a company was meeting its fiduciary duty to shareholders. Given the important role the private sector played in all aspects of the response and recovery, any loss of private sector involvement could be critical. ■

1   *Hearing on Recovering from Hurricane Katrina: Responding to the Immediate Needs of Its Victims Before Senate Comm. on Homeland Security and Gov't Affairs*, 109th Cong. (Sept. 28, 2005) at 58 (statement of Melvin Holden) [hereinafter *Sept. 28, 2005 Senate Comm. Hearing*].

2   Dep't of Homeland Sec., *Major Mgm't Challenges Facing the Dep't of Homeland Sec.*, Rpt. of the Inspector Gen., DHS FY 2005 Performance and Accountability Rpt. (Dec. 2005) at 110, *available at*, http://www.dhs.gov/interweb/assetlibrary/OIG_06-14_Dec05.pdf (last visited Jan. 28, 2006) [hereinafter *DHS IG Rpt.*].

3   *DHS IG Rpt.* at 111.

4   Amy Belasco, Cong. Research Service (CRS), *Reallocation of Hurricane Katrina Emer. Approps.: Defense and Other Issues* (Dec. 15, 2005) at CRS-3 [hereinafter *CRS Approps Rpt.*].

5   *Id.* at CRS-3-CRS-4.

6   Frank Donze, *Nagin decries slow pace of relief*, TIMES-PIC. (New Orleans, LA) Oct. 21, 2005 at 1.

7   James Varney, *Want answers?  Don't ask FEMA*, TIMES-PIC. (New Orleans, LA) Oct. 22, 2005 at 1.

8   *Hearing on Hurricane Katrina: The Role of the Fed. Emer. Mgm't Agency Before Select Comm.*, 109th Cong. (Sept. 27, 2005) at 100 (statement of Michael Brown, former Undersecretary of Emergency Preparedness and Response) [hereinafter *Sept. 27, 2005 Select Comm. Hearing*].

9   Tom Gardner, *Former FEMA director shoulders greater share of blame for Katrina failures*, ASSOC. PRESS, Jan. 19, 2006.

10   *Sept. 28, 2005 Senate Comm. Hearing* at 82 (statement of Sen. Mark Pryor).

11   *Sept. 27, 2005 Select Comm. Hearing* at 65 (statement of Michael Brown).  Note, each trailer contained 18,000 meals.

12   *Id.* at 150 (statement of Rep. Chip Pickering).

13   *Id.* at 65 (statement of Rep. Gene Taylor).

14   *Id.* at 66 (statement of Michael Brown).

15   Interview by Select Comm. Staff with Robert Latham, Director, Mississippi Emergency Management Agency, in Jackson, MS (Oct. 14, 2005) [hereinafter Latham Interview].

16   *Id.*

17   *Hearing on Hurricane Katrina: Perspectives of FEMA's Operations Professionals Before Senate Comm. on Homeland Security and Gov't Affairs*, 109th Cong. (Dec. 8, 2005) at 6 (written statement of William L. Carwile) [hereinafter *Dec. 8, 2005 Senate Hearing*].

18   *Id.*

19   *Id.*

20   *Id.*

21   Interview by Select Comm. Staff with Bruce Baughman, Director, Alabama Emergency Management Agency, in Clancy, AL (Oct. 11, 2005) [hereinafter Baughman Interview].

22   Interview by Select Comm. Staff with Tim Payne, Branch Chief and Emergency Management Program Coordinator, Alabama, in Clanton, AL (Oct. 11, 2005) [hereinafter Payne Interview].

23   Baughman Interview.

24   *Id.*

25   *Id.*

26   Payne Interview.  These items included transportation, water, ice, materials handling equipment, cots plus bedding supplies, sandbags, meals, fuel, tarps, project management and logistics services, special needs beds, headquarters / office coordination capabilities.

27   *Sept. 27, 2005 Select Comm. Hearing* at 73 (statement of Michael Brown).

28   Frank Davies, *Gov. Bush: Keep Disaster Response Local*, HERALD (Miami), Oct. 20, 2005, at A-26 [hereinafter *Herald Article*].

29   *Id.*

30   Briefing for Select Comm. Staff by Gary Moore, Director of Logistics, FEMA (Jan. 9, 2006).

31   *See* Interview by Select Comm. Staff with Scott Wells, Deputy  FEMA Federal Coordinating Officer, in Baton Rouge, LA (Nov. 9, 2005), [hereinafter Wells Interview]; *see also* Interview by Select Comm. Staff with Tony Robinson, FEMA Operations Officer, in Baton Rouge, LA (Nov. 10, 2005) [hereinafter Robinson Interview].

32   Interview by Select Comm. Staff with Matt Farlow, Chief Information Technology Division (LOHSEP), in Baton Rouge, LA (Nov. 4, 2005) [hereinafter Farlow Interview].

33   *Id.*

34   *Id.*

35   *Id.*

36   *See* Interview by Select Comm. Staff with LTC William Doran, Chief, Operations Division, Louisiana Office of Homeland Security and Emergency Preparedness (LOHSEP), in Baton Rouge, LA (Nov. 7, 2005) [hereinafter Doran Interview]; *see also* Interview by Select Comm. Staff with Jim Ballou, Operations Division, Louisiana Office of Homeland Security and Emergency Preparedness (LOHSEP), in Baton Rouge, LA (Nov. 7, 2005) [hereinafter Ballou Interview].

37   *See* Doran Interview; *see also* Ballou Interview.

38   *See* Wells Interview; *see also* Robinson Interview.

39   Robinson Interview.

40   *Id.*

41   *Id.*

42   *Id.*

43   *See* Doran Interview; *see also* Ballou Interview; *see also* Interview by Select Comm. Staff with Dr. Walter Maestri, Emergency Manager for Jefferson Parish, in New Orleans, LA (Nov. 8, 2005) [hereinafter Maestri Interview]; Interview by Select Comm. Staff with Jiff Hingle, Plaquemines Parish Sherriff, in New Orleans, LA (Nov. 8, 2005) [hereinafter Hingle Interview]; *see also* Interview by Select Comm. Staff with Terry Ebbert, Director of Homeland Security for the City of New Orleans, in New Orleans, LA (Nov. 9, 2005) [hereinafter Ebbert Interview].

44   Farlow Interview.

45 *Sept. 27, 2005 Select Comm. Hearing* at 110 (statement by Michael Brown); *see also* Interview by Select Comm. Staff with Bill Lokey, FEMA Federal Coordinating Officer, in Washington, DC (Dec. 2, 2005) [hereinafter Lokey Interview].

46 *See* Doran Interview; *see also* Ballow Interview; *see also* Lokey Interview; *see also* Interview by Select Comm. Staff with Phil Parr, Dep. Fed. Coordinating Officer, FEMA, in Washington, DC (Dec. 8, 2005) [hereinafter Parr Interview].

47 Interview by Select Comm. Staff with Andy Kopplin, Chief of Staff to Governor Blanco, in Baton Rouge, LA (Nov. 6, 2005) [hereinafter Kopplin Interview].

48 *See* Maestri Interview; *see also* Hingle Interview; *see also* Ebbert Interview.

49 Maestri Interview.

50 *See,* Interview by Select Comm. Staff with Jeff Smith, Deputy Director, Louisiana Office of Homeland Security and Emergency Preparedness, in Baton Rouge, LA (Nov. 7, 2005) [hereinafter Smith Interview]; *see also* Lokey Interview; *see also* Wells Interview.

51 Ebbert Interview.

52 *Id.*

53 *Id.*

54 Kopplin Interview.

55 Hingle Interview.

56 *See* Wells Interview; *see also* Robinson Interview.

57 *Id.*

58 *Id.*

59 Robinson Interview.

60 *Sept. 27, 2005 Select Comm. Hearing,* at 106-107 (statement of Michael Brown).

61 *Id.* at 108 (statement of Michael Brown).

62 *Id.* at 110 (statement of Michael Brown).

63 *Id.* at 108 (statement of Michael Brown).

64 *Id.* at 110 (statement of Michael Brown).

65 *Sept. 28, 2005 Senate Comm. Hearing* at 5-6 (written statement of Melvin Holden).

66 *Id.* at 7 (written statement of Melvin Holden).

67 *Dec. 8, 2005 Senate Comm. Hearing* at 9 (written statement of William Carwile).

68 *Id.*

69 *Sept. 27, 2005 Select Comm. Hearing* at 164 (statement of Michael Brown).

70 *Id.* Note, Mr. Brown left FEMA shortly after this plan was devised. He testified that he was unaware of whether this proposal was ultimately implemented. *Sept. 27, 2005 Select Comm. Hearing* at 164 (statement of Michael Brown).

71 *Sept. 28, 2005 Senate Comm. Hearing* at 9 (written statement of William Carwile).

72 *Id.*

73 Baughman Interview.

74 Baughman Interview; *see also* Interview by Select Comm. Staff with David Tranter, General Counsel for Alabama Emergency Management Agency, in Clanton, AL (Oct. 11, 2005) [hereinafter Tranter Interview].

75 Interview by Select Comm. Staff with Toby Roth, Chief of Staff to Governor Barbour, in Montgomery, AL (Oct. 12, 2005) [hereinafter Roth Interview].

76 *Dec. 8, 2005 Senate Comm. Hearing* at 6 (written statement of William Carwile).

77 *Sept. 27, 2005 Select Comm. Hearing* at 149-150 (statement of Rep. Chip Pickering); *see also Sept. 27, 2005 Select Comm. Hearing* at 146 (statement of Michael Brown.)

78 *Sept. 27, 2005 Select Comm. Hearing* at 150 (statement of Rep. Chip Pickering).

79 *Id.* at 149-150 (statement of Michael Brown).

80 *Dec. 8, 2005 Senate Comm. Hearing* at 6 (written statement of William Carwile).

81 *Id.* at 163 (written statement of William Carwile).

82 *Hearing on Hurricane Katrina: What Can Government Learn from the Private Sector's Response Before the Senate Comm. on Homeland Security and Gov't Affairs,* 109th Cong. (Nov. 16, 2005) at 6 (written statement of Jason Jackson) [hereinafter *Nov. 16, 2005 Senate Comm. Hearing*].

83 *Id.* at 2 (written statement of David. M. Ratcliffe).

84 *Id.* at 5 (written statement of David. M. Ratcliffe).

85 *Id.* at 7-8 (written statement of Kevin T. Regan).

86 *Id.* at 3 (written statement of Stanley S. Litow).

87 *Id.*

88 Office of Inspector General, Dep't of Homeland Security, *Emergency Preparedness and Response Could Better Integrate Information Technology with Incident Response and Recovery* (Rpt. No. OIG-05-36), at 5 (Sept. 2005) [hereinafter *DHS IT Report*].

89 *See generally, DHS IT Report; see also* Laurie Sullivan, *FEMA's Foul-up; Report says agency's computer systems failed to track supplies during last year's hurricane season,* INFOR. WEEK, Oct. 3, 2005 [hereinafter *FEMA Foul Up Article*].

90 *FEMA Foul Up Article.*

91 *DHS IT Report* at 21.

92 *Id.* at 3.

93 *Id.* at 27.

94 *FEMA Foul Up Article.*

95 *DHS IG Report* at 46.

96 *FEMA Foul Up Article.*

97 *Id.*

98 *Id.*

99 *Katrina Spending Highlights*, ASSOC. PRESS, Sept. 8, 2005.

100 *Sept. 28, 2005 Senate Comm. Hearing* at 47 (statement of Dan Coody).

101 *Id.*

102 *Id.* at 79 (statement of Dan Coody). Mr. Coody further stated that Wal-Mart "immediately responded by sending two engineers to create a warehouse system for our facility, a distribution center supervisor and two additional employees to oversee the operation. During peak hours we had over 100 volunteers, city employees, Wal-Mart employees, and work release inmates working side by side to organize the donations. The trailers were unloaded by Saturday [September 10], and the donations were ready for shipment by September 15." *Sept. 28, 2005 Senate Comm. Hearing* at 2 (written statement of Dan Coody).

103 *Nov. 16, 2005 Senate Comm. Hearing* at 2 (statement of David Ratcliffe).

104 *Id.* at 2 (statement of Kevin T. Regan).

105 *Id.* at 1-2 (statement of Jason Jackson).

106 *Id.* at 22 (statement of Stanley S. Litow).

107 *Sept. 28, 2005 Senate Comm. Hearing* at 48 (statement of Dan Coody).

108 *Id.* at 2-3 (written statement of Dan Coody).

109 *Id.* at 48 (statement of Dan Coody).

110 *Id.*

111 *Id.* at 49-50 (statement of Dan Coody).

112 *Id.* at 80 (statement of Dan Coody).

113 *Id.* at 80-81 (statement of Dan Coody).

114 *Id.* at 81 (statement of Dan Coody).

115 *Id.*

116 *Id.*

117 Renae Merle, *Lack of Contracts Hampered FEMA; Dealing With Disaster on the Fly Proved Costly*, WASH. POST, Oct. 10, 2005, at A01 [hereinafter *Contracts Article*].

118 *Contracts Article.*

119 *Nov. 2, 2005, Select Comm. Hearing* at 5 (statement of Chairman Tom Davis).

120 Interview by Select Comm. Staff with Greg Rothwell, DHS Chief Procurement Officer, and Mui Erkum, Chief of Staff to Greg Rothwell, in Washington, D.C. (Sept. 19, 2005) [hereinafter Rothwell / Erkum Interview].

121 *Id.*

122 Smith Interview; *see also* Maestri Interview.

123 Smith Interview.

124 *Id.*

125 *Id.*

126 *Sept. 27, 2005 Select Comm. Hearing* at 100 (statement of Michael Brown).

127 Chris Gosier, *Another Katrina casualty: Competition; No-bid Contracting Surges for Recovery Work*, FED. NEWS, Jan. 09, 2006, at 1 [hereinafter *No-bid Article*].

128 *Id.*

129 *See generally Nov. 2, 2005 Select Comm. Hearing.*

130 Interview by Select Comm. Staff with Stephen Marlo, Vice President and Manager of Washington Operations and George Bevan, The Shaw Group, in Washington, D.C. (Oct. 25, 2005) [hereinafter Marlo / Bevan Interview].

131 The blue roof program involves teams of contract personnel professionally installing high quality plastic sheeting over damaged roofs. This was first used extensively following Hurricane Andrew and again in Hurricane Georges in Puerto Rico, and, in 2004, in Florida. It enables families to reoccupy their houses until more permanent repairs can be made.

132 Marlo / Bevan Interview.

133 *Id.*

134 *Id.*

135 Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121-5206 (2005) [hereinafter Stafford Act].

136 Rothwell / Erkum Interview.

137 *Id.*

138 *Id.* Procurement officials indicated that the $250,000 card threshold increase was unnecessary and did not plan to use it.

139 Rothwell / Erkum Interview.

140 *Id.*

141 *Id.*

142 *Id.*

143 *Id.*

144 *Id.*

145 *Id.*

146 *Id.*

147 *Id.*

148 *Id.*

149 *See generally* Rothwell / Erkum Interview.

150 Rothwell / Erkum Interview.

151 Gov't Accountability Office, *Successes and Challenges in DHS' Efforts to Create an Effective Acquisition Organization* (GAO-05-179) (Mar. 2005) at 5.

152 Smith Interview.

[153] *Id.*

[154] *Id.*

[155] *See* Smith Interview; *see also* Maestri Interview.

[156] During the Nov. 2, 2005 Select Comm. Hearing on contracting, Members posed questions that witnesses from DHS and FEMA were unable to answer.  Although they committed to providing answers to these questions as well as additional information, agency personnel failed to do so despite repeated inquiries. *See generally, Nov. 2, 2005 Select Comm. Hearing.*

[157] Stafford Act. Note, the Stafford Act was first enacted in 1974.

[158] *See* Stafford Act, at § 5150; *see also* Fed. Acq. Reg. (FAR) §§ 26.200 – 26.201.

[159] *See* Stafford Act, at §§ 5121-5206, which directs that preference be given "to the extent feasible and practicable" to businesses and individuals from the affected areas.

[160] *See HAP Construction Inc.,* 98-2 CPD 76 (1998) (Gov't Accountability Office Decision No. B-280044.2) (Sept. 21, 1998).

[161] *See* Stafford Act, at §§ 5121-5206.

[162] *Nov. 2, 2005 Select Comm. Hearing* at 88-89 (statement of Norbert Doyle).

[163] *Dec. 8, 2005 Senate Hearing* (statement of Scott Wells, Deputy Federal Coordination Officer, FEMA (citing press reports)

[164] Greta Wodele, *FEMA officials: Military delayed Superdome evacuation,* GOVEXEC.COM, Dec. 8, 2005.

[165] Interview by Select Comm. Staff of Randy Perkins, Managing Vice President of AshBritt Environmental, Inc., in Washington, D.C. (Nov. 14, 2005) [hereinafter Perkins Interview].

[166] *Id.*

[167] *Id.*

[168] *Id.*

[169] *Id.*

[170] *Id.*

[171] *Sept. 27, 2005 Select Comm. Hearing* at 150-151 (statement of Michael Brown).

[172] *Id.* at 153 (statement of Michael Brown).

[173] Joshua Cogswell, *Doling of storm funds rapped,* CLARION-LEDGER (Jackson, Mississippi) Nov. 13, 2005, at 1A [hereinafter *Storm Funds Article*].

[174] *Id.*

[175] *Id.*

[176] *See generally, Nov. 2, 2005, Select Comm. Hearing; see also* Dec. 8, 2005 Senate Comm. Hearing.

[177] *Id.; see also* Press Release, Rep. Chip Pickering, regarding Contracting (Nov. 3, 2005).

[178] Dep't of Homeland Security, *Report of U.S. Gov't Direct Contracts, including FEMA, as provided by the HCIC, as of December 12, 2005.*

[179] Press Release, Rep. Chip Pickering, regarding Contracting and the Stafford Act (Dec. 21, 2005).

[180] U.S. Army Corps of Engineers, *Small/Local Business Update* as of 1/23/06.

[181] *See, Mississippi; Major Disaster and Related Determinations* (FEMA-1604-DR, Amendment 12) (Aug. 29, 2005, as amended Dec. 21, 2005).

[182] Mike Brunker, *Dust flies over Katrina's Debris, MSNBC,* Jan. 29, 2006.

[183] Interview (Telephone) by Rep. Pickering Staff with Brent Warr, Mayor, Gulfport, MS from Washington, D.C.  (Dec. 2005).

[184] Select Committee Members who toured the Gulf coast in January 2006 agreed with this assessment.

[185] *Storm Funds Article.*

[186] *Id.*

[187] *Id.*

[188] *Id.*

[189] *Id.*

[190] *Id.*

[191] *Id.*

[192] *Dec. 8, 2005 Senate Comm. Hearing* at 7-8 (written statement of William Carwile).

[193] Interview by Select Comm. Staff with Jon K. Waldron and T. Michael Dyer, outside counsel for Carnival Cruise Lines, in Washington, D.C. (Oct. 3, 2005) [hereinafter Carnival Counsel Interview].

[194] *Nov. 2, 2005 Select Comm. Hearing* at 170 (statement of Terry Thornton).

[195] Carnival Counsel Interview.

[196] *Id.*

[197] *Id.*

[198] *Nov. 2, 2005 Select Comm. Hearing* at 172 (statement of Rep. William Jefferson).

[199] *Id.* at 173-174 (statement of Terry Thornton).



*"While well intentioned, the volunteers never had a good grasp on security requirements for financial assistance distribution operations. On numerous instances, the ARC [American Red Cross] volunteers would simply find a vacant parking area and commence voucher distribution operations. Immediately, crowds would gather and would overwhelm the distribution site. The ARC would then call on the Guard for assistance.*

*"Repeated attempts were made to reinforce the need for prior coordination for site security. It was not until mid-September that the ARC started coordinating these operations."*

Major General Harold A. Cross
The Adjutant General, State of Mississippi
In Response to Questions from Select Committee, November 22, 2005

# CHARITABLE ORGANIZATIONS

## Contributions by charitable organizations assisted many in need, but the American Red Cross and others faced challenges due to the size of the mission, inadequate logistics capacity, and a disorganized shelter process



### Summary

Following Katrina's devastation, countless numbers of charities provided billions of dollars in relief to those in need. According to the Center on Philanthropy at Indiana University, as of January 9, 2006, private donations, including cash and in-kind gifts have reached $3.13 billion.[1] According to the Government Accountability Office (GAO), the efforts of charitable organizations in the Gulf coast represent the largest disaster response effort in United States history.[2]

Under the National Response Plan (NRP), the American Red Cross (Red Cross) is the primary agency responsible for Emergency Support Function (ESF) #6, Mass Care, Housing and Human Services. As the only nongovernmental organization with lead agency responsibilities under the NRP, the Red Cross plays the crucial role of helping to provide food and shelter to disaster victims.

Katrina, however, was too much for the Red Cross. The Red Cross was challenged to meet its responsibilities under the NRP, as its $2 billion relief operation was 20 times larger than any previous Red Cross mission. Like FEMA, the Red Cross did not have a logistics capacity sophisticated enough to deal with a catastrophe of Katrina's size. The Red Cross was dependent on FEMA and the Department of Defense (DOD) to provide critical commodities such as kitchen supplies, water, and food. The Red Cross was challenged by the sometimes disorganized manner in which shelters were established. Some shelters were unknown to the Red Cross until after they were already opened by local officials. The Red Cross was unable to staff some locally-operated shelters, including the Superdome, because charity officials were denied access.

Challenges aside, as of January 12, 2006, the Red Cross reported it had raised $2 billion for Katrina relief, by far the largest amount of money raised by a charity.[3] The Salvation Army had raised the second-highest amount, $295 million.[4] The Bush-Clinton Katrina Fund and Catholic Charities were the next-largest fund raisers, raising $137 and $100 million respectively.[5] Other major U.S. charitable organizations, including the United Way, have also contributed meaningfully to the response and recovery effort. One feature of the United Way's response has been its focus on restoring the network of local social service agencies in the region.[6]

Many of the charities responding to Katrina worked with each other to coordinate the delivery of a multitude of services, including providing food, shelter, and medical assistance.[7] Charities have shared information through daily conference calls and through electronic databases that allow multiple organizations to obtain information about services provided to hurricane victims.[8]

As much as any organization, public or private, the Red Cross played a substantial role in the immediate response to Hurricane Katrina. In what became a $2 billion, 220,000-person enterprise, the relief efforts undertaken by the Red Cross include the provision of financial assistance to 1.2 million families, encompassing more than 3.7 million hurricane survivors.[9] As of January 9, 2006, the Red Cross reported that since Katrina made landfall, it had provided hurricane survivors with nearly

3.42 million overnight stays in nearly 1,100 shelters across 27 states and the District of Columbia.[10] In coordination with the Southern Baptist Convention,[11] the Red Cross has served more than 52 million meals or snacks to hurricane survivors.[12] The Katrina response is larger — 20 times so — than any other Red Cross mission in its 125-year history.[13]

## Pre-landfall actions

The Red Cross' Gulf coast-area preparation was far along two days before Katrina made landfall. As of 2:00 p.m. on August 27, the Red Cross reported to the White House and the Department of Homeland Security, among other governmental organizations that it "has every resource at its disposal on alert/moving in anticipation of this event to include personnel, equipment, and materials."[14] Key aspects of this preparation included:

- Chapters across the region are opening shelters in support of evacuations in all states.[15]
- 275,000 HeaterMeals staged in Baton Rouge, Louisiana.
- 225,000 HeaterMeals staged in Montgomery, Alabama.
- 15 sites being identified to bring in big kitchens with support of Southern Baptists to provide 300,000 meals per day feeding capability.
- All 14 Disaster Field Supply Center warehouses loading supplies including 50,000 cots, 100,000 blankets, comfort and clean-up kits.
- All vehicles in the Red Cross fleet across the country are on alert for possible deployment and are being dispatched to staging areas.
- All 8 Emergency Communications Response Vehicles (ECRVs) deployed to staging areas.
- Red Cross staff deployed to NRCC, Region VI RRCC, Region IV RRCC, ERT-As and other ESF #6 posts.[16]

By August 28, the Red Cross started to understand the potential magnitude of Katrina. One of its Disaster Operations Reports noted, if Katrina makes landfall at its current pressure, "it will be the most intense storm to hit the U.S. mainland."[17] Also on the same day it was reported, "For the first time ever, an ESF6 coordination center will be set up tomorrow at American Red Cross national headquarters to coordinate the deliver [sic] mass care services with our governmental and non-governmental organization partners."[18]

*Sites for 25 kitchens for a total daily capacity of 500,000 people were identified and pre-staged.*

## Post-landfall actions

As Katrina made landfall on August 29, the Red Cross was fully staffing all of the relevant state and federal Emergency Operations Centers (EOCs), including Alabama, Louisiana, Florida, Mississippi, Georgia, South Carolina, Tennessee, Federal Emergency Management Agency (FEMA) Regions IV and VI's Regional Response Coordination Center (RRCC), FEMA's National Response Coordination Center (NRCC), as well as Emergency Response Advance Element Teams (ERT-A) teams in Florida, Alabama, Mississippi and Louisiana.[19] Sites for 25 kitchens for a total daily capacity of 500,000 people were identified and pre-staged.[20] The Red Cross was also aware of the increasing population at the Superdome, a shelter of last resort it did not support.[21] Figure 1 shows Red Cross interactions with these various operations centers.

Figure 1:
**Red Cross Involvement at Emergency Operations Centers**



RED CROSS

               A FAILURE OF INITIATIVE

## Montgomery, Alabama Regional Headquarters

The day-to-day paid operations staff of the service area coordinates the fundraising and communications and provides the institutional knowledge of the affected area.[22] Armed with the right data, and knowledge of the area, the information and resources management cell can provide essential services to those in need.[23]

The Red Cross' temporary, regional disaster headquarters in Montgomery, Alabama serves Alabama, Mississippi, Louisiana, and the Florida panhandle.[24] The facility serves, "triple functions:" (1) a volunteer and staff shelter; (2) a warehouse for food and supplies; and (3) a temporary regional corporate headquarters – basically a hub for all relief operations in the Gulf coast region.[25]

The facility has been under lease for over a year, and was used during the 2004 hurricane season as a base of response operations for Hurricanes Dennis and Ivan.[26] Following Hurricane Katrina, the facility was re-opened Thursday, September 1, and was mostly operational within 24 hours and completely operational within 72 hours.[27] Skip Batchelor, a 20-year Red Cross veteran, said the facility would remain operational through October 2005.[28] The lifecycle of the emergency facility was, therefore, about two months.[29]

Located in an old K-Mart building, the facility houses all of the functions of a major corporation.[30] Having the appearance of large political campaign, there are hundreds of folding tables and chairs divided into work areas by function.[31] Some functional areas included:[32]

**Warehousing.** Approximately 30 percent of the facility served as storage location for food stuffs and supplies, including, cots, blankets, coolers, comfort kits, and meals ready to eat (MREs).

**Staff Shelter.** At its peak the facility housed 450 Red Cross personnel (staff and volunteers).

**Transportation.** The facility's parking lot was approximately 30 percent populated with large rental trucks, most supplied by Budget, which donated approximately 50 percent of the rental trucks free of charge. Numerous truck drivers reported each morning ready to drive goods to various points of service in the region. The Red



Cross contracted with Shell to install an on site gasoline supply for its vehicles. The Red Cross was able to take advantage of wholesale pricing on this gasoline.

**Information Technology (IT).** Work stations had computer, internet and telephony capability. There was a central IT department that supported the entire facility.

**Real Estate.** The Red Cross leased other facilities to serve as points of contact for client interaction. Their real estate team located and secured these properties.

**Chapter Outreach.** Personnel attempted to coordinate the field needs with the resources available at headquarters.

**Jobs and Training.** Served as a clearinghouse for job opportunities and training for the displaced.

**Financial Assistance.** Analysis of client needs and eligibility for financial assistance.

**FEMA interface.** Provided assistance in connecting victims to FEMA.

**Other NGO Coordination.** Personnel worked to coordinate with the other key charities and non-government organizations (NGOs) to ensure that the clients are directed to and made aware of all of the potential relief resources. The key charities that clients are referred to include: Baptist Kitchens

(food), Mennonites (home rebuilding), VOAD – Voluntary Organizations Active in Disaster (various local volunteers and other smaller relief entities, many of which are faith-based), Catholic Charities, and Habitat for Humanity (new homes).

**Government Liaison.** Government outreach to coordinate shelter operations, rescue and client outreach.

**Volunteer Coordination.** At its peak, the facility processed 45,000 volunteers.

**Data Entry.** There appeared to be 60 to 100 work stations for data entry, half of which are paid temporary workers and half are volunteers.

The ability of the Red Cross to rapidly open and operate such a sophisticated facility in a short amount time reflects the sophisticated planning regime the Red Cross has long had in place. The rapid standing up of the facility was described by Laura Howe a Birmingham-based Red Cross official as the equivalent of opening a Fortune 500 company in a couple days time.[33]

## The Red Cross, much like FEMA, did not have a logistics capacity sophisticated enough to deal with a truly catastrophic disaster the size of Katrina

The Red Cross was dependent on FEMA and DOD to provide certain supplies—particularly food in the form of MREs—so it suffered from all the weaknesses in the FEMA and DOD supply chain discussed earlier.

The flooding of New Orleans became a reality on August 30 and the Mayor declared that "80 percent of the city is under water and media sources report the water level is still rising, due in part to broken levees and failed water pumps in the city."[34] By 8:00 a.m. on August 30, the Red Cross was operating 254 shelters for 41,013 people and serving more than 63,000 meals a day.[35] According to the Red Cross' periodic reporting documentation, these numbers continued to grow. The largest number of meals served in a day occurred on September 4, when nearly 946,000 meals were provided.[36] Figure 2 shows the Red Cross daily statistics for the number of shelters in operation, their population, and the number of meals served per day.

Figure 2:

**Red Cross Service Levels By Day**

| Date | Number of Shelters | Population | Number of Meals | Source |
|------|-------------------|-----------|-----------------|--------|
| August 26 | 6 | 584 | 1,209 | DOSR #2 |
| August 27 | 3 | 252 | 3,884 | DOSR #4 |
| August 28 | 3 | 244 | 4,454 | DOSR #6 |
| August 29 | 239 | 37,091 | N/A | DOSR #9 |
| August 30 | 254 | 41,013 | 63,175 | DOSR #11 |
| August 31 | 259 | 52,719 | 114,413 | DOSR #12 |
| September 1 | 275 | 76,453 | 170,465 | DOSR #14 |
| September 2 | 308 | 94,308 | N/A | DOSR #17 |
| September 3 | 361 | 96,178 | 137,588 | DOSR #18 |
| September 4 | 397 | 106,970 | 945,886 | DOSR #20 |
| September 5 | 413 | 124,617 | 618,938 | DOSR #22 |
| September 6 | 490 | 125,941 | 485,983 | DOSR #24 |
| September 7 | 504 | 143,712 | 669,271 | DOSR #26 |
| September 8 | 527 | 138,294 | 683,826 | DOSR #28 |
| September 9 | 510 | 101,381 | 534,864 | DOSR #30 |
| September 10 | 468 | 97,892 | 501,318 | DOSR #32 |
| September 11 | 443 | 88,883 | 491,751 | DOSR #34 |
| September 12 | 445 | 74,890 | 444,793 | DOSR #36 |
| September 13 | 348 | 62,931 | 359,816 | DOSR #38 |

Red Cross

Figure 3 shows the daily shelter population for Louisiana, Mississippi, Alabama, and a fourth category with the shelter population in all other states.

Figure 3:

**Daily Shelter Population By State**



RED CROSS

The Red Cross was encouraged by its pre-landfall staging operation, deeming it largely a success.[37] That being said, the unprecedented devastation of Katrina, both in terms of property damage and number of

individuals affected, was much larger than the Red Cross was equipped to handle. Its logistics system was not sophisticated enough – especially with regard to food service. Many problems were experienced in obtaining enough food to satisfy client needs. Many of the food orders processed through FEMA were either inexplicably canceled or never satisfied. On follow-up, it was discovered that many of the orders placed by the Red Cross with FEMA were not reflected in FEMA's systems.[38] FEMA's logistics system was not sophisticated enough to handle the volume Katrina triggered.

The Red Cross experienced substantial communication issues with FEMA.[39] The Red Cross relied on FEMA to provide food, fuel, mobile refrigeration equipment, portable toilets, and many other primary necessities to operate its shelters.[40] Ordinarily these needs are requested by the Red Cross through the respective states.[41] As Katrina gathered force the Red Cross compiled requests for Louisiana, Mississippi, and Alabama among other states.[42] These requests reflected predicted need levels for food, MREs, water, fuel, and other indispensable commodities.[43] In Mississippi, the Red Cross requests were cut substantially by FEMA middle management.[44] Joseph C. Becker, Senior Vice President of Preparedness and Response told Select Committee staff that the upper management of FEMA, including Dan Craig, the Director of the Recovery Division was responsive to Red Cross needs, but the middle level personnel, who were described as "FEMA's mushy middle" proved to be unnecessarily meddlesome.[45] FEMA's middle ranks, according to Becker, canceled orders, lost orders and were the root cause of many of the problems experienced in the field.[46] MREs were ordered and were to be used to feed people during the period before the feeding kitchens were up and running.[47] These MREs were canceled by FEMA under the logic that the Red Cross had also ordered food for the kitchens.[48]

The master log of official requests made by the Red Cross to FEMA under ESF #6 further reveals the ineffective logistics system.[49] The official requests, called Action Request Forms (ARFs), are processed through the FEMA logistics system.[50] A total of 99 ARFs were submitted to FEMA by the Red Cross. Red Cross resource requests are processed through the five emergency coordination centers – the NRCC at FEMA headquarters (18 ARFs), the Regional Response Coordination Center (RRCC) for FEMA Region IV in Atlanta, Georgia (22 ARFs), the RRCC

for FEMA Region VI in Denton, Texas (9 ARFs), the Joint Field Office (JFO) in Baton Rouge, Louisiana (30 ARFs), the JFO in Jackson, Mississippi (13 ARFs), and the JFO in Austin, Texas (7 ARFs).

Given the enormous nature of the Katrina relief effort, and the important role the Red Cross plays in the NRP, 99 requests is not an extraordinarily large number. FEMA, however, could not handle these requests. Only 22 of the 99 ARFs were deemed "Received" by the Red Cross, and 8 were canceled or withdrawn.

A careful review of the master log suggests that the logistics system did not work. Figure 4 is a table identifying logistics problems.

Figure 4:

**Official Requests By The Red Cross to FEMA (selected).**

| Center | Date Requested | Resources Ordered | What Occurred |
|--------|----------------|-------------------|---------------|
| NRCC | August 30 | 700,000 MREs for AL and MS | Received only 400,000 and not until September 8 did 600,000 additional MREs arrive for MS. |
| NRCC | September 1 | 300,000 MREs for LA | Order canceled, then un-canceled. Product delivered on October 8. |
| NRCC | September 10 | 126 5-person security teams needed (630 total) for sites in MS | No security received. |
| Reg. IV | September 1-3 | 13 orders for "Kitchen Support," which includes refrigerator, propane, diesel, hand washing stations, porta potties, water buffalo, among other kitchen items. | Received, 10-14 days after request was approved. RC forced to purchase items independently to ensure continuous feeding. |
| Reg. VI | September 1 | 9 orders for "Kitchen Support" for Louisiana. Kitchens were for use in Alexandria, Baton Rouge, Bogor, Covington, Hammond, Kenner, and Prairieville. | Not received. Items purchased independently by Red Cross. |

RED CROSS

Chapter resources and self-reliance could be buttressed by extending chapter self-reliance to 72 hours. Each chapter is generally equipped to survive on its own for

the first 48 hours. If expanded to 72 hours, FEMA should be able to assist the Red Cross at the national level in re-stocking the pipeline.[51]

## The Red Cross was challenged by the sometimes disorganized manner in which shelters were established

While the Red Cross has an established role in operating shelters, many of the local governments set up ad hoc shelters without notifying the Red Cross. In other cases, the Red Cross was denied access to shelters.

The Red Cross has been criticized in both Mississippi and Louisiana for a variety of reasons, from excessive levels of bureaucracy to lack of sufficient shelters and food.[52] Becker said the root cause of many problems centered on substantial incongruities between the state and local political leadership on one hand and state emergency management personnel on the other.[53] Far too often state emergency management personnel and local political leadership were not aligned.[54] The Red Cross would receive one set of directions from the state and another from the locals.[55] Becker said, however, with independently elected sheriffs, mayors, and county and parish commissioners, this is not an easily avoidable problem.[56] Many complaints lodged at the Red Cross reflected their policy of not operating shelters in danger zones.[57] Local political leadership often feels compelled to open shelters in their locales even when the entire county or parish is subject to a mandatory evacuation order.[58] The Red Cross has trouble servicing these shelters, both from an access perspective (the roads are sometimes inaccessible) and from an identification perspective (sometimes nobody tells the Red Cross where the shelters are).[59]

The Mississippi National Guard had numerous issues with the Red Cross. The primary complaint was the Red Cross' failure to establish a formal operations section in accordance with the National Incident Management System combined with the fact that the Red Cross is staffed almost exclusively by volunteers. According to Major General Harold Cross, the Mississippi Adjutant General:

> While well intentioned, the volunteers never had a good grasp on security requirements for financial assistance distribution operations. On numerous instances, the ARC volunteers would

simply find a vacant parking area and commence voucher distribution operations. Immediately, crowds would gather and would overwhelm the distribution site. The ARC would then call on the Guard for assistance. Repeated attempts were made to reinforce the need for prior coordination for site security. It was not until mid-September that the ARC started coordinating these operations. Also, the ARC had volunteers who attempted to coordinate directly with subordinate Guard units for shelter and distribution site security. The Forward EOC operations officer met with ARC representatives on numerous occasions to define the requirements for security taskings. The ARC rarely adhered to these requirements. Consequently, the National Guard stayed in a reactive mode concerning security of distribution sites and shelters and hundreds of man hours were wasted. For future events, if the ARC would position a senior operations representative in the Forward Emergency Operations Center, many of the security issues would be resolved. This senior person should not rotate every few days.[60]

Cross also recommended the integration of NGO's like the Red Cross, into the Incident Command System.

GAO has testified the Red Cross did not provide relief in certain hard-to-reach areas because of safety policies.[61] Similarly, media reports indicate the Red Cross was slow to arrive in some small rural towns.[62] The Mississippi town of Pearlington, population 1,684, received no Red Cross support for weeks.[63] A Florida state disaster team set up a shelter, but the Red Cross said it was unsafe and declined to run it.[64] In Pearlington, the Red Cross declined to operate one shelter because it lacked a dehumidifier.[65]

Far too many shelters were unknown to the Red Cross, making it difficult for it to deploy resources.[66] Many of these shelters were within the danger or surge zones, including the Superdome. The Red Cross does not service these "shelters of last resort," as it would put its volunteers in harm's way.[67] After Katrina passed, the Red Cross did attempt to deliver provisions to the Superdome, but was denied access.[68] "The Homeland Security Department has requested and continues to request that the American Red Cross not come back into New Orleans. Right now access

*The Red Cross does not service these "shelters of last resort," as it would put its volunteers in harm's way.*

is controlled by the National Guard and local authorities. . . . We cannot get into New Orleans against their orders," Renita Hosler, a Red Cross spokesperson, told *The Pittsburgh Post-Gazette.*[69]

The Red Cross encountered many access problems where local law enforcement would not permit entry to establish a shelter.[70] The Select Committee asked the Red Cross for an accounting of the shelters utilized as compared to the pre-approved shelter list,[71] and for the reasons behind any differences. The Red Cross provided the Select Committee with a complete list of every shelter in operation between the dates of August 25 and September 30,[72] but will not provide a specific listing explaining why certain pre-approved shelters were not used. Lori Polacheck, of the Red Cross general counsel's office said this was too difficult an undertaking.[73]

The Red Cross was challenged by the magnitude and chaos of the evacuation of people before landfall and after the flooding in New Orleans. People were moved, either by government agencies or on their own initiatives, all over the country in a haphazard way, making it difficult for the Red Cross to track and care for the needs of evacuees.

From the Red Cross' perspective, the transportation of evacuees by FEMA was disorganized and uncoordinated. As a primary provider in the feeding and sheltering of the displaced, the Red Cross needed advance notice of how many people it would be asked to serve. Many problems were reported in this area. The information communicated to the Red Cross by FEMA was unreliable. There appeared to be no correlation between the information communicated by FEMA and what actually happened.[74] Howe noted that often airplanes of evacuees would arrive without any warning. Conversely, it seemed to Howe, whenever warnings of arrivals were communicated, the arrivals often failed to materialize.[75]

This has been chronicled in the press. *The San Jose Mercury News* reported on September 8 that a plan to send 1,000 evacuees to California had been put on hold.[76] The Red Cross, Catholic Charities, and the city of San Francisco had spent days readying a shelter at St. Mary's Cathedral.[77] On September 11 *The Columbus*

*Dispatch* reported a similar story; Columbus, Cleveland and Cincinnati were set to take 1,000 evacuees on September 8, but the in-bound flights were canceled by FEMA.[78] Evacuees were scheduled by FEMA to be transported to Ohio. Fred Strathman, a spokesman for the Ohio Emergency Management Agency, indicated to the newspaper that the plan to send evacuees to Ohio was delayed twice by FEMA and then apparently canceled.[79] A spokesman for the Red Cross of Greater Columbus, Lynn Cook said, "Are we a little tired of pumping things up and taking them back down? Yeah."[80] Similarly, *The Courier-Journal* of Louisville, Kentucky reported that on September 13, FEMA suspended evacuation flights due to the unwillingness of evacuees to relocate so far from the Gulf coast.[81] According to the newspaper, on September 5, federal officials told Louisville that 500 evacuees would be arriving at any time.[82] The Red Cross had worked to prepare a shelter and had stockpiled food and clothing.[83] All for nothing.

More than any other hurricane, Katrina has produced a large volume of seemingly permanent evacuees. The Red Cross is now finding that a large number of evacuees are not going home.[84]

## The Red Cross has not escaped substantial public criticism

The Red Cross has not escaped substantial criticism.[85] The most obvious casualty of this criticism came on December 13, when its president, Marsha Evans, announced her resignation.[86] According to press accounts, even Evans acknowledged the organization's response to Katrina and Rita had been uneven, "eclips[ing] even our direst, worst-case scenarios."[87]

At a December 13 hearing conducted by the House Committee on Ways and Means Oversight Subcommittee to review the response by charities to Hurricane Katrina, Louisiana Representative Jim McCrery was extremely critical of the Red Cross:[88]

Hurricane Katrina, and the subsequent flooding of New Orleans, displaced roughly one million

people from their homes in Southeast Louisiana. Tens of thousands of evacuees sought shelter in my district. It was clear from the beginning that the Red Cross simply did not have the sheltering capacity to meet immediate needs. Small independent shelters began popping up by the dozens across Northwest Louisiana. At the peak, there were over forty shelters in my district, while fewer than ten of those were operated by the Red Cross. Red Cross had serious trouble operating at least three of the larger shelters in my district: Hirsch Coliseum in Shreveport, LA, CenturyTel Center in Bossier City, LA, and the Health and Physical Educational Building at Northwestern State University in Natchitoches, LA.

Several days after Katrina's landfall, the American Red Cross asked a network of local churches, led by the First Assembly of God, to take over the Red Cross Shelter at Hirsch Coliseum in Shreveport, LA. Steve Beyer, an Associate Pastor with one of the churches, agreed to manage the shelter until a replacement Red Cross manager could be found. No one replaced him. Mr. Beyer operated the Hirsch Coliseum shelter, where 6,200 people came through its doors, with only two Red Cross volunteers for the first two weeks. The Red Cross asked church volunteers to wear Red Cross shirts, I suppose to give the appearance that Red Cross was operating the shelter.

The CenturyTel Center in Bossier City, LA, opened as an independent shelter one week after the storm in response to overwhelming need for additional sheltering capacity. CenturyTel operated on the backs of local government and community organizations while it waited for certification from the American Red Cross. Even after the American Red Cross moved in, local charities provided all of the food for seven days until Red Cross could secure food....

The American Red Cross shelter at Northwestern State University was managed by the City of Natchitoches and the Natchitoches Parish Sheriff's Department in conjunction with the University. Dr. Bill Dickens, the shelter's manager, had one Red Cross volunteer to help service the 1,000 evacuees housed each night at the site for the first 10 days following the storm. I should note that it took

seven days for this shelter to receive any of the $60,000 in new bedding that was donated to the local Red Cross chapter by General Motors. The bedding sat unused in a Red Cross facility seventy miles away in Shreveport, LA, despite the fact that some evacuees in Natchitoches were sleeping on the floor. The failure to get these resources to the shelter in a timely fashion represents an inexcusable breakdown in communication and coordination within the Red Cross.

While the Red Cross could barely manage its own network of shelters, the organization offered little assistance to struggling independent shelters. Dennis Butcher, the Office of Emergency Preparedness Director for Claiborne Parish, was instructed by the Red Cross to fend for himself. Mr. Butcher operated an independent shelter of 1,200 evacuees for over a month without any assistance from the Red Cross. I wish Mr. Butcher's experience was unique, but the Red Cross also refused requests for assistance from the Office of Emergency Preparedness Directors for Claiborne, Sabine, Vernon and Webster Parishes. I also spoke with OEP and other officials on the Mississippi Gulf Coast who experienced similar treatment from the Red Cross.[89]

## But Katrina was bigger than the Red Cross

The response to Hurricane Katrina has been more complex than any previous Red Cross-involved disaster. The string of 2004 hurricanes in Florida was the previous benchmark, when the Red Cross provided financial assistance to 73,000 families. During Katrina, the number is up to 1.2 million families. In 2004 it provided 519,000 nights of shelter. During Katrina the figure currently stands at 3.42 million. The 2004 hurricanes were attended to by 35,000 volunteers; Katrina required 220,000 volunteers.[90] The total estimated expenditures by the Red Cross for Katrina-related aid is in excess of $2 billion.

Figure 5 compares Katrina and Rita to Hurricane Season 2004.[91]

Figure 5:

**Hurricane Season 2004 v. Katrina and Rita**

| Category | Hurricane Season 2004 | Katrina and Rita |
|---|---|---|
| Shelter Nights | 519,000 | 3.42 million |
| No. of Families Provided With Financial Support | 73,000 | 1.2 million |
| Meals and Snacks Provided | Close to 16.5 million | More than 52.6 million |
| Total Spent | $130 million | $2 billion |

RED CROSS

This $2 billion operation must be contrasted with the Red Cross' overall financial model. According to its 2004 Annual Report, its operating revenues were just over $3 billion.[92] In 2004, its stated operating expenses for domestic disaster services was $261 million. It is unrealistic to expect any charitable relief organization to instantaneously pivot in response to the might inflicted by Katrina. As Katrina was too large for the emergency management professionals in the state of Louisiana, the city of New Orleans, and FEMA, it was as well for the Red Cross.

The Red Cross readily agrees it did not have a presence everywhere throughout the affected region.[93] The primary mission of the Red Cross is to provide food, clothing, and shelter to victims of disasters.[94] Given its size, there are misconceptions about its capabilities.[95] The Red Cross does not provide transportation, does not get involved with search and rescue operations, does not participate in evacuations, and does not provide medical care (other than providing assistance with minor medical issues).[96]

In testimony before the House Committee on Ways and Means Oversight Subcommittee, the Red Cross'

*The Red Cross does not provide transportation, does not get involved with search and rescue operations, does not participate in evacuations, and does not provide medical care (other than providing assistance with minor medical issues).*

Becker said, "we fell short of being universally present everywhere there was a need."[97] He continued, "Given the number of people in need, our response was geared toward places that we knew we could get to immediately and places where we knew people were congregated. It was our goal to reach the greatest number of people with the most possible speed."[98]

As a leading provider of food and shelter to those affected by Katrina, the Red Cross is often asked why it was not active within New Orleans, whether it be on the ground, co-located with the search and rescue teams, or in the shelters of last resort such as the Convention Center and the Superdome. Becker addressed this in his testimony:[99]

There were a number of questions regarding why we did not re-enter the City of New Orleans. The American Red Cross of Southeast Louisiana, located in the City of New Orleans, heeded the evacuation order called for by local authorities. The chapter relocated to the town of Covington, located on the north side of Lake Pontchartrain. Our service delivery in New Orleans differed from that provided to other affected areas in Alabama, Louisiana, and Mississippi. Under the Louisiana State Plan, if a Category 3 or higher storm is headed for Louisiana, 23 parishes, including Orleans Parish, are to begin an evacuation inland. The inland parishes, in cooperation with state agencies and the American Red Cross, are to shelter evacuees from "Risk Area Parishes," as there are no shelter sites that meet hurricane safety criteria within Orleans Parish. In fact, it has been the policy of the Red Cross that there are no safe areas south of the I-10/I-12 corridor for a large scale hurricane. The Louisiana Plan, which makes no reference to the Red Cross operating shelters within the city, enumerates eight distinct shelter types, plus what is described as the "Refuge of Last Resort." The Convention Center and the Superdome served as refuges of last resort. Under state plans, these facilities are to open when local authorities terminate an evacuation due to unsafe driving conditions. These facilities are not operated by the Red Cross. In practice, after the threat has passed, the Red Cross at times staffs shelters of last resort, providing services to people. We do not establish

shelters in facilities that do not meet our criteria for safety during landfall.

Consistent with State and local plans, and our practice in previous disasters, we were asked by state and federal officials not to enter New Orleans. While we were in constant communication with local and state authorities, it was not deemed safe for Red Cross personnel to re-enter the city of New Orleans. The Red Cross does not place our client evacuees, staff, volunteers, or resources in harm's way. It is our practice to heed evacuation orders and assist those in need of shelter outside of high-risk areas.

Additionally, it was the goal of local and state officials to fully evacuate the city of New Orleans after the storm passed. We were instructed by authorities that, in addition to issues of safety, if the Red Cross provided services to survivors within New Orleans, it would discourage people from heeding evacuation orders. At the direction of public officials, we entered New Orleans in a coordinated fashion to provide services at the earliest possible time.

This was a difficult scenario for the Red Cross. Eighty percent of our local Red Cross staff in the Southeast Louisiana Chapter lost their homes to Katrina, yet while they themselves were victims, they desperately wanted to provide support to their neighbors in need, and to this day they continue to do so. We are still engaged in active operations in the city.

### Important assistance was provided by the Salvation Army, Catholic Charities, the United Way, and the National Voluntary Organizations Active in Disaster

As the only charitable organization with primary responsibility under the NRP, the Red Cross received a lot of Select Committee attention. Beyond the Red Cross, however, there was a vast network of charities that contributed meaningfully to the response efforts in the Gulf coast area. The important contributions of organizations such as the Salvation Army, Catholic Charities USA, the United Way, and the National Voluntary Organizations Active in Disaster (NVOAD) merit attention.



FEMA

### Salvation Army

The Salvation Army has been at the site of most major natural disasters in America for more than a century.[100] It has developed areas of expertise in disaster response: mass feeding to survivors and emergency responders immediately after a disaster has occurred; sheltering those affected while tending to their spiritual and emotional needs; and then, the continuation of social service assistance to ensure the survivors have the means to move back into some semblance of the routine known before the disaster struck.[101]

In responding to those affected by Hurricane Katrina, the Salvation Army staged personnel and equipment in the states adjacent to the primary strike zone. Major Todd Hawks of the Salvation Army, summarized some of the key contributions the Salvation Army made to immediate response efforts:

- Loaded meals on 72 mobile canteens, each capable of providing 5,000 hot meals per day, and two 54-foot mobile kitchens, each capable of providing 20,000 hot meals per day. We intended to dispatch these mobile feeding units into those geographic areas determined by FEMA to be the hardest hit, and to dispatch additional units as needed.
- Mobilized 200 officers, employees, and volunteers to man these mobile kitchens.
- Prepared to dispatch portable shower units, trucks transformed into 1-stop shops called comfort stations, and emergency response command stations for officers to direct the response efforts.[102]

In the immediate aftermath of Katrina, the Salvation Army facilitated mass feeding, moving mobile feeding units into New Orleans, Biloxi, Gulfport, Mobile and numerous other affected communities within hours after the storm had passed.[103] In total the number of mobile canteens deployed numbered 178 and the number of field kitchens reached 11.[104] Since Katrina struck, the Salvation Army has served more than 5 million hot meals and more than 7 million sandwiches and snacks to survivors and first responders.[105] Although not a primary activity for the Salvation Army, at its highest point, it operated 225 shelters for more than 31,000 people.[106]

## Catholic Charities

Catholic Charities USA is the membership association of one of the nation's largest social service networks. Catholic Charities agencies provide vital social services to people in need, regardless of their religious, social, or economic backgrounds.[107] As of January 6, 2006, Catholic Charities had allocated more than $56 million to over 60 local Catholic Charities and other Catholic organizations responding to the needs of families affected by the Gulf coast hurricanes.[108] In total, Catholic Charities USA has raised $137 million to assist the network's largest disaster response effort in its history.[109] Dozens of Catholic Charities agencies and Catholic organizations have each received disaster relief grants from Catholic Charities USA, ranging from $6,000 to $25 million.[110] Across the nation, more than 80 local Catholic Charities are working to meet the needs of hurricane victims.[111] Relief efforts have included: providing victims with food, financial aid, clothing, shelter, gas and retail store cards, and household goods; helping with medical and prescription needs; offering clean up assistance; helping victims work with FEMA and other groups; and providing crisis counseling, case management, transportation, job placement, and temporary and long-term housing.[112]

## United Way

United Way of America is the national organization that provides leadership to approximately 1,350 community-based United Way organizations. Each is independent, separately incorporated, and governed by local volunteers.[113] As of December 15, 2005, the United Way of America has raised $45 million to support hurricane response and recovery efforts.[114] Through its Hurricane Response and Recovery Fund, the United Way has focused its efforts on restoring the abilities of social service agencies in the Gulf coast region.[115] Many human services organizations in the Gulf coast states suffered tremendous damage to their facilities, which severely limited their ability to provide services to those in need.[116] United Ways throughout the affected areas have worked with partner agencies to ensure services such as emergency assistance, food, clothing, housing and transportation are available to those in need.[117]

## National Voluntary Organizations Active in Disaster (NVOAD)

NVOAD is a national charity umbrella organization composed of approximately 40 charities that provide services following disasters.[118] As a designated support agency under ESF #6, NVOAD is responsible for sharing information with its member organizations regarding the severity of the disaster, needs identified, and actions taken to address these needs.[119] NVOAD coordinates planning efforts by many voluntary organizations responding to disaster.[120] Member organizations provide a more effective and efficient service to the community in need by agreeing to share information and combine resources.[121] This cooperation has proven to be an effective way for a multitude of organizations to work together in during an emergency.[122]

During the immediate response to Katrina, NVOAD organized daily conference calls with FEMA and other federal government representatives and its member



FEMA



organizations operating in the Gulf coast region.[123] NVOAD also invited nonmember charitable organizations that were providing relief to hurricane victims to participate in these calls, which sometimes included more than 40 organizations at once. During these calls, both the federal government and charities were able to provide information and answer questions about services provided, needs identified, and the organizations' abilities to meet these needs.[124]

## Conclusion

Since August 29, charitable donations to Katrina relief have exceeded $3 billion. Two-thirds of this amount has been raised by the Red Cross. With its $2 billion relief effort, the Red Cross has been able to fulfill many of its obligations under the National Response Plan. Katrina, however, overwhelmed the Red Cross. The Red Cross, like FEMA, did not have a logistics capacity sophisticated enough to fully support the massive number of Gulf coast victims. Among other challenges, the Red Cross was required to grapple with the sometimes disorganized manner in which shelters were established. While it has a well-defined role in operating shelters, many of the local governments set up ad hoc shelters without notifying Red Cross officials. In some cases, the Red Cross was denied access to shelters. Despite falling short of being universally present everywhere there was a need, the Red Cross and numerous other charitable organizations performed admirably and heroically in reaching the greatest number of people with impressive speed. ∎

1   Center on Philanthropy at Indiana University, *Gulf Coast Hurricane Relief Donations*, http://www.philanthropy.iupui.edu/Hurricane_Katrina. html (Jan. 9, 2006) [hereinafter Center on Philanthropy – Donations]; Spreadsheet, Center on Philanthropy, *U.S. Organizations Providing Hurricane Relief Efforts* (Jan. 9 2005) [hereinafter Center on Philanthropy – Spreadsheet].

2   *Hearing to Review the Response by Charities to Hurricane Katrina Before Subcommittee on Oversight of the House Committee on Ways and Means*, 109th Cong. (Dec. 13, 2005) (written statement of Cynthia M. Fagnoni, Managing Dir., Educ., Workforce and Income Sec., U.S. Gov. Accountability Office) [hereinafter *Dec. 13, 2005 Ways and Means Oversight Hearing* (written statement of Cynthia Fagnoni)].

3   American Red Cross, *Facts at a Glance*,  http://www.redcross.org/news/ds/hurricanes/2005/facts.html (Jan. 12, 2006) [hereinafter Jan. 12, 2006 Red Cross Facts at a Glance].

4   Center on Philanthropy – Donations; Center on Philanthropy – Spreadsheet.

5   Center on Philanthropy – Donations; Center on Philanthropy – Spreadsheet; *Dec. 13, 2005 Ways and Means Oversight Hearing* (written statement of Cynthia Fagnoni); Press Release, Catholic Charities USA,  *Catholic Charities USA, 13 Other Major Nonprofits Reaffirm Commitment to Human Needs Aspect of Gulf Coast Recovery*, Jan. 6, 2005, http://www.catholiccharitiesusa.org/news/content_displays.cfm?fuseaction=display_do cument&id=743&location=3.

6   Press Release, United Way, *United Way Receives $10 Million Grant From Lilly Endowment For Hurricane Recovery and Rebuilding*, Nov. 3, 2005 at http://national.unitedway.org/files/pdf/press_releases/Lilly_Endowment_Grant_FINAL_Nov_2005.PDF [hereinafter Nov. 3, 2005 United Way Press Release].

7   *Dec. 13, 2005 Ways and Means Oversight Hearing* (written statement of Cynthia Fagnoni).

8   *Id.*

9   Jan. 12, 2006 Red Cross Facts at a Glance.

10   American Red Cross, *Facts at a Glance*,  http://www.redcross.org/news/ds/hurricanes/2005/facts.html (Jan. 9, 2006) [hereinafter Jan. 9, 2006 Red Cross Facts at a Glance].

11   The Southern Baptist Convention provides the manpower and the kitchens, and the Red Cross provides supplies and logistics.   Gabrielle DeFord and Maryann Sinkler, *Southern Baptists Help Feed Millions After Katrina*, Sept. 14, 2005, http:www.redcross.org.

12   Jan. 9, 2006 Red Cross Facts at a Glance.

13   *Hearing to Review the Response by Charities to Hurricane Katrina Before Subcommittee on Oversight of the House Committee on Ways and Means*, 109th Cong. (Dec. 13, 2005) (written statement of Joseph C. Becker, Senior Vice President Preparedness and Response, American Red Cross) [hereinafter *Dec. 13, 2005 Ways and Means Oversight Hearing* (statement of Joseph C. Becker)].

14   E-mail correspondence from Carol Hall, American Red Cross, to Kirstjen M. Nielsen, et al. (Aug. 27, 2005) (2:48 p.m.) [hereinafter Aug. 27, 2005 Hall E-mail].

15   A complete list of all pre-approved shelters for Louisiana, Mississippi and Alabama was supplied to the Select Comm. The establishment of shelters is carefully planned for and part of the chapter disaster planning regime. See ARC 4496, Standards for Hurricane Evacuation Shelter Selection (Jan. 2002); ARC Shelter Operations Management Toolkit (Sept. 2005); Complete Shelter Listings for Alabama, Mississippi, and Louisiana.

16   Aug. 27, 2005 Hall E-mail.

17   American Red Cross, *Disaster Operations Summary Report (DOSR) #7* at 2 (Aug. 28, 2005).

18   American Red Cross, DOSR#7 at 3 (Aug. 28, 2005).

19   American Red Cross, DOSR#9 at 3 (Aug. 29, 2005).

20   *Id.* at 2.

21   *Id.* at 1.

22   Interview by Select Comm. Staff with Laura Howe and Skip Batchelor, American Red Cross, in Montgomery, AL (Oct. 11, 2005) [hereinafter Oct. 11, 2005 Red Cross Interview].

23   *Id.*

24   *Id.*

25   *Id.*

26   *Id.*

27   *Id.*

28   *Id.*

29   *Id.*

30   *Id.*

31   *Id.*

32   *Id.*

33   *Id.*

34   American Red Cross, DOSR#11 at 2 (Aug. 30, 2005).

35   *Id.* at 1.

36   American Red Cross, DOSR#20 at 3 (Sept. 4, 2005).

37   Oct. 11, 2005 Red Cross Interview; Interview by Select Comm. Staff with Joseph C. Becker, Sr. Vice Pres., Preparedness and Response, American Red Cross, in Wash., DC (Oct. 14, 2005) [hereinafter Oct. 14, 2005 Red Cross Interview].

38   Oct. 11, 2005 Red Cross Interview; Oct. 14, 2005 Red Cross Interview.

39   Oct. 14, 2005 Red Cross Interview.

40   *Id.*

41   *Id.*

42   *Id.*

43   *Id.*

44   *Id.*

45   *Id.*

46   *Id.*

47   *Id.*

48   *Id.*

49   American Red Cross, ESF #6 Master Log at 2 (Dec. 22, 2005).

50   *Id.*

51   Oct. 11, 2005 Red Cross Interview; Oct. 14, 2005 Red Cross Interview.

52   Oct. 14, 2005 Red Cross Interview.

53   *Id.*

54   *Id.*

55   *Id.*

56   *Id.*

57   The Select Comm. reviewed planning documentation from individual Red Cross chapters.  Disaster Response Plans were submitted from the following Red Cross chapters:  Southeastern Louisiana (June 205), St. Bernard Parish Chapter (undated), Northwest Louisiana Chapter (June 2005), Northeast Louisiana Chapter (June 2005), Central Louisiana Chapter (Apr. 2002), South Central Mississippi Chapter (Sept. 2004), Mississippi Gulf Coast Chapter (Sept. 2005), Southeast Mississippi Chapter (Feb. 2003), and Alabama Gulf Coast Chapter (Jan. 1997). Statewide plans were received from the Red Cross in Alabama and Mississippi. The Red Cross is now organized into eight Service Areas, rather than by state.  The state plans obtained by the Select Comm. from Alabama and Mississippi are now technically obsolete.

58   Oct. 14, 2005 Red Cross Interview.

59   *Id.*

60   *Hearing on Hurricane Katrina: Preparedness and Response by the Department of Defense, the Coast Guard, and the National Guard of Louisiana, Mississippi, and Alabama Before the Select Comm.*, 109th Cong. (Oct. 27, 2005) (written response to questions for the record of Maj. Gen. Harold A. Cross, the Adjutant General, State of Mississippi.); Mississippi National Guard, Hurricane Katrina Narrative, Daily Logs (Aug. 2005 – Nov. 2005).

61   *Dec. 13, 2005 Ways and Means Oversight Hearing* (written statement of Cynthia Fagnoni).

62   Martha T. Moore, *Red Cross in Critics' Cross Hairs*, USA TODAY, Oct. 17, 2005 [hereinafter Oct. 17 Moore Article].

63   *Id.*

64   *Id.*

65   *Id.*

66   Oct. 14, 2005 Red Cross Interview.

67   *Id.*

68   Oct. 14, 2005 Red Cross Interview; *Dec. 13, 2005 Ways and Means Oversight Hearing* (statement of Joseph C. Becker).

69   Ann Rodgers, *Homeland Security Won't Let Red Cross Deliver Food*, PITTSBURGH POST-GAZETTE, Sept. 3, 2005; *Dec. 13, 2005 Ways and Means Oversight Hearing* (Statement of Joseph C. Becker).

70   Oct. 11, 2005 Red Cross Interview; Oct. 14, 2005 Red Cross Interview.

71   Pre-approved Shelter Listings for Alabama, Mississippi, and Louisiana.

72   Hurricane Katrina Daily Shelter Populations, American Red Cross, Aug. 25, 2005 to Sept. 30, 2005.

73   Telephone Interview by Select Comm. Staff with Lori Polacheck, Senior Counsel, American Red Cross, Wash., DC (Jan. 23, 2005).

74   Oct. 14, 2005 Red Cross Interview.

75   *Id.*

76   Mary Anne Ostrom and Chuck Carroll, *Feds Hold Off On Sending 1,000 Evacuees to California; Families Want to Remain Closer to Home*, SAN JOSE MERCURY NEWS, Sept. 8, 2005 [hereinafter Sept. 8, 2005 Ostrom Article].

77   Sept. 8, 2005 Ostrom Article.

78   Robert Vitale, *With Few Evacuees Interested, Flights to Ohio Canceled*,  THE COLUMBUS DISPATCH, Sept. 11, 2005 at A21 [Sept. 1, 2005 Vitale Article].

79   Sept. 1, 2005 Vitale Article.

80   *Id.*

81   Chris Kenning, *Evacuee Airlift Not Coming To City*, THE COURIER-JOURNAL (Louisville, KY), Sept. 14, 2005 at 1B [Sept. 14, 2005 Kenning Article].

82   Sept. 14, 2005 Kenning Article.

83   *Id.*

84   Oct. 11, 2005 Red Cross Interview; Oct. 14, 2005 Red Cross Interview.

85   *See generally*, Editorial, *Red Cross Operations Due For A Tune-Up*, MIAMI HERALD, Jan. 3, 2006 at A16; Jacqueline L. Salmon, *Red Cross Bolstering Minority Outreach; Recruitment a Priority After Storms Expose Sensitivity Gaps*, THE WASH. POST, Dec. 5, 2005 at A1; Jacqueline L. Salmon and Elizabeth Williamson, *Red Cross Borrowing Funds For Storm Aid – Loan of $340 Million Comes as Nonprofit Draws New Scrutiny*, THE WASH. POST, Oct. 28, 2005 at A1; Oct. 17 Moore Article; Josh Getlin et al., *A Long Road To Recovery; Red Cross' Huge Effort Not Without Critics; Defenders Say The Scope Of The Storms Pushed The Short-Term Aid Expert Out Of Its League*, LA TIMES, Oct. 7, 2005, A1; Josh Getlin et al., *Fundraising Phenom – Red Cross – Is Under Fire*, LA TIMES, Oct. 6, 2005; Chad Terhune, *Along Battered Gulf, Katrina Aid Stirs Unintended Rivalry, Salvation Army Wins Hearts, Red Cross Faces Critics; Two Different Missions*, THE WALL STREET JOURNAL, Sept. 29, 2005 at A1; Associated Press, *Despite Katrina Efforts, Red Cross Draws Criticism*, USA TODAY, Sept. 28, 2005; Sean Gregory, *Trying To Get It Right This Time*, TIME, Sept. 26, 2005 at 24.

86   Press Release, American Red Cross, *Marsha J. Evans Steps Down As American Red Cross President and CEO* (Dec. 13, 2005).

87   David Cary, *American Red Cross President Resigns*, AP, Dec. 14, 2005.

88   *Hearing to Review the Response by Charities to Hurricane Katrina Before Subcommittee on Oversight of the House Committee on Ways and Means*, 109th Cong. (Dec. 13, 2005) (statement of  The Honorable Jim McCrery) [hereinafter *Dec. 13, 2005 Ways and Means Oversight Hearing* (statement of Rep. McCrery)].

89  *Dec. 13, 2005 Ways and Means Oversight Hearing* (statement of Rep. McCrery).

90  Oct. 14, 2005 Red Cross Interview; Facts at a Glance, American Red Cross website (Jan. 9, 2006), http://www.redcross.org/news/ds/ hurricanes/2005/facts.html.

91  *Dec. 13, 2005 Ways and Means Oversight Hearing* (statement of Joseph C. Becker).

92  American Red Cross, *2004 Annual Report* at 8. For a third party view of the Red Cross' finances, *see* Charity Navigator, http://www. charitynavigator.org.

93  *Dec. 13, 2005 Ways and Means Oversight Hearing* (statement of Joseph C. Becker).

94  Oct. 14, 2005 Red Cross Interview.

95  *Id.*

96  *Id.*

97  *Dec. 13, 2005 Ways and Means Oversight Hearing* (statement of Joseph C. Becker).

98  *Id.*

99  *Id.*

100 *Hearing to Review the Response by Charities to Hurricane Katrina Before Subcommittee on Oversight of the House Committee on Ways and Means,* 109th Cong. (Dec. 13, 2005) (statement of Major Todd Hawks, Public Affairs Secretary and Associate National Community Relations and Development Secretary, Salvation Army of America) [hereinafter *Dec. 13, 2005 Ways and Means Oversight Hearing* (statement of Todd Hawks)].

101 *Dec. 13, 2005 Ways and Means Oversight Hearing* (statement of Todd Hawks).

102 *Id.*

103 *Id.*

104 *Id.*

105 *Id.*

106 Nov. 3., 2005 United Way Press Release.

107 Catholic Charities, About, http://www.catholiccharitiesusa.org/about/index.cfm?cfid=6359238&cftoken=12248968.

108 Press Release, Catholic Charities USA, *Catholic Charities USA, 13 Other Major Nonprofits Reaffirm Commitment to Human Needs Aspect of Gulf Coast Recovery* (Jan. 6, 2005), http://www.catholiccharitiesusa.org/news/content_displays.cfm?fuseaction=display_document&id=743&location =3 [hereinafter Jan. 6, 2005 Catholic Charities Press Release].

109 Jan. 6, 2005 Catholic Charities Press Release.

110 *Id.*

111 *Id.*

112 *Id.*

113 Press Release, American Red Cross, *Salvation Army, and United Way, American Red Cross, Salvation Army, and United Way 'Put People First' When Addressing Needs Of Hurricane Katrina Victims – Three Organizations Prepare for Next Disaster* (Sept. 23, 2005) [hereinafter Sept. 23, 2005 Joint Press Release].

114 Center on Philanthropy – Donations; Center on Philanthropy – Spreadsheet.

115 Nov. 3, 2005 United Way Press Release.

116 *Id.*

117 *Id.*

118 Members of NVOAD are: Adventist Community Services, America's Second Harvest, American Baptist Men USA, American Disaster Reserve, American Radio Relay League, Inc. (ARRL), American Red Cross, Ananda Marga Universal Relief Team (AMURT), Catholic Charities USA, Center for International Disaster Information (formerly Volunteers in Technical Assistance), Christian Disaster Response, Christian Reformed World Relief Committee (CRWRC), Church of the Brethren-Emergency Response, Church World Service, Convoy of Hope, Disaster Psychiatry Outreach, Episcopal Relief and Development, Friends Disaster Service, Inc., Humane Society of the United States International Aid, International Critical Incident Stress Foundation, International Relief Friendship Foundation (IRFF), Lutheran Disaster Response, Mennonite Disaster Service, Mercy Medical Airlift (Angel Flight), National Emergency Response Team, National Organization for Victim Assistance, Nazarene Disaster Response, Northwest Medical Teams International, Presbyterian Church (USA), REACT International, Inc., Society of St. Vincent de Paul, Southern Baptist Convention, The Points of Light Foundation, The Salvation Army, United Church of Christ-Wider Church Ministries, United Jewish Communities, United Methodist Committee on Relief, United Way of America, Volunteers of America, and World Vision. *See* NVOAD, Members, http://www.nvoad.org/membersdb.php?members=National.

119 *Dec. 13, 2005 Ways and Means Oversight Hearing* (written statement of Cynthia Fagnoni); NVOAD, About, http://www.nvoad.org/about.php [hereinafter Website Materials, About NVOAD].

120 *Id.*

121 *Id.*

122 *Id.*

123 *Id.*

124 *Id.*

"Order is indeed the dream of man,
but chaos, which is only another word for dumb, blind, witless chance,
is still the law of nature."

WALLACE STEGNER
*Crossing to Safety*


"Nature, to be commanded, must be obeyed."

FRANCIS BACON

BARGE000435

# CONCLUSION

The preparation for and response to Hurricane Katrina should disturb all Americans. While the Select Committee believes all people involved, at all levels of government, were trying their best to save lives and ease suffering, their best just wasn't good enough.

In this report we have tried to tell the story of the inadequate preparation and response. We cover a lot of territory – from evacuations to medical care, communications to contracting. We hope our findings will prompt the changes needed to make all levels of government better prepared and better able to respond the next time.

The resolution that created the Select Committee charged us with compiling findings, not recommendations. But in reality that's a distinction without a difference. Moving from our findings to legislative, organizational, and policy changes need not be a long or difficult journey.

We are left scratching our heads at the range of inefficiency and ineffectivness that characterized government behavior right before and after this storm. But passivity did the most damage. The failure of initiative cost lives, prolonged suffering, and left all Americans justifiably concerned our government is no better prepared to protect its people than it was before 9/11, even if we are.

How can we set up a system to protect against passivity? Why do we repeatedly seem out of synch during disasters? Why do we continually seem to be one disaster behind?

We have not found every fact nor contemplated all successes and failures. What we have done over four months is intensely focus on a three-week period, uncovering a multitude of problems. We have learned more than enough to instruct those who will now have to craft and execute changes for the future.

We leave it to readers to determine whether we have done a fair and thorough job, and whether we identified and supported findings in a way that will foster change. Some predicted we would place disproportionate blame on one person or another, or that we would give some others a pass. We hope it is clear we have done neither.

We have not sought to assign individual blame, though it is clear in our report that some were not up to the challenge that was Katrina. Rather, we have tried to tell the story of government's preparation for and response to a massive storm, and identify lessons learned.

Our interaction with the White House illustrates this point. Some insist the White House's failure to provide, for example, e-mails to and from the White House Chief of Staff means we have insufficient information to determine why government failed. That view exalts political curiosity over the practical realities of a serious investigation.

While our dealings with the White House proved frustrating and difficult, we ended up with more than enough information to determine what went wrong there, to form a picture of a White House that, like many entities, was overcome by the fog of war. There is a big difference between having enough information to find institutional fault, which we do, and having information to assign individual blame, which, in the case of the White House, in large part we do not.

It's the former that's important if the goal is to be better prepared the next time. This was not about some individual's failure of initiative. It was about organizational and societal failures of initiative. There was more than enough failure to go around:

- Tardy and ineffective execution of the National Response Plan.
- An under-trained and under-staffed Federal Emergency Management Agency.
- A Catastrophic Incident Annex that was never invoked, and doubt that it would have done the job anyway.
- A perplexing inability to learn from Hurricane Pam and other exercises.
- Levees not built to withstand the most severe hurricanes.
- An incomplete evacuation that led to deaths and tremendous suffering.
- A complete breakdown in communications that paralyzed command and control and made situational awareness murky at best.
- The failure of state and local officials to maintain law and order.
- Haphazard and incomplete emergency shelter and housing plans.
- An overwhelmed FEMA logistics and contracting system that could not support the effective provision of urgently needed supplies.

The Select Committee encountered shortcomings and challenges even among those response elements that went relatively well and saved many lives. The military performed an invaluable role once forces were deployed, but encountered coordination problems with FEMA, the National Guard, and state officials. State-to-state emergency aid compacts were critical in restoring law and order and accelerating relief supplies, but too many people remain unfamiliar with the process. Contributions from charitable groups were enormously helpful, but they too were overwhelmed by the size of the storm.

Many of our findings are mixed in nature. Evacuations of general populations, for example, went relatively well in all three states. But declarations of mandatory evacuations in metropolitan New Orleans came late or not at all, and that, coupled with the decision to shelter but not evacuate the remaining population prolonged suffering. We saw heroic examples of medical care and patient needs being met under dire circumstances. But too often the deployment of medical personnel was reactive, not proactive.

The Select Committee acknowledges it was often torn between sympathy and incredulity, compassion and criticism. On the one hand, we understood Katrina was so big and so devastating that death and chaos were inevitable. We understood that top federal, state, and local officials overlooked some steps and some needs in the hours and days after landfall because they were focused on saving lives. But on the other hand, a dispassionate review made it clear that even an extraordinary lack of situational awareness could not excuse many of the shortcomings and organizational inaction evident in the documents and communications the Select Committee reviewed.

Leadership requires decisions to be made even when based on flawed and incomplete information. Too often during the immediate response to Katrina, sparse or conflicting information was used as an excuse for inaction rather than an imperative to step in and fill an obvious vacuum. Information passed through the maze of departmental operations centers and ironically-named "coordinating" committees, losing timeliness and relevance as it was massaged and interpreted for internal audiences.

As a result, leaders became detached from the changing minute-to-minute realities of Katrina. Information translated into pre-cast bureaucratic jargon put more

than geographic distance between Washington and the Gulf coast. Summaries and situation reports describing the gross totals of relief supplies directed to affected areas did not say when or how or to whom those desperately needed supplies would be delivered. And apparently no one asked.

Communications aren't a problem when you're only talking to yourself.

The Select Committee believes too many leaders failed to lead. Top aides failed as well, primarily in mis-prioritizing their bosses' attention and action. Critical time was wasted on issues of no importance to disaster response, such as winning the blame game, waging a public relations battle, or debating the advantages of wardrobe choices.

We have spared our readers a rehashing of unflattering e-mails involving Michael Brown and Governor Blanco and others, as they have been given more than enough attention by the media. We will pause only briefly here to urge future responders to make people, not politics, their priority.

We further urge public officials confronting the next Katrina to remember disaster response must be based on knowledge, not rumors. Government at all levels lost credibility due to inaccurate or unsubstantiated public statements made by officials regarding law and order, levee breaches, and overall response efforts.

The media must share some of the blame here. The Select Committee agrees the media can and should help serve as the public's "first informer" after disasters. In the 21st century, Americans depend on timely and accurate reporting, especially during times of crisis. But it's clear accurate reporting was among Katrina's many victims. If anyone rioted, it was the media. Many stories of rape, murder, and general lawlessness were at best unsubstantiated, at worst simply false. And that's too bad, because this storm needed no exaggeration.

As discussed in our report, widely-distributed uncorroborated rumors caused resources to be deployed, and important time and energy wasted, chasing down the imaginary. Already traumatized people in the Superdome and elsewhere, listening to their transistor radios, were further panicked.

"The sensational accounts delayed rescue and evacuation efforts already hampered by poor planning and a lack of coordination among local, state, and federal

agencies. People rushing to the Gulf coast to fly rescue helicopters or to distribute food, water and other aid steeled themselves for battle. In communities near and far, the seeds were planted that the victims of Katrina should be kept away, or at least handled with extreme caution," the *Washington Post* reported on October 5.[1]

Lt. Gen. H. Steven Blum told the Select Committee on October 27, "We focused assets and resources based on situational awareness provided to us by the media, frankly. And the media failed in their responsibility to get it right. …we sent forces and capabilities to places that didn't need to go there in numbers that were far in excess of what was required, because they kept running the same B roll over and over….and the impression to us that were watching it was that the condition did not change. But the conditions were continually changing."[2]

E-mails obtained by the Select Committee reinforce the conclusion that top military officials were relying on news reports for information – information used to plan and deploy resources.[3]

The Select Committee does not mean to suggest the media is solely responsible for responders' lack of situational awareness, or the destruction of communications infrastructure that thrust television into the role of first informer for the military as well as the general public. Nor is the media solely responsible for reporting comments from sources they believed to be credible – especially top officials.

The Select Committee does, however, believe such circumstances make accurate reporting, especially in the period immediately after the storm, all the more important. Skepticism and fact-checking are easier when the sea is calm, but more vital when it is not.

As with so many other failures related to Katrina, what's most vexing is that emergency managers should have known such problems would arise among the chaos. Dr. Kathleen Tierney, head of the University of Colorado-Boulder Natural Hazards Center, told Select Committee staff that misleading or completely false media reports should have been among the most foreseeable elements of Katrina. "It's a well-documented element of disaster response," she said. "What you do has to be based on knowledge, not rumor, and you're going to be faced with a lot of rumors."[4]

Benigno Aguirre, sociology professor at the University of Delaware Disaster Research Center, told the *Philadelphia Inquirer*, "It's discouraging for those who spend their lives studying disaster behavior that journalists so often get it wrong."[5]

Former FEMA Director Michael Brown told the Select Committee one of his biggest failures was failing to properly utilize the media as first informer.

"I failed initially to set up a series of regular briefings to the media about what FEMA was doing throughout the Gulf coast region," Brown said at the Select Committee's September 27 hearing. "Instead, I became tied to the news shows, going on the news shows early in the morning and late at night, and that was just a mistake. We should have been feeding that information to the press…in the manner and time that we wanted to, instead of letting the press drive us."[6]

Finally, a word about public communications. Both the message and the messengers were ineffective before and after Katrina. Messages to the public were uncoordinated and often confusing, leaving important questions unanswered. Federal, state, and local officials did not have a unified strategy for communicating with the public.

Risk communication is a well-researched field of study. There are accepted core principles for successfully communicating risks to the public. Information about threats should be consistent, accurate, clear, and provided repeatedly through multiple methods. It should be timely. It should be specific about the potential threat. It needs to get to people regardless of their level of access to information.

The Select Committee heard loud and clear from Gulf coast residents that the dangers of the coming hurricane could have been presented in a more effective manner, an issue which also carried racial and socioeconomic implications. If people don't hear a message from someone they trust, they will be skeptical.

Doreen Keeler, a New Orleans resident who evacuated before Mayor Nagin called for a mandatory evacuation, told the Select Committee local officials should have called for mandatory evacuations earlier, noting how difficult it was to convince the elderly residents of New Orleans to leave.[7] "If a mandatory evacuation would have been called earlier," she said, "it would have been easier to move seniors out of the area and many lives would have been saved. It took me almost 24 hours to get my in-laws to leave. Others tell the same story. The severity of the storm was not stressed by elected officials."[8]

The relevant "elected officials," we are sure, would contest that. In fact they did, in testimony before the Select Committee. But it's the public perception of what was stressed that's important here. The failure of initiative was also a failure of empathy, a myopia to the need to reach more people on their own terms.

Four and half years after 9/11, Americans deserve more than the state of nature after disaster strikes. With this report we have tried to identify where and why chaos ensued, so that even a storm the size of Katrina can be met with more order, more urgency, more coordination, and more initiative. ■

---

1   Robert E. Pierre and Ann Gerhart, *News of Pandemonium May Have Slowed Aid*, WASHINGTON POST, Oct. 5, 2005, at A8.

2   *Hearing on Hurricane Katrina: Preparedness And Response By The Department Of Defense, The Coast Guard, And The National Guard Of Louisiana, Mississippi And Alabama Before the Select Comm.*, 109th Congress (Oct. 27, 2005), (statement of  Lt. Gen. H. Steven Blum, Chief, Nat'l Guard Bureau).

3   *See* e.g., E-mail correspondence from 1A JOC Watch Battle Captain to Lt. General Russell Honoré (Aug. 29, 2005).

4   Interview by Select Comm. Staff with Kathleen J. Tierney, Director, Natural Hazards Research and Applications Information Center, Institute of Behavioral Science, U. of Colorado at Boulder (Oct. 6, 2005).

5   Beth Gillin, *Katrina Spawned rumors; media ran with them*, THE PHILADELPHIA INQUIRER, Sept. 28, 2005, at A2.

6   *Hearing On Hurricane Katrina: The Role Of The Federal Emergency Management Agency Before the Select Comm.*, 109th Congress (Sept. 27, 2005), (statement of Michael D. Brown, former Undersecretary of Emergency Preparedness and Response, DHS).

7   *Hearing on Hurricane Katrina: Voices from Inside the Storm Before Select Comm.*, 109th Congress, (Dec. 6, 2005) (written statement of Doreen Keeler Tomlinson, resident of New Orleans, LA).

8   *Id.*

BARGE000441