# EXHIBIT 7



KDON Marine Consulting
**8876 Gulf Freeway, Suite 120**
Houston, Texas 77017

(713) 944-0966                                Fax (713) 944-2546

---

June 13, 2008

Declaration of
Donald J. Green
Commander, USCG (Retired)
Marine Consultant

Ref:   In Re: Ingram Barge, Civil Action No. 05-5724, Sec. "C", Mag. (2), consolidated into Civil Action No. 05-4419 And In Re: Katrina Canal Breaches Litigation; In the United States District Court, Eastern District of Louisiana
KDON File:  06538

### 1.    INTRODUCTION

The following are my opinions regarding the circumstances surrounding the breakaway of the barge *ING 4727* from the Lafarge North America Inc. (LNA) facility, Inner Harbor Navigation Canal (IHNC) a/k/a Industrial Canal, New Orleans, Louisiana, during hurricane Katrina on or about the morning of August 29, 2005.

### 2.    BASIS OF OPINION

In order to render my opinions outlined below I have reviewed and considered the following information:

#### 2.1    Information Reviewed

- Various photographs;
- Transportation Agreement: Ingram contract with Lafarge;
- Service Agreement: Zito Fleeting, LLC contract with Ingram Barge Company;
- Logs of Unique Towing;
- Joseph C. Domino, Inc. Invoice, dated 8/27/05;
- Joseph C. Domino, Inc., Policies and Procedures Manual;
- Certificate of Documentation for the *REGINA H;*
- Certificate of Insurance: Gulf Coast Marine, LLC;
- Hull Policy: Lizana/Unique Towing, Inc., Richard C. Heck & Joseph M. Lizana;
- Policy of Insurance: Heck/Lizana/Unique Towing, Inc.;
- Deposition of Gerald McNeill, Joe Domino, Inc., Tug Broker;
- Exhibits to McNeill deposition;

- Deposition of Captain Grabert, Captain of the *REGINA H*;
- Deposition of Eric Thigpen, deckhand;
- Deposition of Daniel Mecklenborg, Ingram Corporate Representative/House Counsel;
- Deposition of Terry Adams, eyewitness;
- Deposition of Ed VanderMuelen, Lafarge Corporation Representative;
- Deposition of Ed Busch, Lafarge Assistant Terminal Manager;
- Deposition of Earl Smith, Lafarge Employee;
- Deposition of Pankaj Shah, Ingram Barge Company Vice President;
- Deposition of Scott Nobles, Ingram Barge Company Vice President;
- Deposition of David Sehrt, Ingram Barge Company Senior Vice President;
- Deposition of David Feagley, Ingram Barge Company Operations Manager;
- Deposition of Jim Reed, resident of Saint Bernard's Parish
- Deposition excerpts of William Villavaso, Sewerage & Water Board employee;
- Coast Guard Sector New Orleans Maritime Hurricane Contingency Port Plan;
- Coast Guard Sector New Orleans Hurricane Plan;
- Greater New Orleans Barge Fleeting Association Guidebook;
- Records of National Hurricane Center;
- National Hurricane Center: KATRINA Graphics Archive;
- U.S. Coast Guard documents:
  1. Press Release: Media Advisory: Coast Guard Prepares for Hurricane Katrina, dated 8/27/05;
  2. Press Release: Media Advisory: Web site launched to provide latest Coast Guard Information on Hurricane Katrina Operations, dated 8/27/05;
  3. Press Release: Coast Guard Urges Mariners to Prepare for Hurricane Katrina, dated 8/27/05;
  4. Marine Safety Bulletin: Set Port Condition WHISKEY, dated August 2005;
  5. Marine Safety Information Bulletin 22-05, dated 8/27/05;
- Database printout of towing vessels used by Ingram (about 25 listed in Louisiana for August 2005);
- Daily barge position reports;
- State of Emergency/Parish Evacuation Orders;
- U.S. Coast Guard Local Notice to Mariners, dated August 24 and September 14, 2005;
- Weather Advisories from Impact Weather, Ingram Bates numbers: 0649, 1650, 0651, 0665, and 0668;
- Ingram Barge Company list of towing vendors utilized between June and December 2005;
- Lafarge North America Responses to Interrogatories/Request for Production of Documents;
- Lafarge Response to Request for Admissions with attachments:
  1. Barge *ING 4727*, Barge Unloading Report, dated 8/26/05;
  2. NWO Terminal Report, dated 8/22/05;
  3. Fleet Picture, dated 8/9/05;
  4. Lafarge Barge/Truck/Rail report, dated 5/16/05;
  5. Statement of Ed Busch;
  6. Statement of Earl L. Smith; and
  7. New Orleans Terminal Hurricane Preparation Checklist; and
- Ingram Responses to Request for Admissions.

2

BARGE000525

## 2.2 Additional Considerations

In addition to the above, I have reviewed safety procedures, federal rules and regulations, the Coast Guard online database, conducted online research for information regarding Hurricane Katrina, reviewed Coast Guard Marine Safety Bulletins, and various news reports regarding Hurricane Katrina, visited and inspected the remnants of the mooring lines used to moor the *ING 4727* and the *ING 4745* together, visited the Lafarge waterfront facility, inspected the *ING 4727,* and drawn on personal experience and training; all for the purpose of rendering opinions as to the cause or causes of the breakaway of barge *ING 4727*.

## 3. CIRCUMSTANCES

This case involves the breakaway of the uninspected and undocumented hopper barge *ING 4727* from the Lafarge North America, Inc. cement facility, New Orleans, Louisiana during Hurricane Katrina. The *ING 4727* is of the following particulars.

| | |
|---|---|
| Registration/VIN: | Undocumented |
| Service: | Barge |
| Operator: | Ingram Barge Company |
| Date of Build: | 1990 |
| Propulsion: | Non-self-propelled |
| Hull Material: | Steel |
| Gross Tons: | 960 tons (Estimated) |
| Net Tons: | 960 tons (Estimated) |
| Length: | 200.0 ft. |
| Breadth: | 35 ft. |
| Depth: | 12 ft. |
| Light draft: | 1'4.5" |

At the time of the breakaway the *ING 4727* was empty and moored outboard and alongside the loaded *ING 4745* at the Lafarge North America, Inc., facility located on the west side of the Inner Harbor Navigation Canal, between the Florida Avenue and Claiborne Avenue bridges, New Orleans, Louisiana.

### 3.1 Breakaway

### 3.1.2 General

During the early morning hours of August 29, 2005, the *ING 4727* broke free of its moorings during Hurricane Katrina and drifted south in the IHNC  The *ING 4727* passed through the levee, eventually coming to rest in the adjacent residential neighborhood within the Lower Ninth Ward.

The National Hurricane Center, Hurricane Katrina Intermediate Advisory Number 26A, 6 AM CST Monday August 29, 2005, reported that the hurricane was located about 70 miles south-southeast of New Orleans, Louisiana. The Advisory indicated that maximum sustained winds were near 145 MPH with higher gusts, a category four hurricane, and that hurricane force winds extended outward up to 120 miles from the center.

The *ING 4727* had been delivered to the Lafarge facility, loaded with oil field grade cement, on the morning of August 26, 2005, at about 1125 hours by the towing vessel *CONNIE Z*, operated by Zito Fleeting, LLC, an agent for Ingram Barge Company. Lafarge completed unloading the *ING 4727* on the morning of August 27th. Mr. Ed Busch, Lafarge Assistant Terminal Manager, testified that he telephoned Zito Fleeting at about 0900 hours and, not having reached anyone, left a voice message that the *ING 4727* was ready to be picked up. The *ING 4727* was never picked up by Zito Fleeting, LLC before the onslaught of Hurricane Katrina.

Mr. Busch testified that, during the morning of the 27th, Lafarge personnel made preparations for the expected arrival of Hurricane Katrina. At that time there were 7 barges located at the Lafarge facility arranged in two (2) tiers; one tier of 5 loaded barges was secured to the north end of the facility dock; and the other tier, adjacent to the north tier, consisted of two (2) barges, one loaded and the *ING 4727*, which, by that time was empty and moored against the dock. Witness testimony indicates that the difference in freeboard (height) between the *ING 4727* and the *ING 4745* was about 6-8 feet. The two barges were reported secured together with 3 one-part mooring lines. Mr. Busch stated that he was concerned about having the empty *ING 4727* on the inside against the dock and the loaded barge on the outside fearing that the *ING 4727* would possibly rise over the dock with the expected storm surge. At about 1000 hours on August 27th, Mr. Busch called Joseph C. Domino, Inc., a towing vessel broker, and requested a towing vessel be dispatched to Lafarge to top around the *ING 4727* and *ING 4745*, placing the loaded *ING 4745* against the dock. He did not request them to add or supply additional mooring lines. Shortly thereafter, about noon on the 27th, Mr. Busch and other Lafarge personnel reportedly secured the facility and barges and evacuated the area.

Mr. Busch testified that prior to the onset of Hurricane Katrina the Lafarge facility's communication capabilities were limited. Mr. Busch stated that telephone service was limited, and email service had been down since some time before the storm. Communications were limited to Nextel cell phone service. Mr. Busch testified that he and other Lafarge personnel were alerted that Hurricane Katrina was heading for New Orleans by family via cell phone calls.

Mr. Gerald McNeill, Joseph C. Domino, Inc., dispatched the towing vessel *REGINA H* to the Lafarge facility to affect the top around of the barges at the Lafarge facility. At about 1425 hours on the 27th, the *REGINA H* arrived at the Lafarge facility, which was at that time abandoned. The *ING 4727* and the *ING 4745* were topped around and secured. Eric Thigpen, deckhand aboard the *REGINA H,* testified that he secured the loaded *ING 4745* to the dock using 3 or 4 mooring lines. Mr. Thigpen testified that he observed that the *ING 4745* and the *ING 4727* were moored together with 3 one-part 2-inch mooring lines; one (1) line on each end and one (1) line about amidships. Both Mr. McNeill and Captain Raymond Grabert, Jr., captain of the *REGINA H,* testified that, had they been asked to remove the ING *4727* from the Lafarge facility, it could have been towed to a fleet in the Mississippi River. There was also testimony that rigging or mooring lines could have been added if requested.

Captain Grabert testified that he assumed the barges he was instructed to top around had sufficient rigging in place; therefore, he did not bring extra rigging. Deckhand Thigpen testified that he had to search the Lafarge dock for additional lines with which to secure the *ING 4745* to the dock. He, Thigpen, stated that he found one additional line on the dock, which he utilized in securing the two barge tier to the dock.

Mr. Busch testified that he instructed his personnel to secure the barges to the dock in such a manner as to allow for the expected storm surge. Mr. Busch described the arrangement as follows: The mooring was secured to a mooring bollard affixed to the dock then looped around the cement pilings with 3 loops thence to the cleats or bitts on the barge. Mr. Busch theorized that this method would allow a pay out of the mooring line as the water level rose in the canal. Aerial photographs of the Lafarge facility subsequent to the passage of Hurricane Katrina reveal that the northern most mooring line of the northern tier of the five (5) loaded barges apparently slipped over the piling allowing the northern tier to shift away from the dock toward the southern tier of barges. The Lafarge New Orleans Terminal Hurricane Preparation Checklist requires that all barges be cabled to shore. Mr. Busch's method of securing the barges to the facility dock was also contrary to Lafarge's published procedure.

Mr. Stanley Cook, Ingram Barge Company area maintenance manager testified that he was directed by an unidentified Ingram person to check Ingram barges in the area. Mr. Cook visited the Lafarge facility on the morning of August 27, 2005, ostensibly to only check barge covers. Mr. Cook testified *"I was instructed to go out and check the covers; make sure they were being tied down; if they did not have line, provide them with the line to do so."* (Cook deposition: Page 69, line 25 to page 70, line 2). Mr. Cook, a retired Coast Guard officer, testified that he was not concerned with the safety of the barges.

### 3.1.3   Breakaway Event

Mr. William Villavaso, eyewitness, testified that on the morning of August 29, 2005, between the hours of 0400-0610, he witnessed a barge strike the floodwall resulting in a breach near the Florida Avenue Bridge. Mr. Villavaso was a Sewerage & Water Board employee stationed at the Sewerage & Water Board facility near the Florida Avenue Bridge. Mr. Villavaso was standing in a doorway when he heard an explosion and saw what appeared to him to be a barge, which broke the floodwall. Mr. Villavaso said the wall *"looked like a mouth with a tooth out"*. After such time the area and facility proceeded to flood.

Mr. Terry Adams, eye witness, testified that on the morning of August 29, 2005, at about 0530-0600 hours, he witnessed a barge in the canal heading for the levee. Mr. Adams stated that he heard a bang followed within minutes by a tidal wave coming through the levee.

The *ING 4727* eventually came to rest within the Lower Ninth Ward (South breach). Post Katrina aerial photographs of the area show the *ING 4727* located in the area just east of the IHNC east levee near the Claiborne Street Bridge.

The *ING 4727* was subsequently cut up into sections and removed from the area.

### 3.1.4   Significant Events

The Coast Guard, the National Hurricane Center and national and local news organizations all issued a plethora of bulletins, broadcasts, warnings and advisories to the marine industry and to the public at large advising that Hurricane Katrina was a dangerous hurricane and that its expected trajectory would take it toward the Greater New Orleans area.

Mr. Busch, the interim Lafarge manager, called Zito Towing ostensibly to have them remove the empty *4727* to a fleet, but failed to follow-up and later failed to instruct Joseph C. Domino, Inc. to provide and install additional mooring.

The *REGINA H*, which was dispatched to top around the *ING 4745* and the *ING 4727*, did not carry extra mooring rigging even though it was evident that the mission to top around the barges was because of the expected hurricane force winds and surge expected in the New Orleans area. The testimony of Mr. Thigpen is that he had to search the Lafarge dock for additional lines with which to secure the barges once they were topped around. Both Captain Grabert and Mr. Thigpen testified that the *ING 4727* and the *ING 4745* were moored together with only 3 one-part 2-inch polypropylene lines.

## 4. APPLICABLE STANDARDS AND REGULATIONS

Coast Guard Sector New Orleans Hurricane plan, Annex C provides for task requirements at port conditions Whiskey, X-Ray, Yankee and Zulu, as set forth therein. Particularly, port condition X-Ray requires that a facility: a) determine the special needs and attentions of vessels moored at the facility; and b) determine whether vessels desiring to remain moored at this facility during the hurricane will be allowed to do so. Notify the vessel master, vessel agent, and the COTP of the facilities decision.

Title 33 Code of Federal Regulations (CFR) Part 6, PROTECTION AND SECURITY OF VESSELS, HARBORS, AND WATERFRONT FACILITIES, § 6.14-2 Condition of waterfront facility a danger to vessel, and § 6.19–1 Responsibility for Security of Vessels and Waterfront Facilities, Primary responsibility. Both regulations cite conditions under which the Captain of the Port finds that the mooring of any vessel to a wharf, dock, pier, or other waterfront structure would endanger such vessel, or the harbor or any facility therein by reason of conditions existing on or about such wharf, dock, pier, or other waterfront structure; however, regardless of the Coast Guard's authority in this regard, the masters, owners, and agents of vessels or other waterfront facility have <u>primary</u> responsibility for the protection and security of such vessels.

Greater New Orleans Barge Fleeting Association's "Standard of Care & Streamlined Inspection Program Guide Book" – This guide book, although not a requirement for vessels moored in the IHNC, provides a comprehensive guide to the proper, safe and adequate mooring methods for fleet and facility operators. On page 17, the guide advises that moorings from high to low fittings should be avoided if the fitting on the lower barge may allow the line to slip off.

Coast Guard Sector New Orleans Hurricane Plan; Enclosure (11) Maritime Hurricane Contingency Port Plan "A Guide to Port Planning and Preparation" Appendix 2- Recommended Precautionary Measures for Barges, Applies to Barges: Moored:

> *"Mooring lines doubled up with due consideration given to the effects of predicted storm surge.* **Special attention should be paid to barges moored in the proximity of bridges."** (Emphasis added) (Note: The Lafarge facility is located between two (2) major bridges used as primary evacuation routes from the Lower Ninth Ward of New Orleans.)
>
> *"Spare mooring lines and/or wires should be readily available."*

BARGE000529

Coast Guard Sector New Orleans – Marine Safety Bulletin, Volume V, Issue XXXV, dated August 2005 – This bulletin notified the general maritime industry that <u>Port Condition WHISKEY</u> had been set. The bulletin states: "*All vessels operating below the Huey P. Long Bridge are <u>strongly urged</u> to implement these measures*". The applicable measure, which applied to the *ING 4727* was: "*Mooring lines doubled up with due consideration given to the effects of predicted storm surge. Spare mooring lines and/or wires should be readily available*" The bulletin further recommended to marine operators: "*You are encouraged to review your existing hurricane plan or develop a plan if you do not have one."* Lafarge did not have a hurricane plan, but only a single page Hurricane Checklist.

**5.    OPINIONS**

**5.1**   Subject to receiving additional information or records it is my opinion that the cause or causes of the breakaway of the *ING 4727* from its mooring at the Lafarge facility during Hurricane Katrina was most likely the combination of hurricane force winds and rising water levels in advance of Hurricane Katrina, known to all parties, and the acts and omissions of the parties discussed herein. Post hurricane aerial photographs reveal that the northern tier of five (5) loaded barges' northern mooring lines slipped or parted allowing the tier of barges to set down and allide with the southern tier of barges, *ING 4727* and *ING 4745*. It is possible that the resultant forces of an allision between the tiers of barges would have caused the 3 single-part mooring lines between the *ING 4727* and the *ING 4745* to part allowing the *ING 4727* to drift uncontrollably in hurricane winds toward the levee.

**5.2**   It is my opinion that Lafarge North America, Inc.'s New Orleans facility failed to properly moor the *ING 4727* to the *ING 4745* to withstand the hurricane force winds and predicted storm surge expected upon the approach of Hurricane Katrina. The testimony of witnesses indicates that the two barges were moored together with 3 one-part 2-inch polypropylene mooring lines and that the height difference between the two barges was about 6 feet. This mooring arrangement, in my opinion, is totally inadequate to prevent a breakaway during hurricane force winds. Further, it is my opinion that the decision to top around the barges, placing the empty *ING 4727* on the outboard side of the tier, was imprudent, unseamanlike and unnecessarily exposed the empty *ING 4727* to the likelihood of breaking away from its moorings. Additionally, the fact that there were 7 barges moored at the Lafarge facility and the only barge that broke loose from its mooring was the empty *ING 4727* leads one to the conclusion that had Lafarge not discharged the *ING 4727* it is more likely than not that the breakaway would not have occurred.

**5.3**   It is my opinion that Lafarge North America, Inc. violated their own published "Hurricane Preparation Checklist" by not cabling the barges to shore. The testimony of Mr. VanderMuelen indicates that the mooring procedure was changed in practice some years ago to the procedure used by Mr. Busch to prepare the facility for Katrina. It is my opinion that had Lafarge personnel followed the published procedure to cable the barges to shore, as opposed to using soft line to secure the barges to the dock, the northern most mooring line on the 5 barge tier would have held the tier against the dock and not allowed the tier to shift south striking the adjacent 2 barge tier, which included the *ING 4727*.

**5.4** It is my opinion that Lafarge's failure to order Joseph C. Domino, Inc., to provide additional rigging and to remove the *ING 4727* from the facility and tow it to a fleet in the Mississippi River rather than top the two barges around could and would have prevented this breakaway.  The testimony of Mr. Gerald McNeill, Joseph C. Domino, Inc., indicates that *REGINA H* could have towed the *ING 4727* had Lafarge ordered it to do so.

**5.5** It is my opinion that Lafarge failed to ensure that the *ING 4727* and *ING 4745* had sufficient rigging and or mooring lines to secure the two barges together at the Lafarge dock facility.  It is my opinion that it was their duty and responsibility to ensure that the barges were secured in such a manner, i.e. doubled up mooring lines, to withstand the expected hurricane force winds and tides of Hurricane Katrina, which they did not do.  Had Lafarge requested of Joseph C. Domino, Inc., at the time they requested a towing vessel top around the barges, to provide additional lines to double up the mooring lines between the *ING 4727* and the *ING 4745*, the *REGINA H* could and would have provided extra mooring lines.

**5.6** It is my opinion that Lafarge North America, Inc., violated the provisions of 33 CFR 162.75 (b)(3)(ii) Anchoring and Mooring: for their failure to ensure that the *ING 4727* was adequately moored to withstand the anticipated hurricane force winds of Hurricane Katrina.  The available testimony in this case clearly demonstrates this to be the case.

**5.7** It is my opinion that Lafarge North America, Inc., violated the provisions of 33 CFR 6.19, Primary responsibility, for their failure to ensure that the *ING 4727* was secure and safe at the Lafarge facility.  Again, the available testimony in this case clearly demonstrates this to be the case.

**5.8** It is my opinion that Lafarge failed to adhere to the recommendations of the Coast Guard Sector New Orleans Hurricane plan, particularly Appendix 2 requiring that mooring lines be doubled up and that special attention be given to barges moored in the proximity of bridges.  In addition, Lafarge failed to adhere to the recommendations of Annex C by failing to determine the special needs and intentions of vessels moored at the facility, failing to determine whether vessels desiring to remain moored at the facility during the hurricane would be allowed to do so and failing to notify the vessel master, vessel agent, and the COTP of the facilities decision.  Had such notification taken place, it is clear that the vessel master, vessel, and the COTP would have been apprised that the ING 4727 was released for pick-up and moored with only 3 single part lines. Such notification would have resulted in the vessel being moved and/or properly secured thus preventing the breakaway.

**5.9** It is my opinion that the breakaway of the *ING 4727* was preventable through the application of good seamanship and the maritime standards of care discussed in this report.

**6.    PROFESSIONAL SERVICE FEES**

Fees for my professional services are as follows:

- For review, investigation, issuing report or court appearance:  $350.00 per hour

7.   **CURRICULUM VITAE**

A copy of my Curriculum Vitae and List of Cases is attached hereto.

8.   **PUBLICATION, BOOKS, AND ARTICLES PUBLISHED**

I have not published or written any books, publications or articles during my career.

9.   **COMMENTS**

The above opinions are based on more than 40 years of marine experience, training, education, service aboard vessels, inspection and examination of vessels, and investigation of hundreds of marine casualties to determine cause, and enforcement of U.S. Statutes with regard to vessel and personnel safety.  I am a Commander in the U.S. Coast Guard (Retired).  I hold a Master 1600 Gross Ton Oceans, Second Mate Unlimited Tonnage and Master Towing Vessels Oceans and Western Rivers license issued by the U.S. Coast Guard.  I am also a Coast Guard certified instructor of navigation, seamanship, vessel safety, radar theory, collision avoidance and Navigation Rules (Rules of the Road).

This is a preliminary report and may be revised or amended upon receipt of further information.

Sincerely,

*[signature]*

D. J. Green
Commander, USCG (Retired)
Marine Consultant

Attachments:   CV and List of Cases