# EXHIBIT 11

1                UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF LOUISIANA

3

4    IN THE MATTER OF THE        *    CIVIL ACTION
     COMPLAINT OF INGRAM         *
5    BARGE COMPANY, AS OWNER     *    NO. 05-4419
     OF THE ING4727,             *        C/W 05-4237
6    PETITIONING FOR             *        C/W 05-5531
     EXONERATION FROM OR         *        C/W 05-5724
7    LIMITATION OF LIABILITY     *    SECTION "C" (2)
                                 *
8                                *    JUDGE HELEN G.
                                 *        BERRIGAN
9                                *
                                 *    MAG. JUDGE, JOSEPH
10                               *        WILKENSON, JR.
                                 *
11   *  *  *  *  *  *  *  *  *  *  *  *  *

12

13

14              Deposition of David Scott Castaing taken

15   at the law offices of Sutterfield and Webb,

16   located at 650 Poydras Street, Suite 2715, New

17   Orleans, Louisiana 70130, beginning on the 30th

18   day of November, 2006.

19

20

21

22   Reported by:

23           Peter Caruso, CCR-CVR
             Certified Court Reporter
24

25

BARGE000613

2

```
1    APPEARANCES:

2

     Representing the Plaintiffs,
3         Ethel Mumford, et al:

4         WIEDEMANN & WIEDEMANN
          Attorneys at Law
5         By: Lawrence D. Wiedemann, Esq.
          821 Baronne Street
6         New Orleans, Louisiana 70113

7         LAW OFFICE OF BRIAN A. GILBERT
          Attorneys at Law
8         By: Brian A. Gilbert, Esq.
          3232 Edenborn Avenue
9         Metairie, Louisiana 70002

10        MR. PATRICK J. SANDERS, ESQ.
          Attorney at Law
11        3316 Ridgelake Drive
          Metairie, Louisiana 70002

12

13   Representing the Plaintiffs:

14

15        HEARD ROBINS
          Attorneys at Law
          By: Jeth Jones Esq.
16        One Allen Center
          500 Dallas
17        Suite 3100
          Houston, Texas 77002

18

19   Representing the Plaintiffs,
          Marie Benoit, et al:
20
          MAPLES & KIRWAN, LLC
21        Attorneys at Law
          By: Carlos Zelaya, II, Esq.
22        902 Julia Street
          New Orleans, Louisiana 70113

23

24

25
```

BARGE000614

3

1    <u>Representing Joseph C. Domino, Inc.</u>
          <u>and Unique Towing, Inc.</u>:
2
          **EMMETT, COBB, WAITS & HENNING**
3         Attorneys at Law
          By: John F. Emmett, Esq.
4         1515 Poydras Street
          Suite 1950
5         New Orleans, Louisiana 70112

6    <u>Representing Joseph C. Domino, Inc.</u>:

7         **HARRIS & RUFTY, L.L.C.**
          Attorneys at Law
8         By: Jill Willhoft, Esq.
          650 Poydras Street
9         Suite 2710
          New Orleans, Louisiana 70130
10
     <u>Representing Lafarge North America, Inc.</u>:
11
          **CHAFFE, McCALL, L.L.P.**
12        Attorneys at Law
          By: Robert B. Fisher, Jr., Esq.
13        2300 Energy Centre
          1100 Poydras Street
14        New Orleans, Louisiana 70163

15   <u>Representing Ingram Barge Company</u>:

16        **LISKOW & LEWIS**
          Attorneys at Law
17        By: Don Haycraft, Esq.
          701 Poydras Street
18        50th Floor
          New Orleans, Louisiana 70139
19
     <u>Representing New York Marine and</u>
20        <u>General Insurance Company</u>:

21        **SUTTERFIELD & WEBB, L.L.C.**
          Attorneys at Law
22        By: Daniel A. Webb, Esq.
          650 Poydras Street
23        Suite 2715
          New Orleans, Louisiana 70130

24

25

BARGE000615

4

1     <u>Representing Board of Commissioners,</u>
        <u>Port of New Orleans</u>:

2

3     **DAIGLE, FISSE & KESSENICH**
     Attorneys at Law.
     By: Jonathan H. Sandoz, Esq.

4     P. O. Box 5350
     Covington, Louisiana 70434-5350

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BARGE000616

5

1

## EXAMINATION INDEX

2

Caption . . . . . . . . . . . . . . . . . . . . . . . . 1

3

Appearances . . . . . . . . . . . . . . . . . . . 2,3,4

4

Stipulation . . . . . . . . . . . . . . . . . . . . 6

5

Examination:

6

     By Mr. Wiedemann . . . . . . . . . . . . . . . . 7

7

     By Mr. Fisher . . . . . . . . . . . . . . . . . . 63

8

Reporter's Page . . . . . . . . . . . . . . . . . . 66

9

Certificate . . . . . . . . . . . . . . . . . . . . 67

10

Witness' Certificate . . . . . . . . . . . . . . . . 68

11

Corrections/Changes Page . . . . . . . . . . . . . 69

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                    S T I P U L A T I O N

2

3          It is stipulated and agreed to, by and

4     between counsel, that the perpetuation deposition

5     of David Castaing, is hereby taken, pursuant to

6     Notice, for all purposes, under the rules of the

7     Louisiana Code of Civil Procedure;

8          That the parties hereto waive all

9     formalities in connection with the taking of this

10    deposition, except that of reading and signing;

11    and

12         That all objections, except those as to

13    the form of the question and/or the responsiveness

14    of the answer, are reserved until the time of the

15    trial of this case.

16

17                    *  *  *  *  *

18

19

20         Peter Caruso, Certified Court Reporter,

21    officiated in administering the oath to the

22    herein witness.

23

24

25

BARGE000618

DAVID CASTAING

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF THE    •   CIVIL ACTION
COMPLAINT OF INGRAM    •
BARGE COMPANY, AS OWNER •   NO. 05-4419
OF THE ING4727,       •    C/W 05-4237
PETITIONING FOR      •    C/W 05-5531
EXONERATION FROM OR    •    C/W 05-5724
LIMITATION OF LIABILITY •   SECTION "C" (2)
              •
•   JUDGE HELEN G.
            •
            •     BERRIGAN
            •
            •    MAG. JUDGE, JOSEPH
            •      WILKENSON, JR.
            •

• • • • • • • • • • • • • •

Deposition of David Scott Castaing taken
at the law offices of Sutterfield and Webb,
located at 650 Poydras Street, Suite 2715, New
Orleans, Louisiana 70130, beginning on the 30th
day of November, 2006.

Reported by:
Peter Caruso, CCR-CVR
Certified Court Reporter

APPEARANCES:

Representing the Plaintiffs,
   Ethel Mumford, et al:

WIEDEMANN & WIEDEMANN
Attorneys at Law
By: Lawrence D. Wiedemann, Esq.
821 Baronne Street
New Orleans, Louisiana 70113

LAW OFFICE OF BRIAN A. GILBERT
Attorneys at Law
By: Brian A. Gilbert, Esq.
3232 Edenborn Avenue
Metairie, Louisiana 70002

MR. PATRICK J. SANDERS, ESQ.
Attorney at Law
3316 Ridgelake Drive
Metairie, Louisiana 70002

Representing the Plaintiffs:

HEARD ROBINS
Attorneys at Law
By: Jeth Jones Esq.
One Allen Center
500 Dallas
Suite 3100
Houston, Texas 77002

Representing the Plaintiffs,
   Marie Benoit, et al:

Representing Joseph C. Domino, Inc.
and Unique Towing, Inc.:

EMMETT, COBB, WAITS & HENNING
Attorneys at Law
By: John F. Emmett, Esq.
1515 Poydras Street
Suite 1950
New Orleans, Louisiana 70112

Representing Joseph C. Domino, Inc.:

HARRIS & RUFTY, L.L.C.
Attorneys at Law
By: Jill Willhoft, Esq.
650 Poydras Street
Suite 2710
New Orleans, Louisiana 70130

Representing Lafarge North America, Inc.:

CHAFFE, McCALL, L.L.P.
Attorneys at Law
By: Robert B. Fisher, Jr., Esq.
2300 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163

Representing Ingram Barge Company:

LISKOW & LEWIS
Attorneys at Law
By: Don Haycraft, Esq.
701 Poydras Street
50th Floor

Representing Board of Commissioners,
Port of New Orleans:

DAIGLE, FISSE & KESSENICH
Attorneys at Law
By: Jonathan H. Sandoz, Esq.
P. O. Box 5350
Covington, Louisiana 70434-5350

- 4 -

BARGE000619

**DAVID CASTAING**

MINIDEP by Kenson

### EXAMINATION INDEX

Caption. . . . . . . . . . . . . . . . . . . . . . . .1

Appearances. . . . . . . . . . . . . . . . . . . . .2,3,4

Stipulation. . . . . . . . . . . . . . . . . . . . . . . .6

Examination:

    By Mr. Wiedemann . . . . . . . . . . . . . . . . . . .7

    By Mr. Fisher. . . . . . . . . . . . . . . . . . . . 63

Reporter's Page. . . . . . . . . . . . . . . . . . . 66

Certificate. . . . . . . . . . . . . . . . . . . . . . . 67

Witness' Certificate . . . . . . . . . . . . . . . . 68

Corrections/Changes Page . . . . . . . . . . . . . . . 69

- 5 -

### STIPULATION

It is stipulated and agreed to, by and between counsel, that the perpetuation deposition of David Castaing, is hereby taken, pursuant to Notice, for all purposes, under the rules of the Louisiana Code of Civil Procedure;

    That the parties hereto waive all formalities in connection with the taking of this deposition, except that of reading and signing; and

    That all objections, except those as to the form of the question and/or the responsiveness of the answer, are reserved until the time of the trial of this case.

* * * * *

    Peter Caruso, Certified Court Reporter, officiated in administering the oath to the herein witness.

- 6 -

**DAVID CASTAING**

1  David Castaing, 124 Rue Holiday,
2  Slidell, Louisiana 70461, after having been first
3  duly sworn by the reporter to tell the truth, the
4  whole truth, and nothing but the truth, was
5  examined and testified as follows:
6    MR. WIEDEMANN:
7      Mr. Castaing -- well, first of fall,
8    we're going to make the usual
9    stipulation?
10   MS. WILLHOFT:
11     Yes.
12   MR. WIEDEMANN:
13     Do you want to reserve the right to
14   read and sign?
15   MS. WILLHOFT:
16     We reserve the right.
17   MR. WIEDEMANN:
18     Reserve your right to read and sign?
19   MS. WILLHOFT:
20     Yes.
21            EXAMINATION
22 BY MR. WIEDEMANN:
23   Q.  Your full name is Scott Castaing?
24   A.  David Scott Castaing.
25   Q.  David Scott, and C-a-s-t-a-i-n-g?

- 7 -

1    A.  Yes.
2    Q.  What is your name, Mr. Castaing?
3    A.  124 Rue Holiday, Slidell, Louisiana.
4    Q.  Is that your regular address, or you have
5  it because of the hurricane?
6    A.  That's my home address.
7    Q.  By whom are you employed, sir?
8    A.  Joseph C. Domino.
9    Q.  And how long have you been employed by
10 Joseph Domino?
11   A.  Eleven and three-quarter years.
12   Q.  And what is your present job capacity?
13   A.  Dispatcher.
14   Q.  And in the eleven and three-quarter
15 years, have you always been a dispatcher?
16   A.  Yes.
17   Q.  Does Joseph Domino have more than one
18 dispatcher in this area?
19   A.  One dispatcher building.  There's
20 actually three of us that dispatch.
21   Q.  You work shift work?
22   A.  Correct.
23   Q.  But is there more than one dispatching
24 office?
25   A.  No, just one dispatching office.

- 8 -

1    Q.  And where is that located?
2    A.  On River Road, 5520 River Road, Marrero.
3    Q.  And who are the other two dispatchers
4  that work the other shifts with you?
5    A.  That would be Gerald McNeill and Patrick
6  McNeill
7    Q.  Are they related to the former president
8  of --
9    A.  Patrick is the grandson.
10   Q.  Okay.  And who is Gerald?
11   A.  His ex-son-in-law.
12   Q.  And you are actually on the payroll of
13 Joe Domino?
14   A.  Correct.
15   Q.  And as a dispatcher of Joe Domino, do you
16 arrange for vessels to do a certain tasks for
17 customers?
18   A.  Correct.
19   Q.  Tell me how you, how do you -- do you
20 have contracts or agreements, or do you know?
21   A.  No contracts or agreements.  It's a per-
22 call basis, hourly work.  The customer will call
23 Joseph C. Domino, and ask for boat availability
24 per job.
25   Q.  As a dispatcher, do you have a list of --

- 9 -

1  as you're working on a day-by-day basis, a list
2  of the vessel owners to call?
3    A.  There are presently five vessels that, I
4  guess you could say are dedicated to Joseph C.
5  Domino.
6    Q.  And talking about the point in time of
7  Hurricane Katrina, August 29, 2005, how many
8  vessels worked exclusively for Joe Domino?
9    A.  Five.
10   Q.  What were the five?
11   A.  The Regina H, the Karche.
12   Q.  How do you spell that?
13   A.  K-a-r-c-h-e.  The Mr. Cass.
14   Q.  Miss?
15   A.  Mr. Cass, C-a-s-s.  That's four.  The
16 Shane C.  Am I missing one.
17   MR. EMMETT:
18     Jeck.
19   THE WITNESS:
20     Jeck.  I'm sorry.  Jeck.  The Jeck.
21   MR. WIEDEMANN:
22     The what?
23   THE WITNESS:
24     Jeck, the Motor Vessel Jeck,
25   J-e-c-k.

- 10 -

BARGE000621

DAVID CASTAING

BY MR. WIEDEMANN:

1  BY MR. WIEDEMANN:
2      Q.  And the Regina H was owned by Unique
3  Towing?
4      A.  At that time, correct.
5      Q.  And what about the Karche?
6      A.  That would be Lizana Towing.
7      Q.  And Lizana used to be a partner with the
8  owner of the Regina H, or do you know?
9      A.  He still is.
10     Q.  And the Mr. Cass?
11     A.  That's owned by Cass Marine Towing.
12     Q.  And what about Mr. Jeck?
13     A.  Excuse me?
14     Q.  What's the other one?
15     A.  The Shane C.
16     Q.  Shane C.
17     A.  That is Shane C. Marine Towing.
18     Q.  And didn't you mention another one?
19     A.  The Jeck.
20     Q.  Jeck, J-e-c-k.
21     A.  Right.  That was owned by Marion Towing.
22     Q.  And these vessels were exclusively for
23  Joe Domino?
24     A.  They work exclusively through Joe Domino.
25     Q.  All right.  And were there other vessels
                    - 11 -

1      A.  No.
2      Q.  -- you'd call?
3      A.  No, sir.
4      Q.  But these ones that you have named would
5  be the ones that you would call first --
6      A.  Primary.
7      Q.  -- if you had a job?
8      A.  Yeah, those are primary vessels.
9      Q.  And is there any order or sequence in
10  which you would call them, a rotation?
11     A.  Rotation.
12     Q.  Huh?
13     A.  It goes by rotation.
14     Q.  Well, how would you know where -- if you
15  don't have a list, how would you know when you're
16  rotating?
17     A.  Well, we keep a list of our primary
18  vessels on our worksheet.
19     Q.  Okay.  So then you have a worksheet at your
20  desk?
21     A.  Correct.
22     Q.  That has the primary vessels?
23     A.  Correct.
24     Q.  And then you would rotate those and make
25  a mark or something?
                    - 13 -

1  that worked in a less regular fashion with Joe
2  Domino?
3      A.  On an on-call basis.  If we need outside
4  boats, we'll call on other companies and see if
5  there is availability of their boats to use them.
6      Q.  Did Joe Domino have a list -- these
7  obviously were on a list that you used on a
8  regular basis?
9      A.  Right.
10     Q.  Was there a list of other vessels that
11  you could call when you had more business than
12  you could handle?
13     A.  There's not a list, no.  There's just a
14  couple of other companies that Domino would call.
15     Q.  And who would they be?
16     A.  For instance, there would be Jefferson
17  Marine Towing.
18     Q.  And what would be their vessel?
19     A.  I don't all of them.
20     Q.  Okay.
21     A.  I can name a few.
22     Q.  Okay.  But there's no list that you have
23  posted on a -
24     A.  No.
25     Q.  -- board where --
                    - 12 -

1      A.  Scratch, scratch the name out as they go
2  down -- as we go down the list.
3      Q.  So that everybody would get a turn?
4      A.  Correct.
5      Q.  And the -- were any of these vessels,
6  ones that were on the list, were they -- you
7  utilized for a particular customers?
8      A.  Not as of recent.  We had customers at
9  one point would ask for certain vessels.
10     Q.  I'm speaking about back at the time of
11  Hurricane Katrina and before.
12     A.  No.
13     Q.  Huh?
14     A.  No.
15     Q.  So are you saying that there was no
16  preferential utilization of one vessel for a
17  particular customer?
18     A.  Not at that time.
19     Q.  There is now?
20     A.  No.
21     Q.  There was a time when that was true?
22     A.  We had one company that would ask for
23  like, particularly the Shane C.
24     Q.  But that was how long ago?
25     A.  It might have been four years ago.
                    - 14 -

**DAVID CASTAING**

MiniDep by Kenson

1    Q.  Okay. So that if a customer called,
2  let's say like, Lafarge North America, the cement
3  operation on the Industrial Canal, and asked for
4  a vessel, would they make a specific request or
5  would they just ask you to send a vessel?
6    A.  Just to send a vessel.
7    Q.  And they would ask you -- the customer in
8  this case, Lafarge, would tell you what they
9  wanted done?
10    A.  No. Just to send a vessel to check in at
11  their dock, do some shifting, but nothing in
12  particular.
13    Q.  Well, how would they -- in other words,
14  when you dispatched a vessel, say to Lafarge, as
15  the dispatcher you would not tell them what they
16  were expected to do?
17    A.  No, I would -- I would instruct the boat
18  to check in with Lafarge.
19    Q.  Well --
20    MR. EMMETT:
21      Are we talking generally here?
22    MR. WIEDEMANN:
23      Yes.
24    MR. EMMETT:
25      Not the specific dispatch?

- 15 -

1    MR. WIEDEMANN:
2      Yes.
3    MS. WILLHOFT:
4      Generally not, not just this one
5      particular case.
6  BY MR. WIEDEMANN:
7    Q.  So you would just -- in this case, if
8  Lafarge called and asked for a vessel, you would
9  just call the vessel and tell them to go to
10  Lafarge's facility?
11    A.  Correct.
12    Q.  You wouldn't tell them anything about
13  what they were supposed to do?
14    A.  No, sir.
15    Q.  Would you direct them as to any equipment
16  to bring with them?
17    A.  I'm sorry?
18    Q.  Would you direct them to bring, if need
19  be, any equipment, lines, cables or --
20    A.  No.
21    Q.  Hm?
22    A.  No, sir.
23    Q.  You would depend on the customer who was
24  making the request to have whatever might be
25  needed to carry out their job?

- 16 -

1    MR. FISHER:
2      Object to the form.
3    THE WITNESS:
4      I don't understand your question.
5  BY MR. WIEDEMANN:
6    Q.  Well, let's assume that a particular job
7  need certain cables, certain lines --
8    A.  We don't provide the rigging at the
9  facility. The facility provides the rigging at
10  the facility.
11    Q.  That's my question. So you don't have to
12  tell the vessels that you assign to a customer to
13  bring any special lines or special rigging
14  because that's provided by the customer; is
15  that --
16    A.  We -- no, we are -- we don't tell the
17  vessel to bring any, any equipment.
18    Q.  And that's because you expect whatever
19  equipment that is needed to be supplied by the
20  customer?
21    MR. FISHER:
22      Object to the form.
23    THE WITNESS:
24      Yeah. We don't supply lines and
25      cables.

- 17 -

1  BY MR. WIEDEMANN:
2    Q.  Well, who supplies them?
3    A.  I don't know.
4    Q.  So you have no idea who supplies the
5  lines and cables for whatever job is needed?
6    A.  On this particular Lafarge case? No, I
7  don't know.
8    Q.  No, I'm not asking about that. I'm just
9  asking you generally.
10    MR. FISHER:
11      Are you talking from a hypothet to a
12      specific? Are we still talking hypothet?
13    MR. WIEDEMANN:
14      He might be specific. I was just
15      talking about generally. He went to the
16      specifics.
17  BY MR. WIEDEMANN:
18    Q.  My question is, is that you dispatch a
19  vessel to a particular customer, you don't know
20  what job is to be done; am I correct?
21    A.  Correct.
22    Q.  You don't know what equipment is needed
23  to do the job; is that correct?
24    A.  I know a towboat is needed?
25    Q.  Huh?

- 18 -

**Peter Caruso & Associates (504) 432-3656**
P.O. Box 10741, Jefferson, Louisiana 70181

BARGE000623

DAVID CASTAING         MINIDEP by Kenson

1    A.  I know a towboat is needed.
2    Q.  But you don't know what kind of equipment
3  might be needed?
4    A.  No, sir.
5    Q.  And so, how do you know whether or not
6  the vessel that you assign can carry out the task
7  that it's being assigned to?
8    A.  The vessel's equipped to do the job.
9    Q.  Are they equipped with extra line and
10  extra cable to do jobs?
11    A.  Yeah.  They have lines and cables on the
12  vessels.
13    Q.  Do you not bill the customers for any
14  lines and cables that are used?
15    A.  The vessels don't leave lines -- their
16  lines and cables.  That's for their personal tows
17  and so forth they might push.  They do not
18  leave -- they don't leave their rig in that
19  facility.
20    Q.  On the 27th of August -- excuse me, yeah,
21  27th of August, did you dispatch the Regina H to
22  the Lafarge facility?
23    A.  Yes.
24    Q.  And let me show you what has previously
25  been identified as -- it's a Domino exhibit,

- 19 -

1    A.  Who is --
2    Q.  What's his full name?
3    A.  -- Ed?
4    Q.  Yeah.
5    A.  Ed Busch.
6    Q.  So Ed Busch called you at 10 a.m.?
7    A.  Correct.
8    Q.  And you wrote down, "Report to Lafarge,
9  swap out.  Regina H, Lafarge."  And that's your
10  handwriting?
11    A.  Correct.
12    Q.  So Mr. Busch told you that he wanted to
13  do what, when you say "swap out"?
14    A.  On that particular job, he wanted us to
15  just top around the two barges that were at the
16  dock and respot them where they were at tied up.
17    Q.  So on this particular occasion he told
18  you what he wanted done?
19    A.  Correct.
20    Q.  And did you tell the crew of the Regina H
21  what they were to do?
22    A.  Yes.
23    Q.  Did Mr. Busch tell you that they had to
24  do anything else but top them around, to add any
25  lines or do anything?

- 21 -

1  Bates stamp -- it's a Bate stamp 00009.  You see
2  that?  Do you recognize that document?
3    A.  This is my worksheet.
4    Q.  And what we see is the -- these blocks
5  are when you assign vessels?
6    A.  The blocks are the job orders.
7    Q.  And that's in successive order?  Is that
8  how you rotate them?
9    A.  Rotate the vessels?  The vessel names are
10  here and they're rotated here (indicating).
11    Q.  So these are assignments that you made to
12  Regina H?
13    A.  Those were jobs that were dispatched to
14  the Regina H.
15    Q.  And you've got -- what is this block here
16  (indicating)?  What time is that?
17    A.  It's 10 a.m.
18    Q.  And is that your handwriting?
19    A.  Yes.
20    Q.  What's the "Ed" stand for?
21    A.  Ed.  That's the name of the person that
22  ordered the job.
23    Q.  So Ed would be a person from Lafarge?
24    A.  Correct.
25    Q.  Who is that?  Do you know?

- 20 -

1    A.  No.
2    Q.  Hm?
3    A.  No.
4    Q.  What did you understand when he told you
5  that he wanted them "topped around"?
6    A.  To top around the two barges and retie
7  them to the dock.
8    Q.  Did he tell you why he wanted them topped
9  around?
10    A.  He wanted the empty that was tied to the
11  dock, and the load was on the outside of the
12  empty, he wanted them topped around, to where the
13  load was tied to the dock.
14    Q.  Did he tell you anything else besides he
15  wanted the -- he described the barges, one being
16  full, one being empty, and the empty being up to
17  the dock and the full outside?
18    A.  Correct.
19    Q.  And he wanted that reversed?
20    A.  Correct.
21    Q.  What else did he tell you?
22    A.  That was it.
23    Q.  Did he say any reason why he was topping
24  them around?
25    A.  Only that they wanted the load, the

- 22 -

DAVID CASTAING                          MINIDEP by Kenson

1  heavier barge tied to the dock.
2      Q.  Did he say anything to you about the
3  weather having something to do with it?
4      A.  No.
5      Q.  Hm?
6      A.  No, sir.  He just wanted the load tied to
7  the dock, the empty on the outside.
8      Q.  And he said nothing else, huh?
9      A.  I don't recall, no, sir.
10     Q.  How did he call you?  How did Ed Busch
11  call you?
12     A.  Telephone.
13     Q.  Did you all from time to time fax or e-
14  mail --
15     A.  No.
16     Q.  -- customers like Ed Busch?
17     A.  No, sir.
18     Q.  Did you all have faxing or e-mail
19  capacity?
20     A.  Yes, sir.
21     Q.  When would you use that?
22     A.  Faxing?
23     Q.  Uh-huh (affirmative response).
24     A.  Faxing logs, receiving logs.  Just
25  general faxing purposes.
                    - 23 -

1      A.  Only when they were finished.
2      Q.  And they called you back when they were
3  finished?
4      A.  Correct.
5      Q.  And what time was that?
6      A.  Oh, I don't recall.
7      Q.  What did they say when they called you
8  back?
9      A.  They said they were finished, finished at
10  Lafarge.
11     Q.  Did they tell you that nobody was there
12  when they got there?
13     A.  No, I don't recall.
14     Q.  Hm?
15     A.  No, I don't believe so.
16     Q.  You're not aware that the facility --
17  there was nobody available when they arrived?
18        MR. FISHER:
19            Object to the form.
20        THE WITNESS:
21            No.  I'm not aware of that, no.
22  BY MR. WIEDEMANN:
23     Q.  They never told you that when they came
24  back, or when they talked to you?
25     A.  No.  Not that I'm aware of, no.
                    - 25 -

1      Q.  Logs from whom?
2      A.  If Domino was to hire a boat from another
3  company, their company would fax us copies of the
4  logs for billing.
5      Q.  What about the companies like Regina H --
6  I mean, Unique, would they fax you logs?
7      A.  No.
8      Q.  And when you told the Regina H to go to
9  Lafarge, did you expect someone to be there to
10  show them what to do?
11     A.  Normally there is someone there.  I don't
12  know if there was anyone there at that time.
13     Q.  Did the Regina H call you, or did you
14  have any communication with them after you made
15  the assignment at 10 a.m. regarding the Lafarge?
16     A.  Yeah.  With who?
17     Q.  With the crew of the Regina H.
18     A.  I dispatched the order to the vessel.
19     Q.  I'm saying at 10 a.m., which you noted in
20  your log, you dispatched them to Lafarge after
21  you had a conversation with Ed Busch, right?
22     A.  Correct.
23     Q.  Now my question is, did you have any
24  further conversations with them after they got to
25  the Lafarge facility?
                    - 24 -

1      Q.  Did you then assign them somewhere else
2  after they left the --
3      A.  After Lafarge?
4      Q.  Yes.
5      A.  I believe they went and did another job,
6  for Waterman.  I really don't recall.  I'd have
7  to look at my sheet here.
8      Q.  Well, you got it.  Here it is right here
9  (indicating).
10     A.  Waterman.
11     Q.  At 11 -- and what is that (indicating)?
12  I can't read that.
13     A.  11 a.m.
14     Q.  Eleven a.m. you told them to go to
15  Waterman?
16     A.  The 11 a.m. is not when I dispatched the
17  vessel.  It's the time that the job came in.
18     Q.  Okay.  So this reflects the call that you
19  received from Waterman?
20     A.  Right.  From Plimsoll.  Plimsoll would be
21  the --
22     Q.  What is Plimsoll?
23     A.  That's the company that operates Waterman
24  fleet.
25     Q.  And where is Waterman fleet located?
                    - 26 -

BARGE000625

DAVID CASTAING

1   A. It's approximately Mile 92, the lower
2   Mississippi River.
3   Q. That would be near Algiers Point?
4   A. Below Algiers Point.
5   Q. And where is the dispatch of the Regina H
6   to the Waterman facility?
7   A. Where is it?
8   Q. Yeah.
9   A. As far as the time it was dispatched?
10  Q. Yeah.
11  A. We don't log -- we don't take record of
12  that.
13  Q. You did your recording when you
14  dispatched them to the Lafarge facility at 10
15  a.m.?
16  A. Ten a.m. is when I received the call from
17  Ed Busch.
18  Q. So that's not the time you dispatched it?
19  A. No, sir.
20  Q. What time did you dispatch it to Lafarge?
21  A. I would have dispatched that job when
22  they were finished the previous job.
23  Q. So you don't have any record --
24  A. Which looks like it might have been for
25  Kirby.

                        - 27 -

1   Q. But you don't have any record of that?
2   A. No, sir.
3   Q. You don't know what time you dispatched
4   them?
5   A. No, sir.
6   Q. Let me show you the logs for the Regina H
7   for the 27th. Have you seen those before?
8   A. It's been over a year, I'm sure.
9   Q. It appears according to the vessel log on
10  the 27th --
11      MR. WIEDEMANN:
12          You've got a copy of that?
13      MS. WILLHOFT:
14          There's four pages.
15      MR. WIEDEMANN:
16          This is the 12, 00012.
17  BY MR. WIEDEMANN:
18  Q. This is Bates stamp Domino 00012. This
19  is the log that indicates that at 1330 they
20  departed the base, Mile 94. You see that
21  (indicating)?
22  A. Uh-huh (affirmative response).
23  Q. Where is the base Mile 94?
24  A. That could either be on either side of
25  the river. But 94 is in the vicinity of John W.

                        - 28 -

1   Stone fueldock and/or Celeste Street wharf, which
2   was two of the primary areas where the boat would
3   standby waiting for orders.
4   Q. At J.W. Stone. And what's the other one?
5   A. Celeste Street wharf.
6   Q. Well, in the documents preceding that,
7   that is 00010, 00011, 00012, 00013, it appears
8   that the Regina H on each occasion was departing
9   from a base at Mile 94. You see that?
10  A. Uh-huh (affirmative response).
11  Q. Hm? And that would be the John W. Stone
12  fleeting operation?
13  A. It's a fuel dock.
14      MR. EMMETT:
15          It's a fuel dock.
16      MR. WIEDEMANN:
17          Fuel dock, okay.
18  BY MR. WIEDEMANN:
19  Q. And that's --
20  A. Or Celeste Street wharf.
21  Q. But 94 would be the fuel dock?
22  A. In that vicinity, yes.
23  Q. And the log shows that -- that is 00012.
24  So I'll just call it 12. Okay? It departed 94
25  at 1330. So apparently that would be the time

                        - 29 -

1   you dispatched it?
2   A. Correct.
3   Q. So the call came in at 10 a.m. from Busch
4   and it wasn't until 1330 that you dispatched it?
5   A. Correct.
6   Q. Why is that? Was it -- was it on another
7   job, or what was the reason for the delay?
8   A. Okay. What it is the delay -- there's --
9   prior to that on 8/27 at 12:15, he looks like he
10  was working for the Kirby on my worksheet, he
11  departed 108 fleet at 1215. It's at that time
12  that vessel would have called me and said he was
13  finished. And at that time I would have
14  dispatched him to Lafarge.
15  Q. So it shows that at -- 11 shows at 1330
16  it was -- arrived at base and their stop time?
17  A. Right. That's the start and stop time
18  for that job.
19  Q. So he would have called you in to tell
20  you that he had completed the Kirby job?
21  A. Correct.
22  Q. And it would have been at that time,
23  1330, when you would have dispatched him to
24  the --
25  A. 1330 is the stop time on that work order.

                        - 30 -

DAVID CASTAING                                                                    MINIDEP by Kenson

1    Q. But then it shows at --
2    A. At 1215 he would have been dispatched to
3 go to Lafarge.
4    Q. It shows at 1330 he departed the base.
5    A. Well, he was just starting him time on a
6 new, on a new job.
7    Q. Would that be the start --
8    A. It represents a start time for that
9 particular job, departing base.
10    Q. But as I understand it on 11, he would
11 call you in and say he's finished the Kirby job,
12 and that's at 1330 --
13        MR. EMMETT:
14            Object to form.  Misstates his
15        testimony.
16 BY MR. WIEDEMANN:
17    Q. Hm?
18    A. He would have called at 1215, when he
19 finished the job.
20    Q. Okay.
21    A. And 1330 was his stop time, running back
22 to base.
23    Q. So he talked to you, you think, at 1215?
24    A. Correct.
25    Q. And then you told him to go to the
                            - 31 -

1 called Zito at 9 a.m., an hour before he called
2 you and asked them to pick up the empty barge?
3    A. No, sir.
4    Q. So you had no discussion about, about
5 anything to do with the removal of the empty
6 barge from the Lafarge facility?
7    A. No, sir.
8    Q. If Mr. Busch had requested you to remove
9 the empty barges, would there be any problem with
10 your telling or instructing the Regina H to do
11 that?
12        MR. FISHER:
13            Object to form.
14        THE WITNESS:
15            No.
16 BY MR. WIEDEMANN:
17    Q. Because as a matter -- so that would
18 depend on the instruction from the customer?
19    A. Correct.
20    Q. And the only instruction you got was to
21 top the barges around?
22    A. Correct.
23    Q. And that's what you conveyed to the crew
24 of the Regina H?
25    A. Yes.
                            - 33 -

1 Lafarge.
2    A. Lafarge.
3    Q. Why would he go to the base?
4    A. The job starts -- their hourly job, the
5 time starts from the time they depart base to the
6 time they get back to base.
7    Q. So --
8    A. He was at Mile 108, Mile 108 on the
9 Mississippi River.  So as he was passing 94, that
10 was his stop time for Kirby and then his start
11 time for Lafarge.
12    Q. So at 1330 he would have -- insofar as
13 charge time --
14    A. Correct.  Right.  You know, we would have
15 been charging Lafarge at 1215, from 1215.
16    Q. But they're charging them from 1330?
17    A. Correct.
18    Q. And when you spoke to Mr. Ed Busch about
19 10 o'clock, did he indicate to you that, that he
20 would be leaving the facility?
21    A. No, sir.
22    Q. Did he indicate to you that he had
23 requested Zito to pick up the empty barge?
24    A. No, sir.
25    Q. He didn't mention to you that he had
                            - 32 -

1    Q. Now it indicates that after -- and I'm
2 talking when I say "it," I'm talking about the
3 logs, and I'm looking at No. 13 -- that after
4 leaving the Lafarge facility and going through
5 the locks, that there was another job assigned to
6 the Regina H?
7    A. Correct.
8    Q. And is that on your personal log?
9    A. To report to Waterman fleet.
10    Q. And where is the Waterman fleet?
11    A. That's around Mile 92, below Algiers
12 Point.
13    Q. And how did that call come into you --
14 what time did that come in?
15    A. At 11 a.m.
16    Q. So an hour after you got the call from
17 Lafarge, you got the call from Waterman?
18    A. Correct.
19    Q. And it appears that the start time for
20 that was 1700?
21    A. Correct.
22    Q. And that would mean that they were back
23 at -- passing base or whatever?
24    A. No.  That would have meant they went
25 straight to Waterman fleet.
                            - 34 -

DAVID CASTAING

1   Q. Well, it appears that -- on the preceding
2   page, on 12, that they arrived at the base at
3   1715, that's the stop time?
4      A. Uh-huh (affirmative response).
5      Q. Do you see that?
6      A. (Witness nods head affirmatively.)
7      Q. And then the start time is 1700?
8      A. Uh-huh (affirmative response).  That
9   would probably have been a customer request to
10  start time at 1700.
11     Q. So at 1700 they -- and you talked to them
12  at 11 o'clock?
13     A. Now you're talking -- you talked to the
14  customer.
15     Q. The customer, correct, to Waterman.  What
16  did Waterman tell you they wanted done?
17     A. They didn't.  They said they needed a
18  boat to report to the fleet.
19     Q. They didn't give you any instructions as
20  to what they wanted done?
21     A. No, sir.
22     Q. Well, how did -- at 1720 they got on the
23  log, 13, it says, "Build tow."
24     A. They get, the vessel would get the orders
25  from the fleet boat at Waterman Fleet.

- 35 -

1   don't know if those barges were going on a ship,
2   or if they were going up north or going south,
3   or --
4      Q. But, but --
5      A. Apparently building tow for another
6   vessel.
7      Q. So you knew that the Regina H was not
8   building tow to do something with itself?
9      A. Correct.
10     Q. They were just building tow for some
11  other vessel to do whatever was supposed to be
12  done?
13     A. Correct.
14     Q. And they finished that apparently at -- I
15  can't quite read it -- was it 20 -- they finished
16  at 2000?
17     A. 2030.
18     Q. 2030, that's when they stopped?
19     A. Yeah.  They finished, finished, they
20  completed the job at 2000.  That looks like "Stop
21  job at 2030."
22     Q. And that would mean they were back at
23  base?
24     A. Correct.  Well, not necessarily back at
25  base.  With this particular fleet, they'll give

- 37 -

1   Q. So is it your testimony that you didn't
2   tell them that they were to go to Waterman to
3   build tow?
4      A. Correct.
5      Q. Waterman didn't tell you that?
6      A. Right.
7      Q. You just told the Regina H to go there
8   and do whatever they had to do?
9      A. Correct.
10     Q. And so that job was started, for billing
11  purposes, at 1700, right?
12     A. Correct.
13     Q. So that would be five o'clock?
14     A. Five p.m.
15     Q. Okay.  And they went and they started
16  building tow and he describes the tow that he
17  built; is that correct?
18     A. Correct.
19     Q. And do you know what they were building
20  tow for?
21     A. No, I do not.
22     Q. Well, if you're building tow in a
23  fleeting operation, what is the purpose of that?
24  Do you know?
25     A. It could be for a number of things.  I

- 36 -

1   the boat the start and stop times.
2      Q. Okay.  And were you on -- as the log
3   reflects, you were on duty at that time?
4      A. Yes.
5      Q. What would have been your work schedule?
6      A. I don't recall what it was a year ago.
7      Q. Well, I mean, looking at the log, can you
8   tell us what shift you were working?  Obviously
9   you were on at ten o'clock.  I mean, before ten
10  o'clock.
11     A. I was -- really I don't recall what -- if
12  it's during a weekday, we would work every
13  other -- on call every other day; weekends, every
14  third weekend.  That's pretty much how our work
15  schedule works.
16     Q. Well, your first entry is 7 a.m.?
17     A. Correct.
18     Q. Next one is 9:00, 9:00, 9:30, 10:00,
19  10:45, 11:00.  Would that give you some idea what
20  shift you were working?
21     A. Well, if this was a weekend, I was on
22  call for the entire weekend, 24, 24/7, you know,
23  24 hours a day.
24     Q. So if this was a Saturday, you would be
25  working Saturday and Sunday?

- 38 -

DAVID CASTAING

1    A.  Friday, Saturday and Sunday.
2    Q.  Now, you would make a similar log for
3 every other vessel?
4    A.  No.  Every vessel is on this particular
5 worksheet.
6    Q.  Okay.  This is the one -- this is your
7 worksheet for that --
8    A.  For that weekend.
9    Q.  Is that the whole weekend?
10    A.  That's what it looks like --
11    Q.  It says 8/27 --
12    A.  -- Saturday and Sunday.
13    Q.  -- 8/28.
14       MR. WEBB:
15          Wait.  You both can't talk at the
16       same time.  I'm having trouble hearing
17       you all.
18 BY MR. WIEDEMANN:
19    Q.  This log is for 8/27, 8/28/05; is that
20 right?
21    A.  Yes.
22    Q.  And these are all of the calls that you
23 received on those two days?
24    A.  Two days, correct.
25    Q.  So you were on the radio 24 hours?

- 39 -

1 office, which is 341-1122.
2    Q.  That's a cell phone?
3    A.  That's the 24-hour dispatch.
4    Q.  So that's a --
5    A.  Not a cell phone.
6    Q.  It's a --
7    A.  Office number.
8    Q.  It's a fixed --
9    A.  Land line.
10    Q.  Land line, yeah.  So the customer would
11 call in on the land line?
12    A.  Correct.
13    Q.  And then you would call the vessels on
14 what, a cell phone?
15    A.  The vessel has a cell phone.  I would
16 call the vessel's cell phone.
17    Q.  But you would use a land line?
18    A.  Correct.
19    Q.  And do you have a list of the vessel's
20 cell phones, the numbers?
21    A.  Yeah.  They're on the work pads.
22    Q.  On some document you have available to
23 you?
24    A.  We have a list of customers' names and
25 phone numbers as well as all vessels.

- 41 -

1    A.  I was on call.
2    Q.  Call?  So you would leave the radio on
3 on?
4    A.  There's no radio.
5    Q.  Phone?  How do you dispatch, by two-way?
6    A.  Telephone.
7    Q.  By two-way telephone?
8    A.  By telephone.
9    Q.  So you don't have any -- do you have any
10 access to what traffic is going on besides your
11 own traffic?
12    A.  No, sir.
13    Q.  You're not monitoring what's going on on
14 the river, or what's going on in the canal, or
15 what's going on at the fleeting operation?
16    A.  No, sir.
17    Q.  Your communication is with the customer
18 who calls in on a telephone?
19    A.  Correct.
20    Q.  And you call the -- assign the job to a
21 particular vessel by telephone?
22    A.  Correct.
23    Q.  And what is the number that is called by
24 the customer at that time?
25    A.  They would call Joseph C. Domino's

- 40 -

1    Q.  And that would have, that list would have
2 the cell phones of each vessel?
3    A.  Correct.
4    Q.  So you'd know how to reach them?
5    A.  Yes, sir.
6    Q.  Did you deal with vessels any other way
7 than through their cell phones?
8    A.  No.
9    Q.  Did you -- that is, when I say "you," I'm
10 talking about Joe Domino.  Did you all monitor
11 weather on behalf of your vessel operators?
12    A.  No.  Just by personally watching the
13 news.
14    Q.  Did you communicate weather in any way to
15 the vessels?
16    A.  No.
17    Q.  How would you know when not to dispatch a
18 vessel because of weather conditions?
19    A.  The vessels themselves monitored the
20 locks as to when they could -- when the locks
21 would shut down for the storm.
22    Q.  They would monitor the locks.  You
23 mean --
24    A.  The locks would shut down without notice,
25 and they would keep in contact with the locks.

- 42 -

DAVID CASTAING

1  And when they knew the locks were going to
2  shutdown, that's when they would call Domino and
3  tell Domino that they have to get out of the
4  river before that certain time, before the locks
5  close.
6      Q.  You're talking about the locks on the
7  Industrial Canal?
8      A.  The Industrial Canal, the Harvey Canal,
9  the Algiers Canal.
10     Q.  Do you know when the locks were closed?
11     A.  No.
12     Q.  Well, they must have called you to tell
13  you?
14     A.  No.  They called me and tell me they have
15  to get into the canal before the locks close.
16     Q.  To get into either the Industrial Canal
17  or the Harvey Canal --
18     A.  The Harvey Canal.
19     Q.  Huh?
20     A.  The Harvey Canal.
21     Q.  Did all the locks close simultaneously?
22     A.  I do not know.
23     Q.  When the call was made that the locks
24  were closed, did you all record that?
25     A.  No.

- 43 -

1      Q.  Well, how would one know that the vessels
2  were no longer operational?
3      A.  How would one know?
4      Q.  You're a dispatcher sending vessels to
5  customers --
6      A.  They would call me.  They'd call me and
7  say that they're heading into the canal.
8      Q.  So these vessels that were working for
9  Domino called in to tell you the locks were
10  closed, but you don't recall at this time when?
11     A.  I don't know what time the locks closed,
12  no.
13     Q.  But if they would have stopped, they
14  would have had to stop before the locks closed?
15     A.  Stop?
16     Q.  Operating.
17     A.  They'd finish their job and get through
18  the locks before the locks closed, correct.
19     Q.  So the vessels would monitor the
20  lockmaster?
21     A.  Correct.
22     Q.  Would Joe Domino monitor the lockmaster?
23     A.  No, sir.
24     Q.  So Joe Domino did not communicate to the
25  vessels when they should seek getting -- seek

- 44 -

1  harbor into canals?
2      A.  Right.
3      Q.  You did not?
4      A.  We did not.
5      Q.  All right.  Since this happened, have you
6  found out anything about when the locks closed?
7      A.  No, sir.
8      Q.  Did you -- when did you leave the
9  operation -- that is, the Joe Domino operation,
10  which shows you there on the 27th and 28th -- I
11  believe you said Friday, Saturday and Sunday,
12  right?
13     A.  Correct.
14     Q.  So the last time you would have worked
15  would have been on the 28th?
16     A.  During the storm, I was on call
17  throughout the storm for approximately, I want to
18  say maybe a week afterwards.
19     Q.  Did you continue on the 28th to dispatch
20  vessels?
21     A.  I don't recall.  I don't recall.  I would
22  have to see a reference.  I don't believe on the
23  28th.  Was that the date of the storm?
24     Q.  No, 29th was the day of the storm.  28th
25  was a Sunday.

- 45 -

1      A.  I don't recall dispatching any boats.  I
2  would have to --
3      Q.  What would you look at?  This wouldn't
4  tell you, this document?
5      A.  Well, this is the 28th and 29th.  I'm
6  sorry.  Yes.  So therefore there's nothing
7  looks --
8      Q.  No, it's the 27th and 28th.
9      A.  27th and 28th.  So on the 29th nothing
10  would have been dispatched.  It looks like the
11  final job call in that I took was on the -- that
12  would have been the 27th
13     Q.  That's the one where you dispatched the
14  Regina H to Waterman?
15     A.  Correct.
16     Q.  And this would be the only document that
17  you would prepare in connection with your
18  dispatching?
19     A.  Yes.
20     Q.  Hm?
21     A.  Yes.
22     Q.  You don't make a log of telephone calls?
23     A.  No, sir.
24     Q.  And you don't make a log of -- when I say
25  "telephone calls," from the customer to you or

- 46 -

**DAVID CASTAING**

**- 47 -**

1 from you to the vessel?
2   A.  No, sir.
3   Q.  How does Joe Domino determine how to bill
4 a customer?
5   A.  These -- the jobs are written into the
6 invoice book, which invoices then are printed
7 from that book.
8   Q.  Well, invoices -- you have obviously a
9 starting time and a finish time, and that must
10 have some meaning; is that right?
11   A.  Yeah.
12   Q.  Because you bill by the hour?
13   A.  Correct.
14   Q.  So how do you know what to bill if this
15 is the only document you record?
16   A.  This is the order sheet.
17   Q.  I understand.
18   A.  These jobs on this order sheet are
19 transferred into an invoice book, where the
20 accountant would print invoices from the jobs in
21 the invoice book.
22   Q.  Where does the person who posts the
23 charges from the invoice book, where does he get
24 the information when the job started and when the
25 job ended to determine --

**- 49 -**

1   Q.  You do that yourself?
2   A.  I do that, as well as the other
3 dispatchers do that.
4   Q.  So you collect the logs and make out the
5 bills?
6   A.  I don't make out the bills, no.
7   Q.  Who makes out the bills?
8   A.  The accountant makes out the bills.
9   Q.  And who is that?
10   A.  At that time was Charlene Stein.
11   Q.  And she would make them out from the logs
12 she obtains from the vessels?
13   A.  The dispatchers would put the times from
14 the logs into the invoice book.
15   Q.  But the only thing you have on your -- as
16 a dispatcher is the time that they called was
17 made to you?
18   A.  And the logs are brought in once a week,
19 the log is brought in once a week from the
20 vessel.
21   Q.  But this document that you have, which is
22 Exhibit F, you can't bill from that because it
23 doesn't show anything about when the job was
24 started and when it was ended?
25   A.  Correct.  It doesn't show on the

**- 48 -**

1   A.  From the boat logs.
2   Q.  So you all get the boat logs?
3   A.  Correct.
4   Q.  So you got a boat log for every boat that
5 worked for you all on a day-by-day basis?
6   A.  Yes.
7   Q.  So you would have logs for the 27th and
8 the 28th and the 26th?
9   A.  Correct.
10   Q.  Hm?
11   A.  Correct.
12   Q.  So the vessel owner -- each vessel owner
13 is obligated to send to you -- I meant Joe
14 Domino, I mean.
15   A.  Uh-huh (affirmative response).
16   Q.  -- the vessel log for you to compute the
17 time involved?
18   A.  Correct.
19   Q.  And those are kept by the - what do you
20 call the guy who computes that?
21   A.  I'm sorry?
22   Q.  Who was the person that computes those
23 charges, what is his title?
24   A.  That would be the dispatcher, the
25 dispatcher.

**- 50 -**

1 worksheet, no.  It shows in the invoice book.
2   Q.  So when you say here that at 10 a.m. you
3 got a call from Ed Busch for the Regina and you
4 sent the Regina H to the Lafarge, it doesn't say
5 when it went and when it got there, when it
6 stopped and when the job ended; is that right?
7   A.  Correct.
8   Q.  So you have to have the invoice -- you
9 have to have the log to complete the invoice?
10   A.  Correct.
11   Q.  Anything else that's utilized in billing?
12   A.  No.  It's just billed strictly off the
13 boat log.
14   Q.  And do the -- and Joe Domino works on a
15 percentile of what they collect from the
16 customer?
17   A.  A commission.
18   Q.  And what's the commission?
19   A.  Ten percent.
20   Q.  And does Joe Domino also from time to
21 time provide fuel for the vessels and deduct it
22 from what's due to them?
23   A.  Joe Domino has the account for fuel.
24   Q.  Do all of the vessels?
25   A.  For the vessels, right, for the vessels

DAVID CASTAING

1 that are working for Joe Domino.
2    Q. The vessels, like the Regina H, that work
3 regularly for Joe Domino charge their fuel to Joe
4 Domino?
5    A. Correct.
6    Q. Where at?
7    A. We normally -- the vessels normally get
8 their fuel from John W. Stone.
9    Q. So in addition to the commission paid by
10 the vessels they charge fuel and that is deducted
11 from what's due to them after the customer pays?
12    A. I'm not sure how that's -- I don't have
13 anything to do with the payment of the boats, but
14 I just understand that the fuel that is charged
15 to Domino for that vessel is deducted from the
16 vessel pay at some point.
17    Q. Does Joe Domino provide any other
18 facility to the vessel, such as insurance or --
19    A. Not that I'm aware of.
20    Q. Maintenance and upkeep?
21    A. No.
22    Q. Do they provide any of the crews to the
23 vessels?
24    A. No.
25    Q. Did you at some point in time learn that

- 51 -

1 Mr. McNeill about that?
2    A. No.
3    Q. Did you talk to any of the crew members
4 of the Regina H?
5    A. No.
6    Q. Did you talk to the owner of the Regina
7 H?
8    A. No.
9    Q. Did Mr. McNeill or anyone else tell you
10 why the barge broke loose?
11    A. No.
12    Q. So you don't have any idea why it broke
13 loose?
14    A. Not at all.
15    Q. Do you know where the Mr. Cass and the
16 Regina H and the Henry Clay went on the 27th and
17 the 28th?
18    A. Where they went after?
19    MR. EMMETT:
20       Henry Clay?
21    MR. WEBB:
22       Henry Clay?  Is Henry Clay a vessel?
23    THE WITNESS:
24       No.  Henry Clay's a --
25    MR. EMMETT:

- 53 -

1 the empty barge that had been topped around by
2 the Regina H had broke loose?
3    A. Would you repeat that, please?
4    Q. Did you at some point in time learn that
5 the empty Ingram barge that had been topped
6 around by the Regina H on the 27th of August had
7 broken loose?  Did you learn that?
8    A. Apparently so. I'm sitting here with all
9 you guys.
10    Q. Well, I understand. But that's fourteen
11 months ago.
12    A. So you're asking for a time frame?
13    Q. Yes.
14    A. I wouldn't -- it might have been weeks.
15    Q. How did you come to find out?
16    A. Through Patrick McNeill at Domino,
17 informed me that it was the barge at Lafarge that
18 broke through.
19    Q. What did he tell you about why the barge
20 was no longer in the canal but out on the land
21 and didn't have wheels?
22    A. He just said the barge that went through
23 the breach in the levee was one of the barges
24 from Lafarge.
25    Q. And did you talk to anybody else besides

- 52 -

1       Street?
2    THE WITNESS:
3       -- street.
4 BY MR. WIEDEMANN:
5    Q. I'm sorry.
6    MR. SANDERS:
7       The Shane C.
8    MR. WIEDEMANN:
9       The Shane C. I'm looking at the
10 wrong thing.
11 BY MR. WIEDEMANN:
12    Q. Do you know where those vessels that are
13 on your log, Exhibit F, went at any time before
14 the hurricane?
15    A. I can see their jobs wrote on the paper
16 here, where they went.
17    Q. No. I understand their jobs. But at
18 some point in time you indicated that they had to
19 get into the canals. Do you know where the
20 specific vessels went?
21    A. All of the vessels went into the Harvey
22 Canal.
23    Q. Do you know when they went into the
24 Harvey Canal?
25    A. I don't know a specific time.

- 54 -

DAVID CASTAING

MINIDEP by Kenson

1    Q.   Did they call you to tell you when they
2  went in?
3    A.   They called to tell me they were going
4  in.
5    Q.   But you didn't make a note of that?
6    A.   No, sir.
7    Q.   And you don't recall at this time?
8    A.   Correct.
9    Q.   Do you have an idea of when they went in
10 with relation the 27th or the 28th?
11   A.   At some point on the 27th.
12   Q.   And what do you base that on?
13   A.   By looking at this worksheet.
14   Q.   But the worksheet doesn't show that the
15 Regina H was still working at five something on
16 the 27th?
17   A.   Correct.
18   Q.   Hm?
19   A.   No, it doesn't.
20   Q.   So how do you know what it was doing
21 after that?
22   A.   I was on call. I was the dispatcher.
23   Q.   But you don't remember -- you don't
24 remember when they called you; is that correct?
25   A.   I don't remember when they called, no.
                    - 55 -

1    A.   For Ingram?
2    Q.   For Ingram or for Lafarge.
3    A.   Sure.
4    Q.   Hm?
5    A.   Not -- no, not -- for various customers
6  we've taken barges out of the Industrial Canal.
7    Q.   But have you ever taken barges for Ingram
8  or Lafarge out of the Industrial Canal?
9    A.   Yes.
10   Q.   For who, for which ones, or both?
11   A.   Oh, for Ingram.
12   MR. FISHER:
13        Are we talking about just Ingram or
14   Lafarge?
15   MR. HAYCRAFT:
16        Or Ingram barges at Lafarge. It's a
17   very confusing question.
18   MR. FISHER:
19        There's three different
20   possibilities, so let's try to clear up
21   the record.
22   MR. WIEDEMANN:
23        You want to ask him?
24   MR. FISHER:
25        No.
                    - 57 -

1  That was over a year ago. I don't recall.
2    MR. SANDERS:
3        Let's take a break.
4        (At this time, a break was taken.)
5  BY MR. WIEDEMANN:
6    Q.   Has Joe Domino ever performed services
7  for Ingram or any of its related companies,
8  Ingram Barge Company?
9    MR. FISHER:
10       Object to the form.
11   THE WITNESS:
12       We've dispatched boats to work for
13   Ingram.
14 BY MR. WIEDEMANN:
15   Q.   In what way?
16   A.   Oh, from fleet work to harbor shifting.
17   Q.   Have you dispatched boats to bring Ingram
18 barges into the Lafarge cement plant?
19   A.   Not that I recall no. Not for Ingram.
20   Q.   Huh?
21   A.   For Ingram, working for Ingram?
22   Q.   Yes.
23   A.   Not that I recall, no.
24   Q.   Have you ever taken barges out of, Ingram
25 barges out of the Industrial Canal at any time?
                    - 56 -

1    MR. WIEDEMANN:
2        Okay.
3    MR. FISHER:
4        It's your question.
5  BY MR. WIEDEMANN:
6    Q.   Have you had occasion to take Ingram
7  barges out of the Industrial Canal?
8    A.   Yes.
9    Q.   And how would that come about?
10   A.   That would come about, one of the boats
11 working for Ingram out of their fleet and getting
12 dispatched from Ingram dispatcher.
13   Q.   You're talking about one of Ingram's
14 boats working out of Ingram --
15   A.   No. One of the five boats that work for
16 Domino working for Ingram at one of their fleets.
17   Q.   When did those boats work for Ingram?
18   A.   We probably hadn't done that in three
19 years.
20   Q.   And you would get a call from Ingram?
21   MR. HAYCRAFT:
22       You're talking about what he did
23   three years ago?
24   MR. SANDERS:
25       Correct.
                    - 58 -

DAVID CASTAING                                    MINIDEP by Kenson

| | |
|---|---|
| 1 MR. HAYCRAFT: | 1 A. To dispatch the vessel, correct. |
| 2 The question is in the present. | 2 Q. But it's your testimony that that |
| 3 THE WITNESS: | 3 stopped -- I'm talking about at the time of the |
| 4 Okay. Ingram would call Joseph C. | 4 hurricane, August 29, that had stopped for more |
| 5 Domino and ask if they had a boat they | 5 than a year? |
| 6 could send to their fleet. | 6 A. To my recollection we haven't worked for |
| 7 BY MR. WIEDEMANN: | 7 Ingram for more than year prior to it. |
| 8 Q. Okay. | 8 Q. Prior to the hurricane? |
| 9 A. We would send the boat to the fleet. The | 9 A. Correct. Unfortunately. |
| 10 boat from that point would take orders from | 10 Q. Why do you say unfortunately? |
| 11 Ingram. | 11 A. Domino likes all the work Domino can get. |
| 12 Q. And what fleet would that be? | 12 Q. Did Domino -- did you all receive any |
| 13 A. At that time it was Orgulf fleet. | 13 calls from any of your customers to assist with |
| 14 Q. Does Ingram still use that fleet for its | 14 hurricane preparation? |
| 15 barges? | 15 A. No, sir. |
| 16 MR. HAYCRAFT: | 16 Q. Did Domino have anything to do with |
| 17 Object to the form. No foundation. | 17 hurricane preparation with relation to the |
| 18 BY MR. WIEDEMANN: | 18 vessels that worked for it? |
| 19 Q. You can answer. | 19 A. No, sir. |
| 20 A. I don't know if Ingram still operates | 20 Q. You all didn't put out any directives or |
| 21 their fleet or not. I know Zito has, I think | 21 instructions or anything to the vessels? |
| 22 Zito is operating that fleet now, if I'm not | 22 A. No, no, sir. |
| 23 mistaken. | 23 Q. Did Domino have a safety director at that |
| 24 Q. And you don't know -- and I'm talking | 24 time? |
| 25 about at the time of this hurricane, August the | 25 A. Safety director? |
| - 59 - | - 61 - |

| | |
|---|---|
| 1 29th, 2005. Do you know what fleet Ingram was | 1 Q. A man who was in charge of safety? |
| 2 using for its barges? | 2 A. We have -- Domino follows AWRCP |
| 3 A. No, sir. | 3 procedures and certifications. There's no safety |
| 4 Q. Do you know what vessels were bringing | 4 director with Domino. |
| 5 its barges into the area and then into the | 5 Q. But someone inspects the vessels? |
| 6 Lafarge facility? | 6 A. Yes, that would be me. |
| 7 A. No, sir. | 7 Q. You inspect the vessels? |
| 8 MR. FISHER: | 8 A. Correct. |
| 9 Object to the form. | 9 Q. To see that they comply? |
| 10 BY MR. WIEDEMANN: | 10 A. Correct. |
| 11 Q. And in the last three years, Joe Domino | 11 Q. And what background do you have to do |
| 12 has not had to dispatch -- had occasion to | 12 that, just on-the-job training, or what? |
| 13 dispatch vessels to handle Ingram barges? | 13 A. Yes, on-the-job training. |
| 14 MR. EMMETT: | 14 Q. And were you the only one, or did all of |
| 15 Object to form. | 15 the dispatchers do that? |
| 16 THE WITNESS: | 16 A. I was the only one. |
| 17 We haven't done any work directly | 17 Q. But in doing that you would not give the |
| 18 with Ingram. It may have -- it's been | 18 vessels working for Domino any safety manuals or |
| 19 over a year, so it might be two years | 19 safety directives to follow? |
| 20 before, done any work for Ingram. | 20 A. They have their policies and procedures |
| 21 BY MR. WIEDEMANN: | 21 manual. |
| 22 Q. And when you did work for Ingram, Ingram | 22 Q. Who does? |
| 23 would call Domino? | 23 A. All the vessels. |
| 24 A. For? | 24 Q. But I'm talking about Domino, I'm not |
| 25 Q. To dispatch a vessel. | 25 talking about the vessels. Did Domino give the |
| - 60 - | - 62 - |

**DAVID CASTAING**                                          MINIDEP by Kenson

1  vessels any manuals or instructions or directions
2  as to what they should do with regard to safety?
3  A. No.
4  Q. Did Domino give any instructions or
5  directions to what the vessels working for them
6  should do with respect to hurricanes or
7  inclement --
8  A. No.
9  Q. -- weather?
10  A. No.
11  MR. WIEDEMANN:
12  Thank you. I have no further
13  questions.
14  MR. EMMETT:
15  Anybody else?
16  EXAMINATION
17  BY MR. FISHER:
18  Q. Mr. Castaing, good afternoon. My name is
19  Robert Fisher. I represent Lafarge North America
20  in this case.
21  In your experience, has Joe Domino ever
22  moved an Ingram barge at the request of anybody
23  other than Ingram?
24  A. No.
25  MR. HAYCRAFT:

                        - 63 -

1  Correct.
2  MR. FISHER:
3  Thank you, sir.
4  (Whereupon, the deposition was concluded.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                        - 65 -

1  I didn't follow that question.
2  Could you repeat the question, Peter.
3  MR. FISHER:
4  I read it right off that sheet
5  (indicating).
6  MR. HAYCRAFT:
7  And to follow up on Mr. Fisher's
8  question, what did you understand the
9  question to mean in terms of moving the
10  Ingram barge?
11  THE WITNESS:
12  As to towing it somewhere.
13  MR. HAYCRAFT:
14  From Point A to Point B?
15  THE WITNESS:
16  From Point A to Point B.
17  MR. HAYCRAFT:
18  Obviously Joe Domino has brokered
19  the shifting of barges at Lafarge's
20  facility that might include Ingram -
21  THE WITNESS:
22  Correct.
23  MR. HAYCRAFT:
24  -- barges, correct?
25  THE WITNESS:

                        - 64 -

REPORTER'S PAGE

I, Peter Caruso, Certified Court Reporter, in and for
the State of Louisiana, the officer, as defined in Rule 28 of the
Federal Rules of Civil Procedure and/or Article 1434(b) of the
Louisiana Code of Civil Procedure, before whom this sworn
testimony was taken, do hereby state on the Record:

That due to the interaction in the spontaneous
discourse of this proceeding, dashes ( -) have been used to
indicate pauses, changes in thought, and/or talk-overs; that same
is the proper method for a Court Reporter's transcription of
proceeding, and that the dashes ( -) do not indicate that words
or phrases have been left out of this transcript;

That any words and/or names which could not be verified
through reference material have been denoted with the phrase
"(phonetic)."

Peter Caruso, CVR-CCR

Certified Court Reporter

                        - 66 -

C E R T I F I C A T E
This certification is valid only for a transcript

DAVID CASTAING                                                    MINIDEP by Kenson

accompanied by my original signature and original blue stamp on
this page.

    I, Peter Caruso, Certified Court Reporter, in and for
the State of Louisiana, as the officer before whom this testimony
was taken, do hereby certify that
David Castaing, after having been first duly sworn by me upon
authority of R.S. 37:2554, did testify as hereinbefore set forth
in the foregoing 65 pages;

    That this testimony was reported by me in the
Stenographic (voice-writing) method, was prepared and transcribed
by me or under my personal direction and supervision, and is a
true and correct transcript to the best of my ability and
understanding;

    That I am not related to counsel or to the parties
herein; am not otherwise interested in the outcome of this
matter; and am a valid member in good standing of the Louisiana
State Board of Examiners of Certified Shorthand Reporters.


    Peter Caruso, CCR-CVR
    Certified Court Reporter
Louisiana License #20088

- 67 -

---

CORRECTIONS/CHANGES TO THE DEPOSITION OF:

David Castaing

Taken: Thursday, November 30, 2006

Page/Line  Reading        Should Read

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

- 69 -

---

WITNESS' CERTIFICATE



    I, David Castaing, do hereby

certify that I have read, or have had read to me,

the foregoing testimony, and it is true and

correct to the best of my ability and

understanding.

(Check one)

Without corrections.

With corrections and/or

additions attached hereto.

David Castaing

- 68 -

**DAVID CASTAING**

MINDEX by Kenson

| Word ... Page | Word ... Page | Word ... Page | Word ... Page | Word ... Page |
|---|---|---|---|---|
| 00009 ... 20 | assignment ... 24 | certifications ... 62 | Dispatcher ... 8, 9, 15, 44, 48, 49, 55, 58 | fueldock ... 29 |
| 00010 ... 29 | assignments ... 20 | charge ... 32, 51, 62 | dispatchers ... 9, 49, 62 | full ... 7, 21, 22 |
| 00011 ... 29 | assist ... 61 | charged ... 51 | dispatching ... 8, 46 | further ... 24, 63 |
| 00012 ... 28, 29 | August ... 10, 19, 52, 59, 61 | charges ... 47, 48 | dock ... 15, 21-23, 29 | **G** |
| 00013 ... 29 | availability ... 9, 12 | charging ... 32 | document ... 20, 41, 46, 47, 49 | general ... 23 |
| 05 ... 39 | available ... 25, 41 | Charlene ... 49 | documents ... 29 | generally ... 15, 16, 18 |
| 10 ... 20, 21, 24, 27, 30, 32, 38, 50 | aware ... 25, 51 | check ... 15 | Domino ... 8-12, 19, 24, 28, 42-45, 47, 48, 50-52, 56, 58-64 | Gerald ... 9 |
| 10:00 ... 38 | AWRCP ... 62 | Clay ... 53 | | get ... 14, 32, 35, 43, 44, 47, 56, 62, 63 |
| 10:45 ... 38 | **B** | close ... 43 | | give ... 35, 37, 38, 62, 63 |
| 108 ... 30, 32 | back ... 14, 25, 31, 32, 34, 37 | closed ... 43-45 | due ... 50, 51 | go ... 14, 16, 24, 26, 31, 32, 36 |
| 11 ... 26, 30, 31, 34, 35, 38 | background ... 62 | collect ... 49, 50 | duly ... 7 | going ... 7, 34, 37, 40, 43, 55 |
| 11:00 ... 38 | barge ... 23, 32, 33, 52, 53, 56, 63, 64 | come ... 34, 52, 58 | duty ... 38 | good ... 63 |
| 1122 ... 41 | barges ... 21, 22, 33, 37, 52, 56-60, 64 | commission ... 50, 51 | **E** | grandson ... 9 |
| 12 ... 28-30, 35 | base ... 28-32, 34, 35, 37, 55 | communicate ... 42, 44 | each ... 29, 42, 48 | guess ... 10 |
| 12:15 ... 30 | basis ... 9, 10, 12, 48 | communication ... 24, 40 | Ed ... 20, 21, 23, 24, 27, 32, 50 | guys ... 52 |
| 1215 ... 30-32 | Bate ... 20 | companies ... 12, 24, 56 | Eleven ... 8, 26 | **H** |
| 124 ... 7, 8 | Bates ... 20, 28 | Company ... 14, 24, 26, 56 | EMMETT ... 10, 15, 29, 31, 53, 60, 63 | handle ... 12, 60 |
| 13 ... 34, 35 | Below ... 27, 34 | complete ... 50 | employed ... 8 | handwriting ... 20, 21 |
| 1330 ... 28-32 | bill ... 19, 47, 49 | completed ... 30, 37 | empty ... 22, 23, 32, 33, 52 | harbor ... 45, 56 |
| 1700 ... 34-36 | billed ... 50 | comply ... 62 | entire ... 38 | Harvey ... 43, 54 |
| 1715 ... 35 | billing ... 24, 36, 50 | compute ... 48 | entry ... 38 | HAYCRAFT ... 57-59, 63, 64 |
| 1720 ... 35 | bills ... 49 | computes ... 48 | equipment ... 16-19 | head ... 35 |
| 20 ... 37 | block ... 20 | concluded ... 65 | equipped ... 19 | heading ... 44 |
| 2000 ... 37 | blocks ... 20 | conditions ... 42 | everybody ... 14 | hearing ... 39 |
| 2005 ... 10, 60 | board ... 12 | confusing ... 57 | ex ... 9 | heavier ... 23 |
| 2030 ... 37 | boat ... 9, 15, 24, 29, 35, 38, 48, 50, 59 | connection ... 46 | EXAMINATION ... 7, 63 | Henry ... 53 |
| 24 ... 38, 39, 41 | boats ... 12, 46, 51, 56, 58 | contact ... 42 | examined ... 7 | hire ... 24 |
| 26th ... 48 | book ... 47, 49, 50 | continue ... 45 | exclusively ... 10, 11 | Holiday ... 7, 8 |
| 27 ... 30, 39 | both ... 39, 57 | contracts ... 9 | Exhibit ... 19, 49, 54 | home ... 8 |
| 27th ... 19, 28, 45, 46, 48, 52, 53, 55 | breach ... 52 | conversation ... 24 | expect ... 17, 24 | hour ... 33, 34, 41, 47 |
| 28 ... 39 | break ... 56 | conversations ... 24 | expected ... 15 | hourly ... 9, 32 |
| 28th ... 45, 46, 48, 53, 55 | broke ... 52, 53 | conveyed ... 33 | experience ... 63 | hours ... 38, 39 |
| 29 ... 10, 61 | broken ... 52 | copies ... 24 | extra ... 19 | hurricane ... 8, 10, 14, 54, 59, 61 |
| 29th ... 45, 46, 60 | brokered ... 64 | copy ... 28 | **F** | hurricanes ... 63 |
| 341 ... 41 | brought ... 49 | couple ... 12 | facility ... 16, 17, 19, 24, 25, 27, 32-34, 51, 60, 64 | hypothet ... 18 |
| 5520 ... 9 | build ... 35, 36 | crew ... 21, 24, 33, 53 | fall ... 7 | **I** |
| 7 ... 38 | building ... 8, 36, 37 | crews ... 51 | far ... 27 | identified ... 19 |
| 70461 ... 7 | built ... 36 | customer ... 9, 14-18, 33, 35, 40, 41, 46, 47, 50, 51 | fashion ... 12 | inclement ... 8 |
| 8 ... 30, 39 | Busch ... 21, 23, 24, 27, 30, 32, 33, 50 | customers ... 9, 14, 19, 23, 44, 57, 61 | fax ... 23, 24 | indicated ... 54 |
| 9 ... 33, 38 | business ... 12 | **D** | faxing ... 23 | indicating ... 20, 26, 28, 64 |
| 9:00 ... 38 | **C** | date ... 45 | final ... 46 | Industrial ... 15, 43, 56-58 |
| 9:30 ... 38 | cable ... 19 | David ... 7 | find ... 62 | informed ... 52 |
| 92 ... 27, 34 | cables ... 16-19 | day ... 10, 38, 45, 48 | first ... 7, 13, 38 | Ingram ... 52, 56-61, 63, 64 |
| 94 ... 28, 29, 32 | call ... 9, 10, 12, 13, 16, 23, 24, 26, 27, 29-31, 34, 38, 40, 41, 43-46, 48, 50, 55, 58-60 | days ... 39 | FISHER ... 17, 18, 25, 33, 56-58, 60, 63-65 | insofar ... 32 |
| **A** | called ... 15, 16, 21, 25, 30, 31, 33, 40, 43, 44, 49, 55 | deal ... 42 | five ... 10, 36, 55, 58 | inspect ... 62 |
| a.m. ... 20, 21, 24, 26, 27, 30, 33, 34, 38, 50 | calls ... 39, 40, 46, 61 | dedicated ... 10 | fixed ... 41 | inspects ... 62 |
| access ... 40 | can ... 12, 19, 38, 54, 59, 61 | deduct ... 50 | fleet ... 26, 30, 34, 35, 37, 56, 58-60 | instruct ... 15 |
| according ... 28 | Canal ... 15, 40, 43, 44, 52, 54, 56-58 | deducted ... 51 | fleeting ... 29, 36, 40 | instructing ... 33 |
| account ... 50 | canals ... 45, 54 | delay ... 30 | fleets ... 58 | instruction ... 33 |
| accountant ... 47, 49 | capacity ... 8, 23 | depart ... 32 | follow ... 62, 64 | instructions ... 35, 61, 63 |
| add ... 21 | carry ... 16, 19 | departed ... 28-31 | follows ... 7, 62 | insurance ... 51 |
| addition ... 51 | case ... 15, 16, 18, 63 | departing ... 29, 31 | form ... 17, 25, 31, 33, 56, 59, 60 | invoice ... 47, 49, 50 |
| address ... 8 | Cass ... 10, 11, 53 | deposition ... 65 | former ... 9 | invoices ... 47 |
| afternoon ... 63 | Castaing ... 7, 8, 63 | described ... 22 | forth ... 19 | **J** |
| agreements ... 9 | Celeste ... 9 | describes ... 36 | found ... 45 | J.W. ... 29 |
| Algiers ... 27, 34, 43 | cell ... 41, 42 | desk ... 13 | foundation ... 59 | Jeck ... 10, 11 |
| America ... 15, 63 | cement ... 15, 56 | determine ... 47 | four ... 10, 14, 28 | Jefferson ... 12 |
| Apparently ... 29, 37, 52 | certain ... 9, 14, 17, 43 | different ... 57 | fourteen ... 52 | job ... 13, 16-21, 26, 27, 30-32, 34, 36, 37, 40, 44, 46, 47, 49, 50, 62 |
| appears ... 28, 29, 34, 35 | | directions ... 63 | frame ... 52 | jobs ... 19, 20, 47, 54 |
| approximately ... 27, 45 | | directives ... 61, 62 | Friday ... 39, 45 | Joe ... 9-12, 42, 44, 45, 47, 48, 50, 51, 56, 60, 63, 64 |
| area ... 8, 60 | | directly ... 60 | fuel ... 29, 50, 51 | |
| areas ... 29 | | director ... 61, 62 | | |
| arrange ... 9 | | dispatch ... 8, 15, 18, 19, 27, 40-42, 45, 60, 61 | | |
| arrived ... 25, 30, 35 | | dispatched ... 15, 20, 24, 26-28, 30, 31, 46, 56, 58 | | |
| assign ... 17, 19, 20, 26, 40 | | | | |
| assigned ... 19, 34 | | | | |

**DAVID CASTAING**

MINDEX by Kenson

| Word ... Page | Word ... Page | Word ... Page | Word ... Page | Word ... Page |
|---|---|---|---|---|
| John ... 28, 29, 51 | near ... 27 | president ... 9 | services ... 56 | tow ... 35-37 |
| Joseph ... 8-10, 40, 59 | needed ... 16-19, 35 | previous ... 27 | Shane ... 10, 11, 14, 54 | towboat ... 18, 19 |
| **K** | new ... 31 | previously ... 19 | sheet ... 26, 47, 64 | Towing ... 11, 12, 64 |
| Karche ... 10, 11 | news ... 42 | print ... 47 | shift ... 8, 38 | tows ... 19 |
| Katrina ... 10, 14 | nobody ... 25 | printed ... 47 | shifting ... 15, 56, 64 | traffic ... 40 |
| Kirby ... 27, 30-32 | normally ... 24, 51 | prior ... 30, 61 | shifts ... 9 | training ... 62 |
| **L** | north ... 15, 37, 63 | problem ... 33 | ship ... 37 | transferred ... 47 |
| Lafarge ... 15, 16, 18-21, | note ... 55 | procedures ... 62 | show ... 19, 24, 28, 49, 55 | trouble ... 39 |
| 24-27, 30-34, 50, 52, | noted ... 24 | provide ... 17, 50, 51 | shows ... 29-31, 45, 50 | truth ... 7 |
| 56, 57, 60, 63 | notice ... 42 | provided ... 17 | shut ... 42 | turn ... 14 |
| Land ... 41, 52 | numbers ... 41 | provides ... 17 | shutdown ... 43 | two ... 9, 21, 22, 29, 39, 40, |
| learn ... 51, 52 | **O** | push ... 19 | side ... 28 | 60 |
| leave ... 19, 40, 45 | Object ... 17, 25, 31, 33, 56, | **Q** | sign ... 7 | **U** |
| leaving ... 32, 34 | 59, 60 | quarter ... 8 | similar ... 39 | unfortunately ... 61 |
| left ... 26 | obligated ... 48 | **R** | simultaneously ... 43 | Unique ... 11, 24 |
| levee ... 52 | obtains ... 49 | radio ... 39, 40 | sitting ... 52 | upkeep ... 51 |
| line ... 19, 41 | occasion ... 21, 29, 58, 60 | reach ... 42 | Slidell ... 7, 8 | using ... 60 |
| lines ... 16-19, 21 | office ... 8, 41 | reason ... 22, 30 | son ... 9 | utilization ... 14 |
| list ... 9, 10, 12-14, 41, 42 | one ... 8, 10, 11, 14, 16, 22, | receive ... 61 | south ... 37 | utilized ... 14, 50 |
| Lizana ... 11 | 29, 38, 39, 44, 46, 52, | received ... 26, 27, 39 | special ... 17 | **V** |
| load ... 22, 23 | 58, 62 | receiving ... 23 | specific ... 15, 18, 54 | vessel ... 10, 12, 14-20, 24, |
| located ... 9, 26 | ones ... 13, 14, 57 | recent ... 14 | specifics ... 18 | 26, 28, 30, 35, 37, |
| lockmaster ... 44 | operates ... 26, 59 | recognize ... 20 | spell ... 10 | 39-42, 47-49, 51, 53, |
| locks ... 34, 42-45 | Operating ... 44, 59 | recording ... 27 | stamp ... 20, 28 | 60, 61 |
| log ... 24, 27-29, 34, 35, 38, | operation ... 15, 29, 36, 40, | reflects ... 26, 38 | stand ... 20 | vessels ... 9-14, 17, 19, 20, |
| 39, 46, 48-50, 54 | 45 | Regina ... 10, 11, 19-21, 24, | standby ... 29 | 41, 42, 44, 45, 49-51, |
| logs ... 23, 24, 28, 34, 48, 49 | operational ... 44 | 27-29, 33, 34, 36, 37, | start ... 30-32, 34, 35, 38 | 54, 60-63 |
| long ... 8, 14 | operators ... 42 | 46, 50-53, 55 | started ... 36, 47, 49 | vicinity ... 28, 29 |
| longer ... 44, 52 | order ... 13, 20, 24, 30, 47 | regular ... 8, 12 | starting ... 31, 47 | **W** |
| look ... 26, 46 | ordered ... 20 | regularly ... 51 | starts ... 32 | Wait ... 39 |
| looking ... 34, 38, 54, 55 | orders ... 20, 29, 35, 59 | relation ... 55, 61 | Stein ... 49 | waiting ... 29 |
| loose ... 52, 53 | Orgulf ... 59 | removal ... 33 | stipulation ... 7 | watching ... 42 |
| Louisiana ... 7, 8 | own ... 40 | remove ... 33 | Stone ... 29, 51 | Waterman ... 26, 27, 34-36, |
| lower ... 27 | owned ... 11 | report ... 21, 34, 35 | stop ... 30-32, 35, 37, 38, 44 | 46 |
| **M** | owner ... 11, 48, 53 | reporter ... 7 | stopped ... 37, 44, 50, 61 | weather ... 23, 42, 63 |
| mail ... 23 | owners ... 10 | request ... 15, 16, 35, 63 | storm ... 42, 45 | WEBB ... 39, 53 |
| Maintenance ... 51 | **P** | requested ... 32, 33 | straight ... 34 | week ... 45, 49 |
| make ... 7, 13, 15, 39, 46, 49, | p.m. ... 36 | Reserve ... 7 | Street ... 29, 54 | weekday ... 38 |
| 55 | pads ... 41 | respect ... 63 | strictly ... 50 | weekend ... 38, 39 |
| making ... 16 | paid ... 51 | response ... 23, 28, 29, 35, 48 | successive ... 20 | weekends ... 38 |
| man ... 62 | particularly ... 14 | respot ... 21 | Sunday ... 38, 39, 45 | weeks ... 52 |
| manual ... 62 | partner ... 11 | retie ... 22 | supplied ... 17 | wharf ... 29 |
| manuals ... 62, 63 | passing ... 32, 34 | reversed ... 22 | supplies ... 18 | wheels ... 52 |
| many ... 10 | Patrick ... 9, 52 | rig ... 19 | supply ... 17 | Whereupon ... 65 |
| Marine ... 11, 12 | pay ... 51 | rigging ... 17 | supposed ... 16, 37 | whole ... 7, 39 |
| Marion ... 11 | payment ... 51 | River ... 9, 27, 28, 32, 40, 43 | swap ... 21 | WIEDEMANN ... 7, 10, 11, |
| mark ... 13 | payroll ... 9 | Road ... 9 | sworn ... 7 | 15-18, 25, 28, 29, 31, |
| Marrero ... 9 | pays ... 51 | Robert ... 63 | **T** | 33, 39, 54, 56-60, 63 |
| McNeill ... 9, 52, 53 | percent ... 50 | rotate ... 13, 20 | task ... 19 | will ... 9 |
| meant ... 34, 48 | percentile ... 50 | rotated ... 20 | tasks ... 9 | WILLHOFT ... 7, 16, 28 |
| members ... 53 | performed ... 56 | rotating ... 13 | telephone ... 23, 40, 46 | WITNESS ... 10, 17, 25, 33, |
| Mile ... 27-29, 32, 34 | person ... 20, 47, 48 | rotation ... 13 | telling ... 33 | 35, 53, 54, 56, 59, 60, |
| Miss ... 10 | personal ... 19, 34 | Rue ... 7, 8 | Ten ... 27, 38, 50 | 64 |
| missing ... 10 | personally ... 42 | running ... 31 | terms ... 64 | words ... 15 |
| Mississippi ... 27, 32 | Peter ... 64 | **S** | testimony ... 31, 36, 61 | work ... 8, 9, 11, 30, 38, 41, |
| Misstates ... 11 | phone ... 40, 41 | safety ... 61-63 | therefore ... 46 | 51, 56, 58, 60, 61 |
| mistaken ... 59 | phones ... 41, 42 | SANDERS ... 54, 56, 58 | these ... 11-14, 20, 39, 44, 47 | worked ... 10, 12, 45, 48, 61 |
| monitor ... 42, 44 | pick ... 32, 33 | Saturday ... 38, 39, 45 | third ... 38 | working ... 10, 30, 38, 44, 51, |
| monitored ... 42 | plant ... 56 | schedule ... 38 | three ... 8, 57, 58, 60 | 55, 56, 58, 62, 63 |
| monitoring ... 40 | Plimsoll ... 26 | Scott ... 7 | tied ... 21-23 | works ... 38, 50 |
| months ... 52 | policies ... 62 | Scratch ... 14 | time ... 10, 11, 14, 20, 23-32, | worksheet ... 13, 20, 30, 39, |
| Motor ... 10 | possibilities ... 57 | see ... 12, 20, 28, 29, 35, 45, | 34, 35, 38-40, 43-45, | 50, 55 |
| moved ... 63 | posted ... 12 | 54, 62 | 47-52, 54-56, 59, 61 | written ... 47 |
| moving ... 64 | posts ... 47 | seek ... 44 | times ... 38, 49 | wrote ... 21, 54 |
| much ... 38 | preceding ... 29, 35 | seen ... 28 | title ... 48 | **Y** |
| **N** | preferential ... 14 | sending ... 44 | took ... 46 | year ... 28, 38, 56, 60, 61 |
| named ... 13 | preparation ... 61 | sent ... 50 | top ... 21, 22, 33 | years ... 8, 14, 58, 60 |
| names ... 20, 41 | prepare ... 46 | sequence ... 13 | topped ... 22, 52 | |
| | present ... 8, 59 | | topping ... 22 | |

**DAVID CASTAING**

MINDEX by Kenson

| Word ... Page | Word ... Page | Word ... Page | Word ... Page | Word ... Page |
|---|---|---|---|---|

**Z**

Zito ... 32, 33, 59