# EXHIBIT 12

1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF LOUISIANA

3

4   IN THE MATTER OF THE        *   CIVIL ACTION
    COMPLAINT OF INGRAM         *
5   BARGE COMPANY, AS OWNER     *   NO. 05-4419
    OF THE ING4727,             *        C/W 05-4237
6   PETITIONING FOR             *        C/W 05-5531
    EXONERATION FROM OR         *        C/W 05-5724
7   LIMITATION OF LIABILITY     *   SECTION "C" (2)
                                *
8                               *   JUDGE HELEN G.
                                *      BERRIGAN
9                               *
                                *   MAG. JUDGE, JOSEPH
10                              *      WILKENSON, JR.
                                *
11  * * * * * * * * * * * * *   *

12

13

14          Deposition of GERALD THOMAS McNEILL,

15   taken at the law offices of Emmett, Cobb, Waits &

16   Henning, located at 1515 Poydras Street, Suite

17   1950, New Orleans, Louisiana 70112, beginning on

18   the 11th day of October, 2006, at 10:05 a.m.

19

20   Reported by:

21        Sharon Waldrup Black, CCR
          Certified Court Reporter
22

23

24

25

PETER CARUSO & ASSOCIATES (504) 432-3656
P.O. BOX 10741, JEFFERSON, LOUISIANA 70181

BARGE000640

2

```
 1      APPEARANCES:

 2
        Representing the Plaintiffs,
 3           Ethel Mumford, et al:

 4           WIEDEMANN & WIEDEMANN
             Attorneys at Law
 5           By: Lawrence D. Wiedemann, Esq. (#13457)
             821 Baronne Street
 6           New Orleans, Louisiana 70113

 7           LAW OFFICE OF BRIAN A. GILBERT
             Attorneys at Law
 8           By: Brian A. Gilbert, Esq. (#21297)
             3232 Edenborn Avenue
 9           Metairie, Louisiana 70002

10           MR. PATRICK J. SANDERS, ESQ. (#18741)
             Attorney at Law
11           3316 Ridgelake Drive
             Metairie, Louisiana 70002
12
        Representing the Plaintiffs,
13           The Parfait Family, et al:

14           LAW OFFICES OF ASHTON R. O'DWYER, JR.
             Attorneys at Law
15           By: Ashton R. O'Dwyer, Jr., Esq. (#10166)
             365 Canal Street
16           Suite 2670
             New Orleans, Louisiana 70130
17
        Representing the Plaintiffs,
18           Blair Boutte, et al:

19           BURGOS & EVANS
             Attorneys at Law
20           By: Robert B. Evans, III, Esq. (#23473)
             3632 Canal Street
21           New Orleans, Louisiana 70119

22

23

24

25
```

3

1      Representing the Plaintiffs,
          Marie Benoit, et al:

2

3      **MAPLES & KIRWAN, LLC**
       Attorneys at Law
       By: Laurent Demosthemidy
4      902 Julia Street
       New Orleans, Louisiana 70113

5

       Representing Joseph C. Domino, Inc.
6         and Unique Towing, Inc.:

7      **EMMETT, COBB, WAITS & HENNING**
       Attorneys at Law
8      By: John F. Emmett, Esq.
       1515 Poydras Street
9      Suite 1950
       New Orleans, Louisiana 70112

10

       Representing Joseph C. Domino, Inc.:
11

12     **HARRIS & RUFTY, L.L.C.**
       Attorneys at Law
       By: Rufus C. Harris, III, Esq.
13     650 Poydras Street
       Suite 2710
14     New Orleans, Louisiana 70130

15     Representing LaFarge North America, Inc.:

16     **CHAFFE, McCALL, L.L.P.**
       Attorneys at Law
17     By: Robert B. Fisher, Jr., Esq.
       2300 Energy Centre
18     1100 Poydras Street
       New Orleans, Louisiana 70163

19

       Representing Ingram Barge Company:
20

21     **LISKOW & LEWIS**
       Attorneys at Law
       By: Don Haycraft, Esq.
22     701 Poydras Street
       50th Floor
23     New Orleans, Louisiana 70139

24

25

4

1    Representing New York Marine and
          General Insurance Company:
2
          SUTTERFIELD & WEBB, L.L.C.
3         Attorneys at Law
          By: Daniel A. Webb, Esq.
4         650 Poydras Street
          Suite 2715
5         New Orleans, Louisiana 70130

6    Representing American Owners Mutual
          Protection and Indemnity Association:
7
          MONTGOMERY, BARNETT, BROWN & READ,
8         HAMMOND & MINTZ
          Attorneys at Law
9         By: Philip S. Brooks, Jr., Esq.
          1100 Poydras Street
10        New Orleans, Louisiana 70163

11   Representing Board of Commissioners,
          Port of New Orleans:
12
          DAIGLE, FISSE & KESSENICH
13        Attorneys at Law
          By: Jonathan H. Sandoz, Esq.
14        P. O. Box 5350
          Covington, Louisiana 70434-5350
15

16

17

18

19

20

21

22

23

24

25

5

EXAMINATION INDEX

Caption . . . . . . . . . . . . . . . . . . . . 1

Appearances . . . . . . . . . . . . . . . 2, 3, 4

Exhibit Index . . . . . . . . . . . . . . . . . 6

Stipulation . . . . . . . . . . . . . . . . . 7

Examination:

    By Mr. Wiedemann   . . . . . . . . . . . . . 9

Reporter's Page . . . . . . . . . . . . . . . 119

Certificate . . . . . . . . . . . . . . . . . 120

Witness' Certificate . . . . . . . . . . . . 121

Corrections/Changes Page   . . . . . . . . . . 122

6

EXHIBIT INDEX

1

Exhibit Number 1:
2      (30)(b)(5) Notice for Request for
       Production of Documents (7 Pages)
3

Exhibit Number 2:
4      Invoice from Joseph C. Domino, Inc.
       To Lafarge Concrete for services of
5      the REGINA H on August 27, 2005
       (1 Page)
6

Exhibit Number 3:
7      Dispatcher log/worksheet of Joseph
       C. Domino, Inc. (1 Page)
8

Exhibit Number 4:
9      Logs of the REGINA H for August
       27, 2005 (4 Pages)
10

Exhibit Number 5:
11     Policies and Procedures Manual
       of Joseph C. Domino, Inc.
12     (141 Pages)

13  Exhibit Number 6:
       Certificate of Documentation
14     (1 Page)

15  Exhibit Number 7:
       Boat Brokers Liability Policy issued
16     to Joseph C. Domino, Inc. by Gulf
       Coast Marine (10 Pages)
17

Exhibit Number 8:
18     Primary Marine Policy issued to
       Unique Towing/Lizana by CNA
19     (15 Pages)

20  Exhibit Number 9:
       Excess policy of insurance for
21     Heck/Lizana/Unique Towing, Inc.
       (38 Pages)
22

Exhibit Number 10:
23     Log books of Unique Towing for
       the REGINA H for 30-day period
24     before and 60-day period after
       August 27, 2005 (76 Pages)

25

PETER CARUSO & ASSOCIATES (504) 432-3656
P.O. BOX 10741, JEFFERSON, LOUISIANA 70181

BARGE000645

7

1   S T I P U L A T I O N

2          It is stipulated and agreed to, by and

3   between counsel, that the deposition of GERALD

4   THOMAS McNEILL, is hereby taken, pursuant to

5   Notice, for all purposes, under the Federal Code

6   of Civil Procedure Rule 30(b)(6);

7          That the parties hereto waive all

8   formalities in connection with the taking of this

9   deposition; except those are to reading and

10  signing; and

11         That all objections, except those as to

12  the form of the question and/or the responsiveness

13  of the answer, are reserved until the time of the

14  trial of this case.

15

16                    *  *  *  *  *

17

18

19

20         Sharon Waldrup Black, Certified Court

21  Reporter, officiated in administering the oath to

22  the herein witness.

23

24

25

DEPO. OF GERALD THOMAS MCNEILL

<span style="float:right">MiniDep by Kenson</span>

1       GERALD THOMAS McNEILL, 301
2 North Oak Street, Hammond, Louisiana 70401-3217,
3 having been first duly sworn by the reporter to
4 tell the truth, the whole truth, and nothing but
5 the truth, was examined and testified as follows:
6       MR. EMMETT:
7           Before we begin, for the Record,
8 I filed a Motion for a Protective Order
9 in connection with the Notice of
10 (30)(b)(6) and (30)(b)(5) directed to
11 Joseph C. Domino, Incorporated.
12           I reserve all the objections stated
13 in the Motion for a Protective Order.
14 However, I am producing the witness to
15 you today for you to ask the questions
16 that are contained in your notice.
17 Subject to that we'll start.
18       MR. WIEDEMANN:
19           You want to make the usual
20 stipulation?  Do you waive the reading
21 and signing?
22       MR. EMMETT:
23           I'll wait.  I think we'll read and
24 sign, but we'll reserve all objections
25 save as to form and responsiveness.
- 8 -

1       MR. WIEDEMANN:
2           You reserve the right to sign?
3       MR. EMMETT:
4           Correct.
5       MR. WIEDEMANN:
6           You'll decide at the end.
7       MR. EMMETT:
8           Yes.
9       E X A M I N A T I O N
10 BY MR. WIEDEMANN:
11    Q. Would you state your full name, please,
12 sir?
13    A. Gerald Thomas McNeill.
14    Q. And by whom are you employed, Mr.
15 McNeill?
16    A. Joseph C. Domino, Incorporated and
17 Southeastern Louisiana University.
18    Q. And what is your job title with
19 Joseph C. Domino?
20    A. Currently I'm a part-time dispatcher.  I
21 was president of the corporation until
22 January 30, 2006.
23    Q. And how long were you president of the
24 company, approximately?
25    A. 20 -- almost 22 years.  21 years.
- 9 -

1    Q. And you're also employed by -- is it UNO,
2 you said?
3    A. No.  Southeastern.
4    Q. Southeastern.
5    A. Yes, sir.
6    Q. In what capacity?
7    A. Instructor of Geography.  That's my
8 full-time employer now.
9    Q. What brought about your change in
10 long-term employment with Joe Domino?
11    A. Personal reasons.  Well, ever since I
12 was, I guess you'd say, a graduate of college I
13 wanted to teach.
14       I ended up marrying Mr. Domino's daughter
15 and went to work for the corporation.  I stayed
16 with the corporation until my son was able to
17 take over.
18    Q. So your son is now president?
19    A. Yes, sir.
20    Q. And what is his name?
21    A. Patrick Thomas McNeill.
22    Q. And through your years of association
23 with Joe Domino as the president up until
24 January, you're familiar with the operation of
25 the corporation?
- 10 -

1    A. Yes, sir.
2    Q. Tell me, what is the business of Joe
3 Domino, Incorporated?
4    A. Joseph C. Domino, Incorporated is a
5 marine towing brokerage.
6    Q. Does it own any vessels?
7    A. No, sir.
8    Q. It is strictly a brokerage company?
9    A. Yes, sir.
10    Q. And does it have -- and when I say
11 "does," I mean at the time you were there.  Did
12 it have contracts with vessel owners?
13    A. We have brokered vessels that work for
14 the towing brokerage by verbal agreement.
15    Q. You don't have written agreements with
16 the --
17    A. No, sir.
18    Q. -- tow companies?
19    A. No, sir.
20    Q. What about the employees that crew the
21 vessels?  What is their relationship with Joe
22 Domino?
23    A. The crewing of the vessels is usually
24 done by the owners of the vessels.
25    Q. When you say "usually" --
- 11 -

BARGE000647

DEPO. OF GERALD THOMAS MCNEILL

1    A.  Unless they hire someone to do it for
2  them.
3    Q.  Does Joe Domino ever furnish the crew for
4  the vessels that --
5    A.  No, sir.
6    Q.  -- they engage?
7    A.  No, sir.  We're not involved in
8  operations.
9    Q.  So all of your agreements with the vessel
10  owners that you broker are verbal agreements?
11    A.  Yes, sir.
12    Q.  Is that unusual in the industry or is
13  that --
14    A.  To us it's not at Joseph C. Domino, Inc.
15  It's not -- Joseph C. Domino, Inc. has been in
16  business since 1949.  And it's been carried on
17  that way ever since it was started.
18    Q.  Does Joe Domino advertise for brokerage?
19    A.  No, sir.
20    Q.  His business comes from years of being in
21  the business and dealing with people?
22    A.  Word of mouth.
23    Q.  Did Joe Domino have contracts with
24  companies or persons using the vessels?  In other
25  words, the ultimate user, which was in this case,

                        - 12 -

1  Lafarge?
2    A.  Most of our work is done verbally, as
3  well.  Joseph C. Domino has one brokered vessel
4  at the present that has a written contract with a
5  client/customer.  The rest of them work on a job
6  to job basis verbally.
7    Q.  So which one is the one that has a
8  contract?
9    A.  The name of the boat or the customer?
10    Q.  The boat and the customer.
11    A.  The name of the boat is the KARCHE,
12  K-A-R-C-H-E.  The name of the client or customer
13  is Kirby Corporation.
14    Q.  And why is there a contract in this one
15  instance?
16    A.  The customer required one.
17    Q.  So you have no documentation other than
18  the KARCHE and Kirby Corporation situation of
19  agreements with vessel owners or agreements with
20  the users of vessels?
21    A.  The only documentation we now have refers
22  to what we call "The Responsible Carrier Program"
23  through the American Waterways Operators.  That's
24  the only documentation that we have, but it does
25  not specifically name vessels, it does not

                        - 13 -

1  specifically name customers.
2    Q.  And what is that document?
3        MR. WIEDEMANN:
4            Do you have that with you?
5        MR. EMMETT:
6            I have a packet for you.  I think
7        that manual is being produced in
8        response to Request Number 13.
9        (Handing documents.)
10        MR. WIEDEMANN:
11            Let's go off the Record.
12  (Off-the-Record.)
13  BY MR. WIEDEMANN:
14    Q.  The document that you just referred to,
15  do you know what tab that is?
16    A.  Tab 13.
17    Q.  13?  And that's called Policies and
18  Procedures of Joseph C. Domino, Incorporated?
19    A.  Yes, sir.
20    Q.  And that's the only, to your knowledge,
21  written document referencing the vessels brokered
22  by you or you --
23    A.  That's the only document referencing the
24  brokered vessels that work through us, Joseph C.
25  Domino.

                        - 14 -

1    Q.  But this is an in-house document.
2    A.  Yes.  It's in-house, but it is guided by
3  American Waterways guidelines.  And we hired --
4  Joseph C. Domino, Inc. hired a consultant to help
5  us put that together.  That is the standard
6  quality, if you want to call it, quality program
7  of the industry.
8    Q.  And the document makes reference to the
9  obligations and the responsibilities of crew
10  members?
11    A.  All right.  Let me see if I can explain.
12  The document is geared towards the vessels that
13  are chartered by Joseph C. Domino, Incorporated.
14        It states at the very beginning that
15  Joseph C. Domino, Incorporated is a marine
16  broker.  The vessels follow this policy for
17  safety and navigational purposes.
18    Q.  Is this document given to the vessel
19  owners that you broker?
20    A.  Yes, sir.
21    Q.  And are they responsible to follow this
22  document?
23    A.  They are responsible.  They are required
24  to have four meetings a month on board the
25  vessel.  Every quarter there is a follow up

                        - 15 -

1  inspection done by the compliance officer of
2  Joseph C. Domino, Incorporated.
3         And then at the third year anniversary of
4  us, Joseph C. Domino, Inc., becoming a member of
5  RCP, it has to be an outside auditor to come in
6  to see if we're following AWO and RCP
7  requirements.
8      Q.  So when you say that the owner in Section
9  2.1, it would be the owner of the vessels, is
10 responsible for compliance with all Joseph C.
11 Domino, Incorporated policies and procedures,
12 responsible for training and ensuring that all
13 crew members follow the procedures.
14        You not only give this to the owners, but
15 you have an enforcement policy.
16     A.  The owner, the captain of the vessels,
17 are the ones who follow that on board the
18 vessels.
19        Domino only has a compliance officer that
20 goes on board every quarter, or every three
21 months, which we will look at records of
22 meetings, we will have a walk around inspection
23 of the boat to make sure they're following safety
24 procedures as indicated.
25     Q.  And who is your compliance officer?
                    - 16 -

1      A.  Scott Castaing.
2      Q.  Is he still employed by the company?
3      A.  Yes, sir.
4      Q.  And that's his title, Compliance Officer?
5      A.  He's our Chief Dispatcher and Compliance
6  Officer.
7      Q.  And when you say in this document you
8  deal with the captain or the relief captain, the
9  pilot and the deck hands --
10     A.  The vessel deals with them, not Domino.
11     Q.  Well, when you give this document to the
12 vessel owners --
13     A.  Uh-huh. (Affirmative response.)
14     Q.  -- and then follow up to see that they
15 have complied with the document, are you not then
16 -- well, let me ask you, if they don't comply
17 with it, what happens?
18     A.  If they don't comply we -- my
19 understanding, the compliance officer will write
20 up a report, and then they will have to do what
21 they're not following, whether it would be a
22 safety meeting or a training session.
23        If it's not followed up, well, then they
24 can't work for Joseph C. Domino, Inc.
25     Q.  In fact, you have a disciplinary policy,
                    - 17 -

1  don't you?
2      MR. EMMETT:
3         If you want to refer to the
4  manual, you can.
5      THE WITNESS:
6         Yeah.  You want me to refer to
7  the manual?
8  BY MR. WIEDEMANN:
9      Q.  Yes.  Section 1.090, Disciplinary Policy.
10 Section "I", I believe it is.
11     A.  The second paragraph I think will answer
12 your last question.
13        "In most instances minor infractions will
14 result in a reprimand or counseling from
15 management personnel."
16     Q.  Do the owners of vessels sign off to this
17 agreement, this policy?
18     A.  No.  We don't have any signature records.
19 No, sir.
20     Q.  Well, I would assume that every owner
21 that is working for Joe Domino as a broker gets a
22 copy of this?
23     A.  Yes.  That's what I stated.
24     Q.  And your compliance officer, how does he
25 obtain the authority to go aboard vessels and
                    - 18 -

1  make compliance --
2      A.  From the --
3      Q.  -- inspections?
4      A.  From the boat owner.
5      Q.  And how is that done?  Is that done by
6  some kind of document that grants the permission?
7      A.  Verbal.
8      Q.  So verbally between Joe Domino and the
9  vessel owners, your compliance officer has a
10 right to go aboard, check to see whether the
11 crews and the owners are complying with your
12 policy?
13     A.  Yes, sir.
14     Q.  And if they're not complying with your
15 policy, then what happens?
16     A.  Well, as stated here, there are some
17 standards for immediate dismissal, but we have,
18 to my knowledge, never have gotten to that
19 particular category of having any major
20 violations.
21        This program has been in effect for not
22 quite three years with Joseph C. Domino, Inc.
23     Q.  When did it go into effect?  Do you know
24 the date?
25     A.  I want to say February of 2004,
                    - 19 -

DEPO. OF GERALD THOMAS MCNEILL

MINIDEP by Kenson

1 approximately.
2    Q.  And the parties utilizing the vessels
3 through Joe Domino, are they given a copy of this
4 document, as well?
5    A.  No, sir.
6    Q.  So that Joe Domino is attempting through
7 this document and through its brokerage
8 agreement, this verbal brokerage agreement, to
9 set forth standards that the boat owners will
10 follow; is that correct?
11    A.  Yes, sir.
12    Q.  And if they do not follow those standards
13 when inspections are made by your compliance
14 officer, there are remedies, one of which would
15 be cancellation of the verbal agreement?
16    A.  Certainly that would be the final outcome
17 if they wouldn't follow the policies.
18    Q.  And has Joe Domino cancelled verbal
19 agreements with vessel owners in the past for
20 failure to comply with these?
21    A.  No, sir.
22    Q.  And since 1949, you don't know of any
23 boat owner that has violated these policies
24 resulting in some action by the compliance
25 officer?

- 20 -

1    Q.  You mentioned the national organization.
2    A.  AWO?
3    Q.  Yes.
4    A.  American Waterways Operation.
5    Q.  Yes.  And they produced documents?
6    A.  Before 2004?
7    Q.  Yeah.
8    A.  I can't answer that.
9    Q.  You indicated that this came from --
10    A.  It was AW -- this is AWO's program,
11 Responsible Carrier Program.  It's under the
12 guidelines of AWO.  Before we became a member, I
13 have no idea what they were issuing or, if you
14 want to say, giving people involved in the
15 industry.  I have no idea.
16    Q.  So when did you all become a member with
17 AWO?
18    A.  It's been off and on.  We were an
19 associate member prior to becoming this type of
20 member, which is under the category of Marine
21 Towing Brokers.
22    Q.  So prior to February of 2004, you all did
23 not exercise any effort to get the boat owners to
24 comply with regulations such as is contained in
25 this document?

- 22 -

1       MR. EMMETT:
2          Object to the form.  The witness
3       testified the document went into
4       existence in February of '04.  The
5       question asks about the 1940's.
6       MR. WIEDEMANN:
7          I stand corrected.
8 BY MR. WIEDEMANN:
9    Q.  Since this went into effect in February
10 of 2004 --
11    A.  Yes, sir.
12    Q.  -- no one has been found to have been
13 compliant with this document?
14    A.  Non-compliant?
15    Q.  Non-compliant?
16    A.  No, sir.
17    Q.  It's good you're a professor, you can
18 help me.  Before February of 2004, was there some
19 preceding document relative to the dictates of
20 how you operate?
21    A.  No, sir. There were no other written
22 documents prior to this.
23    Q.  This is the first document that you all
24 utilized?
25    A.  Yes, sir.

- 21 -

1    A.  I did not know anything about regulations
2 before 2004.  That's included here.  We -- Joseph
3 C. Domino, Inc. required the boats to work for us
4 by verbal agreement.
5    Q.  But you were president, you said, for
6 some 20 --
7    A.  Yeah.  Almost 22 years.
8    Q.  22 years.  But you don't know of any
9 other document or policy that Joe Domino had
10 relative to --
11    A.  That was not --
12    Q.  -- this owner --
13    A.  Again, all agreements were verbal.  There
14 was no documents.
15    Q.  What brought about the utilization of
16 this document, Policies and Procedures?
17    A.  As stated previous, it has become the
18 standard of the industry.  And customers wanted
19 to know if we were a responsible carrier, or as
20 they say "RCP."
21       And I have not -- Joseph C. Domino,
22 Incorporated has not experienced any customer
23 saying, "We will not work with you because you're
24 not RCP," but that is hearsay.  If you're not
25 RCP, you might not get the work.

- 23 -

**DEPO. OF GERALD THOMAS MCNEILL**

1  Q.  So it was customer --
2  A.  Generated. Yes, sir.
3  Q.  -- demands that Joe Domino take some part
4  in regulating the owners' conduct?
5  A.  Joseph C. Domino, Inc., as a marine
6  towing broker, has relationships with clients and
7  customers who move barges, et cetera, on the
8  waterways.  Yes, we do listen to customers'
9  requests.
10  Q.  Well, would I be correct in assuming that
11  the customers were concerned that single boat
12  owners or boat owners of several vessels might
13  not have an inspection and regulation policy and
14  wanted to know whether
15  A.  I don't think that's totally the case.
16  MR. EMMETT:
17       Object to form.  You continually
18       refer to regulations.  These are policies
19       and procedures, not regulations.
20       Subject to that -- and I'll make
21       that objection continuing.
22  BY MR. WIEDEMANN:
23  Q.  Was it your understanding that there was
24  a void in policy and procedures that existed
25  among boat owners that required from the customer
                          - 24 -

1  some regulation or enforcement by the brokers?
2  A.  I don't have any specific knowledge of
3  that.
4  Q.  And after you enacted and compiled this
5  Policy and Procedure in February of 2004, did you
6  distribute it to the customers?
7  MR. EMMETT:
8       Objection.  Asked and answered.
9  THE WITNESS:
10       No, sir.  It's not going to the
11       customers.
12  BY MR. WIEDEMANN:
13  Q.  Well, when the customers asked you if you
14  were doing something in this area, you never gave
15  them a copy of this document?
16  A.  We did not give them a copy of the
17  document.  They asked if we're RCP
18  certified, and that would be verbally, not
19  written.
20  Q.  And so you have told customers verbally
21  that you are RCP certified?
22  A.  If asked, yes, we have.
23  Q.  And when you say you are RCP certified,
24  that means you as a broker are RCP certified or
25  does it mean that the vessel --
                          - 25 -

1  A.  It means that the vessels that are worked
2  through the brokerage are RCP.  There is a little
3  bit of difference between brokerage and vessel.
4       To have Joseph C. Domino, Inc.'s name on
5  this document it had to be specified as it is, at
6  the beginning of this document, that we are a
7  marine towing brokerage and the vessels that work
8  through us are brokered vessels.
9  Q.  But when you say "RCP certified," that's
10  means that
11  A.  It's under Joseph C. Domino's name, so I
12  would have to say that the answer is yes.
13  Q.  So you said you don't send this to the
14  customer.
15  A.  No.
16  Q.  But when the customer asks, you tell them
17  that the vessels and Joe Domino are RCP
18  certified?
19  A.  If they ask, yes, we do.  We say, "Yes."
20  Q.  What does RCP certified mean?
21  A.  Responsible Carrier Program.
22  Q.  So you're telling the owners, or rather
23  the users I should say, that you and your vessel
24  owners are in fact certified?
25  A.  Yes, sir.
                          - 26 -

1  Q.  And you, through your compliance officer,
2  Mr. Castaing, at one point in time, seek to make
3  sure that the vessels are RCP certified?
4  A.  That's what the meetings and the
5  quarterly inspection is all about.
6  Q.  Now, Mr. Castaing, did he come into that
7  position --
8  A.  Only when we went RCP.
9  Q.  Yes.  Which would have been February of
10  2004?
11  A.  Yes, sir.
12  Q.  And he has been the compliance officer
13  since then?
14  A.  Yes, sir.
15  Q.  So he would be the one, or are there
16  others that make these inspections?
17  A.  He is the one that makes these inspections.
18  Q.  And does he, in making these inspections,
19  generate an inspection document?
20  A.  Yes, sir.
21  Q.  What is that called?
22  A.  Other than Inspection Sheet, I have -- I
23  don't have any other title for it.
24  Q.  But that's a written document?
25  A.  Yes.  On file at the office.
                          - 27 -

MINIDEP by Kenson

1    Q. And he would do that, how often?
2    A. As stated, every quarter.
3    Q. He would inspect every vessel under Joe
4 Domino's --
5    A. Every vessel that's RCP certified.
6    Q. Are there vessels working under Joe
7 Domino's brokerage that are not RCP certified?
8    A. The vessels that are full-time and work
9 only for Joseph C. Domino, Inc. are the ones that
10 we work.
11    There is on occasion a job which might be
12 covered, again, by verbal agreement, by a outside
13 boat or a part-time boat. Part-time boats are
14 not RCP, as far as I know, unless they tell me.
15    Q. So that would occur because you would
16 have to go out of your normal
17    A. Normal business?
18    Q. Yes.
19    A. It's normal business operations. If we
20 receive a job, Joseph C. Domino, Inc. receives a
21 job from a client and we do not have a full-time
22 vessel available to do the job, that's how we
23 operate.
24    That's how we make money on commissions.
25 We would seek an outside boat. I will have to

- 28 -

1    A. Yes, sir.
2    Q. And as a dispatcher, does he work a
3 regular schedule or --
4    A. He works regular office hours. And then
5 he takes, as we say in our corporation, duty
6 nights, where he would actually take calls during
7 the week or a weekend when he is on duty.
8    Q. When you say "take calls," calls to
9 inspect the vessels?
10    A. No, sir. Not as -- you know, that's
11 beyond -- this is normal business operations,
12 when we take calls from customers. Normal
13 business operations.
14    Q. Is he the only one within the corporate
15 structure that did these compliance --
16    A. Yes, sir.
17    Q. -- inspections?
18    A. Yes, sir.
19    Q. And he generates one document on each
20 vessel every quarter?
21    A. To my knowledge, one document every
22 quarter per vessel, or he might combine them.
23 I'm not sure. Or he might combine them onto one
24 sheet. But he does go on every vessel, full-time
25 vessel.

- 30 -

1 say it's few and far between, but, yes, it has
2 happened.
3    Q. So Scott Castaing on a quarterly basis
4 would inspect all of the vessels under ongoing
5 relationships
6    A. Only the full-time vessels. And because
7 we have a verbal agreement with them, then we can
8 go on their vessels for inspection. Only the
9 full-time vessels.
10    Q. And other than the verbal agreement,
11 there's no written agreement regarding that?
12    A. Regarding what, sir?
13    Q. Certification.
14    A. The certification is here.
15    Q. Yes, I understand. Between the boat
16 owners and Domino?
17    A. The full-time vessels have this document.
18 (Indicating.)
19    Q. Well, do they sign off on the document?
20    A. No, sir.
21    Q. Do they verbally agree to comply with the
22 document?
23    A. Yes, sir.
24    Q. And Mr. Castaing, in addition to being a
25 compliance officer, is a dispatcher?

- 29 -

1    Q. So every quarter there would be a report
2 for either multiple vessels or single vessels,
3 but would include all vessels?
4    A. That are full-time brokered through the
5 corporation.
6    Q. Is there anything else that he generates
7 other than this inspection report?
8    MR. EMMETT:
9      Object to form.
10    THE WITNESS:
11      I don't think so, for -- as far as
12      anything written, we have this on file at
13      the office.
14 BY MR. WIEDEMANN:
15    Q. Yes.
16    A. But as far as written documentation,
17 anything else, I don't think so.
18    Q. And has he receive any specialized
19 training in doing these compliance inspections?
20    A. The training was given through the
21 counseling firm that we hired to help us do this,
22 to help us write this Policy and Procedures
23 document.
24    Q. And who was the counseling firm doing
25 that? If you remember.

- 31 -

DEPO. OF GERALD THOMAS MCNEILL                                    MINIDEP by Kenson

1    A.  Foret Enterprises.
2    Q.  And Foret Enterprises helped you all
3 write this Policy and Procedures --
4    A.  Yes, sir.
5    Q.  -- document?
6    A.  Yes, sir.  Using AWO guidelines.
7    Q.  And where are they located?
8    A.  Houston.
9    Q.  And what brought about enacting, creating
10 this Policy and Procedures?
11   A.  As stated previous, customer-generated.
12   Q.  Customer-generated.  Okay.  And what else
13 did Foret Enterprises of Houston do, set up an
14 inspection program for Mr. Castaing?
15   A.  They set up whatever was necessary for
16 this Policy and Procedures.
17   Q.  Well, I meant, did they train him or give
18 him some document to utilize?
19   A.  There was conversations between the
20 counseling corporation and Scott Castaing.
21   Q.  And did he receive from them any forms to
22 utilize in this, that you know of?
23   A.  The initial forms, yes.
24   Q.  And then eventually I guess they were
25 incorporated to the corporation forms?
                          - 32 -

1         Kirby, and everything else is verbal with
2         their customers.
3 BY MR. WIEDEMANN:
4    Q.  Is that correct?
5    A.  Yes.  Everything's verbal except for one
6 written contract.
7    Q.  Well, you just told me that you would
8 send invoices and boat logs.  I mean, I don't
9 know
10   A.  That's not contracts.  That's two
11 different things.  It's two different things.
12   Q.  So the only documents that would be
13 generated between Joe Domino and the customer
14 would be these invoices and boat logs?
15   A.  Yes, sir.
16   Q.  How would the customers communicate with
17 Joe Domino relative to the engagement of vessels?
18   A.  By phone.
19   Q.  Did you receive faxes or e-mails, or any
20 other method of communication, other than
21 telephone?
22   A.  I can't say that we have never received
23 an e-mail or a fax for a job, but 99.9 percent of
24 them are verbal, on the phone.
25   Q.  What is Joe Domino's fax number?
                          - 34 -

1    A.  We made copies of them to keep them
2 going.
3    Q.  Did they give him any kind of journal or
4 any book to guide him in making these
5 inspections?
6    A.  Well, he's got this book, which is what
7 he looks for, and then the inspection sheet.  I
8 cannot give you details of what is on that
9 inspection sheet. (Indicating.)
10   Q.  And is he still employed by the company?
11   A.  Yes, sir.
12   Q.  And these will be the customer.
13 (Indicating.) What documents are prepared and
14 executed between Joe Domino and the customer?
15   A.  The documents that are prepared from
16 Joseph C. Domino to customers are invoices with
17 boat logs attached.
18   Q.  Logs, you said?
19   A.  Yeah, logs, l-o-g-s.
20   Q.  Did Joe Domino have any contracts with
21 the customers relative to the furnishing of
22 those?
23        MR. EMMETT:
24             Object to form.  Asked and answered.
25        He told you they had one contract with
                          - 33 -

1    A.  504-341-1258.
2    Q.  And what is the e-mail address?
3    A.  Depending on who it is.  It's the name of
4 the employee @dominotowing.com.
5    Q.  So in your case it would be mcneill@
6    A.  This is -- I don't use mine since I'm
7 part-time, but I think it's under
8 gtmcneill@dominotowing.com.
9    Q.  And anybody else would be --
10   A.  Usually a first name.  Like
11 scott@dominotowing.com.
12   Q.  But the corporation itself doesn't have
13 an e-mail address?
14   A.  No, sir.
15   Q.  And so, as I understand, on your day by
16 day basis, your business is conducted with the
17 customer vis a vie telephone?
18   A.  Yes, sir.
19   Q.  99 percent of it?
20   A.  Yes, sir.
21   Q.  And these telephone engagements, are they
22 recorded?  Do you have any type of --
23   A.  If we receive a job from a customer or a
24 client it is written down on a worksheet.  The
25 worksheet, it looks like little squares or
                          - 35 -

MINIDEP by Kenson

1 rectangles on it.
2       The worksheet will indicate the time the
3 call came in. It will have the -- example, it
4 will have the number of the barge and where it's
5 located. Say, Point A. And then we will write
6 down where it's going to, Point B.
7       And then the name of the customer will be
8 written down at the lower right-hand side of the
9 document, the worksheet. When the boat is
10 dispatched to the job, then the boat's name is
11 written on that same little square or rectangle.
12   Q. Let me show you what we have been
13 previously provided by your counsel, I believe.
14 And is this what you're talking about? It's a
15 daily log. (Indicating.)
16   A. That's not the worksheet. That's a daily
17 boat log.
18       MR. EMMETT:
19           If you look in Tab 11, the second
20           piece of paper, that is the work-
21           sheet --
22       THE WITNESS:
23           This is --
24       MR. EMMETT:
25           -- for August 27th.
                    - 36 -

1 boat to Bollinger, Algiers.
2       On the lower right-hand corner is the
3 name of the customer, which is Bollinger. And
4 the lower left-hand side would be the name of the
5 vessel that's dispatched to the customer.
6   Q. So in that case the top one would be
7 7:00 a.m.
8   A. Yes, sir.
9   Q. Report to Bollinger, Algiers. And that
10 would be the --
11   A. The MR. CASS, and that would be the boat
12 that did the job. And Bollinger is the customer.
13   Q. All right. And so every call-in would be
14 put into a block like this?
15   A. Every -- not every call. Every called in
16 job, if we have an actual job to complete. Not
17 every call is written on the worksheet.
18   Q. And who prepares this document?
19   A. The dispatchers.
20   Q. Mr. Castaing, and who's the other
21 dispatchers? Or at the time
22   A. Currently myself, okay. Myself or my
23 son.
24   Q. Your son's name is?
25   A. Patrick Thomas McNeill.
                    - 38 -

1 BY MR. WIEDEMANN:
2   Q. So what we're talking about, when a
3 customer calls in --
4       MR. EMMETT:
5           You have it in your hand.
6 BY MR. WIEDEMANN:
7   Q. -- it's the document with the squares on
8 it?
9   A. Yes, sir.
10   Q. And tell me if that's the worksheet that
11 you're talking about? (Showing document.)
12   A. Yes, sir.
13   Q. And these would be call ins?
14   A. Phone call ins. If you see, in the upper
15 right-hand corner, the time the job was called
16 in, the description of the job in the center of
17 the little box.
18   Q. I don't see a time. Maybe I'm missing
19 something.
20   A. Up in the upper right-hand corner.
21   Q. Oh, 7:24 or --
22   A. 7:00 A, 7:00 a.m. in the morning. All
23 right. Then it says, "Report to Bollinger,
24 Algiers," if you're reading that particular
25 worksheet, which tells us that we need to send a
                    - 37 -

1   Q. Didn't you tell me he took your job?
2   A. Yes. But even though he is president he
3 still has to dispatch.
4   Q. Patrick McNeill and who else?
5   A. Scott Castaing.
6   Q. Are there any other dispatchers?
7   A. Myself.
8   Q. And so you do that part-time?
9   A. Yes, sir.
10   Q. So every day when you're getting call-
11 ins you make a document?
12   A. Now, sometimes there are days combined on
13 one sheet, but every job is documented like that.
14   Q. But this doesn't have a date on it. How
15 do you know what day it is?
16   A. It should be up in the right corner down
17 here. (Indicating.)
18   Q. Oh, okay. I see 8/27. Well, this says
19 8/27, 8/28, so it's two days.
20   A. It happened to be a weekend.
21   Q. And then the next document that you have
22 behind that is the daily log. Tell me about
23 that.
24   A. Boats are required to keep logs of their
25 movements, and they put it on a log in.
                    - 39 -

1   Sometimes they combine it, but they put
2   it on a sheet of paper on a daily basis, what
3   time they left a facility, what time they got to
4   the next point, what time they went through
5   locks.
6   Whatever the boat is doing is documented
7   on the logs.
8   Q.  How does this come to Joe Domino?
9   A.  By the crew members that are getting off
10  of the boat.
11  Q.  It's hand delivered?
12  A.  Yes, sir.
13  Q.  Is there any other document that's
14  generated, other than the daily logs and the
15  call-ins for --
16  A.  For Joseph C. Domino, a daily, normal
17  business day worksheet, we receive logs.  We
18  invoice customers.  So the three things we've
19  mentioned, worksheet, logs, invoices.  That's
20  Domino's documents.
21  Q.  And an invoice, for instance --
22  A.  Like that.  Yes, sir. (Indicating.)
23  Q.  Like the first document in the group you
24  gave me?
25  A.  Yes, sir.

- 40 -

1   Q.  So these three documents that are in
2   are the only -- well two documents are generated
3   by Joe Domino.  That is the invoice and the call-
4   ins.
5   A.  Uh-huh. (Affirmative response.)
6   Q.  The other documents are generated by
7   the --
8   A.  Chartered vessels.
9   Q.  By the vessels?
10  A.  Yeah.  By the brokered vessels.
11  Q.  And delivered to you all?
12  A.  Yes, sir.
13  Q.  And what do you use those for?
14  A.  We attach a copy of the boat log to the
15  invoice when we mail it to the customer.
16  Q.  Now, let me show you what is -- I think
17  you have it here.  I'm talking about the logs,
18  daily logs for August 27, 2005.
19  A.  Okay.
20  Q.  On the REGINA H.
21  A.  Yes, sir.
22  Q.  Actually, there are several on the 27th.
23  I'm talking about the one that -- I don't see a
24  document number on it.  But it's the 8 27/05 log.
25  daily log, from the REGINA H, starting at 13:30.

- 41 -

1   A.  Yes, sir.
2   Q.  Is that right?
3   A.  Yes, sir.
4   Q.  Do you see that document?
5   A.  Yes, sir.  I'm looking at it.
6   Q.  And that has, at the top it says, "Job
7   for Domino."  Does the REGINA H -- was this one of
8   the vessels that worked for more than one --
9   A.  This is a full-time brokered vessel for
10  Domino.
11  Q.  And so that the only one they would work
12  for would be Domino?
13  A.  That's correct.
14  Q.  And the crew members are listed on the
15  right, Grabert, Dufrene, Templet and Thigpen?
16  A.  Yes, sir.
17  Q.  Were any of those people in the employ of
18  Domino?
19  A.  No, sir.
20  Q.  Do you know who they were employed by?
21  A.  At the top of the log, Unique Towing.
22  Q.  Okay.  I didn't see that.  And Unique
23  Towing was one of the companies that Domino dealt
24  with?
25  A.  Yes, sir.

- 42 -

1   Q.  For how long a period of time,
2   approximately?
3   A.  20 years.
4   Q.  And Unique Towing, approximately how many
5   vessels did they operate?
6   A.  One.
7   Q.  One, which is the REGINA H?
8   A.  Yes, sir.
9   Q.  Was it always the same in the 20-year
10  period or did it have another name or --
11  A.  As far as I recollect, it's always been
12  the same.
13  Q.  And Unique Towing is operated by whom?
14  A.  The owner is Richard Charles Heck.
15  Q.  And let's look at this document.  In
16  addition to the crew members and -- it starts out
17  at 13:30, depart at Base Mile 94.  Where is that?
18  A.  94 Mileboard, a head of the passes of the
19  Mississippi River.
20  Q.  And can you read what's in the
21  parenthesis for me?
22  A.  It says, "For LD," which is an
23  abbreviation for "load."  Then it has a -- Barge
24  Number ING4727, with a comma, then the word,
25  "Empty," with another Barge Number ING4745, end

- 43 -

MINIDEP by Kenson

| | |
|---|---|
| 1 parenthesis. | 1 about the job was transferred. |
| 2    Q.   So that indicates that 4727 is loaded? | 2    Q.   But the report, when you say "10:00 a.m.," |
| 3    A.   According to what the log states, but I | 3 report to Lafarge, swap out," it doesn't mention |
| 4 think we all know that that's incorrect. | 4 any barges.  See, the called-in report. |
| 5         Now, if you look further down in the boat | 5    A.   My understanding with communications with |
| 6 log, if you go down to the line where it says | 6 Mr. Castaing, there was not barge numbers given. |
| 7 1425, and you go across to the very end, now he's | 7 That's why he didn't list any barge numbers on |
| 8 still saying, "With LD ING4727."  And then it's | 8 the worksheet. |
| 9 been cut off with the copy.  And he's putting | 9    Q.   Well, how did the vessel get the barge |
| 10 "Empty" there, "4745."  Same thing as stated up | 10 numbers |
| 11 at the top. | 11    A.   They're on the barges. |
| 12    Q.   So you're saying that you know that | 12    Q.   Well at 1300 it says he departed Base |
| 13 that's wrong and that 4745 was the loaded barge | 13 Mile 94. |
| 14 and | 14    A.   Uh-huh. (Affirmative response.) |
| 15    A.   Uh-huh. (Affirmative response.) | 15    Q.   He had not made it there yet. |
| 16    Q.   -- 4727 was the empty barge? | 16    A.   Right. |
| 17    A.   Yes, sir. | 17    Q.   So where did he get the information from? |
| 18    Q.   Where does that indicate to you -- where | 18    A.   Well, this was written afterwards, so I |
| 19 were they picked up from? | 19 can't answer when did he write this or how did he |
| 20    A.   It's -- if you go through the log it | 20 write that.  I would assume when he got to |
| 21 starts off where he departed base, where he | 21 Lafarge Cement he did this. |
| 22 traveled through.  To get to Lafarge Cement dock | 22         There is a possibility that there were |
| 23 you have to go through Industrial Canal locks. | 23 numbers given to Mr. Castaing, but it wasn't |
| 24         So the next time listed is when he | 24 written on the worksheet. |
| 25 arrived at the locks.  The next entry is when he | 25    Q.   So you don't know whether Castaing gave |
| - 44 - | - 46 - |
| 1 entered and cleared the locks. | 1 him the -- |
| 2    Q.   Let me just interrupt you for a minute. | 2    A.   He gave him the directions that were |
| 3 What I'm trying to find out is, where were the | 3 given to him by Lafarge. |
| 4 barges picked up at? | 4    Q.   That is to swap out -- |
| 5    A.   Well, it -- that's where I'm getting to | 5    A.   To swap out the load and the empty, which |
| 6 it. | 6 is something -- normal business dealings with |
| 7    Q.   Okay. | 7 Lafarge. |
| 8    A.   When you get to 1445 -- I'm sorry, 1425, | 8    Q.   Just so we'll be clear, the call-in |
| 9 it says, "Arrive Lafarge Cement."  That's where | 9 document doesn't say "Swap out the loaded barge |
| 10 the barges were. | 10 and the empty barge."  It just says "Swap out;" |
| 11    Q.   So when he starts, departed base at Mile | 11 is that correct? |
| 12 95 he doesn't have any barges? | 12    A.   Yes, sir. |
| 13    A.   No.  That's light boat. | 13    Q.   So you don't know at this point what was |
| 14    Q.   But somebody told him about apparently, | 14 told to him, or do you know? |
| 15 the barges? | 15    A.   I don't know exactly what was told.  He |
| 16    A.   Well, yes.  You go back to your | 16 was the dispatcher on duty.  But I will have to |
| 17 worksheet, okay.  Go back to the worksheet.  We | 17 say that when it's a normal situation -- this is |
| 18 received a call from Lafarge at 10:00 a.m. | 18 a very common job that we do for Lafarge, and |
| 19         And Mr. Castaing has written down, | 19 when we say "Swap out," we know through previous |
| 20 "Report to Lafarge."  And he has the term "swap | 20 jobs with Lafarge we're moving the barge that's |
| 21 out" listed underneath that.  So, yes, the job | 21 been unloaded away from the dock and putting the |
| 22 was communicated from our dispatcher, Joseph C. | 22 barge that is loaded against the dock. |
| 23 Domino, Inc.'s dispatcher to the chartered | 23    Q.   And so this is something that you would |
| 24 vessel. | 24 do on a fairly regular basis with Lafarge? |
| 25         And the information that was given to us | 25    A.   Whenever they would call and ask us to do |
| - 45 - | - 47 - |

DEPO. OF GERALD THOMAS MCNEILL

MINIDEP by Kenson

1 it.
2      Q.  So they would call and ask you to swap
3 out barges, put a full barge inboard of an empty
4 barge on occasions when there was no weather
5 conditions?
6      A.  Oh, absolutely.  It's year round.
7      Q.  What would be the reason for that in
8 normal conditions?
9      A.  From my understanding, that's how they
10 get the cargo out of the barge.
11      Q.  They have to move the full one in to
12 empty it out?
13      A.  As far as I know.  I'm not the operations
14 person, okay.  I'm not there, but my
15 understanding, that's what happens.
16      Q.  And then so that the  - when we start at
17 13:30.  That apparently the information which you
18 recognize as being erroneous, was apparently
19 entered on the daily log after the job was
20 complete; is that correct?
21      A.  From my knowledge, the usual scenario is
22 that the captain will keep a scratch sheet, a
23 legal pad, and write down what is going on at
24 that particular job.
25          When the job is completed he will write
                    - 48 -

1 the boat log from the notes that he put down on
2 his legal pad, or scratch paper, or whatever the
3 case may be.
4      Q.  The next entry is "1400, arrived at the
5 Industrial Locks, L/Boat"?
6      A.  "L/Boat," light boat.  Nothing in tow.
7 The boat by itself.
8      Q.  And then at 14:04, [14:15 they entered, I
9 assume, the locks and cleared eastbound; that's
10 correct?
11      A.  Yes, sir.
12      Q.  And that would be going toward Lake
13 Pontchartrain?
14      A.  From the river to the canal.
15      Q.  And at "14:25, arrived at Lafarge Cement,
16 topping around;" is that correct?  Not
17 tipping --
18      A.  No.  Topping.
19      Q.  "Topping around on dock with loaded
20 Ingram4727, empty 4745."  It's cut off on mine.
21      A.  Yes, sir.  It's cut off on mine, too.
22      Q.  That again is incorrect, the numbers, or
23 do you know?
24      A.  Well, the numbers are correct.  The
25 indication of whether it's loaded or empty, to my
                    - 49 -

1 knowledge, is incorrect.
2      Q.  The status of the barge is incorrect.
3 It's a barge --
4      A.  But the barge numbers are correct.
5      Q.  Then at "1500, barge is secured" --
6      A.  "Barge is secured" --
7      Q.  -- "depart light boat westbound."  That
8 would be going back toward the Mississippi?
9      A.  Yes, sir.
10      Q.  And at "15:10, arrived at the Industrial
11 Lock."
12      A.  Yes, sir.
13      Q.  That's on the 27th, right?
14      A.  Yes, sir.
15      Q.  And then I can't  - what is this,   "30-
16 "
17      A.  Well, I would assume it's 16:30 to 17:00.
18      Q.  Okay.  And mine was cut off.
19      A.  Yeah.  Again, it's not on my copy,
20 either.
21      Q.  And they entered and cleared --
22      A.  The Industrial Locks.
23      Q.  -- northbound, right?
24      A.  Cleared -- well, when you get into the
25 river, whenever you say "going upriver," in most
                    - 50 -

1 cases people will say that it is going
2 northbound, even though the river doesn't flow
3 north and south at that point.
4      Q.  So it would be headed --
5      A.  Upriver.
6      Q.  -- upriver, okay.  And then at "7:15,
7 arrived at the base."  That would be --
8      A.  Back at Mile 94.
9      Q.  Mile 94.  Where is Mile 94 with relation
10 to the Industrial Canal Locks?
11      A.  It's very close upriver from the lock.
12 And the place he's talking about would be on the
13 West Bank side of the river.
14      Q.  How far approximately from the Industrial
15 Canal?
16      A.  Less than two miles.
17      Q.  Other than Mile 94, does it have
18 another --
19      A.  I assume that this is near Waterman
20 Fleet, where he was tying up at.
21      Q.  And do they have a fleeting facility near
22 Mardi Gras World?
23      A.  Mardi Gras World is in Algiers.  Yes,
24 there is a fleeting facility right below the
25 Crescent City Connection, which I think would be
                    - 51 -

DEPO. OF GERALD THOMAS MCNEILL                    MINIDEP by Kenson

1  the one you're referring -- by Mardi Gras World.
2      Q.   What is that called; do you know?
3      A.   It has gone through many different names
4  over the years.  The name that I'm most familiar
5  with is Orgulf Fleet, O-r-g-u-l-f.  I think now
6  it is under the operation of Zito, Z-i-t-o.
7      Q.   Is that upriver from the Industrial
8  Canal?
9      A.   Yes, sir.
10     Q.   And is that near --
11     A.   That's further upriver than where the
12  base is being indicated here.
13     Q.   Mile 94 is the base.
14     A.   Uh-huh. (Affirmative response.)
15     Q.   And what is at the base, besides the
16  REGINA H?
17     A.   Whatever is tied up there.  It's not any
18  particular facility, other than what I assume is
19  Waterman Fleet.
20     Q.   And how far is Zito's fleeting
21  operation --
22     A.   It's right upriver from Algiers Point.
23     Q.   About how far, approximately?
24     A.   If you go from the upper end of Waterman
25  Fleet to the lower end of Zito Fleet, I would say
                        - 52 -

1  in between a half and three-quarters of a mile.
2  (Off-the-Record.)
3  BY MR. WIEDEMANN:
4      Q.   Mr. McNeill, the daily log of the REGINA
5  H indicates that they were topping around the two
6  barges, although they mis-identified by status.
7  What does "topping around" mean to you?
8      A.   "Topping around" means swapping around
9  the barge positions.
10     Q.   Does that mean - the barges are at the
11  Lafarge Dock, and I presume that they were moored
12  to one another and then one is moored to the
13  dock.
14     A.   Yes, sir.
15     Q.   Is that correct?
16     A.   Yes.
17     Q.   Does "topping around" mean taking the two
18  barges apart as they are attached to one another
19  or does it mean just releasing the barge at the
20  dock, turning the barges around and replacing the
21  lines at the dock?
22     A.   It means that you untie the barge at the
23  dock.  You leave the barges tied together, and
24  you maneuver away from the dock.  You sling them
25  around and you place them back into the dock so
                        - 53 -

1  they would be in opposite positions.
2      Q.   Okay.  So in this case if the inboard
3  barge, the barge next to the dock --
4      A.   Uh-huh. (Affirmative response.)
5      Q.   -- was the light barge --
6      A.   Okay.
7      Q.   -- you would undo the light barge's
8  mooring to the dock.
9      A.   Yes, sir.
10     Q.   Turn it around where the loaded barge
11  would be inside, and then re-attach the loaded
12  barge to the dock as the light barge was attached
13  previously?
14     A.   Well, I can't answer exactly if it's
15  exactly the same.  But it would be secured to the
16  dock.
17     Q.   But "topping around," as you understand
18  it, in your 20 some odd years as the president of
19  Domino would be not taking the barges apart, as
20  they are moored to one another; that correct?
21     A.   No, sir.  It's not necessary.
22     Q.   That would be a much more laborious job
23  and there would be no reason to do it.
24     A.   That is up to the vessel captain
25  directing the deck hands, but it is not
                        - 54 -

1  necessary.
2      Q.   Do you know who was at the Lafarge dock
3  at the time that the two barges were topped
4  around?  Do you have any knowledge of that?
5          MR. EMMETT:
6               Object to form.  Are you asking
7          for a Lafarge personnel or are you asking
8          for a
9          MR. WIEDEMANN:
10              For Lafarge personnel.
11         MR. EMMETT:
12              Lafarge personnel.
13         THE WITNESS:
14              I don't know anything about
15         Lafarge personnel.
16  BY MR. WIEDEMANN:
17     Q.   Have you talked to any of the crew
18  members or the operators of the REGINA H
19  concerning what took place at the Lafarge dock?
20     A.   I sat in on a conversation with Captain
21  Raymond Grabert.
22     Q.   And did he explain to you what took
23  place?
24         MR. EMMETT:
25              Let me interpose an objection at
                        - 55 -

1 this point. This conversation took place
2 in the presence of counsel,
3 client counsel.
4      I'm going to allow him to answer
5 the questions of what Raymond said,
6 but I want it understood, this is without
7 a waiver of the attorney/client
8 privilege.
9 MR. O'DWYER:
10      Let me state an objection for the
11 Record. Any attorney/client privilege
12 has been waived, so say the clients of
13 Ashton O'Dwyer.
14 MR. EMMETT:
15      Thank you, sir. Go ahead.
16 BY MR. WIEDEMANN:
17      Q. Would you tell me what Mr. Grabert is
18 it Grabert said?
19      A. I said Grabert.
20      Q. Grabert.
21      A. As stated, I sat in on a conversation
22 with Captain Grabert, who was discussing what
23 took place with an attorney named Jeff Tillery.
24      Q. And what did he tell you or what did you
25 hear him say with reference to what took place?
- 56 -

1 loaded barge to the dock was any different than
2 the mooring before? Obviously --
3      A. I don't remember any conversation saying
4 it was any different or the same. All I remember
5 is that he secured the dock -- the barges to the
6 dock.
7      Q. And so it would have been, as far as you
8 understood his description, a question of mooring
9 to the dock the loaded barge, with the same
10 mooring lines, or did you understand differently?
11      A. It is the facility's responsibility to
12 have ropes, lines to tie up with. We -- the
13 boat, the vessel, nor does Joseph C. Domino, Inc.
14 furnish ropes to tie up the barges.
15      Q. So from your experience it's the duty of
16 the customer, Lafarge in this case --
17      A. Uh-huh. (Affirmative response.)
18      Q. -- to provide the mooring lines and the
19 crews of your vessels, the vessels under your
20 brokerage --
21      A. Yes, sir.
22      Q. -- would use those lines that are
23 furnished.
24      A. Yeah. It's my understanding the same
25 lines were used, to the best of my knowledge.
- 58 -

1      A. He stated that he went to Lafarge dock
2 and topped around the barges, as we've already
3 stated here.
4      The deck hand untied the barge at the
5 dock. He pulled them out, topped them around,
6 brought the barges back in and tied up the load
7 against the dock.
8      Q. Did he indicate to you that he had done
9 anything to change the mooring between the two
10 barges?
11      A. No, sir. Not as far as I know. But,
12 again, he wasn't talking directly to me. He was
13 talking to the attorney.
14      Q. But in the conversation that you
15 overheard, did he describe what I have asked you
16 earlier, that the topping around, required the
17 release of the light barge from the dock, and
18 turned around and re-attached the loaded barge to
19 the dock?
20      A. Without taking the barges apart.
21      Q. Is that your understanding of what he --
22      A. Yes, sir.
23      Q. -- described?
24      A. Yes, sir.
25      Q. Did he describe that the mooring of the
- 57 -

1      Q. Did Mr. Grabert indicate to you that
2 there was any personnel at the Lafarge dock at
3 the time that he topped the barges around?
4      A. My understanding, that no one -- there
5 was no Lafarge personnel there.
6      Q. It was your understanding that the
7 facility was not staffed at all?
8      A. Well, I have no idea about being staffed,
9 but as far as at the dock, when he topped the
10 barges around there were no Lafarge personnel.
11      Q. Well, do you know where the 10:00 a.m.
12 came from Lafarge to swap out the barges?
13      A. I know the person it came from, but I
14 don't know where the call originated from.
15      Q. Who did it come from?
16      A. Ed Bush.
17      Q. But you don't know where he called from?
18      A. No, sir.
19      Q. Do you know who he called to?
20      A. The dispatcher on duty was Scott
21 Castaing.
22      Q. The Zito facility, or whatever name it
23 was -- I know there have been some change of
24 names
25      A. Uh-huh. (Affirmative response.)
- 59 -

**MiniDep by Kenson**

1    Q. -- but I'm talking about that facility.
2  Do they take barges like the barges involved
3  herein, in that facility?
4    A. I don't know, you know. That's beyond my
5  knowledge at Domino, what Zito does with barges
6  in their fleet.
7    Q. But you're familiar with the fleeting
8  operation, though, and --
9    A. I'm familiar that it is a fleeting
10 operation. I'm familiar that we have dispatched
11 boats to go pick up a barge or deliver a barge to
12 a fleeting facility, but as far as the fleeting
13 operations, I don't know anything about that.
14   Q. But you do know that the fleeting
15 operation, whether it be Zito or another name
16 that you have described --
17   A. Uh-huh. (Affirmative response.)
18   Q. -- does take in loaded or unloaded barges
19 for fleeting purposes.
20   A. I would assume so, yes.
21   Q. Are there any other fleeting operations
22 known to you in the vicinity of the Industrial
23 Canal locks, other than the one you described,
24 Zito, either upriver or down river?
25   A. In between the Industrial Canal locks and
- 60 -

1  the Algiers locks, to my knowledge, there are two
2  fleets. One called Star Fleet and another one
3  called Elmwood Fleet.
4    Q. And those are upriver or down river?
5    A. From where?
6    Q. From the locks?
7    A. Well, it's in between the Industrial and
8  Algiers, which would be down river.
9    Q. And upriver, are there any others?
10   A. I previously mentioned Waterman Fleet,
11 and then of course the one we just discussed,
12 Zito Fleet.
13   Q. But the Zito Fleet is right close or not
14 to far from the Industrial Canal. Are there
15 other fleeting operations up the river?
16   A. They -- going Mileboard-wise, the
17 Industrial Canal is approximately 92 AHP and the
18 Algiers locks is approximately 88 AHP, so they're
19 within four miles of the Industrial locks down
20 river.
21   Q. Now, when the REGINA H left Lafarge, it
22 went through the locks --
23   A. Yes, sir.
24   Q. -- at 15:10; is that correct, on the
25 27th?
- 61 -

1    A. That's when he arrived back at the locks,
2  light boat, going back to the river.
3    Q. And he entered --
4    A. He entered at 16:30 and cleared, as best
5  as I can make out on this copy, 17:00.
6    Q. Is there anything to indicate that the
7  REGINA H at that point in time could not have
8  taken the Barge 4727 through the locks?
9        MR. EMMETT:
10           Object to form. You may answer.
11       THE WITNESS:
12           Our, Joseph C. Domino, Inc.'s,
13       instructions were to swap out the barges
14       at Lafarge. Our instructions were not to
15       move a barge away from Lafarge.
16       So I can't answer as far as bringing
17       a barge out. That's beyond the scope
18       of our normal business dealings with
19       the customer.
20 BY MR. WIEDEMANN:
21   Q. If Lafarge had instructed you to take out
22 the 4727, which was light at that time, is there
23 any reason why it could not have been taken
24 through the locks and to a fleeting facility, as
25 you've described?
- 62 -

1    A. If we would have received orders from
2  Lafarge, looking at the logs, I see no reason why
3  we couldn't have moved it out, but we didn't have
4  that order.
5        Again, our job was to swap at the dock,
6  not to move the barge away from the dock.
7    Q. So that Lafarge dictates what you do by
8  the call-in and/or request that's made of --
9    A. Yeah. That's the job. That dictates --
10 Lafarge dictated in this particular instance.
11 Any other customer that calls in, they dictate
12 what the job is.
13       Domino or the chartered or brokered
14 vessels have no authority to do anything else.
15   Q. Just so we'll be clear, you know of no
16 reason, if Lafarge had said, "Look, take the
17 light barge -- the Ingram 4727, take it out and
18 bring it to a fleeting operation on the river,"
19 there was no reason why you couldn't do that?
20   A. I think that's a hypothetical, but if we
21 were given the orders, looking again, looking at
22 the log, I see no reason why we couldn't have
23 moved it. But, again, that was beyond the scope
24 of our job.
25   Q. What is your instructions, if any, to the
- 63 -

1 vessel owners with regard to mooring barges? You
2 don't have any --
3     A.  No.  That's Operations.  And Domino is
4 the brokerage.  We get the job, and dispatch it
5 and invoice it, as we've discussed.  Operations,
6 we don't control that from the brokerage.
7     Q.  But when a barge is delivered to a
8 facility like Lafarge in this case --
9     A.  Yes, sir.
10     Q.  -- who would ordinarily handle the
11 mooring operations?
12     A.  The captain and the deck hand.
13     Q.  And where would they get the mooring
14 lines from?  They don't have any on the vessels,
15 do they?
16     A.  We have lines.  The chartered brokered
17 vessels have lines on board, but it's for their
18 use when they're underway, when they're
19 navigating with a barge.  We can't afford to
20 furnish lines to every facility that we go to to
21 tie up a barge.
22         So in case, yes, the customer has
23 responsibility for the mooring lines.
24     Q.  So when you get a call from a customer
25 like Lafarge to top a barge around or to move a

-- 64 --

1 barge, or do whatever you have to do with barges
2 through the vessels under your brokerage, you
3 assume that the customer has the lines that have
4 to be utilized to moor them.
5     A.  Yes.  The lines have to be furnished.
6     Q.  At the time, on the 27th, at 10:30 when
7 you all received this call from Mr. --
8     A.  Castaing?
9     Q.  Not at Lafarge.  Mr. Bush was employed by
10 Lafarge.
11     A.  Okay.
12     Q.  Did you know what the weather conditions
13 were at that time or what the prediction was?
14     A.  Well, first of all, I didn't receive the
15 call.  The dispatcher on duty received the call.
16 I would assume, like everyone else, had looked at
17 TV and knew what was in the Gulf of Mexico.
18         So I would assume that he knew that by
19 TV, if that's what you're alluding to.
20     Q.  Well I assume you must have talked to
21 Mr. Castaing since this occurrence.
22     A.  Sure.  Sure.
23     Q.  Did Lafarge ask Mr. Castaing when they
24 made the call-in to take any kind of additional
25 precautions with regard to the mooring of the

-- 65 --

1 barges in light of the predictions?
2     A.  Not as far as I know.  The only thing that
3 was stated was to swap them out or top them
4 around and secure the load at the dock.
5     MR. O'DWYER:
6         Let me object to the form of the
7         question.  The worksheet does not say
8         anything about topping around.
9     THE WITNESS:
10         Well, as indicated --
11     MR. EMMETT:
12         It's not a question.  Just let
13         it go.
14 BY MR. WIEDEMANN:
15     Q.  And so that we can be clear, the call-in
16 does not indicate topping around.  It's the log
17 of the REGINA H, which reflects topping; is that
18 correct?
19     MR. EMMETT:
20         Well, object to form.  The document
21         speaks for itself.  You can read what the
22         document says.
23     THE WITNESS:
24         The document says swap out.  The
25         REGINA H's logs say topping around.

-- 66 --

1         And in my knowledge, it's the same thing.
2 BY MR. WIEDEMANN:
3     Q.  If Lafarge had requested your dispatcher,
4 Mr. Castaing, to take some additional precaution
5 in light of potential weather and provided the
6 means to do so, would you have instructed the
7 vessel owner to follow their direction?
8     MR. EMMETT:
9         Object to form.  Speculative.
10         Go ahead.
11     MR. FISHER:
12         Let me add my objection to this.
13         All this is getting very far afield from
14         what this witness actually knows.  He was
15         not at the terminal.
16         He was not privy to the conversation
17         between Mr. Bush and Mr. Castaing and he
18         wasn't on the REGINA H.  That much is
19         clear.
20     THE WITNESS:
21         Okay.  What's the question here,
22         please?
23 BY MR. WIEDEMANN:
24     Q.  The question is, if the customer, in this
25 case Lafarge, had requested any type of special

-- 67 --

MINIDEP by Kenson

1 mooring of you, of your company as the broker,
2 would you have transmitted that to the vessel?
3     A.  Absolutely.  It's part of the job
4 description.  Then we pass it on as dispatching
5 to the vessel.
6         So if there is a description, a request
7 made in the phone call to Joseph C. Domino, Inc.,
8 then that is transmitted or dispatched to the
9 vessel.
10     Q.  And the REGINA H, after it left Lafarge
11 on the 27th, and went back to the base at Mile
12 94 --
13     A.  Yes, sir.
14     Q.  -- was it engaged in doing anything else
15 that you know of?
16     A.  According to the next log and according
17 to the worksheet, that was the last job on here.
18 Up at the second column it says, "Report to
19 Waterman."
20         And it looks to me, looking at the log,
21 that they, as indicated on the log, they built
22 tow, they put barges together at Waterman Fleet.
23     Q.  I'm a little confused because it seems to
24 say that they arrived at the base on the 27th at
25 7:15.

- 68 -

1     A.  Then it says 17:00 for the next job.  I
2 would assume that the fleet, Waterman Fleet,
3 indicated to the boat to start his time for the
4 job at 17:00.
5     Q.  But at 7:15 it said it arrived at the
6 base.  It said --
7     A.  Same place.  The same place.
8     Q.  No.  But it says, "Stop time."
9     A.  Yeah.  That's for the billing purposes
10 for the Lafarge job.  And then the 17:00 on the
11 next log is for billing purposes for Waterman
12 Fleet.  And I -- again, as I said, I would assume
13 that Waterman Fleet, the dispatcher there said to
14 start time at 17:00.
15     Q.  Did Domino have other vessels available
16 on the 27th to take the 4727 out of the
17 Industrial Canal if they had been requested to do
18 so?
19     A.  According to the worksheet from
20 Mr. Castaing, on that weekend we had one other
21 vessel working in the Port of New Orleans.  And
22 without seeing the logs, just looking at the
23 worksheet, he looked busy.
24         So I would say that Domino, Joseph C.
25 Domino, Incorporated did not have another boat

- 69 -

1 available.
2     Q.  But if Lafarge would have requested at
3 10:00 a.m. to take the barge out, there would
4 have been nothing in the way of REGINA H taking
5 the barge out of the Industrial Canal; is that
6 right?
7         MR. FISHER:
8             Object to form.  Asked and
9         answered twice.  Go ahead.
10         THE WITNESS:
11             If instructed, again, looking at
12         the logs, we probably could have done it.
13 BY MR. WIEDEMANN:
14     Q.  Now the vessel owners that work for you,
15 are they RCP qualified?
16     A.  Yes, sir.
17     Q.  And how do they obtain that
18 qualification?  Do they have to take some kind of
19 testing or how do you --
20     A.  They have to prepare the boat for safety,
21 from labeling steps to having the right kind of
22 plumbing.  It's a whole system of what the boat
23 should have onboard.  So it's safety features.
24         Once they are inspected and they have
25 these features they are in the process of getting

- 70 -

1 RCP certified.
2         MR. O'DWYER:
3             Let me object to the question
4         as non-responsive.  The question was
5         are the boats that work for you, RCP
6         compliant or certified.  That was the
7         question.
8         MR. EMMETT:
9             Don't answer that one.  Only one
10         lawyer.
11 BY MR. WIEDEMANN:
12     Q.  I'll ask the question, are the boats that
13 work for you RCP certified?
14         THE WITNESS:
15             Answer?
16         MR. EMMETT:
17             Yes.
18         THE WITNESS:
19             The boats that are brokered through
20         Joseph C. Domino, Inc. on a full-time
21         basis are RCP certified.
22 BY MR. WIEDEMANN:
23     Q.  Do you know who Richard C. Heck is?
24     A.  As stated previously, he's the owner of
25 Unique Towing.

- 71 -

DEPO. OF GERALD THOMAS MCNEILL

1  Q.  And what about Lizana?
2  A.  The name Lizana or a company named
3  Lizana?
4  Q.  The name Lizana.  Joseph M. Lizana.
5  A.  He is part owner of a vessel that is
6  brokered through Joseph C. Domino, Inc.
7  Q.  Are any of the companies that provide
8  vessels, in addition to Joseph Domino, additional
9  insureds under Joseph Domino's policy?
10  A.  Our boat brokers policy states that we
11  have to be named as additional insureds for the
12  vessels that work for us.
13  Q.  So that Joseph Domino is an additional
14  insured under the vessels that work for you?
15  A.  No.  No.  This is part of the documents,
16  I think, that have been presented to you.
17  (Indicating.)
18      MR. EMMETT:
19        Let me just short circuit it since
20      you're really into a legal area.  I've
21      produced the three policies to you.
22      One is a boat brokers policy --
23      MR. WIEDEMANN:
24        Yes.
25      MR. EMMETT:

- 72 -

1        -- that is written for Joseph C.
2      Domino.  That policy has a requirement in
3      it that Joseph C. Domino be named as an
4      additional insured and subrogation waived
5      in the boat owners policy.
6        And I've produced to you the primary
7      and the excess boat owners policies.
8      THE WITNESS:
9        You want me to read what it says?
10     MR. EMMETT:
11       They can read the document.
12     THE WITNESS:
13       Okay.
14     MR. EMMETT:
15       That's why I gave it to them.
16  BY MR. WIEDEMANN:
17  Q.  My question was, are any of the boat
18  owners covered as additional insureds under Joe
19  Domino's policy?
20     MR. EMMETT:
21       If you know.
22     THE WITNESS:
23       I can't answer that.
24  BY MR. WIEDEMANN:
25  Q.  You don't know?

- 73 -

1  A.  No.
2  Q.  Did you interview any of the other crew
3  members aboard the vessel, other than -- you had
4  mentioned you had an interview with Mr. Castaing
5  and Mr. Grabert.
6        Did you interview or were you present
7  when any other members of the crew were
8  interviewed?  Mr. Dufrene, Templet, Thigpen?
9  A.  No, sir.
10  Q.  To your knowledge, have statements been
11  taken from those people?
12  A.  I have no idea.
13  (Off-the-Record.)
14  (A lunch break was taken.)
15  BY MR. WIEDEMANN:
16  Q.  Mr. McNeill, let me ask you, has Domino
17  ever owned any vessels to your knowledge?
18  A.  No, sir.
19  Q.  Have they ever had an interest in the
20  REGINA H?
21  A.  No, sir.
22  Q.  When I say "own," I mean fully or
23  partially?  As far as you know, never?
24  A.  Correct.
25  Q.  You mentioned that the agreement between

- 74 -

1  Domino and Unique, and all of your regular boat
2  owners was verbal; is that correct?
3  A.  Yes, sir.
4  Q.  There was no written contract.  And I
5  believe I've asked you that and you said no.
6  A.  That's correct.
7  Q.  What is the nature of the verbal contract
8  between Unique and Domino?  How would you
9  characterize that?
10  A.  The vessel owner agrees to work for
11  Joseph C. Domino, Inc. for a commission.
12  Joseph C. Domino, Inc. handles the billing.  Once
13  we get paid, we pay the boat owner less the
14  commission due to Joseph C. Domino, Inc.
15  Q.  And there is a further agreement that you
16  didn't mention.  And that is that the vessel
17  owner will include Domino as an additional
18  insured.
19  A.  That's included on our boat owners
20  policy.  It says, "Said policy must name Joseph
21  C. Domino, Inc. as an additional insured."
22  That's from Domino's boat brokers, which it's
23  telling them that they have to name us as an
24  additional insured.
25  Q.  And that is part of the agreement, as

- 75 -

1 well.
2    A. Yes. That is part of the agreement. If
3 we don't have that, they can't work for us.
4    Q. And that's true not only of Unique, but
5 that's true of all of your --
6    A. Full-time brokered boats. The full-time
7 brokered boats. Yes, sir.
8    Q. Now on August 27th, when the REGINA H was
9 sent to Lafarge, and I'm speaking about the
10 vessel itself, was it RCP compliant?
11    A. Yes, sir.
12    Q. Not through you, but personally itself?
13    A. All right. As best I can explain it. The
14 RCP certification is in Domino's name. But as
15 the first page states, Joseph C. Domino is the
16 broker. And then these boats work through Joseph
17 C. Domino, Inc.
18       Now, this RCP certification has been
19 devised by the American Waterways Operators. My
20 understanding, once we are - once Joseph C.
21 Domino, Inc. and the brokered vessels -- once we
22 are certified, we have that certification for
23 three years.
24       At the end of the three-year period there
25 is an outside auditor that comes in and inspects
                    - 76 -

1 the boats to make they still have all their
2 safety items on board the boat, from labeling of
3 stairs to piping and that sort of items on the
4 boat, and that they have all their paperwork in
5 order, which would be keeping track of their on
6 board meetings, for example.
7    MR. O'DWYER:
8       Let me object to the question as
9    non-responsive. I think the question the
10    man asked was, does Unique have
11    a certificate from AWO identifying Unique
12    as a member of AWO's Responsible Carrier
13    Program?
14       Let's quit beating around the bush.
15    I object.
16    MR. EMMETT:
17       Don't answer that.
18 BY MR. WIEDEMANN:
19    Q. If I understand your answer correctly,
20 Unique was not on August 27, 2006 personally
21 certified; is that correct?
22    MR. EVANS:
23       2005.
24    MR. WIEDEMANN:
25       2005. Excuse me.
                    - 77 -

1    MR. EMMETT:
2       If you know.
3    THE WITNESS:
4       The only certificate issued is to
5    Joseph C. Domino, Incorporated.
6 BY MR. WIEDEMANN:
7    Q. And as I understand it, the AWO, at the
8 end of a three-year period would then go out and
9 check the vessels; is that correct?
10    A. Not AWO. An outside firm.
11    Q. An outside firm to determine whether or
12 not they would be qualified for an RCP
13    A. To continue the RCP.
14    Q. But that hasn't occurred yet because --
15    A. Yes, sir.
16    Q. -- you all went online in February.
17    A. Yeah. It could have been January, but,
18 yes, it hasn't been three years yet.
19    Q. It will be sometime in 2007?
20    A. Yes, sir.
21    Q. And that would entail a checking of
22 whether or not the vessel itself keeps proper
23 records and documentation, and so forth; is that
24 correct?
25    A. That's part of it, yes, sir.
                    - 78 -

1    Q. And does your inspector, Castaing, during
2 the interim period before the three years is up,
3 check to see if those things are done?
4    A. I am not sure if that is checked on his
5 quarterly basis when he goes to the boat, but I
6 would assume some of that is checked, yes, sir.
7    Q. What is the responsibility of the boat
8 owners such as the REGINA H to Domino under the
9 verbal agreement that you have with them?
10    A. As it states -- as it is now under RCP
11 their verbal agreement is to maintain RCP status.
12    Q. And who checks to see that that is the
13 case? You don't know whether Castaing is the
14 only one that does it. Who checks it?
15    A. The initial audit stated that the boat
16 was certified through Joseph C. Domino, Inc. The
17 quarterly boardings will verify, to the best of
18 my knowledge, some of the same things, that the
19 initial audit took place.
20       I can't give you exactly what's on the
21 checklist, but some of that, I'm quite sure it
22 goes through the same process as the initial
23 audit.
24       And then if we do not have -- Joseph C.
25 Domino, Inc. does not receive any complaints from
                    - 79 -

DEPO. OF GERALD THOMAS MCNEILL | MINIDEP by Kenson

1 customers, we do not receive any complaints from
2 anyone, well then we assume that they are still
3 following the guidelines.
4    Q.  But the quarterly inspections by Castaing
5 would be to determine whether or not they have;
6 is that right?
7    A.  Yes, sir.
8    Q.  And he makes a report of that?
9    A.  Yes, sir.
10    Q.  Okay.  How long has Domino and Unique had
11 a relationship?
12    A.  As previously stated, for about 20 years.
13    Q.  And what about the relationship between
14 Domino and Lafarge?
15    A.  I can't give an answer on years, but I
16 would say several years.  But I can't give a
17 definite answer.
18    Q.  What about with Ingram?
19    A.  Several years.
20    Q.  And those agreements or those
21 relationships, those again are verbal?
22    A.  Yes, sir.
23    Q.  There's no document that supports the
24 relationship?
25    A.  No, sir.

- 80 -

1    Q.  To your knowledge, during the period
2 August 26th through August 29, did Domino
3 instruct any vessels to add additional lines or
4 take on any special precautions for heavy weather
5 to its vessel operators?
6    A.  What's the period?  Did they --
7    Q.  August 26th through the 29th.
8    A.  Did we instruct, did Joseph C. Domino
9    Q.  Did Joseph Domino give any instructions
10 to its vessel operators under the brokerage
11 operation to add additional lines or to take
12 additional precautions regarding the weather
13 conditions?
14        MR. EMMETT:
15            Object to the form of the question.
16            It doesn't ask him specifically what
17            vessels you're referring to.
18            Go ahead, sir.
19 BY MR. WIEDEMANN:
20    Q.  Well, let's talk about the Unique vessel,
21 REGINA H?
22    A.  As far as I know, no.
23    Q.  Did Domino ever give instructions to
24 vessel owners concerning what to do or not to do
25 under certain weather conditions?

- 81 -

1    A.  I think there needs to be a stipulation
2 there.  Are you talking about a vessel that has a
3 barge in tow as navigation?  Are you talking
4 about the boat by itself?  I think there's some
5 differences with your question here.
6    Q.  Let's just start with, does Domino give
7 any instructions to its vessel operators under
8 any circumstances concerning weather conditions
9 and what to do in certain weather conditions?
10    A.  The main thing that I remember that
11 Domino has done under adverse conditions is to
12 guide the brokered vessels on where to secure
13 themselves for the adverse weather.
14        The operation part of it, if the vessel
15 has a barge in tow, moving -- if it's under -- if
16 it's completely under their control, they were
17 going from Point A to Point B, well then it goes
18 under the operation part of what is best to do
19 from the crew.
20    Q.  So under certain circumstances you might
21 direct a vessel to a berthing or fleeting
22 operation where the weather dictated?
23    A.  That would -- not a fleeting operation.
24 Maybe to a berth.  We don't -- Joseph C. Domino
25 does not tell the boats to go to a fleet for the

- 82 -

1 adverse conditions.
2        Joseph C. Domino could tell them to
3 secure themselves at a berth, which is not a
4 fleet.  We don't have any authority to do that to
5 a fleet.
6    Q.  The document that you produced concerning
7 the calls that are coming in, which is the
8 squares, blocks document.  That records what is
9 coming in to you and what transmit to the vessel;
10 is that correct.
11    A.  Yes.  It records what has been said from
12 the customer to the dispatcher.  Maybe not
13 completely recorded, but if the dispatcher is
14 familiar with the orders, if something takes
15 place time and time again, the basic things are
16 written down here and recorded, and then the boat
17 is dispatched.
18        And then the boat's name is written on
19 the little square.
20    Q.  So that if Lafarge had asked for a
21 special mooring to be done on the 27th, would the
22 dispatcher not record that and instruct the
23 vessels to that request?
24        MR. EMMETT:
25            Object to form.

- 83 -

DEPO. OF GERALD THOMAS MCNEILL                    MINIDEP by Kenson

1  MR. FISHER:
2          Object to -- that's been asked
3  and answered earlier. It's an
4  improper question.
5  MR. EMMETT:
6          Go ahead.
7  THE WITNESS:
8          I think the big word in here is
9  "if." I think it's hypothetical.
10  Whether it would have been recorded or
11  not, I can't answer. Depending on
12  the dispatcher.
13          If it was something that was passed
14  on in the instructions, yes, the
15  dispatcher would have passed it on to the
16  boat.
17  BY MR. WIEDEMANN:
18      Q.   And do you recognize the handwriting in
19  those squares?
20      A.   Yes, sir.
21      Q.   And who is that?
22      A.   Scott Castaing.
23      Q.   And it looks like to me on the first row,
24  which is one, two, three, four, five, six --
25      A.   Uh-huh. (Affirmative response.)
                    - 84 -

1      Q.   That would be the 27th?
2      A.   It looks like to me it's all the 27th.
3      Q.   Well at the bottom it says "27th-28th."
4      A.   Because it was a weekend duty. Usually
5  on a weekend duty the dispatcher will put two
6  days on the worksheets.
7      Q.   So there's no way to tell which was done
8  on the 27th and which was done on the 28th?
9      A.   Well, if you look at it, it all states in
10  the morning of one morning. And we know that
11  Lafarge called on the 27th. And that's been
12  backed up by logs. So the deduction would be
13  made that all of this is on the 27th.
14      Q.   And is that a usual number of vessels,
15  one, two, three, four, five, six, seven, on a day
16  like the 27th? Is that consistent with your
17  normal --
18      A.   It's -- it doesn't have that many
19  vessels. There's only two vessels listed.
20      Q.   Yes.
21      A.   That's the number of jobs. That's the
22  number of jobs. That varies. It depends on
23  business. It varies. It could be more than that
24  or it could be less.
25      Q.   How many vessels did you have at that
                    - 85 -

1  time that were full-time vessels?
2      A.   Five.
3      Q.   And this is only two of the five?
4      A.   Uh-huh. (Affirmative response.)
5      Q.   Who are the other three that are not on
6  this list?
7      A.   The M/V KARCHE, the M/V JECK and the M/V
8  SHANE C.
9      Q.   And do you know where they were at that
10  time?
11      A.   It is my understanding they were in route
12  to Harvey Canal, if not already in Harvey Canal.
13      Q.   What makes you say that?
14      A.   The -- all of the vessels were secured in
15  the Harvey Canal, other than one, for the
16  hurricane.
17      Q.   So it's your understanding that the three
18  vessels that are not shown on these dispatchers -
19  - were in the Harvey Canal?
20      A.   Either there or in route. I could only
21  verify it if I had logs in front of me.
22      Q.   So did someone direct them to go to the
23  Harvey Canal or is that just something you
24  learned?
25      A.   That's something we learned, but the
                    - 86 -

1  berthing of the vessels during adverse conditions
2  also comes under the discretion of the boat
3  owner.
4          So it is going to be an agreement between
5  Domino and the boat owner, where they're going to
6  secure the boat.
7      Q.   And that would be, again, a verbal
8  agreement?
9      A.   Yes, sir.
10      Q.   But it's your recollection or your
11  understanding, I believe was your words, that
12  these three vessels were in the Industrial Canal.
13      A.   No, sir, not Industrial.
14      Q.   Excuse me. Were on their way to the
15  Industrial Canal.
16      A.   No, sir. Harvey.
17  MR. EMMETT:
18          Harvey Canal.
19  BY MR. WIEDEMANN:
20      Q.   Harvey Canal. I'm sorry. Harvey Canal.
21  I got confused.
22      A.   That's okay. I know they were in the
23  Harvey Canal after the hurricane, so deduction
24  means that they were there at the Harvey Canal
25  during the hurricane.
                    - 87 -

1   I cannot give you an exact time at this
2   moment when they arrived there. I don't know.
3      Q. And you don't know what time they may
4   have gone into the Harvey Canal?
5      A. I can't tell you that, yeah.
6      Q. How far is the Harvey Canal from the
7   Industrial Canal locks?
8      A. Approximately six miles.
9      Q. And do you know when and if the locks
10  were closed at some point in time?
11     A. That is up to the discretion of the Corps
12  of Engineers and the Lockmaster. I cannot tell
13  you when they closed.
14     Q. You don't personally know?
15     A. No, sir.
16     Q. Does Domino monitor the weather, either
17  by radio or television, or some other method
18  during periods like we had with Katrina?
19     A. The only monitoring that I know of was
20  TV.
21     Q. Does your dispatcher or anyone else with
22  the company transmit weather information to the
23  vessel operators?
24     A. I can't say definitely yes or definitely
25  no. The motor vessel, the brokered vessels, have

- 88 -

1   not on your list to go to the Harvey Canal? Was
2   that something that originated from Domino or was
3   it something that came from the vessel
4   owners/operators?
5      A. The vessel owners.
6      Q. But they would make Domino aware where
7   they are?
8      A. Sure.
9      Q. Is that correct?
10     A. Yes.
11     Q. Do you know when they went into the
12  Harvey Canal?
13     A. I've already answered that. No, I don't.
14     Q. When was the first time that you knew
15  that they were in the Harvey Canal?
16     A. After I talked to Scott, after the
17  hurricane.
18     Q. Scott?
19     A. Castaing.
20     Q. So he would have been in contact with
21  them?
22     A. He was the dispatcher on duty for the
23  weekend, yes.
24     Q. And so he would be the one that would be
25  in contact with them and would where they were?

- 90 -

1   access to TV, as well.
2      So I can't say whether Domino, the
3   dispatcher on duty, transferred any of that TV
4   material to the boat directly or if the boat knew
5   of it on its own.
6      Q. Does Domino take it upon itself to
7   apprize the vessel operators or the vessel owners
8   of adverse weather conditions?
9      MR. EMMETT:
10        Object to form. Asked and
11     answered. Same question. Go ahead
12     again.
13     THE WITNESS:
14        Repeat the question, please.
15  BY MR. WIEDEMANN:
16     Q. Does Domino take it upon itself to make
17  the vessel owners/operators aware of potential
18  weather problems and cautions against --
19     A. I would say, yes, that we do. Joseph C.
20  Domino does talk to the vessels. Whether it is a
21  direct call to them after looking at TV or
22  whether it's during a conversation between the
23  two vessels that might have been initiated by the
24  vessel. I can't answer that positively.
25     Q. Do you know who caused the three vessels

- 89 -

1      A. He was the dispatcher on duty. And, yes,
2   he would have better knowledge than me at that
3   particular time, yes.
4      Q. Did he transmit that knowledge to you at
5   any point in time, when they went into the canal?
6      A. No, sir.
7      Q. Am I correct that when Domino went in and
8   made the change in the positioning of the barges
9   and then went back to Mile 94 --
10     A. Uh-huh. (Affirmative response.)
11     Q. -- it went back light boat; did it not?
12     MR. EMMETT:
13        Object to the form of the question.
14     Domino did not do the swapping out or the
15     topping.
16     MR. WIEDEMANN:
17        You're right. You're right.
18     I'm sorry.
19     MR. EMMETT:
20        Subject to that, go ahead.
21     MR. WIEDEMANN:
22        Yes.
23  BY MR. WIEDEMANN:
24     Q. When Unique went in to top around the two
25  barges and came out of the Industrial Canal, it

- 91 -

1 came out light; is that correct?
2    A.  Yes, that's correct.
3    Q.  But if it had taken a barge with it there
4 would have been a billing for the transmission of
5 the barge from the Lafarge facility to wherever
6 it was transmitted; is that correct?
7         MR. EMMETT:
8             Object to form.  Speculative.
9 You can answer it.
10       THE WITNESS:
11            The billing cycle was in process
12       even with the vessel coming out of the
13       Industrial Canal light boat.  The
14       charges, as you can see by the invoice,
15       are by the hour.
16            And they incorporate and match up
17       with what's on the boat log. So to try to
18       answer your question, any time we're on a
19       job it is a billable cycle.
20 BY MR. WIEDEMANN:
21    Q.  So is it your testimony that you would
22 not have made any more money by taking the barge,
23 the empty barge, out of the Lafarge facility if
24 you had been requested to do so and transporting
25 it through the locks to the nearest fleeting

- 92 -

1 operation?
2    A.  Again, that's a finite.  When you get a
3 barge in tow it will take more time than running
4 light boat.  And it also depends on where we were
5 instructed to bring a barge to.
6         Now, if we were going to Mile 94 to tie
7 off the barge, if the vessel had the barge in tow
8 and was going to Mile 94, the billing cycle would
9 have been very, very similar.
10    Q.  But if it's going to a fleeting operation
11 upriver it would be in a different billing cycle?
12    A.  Oh, absolutely.
13    Q.  Was there a decline in business between
14 the 26th, 27th and 28th as it existed prior to
15 that time?
16       MR. EMMETT:
17            Object to form.  Asked and
18       answered.
19       THE WITNESS:
20            You want me to answer?
21       MR. EMMETT:
22            Yeah.  I mean, you could tell him
23       what you told him before.
24       THE WITNESS:
25            The business fluctuates.  Once the

- 93 -

1       vessels were in Harvey Canal, yes,
2       business declined.
3 BY MR. WIEDEMANN:
4    Q.  And Domino does not make any decision as
5 to when a vessel is taken out of service, a
6 vessel that's working for you full-time?
7    A.  A decision to take it out of service.  In
8 what capacity?
9    Q.  To bring it into the Industrial Canal or
10 bring it into the Harvey Canal?
11       MR. EMMETT:
12            Is this waiting on weather -
13       a waiting on weather question, or --
14       MR. WIEDEMANN:
15            The weather, yes.  The weather or --
16       MR. EMMETT:
17            Was this take it out of service
18       because it's had a break down or --
19       MR. WIEDEMANN:
20            No.
21 BY MR. WIEDEMANN:
22    Q.  I'm talking about, does Domino have any
23 input or any decision making capacity about
24 whether or not a vessel is taken out of service
25 due to weather, a full-time vessel?

- 94 -

1    A.  I cannot say totally, no, but I cannot
2 say totally, yes.  If the vessel says something
3 to us, Joseph C. Domino, Inc. -- for example, we,
4 the vessel crew, has heard that the locks are
5 going to shut down, the vessel needs to get into
6 the canal, well, then, we would say, Joseph C.
7 Domino dispatcher would say, "Please go secure in
8 the canal."
9    Q.  Did Ingram ever ask Domino to pick up a
10 barge at a Lafarge facility; to your knowledge?
11    A.  On this date?
12    Q.  No, no, at any time.  I mean --
13    A.  There is a possibility, but I can't
14 answer definitely, yes, or definitely, no,
15 without looking at records.
16    Q.  But, I mean, have you dealt with Lafarge
17 over the years when you were president?
18    A.  Yes.  Lafarge is a regular customer, and
19 we do -- Joseph C. Domino, Inc. does dispatch
20 boats to Lafarge when Lafarge calls us.
21    Q.  Did Ingram ever ask Domino to pick up a
22 barge at the Lafarge facility?
23    A.  I can't answer that.  It's possible, but
24 it certainly wasn't on this date.
25    Q.  But if it did, it would show up on a

- 95 -

DEPO. OF GERALD THOMAS McNEILL

1  document similar to the document that you have?
2      A.  Yes.  The basic documents that Joseph C.
3  Domino has brought here.  It would show up on the
4  worksheet, it would show up on the boat logs, it
5  would show up on the invoice.
6      Q.  Have you brought other documents with
7  you?  I don't remember seeing them.
8      A.  I brought Boat Brokers Liability.
9      Q.  No, no.  I'm talking about the square
10 document, the --
11     A.  What about it?
12     Q.  The dispatch document.
13     A.  What about it?
14     Q.  If you did take barges, Ingram barges,
15 for pick up --
16     A.  From Point A to Point B?
17     Q.  Yes.
18     A.  Yes, it would show up.
19     Q.  It would show up on that?
20     A.  Yeah.
21     Q.  But that's the only one you have here
22 now?
23     A.  Yes.
24     MR. EMMETT:
25         You didn't request --

- 96 -

1  is something that Domino does.
2      So, yes, we would move it.  And it would
3  be documented on a worksheet.  It would be
4  documented on an invoice.
5      Q.  So the worksheet, it would be the
6  critical thing to determine where you may have
7  picked up barges, where you may have dropped off
8  barges?
9      A.  Along with the boat logs.  As stated
10 before, the boat logs give you information of
11 what the vessel is doing.
12     Q.  Did Ingram ask Domino to do anything with
13 the 4727 during the period August 26th to
14 August 29th?
15     A.  No.
16     Q.  Were any Domino brokered vessels in the
17 Industrial Canal or the Intracoastal Waterway on
18 August 28th and August 29th; do you know?
19     A.  Are you talking about the Intracoastal
20 Waterway west or east?
21     Q.  I don't - I'm thinking
22     A.  If you're talking east, you would be
23 talking about the Industrial Canal.
24     Q.  Right.  Yes.
25     A.  There was not any Domino boats in the

- 98 -

1      MR. WIEDEMANN:
2          I understand.  I'm just trying to --
3      THE WITNESS:
4          Yeah.
5      MR. WIEDEMANN:
6          He said that they have documents
7  on it.
8  BY MR. WIEDEMANN:
9      Q.  But there are similar documents for every
10 day; is that right?
11     A.  Yes.  Well, yes.  It might be on
12 different sheets, but there's documents.
13     Q.  And the same thing would be true, if you
14 ever delivered a barge to Ingram that would show
15 up on that?
16     A.  Delivered a barge to Ingram?
17     Q.  Yes.
18     A.  I'm a little bit confused.  Ingram is a
19 customer of --
20     Q.  Yes.
21     A.  Deliver a barge to Ingram?
22     Q.  To Lafarge, I'm talking about.
23     A.  Hypothetically, if Ingram called Domino
24 and said, "We have a barge to pick up at Point A
25 to deliver to Lafarge Cement," that is a job that

- 97 -

1  Industrial Canal.
2      Q.  I don't think it was east.  I think it
3  was north and south.  Maybe I'm wrong.
4      A.  Well, you have to realize --
5      MR. EMMETT:
6          It runs east and west.
7      THE WITNESS:
8          The Gulf Intracoastal Waterway runs
9  east, west.  At times it might not go
10 in that exact direction, that cardinal
11 direction, but it's called the Gulf
12 Intracoastal Waterway east and west.
13 BY MR. WIEDEMANN:
14     Q.  All right.  Do you know where the REGINA
15 H and the MR. CASS berthed on the 28th and 29th?
16 I believe you said --
17     A.  Harvey Canal.
18     Q.  Those two weren't --
19     A.  Yes.  Harvey Canal.
20     Q.  - together with the other three?  Is
21 that your understanding?
22     A.  Yes.  They all went to the Harvey Canal.
23     Q.  So all five of the boats that regularly
24 were --
25     A.  No, no.  One vessel, the KARCHE, was in

- 99 -

DEPO. OF GERALD THOMAS MCNEILL                    MiniDEP by Kenson

1  Baton Rouge.
2      Q.  So there were four vessels that Domino
3  frequently or customarily used that
4      A.  Full-time brokered boats.
5      Q.  Were in the Harvey Canal?
6      A.  In the Harvey Canal, yes.
7      Q.  Do you know when they went in?
8      A.  As answered before, I don't know exactly.
9      Q.  And I asked you about two more.  That's
10  why I said that.
11      A.  If you look at the logs presented from
12  the REGINA H, the last job, you know, it would be
13  after that.
14      Q.  And the last job, according to this log
15  that you all presented, was on the 27th?
16      A.  Right.
17      Q.  At 20:30.
18      A.  So it had to be after that when the
19  REGINA H went into the Harvey Canal.
20      Q.  But the REGINA H says on 20:30 it stopped
21  the job?
22      A.  That's the last job that Domino received
23  by telephone.  We dispatched to the brokered
24  boat.  That was the last job.  Billable
25  information, that's the last job we did.
                        - 100 -

1      Q.  But there would be a --
2      A.  There would not be any billable
3  information after 20:30.
4      Q.  I understand, but there would be a log
5  showing, or should be a log showing where the
6  vessels went and when.
7      A.  There should be.  Whether there is or
8  not, I cannot answer that without looking at
9  records.
10      Q.  But you only use the log insofar as
11  billable allows it, but --
12      A.  That's my business.
13      Q.  But the logs are kept to show what the
14  vessel does in addition to billable hours; is it
15  not?
16      A.  Yes, it is.
17      MR. EMMETT:
18           We've looked at the logs, Larry.
19      THE WITNESS:
20           Huh?
21      MR. EMMETT:
22           The last log entry that we have
23      is for the 27th.  And then --
24      MR. WIEDEMANN:
25           On the 23rd here.
                        - 101 -

1      MR. EMMETT:
2           They don't resume until September
3      the 8th.  And I've provided to you all of
4      the logs.
5      MR. WIEDEMANN:
6           Off the Record.
7  (Off-the-Record.)
8      MR. O'DWYER:
9           For the Record, the onus is going to
10      be on the owner to explain why logs are
11      missing.
12      MR. EMMETT:
13           There aren't any missing logs,
14      Mr. O'Dwyer.  Let's go.
15      MR. WIEDEMANN:
16           I understand that.
17      MR. O'DWYER:
18           And I'm serving notice of an adverse
19      presumption if proper disclosure is not
20      made by the owner, and if it turns out
21      that Domino was also implicated in the
22      missing logs, then I'm going to invoke
23      the presumption against them, too.
24      MR. EMMETT:
25           Let's go.
                        - 102 -

1  BY MR. WIEDEMANN:
2      Q.  Do you know personally anything about why
3  the barge broke loose?
4      A.  I do not know anything personally, no.
5      Q.  Do you know anything from what you've
6  been told by somebody who might be in a better
7  position?
8      A.  No, sir.
9      Q.  Do you know whether or not the lines
10  broke loose or what caused the barge to be set
11  free?  Do you have any personal knowledge?
12      A.  No, sir.
13      MR. FISHER:
14           Object to the question.
15  BY MR. WIEDEMANN:
16      Q.  Do you have any indirect knowledge?
17      A.  No, sir.
18      Q.  Do you know whether any other barges at
19  the Lafarge facility broke loose?
20      A.  I don't know, sir.
21      Q.  Huh?
22      A.  I don't know of any.
23      Q.  You have no personal knowledge and you
24  have no secondary knowledge?
25      A.  Of barges breaking loose, no.
                        - 103 -

MINIDEP by Kenson

1    Q.   Did you take any notes of your meeting
2  with Jeff Tillery or Captain Grabert?
3    A.   No, sir.
4    Q.   Did Grabert tell you or indicate that he
5  gave any special instructions to his crew with
6  regard to the barge in question, the 4727?
7    A.   The 4727?
8    Q.   Yes.
9    A.   The only thing I know about the 4727, is
10 that it was on the outside when he left.
11   Q.   And I believe that you already told me
12 that Unique Towing has been in business with your
13 company for 20 years; is that correct?
14   A.   Yes, sir.
15   Q.   And the reports of Scott Castaing would
16 be in the company records; is that right?
17   A.   What reports are you referring to?
18   Q.   The quarterly reports of his inspections?
19   A.   Yes.
20   Q.   They would be in the company records?
21   A.   Yes, yes.
22   Q.   They're not destroyed, then, that you
23 know of?
24   A.   No.  They wouldn't be destroyed.
25   Q.   Do you know Mr. Heck? Does he own Heck's

- 104 -

1    A.   First the vessel would notify Joseph C.
2  Domino, Inc.'s dispatcher that extra lines were
3  left.  The only times that we do that is when
4  there are not any left by the customer, either on
5  board the barge or on the facility.
6    Q.   So that would be recorded in the
7  dispatch --
8    A.   Sometime -- for example, if two lines
9  were left with the barge, yes, it's usually put
10 on the worksheet.
11        If we don't get those lines back, if the
12 vessel doesn't actually acquire them back, then
13 they would be billable items.
14   Q.   And insofar as your billing to Lafarge,
15 there is no billing for additional lines, is
16 there?
17   A.   No, sir.  You have a copy of it.  It just
18 has the billable hours with the fuel surcharge.
19   Q.   But if the lines were left and not
20 returned there would be a bill for that?
21   A.   Yes, sir.
22   Q.   And have you found any bill for such a
23 charge?
24   A.   For Lafarge?
25   Q.   Yes.

- 106 -

1  Towing Company?
2    A.   Yes.
3    Q.   Do you all do business with him?
4    A.   Heck's Towing Company was another boat
5  company for awhile.  And I can't remember which
6  boat was underneath it.
7        I think it was the M/V JECK.  But it was
8  a towing company, so it was -- he was the owner.
9    Q.   But did he do business with Domino?
10   A.   Yes.
11   Q.   Does he do business with Domino today?
12   A.   Yes.
13   Q.   What vessels does he have?
14   A.   Today he owns 50 percent of the M/V
15 KARCHE.
16   Q.   Did he at one time own
17   A.   He also still owns the REGINA H.
18   Q.   What about the WHO 'DAT?  Is that --
19   A.   The WHO 'DAT?
20   Q.   Yes.
21   A.   That was a vessel that used to work for
22 us.  Mr. Heck did not own it.
23   Q.   If a vessel operator/owner uses lines
24 from the vessel to moor barges, would the
25 customer be billed for that?

- 105 -

1    A.   No.
2    Q.   Does Unique use the same address as
3  Domino?
4    A.   They have.
5        MR. EMMETT:
6           Physical address or a P.O. Box?
7        MR. WIEDEMANN:
8           Physical address.
9        MR. EMMETT:
10          Physical address.
11       THE WITNESS:
12          Physical address, yes, 5520 River
13 Road in Marrero.  Post Office boxes are
14 different.
15 BY MR. WIEDEMANN:
16   Q.   But are the companies in any way
17 inter-related?
18   A.   Other than being brokered, no.
19   Q.   Unique is a boat owner, Domino is a boat
20 broker.
21   A.   Right.
22   Q.   And then neither one has an interest in
23 the other company?
24   A.   We have a -- depending on how you define
25 "interest."

- 107 -

1    Q.  No.  I'm
2    A.  We have an interest with each other to
3  accomplish a job, to run a business.  But as far
4  as ownership interest, we don't have any.
5    Q.  And what I'm talking about is -- I
6  understand you have an interest as a broker.
7    A.  Right.
8    Q.  You make a commission.
9    A.  Right.
10    Q.  And the boat owner gets paid for his
11  effort.
12    A.  Right.  Yes.
13    Q.  But other than that, there is no
14  inter-relationship whereby one company benefits
15  from the operations of the other, other than the
16  commission?
17    A.  Other than a commission, no.
18    Q.  Do you know of any -- I'm speaking about
19  personally or indirectly, of any eyewitnesses or
20  anyone having information as to why the 4727
21  broke loose from its moorings?  Do you have any
22  personal or acquired information?
23    A.  No, sir.
24    MR. FISHER:
25      Objection.  Asked and answered.
- 108 -

1  BY MR. WIEDEMANN:
2    Q.  Do you have any personal or acquired
3  information as to why the 4727 went through the
4  Industrial Canal wall and wound up on the land
5  side?
6    MR. WEBB:
7      Objection.  That's part of Phase 2,
8    Larry.  You know it.  That's not even a
9    fair question.
10    MR. WIEDEMANN:
11      Well, I don't know how else to put
12    it.  I mean, you know --
13    MR. EMMETT:
14      Go ahead and answer it so you don't
15    have to come back for Phase 2.
16    THE WITNESS:
17      No.
18    MR. WIEDEMANN:
19      What do you want me to say?  It
20    just flew.
21    THE WITNESS:
22      No.
23  BY MR. WIEDEMANN:
24    Q.  Do you know why the barge flew over the
25  wall and wound up on the Industrial land side?
- 109 -

1    MR. WEBB:
2      Objection to the form of the
3    question.
4    THE WITNESS:
5      No.
6    MR. WEBB:
7      It's beyond Phase 1 discovery as
8    defined by the Court.
9    MR. WIEDEMANN:
10      All right.
11    THE WITNESS:
12      No.
13    MR. WEBB:
14      It wasn't a funny objection.  It
15    was serious.
16    MR. WIEDEMANN:
17      Okay.
18  BY MR. WIEDEMANN:
19    Q.  To your knowledge, did Domino broker any
20  vessel operations on the 28th?
21    A.  No, sir.
22    Q.  It did not or --
23    A.  Did not.
24    Q.  -- or you don't know?
25    A.  Did not.
- 110 -

1    Q.  It did not.  So the last day for
2  operations vis a vie Domino is the 27th?
3    A.  As far as I know, yes.  It was the 27th.
4    MR. EMMETT:
5      I'm going to make a return on the
6    (30)(b)(5) Request for Production of
7    Documents on the Record.
8      We had produced in response to
9    Request Number 11 three documents which
10    consists of the invoice from Domino to
11    Lafarge for the services of the REGINA H
12    on August 27th.  I guess I will mark that
13    as Exhibit Number 1.
14    MR. BROOKS:
15      And if this is going to go on, I
16    would suggest we do the (30)(b)(5) as
17    Exhibit Number 1.  It's always
18    MR. EMMETT:
19      The request?
20    MR. BROOKS:
21      Yes.
22    MR. EMMETT:
23      All right.  I will make the
24    (30)(b)(5) request Exhibit Number 1.
25      I will mark then the invoice as
- 111 -

1  Exhibit Number 2.
2      I will mark as Exhibit Number 3 the
3  dispatchers log/worksheet discussed by
4  the witness.
5      Exhibit 4 will be a four-page
6  document consisting of the logs of the
7  REGINA H for August 27, 2005.
8      The next document that we have
9  produced is the Joseph C. Domino Policies
10  and Procedures Manual, which the witness
11  described as being generated and reliance
12  on American Waterways Operators
13  standards. That's Exhibit 5.
14      The next document we produced is the
15  Certificate of Documentation, which is in
16  response to Number 18, which I'll mark as
17  Exhibit 6.
18      We have produced in response to
19  Request Number 23, insurance policies. I
20  will mark as Exhibit 7 the Boat Brokers
21  Liability Policy issued to Joseph C.
22  Domino.
23      I'm going to mark as Exhibit 8 the
24  Primary Marine Policy issued to Unique
25  Towing/Lizana, which consists of multiple

- 112 -

1  MR. WIEDEMANN:
2      Yes. The Court scheduling order
3  actually requires the
4  MR. EMMETT:
5      Correct.
6  MR. WIEDEMANN:
7      What we got from yesterday from
8  Domino, a Motion for Protective Order.
9  MR. EMMETT:
10      Right.
11  MR. WIEDEMANN:
12      We reserve the right to file an
13  opposition and to seek
14  MR. EMMETT:
15      Right. I want to discuss that with
16  you. If you're satisfied that he has
17  responded to your questions, I'm prepared
18  to moot out the Protective Order?
19  MR. WIEDEMANN:
20      Huh?
21  MR. EMMETT:
22      I'm prepared to moot it out. I
23  filed it simply in the event that I
24  needed it. I wanted to cooperate with
25  you and bring the witness here.

- 114 -

1  pages.
2      I'm going to mark as Exhibit 9 the
3  excess policy that we produced in
4  response to the request.
5      The last document we have was in
6  response to Number 33, which is really
7  mis-numbered because there are two 33's.
8  That's your second 33, which are the log
9  books of the vessel for the 30-day period
10  prior to the hurricane and the 60-day
11  period thereafter. And I'll simply mark
12  that as Exhibit Number 10.
13      For the Record, some of these
14  documents are responsive to more than one
15  request, but those are the only documents
16  that we have that are responsive to the
17  requests that you've made.
18  MR. WIEDEMANN:
19      We'd like to reserve our rights to
20  object to the adequacy of the return.
21  MR. EMMETT:
22      Okay.
23  MR. EMMETT:
24      You want to BATES Stamp all of those
25  exhibits?

- 113 -

1  MR. WIEDEMANN:
2      Right.
3  MR. EMMETT:
4      And if you're satisfied he has
5  responded to your notice, I don't need to
6  proceed with that motion.
7  MR. WIEDEMANN:
8      I would just like to go over and
9  make sure I'm not missing anything.
10  MR. EMMETT:
11      Fine. No problem.
12  (Off-the-Record.)
13  BY MR. WIEDEMANN:
14      Q. Let me just ask one other question. Did
15  Lafarge impose any requirements, written or oral,
16  on Domino for insurance?
17      A. For insurance?
18      Q. Yes. Did it require Domino to carry any
19  type of insurance?
20      A. I can't remember if Lafarge individually
21  -- many times we have customers that will require
22  Domino to have boat brokers insurance, as well as
23  the vessels to have insurance.
24      Q. And I understand that you had no written
25  agreement with them, so there's no indemnity

- 115 -

1 agreement or anything between you?
2   A. Between Lafarge and Domino?
3   Q. Yes.
4   A. There's no written agreements.
5   Q. Are you aware of any investigation that
6 was made subsequent to August 29 of the reason
7 for the movement of the 4727 from the dock? Do
8 you know of any investigation?
9       MR. EMMETT:
10          Is this an investigation by Domino
11      or at Domino's direction?
12      MR. WIEDEMANN:
13          By Domino or by someone else that
14      he's aware of.
15      MR. EMMETT:
16          Well, I mean, in a public domain
17      there are all sorts of things out there.
18      MR. WEBB:
19          The Coast Guard?
20      MR. GILBERT:
21          Just let him answer what he knows.
22      MR. WEBB:
23          NCF?
24      MR. GILBERT:
25          Just let the witness answer.

- 116 -

1           Well, you know it must be true.
2           Thank you.
3       THE WITNESS:
4           You're welcome.
5 (The deposition was concluded at approximately
6 2:15 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

- 118 -

1       MR. EMMETT:
2           Go ahead.
3       THE WITNESS:
4           Can you please ask the question?
5 BY MR. WIEDEMANN:
6   Q. Do you know of any Coast Guard
7 investigation? Do you know of any police
8 investigation?
9       Do you know of any Army investigation,
10 any FEMA investigation, any -- what else they
11 got? Any investigation? What else do you want me
12 to ask him?
13      MR. GILBERT:
14          John was trying to limit the scope
15      of the question to a fair one, and you
16      only expanded.
17      MR. WIEDEMANN:
18          I asked him if he knows of any
19      investigation personally or through
20      information. That's all. He can say
21      either you do or you don't.
22      THE WITNESS:
23          The only investigations I know of
24      is what I've read in the paper.
25      MR. WIEDEMANN:

- 117 -

REPORTER'S PAGE

I, Sharon Waldrup Black, Certified Court Reporter, in
and for the State of Louisiana, the officer, as defined in Rule
28 of the Federal Rules of Civil Procedure and/or Article 1434(b)
of the Louisiana Code of Civil Procedure, before whom this sworn
testimony was taken, do hereby state on the Record:

        That due to the interaction in the spontaneous
discourse of this proceeding, dashes ( -) have been used to
indicate pauses, changes in thought, and/or talk-overs; that same
is the proper method for a Court Reporter's transcription of
proceeding, and that the dashes ( -) do not indicate that words
or phrases have been left out of this transcript;

        That any words and/or names which could not be verified
through reference material have been denoted with the phrase
"(phonetic)."


                Sharon Waldrup Black, CCR
                Certified Court Reporter


- 119 -

BARGE000674

DEPO. OF GERALD THOMAS MCNEILL                    MINIDEP by Kenson

CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original blue stamp on this page.

I, Sharon Waldrup Black, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that GERALD THOMAS McNEILL, after having been first duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing one hundred nineteen (119) pages;

That this testimony was reported by me in the Stenographic (voice-writing) method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

That I am not related to counsel or to the parties herein; am not otherwise interested in the outcome of this matter; and am a valid member in good standing of the Louisiana State Board of Examiners of Certified Shorthand Reporters.


Sharon Waldrup Black, CCR
Certified Court Reporter
Louisiana License #21009


- 120 -

BARGE000675

# DEPO. OF GERALD THOMAS MCNEILL

MINDEX by Kenson

| Word | ... | Page |
| --- | --- | --- |

05 ... 41
1 ... 16, 18, 110, 111
1.090 ... 18
10 ... 45, 46, 50, 59, 61, 65, 70, 113
10:00 ... 45, 46, 59, 70
10:30 ... 65
11 ... 36, 41, 111
1258 ... 35
13 ... 14, 41, 43, 48
13:30 ... 41, 43, 48
1300 ... 46
14:04 ... 49
14:15 ... 49
14:25 ... 49
1400 ... 49
1425 ... 44, 45
1445 ... 45
15:10 ... 50, 61
1500 ... 50
16:30 ... 50, 62
17:00 ... 50, 62, 69
18 ... 112
2 ... 16, 109, 112, 118
2.1 ... 16
2:15 ... 118
20 ... 9, 23, 43, 54, 80, 100, 101, 104
20:30 ... 100, 101
2004 ... 19, 21-23, 25, 27
2005 ... 41, 77, 112
2006 ... 9, 77
2007 ... 78
21 ... 9
22 ... 9, 23
23 ... 112
23rd ... 101
26th ... 81, 93, 98
27 ... 39, 41, 77, 112
27th ... 36, 41, 50, 61, 65, 68, 69, 76, 83, 85, 93, 100, 101, 111
28 ... 39
28th ... 85, 93, 98, 99, 110
29 ... 81, 116
29th ... 81, 98, 99
3 ... 112
30 ... 8, 9, 41, 43, 48, 50, 62, 65, 100, 101, 111, 113
301 ... 8
3217 ... 8
33 ... 113
341 ... 35
4 ... 112
4727 ... 44, 62, 63, 69, 98, 104, 108, 109, 116
4745 ... 44, 49
5 ... 8, 111, 112
50 ... 105
504 ... 35
5520 ... 107
6 ... 8, 112
60 ... 113
7 ... 37, 38, 51, 68, 69, 112
7:00 ... 37, 38
7:15 ... 51, 68, 69
7:24 ... 37
70401 ... 8
8 ... 39, 41, 112

88 ... 61
8th ... 102
9 ... 34, 113
92 ... 61
94 ... 43, 46, 51, 52, 68, 91, 93
95 ... 45
99 ... 34, 35
99.9 ... 34

**A**

a.m. ... 37, 38, 45, 46, 59, 70
abbreviation ... 43
able ... 10
aboard ... 18, 19, 74
access ... 89
accomplish ... 108
According ... 44, 68, 69, 100
acquire ... 106
acquired ... 108, 109
across ... 44
action ... 20
actual ... 38
add ... 67, 81
addition ... 29, 43, 72, 101
address ... 35, 107
adequacy ... 113
adverse ... 82, 83, 87, 89, 102
advertise ... 12
afford ... 64
afield ... 67
against ... 47, 57, 89, 102
agree ... 29
agreement ... 11, 18, 20, 23, 28, 29, 74-76, 79, 87, 115, 116
agreements ... 11-13, 20, 23, 80, 116
agrees ... 75
ahead ... 56, 67, 70, 81, 84, 89, 91, 109, 117
AHP ... 61
Algiers ... 37, 38, 51, 52, 61
allow ... 56
allows ... 101
alluding ... 65
American ... 13, 15, 22, 76, 112
among ... 24
anniversary ... 16
apparently ... 45, 48
apprize ... 89
approximately ... 9, 20, 43, 51, 52, 61, 88, 118
area ... 25, 72
Army ... 117
Arrive ... 45
arrived ... 44, 49-51, 62, 68, 69, 88
Ashton ... 56
associate ... 22
association ... 10
attach ... 41, 54
attached ... 33, 53, 54, 57
attempting ... 20
attorney ... 56, 57
audit ... 79

auditor ... 16, 76
August ... 36, 41, 76, 77, 81, 98, 111, 112, 116
authority ... 18, 63, 83
available ... 28, 69, 70
AW ... 22
aware ... 89, 90, 116
awhile ... 105
AWO ... 16, 22, 32, 77, 78

**B**

back ... 45, 50, 51, 53, 57, 62, 68, 91, 106, 109
backed ... 85
Bank ... 51
barge ... 36, 43, 44, 46-48, 50, 53, 54, 57, 58, 60, 62-65, 70, 82, 92, 93, 95, 97, 103, 104, 106, 109
... barges 24, 45, 46, 48, 53-55, 57-60, 62, 64-66, 68, 91, 96, 98, 103, 105
base ... 43-46, 51, 52, 68, 69
basic ... 83, 96
basis ... 13, 29, 35, 40, 47, 71, 79
BATES ... 113
Baton ... 100
beating ... 77
became ... 22
become ... 22, 23
becoming ... 16, 22
behind ... 39
below ... 51
benefits ... 108
berth ... 82, 83
berthed ... 99
berthing ... 82, 87
big ... 84
bill ... 106
billable ... 92, 100, 101, 106
billed ... 105
billing ... 69, 75, 92, 93, 106
bit ... 26, 97
block ... 38
blocks ... 83
board ... 15, 16, 64, 77, 106
boardings ... 79
boat ... 13, 16, 19, 20, 22, 24, 28, 29, 33, 34, 36, 38, 40, 41, 44, 45, 49, 50, 58, 62, 69, 70, 72, 73, 75, ... 77, 79, 82-84, 87, 89, 91-93, 96, 98, 100, 105, 107, 108, 112, 115
boats ... 23, 28, 39, 60, 71, 76, 77, 82, 95, 98-100
Bollinger ... 37, 38
book ... 33
books ... 113
bottom ... 85
box ... 37, 107
boxes ... 107
break ... 74, 94
breaking ... 103
broke ... 103, 108
broker ... 12, 15, 18, 24, 25,

68, 76, 107, 108, 110
brokerage ... 11, 12, 20, 26, 28, 58, 64, 65, 81
brokered ... 11, 13, 14, 26, 31, 41, 42, 63, 64, 71, 72, 76, 82, 88, 98, 100, 107
brokers ... 22, 25, 72, 75, 96, 112, 115
BROOKS ... 111
brought ... 10, 23, 32, 57, 96
built ... 82
Bush ... 59, 65, 67, 77
business ... 11, 12, 28, 30, 35, 40, 47, 62, 85, 93, 94, 101, 104, 105, 108
busy ... 69

**C**

call ... 13, 15, 36-41, 45, 47, 48, 59, 63-66, 68, 89
called ... 14, 27, 37, 38, 46, 52, 59, 61, 85, 97, 99
calls ... 30, 37, 63, 83, 95
can ... 15, 18, 21, 29, 43, 62, 66, 73, 76, 91, 104
Canal ... 44, 49, 51, 52, 60, 61, 69, 70, 86-88, 90-92, 94, 95, 98-100, 109
cancellation ... 20
cancelled ... 20
capacity ... 10, 94
captain ... 16, 17, 48, 54-56, 64, 104
cardinal ... 99
cargo ... 48
carried ... 12
carrier ... 13, 22, 23, 26, 77
carry ... 115
case ... 12, 24, 35, 38, 49, 54, 58, 64, 67, 79
cases ... 51
CASS ... 38, 99
Casting ... 17, 27, 29, 32, 38, 39, 45, 46, 59, 65, 67, 69, 74, 79, 80, 84, 90, 104
category ... 19, 22
caused ... 89, 103
cautions ... 89
Cement ... 44-46, 49, 97
center ... 37
certain ... 81, 82
certainly ... 20, 95
certificate ... 77, 78, 112
certification ... 29, 76
certified ... 25-28, 71, 76, 77, 79
cetera ... 24
change ... 10, 57, 59, 91
characterize ... 75
charge ... 106
charges ... 92
Charles ... 43
chartered ... 15, 41, 45, 63, 64
check ... 19, 78, 79
checked ... 79
checking ... 78

checklist ... 79
checks ... 79
Chief ... 17
circuit ... 72
circumstances ... 82
City ... 51
cleared ... 45, 49, 50, 62
clients ... 24, 56
close ... 51, 61
closed ... 88
Coast ... 116, 117
college ... 10
column ... 68
combine ... 30, 40
combined ... 39
come ... 16, 27, 40, 59, 109
comes ... 12, 76, 87
coming ... 83, 92
comma ... 43
commission ... 75, 108
commissions ... 28
common ... 47
communicate ... 34
communicated ... 45
communication ... 34
communications ... 46
companies ... 11, 12, 42, 72, 107
Company ... 9, 11, 17, 33, 68, 72, 88, 104, 105, 107, 108
compiled ... 17
complaints ... 79, 80
complete ... 38, 48
completed ... 48
completely ... 82, 83
compliance ... 16-20, 27, 29-31
compliant ... 21, 71, 76
complied ... 17
comply ... 17, 20, 22, 29
complying ... 19
concerned ... 24
concerning ... 55, 81-83
concluded ... 118
conditions ... 48, 65, 81-83, 87, 89
conduct ... 24
conducted ... 35
confused ... 68, 87, 97
connection ... 8, 51
consistent ... 85
consisting ... 112
consists ... 111, 112
consultant ... 15
contact ... 90
contained ... 4, 22
continually ... 24
continue ... 78
continuing ... 24
contract ... 13, 33, 34, 75
contracts ... 11, 12, 33, 34
control ... 64, 82
conversation ... 55-58, 67, 89
conversations ... 32
cooperate ... 114
copies ... 33
copy ... 18, 20, 25, 41, 44, 50, 62, 106

# DEPO. OF GERALD THOMAS MCNEILL

MINDEX by Kenson

**Word ... Page**

corner ... 37-39
corporate ... 30
corporation ... 9, 10, 13, 30-32, 35
Corps ... 88
corrected ... 21
correctly ... 77
counsel ... 36, 56
counseling ... 18, 31, 32
course ... 61
Court ... 110, 114
covered ... 28, 73
creating ... 32
Crescent ... 51
crew ... 11, 12, 15, 16, 40, 42, 43, 55, 74, 82, 95, 104
crewing ... 11
crews ... 19, 58
critical ... 98
Currently ... 9, 38
customarily ... 100
customer ... 13, 23, 24, 26, 32-38, 41, 58, 62-65, 67, 83, 95, 97, 105, 106
customers ... 14, 23-25, 30, 33, 34, 40, 80, 115
cut ... 44, 49, 50
cycle ... 92, 93

**D**

daily ... 36, 39-41, 48, 53
date ... 19, 39, 95
daughter ... 10
day ... 35, 39, 40, 85, 97, 111, 113
days ... 39, 85
deal ... 17
dealing ... 12
dealings ... 47, 62
deals ... 17
dealt ... 42, 95
decide ... 9
decision ... 94
deck ... 17, 54, 57, 64
decline ... 93
declined ... 94
deduction ... 85, 87
define ... 107
defined ... 110
definite ... 80
definitely ... 88, 95
deliver ... 60, 97
delivered ... 40, 41, 64, 97
demands ... 24
depart ... 43, 50
departed ... 44-46
deposition ... 118
describe ... 57
described ... 57, 60, 62, 112
description ... 37, 58, 68
destroyed ... 104
determine ... 78, 80, 98
devised ... 76
dictate ... 63
dictated ... 63, 82
dictates ... 21, 63
difference ... 26
differences ... 82

different ... 34, 52, 58, 93, 97, 107
differently ... 58
directed ... 8
directing ... 54
direction ... 67, 99, 116
directions ... 47
directly ... 57, 89
Disciplinary ... 17, 18
disclosure ... 102
discovery ... 110
discretion ... 87, 88
discussing ... 56
dismissal ... 19
dispatch ... 39, 64, 95, 96, 106
dispatched ... 36, 38, 60, 68, 83, 100
dispatcher ... 7, 19, 29, 30, 45, 47, 59, 65, 67, 69, 83-85, 88-91, 95, 106
dispatchers ... 38, 39, 86, 112
dispatching ... 68
distribute ...¿25
dock ... 44, 47, 49, 53-55, 57-59, 63, 66, 116
document ... 11, 15, 17, 19-23, 25-27, 29-32, 36-43, 47, 66, 73, 80, 83, 96, 112, 113
Documentation ... 13, 31, 78, 112
documented ... 39, 40, 98
documents ... 14, 21-23, 33, 34, 40, 41, 72, 96, 97, 111, 113
domain ... 116
Domino ... 8-20, 23, 24, 26, 28, 29, 33, 34, 40-42, 45, 54, 58, 60, 62-64, 68, 69, 71-76, 78-83, 87-91, ... 94-98, 100, 102, 105-107, 110-112, 114-116
dominotowing.com. ... 35
dropped ... 98
due ... 75, 94
Dufrene ... 42, 74
duly ... 8
duty ... 30, 47, 58, 59, 65, 85, 89-91

**E**

each ... 30, 108
earlier ... 57, 84
east ... 98, 99
eastbound ... 49
Ed ... 59
effect ... 19, 21
effort ... 22, 108
Elmwood ... 61
EMMETT ... 8, 9, 14, 18, 21, 24, 25, 31, 33, 36, 37, 55, 56, 62, 66, 67, 71-73, 77, 78, 81, 83, 84, 87, ... 89, 91-94, 96, 99, 101, 102, 107, 109, 111, 113-117
employ ... 42

employed ... 9, 10, 17, 33, 42, 65
employee ... 35
employees ... 11
employer ... 10
employment ... 10
Empty ... 43, 44, 47-49, 92
enacted ... 25
enacting ... 32
enforcement ... 16, 25
engage ... 12
engaged ... 68
engagement ... 34
engagements ... 35
Engineers ... 88
ensuring ... 16
entail ... 78
entered ... 45, 48-50, 62
Enterprises ... 32
entry ... 44, 49, 101
erroneous ... 48
et ... 24
EVANS ... 77
eventually ... 32
everyone ... 65
everything ... 34
examined ... 8
example ... 36, 77, 95, 106
except ... 34
excess ... 73, 113
executed ... 33
exercise ... 22
Exhibit ... 111-113
exhibits ... 113
existed ... 24, 93
existence ... 21
expanded ... 117
experience ... 58
experienced ... 23
explain ... 15, 55, 76, 102
extra ... 106
eyewitnesses ... 108

**F**

facility ... 40, 51, 52, 59, 60, 62, 64, 92, 95, 103, 106
failure ... 20
fair ... 109, 117
fairly ... 47
far ... 28, 29, 31, 43, 48, 51, 52, 57-62, 66, 67, 74, 81, 88, 108, 111
fax ... 34
faxes ... 34
features ... 70
February ... 19, 21, 22, 25, 27, 78
FEMA ... 117
file ... 27, 31, 114
filed ... 8, 114
final ... 20
find ... 45
Fine ... 115
finite ... 93
firm ... 31, 78
first ... 8, 21, 35, 40, 65, 76, 84, 90, 106
FISHER ... 67, 70, 84, 103, 108

five ... 84-86, 99
Fleet ... 51, 52, 60, 61, 68, 69, 82, 83
fleeting ... 51, 52, 60-63, 82, 92, 93
fleets ... 61
flew ... 109
flow ... 51
fluctuates ... 93
follow ... 15-17, 20, 67
followed ... 17
following ... 16, 17, 80
follows ... 8
Foret ... 32
form ... 8, 21, 24, 31, 33, 55, 62, 66, 67, 70, 81, 83, 89, 91-93, 110
forms ... 32
forth ... 20, 78
found ... 21, 106
four ... 15, 61, 84, 85, 100, 112
free ... 103
frequently ... 100
front ... 86
fuel ... 106
full ... 9, 10, 28-31, 42, 48, 71, 76, 86, 94, 100
fully ... 74
funny ... 110
furnishing ... 33
further ... 44, 52, 75

**G**

gave ... 25, 40, 46, 47, 73, 104
geared ... 15
generate ... 27
generated ... 24, 32, 34, 40, 41, 112
generates ... 30, 31
Geography ... 10
GERALD ... 8, 9
get ... 22, 23, 44-46, 48, 50, 64, 75, 93, 95, 106
gets ... 18, 108
GILBERT ... 116, 117
give ... 16, 17, 25, 32, 33, 79-82, 88, 98
given ... 15, 20, 31, 45-47, 63
go ... 14, 18, 19, 28-30, 44, 45, 52, 56, 60, 64, 66, 67, 70, 78, 81, 82, 84, 86, 89-91, 95, 99, 102, 109, ... 111, 115, 117
going ... 25, 33, 36, 48-51, 56, 61, 62, 82, 87, 93, 95, 102, 111-113
gone ... 52, 88
good ... 21
Grabert ... 42, 55, 56, 59, 74, 104
graduate ... 10
grants ... 19
Gras ... 51, 52
group ... 40
gtmcneill ... 35
Guard ... 116, 117
guess ... 10, 32, 111

**Word ... Page**

guide ... 33, 82
guided ... 15
guidelines ... 15, 22, 32, 80
Gulf ... 65, 99

**H**

half ... 53
Hammond ... 8
hand ... 36-38, 40, 57, 64
handle ... 64
handles ... 75
hands ... 17, 54
handwriting ... 84
Harvey ... 86-88, 90, 94, 99, 100
head ... 43
headed ... 51
hear ... 56
heard ... 95
hearsay ... 23
heavy ... 81
Heck ... 43, 71, 104, 105
help ... 15, 21, 31
helped ... 32
herein ... 60
hire ... 12
hired ... 15, 31
hour ... 92
hours ... 30, 101, 106
house ... 15
Houston ... 32
hurricane ... 86, 87, 90, 113
hypothetical ... 63, 84
Hypothetically ... 97

**I**

identified ... 53
identifying ... 77
immediate ... 19
implicated ... 102
impose ... 115
improper ... 84
inboard ... 48, 54
Inc ... 12, 15-17, 19, 23, 24, 26, 28, 45, 58, 62, 68, 71, 72, 75, 76, 79, 95, 106
Inc. ... 12, 15-17, 19, 23, 24, 26, 28, 45, 58, 62, 68, 71, 72, 75, 76, 79, 95, 106
incorporate ... 92
Incorporated ... 8, 9, 11, 14-16, 23, 32, 69, 78
incorrect ... 44, 49, 50
indemnity ... 115
indicated ... 16, 22, 52, 66, 68, 69
Indicating ... 29, 33, 36, 39, 40, 72
indication ... 49
indirect ... 103
indirectly ... 108
individually ... 115
Industrial ... 44, 49-52, 60, 61, 69, 70, 87, 88, 91, 92, 94, 98, 99, 109
industry ... 12, 15, 22, 23
infractions ... 18
ING4727 ... 43, 44

# DEPO. OF GERALD THOMAS MCNEILL

MINDEX by Kenson

| Word ... Page | Word ... Page | Word ... Page | Word ... Page | Word ... Page |
|---|---|---|---|---|
| ING4745 ... 43 | 103, 110 | management ... 18 | Non ... 21, 71, 77 | owners ... 11-13, 15-20, 22, |
| Ingram ... 63, 80, 95-98 | known ... 60 | maneuver ... 53 | nor ... 58 | 24, 26, 29, 64, 70, 73, |
| Ingram4727 ... 49 | knows ... 67, 116, 117 | Manual ... 14, 18, 112 | normal ... 28, 30, 40, 47, 48, | 75, 79, 81, 89, 90 |
| initial ... 32, 79 | **L** | many ... 43, 52, 85, 115 | 62, 85 | ownership ... 108 |
| initiated ... 89 | 1949 ... 12, 20 | Mardi ... 51, 52 | North ... 8, 51, 99 | owns ... 105 |
| input ... 94 | labeling ... 70, 77 | marine ... 11, 15, 22, 24, 26, | northbound ... 50, 51 | **P** |
| ins ... 37, 39-41 | laborious ... 54 | 112 | notes ... 49, 104 | p.m. ... 118 |
| inside ... 54 | Lafarge ... 13, 44-47, 49, | mark ... 111-113 | Notice ... 8, 102, 115 | P.O. ... 107 |
| insofar ... 101, 106 | 53, 55, 57-59, 61-65, | Marrero ... 107 | notify ... 106 | packet ... 14 |
| inspect ... 28-30 | 67-70, 76, 80, 83, 85, | marrying ... 10 | numbered ... 113 | pad ... 48, 49 |
| inspected ... 70 | 92, 95, 97, 103, 106, | match ... 92 | numbers ... 46, 49, 50 | paid ... 75, 108 |
| inspection ... 16, 24, 27, 29, | 111, 115, ... 116 | material ... 89 | **O** | paperwork ... 77 |
| 31-33 | Lake ... 49 | McNeill ... 8-10, 35, 38, 39, | Oak ... 8 | parenthesis ... 43, 44 |
| inspections ... 19, 20, 27, 30, | land ... 109 | 53, 74 | Object ... 21, 24, 31, 33, 55, | partially ... 74 |
| 31, 33, 80, 104 | Larry ... 101, 109 | means ... 25, 26, 53, 67, 87 | 62, 66, 67, 70, 71, 77, | parties ... 20 |
| inspector ... 79 | lawyer ... 71 | meant ... 32 | 81, 83, 84, 89, 91-93, | pass ... 68 |
| inspects ... 76 | LD ... 43, 44 | meeting ... 17, 104 | 103, 113 | passed ... 84 |
| instruct ... 81, 83 | learned ... 86 | meetings ... 15, 16, 27, 77 | Objection ... 24, 25, 55, 56, | passes ... 43 |
| instructed ... 62, 67, 70, 93 | leave ... 53 | member ... 16, 22, 77 | 67, 108-110 | past ... 20 |
| instructions ... 62, 63, 81, | left ... 38, 40, 61, 68, 104, | members ... 15, 16, 40, 42, | objections ... 8 | Patrick ... 10, 38, 39 |
| 82, 84, 104 | 106 | 43, 55, 74 | obligations ... 15 | pay ... 75 |
| Instructor ... 10 | legal ... 48, 49, 72 | method ... 34, 88 | obtain ... 18, 70 | people ... 12, 22, 42, 51, 74 |
| insurance ... 112, 115 | Liability ... 96, 112 | Mexico ... 65 | occasion ... 28 | percent ... 34, 35, 105 |
| insured ... 72, 73, 75 | light ... 45, 49, 50, 54, 57, | Mile ... 43, 45, 46, 51-53, | occasions ... 48 | period ... 43, 76, 78, 79, 81, |
| insureds ... 72, 73 | 62, 63, 66, 67, 91-93 | 68, 91, 93 | occur ... 28 | 98, 113 |
| inter ... 107, 108 | limit ... 117 | Mileboard ... 43, 61 | occurred ... 78 | periods ... 88 |
| interest ... 74, 107, 108 | line ... 44 | miles ... 51, 61, 88 | occurrence ... 65 | permission ... 19 |
| interim ... 79 | lines ... 53, 58, 64, 65, 81, | mine ... 35, 49, 50 | odd ... 54 | person ... 48, 59 |
| interpose ... 55 | 103, 105, 106 | minor ... 18 | Office ... 27, 30, 31, 107 | Personal ... 10, 103, 108, |
| interrupt ... 45 | list ... 46, 86, 90 | mis ... 53, 113 | officer ... 16-20, 27, 29 | 109 |
| interview ... 74 | listed ... 42, 44, 45, 85 | missing ... 37, 102, 115 | often ... 28 | personally ... 76, 77, 88, 103, |
| interviewed ... 74 | Lizana ... 72, 112 | Mississippi ... 43, 50 | onboard ... 70 | 108, 117 |
| Intracoastal ... 98, 99 | load ... 43, 47, 57, 66 | money ... 28, 92 | one ... 13, 20, 21, 27, 30, 33, | personnel ... 18, 55, 59 |
| investigation ... 116, 117 | loaded ... 44, 47, 49, 54, 57, | monitor ... 88 | 34, 38, 39, 41-43, 48, | persons ... 12 |
| investigations ... 117 | 58, 60 | monitoring ... 88 | 52-54, 59-61, 69, 71, | Phase ... 109, 110 |
| invoice ... 40, 41, 64, 92, 96, | located ... 32, 36 | month ... 15 | 72, 79, 84-86, 90, 96, | phone ... 34, 37, 68 |
| 98, 111 | Lock ... 50, 51 | months ... 16 | 99, ... 105, 107, 108, | Physical ... 107 |
| invoices ... 33, 34, 40 | Lockmaster ... 88 | moor ... 65, 105 | 113, 115, 117 | pick ... 60, 95-97 |
| invoke ... 102 | locks ... 40, 44, 45, 49-51, | moored ... 53, 54 | ones ... 16, 28 | picked ... 44, 45, 98 |
| issued ... 78, 112 | 60-62, 88, 92, 95 | mooring ... 54, 57, 58, 64, | ongoing ... 29 | piece ... 36 |
| issuing ... 22 | log ... 36, 39, 41, 42, 44, | 65, 68, 83 | online ... 78 | pilot ... 17 |
| items ... 77, 106 | 48, 49, 53, 63, 66, 68, | moorings ... 108 | onus ... 102 | piping ... 77 |
| **J** | 69, 92, 100, 101, 112, | moot ... 114 | operate ... 21, 28, 43 | place ... 51, 53, 55, 56, 69, |
| January ... 9, 10, 78 | 113 | morning ... 37, 85 | operated ... 43 | 79, 83 |
| JECK ... 86, 105 | logs ... 33, 34, 39-41, 63, | Motion ... 8, 114, 115 | operation ... 10, 22, 52, 60, | plumbing ... 70 |
| Jeff ... 56, 104 | 66, 69, 70, 85, 86, 96, | motor ... 88 | 63, 81, 82, 93 | police ... 117 |
| job ... 9, 13, 28, 34-39, 42, | 98, 100-102, 112 | mouth ... 12 | operations ... 12, 28, 30, 48, | policies ... 14, 16, 20, 23, 24, |
| 45-48, 54, 63, 64, 68, | long ... 9, 10, 43, 80 | move ... 24, 48, 62-64, 98 | 60, 61, 64, 108, 110, | 72, 73, 112 |
| 69, 92, 97, 100, 108 | look ... 16, 36, 43, 44, 63, | moved ... 63 | 111 | policy ... 15-19, 23-25, 31, |
| jobs ... 47, 85 | 85, 100 | movement ... 116 | operator ... 105 | 32, 72, 73, 75, 112, |
| Joe ... 10-12, 18-20, 23, 24, | looked ... 65, 69, 101 | movements ... 39 | operators ... 13, 55, 76, 81, | 113 |
| 26, 28, 33, 34, 40, 41, | looking ... 42, 63, 68-70, | moving ... 47, 82 | 82, 88-90, 112 | Pontchartrain ... 49 |
| 73 | 89, 95, 101 | much ... 52, 67 | opposite ... 54 | Port ... 69 |
| John ... 117 | loose ... 103, 108 | multiple ... 31, 112 | opposition ... 114 | position ... 27, 103 |
| Joseph ... 8, 9, 11-17, 19, 23, | Louisiana ... 8, 9 | **N** | oral ... 115 | positioning ... 91 |
| 24, 26, 28, 33, 40, 45, | lower ... 36, 38, 52 | named ... 56, 72, 73 | Order ... 8, 63, 77, 114 | positions ... 53, 54 |
| 58, 62, 68, 69, 71-73, | lunch ... 74 | names ... 52, 59 | orders ... 63, 83 | positively ... 89 |
| 75, 76, 78, 79, 81-83, | **M** | national ... 22 | ordinarily ... 64 | possibility ... 46, 95 |
| 89, ... 95, 96, 106, 112 | mail ... 34, 35, 41 | navigating ... 64 | organization ... 22 | Post ... 107 |
| journal ... 33 | mails ... 34 | navigation ... 82 | Orgulf ... 52 | potential ... 67, 89 |
| **K** | main ... 82 | navigational ... 15 | originated ... 59, 90 | precaution ... 67 |
| KARCHE ... 13, 86, 99, 105 | maintain ... 79 | NCF ... 116 | Orleans ... 69 | precautions ... 65, 81 |
| Katrina ... 88 | major ... 19 | near ... 51, 52 | outcome ... 20 | preceding ... 21 |
| keeps ... 70 | make ... 8, 16, 19, 24, 27, | nearest ... 92 | overheard ... 47 | prediction ... 65 |
| Kirby ... 13, 34 | 28, 39, 62, 77, 89, 90, | necessary ... 32, 54, 55 | own ... 11, 74, 89, 104, 105 | predictions ... 66 |
| knowledge ... 14, 19, 25, 30, | 94, 108, 111, 115 | needed ... 114 | owned ... 74 | prepare ... 70 |
| 48, 50, 55, 58, 60, 61, | making ... 27, 33, 94 | neither ... 107 | owner ... 16, 18-20, 23, 43, | prepared ... 33, 114 |
| 67, 74, 79, 81, 91, 95, | man ... 77 | New ... 69 | 67, 71, 72, 75, 87, 102, | prepares ... 38 |
| | | nights ... 30 | 105, 107, 108 | presence ... 56 |

# DEPO. OF GERALD THOMAS MCNEILL

Word ... Page

present ... 13, 74
presented ... 72, 100
president ... 9, 10, 23, 39, 54, 95
presumption ... 102
previous ... 23, 32, 47
previously ... 36, 54, 61, 71, 80
prior ... 21, 22, 93, 113
privilege ... 56
privy ... 67
problem ... 115
problems ... 89
Procedure ... 25
Procedures ... 4, 16, 23, 24, 31, 32, 112
proceed ... 115
produced ... 14, 22, 72, 73, 83, 111-113
producing ... 8
Production ... 111
professor ... 21
program ... 13, 15, 19, 22, 26, 32, 77
proper ... 78, 102
Protective ... 8, 114
provide ... 58, 72
provided ... 36, 67, 102
public ... 116
pulled ... 57
putting ... 44, 47

**Q**

qualification ... 70
qualified ... 70, 78
quality ... 15
quarter ... 15, 16, 28, 30, 31
quarterly ... 27, 29, 79, 80, 104
quarters ... 53
quit ... 77

**R**

radio ... 88
rather ... 26
Raymond ... 55, 56
RCP ... 16, 23, 25-28, 70, 71, 76, 78, 79
re ... 54, 57
realize ... 99
reason ... 48, 54, 62, 63, 116
reasons ... 10
receive ... 28, 31, 32, 34, 35, 40, 65, 79, 80
received ... 34, 45, 63, 65, 100
receives ... 28
recognize ... 48, 84
recorded ... 35, 83, 84, 106
records ... 16, 18, 78, 83, 95, 101, 104
rectangle ... 36
rectangles ... 36
referencing ... 14
referred ... 14
refers ... 13
reflects ... 66
REGINA ... 41-43, 52, 53, 55, 61, 62, 66-68, 70, 74, 76, 79, 81, 99, 100,

105, 111, 112
regular ... 30, 47, 75, 95
regularly ... 99
regulating ... 24
regulation ... 24, 25
regulations ... 22-24
relation ... 51
relationship ... 11, 80, 108
relationships ... 24, 29, 80
relative ... 21, 23, 33, 34
release ... 57
releasing ... 53
reliance ... 112
relief ... 17
remedies ... 20
replacing ... 53
report ... 17, 31, 37, 38, 45, 46, 68, 80
reporter ... 8
reports ... 104
reprimand ... 18
Request ... 14, 63, 68, 83, 96, 111-113
requested ... 67, 69, 70, 92
requests ... 24, 113
require ... 115
required ... 13, 15, 23, 24, 39, 57
requirement ... 73
requirements ... 16, 115
requires ... 114
reserve ... 8, 9, 113, 114
responded ... 114, 115
response ... 14, 17, 41, 44, 46, 52, 54, 58-60, 84, 86, 91, 111-113
responsibilities ... 15
responsibility ... 58, 64, 79
Responsible ... 13, 15, 16, 22, 23, 26, 77
responsive ... 71, 77, 113
responsiveness ... 8
result ... 18
resulting ... 20
resume ... 102
return ... 111, 113
returned ... 106
Richard ... 43, 71
rights ... 113
river ... 43, 49-51, 60-63, 107
Road ... 107
ropes ... 58
Rouge ... 100
round ... 48
route ... 86
row ... 84
run ... 108
running ... 93
runs ... 99

**S**

safety ... 15-17, 70, 77
sat ... 55, 56
satisfied ... 114, 115
save ... 8
scenario ... 48
schedule ... 30
scheduling ... 114
scope ... 62, 63, 117

Scott ... 17, 29, 32, 35, 39, 59, 84, 90, 104
scratch ... 48, 49
second ... 18, 36, 68, 113
secondary ... 103
secure ... 66, 82, 83, 87, 95
secured ... 50, 54, 58, 86
see ... 15-17, 19, 37, 39, 41, 42, 46, 63, 79, 92
seeing ... 69, 96
seek ... 27, 28, 114
sent ... 76
September ... 102
serious ... 110
service ... 94
services ... 111
serving ... 102
session ... 17
set ... 20, 32, 103
seven ... 85
several ... 24, 41, 80
SHANE ... 86
sheet ... 27, 30, 33, 36, 39, 40, 48
sheets ... 97
show ... 36, 41, 95-97, 101
Showing ... 37, 101
shown ... 86
shut ... 95
side ... 36, 38, 51, 109
sign ... 8, 9, 18, 29
signature ... 18
signing ... 8
similar ... 93, 96, 97
simply ... 113, 114
single ... 24, 31
situation ... 13, 47
six ... 84, 85, 88
sling ... 53
son ... 10, 38
sorts ... 116
south ... 51, 99
Southeastern ... 9, 10
speaks ... 66
special ... 67, 81, 83, 104
specialized ... 31
specific ... 25
specified ... 26
Speculative ... 67, 92
square ... 36, 83, 96
squares ... 35, 37, 83, 84
staffed ... 59
stairs ... 77
Stamp ... 113
stand ... 21
standard ... 15, 23
standards ... 19, 20, 112
Star ... 61
start ... 8, 48, 69, 82
started ... 12
starting ... 41
starts ... 43-45
state ... 9, 56
statements ... 74
status ... 16, 53, 79
stayed ... 10
steps ... 70
stipulation ... 8, 82
Stop ... 69

stopped ... 100
Street ... 8
strictly ... 11
structure ... 30
subrogation ... 73
subsequent ... 116
supports ... 80
surcharge ... 106
swap ... 45-48, 59, 62, 63, 66
swapping ... 53, 91
sworn ... 8
system ... 70

**T**

Tab ... 14, 36
taking ... 53, 54, 57, 70, 92
teach ... 10
telephone ... 34, 35, 100
television ... 88
telling ... 26, 75
tells ... 37
Templet ... 42, 74
term ... 10, 45
terminal ... 67
testimony ... 92
testing ... 70
These ... 20, 24, 27, 30, 31, 33-35, 37, 41, 70, 76, 86, 87, 113
Thigpen ... 42, 74
third ... 16
Thomas ... 8-10, 38
three ... 16, 19, 40, 41, 53, 72, 76, 78, 79, 84-87, 89, 99, 111
tie ... 58, 64, 93
tied ... 52, 53, 57
Tillery ... 56, 104
time ... 9-11, 27-31, 35-40, 42-44, 55, 59, 62, 65, 69, 71, 76, 83, 86, 88, 90-95, 100, 105
times ... 99, 106, 115
tipping ... 49
title ... 9, 17, 27
today ... 8, 105
took ... 39, 55, 56, 79
top ... 38, 42, 44, 64, 66, 91
topped ... 55, 57, 59
topping ... 49, 53, 54, 57, 66, 91
tow ... 11, 49, 68, 82, 93
toward ... 49, 50
towards ... 15
Towing ... 11, 22, 24, 26, 42, 43, 71, 104, 105, 112
track ... 77
train ... 32
training ... 16, 17, 31
transferred ... 46, 89
transmission ... 92
transmit ... 83, 88, 91
transmitted ... 68, 92
transporting ... 92
traveled ... 44
truth ... 8
Turn ... 54
turned ... 57
turning ... 53
turns ... 102

TV ... 65, 88, 89
twice ... 70
two ... 34, 39, 41, 51, 53, 55, 57, 61, 84-86, 89, 91, 99, 100, 106, 113
tying ... 51

**U**

ultimate ... 12
underneath ... 45, 105
understood ... 56, 58
underway ... 64
undo ... 54
Unique ... 42, 43, 71, 75-77, 80, 81, 91, 104, 107, 112
University ... 9
unless ... 12, 28
unloaded ... 47, 60
UNO ... 10
untie ... 53
untied ... 57
unusual ... 14
upper ... 37, 52
upriver ... 50-52, 60, 61, 93
user ... 12
users ... 13, 26
uses ... 105
Using ... 12, 32
utilization ... 23
utilize ... 32
utilized ... 21, 65
utilizing ... 20

**V**

varies ... 85
verbal ... 11, 12, 19, 20, 23, 28, 29, 34, 75, 79, 80, 87
verify ... 79, 86
vessel ... 11-13, 15, 17, 19, 20, 25, 26, 28, 30, 38, 42, 45, 46, 54, 58, 64, 67-70, 72, 74-76, 78, 81-83, 88-90, 92-95, 98, 99, 101, 105, 106, 110, 113
vessels ... 11-16, 18, 20, 24, 26-31, 34, 41-43, 58, 63-65, 69, 72, 74, 76, 78, 81-83, 85-89, 94, 98, 100, ... 101, 105, 115
vicinity ... 60
vie ... 35, 111
violated ... 20
violations ... 19
vis ... 35, 111
void ... 24

**W**

wait ... 8
waiting ... 94
waiver ... 56
walk ... 16
wall ... 109
Waterman ... 51, 52, 61, 68, 69
Waterway ... 98, 99
waterways ... 13, 15, 22, 24, 76, 112

**DEPO. OF GERALD THOMAS MCNEILL**

| Word ... Page | Word ... Page | Word ... Page | Word ... Page | Word ... Page |
|---|---|---|---|---|

weather ... 48, 65, 67, 81, 82,
    88, 89, 94
WEBB ... 109, 110, 116
week ... 30
weekend ... 30, 39, 69, 85,
    90
welcome ... 118
west ... 51, 98, 99
westbound ... 50
whereby ... 108
whole ... 8, 70
WIEDEMANN ... 8, 9, 14,
    18, 21, 24, 25, 31, 34,
    37, 53, 55, 56, 62, 66,
    67, 70-74, 77, 78, 81,
    84, ... 87, 89, 91, 92,
    94, 97, 99, 101-103,
    107, 109, 110, 113-117
will ... 16-18, 20, 23, 28, 33,
    36, 47, 48, 51, 75, 78,
    79, 85, 93, 111, 112,
    115
wise ... 61
WITNESS ... 8, 18, 21, 25,
    31, 36, 55, 62, 66, 67,
    70, 71, 73, 78, 84, 89,
    92, 93, 97, 99, 101,
    107, 109, ... 110, 112,
    114, 116-118
Word ... 12, 43, 84
words ... 12, 87
work ... 10, 11, 13, 14, 17,
    23, 26, 28, 30, 36, 42,
    70-72, 75, 76, 105
worked ... 26, 42
working ... 18, 28, 69, 94
works ... 30
worksheet ... 35-38, 40, 45,
    46, 66, 68, 69, 96, 98,
    106, 112
worksheets ... 85
World ... 51, 52
wound ... 109
write ... 17, 31, 32, 36, 46,
    48
written ... 11, 13, 14, 21, 25,
    27, 29, 31, 34-36, 38,
    45, 46, 73, 75, 83, 115,
    116

**Y**

year ... 16, 43, 48, 76, 78
years ... 9, 10, 12, 19, 23, 43,
    52, 54, 76, 78-80, 95,
    104
yesterday ... 114

**Z**

Zito ... 52, 59-61

120

## C E R T I F I C A T E

1    This certification is valid only for a

2    transcript accompanied by my original signature and

3    original blue stamp on this page.

4         I, Sharon Waldrup Black, Certified Court

5    Reporter, in and for the State of Louisiana, as the

6    officer before whom this testimony was taken, do hereby

7    certify that GERALD THOMAS McNEILL, after having been

8    first duly sworn by me upon authority of R.S. 37:2554, did

9    testify as hereinbefore set forth in the foregoing one

10   hundred nineteen (119) pages;

11        That this testimony was reported by me in the

12   Stenographic (voice-writing) method, was prepared and

13   transcribed by me or under my personal direction and

14   supervision, and is a true and correct transcript to the

15   best of my ability and understanding;

16        That I am not related to counsel or to the

17   parties herein; am not otherwise interested in the outcome

18   of this matter; and am a valid member in good standing of

19   the Louisiana State Board of Examiners of Certified

20   Shorthand Reporters.



OFFICIAL SEAL
SHARON WALDRUP BLACK
Certified Court Reporter
in and for the State of Louisiana
Certificate Number 21009
Certificate expires 12-31-08

Sharon Waldrup Black, CCR
Certified Court Reporter
Louisiana License #21009

PETER CARUSO & ASSOCIATES (504) 432-3656
P.O. BOX 10741, JEFFERSON, LOUISIANA 70181

BARGE000681