# EXHIBIT 13



KDON Marine Consulting
8876 Gulf Freeway, Suite 120
Houston, Texas 77017

(713) 944-0966                                        Fax (713) 944-2546

January 17, 2007                                                              <u>**Via Email**</u>

Lawrence D. Wiedemann
Wiedemann & Wiedemann
821 Baronne Street
New Orleans, Louisiana 70113

Ref:   In the Matter of the Complaint of Ingram Barge Company, as Owner of the *ING 4727*, Petitioning for Exoneration From or Limitation of Liability; In the United States District Court, Eastern District of Louisiana
KDON File:  06538

Dear Mr. Wiedemann:

### 1.   INTRODUCTION

At your request I have been engaged by your firm to render opinions regarding the circumstances surrounding the breakaway of the barge *ING 4727* from the Lafarge North America Inc. (LNA) facility, Inner Harbor Navigation Canal (IHNC) a/k/a Industrial Canal, New Orleans, Louisiana, during hurricane Katrina on or about the morning of August 29, 2005.

### 2.   BASIS OF OPINION

In order to render my opinions outlined below I have reviewed and considered the following information:

#### 2.1   Attorney Supplied Information

- Various photographs;
- Transportation Agreement: Ingram contract with Lafarge;
- Service Agreement: Zito Fleeting, LLC contract with Ingram Barge Company;
- Logs of Unique Towing;
- Joseph C. Domino, Inc. Invoice, dated 8/27/05;
- Joseph C. Domino, Inc., Policies and Procedures Manual;
- Certificate of Documentation for the *REGINA H;*
- Certificate of Insurance: Gulf Coast Marine, LLC;
- Hull Policy: Lizana/Unique Towing, Inc., Richard C. Heck & Joseph M. Lizana;

- Policy of Insurance: Heck/Lizana/Unique Towing, Inc.;
- Deposition of Gerald McNeill, Joe Domino, Inc., Tug Broker;
- Exhibits to McNeill deposition;
- Deposition of Captain Grabert, Captain of the *REGINA H*;
- Deposition of Eric Thigpen, deckhand;
- Deposition of Daniel Mecklenborg, Ingram Corporate Representative/House Counsel;
- Deposition of Terry Adams, eyewitness;
- Deposition of Ed VanderMuelen, Lafarge Corporation Representative;
- Deposition of Ed Busch, Lafarge Assistant Terminal Manager;
- Deposition of Earl Smith, Lafarge Employee;
- Deposition of Pankaj Shah, Ingram Barge Company Vice President;
- Deposition of Scott Nobles, Ingram Barge Company Vice President;
- Deposition of David Sehrt, Ingram Barge Company Senior Vice President;
- Deposition of David Feagley, Ingram Barge Company Operations Manager;
- Coast Guard Sector New Orleans Maritime Hurricane Contingency Port Plan;
- Coast Guard Sector New Orleans Hurricane Plan;
- Greater New Orleans Barge Fleeting Association Guidebook;
- Records of National Hurricane Center;
- National Hurricane Center: KATRINA Graphics Archive;
- U.S. Coast Guard documents:
  1. Press Release: Media Advisory: Coast Guard Prepares for Hurricane Katrina, dated 8/27/05;
  2. Press Release: Media Advisory: Web site launched to provide latest Coast Guard Information on Hurricane Katrina Operations, dated 8/27/05;
  3. Press Release: Coast Guard Urges Mariners to Prepare for Hurricane Katrina, dated 8/27/05;
  4. Marine Safety Bulletin: Set Port Condition WHISKEY, dated August 2005;
  5. Marine Safety Information Bulletin 22-05, dated 8/27/05;
- Database printout of towing vessels used by Ingram (about 25 listed in Louisiana for August 2005);
- Daily barge position reports;
- State of Emergency/Parish Evacuation Orders;
- U.S. Coast Guard Local Notice to Mariners, dated August 24 and September 14, 2005;
- Weather Advisories from Impact Weather, Ingram Bates numbers: 0649, 1650, 0651, 0665, and 0668;
- Ingram Barge Company list of towing vendors utilized between June and December 2005;
- Lafarge North America Responses to Interrogatories/Request for Production of Documents;
- Lafarge Response to Request for Admissions with attachments:
  1. Barge *ING 4727*, Barge Unloading Report, dated 8/26/05;
  2. NWO Terminal Report, dated 8/22/05;
  3. Fleet Picture, dated 8/9/05;
  4. Lafarge Barge/Truck/Rail report, dated 5/16/05;
  5. Statement of Ed Busch;

BARGE000683

   6. Statement of Earl L. Smith; and
   7. New Orleans Terminal Hurricane Preparation Checklist; and
- Ingram Responses to Request for Admissions.

## 2.2     Additional Considerations

In addition to the above, I have reviewed safety procedures, federal rules and regulations, the Coast Guard online database, conducted online research for information regarding Hurricane Katrina, reviewed Coast Guard Marine Safety Bulletins, and various news reports regarding Hurricane Katrina, visited and inspected the New Orleans Lafarge facility, remnants of the mooring lines used to moor the *ING 4727* and the *ING 4745* together and inspected the lower hull of the *ING 4727*, and drawn on personal experience and training; all for the purpose of rendering opinions as to the cause or causes of the breakaway of barge *ING 4727*.

## 3.     CIRCUMSTANCES

This case involves the breakaway of the uninspected and undocumented hopper barge *ING 4727* from the Lafarge North America, Inc. cement facility, New Orleans, Louisiana during Hurricane Katrina.  The *ING 4727* is of the following particulars.

| | |
|---|---|
| Registration/VIN: | Undocumented |
| Service: | Barge |
| Operator: | Ingram Barge Company |
| Date of Build: | 1990 |
| Propulsion: | Non-self-propelled |
| Hull Material: | Steel |
| Gross Tons: | 960 tons (Estimated) |
| Net Tons: | 960 tons (Estimated) |
| Length: | 200.0 ft. |
| Breadth: | 35 ft. |
| Depth: | 12 ft. |
| Light draft: | 1'4.5" |

At the time of the breakaway the *ING 4727* was empty and moored outboard and alongside the loaded *ING 4745* at the Lafarge North America, Inc. facility located on the west side of the Inner Harbor Navigation Canal, between the Florida Avenue and Claiborne Avenue bridges, New Orleans, Louisiana.

## 3.1    Breakaway

## 3.1.2    General

During the early morning hours of August 29, 2005, at about 0530-0600, the *ING 4727* broke free of its moorings during Hurricane Katrina, drifted south in the IHNC and allided with the east side levee of the canal causing a breach in the levee, which precipitated a catastrophic inundation of the area.  The *ING 4727* passed through the levee, eventually coming to rest in the adjacent residential neighborhood within the Lower Ninth Ward.

The National Hurricane Center, Hurricane Katrina Intermediate Advisory Number 26A, 6 AM CST Monday August 29, 2005, reported that the hurricane was located about 70 miles south-southeast of New Orleans, Louisiana. The Advisory indicated that maximum sustained winds were near 145 MPH with higher gusts, a category four hurricane, and that hurricane force winds extended outward up to 120 miles from the center. The Advisory also indicated that coastal storm surge flooding of 18 to 22 feet above normal tide levels could be expected near and to the east of where the center makes landfall. It was predicted that some levees in the Greater New Orleans area could be overtopped.

Ingram Barge Company is a privately held common carrier barge company. Ingram owns and/or operates approximately 4,000 towing vessels and barges operating on the inland waters of the United States. Ingram is a member of the American Waterways Operators (AWO) and a participant of the American Waterways Operators' "Responsible Carrier Program"

The *ING 4727* had been delivered to the Lafarge facility, loaded with oil field grade cement, on the morning of August 26, 2005, at about 1125 hours by the towing vessel *CONNIE Z*, operated by Zito Fleeting, LLC, an agent for Ingram Barge Company. Lafarge completed unloading the *ING 4727* on the morning of August 27th. Mr. Ed Busch, Lafarge Assistant Terminal Manager, testified that he telephoned Zito Fleeting at about 0900 hours and, not having reached anyone, left a voice message that the *ING 4727* was ready to be picked up. The *ING 4727* was never picked up by Zito Fleeting, LLC before the onslaught of Hurricane Katrina.

Mr. Busch testified that during the morning of the 27th Lafarge personnel made preparations for the expected arrival of Hurricane Katrina. At that time there were 7 barges located at the Lafarge facility arranged in two (2) tiers; one tier of 5 loaded barges was secured to the north end of the facility dock; and the other tier, adjacent to the north tier, consisted of two (2) barges, one loaded and the *ING 4727*, which, by that time was empty and moored against the dock. Witness testimony indicates that the difference in freeboard (height) between the *ING 4727* and the *ING 4745* was about 6 feet. The two barges were reported secured together with 3 one-part mooring lines. Mr. Busch stated that he was concerned about having the empty *ING 4727* on the inside against the dock and the loaded barge on the outside fearing that the *ING 4727* would possibly rise over the dock with the expected storm surge. At about 1000 hours on August 27th, Mr. Busch called Joseph C. Domino, Inc. a towing vessel broker, and requested a towing vessel be dispatched to Lafarge to top around the *ING 4727* and *ING 4745*, placing the loaded *ING 4745* against the dock. Shortly thereafter, about noon on the 27th, Mr. Busch and other Lafarge personnel reportedly secured the facility and barges and evacuated the area.

Mr. Busch testified that prior to the onset of Hurricane Katrina the Lafarge facility's communication capabilities were limited. Mr. Busch stated that telephone service was limited, and email service had been down since some time before the storm. Communications were limited to Nextel cell phone service. Mr. Busch testified that he and other Lafarge personnel were alerted that Hurricane Katrina was heading for New Orleans by family via cell phone calls.

Mr. Gerald McNeill, Joseph C. Domino, Inc., dispatched the towing vessel *REGINA H* to the Lafarge facility to affect the top around of the barges at the Lafarge facility. At about 1425 hours on the 27th, the *REGINA H* arrived at the Lafarge facility, which was at that time abandoned. The *ING 4727* and the *ING 4745* were topped around and secured. Eric Thigpen, deckhand aboard the *REGINA H,* testified that he secured the loaded *ING 4745* to the dock using 3 or 4 mooring lines. Mr. Thigpen testified that he observed that the *ING 4745* and the *ING 4727* were moored together with 3 one-part 2-inch mooring lines; one (1) line on each end and one (1) line about amidships. Both Mr. McNeill and Captain Raymond Grabert, Jr., captain of the *REGINA H,* testified that, had they been asked to remove the ING *4727* from the Lafarge facility, it could have been towed to a fleet in the Mississippi River.

Captain Grabert testified that he assumed that the barges he was instructed to top around had sufficient rigging in place; therefore, he did not bring extra rigging. Deckhand Thigpen testified that he had to search the Lafarge dock for additional lines with which to secure the *ING 4745* to the dock. He, Thigpen, stated that he found one additional line on the dock, which he utilized in securing the two barge tier to the dock.

Mr. Busch testified that he instructed his personnel to secure the barges to the dock in such a manner as to allow for the expected storm surge. Mr. Busch described the arrangement as follows: The mooring line was secured to a mooring bollard affixed to the dock then looped around the cement pilings with 3 loops thence to the cleats or bitts on the barge. Mr. Busch theorized that this method would allow a pay out of the mooring line as the water level rose in the canal. Aerial photographs of the Lafarge facility subsequent to the passage of Hurricane Katrina reveal that the northern most mooring line of the northern tier of the five (5) loaded barges apparently slipped over the piling allowing the northern tier to shift away from the dock toward the southern tier of barges. The Lafarge New Orleans Terminal Hurricane Preparation Checklist requires that all barges be cabled to shore. Mr. Busch's method of securing the barges to the facility dock was also contrary to Lafarge's published procedure.

### 3.1.3   Breakaway Event

Mr. Terry Adams, eye witness, testified that on the morning of August 29, 2005, at about 0530-0600 hours, he witnessed a barge in the canal heading for the levee. Mr. Adams stated that he heard a bang followed within minutes by a tidal wave coming through the levee. Mr. Adams testified that he woke about 0500 hours on the morning of August 29th and when he put his feet on the floor the carpet was wet. He immediately began gathering food, water and other essentials and proceeded to the attic of his house. His house was located at 2604 Deslonde Street, within a half block of the IHNC east levee. Mr. Adams proceeded to the attic and knocked out the attic fan, which was installed in his roof and looked out at the surrounding area. He stated that he could see the levee and the Claiborne Street Bridge and that he could see water coming over and under the levee before the barge hit the levee.

Mr. Adams further stated that after the barge struck the levee the water rose within minutes and flooded his house and that other houses in the neighborhood began floating, drifting and colliding with each other. Mr. Adams was eventually rescued from his roof top on Wednesday, August 31st.

The *ING 4727* eventually came to rest within the Lower Ninth Ward. Post Katrina aerial photographs of the area show the *ING 4727* located in the area just east of the IHNC east levee near the Claiborne Street Bridge.

The *ING 4727* was subsequently cut up into sections and removed from the area.

### 3.1.4   Significant Events Preceding the Breakaway

Available testimony in this case indicates that executives of Ingram Barge Company conducted "Hurricane meetings" on the afternoon of August 26 and the mornings of August 27, 28, and 29, to discuss the trajectory of the oncoming Hurricane Katrina.  Messrs Scott Nobles, Senior Vice President; David Sehrt, Senior Vice President and Chief Operating Officer; Pankaj Shah, Senior Vice President, Customer Service all testified that they discussed the developing weather conditions.  All of the witnesses essentially testified that they were concerned with the Ingram vessels under their direct control.  Third party custodians of barges, such as Lafarge, were allegedly not discussed.  Reportedly, Ingram did not contact or inquire about the condition, status, or mooring arrangements of any of their barges that were in the custody of third parties. Ingram Barge Company had no written hurricane plan.

Mr. Pankaj Shah, responsible for customer service, stated that it is Ingram's policy that once a barge is delivered to a dock or fleet it is then the responsibility of the fleet or facility to take care of the barge.  Ingram was aware that the *ING 4727* was located at the Lafarge facility; however, did not attempt to ascertain the condition of the *ING 4727* or its mooring arrangement.

The Coast Guard, the National Hurricane Center and national and local news organizations all issued a plethora of bulletins, broadcasts, warnings and advisories to the marine industry and to the public at large advising that Hurricane Katrina was a dangerous hurricane and that its expected trajectory would take it toward the Greater New Orleans area.

The *REGINA H*, which was dispatched to top around the *ING 4745* and the *ING 4727*, did not carry extra mooring rigging even though it was evident that the mission to top around the barges was because of the expected hurricane force winds and surge expected in the New Orleans area. The testimony of Mr. Thigpen is that he had to search the Lafarge dock for additional lines with which to secure the barges once they were topped around.  Both Captain Grabert and Mr. Thigpen testified that the *ING 4727* and the *ING 4745* were moored together with only 3 one-part 2-inch polypropylene lines.

### 4.        APPLICABLE STANDARDS AND REGULATIONS

Title 33 Code of Federal Regulations (CFR) Part 162-INLAND WATERWAYS NAVIGATION REGULATIONS, § 162.75, All waterways tributary to the Gulf of Mexico (except the Mississippi River, its tributaries, South and Southwest Passes and Atchafalaya River) from St. Marks, Fla., to the Rio Grande. Paragraph (b) (3) (ii) Waterways: Anchoring or mooring: When tied up individually, all vessels and tows shall be moored by bow and stern lines. Tows shall be secured at sufficiently frequent intervals to insure their not being drawn

away from the bank by winds, currents, or the suction of passing vessels. Lines shall be shortened so that the various barges in a tow will be as close together as possible.

Title 33 Code of Federal Regulations (CFR) Part 6, PROTECTION AND SECURITY OF VESSELS, HARBORS, AND WATERFRONT FACILITIES, § 6.14-2 Condition of waterfront facility a danger to vessel, and § 6.19–1 Responsibility for Security of Vessels and Waterfront Facilities, Primary responsibility. Both regulations cite conditions under which the Captain of the Port finds that the mooring of any vessel to a wharf, dock, pier, or other waterfront structure would endanger such vessel, or the harbor or any facility therein by reason of conditions existing on or about such wharf, dock, pier, or other waterfront structure; however, regardless of the Coast Guard's authority in this regard, the masters, owners, and agents of vessels or other waterfront facility have <u>primary</u> responsibility for the protection and security of such vessels.

United States Coast Pilot 5, Gulf of Mexico, Puerto Rico, and Virgin Islands, 2003, 30th Edition, Chapter 8, Mississippi River, page 302, article (205) Extracts from the rules and regulations for the Inner Harbor Navigation Canal are as follows: Specifically, article (208) Vessels shall not be berthed two abreast alongside any wharves, bulkheads, or clusters, except that small barges or other small craft may be moored two or more abreast when necessary clearances for proper operation of the canal can be maintained, and permission of the Superintendent shall have been obtained. At the time of the breakaway, August 29, 2005, there were 7 barges at the Lafarge facility, 5 loaded barges breasted together in one tier and 2 barges, *ING 4745* and *ING 4727* breasted together adjacent to the 5 barge tier.

Greater New Orleans Barge Fleeting Association's "Standard of Care & Streamlined Inspection Program Guide Book" – This guide book, although not a requirement for vessels moored in the IHNC, provides a comprehensive guide to the proper, safe and adequate mooring methods for fleet and facility operators. On page 17, the guide advises that moorings from high to low fittings should be avoided if the fitting on the lower barge may allow the line to slip off.

Coast Guard Sector New Orleans Hurricane Plan; Enclosure (11) Maritime Hurricane Contingency Port Plan "A Guide to Port Planning and Preparation" Appendix 2- Recommended Precautionary Measures for Barges, Applies to Barges: Moored:

> *"Mooring lines doubled up with due consideration given to the effects of predicted storm surge.* **Special attention should be paid to barges moored in the proximity of bridges."** (Emphasis added) (Note: The Lafarge facility is located between two (2) major bridges used as primary evacuation routes from the Lower Ninth Ward of New Orleans.)

> *"Spare mooring lines and/or wires should be readily available."*

Coast Guard Sector New Orleans Hurricane Plan; Enclosure (11) Maritime Hurricane Contingency Port Plan "A Guide to Port Planning and Preparation" ANNEX C, II. PORT CONDITION X-RAY (48 HOURS BEFORE ANTICIPATED LANDFALL), TASK REQUIREMENT:

> *"(a) Determine the special needs and intentions of vessels moored at the facility*

> *(b) Determine whether vessels desiring to remain moored to the facility during the hurricane will be allowed to do so. Notify the vessel master, vessel agent, and the COTP of the facility's decision."*

Coast Guard Sector New Orleans – Marine Safety Bulletin, Volume V, Issue XXXV, dated August 2005 – This bulletin notified the general maritime industry that <u>Port Condition WHISKEY</u> had been set. The bulletin states: "*All vessels operating below the Huey P. Long Bridge are <u>strongly urged</u> to implement these measures*". The applicable measure, which applied to the *ING 4727* was: "*Mooring lines doubled up with due consideration given to the effects of predicted storm surge. Spare mooring lines and/or wires should be readily available*" The bulletin further recommended to marine operators: "*You are encouraged to review your existing hurricane plan or develop a plan if you do not have one.*" Ingram management all testified that Ingram did not have a hurricane plan nor was one developed prior to Hurricane Katrina.

## 5.   OPINIONS

**5.1**   Subject to receiving additional information or records it is my opinion that the cause or causes of the breakaway of the *ING 4727* from its mooring at the Lafarge facility during Hurricane Katrina and its subsequent alliding with the east levee of the Inner Harbor Navigation Canal was most likely the combination of hurricane force winds and rising water levels in advance of Hurricane Katrina, known to all parties, and the acts and other omissions of the parties discussed herein. Post hurricane aerial photographs reveal that the northern tier of five (5) loaded barges' northern mooring lines slipped or parted allowing the tier of barges to set down and allide with the southern tier of barges, *ING 4727* and *ING 4745*. It is probable that the resultant forces of an allision between the tiers of barges would have caused the 3 single-part mooring lines between the *ING 4727* and the *ING 4745* to part allowing the *ING 4727* to drift uncontrollably in hurricane winds toward the levee. The only eye witness, Mr. Terry Adams, testified that he saw the *ING 4727* drifting toward the levee and heard a loud bang when it allided with the levee wall.

**5.2**   It is my opinion that Ingram Barge Company failed to obtain assurances from third party holders of their barges, such as Lafarge, that the *ING 4727* was indeed prepared for the expected arrival of Hurricane Katrina, such as its position at the facility and its moorings. The professed policy of Ingram was not to contact third party holders of their vessels. Had Ingram made contact with Lafarge and recommended proper mooring procedures, such as doubling up mooring lines and avoiding mooring empty and loaded barges together, it is probable that this breakaway could and would have been prevented.

**5.3**   It is my opinion that Ingram Barge Company failed to have a comprehensive hurricane plan in place prior to the onset of Hurricane Katrina. Had Ingram had a plan it is more likely than not that the plan would and could have incorporated the basic recommendation of the Coast Guard Sector's Hurricane Plan, such as doubling up mooring lines or cables, having spare mooring lines readily available if needed, and avoiding mooring empty and loaded barges together. Even though the Coast Guard

strongly recommended the marine industry review their existing hurricane plan or develop a plan if there were none, Ingram totally ignored that recommendation.

**5.4** It is my opinion that had Ingram Barge Company elected to fleet the *ING 4727* in the Mississippi River rather than deliver it to Lafarge due to the unpredictability of Hurricane Katrina this breakaway could and would have been prevented. The record indicates that Ingram knew of the unpredictability of Hurricane Katrina as early as 0750 hours on August 26, 2005 from an Impact Weather advisory. The record indicates that the *ING 4727* was delivered loaded to Lafarge at 1125 hours on August 26th. If the delivery could not have been prevented due to vessel operations, Ingram could and should have advised that the *ING 4727* not be discharged, which would have been preferable at the time of the onset of hurricane force winds and rising waters because vessels in a fully loaded condition normally fare better than light vessel in hurricanes.

**5.5** Another cause of this breakaway was Ingram Barge Company management's fault in the following non-exclusive particulars, all of which indicate that management had privity and knowledge (in no order of priority):

a. Ingram Barge Company had no hurricane plan, procedures or policies in place to provide guidance to its vessel operating personnel or third party custodians of its vessels, such as Lafarge North America, Inc.;

b. Ingram Barge Company was aware that Hurricane Katrina was forecasted to strike the New Orleans area as early as August 26, 2005, yet took no action to notify or advise third party custodians, such as Lafarge, regarding proper and adequate measures to be taken to secure barges in their custody to prevent possible breakaways from hurricane force winds and expected storm surges;

c. Ingram Barge Company was aware that the *ING 4727* was located at the Lafarge facility, between two (2) major bridges used for hurricane evacuation, and would be exposed to hurricane force winds and rising waters. Yet Ingram took no action what-so-ever to assure themselves that the *ING 4727* was properly secured to withstand the expected arrival of Hurricane Katrina;

d. Ingram Barge Company made a conscious decision not to call any third party, such as Lafarge, to inquire as to the condition or status of their barges. The testimony of Pankaj Shah, Ingram VP Customer Service, is in essence that Ingram does not have concern for barges in third party hands; and

e. Ingram Barge Company management met specifically on at least 4 occasions, August 26, 27, 28 and 29, 2005, to discuss the trajectory of Hurricane Katrina and to make preparations for only those vessels in their custody. Incredibly, knowing full well that Hurricane Katrina was a category four hurricane with predications of a storm surge of 18-22 feet, and that the *ING 4727*, being located in the IHNC, would be exposed to such destructive forces, did nothing to ensure its safety.

BARGE000690

**5.6** It is my opinion that Lafarge North America, Inc.'s New Orleans facility failed to properly moor the *ING 4727* to the *ING 4745* to withstand the hurricane force winds and predicted storm surge expected upon the approach of Hurricane Katrina. The testimony of witnesses indicates that the two barges were moored together with 3 one-part 2-inch polypropylene mooring lines and that the height difference between the two barges was about 6 feet. This mooring arrangement, in my opinion, is totally inadequate to prevent a breakaway during hurricane force winds. Further, it is my opinion that the decision to top around the barges, placing the empty *ING 4727* on the outboard side of the tier, was imprudent, unseamanlike and unnecessarily exposed the empty *ING 4727* to the likelihood of breaking away from its moorings. The fact that there were 7 barges moored at the Lafarge facility and the only barge that broke loose from its mooring was the empty *ING 4727* leads one to the conclusion that had Lafarge not discharged the *ING 4727* it is likely that the breakaway may not have occurred.

**5.7** It is my opinion that Lafarge North America, Inc. violated their own published "Hurricane Preparation Checklist" by not cabling the barges to shore. The testimony of Mr. VanderMuelen indicates that the mooring procedure was changed in practice some years ago to the procedure used by Mr. Busch to prepare the facility for Katrina. It is my opinion that had Lafarge personnel followed the published procedure to cable the barges to shore, as opposed to using soft line to secure the barges to the dock, the northern most mooring line on the 5 barge tier would have held the tier against the dock and not allowed the tier to shift south striking the adjacent 2 barge tier, which included the *ING 4727*.

**5.8** It is my opinion that Lafarge's failure to order Joseph C. Domino, Inc. to remove the *ING 4727* from the facility and tow it to a fleet in the Mississippi River rather than top the two barges around this breakaway could and would have been prevented. The testimony of Mr. Gerald McNeill, Joseph C. Domino, Inc., indicates that *REGINA H* could have towed the *ING 4727* had Lafarge ordered so.

**5.9** It is my opinion that the owners and or operators of the *REGINA H* failed to ensure that the vessel had sufficient rigging and or mooring lines to secure the two barges, *ING 4727* and *ING 4745,* to the Lafarge dock facility. The testimony of Mr. Thigpen indicates that once the barges were topped around he had to search the dock for additional mooring lines to, in his opinion, adequately secure the *ING 4745* to the face of the dock. Further, Captain Grabert and Mr. Thigpen both testified that the two barges were moored with only 3 one-part mooring lines. It is my opinion that it was their duty and responsibility to ensure that the barges were secured in such a manner, i.e. doubled up mooring lines, to withstand the expected hurricane force winds and tides of Hurricane Katrina, which they did not do. These failures on the part of the owners, operators and crew of the *REGINA H* rendered the *REGINA H* unseaworthy. Further, it is my opinion that the owners of the *REGINA H* had privity and knowledge that the vessel and crew were ill prepared and lacked the necessary rigging and mooring lines to affect a safe mooring for the barges.

BARGE000691

**5.10** It is my opinion that Ingram Barge Company, Lafarge North America, Inc. and Unique Towing, Inc all violated the provisions of 33 CFR 162.75 (b)(3)(ii) Anchoring and Mooring: for their failure to ensure that the *ING 4727* was adequately moored to withstand the anticipated hurricane force winds of Hurricane Katrina. The available testimony in this case clearly demonstrates this to be the case.

**5.11** It is my opinion that Ingram Barge Company, Lafarge North America, Inc. and Unique Towing, Inc. all violated the provisions of 33 CFR 6.19, Primary responsibility, for their failure to ensure that the *ING 4727* was secure and safe at the Lafarge facility. Again, the available testimony in this case clearly demonstrates this to be the case.

**5.12** It is my opinion that Lafarge North America, Inc. was in violation of the Rules and Regulations for the Inner Harbor Navigation Canal, which extracts are published in the United States Coast Pilot, Volume 5, Chapter 8, Mississippi River. Specifically, Article (207), which states in part:  Vessels shall not be berthed two abreast alongside any wharves, bulkheads, or clusters. The regulation exempts small barges, which the *ING 4727* is not. At the time of the breakaway there were two tiers of barges; one tier of 5 loaded barges and one tier of 2 barges.

**5.13** It is my opinion that Lafarge North America, Inc. failed to adhere to the provisions of the Coast Guard Sector New Orleans Hurricane Plan; Enclosure (11) Maritime Hurricane Contingency Port Plan "A Guide to Port Planning and Preparation" Appendix 2- Recommended Precautionary Measures for Barges, and ANNEX C, II. PORT CONDITION X-RAY (48 HOURS BEFORE ANTICIPATED LANDFALL), TASK REQUIREMENT. Specifically, Lafarge failed to double up mooring lines, have spare mooring lines and/or wires readily available, or notify Ingram or the Coast Guard of their intentions. The available testimony in this case indicates that the Lafarge facility personnel did not double up mooring lines, have spare mooring lines available, nor did they notify Ingram or the Coast Guard of their intentions regarding securing the barges at their facility for the oncoming Hurricane Katrina.

**5.14** It is my opinion that the Ingram Barge Company's barge *ING 4727* was unseaworthy at the time of the onset of hurricane force winds and storm surges of Hurricane Katrina for all the reasons outlined above.

**6.    PROFESSIONAL SERVICE FEES**

Fees for my professional services are as follows:

- For review, investigation, issuing report or court appearance:  $350.00 per hour

**7.    CURRICULUM VITAE**

A copy of my Curriculum Vitae and List of Cases is attached hereto.

11

BARGE000692

**8.     PUBLICATION, BOOKS, AND ARTICLES PUBLISHED**

I have not published or written any books, publications or articles during my career.

**9.     COMMENTS**

The above opinions are based on more than 40 years of marine experience, training, education, service aboard vessels, inspection and examination of vessels, and investigation of hundreds of marine casualties to determine cause, and enforcement of U.S. Statutes with regard to vessel and personnel safety. I am a Commander in the U.S. Coast Guard (Retired). I hold a Master 1600 Gross Ton Oceans, Second Mate Unlimited Tonnage and Master Towing Vessels Oceans and Western Rivers license issued by the U.S. Coast Guard. I am also a Coast Guard certified instructor of navigation, seamanship, vessel safety, radar theory, collision avoidance and Navigation Rules (Rules of the Road).

This is a preliminary report and may be revised or amended upon receipt of further information.

Sincerely,

D. J. Green
Commander, USCG (Retired)
Marine Consultant

Attachments:   CV and List of Cases