# EXHIBIT 14

**EDWARD VANDERMEULEN**

MIN-U-SCRIPT by Kenson

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF THE    * CIVIL ACTION
COMPLAINT OF INGRAM    *
BARGE COMPANY, AS OWNER  * NO. 05-4419
OF THE ING4727,      C/W 05-4237
PETITIONING FOR    *  C/W 05-5531
EXONERATION FROM OR  *  C/W 05-5724
LIMITATION OF LIABILITY * SECTION "C" (2)
               *
* JUDGE HELEN G.    *
          BERRIGAN
          *
          * MAG. JUDGE, JOSEPH
          *  WILKENSON, JR.

* * * * * * * * * * * * * *

Deposition of Edward VanderMuelen taken
at the law offices of Chaffe McCall, located at
1100 Poydras Street, Suite 2300, New Orleans,
Louisiana 70163, beginning on the 10th day of
November, 2006.

Reported by:
Peter Caruso, CCR-CVR
Certified Court Reporter

APPEARANCES:

Representing the Plaintiffs,
Ethel Mumford, et al:

WIEDEMANN & WIEDEMANN
Attorneys at Law
By: Lawrence D. Wiedemann, Esq. (#13457)
821 Baronne Street
New Orleans, Louisiana 70113

LAW OFFICE OF BRIAN A. GILBERT
Attorneys at Law
By: Brian A. Gilbert, Esq. (#21297)
3232 Edenborn Avenue
Metairie, Louisiana 70002

MR. PATRICK J. SANDERS, ESQ. (#18741)
Attorney at Law
3316 Ridgelake Drive
Metairie, Louisiana 70002

Representing the Plaintiffs,
The Parfait Family, et al:

LAW OFFICES OF ASHTON R. O'DWYER, JR.
Attorneys at Law
By: Ashton R. O'Dwyer, Jr., Esq. (#10166)
365 Canal Street
Suite 2670
New Orleans, Louisiana 70130

Representing the Plaintiffs,
Blair Boutte, et al:

Representing the Plaintiffs,
Marie Benoit, et al:

MAPLES & KIRWAN, LLC
Attorneys at Law
By: Carlos Zelaya, II, Esq.
902 Julia Street
New Orleans, Louisiana 70113

Representing Joseph C. Domino, Inc.
and Unique Towing, Inc.:

EMMETT, COBB, WAITS & HENNING
Attorneys at Law
By: John F. Emmett, Esq.
1515 Poydras Street
Suite 1950
New Orleans, Louisiana 70112

Representing Joseph C. Domino, Inc.:

HARRIS & RUFTY, L.L.C.
Attorneys at Law
By: Jill Wilhoft, Esq.
650 Poydras Street
Suite 2710
New Orleans, Louisiana 70130

Representing Lafarge North America, Inc.:

CHAFFE, McCALL, L.L.P.
Attorneys at Law
By: Robert B. Fisher, Jr., Esq.
    Derek Walker, Esq.
2300 Energy Centre

Representing New York Marine and
General Insurance Company:

SUTTERFIELD & WEBB, L.L.C.
Attorneys at Law
By: Daniel A. Webb, Esq.
650 Poydras Street
Suite 2715
New Orleans, Louisiana 70130

Representing American Owners Mutual
Protection and Indemnity Association:

MONTGOMERY, BARNETT, BROWN & READ,
HAMMOND & MINTZ
Attorneys at Law
By: Philip S. Brooks, Jr., Esq.
1100 Poydras Street
New Orleans, Louisiana 70163

Representing Board of Commissioners,
Port of New Orleans:

DAIGLE, FISSE & KESSENICH
Attorneys at Law
By: Jonathan H. Sandoz, Esq.
P. O. Box 5350
Covington, Louisiana 70434-5350

Representing Lafarge North America, Inc.:

GOODWIN PROCTOR, LLP
Attorneys at Law
By: Mark Raffman, Esq.
901 New York Avenue

BARGE000694

EDWARD VANDERMEULEN

MINIDEP by Kenson

## EXAMINATION INDEX

Caption. . . . . . . . . . . . . . . . . . . . . . . .1

Appearances. . . . . . . . . . . . . . . . . .2,3,4

Stipulation. . . . . . . . . . . . . . . . . . . . . .6

Examination:

    By Mr. Wiedemann . . . . . . . . . . . . . . . . . . . .7

Reporter's Page. . . . . . . . . . . . . . . . . . . .152

Certificate. . . . . . . . . . . . . . . . . . . . . .153

Witness' Certificate . . . . . . . . . . . . . . . . .154

Corrections/Changes Page . . . . . . . . . . . . . . .155

- 5 -

## STIPULATION

It is stipulated and agreed to, by and between counsel, that the perpetuation deposition of Edward VanderMeulen, is hereby taken, pursuant to Notice, for all purposes, under the rules of the Louisiana Code of Civil Procedure;

    That the parties hereto waive all formalities in connection with the taking of this deposition, except that of reading and signing; and

    That all objections, except those as to the form of the question and/or the responsiveness of the answer, are reserved until the time of the trial of this case.

* * * * *

    Peter Caruso, Certified Court Reporter, officiated in administering the oath to the herein witness.

- 6 -

**EDWARD VANDERMEULEN**

MiniDOT by Kenzon

1   Edward VanderMeulen, 13774 Rockwood
2   Court, Morrison, Illinois 61270, after having
3   been first duly sworn by the reporter to tell the
4   truth, the whole truth, and nothing but the
5   truth, was examined and testified as follows:
6           E X A M I N A T I O N
7   MR. WIEDEMANN:
8           Usual stipulations, reserve the
9   right to --
10  MR. WEBB:
11          Oh, we're reserving the right to
12  read and sign.
13  MR. WIEDEMANN:
14          Okay.
15  MR. WEBB:
16          And, Larry, before you start, I
17  have a hearing problem , a 50 percent
18  hearing loss in my right ear, and our
19  witness wears hearing aids. So, you tend
20  to kind of not talk too loud, so I really
21  ask you to speak up.
22  MR. WIEDMEMANN:
23          I'll do my best.
24  MR. WEBB:
25          Good. I know you have that great

-- 7 --

1   word.
2       Q.  Okay. And where do you live, Mr.
3   VanderMeulen? How do you pronounce it, Vander --
4       A.  VanderMeulen
5       Q.  Meulen. I should pronounce it; I'm
6   German myself.
7       A.  I'm Dutch.
8       Q.  Okay. You're Dutch. Well, that's why I
9   can't pronounce it.
10          Where do you live, sir?
11      A.  I live in Morrison, Illinois.
12      Q.  Morrison, Illinois. And what's your
13  address?
14      A.  13774 Rockwood, which is all one word,
15  Court.
16      Q.  Is that a suburb of --
17      A.  No. It's a small town of 4,500 people.
18      Q.  Okay. What is your present employment?
19      A.  I work for Lafarge North America.
20      Q.  How long have you worked for Lafarge?
21      A.  I started in 1968 with Missouri Portland
22  Cement Company, and I've been continuously
23  employed. LaFarge acquired Missouri Portland
24  Cement in the late 80s, and actually, you know,
25  took over operating control and so forth in 1991.

-- 9 --

1   voice. I've seen it in the courtroom, I
2   heard it in the courtroom before.
3   MR. WIEDEMANN:
4           If I ask something that you don't
5   understand either because hearing or
6   otherwise, you have a right to stop me
7   and ask me to repeat it. Okay?
8   THE WITNESS:
9           Yes, sir.
10  MR. WIEDEMANN:
11          We're not here to get you to answer
12  questions without knowing what they are.
13  Okay?
14  THE WITNESS:
15          You bet.
16  MR. WEBB:
17          And you need to speak up, because
18  that young lady down there needs to hear
19  what you're saying.
20  BY MR. WIEDEMANN:
21      Q.  Would you tell us your full name, please?
22      A.  My name is Edward Frank VanderMeulen.
23      Q.  And it's V-a-n-d-e-r?
24      A.  Yes, sir. And it's a capital M-e-u-l-e-
25  n. And the "M" is capitalized, but it's all one

-- 8 --

1   So I've been continuously employed, but became a
2   LaFarge employee in 1991.
3       Q.  Since 1968 you've been employed in the
4   cement business in that area; is that right?
5       A.  In numerous areas, but, yes, I have.
6       Q.  What is your present title or -- or let
7   me go ahead. What was your title with Lafarge at
8   the time of the hurricane in August 29, 2005?
9       A.  Area Distribution Manager/Project
10  Management.
11      Q.  An area distribution manager encompasses
12  what, just general?
13      A.  An area distribution manager is generally
14  a tier above a terminal manager, has
15  responsibility for multiple operating facilities,
16  and interfaces with the business unit to work out
17  logistic plans and assets and our management of
18  our assets and so forth.
19      Q.  And you also have, you're a project
20  manager?
21      A.  Yes, I am.
22      Q.  And what does that entail?
23      A.  I'm involved in capital projects, such as
24  building silos or replating barges and so forth.
25      Q.  So does Lafarge own barges themselves?

-- 10 --

BARGE000696

EDWARD VANDERMEULEN

MIN-U-SCRIPT by Kelson

**- 11 -**

1    A.  Yes, Lafarge does.

2    Q.  Indirectly?  I mean, directly or a

3 subsidiary?

4    A.  We directly own some specialized barges.

5    Q.  And you say you've been all over.  Where

6 have you worked with Lafarge or the predecessor

7 company?

8    A.  I started at a barge terminal in Chicago

9 in 1968.  And I've move my — I've been

10 transferred, for instance, to Owensboro,

11 Kentucky, back to Chicago, from Chicago to

12 Nashville, and then from Nashville to my present

13 location.  I've been involved in building

14 terminals and opening facilities and operating

15 and maintaining our, our barge fleet throughout

16 the inland river system.

17    Q.  And primarily you're involvement has been

18 on the Mississippi and it's subsidiaries?

19    A.  Yes.  I would say roughly a geographical

20 area from Pittsburgh to Omaha and from

21 Minneapolis to New Orleans.

22    Q.  What is your educational background?

23    A.  I completed high school.  I was an

24 aircraft mechanic in the Air Force.  I then

25 became employed with Missouri Portland Cement

**- 12 -**

1 Company.  I have about two-and-a-half years of

2 college.  I've never finished any degree program.

3    I've taken a lot of seminars and training

4 courses relating to engineering, operations,

5 business, etc., that related to my job.  I was a

6 commissioned firefighter and an emergency medical

7 technician and an emergency rescue technician.

8 And I think that summarizes it about as well as I

9 can.

10    Q.  Were you furnished with the Notice of

11 Deposition of Lafarge, the 30(B)(6) and 30(B)5?

12 That's a notice of this deposition which

13 specifies the areas of inquiry and the documents

14 that might be utilized.

15    A.  Yes.  I — you know, as to specifically

16 being served with a notice, I'm not sure I know

17 what that means.  But I was informed that and

18 asked to do this.

19    Q.  Well, my question is:  Have you reviewed

20 the document for the deposition for which you're

21 appearing today?

22    A.  Yes, I have.

23    Q.  And do you feel that you have the

24 knowledge to answer all of the areas of inquiry

25 from your connexity with Lafarge?

**- 13 -**

1    A.  I believe I have reasonable knowledge to

2 answer the questions.

3    Q.  In your job as distribution manager, does

4 that include the Mississippi River operation, or

5 I should say the Industrial Canal operation in

6 the Metropolitan New Orleans area?

7    A.  I do not have direct responsibility for

8 that area.

9    Q.  So as a distribution manager you're

10 limited to a certain area?

11    A.  That's correct.  In our structure, there

12 are area distribution managers that take care of

13 different facilities.

14    Q.  Who was the distribution manager for the

15 area that would be over the — include the

16 Lafarge facility on the Industrial Canal?

17    MR. WEBB:

18       At what point in time, Counsel?

19    MR. WIEDEMANN:

20       In August of 2005.

21 BY MR. WIEDEMANN:

22    Q.  Unless I say otherwise I'm talking about

23 August of 2005.

24    A.  A.J. Guthrie.

25    Q.  And he would be — that's G-u-t-h-e-r-i-

**- 14 -**

1 e?

2    A.  G-u-t-h-r-i-e.

3    Q.  And is he still with the company?

4    A.  Yes, he is.

5    Q.  So he would have the same position as you

6 have with relation to the Lafarge facility on the

7 Industrial Canal?

8    A.  The difference is that he has direct

9 responsibility for multiple locations and

10 operations, and I primarily focus on capital

11 projects and larger projects at this time.

12    Q.  By capital projects, you mean building

13 facilities?

14    A.  That's correct.

15    Q.  And so you're not directly involved in

16 the distribution of the product of your company?

17    A.  I am on a peripheral basis.  Other

18 activities that I'm involved in are generalized

19 management in the River Region over operating

20 activities and establishing standard operating

21 procedures.

22    Q.  So you would be involved in developing

23 standard operating procedures?

24    A.  Yes, I have, and I am, yes.

25    Q.  What standard operating procedures that

BARGE000697

EDWARD VANDERMEULEN

MinUScript by Kenon

1 you're aware of that were in existence at the
2 time in question?
3     A.  We have a two-tiered system at Lafarge.
4 We have standard operating procedures that are
5 centrally generated that apply in general to all
6 of our facilities.  The second tier would be
7 site-specific operating procedures that in order
8 to be effective have to be generated locally
9 because there's a wide diversity of operations
10 that we have, and of course you can't make a
11 procedure that fits every location.
12     Q.  So the first system is a general system
13 that the company has; is that correct?
14     A.  That's correct.
15     Q.  Is that a written system?
16     A.  Yes.
17     Q.  What's it called?
18     A.  Standard operating procedures, or --
19     Q.  I'm sorry?
20         MR. WEBB:
21             Did you have anything else you were
22         adding?
23         THE WITNESS:
24             No.
25         MR. WEBB:

- 15 -

1             Okay.  All right.
2 BY MR. WIEDEMANN:
3     Q.  And then you have site-specific
4 procedures that would be applicable to a specific
5 site; is that correct?
6     A.  That's correct.
7     Q.  And would there be one procedure that was
8 in place that applied to the Industrial Canal
9 facility?
10     A.  Yes, there was.
11     Q.  And what would that be called?
12     A.  At New Orleans there is a hurricane
13 preparedness checklist or procedure.  I don't
14 recall if it was called a checklist or a
15 procedure.
16     Q.  Hurricane?
17     A.  Hurricane Preparedness.
18     Q.  Procedure?
19     A.  Yes.
20     Q.  And both of these are written documents?
21     A.  That's correct.
22     Q.  Let me show you what has previously been
23 produced as LNA-113, and it's entitled "New
24 Orleans Terminal Hurricane Preparation
25 Checklist."  And is that the site-specific

- 16 -

1 procedure of Lafarge?
2     A.  Yes, sir, it is.
3     Q.  And there is a similar national
4 procedure; is that correct?
5     A.  The national procedure, or the standard
6 operating procedure requires that all facilities
7 have a preparation checklist such as this.  The
8 details you can't do on a large scale because of
9 the diversity of our operations.
10     Q.  So the national procedure would require
11 the local facilities to adopt a procedure that
12 would be geographically applicable; is that
13 right?
14     A.  Yes.
15     Q.  And this procedure is given to all of the
16 people who operate your -- the local facilities?
17     A.  That procedure is not given from the
18 larger organization, but it's distributed and
19 available for the people that operate our
20 facilities at the facility.
21     Q.  This is generated by the local people?
22     A.  Yes.
23     Q.  And then it's sent to the national people
24 to be approved?
25     A.  No.  It is reviewed through our safety

- 17 -

1 audit process where people come to the facility
2 and look at items such as that.
3     Q.  What is your safety audit?  What is your
4 safety audit?
5     A.  We have -- we have regional safety teams
6 that are populated with operating people and
7 safety advisors and our safety managers who visit
8 our facilities on a regular basis and check for
9 documentation and procedures and also general
10 safety conditions at the facility.
11     Q.  Who's in charge of that safety audit
12 team?
13     A.  We have a regional safety director, whose
14 name is Dan Thompson.
15     Q.  Dan what?
16     A.  Dan Thompson.
17     Q.  Thompson?
18     A.  Yes, sir.
19     Q.  And he's the head of the audit team?
20     A.  He's the head of the audit process.
21     Q.  When I showed you this document, which is
22 LNA-113, you didn't hesitate to say that's the
23 local checklist, did you?
24     A.  No, I did not.
25     Q.  So I assume you've seen it before and you

- 18 -

BARGE000698

EDWARD VANDERMEULEN

MINIDEP by Kellspan

1 know what it is?

2    A. Yes, I have, and I do know what it is.

3    Q. And is the local operation after they

4 enact this checklist and it's approved by the

5 audit group, is that -- are they expected to

6 carry out this program?

7     MR. WEBB:

8       Object to the form of the question.

9     You can answer.

10     THE WITNESS:

11       Yes, they are expected to carry out

12     that program.

13 BY MR. WIEDEMANN:

14    Q. The whole purpose of enacting a local

15 checklist and a national checklist is to have

16 some uniformity of procedure; isn't that so?

17    A. Yes.

18    Q. And in this document it says, in the

19 second -- in the second sentence it says, "Cable

20 all barges to a shore."

21     MR. O'DWYER:

22       Counsel, I have a question on the

23     document you just handed over. It's got

24     some quotation marks on here. Are those

25     yours?

- 19 -

1     MR. WIEDEMANN:

2       Yes, those are mine, yes.

3     MR. WEBB:

4       All right.

5     MR. WIEDEMANN:

6       I haven't introduced the document.

7     MR. WEBB:

8       No. I'm just asking, because, I

9     mean, there's extra marks on this paper

10     and I wanted to know where they came

11     from, that's all.

12     MR. WIEDEMANN:

13       I'm introducing it by reference to

14     your number.

15     MR. WEBB:

16       No problem. I just wanted to know

17     where the extra marks came from.

18     MR. WIEDEMANN:

19       Okay. There are plenty of extra

20     marks; yellow, green, pink.

21     MR. WEBB:

22       Well, they're not on this sheet.

23     MR. WIEDEMANN:

24       Well, no, no, but we haven't gotten

25     there yet. Okay?

- 20 -

1     MR. WEBB:

2       Okay.

3 BY MR. WIEDEMANN:

4    Q. You see that document?

5    A. Yes, sir, I do.

6    Q. And the hurricane protection procedures

7 requires that all barges be cabled to the dock.

8 Do you see that?

9    A. I see where it says "Cable all barges to

10 shore."

11    Q. And what does cable mean, cabling the

12 barges to shore mean to you?

13    A. It means to me that at the time this

14 procedure was written that cables were suggested

15 in the procedures to be used at that time.

16    Q. Well, I mean, when you say "suggested,"

17 it's drawn up by the local people --

18    A. Yes.

19    Q. -- with specific knowledge to local

20 problems, it's reviewed by the auditing group

21 headed by Mr. Thompson?

22    A. Correct.

23    Q. And presumably it goes to the home office

24 at some point; is that right?

25     MR. WEBB:

- 21 -

1       I object to the form of the

2     question. That is not what this witness

3     has testified to.

4 BY MR. WIEDEMANN:

5    Q. You can answer.

6    A. That was correct. Since this was

7 written, we've upgraded our procedures for

8 mooring barges. And we've used what we feel is a

9 better way to moor barges.

10    Q. That's subsequent to August 29, 2005?

11    A. Yes, sir.

12    Q. But as of August 29, 2005, this was the

13 hurricane procedure applicable to the facility on

14 the Industrial Canal?

15    A. Well, as of August 27, 2005, this was the

16 checklist. The procedures in fact had been

17 upgraded.

18    Q. Well, where is the upgrade?

19    A. It -- the upgrade doesn't appear in here.

20 The upgrade was implemented at the time, on

21 August 27.

22    Q. It's your understanding that the barges

23 at the Lafarge facility on the Industrial Canal

24 were cabled on the -- after the 27th?

25    A. No. No, they weren't cabled.

- 22 -

EDWARD VANDERMEULEN

1    Q. So if there was an updated procedure, the
2  procedure was not followed?
3      MR. WEBB:
4         Object to the form of the question.
5      You're misunderstanding what he's telling
6      you.
7      MR. WIEDEMANN:
8         I'm not misunderstanding him.
9      MR. WEBB:
10        Yes, you are.
11 BY MR. WIEDEMANN:
12   Q. The procedure that is in force and that
13 was — that was produced to me by Lafarge as the
14 document in force August the 29th, 2005, at the
15 time of Hurricane Katrina, and you're now telling
16 me that what they produced is not the final
17 document?
18   A. I'm — I'm telling you that this is the
19 document and that we did not upgrade that
20 particular statement on our checklist, but we did
21 upgrade our procedure. We didn't take care of
22 our paperwork, but we did a better job of
23 securing the barges.
24   Q. This happened after the 27th, y'all
25 enacted a new procedure?

- 23 -

1  around those bumpers. And it's kind of a place
2  that — it's kind of a place to hold the line in
3  place that the other end of the line goes onto
4  the barge and attaches to the barge. Now, when
5  you have a weather event, like a hurricane, we
6  expect that there's going to be a surge or
7  water's going to rise.
8        What this long-lining procedure does is
9  allow wraps of that line to uncoil from their
10 resting place, or where they're placed on the
11 cylinders, and gives us extra line, so that when
12 the barges rise along with the rising water, that
13 we maintain that connection. That —
14   Q. When did you all — I didn't mean to
15 interrupt you.
16   A. Yeah. First off, that gives us
17 flexibility when the water rises. Secondly, it's
18 something we can deploy quickly and safely,
19 because, you know, line is much more pliable,
20 it's lighter. And in fact, this particular line
21 is, is stronger and more suitable than the cable
22 that we had. And what we do at the terminal is
23 keep a full line, a brand new 8-strand line
24 available so that we can secure the barges when
25 we go into this mode in preparation for a weather

- 25 -

1    A. No. No. It was well in advance of the
2  27th. And I don't know when, but it was in
3  advance of the 27th.
4    Q. Well, tell me — tell me what led to the
5  change in the hurricane procedure that was not
6  reduced to writing before the 27th.
7    A. First off, we try to continuously improve
8  everything we do at Lafarge, and safety is for us
9  a very, very prioritized and critical area for us.
10 The fellow that — that wrote this procedure was
11 very experienced in mooring barges. And a couple
12 of years ago, we had our dock renovated. That
13 allowed us to go to a mooring procedure called
14 "long-line."
15       What we do when we long-line is, number
16 one, it's something that has to be done with
17 rope, with rope for mooring barges. So we start
18 with a very premium line. We use a 2-inch, 8-
19 braid polypropylene line, that's a first-rate
20 mooring line for barges. And when we prepare for
21 a hurricane, we affix that line to a bollard
22 along our dock, and then we've got cylindrical
23 bumpers that the barges come against when they're
24 moored at our dock.
25       So we wrap three wraps of that line

- 24 -

1  event.
2    Q. Has all of this new — when did this new
3  procedure, when did Lafarge determine that this
4  procedure locally would be utilized? Was it two
5  years ago?
6    A. I don't know.
7    Q. Well, give me — give me your best
8  estimate?
9    A. My best estimate would be somewhere
10 between one and two years ago.
11   Q. Within that period —
12   A. One or two years prior to this date.
13   Q. Okay. Prior to August —
14   A. Not prior to today, no.
15   Q. Prior to August 27th, you're talking
16 about?
17   A. Yeah, prior to August 27th of 2005.
18   Q. But the written directions, or the
19 written procedure has not been changed as of this
20 date; is that correct?
21   A. That's correct.
22   Q. And the written procedure that's still in
23 the local office is the same as the procedure
24 before you? That is, you cable all barges to the
25 dock; isn't that so?

- 26 -

BARGE000700

EDWARD VANDERMEULEN

1    A. Yes, sir, we -- we --
2    Q. Well, how did you make it known to the
3 people working in the Lafarge facility that the
4 procedure had been changed, and how did the audit
5 people, how would they know what the procedure
6 was when they come down here to audit
7 New Orleans?
8        MR. WEBB:
9            Object to the form of the question.
10            Which one do you want him to answer?
11        MR. WIEDEMANN:
12            I'll make it --
13 BY MR. WIEDEMANN:
14    Q. How did you all make it known to the
15 people who are working at the Lafarge facility
16 that the procedure has been changed?
17    A. Well, our -- our workforce at our
18 terminals are small, cross-functional teams. And
19 something like this -- first off, there is
20 constant communications on a daily basis about
21 safety between all the members of our teams at a
22 terminal. Terminal workforce is probably ten
23 people.
24            Generally speaking, you have three or
25 four people that literally rub elbows every day

- 27 -

1 when they go to work. So these people
2 communicated very well. We're very participative
3 in every -- everyone in that group works side by
4 side, hand in hand with everyone else.
5            The other issue is, is that this system
6 had been deployed on several occasions prior to
7 August 27th of 2005 because in this area there's
8 a lot of weather alerts. So these guys have
9 practiced that procedure numerous times.
10 Everyone was very well informed at the site.
11    Q. So you all are well aware that there are
12 hurricanes and extremely bad weather in the
13 metropolitan area; is that correct?
14        MR. WEBB:
15            Object to the form of the question.
16 BY MR. WIEDEMANN:
17    Q. That is your company?
18        MR. WEBB:
19            Object to the form of the question.
20 BY MR. WIEDEMANN:
21    Q. Isn't that so?
22    A. Yes.
23    Q. And that's why you enacted cabling of
24 barges at some point in time, to guard against
25 that extreme weather, wasn't it?

- 28 -

1        MR. WEBB:
2            Same objection.
3        THE WITNESS:
4            As I said, we -- we always look for
5 ways to improve.
6 BY MR. WIEDEMANN:
7    Q. Well, one way to improve safety is to
8 publish what you consider to be safe, isn't it?
9    A. I agree that we should upgrade our
10 checklist, yes.
11    Q. In fact, at the bottom it says "Safe,"
12 underscored and about five parenthesis under --
13 over it. If you're going to stress safe, don't
14 you want to make it known to everybody in
15 writing?
16    A. Well, we do. We -- we -- we make it very
17 clear to all of the people on our team at a
18 terminal.
19    Q. Well, where is any other document showing
20 that the New Orleans terminal hurricane
21 preparation checklist was changed?
22    A. I don't know.
23    Q. You don't know of any document?
24    A. I don't.
25    Q. You don't know of any correspondence

- 29 -

1 between these people that you say are
2 communicating, any e-mails, any faxes, any
3 letters telling them that the procedure is
4 changed?
5    A. People that work on a dock, hand in hand,
6 don't e-mail each other or send faxes to each
7 other, they communicate very directly, very
8 effectively as well.
9    Q. Well, what about the, what about the
10 safety, the safety audit team headed by Mr.
11 Thompson? When he comes down here and finds that
12 they got a procedure in writing that is talking
13 about cabling and it's all been changed two years
14 ago, he doesn't do anything about it?
15        MR. WEBB:
16            Object to the form of the question.
17 BY MR. WIEDEMANN:
18    Q. Hm?
19    A. He may or may not have picked that up on
20 his safety audit, because --
21    Q. Isn't that his job?
22    A. -- that might not have been demonstrated.
23    Q. Hm?
24        MR. WEBB:
25            Object to the form of the question.

- 30 -

BARGE000701

1 It's argumentative.

2 BY MR. WIEDEMANN:

3 Q. The safety team headed by Mr. Thompson
4 goes from plant to plant to inspect the safety
5 procedures and to make recommendations and
6 changes, do they not? That's their purpose?

7 A. Their primary interest is to make sure
8 that there are procedures in existence and in
9 place. And again, procedures are generated
10 locally.

11 Q. Well, this procedure was generated
12 locally?

13 A. Yes, it was. And it was improved
14 locally.

15 Q. But there's no written generation of the
16 improvement; hm?

17 A. We did not record the improvement.

18 Q. But you said it's generated locally, so
19 there should be a document locally and there
20 should be a document at the national office
21 showing that the local procedure has been
22 changed, shouldn't there?

23 A. They should have upgraded that document
24 like they upgraded the procedure.

25 Q. And whose responsibility was it to

- 31 -

1 upgrade the document?

2 A. The terminal manager.

3 Q. And whose responsibility was it to
4 inspect and make sure that the terminal manager
5 carried out his job?

6 A. In general or specific?

7 Q. In general.

8 A. In general, he reports to the area
9 distribution manager.

10 Q. And that would be whom?

11 A. A.J. Guthrie.

12 Q. And would it not also be the
13 responsibility of the audit team headed by Mr.
14 Thompson to see that if there are changes in
15 force, that the procedure is changed in writing?

16 A. It would be their responsibility.

17 Q. So who is the terminal manager here?

18 A. Dennis Millon.

19 Q. How do you spell his last name?

20 A. M-i-l-l-o-n.

21 Q. So Mr. Millon was — didn't do what he
22 was supposed to do in not producing a new
23 document; isn't that so?

24 A. Yes.

25 Q. And Mr. Thompson as the safety audit, the

- 32 -

1 head of the safety audit team, didn't do what he
2 was supposed to do in making sure that whatever
3 was in force was reduced to writing?

4 A. Yes.

5 Q. Now, you say that they started this new
6 procedure, long-lining; is that correct?

7 A. That's correct.

8 Q. Did you read Mr. Smith's and — the
9 statements of Mr. Busch and Mr. Smith?

10 A. Yes, I have.

11 Q. Those are employees of your company?

12 A. Yes, they are.

13 Q. Did you read that on the 27th that they
14 were -- they went out to buy line in order to
15 moor these barges?

16 A. No, I did not.

17 Q. Well, I mean, if they had this new
18 procedure of long-lining, wouldn't you expect
19 them to have a supply of long-lining polyurethane
20 rope or whatever?

21 MR. WEBB:

22 You can answer the question.

23 THE WITNESS:

24 What I read in either one or both of
25 those statements was that we had a brand

- 33 -

1 new coil of first -- and I believe we had
2 a brand new coil of line designated
3 specifically for the implementation of
4 those procedures.

5 BY MR. WIEDEMANN:

6 Q. Has anyone in the Lafarge system
7 criticized Mr. Thompson or Mr. Guthrie for the
8 failure to change the hurricane procedure as it
9 was promulgated and furnished to us in this
10 litigation?

11 A. I don't know.

12 Q. You don't know?

13 A. I don't know.

14 Q. Would you be in the loop that should know
15 if it was done?

16 A. Possibly, but not necessarily.

17 Q. Well, you said that Lafarge is very
18 safety-minded. I would assume that if somebody
19 violates a safety procedure that somebody looks
20 into it?

21 MR. WEBB:

22 Object to the form of the question.

23 There's been no testimony of the
24 violation of a safety procedure.

25 MR. WIEDEMANN:

- 34 -

BARGE000702

EDWARD VANDERMEULEN

MINDHUB by Kenson

**Page - 35 -**

1    He said Mr. Thompson didn't do his
2    duty in seeing that this was changed, and
3    he said that Mr. Guthrie didn't do his
4    duty in changing it.
5  BY MR. WIEDEMANN:
6    Q. So, isn't that a safety violation?
7    MR. WEBB:
8        Object to the form of the question.
9  BY MR. WIEDEMANN:
10    Q. You can answer. When he objects, you can
11  answer.
12    A. Well, I'll be -- and in the most sincere
13  way, I guess I would tell you that after I
14  congratulated them for improving the procedure, I
15  would chastise them for not keeping their
16  paperwork in better condition.
17    Q. But you're not the person who is in a
18  position to chastise them, I assume, are you?
19    A. Yes.
20    Q. Are you?
21    A. Everyone in Lafarge is empowered to be a
22  safety agent.
23    Q. You mean from the lowest man down
24  safety -- safety starts at the lowest point and
25  goes up?

**Page - 36 -**

1    A. Yes. It flows both ways.
2    Q. Well, how did it flow down to Mr. Guthrie
3  and Mr. Thompson that they had been remiss in not
4  upgrading the hurricane procedure?
5    MR. WEBB:
6        Object to the form of the question.
7    THE WITNESS:
8        I don't think that they realized
9        that that checklist did not get upgraded
10        as the procedure did.
11  BY MR. WIEDEMANN:
12    Q. Well, since you say you are part of the
13  enforcement team, did you talk to Mr. Guthrie?
14    MR. WEBB:
15        Object to the form of the question.
16        There's been absolutely no testimony
17        about any enforcement team. That's an
18        unfair question.
19  BY MR. WIEDEMANN:
20    Q. You can answer the question.
21    A. I'm sorry?
22    Q. Did you talk to Mr. Guthrie about this
23  deficiency?
24    A. At the time I was not aware of it.
25    Q. When did you become aware of it?

**Page - 37 -**

1    A. Within the last few months, when I first
2  saw that document and I was first aware of the
3  long-lining procedure that was in place.
4    Q. So you in your position were not aware of
5  the long-lining procedure that's supposed to be
6  in place until just recently?
7    A. That's correct.
8    Q. Well, I thought you said everybody in
9  safety and everybody in Lafarge knows what's
10  going on. How come -- how do you think you
11  didn't know that?
12    A. I said that on a local level. You have
13  to -- we probably have 30 or 40 facilities in the
14  River Region, and I can't possibly know every
15  procedure at every facility in my position.
16    Q. Well, who would be -- who would be vested
17  with the responsibility? You say the local
18  people make up the hurricane protection checklist
19  for the New Orleans terminal because it's
20  regionalized. Who audits to see that what
21  they're doing meets safety standards required by
22  various regulatory bodies?
23    A. That falls under the responsibility of
24  the area distribution manager for that facility
25  and our safety people.

**Page - 38 -**

1    Q. That would be Thompson's group?
2    A. Yes, Thompson's group.
3    Q. And that would be the area safety --
4  distribution person would be whom?
5    A. A.J. Guthrie.
6    Q. Guthrie, okay. How many -- you say
7  there's many, many facilities on the Mississippi
8  River. How many of them are in the vicinity of
9  the mouth of the river in, say, Baton Rouge,
10  Louisiana?
11    A. They have two facilities between Baton
12  Rouge and the mouth of the river in the cement
13  group that I work within. Lafarge also has other
14  business presences in New Orleans, but I'm not
15  involved in those.
16    Q. So you have the Industrial Canal --
17  Industrial bridge -- excuse me -- the Industrial
18  Canal facility, and you have another facility
19  where?
20    A. We have one in Union, Louisiana.
21    Q. And that's on the Mississippi?
22    A. Yes.
23    Q. And what other facilities they have, you
24  said that are not in the cement business?
25    A. They have -- we have a ready-mix business

1 and possibly other businesses that I'm not
2 familiar with, but I don't know the locations of
3 them.
4    Q. So there are other businesses besides the
5 cement business that deal with barges and
6 unloading and loading of barges?
7    A. I don't know. All I know about are the
8 cement operations.
9    Q. Does Lafarge have an organizational chart
10 that would show all of the businesses that it
11 owns and operates?
12    A. I would suppose. I have not seen one
13 perhaps of that magnitude or that scope.
14    Q. Does the Union, Louisiana facility have a
15 hurricane protection checklist, also?
16    A. I don't know.
17    Q. Well, they should have a hurricane
18 protection checklist, should they not?
19       MR. WEBB:
20          Object --
21       THE WITNESS:
22          Yes.
23       MR. WEBB:
24          -- to the form of the question.
25 BY MR. WIEDEMANN:

- 39 -

1    Q. You haven't seen it?
2    A. I have not seen it. If -- not in my
3 memory. I don't recall.
4    Q. Do you know whether it's different than
5 this one? That's LNA-113.
6       MR. WEBB:
7          If he hasn't seen it, how could he
8       know, Larry? That's a silly question.
9       MR. WIEDEMANN:
10          He could have heard it. I don't
11       know. He doesn't have to see it.
12       MR. O'DWYER:
13          Well, let me object to something
14       right now on behalf of my clients. If he
15       doesn't know, then what is he doing here
16       speaking on behalf of Lafarge? The
17       objection's made for the Record.
18       MR. WEBB:
19          All right. Well, you don't --
20       MR. O'DWYER:
21          You don't have to respond if you
22       don't want to.
23       MR. WEBB:
24          Well, I'm not going to.
25 BY MR. WIEDEMANN:

- 40 -

1    Q. Do you know what the Union, Louisiana
2 checklist provided either having seen it or heard
3 it or in any other way?
4    A. I don't recall.
5    Q. Mr. Thompson would be the person, also
6 his safety auditing team, that would inspect the
7 Union facility regarding safety?
8    A. Yes.
9    Q. And does Lafarge own any towing companies
10 to your knowledge?
11    A. We don't own any towing companies on the
12 inland rivers that I'm aware of.
13    Q. Do they own any fleeting facilities to
14 your knowledge?
15    A. None that I know.
16    Q. Have you spoken with Mr. Smith or Mr.
17 Busch at the New Orleans facility?
18    A. Yes.
19    Q. You spoke to them recently?
20    A. Yes, I have.
21    Q. In regard to this case?
22    A. Yes, I have.
23    Q. How did you come to meet with them
24 regarding this case?
25    A. In preparation for my role as a deponent,

- 41 -

1 I talked to both Ed Busch and Earl Smith.
2    Q. And when did you speak with them?
3    A. I would say -- I don't know the exact
4 date, but I would say about the middle of
5 September. And I talked to Ed Busch on the
6 telephone maybe a week ago or so.
7    Q. About this case?
8    A. Yes.
9    Q. And it was in the early part -- in the
10 middle part of September?
11    A. Approximately. I would say it's been --
12    Q. What did you talk to them about? What
13 was the purpose of your discussion with them?
14    A. The purpose of the discussion was so that
15 I could learn what they did at the terminal
16 regarding the Katrina storm.
17    Q. And did you talk to Mr. Guthrie?
18    A. I have talked to Mr. Guthrie.
19    Q. Did you talk to Mr. Thompson?
20    A. I have not talked to Mr. Thompson.
21    Q. And did you tell Mr. Guthrie that the
22 hurricane preparation checklist that is LNA-113
23 had not been changed before the hurricane?
24    A. I don't recall.
25    Q. Did you ask him why it hadn't been

- 42 -

EDWARD VANDERMEULEN

1 changed?

2    A. I don't recall.

3    Q. Well, the safety program through Lafarge

4 operated through consistency and inspection, does

5 it not?

6    A. It's certainly important to it, yes.

7    Q. Well, if you knew that the checklist was

8 deficient, and you talked to Mr. Guthrie --

9 excuse me, to Mr. Guthrie and Mr. Smith and Mr.

10 Busch, but you never asked them why it was never

11 changed before Hurricane Katrina?

12      MR. WEBB:

13         Object to the form of the question.

14      THE WITNESS:

15         I said I don't recall. I talk to

16      Mr. Guthrie about literally thousands of

17      operating issues in the course of our

18      conversation over a month and I don't

19      specifically recall a discussion about

20      the procedure being upgraded but the

21      checklist not being upgraded.

22 BY MR. WIEDEMANN:

23    Q. Well, you knew when you talked to Mr.

24 Guthrie and Mr. Busch and Mr. Smith that you

25 weren't talking about just general business, you

- 43 -

1 were talking about a barge, 4127 [sic], that went

2 through a wall and wound up -- you knew that this

3 involved the case, did you not?

4      MR. WEBB:

5         Object to the form of the question.

6      MR. GILBERT:

7         It's 4727.

8      MR. WIEDEMANN:

9         4727.

10      MR. WEBB:

11         That's not the basis for my

12      objection.

13 BY MR. WIEDEMANN:

14    Q. At the time -- I'll repeat it -- at the

15 time you talked to Mr. Guthrie and Mr. Smith and

16 Mr. Busch, you knew at that time that a barge

17 belonging to -- from the Lafarge facility had

18 been involved in an incident, were you not?

19      MR. WEBB:

20         Object to the form of the question.

21      THE WITNESS:

22         Yes, I was aware.

23 BY MR. WIEDEMANN:

24    Q. And are you telling me today, although

25 you were aware of that occurrence, that you never

- 44 -

1 discussed with them the specific things involving

2 that, the checklist and what happened previously?

3 Did you even talk to anybody about that?

4    A. The discussion was focused on what was

5 done at the terminal. And I don't recall talking

6 with them about that particular item on that

7 checklist.

8    Q. And still as we sit here today, there is

9 no change in the written policy of the Lafarge

10 facility in New Orleans with regard to hurricane

11 preparedness?

12    A. There's no change in the checklist that I

13 have seen.

14    Q. Although you knew about, Mr. Thompson

15 knew about it, Mr. Guthrie knew about it, and

16 presumably others, but there has been no change

17 in the written document that we have, that's been

18 furnished by Lafarge?

19      MR. WEBB:

20         Object to the form of the question.

21      THE WITNESS:

22         I can't speak for Mr. Thompson and

23      Mr. Guthrie. As far as I know, that

24      checklist wasn't updated.

25 BY MR. WIEDEMANN:

- 45 -

1    Q. Was there any correspondence between you

2 and -- I don't want to say you, I'm sorry --

3 between the company and Mr. Guthrie or Mr.

4 Thompson or Mr. Busch or Mr. Smith regarding your

5 conversation or their recollection of what

6 happened?

7    A. I'm sorry, but you brought a lot of

8 people in.

9    Q. You told me that you talked to them, I

10 presume verbally; is that correct?

11    A. Mr. Thompson, Mr. Guthrie, Mr. Smith, Mr.

12 Busch?

13    Q. Uh-huh (affirmative response).

14    A. I have talked to them verbally.

15    Q. And you talked to Mr. Guthrie and Mr.

16 Busch and Mr. Smith specifically with reference

17 to the barge that broke loose from the Lafarge

18 plant on the Industrial Canal?

19    A. I talked to them specifically about the

20 barge having -- yes.

21    Q. And my question to you: Is there any

22 e-mails, faxes, correspondence between anyone in

23 the Lafarge office and Mr. Guthrie and Mr. Smith

24 and Mr. Busch, or any of the three of them,

25 concerning the incident with the barge?

- 46 -

EDWARD VANDERMEULEN

1   A.  I don't know.
2   Q.  You don't know of any?
3   A.  (No response.)
4   Q.  You don't know of any?
5   A.  No, I don't.
6   Q.  Have you personally ever e-mailed, faxed
7   or written to the three of them, I mean, Busch,
8   Smith and Guthrie, about this incident?
9   A.  I don't recall.
10  Q.  After talking to Mr. Guthrie and Mr.
11  Smith and Mr. Busch, did you e-mail, fax or write
12  to anybody within the Lafarge company about the
13  conversation with them or the hurricane
14  protection checklist?
15  A.  I would say no.  No.
16  Q.  So there's no written trail of your
17  discussion with these local people and your,
18  perhaps, recitation of what you discovered from
19  them at any time?  There's no paper trail?
20  A.  None that I'm aware.
21  Q.  Did you -- did Lafarge to your knowledge
22  conduct an investigation concerning the breakaway
23  of the barge?
24  A.  Lafarge secured counsel to conduct an
25  investigation regarding the breakaway of the

- 47 -

1   barge.
2   Q.  When you spoke to Mr. Busch and Mr. Smith
3   and Mr. Guthrie, was counsel present?
4   A.  Counsel was present when I spoke to Mr.
5   Busch and to Mr. Smith, not when I had spoken to
6   Mr. Guthrie.
7   Q.  So you instituted the discussion with Mr.
8   Guthrie yourself?
9   A.  I speak with Mr. Guthrie almost on a
10  daily basis.
11  Q.  Well, I'm talking about a major incident
12  that occurred in New Orleans.  You talked to him
13  about that, did you not?
14  A.  Yes, I have.
15  Q.  And you instituted that conversation
16  personally?
17  A.  Yes, I have.
18  Q.  And in that conversation did you discuss
19  with him how this breakaway occurred?
20  A.  I -- I have.
21  Q.  And what did he tell you?
22  A.  I don't recall any specific of that.  It
23  was basically an informal discussion, and I can't
24  recall any significant items that Mr. Guthrie
25  informed me of.

- 48 -

1   Q.  Well, you had a conversation with him, I
2   assume about the incident, the breakaway of the
3   barge, and what occurred after the breakaway; is
4   that correct?
5   A.  That would be correct.  We have discussed
6   it.
7   Q.  Tell me what you said to him.  Weren't
8   you interested in, how did this barge get loose,
9   and did you ask him that?
10  A.  I don't know that I would have ever asked
11  him that directly, because I talk to him so
12  frequently that our shared discussion is probably
13  an accumulation of small bits and pieces.  I just
14  don't recall ever asking him that question.
15  Q.  Well, you don't consider shared pieces of
16  information to be equated to what happened in
17  Hurricane Katrina, do you?
18  A.  Do I -- do I equate shared pieces --would
19  you say that over again?
20  Q.  My question is:  Are you telling me you
21  talked to Mr. Guthrie about Hurricane Katrina and
22  a barge breaking loose and you don't remember
23  what you talked to him about?
24  A.  I --
25  Q.  Is that what you're telling me?

- 49 -

1   A.  I am telling you -- I'm telling you that,
2   that our conversations have been informal,
3   extremely frequent, probably never focused
4   exclusively on Katrina, and there are details of
5   those discussions that I may not recall.
6   Q.  What do you recall insofar as what Mr.
7   Guthrie told you in any conversation concerning
8   how the barge broke loose from the Lafarge
9   facilities?
10  A.  I don't know that Mr. Guthrie ever
11  speculated with me on that question.
12  Q.  Did you ever speculate with him on what
13  was the cause?
14  A.  I don't recall doing that.
15  Q.  Were you instructed by someone in the
16  Lafarge organization to contact Mr. Guthrie with
17  regard to this occurrence?
18  A.  No, I was not.
19  Q.  You did that on your own?
20  A.  I speak to Mr. Guthrie almost on a daily
21  basis on my own.  I've known him a long time.
22  He's a good friend of mine.
23  Q.  And it's your testimony that you cannot
24  at this time recall what you said to him about
25  the barge breaking away and you cannot recall

- 50 -

BARGE000706

MiniDep by Kenson

**EDWARD VANDERMEULEN**

1 what he said to you about the barge breaking
2 away; is that correct?
3    A. That's correct.
4       MR. WEBB:
5          Larry, do you mind if we take a
6       quick break?
7          (At this time, a break was taken.)
8 BY MR. WIEDEMANN:
9    Q. Did -- and again when I say, I'm talking
10 about the time of this occurrence, okay, unless I
11 say otherwise.
12       Did Lafarge have a procedure for
13 investigating catastrophic or meaningful
14 incidents at that time?
15    A. I don't know.
16    Q. Who would know that?
17    A. I would refer you to my boss, who's the
18 director of distribution.
19    Q. And what's his name?
20    A. Jon Erbes.
21    Q. John?
22    A. Yeah, J-o-n, Jon.
23    Q. Jon?
24    A. Jon.
25    Q. Okay.

- 51 -

1    A. E-r-b-e-s.
2    Q. Huh?
3    A. E-r-b-e-s.
4    Q. What is his title?
5    A. He's the director of distribution.
6    Q. What does the -- because you've indicated
7 Mr. Thompson is the head of safety and audit
8 team. What is their job?
9    A. Mr. Thompson is our Director of Safety in
10 the River Region.
11    Q. And that's Don Thompson?
12    A. Dan.
13    Q. Dan Thompson?
14    A. Yes.
15    Q. And he's the Director of Safety?
16    A. Yes.
17    Q. In what region?
18    A. The River Region.
19    Q. Well, as the Director of Safety, because
20 most directors of safety -- and I'm not implying
21 it's true here -- they investigate accidents and
22 see why accidents happen and how they might be
23 prevented. Did Lafarge have such a policy, that
24 you know of?
25    A. In Mr. Thompson's role he does

- 52 -

1 investigate accidents. And of course, depending
2 on the scope, etc., we would engage outside help
3 in the form of counsel and experts and so forth.
4    Q. So Mr. Thompson would be the one who
5 would originate an investigation vis-á-vis this
6 locality, or would it possibly come from above?
7    A. Relating to safety he would. We have a
8 risk management department that involved, or
9 could be involved. You said who would
10 investigate an incident like this, or do we have
11 a procedure or policy regarding it --
12    Q. Yes.
13    A. -- and I simply don't know.
14    Q. So that would be something that Mr.
15 Thompson would know; is that correct?
16    A. I would refer you to him to find out.
17    Q. Or, or the director of distribution,
18 Mr. --
19    A. Erbes.
20    Q. Erbes.
21    A. He's my boss and, you know.
22    Q. Okay. Do you have a National Safety
23 Director?
24    A. Yes, we do.
25    Q. Who is he?

- 53 -

1    A. Dave Harmon.
2    Q. Dave Herman.
3    A. Harmon, H-a-r-m-o-n.
4    Q. And he's the National Safety Director?
5    A. Or similar title, but he's responsible
6 for safety in North America.
7    Q. But you don't know personally or within
8 your corporate capacity of an investigation that
9 was conducted to determine the cause and
10 prevention of this incident?
11    A. Well, I think you first asked me if we
12 have a policy to investigate.
13    Q. Yes.
14    A. Now you're asking me if I don't know
15 about it.
16    Q. Well --
17    A. And I do know about it. You know, we're
18 all here.
19    Q. Let's go back to the policy. What's the
20 policy, if you know?
21    A. I said I don't know.
22    Q. You don't know, for instance, that in an
23 accident the people go out, you know, from the
24 company and investigate and come up with a root
25 cause analysis or a way to try and prevent it

- 54 -

EDWARD VANDERMEULEN

1 from happening?
2 A. Now we switched over again. I mean, you
3 started out, do we have a policy. I said I don't
4 know. Now, do I know that we --
5 Q. Well --
6 A. -- analyze and --
7 Q. Well, I ask the questions.
8 A. Go ahead.
9 Q. If you don't understand it, you say I
10 don't know understand it.
11 A. Okay.
12 Q. I'm not going to answer questions today.
13 A. Sure.
14 Q. All right.
15 A. You bet. You bet.
16 Q. My question is: Did they have a policy?
17 We have an accident, it happened on the
18 Mississippi River, three people are killed, what
19 happens, what goes into place is so far as --
20 MR. WEBB:
21 Asked and answered.
22 MR. WIEDEMANN:
23 -- Lafarge's policy?
24 MR. WEBB:
25 And you are now far afield from a

- 55 -

1 30(B)(6) notice.
2 MR. WIEDEMANN:
3 Okay.
4 MR. WEBB:
5 So, I mean, I don't know where
6 you're going with this, but I can tell
7 you that an investigation has been
8 conducted by counsel, that's it.
9 MR. WIEDEMANN:
10 Well, I haven't asked him a word
11 about counsel.
12 MR. WEBB:
13 Well, I'm telling you --
14 MR. WIEDEMANN:
15 I'm not going to ask him about
16 counsel.
17 MR. WEBB:
18 You're right you're not.
19 MR. WIEDEMANN:
20 And that's all he's got to say.
21 Okay? And if says it was done by
22 counsel, that's fine. I'm not concerned
23 about -- and I'm not, for your
24 information, I'm not asking him about
25 that. Counsel does not originate an

- 56 -

1 investigation. The company originates
2 investigations and counsel may become
3 involved from the company's standpoint.
4 And that's what I'm asking him, what does
5 the policy with Lafarge --
6 MR. WEBB:
7 And he's already told you he doesn't
8 know, so let's go to a new question.
9 BY MR. WIEDEMANN:
10 Q. You don't know the policy?
11 A. That's correct.
12 Q. You have no personal knowledge of how an
13 investigation is originated or by whom?
14 A. I have no personal knowledge of a
15 specific policy to originate an investigation.
16 Q. When you spoke to Mr. Guthrie several
17 months ago -- I don't remember exactly when you
18 said -- but when you talked to Mr. Guthrie, did
19 he tell you that somebody from the company was
20 conducting an investigation?
21 A. Yes, he did.
22 Q. And what did he tell you? I don't want
23 to hear what he told you about what counsel's
24 told him. What did he tell you about the
25 investigation?

- 57 -

1 A. He told me after the storm that
2 approximately when we were able to get back to
3 our facility that Mike Gordon was in New Orleans
4 trying to look at the facility to ascertain what
5 had happened.
6 Q. Who is Mike Gordon?
7 A. Mike Gordon is our vice president of
8 Logistics.
9 Q. Did he tell you anybody else from the
10 company was involved?
11 A. No.
12 Q. Did Mike Gordon, to your knowledge, make
13 a report of his investigation?
14 A. I don't know.
15 Q. Do you know what his findings were?
16 A. I do not know.
17 Q. Did Mr. Guthrie tell you?
18 A. I don't know -- no. A.J. did not tell me
19 any findings.
20 Q. So, you don't know of any policy for
21 investigation, you don't know any procedure for
22 an investigation of incident, and you don't know
23 any record methodology of an investigation; is
24 that correct?
25 A. That's correct.

- 58 -

EDWARD VANDERMEULEN

MINIDEP N-Kenson

1    Q.  So you don't have any knowledge of how
2  your company originates an investigation, how
3  they conduct it, and what comes out of that
4  investigation insofar as findings, conclusions,
5  whatever; is that right?
6    A.  That's correct.
7    Q.  How did Mike Gordon come to be involved
8  in the investigation, if you know?
9    A.  I don't know.
10   Q.  Mr. Guthrie didn't tell you?
11   A.  No, he did not.
12   Q.  Does Mr. Gordon have any experience --you
13  said he's vice president of Logistics.  Does he
14  have any experience to your knowledge in accident
15  investigation?
16   A.  I don't know.
17   Q.  Does he have anything to do with safety
18  insofar as the company's concerned?
19   A.  Everyone in Lafarge is a safety agent and
20  involved in Safety.
21   Q.  Well, you're involved in safety then?
22   A.  Yes, I am.
23   Q.  But you don't know the safety procedure
24  or the investigatory methods or the reporting of
25  results although you're involved in safety; is

- 59 -

1  that right?
2    A.  Well, I do know some reporting of
3  results.  And if you want to rehash what you
4  said, I'm not familiar what the policy is for
5  instituting an investigation.
6    Q.  Well, if you, like everybody else, is in
7  charge of safety, how do you -- and you don't
8  know anything about how it's --
9    A.  I never said everybody was in charge of
10  safety, nor did I say I was in charge of safety.
11  I'm responsible to conduct myself safely, and
12  everyone in Lafarge is empowered as a safety
13  agent.
14   Q.  All right.  Okay.  As a safety agent for
15  Lafarge, have you heard of a root cause analysis
16  of the occurrence of the barge in this incident?
17       MR. WEBB:
18            Object to the form of the question.
19  BY MR. WIEDEMANN:
20   Q.  The release of the barge?
21   A.  I'm aware that counsel is --
22   Q.  No.
23   A.  -- investigating.
24   Q.  I'm not asking about that.  Do you know
25  what a root cause analysis is?

- 60 -

1    A.  A root cause failure analysis?
2    Q.  Yes.
3    A.  Insofar in operational items, yes.
4    Q.  You've heard of that before?
5    A.  Yes, I have.
6    Q.  You've heard of root cause analysis in
7  regard to accidents and occurrence of accidents?
8    A.  I have.
9    Q.  And so your company does from time to
10  time come up with a root cause analysis of -- for
11  the occurrence of an accident?
12   A.  Yes, our company does.
13   Q.  What do you call that, that particular
14  document or finding?  Do you call it root cause
15  analysis, or you call it something else?
16   A.  I would -- I can't recall specifically.
17   Q.  But you know that an investigation of
18  accident originates such a document, whatever you
19  want to call it?
20   A.  Yes, very, very thoroughly.
21   Q.  It's a very thorough document?
22   A.  (Witness nods head affirmatively.)
23   Q.  And don't shake your head, please,
24  because he can't take it down.
25   A.  You bet.  I'm sorry.  I've very

- 61 -

1  expressive.
2    Q.  It's human nature.
3    A.  Yeah.
4    Q.  And would the document -- I call it root
5  cause analysis -- you may call it something
6  else -- would it also, since it would make
7  recommendations of changes to make something more
8  safe?
9    A.  Yes, it would.
10   Q.  And are you sure that there was such a
11  document generated in this incident?
12   A.  No, I'm not.
13   Q.  And do you know why it would not be
14  generated in this case if it's generated in other
15  cases?
16   A.  The cases I alluded to were generally
17  speaking personal safety -- of a personal safety
18  in nature.  This particular incident is different
19  in that the investigation has been given over to
20  counsel and we did not have it in our facility.
21  We've not had any injuries and any other
22  incidents that I'm aware of.
23   Q.  So is it your testimony that Lafarge,
24  which is an international company, only
25  investigates accidents and makes reports of root

- 62 -

EDWARD VANDERMEULEN

MINIDEP by Kerison

1 cause analysis if it involves their own employees
2 but not third parties?
3      MR. WEBB:
4          Object to the form of the question.
5 BY MR. WIEDEMANN:
6    Q. You can answer.
7    A. I don't, I don't know.
8    Q. You don't know?
9    A. (No response).
10   Q. Well, you just said a moment ago in
11 answer to my question that you only do that when
12 people in your employ are hurt; is that correct?
13   A. No. I'm saying that in my experience it
14 has been primarily cases where it's involved
15 personal injuries or a high-risk or a near-miss
16 with personal safety, but, of course, we have
17 vehicular accidents, etc. As it relates to this
18 particular case, I don't know.
19   Q. Do you know whether Mr. Gordon retained
20 any expert prior to retaining counsel that
21 investigated this matter?
22   A. No, I don't.
23   Q. Do you have an engineering department?
24   A. Yes, we have an engineering. It — yes,
25 we have one.

- 63 -

1    Q. Does it have anything to do with accident
2 investigations?
3    A. No.
4      MR. O'DWYER:
5          On behalf of my clients, before we
6      leave this area, I'm calling for
7      production of Lafarge's root cause
8      analysis with respect to this incident.
9      I know it exists. Don't try to hide it.
10     I want it.
11     MR. GILBERT:
12         Join in that.
13 BY MR. WIEDEMANN:
14   Q. The LNA-113, the New Orleans Terminal
15 Hurricane Preparation Checklist, do you know who
16 prepared this?
17   A. Yes.
18   Q. Who was it?
19   A. Ed Busch.
20   Q. Ed Busch prepared this document?
21   A. Yes, he did.
22   Q. Do you know when he prepared it? It's
23 not dated.
24   A. No. We discussed that before I — no, I
25 don't know.

- 64 -

1    Q. No. I don't believe I asked you. But if
2 I did, I'm —my question is: It's not dated,
3 okay, and you know Mr. Busch prepared it, how did
4 you find that out?
5    A. Mr. Busch told me that he prepared it.
6    Q. When you recently talked to him?
7    A. Yes.
8    Q. Did he tell you when he prepared it?
9    A. Not that I recall. I don't recall.
10   Q. Well, you say — you say that when you
11 talked to him that the policy had been changed
12 before — right before the 27th.
13     MR. WEBB:
14         Object to the form of the question.
15     That's not what he testified to. Go back
16     and look at the Record.
17     MR. WIEDEMANN:
18         Well, I'm not going to go back and
19     look at the Record.
20 BY MR. WIEDEMANN:
21   Q. Did you not say you spoke to Mr. Guthrie
22 about the — about changes that had been made in
23 the hurricane preparation checklist?
24     MR. WEBB:
25         Now, do you mean Guthrie or Busch

- 65 -

1    this time?
2 BY MR. WIEDEMANN:
3    Q. Or Busch, I'm sorry. Did you talk to Mr.
4 Busch about changes that had been made in the
5 hurricane checklist?
6    A. I don't recall.
7    Q. Well, who did you talk to when you say
8 you found out that they had — before the 27th
9 they had changed the procedure?
10   A. Who did I talk to when I found out before
11 the 27th that they had changed the procedure? My
12 knowledge of that procedure is that that was the
13 procedure in place prior to the hurricane. I
14 know Ed Busch wrote that procedure. I only
15 surmise that it was written probably at least a
16 year or two before the hurricane, because after
17 our dock was renovated and we had the ability to
18 long-line, we adopted new — a new and upgraded
19 way of mooring our barges.
20     MR. O'DWYER:
21         All right. Let me object to the
22     form of the question — only object to
23     the responsiveness of the answer. The
24     witness previously said that he
25     understood the upgraded procedure to have

- 66 -

BARGE000710

EDWARD VANDERMEULEN

1  come into effect a year or two before
2  August 27th. He's now changed that and
3  said that this written procedure came
4  into effect and was written a year or two
5  before August 27th. He can't have it
6  both ways.
7  MR. WEBB:
8      Ashton, the Record will be clear as
9  to what's been said. I mean --
10 MR. O'DWYER:
11     I know exactly what he said.
12 MR. WEBB:
13     Some of Larry's questions have been
14 very confusing even to me and hopefully
15 to you, and I'm going to ask also that
16 you refrain from making objections,
17 again. You may make requests, but you
18 may not make objections because of the
19 order that we're taking this deposition
20 pursuant to. I've been very patient in
21 listening to you, but I'd ask that you
22 stop interrupting, please. If not, we're
23 going to be here all day.
24 MR. WIEDEMANN:
25     Well, we might be anyway.

- 67 -

1  MR. WEBB:
2      Well --
3  MR. WIEDEMANN:
4      So --
5  MR. WEBB:
6      Let's move on, please.
7  BY MR. WIEDEMANN:
8      Q. You testified that the procedure in this
9  written document, LNA-113, was changed sometime
10 before the 27th of August, 2005; is that correct?
11     A. The procedure that we employed was
12 changed before August 27th, 2005.
13     Q. How long before August 27th?
14     A. I don't know.
15     Q. You don't know whether it was the 26th?
16     A. I could not believe that it was done on
17 the 26th just by virtue of my conversations and
18 the activity, but I don't know. No, I don't
19 know.
20     Q. You don't know when it was changed?
21     A. That's correct.
22     Q. When was the facility renovated?
23     A. Approximately two to four years prior to
24 2005.
25     Q. So two to four years prior to 2005 the

- 68 -

1  Industrial Canal facility was renovated; is that
2  right?
3      A. Partially renovated, partially renovated.
4      Q. Well, you mentioned the renovation. Was
5  the wharf renovated four or five years ago?
6      A. Within that scope of time, yes.
7  Approximately.
8      Q. Were the wharf fixtures, that is, the
9  mooring fixtures renovated four or five years
10 ago?
11     A. Between two and four or five years ago, I
12 would say. I'm estimating.
13     Q. So then it became apparent that two to
14 five years ago that the renovation of the
15 facility would allow for long-line; isn't that
16 so?
17     A. I would agree.
18     Q. But in spite of that, this document, LNA-
19 113, has not been changed even until today when
20 we're taking your deposition?
21     A. I'm not aware that it hasn't been changed
22 as of today. I don't know. It wasn't changed as
23 of the date of the storm.
24     Q. It wasn't changed as of the date that
25 counsel furnished this document in a Request for

- 69 -

1  Production of Documents, which was on October
2  1st -- October 3rd, 2006. Can you testify that
3  it's ever been changed?
4      A. No, I don't know.
5      Q. Can you testify why it hasn't been
6  changed?
7      A. I don't know.
8      Q. You mentioned a two-stage procedure, a
9  national procedure and a local procedure; is that
10 correct?
11     A. Yes.
12     Q. Is the national procedure a written
13 procedure like the local procedure is?
14     A. Yes.
15     Q. And that is called what? I mean, what's
16 the name of it?
17     A. I think the current technology is the
18 acronym DOPM, Distribution Operating Procedures
19 Manual.
20     Q. And does the national procedure deal with
21 inclement weather as well?
22     A. No.
23     Q. Well, in this case, on the 29th of August
24 of 2005, you had a storm in Joppa, Illinois. Are
25 you aware of that?

- 70 -

**EDWARD VANDERMEULEN**

1    A.  Yes.
2    Q.  And as a result of that store in Joppa,
3  Illinois, Lafarge allegedly called Ingram to come
4  out and check their barges, the mooring on their
5  barges.  Are you aware of that?
6    A.  No.
7    Q.  Well, let me show you a document, LNA-
8  278.  See that document?
9    A.  Yes, I do.
10   Q.  And it indicates that on the 29th of
11  September [sic], 2005, there was some inclement
12  weather in Joppa, Illinois, and --
13   A.  Yes.
14   Q.  -- Ingram was called to come out and
15  check their barges; isn't that so?
16       MR. HAYCRAFT:
17           Object to the form.
18       MR. WEBB:
19           Larry, this document says what it
20       says.  Okay?  And you're butchering it.
21       MR. WIEDEMANN:
22           Okay.  You want me to read it, so
23       counsel will --
24       MR. WEBB:
25           You're talking about 278?

                        - 71 -

1       MR. WIEDEMANN:
2           Yes, talking about 278.
3       MR. WEBB:
4           Okay.
5       MR. WIEDEMANN:
6           It's a document originating from
7       Rachael Burnett to Rich Corzine and it
8       says:  "Ingram coming to Joppa plant."
9       That's the subject matter.  "I've given
10      Ingram the okay to come to Joppa within
11      the next 45 minutes to an hour to tie
12      down and inspect all their barges in our
13      fleet.  David Williams stated that there
14      has been a change in the storm direction
15      and high winds may now be heading our
16      way.  I've notified the butry to be on
17      the lookout for them."
18          Okay.  Did I butcher the reading?
19      MR. WEBB:
20          No.  You read it accurately.
21      THE WITNESS:
22          Yes, you did.  You read it
23      accurately.
24  BY MR. WIEDEMANN:
25      Q.  Isn't a fact that this document confirms

                        - 72 -

1  that Joppa -- in Joppa they had inclement weather
2  on August 29th, 2005?
3    A.  It confers that.
4    Q.  And that as a result of that inclement
5  weather, the Lafarge people called Ingram to come
6  out and check their barges.
7       MR. WEBB:
8           Larry, that is nowhere in this
9       document.  It says "I have given Ingram
10      the okay."  It doesn't say I called
11      Ingram.  It doesn't say Ingram called us.
12      Ask the witness.
13      MR. WIEDEMANN:
14          You can make an objection if you
15      want, but don't tell the witness what he
16      should answer, if that's what you're
17      trying to do.
18      MR. WEBB:
19          Larry, if you'd read the paper,
20      you're not being fair.
21  BY MR. WIEDEMANN:
22      Q.  Have you seen this document before?
23      A.  Yes, I have.
24      Q.  Who showed it to you?
25      A.  Counsel.

                        - 73 -

1      Q.  And do you know why this document came
2  up?
3    A.  No, I don't.
4    Q.  Tell me what it means to you.
5       MR. HAYCRAFT:
6           Object to the form.
7       THE WITNESS:
8           What it means to me is that Ingram
9       called us and asked if they could check
10      their barge fleet in the face of
11      impending bad weather.  Further --
12      further what it means to me is because
13      high winds were mentioned in this e-mail,
14      that Ingram wanted to come and tie down
15      and make sure their fiberglass covers
16      didn't blow off the barges.  Originally -
17      - originally you stated mooring.  At our
18      Joppa plant, we have a full-time boat
19      that stands by and attends the barges in
20      our fleet.  We have a full-time dedicated
21      boat that does that because there's a
22      large number of barges that are being
23      loaded and waiting to be loaded.  So, my
24      experience would indicate to me that this
25      meant that Ingram was concerned about

                        - 74 -

BARGE000712

EDWARD VANDERMEULEN

1     high winds and wanted to come and make
2     sure that their fiberglass covers were
3     tied down with a small line to keep them
4     from blowing off in the wind.
5 BY MR. WIEDEMANN:
6     Q. Okay. Maybe -- maybe I'm a butcher, but
7 I don't see anything about fiberglass covers.
8     A. Well, that's what you tie down in a wind.
9 That's what blows away in the wind on hopper
10 barges.
11     Q. But in any event my question is:
12 New Orleans is not the only place where storms
13 occur; is that so?
14     A. That's correct.
15     Q. And apparently a storm occurred in Joppa,
16 Illinois, on the 29th, the day that Katrina hit
17 New Orleans, and you're telling me that your
18 company in Joppa had no storm procedure?
19     A. I've never said that.
20     Q. Well, what was their storm procedure? I
21 asked you about the national procedure. What was
22 it relative to Joppa when a storm hits?
23     A. First off --
24     Q. Is your procedure you call Ingram?
25     A. First off, Joppa is a producing facility.

- 75 -

1 I work in the distribution department. I have --
2 as I indicated to you, the Tier I procedures are
3 distribution operating procedures. Joppa is a
4 production facility. I am not part of the
5 production department. I do not know what their
6 procedures are.
7     MR. WIEDEMANN:
8         Well, then, I'm going to ask that
9     we continue, not stop right now, but I'm
10     going to ask that we continue the 30(B)6
11     deposition for Lafarge to produce
12     somebody that knows about the corporation
13     that he has just said he doesn't know
14     about.
15     MR. WEBB:
16         Larry, we'll argue that later --
17     MR. WIEDEMANN:
18         Yes.
19     MR. WEBB:
20         -- but you're way beyond the scope
21     and I think it's improper. But go ahead,
22     we'll argue it later.
23 BY MR. WIEDEMANN:
24     Q. First of all, let me ask you, who is
25 Rachael Burnett?

- 76 -

1     A. Rachael Burnett was our -- forgive me for
2 not maybe knowing -- I'm going to say barge
3 scheduler.
4     Q. Is she still employed by the company?
5     A. No, she is not.
6     Q. Who is she employed by? Do you know?
7     A. No, I do not.
8     Q. Do you know where she lives?
9     A. No, I do not.
10     Q. And who is Rich Corzine?
11     A. Rich Corzine is a supervisor at our Joppa
12 production facility.
13     Q. And who is Bonnie Barnes?
14     A. Barney Barnes was formerly another
15 manager at our production facility in Joppa,
16 Illinois.
17     Q. And where is he now?
18     A. He left the company and I don't know.
19     Q. Do you know where he lives?
20     A. No, sir.
21     Q. What about Jay Darlington?
22     A. Jay Darlington was our barge coordinator.
23     Q. A.J. Guthrie?
24     A. A.J. Guthrie is area distribution
25 manager.

- 77 -

1     Q. That's one we talked about earlier?
2     A. Yes, sir.
3     Q. And did you talk to any of these people
4 about this e-mail?
5     A. No, I have not.
6     Q. So your interpretation of the e-mail is
7 not a result of information that you go from the
8 people involved in the e-mail, it's your
9 assumption of what it means?
10     A. That's correct.
11     Q. And it's your testimony that you read
12 this e-mail to mean that Ingram called Joppa; is
13 that what you read it to be?
14     A. I interpreted it to mean that Ingram
15 called Rachael Burnett.
16     Q. Who's in Joppa?
17     A. I believe she was at the time.
18     Q. Because they were concerned about their
19 barges, apparently?
20     A. I think barge covers.
21     Q. They were concerned about their barges
22 and the security of their barges; is that
23 correct?
24     MR. HAYCRAFT:
25         Object to the form.

- 78 -

## EDWARD VANDERMEULEN

1 BY MR. WIEDEMANN:
2    Q. Is that so?
3    A. Specifically the covers, in my opinion.
4    Q. Now, I don't see anything about covers in
5 here. Where do you get that from?
6      MR. WEBB:
7        He's already explained that to you.
8    You want him to explain it again?
9      MR. WIEDEMANN:
10        Yeah, because I'm still --
11      MR. WEBB:
12        Okay.
13      MR. WIEDEMANN:
14        I want him to explain it again.
15      THE WITNESS:
16        Well, our fleet is tended by a full-
17 time boat, and to my knowledge Ingram has
18 never asked to look at the moorings at
19 any of our facilities, the mooring of
20 their barges. On the other hand, barge
21 covers in high wind are particularly
22 vulnerable and should be tied down so
23 that the clasps that hold them to the
24 barges don't release with the agitation
25 of the wind and the cover blow away. The

- 79 -

1 covers blowing away were a huge problem
2 after this particular storm, all the way
3 from Louisiana all the way up into the
4 northern parts of the Mississippi River
5 Basin.
6 BY MR. WIEDEMANN:
7    Q. Well, did Lafarge to your knowledge call,
8 or did Ingram to your knowledge call Lafarge
9 about the covers on the barge, the barges on the
10 Industrial Canal?
11    A. I don't know.
12    Q. Well, we had much higher winds than you
13 had in Joppa, didn't we?
14    A. Yes, we -- I don't know if we had higher
15 winds, to be honest.
16    Q. Did Lafarge to your knowledge call Ingram
17 and -- for any reason concerning the barges on
18 the Industrial Canal?
19    A. For any reason?
20    Q. Yes.
21    A. Lafarge calls Ingram or their fleet
22 designee for several reasons about barges on the
23 inner harbor.
24    Q. So just so I'll be clear, when it says
25 "I've given Ingram the okay to tie down and

- 80 -

1 inspect all their barges in our fleet," you
2 interpret that without having talked to anybody
3 that's privy to this communication, you interpret
4 that to mean just the covers; is that right?
5    A. That's correct, that's how I interpret
6 it.
7    Q. But this is not your department, as I
8 understand it?
9    A. The production of cement is not my
10 department, that's correct.
11    Q. So you're not involved on a day-by-day
12 basis in what happens in the production end?
13    A. That's correct.
14    Q. And these people that originated this
15 e-mail are directly involved in this?
16    A. Yes, they are.
17    Q. So they would be more knowledgeable than
18 you concerning that aspect of the business?
19    A. Yes, they would.
20    Q. To your knowledge, did Ingram go to the
21 Joppa facility to inspect their barges?
22    A. I don't know.
23    Q. So it appears that even though the barges
24 were in the Lafarge facility that Ingram was
25 still concerned enough to call about their barges

- 81 -

1 to see whether they were properly taken care of?
2      MR. HAYCRAFT:
3        Object to the form.
4 BY MR. WIEDEMANN:
5    Q. Is that not so?
6    A. Not according to my -- you know, not
7 according to my interpretation of -- of this.
8    Q. Didn't you interpret this to mean that
9 Ingram called Lafarge; isn't that what you said?
10    A. Yes, yes.
11    Q. Okay?
12    A. Yes.
13    Q. And Ingram called Lafarge because they
14 were concerned about the security of their barges
15 in the Joppa facility; isn't that so?
16    A. I interpret this to mean that Ingram
17 called Lafarge to check and secure their barge
18 covers.
19    Q. All right. Now, the -- it's my
20 understanding that Mr. Busch of the local office
21 prepared this LNA-113; is that right?
22    A. Yes, it is.
23    Q. What experience did he have in preparing
24 such a document to your knowledge?
25    A. Mr. Busch started from -- started his

- 82 -

EDWARD VANDERMEULEN

MinuScript by Kathleen

1 employment in our industry in about 1982, at
2 Sparrow's Point, which is in the eastern part of
3 our country, and he was involved in operations
4 and barge operations, and specifically involved
5 in mooring of ships and barges and so forth.
6         So he has up till that point, at least to
7 my knowledge, about a 23-year history of dealing
8 with operations and marine procedures.
9       Q. So he promulgated this document and put
10 it down in writing and put it in the company
11 records; is that right?
12      A. Yes.
13      Q. And you say that he's the one who changed
14 the procedures sometime before August 27th, 2005,
15 and with all his experience, as you have
16 described it, that he certainly knew that he
17 should make a written document of his changes,
18 wouldn't he? Wouldn't you assume that?
19          MR. WEBB:
20              Object to the form of the question.
21          THE WITNESS:
22              Would I assume it?
23 BY MR. WIEDEMANN:
24      Q. Yes.
25      A. I would assume it, yes.

- 83 -

1      Q. Now, in talking to Mr. Busch, as you
2 indicated after this occurrence, did he tell you
3 that he had called Ingram on the 27th of August
4 to come pick up their barge?
5      A. No. Mr. Busch informed me that he called
6 Zito and -- in order to release the barge for
7 pickup.
8      Q. Let me show you Answers to
9 Interrogatories filed by your counsel for your
10 company here. It's No. 20, and it says,
11 "According to LNA-113, employee" -- that's
12 Lafarge National American -- "employee Ed Busch,
13 a call was made on August 27th, 2005, to release
14 the barge over voicemail to one of Ingram's
15 representatives in New Orleans."
16      A. Yes. I -- I --
17      Q. You read that before?
18      A. I'm sure I have.
19      Q. Why did you say Zito?
20      A. Well, if you know, this says "Ingram's
21 representative." We have an affreightment
22 agreement with Ingram. And what that states, we
23 pay Ingram so much money to allow us to put our
24 product in their barge and deliver that to our
25 dock.

- 84 -

1      Now the way Ingram does that is, Ingram
2 designates a local fleet. You know, Ingram
3 operates big river line boats. Okay? So the
4 majority of the journey is -- these barges is
5 done on a larger boat that goes from one point to
6 another. When it gets to a local market, it
7 drops that barge into --
8      Q. I don't want to interrupt you, but that
9 has nothing to do with my question. Now if you
10 want to go on, then I'll go to the bathroom.
11          MR. WEBB:
12              Just answer his question.
13          MR. WIEDEMANN:
14              But I'll let him go ahead and make a
15 speech.
16          MR. WEBB:
17              So you're taking a break?
18          MR. WIEDEMANN:
19              No, I'm not taking a break. Why
20 doesn't he go ahead and talk about what
21 he wants to talk about.
22          MR. WEBB:
23              Well, he's not going to talk if
24 you're gone, Larry.
25          MR. WIEDEMANN:

- 85 -

1      I don't want to interrupt him.
2          MR. HAYCRAFT:
3              I object to your interruption.
4          MR. WEBB:
5              No, he's not going to keep talking.
6          MR. WIEDEMANN:
7              Let him finish what he was saying.
8          MR. WEBB:
9              No, we're taking a break.
10          MR. WIEDEMANN:
11              Well --
12          MR. WEBB:
13              Well, we're taking a break.
14              (At this time, a break was taken.)
15 BY MR. WIEDEMANN:
16      Q. Did you finish your answer? I didn't
17 want to interrupt you.
18      A. No, I hadn't.
19      Q. Okay. Well, go ahead and finish your
20 answer.
21      A. Well, what we were talking about was
22 Ingram's representative. And --
23      Q. That's not what I was talking about, but
24 you go ahead and talk about it.
25          MR. WEBB:

- 86 -

BARGE000715

EDWARD VANDERMEULEN

**MINIDIV by Kelson**

| | |
|---|---|

1    Why don't you just answer his
2    question.
3    THE WITNESS:
4        Okay.
5    MR. WEBB:
6        He can re-ask it --
7    THE WITNESS:
8        Yeah.
9    MR. WEBB:
10      -- if he was unhappy with your
11   answer.
12 BY MR. WIEDEMANN:
13   Q.  No.  I'm reading the answer of your
14 attorney to written interrogatories.  You know
15 what written interrogatories are?
16   A.  Generally speaking, yes.
17   Q.  They're questions that counsel asks of
18 one another and they have to answer them to the
19 best of their knowledge and information.
20   A.  Uh-huh (affirmative response).
21   Q.  And this is what -- you've seen this
22 before, haven't you?
23   A.  I believe I have.  Yes.
24   Q.  And their answer -- that is, your
25 attorneys for your company answered, "LNA is not

- 87 -

1 be picked up.
2   Q.  But there's nothing in here about Zito,
3 in your counsel's response.  You read it.  Is
4 there anything about Zito in there?
5   A.  There is no mention of Zito.
6   Q.  So where did you get Zito from?
7   A.  Zito is Ingram's representative in the
8 New Orleans terminal.
9   Q.  So Zito, according to your knowledge, is
10 Ingram's agent?
11   MR. HAYCRAFT:
12      Object to the form.  I think it
13     calls for a legal conclusion.
14 BY MR. WIEDEMANN:
15   Q.  You can answer if you feel qualified.
16   A.  I am not qualified to say agent.
17   Q.  What do you mean then that Zito is
18 Ingram's representative in this area?
19   A.  Ingram does not provide local service to
20 people like us directly.  Ingram relies on fleets
21 with smaller boats to deliver barges to customers
22 like us and Ingram pays them as part of an
23 affreightment agreement that we have with Ingram.
24   Q.  It's your understanding that Ingram has
25 an agreement with Zito to pick up barges from

- 89 -

1 aware of any written instructions."  That's just
2 a part.  And this is the part that I asked you
3 about.
4   A.  Okay.
5   Q.  "According to LNA, Lafarge employee Ed
6 Busch, a call was made on August 27th, 2005, to
7 release the barge over voicemail to one of
8 Ingram's representatives in New Orleans."  Okay?
9   A.  Okay.
10   Q.  You see that?
11   A.  Yes.
12   Q.  Your counsel is showing it to you?
13   A.  Yes.
14   Q.  Had you ever talked to Mr. Busch about
15 this?
16   A.  Yes, I have.
17   Q.  When?
18   A.  On the occasion that I met him in
19 September of 2006 at the New Orleans terminal.
20   Q.  And what does it mean that he released
21 the barge to Ingram on the 27th, two days before
22 the hurricane?
23   A.  It means that he called and left a voice
24 message with Ingram's designated fleeting service
25 and stated that the barge was empty and ready to

- 88 -

1 your facility, or bring barges into your
2 facility?
3   A.  Yes, it is.
4   Q.  And they're authorized to do that when
5 you all request it?
6   A.  Yes.
7   Q.  And in this case, on the 27th, Mr. Busch
8 requested, according to your information, Zito to
9 pick up the empty barge, 4727; is that correct?
10   A.  He would have told him it was empty and
11 ready to be picked up.
12   Q.  Do you know at what time he called?
13   A.  Approximately 9:00 a.m.  Approximately, I
14 don't know precisely, but --
15   Q.  That is information that you got from Mr.
16 Busch?
17   A.  That's correct.
18   Q.  That he called about 9:00 a.m. to Zito
19 and told him to pick up the barge?
20   MR. HAYCRAFT:
21      Object to the form of the question.
22 BY MR. WIEDEMANN:
23   Q.  Is that your understanding?
24   A.  My understanding was, he called
25 approximately 9:00 a.m., left a voice message

- 90 -

EDWARD VANDERMEULEN

1  that the barge was empty and ready to be picked
2  up.
3      Q.  And when a barge is empty and ready to
4  pick up, it's the responsibility of the -- of
5  Ingram to pick it up?
6      MR. HAYCRAFT:
7          Object to the form of the question.
8  BY MR. WIEDEMANN:
9      Q.  Is that correct?
10     A.  Yes.
11     Q.  Lafarge doesn't move barges in and out of
12  their facilities, do they?
13     A.  No, we do not.
14     Q.  It's the Ingram, if it happens to be
15  Ingram, has a barge brought in, delivered to your
16  facility, it's their responsibility when it's
17  ready to be taken out to take it out, or have
18  someone take it out; right?
19     A.  Yes.
20     Q.  You don't have a fleeting operation, once
21  your cement is delivered and unloaded, you have
22  no further use for the empty barge; is that
23  correct?
24     A.  That's correct.
25     Q.  And it should be put back in commerce as

- 91 -

1  quickly as possible; isn't that so?
2      A.  Yes.
3      Q.  Therefore, was not Ingram under this
4  arrangement supposed to pick up the barge on the
5  27th, before the hurricane?
6      MR. HAYCRAFT:
7          Object to the form.
8      THE WITNESS:
9          I can't speak to whether they're
10         supposed to pick it -- supposed to pick
11         it up in that given time frame, I don't
12         know.
13  BY MR. WIEDEMANN:
14     Q.  You said earlier that Mr. Busch,
15  according to your conversation with him, said
16  that he called Zito because Zito was Ingram's
17  representative to pick up the barge; isn't that
18  so?
19     A.  Yes.
20     Q.  Now Lafarge doesn't bring in barges and
21  they don't take barges out; is that correct?
22     A.  That's correct.
23     Q.  When the barge is ready to be taken out,
24  you call your customer and tell him, or the
25  carrier, you call them to come pick up their

- 92 -

1  barge and take it whether they want to take it;
2  isn't that so?
3      A.  Yes.
4      Q.  And it's your understanding that the
5  facility here did not that through Zito Towing at
6  the instruction of Ingram?
7      A.  Yes.
8      Q.  So Mr. Busch was doing what he was
9  supposed to do, and that is, call Zito to pick up
10  the Ingram barge and take it to a fleeting
11  operation?
12     A.  Yes.
13     Q.  And the fleeting operation would be
14  where?
15     A.  Algiers.
16     Q.  And that's how far from the Industrial
17  Canal?  Do you know?
18     A.  No, sir.
19     Q.  Now, so are you aware that Mr. Busch also
20  called someone after 9:00 a.m., Unique Towing, to
21  come in and turn the barges around?  Top them
22  around, I think is the word.
23     A.  Yes.
24     Q.  And is it not a fact that the empty barge
25  was no longer any use to your company, it had

- 93 -

1  been empty and was ready to go?
2      A.  Yes.
3      Q.  There was no reason for you all to keep
4  it at the Lafarge facility?
5      A.  No.
6      Q.  And do you know that Unique came in and
7  topped the barges around, that is, turn the empty
8  4727 from the dockside to the outside and turned
9  the full barge to the dockside; are you aware of
10  that?
11     A.  Yes, sir.  Just one point of
12  clarification.  I refer to them as Domino.  I
13  assume Domino and Unique are the same.
14     Q.  What is the expectation of Lafarge that
15  the barge, the empty barge, 4727, would be
16  removed from the Lafarge facility before the
17  hurricane?
18     A.  I don't know.
19     Q.  Well, isn't that what Mr. Busch was
20  trying to accomplish?
21     A.  I don't know.
22     Q.  Well, you talked to him and didn't he
23  tell you he called Zito to come get the barge?
24     A.  Yes, he did.
25     Q.  Didn't he call them before the hurricane?

- 94 -

BARGE000717

EDWARD VANDERMEULEN

1    A. Yes, he did.
2    Q. Didn't he call them around 9:00 a.m. in
3 the morning?
4    A. Yes, he did.
5    Q. Well, if his request had been followed,
6 the barge would have been gone before the
7 hurricane?
8        MR. HAYCRAFT:
9            Object to the form.
10 BY MR. WIEDEMANN:
11   Q. Isn't that so?
12       MR. HAYCRAFT:
13           Object to the form.
14       THE WITNESS:
15           I don't know what his expectation
16       was.
17 BY MR. WIEDEMANN:
18   Q. After Mr. Busch called Zito at 9:00 a.m.
19 on the 27th, did you -- did you or do you contend
20 that Lafarge was still in custody of the barge,
21 or had the custody been returned to Ingram?
22       MR. WEBB:
23           Object to the form of the question.
24           Calls for a legal conclusion.
25 BY MR. WIEDEMANN:

                    - 95 -

1 or the carrier in this case?
2        MR. HAYCRAFT:
3            Object to the form of the question.
4 BY MR. WIEDEMANN:
5    Q. Is that right?
6    A. Yes.
7    Q. And the way you would do that in this
8 case would be for your employee, Busch in this
9 instance, to call Zito to come get the barge; is
10 that right?
11       MR. HAYCRAFT:
12           Object to the form of the question.
13           That mistates his prior testimony of what
14           the transmission of that information was.
15 BY MR. WIEDEMANN:
16   Q. You can answer.
17   A. Yes.
18   Q. And this was an arrangement that existed
19 before the 27th, that Zito representing Ingram
20 would bring barges in and take barges out of the
21 Industrial Canal; is that correct?
22   A. Yes.
23   Q. Do you know that the Unique vessel,
24 REGINA H, came to the Lafarge facility on the
25 morning of the 27th?

                    - 97 -

1    Q. You can answer.
2    A. The barge was still at our dock.
3    Q. But the custody had been tendered to
4 Ingram as far as your understanding?
5        MR. HAYCRAFT:
6            Object to the form.
7        THE WITNESS:
8            I don't know.
9 BY MR. WIEDEMANN:
10   Q. Well, your customer determines -- they
11 use the word -- I get them mixed up -- the
12 carrier, in this case Ingram, has the
13 responsibility of removing the barge, their barge
14 when it's no longer needed; isn't that so?
15       MR. HAYCRAFT:
16           Object to the form of the question.
17 BY MR. WIEDEMANN:
18   Q. Hm?
19   A. Yes.
20   Q. Your company has no facility to remove
21 the barge, you don't have a tugboat or a vessel
22 there to do that?
23   A. That's correct.
24   Q. So you depend on the customer to remove
25 the barge when it becomes necessary to remove it,

                    - 96 -

1        MR. EMMETT:
2            Object to form.
3        THE WITNESS:
4            I don't know what time the vessel
5            came.
6 BY MR. WIEDEMANN:
7    Q. I didn't say a time. I didn't say the
8 time.
9    A. You said morning --
10   Q. Okay.
11   A. -- which I interpret to mean at noon.
12 Morning ends --
13   Q. Before noon, yes.
14   A. No, I don't know that.
15   Q. Do you know that the REGINA H, a Unique
16 Towing vessel, came in to the Lafarge facility on
17 the 27th to top around the two barges?
18   A. Yes.
19   Q. Do you know that Lafarge called, a
20 Lafarge representative called Unique to do this?
21   A. Yes.
22   Q. Do you know who called?
23   A. Ed Busch.
24   Q. And the reason he called is because the
25 barges presented a hazard with the loaded barge

                    - 98 -

EDWARD VANDERMEULEN                                          MINIDEP by Kenson

1  on the outside and the empty barge on the inside?
2      MR. WEBB:
3          Object to the form of the question.
4  BY MR. WIEDEMANN:
5      Q.  Isn't that so?
6      A.  They presented a potential hazard.
7      Q.  Right.  And so the fact that the empty
8  barge wasn't picked up, Lafarge had to then try
9  to prevent this hazard by topping around the
10 barges?
11     MR. WEBB:
12         Object to the form of the question.
13 BY MR. WIEDEMANN:
14     Q.  Do you understand the question?
15     A.  Yes.
16     Q.  Are you going to answer?
17     A.  Yes.  I answered yes.
18     Q.  So, in essence, this hazard was placed on
19 Lafarge, your company, by the fact that the empty
20 barge was not removed; isn't that so?
21     A.  Yes.
22     Q.  Do you know when the REGINA H came in
23 to -- let me go back.  You know that Mr. Busch
24 called for the REGINA H from Unique; is that
25 right?

- 99 -

1      A.  I assume it is.
2      Q.  And that's why Busch called Zito; is that
3  right?
4      A.  Busch called Zito because Zito was
5  Ingram's designated servicing agent.  Their
6  service provider.
7      Q.  If he asked Unique to take the barge, the
8  empty barge out and bring it to the Algiers
9  fleeting operation, in essence, you would be
10 undertaking that expense at your own company;
11 isn't that so?
12     MR. WEBB:
13         Object to the form of the question.
14     THE WITNESS:
15         We would be charged for that
16 service.
17 BY MR. WIEDEMANN:
18     Q.  And it's the carrier's obligation to
19 provide that service through Zito; is it not so?
20     MR. HAYCRAFT:
21         Object.  Object to the form.  It
22 mistakes his prior testimony.
23 BY MR. WIEDEMANN:
24     Q.  Isn't that so?
25     A.  Yes.

- 101 -

1      A.  Yes.
2      Q.  Was he the one that determined that there
3  was a hazard with the loaded barge being outside
4  and the empty barge being inboard?
5      A.  He was the one who determined there was a
6  potential hazard with that arrangement.
7      Q.  And when the barge wasn't picked up, he
8  then called Unique to do the top around?
9      A.  Yes.  And to facilitate the pick up.
10     Q.  Well, do you know why he didn't request
11 Unique to take the empty barge out and bring it
12 to the Algiers' fleeting operations at that point
13 in time?
14     A.  I believe because it's Zito's job to come
15 and get it, and we use Domino, or Unique, to
16 switch things around at our dock.  And I also
17 believe that not knowing where that barge could
18 be brought to, that it would have been a more
19 prudent decision to keep it moored if possible at
20 our protected slip.
21     Q.  Well, you all know that Zito fleets
22 Ingram barges at the Algiers' location?
23     A.  Yes.
24     Q.  And that's a short distance from the
25 Industrial Canal?  Do you know that?

- 100 -

1      Q.  When was the, if you know, when was the
2  4727 unloaded?  Do you know?
3      A.  It was -- it was unloaded from a period
4  of about noon on Friday until approximately 8:00,
5  8:00 a.m., 9:00 a.m. on Saturday.
6      Q.  And you're talking about the -- Friday
7  was the 26th?
8      A.  Yes.
9      Q.  And Saturday was the 27th?
10     A.  Yes.
11     Q.  The document has been supplied by
12 Lafarge, No. 105, and this --
13     MR. WIEDEMANN:
14         Do you have a copy?  I'm sorry.
15     MR. WEBB:
16         We have a copy.
17 BY MR. WIEDEMANN:
18     Q.  This document is dated 8/26/05 up in the
19 left-hand corner?
20     A.  Yes, sir.
21     Q.  And it pertains to ING, Ingram Barge,
22 4727?
23     A.  That's correct.
24     Q.  Are you familiar with this document?
25     A.  Yes, I am.

- 102 -

Peter Caruso & Associates (504) 432-3656
P.O. Box 10741, Jefferson, Louisiana 70181

BARGE000719

EDWARD VANDERMEULEN

MINI DE by Kenson

1    Q.  And it shows the barges in the diagram.
2  What does it mean when it says "dry all around"?
3  I'm not --
4    A.  Those --
5    Q.  Do you know?
6    A.  Yes.  Those represent the -- they're
7  little circles, and on the periphery of this
8  diagram are deck hatches.  And those indications
9  of dry would be looking inside the flotation
10  compartments on the barge.  Because when we
11  receive a barge, we want to make sure that it's
12  not taking on water.  So --
13    Q.  Okay.  So that's, that's just an
14  indication that the barge is dry and able to
15  receive product?
16    A.  (Witness shakes head negatively.)
17    Q.  Or does it?  He's shaking his head I
18  don't know.
19    A.  Well, we don't put product in the barge
20  at our terminal.
21    Q.  Well, I mean, just taking it out.  I'm
22  sorry.
23    A.  Yeah.
24    Q.  Okay.  So does it mean that on this case
25  you're emptying it?  Does that mean that this

- 103 -

1  barge then is empty?
2    A.  No.  It just means that upon arrival it
3  didn't have any water in the flotation
4  compartment.
5    Q.  It didn't take on any water from the
6  covers or whatever?
7    MR. WEBB:
8         Off the Record.
9  BY MR. WIEDEMANN:
10    Q.  And this document goes on to state times
11  on the 26th of August when certain things were
12  done.  Are you familiar with the operation,
13  because I'm not?
14    A.  Yes, I am familiar in general.
15    Q.  It starts off at 12:20, and that would be
16  20 minutes after 12:00, noon, right?
17    A.  That's correct.
18    Q.  And that means they're pumping cement
19  into the barge?
20    A.  No.  They're removing cement from the
21  barge.
22    Q.  I'm sorry.  They're removing cement?
23    A.  Yes.
24    Q.  And then they're finished when it says
25  "Pumping at 2330," which would be 30 minutes

- 104 -

1  before midnight.  What does that mean?
2    A.  What's that 2230?
3    Q.  Is it 2230 or 2330?  2230?
4    A.  That means that afer moving some covers
5  at 2150, they resumed pumping at 2230.
6    Q.  And when did they complete pumping?
7    A.  From what I'm told, it was made empty
8  approximately 9:00 a.m., 8:00 or 9:00 a.m. on the
9  27th.
10    Q.  So the barge was empty, according to your
11  information, at 9:00 a.m. on the 27th, and that's
12  when Mr. Busch called Zito?
13    A.  Approximately 9:00 a.m., yes.
14    Q.  Almost immediately after it was empty?
15    A.  Yes.
16    Q.  Let me show you what has previously been
17  identified as IBCO-1, which is the Ingram barge
18  number, which is a transportation agreement.
19  Have you seen the agreement before?
20    A.  Yes, I have.
21    Q.  Well, the agreement that I have, which
22  covers a period December 14th, and I think it
23  goes through January 1st, 2005 -- through
24  December 31st, 2005, which is the period of the
25  agreement; is that correct?

- 105 -

1    A.  Yes.
2    Q.  And the document I have which was
3  provided to me by Ingram does not have a
4  signature or an initial by Lafarge.  Do you see
5  that?
6    A.  Yes, sir.
7    Q.  And this was furnished to me as the
8  document that is the document, the contract
9  document between Ingram and Lafarge, but I do not
10  see where Lafarge signed the document.  Do you?
11    A.  No, I do not.
12    Q.  Does a signed copy of the agreement, to
13  your knowledge, exist?
14    A.  Yes.
15    Q.  When have you seen a signed copy?
16    A.  I believe my copy of this was a signed
17  copy.
18    Q.  Signed by whom?
19    A.  Frank Lazarowicz, the transportation
20  manager.
21    Q.  And it has his initials or signature?
22    A.  I believe it was his signature.
23    Q.  Do you know when he signed it?
24    A.  No, I do not.
25    Q.  Do you know why I was supplied with a

- 106 -

BARGE000720

**EDWARD VANDERMEULEN**

| | |
|---|---|
| 1 document that's not signed by Lafarge? | 1  Q. You don't know when he signed it? |
| 2  A. No, sir. | 2  A. No, I do not. |
| 3  Q. Do you know whether he signed it after I | 3  Q. You didn't see him sign it? |
| 4 got the document? | 4  A. No, I did not. |
| 5  A. I don't know when you got the document. | 5  Q. Did you talk to him and ask him when he |
| 6  Q. In September of 2005, I believe the | 6 signed it? |
| 7 answers were. October 3rd, 2006. I'm sorry. | 7  A. No. |
| 8  A. Well, he wouldn't have signed it, because | 8  Q. Do you know what the barge spotter system |
| 9 he's no longer with the company for the last few | 9 is? |
| 10 months. | 10  A. Barge spotter? |
| 11  Q. So he might have signed it three months | 11  Q. Yes. |
| 12 ago? | 12  A. No. We have other similarly named |
| 13  MR. WEBB: | 13 systems, but barge spotter is not a term that I |
| 14  Object to the form of the question. | 14 recall. |
| 15 BY MR. WIEDEMANN: | 15  Q. Well, I'm referring to an e-mail. It's |
| 16  Q. You can answer it. | 16 numbered Lafarge 260, and it's from Frank, |
| 17  A. I don't know. | 17 whatever his last name is, to -- well, I think |
| 18  Q. Where is he now? | 18 it's from Kurt Thompson -- Thomasson to Frank. |
| 19  A. He's not with our company anymore, and I | 19 You see that document? |
| 20 don't know where he's at. | 20  A. Yes, I see it now. |
| 21  Q. Do people just disappear, or -- | 21  Q. And they're making reference to the barge |
| 22  MR. WEBB: | 22 spotter and there's apparently a problem with |
| 23  Object to the form of the question. | 23 that. Do you know what that is? |
| 24 BY MR. WIEDEMANN: | 24  A. Well, I recognize that it was reported to |
| 25  Q. How long was he with your company? | 25 IntelliTrans, and IntelliTrans was a new barge |
| - 107 - | - 109 - |
| 1  A. Approximately seven or eight years. | 1 tracking system that we had begun to use. And I |
| 2  Q. But he's gone and you don't have any idea | 2 had not seen barge spotter reference before, but |
| 3 where he is? | 3 I know what that tracking system is. |
| 4  A. That's correct. | 4  Q. What they're referring to is a tracking |
| 5  Q. What's his name? | 5 situation, where you can track where barges are |
| 6  A. Frank. | 6 and -- |
| 7  Q. Frank. | 7  A. Yes. |
| 8  A. Lazarowicz. | 8  Q. -- throughout the system? |
| 9  Q. Can you spell it? | 9  A. Yes. |
| 10  A. L-a-z-a-r-o-w-i-c-z. | 10  Q. Is it like a satellite program, or do you |
| 11  Q. C-z? | 11 know? |
| 12  A. Yeah. | 12  A. No, I don't know. |
| 13  Q. I understand why he's gone. Nobody could | 13  Q. But apparently at that time, that is -- |
| 14 pronounce his name. | 14 the date of that is August 28th that your spotter |
| 15  MR. WEBB: | 15 system -- that system was not working properly; |
| 16  Object to the form of the question. | 16 is that correct? |
| 17 BY MR. WIEDEMANN: | 17  A. I know that it has been a problematical |
| 18  Q. Do you know who he's working for at this | 18 system. I can't say if it was working correctly |
| 19 time? | 19 on that date. |
| 20  A. No, sir. | 20  Q. And I ask you to look at 257. It's |
| 21  Q. But you didn't see him sign it? I don't | 21 Lafarge 257. |
| 22 know why I -- I see he's got his name on there. | 22  A. (Witness complies.) |
| 23 He spells it L-a-z-a -- L-a-z-a-r-o-w-i-c-z. Is | 23  Q. And that is also an e-mail from Mr. John |
| 24 that correct? | 24 Caldwell to John Erbes that you mentioned |
| 25  A. That's correct. | 25 earlier; is that right? |
| - 108 - | - 110 - |

EDWARD VANDERMEULEN

1    A.  Yes.
2    Q.  Erbes?
3    A.  Erbes, yes.
4    Q.  And he says, "Hope your trip is going
5  well.  Just curious what the emergency plan is
6  for New Orleans, Louisiana terminal."  Do you
7  know what he's talking about, the emergency
8  plans?
9    A.  Not specifically.
10    Q.  Well, was there an emergency plan?
11    A.  Related to this e-mail?
12    Q.  Related to Lafarge.
13    A.  Yes.
14    Q.  Who is John Caldwell?
15    A.  John Caldwell is a marketing manager.
16    Q.  Well, why is he —
17    A.  Marketing manager of Marketing for the
18  River Region.
19    Q.  Why would he be inquiring if there's an
20  emergency plan the day before the hurricane if he
21  knew there was an emergency plan in existence?
22        MR. WEBB:
23            Object to the form of the question.
24  BY MR. WIEDEMANN:
25    Q.  He's an executive, isn't he?

                  - 111 -

1        BY MR. WIEDEMANN:
2    Q.  You can answer it.
3    A.  No, I don't know that.
4    Q.  I'm referring to Document 268.  You see
5  that document?  You have it in front of you?
6        MR. WEBB:
7            He has 268 and 269, Larry.
8  BY MR. WIEDEMANN:
9    Q.  Well, it's — all right.  And that is
10  dated what date?
11    A.  (No response.)
12    Q.  Do you see a date on it?
13        MR. WEBB:
14            You have to look at the preceding
15            page, 267, to get the date.
16        THE WITNESS:
17            All right.
18  BY MR. WIEDEMANN:
19    Q.  267 and 268 are dated the 29th, and it
20  refers to, on 268, to "New Orleans and Westlake
21  have incurred twelve oil wells stockouts with
22  great concessions paid upwards of $170,000."  Do
23  you see that?
24    A.  Yes, I do.
25    Q.  This was before the hurricane, where you

                  - 113 -

1    A.  Yes, he is.
2    Q.  Well, can you explain why he would be
3  asking about an emergency plan the day before the
4  hurricane?
5        MR. WEBB:
6            Object to the form of the question.
7        THE WITNESS:
8            Because he was probably very
9            concerned that we would be able to
10            continuously supply our customers in
11            areas that would perhaps be affected by a
12            huge, natural catastrophe like Katrina.
13  BY MR. WIEDEMANN:
14    Q.  So you think he was worried about the
15  ability to supply customers; is that right?
16    A.  Yes, I do.
17    Q.  Or do you know, or are you aware of the
18  fact that your company was assessed $170,000
19  because of their inability to service customers?
20        MR. WEBB:
21            Object to the form of the question.
22  BY MR. WIEDEMANN:
23    Q.  Before the hurricane?
24        MR. WEBB:
25            Object to the form of the question.

                  - 112 -

1  had incurred the shortages due to low levels in
2  the Upper Mississippi where you couldn't
3  transport; isn't that so?
4        MR. WEBB:
5            Object to the form of the question.
6        THE WITNESS:
7            Specifically, I don't know if low
8            water was the cause for the, you know,
9            directly for those charges.
10  BY MR. WIEDEMANN:
11    Q.  But you know it occurred before the
12  hurricane, the shortages?
13    A.  Yeah, the stockouts, yes.
14    Q.  And you knew that your company was going
15  to face further stockouts as a result of the
16  hurricane?
17    A.  Further stockouts as a result of the
18  hurricane?  We probably would agree that we would
19  have a hard time servicing our customers.  We're
20  a very customer-orientated company.
21        MR. WIEDEMANN:
22            If you want to break, we can break
23            now.
24        MR. WEBB:
25            That's fine.

                  - 114 -

EDWARD VANDERMEULEN

1 (At this time, a lunch break was taken.)
2 BY MR. WIEDEMANN:
3 Q. Let me show you what has been identified
4 as LNA-147. This is an e-mail from Rachael
5 Burnett, who you previously identified, and I
6 believe the other people who were copied have
7 been identified, and it's a Lafarge e-mail dated
8 8/29/2005.
9 It says that, "In regard to Ingram 4727,
10 Ingram is reporting this barge at New Orleans,
11 Louisiana dock. However, they could have shifted
12 it to Algiers before storm. Won't be able to
13 verify until Ingram or LNA employees return to
14 the office in the Gulf." Are you familiar with
15 that document?
16 A. I've seen that document, yes.
17 Q. You've seen it before? So apparently,
18 because of the inoperability of what has been
19 identified as the spotter, is that --
20 A. IntelliTrans was the --
21 Q. Yeah.
22 A. -- system.
23 Q. That you all didn't and Ingram didn't
24 know where the barge was?
25 MR. WEBB:
- 115 -

1 Object to the form of the question.
2 MR. WIEDEMANN:
3 Huh?
4 MR. WEBB:
5 Object to the form of the question.
6 MR. HAYCRAFT:
7 And I object to the part that deals
8 with what Ingram did or didn't know.
9 BY MR. WIEDEMANN:
10 Q. Well, isn't that what the letter -- isn't
11 that what the e-mail says, that Ingram didn't
12 know where the barge was, and apparently you all
13 didn't know where it was?
14 MR. WEBB:
15 It says what it says, Larry.
16 MR. WIEDEMANN:
17 Well, he's interpreted several
18 others in his own interpretations, so,
19 and nobody objected when he was
20 interpreting --
21 MR. HAYCRAFT:
22 Since we're all making speaking
23 objections for the moment, it says what
24 it says, like Dan said, Ingram is
25 reporting this barge at the NOLA dock, so
- 116 -

1 you're question misstates what the words
2 on the paper say. That's my objection.
3 MR. WIEDEMANN:
4 All right.
5 BY MR. WIEDEMANN:
6 Q. And when did you see this, this e-mail?
7 A. I would say sometime in October of this
8 year.
9 Q. And it came up in what connection? Was
10 it an investigation by your company or --
11 A. Just in preparation for this deposition.
12 Q. And you're talking about October of 2006?
13 A. Yes, I am.
14 MR. WEBB:
15 We thought it would be a good idea
16 to have the witness review all the
17 documents we produced.
18 MR. WIEDEMANN:
19 I think that's --
20 BY MR. WIEDEMANN:
21 Q. Did you review any photographs of the
22 Lafarge facility or the mooring of the barges?
23 A. I saw a duplication of, I believe, a
24 satellite photo that showed, you know, a view of
25 the facility, but it looked like at quite a
- 117 -

1 distance.
2 Q. But no photographs, other than the
3 satellite, that were taken by -- of the mooring
4 of the barges in their pre-hurricane?
5 A. No. It was post-hurricane.
6 Q. And it was a satellite photograph, you
7 say?
8 A. I believe so. It was --
9 Q. Yeah. Now, are you aware that your
10 company or Ingram has settled with some people
11 involving the barge breakaway?
12 A. No. I am not aware of that.
13 Q. Are you aware of any agreement between
14 Lafarge and Ingram regarding indemnification?
15 A. No, I am not.
16 Q. Who would be -- who in your company would
17 be aware of those matters, settlement or
18 indemnification?
19 A. Counsel, as far as I know.
20 Q. You have an in-house counsel at Lafarge?
21 A. Not to my knowledge.
22 Q. Do they have a legal department at
23 Lafarge?
24 A. Yes, we do.
25 Q. And who's the head of the legal
- 118 -

BARGE000723

EDWARD VANDERMEULEN

1 department, if you know?
2    A. I'm not sure at this point. It's quite a
3 bit above my head.
4    Q. And where are they located?
5    A. In Herndon, Virginia.
6        MR. WEBB:
7           You're getting way beyond the scope
8        again.
9        MR. WIEDEMANN:
10          Well, it's not beyond the scope.
11       MR. WEBB:
12          I respectfully disagree with you,
13       Counsel.
14       MR. WIEDEMANN:
15          Well, you may find it very, very
16       germaine.
17 BY MR. WIEDEMANN:
18    Q. Herndon, Virginia, is the home office of
19 Lafarge?
20    A. Yes.
21    Q. That's where the executive offices are?
22    A. Yes.
23    Q. And to your knowledge has there ever been
24 a breakaway of Lafarge barges when they have been
25 cabled to the dock or cabled to one another?

- 119 -

1    A. As far as cables go?
2    Q. Yes.
3    A. I don't know of any breakaways that have
4 occurred from our dock under any circumstances.
5    Q. I'm not talking about just the Industrial
6 Canal. I'm talking about, do you know of any
7 barges that have broke, let's say, between here
8 and Baton Rouge that have broken away that were
9 cabled together or cabled to the dock?
10       MR. WEBB:
11          I'm going to object as beyond the
12       scope of what you've noticed. If you
13       want to talk about the Lafarge facility
14       on the Inner Harbor Canal, fine; ask him.
15 BY MR. WIEDEMANN:
16    Q. You can answer it.
17    A. I'm not aware of any breakaways.
18    Q. Where is the Union -- you mentioned a
19 Union facility -- Union, Louisiana?
20    A. Yes.
21    Q. Where is that? Do you know?
22    A. Close to Donaldsonville.
23    Q. It's up here (indicating)?
24    A. Right above the Sunshine bridge.
25    Q. And that's -- I have never heard of

- 120 -

1 Union, Louisiana. But that's near Donaldsville?
2    A. Yes.
3    Q. And there's a plant there?
4    A. It's a distribution terminal.
5    Q. Cement?
6    A. Yes.
7    Q. Is it Lafarge?
8    A. Yes, it is.
9    Q. You mentioned this long-lining that you
10 described as an unwritten policy at the
11 Industrial Canal facility. Does any of the other
12 Lafarge facilities, such as Union, have a written
13 policy regarding long-lining?
14    A. I don't know.
15    Q. Do you know of any Lafarge facility that
16 has a written policy concerning long-lining?
17    A. I don't know.
18    Q. When did you first hear about long-
19 lining?
20    A. The first time I heard of it at the
21 New Orleans terminal was sometime in September,
22 when I visited the New Orleans terminal.
23    Q. After the hurricane?
24    A. Yes, September of 2006.
25    Q. That's the first time you've ever heard

- 121 -

1 of long-lining?
2    A. I have heard of that type of a process on
3 the Great Lakes and some other barge terminals in
4 my past; specifically, I can't recall.
5    Q. You don't know of any written manual or
6 publication by Lafarge referencing long-lining?
7    A. No, I do not.
8    Q. Before you learned about long-lining
9 after the hurricane, was it your impression
10 before that that the barges had been cabled to
11 shore?
12    A. I did not have an impression before I
13 went to the terminal.
14    Q. But it was after you went to the terminal
15 that you were told about this long-line
16 procedure?
17    A. That's correct.
18    Q. Do you know that it's, or have you heard
19 that it's improper to moor an empty barge to a
20 loaded barge in anticipation of weather?
21       MR. WEBB:
22          Object to the form of the question.
23       THE WITNESS:
24          Do I know that?
25 BY MR. WIEDEMANN:

- 122 -

**Peter Caruso & Associates (504) 432-3656**
P.O. Box 10741, Jefferson, Louisiana 70181

**EDWARD VANDERMEULEN**

— 123 —

1  Q.  Yes.
2  A.  No, I do not know that.
3  Q.  Do you not know that in fleeting
4 operations that they always put empty barges or
5 light barges next to one another and full barges
6 next to one another?
7  A.  No, I don't know that.
8  Q.  That's beyond your knowledge?
9  A.  Yes.
10  Q.  Were there loaded barges at the
11 Industrial Canal facility at the time of Rita,
12 two weeks after, approximately after Hurricane
13 Katrina?
14  A.  I don't know.
15  Q.  You don't know?
16  A.  I don't know.
17  Q.  Do you know what was done at the -- with
18 regard to barges at the facility in Rita?
19  A.  No, I don't.
20  Q.  Do you know what caused the empty barge
21 to breakaway from the full barge in the
22 Industrial Canal?
23  A.  No, I don't.
24  Q.  No one has told you what the cause of
25 that was?

— 124 —

1  A.  No one has told me.
2  Q.  Are you aware that there were other
3 barges besides the two Ingram barges that were at
4 the Industrial Canal facility?
5  A.  Yes, I am aware.
6  Q.  And are you aware where they were
7 located?
8  A.  Yes.
9  Q.  And do you know what happened to them
10 after the hurricane?
11  A.  I know that they were all attached and
12 moored to our dock and to each other.
13  Q.  Were they loaded or empty?
14  A.  They were loaded.
15  Q.  And why did they have -- there were five
16 other barges, were there?
17  A.  Besides the load and empty, there were
18 -- yes, there was a total of seven.
19  Q.  Why would they have seven, or six loaded
20 barges at the facility at that time?
21  A.  Precisely, I don't know.  I assume that,
22 you know, we get barges at a certain rate, we
23 unload them at a certain rate, and we have to
24 select ones to unload.  I presume they accumulate
25 and there is a very normal course of our

— 125 —

1 business.
2  Q.  Are you aware -- are you aware that the
3 five barges that were moored adjacent to the two
4 barges shifted in the hurricane?  Are you aware
5 of that?
6  A.  When you say "shifted," could you just
7 elaborate on that a little bit?  I'm not quite --
8  Q.  Well, I'll show you a photograph.  I'm
9 going to show you a photograph.  If you'll look,
10 it's an aerial photograph, you'll see in the
11 upper left-hand corner --
12  MR. WEBB:
13  Larry, do you know the date that
14  this was taken, and the source?
15  MR. WIEDEMANN:
16  I don't know.
17  MR. WEBB:
18  You don't have a date specific?
19  MR. WIEDEMANN:
20  No, I don't have a date specific.
21  MR. WEBB:
22  Okay.
23  MR. WIEDEMANN:
24  I could probably get you a date
25  specific.

— 126 —

1  MR. WEBB:
2  It would be nice to have it.
3  MR. WIEDEMANN:
4  Well, I'll send you a note on it.
5 BY MR. WIEDEMANN:
6  Q.  These are the five barges, the white
7 things there (indicating)?
8  A.  Sure.
9  Q.  And the one remaining barge, the Ingram
10 barge (indicating)?
11  A.  Yes.
12  Q.  Okay?
13  A.  Uh-huh (affirmative response).
14  Q.  And the testimony of, I believe it
15 was --
16  MR. SANDOZ:
17  Thigpen.
18 BY MR. WIEDEMANN:
19  Q.  Thigpen, yeah, the deckhand said that
20 before the hurricane these five barges were, were
21 farther to the left and moved when the hurricane
22 came in, which would have come in from the
23 northwest.  You see that?
24  MR. HAYCRAFT:
25  Object to the form.

EDWARD VANDERMEULEN

MINISCRIPT by Kaplan

1    MR. WEBB:
2         Object to the form of the question.
3    BY MR. WIEDEMANN:
4    Q.  You can see the picture there
5    (indicating)?
6    A.  Yes, I can.
7    Q.  How did you understand that the five
8    barges, which extend beyond the dock or the
9    wharf, how they were moored to the wharf, the
10   outside barge?
11   A.  Those five barges look precisely as it
12   was explained to me that they were tied off prior
13   to the storm.
14   Q.  Tied off how?
15   A.  In exactly that fashion.
16   Q.  So it's your testimony that as it's shown
17   in this photograph is the way it was before the
18   hurricane?
19   A.  Yes, that's correct.
20   Q.  And that -- where was the Ingram barge
21   according to your understanding in relation to
22   those six barges?
23   A.  Well, do you want me to, you know, point
24   to you -- for you?
25   Q.  Yeah, just tell me where it was.

- 127 -

1    A.  The 4727 would have been in a position
2    right below it.  This is north.  The 4727 would
3    have been in a position below this particular
4    tier of barges, and the loaded barge would have
5    been inside, or adjacent to the dock inside the
6    4727.  (Indicating.)
7    Q.  So it's your testimony that the 4727
8    would have been parallel to the dockside barge?
9    A.  Yes.
10   Q.  And it would have been directly opposite
11   the No. 2 loaded barge shown in white?
12   A.  Yeah, that would be correct.  Yes.
13   Q.  Who did you get the information from that
14   these barges were -- that these five barges were
15   in the same position post-hurricane that they
16   were pre-hurricane?
17   A.  Post-hurricane?
18   Q.  After the hurricane?
19   A.  Well, the positions of those barges was
20   related to me by Ed Busch and Earl Smith prior --
21   in the condition that they were in prior to the
22   hurricane, and I've been told and seen similar
23   satellite photographs demonstrating what you just
24   showed me.
25   Q.  Did anybody tell you that the five barges

- 128 -

1    shifted and played a role in breaking loose the
2    4727?
3    A.  No.  Nobody's ever told me that they
4    played a role in breaking away the 4727.  They
5    were -- they were made to have some -- made to be
6    able to rise with the surge, and naturally,
7    there'll be a little slack line after that
8    occurs.
9    Q.  You're not aware of what was -- I believe
10   I asked this, but I just want to make sure --
11   that there were any loaded barge or empty barges
12   at the time of Rita in the Industrial Canal; you
13   don't have any information concerning that?
14   A.  No, I do not.
15   MR. WEBB:
16        Larry, we had a better closeup of
17   that same photo.  It's No. 379 --
18   MR. WIEDEMANN:
19        Uh-huh (affirmative response).
20   MR. WEBB:
21        -- that we've already produced.
22   It's not in color, but you may want
23   to --
24   MR. WIEDEMANN:
25        We can -- I'll substitute 379.

- 129 -

1    MR. WEBB:
2        Well, I want to show it to you,
3    because it's hard to tell.
4    MR. WIEDEMANN:
5        I've seen it.
6    MR. WEBB:
7        Some of the things that are on that
8    are not as clear as they are on here, and
9    I think --
10   MR. WIEDEMANN:
11        I don't mind you putting in a
12   doctored up photograph.
13   MR. WEBB:
14        I don't even know where --
15   MR. WIEDEMANN:
16        379 is good enough for me.  Okay?
17   MR. WEBB:
18        What I'm saying is, it gives this
19   witness a better photograph to look at to
20   answer your questions than that one.
21   MR. WIEDEMANN:
22        Well, I --
23   MR. WEBB:
24        Because there's some detail on this
25   one that you can't tell from that.

- 130 -

EDWARD VANDERMEULEN

MINDEP by Kenan

1    MR. WIEDEMANN:
2        I don't want to go back and question
3    him again.  If you're prepared to accept
4    379 as --
5    MR. WEBB:
6        No.  Because I'm going to let it
7    stay in, because that one's very
8    confusing.  If that's what you want to
9    do, that's fine.
10   MR. WIEDEMANN:
11       All right.  Well, I'll --
12   MR. SANDERS:
13       The witness had no problem answering
14   it and we're going to attach it.
15   MR. WEBB:
16       Well, that's your comment, Counsel,
17   and it's not appropriate.  So, go ahead.
18   MR. WIEDEMANN:
19       We'll attach it as an exhibit, and
20   I'll make a photocopy of it.
21   MR. WEBB:
22       You understand?
23   THE WITNESS:
24       Yes.  May I have a moment to talk to
25   counsel, please?

- 131 -

1    MR. WIEDEMANN:
2        Yeah, go ahead.  You can always talk
3    to counsel.
4        (At this time, a break was taken.)
5    BY MR. WIEDEMANN:
6    Q.  Is Jay Darlington still employed by
7    Lafarge?
8    A.  No, he is not.
9    Q.  Do you know where he is?
10   A.  He lives in Kansas City, Missouri.
11   Q.  And do you know who he works for?
12   A.  No, I don't.
13   Q.  Do you know whether or not your company
14   is ISO-9000 certified?
15   MR. WEBB:
16       Now that's beyond the scope.
17   MR. WIEDEMANN:
18       How is it beyond the scope?
19   MR. WEBB:
20       I didn't see anything in there about
21   any certifications.  I mean, I'll let him
22   answer, but we're not going past yes or
23   no.
24   MR. WIEDEMANN:
25       Well, he may want to explain.

- 132 -

1    MR. SANDERS:
2        No, it's over.
3    MR. GILBERT:
4        Let him answer.
5    THE WITNESS:
6        We are at certain facilities.
7    BY MR. WIEDEMANN:
8    Q.  What about the Industrial Canal facility?
9    A.  No.
10   Q.  Why not?
11   A.  Generally speaking, ISO certification is
12   appropriate at manufacturing facilities, and we
13   are in the process of becoming certified in more
14   and more of our facilities every day.
15   Q.  Is the Union, Louisiana facility ISO-9000
16   certified?
17   A.  No.
18   Q.  Have either one of those facilities been
19   rejected for certification?
20   A.  No.
21   Q.  Have they been audited for certification?
22   A.  No.
23   Q.  Why not?
24   A.  Our distribution department has not yet
25   entered that process.

- 133 -

1    Q.  So they haven't applied for
2    certification?
3    A.  They have not applied for certification.
4    Q.  What certification does the Industrial
5    Canal facility and Union, Louisiana, have?
6    A.  I don't know.  All I know is that we seek
7    to be in compliance with all regulations.
8    Q.  Do you all -- what regulations do you
9    utilize in determining whether or not your
10   facility is being in compliance with governmental
11   regulations?
12   MR. WEBB:
13       Object to the form of the question.
14   I don't even understand it.
15   MR. WIEDEMANN:
16       Well, I didn't ask it of you.
17   MR. WEBB:
18       Well, I object to the form.
19   MR. WIEDEMANN:
20       I can understand that you might not
21   understand it, but I asked it of the
22   witness.
23   MR. WEBB:
24       Well, answer it if you can.
25   THE WITNESS:

- 134 -

BARGE000727

EDWARD VANDERMEULEN

MINIDEP by Ranson

1 We comply with all safety,
2 environmental regulatory regulations that
3 we're aware of, we comply.
4 BY MR. WIEDEMANN:
5 Q. Who is Lafarge's regulatory compliance
6 officer? If you know.
7 A. We have people that — you know, as I
8 stated before, we have a person in the North
9 American basis that takes care of safety. We
10 have an environmental department. We have legal
11 people. There's a variety of compliances that
12 are required of businesses, and those are handled
13 by specific departments.
14 Q. And who is the person who is in charge
15 of — I know you may have different departments,
16 but who is the person most in charge with
17 regulatory compliance in the Lafarge structure?
18 A. I don't know.
19 Q. They have a department for that?
20 A. We have a legal department and safety
21 department and environmental —
22 MR. WEBB:
23 That's not what he asked you.
24 Answer the question, please.
25 BY MR. WIEDEMANN:

- 135 -

1 Q. The regulatory department, do you have a
2 regulatory compliance department within the
3 corporate structure?
4 A. I would say our legal department would
5 be.
6 Q. And do you know whether or not your
7 company utilizes the U.S. Coast Guard Hurricane
8 Plan as a part and parcel of its safety program?
9 A. No, I do not.
10 Q. Have you ever seen that before?
11 A. No.
12 Q. Do you know whether or not your company
13 utilizes the Standard Care of Streamlined
14 Inspection Program for barge and fleeting
15 operations? Have you ever seen that before?
16 A. No, I have not.
17 Q. You don't know whether or not that's
18 utilized?
19 A. I haven't seen it before.
20 Q. So you're not involved in safety of any -
21 -
22 MR. WEBB:
23 Counsel, can we see that, please?
24 MR. WIEDEMANN:
25 That was produced by Ingram.

- 136 -

1 MR. WEBB:
2 I know, but I didn't get to see
3 everything they gave me.
4 MR. EMMETT:
5 That's barge fleeting?
6 MR. WIEDEMANN:
7 Yeah, right.
8 MR. WEBB:
9 Oh, oh, it's fleeting, okay. All
10 right. Nothing to do with terminals
11 then. Okay.
12 MR. WIEDEMANN:
13 No.
14 MR. WEBB:
15 All right.
16 BY MR. WIEDEMANN:
17 Q. Are you aware that the Lafarge facility
18 on the 27th at some point in time was abandoned?
19 A. I am aware that our employees left the
20 terminal.
21 Q. Were you aware that there was no one in
22 the terminal after some point in time on the
23 27th?
24 A. Yes.
25 Q. Do you know what time they left?

- 137 -

1 A. The best I could approximate it would be
2 early afternoon.
3 Q. Well, I mean, in speaking to Mr. Busch
4 did he give you a time when they left?
5 A. Mr. Busch left somewhere around 1:00 p.m.
6 Earl Smith and Reginald Johnson left sometime
7 later, or Louis Robin and Earl Smith and another
8 gentleman left sometime later.
9 MR. O'DWYER:
10 Could we have those names again,
11 please?
12 (There was a read back of the names.)
13 BY MR. WIEDEMANN:
14 Q. When you spoke to Mr. Busch, he indicated
15 to you that he called Zito on the morning of the
16 27th; is that correct?
17 A. Yes.
18 Q. About 9:00 a.m.?
19 A. Approximately, yes.
20 Q. Did he indicate to you that he called
21 anyone else?
22 A. Yes.
23 Q. Who?
24 A. He called our area safety advisor. He
25 had more than one conversation with our area

- 138 -

EDWARD VANDERMEULEN

MINIDEAS by Ranson

1  safety advisor.
2      Q.  And who was your area safety advisor?
3      A.  You'll have to forgive me, my mind is
4  just a little blank.
5      Q.  I understand.
6      A.  Jennifer Arnold.  Jennifer Arnold.
7      Q.  Where is she located?
8      A.  She's located in Paducah, Kentucky.
9      Q.  And do you know what he called her for?
10     A.  Well, he called her back after she called
11 him.  They had a couple of phone conversations
12 because she had been monitoring what was going on
13 in the Gulf, and that being the morning that we
14 first became aware that the storm might be headed
15 toward New Orleans.  She, as area safety advisor,
16 called to see that the terminal was secure and
17 that our people were leaving the terminal for
18 their own safety.
19     Q.  And so Jennifer Arnold called him
20 apparently; is that correct?
21     A.  Yes.  Yes.
22     Q.  And, but that was, you know, after his
23 nine o'clock call, or before?  Do you know?
24     A.  I don't know.
25     Q.  Did Mr. Busch indicate he made any other

- 139 -

1 calls other than to Zito and back and forth to
2 Ms. Arnold?
3      A.  No.
4      Q.  Did he receive any calls to your
5 knowledge, besides Arnold?
6      A.  Yes.  Annette Gaskin, who was another
7 terminal employee.
8      Q.  What's his first name?
9      A.  Annette.
10     Q.  Annette?
11     A.  Yes.
12     Q.  It's a lady.
13     A.  Annette.
14     Q.  Gaskin?
15     A.  Gaskin, G-a-s-k-i-n.
16     Q.  And where is she located?
17     A.  In New Orleans.
18     Q.  And what facility was she located at?
19     A.  She's the administrative assistant at the
20 New Orleans terminal.
21     Q.  So she called Busch?
22     A.  Ed Busch, yes.
23     Q.  About what?
24     A.  She wanted to inform him that she had
25 learned about Katrina having strengthened and

- 140 -

1 changed direction toward the terminal.  She had
2 learned of the threat and she wanted to make sure
3 that Ed and the fellows at the terminal were
4 informed of that threat.
5      Q.  Did he indicate to you that he told Mrs.
6 Gaskin and -- maybe it's Miss -- Ms. Gaskin and
7 Ms. Arnold that he had called Zito and asked them
8 to pick up the barge on behalf of Ingram?
9      MR. HAYCRAFT:
10         Object to the form of the question.
11     THE WITNESS:
12         I don't know.
13 BY MR. WIEDEMANN:
14     Q.  Pardon?  You don't know the answer?
15     A.  No.
16     Q.  Or least he didn't tell you that?
17     A.  No, he did not.
18     Q.  Did he indicate that he received a call
19 from anyone else other than Jennifer Arnold and
20 Annette Gaskin?
21     A.  No.
22     Q.  Or that he called anyone else?
23     A.  No.
24     Q.  Other than -- of course he called Zito?
25     A.  Well, now, he did make calls to Domino,

- 141 -

1 but we discussed that before.
2      Q.  Yeah.  He made calls --
3      A.  Yeah.
4      Q.  -- to Domino to get the turnaround?
5      A.  Yes.
6      Q.  He indicated that to you?
7      A.  Yes.
8      Q.  Did he indicate to you that he made any
9 additional calls other than to those people?
10     A.  No.
11     Q.  And Domino was just to bring in the
12 turnaround vessel?
13     A.  Yes.
14     Q.  Was he at the facility as far as you know
15 when he made these calls?
16     A.  As far as I know, yes.
17     Q.  Was he at the facility to your knowledge
18 when the turnaround was made?
19     A.  No.
20     Q.  He was not?
21     A.  That's correct.  No, he was not.
22     Q.  No one was at the facility, or do you
23 know?
24     A.  I don't know.
25     Q.  But you know he was not?

- 142 -

EDWARD VANDERMEULEN

1   A. He was not.
2   Q. How do you know that?
3   A. He told me that he left before it was
4 made and that he gave very specific instructions
5 to Domino as to how to top it around.
6   Q. What were the instructions that he gave
7 to Domino as he related it to you?
8   A. To top the barge around, to put the 4727
9 on the outside, and that was it.
10   Q. He didn't to your knowledge tell Domino
11 anything about --
12   A. I apologize. He also specifically told
13 them to tie the load in in the long-lining
14 technique that was used with the tier above it.
15   Q. Did he indicate to you that he gave any
16 instructions to Domino as to changing the mooring
17 between the two barges after they were turned
18 around?
19   A. No. He told me that they were tied as he
20 wanted them, and he wanted that attachment to
21 remain the same.
22   Q. So it was your understanding that there
23 was no instruction with regard --
24   A. Yes.
25   Q. -- to that, just to turn them around and

- 143 -

1 moor them to the dock; is that right?
2   A. What did you say? Would you just say
3 that again? I'm sorry.
4   Q. His indication to you was that there
5 was -- he never instructed for any change in the
6 mooring between the two barges, only that they be
7 turned around and moored to the dock intact?
8   A. That's correct.
9   MR. WIEDEMANN:
10      I'm going to mark the Notice of
11   30(B)(6) to Lafarge as No. 14 as far as
12   identification, and the Hurricane
13   Preparation Checklist as No. 15 for
14   purposes of identification. And I'm
15   going to submit a xerox copy of those.
16   And I would offer the xerox copy of the
17   aerial photograph as No. 16.
18   MR. WEBB:
19      With the understanding that you'll
20   be the custodian of the original?
21   MR. WIEDEMANN:
22      Yes.
23   MR. WEBB:
24      Okay.
25   MR. WIEDEMANN:

- 144 -

1      I'll be the custodian of the
2 original. And I'm going to offer,
3 introduce and file into evidence each and
4 every Lafarge Bates stamped document that
5 I made reference to and showed to the
6 witness.
7   MR. WEBB:
8      I'm not going to agree to it, but I
9 understand what you're doing.
10   MR. WIEDEMANN:
11      Well, I mean, if you want me to go
12 back through and --
13   MR. WEBB:
14      No, I mean, I'll trust someone to
15 read the record and make the numbers at
16 the end.
17   MR. EMMETT:
18      I don't have a problem attaching to
19 it.
20   MR. WIEDEMANN:
21      Huh?
22   MR. SANDOZ:
23      We're not judges, we can't --
24   MR. WEBB:
25      I thought we decided we weren't

- 145 -

1 going to attach any exhibits, we were
2 just going to have all with our Bates
3 stamp numbers and that was it.
4   MR. WIEDEMANN:
5      Well, I understand.
6   MR. WEBB:
7      If I'm wrong, I'm wrong. I'm sorry.
8   MR. WIEDEMANN:
9      I just wanted to make sure that the
10 record reflects that the Bates stamps
11 numbers that I have referenced and shown
12 to the witness are being offered in
13 evidence.
14   MR. WEBB:
15      As an exhibit?
16   MR. WIEDEMANN:
17      As an exhibit.
18   MR. WEBB:
19      Okay.
20   MR. BROOKS:
21      I object to the offer of those
22 documents as exhibits in evidence. I
23 don't think that --
24   MR. WEBB:
25      It's an exhibit to the deposition,

- 146 -

EDWARD VANDERMEULEN

1 that's all it is. I don't have a problem
2 with that.
3 MR. WIEDEMANN:
4     That's what I'm talking about.
5 MR. WEBB:
6     We're communicating.
7 MR. WIEDEMANN:
8     If you want, I'll submit them.
9 MR. WEBB:
10     No, no, no.
11 MR. WIEDEMANN:
12     I don't feel like going through and
13 pulling them all out. I would have done
14 it as we went along.
15 MR. WEBB:
16     No, no, that's okay. I trust you.
17 MR. WIEDEMANN:
18     Dan, you're not going to produce
19 anybody else in response to the 30(B)(6)?
20
21 MR. WEBB:
22     No, sir. As far as I am concerned,
23 we have fully complied with the notice.
24 MR. WIEDEMANN:
25     We're not sure that that's true,

- 147 -

1 but --
2 MR. WEBB:
3     You're entitled to your opinion.
4 You can brief it when you want.
5 MR. WIEDEMANN:
6     We reserve our rights insofar as any
7 additional --
8 MR. WEBB:
9     Surely.
10 MR. WIEDEMANN:
11     The areas that this witness has
12 indicated he's not able to testify to,
13 we're reserving our rights with respect
14 to those. And we have no further
15 questions.
16 MR. WEBB:
17     Anybody else?
18 MR. O'DWYER:
19     I just want to state for the Record
20 that I'm calling for production of the
21 following documents: Number one, would
22 be Lafarge's Tier One disaster
23 preparation and response plan or any Tier
24 One plan by any other name. Number two,
25 the Union and Joppa severe weather or

- 148 -

1 hurricane preparation plans. If the,
2 quote, upgrade, close quote, to the
3 Industrial Canal hurricane preparation
4 plan exists -- what did I say? -- if the
5 upgrade to the Industrial Canal's
6 hurricane preparation plan exists in
7 writing in any form, I call for
8 production of it, whether it be in
9 facsimile form, in electronic or e-mail
10 form, in writing between human beings
11 describing how what is written in the
12 plan that's been produced has been
13 upgraded, I call for the production of
14 it.
15     Number three would be -- number four
16 would be Lafarge's root cause analysis
17 with respect to this incident and any
18 investigative materials, statements,
19 reports, memos, etc., generated in
20 connection therewith. And lastly, we're
21 calling for production of any and all
22 agreements between and among Ingram and
23 Lafarge or their underwriters and
24 claimants in this case dealing with
25 settlement with claimants or dealing with

- 149 -

1 issues of indemnity and/or contribution
2 between and among Ingram and Lafarge and
3 their underwriters.
4     And the reason I'm calling for
5 production of this document at this time
6 is because, as counsel know, our efforts
7 in this case have been stymied by the
8 court in two significant respects. One,
9 she, in response to a motion filed by
10 Ingram, denied class action status, and
11 two, in a motion filed by Unique did the
12 same thing, denying class action status.
13 The limitation proceeding therefore --
14 proceedings therefore are being used as a
15 procedural device that is prejudicing
16 claimants in this case. And if
17 agreements for indemnity or contribution
18 exists between Ingram and Lafarge and
19 their respective underwriters, which have
20 not been disclosed to counsel and the
21 court, then fraud upon the court is being
22 committed, and that's why I'm calling for
23 production of such settlement agreements.
24
25 MR. WEBB:

- 150 -

**EDWARD VANDERMEULEN**

MINUDE by Kersaa

| | |
|---|---|
| 1 | Counsel, I can't believe you made |
| 2 | that last statement, because you're |
| 3 | implying that there's a Mary Carter |
| 4 | agreement in place or some such other |
| 5 | agreement. |
| 6 | MR. O'DWYER: |
| 7 | I'm asking if there is -- |
| 8 | MR. WEBB: |
| 9 | No. |
| 10 | MR. O'DWYER: |
| 11 | -- to disclose it, that's what I'm |
| 12 | asking. |
| 13 | MR. WEBB: |
| 14 | I take issue with you even asking. |
| 15 | MR. O'DWYER: |
| 16 | I'm very sorry. |
| 17 | (At this time, a break was taken.) |
| 18 | MR. WEBB: |
| 19 | We'll waive reading and signing. |
| 20 | (Whereupon, the deposition was concluded.) |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

- 151 -

accompanied by my original signature and original blue stamp on this page.

I, Peter Caruso, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that

Edward VanderMeulen, after having been first duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 151 pages;

That this testimony was reported by me in the Stenographic (voice-writing) method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

That I am not related to counsel or to the parties herein; am not otherwise interested in the outcome of this matter; and am a valid member in good standing of the Louisiana State Board of Examiners of Certified Shorthand Reporters.


Peter Caruso, CCR-CVR
Certified Court Reporter
Louisiana License #20088

- 153 -

---

**REPORTER'S PAGE**

I, Peter Caruso, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(b) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the Record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes ( -) have been used to indicate pauses, changes in thought, and/or talk-overs; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes ( -) do not indicate that words or phrases have been left out of this transcript;

That any words and/or names which could not be verified through reference material have been denoted with the phrase "(phonetic)."


Peter Caruso, CVR-CCR
Certified Court Reporter

- 152 -


**C E R T I F I C A T E**
This certification is valid only for a transcript

WITNESS' CERTIFICATE


I, Edward VanderMeulen, do hereby

certify that I have read, or have had read to me,

the foregoing testimony, and it is true and

correct to the best of my ability and

understanding.

(Check one)

Without corrections.

With corrections and/or

additions attached hereto.

Edward VanderMeulen

- 154 -

EDWARD VANDERMEULEN

Signature          Date

CORRECTIONS/CHANGES TO THE DEPOSITION OF:

Edward VanderMeulen

Taken: Friday, November 10, 2006

Page/Line  Reading          Should Read

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

- 155 -

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE | * | CIVIL ACTION |
| COMPLAINT OF INGRAM BARGE | * | |
| COMPANY, AS OWNER OF THE | * | NO. 05-4419 |
| ING4727, PETITIONING FOR | * | C/W 05-4237 |
| EXONERATION FROM OR | * | C/W 05-5531 |
| LIMITATION OF LIABILITY | * | C/W 05-5724 |
| | * | SECTION "C" (2) |
| | * | |
| | * | JUDGE HELEN G. BERRIGAN |
| | * | |
| | * | MAG. JUDGE JOSEPH C. |
| | * | WILKENSON, JR. |

## NOTICE OF PROPOSED FRCP 30(b)(6) DEPOSITION
## AND RECORDS DEPOSITION

TO:

Robert B. Fisher, Jr. Esq.
Derek A. Walker, Esq.
Thomas D. Forbes, Esq.
Chaffe McCall, LLP
1100 Poydras Street
New Orleans, LA 70163

Daniel A. Webb, Esq.
Sutterfield and Webb, LLC
650 Poydras Street
Suite 2715
New Orleans, LA 70130

John D. Aldock, Esq.
Mark Raffman, Esq.
Goodwin Proctor, LLP
901 New York Avenue
Washington, D.C. 20001

Sherman G. Fendler, Esq.
Brett D. Wise, Esq.
David W. Leefe, Esq.
Don K. Haycaft, Esq.
Liskow & Lewis
701 Poydras Street, 50th Floor
New Orleans, LA 70139

A. Gordon Grant, Jr. Esq.
Phillip S. Brooks, Esq.
Montgomery, Barnett, Brown, Read,
Hammond, & Mintz
1100 Poydras Street
New Orleans, LA 70163

14


EXHIBIT
A

John F. Emmett, Esq.
Emmet, Cobb, Waits, & Henning
Suite 1950
1515 Poydras Street
New Orleans, LA 70112

Robin D. Smith, Esq.
Peter D. Keisler, Esq.
Phyllis J. Figley, Esq.
Torts Branch, U.S. Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, D.C. 20044

Rufus C. Harris, III, Esq.
Harris & Ruffy, LLC
650 Poydras Street
Suite 2710
New Orleans, LA 70130

Peter G. Myer, Esq.
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 14271
Washington D.C. 20044-4271

**YOU ARE HEREBY NOTIFIED** that counsel for plaintiffs Ethel Mumford, et al, The

Parfait Family, et al, Marie Benoit, et al, and Blair Boutte, et al (Group A) will conduct the FRCP

30(b)(6) deposition of the following named organization, under oath, before a court reporter or other

person authorized to administer oaths, at the place, date and time stated below, to continue from day

to day until concluded. The organization subject to deposition is to designate one or more persons

with knowledge in order to render testimony concerning the topics enumerated below.

The organization is also directed to produce at the office of Wiedemann & Wiedemann, 821

Barrone Street, New Orleans, LA 70113 the items described on the attached *30(b) (5) notice*, at least

seven days in advance of the date on which testimony is scheduled to occur.

You are invited to attend and participate as is appropriate according to law.

ORGANIZATIONAL DEPONENT: LAFARGE NORTH AMERICA, Inc. THROUGH
IT'S COUNSEL, John D. Aldock, Esq.
Goodwin Proctor, LLP, 901 New York Avenue
Washington, D.C. 20001

DATE, TIME: OCTOBER 12, 2006 AT 9:00 a.m.

LOCATION: 821 BARONNE STREET, NEW ORLEANS, LA 70113

BARGE000735

## TOPICS

1.   The identities and whereabouts of any and all of Ingram Barge's managing or other agents, officers, supervising or other employees, personnel and/or representatives having any control or authority whatsoever over the custody, use, care, storage, mooring, berthing, handling, charter, navigation and/or movement of ING 4727 from August 22, 2005 through August 29, 2005;

2.   The point(s) of origin of ING 4727 and its movements leading to its delivery to/at the Industrial Canal Lafarge facility;

3.   Any and all circumstances by which Ingram Barge/Lafarge/Domino/Unique Towing acquired knowledge of the weather disturbance eventually named Katrina, including but not limited to how, when and where said knowledge was first acquired, by whom it was acquired, and how, when, where, and by whom additional or subsequent knowledge of said weather was acquired by Ingram, as well as the substance of the knowledge acquired;

4.   Any and all measures and preparations which Ingram Barge/Lafarge/Domino/Unique/owing undertook, ordered, directed, requested, arranged, or of which Ingram had knowledge or anticipation, and/or about which Ingram Barge/Lafarge/Domino/Unique/Towing inquired, to move, remove, prepare or secure ING 4727 for Katrina, including but not limited to the dates, times and substance of said activities, by whom they were taken and/or at whose direction they occurred, and any and all reasons therefor;

5.   Nature, location, capacity, availability, purpose and description of any and all barge or other fleet points available to Ingram Barge/Lafarge/Domino/Unique Towing within a 50 mile radius of the Industrial Canal;

6.   The identities and owners of any and all barges fleeted during or because of Katrina at fleet points referenced above;

7.   The identities and owners of any and all vessels in or on the Industrial Canal from August 26, 2005 through August 29, 2005 capable of serving as a power unit for ING 4727, and/or capable of maintaining the position of ING 4727 in its berth at Lafarge;

8.   The existence, nature, contents, custodian(s) and timing of any and all written, verbal, electronic, email and/or other communications between Ingram Barge/Lafarge/Domino/Unique Towing and any other entity or person, and/or within the Ingram organization, and/or within the Lafarge and/or Unique Towing (Joe Domino) organizations, concerning ING 4727 from August 22, 2005 through August 29, 2005, including but not limited to the participants in such communications, identities and whereabouts of persons with knowledge of such communications;

9.   Any and all knowledge Ingram Barge/Lafarge/Domino/Unique Towing had/has of the

mooring methods and equipment used to tie ING 4727 from August 26, 2005 through August 29, 2005, including but not limited to the substance of such knowledge, how and when and by whom acquired;

10. Any and all knowledge Ingram Barge/Lafarge/Domino/Unique Towing had/has of ING 4727's escape from its berth at Lafarge during the effects of Katrina, including but not limited to the substance of such knowledge, how and when and by whom acquired;

11. Any and all measures taken, ordered, requested, arranged or anticipated by Ingram Barge/Lafarge/Domino/Unique Towing in response to knowledge, if any, that ING 4727 had escaped from its berth at Lafarge during the effects of Katrina;

12. Knowledge of the physical and dynamic characteristics of ING 4727 when unloaded and subject simultaneously to hurricane force wind and rising water and/or storm surge;

13. Knowledge of the sufficiency or adequacy of methods used to moor and/or tie ING 4727 in advance of the arrival of Katrina;

14. Any and all inquiry(ies) made by Ingram Barge/Lafarge/Domino/Unique Towing from August 22, 2005 through August 29, 2005 regarding Katrina, its strength, direction, position, forecasts and effects;

15. Any and all inquiry(ies) made by Ingram Barge/Lafarge/Domino/Unique Towing from August 22, 2005 through August 29, 2005 regarding ING 4727, its status, position, location, seaworthiness, fitness for Katrina, potential hazards it presented, physical and/or dynamic characteristics when unloaded and subject simultaneously to hurricane force wind and rising water and/or storm surge, and/or measures available to minimize risk of hazards it presented;

16. Existence, nature, contents and custodian(s) of any and all written or other policies, standards, manuals, guidelines, regulations, instructions, training materials, memoranda, bulletins, correspondence and other communications and/or publications possessed by, used by, implemented by, consulted by, and/or available to Ingram Barge/Lafarge/Domino/Unique Towing from August 26, 2005 through August 29, 2005 concerning (a) the advisability, feasibility and/or procedure for securing, sinking, ballasting, anchoring, moving of a barge from/in an inland waterway, specifically including but not limited to ING 4727, under threat of hurricane; and/or (b) the seaworthiness of a barge, specifically including but not limited to ING 4727, while under threat of hurricane;

17. Identities and whereabouts of any and all shoreside personnel present at the Lafarge facility from August 22, 2005 through August 29, 2005 with any knowledge of ING 4727's movements, moorings, mission, charter, and/or of any and all measures and/or decisions undertaken with respect to the approach and/or effects of Katrina;

18. Identities and whereabouts of any and all personnel assigned or called upon to man or crew or moor or move ING 4727 from August 22, 2005 through August 29, 2005;

BARGE000737

19.  The nature and identity of any and all cargo carried by ING 4727 to Lafarge from August 22, 2005 through August 29, 2005, and the identities and whereabouts of any and all persons with knowledge thereof;

20.  Any and all inspections of ING 4727, its moorings, structure, hull, interior, appurtenances, superstructure, hatches, ports, cleats, parts, hardware, berth, and/or exterior in anticipation of and/or during Katrina, including the timing, extent and identities and whereabouts of any and all participants in such inspection;

21.  The existence, nature, contents and custodian(s) of any and all maintenance and inspection records for ING 4727;

22.  The existence, nature, contents and custodian(s) of any and all accident and/or incident reports describing occurrences in which ING 4727 was involved, during Katrina, and otherwise;

23.  The existence, nature, contents and custodian(s) of any and all investigatory documents pertaining to ING 4727's berthing and/or mooring at Lafarge, escape from its berth at Lafarge, and/or possible breach(es) of the Industrial Canal floodwall;

24.  The existence, nature, contents and custodian(s) of any and all reports, writings, records, correspondence, memoranda, bulletins and other materials concerning any movement of ING 4727 from within the Industrial Canal to or through the eastern floodwall, into the residential area of the Lower Ninth Ward;

25.  The existence, nature, contents, substance and language of any and all contracts delegating to another person or entity any authority, management and/or control whatsoever over ING 4727 and in effect from August 22, 2005 through August 29, 2005;

26.  Any and all written, oral or other delegation to another person or entity of authority, management and/or control over ING 4727 from August 22, 2005 through August 29, 2005;

27.  Existence, nature, contents, substance and custodian(s) of any and all bills of lading, manifests, logs, diaries, ship records, charters, contracts, agreements and other documents relative to ING 4727's entire mission or voyage in which it was involved on dates including but not limited to August 27, 2005;

28.  The existence, nature, contents, substance, language, coverage terms and limits of any and all policies of liability, pollution, excess, reinsurance and other hazard insurance issued to Ingram Barge/Lafarge/Domino/UniqueTowing and/or providing coverage of ING 4727 from August 22, 2005 - August 29, 2005, as per remedies afforded under, and consequences of, *Crown Zellerbach Corp* and related law and case;

29.  Nature and availability of any and all measures, including but not limited to mooring, movement, ballasting, anchorage and/or sinkage of ING 4727, reasonably likely to prevent

its movement to and/or through the Industrial Canal floodwall during the effects of Katrina;

30.   Identities and whereabouts of any and all witnesses to and/or persons with knowledge of any and all of the foregoing;

31.   Nature, existence, contents and custodian(s) of any and all writings and/or things describing, memorializing, reporting and/or containing information relative to any or all of the foregoing;

32.   Identities and whereabouts of any and all persons with knowledge of the movements of ING 4727 from the Lafarge dock to its eventual resting place in the residential area of the Lower Ninth Ward;

33.   Any and all written designs, plans, specifications, capacities, weather tolerances, weights, measurements, performance data for or applicable to ING 4727;

34.   Any and all sale, registration and ownership documents pertaining to ING 4727;

35.   Any and all manufacturer literature, operations manuals, data, instructions, warnings and other writings concerning operation and use of ING 4727;

36.   Any and all accident/allision history as to ING 4724;

37.   Description and origin of any and all pre and post August 29, 2005 damage to ING 4727;

38.   The names of any charterers of ING 4727 for the past two years;

39.   The existence, contents and custodians of any video surveillance at the Lafarge facility;

40.   The existence, contents, nature, availability and custodian of any emergency guidelines for charterers such as Lafarge or for towing companies such as Domino or Unique with respect to Ingram barges;

41.   Any and all loading, unloading, moving, berthing, mooring and other activities taken with respect to ING 4727 while at the Lafarge facility.

42.   Any and all facts concerning the seaworthiness, adequacy or fitness of ING 4727, and/or any and all equipment and/or structures used to secure, berth, store or secure ING 4727 at the Lafarge facility;

43.   Any and all communications between Ingram, Lafarge and/or Domino/Unique concerning ING 4727;

44.    Relationship(s) between Lafarge and/or Riverway, and/or Ingram and/or Domino/Unique.

45.    Any and all other relevant factual matters of which the deponent(s) have knowledge.

Respectfully submitted,

Brian A. Gilbert ( 21297)
LAW OFFICE OF BRIAN A. GILBERT
3232 Edenborn Avenue
Metairie, Louisiana 70002
Telephone:  (504) 885-7700
Facsimile:  (504) 885-7997
Counsel for Ethel Mumford, et al

Patrick J. Sanders, Esq. (18741)
ATTORNEY AT LAW
3316 Ridgelake Drive
Metairie, LA 70002
Phone: 504/834-0646
Counsel for Ethel Mumford, et al

Lawrence D. Wiedemann, Esq. (13457)
Karl Wiedemann, Esq. (18502)
Karen Wiedemann, Esq.(21151)
WIEDEMANN & WIEDEMANN
821 Barrone Street
New Orleans, LA 70113
Phone: 504/581-6180
Fax: 504/581-4336
Counsel for Ethel Mumford, et al

_F. Gerald Maples_

F. Gerald Maples, Esq.(25960)
Carlos A. Zelaya, II, Esq.(22900)
MAPLES & KIRWAN, LLC
902 Julia Street
New Orleans, LA 70113
Phone: 504/569-8732
Fax: 504/525-6932
Counsel for Marie Benoit, et al

_Ashton R. O'Dwyer_

Ashton R. O'Dwyer, Esq.(10166)
LAW OFFICES OF ASHTON R.
O'DWYER, JR.
365 Canal Street, Suite 2670
New Orleans, LA 70130
Phone: 504/561-6561
Fax: 504/561-6560
Counsel for The Parfait Family, et al

_Robert B. Evans_

Robert B. Evans, III (23473)
BURGOS & EVANS
3632 Canal Street
New Orleans, LA 70119
Phone: 504/488-3722
Counsel for Blair Boutte, et al

## CERTIFICATE OF SERVICE

I certify that a copy of the above and foregoing has been served upon all counsel of record by United States Mail, postage pre-paid and properly addressed, this _18th_ day of _August_, 2006.

BARGE000741

# New Orleans Terminal

## Hurricane Preparation Checklist

Name of Hurricane _____

Date        _____

___ Move the barge unloader (Rambo) to the south end of the dock against the stops and tie barge ropes around the wheels.

___ Cable all barges to shore.

___ Disconnect power to the wharf

___ Remove all loose items from barge unloader (Rambo) and put inside the containers on the Rambo and lock the doors.

___ Remove all loose items from the wharf and store in the marine shed or under group IV silos.

___ Remove all equipment i.e. Welding machine, fork lift, Bobcat from the wharf and store in the marine shed or under group IV silos.

___ Remove all loose items (Tools, etc.) from group III & IV silo roofs and store in the elevators

___ Disconnect the power in the terminal (do this last)

## ((((((BE SAFE))))))

15

LNA000113