# EXHIBIT 17

1                UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF LOUISIANA

3

4   IN THE MATTER OF THE        *    CIVIL ACTION
    COMPLAINT OF INGRAM         *
5   BARGE COMPANY, AS           *    NO. 05-4419 w/
    OWNER OF THE ING4727,       *    Consolidated cases
6   PETITIONING FOR             *
    EXONERATION FROM OR         *    SECTION: "C"
7   LIMITATION OF LIABILITY     *
                                *    MAGISTRATE 2
8   * * * * * * * * * * * * * * *

9

10

11

12

13

14              Deposition of **TERRY MARK ADAMS**, taken at

15   the law offices of Wiedemann & Wiedemann, located

16   at 821 Baronne Street, New Orleans, Louisiana

17   70113, beginning on the 13th day of November, 2006

18   at 2:04 p.m.

19

20   Reported by:

21        Sharon Waldrup Black, CCR
          Certified Court Reporter
22

23

24

25

MINIDEP by Kenson

1     TERRY MARK ADAMS, 2165 Carol
2 Sue Avenue, Gretna, Louisiana 70056, after having
3 been first duly sworn by the reporter to tell the
4 truth, the whole truth, and nothing but the
5 truth, was examined and testified as follows:
6     MR. WIEDEMANN:
7         Let the Record reflect that the
8     deposition of Terry Adams is being taken
9     for any and all purposes under the
10     Federal Rules of Civil Procedure, and
11     more importantly, for perpetuation in
12     the event that he is not available for
13     the trial of this matter.
14         We will -- what's your pleasure
15     about objections? Should we waive them,
16     or what?
17     MR. EMMETT:
18         I think because it's a
19     perpetuation deposition we should
20     make them.
21     MR. WIEDEMANN:
22         Okay. All objections will be made
23     during the deposition. The witness will
24     reserve the right to read and sign. And
25     just for the Record, the Court sort of

- 7 -

1 permits only one attorney for the
2 claimants to examine a witness, and only
3 one attorney from Class B, which is the
4 -- for lack of a better word, the
5 defendant group, unless there is a
6 potential conflict.
7         And I do not see any potential
8     conflict between the defendants as to
9     this fact witness. So I would ask
10     the Group B to designate who is going
11     to examine this witness, which attorney.
12     MR. EMMETT:
13         Mr. Fisher will be conducting the
14     examination.
15     MR. WIEDEMANN:
16         Okay.
17     E X A M I N A T I O N
18 BY MR. WIEDEMANN:
19     Q. Mr. Adams, would you tell us your full
20 name, sir?
21     A. Terry Mark Adams.
22     Q. And how old are you, sir?
23     A. 44.
24     Q. And what is your educational background?
25 How far did you go in school?

- 8 -

1     A. I graduated, two years of college.
2     Q. And where did you graduate from?
3     A. George Washington Carver.
4     Q. In New Orleans?
5     A. Yes.
6     Q. And you went to two years of college,
7 where?
8     A. SUNO.
9     Q. All right. And what did you study at
10 SUNO?
11     A. Business Administration.
12     Q. After leaving, or after your two years
13 of college at SUNO, what did you do?
14     A. Went into the United States Marines.
15     Q. What year did you go into the United
16 States Marines?
17     A. '82.
18     Q. And how long were you in?
19     A. Until '85.
20     Q. And that was a three-year enlistment?
21     A. Yes, it was.
22     Q. And then did you receive an honorable
23 discharge?
24     A. Yes, I did.
25     Q. Where did you serve with the United

- 9 -

1 States Marine Corp from '82 to '85?
2     A. The first year was in Okinawa, Japan.
3     Q. Okay.
4     A. And then Camp LeJeune in North Carolina.
5     Q. And after leaving the Marine Corps, did
6 you come back to New Orleans?
7     A. Yes, I did.
8     Q. And have you lived in New Orleans
9 continually since your completion of your
10 military service in 1985?
11     A. Yeah.
12     Q. Did you join the Marine Corps?
13     A. Yes, I did.
14     Q. Okay. And what kind of occupation have
15 you pursued since 1985?
16     A. I worked in my nephew's body shop and in
17 construction. Now I'm a driver at Matrana's
18 Produce.
19     Q. And your nephew's name?
20     A. Ducros.
21     Q. And what was the name of his body shop?
22     A. Ducros Automotive.
23     Q. And where was that located?
24     A. 9330 Chef Highway.
25     Q. And now you're a driver for Matrana

- 10 -

1 Produce?

2    A. Matrana's Produce.

3    Q. And what as a driver for Matrana's

4 Produce, what do you do? Do you deliver produce?

5    A. Produce.

6    Q. To stores?

7    A. Fruits and vegetables to stores and

8 restaurants.

9    Q. And are you married, sir?

10    A. No, I'm not.

11    Q. Okay. Have you been married in the

12 past?

13    A. Yes.

14    Q. And you're divorced?

15    A. Yes, I am.

16    Q. What was your wife's name?

17    A. Andrea Burns.

18    Q. All right. Do you have children?

19    A. Yes.

20    Q. How many?

21    A. Six.

22    Q. And are they all grown?

23    A. Except one.

24    Q. And what's the -- what's the age of the

25 youngest?

- 11 -

---

1 living?

2    A. 2604 Deslonde.

3    MR. HAYCRAFT:

4       I'm sorry. I didn't hear that.

5    THE WITNESS:

6       2604 Deslonde.

7 BY MR. WIEDEMANN:

8    Q. And the property at 2604 Deslonde was

9 owned by whom?

10    A. My father.

11    Q. And how long had you lived at 2604

12 Deslonde?

13    A. Basically all my life.

14    Q. Okay. And is your father deceased?

15    A. Yes, he is.

16    Q. And who owns the property now or?

17    A. It's a family property. I mean, nobody

18 actually owns it. It's never been took out of my

19 father's name.

20    Q. You have brothers and sisters?

21    A. Yes, I do.

22    Q. So the succession of your father was not

23 -- hasn't been opened?

24    A. No. No.

25    Q. But at the time of the hurricane of

- 13 -

---

1    A. She's nine.

2    Q. And where do you live at the present

3 time?

4    A. I was staying in by my niece on -- in

5 Gretna, on Carol Sue.

6    Q. And what's the address on Carol Sue?

7    A. 2165 Carol Sue.

8    Q. 2165 Carol Sue?

9    A. Uh-huh. (Affirmative response.)

10    Q. And how long have you lived at that

11 address?

12    A. Since I came back from Houston, Texas in

13 November of last year.

14    Q. And where in Houston were you living?

15    A. I spent the first two months in the

16 Holiday Inn, and then I moved in an apartment

17 with my son. Sharptown Manor.

18    Q. And you were in Houston for what reason?

19    A. Katrina.

20    Q. Okay.

21    A. Hurricane Katrina.

22    Q. All right. When did you leave New

23 Orleans to go to Houston?

24    A. About three days after the -- Katrina.

25    Q. Okay. Prior to Katrina, where were you

- 12 -

---

1 August 29, 2005, where were you living?

2    A. 2604 Deslonde.

3    Q. And how long had you been living at that

4 address?

5    A. Since 2003.

6    Q. All right. And did anyone else live at

7 that residence with you?

8    A. Kenneth Ducros.

9    Q. That's your nephew?

10    A. Uh-huh. (Affirmative response.)

11    Q. And anyone else?

12    A. That's it.

13    Q. At the time of the hurricane on August

14 29, 2005, was anyone at that house, 2604 Deslonde

15 Street, with you?

16    A. I was there by myself.

17    Q. Where was your nephew, Kenny?

18    A. He had went across the canal by one of

19 his friends, Leroy Crawford.

20    Q. Okay. So you were home alone at that

21 time?

22    A. Uh-huh. (Affirmative response.)

23    Q. Okay. What time did you arrive at the

24 Deslonde property on the 28th of August

25    A. I went inside about 8:00 o'clock

- 14 -

DEPO. OF TERRY MARK ADAMS                    MINIDEP by Kenson

1 that night.
2      Q.  That would have been on the 28th?
3      A.  Yes.
4           MR. HAYCRAFT:
5                I object to the leading form
6      of the question.
7  BY MR. WIEDEMANN:
8      Q.  8:00 o'clock on what date?
9      A.  On the 28th.
10     Q.  And did you leave the house after 8:00
11 o'clock on the 28th?
12     A.  No, unh-unh. (Negative response.)
13     Q.  Were you aware of impending weather
14 conditions?
15     A.  I was aware of the hurricane was on its
16 way.
17     Q.  And had you followed it, or did you
18 follow it on TV?
19     A.  No.
20     Q.  Had you been at this house on Deslonde
21 for prior hurricanes?
22     A.  Yeah.
23     Q.  Like when?
24     A.  All of them.  They always turned.
25     Q.  So did you have any intention of
                        - 15 -

1      Q.  And did you go to sleep?  Did you go to
2  sleep?
3      A.  Yeah.  I fell asleep eventually.
4      Q.  All right.  What time did you wake up on
5  the 28th or the 29th?
6           MR. HAYCRAFT:
7                Object to the form of the
8           question.
9           MR. FISHER:
10               Object to the form.
11          THE WITNESS:
12               I woke up that Monday morning
13          about 5:00 in the morning.
14 BY MR. WIEDEMANN:
15     Q.  And what caused you to wake up?
16     A.  I don't know.  I was working and it was
17 a Sunday, so I -- you know, I just got up.
18     Q.  Do you ordinarily get up about that
19 time?
20     A.  About that time.
21     Q.  Okay.  And so that was your normal --
22 the time for getting out of bed?
23     A.  Yeah.  It was Monday morning.
24     Q.  And when you got up at 5:00 a.m., what
25 was going on?
                        - 17 -

1  evacuating the house?
2      A.  No.
3      Q.  Did you consider the house as you had --
4  since you had lived there to be safe?
5           MR. FISHER:
6                Object to the leading question.
7  BY MR. WIEDEMANN:
8      Q.  Were you concerned about the house at
9  all?
10     A.  No.
11          MR. FISHER:
12               Continuing objection.
13 BY MR. WIEDEMANN:
14     Q.  All right.  And you arrived home at 8:00
15 p.m.  What did you do after 8:00 p.m.?
16     A.  I took a shower and laid down.
17     Q.  You had worked that day?
18     A.  No.
19     Q.  And that was
20     A.  We hadn't been working in the hurricane
21 for the last two days, so, nobody -- I don't
22 think nobody was working.
23     Q.  So when you say you laid down, did you
24 go to bed or you laid down on the couch, or what?
25     A.  I went in the bed and laid down.
                        - 16 -

1      A.  The carpet on the floor was wet.
2      Q.  Okay.  And when did you notice that?
3      A.  As soon as I turned to put my feet on
4  the floor.
5      Q.  And when you saw that the carpet was
6  wet, what did you do?
7      A.  I started getting things together to try
8  to get in the attic.
9      Q.  And what did you gather, if anything, to
10 get into the attic?
11     A.  My phone, my -- some change, a couple of
12 -- some changing clothes and a couple of candles.
13     Q.  All right.  And how did you -- how did
14 you go about getting into the attic?
15     A.  I had a pull down stairs.
16     Q.  And did the pull down stairs, did they
17 have a ladder to get --
18     A.  Yeah.
19     Q.  And when you got into the attic, what
20 did you do?
21     A.  The first thing I did was went to the
22 wind turbine and knocked it out.
23     Q.  And the wind turbine, when you knock it
24 out, that gave you access to what?
25     A.  I was out.  I was on the roof then.
                        - 18 -

DEPO. OF TERRY MARK ADAMS                    MINIDEP by Kenson

1    Q. Did you -- when you pulled down the
2  stairs and went up into the attic, was it your
3  intention at that time to go to the roof?
4    A. Not really. I was just going to get in
5  the attic. But when -- as I was going up the
6  water was like touching my ankles. (Indicating.)
7  So I said, "Something is really wrong." So I
8  said, "I'd better make me a hole to exit."
9    Q. Okay. And did you -- when you made the
10  hole, that is the -- the wind vent you took out?
11    A. Yeah, the wind turbine.
12    Q. And how were you able to get that out?
13    A. With a hammer.
14    Q. You had brought a hammer with you?
15    A. Uh-huh. (Affirmative response.)
16    Q. Okay. Did you have any food or water
17  with you?
18    A. Yes, I did.
19    Q. And how long after 5:00 a.m. when you
20  got up was it before you went on to the attic?
21    A. I played around downstairs and grabbed
22  everything. I must have -- by the time it was
23  all over, it was about between 20 and 30 minutes
24  when I bust the wind turbine down and came out
25  the top of the attic.

- 19 -

1    Q. Okay. So what time do you think it was
2  when you got on the roof after busting out the
3  turbine?
4    A. Somewhere between like 5:30, 6:00
5  o'clock.
6    Q. And at that time, at 5:30 or 6:00
7  o'clock when you got up onto the attic, what was
8  the -- was it daylight or dark, or what?
9    MR. O'DWYER:
10        I think counsel mis-spoke. Did
11        counsel mean to say "in the attic" or
12        "on the roof?"
13    MR. WIEDEMANN:
14        Yeah. On the roof, yeah.
15    MR. O'DWYER:
16        All right.
17  BY MR. WIEDEMANN:
18    Q. When you got onto the roof at 5:30 or
19  thereabouts, was it daylight at that time?
20    A. No. It wasn't quite daylight yet.
21    Q. Okay. When you got up there, could you
22  see the canal and --
23    MR. FISHER:
24        Object to the from. Leading.
25    MR. EMMETT:

- 20 -

1        I join.
2    MR. HAYCRAFT:
3        The same.
4    THE WITNESS:
5        I could see -- I could see the
6        levee. I could see that it -- I could
7        look at it and see it was still there.
8  BY MR. WIEDEMANN:
9    Q. When you say "the levee," what do you
10  mean by the levee?
11    A. Well, we call it the levee. Y'all might
12  call it a wall. But there's a levee and then
13  there's a brick wall.
14    Q. Okay. All right. And what -- how could
15  you see the wall or the levee, as you call it?
16  What
17    A. It was brick.
18    Q. What color was it?
19    A. It's -- it looks white at night. It's
20  concrete.
21    Q. And on Deslonde Street, at 2604, how far
22  are you from the levee or the wall, if you were
23  on Deslonde?
24    MR. FISHER:
25        We haven't established where

- 21 -

1        he was.
2    MR. WIEDEMANN:
3        He said he was at 2604 Deslonde.
4        Is that unestablished?
5    MR. SANDERS:
6        Why don't you just ask him again?
7    MR. WIEDEMANN:
8        Huh?
9    MR. SANDERS:
10        Just ask him again.
11  BY MR. WIEDEMANN:
12    Q. Did you -- after 8:00 p.m., 8:00 o'clock
13  or when you got home at 2605 -- 4 Deslonde, did
14  you ever leave that --
15    A. I did not leave the house.
16    Q. When you got on the roof, was it the
17  same roof of that house?
18    A. Yes, it was.
19    Q. Okay. And the wall -- well, that's what
20  I started to ask you. Where is Deslonde Street
21  with relation to the Industrial Canal if you walk
22  from your house to the Industrial Canal?
23    A. It's not a half a block.
24    Q. What -- what is the street that runs
25  along the canal?

- 22 -

DEPO. OF TERRY MARK ADAMS                                    MINIDEP by Kenson

1    A.  It's Jordan Avenue and then Deslonde.
2    Q.  Okay.  So you're one block over from
3  Jordan Avenue?
4    A.  Jordan Avenue is to my backyard.
5    Q.  Okay.  All right.  And where is Deslonde
6  with relation to the Claiborne Avenue Bridge?
7    A.  I'd say about eight or nine blocks from
8  the Claiborne Avenue bridge.
9    Q.  To the bridge itself?
10   A.  To the bridge itself.
11   Q.  And when you got up on the roof, you say
12  you could see the levee or the wall; is that
13  correct?
14   A.  Yeah.
15   Q.  Could you see the levee or the wall to
16  the Florida Avenue bridge?
17   A.  Yes, I could.
18   Q.  Could you see the levee or the wall to
19  the Claiborne Avenue bridge?
20   A.  Yes, I could.
21   Q.  Tell me what the wall looked like as you
22  looked at it from the roof at 5:30 or thereabouts
23  on the 29th.
24   A.  Between -- I'd say somewhere between
25  5:30 and 6:00 the levee right by my house, the

- 23 -

1  up and down?
2    A.  It was straight up.  It just was coming
3  over and under.
4    Q.  Okay.  Did you see anything else after
5  you were on the roof at 5:30 or thereabouts?
6    A.  When I looked toward the Claiborne
7  bridge I could see something coming toward the
8  levee, toward the wall.  I couldn't exactly see
9  what it was.  And kept watching it.  Then I heard
10  something that sounded like a bang.  When I heard
11  the bang I seen the barge come floating through.
12         After the barge came through the water
13  came through, like the water must have rose about
14  12 feet in seconds.
15   Q.  All right.  When did you -- when did you
16  determine that it was a barge?  You said you saw
17  a barge come through.
18   A.  Well, when it hit the wall I -- I knew
19  it had to be a barge because wouldn't nothing
20  else be on the water.
21   Q.  Did you see it before it hit the wall?
22   A.  I could see it, but I couldn't make out
23  what it was.  I mean -- I mean, it wasn't no
24  house.  It was just a big old object.
25   Q.  Okay.  And tell us -- you say -- what

- 25 -

1  water was kind of like coming under it.
2         I could see that.  And a little over it.
3  But the levee was still there.  The rest of the
4  levee was totally intact.
5    Q.  All right.  When you say "levee," you
6  mean the
7    A.  The wall.
8    Q.  -- wall?
9    A.  The wall.
10   Q.  And tell me, when you saw water coming
11  over the wall and some coming under, where was
12  that at with relation --
13   A.  That was at -- that was at Jordan Avenue
14  and Law Street, right in the back of my house.  I
15  could see that.
16   Q.  Okay.  And how -- how far away was that
17  from your house?
18   A.  About a half a block.
19   Q.  But was there any breach in the wall
20  or --
21   A.  No.  It wasn't no breach.  It wasn't --
22   Q.  Okay.
23   A.  It --
24   Q.  You could see the -- could you see
25  whether the wall was leaning, or was it straight

- 24 -

1  did you hear?  What -- what called your attention
2  to it first, when you saw it or what?
3    A.  When I saw it, I kept watching.  I was
4  like, "What is that?"  I knew it was something
5  big, and I knew -- you know, I say, "Well, I know
6  this canal don't be having nothing on it like
7  that."  And I said, "That's got to be a barge."
8    Q.  And how long was that before you heard
9  anything else, when you saw --
10   A.  About -- the water was coming towards
11  us.  About a matter of 30 seconds I heard
12  something hit the wall like, boom.
13   Q.  All right.  And were you looking in that
14  direction?
15   A.  Yeah.  I was already looking that way.
16   Q.  And tell us what you saw after you heard
17  the boom.
18   A.  After I heard that, the water came
19  through.  It was like a tidal wave or the
20  tsunami.  Cars were getting rolled, houses were
21  getting pushed apart.
22   Q.  Okay.  And what happened to the wall
23  where the -- where the -- you heard the bang and
24  -- and saw the tsunami?
25   A.  It disappeared.

- 26 -

**DEPO. OF TERRY MARK ADAMS**

1  Q.  Okay.  And where did the barge go
2  after --
3  A.  The barge went in the neighborhood, and
4  went toward Deslonde Street.  It was like going
5  toward Deslonde and Tennessee Street.
6  Q.  And did you see the barge?  Did it
7  strike anything?
8  A.  A couple of houses.
9  Q.  And what happened to your house after
10  the -- this water came through?
11  A.  Well, the force from that barge lifted
12  my house up off the ground, and it started going
13  towards -- towards Claiborne.
14  Q.  All right.  And how far did your
15  house --
16  A.  My house went down the street about
17  almost a block.
18  Q.  And how big a house was that?
19  A.  Three-bedroom house.
20  Q.  Okay.  And how deep was the water as --
21  as you saw your house moving or right before you
22  saw your house move?
23  A.  The water went from about -- about three
24  feet, about almost in the area of 20 feet 'cause
25  the water covered the streetlight.

- 27 -

1  Q.  Okay.  And the water that moved your
2  house and covered the streetlight, where did it
3  come from?
4  A.  From down the street where the barge
5  came through at.
6  Q.  Were there other people around there?
7  A.  They had some people across the street
8  on a house.  They had some people right down the
9  street on a house.  And they had a lot of people
10  on Tennessee Street on top of houses.
11  Q.  Okay.  And what -- what, if anything,
12  was going on with them that you saw?
13  A.  Everybody was just in pandemonium.  I
14  mean, cars were floating around.  They had people
15  floating on top of rooftops and bathtubs, and
16  refrigerators was floating around.
17  Q.  You were still on the roof?
18  A.  Yeah.  I was still on the roof.
19  Q.  Did you see any -- any of your
20  neighbors?
21  A.  Christopher Weaver came by on a roof.  I
22  help him come -- I pulled him in the roof with
23  me.
24  Q.  How did you pull him on the roof with
25  you?

- 28 -

1  A.  With Christmas lights.
2  Q.  And did he stay on the roof with you?
3  A.  Yeah.  He stayed there with me.
4  Q.  Where did he come from, if you know?
5  A.  His house is on Jourdan Avenue.  So when
6  the water hit his house it just -- it just
7  disappeared.  And it -- I mean, his house just
8  disappeared.
9  Q.  And were -- was the -- when you say
10  "floated by on a roof," was it on the roof of his
11  house, or do you know?
12  A.  I don't know.  It was just a little
13  piece of roof, smaller than this table.
14  (Indicating.)  It was just a little piece of
15  roof.
16  Q.  Okay.  And when you pulled him up on to
17  your roof --
18  A.  Yeah.  I pulled him on the roof with me.
19  Q.  All right.  As -- as your house, you
20  say, was floating, did anything happen to the
21  house, any part of the house?
22  A.  Yeah.  The front porch broke off of it.
23  Q.  And did you remain on the house after --
24  A.  Yeah.
25  Q.  -- it floated?

- 29 -

1  A.  Yeah.
2  Q.  Did it eventually come to rest?
3  A.  Yeah.  It -- it kind of came back
4  towards the canal.  And when the water was going
5  back into the canal, like the next day it came
6  back and lodged up against a post.
7       And that's where it stayed 'til the
8  National Guard came that Wednesday morning and
9  got me out of there.
10  Q.  And so you were on the roof from when to
11  when?
12  A.  From Monday to Wednesday.
13  Q.  From -- the Monday would have been
14  the 29th?
15  A.  Monday morning.
16  Q.  At 5:30 or thereabouts?
17  A.  Yeah.
18  Q.  Okay.  And when were you taken off?
19  A.  Wednesday, somewhere around 10:00, 11:00
20  o'clock.
21  Q.  How were you taken off?
22  A.  By helicopter.
23  Q.  And was anybody taken off with you?
24  A.  Me and Chris.
25  Q.  Chris Weaver?

- 30 -

DEPO. OF TERRY MARK ADAMS                                    MINIDEP by Kenson

1   A.  Yes.
2   Q.  Okay.  Y'all were both taken off by
3   helicopter?
4   A.  Uh-huh.  (Affirmative response.)
5   Q.  Do you know what -- what helicopter?
6   A.  I don't know.
7   Q.  You don't know who --
8   A.  I don't know.  At first they were just
9   flying by us because the water was pulling us
10  back toward the canal, and they couldn't get a
11  boat back there.
12      The current was pulling back.  And they
13  -- it was like, if you put a boat back there it
14  was going to get sucked in the canal.  So that's
15  why we sit there so long.
16  Q.  And did you do anything to cause the --
17  the helicopter to come to get you out?
18  A.  The people started flying over there
19  about 9:00, 10:00 o'clock Monday morning.  It was
20  clear.  And they had been -- they had been --
21  they had helicopters and planes flying -- flying
22  over.
23  Q.  When you were picked up, how did you get
24  aboard the helicopter?
25  A.  They lowered the little hoist down

- 31 -

1   and I got on it.
2   Q.  Okay.  And where were you taken from --
3   from Deslonde?
4   A.  To the Superdome.
5   Q.  Okay.  And how long did you remain at
6   the Superdome?
7   A.  I didn't stay there very long because I
8   overheard the National Guard telling the people
9   that the water was rising.  So I wind up at the
10  Convention Center.
11  Q.  And how long did you stay at the
12  Convention Center?
13  A.  Not long.  We went -- we walked -- me, I
14  ran into my nephew and Leroy at the Convention --
15  at the Superdome.  We walked to a hotel on -- on
16  Toulouse.  Leroy's brother worked there.  And we
17  went on Bourbon -- we went on Bienville Street in
18  a parking lot and got his car right across the
19  street from where D.H. Holmes used to be.
20      And we were able to drive alongside the
21  Convention Center Boulevard, hit the river and
22  take Highway 90, and go to Houston.
23  Q.  So you drove with -- with -- who was it
24  with you?
25  A.  It was Leroy, Kenny Ducros and Wayne.

- 32 -

1   Q.  Who?
2   A.  Wayne Crawford.
3   Q.  Who is Leroy?
4   A.  Leroy Crawford.
5   Q.  Okay.  That's your nephew?
6   A.  No.  That's my nephew's friend.  That's
7   who else my nephew was by.
8   Q.  Okay.  And what about Weaver?  Where did
9   he go?
10  A.  When he -- they lifted him to the
11  Superdome.  He was injured, so I lost track of
12  him.  He went to some kind of medical thing they
13  had set up in the Superdome.  He was injured.
14      Apparently when the -- when the water
15  hit a truck knocked his leg and put a big old
16  gash in it.  So when -- they carried him off.  I
17  didn't need to be carried off the plane.  I
18  walked into the Superdome.
19  Q.  So y'all got separated at that time?
20  A.  Yeah.  He was -- he needed medical
21  attention.
22  Q.  And have you seen him since that time?
23  A.  Yeah.  I seen him a couple of times.
24  Q.  Were there other people besides yourself
25  on the roof of houses in that area at the time,

- 33 -

1   at this time?
2   A.  Yeah.  There was a lot of people on top
3   of roofs.
4   Q.  Who -- who else do you know that was on
5   roofs?
6   A.  On Tennessee Street I know Piggy was on
7   top of the roof.  They had a couple of --
8   Q.  Who --
9   A.  -- Sorapuru's on --
10  Q.  Who's Piggy?
11  A.  That's -- I don't know Piggy real name.
12  That's all we ever called him. .
13  Q.  Okay.
14  A.  A couple of Sorapuru's was on the roof.
15  The Green's.  There was just a lot of -- and the
16  lady across the street from me was on the roof,
17  but her -- her -- her daddy and her brother fell
18  in the water.
19  MR. FISHER:
20      Object to -- counsel, when -- do
21  we have a time line here or do we have
22  a -- a continuum of what the witness
23  first told us in terms of time?
24      Was all of this when he first came
25  out on his roof or was it one hour,

- 34 -

MINIDEP by Kenson

1   two hours, three or five hours later?
2   I think we're getting a confused
3   Record here.
4   BY MR. WIEDEMANN:
5   Q.   When did you see other people on the
6   roofs in the neighborhood?
7   A.   Everybody started -- I mean, right after
8   the -- the barge hit, it looked like everybody
9   popped up on the roof, because I guess they could
10  no longer stay in their houses.  So that's when
11  we started talking to one another.
12  Q.   So you -- and that what, you were
13  talking to people on other roofs?
14  A.   Yeah.  I mean, I could -- I could -- my
15  house rolled down and bump into somebody else
16  house.  And -- you know.
17  Q.   And you said Piggy was one of them?
18  A.   I know Piggy was on the roof because he
19  asked me to check on his horse, which was tied up
20  in the yard right behind me.  That's why I
21  remember him, because he said, "Check on my
22  horse."  The horse had drowned.
23  Q.   During the time after you went up to
24  knock out the vent and get on the roof, did you
25  ever leave the roof until you were taken off by

- 35 -

1   helicopter?
2   A.   No.
3   Q.   Okay.  Did Weaver ever leave the roof?
4   A.   No.
5   Q.   Did anybody else come up on the roof?
6   A.   No, not with us.
7   Q.   Did you see any identification on the
8   barge that you saw come through the wall?
9   A.   No, unh-unh. (Negative response.)
10  Q.   The place where the barge came through
11  the wall, do you -- can you tell us where that
12  was with relation to the streets involved?
13  A.   That barge had to come through somewhere
14  around Prieur or Johnson.  Prieur or Johnson, or
15  Roman.  Somewhere in that -- in that block
16  radius.
17  Q.   Prieur and Johnson and Roman would run
18  toward the canal and away from the canal?
19  A.   Yeah.
20  Q.   Okay.  And did you -- did you see any
21  other break in the wall at any time after --
22  before or after you saw the break in the area
23  that you described with the barge?
24  A.   Did I see any other breaks?
25  Q.   Uh-huh. (Affirmative response.)

- 36 -

1   A.   The only other break was down there by
2   me, but it was -- it was -- like I said, that was
3   more of a leak than a break.  That's how I had
4   time to gather up all the things I gather up, and
5   get to the roof.
6   Q.   Okay.  And how would you describe the --
7   and -- as the barge hit and came through the
8   wall, how would you describe the water that was
9   coming out at -- after -- at that point in time?
10      MR. EMMETT:
11          Object to the form.  You can
12      answer it, sir.
13      THE WITNESS:
14          I'd say -- if that would have
15      happened right by my house I probably
16      wouldn't have made it.  Because the
17      water came through like it was a tidal
18      wave or tsunami.
19          It was -- it came with such force
20      that you wouldn't -- you couldn't have
21      made it to the roof.
22  BY MR. WIEDEMANN:
23  Q.   Did anything -- did you observe anything
24  that happened to the wall after the break when
25  the barge came through?

- 37 -

1   A.   When the barge hit the wall, that part
2   of the wall just disappeared.
3   Q.   And how much of the wall disappeared, if
4   you can estimate for us?
5   A.   Oh, about a quarter block was gone.  And
6   as time went on it got bigger.  I know that.
7   Q.   Now, the break that you saw from the --
8   where the barge came through was to -- to the --
9   to your left toward the Claiborne Avenue?
10  A.   Uh-huh. (Affirmative response.)
11  Q.   Did you see any break occur in the wall
12  toward the Florida Avenue bridge?
13  A.   I wouldn't consider that to be a break.
14  After the wall -- after the barge came through
15  the wall by me gave.  It slowly just collapsed.
16  Q.   That was after the barge came through?
17  A.   Yeah.
18  Q.   And was water flowing down that way from
19  the break in the wall?
20  A.   Yeah.
21  Q.   Now, Terry, have you been promised
22  anything by anybody connected with this suit for
23  your testimony?
24  A.   No.
25  Q.   Have you met with myself and attorneys

- 38 -

MINIDEP by Kenson

1  in this case?
2      A.  Yes.
3      Q.  When?
4      A.  On another day, and last week, and in my
5  neighborhood a couple of -- I don't know, a
6  couple of weeks ago.
7      Q.  All right.  And have you been paid any
8  money for testifying?
9      A.  Other than for food and lunch, that was
10 it.
11     Q.  Have you -- have you been able to get
12 back into your house?
13     A.  My house is gone.  It's -- it's --
14 it's -- it floated down the street and then they
15 tore it down.
16     Q.  Did you have any flood insurance on your
17 house?
18     A.  No.
19     Q.  Did you -- did you or your family
20 receive anything for the loss of the house?
21     A.  No.
22     MR. WIEDEMANN:
23         I have no further questions.
24     MR. FISHER:
25         We'd like to take a short break,

- 39 -

1  Larry.  Could we?
2      MR. WIEDEMANN:
3          Okay.
4  (Off-the-Record.)
5      MR. FISHER:
6          Okay.  We're back on the Record.
7             E X A M I N A T I O N
8  BY MR. FISHER:
9      Q.  Okay.  Mr. Adams, my name is Robert
10 Fisher.  I, with my partner, Derek Walker, we
11 represent Lafarge North America.  I'm going to
12 ask you some questions.
13         Let me know if you don't understand what
14 I have just asked you or if you need a
15 clarification, or want us to restate the
16 question, or the court reporter read it back,
17 we'll read it back, okay?
18     A.  Okay.
19     Q.  Now, sir, are you a plaintiff or a
20 claimant in the lawsuit filed by -- originally by
21 someone named Ethel Mumford against Ingram Barge
22 Company and others?
23     A.  I don't even know a Ethel Mumford.
24     Q.  All right.  Are you a plaintiff in one
25 of the amended lawsuits filed by Mr. Lawrence

- 40 -

1  Wiedemann on behalf of certain people who lived
2  in the Ninth Ward at the time of Hurricane
3  Katrina?
4      A.  Yes.
5      Q.  Okay.  When did you join the lawsuit?
6      A.  I -- I couldn't tell you the exact time
7  or the exact date, or anything like that.
8      Q.  How did you find out that a lawsuit was
9  in progress directed towards Ingram Barge Company
10 and others?
11     A.  Well, I talked to Christopher Weaver,
12 who first told me, but I didn't know of -- I
13 didn't know who it was exactly aimed at or who it
14 was exactly against.
15     Q.  And what did Mr. Weaver tell you?
16     A.  He just told me that, "Didn't you" -- he
17 asked was I in the -- in the lower Ninth Ward
18 during the time of the -- Katrina.  I said,
19 "Yeah."
20         He said, "You helped me?"  I said,
21 "Yeah."  He said, "You actually seen the break,
22 didn't you?"  I said, "Yeah."  He said, "Well, I
23 want you to talk to my attorneys."
24     Q.  And who was his attorney?
25     A.  Mr. Wiedemann, I guess.

- 41 -

1      Q.  Okay.  And when was that?
2      A.  A couple of months ago.
3      Q.  A couple of months ago, okay.
4      A.  I don't think it was right after
5  Katrina.  I don't think it was the months
6  following.  I think it was in the -- in the new
7  year, somewhere around three or four months.
8      Q.  Sometime after January 1, 2006, then?
9  Can you give us a month, sir?
10     A.  I don't know.  I know it was after
11 January 1st.
12     Q.  Uh-huh.  (Affirmative response.)
13     A.  And it was after the month of January
14 altogether, because I stayed in Houston all the
15 way until November.  Then I came back and stayed
16 by my sister.  And I didn't -- I didn't catch up
17 with Chris -- Chris went to Florida, I went to
18 Texas.
19         And when I finally caught up with him I
20 seen him in the -- in the upper Ninth Ward, and
21 he told me about his attorney.
22     Q.  Now, is Mr. Weaver involved in this
23 lawsuit, also?
24     A.  I don't know Mr. Weaver's business.
25     Q.  Well, did he tell you that he was

- 42 -

**DEPO. OF TERRY MARK ADAMS**                    MiniDep by Kenson

1  involved in this lawsuit?
2      A. I don't know. That's what -- I don't --
3  I see Chris sparingly. We don't live across the
4  -- next door to each other anymore.
5      Q. So Mr. Weaver, then, as you've just
6  testified, put you in touch with Mr. Weaver --
7  Mr. Wiedemann; is that correct?
8      A. Yes. Yes.
9      Q. And then with respect to the lawsuit
10 filed by Mr. Wiedemann on your behalf and others,
11 did you sign a contract or a written agreement?
12     A. Yes, I did.
13     Q. Okay. Where is that contract? Do you
14 have it with you today?
15     A. No, I don't.
16     MR. FISHER:
17         I call for production of it.
18     MR. WIEDEMANN:
19         For what purpose? That's an
20     attorney/client privilege. I call for
21     production of your contract with
22     Lafarge and Ingram's contract with
23     their attorneys.
24     MR. FISHER:
25         Let's move on, counsel.
- 43 -

1  BY MR. FISHER:
2      Q. What kind of work were you involved in
3  at the time of the hurricane?
4      A. I was doing work for V. Keeler,
5  construction work.
6      Q. I'm sorry. I didn't quite get the name.
7      A. Vernon Keeler & Associates.
8      Q. Vernon & Chiller?
9      A. Keeler.
10     Q. Keeler.
11     A. Keeler.
12     Q. How do we spell that?
13     A. K-e-e-l-e-r.
14     Q. Okay. Where are they located?
15     A. On Alvaz Street.
16     Q. Okay. What kind of work were you doing
17 for them?
18     A. Construction.
19     Q. Okay. But construction's a rather broad
20 term. Were you doing carpentry work or you were
21 doing sheet metal work, or what?
22     A. That would be carpentry work.
23 Construction would be street or tearing some
24 down, construction. I was doing street work. I
25 was building curbs in Metairie on Veterans
- 44 -

1  Highway.
2      Q. So that would be, what? That would be
3  building forms and pouring concrete for curbs?
4      A. Yeah.
5      Q. Is that correct?
6      A. Yeah.
7      Q. Okay. I'm just trying to find out what
8  you were exactly doing there. And that was the
9  job that you were going to, that you told us
10 earlier, you get up on -- early in the morning of
11 August 29, 2005 and go back to work that Monday?
12     A. I can't say that I was going to that job
13 because that was the Sunday. And that Monday,
14 they were saying that, you know, the hurricane
15 was coming. And nobody told us to come to work.
16     Q. Okay.
17     A. But when you're getting up early in the
18 morning going to a job you -- you get up at the
19 same time every morning.
20     Q. Let's go back to the point in time where
21 you got up on the morning of Monday, August 29,
22 2005, the day of the storm.
23     A. Okay.
24     Q. And you told us earlier in response to
25 Mr. Wiedemann's questions, you got up around 5:00
- 45 -

1  o'clock in the morning because that's the normal
2  time that you get up; is that true?
3      A. I still do it today.
4      Q. All right. Now, at some point in time
5  after you woke up, you got out of bed. And you
6  told us that when your feet hit the ground your
7  carpet was wet.
8      A. (Witness nodding head affirmatively.)
9      Q. You're nodding your head, yes. Okay.
10 How did the water get into your house?
11     A. At that point in time -- I knew the
12 water had to come from under the house.
13     Q. Okay. Was it coming up through the
14 floor or your front door, or the windows? How
15 did it get in?
16     A. The windows are higher than the doors,
17 but I'm -- I'm speculating that it was coming
18 from under the plywood on the floor.
19     Q. Okay. You've got a plywood sub-floor
20 and a carpet over that; is that correct, sir?
21     A. Yeah.
22     Q. So when you got out of bed and put your
23 feet down on your carpet and found it was wet,
24 how many -- how much water did you have in your
25 house then?
- 46 -

DEPO. OF TERRY MARK ADAMS

1    A.  My feet was wet, but I didn't have much
2  water in there.
3    Q.  Okay.  What --
4    A.  You know, like just hitting the edge of
5  my feet.
6    Q.  Can you give us your best estimate of
7  how much water was in when you first got out of
8  bed?
9    A.  I'd say about two inches or three
10  inches.
11    Q.  And what time was that?
12    A.  It was about a little after 5:00.  5:00,
13  somewhere around there.  Not -- not much.
14    Q.  Now, the next thing you did after
15  finding out that your carpet was wet and there
16  was an inch or two, maybe, of water in your
17  house, what did you do next?
18    A.  I gathered things that I thought I was
19  going to need.  My phone, and I got some money.
20  I got an extra set of clothes.  I got a hammer
21  out the front room.  I got water.  I got some
22  oranges.
23    Q.  Well, while you were doing all these
24  things, did you happen to open a door or a window
25  and take a look outside?

- 47 -

1    A.  No.
2    Q.  Did you -- do you have any idea of what
3  the weather outside your house was doing?
4    A.  Oh, the weather was bad.  I can hear the
5  weather.
6    Q.  And was it raining at the time?
7    A.  Yeah, it was raining.
8    Q.  Was it a hard rain?
9    A.  Yeah.
10    Q.  Okay.  Now -- so after making your
11  preparations, as you've described, of getting
12  your phone and your hammer, and some oranges, you
13  then, in answer to one of Mr. Wiedemann's
14  questions earlier, told us about how you pulled
15  down an attic stair and went into your attic; is
16  that correct?
17    A.  Uh-huh.  (Affirmative response.)
18    Q.  And at the time you pulled down the
19  stair and went in the attic, what time was that,
20  sir?
21    A.  That took every bit of maybe 5:15, 5:20.
22    Q.  Okay.  Now, how high was the water
23  inside your house at the time you pulled down the
24  attic stair and started to go up?
25    A.  About ankle level then.

- 48 -

1    Q.  Ankle level, okay.  And nothing at that
2  time prompted your curiosity to go outside your
3  front door, back door, open a window and take a
4  look out and see what was going on in the street
5  around your house?
6    A.  No.
7    Q.  Why not?
8    A.  I've been -- I was in the May 3rd floor.
9  I was in a couple of other -- a couple of other
10  times my neighborhood flooded.  It would always
11  get to about the second step.  It ain't never
12  came in the house.
13    Q.  Well, the fact alone that it had come
14  into your house, didn't that tell you that this
15  is a little bit different from the May 3rd flood?
16    A.  That's why I went to the attic.
17    Q.  Okay.  So you went to the attic, then,
18  before you even knew what was going on outside;
19  isn't that true?
20    A.  Yeah.
21    Q.  When you actually went up to the attic,
22  what time was that?  And the water was ankle
23  deep, as you describe it.
24    A.  All this happened between about 5:00
25  and about 5:35, 45.

- 49 -

1    Q.  5:00 and 5:15?
2        MR. WIEDEMANN:
3            5:45.
4  BY MR. FISHER:
5    Q.  5:00 and 5:45.  I'm sorry.  I didn't
6  catch that.  Is your house a raised house, Mr.
7  Adams?
8    A.  Yes, it is.
9    Q.  Okay.  What kind of piers does it sit
10  on?
11    A.  It's two cinder blocks high off the
12  ground.
13    Q.  Two cinder blocks.  And how high off the
14  ground is that?
15    A.  I don't know approximately how high the
16  cinder blocks are, but it's about -- it's about
17  two foot off the ground.
18    Q.  Okay.  So you have what some people
19  might call a crawl space under your house?
20    A.  Uh-huh.  (Affirmative response.)
21    Q.  Do you have any pipes or anything under
22  it?
23    A.  Yes, I do.  Drain pipes.
24    Q.  Drain pipes.  All right.  And you've got
25  how many doors or entrances to your house?

- 50 -

**DEPO. OF TERRY MARK ADAMS**   MiNiDEP by Kenson

| | |
|---|---|
| 1   A.   Two. | 1  this pull down stairway? |
| 2   Q.   You've got a front door? | 2    A.   Yeah. |
| 3   A.   And a back door. | 3    Q.   And you took your supplies up there with |
| 4   Q.   And a back door. Okay. And you had | 4  you? |
| 5  told us earlier, I think, you had three bedrooms; | 5    A.   Uh-huh. (Affirmative response.) |
| 6  is that correct? | 6    Q.   At that point in time, that's when the |
| 7   A.   Yeah. | 7  water was ankle deep now, right? |
| 8   Q.   All right. What color is your house? | 8    A.   Uh-huh. (Affirmative response.) |
| 9   A.   Was? | 9    Q.   At that point in time had you spoken |
| 10   Q.   Was? | 10  with anybody on your cell phone? |
| 11   A.   It was an off gray. | 11    A.   No. Unh-unh. (Negative response.) |
| 12   Q.   An off gray. And your house is not a | 12    Q.   What was the number on your cell |
| 13  two-story house, I gather. It's a raised -- a | 13  telephone at the time? |
| 14  house that's -- a raised house on piers with an | 14    A.   The same number. 202-3022. |
| 15. attic; is that correct? | 15    Q.   I'm sorry? |
| 16   A.   Uh-huh. (Affirmative response.) | 16    A.   202-3022. |
| 17   Q.   And what kind of roof do you have? What | 17    Q.   And you still have that same cell phone |
| 18  type of roof? | 18  there today? |
| 19   A.   I have a regular gabled roof. The pitch | 19    A.   Yes, I do. |
| 20  on it must have been about six feet. | 20    Q.   And what cellular telephone provider did |
| 21   Q.   In other words, the peak of the attic | 21  you use then? |
| 22  inside the -- under the gables is six feet at the | 22    A.   Nextel. |
| 23  highest place; is that right? | 23    Q.   Nextel? |
| 24   A.   Yeah. (Witness nodding head | 24    A.   I still do. |
| 25  affirmatively.) | 25    Q.   Now, when you got up to your attic that |
| - 51 - | - 53 - |
| 1   Q.   You're nodding your head, yes. What | 1  you just described to us, that has steps about |
| 2  about your roof -- the roof materials itself, or | 2  six feet under the gable of the roof, what did |
| 3  the roof materials themselves, what kind of | 3  you do then? |
| 4  shingles or other kind of roof materials did you | 4    A.   Well, all the talk on the news about |
| 5  have at the time? | 5  having to use something to make you a hole in the |
| 6   A.   The roof had a half-inch of plywood on | 6  roof. And that's the first thing I did, I |
| 7  it. And it had 20-year shingles on it. I just | 7  knocked out the wind turbine. |
| 8  re-done the house in 1996. | 8    Q.   How big is this wind turbine? |
| 9   Q.   Would they be the type of shingles that | 9    A.   A regular wind turbine, I don't know. I |
| 10  people might describe as asphalt seal tab | 10  guess it's about one and a half by one and a |
| 11  shingles? | 11  half. |
| 12   A.   I don't think they were -- they had | 12    Q.   Okay. Is the wind turbine in the peak |
| 13  nothing to do with asphalt. Those were new | 13  of the gable or is sort of like down the slope of |
| 14  shingles. | 14  the gable? |
| 15   Q.   Okay. I'm aware of that. I'm just | 15    A.   Coming down the slope. |
| 16  trying to figure out, find out what kind of roof | 16    Q.   Okay. How were you able to squeeze out |
| 17  you had. Was it a slate roof or just -- | 17  of your wind turbine hole? Did you need a |
| 18   A.   No, it wasn't no slate roof. I had just | 18  ladder? |
| 19  redone it in '96. But I didn't -- they had done | 19    A.   I broke -- I broke a big enough hole. I |
| 20  away with the asphalt. | 20  knew I wouldn't be able to squeeze my whole body |
| 21   Q.   Okay. Well, I'm not asking about | 21  out of a wind turbine hole. |
| 22  asbestos. I'm talking about asphalt. They're | 22    Q.   And you did that with what tools? |
| 23  just two different things. All right. We'll | 23    A.   A hammer. |
| 24  move on. | 24    Q.   Okay. A hammer. So you were able to |
| 25         So you went up to your attic by means of | 25  make -- you were able then to make a hole large |
| - 52 - | - 54 - |

MINIDEP by Kenson

1  enough for you to squeeze out of the wind turbine
2  hole; is that correct?
3     A.  Yeah.
4     Q.  What was the -- what were the conditions
5  outside your house at the time you went into the
6  attic and started to make the wind -- the hole in
7  the wind turbine assembly?
8     A.  It was raining pretty hard.
9     Q.  And when you -- after you managed to
10 break through the roof, making the hole around
11 the area where the wind turbine was installed,
12 did you then look outside?
13    A.  Yeah.
14    Q.  Did you look outside before you actually
15 got up on the roof?
16    A.  Yeah.
17    Q.  What did you see when you first looked
18 outside?
19    A.  I could see water coming up.  I could
20 look at the levee right by me.  I could see that
21 it was -- the water was leaking over and coming
22 from under it.
23    Q.  Why did you have the urgency, if you
24 will, to break a hole in your roof and then get
25 out on it?

- 55 -

1     A.  The presence of mind, because all
2  during the -- all during the day watching TV,
3  they was saying, "If you get in your roof, bring
4  something to put a hole in it."
5        And I knew that that wind turbine --
6  whoever cut it out, didn't cut it exact.  They
7  had to have a extra cut somewhere, which would
8  make it the weakest point of the roof.
9     Q.  Okay.  So -- well, after you succeeded
10 in cutting a hole in your roof where the wind
11 turbine was installed, you looked out then,
12 through the hole?
13    A.  I didn't cut a hole.  I knocked a hole
14 in the roof.
15    Q.  You knocked a hole in the roof?
16    A.  Yeah.
17    Q.  Okay.  All right.  Then was that the
18 first time that you actually looked outside
19 after --
20    A.  Yeah.
21    Q.  -- you knocked the hole into the roof?
22    A.  Yeah.  That was the first time I
23 actually looked around outside.
24    Q.  Now, tell us, Mr. Adams, what did you
25 see?  It was still raining then?

- 56 -

1     A.  Still raining.  The water was --
2  water was coming up, but it was creeping up kind
3  of slow.  And there was nobody there.
4     Q.  How deep was the water in the street
5  then, when you say it was coming up slowly?
6     A.  The street was covered.  My house sits
7  like two feet off the ground, so the street was
8  already covered.
9     Q.  What about your yard or the area around
10 your house?
11    A.  My yard was covered.  The water -- my
12 house is two foot off the ground.  If the water
13 was in the house, the yard had to be covered.
14    Q.  Okay.  At -- at the time you made that
15 observation, after knocking the hole in the roof
16 where the wind turbine is, how far could you see?
17    A.  I could see the -- I could see the
18 Industrial Canal.  I could see the wall.  I could
19 see Tierney (phonetic) Street.  I could see -- it
20 was a pretty good distance, and no light affected
21 my eyes.  So I could see pretty good.
22    Q.  Were any of the streetlights still on
23 then, when you made that observation?
24    A.  No, unh-unh. (Negative response.)
25    Q.  Did you have any power in your house

- 57 -

1  when you --
2     A.  The power went out about 12:00 o'clock.
3     Q.  12:00, midnight?
4     A.  Yeah.
5     Q.  At any time before you went upstairs
6  into the attic and then while you were in the
7  attic, did you have any kind of radio or portable
8  TV set that went on batteries, or anything with
9  batteries to take with you, that would have given
10 you information?
11    A.  I had a flashlight.
12    Q.  You had a flashlight.  But you had no
13 radio, no battery radio?
14    A.  No.
15    Q.  Okay.  Now, when you made the
16 observation you just told us about, after looking
17 through a hole that was the area around where the
18 wind turbine was, and you said that you could see
19 the levee and the flood wall structure, how many
20 blocks is it from your house at 2604 Deslonde to
21 the flood wall levee area?
22    A.  About half a block.
23    Q.  Half a block.  You could actually see
24 the levee?
25    A.  I could see the water.

- 58 -

1    Q.   Could you see the white -- the grayish
2    white concrete cap on top of the levee?
3    A.   Yes.
4    Q.   Okay.  And the water in the street then
5    was covering the streets and also your front and
6    back yards, and was inside your house then; is
7    that correct?
8    A.   Uh-huh.  (Affirmative response.)
9    Q.   What about the -- since you say that
10   you -- tell us you could see the levee and flood
11   wall structure, what was going on with it at the
12   time, that you first made the observation from
13   the turbine hole?
14   A.   Right at Law Street there was a -- there
15   was a leak where the water was coming over, and
16   it was coming from under there.  I could see
17   where it was coming under because it was -- it
18   was creating like a draft.
19        It was creating like a back draft and it
20   was going down underneath it.  That's how I know
21   it wasn't going underneath it, it was actually
22   coming from under there.
23   Q.   So it was seeping underneath the levee
24   flood wall structure?
25   A.   Uh-huh.  (Affirmative response.)

- 59 -

1    MR. SANDOZ:
2         Objection to form.
3    THE WITNESS:
4         Uh-huh.  (Affirmative response.)
5    BY MR. FISHER:
6    Q.   And what about any other water coming in
7    from any other direction?
8    A.   Not yet, but the -- the levee was
9    basically from there all the way to Claiborne.
10   You can basically see that it was just about
11   intact.
12   Q.   What time was it when you made the first
13   observation after you got the hole in the roof
14   and you saw what you just told us?  What time was
15   it?
16   A.   Somewhere between 5:30 and 6:00.
17   Q.   Okay.  You were wearing a watch at the
18   time?
19   A.   No.
20   Q.   And you had your cell phone with you,
21   though, didn't you?
22   A.   Yeah, I had my cell phone with me.
23   Q.   And it has the time on it, right?
24   A.   Uh-huh.  (Affirmative response.)
25   Q.   Did you happen to look at your cell

- 60 -

1    phone?
2    A.   Several times.
3    Q.   Do you have any recollection, as we sit
4    here today, of what time your cell phone clock
5    showed at that point in time?
6    A.   It's like I say, when I glanced at it
7    that once or twice it was -- it was between 5:00,
8    5:30, 6:00 o'clock.
9    Q.   Okay.
10   A.   I didn't have time to just keep looking
11   at it and every minute that something happened, I
12   could document it.  It was just like I'd glance
13   at it and set it down.
14   Q.   Now, in addition to your observation of
15   the water coming -- seeping from under the levee
16   flood wall structure, was there any water at that
17   point in time coming over the top of it?
18   A.   Yes.
19        MR. SANDOZ:
20        Objection to form.
21   BY MR. FISHER:
22   Q.   Okay.  Can you describe for us how the
23   water was coming over the top?
24   A.   Like when the wave it, the water jumped
25   over.  The wave hit it, it would jump over.

- 61 -

1    Q.   Well, was it coming like successive
2    waves or was it --
3    A.   Yeah.
4    Q.   -- a continuous thing?
5    A.   It was a continuous wave.  As a wave
6    hit, water would jump over.
7    Q.   How far apart, if you can tell us this,
8    sir, were the intervals between when the wave
9    would hit and come over, and then the next wave
10   hit and come over?
11   A.   Seconds.
12   Q.   Okay.  And what about the amount or the
13   volume of water that was coming over the top of
14   the flood wall and as well as from under it into
15   the streets around you?  Can you give us an idea
16   of how much water was coming in?
17        MR. SANDOZ:
18        Objection.  Validation.
19   THE WITNESS:
20        It was -- it was slow to me because
21        my -- I mean, the yard was -- you know,
22        the yard wasn't filling up too fast.
23        And like I say, the neighborhood wasn't
24        really discombobulated yet.
25        And you could see -- you could

- 62 -

1  still see cars. You know, the top
2  portion of cars and all this here.
3  So it was pretty slow. Right at the
4  door. You know, it was rising slow.
5  BY MR. FISHER:
6  Q. Okay. At that point in time, when you
7  made those observations from the hole that you
8  had just made in your roof, of the water coming
9  under the flood wall, as well as over the top of
10  it, was the water that was coming over the top in
11  more -- strike that -- a continuous flow of water
12  all along the length of the flood wall?
13  A. No.
14  Q. Okay. Can you tell us --
15  A. No.
16  Q. -- where in the flood wall, then, the
17  water was coming over the top in relation to,
18  say, your house?
19  A. By us -- the the levee goes up by us.
20  Down on the other end the levee sits pretty low
21  because they had a road that was built. But when
22  you first come over the road you got to go over a
23  hill.
24  So down the rest of the flood wall it
25  was -- it was pretty well holding up.

- 63 -

1  Q. When you say "Jourdan Avenue bridge,"
2  are you also referring to the same bridge as we
3  call the Florida Avenue bridge?
4  A. The Florida Avenue bridge.
5  Q. All right. So the area that you've just
6  described, Mr. Adams, so we'll be clear on the
7  Record, is an area between where Law Street then
8  perpendiculars into or runs into Jourdan Avenue
9  and the levee at a right angle, and then north of
10  that to the Florida Avenue bridge; is that
11  correct?
12  MR. WIEDEMANN:
13  I object to the form of the
14  question. That's not what he said.
15  BY MR. FISHER:
16  Q. Is that -- is that the area we're
17  talking about?
18  A. Right. Florida -- from -- from Florida
19  Avenue, where I live at, it's -- it's in the
20  block between -- Law and Florida Avenue is only
21  one block apart.
22  Q. All right.
23  A. And that block right there, the levee --
24  the levee is closer to the canal than it's --
25  it's -- it's -- the road is -- is -- is -- they

- 65 -

1  Q. So it's your testimony, then, that the
2  rest of the flood wall, from where Law Street,
3  more or less -- you're on the corner of Deslonde
4  and Law, right?
5  A. Yeah.
6  Q. Well, Law Street perpendiculars into or
7  runs into the flood wall, Jourdan Avenue flood
8  wall, at a right angle. And the rest of the
9  flood wall between that area south to the
10  Claiborne bridge there, there was no overtopping
11  at that time?
12  A. No, not yet.
13  Q. But in the area that you've just
14  described, which is between Law --
15  A. Where I lived at the wall is closer to
16  the canal. Once you start going towards
17  Claiborne the wall sits farther back.
18  Q. Uh-huh. (Affirmative response.)
19  A. And there's a -- there's a street that
20  was dug to get to those companies back there.
21  But where I'm at, they had a hill. And they had
22  to go over the hill, and then go down.
23  And we were close to the Jourdan Avenue
24  bridge. If you look at it, if you look at the
25  Jourdan Avenue bridge, it sits real, real low.

- 64 -

1  got a hump right there where they had the two big
2  pipes that goes into the pumping station or
3  whatever.
4  Q. So the area, then, that you observed the
5  water coming from under the levee flood wall
6  structure, as well as over the top, is that in
7  the -- close to the two large pipes?
8  A. Yeah.
9  MR. SANDOZ:
10  Objection to form.
11  BY MR. FISHER:
12  Q. All right. Now, you told us earlier, of
13  course, in answer to one or more of Mr.
14  Wiedemann's questions, that you saw a barge, and
15  the barge went through the flood wall.
16  But that was more towards the Claiborne
17  Avenue Bridge, right?
18  A. Uh-huh. (Affirmative response.)
19  Q. All right. After you made the
20  observations you've just told us about after
21  first making the hole in your roof and taking a
22  look at the water coming both under, as well as
23  over the top of the levee and the flood wall
24  between Law and Florida Avenue, when was it that
25  you first noticed water coming over the top of

- 66 -

DEPO. OF TERRY MARK ADAMS                          MiniDep by Kenson

1  the rest of the flood wall between where Law
2  Street runs into Jourdan Avenue and Claiborne
3  Avenue?
4      A.  I could say the water was high up on
5  those, but I -- I can't say it was really coming
6  over it, like it was coming over by us.  I can't
7  say it was like that down there.
8      Q.  Were you able to see continuously the
9  area between where Law Street comes at right
10  angles into Jourdan Avenue and the flood wall,
11  between there and the Claiborne Avenue bridge?
12          Were you able to see that area?
13      A.  I could see it.
14      Q.  There wasn't anything in your way?  No
15  obstructions, no trees?
16      A.  Most of the trees were stripped bare.
17  They -- they didn't have anything on them.
18      Q.  Why was that?
19      A.  The wind.
20      Q.  When you made the observation that you
21  just told us about when you first poked your head
22  through the hole that you had created where the
23  turbine was, can you tell us how far above the
24  ground you were?
25          In other words, your height of eyes,
                        - 67 -

1  some people might call it.  In other words, when
2  you were looking out, how high you got -- you
3  already told us that your house is two feet off
4  the ground.
5      A.  Uh-huh.  (Affirmative response.)
6      Q.  Then you've got obviously a ceiling
7  height, from floor to ceiling.  And then you've
8  got your attic and your gables.  So I want to --
9  I'm trying to -- what I'm trying to find out is
10  how -- where were your eyes in relation to the
11  ground when you made that observation?
12      A.  Two, eight, six, what that's 14.  About
13  14 feet.
14      Q.  About 14 feet off the ground?
15      A.  Yeah.
16      Q.  Is that correct?
17      A.  Yeah.
18      Q.  Okay.
19  (The videographer advises that a break must be
20  taken in order that the tape may be changed.)
21      MR. WIEDEMANN:
22          Okay.
23      MR. FISHER:
24          Okay.
25  (Off-the-Record.)
                        - 68 -

1  BY MR. FISHER:
2      Q.  When you told us earlier that you had
3  observed water to be both seeping under the levee
4  flood wall, as well as coming over the top of it,
5  in the vicinity of where Law perpendiculars or
6  right angles into Jourdan Avenue, what -- was
7  that the water that caused the -- that came in
8  and actually caused your -- that initially caused
9  your house to have water in it, coming from that
10  area?
11      MR. SANDOZ:
12          Objection to form.  It's lack of
13  foundation.
14      THE WITNESS:
15          I think it was.
16  BY MR. FISHER:
17      Q.  Okay.  Now, as -- as you went up to the
18  attic and then cut a hole in the roof or knocked
19  the hole in the roof, and made the observations
20  you told us about a few minutes ago, was the
21  water then continuing to seep under the flood
22  wall, as well as come over the top of it?
23      A.  Yeah.
24      MR. SANDOZ:
25          Objection to form.
                        - 69 -

1  BY MR. FISHER:
2      Q.  At any point in time, did it actually
3  slow down or stop --
4      A.  No.
5      Q.  -- seeping, as well as overtopping?
6      A.  No.
7      MR. SANDOZ:
8          Objection to form.
9  BY MR. FISHER:
10      Q.  Now, when you first woke up at 5:00 in
11  the morning, and of course making the
12  preparations that you've just described to us
13  earlier, was it light or dark then, actually?
14      A.  It was still dark.
15      Q.  Still dark.  Do you know when daybreak
16  or sunrise was on that day?
17      A.  No.  I -- I didn't really pay attention
18  to it.  There was so much going on that I didn't
19  really pay attention to the time when day broke
20  or anything like that.
21      Q.  Now, when you went up to -- when you
22  went to the attic and made the hole in the roof,
23  was it light or dark then?
24      A.  It was still dark when I put the hole in
25  the roof.
                        - 70 -

1    Q.  Well, how could you see when you looked
2  out of the hole if it was still dark?
3    A.  How could I see?  I'm -- I'm -- I'm only
4  half a block away.
5    Q.  Okay.  And you can see in the dark?
6    A.  I mean, it's not like it's a room dark.
7    Q.  And it was raining at the time?
8    A.  I mean, you know, we're in a wide open
9  facility.
10    Q.  It was raining at the time?
11    A.  It was raining.  It was raining.
12    Q.  This was a hard rain wasn't it?
13    A.  Right.
14    Q.  And you could -- and the power had gone
15  out at midnight?
16    A.  Yeah.
17    Q.  So as I understand your testimony, the
18  power's out, there were no lights, it's a hard
19  rain and it's dark.  How was it that you could
20  see all of these things that you've just told us?
21    A.  The levee right there.
22    Q.  Now, let me let me ask you about the
23  trees for a minute again.  You told us that the
24  trees had lost some of their leaves; is that
25  correct?

- 71 -

1  between that area, but I'm going to tell you that
2  no tree obstructed my view.
3    Q.  Okay.  Can you tell us anything about
4  the trees that were in fact between your house
5  and the area that you first observed the barge?
6        In other words, the height of the trees,
7  the size of the trees, the diameter of the -- the
8  umbrella or the leafy areas or branches of the
9  trees?  Can you tell us about the trees?
10    A.  I'm going to tell you there are no
11  Audubon Park trees in people backyard in the
12  lower Ninth Ward.  Now, anything above that, I
13  would be telling you something I don't know
14  nothing about.
15        There are no branches that spread out
16  seven feet long in our backyards.  We -- we -- I
17  mean, we just don't grow trees like that.
18        Now, if you go to Tennessee Street right
19  now you'd probably see a whole lot of trees, but
20  Deslonde Street is basically bare.
21    Q.  So as I understand your testimony, from
22  what you've just told us, there are no sizable or
23  large trees of any kind between your house at the
24  corner of Law and Deslonde and where you first
25  saw the barge that did interfere -- in fact,

- 73 -

1    A.  Most of them were bare.
2    Q.  Most of them were bare.  What kind of
3  trees are they?
4    A.  I couldn't really tell you.  I don't --
5  I don't -- I don't know nothing about trees.
6    Q.  Most of the trees in your neighborhood,
7  in fact sir, are live oaks, aren't they?
8    A.  I don't know.  There's a lot of trees
9  that line Tennessee Street.  But on the other
10  side of that there's not many trees.  It ain't
11  like we got big trees in our backyards, you know.
12        It's not like that.  There's only one
13  street that's lined with big trees, and that's
14  Tennessee Street.  And I lived before you get to
15  Tennessee Street.  Jourdan Avenue and Deslonde.
16    Q.  So there's no trees then, is what you're
17  telling us, between your house at the corner of
18  Deslonde and Law, and Jourdan Avenue?
19    A.  No.
20    Q.  Okay.  Now, are there any trees between
21  your house and where you eventually told us you
22  saw the barge come in through the flood wall?
23        How many trees between your house and
24  that area at the time?
25    A.  I'm not going to say there are no trees

- 72 -

1  interfere -- did not interfere with your
2  observation.
3        MR. WIEDEMANN:
4            I'm going to object to the form
5        of the question.
6        THE WITNESS:
7            I'm going to tell you
8        MR. WIEDEMANN:
9            Wait just a minute.
10        MR. FISHER:
11            All right.  Hold on.
12        MR. WIEDEMANN:
13            He said there was nothing that
14        blocked his view, no tree that blocked
15        his view.
16  BY MR. FISHER:
17    Q.  So nothing blocked your view.  That's
18  your testimony, sir?  No tree blocked your view;
19  is that correct?
20    A.  I could see the levee the whole time.
21    Q.  How far could you see of the levee flood
22  wall from the top of your roof?
23    A.  The whole levee.
24    Q.  Between, where?
25    A.  I could see the

- 74 -

DEPO. OF TERRY MARK ADAMS                    MINIDEP by Kenson

1    Q.  Where to where?
2    A.  I could see the Claiborne bridge.
3    Q.  You could see the Claiborne bridge?
4    A.  Uh-huh. (Affirmative response.)
5    Q.  Okay.  And this was through the hard
6  rain that was going on then?
7    A.  Uh-huh. (Affirmative response.)
8    Q.  And without the benefit of daylight or
9  sunrise yet, right?
10   A.  No.
11   Q.  You could or you couldn't?
12   A.  I could see everything.  I could see the
13  bridge.  The bridge is gray.  The wall was gray.
14  I could see everything.  And at night it looks --
15  it kind of looks white.
16   Q.  Could you actually see the structures
17  that you just described or their outlines?
18   A.  I could see the structures.
19   Q.  By "structures," I'm talking about the
20  levee flood wall structure and the bridge, the
21  Claiborne bridge.
22   A.  Yeah.  I could see those items.  I could
23  see the bridge.
24   Q.  Okay.
25   A.  Not a outline.  The bridge.  Not a
                    - 75 -

1  tell us, when you got yourself through the hole
2  that you had made around where the wind turbine
3  was installed and actually got up on top of your
4  roof?  What -- what time was that?
5    A.  I think between 5:00 -- 5:25, 5:45.  I
6  was up on the roof by 5:45 for sure.
7    Q.  Okay.  When you got up on top of your
8  roof after going -- coming outside and getting
9  through the hole, can you tell us what the
10  visibility was like then?
11   A.  The visibility?
12   Q.  Yeah.  It was still dark then?
13   A.  Yeah, it was still dark.
14   Q.  And you were able to see the water
15  coming under the flood wall, the water coming
16  over the top of it, and you were also able to see
17  from where you were the entire length of the
18  flood wall between Florida Avenue and Claiborne
19  Avenue; is that correct?
20   A.  Yes.
21   Q.  Now, was it still raining hard at the
22  time you actually got on top of the roof?
23   A.  Yes.
24   Q.  When you first saw the barge, was it
25  still dark?
                    - 77 -

1  outline of the levee.  I could see the levee.
2    Q.  Was the Claiborne Avenue and the --
3  raised or in the lowered position at the time?
4    A.  It was in the lowered position.
5    Q.  What about the Florida Avenue bridge at
6  the time?
7    A.  It was in the lowered position.
8    Q.  It was in the lowered position?
9    A.  Yeah, very much so.
10   Q.  Now, when you first went up to the attic
11  and made the hole, and made these observations
12  you've just been telling us about, did you see
13  anybody else in your neighborhood when you first
14  looked out the hole?
15   A.  Not just yet.
16   Q.  When was it that you first saw another
17  person?
18   A.  After the barge came through a lot of
19  people started popping on their roof.  A lot of
20  people started hollering.  Christopher Weaver was
21  on a piece of roof a little smaller than this
22  table. (Indicating.)
23   Q.  I'm going to ask you more about the
24  barge and your observations of it in a few
25  minutes, but what time was it, as best you can
                    - 76 -

1    A.  Yes.
2    Q.  Then can you tell us when it was in cell
3  phone clock time, when you first saw the barge?
4    A.  I don't know.  I -- like I said, I
5  looked at the cell phone once or twice, but I
6  wasn't constantly like -- it's 5:36, 5:37.  I
7  wasn't doing that.
8    Q.  Well, let me ask it in a slightly
9  different way.  Between the time that you first
10  saw the barge and backing up to the time that you
11  cut the hole or knocked the hole in the roof, how
12  many minutes passed by, approximately, or hours?
13   A.  I came through the roof somewhere
14  between 5:20 and 5:45.  I seen the barge upwards
15  towards 6:00 o'clock.
16   Q.  So around 6:00 o'clock you saw the barge
17  for the first time; is that correct?
18   A.  No.  I seen -- I said I seen the barge
19  upwards towards 6:00 o'clock, not 6:00 o'clock.
20  It wasn't exactly 6:00 o'clock yet.
21   Q.  Well, when you say "upwards towards 6:00
22  o'clock," are we talking about before 6:00
23  o'clock?
24   A.  15-minute span, I seen the barge.  I
25  watched the barge.  I didn't know it was a
                    - 78 -

DEPO. OF TERRY MARK ADAMS                                    MINIDEP by Kenson

1  barge at first.
2      Q.  Okay.  Well, can you give us an idea,
3  sir, from the time you first saw the barge and
4  you kept it under continuous observation for 15
5  minutes, can you relate that somehow to clock
6  time?
7      A.  Can I just say, by the time my feet hit
8  the carpet and by the time I -- by the time I
9  experienced everything, it was all over by about
10 ten minutes after 6:00.
11     Q.  Okay.
12     A.  Now, you can -- you can make those
13 times, but by about ten minute after 6:00 the
14 water had came and people were on the roofs and
15 everything.
16         Now, as for going minute for minute, I
17 don't think I can actually tell you minute for
18 minute how that happened.
19     Q.  I want to ask you some specific
20 questions about your observations of the barge
21 and also hearing the noise that you described to
22 us earlier in response to Mr. Wiedemann's
23 questions.
24         What did you hear or see first, the
25 noise or the barge?
                        - 79 -

1  sure that I get the chronology of this down
2  correctly, Mr. Adams, first you saw an object in
3  the canal; is that correct?
4      A.  Uh-huh.  (Affirmative response.)
5      Q.  And how much of the object could you
6  see?
7      A.  It was like leaning like this
8  (indicating) where I could see the front of it,
9  but I couldn't see the whole side of it.
10     Q.  Well, what did it look like?
11     A.  Like I say, an ark.
12     Q.  An ark.  Well, what color was it?
13     A.  In the nighttime, black.
14     Q.  Okay.  What did you think it was, other
15 than an ark, or did you?
16     A.  I didn't know what it was.  I just
17 didn't want it to come down to Law Street.
18     Q.  Okay.
19     A.  That's what I wanted it to do.  I wanted
20 it to stay where it was at.
21     Q.  All right.  How was the ark or later the
22 barge, riding in the water?  Was it high up in
23 the water or was it low down in the water when
24 you first saw it?
25     A.  High up or low down?  What's - I'm not
                        - 81 -

1      A.  I seen something on the water that that
2  really looked like an ark to me.  I was like
3  that's real funny.  And I didn't -- I didn't know
4  it was a barge until I heard it hit.  And when it
5  hit it sounded empty.
6          And that's what made me realize that it
7  was some type of steel container.  That's what
8  made me realize that it was a barge, the sound of
9  it.
10     Q.  Okay.  Let me ask you this, then.  When
11 you made this observation of seeing the object
12 that you thought was an ark, or like an ark, and
13 it turned out to be a barge, where was this
14 object in relation to Jourdan Avenue and the
15 nearest cross street that the object was --
16     A.  It looked like it was about Galvez
17 Street, Galvez and Johnson.  Right up in that
18 area.
19     Q.  This would be North Galvez and North
20 Johnson?
21     A.  Yeah.
22     Q.  How many blocks away from your house is
23 that?
24     A.  About five.  About five.
25     Q.  About five.  And so in order to make
                        - 80 -

1  sure what you're asking.
2      Q.  In other words, was it -- how much of
3  the barge could you actually see?  In other
4  words, the part that would normally be above the
5  water line to the top of it, how much of it could
6  you see?
7      A.  I could see -- I could see right at
8  about four feet of that barge sticking out there
9  over the -- over the flood wall.
10     Q.  Okay.  And this was five blocks away
11 when you first saw it, right?
12     A.  Uh-huh.  (Affirmative response.)
13     Q.  And that was in the time frame that you
14 earlier gave us, between say, 5:45 and ten
15 minutes after 6:00; is that correct?
16     A.  Yeah.  (Shaking head affirmatively.)
17     Q.  You've got to say "yes" or "no," because
18 if you shake your head --
19     A.  Yes.
20     Q.  -- she's not going to be able to take
21 that down, okay?
22     A.  Yes.  Okay.  Okay.
23     Q.  All right.  Now, after making your first
24 observation, the sighting of the object that
25 turned out to be a barge, as you said, how high
                        - 82 -

1 was the water in the street around your house
2 then?
3     A. About a -- about at car door level.
4 Right at -- right at the glass. I guess you
5 would give it, what, four feet?
6     Q. About four feet?
7     A. Yeah. Right at the -- right at the
8 glass on a car door, because my truck, the -- the
9 glass was right -- the -- the water was right at
10 the glass.
11     Q. Could you see your truck from the roof?
12     A. I could see the top portion of it.
13     Q. So the water, in the 30-minute time
14 frame we're talking about, between -- say, around
15 5:45 and ten after 6:00, and when you made the
16 earlier observation about the water in your
17 house, it had risen about two feet?
18     A. Yeah. It was -- I mean, if you want to
19 say two feet. But, I mean, give or take a feet
20 or two -- I guess about that much.
21     Q. And was -- when you made the observation
22 assuming the object that turned out to be as you
23 said a barge, was the water still continuing to
24 seep from underneath and come over the top of the
25 flood wall?

- 83 -

1     A. Yeah.
2         MR. SANDOZ:
3             Objection to form.
4         THE WITNESS:
5             Yeah. I never said that the water
6         stopped seeping right there by me. I
7         never did -- it was coming from right
8         there.
9 BY MR. FISHER:
10     Q. So it was both --
11     A. It wasn't coming at an alarming rate.
12     Q. The water was both seeping and
13 overtopping; is that correct?
14     A. Yeah.
15         MR. SANDOZ:
16             Objection to form.
17 BY MR. FISHER:
18     Q. Now, you told us earlier in response to
19 one of Mr. Wiedemann's questions that you heard a
20 noise. And this noise was after you first
21 sighted the ark?
22     A. I'm watching the barge. I don't know
23 what it is. So I'm watching it. I'm saying, "I
24 don't want that to come down here," whatever it
25 is/. So while I'm looking at it, it hits the --

- 84 -

1 whatever it hits, the wall. It hits the -- the
2 -- the wall. I hear the bang. When I hear the
3 bang I watch it go into the neighborhood. And I
4 watched everything come behind it.
5         I watched all the water come behind it.
6 It was like a tidal wave or a tsunami. That's
7 when cars started lifting up and houses started
8 moving.
9     Q. When you heard the bang you associated
10 that noise with this ark or barge striking the
11 flood wall?
12         MR. O'DWYER:
13             Let me object to the form of the
14         question. Counsel, you're misleading
15         him.
16         THE WITNESS:
17             Well --
18         MR. O'DWYER:
19             He said, "When it hit the wall I
20         heard a bang."
21         MR. FISHER:
22             All right.
23 BY MR. FISHER:
24     Q. You heard a bang?
25     A. Yeah.

- 85 -

1     Q. Was it a sharp bang or a really loud
2 bang, or what? Can you describe it.
3     A. A loud bang.
4     Q. Can you describe for us what you heard?
5     A. A loud bang. So, I mean, intensify a
6 empty can hitting something.
7     Q. Was there only one bang or a succession,
8 or several bangs?
9     A. That's all I heard, was one.
10     Q. Okay.
11     A. That's all I heard, was one.
12     Q. In connection with the noise that you
13 heard, Mr. Adams, was it in your opinion, from
14 what you heard, a noise that might be associated
15 with metal in contact with metal?
16         MR. WIEDEMANN:
17             I object to the form of the
18         question that it's an opinion of a
19         fact witness.
20         MR. FISHER:
21             Go ahead. You can answer.
22         THE WITNESS:
23             No. I don't think it was metal
24         in contact with metal.
25 BY MR. FISHER:

- 86 -

MINIDEP by Kenson

1    Q.  So what was it?
2    A.  I think it was the barge hitting the
3    levee.  That's what I really think it was.
4    Q.  Hitting what part of the levee?
5    A.  What part of the levee?
6    Q.  Yes.  What part of the levee it hit
7    first?  Would it have hit --
8    A.  What part of the levee?
9    Q.  Yes.  What part of the levee?
10   A.  I mean, what you mean, what part?
11   A.  Well, the levee, as I appreciate it in
12   your neighborhood, is comprised of an earthen
13   levee or dirt dam.  And on top there is a
14   concrete structure.
15   A.  Okay.  We consider the levee,
16   everything.
17   Q.  All right.  Fine.
18   A.  So there's an upswing of -- of dirt.
19   Q.  All right.
20   A.  And then there's a concrete wall.
21   Q.  Okay.  Okay.  What part did it hit?
22   A.  It hit the concrete wall.
23   Q.  Okay.  And that -- you associate the
24   barge with the noise of hitting a concrete wall;
25   is that correct?

- 87 -

1    A.  Yes.
2    Q.  All right.  How far away from your house
3    at the time you made that observation of the
4    barge hitting the wall and hearing the noise --
5    how far away from your house was the barge?
6    A.  That distance is about five blocks
7    whether I'm sitting on my house, in my house or
8    around my house.  It's about five blocks.
9    Q.  Could it have been further?
10   A.  A block or two, maybe, but not farther
11   than that.
12   Q.  And when you made that observation,
13   again, did you have an unrestricted view of what
14   you have just told us you saw and heard?
15   A.  Yes, I did.
16   Q.  And there was nothing in your way that
17   obstructed your vision; is that correct?
18   A.  No.  There was nothing in the way.
19   Q.  Okay.  And it was still dark then; isn't
20   that true?
21   A.  Yeah, it was still dark.
22   Q.  And it was still raining hard; isn't
23   that correct?
24   A.  Uh-huh.  (Affirmative response.)
25   Q.  Can you describe for us the wind at the

- 88 -

1    time you made that observation, seeing the --
2    hearing the boom?
3    A.  The wind was pretty hard, but I was -- I
4    was on a -- I was on a roof, so it wasn't that
5    hard, was it?  I was standing on a roof.  So you
6    think I'd risk myself and -- and get on top of
7    the roof with the risk of falling?
8    Q.  Can you tell us about how many miles per
9    hour the sustained wind was at the time you made
10   that observation of the barge?
11   A.  The wind was blowing good enough for me
12   to stand on that roof.  Had it been -- not been
13   that good, I wouldn't have got on the roof.  Now,
14   you can put your own miles per hour, because I
15   don't know nothing about winds and miles per
16   hours.
17       I can only tell you that it was good
18   enough where I can get on my roof and not fall
19   off.  And I knew that much.  Now, had the wind
20   been blowing that bad, had the rain been raining
21   that bad, I would have never come out that roof.
22   I would have stayed in the ceiling.
23   Q.  When you made that observation, how was
24   the wind affecting the trees around you?
25   A.  The trees around me?

- 89 -

1    Q.  Whatever trees there were.
2    A.  Most of the trees were bare.
3    Q.  Okay.
4    A.  Now, I can't -- now, the ones that --
5    that -- that sit on Tennessee Street, they might
6    have had leaves.  But like I say, I'm before you
7    get to Tennessee Street, so the trees that --
8    that -- the little, small trees, trees in
9    people's backyards were practically bare, because
10   they didn't have no leaves on it.
11   Q.  Was the wind affecting those little
12   trees?
13   A.  I guess so.  They were blowing.
14   Q.  It was blowing the trees?
15   A.  Yeah.  But they wasn't like they was
16   bending them or throwing them out the ground.
17   They were blowing.  I think most of the damage to
18   the trees had happened during the night.
19       I think so, because when -- a couple of
20   trees were on the ground.  A couple of things
21   were blown out of proportion, but it wasn't
22   happening while I was on the roof.
23   Q.  And after you first saw the ark or the
24   barge and heard the noise, as you describe it, a
25   barge hitting the concrete, upper part of the

- 90 -

**DEPO. OF TERRY MARK ADAMS**

1 levee flood wall area, was there anybody else
2 around you, any other people then?
3    A.  No.
4    Q.  Okay.
5    A.  I was in the house by myself.  I went on
6 the roof by myself.
7    Q.  Okay.  When was it from that point in
8 time, using that as a reference, that you saw the
9 first person, you know, one of your neighbors or
10 whoever it was, in your area?
11   A.  The first person I came in contact with
12 was Chris.
13   Q.  He was floating on a piece of a roof?
14   A.  Chris was a little bit after 6:00, you
15 know, because it was -- it was just now starting
16 to kind of, you know -- it wasn't daylight yet,
17 but it was -- it was coming up.
18        So it was a little bit after 6:00,
19 somewhere around 6:15, 6:20, or somewhere around
20 like that.
21   Q.  Where was Chris when you first saw him?
22   A.  On a piece of roof.
23   Q.  How far away from you?
24   A.  Coming alongside of me.
25   Q.  Did he holler to you or you holler

- 91 -

1 to him?
2    A.  Yeah.  He hollered to me.  I didn't --
3 I mean, he was like, "Hey."  I was like, "Oh."
4 He was right there.
5    Q.  How high was the water then, when Chris
6 came along?
7    A.  Huh?
8    Q.  When Chris came along, how high was the
9 water in relation to your roof?
10   A.  It was on my roof by then.
11   Q.  On the lower part of the eaves or up on
12 the gable of the roof?
13   A.  No.  It was kind of -- almost coming in
14 with me.  Like I said, it was creeping up the
15 roof.
16   Q.  Well, were you on the top part of the
17 gable, the peak of the gable?
18   A.  I was at the top of the house.
19   Q.  Okay.  And how far below you on the
20 slope of your roof gable was the water then when
21 Chris came by?
22   A.  I'd say I had about a foot of water on
23 my roof.
24   Q.  Okay.  What did you do next?
25   A.  Well, he hollered.  I threw him a -- I

- 92 -

1 threw him some Christmas lights, pulled him in
2 the roof, gave him the extra set of clothes I had
3 to put on.  And from there we just sit down
4 and -- and rode the rest of the -- rode it out.
5    Q.  So you threw Chris a string of Christmas
6 tree lights; is that correct?
7    A.  Yeah.  That's what we had.  That's all I
8 had on the roof.
9    Q.  And you pulled him up on the roof with
10 you?
11   A.  Uh-huh.  (Affirmative response.)
12   Q.  Now, did he see the barge?
13   A.  I don't know.  I don't know what to tell
14 you.
15   Q.  Did you talk to him about whether he saw
16 the barge or not?
17   A.  No.  We -- our conversation was on, "You
18 are cut bad.  You are bleeding.  And I don't know
19 what's going to happen in here with you because
20 you need to -- to get some medical attention."
21   Q.  So you -- you didn't tell Chris what you
22 had just seen and heard; is that true?
23   A.  Huh?
24   Q.  You didn't tell Chris what you'd just
25 seen and heard, did you?

- 93 -

1    A.  It didn't seem important at the time
2 with a cut on his leg that long. (Indicating.)  I
3 don't think he wanted to hear about my excursion,
4 and he don't know if he going to bleed to death
5 io this roof.
6        MR. WIEDEMANN:
7            Indicating about six inches.
8        THE WITNESS:
9            I don't think it was important, what
10       I had to say.  I'm trying to say I don't
11       want him to die in here with me.  I'm
12       trying to figure out how we going to
13       stop this blood.
14 BY MR. FISHER:
15   Q.  Well, did you do something to stop the
16 blood?
17   A.  Yeah.  We tied a -- I tied a piece of
18 sweatshirt on him.
19   Q.  All right.  Well, at any point in time
20 between the time that you actually went up on the
21 roof, excuse me, that you went up into the attic,
22 as you described to us, and then breaking out the
23 hole and going on your roof, and then seeing the
24 barge and hearing the noise, did you take your
25 cell phone and call 9-1-1, and ask for help?

- 94 -

DEPO. OF TERRY MARK ADAMS

MINIDEP by Kenson

1    A. No. I did eventually, but it wasn't at
2  that time.
3    Q. When did you first call 9-1-1 or call
4  for help?
5    A. It had to be close to 6:30, 7:00
6  o'clock, somewhere around up in there. It might
7  have been a little after that. I talked to a
8  couple of people from the roof, from the attic.
9        And I talked to an operator in Oklahoma
10 City. The operator in Kenner hung the phone up on
11 me. She said she had her own problems.
12   Q. Did you call 9-1-1, then?
13   A. 9-1-1 wasn't answering. Nobody could
14 get 9-1-1 at that time.
15   Q. Well, did you try to call 9-1-1?
16   A. I tried it several times. I had people
17 in other states calling 9-1-1. Tony Lewis called
18 9-1-1 from Atlanta for me. And Mona Lewis called
19 9-1-1 from Texas for me. 9-1-1 in New Orleans
20 was not answering. That's how I get a 9-1-1 in
21 Oklahoma.
22   Q. Did your neighbor, Mr. Weaver, have a
23 cell phone with him?
24   A. No, unh-unh. (Negative response.)
25   Q. Do you know if he managed to call 9-1-1

- 95 -

1  at any time during the morning of 29, August,
2  2005?
3        MR. WIEDEMANN:
4            Without a telephone? I object to
5        the form.
6        MR. FISHER:
7            Well, he could have gotten one,
8        counsel. I'm just asking if he knows.
9        MR. WIEDEMANN:
10           Well, you didn't ask him --
11       THE WITNESS:
12           I don't -- I mean, I don't know.
13       I don't know what Chris done.
14 BY MR. FISHER:
15   Q. Did Chris borrow your cell phone on that
16 morning?
17   A. He talked to some people. I don't know
18 who he talked to. I let him use my cell phone.
19 I think he called Michael Knight.
20   Q. Okay. But did Chris call 9-1-1, do you
21 know?
22   A. I don't know. I don't know.
23   Q. Did he --
24   A. I think Chris called his old lady. I
25 don't -- I mean, what could 9-1-1 do for you?

- 96 -

1  What we going to keep calling 9-1-1 for? No help
2  is coming. What, we going to keep calling 9-1-1
3  and they not answering, and nobody's sending
4  help?
5    Q. Did you ask Chris to call 9-1-1?
6    A. No, I didn't.
7    Q. And you just described for us how you
8  threw Chris Weaver a string of Christmas tree
9  lights and assisted him in getting up on the
10 roof, and trying to do something about stopping
11 the blood from his cut, right?
12   A. Uh-huh. (Affirmative response.)
13   Q. When was that? About what time did you
14 assist Chris Weaver?
15   A. By the time I got Chris situated and
16 everything it was -- it was -- the light had done
17 came up.
18   Q. When? About what time?
19   A. I guess it had to be upwards of 7:00 or
20 closer to 7:00. Somewhere around up in there. I
21 know the light was up. I know that.
22       Because I could basically -- by then, I
23 -- I knew what was going on with Chris. And
24 I knew the light was up, that we could see inside
25 the ceiling, inside.

- 97 -

1        The light was coming through the hole
2  and I could see inside the ceiling.
3    Q. Okay. When you say "inside the
4  ceiling," you could look into the hole and see
5  light in your attic? Is that what you're telling
6  me?
7    A. No. We had moved. Once I pulled him
8  in, I pulled him in the attic. I did not leave
9  him on top the roof bleeding. I pulled him in
10 the attic. And we got in the attic.
11       By that time the light was coming in. I
12 could tend to him. If I would have pulled him in
13 before it would still have been dark.
14   Q. When you pulled him in and then got him
15 in to your attic, was there any water in your
16 attic then?
17   A. Yeah.
18   Q. How deep was the water in your attic
19 when you did that?
20   A. It was just barely hitting on the roof.
21 It was just barely hitting on the ceiling. It
22 was inside the house. The house had done lifted
23 up, and it -- it was barely just hitting up
24 against the ceiling.
25   Q. Does the attic have a floor?

- 98 -

**DEPO. OF TERRY MARK ADAMS**

1  A.  Yes, it does.

2  Q.  What material is that?

3  A.  2 x 6.

4  Q.  Does it --

5  A.  2 x 6 insulation and sheetrock.

6  Q.  Is it covered with plywood or sheetrock,

7  or something?

8  A.  I had about four sheets of plywood right

9  around where you pull the pull down stairs at for

10  storing things.

11  Q.  So that's where you and Chris Weaver

12  then camped out when you were trying to give him

13  medical attention?

14  A.  Yeah.

15  Q.  And at that point in time, what you

16  describe as somewhere in the vicinity of 7:00

17  o'clock or afterwards, had your house actually

18  lifted off its foundation?

19  A.  Yeah.

20  Q.  When did that happen?

21  A.  The barge came through and sent water

22  everywhere.  Not only did my house lift up, but

23  the other portion of the levee gave away because

24  the water came from both sides and it tilted it

25  all the way over.

- 99 -

1  And then my house lifted up.  And I was

2  kind of like sitting there.  And I'm in a -- I'm

3  in awe of what's happening.  And then Chris came

4  by.  I pulled Chris in.  Then about 7:30 I

5  noticed the feebleness of my situation, and just

6  took it in.

7  Q.  About what time was it, sir, in relation

8  to when you took Chris Weaver into the attic and

9  tried to give him some kind of medical help, to

10  stop the blood?

11  You just told us there was a -- some

12  kind of collapse of the levee or flood wall; is

13  that correct?

14  A.  Yeah.  The rest of the -- the rest of

15  the flood wall gave.  The one right by me gave

16  way.

17  Q.  That was the one between where Law

18  Street meets the levee --

19  A.  Right.

20  Q.  -- and the Florida Avenue bridge?

21  A.  Right.

22  Q.  That gave way?

23  A.  That gave way.

24  Q.  At about what time, 7:30?

25  A.  No.

- 100 -

1  Q.  Before that?

2  A.  When the barge hit the water came in.

3  The water -- the levee got water from both sides

4  and it tilted it.

5  Q.  So the flood wall you're describing --

6  when you say the flood wall or the levee, and the

7  flood wall tilted, you're talking about that part

8  of it closest to your house --

9  A.  Yeah.

10  Q.  -- at Law Street; is that correct?

11  A.  Yeah.  Yeah.

12  Q.  What about the rest of the levee flood

13  wall structure further down near Claiborne

14  Avenue?  Did it also tilt, if you know?

15  A.  No.  Between -- between the break here,

16  between where mine gave at and where the barge

17  came in, they still had a little levee up.

18  (Indicating.)  And they still had levee up from

19  on the other side the barge break to Claiborne.

20  Q.  Okay.

21  A.  The water actually receded with parts of

22  the levee still up.

23  Q.  Now when the area of the flood wall

24  between Law Street and Florida Avenue tilted as

25  you describe it, what time is that, about?

- 101 -

1  MR. O'DWYER:

2  Let me object to the form of

3  the question.  What the witness said

4  is that the levee got -- the levee by

5  him got water from both sides and the

6  wall tilted.

7  BY MR. FISHER:

8  Q.  Okay.  What time was it when the wall

9  tilted?

10  A.  When the barge came through.  Somewhere

11  between like 5:30, 6:00 o'clock, or somewhere

12  around up in there.

13  Q.  And I thought you just told us that you

14  saw the wall near -- between Law Street and

15  Florida Avenue tilt sometime after 7:30 when you

16  got Mr. Weaver into the attic.

17  A.  No.  I told you I brought Mr. Weaver in

18  the attic and get him some medical attention.

19  The wall on Florida -- on Florida Avenue and Law,

20  it gave out.

21  When the barge came through, the water

22  rushed in like the tsunami.  And cars and stuff

23  were being thrown around, and houses were being

24  tore apart.  When the water got there by me, the

25  first thing that happened was the levee folded.

- 102 -

**MiniDep by Kenson**

1  It folded. It gave.
2    Q. And I'm just trying to find out about
3  what time that that happened.
4    A. A couple of minutes later. I don't
5  know. 6:00 and -- 5:45, 5:30, 6:00 o'clock, it
6  might have been another 15 minutes. I see Chris
7  come floating by.
8       His house was on Jourdan Avenue right
9  across the street from where the levee gave at.
10 So apparently when the water rushed in there on
11 his house, his house must have gave up.
12   Q. What was the street address or municipal
13 address of Chris Weaver's house?
14   A. I don't know exactly, but it's got to be
15 26 -- it's got to be 26. It's on the -- it's on
16 the odd side. 2630 something, or 2616, or
17 somewhere around up in there.
18      It's on the -- it's on the low end of
19 the block, so it's got to be in the low numbers.
20   Q. And it's on Law?
21   A. Jourdan Avenue.
22   Q. Oh, it's on Jourdan Avenue.
23   A. It's on Jourdan Avenue. So he's like
24 about a couple of steps from where the break is.
25   Q. All right. After Chris -- you got Chris
                          - 103 -

1  up on your roof with the Christmas tree lights,
2  did he tell you anything about his own
3  observations or experiences from his own house
4  close to the levee?
5    A. After he settled down he told me that he
6  was -- he was in the house. The water came. The
7  house more or less just got obliterated. And he
8  was trying to hold on to things, and do this and
9  do that. And then some kind of way he got a hold
10 to a little piece of roof.
11   Q. So he got up on his roof then?
12   A. No. I said he got a hold to a little
13 piece of roof. Now, how he did that, I don't
14 know.
15   Q. And what happened to his house?
16   A. The house he was in, its owned by
17 Ms. Annie Mae Waterhouse. The house is gone. It
18 doesn't exist anymore. Unlike my house, his
19 house was a older structure.
20      ' And when the water got in or whatever
21 hit it, it totally just disappeared.
22   Q. So he was a renter, and this house was
23 owned by Ms. Annie Mae Waterhouse?
24   A. No. He was -- he was living with her --
25 Edwina, Ms. Waterhouse's daughter. He was living
                          - 104 -

1  there with her daughter.
2    Q. And Edwina's name, last name, is
3  Waterhouse?
4    A. Yes.
5    Q. After you attended to Mr. Weaver's cut
6  and at some point in time then, did you go back
7  up on your roof, go out through the hole again?
8    A. I'm looking at him going through the
9  roof, and I'm noticing the feebleness of my
10 situation. The best spot for me is in the -- in
11 the ceiling.
12      And what I'm going to do? I can't -- I
13 can't drink all the water. I can't swim nowhere.
14 There's nowhere to go. What I'm going to do?
15 Might as well just sit down, huh?
16   Q. So when you said you just were going to
17 sit down, did you sit down inside your attic or
18 did you and Mr. Weaver go out on the roof?
19   A. We sit down in the attic.
20   Q. Now from the time you went up in the
21 attic until the time you were rescued, did you
22 make any telephone calls?
23   A. I called everybody. I called my
24 children. They were in the Superdome.
25   Q. Who are your children now?
                          - 105 -

1    A. Terri and Debra.
2    Q. One of them is named Terri?
3    A. Yeah.
4    Q. Okay. And her last name is Adams?
5    A. Adams.
6    Q. And there's another one? Debra, you
7  call her?
8    A. Yeah.
9    Q. And where was Debra?
10   A. The Hyatt Regency. The one where all
11 the windows blew out.
12   Q. And where was Terri when you talked to
13 her?
14   A. Terry was on -- in Carrollton on
15 Belfast.
16   Q. And in addition to calling your two
17 children, Terri and Debra, who else did you talk
18 to that morning?
19   A. I talked to Mona, I talked to Toni, I
20 talked to Jesse.
21   Q. Who's Mona? Let me -- I'm trying to
22 find out who these people are.
23   A. Mona Lewis.
24   Q. And is she a friend, a girlfriend, or
25 what?
                          - 106 -

DEPO. OF TERRY MARK ADAMS                              MINIDEP by Kenson

1    A.  She's just a friend.
2    Q.  Okay.  And where was she when you talked
3  to her?
4    A.  She was in Georgia.
5    Q.  And there was another person.  You
6  mentioned --
7    A.  My sister, Toni.
8    Q.  Toni?
9    A.  Toni, T-o-n-i.
10   Q.  T-o-n-i.  Her name is also Adams?
11   A.  Lewis.
12   Q.  Toni Lewis?
13   A.  Yeah.
14   Q.  And where was Toni when you spoke with
15  her?
16   A.  Her and Mona were together.
17   Q.  In Georgia?
18   A.  Yeah.  I think they were in Georgia.
19  It's either Georgia or either right outside of
20  Ft. Worth, in that little town in Texas.
21   Q.  They had evacuated before the storm?
22   A.  Yeah, they left.
23   Q.  Do you recall speaking with anyone else
24  besides your two daughters?
25   A.  I spoke to a lot of people.  After that
                       - 107 -

1  I was like calling everybody telling them "The
2  Ninth Ward is underwater."  It's -- it's over
3  with.  I just was talking to all kind of people.
4    Q.  After the point in time that you went
5  into the attic with -- taking Mr. Weaver with you
6  and trying to help give him some assistance, did
7  you later go back out on your roof?
8    A.  Yeah.  I went back out on my roof
9  several times.
10   Q.  When you first returned or went to your
11  roof, in other words, went outside again, when
12  was that in relation to these other events you've
13  described?  In other words, in terms of hours or
14  minutes?
15   A.  After 7:00.  I -- I don't know.  I was
16  just going up there.  I went up there several
17  times just to look at all the water and look
18  around like I was in awe of all this water.  I'm
19  like --
20   Q.  How deep was the water then, when you
21  made that first observation?
22   A.  The streetlight was covered.
23   Q.  The streetlights?  How high above the
24  ground is that?  Give me your best estimate.
25   A.  I don't know.  I don't know.
                       - 108 -

1    Q.  Did you see any barges then, when you
2  went back up on the roof?
3    A.  Did I see any barges?
4    Q.  Yeah.
5    A.  I mean, after it came through and -- and
6  went in the neighborhood a little while, and I
7  seen what it did, I -- I didn't really have no
8  warrant to want to see it again.
9    Q.  Well, after -- I think you told us
10  earlier that you kept the barge under observation
11  for around 15 minutes; is this correct?
12   A.  After it -- I said I watched it while it
13  was on the canal.
14   Q.  Uh-huh.  (Affirmative response.)
15   A.  When it bust through the levee --
16   Q.  Uh-huh.  (Affirmative response.)
17   A.  And then I thought about how -- how much
18  in trouble those people down the street were, and
19  I thought about the things that were taking
20  place, the barge done left my mind.  I was
21  thinking about, "Well, somebody down there ain't
22  going to make it."
23       So the barge was -- it -- it -- I mean,
24  I was thinking about friends that I had down that
25  had possibly stayed, and friends that I knew
                       - 109 -

1  would not leave.  Been here, been in the lower
2  Ninth Ward 40 years, since Betsy.  And they
3  refused to go anywhere.
4    Q.  Now the cross street that you told us
5  that the barge came through at was in the area of
6  North Roman, North Johnson, North Prieur?  Where
7  was it?
8    A.  I said the barge -- the barge came
9  through somewhere between maybe Johnson and
10  Roman.  Somewhere down that way.
11   Q.  Okay.
12   A.  I don't -- I can't remember the exact
13  street because I wasn't at the exact location.
14  But I know -- I can name you every block from
15  where I live at, all the way to St. Claude
16  Street.
17       So I can basically tell you where --
18  well, approximately how far I am and how many
19  blocks it is just by the name of the streets.
20   Q.  And after it came through in the area of
21  North Roman and North Johnson, it went into that
22  part of the neighborhood some distance, and came
23  to rest where?
24   A.  For me the barge went in, came --
25  rumbled around Jourdan Avenue, Deslonde and
                       - 110 -

MINIDEP by Kenson

1  Tennessee. And then as the water receded the
2  barge came back. And that's where it rested at.
3  Wherever it -- wherever it rests at, it went out
4  a little bit more and came back.
5       Just like my house. My house went out a
6  half a block. And it came back when the water
7  started receding.
8  Q. When you say it came back, just to make
9  sure the Record is clear as to your testimony on
10  this point, Mr. Adams, do you mean coming back in
11  the direction of the canal?
12  A. Yes.
13  Q. Okay. After making the observations,
14  your first observations of the barge, when it
15  came through the levee flood wall structure, as
16  far as you think maybe Tennessee Street, and then
17  it came back towards the canal, when was the next
18  point in time that you saw the barge?
19  A. The next time I saw the barge?
20  Q. Yeah.
21  A. Was in Texas.
22  Q. I'm sorry?
23  A. In Texas.
24  Q. In Texas.
25  A. Yeah. When they showed it again.
- 111 -

1  Q. Can you tell us where that house was?
2  A. It was about Jourdan Avenue and Tonti.
3  Q. Jourdan Avenue and Tonti?
4  A. Yeah.
5  Q. How close to the Claiborne Avenue bridge
6  was that, to try to get a reference point?
7  A. It's about seven blocks.
8  Q. I'm sorry?
9  A. It's about seven blocks from there.
10  Q. Seven blocks from the bridge?
11  A. Yeah. Take a block or two.
12  Q. The Claiborne Avenue bridge. Can you
13  describe these people that you talked to?
14  A. No. I -- I mean --
15  Q. Well, it was a man, a woman, a boy, a
16  girl, or --
17  A. It was like a family. It's like a
18  family, about four people. They were in the
19  upstairs house. I was trying to get them some
20  water. They didn't have no water.
21  Q. What did they tell you?
22  A. They just told me that they had
23  stayed -- they had stayed there.
24  Q. And what else did they tell you?
25  A. Well, that's just about it. They all
- 113 -

1  Q. I'm sorry. So the barge --
2  A. I mean, the barge did not -- I mean,
3  after it came through and caused all the damage,
4  the barge no longer was my concern. My concern
5  was thinking about people that I knew had stayed
6  there, and that didn't have the chance I had, to
7  grab nothing and get to the roof.
8  Q. So where did the barge end up?
9  A. It rested right at about Jourdan Avenue
10  and North Roman, or Jourdan Avenue and Prieur
11  Street, somewhere around in that area. That's
12  where it rested at.
13  Q. When you say you saw it in Texas, this
14  was on TV?
15  A. Yeah.
16  Q. Have you spoken with anybody since then
17  who says they saw the barge hit the wall?
18  A. No. But there was some people in the
19  upstairs house on Jourdan Avenue, that I spoke
20  with during -- after everything was over with,
21  but I don't remember who they were though.
22  Q. Where on Jourdan Avenue was that?
23  A. It -- it was a -- it was one of the very
24  few rental properties they had in that area. And
25  those were new people.
- 112 -

1  right. You know, why the helicopters keep
2  passing us by, because the helicopters started
3  flying as soon as it got daylight.
4  Q. And did they talk to you about the
5  barge?
6  A. No. The barge was not a concern once --
7  I mean, we were worrying about each other's
8  lives. The barge had done its damage. I mean,
9  what -- we can't -- we can't take it back.
10  Q. You earlier described to us in response
11  to one of Mr. Wiedemann's questions that you were
12  on the roof of your house for around two days
13  before you were rescued; is that correct?
14  A. Uh-huh. (Affirmative response.)
15  Q. How did you get the attention of the
16  responders that later came to help you and rescue
17  you?
18  A. I told you, they started flying when
19  daylight hit.
20  Q. So daylight on the morning of 29,
21  August?
22  A. As soon as -- as soon as the weather --
23  as soon as everything cleared up, which wasn't
24  long. Maybe about 8:00, 9:00 o'clock it was all
25  clear. The birds were flying.
- 114 -

**MINIDEP by Kenson**

1  Q. So they came and --
2  A. They had -- they had helicopters and
3  planes flying all over the Ninth Ward.
4  Q. And that was between 8:00 and 9:00
5  o'clock on the morning of 29, August. You saw
6  helicopters and planes flying over the Ninth
7  Ward; is that correct?
8  A. Yeah.
9  Q. Okay. And at that time there was no
10  more wind?
11  A. No.
12  Q. The sun was out?
13  A. Yeah.
14  Q. Was there any rain then?
15  A. I told you it was basically clear. It
16  looked like a normal day. (Witness shaking head.)
17  Q. You were shaking your head, no. So
18  there was no rain then?
19  A. No rain. No wind. No more storm excess
20  left over. Nothing. It was just like a normal
21  day.
22  Q. Okay. How did you come up with the time
23  of between 8:00 and 9:00 o'clock when you saw the
24  helicopters and planes? You looked at your cell
25  phone clock?

- 115 -

1  A. Well, I'm -- I'm saying 8:00 or 9:00.
2  It could have been a little later, but, I mean --
3  Q. Uh-huh. (Affirmative response.)
4  A. -- you're asking me about things that
5  wasn't of the essence at that time. I mean, they
6  had people on rooftops. Like I say, the lady
7  across the street from me, she telling me that
8  her daddy and her brother fell in the water.
9  So I'm not really worrying about time.
10  I'm guesstimating, from the time that daylight
11  came up, everything had done happened, it was
12  over with. I couldn't change it, I accept my
13  situation.
14  I'm on the roof. The only way I'm going
15  to get off here is if somebody come help me. So,
16  I mean, I don't want to just keep looking at this
17  clock. Well, what, I'm trying to settle this
18  lady down across the street.
19  "Look, help is coming. You just don't
20  fall in the water. I got some Gatorade bottles
21  for the water over here. If y'all want some I'll
22  get it over there to y'all."
23  I got Bryson over here saying, "Check on
24  my horse." And there's dogs all over the place
25  on top of rooftops. So, I mean, I'm saying that.

-.116 -

1  But like I say, it could have been a hour later
2  or whatever. But I'm saying, like, I -- I didn't
3  check my clock every time because of the --
4  Q. I understand.
5  A. -- of the feebleness of the situation,
6  says, what I'm going to keep checking this watch
7  for, and "I'm not getting off of this roof no
8  time soon."
9  Q. I'm just asking you. I understand that,
10  Mr. Adams. I'm just asking you for your best
11  estimate of the time when you saw the helicopters
12  and the planes first arrive and the sun was out,
13  there was no more wind and no more rain. Between
14  8:00 and 9:00 o'clock; is that your best
15  estimate?
16  MR. WIEDEMANN:
17  I think he said between 9:00 and
18  9:30.
19  THE WITNESS:
20  Well --
21  MR. SANDERS:
22  Give or take a hour or two.
23  THE WITNESS:
24  That's give or take a hour or
25  two.

- 117 -

1  BY MR. FISHER:
2  Q. All Right. In any event, it was --
3  A. 10:00 o'clock might have -- could have
4  been the latest. I know by -- I know by the time
5  it got around lunchtime it was basically clear.
6  Q. So it was that morning, in any event,
7  wasn't it?
8  A. Huh?
9  Q. It was that morning, the morning of 29,
10  August?
11  A. It was that morning.
12  Q. Okay.
13  A. It was that morning. It cleared up that
14  morning.
15  Q. All right. Did you ever find out who
16  these folks were that you -- the family of four
17  people that had also stayed near Jourdan Avenue
18  and North Tonti?
19  A. No. Like I said, the helicopter lifted
20  me, Chris and the lady across the street. They
21  dropped us off across the canal, and went back
22  and got a few other people. Then another
23  helicopter came and took us to the Superdome, at
24  which point I seen my nephew and them.
25  We went on by the hotel on Toulouse, got

- 118 -

DEPO. OF TERRY MARK ADAMS                    MINIDEP by Kenson

1  the keys from Leroy brother, went and got Leroy
2  car at the hotel parked by D.H. Holmes. And from
3  there we left for Texas.
4      Q.  Who was the lady across the street that
5  was also rescued?
6      A.  I don't know her name.  I -- I don't
7  know her name.
8      Q.  And going back to the family of four
9  people that stayed, were they also rescued?
10     A.  Yeah.
11     Q.  By the -- at the same point in time that
12 you and Chris were rescued, or earlier, or --
13     A.  No.  That was -- that was -- there was
14 three people that got out the helicopter with me.
15 It was -- it was me, Chris and the lady across
16 the street.  We were dropped off right on the
17 other side of the canal, right by the bridge.
18         Another helicopter came that already had
19 people in it, picked us up and brought us to the
20 Superdome. The helicopter that set us down, he
21 went back across the canal. Now, who he picked
22 up, I don't know. But he was not the same one
23 that brought us to the Superdome.
24         It was a different helicopter. We got
25 out of one and got in another. It was like one
                      - 119 -

1  of them was for getting people off the roof and
2  the other one was transporting people to uptown
3  New Orleans.
4      Q.  When you had the conversation with this
5  family of four people who were in the vicinity of
6  Jourdan Avenue and North Tonti, where were you
7  and where were they?
8          In other words, where were you together
9  with these people when you had this conversation?
10     A.  My house had went up the street about a
11 half a block. And there's Dorgenois, Rocheblave,
12 and then Tonti. I was close to Dorgenois.
13 There's Rocheblave and then Tonti, so maybe two
14 blocks.
15     Q.  So you were yelling at them, or how were
16 you --
17     A.  Yeah. I'm on my roof running back and
18 forth.
19     Q.  Okay.
20     A.  I'm running from -- from -- from one end
21 of the house to the other end of the house.
22     Q.  And they were on their roof, also?
23     A.  And they was in the upstairs house.
24     Q.  In the upstairs --
25     A.  Yeah.
                      - 120 -

1      Q.  -- of the house.  Okay.  Then did they
2  say anything to you at that time about having
3  seen a barge?
4      A.  No.
5      Q.  You don't recall that they said anything
6  to you about observing a barge?
7      A.  No. (Shaking head negatively.)
8      Q.  You're shaking your head, no.
9      A.  No.
10     Q.  So then, is it fair to say, Mr. Adams,
11 that you haven't talked to anybody that actually
12 saw the barge make contact with the flood wall
13 and come through?
14     A.  No.
15     Q.  You're the only person that observed
16 this; is that correct, as far as you know?
17         MR. WIEDEMANN:
18         That's -- that's not what he said.
19         He said he hadn't talked to anybody.
20 BY MR. FISHER:
21     Q.  You hadn't talked to anybody who saw it?
22     A.  I haven't talked to anybody that --
23 that -- I mean, if I brought the conversation up.
24 But when we talk to each other about what
25 happened, we more focused on "How's your family?
                      - 121 -

1  Did you lose anybody?"
2          I mean, the barge done what it did and
3  we -- we -- I mean, why would we want to keep
4  talking about how it came through and when it
5  came through?
6          When I see people from my neighborhood,
7  which is totally gone for like seven blocks, it's
8  "How you doing? How's your family? Did all of
9  y'all get out?" It's not "Did you see that barge
10 come through?" That's not the conversation.
11     Q.  So in the 14 and a half months since the
12 storm, as I understand your testimony, you
13 haven't spoken with anyone from your neighborhood
14 that saw the barge come through the levee; is
15 that correct?
16     A.  That's correct.
17     Q.  Okay. Let me ask you about this person
18 that you referred to called Piggy. When was it
19 that morning, the morning of the storm, of
20 course, that you had a conversation with Piggy?
21     A.  Daylight, it might have been. I don't
22 know. Daylight had came. It might have been
23 about 7:00, 7:30, somewhere like that. He on the
24 roof. I'm on the roof. He's on Tennessee
25 Street. I'm on Deslonde Street.
                      - 122 -

1    Q.  When did Piggy's horse drown?
2    A.  I don't know. I couldn't really tell
3 you. They found him up -- they found the horse
4 about a month later. When he drown, I couldn't
5 -- I know the horse was tied up. I didn't -- I
6 didn't actually go back there and check on him.
7 It was a horse.
8    Q.  I thought you told us earlier that you
9 saw the horse that morning and it was drowned.
10   A.  Huh? I said the horse drowned. I
11 didn't say it had drowned that morning. I don't
12 know when the horse drowned. I don't --
13   Q.  Did Piggy tell you it was drowned?
14   A.  No. Somebody -- as a matter of fact,
15 Piggy told me the horse drowned because she was
16 next -- lived next door to the lot where the
17 horse was tied up at.
18       And I inquired about the horse. I said,
19 "Whatever happened to Piggy horse?" She said,
20 "They found the horse covered by some house, or
21 something."
22   Q.  Didn't you tell us earlier that Piggy
23 asked you to check on the horse?
24   A.  Yeah.
25   Q.  What point in time was that?
                     - 123 -

1    A.  Daylight.
2    Q.  After the barge came through, or before?
3    A.  Daylight. It was about 7:30, 8:00
4 o'clock, 7:00 o'clock. I know it was daylight.
5 And Piggy was on the roof I could see. And he
6 says, "Seaboo, go check on my horse." I look in
7 the backyard. I say, "I don't see your horse,
8 Piggy."
9    Q.  What's Piggy's name?
10   A.  Bryson.
11   Q.  Bryson?
12   A.  Uh-huh. (Affirmative response.)
13   Q.  B-r-y-s-o-n?
14   A.  Bryson. That's --
15   Q.  What's his first name?
16   A.  That's his first name.
17   Q.  Bryson. What's his last name?
18   A.  I don't know.
19   Q.  Okay. And where did he live in relation
20 to your house?
21   A.  He lived on Tennessee and Florida
22 Avenue.
23   Q.  This is in the same general neighborhood
24 that you live in, correct?
25   A.  That's like across the street.
                     - 124 -

1    Q.  And what are your neighborhood
2 nicknames?
3    A.  My neighborhood nickname?
4    Q.  Yeah.
5    A.  He's Piggy and I'm Seaboo.
6    Q.  S-c-a-b-o-o?
7    A.  Yeah.
8    Q.  Is that close?
9    A.  That's close.
10   Q.  A pretty good guess.
11   A.  Yeah, that's close.
12   Q.  You got any more nicknames?
13   A.  That's it.
14   Q.  Do you know -- do you or your family own
15 any other property in that neighborhood?
16   A.  I owned a house in the 2500 block of
17 Deslonde, 2542. And I owned a lot next door to
18 my daddy house.
19   Q.  What's the address of the lot, or does
20 it have one?
21   A.  2610.
22   Q.  2610 Deslonde?
23   A.  Yeah. Then you had the Hiller's,
24 (phonetic) then you had the Jenkins, then you had
25 the Waterhouses again. There was a bar on the
                     - 125 -

1 corner. Across the street they had the Williams,
2 they had the Browns, they had the Watsons. All
3 us been there more than 20 years.
4    Q.  The property at 2542 Deslonde, what
5 color was that house?
6    A.  Like a burnt orange.
7    Q.  Orange? And your house you described to
8 us is sort of a gray color?
9    A.  Yeah. Olive drab gray or whatever.
10   Q.  2542 Deslonde, you owned that house at
11 the time of the storm?
12   A.  Uh-huh. (Affirmative response.)
13   Q.  Was it rental property?
14   A.  No, it wasn't -- it wasn't finished. It
15 wasn't in operation yet.
16   Q.  It wasn't -- no one was living in it at
17 the time?
18   A.  Nobody was living in it.
19   Q.  You had intended to finish it. Is that
20 what you said?
21   A.  Yeah.
22   Q.  And what were you going to do with it
23 then?
24   A.  I was going to rent it.
25   Q.  And the lot at 2610 Deslonde, that was a
                     - 126 -

1 vacant lot, then?
2    A.  Yeah.
3    Q.  And what were your plans for that lot?
4    A.  None yet, because you can't put no
5 double houses in the first block of Deslonde
6 Street, so -- if I did anything with it, it would
7 have to be a single house.
8    Q.  In addition to your account of the facts
9 that you've given us here this afternoon, have
10 you ever given anyone else, at any time, a
11 different version of these facts?
12    A.  No.  I never spoke with anybody else.
13    Q.  Had you ever given Mr. Wiedemann or
14 anyone else a different version of these facts?
15    A.  No.
16    Q.  At any point in time after the
17 hurricane, did you talk to anybody in the media?
18 And by "media," I mean newspapers, magazines,
19 television stations, national network TV?
20    A.  No.  There is a guy that says I talked
21 to him, but I never spoke with him.  His name is
22 Greg Sumenski or something.  He's got this theory
23 out there.
24    Q.  And what was his name?  I'm sorry.
25    A.  Greg Sumenski.

- 127 -

1 said?
2    A.  Yeah.  He has me on the 17th Street
3 Canal.  That's -- that's what he knows.  That's
4 what he thinks.  He thinks the Industrial Canal
5 and the 17th Street Canal is the same canal.
6    Q.  So it's your testimony this afternoon,
7 Mr. Adams, that you never gave any kind of
8 account of these facts to Mr. Sumenski or anyone
9 else; is that true?
10    A.  No.
11    Q.  That's correct?
12    A.  That's correct.
13    Q.  Did you -- for example, did you ever
14 tell anybody that the levees or the levee and
15 flood walls in your neighborhood were blown or
16 blown up by anybody?
17    A.  No.
18    Q.  Did you ever give anyone any statements,
19 either oral or written, that the levees or flood
20 walls were blown up?
21    A.  No.
22    Q.  Have you given anybody any statements at
23 all about the account of the facts that you've
24 just given us this afternoon?
25    A.  No.

- 129 -

1    Q.  Gray Sumenski.
2    A.  Greg, G-r-e-g.
3    Q.  Greg Sumenski.
4    A.  Yeah.
5    Q.  And what company is he with?
6    A.  I don't know.  I never spoke with him.
7 He's got this three bang theory going that he put
8 together, but I never spoke with him personally.
9         MR. SANDOZ:
10    A  what theory, did you say?
11         THE WITNESS:
12    A  three bang theory.  Something
13         about the levee was blown and all this
14         here.
15 BY MR. FISHER:
16    Q.  Yeah.  When did you talk to Mr.
17 Sumenski?
18         MR. SANDERS:
19             He said he didn't.
20         MR. SANDOZ:
21             I object to --
22 BY MR. FISHER:
23    Q.  Or did you?
24    A.  I never spoke with him.
25    Q.  All right.  He has a theory, then, you

- 128 -

1    Q.  By a statement, I mean, in writing or
2 orally?
3         MR. WIEDEMANN:
4             I'm going to object to the form of
5         the question.  You asked him about
6         attorneys, the media, anyone else.
7         What are you talking about now?
8         MR. WALKER:
9             I think he intends it to be in
10         as broad as possible context.
11         MR. FISHER:
12             Accounts is one thing, counsel,
13         statements are another.
14         MR. WIEDEMANN:
15             You're not asking that.  You asked
16         him if he's talked to anybody already.
17         Media, lawyers, Sumenski or Sumanski, or
18         anybody else.  He's already answered it.
19         MR. WALKER:
20             No, the first was accounts, and now
21         it is statements.
22         MR. WIEDEMANN:
23             Yeah.  He asked about statements
24         already.
25         MR. FISHER:

- 130 -

**DEPO. OF TERRY MARK ADAMS**

1    No
2    MR. WIEDEMANN:
3        He asked written and oral.
4    MR. O'DWYER:
5        The question's repetitive, and
6    that's the reason for the objection.
7    MR. FISHER:
8        He can answer it.
9    BY MR. FISHER:
10   Q.  Mr. Adams, have you ever been arrested?
11   A.  Yes, I have.
12   MR. WIEDEMANN:
13       I object to the question. It's not
14   relevant. I instruct him not to answer
15   it. An arrest is not discoverable.
16   MR. EMMETT:
17       Counsel, you have -- you have no
18   right to instruct this witness not to
19   answer.
20   MR. FISHER:
21       It goes to his credibility, counsel,
22   and you know it. I will ask that the
23   witness answer the question.
24   MR. WIEDEMANN:
25       He answered it.

- 131 -

1    Q.  What happened with that --
2    A.  Probation.
3    Q.  -- arrest? Was that a federal or a
4    state charge?
5    A.  That was a state charge.
6    Q.  How old were you then?
7    A.  I don't know. I mean, that was like in
8    the '80's. And all my state -- state charges
9    that I was convicted was between '88 and '92.
10   That was three state charges that I was convicted
11   of. All of them I got probation.
12       I caught a federal conspiracy case in
13   2000. I got five years for that. Came home at
14   the end -- at the beginning of 2004, end of 2003.
15   Q.  Let me stop you there, Mr. Adams. On
16   the federal conspiracy case, what was the nature
17   of the charge?
18   A.  Conspiracy to distribute cocaine.
19   Q.  To, what?
20   A.  To distribute cocaine.
21   Q.  To distribute cocaine. And that was a
22   federal charge?
23   A.  Yes, it was.
24   Q.  Did you plead or were you found guilty?
25   A.  I pleaded.

- 133 -

1        THE WITNESS:
2            Yes, I have.
3    BY MR. FISHER:
4    Q.  When was that?
5    A.  Arrest?
6    Q.  Yeah.
7    A.  Just arrest?
8    Q.  Well, let's start with arrest?
9    A.  Okay. I've been arrested numerous
10   amount of times.
11   Q.  How many times?
12   A.  I couldn't really tell you that, to be
13   exact.
14   Q.  For what reason or reasons?
15   A.  I know of four that stands out more than
16   others. Maybe five.
17   Q.  Okay.
18       MR. WIEDEMANN:
19           Let me just make my objection
20       general.
21   BY MR. FISHER:
22   Q.  Okay. Let's start with the first
23   arrest. When was that?
24   A.  In the 80's, I was arrested for
25   possession of crack cocaine, in the late 80's.

- 132 -

1    Q.  And a plea bargain was arranged by your
2    attorney and the government lawyers; is that
3    correct?
4    A.  I guess. That's -- that's basically
5    what happened, I guess.
6    Q.  You were sentenced to five years, sir?
7    A.  Yes, I was.
8    Q.  And how much of that time did you serve?
9    A.  Close to four.
10   Q.  At which facility?
11   A.  I was at FCI Yazoo and FCI Coleman,
12   Coleman, Florida.
13   Q.  Have you ever been arrested or convicted
14   on any other charges that were not drug-related?
15   A.  Yeah. I had an arrest. I think it was
16   in -- that was a long time ago. I think it was
17   in -- in the '90s. Somewhere in the early '90's
18   I was arrested on three counts of attempted
19   murder.
20   (The videographer advises that there was one
21   minute remaining on the tape.)
22   (Off-the-Record.)
23   BY MR. FISHER:
24   Q.  All right. Mr. Adams, a few minutes ago
25   we were discussing your previous arrests and

- 134 -

1 convictions. And what I want to do is, I want
2 to -- starting with the -- let me make sure I
3 have this down properly, correctly.
4           You were arrested, I think you told us,
5 three times for possession of crack cocaine in
6 the early 1980's?
7       MR. WIEDEMANN:
8           I'm going to make an objection
9       in that there is no conviction on
10       those charges that is less than
11       ten years old.
12 BY MR. FISHER:
13   Q.  And these charges were disposed of?
14       MR. WIEDEMANN:
15           So I'll make a general objection.
16       MR. FISHER:
17           Okay. Thank you, counsel.
18 BY MR. FISHER:
19   Q.  These charges were disposed of, as you
20 told us, by means of probation?
21   A.  Yes.
22   Q.  And there were --
23   A.  Those three -- those three.
24   Q.  There were three counts, three separate
25 arrests?

- 135 -

1   A.  Yeah. Three -- I don't remember the
2 years or anything, but they were -- they were
3 over the course of a couple of years.
4   Q.  When was it -- it was in the late or
5 early 1990's that you were arrested on three
6 counts of attempted murder?
7   A.  I really --
8       MR. WIEDEMANN:
9           I -- I object to that. I'll make an
10       objection to that line of questioning in
11       that the charges were never accepted.
12       THE WITNESS:
13           I think it was either early to
14       mid-1990's.
15 BY MR. FISHER:
16   Q.  Was this in conjunction with an assault
17 on a person or persons with a weapon?
18   A.  You
19   Q.  Were you charged with using a deadly
20 force against somebody in attempting to kill
21 them? Is that what the charge was? There was --
22   A.  I said -- I said three counts of
23 attempted murder.
24   Q.  Okay. Well, how was it that the police
25 accused you of attempting to murder somebody?

- 136 -

1   A.  The police didn't kill me -- accuse me.
2   A.  guy's mother called them and told them that I
3 had done it.
4   Q.  Well, was this three separate people or
5 just one --
6   A.  Three separate people.
7   Q.  Okay. What were their names?
8   A.  One of them name was Earl. Erica. And
9 I don't -- I don't -- I don't even much know the
10 other lady. I know it was a lady in a car.
11   Q.  Were these people that you knew?
12   A.  I knew Erica.
13   Q.  Erica?
14   A.  I don't know Erica last name.
15   Q.  Does she have -- does she have a last
16 name?
17   A.  I don't know her last name.
18   Q.  Does Earl have a last name?
19   A.  Earl Smith.
20   Q.  Earl Smith. And the -- although you
21 were arrested there were -- the charges were
22 never
23   A.  The charges were dismissed.
24   Q.  They were dismissed?
25   A.  Yeah.

- 137 -

1       MR. O'DWYER:
2           Since the stipulation says we have
3       to make objections on the Record, I
4       just want the Record to reflect my
5       objection on behalf of my clients to
6       this line of questioning.
7       MR. FISHER:
8           Well, I notice that, you know, in
9       accordance with the protocol that we're
10       operating under, we're supposed to have
11       one lawyer objecting. And we seem to
12       have two.
13       MR. SANDERS:
14           It goes both ways. We had
15       objections from all over the table when
16       Mr. Wiedemann was questioning.
17       MR. FISHER:
18           Let's move on.
19 BY MR. FISHER:
20   Q.  So nothing ever came of the attempted
21 murder charges, they were dismissed?
22   A.  They were thrown out.
23   Q.  Thrown out, you say?
24   A.  Thrown out.
25   Q.  Okay. Any other crimes or misdemeanors

- 138 -

DEPO. OF TERRY MARK ADAMS                    MINIDEP by Kenson

1 you were arrested for, in addition to the three
2 crack cocaine things and the attempted murder?
3     A. It was — I got quite a few arrests for
4 different things, but it's not no more felonies,
5 I don't think. I think it's like traffic. And
6 there might have been a — a child support or
7 two. But I don't think it was nothing else.
8     Q. Let's go to the conspiracy charge. That
9 was the one that was — that proceeded in Federal
10 Court. That was conspiracy to distribute crack
11 cocaine?
12     A. The conspiracy to distribute 50 kilos of
13 cocaine and 50 grams of crack. That's what the
14 indictment was.
15     Q. Were you the only defendant in
16 connection with those charges or were there other
17 defendants?
18     A. I think there was about 13 of us
19 altogether.
20     Q. Did you actually testify in Federal
21 Court in those proceedings?
22     A. Not at those proceedings.
23     Q. Okay. What proceedings, if any, did you
24 testify in, in Federal Court?
25     A. The Len Davis proceedings.

- 139 -

1     Q. How much money?
2     A. That amount?
3     Q. Yes.
4     A. [This portion of testimony is removed by
5 agreement of all counsel and placed under seal in
6 the possession of Lawrence Wiedemann.]
7     Q. You actually received that money?
8     A. I just said it.
9     Q. Yeah. From the federal government?
10     A. Yes, I did.
11     Q. What year was that that you received the
12 money?
13     A. '96 or '97.
14     Q. Have you ever filed any income tax
15 returns during the period of your first
16 employment through now?
17     A. What you mean?
18     Q. Federal and state income tax returns.
19 Have you ever filed any?
20     A. The last two years.
21     Q. Which would be the calendar years 2004
22 and 2005?
23     A. '04 and '05.
24     Q. '04 and '05, you filed returns?
25     A. Uh-huh. (Affirmative response.)

- 141 -

1     Q. Len Davis was a New Orleans Police
2 Officer; is that correct?
3     A. Uh-huh. Uh-huh. (Affirmative response.)
4     Q. How was it that you came to become a
5 witness in the Len Davis matter?
6     MR. WIEDEMANN:
7         I object to the line — this line
8 of questioning, and being a witness
9 in a case is — is not relevant.
10     MR. FISHER:
11         You can answer it.
12     THE WITNESS:
13         I was the — the drug dealer
14 that he was extorting money from.
15 BY MR. FISHER:
16     Q. How much money did he extort from you?
17     A. From me, a couple of thousand. From the
18 FBI, I think it was more of like a hundred and
19 something thousand.
20     Q. Did anyone ever promise you money in
21 exchange for testifying in the Len Davis case?
22     A. No.
23     Q. Did anyone actually give you money for
24 testifying in connection with the Len Davis case?
25     A. Yeah.

- 140 -

1     Q. State and federal; is that correct?
2     A. Uh-huh. (Affirmative response.)
3     Q. What about before that?
4     A. Off and on. I couldn't really tell you
5 the years. I mean, I filed it all three years I
6 was in the Marine Corps. And the rest of the
7 years was like, when I worked I filed them. When
8 I didn't work, I didn't file. I can't remember
9 the exact years.
10     Q. Going back to the time when you were in
11 the process of climbing up in your attic and then
12 making a hole in your roof, and then throwing the
13 Christmas tree lights to Chris Weaver, and making
14 the observations you made, and then later, two
15 days later, getting rescued, at any time during
16 that time frame that I've just mentioned, did
17 your cell phone get wet and become inoperative?
18     A. No.
19     Q. Did it — the battery run down at any
20 time during this process?
21     A. The battery did run down.
22     Q. When did the battery go down?
23     A. The battery ran down on Tuesday.
24 Sometime Tuesday evening the battery ran down.
25     Q. Okay. After you ascertained that

- 142 -

DEPO. OF TERRY MARK ADAMS

MINIDEP by Kenson

- 143 -

1  Mr. Weaver was injured, or cut on his leg, as you
2  described it earlier, did you use your phone to
3  call anyone for help after you found out that he
4  had been hurt?
5      A.  I said we called 9-1-1 a bunch of times.
6  And I called a lot of different people.
7      Q.  And did the calls -- besides the
8  unsuccessful 9-1-1 attempts, when you talked to
9  some of these other people, whose names you
10  mentioned earlier, did you ask them to provide
11  assistance because Mr. Weaver was hurt?
12      A.  Mona put me on -- put me on a operator
13  from Oklahoma, whom I spoke with for awhile.  But
14  as for ascertaining help for him, there was no
15  help to be got.  You know, I mean, the operator
16  -- I mean, it was like the planes were flying
17  overhead and they wasn't doing anything.
18          So what -- what I'm going to do?  Keep
19  calling and calling, and calling, and --
20      Q.  When did you have that conversation with
21  Mona?
22      A.  That morning.
23      Q.  As best you can remember.
24      A.  That morning about 9:00 or 10:00
25  o'clock.

- 144 -

1      Q.  In addition to the arrests, the criminal
2  charges, criminal matters you've just described
3  to us, are there any other ones besides the one
4  that you've mentioned?
5      A.  Three arrests and three convictions in
6  the state, the Len Davis thing, and the
7  conspiracy, the attempted murders.  That's all
8  that really comes out to me.  The rest of it is
9  basically misdemeanors.
10      Q.  At the time of Katrina, 29, August,
11  2005, were you operating under any kind of
12  probation, sir, either state or federal?
13      A.  Still on it.
14      Q.  You're still on probation?
15      A.  Uh-huh.  (Affirmative response.)
16      Q.  Was that federal as well as state?
17      A.  Federal.  Federal.
18      Q.  Just federal, but not state?
19      A.  No state.
20      Q.  Who is your federal probation officer?
21      A.  Jeff Hern.
22      Q.  And is he here in the United States
23  District Court for the Eastern District of
24  Louisiana?
25      A.  Yes, he is.

- 145 -

1      Q.  Mr. Adams, where are you presently
2  residing?
3      A.  I was on 20 -- I'm still getting my mail
4  at 2165 Carol Sue.
5      Q.  Uh-huh.  (Affirmative response.)
6      A.  But I'm in a contract to purchase a
7  house on Elysian Fields.
8      Q.  Where is Carol Sue?  What part of the
9  city?
10      A.  Across the river.  Gretna.
11      Q.  Gretna, okay.  So a contractor purchased
12  the house?  Is that what you said?
13      A.  No.  I'm in a contract, a purchase
14  agreement on a house on Elysian Fields.
15      Q.  A purchase agreement.  I'm sorry.  I
16  misunderstood you.  Where on Elysian Fields is
17  that?
18      A.  1726-28.
19      Q.  1726-28 Elysian Fields.
20      A.  Yeah.
21      Q.  When does the Act of Sale go through?
22      A.  We don't -- we don't know just yet.
23  It's going through an appraisal and the title
24  search right now.
25      Q.  So you're still living at the Carol Sue

- 146 -

1  address --
2      A.  Yes.
3      Q.  -- while that's in progress?
4      A.  Yes.
5      Q.  Then you're presently working for
6  Matrana's Produce in Gretna; is that correct?
7      A.  Westwego.
8      Q.  Westwego.  Sorry.  Who is your work
9  supervisor there?
10      A.  I don't know his last name.  Calvin or
11  Mike.
12      Q.  How long have you been working there?
13      A.  I think since April.
14      Q.  And you are a driver; is that correct?
15      A.  Yes.
16      Q.  You drive a produce truck?
17      A.  Yes, I do.
18      Q.  Okay.  What's your present salary at
19  Matrana's?
20      A.  I make $12.50 an hour.
21      Q.  That's before deductions and taxes?
22      A.  Yeah.
23      Q.  How are you planning to finance the
24  house that you're about to purchase?
25      A.  Well, I had some money.  I had some

1  property I got. I had a few dollars to put down,
2  and I'm working.
3      Q.  Okay. What's the -- what's the down
4  payment that's required by the bank or lender?
5      A.  Well, it's -- I had to put down -- I had
6  to give the seller $2,000.
7      Q.  You had to give the seller $2,000? That
8  was like earnest money or something?
9      A.  Yeah.
10     Q.  Who's the financial institution that
11 you're going to use to help you with this?
12     A.  I think it's Allstate Mortgage.
13     Q.  And what is their requirement about --
14     MR. WIEDEMANN:
15         I'm going to object to the relevancy
16     of this, as to what his financial
17     arrangement is with buying property.
18         This is a fact witness about an
19     accident and this is irrelevant.
20     MR. WALKER:
21         He's a plaintiff.
22 BY MR. FISHER:
23     Q.  Now you are, as you've told us, one of
24 the plaintiffs in the lawsuit that we're talking
25 about here today, aren't you?

- 147 -

1      A.  Yes.
2      Q.  Do you expect to be here when this case
3  goes to trial, sir?
4      A.  Yes, I do.
5      Q.  Okay. Mr. Adams, before you went
6  upstairs in your house on the morning of 29,
7  August 2005, just to make sure the -- your
8  testimony on the Record are clear, you did not
9  look out of any window or door in your house
10 before you went upstairs; is that correct?
11     A.  That's correct.
12     MR. FISHER:
13         No further questions, counsel.
14     MR. WIEDEMANN:
15         All right. We can go off the
16     Record.
17 (Off-the-Record.)
18     MR. FISHER:
19         I just have one more question
20     and then I'll tender to whoever
21     is next, whoever that is.
22 BY MR. FISHER:
23     Q.  Mr. Adams, just to make sure that the
24 Record is clear on this point, sir, we talked
25 earlier in your testimony this afternoon about

- 148 -

1  whether you gave any statements, either oral or
2  written, to anyone after the day of the hurricane
3  in connection with the events that we've just
4  been discussing today.
5         That is the barge and the flood wall,
6  and all of the associated facts. So did you give
7  anyone any statements, either oral or written,
8  about the matters we've just been talking about
9  today?
10     A.  No.
11     MR. FISHER:
12         Thank you.
13     MR. WIEDEMANN:
14         Let me just make a statement for
15     the Record. Mr. Adams has given
16     statements to counsel, which are
17     privileged and which we have told him
18     are privileged, so when he says he
19     hasn't given a statement, there --
20     there have -- he hasn't given a
21     statement that's discoverable.
22         E X A M I N A T I O N
23 BY MR. SANDOZ:
24     Q.  Mr. Adams, my name is Jonathan Sandoz,
25 and I represent the Board of Commissioners of the

- 149 -

1  Port of New Orleans. You haven't sued me, nor
2  have your lawyers, but one of the defendants in
3  your lawsuit has brought me into the case. And I
4  just have a few questions. And hopefully we can
5  make it quick.
6         You testified it was on the 28th you
7  returned home at about 5:00 o'clock p.m.; is that
8  right?
9      A.  8:00 o'clock.
10     Q.  8:00 o'clock, p.m.? And at some point
11 after that you laid down in your bed and you fell
12 asleep, right?
13     A.  Right.
14     Q.  Do you remember what time it was you
15 fell asleep?
16     A.  No. I know I woked [sic] up later on,
17 early in the morning. It must have been about
18 1:00 o'clock, because I know the TV was blinking,
19 the -- the power, the clock. It was -- it had
20 done went out, so that's how I knew the power was
21 off.
22     Q.  You don't know how long you had been
23 sleeping as of that time?
24     A.  No.
25     Q.  Do you remember what time it was that

- 150 -

**DEPO. OF TERRY MARK ADAMS**

1 you laid down in bed to go to sleep?
2    A. I took a shower. It must have been
3 about 8:30, 9:00 o'clock. Came in at 8:00, took
4 a shower, laid down.
5    Q. Okay. When you woke up at 1:00 o'clock,
6 was it raining?
7    A. Yeah.
8    Q. Raining pretty hard?
9    A. Yeah.
10    Q. Okay. When you woke up at 5:00 o'clock
11 the next morning, was it raining?
12    A. Yeah.
13    Q. Raining pretty hard?
14    A. Yeah.
15    Q. When you put your foot down and your
16 foot got wet, when you were getting up out of
17 bed, was it still raining?
18    A. Yeah.
19    Q. Okay. You already testified that the
20 water had come up or you thought it was coming up
21 through the sub-flooring of your house?
22    A. Yeah.
23    Q. With the exception of getting up at
24 about 1:00 o'clock and noticing the light
25 blinking, you were asleep that entire night; were

- 151 -

1 you not?
2    A. Right.
3    Q. So you have no personal knowledge,
4 correct me if I'm wrong, the source of the water
5 that had flooded your neighborhood as of 5:00
6 o'clock on the morning of the 29th of August?
7    A. No.
8    Q. Is that right?
9    A. No.
10    Q. Is that right?
11    A. Yeah. I had no knowledge of where the
12 water was coming from when it first entered the
13 house.
14    Q. Had your neighborhood flooded from rain
15 before?
16    A. Yeah.
17    Q. Okay. How many times before had your
18 neighborhood flooded from rainwater?
19    A. Well, from rainwater, it never enters
20 the house.
21    Q. I understand that, but just as far as
22 your neighborhood flooding, covering the streets?
23    A. Covering the street? A couple of times.
24 I couldn't tell you how many exactly, but I know
25 for sure the May 3rd because it -- you know, it

- 152 -

1 really got up to the steps on May 3rd. But other
2 times it -- the drains would back up, you know.
3 We had water covering the street, but it -- I
4 mean, it never comes in the house.
5    Q. So as far as you were concerned, when
6 you woke up at 5:00 o'clock the next morning it
7 could have been flood from rainwater, right?
8       MR. HAYCRAFT:
9          Object to the form.
10       THE WITNESS:
11          It could have been.
12 BY MR. SANDOZ:
13    Q. It could have been any source. You
14 don't know.
15    A. Could have been.
16    Q. Earlier you testified that you saw water
17 coming over the top of the flood wall when the
18 waves would hit it, right?
19    A. Yeah.
20    Q. And I believe you said it was every few
21 seconds a wave would hit and some water would
22 spill over; is that right?
23    A. It was continuous, like every second. I
24 mean, it was puch, puch, puch, puch. (Phonetic.)
25 It ain't like it stopped and started again. It

- 153 -

1 was continuous.
2    Q. Okay. What about this seeping of the
3 water that you've described earlier? Where
4 exactly in the levee or flood wall system did you
5 see this "seeping?"
6    A. Right by my house. Right at Law Street.
7    Q. No. I understand that. But you
8 described the levee earlier as having some
9 earthen base and then the flood wall on top of
10 the earthen base; is that not right?
11    A. Right -- right by my house the water was
12 coming under the wall and over it.
13    Q. Under the concrete structure?
14    A. Yeah.
15    Q. Where the concrete structure sits on top
16 of the ground?
17    A. Right.
18    Q. How long along the flood wall did you
19 see this seepage occurring?
20    A. That was only a couple of -- maybe three
21 or four feet wide.
22    Q. And other than that three or four-foot
23 wide area where you saw the water seeping, did
24 you see seeping anywhere else along that flood
25 wall?

- 154 -

DEPO. OF TERRY MARK ADAMS

MINIDEP by Kenson

1    A. No.

2    Q. How long did you witness this seeping

3 occur?

4    A. All the way until the -- that barge came

5 into the -- in the neighborhood.

6    Q. So about a half hour at best?  Does that

7 sound about right?

8    A. Something like that, give or take.

9    Q. How long was it after you got up on your

10 roof before the winds started to subside and the

11 waves quit hitting the top of the flood wall?

12    A. The winds -- like, the wind didn't start

13 to subside until maybe -- like close to 7:00

14 o'clock.  It might have been close to 7:00, 7:30,

15 but the -- the waves didn't stop.  It -- it --

16 the waves didn't stop until the wall -- until the

17 wall gave, 'til the barge came through and the

18 wall totaled.

19    Q. Okay.

20    MR. SANDOZ:

21        That's all I have, Mr. Adams.

22    Thank you.

23        E X A M I N A T I O N

24 BY MR. WIEDEMANN:

25    Q. Mr. Adams, as we sit here, having

- 155 -

1 testified for several hours and 14 months past,

2 is there any doubt in your mind that the barge

3 broke the flood wall and flooded your area?

4    MR. FISHER:

5        Objection

6    THE WITNESS:

7        There's no doubt in my mind.  The

8    barge is what came through the wall.

9    MR. WIEDEMANN:

10        Thank you.

11        E X A M I N A T I O N

12 BY MR. FISHER:

13    Q. When's the last time you saw Chris

14 Weaver?

15    A. The other day.

16    Q. The other day.

17    A. About -- about a week or two ago.

18    Q. Where was he when you saw him?

19    A. By Church's Chicken.

20    Q. And what was he doing then?

21    A. We gather by Church's Chicken because

22 there's no place to gather across the canal.  So

23 we come on the upper Ninth Ward by Church's

24 Chicken on St. Claude and we meet up.

25    Q. How does somebody get in touch with him?

- 156 -

1    MR. O'DWYER:

2        Objection.  This is improper re-

3    direct.

4    MR. GILBERT:

5        Through his counsel.  Through his

6    counsel.

7    MR. FISHER:

8        Are you his counsel, counsel?

9    MR. GILBERT:

10        Yes.

11    MR. WIEDEMANN:

12        You can go eat chicken at

13    Church's.

14 BY MR. FISHER:

15    Q. How do you get in touch with him?

16    A. Like I say, I see him -- you know,

17 through passing.  We gather by Church's Chicken.

18 There's no way to meet across the canal because

19 across the canal is totally gone.

20        So we gather up right there across the

21 bridge by Church's on St. Claude and Desaix, and

22 just see everybody that come through.

23    Q. Where does he work?

24    A. I don't think he works.

25    Q. When you saw him at Church's Chicken in

- 157 -

1 the last week or so, did you talk about this

2 case?

3    MR. WIEDEMANN:

4        I'm going to object, that this is

5    not proper re-cross.  Nobody asked him

6    about nobody on -- on direct about

7    Weaver and where Weaver is, where Weaver

8    works.  This is totally off the base.

9    MR. FISHER:

10        It's also discovery too.

11    MR. WIEDEMANN:

12        This is perpetuation.

13    MR. FISHER:

14        Oh, but he's going to be here for

15    trial, so that takes care of that.

16    MR. WIEDEMANN:

17        Well, we don't know.  Well, if he

18    is, then you can ask him at trial, if

19    the Court permits you.

20    MR. FISHER:

21        It's discovery, counsel.  He can

22    answer the question.  You can answer

23    the question.

24    THE WITNESS:

25        Yeah.  What's your question.

- 158 -

**DEPO. OF TERRY MARK ADAMS**

MiniDep by Kenson

1    MR. FISHER:

2        She can read it back?

3  (There was a read back by the Court Reporter.)

4    THE WITNESS:

5        Oh, no. We didn't talk about

6    the case.

7  BY MR. FISHER:

8    Q. He didn't tell you that he had been

9  asked to testify as a witness in this case?

10    A. (Witness shaking head negatively.)

11    Q. You're shaking you head no. Did you

12  tell him that you were going to testify in this

13  case?

14    A. No.

15    Q. Did you talk to him about the barge?

16    A. No.

17    MR. FISHER:

18        That's it.

19  (The deposition was concluded at 5:05 p.m.)

20

21

22

23

24

25

- 159 -

---

**CERTIFICATE**

This certification is valid only for a transcript accompanied by my original signature and original blue stamp on this page.

I, Sharon Waldrup Black, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that TERRY MARK ADAMS, after having been first duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing one hundred fifty-nine (159) pages;

That this testimony was reported by me in the Stenographic (voice-writing) method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

That I am not related to counsel or to the parties herein; am not otherwise interested in the outcome of this matter; and am a valid member in good standing of the Louisiana State Board of Examiners of Certified Shorthand Reporters.


Sharon Waldrup Black, CCR
Certified Court Reporter
Louisiana License #21009

- 161 -

---

**REPORTER'S PAGE**

I, Sharon Waldrup Black, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(b) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the Record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes ( - ) have been used to indicate pauses, changes in thought, and/or talk-overs; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes ( - ) do not indicate that words or phrases have been left out of this transcript;

That any words and/or names which could not be verified through reference material have been denoted with the phrase "(phonetic)."


Sharon Waldrup Black, CCR
Certified Court Reporter

- 160 -