# EXHIBIT 18

MURPH, JR., ARTHUR LEE

12/17/2007

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES   * CIVIL ACTION

                                * NO. 05-4182

PERTAINS TO: BARGES             * Consolidated

                                * SECTION "K(2)"

Boutte v. Lafarge      05-5531 *

Mumford v. Ingram      05-5724 * JUDGE DUVAL

Lagarde v. Lafarge     06-5342 *

Perry v. Ingram        06-6299 * MAG. WILKINSON

Benoit v. Lafarge      06-7516 *

Parfait Family v. USA  07-3500 *

Lafarge v. USA         07-5178 *

   *   *   *   *   *   *   *   *   *   *   *


(V O L U M E   I)

        Deposition of ARTHUR LEE MURPH, JR.,

given at the Law Offices of Bruno & Bruno, 855

Baronne St., New Orleans, LA 70113, on December

17th, 2007.


REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

MURPH, JR., ARTHUR LEE

12/17/2007

<table>
<tr><td>

Page 2

1  APPEARANCES:
2  REPRESENTING THE PLAINTIFFS:
3     BRUNO & BRUNO
4     (BY:  JOSEPH M. BRUNO, ESQUIRE)
5     855 Baronne Street
6     New Orleans, Louisiana 70113
7     504-525-1335
8  - and -
9     WIEDEMANN & WIEDEMANN
10    (BY:  LAWRENCE D. WIEDEMANN, ESQUIRE)
11    821 Baronne Street
12    New Orleans, Louisiana 70113
13    504-581-6180
14  - and -
15    BRIAN A. GILBERT, P.L.C.
16    (BY:  BRIAN A. GILBERT, ESQUIRE)
17    821 Baronne Street
18    New Orleans, Louisiana 70113
19    504-885-7700
20  - and -
21    LAW OFFICE OF PATRICK J. SANDERS
22    (BY:  PATRICK J. SANDERS, ESQUIRE)
23    3123 Ridgelake Drive, Suite B
24    Metairie, Louisiana 70002
25    504-834-0646

</td><td>

Page 4

1  - and -
2     GOODWIN PROCTOR, L.L.P.
3     (BY:  MARK S. RAFFMAN, ESQUIRE)
4     (BY:  JOHN D. ALDOCK, ESQUIRE)
5     901 New York Avenue, NW
6     Washington, D.C. 20001
7     202-346-4000
8
9  REPRESENTING NEW YORK MARINE & GENERAL
10 INSURANCE COMPANY:
11    SUTTERFIELD & WEBB
12    (BY:  DANIEL A. WEBB, ESQUIRE)
13    650 Poydras Street, Suite 2715
14    New Orleans, Louisiana 70130
15    504-598-2715
16
17 REPRESENTING ZITO:
18    MOULEDOUX, BLAND, LEGRAND & BRACKETT,
19    L.L.C.
20    (BY:  WILLIAM C. EMORY, ESQUIRE)
21    701 Poydras Street, Suite 4250
22    New Orleans, Louisiana 70130
23    504-595-3000
24
25

</td></tr>
<tr><td>

Page 3

1  REPRESENTING THE AMERICAN CLUB:
2     MONTGOMERY, BARNETT, BROWN, READ,
3     HAMMOND & MINTZ, L.L.P.
4     (BY:  PHILIP S. BROOKS, JR., ESQUIRE)
5     3200 Energy Centre
6     1100 Poydras Street
7     New Orleans, Louisiana 70163
8     504-585-3200
9
10 REPRESENTING WASHINGTON GROUP INTERNATIONAL:
11    STONE PIGMAN WALTHER WITTMANN, L.L.C.
12    (BY:  CARMELITE M. BERTAUT, ESQUIRE)
13    (BY:  HEATHER LONIAN, ESQUIRE)
14    546 Carondelet Street
15    New Orleans, Louisiana 70130
16    504-581-3200
17
18 REPRESENTING LAFARGE NORTH AMERICA:
19    CHAFFE, MCCALL, L.L.P.
20    (BY:  DEREK A. WALKER, ESQUIRE)
21    (BY:  ROBERT B. FISHER, JR., ESQUIRE)
22    2300 Energy Centre
23    1100 Poydras Street
24    New Orleans, Louisiana 70163-2300
25    504-585-7000

</td><td>

Page 5

1  REPRESENTING ORLEANS LEVEE DISTRICT:
2     MCCRANIE, SISTRUNK, ANZELMO, HARDY,
3     MAXWELL & MCDANIEL
4     (BY:  ANDRE LAGARDE, ESQUIRE)
5     3445 N. Causeway Boulevard, Suite 800
6     Metairie, Louisiana 70002
7     504-831-0946
8
9  REPRESENTING JEFFERSON PARISH:
10    BURGLASS & TANKERSLEY
11    (BY:  MONICA M. WALDRON-BURGLASS,
12    ESQUIRE)
13    5213 Airline Drive
14    Metairie, Louisiana 70001
15    504-836-2220
16
17 REPRESENTING PORT OF NEW ORLEANS:
18    DAIGLE, FISSE & KESSENICH, PLC
19    (BY:  KIRK N. AURANDT, ESQUIRE)
20    (VIA TELECONFERENCING)
21    227 Highway 21, Madisonville,
22    Louisiana 70447
23    985-871-0800
24
25

</td></tr>
</table>

2 (Pages 2 to 5)

MURPH, JR., ARTHUR LEE

12/17/2007

| Page 6 | |
|---|---|
| 1 | ALSO PRESENT: |
| 2 | DON HAYCRAFT, ESQ. |
| 3 | AARON RIVES, ESQ. |
| 4 | PETER KEELEY |
| 5 | JOHN SHELONKO |
| 6 | |
| 7 | VIDEOGRAPHER: |
| 8 | GILLEY DELORIMIER (DEPO-VUE) |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

**Page 8**

1  S T I P U L A T I O N
2      IT IS STIPULATED AND AGREED by and
3  among counsel for the parties hereto that the
4  deposition of the aforementioned witness may be
5  taken for all purposes permitted within the
6  Federal Rules of Civil Procedure, in accordance
7  with law, pursuant to notice;
8      That all formalities, save reading
9  and signing of the original transcript by the
10 deponent, are hereby specifically waived;
11     That all objections, save those as to
12 the form of the question and the responsiveness
13 of the answer, are reserved until such time as
14 this deposition, or any part thereof, is used
15 or sought to be used in evidence.
16
17
18          * * *
19
20
21
22     JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23 Certified Court Reporter in and for the State
24 of Louisiana, officiated in administering the
25 oath to the witness.

**Page 7**

1    E X A M I N A T I O N   I N D E X
2
3  EXAMINATION BY:                PAGE
4
5  MR. WIEDEMANN ............................  11
6  MS. BERTAUT  ............................  87
7  MR. WALKER   ............................ 121
8  MR. BRUNO    ............................ 138
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 9**

1      MR. GILBERT:
2          Brian Gilbert, Lawrence Wiedemann
3      and Patrick Sanders, barge plaintiffs
4      subgroup litigation committee
5      representing the plaintiffs in this
6      action.
7      MR. BRUNO:
8          Joseph Bruno, plaintiffs liaison
9      counsel.
10     MR. BROOKS:
11         Philip Brooks representing The
12     American club.
13     MS. BERTAUT:
14         Carmelite Bertaut for Washington
15     Group.
16     MR. LAGARDE:
17         Andre Lagarde for the Orleans
18     Levee District.
19     MR. EMORY:
20         Bill Emory here for Zito.
21     MS. WALDRON:
22         Monica Waldron for Jefferson
23     Parish.
24     MS. LONIAN:
25         Heather Lonian for Washington

Johns Pendleton Court Reporters                    800 562-1285

BARGE000837

Case 2:05-cv-04182-SRD-JCW   Document 15549-44   Filed 09/29/08   Page 5 of 41

## Page 10

1  Group.  Aaron Rives, Emmett, Cobb,
2  Waits & Henning.  I'm observing,
3  involved in an affiliated action.
4
5  MR. WEBB:
6      Dan Webb, New York Marine.
7  MR. RAFFMAN:
8      Mark Raffman, Goodwin Proctor,
9  Lafarge North America.
10  MR. WALKER:
11      Derek Walker and Rob Fisher,
12  Chaffe, McCall for Lafarge North
13  America.
14  MR. HAYCRAFT:
15      Also appearing Don Haycraft, in
16  another action Ingram Barge Company.
17  ARTHUR LEE MURPH, JR.
18  105 Berkley Drive, New Orleans, Louisiana
19  70131, a witness named in the above
20  stipulation, having been first duly sworn, was
21  examined and testified on his oath as follows:
22  MR. WIEDEMANN:
23      Anybody object to the usual
24  stipulation?
25  MR. GILBERT:

## Page 11

1      That's fine.
2  MR. WIEDEMANN:
3      Hearing no objection, the
4  reporter has so recorded.
5  EXAMINATION BY MR. WIEDEMANN:
6  Q.  Would state your full name please,
7  sir?
8  A.  Arthur --
9  MR. WALKER:
10      Before we start, Joe, is there
11  something in the case management order
12  we should show about, any usual
13  stipulation or something different
14  than the usual stipulation?
15  MR. BRUNO:
16      No, I'm not aware of it.  I think
17  we've all been comfortable with the
18  usual stipulations in the past.
19  MR. WALKER:
20      Okay.
21  MS. BERTAUT:
22      The CMO does have a provision for
23  conduct at the depositions, but I
24  don't know that it's inconsistent with
25  the usual stipulations.

## Page 12

1  MR. BRUNO:
2      Right.  We're not required to
3  stipulate, but if we do we do.
4  MR. WALKER:
5      Okay.
6  EXAMINATION BY MR. WIEDEMANN:
7  Q.  Would you state your full name,
8  Mr. Murph?
9  A.  Arthur Lee Murph, Jr.
10  Q.  And how old are you, sir?
11  A.  Fifty-seven.
12  Q.  And where do you presently live?
13  A.  105 Berkeley Drive, New Orleans.
14  Q.  And with whom do you live at that
15  address?
16  A.  My wife and daughter.
17  Q.  What is your wife's name?
18  A.  Jeanne Murph.
19  Q.  And your daughter?
20  A.  Ariana Church.
21  Q.  How old is she?
22  A.  Fifteen.
23  Q.  The Berkeley Street address is -- do
24  you own that or buying it or rent it or what?
25  A.  It's mine.  My own.

## Page 13

1  Q.  Okay.  You purchased that when?
2  A.  Oh, I don't know, a couple of years
3  ago.
4  Q.  After Hurricane Katrina?
5  A.  Yes.
6  Q.  Can you tell us your Social Security
7  number?
8  A.  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.
9  Q.  Prior to living at the Berkley Street
10  address which I understand you purchased after
11  Hurricane Katrina -- is that correct?
12  A.  Yes.
13  Q.  Where did you live before that?
14  A.  On Jourdan Avenue.
15  Q.  And what the address on Jourdan
16  Avenue?
17  A.  Um -- damn, I can't even remember the
18  address.  Um --
19  Q.  1739?  Does that ring a bell?
20  A.  That's it.
21  Q.  Okay.  And how long did you live at
22  1739 Jourdan?
23  A.  Maybe ten years or so, I don't know.
24  I can't remember.
25  Q.  Did you own that house at Jourdan

MURPH, JR., ARTHUR LEE

12/17/2007

Page 14

```
1   Avenue?
2      A.  Yes.
3      Q.  All right.  And could you describe the
4   house for me?  By that, I mean was it a single,
5   one-story house?
6      A.  It was a one-story.
7      Q.  Was it on a slab?
8      A.  Yes.
9      Q.  And you purchased it ten years --
10  approximately ten years before Hurricane
11  Katrina?
12     A.  Somewhere along there.
13     Q.  And by whom were you employed at the
14  time of the hurricane?
15     A.  Brice Building Company.
16     Q.  What was your job capacity?
17     A.  A carpenter.
18     Q.  And how long had you been employed by
19  them?  Approximately.
20     A.  About twelve years.
21     Q.  Okay.  Who are you employed by now?
22     A.  Same people.
23     Q.  Same people?  So you've been employed
24  with -- twelve years before Hurricane Katrina,
25  and you're still employed by them?
```

Page 16

```
1      A.  No.
2      Q.  Where is your home originally?
3      A.  Tallulah, Louisiana.
4      Q.  And your wife is from Wisconsin?
5      A.  Madison.
6      Q.  All right.  Did y'all meet here in New
7   Orleans or --
8      A.  Yes.
9      Q.  She was nursing here?
10     A.  Yes.
11     Q.  Okay.  And how long have y'all been
12  married?
13     A.  Probably about six, seven years.
14  We've been together for thirty.
15     Q.  You are married now six or seven
16  years?
17     A.  (Nods affirmatively.)
18     Q.  But you've been together --
19     A.  It might be longer than that, I don't
20  know.
21     Q.  -- approximately thirty years?
22     A.  Yes.
23     Q.  What is your educational background;
24  how far did you go in school?
25     A.  11th grade.
```

Page 15

```
1      A.  Yep.
2      Q.  In the capacity as a carpenter?
3      A.  Carpenter foreman now.
4      Q.  Carpenter foreman?  Where are they
5   located?
6      A.  They're on, um -- Causeway Boulevard.
7   Executive Tower, 301 Causeway.
8      Q.  Is your wife employed?
9      A.  Not right now.
10     Q.  Was she employed at the time of the
11  hurricane?
12     A.  Yes.
13     Q.  Where at?
14     A.  She worked for Dr. Fisherman.
15     Q.  Dr. Fishman?
16     A.  Uh-huh.
17     Q.  As a receptionist or a nurse or --
18     A.  She was a nurse.
19     Q.  She's a graduate nurse?
20     A.  Yep.
21     Q.  Do you know from where?  Where did she
22  study nursing?
23     A.  In Wisconsin.
24     Q.  Okay.  Are you originally from New
25  Orleans?
```

Page 17

```
1      Q.  In Tallulah?
2      A.  No, in New Orleans.
3      Q.  In New Orleans?
4      A.  Uh-huh.
5      Q.  So you came to New Orleans as a child?
6      A.  Uh-huh.
7      Q.  Okay.  And you finished the 11th grade
8   where?
9      A.  At Kennedy.
10     Q.  Did you have any training after
11  leaving Kennedy school?
12     A.  I went to Delgado.
13     Q.  Okay.  Is that where you learned
14  carpentry?
15     A.  No, just out in the field.
16     Q.  Okay.  But Delgado, what were you --
17     A.  Auto mechanic, small engines.
18     Q.  Did you ever work as an auto mechanic?
19     A.  No.
20     Q.  Since you left school, either at
21  Kennedy or Delgado, what type of work have you
22  done besides your work with Birch?
23     A.  Brice.
24     Q.  Brice, I'm sorry.  Okay.
25     A.  I'm a carpenter.
```

5 (Pages 14 to 17)

BARGE000839

MURPH, JR., ARTHUR LEE

12/17/2007

Page 18

1    Q.  Has that been your occupation --
2    A.  That's it.
3    Q.  -- since you finished school?
4    A.  (Nods affirmatively.)
5    Q.  Have you always been with them?
6    A.  No.  I was a soldier before that.
7    Q.  You were in the military?
8    A.  Yeah.
9    Q.  How long were you in the military?
10   A.  Three years.
11   Q.  What branch?
12   A.  Army.
13   Q.  And during what period of time?
14   A.  '68 to '70.
15   Q.  So you were in the Vietnam period?
16   A.  Yep.
17   Q.  Did you serve in Vietnam?
18   A.  Yes.
19   Q.  For how long?
20   A.  A year.
21   Q.  You left the military in 1970?
22   A.  December 10th.
23   Q.  Okay.  Did you receive any wounds or
24   any --
25   A.  No.

Page 19

1    Q.  -- problem in Vietnam?
2    A.  No.
3    Q.  Did you receive any awards, medals?
4    A.  Regular medals that they give you.
5    Q.  Combat?
6    A.  Yes.
7    Q.  You were honorably discharged in '70?
8    A.  Yes.
9    Q.  All right.  What rank did you have in
10   the service?
11   A.  D-4.  Spec 4.
12   Q.  Since you separated from the military
13   in 1970 have you retained any connection with
14   the military, reserve or anything?
15   A.  No.
16   Q.  When you got out, that was it?
17   A.  That was it.
18   Q.  Now, at the time of Hurricane Katrina,
19   you were living at the 1739 Jourdan Avenue
20   residence, is that right?
21   A.  Yes.
22   Q.  And who was there with you?  Before
23   the hurricane I'm talking about, your wife and
24   your daughter?
25   A.  How you mean?

Page 20

1    Q.  Well, before the hurricane came, you
2    all were living on Jourdan Avenue?
3    A.  Yes.
4    Q.  Was it your wife and daughter living
5    there?
6    A.  Yes.
7    Q.  Or was anybody else living with you?
8    A.  I had some friends stayed in the back.
9    Q.  So you had a single-family dwelling?
10   A.  Yes.
11   Q.  And then what was in the back?
12   A.  A lil efficiency.
13   Q.  Was it attached to the same residence?
14   A.  No.
15   Q.  It was a separate --
16   A.  Separate.
17   Q.  Okay.  And was that a one-story or a
18   two-story?
19   A.  One-story.
20   A.  It was on a slab?
21   A.  Yes.
22   Q.  And how many people lived in the --
23   A.  One.
24   Q.  Who was that?
25   A.  Um --

Page 21

1    Q.  At the time.
2    A.  One of my sister's boyfriend's.
3    Q.  Do you know what his name was?
4    A.  I can't remember his name.  My wife
5    keep up with all that.
6    Q.  You don't remember his first name or
7    his last name?
8    A.  Dray.
9    Q.  D-R-A-Y?
10   A.  Something like that.
11   Q.  Okay.  And he rented from you?
12   A.  Yes.
13   Q.  Okay.  Dray was the only one that
14   occupied the efficiency?
15   A.  Yes.
16       MR. WALKER:
17          I'd like to pose an objection at
18       this stage.  Larry, you're leading him
19       and you're also interrupting his
20       questions.  If you would ask him a
21       question, allow him to answer without
22       leading him.
23       MR. WEBB:
24          And I can't hear either one of
25       you.

6 (Pages 18 to 21)

Johns Pendleton Court Reporters                          800 562-1285

BARGE000840

MURPH, JR., ARTHUR LEE

12/17/2007

Page 22

1    MR. SANDERS:
2         He can lead the witness if he
3    wants under the usual stipulations.
4    MR. WIEDEMANN:
5         I can't cure that problem but you
6    could maybe move a little closer.
7    MR. WEBB:
8         Speak up.
9    EXAMINATION BY MR. WIEDEMANN:
10   Q.  Did anyone live in the efficiency
11   other than Dray who you've identified?
12   A.  No.
13   Q.  Who lived in the main residence, the
14   single-family residence?
15   A.  Me and my wife and my daughter.
16   Q.  No one else lived with y'all?
17   A.  No.
18   Q.  Okay.  And tell me, before the
19   hurricane -- well, let's talk about the day
20   before the hurricane, the 28th, which is a
21   Sunday.
22   A.  Yes.
23   Q.  Were you and your wife and your
24   daughter at the residence?
25   A.  For a while.

Page 23

1    Q.  Okay.  Tell me what happened with
2    regard to your wife and your daughter.
3    A.  I brought her to a hotel.
4    Q.  Where did you take them?
5    A.  The Hyatt.
6    Q.  And did you check in at the Hyatt?
7    A.  I checked them in.  They checked
8    themselves in.
9    Q.  Did you go with them to the Hyatt?
10   A.  I brought them there.
11   Q.  Okay.  Did you check in?
12   A.  No.
13   Q.  Okay.  When you took your wife and
14   your child to the Hyatt in New Orleans, was it
15   your intention to stay there?
16   A.  Sure.
17   Q.  Okay.  And why did you not stay there?
18   A.  Because I went back for the dog.
19   Q.  Okay.  What time did you take your
20   wife and your daughter to the hotel?
21   A.  It was in the evening.
22   Q.  Do you remember approximately when?
23   A.  I can't remember exactly what time.
24   Q.  Was it dark?
25   A.  No, it was daylight.

Page 24

1    Q.  Was that a Sunday -- Sunday evening?
2    A.  Yes.
3    Q.  It was daylight, but you don't
4    remember the time.
5    A.  No, I don't remember the exact time.
6    Q.  And -- but when you got to the hotel,
7    did you register or did your wife register?
8    A.  My sister registered.
9    Q.  She was with you?
10   A.  No.  She worked there.
11   Q.  Oh, okay.  So she preregistered your
12   family?
13   A.  Yep.
14   Q.  And what's your sister's name?
15   A.  Doris.
16   Q.  What's her last name?
17   A.  Murph.
18   Q.  So Doris was working at the hotel, and
19   she arranged for you to be admitted?
20   A.  Yes.
21   Q.  Did you all use a credit card to pay
22   for the hotel?
23   A.  No.  She worked for the hotel.
24   Q.  Okay.  So you got -- because of her
25   employment you got a room at no charge?

Page 25

1    A.  Yes.
2    Q.  Okay.  Did you bring clothing to the
3    hotel?
4    A.  My wife did.
5    Q.  For you and your wife and the
6    daughter?
7    A.  For everybody.
8    Q.  Okay.  And you didn't stay after you
9    dropped them off.
10   A.  No.
11   Q.  And why was that?
12   A.  Because I went back to the house for
13   the dog.
14   Q.  Before going to the hotel, did you
15   bring your dog with you?
16   A.  No.
17   Q.  Why not?
18   A.  Just didn't -- who let's dogs in
19   hotels?
20   Q.  And when you got to the hotel, did you
21   find that there was some other provision for
22   animals?
23   A.  I saw people had animals.
24   Q.  Okay.  And did you inquire whether you
25   could bring your animal?

7 (Pages 22 to 25)

MURPH, JR., ARTHUR LEE

12/17/2007

Page 26

1      A.  I figured I could.  Everybody else had
2  a dog up there.
3      Q.  With what kind -- did you have one dog
4  or more?
5      A.  One dog.
6      Q.  What kind of dog was it?
7      A.  A pit bull.
8      Q.  What's the dog 's name?
9      A.  Gebora.
10     Q.  Gebora?
11     A.  Gebora.
12     Q.  And you went back to get Gebora to
13 bring to the hotel?
14     A.  Yes.
15     Q.  And do you remember when time you went
16 back or what time you arrived at your house?
17     A.  I went -- no.
18        MR. WALKER:
19           Objection.
20 EXAMINATION BY MR. WIEDEMANN:
21     Q.  Was it daylight when you got back to
22 your house on Jourdan Avenue, do you recall?
23     A.  No, I sure don't.
24     Q.  Okay.  Did you have a watch at that
25 time --

Page 27

1      A.  Yes.
2      Q.  -- on you?  But you don't recall the
3  time you got back to the house.
4      A.  No.
5      Q.  Okay.  Did you go alone when you went
6  back to the house?
7      A.  No.
8      Q.  Somebody was with you?
9      A.  Somebody brought me back, because I
10 dropped my car.
11     Q.  When you went to the Hyatt, you left
12 your car?
13     A.  I put it on higher ground.
14     Q.  Okay.  And who was the person that
15 went with you?
16     A.  Felton.
17     Q.  What's his first name?
18     A.  Felton.
19     Q.  Do you know his last name?
20     A.  Bracy.
21     Q.  All right.  So before you went to --
22 well, let me ask you this: When you left
23 Jourdan Avenue, you drove your wife and your
24 daughter to the hotel?
25     A.  Right.

Page 28

1      Q.  And was he with you?
2      A.  Nope.
3      Q.  Okay.  So after you left the hotel,
4  you met him somewhere?
5      A.  Yes.
6      Q.  Where at?
7      A.  On Paris Avenue.
8      Q.  He lived on Paris Avenue?
9      A.  No.
10     Q.  Okay.  Well, what was the relationship
11 between you and Felton?
12     A.  Friend.
13     Q.  Friends?  Okay.  Why did you go to
14 Paris Avenue?
15     A.  To drop the car off on higher ground.
16     Q.  Okay.  Did you have a place where you
17 could drop your car?
18     A.  Yes.
19     Q.  Where at?
20     A.  On Paris Avenue.  By a friend of
21 mine 's.  I don't know the address.
22     Q.  Okay.  But it was somebody's house.
23     A.  Yes.
24     Q.  Okay.  Do you know the name?
25     A.  It was Mike's cousin.

Page 29

1      Q.  Who is Mike?
2      A.  A friend.
3      Q.  Okay.  So it's a friend of a friend.
4      A.  Right.
5      Q.  But you don't know --
6      A.  I knowed them, but -- just as a
7  friend.
8      Q.  Okay.  Do you know Mike 's last name?
9      A.  Um -- Mimmet.
10     Q.  So had you been in touch with Mike
11 about leaving your car on Paris Avenue?
12     A.  No.  I was in touch with Sean.  That
13 was the guy 's name.
14     Q.  Okay.  Sean was the one that had a
15 house on Paris?
16     A.  (Nods affirmatively.)
17     Q.  Is that correct?
18     A.  That's his sister.
19     Q.  All right.  So in any event, before
20 you went to the Hyatt, had you made
21 arrangements --
22     A.  Yes.
23     Q.  -- to put your car an Paris Avenue?
24     A.  Yes, I did.
25     Q.  Okay.  And that was made through Mike

8 (Pages 26 to 29)

MURPH, JR., ARTHUR LEE

12/17/2007

Page 30

1   or Sean?
2       A.  Right.  It was made through Sean.
3       Q.  Okay.  How many cars did you have at
4   that time?
5       A.  Two.
6       Q.  What type of cars?
7       A.  A truck and a car.
8       Q.  Okay.  Did you bring both of them to
9   Paris Avenue?
10      A.  Yes.
11      Q.  Okay.  Was that after you dropped your
12  wife off and your child?
13      A.  Before.
14      Q.  Okay.  So before going to the Hyatt
15  you had taken your car and your truck to Paris
16  Avenue?
17      A.  My truck.
18      Q.  Okay.  And then after you went to the
19  Hyatt, you took your car to Paris Avenue.
20      A.  Right.
21      Q.  And you met your friend who drove you
22  back home.
23      A.  Right.
24      Q.  Do you recall what time you arrived at
25  home on Jourdan Avenue?

Page 31

1       A.  No, I sure don't.
2       Q.  All right.  Was it still daylight or
3   was it dark?
4       A.  I don't know.  It was raining.
5       Q.  It was raining at that time?
6       A.  Yep.
7       Q.  Had you been following the weather;
8   were you aware of what the weather situation
9   was?
10      A.  Yes.  Yes, I was.
11      Q.  When you went back to Jourdan Avenue,
12  after dropping off your car and your truck, was
13  it your intention to return to the Hyatt?
14      A.  Yes.
15      Q.  How did you plan on getting back to
16  the Hyatt since your truck and your car were
17  now at Paris Avenue?
18      A.  Felton.
19      Q.  Where did Felton live?
20      A.  In the Lower Ninth Ward.
21      Q.  Did he live near you on Jourdan
22  Avenue?
23      A.  Yes.
24      Q.  Did he live on Jourdan Avenue?
25      A.  No.

Page 32

1       Q.  Where did he live, on what street?
2       A.  I can't think of the name of the
3   street, but he stayed in the Lower Ninth Ward.
4       Q.  And what was your situation with
5   Felton; what was your understanding as to what
6   was going to happen?
7       A.  He was going to pick me up, bring me
8   back to the Hyatt.
9       Q.  Was he going to stay at the Hyatt?
10      A.  No.
11      Q.  And Felton, is he related to you or --
12      A.  He's a real good friend.
13      Q.  Okay.  Where did he work at?
14      A.  He work offshore.
15      Q.  Offshore?  For whom, do you know?
16      A.  He was working for Lykes, I think.
17  Lykes Lines.
18      Q.  Okay.  Do you know where he is now?
19      A.  At home.
20      Q.  He's still in the Ninth Ward?
21      A.  No.  He's, um -- let me see.  Yeah.
22  That's the Ninth Ward, but not the Lower Ninth.
23      Q.  Do you know what street he lives on?
24      A.  Clouet.
25      Q.  That's off of the Chef Highway?

Page 33

1       A.  Yeah.
2       Q.  So he dropped you off at your house,
3   and he went where?
4       A.  I guess he went back home.
5       Q.  And he was supposed to pick you up?
6       A.  Right.
7       Q.  Did you have a time arranged when he
8   would pick you up?
9       A.  No.  He said he'd be back.
10      Q.  Okay.  He didn't say any specific
11  time.
12      A.  No.
13      Q.  Did you have a cellphone at that time?
14      A.  Yes.
15      Q.  Did Felton have a cellphone?
16      A.  No.
17      Q.  Did he have a house phone?
18      A.  Yes.
19      Q.  All right.  Did you talk to him after
20  he dropped you off at Jourdan Avenue?
21      A.  No.
22      Q.  Did he call you?
23      A.  No.
24      Q.  Did you call your wife at the hotel?
25      A.  No, she called me.

9 (Pages 30 to 33)

MURPH, JR., ARTHUR LEE

12/17/2007

Page 34

1    Q.  She called you?
2    A.  (Nods affirmatively.)
3    Q.  When did she call you?  Do you recall
4  what time?
5    A.  No.
6    Q.  What was the purpose of her call?
7    A.  What was taking me so long?
8    Q.  And what did you tell her?
9    A.  Waiting on Felton.
10   Q.  Did he ever return?
11   A.  No.
12   Q.  Did you ever hear from him after he
13  dropped you off?
14   A.  Every day.
15   Q.  Huh?
16   A.  No, I didn't hear from him that night.
17   Q.  He didn't call you back?
18   A.  No.
19   Q.  Or you didn't call him.
20   A.  No.
21   Q.  Okay.  So you were stuck at Jourdan
22  Avenue?
23   A.  Right.
24   Q.  You had no transportation?
25   A.  No.

Page 35

1    Q.  Was there anyone at the house or in
2  the efficiency when you returned?
3    A.  No.
4    Q.  You were the sole occupant.
5    A.  Me and the dog.
6    Q.  You and the dog?  Okay.  Were there
7  people in the houses around you that you knew?
8    A.  I have no idea.
9    Q.  You don't know.
10   A.  No.
11   Q.  Okay.  When you got home after Felton
12  let you off, did you ever talk to your wife
13  about your inability to get back down to the
14  hotel?
15   A.  No.  I just stood there.
16   Q.  All right.  Did you talk to your wife
17  at all throughout the evening of the 28th and
18  the morning of the 29th?
19   A.  Yes.
20   Q.  How many times did you talk to her?
21   A.  I have no idea.
22   Q.  All right.  Y'all were communicating
23  throughout the evening and the morning?
24   A.  Yes.
25   Q.  All right.  Were you reporting to her

Page 36

1  what was going on at the house?
2    A.  Yes.
3    Q.  And was she inquiring of you what was
4  happening with you at the house?
5    A.  Nothing.  I was just sitting there.
6    Q.  All right.  There was a point in time
7  when the lights in the house went off?
8    A.  Yes.
9    Q.  When was that?
10   A.  I don't know what time it was, but the
11  television went off and then I was in the dark.
12   Q.  All right.  So did the television and
13  the lights go off at the same time?
14   A.  Yes.
15   Q.  And do you recall what time that was?
16   A.  No, unh-unh.
17   Q.  You didn't check the time on your
18  watch or --
19   A.  No.  It was just dark.
20   Q.  It was after dark, because everything
21  was black.
22   A.  Right.
23   Q.  So the lights and the television went
24  off about the same time?
25   A.  Yes.

Page 37

1    Q.  What about the street lights on
2  Jourdan Avenue?
3    A.  I don't know.  I couldn't see the
4  street lights.
5    Q.  Okay.  So you don't know whether the
6  street lights were on or not.
7    A.  No.
8    Q.  At any point in time on the evening of
9  the 28th, did you ever go out from your house
10  to look at the surrounding area?
11   A.  Yes.
12   Q.  Did you go out more than once?
13   A.  No, I just went out once.
14   Q.  What did you go out -- for what
15  purpose?
16   A.  To go to the garage and turn on --
17  start the generator.
18   Q.  Okay.  And do you recall what time
19  that was?
20   A.  No.
21   Q.  You had a generator in the garage?
22   A.  Yes, I did.
23   Q.  Was it gasoline driven?
24   A.  Yes.
25   Q.  And you had gasoline on hand?

Johns Pendleton Court Reporters                    800 562-1285

BARGE000844

MURPH, JR., ARTHUR LEE

12/17/2007

Page 38

1      A.  Yes.
2      Q.  And the generator that you had in the
3  garage, that would run what?
4      A.  That would turn on the lights and the
5  refrigerator.
6      Q.  Okay.  So how long after the lights
7  went out, or the electricity, that you went out
8  to turn on the generator?
9      A.  Almost immediately.
10     Q.  Okay.  But you don't know what time
11  that was.
12     A.  No.
13     Q.  Did you get a chance -- did you
14  actually start the generator?
15     A.  No.
16     Q.  You did not?
17     A.  No.
18     Q.  Why not?
19     A.  I just didn't start it.  I was just
20  walking around outside looking.
21     Q.  Your purpose in going to the garage
22  was to start the generator.
23     A.  Right.
24     Q.  You have what, just a starter or you
25  had to crank it?

Page 39

1      A.  You had to crank it.
2      Q.  And you didn't get to do that.
3      A.  No.
4      Q.  Okay.  And why did you not get to do
5  it?  Did you just decide not to or what?
6      A.  No, I was hooking it up.  It was just
7  in the garage.  It wasn't set up to operate
8  anything.
9      Q.  Okay.  So you had to make some
10  connections.
11     A.  Right.
12     Q.  And you hadn't yet done that?
13     A.  No.
14     Q.  Where was your dog when you went out?
15     A.  Right there with me.
16     Q.  At any point in time, did you go out
17  and check the levee or the wall across the
18  street from you?
19     A.  Early that day.
20     Q.  Was it daylight when you went out
21  there?
22     A.  Yes, it was.
23     Q.  Do you know what time it was?
24     A.  No.
25     Q.  Why did you go out to check?

Page 40

1      A.  I wanted to see how high the water
2  was.
3      Q.  And that was after you got home in the
4  evening?
5      A.  No.  That was before I brought my
6  wife.
7      Q.  Okay.  So that was earlier in the day.
8      A.  Yes.
9      Q.  And you don't know what time it was,
10  but it was before you took your wife and your
11  daughter to the Hyatt.
12     A.  Right.
13     Q.  And where did you go to check --
14     A.  To the levee.
15     Q.  Did you go up on the levee?
16     A.  Yes, I did.
17     Q.  On the levee, they have --
18     A.  A wall.
19     Q.  -- a concrete wall?
20     A.  Uh-huh.
21     Q.  Did you go up to the wall?
22     A.  Yep.
23     Q.  Were you standing on the wall?
24     A.  No.
25     Q.  Okay.  You were up where you could see

Page 41

1  the water?
2      A.  Right.
3      Q.  And what was the situation?
4      A.  It was high.
5      Q.  Yeah?
6      A.  Very high.
7      Q.  Tell me, how high was it?
8      A.  Up to the top.
9      Q.  Okay.  Was it --
10     A.  Splashing over.
11     Q.  It was splashing over?  Was it running
12  over, so to speak?
13     A.  Unh-unh.
14     Q.  It wasn't overtopping.
15     A.  No.
16     Q.  What was causing it to splash over?
17     A.  The wakes of the water.
18     Q.  The wind?
19     A.  The wind blowing it.
20     Q.  Okay.  All right.  And what was the
21  reason to go up there to check it?
22     A.  To see how high the water was.
23     Q.  Okay.  In the period of time that you
24  had lived there, seven or eight years before
25  Hurricane Katrina, had you ever had any

11 (Pages 38 to 41)

MURPH, JR., ARTHUR LEE

12/17/2007

Page 42

1    flooding in the streets or --
2        A.  No.
3        Q.  But what was -- what concerned you to
4    check it on this particular occasion?
5        A.  Because it was talking about the
6    categories.
7        Q.  Okay.  The category of the hurricane.
8        A.  Right.
9        Q.  You went up one time?
10       A.  That's it.
11       Q.  Okay.  And after you checked the water
12   in the Industrial Canal, what did you do then,
13   did you go back to the --
14       A.  Went back to the house.
15       Q.  Did you start your generator?
16       A.  No.
17       Q.  What happened?
18       A.  Because I didn't need no generator, I
19   had lights.
20       Q.  You had lights in the house?
21       A.  Yeah.
22       Q.  At the time -- when you went out to
23   check the generator, that's before the lights
24   went out, right?
25       A.  The lights went out the night.

Page 43

1        Q.  Okay.  This was earlier in the day.
2        A.  Before I brought my wife to the Hyatt.
3        Q.  All right.  Okay.  So after that, you
4    took your wife and your child to the Hyatt and
5    you came back.
6        A.  Yes.
7        Q.  Okay.  Now, after the lights went out,
8    what did you do?
9        A.  Went outside to get the generator set
10   up.
11       Q.  Again?  This was the second time you
12   went?
13       A.  No.
14       Q.  That was the first time.
15       A.  It was the only time.
16       Q.  Okay.  And that's when you -- was
17   that -- when you went out to check the
18   generator, you had to hook it up, but you
19   didn't do that.
20       A.  Right.
21       Q.  Okay.  And what happened when you went
22   out there to check it up after the lights went
23   out?
24       A.  Nothing.  I just heard some noises.
25       Q.  What kind of noise did you hear?

Page 44

1        A.  I don't know.  Scraping sound.
2        Q.  And where was the scraping sound
3    coming from?
4        A.  From the front of the house.
5        Q.  And the front of the house was on
6    Jourdan Avenue, facing the canal?
7        A.  Right.
8        Q.  So was the scraping sound coming from
9    the direction of the canal?
10       A.  Yes.
11       Q.  Did you know what was causing the
12   scraping sound?
13       A.  No.
14       Q.  Did it cause you some concern at that
15   time?
16       A.  Yes, it did.
17       Q.  Was it -- can you describe what the
18   scraping sound was?
19       A.  No, it just sound like something was
20   rubbing and banging.
21       Q.  And how long did you hear this
22   scraping, banging sound?
23       A.  I don't know.  I was inside.  My house
24   got shutters all around it.
25       Q.  Well, you said you went out to check

Page 45

1    the generator.
2        A.  Right.
3        Q.  Did you hear the scraping, banging
4    sound before you went outside?
5        A.  No.
6        Q.  All right.  When you went outside to
7    the shed, is that when you heard it?
8        A.  No, when I went out to the garage.
9        Q.  To the garage I meant.  Yeah.  Okay.
10       A.  Yeah.  That's when I heard it.
11       Q.  And did it continue after you first
12   heard it when you were out by the generator?
13       A.  Yes.
14       Q.  How long did you hear it scraping and
15   banging?
16       A.  All the time I was outside.
17       Q.  About how long a period of time was
18   that?
19       A.  It wasn't very long, I don't think.
20       Q.  Okay.  When you went back inside, did
21   you -- could you hear it?
22       A.  No.
23       Q.  Okay.  Did you at any point in time
24   when you were out there, when you heard the
25   scraping, banging, did you realize what it was?

12 (Pages 42 to 45)

MURPH, JR., ARTHUR LEE

12/17/2007

Page 46

1    A.  No.
2    Q.  Okay.  Could you describe what it
3  sounded like to you as far as --
4        MR. WALKER:
5          Objection.
6  EXAMINATION BY MR. WIEDEMANN:
7    Q.  You're the one that heard it.  And I
8  just want to know what you thought it sounded
9  like.
10        MR. WALKER:
11          He told you what it sounded like.
12          Asked and answered.
13  EXAMINATION BY MR. WIEDEMANN:
14    Q.  Can you tell us what it sounded like?
15    A.  Just scraping and banging.
16    Q.  Did the scraping and banging stop at
17  any time when you were outside?
18    A.  No.
19        MR. WALKER:
20          Objection, asked and answered.
21  EXAMINATION BY MR. WIEDEMANN:
22    Q.  Did you ever hook up the generator?
23        MR. WALKER:
24          Objection, asked and answered.
25  EXAMINATION BY MR. WIEDEMANN:

Page 47

1    Q.  You can answer.
2    A.  No.
3    Q.  What did you do after you went out to
4  check on the generator and went back to the
5  house after hearing the scraping and banging?
6    A.  I didn't go back to the house when I
7  heard the noise.
8    Q.  What happened?
9    A.  I went to the front of the house.
10    Q.  For what?
11    A.  The see what the noise was.
12    Q.  And what did you see?
13    A.  Nothing but water.
14    Q.  When you say you went to the front of
15  the house, that's the part --
16    A.  I was in the water at the front of the
17  house.  I never got the front.
18    Q.  So you were at the shed where the
19  generator -- generator is?
20    A.  Right.
21    Q.  And you heard the scraping, banging,
22  and you started toward the front of the house?
23    A.  Right.
24    Q.  How long -- how far is it from the
25  shed to the front of the house?

Page 48

1    A.  I guess about a hundred feet.
2    Q.  Okay.
3        MS. BERTAUT:
4          I'm sorry.  I didn't hear that.
5        THE WITNESS:
6          About a hundred feet.
7  EXAMINATION BY MR. WIEDEMANN:
8    Q.  So you were walking from the shed
9  toward Jourdan Avenue?
10    A.  Right.
11    Q.  All right.  In the period of time that
12  you were walking in the direction of Jourdan
13  Avenue, did the scraping and banging stop?
14    A.  No.
15    Q.  And how far did you get from the front
16  of the house?
17    A.  About midway.
18    Q.  About fifty feet from the shed?
19    A.  Right.
20    Q.  And then what happened?
21    A.  Water started to come down the street.
22    Q.  And the water was coming from where?
23  From what direction?
24    A.  North, I guess.
25    Q.  Huh?

Page 49

1    A.  I guess it was coming from north.
2    Q.  Well, the house faces the --
3    A.  Right.  It came from the right side of
4  the house.
5    Q.  And the right side of the house would
6  be what?
7    A.  If I'm coming up the drive, going up
8  the driveway, it would be to my right.  And
9  Jourdan Avenue would be in front of me.
10    Q.  Okay.  And the water was coming up
11  your drive?
12    A.  Right.  It was coming down the street.
13    Q.  Okay.  And describe what you saw as
14  the water was coming toward you.
15    A.  Nothing.  I hauled ass to the back
16  door.
17    Q.  Well, I mean, obviously -- I want you
18  to describe what you saw that made you --
19    A.  A lot of water coming.
20    Q.  All right.  Was it coming fast or
21  slow?
22    A.  Yeah, it was coming fast.
23    Q.  So that you -- what did you do then,
24  when you saw -- when you were fifty feet from
25  the front of your house?

13 (Pages 46 to 49)

MURPH, JR., ARTHUR LEE

Page 50

1     A.  Turned around and went back in the
2  house.
3     Q.  Okay.  And your dog was with you?
4     A.  Yep.
5     Q.  And when you got in the house, what
6  did you do?
7     A.  Panicked.
8     Q.  Well, what caused you to panic?  You
9  were --
10    A.  The rising water.
11    Q.  Okay.  Tell me how -- after you saw it
12  coming down the drive, what happened as you got
13  into the house?
14    A.  Nothing.  I just stood there, me and
15  the dog set on the sofa.
16    Q.  When you got in the house, did you go
17  in through the front door?
18    A.  No.
19    Q.  What door did you use?
20    A.  Went through the back door.
21    Q.  Okay.  So there's a door in the back
22  that you can enter the house?
23    A.  Right.
24    Q.  And when you got into the house, tell
25  me what happened with regard to the water that

Page 51

1  you had seen coming down the driveway.
2     A.  When I saw the water coming down the
3  driveway, I went back to the house.
4     Q.  Okay.  And you went in the house?
5     A.  I went in the house.
6     Q.  And then what happened?
7     A.  I come back out.
8     Q.  For what reason?
9     A.  To get an ax.
10    Q.  Okay.  And the ax was where?
11    A.  In the garage.
12    Q.  Okay.  And where -- when you came out
13  of the back of the house, what was the water
14  level at that point in time?
15    A.  It was about -- I don't know.  I
16  guess -- it was still moving fast.  I didn't
17  really check for no height.
18    Q.  And so you went to get an ax for what
19  purpose?
20    A.  Chop a hole in the roof.
21    Q.  And did you get an ax?
22    A.  Yes.
23    Q.  And did you go back in the house?
24    A.  Yes.
25    Q.  And did you chop a hole?

Page 52

1     A.  Yes, I did.
2     Q.  Where at?
3     A.  In the roof.
4     Q.  I mean for what part of the house?
5     A.  Right in the middle of the house.
6     Q.  Okay.  And could you get into the --
7  when you say the roof, was there an attic?
8     A.  You got an attic, yes.
9     Q.  There was an attic between the roof
10  and the ceiling?
11    A.  Yes.  Right.
12    Q.  All right.  So you chopped a hole in
13  to the attic?
14    A.  Yes.
15    Q.  And did you get into the attic?
16    A.  I was in the attic.  I chopped a hole
17  in the roof.
18    Q.  Okay.  So you first chopped a hole in
19  the ceiling, I guess, right?
20    A.  No.
21    Q.  No?
22    A.  I had stairs pull down in the hallway.
23    Q.  Okay.  All right.  So you have a stair
24  that gives you access to --
25    A.  Right.

Page 53

1     Q.  -- to the --
2     A.  To the attic.
3     Q.  To the attic.  So you pulled the
4  stairs down and you went to the attic.
5     A.  Right.
6     Q.  And the hole you chopped was in the
7  roof, then.
8     A.  Right.
9     Q.  Was the attic high enough for you to
10  stand up in?
11    A.  You can stand, but you'd have to bend
12  a little bit.
13    Q.  Okay.  And when you chopped the hole
14  in the attic, what did you do at that point in
15  time?
16    A.  Nothing, I just stood there and
17  waited.  Looked at the water in the house.
18    Q.  And what was -- as you were in the
19  attic, when you said you were waiting for the
20  water, what was --
21    A.  I wasn't waiting, I was just looking.
22    Q.  What was happening with the water
23  coming in?
24    A.  It was just coming in slow.
25    Q.  Was it gradually rising?

Johns Pendleton Court Reporters                      800 562-1285

MURPH, JR., ARTHUR LEE

12/17/2007

Page 54

1     A.  Slowly.
2     Q.  Okay.  Where was it when you got in
3  the attic?
4     A.  It was just wetting the floors.
5     Q.  Are the floors in your house, are they
6  off the ground?
7     A.  No, it was on the ground.  Around six
8  inches from the ground.
9     Q.  Okay.  All right.  So when you got
10 into the attic and chopped -- how long did you
11 stay in the attic?
12    A.  I didn't stay up there long.
13    Q.  Why is that?
14    A.  Because I got back down and see what
15 was going on, check my furnitures and all that.
16 It didn't do no good.
17    Q.  So you got down and checked your
18 furniture and then you went back in the attic?
19    A.  No.  Got -- set out there with the
20 dog.
21    Q.  And what happened?
22    A.  Nothing.  The water just got higher.
23    Q.  And where did you go when the water
24 got higher?
25    A.  Back to the attic.

Page 55

1     Q.  Okay.  When you went outside, was it
2  continuing to rise?
3     A.  Yeah.  It was still flowing.  It was
4  moving fast.
5     Q.  All right.  What caused you to go back
6  into the attic the second time?
7     A.  I ain't had nothing else to do.
8     Q.  Well, was the water getting to a level
9  that you were concerned?
10    A.  I was concerned when the water was
11 coming down the street.
12    Q.  All right.  How long -- the second
13 time you went in the attic, how long did you
14 stay in the attic?
15    A.  Long enough to cut a hole.
16    Q.  Okay.  Well, you said you went up
17 there originally, you cut a hole, and then you
18 went back down.
19    A.  Right.
20    Q.  Did you cut another hole?
21    A.  No, that's the only time I cut the
22 hole, when I went up there that first time when
23 I told you.
24    Q.  Okay.  How long did you stay in the
25 attic?

Page 56

1     A.  Not long.  To when?
2     Q.  The second time you went in the attic.
3     A.  Until the storm came, I guess.  I
4  don't know.  I stood up there.
5     Q.  Can you give me an estimate of how
6  long?
7     A.  I don't know.  I didn't have a watch.
8  I was just up there until the storm came.
9  Until I got out of it.
10    Q.  You remained in the attic -- when did
11 you get out of the attic?
12    A.  That night, I guess.  Yeah.  At night.
13 I guess it was that night.  It was dark.  Or
14 either that morning.
15    Q.  You're not sure?
16    A.  No, I don't know what time it was.
17    Q.  Okay.  You never had your watch at
18 that time?
19    A.  Yes.
20    Q.  But you never checked the time?
21    A.  I couldn't see it.
22    Q.  Did you remain in the attic for a
23 couple of hours or --
24    A.  Yeah.  I stood there until the water
25 got higher.

Page 57

1     Q.  Did it eventually come into the attic?
2     A.  Yes.
3     Q.  And how high are the ceilings in your
4  house?
5     A.  Eight foot.
6     Q.  So at some point in time the water had
7  risen in your house to the ceiling?
8     A.  It "ris" to the ceiling, yes, it did.
9     Q.  Do you recall what time that was?
10    A.  Shoot, I don't know.
11    Q.  Do you recall, as you were in the
12 attic, as the water rose to the ceiling, did
13 you get on the roof?
14    A.  No.  I just looked out.
15    Q.  Looking out of the attic?
16    A.  Out the roof.  Out the hole.
17    Q.  What could you see when you looked out
18 the hole?
19    A.  The water was higher.  It was up to
20 the edge of the roof.
21    Q.  As you got looking out the roof from
22 the attic?
23    A.  Right.
24    Q.  So how high would that be?
25    A.  The water was about eight feet, I

15 (Pages 54 to 57)

MURPH, JR., ARTHUR LEE

12/17/2007

Page 58

1  guess.
2      Q.  At that point in time?
3      A.  Right.
4      Q.  How long after you had seen the water
5  coming down the driveway --
6      A.  Oh, I don't know.  But -- I don't
7  know.  I guess a few hours or so, I don't know.
8      Q.  Okay.  So when you looked out of the
9  attic hole that you had cut --
10     A.  Right.
11     Q.  -- you could see the water up to your
12  roof level?
13     A.  Right.
14     Q.  Which would be eight feet?
15     A.  Right.  Or better.
16     Q.  Or better?  And you were looking -- as
17  you were looking out of the hole, you were
18  looking in what direction?
19     A.  To the left side of the house.
20     Q.  Would that be where the levee is or --
21     A.  No, that would be to where the
22  driveway is.
23     Q.  Okay.  Could you see the wall from
24  where you were?
25     A.  What wall?

Page 59

1      Q.  The wall along the Industrial Canal.
2      A.  I don't know.  I didn't look that way.
3      Q.  Okay.  Did you at some point in time
4  get out of the house?
5      A.  Yeah.
6      Q.  How?
7      A.  Swam.
8      Q.  Swam to where?
9      A.  Next door.
10     Q.  And was that a two-story house?
11     A.  Yes.
12     Q.  And do you know what time you swam to
13  the other house?
14     A.  No.
15     Q.  When you swam over there, why did you
16  swim over to the other house?  Was that because
17  it was a higher house, or what was the reason?
18     A.  No, because I saw a barge on the front
19  of the house.
20     Q.  When did you see a barge in the front
21  of the house?
22     A.  When I turned around and looked and I
23  seen this wall, I didn't know what it was at
24  first.
25     Q.  And where was the barge when you first

Page 60

1  saw it?
2      A.  On the front of the house.
3      Q.  In the front of your house?
4      A.  Right.
5      Q.  When you saw the barge, was it -- had
6  it hit your house?
7      A.  It was on it.
8      Q.  It was on your house?
9      A.  Right.
10     Q.  On what part of your house?
11     A.  The front.
12     Q.  Did you hear it when it hit the house
13  before?
14     A.  No.
15     Q.  When you got up and looked out the
16  attic, did you see the barge?
17     A.  I saw it then.
18     Q.  Uh-huh.  And what did you see where
19  the barge had come from, could you see?
20     A.  No.  The wind was blowing hard.
21     Q.  Okay.  All right.  And the barge was
22  on the front of your house?
23     A.  Right.
24     Q.  Okay.  And then what happened?
25     A.  I tied an extension cord around me and

Page 61

1  jumped in the water and swam next door.
2      Q.  Okay.  So the reason you swam out from
3  your house was because of the barge?
4      A.  Yeah.
5      Q.  Was the barge -- it was on top of your
6  house?  Was it moving?
7      A.  I don't know if it was moving or not.
8  It was just there.
9      Q.  Was it daylight when you saw it?
10     A.  No, it was dark.
11     Q.  Okay.  Did you see the barge before it
12  was on your house?
13     A.  No.
14     Q.  Did you see it at any time after it
15  was on your house?
16     MR. WALKER:
17         Objection, vague as to time.
18  EXAMINATION BY MR. WIEDEMANN:
19     Q.  You said you saw it -- when you were
20  looking out the roof you saw it on part of your
21  house.
22     A.  Right.
23     MR. WALKER:
24         Objection, asked and answered.
25  EXAMINATION BY MR. WIEDEMANN:

16  (Pages 58 to 61)

BARGE000850

MURPH, JR., ARTHUR LEE

12/17/2007

Page 62

1     Q.  What part of your house was it on?
2     A.  The front.
3     Q.  That would be -- had it intruded into
4  your house in any way?
5     A.  I don't know right then.
6     Q.  Okay.  All right.  And had you heard
7  the barge -- other than the scraping, banging
8  that you heard, had you heard it after that?
9        MR. WALKER:
10         Objection, asked and answered.
11  EXAMINATION BY MR. WIEDEMANN:
12     Q.  Go ahead.  Did you hear anything after
13  that?
14     A.  No.
15     Q.  Was the first time that you saw the
16  barge when you looked out of the roof?
17     A.  Right.
18        MR. WALKER:
19         Objection, asked and answered
20         three times.
21  EXAMINATION BY MR. WIEDEMANN:
22     Q.  You don't know what time that was.
23        MR. WALKER:
24         Objection, asked and answered.
25     A.  No.

Page 63

1  EXAMINATION BY MR. WIEDEMANN:
2     Q.  And after you saw it, you put a cord
3  around yourself?
4     A.  Yes.
5     Q.  And you swam --
6     A.  Next door.
7     Q.  Next door?  Is that across the street
8  or next door?
9     A.  Next door, right on the side of my
10  house.
11     Q.  To the right of you?
12     A.  To the left.
13     Q.  Left?  And whose house was that?
14     A.  Um -- I can't think of her name.  It
15  was one of my friends that she was renting.
16     Q.  Was renting the house next door?
17     A.  Yes.
18     Q.  You can't think of their name.
19     A.  No.
20     Q.  How many people were there in the
21  house next door?
22     A.  Four.
23     Q.  And do you know any of their names at
24  this point in time?
25     A.  I can't think of them people name.  I

Page 64

1  never did deal with them.
2     Q.  Okay.  So they were renting next door
3  to you.
4     A.  Right.
5     Q.  And you knew them before then, before
6  the hurricane.
7     A.  Yeah.
8     Q.  Okay.
9     A.  Just found your neighbors.
10     Q.  And you went there because of what
11  reason?
12     A.  The water was higher than my house.
13     Q.  Okay.  And what was the purpose of the
14  cord you put on?
15     A.  The water was moving fast, I didn't
16  want to get washed out in the canal.
17     Q.  Did you have -- did you have the cord
18  attached to something?
19     A.  To the roof.  To the rafters on the
20  inside the roof.
21     Q.  Okay.  So you had enough cord to
22  enable you to get --
23     A.  A hundred foot.
24     Q.  -- to get to your neighbor's house?
25     A.  Yes.

Page 65

1        MR. WALKER:
2         Let me pose an objection here,
3         Larry.  You mischaracterized his
4         testimony.  In answer to your
5         questions earlier, he said he did not
6         know what the scraping sound was from,
7         and you characterized your question
8         now as it was from the barge, which is
9         a mischaracterization of his
10         testimony.
11  EXAMINATION BY MR. WIEDEMANN:
12     Q.  When you got to the -- swam to your
13  neighbor's house, did you -- how did you get
14  into the house?
15     A.  Through a window on the top floor.
16     Q.  On the second floor?
17     A.  Right.
18     Q.  And there were people there?
19     A.  Yes.
20     Q.  How many?
21     A.  Four.
22     Q.  Okay.  And did you talk to them about
23  what had happened at that point in time?
24     A.  What you mean?
25     Q.  Well, I mean, you had heard these

17 (Pages 62 to 65)

BARGE000851

MURPH, JR., ARTHUR LEE

12/17/2007

Page 66

1 noises and you swam over to their house, there
2 was water rising. Did you all talk about what
3 was going on?
4    A. Yeah.
5    Q. Huh?
6    A. Yeah.
7    Q. Did y'all talk about what was the
8 probable cause of what happened?
9    A. No.
10      MR. WALKER:
11        Objection.
12 EXAMINATION BY MR. WIEDEMANN:
13    Q. Did they give you any information that
14 you didn't already have?
15    A. No. He just asked me how I got there.
16    Q. And how long did you stay in the house
17 next door?
18    A. Until we got rescued.
19    Q. And how were you rescued?
20    A. A friend come down the street with a
21 boat and picked us up.
22    Q. And who was that?
23    A. I can't think of his name. He's just
24 a fellow in the neighborhood with a boat.
25    Q. Okay. And when was that? It was

Page 67

1 daylight?
2    A. It was the day after -- it was after
3 the hurricane.
4    Q. Was it the next day on the 29th?
5    A. Yes.
6    Q. Do you remember what time it was?
7    A. No.
8    Q. Now, did you at any time hear -- after
9 you heard this scraping, banging sound, did you
10 hear any other sounds other than that before
11 you saw the water coming?
12    A. Nothing but the wind blowing hard.
13    Q. Okay. Did you hear -- before the
14 water came down your driveway, did you hear a
15 boom, like a boom or an explosion like?
16    A. I don't think I heard -- I don't
17 believe.
18    Q. Okay.
19      MR. WIEDEMANN:
20        Can we take a break for just a
21      minute?
22      (Off the record.)
23 EXAMINATION BY MR. WIEDEMANN:
24    Q. Mr. Murph, I know that these events
25 took place back in 2005 and your memory is

Page 68

1 maybe not as good as we would expect, or -- it
2 wouldn't be any better for me, either, but did
3 you -- at some point in time were you
4 represented by the Cochran firm in your
5 personal case?
6    A. I wasn't represented by nobody that I
7 know of.
8    Q. Were you represented by Mr. Joe
9 Guidry?
10    A. I don't even know no Joe Guidry.
11    Q. Did you give a statement to the
12 Cochran firm or Mr. Joe Guidry about the events
13 leading up to the hurricane?
14    A. Not that I can remember.
15    Q. Let me show you a transcription of a
16 statement taken on January 25th, 2006.
17      MR. WALKER:
18        Do you have copies for all of us?
19      MR. SANDERS:
20        No.
21      MR. WALKER:
22        Can we make copies?
23      MR. WIEDEMANN:
24        Sure.
25      (Off the record.)

Page 69

1 EXAMINATION BY MR. WIEDEMANN:
2    Q. Mr. Murph, let me show you what
3 purports to be a copy of a statement --
4      MR. WALKER:
5        Let me make an objection for the
6      record. First of all, it's not a copy
7      of a statement, it's excerpts of a
8      statement. We have no idea who
9      transcribed it or under what
10     circumstances, and we object to the
11     fact that it was only provided to us
12     now. We've just made copies and
13     haven't really had a chance to review
14     it.
15     MR. WIEDEMANN:
16       We also have a transcription of
17     the statement.
18     MR. SANDERS:
19       Verbal.
20     MR. WALKER:
21       So you have something more than
22     the excerpts; is that what you're
23     saying?
24     MR. GILBERT:
25       Let me just state for the record

18 (Pages 66 to 69)

MURPH, JR., ARTHUR LEE

12/17/2007

| Page 70 | Page 72 |
|---|---|
| 1  that this is excerpts intended not to | 1  made here, I think it's incumbent upon |
| 2  offend without knowing the terms of | 2  you to show the gentleman the complete |
| 3  any confidentiality agreements between | 3  statement that he made and not these |
| 4  Mr. Murph and Lafarge, if any. | 4  bits and pieces.  And you're |
| 5  MS. BERTAUT: | 5  apparently attempting to refresh his |
| 6     Well, I'm going to -- | 6  recollection, and I think the witness |
| 7  MR. WALKER: | 7  is entitled to a complete copy of |
| 8     Who made the determination that | 8  whatever it is he said that day.  So I |
| 9  it was not offensive or a breach of | 9  have a problem with you showing the |
| 10  confidentiality agreement between | 10  witness this statement. |
| 11  Mr. Murph, Lafarge and -- | 11  MR. GILBERT: |
| 12  MR. GILBERT: | 12     Right.  Well, we believe this is |
| 13     This is not my deposition. | 13  sufficient to refresh his recollection |
| 14  MR. HAYCRAFT: | 14  concerning matters that are relevant |
| 15     Whose is it? | 15  in this deposition. |
| 16  MR. GILBERT: | 16  MS. BERTAUT: |
| 17     I don't have to answer that | 17     I understand that.  I still note |
| 18  question who made the determination. | 18  the objection. |
| 19  MS. BERTAUT: | 19  MR. GILBERT: |
| 20     Well -- | 20     This is not his deposition |
| 21  MR. WALKER: | 21  testimony.  This is just simply a |
| 22     Well, you just made a | 22  memorialization of something he said |
| 23  representation on the record. | 23  earlier. |
| 24  MR. GILBERT: | 24  MS. BERTAUT: |
| 25     It's by way of explanation as to | 25     I understand that.  But under the |

| Page 71 | Page 73 |
|---|---|
| 1  why it's excerpts.  If it's a legally | 1  rules, if you're going to show the |
| 2  sufficient explanation for you, that's | 2  witness a statement to refresh his |
| 3  good.  If it satisfies your curiosity, | 3  recollection, he's entitled to a |
| 4  then that's good, too. | 4  complete copy of the statement. |
| 5  MR. WALKER: | 5  MR. SANDERS: |
| 6     What I'm asking, if you can | 6     Let's move on. |
| 7  answer, is did you create this or was | 7  MR. WIEDEMANN: |
| 8  it created by whoever provided it to | 8     Let the record reflect that all |
| 9  you? | 9  counsel has a copy of the statement. |
| 10  MR. GILBERT: | 10  MR. WEBB: |
| 11     I'm going to assert the right to | 11     Let the record reflect that all |
| 12  withhold attorney work product.  I'm | 12  counsel do not have copies of the |
| 13  on the record here in a deposition, | 13  statement.  They have copies of the |
| 14  and that's not an appropriate question | 14  excerpts, Mr. Wiedemann.  If you're |
| 15  of a non deponent. | 15  going to say it, say I correctly, |
| 16  MR. WALKER: | 16  please. |
| 17     My objection stands.  And it's | 17  MR. SANDERS: |
| 18  not only with respect to the potential | 18     Let's move on. |
| 19  breach of the confidentiality | 19  MR. WIEDEMANN: |
| 20  agreement between Mr. Murph and | 20     All counsel have been furnished a |
| 21  Lafarge. | 21  copy of the excerpts of Statement of |
| 22  MS. BERTAUT: | 22  Arthur Murph, including Mr. Webb, |
| 23     I join in the objection.  If | 23  prior to showing the statement to the |
| 24  you're going to show the witness a | 24  witness. |
| 25  statement that he's alleged to have | 25  MR. WALKER: |

19 (Pages 70 to 73)

BARGE000853

MURPH, JR., ARTHUR LEE

12/17/2007

Page 74

1        Sorry, Larry, but we want to make
2    another objection or statement for the
3    record, and that is that we don't --
4    as I said earlier, I don't know the
5    circumstances under which this
6    purported statement was given, but if
7    it was with respect to a potential or
8    actual representation that Mr. Murph
9    was obtaining from Mr. Guidry or
10   anybody at that firm, it gets into
11   aspects of attorney/client privilege
12   which Mr. Murph has not waived, and I
13   don't see that he has consulted any
14   counsel present with respect to that
15   potential waiver and a knowing waiver
16   on his part of the protections that
17   he's afforded.
18   MR. GILBERT:
19       And Lafarge doesn't have standing
20   to assert that privilege. There's no
21   privity between Mr. Murph and Lafarge.
22   MR. WEBB:
23       Counsel you're dead wrong. All
24   the members of the bar have a
25   responsibility to uphold the code of

Page 75

1    professional responsibility. And if
2    Mr. Guidry did violate the
3    attorney/client privilege, then we're
4    all duty bound to report that to the
5    Office of Disciplinary Counsel, which
6    I intend to do.
7    MR. SANDERS:
8        Okay. It's out. Let's go
9    forward.
10   MR. WIEDEMANN:
11       Okay. Let's get on with it.
12   Y'all finished?
13   MR. WALKER:
14       Yeah. But my statement has
15   something to do beyond that, and that
16   is that you're going to ask Mr. Murph
17   questions regarding a statement which
18   he's going to respond to under oath,
19   and he think he has the right to
20   consult the attorney who provided you
21   this to determine whether he should,
22   knowingly, and if he does, that he
23   does so knowingly, waive or
24   potentially waive an attorney/client
25   privilege.

Page 76

1    MR. GILBERT:
2        He's never been deprived of that
3    right. He's been free to consult that
4    attorney at any time he wants, and as
5    far as way know he has. We don't know
6    whether he has or hasn't.
7    MR. WIEDEMANN:
8        Okay. Y'all finished?
9    EXAMINATION BY MR. WIEDEMANN:
10   Q. Mr. Murph, you have in front of you a
11   excerpt of a Statement of Arthur Murph taken on
12   January 25th, 2006, by Richard J. Guidry (RJG).
13   A. Uh-huh.
14   Q. Do you recall giving a statement to
15   Mr. Guidry?
16   A. I don't think I need to talk about
17   this until and unless I talk to my attorney and
18   see if it's okay to for me to say anything else
19   about this here.
20   Q. Who is your attorney?
21   A. Mr -- my memory ain't that good. I
22   got a card in my pocket. What's that name
23   that's on there? (Tendering.)
24   Q. It's --
25   MR. WIEDEMANN:

Page 77

1        He has given me a card that says
2    Richard J. Richthofen, Jr., 303 South
3    Broad Street, New Orleans 70119.
4    A. Uh-huh.
5    EXAMINATION BY MR. WIEDEMANN:
6    Q. My question, Mr. Murph, is not about
7    the statement itself. Do you recall giving a
8    statement?
9    A. No.
10   Q. Do you recall having your statement
11   transcribed on a machine?
12   A. No.
13   Q. Do you recall ever going to the office
14   of Richard J. Guidry or the office of the
15   Cochran Firm?
16   A. No.
17   Q. You are going to speak to your
18   attorney about this statement?
19   A. Right.
20   Q. You understand that your deposition in
21   regard to the statement will have to be, that
22   part of the deposition, rescheduled at a later
23   time once you have talked to the attorney. You
24   understand that?
25   A. That's fine.

20 (Pages 74 to 77)

BARGE000854

MURPH, JR., ARTHUR LEE

12/17/2007

---

Page 78

1    Q.  Okay.  And that you will probably
2  receive another subpoena to appear for another
3  deposition, which will be related to the
4  statement, assuming your attorney has no
5  objection or doesn't have a legitimate
6  objection.  You understand that?
7    A.  Right.  Yes.
8    Q.  Okay.  Mr. Murph, following Hurricane
9  Katrina, did you meet with any attorneys other
10  than the ones that we've mentioned concerning
11  the damage to your property?
12    A.  I'm going to have to check on that
13  with my lawyer, too.
14    Q.  You're going to check with your
15  lawyer --
16    A.  Right.
17    Q.  -- concerning meeting with attorneys
18  after the hurricane?
19    A.  Yes.
20    Q.  Did you at some point in time
21  following the hurricane make some financial
22  arrangement or settlement with any companies
23  regarding your house?
24    A.  No.  I've been compensated for my
25  losses.

Page 79

1    Q.  By whom?
2    A.  I have to talk with my lawyer about
3  that, too.
4    Q.  So you don't want to talk about --
5    A.  No.
6    Q.  Wait let me just put it on the record.
7  You don't want to talk about who compensated
8  you for your home following the accident?
9    A.  No.
10    Q.  Following the hurricane, I should say.
11    A.  Right.
12    Q.  So we'll be clear, you don't want to
13  talk about meeting with attorneys following the
14  hurricane concerning your property damage or
15  your claim.  Is that correct?
16    A.  Yes.
17    Q.  You don't want to talk about whether
18  you received any settlement funds from the
19  damage to your house or to yourself following
20  the hurricane.
21    A.  Right.
22    Q.  And you don't want to talk about the
23  statement that I have shown you, or the
24  excerpts of a statement, dated January 25,
25  2006, is that correct?

Page 80

1    A.  Yes.
2    Q.  Those are three things that you are
3  going to check with your attorney to determine
4  whether or not you can answer questions
5  concerning those inquiries.
6    A.  Right.
7    Q.  And your attorney is going to be the
8  attorney that you gave me the card from?
9    A.  Yes.
10    Q.  And you are going to get an opinion
11  from the attorney, is that correct?
12    A.  Yes.
13    Q.  And when do you expect you will talk
14  to him, what time frame are we talking about?
15  A week, two weeks?
16    A.  I'm going to try to get in touch with
17  him today.
18    Q.  Okay.  Well, I just want to give you
19  some leeway, because I know you got to work and
20  whatever.
21    A.  Right.
22    Q.  But would two weeks be a sufficient
23  time for you to --
24    A.  I think so.
25    Q.  Okay -- to get an opinion from him.

Page 81

1    A.  Right.
2    Q.  Concerning those three aspects.
3    A.  Yes.
4    Q.  Okay.  Has anyone -- any attorney told
5  you not to testify in this case?
6    A.  I'm going to have to talk with my
7  attorney on that, too.
8    Q.  So you're going to have to talk to him
9  about that.  That's the fourth thing.
10    A.  Right.
11    Q.  About whether any attorney instructed
12  you not to answer questions concerning your
13  property or the other -- the four areas of
14  inquiry we talked about.
15    A.  Right.
16    Q.  Okay.  Did you at some time sign an
17  agreement with anybody, a confidentiality
18  agreement, not to discuss what happened to you,
19  your family or your property in Hurricane
20  Katrina?
21    A.  That's the fifth thing.
22    Q.  Okay.  So you're not going to talk
23  about any confidentiality agreement.
24    A.  No.
25    Q.  Okay.  Now, Mr. Murph, you purchased

21 (Pages 78 to 81)

BARGE000855

MURPH, JR., ARTHUR LEE

12/17/2007

Page 82

1  the property on Jourdan Avenue from
2  Mrs. Shirley Priestly and others, is that
3  correct?
4      A.  Yes.
5      Q.  And let me show you a cash sale of the
6  property to your wife Jeanne A. Church and
7  Arthur L. Church, Jr., which is dated --
8          MR. GILBERT:
9              That's not what it says.  It's to
10             Jeanne A. Church Murph and Arthur L.
11             Murph, Jr.
12  EXAMINATION BY MR. WIEDEMANN:
13      Q.  Which is dated January 21, 2005.  And
14  the statement from the U.S. Department of
15  Housing and Urban Development.
16          You recall that purchase?  This is
17  Jeanne A. Church Murph and Arthur L. Murph,
18  Jr., as purchasers.  Do you recall that?
19      A.  Somewhat.
20      Q.  Well, this sale agreement contains the
21  signature of Arthur L. Murph, Jr.  Is that your
22  signature?
23      A.  Yes, it is.
24      Q.  And it contains the signature of
25  Jeanne A. Church Murph.  Is that the signature

Page 83

1  of your wife?
2      A.  Yes.
3      Q.  All right.  So is that not the
4  agreement that you and she signed regarding the
5  property on Jourdan Avenue?
6      A.  Yes, it is.
7      Q.  And you purchased it from the
8  Priestlies, is that correct?
9      A.  Right.
10      Q.  And did you not, at the time of the
11  purchase of the property, execute a second
12  mortgage for $18,000 on the property?
13      A.  Um -- I can't recall.
14      Q.  Let me show you the statement from the
15  U.S. Department of Housing and Urban
16  Development which reflects proceeds from second
17  mortgage $18,680.  Do you recall that?
18      A.  Somewhat.
19      Q.  Well, let me show you, if I might, the
20  promissory note dated January 21, 2005, the
21  same date as the Act of Sale, for $18,680
22  signed by your wife and yourself.
23          You recognize those signatures?
24      A.  Yes.
25      Q.  Did you not execute a promissory note

Page 84

1  in favor of the Priestlies?
2      A.  I'm going to have to get back with you
3  with my lawyer about all this, because I don't
4  know what it's leading to.  We going to leave
5  that alone.  I'll discuss it with my attorney.
6      Q.  You're going to discuss with your
7  attorney whether or not you can talk about your
8  purchase of property?
9      A.  Yep.
10      Q.  All right.  Have you spoken to any
11  attorneys since you were subpoenaed to testify
12  in this case?
13      A.  Mine.
14      Q.  You spoke to the gentleman whose card
15  you showed us?
16      A.  Yes.
17      Q.  And without telling me what you talked
18  about, did he tell you not to appear here and
19  testify today?
20      A.  No, he didn't.
21      Q.  Did you tell him that you were
22  subpoenaed to testify concerning the Hurricane
23  Katrina matter?
24      A.  Yes.
25      Q.  Did you tell him about any things that

Page 85

1  you had transacted before or after Hurricane
2  Katrina?
3      A.  We talked -- you'll be able to talk
4  with him when I get back with him.
5      Q.  Well, what I want to know is, when you
6  got the subpoena that you knew you were coming
7  here to talk under oath about Hurricane Katrina
8  and how it affected you and what you knew, did
9  you discuss that with your attorney?
10      A.  Yes.
11      Q.  Did he tell you not to appear here and
12  not to testify?
13      A.  No, he didn't.
14      Q.  Did he say that you should assert any
15  kind of privilege?
16      A.  (Shakes head negatively.)
17      Q.  Huh?
18      A.  No.
19      Q.  So before coming here today, even
20  though you talked to your attorney, you were
21  not advised not to assert any privilege that
22  you might have here.
23      A.  He said if I had any problem with
24  anything and any questions, to tell them to get
25  with my attorney, and that's what I'm doing.

22  (Pages 82 to 85)

MURPH, JR., ARTHUR LEE

12/17/2007

Page 86

1    Q.  Did you talk to any other attorneys in
2  the last sixty days regarding this matter?
3    A.  No.
4    Q.  So the only attorney that you've
5  talked to in the last sixty days was the
6  attorney whose card you showed us earlier?
7    A.  Right.
8    Q.  And that is -- that's been your
9  attorney since Hurricane Katrina?
10   A.  You'll have to talk with him about
11 that.
12   Q.  Huh?
13   A.  That's been my attorney.
14   Q.  Okay.
15   MR. GILBERT:
16      Is anybody going to traverse on
17 anything that's been done already?
18   MS. BERTAUT:
19      I have a question.  Is that what
20 you're asking?
21   MR. GILBERT:
22      Yes.
23   MS. BERTAUT:
24      Uh-huh.
25   MR. WIEDEMANN:

Page 87

1       We'll tender the witness subject
2    to advices from his attorney as to
3    what if any limitation he's going to
4    assert, and we'll reschedule the
5    deposition upon that advice, which I
6    understand from him we should -- from
7    the witness we should have in two
8    weeks.  And I'll follow up with the
9    attorney to find out what their
10   position is.
11 EXAMINATION BY MS. BERTAUT:
12   Q.  Mr. Murph, my name is Carmelite
13 Bertaut and I represent one of the parties in
14 this litigation.  I'm going to just ask you a
15 few questions.  If you have any -- if you can't
16 hear me, let me know.  I would ask you to speak
17 up, because I had to -- I had some difficulty
18 and I want to make sure I hear everything that
19 you have to say.
20   A.  Okay.
21   Q.  Mr. Murph, other than your daughter
22 Ariana, do you have any other children?
23   A.  Yes.
24   Q.  What other children?
25   A.  I got two sons.

Page 88

1    Q.  And how old are they?
2    A.  Oh, 39 and 28, somewhere around that
3  area.
4    Q.  At the time of Katrina, they were not
5  living with you?
6    A.  No.
7    Q.  And what are their names?  The
8  39-year-old, let's start with him.
9    A.  Same as mine; Arthur, III.
10   Q.  And the 28-year-old?
11   A.  Ryan.
12   Q.  Ryan?
13   A.  Ryan Ralph Smith.
14   Q.  Is it possible that you purchased 1739
15 Jourdan Avenue in January, 2005?
16   A.  I don't know when I purchased that
17 place.
18   Q.  Do you have ID on you today, sir, a
19 drivers' license?
20   A.  Yes, I do.
21   Q.  Can you take it out for us and tell
22 us --
23   A.  Sure.  Do you want it?
24   Q.  Well, I'm going to ask you what
25 address does it have on it for you.

Page 89

1    A.  105 Berkley.
2    Q.  And you got that license after the
3  storm?
4    A.  Yes.
5    Q.  Well, before you lived at 1739 Jourdan
6  Avenue, where did you live?
7    A.  In Pineville.
8    Q.  Okay.  And that's Pineville,
9  Louisiana?
10   A.  Yes, it is.
11   Q.  Where did you live in Pineville?
12   A.  On Brice Street.
13   Q.  Brice.  Is that B-R-I-C-E?
14   A.  Right.
15   Q.  And how long did you live on Brice
16 Street in Pineville?
17   A.  I can't remember.
18   Q.  Are we talking months, years?
19   A.  Months.
20   Q.  Months.  Did you own the house on
21 Brice Street?
22   A.  No.
23   Q.  Were you still working for -- is it
24 Brice Construction?
25   A.  Same as the street.

23  (Pages 86 to 89)

MURPH, JR., ARTHUR LEE

12/17/2007

Page 90

1    Q.  Were you working for Brice in the
2  Pineville area?
3    A.  No, I wasn't.
4    Q.  Were you commuting every day into the
5  Greater New Orleans area?
6    A.  I wasn't working then.  I was just
7  there with my family.
8    Q.  And I take it by your family you mean
9  your wife?
10   A.  And my daughter.
11   Q.  And your daughter.  Was there some
12 business reason for you to be in Pineville?
13   A.  I didn't have nowheres else to go.
14   Q.  Now, when you were living in
15 Pineville, was that before Katrina?
16   A.  No.
17   Q.  That was after Katrina.
18   A.  Yes.
19   Q.  Okay.  My question, and maybe I --
20 maybe I misunderstood you.  I asked you where
21 you lived before you lived at 1739 Jourdan
22 Avenue.
23   A.  Before 1739 Jourdan Avenue?
24   Q.  Yes, sir.
25   A.  I can't recall the street that I was

Page 91

1  staying on.
2    Q.  Can you recall any addresses before
3  1739 Jourdan Avenue?
4    A.  I stayed in, um -- in the Treme area.
5    Q.  In the Treme?
6    A.  Right.
7    Q.  And when you lived in Treme, where did
8  you live?  What street?
9    A.  In an apartment.
10   Q.  And what street was that on?
11   A.  I think Governor Nichols.
12   Q.  And when you lived on Governor
13 Nichols, you were working at Brice?
14   A.  Yes.
15   Q.  Did you ever live in Franklinton?
16   A.  No.  Not that I know of.  Franklinton?
17 No.
18   Q.  Is the only address in the Lower Nine
19 that you have lived at 1739 Jourdan Avenue?
20   A.  In the Ninth Ward?
21   Q.  Well, I was talking about the Lower
22 Ninth Ward, but let me rephrase the question.
23      Other than 1739 Jourdan Avenue, have
24 you lived at any other addresses in the --
25   A.  Yes.

Page 92

1    Q.  -- Lower Ninth Ward?
2    A.  Yes.
3    Q.  Okay.  Where else have you lived, sir?
4    A.  On Jordan Avenue.
5    Q.  A different number?
6    A.  Yes.
7    Q.  And what number was that?
8    A.  17 -- next door to the house I was
9  staying in.
10   Q.  Excuse me again?
11   A.  Next door to the other house.
12   Q.  Okay.
13   A.  To 1739.  1743 or something like that.
14   Q.  1743 Jourdan?
15   A.  I think so.
16   Q.  And when did you live at 1743 Jourdan?
17   A.  I don't know.  I don't keep up with
18 all these times, I just stay and go.
19   Q.  1743 Jourdan Avenue, did you own that
20 house?
21   A.  No.
22   Q.  Your were renting?
23   A.  Yes.
24   Q.  Do you know who your were renting
25 from?

Page 93

1    A.  I can't remember his name.
2    Q.  It was a man?
3    A.  Yes.
4    Q.  Let me ask you -- 1739, now.  Switch.
5  We're at 1739 Jourdan Avenue.
6    A.  Right.
7    Q.  That house faced the Industrial Canal?
8    A.  Yes.
9    Q.  What was across Jourdan Avenue?  Was
10 there a structure across Jourdan Avenue from
11 1739?
12   A.  A levee.
13   Q.  A levee.  So there were no houses on
14 the other side of the street?
15   A.  No.
16   Q.  No buildings of any sort.
17   A.  None.
18   Q.  Okay.  Now, I'm going to ask you about
19 1743 Jourdan --
20   A.  Right.
21   Q.  -- the rental property that you lived
22 in.
23      Was there any structure across the
24 Jourdan Avenue from that house?
25   A.  No.

BARGE000858

MURPH, JR., ARTHUR LEE

12/17/2007

Page 94

1    Q.  So if you stood either on 1739 or 1743
2  and looked at the canal, you would have no
3  structures between you.
4    A.  You'd see a levee.
5    Q.  Other than 1739 and 1743 Jourdan
6  Avenue, did you live at any other locations in
7  the lower Ninth Ward?
8    A.  No, unh-unh.
9    Q.  The Berkley address that you gave us,
10  is in the east?
11    A.  No.
12    Q.  Where is that?
13    A.  It's on the other side of the river in
14  Algiers.
15    Q.  The time that you spent at 1743
16  Jourdan Avenue, was that months or years?
17    A.  I think about a year, I don't know.  I
18  can't remember.
19    Q.  Did you move from 1743 to 1739?
20    A.  Yes.
21    Q.  Okay.  Back in 2005, before the storm,
22  when you worked for Brice did you come home
23  every night or did you have to travel?
24    A.  Yeah I come home every night.
25    Q.  Again, before Katrina, now, what was

Page 95

1  your work schedule, was it five days a week?
2    A.  Yes.  Sometimes six.
3    Q.  The carpentry work that you do, can
4  you describe for us, is that commercial,
5  residential?
6    A.  Commercial.
7    Q.  Are you a finishing carpenter?
8    A.  Everything.
9    Q.  So you come in after the building is
10  up and finish off the inside?
11    A.  No.  We bring it out the ground and
12  take it until you move in.
13    Q.  In the period of time that you lived
14  in the two addresses on Jourdan Avenue, did you
15  ever have any street flooding on Jourdan Avenue
16  prior to Katrina?
17    A.  No.
18    Q.  You talked about moving your car up on
19  Paris Avenue, your car and your truck.  Do you
20  remember?
21    A.  Yes.
22    Q.  Had you done that prior to Katrina, on
23  any occasion prior to Katrina, moved your
24  vehicles to Paris Avenue to avoid flooding?
25    A.  It never flood around there.

Page 96

1    Q.  So you never had moved to Paris
2  Avenue?
3    A.  Just that one time.
4    Q.  While you were living on Jourdan
5  Avenue, did you go through any other tropical
6  storms or hurricanes?
7    A.  The one that they had on the TV, but
8  it wasn't never like this one here.
9    Q.  Was that Tropical Storm Cindy?
10    A.  Cindy, Rita, I guess, I don't know.  A
11  bunch of storms.
12    Q.  Okay.  Well, the storm that you're
13  thinking about on the television, was that
14  before Katrina?
15    A.  Whatever storm they had before the
16  time that I was staying there, I went through
17  them.
18    Q.  You don't recall any of the names?
19    A.  No.
20    Q.  Did you ever have any damage to your
21  home in the prior storms?
22    A.  No.
23    Q.  Okay.  Prior to the time the water
24  came down the street when Katrina hit, did you
25  notice any wind damage to your house --

Page 97

1    A.  No.
2    Q.  -- from -- and what was the finish on
3  your house?
4    A.  Brick.
5    Q.  To enter your home, the 1739 Jourdan
6  Avenue home, did you have to go up any steps?
7    A.  One.
8    Q.  And do you know the size of your
9  property at 1739 Jourdan Avenue, the land
10  itself?
11    A.  I can't remember that.
12    Q.  The garage that you talked about, this
13  was an attached -- a garage attached to the
14  house?
15    A.  No, it wasn't.  It was separate.
16    Q.  Do you ever have an occasion to walk
17  up toward the levee, toward the floodwall prior
18  to the day before Katrina hit?
19    A.  Yes.
20    Q.  Okay.  On what occasions would you do
21  that?
22    A.  Just walk up there to look.
23    Q.  Okay.  Now, again we're not talking
24  about the Sunday of Katrina; is that right?
25    A.  Come again?

25 (Pages 94 to 97)

BARGE000859

MURPH, JR., ARTHUR LEE

12/17/2007

Page 98

1     Q.  I'm referring to prior to Katrina, not
2  that Sunday of Katrina.  Did you walk up to
3  look at the floodwall and over it?
4     A.  All the time.
5     Q.  All the time.  Okay.  Was this a
6  regular thing you would do?
7     A.  No, I used to cut the levee.
8     Q.  You would cut the levee?
9     A.  Yes.
10    Q.  Who would -- were you hired to do
11 that?
12    A.  No.
13    Q.  Okay.  Why would you do that?
14    A.  To make the front of my house look
15 good.
16    Q.  When did you start -- or when was the
17 first time you cut the levee?
18    A.  Oh, soon as I moved in the house.
19 Ms. priestly used to cut it, so I kept it up.
20    Q.  How much of the levee would you cut
21 when you would cut it?
22    A.  As wide as the front of my house and
23 from the street to the levee where it goes up,
24 right in the turn.
25    Q.  So you would just cut the levee -- the

Page 99

1  grass on the levee immediately in front of your
2  house.
3     A.  Right.
4     Q.  And how often would you do that?
5     A.  Every time I cut my grass.
6     Q.  Did you keep your property up?
7     A.  Yes.
8     Q.  So how frequently would you cut your
9  grass?
10    A.  Every week.
11    Q.  Did you have any trouble cutting the
12 grass on the levee?
13    A.  No.
14    Q.  Did you see any water ponding or
15 accumulating on the levee?
16    A.  No.
17    Q.  Did you see any drainage problems
18 associated with the levee in front of your
19 house?
20    A.  No.
21    Q.  Do you know, when was the last time
22 before Katrina hit that you would have cut the
23 levee?
24    A.  No.  Unh-unh.  I can't remember.
25    Q.  Do you know where the drains were

Page 100

1  around your house?
2     A.  Yes.
3     Q.  Where were they in terms of your --
4  1739 Jourdan Avenue?
5     A.  One was on -- across the street from
6  me directly in front of my house on the levee
7  side.
8     Q.  That's the same one, right?  On the --
9     A.  That's the only one.
10    Q.  Did you keep that levee -- that drain
11 clear?
12    A.  Yes.
13    Q.  Would that be part of your grass
14 cutting?
15    A.  Yes.
16    Q.  Do you know at the time Katrina hit
17 whether that drain was clear?
18    A.  No, I sure don't.
19    Q.  Did you cut the levee when you were
20 living next door at 1743 Jourdan, as well?
21    A.  No.
22    Q.  Now, when you would go toward the
23 floodwall and the Industrial Canal, did you
24 ever have occasion to look on the other side of
25 the floodwall, between the floodwall and the

Page 101

1  canal itself?
2     A.  Yes.
3     Q.  What did you see when you would look
4  there?
5     A.  Nothing but the canal.
6     Q.  Did you ever see any activity going on
7  between the floodwall and the canal itself?
8     A.  What kind of activity?
9     Q.  That's what I'm asking you.
10    A.  No.
11    Q.  No?
12    A.  No, nothing but boats passing.
13    Q.  Were there any businesses located on
14 the canal side of the floodwall in the area of
15 your house?
16    A.  Not directly in front of my house, but
17 off to the left they had a business.
18    Q.  And what business was that, do you
19 know?
20    A.  Something about the rodents.  Rodent
21 control or something.
22    Q.  And was that on the canal side of the
23 levee?
24    A.  Yes.
25    Q.  Were you aware of any work that was

26 (Pages 98 to 101)

MURPH, JR., ARTHUR LEE

12/17/2007

Page 102

1   being done in and around the Industrial Canal
2   near your house?
3       A.  Work on what?
4       Q.  Near the Industrial Canal area,
5   between Jourdan Avenue and the water.
6       A.  They had some people working on the
7   other side.
8       Q.  Okay.  The other side of what?
9       A.  The levee.
10      Q.  What do you know about that work?
11      A.  They just was digging all the time.
12      Q.  When was this?
13      A.  All the time, looked like.
14      Q.  Okay.  When you say all the time, can
15  you be more specific?
16      A.  Most of the time I look out there when
17  I be cutting grass or throwing horse shoes,
18  they have people working.
19      Q.  When you say digging, how were they
20  digging?
21      A.  I guess they was making the canal
22  wider, I don't know what they was doing over
23  there.
24      Q.  Do you know the names of any of the
25  companies --

Page 103

1       A.  No.
2       Q.  -- that were involved?  Let me finish
3   the question.
4           Do you know the names of any of the
5   companies involved in the work that was being
6   done?
7       A.  No, I sure don't.
8       Q.  Did you know anybody who was doing any
9   work in that area?
10      A.  No.
11      Q.  Now, when you say digging, can you
12  describe how they were digging?
13      A.  They was digging in the water.
14      Q.  Digging with shovels, digging with
15  machines?
16      A.  With an excavator.  With a machine.
17      Q.  What kind of machine?
18      A.  An excavator.
19      Q.  Was there one of them?
20      A.  I don't know.
21      Q.  Do you know how many?
22      A.  Maybe two.
23      Q.  Other than an excavator, did you see
24  any other machines in that area?
25      A.  No, unh-unh.

Page 104

1       Q.  And when did you see this work being
2   done?
3       A.  It was being done all the time.
4   That's what I say, I don't know if they were
5   dredging or what.
6       Q.  Well, where were they excavating?
7       A.  Along the -- on the other side of the
8   levee, down in the water.
9       Q.  In the water?
10      A.  In the water.
11      Q.  Are we talking about -- I'm trying to
12  understand the period of time that this work
13  took place.  Are we talking about days, weeks,
14  months?  Can you tell me?
15      A.  Weeks, I guess, months.  They always
16  was over there.
17      Q.  Did you see this work being done when
18  you were standing in front of your house on
19  Jourdan Avenue?
20      A.  No.
21      Q.  Did you have to walk up the levee in
22  order to be able to see it?
23      A.  Yes.
24      Q.  Could you see it if you -- how far up
25  the levee did you have to go before you could

Page 105

1   see this work being done?
2       A.  All the way to the top.
3       Q.  Okay.  All right.  So you had to get
4   to the top and look down?
5       A.  Get to the top and look over.
6       Q.  Look over.  Did you ever see any
7   trucks in the area of your house and the
8   Industrial Canal?
9       A.  No, unh-unh.
10      Q.  Without going up the levee and looking
11  over, was there any way that you could tell
12  that work was ongoing on any given day on the
13  canal side of the floodwall?
14      A.  Yes.
15      Q.  How could you tell?
16      A.  You can see the boom of the excavator
17  sticking up in the sky.
18      Q.  Any other way you could tell?
19      A.  No, not unless you went up there.
20      Q.  Did you ever have any complaints about
21  the work that was being done on the canal side
22  of the levee?
23      A.  No.
24      Q.  In connection with your yard work, did
25  you ever have an occasion to dig into your

27 (Pages 102 to 105)

BARGE000861

MURPH, JR., ARTHUR LEE

12/17/2007

Page 106

1  yard, for flowers or any kind of landscaping?
2      A.  Yes.
3      Q.  Did you ever have problems with water
4  seepage when you would do that?
5      A.  No.
6      Q.  And where would this be, would this be
7  the front or the back of your property?
8      A.  The back.
9      Q.  Who is your supervisor at Brice?
10     A.  Steve Huffman.
11     Q.  Steve Huffman?
12     A.  Yes.
13     Q.  H-O-F-F-M-A-N?
14     A.  Yes.  H-U.
15     Q.  H-U.
16        MR. GILBERT:
17           Carmelite, is your question who
18        is or who was?
19        MS. BERTAUT:
20           Who is.
21  EXAMINATION BY MS. BERTAUT:
22     Q.  Is that what you answered me, who is
23  your supervisor?
24     A.  Yes.
25     Q.  Do you know if Brice did any work

Page 107

1  around the Industrial Canal prior to Katrina?
2      A.  I don't know.  Not around my house.
3      Q.  Not around your house.  Okay.
4           Was it your wife's intention to stay
5  on Jourdan Avenue for the storm?
6      A.  No.
7      Q.  She was always intending to go to the
8  Hyatt?
9      A.  I don't know if she was intending to
10  go to the Hyatt, but he wasn't planning on
11  staying there.
12     Q.  When you walked up the levee -- now,
13  I'm going back on the Sunday of Katrina.  When
14  you walked up the levee and looked at the canal
15  before you brought your wife to the Hyatt, did
16  the level of the water alarm you?
17     A.  A little bit.
18     Q.  Had you ever seen it that high before?
19     A.  No.
20     Q.  When you walked up the levee and
21  looked at the level of the water, did you see
22  anything in the water --
23     A.  No.
24     Q.  -- in the immediate area?
25     A.  (Shakes head negatively.)

Page 108

1      Q.  Okay.  Now, I want to direct your
2  attention to the time when you returned to your
3  house --
4      A.  Right.
5      Q.  -- after you dropped your wife off.
6           At some point did it begin to rain?
7      A.  Yes, it did.
8      Q.  Do you know when in the time line it
9  began to rain?
10     A.  It looked like it might have been
11  raining all day that day.
12     Q.  When you lost your power and the
13  lights went out --
14     A.  Right.
15     Q.  -- was it raining at that point?
16     A.  Yes.
17     Q.  Was it raining hard?
18     A.  I don't know.  The wind was blowing
19  real hard.
20     Q.  To get from your house to your garage
21  that night, to get to the generator, were you
22  under a covered walkway?
23     A.  No.
24     Q.  Did you get wet going into the garage?
25     A.  Yes.

Page 109

1      Q.  Was there any standing water in your
2  yard?
3      A.  A little bit.
4      Q.  Was it over the tops of your shoes?
5      A.  No.
6      Q.  Did you notice any trees down or
7  debris in your yard at that point?
8      A.  No.
9      Q.  To get to the garage you went out your
10  back door?
11     A.  Yes.
12     Q.  Are there steps down in the back?
13     A.  One.
14     Q.  Okay.  And is your garage raised?
15     A.  No.
16     Q.  So were there any steps to get into
17  the garage?
18     A.  No.
19     Q.  The water that was in your backyard,
20  was it up to the step?
21     A.  No.
22     Q.  Could you tell me the two cross
23  streets that 1739 was situated on on Jourdan
24  Avenue?
25     A.  What you mean?

28 (Pages 106 to 109)

MURPH, JR., ARTHUR LEE

12/17/2007

Page 110

1    Q.  Are you between N. Derbigny and N.
2  Roman?
3    A.  Yes.
4    Q.  Was 1739 closer to N. Derbigny or N.
5  Roman?
6    A.  N. Roman.
7    Q.  Do you know how many houses from the
8  corner of N. Roman and Jourdan Avenue your
9  house was?
10   A.  One double.
11   Q.  So that one double would have been to
12  your right?
13   A.  Yes.
14   Q.  When you stood on your front and saw
15  the water coming down Jourdan --
16   A.  I wasn't standing on the front.
17   Q.  Oh.  Where were you, inside?
18   A.  I was coming down the driveway.
19   Q.  When you were standing in your
20  driveway and you looked to your right and you
21  saw the water coming --
22   A.  No.
23   Q.  Okay.  Tell me.
24   A.  I looked ahead and the water was
25  coming.  You look to the right you'd be looking

Page 111

1  at the house.
2    Q.  Okay.  So you saw the water on the
3  street looking straight ahead?
4    A.  Right.
5    Q.  At that point in time, did you notice
6  anything unusual about the levee?
7    A.  No.
8    Q.  Did you look at the levee?
9    A.  No.
10   Q.  Okay.  So what you saw was the water.
11   A.  Yes.
12   Q.  What was the visibility like at that
13  moment?
14   A.  It was dark.
15   Q.  Was it raining?
16   A.  Yes.
17   Q.  Raining hard?
18   A.  It was a blowing rain, like.
19   Q.  Was it coming down in sheets?
20   A.  Off and on, I guess.
21   Q.  Well, I'm interested when you're
22  standing in the driveway.  Was it coming down
23  in sheets?
24   A.  I don't know.  I was looking at the
25  water.

Page 112

1    Q.  The 1743 Jourdan Avenue that you used
2  to live at, the rental, is that to your left or
3  to your right?
4    A.  To the right.
5    Q.  So is that the double between you and
6  N. Roman?
7    A.  Yes.
8    Q.  The house that you swam to was to your
9  left?
10   A.  Yes.
11   Q.  Do you know the number of Jourdan
12  Avenue that house is?
13   A.  No.  It I guess it must -- no, not
14  really.
15   Q.  Is 1743 demolished?
16   A.  It's gone.
17   Q.  It's gone.  And the house that you
18  swam to, is it gone, too?
19   A.  It's gone.
20   Q.  Did you ever see any ads for witnesses
21  as to the levee breaches?
22   A.  Not really.
23   Q.  Did you ever answer any ads for
24  witnesses?
25   A.  No.

Page 113

1    Q.  The excerpts that Mr. Wiedemann showed
2  you, the document that he showed you, had you
3  ever seen that document before today?
4    A.  No.
5    Q.  Were you shown anything before today?
6    A.  No.
7    Q.  Did you meet with lawyers right before
8  coming here today?
9    A.  No.  Just mine.
10   Q.  You met with your lawyer Mr. Guidry?
11   A.  Not today, yesterday.
12   MR. BRUNO:
13     Not today.  Obviously sometime in
14   the past.
15   MR. GILBERT:
16     That's not what --
17   MR. WEBB:
18     That's not what he's testified to
19   earlier.
20   MR. GILBERT:
21     That's a leading question.
22  EXAMINATION BY MS. BERTAUT:
23   Q.  Did you meet with lawyers today, prior
24  to coming into this room?
25   A.  No.

29 (Pages 110 to 113)

MURPH, JR., ARTHUR LEE

12/17/2007

Page 114

```
 1      Q.  No.  Other than your lawyer who
 2   represents you, have you met with any lawyers
 3   in this -- who are now in this room prior to
 4   today?
 5      A.  I'm going to have to -- I can't answer
 6   that.
 7      Q.  You can't answer that because that's
 8   something you want to talk to your lawyer
 9   about?
10      A.  Right.
11      Q.  And I'm sorry.  I may have
12   misunderstood.  What is the name of the lawyer
13   you're going to check with?
14      A.  I can't get his name out right but you
15   can read his card.  He got one of them funny
16   names.  First name Richard.
17      Q.  Richard Richthofen?
18      A.  Yes.
19      Q.  Do you have any pictures of your house
20   after the damage done in the storm?
21      A.  No.
22      Q.  Did you have any insurance on your
23   house?
24      A.  Which one?
25      Q.  1739 Jourdan.
```

Page 115

```
 1      A.  I had insurance.
 2      Q.  Did you file a lawsuit for coverage or
 3   for payments from your insurance company?
 4      A.  No.
 5      Q.  Did you make a Road Home claim?
 6      A.  No, unh-unh.
 7      Q.  Did you ever fill out any forms to
 8   make a claim against the government?
 9      A.  No.
10      Q.  Do you know what a Form 95 is?
11      A.  No.
12      Q.  Have you ever heard that term?
13      A.  No.
14      Q.  Let me just have one minute.  I think
15   I may be done.
16         Mr. Murph, I was not clear, when you
17   were taken by boat from the house next door to
18   you, what day was that?
19      A.  That was Monday.
20      Q.  This was Monday?  And from that house,
21   where were you taken by the boat?
22      A.  To the bridge.
23      Q.  That's the Claiborne bridge?
24      A.  Yes.
25      Q.  Did you spend some time on the bridge?
```

Page 116

```
 1      A.  A couple of hours.
 2      Q.  When you first arrived on the
 3   Claiborne bridge, was it daylight?
 4      A.  Yes.
 5      Q.  Could you see your house from the
 6   bridge?
 7      A.  Yep.
 8      Q.  What did you see?
 9      A.  Water and the house.
10      Q.  Did you look at the canal?
11      A.  It all looked the same because the
12   water had done leveled off.  It was just a big
13   lake.
14      Q.  So you couldn't tell where the
15   Industrial Canal levee was?
16      A.  No.
17      Q.  Looking toward the Industrial Canal, I
18   guess looking north when you're standing on the
19   Claiborne bridge on that day --
20      A.  Right.
21      Q.  -- could see any of the levee or
22   floodwall of the Industrial Canal?
23      A.  Yeah, you could.  You could see the
24   brick part sticking up out the water.
25      Q.  And from the Claiborne bridge, where
```

Page 117

```
 1   did you go next?
 2      A.  To the St. Claude bridge.
 3      Q.  Do you know Carolyn Berryhill?
 4      A.  Carolyn Berryhill?  No.
 5      Q.  How about Diane Berryhill?
 6      A.  No.  That might have been the chicks
 7   that was in the place.  No, I don't -- them
 8   names don't ring no bells.
 9      Q.  Okay.  And then when you were on the
10   St. Claude bridge, from there where did you go?
11      A.  To the Hyatt.
12      Q.  You met up with your wife?
13      A.  Yes.
14      Q.  And that would have been what day?
15      A.  That was the day of -- I guess -- that
16   was the day after the hurricane.
17      Q.  Okay.  Is that Monday or Tuesday?
18      A.  That's Tuesday, I think.
19      Q.  Tuesday.  So did you spend the night
20   on one of these two bridges?
21      A.  No.  I spent the night in that
22   two-story house.
23      Q.  When you got -- back up a minute.
24   When you got to the two-story house, swimming
25   to the two-story house, was it daylight?
```

BARGE000864

MURPH, JR., ARTHUR LEE

12/17/2007

| Page 118 |
|---|
| 1     A.  It was dark. |
| 2     Q.  It was dark? |
| 3     A.  Right. |
| 4     Q.  Was it dark before dawn on Monday? |
| 5     A.  You talking about when I got to the |
| 6  house? |
| 7     Q.  When you got to the house. |
| 8     A.  It was that night, I guess, or early |
| 9  in the morning.  I don't know what time it was. |
| 10     Q.  But that was on Monday. |
| 11     A.  Monday or Sunday, I don't know. |
| 12     Q.  What I'm trying to understand is how |
| 13  long you stayed at 1739 Jourdan Avenue on |
| 14  the -- looking out through the roof. |
| 15     A.  I don't know.  It was late that night. |
| 16  I don't know what time it was, though. |
| 17     Q.  Okay.  When you say that night, I'm |
| 18  just confused whether you're talking Sunday |
| 19  night into Monday morning or -- |
| 20     A.  Somewhere along there.  I don't know |
| 21  if it was Sunday night or Monday morning. |
| 22     Q.  By dawn on Tuesday, do you know where |
| 23  you were? |
| 24     A.  Heading towards the Hyatt. |
| 25     Q.  You had not gotten to the Hyatt by |

| Page 119 |
|---|
| 1  dawn on Tuesday? |
| 2     A.  Dawn.  What you mean dawn, noon or |
| 3  afternoon? |
| 4     Q.  When did you arrive on Tuesday? |
| 5         MR. BRUNO: |
| 6             By dawn she means early morning |
| 7         hours.  Okay? |
| 8     A.  No, it was in the evening. |
| 9  EXAMINATION BY MS. BERTAUT: |
| 10     Q.  I'm sorry. |
| 11     A.  It was in the afternoon.  I don't know |
| 12  if it was -- |
| 13     Q.  Is it your appreciation that you were |
| 14  never represented by Mr. Guidry? |
| 15     A.  No. |
| 16     Q.  No, that's not your understanding? |
| 17     A.  No, I never been represented by |
| 18  Mr. Guidry. |
| 19     Q.  Do you have a copy of any statement |
| 20  that you may have given anyone who came to talk |
| 21  to you about what happened during Katrina? |
| 22     A.  No. |
| 23     Q.  Would you like a copy of that? |
| 24     A.  I got -- I had one just a while ago. |
| 25     Q.  The one that Mr. Wiedemann gave you? |

| Page 120 |
|---|
| 1     A.  Right. |
| 2     Q.  When you were in your attic looking |
| 3  out through the hole in the roof, could you |
| 4  tell the direction the water was flowing in? |
| 5     A.  Run that by me again. |
| 6     Q.  When you were standing in your |
| 7  attic -- |
| 8     A.  Right. |
| 9     Q.  -- looking out through the roof, could |
| 10  you see any direction specific direction the |
| 11  water was moving in? |
| 12     A.  It was moving to the left. |
| 13     Q.  So that would be toward the Claiborne |
| 14  bridge? |
| 15     A.  Yes. |
| 16     Q.  And in that time, it was raining? |
| 17     A.  Yep. |
| 18     Q.  Coming down harder? |
| 19     A.  It was just blowing. |
| 20     Q.  Blowing.  Did you have any occasion to |
| 21  see any trees pulled up that night? |
| 22     A.  No. |
| 23     Q.  Thanks, Mr. Murph.  I don't have any |
| 24  other questions. |
| 25     A.  You're welcome. |

| Page 121 |
|---|
| 1         (Brief recess.) |
| 2         MS. BERTAUT: |
| 3             I just want to clarify that we |
| 4         will reserve our rights to renotice or |
| 5         to participate in a deposition should |
| 6         it be renoticed again in order to |
| 7         delve into the areas that the witness |
| 8         has declined to answer. |
| 9         MR. LAGARDE: |
| 10             Andre Lagarde for the Orleans |
| 11         Levee District.  No questions for the |
| 12         witness today, but same issue as |
| 13         Ms. Bertaut, reserving our rights if |
| 14         and when we reconvene after the |
| 15         privilege issues are resolved. |
| 16  EXAMINATION BY MR. WALKER: |
| 17     Q.  Mr. Murph, my name is Derek Walker and |
| 18  I represent Lafarge North America.  I just have |
| 19  a couple of questions to help me understand |
| 20  your testimony today. |
| 21         What time was it, to the best of your |
| 22  recollection, when you left your house with |
| 23  your wife and daughter and went to the Hyatt? |
| 24     A.  It was in the evening.  I don't know |
| 25  exactly what time it was.  It was in the |

Johns Pendleton Court Reporters                    800 562-1285

BARGE000865

MURPH, JR., ARTHUR LEE

12/17/2007

Page 122

1    afternoon, though.
2      Q.  So, did you have lunch that day?
3      A.  No.
4      Q.  Do you remember if it was after
5    lunchtime that you left?
6      A.  I can't recall.  It's been a while.
7      Q.  What car did you drive to the Hyatt?
8      A.  My wife's.
9      Q.  And what kind of car is that?
10     A.  She got a Chevy.  A 2001 Cavalier.
11     Q.  And you had previously taken another
12   car to Paris Avenue?
13     A.  A truck.
14     Q.  Okay.  And you had already taken it
15   there earlier that day?
16     A.  Right.
17     Q.  What route did you take to go to the
18   Hyatt?  Do you remember what streets you took,
19   which way you went there?
20     A.  Not really.  I just drove on the
21   ground.
22     Q.  Do you remember if you went over the
23   Claiborne Avenue bridge?
24     A.  Yeah.  You got to go over the
25   Claiborne Avenue bridge.

Page 123

1      Q.  Okay.  Did you ever get on I-10?
2      A.  No.  It was on the ground.
3      Q.  Did you take Claiborne to Canal?
4      A.  No.  I went St. Claude, I think.
5    Yeah.  I think I used St. Claude.  I went to
6    St. Claude.
7      Q.  And when you went back to Jourdan
8    Avenue, to your home, later that day, if I
9    understand you correctly, you first went to
10   Paris Avenue?
11     A.  Run that to me again.
12     Q.  Okay.  When you went back to get your
13   dog --
14     A.  Right.
15     Q.  -- okay?  You don't remember what time
16   you left the hotel.
17     A.  No.
18     Q.  Were you there a couple of hours,
19   would you say?
20     A.  No, unh-unh.  I didn't stay there long
21   at all.  Just long enough to drop them off.
22     Q.  Okay.  Walk me through again.  You
23   went from the hotel to where?
24     A.  To a friend of -- to Sean's house.  A
25   friend of mine.

Page 124

1      Q.  And that's on Paris Avenue?
2      A.  Right.
3      Q.  How did you get there?
4      A.  In my wife's car.
5      Q.  Okay.  So you drove yourself to Paris
6    Avenue.
7      A.  Right.
8      Q.  Okay.  And then you left that car at
9    Paris Avenue?
10     A.  Right.
11     Q.  Okay.  At your friend's house?
12     A.  Right.
13     Q.  And you mentioned two names, Mike and
14   Deshawn; is that right?
15     A.  Mike is Sean 's cousin.  They kin to
16   each other some kind of way or another.
17     Q.  And Sean is a woman?
18     A.  No, it's a fella.
19     Q.  It's a man.  Okay.  Mike and Sean.
20   Two males.
21     A.  Right.
22     Q.  At whose house did you leave your car?
23     A.  At Sean 's.
24     Q.  Okay.  And who drove you from there to
25   Jourdan Avenue?

Page 125

1      A.  Sean did.
2      Q.  Okay.  Where does Felton come into the
3    picture?
4      A.  That's a friend of mine.  He stay
5    around my house.
6      Q.  Okay.  But he didn't drive you from
7    Paris Avenue?
8      A.  No.
9      Q.  So Sean drove you to Jourdan Avenue
10   much.
11     A.  Right.
12     Q.  And did he just levee and go back
13   home?
14     A.  Right.
15     Q.  So he just dropped you off.
16     A.  Right.
17     Q.  And Felton was going to take you back
18   to the Hyatt.
19     A.  Right.
20     Q.  Had you already called him to let him
21   know you were coming back and ask him if he
22   could drive you to the hotel?
23     A.  No.  Me and him had been together
24   earlier that evening.
25     Q.  Okay.  You'd seen him at the Hyatt?

32 (Pages 122 to 125)

MURPH, JR., ARTHUR LEE

12/17/2007

| Page 126 | Page 128 |
|---|---|

**Page 126**

1    A.  No.
2    Q.  Okay.  You had been earlier together
3  in your neighborhood.
4    A.  Right.
5    Q.  Okay.  And what had you told him to
6  let him know this?
7    A.  No.  He came to my house.
8    Q.  Before or after you --
9    A.  Before that.
10    Q.  Before you went to the Hyatt.
11    A.  Before I took and moved all the
12  vehicles.
13    Q.  Okay.
14    A.  And he know he was supposed to come
15  back and get me.
16    Q.  So you already knew you were coming
17  back?
18    A.  Yeah.
19    Q.  Well, when did you find out that you
20  could keep dogs at the Hyatt?
21    A.  When I dropped my wife off.
22    Q.  Okay.  But you already arranged with
23  Felton to bring you back?
24    A.  No.  Me and Felton met by Sean 's.
25    Q.  Okay.

**Page 127**

1    A.  We set there and we drank a couple of
2  beers.
3    Q.  All right.  And so did Felton go back
4  with you and Sean?  Or did he drive himself
5  back?
6    A.  Felton drove hisself.
7    Q.  So you and Sean went in one car and
8  Felton went in his own car.
9    A.  Went in another one.  Right.
10    Q.  But while you were at Sean 's drinking
11  a couple of beers, you asked Felton if he could
12  take you back to the Hyatt letter that day.
13    A.  Right.
14    Q.  Is that right?
15    A.  Yes.
16    Q.  Okay.  Well, what route did you take
17  from Paris Avenue to your home at Jourdan
18  Avenue with Sean?
19    A.  Took the Interstate.
20    Q.  Took the Interstate?
21    A.  Yeah.  I think so.
22    Q.  Well, where did you exit the
23  Interstate?
24    A.  We got down at, um -- at Louisa I
25  think that is.  Louisa.  You go around the

**Page 128**

1  bend.  Got down to Louisa.
2    Q.  And then where did you go from Louisa?
3  How did you enter the Ninth Ward?
4    A.  Over the blue bridge.
5    Q.  Is that the St. Claude bridge?
6    A.  No, that's the --
7    Q.  I mean Florida?
8    A.  That's the Florida Avenue bridge.
9    Q.  And then you went down what streets in
10  the --
11    A.  Jourdan.
12    Q.  Okay.  So you came down Jourdan
13  towards your house.
14    A.  Right.
15    Q.  Did you see anything up on the canal
16  at that time?
17    A.  No.
18    Q.  Any boats, barges, anything like that?
19    A.  I wasn't really looking for anything
20  in the canal.
21    Q.  But you were on the passenger side of
22  the car, right?
23    A.  Yes.
24    Q.  So you would have been facing the
25  Industrial Canal side, right?

**Page 129**

1    A.  That's the side I would be sitting on,
2  yes.
3    Q.  And you didn't see anything in the
4  canal that caused you any concern, did you?
5    A.  No.  We were just riding and talking.
6    Q.  And those boats ride pretty high up in
7  the canal when you're down below, don't they?
8    A.  If the water is like it was, it would
9  have.  But on a regular day it would be down,
10  just in the canal.
11    Q.  But that day you already knew the
12  water was way high --
13    A.  Yes.
14    Q.  -- because you had seen it earlier in
15  the day, right?
16    A.  Yes.
17    Q.  So if there had been boat in the
18  canal, it would have been way up high and you
19  would have seen it, wouldn't you?
20    A.  Yeah.
21    Q.  And you didn't see any boat or barge
22  as you drove down.
23    A.  No.
24    Q.  All right.  So Sean dropped you off at
25  your home, is that right?

Johns Pendleton Court Reporters                    800 562-1285

BARGE000867

MURPH, JR., ARTHUR LEE

12/17/2007

Page 130

1    A.  Yes.
2    Q.  Now, just approximately, if you can
3  tell me, how many hours had it been since you
4  had left earlier that day with your wife and
5  daughter?
6    A.  I don't know.  I have no idea.
7    Q.  More than three, less than three?
8    A.  If I fold you any amount of time I'd
9  be lying to you.  I really don't know.
10    Q.  I understand.
11       Earlier, when you went to the levee
12  before you took your wife and daughter, you
13  said that the water was very high in the canal
14  and you saw it splashing over.  Is that right?
15    A.  Right.
16    Q.  When you came back from the Hyatt, was
17  it still splashing over or was it now spilling
18  over into the neighborhood?
19    A.  I don't know.  I didn't really pay it
20  no mind then.
21    Q.  As you drove down Jourdan Avenue,
22  could you see any standing water?
23    A.  No.  It just had the blowing rain,
24  that's it.
25    Q.  Was it nighttime yet?

Page 131

1    A.  Yeah.
2    Q.  But it was blowing rain.
3    A.  Yes, sir.
4    Q.  Do you know where -- in what direction
5  the wind was blowing from?
6    A.  It was blowing from the right side of
7  my house to the left side.  It was blowing
8  toward the Claiborne bridge.
9    Q.  So from Florida Avenue toward
10  Claiborne?
11    A.  Yes.
12    Q.  Now, is Felton 's last name Bercy?
13    A.  Yes.
14    Q.  B-E-R-C-Y?
15    A.  Yes.
16    Q.  Do you have a phone number for him?
17    A.  I don't know it, but I have it.  The
18  number I got in my phone, you can't get him.
19    Q.  Okay.  Did you make any preparations
20  in your house for the incoming storm?
21    A.  What kind of preparations?
22    Q.  Did you put up plywood in your
23  windows?
24    A.  No, I had storm shutters all the way
25  around my house.

Page 132

1    Q.  Did you prepare those storm shutters?
2    A.  They were down.
3    Q.  Meaning that all your windows were
4  shuttered closed?
5    A.  They were all the way down.
6    Q.  So once you were in the house you
7  couldn't see out, could you?
8    A.  You don't know if it's daylight or
9  dark.
10    Q.  So all these times that you testified
11  in answer to Mr. Wiedemann's questions that you
12  came in and out of the house, when you were in
13  the house you couldn't see anything outside.
14    A.  No.
15    Q.  The only time you could see anything
16  was when you were in your driveway or two and
17  from your shed or take your garage, right?
18    A.  I'd have to be outside.
19    Q.  Now, is your garage the same as your
20  shed or are those two different buildings?
21    A.  It's two different buildings.
22    Q.  So you have a garage, a shed, and also
23  an efficiency apartment?
24    A.  Right.
25    Q.  Three structures in your back?

Page 133

1    A.  No.  No shed.  The garage is the shed.
2    Q.  That's what I thought.
3       So you have a garage which is a shed.
4  That's one building.
5    A.  Right.  That's the garage.
6    Q.  And then you have an apartment.
7    A.  Right.
8    Q.  Okay.  Or you had.
9    A.  Right.
10    Q.  The front of your house faced Jourdan
11  Avenue?
12    A.  Front of my house is on Jourdan
13  Avenue.
14    Q.  Right.  Is on Jourdan Avenue.
15    A.  Right.
16    Q.  Did you have a porch?
17    A.  Yes.
18    Q.  And the side door that you testified
19  you went in and out of, how far back from the
20  front of your house was that?
21    A.  It's not a side door, it's a back
22  door.
23    Q.  Back door.
24    A.  Right.
25    Q.  So that would be directly --

34 (Pages 130 to 133)

MURPH, JR., ARTHUR LEE

12/17/2007

Page 134

1    A.  Behind the house.
2    Q.  -- in the backyard?
3    A.  Right.
4    Q.  And what did you have behind your
5  house, did you have a neighbor facing Tennessee
6  Street?
7    A.  Tennessee Street?
8    Q.  I mean Deslonde?
9    A.  How you mean?
10   Q.  Did you have a neighbor directly
11 behind you?
12   A.  Yes.
13   Q.  And do you know who that was, their
14 name?
15   A.  That was my sister's boyfriend.
16   Q.  Your sister's boyfriend?
17   A.  Right.  Dray.
18   Q.  I'm sorry?
19   A.  Dray.
20   Q.  What's his last name?
21   A.  I don't know.
22   Q.  And he was staying at that house?
23   A.  He was staying in a little efficiency
24 in the back.
25   Q.  In your efficiency?

Page 135

1    A.  Yes.
2    Q.  Okay.  Did you have a neighbor behind
3  you?
4    A.  He was my neighbor behind me.
5    Q.  Did you have a house behind you?
6    A.  No.
7    Q.  Were there any tall trees in your
8  backyard or in the backyards next to you?
9    A.  Yes.
10   Q.  And in whose backyard?
11   A.  It was in the people that stay in the
12 double next to me.
13   Q.  Next to you toward?
14   A.  In the two-story.
15   Q.  Toward Claiborne?
16   A.  Right.
17   Q.  Their house faced Jourdan, also?
18   A.  Jourdan Avenue.
19   Q.  And they had a tall tree in their
20 backyard?
21   A.  Right.
22   Q.  No, you said that your house is a
23 one-story house, is that right?
24   A.  Right.
25   Q.  And how tall would you say the peak of

Page 136

1  your roof was?
2    A.  From the ground to the very top?
3    Q.  Yes.
4    A.  I'd say about sixteen, seventeen feet,
5  maybe.
6    Q.  At the that you were in the attic
7  before you tied the extension cord around you
8  to swim away, the water had risen to the height
9  of your attic?  Is that right?
10   A.  It was at the -- it was right even
11 with the gutter.
12   Q.  And you had eight foot ceilings?
13   A.  Right.
14   Q.  Plus I think you said a couple of
15 steps up to your porch?
16   A.  One.
17   Q.  One step up to your porch?
18   A.  One step into the house.
19   Q.  Into the house.  Well, was the porch
20 on the ground or did you have any steps going
21 up to the porch before --
22   A.  The porch is two inches off from the
23 drive -- off from the carport.
24   Q.  Okay.  Now, on your drive back from the
25 Hyatt to Jourdan Avenue with -- from Paris

Page 137

1  Avenue, back to Jourdan Avenue, what was the
2  weather conditions?
3    A.  The wind was blowing, and raining.
4    Q.  Was it dark and stormy?
5    A.  I was dark and the wind was just
6  blowing.
7    Q.  And did you see any standing water
8  around the Paris Avenue area or as you got on
9  or off I-10?
10   A.  No.
11   Q.  Mr. Murph, you know that you're under
12 oath here today; right?
13   A.  Right.
14   Q.  Same as if you were in Court in front
15 of a judge or jury?
16   A.  Right.
17   Q.  And you've told the truth today,
18 haven't you, to the best of your recollection?
19   A.  Yes, I have.
20   Q.  And everything that you said here
21 today is as you remembered living it?
22   A.  Yes.
23   Q.  And the things that you saw, that
24 you've stated here today, is as you remember
25 seeing them?

35 (Pages 134 to 137)

MURPH, JR., ARTHUR LEE

12/17/2007

Page 138

1    A.  Yes.
2    Q.  Okay.  Thank you, Mr. Murph.  That's
3  all I have.
4  EXAMINATION BY MR. BRUNO:
5    Q.  Mr. Murph, my name is Joe Bruno.  And
6  I represent plaintiffs, people who are filing
7  suit against some of the good people in this
8  room.  I'd like to ask you some questions.  And
9  I know you've been here for a long time and I
10  appreciate your patience --
11    A.  Right.
12    Q.  -- in putting up with us.  What I'd
13  like to talk about first is the period of time
14  before Katrina.  All right?  Before the storm.
15  Okay?
16    A.  Uh-huh.
17    Q.  When you first moved to Jourdan.  Can
18  you remember that?
19    A.  No.
20    Q.  All right.  I believe you told us this
21  morning that you had lived on that street for
22  about ten years?
23    A.  Somewhere along there, I guess.
24    Q.  About that.  I know -- I'm not asking
25  you to pinpoint the time, but it's about ten

Page 139

1  years?
2    A.  Yes.
3    Q.  All right.  Can you remember a time
4  when there were businesses in operation on the
5  water side of that floodwall when you lived on
6  Jourdan?
7    A.  Just the time they been working all
8  the time.
9    Q.  I didn't understand that.
10    A.  They always worked on the other side
11  of the levee.
12    Q.  Okay.  By that -- well, let me make
13  sure that you understand my question.
14    A.  Right.
15    Q.  Do you remember any companies who had
16  businesses located on the other side of that
17  floodwall, on wharves or other things that were
18  in the water, on the water side of the levee?
19    A.  No.
20    Q.  Okay.  All right.  But I believe then
21  what you're telling me is, and tell me if I'm
22  wrong, but that during the entire time that you
23  lived on Jourdan there was always some kind of
24  construction activity on the other side of that
25  wall.

Page 140

1    A.  Right.
2    MS. BERTAUT:
3       Object to the form of the
4    question.
5    MR. BRUNO:
6       What's wrong with the form?
7    MS. BERTAUT:
8       Misstates the testimony.
9    MR. BRUNO:
10       That's not a form objection.
11  EXAMINATION BY MR. BRUNO:
12    Q.  Anyway, can you remember during that
13  period of time, that approximate ten years,
14  ever having walked up to the wall to kind of
15  peak over the other side to see what kind of
16  work was going on over there?
17    A.  Yes.
18    Q.  Okay.  Can you describe for us the
19  kind of work activity that you saw going on on
20  the other side of that wall?
21    A.  Yes.
22    Q.  What did you see?
23    A.  I think they was dredging the canal,
24  to make it deeper.
25    Q.  Uh-huh.  All right.  What kinds of

Page 141

1  equipment did you see in use?
2    A.  Excavator.
3    Q.  An excavator?
4    A.  And big backhoes digging in the water.
5    Q.  Digging being old holes?
6    A.  I don't know if he was digging holes,
7  but he was digging in the water.
8    Q.  He was digging something.
9    A.  Right.
10    Q.  Okay.  All right.  Now, can you
11  remember whether during this span of time,
12  about ten years, did you ever see construction
13  people on the land side of the floodwall, in
14  other words, in front of your house?
15    A.  No.
16    Q.  Are you familiar with that logo that
17  the United States Army Corps of Engineers has
18  on their helmets, they've got the castle?
19    A.  Right.
20    Q.  You know what I'm talking about?
21    A.  Exactly.
22    Q.  Did you ever see fellows with that
23  logo on their helmet or on their clothes
24  walking around on the land side of the
25  floodwall by your house?

36 (Pages 138 to 141)

BARGE000870

MURPH, JR., ARTHUR LEE

12/17/2007

## Page 142

1    A.  Sometimes.
2    Q.  Sometimes?
3        MR. LAGARDE:
4            Objection to form.
5        Clarification, Joe.  You talking pre
6    or post-storm?
7        MR. BRUNO:
8            All of these questions were
9    pre-storm.
10       MR. LAGARDE:
11           Thank you, Joe.
12       MR. BRUNO:
13           I made that, I thought, very
14   clear.  But I'll do it again.
15   EXAMINATION BY MR. BRUNO:
16   Q.  We're talking about before the storm.
17   A.  Right.
18   Q.  Before Katrina ever came, or you
19   thought it was coming.
20   A.  Right.
21   Q.  I know I'm testing your memory, but
22   can you give me some sense of how often you
23   would see these fellows with the castles on
24   their helmet in the area in front of your
25   house?

## Page 143

1    A.  They don't normally be there all the
2    time.  Just every now and then.
3    Q.  Every now and then?
4    A.  Right.
5    Q.  Mr. Murph, you ever take walks along
6    the levee near that floodwall?
7    A.  Yes.
8    Q.  Can you remember ever observing any
9    puddling of water on the levee side or the land
10   side of that floodwall while you were taking
11   your walks?
12   A.  On my side of the wall?
13   Q.  Yeah.
14   A.  No.
15   Q.  Nothing like that?
16   A.  Every now and then it might rain a
17   little, they might have a little water going
18   down the drain.  The drain was on the levee
19   side.
20   Q.  Okay.  All right.  And I know that
21   every walk might have been different, but was
22   there some sort of regular route that you might
23   take if you chose to take a walk along the
24   levee, along the wall there?
25   A.  No.

## Page 144

1    Q.  All right.  Is this something you did
2    very regularly, that is, take a little walk
3    along that wall?
4    A.  No.
5    Q.  All right.  I take it that you would
6    drive occasionally up and down Jourdan Avenue.
7    A.  Every day.
8    Q.  Every day.  And would you go -- would
9    your route take you to the right?  Or I think
10   that would be north.  Would that be north --
11   A.  Yeah.
12   Q.  -- if you turn right?
13       Would your ride ever take you that
14   way?
15   A.  It all depends on where I was going.
16   Q.  Okay.  All right.  Did you ever notice
17   any puddling or pooling of water when it wasn't
18   raining along that floodwall?
19   A.  No.
20   Q.  Okay.  All right.  Now, let's talk
21   about the storm.
22   A.  Okay.
23   Q.  Okay?  Hurricane Katrina.  When you
24   got back to the house, to pick up the dog --
25   A.  Right.

## Page 145

1    Q.  Okay?  And I know that this may have
2    been asked a couple hundred times, but I just
3    want to see if I can clarify it.  Was it -- the
4    sun still out --
5    A.  No.
6    Q.  -- or was it dark?
7    A.  It was dark.
8    Q.  It was dark.  Okay.  All right.  And
9    did you watch a little TV?
10   A.  A lil bit.
11   Q.  That night?  Okay.  Do you remember
12   any of the shows you might have saw --
13   A.  No.
14   Q.  -- that night?
15   A.  (Shakes head negatively.)
16   Q.  I imagine you were listening to the
17   news.  Were you listening to the news?
18   A.  I don't know.
19   Q.  Well, were you interested in what was
20   going on with that storm?
21   A.  Yes.
22   Q.  Okay.  And from time to time, did the
23   broadcast bulletins on the TV about what was
24   going on with the storm?
25   A.  Probably.

37 (Pages 142 to 145)

MURPH, JR., ARTHUR LEE

12/17/2007

Page 146

1    Q.  Probably.  Okay.  All right.
2        At some point did you ever get tired
3    and maybe want to go to sleep?
4    A.  No, I don't think.
5    Q.  No?
6    A.  No.
7    Q.  So you just -- tell me how you
8    occupied your time.
9    A.  Just sit there with the dog.
10   Q.  Watching the TV set?
11   A.  Until it went off.
12   Q.  All right.  So you watched the TV
13   until it stopped working.
14   A.  Right.
15   Q.  Is that right?
16   A.  Right.
17   Q.  Okay.  Now, I'm sort of curious.  What
18   made you believe that Paris Road was safer for
19   your car than the Lower Nine?
20   A.  Paris Avenue.
21   Q.  Paris Avenue, I'm sorry.
22   A.  I used to stay in the 7th Ward.
23   Q.  Okay.  But I mean, what about you
24   staying in the 7th Ward made you believe that
25   it was a safer place to put your car than where

Page 147

1    your house was?
2    A.  Because when Betsy came it didn't get
3    wet there.
4    Q.  Okay.  All right.  So you were in the
5    Lower Nine during Betsy?
6    A.  No.  I was in the St. Bernard Project.
7    Q.  Okay.  So it's because -- well, let me
8    ask you this:  Did you have some sense that the
9    Lower Nine would flood again in this hurricane?
10   A.  Yeah.  Sure.
11   Q.  Why did you feel that way?
12   A.  It flooded for Betsy.
13   Q.  Okay.  So the mere fact that it
14   flooded in Betsy made you feel like it probably
15   was going to flood again.
16   A.  Oh, yeah.
17   Q.  Well, can you maybe help me understand
18   why you waited until late Sunday to leave if
19   you had a concern that it might flood in the
20   Lower Nine?
21   A.  Because I knew Felton was going to
22   come back.
23   Q.  Well, I mean when you decided to leave
24   with the wife and your child.
25   A.  Well, I was looking at the news on the

Page 148

1    television.
2    Q.  Okay.  Well, hadn't they been saying
3    for a couple of days to evacuate the city?
4    A.  No.
5    Q.  When is the first time that you heard
6    or saw anybody say anything about you need to
7    leave the city because of the hurricane?
8    A.  Oh, me and my friends, we talked about
9    it.
10   Q.  Was that -- what day of the weekend
11   was that?
12   A.  I don't know.
13   Q.  All right.  Who made the final
14   decision to leave?  You?
15   A.  I did.
16   Q.  You did?  Not your wife?
17   A.  Oh.  And her, too.
18   Q.  Her, too.
19   A.  Right.
20   Q.  It was your wife, wasn't it?
21   A.  Right.
22   Q.  I know better.
23       Now, I know it's hard to remember time
24   and what you were doing over that span of time,
25   but at the point where you decided to get the

Page 149

1    ax and put a hole in your roof, why did you
2    decide to do that?
3    A.  Because I know if water was coming
4    down the street as fast as it was it was going
5    to get high real quick.
6    Q.  Can you help me understand why you
7    felt like it was going to get high quick?
8    A.  Because it was coming down the
9    driveway fast.
10   Q.  All right, sir.  The water was moving
11   very fast?
12   A.  Real fast.
13   Q.  Okay.  All right.  But after you made
14   the hole, you came down again.
15   A.  Right.
16   Q.  So I gather you felt like the danger
17   wasn't quite as bad as it was before?
18   A.  No, I just wanted to check out things
19   downstairs.
20   Q.  Now, whenever it was that you saw this
21   big thing, which you may have described as a
22   barge, I don't even remember, what caused you
23   to look in that direction?
24   A.  I don't know, just peeping up looking
25   around.

38 (Pages 146 to 149)

MURPH, JR., ARTHUR LEE

12/17/2007

---

Page 150

1    Q.  Okay.  All right.  So in essence, you
2  were looking around, and then you saw this big
3  thing.
4    A.  Right.
5    Q.  When you first saw it, was it moving
6  or was it stationary?
7    A.  I don't know.  I don't know if it was
8  moving or it was standing still.  It was so
9  big --
10    Q.  How close to you was this thing?
11    A.  About from here to that wall.
12    Q.  All right.  That's about twenty feet?
13    A.  I guess.  About twenty.
14    Q.  No?
15    A.  Whatever.
16    Q.  About that.  Okay.
17       Do you know whether or not this big
18  thing was in contact with your house?
19    A.  Yeah.
20    Q.  How do you know?
21    A.  Because I looked at it.  I was in the
22  hole in the roof and I looked at the barge
23  right there.
24    Q.  And all of this occurred when it was
25  dark outside.

---

Page 151

1    A.  Right.
2    Q.  Can you give me some sense of how much
3  time passed between the time the lights went
4  out and you saw this big thing next to your
5  house?
6    A.  It was a long time.
7    Q.  It was a long, long time?
8    A.  It was a long time.
9    Q.  Hours?
10    A.  Oh, yeah.  Yeah, it was hours.  For
11  sure.  How many, I don't -- I have no idea.
12    Q.  Okay.  And then you swam over to the
13  neighbor 's house?
14    A.  Yes.
15    Q.  And the water was high?
16    A.  Yeah.
17    Q.  All right.  Get any sleep that night?
18    A.  No.
19    Q.  That's all I've got.  Thank you.
20    A.  You're welcome.
21       MR. WALKER:
22          I'd like add something for the
23       record before you go off.  As counsel
24       for WGI noted, we make the same
25       observation that we reserve any

---

Page 152

1  questioning of Mr. Murph with respect
2  to any other issues which may arise
3  surrounding the statement in the event
4  that he's brought to testify again.
5       MR. WIEDEMANN:
6          Just for the record, there's more
7       than just the statement.  He gave five
8       instances of things he was going to
9       check with his attorney.
10       MR. WALKER:
11          Correct.  Thank you.  We reserve
12       our rights with respect to each and
13       every one of those and any other
14       matters that may come up in the
15       examination of Mr. Murph.
16          Thank you very much, Mr. Murph.
17    A.  That's it?
18       MR. SANDERS:
19          Yeah.
20          (Whereupon the deposition was
21       recessed for the day.)
22
23
24
25

---

Page 153

1       WITNESS' CERTIFICATE
2
3       I, ARTHUR LEE MURPH, JR., do hereby
4  certify that the foregoing testimony was given
5  by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10  _____   _____
11  DATE SIGNED       ARTHUR LEE MURPH, JR.
12
13  _____ Signed with corrections as noted.
14
15  _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25  DATE TAKEN:  December 17th, 2007

Johns Pendleton Court Reporters                    800 562-1285

BARGE000873

MURPH, JR., ARTHUR LEE

12/17/2007

```
                                     Page 154
 1           REPORTER'S CERTIFICATE
 2           I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
 3   Certified Court Reporter in and for the State
 4   of Louisiana, do hereby certify that the
 5   aforementioned witness, after having been first
 6   duly sworn by me to testify to the truth, did
 7   testify as hereinabove set forth;
 8           That said deposition was taken by me
 9   in computer shorthand and thereafter
10   transcribed under my supervision, and is a true
11   and correct transcription to the best of my
12   ability and understanding.
13           I further certify that I am not of
14   counsel, nor related to counsel or the parties
15   hereto, and am in no way interested in the
16   result of said cause.
17
18
19
20
21
22
23   _____
24   JOSEPH A. FAIRBANKS, JR., CCR, RPR
25   CERTIFIED COURT REPORTER #75005
```

Johns Pendleton Court Reporters                    800 562-1285

BARGE000874