# EXHIBIT 19

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 155

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES   * CIVIL ACTION

                                * NO. 05-4182

PERTAINS TO: BARGES             * Consolidated

                                * SECTION "K(2)"

Boutte v. Lafarge        05-5531 *

Mumford v. Ingram        05-5724 * JUDGE DUVAL

Lagarde v. Lafarge       06-5342 *

Perry v. Ingram          06-6299 * MAG. WILKINSON

Benoit v. Lafarge        06-7516 *

Parfait Family v. USA    07-3500 *

Lafarge v. USA           07-5178 *

   *   *   *   *   *   *   *   *   *   *   *


          ( V O L U M E   II)

        Deposition of ARTHUR LEE MURPH, JR.,

given at Chaffe McCall, L.L.P., 2300 Energy

Centre, 1100 Poydras Street, New Orleans,

Louisiana 70163-2300, on January 28th, 2008.


REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

| Page 156 |
|---|
| 1  APPEARANCES: |
| 2  REPRESENTING THE PLAINTIFFS: |
| 3        WIEDEMANN & WIEDEMANN |
| 4        (BY: LAWRENCE D. WIEDEMANN, ESQUIRE) |
| 5        821 Baronne Street |
| 6        New Orleans, Louisiana 70113 |
| 7        504-581-6180 |
| 8  - and - |
| 9        BRIAN A. GILBERT, P.L.C. |
| 10       (BY: BRIAN A. GILBERT, ESQUIRE) |
| 11       821 Baronne Street |
| 12       New Orleans, Louisiana 70113 |
| 13       504-885-7700 |
| 14  - and - |
| 15       LAW OFFICE OF PATRICK J. SANDERS |
| 16       (BY: PATRICK J. SANDERS, ESQUIRE) |
| 17       3123 Ridgelake Drive, Suite B |
| 18       Metairie, Louisiana 70002 |
| 19       504-834-0646 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 157 |
|---|
| 1  REPRESENTING THE DEPONENT: |
| 2        RICHTHOFEN & ASSOCIATES, L.L.C. |
| 3        (BY: RICHARD J. RICHTHOFEN, JR., |
| 4        ESQUIRE) |
| 5        303 S. Broad St., 3rd Floor |
| 6        New Orleans, Louisiana 70119 |
| 7        504-899-7949 |
| 8 |
| 9  REPRESENTING THE AMERICAN CLUB: |
| 10       MONTGOMERY, BARNETT, BROWN, READ, |
| 11       HAMMOND & MINTZ, L.L.P. |
| 12       (BY: PHILIP S. BROOKS, JR., ESQUIRE) |
| 13       3200 Energy Centre |
| 14       1100 Poydras Street |
| 15       New Orleans, Louisiana 70163 |
| 16       504-585-3200 |
| 17 |
| 18  REPRESENTING WASHINGTON GROUP INTERNATIONAL: |
| 19       STONE PIGMAN WALTHER WITTMANN, L.L.C. |
| 20       (BY: CARMELITE M. BERTAUT, ESQUIRE) |
| 21       546 Carondelet Street |
| 22       New Orleans, Louisiana 70130 |
| 23       504-581-3200 |
| 24 |
| 25 |

| Page 158 |
|---|
| 1  REPRESENTING LAFARGE NORTH AMERICA: |
| 2        CHAFFE, MCCALL, L.L.P. |
| 3        (BY: DEREK A. WALKER, ESQUIRE) |
| 4        (BY: ROBERT B. FISHER, JR., ESQUIRE) |
| 5        2300 Energy Centre |
| 6        1100 Poydras Street |
| 7        New Orleans, Louisiana 70163-2300 |
| 8        504-585-7000 |
| 9  - and - |
| 10       GOODWIN PROCTOR, L.L.P. |
| 11       (BY: MARK S. RAFFMAN, ESQUIRE) |
| 12       (VIA TELEPHONE) |
| 13       901 New York Avenue, NW |
| 14       Washington, D.C. 20001 |
| 15       202-346-4000 |
| 16 |
| 17  REPRESENTING NEW YORK MARINE & GENERAL |
| 18  INSURANCE COMPANY: |
| 19       SUTTERFIELD & WEBB |
| 20       (BY: DANIEL A. WEBB, ESQUIRE) |
| 21       650 Poydras Street, Suite 2715 |
| 22       New Orleans, Louisiana 70130 |
| 23       504-598-2715 |
| 24 |
| 25 |

| Page 159 |
|---|
| 1  REPRESENTING ZITO: |
| 2        MOULEDOUX, BLAND, LEGRAND & BRACKETT, |
| 3        L.L.C. |
| 4        (BY: WILLIAM C. EMORY, ESQUIRE) |
| 5        701 Poydras Street, Suite 4250 |
| 6        New Orleans, Louisiana 70130 |
| 7        504-595-3000 |
| 8 |
| 9  REPRESENTING ORLEANS LEVEE DISTRICT: |
| 10       SUTTON LAW FIRM |
| 11       (BY: CHARLES E. SUTTON, JR., ESQUIRE) |
| 12       2101 N. Highway 190, Suite 105 |
| 13       Covington, Louisiana 70433 |
| 14       985-249-5991 |
| 15  - AND - |
| 16       MCCRANIE, SISTRUNK, ANZELMO, HARDY, |
| 17       MAXWELL & MCDANIEL |
| 18       (BY: KASSIE L HARGIS, ESQUIRE) |
| 19       3445 N. Causeway Boulevard, Suite 800 |
| 20       Metairie, Louisiana 70002 |
| 21       504-831-0946 |
| 22 |
| 23 |
| 24 |
| 25 |

2 (Pages 156 to 159)

BARGE000876

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

---

Page 160

```
 1   REPRESENTING JEFFERSON PARISH:
 2       BURGLASS & TANKERSLEY
 3       (BY: MONICA M. WALDRON-BURGLASS,
 4       ESQUIRE)
 5       5213 Airline Drive
 6       Metairie, Louisiana 70001
 7       504-836-2220
 8
 9   REPRESENTING PORT OF NEW ORLEANS:
10       DAIGLE, FISSE & KESSENICH, PLC
11       (BY: KIRK N. AURANDT, ESQUIRE)
12       227 Highway 21, Madisonville,
13       Louisiana 70447
14       985-871-0800
15
16   ALSO PRESENT:
17       DON HAYCRAFT, ESQ.
18       AARON RIVES, ESQ.
19       PETER KEELEY
20       JOHN SHELONKO
21       JESSICA SULLIVAN, ESQ. (VIA TELEPHONE)
22
23
24
25
```

Page 162

```
 1            S T I P U L A T I O N
 2       IT IS STIPULATED AND AGREED by and
 3   among counsel for the parties hereto that the
 4   deposition of the aforementioned witness may be
 5   taken for all purposes permitted within the
 6   Federal Rules of Civil Procedure, in accordance
 7   with law, pursuant to notice;
 8       That all formalities, save reading
 9   and signing of the original transcript by the
10   deponent, are hereby specifically waived;
11       That all objections, save those as to
12   the form of the question and the responsiveness
13   of the answer, are reserved until such time as
14   this deposition, or any part thereof, is used
15   or sought to be used in evidence.
16
17
18                   * * *
19
20
21
22       JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23   Certified Court Reporter in and for the State
24   of Louisiana, officiated in administering the
25   oath to the witness.
```

---

Page 161

```
 1       E X A M I N A T I O N   I N D E X
 2
 3   EXAMINATION BY:              PAGE
 4
 5   MR. GILBERT ............................ 169
 6   MR. RICHTHOFEN .......................... 258
 7   MS. BERTAUT ............................ 259
 8   MR. GILBERT ............................ 281
 9   MR. WALKER ............................ 285
10   MR. GILBERT ............................ 289
11   MR. RICHTHOFEN .......................... 289
12       E X H I B I T   I N D E X
13
14   EXHIBIT NO.                 PAGE
15   Exhibit 1(a) ............................ 225
16   Exhibit 2(a) ............................ 242
17   Exhibit 3(a) ............................ 245
18   Exhibit 4(a) ............................ 246
19   Exhibit 5(a) ............................ 248
20   Exhibit 6(a) ............................ 252
21   Exhibit 7(a) ............................ 252
22   Exhibit 8(a) ............................ 257
23
24
25
```

Page 163

```
 1       ARTHUR LEE MURPH, JR.
 2   105 Berkley Drive, New Orleans, Louisiana
 3   70131, a witness named in the above
 4   stipulation, having been first duly sworn, was
 5   examined and testified on his oath as follows:
 6       MR. RICHTHOFEN:
 7       I'm sorry. If I may, I'm here
 8   for the sole purpose of just
 9   representing Mr. Murph 's interests.
10   And before we begin, I'd request from
11   Lafarge that any confidentiality
12   agreement, any settlement agreement
13   that may or may not exist, that
14   Mr. Murph be allowed to discuss the
15   fact that there is and the terms
16   therein inasmuch as has been released
17   through the discovery process to the
18   plaintiffs' counsel.
19       MR. WALKER:
20       Derek Walker on behalf of
21   Lafarge. Let me first indicate that
22   this is a continuation of a prior
23   deposition. You're aware of that.
24       MR. RICHTHOFEN:
25       Yes.
```

---

Johns Pendleton Court Reporters                    800 562-1285

BARGE000877

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

## Page 164

1  MR. WALKER:
2      Okay.  Secondly, with respect to
3  a waiver, Lafarge does of the agree to
4  waive any of the terms of the
5  confidential agreement nor the
6  settlement agreement.  The redacted
7  settlement agreement has been
8  produced, the document speaks for
9  itself, and Lafarge does not waive the
10  terms of that document.
11  MR. GILBERT:
12      All right.  And I'm going to join
13  in Mr. Richthofen 's request, and I'm
14  going to specifically, for the record,
15  cite to the language in the
16  confidentiality portion of the
17  agreement which says that the Murphs
18  agreed that in the event they should
19  be compelled by legal process, and I
20  believe that would include a subpoena,
21  to reveal the terms of this receipt
22  and release and settlement agreement,
23  they shall first obtain the written
24  permission of Lafarge North America,
25  Inc., New Jourdan, LLC., and New

## Page 165

1  Berkley, LLC, which permission shall
2  not be unreasonably withheld.  Now, if
3  there are representatives here of
4  these entities and there is no reason
5  to withhold that, I would join in
6  Mr. Richthofen 's request that
7  Mr. Murph be allowed to speak about
8  the terms of the settlement.
9  MR. WALKER:
10      Well, again, on behalf of
11  Lafarge, Lafarge will not waive the
12  confidentiality terms of the agreement
13  to allow Mr. Murph to discuss the
14  terms of the agreement.  The agreement
15  speaks for itself as unredacted, Judge
16  Wilkinson has a complete and
17  unredacted version, and he can make a
18  determination beyond any that can be
19  made here today if you wish the bring
20  the matter up to the judge, other than
21  to have Mr. Murph and Lafarge will
22  acknowledge the existence of this
23  agreement.  Other than that, the terms
24  and conditions and other items that
25  are not self-evident from the document

## Page 166

1  itself we do not waive.  As far as New
2  Jourdan and Berkeley, we do not
3  represent them.
4  MR. GILBERT:
5      Okay.  We acknowledge our
6  understanding of what you've just said
7  and we do reserve rights to bring this
8  matter and any other matters ancillary
9  to this to the Court 's attention to
10  be addressed on the merits, if
11  necessary.
12      And what I'm going to do now is
13  I'm going to ask, if there are any
14  other entities here who are parties to
15  the settlement agreement, if they will
16  give their consent.  If there are any
17  other representatives of any of the
18  other entities that are parties to
19  this agreement, I'm asking if they
20  would speak up for the record and
21  either give their consent or refuse.
22  MR. WALKER:
23      Specifically, which entities?
24  MR. GILBERT:
25      Let the record reflect that

## Page 167

1  there's utter silence in the room
2  right now and that no other
3  representative of any other entity
4  that has responded to our request.
5  MR. WALKER:
6      Specifically, you're talking
7  about New Jourdan and Berkley.
8  MR. GILBERT:
9      New Jourdan, Berkley -- there are
10  a number of entities that are named in
11  this settlement agreement as to whom
12  there's purportedly been a settlement
13  with the Murph family.
14  MR. WALKER:
15      I think for clarity of the record
16  you should name them, because I don't
17  think your characterization is
18  necessarily correct.  So New Jourdan,
19  New Berkley, and what other entities
20  are you referring to?
21  MR. GILBERT:
22      On Page 4 of the settlement
23  agreement there is an agreement that
24  the Murphs agreed to indemnify and
25  hold harmless New Jourdan, LLC and its

4 (Pages 164 to 167)

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 168

```
1    assignee and well as any other
2    released party as defined in Section 2
3    below.  And in Section 2.1, there's
4    language whereby the Murphs do release
5    and forever discharge Lafarge North
6    America, Ingram Barge Company, New
7    Jourdan, LLC, New Berkley, LLC, their
8    assigns, representatives, insurers, et
9    cetera.
10        And so I'm asking today if there
11   are any other entities that are party
12   to this agreement who will give
13   permission.
14   MR. WEBB:
15        Counsel, I'm Dan Webb.  I do not
16   represent New Jourdan, LLC.  I
17   represent New York Marine General
18   Insurance Company.  With respect to
19   New Jourdan, LLC, this is the first
20   request that it is aware of, and I can
21   pass it on to its principals, but I
22   have no idea what position its
23   principals would take.
24   MR. GILBERT:
25        Who are the principals of New
```

Page 169

```
1    Jourdan, LLC?
2    MR. WEBB:
3        Don't know.
4    MR. GILBERT:
5        Well, let's go for forward and
6        let's see what we can accomplish.
7    EXAMINATION BY MR. GILBERT:
8    Q.  Mr. Murph, I introduced myself a few
9    minutes ago.  My name is Bryan Gilbert.  I
10   represent residents of the Lower Ninth Ward,
11   parts of St. Bernard Parish in a lawsuit that's
12   been filed against companies that might be
13   responsible for a barge breaking the Industrial
14   Canal floodwall and causing flooding.  Those
15   allegations are not proven, but it is what we
16   allege.
17        You began your deposition
18   December 17th, 2007, if you recall, and there
19   are a few reasons for bringing you here today.
20   By way of explanation, let me just say it's to
21   clarify some matters that we began to talk
22   about in that earlier session, to speak about
23   some matters that you were unsure whether you
24   could talk about without first getting advice
25   of counsel, and to continue the deposition into
```

Page 170

```
1    other topics that we didn't get a chance to get
2    into because of the various obstacles that we
3    needed to contend with during the first
4    session.
5        Have you had a chance to consult an
6    attorney about the matters that you expressed
7    concern about in your first deposition?
8    A.  Yes.
9    Q.  And who would that be?
10   A.  Mr. Richthofen.
11   Q.  And has he given you advice?
12   A.  Some.
13   Q.  Okay.  Have you had sufficient
14   consultation or advice to go forward and answer
15   questions that we were beginning to explore
16   with you during that last session?
17   A.  Yes, I have.
18   Q.  I'm sorry?
19   A.  Yes.
20   Q.  Yes, he has?  You have to speak out
21   loud because the court reporter is taking
22   everything down, a nod or a head shake -- we're
23   not on video.
24        (Whereupon the deponent conferred with
25   counsel off the record.)
```

Page 171

```
1    MR. WALKER:
2        Before you answer, Mr. Murph, let
3    me respond to your initial statement
4    with a couple of statements and
5    objections.  Number one, as noted
6    earlier this is a continuation of
7    Mr. Murph 's prior deposition;
8    therefore, as a continuation those
9    attorneys who were questioning the
10   witness at the time are the ones who
11   properly should be proceeding with any
12   additional questions.  And I don't
13   believe, Mr. Gilbert, that you were
14   the attorney on behalf of the
15   plaintiffs group who was questioning;
16   therefore, we object to your
17   questioning the witness and any change
18   in the attorneys with respect to the
19   continuing deposition.
20        Secondly, you stated that you
21   intend to go into areas that were
22   previously covered.  And to the extent
23   that you do that, we're noting an
24   objection at this time.  There are
25   five limited areas that were reserved
```

5 (Pages 168 to 171)

BARGE000879

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

---

Page 172

1      for this continuing deposition.
2      MR. GILBERT:
3          And just to respond to that, I
4      think that's a misimpression on
5      Lafarge's part.
6   EXAMINATION BY MR. GILBERT:
7      Q.  Okay.  Have you received advice and
8   counsel such that you're able to answer
9   questions today about the topics that we were
10  beginning to explore during the last session?
11     A.  Yes.
12     Q.  Okay.  I'm just going to ask that -- I
13  think maybe Mr. Richthofen already asked you,
14  I'm just going to ask you to speak loud so that
15  everybody around the table can hear, especially
16  me.
17         Rather than rehash everything, I want
18  to clarify a few things and ask a few more
19  questions based on some gaps in the testimony.
20  You testified that you went to the Hyatt that
21  afternoon, and that your sister Doris Murph
22  works there.
23     A.  Yes.
24     Q.  What was her job there?
25     MR. WALKER:

---

Page 173

1          Objection.  Not part of the five
2      areas that we agreed and that were
3      reserved for this deposition.
4      MR. GILBERT:
5          Okay.  Can we just agree to leave
6      the standing objection -- continuing
7      objection on the record rather than
8      disrupting the examination and
9      corrupting the record?
10     MR. WALKER:
11         No, I think what's probably more
12     proper is to interrupt the deposition
13     and bring this matter to Judge
14     Wilkinson, because our position is
15     that any attempt on your part to
16     either go over old testimony or, as I
17     assume y'all also attempt to do later,
18     get into the statement and the
19     confidentiality agreements, unduly
20     prejudice Lafarge if anything is put
21     on the record, and would annoy, harass
22     and potentially embarrass either the
23     deponent or Lafarge as an interested
24     party, and under Rule 30 we are
25     compelled to bring the matter to the

---

Page 174

1          Court 's attention, and it's the Court
2      who should decide.
3   EXAMINATION BY MR. GILBERT:
4      Q.  What was Doris' job at the Hyatt at
5   that time?
6      MR. WALKER:
7          Objection.
8      A.  Security.
9   EXAMINATION BY MR. GILBERT:
10     Q.  Security?  Did she have anything to do
11  with registering guests there?
12     A.  Nope.
13     Q.  Okay.  Do you know what room your
14  family was assigned to at the Hyatt?
15     A.  No.
16     Q.  Okay.  Okay.  You testified earlier
17  that you made a number of -- well, that there
18  were a number of phone calls between you and
19  your wife that evening.  And we're talking
20  about the evening of Sunday, August 28th.  Do
21  you recall those phone calls?
22     MR. WALKER:
23         Sorry.  Note the continuing
24     objection.
25  EXAMINATION BY MR. GILBERT:

---

Page 175

1      Q.  You can answer.
2      A.  No.
3      Q.  You don't recall the phone calls?
4      A.  No.
5      Q.  Do you recall that phone calls even
6   occurred?
7      A.  Yeah.
8      Q.  Okay.  What phone were you on when
9   those phone calls happened?
10     MR. WALKER:
11         Asked and answered.
12  EXAMINATION BY MR. GILBERT:
13     Q.  Were you on a cellphone?
14     A.  Yes.
15     Q.  Do you still have that cellphone?
16     A.  No.
17     Q.  Do you remember the cellphone number
18  of that phone?
19     MR. WALKER:
20         Asked and answered.
21     A.  No.
22  EXAMINATION BY MR. GILBERT:
23     Q.  Do you recall what provider you had?
24     A.  It wasn't my phone.
25     Q.  Whose phone was it?

---

6 (Pages 172 to 175)

BARGE000880

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 176

1     A.  It was the neighbor's phone.
2     Q.  The neighbor's phone?  And so when you
3  spoke -- is it Jeanne or Jeanie?
4     A.  Jeanie.
5     Q.  When you spoke with Jeanie that
6  evening, each time you spoke with her you were
7  on the neighbor 's phone?
8     A.  I can't remember.
9     Q.  Okay.  Did you speak to her at all on
10  your own phone that evening?
11     A.  Yes.
12     Q.  Okay.  And that would have been the
13  cellphone or a land line?
14     A.  Cellphone.
15     Q.  Okay.  Do you remember the service
16  provider you used to use?
17     A.  Nextel.
18     Q.  Nextel?  Was that a phone provided to
19  you through work or was that something you
20  subscribed to?
21     A.  Yes.
22     Q.  Through work?
23     A.  Yes.
24     Q.  And that's Brice Construction?
25     A.  Yes.

Page 177

1     Q.  Okay.  You didn't have to pay the
2  bills for that Nextel phone, did you?
3     A.  No.
4     Q.  You don't have copies of those bills,
5  do you?
6     A.  No.
7     Q.  Okay.  Do you remember last time we
8  had asked you if you remembered giving a
9  statement?
10     A.  Yes.
11         MR. WALKER:
12             Objection.
13  EXAMINATION BY MR. GILBERT:
14     Q.  Do you remember giving a statement?
15     A.  No.
16     Q.  Okay.  Have you had a chance to read
17  over the statement?
18     A.  Yes.
19     Q.  Does it reflect your observations as
20  to the topics the statement deals with?
21         MR. WALKER:
22             Objection.  There's no testimony
23         that Mr. Murph has reviewed the
24         statement.  If you're referring to the
25         redacted version, which is

Page 178

1  objectionable on numerous grounds,
2  then make sure you clarify for the
3  record that you're referring to the
4  redacted version.
5         MR. GILBERT:
6             I'm showing this to counsel, a
7  multi-paged document entitled Excerpts
8  of Statement of Arthur Murph taken
9  January 25th, 2006 by RJG.
10             (Tendering.)
11  EXAMINATION BY MR. GILBERT:
12     Q.  Have you seen this document?
13     A.  Yes.
14     Q.  Have you had a chance to look through
15  it?
16     A.  Yes.
17     Q.  Okay.  Does it help to refresh your
18  memory?
19         MR. WALKER:
20             Objection.
21     A.  Somewhat.
22  EXAMINATION BY MR. GILBERT:
23     Q.  Okay.  I want to direct you to Page 4
24  of the excerpts.
25         MR. WALKER:

Page 179

1             Well, let me note an objection to
2  the use of a redacted statement.
3  Mr. Murph is entitled to review the
4  statement.  And any use of a redacted
5  statement is unfair to Mr. Murph and
6  inappropriate, and we will object and
7  we will stop the deposition and ask
8  Judge Wilkinson to rule on the
9  inappropriate use of the statement to
10  attempt to refresh a witness'
11  recollection under circumstances where
12  the witness has made no statement that
13  he requires any refreshing of his
14  recollection, and therefore, without
15  the need to refresh recollection the
16  use of a statement is incorrect and
17  inappropriate.
18  MR. GILBERT:
19             All right.  Let me clarify.  Is
20  it Lafarge's position that it would be
21  appropriate to use the complete
22  version of this statement in this
23  deposition?
24  MR. WALKER:
25             We're not taking a position one

7 (Pages 176 to 179)

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 180

1  way or the other on that. We're
2  telling you that the use of a redacted
3  statement is inappropriate,
4  particularly where the witness has
5  made no statement that he requires any
6  refreshing of his recollection as to
7  his prior testimony under oath.
8  MR. GILBERT:
9      And I'm just going to respond to
10  that by clarifying my understanding.
11  And it's not my deposition, but my
12  understanding that the statement has
13  been redacted to the extent necessary
14  so as to not violate the terms of the
15  confidentiality agreement that Lafarge
16  a few minutes ago asserted that it
17  would not waive or give permission to
18  Mr. Murph to deviate from.
19  MR. WALKER:
20      That's immaterial because the
21  statement is subject to privilege. It
22  was given by Mr. Murph, as you the
23  barge plaintiffs state in answers to
24  interrogatories, to his attorney, an
25  attorney with whom he has certain

Page 181

1  protections and privileges to which
2  he's entitled. Therefore, the use of
3  that statement is incorrect.
4  EXAMINATION BY MR. GILBERT:
5      Q. Mr. Murph, do you have any objection
6  to --
7  MR. WEBB:
8      And further, on behalf of New
9  York Marine, I'm going to reiterate
10  the position that I took at the
11  earlier part of this deposition, that
12  if you proceed forward with this I
13  fully intend to report the attorney
14  who took the statement and has
15  breached the attorney/client
16  privilege, and possibly others, to the
17  Office of Disciplinary Counsel.
18  MR. RICHTHOFEN:
19      For clarity, to my knowledge
20  Mr. Murph has not asserted a breach of
21  confidentiality, which would be his
22  right to do with all respect to
23  counsel. And I don't know that
24  Mr. Murph has. In my conversations
25  with him, he has not, in fact, as of

Page 182

1  yet done that. And furthermore, in
2  speaking with Mr. Murph, it's my
3  position -- in speaking with him, and
4  in assisting him to speak before the
5  individuals here, that Mr. Murph has
6  read over the said statement and has
7  indicated to me, as I'm sure he will
8  to you, that it is consistent with
9  that which he has already testified to
10  and that the events are fairly
11  consistent with what he said happened.
12  MR. WALKER:
13      When you say the statement, you
14  mean the redacted version.
15  MR. RICHTHOFEN:
16      That is correct, sir. The
17  statement that counsel is arguing
18  about here today.
19  MR. WALKER:
20      So he stands by his prior
21  deposition and sees nothing
22  inconsistent in the redacted
23  statement. Is that what he's told
24  you?
25  MS. BERTAUT:

Page 183

1      I'm going to object.
2  MR. GILBERT:
3      Yeah. Objection. Objection.
4  EXAMINATION BY MR. WALKER:
5      Q. Is that what he's told you?
6  MS. BERTAUT:
7      I have an objection to make
8  before the question is answered,
9  Derek. We're here for a continuation
10  deposition. First of all, Lafarge and
11  Lafarge's insurer has no standing to
12  assert an attorney/client privilege of
13  the witness. The witness is
14  represented by counsel, so Lafarge and
15  their insurers or any other party here
16  has no right to assert any privilege
17  that's between Mr. Murph and his
18  counsel of record, and he should be
19  allowed to state whatever privilege he
20  wants at that time. Secondly, this
21  isn't -- this is inappropriate
22  questioning. Mr. Walker is not
23  questioning the witness now, or the
24  witness' lawyer. We should proceed
25  with the deposition. I understand

8 (Pages 180 to 183)

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 184

1    it's an excerpt of the statement, but
2    so is the settlement agreement. So we
3    don't have full documents of either of
4    these things. We've brought this
5    gentleman back who's not a party to
6    this litigation, and we've got a room
7    full of lawyers. Talk about
8    annoyance, harassment of the other
9    parties here, let this independent
10   witness give the testimony that he
11   knows to be true and let's move on.
12   Y'all went to make -- you want to make
13   challenges to Disciplinary Counsel,
14   Mr. Webb? This is the second time
15   you've alleged that. Please go ahead
16   and do it, but let's get this witness
17   in and out of here, tell his story and
18   move on, because now this is
19   harassment of the rest of us sitting
20   in the room.
21   MR. WALKER:
22       So you had an objection?
23   MS. BERTAUT:
24       I have an objection, that's
25   correct, to Lafarge interrupting the

Page 185

1    witness asserting privileges that they
2    know they have no right to make.
3    MR. WEBB:
4        Counsel, I am by no stretch of
5    the imagination attempting to assert a
6    privilege. What I'm staying, as an
7    officer of the court, is that I see
8    what is an apparent breach of an
9    attorney/client relationship, and as
10   such, not only myself, but you,
11   counselor, are duty bound to so
12   report.
13   MS. BERTAUT:
14       Thank you, Mr. Webb. I
15   appreciate the tutorial.
16   MR. GILBERT:
17       May I ask the witness a question
18   now?
19   MR. WEBB:
20       Certainly.
21   EXAMINATION BY MR. GILBERT:
22   Q. You've read over these excerpts of
23   your statement.
24   A. Yes.
25   Q. Is there anything confidential in

Page 186

1    here?
2    A. I don't know who wrote that thing or
3    where it come about from, but some of that
4    stuff I don't know nothing about.
5    Q. Is there anything confidential in
6    here?
7    A. Not to me.
8    Q. Okay.
9    MR. GILBERT:
10       Then I think that your objection
11   is obviated now.
12   EXAMINATION BY MR. GILBERT:
13   Q. You testified in the earlier
14   deposition, earlier part of the deposition,
15   that before you went to the Hyatt you went and
16   peered over the floodwall to see how high the
17   levee was.
18       Do you remember saying that?
19   A. Yes.
20   Q. Okay. Did you go look after you came
21   back from the Hyatt, also?
22   A. No.
23   Q. Okay. So you only went and looked
24   that one time?
25   A. Right.

Page 187

1    Q. Which was before you took your wife to
2    the Hyatt?
3    A. Yes.
4    Q. Okay. Mr. Murph, I'm going to let you
5    answer this question in your own words: I want
6    to make sure that this is strictly your
7    perception of what took place. You came back
8    from the Hyatt. What happened? Tell us what
9    went on.
10   MR. WALKER:
11       Objection. Asked and answered,
12   and way beyond the five areas to which
13   this deposition is limited.
14   MR. GILBERT:
15       Okay. For the record, we did not
16   agree to limit this deposition. This
17   is a discovery deposition. This is
18   about getting facts out on the record.
19   This is not about cherrypicking what
20   Mr. Murph is going to have on the
21   record. This is a discovery
22   deposition. We're not limited by the rules that
23   apply at trial. This is a discovery
24   deposition. The only reason to object
25

9 (Pages 184 to 187)

BARGE000883

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 188

1        is because you don't want the facts on
2        the record.  We're going to proceed.
3    EXAMINATION BY MR. GILBERT:
4        Q.  You got back from the Hyatt.  What
5    went down?  Just take us through the rest of
6    the day in your own words.
7        A.  I'm just sitting in the house, and
8    then the water and the storm and the flood --
9        Q.  Wait.  Can you -- I just need you to
10   speak up in full sentences so that we can get
11   that all in the record.
12       MR. RICHTHOFEN:
13           Take your time.
14   EXAMINATION BY MR. GILBERT:
15       Q.  Yeah, take your time and just tell
16   your story.
17       A.  I came from the Hyatt, I went home to
18   get the dog, the water came, I went in the
19   attic, chopped me a hole, looked out, God knows
20   what time it was and all I saw was a barge
21   sitting on the house.
22       Q.  How many times did you go into the
23   attic?
24       A.  I don't know.  I can't remember.
25       Q.  Okay.  So you went one time -- the

Page 189

1    first time you went up, you didn't chop a hole,
2    right?
3        A.  Yeah.
4        Q.  You chopped a hole the first time you
5    went up?
6        A.  Yes.
7        Q.  And then you came down a couple times
8    to see what was going on inside the house?
9        A.  Yes.
10       Q.  All right.  Let's go back to when
11   you're in the driveway.  Okay?  When you're
12   going to hook up the generator and get it
13   started.
14       A.  Right.
15       Q.  That's when things started getting
16   hairy, right?
17       A.  Yes.
18       Q.  All right.  You testified that you
19   heard a scraping sound coming from the
20   direction of the canal.
21       A.  Yes.
22       Q.  Okay.  And in your statement --
23   excerpts of your statement on Page 5, which I'm
24   going to show you, I'm just going to ask you to
25   just take a look at the line that I'm pointing

Page 190

1    to and just read that so that everyone knows
2    what you're looking at.
3        A.  I heard a big boom scraping sound, you
4    know, and it was just -- I don't know what's
5    this noise thing they got here.
6        Q.  Wait.  Could you say it louder so I
7    can --
8        A.  I heard a big scraping sound and, you
9    know, and it was just a -- I say it was -- what
10   the hell is this?
11       (Whereupon the deponent conferred with
12   counsel off the record.)
13       A.  I say what the hell is this?  And then
14   I heard a big -- that's me and the dog outside
15   on the garage.
16   EXAMINATION BY MR. GILBERT:
17       Q.  All right.  I'm going to ask you to go
18   to the next line which I'm pointing at and let
19   you read out loud so that everybody else can
20   follow along.  Read it in a loud voice so
21   everybody can hear you.
22       MR. WALKER:
23           Just to be clear on my prior
24   objection, since I've made several --
25       MR. GILBERT:

Page 191

1           It's continuing.
2       MR. WALKER:
3           -- no, since there is no
4    testimony by Mr. Murph that anything
5    he stated in his prior deposition is
6    inconsistent with what's in this
7    statement, or that he had any
8    misrecollection or has any reason to
9    refresh his recollection, the use of a
10   statement to refresh his recollection
11   is improper.
12       MR. GILBERT:
13           Thank you.
14   EXAMINATION BY MR. GILBERT:
15       Q.  You ran read that.
16       A.  So I headed toward the garage.  I
17   leave the front of the house to see what's
18   going -- what the noise was.  By that time I
19   got midway in the driveway, I heard a big boom
20   sound.  And, you know, boom.  And I saw -- now
21   what the hell is this?  And I started walking a
22   little bit quicker towards the front because --
23   the front of my driveway.  It's a long
24   driveway.  My garage is in the backyard by the
25   apartment, you know.  And we heard the sound in

10 (Pages 188 to 191)

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 192

1  the back.
2    Q.  Okay.  Can you explain what you mean
3  when you say a big boom sound.
4    A.  Just a noise.
5    Q.  Well, I mean, I can make a noise
6  rapping on the table.  Would you call that a
7  boom?
8    A.  No.
9    Q.  Could you describe the boom sound?
10   A.  It just was a boom -- with the wind
11 blowing and everything, it just was a loud
12 noise.
13   Q.  Okay.  Was it a high pitched noise, a
14 low pitched noise?  What can you remember?  Why
15 don't you tell me everything about the noise
16 that you can remember.
17   A.  It was just a noise, a loud noise
18 outside.
19   Q.  Could you feel the noise?
20   A.  I wasn't feeling anything.  I was
21 trying to get out of there.
22   Q.  Do you know -- did you notice whether
23 or not the noise echoed?
24   A.  No.
25   Q.  No, you did not notice?

Page 193

1    A.  I don't know if the noise echoed or
2  not.
3    Q.  Okay.  If you had to say how loud the
4  noise was by comparing it to any other noise
5  you've ever heard in your life, how loud would
6  you say the boom was?
7    A.  About as loud a noise it was making
8  when the wind was blowing.
9    Q.  As loud a noise as the wind?
10   A.  Yeah.
11   Q.  But did it sound like wind?
12   A.  No, it didn't sound like no wind, it
13 sound like a loud noise.
14   Q.  Okay.  How many times did you hear
15 that noise?
16   A.  Just that once when I was going up
17 towards -- going up the driveway.
18   Q.  Okay.  What happened immediately after
19 that?
20   A.  The water came.
21   Q.  Okay.  And is that the water that you
22 testified earlier was coming from the right
23 side of your house?
24   A.  Right.
25   Q.  Okay.  Okay.  You said that you had

Page 194

1  chopped a hole in the attic about the middle of
2  the house.
3    A.  Right.
4    Q.  When you say the middle of the house,
5  you mean middle from front to back or back to
6  front, that way in the middle, or middle from
7  side to side?
8    A.  Middle from back to front.
9    Q.  Was the hole on any particular side of
10 your house or was it right in the center?
11   A.  On the left side.
12   Q.  I say again.
13   A.  It was on the left side of the house.
14   Q.  So if you look out the hole, what can
15 you see?
16   A.  Sky.  And the houses.
17   Q.  Okay.  But you're looking in a
18 direction left from your house?  Is that
19 correct?
20   A.  No, I looked to the left -- yeah, to
21 the left side.
22   Q.  Could you see the Claiborne bridge if
23 you're looking out the hole?
24   A.  Yes.
25   Q.  Could you see the floodwall if you're

Page 195

1  looking out the hole?
2    A.  Yes.
3    Q.  Okay.  When you chopped the hole, that
4  was before or after the boom?
5    A.  That was before the boom.
6    Q.  What did the floodwall look like
7  before the boom?
8    A.  It was a regular wall.
9    Q.  How much water was there before the
10 boom?
11   A.  Just rainwater.
12   Q.  Were you scared?
13   A.  Yep.
14   Q.  Have you ever been in the military?
15   A.  Yes.
16   Q.  Did you ever serve overseas?
17   A.  Yes.
18   Q.  During combat?
19   A.  Yes.
20   Q.  Where?
21   A.  Vietnam.
22   Q.  I'll show you on Page 12 of your
23 statement -- I'll show you -- indicate a
24 paragraph around just beyond the middle of the
25 page where you said, I'm a Vietnam veteran and,

11 (Pages 192 to 195)

Page 196

1    look, I was not scared in Nam.
2        Is that true, you weren't scared then?
3    A.  Not like the storm I wasn't.
4    Q.  Okay.  We all know you saw the barge
5    on your house.
6    A.  Right.
7    Q.  Did you see the barge moving at any
8    time?
9    A.  No.
10   Q.  Did you see it knock down any other
11   houses?
12   A.  No.
13   Q.  Did anybody tell you whether or not it
14   knocked down any other houses?
15   A.  No.
16   Q.  At some point did you climb up on the
17   barge?
18   A.  Yes.
19   Q.  When did you do that?
20   A.  The next day, after the storm.
21   Q.  What did you do when you were up
22   there?
23   A.  Wrote my name on it.
24   Q.  Okay.  Did you write your phone number
25   or any other information?

Page 197

1    A.  No.  Just my name.
2    Q.  And it said just Arthur Murph?
3    A.  Arthur L. Murph.
4    Q.  Okay.  Why did you do that?
5    A.  So they know I been on it.
6    Q.  What did you use to write with?
7    A.  A nail.
8    Q.  A nail?
9    A.  Yep.
10   Q.  Okay.  Can you describe what condition
11   the barge was in when you were standing on it?
12   A.  It was a regular barge.  It was in --
13   just barge condition, I guess.  It wasn't bent
14   up.  It's steel.
15   Q.  Did you look down in it?
16   A.  Yes.
17   Q.  What did you see?
18   A.  Some gray stuff.
19   Q.  How much gray stuff?
20   A.  Not much, whatever was left in there I
21   guess they couldn't get out.
22   Q.  Did you ever call 911?
23   A.  Yes.
24   Q.  What phone did you use?
25   A.  My neighbor 's.

Page 198

1    Q.  Their land line or their cellphone?
2    A.  Cellphone.
3    Q.  Did you ever use your phone to call
4    911?
5    A.  I might have.  I don't know if my
6    phone was working then, but I called 911 off a
7    phone.  I can't remember which one.
8    Q.  Do you know your neighbor's name?
9    A.  Joyce.
10   Q.  What's Joyce's last name?
11   A.  I don't know.
12   Q.  Do you know of any photographs of the
13   barge touching your house?
14   A.  Do what?
15   Q.  Do you know if there are any
16   photographs of the barge touching your house?
17   A.  Probably so.
18   Q.  Do you know who took them?
19   A.  Probably everybody that was in the
20   area.
21   Q.  Do you have any?
22   A.  No.
23   Q.  Did you get interviewed by any news
24   crew or anything like that?
25   A.  I didn't get interviewed -- no,

Page 199

1    unh-unh.  I talked to people, but I didn't get
2    no interviews.
3    Q.  Joyce is the neighbor that lived just
4    to the right of you, correct?
5    A.  To the left.
6    Q.  Lived to the left of you?
7    A.  Yes.
8    Q.  Is that where you swam to?
9    A.  Yes.
10   Q.  You don't know who Joyce 's phone
11   provider is, do you?
12   A.  No.
13   Q.  Do you know where that barge came
14   from?
15   A.  Out the canal, I guess.
16   Q.  Did you see it come out the canal?
17   A.  No.
18   Q.  Do you think that boom you heard had
19   anything to do with the barge?
20   A.  I don't know if it had or it hadn't.
21   I can't say.  I didn't see it.
22   Q.  Mr. Murph, when was the first time
23   that you saw this document that we've referred
24   to as Excerpts of Statement of Arthur Murph?
25   A.  In my lawyer's office.

12 (Pages 196 to 199)

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 200

1    Q.  Did you get a copy in the mail in July
2  of '07?
3    A.  No.
4    Q.  When we started back in December you
5  said that you wanted to meet with your
6  attorneys concerning any testimony you might
7  give -- or meet with your attorney
8  Mr. Richthofen about any testimony you might
9  give in deposition about any meetings with any
10  attorneys concerning damage to your house.
11       Were y'all able to discuss that, you
12  and Mr. Richthofen?
13       MR. RICHTHOFEN:
14            You can answer.
15    A.  Yes.
16  EXAMINATION BY MR. GILBERT:
17    Q.  Okay.  Are you able to testify today
18  as to meetings that you may have had with
19  attorneys concerning the damage to your house?
20       (Whereupon the deponent conferred with
21  counsel off the record.)
22    A.  I met with attorneys and I settled my
23  damage claims.
24  EXAMINATION BY MR. GILBERT:
25    Q.  Okay.  All right.  I'm going to show

Page 201

1  you a document marked -- labeled Receipt,
2  Release and Settlement Agreement with
3  Reservation of Rights.  Do you recognize the
4  document?  Take a look at every page.
5       (Off the record.)
6  EXAMINATION BY MR. GILBERT:
7    Q.  Mr. Murph, during the break did you
8  have a chance to review the document that I
9  handed to you?
10    A.  Yes, I did.
11    Q.  Do you recognize it?
12    A.  Yes.
13    Q.  Is this your signature at the back of
14  the document on the page that is marked
15  LNA000704?
16    A.  Yes, it is.
17    Q.  And do you remember signing it?
18    A.  Yes.
19    Q.  Okay.  And is this also your
20  signature, as well, on the page marked LNA705?
21    A.  Yes.
22    Q.  You recall signing both of these?
23    A.  Yes.
24    Q.  What is this document?
25    A.  That's an agreement.

Page 202

1    Q.  And are you making an agreement in
2  this document?
3    A.  You got the paper in your hand, just
4  read it.  I can't talk about that.  Everybody
5  here got a copy, I'm pretty sure.  Just look at
6  it and you'll see.
7    Q.  So you're not able to talk about
8  what's in this document?
9    A.  No.
10    Q.  Who has told you that you can't talk
11  about what's in this document?
12    A.  Nobody told me not to talk about it.
13    Q.  What's the reason that you're not able
14  to talk about it?
15    A.  Because it's got stuff in it that's
16  confidential.
17       MR. RICHTHOFEN:
18            At this time my client would
19       assert that he can, pursuant to the
20       opening statements here where we asked
21       permission from Lafarge to discuss the
22       agreement and they refused, but he
23       will indicate that that is the
24       settlement agreement settling his
25       property damage and that since the

Page 203

1  document is self-evidencing it -- the
2  best evidence of its own terms, that
3  he would refer to that, that anyone
4  who has a copy of that produced in
5  discovery could refer to that for
6  questions regarding the actual terms
7  and conditions, it's in the document,
8  and so not to prejudice Mr. Murph and
9  his confidentiality agreement with
10  Lafarge.
11       MR. GILBERT:
12            Okay.
13  EXAMINATION BY MR. GILBERT:
14    Q.  Let me ask you this:  Where were you
15  when you signed this document?
16    A.  In this building.
17    Q.  Who was present?
18    A.  A couple or few people.
19    Q.  Who?  What are the names?
20    A.  Oh, I can't remember their names.
21    Q.  Are they people that are here today?
22    A.  Yes.
23    Q.  Can you indicate which ones they are?
24    A.  The two right here. (Indicating.)
25    Q.  Okay.  You just pointed to Derek

13 (Pages 200 to 203)

BARGE000887

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 204

1    Walker.  Who else did you just point to?
2        A.   And the man sitting to his left.
3        Q.   The man wearing a red patterned tie
4    with a pen in his hand; Robert Fisher?
5        A.   No.  I said to his left.
6        MR. WALKER:
7             Why don't you just have them
8        raise their hand or something.
9        MR. GILBERT:
10            Okay.  Well, I mean, if the
11       attorneys would agree to raise their
12       hands if they were present, if they're
13       the attorneys that Mr. Murph is
14       talking about right now, let the
15       record reflect who was present.
16            All right.  Nobody is
17       volunteering any information.
18   EXAMINATION BY MR. GILBERT:
19       Q.   Mr. Murph --
20       MS. BERTAUT:
21            Wait.  Mr. Fisher just raised his
22       hand.
23       MR. GILBERT:
24            Okay.  Let the record reflect
25       Mr. Fisher raised his hand.

Page 205

1    EXAMINATION BY MR. GILBERT:
2        Q.   Were there any other persons present
3    when you signed this agreement?
4        A.   Yes.
5        Q.   Who?
6        A.   (Indicating.)
7        Q.   Well, Mr. Walker, Mr. Fisher --
8        A.   That's it.
9        Q.   Just those two?
10       A.   That's all I can remember.
11       Q.   So it was just those two and you --
12       MR. RICHTHOFEN:
13            You need to clarify.  Speak
14       louder so he can hear you.  If you can
15       remember, try to tell him how many
16       people were there.
17       A.   That's all I can remember, those two
18   right now.
19   EXAMINATION BY MR. GILBERT:
20       Q.   Okay.  Was your wife present?
21       A.   Yes.
22       Q.   Was somebody named Parker Harrison
23   present?
24       A.   If they signed that paper, they was.
25       Q.   Do you have any independent

Page 206

1    recollection of that person being there?
2        A.   Yes.  If they signed that paper they
3    was there.
4        Q.   Okay.  So everybody who signed the
5    paper was there?
6        A.   Was there.  Uh-huh.
7        Q.   That's a yes?
8        A.   Yes.
9        Q.   Okay.  All right.  Let me ask you
10   some -- all right.  You say that the
11   document -- it says what it says and everybody
12   sees it and all, and what it says to me is that
13   it's a settlement agreement with Lafarge.
14            Is that correct; is that your
15   understanding of it?
16       A.   Yes.
17       Q.   How did this settlement come about?
18   And by that I mean how did you come into
19   contact with Lafarge?
20       A.   The barge.
21       Q.   Okay.  Did you call them?  Did they
22   call you?  Did you go visit them?  Did they go
23   visit you?  That's the sort of question I'm
24   asking.
25       A.   I called.

Page 207

1        Q.   You called them?
2        A.   Yes.
3        Q.   You did personally?
4        A.   Yes.
5        Q.   Do you know the number that you
6    called?
7        A.   No.
8        Q.   Do you know what office at Lafarge you
9    called?
10       A.   No.
11       Q.   Did you call Lafarge locally, did you
12   call Lafarge at one of their national
13   headquarters or what did you do?
14       A.   I can't remember.
15       Q.   Okay.  How did you get the number for
16   Lafarge?
17       A.   Off the barge.  I took the barge
18   Number and I --
19       Q.   How did you get the phone number for
20   Lafarge?
21       A.   Out the telephone book.
22       Q.   Okay.  You say you got the number off
23   the barge.  You mean the Number ING 4727?
24       A.   Yes.
25       Q.   Okay.  Did you know what ING 4727

14 (Pages 204 to 207)

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 208

1 meant at that time?
2    A.  No.
3    Q.  Okay.  Was Lafarge the first call you
4 made to talk about what had happened?
5    A.  No.  I can't remember who.
6    Q.  I'm sorry?
7    A.  I called a couple numbers.  I was
8 searching for it.
9    Q.  Okay.  And both those numbers you
10 called, that was Lafarge, or was it some other
11 company?
12    A.  Like I say, I was searching for who
13 the barge was for.
14    Q.  Did you ever call Ingram?
15    A.  I may have.
16    Q.  But you don't remember for certain?
17    A.  No.
18    Q.  Okay.  Who did you speak with at
19 Lafarge?
20    A.  I can't remember that name.
21    Q.  Did the person come speak with you
22 personally, or was it only on the telephone?
23    A.  Only on the phone.
24    Q.  Did Lafarge send you any letters,
25 anything in the mail?

Page 209

1    A.  No.
2    Q.  Okay.  Do you know when it was that
3 you made that call to Lafarge, how long after
4 the storm?
5    A.  I guess a couple of weeks, a couple of
6 days, I don't know, I can't remember.
7    Q.  Do you remember where you were when
8 you made that call?  Were you in New Orleans?
9    A.  No.
10    Q.  Where were you?
11    A.  Pineville.
12    Q.  Pineville?
13    A.  Yeah.
14    Q.  Okay.  What did you tell them when you
15 made that call?
16    A.  I just asked them if they miss a
17 barge.
18    Q.  Did you tell them what had happened?
19    A.  Yes.
20    Q.  What did you tell them?
21    A.  It's on my house.
22    Q.  Did you tell them how it got there?
23    A.  I don't know how it got there.  I know
24 it was on my house.
25    Q.  But did you tell them any --

Page 210

1    A.  No.
2    Q.  -- version of how it got there?
3    A.  Just asked them if they're missing a
4 barge.
5    Q.  And what did they tell you?
6    A.  They're missing a few barges.
7    Q.  Okay.  All right.  So after you had
8 that conversation -- what else took place
9 during that conversation that you can remember?
10    A.  Nothing.  We talked back and forth.
11    Q.  Okay.  What did they say to you?
12    A.  They didn't say anything.  We just
13 talked.
14    Q.  Do you know if they made a recording
15 of that conversation?
16    A.  I have no idea.
17    Q.  Did they ask you if they could?
18    A.  I can't remember that.
19    Q.  Okay.  What's the next time you spoke
20 with somebody from any of the companies about
21 the barge?
22    A.  I guess the date that's on that paper.
23    Q.  On this paper in my hand, the receipt
24 and release?
25    A.  I guess.  Right.

Page 211

1    Q.  Did you speak with anybody before you
2 signed this receipt and release, anybody from
3 any of the companies or any of their attorneys?
4    (Whereupon the deponent conferred with
5 counsel off the record.)
6    A.  Some of these questions you asked me I
7 really can't say nothing about because it's
8 going to put me in a situation here.
9    Q.  Okay.  Well, without asking you what
10 was spoken about, can you tell me who you spoke
11 to?
12    A.  No.
13    Q.  No?
14    A.  No, I can't remember who I spoke to.
15    Q.  Okay.  Are any of the people you spoke
16 to in this room?  Do you recognize any of the
17 people in this room as people you spoke to?
18    A.  No, because like I say, I talked to
19 them over the phone.
20    Q.  Okay.  Did you ever have any personal
21 meetings with anybody from Ingram?
22    A.  I don't know.
23    Q.  I'm sorry?
24    A.  I don't know if they was from Ingram
25 or who they was from.

15 (Pages 208 to 211)

BARGE000889

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 212

1    Q.  Did you ever have any conversations
2  with any lawyers from Ingram?
3    A.  Only the people that you got on that
4  paper.
5    Q.  Okay.  So -- you've mentioned
6  Mr. Fisher and Mr. Walker.  Those are the only
7  attorneys that you can remember speaking with
8  on behalf of the barge?
9    A.  So far, yes.
10    Q.  Okay.  Did you ask for Lafarge to
11  compensate you?
12    A.  I asked for to repair my house or put
13  me in something else.
14    Q.  Okay.  And do you remember when that
15  was that you asked for that?
16    A.  Probably the first time we talked over
17  the phone.
18    Q.  Okay.  I'm getting the impression that
19  you spoke a number of times over the phone.
20    A.  Oh, yeah.
21    Q.  Did they make a recording of any of
22  those phone calls?
23    A.  I have no idea.
24    Q.  Do you remember them ever asking you
25  permission to make a recording of any of the

Page 213

1  phone calls?
2    A.  I don't think.
3    Q.  Okay.  Did you ever at some point meet
4  with them and give them a statement?
5    A.  No.
6    Q.  Did you tell them how the barge got on
7  your house?
8    A.  I don't know how it got on the house.
9    Q.  But did you tell them the story of
10  what took place that night?
11    A.  No, I told them, you got a barge on my
12  house and somebody need to do something about
13  it.
14    Q.  You saw the barge after the storm on
15  your house, right?
16    A.  Right.
17    Q.  Was it on anybody else's house, in
18  addition to your house?
19    A.  It just was in the water.  The water
20  was -- it was higher than the houses.
21    Q.  All right.  My question is, could you
22  see that the barge had caused damage to anyone
23  else's house other than your own?
24    A.  It may have.
25    Q.  Okay.  Are you under the impression

Page 214

1  that it did?
2    A.  I wasn't really worried about other
3  people's houses.  I was just worried about my
4  house.
5    Q.  Do you know of anybody else that
6  called Lafarge and said, hey, this barge is on
7  my house?
8    A.  No.
9    Q.  Or called anybody and said, hey, this
10  barge is on my house?
11    A.  No.
12    Q.  Do you know of anybody else that
13  Lafarge had any agreement with because the
14  barge was on that person's house?
15    A.  No.
16    Q.  Do you know anybody else that Lafarge
17  or Ingram or anybody settled with because of
18  the barge other than you?
19    A.  No.
20    Q.  Okay.  Do you know who New Jourdan,
21  LLC is?
22    A.  No.
23    Q.  Do you know who New Berkley, LLC is?
24    A.  No.
25    Q.  Do you know who Daniel Webb is?  Do

Page 215

1  you recognize the attorney who just looked up?
2  He's looking at me right now.
3    A.  If his name Daniel Webb, yeah.
4    Q.  Yeah?  When have you spoken with him
5  before?
6    A.  I never spoke with him at all I don't
7  think.
8    Q.  Okay.  But you recognize him?
9    A.  Yeah, from the last deposition.
10    Q.  Okay.  Anytime before then have you
11  seen him?
12    A.  No.
13    Q.  Okay.  Who did you settle with?
14    A.  The people that's on that paper.
15    Q.  Did you understand that at the time?
16    A.  Yes.
17    Q.  Did you understand that you were
18  settling with Lafarge and with Ingram and with
19  their insurers and with New Jourdan and New
20  Berkley?
21    A.  If that's what they got on that paper.
22    Q.  Did you understand that at the time?
23    A.  If I signed it, I must have.
24    Q.  But you don't know who New Jourdan is?
25    A.  I don't know who New Jourdan is.

16 (Pages 212 to 215)

BARGE000890

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 216

1     Q.  But you settled with them.
2     A.  Yes.
3     Q.  Okay.  Do you know why New Jourdan 's
4  name is on here?  On this release agreement?
5     A.  No.
6     Q.  Do you know why New Berkley is on this
7  release agreement?
8     A.  No.
9     Q.  Do you know why Ingram is on this
10  release agreement?
11     A.  No.
12     Q.  The agreement shows that you signed it
13  on February 9th, 2006.  Did you know on that
14  date of a lawsuit going on against any of these
15  companies?
16     A.  No.
17     Q.  The date you signed this, that wasn't
18  the first time you met with Mr. Walker and Mr.
19  Fisher, correct?
20     A.  I think it is.
21     Q.  But had you spoken with them before?
22     A.  I may have, I don't know.
23     Q.  Did any lawyers for Lafarge give you
24  any advice?
25     A.  No.

Page 217

1     Q.  Did any lawyer give you any advice
2  concerning this agreement?
3     A.  No.
4     Q.  What about Mrs. Murph, did she go get
5  advice from any lawyer concerning this
6  agreement?
7     A.  She may have.  I don't know.
8     Q.  Did any lawyer ever explain to you
9  what every one of these paragraphs and
10  sentences meant in this agreement and what --
11  how it might affect your rights by signing it?
12     A.  I don't know.  They may have.
13     Q.  They may have, but you don't remember?
14     A.  I don't remember.
15     Q.  Did you tell Lafarge or any of their
16  attorneys or anybody acting on behalf of
17  Lafarge or Ingram or any of the parties that
18  you settled with, did you tell them what you
19  wanted this settlement to say?
20     A.  No.
21     Q.  Did anybody acting on your behalf tell
22  them what you wanted this settlement to say?
23     A.  No.
24     Q.  Did you get to look at this before you
25  signed it --

Page 218

1     A.  Yes.
2     Q.  -- or just that day?
3     A.  Yes.
4     Q.  How soon before -- when did you get to
5  see a copy of it before signing it?  How long
6  before you signed it?
7     A.  The same day.
8     Q.  The same day?  Did you take it to a
9  lawyer that day and say, hey, what do you think
10  about this?
11     A.  No.
12     Q.  Why not?
13     A.  For what?
14     Q.  Well -- so I interpret your answer to
15  mean that you didn't think that there was any
16  reason to see a lawyer.
17     A.  No.
18     Q.  Is that correct?
19     A.  Yes.
20     Q.  Did you trust that the lawyers that
21  were putting this together were going to
22  protect you?
23     A.  I don't know.
24     Q.  You don't know whether you did?
25     A.  No.

Page 219

1     Q.  Okay.  Who is Harry Holladay?  Let me
2  just show you the Page LNA074.
3     A.  I don't know who Harry Holladay is.
4     Q.  Had you ever spoken with Harry
5  Holladay before this --
6     A.  I may have.
7     Q.  Before this was signed?
8     A.  Probably.
9     Q.  By telephone, in person, by mail?
10     A.  I can't remember.
11     Q.  Did you ever -- and leading up to
12  signing this agreement, did you ever send any
13  mail or receive any mail back and forth --
14     A.  No.
15     Q.  -- concerning this?
16     A.  No.
17     Q.  But you made telephone calls?
18     A.  Not about that.
19     Q.  Not about the settlement?
20     A.  Oh, yeah.
21     Q.  Yes about the settlement?
22     A.  (Nods affirmatively.)
23     Q.  What about any fax, did you get any
24  faxes or send any faxes about the settlement?
25     A.  No.

BARGE000891

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 220

```
1      Q.  Any E-mails back and forth?
2      A.  Nothing.
3      Q.  Nothing?  The only way y'all ever
4   communicated was by using the telephone?
5      A.  Telephone, yes.
6      Q.  And -- okay.  What telephone would you
7   be using when you made these calls, would that
8   be that Nextel phone, same thing?
9      A.  No, I can't remember that.
10     Q.  Okay.  Well, did you have a land line
11  at the time at your house?
12     A.  I wasn't at my house.  I didn't have a
13  house.
14     Q.  Okay.  You were in Pineville at the
15  time all this was happening?
16     A.  Right.
17     Q.  And was there a land line wherever you
18  were at Pineville?
19     A.  I think they may have had one.
20     Q.  Where were you staying at Pineville?
21     A.  On Brice Street.
22     Q.  Was that an apartment you rented?
23     A.  It was a house.
24     Q.  Y'all rented it?
25     A.  No.  Friend of mine.
```

Page 221

```
1      Q.  Okay.  You were staying with a friend?
2      A.  Right.
3      Q.  What's that friend's name?
4      A.  Felton.
5      Q.  Is that the same Felton that you
6   mentioned earlier when we started the
7   deposition --
8      A.  Yes.
9      Q.  -- the one that was supposed to take
10  you back with the dog?
11     A.  Yes.
12     Q.  Okay.  I understand that the
13  settlement says what it says, and you don't
14  have to testify about what it says but what was
15  your understanding as to what you would get out
16  of it by settling with them?
17     A.  I got it.
18     Q.  What's that?
19     A.  I got it.
20     Q.  What was your understanding of what
21  you would get?
22     A.  That's what I'm saying, I got what I
23  got.
24        (The deponent conferred with counsel
25  off the record.)
```

Page 222

```
1          MR. RICHTHOFEN:
2              You can say that.  Go ahead.
3          Answer the question.
4      A.  What you saying?
5   EXAMINATION BY MR. GILBERT:
6      Q.  What was your understanding of what
7   you would benefit -- what you would get by
8   settling?
9      A.  Another home.
10     Q.  Another home?
11     A.  (Nods affirmatively.)
12     Q.  Did you get another home?
13     A.  I got compensated.
14     Q.  Did you get another home?
15     A.  Yes.
16     Q.  Is that 105 Berkley?
17     A.  Yes.
18     Q.  Okay.  How did you find that house?
19  Did you use an agent, did you look at ads?
20     A.  No.
21     Q.  How did you find that house?
22     A.  Riding around looking for it.
23     Q.  Okay.  All right.  Did you buy that
24  house yourself?
25     A.  Yes.
```

Page 223

```
1      Q.  Okay.  So did you have to come out of
2   your pocket with money to pay for that house?
3   Was that your own money?
4          (Whereupon the deponent conferred with
5   counsel off the record.)
6      A.  I don't think I can discuss that part
7   of it.
8   EXAMINATION BY MR. GILBERT:
9      Q.  Okay.?
10         MR. RICHTHOFEN:
11             Just on behalf of Mr. Murph, I
12         believe that any price that was paid
13         on the property is a matter of public
14         record, and so those documents would
15         evidence exactly, you know, what
16         amounts were paid by him.  In the
17         mortgage and conveyance records that
18         would be available.
19  EXAMINATION BY MR. GILBERT:
20     Q.  Where did you get the money to pay for
21  the house?
22     A.  I don't think I can discuss that
23  either.
24        (Whereupon the deponent conferred with
25  counsel off the record.)
```

18 (Pages 220 to 223)

BARGE000892

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 224

1    A. Yeah. From the settlement.
2  EXAMINATION BY MR. GILBERT:
3    Q. Okay. Were you paid a check?
4      (Whereupon the deponent conferred with
5  counsel off the record.)
6    A. I was paid.
7  EXAMINATION BY MR. GILBERT:
8    Q. Did any money go into your bank
9  account from the settlement?
10    A. No.
11    Q. How did the money get to you for the
12  settlement?
13    A. I don't think I can talk that either.
14    Q. I'm sorry?
15    A. I don't think I can answer that
16  question.
17    Q. All right. Well, let me ask you this:
18  Let me show you a document that I'm going to
19  mark as 1 -- or I don't know where we are,
20  actually, because it would be carried forward
21  from where we were before. Whatever the next
22  exhibit was. I don't remember where we left
23  off. If somebody could figure that out --
24      MR. WIEDEMANN:
25        Make it 1A.

Page 225

1      MR. GILBERT:
2        All right. We'll call it 1A.
3  EXAMINATION BY MR. GILBERT:
4    Q. I'm going to ask you to take a look at
5  that, specifically the photocopy of a Crescent
6  Bank & Trust check at the top. (Tendering.)
7      Have you seen that check before?
8      (Exhibit 1(a) was marked for
9  identification and is attached hereto.)
10    A. I don't know if I have or not.
11  EXAMINATION BY MR. GILBERT:
12    Q. Do you have any idea who obtained that
13  check?
14      MR. RICHTHOFEN:
15        For the record, Mr. Murph is
16      observing a check from Crescent Bank &
17      Trust paid to the order of True Title.
18  EXAMINATION BY MR. GILBERT:
19    Q. Did you ever have that check in your
20  possession?
21    A. No.
22    Q. Do you know who went and got that
23  check?
24    A. No.
25    Q. Okay. Did you see that check at any

Page 226

1  time before today?
2    A. No.
3    Q. Okay. Do you have any idea today as
4  we sit here what that check is?
5    A. A check to True Title.
6    Q. Right. But do you know why that check
7  exists?
8      (Whereupon the deponent conferred with
9  counsel off the record.)
10    A. Yeah. It's written on there.
11  EXAMINATION BY MR. GILBERT:
12    Q. Okay. And you're referring to where
13  it says Purchase of 105 Berkley.
14    A. Right.
15    Q. Okay. And you're not able to explain
16  how this check works into the purchase of the
17  house?
18      (The deponent conferred with counsel
19  off the record.)
20    A. I don't know.
21  EXAMINATION BY MR. GILBERT:
22    Q. Okay. But you did not go obtain this
23  check.
24    A. No.
25    Q. Okay. Did you send somebody to go

Page 227

1  obtain that check?
2    A. I never sent nobody nowhere.
3    Q. Do you have any knowledge about how
4  this check came to be?
5    A. No.
6    Q. Okay. We're going to attach it as
7  1(a).
8      MR. RICHTHOFEN:
9        Can I get a copy?
10      MR. GILBERT:
11        Here you go.
12  EXAMINATION BY MR. GILBERT:
13    Q. Do you remember going to buy 105
14  Berkley on February 9th? Do you remember going
15  to an Act of Sale?
16      (Whereupon the deponent conferred with
17  counsel off the record.)
18    A. Yes.
19  EXAMINATION BY MR. GILBERT:
20    Q. And where was that? Was that at True
21  Title?
22    A. Yes.
23    Q. All right. I'm going to just show you
24  a copy -- just take a look there. (Tendering.)
25      MR. WEBB:

19 (Pages 224 to 227)

Johns Pendleton Court Reporters                    800 562-1285

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 228

1    Excuse me, counsel.  What's the
2  source of these documents?
3  MR. GILBERT:
4    A subpoena that was served on
5  True Title, in person, and he produced
6  on the spot.
7  MR. WEBB:
8    When was the subpoena served?
9  MR. GILBERT:
10    I can't tell you off the top of
11  my head.
12  MR. WEBB:
13    When were the documents received?
14  MR. GILBERT:
15    Last week.
16  MR. WEBB:
17    Why were they not produced to all
18  counsel in this case last week when
19  they were received by you?
20  MR. WALKER:
21    Yeah.  We've never received a
22  copy of the subpoena.
23  MR. GILBERT:
24    Because there wasn't time to
25  upload the subpoena.  He produced on

Page 229

1  the spot.  You'll get copies --
2  MR. WALKER:
3    But a subpoena request has to be
4  served on all --
5  MR. GILBERT:
6    You'll get copies of all of it.
7  MR. WEBB:
8    Counsel, it's totally improper,
9  though, to subpoena documents weeks
10  before a deposition, for you to
11  receive them and hoard them and
12  produce them at a deposition now and
13  not previously provided them to all
14  counsel.  That is not proper, and you
15  know it.
16  MR. GILBERT:
17    They haven't been hoarded.  What
18  would you like done?
19  MR. WALKER:
20    The problem, Brian, and our
21  objection is, number one, the subpoena
22  should have been severed on all
23  parties at the same time.  And number
24  two --
25  MR. GILBERT:

Page 230

1    I think you have copies of all of
2  this, Dan.
3  MR. WALKER:
4    And Number two, we're prejudiced
5  because we're not properly prepared to
6  cross-examine the witness at the
7  deposition.  Therefore we would
8  reserve all rights to question the
9  witness with respect to those
10  documents.
11  MR. GILBERT:
12    I have no problem with that.
13  These are public records, as well.  I
14  have no problem with that.  And I do
15  believe that these are documents
16  already in possession of complaining
17  counsel.
18  MR. WALKER:
19    Well, but it's your obligation to
20  have sent the subpoena to all parties.
21  MR. GILBERT:
22    The subpoena is going to be
23  uploaded.  There wasn't time to do it.
24  MR. WEBB:
25    Gonna be doesn't count, Brian.

Page 231

1  Okay?
2  MR. GILBERT:
3    All right.  You've made your
4  objection.  That's good.  You've made
5  your objection.
6  MR. WEBB:
7    Well, I'm going to call for, on
8  the record, the production of any
9  other documents that you have
10  surreptitiously received by subpoena
11  and have not provided them to counsel.
12  MR. GILBERT:
13    There is nothing surreptitious
14  about it.  You know what?  If you want
15  to take this in the other room and
16  make copies for everybody, I don't
17  care.
18  MR. WEBB:
19    Well, I'd like for you to produce
20  them all now.
21  MR. GILBERT:
22    Here.
23  MR. WEBB:
24    Well, pass them out, please.
25  This is highly improper.

20 (Pages 228 to 231)

BARGE000894

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 232

1    MR. GILBERT:
2      Oh, stop pasturing, Webb.
3    MR. WEBB:
4      I'm not posturing.
5    MR. GILBERT:
6      Here.  You want to go make a copy
7  of all this?  You're free to.
8    MR. WEBB:
9      I'd like to look at it before you
10  start asking questions.
11    MR. GILBERT:
12      I'm not going to ask him
13  questions about what you got in your
14  hand.  I'm not going to be asking him
15  questions about anything you haven't
16  already seen.
17  EXAMINATION BY MR. GILBERT:
18    Q.  Do you remember attending this --
19    MR. WEBB:
20      Excuse me.  Are these copies for
21  all counsel?
22    MR. GILBERT:
23      No.  That's my original.
24    MR. WEBB:
25      They look like there are several

Page 233

1  copies.  That's what I'm trying to
2  find out.
3    MR. GILBERT:
4      Dan, I tell you what --
5    MR. WEBB:
6      May I pass these to all counsel?
7    MR. GILBERT:
8      You can circulate that one copy,
9  but I don't know that there are extra
10  copies there.
11    MR. WEBB:
12      Well, there appears to be.
13    MR. GILBERT:
14      Well, I'm going to have to look
15  at it, okay?  But I'd like to examine
16  the witness.  We can take a break on
17  this.
18    MR. WEBB:
19      I'd like for you to take a break,
20  figure out what documents you received
21  from the subpoena and produced those
22  documents to all counsel here.
23    MR. GILBERT:
24      All right.  I'm going to produce
25  what I'm going to examine this witness

Page 234

1  on.  Okay?  There's that, which is a
2  download from Secretary of State 's
3  website concerning New Jourdan, LLC.
4      This is a settlement statement
5  reflecting sale of 1739 Jourdan
6  Avenue.  And I have copies for
7  everybody, and that's not something
8  that was gained surreptitiously by a
9  subpoena.
10      I have copies of correspondence
11  from True Title to Harry Holladay at
12  Chaffe McCall.
13      I have copies of a promissory
14  note from the Murph family in favor of
15  the Priestly family.
16      And I have copies of Settlement
17  Statements as to 105 Berkley Drive.
18  Oh, yeah, I do have extras of these.
19      I also have copies of a Buy/Sell
20  Agreement through Prudential Gardner.
21      And I suspect that these
22  documents are nothing new.
23    MR. WALKER:
24      Let me reiterate an objection --
25    MR. GILBERT:

Page 235

1      Please, reiterate it.
2    MR. WALKER:
3      -- because my objection is not
4  necessarily the same as the insurer's.
5  Number one, you have the obligation
6  under the rules to make sure that
7  everybody receives copies of a
8  subpoena if it's served on a party.
9      Number two, the production of the
10  documents at this time does not cure
11  the prejudice that your failure to
12  produce the subpoena and the attached
13  document return causes to Lafarge in
14  this examination.
15  EXAMINATION BY MR. GILBERT:
16    Q.  Do you recall going to that Act of
17  Sale?
18    A.  Yes.
19    Q.  Was that the same day that you signed
20  the receipt and release?
21    A.  I don't know.  What date they got on
22  there?
23    Q.  Well, this has -- unless I'm mistaken,
24  correct me if I'm wrong, it says February 9th,
25  2006.

21 (Pages 232 to 235)

BARGE000895

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 236

1        (Whereupon the deponent conferred with
2    counsel off the record.)
3        A. I don't know. I can't remember.
4    EXAMINATION BY MR. GILBERT:
5        Q. Do you remember if y'all did that on
6    the same day?
7        A. I can't remember.
8        Q. Okay. When you did the Act of Sale on
9    105 Berkley, did you get a chance to read
10   through everything that you were signing?
11       A. I'm pretty sure I did.
12       Q. Did you have an attorney advise you?
13       A. No.
14       Q. I see -- I'm going to ask you to jump
15   forward one page into the document called Cash
16   Sale, and I see where it says witnesses, that
17   Harry Holladay was present.
18       A. (Nods affirmatively.)
19       Q. Do you recall Mr. Holladay?
20       A. I think so.
21       Q. Do you know why he was there?
22       A. I don't know.
23       Q. Do you know what he had to do with
24   this sale?
25       A. Not really.

Page 237

1        Q. Because you had already settled with
2    Lafarge at that point, hadn't you?
3        A. I don't think I can --
4        (Whereupon the deponent conferred with
5    counsel off the record.)
6        A. I don't remember.
7    EXAMINATION BY MR. GILBERT:
8        Q. Do you know what reason he had for
9    being there?
10       A. Not really.
11       Q. Okay. Did you have any conversations
12   with him?
13       A. I don't know. I may have.
14       Q. But you don't remember?
15       A. No.
16       Q. All right. Let me go back to 1(a) and
17   show you again the check at the top.
18       Do you know whether that was used to
19   pay for the house? 105 Berkley?
20       A. I don't know.
21       Q. Do you pay notes on 105 Berkley?
22       A. No.
23       Q. Is there a promissory note on 105
24   Berkley?
25       A. I don't know.

Page 238

1        Q. You don't know?
2        A. No.
3        Q. Did you sign any agreement that you
4    were going to make payments on 105 Berkley?
5        A. I can't answer that.
6        Q. You can't answer that?
7        A. (Nods affirmatively.)
8        Q. Okay. Do you own 105 Berkley
9    outright?
10       A. I may.
11       Q. Did you borrow any money to pay for
12   105 Berkley?
13       A. No.
14       Q. Did you go to any bank or any lender
15   to get money for 105 Berkley?
16       A. No.
17       Q. Do you know what a collateral mortgage
18   is?
19       A. No.
20       Q. All right. Let me show you -- I've
21   given this to you as it was produced to me.
22   There's, four pages in, a document called Act
23   of Collateral Mortgage.
24       Do you see that?
25       A. Yes.

Page 239

1        Q. Okay. Is that your signature on Page
2    4 of the Act of Collateral Mortgage?
3        A. Yes.
4        Q. Okay. And is that your wife's
5    signature?
6        A. Yes.
7        Q. Okay. You see at the bottom it says
8    intervenor, and you see Harry Holladay?
9        A. Yes.
10       Q. What does that mean to you?
11       A. I don't know.
12       Q. Do you know why he signed this?
13       A. No.
14       Q. Do you know what this collateral
15   mortgage says?
16       A. No. What?
17       Q. I'm asking if you know.
18       A. No.
19       Q. Do you know if this collateral
20   mortgage has any effect on 105 Berkley Drive?
21       A. No.
22       Q. Do you know if this collateral
23   mortgage has any effect on the settlement that
24   you reached?
25       A. No.

22 (Pages 236 to 239)

BARGE000896

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 240

1    Q.  Did anybody tell you that it did?
2    A.  No.
3    Q.  Did anybody ever tell you that you
4  could not testify in this case?
5    A.  No.
6    Q.  Did anybody tell you that as part of
7  the confidentiality agreement that you couldn't
8  tell people what you saw on August 29th?
9    A.  Nobody -- nope.
10   Q.  I'm sorry?
11   A.  Nope.
12   Q.  Okay.  So have you understood all
13  along that you have been free to discuss what
14  your eyes and ears told you as you were just
15  going through your life on August 29th during
16  the storm?
17   A.  Yes.
18   Q.  Okay.  Let me ask you why at the last
19  deposition were there certain topics that you
20  wouldn't testify about?
21   A.  What topics?
22   Q.  About your statement, about meetings
23  with attorneys after the storm, about the
24  settlement, and, um -- let me just go to
25  Page 81 of the prior deposition, and I'm just

Page 241

1  going to show it to you, and I'll read it at
2  the same time.
3      "Did you at some time sign an
4  agreement with anybody, a confidentiality
5  agreement not to discuss what happened to you,
6  your family or your property in Hurricane
7  Katrina?"
8      And then you say, "That's the fifth
9  thing."  And I think what we mean is that's the
10  fifth thing you need to ask your attorney
11  whether you can testify about.
12      Had anyone told you that you couldn't
13  discuss what happened to you?
14   A.  No.
15   Q.  Okay.  Do you read any part of this
16  settlement document to prohibit you from
17  talking about what happened when you were at
18  your house on August 29th?
19   A.  Everybody know what happened.  I told
20  y'all just a while ago.
21   Q.  Okay.  But my question is whether you
22  have ever been under the impression that this
23  stops you from talking about it.
24   A.  No.
25   Q.  Okay.

Page 242

1      MR. RICHTHOFEN:
2      When Mr. Murph contacted my
3  office after the first deposition he
4  related to me that he was concerned,
5  that he wanted to make sure that he
6  assisted and testified truthfully
7  while at the same time honoring his
8  agreement and terms of the settlement
9  agreement, and that he just wanted
10  clarification on that from me.  And
11  I've instructed him as much as that
12  the agreement is confidential and he
13  can discuss whenever portion he can,
14  and that whatever he saw and heard
15  he's free to testify at will about.
16  EXAMINATION BY MR. GILBERT:
17   Q.  All right.  Well, let me just ask if
18  you recognize this.  And I'm actually going to
19  mark that as 2(a).  And that would be the --
20  let me just finish my sentence.  That would be
21  the cash sale and collateral mortgage, I'll
22  mark and attach as 2(a).
23      Now, I'm sorry --
24      (Exhibit 2(a) was marked for
25  identification and is attached hereto.)

Page 243

1      MR. RICHTHOFEN:
2      You wanted to say something?  Go
3  ahead.
4      THE WITNESS:
5      What's all this got to do with
6  the flood, about who I settled with
7  and what I got?  I thought we coming
8  to talk about a flood, two-day thing.
9  Now we're going into my whole life
10  history.  This ain't got nothing to do
11  with the flood.  My house got tore up,
12  I got compensated for it.
13  MR. GILBERT:
14      Your attorney is going to answer
15  that question for you.
16      (Whereupon the deponent conferred
17  with counsel off the record.)
18  (Off the record.)
19  MR. RICHTHOFEN:
20      Just for the record, I've
21  addressed my client's concerns about
22  the line of questioning.
23  MR. WALKER:
24      That it's totally irrelevant,
25  right?

23 (Pages 240 to 243)

BARGE000897

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 244

1       MR. RICHTHOFEN:
2           I've informed him that it does
3   not in fact have anything to do with
4   the actual flood, that plaintiffs'
5   counsel is asking these questions for
6   a different reason.
7   EXAMINATION BY MR. GILBERT:
8       Q.  Now, there's a cover page attached to
9   it, and I don't know if you're going to
10  recognize that so I'm going to flip it over.
11  But I'm going to ask you if you recognize this
12  Prudential Gardner Agreement to Purchase or
13  Sell, and also direct you to the last page of
14  it where you might see your signature on it.
15  I'll just ask you if you recognize it.
16      (Whereupon the deponent conferred with
17  counsel off the record.)
18  EXAMINATION BY MR. GILBERT:
19      Q.  All right.  Do you recognize that
20  document?  Have you seen it before?
21      A.  Yes.
22      Q.  Is that your signature on it?
23      A.  Yes.
24      Q.  And let me just see here.  All right.
25  We would introduce and attach this as 3(a).

Page 245

1   And that's the Prudential Gardner Buy/Sell
2   Agreement with a fax cover from Jane Hicks, and
3   it looks like a couple of internal documents
4   from TJ Real Estate Services, which is True
5   Title.
6       (Exhibit 3(a) was marked for
7   identification and is attached hereto.)
8   EXAMINATION BY MR. GILBERT:
9       Q.  All right.  Before I forget,
10  Mr. Murph, on the last page of the agreement,
11  the settlement agreement, there's a document
12  called an affidavit which I'm showing to you
13  which is marked as LNA000705.
14      Is that your signature on it?
15      A.  Yes.
16      Q.  Did you tell anybody what to say in
17  this affidavit?
18      A.  No.
19      Q.  You didn't dictate something to
20  somebody and say, these are my words, put them
21  in an affidavit?
22      A.  No.
23      Q.  How did you come to sign this
24  affidavit?
25      A.  It's part of the settlement agreement.

Page 246

1       Q.  Okay.  Did you raise your hand and "I
2   swear under oath" and all that?
3       A.  I don't remember.  No, I don't know.
4   I can't remember if I did or didn't.
5       Q.  All right.  We're going to attach the
6   entirety of the settlement agreement, which is
7   LNA694 through 705 --
8       MR. RICHTHOFEN:
9           Which is a redacted --
10      MR. GILBERT:
11          -- which is a redacted copy of
12  it, because that's all we got, as
13  4(a).
14      (Exhibit 4(a) was marked for
15  identification and is attached hereto.)
16  EXAMINATION BY MR. GILBERT:
17      Q.  What happened to 1739 Jourdan Avenue?
18  Do you still own that?
19      (Whereupon the deponent conferred with
20  counsel off the record.)
21      A.  No.
22  EXAMINATION BY MR. GILBERT:
23      Q.  Who owns that now?
24      A.  I don't know.
25      Q.  How did it come to be that you don't

Page 247

1   own it anymore?  Did you sell it?  Did you --
2   what did you do?
3       A.  I don't know what I did with that
4   thing.
5   EXAMINATION BY MR. GILBERT:
6       Q.  You don't know what happened to 1739,
7   who owns it?
8       A.  No.
9       Q.  Okay.  Did you go to any sale or
10  anything of 1739 Jordan?
11      A.  No.
12      Q.  Did you sign any documents to transfer
13  it to anybody?
14      A.  No.  Not that I know of.
15      Q.  Okay.  When did you buy 1739?
16      A.  I can't remember.
17      Q.  Do you know who Shirley Priestly is?
18      A.  Yes.
19      Q.  Do you know any of Shirley Priestly's
20  children?
21      A.  No.
22      Q.  Do you know Jennifer Fernandez?
23      A.  Yes.
24      Q.  Do you know Wayne Priestly?
25      A.  Yes.

24 (Pages 244 to 247)

BARGE000898

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 248

1    Q.  Okay.
2        (Whereupon the deponent conferred with
3    counsel off the record.)
4    A.  Oh, okay.
5    EXAMINATION BY MR. GILBERT:
6    Q.  Because we're running out of time I'm
7    going to try to -- or at least running out of
8    time before we have to break, I'm going to try
9    and make this quick.
10       Is it correct that when you bought
11   1739 y'all were like 18 and some change short
12   in closing and so they did a second mortgage to
13   y'all?
14   A.  I don't know.  They may have.
15   Q.  All right.  Well, let me ask you --
16   I'm going to show you 5(a) and see if you
17   recognize it.  See if you recognize your
18   signature on it.
19       (Exhibit 5(a) was marked for
20   identification and is attached hereto.)
21   A.  Yes.
22   EXAMINATION BY MR. GILBERT:
23   Q.  What is that document?
24   A.  It's a promissory note.
25   Q.  Okay.  What was -- and it's a -- what

Page 249

1    is the promise contained in that note?
2    A.  I don't know.  It's a price that they
3    got on here.
4    Q.  Well, let me ask you, were you paying
5    notes on 1739?
6    A.  Yes.
7    Q.  Who were you paying them to?
8    A.  The Priestlys.
9    Q.  Okay.  Did you owe anything still at
10   the time of the storm?
11   A.  Yes.
12   Q.  Okay.  When is the last time you've
13   spoken with any of the Priestlys?  And by that
14   I also mean Jennifer Fernandez, any of them.
15   A.  A couple of weeks ago.
16   Q.  Did y'all talk about 1739?
17   A.  No.
18   Q.  When is the last time y'all have
19   spoken about 1739?
20   A.  A couple of weeks ago.
21   Q.  Okay.  You just said you didn't speak
22   about 17 --
23   A.  We didn't speak about it.  I just went
24   there and signed a paper.
25   Q.  What paper did you sign?

Page 250

1    A.  Um -- this promissory note.
2    Q.  Did you sign that a couple of weeks
3    ago?
4        MR. RICHTHOFEN:
5            I think Mr. Murph is alluding to
6            when he met at my office with the
7            Priestlys to extinguish the note.
8            That may be what he's alluding to.
9            There was an extinguishment of the
10           note, and that occurred at my office
11           with the Priestlys.
12   EXAMINATION BY MR. GILBERT:
13   Q.  Is that what you're talking about, a
14   meeting to settle up with them?
15   A.  Right.
16   Q.  All right.  After you bought and moved
17   into 105 Berkley, did you have any more talks
18   with Mr. Lafarge or any of their attorneys?
19   Did you ever speak to them again?
20   A.  No.
21   Q.  Never?
22   A.  No.
23   Q.  What about Mrs. Murph, did she ever
24   hear from any of them?
25   A.  I don't think.  I don't know.

Page 251

1    Q.  Okay.  Did Mrs. Murph ever tell you
2    that she'd had a conversation with any of the
3    attorneys from Lafarge?
4    A.  She may have.
5    Q.  But you don't remember for sure
6    whether or not she did or didn't?
7    A.  No.  Right.
8    Q.  She'd be the better person to be able
9    to answer that question?
10   A.  I don't know.
11   Q.  Okay.  Did you ever talk with Jennifer
12   Fernandez about -- let's say in early '06,
13   spring of '06, did you ever talk with Jennifer
14   Fernandez about any calls that she might have
15   gotten from Lafarge or their attorneys?
16   A.  Who is Jennifer Fernandez?
17   Q.  Shirley Priestly's daughter Jennifer.
18   A.  No, unh-unh.
19   Q.  Okay.  All right.  So you testified
20   that you don't know who owns 1739 Jourdan
21   Avenue right now, and in connection with that,
22   I'm going to -- I want to attach --
23       MR. GILBERT:
24           And I'll let all counsel see
25           this, this is going to be 6(a).  This

25 (Pages 248 to 251)

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 252

```
1         is from the City of New Orleans
2    property database as of today's
3    date -- or I'm sorry, yesterday's
4    date, 6:35 p.m.  Circulate it, as long
5    as it gets back to the court reporter.
6         (Exhibit 6(a) was marked for
7    identification and is attached hereto.)
8         MR. GILBERT:
9           And in connection with 105
10         Berkley, I'm going to attach the same
11         thing and call it 7(a).  It's from the
12         City of New Orleans property database.
13         It was actually downloaded this
14         morning, dated 1/28, 7:38 a.m.  Send
15         that around, too.
16         (Exhibit 7(a) was marked for
17    identification and is attached hereto.)
18    EXAMINATION BY MR. GILBERT:
19    Q.  In your new neighborhood where you
20    live on Berkley, did any of your other
21    neighbors come from the Lower Ninth Ward after
22    the storm?
23    A.  I have no idea.
24    Q.  Do you know any of the other
25    neighbors?
```

Page 253

```
1    A.  Yes.
2    Q.  Okay.  But you don't know whether they
3    came from the Lower 9?
4    A.  I don't think there's nobody come from
5    there.
6    Q.  All right.  I want to ask you a few
7    questions about things that we've talked about
8    earlier.  We've talked about the boom that you
9    heard.  The boom.
10    A.  Right.
11    Q.  How much time went by after you heard
12    the boom before you saw the barge on your
13    house?  How much time do you think that was?
14    A.  Oh, I don't know.
15         MR. WALKER:
16           Objection.  Asked and answered.
17    EXAMINATION BY MR. GILBERT:
18    Q.  You don't know how much time went by?
19    A.  No.
20    Q.  Do you think it was an hour?
21    A.  No.
22    Q.  Do you think it was less?
23    A.  It was more than an hour.
24    Q.  It was more than an hour between the
25    time you heard the boom and the time you saw
```

Page 254

```
1    the barge?
2    A.  Yes.
3    Q.  After you heard the boom, did you hear
4    any more of the scraping sound?
5    A.  No.
6    Q.  You testified that you were not scared
7    in Vietnam but you were scared here.  Why?
8    A.  I know who I was fighting in Vietnam.
9    I ain't never been in no flood before.
10    Q.  Did the boom scare you?
11    A.  No.
12    Q.  Did the flooding scare you?
13    A.  The water scared me.
14    Q.  All right.  You'd testified that you
15    had already smashed out a hole before you heard
16    the boom.  Is that right?
17    A.  I may have.  I don't know.
18    Q.  You went up to the attic.
19    A.  Right.
20    Q.  All right.  Let me see if I can
21    understand.  You're making the connections on
22    the --
23    A.  Generator.
24    Q.  -- on the generator when you hear the
25    scaping sound and the boom; is that right?
```

Page 255

```
1    A.  Right.
2    Q.  Then you go up into the attic.  Is
3    that right?
4    A.  Right.
5    Q.  Had you already cut a hole?  Was the
6    hole already there?
7    A.  No, it wasn't no hole there.  I put
8    the hole there.
9    Q.  Right.  But had you already put it
10    there at that point?
11    A.  Before the boom?  No.
12    Q.  No.  You put it there after the boom?
13    A.  Right.
14    Q.  Okay.  Did the boom sound to you like
15    the sound of a barge crashing into a floodwall?
16    A.  I don't know how a barge sound
17    crashing into a floodwall.
18    Q.  Okay.  Did you get the impression that
19    that's what it was?
20         MR. WALKER:
21           Objection.  Asked and answered.
22    A.  No.
23    EXAMINATION BY MR. GILBERT:
24    Q.  Huh?
25    A.  No.
```

26 (Pages 252 to 255)

BARGE000900

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 256

1    Q.  What impression did you have?
2    A.  I didn't have no impression.  I just
3  heard a noise and I saw the water and I ran in
4  the garage.
5    Q.  Okay.  About what time was it when you
6  heard the boom?
7    A.  I don't know.
8    Q.  You don't know?
9    A.  No.
10   Q.  Was it dark?
11   A.  Yes.
12   Q.  How long after you heard the boom did
13 it get light?
14   A.  The next day.
15   Q.  Well, but how long?  About how long?
16   A.  Oh.  I don't know how long that was.
17   Q.  I'm sorry?
18   A.  I don't know.
19   Q.  Was it an hour?
20   A.  No.
21   Q.  Was it less, more?
22   A.  It was the next -- it was more.
23   Q.  It was more than an hour?
24   A.  Yes.
25   Q.  Okay.  How many booms did you hear?

Page 257

1    A.  Just a bunch of noise I heard.  It
2  didn't really sound like a boom, it was just --
3    Q.  Well, how many booms did you hear that
4  night?  That morning, that night?
5    MR. WALKER:
6        Objection.  Asked and answered.
7    A.  I didn't heard no -- it's just a big
8  scraping sound.  I just said like a boom, but
9  it just was a loud noise.
10 EXAMINATION BY MR. GILBERT:
11   Q.  All right.  Could we gather up the
12 exhibits so I could see what I've got?
13   (Off the record.)
14   MR. GILBERT:
15       All right.  We're going to label
16   the excerpts of the statement as 8(a).
17   (Exhibit 8(a) was marked for
18 identification and is attached hereto.)
19   MR. GILBERT:
20       Y'all want to have a break?  You
21   want to eat lunch?
22   MR. WALKER:
23       Do you have more questions?
24   MR. GILBERT:
25       I don't think.  I think we're

Page 258

1  going to tender.  Reserve rights but
2  we're going to tender.
3    MS. BERTAUT:
4        I have a few.
5    MR. WALKER:
6        We can go as far as we can.  I
7    don't know when they'll bring the
8    food.
9  EXAMINATION BY MR. RICHTHOFEN:
10   Q.  Mr. Murph, this is the second time
11 you've been here, correct?
12   A.  Yes.
13   Q.  This is just for clarity, for the
14 record.  There are about fifteen individuals
15 around the table, at least?
16   A.  About.
17   Q.  Does how does being here with this
18 many people with ties and starched shirts on
19 make you feel?
20   A.  Uncomfortable.
21   Q.  Uh-huh.  Are you nervous?
22   A.  A little bit.
23   Q.  All right.  Has anyone told you how to
24 testify here today?
25   A.  No.

Page 259

1    Q.  Has everything you said been an honest
2  answer to the questions presented to you, as
3  much as you could answer?
4    A.  Yes.
5    Q.  Okay.
6  EXAMINATION BY MS. BERTAUT:
7    Q.  Mr. Murph, my name is Carmelite
8  Bertaut.  We talked the last time --
9    A.  Right.
10   Q.  -- you were here, on the other
11 deposition.
12       Let me just see if I can understand.
13 At the time Katrina hit, you and your family
14 were living at 1739 Jourdan Avenue?
15   A.  Yes.
16   Q.  And you are now on Berkley Drive?
17   A.  Yes.
18   Q.  Do you recall that you paid
19 approximately $93,000 for the house on Jourdan
20 Avenue when you purchased it?
21   A.  I can't remember.
22   Q.  Okay.  Do you know what you paid for
23 the house on Berkley?
24       (Whereupon the deponent conferred with
25 counsel off the record.)

27 (Pages 256 to 259)

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

---

Page 260

1  EXAMINATION BY MS. BERTAUT:
2      Q.  Let ask it this way:  If the public
3  records show that you paid $230,000 for the
4  house on Berkley, does that sound about right?
5      A.  Possibly.
6      Q.  And if the public records show that
7  you and your wife paid approximately $93,400
8  for the house on Jordan Avenue, does that sound
9  about right?
10     A.  Probably.
11     Q.  Okay.  Berkley is a newer house; is
12  that right?
13     A.  Yes.
14     Q.  Than Jordan was.
15     A.  Right.
16     Q.  Is Berkley a bigger house than
17  Jourdan?
18     A.  Yes.
19     Q.  Okay.  So -- and you moved from a
20  smaller, older house for which you paid $93,400
21  to a larger house that was valued at $230,000
22  since the storm.  Is that right?
23     A.  Yes.
24     Q.  And you signed papers to purchase the
25  Berkley property on the same day that you

Page 261

1  signed a settlement agreement with Lafarge, is
2  that right?
3          MR. RICHTHOFEN:
4              If you remember the date.
5      A.  I can't remember the date but it's
6  something like that.
7  EXAMINATION BY MS. BERTAUT:
8      Q.  Okay.  Are you still paying any notes
9  on Jourdan Avenue, any mortgage payments?
10     A.  No.
11     Q.  When did you quit paying mortgage
12  payments on Jourdan Avenue?
13     A.  After the storm.
14     Q.  Was it about the time that you bought
15  Berkley?
16     A.  Probably.
17     Q.  Are you paying any property tax on
18  Jourdan Avenue?
19     A.  No.
20     Q.  Do you maintain the property on
21  Jourdan Avenue?
22     A.  There ain't no property.
23     Q.  Well, do you cut grass or --
24     A.  No.
25     Q.  When did you acquire the North Roman

Page 262

1  property that's behind Jourdan?
2      A.  Um -- I can't remember what date it
3  was.
4      Q.  Okay.  Did you get that from the
5  Priestlys?
6      A.  No.
7      Q.  That was a separate deal?
8      A.  Yes.
9      Q.  Was there any structure on the North
10  Roman property?
11     A.  No.
12     Q.  Okay.  There never was in the time you
13  owned it?
14     A.  No.
15     Q.  Did you acquire the North Roman
16  property after you acquired Jourdan from the
17  Priestlys?
18     A.  Yes.
19     Q.  Do you know who you purchased the
20  North Roman property from?
21     A.  The City of New Orleans.
22     Q.  Was that through a tax sale or
23  something?
24     A.  I can't -- I don't know -- really know
25  how we did that, but --

Page 263

1      Q.  I'm not certain of the number, but
2  it's the agreement to purchase Berkley, which
3  is someplace perhaps in front of you, I don't
4  know.  Let me see if I can find the number.
5  Maybe your lawyer can help you find it to move
6  this along.  I think it would be 3(a).
7          That shows, if you look, sir, up at
8  the right-hand corner, a date of 12/3/05.
9      A.  Uh-huh.
10     Q.  Does that sound about the time that
11  you and your wife decided to purchase Berkley?
12     A.  Yes.
13     Q.  Were there any other houses that you
14  had put agreements to purchase on other than
15  Berkley after the storm?
16     A.  No.
17     Q.  So 105 Berkley is the only property
18  that you attempted to buy after the storm, is
19  that right?
20     A.  I looked at a bunch of houses, but
21  that's the one that I liked.
22     Q.  Is 105 Berkley the only one you signed
23  papers on the purchase?
24     A.  Yes.
25     Q.  And again, let me see if I understand

28 (Pages 260 to 263)

BARGE000902

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 264

1   this correctly:  At no time before you signed
2   what has been identified as the agreement with
3   Lafarge, which is 4(a), at no time before you
4   signed that document did you have an attorney
5   representing your interests review that
6   document, is that correct?
7       A.  No.
8       Q.  When you signed the document that's
9   identified as 4(a)--
10      A.  Right.
11      Q.  -- you said it was in this building.
12  Is that right?
13      A.  Right.
14      Q.  Was that signing of the document
15  videotaped?
16      A.  I don't think.
17      Q.  And prior to arriving at the building
18  on the day that you signed the document
19  identified as 4(a), you had never been shown a
20  copy of the document --
21      A.  No.
22      Q.  -- prior to that time.
23          And similarly, when you signed the
24  papers dealing with Berkley which are
25  identified as 2(a), the Act of Sale and the

Page 265

1   Collateral Mortgage, had you ever had those
2   documents looked at by a lawyer before you
3   signed them?
4       A.  No.
5       Q.  Are you making any sort of payments on
6   a note for Berkley?
7       A.  No.
8       Q.  Were you aware that you have a
9   mortgage on -- that obligates you on the public
10  records for Berkley?
11      A.  No.
12      Q.  Is this the first time you're learning
13  of that, sir?
14      A.  Yes.
15      Q.  Why do you believe that you do not
16  currently own Jourdan Avenue -- what is it,
17  1739 Jourdan Avenue?
18      A.  Yes.
19      Q.  Yes.  Why do you believe that you
20  don't currently own it or that you may not
21  currently own that property?
22      A.  Well, I don't know.
23      Q.  Well, let's see.  At the time Katrina
24  hit, you were the owner of the property, is
25  that right?

Page 266

1       A.  Yes.
2       Q.  I think the question that was on the
3   table was, at the time of Katrina you were the
4   owner of 1739 Jourdan --
5       A.  Right.
6       Q.  -- avenue.
7           And I thought you had said earlier
8   today, sitting in the room, that you think you
9   do not any longer own Jourdan Avenue.
10      A.  Right.
11      Q.  And my question to you is, why do you
12  believe that?
13      A.  That was part of the settlement.
14      Q.  But sitting here today, the only
15  document that you believe you signed concerning
16  Jourdan Avenue in connection with the
17  Lafarge/Ingram settlement is what's been
18  identified as 4(a)?
19          MR. HAYCRAFT:
20              Objection to the form of the
21          question.
22          MR. GILBERT:
23              I didn't think Ingram was a
24          party.
25          MR. HAYCRAFT:

Page 267

1           They're not.
2   EXAMINATION BY MS. BERTAUT:
3       Q.  I'll rephrase the question.  Is the
4   only document that you have signed in
5   connection with settlement of your claims the
6   document identified as 4(a)
7           (Whereupon the deponent conferred with
8   counsel off the record.)
9       A.  Run that by me again.
10          (Whereupon the deponent conferred with
11  counsel off the record.)
12  EXAMINATION BY MS. BERTAUT:
13      Q.  Do you want me to repeat the question?
14          Is the only document that you have
15  signed in which you settled claims arising out
16  of the barge and Katrina the document that's
17  been identified and is sitting in front of you
18  as Exhibit 4(a)?
19      A.  Right.
20      Q.  Did Ingram Barge make any payments to
21  you?
22      A.  No.
23      Q.  Did you execute any other agreements
24  with Ingram Barge?
25      A.  No.

29 (Pages 264 to 267)

Page 268

1    Q.  Do you have any understanding of
2  whether or not Lafarge has made any promises to
3  you that they now have to live up to in
4  connection with the settlement?
5    A.  I don't know.
6    Q.  Why do you believe Lafarge made this
7  settlement with you?
8    A.  To compensate.
9    Q.  Has any representative of Lafarge
10  spoken with you since the last deposition?
11    A.  No.
12    Q.  Have you had any contact with Lafarge
13  since February 9, 2006?
14    A.  No.
15    Q.  Okay.  I'm going to ask you now if
16  you'll take a look at the statement that's --
17  and I forget what that number is.  I think
18  that's -- 8(a).  And if I understood what you
19  told us earlier, you have no recollection of
20  giving a statement.  Is that right?
21    A.  Right.
22    Q.  I'm going to ask you to take a look at
23  it a second, 8(a), the document noted as 8(a).
24  You see it purports to be an interview with
25  somebody named Arthur Lee Murph, Jr.?  Do you

Page 269

1  see that?
2    A.  Yes.
3    Q.  And is that your full name, sir?
4    A.  Yes.
5    Q.  And is your date of birth 12/4/1950?
6    A.  Yes.
7    Q.  And are you a supervisor for a
8  construction company?
9    A.  Yes.
10    Q.  And were you living at 1739 Jourdan
11  Avenue?
12    A.  Yes.
13    Q.  And do you have a daughter?
14    A.  Yes.
15    Q.  And did you bring your family to the
16  Hyatt?
17    A.  Yes.
18    Q.  And would you take look at Page 4.
19    MR. WALKER:
20        Carmelite, I'm going to renew the
21      same objections that I previously made
22      with respect to Brian's questioning on
23      the statement for you, as well.
24    MS. BERTAUT:
25        I understand.

Page 270

1    MR. RICHTHOFEN:
2        Mr. Murph would assert that he
3      can't remember giving a statement.
4    MS. BERTAUT:
5        I understand that.  We're getting
6      there.
7  EXAMINATION BY MS. BERTAUT:
8    Q.  I want you to look at Page 4 where it
9  says -- the fifth set of words, lines, it says,
10  Arthur in bold, and it says, "Right.  He stayed
11  out on Paris Avenue.  Paris Avenue and
12  Lafreniere.  That's where I dropped my two
13  vehicles off.  That's why they were safe
14  through the flood."
15        Do you see that on the document?
16    A.  Yes.
17    Q.  Now, you dropped your two vehicles off
18  on Paris Avenue and Lafreniere, didn't you?
19    A.  Right.
20    Q.  Let's look at Page 9.  Toward the
21  bottom of the page, Mr. Murph, it's got the
22  initials RJG, and it starts in the middle of a
23  sentence, "swam over to your neighbors
24  Mrs. Moses, who was living there."
25    A.  Right.

Page 271

1    Q.  And then it says, Arthur:  "Right.
2  They had four people in that house, in the
3  upstairs apartment."
4        Now, you see that in the statement?
5    A.  Yes.
6    Q.  Now, Mr. Murph you swam to a house
7  with four people in an upstairs apartment,
8  didn't you?
9    A.  Yes.
10    Q.  And it goes on.  If you keep looking
11  at Page 9, it says, right after where we just
12  read, it says, RJG:  "Do you know who owns the
13  house that they were living in?"
14        And then it says, Arthur:  "Someone
15  named Rick.  I can't really, um -- a white
16  dude.  I don't really know his name, but we
17  spoke a bunch of times."
18        You see where that is in this
19  document?
20    A.  Yes.
21    Q.  Do you recall speaking to somebody
22  named Rick before Katrina, a white dude that
23  lived close to you?
24    A.  I don't know if that was his real
25  name, but I remember talking to him.

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 272

1    Q.  In other words, Mr. Murph, this
2  statement reflects a whole lot of things and
3  events that are very similar to your
4  experiences the night Katrina hit, is that
5  right?
6    A.  Yes.
7    Q.  This statement on the first page, or
8  the excerpt, the document says -- if you'll
9  look on the first page, it says, taken
10  January 25, 2006, by RJG.
11        Do you recall the day of the week that
12  January 25, 2006 was?
13    A.  No.
14    Q.  Do you know where you were living at
15  that time?
16    A.  In January, 2006?  Not really.
17    Q.  So there are some things that you
18  don't recall about January 25, 2006, involving
19  your whereabouts and what you were doing, is
20  that right?
21    A.  Right.
22    Q.  Is it possible that you in fact did
23  give a statement on January 25, 2006 to someone
24  concerning your Katrina experiences and you
25  simply just don't recall it?

Page 273

1    A.  It may be.  I just don't remember.
2    Q.  Ant would you say that your memory is
3  better today than it was back in January, 2006,
4  about the sequence of events that happened
5  during Katrina?
6    A.  No.
7    Q.  Okay.  You think your memory was
8  better closer in time to Katrina than it is
9  today?
10    A.  My memory's just shot.
11    Q.  It's shot.  Been through a lot in the
12  last two years; is that right?
13    A.  More than two years.
14    Q.  Okay.  I want to point out one other
15  thing and see if this jogs your memory on
16  anything.  January 25, 2006, is just right
17  before -- a few days before -- I can't count
18  right now, but maybe two weeks before you
19  signed papers on February 9, 2006, is that
20  right?
21    A.  I don't know.
22    Q.  Did you ask, when you signed the
23  papers with Lafarge, what duties or obligations
24  you had as a result of signing the papers?
25    A.  No.

Page 274

1    Q.  Did any of the lawyers present explain
2  to you what duties you may have been taking on
3  by signing those papers?
4    A.  No.
5    Q.  When you spoke to Lafarge prior to
6  signing papers, did you ever tell them that you
7  were personally in the house at the time that
8  the barge came to rest on your home?
9    A.  I may have.
10    Q.  Do you know a lawyer by the name of
11  Pat Hand?
12    A.  Who?
13    Q.  Patrick Hand.
14    A.  No.
15    Q.  What is the status of any insurance
16  claim on Jourdan Avenue; did you make a claim
17  on Jourdan Avenue against your insurer?
18    A.  I think, maybe.
19    Q.  Has that been paid off?
20    A.  I think so.
21    Q.  As a result of just coming today and
22  the last time you were here, is it your
23  understanding that you have promised not to
24  disclose or reveal certain events that happened
25  to you on account of the money or settlement

Page 275

1  that you reached with Lafarge?
2      MR. WALKER:
3        Objection, asked and answered.
4      MR. RICHTHOFEN:
5        Do you understand the question?
6      THE WITNESS:
7        Yes.
8  EXAMINATION BY MS. BERTAUT:
9    Q.  Do you understand my question?
10      MR. RICHTHOFEN:
11        You can answer.
12    A.  Repeat that question again.
13  EXAMINATION BY MS. BERTAUT:
14    Q.  Do you understand that you are
15  obligated not to disclose certain events that
16  you know took place on account of the
17  settlement that you reached with Lafarge?
18    A.  Yes.
19    Q.  And do you have any concerns that you
20  might be at risk -- you or your family might be
21  at risk should you violate the terms of that
22  settlement?
23      MR. RICHTHOFEN:
24        Just for clarity, I don't think
25        my client understood the crux of that

31 (Pages 272 to 275)

BARGE000905

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 276

1    question, which is why I asked him.
2    So I'm going to rephrase it for him if
3    that's okay.
4    MS. BERTAUT:
5        Okay.  Which question are you
6    talking about?  The one about are you
7    afraid about your family?
8    MR. RICHTHOFEN:
9        No, no.  The one before that.
10       Could you read the previously
11   question back, please?
12   MS. BERTAUT:
13       Well, I'll tell you, counsel, I
14   asked him if he understood and he said
15   he did.  Now, if you have an
16   opportunity to question him again, you
17   can, but I'm in the middle of cross
18   right now.
19   MR. WALKER:
20       Well, you said earlier you're
21   trying to get the facts.  Right?  And
22   the fact is based on a very unclear
23   question.
24   MR. GILBERT:
25       If it's based on a

Page 277

1    misunderstanding, we need to get that
2    accurate.
3    MR. RICHTHOFEN:
4        Mr. Murph, is it your
5    understanding that you can't discuss
6    what happened to you because of the
7    confidentiality agreement or you can't
8    discuss the agreement because of the
9    terms of the confidentiality
10   agreement?
11   THE WITNESS:
12       Right.
13   MR. RICHTHOFEN:
14       What's your understanding?  You
15   can't -- you're not allowed to discuss
16   what happened to you with the
17   hurricane, or you're not allowed to
18   discuss the agreement?
19   THE WITNESS:
20       I'm not allowed to discuss the
21   agreement.
22   MS. BERTAUT:
23       That was not my question.
24   MR. RICHTHOFEN:
25       It was the previous -- read the

Page 278

1    question back, please.
2    MR. WEBB:
3        It was a valid interpretation of
4    your question.
5    MR. GILBERT:
6        That was your question, counsel.
7    MR. WALKER:
8        The record is going to show what
9    my question is, gentlemen.
10       (Whereupon the question was
11   read back as follows: "Do you understand that
12   you are obligated not to disclose certain
13   events that you know took place on account of
14   the settlement that you reached with Lafarge?")
15   MS. BERTAUT:
16       That was my question.
17   MR. RICHTHOFEN:
18       Right.  I want to make sure
19   Mr. Murph understood that he's not
20   allowed the discuss the events that
21   took place regarding the settlement
22   agreement, not events that took place
23   in totality of the hurricane and the
24   barge.
25   MS. BERTAUT:

Page 279

1        I understand.
2    MR. WALKER:
3        Which he's already answered for
4    Mr. Gilbert twice.
5    MR. RICHTHOFEN:
6        I'm sorry.  Just for clarity, for
7    my client's safety, I just want to
8    make sure he understood that and that
9    was the answer that was being given to
10   you.
11   EXAMINATION BY MS. BERTAUT:
12   Q.  Are you concerned that should you
13   break the agreement or violate the terms of the
14   agreement that you or your family might be at
15   risk financially?
16   MR. RICHTHOFEN:
17       You can answer that.
18   A.  I don't know.
19   MR. RICHTHOFEN:
20       No, you can answer that honestly.
21   THE WITNESS:
22       I don't understand what she's
23   saying.
24   MR. WALKER:
25       It's all right.  A lot of us

32 (Pages 276 to 279)

BARGE000906

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 280

1      don't understand what she's saying
2   either.  You can say that.
3   EXAMINATION BY MS. BERTAUT:
4      Q.  You don't know?  Is that what your
5   answer is?
6      A.  That's what I said, yes.
7      Q.  Do you have any concerns that if
8   Lafarge believes that you broke the terms of
9   the agreement that your house on Berkley might
10  be foreclosed on or lost?
11     A.  Somewhat.  Yes.
12     Q.  Was there ever a time when you
13  believed that Lafarge was responsible for the
14  damage to your house?
15     A.  Only because I saw the barge.
16     Q.  Do you still believe that to be true?
17     A.  Yeah.  It was on the house.
18     Q.  How about Ingram; was there ever a
19  time when you believed Ingram Barge was
20  responsible for the damage to your house?
21     A.  I didn't really care who was
22  responsible, I just wanted to be compensated
23  for my house.
24     Q.  I understand that.  But my question,
25  Mr. Murph, is was there ever a time when you

Page 281

1   believed that Ingram Barge was responsible for
2   the damage to your house?
3      A.  I don't know.  No.  I don't think.
4      Q.  I think that may be all.
5          That's all the questions I have.
6   Thank you.
7          MR. GILBERT:
8          I got a couple.
9   EXAMINATION BY MR. GILBERT:
10     Q.  How long after you heard the scraping
11  sound did the water come?
12         MR. WALKER:
13         Objection.  Asked and answered
14      about four times.
15         MR. GILBERT:
16         No.  It hasn't been asked.
17         MR. WALKER:
18         Yeah.
19         MR. GILBERT:
20         No.  I have not asked that
21      question.
22  EXAMINATION BY MR. GILBERT:
23     Q.  How long after the scraping sound did
24  the water come?
25         MR. WALKER:

Page 282

1          Objection.
2      A.  A lil while.
3   EXAMINATION BY MR. GILBERT:
4      Q.  What's a lil while?  What's that mean?
5      A.  About three, four minutes, I guess.  I
6   don't know.
7      Q.  You're guessing?
8      A.  Yep.
9      Q.  Okay.  How long after the scraping
10  sound did you cut the hole in the attic?
11         MR. WALKER:
12         Objection.  Asked and answered.
13     A.  Soon as I went to the garage and got
14  the ax and chopped the hole.
15  EXAMINATION BY MR. GILBERT:
16     Q.  Okay.  So that's something you did
17  straight away after you heard the scraping?
18     A.  No.  After I saw the water.
19     Q.  All right.  Okay.  About how long
20  after -- how long after you saw the water did
21  you go do the hole?
22     A.  Immediately.
23     Q.  That's something you went and did
24  straight away.
25     A.  Yes.

Page 283

1      Q.  All right.  How long after the
2   scraping was that that you went and did the
3   hole?
4          MR. WALKER:
5          Objection.  Asked and answered?
6      A.  After the water.  After I saw the
7   water.
8   EXAMINATION BY MR. GILBERT:
9      Q.  Do you know how much time went by?
10     A.  No.
11     Q.  Okay.  Did you meet with any attorneys
12  today other than Mr. Richthofen --
13     A.  No.
14     Q.  -- to prepare for giving testimony?
15     A.  No.
16     Q.  You didn't meet with any of the
17  attorneys from Lafarge?
18     A.  No.
19     Q.  Okay.  All right.  That's it.
20         MR. GILBERT:
21         That's all.  I mean, you know --
22      reserving the right to reexamine if
23      anybody else goes.  But I guess we
24      take a break now?
25         MR. RICHTHOFEN:

33 (Pages 280 to 283)

Page 284

```
1          But before the break, real quick,
2     I would request that if Mr. Murph
3     is -- if anyone has taken a statement
4     from Mr. Murph with regards to these
5     proceedings, I request that I be
6     furnished a copy of that.
7     MR. GILBERT:
8          Call for production.
9     MR. RICHTHOFEN:
10         Do I have to file that with --
11    MR. WALKER:
12         I didn't hear what you said.
13    MR. GILBERT:
14         Just call for production.
15    MR. RICHTHOFEN:
16         I just -- well, whatever it's
17    called.  If I need to file with
18    court -- I would request that if
19    Mr. Murph has made a statement to
20    anyone here, because we have a copy of
21    a statement, you know, a redacted
22    statement, and under the
23    confidentiality agreement, if he's
24    made a statement to anyone -- if
25    anyone here has taken a statement from
```

Page 285

```
1     Mr. Murph that I be furnished a copy
2     of that statement, please.
3     MR. WALKER:
4          Anybody else have any questions?
5     EXAMINATION BY MR. WALKER:
6     Q.   I just have a couple, Mr. Murph.  And
7     if we can get out before lunch you don't have
8     to come back.
9          Do you remember I took your deposition
10    on December 17th, '07, a couple of weeks ago?
11    A.   I can't remember.
12    Q.   Well, you remember in this room, you
13    were here with a bunch of us and I asked you
14    questions?
15    A.   Right.
16    Q.   Maybe that wasn't the right date.
17    MR. WIEDEMANN:
18         It wasn't in this room.  It was
19    in Bruno's office.
20    MR. WALKER:
21         Sorry.  You're right.
22    EXAMINATION BY MR. WALKER:
23    Q.   In Mr. Bruno 's office.
24    A.   Right.
25    Q.   A lot of attorneys asked you
```

Page 286

```
1     questions?
2     A.   Yes.
3     Q.   And you remember you were under
4     oath --
5     A.   Yes.
6     Q.   -- like you were today?
7     A.   Right.
8     Q.   And you promised to tell the truth
9     then, and if you didn't remember anything you'd
10    say you didn't remember, and we told you not to
11    guess?
12    A.   Yes.
13    Q.   You remember all that?
14    A.   Yes.
15    Q.   Did you tell the truth that day?
16    A.   Yes.
17    Q.   Did you give us your best recollection
18    of the events of Katrina and how you lived them
19    and what you saw and what you heard?
20    A.   Yes.
21    Q.   And how about today, did you give us
22    your best recollection?
23    A.   As best as I know.
24    Q.   And the first time we took your
25    deposition you didn't need any statement to
```

Page 287

```
1     refresh your memory, did you?
2     A.   No.
3     Q.   You remembered things just based on
4     your memory, didn't you?
5     A.   Right.
6     Q.   And the redacted statement you've been
7     shown prior to today 's deposition didn't
8     refresh your memory any better than you had it
9     the first time we took your deposition, did it?
10    A.   No.
11    Q.   So you didn't need that statement to
12    give your testimony truthfully, did you?
13    A.   No.
14    Q.   And you don't remember giving the full
15    statement, do you?
16    A.   No, I don't.
17    Q.   You don't remember what attorney you
18    gave it to or --
19    A.   No.
20    Q.   -- whether he was black or white or
21    where it happened?
22    A.   I have no idea where that come from.
23    Q.   Did you ever give this attorney, and I
24    understand it's a difficult question because
25    you don't remember who it was, any authority to
```

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

Page 288

1  release the statement?
2      A.  I ain't had nothing to give to him for
3  the release.
4      Q.  So you don't remember him calling you
5  or you calling him or there being any exchange
6  between you where you gave him permission to
7  release the statement that you might have given
8  him.
9      A.  No.
10     Q.  And you haven't been shown the
11 statement in its entirety without any omissions
12 or deletions, have you?
13     A.  This statement right here?  I got one
14 from my lawyer.
15     Q.  This same piece of paper.
16     A.  This same piece of paper.
17     Q.  You've never seen the complete version
18 that you signed --
19     A.  No.
20     Q.  -- that doesn't have the omissions.
21     A.  No.
22        (Whereupon the deponent conferred with
23 counsel off the record.)
24        MR. RICHTHOFEN:
25            Say that.

Page 289

1        (Whereupon the deponent conferred
2        with counsel off the record.)
3  EXAMINATION BY MR. WALKER:
4      Q.  That's all I have.  Thank you, Mr.
5  Murph.
6        MR. GILBERT:
7            Let me just follow-up.
8  EXAMINATION BY MR. GILBERT:
9      Q.  You looked at the statement before
10 giving this deposition, right?
11     A.  Right.
12     Q.  Did it help you remember things?
13     A.  No.
14     Q.  No?  Okay.
15 EXAMINATION BY MR. RICHTHOFEN:
16     Q.  Did you ever sign a version of this
17 statement?
18     A.  I don't think.  I can't remember
19 signing one.
20     Q.  So do you recall giving this
21 statement?
22     A.  No.
23     Q.  Do you recall hiring any attorney to
24 represent you with regards to the barge and the
25 floodwall breach?

Page 290

1      A.  No.
2      Q.  Okay.  All right.
3        MR. WALKER:
4            Thank you, Mr. Murph.

Page 291

1            WITNESS' CERTIFICATE
2
3        I, ARTHUR LEE MURPH, JR., do hereby
4  certify that the foregoing testimony was given
5  by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10 _____    _____
11 DATE SIGNED        ARTHUR LEE MURPH, JR.
12
13 _____ Signed with corrections as noted.
14
15 _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25 DATE TAKEN:  January 28th, 2008

35 (Pages 288 to 291)

MURPH, JR. (VOL II), ARTHUR LEE

1/28/2008

```
                                         Page 292
 1          REPORTER'S CERTIFICATE
 2          I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
 3     Certified Court Reporter in and for the State
 4     of Louisiana, do hereby certify that the
 5     aforementioned witness, after having been first
 6     duly sworn by me to testify to the truth, did
 7     testify as hereinabove set forth;
 8          That said deposition was taken by me
 9     in computer shorthand and thereafter
10     transcribed under my supervision, and is a true
11     and correct transcription to the best of my
12     ability and understanding.
13          I further certify that I am not of
14     counsel, nor related to counsel or the parties
15     hereto, and am in no way interested in the
16     result of said cause.
17
18
19
20
21
22
23     _____
24     JOSEPH A. FAIRBANKS, JR., CCR, RPR
25     CERTIFIED COURT REPORTER #75005
```

Johns Pendleton Court Reporters                800 562-1285

BARGE000910