# EXHIBIT 21

<u>**Affidavit of John A. Kilpatrick, Ph.D., MRICS**</u>
<u>**Re:  *Katrina Canal Breaches Litigation***</u>

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**BEFORE ME,** the undersigned authority personally came and appeared:

### JOHN A. KILPATRICK, PH.D., MRICS

who after being duly sworn by me, did depose and say that:

1.  I am Dr. John A. Kilpatrick.  I hold a Ph.D. degree in Real Estate Finance, and am a state-certified (general) real estate appraiser in Louisiana and many other states.  I am the President of Greenfield Advisors, formerly Mundy Associates, LLC, a real estate appraisal and consulting firm headquartered in Seattle, Washington.  For more than two decades, our firm has been a leading authority on difficult real estate appraisal problems, specializing in particular in the valuation of contaminated sites. We are unusual, if not unique in the high level of educational and professional qualifications of our staff, including several PhDs, the rigor of our quantitative techniques and our published articles in both academic and professional journals on appraisal techniques.

2.  I am the author or editor of four books on real estate, most recently <u>Subdivision Development</u> (1998), published by the Realtors Land Institute of the National Association of Realtors.  I am presently a consultant on environmentally impaired property to the U.S. General Services Administration, the U.S. Army, and many other organizations.  At the invitation of the Japan Real Estate Institute, I co-authored the authoritative guide on the appraisal of environmentally impaired properties for appraisers in that nation, published in the October, 2003, issue of the <u>Journal of the Japan Real Estate Institute</u>.  I am a member of the Publications Review Board of the U.S. Appraisal Institute, which publishes <u>The Appraisal of Real Estate</u>, currently in its 12th edition, and which is universally regarded as the leading authoritative guide on the subject in the world today.  In 2004, I became one of a handful of appraisers in the United States to be designated as a nationally certified appraisal standards instructor by the Appraisal Standards Board in Washington, D.C.  Also, in 2004, I was honored by my peers in the industry by being nominated for a seat on the Appraisal Qualifications Board and by being named a Member of the Faculty of Valuation of the British Royal Institution of

Chartered Surveyors. I have been professionally engaged in real estate finance, appraisal, development, and teaching for the past twenty-five years. I have been accepted as an expert witness in various state and federal courts throughout the U.S. on matters relating to real estate valuation, contaminated or otherwise impaired property values, construction defects, and statistical analysis.  A more complete and current set of my Professional Qualifications is attached to this affidavit, along with a listing of my trial testimony for the past four years.

3. I am the lead author of "The Aftermath of Katrina:  Recommendations for Real Estate Research", a peer-reviewed article written at the invitation of the Journal of Real Estate Literature (Kilpatrick and Dermisi, 2007) to provide authoritative guidance to academics and real estate practitioners conducting scholarly research into the real estate impacts in New Orleans following the 2005 Hurricane.  The article recognizes that holistic, market-wide analytical methods are necessary to understand the economic and property value issues in the affected areas.

4. I have been asked to opine on behalf of the plaintiffs in the above referenced case on the question of whether or not, from a real estate analysis and appraisal perspective, the matters at hand in this case can be best analyzed as a class action.  My main focus will be on the elements of appraisal methodology that argue for class treatment of valuation issues in this case. In addition, I will briefly discuss loss in business values and damage to personal property with respect to class versus individual assessment of damages.

**Summary of Events Leading to this Case**

5. Levee breaches occurred early on August 29, 2005 on the east side of the Inner Harbor Navigation Canal (IHNC). Plaintiffs' complain that the levee breaches in question were caused by a 200-foot long barge (ING-4727) that escaped its moorings and ended up perched on a house in the Lower Ninth Ward. Common issues of fact and law to be adjudicated include the extent of flood damage to property values caused by the breaches. Our testimony here concerns the measurement of damages to real estate, business values and personal property in the proposed class area and whether these damages are best estimated across the proposed class or in individual cases respecting each of the affected properties.

6. The proposed class area is bounded by the Industrial Canal floodwall on the West, Paris Road on the East, the Mississippi River on the South, and is bounded on the North by

2

the Public Belt or other Railway adjacent to and immediately north of Florida Avenue, and the east-west channel or canal extending from the aforesaid railway to Paris Road (Florida Walk Canal and Forty Arpent Canal)."

7. Approximately 14,831 properties are located in the proposed class area. A majority of these are single family residences, although there was also limited multiple unit rental housing, strip retail shops and public and private sector offices and industrial and warehouse properties. Retail properties are concentrated along parts of Claiborne Ave/Judge Perez Drive, St. Claude Ave/St. Bernard Highway and Paris Road. Industrial and warehouse properties are mostly located near the Mississippi River.

8. These estimates of numbers of properties are preliminary and based on tax roll data from the assessor's offices of the 3rd Assessment District of Orleans Parish and St. Bernard Parish. The exact number of properties affected depends somewhat on definitions (for example, are contiguous lots under the same ownership classified as single or multiple properties) and is subject to revision upon further investigation, but these tax roll figures provide a provisional initial count of the number of affected properties.

9. The tax rolls show 5,506 of the properties are located in the Lower Ninth Ward/Holy Cross area of Orleans Parish, while 5,779 properties are in Chalmette and 3,546 in Arabi, both of these communities being part of St. Bernard Parish.

10. Damage from hurricane Katrina and levee failures provide common elements across the class in terms of types of damages and causes of damages. Moreover, the real estate market throughout the area affected by these events suffered from loss of housing stock and reduction in population. In low lying areas, many homes were entirely destroyed and damage to most properties was so profound as to render cost of repairs greater than the value of structures. Many properties were so profoundly damaged that structures could not reasonably be repaired and many have been demolished. Where properties have been repaired, typically this has involved gutting (removing all interior surfaces to reveal the stud walls and framing), thorough treatment with chemicals to inhibit mold and rot, rewiring and replacement of interior walls, flooring and finishes.

11. Common effects of flooding in the affected area include corrosion of electrical wiring, which requires extensive or complete rewiring of affected properties, damage to drywall or plaster requiring gutting of interior walls, in order to treat the stud walls to prevent rot and mold. In addition, residents of the proposed class area suffered damage or complete

BARGE000943

destruction of personal property, business inventories and vehicles, costs for temporary housing elsewhere and moving costs.

12. An additional common factor in this case is effects on the local real estate market and in particular a degree of "stigma" in market perceptions of the affected properties. It is likely that buyers of property in the proposed class area would or should have some awareness of the risk of future levee breaches. "Stigma," that is the effect on market values of perceptions of risk and damage, has been well documented as a common factor in the peer reviewed real estate literature. (Mundy, 1992, Kilpatrick & Kummerow, 2006[1])

13. If the effects on property values of the common factor could not be evaluated except on an individual property basis, then certifying a class of litigants would be inappropriate and the cases would have to be brought on an individual property basis. However, the very opposite is the case—it would be far more difficult to assess damages to property values if they were appraised individually on a property by property basis rather than in the context of price variations across the affected area and in comparison to comparable unaffected properties. Individual property valuations would be more subject to errors and inconsistency arising from limitations of data, variations in data, personal judgments varying between appraisers and inconsistency in application of appraisal methods.

## Class Treatment in Determination of Damages to Real Estate

14. Our opinion (based on reasoning and evidence developed more fully below) is that considering the damages to individual properties without reference to the patterns of damages across the proposed class area would tend to result in haphazard and inconsistent damages estimates if these cases were adjudicated on an individual basis. Class treatment will allow us to assess the patterns of damages through a coherent mapping of damages across the class area and thus class treatment will lead to much more consistent and reliable damages estimates. In addition, the administrative costs of valuing the properties and damages will be much reduced in a class treatment.

15. Many aspects of recovery from hurricane Katrina have proven to be exceptionally difficult for a variety of reasons. A major factor arguing for class treatment of the property valuation and other economic damages sought in this case is the difficulty of assembling, analyzing and interpreting sufficient data for credible and just damages

---

[1] Mundy, Bill, "Stigma and Value", The Appraisal Journal, 1992. Kilpatrick, John and Max Kummerow, "Stigma Revisited Again", presented at the 2006 ARES conference, 2006.

estimates. Public and private records were destroyed in some cases. Below in this affidavit we outline sources of property characteristics data we have identified that we believe are in combination sufficient to value the properties in the proposed class in a fair, reasonably accurate and consistent manner. These data are diverse and in some cases expensive to acquire from a variety of public and private sources. We believe it will be necessary to combine data on property characteristics from several sources in order to arrive at sufficiently complete information on the affected class of properties to determine values before and after the levee breaches. It would be excessively burdensome for individual property owners to obtain, clean, analyze and interpret this data. Moreover it would require repeating the same or similar extensive data collection activities thousands of times.

16. Once the data has been obtained from diverse sources such as property tax assessor files, multiple listing services data on properties listed and sold, aerial photography, insurance records and other sources, an extensive data cleaning and checking process will, in our judgment, be required to eliminate errors and omissions in the data. It is feasible to do so, but the appraisal process will require time and expertise. It would be burdensome or impossible for individual owners to pay for this work. Moreover, if this work were performed independently for numerous owners by different analysts in individual cases, there would be serious difficulty in ensuring consistency of data, appraisal methods and valuation conclusions across the many properties in the proposed class.

17. On the other hand, there are great economies of scale to be achieved from handling the valuation efforts through a mass appraisal process. Creating a single database for the entire class area will be far more efficient and less costly than obtaining data necessary for performing thousands of individual appraisals.

18. From a real estate appraisal standpoint, class treatment provides a better and more efficient means of valuation. The patterns of damage to affected properties are best assessed by considering the affected area as a whole. The depth of flooding has been mapped by authoritative sources and this information provides evidence relevant to determining the extent and cause of damages fairly across members of the class. Correlating the damages assessment for each individual property in relation to the area wide mapping of flood effects, taking into consideration elevation of homes that determined depths of flooding, reveals the pattern of damages and helps ensure consistency in assessment of damages across the class.

5

19. The United State Corps of Engineers (USACE), for example, in Economic Technical Paper #3 "New Orleans District Depth Damage Curves" has reported results of studies of damages to structures and contents as a function of water depth in floods. The "depth-damage curves" reported in technical paper #3 "were developed by USACE NOD (New Orleans District) for use in estimating depth-damage relationships and damages to structures and contents for flood events. For water depths consistent with the depths of flooding in the proposed class area, it estimated up to 80% damage to single story structures.  Damage to contents were estimated by this USACE report at up to 40% of the value of the structure.

20. While we reserve judgment on the accuracy of its damages percentages conclusions, USACE Technical Paper #3 does provide authoritative support for class treatment. First, it clearly anticipates a class treatment of flood damages by recognizing the relationship between damages and flooding of an area where many properties are similarly affected. Second, Technical Report #3 provides a rationale for area wide evaluations of flood damage based on depths of flooding. That is, it suggests a practical, simple and feasible method for calculating damages on a class wide basis. Thirdly, it proposes a simple, practical and feasible method for class wide assessment of personal property damages by making the reasonable assumption that personal property can be evaluated with reasonable accuracy as a percentage of property value. As Technical Paper # 3 puts it, "The contents damage is calculated as a percent of structure value." In many cases, we believe that the loss of personal property was 100%—for example, junking of cars and trucks damaged by salt water immersion.

21. Consistency in valuation methods and application of methods would be difficult to achieve if individual homes were appraised in isolation from the larger pattern of flood effects. In particular, consideration of these class area wide patterns of flood effects will help the Court to assign causation to the observed damages. Conclusions regarding causation of damages would be more difficult if properties were considered individually without reference to the overall spatial patterns of flooding and observed damages to properties. In general, there are observable gradations in the extent of damages in various parts of the class area that can be more clearly and consistently revealed through a class treatment. We will discuss valuation methods appropriate to this case more fully below.

22. Types of construction, size, age and condition of properties varied across the proposed class area, but the effects of the levee breaches were common to all properties affected. Consistent determination of damages therefore argues for a class approach to

6

valuations. In the Lower Ninth Ward, near where the levee breach occurred and the barge eventually came to rest on Jourdan street, most of the homes were modest, older wood frame structures. In Chalmette in St. Bernard Parish, especially north of Judge Perez Drive, a majority of homes were of brick construction and of more recent vintage. Despite these differences in property characteristics, the effects of the levee breaches affected all properties in the proposed class. In addition, common factors of location, construction and neighborhood characteristics make a mass appraisal approach preferable. Valuation methods are available to account for the particular characteristics of properties using a mass appraisal model. Where consistent and unbiased comparisons of damages are required for a large number of properties, clearly these objectives are best achieved by a mass appraisal approach rather than individual property valuations.

23. Although several styles of homes are found within the class area, many properties are quite similar to their neighbors on the same street. For example, lot sizes are similar along certain streets, with most lots the same size. On some streets, even where some homes have been demolished, remaining slabs make it clear that the sizes of homes were similar. This means that although there are several styles of architecture within the class area, there are efficiencies in valuing properties through a mass appraisal as opposed to individual valuation approach. We believe sales of a particular style, size and vintage home, can be extrapolated to infer prices of nearby properties of similar age, construction materials, and architectural designs using a mass appraisal approach. In short, the commonalities and similarities of properties predominate in determining the most efficient appraisal methods.

24. In the aftermath of the storm, all properties in the area were affected by common factors across the proposed class area that affected real estate market values. These common factors include reduction in population, interruptions in public services, reduction in convenience and amenity due to closing of retail shops, supermarkets, restaurants and schools. Estimates by local officials are that near half of St. Bernard's Parish population had returned and one-third of the Lower Ninth Ward population had returned to their homes as of April 2008. All of the properties in the class area are affected by these common market factors.

25. All property owners faced common factors of increased construction costs and short supply of building contractors relative to the demand for repairs in the aftermath of Katrina. These construction costs issues affected the property markets as a common factor across the proposed class area.

7

26. Another common factor affecting property values throughout the proposed class area (and in New Orleans generally) is fear of another levee failure in a future storm. A perceived risk of flooding creates a negative stigma effect depressing housing and land prices as a common factor across the proposed class area. Hurricane Rita, following closely upon Katrina and the levee failures, reinforced this perception.

27. In low lying areas, this stigma creates a self-fulfilling neighborhood wide negative effect on repopulation and reinvestment through loss of services such as schools, supermarkets and other retail outlets and services businesses in the area and reduction in the local tax base. Stigma, therefore, has become a common factor affecting values of all members of the proposed class of properties. If would be more efficient and accurate to assess these stigma effects on a class rather than an individual basis.

28. Land use regulations are another common factor affecting properties across the class area. For example, base flood elevation requirements determine the required elevation of buildings and thus affect construction costs for foundations, piers and stilts under homes. Issues related to obtaining building permits, loans and insurance have also affected the property market as common factors with effects across the proposed class area.

29. Of particular importance to the affected area was closing of many parochial schools including the area's "flagship" high school, Holy Cross. Many homeowners are concerned about their children's educational opportunities so loss of schools has inhibited reinvestment in housing. This is another example of the many common factors affecting all properties in the proposed class area. In general, properties in the class area were affected by such problems as temporary or permanent interruptions of key public services including water and sewer, public safety, electrical service and trash removal (on an in some cases rather prolonged temporary basis) and deprivation of services such as schools, churches, retail shopping opportunities on a permanent basis.

30. Business and residential property values were affected by the common factor that much of the population left the area and that a substantial percentage have not yet returned and may never return.

31. With the loss of population and customer base it is understandable that many businesses remain closed in the proposed class area including Wal-Mart, Winn Dixie supermarkets and perhaps half or more of all retail establishments in operation before hurricane Katrina. The loss of population, jobs, economic base and neighborhood

8

shopping and other amenities are additional common factors affecting all members of the proposed class.

32. Various sources of data allow us to determine "before" and "after" values on the properties in the class area and thus to allow us to assess damages according to the methods outlined by the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation ("USPAP"). The following paragraphs outline the USPAP requirements for mass appraisals as they apply to class treatment of property damages in this case.

33. In the immediate aftermath of Katrina, for example, the Tax Assessors in both Orleans and St. Bernard's parish simply reduced all of the tax assessments on buildings in the areas heavily affected by flooding by 85% for one story homes and 65% for two story structures. And in addition, they reduced land values by 20%. These across the board damages assessments, based on tax roll assessed values, could be recognized by the court as a simplified method of assessing damages. Moreover, the fact that these across the board reductions in assessments were made is indicative of the common valuation issues across the proposed class. The tax assessors in both parishes treated this as a mass re-assessment of a common factor.

34. Limitations on available data on property characteristics such as size or condition argues for class treatment in that the data collection and analysis required to arrive at credible and reasonably accurate valuations would be beyond the scope of individual appraisal methods. Collection of relevant data would be time consuming and costly and place an undue burden on individual property owners. Much of the data necessary for valuations can more efficiently be acquired on a class basis rather than for each individual property.

35. The tax assessors chose as an emergency measure to make a simple percentage reassessment across the entire proposed class area. On the other extreme, the Court could mandate complete narrative or at least form appraisal reports on each of the individual affected properties. This would be quite expensive and time consuming to implement and subject to the variation inherent in the differing opinions and evaluations of the individual appraisers performing the valuations. It would be infeasible for a single appraiser to value so many properties, so a serious weakness of the "do a full conventional appraisal" approach with an individual property treatment would be the possible inconsistency of the values. That is, different appraisers might put different values on similar properties and consider different factors in making their appraisals.

9

36. We anticipate that mass appraisal methods will be sufficiently accurate for assessment of the great majority of commercial properties. However, we recognize that to accurately assess damages to every property in the proposed class there will be a need to supplement mass appraisal methods with individual attention to:

- A few of the largest properties in the affected area such as the Exxon Mobile Refinery and Domino Sugar's property. We propose to use individual conventional appraisal methods (as opposed to mass appraisal methods) for determining before and after values in the case of several of the largest properties in the affected area. These properties are much larger, unique in the area and worthy of individual attention due to their size and value. Although similar issues of fact and law will be addressed in determining damages, the appropriate appraisal methods for these unique properties differ from the majority of properties where a mass appraisal approach is feasible.

- We also expect to find individual appraisal methods and additional data collection helpful in determining values for other unusual or unique properties (in terms of uses, physical structures, size, title issues, or unusual location) in the proposed class area where mass appraisal methods would prove unreliable. We believe these to be a small minority of the affected properties and that they will be identified as we analyze data on the commercial and residential properties in the area. Consistency of these valuations will be enhanced by class treatment.

37. We recommend an approach intermediate between a class wide percentage assessment of damages (as used as an emergency temporary measure by the Orleans and St. Bernard tax assessors) and a full individual property conventional appraisal. We are aware that an automated valuation model (AVM) approach attempted by the Road Home program failed to accurately value many properties, especially the older properties in New Orleans such as those in the Lower Ninth Ward.

38. We propose, therefore, a mass appraisal approach involving use of existing data sources supplemented by limited data collection and verification of data from existing sources. This will add detail to the valuation of these properties in comparison to a more automated method of valuation, but will be far less expensive than individual conventional appraisals.

39. We will customize the mass appraisal methodology to incorporate property characteristics relevant to property values in these particular neighborhoods. These

10

would include elevations, foundation types, exterior materials, number of stories and the style, age and condition of properties.

40. Where properties are destroyed and no records of their characteristics before Katrina can be found, it may be, in some cases, necessary to infer values from sales and characteristics of similar properties nearby in combination with information allowing us to determine property characteristics such as aerial photos or other observable evidence (i.e. remaining foundations). This will provide a degree of accuracy sufficient to satisfy USPAP requirements that valuations meet "attainable standards of accuracy.[2]"

41. We plan to combine data from a variety of sources to create a database of property characteristics. The cost and time required to obtain these data sources argue for class treatment. Acquiring sufficient data for individual property valuations would be burdensome for individual plaintiffs and inefficient for the Court as the same data issues would be revisited many times with individual treatment. These data sources will include, but not be limited to:

a) Assessor tax rolls and tax assessments. These are useful chiefly in providing a relatively complete list of properties and their locations.

b) Multiple listing service data for several years prior to and subsequent to August 2005. While not every property in the affected neighborhoods will have sold during these periods, enough will have sold for us to establish price points for particular styles, sizes and ages of home.

c) Sanborn's insurance maps, Pictometry aerial photos, Census data and various other sources. These sources will provide additional information relevant to determining property values and we can check and verify data by comparing property characteristics reported in different databases.

d) Additional data that will be collected under the supervision of experienced local real estate appraisers engaged for this process by Greenfield.

42. Analyzing this data across the class will provide a far more consistent and cost effective means of determining damages than if an attempt were made to determine values for each property individually.

**Data Sources**

---

[2] USPAP Standards Rule 6-7.

11

43. The class area includes properties from two parishes, Orleans and St. Bernard. As a result the subject class area database to be used for valuation purposes will need to be conjoined from various data sources some common to both parishes and some differing between parishes. A preliminary inventory of data sources along with their coverage areas are listed below. By geocoding and combining data from various sources it will be possible to place credible, consistent and reasonably accurate before and after values on the real estate in the proposed class area. The time and money costs and expertise required to acquire and analyze data would make individual valuations excessively burdensome or impossible.

44. Data sources available for both Parishes include:

- New Orleans Metropolitan Association of Realtors' Multiple Listing Service (MLS) records of listed and sold properties[3]. This data source contains full property data on all sales and listings of homes in the greater New Orleans area back until well before Hurricane Katrina. A sample data sheet from the New Orleans Metropolitan MLS is attached as Exhibit A. All sales in the proposed class area for several years prior to August 29, 2005 and all sales subsequent to that date will be obtained from this source. Many important property hedonic characteristics of the property are included such as house area, lot area, architectural style, age of the structure, number of bedrooms and bathrooms, etc. Sufficient information is included here, when supplemented with additional neighborhood and location data, for application of mass appraisal methods.

- MLS data has a limitation in that it only covers properties listed and sold through realtors. Transactions between parties who did not list their property with a realtor are not included. However, a service called Deedfax provides a convenient means of assessing all sales. Therefore we can access a complete set of sales prices in an area.

- Louisiana Commercial Real Estate Database (LACDB) records of listed and sold commercial properties[4]. The LACDB is a proprietary, commercially accessible database that contains commercial property sales, listings, and leasing information.  Photographs of properties are often available.

---

[3] http://nom.mlxchange.com.
[4] www.lacdb.com

12

BARGE000952

- Road Home Damages Determinations. The "Road Home" disaster recovery program estimated damages percentages for all homes in the area pursuant to provision of disaster assistance. Payments to owners (many of which have not yet been paid) were based on percentages of value. We understand that appraisals were done of the properties, but these were done by various appraisers of varying local knowledge and expertise. They were mainly focused on physical damages assessment after the hurricane. If we are able to obtain this data, these figures may provide an independent "check method" to confirm value estimates.

- Pictometry Aerial Photographs. A firm called Pictometry, based in Rochester, N.Y. has developed proprietary software for determining the gross building area and height of properties from aerial photographs. The resolution visible in these photos is 6 square inches. This resolution would be sufficient to detect major damage and give some ideal of overall property condition, building materials, age and style of construction insofar as these can be assessed from a photograph, but would not reveal minor damages such as small cracks. The firm informs us that they have "flown" Orleans Parish before Katrina and both Orleans and St. Bernard soon after Katrina (September/October 2005) and again in 2008.

- Sanborn's published maps show lots sizes and the perimeter of buildings, that is, gross building area, shape and positioning on the lot. If house sizes cannot be reliability obtained by other means, these maps could provide a source of lot and house size data.

- Maps showing the extent and depths of the flooding that was the chief cause of the damages. We rely on other experts and the Court to determine the causes of this flooding and extent of liability of the defendants.

45. The following data sources differ between Orleans and St. Bernard Parishes. Greenfield Advisors has obtained copies of the relevant tax rolls from the respective Assessors listed below. These tax rolls provide a comprehensive listing and identification of properties in the proposed class areas.

46. Orleans Parish

- Orleans Parish District 3 Tax Roll. The District 3 Orleans Parish Tax Assessor, has kindly provided a copy of the tax roll for the proposed class area for the years 2005-2008. In addition to property addresses, the tax roll provided contains

13

land, improvement and total market value estimates for years from 2005-2008. An across the board reduction in tax assessments was implemented following Katrina. A new property tax assessment system is currently being installed as part of reforms that will consolidate New Orleans tax assessment responsibilities from the current seven districts to one district for the entire Orleans parish.

- Orleans Parish Lot Shape file. This is a Geographic Information System (GIS) file obtained from the Orleans Parish Offices showing the boundaries of all the properties in the Parish. This shape file is important in that it allows us to assign data to particular properties and thus to implement spatial analysis of property values.

47. St. Bernard Parish:

- St. Bernard Parish Assessor's Tax Roll. A tax roll database has been purchased from the St. Bernard assessor that includes land and improvement assessments, address, ownership and building sizes.

48. A number of maps are available showing various aspects of the proposed class area including elevations, flood depths and the length of time flooding persisted following Katrina. In addition, several maps of geocoded subject properties have been prepared by Greenfield Advisors using data obtained from the tax assessor's offices.   The following sample map shows assessor tax roll addresses geocoded to parcels within the proposed class area. This GIS technology allows us to include location factors as part of our mass appraisal valuation model (see Exhibit B).

49. We anticipate that  "on the ground" verification and collection of additional data on both pre and post Katrina condition of properties to determine before and after values in this case. Therefore we will collect photographs, estimates of condition, and verify property size, type of construction, use, exterior materials and other relevant data. We anticipate collection this data through use of a trained and carefully supervised group of individuals under the supervision of Greenfield Advisors staff and with additional input and supervision from experienced local appraisers familiar with the class area.

**USPAP Requirements for Mass Appraisal Methods**

50. The Uniform Standards of Professional Appraisal Practice ("USPAP") defines a MASS APPRAISAL as "the process of valuing a universe of properties as of a given date using

14

standard methodology, employing common data, and allowing for statistical testing."[5] In addition USPAP Standards Rule 6-1 comments: "Mass appraisal provides for a systematic approach and uniform application of appraisal methods and techniques to obtain estimates of value that allow for statistical review and analysis of results." This uniformity of approach in ascertaining damages to multiple properties is consistent with the objectives of fairness in allocation of damages in litigation. Obviously this mass appraisal approach is far more efficiently applied in a class treatment and is highly consistent with the objectives of class treatment. A mass appraisal approach provides a means for ensuring consistency of treatment across a large group of affected properties.

51. In carrying out a mass appraisal, the appraiser must "employ recognized techniques" for specifying and calibrating property valuation models[6].

52. The USPAP Mass Appraisal Standard 6 recognizes that available information may vary in local circumstances and allows for variation in methods due to variations in available data. This is highly relevant to the current case where many of the properties to be valued no longer exist, having been entirely destroyed by the events associated with hurricane Katrina and the levee breaches.  Comments accompanying Standards Rule 6-5 include the phrase "where applicable and feasible" regarding systems for collecting and maintaining "ownership, geographic (i.e. location), sales, income and expense, cost and property characteristics data." Obviously there are some "applicable and feasible" issues where property records have been destroyed by flooding or the properties no longer exist. The comment to Rule 6-5 also suggests that data collection programs incorporate "a quality control program, including checks and audits of the data to ensure current and consistent records." These requirements clearly argue for class treatment to ensure consistency and quality control with respect to both data and valuation models across the members of the class.

53. An individual approach, on the other hand, would probably mean a considerable number of individual appraisers separately and independently valuing the thousands of properties in the proposed class area. Under such circumstances it is difficult if not impossible to see how consistency of valuations and hence damages assessments could be achieved.

54. USPAP Standards Rule 6-7 mandates *"testing procedures and techniques to ensure that standards of accuracy are maintained."* The comment appended to Rule 6-7 states that

---

[5] http://commerce.appraisalfoundation.org/html/2006%20USPAP/DEFINITIONS.htm
[6] USPAP Standard Rule 6-4 a,b, and c.

BARGE000955

*"… appraisers engaged in mass appraisal have a professional responsibility to ensure that, on an overall basis, models produce value conclusions that meet attainable standards of accuracy. This responsibility requires appraisers to evaluate the performance of models, using techniques that may include but are not limited to, goodness-of-fit statistics, and model performance statistics such as appraisal-to-sale ratios studies, evaluation of hold-out samples, or analysis of residuals."*

55. This monitoring and evaluation of results implicitly recognizes the importance of consistency across a study area, such as a class area.  Implementation of such quality control measures is well documented in the mass appraisal literature, but we note that such methods are incongruent with an individualized valuation approach.

56. Regarding mass appraisal quality control and appraisal error analysis, our firm has performed evaluation studies on mass appraisal models using the ratio statistics referred to in the USPAP Standards Rule 6-7. Implicit in ratio statistics analysis is that a large number of appraisals are performed and available for comparison to sales prices. This implies a mass appraisal method and class treatment.

57. In addition to the formal tests of mass appraisal performance, we can further ensure quality of the mass appraisal effort by several methods as we address this problem:

- First, we a strong team will address the valuation and damages quantification problems. This team consists not only of our own experienced and qualified staff, but also senior experts on the local property markets. One of the functions of this team will be to help us adapt our mass appraisal models to include correct submarket categories and price determining factors (hedonic variables). Another function will be to help with data collection. A third function will be to check results for reasonableness and, we propose, to do additional valuation reconciliation to correct any possible suspected errors revealed in mass appraisal results. These inputs from experienced local appraisers will bring our mass appraisal work closer to traditional appraisal practice and should improve the reliability and accuracy of damages estimates significantly.

- We propose to value damages to some of the larger and more unique properties in the class area by individual valuations. These properties are affected by the same issues of fact and law related to the levee breach, but only in these limited would damages be best assessed through an individualized approach.

16

- We will use a classification system to assist in valuing similar properties. Commercial properties will be classified into types with relatively similar location and space requirements that tend to make for relatively consistent values. Residential properties will be sorted into subgroups for valuation purposes by neighborhood, architectural features and building materials. Thus in the mass appraisal approach, value determining factors include these submarket and property type classification variables.

- We will use well established, peer reviewed statistical methods, specifically spatial statistics, in our mass appraisal price modeling process. We have engaged a leading academic authority, Professor R. Kelley Pace of Louisiana State University, to advise on statistical techniques.

58. In addition to a valuation team with both local market knowledge and statistical skills, we believe that the process we use for estimating values will result in accuracy, reliability and consistency across the proposed class. We propose that this process include:

- Collection of data from secondary sources including assessor's tax roll and property characteristics information and Multiple Listing Service Data on sold properties.  In addition, Census data, aerial photos, Sanborn's insurance maps, FEMA maps, local government land use information, Road Home information and other sources can be used to confirm and augment the property database and add to the list of property and neighborhood characteristics considered in valuing the properties.

- Geo-coding of properties, allowing the mass appraisal model to incorporate location factors, prices of near neighbors or similar (comparable) properties, and neighborhood submarket information into price estimates. Research (Pace, 2002, Fotheringham, et al 2002[7]) has shown that spatial models can outperform models that do not incorporate location.

- Primary data collection will be conducted under careful supervision to assure accuracy, consistency and completeness. USPAP requires that mass appraisal reports must "describe the sources of data and data collection and validation processes."

---

[7] Pace, Kelley, "Closed-Form Maximum Likelihood Estimates of Nearest Neighbor Spatial Dependence" Geographical Analysis, 2002. Fotheringham, A Stewart, Brunsdon, Chris, and Charlton, Martin, Geographically Weighted Regression: The Analysis of Spatially Varying Relationships,John Wiley & Sons, West Sussex, England, 2002.

BARGE000957

17

- Use of experienced local appraisers as part of the valuation team will further ensure relevancy and accuracy of data and analysis.

- Mass appraisal modeling will classify the affected properties into appropriate submarkets by areas and property types and test candidate price affecting variables by the criteria suggested in Standards Rule 6-7.

- We have already spent considerable time and effort to locate sources of data on proposed class area property characteristics and property values. (See "data sources" above.) We believe that data checking and verification will achieve the level of quality control required by USPAP.

59. Individual property valuation methods typically rely on small samples of comparable sales (e.g. 3 in the case of the widely used Uniform Residential Appraisal Report, or URAR, known as the Fannie Mae Form 1004). Estimates from small samples are subject to random and significant statistical variation. A mass appraisal method that looks at the broader geographical pattern and incorporating spatial analysis techniques will result in more stable, scientifically valid estimates of value impacts. Mass appraisal is better suited than individual valuations to sorting out the "signal" from the "noise" with respect to damages while accounting for the effects of other property characteristics.

**Class Treatment for Determination of Damages to Business Values**

60. Businesses in the proposed class area suffered damages due to similar common factors consequent to the levee breaches that affected real estate. As with property values, the damages determination can be made by assessing business values before and after the event with the difference comprising damages. In addition to the change in value of the business, businesses suffered additional damages due to business interruption, moving, clean-up and repairs costs, as well as loss of inventory. Some of the asset values affected may be "intangible assets" such as customer goodwill or other business enterprise values affected by loss of population in the area or other factors related to the levee breach.[8]

61. In determining business values there are three generally accepted approaches: the asset approach; the market approach; and the income approach[9].

---

[8] Lennhoff, David, Ed. *A Business Enterprise Value Anthology.* The Appraisal Institute, Chicago, 2000.
[9] Rabianski, Joseph S., "Going-Concern Value, Market Value and Intangible Value", The Appraisal Journal, April 1996, 183 -194

62. The asset approach views the business as a set of assets and liabilities used to determine business value by summation. The underlying question of the asset approach is "What will it cost to create another business like this one that will produce the same economic benefits for its owners?" This is somewhat analogous to the "cost approach" used in valuing real estate assets.

63. The market approach views the business in the context of the marketplace and seeks to answer the question "What are other businesses worth that are similar to this business?" This is consistent with the "sales comparison" approach or "direct comparison" approach used in valuing real estate and implemented by comparing prices paid for similar businesses.

64. Finally, the income approach views the business as an entity whose primary goal is to make money. The underlying question of the income approach is "If I invest time, money, and effort into business ownership, what economic benefits will it provide me and when?" To implement this approach, estimates are made of business net income (often based on past performance). To convert these income estimates into a business value, either a multiplier (such as a price earnings ratio) or a discount rate which can be used to calculate the present value of a stream of future projected cash flows. These ratios are derived from sales of similar businesses or industry benchmarks for businesses with similar risk/return characteristics.

65. An income approach can be implemented by asking affected businesses to provide copies of their 2002-2007 federal income tax returns. Line 3 on federal Form 1120 (U.S. Corporate Income Tax Return) asks for gross business profits. Changes in Line 3 comparing before and after gross profits would provide evidence of foregone profits as a result of the levee breaches. Historic tax returns are important to gauge the increase in business profits over time and to account for current business conditions at the time of the flooding.

66. Estimates of lost capital assets (cost or market approach data) can be developed from insurance records and maintained by the business owners and local insurance agents.

67. In consultation with local business valuation experts familiar with values of businesses in the affected area, we would develop a set of benchmark, market based multipliers to reflect the value of these businesses based on their net incomes.

19

68. Additional data to be analyzed would include documentation of any losses of inventory, moving costs, temporary increased rentals, clean up and repair costs properties may have suffered as the result of the events related to the levee breach.

69. Our local market consultants and sales comparison data will provide benchmark numbers (rents/sq. ft., capitalization rates, and market prices/sq. ft.) to use in valuing these properties. We anticipate that most of the affected properties will fall into a few generic categories of retail space, industrial space, office space, restaurant space, etc. that can be effectively valued by this broad brush, mass appraisal method.

70. In the event that we are unable to obtain financial data from businesses—for example from businesses whose records were destroyed in the hurricane, business values and damages may be calculated by indirect means.

71. At the national level, the Bureau of Economic Analysis (BEA), part of the U.S. Department of Commerce, provides estimates of corporate profits before taxes at the industry level in Tables 6.16 to 6.21 of the National Income and Product Accounts (NIPAs). From this data we can find North American Industry Classification System (NAICS)[10] two-digit industry statistics, and compute the national level ratio of corporate profits before tax[11] per dollar of real GDP (RGDP). Then, using the BEA's estimates of Gross Metro Product (which is GDP for a given metropolitan area) for the New Orleans Metropolitan Statistical Area, we can compute corporate profits by NAICS category using the formula:

$$\frac{Corp\,\pi_{US}}{RGDP_{US}} = \frac{Corp\,\pi_{NewOrleans}}{RGDP_{NewOrleans}}.$$

72. A second indirect method to determine damages would rely on Form R-4310. In Louisiana, to determine if corporations must pay income taxes, businesses must complete Form R-4310, which asks for dollar value of gross sales in a given year. Using the names of taxable businesses in the affected area and data from this report, we can apply appropriate ratios based on typical and/or sample income statements to estimate business values from reported gross sales. Gross sales, combined with knowledge of the typical expenses of particular categories of businesses would allow a business valuer to make consistent estimates of the value of businesses affected in this case. In

---

[10] The NAICS code system replaced the U.S. Standard Industrial Classification (SIC). http://www.census.gov/epcd/www/naics.html
[11] A BEA methodology paper by Kenneth Petrick (September 2002) contains estimates of profits before tax as a percentage of GDP for certain NAICS two-digit industries. We can estimate these directly from the NIPA tables 6.16 to 6.21.

BARGE000960

valuing real estate, this method has long been used and accepted as the "gross income multiplier" method of determining value.[12]

73. Whichever approach to business valuations proves most feasible and accurate, it is certain that a class treatment would allow for economies of scale in determining these values and increased consistency and accuracy of damages estimates. With individual business valuations by diverse valuers using varying methods, the scope for different and inconsistent business value damages estimates would be greater than would be the case for residential property.

**Class Treatment in the Assessment of Damages to Personal Property**

74. There are various ways to estimate the loss of personal property in this case. A direct method would be to obtain local verification from businesses, homeowners, insurance agents of rental insurance payouts and other insurance payments.

75. Another method appropriate for homeowners would be to conduct samples and determine that personal property can be reasonably estimated as a formulaic percentage of house values. This method is well established in standard homeowners' insurance policies. For example, a homeowner's policy available from the Insurance Services Organization insures personal property for a maximum of 50% of the amount for which the dwelling is covered. In practice, the depreciated value of building contents (personal property) is covered under some policies, while others add (at additional cost) a replacement cost endorsement. We believe that if records have been destroyed, a percentage of the structure value would provide a reasonable benchmark for determination of damages to contents. An advantage of this method would be that once property values before the storm are estimated, personal property damages determination would be straightforward.

76. This percentage of dwelling value approach to determining the insurable value of personal property is authoritatively supported in insurance textbooks, for example, Rejda, 2000.[13]

77. In the case of cars and trucks lost in the storm, readily available sources of values such as Edmunds or Kelley Blue book used car pricing services, combined with state motor vehicle licensing records should provide accurate assessments of the value of vehicles

---

[12] See, for example Ratcliff, Richard (1972) <u>Valuation for Real Estate Decisions</u>, Santa Cruz, Democrat Press.
[13] Rejda, George E. *Principles of Risk Management and Insurance, 10th edition.* Person, Addison, Wesley, Upper Saddle River, NY 2004.

BARGE000961

destroyed. In most cases, vehicles were immersed in sufficient salt water so that they were scrapped. These effects were common across the class area.

78. In assessing personal property damages, adjustments would be made for depth of flooding at the site and for multistory homes whose upper stories may have sustained less damage to personal property along the lines proposed in USACE Technical Report #3. Therefore, in determining personal property damages, the same advantages for class treatment obtain as is the case with assessment of real estate and business damages. Class treatment will provide more efficient determination of damages for many plaintiffs and allow for estimation of damages in a more fair and consistent manner. With individual treatment many opportunities for inconsistency of methods for determining personal property damages would arise.

**Literature review and comments**

79. The governing paradigm for real estate valuation in Louisiana and other states is the Uniform Standards of Professional Appraisal Practice (USPAP), which we have cited above.  Kilpatrick, Throupe, Mundy, and Spiess (2005)[14] summarize mass appraisal methodologies as they are used in the appraisal of contaminated property and as they are applicable under USPAP. Kilpatrick (2004, 2005)[15] specifically applies the use of these techniques in class-action matters.

80. The overwhelming weight of prevailing valuation methodology and the Uniform Standards of Professional Appraisal Practice make it difficult, if not impossible, to consider the valuation problems associated with this case without resorting, at least de facto, to a mass-appraisal model. Prevailing thought among academic researchers is that large-scale valuation issues can be best described using large-scale statistical models and those models meet the criteria outlined in *Daubert*[16.]  Quoting from the USPAP Standard Rule 6-1 (a), "Mass appraisal provides for a systematic approach and uniform application of appraisal methods and techniques to obtain estimates of value that allow for statistical review and analysis of results."

---

[14] Kilpatrick, John A., Ron Throupe, Bill Mundy, and Will Spiess, "Valuation of Impaired Property", Chapter 6 in Simons, Robert, ed., When Bad Things Happen to Good Property (Washington, DC:  Environmental Law Center, 2006).
[15] Kilpatrick, John A., "Real Estate Issues in Class Certification", Class Action Litigation Report, October 8, 2004. Kilpatrick, John A., "Appraising Real Estate in Complex Environmental Class Actions:  An Expert's View", Toxic Law Reporter, January 13, 2005.
[16] For an authoritative view of the real estate analysis perspective on appropriate methods under *Daubert, see* McLean, Dave, Bill Mundy, and John A. Kilpatrick, "Summation of Evidentiary Rules for Real Estate Experts Mandated by Daubert v. Merrell Dow Pharmaceuticals, Inc.", Real Estate Issues, Fall, 1999

BARGE000962

81. In the case of complex goods such as houses or other real estate assets, economic theorists have shown that the prices buyers are willing to pay can be thought of as the sum of what they are willing to pay for particular property characteristics. (Lancaster, 1968, Rosen, 1974)[17]. These property attributes are called "hedonic characteristics" or variables, from a Greek word meaning "pertaining to pleasure" or "relating to like or dislike." A hedonic pricing model, representing the buyer's willingness to pay for a property can be written as: $Ps=\Sigma bx$, where Ps is the price the buyer will pay, and the right hand side of the equation is the sum of the price per unit (a multiplier or coefficient, b, representing the price per unit of each characteristic) times a set of hedonic characteristics (x's).

82. Real estate prices can therefore be represented and explained through "hedonic" models in the form:

price = sum of value of property characteristics.

83. Thus, for example, size of a house has an influence on price, larger houses tend to sell for higher prices. Hedonic models of house prices often include characteristics such as house size, age of the structure, location variables, house features such as garages, and so on, that consumers consider in their pricing decisions.

84. Thousands of refereed academic and professional journal papers have been published reporting statistically significant estimates of the price effects of a wide variety of hedonic characteristics in various markets. Not all property characteristics affect prices positively. Negative characteristics such as age or physical deterioration reduce prices in hedonic models. The size of price effects due to property characteristics can be estimated by statistical analysis of sales price/property characteristics data.

85. Our firm has a unique and longstanding record as analysts of real estate prices. Our staff includes several PhD's with extensive price modeling experience and we have been pioneers in developing new methods for more fairly and accurately assessing damages to property values due to contamination and other factors. We have in many cases produced results deemed by courts to be fair, equitable and the best that can reasonably be achieved to reflect a standard of justice between the parties within the limits of human knowledge and abilities. We aim to approach "best practice" or "state of the art" methods

---

[17] Lancaster, K.J.A., "A New Approach to Consumer Theory", <u>Journal of Political Economy</u> 1966, 132-57. Rosen, S., "Hedonic Prices and Implicit Markets: Price Differentiation in Pure Competition", <u>Journal of Political Economy</u>, 1974, 34-35.

BARGE000963

for estimating fair and reasonable damages and apportioning damages among affected parties.

86. Econometricians use a statistical method called "regression" to find the best fitting coefficients (b's) to multiply by the amounts of each characteristic in order to derive a price estimate. The coefficients are estimated from the data by minimizing the total of squared errors in the prediction of price from the hedonic variables. It is important to point out that this is a relatively objective method involving mathematical algorithms. In comparison to conventional appraisal methods based on ad hoc "judgment and experience" for estimating price impacts of property coefficients, this statistical estimation technique offers far more reliability and objectivity. This consistency and objectivity are extremely desirable features of a valuation method whose purpose is to assess damages equitably across a large sample of properties.

87. In New Orleans we were informed that the Road Home program attempted to use a commercially available automated valuation model (AVM) product to assess values of properties affected by hurricane Katrina with unsatisfactory results. We surmise that there are several possible reasons why the commercial AVM model performed poorly in terms of accurately predicting property values. One has to do with inadequate data. Many data sources in New Orleans were and still are incomplete and inaccurate. Few property characteristics were (and are) reported in publicly available databases. Some of the tax assessor data, for example, was based on self-reports and thus prone to bias and inconsistency.

88. A second reason why a commercial mass appraisal model such as the AVM product used by the Road Home Program might fail to predict values accurately is that the model may not include the important variables that determine price in this market. For example, in New Orleans, there are certain local styles of construction and other issues of local importance such as elevations that may be important in determining prices buyers of properties pay for homes. If the AVM model was "mispecified" that is, omitted some of these important variables, or assumed "functional form" relationships not conforming to local market realities, then the model would tend to predict poorly.

89. A third reason why many commercially available AVM models are inaccurate is that some fail to incorporate recent research on spatial econometrics that can sometimes improve accuracy by taking more account of location factors or submarkets. Some AVM models have spatial autocorrelation of errors, meaning they fail to account fully for location effects on values.

24

90. We propose to correct these problems within a reasonable degree of appraisal certainty in our mass appraisal of the proposed class area. First, we plan to combine data from several sources to enrich the property characteristics set available for price determination. Second, we plan to go beyond the usual AVM techniques by performing fairly extensive checking and verification of data and collection of additional important (although limited) available by inspections of properties. We will therefore create far more accurate and complete data on properties than was available to the Road Home AVM application. We also will incorporate a combination of locally knowledgeable and experienced appraisers with academic statistical expertise so as to produce a state of the art and better specified pricing model that involves classification of properties into subgroups with similar characteristics.

91. In addition, we will explore methods more akin to conventional appraisal, while incorporating the advantages of statistical mass appraisal methods. In real estate appraisal, we often find that a sales comparison approach provides more accurate price estimates when the above equation is modified as follows:

$$Ps=Po+ \Sigma b(Xs-Xo).$$

92. In this equation, a closely comparable similar property sale price, Po, is used as a starting point for the price estimate and this observed sale price Po is "adjusted" to reflect price differences arising from differences in a short list of hedonic characteristics that vary between the two properties. This could be called a "price differences model" because the model estimates the value impact of differences between hedonic characteristics of two properties.  Colwell, Cannaday & Wu (1983) pointed out the mathematical equivalence of such a model to the traditional sales comparison "adjustment grid" method.

93. Colwell, Cannaday and Wu (1983) showed that in the traditional sales comparison approach with only a few comparable sales analyzed, appraisers choices of weighting of certain comparables or adjustments is largely a subjective choice rather than an objective one[18]. Theoretical and empirical support for use of this price differences hedonic approach can be found in Pace, Sirmans & Slawson (2002) and  Kummerow & Galfalvy (2002)[19].

---

[18] Colwell, P. F., R.E. Cannaday, and C. Wu, "The Analytical Foundations of Adjustment-Grid Methods, Journal of the American Real Estate and Urban Economics Association, 1983, 11-29.
[19] Pace, Kelley , Sirmans, C.F., Slawson, Carlos, "Automated Valuation Models" Research Issues in Real Estate, Vol 8, 2002. Kummerow, Max and Hanga Galfalvy, "Error Trade-offs in Regression Appraisal Methods," Valuation Modeling Techniques, chapter 6, 2002.

25

94. Professor Kelly Pace of Louisiana State University, a specialist in spatial statistical methods, has noted the courts' acceptance of hedonic pricing models in complex litigation such as this[20]. We have consulted with Dr. Pace in this matter to incorporate his expertise in spatial statistics and local knowledge and mass appraisal experience into our pricing models.

95. Vandell (1991) pointed out that where appraisers use "ad hoc" techniques to estimate price differences due to hedonic variables, "bias can enter[21]".Traditional "one property at a time" appraisal methods based mainly on "judgment and experience" have difficulty rising to the standard of empirical verification demanded by Daubert.

96. Lipscomb and Gray's (1990) work illustrates the commonly recognized problem that Standard 1 appraisals and Standard 2 reports are heavily influenced by appraisers experience and subjective judgment, rather than empirical data, when developing adjustments in the sales comparison approach[22].   It is the sales comparison approach which is typically given the most reliance in residential property appraisals under USPAP Standard 1 covering individual property appraisal methods.

97. Consistent with USPAP Rule 6 setting forth mass appraisal standards, academics find that multivariate statistical methods, such as the hedonic pricing model, overcome the shortcomings in "one at a time" appraisals.  Hedonic models have been widely used in the valuation field for at least three-quarters of a century.  Bruce and Sundell (1977) show that such models were used as early as 1924 for appraising rural land and in 1935 for appraising forest land in New Hampshire[23].  Lentz and Wang (1998) stated that "Most appraisal textbooks advocate this method as an essential tool for mass appraisal"[24]. Progress has been rapid in recent years in spatial modeling and this has improved the accuracy of mass valuation methods.

98. The application of such models to the appraisal process in cases such this one has strong foundations in the peer-reviewed economics and real estate literature. The early development of theory and methods includes studies by Tiebout (1956)[25], Lancaster

---

[20] http://www.finance.lsu.edu/academics/finance/re/newpage11.htm , retrieved 7/20/06
[21] Vandell, Kerry D., "Optimal Comparable Selection and Weighting", Journal of the American Real Estate and Urban Economics Association, 19(2), 1991, 213-231.
[22] Lipscomb, J.B. and J.B. Gray, "An Empirical Investigation of Four Market-Derived Adjustment Methods, Journal of Real Estate Research, 1990, 53-66.  Lipscomb and Grey's findings are also discussed in Lentz, G.H. and K. Wang, "Residential Appraisal and the Lending Process:  A Survey of Issues", Journal of Real Estate Research, 1998, 11-40.
[23] Bruce, R.W., and P.J. Sundell, "Multiple Regression Analysis:  History and Applications in the Appraisal Profession", Real Estate Appraisal and Analyst, 1977, 37-44.
[24] Lentz and Wang, "Residential Appraisal and the Lending Process: A Survey of Issues," Journal of Real Estate Research, 1988.
[25] Tiebout, C.M., "A Pure Theory of Local Expenditure", Journal of Political Economy, 1956, 416-24.

26

(1966)[26], Muth (1966)[27], Oates (1969)[28], and Rosen (1974)[29]. More advanced development work has been presented by Randolph (1988)[30] who reviewed the statistical properties of residuals, Durbin (1988)[31] who examined spatial autocorrelation; Halvorsen and Palmquist (1981), Durbin and Sung (1990), and Burgess and Harmon (1991)[32] discussing functional form of the valuation model; and Gau and Kohlhepp (1978)[33] who examined colinearity among the variables in the valuation model used in a mass appraisal.

99. Both Butler (1980) and Bajic (1985)[34] discuss the market homogeneity issues. Mark (1983)[35] looks at the time-stability of the coefficients in a mass appraisal model. Parsons (1990) and Smith and Huang (1994)[36] examine market conditions within a mass appraisal model. Atkinson and Crocker (1987)[37] investigate the optimum number of variables in a model.

100. AVMs have come to be routinely used by lenders in both the primary and secondary mortgage markets as a check method to detect fraud, incompetence or bias in conventional appraisals. This major change in underwriting methods provides strong evidence that lenders believe AVM accuracy is sufficiently good so that they can improve their risk/return results by relying on mass appraisal methods as their primary means for documenting property values.

101. Numerous AVM products are now available for purchase by lenders or by consumers on-line. These important developments prove that those who rely on

---

[26] Lancaster, op. cit.

[27] Muth, R.F., "Household Production and Consumer Demand Functions", Econometrica, 1966, 699-08.

[28] Oates, W.E., "The Effects of property Taxes and local Public Spending on Property Values: An Empirical Study of Tax Capitalization and the Tiebout Hypothesis," Journal of Political Economy, 1969, 957-71.

[29] Rosen, op. cit.

[30] Randolph, R. "Estimation of Housing Depreciation: Short Term Quality Change and Long Term Effects," Journal of Urban Economics, 1988, 23, 162-78.

[31] Durbin, R.A., "Estimation of Regression Coefficients in the Presence of Spatially Autocorrelated Error Terms", Review of Economics and Statistics 1988, 466-474.

[32] Halverson, R., and R. Palmquist, "Choice of Functional Form for Hedonic Price Equations", Journal of Urban Economics, 1981, 37-49. Durbin , R.A., and C. Sung, "Specifications of Hedonic Regressions: Non-nested Tests on Measures of Neighborhood Quality", Journal of Urban Economics 1990, 97-110. Burgess, J.F., and O.R. Harmon, "Specification Tests in Hedonic Models", Journal of Real Estate Finance and Economics, 1991, 375-93.

[33] Gau, G.W., and D.B. Kohlhepp, "Multicollinearity and Reduced-Form Price Equations for Residential Markets: AN Evaluation of Alternative Estimation Methods", Journal of the American Real Estate and Urban Economics Association, 1978, 50-69.

[34] Butler, R.V., "Cross-Sectional Variation in the Hedonic Relationship for Urban Housing Markets, Journal of Regional Science, 1980, 439-54. Bajic, V., "Housing Market Segmentation and Demand for Housing Attributes: Some Empirical Findings", Journal of the American Real Estate and Urban Economics Association, 1985, 58-75.

[35] Mark, J.H., "An Empirical Examination of the Stability of Price Equations over Time", Journal of the American Real Estate and Urban Economics Association, 1983, 397-415.

[36] Parsons, G.R., "Hedonic Prices and Public goods: An Argument for Weighting Locational Attributes in Hedonic Regressions by Lot Size", Journal of Urban Economics, 1990, 308-21. Smith, V.K., and J. Huang, "Can Markets Value Air Quality? A Meta-Analysis of Hedonic Property Value Models," Journal of Political Economy, 1994, 209-227.

[37] Atkinson, S.E., and T.D. Crocker, "A Bayesian Approach to Assessing the robustness of Hedonic Property," Journal of Applied Econometrics, 1987, 27-45.

BARGE000967

appraisals as part of their fiduciary responsibilities in real estate lending businesses have chosen in many cases to rely on AVMs in preference to conventional appraisals. This is market evidence of the growing competitiveness and accuracy of these commercial AVMs. Anecdotal evidence suggests that recent problems in the sub-prime mortgage market may be due more to bias in conventional appraisals than the inaccuracy of AVM methods. As *Daubert* requires, statistically based, objective mass appraisal methods move appraisal practice towards a more scientific approach based on objective inference from empirical data

102.     Our firm has seldom seen a case where there is a stronger necessity for class treatment than in this case. The valuation task will be challenging and require considerable time and effort if performed on a class wide basis using mass appraisal methods. If these thousands of properties were valued individually, the valuation task would not only be subject to far greater risk of inconsistency and bias, it would also be far more expensive, time consuming and practically difficult to implement.

103.     Attachments:   Exhibits A and B, Professional Qualifications and recent trial testimony.




                                            JOHN A. KILPATRICK, PH.D., MRICS

Sworn to and subscribed
before me, this 27th day of
June, 2008.


_____