# EXHIBIT 22

MUMFORD, ETHEL

8/5/2008

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES       CIVIL ACTION
CONSOLIDATED LITIGATION

NO. 05-4182
"K" (2)

PERTAINS TO:  BARGE               JUDGE DUVAL

MAG. WILKINSON

BOUTTE V. LAFARGE          05-5531
MUMFORD V. INGRAM          05-5724
LAGARDE V. LARFARGE        06-5342
PERRY V. INGRAM            06-6299
BENOIT V. LAFARGE          06-7516
PARFAIT FAMILY V. USA      07-3500
LAFARGE V. USA             07-5178

DEPOSITION OF ETHYL MAE COLEMAN MUMFORD,
1423 Feliciana Street, New Orleans, Louisiana,
taken in the offices of Chaffe, McCall, 2500
Energy Centre, 1100 Poydras Street, New
Orleans, Louisiana 70163, on Thursday, August
5, 2008.

MUMFORD, ETHEL

8/5/2008

---

**Page 2**

```
 1   APPEARANCES:
 2      WIEDEMANN & WIEDEMANN
        (BY: KARL WIEDEMANN, ESQ.)
 3      821 Baronne Street
        New Orleans, Louisiana 70113
 4         ATTORNEY FOR THE PLAINTIFFS (BARGE)
 5
        LAW OFFICES OF BRIAN GILBERT
 6      (BY: EDWARD MORENO, ESQ.)
        821 Baronne Street
 7      New Orleans, Louisiana 70113
           PLAINTIFFS
 8
 9      BURGLASS & TANKERSLEY
        (BY: LUCIE THORNTON, ESQ.)
10      5213 Airline Drive
        Metairie, Louisiana 70001
11         ATTORNEYS FOR JEFFERSON PARISH
12
13      MCCRANIE, SISTRUNK
        (BY: DARCEY DECKER, ESQ.)
14      Suite 800
        3445 North Causeway Blvd.
15      Metairie, Louisiana 70002
           ATTORNEYS FOR ORLEANS LEVEE DISTRICT
16
17
        MONTGOMERY, BARNETT, BROWN, READ, HAMMOND
18      & MINTZ
        (BY: RONALD J. KITTO, ESQ.)
19      3200 Energy Center
        New Orleans, Louisiana 70163
20         ATTORNEYS FOR THE AMERICAN CLUB
21
22      CHAFFE, MCCALL LLP
        (BY: CHARLES BLANCHARD, ESQ.)
23      2300 Energy Center
        New Orleans, Louisiana 70163
24         ATTORNEYS FOR LAFARGE NORTH AMERICA
25
```

**Page 4**

```
 1            S T I P U L A T I O N
 2
 3      It is stipulated and agreed by and between
 4   counsel for the parties hereto
 5   that the deposition of the aforementioned
 6   witness is hereby being taken under the
 7   Federal Rules of Civil Procedure, for all
 8   purposes, in accordance with law;
 9      That the formality of reading and signing
10   is specifically not waived;
11      That the formalities of certification and
12   filing are specifically waived;
13      That all objections, save those as to the
14   form of the question and the responsiveness of
15   the answer, are hereby reserved until such
16   time as this deposition, or any part thereof,
17   may be used or sought to be used in evidence.
18
19            * * * *
20
21      ROGER D. JOHNS, RDR, CRR, Certified Court
22   Reporter for the State of Louisiana,
23   officiated in administering the oath to the
24   witness.
25
```

**Page 3**

```
 1   APPEARANCES CONTINUED:
 2
 3      GOODWIN PROCTER  LLP
        (BY: MARK S. RAFFMAN, ESQ.)
 4      901 New York Avenue NW
        Washington, D.C. 20001
 5         ATTORNEYS FOR LAFARGE NORTH AMERICA
 6
        CHRISTOVICH & KEARNEY
 7      (BY: CHRISTOPHER ALFIERI, ESQ.)
        Pan American Life Center
 8      Suite 2300
        601 Poydras Street
 9      New Orleans, Louisiana 70130
           ATTORNEYS FOR SWB (ALSO PRESENT)
10
11
12      DUPLASS, ZWAIN
        (BY: RYAN MALONE, ESQ.)
13      3838 North Causeway Blvd.
        Suite 2900  Lakeway Three
14      Metairie, Louisiana  70002
           ATTORNEYS FOR EJLD, LBLD (ALSO
           PRESENT)
15
16
17
18
19   REPORTED BY:  ROGER D. JOHNS, RMR, CRR, CSR
           Certified Court Reporter,
20         State of Louisiana
21
22
23
24
25
```

**Page 5**

```
 1              I N D E X
 2
 3                         PAGE
 4   Exhibit Number 1....................... 62
        Exhibit 2............................ 74
 5      Exhibit 3............................ 76
        Exhibit Number 4..................... 93
 6      Exhibit Number 5..................... 122
        Exhibit 6............................ 127
 7      Exhibit 7............................ 130
        Exhibit Number 8..................... 151
 8   Bates stamped Mumford 000031 through 39... 151
        34............................... 151
 9   Mumford 35............................. 152
     Bates stamped 31..................... 153
10   Exhibit Number 9..................... 171
     Bates stamped Mumford 000046......... 171
11   Exhibit 10........................... 172
        000025............................. 172
12   Exhibit Number 11.................... 173
     Bates stamped 000080 through 82...... 173
13   Exhibit Number 12.................... 175
     Bates stamped Mumford 000028 through 30... 175
14   Exhibit 13........................... 177
     Bates stamped Mumford 000024......... 177
15   Exhibit Number 14.................... 178
     Bates stamped Mumford 43, 44, and 47...... 178
16      47............................. 180
     Exhibit Number 15.................... 180
17   Bates stamped Mumford 83 and 84.......... 181
     Exhibit 16........................... 182
18   Mumford 000065....................... 182
        Exhibit Number 17.................... 183
19   Bates stamped Mumford 76, 77, 78, 79,
     and 85, 86, 87, 88, and 89......... 183
20   Exhibit 18........................... 191
     Bates stamped Mumford 101 and 102........ 191
21   Exhibit Number 19.................... 196
22
23
24
25
```

Johns Pendleton Court Reporters          800 562-1285

BARGE000970

MUMFORD, ETHEL

8/5/2008

Page 6

1        ETHYL MAE COLEMAN MUMFORD,
2    1423 Feliciana Street, New Orleans, Louisiana
3    70117, after being duly sworn, did testify as
4    follows:
5    EXAMINATION BY MR. BLANCHARD:
6        Q.  Good morning, Miss Mumford.
7        A.  Good morning.
8        Q.  My name is Chuck Blanchard and I
9    represent Lafarge North America, Inc. in this
10   matter.  I'm going to be taking your
11   deposition here today.
12           Have you ever been deposed before,
13   Miss Mumford?
14       A.  I don't think so.  I can't remember.
15       Q.  Okay.  Well, the Court Reporter is
16   going to take down everything that we say
17   today, so it's important that you verbalize or
18   state your answers.
19       A.  Okay.
20       Q.  Will you agree to do that?
21       A.  Yes.
22       Q.  Also, you may anticipate my
23   questions, but please wait until I finish my
24   question before you start your answer.  It's
25   easier for the Court Reporter.  Would you

Page 7

1    agree to do that?
2        A.  Yes.
3        Q.  And also, Miss Mumford, if you don't
4    understand any of my questions, please let me
5    know.  Will you agree to do that?
6        A.  Yes.
7        Q.  And if you let me know that you
8    don't understand one of my questions, I'll try
9    to rephrase that question so that you do
10   understand it.  Will you agree to do that?
11       A.  Yes.
12       Q.  And you do understand, Miss Mumford,
13   that you're under oath today just as if you
14   were testifying in court?
15       A.  Yes.
16       Q.  Miss Mumford, are you on any
17   medications or substances that would interfere
18   with your ability to answer any of my
19   questions here today?
20       A.  No.
21       Q.  Are you on any medications
22   currently?
23       A.  Yes.
24       Q.  Which medications are you on, ma'am?
25       A.  I'm on a blood pressure pill.  I

Page 8

1    took one this morning.  I have the bottle if
2    you would like the name.
3        Q.  Well, do you have it with you?
4        A.  Yes.
5        Q.  Well, yes, please.  I think we'll do
6    that.  And how long have you been on blood
7    pressure pills?
8        A.  I guess about ten years.
9        Q.  So you have been on blood pressure
10   pills since before Katrina.  Is that correct?
11       A.  Yes.
12       Q.  Do you take any other medications on
13   a regular basis other than blood pressure
14   pills?
15       A.  Well, I take thyroid pills.
16       Q.  Do you know what medication you take
17   for your thyroid?
18       A.  I think I have that here also.
19   (indicating).
20       Q.  All right.
21           MR. BLANCHARD:
22              For the purpose of the record,
23           the witness has handed me a
24           prescription bottle of Lisinopril
25           HCTZ, which is hydrochlorothiazide.

Page 9

1    EXAMINATION BY MR. BLANCHARD:
2        Q.  This is the blood pressure
3    medication?
4        A.  Yes.
5        Q.  And it's prescribed by which
6    doctor?
7        A.  Dr. Meyers, Ochsner's Hospital.
8        Q.  And you also said you take
9    medication for your thyroid?  Is that
10   correct?
11       A.  Yes.
12       Q.  Do you know the name of that
13   medication?
14       A.  This -- This is a pain pill I take
15   also (indicating).
16           MR. BLANCHARD:
17              The witness has also handed me a
18           prescription bottle for Acetaminophen
19           with codeine.
20   EXAMINATION BY MR. BLANCHARD:
21       Q.  And, Miss Mumford, you take this
22   medication --
23       A.  Yes.
24       Q.  -- for pain?
25       A.  Not all the time.  Just when I have

MUMFORD, ETHEL

8/5/2008

Page 10

1 a pain, like an arthritis pain.
2   Q.  You suffer from arthritis?
3   A.  Slightly.
4   Q.  How long have you been suffering
5 from arthritis?
6   A.  Maybe the last five years.
7   Q.  All right.  Again, you started
8 suffering with arthritis before Katrina?
9   A.  Yes.
10   Q.  And it's the same doctor that
11 prescribes this medication for you?
12   A.  Yes.
13   Q.  All right.
14   A.  This is a nerve pill he gave me also
15 (indicating).
16     MR. BLANCHARD:
17       The witness has handed me a
18     prescription bottle that she purports
19     to be a nerve pill.  I can't read the
20     medication.  It appears to be
21     diazepam, D I A Z A P A M.
22 EXAMINATION BY MR. BLANCHARD:
23   Q.  And this is a nerve pill?
24   A.  Yes.
25   Q.  And who prescribes this to you?

Page 11

1   A.  Dr. Meyers.
2   Q.  Also at Ochsner?
3   A.  Yes.
4   Q.  And how long have you been on this
5 medication?
6   A.  About -- About five years also.
7   Q.  Again, you started on this
8 medication before Katrina; correct?
9   A.  Yes.
10   Q.  And why did you start taking this
11 medication before Katrina?
12   A.  Well, I told the doctor I was a
13 little bit nervous and I couldn't sleep too
14 well at night, so he gave me something for it.
15   Q.  All right.  How often do you take
16 the diazepam?
17   A.  I don't take them very often.  Just
18 when I feel that I can't sleep during the
19 night.  Maybe once or twice a month I might
20 take one.
21   Q.  And before the storm was that about
22 the same amount of usage, once or twice a
23 month?
24   A.  Yes.
25   Q.  So your use of this medication

Page 12

1 hasn't changed since the storm, has it?
2   A.  No.
3   Q.  Thank you.  And again, none of these
4 medications that we talked about today, it
5 doesn't interfere with your ability to
6 understand?
7   A.  No.
8   Q.  Miss Mumford, did you do anything to
9 prepare for your deposition here today?
10   A.  Well, I spoke with my lawyers.
11   Q.  Which lawyers did you speak with?
12   A.  The Wiedemanns and Mr. Edwards.
13   Q.  And did you meet with them before
14 the deposition?
15   A.  Yes.
16   Q.  When did you meet with them?
17   A.  Yesterday.
18   Q.  And what time did you meet with
19 them?
20   A.  About 5:00 o'clock yesterday
21 evening.
22   Q.  And who did you meet with?
23   A.  I met with Karl Wiedemann.  I met
24 with Mr. Edwards this morning.
25   Q.  So you met with Mr. Wiedemann last

Page 13

1 night?
2   A.  Yes.
3   Q.  Was there anyone else in the room
4 besides Mr. Wiedemann?
5   A.  His father was in the room.  Mr.
6 Larry Wiedemann.
7   Q.  So Karl and Larry Wiedemann were in
8 the room?
9   A.  Yes.
10   Q.  Was anyone else in the room?
11   A.  No.
12   Q.  And how long did you meet with the
13 Wiedemanns last night, ma'am?
14   A.  About an hour.
15   Q.  Did they show you any documents?
16   A.  Well, yes.
17   Q.  Do you remember what documents you
18 looked at?
19   A.  Well, mainly the questions they
20 asked me, they had all of that and they went
21 through that with me.
22   Q.  Did they show you any documents
23 related to the litigation?  Such as Answers to
24 Interrogatories?  Did you see anything along
25 those lines?

4 (Pages 10 to 13)

MUMFORD, ETHEL

8/5/2008

```
                                              Page 14
1        A.  Yes.
2        MR. WIEDEMANN:
3        You can't ask me.
4        THE WITNESS:
5        Sorry.
6    EXAMINATION BY MR. BLANCHARD:
7        Q.  What sort of questions do you
8    remember seeing on the documents that you
9    looked at yesterday?
10       A.  Well, they asked me where I was
11   during the storm and I evacuated and went to
12   Lafayette, Louisiana.  Stayed in Motel 6 for
13   about a week.  And from there I got an
14   apartment.
15       Q.  So you remember looking at documents
16   that relayed your evacuation history; correct?
17       A.  Yes.
18       Q.  What else do you remember about the
19   documents that you reviewed?
20       A.  And the loss, my personal loss,
21   property loss.
22       Q.  What sort of documents do you
23   remember concerning your property loss?
24       A.  Well, they had the list of all the
25   property I lost.  Plus my contents.
```

```
                                              Page 15
1        Q.  When you say list of property, were
2    these addresses?
3        A.  Yes, addresses.
4        Q.  So you saw a document with a list of
5    addresses?
6        A.  Yes.
7        Q.  And then you also saw a document
8    with contents?
9        A.  Yes.
10       Q.  And the contents list that you saw,
11   did that relate to a specific property or did
12   it encompass all of your properties?
13       A.  It's the property that I was living
14   in when Katrina occurred.
15       Q.  All right.  And that property was
16   the 4829 Burgundy property?
17       A.  Yes.
18       Q.  The other properties and we're going
19   to get into this a little later, those were
20   rental type properties; correct?
21       A.  Yes.
22       Q.  And you didn't own any personal
23   property or contents in any of those
24   properties, did you?
25       A.  No.
```

```
                                              Page 16
1        Q.  All right.  Now, the documents that
2    you reviewed yesterday, we talked about the
3    list of addresses, we talked about a list of
4    contents; do you remember any other documents
5    that you reviewed yesterday in preparation for
6    your deposition?
7        A.  I reviewed quite a few documents.
8    Let's see.  I can't remember all of them.
9        Q.  Well, do you remember any more in
10   addition to the ones you have just mentioned
11   to me, the list of properties and the list of
12   contents at 4829 Burgundy?
13       A.  Oh, the amount of money I received
14   from FEMA, insurance company, Road Home.
15       Q.  So you also looked at documents that
16   indicated the amount of money you got from
17   FEMA?
18       A.  Yes.
19       Q.  Okay.  And also Road Home?
20       A.  Yes.
21       Q.  And what was the third one?
22       A.  Road Home, FEMA, and insurance.
23       Q.  Insurance?
24       A.  Uh-huh (affirmatively).
25       Q.  Again, we'll get into that in a
```

```
                                              Page 17
1    little more detail later in your deposition.
2    But at this point I just want to go through
3    the documents you reviewed again to the best
4    of your recollection.  We talked about the
5    list of addresses, we talked about the
6    contents at 4829 Burgundy, we talked about the
7    amount you got from FEMA, from Road Home, and
8    from your insurance companies.
9        A.  Yes.
10       Q.  Any other documents that you
11   remember reviewing yesterday?
12       A.  I can't remember right now.
13       Q.  You said this morning you met with
14   Mr. Moreno; correct?
15       A.  Yes.
16       Q.  How long did you meet with him?
17       A.  About 45 minutes.
18       Q.  Did you review any documents with
19   him this morning?
20       A.  The same as I did yesterday.
21       Q.  So that would have been the list of
22   properties, the contents; correct?
23       A.  Yes.
24       Q.  And the FEMA, Road Home, and
25   insurance?
```

5 (Pages 14 to 17)

BARGE000973

MUMFORD, ETHEL

8/5/2008

| Page 18 | Page 20 |
|---|---|
| 1    A.  Yes. | 1    Q.  -- and he developed some sort of |
| 2    Q.  Were there any additional documents | 2    illness while he was working at West |
| 3  that Mr. Moreno showed you today that you | 3  Jefferson? |
| 4  hadn't reviewed yesterday? | 4    A.  I don't know whether he developed an |
| 5    A.  Yes. | 5  illness or not.  The only thing I know, he |
| 6    Q.  What were those documents, ma'am? | 6  died with a heart attack that day he got off |
| 7    A.  Well, mainly the same as yesterday. | 7  from work, which was a Saturday. |
| 8  The insurance, FEMA, Road Home. | 8    Q.  And did you sue someone blaming them |
| 9    Q.  I appreciate that.  Was there | 9  for your husband's heart attack? |
| 10  anything different today?  I don't want to go | 10    A.  After he had worked all day, and I |
| 11  over what we have already been over, ma'am. | 11  went to court and they just made a settlement |
| 12  So if there's anything new today. | 12  with me. |
| 13    A.  I can't remember. | 13    Q.  And again, I am trying to get to the |
| 14    Q.  Miss Mumford, before the lawsuit | 14  nature of the lawsuit, ma'am.  You said that |
| 15  that we're here for today, were you ever | 15  there was a settlement of the lawsuit; |
| 16  involved in any other lawsuits? | 16  correct? |
| 17    A.  Yes. | 17    A.  Yes. |
| 18    Q.  How many? | 18    Q.  And that lawsuit was filed where? |
| 19    A.  One was when my husband passed | 19  Was it filed here in Orleans or Jefferson? |
| 20  away. | 20    A.  Orleans, uh-huh (affirmatively). |
| 21    Q.  And your husband was Henderson | 21    Q.  Who were the Plaintiffs in that |
| 22  Mumford? | 22  lawsuit?  Was it just you or was it you and |
| 23    A.  Yes.  Yes. | 23  your children? |
| 24    Q.  And when did he pass away? | 24    A.  It had a company he was working for, |
| 25    A.  He passed away March, 1983. | 25  but I can't remember what company it was |

| Page 19 | Page 21 |
|---|---|
| 1    Q.  And describe for me the nature of | 1  during that time. |
| 2  that lawsuit. | 2    Q.  Who was suing the company?  It was |
| 3    A.  Well, we went to court and they just | 3  you? |
| 4  made a settlement with me. | 4    A.  It was me. |
| 5    Q.  Was your husband killed in some sort | 5    Q.  Was there anyone else, any other |
| 6  of accident? | 6  family member that was suing the company with |
| 7    A.  He had worked on a job and he left | 7  you? |
| 8  the job and died after he left. | 8    A.  No. |
| 9    Q.  Did he have some sort of illness | 9    Q.  All right.  So you sued the |
| 10  from his work? | 10  company? |
| 11    A.  I think he had a heart condition. | 11    A.  Yes. |
| 12  He had a heart attack the day he died. | 12    Q.  You sued the company here in Orleans |
| 13    Q.  Do you remember who you sued? | 13  Parish? |
| 14    A.  No.  I can't remember. | 14    A.  Yes. |
| 15    Q.  Where did he work? | 15    Q.  Do you remember any of the |
| 16    A.  He was a construction worker and he | 16  allegations in that lawsuit, what you alleged |
| 17  was working at West Jefferson, working on that | 17  against this company? |
| 18  hospital across the river. | 18    A.  I don't remember. |
| 19    Q.  How long had he worked for the | 19    Q.  Who represented you in that lawsuit? |
| 20  construction company? | 20    A.  Fritz Wiedemann. |
| 21    A.  It had been some years.  Maybe five | 21    Q.  You said you went to court on that |
| 22  or six years. | 22  case.  Did you actually testify in court? |
| 23    Q.  You said he was working at West | 23    A.  No. |
| 24  Jefferson Hospital across the river -- | 24    Q.  Did you sit down and give a |
| 25    A.  Yes. | 25  deposition like we're here today for? |

6 (Pages 18 to 21)

MUMFORD, ETHEL

8/5/2008

Page 22

1      A.  No.
2      Q.  Do you remember how much money you
3  got?
4      A.  It could have been 30-something
5  thousand.
6      Q.  Had you ever had occasion to hire
7  Mr. Wiedemann before that time?
8      A.  Other than a car accident, that's
9  the only case I ever had, with my husband and
10  several car accidents.
11      Q.  All right.  So you've had several
12  car accidents where you filed lawsuits?
13      A.  Yes.
14      Q.  How many?
15      A.  I don't know exactly.
16      Q.  Do you remember the first one that
17  you filed, when that occurred?
18      A.  (Witness shakes head negatively.)
19      Q.  Have all the lawsuits involving
20  automobile accidents been filed here in
21  Orleans Parish?
22      A.  Yes.  Yes.
23      Q.  Who has represented you in those
24  lawsuits?
25      A.  The Wiedemanns.

Page 23

1      Q.  So for every lawsuit that you have
2  filed, the Wiedemanns have been your lawyers;
3  correct?
4      A.  Yes.
5      Q.  In any of these automobile accident
6  cases, do you ever remember going to court and
7  testifying in front of the Judge?
8      A.  No.
9      Q.  In any of these automobile accident
10  cases, do you ever remember sitting down and
11  giving a deposition like we're here today for?
12      A.  No.
13      Q.  Do you remember any other lawsuits
14  other than the multiple car accident lawsuits
15  and the lawsuit involving your husband?
16      A.  No.
17      Q.  You mentioned various automobile
18  lawsuits.  Do you remember how many you filed?
19      A.  No.
20      Q.  Was it more than five?
21      A.  It -- I don't think so.  It could
22  have been five maybe.  I really don't know.
23      Q.  So we'll go with approximately five
24  automobile accident lawsuits, the lawsuit
25  involving your husband when he worked at West

Page 24

1  Jefferson.
2      A.  Uh-huh (affirmatively).
3      Q.  Do you remember any other lawsuits?
4      A.  No.
5      Q.  Were you involved in a lawsuit
6  concerning a railroad tankcar leak here in New
7  Orleans?
8      A.  No.  I may have put my name there,
9  but I never went to court, filed suit or
10  anything.
11      Q.  But you think you might have put
12  your name into that one?
13      A.  Yes.
14      Q.  Who was the Plaintiff's lawyer in
15  that case?
16      A.  I don't know.
17      Q.  How did you become involved in that
18  case?
19      A.  Well, I was on Feliciana Street at
20  the time they had the oil leak.  And I gave my
21  name, and that -- that was the end of it.  I
22  never heard any more about it.
23      Q.  Did you ever get any money out of
24  that lawsuit?
25      A.  No.

Page 25

1      Q.  Other than the Wiedemanns, have you
2  ever had occasion to hire any other lawyers?
3      A.  No.  They all worked for the
4  Wiedemanns.
5      Q.  What's your date of birth, ma'am?
6      A.  8/15/27.
7      Q.  Where were you born?
8      A.  Ascension Parish.
9      Q.  How long have you lived in New
10  Orleans?
11      A.  About 60 years.
12      Q.  You were formerly married; correct?
13      A.  Yes.
14      Q.  And was your husband's name
15  Henderson Mumford or Henderson Mumford, Jr.?
16      A.  Henderson Mumford, Jr.
17      Q.  And when did you marry Mr. Mumford?
18      A.  In November, 1948.
19      Q.  You married him here in New Orleans?
20      A.  Yes.
21      Q.  And since you were married, once you
22  began your marriage with Mr. Mumford you have
23  lived in New Orleans ever since that time?
24      A.  Yes.
25      Q.  Do you have any children?

7 (Pages 22 to 25)

BARGE000975

MUMFORD, ETHEL

8/5/2008

Page 26

```
1        A.  Yes.
2        Q.  How many?
3        A.  Two.
4        Q.  What are their names and ages?
5        A.  Lois Mumford Collins, 58.  Henderson
6   Mumford III, 56.
7        Q.  Where does your daughter live?
8        A.  My daughter lives with me right now
9   on Feliciana Street.
10       Q.  Where did she live at the time of
11  Katrina?
12       A.  Burgundy Street, 4829.  We lived
13  together.
14       Q.  Where does your son live?
15       A.  He lives on Chartres Street.  5311
16  Chartres.
17       Q.  Where did he live at the time of
18  Katrina?
19       A.  5311 Chartres Street.
20       Q.  Have you ever had any other
21  children?
22       A.  No.
23       Q.  How many times have you been
24  married?
25       A.  Once.
```

Page 27

```
1        Q.  Your husband, Mr. Mumford, he was
2   the biological father of your two children?
3        A.  Yes.
4        Q.  Was he married at any time before he
5   married you?
6        A.  No.
7        Q.  Did he have any other children other
8   than your two children?
9        A.  No.
10       Q.  Miss Mumford, let's go over your
11  educational background.  Did you go to high
12  school?
13       A.  I went to high school, but during
14  that time I had to finish the eleventh grade
15  and I didn't complete that grade.
16       Q.  Where did you go to high school?
17       A.  Laura Training School in Ascension
18  Parish.  It was Donaldsonville, Louisiana.
19       Q.  And you said you couldn't complete
20  high school?
21       A.  No.
22       Q.  Why was that?
23       A.  That -- It was during the war and
24  gas was rationed during that time and we did
25  not have a school bus, so I was in the
```

Page 28

```
1   eleventh grade.  We didn't have to do the
2   twelfth grade then.  The eleventh would
3   complete the high school.  But I did not
4   finish that.
5        Q.  Have you had any sort of formal
6   education since the eleventh grade?
7        A.  Yes, I went and I took up nursing,
8   certified nursing assistant.
9        Q.  And where did you go for that type
10  of training?
11       A.  I went -- It was in the East.  I
12  can't remember the name of the school.  It's
13  off of Read.  I can't remember the name of the
14  school.
15       Q.  It was in New Orleans East?
16       A.  Yes.  Off of Read.
17       Q.  And when did you go there?
18       A.  I guess about ten years ago.
19       Q.  Did you receive some sort of
20  certificate?
21       A.  Yes.
22       Q.  And what was the exact certificate
23  name for that?
24       A.  It was called CNA, certified nursing
25  assistant, from Baton Rouge.
```

Page 29

```
1        Q.  And why did you go to that training
2   school to become a certified nursing
3   assistant?
4        A.  I wanted to continue to work and I
5   thought I could make more money.
6        Q.  Now, when you left high school in
7   the eleventh grade, is that about the time
8   that you got married to Mr. Mumford?
9        A.  Maybe a few years later.
10       Q.  And were you living in New Orleans
11  when you got married to him?
12       A.  Yes.
13       Q.  Why had you moved to New Orleans?
14       A.  I was living in Ascension Parish and
15  I came to New Orleans to get work.
16       Q.  What type of work?
17       A.  I was working in a restaurant and
18  drugstore.
19       Q.  When you got married to Mr. Mumford,
20  did you continue to work?
21       A.  I was work-- Yes, I wind up
22  working at American Bank.
23       Q.  How long did you work at American
24  Bank?
25       A.  35 years.
```

8 (Pages 26 to 29)

BARGE000976

MUMFORD, ETHEL

8/5/2008

Page 30

1     Q.  What did you do at American Bank?
2     A.  I worked, I did some cleaning, I
3  worked in the mail room, the coffee room.
4     Q.  How old were you when you -- Let me
5  ask you this.  Did you retire from American
6  Bank?
7     A.  Yes.
8     Q.  How old were you when you retired?
9     A.  60 years old.
10    Q.  Did you get any sort of pension from
11 American?
12    A.  Yes.  Yes.  They paid me all in a
13 lump sum.
14    Q.  And at that time did you want to
15 retire?  Did you voluntarily leave?
16    A.  Yes.
17    Q.  Why did you voluntarily leave?
18    A.  Well, I just guess I got tired.  You
19 know, just retired.  Retired.
20    Q.  And at some point after you retired
21 from American Bank did you re-enter the work
22 force?
23    A.  Yes.  That's when I went to school,
24 back to school to take the certified nursing
25 assistant, start working again.

Page 31

1     Q.  So you are currently 80 years old;
2  right?
3     A.  Yes.
4     Q.  And you said about ten years ago you
5  went to the school in New Orleans East?
6     A.  Yes.
7     Q.  So you were about 70 --
8     A.  Yes.
9     Q.  -- at that time?
10    A.  Yes.
11    Q.  Did you work at any time between the
12 ages of 60 and 70?
13    A.  I'm working now.
14    Q.  All right.  I don't think you
15 understood my question.  After you retired
16 from American Bank, all right, you were 60
17 years old; correct?
18    A.  (Witness nods head affirmatively.)
19    Q.  Is that correct?
20    A.  Yes.
21    Q.  And you said when you were around 70
22 you went and got the degree, the certified
23 nursing assistant degree; correct?
24    A.  Yes.
25    Q.  So between the ages of 60 and 70 did

Page 32

1  you work anywhere?
2     A.  Yes.
3     Q.  Where?
4     A.  I did housecleaning and cleaned
5  offices.
6     Q.  Did you work during that entire ten
7  year period doing housecleaning and cleaning
8  offices?
9     A.  Off and on, yes.
10    Q.  So it was part time?
11    A.  Yes.
12    Q.  At American Bank you were full time;
13 correct?
14    A.  Yes.
15    Q.  Were you employed by anyone when you
16 were doing the housecleaning or cleaning the
17 offices?
18    A.  Certain ones, different people I
19 worked for.
20    Q.  Were you self-employed?  In other
21 words, you didn't get a paycheck from anyone?
22 They just paid you as you did the work; right?
23    A.  Yes.
24    Q.  So they paid you a check as you
25 finished the job?

Page 33

1     A.  Yes.
2     Q.  How often did you get work?  You
3  said it was part time.
4     A.  About three days a week.
5     Q.  And did you do that up until the
6  time that you went to the training school?
7     A.  Yes.
8     Q.  How long were you in the training
9  school?
10    A.  About two months.
11    Q.  And after that, after you completed
12 that, what did you do as far as employment?
13    A.  I start taking care of sick people.
14    Q.  Were you actually employed by
15 someone?
16    A.  Yes.
17    Q.  Who was your employer when you first
18 started?
19    A.  I think Mrs. Cahn.  It was private
20 individuals I was working for.  Miss Cahn.
21    Q.  So you didn't work for any sort of
22 company?
23    A.  I worked for one company.  It was --
24 Let's see.  It was -- It was -- I can't come
25 up with the name of the company, but I was

9 (Pages 30 to 33)

MUMFORD, ETHEL

8/5/2008

Page 34

1  taking care of critically ill people.
2      Q.  And where was that?
3      A.  It was here in New Orleans.
4      Q.  Was it at a hospital or a nursing
5  home?
6      A.  In -- In private homes.
7      Q.  So for a portion of the time that
8  you have been working in this field, you have
9  actually worked for a company that sent you
10  out on jobs?
11      A.  Yes.
12      Q.  And other portions of that time you
13  have just gone out and done work on your own
14  --
15      A.  Yes.
16      Q.  -- and been paid directly by the
17  people you did service for?
18      A.  Yes.
19      Q.  And since you started in this field,
20  certified nursing assistant, has your work
21  been full time or part time?
22      A.  Some was part time and some was full
23  time.
24      Q.  All right.  And why was it sometimes
25  part time and sometimes full time?

Page 35

1      A.  It's according to what job I got.
2  If I got a job where I could work eight hours
3  a day, I worked eight hours.  And when that
4  one was done, I probably -- I went on another
5  one that was part time.
6      Q.  How did you get your referrals as to
7  where to go?
8      A.  Through family and friends.
9      Q.  When you turned 65 or so, did you
10  start getting Social Security?
11      A.  I start getting Social Security at
12  60.
13      Q.  All right.  So when you retired from
14  American Bank you got a lump sum.
15      A.  Yes.
16      Q.  And then you started getting Social
17  Security benefits when you were 60.
18      A.  Yes.
19      Q.  Do you get any other sort of pension
20  benefits?
21      A.  I get a small check from the
22  Laborers union hall for my husband.
23      Q.  What labor union that?
24      A.  68 -- Local 689.
25      Q.  Going back to your husband, what

Page 36

1  type of construction work did he do?
2      A.  Buildings.  Buildings and
3  hospitals.
4      Q.  So it was sort of general
5  construction work?
6      A.  Yes.
7      Q.  You told me previously you're still
8  working; correct?
9      A.  Yes.  Yes.
10      Q.  Are you working in this field of
11  certified nursing assistant?
12      A.  Yes.
13      Q.  Are you doing anything else other
14  than that from an employment standpoint?
15      A.  A little cleaning.
16      Q.  So you currently do some cleaning?
17      A.  Yes.
18      Q.  This is housecleaning in people's
19  homes?
20      A.  Yes.
21      Q.  And you still do some of the nursing
22  assistant type?
23      A.  Yes.
24      Q.  What do you do in connection with
25  that as a nursing assistant?

Page 37

1      A.  Right now I'm working for Miss
2  Warshauer.  She's an elderly lady and she
3  can't get around too well.  And I help her
4  back and forth to the bathroom, take her bath,
5  change clothes, I fix food, whatever she
6  need.  I take care of her.
7      Q.  Do you provide any medications to
8  her?
9      A.  No.
10      Q.  Do you provide medications to any of
11  the people that you do nursing work for?
12      A.  Not at this time.
13      Q.  But you have in the past?
14      A.  I have done it.
15      Q.  Have you been trained concerning
16  administration --
17      A.  The nurse -- The nurse trained me
18  what to give the patient.  She fix it all and
19  I just gave it to them, give it to them.
20      Q.  What's your current work schedule?
21      A.  Right now my schedule is 11:00 at
22  night to 8:00 in the morning.
23      Q.  And that's working for Miss --
24      A.  Warshauer.
25      Q.  -- Warshauer?

10 (Pages 34 to 37)

MUMFORD, ETHEL

8/5/2008

Page 38

1    A.  Uh-huh (affirmatively).
2    Q.  How many days a week do you do that?
3    A.  Five.
4    Q.  Did you work last night?
5    A.  Yes.
6    Q.  And during this time period when
7  you're working five days a week during this
8  night shift, are you also cleaning houses
9  during the day?
10    A.  I was, but I -- I just recently gave
11  it up.
12    Q.  How much do you currently get paid?
13    A.  I make $10 an hour.
14    Q.  That rate of $10 an hour, has that
15  been fairly consistent since you started in
16  this field ten years ago?
17    A.  Yes.
18    Q.  Do you file tax returns, Miss
19  Mumford?
20    A.  Yes.
21    Q.  Have you filed a 2007 tax return?
22    A.  Yes.
23    Q.  Did you file a 2006 tax return?
24    A.  Yes.  I'm sure.  Yes.
25    Q.  Have you filed tax returns for the

Page 39

1  last ten years?
2    A.  Yes.
3    Q.  Do you prepare your tax return or
4  does someone prepare it for you?
5    A.  Someone prepare it for me.
6    Q.  Who prepares it for you?
7    A.  The lady's name was Miss Strouder.
8  She's not here now.  I got another lady did
9  the last tax for me.  She's across the river.
10  Her name is -- I can't call her name.
11    Q.  Where across the river?
12    A.  I think -- Right -- The west bank
13  right -- I think it's Algiers.  I'm not too
14  sure.
15    Q.  This is a CPA?
16    A.  Yes.
17    Q.  And it's a woman CPA?
18    A.  Yes.  And I have a company that
19  filed it for me.  I think '06.  I can't call
20  the name either.
21    Q.  Do you have copies of your tax
22  returns?
23    A.  Yes.
24    Q.  For the last ten years?
25    A.  Not the last ten years, but I do

Page 40

1  have some.
2    Q.  Which ones do you have?
3    A.  I have -- I should have '06, '07.  I
4  might have '05.
5    Q.  What about before '05; do you have
6  any of those tax returns?
7    A.  They was all lost in the storm.
8    Q.  Where did you maintain those tax
9  returns?
10    A.  I had them in the house on Burgundy
11  Street.
12    Q.  Did you have them in the attic or
13  the main level?
14    A.  I live in a slab house.  I had it
15  downstairs.  I don't have upstairs.
16    Q.  And those tax returns before 2005
17  you said were destroyed?
18    A.  I should have 2005, --
19    Q.  You should have 2005?
20    A.  -- '6, and '7.
21    Q.  From 2004 and prior --
22    A.  Yes.
23    Q.  -- they were destroyed?
24    A.  Yes.
25    Q.  Your accountant at that time, I

Page 41

1  believe you were a little fuzzy on the name.
2  Do you remember her name?
3    A.  Strouder.
4    Q.  Strouder?
5    A.  Yes.
6    Q.  And she is no longer in the New
7  Orleans area?
8    A.  She in Houston now.
9    Q.  Does she have copies of your tax
10  returns from 2004 and previous?
11    A.  I don't know.
12    Q.  Have you asked her?
13    A.  I never asked her.
14    Q.  The new person that you have doing
15  the tax returns, did she ask you for your
16  prior tax returns?
17    A.  Yes.
18    Q.  2004 and previous?
19    A.  She did.
20    Q.  You didn't have them to give to her;
21  correct?
22    A.  I had the 2004.
23    Q.  So you do have 2004 return.
24    A.  Let's see.  '5 -- The storm was in
25  -- No, I had 2005, '6, and '7.

11 (Pages 38 to 41)

MUMFORD, ETHEL

8/5/2008

Page 42

1      Q.  Do you know if your current
2   accountant asked your former accountant, Miss
3   Strouder, for the old tax returns?
4      A.  Yes.
5      Q.  2004 she did?
6      A.  I went and got them from this
7   company on St. Claude Street.  I can't call
8   the name right now.
9      Q.  So you got the old tax returns, 2004
10  and previous, and you brought it to the new
11  accountant?
12     A.  Yes.
13     Q.  So the new accountant would have
14  your tax returns from 2004; correct?
15     A.  (Witness nods head affirmatively.)
16     Q.  200- --
17     A.  '5.  2005.
18     Q.  All right.  We're having a little
19  disconnect here, ma'am.
20     A.  Yeah.
21     Q.  So let's go back over this.  I know
22  that you have a current accountant that does
23  your tax returns.
24     A.  Uh-huh (affirmatively.)
25     Q.  Her office is across the river?

Page 43

1      A.  Yes.
2      Q.  And she has got your returns for
3   2005, 2006 and 2007?
4      A.  Yes.
5      Q.  Correct?  And you personally have
6   copies of those returns as well?
7      A.  Should be able to find them, yes.
8      Q.  All right.  Now, before the storm,
9   for 2004 you had this other accountant, Miss
10  Strouder, that did your tax returns; correct?
11     Q.  And she is now in Houston?
12     Q.  And she is now in Houston?
13     A.  Yes.
14     Q.  Correct?  Your current accountant,
15  do you know if your current accountant
16  contacted your former accountant to try to get
17  those returns from 2004, 2003, 2002, et
18  cetera?  Do you know whether she did that or
19  not?
20     A.  She contacted the last one I had
21  done in 2006.  That was a company.  They
22  located at St. Claude and Elysian Fields.
23     Q.  So your current accountant contacted
24  this company on St. Claude to get the returns?
25     A.  Yes.

Page 44

1      Q.  But as far as the returns from 2004
2   and prior to that, 2003, --
3      A.  Uh-huh (affirmatively).
4      Q.  -- do you know whether or not Miss
5   Strouder in Houston has those returns?
6      A.  I do not know whether she has them
7   or not.
8      Q.  And do you know whether your current
9   accountant, the one on the west bank, has any
10  returns prior to 2005?
11     A.  No, she doesn't have any.
12     Q.  She doesn't.
13         All right.  We talked about your
14  current jobs.  You do the nursing work and you
15  do the housecleaning.  Do you have any other
16  jobs other than those two?
17     A.  No.
18     Q.  Do you plan to continue doing both
19  of those jobs?
20     A.  Yes.  As long as I can.
21     Q.  No doctor has ever told you you
22  can't work then?
23     A.  No.
24     Q.  What is your current address?
25     A.  1423 Feliciana Street.

Page 45

1      Q.  And that home is in the Upper Ninth
2   Ward?
3      A.  Yes.
4      Q.  So it's on the west side of the
5   Industrial Canal?
6      A.  Yes.
7      Q.  Correct?  Does anyone live with you?
8      A.  I have three family members, each
9   one in an apartment.  I'm in one, I have a
10  granddaughter in another one, a grandson, and
11  my daughter.
12     Q.  So how many units are there at 1423?
13     A.  Four.
14     Q.  Four units.  And they're all
15  occupied?
16     A.  Yes.
17     Q.  How long have you resided there?
18     A.  Since 2006.
19     Q.  And where did you live before 1423
20  Feliciana Street?
21     A.  4829 Burgundy Street.
22     Q.  How long had you lived at 4829
23  Burgundy Street?
24     A.  For 35 years.
25     Q.  Now, you did evacuate --

12 (Pages 42 to 45)

MUMFORD, ETHEL

## Page 46

1    A.  Yes.
2    Q.  -- for the storm, right?  So where
3  did you live between the time of Katrina and
4  the time that you moved to the Feliciana
5  Street address in 2006?
6    A.  Lived in Lafayette, Louisiana.
7    Q.  Did you live in an apartment there?
8    A.  I lived one week in Motel 6 and then
9  I moved in an apartment.
10    Q.  What was the name of the apartment
11  complex?
12    A.  It was HUD -- a HUD apartment.
13    Q.  Did you have to pay for the
14  apartment?
15    A.  Yes.
16    Q.  Did you --
17    A.  They gave me free rent for about a
18  year.
19    Q.  So HUD gave you free rent for about
20  a year?
21    A.  Yes.  It was Himbola Apartments.
22    Q.  So you said you were in Motel 6 for
23  about a week.
24    A.  Yes.
25    Q.  Then you moved into this apartment

## Page 47

1  complex; right?
2    A.  Yes.
3    Q.  And you lived there for about a
4  year?
5    A.  From 200-- -- We gave the apartment
6  up last year.  Last year.  2007.  We kept it
7  until then.  We kept it until May, 2007.
8    Q.  You say "we".  Did someone else live
9  with you?
10    A.  My daughter and I.
11    Q.  I am just trying to get the
12  timetable here, ma'am.
13    A.  Yeah.
14    Q.  You lived in the Motel 6 for about a
15  week.  So that would be maybe September 5th or
16  6th or so of 2005.
17    A.  Uh-huh (affirmatively).
18    Q.  Right?
19    A.  Yes.
20    Q.  And then you moved into this
21  apartment complex; right?
22    A.  Uh-huh (affirmatively).  Yes.  Yes.
23    Q.  Now, you told me in 2006 you moved
24  to Feliciana; is that correct?
25    A.  Yes.  My daughter was left in the

## Page 48

1  apartment in Lafayette.
2    Q.  All right.  What month in 2006 did
3  you move back to Feliciana?
4    A.  February.
5    Q.  Was the Feliciana Street address
6  damaged during the storm?
7    A.  Yes.
8    Q.  How was it damaged?
9    A.  It had water, and upstairs the roof
10  came off and it had -- rainwater messed up
11  everything in there, but what we did, we put a
12  roof on and we brought a generator, so we were
13  able to use the generator and close the hole
14   -- the holes where the rain had washed
15  through.  We closed those and we were able to
16  get light and water, hot water from the
17  generator.
18    Q.  How much water did the Feliciana
19  Street address get?
20    A.  It got maybe halfway, halfway the
21  room.  I don't know how many feet it is.  But
22  it --
23    Q.  Are the ceilings eight feet?
24    A.  I don't know.  It was high ceilings.
25    Q.  All right.  Were they ten feet?

## Page 49

1    A.  I don't know how many feet they are.
2    Q.  But whatever they were, the water
3  line was about halfway up the wall?
4    A.  Halfway.
5    Q.  You said this was a two-story
6  structure?
7    A.  The one downstairs is one-story.
8  The one in the back is two-story.
9    Q.  It's all one, it's all connected,
10  all one structure; correct?
11    A.  It's two buildings.  It's separate,
12  but they on the same ground.
13    Q.  And one of those buildings had the
14  roof blown off?
15    A.  Yes.
16    Q.  So that building had extensive
17  damage from rain coming down; correct?
18    A.  And the bottom from the water, from
19  the flood water.
20    Q.  So you had both, you had the
21  flooding --
22    A.  Yes.
23    Q.  -- and then you had the water coming
24  down from the sky?
25    A.  Yes.

Johns Pendleton Court Reporters                    800 562-1285
BARGE000981

MUMFORD, ETHEL

8/5/2008

Page 50

1    Q.  Did that collapse the ceilings
2  upstairs?
3    A.  Not the whole ceilings, but it was
4  enough to damage the whole place.
5    Q.  So the rain came down, damaged the
6  ceiling, and all of that rain kept flowing all
7  the way to the ground floor?
8    A.  Yes.
9    Q.  Correct?
10   A.  Yes.
11   Q.  Did you make an insurance claim for
12  that property?
13   A.  Yes.
14   Q.  Homeowners claim?  Wind claim?
15   A.  Wind.  Wind and flood.
16   Q.  Wind and flood?
17   A.  Yes.
18   Q.  Do you remember how much you got on
19  the wind?
20   A.  On the wind, I got 29,000 on the
21  apartment and 32 on the other house.  That was
22  the wind.
23   Q.  Let me stop you there.  You said
24  32,000 on the other house.
25   A.  That's the one in the front.

Page 51

1    Q.  All right.
2    A.  I think 32,000 for the wind on that
3  one.
4    Q.  What was the damage to the one in
5  the front that cost so much?
6    A.  That's the one I'm talking about.
7  That's the one in the front.
8    Q.  That's the one that lost the roof?
9    A.  No.  That's the one that had the
10  water from the storm.
11   Q.  All right.  Let's go back over this,
12  ma'am.  The one in the back had the roof blown
13  off.
14   A.  Yes.
15   Q.  All right.  Now, I know it had
16  flooding as well.
17   A.  Yes.
18   Q.  So you made a flood insurance claim
19  and you made a wind insurance claim?
20   A.  Yes.
21   Q.  And you got about 29,000 on the
22  wind?
23   A.  Yes.
24   Q.  Right?  The building in front of
25  that, you had flood.

Page 52

1    A.  Yes.
2    Q.  All right.  Did you also have wind
3  damage to that building?
4    A.  Yes.
5    Q.  What kind of wind damage did you
6  have to the building in front?
7    A.  That was some roof damage also.
8  They paid me for the wind and for the water.
9    Q.  And for the building in front you
10  got, you think, 32,000 for wind damage on that
11  one?
12   A.  Yes.
13   Q.  All right.  So on the back one you
14  got 29,000 in wind damage; in the front one
15  you got 32,000?
16   A.  Yes.
17   Q.  And since February of 2006 you have
18  been living at that Feliciana Street address?
19   A.  Yes.
20   Q.  You told me earlier you lived at
21  4829 Burgundy Street for 35 years.
22   A.  That was -- I was living there when
23  the storm occurred.  I moved over on Burgundy
24  Street in 1971, up until the storm, that was
25  2005.

Page 53

1    Q.  Correct.  Where did you live before
2  4829 Burgundy?
3    A.  6107 North Robertson Street.
4    Q.  That's also in the Lower Ninth Ward?
5    A.  Yes.
6    Q.  And how long had you lived there?
7    A.  From 1951 to 1971.
8    Q.  So you lived there for Betsy?
9    A.  Yes.
10   Q.  You lived there for Camille?
11   A.  Yes.
12   Q.  Where did you live before the 6107
13  North Robertson address?
14   A.  Melpomene Street uptown.
15   Q.  Have you had any other addresses in
16  the New Orleans area other than the ones you
17  have just mentioned to me?
18   A.  I lived with relatives, but when I
19  moved on Melpomene, that's when I moved alone,
20  my husband and I.
21   Q.  So you lived on Melpomene up until
22  about 1951 and then you moved to Robertson
23  Street?
24   A.  Yes.
25   Q.  And then in approximately '71 you

14  (Pages 50 to 53)

Johns Pendleton Court Reporters                    800 562-1285

BARGE000982

MUMFORD, ETHEL

8/5/2008

Page 54

1  moved to Burgundy Street?
2      A.  Yes.
3      Q.  And you lived there for 35 years
4  until the storm?
5      A.  Yes.  About from '5 -- '71 to 2005.
6      Q.  And then we talked about the
7  apartment in Lafayette.
8      A.  Yes.
9      Q.  Correct?  And then you moved into
10  the Feliciana Street address?
11      A.  Yes.
12      Q.  Do you plan to move back into the
13  Burgundy Street address?
14      A.  Yes.
15      Q.  Are those renovations complete?
16      A.  No.
17      Q.  I would like to go over your
18  experiences during Hurricane Betsy.
19      A.  Uh-huh (affirmatively).
20      Q.  You said you lived on 6107 North
21  Robertson Street at the time; correct?
22      A.  Yes.
23      Q.  Did you evacuate for Betsy?
24      A.  We -- We left the night of the storm
25  when the water start coming in and we went to

Page 55

1  a school on St. Claude Street.  McDonogh 19.
2  We stayed there all night.  And the next day
3  the house was flooded, so we walked through
4  the water up to the Industrial Canal to the
5  bridge and we got a ride and went back by my
6  sister-in-law in St. Bernard Project.  It was
7  dry over on this side.
8      Q.  So during the night of Betsy water
9  started coming into your home?
10      A.  Yes.
11      Q.  And then you evacuated to the
12  school?
13      A.  Yes.
14      Q.  And then the next day you managed to
15  get across on the other side of the Industrial
16  Canal?
17      A.  Yes.
18      Q.  How deep was the water in your house
19  at 6107 North Robertson for Betsy?
20      A.  It was higher than the bed.  I don't
21  know how many feet that was.
22      Q.  And at the time of Betsy you had
23  your two children with you?
24      A.  Yes.
25      Q.  So you had to evacuate them to the

Page 56

1  school?
2      A.  Yes.
3      Q.  And then across the Industrial
4  Canal; correct?
5      A.  Yes.  Uh-huh (affirmatively).
6      Q.  Did you have flood insurance on that
7  property at the time?
8      A.  No.
9      Q.  Is it fair to say that Hurricane
10  Betsy was a traumatic experience for you and
11  your family?
12      A.  It really was.  It was really bad.
13      Q.  That property at 6107 North
14  Robertson, did it have wind damage during
15  Betsy as well as flooding?
16      A.  Yes.
17      Q.  What kind of wind damage did it
18  have?
19      A.  It was roof damage.
20      Q.  Did you have that roof repaired?
21      A.  Yes.
22      Q.  Was that covered by insurance at the
23  time?
24      A.  I had some insurance.  I can't
25  remember what they paid me.  I had fire and

Page 57

1  wind storm.  I didn't have flood.  But I can't
2  remember whether I got any money or not.  If I
3  did, it probably wasn't very much.
4      Q.  How long were you out of your home
5  at 6107 North Robertson after Betsy?
6      A.  Not very long.  About a month.
7      Q.  Did you personally or did your
8  husband do the repairs on Robertson?
9      A.  Yes.
10      Q.  And where did you live during that
11  one month period that you were out of your
12  home?
13      A.  In the St. Bernard Project with my
14  sister-in-law.
15      Q.  Let's move forward to Camille.
16  Where were you living at that time?
17      A.  6107 North Robertson Street.
18      Q.  Did you evacuate for that storm?
19      A.  No.  We didn't have any damage.
20      Q.  No flooding at that time?
21      A.  No.
22      Q.  No wind damage?
23      A.  No.
24      Q.  Did you consider evacuating at that
25  time?

15 (Pages 54 to 57)

MUMFORD, ETHEL

8/5/2008

Page 58

1      A.  No.
2      Q.  And is that because the storm was
3  predicted to go more toward Mississippi?  Is
4  that right?
5      A.  Yes.  Yes.
6      Q.  Let's move forward to some other
7  hurricanes.  Do you remember Georges in 1998?
8      A.  I remember that.
9      Q.  And --
10      A.  '98.
11      Q.  You were living in Burgundy Street
12  at that time; right?
13      A.  Yes.
14      Q.  Did you evacuate for that storm?
15      A.  We left for a night or so and went
16  up to a building on St. Charles Street and
17  stayed there where I was working then in that
18  time.
19      Q.  And did you evacuate because you
20  were concerned about flooding?
21      A.  Yes.  I have been concerned about
22  flooding ever since Betsy.  Since Betsy I
23  always leave from the Lower Ninth.
24      Q.  When there's a storm that's
25  predicted to come our way?

Page 59

1      A.  Yes.
2      Q.  And so you evacuated for Georges.
3      A.  Yes.
4      Q.  And that turns out to be not such a
5  big deal.
6      A.  Right.
7      Q.  But you still evacuate.
8      A.  Yes.
9      Q.  All right.  What about Ivan in 2004;
10  do you remember that?
11      A.  Yes.
12      Q.  Did you evacuate for that storm?
13      A.  Yes.  We went in a hotel right on
14  Canal Street.
15      Q.  And the reason you evacuated again
16  was because you were concerned about flooding
17  in the Ninth Ward?
18      A.  Yes.
19      Q.  And you were concerned about
20  flooding based on your experience, your
21  horrible experience during Betsy?
22      A.  Yes.
23      Q.  When you evacuated for Georges in
24  1998, did your children evacuate?
25      A.  Yes.

Page 60

1      Q.  What about for Ivan in 2004; did
2  your children evacuate for that as well?
3      A.  Yes.
4      Q.  Before Katrina, did you have other
5  family members living in the Ninth Ward other
6  than your children?
7      A.  Yes.
8      Q.  Who would those be?
9      A.  My brother, my son, my
10  grandchildren.
11      Q.  Your brother did evacuate for
12  Katrina?
13      A.  Yes.
14      Q.  Did he evacuate for Ivan?
15      A.  I am not sure.
16      Q.  Did he evacuate for Georges?
17      A.  Yes.
18      Q.  And was he living in the Ninth Ward
19  at the time of Betsy?
20      A.  No.
21      Q.  Did any of your family members stay
22  in the Ninth Ward during Katrina?
23      A.  No.
24      Q.  Did any of your friends stay in the
25  Ninth Ward during Katrina?

Page 61

1      A.  No.  Everybody left.
2      Q.  I want to switch gears a little bit
3  and go over the properties that have been
4  identified in this lawsuit for you.  And one
5  of those would be 4829 Burgundy.
6      A.  Yes.
7      Q.  We talked with that one; right?
8      A.  Yes.
9      Q.  The other properties would be 6101
10  North Robertson.  Do you own that property?
11      A.  Yes.  It's a vacant lot there.
12      Q.  The other property is 6105-07 North
13  Robertson.  Do you own that property?
14      A.  Yes.
15      Q.  In fact, that's right next door to
16  the vacant lot, isn't it?
17      A.  Yes, it is.
18      Q.  And the fourth property is 6113-15
19  North Robertson.  You own that?
20      A.  Yes.
21      Q.  And that is also on the same block
22  as the other two properties; right?
23      A.  Yes.
24      Q.  In fact, the empty lot and the
25  6105-07 and then another home and then the

Johns Pendleton Court Reporters                    800 562-1285

BARGE000984

MUMFORD, ETHEL

8/5/2008

Page 62

1    6113-15?
2        A.  Yes.
3        Q.  So all of those properties are
4    clumped close together on Robertson Street?
5        A.  Yes.
6        Q.  We also talked about your property
7    on Feliciana Street.  Do you recall that?
8        A.  Yes.
9        Q.  Do you own any other property in New
10   Orleans other than those five properties?
11       A.  No.
12       Q.  Let's move to the 4829 Burgundy
13   property.  You said you believe you bought
14   that in 1971?  Is that correct?
15       A.  Yes.  Yes.
16       Q.  Do you remember how much you paid
17   for it?
18       A.  About 18,000.
19       Q.  I'm going to go ahead and try to
20   refresh your recollection.  I have some
21   acquisition documents I will show you here
22   which I will mark as Exhibit Number 1, the
23   sale of property concerning 4829 Burgundy
24   Street, and ask you if you can identify this
25   document and identify your signature on page

Page 63

1    4.
2        A.  Yes.  That's my signature.
3        Q.  All right.  So you purchased this
4    property with your husband on March 9th, 1971;
5    correct?
6        A.  Yes.  Yes, sir.
7        Q.  And go to page 2.  You paid $14,400
8    for it?
9        A.  It was 18,000.  I don't see that on
10   it.  Maybe that was the balance.  I thought it
11   was 18,000.
12       Q.  All right.  This document indicates
13   it was 14,400, though; correct?
14       A.  That's what that says.
15       Q.  When you bought the property, did
16   you borrow money to buy it?
17       A.  I had -- I had enough money to put
18   down on it.  I didn't pay cash for it.
19       Q.  Did you have a mortgage on that
20   property?
21       A.  I had a mortgage left after I put
22   the down payment.
23       Q.  Do you still have a mortgage on that
24   property?
25       A.  No.

Page 64

1        Q.  I want to go back to something
2    briefly, Miss Mumford.  Are you aware this
3    case is a class action?
4        A.  Yes.
5        Q.  Do you know the geographical area
6    that encompasses the class?
7        A.  Yes.  It's the Lower Ninth Ward
8    below the Industrial Canal, from Florida
9    Avenue to the river.
10       Q.  Do you know how far it goes from the
11   canal?
12       A.  It goes from the canal all the way
13   down to Delery Street.
14       Q.  And the properties that we have
15   mentioned earlier, specifically the Feliciana
16   property, that's not within the class area, is
17   it?
18       A.  No.
19       Q.  That is actually on the other side
20   of the Industrial Canal.
21       A.  Yes.
22       Q.  So your damages to that property
23   you're not claiming those in this lawsuit, are
24   you?
25       A.  No.

Page 65

1        Q.  The property at 4829 Burgundy,
2    that's a one-story residence; correct?
3        A.  Yes.
4        Q.  And it's on a slab?
5        A.  Yes.
6        Q.  I'm trying to recall.  Is it brick?
7        A.  Brick, yes.
8        Q.  Do you have any pre-storm,
9    pre-Katrina photos of that property?
10       A.  No.
11       Q.  Do you have any pre-Katrina videos
12   of the property?
13       A.  No.
14       Q.  Do you have any pre-Katrina videos
15   of the contents of that property at 4829
16   Burgundy?
17       A.  No.
18       Q.  Do you have any pre-Katrina photos
19   of the contents of 4829 Burgundy?
20       A.  No.
21       Q.  How many square feet is that house?
22       A.  I don't know.  Something I really
23   don't know.
24       Q.  Do you how big the lot is?
25       A.  The lot is 100 -- is -- it's 110 I

17 (Pages 62 to 65)

MUMFORD, ETHEL

8/5/2008

Page 66

1 think by 115.
2     Q. Do you know the elevation of that
3 property?
4     A. No.
5     Q. Did that property experience
6 flooding during Betsy?
7     A. I wasn't living there then, but I
8 don't think it did.
9     Q. Do you know when that house was
10 built?
11     A. Not exactly. I just estimate a
12 time.
13     Q. What is your estimated time as to
14 when that was built?
15     A. I would say 1940.
16     Q. While you were living there and
17 before Katrina, did that property ever
18 experience any flooding?
19     A. No. It had a little flood one time,
20 they had a storm, but I can't remember which
21 storm it was. They had a little water in it.
22     Q. Was it during a hurricane?
23     A. Yes.
24     Q. Do you remember the hurricane?
25     A. I don't remember.

Page 67

1     Q. Do you remember the approximate
2 year?
3     A. No.
4     Q. How much flooding did you get during
5 that event?
6     A. It wasn't much water.
7     Q. Well, was it inches or feet?
8     A. Inches, I'd say.
9     Q. How many inches?
10     A. Maybe about five. Five inches.
11     Q. Did you have flood insurance at the
12 time?
13     A. I think so. I think I had flood
14 insurance.
15     Q. Do you remember getting money on
16 your flood insurance at the time?
17     A. I think they paid me some money, but
18 I don't remember how much it was.
19     Q. When you bought that house at
20 Burgundy, did you buy flood insurance at the
21 time that you purchased the property?
22     A. Yes.
23     Q. And was that because of your prior
24 experience with Betsy?
25     A. Yes.

Page 68

1     Q. So you understood that that area
2 could flood?
3     A. Yes.
4     Q. And that's why you bought the flood
5 insurance; correct?
6     A. Yes.
7     Q. And after the house at 6105-07 North
8 Robertson flooded during Betsy, did you
9 thereafter obtain flood insurance on that
10 property?
11     A. Yes. As far as I could remember, I
12 did.
13     Q. And that was because of the flooding
14 that you experienced during Betsy; correct?
15     A. Yes.
16     Q. Before Katrina had you ever done any
17 renovations to the property at 4829 Burgundy?
18     A. Yes.
19     Q. What kind of renovations?
20     A. It's been some years back I did an
21 addition to the house.
22     Q. What sort of addition did you do to
23 the house?
24     A. I added a den, bathroom, fireplace,
25 and a carport.

Page 69

1     Q. And when did you do that addition?
2     A. I would say the late '80s.
3     Q. Did you do any additions or
4 renovations to your property other than that
5 renovation you talked about in the 1980s?
6     A. I did a little ren-- Well, I did
7 some cabinet work. I redid the cabinets and
8 the floors just before Katrina. And the
9 countertops.
10     Q. How long before Katrina did you do
11 that?
12     A. Just before Katrina. The Friday
13 before Katrina I paid the guys for working and
14 I asked them to come back the next week. That
15 was that Friday before the storm.
16     Q. Who did you pay?
17     A. Mr. Lee and his nephew.
18     Q. Is that the name of a company that
19 --
20     A. No, that's his name. His last name
21 is Lee.
22     Q. Where did you buy the cabinets from?
23     A. They were cabinets I already had. I
24 just did them over, stained them over and I
25 got new countertops.

18 (Pages 66 to 69)

MUMFORD, ETHEL

8/5/2008

Page 70

1    Q.  What kind of countertops did you
2  get?
3    A.  I wasn't a granite, but it's
4  something that looked like granite.
5    Q.  And you did this, you paid these
6  guys the Friday before the storm?
7    A.  Yes.
8    Q.  And how long before that had the
9  work been done?
10    A.  They had been working in there for a
11  couple of months or so.
12    Q.  Do you have any of the receipts, the
13  bills, for Mr. Lee?
14    A.  No.
15    Q.  What about the checks?  Did you pay
16  them with a check?
17    A.  I paid with a check.  I don't -- I
18  don't have any of that.
19    Q.  Any other renovations or -- Well,
20  let me go back.  You said you redid the floor
21  as well?
22    A.  Yes.
23    Q.  What did you do to the floors?
24    A.  Just put new flooring.  Well,
25  covered the floors with a tile, the hall and

Page 71

1  the kitchen and the den.
2    Q.  And again, Mr. Lee did this work?
3    A.  Sears I think it was.
4    Q.  So you bought the tiles from Sears?
5    A.  Yes.
6    Q.  And they did the installation work?
7    A.  They did the installation.  Hardwood
8  floors also.
9    Q.  How old was the roof on 4829
10  Burgundy before Katrina?
11    A.  It could have been about seven years
12  old.
13    Q.  And who did you have repair or --
14  Was it a repair to that roof or a replacement
15  to the roof seven years before the storm?
16    A.  It was a new roof.
17    Q.  A new roof?
18    A.  Uh-huh (affirmatively).
19    Q.  Who did that work?
20    A.  My brother-in-law.  His name is
21  Charles Brumfield.
22    Q.  Is he in the roofing business?
23    A.  Yes, he was in the roofing business.
24    Q.  What's the name of his company?
25    A.  I don't know.  He's expired now.

Page 72

1    Q.  Let's go back to any renovations to
2  that Burgundy Street property.  We talked
3  about the additions in the 1980s, the cabinet
4  and flooring work you did just before the
5  storm, and the roof about seven years
6  earlier.
7    A.  Yes.
8    Q.  Any other renovations or additions
9  to that property pre-Katrina?
10    A.  No, that's all I did.
11    Q.  Had you had any appraisals done of
12  that Burgundy Street property before the
13  storm?
14    A.  No.
15    Q.  Do you know what the tax assessed
16  value of the property was at Burgundy Street
17  before the storm?
18    A.  I was exempt from taxes.  I paid
19  like maybe $50 or $60 a year.
20    Q.  After Katrina, did you take any
21  photographs of the property at 4829 Burgundy
22  Street?
23    A.  No.
24    Q.  Do you have any photographs of the
25  contents of 4829 Burgundy Street?

Page 73

1    A.  No.
2    Q.  Do you have any videos of the 4829
3  Burgundy Street property?
4    A.  No.
5    Q.  Do you have any videos of the
6  contents of the 4829 Burgundy property?
7    A.  No.  I didn't take any pictures or
8  videos.
9    Q.  Now, when your husband died, did you
10  open up a succession?
11    A.  Yes.
12    Q.  And did your husband have a will?
13    A.  No.
14    Q.  And do you remember the lawyer that
15  you hired for the succession proceeding?
16    A.  The last name Russell.  That's not
17  the last.  The first name is Russell.  I can't
18  think of his last name.
19    Q.  And do you remember that in the
20  succession proceeding that you obtained an
21  interest in the property and your children did
22  as well?  Correct?
23    A.  Yes.  Yes.
24    Q.  Do you know what a usufruct is?
25    A.  Yes.

19 (Pages 70 to 73)

BARGE000987

MUMFORD, ETHEL

8/5/2008

Page 74

1    Q.  And do you remember that you
2  obtained ownership interest, one-half of the
3  property?
4    A.  Yes.
5    Q.  And your kids, your two children had
6  the ownership of the other half?
7    A.  Yes.
8    Q.  All right.  You had a usufruct over
9  that; is that right?
10   A.  Yes.  I remember the name.  It was
11 Mr. Ballina.  When you said usufruct.  He's
12 passed away now.  He did the succession for
13 me, instead of Russell.  It wasn't Russell.
14   Q.  I want to go ahead and mark as
15 Exhibit 2 a Google map of the property at 4829
16 Burgundy Street and ask you to take a look at
17 that, ma'am.  Now, do you see that red mark
18 with the "A" in it?
19   A.  Yes.
20   Q.  Does that accurately reflect the
21 location of your property at 4829 Burgundy?
22   A.  Yes.
23   Q.  So it's actually on the river side
24 of St. Claude Avenue; correct?
25   A.  Yes.  Yes.

Page 75

1    Q.  Thank you.  Prior to Hurricane
2  Katrina, immediately prior to that, had you
3  planned any other repairs or renovations to
4  your property at 4829 Burgundy?
5    A.  No.
6    Q.  Had you ever had the property at
7  4829 Burgundy inspected for termites?
8    A.  Yes.
9    Q.  Did you ever have a problem with
10 termite infestation in that home?
11   A.  Yes.
12   Q.  When did you discover that?
13   A.  Years ago.  Maybe about ten years
14 ago.
15   Q.  What did you do after you found out
16 you had termites in your house?
17   A.  We repaired the place.  We called
18 this company and they came every year and
19 inspect.
20   Q.  What was the name of that company?
21   A.  I can't remember.  I had Terminix,
22 Terminix, but they didn't do that.  They did
23 Robertson Street.
24   Q.  How did you discover that you had
25 termite damage at Burgundy?

Page 76

1    A.  They had a little hole in the wall.
2  That's how we found them.
3    Q.  What did you have to do to repair
4  the home?
5    A.  We had to tear out sheetrock and
6  redo the sheetrock and maybe one or two
7  two-by-fours.
8    Q.  We'll move forward, Miss Mumford, to
9  the property at 6105-07 North Robertson.  I'm
10 going to show you a sale of property by Dixie
11 Homestead to Mr. and Mrs. Henderson Mumford.
12 I'll go ahead and mark that as Exhibit 3.  Do
13 you recognize this document, Miss Mumford?
14   A.  Yes.
15   Q.  Is that your signature on the last
16 page of that document?
17   A.  Yes, it is.
18   Q.  And this document reflects that you
19 purchased this property on June 26, 1962;
20 correct?
21   A.  That's -- We made a mortgage on it
22 during that time.  We purchased this property
23 -- Oh, this is 6105-07 North Robertson
24 Street?  Which address is it?
25   Q.  6105-07.  I thought you told me

Page 77

1  earlier you bought it in the '50s.
2    A.  We did, but we made a mortgage on it
3  in '62 from the Dixie Homestead.
4    Q.  Do you know how much you paid for
5  the property in the '50s?
6    A.  Yes.  About $3,500.
7    Q.  Now, this property at 6105-07, what
8  kind of construction is that?  That's a wood
9  frame house?
10   A.  Yes.
11   Q.  And it's raised, isn't it?
12   A.  It's on -- yes, on pillars.  It's a
13 two family story -- one-story, two family.
14   Q.  Do you remember who you bought it
15 from in the '50s?
16   A.  Mr. Rumfola (phonetics).  He was on
17 Esplanade Avenue.
18   Q.  Now, what did you do with that
19 property before the storm?  How did you use
20 it?
21   A.  It was rental property.  Had tenants
22 on both sides.
23   Q.  So before the storm it was rented?
24   A.  Yes.
25   Q.  Who had you rented the property at

20  (Pages 74 to 77)

MUMFORD, ETHEL

8/5/2008

Page 78

1    6105 to?
2        A.  I can't think of her name.  The girl
3    at 6107, I remember their name was Howard.
4    The other girl, I can't remember her name.
5    But the real estate has that information.
6        Q.  Let's follow up on that.  What do
7    you mean, the real estate has that?
8        A.  They collect the rent for me.
9    Carson on Orleans Avenue.
10       Q.  So you have someone manage these
11   properties for you?
12       A.  Collect rent.
13       Q.  And did Carson handle that service
14   for you before the storm?
15       A.  Yes.
16       Q.  How long had Carson been handling
17   that for you?
18       A.  Maybe seven or eight years or
19   longer.
20       Q.  Did you use Carson for your other
21   property as well, the 6113-15?
22       A.  Yes.
23       Q.  The 6105 property, do you remember
24   how much you rented it for before the storm?
25       A.  $350 a month.

Page 79

1        Q.  Did you have a written lease with
2    the person that resided there?
3        A.  It wasn't a lease.  It was not a
4    lease.  I just rented it by the month.
5        Q.  So you went month-to-month with her?
6        A.  Yes.
7        Q.  Did you ever have a written lease at
8    any time on the property at 6105-07?
9        A.  No.
10       Q.  And the 6107 property, did you rent
11   that before the storm?
12       A.  Yes.
13       Q.  Who did you rent that to?
14       A.  My granddaughter was on one side.
15   When the storm occurred, the other side was
16   vacant.  The 6113 side was vacant when the
17   storm occurred.  And my granddaughter was
18   living at 6115.
19       Q.  All right.  Let's go back.  I think
20   you misunderstood me.  We talked about the
21   6105-07 property.
22       A.  Uh-huh (affirmatively).
23       Q.  That's a double, isn't it?
24       A.  Yes.
25       Q.  All right.  And it's one structure

Page 80

1    and there's two front doors with two --
2        A.  Yes.
3        Q.  And the 6105 you told me you rented
4    for $350 a month?
5        A.  On one side, yes.
6        Q.  On one side?
7        A.  That's correct.
8        Q.  All right.  And now I want to go to
9    the 6107 property, which is that same
10   structure.
11       A.  Yes.
12       Q.  Just wait a minute.  Was that
13   property rented before the storm?
14       A.  Yes.
15       Q.  Who had you rented that to?
16       A.  The last name was Howard.  I can't
17   remember her first name.
18       Q.  And what did you rent that property
19   to her for?
20       A.  475 a month.
21       Q.  Were these properties, 6105 and 07,
22   the same size?
23       A.  No.  The 6107 is larger than the
24   6105.
25       Q.  Do you know the square footage of

Page 81

1    6105?
2        A.  I don't know the square footage.
3        Q.  Do you know the square footage of
4    6107?
5        A.  No.  I know the rooms, the amount of
6    rooms they had.
7        Q.  How many rooms, bedrooms were in
8    6105?
9        A.  One bedroom, living room, kitchen
10   and bath.
11       Q.  What about 6107?
12       A.  Three bedrooms, living room,
13   kitchen, a small den.
14       Q.  Your tenants for those properties at
15   6105 and 6107, did they stay for the storm,
16   Katrina?
17       A.  They evacuated.
18       Q.  Did you do anything to protect that
19   property before Katrina such as boarding up
20   windows?
21       A.  Yes.  My son boarded up windows.
22       Q.  On both sides?
23       A.  Yes.
24       Q.  What about on the 4829 Burgundy
25   property?

21 (Pages 78 to 81)

MUMFORD, ETHEL

8/5/2008

Page 82

1     A.  Boarded up windows there also.
2     Q.  I noticed that 4829 Burgundy the
3  front window was gone.
4     A.  I don't know what happened there,
5  whether those people came around checking the
6  houses, whether they broke the window there or
7  not.  But it was wide open.  We boarded it
8  up.  Well, it was boarded up.  They had
9  boarded up.  We boarded up that front window.
10  Let's see, after the storm maybe.
11    Q.  So it wasn't boarded up at the time
12  of the storm, was it?
13    A.  I don't think so.
14    Q.  And do you know how that front
15  window got broken?
16    A.  No.
17    Q.  I want to go over some of those same
18  questions for the 6105-07 property.
19    A.  Uh-huh (affirmatively).
20    Q.  Do you have any photos of that
21  property before Katrina?
22    A.  No.
23    Q.  Do you have any photos of that
24  property after Katrina?
25    A.  No.

Page 83

1     Q.  Do you have any videos of that
2  property before Katrina?
3     A.  No.
4     Q.  Do you have any videos of that
5  property after Katrina?
6     A.  No.
7     Q.  Do you know the elevation of that
8  property at 6105-07 North Robertson?
9     A.  No.
10    Q.  Now, I know that property flooded
11  during Betsy.
12    A.  Yes.
13    Q.  Right?  Did it flood at any other
14  time --
15    A.  No.
16    Q.  -- before Katrina?
17    A.  No.
18    Q.  After you bought that property in
19  the 1950s, had you done any renovations or
20  additions to it up to the time of Katrina?
21    A.  Yes.
22    Q.  What kind?
23    A.  I added two bedrooms, a small den.
24  I closed in the front porch and made a room
25  there.  And then I had a smaller porch.

Page 84

1     Q.  When did you do these renovations?
2     A.  It was in the '50s.  I don't know
3  what year.
4     Q.  Did you make any renovations to that
5  property after the '50s up to the time of
6  Katrina?
7     A.  No.
8     Q.  Had you done any renovations to that
9  property at 6105-07 after the '50s up to the
10  time of Katrina?
11    A.  No.
12    Q.  How old was the roof on that
13  property at 6105-07 at the time of Katrina?
14    A.  It probably was about 14 years.
15    Q.  Is there a mortgage on that
16  property?
17    A.  No.
18    Q.  Was there a mortgage on that
19  property at the time of Katrina?
20    A.  No.
21    Q.  You said earlier that Carson handles
22  the collections of the rent for you; correct?
23    A.  Yes.  Yes.
24    Q.  Do they take a portion of the rents?
25    A.  Yes.

Page 85

1     Q.  And then they turn over the rest to
2  you?
3     A.  Yes.
4     Q.  Do they keep records of the
5  collections of the rents?
6     A.  Yes.
7     Q.  Where is their office located?
8     A.  It's Orleans Street near Broad,
9  North Broad.  I don't know whether they have
10  all of that now, because they had a lot of
11  water there also.
12    Q.  You anticipated my next question.
13  That was whether they had the records.  The
14  answer is you don't know?
15    A.  I don't.
16    Q.  The property at 6105 North Robertson
17  that you had rented for $350 a month before
18  the storm, how long had that been rented to
19  the person that lived there at the time of the
20  storm?
21    A.  She had been living there a couple
22  of years.
23    Q.  At one point you lived in 6107 North
24  Robertson; right?
25    A.  Yes.

Johns Pendleton Court Reporters                    800 562-1285

BARGE000990

MUMFORD, ETHEL

8/5/2008

Page 86

1      Q.   And then you moved out to Burgundy
2  Street.
3      A.   Yes.
4      Q.   Did you start renting the property
5  at 6105-07 after you moved to Burgundy?
6      A.   Yes.
7      Q.   Were there time periods when the
8  property at either 6105 or 07 was not rented?
9      A.   Not a long period of time.
10     Q.   What was the longest that either one
11 of those properties had not been rented?
12     A.   Two months.
13     Q.   Do you have any appraisals of the
14 property at 6105-07 --
15     A.   No.
16     Q.   -- North Robertson Street?
17     A.   No.
18     Q.   Do you know what the tax assessed
19 value of that is?
20     A.   The amount of tax I pay?
21     Q.   Well, the first question would be do
22 you know what it's assessed for?
23     A.   No.
24     Q.   How much tax do you pay on it?
25     A.   I pay 400 and something a year.

Page 87

1      Q.   How much did you pay immediately
2  before Katrina?
3      A.   The same amount.
4      Q.   And that's on both properties
5  together; right?
6      A.   Just for the 6105-07.
7      Q.   How much water did that property get
8  during Katrina?
9      A.   It was -- I don't know how many feet
10 it was, but it was high.  To damage everything
11 in the home.
12     Q.   You gutted that property after the
13 storm; right?
14     A.   Yes.
15     Q.   And I remember going over there and
16 seeing all the walls were down.
17     A.   Yes.
18     Q.   Right?  And the ceilings, the
19 sheetrock, the plaster was gone as well.
20 Right?
21     A.   Yes.
22     Q.   You haven't started any repairs to
23 that property, have you?
24     A.   The only thing I did, I put a roof
25 on there.  It was done when you were down

Page 88

1  there.  I had the roof done.
2      Q.   At 6105-07?
3      A.   Yes.
4      Q.   All right.  So you replaced the roof
5  at 6105-07?
6      A.   Yes.
7      Q.   But you haven't done any repairs
8  inside?
9      A.   Nothing else, no.
10     Q.   Why not?
11     A.   Well, I didn't have the money, but I
12 plan to repair the property there.
13        MR. WIEDEMANN:
14           At any time you need a break,
15        just let us know
16 EXAMINATION BY MR. BLANCHARD:
17     Q.   Do you need a break now?
18     A.   Not now.  Thank you.
19     Q.   Now, when I was over there, I looked
20 at some of the studs in the house.
21     A.   Uh-huh (affirmatively).
22     Q.   Do you know what termite damage
23 looks like?
24     A.   Yes.
25     Q.   Do you remember seeing some of the

Page 89

1  studs in that house at 6105-07 having termite
2  damage?
3      A.   Yes.
4      Q.   In fact, there's termite damage in
5  numerous places in those properties, isn't
6  there?
7      A.   Yeah.
8      Q.   And I didn't see any active termites
9  when I was there.  Is there any active
10 termites in that house now?
11     A.   I don't think so.
12     Q.   So that termite damage that we saw
13 in the walls, that pre-dated the storm;
14 correct?
15     A.   Yes.
16     Q.   And you mentioned that you put a new
17 roof on the property at 6105-07.
18     A.   Yes.
19     Q.   Correct?
20     A.   Yes.
21     Q.   Did you put a new roof on because it
22 had been damaged during Katrina?
23     A.   Yes.
24     Q.   And how was it damaged during
25 Katrina?

23 (Pages 86 to 89)

BARGE000991

MUMFORD, ETHEL

8/5/2008

Page 90

1    A.  It had wind damage.  It damaged the
2  roof.  It was pretty bad.
3    Q.  Really?  Can you explain to me what
4  you remember seeing on the roof, the type of
5  damage that you saw?
6    A.  Well, it just was tore loose and had
7  holes in it.
8    Q.  The roof had holes in it?
9    A.  Yes.  Spots where the wind blew the
10  roofing off the roof.  And we had to replace
11  it.
12    Q.  If you were looking from above the
13  house, could you actually see holes in the
14  roof into the attic?
15    A.  Yes.
16    Q.  And there were more than one of
17  those, weren't there?
18    A.  Yes.
19    Q.  So during Katrina you had rainwater
20  coming down from the sky into that house?
21  Correct?
22    A.  Yes.
23    Q.  Do you remember ceilings being down
24  in 6107 when you first came back after the
25  storm?

Page 91

1    A.  Yes.  Some of the ceiling was out.
2    Q.  And the flood waters didn't reach
3  the ceiling?
4    A.  No.
5    Q.  So that the damage to the ceiling,
6  the ceilings coming down, that was from the
7  rainwater coming through the holes in the
8  roof?
9    A.  Yes.
10    Q.  All right.  Thank you.  How much did
11  it cost to put a new roof on that house?
12    A.  About 7,000 I think it was.
13    Q.  Have you gotten any estimates on
14  repairs to that property?
15    A.  I got one estimate.
16    Q.  From who?
17    A.  I can't remember the name.  But I
18  think I have it at home.
19    Q.  What was that estimate for?
20    A.  It was to redo the whole -- rebuild
21  the whole house.
22    Q.  And did that include replacing those
23  boards that had the termite damage?
24    A.  Yes, uh-huh.
25    Q.  How much was that estimate for?

Page 92

1    A.  It was about $150,000.  I wasn't
2  going to use him.  I was trying to get
3  something cheaper.
4    Q.  So you are still looking for
5  someone?
6    A.  Yes.
7    Q.  And this was to completely redo both
8  sides?
9    A.  Yes.
10    Q.  Did that involve any changes to the
11  floor plans in either?
12    A.  I don't know.  If I would have asked
13  him to change some of it, he probably would
14  have.
15    Q.  But the quote itself, did that
16  include changing the floor plans?
17    A.  No.
18    Q.  Now, you mentioned the roof damage
19  from the wind at 6105-07 North Robertson.  Did
20  you notice any other wind damage to that home
21  when you first came back after Katrina, such
22  as windows blown out?
23    A.  No.
24    Q.  Did you have an awning at the front
25  of that house?

Page 93

1    A.  Yes.
2    Q.  Was that blown off?
3    A.  Yes.
4    Q.  So that was from the wind?
5    A.  Yes.
6    Q.  Have you gotten an estimate on how
7  much it's going to cost to fix that awning?
8    A.  No.
9    Q.  I'm going to move forward to the
10  property at 6113-15 North Robertson.  Do you
11  remember when you bought that property?
12    A.  1968.
13    Q.  Do you remember how much you paid
14  for it?
15    A.  I'm trying to think.  It was maybe
16  15,000.  I can't remember exactly.
17    Q.  All right.  Well, let me refresh
18  your recollection.
19    A.  Or 11,000.
20    Q.  Let me refresh your recollection.
21  I'll show you a document which I have marked
22  as Exhibit Number 4, which is a sale of
23  property to Mr. and Mrs. Henderson Mumford.
24  There's a date at the top, date stamp of
25  February 7, 1968.  And do you recognize this

24 (Pages 90 to 93)

MUMFORD, ETHEL

8/5/2008

Page 94

1   document?
2       A.  Yes.
3       Q.  Look at the last page of that
4   document.  Is that your signature, Mrs.
5   Henderson Mumford?
6       A.  Yes.
7       Q.  So this property, again, this is a
8   double?
9       A.  Yes.
10      Q.  Correct?
11      A.  Yes.
12      Q.  And according to this document, you
13  paid $8,250.
14      A.  Yes.
15      Q.  $8,250 for it; right?
16      A.  Uh-huh (affirmatively), yes.
17      Q.  Was that a rental property as well?
18      A.  Yes.
19      Q.  How long had you been renting that
20  property?
21      A.  Ever since I bought it.
22      Q.  So it's been rental property ever
23  since 1968?
24      A.  Yes.
25      Q.  And that Carson service that you

Page 95

1   talked about earlier, they handled collection
2   of the rents on that one?
3       A.  At the time of the storm they were
4   collecting the rent.
5       Q.  That's also a wood framed structure?
6       A.  Yes.
7       Q.  And it's also raised, isn't it?
8       A.  It is just on pillars.
9       Q.  And again the property is basically
10  two houses down from the last one we talked
11  about; right?
12      A.  Yes.  Exactly.
13      Q.  Do you have any pre-Katrina photos
14  of that property?
15      A.  I took pictures of the front and the
16  back of the house for the insurance company.
17  I may have one at home, the front and the
18  back.
19      Q.  This would have been before the
20  storm?
21      A.  After the storm.
22      Q.  We'll get to that in a minute.
23      A.  Okay.
24      Q.  First I want to talk about photos
25  before the storm.  What it looked like before

Page 96

1   the storm.  Do you have any photos of that?
2       A.  No.
3       Q.  Do you have any photos of the
4   inside, what it looked like before the storm?
5       A.  No.
6       Q.  Do you have any videos of what that
7   house looked like from the outside or the
8   inside before Katrina?
9       A.  No.
10      Q.  You said you may have some photos of
11  that property after the storm.
12      A.  Yes.
13      Q.  When did you take those photos?
14      A.  About 2007.
15      Q.  And those photos, was that before or
16  after you had started repairs on that
17  property?
18      A.  Before.
19      Q.  So when did you start repairs on
20  that property?
21      A.  About two years now.  It's been that
22  long.
23      Q.  We're in 2008 now.  You said you
24  took the photos before you started the
25  renovations; right?

Page 97

1       A.  Yes.
2       Q.  All right.  And you have been
3   working or the renovations for almost two
4   years?
5       A.  Almost two.
6       Q.  So these photos would have been
7   2006?
8       A.  Yes.
9       Q.  How many photos did you take?
10      A.  I just took maybe about two, the
11  front and the back.  Sent it to the insurance
12  company.  But I may have one at my house or I
13  could get one from them.
14      Q.  Did you take any photos of the
15  inside of the house after the storm?
16      A.  No.
17      Q.  Either side?
18      A.  No.
19      Q.  Do you know how many square feet
20  total that property is?
21      A.  No, I don't know square feet.
22      Q.  That was a double; right?
23      A.  Yes.
24      Q.  Were the sides the same size before
25  the storm, 6113 and 15?

25  (Pages 94 to 97)

BARGE000993

MUMFORD, ETHEL

8/5/2008

Page 98

1    A.  We made an addition on it, put it on
2  it, made it larger.
3    Q.  Let's go over that then.  Since you
4  bought the property in February of 1968, have
5  you made any additions to that property at
6  6113-15?
7    A.  Yes.
8    Q.  And what did you do and when did you
9  do it?
10   A.  We did some flooring, redid the
11 floors in there.  That was -- That was in the
12 '70s.
13   Q.  Anything else?
14   A.  That's all before the storm that I
15 could -- We put a roof on.
16   Q.  When did you put the roof on it?
17   A.  About the '70s also.
18   Q.  I thought you mentioned a couple of
19 minutes ago an addition to that property.
20   A.  We -- Since the storm.  I'm
21 renovating now.
22   Q.  All right.  So after the storm you
23 actually, as part of your renovation, you have
24 increased the size of the structure; right?
25   A.  Yes.  Yes.

Page 99

1    Q.  And you have added on?
2    A.  Yes.
3    Q.  How much have you added on?
4    A.  I add on a bathroom, a bedroom, a
5  den, and a deck.
6    Q.  The renovations to both sides of
7  that property, 6113 and 15, are they almost
8  complete?
9    A.  Yes.
10   Q.  In fact, they looked almost complete
11 when I was there a couple of weeks ago.
12   A.  Yes.
13   Q.  What else is left to be done, if
14 anything?
15   A.  Well, we had a leak in there and we
16 had to tear the sheetrock out on one side and
17 redo that.  Then on the other side, we had a
18 leak in the cabinet.  We had to take that,
19 destroy it and buy -- replace it with a new
20 cabinet.
21   Q.  Do you know the elevation of that
22 structure before the storm?
23   A.  No.
24   Q.  Do you know how much water was in
25 that structure?

Page 100

1    A.  I don't know exactly, but it was
2  enough to destroy everything on both sides of
3  the house.
4    Q.  It didn't make it up to the
5  ceilings?
6    A.  No.
7    Q.  When was the first time that you saw
8  that property after the storm?
9    A.  As soon as they let us in that
10 area.  It probably was December, 2005.
11   Q.  And when you first got there to that
12 property, did you see damage to the roof?
13   A.  Yes.
14   Q.  What sort of damage did you see to
15 the roof at 6113-15?
16   A.  Saw some of the cover was blown off,
17 the top of the roof.  Some of the roofing was
18 blown off the top.
19   Q.  Some of the shingles?
20   A.  Yes.
21   Q.  Was it a shingle type roof or a tile
22 roof before the storm?
23   A.  It was a tile.
24   Q.  Like a terra-cotta tile?
25   A.  Yes.

Page 101

1    Q.  And when you first got back to the
2  property after the storm, you remember those
3  tiles, a lot of those tiles being blown --
4    A.  Some of it was blown off, yes.
5    Q.  Do you remember seeing holes in the
6  roof?
7    A.  No.
8    Q.  Do you remember seeing any other
9  damage to the roof other than the tiles being
10 off?
11   A.  No.
12   Q.  Do you understand that under the
13 tiles there's like black paper?
14   A.  Yes.
15   Q.  Tar paper?
16   A.  Yes.
17   Q.  Do you remember that being torn off
18 when you got --
19   A.  I don't remember seeing it torn
20 off.  I saw some of the shingles torn off.
21   Q.  And you have replaced that roof,
22 haven't you?
23   A.  Yes.
24   Q.  When you first entered that
25 structure, either 6113 or 15, after the storm,

26 (Pages 98 to 101)

BARGE000994

MUMFORD, ETHEL

8/5/2008

Page 102

1  do you remember seeing on the ceiling stains,
2  evidence of water coming through the roof?
3     A.  No.
4     Q.  Do you remember seeing other wind
5  damage to that property when you got back to
6  it in December of 2005?
7     A.  No.
8     Q.  Did that property have an awning as
9  well?
10     A.  No.
11     Q.  Had that property ever been
12  subjected to fire at some point?
13     A.  They had a fire in there before I
14  bought it.
15     Q.  Any fires after you bought it?
16     A.  No.
17     Q.  Did you have homeowner's insurance
18  on 6113-15 North Robertson?
19     A.  Fire and wind storm.
20     Q.  Did you make a claim on that?
21     A.  Yes.
22     Q.  And what sort of damages did you
23  seek from the insurance company on that
24  policy?
25     A.  They sent me -- They gave me

Page 103

1  $9,000.
2     Q.  What did they give you the money
3  for?
4     A.  What they said was for the roof.
5  No, I'm wrong.  That's the wrong house.  I'm
6  sorry.  They gave me $1,000 on that house.
7  And when they took the deductible, I had $500
8  left.
9     Q.  And that was on the 6113-15?
10     A.  Yes.
11     Q.  I didn't ask you about the other
12  house, the ones with the holes in the roof.
13  Did you have homeowner's insurance on that?
14     A.  Yes, that's the one they give me the
15  9,000.
16     Q.  And that was to repair the roof?
17     A.  Yes.
18     Q.  Have you sought to get more money
19  from your homeowner's insurance company on
20  that property, 6105-07?
21     A.  No.
22     Q.  What about 6113-15?
23     A.  No.
24     Q.  And just comparing -- Well, let's go
25  back to wind damage to 6113-15.  You told me

Page 104

1  about the tiles off the roof.
2     A.  Uh-huh (affirmatively).
3     Q.  Did you see any other evidence of
4  wind damage to that property when you first
5  came back in December of 2005?
6     A.  No.
7     Q.  All right.  But in comparing the
8  6105-07 to the 6113-15 property, all right,
9  the 6105-07 had holes in the roof?
10     A.  Yes.
11     Q.  Right?  And that had water damage
12  with ceilings down; correct?
13     A.  Yes.
14     Q.  And the 6113-15, it had wind damage,
15  but it was a little -- it was different;
16  right?
17     A.  Yes.
18     Q.  And the difference there being you
19  had the terra-cotta tiles blown off?
20     A.  Yes.
21     Q.  And with both of those houses, were
22  they built at different times?
23     A.  I think they were all built the same
24  time.
25     Q.  But the one at -- I am no expert on

Page 105

1  this, ma'am, but the 6105-07, that looks like
2  that house was built many years ago.  Maybe
3  the '40s or '50s.  Or was it earlier than
4  that?
5     A.  I would say the '40s.
6     Q.  All right.  And the 6113-15, do you
7  think that was built about the same time?
8     A.  About the same time.
9     Q.  But the 6113-15, it had a fire?
10     A.  Yes.
11     Q.  And so they had obviously repaired
12  that house after the fire.
13     A.  Yes.
14     Q.  Okay.  So the construction in the
15  6113-15 was newer than the 6105-07?
16     A.  Where the -- the part they repaired
17  after the fire was newer.
18     Q.  What parts did they repair after the
19  fire?
20     A.  It was the living room at the 6115.
21     Q.  Let's go into the rentals on the
22  6113-15.  Let's start with 6113.
23     A.  Okay.
24     Q.  All right?  Was that rented
25  immediately before the storm?

Johns Pendleton Court Reporters      800 562-1285

BARGE000995

MUMFORD, ETHEL

8/5/2008

Page 106

1     A.  It wasn't rented during the storm.
2     Q.  So it was vacant at the time of the
3  storm?
4     A.  Yes.
5     Q.  And how long had it been vacant
6  before the storm?
7     A.  Several months I would say.
8     Q.  Had you been trying to rent it
9  during that time period?
10     A.  No.  I had to go in and do a little
11  painting, so I didn't -- hadn't gotten to that
12  yet.
13     Q.  So that side needed some work?
14     A.  Yes.
15     Q.  What sort of work did it need?
16     A.  Just painting.  Painting the walls,
17  redoing the walls.
18     Q.  And the last tenants you had in
19  there was what, maybe eight or nine months
20  before the storm?
21     A.  They probably was in there longer
22  than that.  Probably a couple of years.
23     Q.  No, but she hadn't -- The house --
24  She had moved out several months before the
25  storm?

Page 107

1     A.  Yes.
2     Q.  All right.  How much was she paying
3  when she was living there?
4     A.  375 I think she was paying.  I am
5  not really sure.  Either 375 or 475.
6     Q.  Who did you rent it to?
7     A.  The first name was Taurus.  I don't
8  know her last name.  She was the last one in
9  there.  Brown -- No, that's her maiden name.
10  She was the last one in there.  The first name
11  was Taurus.  Carson I think collect that rent
12  for me.
13     Q.  Did you have a written lease with
14  her?
15     A.  No.
16     Q.  The same, month-to-month?
17     A.  Month-to-month.
18     Q.  Did you get a deposit from her?
19     A.  Yes.
20     Q.  Did you give the deposit back to
21  her?
22     A.  No, I didn't give but one deposit
23  back.  I didn't give any deposit back since
24  the storm.
25     Q.  No, but she moved out --

Page 108

1     A.  No, when she left.  She left before
2  the storm.  Correct.
3     Q.  Right.
4     A.  I don't think so.  I don't
5  remember.  Because she left owing a large
6  water bill.  She didn't get any deposit back.
7     Q.  Had she damaged the property?
8     A.  No, not much.
9     Q.  Before this person lived there for a
10  couple of years, had you rented it before
11  that?
12     A.  Yes.
13     Q.  What it continuously rented or --
14     A.  No, it was continuously rented until
15  she moved.
16     Q.  Were you actively trying to rent it
17  at the time of the storm?
18     A.  I wasn't really trying because I
19  wanted to go in there and paint before I
20  rented, and I hadn't did that.
21     Q.  You hadn't done that yet?
22     A.  No.
23     Q.  All right.  Let's go to 6115 North
24  Robertson.  I believe you said that was rented
25  to a family member?

Page 109

1     A.  Yes.
2     Q.  And who was that?
3     A.  Catrice Mumford.
4     Q.  How is she related to you?
5     A.  Granddaughter.
6     Q.  Was she paying you rent?
7     A.  Yes.
8     Q.  How much was she paying you?
9     A.  300 a month.
10     Q.  Now, before you did these
11  renovations to 6113-15, were both of those the
12  same size before the storm?
13     A.  Yes.
14     Q.  And was Catrice on a month-to-month
15  as well?
16     A.  Yes.
17     Q.  How long had she been in the
18  property before the storm?
19     A.  About two years.
20     Q.  Did you have a written lease with
21  her?
22     A.  No.
23     Q.  Was Carson handling the rent
24  collection for that?
25     A.  Yes.  He didn't handle it for

28 (Pages 106 to 109)

MUMFORD, ETHEL

8/5/2008

Page 110

1  Catrice.  She paid me.
2      Q.  I'm sorry?
3      A.  He -- I handled the rent for Catrice
4  Mumford, my granddaughter.
5      Q.  So you didn't go through Carson?
6      A.  No.  With her I did not.
7      Q.  How much of a cut did Carson take?
8      A.  I can't remember offhand.  I can't
9  remember.
10     Q.  Are you okay?  You need to take a
11  break?
12     A.  I'm okay.  I just needed to stand a
13  little while.  My legs.  I'm all right.
14         MR. BLANCHARD:
15         Let's go off for a minute.
16         (Whereupon a discussion was held
17         off the record.)
18  EXAMINATION BY MR. BLANCHARD:
19     Q.  When you were doing your tax returns
20  before Katrina, were you reporting all of the
21  income from these rental properties on your
22  tax returns?
23     A.  Yes.  I had to.
24     Q.  And as far as expenses go, did you
25  keep track of those for each of the

Page 111

1  properties?
2      A.  Yes.
3      Q.  And on your tax returns you gave all
4  of those receipts to your accountants to
5  prepare?
6      A.  Yes.
7      Q.  And so on your tax returns before
8  Katrina, we would see for these rental
9  properties the income; correct?
10     A.  Yes.
11     Q.  And we'd also see all of your
12  expenses; right?
13     A.  I don't know whether Mr. Carson have
14  my expenses or not.  The tax lady has that.
15     Q.  Carson handled the receipts,
16  correct, the receipt of income on the
17  properties?
18     A.  The only thing he did was collect
19  the rent.
20     Q.  Right.  As far as repairs go, you
21  made those yourself?
22     A.  Yes.
23     Q.  And so you would cut your own
24  checks?
25     A.  Yes.

Page 112

1      Q.  And you would give that information
2  to your accountants?
3      A.  Yes.
4      Q.  So as far as any repair expenses go
5  to those properties, you would have given that
6  information to your accountants to include on
7  your tax returns?
8      A.  Yes.
9      Q.  All right.  And with these rental
10  properties, did you make it a habit to closely
11  track the expenses for each of these
12  properties for tax purposes?
13     A.  Yes.  Yes, I tracked.
14     Q.  And all of these records you kept in
15  your house at Burgundy Street before the
16  storm; right?
17     A.  Yes.
18     Q.  You told me earlier all of that was
19  destroyed?
20     A.  Yes.
21     Q.  Did you try to salvage all of those
22  records?
23     A.  It was all wet up.  It was no more
24  good.  I had to throw everything away.
25     Q.  And as far as your expenses go for

Page 113

1  these rental properties, your accountant who's
2  now in Houston may have that?
3      A.  Yes.
4      Q.  But you're not sure?  Is there a
5  mortgage on the 6113-15 North Robertson
6  property?
7      A.  Yes.
8      Q.  To who?
9      A.  SBA.
10     Q.  And this was something that you got
11  after the storm?
12     A.  Yes.
13     Q.  And you applied for an SBA loan on
14  that property?
15     A.  Yes.
16     Q.  Did anyone assist you with that
17  application?
18     A.  No.
19     Q.  Why did you choose to try to get an
20  SBA loan on that property?
21     A.  I didn't have enough money to
22  rebuild it.
23     Q.  Did you seek to get SBA loans on the
24  other properties, specifically 6105-07?
25     A.  Yes.  1423 Feliciana Street.

29 (Pages 110 to 113)

MUMFORD, ETHEL

8/5/2008

Page 114

1    Q.  Did you get an SBA loan on that one?
2    A.  Yes.
3    Q.  Did you try to get an SBA loan on
4  the 6105-07?
5    A.  No.
6    Q.  Why not?
7    A.  The monthly payment was then too
8  high for me.  Too much for me to pay.
9    Q.  How much money did you get on the
10  SBA loan for 6113-15 North Robertson?
11    A.  70,000.
12    Q.  What are your payments on that loan?
13    A.  I have a total of 140,000, and
14  that's $735 a month.
15    Q.  You said your total was 135?
16    A.  140.
17    Q.  140.  So you got 70 on 6113 North
18  Robertson and you got 70 on Feliciana?
19    A.  Yes.
20    Q.  And your total payment is $735 a
21  month?
22    A.  Yes.
23    Q.  So roughly one-half of that is
24  6113-15 North Robertson?
25    A.  Yes.

Page 116

1  them any more because we couldn't -- the house
2  wasn't livable.  We couldn't live in it.  And
3  I just keep giving them money and we couldn't
4  live in the house, so I just stop giving them
5  any more money and took the money I had to try
6  to complete the renovation.
7    Q.  And you say you have been doing it
8  yourself?
9    A.  Yes.
10    Q.  Has anyone been helping you?
11    A.  Well, I have to get a plumber and a
12  carpenter, electrician also.
13    Q.  What plumber did you get?
14    A.  His name is James Curley.
15    Q.  How much have you paid him?
16    A.  I paid him $8,100.
17    Q.  And that was on the 6113-15?
18    A.  Yes.
19    Q.  And you said you needed a carpenter
20  as well; right?
21    A.  Yes.
22    Q.  Who did you hire for that?
23    A.  Well, my son got someone to help him
24  tear the walls out where the water had leaked
25  and replace the sheetrock.

Page 115

1    Q.  How long do you have to pay on that
2  loan?
3    A.  30 years.  Lifetime.
4    Q.  Did you have any mortgages on that
5  property at 6113-15 North Robertson at the
6  time of Katrina?
7    A.  No.
8    Q.  The renovations to 6113-15 North
9  Robertson, have you hired anyone to do those?
10    A.  Yes.
11    Q.  Who did you hire to do that?
12    A.  Diamond Realty.
13    Q.  Have you paid all the bills they
14  have sent you?
15    A.  Yes.
16    Q.  How much have they billed you so
17  far?
18    A.  I have paid them 109,000.
19    Q.  Has anyone else done any work on
20  that property?
21    A.  Yes.  Yes.  They never finished the
22  job.  I have to complete it myself.
23    Q.  Why didn't they finish the job?
24    A.  I don't know.  Well, they start
25  asking me for money and I just wouldn't give

Page 117

1    Q.  How much have you paid the carpenter
2  for that?
3    A.  I pay him about 250, $250.
4    Q.  So total repairs to that house so
5  far, you told me about Diamond Realty, the
6  109,000; right?
7    A.  Yes.
8    Q.  Plus the plumber of 8,100?
9    A.  Yes.
10    Q.  So that's 117,000.  Then you told me
11  about 250 for the carpentry?
12    A.  Yes.
13    Q.  So you're up to about 117,350;
14  right?
15    A.  Okay.
16    Q.  Do you owe anybody else for any
17  repairs on that property, or renovations?
18    A.  No.
19    Q.  Have you had to hire an electrician
20  for that property?
21    A.  Yes.  I got to hire an electrician
22  because there's some electric work that need
23  to be done, completed.
24    Q.  What work needs to be done?
25    A.  On one side they have lights like

30 (Pages 114 to 117)

BARGE000998

MUMFORD, ETHEL

8/5/2008

Page 118

1 that (indicating) and there's nothing in
2 there. That has to be done. And on the side
3 that's near completed, the lights like that up
4 there, you turn them on and all of a sudden
5 they just click off.
6        Q.  Has the electrician given you an
7 estimate?
8        A.  No, not yet.
9        Q.  So other than that, is there
10 anything else that you need to do to get done
11 at that property before it's ready for
12 occupancy?
13        A.  Just to complete the cabinets.
14 That's all.  Like to finish painting the
15 cabinets.
16        Q.  Who's going to do that?
17        A.  Well, I am going to try to get my
18 son to get some help and do that himself.
19        Q.  You told me earlier that you added
20 on to this property.
21        A.  Yes.
22        Q.  How many square feet did you add on?
23        A.  The bedroom I would say -- I don't
24 know how many square feet it is, but it's
25 about 12 by 12.  And the den might be larger

Page 119

1 than that.  But like 14 by 14.  And a bathroom
2 and a deck.  I don't know how --
3        Q.  All right.  The bathroom,
4 approximately how big is that?
5        A.  About 9 by -- I don't know.
6        Q.  All right.  So you added a bedroom,
7 the den, the bath?
8        A.  And --
9        Q.  And a deck?
10        A.  Yes.
11        Q.  With this addition of square
12 footage, did you have to add more air
13 conditioning capacity to that property than
14 you had before the storm?
15        A.  Yes.
16        Q.  What did you have before the storm?
17        A.  Before the storm we had units.
18        Q.  Window units?
19        A.  Yes.
20        Q.  And now you're going to have central
21 AC units; right?
22        A.  Yes.  Yes.
23        Q.  How many tons?
24        A.  I don't know.  It's in there
25 already, but I don't know the size of it.

Page 120

1        Q.  And the property at 6115, does that
2 have granite countertops in the kitchen?
3        A.  It's not granite, but almost like
4 it.  It looks like granite.
5        Q.  What was in that kitchen before the
6 storm?
7        A.  Just the regular cabinets.
8        Q.  Formica?
9        A.  Yes.
10        Q.  Formica?
11        A.  Yes.
12        Q.  And the cabinets, obviously they're
13 new cabinets now; right?
14        A.  I have new cabinets.
15        Q.  And before the storm how old were
16 the cabinets in that kitchen at 6115?
17        A.  They was -- They still looked good.
18 I don't know exactly how old they were.
19        Q.  What are your plans for the 6115
20 side?
21        A.  My granddaughter and her two
22 children are going to live there.
23        Q.  Is this Catrice?
24        A.  Yes.
25        Q.  And are you going to charge her rent

Page 121

1 for that?
2        A.  Yes.  She's going to pay for that.
3        Q.  How much do you plan to charge her?
4        A.  I'll go down to maybe 250.
5        Q.  But you would agree with me that
6 that property at 6115 is in a lot better shape
7 now than it was before the storm?
8        A.  Oh, yes.  Yes.  Yes.
9        Q.  You did a lot of upgrades?
10        A.  Yes.
11        Q.  When do you think you can start
12 renting it to her?
13        A.  I hope by next month.
14        Q.  Let's talk about 6113.
15        A.  Grandson is going to live there.
16        Q.  Grandson is going to live there?
17        A.  Yes.
18        Q.  That property has been completely
19 renovated as well; right?
20        A.  Yes.  Just almost finished.
21        Q.  Did a lot of upgrades to that side
22 as well; right?
23        A.  Yes.
24        Q.  Did you add any square footage on
25 that side?

31 (Pages 118 to 121)

Johns Pendleton Court Reporters                    800 562-1285

MUMFORD, ETHEL

8/5/2008

Page 122

1    A. No.
2    Q. What's your grandson's name?
3    A. Michael.
4    Q. You going to rent it to him?
5    A. Yes.
6    Q. What do you plan to charge him?
7    A. About 300.
8    Q. Are you going to get a lease with
9  him or are you going to go month-to-month?
10   A. I'll go month-to-month.
11   Q. Are you going to get Carson to
12 handle those, or are you going to do those
13 yourself with your relatives?
14   A. I'll try to do those myself.
15   Q. So you're not going to have to pay
16 the commission to Carson?
17   A. No.
18   Q. Do you expect to rent that one out
19 next month?
20   A. Yes.
21   Q. I'm going to mark as Exhibit Number
22 5 a cash sale relating to 6101-03 North
23 Robertson. Now, I know that now that's just a
24 vacant lot; right?
25   A. Yes.

Page 123

1    Q. I'll go ahead and show this to you
2  and ask you if you recognize this document.
3        Do you recognize this document,
4  ma'am?
5    A. Yes.
6    Q. And this reflects your purchase of
7  the 6101-03 North Robertson property on March
8  4th, 2005; right?
9    A. Yes.
10   Q. So this was four months before the
11 storm?
12   A. Yes.
13   Q. And you paid $4,100 for that
14 property; right?
15   A. Yes. Yes.
16   Q. When you bought it, was there
17 actually a structure there?
18   A. No.
19   Q. So it was vacant when you bought it?
20   A. Yes.
21   Q. Do you know when it had been torn
22 down?
23   A. Before I bought it. It was torn
24 down several years. Maybe about three years.
25   Q. And you bought this property from

Page 124

1  the New Orleans Redevelopment Authority.
2    A. Yes.
3    Q. How did you know this property was
4  available through the New Orleans
5  Redevelopment Authority?
6    A. I just went and checked into it and
7  they told me it was available.
8    Q. And was it your understanding the
9  New Orleans Redevelopment Authority handled
10 blighted properties in the city?
11   A. Yes.
12   Q. When you first contacted the New
13 Orleans Redevelopment Authority, did you ask
14 them about other blighted property in the
15 Lower Ninth Ward?
16   A. No, that's the only one.
17   Q. You just focused on this one?
18   A. Yes.
19   Q. I draw your attention to page 3 of
20 the document, ma'am.
21     MR. WIEDEMANN:
22        Counsel, this one doesn't have a
23     page 3.
24     MR. BLANCHARD:
25        Oh. All right. I apologize for

Page 125

1     that.
2  EXAMINATION BY MR. BLANCHARD:
3    Q. (Counsel hands document to Witness.)
4        That one should have a page 3.
5  You see that bolded paragraph, "Purchaser
6  hereby agrees to repair the above-described
7  property --"
8    A. Yes.
9    Q. "-- or to demolish and otherwise
10 remove the blight within 270 days of the date
11 of acquisition". Right?
12   A. Uh-huh (affirmatively).
13   Q. You see that?
14   A. Yes.
15   Q. But again, your testimony is this
16 property was already torn down?
17   A. It was.
18   Q. Did you have any obligations to do
19 anything with the property when you purchased
20 it?
21   A. I had wanted to add on to that
22 double house I had on the corner near the
23 lot.
24   Q. All right.
25   A. That's what I had planned to do, but

32 (Pages 122 to 125)

MUMFORD, ETHEL

8/5/2008

Page 126

1  I never did anything.  But it was already torn
2  down when I bought it.
3      Q.   So your plan when you bought this
4  property was to increase the size of the
5  property at 6105-07?
6      A.   Yes.
7      Q.   What are your current plans for that
8  property?
9      A.   I probably will try and build
10 something, a house on it in the future.
11     Q.   Do you pay any taxes on that
12 property?
13     A.   Yes.
14     Q.   How much?
15     A.   I can't remember.
16     Q.   Have you had any appraisals done of
17 that property since the storm?
18     A.   Not since the storm.
19     Q.   Have you had any appraisals done of
20 the property at 6113-15 since the storm?
21     A.   No.
22     Q.   Did you have any appraisals of that
23 property before the storm?
24     A.   It was a long time before the
25 storm.  I don't even remember when.

Page 127

1      Q.   Do you have any post-storm
2  appraisals of 6105-07?
3      A.   No.
4      Q.   How did you pay for the property at
5  6101 North Robertson?
6      A.   I paid cash.
7      Q.   You didn't borrow the money?
8      A.   No.
9      Q.   So there's no mortgage on that
10 property?
11     A.   No.
12     MR. BLANCHARD:
13         Let's go off the record.
14         (Whereupon a discussion was held
15     off the record.)
16 EXAMINATION BY MR. BLANCHARD:
17     Q.   We're ready to go back on?  Miss
18 Mumford, at some point did your daughter Lois
19 Mumford Callum, donate to you her interest in
20 --
21     A.   Yes.
22     Q.   -- the property that she got through
23 your husband's succession?
24     A.   Yes.
25     Q.   And I'll go ahead and mark this as

Page 128

1  Exhibit 6.  Is this the document whereby Lois
2  Mumford Callum donated to you her interest in
3  certain properties including 4829 Burgundy,
4  6105-07 North Robertson, 6113-15 North
5  Robertson?
6      A.   Uh-huh (affirmatively).
7      Q.   You recognize this document?
8      A.   Yes.  Yes.
9      Q.   And is that your signature on page
10 3?
11     A.   Yes, it is.
12     Q.   And this donation also included her
13 interest in 1423-23 1/2 Feliciana Street;
14 right?
15     A.   Yes.
16     Q.   And that is those four units you
17 talked about earlier?
18     A.   Yes.
19     Q.   Turn to page 3.  There's an estimate
20 on the value of the donated property to be
21 $25,000.  Do you see that?
22     A.   Uh-huh (affirmatively).
23     Q.   Where did you get that number?
24     A.   I don't know.  I don't know.
25     Q.   What lawyer did you hire to handle

Page 129

1  that?  Is that his name down here, Russell
2  Breckenridge?
3      A.   Yes.
4      Q.   That's the Russell you told me about
5  earlier; right?
6      A.   Right.  But it wasn't.  Mr. Ballina.
7      Q.   A different Russell?
8      A.   He's not a Russell.  See, I had
9  thought it was Mr. Russell that did this for
10 me, the question you asked, but it was not
11 him.  It was Mr. Ballina.
12     Q.   Now, this donation, which is
13 February 10th, 2000, why did your daughter
14 donate her interest in these properties to you
15 at that time?
16     A.   Well, she -- I think she might have
17 probably thought she was going to die.
18     Q.   Was she sick?
19     A.   Yes.  She's still sick.
20     Q.   What's wrong with her?
21     A.   Well, she has all kinds of
22 problems.  She have ulcers in her stomach,
23 arthritis from her head to her feet.  All
24 kinds of things.
25     Q.   And she had these same problems in

33 (Pages 126 to 129)

MUMFORD, ETHEL

8/5/2008

Page 130

1    2000?
2        A.  Well, she didn't have actual serious
3    I don't think in 2000.  But she was not well.
4        Q.  So your daughter has been sick for a
5    long time?
6        A.  Yes.  Yes.
7        Q.  Does that cause you distress,
8    emotional distress?
9        A.  Well, I'm kind of used to it now.
10   But it does bother me some.
11       Q.  I'm finished with that.
12           Now, at some point after that,
13   then, Miss Mumford, you donated some property
14   back to your daughter; right?
15       A.  She donated back to me.  I -- What
16   -- How it went anyway.  First, she -- She
17   donated the property to me first.  Then I
18   donate it back to her.
19       Q.  Well, I am going to show you this
20   document, which is dated October 26th, 2004.
21   I ask you if you can identify this document
22   which is captioned "Donation Inter Vivos by
23   Ethyl Coleman Mumford to Lois Mumford
24   Callum".  Exhibit 7.  Do you recognize this
25   document?

Page 131

1        A.  Uh-huh (affirmatively).
2        Q.  Is that your signature on page 3?
3        A.  Yes, it is.
4        Q.  Did you have a chance to read or
5    review this document before you signed it?
6        A.  Part of it.  I didn't read it all.
7        Q.  But you understood what you were
8    doing at this time?
9        A.  I thought I did, yes.
10       Q.  Why did you make this donation to
11   her at this time, in 2004?
12       A.  I just wanted to make sure if
13   anything happened to me, she'll have her
14   share.
15       Q.  So by virtue of this it was your
16   intent to donate some property to her?
17       A.  Yes.
18       Q.  Thank you.  Let's switch gears a
19   little bit to your experience during Katrina.
20   I know that you told me you evacuated to the
21   Motel 6 in Lafayette.
22       A.  Yes.
23       Q.  Right?
24       A.  Yes.
25       Q.  And when was it that you evacuated?

Page 132

1        A.  That Sunday, it was the 28th of
2    August, 2005.
3        Q.  So what time during that day on
4    Sunday the 28th?
5        A.  It was that morning, maybe like 8:00
6    o'clock in the morning.
7        Q.  And --
8            MR. WIEDEMANN:
9            Excuse me, Counsel.  Would you
10       mind showing me that last document
11       that we reviewed?
12           MR. BLANCHARD:
13           Sure.
14           (Counsel hands document to
15       Counsel.)
16           MR. WIEDEMANN:
17           Thank you.  Sorry about that.
18   EXAMINATION BY MR. BLANCHARD:
19       Q.  All right.  And prior to that time
20   that you evacuated, I assume that you were
21   hearing on the television --
22       A.  Yes.
23       Q.  -- the warnings about Katrina?
24       A.  Yes.
25       Q.  You heard it was a Category 5 storm

Page 133

1    coming?
2        A.  Yes.  Heard all of that.
3        Q.  Did you hear the news reports about
4    how much water they expected to be in the
5    city?
6        A.  Yes.
7        Q.  And did you hear reports that it was
8    expected that areas like the Ninth Ward would
9    flood?
10       A.  Yes.
11       Q.  In fact, it was expected most of the
12   city would flood; right?
13       A.  Yes, uh-huh.
14       Q.  And based on that and based on your
15   experience in Betsy, that flooding, is that
16   the reason that you decided to evacuate?
17       A.  Yes.
18       Q.  And who did you evacuate with, if
19   anyone?
20       A.  My daughter, and my son was with us
21   also.
22       Q.  Anyone else besides your daughter
23   and your son?
24       A.  I had a couple of ladies in there,
25   they were staying with me temporary, mental

34 (Pages 130 to 133)

MUMFORD, ETHEL

8/5/2008

Page 134

1  people.  They were with me also.  No, a lady
2  and a man.
3      Q.  And you -- They were staying with
4  you?
5      A.  Yes.
6      Q.  At your house on Burgundy Street?
7      A.  Yes.
8      Q.  Who was that?
9      A.  That was Theresa, and what the other
10 man's name?  I can't thought of his name.
11 They was staying with me temporary, mentally
12 ill people.  They, you know, wasn't bad off,
13 but they were kind of sick.
14     Q.  How did you know these people?
15     A.  I got them from the hospital, from
16 Touro Hospital.
17     Q.  Were these friends of yours?
18     A.  No, not really.
19     Q.  You just made the effort to help
20 some people?
21     A.  Yes.
22     Q.  And you made the effort to get them
23 out of town?
24     A.  Yes.
25     Q.  And did you travel in one car?

Page 135

1      A.  One car.
2      Q.  Was that -- You have a Mercedes;
3  right?
4      A.  Yes.
5      Q.  Was it in the Mercedes?
6      A.  Yes.
7      Q.  What kind of Mercedes is that?
8      A.  An E-320.  1998.
9      Q.  So in the E-320 it was you, your
10 daughter, your son, and these two mentally ill
11 people?
12     A.  Yes.
13     Q.  And that was the extent of the
14 people in the car; right?
15     A.  Yes.
16     Q.  And you took off in the morning, and
17 how long did it take you to get to Lafayette?
18     A.  About midnight.  We were trying to
19 go to Galveston, but we -- the far -- we only
20 got to Lafayette.
21     Q.  That Sunday morning before you left,
22 do you remember there being an evacuation
23 order from the City of New Orleans?
24     A.  Yes.
25     Q.  Do you remember Mayor Nagin saying

Page 136

1  that?
2      A.  Uh-huh (affirmatively).
3      Q.  Other than the Mercedes, did you
4  have any other vehicles --
5      A.  I left two in the yard.
6      Q.  Left two in the yard?
7      A.  Yeah.  One was a Jeep.  I don't know
8  if it was a 19- -- 1903, I believe.  And I had
9  another one, it was a 1906.  It was an
10 Oldsmobile.
11     Q.  Let's go back over those dates
12 again.  The Oldsmobile, what type of car was
13 that?
14     A.  All I can remember, it was an
15 Oldsmobile.  It was a 1905.
16     Q.  You're not talking about the year
17 there, are you?
18     A.  The year.  The year.
19     Q.  It was an old, very old car?
20     A.  No, it was new.  It was a 1905.  I
21 had just bought it.
22     Q.  You mean 2005?
23     A.  I'm going off now.  2005.  Yes.
24     Q.  All right.  I was about to say
25 that's an antique you had back there, ma'am.

Page 137

1  You had a 2005 Oldsmobile?
2      A.  Yes.
3      Q.  And this was kept at your --
4      A.  Yes.
5      Q.  -- house at 4829 Burgundy?
6      A.  Yes.  And I had a Jeep also.  It was
7  about a 2002 maybe.
8      Q.  What kind of Jeep vehicle?
9      A.  It just said Jeep.  I don't know.
10     Q.  And did you own those vehicles?
11     A.  Yes.
12     Q.  Why did you have three vehicles,
13 ma'am?
14     A.  I had one, my daughter was driving
15 the Jeep, and I was driving the Mercedes and
16 the Oldsmobile.  I would just park the
17 Mercedes and drive the Oldsmobile.
18     Q.  The Oldsmobile and the Jeep, were
19 those dependable vehicles?
20     A.  Oh, yeah.
21     Q.  They could have been driven out of
22 town?
23     A.  Yes.
24     Q.  But you decided just to take the
25 Mercedes?

35 (Pages 134 to 137)

MUMFORD, ETHEL

8/5/2008

Page 138

1      A.  Yes.  I was thinking I would come
2  back.
3      Q.  And your daughter could drive;
4  right?
5      A.  Yes.
6      Q.  She had a driver's license?
7      A.  Yes.
8      Q.  And your son could drive as well?
9      A.  Yes.
10     Q.  What happened when you got to
11 Lafayette?
12     A.  We just went -- Somebody told us how
13 to get to this Motel 6.  And when we went
14 there, they had a line of people, so then the
15 lady said, "Well, we just have three rooms"
16 and everybody left and I stayed.  So finally
17 she got some more vacancies and we were able
18 to get one room.  She said she couldn't let us
19 have two, but she could let us have one.  So
20 all five of us were in one.
21     Q.  How many beds were in that room?
22     A.  One.
23     Q.  You were in that room for how long?
24     A.  From that Sunday night until that
25 Saturday in the daytime, the next Saturday.

Page 139

1      Q.  Were all five of you in the room
2  during that time period?
3      A.  Yes.  Yes.
4      Q.  I know you found the apartment.
5      A.  Yes.
6      Q.  Correct?
7      A.  Yes.
8      Q.  When you left New Orleans that
9  Sunday morning, did you take any of your
10 possessions with you?
11     A.  Very little.  I took my policies,
12 insurance policies, some jewelry, and I left
13 some jewelry I forgot.  And a few pieces of
14 clothes.
15     Q.  Did you take any photos with you?
16     A.  No.  I left all of that.  I lost all
17 of those.
18     Q.  And you mentioned insurance
19 policies.
20     A.  Yes.  I took those with me.
21     Q.  This would have been insurance
22 policies on the Burgundy property and the
23 rental properties as well?
24     A.  Yes.  And life policies I had.
25     Q.  Life insurance?

Page 140

1      A.  Yes.
2      Q.  Other than the property insurance
3  and life insurance policies, did you take any
4  other documents with you?
5      A.  No.
6      Q.  Did your children take any of your
7  documents --
8      A.  No.
9      Q.  -- with them?
10     A.  No.
11     Q.  Did they take any of your
12 possessions with them?
13     A.  Just a little something for them to
14 wear themselves.
15     Q.  When did you first find out that
16 there was flooding in the city?
17     A.  Maybe that Tuesday I found out.  It
18 happened Monday, but I found out Tuesday I
19 think it was.
20     Q.  And how did you find out?
21     A.  Well, a friend of mine called me and
22 told me she saw it on the Internet that her
23 house was flooded up to the second floor, and
24 that was around the corner from Robertson
25 Street.  So I was thinking, well, Robertson

Page 141

1  Street is flooded, too.  But I was also
2  thinking that Burgundy Street was okay because
3  they didn't have water up there for Betsy.
4  But it was all the same.  A lot of water.
5      Q.  What was the name of the friend that
6  you talked to?
7      A.  Georgia Holbert.
8      Q.  But she didn't stay during the
9  storm?
10     A.  She left.  She went to Alexandria.
11     Q.  You said she found out about this by
12 looking at the Internet?
13     A.  Yes.
14     Q.  Miss Mumford, do you know what this
15 lawsuit is about that we're here for today?
16     A.  Yes.
17     Q.  What's it about?
18     A.  This is about the breach in the
19 levee caused by the barge.  The class action
20 suit.
21     Q.  Do you know anything else about the
22 lawsuit other than what you just told me?
23     A.  That's all.  And the water.
24     Q.  Do you know where this breach
25 occurred that you just mentioned to me?

36 (Pages 138 to 141)

BARGE001004

MUMFORD, ETHEL

8/5/2008

Page 142

1    A.  In the Industrial Canal.  I don't
2  know the exact place.
3    Q.  Do you know whether there was more
4  than one breach?
5    A.  From what I understand, I think
6  there were more than one.  I don't really
7  know.
8    Q.  Obviously you were in Lafayette at
9  the time of the storm?
10   A.  Yes.
11   Q.  So this barge that you're talking
12  about, you didn't see the barge on the day of
13  the storm, did you?
14   A.  No.
15   Q.  And none of your friends or family
16  saw the barge on the day of the storm?
17   A.  No.
18   Q.  Has anyone told you that they saw
19  the barge on the day of the storm?
20   A.  No.
21   Q.  The breach or breaches of the levees
22  that you talked about -- First let me ask you
23  this.  Do you know what waterway those
24  breaches were on?
25   A.  I don't really know.  But it was on

Page 143

1  our side -- Well, it was -- I don't know.
2    Q.  But you didn't see the breach that
3  you just talked about.
4    A.  No.
5    Q.  And none of your family members saw
6  the breach?
7    A.  No.
8    Q.  And you don't know anyone that saw
9  the breach?
10   A.  No.
11   Q.  And you haven't ever heard from
12  anyone that said they saw the breach?  Is that
13  correct?
14   A.  Someone called me and told me the
15  breach -- the barge was on the ground on
16  Jourdan Avenue somewhere.  It was through the
17  levee and was on -- I saw it on the ground,
18  but I never went close to it.  I could see
19  from the Industrial Canal when I crossed.
20   Q.  This person that told you that they
21  saw it, they saw the barge, this was well
22  after the hurricane?
23   A.  Yes.
24   Q.  This was after the water had already
25  gone out?

Page 144

1    A.  Yes.
2    Q.  When you were in Lafayette on the
3  28th or the 29th, the day of the storm, did
4  you speak with anyone who had stayed in the
5  Ninth Ward during either one of those days?
6    A.  No.
7    Q.  Did any of your family members, as
8  far as you know, speak to anyone who had
9  stayed in the Ninth Ward on the day of the
10  storm, August 29, 2005?
11   A.  No.
12   Q.  I know you told me this earlier, but
13  I need my recollection refreshed a little
14  bit.  When did you first come back to New
15  Orleans after Katrina?
16   A.  February, 2006.
17   Q.  And when you came back to the city,
18  were you alone or were you with family
19  members?
20   A.  My son and I came together.
21   Q.  And where did you go?
22   A.  I went -- I was by my
23  sister-in-law's.
24   Q.  Where was she?
25   A.  On Daneel Street.

Page 145

1    Q.  I'm not familiar with that street.
2  Is that in the Ninth Ward?
3    A.  No, that's Uptown.
4    Q.  Okay.
5    A.  Across Napoleon Avenue.
6    Q.  When you came back in February,
7  2006, did you eventually go into the Lower
8  Ninth Ward?
9    A.  We went in the Lower Ninth Ward
10  December, 2005.  That's the first time we went
11  there.
12   Q.  So the first time you came back to
13  New Orleans was December, 2005?
14   A.  Yes.
15   Q.  And you went into the Ninth Ward?
16   A.  Yes.
17   Q.  Where did you go first?
18   A.  I went to Burgundy Street first.
19   Q.  Which street did you come in on?
20  Was it St. Claude or Claiborne?
21   A.  We were on the interstate and we got
22  off on Franklin Avenue -- Claiborne.  I think
23  it was Claiborne.  North Claiborne.
24   Q.  So you came off Claiborne and you
25  took a right and you went to Burgundy.

37 (Pages 142 to 145)

BARGE001005

MUMFORD, ETHEL

8/5/2008

Page 146

1     A.  Yes.
2     Q.  Now, as you were driving to your
3  home that day, what do you remember seeing in
4  the Ninth Ward?
5     A.  Just devastation.  Everything was
6  just like washed away.
7     Q.  Do you remember seeing -- You
8  remember seeing houses still standing, though;
9  right?
10    A.  Still standing, but they were
11 looking bad.  It was bad.
12    Q.  Did you see blue tarps on roofs?
13    A.  Not at that time.
14    Q.  Did you see trees down?
15    A.  Some places.
16    Q.  Did you see trees lying on houses?
17    A.  I can't remember that.
18    Q.  Do you remember seeing houses that
19 had been burned?
20    A.  No.
21    Q.  Do you remember seeing houses that
22 no longer had their roofs?
23    A.  Yes.
24    Q.  And you remember seeing that in the
25 Ninth Ward?

Page 147

1     A.  Yes.
2     Q.  And when you got to -- Back up.  The
3  first structure you went to was the Burgundy
4  Street.
5     A.  Yes.
6     Q.  When you got there, when did you
7  see?
8     A.  Well, you couldn't get -- I couldn't
9  get in the house.  Everything was all over
10 everywhere.  My dog was in there dead.  We had
11 to bury him.  And I -- I got a little piece in
12 the door, but I was afraid to go in.
13    Q.  Why was it hard to get in the house?
14    A.  Stuff was all over everywhere.
15 Furniture, clothes, everything.  It was just
16 all over.
17    Q.  Was there any furniture up against
18 your front door?
19    A.  We were able to open it up some, but
20 there was a refrigerator, I had just bought
21 that before the storm, it was crossways the
22 den and the kitchen door.
23    Q.  Did you notice whether any of the
24 property -- the property in your house had
25 moved to one side or another?

Page 148

1     A.  Yeah.  It did that.
2     Q.  Which side did it move toward?
3     A.  It moved like stuff we had in the
4  bathrooms all the way in the living room.  It
5  was just all over.
6     Q.  So it was kind of scattered all
7  about?
8     A.  Yeah.  Just all on top of one
9  another.
10    Q.  Which way does your -- The front
11 door of your house faces south, doesn't it?
12    A.  It faces -- Burgundy -- The river.
13 Burgundy Street.
14    Q.  Faces toward the river?
15    A.  Yeah.
16    Q.  Do you know when the flooding
17 started in your house that day?
18    A.  No.
19    Q.  Has anyone told you when the
20 flooding started in your house that day?
21    A.  They just said it was the 29th, that
22 Monday.  I don't know if it was early that
23 morning.
24    Q.  You don't know the time?
25    A.  No.  I don't know.

Page 149

1     Q.  And the same would hold true for the
2  flooding on the Robertson Street properties?
3  You don't know when that occurred?
4     A.  No, I don't.
5     Q.  When you got to your property at
6  Burgundy, was there any evidence that you had
7  been looted?
8     A.  No.
9     Q.  When you got in the house, did you
10 notice anything missing?
11    A.  No.
12    Q.  Your tenants on Robertson Street,
13 did they ever tell you that those properties
14 had been looted?
15    A.  No.
16    Q.  When you got on Burgundy Street --
17 Your house is a ranch style house; right?
18    A.  Yes.
19    Q.  But there are other different kinds
20 of houses on that street; right?
21    A.  Yes.
22    Q.  When you got there, you noticed
23 there was some roof damage as well.  Right?
24    A.  Yeah, they had some roof damage.
25    Q.  Okay.  And when you got in the

38 (Pages 146 to 149)

BARGE001006

MUMFORD, ETHEL

8/5/2008

Page 150

1  house, I apologize if I asked that before, did
2  you see water stains on the ceiling there at
3  the Burgundy Street property?
4      A.  Yeah, that flood water was up to the
5  ceiling as far as I know.
6      Q.  So you believe it was up to the
7  ceiling?
8      A.  Yes.
9      Q.  And you have eight foot ceilings
10 there?
11     A.  I don't know.  But it's low.  It's
12 not high ceilings.
13     Q.  In your neighborhood when you drove
14 up, did you see damages to roofs in your
15 immediate neighborhood, on your block?
16     A.  I never noticed.  But the houses was
17 damaged.  A lot of water they had in there.
18     Q.  Did you see any trees blown down on
19 your block?
20     A.  No.  I didn't see any.
21     Q.  Did you have a fireplace?
22     A.  Yes.
23     Q.  You did?
24     A.  Uh-huh (affirmatively).
25     Q.  Was the fireplace damaged during the

Page 151

1  storm?
2      A.  Yes.
3      Q.  How was it damaged?
4      A.  It just doesn't work at all.
5  Everything in there all white.  I'm trying to
6  repair it.
7      Q.  And this fireplace went up through
8  your roof; right?
9      A.  Yeah.
10     Q.  You made a homeowner's insurance
11 claim on the Burgundy property; right?
12     A.  Yes.
13     Q.  I'm going to mark as Exhibit Number
14 8 some documents that we received from you.
15 The first item is a State Farm Insurance
16 Company letter with some schedules attached.
17     A.  Uh-huh (affirmatively).
18     Q.  I'll ask you to take a look at that.
19 It's Bates stamped Mumford 000031 through 39.
20         Do you recognize these documents?
21     A.  Yes.
22     Q.  I want to draw your attention to the
23 document with the Bates number at the bottom,
24 your Counsel can show it to you, it's going to
25 be 34.  This was your wind policy; correct?

Page 152

1      A.  Yes.
2      Q.  And you were paid amounts for
3  exterior damage to the roof of the main
4  dwelling, the carport, and the shed; correct?
5      A.  Yes.
6      Q.  And this was all wind-caused damage;
7  correct?
8      A.  Yes.
9      Q.  What sort of damage did you have to
10 the carport and shed?
11     A.  The carport, it's kind of torn up
12 from the top.  And the posts on there, they
13 all hanging.  The shed, it could have been the
14 roof I think that was the roof damage on
15 that.
16     Q.  And to the main dwelling, that's
17 your house, again, there was roof damage
18 there; correct?
19     A.  Yes.
20     Q.  And on the next page, Mumford 35,
21 there is a note of net actual cash value
22 payment of $12,613.79.
23     A.  Yes.
24     Q.  That's what you were paid on your
25 wind policy?

Page 153

1      A.  Yes.
2      Q.  Have you sought to obtain any more
3  money from your homeowner's insurance company
4  on the property at 4829 Burgundy?
5      A.  No.
6      Q.  On page 1 of that document, Bates
7  stamped 31, there's a lot of redacted
8  information at the top.  Marked out with a
9  black marker.
10     A.  Yeah.
11     Q.  What is that?
12     A.  That is -- I had wrote on this
13 certain things and fax numbers and all, phone
14 numbers, and I just scratched it all out after
15 I didn't think I would need that any more.
16     Q.  Did anybody tell you to scratch that
17 out?
18     A.  No.  I did that myself.
19     Q.  You said --
20     A.  You can kind of see where I faxed
21 some of the writing.
22     Q.  So you're saying you didn't think
23 that was relevant so you --
24     A.  No.  Well, it is, but I didn't --
25     Q.  Did you scratch that out before or

39 (Pages 150 to 153)

MUMFORD, ETHEL

8/5/2008

Page 154

1  after you filed the lawsuit?
2      A.  Oh, before.  Way before.
3      Q.  Well, do you know when the lawsuit
4  was filed?
5      A.  Let's see.  It was filed in 2006.  I
6  can't remember the exact date.
7      Q.  Now, this document is dated November
8  10th, 2005; right?
9      A.  Yes.
10     Q.  And was this mailed to you?
11     A.  They don't have my correct address
12  on there.
13     Q.  I was going to ask you about.
14  They've got P.O. Box 151, Arabi, Louisiana.
15     A.  That was before the storm.  But I
16  think he mailed it to me in Lafayette.
17     Q.  Well, before the storm you had a
18  P.O. Box in Arabi?
19     A.  Yes.
20     Q.  So you think that this person
21  eventually mailed this to you in Lafayette?
22     A.  In Lafayette, yes.
23     Q.  Do you know how long it took to get
24  to you in Lafayette?
25     A.  It didn't take very long, because he

Page 155

1  was in some part of Louisiana himself.
2      Q.  Do you remember the date that you
3  received this?
4      A.  No.
5      Q.  Now, you said you believed that you
6  redacted this information before you filed the
7  lawsuit.  Is that right?
8      A.  Yes.
9      Q.  Have you ever seen a copy of the
10  lawsuit in this case?
11     A.  Yes.
12     Q.  And were you shown a copy of the
13  lawsuit before it was filed on your behalf?
14     A.  Yes.
15     Q.  And how did you obtain a copy of the
16  lawsuit?
17     A.  I didn't get a copy of it, but they
18  did show it to me.
19     Q.  Who showed it to you?
20     A.  The Wiedemanns.
21     Q.  When did they first show it to you?
22     A.  Well, just before they filed it, I
23  think they showed it to me.
24     Q.  Where did they show it to you?
25     A.  In the office.

Page 156

1      Q.  So you came back to New Orleans for
2  the first time in December of 2005.
3      A.  Yes.
4      Q.  That's the first time you ever set
5  foot in New Orleans after the storm; right?
6      A.  Yes.  The storm was August -- I
7  think I was back before then.  I came back
8  before December, but I just was in and out.
9      Q.  You didn't meet with the Wiedemanns
10  when you were just in and out?
11     A.  Yeah, I went in the office when I
12  was in and out.
13     Q.  When was that?
14     A.  It was about 2005.
15     Q.  What month in 2005?
16     A.  Let's see.  The storm was August.
17  About September, October.
18     Q.  All right.  So I am just trying to
19  clarify, because my notes -- You told me
20  earlier the first time you came was December
21  of 2005.
22     A.  That's when I was allowed to go in
23  the Lower Ninth Ward.
24     Q.  But you actually came back to New
25  Orleans before then?

Page 157

1      A.  Yeah, before this -- They wouldn't
2  let us in the Lower Ninth Ward until a certain
3  time, and that was December.  December.
4      Q.  The first time that you came back,
5  can you give me an approximate date when it
6  was?
7      A.  I can't tell you the exact date, but
8  it was somewhere like September, October.
9      Q.  And when you came in that time in
10  September or October, where did you stay?
11     A.  I stayed with my sister-in-law.  And
12  one time I stayed with my niece.
13     Q.  Your sister-in-law was on Daneel
14  Street?
15     A.  Daneel.
16     Q.  Daneel Street?
17     A.  Yeah.
18     Q.  The first time that you came to New
19  Orleans, I know you didn't go to the Ninth
20  Ward, but the first time you came in, how long
21  were you in town?
22     A.  A couple of days.  I was on
23  Josephine Street that time with my niece.
24     Q.  What did you do on that first trip
25  when you came back to New Orleans?

40 (Pages 154 to 157)

BARGE001008

MUMFORD, ETHEL

8/5/2008

Page 158

1      A.  I think I came for a funeral that
2  first time.  And that time I stayed with my
3  niece.
4      Q.  All right.  So I want to go over the
5  first time.
6      A.  Okay.
7      Q.  This was September or October;
8  right?
9      A.  Yeah.
10      Q.  And you came and stayed with your
11  niece on Josephine Street?
12      A.  Yes.
13      Q.  And how long did you stay with her?
14      A.  A couple of days.
15      Q.  And you went to a funeral at that
16  time?
17      A.  Yeah.
18      Q.  What else did you do?
19      A.  Well, I went -- I went in the
20  Wiedemanns' office also.
21      Q.  Why did you go in to Mr. Wiedemann's
22  office?
23      A.  Well, I always -- I have known him a
24  long time and I went and spoke to him, see how
25  they were getting along.  They said they

Page 159

1  didn't have any water.
2      Q.  Between the time of the storm and
3  the time you came in and saw the Wiedemanns,
4  had anyone from Mr. Wiedemann's office called
5  you?
6      A.  No, I don't think so.  No.
7      Q.  So you're saying you came in to New
8  Orleans and you went to a funeral at that
9  time; right?
10      A.  Yes.
11      Q.  And you hadn't previously been
12  contacted by the Wiedemanns?
13      A.  I don't remember, sir.
14      Q.  Okay.
15      A.  Maybe I had.
16      Q.  Well, did you go and visit the
17  Wiedemanns because they had asked you to come
18  over?
19      A.  No, I just -- I have known them for
20  30-something years and I hadn't seen them so I
21  just went there and visited with them.
22      Q.  And where did you see them at?
23  Where was their office?
24      A.  On Baronne Street.  821 Baronne.
25      Q.  Were they in their office at the

Page 160

1  time?
2      A.  Some of them was there.  They all
3  were not there.
4      Q.  Did they have electricity?
5      A.  Yes.
6      Q.  Who did you meet with there?
7      A.  I think Karen was in the office.
8  Karen Wiedemann.
9      Q.  At that point were the Wiedemanns
10  representing you in connection with any
11  lawsuits?
12      A.  I don't remember the exact month.
13      Q.  Well, when you came back to New
14  Orleans in September or October and you saw
15  the Wiedemanns, did you believe there had been
16  a lawsuit filed on your behalf at that time?
17      A.  I don't think it was filed at that
18  time, the first time I went.
19      Q.  Well, when you went to the
20  Wiedemanns' office, did you go there with the
21  intent of discussing with them a possible
22  lawsuit?
23      A.  Not at that time.
24      Q.  So the purpose at that time was just
25  to see how your lawyers were doing?

Page 161

1      A.  Yeah.
2      Q.  Just popping in to say hi?
3      A.  Yeah.
4      Q.  Who else did you see during that
5  trip other than go to the funeral and see
6  Karen Wiedemann?
7      A.  Nobody else was there.  Oh, Kendrick
8  and Gloria was there.
9      Q.  Where?
10      A.  They were in the office.
11      Q.  At the Wiedemanns'?
12      A.  Yes.
13      Q.  And you knew all of these people?
14      A.  Yes.
15      Q.  Because they had represented you in
16  prior lawsuits?
17      A.  Not Kendrick and Gloria.  They never
18  represented -- They are not lawyers.
19      Q.  Karen is a lawyer.
20      A.  Yes.
21      Q.  And she had represented you in other
22  lawsuits?
23      A.  Yes.
24      Q.  And those lawsuits included those
25  automobile lawsuits --

Johns Pendleton Court Reporters                    800 562-1285
BARGE001009

MUMFORD, ETHEL

8/5/2008

Page 162

```
1       A.  Yes.
2       Q.  -- that we talked about earlier;
3  right?
4       A.  Yes, uh-huh.
5       Q.  Other than Karen, you mentioned two
6  other people, right?  Kendrick?
7       A.  And Gloria.
8       Q.  And who were these people?
9       A.  Well, they were staying in the
10 office because they had nowhere else to go.
11 Their houses washed away.
12      Q.  Had you had prior experiences with
13 either one of those people?
14      A.  Yes.
15      Q.  You knew them?
16      A.  Yes.
17      Q.  And how did you know them?
18      A.  I knew them from -- Kendrick and
19 Gloria from the Wiedemanns' office.
20      Q.  So had they helped in other cases of
21 yours?
22      A.  No.
23      Q.  Well, how did you meet them then at
24 the Wiedemanns' office?
25      A.  I just met them by going there.
```

Page 163

```
1       Q.  Before the storm how often did you
2  go to the Wiedemanns' office?
3       A.  I used to go there three times a
4  week.  I was working for them.
5       Q.  You were working for them?
6       A.  Uh-huh (affirmatively).
7       Q.  Okay.  And what were you doing
8  there?
9       A.  Cleaning.
10      Q.  So that was one of the cleaning jobs
11 that --
12      A.  Yeah.
13      Q.  -- you told me about earlier?
14      A.  Uh-huh (affirmatively).
15      Q.  And for how long had you been doing
16 the cleaning work at the Wiedemanns?
17      A.  30-something years.
18      Q.  Well, that explains why you would
19 know them.  Do you still do cleaning work for
20 the Wiedemanns?
21      A.  Yes.
22      Q.  So you have worked for the
23 Wiedemanns now for 35 years.
24      A.  About that.
25      Q.  And so these other lawsuits that we
```

Page 164

```
1  talked about you filed, obviously you had
2  already been working for the Wiedemanns at the
3  time; right?
4       A.  Yeah.
5       Q.  And when you first visited them in
6  September or October, obviously you weren't
7  doing any work there?
8       A.  No, I wasn't working there then.
9       Q.  The water that flooded you on
10 Burgundy Street, are you aware that there were
11 breaches of levees along the MRGO?  Are you
12 familiar with the MRGO?
13      A.  No.
14      Q.  But as far as the water that flooded
15 you on Burgundy Street, you don't know where
16 that water came from, do you?
17      A.  The river and Industrial Canal.
18      Q.  You think it also came from the
19 river?
20      A.  Yeah, I think so.  The river runs
21 into the Industrial Canal.
22      Q.  What about the water that flooded
23 you on North Robertson Street?  Do you know
24 where that comes from?
25      A.  It's the same water, I think.
```

Page 165

```
1       Q.  But you're not sure?
2       A.  Well, I thought that's where all the
3  water came from, the Industrial Canal and the
4  river.
5       Q.  And how did you come to that
6  information?
7       A.  That's the water we're surrounded
8  by.
9       Q.  Well, --
10      A.  The lake also, but the lake further
11 back.
12      Q.  Has anyone ever told you that the
13 water that flooded you on Burgundy and North
14 Robertson came from the Industrial Canal?
15      A.  Yes.  I knew that's where it came
16 from, because the levee was broke.  That's the
17 same place that happened that way with Betsy
18 also.
19      Q.  So during Betsy there was a breach
20 in the Industrial Canal?
21      A.  Yeah.
22      Q.  And based on that prior information,
23 that's why you believed that there were
24 breaches on the Industrial Canal this time for
25 Katrina?
```

42 (Pages 162 to 165)

MUMFORD, ETHEL

8/5/2008

Page 166

1     A.  Yeah.
2     Q.  When did you decide to file this
3  lawsuit?
4     A.  I think it was early '06.
5     Q.  Why did you decide to file a
6  lawsuit?
7     A.  Well, I had lost everything I had.
8  I didn't have anything.  And the water was the
9  problem that caused all the damage.
10     Q.  So when you first saw the Wiedemanns
11  in September and October of 2005 when you came
12  and visited them, you told me earlier they
13  didn't represent you in any lawsuit at that
14  time, did they?
15     A.  No.
16     Q.  You hadn't decided to file this
17  lawsuit yet, had you?
18     A.  I don't -- It wasn't that time.  The
19  first time I went in the office, we hadn't
20  decided to do -- I hadn't decided.
21     Q.  And you at that point spoke to Miss
22  Wiedemann; right?
23     A.  Yes, uh-huh.
24     Q.  Did you speak to her about --
25         MR. WIEDEMANN:

Page 167

1         Counsel, I object.  I'm
2     instructing her not to say anything
3     about conversations between your
4     attorneys and yourself, Ethyl.
5         MR. BLANCHARD:
6         All right.  Well, she's just
7     testified that she didn't represent
8     her at that time.
9         MR. WIEDEMANN:
10         Objection.  She's not answering
11     questions about discussions between
12     Counsel and the Plaintiff in this
13     lawsuit.
14         MR. BLANCHARD:
15         Just to be clear, you're
16     instructing her not to answer that
17     question?
18         MR. WIEDEMANN:
19         You didn't ask the question.
20  EXAMINATION BY MR. BLANCHARD:
21     Q.  All right.  Well, let me ask a
22  question and then you -- When you first met
23  with Miss Wiedemann after the storm, you told
24  me you just happened to come in and see how
25  they were doing.  Right?

Page 168

1     A.  Yes.
2     Q.  All right.  And she didn't represent
3  you in this lawsuit at the time, did she?
4     A.  I can't remember the exact date and
5  month.
6     Q.  Did she represent you in any other
7  lawsuits at that time?
8     A.  Not at that time.  That I could
9  recall.
10     Q.  And you knew her based on your
11  longstanding relationship as an employee of
12  the Wiedemanns; right?
13     A.  Yes.  Yes.
14     Q.  And when you first came and met with
15  her in September of 2005, what did you talk
16  about?
17         MR. WIEDEMANN:
18         Objection, Counsel.  That is
19     clearly privileged communications and
20     it's improper for you to even ask her,
21     and I am instructing her not to
22     answer.
23  EXAMINATION BY MR. BLANCHARD:
24     Q.  All right.  When you first met with
25  them, the Wiedemanns, in September of 2005,

Page 169

1  you came to the office and visited them as an
2  employee of the Wiedemanns; right?
3     A.  Yes.
4     Q.  And when you were talking to Miss
5  Wiedemann at the time, I assume you were
6  friends with her?
7     A.  Yeah.
8     Q.  Were you talking to her as a friend?
9     A.  Yes.
10     Q.  And there were other employees in
11  the office at the time, Kendrick and the other
12  person that you mentioned?
13     A.  Yes.
14     Q.  Right?  And you were talking to them
15  as acquaintances or friends; right?
16     A.  Yes.
17     Q.  I'll go back to this then, Miss
18  Mumford.  At that time you had not retained
19  them, the Wiedemanns, specifically to
20  represent you in this lawsuit, had you?
21     A.  I can't remember the exact time.  At
22  this time I just -- I don't remember.
23     Q.  Do you ever remember signing any
24  sort of retention agreement with the
25  Wiedemanns?

43 (Pages 166 to 169)

MUMFORD, ETHEL

8/5/2008

---

Page 170

1    A.  Not at that time of visiting.
2    Q.  Have you ever signed any sort of
3  retention agreement with the Wiedemanns in
4  connection with this lawsuit?
5    A.  Yes.
6    Q.  Do you know when you signed that?
7    A.  No.
8    Q.  When you signed that document on
9  that date, was that the date that you retained
10  the Wiedemanns to represent you in this
11  lawsuit?
12    A.  No.
13    Q.  When you came to New Orleans in
14  September of 2005, did you have any ideas
15  about filing a lawsuit in connection with the
16  flooding of the Lower Ninth Ward?
17    A.  Not at that time, no.
18    Q.  At what time did you have
19  information that led you to believe that you
20  would want to file a lawsuit?
21    A.  I can't remember the exact time.
22    Q.  When you went to the Wiedemanns' on
23  September or October of 2005, when you went in
24  there for the first time, you did not have any
25  intent at that visit of hiring them to

---

Page 171

1  represent you in any lawsuit, did you?
2    A.  Not at that time.
3    Q.  All right.  Thank you.  Well, I'll
4  go back to that.  Based on the record we have
5  just established, I would like you to tell me
6  what you discussed with Karen Wiedemann on
7  that day.
8        MR. WIEDEMANN:
9        Objection.  Ethyl, don't answer
10    the question.
11  EXAMINATION BY MR. BLANCHARD:
12    Q.  Now, Miss Mumford, you made a flood
13  claim in connection with your property at 4829
14  Burgundy; right?
15    A.  Yes.
16    Q.  I am going to go ahead and mark as
17  Exhibit Number 9 a copy of the check that we
18  received, which is Bates stamped Mumford
19  000046 for $117,632.44.  Is this a check that
20  you received on your flood insurance policy?
21    A.  Yes.  Yes, it is.
22    Q.  I'll ask you to identify it.
23    A.  Okay.
24    Q.  Do you recognize this document?
25    A.  Yes.

---

Page 172

1    Q.  And is this a copy of a check that
2  you received on your flood insurance policy
3  for 4829 Burgundy?
4    A.  Yes.
5    Q.  I'm going to go ahead and mark as
6  Exhibit 10 --
7        MR. WIEDEMANN:
8        Does that have a Bates number?
9        MR. BLANCHARD:
10        Yes.  This is Bates stamped
11    Mumford 00002- -- I'm sorry.  Yes,
12    000025.  Exhibit 10.
13  EXAMINATION BY MR. BLANCHARD:
14    Q.  There's two items referenced here,
15  Miss Mumford, so I will ask about both of
16  them.  The first one is at the bottom.  A
17  little difficult to read.  But there's a
18  reference to $7,367.56.
19    A.  Yes.
20    Q.  Is that additional flood proceeds
21  you received at 4829 Burgundy?
22    A.  Yes.
23    Q.  Is that right?
24    A.  Yes.
25    Q.  Then there is a reference to another

---

Page 173

1  item above that, $35,000.  There's a note
2  "Settlement of contents damage less
3  deductible of 500."  Is that the amount you
4  received for contents from your flood
5  insurance policy at 4829 Burgundy?
6    A.  They give me the checks in parts and
7  they all supposed to add up to 175,000.
8    Q.  So all of the flood insurance checks
9  that you received on Burgundy, which would
10  include the property damage and the contents,
11  should add up to about $175,000?
12    A.  Yes.
13    Q.  So this $35,000, that's part of the
14  payment that you received?
15    A.  Yes.
16    Q.  I'm going to go ahead and mark as
17  Exhibit Number 11 documents we received from
18  your Counsel Bates stamped 000080 through 82.
19  I'm going to ask you about this document.  And
20  specifically the third page.  That is a list
21  of amounts.  Take a look at that.
22        You see those amounts on page 3?
23  There's a reference to Colonial Claims
24  Corporation and reference to a house being
25  flooded.  Do you see that?  And specifically I

---

44 (Pages 170 to 173)

MUMFORD, ETHEL

8/5/2008

Page 174

1  want to draw your attention to some check
2  dates.  Do you see that?
3      A.  Uh-huh (affirmatively).
4      Q.  There's a reference to a check for
5  $117,632.44.  We already went over that
6  check.  That was one of the checks you
7  received; right?
8      A.  Okay.  Yes.
9      Q.  And then the next item, the
10 $7,367.56, that was another amount you
11 received from your flood insurance company;
12 right?
13     A.  Yes.
14     Q.  And then the next two items are
15 voided; and then after that, the last two
16 items, there's a reference to a check for
17 $35,000.  We already gone over that.
18 That was for contents; right?
19     A.  Yes.
20     Q.  And you received that; correct?
21     A.  Yes.
22     Q.  Then underneath that, there is
23 another reference to $15,000.  Did you receive
24 a check for $15,000?
25     A.  I received one for $15,000, but I

Page 175

1  don't know if it was Burgundy Street or
2  Feliciana Street.  Burgundy Street comes up,
3  as I told you, for $175,000.  That's all I got
4  for Burgundy.  And I got some for Feliciana
5  Street.
6      Q.  But your recollection that the total
7  amount you got for Burgundy Street was
8  $175,000?
9      A.  Yes.
10     Q.  If my math is right, the 117 and the
11 7 and the 35 and 15 will come up to about
12 175,000.
13     A.  Oh.  Well, that's it.
14     Q.  Thank you.  Now, Miss Mumford, you
15 also made a Road Home application at 4829
16 Burgundy Street; right?
17     A.  Yes.  Yes.
18     Q.  I'm going to go ahead and mark as
19 Exhibit Number 12 a document Bates stamped
20 Mumford 000028 through 30, which is a letter
21 to you, RE 4829 Burgundy Street.  I ask you to
22 take a quick look at that.
23         Do you remember getting this
24 document, Miss Mumford?
25     A.  Yes.

Page 176

1      Q.  And did you obtain funds from the
2  Road Home Program for 4829 Burgundy?
3      A.  Yes.
4      Q.  And how much did you get?
5      A.  $50,000.
6      Q.  Thank you.  So insurance proceeds,
7  you received about $175,000?
8      A.  Yes.
9      Q.  And you received 50,000 from Road
10 Home?
11     A.  Yes.
12     Q.  So it's about 225,000 total.
13     A.  Yes.
14     Q.  Did you receive any other monies
15 from insurance companies or any government
16 groups on 4829 Burgundy?
17     A.  The 12,000 from State Farm.
18     Q.  That's right.  I forgot about that.
19 All right.  So you received the 175 in flood,
20 the 50 from the Road Home, and the 12 from
21 State Farm on the wind claim.
22     A.  Yes.
23     Q.  Thank you for correcting me on
24 that.
25         Did you receive any other

Page 177

1  insurance or other proceeds in connection with
2  that property?
3      A.  FEMA.  FEMA gave $4,300, I believe.
4      Q.  Anything else?
5      A.  300 Red Cross.  That's all I could
6  remember.
7      Q.  Thank you.  Let's go to the property
8  at 6105-07 North Robertson Street.  I'll mark
9  as Exhibit 13 a letter to you from the Road
10 Home, Bates stamped Mumford 000024.
11 Apparently we received just the first page of
12 the letter, but that'll be sufficient.  Do you
13 remember getting this letter?
14     A.  Uh-huh (affirmatively).
15     Q.  Is that a "yes"?
16     A.  This is from the Small Rental Road
17 Home.
18     Q.  So you made an application to the
19 Road Home for the property at 6105-07.
20     A.  Yes.
21     Q.  And you remember getting this
22 document dated September 28, 2007 from the
23 Road Home?
24     A.  Yes.
25     Q.  There's a note here in the letter

45 (Pages 174 to 177)

MUMFORD, ETHEL

8/5/2008

Page 178

1  that the maximum award you were eligible to
2  receive was 36,500.
3      A.  That's correct.
4      Q.  Did you get that amount?
5      A.  I didn't get it.  I have to repair
6  the property, rebuild it completely and then
7  they will give me the money.
8      Q.  So it's your understanding that you
9  will be able to obtain this money once you
10  make repairs to the property?
11      A.  Yes.
12      Q.  And spend that amount of money?
13      A.  Yes.
14      Q.  I'm going to mark as Exhibit Number
15  14 a declarations page and other documents
16  related to the Citizens Fair Plan.  This
17  relates to 6105 North Robertson.  It's Bates
18  stamped Mumford 43, 44, and 47.  I ask you to
19  take a look at that.  Do you recognize these
20  documents?
21      A.  Yes.
22      Q.  And the first page, 43, is a
23  declarations page from the Louisiana Citizens
24  Fair Plan.  This indicates that you had
25  coverage on 6105-07 North Robertson for

Page 179

1  $32,000.  Is that right?
2      A.  No.  That's not right.  61 -- That's
3  Feliciana.
4      Q.  You see under "Limit of liability",
5  "Section 1 coverage, coverage A, dwelling"?
6      A.  Yes.
7      Q.  $32,000?
8      A.  Well, that's Feliciana Street.  It
9  says 6105-07.
10      Q.  Yes.  Do you see where it says
11  "Legal address"?
12      A.  "Legal address"?  Legal address.
13  Yes.  That's 6105-07.  That's correct then.
14      Q.  So you had coverage on that property
15  at 6501-07 --
16      A.  Yes.
17      Q.  -- through the Louisiana Citizens
18  Fair Plan?
19      A.  Yes, I had that.  Wind and fire.
20      Q.  And your total coverage for both
21  sides was $32,000; right?
22      A.  Yes.  Correct.
23      Q.  And you mentioned earlier that you
24  had received some monies from them --
25      A.  Yes.

Page 180

1      Q.  -- after the deductible.  And I want
2  you to go to page 47 of that.  And there's a
3  reference to an amount of $555.66 and then
4  there's some handwriting at the top "This is
5  the amount of money I received from insurance
6  company"?
7      A.  Uh-huh (affirmatively).
8      Q.  Is that your handwriting at the top?
9      A.  Yes.  Yes.
10      Q.  So you received these wind insurance
11  proceeds on that property at 6501-07?
12      A.  No, this 6113 and 15 where I
13  received the 500.
14      Q.  Oh, I apologize then.  So that's
15  where you received the $555, was for 6113-15
16  North Robertson?
17      A.  Correct.
18      Q.  And you mentioned earlier on the
19  6105-07 you received about 9,000?
20      A.  I think 9,000.
21      Q.  Okay.  How much did you have the
22  property at 6113-15 North Robertson insured
23  for?  Do you remember?
24      A.  It was about 60,000.
25      Q.  Ms. Mumford, I'm going to mark as

Page 181

1  Exhibit Number 15 a copy of what appears to be
2  an estimate from Diamond's Home Realty,
3  Inc. --
4      A.  Yes.
5      Q.  -- regarding 6113-15 North
6  Robertson.  This is Bates stamped Mumford 83
7  and 84.  I'll ask you to take a look at that.
8  Do you recognize this document?
9      A.  Yes.
10      Q.  This estimate is for $97,500.
11  Right?
12      A.  Yes.
13      Q.  I thought you told me earlier that
14  the Diamond's estimate was 109,000.
15      A.  It was.
16      Q.  Did I get that wrong?
17      A.  That's how much I paid already.
18  This is the estimate they gave me.  But then
19  they said it had to add on and I had to pay
20  for that and I had to pay for gas.  So I paid
21  them a total of 109,000.
22      Q.  There's a list of work items here.
23  Numbers 1 through 20.
24      A.  Uh-huh (affirmatively).
25      Q.  Do you see that?

46 (Pages 178 to 181)

BARGE001014

MUMFORD, ETHEL

8/5/2008

Page 182

1    A.  Yes.
2    Q.  Did they do all of that work?
3    A.  Yes, they did it all, but it -- they
4  didn't really complete all of it.  Because
5  installing new plumbing, I had -- I just got a
6  plumber to do the gas line and to finish up
7  the water line.  And I paid him $8,100.  And
8  other things they didn't do.
9    Q.  This quote from Diamond's Home
10  Realty, this included the addition?
11    A.  Yeah.
12    Q.  So this included everything they
13  were going to do?  This wasn't only repairs;
14  this was the amount where you added on to that
15  property; right?
16    A.  The addition was supposed to have
17  been included in this.
18    Q.  Thank you.  I'll go ahead and mark
19  as Exhibit 16 a proposal from Oscar Johnson
20  dated April 22nd, 2008, I am going to mark it
21  as Exhibit 16, Mumford 000065, and ask you, do
22  you recognize this document, Miss Mumford?  Do
23  you recognize this document?
24    A.  Yes.
25    Q.  There's a reference to "Street",

Page 183

1  2829 Burgundy.  I assume that's wrong.  This
2  is your property at 4829 Burgundy;, right?
3    A.  Yes.
4    Q.  And did you actually hire Mr.
5  Johnson to do electrical work at 4829
6  Burgundy?
7    A.  Yes.  But I paid him more than
8  this.
9    Q.  What did you actually pay him?
10    A.  I paid him 8,300.
11    Q.  Do you have the actual bill from
12  him?
13    A.  I don't have it -- I have it at -- I
14  could get it.
15    Q.  Miss Mumford, I am going to mark as
16  Exhibit Number 17 copies of checks that we
17  received from your Counsel in response to
18  prior discovery requests.  These are Bates
19  stamped Mumford 76, 77, 78, 79, and 85, 86,
20  87, 88, and 89.  I ask you to take a look at
21  that.
22        Have you had a chance to look at
23  that document marked as Exhibit 17?
24    A.  Yes.
25    Q.  Why don't you keep it with you.  I

Page 184

1  am going to ask you some questions about
2  those.
3    A.  Okay.  All right.
4    Q.  Ever since Katrina, have you been
5  keeping track of your expenses that you have
6  incurred?
7    A.  I try to keep as best I can.
8    Q.  And when you write a check, I assume
9  you get the cancelled checks back --
10    A.  Yes, uh-huh.
11    Q.  -- from your bank?
12    A.  Yes.
13    Q.  Have you been keeping all of those
14  since Katrina?
15    A.  I try, yes.
16    Q.  These documents are copies of checks
17  that you wrote; correct?
18    A.  Yes.
19    Q.  And that's your signature on all of
20  these checks?
21    A.  Yes.  Except --
22    Q.  Well, there's some that aren't?
23    A.  Some my husband -- my son.
24    Q.  So your son has the ability to write
25  --

Page 185

1    A.  Yes.
2    Q.  Sign his name on these checks?
3    A.  He's on my checkbook.
4    Q.  And there's a reference in the memo
5  section of these checks to addresses.  Do you
6  see that?
7    A.  Uh-huh (affirmatively).
8    Q.  Such as on the first page there's
9  references to 4829 Burgundy.  But on other
10  pages there are references to other addresses,
11  aren't there?
12    A.  Yeah.
13    Q.  So when you spent monies for repairs
14  to any given residence, was it your habit to
15  include in the memo section the property that
16  that related to?
17    A.  Yes, I try to do that so I'll know.
18    Q.  And these documents were produced to
19  us in connection with this litigation.  Did
20  you go back and collect all of your checks
21  that you had for repairs to your properties
22  and provide those to your lawyers?
23    A.  I didn't give them all.  I still
24  have more.  But I have some new ones.
25    Q.  But you gave them everything you had

Johns Pendleton Court Reporters          800 562-1285

BARGE001015

MUMFORD, ETHEL

8/5/2008

---

Page 186

1  through a certain date?
2      A.  Yes.
3      Q.  And do you know what date that was?
4  Well, maybe I can help you here.  I see
5  references here to June 14th, 2008.
6      A.  Uh-huh (affirmatively).
7      Q.  July 25th, 2008.
8      A.  Yes.  Diamond.
9      Q.  So you collected all of your checks
10  through at least July 25th, 2008 to provide to
11  your lawyers; correct?
12     A.  Yes.  Yes.
13     Q.  Now, going through the checks for
14  4829 Burgundy, do these checks represent all
15  of the amounts that you have spent on repairs
16  to that property through July 25th, 2008?
17     A.  No.
18     Q.  Well, what's missing?
19     A.  I have more checks.  Just I didn't
20  -- I didn't have them all at the time.  But I
21  went to the bank and I got some more checks,
22  what I didn't have.
23     Q.  So are these checks -- all of these
24  checks after July 25th, 2008?
25     A.  No, these are up to July, 2008.  But

---

Page 187

1  I still have more at the house.
2      Q.  So you have more checks?
3      A.  Yes.
4      Q.  And the question was, are those
5  checks all dated after July 25th, 2008 or are
6  there some before?
7      A.  Some are before and some after.
8      Q.  And the checks that you haven't
9  produced so far, do they relate to any
10  specific property?
11     A.  Yes.
12     Q.  Which --
13     A.  6113 and 15 and 4829 Burgundy.
14     Q.  Let's go through some of these
15  checks, Miss Mumford.  On the first page,
16  Bates stamped 76, there's a check for
17  $5,679.74 to Home Depot.  Do you see that?
18     A.  No, I don't see it.  The Home
19  Depot.  Yeah, 5,6-- Yeah, that's Burgundy
20  Street.
21     Q.  Do you know what that was for?
22     A.  Cabinets.
23     Q.  And on that same page, check 2710 to
24  James Curley for $1,100.
25     A.  Uh-huh (affirmatively).  That's for

---

Page 188

1  6113 and 15 North Robertson Street.  That's
2  the plumbing.
3      Q.  You mentioned him earlier to me.
4      A.  Yeah.
5      Q.  On the second page, which is Bates
6  stamped 77, there's a check number -- the
7  check number is actually cut off, but it's
8  dated June 10th, 2008 to Dwayne Williams.  Who
9  is that?
10     A.  He did some work on North Robertson
11  Street.  Work with the cabinets.
12     Q.  Was he the carpenter that you told
13  me about earlier?
14     A.  Yeah.
15     Q.  On the next page, Bates stamped 78,
16  there's a check for $600 to Henderson
17  Mumford.  That's your son; right?
18     A.  That's my son, yeah.  He had folks
19  working with him and he get the material and
20  pay the guys cash and write the check.
21     Q.  Did your son actually do any work on
22  Burgundy Street?
23     A.  Yes.  Yes.
24     Q.  What kind of work has he done there?
25     A.  Well, he does a little bit of

---

Page 189

1  everything.  He do the building, the
2  sheetrock, molding, baseboards.
3      Q.  He hasn't been billing you for any
4  of that, though, has he?
5      A.  I pay him a little something.
6      Q.  You pay him a little something?
7      A.  Uh-huh (affirmatively), I pay him.
8  And if he buy the material, I pay someone to
9  help him, he write a little check.
10     Q.  And if there's anything left over,
11  he keeps it?
12     A.  I give it to him.
13     Q.  Who is -- I see Eugene Richardson on
14  Bates stamped page 79.
15     A.  He's one of the roofers.  On what
16  page?  Yeah.  The roofer.
17     Q.  Now, there are some checks in here
18  as well to Oscar Johnson.  He did the
19  electrical work on Burgundy; right?
20     A.  Yes.  Yes.
21     Q.  And James Curley is the plumber?
22     A.  Plumber, yes.
23     Q.  For Burgundy.
24     A.  Uh-huh (affirmatively).  Burgundy
25  and Robertson.

---

48 (Pages 186 to 189)

MUMFORD, ETHEL

Page 190

```
 1       Q.  Miss Mumford, do you have any
 2   estimate of how much more in expenses there
 3   are for your properties' repairs other than
 4   what you have checks for here?
 5       A.  Yes, I could get some.  I have more.
 6       Q.  You would have to get those checks;
 7   right?
 8       A.  Yes.
 9       Q.  As you sit here today, you can't
10   give me an estimate of how much more you have
11   spent other than what's listed on these
12   checks, can you?
13       A.  I spent for sheetrock, sheetrock I
14   spent about -- I guess about $300 for North
15   Robertson.
16       Q.  Anything else that you can remember?
17       A.  I have Mr. Curley, he wrote me up a
18   proposal for 6,000 and something, but I had
19   figured 8,100 I paid.  But I have that.  I
20   don't have it with me.  The 6,000 he wrote
21   up.  That just was the other day.
22       Q.  But if I was to try to calculate how
23   much you have spent, that would be the checks
24   we are going over --
25       A.  Yes.
```

Page 191

```
 1       Q.  -- plus any additional checks that
 2   you have at home; right?
 3       A.  Yeah.
 4       Q.  Plus any estimates that you
 5   eventually paid for other repairs; right?
 6       A.  Yes.  Yes.
 7       Q.  And as we went over earlier, the
 8   property at 6113-15 is almost complete?
 9       A.  Yes.
10       Q.  And 4829 Burgundy is far long as
11   well; right?
12       A.  Yes.  I don't have a lot more,
13   though.
14       Q.  I'm going to go ahead and mark as
15   Exhibit 18 a copy of something called
16   "Contents estimate" that we received from
17   your Counsel.  It's Bates stamped Mumford 101
18   and 102.  I ask you if you can take a look at
19   that, please.
20           Do you recognize this document?
21       A.  Yes.
22       Q.  Does this relate to your property at
23   4829 Burgundy?
24       A.  Yes.
25       Q.  Who prepared this list?
```

Page 192

```
 1       A.  The guy that gave me -- He just
 2   estimated that.  That's the one that wrote up
 3   the -- what he should pay me for the damage
 4   from State Farm.
 5       Q.  When he actually came out, did you
 6   have any of this property still at the 4829
 7   Burgundy Street address?
 8       A.  Yes.  When he came out, he -- It was
 9   -- It wasn't gutted -- It was gutted I think
10   when he came out there.
11       Q.  So by "gutted" you mean you had
12   taken everything out?
13       A.  Trying to think.  He went out there
14   before we gutted.  He went out there before we
15   gutted.
16       Q.  Did you prepare for him a list of
17   your contents?
18       A.  No.  I don't remember doing it.
19       Q.  Do you have a separate list of all
20   of your contents?
21       A.  I never -- I never did it at all
22   myself.  He did it.
23       Q.  So it was the person sent from the
24   insurance company that did all of this?
25       A.  Yes.
```

Page 193

```
 1       Q.  There's references on this report to
 2   ages.  Did you provide that information to
 3   him?
 4       A.  To what?  What?
 5       Q.  Well, for example, if you look at --
 6   You see the first item?
 7       A.  Yes.
 8       Q.  "R and R carpet over hardwood
 9   floor", do you see that?
10       A.  Carpet.  Yes.
11       Q.  And there's an age there, reference
12   3.
13       A.  Uh-huh (affirmatively).
14       Q.  Did you provide that information to
15   him?
16       A.  No, he I did not.
17       Q.  How old was the carpet in your house
18   at Burgundy at the time of the storm?
19       A.  It was not brand new carpet.  It had
20   been there maybe 12, 13 years.
21       Q.  How old was your washer and dryer at
22   Burgundy at the time of the storm?
23       A.  It was -- The washer was a couple of
24   years old.  The dryer was older.
25       Q.  More than ten years old?
```

MUMFORD, ETHEL

8/5/2008

Page 194

1     A.  Not that long.
2     Q.  More than five years old?
3     A.  Yes.
4     Q.  But as far as, again, these ages
5  here, he didn't ask you for that information?
6  He just put that information down himself?
7     A.  Yes.  I don't remember him asking
8  me.
9     Q.  What about the cost?  Did you
10 provide him any cost information?
11    A.  No.
12    Q.  So what happened here is this
13 gentleman came through your house, he prepared
14 this chart, he calculated the ages.  Is that
15 right?
16    A.  Yes.
17    Q.  There's a total here of, after
18 deductible, of $59,807.63.
19    A.  Uh-huh (affirmatively).
20    Q.  You didn't get that amount, did you?
21    A.  No.  I got $12,000.  I got the
22 contents, you know, I got $125 -- 125,000 for
23 the building, 50,000 for contents.
24    Q.  So you actually got 50 for contents?
25    A.  Yes.  I got that from the -- from

Page 195

1  the flood, though.  From this I got 12,000 and
2  something.  This -- I think this is State
3  Farm.
4     Q.  No, I'll represent to you, ma'am,
5  that this is -- I believe this is the flood
6  policy.
7     A.  It is?  Okay.
8     Q.  Did you have your flood -- Who did
9  you have your flood policy with?
10    A.  Fidelity.
11    Q.  Well, this reference is Fidelity
12 National Insurance Company.
13    A.  Okay.
14    Q.  So this is for flood.
15    A.  All right.
16    Q.  And you received -- you actually
17 received 50,000 for contents.
18    A.  Yes.
19    Q.  Did he send you with the check a
20 list of how he came up with the $50,000?
21    A.  That he said he could only pay me
22 the policy and that was all I had.
23    Q.  So that was your policy limits?
24    A.  Yes.
25    Q.  What was your policy limits for the

Page 196

1  home, the structure?
2     A.  125,000.
3     Q.  He paid you policy limits on --
4     A.  The home.
5     Q.  -- the home and the contents?
6     A.  Yes.
7        MR. BLANCHARD:
8        Let's go off.
9        (Whereupon a discussion was held
10 off the record.)
11 EXAMINATION BY MR. BLANCHARD:
12    Q.  Miss Mumford, I am going to show you
13 Supplemental Answers to Interrogatories that
14 we received from your Counsel January 24th,
15 2008.  And specifically I am going to draw
16 your attention to Interrogatory number 26.
17 You can take a minute to look through it.  I
18 want to ask you just a couple of general
19 questions about it first and then get into
20 number 26.
21        Miss Mumford, have you seen these
22 responses before?
23    A.  Yes.
24    Q.  I'm going to you marked as Exhibit
25 Number 19 the verification in this matter.  I

Page 197

1  ask you to take a look at that.  Do you recall
2  that document, Miss Mumford?
3     A.  Yes.
4     Q.  And did you read that before you
5  signed it?
6     A.  Yes.
7     Q.  Let me just confirm that that is
8  your signature there.  Correct?
9     A.  Yes.
10    Q.  And in that document you verify that
11 you had read all written discovery responses
12 made on your behalf in this matter and that
13 all the information contained therein is true
14 and correct to the best of your knowledge,
15 information, and belief.  Do you see that?  On
16 the verification?
17    A.  Yes.  Yes.
18    Q.  And so these discovery responses
19 that I put in front of you, you had actually
20 read those and made sure that they were
21 correct before you signed the verification;
22 correct?
23    A.  Yes.
24    Q.  All right, Miss Mumford.  Now I want
25 to draw your attention to your response to

MUMFORD, ETHEL

8/5/2008

Page 198

1    Interrogatory number 26.  And the question
2    there was "For each Plaintiff, including the
3    class rep, identify every injury or harm for
4    which damages are sought by that person and
5    each element of damage".  You see on page 26
6    there's a reference to your name, Ethyl Mae
7    Coleman Mumford.  Do you see that?
8        A.  Yes.  Yes.
9        Q.  And these are all the items of
10   damage that you seek recovery for in this
11   case?
12       A.  Uh-huh (affirmatively).
13       Q.  Is that correct?
14       A.  Yes.
15       Q.  I'm going to go a little bit out of
16   order here, but I want to draw your attention
17   to the third item, "Past and future loss and
18   destruction of and damage to immovable and
19   movable property".  Do you see that?
20       A.  Yes.
21       Q.  Do you know what immovable property
22   is?
23       A.  Yes.
24       Q.  What is that?
25       A.  It's like the house, the building I

Page 199

1    can't move.
2        Q.  Now, this item of damage relates to
3    the properties that we talked about earlier in
4    the Lower Ninth Ward; right?
5        A.  Yes.
6        Q.  And it excludes the Feliciana
7    property.
8        A.  Yes.
9        Q.  And in this item of damage you are
10   seeking money; correct?
11       A.  Yes.
12       Q.  And how much money you're seeking
13   depends upon how much damage happened to your
14   property; correct?
15       A.  Yes.
16       Q.  That would be how much damage
17   happened to your property because of flooding;
18   correct?
19       A.  Yes.
20       Q.  Specifically concerning some of the
21   properties that we talked about, specifically
22   6113-15 North Robertson, you told me that you
23   had paid Diamond's about 109,000.
24       A.  Yes.
25       Q.  And then you'd paid someone else

Page 200

1    $8,100.
2        A.  Yes.
3        Q.  And then you had a few other bills;
4    right?
5        A.  Yes.
6        Q.  In this lawsuit are you seeking
7    recovery of all of those amounts from
8    Lafarge?
9        A.  Yes.
10       Q.  So that would include the cost of
11   the additions to that property; correct?
12       A.  I didn't have the addition before
13   the storm, so that wouldn't be included.
14       Q.  So you're saying that should not be
15   included.
16       A.  Yes.  I didn't have it before.
17       Q.  Have you made any attempt to
18   determine how much of the expenses you paid in
19   connection with the property at 6113 --
20       A.  Yes, I have.
21       Q.  Hold on.  Let me finish my
22   question.  Have you made any sort of analysis
23   of how much of the amount you have spent on
24   6113-15 North Robertson related to repairs to
25   the property as it existed prior to the

Page 201

1    storm?  Do you understand that question?
2        A.  Prior to the storm?  That's before
3    the storm.
4        Q.  Well, in other words, you had a
5    certain amount of square footage before the
6    storm.
7        A.  Yes.
8        Q.  Right?  Now you've got more square
9    footage.
10       A.  Yes.
11       Q.  Have you made any sort of
12   determination of how much of that amount you
13   paid to Diamond's and these other people
14   relate to the size of the structure as it
15   existed before the storm versus how big it is
16   now?
17       A.  It's much larger now than it was
18   before the storm.  The lot was like 120 feet
19   deep.  So I added on and made it much larger.
20       Q.  Well, how much in damages do you
21   seek from Lafarge in connection with that
22   property, 6113-15 North Robertson?
23       A.  About 100,000.
24       Q.  And what do you base that on?
25       A.  On the work I have done that the

Johns Pendleton Court Reporters                    800 562-1285

BARGE001019

MUMFORD, ETHEL

8/5/2008

Page 202

1 water caused the damage.
2    Q.  Do you have any documents that
3 relate to that estimate?
4    A.  Yes, I have Diamond's right there.
5    Q.  But the Diamond's amount is more
6 than that; right?
7    A.  Yes.
8    Q.  But you're telling me you're not
9 seeking that much.  Is that correct?
10    A.  I am not seeking for the new part I
11 add on, I am not seeking that.  But I am
12 seeking for the space -- room I had before
13 Katrina.
14    Q.  And that same item, past and future
15 loss and destruction of movable property, do
16 you understand what that is?
17    A.  Yes.
18    Q.  What is that?
19    A.  Movable is the furniture and all.
20 And it's the contents, all that, movable.
21    Q.  And the contents here would relate
22 only to the property at 4829 Burgundy Street;
23 right?
24    A.  Yes.
25    Q.  Are you also seeking recovery for

Page 203

1 the vehicles that you told me about earlier?
2    A.  Yes.  Yes.
3    Q.  How much are you seeking for those?
4    A.  I'd say 10,000.
5    Q.  For both?
6    A.  Yes.
7    Q.  Past and future loss of use of
8 immovables and movables.  Do you see that?
9    A.  Yes.
10    Q.  Do you see that?
11    A.  Yes.
12    Q.  Do you know what you intend to
13 recover from that item of damage?
14    A.  The future movable -- That means --
15 Well, I have to buy new furniture and contents
16 and all of that.
17    Q.  You're seeking that item as past
18 destruction of movable property.
19    A.  Yes.
20    Q.  We already talked about that.
21    A.  Okay.
22    Q.  I am trying to determine whether
23 there's any difference between that and
24 exactly what you mean by past and future loss
25 of immovables and movables.  Loss of use, I'm

Page 204

1 sorry, of movables and non-movables.
2    A.  Loss of use of movables and
3 non-movables.  Well, the loss -- I lost
4 everything movable and unmovable.
5    Q.  Let's move on then to past and
6 future expenses for demolition and salvage of
7 immovable and movable property.  Do you see
8 that?
9    A.  Uh-huh (affirmatively).
10    Q.  Did you salvage any of the movable
11 property in your home?
12    A.  No.  No.
13    Q.  So there is no item of damage for
14 that, is there?
15    A.  No.
16    Q.  Did you salvage either one of the
17 vehicles?
18    A.  No.
19    Q.  So am I correct that you don't have
20 a claim for past and future expense of salvage
21 of movable property, do you?
22    A.  No.
23    Q.  What do you mean by past and future
24 expense for -- I understand demolition of
25 immovable property.  But the property at 6101

Page 205

1 North Robertson, that was demolished before
2 the storm; right?
3    A.  Yes.
4    Q.  Other than gutting the houses, has
5 there been any other work that would be
6 considered demolition for your property on
7 Burgundy or the properties on Robertson?
8    A.  No.
9    Q.  Diminution of property values.  What
10 do you mean by that?
11    A.  The value of the property.
12    Q.  Have you had any appraisals of any
13 of the properties?
14    A.  No.
15    Q.  The property at 6113-15 North
16 Robertson, that's actually better than it was
17 before the storm; right?
18    A.  Yes.
19    Q.  And the property at 4829 Burgundy,
20 when you finish those repairs, that's going to
21 be better than it was before the storm; right?
22    A.  About the same.
23    Q.  About the same?  Do you have any
24 documents in your possession relating to
25 diminution of property values for any of your

52 (Pages 202 to 205)

MUMFORD, ETHEL

8/5/2008

Page 206

1 properties?
2    A.  No.
3    Q.  Miss Mumford, over your lifetime you
4 have been involved in several real estate;
5 properties, correct?
6    A.  Yes.
7    Q.  So you're familiar with managing
8 rental properties?
9    A.  Yes.
10    Q.  And you're familiar with buying and
11 selling properties, aren't you?
12    A.  I never sold any.  I have been
13 buying, but not selling.  We never sold any
14 property.
15    Q.  In considering what your properties
16 are worth now, doesn't that depend on the
17 neighborhood that you're in?
18    A.  Yes, it has a lot to do with it.
19    Q.  All right.  And so when we're
20 talking about Burgundy, that's in a different
21 neighborhood than the Robertson Street
22 properties; right?
23    A.  Yes.
24    Q.  In fact, Burgundy is in Holy Cross;
25 right?

Page 207

1    A.  Uh-huh (affirmatively).
2    Q.  And the Robertson properties are
3 just -- What neighborhood is that in?
4    A.  Well, that's near North Claiborne.
5    Q.  It's part of the Lower Ninth Ward.
6    A.  Yes.
7    Q.  But obviously it's not part of Holy
8 Cross.
9    A.  No.
10    Q.  And in determining values, would you
11 agree that the Holy Cross neighborhood is a
12 nicer neighborhood than the Robertson Street?
13    A.  Yes.
14    Q.  All right.  And the niceness of the
15 neighborhood has an effect on the value of the
16 property; right?
17    A.  Yes.
18    Q.  And so you would agree with me that
19 determining the value of any given property in
20 the Ninth Ward, that's an individual type
21 issue, isn't it?
22    A.  Yes.
23    Q.  You would have to know the
24 neighborhood; right?
25    A.  Yes.

Page 208

1    Q.  You would have to know the condition
2 of the property; right?
3    A.  Yes.
4    Q.  So all of those things are unique to
5 those properties; correct?
6    A.  Yes.
7    Q.  All right.  Thank you.
8    A.  Could -- Would you mind going back
9 or could you go back to this one that says
10 past and future expense for demolition?
11    Q.  Sure.
12    A.  I didn't understand that one too
13 well.
14    Q.  Well, we talked about salvage of
15 movables.  That's to try to recover the
16 movables.
17    A.  Oh, okay.
18    Q.  You didn't do any of that?
19    A.  No, no, no.
20    Q.  And as far as demolition goes, you
21 didn't knock down any of your properties, did
22 you?
23    A.  No, I didn't.
24    Q.  You gutted them?
25    A.  Yeah.

Page 209

1    Q.  But you didn't knock any down.
2    A.  Okay.
3    Q.  That's what the questions had to do
4 with.  All right?
5    A.  All right.  Thank you.
6    Q.  Now, you have here as well, past and
7 future loss of enjoyment of lifestyle.  Do you
8 see that?
9    A.  Yes.
10    Q.  And what do you mean by that?
11    A.  Well, it's a different lifestyle now
12 with all the neighbors and church folk and
13 friends all scattered all over that I don't
14 have any more.  That I really enjoyed that,
15 and all of my church folk.  Most of them are
16 all scattered over everywhere.  All of my
17 neighbors, they all practically gone.
18    Q.  You still go to a church?
19    A.  Yes.
20    Q.  And where is that?
21    A.  It's 831 St. Maurice Avenue.
22    Q.  And you said that when you meant
23 lifestyle, some of your friends you had before
24 are not here?
25    A.  Yeah, they're not there any more.

MUMFORD, ETHEL

8/5/2008

Page 210

1    Q.  These are your friends; right?
2    A.  Yes.
3    Q.  And in determining damages for this,
4  you actually want money for these damages;
5  right?
6    A.  Yes.  Yes.
7    Q.  And when we talk about enjoyment of
8  lifestyle, you're talking about your
9  lifestyle?
10   A.  Yes.
11   Q.  Right?  And wouldn't you agree with
12 me, Miss Mumford, that your lifestyle is
13 different than other people's lifestyles in
14 the Ninth Ward?
15   A.  Yes.  Yes.
16   Q.  Right?
17   A.  Yes.
18   Q.  So when we're talking about losses
19 for enjoyment of lifestyle, that is an
20 individual issue --
21   A.  Uh-huh (affirmatively).
22   Q.  -- for everybody in the Ninth Ward;
23 right?
24   A.  Yes.
25   Q.  And to hear what their damages --

Page 211

1  determine what their damages are for loss of
2  enjoyment of lifestyle, I would have to talk
3  to them?
4    A.  Yeah.
5    Q.  Inconvenience, what do you mean by
6  inconvenience?
7    A.  Well, I mean, I don't have -- It's
8  not the same as it used to be before the
9  storm.  It's just different.  That my house
10 right now, what I am rebuilding is between two
11 blighted houses.  There's no other neighbor in
12 the block right now.  If I would move next
13 month, I'd probably be the only person in the
14 block.  Whereas the whole block was filled.
15 You didn't have no reason to be afraid.
16   Q.  And for this inconvenience you want
17 money; right?
18   A.  Well, I -- I don't know if that's
19 the way you say it or not.
20   Q.  Well, when you file a lawsuit, it's
21 your understanding that one of the reasons
22 you're filing the lawsuit --
23   A.  Yes.
24   Q.  -- or this lawsuit is to get money;
25 right?

Page 212

1    A.  Yes.  Yes.
2    Q.  And as far as your inconvenience
3  goes, your inconvenience is different than
4  other people's inconvenience?
5    A.  Yes.
6    Q.  Inconveniences?  Right?
7    A.  That's right.
8    Q.  So if I want to hear about -- or
9  determine what other people's inconveniences
10 are in the Lower Ninth Ward, I would have to
11 hear that from them?
12   A.  Yes.
13   Q.  You can't speak for what their
14 inconveniences were?
15   A.  Right.
16   Q.  And you can't speak for what their
17 loss of enjoyment of lifestyle was, can you?
18   A.  Correct.
19   Q.  All right.  There's also in here a
20 -- Well, before I get into that, you didn't
21 have any physical injury from the storm, did
22 you?
23   A.  No.
24   Q.  There's a note here "Past and future
25 mental pain, suffering, and anguish."  Do you

Page 213

1  see that?
2    A.  Yes.
3    Q.  What do you mean by that?
4    A.  Well, I went through a lot of
5  pressure having lost everything I had and it
6  kind of worked on my nerves some.  At one time
7  I was at the point I couldn't hardly sleep at
8  night.
9    Q.  I'm sorry, one time you were where?
10   A.  At the point where I couldn't sleep
11 well at night.  But it got a little better.
12   Q.  Have you ever sought any medical
13 treatment for that?
14   A.  The only thing I have is nerve
15 pills.
16   Q.  Which you told me earlier you had
17 those nerve pills before the storm?
18   A.  Which I had before.  It's now even
19 worse than it was before the storm.  But it's
20 a little better now.
21   Q.  All right.  Let's go over that.
22 Because what I asked you earlier, I asked you
23 how many of those pills you were taking.
24   A.  Yeah, I told you I had them before
25 the storm.

54 (Pages 210 to 213)

BARGE001022

MUMFORD, ETHEL

8/5/2008

Page 214

1    Q.  You told me you had them before.
2    A.  Exactly.
3    Q.  You told me you had them after.
4    A.  Yes.
5    Q.  And you told me you were taking
6  about the same amount before and after.
7    A.  Yes.  I don't take too many of them,
8  but I have been more nervous since the storm
9  than I was before.
10    Q.  Have you gone to any doctors and
11  told them this?
12    A.  Well, I told my doctor when he gave
13  me the pills.
14    Q.  And again, these pills, he just
15  renewed your prescription.
16    A.  Yes.
17    Q.  This mental anguish you told me
18  about since the storm, it hasn't prevented you
19  from working, has it?
20    A.  No.
21    Q.  It hasn't caused you any physical
22  problems, has it?
23    A.  No.
24    Q.  You haven't been diagnosed with any
25  mental illnesses, have you?

Page 215

1    A.  No.
2    Q.  Have you ever been treated by a
3  psychiatrist or a psychologist?
4    A.  No.
5    Q.  Do you have any plans to see a
6  psychologist or psychiatrist?
7    A.  No.
8    Q.  Do you have any plans to seek
9  treatment for any mental illnesses?
10    A.  No.
11    Q.  Do you know people whose stress,
12  because of the storm, is worse than yours?
13    A.  Yes.
14    Q.  Do you know people that you believe
15  suffer mental illness as a result of the
16  storm?
17    A.  Some I do.
18    Q.  Their situation obviously is much
19  different than yours; right?
20    A.  Yes.
21    Q.  For those people that have real
22  mental type illnesses that they attribute to
23  the storm, you can't describe what they have
24  gone through, can you?
25    A.  No.

Page 216

1    Q.  And they're going to have to speak
2  for themselves on that; right?
3    A.  Right.
4    Q.  You can't tell me the type of mental
5  problems they have had, can you?
6    A.  No.
7    Q.  There's also one last item -- Let's
8  go over this past and future mental health
9  care expenses.  Do you see that?
10    A.  Yes.
11    Q.  You haven't incurred any of those,
12  have you?
13    A.  No.
14    Q.  So you don't have a claim for that
15  item, do you?
16    A.  No.
17    Q.  And then the last is kind of a
18  catch-all, "Any and all others proven".  Do
19  you know what that means?  Any and all other
20  damages proven.  Do you have any idea what
21  that means?
22    A.  That all the damage I had is already
23  proven.
24    Q.  Well, this would be in addition to
25  the items that we talked about earlier.

Page 217

1    A.  Oh.
2    Q.  Well, let me ask you this.  Do you
3  have any other damages --
4    A.  No.
5    Q.  -- that you're aware of other than
6  what we talked about?
7    A.  No.  No.
8    Q.  Do you understand that you are a
9  class representative in this case?
10    A.  Yes.
11    Q.  Do you understand that you're a
12  class rep for something called a business loss
13  subclass?  Have you been told that?
14    A.  Business loss?
15    Q.  Right.
16    A.  Yes.
17    Q.  Do you know -- Do you have any
18  business losses?
19    A.  No, no more than the property I
20  lost.
21    Q.  Are you seeking any recovery for
22  lost rents?
23    A.  Yes.
24    Q.  Have you made any claims to your
25  insurance company for lost rents?

55 (Pages 214 to 217)

MUMFORD, ETHEL

8/5/2008

Page 218

1    A.  No.
2    Q.  And as far as the amount you're
3  seeking for lost rents, would you agree that
4  the amount that you seek in a rental would
5  depend on where the property is located, what
6  neighborhood it's in?  Is that one factor?
7    A.  Yes.
8    Q.  And would also depend on the
9  condition of the property?
10   A.  Yes.
11   Q.  How old it is; right?
12   A.  Yes.
13   Q.  How big it is; right?
14   A.  Uh-huh (affirmatively).
15   Q.  So in determining -- That was a
16  "yes"?
17   A.  Yes.
18   Q.  Okay.  So in determining the amount
19  of lost rental income, that would depend
20  necessarily on the unique characteristics of
21  that property; right?
22   A.  Yes.  Would it depend on the rent
23  that I collect monthly?  The amount of rent I
24  collect monthly, would that depend on that?
25   Q.  Well, that certainly could be a

Page 219

1  factor.  But as far as -- Rents for different
2  properties, okay, that would depend on where
3  the property is located; right?
4    A.  Uh-huh (affirmatively).
5    Q.  Correct?
6    A.  Yes.
7    Q.  And would depend on the condition of
8  the property; right?
9    A.  Yes.
10   Q.  And in determining the amount of
11  business losses concerning lost rentals, you
12  would have to actually be renting the
13  property; right?
14   A.  Yes.
15   Q.  And one of your properties
16  specifically wasn't rented before the storm;
17  right?
18   A.  Right.
19   Q.  It hadn't been rented for eight
20  months; right?
21   A.  Yes.
22   Q.  And then another factor in
23  calculating your damages from that would be if
24  you actually can collect the rents; right?
25   A.  Because one property wasn't rented?

Page 220

1  One unit was not rented?
2    Q.  No, I am on to a different issue
3  here.  Let me rephrase the question.
4    A.  Okay.
5    Q.  Have you in the past had problems
6  with trying to collect rent from people?
7    A.  I have had problems.
8    Q.  And you have had situations where
9  people have not paid you all the rent that
10  they owed you; right?
11   A.  Yes.
12   Q.  So in determining your damages for
13  lost rentals, obviously whether or not you
14  could collect the rent is an issue.  You
15  agree?
16   A.  Whether I collect it is an issue.
17   Q.  Yes, or whether it's collectable.
18   A.  Yes.
19   Q.  Miss Mumford, are you also aware
20  that you're a class rep for something called
21  the emotional distress class?
22   A.  Yes.
23   Q.  Have you been told that?
24   A.  Yes.
25   Q.  Have you been told that you're a

Page 221

1  class rep for the property damage class?
2    A.  Yes.
3    Q.  Have you, in connection with this
4  lawsuit where you're a class representative,
5  have you attended any of the hearings in court
6  in this case?
7    A.  No.
8    Q.  There was a prior trial involving
9  Ingram.  Did you attend that trial?
10   A.  No.
11   Q.  Other than the one we're here for
12  today, have you attended any depositions in
13  this case?
14   A.  No depositions.
15   Q.  Other than the documents that you
16  produced and we talked about today, have you
17  reviewed any other documents of any kind
18  concerning this case?
19   A.  Yes.
20   Q.  What other documents?
21   A.  I can't name them, but they did --
22  the lawyers did talk with me and went over
23  documents with me, but I can't say what they
24  are right now.
25   Q.  You can't remember --

56 (Pages 218 to 221)

MUMFORD, ETHEL

8/5/2008

Page 222

1    A.  But it was concerning the case.
2    Q.  But you don't remember what those
3  documents were?
4    A.  No.
5    Q.  Have you ever been contacted about
6  any guidance or input in connection with any
7  of the papers filed in this case?
8    A.  Have I ever been --
9    Q.  Involved, consulted by your lawyers
10  or anyone else in connection with filings that
11  are actually made in court in this case?
12    A.  Well, they went to court and they
13  came back, they told me what happened.  That's
14  all I can remember.
15    Q.  That's all you remember?
16    A.  Yeah.
17    Q.  Do you know what a class action is?
18    A.  Yes.
19    Q.  What is it?
20    A.  A class action is a person like
21  myself just representing a whole group of
22  people that's in the area.  And they all have
23  the same problem I had with the water
24  destroying properties and contents and
25  whatnot.  Some of them lost loss of lives and

Page 223

1  all.
2    Q.  And this would be within an area;
3  right?
4    A.  Yes.
5    Q.  You told me earlier you thought the
6  area ended at Delery Street?
7    A.  Yes.
8    Q.  And that's in the Ninth Ward?
9    A.  That's in the Ninth Ward.
10    Q.  When did you first learn that you
11  were going to be a class representative?
12    A.  Oh, the late part of '05.
13    Q.  How did you learn that you would be
14  a class representative?
15    A.  Well, I just heard people talking
16  and then I went and talked with the lawyers
17  and they explained everything to me.
18    Q.  The lawyers being who?
19    A.  The Wiedemanns.
20    Q.  Have you ever had any conversations
21  with Mr. Brian Gilbert about this case?
22    A.  Yes.
23    Q.  Have you ever had any conversations
24  with the Bruno Law Firm?
25    A.  With this case?

Page 224

1    Q.  With any cases.
2    A.  With this case I think it was the
3  Brunos.  But I never was involved in any other
4  case other than the barge case.  The Brunos
5  had a case also, but someone, different ones
6  called me about this case.
7    Q.  Who called you about this case?
8    A.  It's someone that's working with the
9  case.  I can't remember their name.
10    Q.  With who?
11    A.  With -- Someone that's working with
12  the barge case.
13    Q.  They called you about --
14    A.  Just asking questions like the
15  lawyers does.
16    Q.  And that's how you first became
17  involved in this case?
18    A.  Oh, no, no.  I was already involved
19  in it.
20    Q.  Well, what firm called you about
21  becoming involved that you were just --
22    A.  I can't remember their name.
23    Q.  And do you understand that there's a
24  separate lawsuit against the United States
25  government concerning breaches along the

Page 225

1  MRGO?
2    A.  I heard something about it.  I don't
3  really understand.
4    Q.  Have you ever spoken to anyone at
5  the Bruno firm about becoming a party to that
6  lawsuit?
7    A.  No.
8    Q.  Have you ever filed any papers
9  making a claim against the government?
10    A.  No.
11    Q.  There's a form called an SF-95
12  concerning a claim against the government.
13  Did you ever fill out one of those?
14    A.  I don't remember if I did.  I don't
15  think so.
16    Q.  Other than the barge case, have you
17  been approached by anyone else about being a
18  party to another case involving flooding in
19  the Ninth Ward?
20    A.  No.
21    Q.  Well, I am still a little confused,
22  ma'am, and I've got to go back over this,
23  these conversations that you had with this
24  other person about becoming involved --
25    A.  It was someone, they told me who

57 (Pages 222 to 225)

MUMFORD, ETHEL

8/5/2008

| Page 226 |
| --- |

```
 1   they were and they said it was on the barge
 2   case and they told me my name and address and
 3   all, that it was someone that was involved
 4   with this case, but I can't remember their
 5   name.
 6       Q.   Was it somebody from the Wiedemann
 7   firm?
 8       A.   It could have been.
 9       Q.   And was this before you had filed
10   the lawsuit?
11       A.   Well, this was recently.
12       Q.   Recently?
13       A.   Yes.  They asked the same questions
14   the Wiedemanns asked.  They were definitely
15   involved in the barge case.  They told me who
16   they were and all.
17       Q.   Do you understand that there are
18   expenses associated with bringing this
19   lawsuit?
20       A.   Yes.
21       Q.   Who's paying those expenses?
22       A.   The lawyers.
23       Q.   Has anyone given you an estimate of
24   what the costs of the lawsuit are?
25       A.   No.
```

| Page 227 |
| --- |

```
 1       Q.   Do you have any estimate of what
 2   they will be?
 3       A.   No.
 4       Q.   Do you have any financial
 5   obligations with respect to this lawsuit?
 6       A.   No.
 7       Q.   Do you know whether you'll ever be
 8   responsible for any expenses in connection
 9   with this lawsuit?
10       A.   I don't know.
11       Q.   Have you paid any expenses --
12       A.   No.
13       Q.   -- in connection with this lawsuit?
14   No?
15       A.   No.
16       Q.   Have you ever filed for bankruptcy?
17       A.   No.
18       Q.   Have you ever been convicted of a
19   crime?
20       A.   No.
21       Q.   Have you ever been subject to a
22   restraining order?
23       A.   No.
24       Q.   I want to go back over your current
25   work.  You still do housecleanings; right?
```

| Page 228 |
| --- |

```
 1       A.   Not right now.  I'm not doing any
 2   housecleaning.
 3       Q.   You do office cleanings?
 4       A.   Yes.
 5       Q.   You're still working for the
 6   Wiedemanns; right?
 7       A.   Yes.
 8       Q.   How much are they paying you?
 9       A.   They -- I work part time.  I work
10   three days a week, not so many hours, and they
11   pay me about $500, $600 a month.
12       Q.   Now, before the storm how often were
13   you working for them?
14       A.   Three days.
15       Q.   And how much were you being paid
16   then?
17       A.   About the same.
18       Q.   Now, how long was it after the storm
19   before you started working for the Wiedemanns
20   again?
21       A.   It probably was February, 2006.
22       Q.   Have any of the Wiedemanns referred
23   any other housecleaning clients to you?
24       A.   No.
25       Q.   Have the Wiedemanns ever referred
```

| Page 229 |
| --- |

```
 1   you to any other persons that you do office
 2   cleaning for?
 3       A.   No.
 4       Q.   Have the Wiedemanns ever referred
 5   you to any persons that you do nursing type
 6   services for?
 7       A.   No.
 8       Q.   You told me what the Wiedemanns pay
 9   you now.  Have you received any bonuses from
10   the Wiedemanns since the storm?
11       A.   Yes.  They give us Christmas bonus.
12       Q.   Did you receive a Christmas bonus in
13   December, 2005?
14       A.   No.
15       Q.   Did you receive one in December,
16   2004?
17       A.   Yes.
18       Q.   How much?
19       A.   $150.
20       Q.   Did you receive a Christmas bonus
21   from the Wiedemanns in December of 2006?
22       A.   Yes.
23       Q.   How much?
24       A.   150.
25       Q.   Did you receive a bonus from,
```

58 (Pages 226 to 229)

BARGE001026

MUMFORD, ETHEL

8/5/2008

| Page 230 |
| --- |

1  Christmas bonus from the Wiedemanns in
2  December of 2007?
3      A.  Yes.
4      Q.  How much?
5      A.  150.
6      Q.  Other than a Christmas bonus, have
7  you ever received any additional bonuses from
8  the Wiedemanns?
9      A.  No.
10     Q.  Do the Wiedemanns pay you by the
11 hour?
12     A.  They just pay me by the job.
13     Q.  Have you been told that you're going
14 to get a raise any time soon?
15     A.  No, I never ask.
16     Q.  Apart from the money you receive
17 from working for the Wiedemanns and the
18 bonuses, have the Wiedemanns ever paid you any
19 monies or anything else of value?
20     A.  Vacation pay.
21     Q.  They give you vacation pay?
22     A.  Yes.
23     Q.  How much do they pay you vacation
24 pay?
25     A.  They pay me my regular pay.

| Page 231 |
| --- |

1      Q.  Well, how much is that?
2      A.  That's like -- Well, about
3  five-something a month.
4      Q.  So you get that every year from the
5  Wiedemanns?
6      A.  Yes.
7      Q.  So you have got that for this year,
8  for 2008?
9      A.  Not yet.
10     Q.  Did you get it for 2007?
11     A.  Yes.
12     Q.  Did you get it for 2006?
13     A.  Yes.
14     Q.  Did you get it for 2005?
15     A.  No.
16     Q.  Did you get it for 2004?
17     A.  No.  Yes.
18     Q.  You did.  Okay.  Has the amount you
19 get for vacation pay gone up since the storm?
20     A.  No.
21     Q.  Do you have an employment contract
22 with the Wiedemanns?
23     A.  No.
24     Q.  Who do you report to in connection
25 with your employment at the Wiedemanns?

| Page 232 |
| --- |

1      A.  Karen Wiedemann.
2      Q.  When you first saw Karen Wiedemann
3  after the storm in September or October of
4  2005 -- You with me?
5      A.  Uh-huh (affirmatively), yes.
6      Q.  That first visit, were your
7  discussions with her for the purpose of
8  seeking legal advice on that first visit?
9          MR. WIEDEMANN:
10         Ethyl, --
11         THE WITNESS:
12         I don't remember.
13         MR. WIEDEMANN:
14         -- let me instruct you not to
15     discuss anything that was said between
16     you and Karen.
17 EXAMINATION BY MR. BLANCHARD:
18     Q.  Well, I didn't ask what was said.
19 Was the purpose of your conversation with her
20 to seek legal advice?
21         MR. WIEDEMANN:
22         It's the same question.  And I
23     object to it and instruct her not to
24     answer it.
25 EXAMINATION BY MR. BLANCHARD:

| Page 233 |
| --- |

1      Q.  When you first met with Karen
2  Wiedemann after the storm in September,
3  October of 2005, that first discussion, were
4  those discussions intended to be
5  confidential?
6      A.  No.
7      Q.  Well, given that last answer, Miss
8  Mumford, I would like to know what you and
9  Miss Wiedemann talked about when you first
10 came back to New Orleans in September, October
11 of 2005.
12         MR. WIEDEMANN:
13         Objection.  Don't answer the
14     question.  The intent of the
15     discussions has no bearing on whether
16     it's a privileged communication.
17         MR. BLANCHARD:
18         I think we're about done.  Let's
19     take one more quick break and I think
20     we're done.
21         (Whereupon a discussion was held
22     off the record.)
23 EXAMINATION BY MR. BLANCHARD:
24     Q.  Let go back on.  Miss Mumford, I
25 just have a couple of questions --

59 (Pages 230 to 233)

MUMFORD, ETHEL

8/5/2008

Page 234

1    A.   Okay.
2    Q.   -- and then I'll be done.
3    A.   All right.
4    Q.   I know that you worked last night.
5    A.   Uh-huh (affirmatively).
6    Q.   But today as you have been giving
7  this deposition, have you been able to
8  understand my questions?
9    A.   Yes.
10   Q.   And you have been able to answer
11 those questions to the best of your ability;
12 right?
13   A.   Yes.
14   Q.   You seem to me to be an energetic
15 person.
16   A.   Yes.
17   Q.   A lot of work?  So the fact that you
18 have been working this week and last night
19 hasn't affected your ability to answer
20 questions, has it?
21   A.   No.
22      MR. BLANCHARD:
23        That's all the questions I have.
24      Thank you.
25      THE WITNESS:

Page 235

1       Okay.  You're welcome.
2      MR. WIEDEMANN:
3       Okay.
4      THE WITNESS:
5       Thank you.
6      MR. BLANCHARD:
7       Any others?  Thank you.
8      THE WITNESS:
9       Thank you.
10        *   *   *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 236

1
2            WITNESS'S CERTIFICATE
3
4       I, ETHEL COLEMAN MUMFORD, read or
5  have had the preceding testimony read to me,
6  and hereby certify that it is a true and
7  correct transcription of my testimony, with
8  the exception of any attached corrections or
9  changes.
10
11
                _____
12            (Witness' Signature)
13   _____
   DATE SIGNED
14
15 DEPONENT PLEASE INITIAL ONE:
16
   _____  Read with no corrections
17
18 _____  Read and correction sheet attached
19
20
   DATE TAKEN:  AUGUST 5, 2008
21
22
23
24
25

Page 237

1
2            REPORTER'S CERTIFICATE
3
4       I, ROGER D. JOHNS, RMR, RDR, CRR,
5  Certified Court Reporter, do hereby certify
6  that the above-named witness, after having
7  been first duly sworn by me to testify to the
8  truth, did testify as hereinabove set forth;
9  that the testimony was reported by me in
10 shorthand and transcribed under my personal
11 direction and supervision, and is a true and
12 correct transcript, to the best of my ability
13 and understanding; that I am not of counsel,
14 not related to counsel or the parties hereto,
15 and not in any way interested in the outcome
16 of this matter.
17
18
19
20            ROGER D. JOHNS
21         CERTIFIED COURT REPORTER
22           STATE OF LOUISIANA
23
24
25

60  (Pages 234 to 237)