# EXHIBIT 24

HARRIS, JIMMIE

8/4/2008

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES   * CIVIL ACTION

                                * NO. 05-4182

PERTAINS TO: BARGES             * Consolidated

                                * SECTION "K(2)"

Boutte v. Lafarge        05-5531 *

Mumford v. Ingram        05-5724 * JUDGE DUVAL

Lagarde v. Lafarge       06-5342 *

Perry v. Ingram          06-6299 * MAG. WILKINSON

Benoit v. Lafarge        06-7516 *

Parfait Family v. USA    07-3500 *

Lafarge v. USA           07-5178 *

   *  *  *  *  *  *  *  *  *  *  *


        Deposition of JIMMIE DONNELL HARRIS,

given at Chaffe McCall, L.L.P., 2300 Energy

Centre, 1100 Poydras Street, New Orleans,

Louisiana 70163-2300, on August 4th, 2008.



REPORTER BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

HARRIS, JIMMIE

8/4/2008

| | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | REPRESENTING THE PLAINTIFFS: |
| 3 | BRIAN A. GILBERT, P.L.C. |
| 4 | (BY: BRIAN A. GILBERT, ESQUIRE) |
| 5 | 821 Baronne Street |
| 6 | New Orleans, Louisiana 70113 |
| 7 | 504-885-7700 |
| 8 | |
| 9 | REPRESENTING LAFARGE NORTH AMERICA: |
| 10 | GOODWIN PROCTOR, L.L.P. |
| 11 | (BY: MARK S. RAFFMAN, ESQUIRE) |
| 12 | 901 New York Avenue, NW |
| 13 | Washington, D.C. 20001 |
| 14 | 202-346-4000 |
| 15 | - and - |
| 16 | CHAFFE, MCCALL, L.L.P. |
| 17 | (BY: CHARLES BLANCHARD, ESQUIRE) |
| 18 | 2300 Energy Centre |
| 19 | 1100 Poydras Street |
| 20 | New Orleans, Louisiana 70163-2300 |
| 21 | 504-585-7000 |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 4 |
|---|---|
| 1 | REPRESENTING JEFFERSON PARISH: |
| 2 | BURGLASS & TANKERSLEY |
| 3 | (BY: LUCIE THORNTON, ESQUIRE) |
| 4 | 5213 Airline Drive |
| 5 | Metairie, Louisiana 70001 |
| 6 | 504-836-2220 |
| 7 | |
| 8 | REPRESENTING BARGE PSLC: |
| 9 | WIEDEMANN & WIEDEMANN |
| 10 | (BY: EDWARD L. MORENO, ESQUIRE) |
| 11 | 821 Baronne Street |
| 12 | New Orleans, Louisiana 70113 |
| 13 | 504-581-6180 |
| 14 | |
| 15 | REPRESENTING LAKE BORGNE LEVEE DISTRICT: |
| 16 | DUPLASS, ZWAIN, BOURGEOIS, MORTON, |
| 17 | PFISTER & WEINSTOCK |
| 18 | (BY: RYAN MALONE, ESQUIRE) |
| 19 | Three Lakeway Center, 29th Floor |
| 20 | 3838 N. Causeway Boulevard |
| 21 | Metairie, Louisiana 70002 |
| 22 | 504-832-3700 |
| 23 | |
| 24 | |
| 25 | |

| | Page 3 |
|---|---|
| 1 | REPRESENTING THE AMERICAN CLUB: |
| 2 | MONTGOMERY, BARNETT, BROWN, READ, |
| 3 | HAMMOND & MINTZ, L.L.P. |
| 4 | (BY: RONALD J. KITTO, ESQUIRE) |
| 5 | 1100 Poydras Street, Suite 3200 |
| 6 | New Orleans, Louisiana 70163 |
| 7 | 504-585-3200 |
| 8 | |
| 9 | REPRESENTING NEW YORK MARINE & GENERAL |
| 10 | INSURANCE COMPANY: |
| 11 | SUTTERFIELD & WEBB |
| 12 | (BY: DANIEL A. WEBB, ESQUIRE) |
| 13 | 650 Poydras Street, Suite 2715 |
| 14 | New Orleans, Louisiana 70130 |
| 15 | 504-598-2715 |
| 16 | |
| 17 | REPRESENTING ORLEANS LEVEE DISTRICT: |
| 18 | MCCRANIE, SISTRUNK, ANZELMO, HARDY, |
| 19 | MAXWELL & MCDANIEL |
| 20 | (BY: KASSIE HARGIS, ESQUIRE) |
| 21 | 3445 N. Causeway Boulevard, Suite 800 |
| 22 | Metairie, Louisiana 70002 |
| 23 | 504-831-0946 |
| 24 | |
| 25 | |

| | Page 5 |
|---|---|
| 1 | REPRESENTING MRGO PSLC: |
| 2 | BRUNO & BRUNO |
| 3 | (BY: SCOTT L. JOAHEN, ESQUIRE) |
| 4 | 855 Baronne Street |
| 5 | New Orleans, Louisiana 70113 |
| 6 | 504-525-1335 |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

2 (Pages 2 to 5)

HARRIS, JIMMIE

8/4/2008

---

Page 6

1    E X A M I N A T I O N   I N D E X
2
3    EXAMINATION BY:                 PAGE
4
5    MR. RAFFMAN ...............................8
6        E X H I B I T   I N D E X
7
8    EXHIBIT NO.                  PAGE
9    Harris Exhibit 1 ............................68
10   Harris Exhibit 2 ............................70
11   Harris Exhibit 3 ............................76
12   Harris Exhibit 4 ............................85
13   Harris Exhibit 5 ............................87
14   Harris Exhibit 6 ............................89
15   Harris Exhibit 7 ..........................100
16   Harris Exhibit 8 ..........................102
17   Harris Exhibit 9 ..........................104
18   Harris Exhibit 10 ........................111
19   Harris Exhibit 11 ........................112
20   Harris Exhibit 12 ........................117
21   Harris Exhibit 13 ........................128
22   Harris Exhibit 14 ........................129
23
24
25

---

Page 7

1
2        S T I P U L A T I O N
3        IT IS STIPULATED AND AGREED by and
4    among counsel for the parties hereto that the
5    deposition of the aforementioned witness may be
6    taken for all purposes permitted within the
7    Federal Rules of Civil Procedure, in accordance
8    with law, pursuant to notice;
9        That all formalities, save reading
10   and signing of the original transcript by the
11   deponent, are hereby specifically waived;
12       That all objections, save those as to
13   the form of the question and the responsiveness
14   of the answer, are reserved until such time as
15   this deposition, or any part thereof, is used
16   or sought to be used in evidence.
17
18
19            * * *
20
21
22       JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23   Certified Court Reporter in and for the State
24   of Louisiana, officiated in administering the
25   oath to the witness.

---

Page 8

1        JIMMIE DONNELL HARRIS
2    924 Lamanche Street, New Orleans, Louisiana
3    70117, a witness named in the above
4    stipulation, having been first duly sworn, was
5    examined and testified on his oath as follows:
6    EXAMINATION BY MR. RAFFMAN:
7        Q.  Mr. Harris, my name is Mark Raffman.
8    I represent Lafarge North America, and I'll be
9    asking you some questions in your deposition
10   today.
11       Have you ever given a deposition
12   before?
13       A.  No.
14       Q.  All right.  The court reporter is
15   going to take down everything that I say and,
16   more importantly, everything that you say, so
17   in order to help him do his job, when I ask you
18   a question you need to speak an answer.
19   Nodding the head or shaking the head won't give
20   him anything to type.
21       Do you understand that?
22       A.  Yes.
23       Q.  You and I both need to speak loud
24   enough for the court reporter to hear us.
25       Do you understand that?

---

Page 9

1        A.  Yes.
2        Q.  Do you understand that you're under
3    oath today?
4        A.  Yes.
5        Q.  If I ask you a question that you don't
6    understand, will you ask me to clarify my
7    question?
8        A.  Yes.
9        Q.  In order to let the court reporter do
10   his job we have to speak one at a time, so I
11   ask that you please let me finish my questions
12   before you answer and I will do my best to let
13   you finish your answer before I ask the next
14   question.
15       Do you understand?
16       A.  Yes.
17       Q.  Thank you.  If during the course of
18   this afternoon you remember something that you
19   didn't say in response to a previous question,
20   you're allowed to volunteer that you remembered
21   something and add it to the record.
22       Do you understand that?
23       A.  Yes.
24       Q.  Mr. Harris, have you taken any
25   medication or alcohol or drugs that would

---

HARRIS, JIMMIE

8/4/2008

Page 10

1  interfere with your ability to recall events
2  and testify clearly today?
3      A.  No.
4      Q.  Did you do anything to prepare for
5  this deposition?
6      A.  No.
7      Q.  Did you meet with your lawyer before
8  the deposition?
9      A.  Yes.
10     Q.  And your lawyer is Mr. Gilbert?
11     A.  Yes.
12     Q.  And also Mr. Moreno?
13     A.  Yes.
14     Q.  And did you meet with both of these
15  gentlemen to prepare for the deposition?
16     A.  Yes.
17     Q.  When did you meet with them?
18     A.  Ten o'clock.
19     Q.  And that was the first time you met
20  with them to prepare for the deposition?
21     A.  No.
22     Q.  When was the first time you met with
23  them to prepare for the deposition?
24     A.  Let me back it up.  Yes.  It's not no,
25  it's yes.  This is the first time we met to

Page 11

1  prepare for this deposition.
2      Q.  Okay.  Thank you.  That was ten
3  o'clock this morning.
4      A.  Ten o'clock, yes.
5      Q.  Was anyone else present when you met
6  with your counsel to prepare for the
7  deposition?
8      A.  Um -- yes, but they wasn't present
9  while we prepped for the deposition, just there
10  for a question.  Question of me.  That's it.
11     Q.  And who was there for a question of
12  you during that time?
13     A.  Don't remember the name of the
14  gentleman.
15     Q.  Do you remember whether the gentleman
16  was a part of the legal team of Mr. Gilbert and
17  Mr. Moreno and the other lawyers?
18     A.  Yes.
19     Q.  Apart from the meeting with your legal
20  team, did you met with anyone it's to prepare
21  for the deposition?
22     A.  No.
23     Q.  Did you use any documents to refresh
24  your recollection about the testimony you might
25  give today?

Page 12

1      A.  Can you verify that question?  I'm not
2  clear on it.
3      Q.  When you met with your lawyers this
4  morning did you look at any documents?
5      A.  Yes.
6      Q.  And did you -- when you looked at the
7  documents did you remember things that you
8  hadn't remembered before you looked at them?
9      A.  No.  I already -- no.
10     Q.  Did your lawyers give you a memorandum
11  or a script of points to remember?
12         MR. GILBERT:
13             Object.
14     A.  No.
15  EXAMINATION BY MR. RAFFMAN:
16     Q.  I'm going to show you a document that
17  bears the court record number of Document
18  Number 13224, and it's captioned Barge
19  Plaintiffs Preliminary Class Certification
20  Witness and Exhibit Lists.  (Tendering.)  I'll
21  ask you to turn to Page 7 -- actually, it's not
22  at Page 7, it's at Page 2.
23         Do you see an entry there with your
24  name on it?
25     A.  Yes.

Page 13

1      Q.  And that entry has an address 790
2  Bateswood Drive, Apartment 24, Houston, Texas.
3         Have you lived at that address?
4      A.  No.  My family have.
5      Q.  That's an address at which your family
6  has lived?
7      A.  Yes.
8      Q.  Okay.  The entry underneath it reads,
9  Jimmie Harris to prove facts relative to
10  observations during and after storm.
11     A.  Yes.
12     Q.  Do you understand that your
13  observations during and after the storm are one
14  of the subjects that you're designated to
15  testify about?
16     A.  Yes.
17     Q.  And what are your observations during
18  the storm?
19         MR. GILBERT:
20             Object.
21             You can answer if you're able to.
22     A.  Can you clarify?  What do you mean
23  what is my observations?  I don't understand
24  what you mean.
25  EXAMINATION BY MR. RAFFMAN:

4 (Pages 10 to 13)

BARGE001082

HARRIS, JIMMIE

8/4/2008

Page 14

1      Q.   Well, do you have any idea what
2   observations you made during the storm that you
3   might be asked to testify about in this case?
4      A.   Yes.
5      Q.   And what observations would those be?
6      A.   The devastation of the area that was
7   destroyed.
8      Q.   Okay.  During the storm, where were
9   you physically located?
10     A.   Children's Hospital.
11     Q.   And where is Children's Hospital?
12     A.   Tchoupitoulas and Henry Clay Street.
13     Q.   That location is not in the Lower
14  Ninth Ward, correct?
15     A.   Correct.
16     Q.   And if I'm right, that location is
17  near the river on the west side of the
18  Industrial Canal, correct?
19     A.   Correct.
20     Q.   From that location were you able to
21  see devastation in the Lower Ninth Ward during
22  the storm?
23     A.   No.
24     Q.   Are there any other observations
25  during the storm that you expect to testify

Page 15

1   about?
2      A.   No.
3      Q.   What observations after the storm do
4   you expect to testify about?
5      A.   The devastation of my home and many
6   homes around my home.
7         MR. GILBERT:
8            Let me just object to the line of
9         questioning because it does call for
10        him to speculate as to what counsel
11        will ask him when he's on the witness
12        stand.
13           But subject to the objection you
14        can answer.
15  EXAMINATION BY MR. RAFFMAN:
16     Q.   Apart from the devastation of your
17  home and many areas around your home, are there
18  any other observations after the storm that you
19  expect to testify about?
20     A.   No.
21     Q.   When is the first time that you
22  returned to your home after the storm?
23     A.   I don't have the exact time, but it
24  was maybe between a month or two after the
25  storm.

Page 16

1      Q.   Returning your eyes to the witness
2   list that's in front of you, the next topic on
3   that list says, evacuation and displacement.
4         Do you see that under your name?
5      A.   Yes.
6      Q.   What would you expect to testify about
7   regarding evacuation and displacement?
8      A.   I had to evacuate my home, my family
9   had to evacuate, and all of us was displaced
10  from our home.
11     Q.   When did your family evacuate your
12  home?
13     A.   Sunday morning prior to the storm.
14     Q.   How long was your family displaced?
15     A.   Close to three years.
16     Q.   Has your family returned to your home
17  now?
18     A.   Yes.
19     Q.   When did your family return to your
20  home?
21     A.   The 31st of May of this year.
22     Q.   Are there any other subjects regarding
23  evacuation and displacement that you would
24  expect to testify about?
25        MR. GILBERT:

Page 17

1            Continuing objection.
2      A.   Not that I can recall right now.
3   EXAMINATION BY MR. RAFFMAN:
4      Q.   The next item on this witness list
5   under your name is destruction of areas and
6   things within class geography.
7         Do you see that?
8      A.   Yes.
9      Q.   Do you know what the class geography
10  is?
11     A.   No.
12     Q.   What do you expect to testify about
13  regarding destruction of areas and things?
14     A.   Only what I know.
15     Q.   And that would have been your
16  observations of the destruction of your home
17  and areas around your home?
18     A.   Yes.
19     Q.   And is there anything else besides
20  that that you would expect to testify about?
21     A.   Not that I can recall right now.
22     Q.   The next item on the witness list
23  under your name is destruction of properties
24  within the class area.
25        Do you know what the class area is?

5 (Pages 14 to 17)

BARGE001083

HARRIS, JIMMIE

8/4/2008

Page 18

1     A.  I assume I do, yes.
2     Q.  What is the class area?
3     A.  The area within that area where I
4  lived.
5     Q.  Okay.
6     A.  Can you clarify?
7     Q.  Well, the plaintiffs have alleged a
8  class area, and I want to get a sense of the
9  area that you have knowledge about.  So when
10 you say the area where you lived, can you give
11 me some sense of what streets or areas would be
12 the boundaries of that?
13    A.  From Chartres Street to Florida
14 Avenue, from Jourdan Avenue to Delery Street.
15    Q.  And that's the area within which you
16 observed destruction and devastation, as you
17 put it.
18    A.  Yes.
19    Q.  The last item on the witness list
20 under your name says emotional damages due to
21 all of the foregoing.
22       Do you see that?
23    A.  Yes.
24    Q.  Do you understand that the foregoing
25 refers to the other subjects that are listed

Page 19

1  under your name on this witness list?
2     A.  Yes.
3     Q.  And whose emotional damages would you
4  expect to testify about?
5     A.  Mine's.
6     Q.  I'm sorry.  I didn't hear you.
7     A.  Mine's.
8        (Off the record.)
9  EXAMINATION BY MR. RAFFMAN:
10    Q.  Mr. Harris, is it fair to say, then,
11 that the source of your emotional distress was
12 the evacuation and displacement and the
13 destruction of property?
14    A.  Yes.
15    Q.  What is your current address?
16    A.  924 Lamanche Street.
17    Q.  When were you born?
18    A.  December 6th, 1966.
19    Q.  Where were you born?
20    A.  New Orleans, Louisiana.
21    Q.  Have you lived in New Orleans -- well,
22 before Hurricane Katrina had you lived in New
23 Orleans all your life?
24    A.  Yes.
25    Q.  Since the storm, where have you lived?

Page 20

1     A.  In New Orleans.
2     Q.  You've been here continuously
3  throughout.
4     A.  Yes.
5     Q.  Are you married?
6     A.  Yes.
7     Q.  What's your wife's name?
8     A.  April W. Harris.
9     Q.  When did you and she get married?
10    A.  January, 1991.
11    Q.  Do you and she have any children?
12    A.  Yes.
13    Q.  How many?
14    A.  Two.
15    Q.  And who are they?
16    A.  Abrielle Danielle Harris and Jameka
17 Janae Harris.
18    Q.  What is Abrielle's birth date?
19    A.  July 31st, 1991.
20    Q.  What is Jameka's birth date?
21    A.  August 15th, 1984.  I have a
22 correction on our wedding date.  It was '89,
23 not '91.  I'm sorry.  My wife will beat me for
24 that.
25    Q.  Were both your daughters living with

Page 21

1  you at the time of Hurricane Katrina?
2     A.  No.
3     Q.  Okay.  At the time of Hurricane
4  Katrina, were either of your daughters living
5  with you?
6     A.  Yes.
7     Q.  Which daughter was living with you at
8  the time of Katrina?
9     A.  Abrielle.
10    Q.  Where was your daughter Jameka living
11 at the time of Katrina?
12    A.  In an apartment in New Orleans East.
13    Q.  Before you married April W. Harris had
14 you been married previously?
15    A.  Yes.
16    Q.  To whom had you been married?
17    A.  Dana Lynn Simms.
18    Q.  When did you and Ms. Simms get
19 married?
20    A.  When did we get married?
21    Q.  Yes, sir.
22    A.  Gosh, 1985.  I don't remember the
23 exact month.
24    Q.  And when did that marriage end?
25    A.  October, 1987.

Johns Pendleton Court Reporters                    800 562-1285

BARGE001084

HARRIS, JIMMIE

8/4/2008

Page 22

1     Q.  Are there any children from that
2  marriage?
3     A.  No.
4     Q.  What is the highest level of education
5  that you have attained, Mr. Harris?
6     A.  High school grad.
7     Q.  From which high school did you
8  graduate?
9     A.  Francis T. Nichols.
10    Q.  Do you have any college education?
11    A.  Yes.  I haven't completed my degree.
12  I'm working on a degree in fire technology.
13    Q.  When you say fire tech, is that fire
14  technology?
15    A.  Yes.  Fire technology.
16    Q.  And from which institution are you
17  working on that degree?
18    A.  Delgado.
19    Q.  How far are you from completing the
20  requirements for that degree?
21    A.  Three-fourths through the course.
22    Q.  And in which neighborhood of New
23  Orleans did you grow up?
24    A.  The Ninth Ward.
25    Q.  The Lower Ninth Ward?

Page 23

1     A.  The Upper Ninth.  On the other side of
2  the Industrial Canal.
3     Q.  When you say the other side, you mean
4  it was on the west side --
5     A.  The west side, correct.  Yes, sir.
6     Q.  Does April Harris have a college
7  degree?
8     A.  No, she do not.
9     Q.  Is she a high school graduate?
10    A.  Yes, she is.
11    Q.  Does she have any college?
12    A.  No.
13    Q.  Have you served in the armed forces,
14  Mr. Harris?
15    A.  Yes.
16    Q.  Would you describe your -- in which
17  branch did you serve?
18    A.  Army.
19    Q.  During which years have you served in
20  the Army?
21    A.  I'm still actively in the reserve now,
22  as we speak.
23    Q.  When did you enter the Army?
24    A.  October, '84.
25    Q.  Have you been -- when you went into

Page 24

1  the Army in 1984, in what capacity were you
2  serving?
3     A.  Active.
4     Q.  So this was not in the reserve when
5  you went in the Army.
6     A.  Correct.
7     Q.  And how long were you in the Army as
8  an active member of the Army?
9     A.  Three years.
10    Q.  What rank were you when you went into
11  the Army in '84?
12    A.  No rank.  Private.
13    Q.  Did you cease being a member of the
14  active Army in 1987?
15    A.  Yes, ETS.  My contract expired, in
16  other words.
17    Q.  And when your contract expired, what
18  was your rank at that point?
19    A.  PE2.  Private E2.
20    Q.  During the three years you were on
21  active military duty, you rose in rank.
22    A.  Correct.
23    Q.  How long have you served in the Army
24  Reserve?
25    A.  Twenty and a half years.  Close to

Page 25

1  twenty-one years.
2     Q.  You've served continuously in the
3  reserves since you left active duty.
4     A.  Correct.  The Reserve, the National
5  Guard -- I went from the Reserve to the
6  National Guard back to the Reserve.
7     Q.  When your contract expired in 1987,
8  did you receive a discharge from the Army?
9     A.  Yes.
10    Q.  And was it an honorable discharge?
11    A.  Yes.
12    Q.  Have you seen combat duty?
13    A.  No.
14    Q.  Since you have been a member of the
15  Reserve or the National Guard --
16       (Brief interruption.)
17  EXAMINATION BY MR. RAFFMAN:
18    Q.  Sorry for the interruption.
19       Mr. Harris, what is your MOS unit?
20  MOS, I'm sorry.
21    A.  Now?
22    MR. WEBB:
23       Second question:  What is your
24    unit.
25    MR. RAFFMAN:

Johns Pendleton Court Reporters                    800 562-1285

HARRIS, JIMMIE

8/4/2008

## Page 26

1
2     Q.   Your MOS now, what is that?
3     A.   88 zulu 50.
4     Q.   And how long has 88 zulu 50 been your
5  MOS?
6     A.   Since October, 2005.
7     Q.   Before October, 2005, were you in the
8  Reserve?
9     A.   Yes.
10    Q.   And what was your MOS immediately
11 before October, 2005?
12    A.   88 hotel 40.  Hotel is H.
13    Q.   How long was 88 hotel 40 your MOS?
14    A.   I think I crossed over in '92, the
15 year of '92.
16    Q.   And before 1992?
17    A.   62 echo 10.
18    Q.   So your MOS before 1992 was 62 echo
19 10, correct?
20    A.   Correct.  Yes.
21    Q.   And for how long was that your MOS?
22    A.   Three years.
23    Q.   Before 62 echo 10, was there another
24 MOS that you were --
25    A.   Yes.

## Page 27

1     Q.   And what was that MOS?
2     A.   12F10.
3     Q.   For how long was 12F10 your MOS?
4     A.   Three years.
5     Q.   That was the MOS that was immediately
6  after you left active duty?
7     A.   No.
8     Q.   Okay.
9     A.   That was my MOS going into active
10 duty, 12F10.
11    Q.   So 1210 was your MOS while you were in
12 active duty?
13    A.   Yes.
14    Q.   And then when you left active duty you
15 went to 62 echo 150.
16    A.   Yes.
17    Q.   What unit are you a part of?
18    A.   373rd CSSB.  That's combat support
19 sustainment battalion.
20    Q.   How long have you been part of the
21 373rd CSSB?
22    A.   Since October, '05.
23    Q.   And before October of '05, what was
24 your unit?
25    A.   1192nd, transportation terminal

## Page 28

1  brigade.
2     Q.   How long was the 1192nd transportation
3  terminal brigade your unit?
4     A.   Um -- I think since 2002.
5     Q.   Before 2002, what was your unit?
6     A.   441st transportation terminal company.
7     Q.   During what period of time was the
8  441st transportation and terminal company your
9  unit?
10    A.   Five years.
11    Q.   What was your unit while you were on
12 active duty?
13    A.   B company, 3rd engineer battalion.
14    Q.   When you were on active duty where
15 were you stationed?
16    A.   Fort Stewart, Georgia.
17    Q.   When you left active duty, did you
18 come back to New Orleans?
19    A.   Yes.
20    Q.   Your residence at the time of Katrina
21 was 924 Lamanche Street; correct?
22    A.   Yes.
23    Q.   And after the storm, your family
24 relocated to 790 Bateswood Drive, Apartment 24,
25 in Houston?

## Page 29

1     A.   Not directly after the storm, but
2  that's where they ended up at.
3     Q.   Okay.  Today, you and your family all
4  live at 924 Lamanche, right?
5     A.   Yes.
6     Q.   Your family moved back to that address
7  on May 31st of this year.
8     A.   Yes.
9     Q.   Immediately before May 31st of this
10 year, where was your family living?
11    A.   790 Bateswood Drive.
12    Q.   How long did your family live at 790
13 Bateswood Drive?
14    A.   Um -- a little over two years.
15    Q.   And the Bateswood Drive address was an
16 apartment?
17    A.   Yes.
18    Q.   Your wife and your daughter Abrielle
19 lived at the Bateswood address?
20    A.   Yes.
21    Q.   But not your daughter Jameka.
22    A.   Jameka lived at that Bateswood address
23 but a different apartment.
24    Q.   Who is living in your home now?
25    A.   Myself, my wife and my daughter

Johns Pendleton Court Reporters                    800 562-1285

BARGE001086

HARRIS, JIMMIE

8/4/2008

Page 30

1  Abrielle.
2  Q.  And where is Jameka living now?
3  A.  She's living in an apartment.
4  Q.  In New Orleans?
5  A.  Metairie.
6  Q.  Did she move back to the New Orleans
7  area at the same time that your wife and
8  daughter Abrielle moved back to the area?
9  A.  No.  Prior to their moving she moved
10 back.
11 Q.  When did your daughter Jameka move
12 back to the area?
13 A.  Don't know the exact date.
14 Q.  Was it sometime this year?
15 A.  Last year.
16 Q.  2007.
17 A.  Yes.
18 Q.  Did you ever live at the 790 Bateswood
19 Drive address?
20 A.  No.
21 Q.  During the time that your wife and one
22 or more of your daughters lived in Houston,
23 where were you living?
24 A.  Here in New Orleans.
25 Q.  And where in New Orleans were you

Page 31

1  living?
2  A.  In a trailer, trailer park.  The,
3  um -- Cultural Arts Trailer Park.
4  Q.  Where is that located?
5  A.  In a CBD location right off of Orleans
6  Avenue.
7  Q.  Were you renting a trailer from the
8  owners of the Cultural Arts Trailer Park?
9  A.  No.
10 Q.  Were you living in a FEMA trailer?
11 A.  Yes.
12 Q.  Before your family moved to the 790
13 Bateswood Drive address, where were they
14 living?
15 A.  Um -- it was another apartment
16 complex.  I can't remember the name of it.
17 Q.  Was it another -- where was that
18 apartment complex?
19 A.  In Houston.
20 Q.  How long were they in that address?
21 A.  From the time of the storm up until
22 when they moved to the Bateswood apartment
23 complex.
24 Q.  When your family left New Orleans on
25 Sunday, August 28th, 2005, where did they go?

Page 32

1  A.  To Houston, Texas.
2  Q.  Why did they choose Houston?
3  A.  Um -- I don't really know.  They just
4  went west.  Westbound.
5  Q.  That first night where did they stay?
6  A.  They traveled most of the first night.
7  They didn't sleep until the following morning.
8  Q.  How long was it between the time that
9  they arrived in Houston and the time that they
10 first rented that first apartment?
11 A.  Maybe close to a month -- a couple
12 weeks.
13 Q.  During the couple of weeks to a month,
14 where were they staying?
15 A.  From hotel to hotel.
16 Q.  When did you first occupy the FEMA
17 trailer at the Cultural Arts Trailer Park?
18 A.  I don't know the exact date.  It was
19 after the cruise ship left that the fire
20 department and the police department were
21 housed in.
22 Q.  Before you went to the FEMA trailer,
23 you were staying in a cruise ship, right?
24 A.  Yes.  Correct.
25 Q.  You were staying with other members of

Page 33

1  the fire department?
2  A.  Yes.
3  Q.  On a cruise ship.
4  A.  Correct.
5  Q.  How long did you stay on the cruise
6  ship?
7  A.  Don't know exactly the amount of time.
8  Q.  Was it more than a month?
9  A.  Yes.  Maybe three months, maybe four
10 months, something.
11 Q.  Where did you live before you moved to
12 924 Lamanche?
13 A.  I'm not understanding the question.
14      When are you speaking of, after the
15 storm?
16 Q.  All right.  I'm going all the way --
17 I'm sorry to be unclear.
18 A.  Okay.
19 Q.  Let me make sure I understand after
20 the storm, first, and then I'll go back to
21 before the storm.
22 A.  Okay.
23 Q.  After the storm, where was the first
24 place you stayed?
25 A.  With the fire department at Children's

9 (Pages 30 to 33)

HARRIS, JIMMIE

8/4/2008

Page 34

1    Hospital.
2        Q.  How long did you stay with the fire
3    department at Children's Hospital?
4        A.  Maybe four days.
5        Q.  Where did you go after that?
6        A.  It was on General DeGaulle, it was
7    like an old folks retirement home or something
8    like that, where they housed the entire fire
9    department during that time.
10       Q.  Was the retirement home on the west
11   side of the Industrial Canal?
12       A.  Yes.  It's on the west bank.
13           MR. GILBERT:
14               Wrong side of the river, Mark.
15   EXAMINATION BY MR. RAFFMAN:
16       Q.  The retirement home is on the other
17   side of the Mississippi River from New Orleans.
18       A.  Correct.
19       Q.  And how long were you staying in the
20   retirement home?
21       A.  Until they came with the ship, the
22   cruise ship.  I don't remember the exact length
23   of time.
24       Q.  So from the retirement home you went
25   to the cruise ship, right?

Page 35

1        A.  Yes.
2        Q.  From the cruise ship you went to the
3    FEMA trailer; correct?
4        A.  Yes.
5        Q.  After the FEMA trailer, you moved back
6    to 924 Lamanche.
7        A.  Yes.
8        Q.  When did you move back to 924 Lamanche
9    Street, personally?
10       A.  I don't know the exact time.
11       Q.  Was it in 2008?
12       A.  No, 2007, more like 2007.
13       Q.  During which season?
14       A.  I don't know because I was working
15   back and forth, living in a trailer and working
16   at my home, so I don't know the exact date.
17       Q.  You personally did the repairs on your
18   home; right?
19       A.  Yes.
20       Q.  Now I want to go back to before the
21   storm.
22       A.  Okay.
23       Q.  Get a sense of where you lived.
24       A.  Okay.
25       Q.  You told me that you bought the

Page 36

1    property at 924 -- actually, you didn't tell me
2    that.
3            When did you buy the property at 924
4    Lamanche Street?
5        A.  Um -- more like 1991 or 2, one of the
6    other.  '91 or '92.
7        Q.  You were married to April Harris when
8    you bought the property; right?
9        A.  Yes.
10       Q.  Before 924 Lamanche, where did you
11   live?
12       A.  931 Caffin Street.
13       Q.  That is in the Lower Ninth Ward;
14   correct?
15       A.  Yes, that's right around the corner.
16       Q.  Both the Lamanche property and the
17   Caffin Street property are in the Holy Cross
18   neighborhood; am I right?
19       A.  Yes.
20       Q.  How long had you lived at 931 Caffin
21   Street?
22       A.  I don't remember.  I don't remember.
23       Q.  Was it years?
24       A.  Maybe two years, maybe more.
25       Q.  Do you remember where you lived before

Page 37

1    the 931 Caffin Street address?
2        A.  N. Derbigny Street.  I don't remember
3    the exact address.
4        Q.  Was the N. Derbigny Street residence
5    in the Lower Ninth Ward?
6        A.  No, it's on the opposite side of the
7    Industrial Canal.  It's in the Ninth Ward,
8    though.
9        Q.  Apart from the Lamanche address and
10   the Caffin address, had you ever lived in the
11   Lower Ninth Ward?
12       A.  No.
13       Q.  The residence at 924 Lamanche, is that
14   the residence that you claim was damaged in
15   Hurricane Katrina?
16       A.  Yes.
17       Q.  Is that the residence for which you
18   are seeking damages in this case?
19       A.  Yes.
20       Q.  Are there any other properties, real
21   properties, for which you're seeking damages in
22   this case?
23       A.  No.
24       Q.  Who owns the property at 924 Lamanche
25   Street?

10 (Pages 34 to 37)

HARRIS, JIMMIE

8/4/2008

Page 38

1    A.  I do.
2    Q.  Is your wife April also an owner of
3  that property?
4    A.  Yes.
5    Q.  Do you own that property together?
6    A.  Yes.
7    Q.  Are there any mortgages on the
8  property?
9    A.  No.
10    Q.  Any liens or taxes owed of any kind?
11    A.  No.
12    Q.  Did you go into the Army right after
13  you left high school -- graduated high school?
14    A.  Yes.
15    Q.  Okay.  Can you give me a summary of
16  your employment history since you left the Army
17  in 1987?
18    A.  I worked for Yeargin Construction
19  company from -- it's kind of hard.  It's a lot
20  of jobs.  I don't know the exact amount of
21  years, but from '88 until I worked with, um --
22  Sheriff Foti 's deputies department right after
23  that, right after Yeargin.  I don't know the
24  exact year.  Um -- then I worked for Gibbs
25  Construction after that for nine years.

Page 39

1    Q.  Those three jobs you've just
2  mentioned, are they all construction type jobs?
3    A.  Two of them are.
4    Q.  What was the second job, then, please?
5    A.  I was a deputy sheriff working for
6  Sheriff Charles Foti 's deputies office.
7    Q.  How long were you a deputy sheriff?
8    A.  One year.
9    Q.  Why did you levee that job?
10    A.  Boring.
11    Q.  What sort of work were you doing with
12  Gibbs Construction?
13    A.  Everything.  Everything that goes with
14  construction.
15    Q.  After your nine years with Gibbs
16  Construction, what was your next job?
17    A.  Firefighter.
18    Q.  What was your first job as a
19  firefighter?
20    A.  I'm not clear on that question.
21    Q.  Okay.  When you became a firefighter
22  who was your employer?
23    A.  The New Orleans Fire Department.
24    Q.  When did you start working for the New
25  Orleans Fire Department?

Page 40

1    A.  October, '99.
2    Q.  Have you been continuously employed by
3  the New Orleans Fire Department since October
4  of 1999?
5    A.  Yes.
6    Q.  Have you received any promotions at
7  the fire department since '99?
8    A.  No.
9    Q.  Is your -- I don't know how to ask
10  this exactly, but is your job title
11  firefighter?
12    A.  Yes.
13    Q.  When you started working as a
14  firefighter for the New Orleans Fire Department
15  in October of '99, were you a full-time
16  employee?
17    A.  Yes.
18    Q.  Have you been a full-time employee of
19  the fire department continuously since '99?
20    A.  Yes.
21    Q.  Have you continued to receive a
22  regular paycheck from the fire department since
23  '99?
24    A.  Yes.
25    Q.  Did your pay from the fire department

Page 41

1  remain the same in the months after the
2  storm -- Katrina?
3    A.  No.
4    Q.  What happened to your pay from the
5  fire department in the months after Hurricane
6  Katrina?
7    A.  It went haywire.
8    Q.  When you say it went haywire, what
9  does that mean?
10    A.  It fluctuated up and down because the
11  pay system was all screwed up.
12    Q.  Are you compensated on an annual basis
13  as a firefighter?
14    A.  Yes.
15    Q.  And did the amount that the fire
16  department owed you change after the storm --
17  in the months after the storm?
18    A.  I personally, um -- can't answer that
19  because I still haven't caught up with the
20  system as of yet.  I don't understand the
21  system clearly.
22    Q.  What was it about the system that --
23  is it fair to say there was something about the
24  system that was confusing for you after the
25  storm?

11 (Pages 38 to 41)

HARRIS, JIMMIE

Page 42

```
1        MR. GILBERT:
2          You heard that?  I just objected
3      under my breath.  Object.  Because I
4      don't even understand the question.
5      A.  No.
6  EXAMINATION BY MR. RAFFMAN:
7      Q.  No?  Okay.  I only ask because I'm
8  confused.  Explain to me what fluctuated up and
9  down.
10      A.  Because the way our pay scale goes, we
11  work one day on, two days off, and the hourly
12  rate changes tremendously, week by week.  So
13  the pay changes with the hourly rate.  Um --
14  during the storm, all the system was down so a
15  lot of stuff got erased, scrambled, so they had
16  to play catch up.  So the system -- it took
17  them a while for everything to catch up.
18      Q.  Okay.  Do you know where the New
19  Orleans Fire Department maintains the computers
20  or records that are used to keep track of pay?
21      A.  No.
22      Q.  After Katrina did the number of hours
23  you worked for the fire department change?
24      A.  Yes.
25      Q.  What happened to the number of hours
```

Page 43

```
1  you worked for the fire department?
2      A.  We were working longer shifts.
3      Q.  And when you worked those longer
4  shifts, you were paid for each hour that you
5  worked?
6      A.  Yes.
7      Q.  Did you receive any overtime pay?
8      A.  Yes, we always receive overtime pay.
9      Q.  Do you work out of a particular fire
10  house?
11      A.  Yes.
12      Q.  Which fire house do you work out of?
13      A.  Engine 15, Ladder 5.
14      Q.  Where is that fire house located?
15      A.  1114 Arabella Street.
16      Q.  Pardon my ignorance of New Orleans
17  geography.
18          What neighborhood is that fire house
19  located in?
20      A.  Uptown neighborhood.
21      Q.  How long have you worked at Engine 15,
22  Ladder 5?
23      A.  Somewhere between five and six years.
24      Q.  That is the place where you worked at
25  the time of Katrina, then, right?
```

Page 44

```
1      A.  Yes.
2      Q.  That neighborhood is located on the
3  west side of the Industrial Canal, right?
4      A.  Yes.
5          Can I ask a question?  When you asked
6  the question about my working here during
7  Katrina, our firehouse was under renovation
8  during that time so we actually worked off of
9  Claiborne and Carrollton.
10      Q.  The place you worked at Claiborne and
11  Carrollton, is that in the same neighborhood
12  uptown?
13      A.  Yes, it's uptown.  Yes.
14      Q.  Do you do any self-employed work apart
15  from your job with the fire department?
16      A.  No.
17      Q.  What are your duties as a firefighter?
18      A.  Fight fires.
19          (Off the record.)
20  EXAMINATION BY MR. RAFFMAN:
21      Q.  Are you trained as an emergency
22  medical technician?
23      A.  First responder.
24      Q.  First responder.  What does your
25  training as a first responder enable you to do?
```

Page 45

```
1      A.  Stabilize a patient.
2      Q.  Does stabilizing a patient fall within
3  the general description of your job as a
4  firefighter?
5      A.  Yes.
6      Q.  Was Hurricane Katrina the first
7  hurricane that you experienced here in New
8  Orleans?
9      A.  No.
10      Q.  What other hurricanes did you
11  experience here in New Orleans?
12      A.  Hurricane Georges -- I can't name all
13  of them, but, you know.
14      Q.  Were you here for Hurricane Ivan?
15      A.  Yes.
16      Q.  If I'm right, Georges was in 1998.  So
17  you would have been in the Lamanche Street
18  house at that time, correct?
19      A.  Correct.
20      Q.  Did your home sustain any damage
21  during Hurricane Georges?
22      A.  I can't really remember.
23      Q.  I believe Ivan was '04.  Whenever it
24  was, did your home sustain any damage during
25  Hurricane Ivan?
```

Johns Pendleton Court Reporters                    800 562-1285

BARGE001090

HARRIS, JIMMIE

8/4/2008

Page 46

1    A.  I can't say.  I'm not sure.
2    Q.  You're too young to remember Hurricane
3  Betsy; right?
4    A.  I wasn't born yet.
5    Q.  Wasn't born yet.
6    A.  The year after.
7    Q.  Okay.  Do you know what year your home
8  on Lamanche Street was constructed?
9    A.  No.
10   Q.  Did you ever hear anything about
11  damage from Hurricane Betsy to your home or
12  nearby homes?
13   A.  No.
14   Q.  What was the first time you heard that
15  Hurricane Katrina was headed toward New
16  Orleans?
17   A.  Within that week of the 21st through
18  the 25th, somewhere around that time frame.
19   Q.  Tell me what you heard about Katrina,
20  when you heard it, and when you started to
21  become alarmed about the storm.
22   A.  I heard that it was a major category 3
23  storm building, aimed directly for New Orleans.
24  I prepared two days prior to button my house up
25  and get my family prepared to move.

Page 47

1    Q.  And you say two days prior.  On which
2  day did you undertake those preparations --
3  begin to take them?
4    A.  I'm going to say the, um -- Friday
5  prior.
6    Q.  What did you do on the Friday before
7  the storm?
8    A.  Bought plywood, cut out plywood for
9  all my windows, cleared my yard out, make sure
10  everything was cleared from the area, and
11  bought radios, lights, everything a normal
12  person would get for a storm, water, food.
13   Q.  Did you work that day?
14   A.  No.  Yes and no.  I worked on
15  preparing everything, not on my job, though.
16  Not on my job, at the house.
17   Q.  To be clear, you were not working at
18  the fire department on that Friday.
19   A.  Correct.
20   Q.  Did you work at the fire department on
21  Saturday?
22   A.  No.
23   Q.  Did you work the fire department on
24  Sunday?
25   A.  Yes.

Page 48

1    Q.  What did you do on Saturday to prepare
2  for the storm?
3    A.  Continue on icing up sodas and drinks
4  and getting food prepared for my wife and them
5  to leave.
6    Q.  When did you and your family decide
7  that your wife and daughter would leave?
8    A.  I decided when I saw the storm coming
9  directly at New Orleans.  My wife didn't decide
10  until the morning of.  She didn't want to
11  leave.
12   Q.  What discussions did you and your wife
13  have about whether she and your daughter would
14  leave New Orleans?
15   A.  I told her she was leaving.  There was
16  no discussion.  "You're leaving.  I'll pack
17  everything" -- told her she's leaving.  That
18  was it.
19   Q.  When did you first tell her that?
20   A.  That was Saturday night.
21   Q.  Before Saturday night you didn't tell
22  her she was leaving, right?
23   A.  Yes.  We talked about it but she
24  didn't want to leave.  She didn't want to
25  leave.

Page 49

1    Q.  When did you first discuss with her --
2  when did you first talk about, with her,
3  whether she would leave?
4    A.  I don't know.  It was posted on the
5  news in the week prior, it had been coming on
6  the news every day and we was watching the eye
7  of the storm.  So as we watched it daily we
8  talked about what we were going to do, what was
9  the evacuation procedures.  And my thing was
10  automatically, I have to work, you all have to
11  leave.  Because when I'm at work I can't do
12  anything for them.  So that was basically the
13  discussion.  A week prior, as we watched it, as
14  it got closer and closer, the eye got closer
15  and closer coming to New Orleans, I stated, you
16  will leave.  You're leaving.  There's no
17  discussion.  You know, so --
18   Q.  That statement you make, you're
19  leaving --
20   A.  You're leaving.
21   Q.  -- that was on Saturday night, right?
22   A.  It was Saturday night, it was before
23  Saturday night, it was continuously for me
24  telling her that she would leave.  But Saturday
25  was the stamp, you're leaving, that's it.  I

Johns Pendleton Court Reporters          800 562-1285
BARGE001091

HARRIS, JIMMIE

8/4/2008

Page 50

```
 1   don't want to talk about it anymore, you're
 2   leaving.
 3       Q.  What was the source of your
 4   information about Hurricane Katrina?
 5       A.  The news.
 6       Q.  Television?
 7       A.  Yes.
 8       Q.  Radio?
 9       A.  Television, radio, it was broadcast
10   everywhere.  Work.
11       Q.  Did you hear anything about an order
12   to evacuate?
13       A.  Prior?
14       Q.  Before the storm, yes.
15       A.  I think -- I'm not sure.  I think I
16   heard it.  I'm not 100 percent sure.  I'm not
17   sure.
18       Q.  Apart from broadcast television and
19   broadcast radio, what were your other sources
20   of information about the storm in the week
21   prior?
22       A.  Um -- work, my job.
23       Q.  What did you hear about the storm at
24   work?
25       A.  Well, they were preparing for the
```

Page 51

```
 1   worst, so -- they have a protocol that they
 2   have to follow.  So everybody was making sure
 3   they get everything in line preparing for the
 4   worst.
 5       Q.  Were the efforts at work to prepare
 6   for the worst undertaken on the Thursday before
 7   the storm?
 8       A.  Yes.  It was undertaken prior
 9   because -- we have three different platoons
10   that work, so every platoon that comes on
11   worked preparing things for the storm.  So --
12   but then my platoon work, which was Sunday, we
13   were already prepared.
14       Q.  Did you work on the Thursday before
15   the storm?
16       A.  Yes.
17       Q.  And you worked for the fire department
18   on the Thursday --
19       A.  Yes.
20       Q.  On the Thursday before the storm when
21   you were working for the fire department were
22   you preparing for the worst of the hurricane
23   then?
24       A.  Yes.
25       Q.  What were you doing on that Thursday?
```

Page 52

```
 1       A.  We were up loading equipment, stocking
 2   water, supplies, doing all our normal checks.
 3       Q.  And is that because if the storm were
 4   to come to New Orleans the fire department
 5   would be among the people that would have to
 6   protect the people of New Orleans from whatever
 7   the storm threw at them?
 8       A.  Yes.  Correct.
 9       Q.  So there was a special reason for the
10   fire department to be undertaking those
11   preparations, right?
12       A.  Yes.
13       Q.  What did you do to get your house
14   ready for the storm?
15       A.  Sounds like I heard that question
16   before, but I can answer it.  As I said before,
17   a few days prior, cut up plywood for the
18   windows, bought water, food supplies, picked up
19   any object that would fly, secured everything
20   around the house.
21       Q.  Why did you insist that your wife
22   leave?
23       A.  Because we expected the worst and I
24   would not be there to protect my wife and my
25   family.
```

Page 53

```
 1       Q.  When you say we expected the worst,
 2   what do you mean by that?
 3       A.  Well, watching the news, it was a
 4   Category 3 storm heading directly to New
 5   Orleans.  New Orleans is surrounded by water --
 6   the worst; flooding damages.
 7       Q.  You thought it might be dangerous for
 8   your wife and daughter to stay in New Orleans;
 9   right?
10       A.  Pretty much, yes.
11       Q.  People could get hurt or even killed
12   if they're in the middle of a hurricane; right?
13       A.  Possibilities.
14       Q.  So you thought it was prudent for your
15   wife and daughter to get out of New Orleans
16   while they could.
17       A.  Ahead of time, yes.
18       Q.  What time on Sunday did your wife and
19   daughter leave?
20       A.  I don't know exact time.  Um -- I gave
21   them an early morning time, because I left at
22   5:30.  I told them to leave right behind me.
23   Because New Orleans is a close network state,
24   my wife mother stay two blocks away.  So she
25   left home and went to retrieve her mother.  In
```

14 (Pages 50 to 53)

HARRIS, JIMMIE

8/4/2008

Page 54

1  the process, she had to persuade her mother to
2  leave with her.  So when she left, she took her
3  mother, her sister -- her two sisters, her
4  nephew, her niece, she took a whole truckload
5  of people with her.
6      Q.  What kind of vehicle was she driving?
7      A.  She was driving my Avalanche and my
8  daughter was driving her Mercedes.
9      Q.  This is your daughter Jameka who --
10     A.  Jameka, yes.
11     Q.  When you say it was a close network,
12  what did you mean by that?
13     A.  Um -- most families in New Orleans
14  stay close -- near one another.  Like my mother
15  and father stay five minutes away from me, my
16  sister and brother stay five minutes away from
17  me.  And the same with her family; all of hers
18  stay in the same general location, ten minutes
19  apart, in the same -- So when we say Katrina
20  destroyed families, it destroyed my family as
21  well as my wife's family.
22     Q.  Is it fair to say that that's
23  something that happened in any part of the city
24  that was devastated by the storm?
25         MR. GILBERT:

Page 55

1         Object.
2      A.  I guess.  Maybe.
3  EXAMINATION BY MR. RAFFMAN:
4      Q.  When your wife and daughter left town
5  they stopped and picked up a number of your
6  relatives; right?
7      A.  Yes.
8      Q.  These include relatives who might
9  otherwise not have left.
10     A.  Yes, sir.
11     Q.  I think I heard you make a
12  generalization about your neighborhood, that a
13  lot of families in your neighborhood have
14  relatives who live nearby.  Right?
15     A.  Yes.
16     Q.  So any person who lives in your
17  neighborhood, even if they don't have a car
18  themselves, they might have friends or family
19  who could give them a ride out of town, right?
20         MR. JOANEN:
21         Objection.
22         MR. GILBERT:
23         Objection, Mark.
24     A.  I guess.
25  EXAMINATION BY MR. RAFFMAN:

Page 56

1      Q.  Well, if I wanted to ask for any given
2  person whether they had a ride out of town that
3  day, I might need to know something about their
4  family to know whether they got a family member
5  living nearby who could give them a ride, isn't
6  that fair?
7         MR. GILBERT:
8             You would be asking this witness
9         to speculate, which is the nature of
10        my objection, but --
11     A.  No, I wouldn't say that.  I don't --
12  no.
13  EXAMINATION BY MR. RAFFMAN:
14     Q.  You don't know one way or the other.
15     A.  I don't.  I couldn't tell you.
16     Q.  But in the case of your family, did
17  each of those relatives that your wife picked
18  up on the way out of town, did each of them
19  have an independent way to get out?
20     A.  No.
21     Q.  So if I asked -- which of the
22  relatives did your wife pick up?
23     A.  Her mother, two sisters, a nephew and
24  her brother who stood in the same home.
25     Q.  Did your wife's mother have a car?

Page 57

1      A.  No.
2      Q.  Did her two sisters have a car?
3      A.  One of them had a car that was
4  unreliable.
5      Q.  Did the nephew have a car?
6      A.  No.
7      Q.  Did the brother have a car?
8      A.  No.
9      Q.  The fact that these people didn't have
10  a car or that the car was unreliable didn't
11  prevent them from getting out of town, did it?
12         MR. GILBERT:
13             Objection.  You're arguing with
14         the deponent.
15             Subject to the objection.  When I
16         object let me make my objection for
17         the record before you start to speak
18         and I'll tell you it's okay to go
19         ahead and answer.
20     A.  I don't know.
21  EXAMINATION BY MR. RAFFMAN:
22     Q.  Where did you spend the night on
23  Sunday night August 28th and into Monday, the
24  29th?
25     A.  Children's Hospital.

Johns Pendleton Court Reporters                    800 562-1285
BARGE001093

HARRIS, JIMMIE

8/4/2008

Page 58

```
1      Q.  What were you doing there?
2      A.  Um -- listening to the radios, on
3  call, I was working with the fire department.
4      Q.  Could you hear the wind blowing from
5  where you were on that night?
6      A.  Yes.  Yes.
7      Q.  What did that sound like?
8      A.  Horrible.
9      Q.  Was it loud?
10     A.  Yes.
11     Q.  Did it blow all night long?
12     A.  Yes.
13     Q.  When the sun came up was the wind
14  still blowing?
15     A.  I don't remember seeing the sun Monday
16  morning.
17     Q.  Did you have -- when you say you don't
18  remember seeing the sun, was it -- I'm sorry.
19         Did the room you were in at Children's
20  Hospital have a window so you could see
21  outside?
22     A.  Yes.
23     Q.  And as Sunday night went into Monday
24  morning and as the wind blew in that horrible
25  way, did the sky stay dark?
```

Page 59

```
1      A.  Yes.
2      Q.  So dark that you couldn't tell when
3  the sun had come up?
4      A.  Yes.
5      Q.  Was it raining, could you tell?
6      A.  Yes.
7      Q.  How could you tell it was raining?
8      A.  You could see the rain.  You could see
9  it.
10     Q.  And the rain was pelting against the
11  window and making it wet?
12     A.  Yes.
13     Q.  Was it raining throughout the night of
14  Sunday night into Monday morning?
15     A.  Yes.
16     Q.  And did it continue to rain as the
17  daylight began to appear, whenever that
18  happened?
19     A.  Yes.
20     Q.  Did you stay inside all that day
21  Monday, the 29th?
22     A.  Um -- I did until the latter part of
23  the day.  We came out the latter part of the
24  day.
25     Q.  Do you remember about what time it was
```

Page 60

```
1  that you emerged from Children's Hospital and
2  went outside?
3      A.  No.  I don't remember time.
4      Q.  What did you see when you went out of
5  Children's Hospital for the first time after
6  the storm?
7      A.  Devastation, trees broken, wires down,
8  um -- houses damaged.
9      Q.  The area around Children's Hospital,
10  did it flood?
11     A.  No.
12     Q.  When was the first time that you got a
13  firsthand look at the flooding that happened
14  during Katrina?
15         MR. GILBERT:
16         Object.  What flooding?
17  EXAMINATION BY MR. RAFFMAN:
18     Q.  Any flooding.
19     A.  Weeks later.
20     Q.  On --
21     A.  Excuse me.  I got to take that back.
22  Um -- less than a week later.  Less than a week
23  later.
24     Q.  You were in New Orleans as a first
25  responder; right?
```

Page 61

```
1      A.  Yes.
2      Q.  What first response activities did you
3  participate in after Hurricane Katrina?
4      A.  I don't remember exactly, um -- which,
5  um -- first responder response I participated
6  in.  There was numerous fires I participated
7  in.
8      Q.  Were the fires you participated in
9  clustered in a particular part of town?
10     A.  No.
11     Q.  Where were the fires that you
12  participated in putting out after Katrina?
13     A.  Some was uptown, some was in the CBD
14  area.
15     Q.  And when you say CBD, that's the
16  central business district?
17     A.  Central business district, right.
18  Yes.
19     Q.  Apart from uptown and the central
20  business district, did you participate in
21  putting any other fires out in the days
22  immediately following Hurricane Katrina?
23     A.  No.
24     Q.  Was the central business district
25  flooded at the time you were putting out fires?
```

16 (Pages 58 to 61)

HARRIS, JIMMIE

8/4/2008

Page 62

1    A.  Yes.
2    Q.  Did you participate in any rescue
3  activities for people during the first few days
4  after Katrina?
5    A.  No.
6    Q.  Did you observe any looting during the
7  first several days after Katrina?
8    A.  No.  One statement afterwards:  We did
9  do house searches, but we didn't rescue anyone,
10  we just did house searches.
11    Q.  Where were you doing those house
12  searches, Mr. Harris?
13    A.  Uptown, in my district area.
14    Q.  During the several days immediately
15  after Katrina, did you personally remain in the
16  uptown and central business district areas?
17    A.  Yes.
18    Q.  Did you see people who had been hurt
19  by the storm or things that happened to them
20  during the storm?
21    A.  No.
22    Q.  Did you see any people who had died as
23  a result of what happened to them during the
24  storm?
25    A.  No.

Page 63

1    Q.  Okay.  All right.  I believe you
2  testified earlier you did not return to the
3  Lower Ninth Ward until several weeks after the
4  storm.
5    A.  Correct.  Yes.
6    Q.  When did you first learn that the
7  Lower Ninth Ward had been flooded?
8    A.  The day of.
9    Q.  On the day of the storm what did you
10  hear about the Ninth Ward having been flooded?
11    A.  I heard there was a breach in the
12  levee.
13    Q.  How did you hear that?
14    A.  On the fire department radio.
15    Q.  Did you hear anything on that day
16  about a barge?
17    A.  I'm not sure.
18    Q.  Did you hear anything about -- on that
19  day about what had caused the breach in the
20  Lower Ninth Ward?
21    A.  I think I heard about the barge
22  breach.  Because it was two different breaches
23  simultaneously.
24    Q.  When you say two breaches, there were
25  two breaches over there on the Inner Harbor

Page 64

1  Navigation Canal floodwall on the east side of
2  the canal, right?
3    A.  No, I didn't hear about that.  I
4  heard, um -- there was a 17th Street Canal
5  breach, and then there was a Lower Ninth Ward
6  breach.
7    Q.  Uh-huh.
8    A.  So everything was going on at the same
9  time, so there was a lot of confusion.
10    Q.  Do you know what time of day you first
11  heard about the breach of the floodwall into
12  the Lower Ninth Ward?
13    A.  I don't know the exact time.  It
14  was -- I don't know if it was the early part of
15  the morning or towards the noon part, um -- I
16  don't remember the exact time when --
17    Q.  Was the sky still dark when you heard
18  about the breach?
19    A.  Yes.  And when I say dark, I'm talking
20  about this -- cloudy, like overcast.  Not dark
21  dark, like overcast.
22    Q.  The sky was overcast when you heard
23  about it.
24    A.  Correct.  Yes.  Yes.
25    Q.  So then it might have been at any time

Page 65

1  during the day that you first heard about it,
2  as late as noon.
3    A.  Yes.
4    (Off the record.)
5  EXAMINATION BY MR. RAFFMAN:
6    Q.  You did not see the breach in the
7  levee on the Industrial Canal, did you?
8    A.  No.
9    Q.  Have you ever talked to anyone who
10  told you that they saw the levee breach?
11    A.  No.
12    Q.  Did you ever talk to anyone who told
13  you they saw the barge come into the Lower
14  Ninth Ward?
15    A.  No.
16    Q.  Did you ever talk to anyone who told
17  you they saw the barge hit the wall?
18    A.  No.
19    Q.  Did you ever talk to anyone who told
20  you they saw the barge break free from its
21  mooring?
22    A.  No.
23    Q.  What do you think caused the breach in
24  the Industrial Canal floodwall?
25    A.  I don't know.

17 (Pages 62 to 65)

BARGE001095

HARRIS, JIMMIE

8/4/2008

Page 66

```
1        (Brief recess.)
2    EXAMINATION BY MR. RAFFMAN:
3        Q.  During the time that you were at
4    Hospital did you talk to anyone who had stayed
5    behind in the Lower Ninth Ward?
6        A.  No.
7        Q.  Have you ever talked with anyone who
8    rode out the storm at the port of embarkation?
9        A.  I think I spoke with a few of my fire
10   friends, um -- who was actually stuck there.
11   They wouldn't release them from the port.
12       Q.  So they were stuck at the port of
13   embarkation during the storm.
14       A.  Yes.
15       Q.  And when did you talk to these people?
16       A.  Um -- it had to be like -- I think
17   like three or four days after, because we stood
18   at Children's Hospital for three to four days,
19   and then everyone -- the entire department
20   shift, um -- shift to the west bank.  And
21   that's where we all united at.
22       Q.  Do you remember the names of any of
23   the people who rode out the storm at the port
24   of embarkation?
25       A.  No.  I don't know names.  Um -- the
```

Page 67

```
1    guy who I spoke with, um -- a fellow
2    firefighter, um -- no, I don't think he was the
3    actually one who stood at the port of
4    embarkation.
5        Q.  Did anybody who stayed at the port of
6    embarkation tell you about their experience
7    riding out the storm at that place?
8        A.  No.
9        Q.  What is your wife's occupation?
10       A.  She's unemployed right now.
11       Q.  What is her trade?
12       A.  Hair stylist.
13       Q.  Where did she work before the storm?
14       A.  On St. Claude, on the west side of the
15   Industrial Canal.
16       Q.  Her place of employment was in the
17   Upper Ninth Ward?
18       A.  Correct, yes.
19       Q.  When her place -- did her place of
20   employment flood during the storm?
21       A.  Yes.
22       Q.  And what was the name of her place of
23   employment?
24       A.  Positive Attitude Beauty Salon.
25       Q.  Did you own the salon?
```

Page 68

```
1        A.  No.
2        Q.  Is that salon in business today?
3        A.  No.
4        Q.  Did she have employment in Houston?
5        A.  Yes.
6        Q.  What was her employment in Houston?
7        A.  Hair stylist.
8        Q.  She left that employment to come back
9    and live with you at 924 Lamanche.
10       A.  Yes.
11       Q.  All right, how did her income in
12   Houston compare to her income from Positive
13   Attitude Beauty Salon before the storm?
14       A.  Decrease.
15       Q.  She made less money in Houston than
16   she made before the storm.
17       A.  Yes.
18       Q.  I'll hand you what has been marked as
19   Exhibit 1 to your deposition, which is a
20   printout from Google Maps.  Do you recognize
21   the neighborhood on Exhibit 1 as a map of your
22   neighborhood?
23           (Harris Exhibit 1 was marked for
24   identification and is attached hereto.)
25       A.  Yes.
```

Page 69

```
1    EXAMINATION BY MR. RAFFMAN:
2        Q.  And if you'd turn to the second page
3    of the exhibit, there's a little red bubble
4    that has the letter A on it.  Do you recognize
5    that bubble as marking the location of your
6    home at 924 Lamanche Street?
7        A.  Yes.
8        Q.  Did you pay cash for your home when
9    you bought it?
10       A.  No.
11       Q.  Did you have a mortgage?
12       A.  Yes, I had a mortgage.
13       Q.  And when did you pay off that
14   mortgage?
15       A.  After the storm.
16       Q.  When you bought your home what was the
17   purchase price?
18       A.  41,500, I think, if I'm not mistaken.
19       Q.  How much did you put down?
20       A.  I don't remember, because -- I don't
21   remember.
22       Q.  How much did you borrow?
23       A.  I assume -- I think it's the full
24   amount.  I think the full amount.
25       Q.  Do you remember how much of the
```

18 (Pages 66 to 69)

HARRIS, JIMMIE

8/4/2008

## Page 70

1 mortgage was remaining outstanding after the
2 storm?
3      A.  I think 79,300.  I'm just thinking
4 79,300, something like that, because I did a
5 renovation to the home, addition.
6      Q.  Describe the renovation that you just
7 mentioned.
8      A.  I added on a thousand square feet,
9 which is a living room, bedroom, master
10 bathroom and master closet upstairs.
11      Q.  When did you undertake that
12 renovation?
13      A.  2002.
14      Q.  I'm going to show you what's been
15 marked as Exhibit 2 to your deposition.  This
16 is a document that bears a heading cash sale
17 92-180.  Do you recognize this document,
18 Mr. Harris?
19          (Harris Exhibit 2 was marked for
20 identification and is attached hereto.)
21      A.  Yes.
22 EXAMINATION BY MR. RAFFMAN:
23      Q.  Is this a record of the purchase of
24 the 924 Lamanche Street property by you and
25 your wife in 1992?

## Page 71

1      A.  Yes.
2      Q.  If you look at the second page, around
3 the middle of the page, does it refresh your
4 recollection that the purchase price of your
5 home was $42,000?
6      A.  Yes.
7      Q.  When you bought your home in 1992, how
8 many stories of living space were there?
9      A.  One story.
10      Q.  Was the home raised up off the ground?
11      A.  Yes, a raised lap.
12      Q.  How high off the ground was the home
13 raised?
14      A.  I would say two and a half feet.
15      Q.  What kind of construction was the home
16 when you bought it?
17      A.  It's a cinder block construction,
18 exterior walls, um -- the upstairs portion is
19 wood construction.
20      Q.  The home, when you bought it, was only
21 one story, right?
22      A.  Single story, yes.
23      Q.  The second story is what you added in
24 2002?
25      A.  Yes.

## Page 72

1      Q.  How many square feet was the home when
2 you bought it?
3      A.  1400.
4      Q.  Was the addition of the second story
5 in 2002 the first such addition that you did?
6      A.  Yes.
7      Q.  You added 1000 square feet of living
8 space on the second floor?
9      A.  Partially on the first floor and the
10 rest is on the second floor.
11      Q.  What was the construction of the
12 second floor?  It was made out of what?
13      A.  It's wood constructed, um -- plywooded
14 exterior and vinyl siding on top.
15      Q.  Who did the work?
16      A.  Geo Construction.
17      Q.  Was that a firm that you had worked
18 for in the past?
19      A.  No.  That's a friend of mine who has
20 his own construction company.
21      Q.  How big is the lot that you own at 924
22 Lamanche?
23      A.  I don't know the square footage on it.
24      Q.  Do you know the elevation of the lot,
25 how many feet above or below sea level?

## Page 73

1      A.  I don't know exactly, but -- no, I
2 don't.  No.
3      Q.  Do you know whether your house had
4 ever flooded in the past at any time?
5      A.  Not that I know of, no.
6      Q.  Do you have pictures of your home
7 pre-storm?
8      A.  Yes.
9      Q.  Can you describe those pictures for
10 me?
11      A.  Yes.  A well put together home,
12 recently renovated, um -- with major upgrades.
13      Q.  Apart from the upgrade in 2002, had
14 you done other upgrades to your home before the
15 storm?
16      A.  Um -- just the carport.  That was the
17 only other upgrade I did since 2002.
18      Q.  When was the carport added?
19      A.  I think three months before the storm.
20 It was May '05, I think, if I'm not mistaken.
21      Q.  At the time of the storm, did your
22 house need any repairs?
23      A.  No.
24      Q.  When was the last time your house had
25 a new roof before the storm?

19 (Pages 70 to 73)

HARRIS, JIMMIE

8/4/2008

Page 74

1    A.  2002.
2    Q.  Did you ever have termites in your
3  house?
4    A.  Um -- prior to the new construction
5  there were some termite infested wood found,
6  which was taken out during the construction.
7    Q.  In what year was the termite infested
8  wood taken out?
9    A.  2002.
10    (Off the record.)
11  EXAMINATION BY MR. RAFFMAN:
12    Q.  Did you borrow money to undertake the
13  2002 renovation?
14    A.  Yes.
15    Q.  What amount did you borrow?
16    A.  I think it was fifty thousand dollars.
17    Q.  When did you retire that mortgage?
18    A.  It was in '02.  I don't know the exact
19  date or month.  It was -- oh, you're talking
20  about when did I pay it off.
21    Q.  When did you pay off the mortgage?
22    A.  I just recently paid it off.  Um --
23  '05.  I don't know the month.  2005.
24    Q.  Did you receive funds from somebody or
25  some entity that you used to pay off the

Page 75

1  mortgage?
2    A.  Yes.
3    Q.  Would you tell me what the source of
4  those funds was?
5    A.  Yes.  My insurance -- flood insurance.
6    Q.  What company did you have flood
7  insurance with?
8    A.  Allstate.
9    Q.  Were you a part of the National Flood
10  Insurance Program?
11    A.  I'm not sure.  My wife took care of
12  all of that stuff.  I'm not sure.
13    Q.  How much did Allstate pay?
14    A.  A hundred thousand dollars for flood
15  and forty thousand for contents.
16    Q.  I missed the last part of your answer.
17  I'm sorry.
18    A.  Forty thousand for contents.  A
19  hundred thousand for flood.
20    Q.  Do you know what the tax assessed
21  value of your home was before the storm?
22    A.  No.
23    Q.  Did you have an appraisal done on your
24  property within the five years before the
25  storm?

Page 76

1    A.  I think there was an appraisal done
2  prior to the addition on my home.
3    Q.  Do you remember what the appraised
4  value of your home was when the appraisal was
5  done?
6    A.  I don't remember.
7    Q.  I've handed you what has been marked
8  as Harris Exhibit 3.  The Bates number on this
9  document, which is a photograph, was not
10  readable on the printout.  I will represent to
11  you that it was produced to us from your disk.
12  And if I can get the Bates number, I will do
13  it.
14    My question for you is, do you
15  recognize this photograph?
16    (Harris Exhibit 3 was marked for
17  identification and is attached hereto.)
18    A.  Yes.
19  EXAMINATION BY MR. RAFFMAN:
20    Q.  What is in this photograph?
21    A.  It's my home.
22    Q.  Did you take this photograph?
23    A.  Yes.
24    Q.  When did you take this photograph?
25    A.  After the storm.

Page 77

1    Q.  How long after the storm?
2    A.  It least a year.
3    Q.  How do you know it was at least a year
4  after the storm?
5    A.  Because I have a new front door up
6  there.
7    Q.  So this photograph reflects your house
8  after you had done some renovation and repairs
9  after the storm, right?
10    A.  Yes.
11    Q.  This photograph is not a photograph of
12  your house as it existed before the storm;
13  correct?
14    A.  Correct.
15    Q.  When was the first time after the
16  storm that you returned to see your home?
17    A.  At least a couple -- maybe a couple of
18  months.  It's a month or two.
19    Q.  Was anybody with you when you went to
20  see the home?
21    A.  Yes.
22    Q.  Who was with you?
23    A.  My fellow fire fighters.
24    Q.  What did you see?
25    A.  A mess.

20  (Pages 74 to 77)

HARRIS, JIMMIE

8/4/2008

Page 78

1    Q.  Could you had describe the conditions
2  you found when you got there?
3    A.  Yes.  Um -- three inches of mud
4  throughout the streets, trash covering my
5  entire driveway, all the grass was murky,
6  brown, a stench smell.  Um -- the house was --
7  there was two inches of mud throughout the
8  house and there was mildew everywhere
9  throughout the house.  The bulk of my furniture
10  was towards the front door from the first three
11  rooms.
12    Q.  In what direction does your house
13  face?
14    A.  East.
15    Q.  The furniture had moved from where it
16  was before the storm?
17    A.  Three.
18    Q.  In which direction had it floated?
19    A.  East.
20    Q.  Could you tell how high the water had
21  gotten inside the house?
22    A.  Yes.
23    Q.  How high had the water gotten?
24    A.  Seven feet eight inches.
25    Q.  Did you measure?

Page 79

1    A.  No.  Eyesight.
2    Q.  How high were your ceilings?
3    A.  Eight feet.
4    Q.  So the water had come almost but not
5  quite to the ceiling of the first floor.
6    A.  Yes.
7    Q.  The second floor of your home did not
8  flood, correct?
9    A.  Correct.
10    Q.  Do you know where the water came from
11  that flooded your home?
12    A.  No.
13    Q.  Do you know when during August 29th
14  your home flooded?
15    A.  No.
16    Q.  Was there any damage to any of the
17  windows on the second floor?
18    A.  No.
19    Q.  Was there any damage to the roof?
20    A.  Minor.
21    Q.  Describe that damage.
22    A.  Numerous ridge tiles blown off, vinyl
23  siding blown off the front gable.  Also some
24  ridge tiles blown off the first level, the rear
25  section of the home.

Page 80

1    Q.  Does your house have a fireplace?
2    A.  No.
3    Q.  Did any rain get in the second story?
4    A.  No.
5    Q.  Describe for me which rooms were on
6  the first floor of your house.
7    A.  Living room, dining room, kitchen,
8  kitchenette, hallway, um -- bathroom, full
9  sized, to the left, um -- bedroom to the right,
10  the old master bedroom further down the
11  hallway, with a master bathroom in that room,
12  washroom directly behind it, and there's
13  another bedroom on the opposite side of the
14  master bedroom.
15    Q.  How many bedrooms are there on the
16  first floor?
17    A.  Three.
18    Q.  What rooms are on the second floor of
19  the home?
20    A.  Bedroom, master bathroom and a walk-in
21  closet.
22    Q.  Most of the living space in the home
23  is on the first floor?
24    A.  Yes.
25    Q.  When you returned to your home a

Page 81

1  couple of months -- or a month after the storm,
2  did you take pictures on that occasion?
3    A.  No.
4    Q.  You did take pictures of your home in
5  its damaged condition at some point; right?
6    A.  Yes.
7    Q.  You produced a disk with those
8  pictures; right?
9    A.  I produced a disk with numerous
10  pictures, um -- which I would have to go back
11  and redo it and take certain pictures out,
12  because there was pictures of the entire
13  neighborhood.  So it was -- it's pictures of
14  fires -- it's just three or four hundred
15  pictures.
16    Q.  You took pictures of fires.  Is that
17  what you said?
18    A.  Someone took pictures of fires.  My
19  friend and I, we swapped pictures out.  And we
20  just made a slide show out of it.
21    Q.  Where were the fires that were
22  depicted on the --
23    A.  All over the city.  All over.
24    Q.  Were any of the fires in the Lower
25  Ninth Ward?

21 (Pages 78 to 81)

HARRIS, JIMMIE

8/4/2008

Page 82

1      A.  I don't know.  I can't tell you.  I'm
2  not sure.
3          MR. GILBERT:
4            For the record, I don't think
5          y'all have any fire pictures.  I think
6          all you have are house pictures.  You
7          may have other areas in the Lower
8          Nine, but I believe that the discovery
9          request to which we were responding
10         is -- I don't know, was something
11         general.  But I don't think there are
12         any pictures of fires on the disk we
13         gave you.  And I don't know, um --
14         MR. MORENO:
15           We had a disk that was all over
16         the city, and it was like a huge slide
17         show.  It didn't pertain to any of
18         this case.  I said I need you to bring
19         me your pictures that you took of your
20         house before and after, and that's
21         what he produced.  Whatever you
22         have -- yeah.
23  EXAMINATION BY MR. RAFFMAN:
24      Q.  Do you have pictures on your disk of
25  fires that happened during or after Katrina?

Page 83

1      A.  Yes, but I don't think they were in
2  the Lower Ninth Ward district.  They were all
3  uptown fires.
4      Q.  Do you know whether there were any
5  fire in the Lower Ninth Ward or in St. Bernard
6  Parish after the storm?
7      A.  I don't know because I actually work
8  the uptown district.  I don't work down in that
9  district.
10      Q.  The area that you talked about having
11  observed was the area bounded by Chartres,
12  Florida, Jourdan and Delery; am I right?
13      A.  Yes.
14      Q.  Inside that area did you see any
15  damage to homes that had been caused by the
16  wind?
17      A.  I can't tell you what --
18          MR. GILBERT:
19            Let me just put an objection on
20          the record.
21            And you can answer.
22      A.  Okay.  I can't tell you if the damages
23  was caused by wind or not.  I don't know.
24  EXAMINATION BY MR. RAFFMAN:
25      Q.  Did you see homes that had lost their

Page 84

1  roofs?
2      A.  Yes.
3      Q.  Some of those homes were more than one
4  story?
5      A.  Could be, possibility.
6      Q.  Did you see any downed trees?
7      A.  I seen rubble.  Piles of everything;
8  trees, wood from houses, a lot of stuff.
9      Q.  Did you see any trees that had come
10  down on top of homes?
11      A.  Yes.
12      Q.  Can you describe the damage that the
13  trees had done to the homes?
14      A.  Well, the homes was flattened, it was
15  a pile of wood.  And the tree was laying on top
16  of the piles of wood.
17      Q.  Did you see any homes that looked to
18  you like they had been burned by a fire?
19      A.  No.
20      Q.  Did you hear about any homes in the
21  Lower Ninth Ward that had been burned by fire?
22      A.  At what point are we speaking of?
23      Q.  During or after Katrina.
24      A.  Plenty of homes been burned by fire
25  after Katrina.  It's ongoing now.

Page 85

1          MR. GILBERT:
2            It's also asked and answered.
3  EXAMINATION BY MR. RAFFMAN:
4      Q.  Any of your neighbors tell you that
5  the wind had harmed their roofs of their
6  houses?
7      A.  No.  Verbally tell me?  No.
8      Q.  Did you hear about homes in your
9  neighborhood that had their roofs torn off by
10  wind or some other force of nature?
11      A.  I've seen plenty of roofs covered with
12  blue tarps, which mean it was major roof
13  damage.
14      Q.  There's a lot of homes with blue tarps
15  in your neighborhood that you've seen; right?
16      A.  Yes.
17      Q.  I'm showing you what's been marked as
18  Harris Exhibit 4.  The Bates number on this
19  picture is Number 156.  Is that a picture that
20  you took, Mr. Harris?
21          (Harris Exhibit 4 was marked for
22  identification and is attached hereto.)
23      A.  Yes.
24  EXAMINATION BY MR. RAFFMAN:
25      Q.  Can you tell me what is shown in that

22 (Pages 82 to 85)

HARRIS, JIMMIE

8/4/2008

---

Page 86

1  picture?
2      A.  Yes, broken tree branches on top of my
3  shed.
4      Q.  Did the broken tree branch do any
5  damage to the shed?
6      A.  Yes.
7      Q.  Can you describe the damage that the
8  tree branch did to the shed?
9      A.  Punctured a hole through the roof of
10 the shed.
11     Q.  Do you know whether any rain got
12 inside the shed?
13     A.  Yes.
14     Q.  Did any rain get inside the shed?
15     A.  Yes, through the hole.
16     Q.  What did you keep inside the shed?
17     A.  Everything that my wife didn't want
18 inside the home.
19     Q.  Can you name one or more of the items
20 that your wife didn't want inside the home that
21 you kept in the shed?
22     A.  Furniture, clothes, dressers, my
23 lawnmower, weed eater, et cetera, et cetera.
24     Q.  I'm handing you what's been marked as
25 Harris Exhibit 5.  I believe the Bates number

---

Page 88

1  there appears to be some red objects or
2  something red there.  Do you see that?
3      A.  Yes.
4      Q.  Do you know what that is?  What is
5  that?
6      A.  Ridge tiles.
7      Q.  Ridge tiles.
8      A.  Yes.
9      Q.  Are those ridge tiles shown in the
10 photo where they were before the storm?
11     A.  I would guess not.  No.
12     Q.  What has happened to those ridge
13 tiles?
14     A.  It appears as if they're displaced.
15 They're out of line.
16     Q.  Looking at the roof of your own home,
17 do you see that there is one segment that is
18 brown instead of white?
19     A.  Yes.
20     Q.  What happened to that segment of your
21 home?
22     A.  I don't know.  It's not there.  It's
23 gone.
24     Q.  What was there before it was gone?
25     A.  Vinyl siding.

---

Page 87

1  on this is Number 294.  Do you recognize this
2  document, Mr. Harris?
3          (Harris Exhibit 5 was marked for
4  identification and is attached hereto.)
5      A.  Yes.
6  EXAMINATION BY MR. RAFFMAN:
7      Q.  What is it?
8      A.  My home.
9      Q.  It's a photograph of your home?
10     A.  Yes.
11     Q.  Did you take this photograph?
12     A.  Yes.
13     Q.  When did you take this photograph?
14     A.  After Katrina.
15     Q.  Do you know how long after Katrina?
16     A.  Not an exact time frame.
17     Q.  Was this photo taken before you began
18 to repair your home after the storm?
19     A.  Yes, I would say so.
20     Q.  On the right-hand side of the photo,
21 there's another house.  Do you see that?
22     A.  Yes.
23     Q.  Is that your neighbor's home?
24     A.  Yes.
25     Q.  And on the top of your neighbor's home

---

Page 89

1      Q.  The vinyl siding has come away from
2  the upper -- or the lower part of your roof on
3  the right-hand side of the photo; correct?
4      A.  Correct.
5      Q.  I'm showing you what's been marked as
6  Exhibit 6 to your deposition.  Do you recognize
7  this document?
8          (Harris Exhibit 6 was marked for
9  identification and is attached hereto.)
10     A.  Yes.
11 EXAMINATION BY MR. RAFFMAN:
12     Q.  What is it?
13     A.  My furniture out of my home.
14     Q.  When did you take this picture?  Did
15 you take this picture?
16     A.  Yes.
17     Q.  When did you take this picture?
18     A.  After Katrina.
19     Q.  Do you know how long after?
20     A.  I don't know the exact time frame, no.
21     Q.  Am I right that the addition that you
22 put on in 2002 is shown in the front part of
23 the house on the second story?
24     A.  The first and second story.
25     Q.  All right.  Because some of the work

---

23 (Pages 86 to 89)

HARRIS, JIMMIE

8/4/2008

Page 90

1  you did in 2002 is on the first floor.
2      A.  Yes.
3      Q.  All right.  Are there two separate
4  segments to the second story addition?
5      A.  I'm not clear.
6      Q.  Well, I'm looking at a photograph in
7  which there's a second story addition, and then
8  if you look behind it there's a segment of home
9  in which the roof appears to go horizontally
10  across rather than straight back.  Do you under
11  what I'm saying?
12      A.  I understand.  The, um -- the second
13  segment you're looking at is the roof of the
14  first floor -- first area of the home.  The
15  front part is the second story of the home.
16  The part that go horizontally is the roof of
17  the first floor of the home.
18      Q.  Did you replace that roof in 2002 when
19  you did the addition to the second story?
20      A.  Yes, the entire roof on the entire
21  home.
22      Q.  Does this picture show the personal
23  property that was destroyed in the storm?
24      A.  Yes.
25      Q.  Are there any other items of personal

Page 91

1  property that were destroyed in the storm that
2  are not reflected in this picture, that you
3  know of?
4      A.  Yes.
5      Q.  What are those?
6      A.  Everything that was in my shed.  This
7  just came out of my home.
8      Q.  All right.  And apart from what was in
9  the shed, is there anything else that was
10  personal property destroyed in the storm that's
11  not in this photo?
12      A.  Um -- yes, my daughter's car, it was
13  actually parked in the driveway, but it's not
14  showing on this picture.
15      Q.  Apart from your daughter's car,
16  anything else that was personal property
17  destroyed in the storm and not shown in the
18  photo?
19      A.  No.
20      Q.  Who had title to your daughter's car?
21      A.  I did.
22      Q.  What kind of car was it?
23      A.  A '97 -- '94 Chevy Cavalier.
24      Q.  What kind of condition was it in?
25      A.  I would say decent.

Page 92

1      Q.  When your wife evacuated, what car did
2  she drive out of town?
3      A.  My truck, the Avalanche.
4      Q.  Did your daughter drive a different
5  vehicle out of town?
6      A.  Yes.
7      Q.  Which car did she drive out of town?
8      A.  My wife car.
9      Q.  Between Hurricane Katrina and
10  Hurricane Rita, did you visit your home?
11      A.  Yes.
12      Q.  Do you remember when Hurricane Rita
13  hit New Orleans?
14      A.  I don't remember exact date, but yes.
15      Q.  It was in late September, right?
16      A.  Yes.
17      Q.  When I asked you earlier when the
18  first time you visited your home was following
19  Katrina, I thought I heard you say a month or
20  two.
21      A.  Yes.
22      Q.  Now as you think back on it, you're
23  pretty sure you went and saw your home before
24  Rita came through; is that your testimony?
25      A.  Yes.  Yes.

Page 93

1      Q.  Have you ever tried to figure out how
2  much money your damaged personal property is
3  worth?
4          MR. GILBERT:
5              I'm going to object to the
6          question.  It's very vague.
7  EXAMINATION BY MR. RAFFMAN:
8      Q.  Well, I don't want it to be vague.  Do
9  you understand my question?
10      A.  Somewhat.
11      Q.  Well, let me go back and be perfectly
12  clear.
13      A.  Okay.
14      Q.  Have you ever tried to figure out how
15  much money your damaged property, apart from
16  your home, is worth?
17          MR. GILBERT:
18              Same objection because you used
19          the same word.
20      A.  No, because some things you can't put
21  a value to.
22          MR. GILBERT:
23              Mark, for the record, the only
24          reason I'm objecting is because you're
25          asking what something is worth.  Are

24 (Pages 90 to 93)

HARRIS, JIMMIE

8/4/2008

Page 94

1      you talking about replacement value?
2      Are you talking about the value at the
3      time it was damaged?  It's just vague.
4      I don't know that he could answer if
5      you were more specific, but the
6      question itself is kind of ambiguous.
7    EXAMINATION BY MR. RAFFMAN:
8      Q.  Have you ever tried to figure out how
9    much money you want to be compensated for your
10   damaged property other than your home?
11     A.  No.
12     Q.  Have you ever tried to figure out how
13   much money you want to be compensated for the
14   damage to your home?
15     A.  No.
16     Q.  Did you ever create a list of the
17   items that were in your home and that were in
18   your shed that were damaged or destroyed?
19     A.  Yes.
20     Q.  Did you have that list today?
21     A.  No.
22     Q.  What happened to that list?
23     A.  I don't know.  It was given to my
24   wife.
25     Q.  Did you create that list?

Page 95

1      A.  Yes.
2      Q.  When did you make it?
3      A.  Don't remember the exact date.
4      Q.  What year?
5      A.  It could be '06, could be '07.  I
6    don't really remember which year.
7      Q.  Why did you create it?
8      A.  Just to have a memory of everything
9    that we owned -- once owned.
10     Q.  What was -- what did that list look
11   like?
12     A.  It's long.  It's pages.
13     Q.  Is it handwritten?
14     A.  Yes.
15     Q.  Did you write it?
16     A.  Yes.
17     Q.  And when you listed an item did you
18   put a dollar amount next to it?
19     A.  No.
20     Q.  So it was just a list of items.
21     A.  Yes.
22     Q.  When did you give it to your wife?
23     A.  Um -- it could have been right after I
24   created the lift.
25     Q.  Did you gather documents to give to

Page 96

1    your lawyers for production to the defendants
2    in this case?
3      A.  I'm not understanding the question.
4      Q.  Do you know that at some point in this
5    case the defendants, including my client, asked
6    the plaintiffs, including you, to provide
7    certain documents regarding their claims?
8      A.  Okay.
9      Q.  Are you aware of that?
10     A.  I am now, yes.
11     Q.  Before I asked my question were you
12   aware of that?
13     A.  I'm aware of it now, yes.
14     Q.  Before I asked my question were you
15   aware of that?
16     A.  I was asked to provide a list of
17   documents for work that was produced on my
18   home, not for the materials that was damaged
19   within my home.  Just an itemized list of the
20   work that was put into the home to rebuild my
21   home.
22     Q.  So as far as you know, you were never
23   asked to provide a list of the items that were
24   damaged inside your home.
25     A.  Not that I can recollect.

Page 97

1      Q.  If you had been asked to provide a
2    list of the items that were damaged inside your
3    home, could you have provided that list?
4      A.  If need be, yes.
5      Q.  And if you were asked to provide that
6    list today, could you do it?
7      A.  Yes.  Not right at the time, but yes,
8    I probably can produce the list of items.
9      Q.  You don't have it with you today.
10     A.  No.
11     Q.  You'd have to go find it.
12     A.  I may have to recreate another one,
13   yes.
14     Q.  Well, what were the most valuable or
15   expensive items of property that were lost in
16   the flood?
17     A.  My videos of my daughter's graduation,
18   the birth, the parties, the barbecues,
19   everything that I recorded from their birth
20   coming up until now.
21     Q.  Those are valuable because, naturally,
22   they have a great deal of personal value to you
23   as a record of your childs' lives.
24     A.  Yes.
25     Q.  Okay.  Apart from the value to you

25  (Pages 94 to 97)

HARRIS, JIMMIE

8/4/2008

Page 98

1   personally of items of specific sentimental
2   value, I want to focus on expensive items, high
3   dollar items, items that a value can be put on.
4          What were the most expensive items
5   that you lost?
6       A.  Um -- I would say my dining room.
7       Q.  When did you purchase the dining room
8   set?
9       A.  I don't remember the exact date.
10      Q.  Can you give me a ballpark for what
11  the dining room set cost when you bought it?
12      A.  No.  I don't have the ballpark number.
13      Q.  You don't have the specific number
14  either, do you?
15      A.  No.  No.
16      Q.  What are some of the other major items
17  of personal property you lost in the storm?
18      A.  Should I go room for room?
19      Q.  Yes, please.
20      A.  That's a long list.  I need time to
21  create all this stuff.
22      Q.  Why don't you do your best.  I'm
23  asking about the major items.  I understand to
24  list every small item in the house may be
25  beyond what you can do here today, but I think

Page 99

1   the big items, I think it's fair to ask and I
2   would ask you to do your best.
3       A.  Um -- paintings, theater system, um --
4   the living loom -- the dining room/living room
5   set, complete.  Um -- the kitchen area was
6   redid -- recently redone.  Speaking of stove,
7   microwave, refrigerator.  Um -- computer room.
8   Um -- bedroom sets.
9       Q.  You said that the kitchen had recently
10  been redone?
11      A.  Yes.
12      Q.  So the equipment in the kitchen was
13  new?
14      A.  New.  Yes.
15      Q.  When had the kitchen been redone?
16      A.  '04.
17      Q.  So if someone were to try to figure
18  out how much money you would need to be
19  compensated for your kitchen, you would need to
20  take into account the fact that the equipment
21  was new at the time of the storm?
22      A.  Well, just the major items like the
23  stove, the microwave and the refrigerator.
24  That was the three upgrades that was done
25  during that time.  Everything else was upgraded

Page 100

1   in '02 when I did the entire home.
2       Q.  So the upgrades that happened in
3   '05 -- or in '04, you would need to take into
4   account those upgrades in '04 in figuring out
5   how much money that was worth.
6       A.  Yes.
7       Q.  How new was the theater system that
8   you mentioned?
9       A.  In '02.
10      Q.  What kind of condition was that in?
11      A.  Great condition.  Well kept.
12      Q.  So in figuring out how much money you
13  would be entitled to for the theater system if
14  somebody wanted to figure that out, you would
15  say that the condition of the theater system
16  would entitle you to more money because it was
17  in good condition than if it wasn't.
18      A.  Yes.
19      Q.  I'm showing you what's been marked as
20  Exhibit 7 to your deposition.  Do you recognize
21  that?
22          (Harris Exhibit 7 was marked for
23  identification and is attached hereto.)
24      A.  Yes.
25          MR. RAFFMAN:

Page 101

1          The Bates number on this, for
2          counsel's benefit, since it didn't
3          print very well, um -- I believe it's
4          146, but I, um -- I don't have it
5          here.
6   EXAMINATION BY MR. RAFFMAN:
7       Q.  Did you take this picture, Number 7?
8       A.  Yes.
9       Q.  And this shows one of rooms of your
10  home after the storm?
11      A.  Yes.
12      Q.  Which room does it this show?
13      A.  This was the old master bedroom which
14  was my daughter's room which became my fitness
15  room.
16      Q.  What is the piece of furniture that
17  appears to be lying on its side in the middle
18  of the picture?
19      A.  That's a TV.
20      Q.  And the television that's there,
21  that's not the same as the theater system you
22  were talking about, is it?
23      A.  No.  No.  This was in my fitness room.
24      Q.  I'm showing you what's been marked as
25  Harris 8.  Do you recognize this document?

26 (Pages 98 to 101)

HARRIS, JIMMIE

8/4/2008

Page 102

1    (Harris Exhibit 8 was marked for
2  identification and is attached hereto.)
3    A.  Yes.
4  EXAMINATION BY MR. RAFFMAN:
5    Q.  This is another photo you took after
6  the storm?
7    A.  Yes.
8    Q.  What room is depicted in this photo?
9    A.  This is a bedroom across from the
10 bathroom.
11   Q.  When you mentioned earlier that a
12 computer had been destroyed in the storm, is
13 that computer shown in this photo?
14   A.  Yes.
15   Q.  What kind of computer was that?
16   A.  I don't remember the brand.
17   Q.  Do you remember how old the computer
18 was?
19   A.  Um -- it was purchased in '02.
20   Q.  What was the condition of the computer
21 at the time of the storm?
22   A.  It was in great condition.  It was
23 well kept.
24       And I forgot to mention the, um -- if
25 I may, please, the, um -- all of our winter

Page 103

1  clothes was kept in this closet.  We lost them
2  all.
3    Q.  So the winter clothes would be another
4  item that you would be claiming as part of this
5  lawsuit.
6    A.  Well, I would think everything within
7  the home would be part of the lawsuit, so -- I
8  mean --
9    Q.  Right.  And so in trying to itemize
10 the major items that were inside the home --
11   A.  Yes.
12   Q.  -- you mentioned paintings, theater
13 system, dining room and living room set --
14   A.  Uh-huh.  Yes.
15   Q.  -- kitchen equipment, computer, winter
16 clothes, and one other item that I can't read
17 on my handwriting.
18       Those are all items that you're
19 seeking compensation for in this case, am I
20 right?
21   A.  Everything that was within the home,
22 sir.  I mean -- to me.  And I know most of this
23 stuff is irreplaceable, but, you know, I just
24 have to live with it.
25   Q.  So just to be clear, there are other

Page 104

1  thinks you're seeking compensation for besides
2  that list.  Am I right?
3    A.  Yes.  Just everything within the home.
4  Everything I lost.  I lost my home.  I lost my
5  family.  You can't give me the years back that
6  I lost with my family.  I know you can't
7  replace that.  You can't replace the footage
8  that I lost with my family.  It's
9  unreplaceable.
10   Q.  I understand what you just said, and I
11 don't mean in any way to diminish what you just
12 said, but I did ask you a question and I do
13 need to have it answered.  And the question I
14 asked was whether or not that list of items
15 that I mentioned is among the things that you
16 are seeking compensation for in this case?  And
17 if the answer to that question is yes, then a
18 simple yes will do.
19   A.  Yes.
20   Q.  Thank you.  I'm showing you what's
21 marked as Harris Exhibit 9.  Have a look at
22 that document and tell me when you've looked it
23 over.
24    (Harris Exhibit 9 was marked for
25 identification and is attached hereto.)

Page 105

1    A.  I've looked it over.
2  EXAMINATION BY MR. RAFFMAN:
3    Q.  All right.  Do you recognize the
4  document?
5    A.  Yes.
6    Q.  What is it?
7    A.  It was a claim in a suit for the Corps
8  of Engineers that -- it was aired on
9  television, and everyone who stood in that grid
10 square was allocated to file this document.
11   Q.  And this document Harris Number 9,
12 it's captioned claim for damage, injury or
13 death.  Do you see that?
14   A.  Yes.
15   Q.  And this is your claim for damage,
16 injury or death that you submitted to the
17 United States of America, correct?
18   A.  Yes.
19   Q.  And the box in Item 2 there, that's
20 your name and address, correct?
21   A.  Yes.
22   Q.  Where it says signature of claimant,
23 in Box 13A, is that your signature?
24   A.  Yes.
25   Q.  Where it says phone number of

27 (Pages 102 to 105)

HARRIS, JIMMIE

8/4/2008

| Page 106 |
| --- |

1  signatory in Box 13B, is that your phone
2  number?
3      A.  Yes.
4      Q.  Did you sign this form on or around
5  February 27th of 2007?
6      A.  Yes.
7      Q.  You signed this document -- when you
8  signed this document, had you read the part at
9  the bottom where it says that there's a penalty
10  for making false statements?
11      A.  Yes.
12      Q.  Did a lawyer prepare this for you?
13      A.  No.
14      Q.  Did you prepare it yourself?
15      A.  Yes.
16      Q.  You see the box in Item 12A, property
17  damage?  What number is in that box?
18      A.  A hundred thousand dollars.
19      Q.  Is that the amount of compensation
20  that you claimed from the United States
21  government for property damage from Hurricane
22  Katrina?
23      A.  Yes.  I read it as if -- speaking of
24  the dwelling, my home, a hundred thousand
25  dollars, yes.

| Page 107 |
| --- |

1      Q.  The hundred thousand dollar number
2  that you put there is only for damage to your
3  dwelling?  Is that right?
4      A.  Yes.  That's how I put it there.
5      Q.  And so you didn't include in that the
6  kitchen and the other items, the furniture and
7  other items that we just talked about.
8      A.  No.
9      Q.  Now, you wrote under personal injury
10  the letters NA.  Is that your handwriting
11  there?
12      A.  Yes.
13      Q.  And what did you mean to signify by
14  writing NA under personal injury?
15      A.  Non applicable.  No injuries.
16      Q.  Did you understand when you wrote
17  that -- look at the box in Item 10 for a
18  minute.  Do you see that Item 10 includes the
19  words personal injury and mental distress?
20      A.  Yes.
21      Q.  When you wrote NA in Item 12B, did you
22  understand that 12B applied -- what did you
23  understand that Box 12B applied to?
24      A.  My personal injury to me that I
25  sustained.

| Page 108 |
| --- |

1      Q.  Including mental distress that you
2  sustained?
3      A.  I guess if that falls under the same
4  category.  And I put NA describing me, none
5  applicable to me.
6      Q.  And when you did that, you signed it
7  under penalty of law.
8      A.  Yes.
9      Q.  How did you arrive at the number one
10  hundred thousand for property damage?
11      A.  I went off the amount that the
12  insurance company paid me, and that's why I put
13  that amount there.
14      Q.  So you had already been paid a hundred
15  thousand dollars by the insurance company for
16  your property?
17      A.  Yes.
18      Q.  And you had been paid a separate
19  amount for your contents, right?
20      A.  Yes.  That's correct.
21      Q.  And that separate amount was forty
22  thousand dollars?
23      A.  Yes.
24      Q.  Did anyone help you fill this out?
25      A.  No.

| Page 109 |
| --- |

1      Q.  Where did you get the form?
2      A.  They were float everywhere.  I don't
3  know.  Somewhere -- I guess my wife got it from
4  friend of hers or whatever.  And everyone was
5  filling it out.  And they had a deadline to
6  meet.  Everyone had to filling it out due to
7  that deadline, so I filled it out.
8      Q.  Did you understand when you filled it
9  out that in Item 8A there's a section that
10  talks about the breaches and the failure of the
11  hurricane protection levees and walls were the
12  result of the Corps of Engineers negligence and
13  so on?
14      A.  Yes.
15      Q.  You read that part before you signed
16  your name to it.
17      A.  I read it.  Yes, I read it.
18      Q.  So at least when you filled this
19  document out in your own mind you blamed the
20  Corps of Engineers for at least some
21  responsibility for the damage you suffered.
22      A.  Well, I didn't really blame anyone.  I
23  was just seeking help like everyone else was
24  doing, seeking help for my damages.  And
25  everyone was filling it out, and it was at that

Johns Pendleton Court Reporters                     800 562-1285

BARGE001106

HARRIS, JIMMIE

8/4/2008

Page 110

1  moment that you got a deadline to get this form
2  in, and I just filled it out. I don't blame
3  anyone. I don't know who did it, who caused
4  it. I'm not blaming anyone.
5      Q. Do you know whether you are a part of
6  a lawsuit against the Army Corps of Engineers
7  either as a class member or otherwise?
8      MR. JOANEN:
9          Object to the form. It's vague.
10     A. I don't know. I haven't received any
11  documents.
12  EXAMINATION BY MR. RAFFMAN:
13     Q. You've never withdrawn this claim,
14  right?
15     A. No, I just submitted it.
16     Q. All right. Just to be clear, because
17  I asked the question in an offhanded way, have
18  you ever withdrawn this claim?
19     A. No.
20     Q. Did you submit a claim for wind and
21  hail damage?
22     A. Yes.
23     Q. To which insurance company did you
24  submit that claim?
25     A. Allstate.

Page 111

1      Q. Do you remember how much -- do you
2  remember whether Allstate paid anything in that
3  claim?
4      A. Yes.
5      Q. Do you remember how much they paid?
6      A. Sixteen hundred and something,
7  somewhere in that ballpark.
8      Q. I'm handing you what's been marked as
9  Harris 10. Do you recognize this document?
10         (Harris Exhibit 10 was marked for
11  identification and is attached hereto.)
12     A. Yes.
13  EXAMINATION BY MR. RAFFMAN:
14     Q. What is this document?
15     A. It's a wind and hail damage claim
16  payment.
17     Q. And does this reflect that in fact
18  Allstate did paid you $1680.71 for your wind
19  and hail damages?
20     A. Yes.
21     Q. You also submitted a flood insurance
22  claim and a contents claim; correct?
23     A. Yes.
24     Q. Both to Allstate.
25     A. Yes.

Page 112

1      Q. The flood insurance claim was
2  $100,000?
3      A. Yes.
4      Q. Contents claim was $40,000?
5      A. Yes.
6      Q. Both claims were paid by Allstate.
7      A. Yes, sir.
8      Q. I'm showing you what's marked as
9  Harris 11. Do you recognize Harris Exhibit 11?
10         (Harris Exhibit 11 was marked for
11  identification and is attached hereto.)
12     A. Yes, I do.
13  EXAMINATION BY MR. RAFFMAN:
14     Q. What is that?
15     A. This is the payoff for the flood for
16  the contents and the dwelling of my property.
17     Q. So what this shows is that you were
18  paid a hundred and forty thousand dollars by
19  Allstate for your dwelling and for personal
20  property.
21     A. Correct.
22     Q. They paid you a hundred thousand for
23  your dwelling on the flood insurance and the
24  forty thousand on the unscheduled personal
25  property.

Page 113

1      A. Correct.
2      Q. This was paid in or around October of
3  2005?
4      A. Correct. Yes.
5      Q. Mr. Harris, do you know whether your
6  flood insurance policy has a subrogation
7  provision in it?
8      A. I don't know.
9      Q. Do you know what subrogation is?
10     A. No. Explain it to me.
11     Q. A subrogation clause may entitle an
12  insurance company --
13     MR. GILBERT:
14         Nope. Nope. Object. Sorry.
15     You can't advise him.
16     MR. RAFFMAN:
17         I'm not advising him, I'm just
18     asking a question. And since he
19     doesn't understand the term I'm going
20     to explain it to him, then I'm going
21     to ask him a question.
22  EXAMINATION BY MR. RAFFMAN:
23     Q. A subrogation clause is a clause that
24  entitles an insurance carrier to collect money
25  that they've paid out in the event that the

29 (Pages 110 to 113)

HARRIS, JIMMIE

8/4/2008

| Page 114 |
|---|
| 1  policyholder collects that money from a |
| 2  third-party tortfeasor, a third-party |
| 3  defendant.  Do you know one way or the other |
| 4  whether your insurance policy has such a clause |
| 5  in it? |
| 6     A.  I don't know. |
| 7     Q.  Did you have a copy of your flood |
| 8  insurance policy under which you were paid by |
| 9  Allstate? |
| 10    A.  Yes. |
| 11    Q.  Do you have a copy of your homeowner's |
| 12 insurance policy under which you were paid |
| 13 $1,680 by Allstate? |
| 14    A.  Yes. |
| 15    Q.  When you submitted your forty thousand |
| 16 dollar claim for contents, how did you arrive |
| 17 at the forty thousand dollar figure? |
| 18    A.  First of all, I didn't submit for a |
| 19 claim.  Um -- I called for the homeowners to |
| 20 come out and inspect my home.  Allstate already |
| 21 had done did this claim for this.  They arrived |
| 22 at this.  I didn't arrive at that.  I don't |
| 23 know where did they come from with the figures |
| 24 and all.  These are the figures they arrived |
| 25 with.  So I don't have -- I didn't have |

| Page 115 |
|---|
| 1  anything to do with that. |
| 2     Q.  Okay.  Allstate came out and they, |
| 3  um -- sent an adjuster and they told you after |
| 4  the fact this is what we're going to pay you. |
| 5     A.  He never -- they never told me what |
| 6  they were going to pay me.  They just sent an |
| 7  adjuster out, he looked at the home, and then |
| 8  that was it.  Then afterwards, we were called |
| 9  in for a payment. |
| 10    Q.  Did you -- you, um -- you bought flood |
| 11 insurance? |
| 12    A.  Yes. |
| 13    Q.  Why did you buy flood insurance? |
| 14    A.  Because it floods a lot in New |
| 15 Orleans.  And I bought the flood insurance when |
| 16 I bought the home. |
| 17    Q.  Did you feel like you had enough flood |
| 18 insurance? |
| 19    A.  At the time when I purchased it, yes. |
| 20    Q.  Was there something that you learned |
| 21 later that caused you to think you hadn't |
| 22 bought enough flood insurance? |
| 23    A.  Yes, no.  Yes, I feel like I should |
| 24 have bought more.  But then no, no, because I |
| 25 should have bought more homeowner's insurance |

| Page 116 |
|---|
| 1  instead of flood insurance.  But the flood |
| 2  insurance was mandatory for me because I know |
| 3  it floods a lot in New Orleans.  Now, I never |
| 4  knew how much it flooded in the area that I |
| 5  moved in, but I knew it floods in New Orleans. |
| 6  That's why we purchased the flood insurance. |
| 7     Q.  When you said mandatory, um -- what |
| 8  did you mean by that? |
| 9     A.  Mandatory. |
| 10    Q.  Yeah.  I just want to make sure I |
| 11 understood you properly.  You said it was |
| 12 mandatory for you.  There was no government |
| 13 requirement that you have to buy flood |
| 14 insurance; right? |
| 15    A.  No, to me I needed to have flood |
| 16 insurance. |
| 17    Q.  In your judgment you needed flood |
| 18 insurance. |
| 19    A.  I felt I needed flood insurance. |
| 20    Q.  Did you submit a claim to the Road |
| 21 Home program? |
| 22    A.  Yes. |
| 23    Q.  When did you submit the Road Home |
| 24 claim? |
| 25    A.  I don't know the exact date. |

| Page 117 |
|---|
| 1     Q.  Did you receive any money from the |
| 2  Road Home program? |
| 3     A.  Yes. |
| 4     Q.  How much money did you receive from |
| 5  the Road Home Program? |
| 6     A.  Forty-eight something.  I don't know |
| 7  the exact figures. |
| 8     Q.  Did you make a claim to the Small |
| 9  Business Administration? |
| 10    A.  Yes. |
| 11    Q.  What did you hear back from the Small |
| 12 Business Administration? |
| 13    A.  I was denied. |
| 14    Q.  I'm showing you what's been marked as |
| 15 Harris 12.  Do you recognize Exhibit 12 to your |
| 16 deposition? |
| 17       (Harris Exhibit 12 was marked for |
| 18 identification and is attached hereto.) |
| 19    A.  Yes. |
| 20 EXAMINATION BY MR. RAFFMAN: |
| 21    Q.  What is that document? |
| 22    A.  That's a denial document from the |
| 23 Small Business Administration denying me a |
| 24 loan. |
| 25    Q.  If you look at the document, what |

30 (Pages 114 to 117)

HARRIS, JIMMIE

8/4/2008

| Page 118 |
| --- |

1  reasons did the Small Business Administration
2  give for denying you the loan?
3     A.  Because I received an insurance
4  payoff.
5     Q.  The document says here, according to
6  your information you received compensation for
7  your disaster losses from Allstate in amounts
8  that fully cover your eligible disaster
9  damages.  Do you see that section?
10    A.  Yes.
11    Q.  When they talked about the eligible
12 disaster damages, did you have an understanding
13 of what damages were eligible under the Small
14 Business Administration program?
15    A.  No.
16    Q.  Why did you submit an application for
17 a disaster loan to the Small Business
18 Administration?
19    A.  Because I needed funds to help me
20 rebuild my home.
21    Q.  Those funds would have been in
22 addition to the money recovered from Allstate
23 and -- from Allstate.
24    A.  From Allstate, yes.
25    Q.  You hadn't received the Road Home

| Page 119 |
| --- |

1  benefits at the time you applied for the loan.
2     A.  No, I had not even applied for the
3  Road Home.
4     Q.  The repairs that you did on your
5  property you did yourself.
6     A.  Yes.
7     Q.  The cost of those repairs, is that
8  included in your lawsuit?
9     A.  Yes.
10    Q.  When did you start repairing your
11 property?
12    A.  I'd say the middle of 2006.
13    Q.  Have you finished the repairs?
14    A.  Not totally, no.
15    Q.  What did you do to repair your
16 property?
17    A.  Almost everything.  I did the, um --
18 demo, I did the decontamination, I did the
19 windows, doors, interior, um --
20 cabinets, all the, um -- floors, baseboards,
21 all the trim work throughout the house.
22    Q.  Did you do the electrical?
23    A.  No.
24    Q.  You paid someone to do the electrical.
25    A.  Yes.

| Page 120 |
| --- |

1     Q.  Did you do the plumbing?
2     A.  No.  Some of it.  Just the
3  connections, the sinks and stuff like that.
4     Q.  You paid a plumber to do the other
5  part?
6     A.  Yes.
7     Q.  Are there any other contractor type
8  people that you paid to do work on your
9  property?
10    A.  Yes, the AC and heating was done --
11 contracted.  The painting was contracted.
12    Q.  Anything else?
13    A.  And I had assistance with doing the
14 insulating and the sheetrock work.
15    Q.  How much have you spent on the
16 renovation?
17    A.  Right now, I'm over eighty thousand.
18    Q.  Have you spent -- over the last three,
19 four, five months, how much money have you
20 spent on the renovation?
21    A.  Maybe close to ten thousand.
22    Q.  How much had you spent as of the end
23 of '07, if you --
24    A.  I don't know.
25    Q.  Would I be accurate if I told you that

| Page 121 |
| --- |

1  the cost of the demolition as of the end of May
2  of '08 was fifty thousand?
3     A.  No.
4     Q.  Okay.  What was the cost of the
5  demolition at the end of May?
6     A.  The demolition and the renovation?
7     Q.  I'm sorry.  Did I say demolition?
8     A.  The renovation?
9     Q.  What I want to know is the cost of the
10 demolition of all the walls and restoration of
11 the house as of the end of May.  Would it be
12 accurate to say that was fifty thousand
13 dollars?
14    A.  No.
15    Q.  What would the accurate number be?
16    A.  Closer to eighty something thousand
17 dollars.  Now, quote, unquote, I don't have
18 the, um -- the receipt for the, um -- the AC
19 work, AC and heating work that was done because
20 I had, um -- somebody looking over it trying
21 to, um -- locate the guy who did the work
22 because he didn't finish up.  Also, I don't
23 have the receipt in there for the painting
24 because the painting recently finished up.  So
25 the closeout on that isn't wrapped up in those

31 (Pages 118 to 121)

HARRIS, JIMMIE

8/4/2008

Page 122

1    numbers either.
2        Q.  So the eighty thousand dollars that
3    you just told me does not include some
4    additional items that you haven't closed out
5    yet.
6        A.  No, no, no.  You say fifty thousand
7    what you added up with the papers that you
8    received.  And I'm just stating that some of
9    the items -- work items that was done wasn't
10   rolled up in those numbers that you have
11   because I didn't have the documents to submit
12   because I wasn't at closing with those
13   documents.
14       Q.  I understand.  I understand.  The
15   fifty thousand dollars is an inaccurate number.
16       A.  Yes.  Yes.
17       Q.  And if someone had said fifty thousand
18   that would be wrong.
19       A.  Yes.
20       Q.  The number is eighty thousand.
21       A.  Yes.
22       Q.  Okay.  Now I'm going to show you some
23   documents, and the documents bear the Bates
24   numbers Harris 000007 through Harris 000129.
25   Because the stack is thick and it would be

Page 123

1    unwieldy to mark them and reproduce them all,
2    I'm not going to mark them as an exhibit.  But
3    we'll refer to them by Bates number and folks
4    can understand what we're talking about.
5        A.  Okay.
6        Q.  (Tendering.)  Mr. Harris, do you
7    recognize, generally, what documents are
8    included in that stack?
9        A.  Yes.  Receipts from work done, repairs
10   done on my home, yes.
11       Q.  So that -- did you save the receipts
12   as you were doing the work?
13       A.  Yes.
14       Q.  Why did you do that?
15       A.  Because that's what I do, so I can
16   have a total number at completion of the
17   renovation, so I can know exactly what I spent
18   on rebuilding my home.
19       Q.  And am I right that one of the reasons
20   why you want to know what you spent to rebuild
21   your home is that because someday you would ask
22   someone else to compensate you for your loss?
23       A.  No.
24       Q.  No.
25       A.  That's not the reason.

Page 124

1        Q.  No.  The only reason is so that you
2    would understand what the project cost.
3        A.  What it cost me to put my home back
4    together, yes.
5            MR. JOANEN:
6                Mark, let me just interject here
7            on behalf of the MRGO PSLC and any of
8            the other parties that are here
9            involved in the MRGO litigation, these
10           documents weren't produced to us so it
11           puts us in a difficult position.  If
12           they're not attached to the deposition
13           transcript itself, there needs to be,
14           I guess, a way that it will be
15           produced at some point to all the
16           parties who are not part of the barge
17           litigation in particular.
18           MR. RAFFMAN:
19               I don't know that it's the
20           responsibility of the defendant to
21           produce to the MRGO parties generally
22           the documents that are produced to us
23           by the plaintiff, but I understand
24           what you're saying and I think we can
25           certainly talk about processes for

Page 125

1    doing that, and I have no objection.
2            MR. JOANEN:
3                I'm just making a record in the
4            event that there's a trail that
5            involves both litigations, I think
6            it's important that the transcript be
7            complete and documents that are
8            referred to by the witness that may b
9            e utilized at trial, if we don't have
10           copies of those it creates a big
11           issue.
12           MR. RAFFMAN:
13               Your remark is noted.  We'll
14           discuss it off the record afterwards.
15           I think it shouldn't be a big issue
16           for us, but.
17           MR. JOANEN:
18               Well, we're not cutting you off.
19   EXAMINATION BY MR. RAFFMAN:
20       Q.  So the fact that a particular document
21   is in that stack doesn't necessarily mean you
22   expect the defendants to pay you for that,
23   right?
24       A.  I don't quite understand the question.
25       Q.  What I'm trying to figure out is, does

32 (Pages 122 to 125)

HARRIS, JIMMIE

8/4/2008

Page 126

1  your claim in this case include all of those
2  expenses that are in that stack?
3      A.  And plus some, then some.  It's just
4  not everything that's there.
5      Q.  Okay.  Everything that's in that stack
6  is a part of your claim in this case; correct?
7      A.  Yes.
8      Q.  What kind of countertops did your
9  kitchen have before the storm?
10     A.  Formica.
11     Q.  Look at Page 27.  Is Page 27 a receipt
12 for granite countertops?
13     A.  Yes.
14     Q.  And you spent $3,200 on granite
15 countertops?
16     A.  Yes.
17     Q.  Would you agree with me that granite
18 countertops are an upgrade over Formica?
19     A.  Yes.
20     Q.  Look at Page -- I'm sorry.  What was
21 the cost of the theater system that was in your
22 home when the house flooded, if you remember?
23     A.  I don't remember.
24     Q.  Was it an HD system?
25     A.  No.

Page 127

1      Q.  Look at Number 31.  Does Number 31
2  apply to a theater system that you put in your
3  home after the storm?
4      A.  Yes.
5      Q.  And the theater system in this receipt
6  is an HD system, correct?
7      A.  Yes.
8      Q.  Would you agree with me that the HD
9  system that's in Number 31 is an upgrade over
10 the prior system?
11     A.  Somewhat, yes.
12     Q.  Look at Number 54.  Who is Julian
13 Hamilton?
14     A.  My neighbor.
15     Q.  Does Number 54 reflect the purchase of
16 sheetrock by your neighbor Julian Hamilton?
17     A.  Yes.  He picked it up for me.
18     Q.  So this was -- this was sheetrock that
19 he picked up to put in your house.
20     A.  For my home, yes.
21     Q.  Did you have potted plants or trees in
22 your home before the storm?
23     A.  Potted plants and trees?  No.  Maybe a
24 couple of those deals like that, but -- no.
25     MR. RAFFMAN:

Page 128

1          The record will reflect he's
2      pointing to a ficus tree that's here
3      in the conference room.
4      A.  I'm just saying similar to that.
5  EXAMINATION BY MR. RAFFMAN:
6      Q.  Okay.  So if you turn to Page 91, in
7  the upper right-hand corner there's a purchase
8  of two trees from Westheimer Commons.  Do you
9  see that?
10     A.  Yes.
11     Q.  And these were trees that you
12 purchased to put in your home after the storm?
13     A.  Yes.  My wife purchased them.  They
14 were similar to the trees that were previously
15 there.  Similar to them.
16     Q.  That was my question.
17     A.  Okay.
18     Q.  What I'll do, so the record is
19 complete, I'm going to attach the documents
20 Bates numbered 27, 31, 54 and 91 as exhibits.
21 We'll combine that as Harris 13.
22         (Harris Exhibit 13 was marked for
23 identification and is attached hereto.)
24 EXAMINATION BY MR. RAFFMAN:
25     Q.  What demolition work did you do on the

Page 129

1  property?
2      A.  All.  All the sheetrock, walls, doors,
3  windows, everything.
4      Q.  You pulled out the sheetrock.
5      A.  Every bit of it.
6      Q.  Pulled out the doors.
7      A.  Every one of them.
8      Q.  Pulled out the windows.
9      A.  Every one of them.
10     Q.  Pulled out the walls.
11     A.  Yes.
12     Q.  Does the cost of that work get
13 included in the $80,000 figure that you
14 mentioned earlier?
15     A.  It's not even in there.  I did it
16 myself.
17         (Brief recess.)
18 EXAMINATION BY MR. RAFFMAN:
19     Q.  All right.  Harris 14.  (Tendering.)
20 Do you recognize 14?
21         (Harris Exhibit 14 was marked for
22 identification and is attached hereto.)
23     A.  Yes.
24 EXAMINATION BY MR. RAFFMAN:
25     Q.  And 14 is a document that says

HARRIS, JIMMIE

8/4/2008

Page 130

1    verification.  And is Exhibit 14 dated on or
2    around May 23rd, 2008?
3        A.  Yes.
4        Q.  And you signed it?
5        A.  Yes.
6        Q.  And before signing it you reviewed
7    written discovery responses that were made on
8    your behalf, right?
9        A.  Yes.
10       Q.  When you reviewed them you didn't
11   notice anything that caused you to be unable to
12   verify the correctness of what was there,
13   right?
14       A.  Yes.
15       Q.  You thought everything in the
16   documents you read was true and correct as you
17   understood it.
18       A.  Yes.
19       Q.  And when you read the discovery
20   responses did you pay particular attention to
21   the ones that had your name on them?
22       A.  Yes.
23       Q.  Harris 15 is a document that bears the
24   heading Supplemental Answers to Interrogatories
25   Propounded by Barge Entities and dated 24th of

Page 131

1    January, 2008.  I'm going to point your
2    attention to the answer to Interrogatory
3    Number 26 which asks for each individual
4    plaintiff, identify every injury or harm for
5    which damages are sought by that person.  And
6    it goes on from there.  And I've tabbed a page
7    for you.  Have a look at that.  (Tendering.)
8            Was this answer one of the answers
9    that you reviewed before you signed the
10   verification?
11       A.  Yes.
12       Q.  The answer to this interrogatory lists
13   a number of elements of damage that you seek
14   damages for; right?
15       A.  Yes.
16       Q.  And when it says seeks damages, do you
17   understand that that means that you're seeking
18   monetary compensation?
19       A.  Explain it to me.
20       Q.  That you would like to be paid an
21   amount of money for the items of damages which
22   are listed here.
23       A.  Okay.  Yes.
24       Q.  So you want to be paid money for past
25   and future mental, pain, suffering and anguish,

Page 132

1    correct?
2        A.  Yes.
3        Q.  And you want to be paid money for past
4    and future mental health care expense, right?
5        A.  Yes.
6        Q.  And you want to be paid money for past
7    and future loss and destruction of and damage
8    to immovable and movable property, right?
9        A.  Yes.
10       Q.  And you want to be paid money for past
11   and future loss of immovables and movables.
12       A.  Yes.
13       Q.  Another item is you want to be paid
14   for past and future expenses for demolition and
15   salvage of immovable and movable property;
16   right?
17       A.  Yes.
18       Q.  Another one is that you want to be
19   paid money for diminution of property value.
20       A.  Yes.
21       Q.  Another item of your damages that
22   you're claiming is past and future loss of
23   enjoyment of lifestyle, correct?
24       A.  Yes.
25       Q.  Another item of damage is

Page 133

1    inconvenience, right?
2        A.  Yes.
3        Q.  And then another one here, it says any
4    and all others proven.  Do you see that item
5    there?
6        A.  Yes.
7        Q.  Do you, as you sit here today, know of
8    any and all other elements of damage for which
9    you're seeking compensation in this case?
10       A.  No.
11       Q.  Do you know from whom you are seeking
12   those damages?
13       A.  Not exactly, no.
14       Q.  Tell me as best you can your
15   understanding of from whom you're seeking these
16   damages.
17       A.  From whatever -- whomever had the
18   ownership of the barge.
19       Q.  And you are not seeking damages in
20   this case from anybody other than somebody who
21   is responsible for the barge; right?
22       A.  Yes.
23           MR. WEBB:
24               Objection to the vague and
25               ambiguous nature of the question.

34 (Pages 130 to 133)

BARGE001112

HARRIS, JIMMIE

Page 134

```
1       MR. RAFFMAN:
2          Let me be clearer so I cure the
3       objection.
4    EXAMINATION BY MR. RAFFMAN:
5       Q.  You're not seeking any damages from
6    the government in this case; right?
7       A.  No.  I'm not.
8       Q.  You filed an SF 95 form seeking
9    compensation from the government.
10      A.  Yes.
11      Q.  The things that you're asking the
12   government to pay you for in your SF 95 form
13   are some of the same things you're claiming in
14   this case; right?
15      A.  I don't know.  I'm not -- I don't
16   know.
17      Q.  Well, in this case you're seeking
18   damage for your damage to your house, right?
19      A.  Yes.
20      Q.  In your SF 95 form you're seeking
21   money for damage to your house, too; right?
22      A.  Yes.
23      Q.  Did you have an E-mail account at the
24   time of Katrina?
25      A.  Yes.
```

Page 135

```
1       Q.  And who was your E-mail provider?
2       A.  Yahoo.
3       Q.  Did you send or receive E-mails about
4    your damage?
5       A.  No.
6       Q.  Your computer was destroyed in the
7    storm; right?
8       A.  Yes.
9       Q.  When is the first time you had access
10   to a computer after the storm to use your
11   E-mail?
12      A.  I don't know.  It was a while.  I
13   don't know.
14      Q.  Do you have E-mails related to your
15   property damage?
16      A.  Not that I can remember, no.
17      Q.  All right.  Let me ask you some
18   questions about these elements of damage that
19   are on this interrogatory.  And I'm going to
20   start with the third item down, past and future
21   loss and destruction of and damage to immovable
22   and movable property.  Do you see that?
23      A.  Yes.
24      Q.  Let's start with immovable property.
25   Do you understand what immovable property is?
```

Page 136

```
1       A.  Yes.
2       Q.  What is that?
3       A.  My home, the structure.
4       MR. GILBERT:
5          Let me just make a note on the
6       record, um -- if Lafarge is in
7       possession of any E-mail originating,
8       or to which my client is party, I call
9       for production of it.
10      MR. RAFFMAN:
11         I'm not.  Lafarge is not in
12      production.
13      MR. GILBERT:
14         Possession.
15      MR. RAFFMAN:
16         Lafarge does not have E-mails
17      from your client.  I was asking
18      because I'm wondering whether they
19      exist.
20      MR. GILBERT:
21         Got you.  It was a conditional
22      request.  If Lafarge --
23      MR. RAFFMAN:
24         Well, I'll withhold further
25      comment.
```

Page 137

```
1    EXAMINATION BY MR. RAFFMAN:
2       Q.  Damage the immovable property,
3    Mr. Harris, this is for damage to the home that
4    you've already testified about.  Right?
5       A.  Yes.
6       Q.  And it includes the harm that was done
7    to the first floor of your house, right?
8       A.  Yes.
9       Q.  But it doesn't include the hole in the
10   roof of the shed, does it?
11      A.  No.
12      Q.  The amount of this claim, dollar
13   amount, depends on how much damage was done to
14   your property, doesn't it?
15      A.  I don't know, sir.  I don't -- I don't
16   know.
17      Q.  If your house hadn't flooded to within
18   8 inches of the first floor ceiling, you might
19   damage to your home, you'd expect it to be
20   different from if it flooded to the extent it
21   flooded.  Right?
22      A.  I assume.
23      Q.  All right.  Let me ask you about
24   movable property.  This is the personal
25   property you've testified earlier, right?
```

Johns Pendleton Court Reporters          800 562-1285
BARGE001113

HARRIS, JIMMIE

8/4/2008

Page 138

1    A.  Yes.
2    Q.  There's a list of property, but you'd
3  have to go look for it.
4    A.  Yes.
5    Q.  You haven't figured out how much it's
6  worth.
7    A.  No.
8    Q.  How much it's worth depends on what
9  was actually in your house and destroyed in the
10  storm, doesn't it?
11    MR. GILBERT:
12      Objection.  It's misleading.
13    A.  I don't know.
14  EXAMINATION BY MR. RAFFMAN:
15    Q.  In order to figure out how much money
16  you're entitled to for your personal property,
17  doesn't there need to be some list of what
18  property was destroyed?
19    A.  I guess, yes.
20    Q.  How much money are you claiming for
21  the Cavalier, the Chevy Cavalier that was
22  harmed in the storm?
23    A.  I didn't claim anything.
24    Q.  Am I right that your daughter --
25    MR. GILBERT:

Page 139

1      He's asking about this case.
2  EXAMINATION BY MR. RAFFMAN:
3    Q.  In this case, sure.  I'm sorry.  Maybe
4  you didn't understand my question.
5    A.  Okay.
6    Q.  The Chevy Cavalier is a part of your
7  claim in this case; right?
8    A.  Yes.
9    Q.  And you want the defendants in this
10  case to write you a check for the damage that
11  was done to that car.
12    A.  Yes.
13    Q.  How badly was the car damaged?
14    A.  It was totally saturated underwater.
15    Q.  Completely totaled.
16    A.  Yes.
17    Q.  The amount of money that would
18  compensate you for the loss of that car is
19  going to depend, won't it, on how old the car
20  was and what kind of shape it was in?  Isn't
21  that relevant?
22    A.  Yes.
23    Q.  Let me ask, then, the next item, past
24  and future loss of use of immovables and
25  movables.  Do you see that?

Page 140

1    A.  Yes.
2    Q.  What loss of use of immovables are you
3  claiming from the defendants in this case?
4    A.  I'm not sure.
5    Q.  What past and future loss of use of
6  movables are you claiming in this case?
7    A.  I'm not sure.
8    Q.  When you reviewed this interrogatory
9  answer before you verified it, did you have an
10  understanding of what was meant by the phrase
11  past and future loss of immovables and
12  movables?
13    A.  Yes.
14    Q.  And what did you understand that to
15  mean?
16    MR. GILBERT:
17      Let me object because it calls
18      for a level of legal expertise that he
19      doesn't have.  I mean, loss of use is
20      not a vernacular phrase.  I mean, it
21      is a legal term.  And subject to that,
22      he can answer.
23    A.  I don't know.
24  EXAMINATION BY MR. RAFFMAN:
25    Q.  The next item on your list is past and

Page 141

1  future expenses for demolition and salvage of
2  immovable and movable property.  Do you see
3  that?
4    A.  Yes.
5    Q.  This is -- the demolition and salvage
6  are the costs associated with the work you've
7  done to get your house back in shape; right?
8    A.  Yes.
9    Q.  And in order to understand that claim,
10  we need to go through the list of receipts that
11  you supplied plus whatever expenses you
12  incurred that are not in that list, right?
13    A.  Yes.
14    Q.  And we need to analyze what it was you
15  actually spent for demolition and salvage,
16  right?
17    A.  Somewhat.
18    Q.  What else?
19    A.  Plus the manhours I put in in doing my
20  own demolition.
21    Q.  All right.  Your claim includes your
22  man-hours for doing the work.
23    A.  Yes.
24    Q.  And at what rate are you charging the
25  defendants in this case for the work that you

36 (Pages 138 to 141)

Johns Pendleton Court Reporters                    800 562-1285

HARRIS, JIMMIE

8/4/2008

Page 142

1    did in fixing your house?
2        A.  I don't have a number at this time.
3        Q.  Are there any other expenses of
4    demolition and salvage, apart from paying you
5    for your time and apart from the receipts that
6    you've supplied plus whatever other receipts
7    exist, are there any other element of
8    demolition and salvage expense for which you
9    seek compensation here?
10       A.  No.
11       Q.  How many hours have you spent doing
12   demolition and salvage for which you would like
13   to be compensated?
14       A.  I don't know an exact number.
15       Q.  You haven't kept --
16       A.  I don't have a number.  I don't have
17   an exact number.
18       Q.  And you haven't kept track along the
19   way, have you?
20       A.  No.
21       Q.  The next item is diminution of
22   property values.  Do you have an understanding
23   of what that item means?
24       A.  No, not exactly.
25           MR. GILBERT:

Page 143

1            Object, because this is the
2        subject of expert opinion that has
3        been rendered for the benefit of
4        Lafarge and will continue to be
5        rendered for the benefit of Lafarge by
6        John Kilpatrick.  And again, that's
7        something that's going to be defined
8        by the expert, what diminution of
9        property values means in the context
10       of this lawsuit.  Subject to the
11       objection, he can answer if he knows
12       what that even is.
13           MR. RAFFMAN:
14           I asked him does he have an
15       understanding.
16       A.  No.
17   EXAMINATION BY MR. RAFFMAN:
18       Q.  When you signed the interrogatory
19   answer asserting this was one of your elements
20   of damage, did you undertake to develop an
21   understanding of what that meant by asking
22   anybody?
23       A.  Not a clear understanding.
24       Q.  Without telling me anything your
25   lawyer told you or anything you told your

Page 144

1    lawyer, I don't want to ask about that, did you
2    ask the question what does that mean,
3    diminution of property values?
4        A.  To whom?
5        Q.  To anyone.
6        A.  Yes.
7        Q.  To whom did you ask that question?
8        A.  A friend.
9        Q.  Which friend?
10       A.  A close friend of mine 's.
11       Q.  And what is your friend's name?
12       A.  Troy.
13       Q.  I'm sorry?
14       A.  Troy.
15       Q.  Troy.  And what's his last name?
16       A.  Um -- I don't have the last name right
17   off the top.  I don't know exactly the last
18   name.
19       Q.  Okay.  So your close friend Troy, you
20   asked him what that means, and what -- did you
21   ask him what that meant?
22       A.  Yes.
23       Q.  And what did he tell you?
24       A.  The values of the property being
25   downsized from the value it was at that moment.

Page 145

1        Q.  And having asked your friend Troy
2    that meant you felt comfortable enough to sign
3    the verification, right?
4        A.  Yes.
5        Q.  Let me go back to the top of your list
6    here.  Let me just confirm something, first.
7    You are not seeking damages in this case for
8    physical injury to yourself; right?
9        A.  Right.
10       Q.  Do you know of any friends or
11   neighbors or acquaintances in the Lower Ninth
12   Ward that suffered physical injuries due to
13   flooding on August 29th of '05?
14       A.  No, not right off.  No.  No.
15       Q.  Okay.  But you are seeking damages in
16   this case for past and future mental pain,
17   suffering and anguish, right?
18       A.  Yes.
19       Q.  And the distress that you suffered is
20   what you described earlier in the deposition.
21   Do you remember your testimony earlier?
22       A.  Yes.
23       Q.  Is there anything you want to add to
24   that about the mental distress and anguish you
25   suffered?

37 (Pages 142 to 145)

HARRIS, JIMMIE

8/4/2008

Page 146

1     A.  No.
2     Q.  You were not in the Lower Ninth Ward
3  during the storm.
4     A.  No.
5     Q.  And the part of the city that you were
6  in didn't flood.
7     A.  No.  It did not, no.
8     Q.  The distress and suffering and anguish
9  that you've suffered, has it prevented you from
10  working?
11     A.  No.
12     Q.  Has it prevented you from enjoying
13  whatever time with your family you have?
14     A.  Yes.
15     Q.  Okay.  Describe for me how that has
16  happened.
17     A.  Because I didn't have the time with my
18  family for the last three years.  There was
19  lost time with my family for the past three
20  years.
21     MR. GILBERT:
22        Listen to the question.  It's
23     actually a different question.
24  EXAMINATION BY MR. RAFFMAN:
25     Q.  Okay.  During the last three years you

Page 147

1  have been separated from your family for a good
2  amounts of that time; right?
3     A.  Yes.
4     Q.  But you've been together with
5  your family for part of that time.
6     A.  Yes.
7     Q.  And on those occasions when you've
8  been together with your family, has the
9  distress and anguish and suffering prevented
10  you from enjoying the time with your family?
11     A.  Sometime yes, sometime no.
12     Q.  Do you go to church?
13     A.  Yes.
14     Q.  Did you go to church regularly before
15  the storm?
16     A.  Yes.
17     Q.  And after the storm do you continue to
18  go to church regularly?
19     A.  Not as much.
20     Q.  Has your distress, suffering and
21  anguish caused you to curtail the amount of
22  time you spend or go to church?
23     A.  No.
24     Q.  Since the storm, has the mental
25  distress and suffering and anguish that you

Page 148

1  claim affected your appetite?
2     A.  No.
3     Q.  Your distress that you wanted
4  compensation for, this is something that is
5  personal to you; correct?
6     A.  Yes.
7     Q.  And in order for me or anyone else to
8  understand the distress and suffering you've
9  been through, we need to hear it from you,
10  don't we?
11     A.  No.
12     Q.  Who could we hear it from if not you?
13     A.  No one.  You would have to be in my
14  shoes to understand what I'm going through.
15     Q.  All right.  And do you agree with me
16  that in order to present a claim for
17  compensation for emotional distress that you've
18  suffered a jury is going to have to do its best
19  to understand the distress you suffer?  Even if
20  they can't be in your shoes.  Isn't that right?
21     A.  Yes.
22     Q.  And in order for a jury to try to
23  understand the distress you've suffered, don't
24  they need to hear from you the circumstances of
25  your distress?

Page 149

1     A.  Yes.
2     Q.  I want to ask you about past and
3  future mental health care expense which is
4  another item on your list.  What past mental
5  health care expense have you incurred?
6     A.  None.
7     Q.  What future mental health care expense
8  do you expect?
9     A.  I don't know.  I don't have an answer.
10     Q.  Now, when you read this interrogatory
11  answer before you signed the verification, did
12  you take note of that item there for past and
13  future mental health care expense?
14     A.  Yes.
15     Q.  And did it occur to you to ask anybody
16  why am I claiming past and future mental health
17  care expense as part of my claim?
18     A.  No.
19     Q.  And when you took note of that item in
20  the answer, did you say to anybody, that item
21  really doesn't belong there?
22     A.  No.
23     Q.  As you sit here today, are you
24  comfortable with having that item being an
25  element of your damages in this case?

Johns Pendleton Court Reporters                    800 562-1285

BARGE001116

HARRIS, JIMMIE

8/4/2008

Page 150

1      A.  Yes.
2      Q.  And why are you comfortable with that
3  as you sit here today?
4      A.  Because I wouldn't know what mental
5  state of mind I would be in in the future.  I
6  don't know.
7      Q.  Let's look at the item that says past
8  and future loss of enjoyment of lifestyle.
9  Do you see that item there?
10     A.  Yes.
11     Q.  Can you explain to me what you meant
12  by that item?
13     A.  Sure.  I lost the opportunities to
14  watch -- to be with my family and watch my kid
15  grow through the last few years, in and out of
16  the lives of my wife and my kid, and just being
17  there to support them as a family -- as the
18  head of the family.
19     Q.  That's because you were here and they
20  were in Houston.
21     A.  Yes.
22     Q.  Is there anything else that occurs to
23  you that you would seek damages for, for past
24  and future loss of enjoyment of lifestyle?
25     A.  Yes, let's say like right now I can't

Page 151

1  enjoy my wife and kid even though they're back
2  home with me.  Home isn't home anymore, it's
3  just a secluded neighborhood.  There's nothing
4  there.  And until it grows back to be a full
5  community, we're just living sheltered lives
6  away from everyone.  In order for us to go shop
7  we have to go on the other side of town.  We
8  need to go and buy food for the home, we have
9  to go to the other side of town.  So all the
10  amenities, movies, theaters, food and stuff
11  like that, it's taken away from us.  So there's
12  nothing exciting about that.  There's nothing.
13     Q.  Now, in order to explain what you
14  meant by the loss of enjoyment of lifestyle,
15  that's something that only you could explain,
16  right?
17     A.  Speaking of me, yes.
18     Q.  Has the Holy Cross neighborhood where
19  you live, has that neighborhood come back to
20  any greater or lesser degree than other parts
21  of the Lower Ninth Ward?
22     A.  Yes.
23     Q.  Tell me about that, please.
24     A.  Um -- my neighborhood, for instance,
25  and my block, there's -- at one point I was the

Page 152

1  only one living in my home.  Now there's five
2  families living in their home, working on the
3  homes as they're living in it now.  So during
4  the course of time there have been families
5  coming back, rebuilding their homes.  Um --
6  compared to the other side of town where
7  there's just flat land, it's taking them longer
8  to come back and rebuild.
9         So the side of, um -- the southern
10  side of the Industrial Canal is growing more
11  rapidly than the northern side because the
12  northern side took a major hit because it's the
13  deeper side of the, um -- what we call the
14  bowl.  I stay on the higher side of the bowl.
15  The northern side is the lower side of the bowl
16  where the water rose higher.  Where I sustained
17  7 feet eight inches of water, the northern side
18  sustained eighteen feet, twenty feet.  So of
19  course it's going to take them longer to
20  rebuild and come back.
21     Q.  Now, am I right that there are parts
22  of the Holy Cross neighborhood closer to the
23  river that got even less waters than you did?
24     A.  Yes.  Because as you get closer to the
25  river the city slopes upward.  And as you get

Page 153

1  further away from it the city slopes downward.
2     Q.  And the parts of the Holy Cross
3  neighborhood that are closest to the river,
4  um -- how are they doing today?
5     A.  They're growing back slower.  It's
6  just a slow process.  I can't say exactly
7  what's causing it, but it's just a slow
8  process, completely slow.
9     Q.  And in your experience, at least, the
10  progress is different in different
11  neighborhoods over there in the Lower Ninth
12  Ward, right?
13     A.  I would say so.
14     Q.  When did you first hire a lawyer to --
15  before I change the subject, how many homes are
16  there on your block?
17     A.  Maybe eleven.
18     Q.  Now, as you sit here today, how many
19  of those eleven homes have been repaired?
20     A.  Five.
21     Q.  How many of those homes have been
22  demolished?
23     A.  None of them.
24     Q.  How many of them are occupied today?
25     A.  Five.

HARRIS, JIMMIE

8/4/2008

Page 154

1    Q.  When did you first hire a lawyer to
2 sue the barge defendants on your behalf, if you
3 remember?
4    A.  I don't remember.
5    Q.  How did you come to hire a lawyer to
6 sue the barge defendants?
7    A.  I don't remember exactly how I arrived
8 at that position, I don't remember.
9    Q.  Have you attended any of the court
10 hearings in this case?
11    A.  No.
12    Q.  Did you attend a trial of Ingram and
13 Domino?
14    A.  No.  No.
15    Q.  Have you attended any of the
16 depositions of anybody in this case?
17    A.  No.
18    Q.  Apart from the interrogatory answers
19 that you verified, have you reviewed any court
20 documents for the purpose of commenting on
21 them?
22    A.  No.
23    Q.  Describe for me, if you will, your
24 participation, if any, in the direction and
25 control of this litigation.

Page 155

1    A.  I don't understand.  I don't --
2    Q.  Do you participate in the direction
3 and control of the lawsuit against the barge
4 entities?
5    A.  I haven't.  No, I haven't.
6    Q.  Do you understand that you've been
7 proposed as a class representative in this
8 case?
9    A.  Yes.
10    Q.  All right.  What is your understanding
11 of what it means to be a class representative?
12    A.  To be one of the representatives to
13 sit forward and explain my losses, what
14 happened to me during the flood.
15    Q.  Do you know which classes or
16 subclasses you're being proposed to represent?
17    A.  No.
18    Q.  Do you want the Court to certify you
19 as a class representative?
20    A.  Yes.
21    Q.  Why do you want the Court to do that?
22    A.  Because someone have to present what
23 happened to the whole community as a whole.
24 Someone have to be what we call a mouthpiece,
25 to speak out.  I'm just one of them.

Page 156

1    Q.  If the Court decides that this case
2 cannot be a class action, would you go ahead
3 with your suit on an individual basis?  Would
4 that be your intention?
5    A.  Maybe.
6    Q.  You wouldn't rule it out.
7    A.  No.
8    Q.  Has anybody other than a lawyer asked
9 you to be a class representative in this case?
10    A.  No.
11    Q.  Have you ever served as a class
12 representative in any other lawsuit?
13    A.  No.
14    Q.  What understanding do you have, if
15 any, about how the expenses of this lawsuit for
16 the plaintiffs --
17    A.  I don't have any.
18    Q.  All right.  I need to finish my
19 question because I didn't finish it.  But then
20 I know what your answer is.  What understanding
21 do you have, if any, about how the expenses of
22 this lawsuit for the plaintiffs are being
23 borne?
24    A.  I don't know.
25    Q.  Have you paid any expenses up until

Page 157

1 now for the cost of this lawsuit?
2    A.  No.
3    Q.  Have you ever filed for bankruptcy?
4    A.  No.
5    Q.  Have you ever been subject to a
6 retraining order?
7    A.  No.
8    Q.  Have you ever been convicted of a
9 crime other than traffic offense?
10    A.  No.
11    (Off the record.)
12 EXAMINATION BY MR. RAFFMAN:
13    Q.  Where did your family do its grocery
14 shopping before the storm?
15    A.  In Chalmette, right in the
16 neighborhood.  Judge Perez is right there,
17 um -- ten minutes from the house.
18    Q.  I have no other questions.
19    MR. GILBERT:
20      Does the American Club in
21    attendance at this deposition for
22    discovery purposes have any questions?
23    MR. KITTO:
24      No questions.
25    MR. GILBERT:

Johns Pendleton Court Reporters                    800 562-1285

BARGE001118

HARRIS, JIMMIE

8/4/2008

| Page 158 | Page 160 |
|---|---|
| 1   No questions.  Nothing here. | 1       REPORTER'S CERTIFICATE |
| 2 | 2       I, JOSEPH A. FAIRBANKS, JR., CCR, RPR, |
| 3 | 3   Certified Court Reporter in and for the State |
| 4 | 4   of Louisiana, do hereby certify that the |
| 5 | 5   aforementioned witness, after having been first |
| 6 | 6   duly sworn by me to testify to the truth, did |
| 7 | 7   testify as hereinabove set forth; |
| 8 | 8       That said deposition was taken by me |
| 9 | 9   in computer shorthand and thereafter |
| 10 | 10   transcribed under my supervision, and is a true |
| 11 | 11   and correct transcription to the best of my |
| 12 | 12   ability and understanding. |
| 13 | 13       I further certify that I am not of |
| 14 | 14   counsel, nor related to counsel or the parties |
| 15 | 15   hereto, and am in no way interested in the |
| 16 | 16   result of said cause. |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23   _____ |
| 24 | 24   JOSEPH A. FAIRBANKS, JR., CCR, RPR |
| 25 | 25   CERTIFIED COURT REPORTER #75005 |

Page 159

```
 1       WITNESS' CERTIFICATE
 2
 3       I, JIMMIE DONNELL HARRIS, do hereby
 4   certify that the foregoing testimony was given
 5   by me, and that the transcription of said
 6   testimony, with corrections and/or changes, if
 7   any, is true and correct as given by me on the
 8   aforementioned date.
 9
10   _____   _____
11   DATE SIGNED        JIMMIE DONNELL HARRIS
12
13   _____ Signed with corrections as noted.
14
15   _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25   DATE TAKEN:  August 4th, 2008
```

41 (Pages 158 to 160)

BARGE001119