# EXHIBIT 25

RICHE, MICHAEL

8/6/2008

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES   * CIVIL ACTION

                                * NO. 05-4182

PERTAINS TO: BARGES             * Consolidated

                                * SECTION "K(2)"

Boutte v. Lafarge       05-5531 *

Mumford v. Ingram       05-5724 * JUDGE DUVAL

Lagarde v. Lafarge      06-5342 *

Perry v. Ingram         06-6299 * MAG. WILKINSON

Benoit v. Lafarge       06-7516 *

Parfait Family v. USA   07-3500 *

Lafarge v. USA          07-5178 *

   *   *   *   *   *   *   *   *   *   *   *


        Deposition of MICHAEL JOSEPH RICHE,

given at Chaffe McCall, L.L.P., 2300 Energy

Centre, 1100 Poydras Street, New Orleans,

Louisiana 70163-2300, on August 6th, 2008.



REPORTER BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

RICHE, MICHAEL

8/6/2008

| Page 2 |
| --- |

```
 1    APPEARANCES:
 2    REPRESENTING THE BARGE PSLC:
 3         WIEDEMANN & WIEDEMANN
 4         (BY:  KARL WIEDEMANN, ESQUIRE)
 5         (BY:  EDWARD MORENO, ESQUIRE)
 6         821 Baronne Street
 7         New Orleans, Louisiana 70113
 8         504-581-6180
 9
10    REPRESENTING LAFARGE NORTH AMERICA:
11         GOODWIN PROCTOR, L.L.P.
12         (BY:  MARK S. RAFFMAN, ESQUIRE)
13         901 New York Avenue, NW
14         Washington, D.C. 20001
15         202-346-4000
16    - and -
17         CHAFFE, MCCALL, L.L.P.
18         (BY:  CHARLES BLANCHARD, ESQUIRE)
19         2300 Energy Centre
20         1100 Poydras Street
21         New Orleans, Louisiana 70163-2300
22         504-585-7000
23
24
25
```

| Page 4 |
| --- |

```
 1    REPRESENTING LAKE BORGNE LEVEE DISTRICT:
 2         DUPLASS, ZWAIN, BOURGEOIS, MORTON,
 3         PFISTER & WEINSTOCK
 4         (BY:  RYAN MALONE, ESQUIRE)
 5         Three Lakeway Center, 29th Floor
 6         3838 N. Causeway Boulevard
 7         Metairie, Louisiana 70002
 8         504-832-3700
 9
10    REPRESENTING WASHINGTON GROUP INTERNATIONAL:
11         STONE PIGMAN WALTHER WITTMANN, L.L.C.
12         (BY:  HEATHER LONIAN, ESQUIRE)
13         546 Carondelet Street
14         New Orleans, Louisiana 70130
15         504-581-3200
16
17
18
19
20
21
22
23
24
25
```

| Page 3 |
| --- |

```
 1    REPRESENTING THE AMERICAN CLUB:
 2         MONTGOMERY, BARNETT, BROWN, READ,
 3         HAMMOND & MINTZ, L.L.P.
 4         (BY:  RONALD J. KITTO, ESQUIRE)
 5         1100 Poydras Street, Suite 3200
 6         New Orleans, Louisiana 70163
 7         504-585-3200
 8
 9    REPRESENTING ORLEANS LEVEE DISTRICT:
10         MCCRANIE, SISTRUNK, ANZELMO, HARDY,
11         MAXWELL & MCDANIEL
12         (BY:  KASSIE HARGIS, ESQUIRE)
13         3445 N. Causeway Boulevard, Suite 800
14         Metairie, Louisiana 70002
15         504-831-0946
16
17    REPRESENTING JEFFERSON PARISH:
18         BURGLASS & TANKERSLEY
19         (BY: RICHARD PAVLICK, ESQUIRE)
20         5213 Airline Drive
21         Metairie, Louisiana 70001
22         504-836-2220
23
24
25
```

| Page 5 |
| --- |

```
 1                I N D E X
 2         E X A M I N A T I O N   I N D E X
 3                        PAGE
 4    MR. RAFFMAN ...............................7
 5
 6           E X H I B I T   I N D E X
 7                        PAGE
 8    Exhibit 1   ................................ 9
 9    Exhibit 2   ...............................22
10    Exhibit 3   ...............................36
11    Exhibit 4   ...............................48
12    Exhibit 6   ...............................56
13    Exhibit 7   ...............................60
14    Exhibit 8   ...............................87
15    Exhibit 9   ...............................91
16    Exhibit 10  ...............................99
17    Exhibit 11  ..............................109
18    Exhibit 12  ..............................114
19    Exhibit 13  ..............................115
20    Exhibit 14  ..............................118
21    Exhibit 15  ..............................128
22    Exhibit 16  ..............................130
23    Exhibit 17  ..............................131
24    Exhibit 18  ..............................133
25    Exhibit 19  ..............................134
```

2 (Pages 2 to 5)

BARGE001121

RICHE, MICHAEL

8/6/2008

|  | Page 6 |
|---|---|
| 1   Exhibit 20  .............................135<br>2   Exhibit 21  .............................136<br>3   Exhibit 22  .............................138 | |

**Page 6**

1   Exhibit 20  .............................135
2   Exhibit 21  .............................136
3   Exhibit 22  .............................138

**Page 8**

1        MICHAEL JOSEPH RICHE
2   31028 Torres Drive, Lacombe, Louisiana 70445, a
3   witness named in the above stipulation, having
4   been first duly sworn, was examined and
5   testified on his oath as follows:
6   EXAMINATION BY MR. RAFFMAN:
7     Q.  Mr. Riche, my name is Mark Raffman,
8   and I introduced myself to you previously.  I
9   represent Lafarge North America in this lawsuit
10  and I'll be taking your deposition today on
11  behalf of Lafarge.
12       Have you ever given a deposition
13  before?
14    A.  Yes.
15    Q.  When did you give a deposition?
16    A.  I don't remember the date.
17    Q.  How many years ago, approximately?
18    A.  Um -- it's within this year.
19    Q.  In which legal matter did you give a
20  deposition?
21    A.  I filed suit against my business
22  insurance.
23    Q.  Is your business insurance company the
24  Lafayette Insurance Company?
25    A.  Yes.

**Page 7**

1        S T I P U L A T I O N
2        IT IS STIPULATED AND AGREED by and
3   among counsel for the parties hereto that the
4   deposition of the aforementioned witness may be
5   taken for all purposes permitted within the
6   Louisiana Code of Civil Procedure, in
7   accordance with law, pursuant to notice;
8        That all formalities, save reading
9   and signing of the original transcript by the
10  deponent, are hereby specifically waived;
11       That all objections, save those as to
12  the form of the question and the responsiveness
13  of the answer, are reserved until such time as
14  this deposition, or any part thereof, is used
15  or sought to be used in evidence.
16
17
18       * * *
19
20
21
22       JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23  Certified Court Reporter in and for the State
24  of Louisiana, officiated in administering the
25  oath to the witness.

**Page 9**

1     Q.  I'm handing you what's been marked as
2   Exhibit 1 to your deposition.  Exhibit 1 is
3   styled Petition for Damages, Michael Riche
4   d/b/a Mr. Ribbon versus Lafayette Insurance
5   Company.  Do you recognize this document?
6        (Exhibit 1 was marked for
7   identification and is attached hereto.)
8     A.  This is the first time I see this
9   document.
10  EXAMINATION BY MR. RAFFMAN:
11    Q.  You have not seen this Exhibit 1
12  before.
13    A.  Not to my knowledge.
14    Q.  Do you know whether Exhibit 1 to your
15  deposition is a petition for damages in the
16  lawsuit that you filed against Lafayette
17  Insurance Company?
18    A.  Yes.
19    Q.  And this is -- this Exhibit 1 is, in
20  fact, a petition for damages in a suit that you
21  filed.
22    A.  Yes.
23    Q.  When you gave your deposition, did the
24  lawyer for Lafayette Insurance Company ask you
25  questions?

3 (Pages 6 to 9)

BARGE001122

RICHE, MICHAEL

8/6/2008

## Page 10

1    A.  Ask me questions?
2    Q.  Yes.
3    A.  Yes.
4    Q.  You were under oath at that
5  deposition?
6    A.  Yes.
7    Q.  Do you have a copy of the transcript
8  of that deposition?
9    A.  They sent me one.  I don't know
10  exactly where it's at.
11    Q.  In your deposition, did you testify
12  about the damages to your business that
13  happened during Katrina?
14    A.  Yes.
15    Q.  You did testify about the flooding of
16  your business at Mr. Ribbon?
17    A.  Yes.
18    Q.  Did you testify about wind damage to
19  your business at Mr. Ribbon?
20    A.  Yes.
21    Q.  Did you testify about profits that you
22  lost from your business at Mr. Ribbon?
23    A.  I believe so.
24    Q.  Did you testify about customers that
25  you lost at Mr. Ribbon?

## Page 11

1    A.  Yes.
2    Q.  Did you testify about your evacuation
3  from St. Bernard Parish in advance of the
4  storm?
5    A.  Yes.
6    Q.  Who represents you in your suit
7  against Lafayette Insurance Company?
8    A.  Mr. Jon Yeager.
9    Q.  If you asked Mr. Yeager for a copy of
10  your deposition transcript in the Lafayette
11  Insurance Company, do you expect that he'd give
12  it to you?
13    A.  Yes.
14    Q.  Your deposition in the Lafayette
15  insurance company matter was during the
16  calendar year 2008?
17    A.  I think so.
18    Q.  Was it within the last three months?
19    A.  I believe so.  I'm not exactly sure of
20  the date.
21    MR. RAFFMAN:
22      I'll put on the record a request
23    for a copy of the transcript of
24    Mr. Riche 's deposition in the
25    Lafayette Insurance Company matter,

## Page 12

1    and we'll follow it up with something
2    in writing.
3  EXAMINATION BY MR. RAFFMAN:
4    Q.  Apart from the testimony that you've
5  given in the Lafayette Insurance Company
6  matter, Mr. Riche, have you ever given another
7  deposition?
8    A.  No.
9    Q.  As the risk of repeating things you
10  may have heard in your deposition in the
11  Lafayette matter, I'm going to set a couple of
12  ground rules that I hope we can agree to follow
13  today.  I will be asking you questions, and the
14  court reporter will be taking down my questions
15  and your answers.  In order for the court
16  reporter to do his job, you need to verbalize
17  your answers, you need to speak your answers.
18    Do you understand that?
19    A.  Yes.
20    Q.  In order for both of us to allow the
21  court reporter to do his job, we have to speak
22  one at a time.  So I'll ask that you let me
23  finish my questions and I will do my very best
24  not to interrupt your answers.
25    Do you understand that?

## Page 13

1    A.  Yes.
2    Q.  And in order for the court reporter to
3  get your words accurately and also for the
4  consideration of others on the long table in
5  this big room, will you try to keep your voice
6  up in answering my questions?
7    A.  Yes.
8    Q.  Thank you.  You understand that you're
9  under oath in your testimony today.
10    A.  Yes.
11    Q.  Just as if you were in a court of law.
12    A.  Yes.
13    Q.  If I don't understand the question
14  that I ask you, will you ask me to clarify my
15  question?
16    A.  Yes.
17    Q.  If you remember something that's
18  responsive to a question that I asked earlier
19  in the deposition you are welcome to add what
20  you've remembered to your prior answer.
21    Do you understand that?
22    A.  Yes.
23    Q.  Mr. Riche, have you taken any
24  medication or alcohol or drugs, or anything
25  that would interfere with your ability to

4  (Pages 10 to 13)

RICHE, MICHAEL

8/6/2008

Page 14

1  testify truthfully and to the best of your
2  recollection this morning?
3      A.  No.
4      Q.  Did you do anything to prepare for
5  this deposition?
6      A.  I met with my attorneys earlier.
7      Q.  With whom did you meet?
8      A.  These gentlemen here.
9      Q.  And you're gesturing to Mr. Wiedemann
10  and Mr. Moreno, is that right?
11      A.  Right.
12      Q.  Had you met with Mr. Wiedemann or
13  Mr. Moreno before this morning?
14      A.  I met Mr. Wiedemann when we went to
15  look at the properties.
16      MR. MORENO:
17          No, that was me.
18      A.  Oh, I'm sorry.  Mr. Moreno.
19  EXAMINATION BY MR. RAFFMAN:
20      Q.  So the record is clear, you met with
21  Mr. Moreno when you and some representatives
22  from Lafarge went to look at your properties
23  that were damaged in the storm.
24      A.  Yes.
25      Q.  And before that meeting with

Page 15

1  Mr. Moreno had you met with him?
2      A.  Not that I recall.
3      Q.  And before this morning you had never
4  met with Mr. Wiedemann.
5      A.  No, I don't think so.
6      Q.  Apart from -- and you met -- you met
7  with Mr. Moreno and Mr. Wiedemann this morning
8  to prepare for your deposition, right?
9      A.  Right.
10      Q.  How long did you meet with them?
11      A.  About an hour.
12      Q.  Did you review any documents during
13  that meeting?
14      A.  Yes.
15      Q.  Did any of the documents that you
16  reviewed refresh your recollection about any of
17  the events surrounding your business or the
18  storm?
19      A.  Yes.
20      Q.  Which documents did you review that
21  refreshed your recollection?
22      A.  Um -- well, the numbers as far as
23  insurance and losses and all.
24      Q.  Were there any other documents besides
25  those that refreshed your recollection when you

Page 16

1  met with your lawyers this morning?
2      A.  No.
3      Q.  The documents that you reviewed that
4  refreshed your recollection all concerned the
5  claims you made on your insurance companies for
6  your losses during the storm?
7      A.  Yes.
8      Q.  Were any of those documents prepared
9  by lawyers for your review?
10      A.  No, it was all my answers from my
11  information.
12      Q.  None of them was a document that you
13  created specifically for this lawsuit; correct?
14      A.  I don't understand what you're saying.
15      Q.  Describe for me the documents that you
16  reviewed that refreshed your recollection.
17      A.  How much I had lost from the business
18  and how much I had gotten in the insurance, you
19  know, things like that.
20      Q.  They were claims documents that you
21  sent to your insurance company?
22      A.  Right.  And what insurance company had
23  paid me.  The exact dollar figures, you know, I
24  forget.
25      Q.  Okay.  Apart from your meeting with

Page 17

1  counsel this morning, did you do anything else
2  to prepare for your deposition?
3      A.  No.
4      Q.  When did you first hire a lawyer to
5  represent you in this case?
6      A.  I don't remember the date.
7      Q.  In what year?
8      A.  It was after Katrina.
9      Q.  How many months after Katrina?
10      A.  I don't remember.
11      Q.  Was it within a year after Katrina?
12      A.  I can't say for sure.
13      Q.  Tell me how you came to hire a lawyer
14  to represent you in this case.
15      A.  Well, I heard there was a lawsuit
16  because of the barge.
17      Q.  From whom did you hear that?
18      A.  From my neighbor on Charles Drive.
19      Q.  What's your neighbor's name?
20      A.  Fred Keller.
21      Q.  What did your neighbor tell you about
22  the lawsuit?
23      A.  That there was a lawsuit because the
24  barge had come through the Industrial Canal.
25      Q.  When Mr. Keller told you that, what

5  (Pages 14 to 17)

BARGE001124

RICHE, MICHAEL

8/6/2008

Page 18

1   was your -- what actions if any did you take
2   when you heard that?
3       A.  Well, they gave me the number to call
4   for lawyers, and, um -- I called them and told
5   them that I was interested in getting in on the
6   class action.
7       Q.  When you made that phone call who did
8   you speak to?
9       A.  I don't remember.
10      Q.  Before you made that phone call what
11  understanding, if any, did you have about what
12  had caused the flooding in your area?
13      A.  I didn't know exactly what had caused
14  the flooding in the area.  So whatever I heard,
15  like with the, um -- MRGO, I had put in for
16  that one and the barge.
17      Q.  What did you mean when you said for
18  the MRGO you put in for that one?
19      A.  Because with the MRGO, I heard that
20  the water had come in from that way, and then I
21  heard from other people that on Judge Perez the
22  water had come from the Industrial Canal.
23      Q.  Have you hired a lawyer to represent
24  you in a lawsuit against the government
25  involving the MRGO?

Page 19

1       A.  I haven't hired a lawyer, I have
2   gotten in on the class action lawsuit against
3   MRGO.  Oh, that's right, right, Sidney Torres,
4   yeah, that was the lawyer I had to go to.
5       Q.  You hired Sidney Torres to represent
6   you in a class action lawsuit involving the
7   MRGO; is that correct?
8       A.  Right.
9       Q.  Do you know where that lawsuit is
10  pending?
11      A.  I really don't know.
12      Q.  Can you tell me the thrust of your
13  allegations in that lawsuit?
14      A.  Well, I think that MRGO caused my
15  house to be flooded.
16      Q.  Your lawsuit involving the MRGO only
17  seeks damages for the flooding to your house;
18  is that correct?
19      A.  Well, from what I'm understanding now.
20  But at the time when I filed that one I don't
21  remember if I filed it just for the house or
22  for the house and the business and everything.
23      Q.  So as far as you know, your lawsuit
24  involving the MRGO involves both your house and
25  your business, is that correct?

Page 20

1       A.  I don't know.  I don't remember.
2       Q.  Have you ever asked Mr. Torres to
3   withdraw any claims from his lawsuit that
4   relates to your business?
5       A.  No.
6       Q.  Did you ever file a claim form against
7   the United States government?
8       A.  I think that's the -- I think the form
9   you're talking about is that S 95 or whatever
10  it is.  Yeah.  Everyone had to do that, yeah.
11      Q.  Did you file an SF 95 --
12      A.  Yes.
13      Q.  -- form?  I'm sorry, we have to try
14  not to interrupt each other.  Let me ask my
15  question.
16          Did you file an SF 95 form against the
17  government?
18      A.  Yes.
19      Q.  Do you have a copy of that form?
20      A.  I should.  Again, I don't know exactly
21  where it's at.
22      THE WITNESS:
23          I don't know if I provided it for
24  y'all.
25      MR. WIEDEMANN:

Page 21

1           You really can't ask me questions
2   during the deposition.
3       THE WITNESS:
4           Oh.
5   EXAMINATION BY MR. RAFFMAN:
6       Q.  So your testimony is that you believe
7   you have a copy of the SF 95 form, but you're
8   not sure.
9       A.  Correct.
10      Q.  Am I correct in saying that you've
11  looked for documents to produce to your lawyers
12  in this case so your lawyers could give them to
13  Lafarge?
14      A.  Yes.
15      Q.  When you looked for those documents,
16  did you look for the SF 95 form?
17      A.  I looked for everything I could find,
18  yeah.
19      Q.  Do you remember whether you gave the
20  lawyers the SF 95 form?
21      A.  No, and if I remember I would have
22  told you.  I'm just telling you I don't
23  remember.
24      MR. RAFFMAN:
25          I'll represent for the record

6 (Pages 18 to 21)

RICHE, MICHAEL

8/6/2008

Page 22

```
 1        that we didn't receive a copy of the
 2        SF 95 form, and if a copy exists in
 3        the witness' possession, custody or
 4        control, we'd like to have it.  We'll
 5        follow that up with a written request
 6        as well.
 7        MR. WIEDEMANN:
 8             Of course.
 9   EXAMINATION BY MR. RAFFMAN:
10     Q.  Turning your attention back to Riche
11   Exhibit 1, this is the complaint that you filed
12   against Lafayette Insurance Company, you've
13   sued the insurance company for property damage,
14   loss of business income and loss of the
15   contents of your truck; is that right?
16     A.  Yes.
17     Q.  Has that suit been resolved?
18     A.  No.
19     Q.  The suit is still pending?
20     A.  Yes.
21     Q.  Is there a trial date?
22     A.  Not that I know of.
23     Q.  Apart from your lawsuit against the
24   Lafayette Insurance Company, have you been
25   involved in any other lawsuits?
```

Page 23

```
 1     A.  No.
 2     Q.  Did you sign a retention agreement
 3   with your lawyers in this case?
 4     A.  I don't remember.
 5     Q.  I hand you what's been marked as Riche
 6   Exhibit 2.  Exhibit 2 is a blank retention
 7   agreement for Industrial Canal Breach Class
 8   Action Lawsuit.  It does not bear any
 9   signatures.
10        MR. RAFFMAN:
11             My question for this witness is
12        whether he recognizes Exhibit 2 as a
13        form that he has ever seen before.
14        (Exhibit 2 was marked for
15   identification and is attached hereto.)
16     A.  I don't remember.
17   EXAMINATION BY MR. RAFFMAN:
18     Q.  Do you remember signing any sort of
19   document in which you agreed to the retention
20   of lawyers to represents you in this class
21   action case?
22     A.  I don't remember.
23     Q.  Do you know whether you signed an
24   agreement or not?
25     A.  I don't remember.
```

Page 24

```
 1     Q.  I think my question may be a little
 2   different.  I understand that you don't
 3   remember signing one.  My question is, do you
 4   know whether you did or not?
 5     A.  And my answer is the same as your
 6   question was before; I don't remember.
 7     Q.  So you don't know whether you signed
 8   one or not.
 9     A.  I do not remember.
10     Q.  You may have signed one, but you don't
11   remember.
12     A.  I may have, but I don't remember.
13     Q.  Fair enough.  What's your current
14   address, Mr. Riche?
15     A.  31028 Torres Drive, Lacombe, Louisiana
16   70445.
17     Q.  Where is Lacombe, Louisiana?
18     A.  It's between Slidell and Mandeville.
19     Q.  This is on the north shore?
20     A.  On the north shore.
21     Q.  When were you born?
22     A.  March 19th, 1945.
23     Q.  Are you married?
24     A.  Yes.
25     Q.  What is your wife's name?
```

Page 25

```
 1     A.  Glenda Susan.
 2     Q.  When did you marry your wife?
 3     A.  1966.
 4     Q.  And have you been married continuously
 5   throughout the entire time between 1966 and
 6   today?
 7     A.  No.  We divorced for like three years
 8   and then we remarried.
 9     Q.  When did you divorce?
10     A.  I don't remember the exact date.  It
11   was, um -- I'm trying to remember now.  I guess
12   about ten years ago, something like that.
13     Q.  When did you and Mrs. Riche remarry?
14     A.  Three years later.
15     Q.  Apart from your two marriages to
16   Glenda Susan Riche, have you ever been married
17   to anybody else?
18     A.  No.
19     Q.  Do you have children?
20     A.  Yes.
21     Q.  What are the names of your children?
22     A.  Kenneth, we had Randy, and Rebecca.
23     Q.  When was Kenneth born?
24     A.  He's 40 now, so --
25     Q.  All right.  And Rebecca, when was she
```

7 (Pages 22 to 25)

RICHE, MICHAEL

8/6/2008

## Page 26

1  born or how old is she?
2      A.  Rebecca is 25.
3      Q.  And if I'm not mistaken, Randy is
4  deceased.
5      A.  Yes.
6      Q.  He was born when?
7      A.  Um -- '74, I think.
8      Q.  Randy died in 2005?
9      A.  Yeah.  Six months before the storm.
10     Q.  And how did Randy die?
11     A.  Overdose.
12     Q.  Overdose of drugs.
13     A.  Yeah.
14     Q.  Mr. Riche, what is the highest level
15  of education that you have attained?
16     A.  College degree.
17     Q.  When did you receive your college
18  degree?
19     A.  In the seventies.
20     Q.  Where did you attend college?
21     A.  Loyola.
22     Q.  Loyola here in New Orleans?
23     A.  Yes.
24     Q.  What was your course of study at
25  Loyola?

## Page 27

1      A.  Psychology.
2      Q.  And you have a bachelor's degree in
3  psychology from Loyola.
4      A.  Yes.
5      Q.  Do you have any military service?
6      A.  No.
7      Q.  What is your wife's highest degree of
8  education?
9      A.  High school.
10     Q.  Where did your wife attend high
11  school?
12     A.  Nichols.
13     Q.  Where is that school?
14     A.  St. Claude Avenue, I believe it is.
15     Q.  Here in New Orleans.
16     A.  Right.  New Orleans.
17     Q.  Where did you grow up?
18     A.  I'm originally from Plaucheville,
19  Louisiana, and then we moved to New Orleans for
20  the last time in '58, and then I grew up --
21  stayed in New Orleans.
22     Q.  Can you give me a narrative of your
23  work history since you received your psychology
24  degree at Loyola in the 1970s?
25     A.  Yeah.  Um -- when I went to Loyola, I

## Page 28

1  was also working at Kaiser Aluminum.  And when
2  Kaiser Aluminum shut down I, um -- went to work
3  part-time at West Jefferson Hospital, and then,
4  um -- after that I decided to try to find other
5  jobs, but I couldn't, because they said I was
6  too old, and, um -- yeah.  At 37.  So I started
7  up Mr. Ribbon.
8      Q.  When did you start Mr. Ribbon?
9      A.  It was in 1985.
10     Q.  Where were you living when you started
11  that business?
12     A.  3617 Charles Drive in Chalmette.
13     Q.  When did you move to Chalmette?
14     A.  I moved to Chalmette, um -- when I got
15  married in '66.
16     Q.  From 1966 until you and Mrs. Riche
17  were divorced, did you live at 3617 Charles
18  Drive?
19     A.  From the time we were married?  No.
20  We rented.  We lived in a rental property on I
21  think Celestine, and we went to Esteban, then
22  we went the Pakenham, and then we went to
23  Charles.
24     Q.  I'm going to come back to that in a
25  minute.  When you started Mr. Ribbon in 1995,

## Page 29

1  you were married to Glenda and you had three
2  children; right?
3      A.  Right.
4      Q.  Since 1985 -- from 1985 until August
5  of 2005, did you have any employment other than
6  Mr. Ribbon?
7      A.  When I started Mr. Ribbon I was also a
8  sales rep, but I stopped there I think it was
9  like '86 or '87.
10     Q.  For whom were you a sales rep in 1985,
11  1986?
12     A.  I was sales rep for Far East Imports,
13  a silk flower company.  And I forget the name,
14  but it was a ribbon company also I was a sales
15  rep for.
16     Q.  How long did you serve as a sales rep
17  for Far East Imports and another flower
18  company?
19     A.  Approximately two or three years.
20     Q.  This was during the time after you had
21  left Kaiser Aluminum and were looking for other
22  employment, right?
23     A.  Right.  It was after Kaiser and after
24  West Jefferson Hospital, and then I went as a
25  sales rep, and then went into Mr. Ribbon.

8 (Pages 26 to 29)

RICHE, MICHAEL

8/6/2008

---

Page 30

1    Q.  Let me go back to your residences for
2  a little bit and get the narrative on where you
3  lived.  Starting with your current residence.
4  You live now in Lacombe, Louisiana; right?
5    A.  Right.
6    Q.  How long have you lived there?
7    A.  Three years I think it is now.
8    Q.  You moved to Lacombe, Louisiana after
9  Katrina.
10    A.  Exactly.  When we came back into
11  Louisiana, we moved there.
12    Q.  Do you own your home there?
13    A.  Yes.
14    Q.  Who lives there with you?
15    A.  My wife and my granddaughter.  And in
16  the summertime my other granddaughter.
17  Sometimes.
18    Q.  The granddaughter who lives with you
19  year-round is whose child?
20    A.  Randy 's.  The deceased.
21    Q.  Your wife lives there, too; right?
22    A.  Yes.
23    Q.  Is there a mortgage on your home?
24    A.  No.
25    Q.  So you own it outright.

---

Page 31

1    A.  Yes.
2    Q.  You purchased it after Katrina.
3    A.  Yes.
4    Q.  What was the purchase price?
5    A.  $190,000.
6    Q.  You paid $190,000 in cash for that
7  home.
8    A.  Yes.
9    Q.  The money that you used to pay for
10  that home came from where?
11    A.  Most of it from the flood insurance.
12    Q.  The flood insurance that generated the
13  money to purchase your Lacombe home was on what
14  properties?
15    A.  All three of them.
16    Q.  You say all three.  You are referring
17  to the 3617 Charles property as one of them,
18  right?
19    A.  Yes.
20    Q.  And another one is the Judge Perez
21  property that was your business property.
22    A.  Yes.
23    Q.  And the third is the Phillip Court
24  property that was your rental property.
25    A.  Yes.

---

Page 32

1    Q.  Did you look into taking out a
2  mortgage on your Lacombe property rather than
3  financing it in all cash?
4    A.  No one would give me a mortgage.  I
5  was 60 years old with no income.
6    Q.  How many mortgage companies did you
7  ask before deciding that you would finance the
8  entire purchase price with the proceeds of your
9  flood insurance?
10    A.  I didn't go to any mortgage company, I
11  knew they wouldn't loan me.
12    Q.  What research, if any, did you do into
13  the availability of a sub prime mortgage in
14  2005 for your Lacombe property?
15    A.  I'm sorry.  I don't understand the
16  question.
17    Q.  You told me you didn't go to any
18  mortgage companies.
19    A.  No.
20    Q.  I'm sorry, the transcript is now going
21  to be bad because of the exchange we just had,
22  so let me go back.  Am I right that you did not
23  go to any mortgage companies?
24    A.  Right.
25    Q.  Did you go to anybody else to ask

---

Page 33

1  about whether you might get a mortgage for your
2  Lacombe property?
3    A.  No.
4    Q.  Based on your understanding that you
5  would not be favorably received if you asked
6  someone for a mortgage, did you choose to
7  finance the entire purchase price of your
8  Lacombe property with the proceeds of your
9  flood insurance?
10    A.  Yes.
11    Q.  If you had had some of that money
12  available to you to repair your business
13  property, that would have been desirable for
14  your business, wouldn't it?
15    A.  If I had had a place to live.
16    Q.  Assuming you had a place to live, it
17  would also be desirable to have had some money
18  available to repair your business property,
19  right?
20    A.  Yes.
21    Q.  The decision to apply the money to the
22  Lacombe property instead of investing in your
23  business was a decision that you made based on
24  your understanding of the options available to
25  you at the time, right?

---

Johns Pendleton Court Reporters                    800 562-1285

BARGE001128

RICHE, MICHAEL

8/6/2008

Page 34

1    A.  Right.
2    Q.  Before you bought your Lacombe
3  property, where were you living?
4    A.  After Charles Drive?
5    Q.  Yes.
6    A.  In Brandon, Mississippi.
7    Q.  Where were you living in Brandon,
8  Mississippi?
9    A.  The first month we lived by my son 's
10 apartment, and then for the other two months I
11 think it was we got ourselves an apartment in
12 the apartment complex.
13   Q.  Was your son living in Brandon,
14 Mississippi, before Katrina?
15   A.  Yes.
16   Q.  This is your son Kenny.
17   A.  Kenny.
18   Q.  Before Brandon, Mississippi, you were
19 living at 3617 Charles drive, right?
20   A.  Right.
21   Q.  And how long had you been living at
22 3617 Charles Drive before the storm?
23   A.  Thirty-two, thirty-three years,
24 something like that.
25   Q.  Since the 1970s.

Page 35

1    A.  Right.
2    Q.  Did you own that property?
3    A.  Yes.
4    Q.  Was there a mortgage on it?
5    A.  No.
6    Q.  Who lived there with you in the year
7  before the storm?
8    A.  The same; my wife, my granddaughter
9  and my son.
10   Q.  Right.  Before your son 's death, was
11 your granddaughter living with you?
12   A.  Yes.  Um -- I think she was maybe four
13 weeks when he died, and her mother was in jail.
14 So we had gotten custody of her.
15   Q.  So you had custody of your
16 granddaughter before your son 's death.
17   A.  No, after.
18   Q.  Afterwards.  Before your son 's death,
19 did he have custody of your granddaughter?
20   A.  No, he was in jail.
21   Q.  Okay.
22   A.  The baby was born while the mother was
23 in jail.
24   Q.  She is how old now, three years?
25   A.  Three.  Three and a half.

Page 36

1    Q.  So during 2005 you had a grandchild
2  who was born to a mother who was incarcerated,
3  is that right?
4    A.  Right.
5    Q.  And you had to deal with the question
6  of who would have custody of this child whose
7  mother was incarcerated, right?
8    A.  Right.
9    Q.  Was the baby born before your son 's
10 death?
11   A.  Yes.
12   Q.  How long after the baby was born did
13 your son die?
14   A.  I think she was about maybe two or
15 three months.
16   Q.  Within two or three months of this
17 child 's birth, you had then to deal with the
18 death of your son.
19   A.  Right.
20   Q.  And these events took a toll on you,
21 didn't they?
22   A.  Yes, they did.
23   Q.  And even to this day the events take a
24 toll on you, don't they?
25   A.  Yes, they do.

Page 37

1    Q.  I'm handing you what I've marked as
2  Exhibit 3 to your deposition.  Exhibit 3 is a
3  map that I've printed from Google, and you can
4  see there there's a little red bubble there.
5  Do you recognize that red bubble as
6  representing the location of your home at 3617
7  Charles Drive?
8        (Exhibit 3 was marked for
9  identification and is attached hereto.)
10   A.  Yes.
11 EXAMINATION BY MR. RAFFMAN:
12   Q.  That residence was damaged in the
13 storm; right?
14   A.  Yes.
15   Q.  Is it fair to say, Mr. Riche, that --
16 well, let me ask this question, first:  Was
17 your home destroyed in the storm?
18   A.  Yes.
19   Q.  This is the home that you had lived at
20 for thirty years before the storm.
21   A.  Yes.
22   Q.  And is it fair to say that the
23 destruction of the home in which you lived for
24 thirty years also took a toll on you
25 emotionally?

10 (Pages 34 to 37)

RICHE, MICHAEL

8/6/2008

Page 38

1    A.  Yes.
2    Q.  The Charles Street address is east of
3  Paris Road; correct?
4    A.  Yes.
5    Q.  And it's your understanding, as you
6  sit here today, that the water that destroyed
7  your Charles Road Home came from somewhere
8  other than the Industrial Canal, correct?
9    A.  Yes.
10    Q.  You are participating in a class
11  action lawsuit to recover for water that came
12  from the MRGO and destroyed your home; correct?
13    A.  Yes.
14    Q.  At the time of Hurricane Katrina you
15  were the owner of Mr. Ribbon; right?
16    A.  Yes.
17    Q.  What is your employment situation
18  today?
19    A.  Today I am -- I've got Mr. Ribbon
20  going again on the wholesale end out of my van,
21  calling on retail florists.
22    Q.  Apart from your wholesale business, do
23  you have other employment?
24    A.  No.
25    Q.  Is your wife employed today?

Page 39

1    A.  No.
2    Q.  Has your wife worked outside the home
3  since Katrina?
4    A.  No.
5    Q.  Before Katrina did your wife work
6  outside the home?
7    A.  Yes.
8    Q.  What was your wife's employment
9  outside the home before Katrina?
10    A.  Beautician.
11    Q.  Where was your wife employed as a
12  beautician?
13    A.  The Forum in Chalmette.
14    Q.  How long had your wife worked as a
15  beautician at The Forum in Chalmette?
16    A.  At The Forum I think it was maybe a
17  year, because one, The Forum was two beauty
18  shops that combined, and she worked for the
19  other one then.  You know, so then they
20  combined.
21    Q.  She had worked as a beautician for a
22  number of years before the storm?
23    A.  Yes.
24    Q.  When you got custody of your
25  granddaughter did your wife continue to work as

Page 40

1  a beautician?
2    A.  No.
3    Q.  She had to stop working to care for
4  your granddaughter.
5    A.  Right.
6    Q.  Forgive me if I asked this question
7  already, and your lawyer may object, but apart
8  from your work for Mr. Ribbon since the storm
9  you've had no other employment, correct?
10    A.  Correct.
11    Q.  Have you ever been employed as a truck
12  driver?
13    A.  Yes.
14    Q.  Tell me about that.
15    A.  That was way back, Sun Pacific
16  Trucking Lines.  That was in the sixties I
17  think it was.
18    Q.  In the 1960s.
19    A.  Uh-huh.
20    Q.  What is Tropical Paradise, Inc.?
21    A.  That was a business that we used to
22  have in Chalmette.
23    Q.  When you say we, who are you referring
24  to?
25    A.  My wife and I.

Page 41

1    Q.  What was that business?
2    A.  It was all wicker and rattan furniture
3  and accessories.
4    Q.  Did you have a store?
5    A.  Yes.
6    Q.  Where was the store?
7    A.  At one time we had just the Chalmette
8  location, then we had the Chalmette location, a
9  Slidell location and a Metairie location.
10    Q.  When did you and your wife form
11  Tropical Paradise, Inc.?
12    A.  I think it was '79.
13    Q.  This was before you formed Mr. Ribbon.
14    A.  Yes.
15    Q.  As between yourself and your wife, who
16  was the driver behind Tropical Paradise, if
17  either one?
18    A.  What do you mean driver?
19    Q.  Well, that's not a very good question,
20  but who was primarily responsible for the
21  operation of that business?
22    A.  We both were.  Her more so than me
23  because I was working at Kaiser and she was
24  taking care of the business.
25    Q.  What -- at some point you ceased to do

11 (Pages 38 to 41)

RICHE, MICHAEL

8/6/2008

Page 42

1    business as Tropical Paradise, Inc., right?
2        A.   Right.
3        Q.   What happened to that business?
4        A.   In the recession of '82 we had to
5    bankrupt.
6        Q.   Did you go Chapter 11?
7        A.   Right.
8        Q.   Did the business emergency from
9    Chapter 11 bankruptcy?
10       A.   No.
11       Q.   Apart from the Chapter 11 bankruptcy
12   of Tropical Paradise, Inc., have you ever been
13   part of a bankruptcy proceeding?
14       A.   No.
15       Q.   Describe your business Mr. Ribbon.
16       A.   Now or before the storm?
17       Q.   Before the storm.
18       A.   Before the storm?  Okay.  We had a
19   store location on Judge Perez where we sold
20   wholesale and retail, and then I had a truck
21   that I work out of calling on the retail
22   florists selling wholesale to them.
23       Q.   For how many years before the storm
24   did your business Mr. Ribbon work both from the
25   store location and from the truck calling on

Page 43

1    retail operations?
2        A.   For the first I guess two or three
3    years I just did wholesale.  And then my dad
4    passed away and my mom was going crazy just
5    sitting home, so then I opened up a store and
6    she worked in the store.  So it was about '88,
7    '89, something like that that we opened up the
8    store.
9        Q.   Your store was at the same Judge Perez
10   address when you opened it in '88 or '89?
11       A.   No.  No, we opened, um -- on Judy
12   Drive.  We rented a spot there.  And then when
13   the lease was up they wanted to double our rent
14   because we were still in business, so we moved
15   to another location.  And then the location was
16   bad, so then we moved to another location on
17   Judge Perez in that same shopping center.  And
18   then when that lease was up they wanted to
19   double the rent, so then we bought the location
20   where the flood got us.
21       Q.   For the first two or three years you
22   operated only out of your truck; right?
23       A.   Right.
24       Q.   And after that, for a number of years
25   you operated in leased property at Judy Drive

Page 44

1    and then later Judge Perez.
2        A.   Right.
3        Q.   During what year did you buy the Judge
4    Perez property that was damaged in the storm?
5        A.   I think it was about ten years before
6    the storm.  I'm not exactly sure of the year,
7    but ten or so.
8        Q.   From 1988 or '89 until the storm, your
9    business operated both in a store location and
10   doing retail calls with the truck to retail
11   stores.
12       A.   Right.
13       Q.   During the year or so before the
14   storm, did Mr. Ribbon have employees other than
15   yourself?
16       A.   Well, my mom was there every day, then
17   my daughter would come help us, and my wife.
18       Q.   Apart from your mother and your
19   daughter, were there other employees of your
20   business?
21       A.   Well, Randy was like a, um -- what you
22   call it, independent contractor.  I had a truck
23   that he would go out on the road to, and then
24   sometimes work in the store.
25       Q.   After Randy 's passing, did you have

Page 45

1    to hire someone to do the work that Randy had
2    been doing?
3        A.   No.  I didn't replace him.
4        Q.   Other than members of your family, did
5    Mr. Ribbon ever have employees?
6        A.   Yeah.  As subreps, you know.  At one
7    time I had three trucks on the road.
8        Q.   When did you have three trucks on the
9    road?
10       A.   I can't remember those dates.  Um --
11   it was I guess two or three years before the
12   storm.
13       Q.   Did you reduce the number of trucks
14   during the years before the storm?
15       A.   Yes.
16       Q.   Why did you do that?
17       A.   There was no sense in paying insurance
18   and all on trucks and letting them sit in the
19   parking lot.
20       Q.   Why were the trucks sitting in the
21   parking lot?
22       A.   Well, I tried to hire some other
23   people, and they would steal.  So I decided,
24   well, just don't worry about getting somebody
25   else, I'd do it myself.

12 (Pages 42 to 45)

RICHE, MICHAEL

8/6/2008

Page 46

1    Q.  The employees that you hired to try to
2  expand your business proved to be unreliable?
3    A.  Well, I had one of them that was good,
4  you know, but then he left.  And then I had
5  another one that I found out was stealing, so I
6  let him go and just kept the truck with myself
7  and my son, and then when my son passed away it
8  was just me.
9    Q.  As between the store and the truck,
10  which part of your business generated more
11  income in the year or two before the storm?
12    A.  It's probably the truck.
13    Q.  Where were the businesses that you
14  would visit in your truck before the storm?
15    A.  I went from, um -- Hattiesburg -- all
16  the way to Hattiesburg, and then I used to go
17  all the way to Pascagoula, and then to Morgan
18  City, and then north I'd go to, um -- to, um --
19  Prairieville.
20    Q.  Did you have any retail customers that
21  you'd visit with your truck in the Lower Ninth
22  Ward of New Orleans?
23    A.  You mean as far as to sell wholesale?
24    Q.  Yes, sir.
25    A.  No.  I had retail customers living in

Page 47

1  the Ninth Ward coming to the store and buying,
2  but I didn't go to them with my truck.
3    Q.  And you had retail customers who would
4  come to your store from Chalmette, too, right?
5    A.  Yes.
6    Q.  Some of your customers would come to
7  your store from the parts of Chalmette that
8  were east of Paris Road; right?
9    A.  Yes.
10    Q.  Can you give me a sense, today, as you
11  sit here, relative percentage of your customers
12  who came from east of Paris Road from those who
13  came from west of Paris Road in the Lower
14  Ninth?
15    A.  Well, I had customers coming from all
16  over, not just those areas.  I had some coming
17  from the west bank -- I never did, you know, a
18  survey as to who came from east of Paris Road.
19  Like I said, they came from all over; New
20  Orleans East, New Orleans, Metairie.
21    Q.  If you could open your store at Judge
22  Perez tomorrow, do you expect that you'd have
23  the same customer base that you had before the
24  storm?
25    MR. WIEDEMANN:

Page 48

1    I object to the form of the
2  question.
3    Subject to that objection you can
4  answer it.
5    It's an improper hypothetical.
6  EXAMINATION BY MR. RAFFMAN:
7    Q.  Can you answer?
8    A.  There's no way.  Nothing's the same.
9    Q.  One of the reasons that nothing's the
10  same is that large areas of New Orleans were
11  flooded and destroyed; right?
12    A.  Yes.
13    Q.  Not just the Lower Ninth Ward and the
14  area of Chalmette west of Paris Road, but other
15  areas, too, right?
16    A.  Right.
17    Q.  Your business has been affected by
18  flooding that happened in the areas outside the
19  Lower Ninth Ward and the area west of Paris
20  Road, hasn't it?
21    A.  It's been affected by all of it, yeah.
22    Q.  I'm showing you what's been marked as
23  Riche Exhibit Number 4.  Exhibit Number 4 is a
24  Google map with a red bubble.  Do you recognize
25  the red bubble, the letter A, as representing

Page 49

1  the location of your business property on Judge
2  Perez Drive?
3    (Exhibit 4 was marked for
4  identification and is attached hereto.)
5    A.  Yes.
6  EXAMINATION BY MR. RAFFMAN:
7    Q.  That location is where you had your
8  Mr. Ribbon store.
9    A.  Yes.
10    Q.  Apart from Mr. Ribbon, did you have
11  any other business interests at the time of
12  Hurricane Katrina?
13    A.  Other than the rental property, no.
14    Q.  You did have a rental property.
15    A.  Right.
16    Q.  The rental property is the only other
17  business interest apart from Mr. Ribbon at the
18  time of the storm; correct?
19    A.  Right.
20    Q.  What was the address of the rental
21  property?
22    A.  128 and 130 W. Phillip Court,
23  Chalmette.
24    Q.  When did you buy the rental property?
25    A.  I don't remember the exact date, but

Johns Pendleton Court Reporters          800 562-1285

BARGE001132

RICHE, MICHAEL

8/6/2008

Page 50

1  it was when my wife and I divorced.
2      Q.  Did you buy that property to live in
3  it while you were divorced?
4      A.  Right.
5      Q.  When you and your wife got together,
6  you moved back to the Charles Street home and
7  rented the Philip Court property.
8      A.  Right.  Rented the other side.  When I
9  was living there I rented one side and lived in
10  the other, and then when way got back together
11  I moved back to Charles and rented both sides.
12     Q.  I'm handing you what's been marked as
13  Riche Exhibit Number 5, which is yet another
14  Google map, and I would ask you whether the red
15  bubble with the letter A on Riche Number 5
16  represents the location of your Phillip Court
17  property.
18     A.  Yes.
19     Q.  Was 128 Phillip Court rented at the
20  time of Katrina?
21     A.  Yes.
22     Q.  For how long prior to the storm had
23  128 West Phillip Court been rented?
24     A.  Since I bought it.
25     Q.  At the time of Katrina, what was the

Page 51

1  monthly rent that you were receiving from that
2  property?
3      A.  $575.
4      Q.  And at the time of Hurricane Katrina,
5  was 130 West Phillip Court rented?
6      A.  Yes.
7      Q.  For how long prior to the storm was
8  that property rented?
9      A.  Since my wife and I got back together.
10     Q.  It was rented continuously since you
11  and your wife got back together.
12     A.  Right.
13     Q.  What was the monthly rent on that
14  property?
15     A.  Same.
16     Q.  Turning your attention to the
17  Mr. Ribbon property, was the address of that
18  property 8825-27 West Judge Perez Drive?
19     A.  Yes.
20     Q.  Would you describe that property for
21  me, please.
22     A.  It's a two-story building, 20 x
23  100-foot in Village Square Shopping Center.
24     Q.  Describe Village Square Shopping
25  Center.

Page 52

1      A.  Village Square Shopping Center is a
2  shopping center that's individually owned.  And
3  I would say they had about 80 or so businesses
4  in it.
5      Q.  Does it sit right on Judge Perez
6  Drive?
7      A.  You've got a parking lot and the
8  shopping center is in the back of the parking
9  lot.
10     Q.  So if you're driving on Judge Perez
11  Drive, you would turn into a parking lot, park
12  your car and then go into the shops.
13     A.  Correct.
14     Q.  There are about 80 shops that are a
15  part of that shopping center?
16     A.  About 80 units.  Some of the
17  businesses had more than one unit.
18     Q.  What are some of the other businesses
19  that were in the Village Square Shopping Center
20  before the storm?
21        MR. WIEDEMANN:
22            I take it the question is what
23        were some of the other businesses.
24        Right?
25        MR. RAFFMAN:

Page 53

1            Yes.  Yes.
2        MR. WIEDEMANN:
3            Pre-Katrina.
4        MR. RAFFMAN:
5            Pre-Katrina, yeah.
6      A.  Let's see.  There was restaurants,
7  there was a printing shop, um -- lawyer's
8  office, barrooms -- bars, um -- I think there
9  was a T-shirt shop, a vitamin shop, beauty
10  shop, barber shop -- I'm trying to remember
11  some of the others -- there was a church, a
12  cigarette shop.  That's all I can remember
13  right now.  There was all types of shops.
14  EXAMINATION BY MR. RAFFMAN:
15     Q.  You were there at that Judge Perez
16  location for over fifteen years, right?
17     A.  Somewheres around there.  I don't
18  think it's over fifteen, because I had rented
19  one section -- one unit in Village Square, and
20  then I bought the ones where we were at then.
21     Q.  I'm sorry.  My arithmetic isn't very
22  good.  You bought the Judge Perez property in
23  1997, right?
24     A.  Somewheres around there.  I don't know
25  exactly when.

14 (Pages 50 to 53)

RICHE, MICHAEL

8/6/2008

Page 54

1    Q.  You were there as an owner of that
2  property for eight to ten years, maybe?
3    A.  Something like that, yeah.
4    Q.  During the time that you were there in
5  the Judge Perez property, did you observe other
6  businesses come and go?
7    A.  Not that many.  A lot of them had been
8  there for a while, and then the ones that came
9  were still operating, you know.  There's I
10  think one business that I can remember what
11  used to be a shoe store there, but they're not.
12    Q.  What happened to the shoe store?
13    A.  Well, they were located further down
14  the shopping center right by a barroom, and
15  they were having problems there, you know, with
16  the barroom customers panhandling and all, you
17  know, so they closed it up.
18    Q.  The shoe store didn't work at that
19  location.
20    A.  The shoe store did work at that
21  location until the barroom had opened up.
22    Q.  The barroom affected the shoe store 's
23  business.
24    A.  Right.
25    Q.  And the shoe store wasn't able to make

Page 55

1  a go of it after the barroom came in.
2    A.  No.
3    Q.  Is that correct?
4    A.  That's what I assume.  That's what I
5  heard.
6      MR. WIEDEMANN:
7        Counsel, we've been at this
8      nearly an hour and a half.  How about
9      a short break?
10      MR. RAFFMAN:
11        Sure.
12      (Brief recess.)
13  EXAMINATION BY MR. RAFFMAN:
14    Q.  You had described your property on
15  Judge Perez as a two-story building 20 X
16  100 feet.  And to follow-up, what did you have
17  on the first story of your business?
18    A.  First floor I had ribbon and silks,
19  silk flowers, and little novelty items.
20    Q.  What did you have on the second floor?
21    A.  Ribbon and silks and little novelty
22  items.  Part of the second floor was showroom,
23  and part of it was warehouse.
24    Q.  Was the first floor only a showroom
25  area?

Page 56

1    A.  Right.  That was showroom and then the
2  register.
3    Q.  As between the first and second floor
4  of your business, where was most of the
5  inventory kept?
6    A.  Most of the ribbon was downstairs on
7  the first floor.  Upstairs was mostly silks,
8  paint, styrofoam products, film and foil, the
9  bigger items.
10    Q.  When you say bigger, you mean bigger
11  in size or volume?
12    A.  In size or volume, right.  So they
13  can't stick it in their pocket, you know, when
14  they're upstairs, you know.  And the smaller
15  items were downstairs.
16    Q.  In your store, did the size of an item
17  have any relationship to its price or value?
18    A.  Not really.
19    Q.  Smaller items might have been more
20  expensive than bigger items?
21    A.  Right.
22    Q.  Or maybe not.
23    A.  Right.
24    Q.  Do you have any pre-storm pictures of
25  the Judge Perez property?

Page 57

1    A.  No.
2    Q.  Do you know when the building was
3  built?
4    A.  No, I sure don't.
5    Q.  I'm showing you what's been marked as
6  Riche Exhibit 6.  Do you recognize this
7  document?
8      (Exhibit 6 was marked for
9  identification and is attached hereto.)
10    A.  Yes.
11  EXAMINATION BY MR. RAFFMAN:
12    Q.  What is it?
13    A.  That's the title to the property on
14  Judge Perez when I bought it from Frank.
15    Q.  Did you know Frank Drewes and the
16  other two people listed on this document before
17  you bought the property?
18    A.  I only knew Frank when I saw that he
19  had a property for sale and I started talking
20  to him about buying the property.
21    Q.  How much did you pay for the Judge
22  Perez property?
23    A.  I think I was ninety thousand.
24    Q.  If you look at the third page of
25  Exhibit 6, you'll see the amount ninety

Johns Pendleton Court Reporters                    800 562-1285

BARGE001134

RICHE, MICHAEL

8/6/2008

## Page 58

1    thousand there at the top.
2         A.  Right.
3         Q.  Did you take a mortgage to buy the
4    Judge Perez property?
5         A.  Yes.
6         Q.  How much was the mortgage?
7         A.  I'm not exactly sure how much it was.
8         Q.  Did you take a sixty thousand dollar
9    collateral mortgage in 2001?
10        A.  With who?  Because I had it mortgaged
11   with one company, I think, and then I switched
12   over to Whitney Bank.  It might have been the
13   one you're talking about, the sixty thousand.
14        Q.  The $60,000 mortgage was the one that
15   you took second; right?
16        A.  I believe so, yes.
17        Q.  At the time of Katrina, had you paid
18   off that $60,000 mortgage?
19        A.  No.
20        Q.  Have you paid that mortgage off now?
21        A.  They took it out of the insurance
22   money.
23        Q.  The answer is yes, the mortgage has
24   been paid off now; correct?
25        A.  Yes.

## Page 59

1         Q.  All right.  To your knowledge, had the
2    Judge Perez property ever flooded before
3    Hurricane Katrina?
4         A.  No.
5         Q.  What was the condition of the Judge
6    Perez property at the time of Hurricane
7    Katrina?
8         A.  Good.
9         Q.  You bought the property in 1997;
10   correct?
11        A.  Right.
12        Q.  Between 1997 and the time of the
13   storm, what renovations did you undertake, if
14   any, in the building?
15        A.  Well, when I bought the building I cut
16   a whole in that second floor so that you could
17   see part of the upstairs.  Um -- I think I
18   replaced the air conditioning unit.  Um -- took
19   some walls down from upstairs to make it open,
20   built some other walls to make a warehouse
21   section.  And I think that's about it.
22        Q.  When was the last time, before
23   Hurricane Katrina, that the building had a new
24   roof?
25        A.  It had -- it didn't have a new roof

## Page 60

1    since I've been there.  I've had some repairs
2    done on it, but I've never put a new roof.
3         Q.  Do you know whether there had ever
4    been termites in that property?
5         A.  Not to my knowledge.
6         Q.  How much of the $60,000 mortgage was
7    owed at the time of Hurricane Katrina?
8         A.  I'm not exactly sure.  I think it was
9    around 27 to 30,000, something like that.
10        Q.  The rest had been paid down over the
11   years since you took the mortgage.
12        A.  Correct.
13        Q.  What was the tax assessed value of
14   your Judge Perez property before the storm?
15        A.  I don't remember.
16        Q.  Had there been any appraisals of your
17   Judge Perez property before the storm?
18        A.  No.
19        Q.  The units in the Village Square
20   Shopping Center were individually owned by the
21   proprietors of the stores there; right?
22        A.  Right.
23        Q.  Had there been any sales of units in
24   Village Square during the two years before the
25   storm?

## Page 61

1         A.  Not that I'm aware of.
2         Q.  At the time of the storm your business
3    was using one truck; right?
4         A.  Right.
5         Q.  Where was the truck during the storm?
6         A.  Parked in a parking lot in front of
7    the store.
8         Q.  Describe for me the house on West
9    Phillip Court.
10        A.  It's a two-story townhouse, two
11   bedrooms, one and a half bath, brick.
12        Q.  How big is the lot?
13        A.  I don't know exactly.  Probably 50 X
14   100, something like that.
15        Q.  I'm handing you Riche Exhibit Number
16   7.  It bears Bates stamp numbers Riche 000010
17   through 000020.  Mr. Riche, do you recognize
18   this document as the sale document for the
19   Phillip Court property?
20            (Exhibit 7 was marked for
21   identification and is attached hereto.)
22        A.  Yes.
23   EXAMINATION BY MR. RAFFMAN:
24        Q.  Did you know any of the sellers before
25   buying the property?

16 (Pages 58 to 61)

RICHE, MICHAEL

8/6/2008

Page 62

```
1      A.  No.
2      Q.  You bought the property in 1999?
3      A.  Yes.
4      Q.  Had you been renting this property
5  before you bought it?
6      A.  No.
7      Q.  Did you live somewhere other than the
8  Phillip Court property around the time of your
9  divorce, as you were getting divorced from your
10 wife?
11     A.  I lived in the store.
12     Q.  How long did you live in the store?
13     A.  I don't recall.  Too long.
14     Q.  So you moved out of your home, lived
15 in the store for a while, until you could get
16 yourself a place?
17     A.  Right.
18     Q.  Did you take a mortgage to buy the
19 Phillip Court property?
20     A.  Yes.
21     Q.  At the time of the storm, had that
22 mortgage been retired?
23     A.  No.
24     Q.  Is the mortgage retired now?
25     A.  Yes.
```

Page 63

```
1      Q.  How did that mortgage come to be
2  retired?
3      A.  They took the flood money, too.
4      Q.  The mortgage company took the money
5  that you received from your insurance.
6      A.  Correct.
7      Q.  So you own both the Judge Perez and
8  the Phillip Court property free and clear
9  today.
10     A.  Yes.
11     Q.  Did you have flood insurance on the
12 Judge Perez property?
13     A.  Yes.
14     Q.  Did you have flood insurance on the
15 Phillip Court property?
16     A.  Yes.
17     Q.  With which insurance company did you
18 have that flood insurance?
19     A.  Fidelity.
20     Q.  Do you have documentation regarding
21 your Fidelity flood insurance policy?
22     A.  What do you mean documentation?
23     Q.  Do you have a copy of the policy?
24     A.  No.
25     Q.  Do you have a copy of the claim that
```

Page 64

```
1  you made with Fidelity?
2      A.  Yes.
3      Q.  Do you have a copy of the documents
4  evidencing payments by Fidelity on your
5  insurance claim?
6      A.  Yes.
7      Q.  Did you provide those documents to
8  your lawyers so that they could be produced to
9  Lafarge North America in this lawsuit?
10     A.  Yes.
11         MR. RAFFMAN:
12            I don't believe I have seen those
13         documents.  We'll go back and check to
14         see whether they were produced, and if
15         not we'll follow up in writing.
16 EXAMINATION BY MR. RAFFMAN:
17     Q.  That's for counsel's benefit, not for
18 you, Mr. Riche.
19         MR. WIEDEMANN:
20            Of course.
21 EXAMINATION BY MR. RAFFMAN:
22     Q.  Was the Phillip Court property raised
23 up off the ground?
24     A.  No, it's on a slab.
25     Q.  Do you know the elevation of the
```

Page 65

```
1  Phillip Court property, above sea level, below
2  sea level?
3      A.  Don't know.
4      Q.  Same question for Judge Perez.
5      A.  Don't know.
6      Q.  Do you know whether there had been any
7  previous flooding at the Phillip Court
8  property?
9      A.  Not to my knowledge.
10     Q.  Am I correct that the Phillip Court
11 property sits next to or near at least one
12 drainage canal or a canal of some type?
13     A.  Not that I can think of.
14     Q.  What condition was the Phillip Court
15 property at the time of the storm?
16     A.  Good.
17     Q.  Had you made any renovations to the
18 property during the time that you owned it?
19     A.  Yes.  I had put a patio cover all
20 across the back.
21     Q.  Patio cover across the back.
22     A.  Uh-huh.
23     Q.  This was something to provide shade
24 for the patio?
25     A.  Right.
```

17 (Pages 62 to 65)

RICHE, MICHAEL

8/6/2008

Page 66

1     Q.  Can you describe how that was built,
2  what that was like?
3     A.  Metal, with the metal posts and metal
4  roof.
5     Q.  How much did you spend on that patio
6  cover?
7     A.  It was around two thousand.
8     Q.  When did you put that patio cover on?
9     A.  It was when I was living there.  Um --
10  maybe six, seven years.
11     Q.  It would have been six or seven years
12  before the storm?  Well, let's --
13     A.  I don't want to pull a Ray Nagin on
14  you.  Let's see.  Whatever.
15     Q.  Well, it was a few -- you were
16  divorced for three years.
17     A.  Right.
18     Q.  So if you bought the property in 1999,
19  then is it fair to use 2002 as the time when
20  you got back with your wife, give or take?
21     A.  Right.
22     Q.  So in the three years that you --
23  around three years before the storm, you moved
24  back with your wife and began to rent these
25  properties, right?

Page 67

1     A.  Right.
2     Q.  During the three years after you moved
3  out of the Phillip Drive property, what if any
4  renovations did you do to that property?
5     A.  I don't think I did anything.
6     Q.  What happened to the patio cover in
7  the storm?
8     A.  Half of it got ripped off and the
9  other half is still there.
10     Q.  The half that got ripped off was
11  ripped off by the wind; right?
12     A.  I have no idea.
13     Q.  How high did the patio cover sit above
14  the ground?
15     A.  I'd say about eight to ten feet.
16     Q.  Could you tell when you returned
17  whether the floodwaters had gone higher than
18  the top of the patio cover?
19     A.  I couldn't tell.  It looked like it
20  was about even, maybe, I don't know.
21     Q.  What was the tax assessed value of
22  your Phillip Court property?
23     A.  I don't remember.
24     Q.  Had there been any appraisal done on
25  your Phillip Court property in the two or three

Page 68

1  years before the storm?
2     A.  No.
3     Q.  Were there any sales of homes in the
4  Phillip Court neighborhood before the storm?
5     A.  Not to my knowledge.
6     Q.  Do you have any pre-storm pictures of
7  the Phillip Court property?
8     A.  I don't know if they had some in with
9  the title or not.  I'm not sure.  That would be
10  the only ones I'd have.
11     Q.  When was the Phillip Court property
12  built?
13     A.  I don't know.
14     Q.  Two-story property?
15     A.  I don't know.  Yeah, it's two-story.
16  I don't know when it was built.
17     Q.  Where were you living at the time of
18  Hurricane Betsy?
19     A.  Betsy.  I was in New Orleans.
20     Q.  What part of New Orleans?
21     A.  It was Iberville Street.
22     Q.  Which is on the west side of the
23  Industrial Canal, right?
24     A.  Right.
25     Q.  You didn't get flooded during Betsy.

Page 69

1     A.  No.
2     Q.  Did you evacuate during Betsy?
3     A.  No.
4     Q.  Before Hurricane Katrina, did you
5  evacuate for any previous hurricanes?
6     A.  Yes.
7     Q.  Which ones?
8     A.  Just about all of them.
9     Q.  Why did you do that?
10     A.  Because, um -- when I worked at Kaiser
11  I had to stay, so I would evacuate my family,
12  make sure they were safe because if the storm
13  came I couldn't get to them.  And after Kaiser
14  shut down, or whenever a storm was coming, you
15  know, then we'd go visit my son in, you know,
16  Mississippi.
17     (Off the record.)
18  EXAMINATION BY MR. RAFFMAN:
19     Q.  Why wouldn't you stay in New Orleans
20  during a hurricane if you thought one was
21  coming?
22     A.  Because whenever we would evacuate,
23  we'd always bring my mom with us, you know,
24  and, um -- it was basically to visit my son.
25  You know, it would give us an excuse to go see

18 (Pages 66 to 69)

RICHE, MICHAEL

8/6/2008

Page 70

1  them.
2      Q.  It was nothing to do with the safety
3  of your mom or your family or anyone else.
4      A.  Oh, yeah.  That, too, you know.  But
5  for this one, for Katrina, I wasn't going to
6  leave, you know, because they were saying it
7  was going to turn.  And then that Saturday
8  before, everyone was calling me, so I said,
9  okay, let's go.
10      Q.  Tell me what you understood about the
11  storm 's trajectory up until that Saturday.
12      A.  It was supposed to be turning towards
13  the east, going to Florida.
14      Q.  As of Friday, August 26th, 2005, as
15  far as you were concerned the storm was headed
16  where?
17      A.  Towards Florida.
18      Q.  What did you here on Saturday --
19  sorry, from where did you hear -- what was your
20  source of information about the storm 's
21  trajectory on Friday and before?
22      A.  Friday and before was, um -- the
23  newscast on TV.
24      Q.  The newscasters on the television were
25  saying that the storm was going to turn and go

Page 71

1  to Florida.
2      A.  Correct.
3      Q.  What was the first time that you heard
4  the storm might or would be headed toward New
5  Orleans?
6      A.  I think it was that Sunday.
7      Q.  What if anything did you hear about
8  the storm's trajectory on Saturday, the 27th of
9  August?
10      A.  Well, to my knowledge it was still
11  supposed to be going to Florida, but
12  everybody -- you know, my daughter, my wife, my
13  mom, my son in Jackson, you know, were all
14  calling me telling me, you know, y'all come on
15  up for a visit, you know.  And as always, you
16  know, you can go back Monday morning and all,
17  you know.  So I decided well, okay, I might as
18  well go, you know, make everybody happy.  Thank
19  God we did.
20      Q.  During that Saturday when you were
21  receiving all of those phone calls, where were
22  you physically located?
23      A.  In the store.
24      Q.  Where was your wife?
25      A.  My wife was home.

Page 72

1      Q.  Where were the other relatives who
2  were calling you?
3      A.  At their homes.
4      Q.  Some of their homes -- your son was in
5  Mississippi.
6      A.  Right.
7      Q.  And the others, where were they
8  located?
9      A.  My mom was at her house on Pakenham
10  Avenue.  My daughter was at her house, um -- I
11  forget the name of the street, but it was
12  further down in St. Bernard.  And my wife was
13  at home on Charles.
14      Q.  After you received all those calls on
15  Saturday, what did you do next?
16      A.  Closed the store, went picked up my
17  mom, and then went home and got my wife and the
18  baby, and we went to Jackson -- well, Brandon.
19      Q.  Did you board up the windows or do
20  anything else to prepare your properties for
21  the storm?
22      A.  No.
23      Q.  What day did you leave?
24      A.  Saturday.
25      Q.  What time of day?

Page 73

1      A.  About one o'clock.
2      Q.  How did you get from Chalmette to
3  Brandon?
4      A.  We drove.
5      Q.  Which car did you drive?
6      A.  The SUV.
7      Q.  Who was who was in the car with you?
8      A.  My wife, my granddaughter and my mom.
9      Q.  Did you leave any motor vehicles
10  behind?
11      A.  Yes.
12      Q.  Which ones?
13      A.  I left my work truck, which was a Ford
14  van, and I also left a GMC van.
15      Q.  You said the work truck was parked at
16  Judge Perez, right?
17      A.  Right.
18      Q.  Where was the GMC van parked?
19      A.  In front of my house.  I parked it in
20  the yard in front of the windows of the house
21  to try to shield the windows in case anything
22  flew.
23      Q.  Was there a mandatory evacuation order
24  in place at the time you left?
25      A.  No.

19 (Pages 70 to 73)

RICHE, MICHAEL

8/6/2008

Page 74

1    Q.  Did you ever hear about a mandatory
2  evacuation order?
3    A.  No.
4    Q.  Take a look -- I invite your attention
5  to the first page of Riche Number 1.  Look at
6  Paragraph Number 4.  Paragraph 4 of Riche
7  Number 1, this is the petition for damages
8  filed against the Lafayette Insurance Company,
9  and it reads, quote, as a result of mandatory
10  evacuation orders issued by city and parish
11  authorities, the owners and employees of
12  Mr. Ribbon evacuated St. Bernard Parish.
13      Do you see where it says that?
14    A.  Uh-huh.
15    Q.  Is that untrue?
16    A.  I don't remember any mandatory
17  evacuation when we left, no.
18    Q.  So the statement that I just read, is
19  that an untrue statement?
20    MR. WIEDEMANN:
21      Could you re read the statement
22      you're referring to, counsel?
23    MR. RAFFMAN:
24      Yeah.  Quote:  As a result of
25      mandatory evacuation orders issued by

Page 75

1      city and parish authorities, the
2      owners and employees of Mr. Ribbon
3      evacuated St. Bernard Parish.
4    A.  Yeah, I don't remember any mandatory
5  evacuation.
6  EXAMINATION BY MR. RAFFMAN:
7    Q.  The statement in that pleading might
8  or might not be true, but you don't remember
9  it.
10    A.  Right.
11    Q.  If there was a mandatory evacuation
12  order, you'd have complied with it, right?
13    A.  Yes.
14    Q.  You understood that if you stay behind
15  during a hurricane it could be dangerous.
16    A.  Yes.
17    Q.  Storms can cause serious damage.
18    A.  Yes.
19    Q.  Storms can hurt people.
20    A.  Yes.
21    Q.  Storms can kill people.
22    A.  Yes.
23    Q.  So it was a good idea for you and your
24  family to get out before the storm hit.
25    A.  Yes.

Page 76

1    Q.  Did you take anything with you when
2  you left?
3    A.  Three changes of clothes for
4  everybody.
5    Q.  You left the heirlooms behind.
6    A.  Yes.
7    Q.  These were things that were at your
8  home on Charles Street?
9    A.  Right.
10    Q.  You lost some heirlooms in the storm?
11    A.  Yes.
12    Q.  What are some of the heirlooms that
13  you lost in the storm?
14    A.  Well, the biggest thing we lost in the
15  storm was the pictures.  My wife used to take
16  them every time we'd evacuate before, but this
17  time she didn't take them because we thought
18  that the storm was going to turn.
19    Q.  And in previous storms she would take
20  the heirlooms because she was concerned that
21  they might get harmed in the storm.
22    A.  Right.
23    Q.  This particular storm you didn't take
24  them.
25    A.  Correct.

Page 77

1    Q.  The loss of the heirlooms and family
2  photos that were in your Charles Street home is
3  something else that weighs on you after the
4  storm; is that fair?
5    A.  Yeah.  Mainly on her.
6    Q.  So it weighs on her more than it
7  weighs on you?
8    A.  I would think so.
9    Q.  Your reaction and your wife's reaction
10  to losses in the storm are not the same; right?
11    A.  Um -- not exactly, no.  She's a woman.
12    Q.  When did you get up to Brandon on that
13  Saturday?
14    A.  I'm sorry.  What?
15    Q.  When did you get up to Brandon on that
16  Saturday?
17    A.  Um -- shoot, it took us a while to get
18  there.  I think it took us about maybe like six
19  hours, something like that.  Normally it's
20  about three and a half, four hours.
21    Q.  When did you learn that the area in
22  St. Bernard Parish had been flooded in Katrina?
23    A.  If I remember right, it was on Monday.
24  On the news on TV they were showing pictures.
25    Q.  When was the first time you heard

RICHE, MICHAEL

8/6/2008

```
                                              Page 78
 1   anything about a barge?
 2     A.  Like I told you earlier, I don't
 3   remember.  When my neighbors told me about it.
 4     Q.  How many months after the storm was
 5   that?
 6     A.  I don't recall.
 7     Q.  It was after you were living in, um --
 8   your home on the north shore, right?
 9     A.  I don't remember.  I don't remember if
10   it's after we had moved back or not.
11     Q.  Your neighbor told you about the barge
12   at the same time he told you that there was a
13   lawsuit; right?
14     A.  Right.
15     Q.  You joined the lawsuit against the
16   barge -- you signed up for the lawsuit against
17   the barge shortly after your neighbor told you
18   about it; right?
19     A.  Yes.
20     Q.  During the first several days that you
21   were in Brandon after the storm, you didn't
22   hear anything about a barge then, did you?
23     A.  No.
24     Q.  In fact, you didn't hear anything
25   about a barge until the time when your neighbor
```

```
                                              Page 79
 1   told you there was a lawsuit against the barge.
 2     A.  Correct.
 3     Q.  How did you learn about what happened
 4   to your home and your property in St. Bernard
 5   Parish?
 6     A.  Over the TV and the news.
 7     Q.  What did you see on the TV and the
 8   news?
 9     A.  Well, they showed an overall shot, and
10   you could see it was all underwater, and at one
11   point they even showed Village Square on the
12   news and I could see where the shop was all the
13   way up to the second floor.
14     Q.  Was this while you were still in
15   Brandon?
16     A.  Yes.
17     Q.  When was the first time that you came
18   back to Chalmette after the storm?
19     A.  I don't remember.
20     Q.  I have just a few more questions and
21   then we'll be at a break.
22         You didn't see the breach in the
23   Industrial Canal levee, did you?
24     A.  No.
25     Q.  Has anyone ever told you they saw what
```

```
                                              Page 80
 1   happened when the Industrial Canal levee
 2   breached and the water came in?
 3     A.  No.  The only thing I saw was, um --
 4   on the TV, I think it was on 48 Hours, they
 5   were showing something about the St. Bernard
 6   police on top of the government complex and
 7   talking about the water coming in from that
 8   way.
 9     Q.  Coming in from what way?
10     A.  Towards the Industrial Canal.
11     Q.  Leaving aside whatever you saw on the
12   48 Hours television show, has anyone ever told
13   you they saw what happened when the leave
14   breached and the water came in?
15     A.  No.
16     Q.  Has anyone ever told you they saw the
17   barge in the Industrial Canal?
18     A.  No.
19     Q.  Has anyone ever told you they saw the
20   barge hit the wall?
21     A.  No.
22     Q.  Has anyone ever told you they heard
23   the barge hit the wall?
24     A.  No.
25     Q.  Has anyone ever told you they were
```

```
                                              Page 81
 1   present when the wall came down and the water
 2   came into the Ninth Ward?
 3     A.  No.
 4     Q.  Do you have any knowledge, apart from
 5   what you've learned from your lawyers in this
 6   case, about what caused the failure of the
 7   Industrial Canal floodwall?
 8     A.  No.
 9     Q.  Do you have any knowledge, apart from
10   what you learned from your lawyers in this
11   case, about what caused the flooding of your
12   property on Judge Perez Drive?
13     A.  No.
14     Q.  Same answer for your Phillip Court
15   property.
16     A.  Right.
17     Q.  What about your Charles Street
18   property; do you have any knowledge, apart from
19   what you've learned from your lawyers in this
20   case, about what caused that flooding?
21     A.  No, other than what was on the news
22   about the MRGO.
23     Q.  There was a news report that suggested
24   that the MRGO caused the Charles Street
25   flooding.
```

21 (Pages 78 to 81)

BARGE001140

RICHE, MICHAEL

8/6/2008

Page 82

1       A.  Right.
2       Q.  Did that same news report say anything
3   about whether the same flooding that caused the
4   Charles Street damage also had any role in the
5   damage west of Paris Road?
6       A.  Not to my knowledge.
7       Q.  What do you think caused the flooding
8   of your home?
9       MR. WIEDEMANN:
10          I object to the form of the
11   question.
12          Subject to that, you can answer.
13      A.  I have no idea.
14   EXAMINATION BY MR. RAFFMAN:
15      Q.  What do you think caused the flooding
16   of your business?
17      A.  I have no idea.
18      Q.  What do you think caused the flooding
19   of the Phillip Court property?
20      A.  No idea.  I was gone.
21      (Lunch break.)
22   EXAMINATION BY MR. RAFFMAN:
23      Q.  Mr. Riche, we're back on the record.
24   I'm reading to you from a document that's filed
25   with the court, record document 13166.  It's a

Page 83

1   class certification motion.  And under your
2   name there's a category and it says street
3   addresses of properties for which damages are
4   sought, and under that category of street
5   addresses it lists Mr. Ribbon located at
6   8825-27 West Judge Perez Drive, and it lists
7   128-130 West Phillip Court in Chalmette.
8          Are those the two properties for which
9   you're seeking damages in this case?
10      A.  Yes.
11      Q.  You're not seeking damages for the
12   Charles Street property; right?
13      A.  No.
14      Q.  There's no other properties that we're
15   concerned with; right?
16      A.  No.
17      Q.  Bad question.  Let me ask it again.
18          Am I correct that there are no other
19   properties?
20      A.  I have no other properties.
21      Q.  You have no other properties at issue
22   in the lawsuit.
23      A.  No.
24      Q.  I'm really sorry to do this, I just
25   want to get a clean transcript.

Page 84

1          Am I correct that you have no other
2   properties at issue in the lawsuit except for
3   the Judge Perez property and the West Phillip
4   property?
5       A.  Right.
6       Q.  Thank you.  You told me before the
7   break you didn't remember exactly when you
8   first returned to Chalmette and saw the damage
9   to your property.  Did anything happen during
10   the break to refresh your recollection about
11   when it was that you first came back?
12      A.  No.
13      Q.  Whatever it was that you first came
14   back, what did you see what you visited the
15   Judge Perez property?
16      A.  A mess.
17      Q.  Describe the mess that you saw.
18      A.  Well, the front door had been kicked
19   in, and downstairs all the merchandise and the
20   shelves and all were all on the ground in the
21   mud about three to fur feet high and solid all
22   the way across the bottom floor.  And I had to
23   basically dig my way to the stairs to get
24   upstairs, and when I got upstairs I saw where
25   some ceiling tiles had come down, and there was

Page 85

1   some water in the store upstairs on the floor
2   towards front and also towards rear.
3       Q.  There were -- the mud on the first
4   floor was three to four feet high?
5       A.  No, not the mud, the merchandise in
6   the mud.  You know, the ceiling had come down,
7   you had insulation, and on the floor was mud
8   and merchandise all mixed in together like a
9   washboard.
10      Q.  Could you tell from anything you saw
11   how high the water had gotten in the store?
12      A.  Up to the second floor.
13      Q.  Up to the second floor.
14      A.  Right.
15      Q.  How high above the floor of the second
16   floor had the water gotten?
17      A.  I don't believe it went above the
18   floor.  I think it got up to the floor, but I
19   think it stopped.  I didn't see any evidence of
20   it going above the second floor.
21      Q.  Well, water had filled the entire
22   first story, right?
23      A.  Correct.
24      Q.  And then risen to the level of the
25   first story 's ceiling.

BARGE001141

RICHE, MICHAEL

8/6/2008

Page 86

1      A.  Correct.
2      Q.  And then possibly gotten as high as
3  the floor on the second story?
4      A.  Right.
5      Q.  But had not gone higher than the floor
6  of the second story?
7      A.  Right.
8      Q.  On the second story, you said there
9  was some evidence of damage at the roof.
10      A.  Correct.
11      Q.  What did you see there?
12      A.  Ceiling tiles had gotten wet and
13  fallen, and, um -- like I said, towards the
14  front and towards the back, and you could see
15  that some of the boxes had gotten wet.
16      Q.  The boxes had gotten wet because water
17  had come in through the roof?
18      A.  Correct.
19      Q.  The water that came in through the
20  roof would have been rainwater.
21      A.  Right.
22      Q.  The inventory that was in the boxes
23  that got wet, what had happened to that
24  inventory?
25      A.  It was ruined.  It was ruined.

Page 87

1      Q.  Ruined.
2      A.  Ruined, right.
3      Q.  That inventory had been ruined by the
4  rainwater that came in through the roof.
5      A.  Right.  On the second floor, right.
6      Q.  Did you take pictures of the Judge
7  Perez property when you came back?
8      A.  Yes, we took some pictures of it
9  downstairs, and then outside.
10      Q.  How many pictures did you take?
11      A.  I don't remember how many we took, but
12  I think I gave some to the lawyers.
13      Q.  Whatever you took you gave to your
14  lawyers to be produced in the lawsuit to the
15  defendants; right?
16      A.  Right.
17      Q.  I'm going to hand you Riche Exhibit 8
18  and 9.  Riche Exhibit 8 is a color -- pair of
19  color photographs, I will represent for the
20  record, that same photographs appear to have
21  been produced to us in black and white with the
22  Bates Number Riche 000183.  (Tendering.)  This
23  is Riche 8.
24      Riche 9 is two other photographs that
25  have been produced to us, black and white with

Page 88

1  a Bates number Riche 000184.  (Tendering.)
2      Directing your attention first to
3  Riche 8, can you identify that document for me?
4      (Exhibit 8 was marked for
5  identification and is attached hereto.)
6      A.  This is the bottom part.  This is the
7  storefront.  And the top picture is the inside
8  shot from the front door looking into the
9  store.
10  EXAMINATION BY MR. RAFFMAN:
11      Q.  Are the photos in Riche 8 among the
12  photos that you took when you returned to your
13  business address?
14      A.  Yes.
15      Q.  The top picture in Riche 8 shows the
16  store as viewed from what vantage point?
17      A.  From the front door looking into the
18  store.
19      Q.  How high is the ceiling in the store?
20      A.  Um -- I'd say it was about ten to
21  twelve feet.
22      Q.  In the middle of the picture, there's
23  a white square.  Do you see that?
24      A.  Yes.
25      Q.  Do you see that it has letters in it

Page 89

1  that appear to say upstairs?
2      A.  Correct.
3      Q.  Tell me, what is that white square in
4  relation to the property?
5      A.  Okay.  I had put a sign there to let
6  people know what kind of merchandise was
7  upstairs.  It was like silk flower bushes,
8  foil, film, paint, dried flowers.
9      Q.  So that sign is on the first floor and
10  visible from the floor of the first floor,
11  right?
12      A.  Right.  You see, you had the first
13  floor and the ceiling, and then you had about a
14  two-foot space with your air conditioning ducts
15  and all, and then at the top there you can see
16  where there was a rail up top, and that was the
17  second floor.
18      Q.  So that rail that appears in the very
19  upper part of this picture is the second floor.
20      A.  Right.
21      Q.  The second floor is visible from the
22  first floor as the property existed before the
23  storm.
24      A.  Right.
25      Q.  I could walk into your store before

Johns Pendleton Court Reporters                    800 562-1285
BARGE001142

RICHE, MICHAEL

8/6/2008

Page 90

1  the storm and I could see that railing.
2      A.  Excuse me?
3      Q.  I could walk into the store before the
4  storm and I could see that railing from where I
5  was standing on the first floor?
6      A.  Right.  Remember the renovations you
7  asked me that I made?  Well, that's the hole I
8  had cut in so you could see upstairs.
9      Q.  Okay.  The lower picture on Riche 8 is
10  the front of your store, right?
11      A.  Correct.
12      Q.  The parking lot at Village Square is
13  to the left of the buildings in this picture?
14      A.  Right.
15      Q.  This picture shows a part of the
16  storefronts in the Village Square mall,
17  correct?
18      A.  Right.
19      Q.  If you look at the bottom part of
20  Riche 8, the storefront, there is an arrow
21  drawn on that.  Do you see that?
22      A.  Yes.
23      Q.  Did you draw that arrow?
24      A.  I don't remember if I did or not.
25      Q.  The arrow is pointing toward a portion

Page 91

1  of the roof that's on the top of your property,
2  right?  Do you see the part of the roof?
3      A.  Right.
4      Q.  The underside of the roof has a
5  segment that's white and then another segment
6  that's dark.  Do you see that?
7      A.  Yes.
8      Q.  Can you tell me what the white and the
9  dark parts are of the underside of the roof in
10  that photo?
11      A.  Yeah.  That's the plywood, and part of
12  the plywood must have blew off during the
13  storm.
14      Q.  The white part that you see in that
15  photo is the plywood that was there before the
16  storm.
17      A.  Right.
18      Q.  The dark part is the empty space that
19  was left when the plywood blew off during the
20  storm.
21      A.  Exactly.
22      Q.  Water didn't get that high on your
23  building, did it?
24      A.  No.
25      Q.  Riche 9:  Can you tell me what is

Page 92

1  shown -- before that, the two pictures in Riche
2  9, did you take those pictures?
3      (Exhibit 9 was marked for
4  identification and is attached hereto.)
5      A.  Yes.
6  EXAMINATION BY MR. RAFFMAN:
7      Q.  Did you take those pictures at the
8  same time you took the pictures in Riche 8?
9      A.  Yes.
10      Q.  Were the pictures taken the first time
11  you visited the store after the storm?
12      A.  I don't remember if it was the first
13  time.  It probably was, but I don't remember.
14      Q.  Apart from the pictures that are shown
15  in Riche 8 and Riche 9, did you take other
16  pictures of your property after the storm?
17      A.  No.
18      Q.  Okay.  Then tell me what is shown in
19  the Riche 9 pictures.
20      A.  That's again pictures of the store
21  lacking from front to back.
22      Q.  Both of these are the first floor?
23      A.  Right.
24      Q.  The inventory had been piled up on
25  blue shelves?

Page 93

1      A.  Some were blue, some were other
2  colors.
3      Q.  Some of the blue shelves had fallen
4  over?
5      A.  Most of them, yes.
6      Q.  At least one of them hadn't fallen
7  over; right?
8      A.  Right.
9      Q.  Was any inventory on the first floor
10  of your business salvageable after the storm?
11      A.  No.
12      Q.  Was any inventory on second floor of
13  your business salvageable after the storm?
14      A.  Yes.
15      Q.  How much of the second floor inventory
16  were you able to salvage?
17      A.  Um -- I'd say about 80 percent of it
18  so far, but I haven't gone through box by box
19  yet, you know.  Um -- about 80 percent, I'd
20  say, from upstairs.
21      Q.  When you came back to Chalmette after
22  the storm, did you also go to the Phillip Court
23  property?
24      A.  Yes.
25      Q.  What did you see when you visited that

24  (Pages 90 to 93)

RICHE, MICHAEL

8/6/2008

Page 94

1  property?
2      A.  I saw that the front door had -- front
3  doors had been kicked in, and that, you know,
4  everything was full of mud, and everything was
5  in disarray again.  And, um -- I went upstairs
6  and saw that the water had gotten right up to
7  the second floor there, also.  In fact, there,
8  it had gone above the second floor, because I
9  had to replace all the carpets.  All the
10  carpets and all were wet upstairs.
11      Q.  You said the doors had been kicked in
12  at both the Judge Perez and the Phillip Court
13  properties; right?
14      A.  Correct.
15      Q.  Did you mean to say that someone had
16  actually come to the property and physically
17  broken down the doors?
18      A.  I think so, because they were checking
19  for bodies or survivers or whatever.  That's
20  when they put the date and --
21      Q.  At Phillip Court, did you see any
22  damage to the roof?
23      A.  The roof?  Yes.
24      Q.  What had happened to the roof?
25      A.  Oh, I had a electrical vent up on the

Page 95

1  roof, you know, to ventilate the attic, and I
2  noticed that, um -- I assumed that the tenants
3  on that side had stayed, because there was
4  furniture stacked up, because there was no
5  ceiling, um -- or attic stairs, but they had
6  stacked up furniture to get up through the
7  attic, because the little attic door was gone.
8  And I don't know if it was the wind or if the
9  tenants kicked out that ventilator to get out,
10  you know, in case they had to get out through
11  the roof, you know.
12      Q.  The vents had been removed or taken
13  out either by the tenants or the storm.
14      A.  Right.
15      Q.  Apart from the loss of that vent, were
16  any of the -- was there any other damage on the
17  roof?
18      A.  There was roof damage.  You could see
19  where the ceilings got wet, you know, leaks.
20      Q.  So the -- portions of the roof had
21  developed leaks during the storm?
22      A.  Apparently so, yeah.
23      Q.  And some of the rain had gotten into
24  the house?
25      A.  Yeah.  Yeah.

Page 96

1      Q.  And the rain had damaged the ceiling
2  on the second floor.
3      A.  In some areas, yeah.
4      Q.  Was there any property missing from
5  your store?
6      A.  Not to my knowledge.
7      Q.  Was there any property missing from
8  your rental home?
9      A.  Not to my knowledge.
10      Q.  Did you hear about any looting that
11  happened in Chalmette after the storm?
12      A.  Yes.  After I finished gutting out my
13  house they came and cut out all my copper pipes
14  and stole them, busted up the air conditioning
15  unit to get copper out of there.
16      Q.  Copper -- I'm sorry.
17      A.  Go ahead.
18      Q.  Copper pipes were stolen out of your
19  house on Charles Street.
20      A.  Correct.
21      Q.  Nothing was taken from your Phillip
22  Court home.
23      A.  No.
24      Q.  Did you hear about any looting that
25  happened in the Village Square area during or

Page 97

1  after the storm?
2      A.  No, I didn't hear anything about it.
3      Q.  Did you hear about any looting that
4  happened in greater Chalmette after the storm?
5      A.  I heard rumors about looting going on,
6  you know, but --
7      Q.  Did you see any evidence of houses
8  that had burned during the storm when you came
9  back to see the property?
10      A.  I don't recall seeing any evidence of
11  any houses having burned down, but I do
12  remember seeing evidence of some of the stores
13  in Village Square Shopping Center that had
14  burned.  In fact, they showed that on the news,
15  too.  They showed -- it was around by a Super
16  Spuds, Pudgy's Super Spuds that was on fire,
17  and they had showed that on I think I was CNN.
18      Q.  During the storm, some of the stores
19  in Village Square had burned.
20      A.  Right.
21      Q.  You were able to identify those stores
22  as being in Village Square when you saw them
23  burning on the news.
24      A.  Yes.
25      Q.  When you returned to the Chalmette

25 (Pages 94 to 97)

RICHE, MICHAEL

8/6/2008

Page 98

1   area, did you see any evidence that trees had
2   been blown onto houses?
3       A.  I don't recall seeing any trees.  I
4   saw cars in trees, but I don't remember seeing
5   trees blown onto houses, no.  There weren't too
6   many trees around houses.
7       Q.  Did any of the properties in the area
8   of Village Square survive the storm reasonably
9   intact?
10      A.  Not to my knowledge.
11      Q.  Were there any businesses in Village
12  Square that were located on the second story of
13  the mall?
14      A.  You mean only on the second story?
15      Q.  Yes, sir.
16      A.  Um -- there was an attorney that had
17  an office on the second story I think two units
18  down, and -- let's see.  I don't remember if
19  any other ones just had second floor.  Usually
20  if they did have something on the second floor
21  it would be like an attorney's office or an
22  office, you know, something where the people
23  didn't have to climb the stairs to go up and
24  down.
25      Q.  Sure.  So this attorney had his office

Page 99

1   on second floor of a building in which there
2   was a different business on the first floor.
3       A.  Right.
4       Q.  Do you know whether the floodwaters
5   reached this attorney 's office on the second
6   floor?
7       A.  I don't know.
8       Q.  Was the second floor of this
9   attorney's office the same basic level as the
10  second floor of your building?
11      A.  I would imagine so.
12      Q.  I want to focus on your business
13  inventory, your inventory losses, and ask you
14  some questions about those.
15      A.  Okay.
16      Q.  Have you ever tried to figure out how
17  much money the inventory that you lost is
18  worth?
19      A.  Yes.
20      Q.  Have you created a list of the
21  business inventory that you lost in the storm?
22      A.  Yes.
23      Q.  I'm handing you what's been marked as
24  Riche Exhibit 10.  Can you identify that
25  document for me?

Page 100

1       (Exhibit 10 was marked for
2   identification and is attached hereto.)
3       A.  Yes.
4   EXAMINATION BY MR. RAFFMAN:
5       Q.  Is that the business inventory that
6   you were just describing in your testimony?
7       A.  Yes.
8       Q.  When did you create the business
9   inventory in Riche 10?
10      A.  I think I did that for trying to get
11  an SBA loan.
12      Q.  Did you create it in or around
13  December of 2005?
14      A.  Right.
15      Q.  Did you receive an SBA loan?
16      A.  No.
17      Q.  Did you receive a letter from the SBA
18  declining your loan?
19      A.  They said -- I didn't receive a letter
20  saying they declined, they said that I
21  withdrew.  And the reason for that was they
22  were requiring me to have insurance on all
23  three properties, with contents, at a cost of
24  ten thousand dollars, which I had no money to
25  get it with.

Page 101

1       Q.  I'm going to follow this tangent where
2   it goes.  Bear with me.  You applied for an SBA
3   loan sometime in late 2005.
4       A.  Right.
5       Q.  SBA told you that in order to get a
6   loan from them they would require you to buy
7   insurance on all three of your properties.
8       A.  Including contents, which there was
9   nothing there.
10      Q.  You thought it was unreasonable for
11  the SBA to be requiring insurance on contents
12  which were not present in those properties.
13      A.  Exactly.
14      Q.  The insurance, including contents
15  insurance, would have cost you how much?
16      A.  $10,000 for all three properties with
17  contents.
18      And I also asked the insurance
19  company, if something happens do you pay?  And
20  they said, absolutely not, not until the
21  properties are restored and restocked or
22  refurnished.  So it was like throwing $10,000
23  away to get an SBA loan.  And I didn't have the
24  $10,000 to begin with.
25      Q.  The SBA loan never materialized

26 (Pages 98 to 101)

BARGE001145

RICHE, MICHAEL

8/6/2008

Page 102

1  because you decided not to pursue the insurance
2  that they required; right?
3      A. I couldn't. I didn't have the money
4  the pay for the insurance.
5      Q. The SBA loan never materialized
6  because you were unable to procure the
7  insurance that they required.
8      A. Correct.
9      Q. Turning your attention back to Riche
10  10, what was the total amount of the contents
11  that were destroyed in the storm at Mr. Ribbon?
12      A. Well, this list here is Mr. Ribbon.
13      Q. You're referring to the first page of
14  Riche 10.
15      A. Correct.
16      Q. Where it says total ribbon, $66,500?
17      A. Correct.
18      Q. The first page refers to ribbon;
19  right?
20      A. Right.
21      Q. Total value of the ribbon that was
22  lost is what?
23      A. $66,500.
24      Q. Where in your store was that ribbon
25  stored?

Page 103

1      A. On the first floor.
2      Q. What other inventory was destroyed in
3  the storm, apart from the ribbon?
4      A. On Page 2, you'll see the silk
5  flowers, wedding flowers, bushes --
6      Q. Page 2, this is a Bates stamp Number
7  Riche 000173, correct?
8      A. Right.
9      Q. What was the total amount of the
10  destroyed inventory for the flowers?
11      A. $19,500.
12      Q. Where in your store were those flowers
13  kept?
14      A. First floor.
15      Q. The dollar amounts that are listed on
16  the first page for ribbon, does that represent
17  the cost to you of the ribbon?
18      A. Yes.
19      Q. The flowers listed on the second page,
20  does that represent the cost to you of the
21  flowers?
22      A. Yes.
23      Q. On the third page, what is indicated
24  on the third page of your inventory?
25      A. That's more inventory that was on the

Page 104

1  first floor, the wedding novelties, everyday
2  novelties, Christmas, everyday picks and
3  stickups, wedding aisle runners, floral tape.
4      Q. What is the total amount of the
5  inventory on the third page?
6      A. $14,000.
7      Q. This is the cost to you?
8      A. Yes.
9      Q. What about the fourth page, Mr. Riche;
10  what is included on the fourth page of this
11  inventory?
12      A. Okay, the fourth page is the shelves,
13  the cost of the shelves, the calculator, cash
14  register, security system, TV, pricing guns,
15  supplies, bags, pricing labels and also the
16  truck.
17      Q. What was the total amount you list on
18  the fourth page for all of those items?
19      A. $17,149.
20      Q. Where in your store were all of those
21  items kept? Leaving aside for the moment the
22  truck.
23      A. Right. All on the first floor.
24      Q. What was the basis for your assigning
25  values to each of those items here on the

Page 105

1  fourth page?
2      A. The see how much I had lost in the
3  storm with the business.
4      Q. I guess my question is, for things
5  like the security system and the television,
6  does that represent the cost to you of these
7  items?
8      A. Right.
9      Q. And the truck, does that represent the
10  cost to you of the truck?
11      A. Right. Seems kind of low, only two
12  thousand dollars for the truck. It was an old
13  one. No AC.
14      Q. How long had you had the truck?
15      A. I guess about five years, six years,
16  something like that.
17      Q. You had purchased the truck for $2000
18  six years before the storm?
19      A. Right.
20      Q. How long had you had the security
21  system?
22      A. Um -- we had the security system ever
23  since we were in that building, with the second
24  floor part of a showroom and all.
25      Q. You had purchased the security system

27 (Pages 102 to 105)

RICHE, MICHAEL

8/6/2008

Page 106

1  that many years earlier for $4000?
2      A.  Right.
3      Q.  How old were the shelves listed in the
4  top part of this page?
5      A.  Since I went into business.
6      Q.  You had purchased the shelves for
7  $2000?
8      A.  Right.  Most of the shelves I made, as
9  you can see in the photographs.
10     Q.  You had -- if you had made the
11 shelves -- how did you assign a value of $2000,
12 then, to the shelves?
13     A.  Lumber.
14     Q.  You had paid $2000 for the lumber that
15 was used to make the shelves that many years
16 before the storm.
17     A.  Right.  Right.
18     Q.  How old was the cash register?
19     A.  The cash register was I guess -- I
20 think it was the only one I bought, you know,
21 since I started the business.  They broke into
22 the store one time, but I think I was able to
23 repair it.  If I'm not mistaken, I didn't have
24 to buy another one, I don't think.
25     Q.  You had purchased the cash register

Page 107

1  for $350 many years before the storm.
2      A.  Right.
3      Q.  The values that you included in your
4  inventory are the original purchase prices for
5  each of those items regardless of how old they
6  were.
7      A.  Right.
8      Q.  The inventory Riche 10 does not
9  include any of the inventory on the second
10 floor, does it?
11     A.  No.
12     Q.  Why did you not include any of that
13 inventory on this list?
14     A.  Because when I made that list I didn't
15 know I had lost any inventory from upstairs
16 until I started moving boxes that were stacked
17 up by the ceiling and saw that there was some
18 leaks there, too, that had come down in the
19 boxes.
20     Q.  Am I correct, then, that this
21 inventory on Exhibit Riche 10 is only a part of
22 the total inventory that you lost in the storm?
23     A.  Right.
24     Q.  Did you ever come up with a different
25 value for the property that you lost, the

Page 108

1  business inventory that you lost at 8827 West
2  Judge Perez Drive?
3      A.  No, not that I know of.
4      Q.  I want to direct your attention back
5  to Riche Exhibit 1 and focus your attention at
6  the second page, Paragraph 8.  (Tendering.)
7  Reading from that paragraph, it says, at this
8  time petitioner Mike Riche d/b/a Mr. Ribbon
9  shows that its injuries are under the quantum
10 limit to allow for a jury trial since its
11 reasonable damages are less than fifty thousand
12 dollars.
13        Do you see that?
14     A.  Uh-huh.
15     Q.  Can you explain to me why your claim
16 against Lafayette Insurance Company which
17 included property damage was stated to be less
18 than fifty thousand dollars?
19     A.  Yeah.  Lafayette has the business
20 policy.  See, everything downstairs is supposed
21 to be flood.  Okay?  So they only want to know
22 what damages that was caused upstairs from the
23 wind and the roof damage and the rain.  So
24 that's why that's what the difference is on
25 here.

Page 109

1      Q.  The inventory on the first floor was
2  covered by a different insurance policy.
3      A.  Right.  Well, not with Lafayette.  It
4  was the same, but they claimed no flood, that I
5  had to collect from Fidelity for the flood that
6  was downstairs, so they would only pay what
7  wind and rain could cause, the damage.
8      Q.  Why did you sue Lafayette?
9      A.  Because they didn't pay me enough to,
10 um -- fix the building or to, um -- replace the
11 merchandise, you know, so that's why I'm suing
12 Lafayette.
13     Q.  How much are you suing Lafayette for?
14     A.  Well, um -- I have to look and see, I
15 think it's like -- they had me make a list of
16 what was damaged upstairs, and I think it was
17 around $17,000 in merchandise.  They admitted
18 that they only paid me for two air conditioning
19 units that was damaged up on the roof, um --
20 when there were three units up there.  They --
21 I forget how much they made paid me for the
22 roof, but I got an estimate on the roof and
23 that's $11,000.  They paid me $15,000 to
24 replace the roof, the air-conditioners, the
25 ceiling tiles and everything else, and no

28 (Pages 106 to 109)

BARGE001147

RICHE, MICHAEL

8/6/2008

Page 110

1  business interruption.  So that's why I'm suing
2  them.
3      Q.  So Lafayette paid you -- as long as
4  we're on Lafayette, I'm handing you what's been
5  marked as Riche Exhibit 11.  Do you recognize
6  Riche Exhibit 11?
7          (Exhibit 11 was marked for
8  identification and is attached hereto.)
9      A.  Yes.
10  EXAMINATION BY MR. RAFFMAN:
11      Q.  What is that?
12      A.  It's what Lafayette paid me.
13      Q.  Lafayette paid you what amount?
14      A.  $15,262.52.
15      Q.  Your testimony is this payment was
16  made for damage to the second story of your
17  business caused by wind and rain; correct?
18      A.  Right.
19      Q.  And it should also have included the
20  contents of your truck?
21      A.  Well, my policy said that my truck
22  contents was covered, and they said that's
23  excluded because of flood.
24      Q.  That's one of the disputes you have
25  with them about your policy.

Page 111

1      A.  Well, not really the truck, but what
2  they should have paid on the building.
3      Q.  Oh, okay.  Riche 11 is the letter from
4  the insurance company telling you what they're
5  going to pay; right?
6      A.  Right.  That's what they did pay.
7      Q.  You sued them to recover additional
8  money.
9      A.  Yes.
10      Q.  The amount of the additional money for
11  which you sued them is something less than
12  fifty thousand dollars.
13      A.  Right.
14      Q.  But you don't know exactly how much it
15  is.
16      A.  No.
17      Q.  How much did your flood insurance from
18  Fidelity pay you?
19      A.  On the business?
20      Q.  Let's start with that, yes.
21      A.  Now you're asking me to remember.
22  I've got the paperwork turned in.  I think the
23  business, though, was $90,000, I think it was.
24  But you should have all the paperwork on that.
25      Q.  I'll just say for the record I wish I

Page 112

1  had the paperwork on that, but I don't.  So
2  I'll ask you to do the best you can to
3  remember.
4          Did Fidelity provide flood insurance
5  for the Phillip Court property?
6      A.  Yes.
7      Q.  How much did they pay you on that
8  property?
9      A.  I think maybe the store was sixty and
10  Phillip was ninety.  I think that's more like
11  it, yeah.  I can't remember exactly.
12      Q.  Fidelity Insurance paid you $60,000 on
13  the store?
14      A.  I think so, yeah.
15      Q.  Fidelity Insurance paid you $90,000 in
16  flood insurance benefits on the Phillip Court
17  property?
18      A.  I think so.
19      Q.  You also had flood insurance on your
20  Charles Street property.
21      A.  Yes.
22      Q.  Is was that also with Fidelity?
23      A.  Yes.
24      Q.  How much did Fidelity paid pay you on
25  the Charles Street property?

Page 113

1      A.  I think it was $120,000.
2      Q.  So you received a total of $207,000 in
3  flood insurance benefits from Fidelity.
4      A.  Yes and no.
5      Q.  Fidelity paid $270,000 in flood
6  insurance benefits, and you received less than
7  that.
8      A.  Yes.
9      Q.  Let me break it up.  We'll get it
10  right.  Fidelity paid $270,000 in flood
11  insurance benefits; right?
12      A.  Yes.
13      Q.  Part of that was to retire your
14  mortgages.
15      A.  Exactly.
16      Q.  How much of it was to retire your
17  mortgages?
18      A.  I think Phillip Court was like, um --
19  76, 77, somewhere in there, thousand, and then,
20  um -- the store I think was like 27 to 30,000,
21  somewhere in there.
22      Q.  And after the mortgages were retired,
23  you received a payout of somewhere in the
24  neighborhood of $170,000?
25      A.  I guess so, if that's what it amounts

29 (Pages 110 to 113)

BARGE001148

RICHE, MICHAEL

8/6/2008

Page 114

1  to, yeah.
2      Q.  Apart from those two mortgages, there
3  was no other deduction from the Fidelity flood
4  insurance payout; correct?
5      A.  Correct.
6      Q.  Do you know whether your insurance
7  policy with Fidelity has a subrogation clause
8  in it?
9      A.  A what?
10     Q.  Do you know what subrogation is?
11     A.  No.
12     Q.  Do you know whether your policy with
13  Fidelity had a provision in it which says that
14  if Fidelity pays you money for your flood
15  damage and then if you recover damages from a
16  third-party tort defendant that you have to
17  reimburse Fidelity for the money that you
18  received from them?  Do you know whether it has
19  a provision like that in it?
20     A.  I don't know.
21     Q.  Did you have insurance with MetLife on
22  your Phillip Court property?
23     A.  Yes.
24     Q.  Did you submit a claim to MetLife?
25     A.  Yes.

Page 115

1      Q.  What happened to that claim?
2      A.  I think they gave me six thousand wind
3  damages.
4      Q.  I show you Riche 12.  (Tendering.)  It
5  bears a Bates stamp Riche 000165 through 171.
6  Do you recognize this document?
7         (Exhibit 12 was marked for
8  identification and is attached hereto.)
9      A.  Yes.
10  EXAMINATION BY MR. RAFFMAN:
11     Q.  What is this document?
12     A.  That's the letter I got from MetLife.
13     Q.  And in this letter MetLife told you
14  that they would make payment for the wind and
15  hurricane damage but not for the flooding,
16  right?
17     A.  Correct.
18     Q.  You haven't sued MetLife to recover
19  additional damages, have you?
20     A.  No, I haven't.
21     Q.  Did you submit an application to the
22  Louisiana Business Recovery Program?
23     A.  Yes.
24     Q.  Is that also known as the Road Home
25  Program, or is it something else?

Page 116

1      A.  No.  This was Louisiana small business
2  grant program.
3      Q.  The small business grant program is a
4  separate program from the Road Home.
5      A.  Right.
6      Q.  I hand you Riche 13.  Do you recognize
7  the document that's been marked as Riche
8  Exhibit 13?
9         (Exhibit 13 was marked for
10  identification and is attached hereto.)
11     A.  Yes.
12  EXAMINATION BY MR. RAFFMAN:
13     Q.  What is that?
14     A.  That's from the small business grant
15  program.
16     Q.  Did you receive a grant from the
17  Louisiana small business program?
18     A.  Yes, I did.
19     Q.  How much was that grant?
20     A.  Twenty thousand.
21     Q.  This was a grant as opposed to a loan?
22     A.  Right.
23     Q.  You don't have to pay it back.
24     A.  Correct.
25     Q.  What did you do with the money that

Page 117

1  you received from your grant?
2      A.  Um -- I bought inventory, ribbon.
3  They told me that that's the only thing I could
4  do with the money was by inventory, I couldn't
5  use it to repair any of the building.
6      Q.  When did you receive the twenty
7  thousand dollars from the Louisiana small
8  business program?
9      A.  I don't remember the dates, but I
10  received ten thousand, and then I had to
11  purchase the merchandise and then submit my
12  invoices to them, and then they, um -- reissued
13  the other $10,000.  Not reissue, but issued the
14  other $10,000.
15     Q.  You were able to purchase inventory
16  with the grant money and then sell that from
17  your truck.
18     A.  Correct.
19     Q.  You purchased the inventory and sold
20  it from your truck after Hurricane Katrina.
21     A.  Yes.
22     Q.  Have you participated in the Louisiana
23  Road Home Program?
24     A.  Yes.
25     Q.  For which properties?

30 (Pages 114 to 117)

RICHE, MICHAEL

8/6/2008

Page 118

1    A. Charles Drive.
2    Q. You sold your Charles Road property to
3 the Louisiana --
4    A. No, I didn't sell it. I took the
5 rebuild option.
6    Q. You're rebuilding your home on Charles
7 Drive?
8    A. Yes.
9    Q. What do you plan to do with it once
10 it's rebuilt?
11    A. I don't know now. My wife wanted to
12 go home, go home, go home. And now that she
13 goes there, she says, I don't know if I'm going
14 to be able to live here. I don't know.
15    Q. Are you in the process of rebuilding
16 that home?
17    A. Yes.
18    Q. How close are you to finishing?
19    A. I got the sheetrock up, I'm Kilzing it
20 knew, getting ready to paint it.
21    Q. Did you apply for a Road Home grant on
22 the Phillip Court property?
23    A. No. Road Home Program didn't cover
24 rental property.
25    Q. What if any repairs have you done on

Page 119

1 the Mr. Ribbon property, Judge Perez?
2    A. I tried to patch the roof up. And
3 like I said, I've gutted it out, and that's
4 about all I've done on it so far.
5    Q. How much have you spent on repairs for
6 the Judge Perez property?
7    A. The roof -- let's see, I bought tar
8 paper, I bought, um -- some of that, um -- I
9 forget what they call it now, that tar like
10 that's supposed to seal the leaks.
11    Q. Have you done this work yourself?
12    A. Yes.
13    Q. Have you had a contractor do any work
14 on the Village Square property?
15    A. No.
16    Q. I hand you what's been marked as Riche
17 Exhibit 14. It bears a Bates Number Riche
18 000176. Do you recognize this document?
19       (Exhibit 14 was marked for
20 identification and is attached hereto.)
21    A. Yes.
22 EXAMINATION BY MR. RAFFMAN:
23    Q. What is it?
24    A. It's an estimate for replacing the
25 roof on Judge Perez.

Page 120

1    Q. You didn't hire Schaefer Construction
2 to do that work, did you?
3    A. No, I didn't hire anybody yet.
4    Q. This invoice here from Schaefer
5 Construction for appears to be in excess of
6 eleven thousand dollars --
7    A. It's an estimate.
8    Q. It's an estimate, it's not an invoice.
9    A. No, you see at the top it says
10 estimate? Top right-hand corner?
11    Q. I do see that. It's all for roof --
12 Riche 14 is all for roof damage, right?
13    A. Right.
14    Q. Damage caused by the wind.
15    A. Right.
16    Q. You're not claiming that damage in
17 this case, are you?
18    A. No. No. That's for Lafayette.
19 That's what Lafayette should have paid me for
20 the roof, and they paid me I think it was like
21 six thousand, something like that. They paid
22 me fifteen thousand for everything, and the
23 estimate on the roof is eleven.
24    Q. You agree with me that if your
25 business was damaged by wind that's not a part

Page 121

1 of your claim in this case; correct?
2    A. Correct.
3    Q. If rain got in through the roof of
4 your business and damaged your property, that's
5 not a part of this case either, is it?
6    A. Correct. That's why I didn't have any
7 figures for merchandise upstairs on that
8 inventory list, it was just the downstairs.
9    Q. You told me earlier that the reason
10 that was for the downstairs was because you
11 hadn't been upstairs yet when you created it.
12 Right?
13    A. No.
14    Q. No, that's incorrect?
15    A. Right. That's incorrect. I didn't
16 tell you that. I said downstairs was what was
17 damaged from the flood. Okay? Upstairs is not
18 included in that because that was from the wind
19 and rain.
20    Q. So the property that's in Riche
21 Exhibit 10, the downstairs inventory, is that
22 the only inventory you're claiming in this
23 case?
24    A. Yeah. I'm not claiming anything else
25 here.

31 (Pages 118 to 121)

RICHE, MICHAEL

8/6/2008

Page 122

1    Q.  In order for me or a jury or anyone
2  else to understand the difference between the
3  property that was flooded that you're claiming
4  in this case and the property that was damaged
5  by wind and rain that you're not claiming in
6  this case, we have to study what actually
7  caused the damage to that property, right?
8    A.  Right.
9    Q.  We have to understand either from
10  testimony or from inspections what damaged the
11  property; right?
12    A.  Right.
13    Q.  What repairs have you done to the
14  Phillip Court property?
15    A.  I've gutted it.  That's about it right
16  now.  Secured it.
17    Q.  How much if anything have you spent on
18  the repairs to the Phillip Court property?
19    A.  I haven't spent anything other than my
20  time.
21    Q.  Have you -- you haven't sold either
22  Phillip Court or Judge Perez, have you?
23    A.  No.
24    Q.  Have you offered either one for sale?
25    A.  No.

Page 123

1    Q.  The truck that you used for your
2  business in Mr. Ribbon before the storm was
3  destroyed in the storm.
4    A.  Right.
5    Q.  This was the truck that you listed as
6  $2000 in your inventory.
7    A.  Right.
8    Q.  You didn't drive the truck away from
9  Chalmette before the storm.
10    A.  No.
11    Q.  Didn't see a need to do that.
12    A.  No.
13    Q.  After the storm, did you replace that
14  truck?
15    A.  Yes.
16    Q.  When did you replace the truck?
17    A.  I replaced the truck after we got our
18  flood insurance.  My wife and I sat down and
19  decided that I needed to get another truck that
20  I could pay cash for because no loan and a
21  house.  And that's where our money went to,
22  another truck so that I could start working
23  again and a roof over our heads.
24    Q.  Tell me how you reestablished your
25  business after the storm.

Page 124

1    A.  Well, what I could salvage from
2  upstairs I put in the truck and went around to
3  my customers, and then once I got the small
4  business grant, then I could order some
5  merchandise and start selling the ribbon again.
6    Q.  How long were you out of business
7  before you were able to salvage the inventory
8  and then buy some inventory through the small
9  business grant?
10    A.  It was a year.
11    Q.  There was a full year where you were
12  unable to conduct your business.
13    A.  Right.
14    Q.  What did you do during that year?
15    A.  Boy, I wish you were with me.  I
16  gutted, hauled out everything that we've worked
17  for all of our lives and threw it out.  Yep.
18    Q.  You were back in Chalmette -- you were
19  coming back from the Northshore to Chalmette to
20  do that.
21    A.  Right.
22    Q.  And you spent a year doing that.
23    A.  Yeah.  I had to clean out a house on
24  Charles, the business, the rental property and
25  my mom's house.

Page 125

1    Q.  And after a year, you got back in
2  business.
3    A.  Right.
4    Q.  You contacted your old customers?
5    A.  Right.
6    Q.  Told them, I'm back?
7    A.  Right.
8    Q.  And they were happy to have you back?
9    A.  Yeah.  Yeah.  They were happy to see
10  me.
11    Q.  Did they begin to order, buy inventory
12  from you?
13    A.  Yes.
14    Q.  At pre-storm levels of inventory?
15    A.  I'm sorry.
16    Q.  At the same amounts they were buying
17  from you before the storm?
18    A.  No, because I didn't have the
19  inventory I had before the storm.
20    Q.  You were unable to supply the needs of
21  those customers.
22    A.  Right.
23    Q.  You were unable to get a loan to buy
24  more inventory to supply their needs.
25    A.  No.  No, I couldn't get it.

Johns Pendleton Court Reporters                    800 562-1285

BARGE001151

RICHE, MICHAEL

8/6/2008

Page 126

1    Q.  You tried to get a loan from who?
2    A.  No, I didn't try to get a loan.  Who's
3  going to loan me?  Would you loan me, sixty
4  years old, no income, no collateral?  You know?
5  Would you have loaned me?  I don't think so.
6    Q.  Well, leaving aside whether I would or
7  not, you didn't ask me or anyone else, did you?
8    A.  No.  I knew what the answer would be.
9  I've dealt with banks before.
10   Q.  Was there anything apart from your
11 inability to get a loan to buy more
12 inventory --
13   A.  I'm sorry.
14   Q.  I hadn't finished my question.  If you
15 don't understand it, bear with me, because I'll
16 make it understandable.
17   A.  Okay.
18   Q.  Apart from your inability to get a
19 loan, or your perception that a loan would not
20 be available to you, was there anything else
21 that prevented you from supplying your retail
22 customers with the same level of business that
23 you had supplied them before the storm?
24   A.  Yes, I didn't have the inventory and I
25 didn't have the means of getting the inventory.

Page 127

1  In fact, I'll tell you how bad it was.  Okay?
2  There was one particular company that stands
3  out in my mind, I had dealt with them for like
4  twenty years, and they told me -- you know, I
5  called them and told them what had happened, to
6  see if they'd work with me on a net 30 basis --
7  net 30 day basis.  And they told me it had been
8  over a year since I ordered from them so I was
9  considered a new customer and had to have the
10 minimum initial order prepaid.  So that's how
11 much I got from them.
12   Q.  So you were unable to get the same
13 credit from your suppliers after the storm that
14 you had gotten from your suppliers before the
15 storm.
16   A.  Correct.
17   Q.  Your ability to do business after the
18 storm was affected by your ability to secure
19 credit from your suppliers.
20   A.  Correct.
21     (Brief recess.)
22 EXAMINATION BY MR. RAFFMAN:
23   Q.  What other obstacles have you faced in
24 your ability to do business from your truck
25 after the storm?

Page 128

1    A.  Well, quite a few of my customers were
2  destroyed from the storm, also, you know,
3  because I went all along the Gulf Coast.  And
4  some of them have reopened and some of them
5  isn't.  And the ones that have reopened are
6  like me, they got to watch their pennies, you
7  know.
8    Q.  These customers have less demand for
9  your products now because of the storm.
10   A.  It's not that they have less demand
11 for it, but they don't have the money to buy it
12 to speculate sales, they basically have to buy
13 as they sell it, you know.
14   Q.  These customers who are located all
15 throughout the Gulf Coast have less money
16 available to buy your product?
17   A.  Right.
18   Q.  Their lack of funds has caused you
19 losses in your business.
20   A.  Right.
21   Q.  What other obstacles has your business
22 faced in recent -- the last year or two?
23   A.  Gas prices.  Expenses, you know, as
24 far as as to gas. But, um -- other than not
25 having the inventory, you know --

Page 129

1    Q.  If you had more inventory, you could
2  do more business today; right?
3    A.  Oh, yes.  If you ain't got it you
4  can't sell it.
5    Q.  If you had more inventory your
6  business would perform better than it is right
7  now.
8    A.  Yes.
9    Q.  Okay.  I'm going to breeze through
10 some documents about your business.  I'm
11 handing you what's been marked as Riche 15.
12 Have a look, please.  It bears Bates numbers
13 Riche 00198 through 219.  Mr. Riche, is
14 Exhibit 15 your federal tax return for the year
15 2002?
16     (Exhibit 15 was marked for
17 identification and is attached hereto.)
18   A.  Yeah.
19 EXAMINATION BY MR. RAFFMAN:
20   Q.  Directing your attention to the page
21 that has the number Riche 201 at the bottom,
22 Page 5 of the return, this is Schedule C, do
23 you see that?
24   A.  Yes.
25   Q.  Does this page reflect the performance

33 (Pages 126 to 129)

RICHE, MICHAEL

8/6/2008

Page 130

1    of your business Mr. Ribbon during the 2002 tax
2    year?
3        A.  Yes.
4        Q.  Directing your attention to the page
5    that's marked Riche 00216 -- actually, no, I
6    take it back.  Strike that.  Go to Schedule E,
7    Riche 00204.  Do you see that page, Schedule E?
8        A.  Yes.
9        Q.  Do you see a reference to 128 West
10   Phis Court?
11       A.  Yes.
12       Q.  Does this page reflect the performance
13   income or loss of your rental property at
14   Phillips Court?
15       A.  Yes.
16       Q.  That would be for the tax year 2002.
17       A.  Right.
18       Q.  When you filed your 2002 tax return,
19   you were trying to be accurate in your
20   rendering of the numbers relative to your
21   business and your rental property; right?
22       A.  Yes.
23       Q.  I'm handing you Riche Exhibit 16.  Is
24   Riche Exhibit 16 your tax return for the tax
25   year 2003?

Page 131

1        (Exhibit 16 was marked for
2    identification and is attached hereto.)
3        A.  Yes.
4    EXAMINATION BY MR. RAFFMAN:
5        Q.  Directing your attention to Schedule C
6    which bears the Bates Number Riche 00223, does
7    this schedule reflect the performance of your
8    business Mr. Ribbon?
9        A.  Yes.
10       Q.  The performance of your business
11   Mr. Ribbon reflected on this page is for the
12   tax year 2003, correct?
13       A.  Correct.
14       Q.  Directing your attention to Schedule
15   E, Bates Number 00225, does this page reflect
16   the performance of your rental property on
17   Phillip Court during the tax year 2003?
18       A.  Yes.
19       Q.  When you rendered the numbers for your
20   2003 tax return, you were trying to be
21   accurate --
22       A.  Yes.
23       Q.  -- in doing so, correct?
24       A.  Correct.
25       Q.  I'm handing you Riche Exhibit 17.  Is

Page 132

1    Riche Exhibit 17 a copy of your tax return for
2    the tax year 2004?
3        (Exhibit 17 was marked for
4    identification and is attached hereto.)
5        A.  Yes.
6    EXAMINATION BY MR. RAFFMAN:
7        Q.  Do you report your taxes on a calendar
8    year basis?
9        A.  Yes.
10       Q.  You've done so since 2002.
11       A.  Yes.
12       Q.  Directing your attention to the page
13   Bates marked Riche 235, Schedule C, does this
14   page reflect the performance of your business
15   Mr. Ribbon during the calendar year 2004?
16       A.  Yes.
17       Q.  Directing your attention to Schedule
18   E, Riche 237, does this page reflect the
19   performance of your rental property at 128 West
20   Phillip Court during the calendar year 2004?
21       A.  Yes.
22       Q.  The rental property is rendered here
23   and in the prior returns at 128 West Phillip
24   Court.  Do you see that?
25       A.  Yes.

Page 133

1        Q.  But in fact it reflects the rental of
2    both halves of that property, doesn't it?
3        A.  I don't know if it's reflecting just
4    one half or both of them.
5        Q.  You rented both halves of the West
6    Phillip Court property during 2004; correct?
7        A.  Soon as my wife and I got back
8    together.  I don't know if it was 2004 or 2005.
9        Q.  2004 is the year before the storm,
10   right?
11       A.  Right.
12       Q.  You were together for a couple of
13   years before the storm, right?
14       A.  I guess so.  So this must reflect both
15   of them, then.
16       Q.  You wouldn't have only reported to the
17   federal government income from half of the
18   rental property, would you?
19       A.  No.
20       Q.  When you rendered the numbers
21   reflected in your 2004 tax return, you were
22   attempting to be accurate; right?
23       A.  Right.
24       Q.  Riche 18 I've handed you a document
25   Bates marked Riche 000242 through 257.  Is

34 (Pages 130 to 133)

RICHE, MICHAEL

8/6/2008

## Page 134

1  Riche 18 a copy of your federal income tax
2  return for 2005?
3      (Exhibit 18 was marked for
4  identification and is attached hereto.)
5      A.  Yes.
6  EXAMINATION BY MR. RAFFMAN:
7      Q.  Directing your attention to Schedule
8  C, Bates marked Riche 000246, does this
9  schedule reflect the performance of Mr. Ribbon
10  during the calendar year 2005?
11      A.  Yes.
12      Q.  Directing your attention to Riche
13  000248, Schedule E, does this page reflect the
14  performance of your rental property on West
15  Phillip Court during the calendar year 2005?
16      A.  Yes.
17      Q.  When you filled out your 2005 tax
18  return -- or when you rendered those numbers,
19  you were attempting to be accurate; correct?
20      A.  Right.
21      Q.  Did you use a paid tax preparer to do
22  your tax returns?
23      A.  Yes.
24      Q.  Did you use the paid preparer
25  throughout all these years we've just gone

## Page 135

1  through?
2      A.  Yes.
3      (Off the record.)
4  EXAMINATION BY MR. RAFFMAN:
5      Q.  I'm handing you what's been marked
6  Riche Exhibit 19.  Is Riche 19 a copy of your
7  federal tax return for the calendar year 2006?
8      (Exhibit 19 was marked for
9  identification and is attached hereto.)
10      A.  Yes, it is.
11  EXAMINATION BY MR. RAFFMAN:
12      Q.  Directing your attention to Riche 262,
13  Schedule C, does this page reflect the
14  performance of your business Mr. Ribbon during
15  calendar year 2006?
16      A.  Yes.
17      Q.  You had no rental income from your
18  rental properties during 2006, did you?
19      A.  No.
20      Q.  When you rendered the information
21  that's included in your 2006 tax return, you
22  were attempting to be accurate; correct?
23      A.  Yes.
24      Q.  Directing your attention back to
25  Schedule E, which is Riche 264, does this

## Page 136

1  Schedule E reflect your rental property on West
2  Phillip Court in Chalmette?
3      A.  Yes.
4      Q.  And you did take a depreciation
5  expense or depletion during that year.
6      A.  Yes.
7      Q.  All right.  All right.  Riche 20 bears
8  Bates numbers Riche 271 through 283.
9  (Tendering.)  Is Riche Exhibit 20 a copy of
10  your U.S. tax return for the calendar year
11  2007?
12      (Exhibit 20 was marked for
13  identification and is attached hereto.)
14      A.  Yes.
15  EXAMINATION BY MR. RAFFMAN:
16      Q.  Directing your attention to Schedule C
17  Bates marked Riche 000275, does this page
18  reflect the performance of your business
19  Mr. Ribbon during the calendar year 2007?
20      A.  Yes.
21      Q.  You had no rental income from your
22  West Phillip Court property that year, did you?
23      A.  No.
24      Q.  But directing your attention to
25  000277, Schedule E, you did report a

## Page 137

1  depreciation expense or a depletion of $1,208
2  during that year?
3      A.  Yes.
4      Q.  When you rendered the numbers that
5  were used in your 2007 tax return, you were
6  attempting to be accurate; correct?
7      A.  Yes.
8      Q.  Do you know what interrogatories are?
9      A.  No.
10      Q.  Earlier in this case, were you asked
11  to review a set of questions that were put in
12  writing by the defendants in this case and then
13  asked to supply some information to answer
14  those questions?
15      A.  No.
16      Q.  Do you know what a discovery response
17  is?
18      A.  No, not really.
19      Q.  I'm going to show you Riche
20  Exhibit 21.  Tendering.)  Do you recognize
21  Exhibit 21 as a verification that was signed by
22  you on or around May 16th, 2008?
23      (Exhibit 21 was marked for
24  identification and is attached hereto.)
25      A.  Yes.

35 (Pages 134 to 137)

RICHE, MICHAEL

8/6/2008

Page 138

1  EXAMINATION BY MR. RAFFMAN:
2    Q.  In fact, the signature that's right on
3  top of plaintiffs signature there, that's your
4  signature.
5    A.  Yes.
6    Q.  The verification says that you,
7  Michael Riche, verifies that he has read all
8  written discovery responses made on his behalf
9  in this matter and that all that is contained
10  therein is true and correct to the best of his
11  or her knowledge, information and belief.  You
12  signed that; right?
13    A.  Yes.  Yes.
14    Q.  What had you read before you signed
15  that?
16    A.  It was a stack of questions asking me
17  about what happened during the storm, where was
18  I and where I evacuated to and all that.
19    Q.  Now you understand that the word
20  discovery responses refers to that stack of
21  questions and answers.
22    A.  Now I do, yeah.
23    Q.  Now let me pull out some of the things
24  in that stack and ask you some questions about
25  it.  I'm going to hand you a set of

Page 139

1  Supplemental Answers to Interrogatories
2  Propounded by Barge Entities.  And I've marked
3  the page for you.  Before I ask any questions
4  about this page, I'm going to mark that as
5  Riche 22.  So we have some frame of reference
6  here, I'm handing you what's been marked as
7  Riche Exhibit 22.  Do you recognize this as one
8  of the sets of discovery responses that you
9  reviewed and verified?
10    (Exhibit 22 was marked for
11  identification and is attached hereto.)
12    A.  Yes.
13  EXAMINATION BY MR. RAFFMAN:
14    Q.  I have directed your attention to
15  Supplemental Answer to Interrogatory Number 26.
16  Do you see that there is a section with your
17  name where it says Michael Riche seeks damages
18  for, and then a series of items?  Do you see
19  that?
20    A.  Yes.
21    Q.  You verified that answer when you
22  signed the verification.
23    A.  Right.
24    Q.  Looking down this list of items that
25  you seek damages for in this case, do you see

Page 140

1  any items in there that you are not seeking
2  damages for in this case, that are wrong?
3    A.  No.
4    Q.  Let's start at the top, then.  The
5  emotional stress, the past and future mental
6  pain, suffering and anguish.  You see that
7  item.
8    A.  Uh-huh.  Yes.
9    Q.  You're not seeking damages for any
10  physical injury that you suffered during the
11  storm; correct?
12    A.  Correct.
13    Q.  You didn't stay behind during the
14  storm?
15    A.  No.
16    Q.  You weren't subjected the torrents of
17  water threatening your life?
18    A.  No.
19    Q.  Do you know of any friends, neighbors
20  or acquaintances who suffered any physical
21  injuries in the flood on August 29th?
22    A.  Yes.  I have friends who lost, um --
23  both their parents.
24    Q.  Their parents remained and died during
25  the flood.

Page 141

1    A.  Right.
2    Q.  Where were their parents during the
3  flood?
4    A.  In Chalmette.
5    Q.  On which side of Paris Road?
6    A.  On the, um -- I think they were on
7  the, um -- east side of Paris Road.
8    Q.  Those people who died in the flood on
9  the east side of Paris Road, they're not even
10  included in the class in this case; right?
11    A.  No.  No.
12    Q.  Am I correct that they're not included
13  in the class in this case?
14    A.  Correct.
15    Q.  To your knowledge, however, there are
16  people who were on the west side of Paris Road
17  who suffered physical injuries or even death as
18  a result of flooding from having remained
19  behind during the storm.
20    A.  Yes.
21    Q.  Your mental pain, suffering and
22  anguish relates to something other than
23  physical injuries that you suffered.
24    A.  Right.
25    Q.  And because you didn't remain behind

36 (Pages 138 to 141)

BARGE001155

RICHE, MICHAEL

8/6/2008

Page 142

1  during the storm, your mental pain, suffering
2  and anguish relates to something other than
3  fearing for your life as a result of being put
4  in any fearful situation during the storm.
5      A.  Correct.
6      Q.  Describe for me the mental pain,
7  suffering and anguish for which you're seeking
8  compensation in this case.
9      A.  Well, first of all, our means of
10  income, our means of earning a living has been
11  turned upside-down.  Um -- our friends are
12  scattered all over the place.  Um -- everything
13  that we worked for all of our lives is gone.
14      Q.  And without meaning to diminish any of
15  that, and only because I want to understand
16  everything about this claim, is there anything
17  else besides what you've just mentioned that's
18  a part of the mental pain, suffering and
19  anguish for which you seek compensation in this
20  case?
21      A.  Not that I can think of right now.
22      Q.  The friends that have been scattered,
23  where did they live before the storm?
24      A.  Chalmette.
25      Q.  Did they live in your neighborhood

Page 143

1  near Charles Street?
2      A.  Yeah.  Some of them did and some of
3  them lived on the east side of Paris Road, some
4  of them lived on the west side of Paris Road.
5      Q.  It was both sides of Paris Road;
6  right?
7      A.  Right.  Right.
8      Q.  They weren't all on the west side of
9  Paris Road.
10      A.  No.
11      Q.  The mental pain and suffering and
12  anguish that you associate with the three items
13  that you've just mentioned, how does that
14  compare with the mental pain and anguish you've
15  described earlier attendant on the loss of your
16  son and the family circumstances that set upon
17  you earlier in that year?
18      A.  How does it compare?  There's no
19  comparison.  If you haven't lost a child you
20  don't know.
21      Q.  Losing the child was harder on you?
22      A.  Yeah.
23      Q.  The mental pain and anguish and
24  suffering that you've -- that you associate
25  with losing your means of living and the

Page 144

1  scattering of your friends and the loss of what
2  you worked for, do you have any physical
3  symptoms that you associate with that distress?
4      A.  Forgetting.  It's not as bad now, but
5  sometimes I don't know where I'm at.  You know,
6  I'm driving along and I forget where I'm going,
7  you know.  Stuff like that.
8      Q.  Do you associate that uniquely with
9  what happened to you as a result of the storm?
10      A.  I guess it's a combination.
11      Q.  Have you received any mental health
12  care or treatment?
13      A.  No.
14      Q.  You are and have been able to work
15  notwithstanding the suffering and distress
16  you've suffered.
17      A.  Right.
18      Q.  And you are able to enjoy time with
19  your family?
20      A.  Yes.
21      Q.  Do you go to church?
22      A.  Yes.
23      Q.  Have you gone to church after the
24  storm with the same or more or less frequency
25  as before?

Page 145

1      A.  Oh, yes.
2      Q.  That was a bad question.  Do you go to
3  church more frequently after the storm?
4      A.  No.
5      Q.  Less frequently?
6      A.  No.  The same.
7      Q.  The same.  It had to be one of those
8  three.
9          Your appetite has been okay?
10      A.  Yes.
11      Q.  The distress that you suffered
12  associated with the storm and its aftermath is
13  uniquely associated with your personal
14  circumstances, isn't it?
15      A.  I don't understand exactly what your
16  question is.
17      Q.  Can you speak for anyone else
18  regarding the issue of emotional distress?
19      A.  Yeah.
20      Q.  For whom can you speak?
21      A.  I can speak for just about everybody
22  that went through it.  Because every time you
23  run across somebody that went through it and
24  lost everything, we have to talk about it.
25  Whereas when you meet somebody who hasn't gone

37 (Pages 142 to 145)

RICHE, MICHAEL

8/6/2008

Page 146

1  through it they don't want to hear about it,
2  you should be over it by now. You know? But
3  whenever you run across somebody who lost
4  everything, you want to talk about it.
5      Q.  So it's something that you and they
6  will talk about between yourselves, right?
7      A.  Yeah.
8      Q.  And when you said you can speak for
9  everyone, that's what you meant by that, right?
10     A.  Right.  Everybody I think feels the
11  same, you know, that they've lost everything
12  and all their friends are scattered all over
13  the place, life has completely been turned
14  upside-down.
15     Q.  So is it your testimony that to
16  compensate you for the emotional distress that
17  you've suffered we could just pick a person at
18  random from among the people in Chalmette or
19  the Lower Ninth Ward who suffered the same
20  things as you and they would be perfectly able
21  to describe your distress in a way that would
22  give an accurate picture.
23         MR. WIEDEMANN:
24             Object to the form of the
25         question.  You've mischaracterized the

Page 147

1         witness' testimony.
2             Subject to that, if you can you
3         can answer.
4      A.  Well, I'm sure they have their own
5  circumstances like everybody else has.  Not
6  everybody's situation is unique, but it's all
7  common in that they've lost everything.
8  EXAMINATION BY MR. RAFFMAN:
9      Q.  The distress that losing -- whatever
10  they've lost, the distress that results from
11  that loss is unique to the individual people,
12  right?
13         MR. WIEDEMANN:
14             Objection is continuing.
15     A.  I'm sorry?  It's unique.
16  EXAMINATION BY MR. RAFFMAN:
17     Q.  The distress that people suffered --
18  well, let me ask it this way:  Not everybody
19  reacts to a loss in the same way; right?
20     A.  Correct.
21     Q.  Different people will react in
22  different ways; right?
23     A.  Correct.
24     Q.  Some people will be devastated by a
25  loss.  Right?

Page 148

1      A.  Right.
2      Q.  Some people will fare better
3  emotionally.  Right?
4      A.  Correct.
5      Q.  There's no way to generalize the
6  emotional reaction of everybody in a large
7  geographic area, isn't that fair?
8         MR. WIEDEMANN:
9             Object to the form of the
10         question.
11     A.  I don't think you can say that
12  everyone feels exactly the same, but everybody
13  has felt the loss, not only of their
14  possessions, but their lifestyle, you know,
15  their friends.  Um -- you know, like myself,
16  like you say, when we last our sone and all we
17  had our friends to help us up.  Then after the
18  storm they're gone.
19     Q.  And for you, the loss of a support
20  network at a time of particular need and
21  poignancy was particularly sharply felt, right?
22     A.  Right.
23     Q.  Even then the loss of that support
24  network was partly people east of Paris Road
25  and partly people west of Paris Road.

Page 149

1      A.  Yes.
2      Q.  Let me ask you about the next item on
3  this list here, mental health care and
4  expenses.  Do you see it says past and future
5  mental health care expense?  Do you see that
6  item?
7      A.  Right.
8      Q.  What damages are you seeking for past
9  and future mental health care expenses?
10     A.  I don't know.
11     Q.  Do you have any past mental health
12  care expenses?
13     A.  No.
14     Q.  Do you expect to have any future
15  mental health care expenses?
16     A.  I don't know.
17     Q.  As you sit here today in this
18  deposition, are you planning to consult a
19  mental health care provider?
20     A.  No.
21     Q.  When you signed the interrogatory
22  response verification, were you planning to
23  consult a mental health care provider?
24     A.  No.
25     Q.  The next item on your list of

38 (Pages 146 to 149)

RICHE, MICHAEL

8/6/2008

| | Page 150 |
|---|---|

1   damages -- before I move on, when you say
2   you're seeking damages for past and future
3   mental pain, suffering and anguish, do you have
4   a number in mind?
5       A.  No.
6       Q.  All right.  The next item on the list
7   is the past and future loss and destruction of
8   and damage to immovable and movable property.
9           Apart from the property at Judge Perez
10  and at Phillip Court, is there other immovable
11  and movable property that you have in mind in
12  this item of damages?
13      A.  No.
14      Q.  The immovable property refers to Judge
15  Perez and West Phillip Court; right?
16      A.  Right.
17      Q.  The only damages you're seeking in
18  this case are flood damages, not wind or rain
19  damages; right?
20      A.  Right.
21      Q.  Have you quantified the amount of
22  money that you're seeking for the flood damage
23  to either the Judge Perez or the West Phillip
24  property or both?
25      A.  I don't remember, no.  No.

| | Page 151 |
|---|---|

1       Q.  Your claim also includes -- well, let
2   me -- for immovable property.  Um -- in order
3   to quantify your claim, we're going to have to
4   figure out which damage was due to the flood
5   and which damage was due to the wind and rain,
6   right?
7       A.  Right.
8       Q.  Let me move to the next item, past and
9   future -- I'm sorry.  I need to reload.  I
10  wanted to ask you about loss and destruction of
11  movable property.  This refers to what
12  property?
13      A.  The merchandise, the inventory out at
14  the store.
15      Q.  Does it also refer to your truck?
16      A.  Yes.
17      Q.  Was there also a motor vehicle at the
18  West Phillip property?
19      A.  No.
20      Q.  The truck is the only motor vehicle
21  for which you're claiming damages in this case?
22      A.  Right.
23      Q.  Was there any movable property for
24  which you're claiming damages inside the West
25  Phillip house?

| | Page 152 |
|---|---|

1       A.  Washer and drier and stove.
2       Q.  How will you quantify the amount of
3   damages that you're entitled to receive for the
4   washer and dryer and stove?
5       A.  The approximate cost of it, for a
6   washer and drier and stove.
7       Q.  Can you tell me as we sit here today
8   what you think that number would be?
9       A.  Probably for a stove, of course that
10  was back then, now the prices are ridiculous,
11  but around four or five hundred dollars for a
12  stove, and washer and dryer I guess around
13  three, four hundred.
14      Q.  The inventory that we talked about,
15  you're relying on the inventory list that's
16  Riche Exhibit Number 10?
17      A.  Yes.
18      Q.  In the process of figuring out how
19  much money you're entitled to involves
20  identifying what the movable property was and
21  then assigning a value to each element of
22  movable property, right?
23      A.  Right.
24      Q.  And I guess we'd also need to know
25  what kind of shape the property was in to be

| | Page 153 |
|---|---|

1   fair about the amount of money that you'd be
2   entitled to, right?
3       A.  Right.
4       Q.  There's a separate item here in your
5   interrogatory answer for past and future loss
6   of use of immovables and movables.  Do you see
7   that?
8       A.  Yes.
9       Q.  Can you explain that item to me?
10      A.  Yeah.  That's, um -- the loss of being
11  able to rent out the duplex and to open the
12  business.
13      Q.  This is lost income from the duplex
14  and lost income from the business?
15      A.  Right.
16      Q.  Well, if you look down another few
17  items, do you see there's a separate item there
18  for past and future lost income?
19      A.  Right.
20      Q.  Can you tell me whether that element
21  past and future lost income is different from
22  past and future loss of use?
23      A.  I don't think so.
24      Q.  Okay.  As far as you're concerned,
25  they're the same.

BARGE001158

RICHE, MICHAEL

8/6/2008

Page 154

1    A.  Right.
2    Q.  Next item on the list is past and
3  future expenses for demolition and salvage of
4  immovable and movable property.  Tell me what
5  those expenses are in your case.
6    A.  It was the year that it took me to gut
7  them out, clean them out.
8    Q.  During the year that you spent gutting
9  and cleaning the three properties, what
10  percentage of your time was spent at the
11  Phillip Court and Judge Perez property as
12  opposed to the Charles Street property?
13    A.  Well, actually, there was four
14  properties that I did.  I had to do my mom's
15  house, too.  So 25, 25 and 25, I guess.  I
16  don't know.  I didn't -- of course, the store
17  was harder because of the ribbon.  Trying to
18  shovel ribbon out, you know, every time you
19  take a shovel full, the ribbon would come apart
20  and pull everything off the shovel, so you go
21  with an empty shovel to the wheelbarrow.  You
22  know?  And then later on, I couldn't work as
23  long.  I was getting tired, you know.
24    Q.  So if I understood you right, you
25  spent more time at the business property than

Page 155

1  the others?
2    A.  I think so, yeah.
3    Q.  Aside from the time that you spent,
4  are there other expenses for demolition and
5  salvage that you're seeking in this case?
6    A.  Well, my son had come in to help me,
7  and he had hired some Mexicans to help with,
8  um -- my house and my mom's house.  At the end,
9  you know, when they were putting -- the parish
10  was going the put a hundred dollar a day fine,
11  you know, if you didn't have it cleaned up and
12  all that, so he came in and hired some Mexicans
13  that he paid for to try to get me to where I
14  wouldn't be fined.
15    Q.  This was money that your son paid?
16    A.  Right.
17    Q.  Did you pay him back?
18    A.  No.
19    Q.  So you would not have a claim for
20  those expenses, I would have to have your --
21  your son would have to be the plaintiff to get
22  those, wouldn't he?
23    A.  I don't know.
24    Q.  Well, people that did the labor on
25  those homes were paid by your son, right?

Page 156

1    A.  Right.
2    Q.  Your son is the person who's out of
3  pocket for those expenses.
4    A.  Right.
5    Q.  Are there other expenses of demolition
6  and salvage that you haven't told me about yet?
7    A.  Not that I know of.
8    Q.  The time that it took you to do the
9  cleanup, I think I heard you say that that's
10  something for which you expect to be
11  compensated in this lawsuit.
12    A.  Yes, I think I should be.
13    Q.  And tell me what the amount of
14  compensation is that you're claiming for that
15  element of your damages.
16    A.  The amount of money?
17    Q.  Yes, sir.
18    A.  I have no idea.
19    Q.  As we sit here today, you can't tell
20  me an amount you think would be fair
21  compensation for the work that you did?
22    A.  No, I haven't tried to figure it out.
23    Q.  In order to figure that out, do I need
24  to know something about the number of hours you
25  spent?

Page 157

1    A.  I guess so, yeah.
2    Q.  Can you tell me how many hours you
3  spent?
4    A.  Um -- I spent about six hours a day --
5  well, six hours a day working.  That was at the
6  beginning.  And at the end of this year I was
7  working like four hours, you know, because,
8  like I said, I just couldn't go anymore.  But,
9  um -- it was six days a week.
10    Q.  So to figure out how much money you're
11  claiming to be compensated for the work that
12  you did on demolition and salvage, we take the
13  number of hours that you worked and multiply
14  that by an hourly amount that you would tell us
15  later once you've thought about what you think
16  is fair.
17    A.  Right.
18    Q.  The next item on your list is
19  diminution of property values.  Do you see
20  that?
21    A.  Yes.
22    Q.  And this is for the amount that your
23  Judge Perez property went down in value after
24  the storm?
25    A.  Yes.

40 (Pages 154 to 157)

RICHE, MICHAEL

8/6/2008

Page 158

1    Q.  Same thing is true for your Phillip
2  Court property?
3    A.  Yeah.
4    Q.  For a business property, does the
5  value before the storm have anything to do with
6  how the business is doing that occupies the
7  property?
8    A.  No, it doesn't have anything to do
9  with it, but if you're going to sell it or turn
10  it over it has something to do with it.
11    Q.  I didn't understand your last answer.
12  If you were going to sell it or turn it over
13  what?
14    A.  Right.  Then the value of the property
15  has something to do with it.  It doesn't affect
16  the business part of it while you're in there
17  doing business, but like, okay, say if I wanted
18  to sell the building now, I couldn't get what I
19  paid for it.
20    Q.  You've been down to Village Square
21  sometime in the past few weeks; right?
22    A.  Yes.
23    Q.  How many businesses are there doing
24  business, open for business now?
25    A.  Now?  I don't know.  I'd have to guess

Page 159

1  maybe half a dozen, a dozen at the most, I
2  would say.
3    Q.  How many have opened in the last three
4  weeks?
5    A.  In the last three weeks?
6    Q.  Yes, sir.
7    A.  I don't think -- none that I know of.
8    Q.  The pre-storm value of your business
9  property have anything to do with the location
10  of the property?
11    A.  Yes.
12    Q.  Some locations are more desirable for
13  doing business than others, aren't they?
14    A.  Yes.
15    Q.  In fact, one of the things you hear
16  about every now and then is the three biggest
17  attributes of a business are location,
18  location, location.  Have you ever heard that?
19    A.  Yes.
20    Q.  So the drop in value of your business
21  after the storm is partly a function of the
22  specific shopping center that it's located in,
23  isn't it?
24    A.  Not really.
25    Q.  No?  Why do you say that?

Page 160

1    A.  Because all the properties in
2  St. Bernard have dropped since the storm.  Very
3  little businesses have come back.  In fact,
4  that's why you don't see Wal-Mart there now.
5  You know?
6    Q.  Was there a Wal-Mart in St. Bernard
7  before the storm?
8    A.  Yes.  There was a Super Wal-Mart.
9    Q.  Where was that?
10    A.  On Judge Perez right around by the
11  government complex.
12    Q.  Is that east or west of Paris Road?
13    A.  That was, um -- west of Paris Road.
14       (Brief recess.)
15  EXAMINATION BY MR. RAFFMAN:
16    Q.  Mr. Riche, apart from the Phillip
17  Court home and the Judge Perez property, you've
18  not bought or sold any property in the class
19  area, ever, right?
20    A.  No.
21    Q.  You've not bought or sold any property
22  in the class area since the storm; right?
23    A.  No.
24    Q.  And you're not trained in real estate
25  appraisal?

Page 161

1    A.  No.
2    Q.  You're not trained in any capacity in
3  real estate; right?
4    A.  No, I am not.
5    Q.  The next item on your interrogatory
6  list, moving downward, says past and future
7  loss and destruction of businesses and business
8  assets.  Does that item include anything that
9  you've not previously included in the other
10  items on this list that we've talked about
11  already?
12    A.  No.
13    Q.  The next item is past and future lost
14  profits.  Do you see that?
15    A.  Yes.
16    Q.  Explain to me what that element
17  represents.
18    A.  It's the profit I could have made
19  since the storm, in the past, and the future,
20  because I still don't have a building that is
21  accessible to customers to come and do business
22  with me, and I don't have the inventory to do
23  the business either.
24    Q.  Have you figured out what that number
25  ought to be?

41 (Pages 158 to 161)

RICHE, MICHAEL

8/6/2008

---

Page 162

1    A.  No.
2    Q.  Have you thought about how to figure
3  that out?
4    A.  Not really.
5    Q.  Your business has made a certain
6  amount of income since the storm; right?
7    A.  Right.
8    Q.  That income is associated with the
9  business you do out of your truck.
10    A.  Right.
11    Q.  You've testified that the business you
12  do out of your truck has declined some after
13  the storm; right?
14    A.  Yes.
15    Q.  One of the reasons that's true is
16  because you're unable to get the credit to buy
17  the inventory that you need; right?
18    A.  Right.
19    Q.  Another reason that's true is because
20  your customers up and down the Gulf Coast
21  aren't buying what whey used to.
22    A.  Correct.
23    Q.  In order to figure out the lost profit
24  that you've suffered because of the flooding
25  from the Industrial Canal, we're going to have

---

Page 163

1  to separate the lost profit that's from that
2  flooding from the lost profit because your
3  customers on the Gulf Coast don't need your
4  product, won't we?
5    A.  Now, would you repeat that?
6    Q.  You understand that the lost profits
7  you're seeking in this case is the lost profit
8  from what you say was caused by the barge.
9  Yes?
10    A.  Yes.
11    Q.  The barge isn't going to pay you for
12  lost profits that you've suffered because your
13  customers on the Gulf Coast don't need your
14  product anymore, do you understand that?
15    A.  Right.
16    Q.  In order to figure out what your lost
17  profits are because of your allegations about
18  the barge, focusing now on business that you do
19  from your truck, some kind of a separation has
20  to be made between the business you lost
21  attributable to the flooding from the
22  Industrial Canal --
23    A.  Right.
24    Q.  -- from the bigger Katrina catastrophe
25  that's got nothing to do with the barge.  Isn't

---

Page 164

1  that right?
2    A.  Right.
3    Q.  And there's the business that you did
4  from your store is another part of your lost
5  profits that's got to be figured out.  Right?
6    A.  Right.
7    Q.  And there your claim is that the store
8  can't do business anymore because of what you
9  say is flooding from the Industrial Canal.
10    A.  Right.
11    Q.  In order to figure out what those lost
12  profits would be, don't we have to figure out
13  what your business situation would have been if
14  the Industrial Canal breaches never happened?
15    A.  Right.  All the retail sales is gone.
16  So anything that was sold at retail is gone
17  because the store --
18    Q.  I'm sorry.  I didn't mean to
19  interrupt.  Had you finished your answer?
20    A.  Right.  Uh-huh.  I said all the retail
21  sales that we made in the store, that was the
22  only way we sold retail was out of the store,
23  all of that is gone.  And then some wholesale
24  out of the store, also.
25    Q.  And in order to figure out how much

---

Page 165

1  money that is, we need to know something about
2  your business, right?
3    A.  Right.
4    Q.  We need to know how much of your
5  business you were doing out of the store as
6  opposed to out of your truck.
7    A.  Right.
8    Q.  Can you tell me, as we sit here today,
9  how much of your business were you doing out of
10  your store as opposed to out of your truck?
11    A.  No, I don't know it exactly, no.
12    Q.  You have business records from before
13  the storm.
14      MR. WIEDEMANN:
15      Is that a question?
16  EXAMINATION BY MR. RAFFMAN:
17    Q.  Yes.
18    A.  I have some.
19    Q.  The records survived the storm?
20    A.  Some of them I found, yeah.  Um --
21      THE WITNESS:
22      I think it was like four boxes I
23    gave you.
24  EXAMINATION BY MR. RAFFMAN:
25    Q.  What was in those four boxes that

---

42 (Pages 162 to 165)

Johns Pendleton Court Reporters                    800 562-1285

BARGE001161

RICHE, MICHAEL

8/6/2008

| Page 166 |
| --- |

1  survived the storm?
2      A.   Sales invoices and purchase invoices.
3      Q.   Using the sales invoices and purchase
4  invoices from before the storm, could we or
5  someone else reconstruct the income and the
6  expenses in your business?
7      A.   Um -- some of them, not all of them.
8  The purchase invoices was just from
9  merchandise, it wouldn't be all of the expenses
10  from the business.  And the sales -- the
11  invoices on the sales would basically be
12  wholesale only and not retail.
13      Q.   Is your business sensitive to upturns
14  or downturns in the economy?
15      A.   Yes.
16      Q.   Why is that so?  If you know.
17      A.   I think every business other than your
18  necessities like grocery stores, and even they
19  feel it, is sensitive to the economy.
20      Q.   Are some businesses more sensitive to
21  the economy than others, in your experience as
22  a businessman?
23      A.   Yes.
24      Q.   And in the range of sensitivity, where
25  does your business fall?

| Page 167 |
| --- |

1      A.   Um -- I'd say my business is more of
2  a, um -- a non necessity.  Okay?  Um -- most of
3  the businesses in the floral industry is
4  funerals and weddings.
5      Q.   When the economy is good, people may
6  spend more on flowers for their funerals and
7  weddings?
8      A.   Well, not just for funerals and
9  weddings, they'll buy a little bit nicer thing
10  for their wives to get out of the doghouse and
11  all of that stuff, you know, but if times are
12  hard, you know -- what is it?  I can't bring
13  you flowers because I had to fill up my gas
14  tank
15      Q.   The point then is, your business is
16  somewhat more sensitive to upturns and
17  downturns in the economy than other businesses
18  may be.
19      A.   Yeah.  More so than, say, grocery
20  stores.
21      Q.   Let's look at the next item on this
22  list here.  It says past and future lost
23  income.  Do you see that?
24      A.   Yes.
25      Q.   Is that different from lost profit?

| Page 168 |
| --- |

1      A.   Yeah.  Income is what you take in,
2  profit is what you get to keep out of it.
3      Q.   Well, are you telling me that you'll
4  be compensated separately in this case for lost
5  income and for lost profit?
6      A.   Um -- no, I guess not.
7      Q.   I'm just trying to understand your
8  interrogatory response.  Can you tell me what
9  lost income means?
10      A.   Yeah.  It's the inability to make
11  money.
12      Q.   How is that different from past and
13  future lost profit?  That's what I'm trying to
14  get at.
15      A.   Okay, income enables you to pay your
16  expenses like the high gas price.  Okay?  You
17  make the income and that's the gross, say like
18  gross sales you make.  But then the profit is
19  after you pay all the expenses what you got
20  left over.
21      Q.   In this case you're not claiming that
22  the defendants should pay you one set of money
23  for lost income for sales you couldn't make on
24  flowers and then more money for profit that you
25  would have made on those same flowers after you

| Page 169 |
| --- |

1  pay expenses.
2      A.   No.
3      Q.   You're only seeking one recovery for
4  lost business income or profit.
5      A.   Yes.
6      Q.   The next item on your list is past and
7  future lost earning capacity.  What does that
8  refer to?
9      A.   It's my ability to be able to make the
10  sales and to earn income.
11      Q.   Is that the same money as lost profit
12  or lost income?
13      A.   I imagine so.
14      Q.   It's not a separate sum of money.
15      A.   No.
16      Q.   Past and future lost business
17  opportunity is your next item there.  Do you
18  see that?
19      A.   Uh-huh.
20      Q.   Is that a separate item of damages
21  from those other ones we've just discussed?
22      A.   No.
23      Q.   The next two items, past and future
24  loss of enjoyment of lifestyle, do you see
25  that?

43 (Pages 166 to 169)

RICHE, MICHAEL

8/6/2008

Page 170

1    A.  Yes.
2    Q.  Is there anything associated with that
3  item of damages other than what you've
4  testified about today?
5    A.  Well, yeah, like we used to be able to
6  go on vacation every year, which we haven't
7  gone on vacation since the storm because we
8  can't afford it.  You know, our lifestyle has
9  completely changed.
10    Q.  Is part of the change in your
11  lifestyle that you no longer live in your
12  neighborhood with all your neighbors on Charles
13  Drive?
14    A.  That's part of it, yeah.
15    Q.  Inconvenience is the next item on your
16  list.  You see that?
17    A.  Yes.
18    Q.  Is there anything about inconvenience
19  that you want to add to what you've testified
20  about earlier today?
21    A.  No.
22    Q.  The last item on your list there, do
23  you see that it says any and all others proven?
24    A.  Yes.
25    Q.  Are there any other element of damages

Page 171

1  for which you seek compensation in this
2  lawsuit?
3    A.  Not that I know of.
4    Q.  You understand this is lawsuit is
5  filled as a class action.
6    A.  Right.
7    Q.  And you're being deposed today as a
8  prospective class representative.  Do you
9  understand that?
10    A.  Right.
11    Q.  What is a class representative?
12    A.  That's, um -- one who represents --
13  like myself, a small businessman in
14  St. Bernard, I'm representing the other
15  business people in St. Bernard.
16    Q.  So you represent Wal-Mart?
17    A.  No way.
18    Q.  You're not a representative for
19  Wal-Mart.
20    A.  No way.
21    Q.  And you sort of smile and laugh when
22  you say that.  Why do you smile and laugh when
23  you say that?
24    A.  Because we're not in the same
25  ballpark.

Page 172

1    Q.  And when you say you're not in the
2  same ballpark, what do you mean by that?
3    A.  Let's see.  What can I compare that
4  to?  I guess New York City with Chalmette.
5    Q.  New York is bigger than Chalmette?
6    A.  Yeah.  Money and big and all.
7    Q.  Wal-Mart is bigger than you?
8    A.  A little bit, yeah.
9    Q.  You, as a small business person,
10  wouldn't purport to represent the interests of
11  a much larger business such as a Wal-Mart.
12    A.  No.
13    Q.  Are there grocery stores and gas
14  stations in the class area?
15    A.  Um -- there were some, yeah.  Are they
16  now?
17    Q.  Before the storm, were there?
18    A.  Before the storm, yeah.  Yeah.  There
19  were.
20    Q.  These are businesses who are not
21  necessarily subject to the kinds of business
22  upturns and downturns that you've had?
23    A.  Not as extreme as I have, but I'm
24  sure -- you know, my dad used to have a corner
25  grocery store, too, and when times were tough

Page 173

1  you could feel it even in the grocery store.
2    Q.  Their experience of an economic
3  downturn would not be the same as yours; right?
4    A.  I can't say that.
5    Q.  You don't know.
6    A.  No.
7    Q.  Are there any manufacturing plants or
8  operations in the class area?
9    A.  Um -- there may have been.  I can't
10  think of any offhand.  I don't know if you'd
11  call like a sugar refinery and, um -- what is
12  that, Mobil or whatever the refinery is on the
13  east side -- or west side of Paris Road, and,
14  um -- I don't know if that might have been some
15  gutter shops or something like that, you know,
16  T-shirt shops, I don't know if you call that
17  manufacturing, that did the screen printing,
18  you know.
19    Q.  Are those businesses that you as an
20  owner of a small business in Chalmette would
21  represent in a class action?
22    A.  The small ones, yeah.  Again, I
23  couldn't represent the refinery or the -- the
24  sugar refinery or the oil refinery.  But like
25  the T-shirt shops, the silk screening and all,

Johns Pendleton Court Reporters                    800 562-1285
BARGE001163

RICHE, MICHAEL

8/6/2008

---

Page 174

1    yeah, they'd be a mom and pop type operation.
2        Q.  So your understanding of being a class
3    representative is that you're comfortable
4    representing other mom and pop type operations
5    in Chalmette.
6        A.  Yes.  Yes.
7        Q.  How did you come to be a proposed
8    class representative; how did that happen?
9        A.  When I filled out the forms for the
10   lawyers they asked me if I would be willing to
11   be a representative.
12       Q.  And you put down that you would.
13       A.  Yes.
14       Q.  Somebody called you and you had a
15   discussion -- I don't want to hear what you
16   said to and from, because I'm going to get an
17   instruction from Mr. Wiedemann.  But there was
18   a communication between you and someone else in
19   which you confirmed you were willing to do
20   that.
21       A.  Yes.
22       Q.  What's your understanding of your
23   duties as a class representative?
24       A.  To do the things we're doing today.
25       Q.  Giving a deposition?

---

Page 175

1        A.  Right.  Giving a deposition, providing
2    whatever information I can provide to tell them
3    my story.
4        Q.  Is there anything else?
5        A.  No.
6        Q.  Do you have any understanding about a
7    duty to supervise and direct the litigation in
8    any way?
9        A.  No.
10       Q.  You have not supervised or directed
11   the litigation in any way, have you?
12       A.  No.
13       Q.  Have you attended any of the court
14   hearings in the case?
15       A.  No.
16       Q.  Have you offered comments on any of
17   the court documents that have been filed, apart
18   from your interrogatory answers?
19       A.  No, just my part.
20       Q.  When you say just your part, it's just
21   those answers that pertain specifically to you,
22   Mr. Riche.
23       A.  Right.
24       Q.  If the Court decides that this case
25   cannot proceed as a class action, would you

---

Page 176

1    nonetheless continue with your lawsuit to seek
2    compensation for the losses that you have
3    identified in your interrogatory responses?
4        A.  I'd have to consult with the
5    attorneys.  I'm a ribbon salesman, not an
6    attorney.
7        Q.  You might fold up your tents and go
8    away, but you just don't know?
9        A.  I don't know.
10       Q.  Have you ever served as a class
11   representative in any other lawsuit?
12       A.  No.
13       Q.  Do you have any understanding about
14   who bears the expenses of this lawsuit?
15       A.  Yes.
16       Q.  Do you understand that you may bear
17   any of those expenses?
18       A.  Yes, that's what I'm told.
19       Q.  What expenses might you bear?
20       A.  I don't know.
21       Q.  Have you borne any expenses so far?
22       A.  No.
23       Q.  Have you ever been convicted of a
24   crime other than a traffic offense?
25       A.  No.

---

Page 177

1        Q.  Have you ever been subject to a
2    restraining order?
3        A.  No.
4        Q.  Let me direct your attention back very
5    briefly to Riche Exhibit 7.  (Tendering.)
6    There is an item -- second item down, do you
7    see where it says -- this is on Riche 000014.
8    There is an entry there that says Temporary
9    Retraining Order Number 87116 against Michael
10   J. Riche dated and recorded March 3rd, 1999.
11   Can you tell us what that's about?
12       A.  I guess that's when we were divorced.
13   I didn't even go to the house, and apparently
14   she put a restraining order on me.  I didn't
15   even remember it.
16       Q.  You don't remember one way or the
17   other what happened.
18       A.  No.  Like I said, we were divorced and
19   I didn't even go to the house.  Well,
20   apparently she put a restraining on order on
21   me.  I don't know why.
22       (Brief recess.)
23       MR. RAFFMAN:
24           All right.  On the record, I
25       don't have any other questions at this

---

45 (Pages 174 to 177)

RICHE, MICHAEL

8/6/2008

---

Page 178

1     time.  Um -- I do need to go back and
2     check the discovery responses, and
3     reserve on that, but, um -- I'm
4     through for the day for sure.
5     MR. WIEDEMANN:
6        And I don't have any questions.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 180

1              REPORTER'S CERTIFICATE
2         I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3     Certified Court Reporter in and for the State
4     of Louisiana, do hereby certify that the
5     aforementioned witness, after having been first
6     duly sworn by me to testify to the truth, did
7     testify as hereinabove set forth;
8         That said deposition was taken by me
9     in computer shorthand and thereafter
10    transcribed under my supervision, and is a true
11    and correct transcription to the best of my
12    ability and understanding.
13        I further certify that I am not of
14    counsel, nor related to counsel or the parties
15    hereto, and am in no way interested in the
16    result of said cause.
17
18
19
20
21
22
23    _____
24    JOSEPH A. FAIRBANKS, JR., CCR, RPR
25    CERTIFIED COURT REPORTER #75005

---

Page 179

1           WITNESS' CERTIFICATE
2
3         I, MICHAEL JOSEPH RICHE, do hereby
4     certify that the foregoing testimony was given
5     by me, and that the transcription of said
6     testimony, with corrections and/or changes, if
7     any, is true and correct as given by me on the
8     aforementioned date.
9
10    _____     _____
11    DATE SIGNED          MICHAEL JOSEPH RICHE
12
13    _____ Signed with corrections as noted.
14
15    _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25    DATE TAKEN:  August 6th, 2008

---

Johns Pendleton Court Reporters

800 562-1285

BARGE001165