# EXHIBIT 26

GLASER, JACOB

8/7/2008

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES   * CIVIL ACTION

                                * NO. 05-4182

PERTAINS TO: BARGES             * Consolidated

                                * SECTION "K(2)"

Boutte v. Lafarge       05-5531 *

Mumford v. Ingram       05-5724 * JUDGE DUVAL

Lagarde v. Lafarge      06-5342 *

Perry v. Ingram         06-6299 * MAG. WILKINSON

Benoit v. Lafarge       06-7516 *

Parfait Family v. USA   07-3500 *

Lafarge v. USA          07-5178 *

   *   *   *   *   *   *   *   *   *   *   *


        Deposition of JACOB ROBERT GLASER,

given at Chaffe McCall, L.L.P., 2300 Energy

Centre, 1100 Poydras Street, New Orleans,

Louisiana 70163-2300, on August 7th, 2008.



REPORTER BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

GLASER, JACOB

8/7/2008

| Page 2 |
|---|
| 1  APPEARANCES: |
| 2  REPRESENTING THE BARGE PSLC: |
| 3       BRIAN A. GILBERT, APLC |
| 4       (BY:  BRIAN A. GILBERT, ESQUIRE) |
| 5       821 Baronne Street |
| 6       New Orleans, Louisiana 70113 |
| 7       504-885-7700 |
| 8  - and - |
| 9       WIEDEMANN & WIEDEMANN |
| 10      (BY:  EDWARD MORENO, ESQUIRE) |
| 11      821 Baronne Street |
| 12      New Orleans, Louisiana 70113 |
| 13      504-581-6180 |
| 14 |
| 15 REPRESENTING LAFARGE NORTH AMERICA: |
| 16      GOODWIN PROCTOR, L.L.P. |
| 17      (BY:  MARK S. RAFFMAN, ESQUIRE) |
| 18      (BY:  MARIE SCOTT, ESQUIRE) |
| 19      901 New York Avenue, NW |
| 20      Washington, D.C. 20001 |
| 21      202-346-4000 |
| 22 - and - |
| 23 |
| 24 |
| 25 |

| Page 4 |
|---|
| 1  REPRESENTING ORLEANS LEVEE DISTRICT: |
| 2       MCCRANIE, SISTRUNK, ANZELMO, HARDY, |
| 3       MAXWELL & MCDANIEL |
| 4       (BY:  MARK E. HANNA, ESQUIRE) |
| 5       3445 N. Causeway Boulevard, Suite 800 |
| 6       Metairie, Louisiana 70002 |
| 7       504-831-0946 |
| 8 |
| 9  REPRESENTING JEFFERSON PARISH: |
| 10      BURGLASS & TANKERSLEY |
| 11      (BY:  RICHARD PAVLICK, ESQUIRE) |
| 12      5213 Airline Drive |
| 13      Metairie, Louisiana 70001 |
| 14      504-836-2220 |
| 15 |
| 16 REPRESENTING LAKE BORGNE LEVEE DISTRICT: |
| 17      DUPLASS, ZWAIN, BOURGEOIS, MORTON, |
| 18      PFISTER & WEINSTOCK |
| 19      (BY:  NICOLE BOYER-DUPLASS, ESQUIRE) |
| 20      Three Lakeway Center, 29th Floor |
| 21      3838 N. Causeway Boulevard |
| 22      Metairie, Louisiana 70002 |
| 23      504-832-3700 |
| 24 |
| 25 |

| Page 3 |
|---|
| 1       CHAFFE, MCCALL, L.L.P. |
| 2       (BY:  CHARLES BLANCHARD, ESQUIRE) |
| 3       2300 Energy Centre |
| 4       1100 Poydras Street |
| 5       New Orleans, Louisiana 70163-2300 |
| 6       504-585-7000 |
| 7 |
| 8  REPRESENTING NEW YORK MARINE & GENERAL |
| 9  INSURANCE COMPANY: |
| 10      SUTTERFIELD & WEBB, LLC |
| 11      (BY:  DANIEL A. WEBB, ESQUIRE) |
| 12      650 Poydras Street, Suite 2715 |
| 13      New Orleans, Louisiana 70130 |
| 14      504-598-2715 |
| 15 |
| 16 REPRESENTING THE AMERICAN CLUB: |
| 17      MONTGOMERY, BARNETT, BROWN, READ, |
| 18      HAMMOND & MINTZ, L.L.P. |
| 19      (BY:  RONALD J. KITTO, ESQUIRE) |
| 20      1100 Poydras Street, Suite 3200 |
| 21      New Orleans, Louisiana 70163 |
| 22      504-585-3200 |
| 23 |
| 24 |
| 25 |

| Page 5 |
|---|
| 1  REPRESENTING WASHINGTON GROUP INTERNATIONAL: |
| 2       STONE PIGMAN WALTHER WITTMANN, L.L.C. |
| 3       (BY:  HEATHER LONIAN, ESQUIRE) |
| 4       546 Carondelet Street |
| 5       New Orleans, Louisiana 70130 |
| 6       504-581-3200 |
| 7 |
| 8  REPRESENTING SEWERAGE AND WATER BOARD: |
| 9       CHRISTOVICH & KEARNEY |
| 10      (BY:  CHRISTOPHER J. ALFIERI, ESQUIRE) |
| 11      601 Poydras Street, Suite 2300 |
| 12      New Orleans, Louisiana 70130 |
| 13      504-561-5700 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

2 (Pages 2 to 5)

BARGE001167

GLASER, JACOB

8/7/2008

Page 6

1           I N D E X
2   EXAMINATION BY:              PAGE
3   MR. RAFFMAN  ................9
4   MR. GILBERT  ...............146
5   MR. RAFFMAN  ...............148
6
7   EXHIBIT NO.               PAGE
8   Glaser Exhibit 1 ............16
9   Glaser Exhibit 2 ............18
10  Glaser Exhibit 3 ............19
11  Glaser Exhibit 4 ............21
12  Glaser Exhibit 5 ............21
13  Glaser Exhibit 6 ............32
14  Glaser Exhibit 7 ............37
15  Glaser Exhibit 8 ............39
16  Glaser Exhibit 9 ............40
17  Glaser Exhibit 10 ...........42
18  Glaser Exhibit 11 ...........44
19  Glaser Exhibit 12 ...........53
20  Glaser Exhibit 13 ...........54
21  Glaser Exhibit 14 ...........81
22  Glaser Exhibit 15 ...........82
23  Glaser Exhibit 16 ...........88
24  Glaser Exhibit 17 ...........88
25  Glaser Exhibit 18 ...........90

Page 7

1   Glaser Exhibit 19 ...........92
2   Glaser Exhibit 20 ...........94
3   Glaser Exhibit 21 ...........99
4   Glaser Exhibit 22 ..........100
5   Glaser Exhibit 23 ..........109
6   Glaser Exhibit 24 ..........123
7   Glaser Exhibit 25 ..........124
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1           S T I P U L A T I O N
2        IT IS STIPULATED AND AGREED by and
3   among counsel for the parties hereto that the
4   deposition of the aforementioned witness may be
5   taken for all purposes permitted within the
6   Louisiana Code of Civil Procedure, in
7   accordance with law, pursuant to notice;
8        That all formalities, save reading
9   and signing of the original transcript by the
10  deponent, are hereby specifically waived;
11       That all objections, save those as to
12  the form of the question and the responsiveness
13  of the answer, are reserved until such time as
14  this deposition, or any part thereof, is used
15  or sought to be used in evidence.
16
17
18                * * *
19
20
21
22        JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23  Certified Court Reporter in and for the State
24  of Louisiana, officiated in administering the
25  oath to the witness.

Page 9

1        JACOB ROBERT GLASER
2   308 Sweet Gum Lane, Madisonville, Louisiana
3   70447, a witness named in the above
4   stipulation, having been first duly sworn, was
5   examined and testified on his oath as follows:
6   EXAMINATION BY MR. RAFFMAN:
7        Q.  Mr. Glaser, my name is Mark Raffman
8   and I represent Lafarge North America which is
9   one of the defendants in this lawsuit.  I'll be
10  taking your deposition today.  I'll be asking
11  you some questions, and I'll ask you to answer
12  my questions.  You understand that.
13       A.  Yes, sir.
14       Q.  Have you ever given a deposition
15  before?
16       A.  Yes, sir.
17       Q.  When did you give a deposition?
18       A.  This year.
19       Q.  Just one?
20       A.  One.
21       Q.  What was the proceeding in which you
22  gave a deposition?
23       A.  Auto accident.
24       Q.  This is an auto accident case
25  involving yourself and your wife?

3 (Pages 6 to 9)

GLASER, JACOB

8/7/2008

| Page 10 |
| --- |

```
 1      A.  My wife.
 2      Q.  Just your wife.
 3      A.  Yes.
 4      Q.  You were not in the auto accident.
 5      A.  No.
 6      Q.  When did you give the deposition?
 7      A.  I'm guessing on a date.  I'd have to
 8  try to look that up, but I would say maybe
 9  April.
10      Q.  Sometime in April.  Is your wife the
11  plaintiff in the auto accident case?
12      A.  Yes.
13      Q.  Some of what I'm about to say may be
14  redundant because you've heard it before from
15  your earlier deposition, but I'll say it
16  anyway.  I will be asking you questions, and
17  you'll be answering them, and the court
18  reporter will be taking down what we both say.
19  In order for the court reporter to do his job
20  each of us has to speak rather than answering
21  with nods or gestures.  Do you understand that?
22      A.  Yes, sir.
23      Q.  In order for the court reporter to
24  accurately take down what we each say, and in
25  order to allow the people around this large
```

| Page 11 |
| --- |

```
 1  conference table to hear us, we each need to
 2  keep our voices up.  I'll try to keep my voice
 3  up.  Will you do the same?
 4      A.  Yes, sir.
 5      Q.  The court reporter can only take down
 6  one person's words at a time, so you and I each
 7  need to let each other finish before we begin
 8  to speak.  I will try my best to let you finish
 9  your answers before I speak.  Will you do your
10  best to let me finish my questions before you
11  answer them?
12      A.  Yes, sir.
13      Q.  You understand that you're under oath
14  here as if you were in a court of law.
15      A.  Yes, sir.
16      Q.  If you don't understand something that
17  I ask, will you ask me to clarify my question?
18      A.  Yes, sir.
19      Q.  If you remember something later in the
20  day that would have been responsive to a
21  question I asked earlier, you're welcome to add
22  to your previous testimony.  Do you understand
23  that?
24      A.  Yes, sir.
25      Q.  If you need to take a break or want to
```

| Page 12 |
| --- |

```
 1  take a break, for any reason whatsoever, I will
 2  only ask that you finish answering my question,
 3  and then we will take a break.  Do you
 4  understand?
 5      A.  Yes, sir.
 6      Q.  Have you taken any medication or drugs
 7  or alcohol that would interfere with your
 8  ability to testify truthfully and accurately
 9  today?
10      A.  No, sir.
11      Q.  Is there any other reason why you
12  cannot testify truthfully and accurately to the
13  best of your ability today?
14      A.  No, sir.
15      Q.  What did you do to prepare for this
16  deposition?
17      A.  I had a meeting with Mr. Gilbert.
18      Q.  Mr. Gilbert is your lawyer?
19      A.  Yes, sir.
20      Q.  When did you meet with Mr. Gilbert?
21      A.  Today.
22      Q.  For how long?
23      A.  An hour.
24      Q.  Before your meeting with Mr. Gilbert,
25  had you done anything else to prepare for the
```

| Page 13 |
| --- |

```
 1  deposition?
 2      A.  No, sir.
 3      Q.  Did you review any documents to
 4  prepare for the deposition?
 5      A.  Yes, sir.
 6      Q.  Did any of the documents that you
 7  reviewed refresh your recollection about the
 8  events that you expect to testify about today?
 9      A.  Somewhat.
10      Q.  What documents did you review that
11  refreshed your recollection?
12      A.  Some of the paperwork Mr. Gilbert had
13  sent us previously.
14      Q.  Can you describe that paperwork?
15      A.  Mostly questionnaires.
16      Q.  Were these questionnaires to which you
17  had -- can you describe the questionnaires for
18  me, please?
19      A.  It was somewhat of a form
20  questionnaire about the barge case accident,
21  sent I believe to everyone that was involved in
22  it.
23      Q.  Do you have a copy of the form
24  questionnaire here with you today?
25      A.  I do not.
```

4 (Pages 10 to 13)

GLASER, JACOB

8/7/2008

| | Page 14 |
|---|---|
| 1 | MR. RAFFMAN: |
| 2 | I would ask that a copy of the |
| 3 | form questionnaire that Mr. Glaser |
| 4 | used to refresh his recollection be |
| 5 | provided to me in connection with this |
| 6 | examination. |
| 7 | MR. GILBERT: |
| 8 | And I would refer you to the |
| 9 | privileged log that we filed herein. |
| 10 | To the extent that it describes such a |
| 11 | questionnaire it will not be |
| 12 | furnished. |
| 13 | EXAMINATION BY MR. RAFFMAN: |
| 14 | Q.  The questionnaire that you used to |
| 15 | refresh your recollection -- |
| 16 | MR. RAFFMAN: |
| 17 | Just to be clear for the record, |
| 18 | um -- you are refusing to produce to |
| 19 | me at the deposition -- |
| 20 | MR. GILBERT: |
| 21 | It's very clear. |
| 22 | MR. RAFFMAN: |
| 23 | Let me just finish what I'm |
| 24 | saying and then we'll move on. |
| 25 | You are refusing to produce the |

| | Page 15 |
|---|---|
| 1 | questionnaire that Mr. Glaser used to |
| 2 | refresh his recollection in |
| 3 | preparation for his deposition |
| 4 | testimony.  Is that a correct |
| 5 | understanding, Mr. Gilbert? |
| 6 | MR. GILBERT: |
| 7 | I am refusing to produce a |
| 8 | questionnaire that was used -- well, |
| 9 | I'm not going to describe what it was |
| 10 | used, I'm going to refer you to the |
| 11 | privileged log.  And I will tell you |
| 12 | that you are entitled to look at the |
| 13 | discovery responses that Mr. Glaser |
| 14 | referred to to refresh his memory in |
| 15 | preparation for this deposition. |
| 16 | EXAMINATION BY MR. RAFFMAN: |
| 17 | Q.  In addition to the questionnaire that |
| 18 | you used to refresh your recollection for the |
| 19 | deposition, Mr. Glaser, were there other |
| 20 | documents that you looked at? |
| 21 | A.  No. |
| 22 | MR. GILBERT: |
| 23 | And I'm going to represent for |
| 24 | the record that Mr. Glaser did review |
| 25 | his discovery responses. |

| | Page 16 |
|---|---|
| 1 | MR. RAFFMAN: |
| 2 | I appreciate your representation. |
| 3 | I different understand that counsel |
| 4 | was under oath, but that's fine. |
| 5 | EXAMINATION BY MR. RAFFMAN: |
| 6 | Q.  Mr. Glaser, let me hand you some |
| 7 | documents that I'll mark as exhibits to the |
| 8 | deposition.  I've marked as Glaser 1 Answers to |
| 9 | Interrogatories Propounded by the Barge |
| 10 | Entities.  I ask you to take a look at that and |
| 11 | tell me whether this document is one of the |
| 12 | documents you reviewed -- or strike that.  Take |
| 13 | a look at the document.  (Tendering.) |
| 14 | (Glaser Exhibit 1 was marked for |
| 15 | identification and is attached hereto.) |
| 16 | MR. RAFFMAN: |
| 17 | The record will reflect that |
| 18 | Mr. Glaser has reviewed the document |
| 19 | for over a minute. |
| 20 | MR. GILBERT: |
| 21 | Counsel, would you like him to |
| 22 | look at every page of it, or are there |
| 23 | any particular pages that you would |
| 24 | like him to look at and abstain from |
| 25 | looking at the other pages?  What |

| | Page 17 |
|---|---|
| 1 | would you like him to do?  Do you have |
| 2 | a question? |
| 3 | MR. RAFFMAN: |
| 4 | Mr. Gilbert, I will ask you not |
| 5 | to interrupt my questioning.  Yes, I |
| 6 | do have a question. |
| 7 | MR. GILBERT: |
| 8 | You haven't asked a question. |
| 9 | And I haven't interrupted your |
| 10 | question. |
| 11 | MR. RAFFMAN: |
| 12 | That's correct.  You're speaking |
| 13 | out of turn. |
| 14 | MR. GILBERT: |
| 15 | You don't make the rules, |
| 16 | Mr. Raffman. |
| 17 | MR. RAFFMAN: |
| 18 | Actually, the rules are set out |
| 19 | in Case Management Order No. 4 and 5. |
| 20 | And if the interruptions continue, |
| 21 | we'll take it to the Magistrate. |
| 22 | MR. GILBERT: |
| 23 | Please feel free to do that. |
| 24 | EXAMINATION BY MR. RAFFMAN: |
| 25 | Q.  Mr. Glaser, do you recognize Glaser |

5 (Pages 14 to 17)

GLASER, JACOB

8/7/2008

Page 18

1 Exhibit 1 as one of the documents that you
2 reviewed to prepare for your deposition?
3     A. I recognize some of these pages that I
4 reviewed today.
5     Q. So some of the pages that are in
6 Exhibit 1 were taken out for your review?
7     A. I cannot recall.
8     Q. Let me show you a document that's been
9 marked as Exhibit 2 to your deposition. Glaser
10 Exhibit 2 is another set of interrogatory
11 responses that were produced to us by the
12 plaintiffs. Do you recognize Glaser Exhibit 2
13 as one of the documents you reviewed to prepare
14 for your deposition?
15         (Glaser Exhibit 2 was marked for
16 identification and is attached hereto.)
17     A. Some of the pages.
18 EXAMINATION BY MR. RAFFMAN:
19     Q. Some of the pages but not all of them,
20 correct?
21     A. Some of the pages I recognize, some of
22 them I can't recall.
23     Q. Okay. Glaser Exhibit 3 to your
24 deposition is another set of interrogatory
25 responses produced by the plaintiffs in this

Page 19

1 case. Do you recognize Glaser Exhibit 3 as one
2 of the documents that you reviewed to prepare
3 for your deposition?
4         (Glaser Exhibit 3 was marked for
5 identification and is attached hereto.)
6     A. Again, some of the pages I recognize,
7 some I do not.
8 EXAMINATION BY MR. RAFFMAN:
9     Q. Which of the pages do you recognize in
10 these documents, Mr. Glaser? Let me ask it
11 this way: Do you recognize the pages that have
12 your name on it?
13     A. Yes, sir.
14     Q. Those are the pages that you used to
15 refresh your recollection for the deposition,
16 right?
17     A. Some of them. I guess so.
18     Q. Some of them. And in addition to
19 those pages, you used the questionnaire to
20 prepare for your deposition, right?
21     A. I'm not going to say that I used the
22 questionnaire to prepare for anything today.
23     Q. Did the document -- the questionnaire
24 that you referred to earlier that you used to
25 refresh your recollection, are these exhibits

Page 20

1 the questionnaire you were referring to?
2     A. Similar.
3     Q. Similar. Not the same, correct?
4     A. Not exactly the same.
5     Q. What was different?
6     A. Format.
7     Q. Is the information that's shown in
8 these interrogatory answers the same as the
9 information that was contained in the
10 questionnaire?
11     A. Sir, I can only answer with what I saw
12 today I see some pages familiar to the pages I
13 had seen today in these documents.
14     Q. So the only way that I could know
15 whether the information in the questionnaire is
16 exactly the same as the information in the
17 interrogatory responses would be for me to
18 compare the two. Isn't that fair?
19     A. Or possibly me to compare the two.
20     Q. Somebody has to compare the two,
21 right?
22     A. I would say it would be me, because I
23 saw the documents today and have seen these
24 documents.
25     Q. Right. Now, are you able, as way sit

Page 21

1 here today, to compare the questionnaire that
2 you used to refresh your recollection with the
3 information that's in these responses?
4     A. No.
5     Q. Could you do that?
6     A. No.
7     Q. Let's just run the string on these
8 interrogatory answers. I'll hand you Glaser
9 Exhibit 4 and ask you the same question. Is
10 that one of the documents used to refresh your
11 recollection for the deposition?
12         (Glaser Exhibit 4 was marked for
13 identification and is attached hereto.)
14     A. Again, sir, some of these pages I
15 possibly have seen today.
16 EXAMINATION BY MR. RAFFMAN:
17     Q. Same question for Glaser Exhibit 5,
18 another set of interrogatory answers.
19 (Tendering.)
20         (Glaser Exhibit 5 was marked for
21 identification and is attached hereto.)
22     A. Again, these are some of the questions
23 I may have seen today.
24 EXAMINATION BY MR. RAFFMAN:
25     Q. Okay. Thank you.

Johns Pendleton Court Reporters          800 562-1285

BARGE001171

GLASER, JACOB

8/7/2008

Page 22

```
1        Apart from the questionnaire and some
2   portions of Glaser Exhibits 1 through 5, are
3   there any other documents that you used to
4   refresh your recollection to prepare for this
5   deposition today?
6       A.  Not that I recall.
7       Q.  Thank you.  Mr. Glaser, where do you
8   live now?
9       A.  Madisonville, Louisiana.
10      Q.  What's your address?
11      A.  308 Sweet Gum Lane.
12      Q.  Madisonville, Louisiana is on the
13  north shore of Lake Pontchartrain?
14      A.  Correct.
15      Q.  When were you born?
16      A.  June 13th, 1949.
17      Q.  Where did you grow up?
18      A.  New Orleans.
19      Q.  You lived in New Orleans or environs
20  your whole life?
21      A.  Not to this date.  Please clarify
22  that.  I apologize.  Please clarify it.  How
23  long?  Where?
24      Q.  Sure.  Did you live in -- you grew up
25  in Orleans Parish?
```

Page 23

```
1       A.  Yes.
2       Q.  And did you ever move out of Orleans
3   Parish?
4       A.  Yes.
5       Q.  When did you do that?
6       A.  In 1976.
7       Q.  Where did you move when you --
8       A.  Chalmette, Louisiana.
9       Q.  How long did you live at Chalmette,
10  Louisiana?
11      A.  Until the hurricane.
12      Q.  Okay.  Are you married?
13      A.  Yes, sir.
14      Q.  What's your wife's name?
15      A.  Diane Glaser.
16      Q.  How long have you and Mrs. Glaser been
17  married?
18      A.  Since 1977.
19      Q.  Do you have any children?
20      A.  Two.
21      Q.  What are their names and ages?
22      A.  Jacob is 26, Angelle is 27.
23      Q.  How do you spell your daughter's name?
24      A.  A-N-G-E-L-L-E.
25      Q.  And you've been married to
```

Page 24

```
1   Mrs. Glaser -- Diane Glaser continuously since
2   1977.
3       A.  Yes, sir.
4       Q.  Had you been married before you
5   married Diane Glaser?
6       A.  Yes, sir.
7       Q.  Your other marriage before marrying
8   Diane Glaser, is that your only other marriage?
9       A.  Yes, sir.
10      Q.  When was your first marriage?
11      A.  That was in 1970.  '71.  I'm sorry.
12      Q.  How long did that marriage last?
13      A.  Approximately a year.
14      Q.  Are there any children by that
15  marriage?
16      A.  No, sir.
17      Q.  What is the highest level of education
18  that you've obtained, Mr. Glaser?
19      A.  Two years of college.
20      Q.  Where did you attend college?
21      A.  Delgado.
22      Q.  Delgado is here in New Orleans?
23      A.  Yes, sir.
24      Q.  What did you study at Delgado?
25      A.  Accounting, um -- business studies.
```

Page 25

```
1       Q.  Before going to two years of -- I'm
2   sorry.
3       A.  No, go ahead.  Continue.
4       Q.  Before your two years at Delgado, you
5   had graduated high school?
6       A.  Yes, sir.
7       Q.  Where did you attend high school?
8       A.  Holy Cross.
9       Q.  Holy Cross High School is over there
10  in the Lower Ninth Ward?
11      A.  Yes, sir.
12      Q.  And in which neighborhood of New
13  Orleans did you grow up?
14      A.  Gentilly.
15      Q.  Gentilly is on the western side of the
16  Inner Harbor Navigation Canal; right?
17      A.  I believe so.
18      Q.  After your two years at Delgado, did
19  you enter the workforce?
20      A.  Yes, sir.
21      Q.  What was your first employment after
22  Delgado?
23      A.  We were in the jewelry business.
24      Q.  Did your parents own a jewelry store?
25      A.  No, sir.
```

7 (Pages 22 to 25)

BARGE001172

GLASER, JACOB

8/7/2008

Page 26

1    Q.   Was there a jewelry store in your
2  family?
3    A.   No, sir.
4    Q.   You went into the jewelry business
5  immediately after leaving Delgado.
6    A.   No, sir.
7    Q.   Okay.  Describe for me the course of
8  your employment history.
9    A.   I started in the jewelry business in
10  the mid seventies, and then attended Delgado
11  through that period.
12    Q.   You didn't go to Delgado right out of
13  high school.
14    A.   No, sir.
15    Q.   That was my mistaken assumption.
16  Thank you for clarifying.
17       So when you got out of high school --
18  in what year?
19    A.   1967.
20    Q.   What did you do right out of high
21  school?
22    A.   Worked.
23    Q.   And in what trade or occupation?
24    A.   Shoe salesman.
25    Q.   Did you have any military service?

Page 27

1    A.   Yes, sir.
2    Q.   Tell me about your military service.
3    A.   United States Navy.
4    Q.   When were you in the Navy?
5    A.   Um -- from '68 to '72.
6    Q.   What was your rank on induction into
7  the Navy?
8    A.   E1 you go in.
9    Q.   What was your rank when you left the
10  Navy in 1972?
11    A.   I was still in the reserves, E3.
12    Q.   Did you see combat action during the
13  four years you were in the Navy?
14    A.   No, sir.
15    Q.   Where were you stationed when you were
16  in the Navy?
17    A.   Guam.
18    Q.   Did you receive an honorable
19  discharge?
20    A.   Yes, sir.
21    Q.   Any decorations or awards?
22    A.   No, sir.
23    Q.   After you left the Navy in 1972, what
24  did you do next for employment?
25    A.   I went back to shoe sales.

Page 28

1    Q.   How long were you in the line of shoe
2  sales?
3    A.   My I readdress -- you said 1972 when I
4  left the Navy.  Actually, I was in the reserve,
5  so we got early outs in 1969.
6    Q.   Okay.  Let me go back, then.  You were
7  at Guam for how long?
8    A.   A little less than two years.
9    Q.   And after Guam, where did you go next?
10    A.   New Orleans.
11    Q.   New Orleans.  And you returned to New
12  Orleans in what year?
13    A.   1970.
14    Q.   When you returned to New Orleans in
15  1970, what line of work did you go into?
16    A.   Shoe sales.
17    Q.   During the period from 1970 to '72,
18  were you also in the reserves?
19    A.   Yes, sir.
20    Q.   And you were in the reserves at the
21  same time you were pursuing shoe sales.
22    A.   Yes, sir.
23    Q.   Okay.  How long were you in the shoe
24  sales trade?
25    A.   Until about 1971.

Page 29

1    Q.   What did you do in 1971?
2    A.   Went to work for a costume jewelry
3  manufacturer.
4    Q.   What was the name of the manufacturer?
5    A.   Tammany Jewels.
6    Q.   They were here in New Orleans?
7    A.   No, sir.
8    Q.   Where are they located?
9    A.   Indianapolis, Indiana.
10    Q.   What did you do for Tammany Jewels?
11    A.   Set up stores, managed shipping,
12  multiple tasks.
13    Q.   How long were you employed by Tammany
14  Jewelers?
15    A.   Approximately eighteen months.
16    Q.   When you left their employ, what did
17  you do next?
18    A.   Returned to New Orleans.
19    Q.   When you went into the employ of
20  Tammany Jewelers, did you move away from New
21  Orleans?
22    A.   Yes, sir.
23    Q.   To where did you move?
24    A.   Indianapolis, Indiana.
25    Q.   That move to Indianapolis coincided

Johns Pendleton Court Reporters          800 562-1285
BARGE001173

GLASER, JACOB

8/7/2008

Page 30

1    with the dates of your first marriage.
2        A.   Yes, sir.
3        Q.   You moved back to New Orleans around
4    the time your first marriage ended.
5        A.   Yes, sir.
6        Q.   When you returned to New Orleans, what
7    employment did you pursue then?
8        A.   Went into the jewelry business.
9        Q.   Okay.  Now, tell me about your first
10   entree into the jewelry business, if you
11   understand what I'm asking you.
12       A.   Opened a location in New Orleans.
13       Q.   Where was your first location?
14       A.   French Quarter.
15       Q.   What was the name of your business?
16       A.   Beaux Bijoux.
17       Q.   Thank you.  Even an out-of-towner can
18   learn to spell.
19           How long did you own Beaux Bijoux?
20       A.   Ten years.
21       Q.   Were you the sole proprietor of Beaux
22   Bijoux?
23       A.   Yes.
24       Q.   What became of Beaux Bijoux at the end
25   of those ten years?

Page 31

1        A.   Moved it to Chalmette.
2        Q.   What year did you move your business
3    to Chalmette?
4        A.   1984.
5        Q.   Did you own the building in which
6    Beaux Bijoux operated?
7        A.   No, sir.
8        Q.   Did you rent?
9        A.   Yes, sir.
10       Q.   When you moved your business to
11   Chalmette in 1984, what was the address to
12   which you moved?
13       A.   8400 West Judge Perez Drive.
14       Q.   That address is the address at which
15   you were operating your business at the time
16   Hurricane Katrina struck New Orleans; am I
17   right?
18       A.   Yes, sir.
19       Q.   When you moved your business to
20   Chalmette, did you change the name?
21       A.   Yes, sir.
22       Q.   What was the name of the business?
23       A.   Holiday Jewelers.
24       Q.   When did your business first come to
25   be known by the name Holiday Jewelers?

Page 32

1        A.   When we moved.
2        Q.   1984.
3        A.   Yes.
4        Q.   Did you operate your business Holiday
5    Jewelers continuously at the West Judge Perez
6    Drive location from 1984 through the time of
7    Hurricane Katrina?
8        A.   Yes, sir.
9        Q.   I'm handing you what's been marked as
10   Exhibit 6 to your deposition.  Exhibit 6 is a
11   map print from Google with a little red bubble
12   on it.  I ask you, do you recognize the little
13   red bubble on Exhibit 6 as the location of your
14   store at 8400 West Judge Perez?
15           (Glaser Exhibit 6 was marked for
16   identification and is attached hereto.)
17       A.   I would say it's very close but not
18   exactly where it was.
19   EXAMINATION BY MR. RAFFMAN:
20       Q.   If I hand you a pen, would you please
21   mark on the map exactly where your store was.
22       A.   (Witness complies.)
23           MR. RAFFMAN:
24               The witness has placed an X on
25           the map at the location of the store.

Page 33

1    EXAMINATION BY MR. RAFFMAN:
2        Q.   Does the X on the map represent the
3    location of the store?
4        A.   Yes, as close as I can tell from the
5    map.
6        Q.   Thank you.  Under what form of
7    business did Holiday Jewelers operate?
8        A.   I don't understand the question.
9        Q.   Did your business Holiday Jewelers
10   operate as a corporation?
11       A.   Yes.
12       Q.   When did you incorporate the business?
13       A.   Upon moving to St. Bernard Parish in
14   1984.
15       Q.   Apart from yourself and Mrs. Glaser,
16   have there ever been other owners or
17   shareholders in Holiday Jewelers?
18       A.   No, sir.
19       Q.   Has Mrs. Glaser had an interest in
20   Holiday Jewelers?
21       A.   Define interest.
22       Q.   Well, who were the shareholders of
23   Holiday Jewelers?
24       A.   I was the stockholder.
25       Q.   Just you.

9  (Pages 30 to 33)

GLASER, JACOB

8/7/2008

---

Page 34

1    A.  Yes, sir.
2    Q.  Have there been any years since 1984
3  in which Holiday Jewelers did not make a
4  profit?
5        Let me qualify the question.  Between
6  1984 and 2005 before Katrina -- actually,
7  that's bad question, too.  I'm going to reload.
8        Between 1985 and 2004, were there any
9  years in which Holiday Jewelers did not make a
10  profit?
11    A.  I believe so.
12    Q.  How many years were those?
13    A.  I cannot recall.
14    Q.  Between 2000 and 2004, were there any
15  years in which your business Holiday Jewelers
16  did not make a profit?
17    A.  I cannot recall.
18    Q.  Is it fair to say that the performance
19  of your business fluctuated from year to year?
20    A.  Positively.
21    Q.  The building at 8400, you didn't own
22  that building, did you?
23    A.  No, sir.
24    Q.  I'm now referring to a document that's
25  been filed with the court, record document

Page 35

1  13166.  This is plaintiff's motion to certify
2  the class.  I will not mark it as an exhibit,
3  but I'm going to show it to you and
4  particularly the part at Page 7 which pertains
5  to Jacob Robert "Bob" Glaser.  Do you see the
6  part of this motion that I'm referring to,
7  Mr. Glaser?
8    A.  Part F, Jacob Robert Glaser.
9    Q.  Turning your attention now to the item
10  marked 4, it says, street addresses of
11  properties for which damages are sought, with
12  detailed information.  Do you see that?
13    A.  Yes, sir.
14    Q.  And do you see that under your name it
15  says none?  Correct?
16    A.  Yes, sir.
17    Q.  Am I right then that you are not
18  seeking damages in this case for damage to real
19  property?
20    A.  Define real property.  Movable
21  property?
22    Q.  Um -- immovable property is
23  specifically what I'm talking about now.
24    A.  Yes, sir, we're not seeking damages
25  for immovable property.

Page 36

1    Q.  And just to be clear, you are seeking
2  damages in this case for the loss of your
3  inventory, equipment and fixtures that were in
4  the store.  Right?
5    A.  Yes, sir.
6    Q.  But you're not seeking damages for the
7  building or the lot.
8    A.  No, sir.
9    Q.  Am I correct that you're not seeing
10  damages for the building or the lot?
11    A.  Yes, sir.
12    Q.  Have you ever been a plaintiff in a
13  different lawsuit, Mr. Glaser?
14    A.  Yes, sir.
15    Q.  What lawsuits have you been a
16  plaintiff in?
17    A.  Against Murphy Oil Refinery in
18  Chalmette.  Against our homeowner's insurance
19  American National.  And that's all that I can
20  recall at this time.
21    Q.  Did you ever participate in a case
22  against the State of Louisiana involving
23  pension benefits?
24    A.  No, sir.
25    Q.  Are you at all familiar with a case

Page 37

1  entitled Donald Abshire versus the State of
2  Louisiana?
3    A.  Those names don't familiarize myself
4  with me.
5    Q.  All right.  I'll hand you what has
6  been marked as Glaser Exhibit 7, which is an
7  Amended Notice of Removal in the United States
8  District Court for the Middle District of
9  Louisiana, 2001.  (Tendering.)  I've tabbed a
10  page on which I believe your name may appear.
11  I'm showing you -- your counsel is showing you
12  Glaser Exhibit 7.  Does Exhibit 7 refresh your
13  recollection about your participation in a
14  lawsuit against the State of Louisiana?
15        (Glaser Exhibit 7 was marked for
16  identification and is attached hereto.)
17    A.  Again, I don't recognize any of that
18  at this time.
19  EXAMINATION BY MR. RAFFMAN:
20    Q.  Turning your attention to the names
21  that appear on Page 13, do you see the name
22  Diane Guerra Glaser on that page?
23    A.  Yes, sir.
24    Q.  And that is your wife, right?
25    A.  Yes, sir.

10 (Pages 34 to 37)

BARGE001175

GLASER, JACOB

8/7/2008

Page 38

1     Q.  Her maiden name is Guerra.
2     A.  Yes, sir.
3     Q.  Underneath her name there's another
4  name, Glaser, Jacob R.
5     A.  Yes, sir.
6     Q.  And that is your name, right?
7     A.  Yes, sir.
8     Q.  You go by the name Bob, but your name
9  is Jacob R. Glaser.
10    A.  Yes, sir.
11    Q.  You are unable to remember or shed any
12 light at this time on the participation by you
13 or your wife in the lawsuit reflected in Glaser
14 7; correct?
15    A.  Not against the State of Louisiana as
16 you indicated to me earlier that's what that
17 is.  I'm not an attorney.  I don't know how all
18 that terminology --
19    Q.  You, um -- don't remember
20 participating in a lawsuit in 2001 relating to
21 pension benefits?
22    A.  No, sir.
23    Q.  Is it fair to say the lawsuit that's
24 in this Exhibit 7 is quite foreign to your
25 comprehension today?

Page 39

1     A.  Yes, sir.
2     Q.  You mentioned a lawsuit against Murphy
3  Oil.
4     A.  Yes, sir.
5     Q.  What was that lawsuit about?
6     A.  Oil on our rental property and
7  personal home in St. Bernard Parish.
8     Q.  I'm handing you what's been marked as
9  Glaser Exhibit 8.  Do you recognize Glaser
10 Exhibit 8 as a copy of the petition that was
11 filed on your behalf and your wife's behalf
12 against Murphy Oil?
13       (Glaser Exhibit 8 was marked for
14 identification and is attached hereto.)
15    A.  Yes, sir.
16 EXAMINATION BY MR. RAFFMAN:
17    Q.  Where was your personal home?
18    A.  In St. Bernard Parish.
19    Q.  The address?
20    A.  3716 Riverland Drive.
21    Q.  That address is east of Paris Road?
22    A.  Yes, sir.
23    Q.  I'm handing you a document marked
24 Glaser Exhibit 9 and ask you to tell me whether
25 the red bubble in this Google map represents

Page 40

1  the location of your personal home at 3716
2  Riverland Drive.
3        (Glaser Exhibit 9 was marked for
4  identification and is attached hereto.)
5     A.  I would say yes, sir.
6  EXAMINATION BY MR. RAFFMAN:
7     Q.  Where was your rental property?
8     A.  Jacob Drive in St. Bernard Parish.
9     Q.  What was the address of the rental
10 property?
11    A.  2808 and 10 Jacob Drive.
12    Q.  Both -- sorry.  That property is also
13 east of Paris Road?
14    A.  Yes, sir.
15    Q.  You alleged in your suit against
16 Murphy Oil that both your personal home and
17 your rental property had been contaminated with
18 oil as a result of something that happened at
19 Murphy Oil?
20    A.  Yes, sir.
21    Q.  Did you make any allegations in your
22 complaint against Murphy Oil regarding harm to
23 your business Holiday Jewelers?
24    A.  No, sir.
25    Q.  Is it your contention in this case

Page 41

1  that Murphy Oil had nothing to do with any harm
2  to your business at Holiday Jewelers?
3     A.  Yes, sir.
4     Q.  Is it your contention in this case
5  that the only source of harm to your business
6  at Holiday Jewelers is the damage that you
7  allege was caused by the barge?
8     A.  Yes, sir.
9     Q.  All right.  I'm going to hand you back
10 Glaser Exhibit 8 and I'll ask you to turn to
11 Paragraph 66, Mr. Glaser.  Exhibit 8 is the
12 complaint that was filed on your behalf against
13 Murphy Oil; correct?
14    A.  Yes, sir.
15    Q.  Would you read for the record the
16 allegations in your complaint in Paragraph 66
17 of your complaint against Murphy Oil?
18    A.  The crude oil, petroleum and petroleum
19 by-products that spilled into St. Bernard
20 Parish from the Murphy Oil facility delayed the
21 recovery and restoration of the parish and the
22 return of parish residents which adversely
23 affected plaintiff's business Holiday Jewelers.
24    Q.  And that's an allegation you made in
25 your suit against Murphy Oil, correct?

11 (Pages 38 to 41)

GLASER, JACOB

8/7/2008

Page 42

1    A.  Yes, sir.
2    Q.  I'm handing you what I've marked as
3  Glaser Exhibit 10.  You recognize Glaser
4  Exhibit 10 as a copy of the Petition for
5  Damages and Jury Demand that was filed on your
6  behalf and your wife's behalf against American
7  National Property and Casualty Companies?
8        (Glaser Exhibit 10 was marked for
9  identification and is attached hereto.)
10    A.  Yes, sir.
11  EXAMINATION BY MR. RAFFMAN:
12    Q.  What was the thrust of that lawsuit?
13    A.  Um -- further damages to our personal
14  home.
15    Q.  Before I go deeper into this lawsuit I
16  want to go back to Murphy Oil for a minute.
17    A.  Yes, sir.
18    Q.  Has the Murphy Oil case, the complaint
19  you filed against Murphy Oil, been resolved?
20    A.  Yes, sir.
21    Q.  How was that resolved?
22    A.  Settled out of court.
23    Q.  Murphy Oil paid you some money?
24    A.  Yes, sir.
25    Q.  How much did they pay you?

Page 43

1    A.  For which property, sir?
2    Q.  Total.
3    A.  Um -- about a hundred and sixty-five
4  thousand dollars.
5    Q.  In return for receiving that payment,
6  you released all your claims against Murphy
7  Oil, didn't you?
8    A.  Yes, sir.
9    Q.  Including any claims you might have
10  had relating to your business Holiday Jewelers.
11    A.  Yes, sir.
12    Q.  Has the case against American National
13  Property and Casualty Company been resolved?
14    A.  Not quite.
15    Q.  What's the status of that case?
16    A.  Waiting for payment from American
17  National to our attorneys.
18    Q.  Has a settlement been reached?
19    A.  Yes, sir.
20    Q.  You didn't give a deposition in the
21  Murphy Oil case, did you?
22    A.  No, sir.
23    Q.  You didn't give a deposition in the
24  American National case either; right?
25    A.  No, sir.

Page 44

1    Q.  Bad question.  Did you give a
2  deposition in the American National case?
3    A.  No, sir.
4    Q.  That's a better question.
5        Did you file a lawsuit against a
6  company called Audubon Enterprises d/b/a
7  Fahrenheit?
8    A.  No, sir.
9    Q.  Did your son file such a lawsuit?
10    A.  That I cannot answer for my son.
11    Q.  What's your son 's middle initial?
12    A.  R.
13    Q.  I'm showing you what's been marked as
14  Glaser Exhibit 11.  Glaser Exhibit 11 is a Petition for
15  Damages filed by Jacob R. Glaser versus 1225
16  Audubon Enterprises, L.L.C. d/b/a Fahrenheit.
17  Mr. Glaser, have you ever seen this document
18  before?
19        (Glaser Exhibit 11 was marked for
20  identification and is attached hereto.)
21    A.  No, sir.
22  EXAMINATION BY MR. RAFFMAN:
23    Q.  Do you have -- having looked at the
24  document, does it refresh your recollection as
25  to whether you or your son have ever filed a

Page 45

1  lawsuit against Audubon Enterprises?
2    A.  I believe this belongs to my son, not
3  me.
4    Q.  The events alleged in the complaint
5  about, um -- a barroom fight have nothing to do
6  with you.
7    A.  No, sir.
8    Q.  Did you also participate in a lawsuit
9  in the late 1990s regarding emissions from the
10  Murphy Oil refinery?
11    A.  Yes, sir.
12    Q.  What was the --
13    A.  Excuse me.  You say emissions.  Is
14  this commonly referred to as the water case?
15    Q.  Tell me what you can say about the
16  case that you participated in in the late 1990s
17  against Murphy Oil.
18    A.  I apologize.  I believe what I'm
19  referring to is against Mobil Oil, not Murphy
20  Oil.
21    Q.  Okay.  Then I may have it wrong.  Tell
22  me about the Mobil Oil lawsuit you're referring
23  to.
24    A.  And I'm very vague on this, because
25  it's something that was going on for all of

12  (Pages 42 to 45)

GLASER, JACOB

8/7/2008

Page 46

1   St. Bernard Parish. It was some water, um --
2   fouling of a water intake in St. Bernard
3   Parish, and that I understand is an either
4   ongoing or -- case.
5       Q. Is the case involving Mobil Oil a
6   class action?
7       A. I believe so, sir.
8       Q. Are you a representative of a class in
9   that case?
10      A. No, sir.
11      Q. Have you signed up with a lawyer or a
12  law firm to participate in that case?
13      A. Yes, sir.
14      Q. What lawyer or law firm?
15      A. Sidney Torres.
16      Q. Apart from representation in that
17  Mobil Oil case, has Mr. Torres represented you
18  in any other litigation?
19      A. Not that I recall at this time.
20      Q. Is there any other litigation to which
21  you've been a party that you've not testified
22  about already in this deposition?
23      A. I know we're also part of the levee
24  breach against the Army Corps of Engineers.
25  I've filled out personally some form and sent

Page 47

1   it in to Army Corps of Engineers.
2       Q. Apart from your participation in that
3   legal proceeding against the Army Corps and --
4       MR. GILBERT:
5           Let me just object at this point
6       because he didn't testify that he was
7       participating in a legal proceeding,
8       he said he submitted a claim.
9       MR. RAFFMAN:
10          Actually, my question was about
11      lawsuits. And he answered it the way
12      he answered it.
13  EXAMINATION BY MR. RAFFMAN:
14      Q. Apart from whatever participation you
15  have in a legal proceeding against the Corps,
16  whatever it is, are there any other lawsuits
17  that you've participated in that we've not
18  discussed at this deposition today?
19      A. Not that I can recall at this time.
20      Q. The claim form that you filled out and
21  sent to the Corps, was that a claim form SF 95?
22      A. I can only answer I think so because I
23  don't have the form in front of me.
24      Q. Do you have a copy of that form?
25      A. I do, in my file, which I'll be glad

Page 48

1   to give to my attorney.
2       MR. RAFFMAN:
3           Well, I'll say for the record
4       that the form was not produced and we
5       ask that it be produced. We'll follow
6       up in writing.
7       MR. GILBERT:
8           Agreed.
9   EXAMINATION BY MR. RAFFMAN:
10      Q. Did you fill the SF 95 form out
11  yourself?
12      A. Yes, sir.
13      Q. Did you have the assistance of a
14  lawyer in filling out that form?
15      A. No, sir.
16      Q. Have you retained a lawyer to
17  represent you in any capacity in connection
18  with your claims against the Corps?
19      A. Um -- attorney David Batt who
20  represented us in our claim against American
21  National and Murphy Oil I believe also filed a
22  similar form, but I do not have any of that
23  paperwork.
24      Q. You believe Mr. Batt filed a similar
25  form on your behalf with the Corps?

Page 49

1       A. I believe. I would have to contact
2   Mr. Batt 's office to verify that.
3       Q. If you contacted Mr. Batt's office,
4   and if in fact Mr. Batt had filed a form on
5   your behalf, do you expect that he would
6   provide you with a copy?
7       A. Yes.
8       MR. RAFFMAN:
9           We would ask for a copy of that
10      form, as well, and will follow up in
11      writing.
12      (Off the record.)
13  EXAMINATION BY MR. RAFFMAN:
14      Q. I'll try to clarify. There is one
15  claim form that you have in your possession
16  that you filled out by yourself, right?
17      A. Yes, sir.
18      Q. And there may be another one that
19  Mr. Batt filled out on your behalf, correct?
20      A. Yes, sir.
21      Q. As we sit here today, can you testify
22  about the damages that you claimed in the form
23  that you filled out?
24      A. I can try to recall to the best of my
25  ability.

13 (Pages 46 to 49)

BARGE001178

GLASER, JACOB

8/7/2008

<table>
<tr><td>

Page 50

1     Q.  What can you tell us about the damages
2   claimed in the form you filled out?
3     A.  For my personal home.  That's what
4   you're asking?  For my personal home?
5     Q.  Um -- that's one of my questions.
6     A.  That's the form I filled out.
7     Q.  So the SF 95 that you filled out is
8   limited to damage to your personal home.
9     A.  To my recollection, correct.
10    Q.  As far as you know, you've never filed
11  a form with the Corps of Engineers seeking
12  money for damage to your business inventory?
13    A.  To my knowledge, I have not.  Whether
14  Mr. Batt has on my behalf, I have no idea.
15    Q.  Your current residence is in
16  Madisonville, Louisiana; right?
17    A.  Yes, sir.
18    Q.  308 Sweet Gum Lane, right?
19    A.  Yes, sir.
20    Q.  Do you own that property?
21    A.  Yes, sir.
22    Q.  When did you buy it?
23    A.  June '06.
24    Q.  Who lives there with you?
25    A.  My wife and myself.

</td><td>

Page 52

1   there been a mortgage on the property?
2     A.  Yes, sir.
3     Q.  Okay.  Narrate for me the history of
4   the mortgages on the Sweet Gum property.
5     A.  SBA dumped $10,000 and recorded a
6   mortgage.
7     Q.  The SBA required a mortgage in order
8   to give you a grant of $10,000, or a loan or --
9     A.  SBA loan.
10    Q.  Okay.  You received an SBA loan of
11  $10,000; right?
12    A.  That's the amount we received.
13    Q.  In order to receive the SBA loan of
14  ten thousand, you were required to put a
15  mortgage on your property?  It's better if you
16  explain it to me, Mr. Glaser.
17    A.  SBA was going to give us an amount
18  larger than $10,000.  Any amount larger than
19  $10,000 required a mortgage.  They
20  automatically dumped $10,000, which then
21  pursued them to file a mortgage and for us to
22  take additional funding.  But we elected not to
23  do that.  Too many complications and
24  stipulations.
25    Q.  So you elected not to accept an SBA

</td></tr>
<tr><td>

Page 51

1     Q.  The children do not live at home;
2   right?
3     A.  No, sir.  But they occasionally stay.
4     Q.  Where do your children live?
5     A.  Our son lives in St. Bernard, and our
6   daughter lives in Slidell.
7     Q.  Was your son living in St. Bernard
8   before the storm?
9     A.  Yes, sir.
10    Q.  What was his address before the storm?
11    A.  3716 Riverland.
12    Q.  Before the storm, he lived at home
13  with you.
14    A.  Yes, sir.
15    Q.  What is his address now, after the
16  storm?
17    A.  He just bought a house.  I think it's
18  201 W. Girard.
19    Q.  Is there a mortgage on your 308 Sweet
20  Gum Lane property?
21    A.  Not at this time.
22    Q.  When you first purchased the property
23  in 2006, was there a mortgage?
24    A.  No, sir.
25    Q.  Since June of 2006 until today, has

</td><td>

Page 53

1   loan of higher than $10,000, and at that point
2   they removed the mortgage from your home.
3     A.  Yes, sir.
4     Q.  I'm handing you what's been marked as
5   Exhibit 12 to the Glaser deposition.  Is
6   Exhibit 12 the record of the cash sale by which
7   you acquired your property at 308 Sweet Gum
8   Lane?
9         (Glaser Exhibit 12 was marked for
10  identification and is attached hereto.)
11    A.  Yes, sir.
12  EXAMINATION BY MR. RAFFMAN:
13    Q.  What was the purchase price of the
14  Sweet Gum Lane property?
15    A.  Two twenty-five.
16    Q.  Did you pay cash for that property?
17    A.  Yes, sir.
18    Q.  What were the sources or source of
19  cash that you used to purchase the sweet gum
20  property?
21    A.  Insurance proceeds from Riverland and
22  Jacob Drive.
23    Q.  But not insurance proceeds from any
24  recovery from Holiday Jewelers?
25    A.  No, sir.

</td></tr>
</table>

14 (Pages 50 to 53)

BARGE001179

GLASER, JACOB

8/7/2008

---

Page 54

1    Q.  I'm handing you Glaser 13.  Glaser 13
2  is a document entitled Multiple Indebtedness
3  Mortgage.  My question for you, Mr. Glaser, is
4  this a copy of the mortgage that was recorded
5  by the SBA and then later removed?
6      (Glaser Exhibit 13 was marked for
7  identification and is attached hereto.)
8      A.  Yes, sir, it looks to be.
9  EXAMINATION BY MR. RAFFMAN:
10     Q.  When did you move into the property on
11 Sweet Gum Lane?
12     A.  July '06.
13     Q.  Before that, where had you been
14 living?
15     A.  In '06?  Covington, Louisiana.
16     Q.  How long were you -- not to make a
17 mystery out of this, I'm going to work backward
18 to the storm.  So before you moved into the
19 Sweet Gum residence, where were you living
20 right before that?
21     A.  An apartment in Covington, Louisiana.
22     Q.  And how long were you in that
23 apartment?
24     A.  Approximately six months.
25     Q.  Before you moved into that apartment,

Page 55

1  where were you living?
2      A.  Panama City, Florida.
3      Q.  And were you in an apartment there?
4  In what kind of housing were you?
5      A.  Fourplex, yeah.  A townhouse.
6      Q.  Is that where you went right after the
7  storm?
8      A.  No.
9      Q.  Okay.  There's another piece to the
10 puzzle.
11     A.  Hotel.
12     Q.  When you left St. Bernard Parish you
13 went to a hotel, right?
14     A.  Yes, sir.
15     Q.  And how long were you in the hotel?
16     A.  Approximately two, two and a half
17 weeks.
18     Q.  Where was the hotel?
19     A.  Dauphine, Alabama.
20     Q.  From Dauphine, you went to where?
21     A.  Panama City.
22     Q.  From Panama City to where?
23     A.  Covington.
24     Q.  I'm going to wind the clock way back.
25 I'm going to ask you about Hurricane Betsy.

Page 56

1      Where were you during Hurricane Betsy?
2      A.  New Orleans.
3      Q.  Your home was in what neighborhood?
4      A.  Gentilly.
5      Q.  This would have been around the time
6  you were in high school at Holy Cross, right?
7      A.  Yes, sir.
8      Q.  Did your high school flood in
9  Hurricane Betsy?
10     A.  I do not believe, but I cannot recall.
11     Q.  Did you ever see any of the flooding
12 that Hurricane Betsy caused in the Lower Ninth
13 Ward?
14     A.  There was no TV, no electricity, no
15 coverages.  So did I physically go there?  No.
16 But I saw flooding in Gentilly.
17     Q.  What happened in Gentilly during
18 Hurricane Betsy?
19     A.  Much of the area around my home
20 flooded.
21     Q.  Do you know where the water came from
22 that flooded your home in Gentilly during
23 Hurricane Betsy?
24     A.  No, sir.
25     Q.  Did you evacuate during Hurricane

Page 57

1  Betsy?
2      A.  No, sir.
3      Q.  Stayed in New Orleans?
4      A.  Yes, sir.
5      Q.  When the hurricane came through, was
6  it scary?
7      A.  Yes, sir.
8      Q.  What was the noise like?
9      A.  Shingles blowing off the roof, high,
10 high winds, darkness, no electricity again.
11     Q.  Before Hurricane Katrina had you ever
12 evacuated New Orleans for any hurricanes?
13     (Off the record.)
14 EXAMINATION BY MR. RAFFMAN:
15     Q.  My question -- you appropriately
16 corrected me.  My question is, did you evacuate
17 for any hurricanes before Hurricane Katrina?
18     A.  Yes, sir.
19     Q.  Which hurricanes did you evacuate for?
20     A.  Ivan, positively.  Georges.  And there
21 may have been some other ones, I just can't
22 recall the names of them at this time.
23     Q.  After your experience in Betsy, did
24 you ever intentionally stay in New Orleans as a
25 hurricane was thought to be approaching?

15 (Pages 54 to 57)

GLASER, JACOB

8/7/2008

Page 58

1      A.  Not anything in a higher category.
2      Q.  When did you evacuate St. Bernard
3  Parish in advance of Hurricane Katrina?
4      A.  It was approximately, um -- 1:00 or
5  2:00 or 3:00 a.m. on Sunday.
6      Q.  Tell me what you did on the Friday
7  before Hurricane Katrina.
8      A.  Watched a lot of TV looking for the
9  information on the storm.  Worked part of the
10 day.
11     Q.  Where were you working?
12     A.  Holiday Jewelers.
13     Q.  Shop was open?
14     A.  Yes.
15     Q.  Did you close early that day?
16     A.  I believe we might have left a little
17 early.
18     Q.  As you were watching the television on
19 that Friday, what were you seeing or hearing
20 about the track of the storm?
21     A.  Thought it was going to miss us.
22     Q.  Where did you think it was going to
23 head?
24     A.  I thought it was going further west
25 toward Texas.

Page 59

1      Q.  When was the first time that you began
2  to understand that this storm could be headed
3  to you?
4      A.  Early Saturday a.m.
5      Q.  What did you hear then that caused you
6  to have that belief?
7      A.  News reports.
8      Q.  Was your store open on Saturday?
9      A.  Yes.
10     Q.  Did you open that Saturday?
11     A.  Not at all.
12     Q.  What did you do on that Saturday?
13     A.  Went back to the store, double-checked
14 everything as we had left it Friday, packed a
15 lot of our personal stuff -- you know, our
16 personal belongings to evacuate, checked with
17 our family and friends.
18     Q.  Did you ever hear anything about an
19 order to evacuate?
20     A.  No.
21     Q.  When you evacuated in advance of
22 Hurricane Georges, did you prepare your store
23 for the storm then?
24     A.  Same as we do every night.  We lock
25 pretty much everything up because we're a

Page 60

1  jewelry business.
2      Q.  Let me unpack that a little bit.
3      What do you do each night to break
4  your store down before you leave the store for
5  the night?
6      A.  We lock merchandise away, um -- set
7  alarms, um -- you want me to continue to do a
8  punch list with you?  I'm asking you a
9  question, and I apologize for that, but --
10     Q.  It's long list of thing you do?
11     A.  Yeah.  Pretty much every day.
12     Q.  Well, because you're a jewelry store
13 you have some very valuable and small items in
14 the store, right?
15     A.  Yes, sir.
16     Q.  And it's important for you to make
17 sure that those items are secure before you
18 leave the store, right?
19     A.  As best as possible, yes.
20     Q.  What do you do to secure those
21 valuable small items in your store?
22     A.  Lock them up.  Some things go in
23 vaults, some things just get locked up --
24     Q.  When you --
25     A.  -- in cabinets or cases or --

Page 61

1      Q.  You lock things up in vaults or in
2  cabinets or cases in order to protect them from
3  somebody breaking in and taking them; right?
4      A.  Yes, sir.
5      Q.  So it's important to lock them away in
6  sturdy vessels.  Fair enough?
7      A.  That's a fair statement.
8         MR. GILBERT:
9            Interesting choice of words.
10 EXAMINATION BY MR. RAFFMAN:
11     Q.  When you evacuated in advance of
12 Hurricane Georges, you put the valuable items
13 in the vaults or the sturdy cases, right?
14     A.  Yes, sir.
15     Q.  And when you evacuated in advance of
16 Hurricane Ivan, you did the same thing.
17     A.  Yes, sir.
18     Q.  And when you evacuated in advance of
19 Hurricane Katrina, you did the same thing.
20     A.  Yes, sir.
21     Q.  Why did you decide to evacuate?
22     A.  Can we say Bob Breck told us to get
23 the hell out of town?
24     Q.  Who is Bob Breck?
25     A.  He's the local weatherman.

16 (Pages 58 to 61)

GLASER, JACOB

8/7/2008

Page 62

1    Q.  You understood that to remain behind
2  in a hurricane could be dangerous.
3    A.  Yes.
4    Q.  That storms can hurt people who
5  remain.
6    A.  Yes, sir.
7    Q.  Maybe even kill them.
8    A.  Yes, sir.
9    Q.  What did you take with you when you
10 left?
11   A.  A few days of clothes, some money,
12 things for a three-day evacuation, planning to
13 be back.
14   Q.  You were out of town when the water
15 inundated St. Bernard Parish, right?
16   A.  Yes, sir.
17   Q.  Water inundated your home, right?
18   A.  Yes, sir.
19   Q.  How high did the water get on your
20 home?
21   A.  We believe eleven feet.
22   Q.  Water inundated your business that you
23 rented?
24   A.  Yes, sir.
25   Q.  Apart from what your lawyers have told

Page 63

1  you, do you know where the water came from that
2  inundated your home?
3    A.  I can assume that the levee breach
4  acted as a funnel which flooded a good portion
5  of St. Bernard Parish, as well as the lower
6  lying areas of St. Bernard Parish had some
7  levee toppings.
8        You asked me if I knew.  I wasn't
9  there.  But from living there I can assume the
10 answer I gave.
11   Q.  There were levee breaches that
12 occurred at various places along the hurricane
13 protection system, right?
14   A.  I don't know that yes or no, but I
15 assume that to be true.
16   Q.  Whatever you know about where the
17 water came from, apart from what your lawyers
18 have told you, is inferences you draw from
19 whatever information you have.  Is that fair?
20   A.  That's fair.
21   Q.  You haven't studied where the water
22 came from that inundated your home, have you?
23   A.  No, sir, not in any formal way.
24   Q.  Nor have you studied where the water
25 came from that inundated your business.

Page 64

1    A.  No, sir.  Not in any formal way.
2    Q.  Same answer for both your home and
3  business.
4    A.  Yes.
5    Q.  You didn't witness any breach of any
6  levee, did you?
7    A.  No, sir.
8    Q.  Has anybody ever told you they saw
9  what happened when a levee breached?
10   A.  No, sir.
11   Q.  Has anybody ever told you they saw the
12 barge in the Industrial Canal?
13   A.  No, sir.
14   Q.  Has anybody ever told you they saw the
15 barge enter the Lower Ninth Ward?
16   A.  No, sir.
17      (Off the record.)
18 EXAMINATION BY MR. RAFFMAN:
19   Q.  Apart from what your lawyer has told
20 you, do you have any knowledge about what
21 caused any breach of any levee or floodwall in
22 Lower Ninth Ward or St. Bernard?
23   A.  I personally don't.  Again, except
24 news reports and things of that nature.
25      MR. RAFFMAN:

Page 65

1        I'm ready to take a break.
2        (Off the record.)
3  EXAMINATION BY MR. RAFFMAN:
4    Q.  Mr. Glaser, I'd like to ask you some
5  questions about your business before the storm.
6        Holiday Jewelers had one location,
7  right?
8    A.  Yes, sir.
9    Q.  Describe the nature of your business.
10   A.  Retail jewelry sales.
11   Q.  What sources of income did your
12 business have?
13   A.  Sales.
14   Q.  Sales that were done out of the store.
15   A.  Yes.
16   Q.  Did you ever do any mail order
17 business?
18   A.  No.
19   Q.  What percentage of your business was
20 made with people who came to your store to buy
21 jewelry?
22   A.  The majority.
23   Q.  Did you ever do any sales over the
24 Internet?
25   A.  No.

17 (Pages 62 to 65)

BARGE001182

GLASER, JACOB

8/7/2008

Page 66

1    Q.  Did ever do any sales to people who
2  didn't come to your store to look at and buy
3  jewelry?
4    A.  Can you clarify that question a little
5  bit?
6    Q.  Sure.  When I asked you what
7  percentage of your sales was to people who came
8  into the store, you said the majority, and I
9  want to know about the ones that aren't in that
10  majority.
11    A.  The only possible thing I could think
12  of would be if someone moved away and said send
13  me a present for -- or whatever.  But that
14  would be a small percentage, if that's what
15  you're trying to get at, of the total sales.
16  It was -- there was no Internet or -- but
17  occasionally we would ship something to someone
18  as a sale.
19    Q.  Apart from sales that you made from
20  your store, was there any other source of
21  income for Holiday Jewelers?
22    A.  No.
23    Q.  What were the business expenses of
24  Holiday Jewelers as it operated before the
25  storm?

Page 67

1    A.  You want me to give you a list of
2  lights, gas, water?  I mean, is that -- the
3  normal expenses that any retail location would
4  have.
5    Q.  Sure.  One of those would be rent,
6  right?
7    A.  Yes.
8    Q.  And utilities.
9    A.  Right.
10    Q.  Inventory?
11    A.  Does that fall under expense or --
12    Q.  No?
13    A.  I'm asking.  You're classifying --
14  yes.  Inventory is part of the things that
15  would go to facilitate any type of retail
16  business.
17    Q.  You had to buy insurance?
18    A.  Yes.
19    Q.  Did you have employees?
20    A.  Not at the time of the storm, except
21  my wife and I.
22    Q.  Was there a different time before the
23  storm that you did have employees in your
24  store?
25    A.  Yes.

Page 68

1    Q.  When was that?
2    A.  Usually Christmas season, which is the
3  bulk of the business.
4    Q.  You would hire temporary employees
5  around the Christmas season to help you conduct
6  your business?
7    A.  Correct.
8    Q.  So one of the things that some
9  businesses have to pay but you did not at the
10  time of the storm was compensation for
11  employees, wages.
12    A.  Correct.
13    Q.  Your business was a seasonal business?
14    A.  Yes.
15    Q.  Apart from rent, utilities, inventory
16  or costs of goods and insurance, were there any
17  other major expenses borne by your business
18  before the storm?
19    A.  Not that I can recall.  I mean, we
20  could pull up some kind of retail what if list,
21  but that's all I could suggest.
22    Q.  If I wanted to get any more detailed
23  on your expenses I'd have to really look at
24  your business records, wouldn't I?
25    A.  Yes.

Page 69

1    Q.  To calculate the profits that you make
2  in your store before the storm, you would take
3  the gross sales and subtract all the expenses,
4  right?
5    A.  Yes.
6    Q.  In the three years before the storm,
7  were there fluctuations in the amount of your
8  gross sales?
9    A.  Yes.
10    Q.  Describe for me those fluctuations.
11    A.  Some up, some down.
12    Q.  In some years you sold more product
13  than others, right?
14    A.  Yes.
15    Q.  In the three years before the storm,
16  were there fluctuations in your expenses?
17    A.  Yes.
18    Q.  Describe those fluctuations.
19    A.  One month the utility bill may be
20  higher than another; some up, some down.
21    Q.  In order to figure out what your
22  profits were before the storm we'd have to go
23  back and figure out what your gross sales were
24  and what your expenses were and then tally that
25  up to get the profits, right?

Johns Pendleton Court Reporters

800 562-1285

BARGE001183

GLASER, JACOB

8/7/2008

Page 70

1    A.   Yes.
2    Q.   Can you tell us as you sit here today
3    what your profit for Holiday Jewelers was in
4    2002?
5    A.   No, sir.
6    Q.   2003?
7    A.   No, sir.
8    Q.   2004?
9    A.   No, sir.
10    Q.   Can you tell us as you sit here to
11    today what your gross sales were for 2002?
12    A.   No, sir.
13    Q.   2003?
14    A.   No, sir.
15    Q.   2004?
16    A.   No, sir.
17    Q.   Can you tell us as you sit here today
18    what your expenses were for 2002?
19    A.   No, sir.
20    Q.   2003?
21    A.   No, sir.
22    Q.   2004?
23    A.   No, sir.
24    Q.   What were the terms of your lease?
25    A.   Basically we were on a year-to-year.

Page 71

1    Q.   Your lease expired at the end of 2005?
2    No, let me rephrase. I'll go back.  On what
3    date after the storm did your lease expire?
4    A.   We got no, really, response from
5    anybody from the shopping center, and no
6    communication, I should say, from us -- to us
7    from them.
8    Q.   Before the storm, your lease was on a
9    year-to-year basis, right?
10    A.   Uh-huh.
11    Q.   What was the anniversary date --
12    A.   I believe it was in November.
13    Q.   Your lease ran from November, 2002,
14    through 2003 and so on.
15    A.   In theory, yes.
16    Q.   You renewed your lease each year.
17    A.   It was an automatic renewal.
18    Q.   The lease would automatically roll
19    over unless either party terminated.
20    A.   Yes.
21    Q.   Did your rent go up from year to year
22    between two and 2004?
23    A.   I think it was fairly consistent.
24    Q.   What did you pay in rent per month, if
25    you can remember?

Page 72

1    A.   Approximately eleven hundred.
2    Q.   Who was your landlord?
3    A.   The building was in bankruptcy, so
4    someone else took over.
5    Q.   Was the building in bankruptcy before
6    Hurricane Katrina?
7    A.   Yes.
8    Q.   Describe the building.
9    A.   It was a retail strip mall.
10    Q.   When was the strip mall built, if you
11    know?
12    A.   '84.
13    Q.   It was new when you moved in?
14    A.   Yes.
15    Q.   How many stories was it?
16    A.   One.
17    Q.   Raised up off the ground?
18    A.   Small slab.
19    Q.   What construction; brick, wood,
20    something else?
21    A.   Um -- I'm not a contractor, but it had
22    cinder block and glass store fronts.
23    Q.   How many square feet did you occupy?
24    A.   Approximately 1000.
25    Q.   Describe your store.

Page 73

1    A.   As in how?
2    Q.   The layout.
3    A.   Um -- entrance, showroom, rear was
4    separate office/work room.
5    Q.   So as you walk in from the front you
6    would enter the showroom?
7    A.   Yes.
8    Q.   And as you proceed to the back you
9    would go through a new or separate space that
10    would be office space.
11    A.   Not for customer visit, but for
12    employees, yes.
13    Q.   The back was reserved for employees.
14    A.   Yes.
15    Q.   Where was the vault located?
16    A.   In the back.  In the office.
17    Q.   Where were the cabinets into which you
18    put the jewelry that did not go into the vault
19    when you would close up for the night?
20    A.   Mostly in the front of the store.
21    Q.   So you would take the jewelry out of
22    the glass showcases and put them in locked
23    cabinets in the front of the store.
24    A.   Um -- some of the jewelry, yes.
25    Q.   Do you know the elevation of the

19 (Pages 70 to 73)

GLASER, JACOB

Page 74

1   property, how high above sea level?
2     A.  No.
3     Q.  In the three years before the storm,
4   did your business make a profit in each of
5   those three years?
6     A.  I cannot recall.
7     Q.  How many other businesses were in the
8   strip mall at the time of the storm?
9     A.  I'm approximating twelve to fifteen.
10     Q.  In the three years before the storm,
11   did any of those twelve or fifteen businesses
12   turn over from one business to another?
13     A.  Certainly.
14     Q.  What kind of turnover was there in the
15   three years prior to the storm?  In your strip
16   mall.  If you can characterize it for me.
17        MR. GILBERT:
18            Let me just object to the
19            question.  Kind of turn over.  I think
20            that's what he's struggling with.
21   EXAMINATION BY MR. RAFFMAN:
22     Q.  I can rephrase it.
23     A.  Yes.  Please.
24     Q.  In the three years prior to the storm,
25   how many of the businesses in the strip mall

Page 75

1   turned over from one business to another?
2     A.  I'm going to say two.  And that's a
3   guess, again, going back off of memory.
4     Q.  Do you remember what businesses left?
5     A.  No, not by name.  But I'm thinking in
6   my mind by shopping center spot or location.
7   There were two on the other end that I think
8   left and moved to another location and were
9   replaced with something else.
10     Q.  Did any businesses in the strip mall
11   ever fail?
12     A.  Oh, yes.
13     Q.  How many businesses in your experience
14   from 1984 until you left in '05, how many
15   businesses in the strip mall failed?
16     A.  In twenty years?  I don't know.  But
17   that is -- if you go to our big shopping center
18   Lakeside, businesses come and go and change
19   locations, and we've had some of that as well.
20   We occupied the same location for twenty years.
21     Q.  And in that respect your business was
22   different from many other businesses; right?
23     A.  I'll agree to that.
24     Q.  Some businesses that were your
25   neighbors didn't make it, right?

Page 76

1        MR. GILBERT:
2            Object to didn't make it.  Let's
3            clarify that, please.
4   EXAMINATION BY MR. RAFFMAN:
5     Q.  They failed.
6     A.  I don't know anyone else's personal
7   business.  They may have closed and moved to a
8   new location.  I know that could be a fact.
9   How many?  In twenty years?
10     Q.  Your business.  Your business was
11   based on customers coming to your store, right?
12     A.  Primarily.
13     Q.  From Where did your customers come?
14     A.  Primarily St. Bernard.
15     Q.  Some of your customers came from the
16   Lower Ninth Ward?
17     A.  Yes.
18     Q.  Some of them came from the area of
19   St. Bernard that was west of Paris Road?
20     A.  Yes.
21     Q.  Some of them came from the areas of
22   St. Bernard that was east of Paris Road.
23     A.  Yes.
24     Q.  Can you quantify for me, today, what
25   percentage of your customers came from the

Page 77

1   areas east of Paris Road as opposed to west of
2   Paris Road?
3     A.  No.
4     Q.  Do you know anything about the
5   profitability of any of the other businesses in
6   your strip mall before Hurricane Katrina?
7     A.  No.  That would be private information
8   to that business.
9     Q.  You're not telling me that all the
10   businesses in the strip mall were uniformly
11   profitable or unprofitable.  You can't say
12   that, can you?
13     A.  I have no knowledge of any of that.
14     Q.  Can you name some of the businesses
15   that were your neighbors in the strip mall
16   before the --
17     A.  Blockbuster.
18     Q.  Blockbuster is a national video rental
19   chain; right?
20     A.  Directly adjacent to our store.
21     Q.  They're a national video rental chain;
22   right?
23     A.  I believe so.
24     Q.  They were your next-door neighbors.
25     A.  Yes.

Johns Pendleton Court Reporters                    800 562-1285

BARGE001185

GLASER, JACOB

8/7/2008

Page 78

1    Q.   Some of the other businesses that were
2  doing business in the strip mall before the
3  storm?
4    A.   Subway.
5    Q.   Subway is a franchise fast food
6  sandwich shop?
7    A.   I believe so.
8    Q.   Some of the other businesses that were
9  your neighbors?
10   A.   There were some financial -- Wells
11  Fargo, um -- I think the other one was, um --
12  American National Finance, I think.  There were
13  some, um -- doctors' office, um -- there was a,
14  um -- a gymnasium/workout place.  They occupied
15  a large portion.
16   Q.   Do you know who owned the Blockbuster?
17   A.   Blockbuster.
18   Q.   You don't know whether the Blockbuster
19  was an individual franchise or company-owned
20  store, do you?
21   A.   Do not.
22   Q.   The same answer for the Subway?
23   A.   That was a franchise store.
24   Q.   So somebody owned it?
25   A.   Yes.

Page 79

1    Q.   Who owned it?
2    A.   I cannot remember a name.
3    Q.   Do you know what the owner of the
4  Subway store has done to make a living after
5  Hurricane Katrina?
6    A.   No.  No.
7    Q.   You don't know how she's done one way
8  or the other.
9    A.   No.
10   Q.   When you returned to Chalmette after
11  Hurricane Katrina, describe what you saw.
12   A.   Chaos.
13   Q.   When did you --
14   A.   Destruction.
15   Q.   When did you first return?
16   A.   A mess.
17   Q.   Those were the conditions you found
18  throughout Chalmette?
19   A.   Yes.
20   Q.   Both east and west of Paris Road?
21   A.   On my first visit I was only allowed
22  to go to my store.
23   Q.   That was the conditions you saw at
24  your store.
25   A.   Again, that would be west of Paris

Page 80

1  Road.
2    Q.   Okay.  When did you first return to
3  your home?
4    A.   After Hurricane Rita.
5    Q.   What was the date on which you first
6  went to visit the store?
7    A.   Two days before Hurricane Rita.
8    Q.   That was in September of '05.
9    A.   Approximately three weeks after
10  Hurricane Katrina.
11   Q.   When you went back to your store --
12  let me go back a second.  Do you have any
13  pre-storm pictures of your store?
14   A.   No.  Washed away.
15   Q.   The pre-storm pictures of the store
16  were lost in the flood?
17   A.   Yes.
18   Q.   Where were they kept before Hurricane
19  Katrina?
20   A.   Some at the store, some at my home.
21   Q.   And they were lost in both locations.
22   A.   Yes.
23   Q.   When you went back after the storm did
24  you take pictures of the damage to your store?
25   A.   Yes.

Page 81

1    Q.   Did you provide copies of the pictures
2  that you took to your lawyers so that they
3  could be produced to the defendants in this
4  case?
5    A.   Yes.
6    Q.   I'm going to ask you about some of the
7  pictures.  I'm handing you what's been marked
8  as Glaser Exhibit 14.  Do you recognize that as
9  one of the pictures that you took after the
10  storm?
11      (Glaser Exhibit 14 was marked for
12  identification and is attached hereto.)
13   A.   Yes.
14  EXAMINATION BY MR. RAFFMAN:
15   Q.   What is shown in that picture?
16   A.   Um -- front view of the shopping
17  center.
18   Q.   Would you place an X on that by the
19  location of your store Holiday Jewelers, if
20  it's shown in the picture.
21   A.   Yes.  It's right here.
22   Q.   Okay.  Why don't you make an X there
23  so the record will reflect the location of your
24  store in the mall.
25   A.   Okay.

21 (Pages 78 to 81)

GLASER, JACOB

8/7/2008

Page 82

1    Q.  I hand you what I'm marking as Glaser
2   Exhibit 15 and ask you to identify this as a
3   picture that you took upon your return to
4   Chalmette after Hurricane Katrina.
5        (Glaser Exhibit 15 was marked for
6   identification and is attached hereto.)
7    A.  Yes.
8   EXAMINATION BY MR. RAFFMAN:
9    Q.  What is shown in that picture?
10    A.  Front of our shopping center, a
11   picture of my wife standing in front of the
12   store, muddy, in boots.
13    Q.  Did you take this picture on that
14   first trip back after Hurricane Katrina?
15    A.  We have several pictures that we've
16   taken, and I cannot attest that this was on the
17   first or second or third trip back, because we
18   made repeated trips trying to collect stuff.
19    Q.  What were the conditions like inside
20   your store when you returned after the storm?
21    A.  Muck and mire and just everything
22   askew.
23    Q.  Before the storm, what fixtures did
24   you have in the store?
25    A.  Display cases, primarily that's, you

Page 83

1   know -- work benches, desk, computers.  Is that
2   the kind of answers you're looking for?
3    Q.  Were there any other fixtures or
4   equipment that you used in your business apart
5   from the jewelry inventory itself?
6    A.  Equipment.  We used a lot of jewelry
7   equipment, tools and machines and equipment.
8    Q.  What was the condition of the fixtures
9   and equipment when you returned?
10    A.  Totally destroyed.
11    Q.  What about the jewelry inventory that
12   you had put in the vault, what was the
13   condition of that inventory when you returned?
14    A.  That was in the vault, so it was full
15   of mud and things of that nature but pretty
16   much intact.
17    Q.  What about the jewelry that you had
18   placed in the cases before you left to
19   evacuate?
20    A.  Um -- that was vandalized at some
21   point after the storm.  Most of that was gone.
22    Q.  When did you discover that your
23   display cases had been vandalized?
24    A.  On the second trip after Hurricane
25   Rita.

Page 84

1    Q.  On the first trip back did you have
2   occasion to look in those cases to see whether
3   the jewelry was there?
4    A.  Most of the cases were still locked,
5   although they were askew.  We couldn't find
6   keys to look for them.  But assuming they were
7   still locked, we assumed everything was still
8   intact.
9    Q.  When you returned on your second visit
10   to the shopping center, what did you see with
11   regard to those cases?
12    A.  Busted locks and inventory gone.
13    Q.  Between the time that you first
14   returned to your store after Katrina and the
15   time you came back to the store the second
16   time, someone had broken into those cases and
17   removed the jewelry that had been there.
18    A.  Yes.  I would assume, because it was
19   gone.
20    Q.  How long passed between the time you
21   first returned to your store after Katrina and
22   the second visit on which you discovered the
23   broken locks?
24    A.  Approximately three weeks.
25    Q.  During those three weeks, what

Page 85

1   efforts, if any, did you make to arrange for
2   the locks on those jewelry cases to be opened
3   so that the jewelry could be removed?
4    A.  Repeat that again?
5    Q.  During those three weeks did you do
6   anything to try to get those cases open to get
7   the jewelry?
8    A.  No, I was not physically at the store.
9        Is that what you're asking?  And we
10   made a number of phone calls, but there was no
11   police, no nothing that could answer to
12   anything down there.  Is that -- is that what
13   your question is?  I'm not clear on your
14   question.
15    Q.  You called somebody to try to get them
16   to open those cases to get that jewelry out?
17    A.  Um -- there was nobody that could be
18   there.  Hurricane Rita had gone on, you
19   couldn't get back in.  They were evacuated
20   again.
21    Q.  How long after Hurricane Rita were you
22   prevented from going back to your store by
23   virtue of any mandatory order?
24    A.  I would say approximately two weeks --
25   two, two and a half weeks.

22 (Pages 82 to 85)

GLASER, JACOB

8/7/2008

Page 86

1    Q.  When you returned that second time and
2  found the cases had been vandalized, did you
3  become aware of any of the other stores in your
4  shopping center that had also been vandalized?
5    A.  Yes.
6    Q.  Describe the vandalism that had taken
7  place in the other stores?
8    A.  We noticed Blockbuster had --
9  obviously the CDs or DVDs or whatever those
10  things are, were all askew in the parking lot.
11    Q.  Anything -- any other vandalism that
12  you noticed in the shopping center at that
13  time?
14    A.  I noticed some what appeared to be
15  files or file cabinets from one of the
16  financial companies, again in the parking lot.
17  Um -- I must say this:  We did not go around
18  looking in other places.  It was just unworldly
19  is the only word I can describe.  There was no
20  police or people around.  This was the Lone
21  Ranger and Tonto, you know, just out in the
22  boonies.  There was nothing there.
23    Q.  I'm just asking for what you saw --
24    A.  I understand.
25    Q.  -- when you returned.

Page 87

1      This visit that you're describing was
2  after Hurricane Rita.
3    A.  Yes.
4    Q.  As you sit here today you can't say
5  whether Glaser 14 and Glaser 15 were taken
6  before Rita or after Rita.
7    A.  That's correct, I could not identify
8  before or after.
9    Q.  Do you know whether your store flooded
10  during Rita?
11    A.  I believe it did.  I was told it did.
12    Q.  Would the same be true of the other
13  photographs that you gave your lawyer to be
14  produced, that is, that you don't know whether
15  they were taken before or after Hurricane Rita?
16    A.  I haven't viewed all of them that I've
17  given him, but for the most part yes.  But I
18  know at one point somewhere in there we have a
19  photograph of a number of family friends that,
20  you know, tried to help us do things with our
21  home as well as our business.  So that may have
22  been literally months afterwards as opposed to
23  the initial first few days or so, or weeks or
24  so.
25    Q.  I've marked a photograph as Glaser 16.

Page 88

1  Can you identify that photograph as the one you
2  were just describing?
3      (Glaser Exhibit 16 was marked for
4  identification and is attached hereto.)
5    A.  I would assume this was the latter
6  photograph.  After Rita.
7  EXAMINATION BY MR. RAFFMAN:
8    Q.  I'm going to hand you a stack of
9  photographs that I'm marking as Glaser Exhibit
10  17.  I'll ask you to look these through and see
11  whether there is any of them that you can
12  definitively identify as having been taken
13  before Hurricane Rita.
14      (Glaser Exhibit 17 was marked for
15  identification and is attached hereto.)
16    A.  I'm going to return this stack, and I
17  believe this is prior to Rita.  (Tendering.)
18  EXAMINATION BY MR. RAFFMAN:
19    Q.  Okay.
20      MR. GILBERT:
21        Let's clarify which is prior to
22  Rita.
23  EXAMINATION BY MR. RAFFMAN:
24    Q.  What we're going to do is this:  I
25  have a stack that is Glaser 17.  It's a smaller

Page 89

1  stack than the one I handed you, but the stack
2  that is now marked as Glaser 17, can you
3  identify these photographs as having been taken
4  before Hurricane Rita?
5    A.  I believe the stack that you marked as
6  17 and are now holding to be before Rita.
7    Q.  And on what basis do you hold that
8  belief?
9    A.  The, um -- disarray of furniture,
10  fixtures, equipment, and those other
11  photographs have some pictures of some
12  vandalism which has occurred.  And I must note
13  that plenty of these pages have two pictures on
14  it, so one picture may be before Rita and one
15  may be after, but I believe truly this to be
16  the pre-Rita stack, and this to be afterwards
17  of Rita.
18    Q.  All right.  Because the record needs
19  to be clear, and we sitting around this table
20  all understand what you've just testified, but
21  let's go back.  The stack of photos that's been
22  marked as Exhibit 17 you believe to have been
23  taken before Hurricane Rita.
24    A.  Correct.
25    Q.  Correct?  I'm now going to place a

Johns Pendleton Court Reporters                    800 562-1285

BARGE001188

GLASER, JACOB

8/7/2008

Page 90

1    sticker on another stack of photos which has
2    been marked Glaser Exhibit 18.
3        Mr. Glaser, is it your testimony you
4    believe that the photos in Glaser Exhibit 18
5    were taken after Hurricane Rita?
6        (Glaser Exhibit 18 was marked for
7    identification and is attached hereto.)
8        A.  I believe so.
9    EXAMINATION BY MR. RAFFMAN:
10       Q.  Some of the pictures in Exhibit 18
11   reflect the vandalized cases about which you've
12   previously testified.
13       A.  Yes.
14       Q.  Would you please place an X next to
15   those pictures in Exhibit 18 that show the
16   vandalized cases about which you've testified.
17       A.  (Witness complies.)
18       Q.  So you have now marked with an X those
19   photos in Exhibit 18 that reflect vandalized
20   cases, is that correct?
21       A.  That's correct.
22       Q.  We can put Exhibit 18 back together
23   again by simply taking the pages --
24       A.  Oh, all right.
25       (Off the record.)

Page 91

1    EXAMINATION BY MR. RAFFMAN:
2        Q.  As you sit here today, Mr. Glaser, you
3    don't know the condition of the jewelry that
4    was in the cases that were vandalized at the
5    time they were vandalized, do you?
6        A.  No.
7    EXAMINATION BY MR. RAFFMAN:
8        Q.  When you came back to visit the
9    Holiday Jewelers business property, did you see
10   any damage to the roof?
11       A.  I can't remember.
12       Q.  Do you know whether any rain got in
13   the roof of your business?
14       A.  I do not know.
15       Q.  At some time after Hurricane Katrina
16   did your business suffer a fire?
17       A.  Not to my knowledge.
18       Q.  Did you create a list of the
19   property -- business property that you lost in
20   the storm?
21       A.  When you say business property, you
22   mean for insurance purposes or SBA or things of
23   that nature, or just for my own information,
24   or --
25       Q.  Any list.

Page 92

1        A.  Yes.
2        Q.  For what purpose or purposes did you
3    create that list?
4        A.  One was for flood insurance, and one
5    was for the business insurance.
6        Q.  Which company provided your flood
7    insurance?
8        A.  Pardon me for not remembering, but --
9    I think it was Fidelity Insurance.
10       Q.  Which property provided your business
11   insurance?
12       A.  Jewelers Mutual.
13       Q.  I'm going to show you what's been
14   marked as Glaser Exhibit 19.  Do recognize
15   Glaser Exhibit 19?
16       (Glaser Exhibit 19 was marked for
17   identification and is attached hereto.)
18       A.  Yes.
19   EXAMINATION BY MR. RAFFMAN:
20       Q.  What is that?
21       A.  I believe this is a list for business
22   insurance.
23       Q.  The business insurance was through
24   Jewelers Mutual?
25       A.  I believe so.

Page 93

1        Q.  What did you do to compile this list
2    that's Glaser Exhibit 19?
3        A.  Go from memory the things that we had
4    in the store.
5        Q.  You've written here that the two-page
6    total -- the numbers at the bottom, two-page
7    total, is $101,707.  Do you see that?
8        A.  I see it.
9        Q.  That $101,707?
10       A.  Yes.
11       Q.  What does that total represent?
12       A.  Things that we turned in to either the
13   flood insurance company or the business
14   policy -- things we turned in to the insurance
15   companies, either flood or business.
16       Q.  Does that represent the total amount
17   of the movable property in your store that was
18   destroyed in Hurricane Katrina?
19       A.  No.
20       Q.  What is missing from that figure?
21       A.  Things of inventory, um -- the flood
22   adjuster told us to -- we only had forty-four
23   thousand dollars of flood, and he told us to
24   quit when we got close to a hundred, and that's
25   what we did.

24  (Pages 90 to 93)

Johns Pendleton Court Reporters                    800 562-1285

BARGE001189

Page 94

1    Q.  Did you submit this list to Jewelers
2  Mutual?
3    A.  I believe everything that we had
4  insurance wise was through Jewelers Mutual.
5    You were asking me earlier the actual
6  name of the flood company, and I do not recall.
7  I thought it might have been Fidelity, but we
8  had everything through Jewelers Mutual who
9  wrote the policies.  And where they, um -- I
10  forgot the word you use, but bill it out to
11  national flood, I don't know who wrote it.
12    Q.  I'm -- here's Glaser 20.
13  (Tendering.)  Glaser 20 is a document that
14  bears a Bates Number 000070 with Mr. Glaser 's
15  name on it.  Do you recognize Glaser
16  Exhibit 20?
17    (Glaser Exhibit 20 was marked for
18  identification and is attached hereto.)
19    A.  Yes.
20  EXAMINATION BY MR. RAFFMAN:
21    Q.  What is that document?
22    A.  This is from the adjuster for the
23  business owner 's policy.
24    Q.  Did you submit the list that's been
25  marked as Glaser Exhibit 19 as a response to

Page 95

1  the letter from the adjuster that is Glaser
2  Exhibit 20?
3    A.  I believe so.
4    Q.  Do you see on Glaser Exhibit 20 that
5  the adjuster had asked you for an itemized list
6  of all articles claimed as damaged and/or lost
7  by a cause other than rising water?  Do you see
8  that?
9    A.  Item 1, all articles lost caused by
10  other than rising water.  Yes.
11    Q.  Did you advise your adjuster, one way
12  or the other, what had caused the damage to the
13  items listed in Glaser Exhibit 19?
14    A.  No.
15    Q.  Are the numbers that are listed next
16  to each item on Exhibit 19 reflective of the
17  cost to you of the items?
18    A.  To replace?  To initially purchase?
19    Q.  Let me ask it more broadly, and you
20  can tell me what the answer is.
21    How did you arrive at the numbers that
22  you listed in the right-hand column on
23  Exhibit 19?
24    A.  We estimated the items that we had
25  lost and what we thought was the cost to

Page 96

1  purchase those items.
2    Q.  The numbers that are listed in the
3  right-hand column are the replacement cost as
4  you estimated it?
5    A.  No.  The original cost.
6    Q.  Thank you for clarifying.  So, for
7  instance, for the item that says giftware, five
8  hundred dollars, halfway down the page -- do
9  you see that?
10    A.  I don't see --
11    Q.  First page?
12    A.  Um -- giftware, yes.
13    Q.  To arrive at that number, you
14  estimated what you had paid out for the
15  giftware that was lost in the storm.
16    A.  Yes.
17    Q.  You went through the same process with
18  respect to each of the itemized items on the
19  list.
20    A.  Yes.
21    Q.  Turning to the second page.  It says
22  showcases.  Do you see that?
23    A.  Yes.
24    Q.  You had twelve showcases in the store.
25    A.  Yes.

Page 97

1    Q.  You estimated the cost to you of those
2  showcases at twenty-two hundred dollars each?
3    A.  Yes.
4    Q.  You arrived at a number of $26,400;
5  correct?
6    A.  Yes.
7    Q.  How long before the storm had you
8  purchased those showcases?
9    A.  In '84.
10    Q.  When you purchased them in 1984, you
11  paid $2200 for each one.
12    A.  Yes.
13    Q.  And when you tallied up the
14  Number $26,400, you did not take any
15  depreciation on those --
16    A.  No.
17    Q.  -- in putting that number down.
18    A.  No.
19    Q.  Did you understand why your business
20  insurer was asking you for a list of the
21  articles that were damaged or lost by a cause
22  other than rising water?
23    A.  Yes.
24    Q.  What was your understanding of that
25  request?

GLASER, JACOB

8/7/2008

Page 98

1    A.  My list -- I believe this list as you
2  have as 19 was made before this, because we had
3  been in contact with our insurance company and
4  we turned this in and Mr. Fredo and I had
5  several conversations back and forth about
6  damages and items and so forth.
7    Q.  Did you understand that your business
8  insurance didn't provide coverage for rising
9  water as opposed to other kinds of damages; was
10  that your understanding?
11    A.  From my business owner's policy,
12  correct.
13    Q.  And your business owner's policy is
14  the one that was issued by Jewelers Mutual
15  Insurance Company, Policy Number 901342, is
16  that right?  I'm referring to the number in the
17  letters.
18    A.  I don't have any of those records.
19  That all washed away, but I'm assuming that's
20  our policy number.
21    Q.  Did Jewelers Mutual pay you any money
22  on your claim on that policy?
23    A.  Yes.
24    Q.  They paid you what amount?
25    A.  As I recall, it was $58,000.

Page 99

1    Q.  I'm handing you what's been marked as
2  Glaser Exhibit 21.  Do you see Glaser
3  Exhibit 21?
4      (Glaser Exhibit 21 was marked for
5  identification and is attached hereto.)
6    A.  Yes.
7  EXAMINATION BY MR. RAFFMAN:
8    Q.  Amount of claim, $28,000.  Does Glaser
9  Exhibit 21 reflect that the Jewelers Mutual
10  Insurance Company paid you $58,000 under Policy
11  901342?
12    A.  Yes.
13    Q.  This was the amount that was paid to
14  you under the policy for damages other than
15  flood damage.
16    A.  I have nothing on their checks to me
17  that indicates what any breakdown was for,
18  whether it was for theft, water, nothing.  I
19  just got two checks.
20    Q.  You received one check from your
21  business insurance, which is Jewelers Mutual,
22  right?
23    A.  Two.
24    Q.  Two checks.  I see.  The two checks
25  you received from Jewelers Mutual reflected on

Page 100

1  the second page of Exhibit 21, right?
2    A.  Correct.
3    Q.  One of them is for $10,000, correct?
4    A.  Correct.
5    Q.  One of them is for $48,000.
6    A.  Correct.
7    Q.  As far as you know, was either of
8  these checks for your flood insurance policy?
9    A.  These were not for flood.
10    Q.  So the $58,000 that you received was
11  not for flood.
12    A.  That's correct.
13    Q.  How much did you receive from your
14  flood insurance carrier?
15    A.  Approximately $44,000.
16    Q.  I'm handing you Glaser Exhibit 22.
17  Can you identify Glaser Exhibit 22 for me?
18      (Glaser Exhibit 22 was marked for
19  identification and is attached hereto.)
20    A.  It's a check for our flood insurance.
21  EXAMINATION BY MR. RAFFMAN:
22    Q.  The check that you received was for
23  $44,600; correct?
24    A.  Correct.
25    Q.  That's the amount you received in

Page 101

1  compensation for your flood losses.
2    A.  Correct.
3    Q.  That's separate from the non flood
4  losses for which you were compensated in the
5  amount of $58,000 by Jewelers Mutual.
6    A.  Correct.
7    Q.  Do you know whether your flood
8  insurance policy had a subrogation clause in
9  it?
10    A.  No.
11    Q.  Before we leave Glaser Exhibit 19,
12  there is an entry on the second page of Glaser
13  19 that is customer records, $5,500.  Do you
14  see that?
15    A.  Yes.
16    Q.  What was the basis on which you
17  calculated an amount of fifty-five hundred
18  dollars as the value of your customer records?
19    A.  Computer software, things of that
20  nature.
21    Q.  The amount represented the cost of
22  computer software which you used to keep your
23  customer records?
24    A.  Correct.
25    Q.  Did your policy with Jewelers Mutual

26 (Pages 98 to 101)

BARGE001191

GLASER, JACOB

8/7/2008

Page 102

1  for your non flood insurance include coverage
2  for loss of income?
3      A.  Yes.
4      Q.  Did a part of the payment from your
5  business insurer for your non flood losses
6  include a component for loss of income?
7      A.  Rephrase that question one more time.
8          (Whereupon the previous question was
9  read back.)
10     A.  Yes.
11 EXAMINATION BY MR. RAFFMAN:
12     Q.  Do you know how much that was?
13     A.  I was told it was $750.
14     Q.  Who told you that?
15     A.  I think that came from Jewelers
16 Mutual.
17     Q.  Why so little?
18     A.  You tell me and we'll both know.
19     Q.  You don't know?
20     A.  I don't know.
21     Q.  That's what total value of the movable
22 property that your business lost in the storm?
23     A.  I would guesstimate at $250,000.
24     Q.  How do you arrive at that number?
25     A.  Based on some replacement cost that we

Page 103

1  estimated, um -- and just general prices of
2  materials and things that have gone up;
3  inventory that was lost or damaged.
4      Q.  I think you used the word guesstimate
5  when you said 250,000.  Did I hear you
6  correctly?
7      A.  Correct.  Correct.
8      Q.  If you wanted to do more than
9  guesstimate the amount of your losses for
10 purposes of establishing a damages claim in
11 this case, what would you do as the owner of
12 your business?
13     A.  If I was asked to, I would try to
14 compile some more information.
15     Q.  What kind of information would you
16 compile?
17     A.  Again, look at replacement cost of
18 materials, inventory, things today.
19     Q.  Would you have to know what materials
20 were destroyed in the storm in order to look at
21 the replacement cost?
22     A.  Probably.
23     Q.  What would you use to figure out what
24 was lost in the storm?
25     A.  Unfortunately, we lost all of our

Page 104

1  records so we would have to rely on some
2  memory.
3      Q.  Would Exhibit 19 be useful as a
4  starting point?
5      A.  Somewhat.
6      Q.  Take a look at Exhibit 19.  Study it.
7  Tell me if there are other major items from
8  your business that were lost in the storm and
9  that are not listed on Exhibit 19.
10     A.  I would have to have more time to
11 study this and make a list and compare the two
12 lists.
13     Q.  As you sit here today, you cannot
14 review that list and identify any major items
15 that you lost and that are not included there.
16     A.  The storm was approximately three
17 years ago.  Now, again, as I stated, I would
18 have to sit down and try to go from memory and
19 possibly compare lists with the help of some
20 friends and other jewelers that know things and
21 equipment that they possibly had that I may
22 have overlooked.
23     Q.  As you look down Exhibit 19, is there
24 anything that leaps out at you today that --
25 major item that you missed or that's not

Page 105

1  included there?
2          MR. GILBERT:
3              Asked and answered several times.
4      A.  Again, all I can do is sit down and
5  try to go from, as I said before, memory, and
6  ask friends and other people things that we may
7  have had that -- and compare lists.
8  EXAMINATION BY MR. RAFFMAN:
9      Q.  Without meaning to quarrel with you,
10 Mr --
11     A.  Yeah.  I can think of one thing, it's
12 a polish machine.  I don't see it on here, but
13 I'm scanning this list and we're still having
14 conversation as I'm scanning this list.
15         MR. WEBB:
16             Why don't we take a break and let
17         him look at the list for a few
18         minutes.
19     A.  But still again, I would have to --
20 you're asking me to give you an answer that I
21 can't give you this moment.
22         (Brief recess.)
23 EXAMINATION BY MR. RAFFMAN:
24     Q.  Mr. Glaser, did you file an SF 95 form
25 for Holiday Jewelers?

27 (Pages 102 to 105)

BARGE001192

GLASER, JACOB

8/7/2008

| Page 106 |
|---|
| 1    A.  No.  And I believe that SF 90 form is |
| 2  the Army Corps of Engineers? |
| 3    Q.  Yes. |
| 4    A.  I'm asking you. |
| 5    Q.  That's the form I'm asking you about. |
| 6    A.  No, I did not. |
| 7    Q.  You filed one for yourself personally. |
| 8    A.  That's the only one I did.  I was |
| 9  under the impression that's the only thing we |
| 10  could do was file for ourself individually. |
| 11    Q.  You recovered some items from your |
| 12  vault; right? |
| 13    A.  Yes. |
| 14    Q.  What items did you recover from the |
| 15  vault? |
| 16    A.  Mostly inventory that was in the |
| 17  vault. |
| 18    Q.  What became of that inventory? |
| 19    A.  We still have most of it.  Some we've |
| 20  sold over the last few years.  Very little. |
| 21    Q.  Those items that you sold, can you |
| 22  tell me whether you were able to sell them for |
| 23  a retail price? |
| 24    A.  No. |
| 25    Q.  You had to discount those? |

| Page 108 |
|---|
| 1    Q.  You kept backup tapes. |
| 2    A.  Yes. |
| 3    Q.  When you evacuated, did you take the |
| 4  backup tapes with you? |
| 5    A.  No. |
| 6    Q.  When you had evacuated for Hurricane |
| 7  Georges and Ivan, did you take the backup tapes |
| 8  with you then? |
| 9    A.  No.  We put them in a safe place. |
| 10    Q.  What safe place did you put them in? |
| 11    A.  Our home. |
| 12    Q.  The backup tapes from your business |
| 13  were in your home during Hurricane Katrina; |
| 14  correct? |
| 15    A.  Correct. |
| 16    Q.  The backup tapes from your business |
| 17  were destroyed because your home flooded in |
| 18  Hurricane Katrina; correct? |
| 19    A.  Correct. |
| 20    Q.  What was on those tapes? |
| 21    A.  Approximately eight thousand customer |
| 22  names and records. |
| 23    Q.  Is the loss of those customer names |
| 24  and records parts of your claim in this case? |
| 25    A.  Yes. |

| Page 107 |
|---|
| 1    A.  Positively. |
| 2    Q.  How deep was the discount? |
| 3    A.  Whew.  Probably 40 percent off. |
| 4    Q.  How did you sell them? |
| 5    A.  We still have some clientele that have |
| 6  contacted us over the years. |
| 7    Q.  How did you handle the items that were |
| 8  in the store for customer repairs when the |
| 9  storm happened? |
| 10    A.  We tried to return all of those as |
| 11  humanly possible, but people moved, as we did, |
| 12  phone numbers and things are nonexistent.  We |
| 13  still retain those things in hopes to give them |
| 14  back. |
| 15    Q.  What was the largest diamond that you |
| 16  had in the store on August 29th? |
| 17    A.  Maybe a one carat. |
| 18    Q.  What was the selling price of the most |
| 19  expensive watch that you had in the store on |
| 20  August 29th? |
| 21    A.  Maybe five hundred dollars. |
| 22    Q.  On the customer software that you |
| 23  testified about earlier, did you keep backup |
| 24  tapes? |
| 25    A.  Positively. |

| Page 109 |
|---|
| 1    Q.  Had your home not flooded on |
| 2  August 29th, 2005, would you still have those |
| 3  customer names and records? |
| 4    A.  I would assume so. |
| 5    Q.  I've handed you what's been marked as |
| 6  Glaser Exhibit 23.  Do you recognize Glaser |
| 7  Exhibit 23 as a verification that you signed in |
| 8  May of 2008? |
| 9      (Glaser Exhibit 23 was marked for |
| 10  identification and is attached hereto.) |
| 11    A.  Correct. |
| 12  EXAMINATION BY MR. RAFFMAN: |
| 13    Q.  Is that your signature on Exhibit 28? |
| 14    A.  Correct. |
| 15    Q.  When you signed it, you were verifying |
| 16  that you had read all of the written discovery |
| 17  responses made on your behalf in this matter |
| 18  and that everything contained therein was true |
| 19  and correct to the best of your information, |
| 20  knowledge and belief, right? |
| 21    A.  Correct. |
| 22    Q.  The discovery responses to which this |
| 23  verification refers have been previously marked |
| 24  as Glaser Exhibits 1 through 5; am I right? |
| 25    A.  Yes. |

28 (Pages 106 to 109)

BARGE001193

GLASER, JACOB

8/7/2008

Page 110

1      MR. GILBERT:
2          Look at them first.
3      A.   Yes.
4  EXAMINATION BY MR. RAFFMAN:
5      Q.   I'm going to direct your attention to
6  your response to Interrogatory Number 26 which
7  is included in Glaser Exhibit Number 2.  Does
8  your response to Interrogatory Number 2 set
9  forth the damages that you are claiming in this
10  case?
11      A.   Yes.
12      Q.   Are you seeking damages for past and
13  future mental pain, suffering and anguish?
14      A.   Yes.
15      Q.   Did you also seek damages for mental
16  opinion and anguish in your complaint against
17  Murphy Oil?
18      A.   Yes.
19      Q.   That was one of the claims that you
20  settled with Murphy Oil when you released your
21  claims in return for the money that they paid
22  you.
23      A.   Yes.
24      Q.   Now, you did not stay in St. Bernard
25  Parish during Katrina, right?

Page 111

1      A.   Correct.
2      Q.   And so you were not present for the
3  physical danger attendant on a major hurricane
4  and major flooding, right?
5      A.   Not physically there, correct.
6      Q.   Do you know anybody who stayed behind
7  during the storm?
8      A.   Yes.
9      Q.   Have they described their experience
10  for you of being in the storm during the
11  flooding?
12      A.   Yes.
13      Q.   Where were they during the storm?
14      A.   In the police jury complex.
15      Q.   Which is on which side of Paris Road?
16      A.   The west side of Paris Road.
17      Q.   What did they tell you about their
18  experience during the storm?
19      A.   Horrifying.
20      Q.   What's the name of the person who
21  described that to you?
22      A.   Kent -- his last name escapes me right
23  now.
24      Q.   Did Kent narrate for you any sort of
25  anguish or fright or horror that he suffered

Page 112

1  during the storm?
2      A.   Generally, yes.
3      Q.   The mental anguish and pain for which
4  you're seeking compensation in this case is
5  different from that associated with being
6  horrified or having one's life threatened by
7  being present during the storm.
8      MR. GILBERT:
9          Let me object.  Calls for
10      speculation.
11          Subject to the objection, you can
12      answer.
13      A.   Would someone repeat the question?
14  EXAMINATION BY MR. RAFFMAN:
15      Q.   Well, maybe I'll ask a better
16  question.  Your mental pain and anguish relates
17  to the loss of your business; right?
18      A.   Correct.
19      Q.   You also suffered mental pain and
20  anguish because of the loss of your home;
21  right?
22      A.   Correct.
23      Q.   But you're not seeking that mental
24  pain and anguish in this case, are you?
25      A.   For my home?

Page 113

1      Q.   For the loss of your home.
2      A.   My understanding is this is two
3  separate cases.  What I did with my home in
4  Murphy is not what I'm doing here for pain and
5  anguish, to answer your question.
6      Q.   The pain and anguish that you're
7  seeking here is only for the loss of your
8  business.
9      A.   Yes.
10      Q.   Do you have any physical symptoms that
11  are associated with the pain and anguish that
12  you've suffered because of the loss of your
13  business?
14      A.   Sometimes I don't sleep too good.
15      Q.   Are you able to separate the insomnia
16  that you have from time to time as between the
17  loss of your business and the loss of your
18  home?
19      A.   Yes.
20      Q.   When you don't sleep well from time to
21  time, what is the cause of your not sleeping
22  well?
23      A.   The loss of our business, loss of our
24  way of life in our business, and our income,
25  and doing the same thing for that amount of

29 (Pages 110 to 113)

BARGE001194

GLASER, JACOB

8/7/2008

Page 114

1   time.
2     Q.  Apart from occasional inability to
3  sleep, are there other physical symptoms that
4  you associate with emotional distress of losing
5  your business?
6     A.  Financial pressure, stress, worriment,
7  starting anew at this age.  It's horrible.
8     Q.  Is there anything else that you want
9  to add to that list that stems from the mental
10  anguish and distress of losing your business?
11     A.  Not working with my wife every day
12  since we worked together in our business,
13  having lunch, just general -- I'm using the
14  word camaraderie, but that's more associated
15  with a friend more than a life partner.
16     Q.  Apart from that, is there anything
17  else?
18     A.  Not that I can think of at this time.
19     Q.  Do you know anyone who has been so
20  devastated by the storm and its aftermath that
21  they're really not able to function at any
22  level?
23     A.  Several people.
24     Q.  You would not include yourself among
25  that number, would you?

Page 115

1     A.  No.  Not at this time.
2     Q.  Do you know anyone who has coped
3  better than you have?
4     A.  Yes.
5     Q.  Different people have had different
6  emotional reactions to the storm and its
7  aftermath, in your experience.
8     A.  Correct.
9     Q.  The next item on your list is past and
10  future mental health care expense.  Do you see
11  that?
12     A.  Yes.
13     Q.  Tell me what that refers to.
14     A.  If in the future I need to see a
15  mental health professional to work through the
16  loss of my business and way of life.
17     Q.  Do you have any past mental health
18  care expenses?
19     A.  No.
20     Q.  And as you sit here today, do you have
21  plans to consult a mental health care provider
22  about the distress you have suffered as a
23  result of the loss of your business?
24     A.  Not today.  But after this deposition,
25  maybe.

Page 116

1     Q.  Let the record reflect that Mr. Glaser
2  smiled when he made that last comment.
3        The next item on your list is past and
4  future loss and destruction of and damage to
5  movable property.  Do you see that?
6     A.  Yes, sir.
7     Q.  I note you did not include immovable
8  property in the list.  Correct?
9     A.  Correct.
10     Q.  The movable property that is the
11  subject of your claim includes what?
12     A.  All the things and items that were in
13  our store.
14     Q.  Apart from the things and items that
15  were in your store, is there any other movable
16  property that is included in your claim in this
17  case?
18     A.  Not that I can think of at this time.
19     Q.  Your claim does not include a motor
20  vehicle.
21     A.  No.
22     Q.  The things and items that are in the
23  store are those that are listed in Exhibit 19
24  to your deposition plus whatever other items
25  you might subsequently identify?

Page 117

1     MR. GILBERT:
2        I was just going to ask you to
3     show him Exhibit 19 so we're certain
4     we're all on the same page.
5     MR. RAFFMAN:
6        (Tendering.)
7     A.  Would you repeat the question?  Or the
8  reporter?
9        (Whereupon the previous question was
10  read back.)
11     A.  Again, as I've stated before, I would
12  have to consider other items that may or may
13  not be on this list, as well as things that
14  could not be on this list, as well.
15  EXAMINATION BY MR. RAFFMAN:
16     Q.  Sorry.  I didn't mean to interrupt.
17        As you sit here today, you're not able
18  to shed any more light on the movable property
19  that was lost or destroyed than you have
20  already testified about.  Correct?
21     A.  That's correct.
22     Q.  The next item on your list is for past
23  and future loss of movables.  Do you see that?
24     A.  Yes.
25     Q.  To what does that claim refer?

30 (Pages 114 to 117)

GLASER, JACOB

8/7/2008

**Page 118**

1    A.  Well, future loss of movables would be
2  in the event some item that we recovered from
3  our store over time has deteriorated to a point
4  that it may not be usable.  And that would be a
5  future possible loss of a movable.
6    Q.  In order to understand your claim for
7  past and future loss of use of movables, we
8  need to understand what the movables are that
9  were in your store, right?
10    A.  Inventory and things of that nature,
11  yes.
12    Q.  We can't do that unless we have
13  information from you about what those movables
14  are that you've lost the use of, right?
15    A.  Yes.
16    Q.  That is something you'd also have to
17  study further before you could offer further
18  comment, correct?
19    A.  Correct.
20    Q.  The next item on your list is past and
21  future expenses for salvage of movable
22  property.  What salvage expenses did you incur?
23    A.  Um -- in the event that some of our
24  products were salvaged but needed to be
25  repaired or cleaned and things of that nature.

**Page 119**

1    Q.  Can you tell me what products those
2  were?
3    A.  Primarily, inventory products.  And
4  that's again something that we'd have to go
5  through a list, see what's in need of polishing
6  or cleaning or restoring.
7    Q.  The way to figure out your damages for
8  that item, salvage, would be to identify the
9  items that need salvaging and then the specific
10  expenses that were incurred to do the salvage,
11  right?
12    A.  I would assume that to be correct.
13    Q.  The next item on your list says
14  diminution of property values.  Do you see
15  that?
16    A.  Yes.
17    Q.  That is not related to immovable
18  property; am I right?
19    A.  Say that again now?
20    Q.  To what does that diminution of
21  property value refer?
22    A.  Property would be an immovable, so
23  that would not apply since -- but if it's a
24  movable, there can be diminished valuable to
25  any movable that we recovered.

**Page 120**

1    Q.  That really was my question.  The
2  diminution of property value in the context of
3  your claim relates to the diminution of the
4  value of business inventory or other movable
5  property.
6    A.  Yes.  Correct.
7    Q.  What business inventory or other
8  movable property was diminished in value after
9  Katrina?
10    A.  Again, it would require further
11  examination of some of those items that we
12  recovered and to see what diminished value it
13  would be, to what extent, if any.
14    Q.  In order to evaluate that claim, you'd
15  need to do more work to identify the property
16  that was diminished in value and figure out how
17  far in value it had gone down.
18    A.  That's correct.
19    Q.  All right.  The next item is past and
20  future loss and destruction of business and
21  business assets.  To what does that element
22  refer?
23    A.  That would be things, again, that
24  would have been caused by flooding and other
25  damages to our business, whether it be future

**Page 121**

1  losses, obviously the inability to conduct
2  business.
3    Q.  The item after that says past and
4  future lost profit.  Do you see that?
5    A.  Yes.
6    Q.  And immediately following that, it
7  says past and future lost income.  Do you see
8  that?
9    A.  Yes.
10    Q.  And immediately after that, it says
11  past and future lost earning capacity.  Do you
12  see that?
13    A.  Yes.
14    Q.  And after that is past and future lost
15  business opportunity.  Do you see that?
16    A.  Yes.
17    Q.  Do those five items reflect separate
18  elements of damage, as you see them?
19    A.  It could be.  But it could be all in
20  one.
21    Q.  Well, let's try to work with the
22  concept of your lost profit.
23    A.  Okay.
24    Q.  This claim that's being asserted is on
25  behalf of Bob Glaser personally; right?

31 (Pages 118 to 121)

BARGE001196

GLASER, JACOB

Page 122

1    A.  Yes.
2    Q.  Bob Glaser derived income from Holiday
3  Jewelers; right?
4    A.  Correct.
5    Q.  Bob Glaser was the only shareholder of
6  Holiday Jewelers.
7    A.  Correct.
8    Q.  You've already told me that you could
9  not testify about what profit Holiday Jewelers
10  made in 2002, 2003 and 2004, and I'll ask
11  whether anything that's happened over the
12  course of the afternoon has increased your
13  ability to tell me what your profits were for
14  Holiday Jewelers during those three years.
15    A.  No, I do not know those profits for
16  those years.
17    Q.  Bob Glaser does not operate Holiday --
18  does Holiday Jewelers exist today?
19    A.  Yes.
20    Q.  It does.  And can you tell me, what's
21  the state of Holiday Jewelers today?
22    A.  It's just on paper.
23    Q.  Does Holiday Jewelers make any sales?
24    A.  Very few.
25    Q.  Does Holiday Jewelers file tax

Page 123

1  returns?
2    A.  Yes.
3    Q.  I'm handing you what's been marked as
4  Glaser Exhibit 24.  I'll ask you whether you
5  can identify Glaser Exhibit 24 as a copy of the
6  tax return for Holiday Jewelers for the tax
7  year 2005.
8        (Glaser Exhibit 24 was marked for
9  identification and is attached hereto.)
10    A.  Correct.
11  EXAMINATION BY MR. RAFFMAN:
12    Q.  Do you file on a calendar year basis?
13    A.  Correct.
14    Q.  You paid a preparer to do this return
15  for Holiday Jewelers; right?
16    A.  Correct.
17    Q.  You supplied the information that the
18  preparer used to prepare the return?
19    A.  Correct.
20    Q.  When you supplied the information you
21  were attempting to be accurate?
22    A.  Correct.
23    Q.  And you reviewed the return to make
24  sure you were satisfied it was accurate.
25    A.  I'm not a tax professional, I trust my

Page 124

1  tax person.  But I do sign the returns.
2    Q.  Holiday Jewelers filed a tax return in
3  2006?
4    A.  Yes.
5    Q.  I'm handing you what's been marked as
6  Glaser Exhibit 25.  Is Exhibit 25 a copy of
7  Holiday Jewelers' federal income tax return for
8  calendar year 2006?
9        (Glaser Exhibit 25 was marked for
10  identification and is attached hereto.)
11    A.  Yes.
12  EXAMINATION BY MR. RAFFMAN:
13    Q.  You paid a preparer to prepare this
14  return.
15    A.  Yes.
16    Q.  You attempted to be accurate in
17  supplying him the information he would use to
18  file this return.
19    A.  Yes.
20    Q.  You signed the return after satisfying
21  yourself that it was accurate.
22    A.  I trust my tax professional.  I signed
23  it, yes.
24    Q.  Apart from the residual Holiday
25  Jewelers business, what line of business are

Page 125

1  you pursuing today?
2    A.  I'm a real estate agent.
3    Q.  When did you first go into business as
4  a real estate agent?
5    A.  In May of '06.
6    Q.  Why did you decide to become a real
7  estate agent?
8    A.  There was nothing to go back to in
9  St. Bernard Parish.  I was living in Covington.
10  At that time, real estate was busier than it is
11  today.
12    Q.  Did you file an individual tax return
13  for 2006?
14    A.  Yes.
15    Q.  What income did you report on your tax
16  returns for 2006?
17    A.  I cannot remember but it wasn't much.
18    Q.  Would you characterize your new career
19  as a real estate professional as a success?
20    A.  No.
21    Q.  Tell me about your new career as a
22  real estate professional.
23    A.  I like it, but the real estate
24  profession is not doing that great locally, as
25  you may know, much less nationwide.

BARGE001197

GLASER, JACOB

8/7/2008

Page 126

1    Q. Is it your claim in this case that if
2  Hurricane Katrina had never happened you would
3  have continued to operate Holiday Jewelers?
4    A. Positively.
5    Q. And had you continued to operate
6  Holiday Jewelers, you would not have gone into
7  the real estate profession.
8    A. Yes. Correct.
9    Q. In order to figure out how much profit
10 you lost or how much income you lost, we have
11 to compare the amount of profit or income you
12 would have made from continuing to operate
13 Holiday Jewelers and then subtract the amount
14 of money you were able to make as a real estate
15 professional because you are doing that instead
16 of operating Holiday Jewelers. Is that fair?
17   A. That's fair.
18   Q. Do you have a number in mind?
19   A. No.
20   Q. Did you also seek lost profit or lost
21 income in your claim against Murphy Oil?
22   A. Personally? We did not claim our
23 business against Murphy Oil.
24   Q. Did your complaint against Murphy Oil
25 also contain a component for lost profit or

Page 127

1  lost income?
2    A. I would have to read what our attorney
3  sued for. If that makes sense.
4    Q. Give us a second. Okay, I'll hand you
5  back what's been marked as Exhibit 8.
6      Exhibit 8 is your complaint against
7  Murphy Oil; right?
8    A. Yes.
9    Q. And in fact, in that complaint you did
10 include a claim for lost profit and for lost
11 income, correct?
12   A. It states in here loss of income, loss
13 of profit, but that could be from my rental
14 property.
15   Q. So your testimony is that does not --
16 or does not necessarily involve your business
17 Holiday Jewelers.
18   A. It could or could not. I did not type
19 this.
20   Q. All right. Well, referring you to
21 Glaser Exhibit 24, which is your 2005 tax
22 return, the page Bates marked Glaser 00009
23 which shows an auto expense for $8,763 -- do
24 you see that?
25   A. Yes.

Page 128

1    Q. What's the basis for the $8,763 auto
2  expense?
3    A. It was something our business -- our
4  auto was run through our business, to deliver
5  and pick up parts and pieces and watches and
6  things of that nature in the repair, to bring
7  to -- repairs to watch makers and other people
8  in our industry.
9    Q. You took a deduction on the Holiday
10 Jewelers tax return for the personal auto that
11 you used in the business.
12   A. Yes.
13   Q. When you applied for an SBA loan, what
14 was the purpose of that application?
15   A. What was the purpose? Personally, or
16 business?
17   Q. Let me try and separate it and see if
18 I understand.
19      Did Holiday Jewelers apply for an SBA
20 loan?
21   A. Yes.
22   Q. When did Holiday Jewelers apply for
23 that loan?
24   A. Shortly after the storm, in a FEMA
25 tent in St. Bernard Parish.

Page 129

1    Q. Why did Holiday Jewelers apply for the
2  loan?
3    A. We were in line with everybody else to
4  sign up for everything.
5    Q. Was this the loan that you decided not
6  to pursue after receiving $10,000?
7    A. No. There was two.
8    Q. Two separate SBA loans.
9    A. Yes.
10   Q. What happened to the Holiday Jewelers
11 application for an SBA loan?
12   A. We decided not to pursue it.
13   Q. Why did you decide not to pursue that
14 loan?
15   A. We tried to guesstimate again what it
16 would take to go in business, we got to over
17 two hundred and fifty thousand dollars and we
18 quit, because with we talked to SBA, SBA said
19 no problem, sign here, we'll give you the
20 money, we'll mortgage your house that you're
21 in, your cat, your dog, your kid, your
22 grandkids, and if you don't make it we're going
23 to take everything away from you, and I'll be
24 ninety years old when I pay it off.
25   Q. Is that the same reason you decided

33 (Pages 126 to 129)

Johns Pendleton Court Reporters

800 562-1285

GLASER, JACOB

8/7/2008

---

Page 130

1  not to pursue the SBA loan that you applied for
2  personally?
3      A.  Somewhat.
4      Q.  What were the differences in the
5  reasons for not pursuing either loan?
6      A.  Our home SBA loan, when they dumped
7  the $10,000 in our account, that was an
8  initial -- you apply, they dump the ten.  Then
9  they wanted to give us more money but our home
10 was paid for.  So there was no real need to
11 pursue an SBA loan for a shelter to live in.
12 And again, they would mortgage it to the hilt,
13 cat, kid, dog, everything else under the sun,
14 and I would be almost ninety years old.  It's
15 another thirty-year mortgage.  With no possible
16 income from Holiday Jewelers to pay for all of
17 this.
18     Q.  Why was there no possible income from
19 Holiday Jewelers?
20     A.  We could not rebuild in our location.
21 It's almost three years since the storm.  It
22 took many months just to clean up, much less
23 get things going.  The water damage was
24 tremendous.  Et cetera, et cetera.  No customer
25 base, no inventory, i.e., two fifty from SBA to

---

Page 131

1  start over?
2      Q.  What was your income as a real estate
3  agent in 2007?
4      A.  About $25,000.
5      Q.  How much less was that than your
6  income from Holiday Jewelers in 2004?
7      A.  I could not tell you.  I'd have to
8  look at tax records.  But one thing you have to
9  remember, everything out of that $25,000 as a
10 real estate agent comes out of that $25,000.
11 All expenses is out of the $25,000.
12     Q.  $25,000 is your gross before expenses.
13     A.  Yes.
14     Q.  So in order to figure out what your
15 lost income or lost profit is, we need to take
16 a comparison between the profit you would have
17 made at Holiday Jewelers and the amount of
18 profit you did make as a real estate agent.
19     A.  Plus any other benefits that Holiday
20 Jewelers afforded us.
21     Q.  What other benefits did Holiday
22 Jewelers afford you in the nature of profits
23 and income?
24     A.  Paid my health insurance.
25     Q.  As the sole owner of -- well, all

---

Page 132

1  right.  I understand.
2      As the sole owner of Holiday Jewelers,
3  you derived an income from Holiday Jewelers
4  plus some benefits in the nature of health
5  insurance.
6      A.  Plenty benefits above and beyond just
7  the salary.
8      Q.  And in order to figure out your lost
9  profits as the owner of Holiday Jewelers, we
10 need to take the total value of what the
11 business delivered in terms of profits --
12     A.  Correct.
13     Q.  -- plus employment benefits.  That's a
14 starting point, right?
15     A.  Correct.
16     Q.  We need to project that forward after
17 the storm and derive a number that represents
18 what you would have made after the storm --
19 right?
20     A.  Correct.
21     Q.  And then we need to subtract from that
22 the money you actually made as a real estate
23 professional.
24     A.  Net as a real estate professional.
25 Or -- correct.  You're correct.

---

Page 133

1      Q.  That all depends, of course, on your
2  individual circumstances as a small businessman
3  and then a real estate professional, right?
4      A.  Correct.
5      Q.  Let's go back to your interrogatory
6  answer and finish that up.  There is an item
7  there for past and future loss of enjoyment of
8  lifestyle.  You see that?
9      A.  Yes, sir.
10     Q.  Is there anything beyond what you've
11 testified about today that you would be seeking
12 in connection with that item of damages?
13     A.  The only thing that I can sum up,
14 enjoyment of lifestyle is just the way of life
15 that we had.  Um -- we were convenient and
16 close to shopping, post office which we had to
17 go to from time to time for our business,
18 things of that nature.  So -- those are the
19 things that we miss.
20     Q.  Where did you do your shopping before
21 the storm?
22     A.  We had Wal-Mart, K-Mart, all -- less
23 than a mile.
24     Q.  Where was the Wal-Mart?
25     A.  Wal-Mart was probably about a mile up

---

Johns Pendleton Court Reporters                    800 562-1285

BARGE001199

GLASER, JACOB

8/7/2008

| Page 134 |
|---|
| 1   the street from the store. |
| 2      Q.  West or east of Paris Road? |
| 3      A.  West. |
| 4      Q.  Where was the K-Mart? |
| 5      A.  East. |
| 6      Q.  So is K-Mart was east of Paris Road. |
| 7      A.  Yes. |
| 8      Q.  You shopped at both K-Mart and |
| 9   Wal-Mart. |
| 10     A.  Yes. |
| 11     Q.  Let's go to the next item, |
| 12  inconvenience.  Do you see that? |
| 13     A.  Yes. |
| 14     Q.  Is there anything about inconvenience |
| 15  that you haven't testified about already that |
| 16  you want to add? |
| 17     A.  Again, I hate to use the paraphrase |
| 18  way of life, but that's it.  And I can't think |
| 19  of anything else that we hadn't possibly |
| 20  touched on at this time. |
| 21     Q.  When you use the term way of life, the |
| 22  meaning that term has to you is what you |
| 23  testified about earlier, the ability to be |
| 24  close to shopping and what else? |
| 25     A.  Family, friends, all the conveniences. |

| Page 135 |
|---|
| 1      Q.  Family and friends lived in |
| 2   St. Bernard Parish? |
| 3      A.  Yes. |
| 4      Q.  Some of them lived east of Paris Road? |
| 5      A.  Yes. |
| 6      Q.  Some of them lived west of Paris Road. |
| 7      A.  Yes. |
| 8      Q.  The last item on your list for |
| 9   Interrogatory 26 says any and all others |
| 10  proven.  Do you see that? |
| 11     A.  Yes. |
| 12     Q.  Is there anything else you have in |
| 13  mind under that catchall category? |
| 14     A.  Not at this time. |
| 15     Q.  Who is your lawyer in this case? |
| 16     A.  Brian Gilbert. |
| 17     Q.  When did you hire Brian Gilbert to be |
| 18  your lawyer? |
| 19     A.  I believe it was in '06. |
| 20     Q.  How did Mr. Gilbert come to be your |
| 21  lawyer? |
| 22     A.  Um -- I think through phone |
| 23  conversations had. |
| 24     Q.  Who called who first? |
| 25     A.  That I can honestly not remember. |

| Page 136 |
|---|
| 1      Q.  Who contacted whom first? |
| 2      A.  I cannot remember that either. |
| 3      Q.  Did Mr. Batt refer you to Mr. Gilbert? |
| 4      A.  No. |
| 5      Q.  How did you come to be a proposed |
| 6   class representative in the case? |
| 7      A.  I was asked by Mr. Gilbert. |
| 8      Q.  When did Mr. Gilbert ask you to be a |
| 9   class representative? |
| 10     A.  Early on in the process. |
| 11     Q.  What's your understanding of your role |
| 12  as a class representative? |
| 13     A.  To honestly state and represent things |
| 14  as I know it and to project all information to |
| 15  the best of my ability for the other members of |
| 16  the class. |
| 17     Q.  Is there anything else? |
| 18     A.  Um -- to just -- I can't think of |
| 19  anything else.  I've never done this before, so |
| 20  I'm -- I can't think of anything else to add at |
| 21  this time. |
| 22     Q.  Apart from Holiday Jewelers, how many |
| 23  other jewelry stores, retail jewelry stores are |
| 24  you aware of in the Lower Ninth Ward in the |
| 25  area west of Paris Road in St. Bernard Parish? |

| Page 137 |
|---|
| 1      A.  Before the storm? |
| 2      Q.  Yes. |
| 3      A.  Five. |
| 4      Q.  Where were they located? |
| 5      A.  Two was in Arabi, two was in |
| 6   St. Bernard and one was in Meraux. |
| 7      Q.  The two that were in Arabi are -- |
| 8      A.  Gone. |
| 9      Q.  They're west of Paris Road.  They were |
| 10  west of Paris Road. |
| 11     A.  Yes. |
| 12     Q.  Not operating anymore. |
| 13     A.  No. |
| 14     Q.  The one in Meraux was east of Paris |
| 15  Road. |
| 16     A.  Yes. |
| 17     Q.  Is that one operating? |
| 18     A.  Not to my knowledge. |
| 19     Q.  The other two in St. Bernard, were |
| 20  they east or west of Paris Road? |
| 21     A.  Two in Chalmette were west of Paris |
| 22  Road. |
| 23     Q.  Are either one of them operating? |
| 24     A.  One was myself, and then the other |
| 25  gentleman is working I think two or three days |

35 (Pages 134 to 137)

BARGE001200

GLASER, JACOB

8/7/2008

| Page 138 |
| --- |

1  a week out of a house.
2      Q.  Do you know anything about the
3  pre-storm profits of any of those five jewelry
4  stores?
5      A.  No.
6      Q.  Do you know anything about the
7  post-storm performance of the one that's
8  operating two or three days a week?
9      A.  No, but if he's only operating two or
10  three days a week, I don't know what his
11  personal situation is -- he's, I believe, older
12  than us.
13      Q.  How did you first hear about a lawsuit
14  involving a barge?
15      A.  I believe it was on the news.  I
16  believe.
17      Q.  What did you see on the news about
18  that lawsuit?
19      A.  I believe that someone said there was
20  going to be a lawsuit about it.
21      Q.  When you saw that on television, did
22  you react by -- did you react by taking any
23  action at all?
24      A.  No.
25      Q.  Do you remember anything about the

| Page 139 |
| --- |

1  first time you decided that you were going to
2  participate in a lawsuit involving the barge?
3      A.  Brian and I briefly talked on the
4  phone, and he asked where was our business
5  located, where was our houses located, east or
6  west of Judge Perez Drive?  And we established
7  that -- that the business would probably be the
8  best to pursue -- I hate to use the word best,
9  but because of the proximity to the Industrial
10  Canal, that that water came that way, so that
11  was closest to the canal.
12      Q.  To be clear, your business is several
13  miles from the canal.
14      A.  I would have to clock it, but I would
15  say yes.
16      Q.  Have you attended any of the hearings
17  in this case?
18      A.  No.
19      Q.  Did you attend the trial of Ingram and
20  Domino?
21      A.  Um -- I'm not familiar with that.
22      Q.  You don't know what --
23      A.  No, I didn't go to any trial.
24      Q.  What if any direction and control have
25  you provided to the conduct of this lawsuit by

| Page 140 |
| --- |

1  your lawyers?
2      A.  Repeat that again.
3          (Whereupon the previous question was
4  read back.)
5      A.  Just trying to provide as much
6  information as I have to them to pursue
7  justification for the flooding from the barge.
8  EXAMINATION BY MR. RAFFMAN:
9      Q.  When you are asked for information by
10  your lawyers, you supply it, right?
11      A.  To the best of my ability with what
12  records we have.
13      Q.  And apart from supplying information
14  when you're asked for it, you really don't have
15  any other input into how this case proceeds.
16      A.  No.
17      Q.  Which classes or class are you
18  proposed to represent, do you know?
19      A.  No.
20      Q.  You've never served as a class
21  representative in any other lawsuit; correct?
22      A.  No.
23      Q.  Bad question.  Have you ever served as
24  a class representative in any other lawsuit?
25      A.  No.

| Page 141 |
| --- |

1      Q.  What understanding do you have, if
2  any, about who will bear the expenses
3  associated with bringing this lawsuit?
4      A.  Um -- the attorney firm of Mr. Gilbert
5  will bear the expenses.
6      Q.  Do you understand that you've been
7  designated as a representative for a business
8  loss subclass?
9      A.  Um -- I believe that's the category
10  that I fit in, being a business owner, and only
11  in this case, um -- doing this for my business.
12      Q.  What businesses do you represent as a
13  representative for the business loss subclass?
14      A.  I do not know the other parties that
15  are involved.  I thought that was private
16  information.
17      Q.  Is it fair to say that some businesses
18  in the Lower Ninth Ward in the area of
19  St. Bernard west of Paris Road are bigger than
20  your business?
21      A.  Positively.
22      Q.  Some of them have many employees.
23      A.  Yes.
24      Q.  Some of them are manufacturing
25  operations.

36 (Pages 138 to 141)

GLASER, JACOB

8/7/2008

---

**Page 142**

1    A.  I would assume so.
2    Q.  Are you comfortable serving as a
3  representative for all these various
4  businesses?
5    A.  Yes.
6    Q.  What gives you that level of comfort?
7    A.  I feel I've been in business for
8  thirty years and have suffered a devastating
9  loss, just as other people, regardless of the
10  type of business they were in suffered a like
11  loss, and I hate to use the terminology way of
12  life again but that seems to be what we all
13  talk about when we gather, whether it's
14  personal or business.  And that's it.
15    Q.  Some of the businesses that you would
16  represent sell goods, like yours, right?
17    A.  I would assume so.
18    Q.  Some of them sell services?
19    A.  I would assume so.
20    Q.  Some of them are wholesale?
21    A.  I would assume so.
22    Q.  Some of them are retail?
23    A.  I would assume.
24    Q.  Some of them are big national chains?
25    A.  Possibly could be so.

---

**Page 143**

1    Q.  Some of them have come back.
2    A.  Yes.
3    Q.  Some of them have not.
4    A.  Yes.
5    Q.  And each of them has its own story to
6  tell about the pre-storm business?  Right?
7    A.  Yes.
8    Q.  And each of them has its own story to
9  tell about how it was affected by the storm?
10  Right?
11    A.  Yes.
12    Q.  And each of them has its own story to
13  tell about how its profits and income have been
14  affected by what happened in the storm.  Right?
15    A.  Yes.
16    Q.  Have you ever filed for bankruptcy?
17    A.  No.
18    Q.  Have you ever been convicted of a
19  crime other than a traffic offense?
20    A.  No.
21    Q.  Have you ever been subject to a
22  restraining order?
23    A.  No.
24    MR. RAFFMAN:
25    I think I may be finished.  May I

---

**Page 144**

1  take a break?
2    (Brief recess.)
3  EXAMINATION BY MR. RAFFMAN:
4    Q.  Mr. Glaser, is your wife Diane Glaser
5  working outside the home in your new residence
6  on the north shore?
7    A.  No.
8    Q.  Has she worked outside the home since
9  you evacuated during Katrina?
10    A.  No.
11    Q.  So before the first phone conversation
12  about this lawsuit that you had with Brian
13  Gilbert in which he called you or you called
14  him, did you know Mr. Gilbert?
15    A.  Yes.
16    Q.  What was your relationship with
17  Mr. Gilbert before that first conversation?
18    A.  He had helped my wife in a particular
19  situation.
20    Q.  And in what situation had Mr. Gilbert
21  helped your wife?
22    A.  My mother-in-law, my wife's mother,
23  had been in a home and had an accident, and
24  Mr. Gilbert represented my mother-in-law
25  through my wife.

---

**Page 145**

1    Q.  Your mother-in-law was the plaintiff
2  in that lawsuit?
3    A.  Yes.
4    MR. GILBERT:
5    (Shakes head negatively.)
6  EXAMINATION BY MR. RAFFMAN:
7    Q.  Your wife was the plaintiff in the
8  lawsuit?
9    A.  Yes, because my mother-in-law had
10  passed away.
11    Q.  All right.  So this was a claim that
12  your wife had based on the death of her mother.
13    A.  I'm going to say yes.
14    Q.  How long ago was that case filed?
15    A.  It would be, oh, '04, '03, somewhere
16  in that time frame.
17    Q.  Did the case resolve?
18    A.  Yes.
19    Q.  When did it resolve?
20    A.  I believe it was -- I can't remember
21  if it's before the storm or after the storm.  I
22  think it was in '05.
23    Q.  And is that representation the only
24  relationship that you had with Mr. Gilbert
25  before that first phone call in which you

---

37 (Pages 142 to 145)

GLASER, JACOB

8/7/2008

Page 146

1  called him or he called you about this case?
2      A.  Correct.
3      Q.  I don't have any other questions at
4  this time.
5  EXAMINATION BY MR. GILBERT:
6      Q.  Okay.  All right.  Well, I'm going to
7  throw in my two cents worth.  Let's go back to
8  a couple of things.
9          I'm going to try to do it as best I
10  can without having to dig through the exhibits
11  that we've already stacked up there, but do you
12  recall seeing your answers to interrogatories
13  in which you listed the types of damages, and
14  you were examined by Mr. Raffman concerning
15  that and he asked you what does this mean when
16  you say loss or destruction or damage to
17  movable property and so forth?
18      A.  Yeah.  I remember that.
19      Q.  Okay.  And the movable property that
20  you're claiming, is that the same movable
21  property that appeared in the exhibit that
22  we've called Glaser 19 which was that list that
23  was prepared and submitted to Jewelers Mutual?
24      A.  That and some other things which we
25  did not amass.

Page 147

1      Q.  Okay.  Was there any flood damage to
2  these items in the list provided to Jewelers
3  Mutual?
4      A.  I'm going to say yes.
5      Q.  Was there any damage for other causes
6  to these items on the list --
7      A.  Windows.
8      Q.  Let me finish the question.
9          Was there damage for other causes
10  besides flooding to the items that were listed
11  in that list to Jewelers Mutual?
12      A.  Yes.
13      Q.  You were asked earlier whether you
14  would have had your customer names and records
15  if your house hadn't flooded.  Do you recall
16  being asked that?
17      A.  Yes.
18      Q.  Would you have had your customer names
19  and records if the store hadn't flooded?
20      A.  Positively.
21      Q.  Did you ask that your business be
22  included in the suit against Murphy Oil?
23      A.  No.
24      Q.  Did you have to sign a release in
25  concluding your lawsuit against Murphy Oil?

Page 148

1      A.  Yes.
2      Q.  Did the release designate that the
3  damages were for any particular location?
4      A.  I'm going to -- I can't remember.
5      Q.  Okay.  Do you remember if the release
6  included Lafarge North America or any of its
7  insurers?
8      A.  I would say no.
9      Q.  Do you remember whether the release
10  included any acts or omissions relative to a
11  breakaway barge?
12      A.  I would say no.
13      Q.  That's all I have.
14  EXAMINATION BY MR. RAFFMAN:
15      Q.  All right.  Customer names and records
16  that were lost in the storm were at your home
17  when Katrina hit; right?
18      A.  As well as my business.
19      Q.  They were in both locations; right?
20      A.  Correct.
21      Q.  One set of customer names and records
22  was at your home.  Right?
23      A.  Correct.
24      Q.  All right.
25          MR. RAFFMAN:  I don't have any other

Page 149

1  questions at this time.  I will adjourn the
2  deposition.  There was some pending
3  discovery questions that were asked during
4  the course of the deposition.  I need to
5  study those, but, um -- I need to study
6  them.
7      MR. GILBERT:
8          On the record, send me an E-mail
9      reminding me of what it is that you
10      were seeking other than the things as
11      to which we raised a privilege.
12      MR. RAFFMAN:
13          Right.  We'll send you a note in
14      writing once the transcript comes
15      back.
16      MR. GILBERT:
17          That'll work.  Thank you.

38  (Pages 146 to 149)

GLASER, JACOB

8/7/2008

```
                                Page 150
 1            WITNESS' CERTIFICATE
 2
 3        I, JACOB ROBERT GLASER, do hereby
 4   certify that the foregoing testimony was given
 5   by me, and that the transcription of said
 6   testimony, with corrections and/or changes, if
 7   any, is true and correct as given by me on the
 8   aforementioned date.
 9
10   _____   _____
11   DATE SIGNED       JACOB ROBERT GLASER
12
13   _____ Signed with corrections as noted.
14
15   _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25   DATE TAKEN:  August 7th, 2008
```

```
                                Page 151
 1            REPORTER'S CERTIFICATE
 2        I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
 3   Certified Court Reporter in and for the State
 4   of Louisiana, do hereby certify that the
 5   aforementioned witness, after having been first
 6   duly sworn by me to testify to the truth, did
 7   testify as hereinabove set forth;
 8        That said deposition was taken by me
 9   in computer shorthand and thereafter
10   transcribed under my supervision, and is a true
11   and correct transcription to the best of my
12   ability and understanding.
13        I further certify that I am not of
14   counsel, nor related to counsel or the parties
15   hereto, and am in no way interested in the
16   result of said cause.
17
18
19
20
21
22
23   _____
24        JOSEPH A. FAIRBANKS, JR., CCR, RPR
25        CERTIFIED COURT REPORTER #75005
```

39 (Pages 150 to 151)

BARGE001204