# EXHIBIT 27

KOCH, HERMAN

8/8/2008

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES     CIVIL ACTION
CONSOLIDATED LITIGATION

NO. 05-4182
"K" (2)

PERTAINS TO:  BARGE          JUDGE DUVAL

MAG. WILKINSON

BOUTTE V. LAFARGE          05-5531
MUMFORD V. INGRAM          05-5724
LAGARDE V. LARFARGE        06-5342
PERRY V. INGRAM            06-6299
BENOIT V. LAFARGE          06-7516
PARFAIT FAMILY V. USA      07-3500
LAFARGE V. USA             07-5178

DEPOSITION OF HERMAN HILTON KOCH,
506 Country Club Drive, Picayune, Mississippi
39466, taken in the offices of Chaffe, McCall,
2500 Energy Centre, 1100 Poydras Street, New
Orleans, Louisiana 70163, on Friday, August 8,
2008.

## Page 2

1  APPEARANCES:
2     WIEDEMANN & WIEDEMANN
        (BY: KARL WIEDEMANN, ESQ.)
3        821 Baronne Street
         New Orleans, Louisiana 70113
4           ATTORNEY FOR THE PLAINTIFFS (BARGE)
5
      LAW OFFICES OF BRIAN GILBERT
6        (BY: EDWARD MORENO, ESQ.)
         821 Baronne Street
7        New Orleans, Louisiana 70113
            PLAINTIFFS
8
9     BURGLASS & TANKERSLEY
        (BY: LUCIE THORNTON, ESQ.)
10       5213 Airline Drive
         Metairie, Louisiana 70001
11          ATTORNEYS FOR JEFFERSON PARISH
12
13    MCCRANIE, SISTRUNK
        (BY: DARCEY DECKER, ESQ.)
14       Suite 800
         3445 North Causeway Blvd.
15       Metairie, Louisiana 70002
            ATTORNEYS FOR ORLEANS LEVEE DISTRICT
16
17
      MONTGOMERY, BARNETT, BROWN, READ, HAMMOND
18    & MINTZ
        (BY: RONALD J. KITTO, ESQ.)
19       3200 Energy Center
         New Orleans, Louisiana 70163
20          ATTORNEYS FOR THE AMERICAN CLUB
21
22    CHAFFE, MCCALL LLP
        (BY: CHARLES BLANCHARD, ESQ.
23          DEREK WALKER, ESQ.)
         2300 Energy Center
24       New Orleans, Louisiana 70163
            ATTORNEYS FOR LAFARGE NORTH AMERICA
25

## Page 3

1  APPEARANCES CONTINUED:
2     GOODWIN PROCTER
        (BY: MARIE C. SCOTT, ESQ.)
3        901 New York Avenue, NW
         Washington, D.C. 20001
4           ATTORNEYS FOR LAFARGE NORTH AMERICA
5     SUTTERFIELD & WEBB
        (BY: DANIEL A. WEBB, ESQ.)
6        650 Poydras Street
         Suite 2715
7        New Orleans, Louisiana 70130
            ATTORNEYS FOR NY MARINE
8
      CHRISTOVICH & KEARNEY
9        (BY: CHARLOTTE SAWYER, ESQ.)
         Pan American Life Center
10       Suite 2300
         601 Poydras Street
11       New Orleans, Louisiana 70130
            ATTORNEYS FOR SWB (ALSO PRESENT)
12
13    DUPLASS, ZWAIN
        (BY: NICOLE BOYER, ESQ.)
14       3838 North Causeway Blvd.
         Suite 2900  Lakeway Three
15       Metairie, Louisiana 70002
            ATTORNEYS FOR EJLD, LBLD (ALSO
16          PRESENT)
17
      STONE, PIGMAN
18       (BY: HEATHER LONIAN, ESQ.)
         546 Carondelet Street
19       New Orleans, Louisiana 70130
            ATTORNEYS FOR WASHINGTON GROUP
20          INTERNATIONAL
21
      ALSO PRESENT:
22       AIDA KOCH
23    REPORTED BY: ROGER D. JOHNS, RMR, CRR, CSR
            Certified Court Reporter,
24          State of Louisiana
25

## Page 4

1              S T I P U L A T I O N
2
3        It is stipulated and agreed by and between
4     counsel for the parties hereto
5     that the deposition of the aforementioned
6     witness is hereby being taken under the
7     Federal Rules of Civil Procedure, for all
8     purposes, in accordance with law;
9        That the formality of reading and signing
10    is specifically not waived;
11       That the formalities of certification and
12    filing are specifically waived;
13       That all objections, save those as to the
14    form of the question and the responsiveness of
15    the answer, are hereby reserved until such
16    time as this deposition, or any part thereof,
17    may be used or sought to be used in evidence.
18
19             *  *  *  *
20
21       ROGER D. JOHNS, RDR, CRR, Certified Court
22    Reporter for the State of Louisiana,
23    officiated in administering the oath to the
24    witness.
25

## Page 5

INDEX
                                          PAGE
Koch Number 1............................ 24
Koch Number 2............................ 24
Koch Number 3............................ 24
Koch Number 4............................ 24
Koch Number 5............................ 59
Exhibit Koch Number 6.................... 68
Koch Number 7............................ 70
Koch000007............................... 70
Exhibit Koch Number 8.................... 78
Exhibit Koch Number 9.................... 79
Koch Number 10........................... 83
Koch Number 11........................... 85
Koch 000012 through 16................... 85
Exhibit Koch Number 12................... 96
Exhibit Number 13........................ 98
Koch Number 14........................... 107
Exhibit Koch Number 15................... 112
Exhibit Koch Number 16................... 127
Koch Number 17........................... 135
Koch 000384.............................. 135
Koch 000382.............................. 138
Exhibit Number 18........................ 148
Koch 000387 through 392.................. 148
Koch 000391.............................. 149
388...................................... 149
Koch Number 19........................... 152
Exhibit Koch Number 20................... 159
Koch 000400 through 405.................. 159
Koch 000404.............................. 159
Koch 000402.............................. 162
Koch000403............................... 163
Exhibit Koch Number 21................... 166
Koch 000416.............................. 167
Koch 000414.............................. 167
000415................................... 168
Koch 22.................................. 179
Koch Number 23........................... 182
Koch 000003 and 4........................ 182
Koch 00003............................... 182
Exhibit Koch Number 24................... 192
Koch 000519 through 553.................. 192
Koch 000526.............................. 193
Koch 000526.............................. 196
Koch 000530.............................. 197
Koch 000531 through 533.................. 198

KOCH, HERMAN

8/8/2008

Page 6

1        I N D E X (CONTINUED)
                              PAGE
2     Koch 000534.............................. 199
3     Koch 000535 through 537................. 199
      Koch 000538............................. 200
4     Koch 000539 through 541................. 200
      Koch 000543 through 545................. 201
5     Koch 000546............................. 202
      Koch 547 through 549.................... 202
6     Koch 000550............................. 202
      Koch 000551 through 553................. 203
7     Koch Number 25.......................... 211
      Koch 001173............................. 212
8     Koch 1175............................... 213
      Exhibit 26.............................. 213
9     Koch 001190............................. 213
      1192.................................... 214
10    Koch 27................................. 214
      Koch 001204............................. 215
11    Koch 001206............................. 215
      Koch 28................................. 215
12    Koch 001219............................. 215
      Koch 1221............................... 216
13    Exhibit Koch Number 29................. 216
      Exhibit Number 30...................... 216
14    Koch 001247............................. 217
      Koch Number 31.......................... 229
15
16
17
18    EXAMINATION BY MR. BLANCHARD:............. 7
      EXAMINATION BY MR. WIEDEMANN:............ 258
19    EXAMINATION BY MR. BLANCHARD:............ 259
20
21
22
23
24
25

Page 7

1         HERMAN HILTON KOCH,
2     506 Country Club Drive, Picayune, Mississippi
3     39466, after being duly sworn, did testify as
4     follows:
5     EXAMINATION BY MR. BLANCHARD:
6         Q.  Good afternoon, Mr. Koch.  My name
7     is Chuck Blanchard.  I represent Lafarge North
8     America, Inc.  I'm going to be asking you
9     questions here today.  The first question is,
10    have you ever been deposed before, Mr. Koch?
11        A.  I think one time.  By talking about
12    deposed, you mean have I ever came in on a
13    deposition like this?
14        Q.  Correct.  Have you ever come in a
15    deposition in a case and answered questions in
16    front of a Court Reporter?
17        A.  Not before a Court Reporter, no.
18        Q.  So this is the first time you have
19    ever given a deposition?
20        A.  As far as I know of, yeah.
21        Q.  Have you ever testified in court
22    before?
23        A.  No.
24        Q.  Well, a few instructions then, Mr.
25    Koch.  The Court Reporter is going to take

Page 8

1     down everything that we say today.  So it's
2     important that you verbalize your responses.
3     Would you agree to do that?
4         A.  Yes.
5         Q.  And if you don't understand any of
6     my questions, please let me know.  Would you
7     agree to do that?
8         A.  Yes.
9         Q.  And if you let me know that you
10    don't understand one of my questions, I'll try
11    to rephrase that question so that you do
12    understand.  Do you agree to do that?
13        A.  Yes.
14        Q.  Do you understand, Mr. Koch, that
15    you're under oath today just as if you were in
16    a courtroom?
17        A.  Yes.
18        Q.  Are you on any medications today,
19    Mr. Koch?
20        A.  No.
21        Q.  Are you on any substances, alcohol
22    or any other items, that would interfere with
23    your ability to understand my questions here
24    today?
25        A.  No.

Page 9

1         Q.  Have you ever been involved in any
2     other lawsuits, Mr. Koch?
3         A.  Yes.
4         Q.  Let's go through those.  What's the
5     first lawsuit that you have ever been involved
6     in?
7         A.  It was with Domino Sugar with
8     hearing.  Hearing.  Hearing.  Hearing.  They
9     had a lawsuit at Domino Sugar for people that
10    had lost their hearing due to the machinery in
11    the plant.
12        Q.  And you were a Plaintiff in that
13    lawsuit?
14        A.  Yes, I was.  One of them.
15        Q.  Was that the Arceneaux versus Amstar
16    Corporation lawsuit?
17        A.  I don't know if it was or not.
18        Q.  But the lawsuit involved Domino
19    Sugar?
20        A.  Domino Sugar in Arabi, Louisiana.
21        Q.  And you were formerly employed
22    there; correct?
23        A.  Yes.
24        Q.  Do you have any sort of hearing loss
25    or hearing injuries?

3 (Pages 6 to 9)

KOCH, HERMAN

8/8/2008

Page 10

1    A.  Yes, I do.
2    Q.  The case that you were involved in
3 against Domino Sugar, is that still pending?
4    A.  No.  Not that I know of.
5    Q.  Did that case go to trial?
6    A.  I don't know.  I don't know if it
7 went to trial or not.
8    Q.  Is that case still active?
9    A.  No.
10    Q.  Did you receive any money out of
11 that case?
12    A.  Yes.
13    Q.  You received a settlement?
14    A.  Yes.
15    Q.  How much did you receive?
16    A.  I don't remember.
17    Q.  Was that lawsuit filed in St.
18 Bernard Parish?
19    A.  I don't know.
20    Q.  Who was your lawyer in that
21 lawsuit?
22    A.  I think Sidney Torres, but I'm not
23 sure.  I'm not sure.
24    Q.  When was that lawsuit filed?
25    A.  I don't remember.

Page 11

1    Q.  Was it filed before the hurricane?
2    A.  Yes.
3    Q.  Was it filed more than five years
4 before the hurricane?
5    A.  Yes.  I think so.
6    Q.  Have you been involved in any other
7 lawsuits other than the one against Domino
8 Sugar?
9    A.  Yes.
10    Q.  Let's go to the second lawsuit.
11 What is that about?
12    A.  There's a lawsuit that a lawyer in
13 New York, I read after the storm that he was
14 taking names, and I applied for that lawsuit.
15 And that's in New York.  And my second one was
16 with the Federal government.  And my third one
17 is with the barge here.
18    Q.  Let's go to the first one concerning
19 the lawyer in New York.  What's that lawyer's
20 name?
21    A.  I don't remember his name, but he --
22 he's out of New York.
23    Q.  And you said this was a lawsuit
24 filed after the storm?
25    A.  Yeah.

Page 12

1    Q.  Did you read an ad from this lawyer?
2    A.  Yeah.  In fact, he had a sign after
3 the storm and it was an ad for people to go in
4 to apply for this lawsuit.
5    Q.  Was this something you saw in a
6 newspaper or did you see a sign in the
7 neighborhood?
8    A.  A sign in the neighborhood.
9    Q.  This would have been in St. Bernard
10 Parish?
11    A.  No, in the Lower Ninth Ward.
12    Q.  What did the sign say?
13    A.  I don't recall the exact wording of
14 it, but it said if you lost any property, to
15 contact this phone number and lawyer.
16    Q.  And you did that?
17    A.  And I did that.
18    Q.  And this lawyer you said is in New
19 York?
20    A.  Right.
21    Q.  What is that lawsuit about, Mr.
22 Koch?
23    A.  That lawsuit is about the flooding
24 of the Lower Ninth Ward and St. Bernard
25 Parish.

Page 13

1    Q.  Have you seen a copy of that
2 lawsuit?
3    A.  No, I haven't.
4    Q.  And you're a Plaintiff in that
5 lawsuit; is that correct?
6    A.  Yes.  Yes.  Yes.
7    Q.  And what is your understanding of
8 the allegations in that lawsuit concerning
9 flooding in St. Bernard Parish?
10    A.  The allegations were that the MRGO
11 flooded St. -- St. Bernard Parish and that the
12 levees didn't hold in the Parish.
13    Q.  And it's your understanding that
14 this lawyer from New York represents you in a
15 case against the government involving the
16 MRGO?  Is that correct?
17    A.  Right.
18    Q.  Do you know if any local lawyers,
19 lawyers in the New Orleans area, are involved
20 in that lawsuit?
21    A.  Not that I know of.
22    Q.  How long after Katrina did you see
23 this sign in the Lower Ninth Ward?
24    A.  I guess about two -- two months.  I
25 don't really remember.

4 (Pages 10 to 13)

KOCH, HERMAN

8/8/2008

Page 14

1    Q.  And how long after you saw this sign
2  did you contact this lawyer in New York?
3    A.  I don't -- don't recall.
4    Q.  How long after you first talked to
5  this lawyer in New York did you become a party
6  to this lawsuit?
7    A.  About a week, I guess.  Two weeks.
8    Q.  Were you involved in that lawsuit
9  before you became involved in the lawsuit that
10 we're here today for?
11   A.  Please repeat your question again.
12   Q.  All right.  You told me that a
13 couple of months after the storm you called
14 this lawyer in New York; correct?
15   A.  Right.
16   Q.  And this involved flooding from the
17 MRGO; right?
18   A.  Correct.
19   Q.  And you said about a week later you
20 signed up with this lawyer; correct?
21   A.  About a week later, yes.
22   Q.  Now, at some point you became
23 involved in this lawsuit that we're here today
24 for; correct?
25   A.  Uh-huh (affirmatively).

Page 15

1    Q.  And that involves the barge;
2  correct?
3    A.  Right.
4    Q.  And did you become involved in the
5  barge lawsuit before or after you became
6  involved in the MRGO lawsuit?
7    A.  After.  After the barge -- First it
8  was MRGO and then it was the barge.
9    Q.  Have you ever withdrawn your name as
10 a Plaintiff in the MRGO lawsuit?
11   A.  No.
12   Q.  So in the MRGO lawsuit are you
13 seeking damages for losses to your properties
14 in St. Bernard and Orleans Parish?
15   A.  Yes.
16   Q.  So you're seeking the same damages
17 in the MRGO lawsuit that you're seeking in
18 this lawsuit; isn't that correct?
19   A.  Yes.
20   Q.  Have you had any discussions locally
21 with anyone involved with the MRGO lawsuit?
22   A.  No.
23   Q.  The only conversations you've had
24 are with this lawyer in New York; correct?
25   A.  Yes.

Page 16

1    Q.  Have you filled out any papers or
2  forms in connection with the MRGO lawsuit?
3    A.  Yes.
4    Q.  What have you filled out?
5    A.  He went and he sent me a form and I
6  filled out the form.  That's all.
7    Q.  And you sent the form back to him?
8    A.  And I sent the form back to him.
9    Q.  Did you keep a copy of that form?
10   A.  I think I got it at the house,
11 yeah.
12   Q.  Was that form something called an
13 SF-95?
14   A.  I think it was.
15   Q.  You said you were involved in more
16 than that lawsuit.  You mentioned two other
17 lawsuits.  One was this lawsuit.  But you said
18 there was another lawsuit involving the
19 Federal government that you're involved in?
20   A.  Yes.
21   Q.  Tell me about that lawsuit.
22   A.  That lawsuit was concerning the
23 levees in the Parish that broke.
24   Q.  In St. Bernard Parish?
25   A.  Yes, in St. -- in St. Bernard

Page 17

1  Parish.
2    Q.  Did that lawsuit also involve the
3  MRGO?
4    A.  Yes, uh-huh.  I think it does.  That
5  lawsuit is concerning the Federal government.
6    Q.  Let's go back to the first lawsuit
7  with the lawyer in New York.  Do you know
8  where that lawyer filed the lawsuit?
9    A.  I don't know exactly where, no.
10   Q.  The second lawsuit against the
11 Federal government, that's a different
12 lawsuit?
13   A.  That's a different lawsuit.
14   Q.  Who represents you in that lawsuit?
15   A.  I -- I really don't know.  I just
16 filed the papers and they never did get back
17 with me.
18   Q.  So you don't know the name of the
19 lawyer that represents you in that case?
20   A.  Not -- Not really, no.
21   Q.  Have you ever spoken with the lawyer
22 that --
23   A.  No.  No.
24   Q.  Have you ever sent that lawyer any
25 papers in connection with that lawsuit?

5 (Pages 14 to 17)

BARGE001209

KOCH, HERMAN

8/8/2008

Page 18

1     A.  No.
2     Q.  But you are a Plaintiff in that
3  lawsuit?
4     A.  I am a Plaintiff in that lawsuit.
5     Q.  And in that lawsuit you're alleging
6  that your damages to your properties in St.
7  Bernard and Orleans Parish were the fault of
8  the United States government?
9     A.  Yes.
10     Q.  So you have one lawsuit where you're
11  claiming your property damages in Orleans and
12  Jefferson Parish --
13     A.  Not Jefferson.
14     Q.  I'm sorry, Orleans and St. Bernard;
15  you have one lawsuit involving the MRGO with a
16  lawyer in New York; correct?
17     A.  Right.
18     Q.  You have a second lawsuit against
19  the Federal government concerning the levees
20  in St. Bernard Parish?
21     A.  Yeah, right.
22     Q.  And you're claiming in that lawsuit
23  as well that all of your property damages in
24  Orleans and St. Bernard Parish were the result
25  of the Federal government's acts; right?

Page 19

1     A.  Right.
2     Q.  In the lawsuit filed by the lawyer
3  in New York, are you also claiming emotional
4  distress damages in that lawsuit?
5     A.  No.  No.
6     Q.  So it's strictly property damage in
7  that?
8     A.  It's property damage as far as I
9  know, yeah.
10     Q.  And what properties does that relate
11  to?
12     A.  It relates to the properties that I
13  had in St. Bernard and the Lower Ninth Ward.
14     Q.  And can you go through those
15  properties?
16     A.  Okay.  I have my own property, I had
17  8545 and 47; that was a double, it was a
18  duplex.  I got the property at 3619 Shangri
19  La, that's a townhouse.  I have another duplex
20  on 3409 and 11 Shangri La, that's a duplex.
21  And I got my two properties in the Lower Ninth
22  Ward.  One is 6317 and 19 Douglass Street.
23  And the other property was 6035 and 6037
24  Burgundy Street.
25     Q.  The first property you said, 8545

Page 20

1  and 47, that's Deerfield Avenue?
2     A.  That's Deerfield Drive.
3     Q.  Deerfield Drive.  And in the lawsuit
4  where the New York lawyer represents you,
5  you're claiming damages in that lawsuit
6  related to each of these properties; correct?
7     A.  Right.  Right.
8     Q.  Are you also claiming damages in
9  that lawsuit relating to the loss of your
10  personal property, such as your furniture and
11  items in your home?
12     A.  As far as I know of, it's just the
13  properties.
14     Q.  Just the --
15     A.  I mean, that's all that was
16  mentioned as far as I can remember, was just
17  the properties.  Nothing including the
18  contents.
19     Q.  The second lawsuit that you filed
20  against the U.S. government, are you seeking
21  property damages in that lawsuit relating to
22  the five properties you just mentioned?
23     A.  Yes.
24     Q.  Are you seeking damages for
25  emotional distress in that lawsuit?

Page 21

1     A.  Yes.  Yes, I am.
2     Q.  Are you seeking damages for lost
3  personal property in that lawsuit?
4     A.  Yes.  Yes, I am.
5     Q.  The damages that you're seeking in
6  that lawsuit against the United States
7  government, are they identical to the damages
8  that you're seeking in the suit that we're
9  here for today?
10     A.  I -- I don't -- I don't remember.  I
11  don't remember.
12     Q.  We'll go through that in a little
13  more detail later, Mr. Koch.  Let's go through
14  the last lawsuit that you said you are
15  involved in.  That involves the barge;
16  correct?
17     A.  Right.
18     Q.  That's the one we're here for today;
19  correct?
20     A.  Right.
21     Q.  Have you ever been sued?
22     A.  There's a lawsuit against me right
23  now on one of my properties at 8545
24  Deerfield.  One of the tenants claimed that my
25  fountain fell on the feet of her little girl.

6  (Pages 18 to 21)

KOCH, HERMAN

8/8/2008

Page 22

1    Q.  Where is this lawsuit filed?
2    A.  It's filed in St. -- in St. Bernard
3  Parish, I guess, because that's where the
4  property is.
5    Q.  Do you have a lawyer in that
6  lawsuit?
7    A.  No.  Who's taking care of that is my
8  insurance company as far as I know of.
9    Q.  Who's your insurance company?
10    A.  State Farm.
11    Q.  Have you given any sort of
12  deposition in that lawsuit?
13    A.  No.
14    Q.  And the allegations in that lawsuit
15  are that the fountain fell and hurt a little
16  girl?
17    A.  The fountain fell and hurt this
18  little girl's foot.
19    Q.  How badly is she hurt?
20    A.  I really don't know.  But they claim
21  that her foot was -- was hurt bad and she had
22  to go to the hospital.
23    Q.  When did this occur?
24    A.  Must have occurred about seven or
25  eight months ago, I guess.

Page 23

1    Q.  So this was after the storm?
2    A.  This was after the storm.
3    Q.  Is it fair to say that that lawsuit
4  is causing you some emotional distress, Mr.
5  Koch?
6    A.  It's possible, yes, sure.
7    Q.  Is it causing you emotional
8  distress?
9    A.  I don't know.  I -- I can't answer
10  that.  I don't know if it is or not.  It
11  probably is.  I don't know.
12    Q.  Did you feel any stress when you
13  were served with that lawsuit?
14    A.  Not -- Not really.  I just called up
15  my insurance company and they said that they
16  would take care of it.
17    Q.  Do you know how much the Plaintiffs
18  are claiming in that lawsuit against you?
19    A.  No, I don't.
20    Q.  Did you review any documents to
21  prepare for your deposition here today?
22    A.  Yes, I did.
23    Q.  Which documents did you review?
24    A.  Right here (indicating).
25    MR. BLANCHARD:

Page 24

1    The witness has handed me two
2  items.  The first item is entitled --
3  Actually, there's three items.  The
4  first item is "Answers to
5  Interrogatories Propounded by the
6  Barge Entities", which I will mark as
7  Koch Number 1.  The second is a
8  document entitled "Supplemental
9  Answers to Interrogatories Propounded
10  by Barge Entities", which I will mark
11  as Koch Number 2.  And the third is
12  Barge Plaintiffs, July 3rd, 2008
13    "Supplemental Amended and Superseding
14  Supplemental Answers to
15  Interrogatories Propounded by Barge
16  Entities", which I will mark as Koch
17  Number 3.
18  EXAMINATION BY MR. BLANCHARD:
19    Q.  So just to be clear, Mr. Koch, the
20  documents I marked as Koch 1, 2, and 3 are
21  documents that you reviewed in preparation for
22  your deposition here today?
23    A.  Yes.
24    Q.  And when did you review these
25  documents?

Page 25

1    A.  We -- We reviewed them about 10:30
2  or so.  We reviewed them today.
3    Q.  Who did you review them with?
4    A.  With Karl and Edward.
5    Q.  Mr. Wiedemann and Mr. Moreno here;
6  right?
7    A.  Right.  Right.
8    Q.  Was there anyone else that you
9  reviewed these documents with?
10    A.  Who came in after a little while was
11  Brian Gilbert.
12    Q.  Anyone else?
13    A.  No.
14    Q.  Other than these three documents,
15  did you review any other documents in
16  preparation for your deposition here today?
17    A.  We reviewed my income tax
18  documents.
19    Q.  Your income tax returns?
20    A.  Yeah.  Yeah.  Right.  My income tax
21  returns.
22    Q.  Did you review anything other than
23  the Answers to Interrogatories marked as Koch
24  1, 2, and 3, and your tax returns?
25    A.  We went through some of the receipts

7 (Pages 22 to 25)

KOCH, HERMAN

8/8/2008

Page 26

1  that I have for my homes that got damaged.
2     Q.  So these would be receipts relative
3  to repairs to the properties?
4     A.  Yes.  Yes.  Yes.
5     Q.  So this morning you reviewed the
6  Answers to Interrogatories marked as Koch 1,
7  2, and 3; correct?
8     A.  Uh-huh (affirmatively).
9     Q.  You have to answer "yes".
10    A.  Yes.  Yes.  Yes.
11    Q.  You also reviewed tax returns; is
12 that correct?
13    A.  Yes.
14    Q.  Do you remember what years tax
15 returns you reviewed?
16    A.  I don't recall the years, but it was
17 about five or six tax returns or maybe more.
18    Q.  The third item you mentioned were
19 receipts for repairs to various properties;
20 correct?
21    A.  Yes.
22    Q.  Did you review anything else?
23    A.  Not that I can recall, no.
24    Q.  Did you review any sort of
25 questionnaire that your lawyers had previously

Page 27

1  asked you to fill out?
2     A.  I think those are up in there,
3  aren't they?  Yes, we did -- I did review
4  questionnaires, right.
5     Q.  Well, a little earlier we mentioned
6  these interrogatory responses.
7     A.  Uh-huh (affirmatively).
8     Q.  All right.  And by "questionnaires"
9  I mean something different than these.
10    A.  The -- Right.
11    Q.  You reviewed some other
12 questionnaires different than these?
13    A.  Yes.
14    Q.  And describe those documents for me,
15 Mr. Koch.
16    A.  I really don't recall everything.
17 Some of the questions were -- Some of the
18 questions were concerning the storm.  That's
19 the only thing I really remember.
20    Q.  How many pages was this
21 questionnaire?
22    A.  I guess about seven or eight pages
23 or more.
24    Q.  Had you filled out the
25 questionnaire?

Page 28

1     A.  Yes, I did.
2     Q.  Did that questionnaire help you
3  refresh your recollection?
4     A.  Yes, it did.
5     Q.  Did the Answers to Interrogatories
6  marked as Koch 1, 2, and 3 help you refresh
7  your recollection?
8     A.  Yes, it did.
9     Q.  Did the tax returns that you
10 reviewed help you refresh your recollection?
11    A.  Yes.
12    Q.  Other than the Answers to
13 Interrogatories, the tax returns, the
14 receipts, and the questionnaire, did you
15 review any other documents that helped you
16 refresh your recollection here today?
17    A.  Not that I can remember, no.
18    Q.  Do you know when you filled out this
19 questionnaire?
20    A.  I don't remember.
21       MR. BLANCHARD:
22         We'll call for production of that
23 questionnaire.
24       MR. WIEDEMANN:
25         And we will object to the

Page 29

1  production of the questionnaire as
2  being privileged communication between
3  Counsel and its client.
4        MR. BLANCHARD:
5          Is that document on any sort of
6  privilege log?
7        MR. WIEDEMANN:
8          I believe that it is.
9  EXAMINATION BY MR. BLANCHARD:
10    Q.  Other than meeting with your lawyers
11 here today and reviewing the documents that
12 you mentioned, did you do anything else to
13 prepare for your deposition here today, Mr.
14 Koch?
15    A.  No.
16    Q.  What's your current address?
17    A.  506 Country Club Drive, Picayune,
18 Mississippi.  Zip code, 39466.
19    Q.  What's your date of birth?
20    A.  November 4th, 1937.
21    Q.  Where were you born?
22    A.  New Orleans.
23    Q.  Where did you grow up?
24    A.  Grew up in the Lower Ninth Ward.
25    Q.  Where in the Lower Ninth Ward?

8 (Pages 26 to 29)

KOCH, HERMAN

8/8/2008

Page 30

1     A.   6125 Dauphine Street.
2     Q.   You're married; correct?
3     A.   Yes.
4     Q.   What's your wife's name?
5     A.   Aida, A I D A, Koch, K O C H.
6     Q.   How long have you been married to
7  her?
8     A.   Since January of 1961.
9     Q.   Have you ever been married to anyone
10  else?
11     A.   No.
12     Q.   Do you have any children?
13     A.   Yes.
14     Q.   How many?
15     A.   Three.
16     Q.   Let's start with the oldest.
17     A.   Okay.  How old or --
18     Q.   No, let's --
19     A.   The name?
20     Q.   Give me the name and the age.
21     A.   Okay.  The name is Herman S. Koch,
22  and he was born in December of '61.  So he
23  would be how old?  About 47, 46 years old.
24     Q.   46.
25     A.   46.  Somewhere around that

Page 31

1  ballpark.  And the girl, she was born on May
2  24th, 1969.  And the youngest boy was born on
3  April the 5th, 1976.
4     Q.   What's your girl's name?
5     A.   Jacqueline.
6     Q.   Last name?
7     A.   She's married.  Her last name is
8  Morel, M O R E L.
9     Q.   What's your youngest son's name?
10     A.   Steven.
11     Q.   Steven Koch?
12     A.   Yes.
13     Q.   Where does Herman live?
14     A.   Herman lives in St. Bernard Parish.
15     Q.   Where did he live at the time of the
16  storm?
17     A.   He also lived in St. Bernard Parish.
18     Q.   Did he live with you?
19     A.   No.
20     Q.   Did he live on the east or west side
21  of Paris Avenue at the time of the storm?
22     A.   He lived on the west side.
23     Q.   What was his address at the time of
24  the storm?
25     A.   He lived on Rowley.  I think it was

Page 32

1  918 Rowley, but don't quote me on that.  But
2  he lived on Rowley Boulevard.
3     Q.   Where does he live now?
4     A.   He lives in Meraux now.  Meraux,
5  Louisiana.  That's also in St. Bernard Parish.
6     Q.   Your daughter, where did she live at
7  the time of the storm?
8     A.   Slidell.
9     Q.   Where does she live now?
10     A.   In Slidell.
11     Q.   Your youngest son, where did he live
12  at the time of the storm?
13     A.   He lived in Metairie.
14     Q.   At the time of the storm you believe
15  he lived in Metairie?
16     A.   No, I couldn't -- I could be wrong.
17  I don't know.
18     Q.   Well, let me ask it this way.  Did
19  he live in St. Bernard Parish at the time of
20  the storm?
21     A.   Yes.  Yes, he did, but I think -- I
22  think he lived in St. Bernard.
23     Q.   Do you know the address?
24     A.   3808 Jupiter Drive.
25     Q.   Is that on the east or west side of

Page 33

1  Paris Avenue?
2     A.   It's on the west side.
3          MR. WIEDEMANN:
4             Paris Road.
5  EXAMINATION BY MR. BLANCHARD:
6     Q.   Paris Road.
7     A.   That's on the west side.
8     Q.   Where does he live now?
9     A.   Steven?
10     Q.   Yes.
11     A.   In Slidell.
12     Q.   Let's go through your educational
13  background.
14     A.   Uh-huh (affirmatively).
15     Q.   Mr. Koch, where did you go to high
16  school?
17     A.   At Holy Cross.
18     Q.   Did you graduate?
19     A.   Yes.
20     Q.   Did you go to college?
21     A.   No.  I went to Soule, which is a
22  business college.
23     Q.   I'm sorry, what was the name of
24  that?
25     A.   Soule, spelled S O U L E.  It was on

Johns Pendleton Court Reporters                    800 562-1285

BARGE001213

KOCH, HERMAN

8/8/2008

Page 34

1   Jackson Avenue at one time.
2       Q.  Did you obtain any sort of degree or
3   certificate from that institution?
4       A.  No.  No.
5       Q.  What did you go there for?
6       A.  I went there -- It was primarily a
7   business school.
8       Q.  Were you working at the time that
9   you went to that business school?
10      A.  No.
11      Q.  Have you had any formal education
12  since the time you left this business school?
13      A.  By formal education you mean what,
14  like a trade school or something?
15      Q.  Trade school, college, university.
16      A.  I had went to trade school through
17  the -- through the company, Domino Sugar.  I
18  went to a trade school there.
19      Q.  And was this while you were employed
20  by Domino Sugar?
21      A.  Yes.  Yes.
22      Q.  Now, after you left the business
23  school, did you start working at that point?
24      A.  After I left -- Yes.  Yes.  I
25  started working.

Page 35

1       Q.  Where did you start working?
2       A.  I was employed at the Louisiana
3   National Guard.
4       Q.  Where was that?
5       A.  That was at Jackson Barracks.
6       Q.  In the Lower Ninth Ward?
7       A.  Yeah.
8       Q.  What did you do there?
9       A.  I was a -- I was in the headquarters
10  building as a -- what is known as a
11  clerk-typist.
12      Q.  How long did you work there?
13      A.  I really don't -- don't remember.
14  About two, two years.  A year.
15      Q.  Where did you work after that?
16      A.  After that I went to work for
17  another National Guard outfit on Moss Street
18  and I was a supply sergeant there.
19      Q.  How long did you work there?
20      A.  About six months, and we were called
21  into active duty and we went to Fort Eustis,
22  Virginia.
23      Q.  So obviously you have served in the
24  military; correct?
25      A.  Correct.

Page 36

1       Q.  Are you still part of the military?
2       A.  No.
3       Q.  What years were you in the military?
4       A.  Let's see.  I guess from '57 to
5   about '60.  '60 or '61, I guess.  '62
6   possibly.
7       Q.  Did you receive a discharge?
8       A.  Yes.
9       Q.  Were you honorably discharged?
10      A.  Yes.
11      Q.  Were you ever in combat?
12      A.  No.
13      Q.  Let's go back to your work history.
14  You told me you were in the military, you were
15  called to duty; correct?
16      A.  Correct.
17      Q.  What happened after that as far as
18  your employment history?
19      A.  Okay.  After I came home, I had my
20  time in, so I got out and I went to work for a
21  company named George H. Lehleitner, and it was
22  fixing appliances with George H. Lehleitner.
23      Q.  And where was that business located?
24      A.  This was on Galvez Street at the
25  time.  South Galvez, I think.

Page 37

1       Q.  How long were you with them?
2       A.  Oh, about seven or eight months,
3   maybe a year.
4       Q.  What was your next employment after
5   that?
6       A.  My next employment, I went to Domino
7   Sugar.
8       Q.  Where was that located?
9       A.  That was in Arabi, on North Peters
10  Street.
11      Q.  What year did you start with Domino
12  Sugar?
13      A.  1963.
14      Q.  What was your first position with
15  Domino Sugar?
16      A.  I was a machine attendant.
17      Q.  How long were you with Domino Sugar?
18      A.  Somewhere around 38 years.
19      Q.  You retired from Domino Sugar?
20      A.  Yes.
21      Q.  How old were you when you retired?
22      A.  I think 62.
23      Q.  What year did you retire?
24      A.  In April of 2000.
25      Q.  Did your positions ever change while

10 (Pages 34 to 37)

KOCH, HERMAN

8/8/2008

Page 38

1  you were at Domino Sugar?
2      A.  Yes.  I went from -- from a machine
3  mechanic to the maintenance department.  And
4  that's a different -- that is a different
5  department from where I started off.  And
6  actually, in the first department I was a
7  machine mechanic where you operated the
8  machines.  And then I went to going and
9  maintaining them and fixing them in the same
10 department.  Then after that, I went to
11 another department that was called the
12 maintenance department, where you had to
13 maintain the whole plant.
14     Q.  Did your position ever change after
15 that?
16     A.  No.
17     Q.  You retired in that position?
18     A.  I retired in that position as a
19 maintenance mechanic.
20     Q.  Do you receive pension benefits?
21     A.  Yes.
22     Q.  What sort of pension benefits?
23     A.  What sort?
24     Q.  You receive cash payments every
25 year?

Page 39

1      A.  Yes.
2      Q.  How much?
3      A.  It's 1,465 a month I think I receive
4  from them.
5      Q.  Does that increase every year?
6      A.  No.  It stays the same.
7      Q.  You receive that for the rest of
8  your life?
9      A.  Yes.
10     Q.  Do you receive any other benefits in
11 connection with your retirement such as health
12 insurance?
13     A.  No.
14     Q.  So the only benefit you receive from
15 Domino is the cash payment?
16     A.  Right.
17     Q.  After you retired from Domino, did
18 you have any plans to go back to work?
19     A.  No.
20     Q.  Have you sought any employment since
21 you retired from Domino?
22     A.  No.
23     Q.  You mentioned your address, current
24 address is 506 Country Club Drive, Picayune;
25 correct?

Page 40

1      A.  Correct.
2      Q.  How long have you lived there?
3      A.  Since December of '05.
4      Q.  How much did you pay for that house?
5      A.  169-9.
6      Q.  You own the house?
7      A.  Yes.
8      Q.  Do you have a mortgage on that
9  house?
10     A.  No.
11     Q.  Have you ever had a mortgage on that
12 house?
13     A.  No.
14     Q.  Where did you get the funds to pay
15 for that house?
16     A.  From my flood insurance.
17     Q.  The flood insurance on your various
18 properties in St. Bernard --
19     A.  Right.  Right.
20     Q.  -- and the Lower Ninth Ward?
21     A.  Yes.
22     Q.  Just one other instruction, Mr.
23 Koch.  Please wait until I finish my question
24 --
25     A.  Oh, okay.  Sorry.

Page 41

1      Q.  -- before you answer.  That's fine.
2  You may know the answer to my question, but
3  it's easier for the Court Reporter if you
4  wait.
5      A.  Okay.
6      Q.  Who lives there at that address, 506
7  Country Club Drive?
8      A.  Myself and my wife.
9      Q.  Has anyone else ever lived there
10 with you?
11     A.  No.
12     Q.  Have you lived anywhere else since
13 Hurricane Katrina other than 506 Country Club
14 Drive?
15     A.  Yes.  I lived with my daughter in
16 Slidell.
17     Q.  What period of time did you live
18 with your daughter in Slidell?
19     A.  After Hurricane Katrina until
20 December of '05.
21     Q.  When you bought the 506 Country Club
22 Drive?
23     A.  When I bought the 506 Country Club
24 Drive.
25     Q.  So just to be clear, after Katrina

Johns Pendleton Court Reporters                    800 562-1285

BARGE001215

KOCH, HERMAN

8/8/2008

Page 42

1  you moved in with your daughter for a period
2  of time; correct?
3     A.  Correct.
4     Q.  And then you moved into your current
5  address?
6     A.  Correct.
7     Q.  And you haven't lived anywhere else
8  during that time period, have you?
9     A.  No.  No.
10    Q.  At the time of Katrina where was
11  your residence?
12    A.  8545 Deerfield Drive.
13    Q.  That's in St. Bernard Parish;
14  correct?
15    A.  Yes.
16    Q.  In Chalmette?
17    A.  Yes.
18    Q.  How long had you lived there?
19    A.  Since November 1st of 1971.
20    Q.  Where did you live before November
21  1, 1971?
22    A.  At 6035 Burgundy Street in New
23  Orleans.
24    Q.  How long had you lived at 6035
25  Burgundy Street?

Page 43

1     A.  About two, two and a half years, I
2  think.  About three, three years.  I'm not
3  sure.
4     Q.  Where did you live before you lived
5  at 6035 Burgundy Street?
6     A.  I lived in Parkchester Apartments.
7     Q.  Where is that?
8     A.  That's in New Orleans.  If I can
9  recall, it was off of St. Bernard Avenue in
10  the city.
11    Q.  How long did you live there?
12    A.  Six months, eight months.
13    Q.  Where did you live before that?
14    A.  I lived with my mother.
15    Q.  What address?
16    A.  6125 Dauphine Street.
17    Q.  That's in the Lower Ninth; correct?
18    A.  Uh-huh (affirmatively).
19    Q.  That's a "yes"?
20    A.  Yes.  I'm sorry.
21    Q.  Mr. Koch, you have experienced
22  several hurricanes during your lifetime;
23  correct?
24    A.  Yes.
25    Q.  You lived in New Orleans at the time

Page 44

1  of Hurricane Betsy; correct?
2     A.  Yes.
3     Q.  You lived on Dauphine Street with
4  your mother; right?
5     A.  Yes.  Yes.
6     Q.  Tell me about your experience during
7  Hurricane Betsy.  First off, did you evacuate
8  for Betsy?
9     A.  No.
10    Q.  So you stayed in the Dauphine Street
11  home at the time of Betsy?
12    A.  Yes.
13    Q.  What do you remember about your
14  experiences during Betsy?
15    A.  The water came up about a foot in
16  front of our house, and we had a lot of
17  relatives that came over to my mother's house
18  after the storm and they lived there for about
19  a month after the storm until they could get
20  into their houses that flooded.  And I
21  remember that.
22    Q.  Did the home that you were living in
23  flood?
24    A.  No, it didn't flood.
25    Q.  But you saw many homes in the Lower

Page 45

1  Ninth Ward that flooded; right?
2     A.  Yes.  Yes.
3     Q.  You said some of your friends' homes
4  had flooded?
5     A.  Yes.
6     Q.  Do you remember experiencing a lot
7  of wind during that storm as well?
8     A.  Yes, they had wind.
9     Q.  Was it a scary experience?
10    A.  Yes, it was.
11    Q.  Do you recall Hurricane Camille?
12    A.  Yes.
13    Q.  Did you evacuate for that storm?
14    A.  No, I didn't.
15    Q.  Where were you living at that time?
16    A.  Let's see.  Camille was in what --
17  in 68?  '69.
18    Q.  '69, I believe.
19    A.  I was living on Burgundy Street.
20    Q.  Do you remember Hurricane Ivan?
21    A.  Yes.  I remember a little bit of it,
22  right.
23    Q.  Did you evacuate for that storm?
24    A.  Yes.
25    Q.  Tell me why you evacuated for that

12 (Pages 42 to 45)

KOCH, HERMAN

8/8/2008

Page 46

```
 1    storm.
 2        A.  Because they asked us to evacuate.
 3        Q.  You lived at the Deerfield Drive
 4    address at that time; correct?
 5        A.  Yes.  Correct.
 6        Q.  And were you concerned about
 7    flooding during Hurricane Ivan?
 8        A.  Yes.
 9        Q.  And you understood that staying in
10    your home during Ivan could be dangerous;
11    correct?
12        A.  Correct.
13        Q.  And based on the danger, potential
14    danger from that storm and the potential for
15    flooding, that's why you evacuated; correct?
16        A.  Yes.
17        Q.  Do you remember Hurricane Georges in
18    1998?
19        A.  1998?  Yes.  Yes.  I remember
20    Georges.
21        Q.  Did you evacuate during that storm?
22        A.  I don't remember if I evacuated for
23    Georges.  I don't remember that.  I can
24    remember Ivan, but I never -- I couldn't -- I
25    couldn't remember Georges.
```

Page 47

```
 1        Q.  Based on your experience of living
 2    in the Lower Ninth Ward and St. Bernard
 3    Parish, did you understand that during
 4    hurricanes the Lower Ninth Ward and St.
 5    Bernard could flood?
 6        A.  Yes.
 7        Q.  You understood that as a risk to
 8    living in St. Bernard Parish; correct?
 9        A.  Yes.
10        Q.  And you understood that as a risk of
11    living in the Lower Ninth Ward; correct?
12        A.  Yes.
13        Q.  You evacuated before Katrina;
14    correct?
15        A.  Yes.
16        Q.  When did you evacuate?
17        A.  Saturday evening before the storm.
18        Q.  When did you first discover that
19    Katrina may be a threat?
20        A.  I think it was Friday night.  Friday
21    night before the storm they -- they said that
22    the storm was heading for New Orleans.
23        Q.  How did you hear about that?
24        A.  From the television.
25        Q.  News reports?
```

Page 48

```
 1        A.  Yes.
 2        Q.  When on Saturday did you evacuate?
 3        A.  We left Saturday about 12:00 or 1:00
 4    o'clock that evening.
 5        Q.  I'm sorry, you said in the evening?
 6        A.  Yes.  We left Saturday evening
 7    about, oh, anywhere from 12:00 o'clock to 1:00
 8    o'clock Saturday evening.
 9        Q.  All right.  So around midnight?
10        A.  No.  It wasn't around midnight.
11        It was in the middle of the day?
12        A.  It was in the middle of the day,
13    Saturday in the day.
14        Q.  Right.  So around noon on Saturday,
15    August 28th, is when you evacuated; correct?
16        A.  Right.  Right.
17        Q.  And you evacuated because you
18    understood there was a risk of flooding in St.
19    Bernard Parish; correct?
20        A.  Right.
21        Q.  Do you remember a mandatory
22    evacuation order in St. Bernard Parish at that
23    time?
24        A.  I don't recall, no.  I don't recall
25    that they had that or not.
```

Page 49

```
 1        Q.  Before you evacuated, did you do
 2    anything to secure your home or any of your
 3    rental properties?
 4        A.  No, I didn't secure any of it.  The
 5    only thing I did, I put my -- my cats inside
 6    and I gave them food and water.  But that's
 7    the only thing I did.  The only thing I did
 8    was help my son go and put some -- some
 9    plywood on his house.  That's about all I
10    did.  Why?  Because it wasn't time.  Because
11    we never had time to do anything.
12        Q.  So you didn't board up any of the
13    windows of any of your rental properties?
14        A.  No, I didn't board them up because
15    we didn't have time to.
16        Q.  Did you first hear news reports on
17    that Friday before the storm that Katrina may
18    be coming our way?
19        A.  Yes.  Friday was the first time I --
20    I heard that the storm was heading to New
21    Orleans, Friday.
22        Q.  All right.
23        A.  Friday night.
24        Q.  So you understood on that Friday
25    night that Katrina was headed to New Orleans?
```

Johns Pendleton Court Reporters

800 562-1285

BARGE001217

KOCH, HERMAN

8/8/2008

Page 50

1    A.  Right.
2    Q.  And you understood it was a
3  dangerous storm; correct?
4    A.  Right.
5    Q.  And you evacuated the next day
6  around noon; correct?
7    A.  Noon; correct.
8    Q.  And neither on Friday or that
9  Saturday morning did you do anything to secure
10 any of your properties, did you?
11   A.  No.
12   Q.  Who evacuated with you?
13   A.  Me and my wife.
14   Q.  You traveled together in a car?
15   A.  Yes.
16   Q.  Did you pack up anything?
17   A.  We packed I think a small bag of
18 clothes and a little food and water.  That's
19 all.
20   Q.  Did you take one of your vehicles?
21   A.  One of them.  That's all.  And I
22 left one there.
23   Q.  Which vehicle did you take?
24   A.  I took my truck.  My truck that's --
25 It's a 2000 Chevrolet.  I took that one.

Page 51

1    Q.  You said you had another vehicle as
2  well?
3    A.  Yes.
4    Q.  What kind of vehicle was that?
5    A.  That was a '94 Chevrolet truck.  I
6  left that one.
7    Q.  You left that one at your home on
8  Deerfield?
9    A.  Yes.  Well, no, not on Deerfield.
10 At my aunt's house.  I left it at my aunt's
11 house.
12   Q.  And where did your aunt live?
13   A.  My aunt lived on Chalmette Avenue.
14   Q.  Is that on the east or west side of
15 Paris Road?
16   A.  That's on the west side of Paris
17 Road.
18   Q.  Other than clothes, did you take
19 anything with you such as family heirlooms?
20   A.  No, we didn't take anything like
21 family heirlooms or photographs or nothing.
22   Q.  And at the time of Katrina you
23 understood that it could be -- people can get
24 injured, even killed in hurricanes; correct?
25   A.  Right.

Page 52

1    Q.  And --
2    A.  Yes.
3    Q.  -- that was one of the reasons that
4  you evacuated; correct?
5    A.  Yes.
6    Q.  Where did you evacuate to?
7    A.  Houston, Texas.
8    Q.  Where did you stay in Houston?
9    A.  We stayed with my nephew.
10   Q.  Who's that?
11   A.  His name is Hilton Koch.
12   Q.  How long did you stay with your
13 nephew?
14   A.  We stood there about a week or two
15 weeks, I think.  I'm not sure.
16   Q.  When did you learn that St. Bernard
17 and the Lower Ninth Ward had flooded?
18   A.  Monday morning, on August the 29th.
19 We were watching the television at my nephew's
20 house and they said how New Orleans was
21 flooded, and that's how we learned of the
22 damage that the storm had caused.
23   Q.  You heard New Orleans was flooded;
24 correct?
25   A.  I heard New Orleans and the outlying

Page 53

1  parishes of St. -- St. Bernard, Plaquemines,
2  and the surrounding area were flooded.
3    Q.  You said you were in Houston for two
4  weeks?
5    A.  I really don't remember, but it must
6  have been about two weeks that we was in
7  Houston.
8    Q.  Where did you go after that?
9    A.  After Houston we came back to my
10 daughter's house in Slidell because we were
11 able to get by and go there, and we stayed in
12 Slidell.
13   Q.  And again, you stayed in Slidell
14 until the time that you bought your home in
15 Mississippi; correct?
16   A.  No.  We stayed in Slidell for a
17 week, because I got a trailer, a little camper
18 in Texas, and we came and I pulled that
19 trailer back home, because my daughter had
20 water damage in her house in Slidell.  So we
21 lived in the trailer about two months until I
22 bought the house in Picayune.
23   Q.  So when you moved back to the New
24 Orleans area, you went to Slidell?
25   A.  Right.

14 (Pages 50 to 53)

KOCH, HERMAN

8/8/2008

Page 54

1    Q.  And you had bought a trailer in
2  Texas?  Is that --
3    A.  Yes.
4    Q.  You brought the trailer with you?
5    A.  I brought the trailer with me.
6    Q.  Where did you keep the trailer?
7    A.  I kept the trailer in front of my
8  daughter's home.
9    Q.  In Slidell?
10   A.  In Slidell.
11   Q.  And you stayed there for how long?
12   A.  I stayed there until December of
13 '05.
14   Q.  Who lived in the trailer?
15   A.  Me and my wife.
16   Q.  And at that point is when you -- in
17 December of '05 is when you moved to
18 Mississippi; correct?
19   A.  Right.
20   Q.  When was the first time that you
21 visited any of your properties in the Lower
22 Ninth Ward or St. Bernard Parish after
23 Katrina?
24   A.  Let me think a little bit.  I have
25 to remember.  It was in early -- in early

Page 55

1  '06.  It was around January, February, I
2  think.  We also had to evacuate for Rita, too,
3  because I think Rita came on the heels of
4  Katrina and I remember being at my daughter's
5  and we had to evacuate for Rita, too, because
6  they asked us to evacuate there.
7    Q.  You were living in the trailer at
8  the time?
9    A.  Right.
10   Q.  Correct?
11   A.  Right.
12   Q.  And you understood that staying
13 during Rita could be dangerous; is that
14 correct?
15   A.  They told us to evacuate for Rita,
16 right, so we evacuated.
17   Q.  When you say "they," who is that?
18   A.  Well, it came on the radio that they
19 asked people to evacuate.
20   Q.  Where did you evacuate for Rita?
21   A.  We went to Alabama.
22   Q.  Where in Alabama?
23   A.  Some camping ground around Gulf
24 Shores.
25   Q.  How long were you evacuated for

Page 56

1  Rita?
2    A.  We were there for maybe about a
3  week.
4    Q.  What did you do after that?
5    A.  We came back to Slidell.
6    Q.  And you returned to the trailer?
7    A.  Returned -- We even went and took
8  the trailer to Alabama, because we went to a
9  campground.
10   Q.  Mr. Koch, I want to talk to you
11 about your properties at this point.
12   A.  Okay.
13   Q.  Your property at 8545-47 Deerfield
14 Drive, that was in Chalmette; correct?
15   A.  Yes.
16   Q.  And that was a double; correct?
17   A.  Yes.
18   Q.  You lived on one side?
19   A.  Yes.
20   Q.  The other side was rented?  Is that
21 correct?
22   A.  Yes.
23   Q.  Which side did you live on?
24   A.  8545.
25   Q.  Were those properties the same size,

Page 57

1  8545 and 47?
2    A.  No.
3    Q.  Which one was bigger?
4    A.  Mine, 8545 is bigger.
5    Q.  How many square feet was that?
6    A.  Oh, let's see.  It must have been
7  about -- I'd say about 4,000 square foot at
8  least, I guess.  Because I had the big side.
9    Q.  Is that the total structure or just
10 your side?
11   A.  No, that's just my side.
12   Q.  How big is the total structure?
13   A.  The total structure must be over
14 5,000 feet, I guess.
15   Q.  I'm going to show you a Google map,
16 which I will mark as Koch Number 4.
17       Mr. Koch, I'm going to show you
18 this map and there is a red bubble with an "A"
19 inside of it.  Do you see that?
20   A.  Yeah.
21   Q.  Does that bubble accurately reflect
22 where your property at 8545-47 Deerfield was
23 located?
24   A.  Let's see.  Yes, because it's only
25 one block.  That street was only one block.

Johns Pendleton Court Reporters                    800 562-1285
BARGE001219

KOCH, HERMAN

8/8/2008

Page 58

1 Yes.
2 Q. So that accurately reflects where
3 that property was located?
4 A. Actually, my house was the second
5 house from the corner. Here you got it more
6 to the middle, but it was actually the second
7 house from the corner.
8 Q. Why don't you go ahead and mark with
9 an X where your property at 8545-45 was
10 located.
11 A. Okay. This is the corner. I would
12 say right about here (writing). You can see
13 my mark.
14 Q. So just for purposes of the record,
15 you have actually marked the Google map
16 attached as Koch Number 4 with the location of
17 your property on Deerfield. Correct?
18 A. Uh-huh (affirmatively). Yes.
19 Q. When did you buy that property?
20 A. I bought the lot first. And I think I
21 bought the lot first. And I think I bought
22 the lot in '68.
23 Q. Who did you buy it from?
24 A. I bought it from a gentleman, his
25 name was Fred Segura. I forget how he -- I

Page 59

1 don't remember the name of his company. But I
2 bought that lot from Fred Segura.
3 Q. How much did you pay for it?
4 A. Let me think. I don't remember.
5 Q. Mr. Koch, I'm going to show you
6 what's marked as Exhibit Number 5, a sale of
7 property by State Savings and Loan Association
8 to Mr. and Mrs. Herman Koch dated June 30th,
9 1972, and ask you, have you ever seen this
10 document before?
11 A. Let's see. I think I have, yes. I
12 think I have seen -- Is this the property
13 that's on -- on 8545 and 47 Deerfield? Yes.
14 Because I remember this guy Ciaccio is the one
15 that handled it.
16 Q. Is that the document that reflects
17 your purchase of the lot on Deerfield?
18 A. Yes. Well, we went and purchased
19 the lot I said in '68 and we built in '71 or
20 '72. I am not sure. But this is the man
21 that had -- this is the savings and loan that
22 we went through, and the gentleman that
23 handled it was Peter. I think his name was
24 Ciaccio, call him Chotchee.
25 Q. Go to page 1 of that document.

Page 60

1 There's a note that you paid $31,400 for that
2 property. Do you see that?
3 A. Yeah. Yeah. Right up here,
4 31,400. Right.
5 Q. When you bought it, was it just the
6 lot, or was it the lot and the structure?
7 A. Just the lot.
8 Q. Is this $31,400 what you paid for
9 the lot?
10 A. No.
11 Q. Well, --
12 A. No.
13 Q. -- what is this $31,400 for?
14 A. That's only for the house.
15 Q. So this is for the structure?
16 A. That's for the structure.
17 Q. And you had previously purchased the
18 lot a few years earlier; correct?
19 A. Yes. Correct.
20 Q. Did you hire someone to build the
21 house for you?
22 A. Yes, I did.
23 Q. Who did you hire to build the house?
24 A. His name is Patson Ceiby.
25 Q. When did you move into that house?

Page 61

1 A. November 1st, 1971. I remember it
2 because it was my mother's birthday.
3 Q. Did you ever purchase any other
4 property on Deerfield?
5 A. No.
6 Q. So this document dated June 30th,
7 1972, this was after you had actually been
8 living in the Deerfield address; correct?
9 A. Correct.
10 Q. And do you know why at that point in
11 time you entered into this sale of property
12 agreement by State Savings and Loan
13 Association to you?
14 A. No, I don't.
15 Q. Do you still own that property?
16 A. Yes, I do.
17 Q. That property is a brick structure?
18 Is that correct?
19 A. Correct.
20 Q. It's two stories; correct?
21 A. Two stories.
22 Q. And you said the total structure is
23 over 5,000 square feet?
24 A. Yes. I am -- Now, I don't know the
25 exact measurements of it, but I would say it's

16 (Pages 58 to 61)

KOCH, HERMAN

8/8/2008

Page 62

1  over 5,000 square foot, I think.
2      Q.  How big is the lot?
3      A.  The lot is -- I think the lot is 55
4  feet wide by 110 foot back.
5      Q.  Do you know the elevation of that
6  property?
7      A.  No, I don't.
8      Q.  Before Katrina, did that property
9  ever incur any type of flooding?
10     A.  No.  Water never did get into the
11  house.  Never.
12     Q.  You told me you built the house in
13  '71; correct?
14     A.  The house was completed in '71, yes.
15     Q.  Did you renovate the house in any
16  way after that date?
17     A.  Yes, we put an addition on the back
18  of it.
19     Q.  When did you put the addition on?
20     A.  I think that was in the '80s.  I am
21  not sure, though.
22     Q.  Did you add square feet at that
23  time?
24     A.  Yes.
25     Q.  How many square feet did you add?

Page 63

1      A.  I think about 850 square foot.
2      Q.  You added some rooms?
3      A.  Yes.
4      Q.  What kind of rooms did you add?
5      A.  I added -- Let's see.  I added
6  bedrooms.
7      Q.  Did you add them on one side or
8  both?
9      A.  On one side.  On my side.
10     Q.  The 8545?
11     A.  8545.
12     Q.  Any renovations to that structure
13  after that addition in the '80s?
14     A.  No.
15     Q.  How old was the roof on that
16  structure at the time of Katrina?
17     A.  How old was the roof?  We had just
18  replaced the roof on that house not too long
19  before -- before Katrina.
20     Q.  How long before Katrina?
21     A.  I would say about six months maybe,
22  or seven months.
23     Q.  And you said you replaced the roof?
24     A.  Well, that's a story in itself.
25     Q.  Well, tell me the story.

Page 64

1      A.  I hired a man to replace the roof
2  and I thought he did a thorough job, but I
3  found out what he did, he didn't take off the
4  top roof.  Just added a roof on the old roof.
5  And how I found out about it, I climbed up
6  there myself and found that they still had the
7  old roof under the roof that he put on.
8      Q.  So the person that you hired to
9  replace your roof just slapped new shingles on
10  top of old shingles?
11     A.  Just slapped new shingles on top of
12  old shingles.
13     Q.  Who did that?
14     A.  His name was Tyrone Carl.  I am
15  still looking for him.  I'm still trying to
16  find him.
17     Q.  When did you discover that he had
18  done this repair?
19     A.  I went and I discovered it about a
20  month after when they had a little blow come
21  up, like a little storm, you know?  I seen one
22  shingle that went and popped up it looked
23  like.  So I seen that I had a red roof under
24  there, and on the top he put a black roof.  So
25  I could still see red under there.   So I

Page 65

1  climbed up there and I looked.  And the more I
2  looked, the more I seen that he never took the
3  bottom roof off.  That he just put the new one
4  on top of the old one.
5      Q.  And you discovered this before
6  Katrina; correct?
7      A.  Before Katrina.
8      Q.  Did you do anything to try to fix
9  the faulty repairs that he had done?
10     A.  Well, I caught up with him and he
11  said he didn't believe that happened and I
12  said, "Well, let me show you."  He says, well,
13  the man he must have sent there did it.  So we
14  was in the process of getting the roof, as he
15  said, fixed properly, but in the meanwhile the
16  storm came up and nothing was done.
17     Q.  All right.  So at the time of the
18  storm, you had an old roof that needed to be
19  replaced.  Instead of being replaced, your
20  repairman had just placed additional shingles
21  on top of that?
22     A.  Right.
23     Q.  That was the condition of the roof
24  at the time of Katrina; right?
25     A.  Right.

17 (Pages 62 to 65)

KOCH, HERMAN

Page 66

1      Q.  That was on both sides, 8545 and 47;
2  correct?
3      A.  Correct.
4      Q.  Did your property at 8545-47
5  Deerfield need any other repairs at the time
6  of the storm?
7      A.  No.  No.
8      Q.  Did you ever have any termite damage
9  to that structure?
10     A.  No.
11     Q.  Had you ever had it inspected for
12 termites?
13     A.  Yes.
14     Q.  Did you have it under a termite
15 contract?
16     A.  Yes.
17     Q.  With who?
18     A.  With -- What is the company?  It's a
19 local company down in St. Bernard.  I can't
20 think of the name right now.  His -- The owner
21 of it was Lionel Guillot.  But I don't know
22 how he called his company.  I don't know how
23 he called his company, but who owned the
24 company was Lionel Guillot, because I went to
25 school and all with him.

Page 67

1      Q.  At the time of the storm did you
2  have any mortgages on the property at 8545-47
3  Deerfield?
4      A.  No.
5      Q.  Had you ever had any mortgages on
6  that property?
7      A.  Yes.  At first when I first had it
8  built, I had a mortgage with State -- with the
9  State Savings.
10     Q.  At some point you paid off that
11 mortgage?
12     A.  Yes.
13     Q.  When did you fully pay off that
14 mortgage?
15     A.  I don't remember.
16     Q.  Was it before Katrina?
17     A.  Oh, yes.
18     Q.  What was the tax assessed value of
19 that property at 8545-47 Deerfield at the time
20 of Katrina?
21     A.  The tax assessment?  I don't
22 remember what they was taxing.
23     Q.  How much did you pay in taxes on
24 that property?
25     A.  I think I was tax-exempt.

Page 68

1      Q.  So you paid nothing?
2      A.  Nothing.
3      Q.  Have you ever had that property at
4  8545-47 Deerfield appraised?
5      A.  No.
6         MR. WIEDEMANN:
7            If you should need a break or
8         anything, let him know.
9         THE WITNESS:
10           Let's keep on going.
11 EXAMINATION BY MR. BLANCHARD:
12     Q.  I forgot to tell you that at the
13 beginning, Mr. Koch.  If you need a break for
14 any reason, --
15     A.  Okay.  I'll tell you.
16     Q.  -- let me know.
17        Mr. Koch, I want to move forward
18 to another property, 3409-11 Shangri La.  Is
19 that a property that you owned at the time of
20 Katrina?
21     A.  Yes.
22     Q.  I'm going to mark as Exhibit Koch
23 Number 6 a Google map, again with a red
24 bubble.  I want you to take a look at that and
25 let me know whether or not this map accurately

Page 69

1  reflects where your property at 3409 Shangri
2  La Drive is located.
3      A.  Yes, that's accurate.
4      Q.  Thank you.
5      A.  This is our street, because they got
6  Oz coming down here.  This is Oz Street.  The
7  church.  Yes.  That's accurate.
8      Q.  Thank you.
9      A.  Not great, but accurate enough, I
10 guess.
11     Q.  Why don't you go ahead and mark with
12 a pen exactly where the property is located.
13     A.  I'd say -- I'd say about right here
14 (writing).  Almost in the middle.  I mean,
15 it's close.  Of course, you don't have Oz,
16 because Oz is just one block.  It's a street
17 coming here.  But that's okay.  But you got
18 everything.  That's pretty good.
19     Q.  Just to be clear for the record, you
20 have marked with a little pen mark on Exhibit
21 Koch Number 6 where your property at 3409-11
22 Shangri La is located; correct?
23     A.  Correct.
24     Q.  I'm going to show you a document,
25 Mr. Koch, marked as Koch Number 7, which is a

18 (Pages 66 to 69)

KOCH, HERMAN

8/8/2008

Page 70

1  cash sale by Adeline Bonck it appears to you
2  and your wife.  I ask you to take a look at
3  that.
4      A.  Let's see.
5      Q.  Do you recognize this document?
6          Mr. Koch, turn to page 3 of that
7  document, which is Bates stamped Koch 000007.
8  Is that your signature on that page?
9      A.  Yes.  Yes, it is.
10     Q.  And is that your wife's signature on
11 that page?
12     A.  It looks like it, yes.
13     Q.  All right.  And the property at
14 3409-11 Shangri La, did you pay $100,000 for
15 it?
16     A.  Yes.
17     Q.  So look at page 2 of that document.
18 Do you see the reference, the paragraph
19 beginning "This sale is made" and there's a
20 note to $100,000?  Do you see that?
21     A.  This sale is made at $200,000?  You
22 mean $100,000.
23     Q.  100,000.  Yes.
24     A.  Okay.  I thought you said 200.  I'm
25 sorry.

Page 71

1      Q.  If I did, I apologize.  $100,000.
2  And that's what you paid for the Shangri La
3  property, 3409?
4      A.  Yes.
5      Q.  You see a little higher there's
6  "Improvements that bear municipal number
7  3409-11 Shangri La Drive".  Do you see that?
8      A.  Uh-huh (affirmatively).  Yes.
9      Q.  Do you see that, Mr. Koch?
10     A.  Yes, I see on here "Improvements
11 bearing the municipal number", yes, I see it.
12 Yes.
13     Q.  So, Mr. Koch, is this document the
14 sales document whereby you obtained ownership
15 of 3409-11 Shangri La?
16     A.  Yes, it looks like it.  I guess it
17 must be it.  Of course, I don't remember the
18 original document, I mean, because -- but this
19 is my signature here and this looks like my
20 wife's signature here.
21     Q.  And do you remember when you
22 purchased the property?
23     A.  I purchased that property after I
24 retired.  I think it must have been around
25 2001.

Page 72

1      Q.  This reflects a date of August 16,
2  2000.  Does that refresh your recollection?
3      A.  Yes.  Yes.  That -- That's it.
4  Probably that's it.  I said 2001, but it's --
5  Because I -- I retired in April of 2000.
6      Q.  What type of construction is that
7  property, Mr. Koch?
8      A.  Brick.
9      Q.  It's a double?
10     A.  Double.
11     Q.  Are both sides equally sized?
12     A.  Yes.
13     Q.  How big is each side?
14     A.  I'd say about maybe around 850
15 square foot.  Maybe 900.
16     Q.  Do you have any pre-Katrina photos
17 of that property?
18     A.  They -- We had some of them, but I
19 don't have any on me right now.  Pre --
20 Pre-Katrina?  Oh, pre-Katrina.  I'm sorry.  I
21 thought you meant -- No, I don't have no
22 pre-Katrina photos that I know of.  If I had
23 them, they must have been lost in the storm.
24     Q.  Do you have any pre-storm
25 photographs of the property on Deerfield?

Page 73

1      A.  No, because the storm also took
2  that, too.
3      Q.  When was the home at 3409-11 Shangri
4  La built?
5      A.  I don't know.  I don't know, because
6  I am not the original owner of it.
7      Q.  It wasn't new when you bought it,
8  was it?
9      A.  It wasn't new when I bought it.
10     Q.  That's a one-story structure;
11 correct?
12     A.  Yes.
13     Q.  And it's slab?
14     A.  Slab.
15     Q.  Do you know the elevation of that
16 property?
17     A.  No.
18     Q.  Do you know how big the lot is?
19     A.  No.
20     Q.  Prior to Katrina, did that property
21 ever flood, to the best of your knowledge?
22     A.  No.
23     Q.  At the time of Katrina how old was
24 the roof on that structure?
25     A.  I don't know.

KOCH, HERMAN

8/8/2008

Page 74

1    Q.  Did you do any repairs to the roof
2  between the time you bought it and the time of
3  Katrina?
4    A.  No.
5    Q.  Did you perform any renovations on
6  that property from the time that you purchased
7  it up to the time of Katrina?
8    A.  Yes.
9    Q.  What did you do?
10    A.  I painted it and I put ceramic tiles
11  on the floors and I replaced the carpet and
12  everything, on the two sides.
13    Q.  When did you do that?
14    A.  I did that in about 2003.
15    Q.  That's rental property; correct?
16    A.  Correct.
17    Q.  And you purchased the property in
18  2000; correct?
19    A.  In 2000, right.
20    Q.  While you were doing these
21  renovations, I assume that neither side was
22  occupied?
23    A.  Yeah, right.
24    Q.  So they were vacant at the time you
25  did these renovations?

Page 75

1    A.  Well, no, because they -- they had
2  people -- In fact, my son changed the ceramic
3  tiles and he came in and he did it on the
4  weekends; and then I had a man come there and
5  replace the carpet because the two people
6  worked, you understand, that was in the house,
7  that lived in the house.  So I asked them if
8  they could have -- if I could have access to
9  replace the carpets and they said yeah.  So
10  they replaced the carpets then while the
11  people were still in there.
12    Q.  So you had tenants in both sides of
13  the property while you were doing these
14  renovations?
15    A.  Right.  Right.
16    Q.  Did the property at 3409-11 Shangri
17  La need any repairs at the time of Katrina?
18    A.  No.
19    Q.  Did that property ever have termite
20  infestation that you're aware of?
21    A.  No.  No.  No.
22    Q.  Is there a mortgage on that
23  property?
24    A.  Now?
25    Q.  Now.

Page 76

1    A.  No.
2    Q.  Was there ever a mortgage on that
3  property?
4    A.  Yes.
5    Q.  To who?
6    A.  I don't remember the mortgage
7  company.  I don't -- I don't remember it.
8    Q.  At some point you paid it off?
9    A.  Yes.  At some point I paid it off.
10    Q.  When did you pay it off?
11    A.  I don't -- I don't remember.
12    Q.  Did you pay it off before Katrina?
13    A.  I don't -- Who would tell you that
14  is my wife.  I don't remember if we paid it
15  off before or after Katrina.  But it was paid
16  off before Katrina, I think.
17    MRS. AIDA KOCH:
18    Uh-uh (negatively).
19    THE WITNESS:
20    No.
21    MR. WIEDEMANN:
22    No.
23    MR. BLANCHARD:
24    It's all right, Mrs. Koch.
25    MR. WIEDEMANN:

Page 77

1    Let me just caution you both
2  again.  I tried it this morning.  You
3  can't testify and try and tell him how
4  to testify.
5    MR. WEBB:
6    We can arrange for her to
7  testify.
8    MR. WIEDEMANN:
9    Of course.  At a later date.
10  EXAMINATION BY MR. BLANCHARD:
11    Q.  Mr. Koch, where did you get the
12  money to pay off the mortgage for 3409-11
13  Shangri La?
14    A.  Where did I get the money to pay off
15  the mortgage?  I don't remember.  I don't
16  remember where -- where I got the money.
17    Q.  Do you know whether insurance money
18  you received in connection with Hurricane
19  Katrina was the source of the funds that you
20  used to pay off the mortgage on that property?
21    A.  It's a possibility.
22    Q.  But you don't know?
23    A.  I don't.  I don't remember.
24    Q.  Have you ever had any appraisals of
25  that property?

Johns Pendleton Court Reporters                    800 562-1285

BARGE001224

KOCH, HERMAN

8/8/2008

Page 78

1    A.  I think we appraised it before we
2  bought it.
3    Q.  Did you have any appraisals after
4  the time you bought it?
5    A.  No.
6    Q.  Have you had any appraisals since
7  Katrina?
8    A.  No.
9    Q.  I'm going to mark as Exhibit Koch
10  Number 8 a Google map of 3619 Shangri La
11  Drive.  Before I show you that, you owned the
12  property at 3619 Shangri La.  Is that correct?
13    A.  Right.
14    Q.  Take a look at Exhibit 8.  Does that
15  red bubble on that map accurately indicate
16  where your property is located?
17    A.  No, it's wrong.
18    Q.  Well, go ahead and use that pen and
19  mark on the map in pen where that property is
20  located.
21    A.  Okay.  This is -- Okay.  You got it
22  on -- Where y'all marked it is on Patricia,
23  but it's right about here (writing).  It's
24  almost in the middle of the block in Shangri
25  La, but you don't have it there.  You got it

Page 79

1  marked on -- right here.  You can see the
2  mark.  You got the mark going to Patricia
3  Street.  That's wrong.
4    Q.  For purposes of the record, you have
5  marked on this map in pen the precise location
6  of that property.
7    A.  Well, approximately where it's at,
8  you know.  I mean, I am not sure if it's the
9  precise mark.  But it's in more or less the
10  middle of the block.  Whereas that mark you
11  got it marked on Patricia, it's wrong.
12    Q.  And you marked, to the best of your
13  knowledge and information, where that property
14  is located?
15    A.  Yes.  Yes.  Yes.
16    Q.  When did you buy that property?
17    A.  We bought that property, let me
18  think -- we bought that property around 2004
19  or 2003, somewhere in that area.
20    Q.  Who did you buy it from?
21    A.  Who did we buy it from?  I don't --
22  I don't remember.
23    Q.  I'm going to mark as Exhibit Koch
24  Number 9 an act of cash sale dated June 25th,
25  2004 and ask you to take a look at that.

Page 80

1    A.  Okay.  This is where I bought it.
2  Okay.  I said '03, '04, I wasn't sure what
3  date it was.  See if this is our signatures.
4    Yes, that looks like my signature
5  and that looks like my wife's signature.
6    Q.  Mr. Koch, is this the act of cash
7  sale that relates to your purchase of the
8  property at 3619 Shangri La?
9    A.  Yes.
10    Q.  You paid $64,000 for that property?
11    A.  I believe so, yes.
12    Q.  Does this document refresh your
13  recollection that you paid 64,000 for it?
14    A.  Yes.
15    Q.  And you purchased it from Mr. Chad
16  Roig?  Is that correct?
17    A.  I don't remember his name.
18    Q.  Describe that property for me, Mr.
19  Koch.
20    A.  That property is a townhouse double.
21  It's a brick structure.  It's an
22  upstairs-downstairs.  It's -- I guess it's
23  about 750 square foot or 800 square feet.  I
24  really don't know.
25    Q.  And there's a firewall between that

Page 81

1  property and another property; is that
2  correct?
3    A.  Yes.
4    Q.  Do you know the elevation of that
5  property?
6    A.  No, I don't.
7    Q.  Was that property ever flooded at
8  any time before Katrina?
9    A.  No.  Not that I know of, anyway.
10    Q.  And that's a slab structure?  It's
11  on a slab?
12    A.  It's a slab structure, right.
13    Q.  How big is the lot?
14    A.  I guess that lot must be about 55 by
15  110 also.  Of course, that's the whole lot.
16  It's only a half a lot, so I guess it would be
17  about 35 feet wide and about 110 foot back.
18    Q.  Do you know the elevation of that
19  property?
20    A.  No, I don't.
21    Q.  Did you do any renovations to that
22  property after you purchased it up to the time
23  of Katrina?
24    A.  Let me think.  I don't recall of
25  doing any -- of any renovations to the

21 (Pages 78 to 81)

KOCH, HERMAN

8/8/2008

Page 82

1  property that I can recall.
2      Q.  At the time of Katrina do you know
3  how old the roof was on that structure?
4      A.  No, I don't.
5      Q.  Did that property ever have
6  termites?
7      A.  Not that I know of, no.
8      Q.  Is there currently a mortgage on
9  that property?
10     A.  No.
11     Q.  Was there ever a mortgage on that
12  property?
13     A.  No.
14     Q.  You paid cash for it?
15     A.  Yes.
16     Q.  Have you ever had that property
17  appraised?
18     A.  I think it was appraised before we
19  bought it.
20     Q.  Any appraisals after you bought it?
21     A.  No.
22     Q.  Do you know the tax assessed value
23  of that property?
24     A.  I think it was in the $200 range.  I
25  am not sure.

Page 83

1      Q.  Is that how much you paid in taxes?
2      A.  Yes.  Paid in taxes on it, I think.
3      Q.  Do you know the actual assessed
4  value?
5      A.  No, I don't.  I do not recall
6  it.
7      Q.  Do you have any pre-Katrina photos
8  of that property?
9      A.  No.
10     Q.  Do you own a property at 6317
11  Douglass Street?
12     A.  637 what?
13     Q.  6317-19 Douglass Street?
14     A.  Yes.
15     Q.  That's in the Lower Ninth Ward; is
16  that correct?
17     A.  Yes.
18     Q.  I'm going to show you a Google map I
19  have identified as Koch Number 10.  Does the
20  red bubble on that map, Mr. Koch, accurately
21  reflect where your property at 6317-19
22  Douglass Street is located?
23     A.  Okay.  This is -- Douglass -- I
24  guess it's correct.  It's not on a corner.
25  You got it on a corner.  It's right up in

Page 84

1  here, I guess.  This is McClellan Street.
2  This is Douglass Street.  McClellan Street.
3  They got this map, it's not very accurate.
4      Q.  Just --
5      A.  This is Delery right here, but
6  they're going in -- they got Delery going into
7  McClellan and then they got Delery --
8      Q.  Mr. Koch, why don't you go ahead and
9  mark in pen on that map where you believe your
10  property is located.
11     A.  Okay.  It's the second structure
12  from the corner.
13     Q.  And to be clear for the record, on
14  Koch Number 10 you have marked in pen your
15  belief as to the location of that property at
16  6317-19 Douglass.  Is that correct?
17     A.  Yes.
18     Q.  When did you purchase that property?
19     A.  I don't remember.  It was -- I just
20  don't remember when I purchased that
21  property.
22     Q.  Do you remember how much you paid
23  for it?
24     A.  No, I don't even remember that.
25     Q.  I'm going to mark as Koch Number 11

Page 85

1  a cash sale of property, dated October 16,
2  1984 from Anna Hammel to Herman Koch and your
3  wife.  I ask you if you can identify this
4  document.
5      A.  Okay.  Yeah.  That would seem about
6  right.  This is spelled wrong (indicating).
7  To Aida Ochsa.  It's supposed to be Ochoa, O C
8  H O A.  They got it spelled wrong.  But they
9  got mine on here.
10     Q.  Do you recognize that document, Mr.
11  Koch?
12     A.  Yes.  I'm trying to find -- I'm
13  trying to find the signature.  Then I can
14  recognize it.  There's no signed --
15  signatures, huh?
16     Q.  Well, Mr. Koch, I'll represent to
17  you that this was a document that you produced
18  to us in connection with this litigation and
19  that's reflected by the Bates stamp numbers on
20  the bottom which are Koch 000012 through 16.
21  Do you see those Bates stamp numbers at the
22  bottom?
23         MR. WIEDEMANN:
24            He is talking about right here
25         (indicating).

22  (Pages 82 to 85)

KOCH, HERMAN

8/8/2008

Page 86

1         THE WITNESS:
2         Yeah. Yeah. Yeah.
3    EXAMINATION BY MR. BLANCHARD:
4         Q.  Do you remember buying this property
5    from Anna Hammel?
6         A.  Yes. I remember buying this
7    property from a -- from the daughter of an old
8    lady that passed away in this house, and I
9    forget her name. It was probably Anna
10   Hammel.
11        Q.  And do you see on page 3 an amount
12   of $53,000? Is that your recollection of the
13   amount you paid for the property at 6317
14   Douglass?
15        A.  Yeah, that sounds about right.
16        Q.  And on page 4 of that document do
17   you see your name referenced on that page?
18        A.  Yes.
19        Q.  And there's a stamp there that says
20   "Original signed". Do you see that?
21        A.  Yes.
22        Q.  So after your review of this
23   document, Mr. Koch, is this the cash sale
24   relating to your purchase of your property at
25   6317-19 Douglass?

Page 87

1         A.  As far as I know, it is, yes.
2         Q.  Describe that property for me, Mr.
3    Koch.
4         A.  That property's over 100 years old
5    and that property's also a duplex. It's a
6    shotgun, flat board house. It's on a narrow
7    lot. When I say narrow lot, I say the lot is
8    about maybe 45 foot wide, but it goes way back
9    about 200 and something feet.
10        Q.  A wood frame house?
11        A.  It's a wood frame house. Of course,
12   it's got siding on it now and it's aluminum
13   siding. It's in the -- what is known as the
14   Holy Cross historical district. And it's --
15   It's a two-room -- bedroom shotgun double on
16   each side.
17        Q.  Are both sides equally sized?
18        A.  Both sides is equally sized.
19        Q.  Do you know how many total square
20   feet for the entire structure?
21        A.  No, I don't. If I told you, I would
22   just be guessing. I don't know.
23        Q.  This house is raised; is that
24   correct?
25        A.  This house is on brick pillars,

Page 88

1    that's correct.
2         Q.  How high is it raised?
3         A.  It's raised about I'd say two and a
4    half, three foot. It's rather high.
5         Q.  Do you know the elevation of the
6    actual first floor, the floor of that --
7         A.  No, I do not.
8         Q.  It's a one-story structure, isn't
9    it?
10        A.  One-story structure.
11        Q.  Did that property flood during
12   Betsy?
13        A.  Yes, it did.
14        Q.  How deep was the water during Betsy?
15        A.  I'd say that the water came up in
16   the house about two and a half feet to three
17   feet.
18        Q.  You didn't own the property at that
19   time, did you? Or did you?
20        A.  Yes, I owned the property at that
21   time. When it flooded you're talking?
22        Q.  Yes, during Betsy.
23        A.  Of course, I owned the property. I
24   owned the property according to this since
25   1984. It was sometime in the '80s, but I

Page 89

1    couldn't recall the exact date.
2         Q.  Let's go back over that, because I'm
3    a little confused now. Mr. Koch, according to
4    this document marked as Exhibit Number 11, you
5    purchased the property in 1984. Is that
6    correct?
7         A.  I would assume it is. I am not
8    sure. Because I don't remember every date
9    that I bought houses, you know.
10        Q.  But since you have owned the
11   property at 6317-19 Douglass, it's experienced
12   a flood?
13        A.  Yes. It experienced Katrina.
14        Q.  Before Katrina.
15        A.  No, it never did flood before
16   Katrina.
17        Q.  All right. Do you know whether it
18   flooded during Betsy?
19        A.  No, it didn't flood during Betsy.
20        Q.  And how do you know that, Mr. Koch?
21        A.  Because I lived around there. I
22   lived on Dauphine Street. And Douglass Street
23   is about three blocks further to the river
24   than Dauphine. So at my mother's house they
25   had a foot of water, but on Douglass they

23 (Pages 86 to 89)

KOCH, HERMAN

8/8/2008

Page 90

1  never had not a drop of water because it's
2  closer to the river.
3      Q.  So you are basing this on your
4  recollection of the flooding during Betsy?
5      A.  Exactly.  Yes.
6      Q.  And at that time you lived on
7  Dauphine Street?
8      A.  That's the time I lived on Dauphine,
9  I know it didn't flood.
10     Q.  So when you talked about depth of
11 the water in the structure, you're talking
12 about the depth of the water during Katrina?
13     A.  Katrina.
14     Q.  And what was the depth?
15     A.  Well, according to the walls where I
16 seen water marks -- Now, I didn't actually go
17 there and see the water, but I could see the
18 water came up at least about two and a half to
19 three foot inside of that house during
20 Katrina.
21     Q.  How deep was the water on
22 Deerfield?
23     A.  The water on Deerfield was about 16
24 to 18 feet.
25     Q.  Did that --

Page 91

1      A.  Or maybe even 20.  I really don't
2  know, because it came up on my two-story house
3  about three foot or three and a half foot.
4      Q.  On to the second floor?
5      A.  On to the second floor.
6      Q.  How deep was the water at the
7  3409-11 Shangri La property during Katrina?
8      A.  I don't know.  It had to be at least
9  eight foot or -- or higher.  It had to be
10 about eight foot or higher.
11     Q.  How high were your ceilings on that
12 property?
13     A.  On Shang- -- on 3409 and 11?
14     Q.  Right.
15     A.  It's eight foot ceilings.
16     Q.  Did the water reach the ceiling in
17 that property?
18     A.  It did, yes.  I think it did.
19     Q.  What about 3619 Shangri La; how high
20 did the water get during Katrina at that
21 property?
22     A.  It got a little bit on the second
23 floor, I think.  I am not sure.  Got a little
24 bit on the second floor.
25     Q.  After you purchased the property at

Page 92

1  6317-19 Douglass, from 1984 up to the time of
2  Katrina, had you ever renovated that property?
3      A.  Yes, I did.  I put new floors in
4  there.  I went and I also added some sheetrock
5  in there because the walls were all plastered
6  walls.  You know how they move?  Houses had
7  these strips of wood and they had plaster over
8  it.  Well, I added sheetrock over the plaster
9  and all.  And I installed lockers, because
10 these old houses never had no lockers in them
11 or not.  It was just a shotgun house.  So I
12 installed lockers in every room.
13     Q.  When did you replace the sheetrock?
14     A.  About a year and a half after I was
15 in the house, I guess.
16     Q.  So that would have been in the mid
17 '80s?
18     A.  That would have been in the mid
19 '80s.
20     Q.  When did you add the lockers?
21     A.  Around the same time.
22     Q.  And after that time did you perform
23 any other renovations on the property, either
24 side, up to time of this storm?
25     A.  Well, I'll tell you what.  They had

Page 93

1  an outside shed.  I went and I repaired the
2  two outside sheds because they were falling
3  down, because they were very old.  I did
4  that.  And I also painted it after I installed
5  the sheetrock.  I painted it, and I think I
6  added floor furnaces in that house because
7  they had these old gas heaters, and I
8  installed floor furnaces.
9      Q.  Did you do all of these repairs in
10 the 1980s?
11     A.  Yes.
12     Q.  How old was the roof on that
13 structure at the time of Katrina?
14     A.  I don't have any idea.
15     Q.  Does that property have any termite
16 damage?
17     A.  I haven't checked it since the
18 storm, but before the storm I had it treated
19 every year, you know, for termites.  And at
20 that time it didn't have any termites.  Right
21 now the house is still not repaired.  It's in
22 very bad shape.  And I don't know if they got
23 termites in it or not now.
24     Q.  Have you gutted that house?
25     A.  Yes, it's gutted.

24  (Pages 90 to 93)

BARGE001228

KOCH, HERMAN

8/8/2008

---

Page 94

1    Q.  Did you see evidence of termite
2  damage in the studs in the walls?
3    A.  No, I didn't see it, but, of course,
4  when you start to digging deeper, you never
5  know, you know.  I mean, I didn't go through
6  the whole house, you know, with a magnifying
7  glass.
8    Q.  Is there a mortgage on that
9  property?
10   A.  No.
11   Q.  Has there ever been a mortgage on
12 that property?
13   A.  Yes.
14   Q.  When did you pay it off?
15   A.  I don't remember when it was paid
16 off.
17   Q.  Was it before or after Katrina?
18   A.  It was before Katrina.
19   Q.  Do you have any pre-Katrina photos
20 of that property?
21   A.  No.
22   Q.  Have you ever had that property
23 appraised?
24   A.  We appraised it before we bought it,
25 but that's the last time, I think.  I think it

---

Page 95

1  was appraised before we bought it.
2    Q.  Do you know the taxed assessed value
3  of the property at the time of Katrina?
4    A.  I think they were charging us
5  something like $385 a year for taxes, you
6  know, the City would charge us that.
7    Q.  And that was on both sides?
8    A.  And that was on both sides.
9    Q.  So the total for the structure was
10 $385?
11   A.  Somewhere in that area.  Now, don't
12 quote me on the exact figure, but it was
13 somewhere I think around almost $400 a year.
14   Q.  Since the storm have you tried to
15 sell that property?
16   A.  Yes.  I tried to.
17   Q.  When did you put it on the market?
18   A.  I put it on the market, I forget,
19 but it was not quite a year ago, I think.
20   Q.  When you put it on the market, what
21 was your asking price?
22   A.  I think I was asking 55,000 for it.
23   Q.  Did you get any offers?
24   A.  Yes.  I got about three or four
25 offers.

---

Page 96

1    Q.  How much were the offers?
2    A.  I think the highest offer was around
3  52,000.
4    Q.  And your asking price was 55?
5    A.  Yes.
6    Q.  Did you accept any of the offers?
7    A.  No.
8    Q.  Why not?
9    A.  I don't know.  I had -- I had it in
10 my mind that if I didn't take 55, I wouldn't
11 take nothing else, I guess, and so I didn't
12 sell it.
13   Q.  Is it still on the market?
14   A.  No, it's not on the market.  I
15 pulled it and right now I am debating if I
16 should go and restore it or not.
17   Q.  So you haven't decided whether
18 you're going to restore it?
19   A.  No.  No, I haven't.
20   Q.  Did you own at the time of Katrina
21 property at 6035-37 Burgundy Street?
22   A.  Yes, I did.
23   Q.  I'm going to mark as Exhibit Koch
24 Number 12 another one of those Google maps,
25 Mr. Koch, and ask you the same -- ask you the

---

Page 97

1  same thing, Mr. Koch.  Specifically, does the
2  red bubble on --
3    A.  Match up, huh?
4    Q.  Match up to where you believe that
5  property is located?
6    A.  Let's see.  Burgundy (indicating).
7  Yes, this matches up pretty good.
8    Q.  All right.
9    A.  It's -- It's the second house in the
10 block.  It matches up pretty good.  That's
11 about the closest one.
12     MR. WIEDEMANN:
13     All right.
14     THE WITNESS:
15     Getting --
16 EXAMINATION BY MR. BLANCHARD:
17   Q.  Getting better?
18   A.  Getting better.
19   Q.  Do you remember when you purchased
20 that property?
21   A.  I purchased that property, me and my
22 wife, sometime in '66.  1966 or '67.  I don't
23 remember the exact date.  But somewhere in
24 that area.
25   Q.  Do you remember how much you paid

---

25 (Pages 94 to 97)

BARGE001229

KOCH, HERMAN

8/8/2008

Page 98

1  for it?
2      A.  I think I paid 15,500 for that
3  double house.
4      Q.  Mr. Koch, I am going to mark as
5  Exhibit Number 13 a sale of property from
6  Jackson Homestead Association to Mr. and Mrs.
7  Herman Koch.  This is actually dated June 5th,
8  1978.  I'll represent that this was a document
9  that your lawyer had produced to us in the
10  course of this litigation.  And I ask you do
11  you recognize --
12      A.  1978?
13      Q.  Do you recognize that document?
14      A.  1978?  Now, run this by me one more
15  time.  We sold this property or we bought this
16  property in '78?
17      Q.  Mr. Koch, I am just trying to get
18  the information from you.  Your recollection
19  is you bought it in the '60s; right?
20      A.  That's exactly right.  This is
21  wrong.
22      Q.  And then you moved -- you and your
23  wife moved into the property?
24      A.  We -- We moved in it around 1966 and
25  we lived there about four -- four years, three

Page 99

1  or four years and then we kept that property
2  and we moved to Deerfield.  But that was not
3  in '78.  Maybe in '68, but not '78.  It could
4  have possibly been in '68.  Not '78, though.
5      Q.  You said you paid 15,500 for it?
6      A.  Uh-huh (affirmatively).  Yes.
7      Q.  Who did you buy it from?
8      A.  We bought it from a man, his name
9  was Mr. Sachs.
10      Q.  And this document marked as Exhibit
11  Number 13, this document is entitled "Sale of
12  property from Jackson Homestead Association to
13  Mr. and Mrs. Koch".  On page 4 of that
14  document, is that your signature?
15      A.  On page 4?  Yes.  Yes, that's my
16  signature.  But I don't remember from no
17  Jackson Homestead.  I remember a State
18  Savings, but I don't remember Jackson
19  Homestead.
20      Q.  So you don't recall this document
21  marked as Exhibit Number 13?
22      A.  No, I don't.  If they say the date
23  was '78, they are wrong.  Because I see down
24  here you got "6/8/78," you know.  And that's
25  wrong.  We never bought that property in '78.

Page 100

1      Q.  All right.  Thank you.  How --
2      A.  We might have refinanced it maybe.
3      Q.  Did you refinance it?
4      A.  We probably did and I forgot about
5  it.  I mean, because --
6      Q.  All right.  So you believe now you
7  refinanced it in 1978?
8      A.  Yes, but we -- but you had said we
9  bought it in '78.  Now, as far as buying it,
10  we never bought it in '78.  I mean, we never
11  bought this.  We refinanced it.  We bought in
12  it '68.
13      Q.  So this document marked as Koch
14  Exhibit Number 13, you believe now this is a
15  document that reflects --
16      A.  Yeah, it's possible it could be a
17  true document.
18      Q.  Wait.  This document marked as
19  Exhibit Koch Number 13, you believe this is a
20  document which reflects your refinancing of
21  that property on Burgundy Street?  Is that
22  correct?
23      A.  Yes.  Yes.  Yes.
24      Q.  There's a reference here to an
25  amount of $19,600.  Do you see that?

Page 101

1      A.  Let me see.  Uh-huh (affirmatively).
2      Q.  Do you see that?
3      A.  Yes.  Yes.
4      Q.  So is it your recollection that you
5  refinanced this property in 1978 for $19,600?
6      A.  Yes.
7      Q.  Thank you.  How old is that
8  structure?
9      A.  This property here?
10      Q.  The 6035-37 Burgundy.
11      A.  I don't know.  I don't know.  I have
12  no idea when it was built.
13      Q.  But you said you bought it in '68?
14      A.  I bought it around '68, '6 -- in
15  that area, from '66, '67 to '68.
16      Q.  Was it new when you bought it?
17      A.  No, it wasn't new.
18      Q.  Describe that property for me.
19      A.  That's also a shotgun double and
20  it's got two bedrooms, one bath, a kitchen and
21  a living room on both sides.  They're both
22  equal on both sides.
23      Q.  How many square feet is the total
24  structure?
25      A.  I would say one side must be about

26 (Pages 98 to 101)

BARGE001230

KOCH, HERMAN

8/8/2008

---

Page 102

1  750 square feet.  So you got a total of maybe
2  around 1,500 square feet.
3      Q.  It's a one-story?
4      A.  One-story.
5      Q.  Is it raised?
6      A.  Yes, it's raised off the ground.
7      Q.  How far is it raised off the ground?
8      A.  Raised about a foot and a half.
9      Q.  Do you know the elevation of the
10 property?
11     A.  No, I don't.
12     Q.  Prior to Katrina, was that property
13 flooded at any time?
14     A.  No.
15     Q.  At some point there was a mortgage
16 on that property; correct?
17     A.  Yes.  Yes, there was.
18     Q.  Did you pay off that mortgage before
19 Katrina?
20     A.  Yes.
21     Q.  You sold that property, right, Mr.
22 Koch?
23     A.  Right.  Right.  We just sold it.
24     Q.  And when did you sell it?
25     A.  Not too long ago.

---

Page 103

1      Q.  It was this year; correct?
2      A.  Yes, uh-huh.
3      Q.  Prior to the time that you sold it,
4  specifically at the time of Katrina, do you
5  remember the tax assessed value of that
6  property?
7      A.  It was about the same tax assessment
8  as the one on Douglass Street.  About $350 or
9  380 some-odd dollars, somewhere in that area.
10     Q.  So your total tax bill was about
11 that amount?
12     A.  Right.
13     Q.  From the time you bought it up to
14 the time of Katrina, had you performed any
15 renovations on that property?
16     A.  Yes.  We -- We went and repainted
17 it.  We changed the tiles on the floors.  We
18 went in and generally upgraded the two
19 bathrooms.  And trying to think.  I think, I
20 am not sure, I think we replaced the -- the
21 heaters.  We replaced the water heaters.  And
22 we also replaced one of the floor furnaces.  I
23 do remember we did some renovation on it, a
24 lot of renovation.
25     Q.  And you mentioned several items.

---

Page 104

1  For each of those items do you remember when
2  you made those renovations, what year?
3      A.  Okay.  If we bought it in '68, we
4  had to do that in -- in maybe '69, '70, '71
5  '72, along that path, you know.
6      Q.  So that's when you made the
7  renovations you just told me about?
8      A.  Right.  Right.
9      Q.  How old was the roof on that
10 structure at the time of Katrina?
11     A.  The roof?  I'd say the roof was
12 about three or four years old at the most,
13 because I just replaced that roof.
14     Q.  Did that property ever have termite
15 damage?
16     A.  No.
17     Q.  Do you have any pre-Katrina photos
18 of that property?
19     A.  No, I don't.
20     Q.  We established you sold the
21 property; correct?
22     A.  Correct.
23     Q.  When did you first put it on the
24 market?
25     A.  Let's see.  We're in like August of

---

Page 105

1  '08?  It had to be sometime in early -- maybe
2  March, February or March of '08, I think.  I
3  know it wasn't too, too long ago.
4      Q.  How long was it on the market before
5  you sold it?
6      A.  It wasn't too long.  Maybe about --
7  Maybe around three to four weeks maybe.
8      Q.  Why did you decide to put it on the
9  market?
10     A.  Because the renovation would have
11 cost me too much to justify the cost of the
12 house.  You understand?  I would have put too
13 much into it; that if I wanted to sell it, I
14 probably would have never got my money back
15 out of it.  So I just decided to sell it as
16 is.
17     Q.  Did you do any repairs to that
18 property before you sold it?
19     A.  None whatsoever.
20     Q.  Did you gut it?
21     A.  Oh, that I did do.  I gutted the
22 house.  I gutted the house.
23     Q.  Other than gutting, did you do
24 anything else to it?
25     A.  No, I never did.

27 (Pages 102 to 105)

KOCH, HERMAN

8/8/2008

Page 106

1    Q.  How much did it cost you to gut it?
2    A.  It cost me about I think anywhere
3  from $3,000 to $4,000.  I am not sure.  I
4  would have to get the --
5    Q.  The receipts?
6    A.  The receipts, right.
7    Q.  Who did the gutting?
8    A.  We paid -- I am trying to think of
9  this man.  He was from San Salvador or some
10  place.  He had him and four or five guys and
11  they went and they gutted the house.
12    Q.  Was that Mr. Jose Santos?
13    A.  It might have been.  It might have
14  been, yes.
15    Q.  Now, when you put it on the market,
16  what did you ask for the property?
17    A.  I think we was asking 35.
18    Q.  Who did you sell the property to?
19    A.  I don't remember the man's name, but
20  I know he was in construction and he wanted to
21  redo the house.  And we sold it to him.  I
22  don't remember the name.  I don't remember his
23  name.
24    Q.  Did you sell it to Cartier Homes?
25    A.  It must have been.  I can't vouch

Page 107

1  for his first name, because I am very bad on
2  names.
3    Q.  Let me show you a document you
4  produced?
5    A.  Okay.
6    Q.  -- which is Koch Number 14, which is
7  a cash sale by Herman H. Koch and Aida O. Koch
8  individually and as trustees of the Herman H.
9  Koch and/or Aida O. Koch Revocable Living
10  Trust --
11    A.  That sounds about right.
12    Q.  -- to Cartier Homes.  Do you see
13  that?
14    A.  That sounds about right.
15    Q.  Do you recognize this document?
16    A.  Yes.  This is my signature.
17    Q.  So that's your signature on page 2
18  of the document; correct?
19    A.  Right.  Right.  Right.  That's me.
20  And it looks like my wife's handwriting, too.
21    Q.  Four pages in, you see a document
22  which is a HUD statement?
23    A.  Four pages in?  Right here?  Yeah.
24    Q.  And you see there "Contract sales
25  price", that appears to me to be $35,200?

Page 108

1    A.  Yes.
2    Q.  Do you see that?
3    A.  Yes.
4    Q.  So you sold this property to Cartier
5  Homes for $35,200; correct?
6    A.  No.  I don't think I sold it for
7  that much.  I think I sold it for 32.  I could
8  be wrong.  I could be wrong.
9    Q.  Well, you see on the HUD statement
10  the contract sales price under -- at the top
11  of the left-hand side?
12    A.  The top here?  Yes.  Right.
13    Q.  And what's the number next to the
14  contract sales price?
15    A.  It looks like -- It looks like
16  35,000.  Oh, okay.  It's right over here.
17  It's 35,200.
18    Q.  Does that refresh your recollection
19  that you sold that property for $35,200?
20    A.  Yes, it probably was.  Probably was.
21    Q.  That's what the document reflects;
22  right?
23    A.  Right.  Right.  Right.
24    Q.  That's your signature on the
25  document; right?

Page 109

1    A.  Right.  Right.  Right.
2    Q.  Mr. Koch, there's a reference here
3  that the property was actually sold by the
4  Herman H. Koch and/or Aida O. Koch Revocable
5  Living Trust.  Do you see that?
6    A.  Uh-huh (affirmatively).  That's on
7  what page?
8    Q.  On the first page.
9    A.  Okay.
10    Q.  You see that?
11    A.  Living trust?  Yeah.  Yeah.  Right.
12  Right here in bold print.
13    Q.  So at the time you sold this, this
14  was actually owned by a trust.  Is that
15  correct?
16    A.  Yes.
17    Q.  And when did you form that trust?
18    A.  I think this trust was formed
19  sometime in '06 or '07.  I am not sure.
20    Q.  And who did you have set up that
21  trust?
22    A.  Now you're going into -- I don't --
23  I don't remember.  I don't -- I don't
24  remember.  I got all the files at home, but I
25  don't -- I don't remember.

28 (Pages 106 to 109)

BARGE001232

KOCH, HERMAN

8/8/2008

Page 110

1    Q.  Was this trust set up by a lawyer?
2    A.  Yes.
3    Q.  Is it a lawyer in Mississippi?
4    A.  No.  No, these people were from
5  Louisiana.  These people were from -- But I
6  had to get a lot of it notarized and all, all
7  of this property.  That I do remember.  But I
8  think this lawyer was from Louisiana.  I would
9  have to bring my trust here and then go
10  through it.
11    Q.  Do you remember the name of the
12  lawyer?
13    A.  No, I don't.  I don't -- I don't
14  remember that.
15    Q.  And prior to the time you sold it to
16  Cartier Homes you had transferred this piece
17  of property into the trust?
18    A.  Right.
19    Q.  Isn't it true that you had
20  transferred all of the properties we talked
21  about today into that trust?
22    A.  Yes.  Yes.
23    Q.  And this was done obviously before
24  you sold this property; correct?
25    A.  Before -- Yes.

Page 111

1    Q.  Why did you transfer all of your
2  properties into a trust?
3    A.  Well, I transferred them into a
4  trust because I didn't want to pay no taxes or
5  have my children go through having to pay
6  taxes after me and my wife went and passed
7  away.
8    Q.  You're renting at least one of these
9  properties now, aren't you?  8547 Deerfield?
10    A.  I am renting 8545 and now I am
11  renting 3409 and 3411.  And I also have people
12  that's going to come in 3619, because I almost
13  got that up.
14    Q.  The proceeds from those rentals, are
15  they going into the trust?
16    A.  No.
17    Q.  So you're keeping those rentals
18  yourself personally?
19    A.  That's right.
20    Q.  Does the trust have a bank account?
21    A.  No.
22    Q.  Have any of the expenses for the
23  repairs to any of your properties been paid by
24  the trust?
25    A.  No.

Page 112

1    Q.  I'm going to go ahead and mark as
2  Exhibit Koch Number 15 a document entitled
3  "Inter vivos donation of movable property by
4  Herman H. Koch and Aida O. Koch to the Herman
5  H. Koch and/or Aida O. Koch Revocable Living
6  Trust".  I ask you to take a look at that, Mr.
7  Koch.
8    A.  Yeah, this is what this is.
9    Q.  Do you recognize this document?
10    A.  Yes.  Yes, I do.
11    Q.  And is this document a donation of
12  the properties that we have been discussing
13  here today from you into the trust that you
14  formed?
15    A.  Yes.
16    Q.  And is that consistent with your
17  recollection of you donating or you
18  transferring these properties to the trust?
19  Is that correct?
20    A.  Yes.
21    Q.  All right.  You have got claims in
22  this case that we're here for today against
23  Lafarge North America; correct?
24    A.  Yes.
25    Q.  Those claims that you have, have

Page 113

1  they been transferred to the trust?
2    A.  Not -- Not that I know of, no.
3    Q.  At any time had the claims that you
4  have in this lawsuit been transferred to the
5  trust that you formed?
6    A.  No.
7    Q.  The property on Burgundy, at the
8  time that you sold it, was there any mortgage
9  on that property?
10    A.  No.
11    Q.  At some point there was a mortgage
12  on it?
13    A.  At some time, yes, there was.
14    Q.  When did you pay that off?
15    A.  I don't remember.
16    Q.  Was it paid off before the storm?
17    A.  Yes.
18    Q.  Now, Mr. Koch, after the storm you
19  had several rental properties; correct?
20    A.  Yes.
21    Q.  And you decided to try to sell the
22  Douglass property; correct?
23    A.  Correct.
24    Q.  And you decided to sell and did sell
25  the Burgundy property; correct?

29 (Pages 110 to 113)

KOCH, HERMAN

8/8/2008

---

Page 114

1     A.  Yes.
2     Q.  But you kept the Shangri La and
3  Deerfield properties; correct?
4     A.  Correct.
5     Q.  Why was it that you decided to sell
6  the Orleans Parish properties, but retain the
7  St. Bernard Parish properties?
8     A.  I really don't like to do business
9  in this here city.  It's a hard parish to have
10  to crack.  You got to go through a lot of red
11  tape.  It's easier to do business with
12  properties in St. Bernard than it is in
13  Orleans.  Plus the fact these properties in
14  Orleans would take much more money to bring
15  them back to life than they would in Orleans
16  (sic).  They're older properties.  It would
17  take a lot more money.
18     Q.  All right.  So the first thing you
19  said is you don't like doing business in
20  Orleans Parish; correct?
21     A.  Not if I can avoid it.
22     Q.  And you said it would cost more
23  money to repair the ones in Orleans Parish;
24  correct?
25     A.  Exactly.  Exactly.

---

Page 115

1     Q.  Because those were older properties;
2  right?
3     A.  Exactly.
4     Q.  The properties in St. Bernard were
5  newer properties; correct?
6     A.  Correct.
7     Q.  So the cost to repair the newer
8  properties was going to be less to repair than
9  the older properties; correct?
10     A.  Yes.  Yes.
11     Q.  So that the location of these
12  properties that you had, whether they were in
13  Orleans or St. Bernard Parish, the location of
14  those properties made a difference to you as
15  far as whether or not you wanted to keep them
16  or sell them; correct?
17     A.  Yes.
18     Q.  Because there's differences in those
19  locations; right?
20     A.  Right.
21     Q.  And there's different attributes for
22  each location; right?
23     A.  Yes.
24     Q.  And in your mind it was more
25  advantageous to keep your rental properties in

---

Page 116

1  St. Bernard Parish; correct?
2     A.  Correct.
3     Q.  Do you believe those properties
4  would be easier to rent than the ones in
5  Orleans Parish?
6     A.  Not necessarily, but as I said
7  before, it would be a lot less expensive to
8  put them back in good condition than it would
9  be to do the ones in Orleans Parish.
10     Q.  Is the cost of doing business in
11  Orleans Parish more than in St. Bernard for
12  your rental properties?
13     A.  You really want to know the truth?
14  Yes.
15     Q.  Insurance is more?
16     A.  Not only that, you got to fight this
17  here City Hall, and it's a nightmare.
18     Q.  Was the level of crime different in
19  St. Bernard versus where you had the
20  properties in Orleans?
21     A.  I never thought about it like that,
22  but you are probably right.
23     Q.  All right.
24        MR. BLANCHARD:
25        It's 3:00 o'clock.  Why don't we

---

Page 117

1        take a five minute break.
2        (Recess.)
3  EXAMINATION BY MR. BLANCHARD:
4     Q.  Let's go back on.  Mr. Koch, at the
5  time of Katrina you told me earlier you
6  evacuated; correct?
7     A.  Yes.
8     Q.  So you were in Houston at the time
9  Katrina struck; is that correct?
10     A.  Yes.  Yes.
11     Q.  You understand this lawsuit concerns
12  breaches along the Industrial Canal floodwall?
13     A.  Yes.
14     Q.  You didn't see any of those breaches
15  as they occurred --
16     A.  No.
17     Q.  -- on August 29, 2005, did you?
18     A.  No.
19     Q.  Has anyone ever told you that they
20  saw any of those breaches as they occurred on
21  August 29, 2005?
22     A.  No.
23     Q.  You didn't see at any time the barge
24  that's the subject of this lawsuit on August
25  29th, 2005, did you?

---

30 (Pages 114 to 117)

BARGE001234

KOCH, HERMAN

8/8/2008

**Page 118**

1    A.  No.
2    Q.  Has anyone ever told you that they
3  saw the barge that's the subject matter of
4  this lawsuit at any time during the day on
5  August 29, 2005?
6    A.  I think one general -- I think one
7  gentleman told me after the storm that when he
8  evacuated, he seen the barge -- the barge
9  there.  But I can't vouch for that.  I mean,
10  I'm only going by hearsay.  You understand?
11  But he said he seen a barge parked there.
12    Q.  Who told you this?
13    A.  This was a man that I had a
14  conversation with.  I don't even know his
15  name.
16    Q.  When did you have this conversation?
17    A.  About two or three months after the
18  storm.
19    Q.  Where did you have this
20  conversation?
21    A.  I think we were in the Lower Ninth
22  Ward.
23    Q.  So you were visiting the Lower Ninth
24  Ward at the time?
25    A.  Yes.  I think I was going and having

**Page 119**

1  my houses cleaned out and gutted and all, and
2  he happened to be walking along the sidewalk.
3  I don't even know this man.  But he -- he went
4  and he had happened to mention that fact to
5  me, that he seen a barge parked there.
6    Q.  All right.  He told you he saw a
7  barge parked where?
8    A.  He said on the east side of the
9  Industrial Canal when he was evacuating for
10  the storm.  Now, I don't know this man's name,
11  but I remember him telling me that, you know,
12  distinctly.  Of course, at the time I didn't
13  pay no attention to it, but it stuck in my
14  mind, you know.
15    Q.  Now, he told you that he saw a barge
16  at the time that he was evacuating?
17    A.  Yeah, that he was leaving the city.
18    Q.  Did he tell you what time he was
19  leaving the city?
20    A.  No, he didn't tell me what time,
21  what day or nothing.
22    Q.  All right.  As precisely as you can
23  remember, tell me the nature of your
24  conversation with this man.
25    A.  Well, when he walked by the house,

**Page 120**

1  they had the people was gutting out the house
2  and all, and -- and so he started talking to
3  me and we had a conversation and he asked me
4  if I lived in the Lower Ninth Ward.  I told
5  him no.  I said I lived in St. Bernard.  And
6  he told me, he says, "Well," he says, "didn't
7  y'all's flood waters come from the MRGO?"  I
8  said, "So I heard."  And he says, "Well," he
9  says, "most of the flood waters that came in
10  the Lower Ninth Ward was from the barge that
11  broke the levee in the Industrial Canal."  And
12  that was the first time I ever heard about a
13  barge in the Industrial Canal breaking the
14  levee.  "Oh," I said, "I didn't know that."
15  He said, "Yeah."  He says, "In fact, when I
16  was leaving the city I happened to see a barge
17  parked there."  And that's what he told me.
18    Q.  This was about two or three months
19  after Katrina?
20    A.  More or less that, yeah.  When I was
21  gutting out the house on -- I think it was on
22  Burgundy Street.
23    Q.  And he told you he had seen the
24  barge --
25    A.  Parked.

**Page 121**

1    Q.  -- parked, resting in the Lower
2  Ninth?
3    A.  Parked there.  Parked like the barge
4  was alongside -- I suppose that it was parked
5  along the levee bank.
6    Q.  He didn't tell you that he actually
7  saw the barge traveling through the floodwall,
8  did he?
9    A.  No, no, he didn't say that.  But
10  what he told me is he seen a barge parked
11  there prior to the storm coming.  And so he
12  said, "I seen it parked on the east side."
13  And he said, "This is where all the water
14  mainly came, on the east side."  He said, "On
15  the other side," he said, "it never broke on
16  the other side."  He was telling me that.
17    Q.  So he told you when he was
18  evacuating before the storm he saw a barge?
19    A.  Yes.  When he crossed over the -- I
20  think that's the Judge Siever bridge, he said
21  he seen a barge parked on the side of the
22  levee.
23    Q.  So was it within the canal at the
24  time?
25    A.  Yes, it was in the canal.

Johns Pendleton Court Reporters                          800 562-1285

BARGE001235

KOCH, HERMAN

8/8/2008

---

Page 122

1      Q.  In the canal.  It wasn't in the
2  neighborhood at the time?
3      A.  Oh, no, no, no, no.  I mean, as far
4  as I could understand, no, it wasn't.
5      Q.  So what he told you he saw was as he
6  was leaving, he saw a barge basically moored
7  to a dock?
8      A.  Right.  Right.  Right.
9      Q.  And that's all that he saw?
10      A.  That's all he told me about.
11      Q.  He didn't tell you about anything he
12  saw while the storm was ongoing?
13      A.  He didn't actually tell me he seen a
14  barge break through or anything.  He just said
15  when he was evacuating, he seen a barge parked
16  there.  Now, I don't even know this man's
17  name.  It seems like him and I just got into a
18  talk, into a conversation.
19      Q.  All right.  And that conversation
20  was the first time that you had heard about a
21  barge possibly causing damage in the Lower
22  Ninth Ward; correct?
23      A.  Right.  Right.
24      Q.  The person that you spoke to two or
25  three months after the storm that told you he

---

Page 123

1  saw a barge within the canal itself, what did
2  he look like?
3      A.  This man I guess was about five foot
4  ten.  He was about the same height as me.
5  About six foot.  And he was a colored man.
6  And it's the first time I ever seen him up in
7  that block around there.  But he was walking
8  down the block.  And we were all gutting the
9  houses out and he just stood there watching us
10  and he start talking to me.
11      Q.  How long did you talk to him?
12      A.  Oh, about five minutes or ten
13  minutes.  That's all.
14      Q.  Have you ever seen him since?
15      A.  No, I never seen him since then.
16      Q.  That was the first time you saw him?
17      A.  The first and the last time I seen
18  him.
19      Q.  Did he tell you where he lived?
20      A.  No, he never said nothing.  In fact,
21  -- In fact, I don't know where he could have
22  lived around there because the houses was all
23  flooded out, you know.  But I seen him walking
24  down the side- -- sidewalk.
25      Q.  Okay.  Other than this conversation

---

Page 124

1  with this gentleman, have you had any
2  conversations with anyone else that say they
3  saw a barge on August 29, 2005?
4      A.  No.  No.
5      Q.  Mr. Koch, when was the first time
6  that you saw your property at 6317-19 Douglass
7  Street after Katrina?
8      A.  When was the first time?  Okay.  The
9  storm hit on the 29th of August, right?
10  August, September, October.  I guess it must
11  have been around November, early December.
12      Q.  And you were living in Slidell at
13  the time; correct?
14      A.  I was living in Slidell.
15      Q.  And in November or December of 2005
16  when you first saw the Douglass Street --
17      A.  Property.
18      Q.  -- property, what did you see when
19  you got there?
20      A.  I seen the house was totally
21  destroyed by -- by water.  They had the doors
22  open.  And it was nothing but a shambles.
23  They still had furniture in it.  It was turned
24  upside down and all.  And it was -- it was
25  totally ruint.

---

Page 125

1      Q.  Had the house -- the property been
2  looted?
3      A.  They looted my property after it was
4  gutted, because I had these two front doors
5  that was fancy wood carving and all and they
6  stole the two front doors and they stole my
7  two bathtubs.  I had these old-type bathtubs
8  that had the feet on them, what they call
9  them, these lion's feet.
10      Q.  Okay.
11      A.  They took that and they took the two
12  front doors.  And I'm surprised that they
13  never took the mantel pieces, because I had
14  all of these fancy -- well, not fancy, but
15  nice mantle pieces and I thought they might
16  ransack that, too, but they never got to it.
17      Q.  So sometime after you gutted that
18  property, --
19      A.  After I gutted the property.
20      Q.  -- somebody came and took the
21  doors?
22      A.  Yes.  The two front doors.  They
23  were these old-time doors.  Oh, man, they must
24  have went back to the turn of the century.
25  They had these figurine glass in it and they

---

32 (Pages 122 to 125)

KOCH, HERMAN

8/8/2008

| Page 126 |
| --- |

1  were hand-carved like all around with
2  gingerbread and all, because the house has got
3  them -- they have eaves like, you know, those
4  old-time houses have?  And so the doors
5  matched the top.  And so they took the doors
6  and they went into the bathroom and they took
7  the bathtubs.
8      Q.  Talking about the clawfoot bathtub?
9      A.  Yeah, talking about the clawfoot
10 bathtubs.  Man, they took two of those, one
11 out of each side.
12     Q.  Did they take anything else?
13     A.  Not that I know of, no.
14     Q.  At any time other than that, did
15 your property on Douglass experience any
16 looting?
17     A.  No.
18     Q.  Now, you told me when you got there
19 you saw some evidence of flood damage;
20 correct?
21     A.  Yes.
22     Q.  What was the condition of your roof
23 when you first got to Douglass?
24     A.  I seen about eight or nine, maybe
25 about -- I say not eight or nine.  About three

| Page 127 |
| --- |

1  or four ridge tiles gone.  And I seen the top
2  of the gable where the wind had blown out the
3  -- the two windows up on top of the eaves of
4  the roof.  That I seen.  And as I said, they
5  must have had about three or four or five of
6  the ridge tiles were gone.  And the whole
7  awning.  I had an awning.  I had an aluminum
8  awning.  When I went there, I don't know, but
9  they might have went and they might have stole
10 all of the -- all of the aluminum off the
11 awning that I had.  Because I know that they
12 were going and stealing aluminum.
13     Q.  Well, when you got there right after
14 the storm or when you got there in November or
15 December of 2005, was the awning still there
16 or was --
17     A.  No.
18     Q.  It was gone?
19     A.  It was gone.  Now, I don't know if
20 they stole it or if the wind blew it away or
21 what.  I can't say.
22     Q.  I'm going to mark as Exhibit Koch
23 Number 16 a copy of two photos that we
24 received from your Counsel in response to
25 discovery requests in this case.  And I am

| Page 128 |
| --- |

1  going to ask you about these photos, Mr.
2  Koch.
3      A.  Okay.  That's the frame --
4      Q.  Hold on, Mr. Koch.  Let me ask you a
5  question first.
6      A.  Okay.
7      Q.  Do you recognize this document?
8      A.  What, this right here?
9      Q.  Yes.
10     A.  Yes.
11     Q.  These are copies of two photos;
12 correct?
13     A.  Right.
14     Q.  All right.  And at the top is a
15 photo of what property?
16     A.  The top is a photo of 3619 Shangri
17 La.  That's the townhouse.
18     Q.  And the property at the bottom is
19 what?
20     A.  6317 and 19 Douglass.
21     Q.  Did you take both of these photos?
22     A.  Yes.  My wife took them.
23     Q.  Your wife took them.  When did she
24 take the photo of the Douglass Street
25 property?

| Page 129 |
| --- |

1      A.  After the storm.
2      Q.  Was this during the first visit of
3  yours to Douglass Street after the storm?
4      A.  No, it wasn't the first visit.  I
5  think it was later.  Later.
6      Q.  Do you know approximately when you
7  took this photo?
8      A.  It was maybe about four or five
9  months after, I guess.  I am not sure.
10     Q.  The property as it appears in this
11 photo, is that the same condition that the
12 property was in when you first returned to New
13 Orleans and saw the property in November or
14 December of 2005?
15     A.  Yes.
16     Q.  Now, looking at the photo, there
17 appears to be on the front of the structure
18 some rods that are sticking down.  Is that the
19 awning that you were telling me about?
20     A.  That was the awning that I was
21 telling you.  That was -- In fact, they got on
22 the side -- The side awnings was a replica of
23 the big awning they had in the front.  But the
24 big awning is completely gone now.
25     Q.  All right.  So the awnings on the

33 (Pages 126 to 129)

BARGE001237

KOCH, HERMAN

8/8/2008

## Page 130

1  side of the house, there are some awnings
2  sticking from smaller windows.  Do you see
3  that?
4      A.  Yes.
5      Q.  And the awning that you had in the
6  front was made of the same materials?
7      A.  Exactly.  Yes.
8      Q.  And that awning in the front that
9  spanned the entire front of the house is gone;
10  correct?
11     A.  Yes.  Yes.
12     Q.  And the water did not get that high,
13  did it, Mr. Koch?
14     A.  No.  The water, as I said, inside
15  the house got about three to three and a half
16  foot maybe inside the house.  Maybe just under
17  -- Maybe just under this side of the window.
18  (indicating).  This, about that high inside
19  the house.  I'd say about six to nine inches
20  under the window sills.
21     Q.  So the water didn't get to the place
22  where the awning had been on the front?
23     A.  No.  No.
24     Q.  All right.  So that awning was
25  either destroyed by wind or someone stole it?

## Page 131

1      A.  Exactly.
2      Q.  It wasn't damaged by the flood, was
3  it?
4      A.  No.  I wouldn't say.  So no.  It was
5  destroyed by the wind or somebody stole it.
6      Q.  All right.  Now, above that, you
7  mentioned two windows that had been blown out?
8      A.  Yeah.  Right on the top I was
9  talking about (indicating).
10     Q.  Can you circle on that photo those
11  two windows that you say were blown out?
12     A.  (Writing).
13     Q.  All right.
14         MR. BLANCHARD:
15           So for purposes of the record,
16         the witness has circled two window
17         type structures on this photo.
18  EXAMINATION BY MR. BLANCHARD:
19     Q.  And this is directly above --
20     A.  Of course, --
21     Q.  Hold on, Mr. Koch.
22     A.  Okay.
23     Q.  All right.  Now, on this photo
24  there's an awning and then a portion of roof
25  and then above that, on the V-shaped portion

## Page 132

1  of the roof there are these two small windows;
2  correct?
3      A.  Correct.
4      Q.  All right.  Well, I say small.  How
5  big were the windows?
6      A.  I would say the windows was about --
7  was about 18 to 20 inches high and about maybe
8  around -- maybe around 24 to 30 inches wide.
9      Q.  Was that both or was that each?
10     A.  That's -- That -- I'd say that was
11  both of them.  They were about this big each
12  (indicating).
13     Q.  So what's the combined area of those
14  two windows?
15     A.  The combined area is about -- Okay.
16  You talking about maybe three foot wide and
17  about maybe about 18 to 20 inches high.
18     Q.  And these windows are leading to
19  your attic; correct?
20     A.  Uh-huh (affirmatively).
21     Q.  Is that a "yes"?
22     A.  Yes.
23     Q.  And when you returned after Katrina
24  the first time, these windows were blown out;
25  correct?

## Page 133

1      A.  Yes.
2      Q.  They were completely gone?
3      A.  Right.  Actually, actually, those
4  were like vents.  Vents.  But they look --
5  They were like a window, but they were
6  actually vents I think, you know, to go in to
7  air the attic.
8      Q.  When you returned after the storm --
9  Hold on.
10     A.  They were gone.
11     Q.  Hold on, Mr. Koch.  This entire area
12  where these vents were, those were gone?
13     A.  Right.
14     Q.  So your attic was directly open to
15  the outside, wasn't it?
16     A.  Not all of it, but just that there
17  portion.
18     Q.  Well, certainly the front of the
19  house?
20     A.  Right.  Right.
21     Q.  And so you had this opening where
22  these vents were and that was completely blown
23  out during the storm?
24     A.  Right.  Right.
25     Q.  Correct?

Johns Pendleton Court Reporters

800 562-1285

BARGE001238

KOCH, HERMAN

8/8/2008

Page 134

1    A.  Correct.
2    Q.  And that allowed rainwater to come
3  into your attic; correct?
4    A.  (Witness nods head affirmatively.)
5    Q.  Is that correct?
6    A.  I -- I suppose so.
7    Q.  Now, Mr. Koch, you made a claim
8  against your wind insurer on this property,
9  didn't you?
10    A.  Yes.
11    Q.  Who was your insurance company, your
12  hazard insurance company for this property at
13  the time?
14    A.  State Farm.
15    Q.  And do you remember how much you got
16  from your wind insurer?
17    A.  No, I don't.  You would have to ask
18  my wife.  She keeps all of that, them
19  figures.  I can't -- I don't remember all
20  that.
21    Q.  Well, you got some money from your
22  wind insurer?
23    A.  I got some money from the wind.
24    Q.  All right.  And I'll try to refresh
25  your recollection, Mr. Koch.  I'm going to

Page 135

1  show you what's marked as Koch Number 17, a
2  Road Home application related to 6317-19
3  Douglass Street.  Let me first ask you, you
4  did make a Road Home application --
5    A.  Yes, sir.
6    Q.  -- for that property, didn't you?
7    A.  Yes.
8    Q.  I'm going to go ahead and show you
9  this document marked as Koch Number 17.
10    A.  That's the -- The figure's blurry
11  there.  70,900, value of structure.
12    Q.  Do you recognize this document, Mr.
13  Koch?
14    A.  Yes, I do.
15    Q.  And this is a Road Home application
16  related to 6317-19 Douglass Street; is that
17  correct?
18    A.  Yes, right.
19    Q.  Did you prepare this Road Home
20  application?
21    A.  Yes, I did.
22    Q.  On page Bates stamped Koch 000384,
23  there's a signature there.  Do you see that?
24    A.  Yes.  00034, yes.
25    Q.  Is that your signature?

Page 136

1    A.  Yes.  Yes, it is.
2    Q.  And above that, you see a check mark
3  immediately above that --
4    A.  Uh-huh (affirmatively).
5    Q.  -- next to a paragraph?
6    A.  Right here it says "The undersigned
7  agrees".
8    Q.  Right.  "Agrees and acknowledges
9  that the information provided in this
10  application is true and correct"?
11    A.  Yes.
12    Q.  All right.  And underneath that, the
13  next paragraph of that same section says "I
14  certify that, to the best of my knowledge and
15  belief, all the information on or attached to
16  this application is true; correct, complete
17  and provided in good faith.  I understand that
18  false or fraudulent information on or attached
19  to this application may be grounds for not
20  making a grant and/or loan and may be
21  punishable by a fine and/or imprisonment."  Do
22  you see that?
23    A.  Yes.
24    Q.  Did you read that language before
25  you signed it?

Page 137

1    A.  Yes.  Yes, I must have.  Yes.
2    Q.  So the information that you provided
3  in this Road Home application is true and
4  correct to the best of your information;
5  correct?
6    A.  Yes.
7    Q.  All right.  And I wanted to draw
8  your attention to the second page of that.  Do
9  you see "Damaged residence information"?
10      MR. WIEDEMANN:
11      This is 000381?
12      MR. BLANCHARD:
13      Correct.
14  EXAMINATION BY MR. BLANCHARD:
15    Q.  You see "Damaged residence
16  information"?  That's 6317-19 Douglass;
17  correct?
18    A.  I see what, damage -- damage --
19    Q.  The middle of the page.  Do you see
20  --
21    A.  Oh, yeah.  Yeah.  Yeah.  Yeah.
22  "Damaged residence information".
23    Q.  So this application related to your
24  property at 6317-19 Douglass Street; correct?
25    A.  Yes, right.

BARGE001239

KOCH, HERMAN

8/8/2008

Page 138

1    Q.  Now, go to the next page, which is
2  Bates stamped Koch 000382.  Do you see that?
3    A.  Uh-huh (affirmatively).
4    Q.  Is that a "yes"?
5    A.  Yes.  I see it.
6    Q.  And in the middle of the page
7  there's a reference to "Insurance
8  information".  Do you see that?
9    A.  Right.
10   Q.  And this was your State Farm
11 homeowner's policy; correct?
12   A.  Yes.  As far as I know, yeah.
13   Q.  I'm sorry.  It was your State Farm
14 wind policy for that structure; correct?
15   A.  Right.
16   Q.  In the middle of that section
17 there's a note "If settled, how much for
18 structure".  Do you see that?
19   A.  "If settled" what?  Oh, yeah.  "If
20 settled, how much for structure".  Yeah,
21 right.
22   Q.  There's a reference to the amount of
23 $35,625.99; is that correct?
24   A.  It must be.  And I tell you what.
25 You would have to ask my wife.  But it's

Page 139

1  there, so we must have put it there.
2    Q.  And again, you read that
3  certification concerning the accuracy of this
4  before you signed it; correct?
5    A.  Right.  Right.  Right.
6    Q.  So this reflects that you received
7  $35,625.99 from your wind insurer; correct?
8    A.  Yes.
9    Q.  All right.  And do you have the
10 document from your insurance company that
11 specifies the actual items that you were paid
12 for relative to this amount of $35,625.99?
13   A.  I don't know if I have it or not.  I
14 would have to see at my house if it's still in
15 my file folders, you know.  Because I don't
16 know if we've got that.
17   Q.  Do you maintain an insurance file at
18 your home?
19   A.  Yes.
20   Q.  And all of these insurance documents
21 relative to these properties relative to
22 Katrina damage obviously would have come into
23 existence after Katrina; right?
24   A.  Yes.  But I think we have that at
25 the house, how much we got paid on it, you

Page 140

1  know.
2    Q.  So you think you have documents
3  which specify the items that you got paid for
4  in your wind policy; right?
5    A.  Yes.
6      MR. BLANCHARD:
7        Karl, I'll represent that we
8      didn't receive that.  So I request
9      that.  We'll follow up in writing.
10     MR. WIEDEMANN:
11       Okay.
12 EXAMINATION BY MR. BLANCHARD:
13   Q.  As you sit here today --
14     MR. WIEDEMANN:
15       Counsel, just to be clear, the
16     claim file.
17     MR. BLANCHARD:
18       The claim he submitted to State
19     Farm on this policy, the documents
20     from State Farm which specify the
21     items that made up that $35,625.99.
22     MR. WIEDEMANN:
23       Thank you.
24     MR. BLANCHARD:
25       And we'll do this now.  We're

Page 141

1      going to go through this for several
2      other properties, Karl, and we're
3      going to have the same request for
4      each of those.  All right?
5        MR. WIEDEMANN:
6          Yes.  Thank you.
7  EXAMINATION BY MR. BLANCHARD:
8      Q.  Now, Mr. Koch, if you find the
9  insurance documents that I just mentioned to
10 your lawyer at your house, would you agree to
11 give those to your lawyer?
12     A.  Yeah, sure.
13     Q.  As you sit here today, do you know
14 what items you were paid for that correspond
15 to this amount of $35,625.99?
16     A.  No, I don't know.
17     Q.  Do you know whether you were paid
18 for roof damage?
19     A.  I don't know.  We would have to go
20 and contact the insurance company and see just
21 what they paid for.  I -- I couldn't tell you
22 what they paid or what they didn't pay.  My
23 wife would have that information in our file,
24 you know.  Or the insurance company would have
25 that in their files.

36 (Pages 138 to 141)

BARGE001240

KOCH, HERMAN

8/8/2008

Page 142

1     Q.  And when you got to your home, we
2  talked about you saw some tiles on the roof
3  that were out of place; correct?
4     A.  Yeah.  Yeah.
5     Q.  You saw those vents blown out?
6     A.  Right.
7     Q.  You saw the awning gone; correct?
8     A.  Right.
9     Q.  Based on your recollection, do you
10  remember any other wind damage to that
11  structure when you first got there?
12     A.  Not that I can -- can recall.  There
13  might have been some damage to the rear of the
14  house.  But I -- I don't recall how -- how
15  much it was.  I'm talking about, you know,
16  like the front has these two windows.  Well,
17  the back don't have any windows.  And the back
18  might have got a little damage.
19     Q.  When you first got back to your
20  property at 6317-19 Douglass, when you first
21  walked in did you notice water stains on the
22  ceiling?
23     A.  No.  No.  No.  I never noticed no
24  water stains.  The only water stains that I
25  really noticed is how high it came into the

Page 143

1  rooms, you know.  Because they had a mark all
2  on the wall around the rooms and all and, of
3  course, the tiles were all popping up and all
4  of that kind of stuff.
5     Q.  Mr. Koch, the first time that you
6  entered into the neighborhood around 6317-19
7  Douglass, did you see any trees down in that
8  neighborhood?
9     A.  Trees?
10     Q.  Yes.
11     A.  I seen a lot of branches in the
12  streets, if I can remember, yeah, but I never
13  seen no actual trees in the street, no.
14     Q.  Did you see any trees on houses?
15     A.  No.
16     Q.  Did you see blue tarps on roofs?
17     A.  I seen blue tarps around 6035 and 37
18  Burgundy, but none on Douglass Street.
19     Q.  As you drove Douglass Street, do you
20  remember seeing houses that didn't have their
21  roofs any more and blown off?
22     A.  I seen some tiles gone off of roofs,
23  but I don't remember of the roofs being
24  completely blown off, no.
25     Q.  When you entered that neighborhood

Page 144

1  the first time after the storm, do you
2  remember seeing houses that had been burned?
3     A.  Burned down?
4     Q.  Yes.
5     A.  You talking about fire?
6     Q.  Correct.
7     A.  No.  No, I don't recall that.
8     Q.  Mr. Koch, go to the next page of
9  that Road Home application.  At the top there
10  are questions concerning flood insurance.  Do
11  you see that?
12     A.  Yes.
13     Q.  You had flood insurance on that
14  Douglass Street property at the time of the
15  storm; correct?
16     A.  Yes.
17     Q.  And in that section dealing with
18  flood insurance, your insurance company's name
19  is State Farm; correct?
20     A.  Right.
21     Q.  That's who you had flood insurance
22  through?
23     A.  Yes.
24     Q.  Look at the question that says "If
25  settled, how much for structure?"  Do you see

Page 145

1  that?
2     A.  Yes.
3     Q.  And there's a reference to $73,700.
4  Do you see that?
5     A.  Yes.
6     Q.  Is that the amount of flood
7  insurance that you received on 6317-19
8  Douglass?
9     A.  I don't know.  You would have to ask
10  my wife.  She would know more than me.  I
11  can't say yes or no.  We probably did get this
12  figure, but I don't know for sure.
13     Q.  You would have looked up what you
14  got from the insurance company before you
15  filled out the form; right?
16     A.  Well, yes.  Yes.  But she probably
17  told -- told me this so I put it down.
18  Probably we got that much.
19     Q.  Do you have at your residence your
20  claim information concerning your flood claim
21  on this property?
22     A.  Yes.  We have all of that in a --
23     Q.  In a file?
24     A.  File cabinet, yeah, right.
25        MR. BLANCHARD:

37 (Pages 142 to 145)

KOCH, HERMAN

8/8/2008

Page 146

1        Karl, I'll request that same
2    information I requested before
3    concerning the flood claims.
4        MR. WIEDEMANN:
5        Okay.
6    EXAMINATION BY MR. BLANCHARD:
7    Q.   Mr. Koch, have you received any
8    money in connection with your Road Home
9    application on 6317-19 Douglass?
10    A.   Not a penny.
11    Q.   What is the status of that
12    application?
13    A.   For me, I think it's in limbo.  But
14    no, they -- Right now I'm having a problem
15    with the Road Home because they said I put
16    down many things that I would do that I didn't
17    do.  So this here, I haven't even started on
18    it yet.  But the ones that were for 3409 and
19    11 and 3619 Shangri La, and even at 8547, they
20    claim that I put down stuff that I didn't
21    complete, like handles in a bathroom on the
22    side of the walls and all, and I said, "Well,
23    y'all haven't paid me a dime," I said, "and I
24    am running out of money.  I can't put that
25    stuff."  So right now I guess my status with

Page 147

1    Road Home is in limbo.  I don't know if they
2    will pay me anything.
3    Q.   Have you received any correspondence
4    back from Road Home concerning this
5    application concerning 6317-19 Douglass?
6    A.   Not that I can recall, no.  I have
7    -- No, I take that back.  I think I received
8    some about a month ago, but I forgot this --
9    Oh, yeah.  They wanted to know if I fixed the
10    house up and what kind of people did I have
11    and what -- what nationalities I had in
12    there.  That's the kind of questions that they
13    asked me.  And I said, "I don't have that."
14    In fact, I didn't even answer them.  Because I
15    thought the whole question was irrelevant to
16    me to getting anything to get this house
17    fixed.  You understand?
18    Q.   The water that flooded your property
19    at 6317-19 Douglass Street, do you know where
20    that water came from?
21    A.   No, I have no idea where it came
22    from.  I mean, I wasn't there.  I didn't see
23    nothing.  No.  I have no idea.
24    Q.   Do you have any knowledge as to
25    where the water came from that flooded your

Page 148

1    property on Burgundy Street?
2    A.   No.
3    Q.   Do you have any information
4    concerning where the water came from that
5    flooded any of your properties in St. Bernard
6    Parish?
7    A.   No.
8    Q.   I'm going to mark as Exhibit Number
9    18 Road Home homeowner application, Bates
10    numbered Koch 000387 through 392.  Show this
11    document to you, Mr. Koch.
12    A.   Let's see.  It's got a back side,
13    huh?
14        MR. WIEDEMANN:
15        That's 000387; right?
16        MR. BLANCHARD:
17        387 through 392.
18        MR. WIEDEMANN:
19        Correct.
20        THE WITNESS:
21        392, right.
22        MR. WIEDEMANN:
23        Thank you.
24    EXAMINATION BY MR. BLANCHARD:
25    Q.   Do you recognize this document, Mr.

Page 149

1    Koch?
2    A.   Yes, I do.
3    Q.   Is that your signature on the page
4    marked Koch 000391?
5    A.   Yes, it is.
6    Q.   And you filled out this form;
7    correct?
8    A.   Right.
9    Q.   And you verified that the
10    information in this form was correct at the
11    time you submitted it?
12    A.   Yes.
13    Q.   Turn to page 388.
14    A.   Okay.
15    Q.   This document relates to 6035-37
16    Burgundy Street; is that correct?
17    A.   Yes.  Correct.
18    Q.   And when you first returned to
19    Burgundy Street after the storm, what do you
20    remember seeing there?
21    A.   I remember seeing the same thing I
22    seen on Douglass Street.  That they had the
23    doors were wide open and that the roof there
24    was -- was damaged and they had water damage
25    inside the house.  A lot of water damage.  In

38 (Pages 146 to 149)

KOCH, HERMAN

8/8/2008

Page 150

1  fact, it came up higher than it did on
2  Douglass Street. It came up about a foot from
3  the ceiling or higher than that.
4      Q.  How high were the ceilings there?
5      A.  Eight.  Eight foot.
6      Q.  And the water line was below the
7  ceiling?
8      A.  Yes, right.
9      Q.  And you remember seeing roof damage
10 there; right?
11     A.  Yes, they had roof that --
12     Q.  What kind of roof damage do you
13 remember seeing?
14     A.  I remember of seeing a lot of tiles
15 were -- I'm talking about the roof tiles and
16 maybe little sections of black tiles off the
17 house.  And, in fact, that day that I went
18 there, I was there about a half hour and they
19 had people coming around putting these blue
20 tarps on the roof and they put one on mine and
21 they put one on the other house on the
22 corner.
23     Q.  And they put the blue tarp on your
24 roof because you had roof damage?
25     A.  And they put the blue tarp on my

Page 151

1  roof because it had roof damage on that house.
2      Q.  You said that the doors were gone
3  from that property as well?
4      A.  Well, they -- they had the doors
5  open wide -- wide open, like somebody came
6  there.  I think the National Guard came there
7  and checked for people that might have drowned
8  in there or something, you know.
9      Q.  When you first got there, --
10     A.  Uh-huh (affirmatively).
11     Q.  -- did you notice whether anything
12 had been stolen?
13     A.  Not in that house.  They didn't take
14 anything I don't believe in that house.
15     Q.  Had it been vandalized in any way?
16     A.  No.  No.
17     Q.  You told me about the roof damage.
18 When you first got to Burgundy, did you notice
19 other wind damage to that property?
20     A.  Well, they had a lot of wind damage
21 to the back shed and they also had wind damage
22 on the roof and I seen that they had a lot of
23 the ridge tiles gone.  They had a lot of the
24 seal tab tiles gone.  And they had people
25 coming around that was putting blue tarps on

Page 152

1  the roofs and they put one on mine because I
2  know mine was damaged.
3      Q.  I'm going to show you a copy of a
4  photo which I am going to mark as Koch Number
5  19.  This appears to be copies of two photos.
6  The bottom appears to be 3409-11 Shangri La
7  and the top appears to be 6035-37 Burgundy
8  Street.
9      A.  Uh-huh (affirmatively).
10     Q.  And ask you if you recognize these
11 photos, Mr. Koch.
12     A.  Yes, I do.  I do the top.  The top
13 one is going to be Burgundy and the bottom is
14 going to be 3409 and 11 Shangri La.
15     Q.  Who took these photos?
16     A.  My wife.
17     Q.  When did she take these photos?
18     A.  She took them after the hurricane.
19 The exact date, I don't know when was the
20 exact date.
21     Q.  Had you done any repairs to the
22 6035-37 Burgundy Street property at the time
23 that she took these photos?
24     A.  No, I never.
25     Q.  There's a reference on the side of

Page 153

1  these photos.  If you turn it sideways, am I
2  reading it right, "After Katrina and Rita"?
3      A.  Yes.  It's kind of faded, but that's
4  what they said, I think.  After -- It's kind
5  of blotted out, but I think I can vaguely read
6  that, you know.
7      Q.  So we know these photos were taken
8  after Rita?
9      A.  After Rita, yes.
10     Q.  Was your property on Douglass Street
11 damaged during Rita?
12     A.  I don't know, because I got there
13 after Katrina and Rita.  I don't know if it
14 was damaged before Rita or after Rita.  I
15 couldn't answer that.
16     Q.  On the Douglass Street property, did
17 you make a claim against your wind insurer for
18 any damage resulting from Rita?
19     A.  When I made a claim, I made a claim
20 on both of them, for both Katrina and Rita.
21     Q.  Were they separate claims?
22     A.  No, no, they were one.
23     Q.  Did you make a separate flood
24 insurance claim for flood damage to your
25 property concerning flooding during Rita?

KOCH, HERMAN

8/8/2008

Page 154

1      A.   No.  As far as I -- I can remember,
2   we only made one claim for flood insurance,
3   and that was after Rita.
4      Q.   And that was for whatever flooding
5   you had obtained; correct?
6      A.   Right.
7      Q.   Let's look at the photo again marked
8   as --
9         MR. WIEDEMANN:
10           Koch 17.
11   EXAMINATION BY MR. BLANCHARD:
12      Q.   -- Koch 17.
13      A.   17?
14         MR. WIEDEMANN:
15           I'm sorry, 19.
16   EXAMINATION BY MR. BLANCHARD:
17      Q.   19.
18         MR. WIEDEMANN:
19           I'm sorry, Chuck, it's Koch
20   Exhibit 19.
21         MR. BLANCHARD:
22           Thank you.
23         THE WITNESS:
24           Okay.
25   EXAMINATION BY MR. BLANCHARD:

Page 155

1      Q.   At the front of the Burgundy Street
2   property there appears to be a window near the
3   top of the roof there as well.
4      A.   Yeah.
5      Q.   Correct?
6      A.   Right.
7      Q.   Was that another one of these vents
8   that you told me about?
9      A.   No, that was a -- that was a
10   window.  That was a window.  They didn't have
11   a vent there.  They just had a plain window in
12   front of it.
13      Q.   Was that window blown out during the
14   storm?
15      A.   Not that I remember, no.  It wasn't
16   blown out.
17      Q.   Returning to Koch Number 18, the
18   Road Home application, on page 389 --
19      A.   389.  Okay.
20      Q.   Under "Insurance information", do
21   you see that?
22      A.   Yeah.
23      Q.   There's a reference to State Farm
24   Insurance; correct?
25      A.   Right.

Page 156

1      Q.   And that was your wind insurer;
2   correct?
3      A.   Yes.
4      Q.   There's a note "If settled, how much
5   for structure?" and there's a note there,
6   $16,577.93.  Is that correct?
7      A.   Yes.
8      Q.   So that's the amount of coverage you
9   received from State Farm for wind damages;
10   correct?
11      A.   Correct.
12      Q.   And do you know what damages you
13   were specifically compensated for?
14      A.   Well, we got the flood insurance,
15   which I don't remember, and we must have got
16   this much for wind damage.  As I said, my wife
17   would know better than me, because she keeps
18   track of all of that for us.
19      Q.   This would have included roof
20   damage; correct?
21      A.   That included roof damage right
22   here.  But we also got paid for the flood,
23   too.
24      Q.   And do you have a claim file at your
25   house for this policy?

Page 157

1      A.   We probably do.  Because who keeps
2   all of them documents is my wife.  I'm a very
3   bad paper keeper.
4      Q.   All right.  So you believe you have
5   at home documents which will show your claim
6   application?
7      A.   I should have it, yes.  I should
8   have it.  My wife should have that.
9      Q.   And you should have documents that
10   show the breakdown of the items you were
11   compensated for for your wind insurance;
12   correct?
13      A.   That, I don't know, but I guess we
14   might have it.  I'm not sure.  I can't say yes
15   or no.
16      Q.   All right.
17         MR. BLANCHARD:
18           Karl, again we'll request those
19   documents as well.
20   EXAMINATION BY MR. BLANCHARD:
21      Q.   Turning to the next page, Mr. Koch,
22   which is 390, you see that?
23      A.   Uh-huh (affirmatively).
24      Q.   And at the top there's a reference
25   to flood insurance.  Do you see that?

40  (Pages 154 to 157)

KOCH, HERMAN

8/8/2008

---

Page 158

1      A.   Yes.
2      Q.   And you also had your flood
3   insurance on this property through State
4   Farm?
5      A.   Correct.
6      Q.   Correct?
7      A.   Correct.
8      Q.   Under the section "If settled, how
9   much for structure?", do you see that?
10     A.   Yes.  It says 81-100.
11     Q.   81,100?
12     A.   81,100, right.
13     Q.   $81,100; correct?
14     A.   Must be, yes.
15     Q.   That's the amount of flood insurance
16  you received on this property?
17     A.   It must have been, yes.  Because
18  it's down here.
19     Q.   If you received the $16,577.93 on
20  your wind policy, did you go back to State
21  Farm and ask for any more money?
22     A.   No, not that I know of.
23     Q.   On the Douglass Street property,
24  after you got the 35,000 plus, did you go back
25  to them asking them for more money?

---

Page 159

1      A.   No.
2      Q.   Mr. Koch, did you submit a homeowner
3   application to the Road Home concerning your
4   property at 3619 Shangri La?
5      A.   Yes, I did.
6      Q.   I'll mark this as Exhibit Number
7   20.  I'm going to hand you a homeowner
8   application to the Road Home, Bates stamped
9   Koch 000400 through 405.
10     A.   Okay.
11     Q.   Mr. Koch, is this the Road Home
12  application that you submitted concerning 3619
13  Shangri La?
14     A.   Yes.
15     Q.   On page Bates stamped Koch 000404,
16  is that your signature on that page?
17     A.   Yes.
18     Q.   Did you prepare this application?
19     A.   Yes.
20     Q.   Did you submit this application to
21  the Road Home?
22     A.   Yes.
23     Q.   When was the first time that you
24  visited the 3619 Shangri La property after the
25  storm?

---

Page 160

1      A.   It had to be around the first time
2   -- I think I went and seen all of them at one
3   time.  The same day that I went to 6317 and 19
4   Douglass, that was the same day I went to all
5   of my properties.  Now, what the exact date
6   was, I don't remember.  I don't remember the
7   exact date.
8      Q.   When you got to 3619 Shangri La, did
9   you see evidence of wind damage to that
10  property?
11     A.   Not so much wind damage, but they
12  had water damage inside.  A lot of water
13  damage.  Like it came up high on that one,
14  too.  But the only wind damage I seen is it
15  knocked one of the gutter pipes where it
16  drains the house, it knocked that off.  I
17  don't know if they show it in there, but one
18  of them is missing.  Because they had a drain
19  pipe that was on the end of it.  I seen that
20  was knocked off, and it had to be from the
21  wind.
22     Q.   Mr. Koch, I'm going to draw your
23  attention again to Exhibit Number 16, which is
24  the photos.  The top photo, that's the 3619
25  Shangri La property, isn't it?

---

Page 161

1      A.   Yes.
2      Q.   Looking in that photo, on the side
3   of the house --
4      A.   Yes.
5      Q.   -- there's an area where the siding
6   is gone; is that correct?
7      A.   Correct.
8      Q.   And, in fact, most of the siding on
9   that side of the house is gone; correct?
10     A.   Yes.  Right.
11     Q.   In fact, there's some plywood that's
12  actually showing; is that correct?
13     A.   That's correct.
14     Q.   This was wind damage; right, Mr.
15  Koch?
16     A.   It must have been, yes.
17     Q.   Do you see the gutter gap that you
18  were talking about in that photo as well?
19     A.   Yes.  They had one on the rear and
20  one on the front.  The one on the front was
21  broken from about here on down it looked like
22  (indicating).  But that was missing.  That --
23  That is what I remember.  And also the siding
24  was missing.  You're right.
25     Q.   Did you have roof damage to that

---

41 (Pages 158 to 161)

BARGE001245

KOCH, HERMAN

8/8/2008

Page 162

1  property?
2      A.  A little bit, but not much.
3      Q.  Did you ever put a blue tarp on that
4  roof?
5      A.  No, I never did.
6      Q.  You did make a claim against your
7  wind insurer for that property; correct?
8      A.  Right.  Right.
9      Q.  Turning your attention to Exhibit
10  20, Bates stamped page Koch 000402, do you see
11  that?
12      A.  402.  Okay.
13      Q.  I draw your attention to the middle
14  of that page concerning insurance
15  information.  It's specifically hazard
16  insurance.  The name of the insurance company
17  reference is Louisiana Citizens Fair Plan.  Do
18  you see that?
19      A.  Yes.
20      Q.  And that was your hazard insurer for
21  that property?
22      A.  Yes, it was.
23      Q.  Under the section "If settled, how
24  much for structure?", do you see the amount of
25  $14,419.92?

Page 163

1      A.  Yes.
2      Q.  And that's the amount you received
3  from the Citizens Fair Plan for wind damage to
4  your property at 3619 Shangri La?
5      A.  Yes.
6      Q.  And do you have your claims
7  information concerning that property at your
8  house?
9      A.  I should have it, yes.
10      MR. BLANCHARD:
11          Again, Karl, we'll request that
12      information as well.
13  EXAMINATION BY MR. BLANCHARD:
14      Q.  Turning to the next page, Mr. Koch,
15  000403, you see the reference to flood
16  insurance at the top?
17      A.  Uh-huh (affirmatively).
18      Q.  Is that a "yes"?
19      A.  Flood insurance at the top?
20      Q.  Yes.
21      A.  Yes.
22      Q.  You see that?
23      A.  Yes.  That's true.
24      Q.  Your flood insurer for that property
25  was through Fidelity Insurance Company?

Page 164

1      A.  Yes.
2      Q.  Under the section "If settled, how
3  much for structure?", do you see that
4  $100,000?
5      A.  Right.  Right.
6      Q.  So you received 100,000 in flood
7  insurance proceeds for the flooding to that
8  building?
9      A.  Yes.
10      Q.  The first time that you saw the
11  property at 3409-11 Shangri La after the
12  storm, what do you remember seeing at that
13  property as far as damage to it?
14      A.  I seen all of the interior of the
15  house was all -- it was molded, flooded out
16  from the storm.  And they had all of the
17  stuff, the contents was still in there I guess
18  from the people, if I can remember right.  And
19  all of the walls were destroyed.  And I think
20  the -- I think the water came to -- a little
21  bit on the top of the ceiling, because they
22  had the hot water heaters up there and I had
23  to replace everything in there.  I mean, the
24  hot water heaters, the air conditioners and
25  everything.  I mean, it was totally destroyed,

Page 165

1  you know.  The house was totally destroyed.
2      Q.  Did you see evidence of roof
3  damage?
4      A.  Yes, they had roof damage, but not
5  much.
6      Q.  What kind of roof damage?
7      A.  They had a couple of the seal tabs
8  missing.  They had the -- I am trying to think
9  how you call on top of the house, these --
10  these here twirlys?
11      MR. WEBB:
12          Wind turbine?
13      THE WITNESS:
14          Wind turbine.  One was all
15      crooked.  So that was damage to the
16      wind turbine.  I can remember that.
17      It wasn't off, but it was cocked off
18      to the side.  That thing was about to
19      come off.
20  EXAMINATION BY MR. BLANCHARD:
21      Q.  The bottom photo on Koch Number 19,
22  is that a photo of 3409-11 Shangri La?
23      A.  This one here, yes.
24      Q.  The bottom photo; correct?
25      A.  Yeah.  Correct.

42 (Pages 162 to 165)

KOCH, HERMAN

8/8/2008

Page 166

1      Q.  Had you done any repairs to this
2  property at the time you took this photo?
3      A.  No.
4      Q.  And did you take this photo or did
5  your wife take the photo?
6      A.  My wife took every photo here.
7      Q.  Again, on the side there's a
8  reference to "After Katrina and Rita";
9  correct?
10     A.  Yes.
11     Q.  So this is sometime after Rita?
12     A.  All of them were taken after Rita.
13  All of them.
14     Q.  Did you make a wind insurance claim
15  on this property, Mr. Koch?
16     A.  Yes, I did.
17     Q.  Do you remember how much you
18  received in wind insurance?
19     A.  No, I don't.
20     Q.  Did you make a Road Home application
21  for this property?
22     A.  Yes, I did.
23     Q.  I'm going to mark as Exhibit Koch
24  Number 21 a Road Home application relative to
25  3409-11 Shangri La.  I ask you to take a look

Page 167

1  at that, Mr. Koch.
2      A.  Okay.
3      Q.  Is that your signature on page Koch
4  000416?
5      A.  Yes, it is.
6      Q.  Did you prepare this Road Home
7  application?
8      A.  Yes, I did.
9      Q.  When you prepared it, did you make
10  sure everything was correct before you
11  submitted it?
12     A.  As far as I know of, yes.
13     Q.  Turn to page Koch 000414.
14     A.  414.  Okay.  Okay.
15     Q.  Under the reference "Insurance
16  information", do you see a reference to State
17  Farm Insurance?
18     A.  Insurance, yes.  Yes.
19     Q.  You had wind insurance coverage
20  through State Farm on this property; correct?
21     A.  Right.  Right.  Correct.
22     Q.  And you made a wind claim; correct?
23     A.  Right.  Yes.
24     Q.  Under the section "If settled, how
25  much for structure?", do you see that?

Page 168

1      A.  Yes.
2      Q.  That was $6,297.05; correct?
3      A.  Yes.
4      Q.  So that's the amount of insurance
5  for wind damage that you received on that
6  property?
7      A.  Yes.
8      Q.  And I assume, as for all the other
9  properties, you have a file at home with your
10  claim information concerning that?
11     A.  Yes.  Yes, I do.
12     MR. BLANCHARD:
13        We'll request that information.
14     MR. WIEDEMANN:
15        Yes.
16  EXAMINATION BY MR. BLANCHARD:
17     Q.  The next page, Mr. Koch, 000415, --
18     A.  Okay.
19     Q.  -- I draw your attention to the top
20  concerning flood insurance.  Do you see that?
21     A.  Yes.
22     Q.  Is it true that you had flood
23  insurance through State Farm Insurance on that
24  property at the time of the storm?
25     A.  Yes.

Page 169

1      Q.  I draw your attention to the section
2  "If settled, how much for structure?"  Do you
3  see that?
4      A.  Yes.  100,000.
5      Q.  You received $100,000 in flood
6  insurance on that property?
7      A.  Yes.
8      Q.  Have you ever gone back to State
9  Farm on your wind policy requesting more
10  money?
11     A.  No.
12     Q.  Mr. Koch, did you make a Road Home
13  claim on the 8545-47 Deerfield Drive property?
14     A.  Yes.
15     Q.  Do you have a copy of that at your
16  home?
17     A.  I'm pretty sure I do.  I don't
18  know.  I would have to look.  But I did make a
19  claim on it.
20     MR. BLANCHARD:
21        Now, Karl, I'll represent that we
22     didn't receive a copy of that.  So we
23     request those documents as well.
24     MR. WIEDEMANN:
25        Of the Road Home application for

43 (Pages 166 to 169)

KOCH, HERMAN

8/8/2008

Page 170

1    Deerfield?
2        MR. BLANCHARD:
3        Correct.
4        MR. WIEDEMANN:
5        Of course.
6    EXAMINATION BY MR. BLANCHARD:
7        Q.  Did you have homeowner's insurance
8    on your Deerfield property?
9        A.  Yes, I did.
10       Q.  When you first got to the Deerfield
11   property after the storm, what sort of damage
12   did you see?
13       A.  I seen monumental damage.  Mainly to
14   downstairs.  It was totally destroyed.  The
15   furniture, the appliances, the air
16   conditioners outside.  In fact, they came and
17   they stole the cores out of the air
18   conditioners.  After I had the house cleaned
19   and all of that and gutted, they stole the
20   tubing.
21       Q.  I'm sorry, can you repeat that?
22   After you had the house what?
23       A.  Okay.  When I went there, the house
24   was, of course, totally destroyed.  The
25   stoves, the dryers, everything.  And the water

Page 171

1    got up to about two and a half to three feet
2    on the second floor.  And they had mud in the
3    house about a foot, a foot high on the first
4    floor.
5        Q.  Had either one of the sides of that
6    property been looted?
7        A.  Yes.  They looted the air condition
8    cores.  They steal -- In fact, the whole
9    block, they stole the air condition cores out
10   of the houses in my block.
11       Q.  Was anything else stolen out of that
12   property?
13       A.  Yes.  They came during the storm and
14   we found where people came up to the second
15   story and was in a boat.  They probably had a
16   party in the house.  We found beer bottles all
17   over the floor.  We found -- We found bags of
18   potato chips.  And they probably had about a
19   foot and a half on the second floor, but they
20   -- they stole a lot of stuff on the second
21   floor.  They stole a lot of my cuff links, my
22   watches.  That, I do remember.  And they went
23   and they -- Of course, they took this jar I
24   had full of pennies.  They took money.  And I
25   can remember things like that they took, you

Page 172

1    know.
2        Q.  And this was on your side?
3        A.  And this was on my side.
4        Q.  What was your side again?  I'm
5    sorry.
6        A.  My side was 8545, the large side.
7        Q.  Do you remember anything else stolen
8    from that property other than what you have
9    just mentioned to me?
10       A.  Let me think.  Okay.  After the
11   house was -- After the house was gutted, they
12   went in and came and stole the copper pipe
13   that I had in the house.  And when I went
14   there, how I happened to see is they had water
15   running into the street.  So whoever stole the
16   copper tubing and the pipe didn't even cut off
17   the main valve.  They just sawed the pipes off
18   and I guess they must have ran out of there.
19   I think --
20       Q.  So you had water running at that
21   time?
22       A.  I had water running.  I still had
23   water in the pipes.  That's what I told my
24   wife.  Said these -- these crazy fools could
25   at least turn off the main valve, you know,

Page 173

1    instead of fighting that water coming out of
2    there.  But they -- But when I came there, the
3    water was still running down the driveway
4    where they went and they took the pipes.  All
5    -- All the copper in the walls that I had
6    pipes was copper pipes, and they stole that.
7        Q.  8547 Douglass, was that property
8    looted?
9        A.  No, that wasn't looted, but they
10   looted my side.  Now, I don't know if they
11   took anything.  I really can't say.  Because
12   we had to go and gut it and clean it up.  But
13   I don't know if they took anything from that
14   side.  The only thing I know they took from
15   that side is the core from the air condition.
16   Because I had -- I had one air condition in
17   that side and I had two air conditioners over
18   on my side, and they stole the three of the
19   cores out of my air conditioners.  And my next
20   door neighbor on each side, they took her air
21   conditioners and they took the lady's on the
22   other side of me.  And then I heard after that
23   they stole every air condition core throughout
24   the whole block.
25       Q.  Who was your wind insurer for that

44 (Pages 170 to 173)

KOCH, HERMAN

8/8/2008

Page 174

1  property?
2      A.   State Farm.
3      Q.   Did you make a claim against your
4  wind insurer?
5      A.   Yes.
6      Q.   What sort of items did you seek
7  recovery for against your wind insurer?
8      A.   Mainly for the roof.  Mainly for
9  that roof that I had on there that that --
10  that guy that put that new roof over the old
11  roof.  I wasn't laughing at the time because I
12  was really PO'd.  But anyway, I filed for
13  everything I could get, you know, for wind
14  damage and a man came out there, you know, and
15   -- the adjustor came out there and that's the
16  figure that they gave me.
17      Q.   What did they give you?
18      A.   I don't recall.  I would have to go
19  check and see.
20      Q.   Do you have an insurance file for
21  the property at 8545-47?
22      A.   Yes.  I have an insurance file for
23  every house I've ever had.
24      Q.   That file would include both your
25  wind insurer and your flood claim; right?

Page 175

1      A.   Wind and flood, right.
2          MR. BLANCHARD:
3          Karl, I'll represent that we
4      didn't receive that either, so we will
5      request those documents as well.
6          MR. WIEDEMANN:
7          Certainly.
8  EXAMINATION BY MR. BLANCHARD:
9      Q.   Do you remember how much you
10  received on your wind insurance claim?
11      A.   No, I do not.
12      Q.   Mr. Koch, we have got some discovery
13  responses from you.  You identified a few of
14  those earlier.  And there is a reference there
15  to wind insurance on one of your properties.
16  It didn't specifically identify it, I'll tell
17  you that, but there's a reference to
18  $23,329.10.  Does that sound like the amount
19  you received on that Deerfield property?
20      A.   It might have been, but I can't
21  verify that until I check my --
22      Q.   But you know you recovered against
23  your wind insurance on that?
24      A.   I did recover on my wind insurance,
25  I did.  I'm almost sure I did.

Page 176

1      Q.   And who did you have flood insurance
2  with on that property?
3      A.   On what, on 8545 and 47?
4      Q.   Deerfield, yes.
5      A.   I went through State Farm I think on
6  that.
7      Q.   How much did you receive on your
8  flood policy on those properties?
9      A.   I don't remember.  I would have to
10  ask my wife.  I don't remember.
11      Q.   And that's part of that claim file
12  that you talked about earlier?
13      A.   Yeah.  Right.  Right.  I don't
14  remember.
15      Q.   Mr. Koch, did you have any personal
16  property, movable property in any of your
17  rental properties at the time of the storm?
18      A.   Yes.  I had my -- As I said, I had
19  my vehicle at my aunt's house.  Her -- Her
20  house was about two blocks away.  And I went
21  and parked there because I thought if we would
22  have any water, that her house was a little
23  bit on higher ground than mine, you know.
24      Q.   All right.  Let me ask you
25  specifically about the rental properties.  Did

Page 177

1  you have any personal property at 8547
2  Deerfield --
3      A.   Yes.
4      Q.   -- at the time of the storm?
5      A.   Yes.  I had -- I had -- If I recall,
6  I had a refrigerator, I had a stove, I had a
7  dishwasher.  Now, is that the kind of property
8  you're talking about?
9      Q.   Right.
10      A.   Okay.  I had that and all there.
11      Q.   Did you have any other movable
12  property that you owned within that side,
13  8547?
14      A.   No.  I tell you what.  The only
15  thing I can think of at the moment is I had a
16  refrigerator for that apartment.  I had a
17  dishwasher.  I had a -- I am trying to think.
18  Under the sink, how you call these --
19          MS. THORNTON:
20          Disposal.
21          THE WITNESS:
22          A garbage disposal, yeah.  And I
23      had a stove and I had hot water
24      heaters.  That was ruint.  And, of
25      course, these people had their own

45 (Pages 174 to 177)

BARGE001249

KOCH, HERMAN

8/8/2008

Page 178

1    washer and dryer.
2    EXAMINATION BY MR. BLANCHARD:
3    Q.  When you made your flood insurance
4    claims, --
5    A.  Uh-huh (affirmatively).
6    Q.  -- did you also seek recovery of
7    contents on your house when you lived in 8545?
8    A.  Yes, I did.
9    Q.  How much did you receive on your
10   contents there?
11   A.  I don't know no figures, but I did
12   make a claim.
13   Q.  That's part of the insurance file;
14   correct?
15   A.  That's correct.  It should be all up
16   in that one file.  But I don't know no
17   figures.
18   Q.  But you made a contents claim?
19   A.  But I made a contents claim that I
20   do remember.
21   Q.  Did you also make a flood contents
22   claim for the contents of the property at 8547
23   Deerfield?
24   A.  I don't remember if I made that or
25   not.  I do not remember.

Page 179

1    Q.  Did you make a contents claim on
2    your flood policies on any of your other
3    properties?
4    A.  I cannot say that.  I don't
5    remember.  I would have to ask my wife.  I
6    don't remember that.  She -- She handled all
7    of the insurances.  Mainly the insurances.
8    And she fought with the insurance companies.
9    Q.  Any personal property that you had
10   in your rental properties, if you made a
11   contents claim, you would have made a claim
12   for those contents; correct?
13   A.  I don't know.  I don't know that.  I
14   mean, I don't know that much about insurance,
15   you know.
16   Q.  Let me show you a document marked as
17   Koch 22.  Is this a photo, Mr. Koch, of your
18   property at 8545-47 Deerfield?
19   A.  Yes, it is.
20   Q.  When did you take that photo?  Let
21   me ask you this.  Who took the photo?
22   A.  Probably my wife took this photo.
23   Q.  Do you know when she took the photo?
24   A.  No, I have no idea when she took it.
25   Q.  Had you done any repairs to this

Page 180

1    property at the time the photo was taken?
2    A.  No.  No.
3    Q.  Thank you.
4    A.  I tell you what.  This was after the
5    storm, because my -- my -- my tenant's car is
6    there and they had to come and they had to
7    remove the car because the car got flooded and
8    everything.
9    Q.  So there's --
10   A.  A car there.  An automobile.  And
11   that car was there during and after the storm
12   and they got flooded.  So that photo was taken
13   after the storm.
14   Q.  And the vehicle that's in this
15   picture, that's not your vehicle?
16   A.  No, that's not my vehicle.  That's
17   the vehicle of my tenant.
18   Q.  Have you ever put together a list of
19   your personal property damage during the
20   storm?
21   A.  If I did, I don't remember it.  I
22   don't remember if I did it or not.
23   Q.  Do you know whether your wife ever
24   did that?
25   A.  Maybe she did it, but I don't

Page 181

1    remember of me doing it.  The only time I did
2    a personal property -- Well, that's another
3    property in Slidell I had that wasn't
4    concerning this.
5    Q.  So so you own other property in
6    Slidell?
7    A.  Yes.
8    Q.  That's not part of this lawsuit, is
9    it?
10   A.  No.  No.
11   Q.  So for the properties we have talked
12   about previously during this deposition, you
13   haven't put together a list of personal
14   property for those properties, have you?
15   A.  I -- Please repeat the question.
16   Q.  That was an inartful question.  You
17   don't know whether or not you have a list of
18   all of your personal property that was damaged
19   during the storm?
20   A.  No, I don't.
21   Q.  And you think the best person to
22   talk to about that list would be your wife?
23   A.  I would say so.  She -- She knows
24   more than me about the insurance aspect of
25   this.

46 (Pages 178 to 181)

KOCH, HERMAN

8/8/2008

Page 182

1      Q.  I'm going to mark as Koch Number 23
2  a document we previously received from you
3  marked Koch 000003 and 4, which is a Standard
4  Form 95, "Claim for damage, injury or death."
5  I ask you to take a look at that, Mr. Koch.
6  Do you recognize that document?
7      A.  Yes, I do.
8      Q.  What is this document?
9      A.  This document is a claim form
10  against the Corps of Engineers for property
11  that I lost in Katrina and Rita.
12      Q.  Is that your signature on page Koch
13  00003?
14      A.  000003?  Yes, it is.
15      Q.  Did you personally prepare this
16  document?
17      A.  With the help of my wife, yes.
18      Q.  Did anyone else help you with this
19  document other than your wife?
20      A.  No.
21      Q.  Was it your understanding that the
22  purpose of this form was to seek compensation
23  for damages to your property against the Corps
24  of Engineers?
25      A.  Yes.

Page 183

1      Q.  You understood that when you signed
2  this; correct?
3      A.  Yes.
4      Q.  There's a note on the left-hand side
5  at the bottom.  See there's a reference to
6  "Property damage"?
7      A.  Yes.
8      Q.  And next to that there's a note and
9  it says "Note, I lost five houses"?
10      A.  Yes.
11      Q.  Is that correct?
12      A.  Yes.
13      Q.  Is that your handwriting?
14      A.  Yes.
15      Q.  What are the five houses that you're
16  referencing?
17      A.  Okay.  I lost my own at 8545-47
18  Deerfield.  I lost my house at 3619 Shangri
19  La.  I lost my duplex at 3409-11 Shangri La.
20  I lost my double on 6035 and 37 Burgundy.  And
21  I lost a double on 6317 and 19 Douglass
22  Street.  That's the five properties that I am
23  talking about here.
24      Q.  And you're seeking recovery in the
25  lawsuit that we're here for today for those

Page 184

1  same exact properties, aren't you?
2      A.  Right.
3      Q.  Mr. Koch, did you read this document
4  before you signed it?
5      A.  Yes, I did.
6      Q.  And there's a reference in item 12
7  to property damage of $700,000.  Do you see
8  that?
9      A.  Yes, I do.
10      Q.  You inserted that number; correct?
11      A.  Correct.
12      Q.  Is that an accurate amount?
13      A.  As far as my knowledge goes, it is.
14      Q.  How did you arrive at that amount?
15      A.  Well, I kind of figured up what each
16  house was worth before Katrina and Rita and I
17  came to that figure of all five houses.
18      Q.  Did you prepare any worksheets that
19  you attached to this form?
20      A.  No.  I just went on my own and I
21  filled it out.
22      Q.  Do you still have that worksheet?
23      A.  No.  I don't.  I can't -- I probably
24  don't have it.  I don't know if I have it or
25  not.

Page 185

1      Q.  Next to "Property damage" you put
2  under section 12-B, "50,000" under "Personal
3  injury".  Is that correct?
4      A.  Yes.
5      Q.  So you were seeking personal injury
6  damages of 50,000 against the Corps of
7  Engineers; is that correct?
8      A.  That's correct.
9      Q.  How did you arrive at that figure?
10      A.  Well, my wife had -- after the storm
11  she had two heart attacks.  She was very
12  stressed out.  Not to say the fact that I had
13  went through a bad time myself after losing
14  five houses, plus a big chunk of my income
15  that I had to support me because them five
16  houses was knocked out from under me.  And all
17  I had was a little Social Security check and a
18  check from my -- my employer at Domino.  And
19  that -- that went and it took a lot of income
20  from us.
21      Q.  So that $50,000 represents the
22  injuries that your wife sustained; right?
23      A.  Right.
24      Q.  You're talking about the --
25      A.  Talking about the heart attacks.

47 (Pages 182 to 185)

KOCH, HERMAN

8/8/2008

Page 186

1    Q.  The heart attack?
2    A.  The stress and all of that that
3  these people -- that we went through.
4    Q.  And this amount is also meant to
5  compensate you for your emotional distress?
6    A.  Right.  Not to say the times when I
7  kicked chairs over.
8    Q.  Mr. Koch, drawing your attention to
9  Section 8-A --
10    A.  8-A?  Okay.  8-A.
11    Q.  Do you see the section -- I'll read
12  it to you.  "The hurricane protection levees,
13  I-walls and floodwalls which were supposed to
14  protect the New Orleans metropolitan area
15  failed and were breached during the day of
16  August 29, 2005.  The breaches and failure of
17  the hurricane protection levees, I-walls and
18  floodwalls were a result of Corps of Engineers
19  negligence in design and construction of these
20  levees, I-walls and floodwalls.  Moreover, the
21  Corps were negligent in the design,
22  construction, maintenance of the Mississippi
23  River Gulf Outlet.  In addition, the Corps
24  knew or reasonably should have known that the
25  hurricane protection levees, I-walls and

Page 187

1  floodwalls were inadequate to protect the area
2  from flooding from a fast moving Category 3
3  hurricane and, despite that knowledge, the
4  Corps failed to disclose these inadequacies to
5  the material detriment of the claimant."  Do
6  you see that?
7    A.  Yes.
8    MR. WIEDEMANN:
9      Counsel, for the record's sake, I
10    believe that is 8-B.
11    THE WITNESS:
12      Yes, it is 8-B.
13  EXAMINATION BY MR. BLANCHARD:
14    Q.  The language that I just read from
15  8-B, --
16    A.  Yes.
17    Q.  -- you read that before you signed
18  this; right?
19    A.  Yes.
20    Q.  And you agreed with that statement
21  at the time that you submitted this; correct?
22    A.  Yes.
23    Q.  And you submitted this on October --
24  you signed this on October 22nd, 2006; right?
25    A.  Right.

Page 188

1    Q.  So you want the government to pay
2  for your damages to the five properties that
3  you just mentioned; right?
4    A.  Yes.
5    Q.  And you want the government to pay
6  for the physical injuries and emotional
7  injuries that you and your wife incurred as a
8  result of the flooding; correct?
9    A.  Yes.
10    Q.  You blame the government for your
11  damages, don't you?
12    MR. WIEDEMANN:
13      Object to the form of the
14      question.
15      You can answer subject to that.
16    THE WITNESS:
17      I blame -- Rephrase that
18      question.  I blame what?
19  EXAMINATION BY MR. BLANCHARD:
20    Q.  You blame the government, the Corps
21  of Engineers, for the damages, the flood
22  damages to your properties, don't you?
23    MR. WIEDEMANN:
24      The same objection.
25    THE WITNESS:

Page 189

1      I have no answer for that.  I
2      don't know who to blame.
3  EXAMINATION BY MR. BLANCHARD:
4    Q.  But when you signed this form, you
5  read the paragraph; correct?
6    A.  Someone is to blame, I know.  But I
7  don't know who to blame.
8    Q.  Well, when you signed this, you read
9  that paragraph that said the government was to
10  blame, didn't you?
11    A.  Yes, I read that.
12    Q.  And do you see on that form under
13  the section "Civil penalty for presenting
14  fraudulent claim"?  Do you see that?
15    A.  Yes.  Right.
16    Q.  Did you read that section before you
17  signed it?
18    A.  Yes, I did.
19    Q.  Have you ever withdrawn your claim,
20  the SF-95 form?
21    A.  No.
22    Q.  So it's still pending?
23    A.  Right.
24    Q.  In fact, you told me earlier you
25  have a lawsuit against the government, don't

48 (Pages 186 to 189)

KOCH, HERMAN

8/8/2008

---

Page 190

1   you?
2       A.  Yes.  Here.
3       Q.  This is the lawsuit that you were
4   telling me about earlier?
5       A.  Yes.  Yes.
6       Q.  But you have a lawyer that
7   represents you in connection with this, don't
8   you?
9       A.  No.  No.
10      Q.  Well, let's go back over that.  You
11  told me that you have a lawyer --
12      A.  Oh, that was the lawyer in New
13  York.  But the lawyer in -- I don't know if
14  this is the -- same one.  It probably is
15  the same lawsuit.  Yes.  It's probably the
16  lawyer in New York that's representing here.
17  Because it gets very, very confusing after a
18  time.
19      Q.  Well, I want to try to make it
20  clear.  Because you told me earlier that you
21  had --
22      A.  Right.
23      Q.  -- two lawsuits.  One by the lawyer
24  in New York; correct?
25      A.  Yeah.

---

Page 191

1       Q.  And one against the government by
2   another lawyer down here.  Do you remember
3   telling me that?
4       A.  Yes, I did remember telling you
5   that.  But that was -- This lawyer that is
6   connected with this is probably the say guy, I
7   guess.  Or I got confused when I told you
8   that.
9       Q.  But you know that you have one
10  lawsuit filed by a lawyer in New York.
11      A.  Right.
12      Q.  And that's against the government?
13      A.  Right.  Right.
14      Q.  We know you submitted this SF-95
15  form.
16      A.  Yes.  Correct.  That is correct.
17      Q.  Now, as far as another lawsuit
18  against the government, you might refine your
19  prior answers to you may have a second suit?
20      A.  I don't know.  I really don't know.
21  I don't know.
22      Q.  When you filled out this SF-95 form,
23  under property damage, you see that separate
24  amount of 700,000?
25      A.  Right.

---

Page 192

1       Q.  Did that include your personal
2   property as well as your immovable property?
3       A.  Yes.
4       Q.  So this was your total damage claim?
5       A.  Right.
6       Q.  Mr. Koch, I am going to mark as
7   Exhibit Number 24 a group of documents that we
8   received from your lawyer in connection with
9   this lawsuit, Bates stamped Koch 000518
10  through 553.  I ask you to take a look at
11  that.
12      A.  Uh-huh (affirmatively).  This was
13  water damage here.  Okay.  Yes, these were my
14  -- these were my tenants that were living in
15  my houses.
16      Q.  So these documents which we have
17  identified as Koch Number 24, these were lease
18  agreements that you had in connection with
19  your rental properties?
20      A.  Well, I really never had no lease.
21  It was more or less month by month.
22      Q.  So the leases on all of your rental
23  properties at the time of the storm were
24  month-to-month?
25      A.  Yes.  Generally month -- month by

---

Page 193

1   month.  Because if I had any people tearing up
2   my property, I asked them to leave.
3       Q.  Did you sometimes have problems with
4   people tearing up your rental property?
5       A.  Sometimes, yes.  Sometimes.  Because
6   that's a common occurrence in rentals.
7   Sometimes they -- they don't take care of this
8   stuff like they would their own and they break
9   stuff.  They don't cut the grass.  They --
10  They put flat tires in the front yard.
11      Q.  And from time to time has any of
12  your rental properties, before the storm, been
13  vacant?
14      A.  Yes.  Some of them have been vacant.
15      Q.  So they all haven't -- they all
16  weren't rented continuously before --
17      A.  Most of the time they were.
18      Q.  Sometimes?
19      A.  But they weren't vacant for long.
20      Q.  Look at the document identified as
21  Koch 000519.
22      A.  519.  Okay.
23      Q.  And this is a rental agreement with
24  a Craig Armond.  Do you see that?
25      A.  Yes.

---

Johns Pendleton Court Reporters                    800 562-1285

BARGE001253

KOCH, HERMAN

8/8/2008

Page 194

1    Q.  Was he residing at 8547 Deerfield at
2  the time of the storm?
3    A.  Yes, he was.
4    Q.  There's a reference here to rent of
5  $525 a month.
6    A.  Yes.
7    Q.  Do you see that?
8    A.  Yes.
9    Q.  Is that the rent you were charging
10 him?
11   A.  Yes, it was.
12   Q.  Did he pay you that amount?
13   A.  Yes, he paid me.
14   Q.  Was he behind at the time of the
15 storm?
16   A.  The storm hit on the 29 -- No, he
17 wasn't.  He was not behind.
18   Q.  This lease is dated April 6, 2005.
19 Do you see that?
20   A.  Yeah.  4/6/05.  Right.  Right.
21   Q.  That was a one year rental
22 agreement, wasn't it?
23   A.  Well, I had him to sign these, but
24 we had a verbal agreement if they tore up
25 anything that I was going to ask them to

Page 195

1  leave.
2    Q.  Did you have that verbal agreement
3  with all of your tenants?
4    A.  Yes.  Generally, yes, I had it with
5  all of my tenants.
6    Q.  So as we're going through these
7  leases, --
8    A.  Why --
9    Q.  Wait until I finish.
10   A.  Okay.
11   Q.  As we go through these leases, we
12 have a written lease, right?  Is that
13 correct?  You have something in writing?
14   A.  Yes.
15   Q.  But then you also had side
16 agreements with these people that you could
17 kick them out basically?
18   A.  Well, I talked to a lawyer one time
19 and he says basically if a lease is not
20 notarized, it's not any good to start with;
21 it's not -- it's not worth the paper it's
22 written on.  So all I did was to give these
23 people an application and keep where they
24 worked, how much they made, and so forth and
25 so on, and I told them, I said, "Look, if you

Page 196

1  get into any trouble, can't pay the rent, I am
2  not going to hold you here anyway, I have to
3  leave you go, I have to cut you free," so
4  that's why we had a month-to-month more or
5  less agreement.  Because if somebody can't pay
6  the rent, what is a lease going to do me,
7  saying that they got to stay for six more
8  months in order to fulfill the lease?
9    Q.  So it was your understanding,
10 though, that even though you had written lease
11 agreements with these people, the written
12 lease was invalid?
13   A.  Right.
14   Q.  And that was the case for all of
15 your properties; correct?
16   A.  Correct.
17   Q.  Let's move forward, Mr. Koch.  Go to
18 Koch 000526.
19   A.  526.  Okay.  26.
20   Q.  The first document there is an
21 application for an apartment at 6319
22 Douglass.
23   A.  Correct.
24   Q.  That was one of your properties;
25 correct?

Page 197

1    A.  Yes, sir.
2    Q.  The next page is a one year rental
3  agreement, isn't it?
4    A.  Yes, it is.
5    Q.  And who was this rental agreement
6  with?
7    A.  Nicole Gilmore.
8    Q.  And the rental was $400 a month?
9    A.  Yes.
10   Q.  Did she occupy 6319 Douglass at the
11 time of Katrina?
12   A.  Yes.  She -- She did.  She occupied
13 it.
14   Q.  Was she behind in her rent --
15   A.  No, she was not.
16   Q.  -- at the time of Katrina?
17   A.  No.  No.  No, she was not.
18   Q.  Please go to Koch 000530.
19   A.  Uh-huh (affirmatively).
20   Q.  Is this an application for an
21 apartment concerning 3411 Shangri La?
22   A.  Right.
23   Q.  And this was Mr. Angelo Gonzales,
24 Jr.?
25   A.  Yes.

50 (Pages 194 to 197)

KOCH, HERMAN

8/8/2008

Page 198

1      Q.  And the next page, Bates stamped
2   Koch 000531 through 533, is this your rental
3   agreement with Mr. Gonzales?
4      A.  Yes.  But these were the rules.  As
5   you see, these people never signed nothing.
6   And I told them the rules before they rented
7   the house.  I said, "I don't hold you to no
8   lease."  I said, "Mainly because if you can't
9   pay the rent, what is a lease going to do me
10  anyway?"  I said, "I have to let you go if you
11  can't pay the rent."  But I said, "These are
12  my rules if you come into my house.  If you
13  break any of these rules, I am going to tell
14  you to leave.  And if you don't leave, I am
15  going to go and I am going to put a --"  I am
16  trying to think of the term.  "I am going to
17  go and evict you.  I am going to give you an
18  eviction notice."  And so they abide by these
19  rules.  But it was one month at a time.  One
20  month.  One month.
21     Q.  Paragraph one of Koch 531, you see
22  that?
23     A.  Uh-huh (affirmatively).
24     Q.  Concerning the rental, there's a
25  reference to zero.  Do you see that?

Page 199

1      A.  Yeah.  Right here?  Right.
2      Q.  You weren't charging them zero?
3      A.  No.  No.  No.  No.
4      Q.  What were you charging them?
5      A.  If I recall right, I think it was
6   550 a month.  550 a month.
7      Q.  Was Mr. Gonzales still at that
8   property at the time of the storm?
9      A.  Yes.  He was still there.  I
10  probably put this down in reference that he
11  never paid it when he came in that first --
12  But believe me, I wasn't charging him zero.
13     Q.  Turn to Koch 000534.  You with me,
14  Mr. Koch?
15     A.  Yes, I'm with you.
16     Q.  Is that an application by Adam
17  Peresa for 3409 Shangri La?
18     A.  Right.  That's it.
19     Q.  The next page, Koch 000535 through
20  537, this is a rental agreement that you had
21  with Mr. --
22     A.  Yes.
23     Q.  -- Peresa?
24     A.  Yes.  He paid me 550 a month and he
25  put down a deposit of 550.

Page 200

1      Q.  Was he still in this property at the
2   time of Katrina?
3      A.  Yes, he was.
4      Q.  Was he current in his rent?
5      A.  Yes, he was.
6      Q.  Turn to page Koch 000538.
7      A.  Uh-huh (affirmatively).
8      Q.  Is that an application regarding
9   property at 6035 Burgundy?
10     A.  Yes.
11     Q.  And the next page, Koch 000539
12  through 541.  This is a one year rental
13  agreement with Mr. Marvil Mentivar?
14     A.  No, it wasn't no one year.  It was a
15  one at a time.  The same -- The same -- I had
16  the same agreement with all of these people,
17  but it was more or less a verbal agreement and
18  these were the rules that you had to go and
19  abide by.
20     Q.  So even though it says one year
21  rental agreement, that's not what it was?
22     A.  As I said before, a lawyer once told
23  me, he says if an agreement is not notarized
24  by a witness and by a notary, it's not worth
25  the paper it's written on.

Page 201

1      Q.  There's a reference here to a rental
2   of $410 a month.  Was that what you charged
3   Mr. Mentivar?
4      A.  Yes, I think it was.  Yes, it was.
5      Q.  Was he still in the property at the
6   time of Katrina?
7      A.  Yes, he was in the property at the
8   time of Katrina.  And I think he was only
9   there about two or three months and the storm
10  came.
11     Q.  Turn to page Koch 000542.
12     A.  542.  Okay.
13     Q.  This is an application relative to
14  the property at 6037 Burgundy.  Correct?
15     A.  Yes.  Correct.
16     Q.  And the next page, Koch 000543
17  through 545, this purports to be a one year
18  rental agreement with Mrs. Sibil Montrell.
19     A.  Yeah, right.
20     Q.  The reference rent is $400 a month.
21  Is that what you were charging her?
22     A.  Yes.
23     Q.  Was she in this property at Burgundy
24  at the time of the storm?
25     A.  Yes, she was.

51 (Pages 198 to 201)

BARGE001255

KOCH, HERMAN

8/8/2008

Page 202

1      Q.  Turn to Koch 000546.
2      A.  Okay.
3      Q.  Is this an application relative to
4  3619 Shangri La?
5      A.  Yes, it is.
6      Q.  And the next page, Koch 547 through
7  549, this is a rental agreement with Miss
8  Letty Nunez?
9      A.  Yes.  Right.
10      Q.  Were you charging her the $600 a
11  month on that property as referenced in this
12  rental agreement?
13      A.  Yes, I charged 600 a month plus I
14  would cut her grass.  And so that's why the
15  600, because I added on the grass cutting.  I
16  cut the grass.  And she agreed to it.  She
17  says that she didn't want to cut the grass.  I
18  said, "Well, in order to live in my houses,
19  you need to cut your grass."  That's right.
20      Q.  Did she live in the property at the
21  time of the storm?
22      A.  Yes.  Yes, she did.
23      Q.  One more, Mr. Koch.  Go to Koch
24  000550.  Is that an application relative to
25  6317 Douglass?

Page 203

1      A.  Yes, it is.
2      Q.  And the next page, Koch 000551
3  through 553, --
4      A.  Uh-huh (affirmatively).
5      Q.  -- is that document referenced as a
6  rental agreement concerning Douglass Street?
7      A.  Yes, it is.
8      Q.  And who is the person that signed
9  that?
10      A.  Frances Collins.
11      Q.  This is dated September 4, 2001;
12  correct?
13      A.  Yes.
14      Q.  Was she still in the property at the
15  time of Katrina?
16      A.  Yes.  Yes, she was.
17      Q.  Was she still paying the $350 a
18  month?
19      A.  Yes.
20      Q.  Have you leased any of your rental
21  properties since Katrina?
22      A.  Well, we were -- we are trying to go
23  through the Road Home, and the Road Home has a
24  lease.  But the Road Home called me up
25  yesterday and said that I didn't abide by

Page 204

1  things that I checked off on the paper, so
2  right now I don't know my status, you know,
3  with the Road Home.  I don't know if they're
4  going to pay me anything or what.  But I did
5  go by the Road Home lease.  Now, if they don't
6  pay me nothing, I don't know if the lease is
7  any good or not.
8      Q.  Mr. Koch, you have rented 8547
9  Deerfield since the storm?
10      A.  Yes.
11      Q.  And when was the first time after
12  the storm that you rented that property?
13      A.  Let's see.  I think that was
14  sometime in '07.  I am not sure of the exact
15  date.  But the people -- I had rented that
16  through an agent in the Prudential Real
17  Estate.  I went through an agent there.  And
18  she was renting the problem -- I mean the
19  property and she rented it through FEMA.  And
20  I think the lady stayed in there about five or
21  six months and after her house was fixed, she
22  left.
23      Q.  How much rent did you receive from
24  her?
25      A.  I think it was 825 a month.  And, of

Page 205

1  course, I had to pay the agent for her part in
2  it, too, see.
3      Q.  Now, before the storm you were
4  renting that property for 525 a month; right?
5      A.  Right.  Right.
6      Q.  You said she was in it for five or
7  six months?
8      A.  Five or six months.  And I don't
9  think she went and fulfilled her -- her
10  agreement, and she left.
11      Q.  But you rented it to someone else
12  since that time?
13      A.  No, it's still vacant.
14      Q.  Still vacant.  Are you trying to
15  rent it now?
16      A.  I am trying to rent it, yes, but so
17  far I haven't had anybody to take it yet.
18      Q.  When did she move out?
19      A.  Let's see.  What we in, August?  I
20  think she moved out around April.
21      Q.  Mr. Koch, you remember that I came,
22  met you during the site visits last month to
23  your properties?
24      A.  Yes.
25      Q.  You remember we visited 8545

52 (Pages 202 to 205)

KOCH, HERMAN

8/8/2008

Page 206

1  Deerfield; right?
2      A.  Right.
3      Q.  And you remember we tried to get in
4  8547, but you said someone was there?
5      A.  No.  No one was there.
6      Q.  No one was living at 8547
7  Deerfield --
8      A.  No.
9      Q.  -- when we had this site visit last
10  month?
11      A.  No.  No.  It was just the opposite
12  way around.  You all got in 8547, but I don't
13  know if y'all went in 8545.
14      Q.  Then I have it --
15      A.  Why?  Because they had people in
16  8545, but the 8547 was empty.
17      Q.  All right.  So since the storm you
18  also rented 8545 Deerfield.
19      A.  No.  I have always had 8545 rented.
20  It's just that the people in 8547 stayed in
21  there and left in April.
22      Q.  All right.  Well, let's go to 8545
23  Deerfield.  That was rented before the storm;
24  right?
25      A.  No.  No.

Page 207

1      Q.  That's where you lived?
2      A.  That's where I lived.
3      Q.  But after the storm you started
4  renting it?
5      A.  After the storm I had to rebuild it
6  and then I rented it through a Prudential
7  agent.
8      Q.  Have you rented any other property
9  since the storm?
10      A.  Yes, I've rented 3409 and 3411, and
11  I am about to rent 3619 Shangri La.  All on
12  Shangri La.  And as I told you, I sold 6035
13  and 37 Burgundy.  And I haven't touched
14  6317-19 Douglass.
15      Q.  How much rent are you getting on
16  3409 Shangri La?
17      A.  3409 Shangri La, I am getting 725 a
18  month.
19      Q.  That's more than you were getting
20  before the storm; correct?
21      A.  That's more than I was getting
22  before the storm.
23      Q.  How long has that been rented?
24      A.  We just rented it last month.
25      Q.  3411 Shangri La, what rent are you

Page 208

1  charging on that property?
2      A.  The same on -- The same amount.
3  725.
4      Q.  How long has that been rented?
5      A.  We just rented it about three or
6  four days ago.
7      Q.  And that amount is more than you
8  received since the storm?
9      A.  Yes.
10      Q.  I mean before the storm; right?
11      A.  Yeah, right.
12      Q.  And you said you are getting about
13  ready to rent 3619 Shangri La?
14      A.  Yes.
15      Q.  So you have signed a lease with
16  someone?
17      A.  Well, yes, we -- we went and -- we
18  went through a Road Home lease.  But as I
19  said, I don't know if the Road Home is going
20  to honor me, because they haven't paid me
21  nothing and they called me up and they said I
22  marked on a paper things that I should have
23  done that I never did and they want me to do
24  them, and I don't know if I am going to do
25  them or not because it's going to take more

Page 209

1  money, which I am running out of money quick.
2  So I just might tell them it's a road to
3  nowhere.  You understand?
4      Q.  Assuming that this Road Home
5  application goes through, how much rent are
6  you going to receive on that property?
7      A.  725.
8      Q.  And if you don't go through the Road
9  Home and you independently try to rent it,
10  what do you plan to charge?
11      A.  725.
12      Q.  Again, that's more than you received
13  in rentals before the storm; correct?
14      A.  Correct.
15      Q.  You want to take another five minute
16  break, Mr. Koch?
17      A.  I'm all for rolling through.  It's
18  5:00 o'clock.  What time do we generally knock
19  off.
20      Q.  Let's take a five minute break.
21      A.  Okay.
22      MR. BLANCHARD:
23      I think I've got -- Off the
24  record.
25      (Whereupon a discussion was held

53 (Pages 206 to 209)

KOCH, HERMAN

8/8/2008

Page 210

1     off the record.)
2  EXAMINATION BY MR. BLANCHARD:
3     Q.  Mr. Koch, over the last several
4  years you have rented a lot of properties,
5  haven't you?
6     A.  Yes.
7     Q.  And that's part of your income now,
8  is renting these properties; right?
9     A.  Yes.
10    Q.  You have got experience in buying
11 and selling properties?
12    A.  Yes.
13    Q.  You've got experience with renting
14 properties; correct?
15    A.  Yes.
16    Q.  The amount of rent that you can get
17 on any property, that depends on the location
18 of the property, doesn't it?
19    A.  Yes.
20    Q.  It depends on the condition of the
21 property?  Is that correct?
22    A.  Yes.
23    Q.  All right.  So you might have the
24 same property, but it was in two different
25 sections of town, you might get a different

Page 211

1  rent for that; correct?
2     A.  Yes.
3     Q.  So --
4     A.  Location, location, location.
5     Q.  That's what real estate agents say,
6  location, location, location?
7     A.  That's the key.
8     Q.  And you agree with that?
9     A.  Wholeheartedly.
10    Q.  So the address of the property
11 you're seeking to rent plays a big role in how
12 much rent you can receive?
13    A.  Yes.
14    Q.  Is that correct?
15    A.  Yes.
16    Q.  And that holds true for your
17 properties in the Lower Ninth Ward and in
18 Chalmette; correct?
19    A.  Right.
20    Q.  I'm going to show you a series of
21 tax returns, Mr. Koch, and hopefully we can go
22 through this quickly.  I'll mark as Koch
23 Number 25 your 2002 tax return.  Do you see
24 that?
25    A.  Yes.

Page 212

1     Q.  And on page 2 did you sign that tax
2  return?
3     A.  On page 2?
4     Q.  Yes.
5     A.  Yes, I did.
6     Q.  Did you have a preparer do this
7  return, or you did it yourself?
8     A.  No, I had a preparer do this.
9     Q.  All right.  Did you make sure that
10 everything was correct before you signed it?
11    A.  I made sure to the best of my
12 ability that everything was correct on here.
13    Q.  Turn to Schedule E, which is Bates
14 stamped Koch 001173.  Do you see that?
15    A.  1173?  Okay.  On the side.  1173.
16 Okay.  71 -- Okay.  72.  One more.
17    Q.  You with me, Mr. Koch?
18    A.  Okay.  Yeah.  1173.  Okay.
19    Q.  Right.  And this form relates to
20 your rental properties, doesn't it?
21    A.  Yes.  Uh-huh (affirmatively), as far
22 as I can tell, yeah.
23    Q.  And the line 3, "Rents received", is
24 that information accurate, to the best of your
25 information?

Page 213

1     A.  Line 3?  Yes, as far as I can tell.
2     Q.  All right.  Go on to Koch 1175.
3     A.  Uh-huh (affirmatively).
4     Q.  That's another Schedule E relating
5  to your rental properties; correct?
6     A.  Right.
7     Q.  And this relates to 3409-11 Shangri
8  La; correct?
9     A.  Correct.
10    Q.  That "Rents received" line, line 3?
11    A.  Uh-huh (affirmatively).
12    Q.  Is that accurate?
13    A.  Yes.
14    Q.  I'm going to mark as Exhibit 26 a
15 2003 tax return.  Is that your signature on
16 page 2 of the return?
17    A.  Yes.
18    Q.  Did you verify to the best of your
19 ability that everything in this tax return was
20 correct at the time that you signed it?
21    A.  Yes.
22    Q.  Turning to Schedule E, which is Koch
23 001190, you see that?
24    A.  Yes.
25    Q.  That is information concerning your

54 (Pages 210 to 213)

KOCH, HERMAN

8/8/2008

Page 214

1  rental properties; correct?
2      A.  Correct.
3      Q.  And is all of that information
4  accurate, to the best of your knowledge?
5      A.  Yes.
6      Q.  Turn to page 1192.
7      A.  Okay.
8      Q.  This is another Schedule E for 2003
9  concerning your rental property at 3409-11
10  Shangri La; correct?
11      A.  Correct.
12      Q.  Are the numbers on this form
13  correct, to the best of your knowledge?
14      A.  Yes.
15      Q.  I show you the 2004 tax return,
16  which I am marking as Koch 27.  Is that your
17  signature on page 2 of the form?
18      A.  Yes, it is.
19      Q.  Is the information in this tax
20  return accurate, to the best of your
21  knowledge?
22      A.  Yes, it is.
23      Q.  Did you attempt to verify the
24  information in this return before you signed
25  it?

Page 215

1      A.  Yes.
2      Q.  Turn to page Koch 001204.
3      A.  Okay.
4      Q.  That is the "Supplemental income"
5  Form E concerning your rental properties.  Are
6  the numbers on that form accurate?
7      A.  Yes.
8      Q.  Turn to page Koch 001206.
9      A.  Okay.
10      Q.  Schedule E concerning two additional
11  rental properties.  Is the information on that
12  form correct?
13      A.  Yes.
14      Q.  I'll mark as Koch 28 your 2005 tax
15  return.  Is this in fact your 2005 tax return,
16  Mr. Koch?
17      A.  Yes, it is.
18      Q.  Is that your signature on page 2?
19      A.  Yes, it is.
20      Q.  Did you verify that the information
21  in this return was correct at the time you
22  signed it?
23      A.  Yes, I did.
24      Q.  Turn to page Koch 001219.
25      A.  Okay.

Page 216

1      Q.  This is Form Schedule E concerning
2  your rental properties.  Is the information on
3  this page accurate?
4      A.  Yes.
5      Q.  Turn to page Koch 1221.
6      A.  21.  Okay.  All right.
7      Q.  Is the information on this page
8  concerning additional rental properties
9  accurate?
10      A.  Yes.
11      Q.  I'll mark as Exhibit Koch Number 29
12  your 2006 tax return.  Is that your signature
13  on page 2?
14      A.  Yes, it is.
15      Q.  Did you verify the information in
16  this return was accurate before you signed it?
17      A.  Yes.  Yes, to the best of my
18  ability, yes.
19      Q.  I'm going to mark as Exhibit Number
20  30 your 2007 tax return.
21      A.  Okay.
22      Q.  Is this in fact your 2007 tax
23  return, Mr. Koch?
24      A.  As far as I know it is, yes.  But I
25  don't see no signatures here or nothing.

Page 217

1      Q.  Well, I'll represent to you that
2  this was produced by your Counsel in this
3  case, Mr. Koch.
4      A.  Okay.  Okay.  Yes.  It must be my
5  '07 here.
6      Q.  The information on --
7      A.  Right.
8      Q.  The information on page Koch 001247,
9  do you see that?
10      A.  1247?  Yes.  Okay.
11      Q.  That is information concerning your
12  rental of 8547 Deerfield.
13      A.  Okay.  Uh-huh (affirmatively).
14      Q.  You see that?
15      A.  Yes.
16      Q.  Is that information accurate?
17      A.  It must be.  Yes.
18      Q.  Mr. Koch, how much have you spent
19  repairing your property at 3619 Shangri La?
20      A.  Who could give you a more account of
21  that is my wife.  She has a whole file folder
22  on every penny I have spent on 3619, every
23  penny I have ever spent on 3409-3411, every
24  penny I have ever spent on 8545 and 47
25  Deerfield.  We got every penny we ever spent

Johns Pendleton Court Reporters

800 562-1285

BARGE001259

KOCH, HERMAN

8/8/2008

Page 218

1  on that house, including contractors,
2  materials, labor, everything.
3      Q.  Has your wife prepared a worksheet
4  tabulating the totals for each of the
5  properties?
6      A.  I think she did.  I am not sure, but
7  I think she did tab a worksheet and she's got
8  that figure.
9      Q.  All right.  So you believe your wife
10  has a worksheet from which I can determine
11  your total repair costs for each of these
12  properties?
13      A.  Yes, I'm almost sure she does.
14      MR. BLANCHARD:
15          Well, Karl, we haven't received
16      those worksheets.  So I am going to
17      request those as well.
18      MRS. AIDA KOCH:
19          I just want to say one thing.
20      MR. WIEDEMANN:
21          No.  No, ma'am, no.
22      MRS. AIDA KOCH:
23          No?
24      MR. BLANCHARD:
25          No.

Page 219

1  EXAMINATION BY MR. BLANCHARD:
2      Q.  Have you been able to repair your
3  properties for less than the insurance
4  proceeds that you received?
5      A.  That, I couldn't tell you, because I
6  don't know what I really got from the
7  insurance and what it cost for the properties
8  to be repaired.  I'd have to refer to my wife
9  and ask her that question.
10      Q.  So she's a better person to go to
11  for that?
12      A.  She's a better person with numbers
13  and figures than I am.
14      Q.  So after I look at these insurance
15  files that you have and her worksheets I
16  should be able to determine that?
17      A.  You should be able to determine
18  that.
19      Q.  Mr. Koch, do you know what a class
20  action is?
21      A.  Let see.  A class action is a group
22  of people to form a lawsuit.  Right?
23      Q.  Is that your understanding?
24      A.  Well, it's a group of people that
25  has one aim in mind, is to form a lawsuit

Page 220

1  against a company.  Right?
2      Q.  Do you understand that you're a
3  class representative in this lawsuit?
4      A.  Yes, I do.
5      Q.  When did you learn that you'd be a
6  class representative?
7      A.  Oh, sometime back.  I don't know the
8  exact date.  But it was the first time that I
9  went to see Brian Gilbert's office that he
10  told me he picked me as a class representative
11  for the lawsuit.
12      Q.  Did you have a prior relationship
13  with Mr. Gilbert before you saw him?
14      A.  No, I did not.
15      Q.  Have you ever retained Mr. Gilbert
16  in any lawsuit other than the one we're here
17  for today?
18      A.  No, I have not.
19      Q.  Have you ever retained Mr. Wiedemann
20  in any lawsuit other than the one we're here
21  for today?
22      A.  No, I have not.
23      Q.  Who do you understand you are
24  representing in this case?
25      A.  I am representing the people that

Page 221

1  got flooded.  As I said, I am representing the
2  people that got flooded in the Lower Ninth
3  Ward and in St. Bernard Parish.
4      Q.  Have you been a class representative
5  in any other lawsuit?
6      A.  No, I haven't.
7      Q.  Are you a class representative in
8  the lawsuit filed by your New York lawyer?
9      A.  No, I am not.
10      Q.  You told me earlier that you
11  estimated your property damage claim at
12  $700,000; right?
13      A.  Right.
14      Q.  And your personal injury claim at
15  $50,000; right?
16      A.  Yes.
17      Q.  So your total claim you believe is
18  $750,000?
19      A.  Yes.
20      Q.  If the Court in this case decides
21  that this case cannot go forward as a class
22  action, will you be continuing this lawsuit in
23  an individual capacity?
24      A.  That, I don't know.  I haven't made
25  up my mind yet.

56 (Pages 218 to 221)

KOCH, HERMAN

8/8/2008

| Page 222 |
| --- |

1      Q.  Have you spoken to any other class
2  members in this lawsuit?
3      A.  No, I haven't.
4      Q.  Have you talked to any class
5  representatives in this lawsuit?
6      A.  No.
7      Q.  Do you know the names of any other
8  class representatives?
9      A.  No, I don't.
10      Q.  Do you know whether or not you're
11  representing different subclasses in this
12  case?
13      A.  Subclasses?  Can you define
14  "subclasses" for me?
15      Q.  What sort of damage claims do you
16  think you are representing the class on in
17  this case?
18      A.  What is -- Yeah, but you never told
19  me what is a subclasses yet.
20      Q.  Well, I changed the question, Mr.
21  Koch.
22      A.  What do you mean by "subclasses"?
23      Q.  Well, --
24      A.  Well, okay, you changed --
25      Q.  I am striking the question and

| Page 223 |
| --- |

1  asking you this question.
2      A.  Okay.
3      Q.  You understand you're a class rep in
4  this case; correct?
5      A.  Yes.  Yes.
6      Q.  And for what sort of damages or
7  claims are you representing this class for?
8      A.  For all that the people lost in the
9  storm Katrina and Rita such as their houses,
10  their appliances, their automobiles, and all
11  like that.  This is what I am representing
12  these people for.
13      Q.  Do you understand that there will be
14  expenses associated with this lawsuit?
15      A.  Yes, I do.
16      Q.  Who will be paying those expenses?
17      A.  My lawyers.
18      Q.  By your lawyers, you mean Mr.
19  Wiedemann?
20      A.  Mr. Wiedemann, yes, Karl and
21  Edward.  That's part of it.
22      Q.  Has anyone given you an estimate of
23  the cost of this lawsuit?
24      A.  No.
25      Q.  Do you have any estimate of the

| Page 224 |
| --- |

1  total costs in this lawsuit?
2      A.  No, I have not.
3      Q.  Is it your understanding that you
4  will have any financial obligations with
5  respect to the costs associated with this
6  lawsuit?
7      A.  No.  I haven't -- As far as them
8  charging me anything, no, they haven't charged
9  me anything.
10      Q.  Have you paid any costs in
11  association with this lawsuit?
12      A.  No.
13      Q.  Have you received any bills for
14  costs associated with this lawsuit?
15      A.  No.
16      Q.  Have you ever filed for bankruptcy?
17      A.  No.
18      Q.  Have you ever been convicted of a
19  crime?
20      A.  No.
21      Q.  Have you ever been subject to a
22  restraining order?
23      A.  No.
24      Q.  How did you come about to hire your
25  lawyers in this case?

| Page 225 |
| --- |

1      A.  I seen it advertised in the paper or
2  some place.  They were advertising for people
3  that got flooded and -- in the Lower Ninth
4  Ward and in St. Bernard Parish.
5      Q.  And what name do you remember seeing
6  on the ad?
7      A.  I remember seeing Brian Gilbert's
8  name.
9      Q.  What did you do after you saw this
10  ad?
11      A.  Well, he had his name and his -- his
12  phone number and it said to contact him.  So I
13  contacted Brian.  Brian Gilbert.
14      Q.  Have you ever met with Mr. Gilbert?
15      A.  Not prior to that, no.
16      Q.  Well, have you ever met with him at
17  any time?
18      A.  No.
19      Q.  Did you ever meet with Mr. Wiedemann
20  or Mr. Moreno before today?
21      A.  No.
22      Q.  Have you ever had any other
23  conversations over the telephone with Mr.
24  Gilbert other than the first conversation you
25  had?

57 (Pages 222 to 225)

KOCH, HERMAN

8/8/2008

---

Page 226

1       MR. WIEDEMANN:
2         Let me just caution the witness
3    not to talk about anything you may
4    have discussed with your attorneys.
5    Subject to that, you can answer the
6    question.
7       THE WITNESS:
8         Would you repeat the question,
9    please?
10   EXAMINATION BY MR. BLANCHARD:
11      Q.  Sure.  I am not asking you for the
12   content of the conversation.  You told me
13   earlier that you had a conversation with Mr.
14   Gilbert after you saw the ad in the paper.
15      A.  Right.
16      Q.  Right?
17      A.  Right.
18      Q.  After that time did you have any
19   other conversations with him over the
20   telephone?
21      A.  Not that I can remember, no.
22      Q.  Do you have a written agreement with
23   your lawyers in this lawsuit?
24      A.  Yes, I think.  Yes.
25      Q.  Did the agreement that you have with

---

Page 227

1    your lawyers say that those lawyers would
2    represent you with respect to any claims you
3    might have against the United States
4    government?
5       A.  I don't remember having that
6    clause.  It might have, but I don't remember
7    seeing that.  I can't answer that.
8       Q.  Have you ever attended any of the
9    hearings in this case?
10      A.  No.
11      Q.  Did you attend the trial involving
12   Ingram and Domino in this case?
13      A.  No.
14      Q.  Have you attended any depositions in
15   this case other than the one we're here for
16   today?
17      A.  No.
18      Q.  Have you reviewed any of the papers
19   that your lawyers have filed in court?
20      A.  No.
21      Q.  Have you ever seen a copy of the
22   Complaint that was filed on your behalf in
23   court?
24      A.  No.
25      Q.  Mr. Koch, I'm going to show you a

---

Page 228

1    document previously marked as Exhibit Koch
2    Number 2, which is Supplemental Answers to
3    Interrogatories propounded by Barge Entities.
4    I ask you to take a quick look at that.
5         This is a document that you
6    testified that you reviewed earlier today.  Is
7    that correct?
8       A.  Yes.  Yes.  Uh-huh (affirmatively).
9       Q.  And when you reviewed that document,
10   did you pay particular attention to the
11   portions of it that related to you?
12      A.  Yes, I did.
13      Q.  And when you looked at those
14   particular portions that dealt with you, was
15   the information in those responses accurate?
16      A.  Yes, they were.
17         They have one accusation that, if
18   I can remember right, in one -- it only
19   mentioned that I had one apartment at 8545 and
20   47.  That was the inaccuracy I seen in one of
21   them.  Whereas I had -- it was a duplex and
22   they had it down as a single dwelling.  Now, I
23   don't know which one it was, but I remember
24   one of them --
25      Q.  Other than that, do you remember

---

Page 229

1    anything else in those responses that was
2    inaccurate?
3       A.  No.  No, I don't.
4       Q.  I'm going to show you an exhibit
5    marked as Koch Number 31, which is a
6    verification form.  Is that your signature on
7    the document marked as Koch Exhibit 31?
8       A.  Yes, that's my signature.
9       Q.  And before you signed that, did you
10   read that verification?
11      A.  Yes, I did.
12      Q.  And when you signed that, did you
13   verify that all of the interrogatory responses
14   that had been provided in this case on your
15   behalf were accurate?
16      A.  Yes.
17      Q.  Mr. Koch, there's a section in that
18   interrogatory related to Interrogatory number
19   26.  Maybe your lawyer can direct that portion
20   to you.
21      A.  26.
22      Q.  You see that, Mr. Koch?
23      A.  Yes.  Yes, I see it.
24      Q.  And that question concerned every
25   item of damages which you seek in this case.

---

Johns Pendleton Court Reporters                    800 562-1285

BARGE001262

KOCH, HERMAN

8/8/2008

| Page 230 |
| --- |

1   Is that correct?
2       A.   Yes.
3       Q.   And do you see there's a section in
4   that answer that relates to you and your
5   wife?  Do you see that?
6       A.   Me and my wife?  Oh, yes it says on
7   top, it says "Aida and Herman Koch seek
8   damages for".  Is that the part you're talking
9   about right here?
10      Q.   Yes.
11      A.   Uh-huh (affirmatively).
12      Q.   The first item on that list is "Past
13  and future mental pain, suffering, and
14  anguish".  Do you see that?
15      A.   Yes.
16      Q.   What did you mean by that item?
17      A.   Well, my wife had two heart attacks
18  and she was under a lot of stress throughout
19  this whole ordeal.  Plus the fact that I was
20  under a lot of stress, too.  This is what is
21  meant by future mental pain.  And we still are
22  suffering from some of the after-effects of
23  it.
24      Q.   So you blame your wife's heart
25  attacks on the damage from the hurricane?

| Page 231 |
| --- |

1       A.   Well, I think it was a big part of
2   it, yes.  She was under a great mental
3   strain.  And strain is one of the main enemies
4   of your heart, strain.  Especially mental
5   pain.
6       Q.   Are you claiming that you were
7   physically injured in the storm?
8       A.   No, I am not claiming that I was
9   physically injured, no, I wasn't.
10      Q.   So in this item you personally are
11  seeking recovery for your own mental pain?
12      A.   Yes.
13      Q.   And describe for me the mental pain,
14  suffering, and anguish that you are making a
15  claim for.
16      A.   Well, after the storm there were
17  nights when I couldn't even sleep.  I kept
18  thinking about this night after night, all the
19  houses, what I have worked for my whole life
20  was destroyed in one day.  And the more I
21  thought about it, the madder I got.  And it
22  was a strain on me.  It really was.  I felt
23  like punching the walls.  You don't know me.
24  And I know -- I know, man, it took a big toll
25  on me.

| Page 232 |
| --- |

1       Q.   Have you been to a psychiatrist
2   since Hurricane Katrina?
3       A.   No.  No, I haven't.
4       Q.   Have you been to a psychiatrist in
5   any time in your life?
6       A.   No.
7       Q.   Have you been to a psychologist
8   since Katrina?
9       A.   No.
10      Q.   At any time in your life have you
11  been to a psychologist?
12      A.   No, never have.
13      Q.   Have you taken any medications for
14  stress since Katrina?
15      A.   Well, I've had headaches and I took
16  aspirins and Aleve, if that's what you mean by
17  -- by some kind of form of relief for
18  headaches.  Because I know I get mad and I get
19  these pounding headaches.
20      Q.   Have you taken any prescription
21  medications?
22      A.   No.
23      Q.   Did you take any prescription
24  medications for mental pain or suffering at
25  any time before Katrina?

| Page 233 |
| --- |

1       A.   No.
2       Q.   You're able to function, though, Mr.
3   Koch, regardless of your emotional distress;
4   right?
5       A.   Yes, because you've got to overcome
6   this some kind of way.
7       Q.   Your appetite is okay?
8       A.   Yes.
9       Q.   You enjoy time with your wife and
10  your family?
11      A.   Yes.
12      Q.   Your son, one of your sons, Mr.
13  Koch, has been convicted of a crime?
14      A.   Yes, he has.
15      Q.   Is he in jail?
16      A.   No, he's out on bond.
17      Q.   Is he going to have to serve a
18  prison term?
19      A.   Yes.
20      Q.   For what?  What was the offense?
21      A.   He was accused of going and selling
22  drugs.
23      Q.   That event has caused you quite a
24  bit of mental pain and suffering, hasn't it?
25      A.   I would say so, yes.

59 (Pages 230 to 233)

KOCH, HERMAN

8/8/2008

Page 234

1      Q.  And is the mental pain and stress
2   that you've had because of your son's pending
3   incarceration, is that more than the stress
4   that you incurred during Katrina?
5      A.  I don't know.  It's a toss-up.  You
6   could take your pick.  They're both hard.
7      Q.  Have you had any marital problems
8   since the storm?
9      A.  No.
10     Q.  What about before the storm?
11     A.  No.
12     Q.  You and your wife ever engage in any
13  counseling before the storm?
14     A.  No.
15     Q.  So the relationship with your wife
16  is good?
17     A.  Yes.
18     Q.  As good now as before the storm?
19     A.  Yes.
20     Q.  Is it better now than before the
21  storm?
22     A.  Well, we seem to be a little bit
23  closer now, because ever -- because since we
24  retired, I am closer with my wife now.  And
25  then after the storm, too, I guess I'm close.

Page 235

1      Q.  Have you spoken to friends and
2   acquaintances that lived near you in Chalmette
3   at the time of the storm?
4      A.  Yes, I have spoken to them.
5      Q.  And you mentioned for you
6   specifically your items of emotional
7   distress.
8      A.  Uh-huh (affirmatively).
9      Q.  For your friends or other people
10  that you know that lived in Chalmette or the
11  Lower Ninth Ward, have any of them reacted
12  differently to Katrina as far as stress goes
13  than you?
14     MR. WIEDEMANN:
15        I object to the form of the
16     question, in that how would he know as
17     a lay person how his friends have
18     reacted to a certain situation?
19        Subject to that, you can answer
20     the question if you can.
21     THE WITNESS:
22        Well, my friends was distressed,
23     too, I know, because they were going
24     and telling me that they would never
25     come back to Chalmette and St. Bernard

Page 236

1   ever after what happened, because they
2      also lost everything they had down
3      there.
4   EXAMINATION BY MR. BLANCHARD:
5      Q.  Did anybody that you know living
6   within Chalmette or the Lower Ninth Ward, and
7   by Chalmette I mean west of Paris Road, did
8   any of those persons ever tell you that they
9   needed to see a psychiatrist or psychologist
10  as a result of the stress they endured during
11  and after the storm?
12     A.  No.
13     Q.  Now, you told me earlier that you
14  blame your wife's heart attacks on the stress
15  from the damage in the storm; right?
16     A.  Yes, I do.
17     Q.  And you personally have not had any
18  physical injuries as a result of the stress
19  from the storm, have you?
20     A.  No, but there were many nights
21  when I couldn't sleep.
22     Q.  Do you know anyone living in the
23  Lower Ninth or Chalmette west of Paris Road
24  that has been unable to return to work after
25  Katrina?

Page 237

1      A.  Unable to return to work?  I can't
2   answer that offhand, but I am sure there's a
3   lot of people that lost jobs on account of
4   Katrina.  Their jobs are no longer here.
5      Q.  The second item of damages in
6   Interrogatory 26, past and future mental
7   healthcare expenses, do you see that?
8      A.  Would you repeat that?  Past and
9   future mental healthcare expense?
10     Q.  You see that?
11     A.  Yes, uh-huh (affirmatively).
12     Q.  And that's an item of damage you
13  identified in this response to
14  interrogatories; correct?
15     A.  Uh-huh (affirmatively), right.
16     Q.  What past mental health expenses are
17  you talking about?
18     A.  What past mental health expenses am
19  I talking about?  Well, as far as me going to
20  a psychiatrist, I never went to a
21  psychiatrist, but I have had a lot of mental
22  stress on me, you know.  And I still got it on
23  me.  Every time I think of the storm, I have
24  mental stress.
25     Q.  But you haven't had to pay anybody

60 (Pages 234 to 237)

KOCH, HERMAN

8/8/2008

Page 238

1  for mental healthcare, have you?
2      A.  No.  No, I haven't paid anybody,
3  because I'm a strong person and I got a strong
4  character.  Whereas I know anybody who is
5  weaker than me might have buzzed out.  I don't
6  know.
7      Q.  Because there are some people that
8  are weaker than you?
9      A.  I would imagine so.  Because, of
10  course, I've heard about this, I can't confirm
11  it, but I've heard that people have even went
12  and committed suicide on account of this.
13      Q.  So those people have coped with the
14  effects of Katrina less well than you have?
15      A.  Right.
16      Q.  Do you anticipate any future mental
17  healthcare expense?
18      A.  I can't answer that.
19      Q.  Go to the interrogatory, Mr. Koch.
20  The next item, past and future loss and
21  destruction and damages to immovable and
22  movable property.  Do you see that?
23      A.  Yes.  I see it.
24      Q.  And by that --
25      A.  Okay.  You talking about stuff like

Page 239

1  -- stuff like automobiles or refrigerators?
2  Immovable and movable property?  Or what does
3  that mean?
4      Q.  Well, it's contained in your
5  responses.  What does it mean to you?
6      A.  Well, that means like if you lost an
7  automobile or if you lost a washing machine,
8  refrigerators and all in your properties,
9  that's what that means to me.  Damage to
10  immovable and movable property.  That means
11  like your house is an immovable property.  If
12  you lost that, this is what this means.
13      Q.  And you're claiming those damages in
14  this lawsuit?
15      A.  Right.
16      Q.  And you're also claiming those same
17  damages against the government, aren't you?
18      A.  Yes.
19      Q.  The next item, past and future loss
20  of use of immovables and movables, do you see
21  that?
22      A.  Yes.
23      Q.  What did you mean by that?
24      A.  Past and future loss?  Well, if I
25  have a -- something that is operating now,

Page 240

1  maybe in two or three days it won't be
2  operating.  It'll be broke due to the fault of
3  Katrina.
4      Q.  Are you claiming these same damages
5  against the United States government?
6      A.  Yes, I am.
7      Q.  The next item, past and future
8  expenses for demolition and salvage of
9  immovable and movable property.  Mr. Koch,
10  have you spent any money trying to salvage any
11  of your movables?
12      A.  There -- There were things that I
13  tried to save in my houses that I couldn't
14  save.
15      Q.  Did you incur any expenses in doing
16  that?
17      A.  Well, I had to get the house gutted
18  and all of that stuff.  That's what they're
19  talking about.  I had to get other people's
20  stuff out.  Like they had the people that was
21  in my houses that had their furniture in
22  there.  This is movable stuff that cost me
23  money in order to get their stuff out.  I call
24  them to come and get it, but they wouldn't
25  come.  And so when they wouldn't come, I told

Page 241

1  them, I said, "Well, I'll throw it out.  I
2  have to get rid of it."  They tell me, "Well,
3  more or less you do what you want to it.  We
4  can't use it."
5      Q.  Diminution of property values.  What
6  did you mean by that?
7      A.  Okay.  After the storm, is my
8  property value going to be worth the same
9  thing it was before Katrina?  I doubt it very
10  much.
11      Q.  Some of your properties -- Well,
12  your properties in Chalmette that have been
13  renovated, --
14      A.  Uh-huh (affirmatively).
15      Q.  -- those properties, now that they're
16  renovated, are nicer than they were before the
17  storm; isn't that true?
18      A.  It might be true, but that doesn't
19  point to the property value if I want to sell
20  it, that I would get more than I would get
21  before the storm, would it?
22      Q.  You're renting those properties;
23  right?
24      A.  I agree with you.  I am renting
25  them.

61 (Pages 238 to 241)

BARGE001265

KOCH, HERMAN

8/8/2008

Page 242

1    Q.  And so far your experience has been
2  that the rentals you get now are higher than
3  before the storm; correct?
4    A.  Well, there's one thing you're
5  missing.
6    Q.  Just answer the question, sir.
7    A.  Yes.  Yes, that's true.
8    Q.  Thank you.  You're claiming the same
9  diminution of property values against the
10  government, aren't you?
11    A.  Yes, I am.
12    Q.  The next item, past and future loss
13  and destruction of businesses and business
14  assets, what do you mean by that?
15    A.  Past and future loss and destruction
16  of businesses and business assets.  Well, by
17  that, it might not be easy to rent this
18  property as it was in the past, because it --
19  anyone can tell the population has not come
20  back to St. Bernard.  The population has not
21  come back here.  It's harder to rent
22  properties because people have left.  And
23  after three years, these people, if they're
24  not here in three years, they're not coming
25  back.

Page 243

1    Q.  You're renting 3409 Shangri La?
2    A.  Right.  Right.  But it took -- It's
3  --
4    Q.  How long did it take you to rent
5  that property?
6    A.  Oh, I guess about two to six -- No,
7  not six weeks.  I guess from two to three
8  weeks.
9    Q.  How long did it take you to rent
10  3411 Shangri La?
11    A.  A little bit longer.
12    Q.  So how long?
13    A.  Maybe a week longer.  Or possibly a
14  week and a half.
15    Q.  And this item, past and future loss
16  and destruction of businesses and business
17  assets, you're seeking those same damages
18  against the government, aren't you?
19    A.  Yes.  Yes, I am.
20    Q.  Past and future lost profit and past
21  and future lost income, past and future lost
22  earning capacity, and past and future lost
23  business opportunity, are those any different
24  than the past and future loss of business that
25  you told me about earlier?

Page 244

1    A.  Past and future lost business
2  opportunity.  Yes, you got to realize that
3  these houses were for almost three years where
4  I never got a penny out of them due to Katrina
5  and Rita and flooding from the storm.
6    Q.  So you --
7    A.  I lost all of this income for almost
8  three years now since the storm.
9    Q.  So your claim for loss of income in
10  this case relates solely to the lost income,
11  rental income on your rental properties; is
12  that correct?
13    A.  Well, it's not only the loss of
14  that.  Look at the stress that my wife and I
15  had to go through from the storm.
16    Q.  I am specifically talking about loss
17  of business or income here.  The only income
18  you lost specifically related to the lost
19  rentals on your rental properties; correct?
20    A.  Yes, plus the fact we had to get
21  people to fix them and you have to fight with
22  contractors constantly night and day.
23    Q.  Well, Mr. Koch, let me ask the
24  question again, because I want to limit it to
25  lost income.

Page 245

1    A.  Uh-huh (affirmatively).
2    Q.  I am not trying to trick you here.
3  I am just telling you --
4    A.  Okay.
5    Q.  -- the lost income that you have
6  here is the loss of the rentals on your rental
7  property?
8    A.  Plus, I think.
9    Q.  Okay.
10    A.  Yeah.  Yeah, okay.
11    Q.  I mean, you have other expenses, I
12  know.
13    A.  Right.
14    Q.  But when you're talking about lost
15  income, you're talking about loss of rental
16  income; right?
17    A.  Right.  Right.  Right.
18    Q.  And when you look at that loss of
19  rental income, obviously to determine your
20  lost income, you have to look at the gross
21  receipts that you lost on the rentals less
22  your anticipated expenses; correct?
23    A.  Yes.
24    Q.  All right.  These items, past and
25  future lost income, past and future lost

62 (Pages 242 to 245)

KOCH, HERMAN

8/8/2008

Page 246

1  profit, past and future lost earning capacity,
2  past and future lost business opportunities,
3  you're claiming those same damages against the
4  United States government, aren't you?
5      A.  Yes.
6      Q.  The next item, past and future loss
7  of enjoyment of lifestyle, what do you mean by
8  that?
9      A.  Well, the storm went and it ruined
10 our whole lifestyle.  Because we lost a lot of
11 friends that never came back.  We have lost
12 the opportunity of having hospitals around our
13  -- our house there.  And we lost the stores
14 that was around there.  And it has put a real
15 crink in our lifestyle because we have lost a
16 lot of friends that will never come back.
17 Plus the fact of the convenience it was to
18 live around there.  This was an ideal
19 location.  It wasn't but 15 or 20 minutes to
20 downtown New Orleans.  It was right around the
21 corner from a hospital.  We were right in a
22 section where they had a lot of stores like
23 Wal-Mart and a lot of restaurants.  And from
24 here to where I am at now in Picayune, it's a
25 big difference.  It's a big difference.

Page 247

1      Q.  Why did you decide to relocate to
2  Picayune?
3      A.  Well, I -- I had -- After -- I had
4  no other place to go.  I didn't know if I was
5  going to sell my properties or if I was going
6  to rebuild them.  So this is why I went to
7  Picayune, in order to think a little bit and
8  to be by myself and with my wife so her and I
9  could talk this over.
10     Q.  Do you plan to stay in Picayune?
11     A.  I don't know.  I really don't know.
12     Q.  You're also claiming these same
13 damages against the United States government;
14 correct?
15     A.  Yes.
16     MR. WEBB:
17       Can we take a quick break?
18     MR. BLANCHARD:
19       Yes.  I have got about ten or
20     fifteen minutes left.  So let's have
21     one last break.
22     (Recess.)
23 EXAMINATION BY MR. BLANCHARD:
24     Q.  Mr. Koch, you remember earlier that
25 you told me today before your deposition you

Page 248

1  reviewed some of your Answers to
2  Interrogatories?  Do you remember that?
3      A.  Answers to Interrogatories?  Let's
4  see.  What is Answers to Interrogatories?  Oh,
5  yeah.  Yeah.  Okay.
6      Q.  You remember 1, 2, and 3, we went
7  over that earlier and you said those were the
8  documents that you had reviewed in advance of
9  your deposition here today.
10     A.  Yeah.  Right.
11     MR. WIEDEMANN:
12       Referring to Exhibits 1, 2 and
13     3.
14     THE WITNESS:
15       Oh, okay.  Yeah.  Yeah.
16     MR. WIEDEMANN:
17       That's 2.
18     THE WITNESS:
19       This is 2 here.  Okay.
20 EXAMINATION BY MR. BLANCHARD:
21     Q.  And you told me you went through
22 that, and everything was accurate except for
23 the discrepancy concerning one of your rental
24 properties.
25     A.  They had a part in here about 8545

Page 249

1  and 47.  I think they only mentioned 8547 and
2  they never mentioned 8545.  I think that was
3  the only error that I found.  And it was on
4  the front -- front of it, I think.  I don't
5  see it here.
6      Q.  And we also previously identified
7  Koch 31, which was your verification you
8  signed on May 19, 2008.  Right?
9      A.  Yes.  Yes.  This looks like my
10 signature.
11     Q.  And you read that before you signed
12 it?
13     A.  Uh-huh (affirmatively).
14     Q.  Is that a "yes"?
15     A.  Yes.
16     Q.  Thank you.  I want to draw your
17 attention, Mr. Koch, to Exhibit Number 1.
18     A.  Okay.
19     Q.  Specifically Interrogatory number 35
20 on page 36.
21     A.  Okay.
22     Q.  You see the question?  The question
23 is "Identify by court and docket number each
24 civil or criminal proceeding in which any
25 individual Plaintiff or proposed class

63 (Pages 246 to 249)

KOCH, HERMAN

8/8/2008

Page 250

1 representative has been a party." Do you see
2 that?
3     A.  Yes, I see it.
4     Q.  Mr. Koch, when you read this, you
5 understood that "civil proceeding" meant a
6 lawsuit; isn't that correct?
7     A.  Civil proceeding meant a lawsuit?
8 What are you referring here to?  I mean --
9     Q.  Well, the question had "Identify by
10 court and docket number each civil or criminal
11 proceeding in which any individual Plaintiff
12 or proposed class representative has been a
13 party."  Do you see that?
14     A.  Yes.
15     Q.  And did you understand in that
16 question you were being asked about any other
17 lawsuits that you were involved in?
18     A.  Oh, yes.  Yeah.  Yeah.  Okay.  But
19 sometimes I forget it because it was so long
20 ago that, I mean, it's been -- Like the one in
21 New York, you know, with these lawyers, I
22 haven't heard from them in such a long time
23 that I don't know if it was still on or not,
24 you know.
25     Q.  But when you -- That was a lawsuit

Page 251

1 that you got involved in after Katrina;
2 correct?
3     A.  Right.  Right.
4     Q.  And when you answered this, I want
5 you to turn to page 38, there's a note, "Has
6 submitted administrative and/or Form 95
7 claims."  Correct?
8     A.  Right.
9     Q.  You didn't identify the New York
10 lawsuit at that time, did you?
11     MR. WIEDEMANN:
12         I object to the form of the
13     question.  This man has already
14     testified that he believed the SF-95
15     was one and the same as the New York
16     lawsuit.  In addition, this document
17     has been supplemented and/or
18     superseded on several occasions.
19     MR. BLANCHARD:
20         And we'll --
21     MR. WIEDEMANN:
22     Counsel, please.
23     MR. BLANCHARD:
24         All right.  I'll wait.  I'll
25     wait.

Page 252

1     MR. WIEDEMANN:
2         And subject to my objection, I
3     certainly would allow Mr. Koch to
4     answer any questions in that regard.
5     MR. BLANCHARD:
6         Well, first off, I'd ask, Mr.
7     Wiedemann, that you limit your
8     objections to stating the objection
9     and the grounds for the objection with
10     one word or less instead of a
11     commentary.  The second item is you're
12     mischaracterizing his testimony.
13     Certainly he's testified, and it's
14     clear on the record, that his New York
15     case is separate from the SF-95 form.
16 EXAMINATION BY MR. BLANCHARD:
17     Q.  Subject to that and your lawyer's
18 commentary here, the response that you had in
19 connection with this interrogatory said "Has
20 submitted administrative and/or Form 95
21 claims"; right?
22     A.  Right.  But --
23     Q.  That's correct.
24     A.  Okay.
25     Q.  All right.

Page 253

1     A.  Yes.  Right.
2     Q.  And at the time that this
3 interrogatory was provided, which is December
4 28, 2007, at that time you had pending the
5 case filed by your New York lawyers; isn't
6 that true?
7     A.  Yes.  Yes.
8     Q.  When you were answering these
9 interrogatories, did you ever indicate to your
10 current lawyers that you had this other
11 lawsuit pending in New York?
12     A.  No.  No.  I don't think so.
13     Q.  Mr. Koch, Exhibit Koch Number 2 is a
14 document entitled "Supplemental Answers to
15 Interrogatories Propounded by Barge Entities"
16 dated January 24, 2008.  I want to draw your
17 attention to Interrogatory number 35, which is
18 the same interrogatory, "Identify by court and
19 docket number each civil or criminal
20 proceeding in which any individual Plaintiff
21 or proposed class representative has been a
22 party."  It's the same question.  All right?
23 And under that item there's a supplemental
24 answer.  Do you see that?
25     A.  Okay.  Supplemental answer to

64 (Pages 250 to 253)

BARGE001268

KOCH, HERMAN

8/8/2008

Page 254

1  Interrogatory number 36?
2     Q.  35, I believe.
3     A.  Okay.  35?  Doris Shanks?
4     Q.  Right.  There's a reference to Miss
5  Shanks.  There's no reference to you in that
6  supplemental response, is there?
7     A.  No, but --
8     Q.  That's all.  There's no reference to
9  you; correct?
10    A.  Not -- Not that I can see.
11    Q.  Thank you.
12    A.  I tell you what.  Can I say
13 something?  These lawyers in New York and that
14 Form 95, I signed one with them and then
15 sometime later I signed another one.  I think
16 this is where the confusion is coming in.  It
17 was two Form 95s I signed.  But I -- They had
18 two forms I must have signed and I forgot
19 which one was which and I signed both of
20 them.
21    Q.  But you certainly have retained a
22 New York lawyer?
23    A.  Yes, I have retained a New York
24 lawyer and I must have signed a 95 form with
25 him, too.  Then some months later I signed

Page 255

1  another one and I didn't have a lawyer and I
2  just went and sent it in.
3     Q.  And the lawyer that you have in New
4  York, it's your understanding that he's
5  representing you in a matter against the
6  government?
7     A.  Yes.  Yes.  Yes.  But, of course, I
8  never heard from him in a long time.
9     Q.  Now, let's go to Koch Number 3,
10 which is dated July 3rd, 2008.  Again,
11 Interrogatory number 35, and this is a simple
12 question, Mr. Koch.  Your name isn't
13 referenced in the supplemental answer to
14 Interrogatory number 35, is it?
15    MR. WIEDEMANN:
16    Well I think Exhibit Number --
17 I'm sorry, is it 3?
18    MR. BLANCHARD:
19    Yes, 3.
20    MR. WIEDEMANN:
21    Exhibit Number 3 will speak for
22 itself without any input from Mr.
23 Koch.
24    But subject to that, take a look
25 at it.

Page 256

1     THE WITNESS:
2     What am I supposed to go --
3  EXAMINATION BY MR. BLANCHARD:
4     Q.  I am just asking you to confirm, Mr.
5  Koch, that your name isn't referenced in that
6  supplemental response.
7     A.  Okay.  I see a David Green, a Doris
8  Shanks, John Alford, Jr. and Jerry Alford,
9  Jimmie and Nellie Perry, Jocelyn Moses and
10 Anthony Dunn.  No.  No.  I don't see my name
11 there.  Jocelyn Carter.
12    Q.  Thank you.
13    A.  Oh, okay.
14    Q.  When you were answering the
15 interrogatories marked as Exhibit Number 1,
16 describe for me how you went about answering
17 those interrogatories.
18    A.  Number 1?
19    Q.  No, your answers in Koch Number 1.
20    A.  How I went answering what
21 questions?
22    Q.  Any of the questions.  Did you have
23 the interrogatories in front of you and you
24 wrote in the answers?  Is that how it
25 occurred?

Page 257

1     A.  I think they went and -- and they
2  sent me some -- some -- some questions to
3  answer and I just answered the questions.
4     Q.  So you wrote out the answers
5  yourself?
6     A.  Yes.
7     Q.  Were any lawyers in the room when
8  you answered any of these questions?
9     A.  No.  No.  In fact, I think the forms
10 was sent at the house to answer.  Because I
11 live so far.
12    Q.  Just one final question, Mr. Koch.
13 There were several groups of interrogatories
14 that were submitted --
15    A.  Uh-huh (affirmatively).
16    Q.  -- by your Counsel in this case.
17 After the first time that you filled out the
18 interrogatories, do you remember ever being
19 asked again to provide additional answers to
20 questions?
21    A.  Not that I can remember, no.
22    Q.  So at no time when you answered any
23 of the interrogatories in this case were there
24 any lawyers with you?
25    A.  No.

65 (Pages 254 to 257)

KOCH, HERMAN

8/8/2008

Page 258

1    MR. BLANCHARD:
2      I have no further questions.
3    MR. WIEDEMANN:
4      I just have one or two
5    questions.
6  EXAMINATION BY MR. WIEDEMANN:
7    Q.  Okay?  To your knowledge, Mr. Koch,
8  are you a named plaintiff in any other lawsuit
9  filed by a New York lawyer, a Philadelphia
10 lawyer, or any other lawyer?
11   A.  No.
12   MR. BLANCHARD:
13      Objection, asked and answered.
14 EXAMINATION BY MR. WIEDEMANN:
15   Q.  When you filed that Form SF-95, how
16 did you learn about the necessity for filing
17 an SF-95?
18   A.  I think that lawyer sent me that
19 form in the mail and he asked me to fill it
20 out.  I think this is how I got hold of that
21 form.  And then on the second one I filled
22 out, because I think I filled out two of them,
23 I -- I also filled out another form and sent
24 it in, but I don't know who I sent it in to,
25 the Federal government or what.  That's where

Page 259

1  the confusion comes in.  I filled out two of
2  these 95 forms.  I think that's how it comes.
3  And now the second one, I went and I --
4  because the government asked people if they
5  had any damages or something, so I got one of
6  the forms and somebody said, "Send it in to
7  the government if you had any property loss."
8  So I sent it in.  But I didn't go and think
9  about the other one I had sent in previously
10 to the one in New York.  But he sent me a
11 form, too, I'm thinking.
12   Q.  One final thing.  Did you know of
13 any other people, friends, family,
14 acquaintances, that filed SF-95s?
15   A.  No.
16   MR. WIEDEMANN:
17      Thank you.  Okay.
18 EXAMINATION BY MR. BLANCHARD:
19   Q.  One follow-up.  We previously
20 identified an SF form dated October 22nd, 2006
21 as Koch 23.  Do you see that?
22   A.  Uh-huh (affirmatively).
23   Q.  Do you see that?
24   A.  Uh-huh (affirmatively).
25   Q.  You have to answer "yes" for the

Page 260

1  record.
2    A.  Yes.  Yes.  Yes.
3    MR. WEBB:
4      He hasn't figured out how to
5  spell "uh-huh" yet.
6    THE WITNESS:
7      No, but what I am figuring --
8  EXAMINATION BY MR. BLANCHARD:
9    Q.  Let me ask a question, sir.
10   A.  Okay.
11   Q.  You have just testified that you
12 filled out now you believe two SF-95 forms.
13   A.  Yes.
14   Q.  Is that correct?
15   A.  Yes.  This is what I must have did.
16   Q.  All right.  Do you have a copy of
17 the other SF-95 form?
18   A.  I don't know if I have a copy or
19 not.  I have to look and see.
20   Q.  If you have a copy, will you agree
21 to provide it to your lawyers?
22   A.  I surely will.
23   MR. BLANCHARD:
24      I don't have any other questions,
25   but I am going to leave this

Page 261

1  deposition open pending the additional
2  documents that we have requested in
3  this case and, depending on what's in
4  those documents, we reserve the right
5  to depose him on those documents.
6    MR. WIEDEMANN:
7      Okay.
8    MR. BLANCHARD:
9      So I will keep it open for that
10 purpose only.
11   MR. WIEDEMANN:
12      That being said and for future
13 reference, I'm going to note it's 6:02
14 and we started promptly at 1:00.  So
15 in accordance with any CMO, I just
16 want to keep track of the time.
17   MR. BLANCHARD:
18      Well, and just for purposes of
19 the record, too, we had discussions
20 with Brian about this earlier in the
21 week and we were informed that you
22 guys would not object to going past
23 6:00 based on the fact that we were
24 starting at 1:00 o'clock.
25   MR. WIEDEMANN:

66 (Pages 258 to 261)

KOCH, HERMAN

8/8/2008

Page 262

1    No, no, and we don't object to
2  going past 6:00.  Just going past
3  seven hours for any one deposition.
4    MR. BLANCHARD:
5      All right.  We haven't done that
6  in this case.
7    MR. WIEDEMANN:
8      No, of course, but if it's open,
9  it's possible.
10    MR. BLANCHARD:
11      I understand what you're saying.
12  Okay.
13          *   *   *
14
15
16
17
18
19
20
21
22
23
24
25

Page 263

2          WITNESS'S CERTIFICATE
3
4      I, HERMAN HILTON KOCH, read or have
5  had the preceding testimony read to me, and
6  hereby certify that it is a true and correct
7  transcription of my testimony, with the
8  exception of any attached corrections or
9  changes.
10
11
         _____
12          (Witness' Signature)
13  _____
    DATE SIGNED
14
15  DEPONENT PLEASE INITIAL ONE:
16
    _____ Read with no corrections
17
18  _____ Read and correction sheet attached
19
20
    DATE TAKEN:  AUGUST 8, 2008
21
22
23
24
25

Page 264

1
2          REPORTER'S CERTIFICATE
3
4      I, ROGER D. JOHNS, RMR, RDR, CRR,
5  Certified Court Reporter, do hereby certify
6  that the above-named witness, after having
7  been first duly sworn by me to testify to the
8  truth, did testify as hereinabove set forth;
9  that the testimony was reported by me in
10  shorthand and transcribed under my personal
11  direction and supervision, and is a true and
12  correct transcript, to the best of my ability
13  and understanding; that I am not of counsel,
14  not related to counsel or the parties hereto,
15  and not in any way interested in the outcome
16  of this matter.
17
18
19
20          ROGER D. JOHNS
21      CERTIFIED COURT REPORTER
22        STATE OF LOUISIANA
23
24
25

67 (Pages 262 to 264)