LEXSEE 1999 U.S. DIST. LEXIS 5627



Caution
As of: Sep 29, 2008

### IN THE MATTER OF TT BOAT CORPORATION AS OWNER, AND TIDEWATER MARINE, INC. AS OWNER PRO HAC VICE OF THE TUG GULF CAJUN PRAYING FOR EXONERATION FROM OR LIMITATION OF LIABILITY

### CIVIL ACTION NO. 98-494 SECTION "K"(5)

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

### *1999 U.S. Dist. LEXIS 5627*; *1999 AMC 2776*

### April 13, 1999, Decided
### April 14, 1999, Filed; April 15, 1999, Entered

**DISPOSITION:** [*1] Tidewater's Petition for Limitation of and/or Exoneration From Liability DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant submitted a petition, pursuant to *46 U.S.C.S. § 183 et seq.*, for limitation of or exoneration from liability in plaintiff's action for damages, after the barge defendant's tug boat was pushing collided with plaintiff's platform.

**OVERVIEW:** The court denied defendant's petition for exoneration in plaintiff's action arising from an allision between a barge driven by defendant's tug boat and plaintiff's platform. Despite low visibility, cluttered radar, and knowledge he was off course, the tug's first mate pressed on in bad weather. Defendant did not ensure the tug had properly updated charts that would have shown the location of the platform. The lack of updated charts made the tug unseaworthy. Under the Pennsylvania Rule, plaintiff had the burden at trial to prove that its failure to activate its foghorn could not be a cause of the allision, but this did not absolve defendant of liability. Defendant did not show that failure to use the foghorn was a

superseding cause, as there was no proof the foghorn would have been heard by the tug. Defendant was not entitled to limit its liability under *46 U.S.C.S. § 183(a)* because it had privity and knowledge of the unseaworthiness of the tug. That privity and knowledge was charged to defendant because of its failure to conduct reasonable inspections of the tug to ensure its seaworthiness, which would have indicated the lack of updated charts.

**OUTCOME:** The court denied defendant's petition to limit its liability for damages after defendant's tug steered a barge into plaintiff's platform, finding defendant's employees were the cause of the accident because of the lack of updated charts on the tug and failure to stop the tug during bad weather. Defendant was charged with knowledge of the tug's unseaworthiness because of its failure to inspect the vessel to ensure its seaworthiness.

**LexisNexis(R) Headnotes**

*Admiralty Law > Collisions > Liability > Presumptions*
*Admiralty Law > Collisions > Prevention > Acts of God*

1999 U.S. Dist. LEXIS 5627, *1; 1999 AMC 2776

*& Inevitable Collisions*

*Admiralty Law > Personal Injuries > Maritime Workers' Claims > Unseaworthiness > Burdens of Proof*

[HN1] Normally, the initial burden of proof in proving negligence or unseaworthiness in a maritime case rests on the claimants. However, it is well-established that there is a presumption of fault against a moving vessel that strikes a stationary object, such as a dock or navigational aid. In admiralty, this presumption is more than a mere requirement that the vessel produce some evidence; rather, the moving vessel must show that it was without fault, or that the collision was occasioned by fault of the stationary object or was the result of inevitable accident. The moving vessel must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required.

*Admiralty Law > Collisions > Liability > Burdens of Proof*
*Admiralty Law > Collisions > Liability > Presumptions*
*Admiralty Law > Collisions > Prevention > Regulatory & Statutory Duties > General Overview*

[HN2] Under the Pennsylvania Rule, when a vessel involved in an accident is shown to have breached a statute or regulation, it must show not only that its breach was not a contributory cause of the accident but that it could not have been. In effect, the burden of proof is shifted as to the causation issue once it is established that the vessel violated the statute or regulation. The Pennsylvania Rule applies wherever a statute or regulation that is intended to prevent collisions is violated. In addition, the Pennsylvania Rule applies even in mutual fault collision cases.

*Admiralty Law > Collisions > Liability > Burdens of Proof*
*Admiralty Law > Collisions > Liability > Presumptions*
*Admiralty Law > Collisions > Prevention > Regulatory & Statutory Duties > General Overview*

[HN3] That the Pennsylvania Rule shifts the burden does not mean that a violation of a statute or regulation is dispositive. A party in violation of a regulation may rebut the presumption of causation in a variety of ways. For example, the party may show that the violation was irrelevant because the casualty would have occurred regardless of the violation. Or, the party in violation may show that the fault was incurred as an error, in extremis, because the vessel was placed in a situation through no fault of its own, where collision was imminent, and the violation of the regulation was an emergency action taken to avoid a collision. Finally, the party in violation may offer expert testimony to show that the violation could not have caused the collision.

*Admiralty Law > Collisions > General Overview*
*Torts > Negligence > Causation > Proximate Cause > Intervening Causation*
*Torts > Negligence > Defenses > Comparative Negligence > General Overview*

[HN4] Each party may be held responsible if each party contributed to the cause of an allision.

*Admiralty Law > Personal Injuries > Maritime Tort Actions > Multiple Defendants > Contribution*
*Torts > Negligence > Causation > General Overview*
*Workers' Compensation & SSDI > Maritime Workers' Claims > Negligence*

[HN5] The superseding cause doctrine is similar and related to the principle of proximate causation. Under the superseding cause doctrine, a party may be exonerated from liability where its negligence substantially contributed to another party's injury but the injury was actually brought about by a cause of independent origin that was not foreseeable. The doctrine asks whether a defendant is to be held liable for an injury to which he has in fact made a substantial contribution, when it is brought about by a cause of independent origin, for which he is not responsible.

*Admiralty Law > Personal Injuries > Maritime Tort Actions > General Overview*
*Energy & Utilities Law > Exploration, Discovery & Recovery > General Overview*
*Torts > Negligence > Causation > Proximate Cause > Intervening Causation*

[HN6] The Fifth Circuit has explained that an intervening, negligent, act of a third person is not a superseding cause if one of the following scenarios exists: (a) the actor at the time of negligent conduct should have realized that a third person might so act, or (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

Case 2:05-cv-04182-SRD-JCW   Document 15549-62   Filed 09/29/08   Page 3 of 15

Page 3
1999 U.S. Dist. LEXIS 5627, *1; 1999 AMC 2776

*Admiralty Law > Shipping > Carrier Duties & Obligations > Limitations on Liability*
[HN7] See *46 U.S.C.S. § 183(a).*

*Admiralty Law > Personal Injuries > Maritime Tort Actions > Negligence > Burdens of Proof*
*Admiralty Law > Personal Injuries > Maritime Workers' Claims > Unseaworthiness > Burdens of Proof*
*Admiralty Law > Personal Injuries > Maritime Workers' Claims > Unseaworthiness > Limitations on Liability*
[HN8] To determine whether one is entitled to limit its liability under *46 U.S.C.S. § 183(a)*, the court must undergo a two-step analysis. First, the court determines which acts of negligence or unseaworthiness caused the casualty. Second, the court determines whether the vessel owner had knowledge or privity of these acts. Once a claimant proves negligence or unseaworthiness, the burden of proof shifts to the vessel owner to prove the lack of privity or knowledge.

*Admiralty Law > Shipping > Carrier Duties & Obligations > Limitations on Liability*
[HN9] Privity and knowledge is established where the means of obtaining knowledge exists, or where reasonable inspection would have led to the requisite knowledge. Knowledge is not only what the vessel owner knows but what the vessel owner is charged with discovering in order to be apprised of conditions likely to produce or contribute to a loss.

*Admiralty Law > Shipping > Carrier Duties & Obligations > Limitations on Liability*
[HN10] See *46 U.S.C.S. § 183(e).*

*Admiralty Law > Personal Injuries > Maritime Tort Actions > Negligence > General Overview*
*Admiralty Law > Personal Injuries > Maritime Workers' Claims > Unseaworthiness > Limitations on Liability*
*Transportation Law > Water Transportation > Maintenance & Safety*
[HN11] See *46 U.S.C.S. § 183(f).*

*Admiralty Law > Shipping > Carrier Duties & Obligations > Limitations on Liability*

*Real Property Law > Water Rights > Boundaries*
[HN12] Case law indicates that the list in *46 U.S.C.S. § 183(f)* is not to be taken literally; rather, it is merely an indication of the kinds of river and harbor vessels that are not seagoing. The Fifth Circuit Court of Appeals has held that to determine whether a vessel is a seagoing vessel within the scope of *46 U.S.C.S. § 183(f)*, a court must consider: whether the vessel does, or is intended to, navigate in the seas beyond the Boundary Line in the regular course of its operations. These operations may in fact proceed on either side of the Boundary Line; but the court must find that, considering the design, function, purpose, and capabilities of the vessel, it will be normally expected to engage in substantial operations beyond the nautical boundary.

*Admiralty Law > Personal Injuries > Maritime Workers' Claims > Unseaworthiness > Duty*
*Admiralty Law > Personal Injuries > Maritime Workers' Claims > Unseaworthiness > Limitations on Liability*
*Admiralty Law > Shipping > Carrier Duties & Obligations > Limitations on Liability*
[HN13] A vessel owner may not limit its liability for the unseaworthiness of the vessel if the defect was reasonably discoverable. This duty extends to the duty to ensure that a vessel is equipped with the proper charts: an owner cannot close its eyes to what prudent inspections would disclose. An owner must avail himself of whatever means of knowledge are reasonably necessary to prevent conditions likely to cause losses.

*Admiralty Law > Shipping > Carrier Duties & Obligations > Limitations on Liability*
[HN14] Inspections need not be frequent or burdensome to be adequate and effective, but they must be periodic and systematic.

*Admiralty Law > Personal Injuries > Maritime Workers' Claims > Maritime Tort Claims*
*Admiralty Law > Personal Injuries > Maritime Workers' Claims > Unseaworthiness > Duty*
*Transportation Law > Water Transportation > Maintenance & Safety*
[HN15] The duty of an owner to make its vessel seaworthy is nondelegable, and the fact that the crew is aware of the defects does not transform unseaworthiness into bad seamanship. The nondelegable duty to provide a

1999 U.S. Dist. LEXIS 5627, *1; 1999 AMC 2776

vessel with updated charts requires an owner to periodically check to see if the system in place to update the charts is functioning properly.

**COUNSEL:** For TT BOAT CORPORATION, TIDEWATER MARINE INC, petitioners: Miles Paul Clements, George A. Frilot, III, Joseph Dwight Leblanc, III, Brant David Imperatore, Frilot, Partridge, Kohnke & Clements, LC, New Orleans, LA.

For JAMES SONNIER, intervenor-plaintiff: Allan L. Durand, Scott A. Dartez, Perrin, Landry, deLaunay & Durand, Lafayette, LA.

For ISLAND OPERATING COMPANY, INC., cross-claimant: Hal James Broussard, Ped C. Kay, III, James T. Rivera, Broussard, David & Daigle, Lafayette, LA.

For ROGER BOGGS, claimant: Wesley J. Gralapp, Neblett, Beard & Arsenault, Alexandria, LA.

For ROGER BOGGS, claimant: Frank J. Peragine, Simon, Peragine, Smith & Redfearn, LLP, New Orleans, LA.

For DUKE ENERGY FIELD SERVICES, INC., claimant: John F. Emmett, John Frederick Kessenich, Eugene W. Policastri, Emmett, Cobb, Waits, Kessenich & O'Neil, New Orleans, LA.

For BENJAMIN T GRACI, III, claimant: Daniel E. Becnel, III, Law Offices of Daniel E. Becnel, Jr., LaPlace, LA.

For WALTER OIL & GAS CORPORATION, VASTAR RESOURCES INC, BRITISH-BORNEO EXPLORATION, INC., MURPHY EXPLORATION & PRODUCTION [*2] COMPANY, claimants: Steven Lynn Roberts, Winstol D. Carter, Jr., Edward J. Patterson, III, Scott E. Raynes, Fulbright & Jaworski, Houston, TX.

For ELTON HENRY, claimant: Terry G. Breaux, Terry G. Breaux, APLC, Franklin, LA.

For CLARENCE ANTHONY WILLIAMS, JR, claimant: Lawrence Neil Curtis, Curtis & Lambert, Lafayette, LA.

For KIRK P FLETCHER, claimant: Leonard A. Radlauer, Radlauer & Bernstein, New Orleans, LA.

For EDWARD SUITER, DUNCAN KIRKLEY, PAUL ANDERTON, STEVEN AFFOLTER, claimants: Kenneth R. Bowen, Frank J. Peragine, Robert Leland Redfearn, Jr., Simon, Peragine, Smith & Redfearn, LLP, New Orleans, LA.

For LONNIE EARL WILKINSON, THOMAS BRABHAM, HENRY JAMES LEONARD, ANDY J WILLIAMS, JOHN ANTHONY SCHUSTER, BENNIE W WILLIAMSON, claimants: Julius P. Hebert, Jr., Brian John Marceaux, Hebert & Marceaux, Houma, LA.

For GLOBAL INDUSTRIES, LTD., GLOBAL PIPELINE PLUS, INC., GLOBAL INDUSTRIES OFFSHORE, INC., claimants: George Moore Gilly, James H. Roussel, Thomas Kent Ledyard Morrison, Phelps Dunbar, LLP, New Orleans, LA.

For JOHN E. CHANCE & ASSOCIATES, INC., claimant: William Breen Hidalgo, Jean Paul Picou Overton, Burke & Mayer, New Orleans, LA.

For [*3] JOHN CORDAS, ROBERT SANDERSON, GEORGE ROSSEN, claimants: David John Shea, Lirette & Shea, LLP, Houma, LA.

For ELTON CHARLES GIBSON, claimant: John Gilbert Munoz, Garner & Munoz, New Orleans, LA.

For ELTON CHARLES GIBSON, claimant: Jack Paul Showers, Law Firm of Jack P. Showers, Lafayette, LA.

For ELTON CHARLES GIBSON, claimant: Marvin L. Jeffers, Marvin L. Jeffers, Attorney at Law, New Orleans, LA.

For WALTER OIL & GAS CORPORATION, VASTAR RESOURCES INC, BRITISH-BORNEO EXPLORATION, INC., MURPHY EXPLORATION & PRODUCTION COMPANY, third-party plaintiffs: Steven Lynn Roberts, Winstol D. Carter, Jr., Edward J. Patterson, III, Scott E. Raynes, Fulbright & Jaworski, Houston, TX.

For ISLAND OPERATING COMPANY, INC., third-party plaintiff: Hal James Broussard, Ped C. Kay, III, James T. Rivera, Broussard, David & Daigle, Lafayette, LA.

For ISLAND OPERATING COMPANY, INC., third-party defendant: Hal James Broussard, Ped C. Kay, III, James T. Rivera, Broussard, David & Daigle,

1999 U.S. Dist. LEXIS 5627, *3; 1999 AMC 2776

Lafayette, LA.

**JUDGES:** STANWOOD R. DUVAL, JR., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** STANWOOD R. DUVAL, JR.

**OPINION**

**ORDER AND REASONS**

The limitation and exoneration portions of this case having [*4] come on before trial before this court on March 29, 1999, and ending on April 5, 1999, the court hereby renders the following findings of fact and conclusions of law.

**I. FACTUAL BACKGROUND**

**A. The Events of February 16, 1998**

On February 16, 1998, the GULF CAJUN, a tug owned by the TT Boat Corporation and owned *pro hac vice* by Tidewater Marine, Inc. (together, "Tidewater"), and the barge CHEROKEE, owned by Global Pipelines Plus ("Global"), were in a protected anchorage. At approximately 8:55 a.m., the vessels set off for Main Pass 138, with Captain James Griffin at the helm of the GULF CAJUN. The CHEROKEE was manned by a large crew. The weather was bad when the vessels started out, but the GULF CAJUN ventured out at Global's request despite the high seas because one of Global's other barges had capsized. [1]

> 1   On March 2, 1999, this court issued an Order and Reasons granting summary judgment to Global, holding that the GULF CAJUN, and not the CHEROKEE, was the "dominant mind" of the flotilla, and therefore exonerating Global from liability for the allision. Global's right to limit vis-a-vis the personal injury claimants is moot as a result of a stipulation limiting the total amount of personal injury claims to less than the value of the CHEROKEE.

[*5] At approximately 1:00 p.m., the CHEROKEE allided with a fixed offshore oil platform owned by Walter Oil & Gas ["Walter"] and others in the Gulf of Mexico, West Delta Block 106. The platform was manned by a crew of workers, most of whom were employed by Island Operating Company ("Island"). No one on the platform activated the foghorn on the day of the accident. The allision caused the platform to catch on fire, and persons aboard both the barge and the platform allege that they were injured. On the day following the incident, Tidewater filed a Petition for Exoneration from or Limitation of Liability pursuant to *46 U.S.C. § 183, et seq.*

The person at the helm of the GULF CAJUN when the allision occurred was First Mate Winson Carter. The master of the tug, Captain James Griffin, had gone to bed at approximately 11:50 a.m., after turning over the wheel to Mate Carter. The recollections of witnesses varied regarding the weather at the time Carter took over and at the time of the allision, but a consistent pattern emerged from their testimony. Joseph Fontenot, the Island Operating platform foreman and a very credible witness, testified that at approximately 11:30 a.m., visibility [*6] was approximately 3 miles, and that, by the time of the allision at around 1:00 p.m., visibility had been reduced to 1/4 mile. Roger Boggs, Global's derrick crane operator and the CHEROKEE crew member on watch for the midnight-noon shift, testified that at around 11:30 the weather was foggy and rainy, with 8-10 foot seas, and that he could not see from one end of the barge to the other. Thomas Brabham, the rigger who came on watch at around 11:30 to replace Boggs, confirmed that visibility was very poor at that time. Another Rigger, John Schuster, somewhat contradicted this testimony, stating that the weather was pretty clear at around 11:15 or 11:30, but that there was almost zero visibility by 1:00 when the allision occurred. Anchor foreman Melvin Johnson concurred, testifying that, while there was a "good" fog at 11:30, he could still see from one end of the barge to the other. Mate Carter's testimony at trial differed from the testimony he offered in his deposition. At trial, he said that at 11:50 his visibility was about one mile, and that the weather was windy and rough, with light rain. By noon, the fog was thicker, with 8 foot seas, and the rain was worse, and the weather continued [*7] to deteriorate until the allision. At his deposition, however, Carter testified that there was zero visibility when he first took over the wheel. At trial, Captain Griffin testified that visibility was about 1/2 mile when Carter took over.

The details of the weather are important, because Carter claims that at about thirty minutes before the accident he experienced radar clutter, and the court must

1999 U.S. Dist. LEXIS 5627, *7; 1999 AMC 2776

determine whether this claim is plausible. Unfortunately, the court has had great difficulty in gleaning much reliable information from Carter's testimony. Carter was an equivocal witness in the extreme, changing his answers depending on the question, and depending on the asker of the question. He appeared nervous and coached, and his testimony was difficult to understand because he was not a fluent speaker of English. The court, then, must scrutinize his testimony and carefully consider the testimony of other witnesses in conjunction with it throughout its findings of fact. With regard to the weather, however, the court does find that Carter's testimony at trial, that the weather was worsening, is accurate. While the other witnesses disagree as to the specifics, it appears that from 11:30 [*8] a.m. until at least 12:30 p.m., the fog was thickening. The weather worsened considerably after Captain Griffin went below to go to bed. Before Captain Griffin left, however, visibility was already quite poor.

Before turning in, Captain Griffin told Mate Carter that a platform appeared on the radar. Based on the location of the vessel at this time, the court finds that it is more likely than not that it was the Walter platform. Griffin and Carter could not visually see the platform at this point, but it was clear on the radar. Mate Carter knew that the platform was there, because he had passed it the day before on his way in. It was Griffin's intention that Carter steer the tug at a 120 degree heading until the vessels intersected a prior course that they had navigated earlier when they brought the GULF CAJUN from the Main Pass area to the West Delta area due to bad weather. Once on course, the tug would turn to port in a generally southeasterly direction to navigate around the mouth of the Mississippi River, navigating the vessels out the same way they had come in. To identify the prior course, Griffin retrieved it from the Garmin 210 Global Positioning Satellite (referred to as [*9] "the Garmin" and "the G.P.S.") system. Griffin did not use his charts to plot the course before venturing out because he thought that using the course already plotted in the Garmin unit was sufficient as it was displayed on the unit.

Carter slowed the vessel to 600 rpms immediately after taking the helm. He testified that approximately 30 minutes before the allision, he picked up a boat on the radar and successfully navigated around it. After that, however, he began picking up sea clutter on the radar. He tried to adjust both radars to get rid of the clutter, and changed their ranges, but to no avail -- the radar screen

went "white." Because he was distracted by the problems he was experiencing with the radar, Carter veered off course. He testified that he changed his course slightly to starboard because he was affected by the current.

When he realized he was off course, Mate Carter did not stop the tow. He gave confusing testimony at trial when asked why he did not slow down or stop, saying in one breath that he "thought he could stop the boat," in the next that he would have stopped the tow had he had the choice, and a moment later that he thought he could stop the tow without [*10] advice from the barge. A few minutes later, he testified that he had no discretion to stop the tow, because it was an emergency. It is uncontested that Tidewater had a policy that captains and mates should not proceed in zero visibility, but rather should stop the boat or reduce the speed to bare steerage. A memo detailing the policy was circulated by Tidewater, but Mate Carter says that he never read the memo. *See Tidewater Exhibit 10*. When asked if the allision would have happened had he seen the memo, Carter replied "maybe not." When asked again, he replied, "correct." Tidewater's Safety Operations Manual (the "SOS" manual) also explained that vessels should take extreme caution and travel slowly in reduced visibility. *Tidewater Exhibit 5, Section 19.7*. Tidewater also had a policy that a vessel must always stay at least one mile from fixed platforms. *Tidewater Exhibit 6*. Clearly, Tidewater policy mandated that Mate Carter attempt to steer clear of fixed platforms, and that he stop or slow his tug if his visibility was reduced.

As the court stated above, and as the testimony clearly shows, Carter's testimony was self-contradictory and unreliable. However, this court [*11] finds it difficult to believe that a captain with Mate Carter's experience, regardless of his inability to articulate ideas verbally, would not have known that it is foolish to proceed at zero visibility with cluttered radar in close proximity to an oil platform, or would have thought that as the person driving the vessel, he did not have the authority or ability to either stop or slow the vessel or, at the very least, consult Captain Griffin. Mate Carter clearly made a very foolish navigational error. The court does not believe, however, the Mate Carter would have been less likely to make this error had he read a memo from Tidewater explaining a common-sensical proposition that even an amateur seaman would know: don't proceed if you can't see where you're going. Had Mate Carter stopped or slowed the vessel, the allision in

Case 2:05-cv-04182-SRD-JCW   Document 15549-62   Filed 09/29/08   Page 7 of 15

Page 7
1999 U.S. Dist. LEXIS 5627, *11; 1999 AMC 2776

question would not have occurred.

## B. Charts 11358 and 1116A

Another method Carter could have used to prevent the allision would have been to use the Garmin 210 to plot the latitude and longitude of the vessel on one of two charts, and determine the proximity of the platform as shown on the chart. Mate Carter could have done this had an updated version of [*12] Chart 11358 or a version of Chart 1116A corrected with Notice to Mariners updates been on board the vessel, but neither chart was available.

Chart 1116A, a chart undisputedly used by the crew of the GULF CAJUN, depicts the Gulf at a scale of over 1:400,000, and does not show Walter's platform. *See Tidewater Exhibit No. 19*. Another chart, Chart 11358, depicts the Gulf at a scale of 1:80,000, and shows Walter's fixed platform. *See Tidewater Exhibit No. 20*. Chart 1116A bears two stamped notations which each read as follows:

> CAUTION: Oil well structures, some submerged and capped, submarine cables, and submarine pipelines are charted only where offshore of the indicated limits of the 1:80,000 scale series charts.

In other words, sections of Chart 1116A that do not depict platforms are indicated with the number of the 1:80,000 scale chart that does depict those platforms. For example, the West Delta area, where the allision in question occurred, is clearly stamped on the 1116A chart with "11358", indicating that platforms in the West Delta are not depicted on 1116A but are depicted on 11358. Several Tidewater employees, including Michael Loving, Marine Superintendent [*13] for the Tidewater towing division, testified that Captain Griffin should not sail without a Chart 11358.

The Coast Guard periodically provides Notice to Mariners updates with information on wrecks, new platforms, and weather problems. Mariners typically add this information to their charts where applicable. It was Tidewater policy that captains update their charts with Notice of Mariner changes. Tidewater routinely provided its vessels with "chart kits" so that the charts could be easily updated.

Captain Griffin testified that he only updated Chart 1116A with this information, and not other charts, such

as 11358. Tidewater Marine Superintendent Michael Loving testified that it would "amaze him" to learn that captains believed they did not have to update other charts. Regardless, however, the Chart 1116A on board the GULF CAJUN was not updated. It appears that this was because this chart was removed from the GULF CAJUN sometime during the fall of 1997. Captain Griffin inventoried the vessel's charts in September, 1997, before making a voyage to Venezuela. *See Tidewater Exhibit No. 31*. At that point in time, an allegedly updated Chart 1116A was on board the vessel. After returning [*14] from Venezuela in December, 1997, Griffin discovered that certain of the GULF CAJUN's charts were missing, including 1116A as corrected. Griffin ordered a new 1116A chart, but the chart was not corrected with the Notice to Mariners changes, and unless corrected, this Chart would never have depicted the Walter platform in West Delta 106. Griffin delegated the job of updating the chart to Carter, but his job was nearly impossible, as the binder where the Notice to Mariners updates were kept was disorganized, non-chronological, and incomplete. Carter testified that he did not make the corrections because he thought that the 1116A chart included the all the platforms. (As noted above, Carter's conclusion was absurd, as the chart clearly states on its fact that only the platforms offshore of the area covered by 11358 and other larger-scale charts are included on 1116A). Griffin did not order a new Chart 11358, because he did not check to see if it was missing. He testified that he did not check to see if it was on board after the Venezuela trip, because it was not a chart he used.

Although Mate Carter testified that a Chart 11358 was on board at the time of the allision, there is very [*15] little evidence that the chart was indeed on board the vessel. In an inventory conducted by retired U.S. Coast Guard Officer Guy Clark on behalf of Global the day after the allision, Chart 11358 was nowhere to be found in the wheelhouse. Tidewater claims that the chart was on board the vessel, and cites as evidence an inventory taken months before the allision and the affidavit of Mate Carter. The September inventory, however, is unhelpful, as Griffin had to order new charts after the Venezuela trip because so many charts were missing, and did not order a new 11358, and the court has no more reason to credit Mate Carter's affidavit than it would his live testimony. Tidewater did order a new Chart 11358 the day after the allision. While Walter and others claim that this indicates that the chart was not aboard the vessel, Gary Pope, Tidewater's Area Manager

1999 U.S. Dist. LEXIS 5627, *15; 1999 AMC 2776

for the Towing Division, testified that he ordered the chart because he was unfamiliar with the area and needed to familiarize himself with the scene of the accident. While the court finds his testimony credible, the fact that the chart Tidewater ordered the day after the accident was not a replacement chart for the vessel does not [*16] create an inference that there was a chart aboard the vessel. To this date, Tidewater has been unable to produce the actual chart it claims was on board the GULF CAJUN the day of the allision.

While the court finds it highly likely that no chart 11358 was aboard the vessel at the time of the allision, this finding may ultimately be irrelevant, as most of the charts aboard the GULF CAJUN were out of date. In its response to a request for production in this case, Tidewater claimed that the following charts were on board the M/V GULF CAJUN on February 16, 1998:

116A [sic.], 60th Ed. on chart table

11349, 36th Ed., 6-22-96

11376, 43d Ed., 10-23-93

24481, 6th Ed., 7-16-88

11341, 35th Ed., 5-7-94

11351, 35th Ed., 3/4/95

11357, 31st Ed., 3-16-96

11344, 31st Ed., 2-4-97

11313, 20th Ed., 7-4-92

11316, 36th Ed., 7-8-95

11332, 24th Ed., 3-12-94

11323, 54th Ed., 8-6-94

11356, 32d Ed., 7-22-95

11361, 60th Ed., 1-28-95

1114A, 25th Ed., 1-23-88

1113A 20th Ed., 10-1-88

1115A, 31st Ed., 1-14-89

11358 [Tidewater was unable to identify the date and edition of this chart]

*Tidewater's Response to Request for Production No. 64.*

The charts that were aboard the GULF [*17] CAJUN on the day of allision were, on average, five years old. Furthermore, Captain Dalton, a Tidewater employee, testified that when he inventoried the charts on the GULF CAJUN after the accident, Chart 11358 was on board but out of date. Captain Dalton could not remember how out of date the chart was. *See Tidewater Exhibit 32.*

Further evidence that Chart 11358 would have been out of date even had it been on board is Tidewater's inability to produce any evidence that it ever purchased an updated chart 11358 after 1995. Invoices show that no chart 11358 was ordered after 1995, when the 45th edition was published. *Walter Exhibit 105.* The 45th edition of Chart 11358 was the first edition to show Walter's platform. Even if a chart 11358 were aboard the vessel on the day of the allision, then, the chart would have been useless in preventing the accident, as the Walter platform would not have been depicted on the chart. Without a current 11358 on board, the GULF CAJUN was unseaworthy when it began its voyage.

Mate Carter testified that he thought that Chart 11358 was on board and that he chose not to use it because he did not need it. A question therefore arises as to whether [*18] the vessels' lack of proper charts was really causative of the allision. The court finds that it was. As stated before, Mate Carter's testimony was so internally contradictory, nervous, and rambling, that the court finds it impossible to trust. Additionally, as the court has found that an updated version of Chart 11358 was not on the vessel, the court cannot say that Mate Carter or Captain Griffin would have continued to navigate off out-of-date charts had they had updated charts. *See In the Matter of Texaco, 570 F. Supp. 1272, 1292 (E.D. La. 1983), citing The MARION*, on appeal from the High Court of Justice, Queen's Bench Division (Admiralty Court, 1983). An experienced mariner, knowing that an updated chart is available, and knowing that there is no other way for him to plot his position and avert disaster, would surely have used the updated chart. The court finds that Chart 11358 would have been used had an updated version been available.

Captain Griffin and Mate Carter did use Chart

1999 U.S. Dist. LEXIS 5627, *18; 1999 AMC 2776

1116A on February 16, 1998. Had that chart been updated with Notice to Mariners, the Walter platform would have been marked on the chart in plain view, and the accident could have been prevented. [*19] Mate Carter could have ascertained his latitude and longitude position using the Garmin 210 unit, plotted these data on the chart, and realized that the vessel and its tow were in imminent danger of crashing into the Walter platform. He then could have maneuvered appropriately. The court finds that, had either a current Chart 11358 or an updated Chart 1116A been available, the accident could have been prevented. [2]

> 2   The court notes that merely updating Chart 1116A with Notice to Mariners would not have made the vessel seaworthy. Chart 1116A does not show platforms such as the Walter platform, which is too close to shore to be depicted on 1116A and is depicted on Chart 11358 instead. Notice to Mariners for the West Delta area should be placed on Chart 11358, and that chart should be used to navigate that area. If, however, Chart 1116A had been updated, as Captain Griffin testified was his actual custom and practice, with the Notice to Mariners for the West Delta from 1995 on, the Walter platform would have been depicted on Chart 1116A. Even though the GULF CAJUN would have been unseaworthy because its charts would not have depicted all platforms in the Gulf, the unseaworthiness would not have caused this particular allision, as the Walter platform would have been on the chart used.

[*20]   The court also finds that Tidewater management did not have in place a systematic method of inspecting the charts on its vessels. All of Tidewater's management-level witnesses agreed that it is Tidewater's policy that charts -- all charts -- must be updated whenever a Notice to Mariners is issued. Tidewater, however, almost completely delegated the task of inspecting whether the charts had been properly updated, and even whether the proper charts were on board, to its captains. Michael Loving testified that even though Tidewater marine superintendents board the vessels to do routine safety checks before voyages, these checks concentrate on whether equipment is functional, not whether the proper charts are on board. The port captains and marine superintendents order new charts when the captains tell them that they need new charts. At trial, Robert Arceneaux, Safety Director for Tidewater,

testified that it would be impractical to conduct frequent inventories of vessels' charts. His reason was that there is no way to be certain whether a captain is telling the truth when he says that his charts are updated. But that is exactly the reason why independent inspections are necessary, if [*21] not on a frequent basis, at least on an occasional basis..

Tidewater did sometimes perform safety checks on its vessels, but was unable to show that it ever did a safety check of the GULF CAJUN. Louis "Junior" Plaisance, who was the safety captain for the towing division at the time of the incident, for example, said that while he did safety checks on thirty-five other vessels, he never did a safety check of the GULF CAJUN. He visited the vessel in late January 1999 to bring supplies, including chart kits that had Notice to Mariners stickers (which were never actually used to update the charts) but did not inspect the charts on board because he didn't think he had time before the vessel sailed. As it turned out, the vessel stayed longer than planned, and Plaisance would have had time to check for updated charts. Plaisance testified that he would not be surprised to learn that the charts aboard the GULF CAJUN were out of date. In fact, he estimated that 50% of Tidewater vessel charts are out of date. Like many other Tidewater management witnesses, Plaisance disagreed with the statement that Tidewater should have a "systematic" method of inspecting its charts.

The court concludes by [*22] a preponderance of the evidence that Chart 11358 was not on board the vessel on February 16, 1998, and that an up-to-date Chart 11358, showing the Walter platform, was certainly not on board the vessel. Neither was an updated, corrected Chart 1116A. The court further finds that Tidewater did not have in place a sufficient method of inspecting the vessels to see if charts were updated.

### C. Other Factors

At trial, the parties also brought forth voluminous evidence of other failings on the party of the GULF CAJUN. For example, the court heard evidence that the GULF CAJUN's Navtec weather reporter was broken. It appears that the Navtec was working intermittently and that the GULF CAJUN may have missed some weather reports as a result. The court also finds that Tidewater only ordered the 6:00 a.m. report from the weather service. This fact, however, is irrelevant, as the only report any party has shown that predicted fog was the day

1999 U.S. Dist. LEXIS 5627, *22; 1999 AMC 2776

before, and the crew of the GULF CAJUN would not have given as much credence to an outdated weather report than they would have a current or more recent report. Moreover, updated weather information, provided by the National Weather Service, was available [*23] using the VHF radio.

In addition, several parties argued that Tidewater was negligent because Captain Griffin and Mate Carter did not have a proper lookout. It is undisputed that there was not a lookout outside the wheelhouse. As Captain Griffin stated at trial, "do you want to stand out in the rain?" While this failure was certainly negligent, as well as violative of Tidewater policy, it did not cause the allision. The platform never sounded its foghorn, so standing outside would not have helped the crew of the GULF CAJUN to hear that they were approaching the platform. Similarly, Griffin's failure to plot his course before the voyage was a violation of Tidewater's policy but did not cause the allision. Had he plotted the course, he still would have been using a chart that did not include Walter's platform. The course was in the Garmin 210 unit; the allision occurred not because the crew members did not know where they were going but because the vessels went off-course while Carter was tinkering with the radar, an occurrence that would not have been prevented by plotting the course on paper.

Finally, several parties assert that Mate Carter's lack of a current radar endorsement somehow [*24] caused the allision. While Carter's radar endorsement was technically out of date, he had completed the necessary courses to obtain an updated endorsement from the Coast Guard. He merely had to provide the Coast Guard with his certificate and the endorsement would issue. The court fails to see how a minor technicality such as this caused a major allision. Based on his experience and training, Carter should have been able to read the radar had it been functioning properly. Because of the poor weather conditions, Carter's radar was cluttered. At this point, Carter should have stopped or slowed the vessel and plotted his position on a current chart, and his failure to do these things caused the allision. His outdated radar endorsement was inconsequential.

The court finds by a preponderance of the evidence that, while the Tidewater crew was negligent in several ways, the two negligent acts by Tidewater that were causative were the following: (1) Mate Carter's failure to slow or stop the vessels once he realized he was off-course and was experiencing radar and visibility problems in the vicinity of a known platform, and (2) the failure of Tidewater to ensure that a current version of Chart [*25] 11358 was on board the GULF CAJUN. The court also finds that the lack of either a current 11358 or an updated 1116A made the vessel unseaworthy, and that this unseaworthiness was causative.

## II. TIDEWATER IS NOT ENTITLED TO EXONERATION BECAUSE THE ALLISION WAS CAUSED AT LEAST IN PART BY THE NEGLIGENT ACTS OF ITS EMPLOYEES.

The court gave an oral ruling at trial when it granted the claimants' Rule 52 motion for partial judgment and held that Tidewater was not entitled to exoneration. The following material supplements that ruling.

[HN1] Normally, the initial burden of proof in proving negligence or unseaworthiness in a maritime case rests on the claimants. *Matter of State of La. Dept. of Highways, 455 F. Supp. 272 (E.D. La. 1978)*. However, it is "well-established that there is a presumption of fault against a moving vessel that strikes a stationary object, such as a dock or navigational aid." *Bunge Corporation v. M/V FURNESS BRIDGE, 558 F.2d 790 (5th Cir. 1977)*. In admiralty, this presumption is more than a mere requirement that the vessel produce some evidence; rather, the moving vessel must show that it was "without fault," or that "the collision was occasioned by fault [*26] of the stationary object or was the result of inevitable accident." *Id.* The moving vessel "must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required." *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co., 377 F.2d 724, 726 (5th Cir. 1967), citing Boudoin v. J. Ray McDermott & Co., 281 F.2d 81, 88 (5th Cir. 1960)*.

### A. The *Pennsylvania* Rule

At trial, counsel for Tidewater argued that it was entitled to exoneration even if it acted negligently because Island Operating failed to sound the Walter platform foghorn on the day of the allision. Tidewater contended that under the rule of *THE PENNSYLVANIA*, Island Operating alone should be held liable, because its failure to activate the foghorn was a statutory violation. While Tidewater is correct that the burden will be on Island during the damages and liability portion of this trial to show that its statutory violation did not cause the

allision, it does not follow that Island's negligence would preclude Tidewater from being found contributorily negligent.

[HN2] Under the *Pennsylvania Rule*, when a vessel involved in an accident is [*27] shown to have breached a statute or regulation, it must show not only that its breach was not a contributory cause of the accident but that it could not have been. *THE PENNSYLVANIA v. Troop, 86 U.S. (19 Wall.) 125, 22 L. Ed. 148, 151 (1873).* In effect, the burden of proof is shifted as to the causation issue once it is established that the vessel violated the statute or regulation. *Garner v. Cities Serv. Tankers Corp., 456 F.2d 476, 478 (5th Cir. 1972).* The Pennsylvania Rule applies wherever a statute or regulation that is "intended to prevent collisions" is violated. *THE PENNSYLVANIA, 86 U.S. at 136.* In addition, the Rule applies even in mutual fault collision cases. *Otto Candies, Inc. v. M/V Madeline D., 721 F.2d 1034, 1036, 1987 AMC 911 (5th Cir.1983).*

[HN3] That the Rule shifts the burden does not mean that a violation of a statute or regulation is dispositive. A party in violation of a regulation may rebut the presumption of causation in a variety of ways. For example, the party may show that the violation was irrelevant because the casualty would have occurred regardless of the violation. *See Seacarriers Maritime Co. v. M/V Stolt Jade, 823 F. Supp. 1311* (E.D .La.1993); [*28] *Otto Candies, 721 F.2d at 1036 (5th Cir.1983).* Or, the party in violation may show that the fault was incurred as an error, *in extremis*, because the vessel was placed in a situation through no fault of its own, where collision was imminent, and the violation of the regulation was an emergency action taken to avoid a collision. *Navegacion Castro Riva v. The M.S. Nordholm, 178 F. Supp. 736, 741 (E.D.La.1959), aff'd. 287 F.2d 398 (5th Cir.1961).* Finally, the party in violation may offer expert testimony to show that the violation could not have caused the collision. *See, Hess Shipping Corp. v. SS. Charles Lykes, 417 F.2d 346, 350 (5th Cir.1969), aff'd. on rehearing, 424 F.2d 633 (5th Cir.1970).*

It is uncontested that Island Operating did not sound its foghorn on the day of the allision. Joseph Fontenot, Island's lead operator and the foreman of the platform, testified that he knew that he was required to activate the foghorn if visibility was under five miles, and that visibility was only at about three miles when he went downstairs at 11:30. (Fontenot's testimony was somewhat

confused: based on the different statements he made, he could have been downstairs for [*29] an hour and a half or only forty-five minutes. Either way, he knew when he went downstairs that visibility was poor enough that he should activate the foghorn). Under the *Pennsylvania* Rule, Island will be found partially liable for the allision unless it can show that its failure to sound its foghorn could not have been a cause of the allision.

Application of the *Pennsylvania* Rule, however, does not negate the presumption that a moving vessel that hits a fixed object is at fault. The presumptions are not mutually exclusive; rather, they act in conjunction with one another and will each be relevant when the court allocates fault in the September trial. All that application of the *Pennsylvania* Rule does here is shift burden to Island Operating to show in September that it, too, should not be held partially responsible for the accident. It in no way exonerates Tidewater from liability for the negligent acts of its employees. [HN4] Each party may be held responsible if each party contributed to the cause of the allision. *See, e.g., Chevron Oil Co. v. M/V New Yorker, 297 F. Supp. 412 (E.D. La. 1969)* (each party 50% liable where each party violated regulations).

## B. The "Superseding [*30] Cause" Doctrine

Tidewater similarly argues that Island's failure to sound its foghorn was a superseding cause of the allision, and that even if Tidewater was negligent, it therefore cannot be held liable. [HN5] The "superseding cause" doctrine is similar and related to the principle of "proximate causation." *Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 116 S. Ct. 1813, 135 L. Ed. 2d 113 (1996).* Under the "superseding cause" doctrine, a party may be exonerated from liability where its negligence substantially contributed to another party's injury "but the injury was actually brought about by a cause of independent origin that was not foreseeable." *Id., quoting Schoenbaum, Admiralty and Maritime Law § 5-3, at 165-66 (2d Ed. 1994).* The doctrine asks whether a defendant "is to be held liable for an injury to which he has in fact made a substantial contribution, when it is brought about by a cause of independent origin, for which he is not responsible." *Nunley v. M/V Dauntless Colocotronis, 727 F.2d 455, 464 (5th Cir. 1984).* [HN6] The Fifth Circuit has explained that an intervening, negligent, act of a third person is not a superseding cause if one of the following scenarios exists: [*31]

1999 U.S. Dist. LEXIS 5627, *31; 1999 AMC 2776

(a) the actor at the time of negligent conduct should have realized that a third person might so act, or (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent. *Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 652 (5th Cir. 1982)*, quoting *Nunley, 727 F.2d at 464-65*.

Based on factors a and b of this test, the court cannot find, as a matter of law, that the failure of Island to activate its foghorn superseded the harm caused by Tidewater's negligence. Mate Carter should have realized that objects, including platforms, in the Gulf might not all have foghorns. Presumably, one of the reasons behind Tidewater's policy to stop or slow the boat in reduced visibility is that a platform might have an inactive or dysfunctional foghorn. A reasonable person would not consider Island's failure to activate its foghorn "highly extraordinary"; rather, the action was merely negligent.

[*32] Furthermore, in order to be considered a "superseding cause" of the allision, Island's alleged negligence would have to be causative. At this point, Tidewater has failed to demonstrate that Island's foghorn could have been heard even had it been activated. James Griffin, the captain of the GULF CAJUN, testified that he was navigating in a southerly direction, that wind was coming from the southwest, and that the platform was on his port side. In other words, the wind was blowing toward the platform, and away from the tug. Griffin testified that a person's ability to hear a fog signal is dependent in part on the weather conditions and the wind direction. Island's foreman, Joseph Fontenot, whom the court found to be a very credible witness, did not hear the tug's horn from the platform, with the wind blowing toward him. If he could not hear a foghorn with the wind blowing toward him, it would have been even more difficult for the crew of the GULF CAJUN to hear the platform's foghorn with the wind blowing in the opposite direction. The court finds that there is at least some doubt that the platform's foghorn could have been heard in sufficient time by the crew of the GULF CAJUN, even [*33] if Island had properly activated it.

While the burden under the *Pennsylvania* Rule is still on Island to show at trial that its failure to activate could not be a cause of the allision, Tidewater has not shown for the purposes of the superseding cause doctrine that Island's conduct was the only proximate cause. Accordingly, Tidewater is not entitled to exoneration from liability.

## III. TIDEWATER IS NOT ENTITLED TO LIMIT ITS LIABILITY BECAUSE IT HAD PRIVITY AND KNOWLEDGE OF THE UNSEAWORTHINESS OF THE GULF CAJUN.

The claim for limitation is based on *46 U.S.C. 183(a)*, which provides:

> [HN7] The liability of the owner of any vessel ... for any act, matter, or thing, loss, damage or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

Under the statute, Tidewater would be liable beyond the value of the M/V GULF CAJUN only if it had privity and knowledge of the acts of negligence or conditions of unseaworthiness which caused the claimants' injuries. *Crown Zellerbach Corp. v. Ingram Industries, Inc.,* [*34] *783 F.2d 1296 (5th Cir. 1986)* (*en banc*), *cert. denied*, *479 U.S. 821, 107 S. Ct. 87, 93 L. Ed. 2d 40.*

[HN8] To determine whether Tidewater is entitled to limit its liability, the court must undergo a two-step analysis. First, the court determines which acts of negligence or unseaworthiness caused the casualty. *Farrell Lines, Inc. v. Jones, 530 F.2d 7 (5th Cir. 1976).* Second, the court determines whether the vessel owner had knowledge or privity of these acts. *Id.* Once a claimant proves negligence or unseaworthiness, the burden of proof shifts to the vessel owner to prove the lack of privity or knowledge. *Coryell v. Phipps, 317 U.S. 406, 63 S. Ct. 291, 87 L. Ed. 363 (1943)*; *Coleman v. Jahncke Service, Inc., 341 F.2d 956 (5th Cir. 1965), cert. denied, 382 U.S. 974, 86 S. Ct. 538, 15 L. Ed. 2d 465.* Here, where the court has already determined that Tidewater cannot be exonerated for the allision (that the

1999 U.S. Dist. LEXIS 5627, *34; 1999 AMC 2776

allision was at least partly the result of Tidewater's negligence), the burden of proof now shifts to Tidewater to prove its lack of privity or knowledge.

Tidewater cannot meet the burden to show that it did not have knowledge simply by proving lack of actual knowledge. [HN9] [*35] Privity and knowledge is established where the means of obtaining knowledge exists, or where reasonable inspection would have led to the requisite knowledge. *China Union Lines, Ltd. v. A.O. Andersen & Co., 364 F.2d 769 (5th Cir. 1966), cert denied 386 U.S. 933, 17 L. Ed. 2d 805, 87 S. Ct. 955.* "Knowledge" is not only what the vessel owner knows but what the vessel owner is charged with discovering in order to be apprised of conditions likely to produce or contribute to a loss. *Avera v. Florida Towing Corp., 322 F.2d 155 (5th Cir. 1963)*; *see also Patton-Tully Transportation Co. v. Ratliff, 797 F.2d 206, 211 (5th Cir. 1986)* ("the question with regard to corporate owners is not what the corporation's officers and managers actually knew, but what they objectively ought to have known"), *citing Spencer Kellogg & Sons, Inc. v. Hicks, 285 U.S. 502, 512, 52 S. Ct. 450, 453, 76 L. Ed. 903 (1932).*

Here, the court has already determined that Mate Carter was negligent because he failed to slow or stop the vessels once he realized he was off-course and was experiencing radar and visibility problems in the vicinity of a known platform. This negligence, however, was not within [*36] the privity and knowledge of Tidewater. The court found that Mate Carter's negligence was the result of a foolish navigational error, and that further preventative measures by Tidewater would not have prevented the error. Tidewater, however, did have privity and knowledge of the unseaworthy condition caused by the lack of proper charts aboard the vessel.

**A. Tidewater had privity and knowledge of the unseaworthiness of the vessel because Captain Griffin's privity and knowledge can be imputed to Tidewater under *§ 183(e)*.**

Captain Griffin knew that the GULF CAJUN did not have an updated and corrected chart 1116A when it set sail. He had assigned to Mate Carter the task of updating the chart, but had done nothing to assure that Carter could accomplish that task. Griffin was ultimately responsible for updating the charts on board. Griffin was not even aware of whether there was a chart 11358 on board the vessel, because he did not feel that he needed that chart. In short, Griffin had privity and knowledge of the facts

underlying the vessel's unseaworthy condition at the time the vessel left to save the capsizing Global vessel; indeed, Griffin had privity and knowledge of the [*37] unseaworthy condition since just after his return from Venezuela, when he first realized the charts were missing.

[HN10] *46 U.S.C. § 183(e)* provides as follows:

"In respect of loss of life or bodily injury the privity or knowledge of the master of a seagoing vessel or of the superintendent or managing agent of the owner thereof, at or prior to the commencement of each voyage, shall be deemed conclusively the privity or knowledge of the owner of such vessel." *46 U.S.C. § 183(e)*.

If the GULF CAJUN was a "seagoing vessel," then, under *§ 183(e)* any privity or knowledge of unseaworthiness or other negligence by the captain of the vessel can be imputed to Tidewater. [3] The definition of "seagoing vessel" is embodied in [HN11] *46 U.S.C. § 183(f)*, which provides:

"Seagoing vessel" defined:

As used in subsections (b), (c), (d), and (e) of this section . . . the term "seagoing vessel" shall not include pleasure yachts, tugs towboats, towing vessels, tank vessels, fishing vessels, or their tenders . . . .

*46 U.S.C. 183 (f)*

On the surface, it appears that, as the tug GULF CAJUN belonged to one of the categories of vessels listed in the statute, the term "seagoing vessel" [*38] as defined in *§ 183(f)* does not apply to the GULF CAJUN, and *§ 183(e)* therefore does not apply to the GULF CAJUN. [HN12] Case law, however, indicates that the list in *section 183(f)* is not to be taken literally; rather, it is merely an indication of the kinds of river and harbor vessels that are not "seagoing." *See, e.g., Talbott Big Foot, Inc. v. Boudreaux, 854 F.2d 758, 761 (5th Cir. 1988), citing In re Petition of Dodge, Inc., 282 F.2d 86, 89-90 (2d Cir. 1960).* The *Talbott* court held that to determine whether a vessel is a "seagoing vessel" within the scope of *section 183(f)*, a court must consider:

Whether the vessel does, or is intended

Case 2:05-cv-04182-SRD-JCW   Document 15549-62   Filed 09/29/08   Page 14 of 15

Page 14

1999 U.S. Dist. LEXIS 5627, *38; 1999 AMC 2776

to, navigate in the seas beyond the Boundary Line in the regular course of its operations. These operations may in fact proceed on either side of the Boundary Line; but the court must find that, considering the design, function, purpose, and capabilities of the vessel, it will be normally expected to engage in substantial operations beyond the nautical boundary. *Talbott, 854 F.2d at 761-62*.

Here, the GULF CAJUN is clearly a seagoing vessel. It has gone, among other places, to Venezuela and Edinburgh, Scotland. It is the [*39] kind of vessel intended to navigate the seas beyond the Boundary Line, and would be normally expected to do so. Accordingly, *section 183(e)* applies to the GULF CAJUN, and Captain Griffin's privity and knowledge of the unseaworthiness of the vessel can be imputed directly to Tidewater.

> 3    This case involved many claimants, some bringing claims for personal injury and other for property damage. At this juncture, all of the property damages claimants have settled with Tidewater. The court need not consider, then, whether the standard for finding privity and knowledge for the property damage claimants would be different that for personal injury claimants, as the only claimants remaining have personal injury claims only.

**B. Tidewater had privity and knowledge of the unseaworthiness of the GULF CAJUN because it failed to implement a system to ensure that charts were adequately updated and corrected.**

Even if *section 183(e)* did not apply to the GULF CAJUN, this court would still hold that Tidewater had privity [*40] and knowledge of the vessel's lack of proper charts. [HN13] A vessel owner may not limit its liability for the unseaworthiness of the vessel if the defect was reasonably discoverable. *Brister v. AWI, Inc., 946 F.2d 350, 357 (5th Cir. 1991)*. This duty extends to the duty to ensure that a vessel is equipped with the proper charts:

> "... an owner cannot close its eyes to what prudent inspections would disclose. An owner must avail himself of whatever means of knowledge are reasonably

necessary to prevent conditions likely to cause losses." *Matter of Texaco, Inc., 570 F. Supp. 1272, 1279 (E.D. La. 1983)*. 1959), *aff'd 287 F.2d 398, citing Waterman Steamship Corp. v. Gay Cottons, 414 F.2d 724 (9th Cir. 1969), Avera v. Florida Towing Corp., 322 F.2d 155 (5th Cir. 1963)*.

A corporation such as Tidewater need not monitor its employees by electronic surveillance, or submit its captains and crew to invasive questioning or unduly inconvenient safety checks to fulfill its obligation to ensure that its vessels are seaworthy. Here, Walter's platform had been at West Delta 106 since 1995, only three years. Yet the charts aboard the GULF CAJUN were, on average, five years [*41] old. Tidewater management had never once performed a spot-check of the GULF CAJUN's charts. A "prudent inspection" would have alerted Tidewater to this problem and allowed it to take measures to "prevent conditions likely to cause losses." *See id.* Such [HN14] inspections need not be frequent or burdensome to be adequate and effective, but they must be periodic and systematic. *570 F. Supp. at 1291*.

[HN15] The duty of an owner to make its vessel seaworthy is nondelegable, and the fact that the crew is aware of the defects does not "transform unseaworthiness into bad seamanship." *Id. at 1290*. The nondelegable duty to provide a vessel with updated charts requires an owner to "periodically check to see" if the system in place to update the charts is "functioning properly." *Traylor Bros. Inc. v. Tug Robert Greene, 1986 U.S. Dist. LEXIS 16803, 1986 WL 12229 *4 (E.D. La. 1986), citing Matter of Texaco, Inc., 570 F. Supp. 1272*. Here, the evidence showed that Tidewater did not have an adequate system in place to ensure that its captains were properly updating their charts. Tidewater left the task of ordering new charts when necessary to the captains. [4] While such a delegation of responsibility was perhaps a practical and [*42] deferential means of ensuring that charts were updated, the result of the policy was that management had no method of discovering a failure to update charts if a captain failed to do so, unless an accident occurred. As the legal duty to update the charts was nondelegable, Tidewater needed to do more. Reasonable inspection would have led Tidewater to the knowledge that its vessel was unseaworthy. As such, Tidewater had privity and knowledge of the unseaworthy condition. *China Union*

1999 U.S. Dist. LEXIS 5627, *42; 1999 AMC 2776

*Lines, 364 F.2d 769 (5th Cir. 1966), cert denied 386 U.S. 933, 17 L. Ed. 2d 805, 87 S. Ct. 955.*

> 4    The court notes that it does *not* find that Captain Griffin was a managing agent of Tidewater. If the court were to consider every captain in a company the size of Tidewater to be a manager or officer of the corporation, the concept of management would lose its meaning.

Because Tidewater had privity and knowledge of the unseaworthy condition of the GULF CAJUN, it is not entitled to limit its liability. Accordingly, Tidewater's [*43] Petition for Limitation of and/or Exoneration From Liability is hereby **DENIED**.

New Orleans, Louisiana, this Thirteenth day of April, 1999.

STANWOOD R. DUVAL, JR.

UNITED STATES DISTRICT JUDGE