

Newberg on Class Actions
Database updated June 2008

Alba Conte and Herbert B. Newberg

Chapter 4. Class Categories and Defendant Classes

References

## § 4:24. Rationale for predominance and superiority tests

Judicial economy factors and advantages over other methods for handling the litigation as a practical matter underlie the predominance and superiority requirements for class actions certified under Rule 23(b)(3). The Rules Advisory Committee, commentators, and the courts have stressed these considerations for class suits under this subdivision.

The Advisory Committee Notes for amended Rule 23 explain:

Subdivision (b)(3). In the situations to which this subdivision relates, class-action treatment is not as clearly called for as in those described above, but it may nevertheless be convenient and desirable depending upon the particular facts. Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. Cf. Chaffee, [Some Problems of Equity (1950)] supra, at 201.

The court is required to find, as a condition of holding that a class action may be maintained under this subdivision, that the questions common to the class predominate over the questions affecting individual members. It is only where this predominance exists that economies can be achieved by means of the class-action device….

That common questions predominate is not itself sufficient to justify a class action under subdivision (b)(3), for another method of handling the litigious situation may be available which has greater practical advantages [e.g. test cases or consolidation]…. To reinforce the point that the court with the aid of the parties ought to assess the relative advantages of alternative procedures for handling the total controversy, subdivision (b)(3) requires, as a further condition of maintaining the class action, that the court shall find that the procedure is "superior" to the others in the particular circumstances.[1]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2 Newberg on Class Actions § 4:24 (4th ed.)

Emphasizing that Rule 23(b)(3) was designed to permit a class action when judicial economies could be achieved, together with practical advantages that would flow from a unitary adjudication of common issues in contrast to other forms of adjudication, Judge Kaplan, former Reporter for the Rules Advisory Committee, stated: "The object of the functional tests of Rule 23(b)(3) is to get at the cases where a class action promises important advantages of economy of effort and uniformity of result without undue dilution of procedural safeguards for members of the class or for the opposing party."[2]

> [FN1] Rules Advisory Committee Notes to 1966 Amendments to Rule 23, 39 Federal Rules Decisions pp 69, 102 to 103.

> Klay v. Humana, Inc., 382 F.3d 1241 (11th Cir. 2004), petition for cert. filed (U.S. Oct. 19, 2004). In an action by subscribers to health maintenance organizations (HMOs) brought suits alleging that HMOs violated Racketeer Influenced and Corrupt Organizations Act (RICO) and Employee Retirement Income Security Act (ERISA), suits were consolidated with those by physicians who alleged that HMOs defrauded them with respect to payments for medical services provided to subscribers. The court of appeals held that common questions of law and fact concerning fraud-based RICO claims predominated over individual issues specific to each plaintiff, the district court abused its discretion in certifying state breach of contract claims for classwide treatment, class certification of state unjust enrichment claims was inappropriate, certification of claims that HMOs violated variety of state prompt-pay statutes by failing to send doctors their reimbursements within certain statutorily established deadlines was inappropriate, HMOs waived the issue of whether the district court should have certified a subclass alleging violations of California unfair competition statute, and a class action was superior to other available methods of adjudication of RICO claims.

> Common questions of fact and law predominated with respect to a request to certify a global class in a suit by medical doctors who provided services to persons insured by health maintenance organizations (HMOs). RICO claims were not simply individual allegations of underpayments lumped together and an allegation of official corporate policy or conspiracy was not simply a piece of circumstantial evidence being used to support individual underpayment claims, but instead the very gravamen of claims was a pattern of racketeering activities and existence of nationwide conspiracy to underpay doctors.

> The fact that individualized determinations were necessary to determine the extent of damages allegedly suffered by each plaintiff was not sufficient to defeat class certification on the ground that common questions of law and fact predominated over individual issues; even though individualized damage inquiries were necessary, many of them could be accomplished simply through reference to standardized forms or HMO records of which patients registered with doctors who were reimbursed through the capitation system.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2 Newberg on Class Actions § 4:24 (4th ed.)

[FN2] Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv. L. Rev. 356, 389 to 390 (1967) (emphasis added).

Austell v. Smith, 634 F. Supp. 326 (W.D. N.C. 1986) (securities).

Common questions predominated over individual questions and a class action was a superior, fair, and efficient method of adjudication in Saur v. Snappy Apple Farms, Inc., 203 F.R.D. 281, 144 Lab. Cas. (CCH) ¶34389 (W.D. Mich. 2001) (NO. 1:00-CV-596), in which a class was certified of migrant farm workers alleging non-payment of overtime wages in violation of Fair Labor Standards Act (FLSA) and the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), and retaliatory discharge of one worker.

First, the Court must consider the extent to which the individual class members have a strong interest in individually controlling their claims. In this case, the interest in individual lawsuits is minimal in that the class mechanism allows class members for a more effective and far reaching remedy than would be available to them on an individual basis. Second, the Court must consider the extent of litigation already commenced. There is no mention of previous lawsuits filed and the Court assumes from the absence of mention that no such lawsuits have been filed. Third, the Court must consider the desirability of concentrating this suit in this forum. This forum is the logical home for this suit in that the farm is within the Western District of Michigan and in that at least some of the migrant workers are likely to return to the farm for future seasons. The litigation of this suit here would not pose any significant problems in terms of the Court's docket or attention to other matters. Fourth, the Court is required to consider any difficulties likely to be encountered in the management of this suit. There appear to be no significant problems associated with the class action mechanism and the use of the mechanism appears likely to achieve economies of time, effort and expense in resolving legal issues of class members. The maintenance of the class action is likely to delay trial, but not significantly. Therefore, the Court finds that the AWPA class qualifies for certification under 23(b)(3).

Saur v. Snappy Apple Farms, Inc., 203 F.R.D. 281, 289, 144 Lab. Cas. (CCH) ¶34389 (W.D. Mich. 2001).

Klay v. Humana, Inc., 382 F.3d 1241, 59 Fed. R. Serv. 3d 707 (11th Cir. 2004), cert. denied, 125 S. Ct. 877, 160 L. Ed. 2d 825 (U.S. 2005). The district court abused its discretion in certifying state breach of contract claims for class-wide treatment in an action by subscribers to health maintenance organizations (HMOs) brought suits alleging that HMOs violated the Racketeer Influenced and Corrupt Organizations Act (RICO) and the Employee Retirement Income Security Act (ERISA). Suits were consolidated with those by physicians who alleged that HMOs defrauded them with respect to payments for medical services provided to subscribers.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The certification of the plaintiffs' breach of contract claims failed because, although they were based on questions of contract law that were common to the whole class, the individualized issues of fact they involved would probably predominate. These claims alleged that the defendants breached their obligation to pay plaintiffs and class members for medically necessary services in accordance with their contractual obligations. The court noted that it was clear that class certification was impossible where the 50 states truly established a large number of different legal standards governing a particular claim. On the other hand, if a claim is based on a principle of law that is uniform among the states, class certification is a realistic possibility. Also, if the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate. In such a case, a court clearly must be careful not to certify too many groups. If more than a few of the laws of the 50 states differ, the district judge would face an impossible task of instructing a jury on the relevant law. The burden of showing uniformity or the existence of only a small number of applicable standards among the laws of the 50 states rests squarely with the plaintiffs. Here the plaintiffs alleged that the only real legal issue pertinent to their breach of contract claims was the definition of "breach," which does not differ from state to state. The court noted that Judge Marcus once held, "A breach is a breach is a breach, whether you are on the sunny shores of California or enjoying a sweet autumn breeze in New Jersey." While the plaintiffs' breach of contract claims

necessarily implicate the contract law of all fifty states (since members of the putative class practice in every jurisdiction in the country), the defendants fail to argue on appeal that there are any relevant differences in the applicable laws among these jurisdictions. Their brief fails to point to any material differences among state laws addressing breaches of contract. . . . Consequently, we accept the proposition that the applicable state laws governing contract interpretation and breach are sufficiently identical to constitute common legal issues in this case.

While this relatively simple issue of law is common to all the breach of contract claims, it is far outweighed by the individualized issues of fact pertinent to these claims. The plaintiffs contend that all of the agreements at issue require that doctors be reimbursed at a "reasonable rate" for the "medically necessary" services they provide. We nevertheless recognize that this case involves the actions of many defendants over a significant period of time and that each defendant throughout this period utilized many different form contracts. Indeed, each defendant contracted with different types of care-providing entities, including individual physicians, partnerships, medical practice groups, and the like, each of which necessitated a different type of contract. The sheer number of contracts involved is one factor that makes us hesitant to conclude that common issues of fact predominate; this is not a situation in which all plaintiffs signed the same form contract. . . . The plaintiffs might be able to establish by admission, stipulation, or judicial finding of undisputed fact that, notwithstanding their differences in form or language, all the contracts at issue call for "reasonable compensation" for "medically necessary services." . . . Even assuming, however, that this is a common fact,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2 Newberg on Class Actions § 4:24 (4th ed.)

it, along with the common legal issue of what constitutes a "breach" under state law, is dwarfed by the individualized issues of fact to be resolved.

> Klay v. Humana, Inc., 382 F.3d 1241, 1263–64, 59 Fed. R. Serv. 3d 707 (11th Cir. 2004), cert. denied, 125 S. Ct. 877, 160 L. Ed. 2d 825 (U.S. 2005). The facts that the defendants conspired to underpay doctors, and that they programmed their computer systems to frequently do so in a variety of ways, did nothing to establish that any individual doctor was underpaid on any particular occasion. The evidence that each doctor must introduce to make out each breach claim is essentially the same whether or not a general conspiracy or policy of breaching existed. For example, regardless of whether facts about the conspiracy or computer programs are proven, each doctor must prove the services she provided, the request for reimbursement she submitted, the amount to which she was entitled, the amount she actually received, and the insufficiency of the HMO's reasons for denying full payment. There were no common issues of fact that relieve each plaintiff of a substantial portion of this individual evidentiary burden. While allegations concerning the defendants' conspiracy to underpay doctors, or their policy of and aiding and abetting each other in underpaying doctors, went directly to material elements of each individual plaintiff's RICO claim, here they were merely circumstantial evidence tangentially relevant to each individual plaintiff's breach of contract claim.
>
> Although in this case each of the defendants allegedly breached their contracts in the same general ways, they did so through a variety of specific means that were not subject to generalized proof for a large number of physicians. The plaintiffs, for example, claimed that the defendants often grouped together separate procedures specified on HCFA-1500 forms submitted by doctors, frequently reimbursing them for only one of the procedures actually performed. If the plaintiffs could prove that the billing programs automatically grouped together the first and second procedures specified on the HCFA-1500 form, regardless of what they were, paying doctors only for the first, then the breach of contract issue would be subject to generalized proof. The doctors, after establishing that the computer program worked in this way, would be able to simply submit their HCFA-1500 forms to the court for an easy determination of damages and no further evidence of breach would be necessary.
>
> This was not, however, the type of allegation made by the plaintiffs. The algorithms by which the computer programs allegedly group procedures appeared to be much more varied and complicated than this. Instead of applying one specific universal rule to cheat all doctors (e.g. automatically deducting $100 from everyone's claim), the reimbursement programs were instead alleged to apply a variety of more individually tailored rules, each of which applied to only a subset of the plaintiff class. Thus, proof of any given algorithm concerning grouping would be relevant to only a handful of doctors within the class; separate subclasses would have to be established for each allegedly improper grouping formula. The court found this to be a case in which numerous plaintiffs suffered varying types of injury through different causal mechanisms, thereby creating many separate

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

issues. No one set of operative facts established liability. No single proximate cause applies equally to each potential class member and each defendant.

The court found the same reasoning applied to the plaintiffs' claim that the programs used by the defendants sometimes improperly drop modifiers from doctors' reimbursement requests. For example, a doctor could include a modifier claiming that a particular procedure was "complex," entitling the doctor to greater payment. The plaintiffs alleged that the computer systems sometimes improperly drops the modifier, paying the doctor for a "standard" rather than a "complex" procedure, meaning that he receives less than the full amount to which he is entitled. Because the program does not always automatically drop all modifiers, however, or always ignore a particular modifier under a set of circumstances applicable to most or all applicants, this allegation was not susceptible to class-wide proof. Even if the plaintiffs were to prove that the computer systems "sometimes" improperly drops "certain" modifiers, this fact would do nothing to further any of the plaintiffs' individual breach of contract claims. Each plaintiff would still have to establish that she or he submitted a claim containing a modifier warranting increased payment, that use of the modifier was justified in that particular situation, and that the HMO's computer program improperly dropped it. Generalized evidence that the programs sometimes drop modifiers would not help each plaintiff in satisfying her or his burden of proof of demonstrating that a modifier was improperly dropped in his particular case. Even if the plaintiffs were able to establish that modifiers were automatically dropped in particular situations not applicable to most of the 600,000 plaintiffs involved in this case, such proof would be irrelevant to the large majority of doctors who had not submitted a claim for that particular procedure with the particular modifier at issue.

The court applied similar reasoning to the other ways in which the HMOs allegedly breached their contracts with the fee-for-service providers, such as the defendants' alleged downcoding and denial of payment practices. While some of the capitation claims may have been suitable for class treatment, no capitation provider subclasses were requested or certified.

Thus the court concluded that even though the plaintiffs' breach of contract claims involved some relatively simple common issues of law and possibly some common issues of fact, individualized issues of fact predominated.

Carnegie v. Household Intern., Inc., 376 F.3d 656, R.I.C.O. Bus. Disp. Guide (CCH) P 10706 (7th Cir. 2004), petition for cert. filed (U.S. Oct. 14, 2004). Recipients of income-tax refund anticipation loans (RALs) brought class actions against a bank and tax preparers, alleging various claims including violation of Racketeer Influence and Corrupt Organizations Act (RICO). Following disapproval of a proposed settlement in one of the actions, classes were certified to pursue RICO claims and Defendants sought interlocutory appeals, which were consolidated.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The court of appeals held that the fact that a class contained millions of members did not, by itself, make litigation unmanageable, and a different district court's refusal to certify the class in an earlier action involving same defendants and same allegations was not preclusive, given the defendants' earlier insistence in this action that class treatment was appropriate.

The court observed that the more novel the issue presented by the appeal and so the less likely that the district court's resolution of it will stand, the more important the resolution of the issue is either to the particular litigation or to the general development of class action law, and the more likely the prompt resolution of the issue is to expedite the litigation and prevent a coercive settlement, the stronger the case for allowing the appeal. E.g., In re Bridgestone/Firestone, Inc., 288 F.3d 1012, at 1016, 52 Fed. R. Serv. 3d 422 (7th Cir. 2002), cert. denied, 537 U.S. 1105, 123 S. Ct. 870, 154 L. Ed. 2d 774 (2003); Blair v. Equifax Check Services, Inc., 181 F.3d 832, at 834–35, 43 Fed. R. Serv. 3d 1042 (7th Cir. 1999); Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, at 164, Fed. Sec. L. Rep. (CCH) P 91496, 50 Fed. R. Serv. 3d 1205 (3d Cir. 2001), as amended, (Oct. 16, 2001); Prado-Steiman ex rel. Prado v. Bush, 221 F.3d 1266, at 1278, 47 Fed. R. Serv. 3d 953 (11th Cir. 2000); Waste Management Holdings, Inc. v. Mowbray, 208 F.3d 288, at 294, 46 Fed. R. Serv. 3d 1019 (1st Cir. 2000). The issues that the petitions asked the court to consider first involved the procedures and criteria for converting a settlement class into a litigation class when having initially been approved the settlement is later disapproved, and, second, the bearing of the doctrine of judicial estoppel on class action litigation. These were novel issues whose prompt resolution was important to the development of the law of class actions as well as to the resolution of the present case.

The litigation arose out of refund anticipation loans made jointly by the defendants, "the bank" and "the tax preparer." When the tax preparer files a refund claim with the Internal Revenue Service on behalf of one of its customers, the customer can expect to receive the refund within a few weeks unless the IRS decides to investigate the return. The bank will lend the customer the amount of the refund for the period between the filing of the claim and the receipt of the refund. The annual interest rate on such a "refund anticipation loan" (RAL) will often exceed 100%. Although the bank is the lender, the tax preparer arranges the loan. Plaintiffs alleged that the customer is told neither that the bank pays the tax preparer a fee for having generated the loan nor that the tax preparer receives an ownership interest in the loan.

In 1990, parties started filing a number of class-action suits against the defendants on behalf of a total of 17 million refund-anticipation borrowers, charging violations of various state and federal laws, including RICO. The basic claim was that the defendants lead the borrowers to believe that the tax preparer is their fiduciary, much as if they had hired a lawyer or an accountant to prepare their income tax returns, whereas, unbeknownst to them, the tax preparer is engaged in self-dealing. This conduct is alleged

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

to constitute a scheme to defraud in violation of the federal mail-and wire-fraud statutes, whose violation are "predicate offenses" that can form the basis of a RICO charge.

The defendants objected mainly to the procedure the judge employed and to the brevity with which she pronounced the class manageable despite its vast size. In the previous round of this litigation the defendants had urged the district court to accept the giant class as appropriate for a global settlement, had prevailed in their urging, and so are now precluded by the doctrine of judicial estoppel, from challenging its adequacy, at least as a settlement class It is true that this court reversed the district court's approval of the settlement, but a reversal need not affect the application of judicial estoppel. The purpose of the doctrine is "to protect the integrity of the judicial process." See New Hampshire v. Maine, 532 U.S. 742, at 749–50, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001). The court has also said that

a party who prevails on one ground in a lawsuit cannot turn around and in another lawsuit repudiate the ground. If repudiation were permitted, the incentive to commit perjury and engage in other litigation fraud would be greater. A party envisaging a succession of suits in which a change in position would be advantageous would have an incentive to falsify the evidence in one of the cases, since it would be difficult otherwise to maintain inconsistent positions.

McNamara v. City of Chicago, 138 F.3d 1219, at 1225, 76 Fair Empl. Prac. Cas. (BNA) 668, 73 Empl. Prac. Dec. (CCH) P 45211 (7th Cir. 1998) (citations omitted). In other words, "the purpose of the doctrine … is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant." Ladd v. ITT Corp., 148 F.3d 753, at 756, 22 Employee Benefits Cas. (BNA) 1330 (7th Cir. 1998); see also Bethesda Lutheran Homes and Services, Inc. v. Born, 238 F.3d 853, at 858, 72 Soc. Sec. Rep. Serv. 419 (7th Cir. 2001).

The court noted that the defendants were correct, however, that a class might be suitable for settlement but not for litigation. The class might be unmanageable if the case were actually tried yet manageable as a settlement class because the settlement might eliminate all the thorny issues that the court would have to resolve if the parties fought out the case. But the court observed that although the district judge might have said more about manageability, the defendants have said nothing against it except that there are millions and that is no argument at all. The more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this single class action 17 million suits each seeking damages of $15 to $30. The rejected settlement capped damages at these amounts for single and multiple RALs respectively, and while the amounts might be too low they were indicative of the modest stakes of the individual class members. The court noted that the realistic alternative to a class action is not 17 million individual suits, but zero individual suits, "as only a lunatic or a fanatic sues for $30." But a class action has to be unwieldy indeed before it can be pronounced an inferior alternative—no matter how massive the fraud or other

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2 Newberg on Class Actions § 4:24 (4th ed.)

wrongdoing that will go unpunished if class treatment is denied—to no litigation at all.

The court observed that often, and possibly in this case as well, there is a big difference from the standpoint of manageability between the liability and remedy phases of a class action. The number of class members need have no bearing on the burdensomeness of litigating a violation of RICO. Whether particular members of the class were defrauded and if so what their damages were is another issue, and it may be that if and when the defendants are determined to have violated the law, separate proceedings of some type will be required to determine the entitlements of the individual class members to relief. That prospect need not defeat class treatment of the question whether the defendants violated RICO. Once that question is answered, if it is answered in favor of the class, a global settlement along the lines originally negotiated (though presumably with different dollar figures) will be a natural and appropriate sequel. "And if there is no settlement, that won't be the end of the world." Rule 23 gives district courts discretion to come up with imaginative solutions to problems created by the presence in a class action litigation of individual damages issues. Those solutions include bifurcating liability and damage trials with the same or different juries, appointing a magistrate judge or special master to preside over individual damages proceedings, decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages creating subclasses, or altering or amending the class.

The court rejected the defendants' argument that by requiring them to present their objections to class certification rather than requiring the plaintiff to move for certification, the district judge improperly altered the burden of proof on the question whether the class should be certified. Although the plaintiff class had not formally been certified in the earlier proceedings, that was a formal defect; a surprising but inconsequential technical oversight. The case had been settled as a class action, notices had been sent, objections had been considered and rejected—all on the assumption that a class had been certified. This was de facto certification, albeit of a settlement class only, and that was enough to empower the judge, in the exercise of her discretion to manage litigation before her in an efficient and expeditious manner, to require the defendants to list their objections to the certification of a litigation class, especially since she was explicit that the burden of persuasion on the validity of the objections would remain on the plaintiffs. The defendants themselves had argued that the class was appropriate for settlement purposes.

© 2008 Thomson Reuters/West

CLASSACT § 4:24

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.