

Newberg on Class Actions
Database updated June 2008

Alba Conte and Herbert B. Newberg

Chapter 4. Class Categories and Defendant Classes

References

### § 4:25. Predominance of common questions test applied

In light of the common question requirement's rationale,[1] the predominance test asks whether a class suit for the unitary adjudication of common issues is economical and efficient in the context of all the issues in the suit. Even if judicial economy for the adjudication of the common questions will not outweigh the disadvantages of adjudicating related individual issues when viewed in light of the totality of issues to be determined in a particular case, a court may still find that the unitary adjudication of selected issues that are common is a desirable, economical result. Rule 23(c)(4) provides the court with this power to limit a class to particular issues.[2]

The court properly certified a class of large retailers, joined by a number of smaller merchants and three retail associations in In re Visa Check/MasterMoney Antitrust Litigation[3] an antitrust action challenging rules issued by credit card associations that required stores accepting their credit cards to also accept their debit cards. Causation could be proven on classwide basis, individualized issues did not predominate due to associations' defense of mitigation of damages by steering, the class would be manageable, the district court was not required to determine which of two available techniques for measuring damages would be used before certifying class and certification was warranted in spite of its possible coercive effect.

The district court examined whether plaintiffs could establish each of the three required elements of an antitrust claim—(1) a violation of antitrust law; (2) injury and causation; and (3) damages—using common evidence. Concerning proof of the substantive elements of an antitrust violation, the district court determined that plaintiffs could use common proof to establish the existence of a tying arrangement and to show defendants' market power. Additionally, the court found that the question of coercion was also amenable to proof on a classwide basis because the contractual provision to which all class members were subject—the "honor all cards" rule—would establish the requisite coercion. The defendants did not seriously dispute on appeal that common proof could be used to prove the substantive elements of the antitrust violations, and thus the district court's findings were proper.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The district court also determined that plaintiffs' overcharge theory would permit them to establish injury-in-fact on a classwide basis. The court noted that although defendants argued that the overcharge theory was too speculative, defendants conceded in their briefs that the theory was not unknown and they did not contend that no plaintiff could ever recover under such a theory. The defendants also claimed that injury-in-fact could not be established using common proof because the district court would be required to examine a number of issues on an individual basis, including whether a merchant would have continued to accept off-line debit cards at their current prices even absent the tie, whether the merchant had the ability to process on-line debit transactions, and what forms of payment would replace the transactions formerly processed as off-line debit transactions. But the district court rejected this argument, finding that Carlton's scenario was a complete answer to the defendants' attack on the theory of the complaint, asserted classwide injury resulting from every single class member's overpaying for off-line debit cards as a direct result of the tie and that Carlton's theory did not require analysis of any of the individualized questions suggested by defendants. Thus, the district court concluded that plaintiffs had met their burden of showing that injury-in-fact was amenable to common proof and that class treatment was therefore appropriate.

The district court also considered and rejected defendants' arguments that causation could not be proven on a classwide basis. The court found that defendants' contention that, absent the tie, they would have selectively reduced fees as necessary to retain individual merchants' business was too speculative because defendants had not previously engaged in such merchant- specific pricing. The court also observed that although defendants do have broad pricing categories for different classes of merchants, Carlton's damage formula could easily be adjusted to account for that fact also the court found that defendants' claim that the usage of Visa Check and MasterMoney would decrease absent the tie was contradicted by empirical evidence and was not relevant to Carlton's overcharge theory.

The court further found meritless defendants' contention that a merchant's ability to "steer" made it impossible for plaintiffs to prove causation on a classwide basis. The defendants argued that if a merchant did not want to accept off-line debit cards because of the allegedly inflated fees it would have to pay, the merchant could "steer" its customers to other forms of payment by, for example, converting the transaction to on-line debit by asking for a PIN or for another form of payment. The court found, however, that if a customer refused to be steered, the merchant would have to allow the customer to complete the off-line debit transaction under defendants' "honor all cards" rule. The court stated that the presence of injury and causation is binary; it is either there or it is not. According to Carlton's theory, injury and causation is present for every putative class member. The court observed, however, that if defendants "repackaged" their steering argument as one addressing mitigation of damages, rather than causation, it could have force. Thus, the court properly concluded that causation also could be proven on a classwide basis.

Regarding predominance, although a court must examine the relevant facts and both the

claims and defenses in determining whether a putative class meets the requirements of Rule
23(b)(3), the fact that a defense may arise and may affect different class members differently
does not compel a finding that individual issues predominate over common ones. Instead, as long
as a "sufficient constellation of common issues binds class members together, variations in the
sources and application of a defense will not automatically foreclose class certification under
Rule 23(b)(3). Thus, the question for purposes of determining predominance is not whether a
defense exists, but whether the common issues will predominate over the individual questions
raised by that defense.

The court noted that the defendants' mitigation defense went only to the calculation of
damages. The district court properly found that Carlton's common formula for damages—that
absent the tie, the interchange fees for off-line debit cards would have decreased, the interchange
fees for credit cards would not have increased, and that an individual merchant's damages could
be calculated by comparing those fees with the interchange fees actually paid—was not fatally
flawed. Assuming arguendo that the mitigation defense was in fact viable, the majority of the
issues relating to this defense were common to the class, including, inter alia, whether defendants
"honor all cards" rule allows steering and whether steering is impeded due to the physical
similarities between Visa Check and MasterMoney and defendants' credit cards. The only
individualized question regarding this mitigation defense, if viable, is the extent to which a
particular merchant could have steered.

Common issues may predominate when liability can be determined on a classwide basis,
even when there are some individualized damage issues. District courts have correctly
recognized that any other rule would eliminate antitrust class actions:

> Under Carlton's theory of the case, which the district court found to be sufficiently reliable
> for class certification purposes, plaintiffs can prove on a classwide basis: (1) the substantive
> elements of the antitrust violations; (2) injury-in-fact and causation; (3) viability of the
> mitigation defense; and (4) general application of the overcharge formula for damages. In
> contrast, the only issues that might require some individualized inquiry under Carlton's
> theory are: (1) the extent to which a particular merchant could have steered customers away
> from off-line debit card transactions, assuming the mitigation defense is viable; and (2) the
> calculation of damages using the overcharge formula and, if necessary, mitigation. Under
> these circumstances, we cannot say that the district court's conclusion that the common issues
> of law and fact predominated over the individualized issues constitutes an abuse of its
> discretion.[4]

The court rejected Defendents' argument that the calculation of individualized damages made
this case unmanageable as a class action. There are some situations where courts have
determined that a case is not manageable as a class action because of the necessity for
individualized damages determinations, but nevertheless, failure to certify an action under Rule
23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the
exception rather than the rule. The court noted, citing Newberg on Class Actions (3d ed.), that

there are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.

The district court recognized that although it appeared at this preliminary stage that damages could be determined with the aid of a classwide formula, it had the flexibility to address any individualized damages issues, including the steering mitigation defense, that might arise. In this regard, the court specifically recognized its ability to modify its class certification order, sever liability and damages, or even decertify the class if such an action ultimately became necessary. Because the district court adequately considered how it would address any individualized issues that might arise in the case, the district court's conclusion that this action would be manageable as a class action was proper.

This case involved only two products (credit cards and off-line POS debit cards) with set interchange fees and class members who can be identified by defendants' own records, and there were no individualized issues relating to each plaintiffs' relationship with Visa and MasterCard because defendants' "honor all cards" rule contractually applied to each of the plaintiffs in the putative class. In addition, plaintiffs alleged a common practice affecting each member of the class and have proffered a damages formula to assist with the calculation of damages.

The court noted that the dissent discussed an issue not raised by the parties regarding adequacy of representation aguing that the district court abused its discretion by failing to determine which of the two available techniques for measuring damages should be used before it decided to certify the class, because the choice of the "correct" measure of damages in this action would lead to conflicts among class members and inadequacy of representation.

The two basic methods that courts use to measure damages in tying cases are the "tied product" approach, under which the damages awarded reflect the difference between the price actually paid for the tied product and the price for which the item could have been purchased on the open market, and the so-called "package" measure, which would award damages only to the extent that the plaintiff overpaid for the combination of the tied and tying products. The question of whether to apply the "tied product" or "package" approach is a complex issue that has long divided the circuits but this court had not taken a position on the issue.

The district court discussed these competing lines of cases when it considered whether the alleged injury-in-fact was amenable to classwide treatment. The district court did not choose between the two approaches because it found that plaintiffs' theory of the case, supported by their expert, rendered such a decision unnecessary. The plaintiffs' expert opinion asserted that the price of the tying product (the credit cards) would not have risen absent the tie. The district court found this evidence credible and determined that plaintiffs had made a showing, sufficient to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 5 of 35

CLASSACT § 4:25                                                                                Page 5
2 Newberg on Class Actions § 4:25 (4th ed.)

support class certification, that the price of the tied package would decline without the tie. As a result the court concluded that it need not choose between the competing line of cases because plaintiffs have proffered a sufficient theory of classwide injury under either the "package" or the "tied product" measure of injury.

The court noted that neither the Supreme Court nor this Circuit had delineated the precise circumstances under which a putative class requesting both injunctive and monetary relief can be certified under Rule 23(b)(2). The court did not delve into "this thorny question today," however, because it had already concluded that the district court appropriately certified the class under Rule 23(b)(3).

In Chin v. Chrysler Corp.,[5] an action by car buyers and lessees of vehicles containing allegedly defective ABS systems brought suit against automobile manufacturer alleging five state law claims, including fraud and breach of express and implied warranties, the plaintiffs moved for certification of class consisting of all car buyers and lessees whose vehicles contained allegedly defective ABS systems, regardless of whether they had experienced problems with system, on the ground that common questions of law and fact predominated, and the district court held that the necessity of applying laws of 52 jurisdictions and existence of individualized fact questions precluded a finding that common issues of fact and law predominated, and a class action as formulated was not a superior method for resolving buyers' and lessees' claims.

While the exact number of potential class members was unknown, from 1991 through 1993, Chrysler sold over 200,000 minivans with Bendix 10 ABS systems, and from 1990–1993 it sold an additional 68,000 New Yorker Salons or Fifth Avenues, Imperials, Premiers, Dynasties and Monacos with such systems. In addition, thousands more of the Jeep Cherokees were sold from 1989 through 1991 equipped with the Bendix 9 ABS systems. The potential class of plaintiffs was made up of both people who had and had not suffered problems with their ABS systems. The plaintiffs alleged that to date, there had been over 2,000 complaints by consumers received by Chrysler, consumer advocacy groups or governmental agencies concerning defects in the Bendix ABS, with at least 60 accidents reported, and Chrysler also reportedly bought back at least 35 minivans from owners because of ABS failures. Therefore, since the number of plaintiffs was in the hundreds of thousands, it was clear that the majority of plaintiffs had not experienced the problems with their ABS systems that the plaintiffs alleged were caused by a classwide defect.

Because the court concluded that class certification was not appropriate under Rule 23(b)(3), it did not reach the question whether plaintiffs satisfied the threshold Rule 23(a) requirements. Further, Chrysler did not argue that the plaintiffs had failed to satisfy the threshold Rule 23(a) requirements. However, where the applicable law derives from the law of the 50 states, as opposed to a unitary federal cause of action, differences in state law will compound the disparities among class members from the different states. Thus, certification of a nationwide class in which the law of the 50 states, rather than federal law, must be identified and applied, places the burden upon plaintiffs to credibly demonstrate, through an extensive analysis of state

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 6 of 35

CLASSACT § 4:25                                                                          Page 6
2 Newberg on Class Actions § 4:25 (4th ed.)

law variances, that class certification does not present insuperable obstacles. The plaintiffs cited numerous examples of allegedly common questions of law and fact, including: (a) whether the ABS systems are defective; (b) whether Chrysler knew or reasonably should have known that the vehicles contain a dangerous defect; (c) whether Chrysler caused the distribution and sale of the vehicles under false pretenses by, among other things, concealing the alleged defect; (d) whether Chrysler's conduct violated common and/or statutory law as alleged; and (e) whether the proposed class members have been damaged by Chrysler. The plaintiffs identified the core liability issue as the determination whether the ABS system was defective, and asked that if the court determined that the requested class certification was inappropriate, it alternatively certify a class solely for the purpose of determining whether a defect existed, asserting that the liability issues were predominantly common because the ABS in the vehicles belonging to class members were allegedly identical in material respects.

The plaintiffs argued that their breach of contract and breach of express and implied warranty claims presented predominantly common issues centering upon whether the vehicles had defective ABS systems that render the vehicles unfit for their ordinary use, and that Chrysler fraudulently concealed the alleged defect and misrepresented the safety of the ABS systems to purchasers. Chrysler argued that no classwide proofs of defect could be available for a class that includes members who suffered no ABS failure in their vehicles, and that the proposed class members who had experienced problems with their ABS systems each had different causation problems to overcome, and different types of damage, requiring individual proofs of causation and damages.

The court found that first, whether or not there is a defect would have to be decided according to the laws of each of the 52 applicable jurisdictions. Second, most of the potential class members have never experienced any problems with their ABS systems. Proving a classwide defect where the majority of class members have not experienced any problems with the alleged defective product, if possible at all, would be extremely difficult. Even where the alleged defect has manifested itself, individual issues of actual cause must be adjudicated. Because of the number of plaintiffs' causes of actions under divergent state laws, proving the existence of the alleged classwide defect weighed against a finding of factual predominance.

An analysis of issues in this case other than the defect issue further revealed the lack of truly classwide issues that were implicated by the plaintiffs' claims. For example, under the law of some states, for a plaintiff to prove an implied warranty claim, the plaintiff must demonstrate contractual privity with the defendant. The plaintiffs from these states would have to prove that they purchased their Chrysler vehicle either from Chrysler itself or from one of its agents, as opposed to an independent car dealer or another individual. This would require the court to undertake an inquiry that would turn on facts particular to such individual plaintiffs. Similarly, with regard to the plaintiffs' fraud claims, plaintiffs generally may not prevail without proving the element of reliance. While the plaintiffs assert that reliance may be presumed in the present action, the court noted that the Advisory Committee comments to Rule 23 recognizing that certification under Rule 23(b)(3) may be unsuitable in fraud cases where there are variations in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 7 of 35

CLASSACT § 4:25                                                                    Page 7
2 Newberg on Class Actions § 4:25 (4th ed.)

the kinds or degree of reliance by the persons to whom the alleged misrepresentations were addressed.

The court noted that while it might be desirable for the sake of efficiency to settle upon one state, such as New Jersey, and apply its law in lieu of the other 49 jurisdictions, due process required individual consideration of the choice of law issues raised by each class member's case before certification. Since the laws of each of the 50 states varied on important issues that were relevant to the plaintiffs' causes of action and Chrysler's defenses, the court could not conclude that there would be no conflict in applying the law of a single jurisdiction.

The plaintiffs correctly pointed out that the existence of state law variations is not alone sufficient to preclude class certification.

The plaintiffs asserted that any differences in state law for each cause of action are minor and can be managed by grouping together jurisdictions whose laws are similar and essentially asked the court to certify this class on the basis of mere promises that a manageable litigation plan can be designed in this case for five causes of action under the law of 52 jurisdictions as the litigation progresses. While the plaintiffs did argue in their brief that the court could certify a smaller class or create subclasses if necessary, the plaintiffs, not the court, have the burden of designing a workable plan for trial embracing all claims and defenses prior to class certification.

As to the variations in the applicability of the "vertical privity doctrine" in breach of warranty cases, the plaintiffs conceded that differences regarding this doctrine constituted a substantive disagreement between the states, and offered a grid, purporting to show the states that require vertical privity and those that do not. But the plaintiffs still failed to show that the state law differences concerning the "vertical privity" doctrine did not pose manageability problems.

Chrysler also correctly pointed out that state law varies concerning claimants who had not experienced any property damage as a result of the brake systems at issue. These state law variations were important, since the majority of the plaintiffs had not suffered ABS failure, and sought relief for an alleged defect that had not manifested itself or caused damage in their vehicles. In most jurisdictions, the courts recognize that unless a product actually manifests the alleged defect, no cause of action for breach of express or implied warranty or fraud is actionable.

Even if the plaintiffs could have satisfied the predominance requirement, their class certification motion would fail on the basis of the superiority requirement. In general it is desirable to litigate similar, related claims in one forum; that interest is especially significant in cases such as this in which the recovery being sought by each of the plaintiffs was not sufficiently large to render individualized litigation a realistic possibility. There were numerous factual issues in this case that could not be adjudicated on a classwide basis, and even the governing law would vary from plaintiff to plaintiff. If there existed only a limited number of issues for which there could be no classwide resolution, the court could perhaps certify these

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW    Document 15549-67    Filed 09/29/08    Page 8 of 35

CLASSACT § 4:25                                                                     Page 8
2 Newberg on Class Actions § 4:25 (4th ed.)

cases as class actions and then take steps to alleviate the problems raised by these issues. In short, the court perceived that, if certified as presently proposed, this case would quickly devolve into an unmanageable morass of divergent legal and factual issues. Moreover, such divergent issues were sufficiently numerous to negate any efficiencies brought on by the use of the class action device in this case. These manageability problems would be most acute in relation to the large number of proposed class members who had not suffered any sort of ABS failure in their vehicles. Bifurcating this case for the purpose of resolving more general issues in class form would not alleviate the problems that the court perceived. If there were certain basic issues, such as defect, to which only one state's laws applied and concerning which classwide issues predominated, the court could consider certifying a class with respect to those issues only, but even as to basic issues of defect, classwide resolution could be inappropriate in this case. The plaintiffs failed to set forth a proposal as to how the existence of the alleged common defect could be manageably determined following class certification solely on that issue.

While the plaintiffs presented the court with an analysis of the laws of each of the 50 states for each of their causes of action, they failed to meet their burden of setting forth a workable plan for dealing with these issues at trial, but merely asserted that through the use of subclasses, jury interrogatories, and special verdict forms any differences in state law could be made manageable. The court's analysis in this area would have been aided by a realistic, specific proposal by the plaintiffs concerning how subclasses could be constructed and implemented in this case. Without the aid of such a proposal, the court made an independent review of the possibility of subclasses and bifurcation, and it concluded that such remedies alone could not be used to render this case appropriate for class certification in a federal forum.

The lack of superiority of a nationwide class action in this case was also shown by the fact that, as a result of Chrysler's voluntary recall, it was unclear if there was any useful remedy this court could fashion under the laws of certain states even for those plaintiffs who suffered problems with their ABS systems. There were also administrative remedies that were available that could be superior to the remedies sought in a nationwide class action suit. Specifically, the Motor Vehicle Safety Act, 49 U.S.C.A. §§ 30101 et seq., gives NHTSA the authority to investigate complaints concerning automobile defects and to order a recall where appropriate. Any "interested person" may file a petition with the Secretary of Transportation to initiate proceedings aimed at determining whether a further recall, in addition to Chrysler's voluntary recall, would be appropriate.

Most of the plaintiffs had not suffered ABS failure, and sought relief for an alleged defect that had not yet manifested itself or caused damage in their vehicles. For those plaintiffs who suffered problems with their ABS systems, Chrysler's voluntary recall program provided for replacement of the malfunctioning ABS systems. The court was convinced that in such situations, the administrative remedy provided by NHTSA, including recall of vehicles for inspection and/or repair, was more appropriate than civil litigation seeking equitable relief and money damages in a federal court, and concluded that there was insufficient justification to burden the judicial system with the plaintiffs' claims while there existed an administrative

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

remedy that had been established to assess the technical merits of such claims and that could handle further recall or enforce the current recall and replacement of the ABS systems, if appropriate.

In an interlocutory appeal from a district court order under Fed. R. Civ. P. 23 conditionally certifying a nationwide plaintiff class and subclass in a products liability case against the manufacturer of a drug used for the treatment of epilepsy, the court decertified the class in Valentino v. Carter-Wallace, Inc.[6] In its certification order, the trial court did not discuss whether the adjudication of the certified issues would significantly advance the resolution of the underlying case, thereby achieving judicial economy and efficiency. Nor did the court discuss any alternative methods for adjudicating these claims. The plaintiffs argued, "with considerable justification," that because the case involved only one manufacturer, only one product, only one marketing program, and a relatively short period of time, the case was more manageable for class action purposes than cases that involve multiple manufacturers, multiple products, multiple marketing programs, and a long period of time. It appeared undisputed that the claims of all members of the class would raise some common issues concerning the knowledge and conduct of Carter-Wallace.[7] Carter-Wallace maintained, "with at least equal justification," that the existence of common issues of law or fact is a necessary but not the sole requirement for class certification, and that the class certified here did not meet other Rule 23 requirements, particularly Rule 23(b)(3) requirements that the common issues of fact predominate over individual issues and that the class action be superior to other methods of adjudicating the claims when the numerous adverse reactions of each plaintiff were intertwined with the certified liability issues, and that the law on each liability theory varied widely from state to state.[8] The defendant also noted that the problems with the numerous adverse reactions affected the Rule 23(a) prerequisites of typicality and adequacy of representation in that the drug had had a variety of different effects on different people and; further, that the class did not contain any representative who had allegedly developed aplastic anemia from taking the drug. Carter-Wallace also maintained that class adjudication will be unmanageable and inefficient and that alternative, superior methods of adjudication existed. The court rejected the defendant's threshold contention that, regardless of any specific problems with this particular certification, class certification is never appropriate for multi-state plaintiffs asserting personal injury claims against manufacturers of drugs and medical devices.

> We hold that the law of this circuit, and more specifically our leading decision in Dalkon Shield, does not create any absolute bar to the certification of a multi-state plaintiff class action in the medical products liability context. We decline to hold, at least at this early stage of the litigation, that there can never be a plaintiff class certification in this particular case.[9]

The court noted that in rejecting the nationwide class certification under Rule 23(b)(1)(B) in the Dalkon Shield case, the court was "clearly troubled" by the problems that would arise "in endeavoring to apply the varying punitive damage standards of fifty different jurisdictions."[10] But the court did not hold the commonality obstacle insurmountable.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The court also noted that In re Rhone-Poulenc Rorer Inc.[11] "cast a pall on the future of class action certifications in products liability cases" in the Seventh Circuit.[12] The "constitutional concern of the Rhone-Poulenc court may not be fully in line with the law of this circuit, and constitutional issues were never squarely presented to the district court…. We therefore do not accept Carter-Wallace's invitation in this case to adopt the principles of Rhone-Poulenc as the law of this circuit."[13]

The court was more sympathetic to the approach taken by the Sixth Circuit in In re American Medical Systems:[14]

Our reluctance to close the door on class action litigation in products liability cases is reinforced by current legal developments that could make class litigation more manageable. There has, for example, been discussion of federal class action legislation. See e.g., Thomas D. Rowe, Jr., Beyond the Class Action Rule: An Inventory of Statutory Possibilities to Improve the Federal Class Action, 71 N.Y.U.L. Rev. 186 (1996) (discussing several areas in which legislation might enhance federal class actions)…

In addition, the Advisory Committee on Civil Rules is in the process of modifying Rule 23, and has proposed authorizing the possible certification of settlement classes that need not meet the requirements of Rule 23(b)(3). See Fed. R. Civ. P. 23(b)(4) (Draft Aug. 15, 1996); see also Samuel Estreicher, Foreword, Federal Class Actions After 30 Years, 71 N.Y.U.L. Rev. 1, 6 & n. 26 (1996) (noting that proposed (b)(4) category would allow trial courts to certify class actions for purposes of settlement, even though the requirements of subdivision (b)(3) might not be met for trial); Edward H. Cooper, Rule 23: Challenges to the Rulemaking Process, 71 N.Y.U.L. Rev. 13 (1996) (discussing proposed changes to Rule 23).[15]

In the Valentino case it was not clear that the plaintiffs had met either the typicality or adequacy of representation requirement. The plaintiff class representatives included two individuals who had had difficulty withdrawing from Felbatol and returning to prior medications, one alleging liver failure and one some unspecified type of liver damage. No named plaintiff has experienced aplastic anemia as a result of taking the drug, even though this condition was one of the most serious of the alleged adverse consequences. The named plaintiffs thus might not be able to provide adequate representation for those who have suffered different injuries. Notice could also prove to be problematic. The number of known users who have reportedly suffered actual injuries from the drug is relatively small in comparison with all the users of the drug, so that many potential members of the classes cannot yet know if they are part of the class. "We therefore have serious due process concerns about whether adequate notice under Rule 23(c)(2) can be given to all class members to enable them to make an intelligent choice as to whether to opt out."[16] "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy."[17] Here, the certification order merely reiterated Rule 23(b)(3)'s predominance requirement and was otherwise silent as to any reason why common issues predominated over individual issues certified under Rule 23(c)(4)(A). There was no showing by the plaintiffs of how the class trial could be conducted.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

When common questions do not predominate when compared to all questions that must be adjudicated to dispose of a suit, Rule 23(c)(4) asks whether a suit limited to the unitary adjudication of particular common issues will achieve important and desirable advantages of judicial economy and efficiency. Judicial economy considerations are central to the predominance test of Rule 23(b)(3) and the court's power to limit a class to selected issues under Rule 23(c)(4). Because of authorized court powers under this latter subdivision, a Rule 23(b)(3) class may be certified in appropriate circumstances, without strictly satisfying the predominance test which was designed to apply to the totality of issues in a lawsuit. Many precedents construing the predominance requirement reflect the confluence of the provisions of Rule 23(b)(3) and (c)(4).[18]

Particularly in the early period following amendment of Rule 23 in 1966, courts struggled to find the proper focus of the predominance test for Rule 23(b)(3) class actions. Some of the rulings on the more obvious characteristics of this requirement achieved an easy consensus among courts, while less obvious aspects resulted in conflicting opinions. Most courts have agreed on what the predominance test does not entail: The test was not meant to require that the common issues will be dispositive of the controversy or even be determinative of the liability issues involved.[19]

Class actions can yield significant economies of scale even when some issues vary from claimant to claimant. Thus, the possibility that some class members may have larger damages than others is no significant obstacle to certification. In Shaw v. Toshiba America Information Systems, Inc.,[20] a class was certified of purchasers of allegedly defective computers and a settlement approved in an action against the manufacturer. The court approved the approximately $2.1 billion ($2,100,000,000.00) Settlement Agreement along with attorney's fees in the amount of $147.5 million ($147,500,000.00). Under the terms of the Settlement Agreement Toshiba agreed to pay approximately $2.1 billion ($2,100,000,000.00) in the form of cash remedies, warranty remedies, hardware replacements, software patches, and coupons all designed to address the allegedly defective FDC's in Toshiba's computers and compensate their respective owners. In return, Toshiba admitted no liability and avoided the further expense and inconvenience of complex litigation.

Forty-nine states and the District of Columbia have enacted the Uniform Commercial Code § 2-313 regarding express warranties. The states of Maine, Minnesota, Michigan, and South Carolina adopted minor variations in the language of § 2-313, but those variations do not affect the warranty claims in this case. Louisiana did not adopt § 2-313; but Louisiana state-law establishes the same warranty principles as § 2-313.

Additionally, forty-nine states and the District of Columbia have enacted Uniform Commercial Code § 2-719 regarding limitation of warranty remedies. The states of Alabama, California, Mississippi, Vermont, and Washington adopted minor variations in the language of § 2-719, but those variations do not affect the warranty claims in this case. Louisiana did

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 12 of 35

CLASSACT § 4:25                                                        Page 12
2 Newberg on Class Actions § 4:25 (4th ed.)

not adopt § 2-719; but Louisiana state-law establishes the same warranty principles as § 2-719.

Finally, a limitation of remedy to repair and replacement, such as that contained in the Toshiba warranties in this action, may be avoided under UCC § 2-719 only if the remedy is unconscionable or fails of its essential purpose.[21]

The court found that there were no latent injuries or personal injuries at issue, and there were no choice-of-law problems.

Everyone's loss flows from a single source—the purchase of computers with allegedly defective FDC's. In fact, this case is an even better candidate for certification than Treasure Chest. Here, there are economic losses, not personal injury claims. Courts have been reluctant to certify personal injury classes but have consistently certified classes involving economic harms. Class certification in securities cases is practically routine. See T. Willging, et al., Empirical Study of Class Actions in Four District Courts: Final Report to the Advisory Committee on Civil Rules 17 (Federal Judicial Center 1996) (reporting class certification rates in securities cases ranging from 94% to 100%). Here, there is only a single possible cause of the injuries—the allegedly defective microcode in the FDC's. In Treasure Chest, other causes were possible, such as allergies, smoking, and pre-existing medical conditions. The problems of varying exposure to the ventilation system and differing injuries had to be dealt with in Treasure Chest, too. By comparison, this case is free of such complications. Simply put, the predominance test is met.[22]

Moreover, the predominance test does not involve a comparison of court time needed to adjudicate common issues weighed against time needed to dispose of individual issues,[23] though some early precedents have considered this relative time factor.[24] Such a mechanistic test normally fails to consider the time for duplicative adjudications of the common issues that may be necessary in individual suits by class members, and such a test ignores the power of a court in appropriate circumstances to limit a class suit to particular issues.

In addition, the predominance requirement is not a numerical test that identifies every issue in the suit as suitable for either common or individual treatment and determines whether common questions predominate by examining the resulting balance on the scale.[25] A single common issue may be the overriding one in the litigation, despite the fact that the suit also entails numerous remaining individual questions.

Finally, a court cannot resolve predominance questions by examining the relative importance of the common issues compared to the individual ones.[26] Such a determination is necessarily a subjective one because it is based on assigned values and cannot lead to any predictable results in the application of this predominance test.

In finding that common questions do predominate over individual ones in particular cases,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 13 of 35

CLASSACT § 4:25                                                                    Page 13
2 Newberg on Class Actions § 4:25 (4th ed.)

courts have pointed to such issues that possess the common nucleus of fact for all related questions,[27] have spoken of a common issue as the central[28] or overriding question,[29] or have used similar articulations.[30] One court has construed this test as determining whether there is an essential common link among class members and the defendant for which the court provides a remedy.[31]

Noting that the Ninth Circuit does not recognize an absolute bar to certification of a multistate plaintiff class action in medical products liability context, the court of appeals in Valentino v. Carter-Wallace, Inc.[32] vacated the lower court certification of a nationwide plaintiff class in a products liability action against manufacturers of epilepsy drug, finding that plaintiff class representatives did not demonstrate that their claims met the requirements of typicality and adequate representation. In addition, the Valentino court noted that certification of particular issues without adequate consideration of whether common questions predominated over individual ones was an abuse of discretion. The court noted that implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy, citing Newberg on Class Actions. Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues. But here, the certification order merely reiterated Rule 23(b)(3)'s predominance requirement and was otherwise silent as to any reason why common issues predominate over individual issues certified under Rule 23(c)(4)(A). There was no showing by the plaintiffs of how the class trial could be conducted. Thus the district court abused its discretion by not adequately considering the predominance requirement before certifying the class. In addition, there was no showing why the class mechanism is superior to alternative methods of adjudication, particularly when coupled with the discovery coordination that is made possible by the JPML consolidation. Implicit in all these articulations of satisfaction of the predominance test is the notion that adjudication of the common issues in the particular suit has important and desirable advantages of judicial economy compared to all other issues, or when viewed by themselves.

[FN1] See §§ 4:21, 4:24.

[FN2] Rule 23(c)(4) is set forth in § 4:23.

See also Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 35 Fed. R. Serv. 3d 731 (9th Cir. 1996). Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues, citing Newberg on Class Actions (3d ed.).

In re A.H. Robins Co., Inc., 880 F.2d 709, 13 Fed. R. Serv. 3d 1239 (4th Cir. 1989). Court can certify one of several claims for class treatment under Rule 23(c)(4), citing Newberg on Class Actions (2d ed.). "Courts should take full advantage of the provision in subsection (c)(4) permitting class treatment of separate issues in the case, and, if such

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

separate issues predominate sufficiently (i.e., is the central issue), to certify the entire controversy."

Goldwater v. Alston & Bird, 116 F.R.D. 342, 351 (S.D. Ill. 1987) (securities). Pendent common law negligence and breach of contract claims met the commonality requirement in a fraud-on-the-market federal securities action charging the fraudulent marketing of bonds when "the common nucleus of operative fact is the alleged fraudulent scheme which resulted in the sale of bonds to the plaintiffs." The court found that the proof required to establish the elements of the common law negligence and breach of contract claims would, for the most part, be common to all plaintiffs and, thus, the predominance requirement was satisfied. If there did exist material variances in the existence of a duty in the negligence claims or the existence of a contract in the contract claims, the court could decertify these claims or subclasses of plaintiffs who lived in states which do not impose the duty or recognize the existence of a contract.

[FN3] In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 57 Fed. R. Evid. Serv. 583, 50 Fed. R. Serv. 3d 993 (2d Cir. 2001), cert. denied, 122 S. Ct. 2382, 153 L. Ed. 2d 201 (U.S. 2002).

Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 2007-2 Trade Cas. (CCH) ¶75861 (2d Cir. 2007). The "antitrust injury" prong of asserted claim posed a common legal question, for purposes of determining whether predominance requirement for class certification was satisfied in an action by assignees of IPO issuers in an antitrust class action brought against investment banks that underwrote initial public offerings (IPOs), alleging that banks had violated Sherman Act by fixing their charges for mid-size IPOs at seven percent of proceeds, but the district court denied the motion for class certification because, it concluded that the adequacy requirement of Rule 23(a)(4) and the predominance requirement of Rule 23(b)(3) were not satisfied.

The district court concluded that because Cordes and Creditors Trust are assignees of the entities that instituted this lawsuit and are not themselves members of the putative class, they are not qualified to act as representatives of the class. This court concluded that the fact that the assignee-plaintiffs did not themselves fall within the definition of the class as set forth in the Complaint does not, ipso facto, foreclose their ability to act as class representatives in lieu of the entities that originally brought the claims, both of them members of the class. On remand, the district court should decide whether, on the facts presented in this case, Cordes and Creditors Trust are each adequate representatives of the class.

The district court also concluded that the plaintiffs failed to establish that this litigation meets that requirement because they did not offer evidence to establish that antitrust injury could be proved by a method common to the class.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The antitrust injury element raises both factual questions related to whether the plaintiff has suffered harm and legal questions related to whether that harm is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The district court should have distinguished between antitrust injury's factual questions—as to which both parties offered evidence—and its legal questions—as to which neither party offered evidence. The court concluded, for, that the legal questions raised by the antitrust injury element of this case are common to the class. On remand, the district court should therefore decide whether the factual questions are common to the class. And if the court determines that the factual questions relevant to antitrust injury here are individual to each class member, the court should then determine (1) whether common questions nonetheless predominate, and (2) whether certification of a part of the case would be appropriate even if certification of the whole would not be.

In denying certification, the district court first determined that neither Cordes nor Creditors Trust satisfied the adequacy prerequisite of Rule 23(a)(4). The court noted that "a class representative must be a member of the class" and that both Cordes and Creditors Trust were assigned their interests in the litigation. Assuming for purposes of its analysis that Cordes and Creditors Trust met the other class certification qualifications, it ruled that they were not members of the proposed class and thus could not represent it. The court noted that treating class membership as a transferable asset could lead to a very serious problem in the class action field.

The district court concluded further that Rule 23(b)(3)'s predominance requirement also had not been met. Cordes and Creditors Trust argued that because their expert had provided a formula for assessing damages for all class members, they had also established that they would be able to prove antitrust impact by common proof. The district court rejected this argument because the plaintiffs were ignoring the distinction between antitrust injury or impact, on the one hand, and damages, on the other. Although the court accepted both opinions as not fatally flawed and sufficiently reliable, only the defendants' expert's analysis, the court concluded, "addresses the question before the Court—which is whether antitrust injury or impact can be proved by evidence common to the class." The questions are different, because there is considerably more leeway allowed in proving damages, once antitrust liability is established, than is permitted in proving antitrust liability.

Cordes and Creditors Trust also argued that certification was appropriate because common questions regarding the nature of the conspiracy in a price-fixing case predominate over all other questions, including those regarding injury, citing In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 2001-2 Trade Cas. (CCH) ¶73459, 57 Fed. R. Evid. Serv. 583, 50 Fed. R. Serv. 3d 993 (2d Cir. 2001). The court concluded, however, that Visa Check supported only the proposition that the need for individualized inquiry into damages should not prevent certification of a class with common questions on liability. Based on its conclusion that Cordes and Creditors Trust

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 16 of 35

CLASSACT § 4:25                                                                              Page 16
2 Newberg on Class Actions § 4:25 (4th ed.)

did not establish that in this case there are common questions on liability, the district court rejected this argument, too.

The district court did not find it necessary to engage in either part of the typical inquiry, and decided that regardless of whether Cordes and Creditors Trust could satisfy the typicality requirements, they could not be representatives of the class because they do not themselves fit within the definition of the class as set forth in the Complaint, when it was clear that Cordes and the Creditors Trust are not members of the proposed issuer class and that, as a consequence—and assuming arguendo that they meet the other qualifications for class representation—they cannot represent the issuer class.

The defendants unsuccessfully urged this court on appeal to adopt the district court's conclusion, arguing (1) that Cordes and Creditors Trust are not themselves members of the defined class; (2) in light of the general principle that only a class member can adequately represent the class, Cordes and Creditors Trust cannot represent the class; and (3) "to allow the class action device to become a mechanism for trafficking in litigation would fundamentally undermine the administration of justice in federal courts.

When Western Pacific and EqualNet brought this lawsuit as putative class representatives, they were indisputably members of the class they sought to represent. The subsequent assignment of their claims and interests in this litigation to Cordes and Creditors Trust, did not deprive Cordes and Creditors Trust of the ability, as assignees, to continue to seek recognition as representatives of the class.

The defendants did not contest the validity of the assignments of the bankrupts' antitrust claims to Cordes and Creditors Trust in this instance. It is undisputed that Cordes and Creditors Trust acquired through Western Pacific's and EqualNet's bankruptcy proceedings all or a portion of whatever substantive rights Western Pacific and EqualNet held at the time of their respective bankruptcies to recover for the injuries alleged in the Complaint. The defendants did argue that because neither Cordes nor Creditors Trust was itself a member of the class as pleaded, neither had standing to act as a class representative.

To have standing to sue as a class representative it is essential that a plaintiff must possess the same interest and suffer the same injury shared by all members of the class he represents.Western Pacific and EqualNet were both members of the class. By virtue of the assignments, Cordes and Creditors Trust possessed the same interest and thus could continue to assert a claim for the same injury shared by all members of the class. As assimilated class members by virtue of the assignments. Thus, Cordes and Creditors Trust have standing to pursue the assigned claims as class representatives.

Finally, the court did not believe that allowing Cordes and Creditors Trust to serve as class representatives threatens the district court's power under Article III to hear this

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

dispute. The assignment would be without power to decide the case. The assignment of a class claim by a person who purports to be a class representative does not render the claim less amenable to resolution as a class action, nor class action treatment less beneficial to the litigants, after the transfer of the asserted cause or causes of action than before.

The court would remand for determination of whether Cordes and Creditors had interests that were not antagonistic to the interest of other members of the class and whether their attorneys were qualified, experienced and able to conduct the litigation. With respect to predominance, in order to prevail, on their price-fixing claims, plaintiffs must demonstrate: (1) a violation of antitrust law; (2) injury and causation; and (3) damages.

The first element clearly was met. Horizontal price-fixing agreements are per se violations of the Sherman Act. Cordes and Creditors Trust's allegations of the existence of a price-fixing conspiracy are susceptible to common proof and, if proven true, would satisfy the first element of the plaintiffs' antitrust cause of action.

However, the second element—whether termed "antitrust injury," "causation or impact," or "injury and causation" was more complicated.

The second element of an antitrust cause of action—"antitrust injury"—poses two distinct questions. One is the familiar factual question whether the plaintiff has indeed suffered harm, or "injury-in-fact." The other is the legal question whether any such injury is injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.

Rather than relying on the distinction between the legal and factual questions raised by the antitrust injury element of an antitrust suit, the district court focused on the distinction between antitrust injury and damages. It accurately noted that the plaintiffs' expert, Bamberger, was asked to opine as to damages and the defendants' expert, Willig, as to injury. Reasoning that the plaintiffs' and defendants' experts have been asked … "meaningfully different questions, the district court accepted the testimony of the defendants' expert, Willig, because only he had addressed the question before the Court—which is whether antitrust injury can be proved by evidence common to the class. The district court therefore concluded that the antitrust injury element of Cordes and Creditors Trust's lawsuit presents questions individual to each class member.

But this court did not agree. Although the questions asked of the experts differed precisely as described by the district court, the court found their answers to be directed to the same question: whether injury-in-fact is susceptible to common proof in this case. Neither expert offered any views on the legal question of whether common evidence could prove that the injury allegedly suffered was of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The defendants' expert, Willig, stated
that any determination of whether a particular member of the purported issuer class has been
injured by the clustering or alleged "standardization" of gross spreads would require an
individualized factual analysis about whether, absent such alleged standardization, the issuer
would have paid a gross spread of less than 7% for IPO net proceeds, the same or equal to the
proceeds the issuer actually received as a result of its offering.

And the plaintiffs' expert, Bamberger, opined that the difference between each proposed
class member's but-for fee and the actual fee it was charged measures damages. Each
expert thus evaluated whether it would be possible to measure the but-for fee—that is, the
fee an issuer would have paid absent the conspiracy—by common proof. The plaintiffs'
expert thought that the court could use a single formula to establish the supra competitive
prices a plaintiff had paid; the defendants' expert thought no such formula could be
constructed.

This disagreement goes to the single question of whether injury-in-fact can be proved by
common evidence. Although the plaintiffs' expert would use a single formula while the
defendants' expert would conduct many individualized inquiries, both experts would
determine injury-in-fact by calculating the but-for fee and comparing it to the fee paid. If
the fee paid were higher than the but-for fee, then the plaintiff suffered an injury-in-fact.
Here, the extent of the difference between the but-for fee and the actual fee paid is
relevant to the question of damages, but it is from a comparison between the two that the
court would be asked to decide the question of injury-in-fact. If the plaintiffs' single
formula can be employed to make a valid comparison between the but-for fee and the
actual fee paid, then it seems to us that the injury-in-fact question is common to the class.
Otherwise, it poses individual ones. The district court did not determine which expert is
correct, and this question would have to be resolved on remand.

Notwithstanding the existing open question as to injury-in-fact, the court found the legal
question raised by the antitrust injury element of Cordes's and Creditors Trust's case to be
common to the class. There was only one type of injury alleged in the Complaint—
overcharges paid to a horizontal price-fixing conspiracy. Because each class member
allegedly suffered the same type of injury, the legal question of whether such an injury is
of the type the antitrust laws were intended to prevent and that flows from that which
makes defendants' acts unlawful, is common to the class.

With respect to the predominance requirement, the legal question raised by the antitrust
injury element here is common to the class. If the factual question—injury-in-fact—is
also common, then the predominance requirement of Rule 23(b)(3) is likely met.

Even if the district court concludes that the issue of injury-in-fact presents individual
questions, however, it does not necessarily follow that they predominate over common

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 19 of 35

CLASSACT § 4:25                                                            Page 19
2 Newberg on Class Actions § 4:25 (4th ed.)

ones and that class action treatment is therefore unwarranted. The defendants conceded that any plaintiff who has suffered the type of injury alleged in the Complaint has suffered antitrust injury. But a concession does not eliminate a common issue from the predominance calculus.

These questions, at least, are common: (1) all factual and legal questions that must be resolved to determine whether the defendants violated Section 1 of the Sherman Act; and (2) all factual and legal questions that must be resolved to decide whether, assuming a plaintiff paid supra competitive prices, that payment was caused by the defendants' antitrust violation and constitutes the kind of injury with which the antitrust laws are concerned. The question of injury-in-fact, which in this case is equivalent to whether a particular plaintiff would have paid more in the but-for world, may not be common. The court would not discount the possibility that the individual questions raised by injury-in-fact might then predominate over the several common questions. The court thus found that the predominance question, too, is best left to the sound discretion of the district court on remand.

[FN4] In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 140, 57 Fed. R. Evid. Serv. 583, 50 Fed. R. Serv. 3d 993 (2d Cir. 2001), cert. denied, 122 S. Ct. 2382, 153 L. Ed. 2d 201 (U.S. 2002)

"[N]umerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." Allapattah Services, Inc. v. Exxon Corp., 333 F.3d 1248, 1261, 56 Fed. R. Serv. 3d 677, 50 U.C.C. Rep. Serv. 2d 1047 (11th Cir. 2003), cert. granted in part, 125 S. Ct. 317 (U.S. 2004), miscellaneous rulings, 125 S. Ct. 944, 160 L. Ed. 2d 767 (U.S. 2005), miscellaneous rulings, 125 S. Ct. 1116, 160 L. Ed. 2d 1091 (U.S. 2005) and miscellaneous rulings, 125 S. Ct. 1241, 160 L. Ed. 2d 1093 (U.S. 2005); see, e.g., In re Tri-State Crematory Litigation, 215 F.R.D. 660, 692 n.20 (N.D. Ga. 2003) ("The requirement of determination of damages on an individual basis does not foreclose a finding of predominance or defeat certification of the class."). The necessity of calculating damages on an individual basis, by itself, can be grounds for not certifying a class. Bell Atlantic Corp. v. AT&T Corp., 339 F.3d 294, at 308, 56 Fed. R. Serv. 3d 30 (5th Cir. 2003) (class certification was not appropriate because plaintiffs failed to demonstrate that the calculation of individualized actual economic damages, if any, suffered by the class members could be performed in accordance with the predominance requirement of Rule 23(b)(3)); O'Sullivan v. Countrywide Home Loans, Inc., 319 F.3d 732, at 745, 54 Fed. R. Serv. 3d 909 (5th Cir. 2003) (the district court abused its discretion in certifying class in light of the individual calculation of damages that was required); Allison v. Citgo Petroleum Corp., 151 F.3d 402, at 419, 81 Fair Empl. Prac. Cas. (BNA) 501, 73 Empl. Prac. Dec. (CCH) P 45426 (5th Cir. 1998) (holding that certification under Rule 23(b)(3) was not appropriate because plaintiffs' claims for compensatory and punitive damages had to focus almost entirely on facts and issues specific to individuals rather than the class as a whole).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 20 of 35

CLASSACT § 4:25                                                    Page 20
2 Newberg on Class Actions § 4:25 (4th ed.)

Poulos v. Caesars World, Inc., 379 F.3d 654, R.I.C.O. Bus. Disp. Guide (CCH) P 10728 (9th Cir. 2004). Common issues would not predominate over individualized issues of causation, so class certification was inappropriate in an action by casino and cruise ship patrons against gaming machine manufacturers and casino and cruise ship operators, alleging a scheme to defraud patrons, in violation of Racketeer Influenced and Corrupt Organizations Act (RICO), and common-law claims. Alleged classwide circumstantial evidence of causation was insufficient to show that individualized issues would not predominate.

The court noted that whereas video poker machines are loosely based on a traditional poker game, electronic slot machines are based on earlier mechanical slot machines, which were not computerized. Like their mechanical counterparts, electronic slot machines are played by a single player who initiates play by depositing a coin in the machine. After the deposit, the player may either pull a handle (like the mechanical slot machines require) or push a button. This action causes symbol-adorned reels displayed on the face of the machine to appear to spin as they do on the mechanical machines. Once the reels stop "spinning," the machine pays off by awarding coins according to a set schedule. Pay-offs appear to correspond to winning alignments of symbols on the "pay-off line."

The Class Representatives alleged that, although the electronic slot machines are designed to appear to operate as did the mechanical slot machines of the past, they actually operate quite different as the spinning of the mechanical reels causes a random alignment of symbols on the pay-off line, and the alignment itself triggers any pay-off. Thus, a player's chance of winning a pay-off on a mechanical slot machine is equal to the random chance that the appropriate symbols on the reels would line up in a winning combination. For example, if a jackpot requires the alignment of three jokers on the pay-off line, a player's chance of winning a jackpot on the mechanical machine is determined by how often a joker appears on each reel compared to other symbols.

The Class Representatives argued that, in contrast, a player's odds of winning a pay-off on an electronic slot machine depends on computer programming, not chance. A computer determines the pay-off and the corresponding appearance of the pay-off line on electronic slot machines, such that the computer-generated "spinning" of the reels has nothing to do with a player's chance of winning the game. Additionally, unlike in the mechanical game, where symbols appearing immediately above and below the pay-off line are symbols that the player "has just barely missed," in the electronic game, the machine operator can program the computer to generate "near misses" whenever desired, thus manipulating the psychology of the game by encouraging players to believe that they are just missing jackpots and, relatedly, that the odds of a jackpot are greater than they are. However, unlike in the mechanical version, the chance of winning any prize from an electronic slot machine has nothing to do with the distribution of symbols on the reels but

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 21 of 35

CLASSACT § 4:25                                                                Page 21
2 Newberg on Class Actions § 4:25 (4th ed.)

instead depends entirely on the sophisticated computer programming that predetermines the game's outcome.

The Class Representatives proposed two classes to litigate their claims, the "Video Poker Class" and "Electronic Slot Class," each with two subclasses—a "Card and Tournament Subclass" and a "Cruise Ship Subclass." The "Video Poker Class" and "Electronic Slot Class" were defined nearly identically, and together include:

All persons in the United States, other than directors, officers or employees of suppliers of ["video poker machines" or "electronic slot machines," respectively] or of casinos or persons acting in concert therewith, who have played defendants' ["video poker machines" or "electronic slot machines," respectively] during the period from January 1, 1988 to the present.

The "Card and Tournament Video Poker Subclass" and "Card and Tournament Electronic Slot Subclass" are also similar, and together include:

All persons in the United States, other than directors, officers, or employees of suppliers of ["video poker machines" or "electronic slot machines," respectively] or of casinos or persons acting in concert therewith, who have played defendants' ["video poker machines" or "electronic slot machines," respectively] during the period from January 1, 1988 to the present and who are readily identifiable, i.e., who used club cards to ["play video poker or who played in video poker tournaments" or "play the electronic slot machines," respectively].

The "Cruise Ship Video Poker Subclass" and "Cruise Ship Electronic Slot Subclass" are also similar, and together include:

All persons in the United States, other than directors, officers or employees of suppliers of ["video poker machines" or "electronic slot machines," respectively] or of cruise ship casinos or persons acting in concert therewith, who have played the Cruise Ship Casinos' ["video poker machines" or "electronic slot machines," respectively] during the period from January 1, 1988 to the present.

Altogether, the proposed classes "encompass[ ] hundreds of thousands, if not millions, of individuals who have played video poker or electronic slot machines."

The court concluded that the district court did not abuse its discretion in determining that individualized reliance issues related to proof of causation would predominate over common questions. Here, reliance provided a key causal link between the Casinos' alleged misrepresentations and the Class Representatives' injury. For example, the Class Representatives alleged that video poker machines are designed in their appearance and labeling and represented and advertised to the public as replicating random shuffling of a standard deck followed by a deal and a draw from such a deck, when in fact the machines do not use cards and do not operate in the manner of a card game. Even taking the Class Representatives' allegations as true, however, and assuming that all plaintiffs in the proposed classes suffered financial loss or other concrete injury as a consequence of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 22 of 35

CLASSACT § 4:25                                                              Page 22
2 Newberg on Class Actions § 4:25 (4th ed.)

playing the machines, it does not necessarily follow that plaintiffs' injuries are causally linked to the Casinos' alleged misrepresentations. Individualized reliance issues related to plaintiffs' knowledge, motivations, and expectations bore heavily on the causation analysis.

The unique nature of gambling transactions and the allegations underlying the class claims required forging a chain of inferences that, viewed together, amount to individualized reliance.

A plaintiff must draw a causal link between the alleged fraud and the alleged harm. The plaintiff might draw this link by proving that the Casinos' failure to inform players that the electronic slot machines operate differently than their mechanical counterparts affected her decision to play, or that she was influenced by the fact that electronic slot machines look like traditional slot machines. In turn, this would require her to establish that she was aware of how the mechanical slot machines operated, was unaware that the electronic slot machines operated differently than those machines, and was motivated to play the electronic slot machine based on her knowledge of these factors. A plaintiff alleging losses stemming from misrepresentations related to the video poker machines might also draw a causal link by establishing that she was an ace player in the traditional table poker game and played the video poker game, at least in part, because she was misled into believing that the video poker and table poker games functioned similarly and offered the same odds. The court noted that gamblers do not share a common universe of knowledge and expectations—one motivation does not "fit all." Some players may be unconcerned with the odds of winning, instead engaging in casual gambling as entertainment or a social activity. Others may have played with absolutely no knowledge or information regarding the odds of winning such that the appearance and labeling of the machines is irrelevant and did nothing to influence their perceptions. Still others may have played fully aware of how the machines operate. Thus, to prove proximate causation in this case, an individualized showing of reliance was required.

The Class Representatives attempted to transform alleged affirmative misrepresentations into omissions, arguing that the Casinos "omit" the material information that the machines operate differently. This argument greatly oversimplifies the electronic slot machine claims. The court concluded that, at best, the electronic slot machine claims were mixed claims based on both affirmative misrepresentations and omissions. As stated in the complaint, the representations at issue are both "express and implied." There often is a fine line between these two concepts, here the Class Representatives contended that, to no small extent, it is the trade dress of the electronic slot machines that makes them misleading—for example, the affirmative placement of symbols on the reels and the affirmative advertisement of the opportunity to "buy" more than one "line" at a time by placing additional coins in the machine. That the machines neglected to specify that they operate differently than their older mechanical counterparts was but one part of a much broader claim. Simply put, the Class Representatives' claims were based as much on what

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 23 of 35

CLASSACT § 4:25                                                                Page 23
2 Newberg on Class Actions § 4:25 (4th ed.)

is there as what is purportedly missing.

The court also rejected Class Representatives' second fallback position is that reliance could be proven through classwide circumstantial evidence, such that individualized reliance issues related to causation would not predominate. This argument was a variation on both the causation and presumption of reliance themes. The suggestion that "common sense" links the act of a player's falling for the misrepresentations or omissions on the machines to the ensuing loss was just another effort to avoid the necessary proof of causation.

The court was not persuaded by the Class Representatives' argument that the gambling transactions here are analogous to the transactions at issue in Garner v. Healy, 184 F.R.D. 598, R.I.C.O. Bus. Disp. Guide (CCH) P 9661 (N.D. Ill. 1999). In Garner, the district court certified a class of consumers who purchased a substance represented as "car wax" that allegedly contained no wax, holding that the alleged fraud "was perpetrated in a uniform manner against members of the class," such that individual reliance issues would not predominate. The court quite sensibly concluded that "if Plaintiffs paid money for a 'wax,' but instead received a worthless 'non-wax' product, then issues of proximate cause would be relatively simple to resolve on a classwide basis."

Indeed, there may be no single, logical explanation for gambling—it may be an addiction, a form of escape, a casual endeavor, a hobby, a risk-taking money venture, or scores of other things. The vast array of knowledge and expectations that players bring to the machines ensures that the "value" of gambling differs greatly from player to player, with some people playing for "entertainment value" or for any number of other reasons as much as to win. Consequently, we conclude that classwide circumstantial evidence would not suffice to prove causation in this case.

379 F.3d 654 at 668.

Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp., 100 Fed. Appx. 296, 2004-1 Trade Cas. (CCH) P 74445, 58 Fed. R. Serv. 3d 768 (5th Cir. 2004) (Not selected for publication in the Federal Reporter). A determination that the predominance requirement for class certification was not met was not an abuse of discretion in a price-fixing suit against a bread manufacturer. Despite an expert's view that damages could be calculated in a relatively straightforward manner, the district court was not required to accept the expert's view, and individualized proof would be required to establish the amount of damages as to each class member and whether each class member could take advantage of the fraudulent concealment doctrine to extend the limitations period.

This court has held that a district court did not abuse its discretion in certifying a class action where "calculating damages will require some individualized determinations," and "virtually every issue prior to damages is a common one." Bertulli v. Independent Ass'n of Continental Pilots, 242 F.3d 290, at 298, 166 L.R.R.M. (BNA) 2520, 142 Lab. Cas.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 24 of 35

CLASSACT § 4:25                                                        Page 24
2 Newberg on Class Actions § 4:25 (4th ed.)

(CCH) P 10913, 48 Fed. R. Serv. 3d 1022 (5th Cir. 2001). However, Bertulli merely held that the district court had not abused its discretion; it does not hold that the calculation of damages can never be a grounds for denying class certification. Bertulli is also distinguishable because the court noted that for the vast majority of plaintiffs, damages will be nominal and their primary relief will be injunctive. In Bertulli, the court recognized the plaintiffs' claims for injunctive relief on top of money damages, noting that not all of the relief requires individualized determination.

On the issue of damages, the district court in this case concluded that individualized determination would be required because many of the class members negotiated a price rather than being charged strictly on price lists, reasoning that if the bidding process used by school districts and private label purchasers originally began with a wholesale price list that was fixed, the final price paid involved many factors including the amount of products purchased, the geographic market, the particular services included with each purchase, delivery costs, the discount negotiated off the wholesale price list, and potentially the negotiating skills of the purchaser and the sales representative.

The courts have long held in antitrust cases that once the fact of damages is proven, there is a relaxed burden of proving the amount of damages. The district court correctly summarized this law by noting that while damages in the antitrust context need not be proven with exact particularity, they may not be merely speculative, reasoning that although proof of antitrust injury can be shown by the common proof that each was in fact injured by the alleged conspiracy, the amount of damages resulting from that injury will require some degree of investigation into facts specific to each Plaintiff and potentially facts specific to each Plaintiff's numerous negotiations and transactions over the course of many years.

In addition, plaintiffs should not be heard to complain that the class includes larger purchasers who individually negotiated prices. Defendant Interstate Brands was willing to agree to a class limited to purchasers who relied on the price lists and subject to other limitations, but plaintiffs wanted to include the larger purchasers who used a bidding process.

Plaintiffs alleged that they offered an expert's view that damages could be calculated in a relatively straightforward manner, and that the district court failed to even discuss the expert's opinion. The district court did cite to the certification hearing transcript where the expert's views were discussed by counsel, and stated that it nevertheless did not believe, given the numerous independent factors that go into both the price that should have been paid and the price that was actually paid, that there could be any general formula for calculating damages with precision, amounting to more than speculation, without requiring some degree of inquiry into the individual facts of 52,000 Plaintiffs and potentially thousands of transactions. Given the unique nature of the individual transactions, the court properly concluded that it is was reasonable to assume that a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

generalized formula can be created.

This court concluded that the district court was not required to accept the expert's view. Class certification is a ultimately a legal determination for the court, based on the standards set forth in Rule 23, and the views of an expert in economics or any other field can at most inform that decision. While the credentials of the expert were solid, his affidavit was not so compelling that it had to conclude that the district court's refusal to certify the class was an abuse of discretion. The expert did not address the fraudulent concealment issue which the district court found was one of two reasons that individual issues predominated over class issues.

The expert did not offer a formula based on regression analysis, but merely opined that one could be found. The affidavit was only a preliminary overview of how damages might be calculated.

Charleswell v. Chase Manhattan Bank, N.A., 223 F.R.D. 371 (D.V.I. 2004). In an action by mortgagors whose properties were destroyed or damaged by a hurricane against the bank and the mortgage company which held mortgages on their properties, alleging that defendants failed to provide or procure adequate hazard insurance coverage for the properties as agreed, and charged excessive premiums after the hurricane, predominance and commonality requirements for class certification were not satisfied with respect to claims of mortgagors that mortgagees failed to obtain adequate hazard insurance, claims of mortgagors that mortgagees failed to inform then that they were entitled to "additional" coverage under terms of hazard insurance policy, and claims of mortgagors that mortgagees charged excessive hazard insurance premiums.

The predominance factor was particularly significant here because, for at least two of the three claims, common questions did not predominate. Based on the record, the court could not certify a class with claims based on separate, written, contractual agreements between plaintiffs and the Chase defendants. Plaintiffs did not provide any evidence of written agreements for insurance between the Chase defendants and the purported class members. To the contrary, based on the named plaintiffs' deposition testimony, these agreements were oral and, therefore, inappropriate for resolution in a class action. Plaintiffs also failed to explain the relationship between these separate agreements and the Lloyd's policy. If the Lloyd's policy was "essentially reinsurance," it was not clear how the terms of this policy could control the separate contractual agreements with plaintiffs.

Alternatively, if plaintiffs determined that the Lloyd's policy was the only written insurance policy covering plaintiffs, it was possible that common questions would predominate. Although plaintiffs might not be able to successfully argue that defendants owed them any duties under the Lloyd's policy, the resolution of this question would be common to the class. Depending on the evidence, other common questions could include

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW    Document 15549-67    Filed 09/29/08    Page 26 of 35

CLASSACT § 4:25                                                         Page 26
2 Newberg on Class Actions § 4:25 (4th ed.)

whether defendants adequately notified plaintiffs of the terms of their coverage and the single occurrence limit and whether defendants discouraged plaintiffs from filing claims for additional coverage during the adjustment process. If warranted by such additional evidence, the court would consider certification of a class based on claims for additional coverage under the Lloyd's policy—a class of Chase mortgage holders insured under the Lloyd's policy at the time of the hurricane who sustained damages that would have been included under the so-called "additional coverage" in the Lloyd's policy and did not assert such claims. However, plaintiffs did not brief the legal issues associated with such a claim under the Lloyd's policy and still relied on the existence of a separate agreements, so it was not appropriate for the court to certify a class with claims based on the Lloyd's policy at this time.

In re Terazosin Hydrochloride Antitrust Litigation, 203 F.R.D. 551, at 559, 2001-2 Trade Cas. (CCH) P 73469 (S.D. Fla. 2001), order vacated, 350 F.3d 1181, 2003-2 Trade Cas. (CCH) P 74222, 57 Fed. R. Serv. 3d 997 (11th Cir. 2003) (upholding class certification where the plaintiffs offered an "algebraic formula for the computation of class members' overcharge damages" despite the fact that "the jury will also have to consider some individualized evidence in rendering individual damage calculations").

Silva-Arriaga v. Texas Exp., Inc., 222 F.R.D. 684 (M.D. Fla. 2004). A class was certified in an action by migrant agricultural workers against their employer alleging violations of Migrant and Seasonal Agricultural Worker Protection Act (AWPA) and Fair Labor Standards Act (FLSA). With respect to predominance, the AWPA violations alleged in the Complaint could be grouped into three issues: (1) whether defendants failed to keep and preserve payroll records; (2) whether defendants failed to provide wage statements on each payday; and (3) whether defendants failed to pay wages promptly when due. The Complaint alleged that these issues of fact and law are common to the named plaintiffs and to a class of over 200 individuals who worked for defendants in and near the Hendry County, Florida area during the 2003 lemon harvest. Neither party raised any factual or legal issue that affects these some 200 individuals that are not common to the proposed class. The resolution of the three class-wide issues listed above would resolve each potential class member's underlying cause of action against defendants under the AWPA.

Pickett v. IBP, Inc., 2001 WL 34886460 (M.D. Ala. 2001) (if damages can be computed using statistical techniques, the existence of individualized damage claims does not pose a barrier to certification).

"[I]t is plaintiffs' burden to establish that common or generalized proof will predominate at trial with respect to these essential elements." In re Linerboard Antitrust Litigation, 203 F.R.D. 197, at 214, 2001-2 Trade Cas. (CCH) P 73426 (E.D. Pa. 2001), judgment aff'd, 305 F.3d 145, 2002-2 Trade Cas. (CCH) P 73790, 53 Fed. R. Serv. 3d 999 (3d Cir. 2002), cert. denied, 538 U.S. 977, 123 S. Ct. 1786, 155 L. Ed. 2d 666 (2003). De Leon-Granados v. Eller and Sons Trees, Inc., 497 F.3d 1214, 12 Wage & Hour Cas. 2d (BNA) 1479, 154

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Lab. Cas. (CCH) P 35337, 68 Fed. R. Serv. 3d 1108 (11th Cir. 2007). Migrant workers' claims were appropriate for opt-out class certification under the AWPA in an action against their employer alleging violation their rights under the Migrant and Seasonal Agricultural Worker Protection Act (AWPA) and the Fair Labor Standards Act (FLSA). The district court for the granted the workers' motions to certify a proposed class consisting of over 1,500 migrant workers admitted to the United States under the temporary foreign worker visa program to work and a sub-class consisting of those workers who pledged collateral with employer's agents in order to obtain employment.

The district court did not abuse its discretion in finding that class representatives were adequate, and the need for an individualized assessment of the facts necessary to determine the amount of hours each migrant worker worked compared to the amount recorded did not preclude class certification.

The workers initially moved for class certification of their AWPA claims on June 29, 2005. On July 27, 2005, they filed a motion for preliminary certification of a collective action for their claims under the FLSA. On October 18, 2005, the district court issued an order denying the motion for class certification of the AWPA claims without prejudice and instructing the parties to conduct additional discovery on issues pertaining to class certification. In the same order, the court granted preliminary certification of a collective action under 29 U.S.C. § 216(b) for the FLSA claims. According to the Appellants, opt-in notices for the FLSA collective action were sent to approximately 1,800 current and former employees of Eller & Sons. Only 30 of the potential class members, in addition to the five named plaintiffs, completed and returned their opt-in forms before the time period closed.

On January 31, 2006, the workers filed a renewed motion for class certification under Fed. R. Civ. P. 23(b)(3) for the AWPA claims, seeking to represent a class consisting of "all those individuals admitted as H-2B temporary foreign workers pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(b), who were employed in [Eller & Sons'] forestry operations from June 1999 until the present." They also proposed a sub-class of "all those individuals admitted as H-2B temporary foreign workers pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(b), who were employed in [Eller & Sons'] forestry operations from January 1, 2003 until the present, who pledged collateral with [Eller & Sons'] agents in order to obtain employment with the [Eller & Sons]."

On September 28, 2006, the district court granted the motion to certify under Fed. R. Civ. P. 23(b)(3). The court rejected the Appellants' argument that a collective action would be a superior method of adjudicating the workers' AWPA claims, finding that a § 216(b) collective action would not adequately address the workers' AWPA claims. The district court also found the workers satisfied their burden to establish the existence of the Rule 23 prerequisites. The Appellants filed a timely appeal, asking us to determine whether the district court abused its discretion in granting class certification.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Appellants argued on appeal that the district court abused its discretion in granting class certification claiming this action is based on the FLSA and must therefore be adjudicated as an opt-in collective action under 29 U.S.C. § 216(b) instead of an opt-out Rule 23(b)(3) class action. Alternatively, the Appellants argue that even if a Rule 23 class action is not precluded by 29 U.S.C. § 216(b), the district court abused its discretion in certifying the class because the workers failed to prove the necessary prerequisites under Rule 23.

The Appellants maintain that the bulk of the purported AWPA claims are derived from alleged FLSA violations and must therefore be brought in a collective action.

It was unclear how the Appellants came up with a total of 6,000 potential class members. The Complaint alleged the class included over 1,500 individuals.

Although both the AWPA claims and FLSA claims sought unpaid wages, they were not identical. The workers were entitled to recover the prevailing wage rate under the AWPA and only the minimum wage rate under the FLSA. Thus, the workers' AWPA wage claims were not disguised FLSA claims and could properly be brought in a Rule 23(b)(3) class action. Likewise, the workers' AWPA claims that did not seek unpaid wages, including claims based on the failure to make, keep and provide accurate work records, the failure to provide workers with promised full-time employment, knowingly providing them with false and misleading information regarding the terms and existence of employment, and wrongfully requiring them to post deeds to their land as collateral to obtain employment could not be asserted under the FLSA, and are also appropriate for an AWPA class action under Rule 23.

The statutory text of the AWPA supports the conclusion that the workers are entitled to bring their AWPA claims as a Rule 23 class action. Its private right of action provision provides that if a complaint is certified as a class action, the court shall award no more than the lesser of up to $500 per plaintiff per violation, or up to $500,000 or other equitable relief. 29 U.S.C. § 1854(c)(1)(B), contemplating that an action based on violations of the AWPA may be certified as a class action. Moreover, where Congress intended an external statute to provide the exclusive remedy for conduct that violates the AWPA, it expressly said so and limited the AWPA accordingly. For example, section 1854(d) provides that "where a State workers' compensation law is applicable and coverage is provided for a migrant or seasonal agricultural worker, the workers' compensation benefits shall be the exclusive remedy for loss of such worker under this Chapter in the case of bodily injury or death in accordance with such State's workers' compensation law." If Congress intended § 216(b) to be the exclusive remedy for violations of the AWPA's wage payment provisions, it would have also said so. Thus, the district court did not err in finding the AWPA claims cognizable for class action treatment.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 29 of 35

CLASSACT § 4:25                                                    Page 29
2 Newberg on Class Actions § 4:25 (4th ed.)

The Appellants argued that even if a Rule 23 action was not precluded by 29 U.S.C. § 216(b), the district court abused its discretion in granting class certification because the Rule 23 requirements were not met because the class representatives invoked the Fifth Amendment during their depositions when asked if they worked for other employers in the United States. The Appellants claimed the negative inferences that can be drawn from the invocation of the Fifth Amendment make the named plaintiffs unsuitable class representatives. In its order granting certification, the district court acknowledged this issue, but concluded it would revisit the issue after its relevance was resolved. The district court's commitment convinced the court that the district court will re-examine the issue throughout the proceedings and will assure class representation is adequate.

Finally, the Appellants argued that a class action was not the superior method of adjudicating the workers' AWPA claims because a highly individualized assessment of the facts will be necessary to determine the amount of hours each employee worked compared to the amount recorded. While valid concern, the court still upheld class certification, noting that under the AWPA, aggrieved workers are entitled to recover either actual damages or statutory damages of up to $500 per plaintiff. 29 U.S.C. § 1854(c). While it was not clear from the complaint whether the workers seek actual or statutory damages, it was within the district court's discretion to award statutory damages where proof of actual damages is scarce. The award of statutory damages would eliminate the need to determine individualized damages based on actual hours worked.

Thus, the Appellants failed to prove the AWPA claims were required to be brought as an FLSA collective action. Given the district court's commitment to continually monitor the appropriateness of a class action, the district court did not abuse its discretion in finding that the Rule 23 prerequisites were met.

[FN5] Chin v. Chrysler Corp., 182 F.R.D. 448, 41 Fed. R. Serv. 3d 1561 (D.N.J. 1998).

[FN6] Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 35 Fed. R. Serv. 3d 731 (9th Cir. 1996).

[FN7] Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1229, 35 Fed. R. Serv. 3d 731 (9th Cir. 1996).

[FN8] Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1229, 35 Fed. R. Serv. 3d 731 (9th Cir. 1996).

[FN9] Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1230, 35 Fed. R. Serv. 3d 731 (9th Cir. 1996).

[FN10] Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1230, 35 Fed. R. Serv. 3d 731 (9th Cir. 1996).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 30 of 35

CLASSACT § 4:25                                                    Page 30
2 Newberg on Class Actions § 4:25 (4th ed.)

[FN11] Matter of Rhone-Poulenc Rorer Inc., 51 F.3d 1293 (7th Cir. 1995).

[FN12] Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1232, 35 Fed. R. Serv. 3d 731 (9th Cir. 1996).

See also Castano v. American Tobacco Co., 84 F.3d 734, 34 Fed. R. Serv. 3d 1167 (5th Cir. 1996) (decertifying national class of all nicotine-dependent persons, and expressing approval of Rhone-Poulenc).

[FN13] Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1232, 35 Fed. R. Serv. 3d 731 (9th Cir. 1996).

[FN14] In re American Medical Systems, Inc., 75 F.3d 1069, 34 Fed. R. Serv. 3d 685, 1996 FED App. 49P (6th Cir. 1996).

[FN15] Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1233, 35 Fed. R. Serv. 3d 731 (9th Cir. 1996).

[FN16] Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234, 35 Fed. R. Serv. 3d 731 (9th Cir. 1996).

[FN17] Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234, 35 Fed. R. Serv. 3d 731 (9th Cir. 1996), citing Newberg on Class Actions (3d ed.).

[FN18] In re Fine Paper Antitrust Litigation, 685 F.2d 810, 10 Fed. R. Evid. Serv. 1621 (3d Cir. 1982) (antitrust) (court certified class on issue of horizontal conspiracy while denying class on issue of vertical conspiracy; common questions which existed for the former issue would have been overwhelmed by individual questions with respect to the latter).

Barker v. FSC Securities Corp., 133 F.R.D. 548 (W.D. Ark. 1989). In an action by customers of investment firms against an investment manager and his present and former corporate employers, alleging securities fraud, common law fraud, conversion, breach of fiduciary duty, negligence, and liability as "controlling persons" under federal securities statutes arising out of investment manager's alleged misuse of plaintiffs' funds, a class was certified despite defendants' argument that individual issues predominated as to plaintiffs' negligent supervision claim because different individual and corporate defendants supervised the investment manager at different times. Thus, not all class members had claims against every defendant when the defendant investment firms had an independent legal relationship, that of common ownership, and thus were juridically linked.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 31 of 35

CLASSACT § 4:25                                                      Page 31
2 Newberg on Class Actions § 4:25 (4th ed.)

In re Three Mile Island Litigation, 87 F.R.D. 433 (M.D. Pa. 1980) (mass tort) (Rule 23(b)(3) class certified for one claim concerning continued medical monitoring; class not certified for personal injury claim because individual questions would predominate).

Ouellette v. International Paper Co., 86 F.R.D. 476 (D. Vt. 1980) (mass tort/environmental).

[FN19] Eisenberg v. Gagnon, 766 F.2d 770, Fed. Sec. L. Rep. (CCH) ¶92202, 18 Fed. R. Evid. Serv. 783, 2 Fed. R. Serv. 3d 980 (3d Cir. 1985) (securities). Presence of individual questions as to the reliance of each investor did not mean that common questions of law and fact did not predominate over questions affecting individual class members, citing Newberg on Class Actions. Joseph v. General Motors Corp., 109 F.R.D. 635 (D. Colo. 1986) (Magnuson-Moss Act).

McCarthy v. Kleindienst, 741 F.2d 1406, 1415, 39 Fed. R. Serv. 2d 1165 (D.C. Cir. 1984) (civil rights) ("…mere fact that damage awards will ultimately require individual fact determinations is insufficient by itself to preclude class certification"); Liberty Alliance of the Blind v. Califano, 568 F.2d 333 (3d Cir. 1977) (government benefits); Esplin v. Hirschi, 402 F.2d 94, 12 Fed. R. Serv. 2d 525 (10th Cir. 1968) (securities); Aguirre v. Bustos, 89 F.R.D. 645, 91 Lab. Cas. (CCH) ¶34039 (D.N.M. 1981) (labor); Wolfson v. Artisans Sav. Bank, 83 F.R.D. 547, 28 Fed. R. Serv. 2d 726 (D. Del. 1979) (antitrust citing Newberg on Class Actions); American Trading & Production Corp. v. Fischbach & Moore, Inc., 47 F.R.D. 155 (N.D. Ill. 1969) (mass tort).

Olden v. LaFarge Corp., 383 F.3d 495, 34 Envtl. L. Rep. 20091, 2004 FED App. 0296P (6th Cir. 2004). A class of homeowners was properly certified in an action against the owner of a cement manufacturing plant, alleging personal and property damage caused by toxic pollutants originating from the plant. The district court properly allowed individual class members to aggregate their damages to meet the amount in controversy requirement, and certified a class action under both Rule 23(b)(2) and Rule 23(b)(3).

The thrust of the defendant's argument was that common questions did not predominate because toxins: (a) "originated from disparate sources within the one-square mile Lafarge facility and perhaps other industrial sources;" (b) were disbursed to properties in varying concentrations; (c) allegedly caused a variety of personal injuries; and (d) allegedly caused widely varying property damages.

With respect to the first issue, the fact that toxins may have originated from disparate sources within Lafarge's facility was of little relevance since Lafarge's liability presumably would not vary depending upon where within its facility toxins originated. With regard to these "other industrial sources," presumably the Abiti Price Plant and Fletcher Paper Co., the defendant did not allege that the toxins from these sources were indistinguishable from the toxins from Lafarge's plant. Also, the defendant did not allege

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 32 of 35

CLASSACT § 4:25                                                        Page 32
2 Newberg on Class Actions § 4:25 (4th ed.)

that these other sources produced significant amount of toxins relative to Lafarge, which is the nation's largest cement plant. The court noted that if it was determined that the defendant did not, on its own, emit enough pollutants to establish liability (either because the plaintiffs cannot establish negligence, causation or "significant harm" in the case of the plaintiffs' nuisance claim), the defendant would prevail. Moreover, damages can be reduced to reflect the proportion of the class' injury not caused by the defendant.

With regard to the remaining issues, the plaintiffs have raised common allegations which would likely allow the court to determine liability (including causation) for the class as a whole. For example, although some named plaintiffs admittedly described a variety of minor personal medical issues (wheezing, "very bad breathing things," nausea, headaches, etc.) which might require individualized damage determinations, the thrust of the plaintiffs' personal injury complaint was related to the general increased risk of the class suffering medical problems in the future. Whether the defendant's negligence caused some increased health risk and even whether it tended to cause the class minor medical issues could likely be determined for the entire class, and although some named plaintiffs presented a number of minor examples of specific property damage (roof damage, dead rose bushes, damaged window pane, peeling stain on deck, rusting of automobile), this was "no more than illustrative" of the common argument that the class's properties were regularly covered in cement dust, causing minor property damage and a predictable reduction of property value and enjoyment of the property. Whether the defendant's negligence generally caused minor property damage and cement dust could most likely be determined for the entire class as well.

[FN20] Shaw v. Toshiba America Information Systems, Inc., 91 F. Supp. 2d 942 (E.D. Tex. 2000).

[FN21] Shaw v. Toshiba America Information Systems, Inc., 91 F. Supp. 2d 942, 956 to 957 (E.D. Tex. 2000).

[FN22] Shaw v. Toshiba America Information Systems, Inc., 91 F. Supp. 2d 942, 957 to 958 (E.D. Tex. 2000). This case also met the superiority test of Rule 23(b)(3). Given the identity of the legal and factual issues, the suggestion that laptop owners should file thousands or millions of individual lawsuits is preposterous and would constitute an egregious waste of judicial resources and private resources. It would be economically unreasonable for many class members to adjudicate their separate claims individually. The critical and identical factual issues require substantial discovery, expert testimony, and trial time. There was no possible reason for wanting these issues to be developed repeatedly ad infinitum by individual claimants.

[FN23] Grueschow v. Harris, 492 F. Supp. 419 (D.S.D. 1980), judgment aff'd, 633 F.2d 1264 (8th Cir. 1980) (government benefits) (need for case-by-case determination of eligibility after liability determination would not bar class).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Sommers v. Abraham Lincoln Federal Sav. and Loan Ass'n, 66 F.R.D. 581 (E.D. Pa. 1975) (antitrust).

State of Minn. v. U. S. Steel Corp., 44 F.R.D. 559, 569 (D. Minn. 1968) (antitrust):
In determining "predominance," defendants attempt to establish as a test the total amount of time which will be spent on proof of the common issue of conspiracy in a class action compared to time spent on individual damage and fraudulent concealment proof in the trial of the same class action. They thus argue that the question of conspiracy does not predominate. If this be the correct approach to the question, arguably it is true that as a class action more time in total will be spent in proof of individual damage claims in any of the class actions than will be spent in proof of conspiracy. Following defendant's line of reasoning, it would seem, however, that the situation should be considered and compared to that which would exist were no class action to be allowed. So for instance, if there were to be but a single case for trial, the court would expect that the great bulk of the time of that trial would be consumed with proof or the attempted proof of the existence and effect of a conspiracy and that the fraudulent concealment and damage issues would be far less predominant in the sense of time consumed at the trial. Were there to be 500 separate suits, this same pattern undoubtedly would prevail as to each. It seems specious and begging the question to say that if these 500 law suits were brought into a class so that proof on the issues of conspiracy need be adduced only once and the result then becomes binding on all 500, that thereby the common issue of conspiracy no longer predominates because from a total time standpoint, cumulatively individual damage proof will take longer. Of course, if defendants are upheld in their current posture of denying any conspiracy, then this is clearly the only issue that ever will be tried and certainly it cannot then be gainsayed [sic] but that such is the predominant question.

State of Minn. v. U. S. Steel Corp., 44 F.R.D. 559, 569 (D. Minn. 1968).

[FN24] B and B Investment Club v. Kleinert's Inc., 62 F.R.D. 140, Fed. Sec. L. Rep. (CCH) ¶94451 (E.D. Pa. 1974) (securities) (comparison of time that would be spent on common issues with that spent on individual issues is proper in determining predominance).

Gold Strike Stamp Co. v. Christensen, 436 F.2d 791 (10th Cir. 1970) (antitrust); Berland v. Mack, 48 F.R.D. 121, Fed. Sec. L. Rep. (CCH) ¶92499 (S.D. N.Y. 1969) (securities); Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42 (S.D. N.Y. 1966) (securities).

[FN25] Arthur Young & Co. v. U. S. Dist. Court, 549 F.2d 686, Fed. Sec. L. Rep. (CCH) ¶95925 (9th Cir. 1977) (securities) (where there was no showing by defendant of the volume of claims that would be subject to a defense of nonreliance, class would not be denied on basis of such defenses).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 34 of 35

CLASSACT § 4:25                                                          Page 34
2 Newberg on Class Actions § 4:25 (4th ed.)

Deutschman v. Beneficial Corp., 132 F.R.D. 359, Fed. Sec. L. Rep. (CCH) ¶95895 (D. Del. 1990) (securities). Predominance test is not a numerical test and does not require the court to add up the common issues and the individual issues and determine which is greater, citing Newberg on Class Actions (2d ed.).

Haywood v. Barnes, 109 F.R.D. 568, 27 Wage & Hour Cas. (BNA) 873, 106 Lab. Cas. (CCH) ¶34879 (E.D. N.C. 1986) (labor). Class action certified under the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C.A. §§ 1801 et seq.: "The fact that the potential amount of damages might vary individually with the number of violations does not preclude class certification where common questions of law and fact as to liability clearly predominate." Finally, substantial evidence indicated a systemic failure to keep the required records, and the existence of some differences in the treatment of individual class members did not preclude a finding of predominance.

Chevalier v. Baird Sav. Ass'n, 72 F.R.D. 140, 24 Fed. R. Serv. 2d 1094 (E.D. Pa. 1976) (antitrust) (there need be a preponderance of common questions, not unanimity of them).

Cf. In re Storage Technology Corp. Securities Litigation, 113 F.R.D. 113, 117, Fed. Sec. L. Rep. (CCH) ¶93031, 6 Fed. R. Serv. 3d 1175 (D. Colo. 1986) (securities). Common questions regarding the defendants' allegedly fraudulent conduct over a 28-month period formed a common nucleus sufficient to meet the predominance requirement. "While there may not have been a consistent 'quantum of hype' throughout the 28-month period," and while the misrepresentations involved different corporation projects, there was "sufficient commonality to support class certification."

[FN26] Gulish v. U. S., 78 F.R.D. 515, 26 Fed. R. Serv. 2d 537 (W.D. Pa. 1978), dismissed, 594 F.2d 855 (3d Cir. 1979) (government regulation) (overwhelming individual questions barred class; excessive size of individual question precludes certification; smaller class was eventually certified).

[FN27] Esplin v. Hirschi, 402 F.2d 94, 12 Fed. R. Serv. 2d 525 (10th Cir. 1968) (securities); Green v. Wolf Corp., 406 F.2d 291, 9 A.L.R. Fed. 100 (2d Cir. 1968) (securities); Byrnes v. IDS Realty Trust, 70 F.R.D. 608 (D. Minn. 1976) (securities) (common nucleus of facts); Siegel v. Chicken Delight, Inc., 271 F. Supp. 722 (N.D. Cal. 1967) (securities).

Ouellette v. International Paper Co., 86 F.R.D. 476 (D. Vt. 1980) (environmental/mass tort) (there was no common nucleus of operative fact uniting the claims of persons alleging air pollution damage).

The term common nucleus of operative fact was borrowed from United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218, 61 L.R.R.M. (BNA) 2561, 53 Lab. Cas. (CCH) ¶11135, 10 Fed. R. Serv. 2d 361 (1966) (labor), which

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 2:05-cv-04182-SRD-JCW   Document 15549-67   Filed 09/29/08   Page 35 of 35

CLASSACT § 4:25                                                                    Page 35
2 Newberg on Class Actions § 4:25 (4th ed.)

outlined appropriate circumstances for invoking pendent jurisdiction over related claims.

[FN28] State of Ala. v. Blue Bird Body Co., Inc., 71 F.R.D. 606 (M.D. Ala. 1976), aff'd in part, rev'd in part, 573 F.2d 309 (5th Cir. 1978) (antitrust) (central and predominant issue was the existence of monopoly and restraint of trade).

Gold Strike Stamp Co. v. Christensen, 436 F.2d 791 (10th Cir. 1970) (antitrust); Chmieleski v. City Products Corp., 71 F.R.D. 118 (W.D. Mo. 1976) (antitrust); City of New York v. General Motors Corp., 60 F.R.D. 393 (S.D. N.Y. 1973), order rev'd, 501 F.2d 639 (2d Cir. 1974) (antitrust).

[FN29] Philadelphia Elec. Co. v. Anaconda Am. Brass Co., 43 F.R.D. 452 (E.D. Pa. 1968) (antitrust).

[FN30] State of Ala. v. Blue Bird Body Co., Inc., 71 F.R.D. 606 (M.D. Ala. 1976), aff'd in part, rev'd in part, 573 F.2d 309 (5th Cir. 1978) (antitrust).

[FN31] Friedlander v. Barnes, 104 F.R.D. 417, Fed. Sec. L. Rep. (CCH) ¶91675 (S.D. N.Y. 1984) (securities). When a single document is alleged to be materially false and misleading, the common questions predominate over those affecting only individual class members.

Halverson v. Convenient Food Mart, Inc., 69 F.R.D. 331 (N.D. Ill. 1974) (antitrust).

[FN32] Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 35 Fed. R. Serv. 3d 731 (9th Cir. 1996).

© 2008 Thomson Reuters/West

CLASSACT § 4:25

END OF DOCUMENT