UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


PATRICK JOSEPH TURNER,        CIVIL ACTION
INDIVIDUALLY AND AS
REPRESENTATIVE OF SIMILARLY
SITUATED PERSONS
            PLAINTIFFS,

VERSUS                        NO. 05-4206


MURPHY OIL USA, INC.          SECTION "L"
            DEFENDANT         MAGISTRATE 2


    Deposition of U.S. ARMY CORPS OF
ENGINEERS, through its designated
representative, RICHARD VARUSO, Post Office
Box 60267, New Orleans, Louisiana
70160-0267, taken in the offices of Frilot
Partridge, LLC, 1100 Poydras Street, Suite
3600, New Orleans, Louisiana, on Tuesday,
the 22nd day of August, 2006.


APPEARANCES:


  NEBLETT, BEARD & ARSENAULT
  (BY:  JOHN PAUL P. OVERTON, ESQ.)
  2220 BONAVENTURE COURT
  ALEXANDRIA, LOUISIANA  71309

        - AND -

  BRUNO & BRUNO
  (BY:  JOSEPH M. BRUNO, ESQ.)
  (BY:  L. SCOTT JOANEN, ESQ.)
  855 BARONNE STREET
  NEW ORLEANS, LOUISIANA  70113

        - AND -

| Page 2 | Page 4 |
|---|---|

**Page 2**

1  APPEARANCES CONTINUED:
2
   LAMBERT & NELSON
3  (BY: HUGH P. LAMBERT, ESQ.)
   701 MAGAZINE STREET
4  NEW ORLEANS, LOUISIANA 70130
5  - AND -
6  MARTZELL & BICKFORD
   (BY: SCOTT R. BICKFORD, ESQ.)
7  338 LAFAYETTE STREET
   NEW ORLEANS, LOUISIANA 70130
8
   - AND -
9
   LAW OFFICES OF DANIEL E. BECNEL, JR.
10 (BY: REBECCA F. TODD, ESQ.)
   425 WEST AIRLINE HIGHWAY
11 LAPLACE, LOUISIANA 70068
12 ATTORNEYS FOR PLAINTIFFS' COMMITTEE
13
   FRILOT, PARTRIDGE, KOHNKE & CLEMENTS
14 (BY: EDWARD F. KOHNKE, IV, ESQ.)
   (BY: ALLEN J. KROUSE, III, ESQ.)
15 (BY: KERRY J. MILLER, ESQ.)
   (BY: PAUL THIBODEAUX, ESQ.)
16 3600 ENERGY CENTRE
   1100 POYDRAS STREET
17 NEW ORLEANS, LA. 70173-3600
18 ATTORNEYS FOR MURPHY OIL USA, INC.
19
   U.S. DEPARTMENT OF JUSTICE
20 CIVIL DIVISION, TORTS BRANCH
   (BY: ROBIN DOYLE SMITH, ESQ.)
21 POST OFFICE BOX 888
   BENJAMIN FRANKLIN STATION
22 WASHINGTON, D.C. 20044
23 ATTORNEYS FOR UNITED STATES
24
25

**Page 4**

1           * * *
2        INDEX OF EXHIBITS
3
4                              Page
5  Exhibit No. 1 ...................   77
6  Notice of 30(b)(6) videotaped
7  deposition of the U.S. Army Corps of
8  Engineers
9  Exhibit No. 2 ...................   81
10 Document from Corps of Engineers
11 website titled: Better & Stronger, New
12 Orleans Hurricane Protection System
13 Exhibit No. 3 ...................  106
14 Defendant United States' Consent/Ex
15 Parte Motion for Leave to File
16 Memorandum in Support of Motion to
17 Dismiss in Excess of 25 pages
18 Exhibit No. 4 ...................  108
19 Document that was Exhibit 7 to
20 previously marked Exhibit No. 3
21 Exhibit No. 5 ...................  296
22 IPET Report, Volumes 1 and 3 through 8
23 Exhibit No. 6 ...................  305
24 Sketch by Deponent
25

| Page 3 | Page 5 |
|---|---|

**Page 3**

1  ALSO PRESENT:
2  JIM McCONNON
3  KARA MILLER
4  VIDEOGRAPHER:
5  JACK VERWOERDT
   PROFESSIONAL SHORTHAND REPORTERS, INC.
6  601 POYDRAS STREET, SUITE 1615
   NEW ORLEANS, LOUISIANA 70130
7
8  REPORTED BY:
9  PAT KENNEDY QUINTINI
   CERTIFIED COURT REPORTER
10
11
12       * * *
13   EXAMINATION INDEX
14        PAGE
15
16 EXAMINATION BY MR. KOHNKE .........   8
17 EXAMINATION BY MR. BRUNO ..........  302
18
19
20
21
22
23
24
25

**Page 5**

1  Exhibit No. 7 ...................  310
2  Map from Design Memorandum No. 1-A
3  Exhibit No. 8 ...................  345
4  Figure 2.7: Map showing the design
5  flood state levels for selected
6  locations in the New Orleans Area
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

```
 1        S T I P U L A T I O N
 2        It is stipulated and agreed by and
 3   between counsel for the parties hereto that
 4   the deposition of the aforementioned witness
 5   is hereby being taken for all purposes
 6   allowed under the Federal Rules of Civil
 7   Procedure, in accordance with law, pursuant
 8   to notice;
 9        That the formalities of reading and
10   signing are specifically not waived;
11        That the formalities of filing,
12   sealing, and certification are specifically
13   waived;
14        That all objections, save those as to
15   the form of the question and the
16   responsiveness of the answer, are hereby
17   reserved until such time as this deposition,
18   or any part thereof, may be used or sought
19   to be used in evidence.
20                  * * *
21        PAT KENNEDY QUINTINI, Certified
22   Shorthand Reporter, in and for the State of
23   Louisiana, officiated in administering the
24   oath to the witness.
25
```

Page 7

```
 1        THE VIDEOGRAPHER:
 2        This is the videotaped deposition
 3   of Richard Varuso taken in the matter of
 4   Patrick Joe Turner, et al. versus Murphy
 5   Oil, Civil Action No. 05-4258, in the case
 6   in the United States District Court, Eastern
 7   District of Louisiana.  This deposition is
 8   being held at 1100 Poydras Street,
 9   Suite 3800, in New Orleans, Louisiana, on
10   August 22, 2006.  And the time on the video
11   is 9:18 a.m.
12        My name is Jack Verwoerdt with
13   Professional Shorthand.  The court reporter
14   is Pat Quintini with Professional Shorthand.
15        Would the attorneys please
16   introduce themselves for the record.
17   MR. KOHNKE:
18        My name is Ned Kohnke.  Together
19   with Paul Thibodeaux and A.J. Krouse, we
20   represent Murphy Oil, defendant in this
21   action.
22   MR. BICKFORD:
23        Scott Bickford representing the
24   Class.
25   MR. OVERTON:
```

Page 8

```
 1        John Paul Overton representing the
 2   Class.
 3   MR. JOANEN:
 4        Scott Joanen representing the
 5   Class.
 6   MS. TODD:
 7        Rebecca Todd for the Class.
 8   MR. BRUNO:
 9        And Joseph Bruno for the Class.
10   MR. SMITH:
11        I'm Robin Smith.  I represent the
12   United States.  With me is Jim McConnon and
13   Kara Miller.
14        Just for the record, I would like
15   to make it clear that this is not a
16   deposition of Richard Varuso.  This is a
17   deposition of the United States Army Corps
18   of Engineers pursuant to rule 30(b)(6).
19        RICHARD VARUSO,
20   having been duly sworn by the above
21   mentioned court reporter, did testify as
22   follows:
23   EXAMINATION BY MR. KOHNKE:
24        Q.  Mr. Varuso, my name is Ned Kohnke.
25   I represent Murphy Oil in this action and
```

Page 9

```
 1   you have been designated by the Army Corps
 2   of Engineers as its 30(b)(6) representative.
 3   Do you understand that?
 4        A.  Yes.
 5        Q.  Have you ever testified as a
 6   30(b)(6) representative before today?
 7        A.  No.
 8        Q.  Have you testified at all, either
 9   personally or in any capacity, prior to
10   today?
11        A.  Yes.
12        Q.  What type of action?
13        A.  It was a claim from a contractor
14   against the Corps of Engineers for just a
15   construction claim.
16        Q.  And in what --
17        A.  I was an expert witness for the
18   Corps of Engineers, New Orleans District for
19   that.
20        Q.  You were designated as an expert
21   by your employer, the Corps of Engineers?
22        A.  Yes.
23        Q.  Let me hand you a copy, and I will
24   hand your attorney -- I will hand you two
25   copies, one to pass to your attorney -- of
```

3  (Pages 6 to 9)

Page 10

1 the notice of 30(b)(6) videotape deposition
2 of the U.S. Army Corps of Engineers that we
3 filed in this case.
4        Have you seen that before today,
5 just now when I handed it to you?
6    A.  Yes.
7    Q.  When did you first become aware
8 that you would be designated as a 30(b)(6)
9 representative?
10    A.  Approximately two or three weeks
11 ago.
12    Q.  Since that time what have you done
13 personally to review historical documents or
14 to prepare yourself, such as reviewing
15 historical documents?
16    MR. SMITH:
17        I'm going to object to this line
18 of questioning.  The way he's prepared for
19 the deposition is irrelevant.  He has been
20 designated properly as a representative of
21 the Corps.  He's informed to address not the
22 subjects that are in the notice of the
23 deposition, but only three subjects which
24 the Corps has allowed this deposition to go
25 forward on and on which the Corps of

Page 11

1 Engineers has authorized Mr. Varuso to
2 address.
3    MR. KOHNKE:
4        Well, I understand that we have
5 either by agreement or by dictate limited
6 the deposition to those three subject
7 matters.  And let me identify now which
8 those three subject -- which subject matters
9 we are talking about.  Items 2, 3 and 8 of
10 the notice:  Item 2 being the design of the
11 levees along the Mississippi River Gulf
12 Outlet (MRGO) in St. Bernard Parish; No. 3,
13 the construction of the levees along the
14 MRGO in St. Bernard Parish; and No. 8, the
15 performance of the levees along the MRGO in
16 St. Bernard Parish during Hurricane Katrina.
17        Those are the three areas.
18 However, in conducting an examination along
19 those three subject matters, I need to know
20 what this witness has looked at and I'm
21 entitled to know what this witness has
22 looked at to prepare.
23    MR. SMITH:
24        I disagree.  It does not matter
25 how he was prepared for this deposition.  He

Page 12

1 is not testifying of his own personal
2 knowledge.  This is not a deposition of the
3 individual.  This is a deposition of the
4 Corps of Engineers.  He is informed and
5 prepared to address three subjects which
6 have been properly identified.
7    MR. KOHNKE:
8        Are you instructing him not to
9 answer?
10    MR. SMITH:
11        I am instructing him not to
12 answer.
13    MR. KOHNKE:
14        My objection is noted.  We will
15 take that matter up with Judge Fallon.
16 EXAMINATION BY MR. KOHNKE:
17    Q.  In the last two weeks have you
18 engaged in preparation to testify today?
19    MR. SMITH:
20        You may answer.
21    THE WITNESS:
22        Yes.
23 EXAMINATION BY MR. KOHNKE:
24    Q.  Has that included -- without
25 enumerating those records that I had

Page 13

1 previously asked you about, does that
2 include reviewing historical documents?
3    MR. SMITH:
4        You may answer.
5    THE WITNESS:
6        Yes.
7 EXAMINATION BY MR. KOHNKE:
8    Q.  Have you likewise interviewed
9 other members of the Corps of Engineers,
10 that is, staff or employees or Army officers
11 in the Corps --
12    A.  Yes.
13    Q.  -- in order to prepare for today?
14    A.  Yes.
15    Q.  Okay.  Tell me something about
16 your background, first starting with your
17 education.
18    MR. SMITH:
19        I'm going to object to that line
20 of questioning and instruct the witness not
21 to answer for the same reason I gave
22 previously.  Mr. Varuso is not here to
23 testify as an expert.  He is a designee of
24 the Corps of Engineers.  As such, his
25 personal background and qualifications are

4 (Pages 10 to 13)

Page 14

1   irrelevant.
2       MR. KOHNKE:
3           Well, I understand that he is a
4   designee, and I certainly understand the
5   purpose of a 30(b)(6) deposition. But in
6   order to measure whether the Corps has given
7   me the best witness for these three subject
8   areas or a proper witness for these three
9   subject areas, I'm entitled to know
10  something about what he does, where he
11  works, what his education is.
12      He's testified as an expert in a
13  previous case for the Corps. I think I'm
14  entitled to know something about that.
15      Are you instructing him not to
16  answer?
17      MR. SMITH:
18      I think you have misstated the
19  law. The Corps is not required to provide
20  the best witness --
21      MR. KOHNKE:
22      A knowledgeable witness.
23      MR. SMITH:
24      -- a knowledgeable witness.
25      MR. KOHNKE:

Page 15

1       Well, I'm entitled to explore
2   that.
3       MR. SMITH:
4       The test of that will be the
5   questions you ask him of the subject matters
6   that have been designated.
7       MR. KOHNKE:
8       So I'm to understand that you are
9   instructing him not to answer?
10      MR. SMITH:
11      I'm instructing him not to answer
12  questions --
13      MR. KOHNKE:
14      Okay.
15      MR. SMITH:
16      -- concerning his personal
17  qualifications.
18  EXAMINATION BY MR. KOHNKE:
19      Q.  When you testified in a previous
20  case, you say you testified as an expert?
21      A.  That's correct.
22      Q.  In what capacity were you
23  designated as an expert?
24      MR. SMITH:
25      I'm going to instruct him not to

Page 16

1   answer this line of questioning for the same
2   reasons I gave. He is not going to be
3   qualified as an expert in this matter.
4       MR. KOHNKE:
5           Well, I didn't attempt to qualify
6   him. I'm simply asking in what area did he
7   qualify as an expert in that case. Not this
8   case, that case.
9       MR. SMITH:
10      And I understand that. But in
11  that case he was not a 30(b)(6) witness. In
12  this case, he is. And as such, that's not
13  relevant to this deposition today.
14      MR. KOHNKE:
15      But relevance is not your province
16  to determine. It's the judge's province. I
17  believe this is a properly noticed and --
18  deposition under the rules. It's a
19  discovery deposition. You are not to judge
20  and determine what is relevant. That is for
21  the judge. And if you are instructing him
22  not to answer, I must again caution you that
23  I'm going to ask for relief from the judge.
24      MR. SMITH:
25      Perhaps I misspoke. That is not

Page 17

1   within the bounds of this deposition.
2       MR. KOHNKE:
3           Once again, this is a discovery
4   deposition. You are entitled to object but
5   you are not entitled to instruct him not to
6   answer.
7       MR. SMITH:
8       I am entitled to instruct him not
9   to answer questions beyond the three subject
10  matters that have been designated.
11      MR. KOHNKE:
12      Note my objection.
13  EXAMINATION BY MR. KOHNKE:
14      Q.  Let me turn to the first area,
15  which is the design of the Mississippi River
16  Gulf Outlet levee along -- in St. Bernard
17  Parish. Post Katrina has the Corps of
18  Engineers engaged in an analysis and an
19  analysis of the failure of that levee
20  system?
21      A.  Yes.
22      Q.  Has the Corps done so separate and
23  apart from IPET and other associations of
24  experts?
25      MR. SMITH:

Page 18

1      Again I'm going to cut off this
2 line of questioning.  This is not a
3 deposition about what the Corps has done to
4 explore the causes of the flood that
5 occurred last fall.
6      MR. KOHNKE:
7           Well, didn't No. 8 -- doesn't it
8 read:  The performance of the levees along
9 the MRGO in St. Bernard Parish during
10 Hurricane Katrina?  Now, how do I determine
11 what the performance of those levees were
12 unless I find out whether the Corps did an
13 after-Katrina analysis of those same levees?
14      MR. SMITH:
15           You can ask questions about the
16 performance.
17      MR. KOHNKE:
18           Well, that's what I just did.  I
19 don't --
20      MR. SMITH:
21           You asked a question about the
22 Corps' examination.  He is not here to
23 testify about the Corps' investigation.  The
24 IPET study was one subject that was excluded
25 from this deposition.  This is another

Page 19

1 subject that's not within the bounds of this
2 deposition.
3      MR. KOHNKE:
4           Listen to the question.  You
5 didn't hear the question.  Let me try to
6 repeat the question.
7 EXAMINATION BY MR. KOHNKE:
8      Q.   Post Katrina has the Corps engaged
9 in an analysis of the failure of the levees
10 along the MRGO separate and apart from IPET
11 or any of these other associations of
12 experts?
13      MR. SMITH:
14           Again, whether the Corps has
15 studied this and in what fashion the Corps
16 has studied this is not a subject matter
17 this witness is prepared to testify to
18 today.  He is prepared to testify to the
19 performance of the levees.  If you have a
20 question about the performance of the
21 levees, he will attempt to answer that to
22 the best of his ability.
23      MR. KOHNKE:
24           You mean I get to find out that
25 the levees failed and that's it?  Is that

Page 20

1 the only question you are going to allow him
2 to answer, that the levees as a fact failed?
3      MR. SMITH:
4           You may ask the questions.  He is
5 your witness.
6 EXAMINATION BY MR. KOHNKE:
7      Q.   Has the Corps of Engineers done an
8 analysis of the performance of the levees?
9      A.   Yes.
10      Q.   In doing that analysis, did the
11 cause of failure come into focus?
12      A.   Yes.
13      Q.   In looking at the cause of
14 failure, what exactly did the Corps
15 consider?
16      A.   Consideration --
17      MR. SMITH:
18           Now, I'm going to object to this
19 line of questioning.  This is specifically
20 listed as one of the areas that you intended
21 to pursue --
22      MR. KOHNKE:
23           I am.
24      MR. SMITH:
25           -- which was excluded.  This is

Page 21

1 No. 9.
2      MR. KOHNKE:
3           This is No. 8.  It's the
4 performance.
5      MR. SMITH:
6           Please.  Let me read No. 9.
7      MR. KOHNKE:
8           You can read No. 9 all you want.
9      MR. SMITH:
10           COE's review, assessment and/or
11 evaluation of the reasons for the failure of
12 the levees along the MRGO.  He is not
13 prepared to testify to that today.
14      MR. KOHNKE:
15           And that is because why?  You all
16 have decided --
17      MR. SMITH:
18           He is not authorized --
19      MR. KOHNKE:
20           -- he is not going to?
21      MR. SMITH:
22           He is not authorized to.  That was
23 the agreement that we reached pursuant to
24 our conference with Judge Fallon.
25      MR. KOHNKE:

6 (Pages 18 to 21)

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 22

1    You are suggesting that Judge
2  Fallon has blessed your decision not to
3  allow him to testify; is that what you are
4  saying on this record?
5    MR. SMITH:
6      That was what happened at the
7  conference we had with the Judge, yes.
8  EXAMINATION BY MR. KOHNKE:
9    Q.  Tell me what --
10   MR. KOHNKE:
11     Read back the last question,
12 please.
13 (Whereupon, the requested testimony was read
14     by the Court Reporter).
15 "Q.  In looking at the cause of failure,
16 what exactly did the Corps consider?"
17 EXAMINATION BY MR. KOHNKE:
18   Q.  Would you answer that question,
19 please?
20   MR. SMITH:
21     I'm instructing him not to answer.
22 That is plainly within the bounds of Area
23 No. 9.
24   MR. KOHNKE:
25     Well, Counsel, you agree that I'm

Page 23

1  entitled to pursue No. 8, which is -- deals
2  with the performance of the levees along the
3  MRGO in St. Bernard during Hurricane
4  Katrina.  Now, unless somebody was there
5  watching, it has to be information that's
6  gathered after the fact, post Katrina.  And
7  what I'm trying to do now is to find out
8  what that entailed, what that consisted of,
9  who did it, and what they did in order to
10 determine how the levees performed.
11   MR. SMITH:
12     I understand, Counsel, that you
13 are interested in that.  You are interested
14 in all these subject matters.  That's why
15 you noticed it up for a deposition.  The
16 Corps has not authorized him to address
17 those subjects.
18   MR. KOHNKE:
19     Okay.  Let's turn back to the
20 design of the levees.
21 EXAMINATION BY MR. KOHNKE:
22   Q.  Are you familiar with the Flood
23 Control Act of 1965?
24   A.  Somewhat.
25   Q.  Did the Flood Control Act of 1965

Page 24

1  place upon the Corps certain
2  responsibilities concerning the design of a
3  hurricane protection system for Lake
4  Pontchartrain and vicinity?
5    A.  My knowledge of the document, I
6  wouldn't be able to answer that question.
7    Q.  When did you first start working
8  for the Corps?
9    A.  In 1992.
10   Q.  From 1992 going forward, have you
11 become aware of any activities engaged in by
12 the Corps concerning the design and/or
13 construction of a hurricane protection
14 system for Lake Pontchartrain and vicinity?
15   A.  Yes.
16   Q.  What do you understand that that
17 design responsibility consists of?
18   A.  We are given a -- given storm of a
19 given frequency, we refer to that as a
20 standard project hurricane.  That standard
21 project hurricane will have a given
22 still-water level.  That is, basically the
23 elevation of the water that we are going to
24 design the levees to withstand.  Once that
25 elevation is determined, the top of the

Page 25

1  levee or the crown of the levee, if you
2  will, is usually, give or take, two feet
3  plus or minus a foot in addition to wave
4  runup or settlement.  We take these factors
5  into consideration.
6      And so the top of the levee crown
7  is typically two feet give or take a foot
8  higher than the still-water level.  Once
9  that elevation is determined, given the
10 topography of the area and information that
11 we obtain from mooring logs and laboratory
12 tests, perform stability analyses to
13 determine the required stability berms and
14 required levee section to meet the global
15 stability.
16   Q.  In determining the various factors
17 that go into the design that you just
18 testified about, was the Corps of Engineers
19 restricted in any way or controlled in any
20 way in determining what design it should
21 come up with?
22   A.  I'm not sure I understand you.
23   Q.  I'm trying to find out whether the
24 Corps of Engineers had any restrictions
25 placed on it in terms of a design that it

Page 26

1 adopted for the Lake Pontchartrain and
2 vicinity hurricane protection system?
3     A.  I'm not sure.  That's a tough
4 question to answer.  If you have a
5 particular restriction, maybe I can answer a
6 question to a specific --
7     Q.  No.  I'm trying to find out --
8     A.  -- restriction.
9     Q.  I'm trying to find out whether the
10 Corps of Engineers was free to come up with
11 the best design that it could conceive of to
12 protect Lake Pontchartrain and vicinity?
13     A.  It was free to determine a levee
14 section based on the still-water level that
15 was given that was based on the standard
16 project hurricane for which we were
17 authorized to design the levees to.
18     Q.  Well, who determined the standard
19 project hurricane level or criteria?  Who
20 made that determination?  Was that the
21 Corps?
22     A.  Well, I don't know that I can
23 answer that question.
24     Q.  Who can answer that question?  Is
25 there someone at the Corps who can?

Page 27

1     A.  The project manager at the time
2 would probably be able to answer that
3 question.
4     Q.  Well, would it be fair to say that
5 the project manager at the time also was the
6 one who was ultimately in charge of
7 determining what the standard project
8 hurricane criteria would be?
9     A.  That is correct.
10     Q.  And is that the starting point for
11 the design to determine a standard project
12 hurricane?
13     A.  That's correct.
14     Q.  And isn't it true that the
15 standard project hurricane is determined by
16 looking historically at previous hurricanes
17 over some period of time?
18     A.  That's part of it.
19     Q.  And is there any limitation on the
20 project manager in terms of what criteria he
21 decides or relies upon in that exercise of
22 considering the past?
23     A.  As you said, the only information
24 that's there is historical data, so you can
25 only base your assumption on the historical

Page 28

1 data we had, which was based on existing or
2 previous hurricanes.
3     Q.  There is no limitation placed on
4 the project manager as far -- insofar as the
5 Corps' ability to exceed whatever standard?
6     A.  His limitation is based on -- it's
7 from Congress.  We are authorized to design
8 the levee from Congress.  We are given funds
9 and authorized to design a levee to sustain
10 that still-water elevation from a standard
11 project hurricane.
12     Q.  Was there anything in the
13 Congressional mandate that said:  Build --
14 for lack of a better way:  Build an adequate
15 rather than the best hurricane protection
16 system that can be designed?
17     A.  I can't speak to the exact wording
18 of what was in the document.
19     MR. BRUNO:
20         Excuse me, Ned.  Forgive me.  I'm
21 confused.  Are we talking about the entire
22 Lake Pontchartrain system or are we talking
23 about a portion of the system?
24     MR. KOHNKE:
25         I'm talking about --

Page 29

1     MR. BRUNO:
2         Or are we talking about new levees
3 or are we talking about maintenance?  This
4 is extremely broad, and forgive me, I'm not
5 able to follow.
6     MR. KOHNKE:
7         I have been addressing the entire
8 system.  I have been using terms that would
9 encompass the entire Lake Pontchartrain and
10 vicinity hurricane protection system.  I
11 will later on get into focus with the MRGO
12 levee, which is where I'm going to focus.
13 EXAMINATION BY MR. KOHNKE:
14     Q.  Go ahead.
15     MR. SMITH:
16         I'm going to instruct him not to
17 answer the broader question, because that
18 again is beyond the scope of what he is
19 prepared to address.  If you could ask him
20 about the MRGO levees, then that's fine.
21 EXAMINATION BY MR. KOHNKE:
22     Q.  All right.  Well, let me try to
23 come back and get into this more narrow area
24 of the MRGO levee.
25         When I use the term "MRGO levee,"

8  (Pages 26 to 29)

**Page 30**

1  which is, of course, used in the 30(b)(6)
2  notice, do you know what I'm referring to?
3     A.  Yes.
4     Q.  Describe --
5     A.  I assume you are referring to the
6  section of the levee that's south of Bayou
7  Dupre?
8     Q.  I was going to say, describe for
9  us, so that we are all on the same page,
10 what the MRGO levee means to you, the Corps.
11    A.  There is a control structure at
12 Bayou Bienvenu near the GIWW, the Gulf
13 Intracoastal Waterway.  What I refer to the
14 MRGO levee would be the structure of levee
15 that extends south from Bayou Bienvenu past
16 the control structure at Bayou Dupre, until
17 we get to what we refer to as the return
18 levee at Verret.  It's about 12 -- 12 miles
19 give or take of levee south of Bayou
20 Bienvenu.
21    Q.  The stretch that you are referring
22 is to a 12-mile stretch beginning just south
23 from Bayou -- beginning at Bayou Bienvenu
24 control structure, proceeding south,
25 terminating at what you refer to as the

**Page 31**

1  return levee at Verret?
2     A.  That's correct.
3     Q.  Now, in designing the levee system
4  over that 12-mile stretch that we will refer
5  to as the MRGO levee, were there any
6  restrictions placed on the Corps in terms of
7  the size, quality materials that it chose to
8  use?
9     A.  The size was restricted by the
10 still-water elevation that was relative to
11 the standard project hurricane that we were
12 authorized to build the levee to.
13    Q.  And the still-water elevation is a
14 product of assumptions that go into the
15 standard project hurricane, is it not?
16    A.  Yes.
17    Q.  And those assumptions are
18 assumptions made by the project manager of
19 the Corps of Engineers or folks at the Corps
20 of Engineers?
21    A.  That's correct.
22    Q.  And so if I put the question back
23 to you, would you agree that the Corps of
24 Engineers was not restricted, other than by
25 the assumptions it made, starting with the

**Page 32**

1  standard project hurricane?
2     A.  I wouldn't refer to it as a
3  restriction.  The elevation is based on
4  signs.  The still-water level for that
5  standard project hurricane, we were
6  authorized to determine the still-water
7  level for that standard project hurricane,
8  authorized by Congress.  The science that
9  went into determining that still-water level
10 for that given storm is based on the science
11 of previous hurricanes.
12    Q.  Congress doesn't mention anywhere
13 in the 1965 act or any of the legislation
14 that followed the appropriations or
15 anything, it doesn't mention still-water
16 elevations, does it?
17    A.  It mentions -- it mentions
18 standard project hurricane.
19    Q.  And standard project hurricane is
20 a series of assumptions using historical
21 data that the Corps makes; isn't that right?
22    A.  That's correct.
23    Q.  And assumptions are subjective?
24    A.  I don't know that I would say
25 that.

**Page 33**

1     Q.  Well, in this case --
2     A.  Based on -- I will again say that
3  it's based on science and engineering.  It's
4  based on hydraulic engineering and there is
5  literature and textbooks and whatever
6  information you want to try and determine is
7  what those hydraulic engineers use to
8  determine the still-water level.  It wasn't
9  a subjective analysis.  It's a technical
10 analysis.  It's a --
11    Q.  Let me turn to the construction of
12 levees for a moment.  When did the
13 construction of the MRGO levee begin; at
14 what point in time?
15    A.  Approximately 1967.
16    Q.  And what was the design height of
17 the levee when construction began in 1967?
18    A.  Approximately 15.
19    Q.  Do you know exactly?
20    A.  It varied from reach to reach.  I
21 think it's -- again, it's also based on
22 hydraulic analyses.  It was either between
23 15 and 15 and a half, I believe.
24    Q.  Now, the initial --
25    MR. BRUNO:

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 34

1      Excuse me.
2    MR. KOHNKE:
3      Go ahead, Joe.
4    MR. BRUNO:
5      So that we have a reference for
6  the record, the 15 feet is relative to what?
7    THE WITNESS:
8      Well, I was just about, okay, to
9  get into that.
10   EXAMINATION BY MR. KOHNKE:
11     Q.  If you want to ask the question,
12  go ahead and ask the question as you
13  perceive it.
14     A.  It's -- I should qualify that it's
15  elevation 15 to 15 and a half NGVD, National
16  Geodetic Vertical Datum.  That datum is
17  relative to mean sea level back in 1967.
18  Zero NGVD would approximately equal mean sea
19  level.
20     Q.  Now, post Katrina did the Corps of
21  Engineers discover that its use of old
22  vertical datum elevations were in error?
23     A.  I wouldn't use the term "in
24  error."  And we were looking at those datums
25  before Hurricane Katrina.

Page 35

1      Q.  Well, all right.  Let's say at any
2  time surrounding Hurricane Katrina,
3  including post Hurricane Katrina, has the
4  Corps come to the realization that the
5  vertical datum elevations that it had been
6  using to determine levee height and sea wall
7  height were, in fact, off because of the
8  source that it was relying upon?
9      A.  I'm going to ask you to qualify
10  your question, because there is a difference
11  if you are talking about the design of the
12  1967 and if you're talking about the
13  existing conditions in 2005.
14     Q.  Existing conditions in 2005.
15     A.  Because of settlement and
16  subsidence, the elevation, the assumed
17  elevation or water level elevation based on
18  NGVD in 1967 would have been approximately a
19  half foot lower than what they would be
20  now.
21     Q.  Now, I understand that what you
22  are saying is because of subsidence there
23  would be a reduction in height of
24  approximately a half foot.
25     A.  Approximately.

Page 36

1      Q.  Is that what you are saying?
2      A.  We are using that as an average.
3  Now, it depends on what -- the area you are
4  in.  It's not a constant.
5      Q.  Well, but that's a slightly
6  different response to the question I asked.
7  Let me come back to the question.  I'm not
8  asking about the effect of subsidence on the
9  levee.  I'm asking about the reference
10  points the Corps was using to measure the
11  height of the levee --
12     A.  That's correct.
13     Q.  -- to do a profile.
14     A.  They have all subsided.  It
15  depends on the area.  Some areas may be
16  more, some areas may be less.
17     Q.  So in addition to the subsidence
18  of the levee, the reference points that the
19  Corps was relying upon to measure subsidence
20  was also off because those reference points
21  themselves had subsided?
22     A.  The whole area is under
23  subsidence.
24     Q.  That's a yes?
25     A.  That's a yes.

Page 37

1      Q.  And when did this -- when did it
2  become apparent to the Corps that its use of
3  reference points was unreliable because the
4  reference points had subsided?
5    MR. SMITH:
6      I'm going to object to that
7  question.  This, again, is getting into the
8  Corps' review.  It's No. 9, Corps' review,
9  assessment and evaluation of the reasons for
10  the failure of the levees.  To the extent
11  you have a question that goes back to when
12  the levees were designed or constructed,
13  it's a proper question.  I'm going to
14  instruct him not to answer that question.
15   EXAMINATION BY MR. KOHNKE:
16     Q.  Okay.  In 1967 when construction
17  began, did the Corps of Engineers make a
18  determination as to the quality or makeup of
19  the soil where it was going to be placing
20  this MRGO levee?
21     A.  Yes.
22     Q.  Did it do so through soil
23  sampling?
24     A.  Yes.
25     Q.  And what conclusions did the Corps

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 38

1  reach with respect to the suitability of the
2  soil to support a levee system? During this
3  12-mile -- everything relates to this
4  12-mile stretch --
5      A.  I understand.
6      Q.  -- that I'm referring to as the
7  MRGO.
8      A.  I'm not sure I can answer the
9  question based on the suitability.
10     Q.  Let me refine it.
11     A.  Soil --
12     Q.  Go ahead.
13     A.  Okay. Soil conditions change from
14 location to location and the design of the
15 levee will be based on the information that
16 we obtain from those soil borings and
17 laboratory testing. One area isn't more
18 suitable than another area. There are just
19 different conditions and the levee needs to
20 be designed based on those foundation
21 conditions.
22     Q.  Is the person who makes this
23 determination or analyzes that soil, is that
24 a geotechnical engineer?
25     A.  That's correct.

Page 39

1      Q.  Are you a geotechnical engineer?
2      A.  Yes.
3      Q.  And were you involved from --
4  1992, I believe, is when you began working
5  with the Corps -- were you involved in
6  analyzing soil along this 12-mile stretch?
7      MR. SMITH:
8          I'm going to object to that.
9  Again, it's irrelevant. He is here to
10 testify concerning those specifics.
11 Whether he discovered that in the course of
12 his employment or whether he learned that in
13 preparing for this deposition today is
14 irrelevant. And to be honest, strictly
15 speaking, it's beyond the scope. If you
16 have a question, he will testify to the
17 knowledge that he has.
18     MR. KOHNKE:
19         Well, note my objection again.
20 EXAMINATION BY MR. KOHNKE:
21     Q.  In 1967 did the Corps of Engineers
22 rely upon geotechnical engineers to consider
23 the soil content and makeup before
24 constructing this 12-mile levee?
25     A.  Yes.

Page 40

1      Q.  Did it determine in advance of
2  construction how many lifts would be
3  necessary in order to achieve the design
4  height?
5      A.  Analyses are performed to estimate
6  that.
7      Q.  All right. What was the estimate?
8  In 1967 when work began, what was the Corps'
9  estimate as to how many lifts were
10 necessary?
11     A.  I don't know that I can answer
12 that exact question. I know they did place
13 three lifts in one area. They knew they
14 needed at least three lifts.
15     Q.  What area would that one area be?
16     A.  Between Bayou Bienvenu and Bayou
17 Dupre.
18     Q.  And how many miles of the 12-mile
19 section would that consist of?
20     A.  I believe it's 6.2.
21     Q.  And what you are saying is you
22 know that they made three lifts?
23     A.  There is an original lift. We
24 refer to that as a lift. And then they
25 refer to the subsequent as enlargements.

Page 41

1      Q.  And there have been two subsequent
2  enlargements since the --
3      A.  Since the first lift, that's
4  correct.
5      Q.  When were those done? When was
6  the original lift done, first of all?
7      A.  1967.
8      Q.  All right.
9      A.  Between 1967 and 1968 the first
10 enlargement was -- the plans and specs went
11 out in 1970 -- I think it was approximately
12 1976 -- 1978, I believe. And then the
13 second enlargement was approximately 1983.
14     Q.  And after each enlargement,
15 profiles were done to determine the height
16 of the levee?
17     A.  Before each enlargement there are
18 surveys to determine the existing elevation.
19 Once construction is complete, the
20 contractor constructing the levee is
21 obligated to provide the Corps of Engineers
22 with as-built cross-sections, compliance
23 cross-sections.
24     Q.  And how is that done? Through a
25 surveyor?

11 (Pages 38 to 41)

Page 42

1    A.  Surveyors.
2    Q.  Are those repeated annually or
3  only at each time a lift or enlargement is
4  performed?
5    A.  They would have been performed
6  subsequent to each contract that was -- we
7  were authorized to build.  In other words,
8  if we were given authorized funds to do a
9  second enlargement then at that time we
10  would have a survey party go out to the site
11  and perform those surveys.
12    Q.  What was the surveyed height of
13  the levee following -- the second
14  enlargement was concluded in what year, by
15  the way?
16    A.  1983.  These are approximate
17  dates, now, based on the contract plans and
18  specs.
19    Q.  All right.  In 1983 after the
20  construction of the second enlargement is
21  completed, a surveyor is sent out to
22  ascertain the height of the levee along
23  this, what we are referring to as a 6.2-mile
24  stretch; is that correct?
25    A.  That's correct.

Page 43

1    Q.  What was the height of the levee
2  measured in 1983?
3    A.  Approximately 20 and a half NGVD.
4    Q.  Since 1983 have any further
5  profiles -- I'm using the word "profiles" to
6  refer to the surveyed determination of
7  height -- were any profiles done of the
8  levee in this particular stretch?
9    A.  In 19 -- In approximately 1991,
10  '93, in that time frame, in that 6.2-mile
11  stretch.
12    Q.  What was the purpose of going out
13  in '91 to '93?
14    A.  We were --
15    Q.  Is there another enlargement
16  planned?
17    A.  We were trying to get funds -- we
18  were trying to get authorization from
19  Congress to put a subsequent lift on that
20  section of levee.
21    Q.  So another lift or enlargement was
22  planned, but you were awaiting funds and the
23  absence of funds had delayed this third
24  enlargement?
25    A.  Yes.

Page 44

1    Q.  In 1991, '93, what sort of
2  elevation was measured?
3    A.  I would have to -- I don't want to
4  give you an approximate elevation.  I'm not
5  positive.
6    Q.  Well, how can you become positive?
7    A.  I'd have to look at the plans and
8  specs for that given set of plans and specs.
9    Q.  Give me -- subject to what those
10  plans and specs will reveal, give me your
11  approximation as to what that height was.
12    A.  I can give you an approximation
13  based on Lidar data.  That's surveys that
14  were taken after Katrina.  The sections of
15  levee along the MRGO that remained intact
16  after Hurricane Katrina, the elevations were
17  approximately 15.
18    Q.  So after Katrina Lidar data was
19  obtained and you are saying that after
20  Katrina the elevations were approximately
21  15?
22    A.  For the levee sections that
23  remained intact.
24    Q.  I understand.
25    A.  Okay.

Page 45

1    Q.  Is this 6.2 miles between Bayou
2  Bienvenu and Dupre part of the intact?
3    A.  There were sections of that --
4  there were sections of that stretch that
5  remained intact after the hurricane.
6    Q.  Now, how can I get you to be
7  absolutely certain to know at the data that
8  you referred to in 1983 -- excuse me --
9  1991, '93?  What do you have to do to find
10  that data?
11    A.  I would just have to review the
12  set of plans and specs for that contract.
13    Q.  Where are those plans and specs?
14    A.  We have them at the Corps.
15    Q.  And how long would it take you to
16  do that?
17    A.  Not very long.
18    Q.  At the lunch break can you arrange
19  to either go up there or have someone bring
20  them here?
21    MR. SMITH:
22      We can inquire at the lunch break.
23    MR. BRUNO:
24      May we know if it's on the
25  website, and if so, there would be a

Page 46

1  descriptor to allow us to obtain it through
2  that process?
3      MR. SMITH:
4          Yes, certainly.
5      MR. KOHNKE:
6          Are you saying it is on the
7  website?
8      MR. SMITH:
9          No. I don't know. I said -- I
10  understood the question to be, if it's
11  available on the website, then we will
12  certainly provide that information to you.
13      MR. BRUNO:
14          Finally, Ned, may we learn what
15  would be the appropriate descriptor of these
16  plans and specs?
17  EXAMINATION BY MR. KOHNKE:
18      Q.  Now, was all 12 miles of the MRGO
19  levee built to the design height prior to
20  Hurricane Katrina?  100 percent of it I'm
21  referring to.
22      A.  Would you repeat your question?
23      Q.  Was 100 percent of the 12-mile
24  section of levee that we have referred to as
25  the MRGO levee, was all of it built to the

Page 47

1  design height?
2      A.  They were built to the design
3  height after construction.
4      Q.  I understand after construction.
5  Let me refine my question. Just prior to
6  Katrina, were all of the levees built to the
7  design height along the MRGO?
8      MR. SMITH:
9          I'm going to object to the
10  question. The form of the question is
11  vague, because I'm not sure you are saying
12  built, but just prior to Katrina.
13      MR. BRUNO:
14          We are talking about reach two,
15  are we not?
16      MR. KOHNKE:
17          Reach two?
18      MR. BRUNO:
19          Yes.
20      MR. KOHNKE:
21          I'm talking about that 12-mile
22  stretch that I'm referring to as the MRGO.
23      MR. SMITH:
24          South of Bayou Bienvenu, the whole
25  stretch here.

Page 48

1      MR. BRUNO:
2          Is this 12-mile stretch less than
3  reach two?
4      MR. SMITH:
5          No. I think in the other
6  litigation it's generally been referred to
7  as reach two.
8      MR. KOHNKE:
9          I will refer to it any way you
10  want.
11  EXAMINATION BY MR. KOHNKE:
12      Q.  I'm referring to it as the MRGO
13  levee, which is referred as the 12-mile
14  stretch commencing at Bayou Bienvenu,
15  proceeding south to the return levee at
16  Verret. And what my question is, was that
17  on the day before Katrina, or just before
18  Katrina hit on August 29 of 2005, was that
19  entire levee system at the design height,
20  not built but at the design height?
21      A.  I understand your question now.
22  The answer would be no.
23      Q.  How do you know the answer to
24  that?
25      A.  Based on the Lidar data that I

Page 49

1  explained previously.
2      Q.  What parts were below the design
3  height?
4      A.  There was no data available after
5  Hurricane Katrina that showed any section
6  was at the design elevation.
7      Q.  Would it be fair to say that the
8  entire 12-mile section of levee known as the
9  MRGO was at a height below the design height
10  on the date Katrina hit this area?
11      A.  Again, based on the Lidar data we
12  have, that's the only information we have.
13  And all that data showed the data that we
14  have for the remaining sections of levee
15  along that 12-mile stretch, all the
16  elevations of the intact levees were below
17  the design elevation.
18      Q.  What is the greatest degree to
19  which it was below the design height
20  measured in feet?
21      A.  Approximately five feet.
22      Q.  Five feet. And what is the least
23  amount of measurement below the design
24  height that you measured?
25      A.  I think I would have to give you

13 (Pages 46 to 49)

Page 50

1   just an average. I think five feet is an
2   approximate average. I think for the most
3   part everything was around elevation 15.
4   Not much difference. Now, there are
5   areas -- are you referring to areas that
6   were eroded away after --
7       Q. No. I'm just referring to --
8       A. -- the intact levee sections?
9       Q. Yes.
10      A. I would say 15 -- five feet is a
11  good approximation of an average.
12      Q. It's an average. Now, let me see
13  if I can understand, put this in a
14  perspective. Based upon measurements that
15  the Corps did after Hurricane Katrina using
16  the Lidar data that you earlier described,
17  the Corps has determined that just prior to
18  Katrina the levee system which protected --
19  which protected the St. Bernard area, I will
20  call it, that 12-mile MRGO levee, was at an
21  average of five feet below its design
22  height?
23      A. That's correct.
24      Q. Okay. How long -- did the Corps
25  understand and realize that the levee

Page 51

1   system, this hurricane protection levee
2   during this -- along this 12-mile stretch
3   was, in fact, five feet or so below its
4   design height? Did you understand that
5   before Katrina?
6       MR. SMITH:
7           I'm going to instruct him not to
8   answer that. What the Corps knew and when
9   it knew it is the subject of this.
10      MR. KOHNKE:
11          That's part of the construction,
12  to know what you have constructed.
13  Item No. 2 -- excuse me -- 3 deals with
14  construction of the levees. Now, once you
15  have constructed, you can't walk away and
16  say: That's it, I have done it. You have
17  got to realize what you have constructed and
18  if it's changed, you have to understand that
19  it's changed.
20      MR. SMITH:
21          That's argument, Counsel.
22      MR. KOHNKE:
23          That's not argument. That's a
24  question.
25  EXAMINATION BY MR. KOHNKE:

Page 52

1       Q. I want to know whether the Corps
2   after building this levee walked away and
3   never again bothered to measure it, or
4   whether they did measure it prior to
5   Katrina?
6       MR. SMITH:
7           No. 7 in the list of subjects that
8   you listed for this deposition is any
9   assessment done prior to Hurricane Katrina
10  that indicated the existence of any problem,
11  issue or undesired condition. That's
12  exactly what you have just asked him here.
13  I'm going to instruct him not to answer the
14  question.
15      MR. KOHNKE:
16          All right. I object.
17  EXAMINATION BY MR. KOHNKE:
18      Q. Now, let me talk a little bit
19  about the, some more about the construction
20  of the levee that we have been discussing,
21  the MRGO levee. What is hydraulic fill?
22      A. Hydraulic fill is the way it was
23  constructed along the MRGO. Like, you are
24  referring to hydraulic fill with respect to
25  this levee, I'm assuming is your question?

Page 53

1       Q. No. Just generally speaking, what
2   is hydraulic fill?
3       MR. SMITH:
4           I'm going to instruct him not to
5   answer general questions unrelated to MRGO.
6   If you want to ask a question about the MRGO
7   levee and it has something to do with
8   hydraulic fill, that's perfectly fine. But
9   he is not here to testify as an expert what
10  hydraulic fill might be considered in the
11  abstract.
12      MR. KOHNKE:
13          Not in the abstract. I want to
14  know what the Corps of Engineers considers
15  hydraulic fill to be. I think that's a
16  perfectly legitimate question.
17      MR. BRUNO:
18          May we at least learn whether
19  these words put together are utilized by the
20  witness or by the Corps in the day-to-day
21  operations, and if they are used, what do
22  they mean to the Corps when they are used in
23  those day-to-day operations? It has nothing
24  to do with expertise.
25      MR. SMITH:

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 54

1    I am going to allow -- I am going
2  to allow him to answer because I know where
3  this is going and I think it's a proper line
4  of questioning.
5  EXAMINATION BY MR. KOHNKE:
6    Q.  Okay, go ahead.
7    A.  Hydraulic fill is essentially
8  material that would be disposed of after
9  dredging operations.  They refer to it as
10 hydraulic fill because you are using water
11 pressure to bring up material into a dredge
12 and then pumped into a given area as fill.
13    Again, that's why they refer to it
14 as hydraulic fill, because there is water in
15 addition to the material that's being
16 dredged for use.
17    Q.  Does the Corps of Engineers
18 utilize hydraulic fill in constructing
19 levees along the Lake Pontchartrain and
20 vicinity hurricane protection system?
21    MR. SMITH:
22    Again, are you restricting this
23 just to the MRGO levees?
24    MR. KOHNKE:
25    Yes.

Page 55

1    THE WITNESS:
2    They did.  Yes, they did.
3  EXAMINATION BY MR. KOHNKE:
4    Q.  When did the Corps make a decision
5  to first begin using hydraulic fill to
6  construct the MRGO levee?
7    A.  That would have been during the
8  phase of design of the plans and
9  specifications for the first levee
10 enlargement, which would have been in the
11 middle -- mid '60s.
12    Q.  Is the use of hydraulic fill, is
13 that problematic in terms of the type and
14 composition of the levee that results?
15    A.  I wouldn't use the word
16 "problematic."
17    Q.  What term would you use?
18    A.  It's just a different process.
19    Q.  What other types of soils in
20 addition to hydraulic fill, or materials in
21 addition to hydraulic fill was used by the
22 Corps in the construction of the MRGO levee?
23    A.  They used an adjacent borrow,
24 which was on the flood side for the
25 subsequent enlargements.

Page 56

1    Q.  An adjacent borrow from where?
2    A.  On the flood side.
3    Q.  Define flood side.  The open water
4  side?
5    A.  Between the levee and the MRGO
6  channel.
7    Q.  What type of -- let me back up.
8    Prior to beginning the
9  construction of the MRGO levee, what type of
10 analysis did the Corps do over the various
11 soils that it intended to use to construct
12 that levee?
13    A.  Performed soil borings and
14 laboratory tests.
15    Q.  Was there an object to try to
16 determine whether certain soil was suitable
17 versus non-suitable, unsuitable?
18    A.  That would have been based on the
19 classification of the material.
20    Q.  What are the different
21 classifications the Corps has for the
22 different soils?
23    A.  There is numerous.  I don't know
24 if you want to go --
25    Q.  Of the soils --

Page 57

1    A.  -- through all of them.
2    Q.  Of the soils used in the MRGO
3  levee.
4    A.  It would have been a combination
5  of clays, and now, each one of these is --
6  there are varying degrees of -- this is a
7  generic term now -- clays and silts and
8  silty sands.
9    Q.  Is there something known as
10 peat --
11    A.  Yes.
12    Q.  -- that is sometimes used as well?
13    A.  Right.
14    Q.  What is peat?
15    A.  Peat is also referred to as an
16 organic material, which is -- the best way
17 to describe that would be decomposed
18 vegetation that mixes with the existing
19 soil, which sort of looked like mulch.
20    Q.  Is there a preferred material to
21 use in levee building in constructing a
22 hurricane protection system such as the MRGO
23 levee?
24    A.  Our plans and specs mandate that a
25 contractor use clays and silts and no other

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 58

1  type of material.
2      Q.  And how do you monitor the
3  contractor in terms of what he or it uses?
4      A.  We'll typically perform
5  classifications over -- it will usually be,
6  for a given amount of material placed that
7  varies from contract to contract, but for a
8  given amount of cubic yards placed he is
9  required to perform classification
10  laboratory tests to determine that the
11  material he is placing is meeting the
12  specifications.
13      Q.  Is that done by the Corps going
14  out and doing sampling and sending it to a
15  Corps laboratory, or is there an outside
16  laboratory used for that?
17      A.  It's an outside laboratory that
18  the contractor acquires.
19      Q.  Now, the contracts that the
20  contractors, require that the contractors
21  use clays and silts.  Of the two materials
22  is one better than the other?
23      A.  You may have to qualify your
24  question better.  Better with respect to
25  what?

Page 59

1      Q.  For constructing a levee, a
2  hurricane protection levee such as the MRGO?
3      A.  For construction, not necessarily,
4  no.
5      Q.  For withstanding the effects of
6  overtopping, is one better than the other?
7      A.  There is -- okay?
8  MR. SMITH:
9      Yes.
10  THE WITNESS:
11      There is numerous science of
12  erosion protection -- or erosion resistance,
13  some various studies.  There's a new ASCE --
14  I'm sorry, an ASTM spec that determines the
15  method to be used to determine the
16  erodibility or the erosion resistance of a
17  given soil.  There is a university that's
18  doing some similar testing.  And the type of
19  material with respect to erosion resistance
20  is just one factor in the erosion resistance
21  of a levee section as a whole.
22  EXAMINATION BY MR. KOHNKE:
23      Q.  What is the number of this ASTM
24  spec?
25      A.  I have to look it up for you.

Page 60

1      Q.  Okay.  And when was this spec
2  promulgated or made available by the
3  American Society of -- what is it -- Testing
4  Materials?
5      A.  American Society for Testing and
6  Materials, that's right.
7      Q.  When was this --
8      A.  The late '90s.  I couldn't give
9  you an exact date right now.  I have to look
10  it up.
11      Q.  Prior to the late '90s and prior
12  to the introduction of this specification,
13  what sort of conclusion did the Corps reach
14  with respect to the erodibility of the soils
15  that it was choosing to use for the MRGO
16  levee system?
17      A.  Prior to?
18      Q.  Prior to the introduction of the
19  ASTM spec that you just referred to, what
20  was the standard?
21      A.  None that I'm aware of.
22      Q.  There was no standard at all?
23      A.  For erosion resistance?
24      Q.  Yes.
25      A.  None that I'm aware of.

Page 61

1      Q.  Was there any understanding as to
2  the -- forget standard.  Was there any
3  understanding on the part of the Corps that
4  some soils would be more erosion resistant
5  than others?
6      A.  I have to answer that question
7  that our responsibility was to design a
8  levee to hold back water at a given
9  still-water elevation, not for overtopping.
10      Q.  Now, I want to be clear about this
11  and I want you to be clear so that I'm not
12  confused.  When you say your responsibility
13  was to design a levee that was not to be
14  overtopped, is that your conclusion or is
15  that your testimony on behalf of the Corps?
16      A.  Any -- anything -- any monies that
17  we would have spent to prevent the levee
18  from erosion because of overtopping would
19  have been against the money that we were
20  obligated to -- excuse my terms here, give
21  me a second.  Basically Congress allowed us
22  money to build levees to a given elevation.
23  Any monies we would have spent above and
24  beyond to prevent water from overtopping or
25  for elevations higher than that still-water

16 (Pages 58 to 61)

Page 62

1  level based on that standard project
2  hurricane, we were not authorized to spend
3  money to do those types of improvements to
4  the levee.
5      If I can rephrase, if I assume the
6  levees overtopped, then I'm actually
7  assuming a still-water level higher than SPH
8  and we are not authorized to spend monies to
9  do that.
10     MR. KOHNKE:
11         I'm going to ask you to go back to
12  the previous answer given. And then I said,
13  I want to be clear, and then I asked another
14  question and got another answer. Would you
15  go back and read back the previous answer?
16  (Whereupon, the requested testimony was read
17         by the Court Reporter).
18  "A. I have to answer that question that
19  our responsibility was to design a levee to
20  hold back water at a given still-water
21  elevation, not for overtopping."
22  EXAMINATION BY MR. KOHNKE:
23     Q.  I want to go back to your previous
24  answer and try to understand it. You said
25  that your responsibility was to design a

Page 63

1  levee to hold back water in a given
2  still-water elevation. Do you recall that
3  testimony?
4      A.  Yes.
5      Q.  When you say "still water," do you
6  mean water that is not producing waves?
7  What do you mean by still water?
8      A.  The still water is basically the
9  hydraulic analysis for that standard project
10  hurricane. That is the elevation of the
11  water in NGVD of that given standard project
12  hurricane, the elevation of the water that
13  water -- that storm would produce.
14     Q.  But define still water. That's
15  the part of your answer that I want you to
16  further define.
17     A.  There is -- there is --
18     Q.  What does still water mean?
19     A.  It's the storm surge that they
20  assume for that given standard project
21  hurricane, and there are waves assumed in
22  that standard -- in that still-water level.
23     Q.  So it is not what it sounds like,
24  it is not still water?
25     A.  It's not calm water. That's just

Page 64

1  the term we use.
2      Q.  Now, let's get back to the design
3  as it relates to overtopping. I want to
4  understand. There was a design height of
5  the MRGO levee that was designed and
6  believed to be in place prior to Hurricane
7  Katrina; is that correct?
8      A.  I'm not going to say believed to
9  be in place.
10     Q.  You knew, in fact, it was not in
11  place?
12     A.  I have to go back to seven, that
13  question.
14     MR. SMITH:
15         I think we are getting back into
16  the assessment.
17     MR. KOHNKE:
18         Okay. You're telling -- you're
19  instructing him not to answer the question
20  as to what the Corps knew prior to Hurricane
21  Katrina about the actual height of the
22  levee, not its design but actually as it
23  existed prior to Hurricane Katrina?
24     MR. SMITH:
25         Correct. It's not -- you are not

Page 65

1  asking him about how it was designed --
2      MR. KOHNKE:
3          I'm asking him --
4      MR. SMITH:
5          -- or how it was constructed or
6  how it performed, you are asking him another
7  question.
8      MR. KOHNKE:
9          I'm asking him whether the Corps
10  understood prior to Hurricane Katrina that
11  the height of the levee that it had designed
12  was no longer at that height, it was at an
13  average of five feet lower than that height.
14     MR. SMITH:
15         Right. And I think I instructed
16  him not to answer that question previously
17  and I will instruct him again not to answer
18  that question.
19  EXAMINATION BY MR. KOHNKE:
20     Q.  Would it be correct to say, sir,
21  that the design of a levee to hold back
22  waters assuming a certain still-water
23  elevation is no longer effective if that
24  design height no longer exists?
25     MR. SMITH:

17  (Pages 62 to 65)

Page 66

1    Again, this is an abstract
2  question unconnected to the subjects that he
3  is here to address today. That would be a
4  proper question to ask an expert in this
5  area. You haven't asked him anything about
6  the MRGO levees in that question, as I can
7  perceive.
8    MR. KOHNKE:
9    Okay. Well, let me try to make it
10 a MRGO question then.
11 EXAMINATION BY MR. KOHNKE:
12   Q. Is it true that the MRGO levee was
13 built to a design height at the time it was
14 constructed and additional lifts were made?
15   A. Yes.
16   Q. Is it true that sometime after the
17 second lift -- and no other lifts were made
18 after the second lift; isn't that right?
19   A. No.
20   Q. And after that second lift
21 subsidence occurred?
22   A. That's correct.
23   Q. Is it also true that the effect of
24 the subsidence was to reduce the levee an
25 average of five feet from that to which it

Page 67

1  had been previously built?
2    A. That's correct.
3    Q. And is it true that the
4  assumptions about overtopping and erosion
5  assumes that a levee is not going to be
6  overtopped, the assumptions that the Corps
7  made at the time of its design?
8    A. That's correct.
9    Q. And those assumptions no longer
10 apply given that subsidence of five feet?
11   A. I would have to check the actual
12 still-water elevation and see what that was
13 with respect to the existing elevation at
14 the time. I'm not sure that even at
15 elevation 15, that that might have been
16 higher than the still-water level.
17   Q. We were talking about hydraulic
18 fill. Let me get back to the question.
19 Does the Corps consider hydraulic fill to be
20 clay or silt?
21   A. It could be a combination of both.
22 It depends on the area that you are
23 dredging.
24   Q. And the Corps doesn't know what
25 it's dredging until it's been dredged and

Page 68

1  put in place?
2    A. Not true.
3    Q. Not true. So for each yard or
4  each hundred yards the Corps knows in
5  advance how much silt and how much clay is
6  going to be dredged hydraulically and put in
7  place?
8    A. Well, you are asking me every
9  hundred yards?
10   Q. At what interval is the sampling
11 occurring?
12   A. Approximately every 500 to a
13 thousand feet.
14   Q. And there are assumptions being
15 made that if a sample produces a certain
16 type of finding, clay or silt or some
17 combination of the two, that that will
18 continue for some distance; isn't that
19 correct?
20   A. There is a geologic profile that's
21 based on -- from our geologists based on
22 their historical knowledge as well as the
23 information gathered from the borings on
24 what soil type will be, exist between the
25 borings.

Page 69

1    Q. And was there a degree of
2  tolerance or allowance as to how much sand
3  or silty sand, I think you referred to it
4  as, would be included or could be included
5  and still meet specifications?
6    A. The act of placing the hydraulic
7  fill tends to leave the clay material behind
8  in the area where they were going to place
9  the embankment. And the more granular
10 materials, the silts and the sands, tend to
11 wash away. So the act of constructing a
12 levee with hydraulic fill tends to leave
13 more clay behind in the levee section than
14 the silt and sands.
15   Q. Did the Corps determine at any
16 point after each one of these enlargements
17 or lifts that some portion or what portion
18 of the MRGO levee in the various sections
19 measured included silty sands or peat?
20   A. We performed soil borings prior to
21 each levee enlargement, the first and second
22 enlargements. I think I'm answering your
23 question.
24   Q. No, you are not. If you are
25 talking about borings of the area that is

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 70

1    going to be dredged, you are not.
2       A.  No.  I'm talking about the
3    existing embankment, the existing levee.
4       Q.  I'm talking about after each lift
5    or enlargement, what did the Corps do to
6    determine the content of peat versus sandy
7    soil versus clay it had just lifted and put
8    in place?
9       A.  That's what I referred to earlier.
10   I believe I answered this question, as the
11   contractor constructing the levee is
12   required to perform quality assurance
13   testing, quality control testing during the
14   placement of the levee section to determine
15   that the material being placed meets the
16   specifications.
17      Q.  All right.  Let me ask you some
18   questions about erodibility.  How and why
19   does clay better resist erodibility when an
20   overtopping occurs?
21      MR. SMITH:
22         Go ahead.
23      THE WITNESS:
24         It's more complicated than just
25   the material type.  There are more factors

Page 71

1    that go into erodibility of a soil other
2    than just the soil type.
3    EXAMINATION BY MR. KOHNKE:
4       Q.  What are those factors?
5    Compaction, is that one?
6       A.  Compaction would be one.
7       Q.  Is that something that the Corps
8    requires its contractors to do in building
9    the MRGO levee?
10      A.  That material was uncompacted
11   fill.
12      Q.  Uncompacted?
13      A.  Yes.
14      Q.  What do you mean by that?
15      A.  That we don't monitor the
16   contractors' densities or moisture contents
17   in the soil as he is placing them.
18      Q.  Why not?
19      A.  There are various reasons for --
20   I'm not sure if you are asking me a general
21   question or if you are asking about the
22   actual MRGO levees.
23      Q.  Well, in light of counsel's
24   objections, I'm asking you, in order to
25   satisfy his requirements about the MRGO

Page 72

1    levee, why not?
2       A.  That would have been based on
3    location of the levee, the fact that they
4    were using hydraulic fill to place an
5    embankment, and the act of being able to
6    shape the levee using equipment.  We were
7    confident that the, building the uncompacted
8    levee would sustain the still-water level
9    for that given standard project hurricane.
10      Q.  Explain that to me.  Why were you
11   confident of that?
12      A.  Because there are uncompacted
13   levees built all over the country.  It's not
14   an uncommon practice to build an uncompacted
15   levee.  And they perform -- there is
16   evidence that they perform quite well to
17   hold back levee -- to hold back water below
18   the crown elevation of the levee.
19      Q.  Of these uncompacted levees along
20   the 12-mile stretch of the MRGO, how many of
21   those levees performed and remained intact
22   post hurricane?
23      A.  What do you mean by how many?
24      Q.  How many miles?  How many miles
25   suffered breaches?  What was the extent of

Page 73

1    the breaches, in other words?
2       A.  I couldn't give you an exact
3    length.  I mean, there were sections of --
4    there were sections of levee between in that
5    12-mile stretch that remained intact and
6    there were sections of levee in that stretch
7    that were eroded probably 10 feet below what
8    the existing levee crown was.
9       Q.  Was hydraulic fill used in the
10   sections of levee north of Bayou Bienvenu?
11      A.  I don't believe.
12      Q.  How did those levee fare post
13   Katrina?
14      MR. SMITH:
15         I'm going to object because it's
16   not really about the MRGO levees.
17   EXAMINATION BY MR. KOHNKE:
18      Q.  Were those levees compacted north
19   of Bayou Bienvenu?
20      MR. SMITH:
21         Again, he is not here to testify
22   about the other levees in the Lake
23   Pontchartrain vicinity of the hurricane
24   protection project.
25      MR. KOHNKE:

19  (Pages 70 to 73)

Page 74

1     Are you saying that the levees
2 north of Bayou Bienvenu are not part of the
3 MRGO levees?
4     MR. SMITH:
5         Not as you have defined them for
6 purposes of this deposition.
7     MR. KOHNKE:
8         Well, I'm talking about the MRGO
9 levees. That's what we are talking about.
10 Now, your witness at some point defined it
11 starting from Bayou Bienvenu south to the --
12 to Verret. I'm asking about the entire MRGO
13 levee system and we both know it extends
14 above or north of Bayou Bienvenu.
15     MR. SMITH:
16         But that's not in St. Bernard
17 Parish. That's in Orleans Parish.
18 EXAMINATION BY MR. KOHNKE:
19     Q.  Are you prepared to answer the
20 question, sir?
21     MR. SMITH:
22         I'm going to instruct him not to
23 answer it.
24     MR. KOHNKE:
25         The reason why you are doing that

Page 75

1 is what?
2     MR. SMITH:
3         Because those levees are in
4 Orleans Parish.
5     MR. KOHNKE:
6         You don't believe that the
7 comparison of those levees is a consistent
8 way to look at compaction versus
9 non-compaction?
10     MR. SMITH:
11         I think you can discuss that with
12 your experts.
13     MR. BRUNO:
14         Can we take a break, please?
15     MR. KOHNKE:
16         Sure.
17     THE VIDEOGRAPHER:
18         Going off the record at 10:21.
19     (Whereupon, a brief recess was taken.)
20     THE VIDEOGRAPHER:
21         We are back on the record at
22 10:37 a.m.
23 EXAMINATION BY MR. KOHNKE:
24     Q.  I have marked the --
25     A.  I would like to qualify an answer,

Page 76

1 if I could, to a previous statement or
2 previous question that you had asked.
3     Q.  Sure. What was the question; do
4 you remember?
5     A.  The question was asking how
6 much -- what the difference was essentially
7 between what the last design grade was from
8 the second enlargement to what it was
9 preKatrina. We had mentioned it was about
10 five feet --
11     Q.  Yes.
12     A.  -- was about the elevation
13 difference.
14     Q.  Yes.
15     A.  That was assuming the elevation of
16 20 which the levee was built to. The
17 elevation 20 has about two and a half feet
18 of sediment encompassed in that elevation.
19 In other words, the actual design we were at
20 17 and a half. We overbuilt it to 20
21 because we know the levee was going to
22 settle and we would eventually be back to 17
23 and a half.
24         So to answer your question, it
25 really wouldn't be five feet. It's about

Page 77

1 two and a half feet.
2     MR. KOHNKE:
3         Okay. I have marked for
4 identification as Exhibit 1 the notice of
5 30(b)(6) videotaped deposition of the
6 U.S. Army Corps of Engineers and I would ask
7 that it be attached to the deposition and
8 made a part of the record.
9 (Exhibit No. 1 marked for identification.)
10         And I'm going to ask you to turn,
11 together with your counsel, Mr. Smith, to
12 turn to the various numbers. You will see
13 the subject matters designated where we have
14 requested the Corps to produce a witness,
15 No. 14.
16         And this is in response to
17 something you said, Mr. Smith, on the record
18 about an agreement and I want to go through
19 this real quickly.
20         Item No. 1 is the Corps' response
21 to Murphy's May 4, 2006 request for records
22 pursuant to the -- to FOIA, and this
23 particular Item No. 1 was withdrawn by
24 Murphy and it so designates in this notice.
25         No. 2 and No. 3 are the areas in

Page 78

1  which you have produced this witness,
2  Mr. Varuso, to testify along with No. 8.
3  All of the other numbers, specifically 4, 5,
4  6, 7, 9, 10, 11, 12, 13 and 14, have the
5  notation that the Corps of Engineers has
6  made a final agency determination rejecting
7  Murphy's request to produce a Corps
8  representative to testify on this subject
9  area. There is no agreement that we have
10  reached. You have simply refused to produce
11  someone to testify on this area.
12          Now, do you have some contrary
13  information you would like to state on the
14  record?
15      MR. SMITH:
16          Did you say No. 5 was not
17  withdrawn? I think No. 5 was withdrawn
18  also.
19      MR. KOHNKE:
20          5 was withdrawn and 1 was
21  withdrawn. And with the exception of 2, 3
22  and 8, all of the others were objected to
23  and you have refused to produce a witness.
24  And what this notation seeks to do in polite
25  terms is to state that you have determined

Page 79

1  that you are not going to honor the request
2  to produce a witness.
3      MR. SMITH:
4          Yes. And I don't have any
5  contrary information to that.
6      MR. KOHNKE:
7          So there is no agreement with
8  respect to these others?
9      MR. SMITH:
10          No, that's fine. If I said that,
11  that was incorrect.
12      MR. BRUNO:
13          Excuse me. We have unfortunately,
14  I guess, the original notice which was filed
15  and date stamped June 27, 2006. Was there a
16  subsequent notice prepared?
17      MR. KOHNKE:
18          Yes, this is a third notice, and I
19  didn't go to the notices, Joe, but I suspect
20  that there is a second or now a third
21  notice.
22      MR. BRUNO:
23          Can we have a copy, A.J.?
24      MR. KROUSE:
25          Sure.

Page 80

1      MR. BRUNO:
2          Maybe somebody could get us a copy
3  so we can follow along.
4      MR. KOHNKE:
5          I have one right here for you.
6      MR. BRUNO:
7          Thank you.
8  EXAMINATION BY MR. KOHNKE:
9      Q.  What is Project Guardian?
10      A.  Task Force Guardian?
11      Q.  Task Force Guardian.
12      A.  Task Force Guardian was the group
13  set up that was going to repair the levees
14  and flood walls damaged during Hurricane
15  Katrina.
16      Q.  And when you say, "levees and
17  flood walls," does this include the MRGO
18  levee?
19      A.  Yes.
20      Q.  To repair -- does that suggest
21  merely bringing it back to the prehurricane
22  condition, preKatrina condition?
23      MR. SMITH:
24          I am going to object again. This
25  is beyond the scope of this deposition.

Page 81

1      MR. KOHNKE:
2          Are you instructing him not to
3  answer?
4      MR. SMITH:
5          Yes.
6  EXAMINATION BY MR. KOHNKE:
7      Q.  Let me hand to you now an exhibit
8  that I will mark as Exhibit 2.
9  (Exhibit No. 2 marked for identification.)
10          Something that I got off the
11  Corps', or actually someone else got off the
12  Corps' website, and ask you if you have seen
13  that before?
14      MR. BRUNO:
15          May we know whether the intent was
16  to repair to a particular height, or is that
17  outside of the scope?
18      MR. KOHNKE:
19          I'm going to try to get to that,
20  Joe, but I thought I would build to it.
21      MR. BRUNO:
22          May I just ask the court reporter
23  somehow to note on the record each time
24  counsel instructs the witness not to answer?
25  Can I do that?

Page 82

```
1        Okay, never mind.
2   EXAMINATION BY MR. KOHNKE:
3      Q.  Do you recognize that?
4      A.  Some of these -- some of these
5   pages.
6      Q.  On the first page of that document
7   Exhibit 2 that I have just handed to you it
8   has the Corps -- what I will call the
9   trademark, which is the castle, and it has
10  the words "better and stronger." Now, does
11  better improve a different design, does that
12  suggest a different design when you say,
13  "better"?
14     MR. SMITH:
15         I'm going to instruct the witness
16  not to answer questions about Task Force
17  Guardian or repairs of the levee subsequent
18  to Hurricane Katrina.
19  EXAMINATION BY MR. KOHNKE:
20     Q.  Further down in Exhibit 2 it has
21  underlined in bold letters "planned
22  improvements." Does improvements mean a
23  different design?
24     MR. SMITH:
25         I'm going to instruct the witness
```

Page 83

```
1   not to answer.
2   EXAMINATION BY MR. KOHNKE:
3      Q.  Below that there are four bullet
4   points and it says -- the first one says:
5   Rebuilding and raising levees and floodwalls
6   to their design height.  Does that recognize
7   the fact that the levees in particular along
8   the MRGO were not at their design height at
9   the time of Hurricane Katrina?
10     MR. SMITH:
11         I'm instructing the witness not to
12  answer the question.
13  EXAMINATION BY MR. KOHNKE:
14     Q.  Going to the second bullet point
15  it says: Incorporating state of the art
16  technology.  Was state of the art technology
17  not incorporated in the original design and
18  construction?
19     MR. SMITH:
20         Object to the form of the
21  question. It's argumentative.
22  EXAMINATION BY MR. KOHNKE:
23     Q.  Answer the question, please.
24  Objection means, he is not instructing you
25  not to answer.  It means he is simply
```

Page 84

```
1   objecting.
2      MR. SMITH:
3         Right.
4      THE WITNESS:
5         Repeat the question, if you would.
6      MR. KOHNKE:
7         Sure.
8      MR. SMITH:
9         It's an improper question and
10  answer.
11  EXAMINATION BY MR. KOHNKE:
12     Q.  The second bullet point reads:
13  Incorporating state of the art engineering
14  and technology.  Since this is under the
15  heading of a planned improvement, does this
16  mean that the original design and
17  construction did not incorporate state of
18  the art engineering and construction?
19     MR. SMITH:
20         I'm going to instruct him not to
21  answer the question about what this document
22  means.  If you want to ask him about how the
23  levees were constructed, you may ask him
24  whether the levees were constructed in a
25  certain fashion.  He is not here to testify
```

Page 85

```
1   concerning this document.  This document was
2   created after Katrina.
3      MR. KOHNKE:
4         When you look at the notice, let's
5   start with No. 2 and No. 3. It says:  The
6   design of the levees along the Mississippi
7   River Gulf Outlet and the construction of
8   the levees.  It doesn't relate to time, does
9   it, sir? Mr. Smith?
10         You want to limit me to preKatrina
11  questions. I'm entitled to ask him about
12  the design and construction of the levees
13  post Katrina.
14     MR. SMITH:
15         Okay.  You can ask him about that.
16     MR. KOHNKE:
17         Well, that's what I just did and
18  you instructed him not to answer.
19     MR. SMITH:
20         No.  You asked him a question
21  about this document.
22     MR. BRUNO:
23         Ned, just for the record, we just
24  need a better descriptor of whatever it is
25  you are looking at.
```

22 (Pages 82 to 85)

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 86

1    MR. KOHNKE:
2        It's Exhibit 2, Joe, and this is a
3    document, I think the witness has said --
4    EXAMINATION BY MR. KOHNKE:
5    Q.  And I will ask you again, this
6    comes from the Corps' website, does it not?
7    A.  Yes.
8    Q.  And is this part of the Task Force
9    Guardian project, as I will call it?
10   MR. SMITH:
11       I'm going to instruct him not to
12   answer questions about this document.  If
13   you have a question about the levees, he may
14   answer that question.
15   MR. KOHNKE:
16       Well, I do have a question about
17   the levee and I'm not asking him about the
18   document.  I'm asking him whether the
19   information in the document is something
20   that's being incorporated into the levee by
21   planned improvements.
22       Now, the fact that your document
23   reads "planned improvements" doesn't
24   prohibit or limit me from asking about
25   planned improvements to the levee.

Page 87

1    MR. SMITH:
2        I agree.  You may ask him
3    questions about the levee.
4    EXAMINATION BY MR. KOHNKE:
5    Q.  All right.  The third bullet
6    point: Correcting design and construction
7    flaws.  Tell me how that is a planned
8    improvement.  What correction of design and
9    construction flaws does that refer to?
10   MR. SMITH:
11       I'm going to object.  That's a
12   question about this document.
13   EXAMINATION BY MR. KOHNKE:
14   Q.  Answer the question, please.
15   MR. SMITH:
16       I'm instructing him not to answer.
17   EXAMINATION BY MR. KOHNKE:
18   Q.  Before design flaws can be
19   corrected is it generally true that they
20   must be identified?
21   MR. SMITH:
22       I'm instructing him not to answer
23   the question.
24   MR. KOHNKE:
25       Are you telling him he can't

Page 88

1    answer a general question about correcting a
2    design flaw which the Corps admits that it
3    had in these levees, and he can't answer
4    whether before they can be corrected they
5    must first be identified; is that what you
6    are saying?
7    MR. SMITH:
8        That's correct.
9    EXAMINATION BY MR. KOHNKE:
10   Q.  Were there any design or
11   construction flaws in the hurricane
12   protection levee known as the MRGO levee?
13   A.  No.
14   Q.  If the Corps is taking the
15   position post Katrina that there were design
16   or construction flaws, that would be
17   something that the Corps did inadvertently?
18   MR. SMITH:
19       Object to the question.  I'm
20   directing him not to answer the question.
21   EXAMINATION BY MR. KOHNKE:
22   Q.  Does Task Force Guardian in any
23   way rely upon outside information or outside
24   knowledge in constructing and designing
25   these new and improved levees?  Outside of

Page 89

1    the Corps, I mean.
2    A.  I'm going to ask you to ask the
3    question again, if you would.
4    Q.  Sure.  Sure.  Project Guardian is
5    the -- Task Force, excuse me, Task Force
6    Guardian is the name of the entity that is
7    engaged in designing and constructing the
8    new and improved levees; is that correct?
9    A.  You are referring to the terms
10   "new and improved."
11   Q.  Yes.
12   A.  I'm going to refer to that as the,
13   bringing the existing levees back to their
14   design grade.
15   Q.  Only to the design grade, not
16   improved?  Just to the original design?
17   A.  There were improvements made.
18   Q.  There were improvements.  These
19   were planned improvements?
20   A.  Now, that's a general term now.
21   If you are asking me about the levees along
22   the MRGO.
23   Q.  I am.
24   A.  They were brought back to their
25   design grade.

23 (Pages 86 to 89)

Page 90

1    Q.  Okay.  There were no planned
2  improvements?
3    A.  The improvements that were made
4  were bringing the elevation to elevation 20,
5  which is two and a half feet higher than the
6  existing design grade of 17 and a half.
7    Q.  Was there a conscious choice or
8  decision to use a better grade of soil
9  material in constructing the levees post
10  hurricane?
11    A.  They used -- what we used is an
12  adjacent borrow pit as opposed to dredging
13  in material.
14    Q.  I didn't ask you where.  I said:
15  Was there a conscious decision to use a
16  better grade of soil?
17    A.  No.  We use the -- we have the
18  same requirements that we did in 1967 as we
19  do now:  Clays, high plasticity clays, low
20  plasticity clays and silts were allowed,
21  although they were not incorporated
22  consciously into this levee section.
23    Q.  Was hydraulic fill used?
24    A.  No.
25    Q.  Why not?

Page 91

1    A.  This was a function of being able
2  to build it faster.  We needed to be able to
3  build -- we had a certain window to build
4  the levee system in.  There is no way we
5  could have used hydraulic fill to build the
6  levee back to design grade in the given
7  amount of time we had.
8    Q.  Was compaction performed?
9    A.  Yes.
10    Q.  So that would be a planned
11  improvement, then, wouldn't it?
12    A.  As I said earlier, an uncompacted
13  levee will hold back still-water level on
14  the flood side of the levee below design
15  grade.
16    Q.  What about on the back side of the
17  levee?  Will not a compacted levee hold back
18  water that overtops and reaches the back
19  side of the levee?
20    A.  That depends, as I said before,
21  on -- there are a lot of factors that go
22  into erosion, not just compaction.
23    Q.  Well, what was the reason why the
24  Corps decided to compact the levee post
25  Katrina that it's constructing today along

Page 92

1  the MRGO?
2    MR. SMITH:
3      Asked and answered.  Object.
4  EXAMINATION BY MR. KOHNKE:
5    Q.  Answer the question, please.
6    A.  The goal was to -- given the fact
7  that the levee did not perform as well as we
8  would have liked to have seen it during
9  Hurricane Katrina, we incorporated
10  compaction as a means of -- may I answer?
11    Q.  Yes, I'm sorry, go ahead.
12    A.  Given the performance of the levee
13  during Hurricane Katrina, being that it was
14  overtopped, we tried to incorporate
15  compaction as a means to prevent some
16  erodibility of the levee during a similar
17  storm.
18    Q.  Was the erodibility on the open
19  water side or on the back side that you are
20  referring to now?
21    A.  The vast majority of it would have
22  been on the protected side, the land side.
23    Q.  The protected side.  And that's
24  where the levees, in fact, failed because of
25  the mechanism of overtopping and erosion on

Page 93

1  the back side, the protected side?
2    A.  That's correct.
3    Q.  So to prevent that failure from
4  reoccurring, this time the Corps elected to
5  use compaction or have its contractors
6  compact the levees that it's reconstructing;
7  isn't that correct?
8    A.  Using semicompacted fills is
9  another means of --
10    MR. KOHNKE:
11      Would you read back my question?
12  I'm not asking about what means are
13  available or another means that are
14  available.  I'm asking you about specific.
15  Listen to this question.
16      Please, read it back, Pat.
17  (Whereupon, the requested testimony was read
18      by the Court Reporter).
19  "Q.  So to prevent that failure from
20  reoccurring, this time the Corps elected to
21  use compaction or have its contractors
22  compact the levees that it's reconstructing;
23  isn't that correct?"
24    THE WITNESS:
25      Yes, they did.

24  (Pages 90 to 93)

Page 94

1  EXAMINATION BY MR. KOHNKE:
2      Q.  Who is your superior that you
3  answer to at the Corps of Engineers?  Who is
4  your senior?
5      MR. SMITH:
6          I'm objecting to the question and
7  instructing the witness not to answer.
8  EXAMINATION BY MR. KOHNKE:
9      Q.  Who is John Jaeger?
10     MR. SMITH:
11         I'm objecting and instructing the
12 witness not to answer.
13 EXAMINATION BY MR. KOHNKE:
14     Q.  Is John Jaeger a PhD and
15 professional engineer who has the title of
16 chief of engineering and construction?
17     MR. SMITH:
18         I'm instructing the witness not to
19 answer.
20 EXAMINATION BY MR. KOHNKE:
21     Q.  Do you know who Jeremy Stevenson
22 is?
23     MR. SMITH:
24         The witness is instructed not to
25 answer.

Page 95

1  EXAMINATION BY MR. KOHNKE:
2      Q.  Is he an employee of the Corps of
3  Engineers based in Huntington, West
4  Virginia?
5      MR. SMITH:
6          The witness is instructed not to
7  answer.
8  EXAMINATION BY MR. KOHNKE:
9      Q.  Who is Wayne Stroupe?  Is he a
10 public affairs officer with the Research and
11 Development Center in Vicksburg?
12     MR. SMITH:
13         The witness is instructed not to
14 answer.
15 EXAMINATION BY MR. KOHNKE:
16     Q.  Who's Reed Mosher?
17     MR. SMITH:
18         The witness is instructed not to
19 answer.
20 EXAMINATION BY MR. KOHNKE:
21     Q.  Is he a PhD who's the technical
22 director of survivability and protective
23 structures?
24     MR. SMITH:
25         The witness is instructed not to

Page 96

1  answer.
2  EXAMINATION BY MR. KOHNKE:
3      Q.  Is Denise Martin a computer
4  scientist with the Information and
5  Technology Laboratory in Vicksburg?
6      MR. SMITH:
7          I'm instructing the witness not to
8  answer any of the questions that you are
9  posing, which appear to be taken from the
10 IPET report that was again one of the topics
11 on which --
12     MR. KOHNKE:
13         You are refusing to have him
14 testify about that?
15     MR. SMITH:
16         Yes.  Concerning the IPET report.
17     MR. KOHNKE:
18         I understand that.  But you also
19 understand that I'm going to make a record
20 for Judge Fallon?
21     MR. SMITH:
22         And I'm making a record too.
23     MR. KOHNKE:
24         It won't do anybody any good for
25 him to rule on questions that aren't asked,

Page 97

1  so I'm going to ask the question.  You can
2  instruct him and then we will ask for a
3  ruling.
4      MR. SMITH:
5          I just want to point out for the
6  record that you appear to be reading from
7  the IPET report --
8      MR. KOHNKE:
9          Well, let me --
10     MR. SMITH:
11         -- which was one -- which was one
12 of the subjects that was noticed to be
13 deposed upon.  This witness is not
14 authorized to answer questions on that
15 topic.
16     MR. KOHNKE:
17         Meaning you are refusing to allow
18 it?  I understand that.
19     MR. SMITH:
20         No, not me.  The Corps has
21 designated the witness and has only
22 designated him to testify in certain areas,
23 not me.
24 EXAMINATION BY MR. KOHNKE:
25     Q.  James K. Garster, is he the team

25 (Pages 94 to 97)

Page 98

1  leader, survey engineer, topographic
2  engineering center in Alexandria, Virginia?
3      MR. SMITH:
4          The witness is instructed not to
5  answer.
6  EXAMINATION BY MR. KOHNKE:
7      Q.  Bruce Ebersole, is he a
8  professional engineer, chief of flood and
9  storm protection division, Coastal and
10 Hydraulics Laboratory in Vicksburg?
11     MR. SMITH:
12         The witness is instructed not to
13 answer.
14 EXAMINATION BY MR. KOHNKE:
15     Q.  Donald T. Resio, is he a PhD
16 senior scientist Coastal and Hydraulics
17 Laboratory in Vicksburg?
18     MR. SMITH:
19         The witness is instructed not to
20 answer.
21 EXAMINATION BY MR. KOHNKE:
22     Q.  Michael K. Sharp, is he a PhD,
23 engineer, Technical Director of Civil Works,
24 Infrastructure Geotechnical and Structures
25 Laboratory in Vicksburg?

Page 99

1      MR. SMITH:
2          The witness is instructed not to
3  answer.
4  EXAMINATION BY MR. KOHNKE:
5      Q.  Ron Moentenich, is he a
6  professional engineer with the Hydroelectric
7  Design Center in Portland, Oregon?
8      MR. SMITH:
9          The witness is instructed not to
10 answer.
11 EXAMINATION BY MR. KOHNKE:
12     Q.  David Moser, is he a PhD chief
13 economist with the Corps of Engineers in
14 Alexandria, Virginia?
15     MR. SMITH:
16         The witness is instructed not to
17 answer.
18 EXAMINATION BY MR. KOHNKE:
19     Q.  Is Jerry Foster a professional
20 engineer who is in headquarters, U.S. Army
21 Corps of Engineers in Washington, D.C.?
22     MR. SMITH:
23         The witness is instructed not to
24 answer.
25 EXAMINATION BY MR. KOHNKE:

Page 100

1      Q.  Are these 12 individuals whose
2  names I just read to you all authors of the
3  IPET report that Mr. Smith correctly
4  recognized that I was reading from?
5      MR. SMITH:
6          The witness is instructed not to
7  answer.
8  EXAMINATION BY MR. KOHNKE:
9      Q.  What is the IPET report?
10     MR. SMITH:
11         The witness is instructed not to
12 answer.
13 EXAMINATION BY MR. KOHNKE:
14     Q.  Does the Corps of Engineers
15 involve itself in the creation of the IPET
16 report?
17     MR. SMITH:
18         The witness is instructed not to
19 answer.
20 EXAMINATION BY MR. KOHNKE:
21     Q.  Has the Corps of Engineers
22 received the final draft of the IPET report,
23 which is what I'm reading from, which
24 Mr. Smith apparently recognized?
25     MR. SMITH:

Page 101

1          The witness is instructed not to
2  answer.
3  EXAMINATION BY MR. KOHNKE:
4      Q.  And is it dated June 1, 2006?
5      MR. SMITH:
6          The witness is instructed not to
7  answer.
8  EXAMINATION BY MR. KOHNKE:
9      Q.  Now, in addition to the IPET
10 report, has the Corps of Engineers done its
11 own, independent of IPET, analysis of the
12 failure of the MRGO levee post hurricane?
13     MR. SMITH:
14         The witness is instructed not to
15 answer.
16     MR. KOHNKE:
17         He can't answer the question as to
18 whether there is some other basis for the
19 work that's ongoing now through Task Force
20 Guardian other than IPET?
21     MR. SMITH:
22         The witness is instructed not to
23 answer, yes, sir, subject to --
24     MR. KOHNKE:
25         So, Mr. Smith, as I understand it,

26 (Pages 98 to 101)

Page 102

1  you are not going to let him testify about
2  what IPET is, but it is clear that the Corps
3  is doing work through Task Force Guardian
4  that replies upon IPET. And you are going
5  to prohibit me from getting into what that
6  reliance is.
7      MR. SMITH:
8          Counsel, I don't know what is
9  clear to you.
10     MR. KOHNKE:
11         Let me tell you what is clear to
12 me. In the IPET report in the first volume
13 on Page 43 it reads: During the conduct of
14 the IPET studies, there has been continuous
15 interaction with the Corps of Engineers
16 entities in New Orleans responsible for the
17 repair and reconstitution of hurricane
18 protection in the region. These
19 organizations, Task Force Hope, Task Force
20 Guardian, and the New Orleans District, have
21 representatives embedded in the IPET teams
22 providing an effective two-way conduit for
23 information and rapid transfer of results
24 and lessons learned. It was imperative that
25 the knowledge gained by the IPET and others

Page 103

1  be immediately made available to those
2  responsible for repair and reconstruction,
3  end quote.
4      What I'm now trying to find out
5  is, who those others are that the Corps is
6  relying upon in doing this reconstruction
7  that is currently going on through Task
8  Force Guardian.
9      Now, that's my question. It's not
10 IPET. And if I can't get into IPET, I'm
11 entitled to know what the Corps is doing in
12 the design and reconstruction of these
13 levees, these Items 2 and 3 of my notice,
14 and I'm entitled to know what they are
15 relying upon in order to do that design and
16 construction. Now, will you let him answer
17 those questions?
18     MR. SMITH:
19         I will.
20 EXAMINATION BY MR. KOHNKE:
21     Q.  Tell me what information,
22 excluding IPET, the Corps relies upon in
23 determining how to design and how to
24 construct these levees post Katrina with
25 whatever improvements are being

Page 104

1  incorporated.
2      A.  As I mentioned before, our
3  interpretation of the reason that those
4  levees failed or did not perform as well as
5  we would have liked to have seen them during
6  Hurricane Katrina was erosion on the
7  protected side.
8      Q.  That's on the back side?
9      A.  That's correct.
10     Q.  Okay.
11     A.  Now, our design, we are using the
12 same analysis that is industry accepted all
13 over the country and the world, which is
14 global slope stability analysis to insure
15 the stability of the levee with water to its
16 still-water level. That analysis is the
17 same analysis that was performed in the
18 1960s as it is now.
19     The elevation of that still-water
20 level has remained the same, because we are
21 not authorized to design the elevation of
22 that levee any higher than the existing
23 standard project hurricane. The global
24 stability analysis, as I said, remains the
25 same.

Page 105

1      The difference between the levee
2  constructed in 1960s through the 1980s and
3  now, the only difference is the
4  semicompacted nature of the fill in the main
5  line levee section and on the flood side,
6  the flood side berms. Those sections were
7  semicompacted in 12-inch lifts. The
8  protected side berm is an uncompacted berm,
9  placed in the maximum of three-foot lifts
10 for the stability berm on the flood side.
11     In order to provide erosion
12 resistance, which is commonly done on levee
13 embankments, is to fertilize and seed the
14 levee section so that vegetation grows. And
15 again, industry standard and evidence
16 throughout our 40 or 50 years of designing
17 levees and constructing levees and seeing
18 them perform, not just in this area but all
19 over the country, is that vegetation on an
20 embankment provides significant erosion
21 resistance than just the earth and fill
22 itself.
23     Q.  Was clay trucked in to reconstruct
24 the levees along the MRGO?
25     A.  Yes, it was. It was barged in.

27 (Pages 102 to 105)

## Page 106

```
 1      Q.  Barged in?
 2      A.  Yes.
 3      Q.  And these are the same levees that
 4  were hydraulically created?
 5      A.  That's correct.
 6      Q.  Let me hand you a document that I
 7  will mark for identification as Exhibit 3.
 8  (Exhibit No. 3 marked for identification.)
 9      MR. KOHNKE:
10          Here is one for your counsel.
11          And, Joe, can you catch this?
12  That will look good on camera.
13  EXAMINATION BY MR. KOHNKE:
14      Q.  This for the record is a pleading
15  filed by the Corps of Engineers in other
16  litigation and it contains various
17  attachments that the Corps elected to
18  attach.  Those attachments are not complete.
19  That is, there are page selections made.
20  And I want to ask you first about that and
21  ask particularly Mr. Smith about that.
22      MR. KOHNKE:
23          Exhibit 7 to the deposition --
24  excuse me, to the pleading, Mr. Smith, I
25  will hand you this, and I will mark
```

## Page 107

```
 1  Exhibit 7 to Exhibit 3 as Exhibit 4.
 2          Now, I'm sure I have confused
 3  everyone.  Exhibit 3 is the Corps of
 4  Engineers' pleading and attachments.  It has
 5  various attachments to it, one of which has
 6  a typed page with the centered word
 7  "Exhibit" and then the number seven.  I have
 8  made that particular Exhibit No. 4 to this
 9  deposition, an exhibit to this deposition.
10          And I want to ask you, Mr. Smith,
11  when you turn the page to Exhibit 4 that I
12  have just handed you, it reads:  Lake
13  Pontchartrain, Louisiana and Vicinity
14  Hurricane Protection Project Reevaluation
15  Study, July 1984.
16      MR. BRUNO:
17          I'm sorry, Mr. Kohnke.  Let me
18  just catch up with you.
19      MR. KOHNKE:
20          This is Exhibit 7 to the
21  deposition exhibit I have just handed you.
22      MR. BRUNO:
23          Understood.  I just need to get
24  there.
25      MR. LAMBERT:
```

## Page 108

```
 1          You are making it what?
 2      MR. KOHNKE:
 3          I'm making it Deposition
 4  Exhibit 4.
 5  (Exhibit No. 4 marked for identification.)
 6      MR. BRUNO:
 7          Do I have that?
 8      MR. KOHNKE:
 9          You should, unless in collating
10  all this something got screwed up.
11      MR. BRUNO:
12          I have Exhibit 5, which is a
13  document which goes from Page 14.
14      MR. KOHNKE:
15          There are numerous pages missing,
16  and that's what I'm about to address.
17      MR. BRUNO:
18          Okay.
19      MR. KOHNKE:
20          Joe, I will hand this to you in a
21  moment.
22          Mr. Smith, will you agree to
23  produce what is referred to as -- it's now
24  Deposition Exhibit 4, but in the attachment
25  to Exhibit 3 that I just handed you it is an
```

## Page 109

```
 1  attached exhibit to that pleading filed by
 2  the Corps of Engineers and it bears
 3  Exhibit 7.  It's incomplete.  And I would
 4  like to have the complete exhibit.  Will you
 5  agree to produce that?
 6      MR. SMITH:
 7          That's publicly available.  I
 8  believe it's publicly available.
 9      MR. KOHNKE:
10          The answer is you won't produce
11  it?
12      MR. SMITH:
13          No, I will.  I will.  It was
14  produced in the litigation to the Corps in
15  its entirety and to the plaintiffs.
16      MR. KOHNKE:
17          All right.  There is also an
18  attached Exhibit 5 to the Corps' motion
19  which was, for the record, an ex parte
20  motion for leave to file a memorandum in
21  support of a motion to dismiss in excess of
22  25 pages.  Will you also produce a complete
23  Exhibit 5, that is incomplete as I read it?
24      MR. SMITH:
25          Yes, we will produce the complete
```

28 (Pages 106 to 109)

Page 110

1  exhibit.
2  EXAMINATION BY MR. KOHNKE:
3    Q.   Let me turn to Page 16 of
4  Exhibit 5 to Exhibit 3, and ask you to do
5  that, please, Mr. Varuso.
6    MR. LAMBERT:
7       Exhibit 5 -- I'm sorry,
8  Exhibit 3 -- Exhibit 5 is now going to be --
9    MR. KOHNKE:
10      I'm not making it an exhibit.
11  It's Page 16. You got it?
12    MR. BRUNO:
13     I got it. I have the whole thing.
14    MR. KOHNKE:
15      Well, then you don't need to
16  produce it. I will get it from Mr. Bruno.
17  EXAMINATION BY MR. KOHNKE:
18    Q.   Turn to Page 16, if you will,
19  Mr. Varuso.
20    A.   Okay.
21    Q.   This exhibit that Page 16 comes
22  from that is in turn attached to the United
23  States ex parte motion for leave to file a
24  lengthy memorandum, I will call it, is part
25  of a reconnaissance report on channel bank

Page 111

1  erosion; is that not correct?
2       If you look at the top page, it
3  goes from the top page right to Page 14.
4    MR. SMITH:
5       I'm going to -- unless you can
6  explain what this has to do with the
7  subject --
8    MR. KOHNKE:
9       Well, I'm going to ask him a
10  question about it, but I'm trying to
11  identify what it is first.
12    MR. SMITH:
13      Because I'm having a hard time
14  finding it myself. I mean, I know what it
15  is, but I can't find it in here.
16  EXAMINATION BY MR. KOHNKE:
17    Q.   This is the reconnaissance report
18  as it so states?
19    A.   I'm acclimating myself to what
20  this report is.
21    Q.   Are you on Exhibit 5?
22    A.   Yes, I am. Okay.
23    Q.   It's a reconnaissance report and
24  it's dated February 1998; is that right?
25    A.   That's right.

Page 112

1    Q.   And the next page to Exhibit 5
2  from that cover page is Page 14; is that
3  correct?
4       Turn the page. Turn the page.
5  What is the number at the bottom?
6    A.   Oh, 14. I'm sorry. I was looking
7  at the page at the top. Okay.
8    Q.   And then 15 and then 16?
9    A.   Yep.
10    Q.   Turn to Page 16, if you will,
11  please.
12    A.   Okay.
13    Q.   The last paragraph before the
14  heading at the bottom reads, and I quote:
15  Substantially more dredging in the inland
16  reaches of the MRGO has been performed for
17  other purposes than the channel maintenance.
18  A significant amount of dredging has been
19  performed to obtain construction material
20  for the Lake Pontchartrain and vicinity
21  hurricane protection levees. Between 1968
22  and 1983 an estimated 100 million cubic
23  yards of dredge material (33 million cubic
24  yards of inplace levee fill) was removed
25  from the MRGO for use in levee construction.

Page 113

1  The extraction of this quantity of fill
2  material has significantly reduced
3  maintenance dredging requirements between
4  mile 47 and mile 60.
5       Where is mile 47 to mile 60; can
6  you identify that for me?
7    A.   I would have to look at a map.
8    Q.   Well, it just so happens that
9  there is a map attached to this exhibit.
10    A.   Okay.
11    Q.   If you will turn to it, please?
12       And you will see along the dotted
13  line that is the location of the MRGO, you
14  will see some mile markers. Do you see
15  that, sir?
16    A.   Yes, I do.
17    Q.   Can you -- looking at that can you
18  tell me if mile 45 through -- excuse me --
19  mile 47 through mile 60 takes us into that
20  area of the MRGO approximating St. Bernard
21  Parish, Chalmette in particular?
22    A.   Yes.
23    Q.   So the area we are talking about
24  where all this hydraulic fill was deposited
25  was in that area where Chalmette and Meraux

Page 114

1   are according to the map?
2       A.   It appears to be along the MRGO
3   just south of Bayou Bienvenu.
4       Q.   And it is -- we are talking about
5   a 13-mile stretch; is that correct?
6       A.   That's correct.
7       Q.   And that 13-mile stretch -- what
8   areas would you say in St. Bernard Parish
9   that 13-mile stretch is closest to?  Would
10  it be Chalmette/Meraux area?
11      A.   Yes.
12      Q.   To continue with the quote:  The
13  extraction -- well, to pick up:  The
14  extraction of this quantity of fill material
15  has significantly reduced maintenance
16  dredging requirements between mile 47 and
17  mile 60.  Thus, channel maintenance
18  requirements have been masked by fill
19  extraction for levee construction, end
20  quote.
21      Have I read that correctly?
22      A.   Yes, you have.
23      Q.   What do they mean when they say,
24  "maintenance requirements have been masked"?
25  Does that mean you have reduced the cost of

Page 115

1   maintenance requirements?
2       MR. SMITH:
3       I'm going to instruct the witness
4   not to answer this question.  Maintenance
5   was not one of the subjects he is prepared
6   to testify to today.
7       MR. KOHNKE:
8       Well, it's certainly part of
9   construction, Counsel, and I'm asking him a
10  question about that.
11      MR. SMITH:
12      He is instructed not to answer
13  questions about the maintenance.
14      MR. KOHNKE:
15      Well, let me talk about the cost
16  of construction and the design.
17  EXAMINATION BY MR. KOHNKE:
18      Q.   Was it the original design to use
19  the available material rather than the best
20  material in order to reduce the costs to the
21  Corps of Engineers?
22      A.   I wouldn't phrase it that way.
23      Q.   Well, was there a cost savings in
24  using dredge material as opposed to
25  trucked-in or barged-in clay?

Page 116

1       A.   Yes, there was.
2       Q.   And that cost savings has now been
3   ignored in favor of doing it -- of
4   rebuilding the levee with barged-in clay?
5       MR. SMITH:
6       Object to the form of the question
7   as vague as to time.
8   EXAMINATION BY MR. KOHNKE:
9       Q.   Currently today, as the -- and
10  previous to today, post Hurricane Katrina,
11  the MRGO levee is being repaired with
12  trucked-in or barged-in clay; is that
13  correct?
14      A.   Not all of it.  Portions of it.
15      Q.   Well, the portions between mile 47
16  and 60?
17      A.   Not a hundred percent of that
18  levee is being constructed with barged-in
19  material either.
20      Q.   What percentage of that levee is
21  being constructed with barged-in material?
22      A.   I would hesitate to give an exact
23  percentage.
24      Q.   Don't give an exact, but don't
25  hesitate either.  Give me your best

Page 117

1   estimate.
2       A.   50 percent.
3       Q.   50 percent.  All right.  Is it
4   more expensive to barge in?
5       A.   Yes, it is.
6       Q.   Particularly so when you are going
7   to have to be dredging the MRGO anyway, and
8   you are going to have to do something with
9   the spoil; it's a lot cheaper to use that
10  spoil to make a levee, isn't it?
11      A.   That's correct.
12      Q.   So today the cost savings is being
13  eschewed in favor of a more expensive
14  barging in of clay, for 50 percent, at
15  least, of the levee in question?
16      A.   Yes, and there is a reason for
17  that.
18      Q.   I'm sure there is.  What is it?
19      A.   Time.
20      Q.   Time.  Not having anything to do
21  with quality, only time?
22      A.   Absolutely time, that's right.
23      Q.   Has nothing to do with quality?
24      A.   That's correct.
25      Q.   How about the compaction; does

Page 118

```
 1   that have anything to do with time, too?  Is
 2   it cheaper -- excuse me.  Is it a savings of
 3   time to compact the levee as opposed to
 4   leaving it uncompacted?
 5       A.   No.
 6       Q.   So the Corps is spending more
 7   money to compact the levee than to leave it
 8   uncompacted, which would be cheaper?
 9       A.   That's correct.
10       Q.   And that has nothing to do with
11   time, that has only to do with quality?
12       A.   Yes.
13       Q.   Would it be fair to say that
14   preKatrina 100 percent of the levee between
15   mile 47 and 60 of the MRGO was dredged
16   material?
17       A.   Yes.
18       Q.   Would it be fair to say that post
19   Katrina zero percent of the levee between
20   mile 47 and mile 60 is dredge material?
21       A.   I'm sorry?
22       Q.   Zero percent?
23       A.   Zero percent was dredged?
24       Q.   Post Katrina.
25       A.   That's correct.
```

Page 119

```
 1       Q.   And your testimony today is the
 2   only reason for not using dredge material to
 3   rebuild the mile 47 to mile 60 is it's
 4   quicker to barge in the material?
 5       A.   Well, that's not what I said.
 6       Q.   Okay.  I just want to be clear
 7   that's not what you are saying.
 8           Now, how is the clay being
 9   obtained?  I'm sure from a borrow pit
10   somewhere.
11       A.   That's correct.
12       Q.   But where is that borrow pit?
13       A.   North of the Lake Pontchartrain.
14       Q.   Where north of Lake Pontchartrain?
15       A.   I believe it's in Mississippi.
16       Q.   Where in Mississippi?
17       A.   Near Pearl River.
18       Q.   And tell me the mechanism.  Is it
19   there is a private landowner that the Corps
20   has acquired his land for purposes, or their
21   land for purposes of extracting the clay?
22       A.   That's correct.
23       Q.   Do you know the name of the
24   private landowner?
25       A.   No.  I could find out, but I don't
```

Page 120

```
 1   know his name off the top of my head.
 2       Q.   How large a tract of ground has
 3   been acquired?
 4       A.   I would have to look up that
 5   information as well.  I don't know the exact
 6   acreage.
 7       Q.   What method is being used to dig
 8   this clay out?
 9       A.   Excavators.
10       Q.   There is a private contractor
11   doing this?
12       A.   Yes.
13       Q.   When you say, "excavators," this
14   is what type of crane?  Is it a crane?
15       A.   Well, it's a piece of equipment.
16   It's a long reach excavator.
17       Q.   Is there one working or is there
18   more than one?
19       A.   There is multiple working.
20       Q.   Multiple workers.  And when they
21   excavate a bucket of clay, what happens?  Do
22   they then load it into a dump truck or into
23   a barge?
24       A.   Into the barge.
25       Q.   And the barge is -- how do they
```

Page 121

```
 1   get it from the land to the barge?  How is
 2   that happening?
 3       A.   I have not actually been at the
 4   site to witness the exact operation, but
 5   excavators are used to dig the material and
 6   it's eventually placed into a barge and the
 7   barge is shipped down to the MRGO.
 8       Q.   Well, I understand it's eventually
 9   placed in a barge, but unless there is a
10   navigable waterway going right up to that
11   landowner's property, then there must be a
12   truck involved somewhere along the way?
13       A.   I believe he is pretty near the
14   Pearl River.  I don't think there is much
15   time between getting the material out of the
16   ground and into the barge.
17       Q.   I'm not asking about the time.
18   I'm asking about the means.  How does it get
19   into the barge?
20       A.   I would have to find out what the
21   exact operation is.
22       Q.   The answer is you don't know?
23       A.   That's correct.
24       Q.   The answer is, is that it may very
25   well be put into a truck or some other
```

31 (Pages 118 to 121)

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 122

1   conveyance and then brought to a barge and
2   loaded into a barge?
3       A.  That's possible.  I don't believe
4   it's taking that much time, though.
5       Q.  And the barge is then, or a
6   flotilla of barges is then brought by
7   tugboat across Lake Pontchartrain -- down
8   Pearl River across Lake Pontchartrain into
9   the MRGO; is that what happens?
10      A.  That's correct.
11      Q.  And then brought up, and then
12  another crane then offloads the clay from
13  the barge to the levee?
14      A.  Another excavator.
15      Q.  Another excavator.  And then a
16  compaction process takes place.
17      A.  That's correct.
18      Q.  Using what?  Bulldozers?
19      A.  Bulldozers.
20      Q.  And you are telling me that that's
21  quicker than having a hydraulic dredge which
22  is operating in the MRGO adjacent to the
23  levee take dredge materials and putting it
24  up on the bank for the levee?
25      A.  Because we are looking to compact

Page 123

1   the levee section.  In order to get the
2   moisture contents we need to get the
3   compaction that's in our specifications, you
4   have to process the material.  You have to
5   draw the material out and process it.  That
6   would take days.
7       Q.  So if you weren't compacting it
8   the way the Corps constructed the levees
9   preKatrina, then it would be quicker to use
10  dredge materials?
11      A.  I would have to put numbers to
12  that.  I can't answer that question.  I
13  would have to spend time with our cost
14  engineers and see how long it would actually
15  take and compare the two times.
16      Q.  I'm not asking as a function of
17  cost.  I'm asking as a function of time.
18      A.  Well, that's what they do.  They
19  determine project durations.
20      Q.  Is the clay that's being brought
21  in more resilient to erosion and erosion
22  from overtopping than the dredge material
23  that had been used prior to Hurricane
24  Katrina?
25      A.  Not appreciably.

Page 124

1       Q.  Not appreciably.  How do you come
2   to that conclusion?
3       A.  We ran erosion tests prior to
4   Katrina of the material being placed as well
5   as the existing embankment sections that
6   were still intact after Hurricane Katrina.
7       Q.  Was the 20 Arpent and 40 Arpent
8   Canal levees, did they remain intact after
9   Hurricane Katrina?
10      MR. SMITH:
11          I'm going to object to the
12  question.  It's beyond the scope of his
13  testimony here today and I direct him not to
14  answer.
15  EXAMINATION BY MR. KOHNKE:
16      Q.  Isn't it true that the IPET report
17  compares the erosion that would follow
18  overtopping using various assumptions, one
19  being clay, one being sand and clay, and the
20  other being hydraulic fill?
21      MR. SMITH:
22          I'm instructing the witness not to
23  answer the questions about the IPET report.
24  EXAMINATION BY MR. KOHNKE:
25      Q.  Isn't the amount of erosion that

Page 125

1   would follow the hydraulic fill when
2   hydraulic fill is used when compared to
3   clay, isn't it more than a hundred percent
4   difference?
5       MR. SMITH:
6           I'm going to ask for the question
7   to be read back, because I didn't catch it.
8   (Whereupon, the requested testimony was read
9           by the Court Reporter).
10  "Q.  Isn't the amount of erosion that would
11  follow the hydraulic fill when hydraulic
12  fill is used when compared to clay, isn't it
13  more than a hundred percent difference?
14      MR. SMITH:
15          You mean --
16      MR. KOHNKE:
17          I'm trying -- he says that it's
18  not appreciable, the difference is not
19  appreciable, and I'm trying to get him to
20  elaborate.
21      MR. SMITH:
22          We are going to allow him to
23  answer that question.
24      THE WITNESS:
25          Well, there is a chart that the

32  (Pages 122 to 125)