Page 126

1  material is plotted on, that the results of
2  the erosion tests are plotted on. And there
3  are five zones ranging from highly erodible
4  to high resistant to erosion and three zones
5  in between.
6  EXAMINATION BY MR. KOHNKE:
7      Q. What is most highly resistant to
8  erosion? Is it clay?
9      A. There are more factors than just
10 material type. You have to assume all the
11 same factors into account of the same --
12     Q. Assuming all the same factors, is
13 clay the most highly resistant to erosion?
14     A. A highly plastic clay would be
15 more resistant to erosion than --
16     Q. Than peat?
17     A. Yes.
18     Q. Than sandy soil?
19     A. Yes.
20     Q. Was peat and sandy soil used in
21 the hydraulic or dredged material that was
22 used to build the MRGO levee preKatrina?
23     A. Based on the borings that were
24 taken prior to the second enlargement of
25 those levees. Borings were taken and soils

Page 127

1  were tested along the center line of those
2  levees in 1981, give or take. The results
3  of those borings and testing showed very
4  little sands or silts in those borings.
5      Q. How about peat?
6      A. Very little peat. I don't recall
7  seeing any peat, actually, in the levee
8  sections in those borings.
9      Q. Now, you told me that the decision
10 to barge clay in to reconstruct the levees
11 post Katrina was a function of time. Do you
12 recall that testimony?
13     A. Yes.
14     Q. Harkening back to Page 16 of the
15 Exhibit 5 attached to what is now Exhibit 3
16 to this deposition, isn't it true that the
17 original decision to use dredged material
18 was a cost -- was because of the cost
19 savings that the Corps would enjoy?
20     A. I do not believe that was the only
21 reason.
22     Q. I didn't ask you if it was the
23 only reason. Isn't that the reason, though,
24 principal reason?
25     A. Not to my knowledge, no.

Page 128

1      Q. Not to your knowledge. What was
2  the principal reason for using dredge
3  material to construct the levees between
4  mile 47 and mile 60?
5      A. I believe there were environmental
6  concerns with using an adjacent borrow pit.
7      Q. Where do you get that information?
8      A. It's just historical --
9  MR. SMITH:
10     Object -- I'm going to object to
11 that question and instruct the witness not
12 to answer.
13 MR. KOHNKE:
14     Well, he has given me an answer.
15 He's obviously looked at historical
16 documents. I tried to get into what
17 historical documents he looked at and you
18 wouldn't let him do it, but you're going to
19 let him --
20 MR. SMITH:
21     Yes, it doesn't matter whether he
22 got it off of a flash card that was given to
23 him. He is here to testify as a
24 representative of the Corps. These are the
25 Corps' answers.

Page 129

1  MR. KOHNKE:
2      But I'm entitled to explore the
3  basis for the answers. This is called
4  cross-examination for a very good reason. I
5  don't just have to accept it. I get to
6  explore it in addition to hearing it.
7  MR. SMITH:
8      I didn't know this was
9  cross-examination.
10 MR. KOHNKE:
11     You didn't? You didn't know this
12 was cross-examination?
13 MR. SMITH:
14     This is a deposition.
15 MR. KOHNKE:
16     I see. Okay. In the
17 correspondence you didn't understand that
18 the purpose of this was to establish the
19 liability of the Corps pursuant to Article
20 2323 of the Louisiana Code of Civil
21 Procedure?
22 MR. SMITH:
23     I think I learned that later.
24 MR. KOHNKE:
25     Okay. Well, then that means we

33 (Pages 126 to 129)

Page 130

1  are adverse. That means this is
2  cross-examination.
3      MR. SMITH:
4          I believe we are adverse. I stand
5  corrected. Thank you.
6      MR. BRUNO:
7          Since that's been brought up, may
8  I know whether or not either Murphy -- has
9  it filed any third party complaint against
10 the United States of America through the
11 Army Corps of Engineers, or has the United
12 States Army Corps of Engineers received any
13 indication or notice of any third party
14 complaint that has been filed by Murphy in
15 this litigation? Inasmuch as they claim
16 that you guys are adverse, I'm not aware of
17 any third party complaint that's been filed.
18     MR. SMITH:
19         I agree. Your point is well
20 taken. We are not adverse in that sense.
21     MR. BRUNO:
22         Well, the answer to the question
23 is yes or no. Has there been a third party
24 complaint filed?
25     MR. MILLER:

Page 131

1          None has been filed.
2      MR. BRUNO:
3          The United States of America has
4  received no such indication that one has
5  been filed; is that true, Robin?
6      MR. SMITH:
7          That's true.
8      MR. BRUNO:
9          Do you have any information
10 whatsoever that the Murphy Oil Company
11 intends to make claim against you for monies
12 of any kind?
13     MR. SMITH:
14         We have no indication of that.
15     MR. BRUNO:
16         Thank you.
17 EXAMINATION BY MR. KOHNKE:
18     Q. Turning back to the soil sampling.
19 What materials were -- you referred to some
20 soil borings in 1983. What materials were
21 found in those borings?
22     A. Primarily clays with some silts
23 and silty sands.
24     Q. What percentages?
25     A. It would be hard to give you a

Page 132

1  percent.
2      Q. And how many borings were done
3  between -- along this 12-mile stretch that
4  we have been referring to as the MRGO?
5      A. Approximately six to eight in the
6  stretch, in the five -- in the 6.2-mile
7  reach between -- I shouldn't say that. I
8  don't think it was federal reach. It was
9  broken up into a subreach. I would say in
10 the range of -- well, it may have been for
11 the whole reach for the 6-mile stretch.
12     Q. And you say six to eight borings.
13 And how is a boring done?
14     A. There is a drill rig that pushes a
15 sample into the ground, a five-inch diameter
16 sample. That sample is extruded and
17 typically the samples are taken 60 to
18 80-feet deep.
19     Q. So approximately every mile a
20 five-inch core was obtained?
21     A. Correct.
22     Q. And so over a period of 6.2 miles,
23 there was something on the order of
24 25 inches, 30 inches of soil were examined
25 in diameter?

Page 133

1      A. I suppose you could think about it
2  that way.
3      Q. And based on that, you conclude
4  that it was primarily clay that was being
5  dredged up by the various dredges when the
6  MRGO levee was --
7      A. Based on those borings.
8      Q. Based on that. Based on nothing
9  but that? How deep was the boring?
10     A. Approximately 80 feet deep.
11     Q. And how deep was the dredging for
12 purposes of obtaining spoil to create a
13 levee?
14     MR. SMITH:
15         You know, I'm confused. I thought
16 these were borings that were taken out of
17 the levee itself.
18     MR. KOHNKE:
19         That's correct.
20     MR. SMITH:
21         Are we changing subjects now, back
22 to the borings from the canal channel or --
23 EXAMINATION BY MR. KOHNKE:
24     Q. These borings you are talking
25 about, these were taken of the levee itself

34 (Pages 130 to 133)

Page 134

1  or outside of the levee where the spoil was?
2     A. Prior to the second levee
3  enlargement.
4     Q. Prior to the second levee
5  enlargement, borings were taken of what
6  area?
7     A. The levee section. The center
8  line of the levee.
9     Q. But what was done to determine
10 where the new spoil for the second
11 enlargement --
12    A. There were also borings taken in
13 those areas.
14    Q. And that would have been in the
15 area where the spoil was going to be
16 dredged?
17    A. Correct.
18    Q. How deep was that bored to?
19    A. Typically 20 feet.
20    Q. And how deep was the dredging?
21    A. Probably on the order of five
22 feet.
23    Q. And of the bore samples that you
24 are now referring to, are you able to tell
25 me what the first five feet consisted of, of

Page 135

1  each of those borings?
2     A. I would have to look back and
3  examine those borings more closely. If you
4  are referring to -- what I can tell you is
5  that if you are looking at the borings of
6  the center line levee, the center line of
7  the levee subsequent to the second
8  enlargement, the material that existed in
9  that levee section subsequent to that
10 enlargement showed mostly clay, indicating
11 that the dredge material that was used for
12 those two enlargements were also clay.
13    Q. Had IPET concluded that the reason
14 for the failure, one of the reasons for the
15 failure of the MRGO levee was that improper
16 or inadequate soils were being used, had
17 been used to construct the levee --
18    MR. SMITH:
19       I'm instructing the witness --
20 EXAMINATION BY MR. KOHNKE:
21    Q. -- particularly sandy soil and
22 peat?
23    MR. SMITH:
24       I'm instructing the witness not to
25 answer the question.

Page 136

1  EXAMINATION BY MR. KOHNKE:
2     Q. All right. When the IPET -- the
3  IPET report has been produced in -- to date
4  three drafts; is that not correct?
5     MR. SMITH:
6        I'm instructing the witness not to
7  answer any questions about --
8     MR. KOHNKE:
9        I'm not asking about the contents
10 of it. I'm asking him whether it's been
11 produced in draft form.
12    MR. SMITH:
13       I understand. And I'm instructing
14 him not to answer questions about the IPET
15 report.
16 EXAMINATION BY MR. KOHNKE:
17    Q. Is it true that the Corps of
18 Engineers has embedded in the IPET team
19 various members or employees of the Corps
20 working with IPET?
21    A. We work with IPET during Task
22 Force Guardian.
23    Q. Task Force Guardian again being
24 the entity that is reconstructing and
25 redesigning these levees?

Page 137

1     A. Correct.
2     Q. And in order to properly redesign
3  and properly reconstruct, you have to know
4  what went right, what went wrong, what needs
5  to be changed; is that correct?
6     A. That's fair to say.
7     Q. Is it fair to say, without getting
8  into the specifics, that the Corps has
9  relied upon IPET and the information that
10 they have produced in the various drafts to
11 date?
12    A. I would use the term that we
13 worked with them rather than relied on them.
14    Q. Well, isn't it true that 13 of the
15 20 some-odd members of the IPET team are
16 Corps employees?
17    MR. SMITH:
18       I'm instructing the witness not to
19 answer.
20 EXAMINATION BY MR. KOHNKE:
21    Q. So if one were to look at IPET it
22 is, at least half of IPET is the Corps of
23 Engineers; isn't that correct?
24    MR. SMITH:
25       I'm instructing the witness not to

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 138

1  answer.
2  EXAMINATION BY MR. KOHNKE:
3      Q. Have you looked at the first
4  volume of the final draft of the IPET
5  report?
6      MR. SMITH:
7          I'm instructing the witness not to
8  answer.
9      MR. KOHNKE:
10         The reason you are instructing him
11  not to answer is that you feel that the IPET
12  report is just a draft and not a final
13  report; is that correct?
14     MR. SMITH:
15         I'm instructing him not to answer
16  because he is not designated and authorized
17  to address that subject at this deposition.
18     MR. KOHNKE:
19         Will you produce a witness who
20  will testify about the IPET report and the
21  Corps' involvement in formulating the
22  conclusions expressed therein?
23     MR. SMITH:
24         That was subject to the deposition
25  notice and the Corps has determined it will

Page 139

1  not produce a witness to testify as to that.
2      MR. KOHNKE:
3          You will not produce a witness.
4  Okay. The Corps has made that
5  determination; is that what you are saying?
6      MR. SMITH:
7          Yes. And you received a letter to
8  that effect.
9      MR. KOHNKE:
10         I understand. I understand. I'm
11  just saying this for the record.
12     THE VIDEOGRAPHER:
13         We're going off the record. It's
14  11:32. This is the end of Tape No. 1.
15  (Whereupon, a brief recess was taken.)
16     THE VIDEOGRAPHER:
17         We are back on the record. This
18  is Tape 2. It's 11:52 p.m.
19         We originally read the action as
20  Case No. 05-4208 and it's really Civil
21  Action No. 05-4206. So 05-4206, for the
22  record, is the correct Civil Action number.
23     THE WITNESS:
24         I'd like to answer another
25  question that you asked earlier that I

Page 140

1  didn't have the answer for, but I have
2  recently found out. You were asking what
3  the elevation was of the levee subsequent to
4  the third levee enlargement.
5  EXAMINATION BY MR. KOHNKE:
6      Q. Yes, subsequent to the third or --
7  when was the third levee enlargement?
8      A. In 1994, 1993 time frame.
9      Q. I thought you only completed two
10  enlargements?
11     A. Actually this levee section was
12  south of Bayou Dupre, probably around mile
13  marker 55, and encompassed the last
14  portion -- the last maybe thousand feet of
15  the levee that we are referring to right
16  now, the MRGO levee, and encompassed a piece
17  of levee that extends from the MRGO to
18  Highway 46. The existing elevations in that
19  area were approximately 17 to 18.
20     Q. Now, you talked about the third
21  elevation. There was an initial one, and
22  then I thought you said a first and second?
23     A. Right. And there was a third.
24  There was a third. It covered just a
25  portion of the MRGO that was the last

Page 141

1  thousand feet before the return levee that
2  we referred to the Verret to Caernarvon.
3  The section that goes from --
4      Q. Mr. Varuso, let me turn back to
5  Exhibit 2, which is in front of you. The
6  third bullet point under Planned
7  Improvements reads correcting design and
8  construction flaws. And I want to separate
9  out what design and what construction refer
10  to here.
11         When you refer to correcting a
12  design flaw, what design flaws does this
13  allude to?
14     MR. SMITH:
15         I'm instructing the witness not to
16  answer questions about this document.
17     MR. KOHNKE:
18         Well, this is part of the
19  construction of the MRGO levee system. This
20  document relates to, in this particular
21  bullet point relates to correcting that
22  design and construction flaw.
23     MR. SMITH:
24         This document refers to a design
25  and construction flaw, but this witness has

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 142

1  testified that there was no design or
2  construction flaw in the levee as
3  constructed prior to Hurricane Katrina. You
4  asked him about that and he testified as to
5  that. But now you are asking him the
6  question about this document.
7      MR. KOHNKE:
8          Yeah, I'm impeaching his prior
9  testimony with a Corps of Engineers document
10 that follows Hurricane Katrina and would
11 appear to certainly impeach any testimony
12 that there was no design or construction
13 flaw preKatrina.
14     MR. SMITH:
15         And I'm going to instruct him --
16     MR. KOHNKE:
17         That's what this is, impeachment.
18     MR. SMITH:
19         I'm instructing him not to answer
20 questions about this document.
21     MR. KOHNKE:
22         All right. Well, let me -- I
23 understand your instruction and I have to
24 live with it until, certainly until
25 tomorrow. But let me ask a few questions

Page 143

1  for the record.
2  EXAMINATION BY MR. KOHNKE:
3      Q. When the Corps of Engineers puts
4  out a document such as Exhibit 2, without
5  getting into the details of the content of
6  Exhibit 2, is there some approval process
7  before this language is incorporated on the
8  website?
9      MR. SMITH:
10         Instructing the witness not to
11 answer.
12     MR. KOHNKE:
13         I'm not asking about details. I'm
14 just asking about the creation and input
15 into Exhibit 2.
16     MR. SMITH:
17         I understand. And he is
18 instructed not to answer questions about
19 that exhibit, either the exhibit itself or
20 the process leading up to the creation of
21 that exhibit.
22 EXAMINATION BY MR. KOHNKE:
23     Q. Can you tell me, please, what the
24 process is at the Corps of Engineers for
25 ultimate approval of the IPET report? I

Page 144

1  understand that is in draft form now and has
2  not yet been approved or adopted, but what
3  is that process?
4      MR. SMITH:
5          The witness is instructed not to
6  answer.
7      MR. KOHNKE:
8          Why is that?
9      MR. SMITH:
10         It's beyond the subjects upon
11 which he has been authorized to speak today.
12     MR. KOHNKE:
13         Who is the person who has done the
14 authorizations that you are referring to?
15 Is there such a person?
16     MR. SMITH:
17         You received a letter from the
18 Corps of Engineers, I believe it was signed
19 by Marc Cohen (phonetic), who is the
20 assistant chief counsel, if I recall his
21 title correctly.
22 EXAMINATION BY MR. KOHNKE:
23     Q. Is it correct that the levees
24 along the northeast side of St. Bernard
25 Parish, that is along the MRGO, had numerous

Page 145

1  breaches and were washed out over various
2  lengths there?
3      A. Yes.
4      Q. And these were the same levees
5  that were constructed using hydraulic fill?
6      A. That's correct.
7      Q. And you believe that -- well,
8  strike that.
9          There were other portions of the
10 levees that, in the overall New Orleans and
11 vicinity hurricane protection system that
12 survived intact; is that correct?
13     MR. SMITH:
14         I'm instructing the witness not to
15 answer.
16 EXAMINATION BY MR. KOHNKE:
17     Q. Is it true that the Corps
18 determined that those levees that had been
19 constructed of clay material as opposed to
20 hydraulic fill survived overtopping without
21 backside erosion in a much better manner
22 than the hydraulic fill constructed levees?
23     MR. SMITH:
24         I'm going to instruct the witness
25 not to answer that question.

Page 146

1  MR. KOHNKE:
2      Why?
3  MR. SMITH:
4      As I understand it, it pertains to
5  neither the design construction or
6  performance.
7  MR. KOHNKE:
8      Actually it's all three. The
9  design -- when a decision is made to use
10 hydraulic fill versus clay, that's part of
11 the design. And I'm asking about the
12 performance of that design when I ask this
13 question.
14 MR. SMITH:
15     Well, I did not understand your
16 question. You are asking him something
17 about the way the MRGO levee was designed?
18 MR. KOHNKE:
19     And how that design performed by
20 comparing the two different designs.
21 MR. SMITH:
22     There is no other design.
23 MR. KOHNKE:
24     Well, there is certainly a portion
25 that is filled -- made with hydraulic fill

Page 147

1  and there are portions that are not and I'm
2  asking him to compare those portions.
3  MR. SMITH:
4      I will allow him to answer that.
5  I think it's fair.
6  EXAMINATION BY MR. KOHNKE:
7  Q. Mr. Varuso?
8  A. You are attempting to make a
9  distinction or a separation between
10 hydraulic fill and clay material. That is
11 not true.
12 Q. You are saying it is the Corps'
13 judgment or it's the Corps' testimony that
14 there is no distinction between -- along
15 this 12-mile stretch of the MRGO levee as to
16 how the levees performed one portion to
17 another depending upon --
18 A. What I'm saying is you are asking
19 the difference between clay fill and
20 hydraulic fill. Hydraulic fill is a way, a
21 means of placing the material, not a
22 different material type.
23 Q. I understand the distinction. I
24 see your point. Let me can back up.
25     Without regard to the means of

Page 148

1  constructing the levee, let's just talk
2  about the type of soil used in the process.
3  Is it true that those portions of the levee
4  where the levee consisted more of sandy silt
5  and peat, that overtopping and backside
6  erosion was greater than those portions of
7  the levee that consisted primarily of clay?
8  MR. SMITH:
9      Again, this is limited just to the
10 MRGO levees. That's the premise of your
11 question.
12 MR. KOHNKE:
13     That is the premise.
14 THE WITNESS:
15     We have not yet taken borings --
16 between the time that the post Katrina, we
17 did not take borings in the areas where the
18 levee remained intact and in areas where the
19 levee had failed. To make a distinction
20 between what that levee -- what the primary
21 consistence of section of levee would have
22 been. In addition, I don't know where we
23 would get the data from to see what the
24 levee section was made of in the area that
25 was washed out, because that levee was

Page 149

1  washed out. There is no data. The material
2  is gone.
3  Q. Has the --
4  A. So I don't know how we would make
5  that comparison because there is no sample,
6  there is no soil sample to take.
7  Q. Didn't the material that
8  constituted the levee, didn't it get spread
9  on the back side after the overtopping and
10 breaching? Isn't there -- don't the aerial
11 photographs tend to show that material as
12 having spread towards the back side, from
13 the top towards the back?
14 A. There is material there. Now, to
15 say that that is a hundred percent of -- all
16 that material that is there is all levee
17 section, you can't make that determination
18 because there are sediments within the storm
19 surge, as the hurricane approached,
20 encompassed in that storm surge and that
21 material was spread out within the levee
22 section, in the marsh area, and actually in
23 the neighborhoods.
24 Q. Has the Corps of Engineers
25 received information from any source to the

38 (Pages 146 to 149)

Page 150

1  effect that some portion, significant
2  portion of the breaches that occurred along
3  the MRGO was the result of sandy soil being
4  used to construct the levee and overtopping
5  of that sandy soil?
6      MR. SMITH:
7          I'm going to instruct the witness
8  not to answer questions about the post
9  Katrina analysis and sources of information.
10     MR. KOHNKE:
11         No. 8 is the performance of the
12 levees along the MRGO in St. Bernard.
13     MR. SMITH:
14         Right. You asked questions about
15 information.
16     MR. KOHNKE:
17         Well, in order to know how the
18 levee performed there has to be an analysis
19 post event of that performance. I'm asking
20 about that analysis. Once again, I'm not --
21 I know that no one from the Corps -- at
22 least I assume no one from the Corps was
23 present during the moment when the hurricane
24 is striking Louisiana. No one is down there
25 on the MRGO levee observing. So any

Page 151

1  analysis of performance has to be after the
2  fact and I'm asking about after-the-fact
3  information.
4      MR. SMITH:
5          All right. Restate the question.
6  You may be right about that.
7      MR. KOHNKE:
8          Would you go back and reread the
9  question?
10 (Whereupon, the requested testimony was read
11     by the Court Reporter).
12 "Q. Has the Corps of Engineers received
13 information from any source to the effect
14 that some portion, significant portion of
15 the breaches that occurred along the MRGO
16 was the result of sandy soil being used to
17 construct the levee and overtopping of that
18 sandy soil?"
19     THE WITNESS:
20         Not that I'm aware of.
21 EXAMINATION BY MR. KOHNKE:
22     Q. Without going into what the
23 reports say, because your counsel has
24 instructed you not to answer, would it be
25 fair to say that -- well, strike that.

Page 152

1      When you say, "not that I'm aware
2  of," are you speaking again for the Corps,
3  you are not aware of the Corps being aware
4  of any information to that effect?
5      A. Referring to the type of material
6  that existed in the levee post Katrina?
7      Q. I'm referring to the breaches, the
8  areas where the breaches occurred.
9      A. Okay.
10     Q. Having been a direct result of a
11 type of material being used to construct the
12 levee at that point when overtopping occurs.
13     A. There have not been any
14 significant soil samples, which is the only
15 way you could determine what the material of
16 the levee consisted of right before Katrina.
17 The only way you could get that would be the
18 existing levee sections that remained
19 intact. Borings have not been taken by any
20 entity that I'm -- by any entity to
21 determine what type of soil existed in those
22 levee sections.
23     Q. So you are making the judgment, I
24 believe, and correct me if I'm wrong, you
25 are making the judgment that soil samples

Page 153

1  are the only way to determine what that
2  levee consisted of at that location where
3  the breach occurs?
4      A. Yes.
5      Q. Now, notwithstanding that
6  testimony, has the Corps received any
7  information from any sources that would
8  indicate that the levees there were made of
9  one type of soil versus another? At the
10 areas of these breaches I'm referring to.
11     MR. SMITH:
12         You have asked this, and I know
13 you are still trying to get an answer. You
14 don't feel like you have gotten an answer,
15 but I still feel like this is a little bit,
16 like, removed from the actual performance.
17 It seems like you are trying to probe what
18 other people may have said and I'm aware, as
19 you are, that other people have said what
20 you are positing in your question.
21     MR. KOHNKE:
22         Of course.
23     MR. SMITH:
24         But that's not the Corps.
25     MR. KOHNKE:

39 (Pages 150 to 153)

Page 154

1    Well, I'm asking has the Corps
2    received that information. You're aware of
3    it. I'm aware of it. I suspect the witness
4    is. But he indicates to me it's not
5    reliable. He doesn't say yes or no, I have
6    received it, he says it's not reliable,
7    which suggests to me, A, he's received it,
8    and B, he is making a value judgment about
9    what can be relied upon. So I understand
10   that, I have accepted that, I just want to
11   get back into what they received.
12        MR. SMITH:
13            All right. If you can answer that
14   question. I think that's fair.
15        THE WITNESS:
16            There have been judgments made or
17   comments made about what that levee may have
18   consisted of, what type of soil that levee
19   consisted of. I'm aware of that.
20   EXAMINATION BY MR. KOHNKE:
21       Q. And the consistency of -- the
22   materials where you are speaking of, the
23   materials that contribute to the breach, you
24   understand that's the relationship?
25       A. I understand that.

Page 155

1        Q. Okay. And that there are -- there
2    has been opinions offered that I'm referring
3    to now by way of information, there have
4    been opinions offered that, because the
5    material that was used to build the levee
6    was more sandy and less clay that that
7    overtopping produced backside erosion and
8    thus a breach.
9            Have I correctly stated what those
10   opinions conclude?
11       A. There is a lot of conclusions out
12   there. I couldn't say whether or not you
13   are paraphrasing that correctly.
14       Q. Well, let's start with the
15   proposition -- let's start with the
16   proposition that you do not accept those
17   opinions, the Corps does not. I'm only
18   asking about information the Corps has
19   received. We understand that that's the
20   arena in which I am speaking?
21       A. Okay.
22       Q. Now, let's talk about the
23   information. There have been opinions
24   offered to the Corps from various sources
25   that the cause of the breaches along the

Page 156

1    MRGO -- let's start with how many there
2    were. How many major breaches were there
3    along the MRGO?
4        A. I don't think I could put a number
5    on it. A significant portion of the levee
6    between -- in that 12 miles.
7        Q. Have some opinions numbered up to
8    50?
9        A. There may have.
10       Q. Is that within a ball park, or is
11   it more like 200 or more like five?
12       A. It sounds reasonable.
13       Q. 50. Okay. Then with the
14   exception of a couple, that opinions have
15   been offered that all those breaches are the
16   result of sandy soil being used to construct
17   the levee which when overtopped eroded from
18   the back side?
19       MR. SMITH:
20           I'm sorry. I'm not sure I
21   understand the question. What is the
22   question?
23       MR. KOHNKE:
24           I'm trying to get to the
25   information that has come into the Corps'

Page 157

1    possession as part of the performance of its
2    levees that it designed and constructed in
3    the '60s through the '80s. And the question
4    is: Is that the opinions that the Corps has
5    received, although it may not accept for
6    whatever reasons it chooses to, is that of
7    those 50 some-odd breaches, almost all of
8    them are the result of the choice of soils
9    used to construct the levee?
10       MR. SMITH:
11           I'm going to instruct the witness
12   not to answer this question. I really do
13   think it's just more than one step removed
14   from the performance of the levees. If you
15   want to use that as a premise for a question
16   about the performance of the levees, I think
17   that would be fair. But just to inquire
18   about what information the Corps may have
19   received, I'm not sure if that really fits.
20       MR. KOHNKE:
21           Well, it gets back into the
22   construction. We have already established
23   that in the new design, the new
24   construction, the Corps is barging in clay
25   and is compacting that clay. And so what

Page 158

1  I'm doing now is I'm trying to establish why
2  that decision was made to barge in and
3  compact clay as opposed to use the more
4  readily available materials. And so I'm
5  assuming that the information the Corps
6  received post hurricane from whatever
7  sources led to that. And I'm exploring that
8  design and construction decision.
9      MR. SMITH:
10        Well, why don't you just ask that
11 question. That would be a fair question.
12     MR. KOHNKE:
13        Okay. Okay.
14 EXAMINATION BY MR. KOHNKE:
15     Q. We have established, sir, that the
16 Corps is today barging clay in, using clay
17 to construct the levees along the MRGO; is
18 that a fair statement?
19     A. Portions of it, yes.
20     Q. Portions of it. And clearly,
21 let's be clear for the record, what portions
22 are we referring to?
23     A. There was a small portion south of
24 Bayou Dupre where we used the barge
25 material. For the most part, it's portions

Page 159

1  of the levee, whether it be the flood side,
2  stability berm or the mainland section of
3  the levee between Bayou Bienvenu and Bayou
4  Dupre.
5      Q. Okay.
6      A. Not all that levee impacted
7  section but there are portions within that
8  reach that are using the barged-in material.
9      Q. Of the portion of the levee
10 between Bayou Bienvenu and Bayou Dupre,
11 roughly how many breaches, major breaches
12 occurred in that stretch?
13     A. Maybe 25.
14 MR. BRUNO:
15        May I ask a favor, please, for me
16 for this record? Mr. Kohnke, may we learn
17 the definition of the words "overtopping"
18 and "breach"?
19     MR. KOHNKE:
20        Good idea. Sure, let's do that.
21 EXAMINATION BY MR. KOHNKE:
22     Q. Define overtopping.
23     A. When the elevation of the water
24 from the storm surge exceeds the elevation
25 of the crown of the levee.

Page 160

1      Q. When overtopping occurs, some
2  amount of water -- assuming the levee
3  remains intact, some amount of water will
4  cross the levee to the protected side; is
5  that correct?
6      A. That's correct.
7      Q. Now, contrast that with a breach.
8      A. A breach is when the section of
9  the levee erodes away or is washed away and
10 no longer exists or you no longer have the
11 levee crown elevation you had prior to the
12 storm surge.
13     Q. Is that sometimes referred to as a
14 catastrophic failure?
15     A. That's a subjective term, I
16 suppose.
17     Q. The Corps may not use it, but it
18 would aptly describe what the process is?
19     A. It's a subjective term, I think.
20     Q. You say it's an objective term or
21 subjective? I did not hear you.
22     A. Your opinion.
23 MR. SMITH:
24        He is asking what you said.
25 THE WITNESS:

Page 161

1        Objective.
2  EXAMINATION BY MR. KOHNKE:
3      Q. Objective?
4      A. Objective. Maybe I'm using the
5  term in the wrong way.
6      Q. I think you are, but I will accept
7  it.
8  MR. SMITH:
9        I thought he said -- did you say
10 "objective" or "subjective"?
11 MR. KOHNKE:
12        He said "objective."
13 MR. SMITH:
14        No, he said "subjective."
15 EXAMINATION BY MR. KOHNKE:
16     Q. Let's clear it up. You used
17 the --
18     A. Objective -- subjective meaning
19 one's opinion.
20     Q. Okay. Okay. A levee is supposed
21 to hold something back particularly at a
22 time of flood, is it not?
23     A. Yes.
24     Q. And when the levee ceases to
25 exist, opens up and that water comes

41 (Pages 158 to 161)

Page 162

1  through, would that be a failure of the
2  levee?
3  A. Yes.
4  Q. And when it floods 80 percent of
5  the City of New Orleans, would that be a
6  catastrophic failure?
7  MR. SMITH:
8      I'm going to object.
9  MR. KOHNKE:
10     Well, if you lived here you
11 wouldn't object.
12 EXAMINATION BY MR. KOHNKE:
13 Q. All right. Now, let's get back to
14 my question. I know that today the Corps is
15 barging in a different type of material than
16 was used before. We have established that,
17 correct?
18 A. Yes.
19 Q. I know that today the Corps is
20 mandating that compaction occur. That was
21 not done before; is that correct?
22 A. That's correct.
23 Q. And I assume that the decisions to
24 compact and to use clay are the product of
25 information the Corps has received since

Page 163

1  this hurricane -- since Hurricane Katrina?
2  MR. SMITH:
3      Object to the form. You may
4  answer now.
5  THE WITNESS:
6      The information received was the
7  fact that the levee did not perform as well
8  as we would have liked it to.
9  EXAMINATION BY MR. KOHNKE:
10 Q. Fair enough. Fair enough.
11 A. Not from other entities.
12 Q. And even though the Corps may not
13 have acted on it, the Corps did receive
14 information from other entities that the
15 reasons for these breaches was the type of
16 soil that was being used?
17 A. This is well after our plans and
18 specifications and the contract was already
19 on ground.
20 Q. That may be and I accept that.
21 But the Corps did receive information to the
22 effect that clay should be used and it
23 should be compacted to construct a hurricane
24 protection levee?
25 A. There were opinions made that that

Page 164

1  is a means of constructing a levee.
2  Q. Does the Corps agree with those
3  opinions?
4  A. We incorporated that into -- but
5  before those opinions were made, we
6  incorporated those into our plans and
7  specifications well before those opinions
8  were brought to our attention.
9  Q. But those weren't opinions that
10 apparently the Corps had back in the '60s
11 through the '80s because it neither used
12 clay nor did it use compacted material?
13 A. It used clay.
14 Q. Well, it happened to pick some
15 clay up when it dredged, but it wasn't --
16 A. The act of placing hydraulic fill
17 in the manner in which it was told to do by,
18 to the contractors as part of our plans and
19 specification, the act of placing the
20 hydraulic fill in that manner tends to wash
21 away most of the sands and silts and what
22 remains are clay balls in the area where the
23 levee section would be built. So what
24 remains, even though you are using hydraulic
25 fill, the remaining material is primarily

Page 165

1  clay.
2  Q. And that was the Corps' method for
3  making sure that the levees that it was
4  constructing to protect the Chalmette and
5  Meraux area were going to primarily be
6  constructed of clay?
7  A. That's correct.
8  Q. Is that the most foolproof method
9  of insuring that the levees used to protect
10 Chalmette and Meraux are going to be
11 primarily constructed of clay, or would a
12 better method be to excavate clay from a
13 borrow pit and to barge it in and put
14 nothing but clay there rather than whatever
15 you happen to dredge out of the bottom of
16 the water?
17 MR. SMITH:
18     I'm going to object and instruct
19 the witness not to answer. He is not here
20 to testify as an expert concerning the best
21 way to construct levees.
22 MR. KOHNKE:
23     Okay.
24 EXAMINATION BY MR. KOHNKE:
25 Q. Part of this is design, part of

42 (Pages 162 to 165)

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 166

1  this is construction. I'm asking which is
2  the better method, to dredge whatever comes
3  up and hope that the sand and silt washes
4  away leaving you with balls of clay, or to
5  specifically target clay reservoirs in a
6  borrow pit and to excavate that and use that
7  and only that? That's my question.
8      MR. SMITH:
9          Right. But I think you have
10 explored this in relationship to how they
11 have constructed MRGO preKatrina and post
12 Katrina. And now you are trying to get an
13 abstraction from him.
14     MR. KOHNKE:
15         No. I'm trying --
16     MR. SMITH:
17         I'm not going to allow him to
18 answer abstractions. If you want to ask
19 him -- you have asked him several times
20 about the differences between preKatrina and
21 post Katrina construction.
22     MR. KOHNKE:
23         I'm asking him which is better,
24 not an abstraction, which was the better way
25 of insuring that you have a clay levee to

Page 167

1  protect these communities. That's all I'm
2  asking. It's not an abstraction. To make a
3  choice, to pick which one is the better
4  method.
5      MR. SMITH:
6          I'm going to instruct him not to
7  answer that question.
8      MR. KOHNKE:
9          How is it -- why? Because it's an
10 abstraction to ask him which is the better
11 method?
12     MR. SMITH:
13         I won't -- I take that back. I
14 will allow him to answer that question with
15 respect to the MRGO levees. Yes, that's a
16 fair question.
17 EXAMINATION BY MR. KOHNKE:
18     Q. Okay. Which is the better method
19 to insure that you are left with a clay, a
20 levee constructed of clay?
21     A. In part of your question you made
22 the comment that you use hydraulic fill and
23 take whatever you get, which is what is left
24 and hope that it's clay. That is not how
25 it's built when you use a hydraulic fill.

Page 168

1  It's not a hope, roll of the dice that you
2  get the material you are looking for.
3          As I explained before, that method
4  is used and has been used in various levees
5  throughout the country, using a compacted
6  hydraulic fill and it works quite well to
7  make sure you are left with clay material.
8          In addition to that, quality
9  assurance and quality control is performed
10 throughout the levee construction to make
11 sure that the material that remains is what
12 we are looking for and meets the plans and
13 specifications. It's not a hope.
14         In addition to that, our post
15 construction borings for the two subsequent
16 levee enlargements since that show
17 predominantly clay materials in those
18 levees.
19     Q. Okay. Which is the better method?
20     A. One is not better than the other.
21 They both can be performed quite well and
22 you can get the levee section you're looking
23 for as long as the quality assurance and
24 quality control is in place during
25 construction.

Page 169

1      Q. Your testimony is if everything
2  falls into place in terms of quality control
3  and quality of construction that one is not
4  better than the other?
5      A. Given the same material for
6  borrow, yes.
7      Q. And then again, the quality
8  control you are referring to -- well, you
9  have testified as to what that quality
10 control is.
11         So if the quality control is in
12 place and if it's up to the quality that
13 it's supposed to meet and you are obtaining
14 the material that you are anticipating
15 meeting and if the sand and if all the stuff
16 washes off as it should, then the two
17 methods are equal?
18     A. Well, what I'm saying is that you
19 can have the same result of an uncompacted
20 levee section by either method, meaning
21 meeting the same spec requirements.
22     Q. Now, when obtaining hydraulic fill
23 material, this is done through what? A
24 suction barge or a dredge?
25     A. A dredge.

43 (Pages 166 to 169)

Page 170

1    Q. A dredge. So that bucket goes
2  down and picks up -- down to what, five feet
3  below the bottom of the MRGO; is that right?
4    A. I'm not sure if the dredge used a
5  bucket or if it's a siphon or what the
6  actual type of dredge was used at that time.
7  I couldn't answer that question.
8    Q. A siphon would be another name for
9  a suction barge -- suction dredge?
10   A. Yes.
11   Q. So the crane operator doesn't know
12 what his bucket is going to do, he just
13 knows that he is going down five -- going
14 down to the bottom of the MRGO and he is
15 dredging a bucketful of mud and he plops it
16 up wherever it's intended to be placed.
17 That's how it's done if it's a crane
18 operator?
19   A. I don't believe it was done in
20 that manner, but I would have to -- if it
21 was used with a bucket, I'm not sure if it
22 was a suction dredge. I would have to find
23 out the exact method that was used in the
24 hydraulic fill.
25   Q. If it's a suction dredge, there is

Page 171

1  like a big stinger or feeler going across
2  the bottom side to side sucking up whatever
3  comes up; is that correct?
4    A. The existing material that's
5  there. We know what it is. We know what it
6  is based on, based on our geologic knowledge
7  of the area.
8    Q. And based upon soil sampling?
9    A. Right.
10   Q. And that soil sampling you have
11 already indicated in a six-mile area was
12 approximately 10 inches of total diameter?
13   A. The borrow borings are typically
14 taken more often than that.
15   Q. How often?
16   A. I would have to find out what the
17 frequency of the borrow borings was in that
18 area. I don't recall that.
19   Q. You don't know what they are?
20   A. What the spacing was? I would
21 have to find out.
22   Q. So you don't know what the spacing
23 is, but you are confident, based upon that
24 spacing, that this dredge was picking up
25 material that was known not unknown?

Page 172

1    A. That's correct.
2  MR. BRUNO:
3    May we have a definition of the
4  phrase "borrow borings"?
5  THE WITNESS:
6    It's a soil sample taken typically
7  15 to 20 feet deep in the area where the
8  borrow material -- the borrow material is
9  the material that's taken from one location
10 to be used to construct the levee section.
11 We refer to that material as borrow,
12 borrowing from one site to construct the
13 levee. So the borings we take to determine
14 what the material is in that area we refer
15 to those as borrow borings.
16 MR. BRUNO:
17   Thank you.
18 EXAMINATION BY MR. KOHNKE:
19   Q. Now, each year the MRGO -- was it
20 each year or every other year? How often --
21 on what intervals was the MRGO dredged for
22 navigational purposes?
23 MR. SMITH:
24   I am going to object to that
25 question and instruct him not to answer.

Page 173

1  MR. KOHNKE:
2    The only thing I'm trying to do is
3  I'm trying to get to the quality of the
4  material. I'm not interested in the
5  navigational aspects of the MRGO.
6  MR. SMITH:
7    Well, perhaps you could rephrase
8  your question.
9  EXAMINATION BY MR. KOHNKE:
10   Q. Was there an interval at which
11 dredge materials were used? I read to you a
12 portion of a reconnaissance report from 1988
13 that indicated the dredge materials were
14 being used as part of the maintenance of a
15 channel. Do you recall that?
16   A. Yes.
17   Q. Of the channel, MRGO channel. And
18 I'm trying to find out at what interval that
19 was done?
20   A. I would have to find that out.
21   Q. What was causing the MRGO to fill
22 back in to need to be dredged?
23 MR. SMITH:
24   Objection. I'm going to instruct
25 the witness not to answer.

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 174

1  EXAMINATION BY MR. KOHNKE:
2     Q. Well, if the top five feet was
3  silt that was coming back from the marsh or
4  sinking in, then it would be silt being used
5  to build the levee? Whatever the top five
6  feet was that was what was being used; is
7  that correct?
8     A. Whatever the top five feet was,
9  was what was being used, yes.
10    Q. Do you know what silt is?
11    A. Sure.
12    Q. What is silt?
13    A. It's a classification of soil with
14 a given plasticity index and some other soil
15 parameters that classify it as a silt.
16    Q. At the other end of the MRGO is
17 Chandelier and Breton Island and Gozer
18 Island and Kerlew; isn't that correct?
19    A. That sounds about right, yes.
20    Q. Those are sandy islands, aren't
21 they?
22    A. I couldn't answer that question.
23 What exactly it's made of, I couldn't answer
24 that question with any certainty.
25    Q. Well, is there sand at the other

Page 175

1  end of the MRGO?
2     MR. SMITH:
3        I know where you are going with
4  this, but --
5     MR. KOHNKE:
6        For the record, what I want to
7  establish is that there is sand at the other
8  end of the MRGO. And hurricanes and tidal
9  movements and others may move that sand.
10 Vessels that are dragging bottom or stirring
11 it up and tide moves it, and that every so
12 often when the MRGO is dredged sand is what
13 is on top, and that's what I'm exploring.
14    MR. SMITH:
15       Right. I understand your theory
16 of the case. And it's something you can
17 develop with your experts at trial, but he's
18 testified that they know what is in the
19 channel bed because they do borings.
20    MR. KOHNKE:
21       Well, and I want to cross-examine
22 him on that because I believe that his
23 statement as to his knowledge
24 notwithstanding, there may very well be
25 other factors that he isn't taking into

Page 176

1  account.
2     MR. SMITH:
3        I appreciate that.
4  EXAMINATION BY MR. KOHNKE:
5     Q. When hurricanes that preceded
6  Katrina would move in -- during '65 there
7  was Betsy; is that correct?
8     A. That's correct.
9     Q. '69 was Camille. There were a
10 number of hurricanes that would hit the Gulf
11 Coast particularly to the east of us; isn't
12 that right?
13    A. I'm not sure what the exact
14 hurricanes were or where they struck.
15    Q. There has been surges that have
16 come into Louisiana since 1965?
17    A. Sure.
18    Q. Would it be logical, are you not
19 aware that it is necessary to redredge the
20 MRGO from time to time to maintain a certain
21 depth because it tends to fill in?
22    A. Yes.
23    Q. And it fills in with a variety of
24 things? It fills in with silt and sand;
25 isn't that correct?

Page 177

1     A. And possibly some clays.
2     Q. Possibly some -- where would these
3  clays come from?
4     A. Well, let me rephrase my answer.
5  There would still be clays existing in
6  whatever material they are dredging.
7     Q. But covered over by other
8  materials that --
9     A. Yeah, it would be a mix.
10    Q. -- are deposited?
11    A. It would be a mix of materials.
12    Q. Okay. But the clays, if they were
13 there to begin with, they would be at the
14 bottom if they are then being covered over
15 by other materials?
16    A. Possibly.
17    Q. And if you are going to dredge the
18 first five feet, you may not get down to the
19 clay; you may be dredging what's been
20 deposited since you last dredged?
21    A. Then we would continue to dredge
22 until the clay material was uncovered and
23 placed.
24    Q. If it was your intention to only
25 dredge clay?

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 178

1  A. That would have been the
2  intention.
3  Q. But in 1988 you saw the intention
4  was not to get to clay, but rather, to
5  maintain a navigable channel, and that's
6  what was being used -- that's the material
7  being used to create the levee?
8  MR. SMITH:
9    I am going to object to that
10 question, because that's not what the
11 document says. You may answer. You may
12 answer.
13 THE WITNESS:
14   The document is referring to using
15 the barge, the dredge material for borrow
16 for other sections of the Lake Pontchartrain
17 hurricane vicinity levees, 100 million cubic
18 yards. 100 million cubic yards, that's
19 going to be well more than the five feet
20 that would be on the top of the borrow area.
21 EXAMINATION BY MR. KOHNKE:
22 Q. That's over how many years, sir?
23 Read it.
24 A. From 1968 to 1983.
25 Q. Okay. That's 15 years, right? So

Page 179

1  you have got a quick back of the envelope,
2  maybe not even on an envelope, maybe in your
3  head calculation of the length of the MRGO,
4  the number of years and the depth to which
5  that dredging occurred? By using --
6  starting with the cubic number of yards?
7  A. I can get a pretty decent feel of
8  what it's going to take to get a hundred
9  million cubic yards.
10 Q. Did the hydraulic fill material
11 that was being sucked from the bottom of the
12 MRGO, from the base of the MRGO, include
13 from time to time shell, shell materials?
14 A. I'm not aware of any boring that
15 indicates that significant amounts of shell
16 were being dredged from the bottom of the
17 channel.
18 Q. Are you aware of observations made
19 by individuals in the wake of Hurricane
20 Katrina that shell materials had been spread
21 over these deposited or redeposited levee
22 systems; that is, as the soil spread out,
23 there were shell among it?
24 A. There are observations that shell
25 existed in the areas where the levee once

Page 180

1  was before the hurricane.
2  Q. Fair enough.
3  A. You cannot say whether or not that
4  was actually part of the levee section
5  before the hurricane storm surge impacted
6  the levee.
7  Q. So the shell, you are saying, may
8  have come from something other than the
9  contents of the levee itself?
10 A. That's correct.
11 Q. Has the Corps done anything to
12 rule in or rule out the conclusion that
13 these levees were constructed using
14 shell-like materials?
15 A. There is no evidence in any of the
16 preexisting borings among the center line of
17 the levee that shows any significant amount
18 of shell in that levee section.
19 Q. Now we are talking about the
20 center line borings of the levee system.
21 Let's talk about, in this 6.2 miles I think
22 that you referenced earlier, there were six
23 or so borings, each one about five inches
24 deep?
25 A. Five inches in diameter.

Page 181

1  Q. Five inches in diameter?
2  A. 80 feet deep.
3  Q. And you are saying there was no
4  shells in any of these six borings?
5  A. I wouldn't say there was zero
6  percent, no.
7  Q. When the borings are obtained,
8  what sort of stratification within this
9  column is observed? What kind of reference
10 is made as to what exists in the first five
11 feet, the second five feet and so on? What
12 differentiation?
13 A. It's based on classification of
14 the soil. If they run from one material
15 type to the next, they will denote that with
16 a given symbol in the boring log.
17 Q. And that is a standard that the
18 Corps requires that these borings --
19 A. It's an industry standard.
20 Q. That's my question. What does the
21 Corps require? When a boring is done it's
22 done by a contractor, right?
23 A. At this time we may have had our
24 own boring crew take those borings.
25 Q. When are we talking about, what

Page 182

1  time frame?
2      A.  Between the '60s and the '80s when
3  these borings were taken.
4      Q.  Have you looked at any of those
5  boring samples?
6      A.  Yes.
7      Q.  Which ones?
8      MR. SMITH:
9          The samples or the logs of the
10 borings?
11     MR. KOHNKE:
12         Whatever he has looked at. What
13 has he looked at?
14     THE WITNESS:
15         Well, that's a correct
16 distinction. The boring logs, the samples
17 are obviously no longer around.
18 EXAMINATION BY MR. KOHNKE:
19     Q.  When did you do that?
20     A.  Recently.
21     Q.  Why?
22     A.  Since Hurricane Katrina.
23     Q.  Why?
24     A.  With discussion as to how the
25 levee performed and in our analysis or in

Page 183

1  our decision on putting together the plans
2  and specifications for the new levee section
3  as well as in preparation for this.
4      Q.  As well as in preparation for
5  this. Identify for me what years you have
6  looked at and what sections you have looked
7  at. I want to know what logs.
8      A.  The dates are approximate. I
9  haven't memorized the dates, but essentially
10 in the early '70's and in the early '80s new
11 borings were abstracted from these areas and
12 tests performed; and those are the boring
13 logs that I have looked at in the 12-mile
14 stretch.
15     Q.  How many different logs have you
16 looked at during that period for that
17 stretch?
18     A.  Including the existing borings
19 that were taken in 1960 before the first
20 levee lift was placed, probably 40 give or
21 take.
22     MR. KOHNKE:
23         Mr. Smith, is this information
24 also publicly available?
25     MR. SMITH:

Page 184

1          I don't know whether it is or not.
2      MR. KOHNKE:
3          I would -- in the event it is not
4  and accepting your statement that you don't
5  know one way or the other, let me assume
6  that it's not and ask would you agree to
7  produce it, these logs, so that my expert
8  can review the same material?
9      MR. SMITH:
10         If you would serve us with a
11 subpoena duces tecum? I would be happy to
12 comply with that. I don't see any problem.
13     MR. KOHNKE:
14         And I will include in the subpoena
15 anything else that I can't locate in the
16 public domain --
17     MR. SMITH:
18         That's fine.
19     MR. KOHNKE:
20         -- in the way of exhibits to these
21 pleadings that I have referred to and made a
22 part of the deposition.
23     MR. SMITH:
24         That's fine.
25 EXAMINATION BY MR. KOHNKE:

Page 185

1      Q.  Does the clay material that you
2  are referring to have shell in it?
3      A.  My recollection of the boring logs
4  was just -- I don't know if I can put a
5  number on it, you know, just a small number
6  of small samples within the boring logs that
7  indicate there may have been some shell
8  present. Nothing that I would consider or
9  that the Corps would consider appreciable.
10     Q.  Is there a threshold that is
11 objectively stated somewhere as to what is
12 appreciable or what is a level of concern in
13 terms of shell content?
14     A.  Our specifications, referring to
15 the placement of levee fill, say that there
16 is no -- less than one percent of
17 objectionable material should be placed in
18 the levee section. That's in our current
19 specification.
20     Q.  Objectable?
21     A.  Objectionable. Excuse me,
22 objectionable material.
23     Q.  And what would be included in
24 objectionable material besides shell?
25     A.  Logs, stumps, large sticks, that

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 186

1  sort of --
2  Q. Is sand an objectionable material?
3  A. Sand is not something that's
4  allowed in our current specification for
5  levee construction.
6  Q. So sand is something that's not
7  currently allowed in your levee
8  specification. When was it first not
9  allowed or disallowed, sand that is?
10  A. I would have to check to see if it
11  was ever allowed. I'm not positive that we
12  ever allowed sand to be a portion of the
13  levee section. I wouldn't imagine that it
14  was.
15  Q. Where would you check to find that
16  out?
17  A. Historical documents. I would
18  have to check the specifications from the
19  1967, '68 plans and specifications.
20  MR. KOHNKE:
21  Mr. Smith, can you include that?
22  I include that in my request, and if I serve
23  you with a subpoena duces tecum, will you
24  comply with that by producing those
25  specifications?

Page 187

1  MR. SMITH:
2  I'm not sure this is really -- I
3  know you are getting into Area 10, which is
4  the differences between pre and post Katrina
5  standards and manuals, which is something we
6  didn't agree to testify concerning.
7  MR. KOHNKE:
8  Actually, I see this as in the
9  first three. It is part of the design.
10  It's certainly a standard that is part of
11  the design. Then the question deals with
12  whether that design was met in the
13  construction, which is what the logs are
14  going to look at. And ultimately those two
15  things will determine how -- help me
16  determine how the levees performed.
17  MR. SMITH:
18  I think -- you know, we can't say
19  for sure whether those manuals, historical
20  documents exist, but we will -- if you serve
21  us a subpoena, we will certainly search for
22  them.
23  MR. KOHNKE:
24  All right. I appreciate your
25  answer, but let me come back to the witness

Page 188

1  and ask.
2  EXAMINATION BY MR. KOHNKE:
3  Q. It's your understanding, having
4  been an employee of the Corps since -- you
5  started, I think, in '92, I think you
6  said -- that there is a standard that
7  relates to objectionable materials. You
8  defined objectionable materials as being
9  shell, logs and the like, but you initially
10  left out sand. And I'm now asking you:
11  Does objectionable materials include sand or
12  not, as far as you understand?
13  A. That's correct.
14  Q. It does. Okay. So it more
15  than --
16  A. It's not a soil type that's
17  allowed in our current spec for construction
18  of levees.
19  Q. You went too fast and I was about
20  to ask a question.
21  (Whereupon, the requested testimony was read
22  by the Court Reporter).
23  "A. It's not a soil type that's allowed in
24  our current spec for construction of
25  levees."

Page 189

1  EXAMINATION BY MR. KOHNKE:
2  Q. When did our current specs become,
3  quote, current specs? Post Katrina?
4  A. Oh, no. This is before Katrina.
5  Q. How long before Katrina?
6  A. Like I said, I would have to go
7  back and see how far it's been since -- if
8  the spec has ever changed. I'm not aware
9  that it's ever changed since its current
10  form.
11  Q. Why do you use current if you are
12  not aware that it ever changed?
13  MR. SMITH:
14  I object to that. That's
15  argumentative. Because he doesn't know
16  whether it's changed. That's why he used
17  it.
18  MR. KOHNKE:
19  Well, then why -- that's why I
20  asked him why he used current. If he
21  doesn't know, he's using current as if he
22  does know. That's what I'm --
23  MR. SMITH:
24  He knows what -- he is trying to
25  qualify it to make it clear that he doesn't

Page 190

1  know whether it's ever been different.
2  EXAMINATION BY MR. KOHNKE:
3     Q. When you use current, you may be
4  using current without any reason at all,
5  because as far as you know, there has never
6  been a change?
7     A. I'm using the word "current"
8  because that's what it is today.
9     Q. Okay. Okay. And you are not
10 aware of a change?
11    A. Since I have been there in 1992
12 that's what the spec has been.
13    Q. Now, according to the spec that's
14 always been there as far as you know, if
15 more than one percent of this levee consists
16 of sand at any given point -- strike that.
17 One percent content of sand would be
18 objectionable?
19    A. I would have to -- honestly, I
20 think I would have to discuss that with
21 somebody else to see -- I know that the term
22 "objectionable" typically is referring to
23 large stumps, material that's essentially
24 not soil is, I believe, what the term
25 "objectionable" was placed in the spec for.

Page 191

1  I can testify to that. I can also testify
2  to that our current spec does not allow sand
3  at all in the levee section.
4     Q. Your current spec does not allow
5  any sand in the levee section at all,
6  meaning any? You are pausing. Did I just
7  say it correctly?
8     A. It's not allowed, that's correct.
9     Q. It's not allowed. Okay. Now,
10 your current spec has been in effect, you
11 don't know for how long, but it's as long as
12 you know. There has never been a previous
13 spec that you are aware of; is that right?
14    A. Right.
15    Q. So does that include the 1960s
16 when you refer to the current spec?
17    A. As I said, I'm not aware if it had
18 ever changed from the 1960s until now. I
19 would have to go back and see what the spec
20 was.
21    Q. In 1988 when the report indicated
22 that dredge materials were being used to
23 make the levee, was that spec in existence
24 then that did not allow any sand?
25    A. As I said, I would have to check

Page 192

1  the spec that was in place for that set of
2  plans and specs in the 1980s when that
3  subsequent enlargement was put in place.
4     Q. Well, can you get that by a phone
5  call just like you got during the last
6  break, you called the office?
7     A. It would probably be more
8  difficult to get than just by a phone call.
9  The plans are more readily available than
10 the specifications are.
11    Q. Why is sand not allowed or
12 disallowed in the construction of a levee?
13    A. To answer that question
14 completely, I would have to talk to some
15 other people to discuss the history of the
16 specifications.
17    Q. I don't want a treatise. All I'm
18 looking for is a reason. Is it good or is
19 it bad to have sand? I assume it's bad if
20 it's not allowed.
21    A. There are sands placed in levees
22 in different locations with clay caps on
23 top. So to say that a sand could never be
24 used in a levee section, I wouldn't want to
25 make that generalization. Because there are

Page 193

1  occasions where you can place sand in the
2  levee section and then cover it with clay.
3     Q. Is the reason why you don't want
4  sand is because sand is not resistent to
5  erosion and does not offer the same
6  stability as less permeable materials such
7  as clays?
8     A. I wouldn't say less stable but
9  because of the erodibility, the ability to
10 hold back water at that given still-water
11 level.
12    Q. So the reason why sand is not
13 allowed is because of its inability to hold
14 back water, and the other reason was what?
15    A. Erodibility.
16    Q. Erodibility. Now, erodibility
17 occurs when you have overtopping. That's
18 one of the things that happens on the back
19 side of this?
20    A. Yes.
21    Q. So if you have a sand-constructed
22 levee with overtopping, you have a greater
23 probability of erodibility occurring, the
24 erosion of the levee?
25    MR. SMITH:

49 (Pages 190 to 193)

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4