Page 194

1    Are you asking him that question
2  about the performance of the MRGO levees
3  now?
4    MR. KOHNKE:
5    No.  The design and construction
6  of those levees from the '60s through the
7  '80s.
8    MR. SMITH:
9    Since he's testified that there
10 wasn't any sand in these levees, I'm not
11 sure how that's a question about these
12 levees.
13   MR. KOHNKE:
14   I'm sorry.  What did you say,
15 Mr. Smith?
16   MR. SMITH:
17   He's testified that there wasn't,
18 to his knowledge, any sand in these levees
19 so I fail to see how that could be a
20 question about these levees.
21   MR. KOHNKE:
22   Well, because just in the offhand
23 chance that somebody concludes there was
24 sand there, then I think I would like to
25 have the standard that the Corps expects

Page 195

1  their levees to be built to so that the
2  trier of fact can decide, if there is sand,
3  whether that standard was met.  I think I'm
4  entitled to that.
5    MR. SMITH:
6    I think so too, through your own
7  experts.  I'm going to instruct him not to
8  answer the question.
9    MR. KOHNKE:
10   And the question you are
11 instructing him not to answer is?
12   MR. SMITH:
13   The reporter can read it back.
14   MR. KOHNKE:
15   Well, then, let me ask a new one
16 and see if you give him a similar
17 instruction.
18 EXAMINATION BY MR. KOHNKE:
19   Q.  When sand is used in the
20 construction of a levee, it renders that
21 levee more susceptible to erosion?
22   MR. SMITH:
23   I'm instructing him not to answer
24 that question because these were not sand
25 levees.

Page 196

1    MR. KOHNKE:
2    Well, I understand you may not
3  have thought they were and I understand you
4  may not have that wanted them to be, but you
5  do understand they may very well turn out
6  factually to have been constructed with
7  sand.
8    MR. SMITH:
9    Right.
10   MR. KOHNKE:
11   And so in that event, you don't
12 have to worry about it if it's not true.  If
13 you say it didn't happen, it didn't happen
14 and you don't have to worry about it.  But
15 in the event there is any sand in the levees
16 I'm entitled to find out what his
17 expectations would be.
18   In other words, why do you have
19 the design characteristic or the design
20 requirement that there be no sand.  That's
21 where I'm going.
22   MR. SMITH:
23   You've already asked him that and
24 he's answered that, but that's not the
25 question you are asking him.

Page 197

1    MR. KOHNKE:
2    Well, I'm entitled to this
3  information.  If they have a standard that
4  prohibits sand, I need to know the reasons
5  why, because it just may turn out factually
6  that there was sand.
7    MR. SMITH:
8    To the extent you are asking him
9  now, it's a hypothetical question, which is
10 not a proper question for this witness.
11 EXAMINATION BY MR. KOHNKE:
12   Q.  What effect does wave action have
13 on a levee --
14   MR. SMITH:
15   I'm going to instruct him not to
16 answer.  I'm sorry, I thought you were
17 finished.
18   MR. KOHNKE:
19   Well, go ahead.
20   MR. SMITH:
21   When you say what does it have,
22 that sounds to me like again, an expert type
23 question.  If you are asking him what effect
24 did overtopping have on the MRGO levees,
25 that's a question I think he's been asked

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 198

1  and answered.
2      MR. KOHNKE:
3          Yeah, but I want to ask him, what
4  effect does wave action have on a levee
5  constructed with sand?
6      MR. SMITH:
7          I'm going to instruct him not to
8  answer that question.
9  EXAMINATION BY MR. KOHNKE:
10     Q.  If a levee has -- if there is wave
11 action which overtops a levee, does it
12 produce an accelerated force on the back
13 side?
14     MR. SMITH:
15         Again, I'm going to instruct him
16 not to answer.
17 EXAMINATION BY MR. KOHNKE:
18     Q.  Does proper levee design take into
19 account the possibility of wave action which
20 overtops that levee?
21     MR. SMITH:
22         Again, I'm going to instruct him
23 not to answer.
24     MR. KOHNKE:
25         That is a design question directly

Page 199

1  related to the MRGO levee.  Why are you
2  instructing him not to answer that?
3      MR. BRUNO:
4          For my purposes, forgive me,
5  Mr. Kohnke, may I know what you mean by wave
6  action?
7      MR. KOHNKE:
8          Well, maybe I should define it,
9  because I thought it was obvious.  And if
10 anyone needs to ask me that, then clearly it
11 has other meanings, so I will assume that I
12 need to have it defined.
13 EXAMINATION BY MR. KOHNKE:
14     Q.  Let me ask you.  When a Corps of
15 Engineers representative refers to wave
16 action, the Corps of Engineers compares wave
17 action to the alternative which I believe is
18 still water; is that right?
19         What does wave action mean?
20 Compare it, contrast it to still water or to
21 any other condition that you have to take
22 into account when designing a levee.
23     A.  I would assume the wave force that
24 we -- that we -- or the height of the wave,
25 or the wave -- there is a wave force diagram

Page 200

1  that we assume for a given wave for a given,
2  in this case, standard project hurricane.
3  And that wave, if there is a floodwall, that
4  force will be considered in the design of
5  that floodwall.
6          The same wave for a design of a
7  levee we will design a flood side wave berm
8  to dissipate the energy of that wave before
9  it reaches the crown of the levee.
10     Q.  So the wave berm on the flood side
11 is another way of saying that's at the base
12 of the levee; is that correct?
13     A.  It's a steep -- it's a shallower
14 slope than the main line levee section that
15 extends from the main line levee slope to
16 the crown to some distance down to natural
17 ground surface.
18     Q.  Let me get back to my question.  I
19 want you to try to define for me what wave
20 action is, if that is a definable term and I
21 want you to compare it to still water which
22 is another term used earlier in this
23 deposition.
24     MR. SMITH:
25         I'm going to object to asking him

Page 201

1  to define terms as though he were an expert.
2  If you have a question about whether --
3      MR. KOHNKE:
4          I'm asking the Corps to do that.
5      MR. SMITH:
6          Okay.  Whether the Corps --
7  whether this pertains to the design of the
8  MRGO levee, then why don't you ask him
9  whether they considered wave action in the
10 design of the MRGO levee.
11     MR. KOHNKE:
12         Well, the problem is it won't
13 answer Joe's question.
14     MR. BRUNO:
15         Excuse me.  The reason I asked the
16 question, to be perfectly candid, is because
17 when I heard the word "wave action" I was
18 considering a large vessel traveling up or
19 down the MRGO and causing what I would have
20 called wave action against the levee.  It
21 could also mean the wave action created by
22 wind, and I didn't understand, A, if there
23 was a distinction --
24     MR. SMITH:
25         I think, the problem, I think, I'm

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

## Page 202

1  not trying to be too lawyerly here, is that
2  he has some expertise and I think it's
3  typical to try to draw upon his expertise,
4  but he is not really being presented here
5  today as an expert but as a fact witness.
6  You are attempting to get him to define
7  terms. Why don't you ask him a question.
8  Let him put it in his own words. If you
9  don't understand some of the words he uses,
10 you can certainly ask him to explain the
11 terminology he is using.
12     MR. KOHNKE:
13         Well, I have asked a couple of
14 times and I have been confused, and so I
15 thought following his lead may not work for
16 me. It didn't work for me before.
17         What I want to have done is I want
18 to break down a couple of pieces of what he
19 said. He talked about still water as part
20 of a process, of the design process, and I'm
21 trying to differentiate that still water
22 from what I think of as surge or wave
23 action, which ultimately we know was brought
24 to bear against these levees.
25         And then I will get into the

## Page 203

1  question, but I need to understand what he
2  is using as part of his answer to refine my
3  question.
4      MR. SMITH:
5          I wonder if you could just ask him
6  a question about the performance of the MRGO
7  levees. It sounds like that's where you are
8  going here and maybe you could incorporate
9  that into your question. I think you could
10 get there, but I'm not -- I'm going to
11 instruct him not to answer the abstract
12 expert type of questions.
13     MR. KOHNKE:
14         All right. Well, I'm --
15     MR. SMITH:
16         To the extent that he needs to
17 define terms to explain an answer about the
18 performance of the MRGO levees, I think
19 that's certainly fair.
20 EXAMINATION BY MR. KOHNKE:
21     Q.  With that instruction to the
22 witness in mind, let me ask you, because if
23 you instructed him not to answer then you
24 are not going to answer, but let me ask.
25 Are you capable of defining wave action? Is

## Page 204

1  that something that is capable of
2  definition?
3      MR. SMITH:
4          I'm going to instruct him not to
5  answer.
6      MR. KOHNKE:
7          I'm not asking him for the
8  definition. Come on. I'm asking is it -- I
9  want Judge Fallon to know whether this is a
10 term that can be defined or whether it can't
11 be. Because perhaps this is an academic
12 exercise. You are instructing him not to
13 answer something that he can't answer in the
14 first place. If he can answer it, then you
15 are instructing him not to answer something
16 he can and Judge Fallon can rule upon that.
17     MR. SMITH:
18         You can ask him factual questions.
19 He can either tell you whether he knows the
20 answer to the factual question you ask or
21 not. And if you want to know whether
22 certain terms have technical meanings within
23 the industry or within the profession then
24 that's something properly addressed to an
25 expert in that area.

## Page 205

1      MR. KOHNKE:
2          All right. I object to the
3  instruction that you are giving the witness
4  not to answer and the instruction you are
5  giving me as to what I can or can't do. But
6  I'm not going to beat my head against the
7  wall any longer. Let me go ahead and
8  formulate some questions, but I in no way
9  waive my objections. Let me come back and
10 try and ask some questions to comply with
11 Mr. Smith's limitations that are being
12 placed upon me.
13 EXAMINATION BY MR. KOHNKE:
14     Q.  When designing the MRGO levee
15 system, did the Corps of Engineers take into
16 account that that levee might be overtopped
17 at any point in time when a hurricane came
18 into our area?
19     A.  No. We are not authorized to do
20 so.
21     Q.  You are not authorized to assume
22 that the levee will be overtopped?
23     A.  That assumes a greater amount of
24 water than what the still-water level would
25 be for that given standard project

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 206

1  hurricane.
2      Q.  When you say the Corps is not
3  authorized, give me the name of the entity
4  that prevents the Corps from taking
5  overtopping into account.  What is the
6  higher authority that prevents you?
7      A.  It's a function of -- I can't
8  state the exact document, but when we were
9  given authorization to design and build the
10  MRGO levee, we are told that you will design
11  this levee for the standard project
12  hurricane.  That's what we are authorized to
13  build the levee to.
14      Q.  Who gave you that instruction?
15      A.  This comes from Congress.
16      Q.  Congress gave you an
17  instruction -- Congress gave the Corps of
18  Engineers an instruction that they were to
19  utilize design criteria that did not take
20  into account the possibility that the levee
21  that was going to be built by the Corps
22  would be overtopped?
23      A.  Making the assumption that the
24  levee would be overtopped is assuming that
25  the still water -- let me -- can I finish

Page 207

1  the question?
2      Q.  Yeah, but you are changing my
3  question.  You are saying making the
4  assumption.  I didn't ask you to make the
5  assumption.  I said to take into account a
6  possibility.  There is a big difference
7  between making an assumption when you are
8  designing something versus taking into
9  account a possibility.  That's what I'm
10  asking you.
11      A.  I don't see the distinction there.
12      Q.  Maybe so, but let's get it clear
13  for the record.  Do you understand what my
14  question is?
15      A.  You're asking me -- the question,
16  as I understand it, is asking did we take
17  into consideration that the levee may be
18  overtopped, that the levee elevation would
19  be overtopped by some given storm.
20      Q.  Did you take that into
21  consideration?  That's the question.
22      A.  You are going to have to define
23  the word "consideration."  I'm not sure what
24  you mean by considering.
25      Q.  Was the possibility that it might

Page 208

1  occur and the consequences if it did occur
2  considered or thought about and discussed,
3  part of your design criteria?
4      A.  It's not part of the design
5  criteria.
6      Q.  Okay.
7      A.  And the reason is, if I assume
8  that the levee is overtopped, if I assume
9  that the water elevation is greater than the
10  top of the levee and I take that into
11  consideration or into account in my design
12  calculations, then I am inherently assuming
13  that the water elevation is higher than the
14  still-water level for which I'm authorized
15  to design the levee for.
16      MR. KOHNKE:
17          Could you read back the last half
18  of what he just said.  Just read back the
19  whole answer.  And then I suggest we take a
20  lunch break.
21  (Whereupon, the requested testimony was read
22          by the Court Reporter.)
23  "A.  It's not part of the design criteria.
24  And the reason is, if I assume that the
25  levee is overtopped, if I assume that the

Page 209

1  water elevation is greater than the top of
2  the levee and I take that into consideration
3  or into account in my design calculations,
4  then I am inherently assuming that the water
5  elevation is higher than the still-water
6  level for which I'm authorized to design the
7  levee for."
8  EXAMINATION BY MR. KOHNKE:
9      Q.  Does the still-water level --
10  strike that.
11          In assuming a still-water -- what
12  is a still-water level?  Define that for me.
13      A.  That's the elevation of the water
14  from a given storm surge from that given
15  standard project hurricane.
16      Q.  So you assume a water level from a
17  given storm -- a standard project hurricane,
18  not a given storm, a standard project
19  hurricane?
20      A.  That is correct.
21      Q.  And based upon that still-water
22  level, which is the ultimate height of the
23  water; is that correct?
24      A.  That's correct.
25      Q.  From that standard project

53 (Pages 206 to 209)

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 210

1  hurricane you then design a levee height,
2  design a levee, and that includes the height
3  of the levee?
4      A.  That's correct.
5      Q.  And you are designing a levee that
6  will not be overtopped, because if you know
7  the height of the water through the
8  still-water elevation and you then design a
9  levee, you are not going to design something
10 below that, you are going to design
11 something to meet and defeat that
12 still-water elevation, aren't you?
13     A.  The defeat, as you call it, is
14 going to consider.
15     Q.  To protect, to protect, not
16 defeat, to protect.
17     A.  Okay.  And that additional height
18 is going to be based on the eventual
19 settlement --
20     Q.  Of course.
21     A.  -- and subsidence, that's why the
22 elevation is higher than what the
23 still-water level is.
24     Q.  Based upon the anticipated
25 settlement or subsidence -- which are two

Page 211

1  different things, are they not?
2      A.  Yes.
3      Q.  You are assuming that you will be
4  left with a levee height that will not be
5  overtopped by the still water that your
6  model --
7      A.  For that given standard project
8  hurricane, yes.
9      Q.  For that given standard project
10 hurricane.  And if you have made all of your
11 assumptions, if all of your assumptions are
12 correct and if no hurricane exceeds the
13 standard project hurricane, then you expect
14 no topping?
15     A.  That's correct.
16     Q.  Now, in point of fact the levee
17 was some several feet below the height at
18 which it was supposed to be to meet the
19 requirements of the standard project
20 hurricane still-water elevation?
21     A.  In some locations.
22     Q.  Along the MRGO it was on average
23 of what, two or three feet below the amount
24 needed?
25     A.  Between Bayou Bienvenu and Bayou

Page 212

1  Dupre, that's the approximate elevation.
2  The reason why, there was a section of
3  levee --
4      Q.  So you anticipate that, at least
5  along that stretch, there would be
6  overtopping if a standard project hurricane
7  comes along?
8      A.  Well --
9      Q.  Yes or no?
10     A.  Well, during the lunch break I'm
11 hoping to get what that still-water level
12 was.  I don't have all of these numbers
13 memorized.  Now, it's quite possible that
14 the elevation of the top of the levee may
15 have still been above what I assume the
16 still-water level was.
17     Q.  It's possible but if, in fact,
18 your levee is two to three feet below what
19 you wanted it to be because of subsidence
20 and settlement and if the standard project
21 hurricane comes along, then it is two to
22 three feet below that level needed to --
23     A.  It's two to three feet below the
24 design grade which is higher than the
25 still-water level.  Two different numbers.

Page 213

1  Still-water level is probably -- is
2  approximately 15.
3      Q.  If the --
4      A.  The design grade is 17 and a half.
5  That's how we were short the two and a half
6  feet.
7      Q.  Say that again.
8      A.  The two and a half feet that we're
9  short is the elevation, approximately 15 in
10 some of the areas that we've seen, based on
11 the Lidar survey data -- that's the existing
12 elevation based on the Lidar survey data
13 that we have post Katrina --
14     Q.  15 --
15     A.  -- of the levee sections remaining
16 intact.
17     Q.  So you measured post hurricane
18 using Lidar data?
19     A.  We have an elevation on average of
20 15.
21     Q.  On average of 15.  Okay.
22     A.  The design grade of the levee is
23 17 and a half.
24     Q.  And that's how you get the
25 shortage --

54 (Pages 210 to 213)

Page 214

1    A.  Of two and a half feet.
2    Q.  -- or the settlement and
3 subsidence.
4    A.  Approximately.  The still-water
5 level for the standard project hurricane is
6 not 17 and a half.
7    Q.  What is it?
8    A.  It's something less than that.
9    Q.  What is it?
10    A.  It's approximately 15, but I will
11 get the exact number for you hopefully
12 during lunch.
13    Q.  And the number you are going to
14 get for me will be a number that is
15 incorporated in the standard project
16 hurricane criteria -- not criteria, but
17 conclusions, the formula?
18    A.  The elevation -- it's the
19 still-water elevation developed from the
20 standard project hurricane.
21    Q.  Now, has the Corps of Engineers
22 been criticized for the adoption of the
23 standard project hurricane information that
24 it is using?  I asked that question very
25 badly.

Page 215

1      Is the information that goes into
2 the standard project hurricane used by the
3 Corps of Engineers, has it been criticized?
4    MR. SMITH:
5      Objection, and instruct the
6 witness not to answer.
7 EXAMINATION BY MR. KOHNKE:
8    Q.  When was that standard project
9 hurricane calculation arrived at?  When was
10 the still-water elevation part of it arrived
11 at?
12    A.  In the mid 1960s.
13    Q.  Was it ever updated?
14    A.  No.  We are not authorized to
15 update it.
16    Q.  I didn't ask you that, did I?  I
17 asked you was it ever updated?
18    A.  No.
19    Q.  Now, who prevents you from
20 updating it?
21    A.  The Corps of Engineers needs to be
22 authorized by -- I'm answering your
23 question.
24    Q.  Okay.  Go ahead.  It sounds like a
25 simple question, who, and it's either the

Page 216

1 president, the Congress, the Secretary of
2 the Army, but if it isn't that simple, go
3 ahead.
4    A.  We are authorized by Congress to
5 change elevations or to increase design
6 criteria for any portions of the project
7 that we are currently working on.
8    Q.  Did the Corps of Engineers have
9 communication with the National Weather
10 Service throughout your tenure?
11    MR. SMITH:
12      I am going to object, and instruct
13 him not to answer.
14 EXAMINATION BY MR. KOHNKE:
15    Q.  The National Weather Service has,
16 I think as part of it the National Hurricane
17 Center in Miami; is that correct?
18    MR. SMITH:
19      I'm going to instruct you not to
20 answer.
21 EXAMINATION BY MR. KOHNKE:
22    Q.  Did you ever try to get scientific
23 data incorporated into the standard project
24 hurricane calculation of still-water
25 elevation?

Page 217

1    MR. SMITH:
2      I am going to object as vague.
3 I'm not really sure --
4 EXAMINATION BY MR. KOHNKE:
5    Q.  What is the wind speed and the
6 barometric pressure of the standard project
7 hurricane that the Corps used?
8    MR. SMITH:
9      I'm going to instruct him not to
10 answer.
11    MR. KOHNKE:
12      He is relying upon the standard
13 project hurricane to tell me that the
14 still-water elevation may not have been
15 above the height of the levees as they
16 existed on August 28, yet I can't get into
17 the accuracy or the wisdom of reliance upon
18 that data?
19    MR. SMITH:
20      Correct.
21    MR. KOHNKE:
22      Okay.
23 EXAMINATION BY MR. KOHNKE:
24    Q.  In any event, if the actual
25 elevation of the levee is below that of the

55 (Pages 214 to 217)

Page 218

1  still-water elevation then the Corps would
2  expect there to be overtopping in areas
3  where that condition exists?
4      A.  Yes.
5      Q.  And if there is overtopping and if
6  the levee consists of sandy material it
7  would be an expectation that that sandy
8  material would erode much more rapidly than
9  acceptable material such as clay?
10     MR. SMITH:
11         I'm going to instruct him not to
12  answer.
13     MR. KOHNKE:
14         Let's take a lunch break.
15     THE VIDEOGRAPHER:
16         Going off the record. It's
17  1:03 p.m.
18  (Whereupon, a recess was taken for lunch).
19     THE VIDEOGRAPHER:
20         We are back on the record. It's
21  2:18 p.m.
22  EXAMINATION BY MR. KOHNKE:
23     Q.  Mr. Varuso, let me return to the
24  soil sampling that you testified about. You
25  indicated that you had looked at the logs, I

Page 219

1  think they are called?
2      A.  That's correct.
3      Q.  And you thought you looked at
4  approximately 40 of them over a period of
5  time -- looked at 40 of them recently, but
6  they covered a period of time starting in
7  the mid to late '60s?
8      A.  That's correct.
9      Q.  And in looking at the logs, what
10  specifically were you looking for?
11     A.  Material types, moisture contents,
12  and material classification.
13     Q.  Was that it?
14     A.  Essentially.
15     Q.  And how do these logs read? Tell
16  me what they look like. Is it a column of
17  numbers?
18     A.  Column is a good way to phrase it.
19  It's a -- I guess, if I was going to sort of
20  narrow it down for you, it would be a
21  drawing of a long rectangle, which would
22  indicate the diameter of the boring. And as
23  you go down with depth you would notice
24  varying changes in stratification based on
25  soil laboratory tests that classify the

Page 220

1  materials. And those different symbols
2  would indicate different material types.
3      Q.  So the material type, moisture
4  content, and what other -- what is the third
5  category?
6      A.  Well, I said soil classification,
7  which is essentially material type.
8      Q.  Soil classification which is
9  essentially material type and moisture
10  content at various stratas?
11     A.  Correct.
12     Q.  And they use symbols on these
13  things?
14     A.  That's correct.
15     Q.  What is the symbol used for sand,
16  or is there one?
17     A.  There is a symbol for sand.
18     Q.  What is that?
19     A.  It would just be a series of dots.
20     Q.  And what for peat?
21     A.  A wavy line, that would sort of
22  indicate like, almost like water, I guess
23  you -- typical people would use that as a
24  symbol for water.
25     Q.  And is clay broken down into

Page 221

1  subparts, or is it simply a single symbol?
2      A.  Two material types essentially for
3  clays, CH which stands for a highly plastic
4  clay and CL which is a low plasticity clay.
5      Q.  You want highly -- highly plastic
6  would be better than low plastic for levee
7  construction?
8      A.  They are pretty similar. I
9  wouldn't really discern much difference
10  between the CH and the CL.
11     Q.  Well, if you had to choose which
12  is the better for levee construction
13  material, which would be the better?
14     A.  It would really depend on some
15  other characteristics of the CH and the CL,
16  other than material type. The moisture
17  content and some other characteristics would
18  come into play. I wouldn't be able just off
19  the cuff to say a CH is much better than a
20  CL.
21     Q.  And these borings all go to an
22  identical depth; that is, a similar length
23  and bore?
24     A.  For the same date. In other
25  words, if a series of borings were taken at

56 (Pages 218 to 221)

Page 222

1  the same time, they were taken at the same
2  elevation.
3      Q.  What is the average depth of the
4  boring?
5      A.  Approximately 80 feet in the
6  center line of the levee.
7      Q.  Now, this is all -- everything you
8  have been describing is along the center
9  line of the levee?
10     A.  Correct.
11     Q.  And what type of -- and that is a
12 boring that's done after the levee has been
13 constructed, or what is the word you used,
14 when the layers -- what is the word?
15     A.  Oh, the enlargements.
16     Q.  Enlargements.  That's after the
17 three enlargements?
18     A.  And there was also a series of
19 borings, a series of borings taken prior to
20 the first lift in the 1960s, which gives us
21 an idea of what the foundation conditions
22 are.  And that is used in the stability
23 analysis.
24     Q.  And that was a, just that first
25 lift would have been put on an area that

Page 223

1  was, generally speaking, a spoil bank from
2  the original dredging of the MRGO?
3      A.  There may have been some -- I
4  would imagine there would have been some
5  spoil in that area.
6      Q.  And now, what would be the purpose
7  of sampling the sea bed along the MRGO where
8  dredge material was going to be removed and
9  used to make the levee?
10     A.  To determine material type.
11     Q.  Why?
12     A.  And moisture content.
13     Q.  Why?
14     A.  For the purposes of making sure
15 that the material types being placed in the
16 levee are what we are looking for.
17     Q.  And the moisture content is part
18 of that.  You want a low moisture content?
19     A.  Well, when you are hydraulically
20 dredging, I guess, the moisture content
21 would really give us an idea of how long
22 it's going to take for that water to
23 reside -- to subside, essentially.  That's
24 why it takes so much longer to build a
25 hydraulically-filled levee than it would be

Page 224

1  a compacted levee, because it takes so long
2  for that moisture to leave the levee section
3  before you could continue to pump in
4  additional fill, shape the levee and get it
5  to its grade.
6      Q.  Now, the third lift was done what
7  year, the last one?
8      A.  The third enlargement was done in
9  the early '90s and that was essentially,
10 approximate station 945 to approximately
11 station 1200.  I'm approximating the station
12 numbers.  But that's south of Bayou Dupre,
13 down past where the return levee is, and
14 then the return levee down to Highway 46.
15     Q.  And the enlargement, the last
16 enlargement done north of Bayou Dupre?
17     A.  Would have been in the early '80s.
18     Q.  What took so long to add these
19 enlargements?  Certainly it can't take ten
20 years, 15 on average for the settlement to
21 occur sufficient to add to a levee.
22     A.  It's funding.
23     Q.  Funding.  Okay.
24         And the lack of completion of the
25 levee, to the extent that the MRGO was not

Page 225

1  100 percent complete as you described it,
2  I'm not going to go back into it, that was
3  also due to funding?
4      A.  Repeat your question if you would.
5      Q.  Sure.  When I asked you an earlier
6  question, was the MRGO levee 100 percent
7  completed to its design height, you
8  indicated no.  And I thought you indicated
9  that there was some small percentage of that
10 levee or portion of that levee left to be
11 completed, added to.
12     A.  Yes.
13     Q.  Where was that?
14     A.  Between Bayou Bienvenu and Bayou
15 Dupre, between those two structures, and
16 then approximately 20,000 feet south of
17 Bayou Dupre.
18     Q.  So let's go back to what your
19 original testimony was about the design of
20 this levee and the design heights and so
21 forth.  If I understand correctly, using a
22 standard project hurricane analysis or an
23 analysis of what a standard project
24 hurricane would look like, that analysis
25 produces something known as a still-water

57 (Pages 222 to 225)

Page 226

1  elevation. That still-water elevation is
2  the determining factor for the height to
3  which the levee is going to be designed. Am
4  I stating that correctly?
5      A.  It's part of it.  Over the break I
6  established that the still-water elevation
7  was between 12 and a half -- between
8  elevation 12 and a half and 13 along the
9  MRGO levee that we are discussing today.
10     Q.  Okay.
11     A.  The additional elevation for
12  that --
13     Q.  This is by design?
14     A.  This is by --
15     Q.  Using the standard project
16  hurricane as a criteria for establishing a
17  height?
18     A.  There is a hydraulic analysis that
19  takes place to determine what that elevation
20  is based on that standard project hurricane.
21     Q.  12 and a half to 13 feet?
22     A.  Correct.
23     Q.  This would be the entire length of
24  the MRGO levee?
25     A.  Yes.

Page 227

1      Q.  And you had earlier said in the
2  deposition, I thought, that the still-water
3  elevation was 15 feet?
4      A.  I said it was approximate.  I
5  wasn't quite sure of the exact number but I
6  have established that it's 12 and a half to
7  13.
8      Q.  Okay.  And then I think you said
9  that the levee was actually built, and I
10  don't mean designed but initially built to
11  20 feet, and then because of settlement and
12  subsidence there was an expectation that it
13  would settle to a lower elevation.  Did you
14  say that?
15     A.  That's correct.
16     Q.  So the design level that was
17  anticipated you would arrive at after a
18  20-foot levee is initially constructed
19  through subsidence and settlement would be,
20  I thought you said, 17 and a half feet?
21     A.  That's correct.
22     Q.  So what name do you give the 17
23  and a half feet?  Is that just a design
24  height?
25     A.  That's the design elevation,

Page 228

1  design grade.
2      Q.  Design --
3      A.  Grade.
4      Q.  -- grade.  Now, I had earlier
5  asked you some questions about could the
6  Corps have done more to prevent overtopping
7  and so forth, and I forget exactly at what
8  point this information came in, that's why I
9  vaguely reference the question.  But you
10  indicated that the Corps was prohibited, or
11  if not prohibited, you said you were
12  restricted in your abilities to build the
13  levee higher than a certain height and I
14  thought the reference you used was the
15  still-water elevation.
16     A.  I believe your question was
17  whether or not we could design it for
18  overtopping, not the elevation of the levee.
19     Q.  Correct.  That probably was it.  I
20  think it was.  Go ahead.  Give me the answer
21  that you gave in answer to that question.
22  Could the Corps have designed the levee in
23  such a way as to prevent overtopping?  And I
24  think your answer was:  We were limited in
25  our design to the still-water elevation.  Is

Page 229

1  that what you said?
2      A.  We were limited in the elevation
3  of the levee based on that being one of the
4  criteria, the still-water elevation, which
5  is a function of the standard project
6  hurricane in addition to whatever wave loads
7  that they assume, whatever wave lot that
8  they assume, which is also a function of the
9  wave berm design.  So those two factors come
10 into play.
11     Q.  You are saying the Corps of
12 Engineers was limited in the design height
13 or the design grade to what height?  What
14 number are you saying?
15     A.  17 and a half is the design grade.
16     Q.  But where does the still-water
17 elevation come in?  Is that a limitation in
18 any way?
19     A.  It's a function of the design.
20 I'm not sure I understand --
21     Q.  Let me try to back up and give you
22 this information.
23     A.  I want to make sure I answer your
24 question.
25     Q.  Okay.  I want to know whether the

58 (Pages 226 to 229)

Page 230

1  Corps could have and should have anticipated
2  overtopping. And we ended up getting into
3  an area where you said: We built the levee
4  to a height that would take into account
5  still-water elevation.
6      A.  That's correct.
7      Q.  And the implication of your answer
8  to me was, and if I'm wrongly assuming tell
9  me now, that we couldn't go higher than that
10 without some specific authority from
11 Congress.
12     A.  Let me rephrase my answer to the
13 question and see if I can clarify it for
14 you.
15     Q.  Please.
16     A.  The first variable that comes into
17 play in determining what that design grade
18 is, which is 17 and a half, the MRGO, the
19 one variable is the still-water elevation,
20 which in this case is elevation 13. In
21 addition to that, we have to assume that the
22 storm, this standard project hurricane will
23 produce some wave. The difference between
24 the still-water level and the 17 and a half
25 is the elevation needed for that wave runup.

Page 231

1  It's an additional four and a half feet for
2  wave runups. So from 13 to 17 and a half,
3  that's four and a half feet for wave runup.
4      So our design grade is 17 and a
5  half for that given still-water level with
6  the wave load for that given standard
7  project hurricane.
8      Q.  Okay.
9      A.  Okay. In addition to that -- and
10 those are basically hydraulic
11 considerations, hydraulic concerns of how
12 high the water will be and how much wave do
13 we expect from that given storm.
14     Q.  Is the expectation of wave height
15 or wave runup also a part of the standard
16 project hurricane calculation? In other
17 words, is it one of the numbers that is
18 produced when you come up with the standard
19 project hurricane?
20     A.  That's right.
21     Q.  Or is that a separate assumption?
22     A.  No. It's based on the standard
23 project hurricane. Hydraulic engineering
24 analyses determine those -- determine those
25 values.

Page 232

1      Q.  Okay.
2      A.  So those are the hydraulic
3  considerations that go into the design grade
4  of 17 and a half.
5      In a perfect world, if I was -- if
6  we could build the levee in an area where it
7  would never settle and never subside, then
8  we could leave the levee at 17 and a half
9  and then walk away. But that doesn't
10 happen. We know the levee is going to
11 settle. The day after we leave or the day
12 after they finish constructing the levee, we
13 will start seeing settlement. Because of
14 that, we add the additional two and a half
15 feet.
16     Q.  To get the 20.
17     A.  To get the 20, because we want to
18 have some time for settlement. We don't
19 want to basically build the levee to 17 and
20 a half and six months later be deficient.
21 So the geotechnical considerations for the
22 levee elevation is the two and a half
23 additional feet we need for settlement.
24     Now, with that in mind, to answer
25 your question about assuming overtopping in

Page 233

1  the design. If I'm to consider that the
2  levee will be overtopped, then in order for
3  the levee to get above -- over and above 17
4  and a half or even 20, for that matter, then
5  the still-water level -- in other words, the
6  20 encompasses settlement and wave runup on
7  top of the still-water elevation.
8      Those things in mind for that
9  storm, that water should never overtop the
10 levee. The only way for water to overtop
11 that levee would be for the still-water
12 level, which is the base elevation -- the
13 base elevation, if you will, of our analysis
14 of how high the levee will be, that
15 elevation has to be higher in order for that
16 to overtop, to make the same additions.
17     So now, in order to get above
18 elevation 20, let's say, the still-water
19 level would have to be, say, 15 and a half
20 and then wave runup on top of that would
21 give me above and beyond 20.
22     Q.  Correspondingly higher and so
23 forth.
24     A.  That's right. So the only way you
25 could assume that a levee at elevation 20

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

**Page 234**

1  would be overtopped was that the base
2  elevation for that storm would be higher
3  than elevation 13.
4     Q.  And I know you personally have no
5  knowledge and you are not here to talk about
6  your personal knowledge anyway, but someone
7  or some entity at the Corps made a decision
8  on what data to use to formulate the
9  standard project hurricane; is that a fair
10  statement?
11     A.  Yes.
12     Q.  And that was done in what year?
13  The one that ended up controlling the design
14  of the MRGO levee.
15     MR. SMITH:
16         I'm going to instruct the witness
17  not to answer.
18     MR. KOHNKE:
19         Well, this gets right to the heart
20  of design.  When you design a hurricane, the
21  most critical thing, it seems to me, is to
22  assume certain factors that go into a
23  standard project hurricane.
24     MR. SMITH:
25         All right.  If you know, you may

**Page 235**

1  answer.
2     THE WITNESS:
3         The exact year, I can't say.  What
4  I can tell you is that the original sets of
5  plans and specifications for that levee was
6  done in 1967.  So somewhere just prior to
7  1967 those analyses would have been
8  performed.
9  EXAMINATION BY MR. KOHNKE:
10     Q.  And in 1969 Hurricane Camille hit
11  the Gulf Coast.  You are aware of that, I
12  believe.
13     A.  Yes.
14     Q.  And Hurricane Camille was a
15  category five, I believe, when it struck.
16  We now know through the Simpson-Saffir
17  rating, whatever you want to call it,
18  categorization, it is now -- it is -- it was
19  rated today, maybe back then they had that,
20  I don't know, but hurricane five; isn't that
21  correct?  Category five.
22     MR. SMITH:
23         I'm going to instruct him not to
24  answer questions about that.  I don't see a
25  connection to the topics upon which he is

**Page 236**

1  authorized to speak today.
2  EXAMINATION BY MR. KOHNKE:
3     Q.  In 1965 Hurricane Betsy hit the
4  New Orleans area, did it not?
5     A.  Yes.
6     Q.  And that same year is when
7  Congress passed the Flood Control Act of
8  1965?
9     A.  That's correct.
10     Q.  That gave rise to the Lake
11  Pontchartrain and vicinity hurricane
12  prediction system?
13     A.  That's correct.
14     Q.  Was the hurricane of 1965 known as
15  Hurricane Betsy used to calculate the
16  standard project hurricane?
17     A.  It was considered.  It wasn't the
18  only consideration, but that was part of the
19  hydraulic analysis.
20     Q.  So the standard project hurricane
21  considered a number of previous hurricanes,
22  did it not?
23     A.  To my knowledge, yes.
24     Q.  And your testimony is that
25  Hurricane Betsy in 1965 was one of the

**Page 237**

1  hurricanes that was put into the mix, its
2  meteorological conditions, track, all of the
3  measurements taken in '65 were also
4  included?
5     A.  I'm not a hydraulic engineer, so
6  to say what exact data went into that
7  analysis, I wouldn't be able to answer that
8  question.
9     Q.  But essentially what the standard
10  project hurricane does is it attempts to
11  look forward in time and predict what sort
12  of forces we need to design a hurricane
13  protection system to meet?
14     MR. SMITH:
15         I'm going to instruct him not to
16  answer this question.  This is another area
17  that I know you have an interest in.  It's a
18  specifically identified area.
19     MR. KOHNKE:
20         Well, look, I will give you some
21  credit here.  There is some overlap in the
22  notice.  But when one is designing a
23  hurricane system I don't know any way I can
24  ask him questions about that design without
25  knowing what goes into the design.  And one

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 238

1  of the things that I'm asking him is, is the
2  standard project hurricane, that was at the
3  core of the design, in fact, it determines
4  the design, whether that is an attempt to
5  predict what future forces will hit the
6  area.
7       That, to me, is -- not only is it
8  at the core of this case, but it's also at
9  the core of Question No. 2 that we have
10  agreed upon this witness is here to testify
11  about. Let me --
12       MR. SMITH:
13          Can you just -- yeah, can you
14  reread the question?
15       MR. KOHNKE:
16          I don't think there is any sharp
17  edges on this question.
18       MR. SMITH:
19          Okay. I understand. Could you
20  just restate the -- could you read back the
21  question, please.
22  (Whereupon, the requested testimony was read
23          by the Court Reporter).
24  "Q.  But essentially what the standard
25  project hurricane does is it attempts to

Page 239

1  look forward in time and predict what sort
2  of forces we need to design a hurricane
3  protection system to meet?"
4       THE WITNESS:
5          Again, not being a hydraulic
6  engineer, I don't know that I would say you
7  are looking forward in time. You are
8  actually looking back in time and developing
9  data, historical data to determine what --
10  EXAMINATION BY MR. KOHNKE:
11       Q.  To predict a design?
12       A.  Well, to come up with an elevation
13  of what is expected to --
14       Q.  You're looking back --
15       A.  What is reasonable, what would be
16  a reasonable storm to hit the area based on
17  historical data.
18       Q.  All right. You said it better
19  than I can. Let me see if I can restate
20  what you just said. You are looking back in
21  time to predict what sort of reasonable
22  storm one can expect in the future in order
23  to, in the present, build a hurricane
24  protection system?
25       A.  I think that's reasonable to say,

Page 240

1  yes.
2       Q.  All right. Now, and the reason
3  why we look back in time is because there is
4  certainty in looking back, whereas in
5  looking forward you are only trying to
6  predict the future, which is uncertain?
7       A.  Safe to say.
8       Q.  Would it be feasible as events
9  unfold into the '60s and '70s and '80s, and
10  as more information is obtained, to include
11  that new certain information in your
12  modeling or in your assumptions so that any
13  future protection you are seeking to design
14  for is, in fact, suitable?
15       A.  It would be, but we would have to
16  be authorized to do so.
17       Q.  By whom?
18       A.  By Congress.
19       Q.  That sort of gets us back to where
20  I was in the beginning.
21       Now, have you personally -- have
22  you personally gone back and looked at any
23  of the authorizing legislation, any of the
24  mandates from Congress?
25       MR. SMITH:

Page 241

1          I'm going to instruct him --
2       MR. KOHNKE:
3          Well, wait.
4       MR. SMITH:
5          -- not to answer that question.
6       MR. KOHNKE:
7          Robert, let me address this.
8  Mr. Varuso has at various times said: We
9  are not authorized by Congress. And I hear
10  his testimony. It's part of the record.
11  What I want to do now is to find out the
12  basis for that statement. It may be that he
13  has a very good basis. It may be that he
14  has no basis, but I believe I'm entitled to
15  find out the basis for that statement.
16  We've heard it a number of times.
17          What I want to do is find out what
18  he's looked at to know that that's a true
19  and accurate statement. I didn't ask him
20  about it. He brought that out as a reason
21  why something isn't being done that I did
22  ask about.
23  EXAMINATION BY MR. KOHNKE:
24       Q.  Can you answer that question
25  subject to his --

61 (Pages 238 to 241)

Page 242

1   MR. SMITH:
2       Before you answer it --
3   MR. KOHNKE:
4       It's just been suggested to me
5   that Mr. Varuso has on a number of occasions
6   cited that mandate or that restriction as a
7   limitation on their design abilities at the
8   Corps of Engineers. And so for these
9   reasons I think I have to explore this. And
10  I think in fairness I should be allowed to.
11  MR. SMITH:
12      I will allow him to answer.
13  MR. KOHNKE:
14      Thank you.
15  THE WITNESS:
16      I have not personally looked at
17  the mandate.
18  EXAMINATION BY MR. KOHNKE:
19  Q.  Fair enough. What, then, do you
20  rely upon in answering the question as you
21  have?
22  A.  I would phrase it as general
23  knowledge of employees involved in the
24  projects, in particular, the Lake
25  Pontchartrain and vicinity protection.

Page 243

1   People involved in designing the different
2   levee lifts, enlargements and whatnot, it's
3   general knowledge that we have through the
4   different project managers that that is the
5   case.
6   Q.  Okay. So different project
7   managers in conversation have mentioned to
8   you, suggested to you that the Corps is
9   limited in its design abilities to what
10  Congress has mandated?
11  A.  That we're -- those conversations
12  relate to the fact that we are authorized to
13  design the levees to a given elevation based
14  on that standard project hurricane and
15  nothing more.
16  Q.  Have you specifically heard from
17  any source or learned from any source by
18  conversation or written word or any other
19  way that Congress has actually gone on
20  record in some fashion as saying that these
21  are the criteria for you to use in
22  establishing a design for the hurricane
23  protection levee down in St. Bernard,
24  particularly the MRGO? Has Congress gone so
25  far as to tell the Corps what the

Page 244

1   limitations of its design shall be? Have
2   you heard that, is what I'm asking?
3   A.  Well, the limitations on the
4   design, and I assume you are again referring
5   to elevations of still water with respect to
6   the standard project hurricane.
7   Q.  Yes, that's fair enough.
8   A.  That is based on, obviously
9   Congress is not going to tell us: You are
10  going to design it to elevation 13. They
11  are going to say: You need to take the data
12  you have, and they are going to rely on the
13  hydraulic engineers and their knowledge of
14  the science to determine what that elevation
15  is going to be.
16  Q.  Who is going to rely upon the
17  hydraulic engineers?
18  A.  Congress would.
19  Q.  Congress would.
20  A.  In other words, they are
21  instructing the Corps of Engineers, or they
22  are authorizing the Corps of Engineers to
23  build a levee protection system that would
24  protect the area for a standard project
25  hurricane. And it's up to the Corps of

Page 245

1   Engineers to determine what criteria goes
2   into the standard project hurricane.
3   Q.  Did Congress actually, as far as
4   you have been made aware, actually make
5   reference to a standard project hurricane,
6   or did they say protect the area from
7   hurricanes?
8   A.  To my knowledge, the word
9   "standard project hurricane" is used in
10  the -- to my knowledge.
11  Q.  Okay. Now, let me get back to --
12  I got a little bit afield here, but when I
13  talked about the borings that were done of
14  the center line of the levee, you mentioned
15  that at each strata or stratum there are
16  these symbols that indicate the content. Is
17  there a moisture symbol?
18  A.  There is a moisture number,
19  moisture content associated with that.
20  Q.  Now, once these samples are
21  taken -- well, let me back up. Was there
22  any sample taken along the 12-mile stretch
23  that indicated from the borings that there
24  was either too much moisture or too much
25  sand?

62  (Pages 242 to 245)

Page 246

```
1       A.  Not to my knowledge of the ones I
2   have seen, not sand.
3       Q.  Of course, the amount of moisture
4   and the amount of sand in 80 feet wouldn't
5   be as great a concern as in one foot, would
6   it?
7       A.  Are you referring to the upper one
8   foot?
9       Q.  Upper one foot versus the bottom
10  of the boring, which is at a depth of
11  80 feet.
12      A.  Well, with respect to erosion, no.
13      Q.  With respect to erosion.  Okay.
14          Now, when you say you have looked
15  at these borings and some 40 of them
16  somewhat recently, were you focused on all
17  80 feet or were you focused on the top?
18      A.  20 feet.
19      Q.  20 feet.
20      A.  Essentially the top 20 feet, which
21  would have been the fill that was used to
22  create the levees.
23      Q.  What would happen when a boring
24  would indicate that up in the top 20 feet
25  there was more moisture or more sand than
```

Page 247

```
1   the Corps specified allowable?
2       A.  Again, I don't recall seeing any
3   of the borings that showed any symbol for
4   just -- just sand, which would be a symbol
5   that showed just --
6       Q.  Pure sand.
7       A.  -- the dots as pure sand.  I don't
8   recall seeing any sample that indicated pure
9   sand in the levee section.
10      Q.  Did you recall seeing some that
11  indicated a mixture of sand and other
12  materials?
13      A.  There was some mix of sand and
14  silt -- I mean, excuse me, clays, silts and
15  I believe there might have been one or two
16  borings that showed a silty sand.
17      Q.  Now, when it showed a silty sand,
18  was that remediated in some way after the
19  boring was done?
20      A.  The subsequent lift would have
21  been placed and for the next enlargement.
22  So the ones I'm referring to may have been
23  prior to the second enlargement.
24      Q.  Well, between the first and the
25  second enlargement, how many years elapsed?
```

Page 248

```
1       A.  Between the first and the second
2   enlargement about -- I think it was about
3   five years.
4       Q.  And the --
5       A.  No.  I'm sorry, probably closer to
6   ten years I believe.
7       Q.  All right.  So for ten years there
8   was a levee in place with perhaps sand at
9   the top indicated by the boring that was
10  going to be remedied with the next
11  enlargement?
12      A.  Well, I'm not sure if I would use
13  the word "remedied."  You are referring
14  to --
15      Q.  Well, remediated.
16      A.  Well, you need to keep in mind
17  that you need to look at the levee section
18  as a whole.  If the majority of the section
19  shows all or mostly clay, predominantly
20  clay, then I wouldn't expect to have an
21  issue with the levee if it's predominantly
22  clay.
23          In the areas where we saw the
24  mixture of materials then more than likely
25  in the subsequent lift, the second
```

Page 249

```
1   enlargement, they would have placed clay
2   material on top of that section and covered
3   that, those silty sands and silts.
4       Q.  Where did these first and second
5   enlargements come from?
6       A.  The same area, the flood side of
7   the existing levee section.
8       Q.  Dredged materials?
9       A.  I believe so, yes.
10      Q.  And we are talking now between
11  Bayou Bienvenu and Bayou Dupre?
12      A.  And also south of Bayou Dupre.
13      Q.  Okay.  And then there was a third
14  enlargement at the southernmost end of this
15  MRGO?
16      A.  Correct.
17      Q.  And that was between where and
18  where?
19      A.  Like I said, it was around station
20  945, I believe is the station number.  It's
21  about four miles south of Bayou Dupre.  From
22  that location down to that return levee that
23  I referred to, and then there is a section
24  of levee that's sort of perpendicular to
25  that 12-mile stretch we are talking about.
```

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 250

1 And that levee intersects Highway 46. That
2 was a stretch that was raised to elevation
3 20 in 1993.
4     Q.  Now, earlier in the deposition,
5 before lunch, I had asked you about how much
6 sand was allowable and at one point you
7 indicated that no sand, according to the
8 specifications that you recall that the
9 Corps had for its contractors, that no sand
10 was allowable. Have you checked over lunch
11 to determine whether that was a correct or
12 an incorrect statement?
13     A.  I was trying to get my hands on
14 those specs and I have not had any luck with
15 that.
16     Q.  All right. So to the extent that
17 those regulations provide for some sand that
18 is allowable in the construction of a levee
19 versus no sand, you don't know --
20     A.  I know since approximately 1982
21 the spec has not changed to not allow sand
22 materials in a levee section.
23     Q.  Since 1982 sand has not been
24 allowed in a levee section?
25     A.  Correct.

Page 251

1     Q.  And the last --
2     A.  That's pure sand now, I'm talking
3 about. It would be symbolized as an SP in
4 those boring holes.
5     Q.  You are talking about pure sand?
6     A.  Yes.
7     Q.  But some percentage of sand would
8 be allowed, is that what I understand?
9     A.  I would say that engineering
10 judgment would have to be used to see
11 whether or not there was an issue with that.
12     Q.  What is the percentage that is
13 allowable, or is that subjective?
14     A.  Like I said, I think you have to
15 use engineering judgment.
16     Q.  And whose engineering judgment
17 would that be?
18     A.  The engineering judgment of
19 whatever engineer is working on the --
20     Q.  Someone at the Corps?
21     A.  Right.
22     Q.  And would one engineer -- has the
23 same engineer been involved in the
24 construction of the MRGO levee from the '60s
25 through?

Page 252

1     A.  No.
2     Q.  So we are talking about how many
3 different individuals have been involved?
4     A.  It would be hard to say.
5     Q.  And each one of them might have a
6 different judgment about that, if there is
7 no standard that's been published?
8     A.  Well, let me clarify that then.
9 The Corps of Engineers' position behind this
10 with respect to their guide specifications
11 for levee construction since 1982, as I
12 said, did not allow sand to be placed in the
13 levee sections.
14     Q.  Can I interrupt you? Where do I
15 find this?
16     A.  The guide specifications?
17     Q.  Yes.
18     A.  We have them.
19     Q.  Is that in the public domain? Is
20 that publicly available?
21     A.  If it's on the web --
22     MR. KOHNKE:
23         Mr. Smith, can you answer that?
24     MR. SMITH:
25         I don't know.

Page 253

1     MR. KOHNKE:
2         You can't. Okay.
3 EXAMINATION BY MR. KOHNKE:
4     Q.  Why don't you go ahead and try to
5 answer that.
6     A.  I don't know whether or not it's
7 on the website, that we've been referring
8 to, but it's available.
9     MR. KOHNKE:
10         Joe, you got it? My Mexican
11 friend seems to have it.
12     MR. BRUNO:
13         Yes.
14     MR. KOHNKE:
15         Si.
16     MR. BRUNO:
17         Si.
18     THE WITNESS:
19         All right. So during the
20 construction of the levee, and I referred to
21 this before too, that the quality assurance
22 and quality control is in place during the
23 construction of the levee to insure that
24 those same materials are not placed in the
25 levee section, and still would have been

64 (Pages 250 to 253)

Page 254

```
1   part of the levee -- part of the
2   specifications and contract requirements
3   since 1982.
4   EXAMINATION BY MR. KOHNKE:
5      Q.  Okay.
6      A.  And the engineers, construction
7   engineers and the design engineers would
8   have done everything they could have working
9   with the contractors to insure that the sand
10  was not placed in the levees.
11     Q.  That's the way it's supposed to
12  work?
13     A.  That's the way it typically does
14  work.
15     Q.  Now, going back to the standard
16  project hurricane and the design grade of
17  the levee in question, the Corps would build
18  a levee -- the levee along the MRGO to a
19  height of approximately 20 feet anticipating
20  settlement and subsidence, correct?
21     A.  Correct.
22     Q.  And that anticipated settlement
23  and subsidence was going to then bring the
24  levee down to the design grade of 17 and a
25  half feet?
```

Page 255

```
1      A.  At some point.
2      Q.  At some point.  So the two and a
3   half feet of height that was originally
4   built was expected to disappear over a
5   period of time because of subsidence and
6   settlement?
7      A.  That's correct.
8      Q.  That period of time is not an
9   exact amount of time, is it?
10     A.  We estimate it.  Using soil
11  laboratory test data, we make an assessment
12  of what we expect the settlement to be.
13     Q.  What was that assessment in the --
14  during the time that these enlargements were
15  made?
16     A.  I would have to look at those
17  because I don't have those particular
18  numbers.
19     Q.  Was it measured in --
20     A.  Again I would say that it's around
21  two and a half feet, that's where the two
22  and a half feet came from.  From the 17 and
23  a half to elevation 20, they expected about
24  two and a half feet of settlement.
25     Q.  Now, was -- as far as you know,
```

Page 256

```
1   was the Congress aware of the fact that the
2   Corps was building a levee to a height of in
3   excess of the 17 and a half foot design
4   grade because of this anticipated settlement
5   and subsidence?
6      A.  I'm not sure whether they were
7   aware of that or not.
8      Q.  But clearly there was an ability
9   of the Corps to actually construct a mound
10  of dirt constituting a levee in excess of
11  the height of 17 and a half feet, albeit for
12  some limited period of time until settlement
13  occurs?
14     A.  That's correct.  As I said before,
15  in a perfect world if we know -- we would
16  not have expected any settlement, then we
17  build it to 17 and a half and we could walk
18  away.  But we can't do that, because we have
19  to maintain that at least elevation of 17
20  and a half.
21     Q.  In the aftermath of Katrina, did
22  the Corps of Engineers grade the performance
23  of the MRGO levee following that hurricane?
24     A.  I'm not sure what you mean by
25  grade.
```

Page 257

```
1      Q.  Well, after the hurricane the
2   Corps obviously had to go out and assess the
3   performance of the levee system.
4      A.  Okay.
5      Q.  Was some written report created
6   within the Corps of Engineers to establish
7   the performance of the levee at various
8   locations, or conversely, the failure of the
9   levee at various locations, an internal
10  Corps document?
11     A.  Internal to our district?
12     Q.  Internal to the Corps.
13     A.  Well, the Corps of Engineers
14  New Orleans District or the --
15     Q.  No.  If you want to limit it to
16  the New Orleans District in initially
17  answering, fine, but I'm asking about the
18  Corps of Engineers generally.
19       I assume, because it's a
20  government agency and it is the Army, that
21  some written report was created in the
22  aftermath of Katrina reporting on this event
23  and the successes or failures of what had
24  been constructed by the Corps.
25       Now, I'm asking you about that
```

65 (Pages 254 to 257)

Page 258

1    written document, that thing that talks
2    about performance.
3        A.  With the exception of the IPET
4    report, I'm not aware of another report.
5    There could be, but I'm not aware of one.
6        Q.  I don't want to get into IPET now
7    because I would like to keep going.  But
8    IPET came together at a later point in time.
9    Before it comes together and begins whatever
10   it begins to go out or
11   send somebody out to make an assessment, an
12   immediate assessment with the possibility of
13   additional hurricanes coming as to what was
14   the status of the levee along the MRGO.
15       A.  Yes.
16       Q.  Did that happen?
17       A.  Yes.
18       Q.  Did that person only come back and
19   verbally report what he saw or did --
20       A.  There was a report.  I believe
21   it's referred to as a PIR, project -- I'm
22   forgetting the acronym.
23       Q.  You have got a lot to deal with,
24   I'm sure.
25       A.  Referred to as a PIR.  That report

Page 259

1    is basically what we use to -- in the
2    various areas to justify the funds we needed
3    to repair the various areas, whether it be
4    flood walls or levees.  So in the area of
5    the MRGO, there would have been a report put
6    together saying:  This is the condition of
7    the levee as exists post Katrina.  This is
8    what we plan to do to repair the section
9    with certain costs and whatnot in place.
10       Q.  And in order to get to the second
11   half of what you just talked about, this is
12   what we plan to do, get that plan
13   formulated, get formulated within the Corps
14   prior to and independent of whatever IPET
15   was doing?
16       A.  Yes.
17       Q.  What written document attends that
18   plan of what you had planned to do.  Is that
19   also called a PIR, or is there another name
20   for it?
21       A.  Well, the specific documents would
22   be the contract plans and specifications
23   that were put together for the different
24   contracts.  In particular for the MRGO
25   levees, two contracts put together.  By

Page 260

1    contracts, I mean sets of plans and
2    specifications between Bayou Bienvenu and
3    Bayou Dupre and then south of Bayou Dupre.
4    So the specifics in the designs would have
5    been the plans and specifications for those
6    two contracts.
7        Q.  What input went into -- what is
8    the source of input that went into those
9    plans and specifications for those two
10   contracts?
11       A.  What do you mean by the source?
12   What source of --
13       Q.  Well, somebody -- someone at the
14   Corps, I presume, had to put together
15   specifications for bidding?
16       A.  Correct.
17       Q.  And somebody had to decide at some
18   point, this time we are going to use clay,
19   we are going to barge it in, and we are
20   going to compact it.  What is the source of
21   those decisions?
22       A.  Just to qualify your question, you
23   said:  This time we are going to use clay.
24   Take a little --
25       Q.  All right.  Let's forget that.

Page 261

1        A.  Okay.
2        Q.  We are going to use clay from
3    Mississippi along the Pearl, near the Pearl
4    River as opposed to dredged materials.
5        A.  Okay.  Well, that decision also
6    came later in the construction of the levee.
7        Q.  When did that decision get made?
8        A.  That was a function, again, of
9    realizing that we did not have time to, A,
10   hydraulically construct the levees out of
11   hydraulic fill.
12       Q.  But when is my question?
13       A.  December time frame, December,
14   January.
15       Q.  December of 2005, January of 2006?
16       A.  That's correct.
17       Q.  Who was involved -- was the
18   decision to use clay that comes from the
19   Mississippi -- from the Pearl River area of
20   Mississippi, put it into barges and to bring
21   it to the site where the work was going to
22   be performed, was all of that decision made
23   about that source of material within the
24   Corps of Engineers?
25       A.  Yes.

PLAINTIFFS' OPPOSITION TO USA'S MOTION FOR PROTECTIVE ORDER - EXHIBIT 4

Page 262

1   Q.   That was obviously made sometime
2   before December when the bids -- when the
3   specifications were written?
4       A.   It would have been made after the
5   plans and specifications were written.  The
6   decision to barge the material is what you
7   are asking me.  The plans and specifications
8   were put together in October.
9       Q.   Did the plans and specifications
10  specify that the clay was to be obtained
11  from Pearl River?
12      A.   No.
13      Q.   It just said clay?
14      A.   We did a borrow pit, an adjacent
15  borrow pit on the protected side of the
16  levee alignment for both contracts, for
17  Bayou Bienvenu to Bayou Dupre and south of
18  Bayou Dupre.  We gave the contractor what we
19  call a borrow pit.
20      Q.   You gave them a borrow pit, what
21  does that mean?  You designated a
22  complete --
23      A.   We designated an area, we took a
24  series of borings, borrow borings, as I
25  referred to before, 20-foot borings that

Page 263

1   showed what material existed in that area to
2   be excavated.
3       Q.   Where was that area physically,
4   geographically?
5       A.   On the protected side of the levee
6   embankment approximately 200 to 300 feet
7   away from the center line of the levee.
8       Q.   On the, I guess it would be on the
9   west side of the levee?  Well, actually --
10      A.   I prefer to call it the protected
11  side.
12      Q.   Protected side.
13      A.   The land side of the levee.
14      Q.   That would be essentially
15  marshland?
16      A.   Essentially.
17      Q.   It would be between the 40 Arpent
18  and the -- well, what would it be between?
19  Define it for me if you can.
20      A.   It's between the non-federal levee
21  that protects the -- St. Charles where there
22  are public stations along that same
23  allotment.  So there is a non-federal levee
24  in the Chalmette/Meraux area.  So between
25  that levee and then the federal levee.

Page 264

1       But you are better off just
2   understanding that it's approximately 200 to
3   300 feet away from the center line of the
4   levee alignment along the MRGO.
5       Q.   Fair enough.  And when the bid was
6   written that way or when the specifications
7   were written that way, somehow or another
8   the contractor who was retained to do this
9   work, somehow or another that contractor is
10  obtaining the clay, the borrow material from
11  Pearl River.  How did that happen?  Why
12  didn't they use that designated borrow pit?
13      A.   They used both, as I mentioned
14  before.
15      Q.   I missed that.
16      A.   Not a hundred percent of the levee
17  was built out of the material from
18  Mississippi.
19      Q.   I missed that.  Okay.
20      A.   Okay.  So a great portion of that
21  levee, protected side berm and main line
22  levee section -- maybe I will back up a
23  little bit more.  The levee was built in
24  three phases.  One phase was to bring the
25  entire footprint of the levee to elevation

Page 265

1   plus 10 NAVD now.  It's North American
2   geodetic data.  It's the new data that we
3   are using since Hurricane Katrina.  NAVD.
4       Q.   What is the significance of that?
5       A.   This is the --
6       Q.   AVD you said?
7       A.   NAVD.
8       Q.   Okay.  What is the difference
9   between NAVD and the other --
10      A.   This is just taking the subsidence
11  of the overall area into account and
12  reestablishing new elevations for those same
13  benchmarks.
14      Q.   I understand.  I earlier had
15  questioned you about that, right?
16      A.   So we bring -- the first phase is
17  to bring everything to elevation ten.  The
18  next phase was to build the protected side
19  stability berm.  The third phase was to
20  build the embankment up to a design grade of
21  17 and a half.  The fourth phase was to put
22  the additional two and a half feet for
23  settlement.  The contract was to build in
24  those four phases in that order.
25      Now, during the process of going

67 (Pages 262 to 265)

Page 266

1 from Phases 2 to 3, the realization was made
2 that we are not going to have time to
3 process the material.
4    Q.  Process means what?
5    A.  Because of the moisture content.
6    Q.  Process means what?  Dry it out?
7    A.  To reduce the moisture content,
8 essentially our specifications allow, if the
9 material is a CH material.
10    Q.  CH stands for?
11    A.  High plasticity clay.  I'm using
12 that as an example.  The material used is a
13 CH, and the material is classified as a CH,
14 then the moisture content has to be below a
15 certain number before it can be placed in
16 the levee section and compacted.  If the
17 moisture content is relatively high, say, on
18 the order of 90 to a hundred percent, that
19 would take longer to process to get it down
20 to the number we are looking for than if the
21 material was, say, 50 percent.
22       So this processing time to get the
23 material out of the borrow pit and then
24 place it in the levee section was taking
25 more time than we had on our hands.  We

Page 267

1 essentially had between December time frame
2 and June 1st to rebuild the levee section.
3 So in order to speed up the process, we
4 brought material in that did not have to be
5 processed.  It was already at this optimum
6 moisture content.  So it could be offloaded
7 from the barge and placed directly in the
8 levee section.
9    Q.  The specification actually recites
10 that CH, that soil, or that type of clay --
11    A.  CH, CL and ML, which is high
12 plasticity clay, low plasticity clay, and ML
13 is silt was allowed.
14    Q.  In any proportion, those three in
15 any proportion, as long as it's only those
16 three?
17    A.  That's correct.
18    Q.  So because of that moisture
19 content and time problem, another source,
20 another borrow source was obtained and that
21 was the Pearl River source?
22    A.  Rephrase your question if you
23 would.
24    Q.  Sure.  Because of the moisture
25 content and the time that that, time problem

Page 268

1 that that created drying out of that clay, a
2 second source with less moisture was
3 obtained --
4    A.  That's correct.
5    Q.  -- that being Pearl River.  Okay.
6       Now, have you gone back and looked
7 at the specifications in the '80s,
8 when the -- that your contractors were
9 required to meet when the -- these lifts or
10 elevations, the second and third elevations
11 were placed on this MRGO levee, whether it
12 required CH, CL or ML?
13    A.  The specification hasn't changed
14 since the early '80s.  I would say that --
15    Q.  So the same specifications were in
16 place?
17    A.  Same specifications.
18    Q.  Same moisture content as well?
19    A.  That's correct.  They may have
20 given -- let me quantify that too.  There
21 are two very -- there are two options that
22 the contractor is allowed.
23    Q.  We got a five minute note just a
24 second ago.  Is this going to be a
25 one-minute answer?

Page 269

1    A.  I can make it a one-minute answer.
2    Q.  Go ahead.
3    A.  The contractor, there is two
4 methods of testing.  He can either test the
5 moisture content or he can test the actual
6 density of the material.  And there are
7 correlations between the two.  So if the
8 spec was written as such for moisture
9 content back in the '80s, then that number
10 would not have changed from now until then.
11    MR. KOHNKE:
12       Okay.  Let's change the tape.
13    THE VIDEOGRAPHER:
14       Going off the record.  It's 3:06.
15 This is the end of Tape 2.
16    (Whereupon, an off-the-record
17       discussion was held.)
18    THE VIDEOGRAPHER:
19       We are back on the record.  It's
20 3:15.  This is the beginning of Tape No. 3.
21 EXAMINATION BY MR. KOHNKE:
22    Q.  I have just a few more minutes to
23 go and then I'm going to turn you over.  I
24 was asking you about the decisions that were
25 made either prior to or around December of

68 (Pages 266 to 269)

Page 270

1   2005 and January of 2006 which led to the
2   work along the MRGO post Hurricane Katrina
3   to restore those levees. And I have been
4   asking you about the decisions with respect
5   to soil source and soil composition. Let me
6   now switch to the decision to use compaction
7   for those same soils.
8          When was that decision arrived at
9   that: We are going to this time compact the
10  soil used along this levee?
11     A.  Prior to the preparation of the
12  plans and specifications, which would have
13  been October of 2005 time frame.
14     Q.  The time frame for the decision
15  would have been around October of 2005?
16     A.  That's correct.
17     Q.  And not by name but generally by
18  job title or job description, what people at
19  the Corps arrived at that conclusion?
20     A.  The engineers.
21     Q.  You and who?
22     A.  The engineers.
23     Q.  The engineers. I thought you
24  said, "me and," I'm sorry. The engineers.
25  And what information were they relying upon

Page 271

1   to reach that conclusion?
2      A.  Well, typically other levee
3   sections we will design for semicompacted
4   fill if the situation allows, and that is
5   using an adjacent borrow.
6      Q.  You are saying other levees, what
7   other levees?
8      A.  Let me preface that by saying
9   there are other levees, hurricane protection
10  levees within our system that we have
11  designed with that type of fill.
12     Q.  I think that the counsel does not
13  want you talking about anything other than
14  MRGO.
15     A.  Okay.
16     Q.  And I have tried to limit myself,
17  although I don't choose to, I would like to
18  go compare it to other levees.
19     A.  I understand.
20     Q.  So we have to play by the same
21  rules.
22     A.  I understand.
23     Q.  Okay. Go ahead.
24     A.  The act of using adjacent
25  material, the borrow pit that we've said we

Page 272

1   established as part of the plans and
2   specifications, the act of, or the ability
3   to have that adjacent borrow allows for the
4   ability to build the levee with
5   semicompacted fill.
6      Q.  Why is that?
7      A.  Because of the process. Because
8   you are not dredging the material and
9   pumping it in and building an uncompacted
10  levee. You are actually -- you are casting
11  the material adjacent and using dozers to
12  construct a levee. So the act of using the
13  dozers to build the levee section almost
14  inherently allows for compaction.
15         Secondly, using the semicompacted
16  method, as I referred to before, gets the
17  water out faster. Actually building the
18  semicompacted levee may have actually been
19  faster to build than an uncompacted levee,
20  because you are getting the water out
21  faster.
22     Q.  Now, you are referring to
23  semicompacted versus -- and uncompacted. Is
24  there a third category of compacted?
25     A.  Well, we refer to semicompacted as

Page 273

1   utilizing data that we have for laboratory
2   tests on the materials that we will use for
3   preparation of the levee for inclusion into
4   the levee section. That material will
5   have -- there is a curve that's developed,
6   and for a given amount of energy you will
7   get a certain degree of compaction. A
8   hundred percent compaction would be -- I
9   guess, we would refer to that as full
10  compaction. You would actually compact it
11  to the maximum density. When I refer to
12  density, that's the unit weight, how much a
13  given sample of soil weighs for a certain
14  volume, that's the density.
15     Q.  Does the Corps of Engineers
16  have -- I'm trying to get back to this
17  rather simple question.
18     A.  Well, I'm --
19     Q.  Maybe it can't be answered simply.
20     A.  That's what --
21     Q.  But the only thing I want to know
22  is: Do they have compacted levees as
23  opposed to semicompacted levees?
24     A.  No.
25     Q.  So there is no -- there may be

Page 274

1 degrees of compaction, but there is no
2 category of compacted meaning more than
3 semicompacted?
4   A.  Correct.  Semicompaction, if I
5 could just quantify this --
6   Q.  Go ahead.
7   A.  -- gets us to between 90 and
8 95 percent of the maximum density.  The
9 maximum density, I guess if you could refer
10 to something that's fully compacted, that
11 would be --
12   Q.  100.
13   A.  -- 100 percent of the maximum
14 obtainable density of the material.  And we
15 usually construct it somewhere between 90
16 and 95 percent.
17   Q.  Now, you said the decision to
18 semicompact the materials that were being
19 used to reconstruct the MRGO levee was made
20 by the Corps of Engineers sometime in
21 October of 2005.  And was that decision made
22 in part because those same engineers
23 concluded that the failure to compact these
24 levees aided in the erosion and breaching
25 during Katrina?

Page 275

1   A.  I would say that the decision was
2 made because that may have been one factor.
3 We tried to encompass all possible factors.
4   Q.  And that --
5   A.  And that may have been one.  That
6 was one of the reasons that we decided to
7 compact the levee.
8   Q.  One of the things that I haven't
9 asked you about, that I hear about from a
10 lot of different sources is armoring.  Do
11 you know what armoring is?
12   A.  Sure.
13   Q.  Are there instances in which
14 armoring aids or -- aids a levee in the
15 sense that it retards erosion and failure?
16   MR. SMITH:
17     Any -- go ahead.
18   THE WITNESS:
19     We use armoring on the flood side
20 of the Mississippi River levees as a means
21 of armoring that side of the embankment due
22 to the high velocities that the river may
23 see from time to time.
24   EXAMINATION BY MR. KOHNKE:
25   Q.  Along portions of the Mississippi

Page 276

1 levee, Mississippi River levee on the back
2 side there is armoring too, particularly
3 where there are flood walls, aren't there?
4   A.  I have to look at specific
5 instances.  I can't think of one.
6   Q.  Well, let me -- is there ever
7 armoring on the back side of a levee?
8   A.  Not usually.
9   Q.  But the question was ever.
10   A.  There could be.
11   Q.  Well, the question is, if there
12 is, why?  What is the reason to armor the
13 back side of a levee?
14   A.  Again, I'm not aware of any levee
15 section that we have that has armoring on
16 the protected side.
17   Q.  In designing a levee, if there is
18 going to be overtopping -- and I understand
19 you say that the Corps did not design any
20 levees with an expectation that there may be
21 overtopping; is that a correct statement?
22   A.  Yes.
23   Q.  But if there is overtopping, is it
24 true that the water travels over the back
25 side with greater velocity, and that's the

Page 277

1 mechanism for the erosion?  And I know you
2 are not saying that happened, but I'm just
3 asking you.
4   A.  Yes, there was -- well, I would
5 probably phrase it as a greater wave energy
6 on the protected side as the water drops and
7 impacts the levee slope.  There is an energy
8 that needs to be dissipated by that levee
9 section.
10   Q.  Is the name for the product of
11 that, is that called scalloping?
12   A.  I'm not sure.
13   MR. BRUNO:
14     Scouring.
15   THE WITNESS:
16     Scouring.
17   MR. KOHNKE:
18     I know, but specifically I'm
19 asking scalloping.
20   THE WITNESS:
21     I don't know that I have heard
22 that term before.
23   EXAMINATION BY MR. KOHNKE:
24   Q.  I have seen that and I was just
25 curious.

70 (Pages 274 to 277)

Page 278

1   A. Okay.
2   Q. I think I understood everything
3 you had to say about the design grade of
4 17 feet and why it was built to a higher --
5 levees were built to a higher elevation
6 because of the expected subsidence down to
7 17 feet, all of which was assuming a
8 still-water elevation of 13 feet.
9   A. Between 12 and a half and 13,
10 depending on the location along the
11 alignment.
12   Q. So the formula would read, using
13 the standard project hurricane criteria that
14 was developed in the '60s, I guess, or
15 '50s -- when was that developed? In the
16 '50s or '60s?
17   A. '60s -- are you referring to the
18 original plan?
19   Q. Standard project hurricane.
20   A. It would have been the '60s.
21   Q. So according to that criteria, if
22 you have a 13-foot-high still-water
23 elevation assumption --
24   A. Okay.
25   Q. -- then the design grade should be

Page 279

1 17 and a half feet?
2   A. Right.
3   Q. And as built it was 15 feet?
4   A. Not as built.
5   Q. Not as built. As --
6   A. Existing condition.
7   Q. -- settled -- as settled and
8 subsided it was 15 feet on average?
9   A. On average.
10   Q. And so that wave runup that you
11 talked about, which had it been -- had it
12 been maintained at design grade would have
13 given you two and a half foot protection
14 against overtopping. You now have -- you
15 don't have that two and a half protection --
16 two and a half foot of protection, do you?
17   A. For the standard project
18 hurricane?
19   Q. For the standard project
20 hurricane. Okay. So then given that same
21 wave runup expectation, you are going to
22 have overtopping, aren't you?
23   A. Again, you are making a
24 generalization --
25   Q. Yes.

Page 280

1   A. -- for that assumed storm?
2   Q. Yes, so for the assumed storm,
3 forget Hurricane Katrina, for the assumed
4 storm with the wave expectations in a
5 standard project hurricane, you would have
6 overtopping with a levee built to 15 feet --
7 not built to but existing at 15 feet?
8   A. If that -- if that levee were to
9 actually experience that particular storm,
10 then it would have been -- there would have
11 been some overtopping of that levee.
12   Q. Did the Corps attempt to
13 determine, calculate whether Katrina met or
14 exceeded the standard project hurricane in
15 terms of both still water and the wave
16 runup?
17   A. Yes, it did.
18   Q. And what was the answer?
19   A. It's been approximated to be the
20 still-water level for, or the height of the
21 water for Hurricane Katrina was about
22 elevation 22.
23   Q. So it was significantly larger or
24 higher than the still-water elevation?
25   A. Correct. Significantly higher

Page 281

1 than what the design grade was of 17 and a
2 half.
3   Q. Both?
4   A. Correct.
5   Q. But even if Hurricane Katrina had
6 not had that surge height, and I don't know
7 if there is a better name for it, but had it
8 not been that height, had it been down at
9 the still-water elevation with the wave
10 runup that comes on top of still-water
11 elevation, there would have been overtopping
12 even at that height?
13   A. I think you're asking if Katrina
14 was equal to the standard project hurricane?
15   Q. Yes, a better way to say it.
16   A. Then you would have had some
17 overtopping. The degree of overtopping is
18 hard to determine because you have to keep
19 in mind that the hydraulic analysis of what
20 the wave will be is -- it's based on science
21 but it's not an exact science. So to say
22 that it would absolutely have overtopped,
23 it's hard to say.
24       Based on our assumptions, we would
25 have assumed that there would have been some

71  (Pages 278 to 281)

Page 282

1  small degree of overtopping.
2      If I can elaborate on that
3  question.
4      Q.  Yeah, go ahead.
5      A.  In addition to that, if the
6  still-water elevation is 12 and a half to 13
7  and we are at average elevation of 15, you
8  do have some wave runup protection still
9  left, if you will.
10     Q.  Yes.
11     A.  And the amount of waves left over,
12 you cannot -- I don't think you could say
13 whether or not you would still have the same
14 amount of erosion.  I would probably venture
15 to say that you would not have had the same
16 amount of erosion as experienced if more
17 significantly overtopped.
18     Q.  You are assuming a level -- a
19 level -- a levee construct of what
20 materials, of all the materials that the
21 Corps requires in their specifications?
22     A.  I'm just basing it on the existing
23 levee that was there now.  I'm just making a
24 relative comparison to what was seen during
25 Katrina and what we are assuming may have

Page 283

1  happened if Katrina was actually the
2  standard project hurricane.
3      Q.  Is there a correlation that has
4  been established between the degree of
5  breaching that follows overtopping and the
6  materials that are used?  Is there any kind
7  of a correlation that one can establish --
8  the Corps has established?
9      A.  We have performed the erosion
10 tests, as I had mentioned, and we did
11 erosion tests on the new replaced material
12 and the newly placed material since
13 Hurricane Katrina, the repaired sections.
14 And existing levee sections still intact
15 after Katrina and made comparisons between
16 those two.
17     Q.  What do those comparisons show?
18     A.  That there was -- it would really
19 help to show it on the figure.  It's kind of
20 hard to kind of --
21     Q.  Articulate it?
22     A.  -- articulate this without looking
23 at the figure.  But the material being
24 placed post Katrina was somewhat better for
25 erosion resistance than the existing.

Page 284

1      Q.  Now, was any attempt made to go
2  into the areas where the breaches occurred
3  and to sample those materials and compare
4  those materials to the ones that are now
5  being constructed with the new clay
6  materials?
7      A.  Again, because of the breached
8  areas, and again, even the areas that were
9  remaining, I don't think you can say that
10 the surface materials, if you would take a
11 sample of the surface materials that
12 existed, someone were to come up and take a
13 grab sample of some material and try to
14 perform some erosion tests on that, I don't
15 think there is any way you could say with
16 any certainty at all that the materials that
17 you'd sample were actually existing levee
18 materials.
19     Q.  How do you account for the fact
20 that at various portions of the MRGO levee,
21 the levees remained intact and other places
22 there were complete destruction in the
23 form -- in the nature of a breach?
24     A.  Because soil placement is not an
25 exact science.

Page 285

1      Q.  Soil placement is not an exact
2  science, meaning different types of soil?
3      A.  You are not going to have -- for
4  the 12 miles of levee section that we are
5  discussing, you will not have one uniform
6  where it's all exactly the same --
7      Q.  Soil.
8      A.  -- soil for every hundred feet.
9      Q.  And would it be a logical
10 extension of that answer to say that in the
11 areas of the breaches there was more sand
12 than where the levee remains intact?
13     A.  I don't know that you can make
14 that quantification.
15     Q.  What is the explanation that the
16 Corps has for that, for those breaches
17 occurring in approximately 50 locations and
18 the levees remaining intact in some other
19 number of locations?
20     A.  There is a lot of forces being
21 placed on the levee at that time.  It's hard
22 to say whether or not the exact same force
23 is being placed on those different sections.
24 The wave action could have been different.
25 It just could have been a function of one

72  (Pages 282 to 285)

Page 286

1  area scouring earlier than another one, and
2  that's where the water tends to go.
3      Q.  In listing the could-have-beens,
4  one of the explanations could have been that
5  there was greater soil -- there was greater
6  sand used in the soil of the area -- in the
7  areas of the breach than in the areas where
8  the levees remained intact?
9      MR. SMITH:
10         Are you asking if that's what the
11  Corps concluded?
12     MR. KOHNKE:
13         Yes.  Well, no, he is giving me
14  some of the could-bes and I'm asking is that
15  one of the could-bes.
16     MR. SMITH:
17         All right.  I will allow this to
18  be forward because I thought you were
19  exploring the performance of the levee.
20     MR. KOHNKE:
21         I am.
22     MR. SMITH:
23         Go ahead.
24     THE WITNESS:
25         The only basis that you could make

Page 287

1  on whether or not one area had more sand
2  than another, in my opinion, without a
3  doubt, is to look at the existing borings,
4  the last set of borings taken, which would
5  have been in the early '80s, which to my
6  knowledge doesn't show any pure sand
7  existing in any of the borings.
8  EXAMINATION BY MR. KOHNKE:
9      Q.  And the total borings done along
10  this stretch was six?
11     A.  Roughly.
12     Q.  So the only sure way to know what
13  the content of the levee was, was to look at
14  six five-inch samples and determine the top
15  20 feet of those soil samples or borings?
16     A.  That's correct.
17     Q.  And is that going to explain to
18  you what the other six miles looks like?
19     A.  It's as representative as we have.
20     Q.  That's as good as you got, but
21  it's not truly going to explain the content
22  of the soil 500 yards away.  It just gives
23  you a five-inch picture six times every two
24  miles?
25     A.  Roughly.  And if --

Page 288

1      Q.  Well, let's do the math real
2  quick.  This is important enough to.
3      A.  Okay.
4      Q.  The distance we are traveling or
5  traversing from first sample to last sample,
6  the total distance between samples is how
7  much?
8      A.  Six miles, approximately.
9      Q.  Six miles.  And there are six
10  samples or five samples?  What are they?
11     A.  Like I said, it's six to eight,
12  somewhere in that range.
13     Q.  So for every mile of levee a
14  five-inch section was bored?
15     A.  That's correct.
16     Q.  And, of course, these levees were
17  placed -- were created in two or three
18  different layerings, or what is the name?  I
19  keep forgetting the name you used.  What is
20  the name?
21     A.  Enlargements.
22     Q.  Enlargements.  Over a period of
23  years using the top five feet of the
24  bottom of the --
25     A.  Approximately five feet.

Page 289

1      Q.  And certainly there are going to
2  be variations within a given mile of the
3  types of soil within that mile, won't there?
4      A.  There may be.
5      Q.  And all you know is you have a
6  five-inch picture for each mile?
7      A.  That's correct.
8      Q.  And other than that, there is no
9  way for the Corps to explain -- assuming
10  that does explain --
11     A.  Keep in mind you are leaving out
12  the picture that when the levee is being
13  constructed, we have a set of plans and
14  specifications that allow certain materials
15  to be placed in the levee section, that
16  being clays and silts, not sands.  So even
17  though we don't have a boring showing,
18  depicting what was placed in between these
19  borings, we have the act of quality control
20  during construction that does not allow sand
21  to be placed.
22     Q.  And that quality control is --
23  does the Corps put an employee, a staff
24  member out on the scene --
25     A.  Yes.

73  (Pages 286 to 289)