UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| | * | |
| IN RE:  KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | |
| | * | NO. 05-4182 |
| | * | |
| PERTAINS TO:  MRGO | * | SECTION "K" (2) |
| | * | |
| | * | JUDGE DUVAL |
| | * | |
| | * | MAGISTRATE WILKINSON |
| * * * * * * * * * * * * * * * * * * * * * * * * * * | * | |

**MEMORANDUM OF LAW IN SUPPORT OF WASHINGTON GROUP
INTERNATIONAL, INC.'S MOTION FOR SUMMARY JUDGMENT**

William D. Treeby, 12901
Carmelite M. Bertaut, 3054
Heather S. Lonian, 29956
Stone Pigman Walther Wittmann L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:      (504) 581-3200
Facsimile:      (504) 581-3361

Adrian Wager-Zito
Debra S. Clayman
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:      (202) 879-4645
Facsimile:      (202) 626-1700

October 9, 2008                         *Attorneys for Washington Group International, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. i

TABLE OF EXHIBITS ..................................................................................... iv

ACRONYMS ................................................................................................. x

I.     EXECUTIVE SUMMARY ...................................................................... ES-1

     A.    The Corps hired WGII to perform remediation and demolition services in connection with a federally-funded and approved IHNC Lock Replacement Project. ............................................................... ES-1

     B.    WGII meets the three conditions for dismissal from this case under the federal government contractor defense. ...................................... ES-2

          1.    Condition 1:  The Corps approved reasonably precise work plans and specifications. ........................................................ ES-3

          2.    Condition 2:  WGII's work conformed to Corps-approved plans and specifications. ........................................................ ES-4

          3.    Condition 3:  WGII had no actual knowledge not otherwise known to the Corps about how the Corps-approved plans would endanger the levees and floodwalls ....................................... ES-5

II.    STATEMENT OF FACTS .......................................................................... 1

     A.    The Lock Replacement Project On The IHNC ....................................... 1

     B.    The East Bank Industrial Area ............................................................. 3

     C.    Corps Hires WGII As Its Contractor To Clear And Remediate The EBIA ......... 5

          1.    The Total Environmental Restoration Contract ("TERC") .................... 5

          2.    Task Order 26 under the TERC ...................................................... 7

     D.    Roles And Responsibilities Of Corps And WGII Personnel On Task 26 ........... 8

          1.    Lee A. Guillory, P.E. (COR, Construction Manager) .......................... 8

          2.    James Montegut (COR, Project Engineer) ....................................... 9

          3.    Quality Assurance Representatives ("QA Inspectors") ....................... 10

          4.    Primary WGII Employees on Task Order 26 .................................... 11

     E.    Phase I:  Recommendation Report for Demolition and Site Preparation ......... 12

          1.    Statement of Work for Demolition and Remediation of EBIA ............... 12

          2.    "Back and forth" in developing the Recommendation Report ............... 13

     F.    Phase II:  Development of Eight Major Work Plans ................................. 14

          1.    Project Work Plan ("PWP") ......................................................... 16

# TABLE OF CONTENTS
(continued)

a. Back-and-forth between Corps and WGII in developing the PWP ............................................................................ 16

b. Corps instructions regarding the levees/floodwalls ................. 16

2. Contractor Quality Control Plan ("CQCP") ........................................ 17

a. The Preparatory Phase .............................................................. 18

b. The Initial Phase ....................................................................... 19

c. The Follow-Up Phase ............................................................... 19

d. Corps' Pre-Final and Final Acceptance Inspections ................. 20

3. Subcontractor Work Plans ................................................................... 20

G. Phase III:  Performance of DFOWs Per Corps-Approved Plans ....................... 21

1. Demolition and Piling Removal ........................................................... 22

a. Plans/specifications were reviewed and approved by the Corps ........................................................................................ 22

b. WGII's work conformed with approved plans/specifications and was accepted by the Corps ................. 23

2. Sewer Lift Station at Saucer Marine ................................................... 23

a. Plans/specifications were reviewed and approved by the Corps ........................................................................................ 24

b. WGII's work conformed with approved plan/specifications and was accepted by Corps ...................... 26

3. Concrete Block #004 ("Wedding Cake") at Boland Marine .................. 27

a. Plans/specifications were reviewed and approved by the Corps ........................................................................................ 27

b. WGII's work conformed with approved plans/specifications and was accepted by the Corps ................. 29

4. Submerged Fuel Tanker Car ................................................................. 30

a. Plans/specifications were reviewed and approved by the Corps ........................................................................................ 30

b. WGII's work conformed with approved plans/specifications and was accepted by the Corps ................. 31

5. Soil Remediation (Including Remediation of the Canal Bank) .............. 31

a. Plans/specifications were reviewed and approved by the Corps ........................................................................................ 31

948424v.1

# TABLE OF CONTENTS
(continued)

**Page**

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | b. | WGII's work conformed with approved plans/specifications and was accepted by the Corps | 34 |
|  | 6. |  | Borrow Pit at McDonough Marine Site | 36 |
|  |  | a. | Plans/specifications were reviewed and approved by the Corps | 37 |
|  |  | b. | WGII's work conformed with approved plans/specifications and was accepted by the Corps | 39 |
|  | 7. |  | Excavation Under Surekote Road at McDonough Marine | 39 |
|  |  | a. | Plans/specifications were reviewed and approved by the Corps | 40 |
|  |  | b. | WGII's work conformed with approved plans/specifications and was accepted by the Corps | 40 |
| H. |  |  | Phase V:  Close Out of EBIA Work Site in May 2005 | 41 |
|  | 1. |  | Final site inspection and "substantial completion" | 41 |
|  | 2. |  | Technical Completion Report | 42 |
| III. |  |  | SUMMARY JUDGMENT STANDARD | 42 |
| IV. |  |  | APPLICABLE LAW – GOVERNMENT CONTRACTOR DEFENSE | 43 |
| A. |  |  | Condition 1:  Government Approved Reasonably Precise Specifications | 47 |
| B. |  |  | Condition 2:  Work Conforms To Government-Approved Specifications | 48 |
| C. |  |  | Condition 3:  Contractor Told United States Of Dangers Associated With Contractor's Work About Which Contractor Had Actual Knowledge | 50 |
| V. |  |  | THE GOVERNMENT CONTRACTOR DEFENSE BARS PLAINTIFFS' CLAIMS | 52 |
| A. |  |  | Demolition And Removal Work On Task Order 26 (Demolition And Removal of Pilings, Sewer Lift Station, Wedding Cake And Tanker Car) | 53 |
|  | 1. |  | The Corps approved reasonably-precise specifications for WGII's work | 53 |
|  | 2. |  | WGII's work conformed to Corps-approved specifications | 54 |
|  | 3. |  | WGII had no actual knowledge that the Corps-approved specifications might endanger levees and floodwalls | 56 |
| B. |  |  | Remediation Work On Task Order 26 (Remediation/Removal Of Contaminants And Excavation Of Borrow Pit): | 58 |
|  | 1. |  | The Corps approved reasonably-precise specifications | 58 |

948424v.1

**TABLE OF CONTENTS**
(continued)

**Page**

2.     WGII's remediation work conformed to Corps-approved
specifications. ........................................................................ 59

3.     WGII had no actual knowledge of potential danger to
levees/floodwalls .................................................................. 60

VI.     CONCLUSION .............................................................................. 60

948424v.1

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ACORN v. U.S. Army Corps of Eng'rs*,
No. Civ. A. 00-0108, 2000 WL 43332 (E.D. La. Apr. 20, 2000)...............................1, 2, 3

*In re Agent Orange*,
517 F.3d 76 (2d Cir. 2008) ............................................................................46, 53

*In re Air Disaster at Ramstein Air Base, Germany*,
81 F.3d 570 (5th Cir. 1996).............. ES-3, ES-5, 43, 47, 49, 50, 51, 53, 54, 55, 58, 59, 60

*Askir v. Brown & Root Servs. Corp.*,
1997 WL 598587 (S.D.N.Y. Sept. 23, 1997) ............................................................. 46

*Beaver Valley Power Co. v. Nat'l Eng'g & Contracting Co.*,
883 F.2d 1210 (3d Cir. 1989) .......................................................................49, 50

*Boyle v. United Tech. Corp.*,
487 U.S. 500 (1988).......................ES-2, ES-3, ES-4, ES-5, 44, 45, 46, 47, 48, 50, 51, 52

*Carley v. Wheeled Coach*,
991 F.2d 1117 (3rd Cir. 1993) .............................................................................. 46

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)............................................................................................ 42

*Corr. Servs. Corp. v. Malesko*,
534 U.S. 61 (2001)........................................................................................46, 52

*Crawford v. Nat'l Lead Co.*,
784 F. Supp. 439 (S.D. Ohio 1989) ........................................................................ 46

*Guillory v. Ree's Contract Serv., Inc.*,
872 F. Supp. 344 (S.D. Miss. 1994)....................................................................... 46

*Harduvel v. General Dynamics Corp.*,
878 F.2d 1311 (11th Cir. 1989) ............................................................................. 49

*Hopper v. Frank*,
16 F.3d 92 (5th Cir. 1994)................................................................................... 43

*Hudgens v. Bell Helicopters*,
328 F.3d 1329 (11th Cir. 2003) ........................................................................43, 46

948424v.1

*In re Katrina Canal Breaches Consol. Litig.*,
    2007 WL 4219351 (E.D. La. Nov. 27, 2007)............................ES-2, ES-4, ES-5, 45, 47,
                                 48, 50, 51, 52, 55, 56

*In re Katrina Canal Breeches Consolidated Litigation*,
    2007 WL 763742 (E.D. La. Mar. 9, 2007).................................................................. 46

*Kerstetter v. Pac. Sci. Co.*,
    210 F.3d 431 (5th Cir. 2000)......................................... ES-3, ES-4, ES-5, 43, 47, 48, 49,
                              50, 51, 55, 56, 57, 58, 59. 60

*Kleemann v. McDonnell Douglas Corp.*,
    890 F.2d 698 (4th Cir. 1989).................................................................... ES-4, 46, 49, 52

*Lewis v. Babcock Indus., Inc.*,
    985 F.2d 83 (2d Cir. 1993).............................................................................................. 46

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994)......................................................................................... 43

*Lujan v. Nat'l Wildlife Fed.*,
    497 U.S. 871 (1990)...................................................................................................... 43

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...................................................................................................... 43

*Miller v. Diamond Shamrock Co.*,
    275 F.3d 414 (5th Cir. 2001).......................................................... ES-4, 49, 51, 55, 60

*Parker v. Crescent Guardian, Inc.*,
    No. 04-1801, 2006 WL 901756 (E.D. La. Apr. 3, 2006)............................................... 42

*Richland-Lexington Airport Dist. v. Atlas Prop., Inc.*,
    854 F. Supp. 400 (D.S.C. 1994) ................................................................................... 46

*Stout v. Borg-Warner Corp.*,
    933 F.2d 331 (5th Cir. 1991),
    *cert. denied*, 502 U.S. 981 (1991).....................................................43, 47, 48, 50, 52, 58

*Tate v. Boeing Helicopters*,
    55 F.3d 1150 (6th Cir. 1995).......................................................................ES-4, 47, 49

*Trevino v. Gen. Dynamics*,
    865 F.2d 1474 (5th Cir. 1989).................................... ES-2, ES-3, ES-5, 47, 48, 51, 53, 56

948424v.1

*In re World Trade Ctr. Disaster Site Litig.*,
       521 F.3d 169 (2d Cir. 2008) ...................................................................................46, 47

*Yearsley v. W.A. Ross Constr. Co.*,
       309 U.S. 18 (1940) ................................................................................................43, 44

## FEDERAL STATUTES

28 U.S.C. § 2680(a) ......................................................................................................... 45

Federal Tort Claims Act,
       28 U.S.C. § 2671 (2000) ........................................................................................... 45

River and Harbor Act of 1956,
       Pub. L. No. 84-455, 70 Stat. 65 .................................................................................. 1

Water Resources Development Act of 1986,
       Pub. L. No. 99-662, 100 Stat. 4082 ....................................................................... 1, 2

Water Resources Development Act of 1996,
       Pub. L. No. 104-303, 110 Stat. 3658 .......................................................................... 2

## FEDERAL RULES

Fed. R. Civ. P. 56(c) ....................................................................................................... 42

948424v.1

# TABLE OF EXHIBITS

Mississippi River-Gulf Outlet New Lock and Connecting Channels
Evaluation Report, Mar. 1997, Vol. 1 Main Report.................................................................Ex. 1

Deposition of Gerald Dicharry, Oct. 2, 2008......................................................................Ex. 2

IHNC Project Fact Sheet......................................................................................................Ex. 3

Project Work Plan, Oct. 2000 ..............................................................................................Ex. 4

Mississippi River-Gulf Outlet New Lock and Connecting Channels
Evaluation Report, Mar. 1997, Vol. 3 Engineering Considerations ....................................Ex. 5

Deposition of Lee Guillory, Vol. II, Aug. 22, 2008 ............................................................Ex. 6

Mississippi River-Gulf Outlet New Lock and Connecting Channels Evaluation
Report, Mar. 1997, Vol. 4 Design Plates for Engineering Investigations ............................Ex. 7

Sampling and Analysis Plan, Jan. 2001................................................................................Ex. 8

Letter from L. Guillory to D. O'Conner, EBIA Right-of-Entry, Nov. 1, 2002 ....................Ex. 9

Memorandum for Construction Division, IHNC Acquisition, Dec. 16, 2002......................Ex. 10

Mississippi River-Gulf Outlet New Lock and Connecting Channels
Evaluation Report, Mar. 1997, Vol. 5 Sampling and Analysis Report ................................Ex. 11

Design Documentation Report No. 1, Feb. 1999, Vol. 1......................................................Ex. 12

RECAP Submittal Report – Criteria Document, Apr. 2001 ................................................Ex. 13

Declaration of Robert Bea, Apr. 16, 2006 ...........................................................................Ex. 14

Total Environmental Restoration Contract ("TERC"), Aug. 17, 1994 ................................Ex. 15

Deposition of Anne Veigel, Apr. 17, 2008...........................................................................Ex. 16

Deposition of Lee Guillory, Vol. I, Jun. 30, 2008...............................................................Ex. 17

Project Execution Plan, Jun. 1, 1999....................................................................................Ex. 18

Deposition of George Bacuta, Ph.D., July 2, 2008 .............................................................Ex. 19

Statement of Work for Excavation and Disposal of Additional
Subsurface Foundations (Mod. 10), Aug. 6, 2001 ..............................................................Ex. 20

948424v.1

Deposition of Dennis O'Conner, Aug. 13, 2008.................................................. Ex. 21

Deposition of Stephen Roe, Apr. 17, 2008...................................................... Ex. 22

Deposition of James Montegut, Aug. 8, 2008.................................................... Ex. 23

Technical Completion Report, Aug. 2005 ........................................................ Ex. 24

Delivery Order 0026, July 12, 1999 (and attached Statement of Work No. 1) .................... Ex. 25

USACE Comments and MK Response for Draft
Recommendation Report, Oct. 15, 1999 .......................................................... Ex. 26

RFP for Contract Modification 10, Aug. 6, 2001................................................. Ex. 27

Technical Analysis of Proposal #113, Aug. 31, 2001 ........................................... Ex. 28

WGII Revised – Final Proposal #113 for Excavation and Disposal of
Additional Subsurface Foundations, Sept. 24, 2001 ............................................ Ex. 29

Contract Modification 1, Nov. 23, 1999......................................................... Ex. 30

Contract Modification 10, Sept. 25, 2001....................................................... Ex. 31

Summary of Experience for L. Guillory.......................................................... Ex. 32

Letter from A. Smith to L. Guillory, COR Designation, Aug. 18, 1999............................ Ex. 33

Letter from J. Weatherly to J. Montegut, COR Designation, Jan. 30, 2001........................ Ex. 34

Deposition of Alvin Clouatre, June 20, 2008 ................................................... Ex. 35

Deposition of Phillip Lee Staggs, Apr. 26, 2008 ............................................... Ex. 36

Inspectors Quality Assurance Report ("QAR") #267, Jan. 16, 2002................................ Ex. 37

Inspectors Quality Assurance Report ("QAR") #318, Mar. 19, 2002................................ Ex. 38

Inspectors Quality Assurance Report ("QAR") #324, Mar. 26, 2002................................ Ex. 39

Letter from J. Sensebe to W. Purdum, Program Manager Change, May 20, 2001...................... Ex. 40

Amended 30(b)(6) Deposition Notice, Mar. 20, 2008 ............................................. Ex. 41

Email from D. O'Conner to E. Romano et al., IHNC Turnover, June 2, 2004 ....................... Ex. 42

948424v.1

Organization Chart, June 19, 2002 ........................................................................ Ex. 43

Recommendation Report, Dec. 1999 ...................................................................... Ex. 44

USACE Comments on MK's Outline for
Recommendation Report, Aug. 6, 1999 ................................................................. Ex. 45

Comment Submittal for Draft - Revision B.,
Recommendation Report, Nov. 5, 1999 ................................................................. Ex. 46

Transmittal and Comments, Final Project Work Plan, Nov. 1, 2000 .................................... Ex. 47

Statement of Work No. 3, May 15, 2000 ................................................................ Ex. 48

Work Plan General Discussion Meeting, Aug. 3, 2000 ................................................. Ex. 49

Work Plan LDEQ Meeting Minutes, Aug. 21, 2000 ................................................... Ex. 50

Work Plan General Discussion Meeting, Oct. 17, 2000 ............................................... Ex. 51

USACE Comments on Draft Project Work Plan, Oct. 27, 2000 ........................................ Ex. 52

Contractor Quality Control Plan, Oct. 2000 ............................................................ Ex. 53

Storm Water Pollution Prevention Plan (Approval Page), Nov. 14, 2000 ......................... Ex. 54

Hurricane Protection Plan (Approval Page), Nov. 14, 2000 ......................................... Ex. 55

Perimeter Monitoring Plan (Approval Page), Nov. 14, 2000 ........................................ Ex. 56

LDEQ Meeting Minutes ................................................................................... Ex. 57

Deposition of John Grieshaber, Vol. II, Aug. 21, 2008 ............................................... Ex. 58

Monthly Photo Log, Nov. 20, 2001 .................................................................... Ex. 59

Monthly Photo Log, Nov. 29, 2004 .................................................................... Ex. 60

Email from L. Guillory to D. O'Conner, Comments on Subcontractor
Excavation SOW ......................................................................................... Ex. 61

Hamp's Demolition Work Plan, Apr. 12, 2001 ....................................................... Ex. 62

Wedding Cake Final Work Plan, Dec. 11, 2001 ..................................................... Ex. 63

Lift Station Removal Plan (Revised), Oct. 19, 2001 ................................................. Ex. 64

948424v.1

Preparatory Phase Meeting Minutes (Demolition), Mar. 29, 2001 ...................................... Ex. 65

Supervisory Coordination Meeting Minutes (Demolition), Apr. 11, 2001 ......................... Ex. 66

Preparatory Phase Inspection Meeting (Demolition), Aug. 8, 2001 ................................... Ex. 67

Initial Phase Inspection Checklist Form for Demolition, Apr. 23, 2001 ............................ Ex. 68

Inspectors Quality Assurance Report ("QAR") #183, Sept. 18, 2001 ................................ Ex. 69

Inspectors Quality Assurance Report ("QAR") #220, Nov. 6, 2001 .................................. Ex. 70

Inspectors Quality Assurance Report ("QAR") #245, Dec. 13, 2001 ................................. Ex. 71

Pre-Final Inspection Reports (Demolition), Aug.-Sept., 2001 ........................................... Ex. 72

Final Acceptance Reports (Demolition), May-Nov., 2001 .................................................. Ex. 73

Final Acceptance Report (Demolition) McDonough Marine, Sept. 18, 2001 ..................... Ex. 74

Lift Station Revised Work Plan, Oct. 1, 2001 ................................................................... Ex. 75

Preparatory Phase Inspection Checklist, Sewer Lift Station, Oct. 3, 2001 ......................... Ex. 76

Lift Station Removal Plan (Revision 1), Oct. 10, 2001 ...................................................... Ex. 77

Lift Station Removal Plan (Revised-Addendum 1), Oct. 12, 2001 ..................................... Ex. 78

Initial Phase Inspection (Lift Station), Oct. 30, 2001 ......................................................... Ex. 79

Inspectors Quality Assurance Report ("QAR") #221, Nov. 7, 2001 .................................. Ex. 80

Inspectors Quality Assurance Report ("QAR") #225, Nov. 13, 2001 ................................. Ex. 81

Sketch 1 – Boland Marine Subsurface Foundations .......................................................... Ex. 82

Preparatory Phase Meeting Minutes (Concrete Blocks), Nov. 14, 2001 ............................. Ex. 83

Inspectors Quality Assurance Report ("QAR") #297, Feb. 22, 2002 ................................. Ex. 84

Inspectors Quality Assurance Report ("QAR") #299, Feb. 24-25, 2002 ............................ Ex. 85

Pre-Final Inspection Report (Concrete Blocks), Mar. 21, 2002 ......................................... Ex. 86

Stewart Submittal for Removal/Disposal of Barge and Tanker, Dec. 2001 ......................... Ex. 87

948424v.1

Statement of Work for Project Site Development and Remedial Action, Aug. 28, 2000.................................................................................................... Ex. 88

Comment Submittal, Refined Sampling and Analysis Plan, Feb. 1, 2001 ........................... Ex. 89

RECAP Submittal Report. – Criteria Document, June 2001 ................................................ Ex. 90

RECAP Corrective Action Plan – Saucer Marine, May 2002 .............................................. Ex. 91

RECAP Corrective Action Plan – Boland Marine, Nov. 2002.............................................. Ex. 92

Inspectors Quality Assurance Report ("QAR") #340, Apr. 16, 2002 .................................. Ex. 93

RECAP Workplan Amendment – Bank Remediation, June 2002 ........................................ Ex. 94

Inspectors Quality Assurance Report ("QAR") #430, Aug. 18, 2002.................................. Ex. 95

Email from L. Guillory to D. O'Conner et al., Draft Bank Material
Remediation, June 25, 2002................................................................................................... Ex. 96

Inspectors Quality Assurance Report ("QAR") #389, June 21, 2002 .................................. Ex. 97

Inspectors Quality Assurance Report ("QAR") #759, Jan. 21, 2004 ................................... Ex. 98

Inspectors Quality Assurance Report ("QAR") #949, Oct. 30-Nov. 1, 2004....................... Ex. 99

Inspectors Quality Assurance Report ("QAR") #999, Jan. 18, 2005 ................................. Ex. 100

Inspectors Quality Assurance Report ("QAR") #471, Oct. 23, 2002................................. Ex. 101

Inspectors Quality Assurance Report ("QAR") #483, Nov. 7, 2002 ................................. Ex. 102

NFAATT Submittal Report – Saucer Marine, May 2003 .................................................. Ex. 103

NFAATT Submittal Report – Boland Marine, June 2005.................................................. Ex. 104

RECAP Submittal Report – Borrow Pit, Aug. 2001 ......................................................... Ex. 105

Comment Submittal, Borrow Pit RECAP Submittal Report, July 3, 2001 ........................ Ex. 106

Transmittal, Borrow Pit RECAP Submittal Report, Sept. 7, 2001 ................................... Ex. 107

Borrow Pit Extension Application, Rev. Jan. 8, 2002........................................................ Ex. 108

Transmittal and Comments, Borrow Pit Extension Application, Feb. 4, 2002 .................. Ex. 109

948424v.1

Memorandum for Construction Division, Geotechnical Stability Analysis
and attachments, May 2, 2002 ....................................................................... Ex. 110

Fax from J. Montegut to L. Guillory attaching Borrow Pit Design Template,
June 10, 2002 .................................................................................................. Ex. 111

RECAP Corrective Action Plan – McDonough Marine, Jan. 2002 ................................... Ex. 112

Transmittal, RECAP Corrective Action Plan – McDonough Marine,
Feb. 26, 2002.................................................................................................... Ex. 113

NFAATT Submittal Report – McDonough Marine, Dec. 2004 ......................................... Ex. 114

Transmittal and Comments, NFAATT Submittal Report – McDonough Marine,
Mar. 9. 2006..................................................................................................... Ex. 115

Letter from J. Montegut to WGII, Final Site Visit, May 26, 2005 ..................... Ex. 116

Email from J. Agan to C. Burdine, EBIA Field Visit, Aug. 9, 2005................................... Ex. 117

Expert Report of Robert Bea filed in *Robinson v. United States*, No. 06-2268,
on July 14, 2008 .............................................................................................. Ex. 118

Deposition of John Grieshaber, Vol. I, June 27, 2008 ...................................... Ex. 119

Inspectors Quality Assurance Report ("QAR") #948, Oct. 29, 2004................................ Ex. 120

948424v.1

## ACRONYMS

| ACRONYM | MEANING |
|---------|---------|
| CAP | Corrective Action Plan |
| COR | Contracting Officer Representative |
| CQCP | Contractor Quality Control Plan |
| CQCSM | Contractor Quality Control System Manager |
| DDR | Design Documentation Report |
| DFOW | Definable Features of Work |
| DQCR | Daily Quality Control Report |
| EBIA | East Bank Industrial Area |
| EIS | Environmental Impact Statement |
| FSP | Field Sampling Plan |
| GIWW | Gulf Intracoastal Waterway |
| FTL | Functional Team Leader |
| FTCA | Federal Tort Claims Act |
| HTRW | Hazardous, Toxic, and Radioactive Waste |
| HPP | Hurricane Preparedness Plan |
| IHNC | Inner Harbor Navigational Canal |
| ITT | International Tank Terminal |
| LDEQ | Louisiana Department of Environmental Quality |
| MRGO | Mississippi River Gulf Outlet |
| NFAATT | No Further Action At This Time |
| NOD | United States Army Corps of Engineers, New Orleans District |
| NGVD | National Geodetic Vertical Datum |
| PMP | Perimeter Monitoring Plan |
| PWP | Project Work Plan |
| QA | Quality Assurance |
| QAPP | Quality Assurance Project Plan |
| QAR | Quality Assurance Report |
| QC | Quality Control |
| RECAP | Risk Evaluation and Corrective Action Program |
| RFP | Request for Proposal |
| SAP | Sampling and Analysis Plan |
| SSHP | Site Safety & Health Plan |
| SOW | Statement of Work |
| SWPPP | Storm Water Pollution Prevention Plan |
| TERC | Total Environmental Restoration Contract |
| USACE | United States Army Corps of Engineers |
| WGII | Washington Group International, Inc. |

948424v.1

| **ACRONYM** | **MEANING** |
|---|---|
| WMP | Waste Management Plan |
| WRDA | Water Resources Development Act |

# I.   EXECUTIVE SUMMARY

The Amended MRGO Class Action Complaint ("Amended Complaint") alleges that Defendant Washington Group International, Inc. ("WGII") "was hired to level and clear abandoned industrial sites along the IHNC/Industrial Canal between the flood wall and the canal itself" in furtherance of a federal navigational lock replacement project, pursuant to a contract with the United States Army Corps of Engineers ("Corps").  Amended Compl. ¶ 40.  In performing this work, which included among other things, the demolition and/or removal of various above-ground and underground structures (buildings, slabs, pilings, barges, a sewer lift station), Plaintiffs claim that WGII somehow caused "underseepage-induced erosion and other damage to the levee and/or flood wall(s)" bordering the work site.  *Id.*  ¶¶ 42, 44.  Based on admitted facts and facts that are not genuinely disputed, Plaintiffs' claims against WGII must be dismissed because WGII is entitled to immunity from suit in this action under the well-established federal government contractor defense.

### A.   The Corps hired WGII to perform remediation and demolition services in connection with a federally-funded and approved IHNC Lock Replacement Project.

In 1998, after decades of study, Congress appropriated funds to begin construction of the Inner Harbor Navigation Canal ("IHNC") Lock Replacement Project.  As part of its plan, the Corps intended to dredge a two-way bypass channel (one lane 22-feet deep and the other 31-feet deep) through the East Bank Industrial Area ("EBIA") in the Lower Ninth Ward of New Orleans.  (*See infra* pp. 1-4).  In July 1999, the Corps selected WGII via a pre-existing Indefinite Delivery-Indefinite Quantity Contract known as a Total Environmental Restoration Contract ("TERC"), to provide demolition and environmental remediation services in the EBIA to prepare the site for dredging.  (*See infra* pp. 5-8).  The project became known as Task Order 26 of the TERC.

948424v.1

**B.     WGII meets the three conditions for dismissal from this case under the federal government contractor defense.**

Federal common law provides that a private contractor cannot be liable under state law

for alleged negligence where the federal government:

> (a) approves in its discretion reasonably precise specifications, (b) supervises
> and controls the implementation of those specifications, and (c) the contractor
> is not aware of reasons not known to the government why the application is
> unsafe or unreasonable.

*In re Katrina Canal Breaches Consol. Litig.*, No. 05-4182, 2007 WL 4219351, at *5 (E.D. La.

Nov. 27, 2007); *Boyle v. United Tech. Corp.*, 487 U.S. 500, 512 (1988).  (*See infra* pp. 43-46).

In its November 27, 2007 opinion, this Court found that the issues presented by WGII's Motion

to Dismiss and the opposition to that motion "are more susceptible to a Rule 56 motion" and that

"WGII will have the opportunity to seek summary judgment at the appropriate time."  *In re*

*Katrina*, 2007 WL 4219351 at *7.  This is that time.

Simply stated, WGII should not be held liable for any alleged negligence relating to its

faithful performance of Task Order 26 in accordance with Corps-approved plans and

specifications, since there is not a scintilla of evidence that WGII, or for that matter the Corps,

knew of any hazard or danger caused to the structural integrity of the IHNC floodwall resulting

from WGII's carefully inspected work.[1]  Through discovery, Plaintiffs have focused their

allegations on seven discrete features of work that WGII and its subcontractors performed in the

EBIA:  demolition and piling removal; removal of a sewer lift station; removal of concrete block

#004 (or the "wedding cake"); removal of a submerged tanker car; excavations associated with

soil remediation; and the excavation of a borrow pit.  WGII satisfies the three conditions of the

---

[1] Of course WGII denies, with good reason, that there was any damage done to the structural integrity of the floodwall as a result of its work, but under controlling authorities that is not the question for the Court posed by this motion.  Plaintiffs must prove, or offer evidence to the effect, that WGII actually knew of such a danger or hazard. *See Trevino v. Gen. Dynamics*, 865 F.2d 1474, 1487 (5th Cir. 1989).

government contractor defense for each of these tasks.  (*See infra* pp. 52-60).  In fact, as to each and every task performed by WGII, the three-condition government contractor defense under the Supreme Court's decision in *Boyle* is satisfied.

1.    Condition 1:  The Corps approved reasonably precise work plans and specifications

The requirement that the United States approve reasonably precise specifications was created to "assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself."  *Boyle*, 487 U.S. at 512.  Thus, the government need not have actually prepared the specifications in order to have "approved" them, *Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 435 (5th Cir. 2000), as long as the government provides a "substantive review or evaluation" of contractor's plans, and is not merely a bureaucratic "rubber stamp."  *Trevino*, 865 F.2d at 1480.  Evidence of "continuous back and forth" between the contractor and the government, such as proof that the contractor and the government "worked closely together on the development of [a project] from its planning stages through its full production" generally is sufficient.  *In re Air Disaster at Ramstein Air Base, Germany*, 81 F.3d 570, 575 (5th Cir. 1996). (*See infra* pp. 47-48).

There could not be a more carefully documented case for the satisfaction of Condition 1 than this case.  All of WGII's and its subcontractors' proposed work plans for each discrete feature of work on Task Order 26 were commented on, discussed, revised and ultimately approved by the Corps before the work began.  (*See infra* pp. 21-41).  In response to Corps-issued Statements of Work, WGII first drafted an overall Recommendation Report for Task Order 26, as well as eight general project work plans.  (*See infra* pp. 12-20).  The Corps commented on these plans on virtually a line-by-line basis in both draft and final formats before approving them.  (*See infra* pp. 12-20).  Before any field activity on each discrete feature of work

ES-3

began, the Corps, WGII, and its subcontractors convened in a Preparatory Meeting to review a more specific work plan (or specifications) for that feature of work.  (*See infra* pp. 21-41).  The Corps' Construction Manager on Task Order 26 testified:  "we would have taken the actual scope of work from the subcontract and the project work plans and quality control plans and have discussed each of the phases of work, what we expected from the contractors and subcontractors, what level of quality control that we expected of all different tiers and what type of QA [Quality Assurance] the government would provide during those phases of work."  (*See infra* pp. 22).  Plaintiffs cannot raise a genuine issue of fact to dispute WGII's satisfaction of Condition 1 of the government contractor defense for any feature of work Plaintiffs challenge.  (*See infra* pp. 52-60).

2.  <u>Condition 2:  WGII's work conformed to Corps-approved plans and specifications</u>

Just as clearly, WGII faithfully followed these Corps-approved plans and specifications in performing its work.  This compliance is demonstrated by clear and convincing, undisputed documentation and testimony.  *Boyle*, 487 U.S. at 512.  The Fifth Circuit has held that the government's issuance of a form or report indicating acceptance of the product and/or its conformity with all required specifications is compelling evidence that the contractor's work met the government's requirements.  *Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 420 (5th Cir. 2001) (collecting cases).  This condition also may be satisfied by showing that the United States "supervise[d] and control[led] the [contractor's] implementation of" approved specifications, *In re Katrina*, 2007 WL 4219351, at *5, or that the government inspected, accepted as complete or used the contractor's work.  *See Kerstetter*, 210 F.3d at 435-36; *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1156 (6th Cir. 1995) (second condition satisfied by proof the government "inspected and approved" contractor's work); *Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698, 701-

ES-4

02 (4th Cir. 1989) (where there is a "continuous exchange between the contractor and the government, the process itself becomes persuasive evidence of product conformity to precise specifications"). (*See infra* pp. 48-50).

Here both WGII and the Corps participated in routine initial inspections and daily follow-up inspections of all major work performed in the EBIA. (*See infra* pp. 21-41). The written results undisputedly show that the Corps approved and accepted WGII and its subcontractors' work on each of the features of WGII's work. (*See infra* pp. 21-41). At the end of Task Order 26, the Corps conducted a final site inspection, as well as a formal review of WGII's Technical Completion Report before concluding that the project was complete. (*See infra* pp. 41-42). Plaintiffs cannot raise a genuine issue of fact to dispute WGII's satisfaction of Condition 2 of the government contractor defense for any feature of work they challenge. (*See infra* pp. 52-60).

3.   Condition 3:  WGII had no actual knowledge not otherwise known to the Corps about how the Corps-approved plans would endanger the levees and floodwalls

To satisfy the third condition of the government contractor defense, the contractor must prove it knew of no "reasons not known to the government why the application" of the approved plans and specifications were "unsafe or unreasonable." *In re Katrina*, 2007 WL 4219351, at *5; *see also Kerstetter*, 210 F.3d at 436; *In re Air Disaster*, 81 F.3d at 575-76. Importantly, however, *Boyle's* third condition does not oblige the contractor to test for or discover inherent risks that neither the United States nor its contractor ever considered to be unsafe. *See Boyle*, 487 U.S. at 513 (rejecting an alternative test for what the contractor could have "reasonably known" as inadequately "protect[ing] the federal interest embodied in the 'discretionary function' exemption"). Rather, the contractor must warn the United States only "of dangers about which it has *actual knowledge*," and not about dangers which, in hindsight, the contractor allegedly *should have* identified. *Trevino*, 865 F.2d at 1487 (emphasis added). (*See infra* pp. 50-52).

948424v.1

The discovery record establishes that WGII had no actual knowledge that the specifications and plans for its work were in any way unsafe or unreasonable or that the implementation of the Corps-approved specifications on Task Order 26 would adversely affect the levees or floodwalls bordering the EBIA.  Furthermore, the Corps was responsible to know, and in fact did know, infinitely more than WGII about the EBIA floodwalls and levees, since WGII was not called upon to work on those structures.[2]  The Corps' knowledge about any potential risks to the levees and floodwalls associated with WGII's demolition and removal work in the EBIA clearly exceeded that of WGII's.  (*See infra* pp. 12-13, 56-58, 60).  The undisputed evidence will show that WGII has met the third and final condition of the government contractor defense, and its motion for summary judgment should be granted.

---

[2] Every relevant witness deposed during discovery testified that, as a TERC contractor on Task Order 26, WGII was not asked to, paid to, or expected to conduct analyses to determine the potential effects of its excavation work on the nearby levees/floodwalls, which were outside the work site.  (*See infra* pp. 12-13).  Rather, the Corps opted to handle any such geotechnical engineering concerns, if it deemed warranted, within the Corps' own New Orleans District Office.  (*See infra* pp. 37-38).

948424v.1

## II.     STATEMENT OF FACTS

### A.     The Lock Replacement Project On The IHNC

The Inner Harbor Navigational Canal ("IHNC") or Industrial Canal, connects the

Mississippi River, the Gulf Intracoastal Waterway ("GIWW"), Lake Pontchartrain, and the

Mississippi River-Gulf Outlet ("MR-GO").  The IHNC navigation lock, currently located north

of the St. Claude Avenue Bridge, "passes barge traffic between the Mississippi River at New

Orleans and the GIWW."  *ACORN v. U.S. Army Corps of Eng'rs*, No. Civ. A. 00-108, 2000 WL

43332, at *6 (E.D. La. Apr. 20, 2000) (Duval, J.).  The IHNC and the lock "link [] small ships

traveling between the MR-GO and the Mississippi River."  *Id.*  The lock has operated since the

early 1920s but "was projected to become dimensionally obsolete by 1970."  *Id.*[3]

In 1956, Congress authorized the Corps to construct an additional lock or a replacement

for the existing IHNC lock, with suitable connection channels.  River and Harbor Act of 1956,

Pub. L. No. 84-455, 70 Stat. 65.  In doing so, Congress gave the Chief of Engineers discretion to

determine both when construction of the lock would be "economically justified" and what the

appropriate "type, dimensions, and cost estimates" of the project should be.  *Id.*  In 1960, the

Corps began investigating lock replacement alternatives.  *ACORN*, 2000 WL 433332 at *6.

Throughout the 1980s and 1990s, the Corps evaluated various potential plans and sites

for the new lock.  *Id.* at *7.  In 1986, Congress modified the 1956 River and Harbor Act and

directed the Secretary of the Army to determine the precise location and design of the lock

project, provided that the Secretary consulted with "affected local communities" and made "a

maximum effort to assure the full participation of members of minority groups" living in

communities affected by the new lock.  Water Resources Development Act of 1986, Pub. L. No.

---

[3] *See* Mississippi River-Gulf Outlet New Lock and Connecting Channels Evaluation Report, Mar. 1997 ("1997 Eval. Rep."), Vol. 1 [Ex. 1 at 2].

99-662, § 844(a)-(b), 100 Stat. 4082, 4177 ("WRDA").  Indeed, for all WRDA projects,

Congress directed the Secretary to weigh "national economic development . . . the quality of the

total environment, the well-being of the people of the United States, the prevention of loss of life,

and the preservation of cultural and historical values."  *Id.* § 904.  In 1996, the WRDA was

amended again to require the Secretary to submit "a comprehensive community impact

plan, . . . that, to the maximum extent practicable, provides for mitigation or compensation, or

both, for the direct and indirect social and cultural impacts" that the lock replacement project

could have on surrounding communities.  Pub. L. No. 104-303, § 326(c) 110 Stat. 3658, 3717.

By March 1997, the Corps had developed a nine-volume Final Evaluation Report ("1997

Evaluation Report") that included an analysis of the various lock replacement alternatives

considered, an Environmental Impact Statement ("EIS"), a Corps' Community Impact Plan

("Mitigation Plan"), and technical data to support the analyses.  *ACORN*, 2000 WL 43332 at *7.[4]

Mr. Gerald Dicharry, Senior Project Manager for the lock replacement project, supervised the

Corps' preparation of the report.[5]  After a "thorough analysis and evaluation of all practicable

alternatives," their "social, environmental, and economic effects," the policy objectives of

WRDA 1986, and "subsequent Congressional guidance," the 1997 Evaluation Report ultimately

recommended the "North of Claiborne Avenue Plan."[6]

The North of Claiborne Avenue Plan provided for the construction of a new lock—110

feet wide by 36 feet deep by 1,200 feet long—north of Claiborne Avenue on the IHNC, as well

as a new St. Claude Avenue Bridge.[7]  In 1998, the Corps' lock replacement project received

---

[4] Deposition of Gerald Dicharry, Oct. 2, 2008 ("Dicharry" attached as Ex. 2) at 14:22-15:24.

[5] Dicharry at 17:11-24.

[6] 1997 Eval. Rep., Vol. 1 [Ex. 1 at 5]; Dicharry at 18:18-25.

[7] *See* 1997 Eval. Rep., Vol. 1 [Ex. 1 at 9].

approval from the Secretary of the Army, followed by appropriations from Congress to begin construction.[8]  *ACORN*, 2000 WL 433332 at *8.

   **B.      The East Bank Industrial Area**

Because constructing a new lock on the IHNC would require shutting down "a vital link" to the GIWW for at least five years, the North of Claiborne Avenue proposal also included a plan for building a temporary two-way bypass channel in a 32-acre industrial area between Claiborne and Florida Avenues, west of the floodwall located between Surekote Road and Jourdan Avenue, and east of the IHNC.[9]  The Corps proposed dredging a 220-feet wide bypass channel to a depth of 31 feet on the canal side (transit channel), and 22 feet on the floodwall side (laying channel).[10] This two-way channel would run north from Claiborne Avenue to Florida Avenue and occupy nearly two-thirds of the 32-acre site, known as the East Bank Industrial Area ("EBIA").[11]  The Corps determined that dredging this proposed bypass channel would not impact the existing levee/floodwall structures bordering the EBIA.[12]

Between 1945 and 2000, the Port of New Orleans owned and leased the EBIA to private companies for marine services use and petroleum distribution.[13]  At the time the Corps approved

---

[8] *See* IHNC Project Fact Sheet [Ex. 3].

[9] *See* 1997 Eval. Rep., Vol. 1 [Ex. 1 at 4-5]; Project Work Plan ("PWP"), Oct. 2000 [Ex. 4 at 10-11] (Site Location Map of the EBIA).  The Corps initially considered building the by-pass channel on the west bank of the IHNC, but the east side was selected because the inventory of facilities on the EBIA (abandoned barges, buildings, storage tanks, wharves, bulkheads, fencing, transformer units, and other debris) were more expendable than the facilities on the west side.  Dicharry at 29:5-30:14; *see also* 1997 Eval. Rep., Vol. 3 [Ex. 5 at 2].

[10] *See* 1997 Eval. Rep., Vol. 3 [Ex. 5 at 3-4]; Deposition of Lee Guillory Vol. II, Aug. 22, 2008 ("Guillory II" attached as Ex. 6) at 118:5-24.

[11] *See* 1997 Eval. Rep., Vol 3 [Ex. 5 at 4-5]; 1997 Eval. Rep., Vol. 4 (Plates B-14T, B-15T) [Ex. 7 at 2-3]; Guillory II at 118:11-20.

[12] *See* Dicharry at 31:17-32:1.

[13] Sampling and Analysis Plan ("SAP"), Jan. 2001 [Ex. 8 at 14-18].

3

the new lock proposal, most of these facilities had been unoccupied for years.[14]  However, after decades of commercial use, the EBIA was littered with assorted structures, contaminants, and debris that the Corps needed to remove before dredging the bypass channel.[15]  Following approval of the 1997 Evaluation Report, the Corps "did an extensive amount of preliminary site investigations" at the EBIA.[16]  Specifically, the Corps hired contractors, Waldemar S. Nelson, Inc. and Dames & Moore, Inc., to preliminarily assess the demolition and site preparation necessary for construction of the new lock, including building the bypass channel at the EBIA.[17]  The contractors reported their findings in an 8-volume Design Documentation Report submitted to the Corps in early 1999.[18]

For planning purposes, the Corps divided the EBIA into six facilities, each named for its most recent tenant.  From south to north, the sites were International Tank Terminal ("ITT"), Saucer Marine, Mayer Yacht, Indian Towing, McDonough Marine and Boland Marine.[19]  Plaintiffs allege that the two levee/floodwall failures on the east side of the IHNC occurred near Boland Marine to the north and Saucer Marine to the south.[20]

---

[14] The Corps officially purchased the EBIA from the Port in 2002.  *See* Ltr. from L. Guillory, Nov. 1, 2002 [Ex. 9]; Memo. for Constr. Div., Dec. 16, 2002 [Ex. 10].

[15] SAP [Ex. 8 at 14].  The Corps conducted a soil investigation at the EBIA in 1993 and discovered significant contamination.  *See* 1997 Eval. Rep., Vol. 5 [Ex. 11 at 3-7].

[16] Guillory II at 47:19-48:3.

[17] *Id.*

[18] Design Doc. Rep. No. 1,  Feb. 1999, Vol. 1 [Ex. 12 at 6-9].  The 1999 Design Documentation Report did not discuss improvements to levees/floodwalls or any other issues related to the flood protection system at the IHNC. *See id.* at 7 ("Structures within these limits not covered in this DDR include the existing [IHNC] lock structure and related facilities, bridges . . . and approach ramps, and floodwalls."); Dicharry at 36:20-38:14.

[19] *See* RECAP Submittal Rep. – Criteria Doc., Apr. 2001 [Ex. 13 at 58, 63].

[20] *See* Declaration of Robert Bea, Apr. 16, 2006 (the "2006 Bea Decl.") [Ex. 14 at 24] (attached to MRGO Plaintiffs' Initial Disclosures).

**C.      Corps Hires WGII As Its Contractor To Clear And Remediate The EBIA**

1.      The Total Environmental Restoration Contract ("TERC")

In August 1994, WGII (formerly, Morrison Knudsen Corporation or "M-K") and the

Corps' Tulsa District entered into an Indefinite Delivery-Indefinite Quantity Contract for the

remediation of various Hazardous, Toxic, and Radioactive Waste ("HTRW") sites in the

southwest region.[21]  This "umbrella" contract, also known as a Total Environmental Restoration

Contract ("TERC"), provided the general requirements for all of WGII's anticipated work on

HTRW sites in the region with the understanding that the Corps would prepare a specific

Statement of Work ("SOW") for each individual Delivery Order (or "Task Order") it later

issued.[22]

In selecting the appropriate contracting mechanism for the EBIA clean-up in 1999, the

Corps had two options:  it could advertise and award an individual environmental remediation

contract based out of the Corps' New Orleans District (the "Corps-NOD"), or it could "utilize

either of two pre-awarded, pre-placed TERC contracts anchored at Tulsa District for a five-state

[southwest] region."[23] "[F]or the sake of time, expediency, [and] experience," the Corps-NOD

chose to use the TERC contracts that were based in the Corps' Tulsa District.[24]   The cost-

reimbursable nature of the TERC was "highly desirable" because it provided "[f]lexibility for the

---

[21] *See* Total Envt'l Restoration Contract ("TERC"), Aug. 17, 1994 [Ex. 15 at 1-109]; Deposition of Anne Veigel, April 17, 2008 ("Veigel" attached as Ex. 16) at 35:20-36:8.

[22] *See* Veigel at 68:23-69:5 (referring to TERC as "an umbrella contract" that contained general conditions for all work performed under the contract, whereas "each task order was specific to the site and the issues at the site"); TERC [Ex. 15 at 8]; *Id.* at 10 ("The requirements related to remedial action will be described in individual Delivery Orders.  The Contractor shall perform all necessary actions to address specific requirements of the Delivery Order."); *see also* Deposition of Lee Guillory Vol. I, June 30, 2008 ("Guillory I" attached as Ex. 17), at 37:5-15 ("[E]ach task order is funded by a separate source" depending on the type of project and the geographic district where the task order is to be performed); Guillory II at 44:16-23 ("delivery order" is essentially the same as a "task order").

[23] Guillory I at 46:24-47:10.

[24] *Id.*

5

Corps to accomplish the work within the time and money [allotted], and . . . to handle the unknowns, unknown contamination, unknown debris, unknown foundations," that might be discovered during the course of performing the contract.[25]   For example, the Corps could address previously unanticipated needs (such as the need to remove unexpected contamination or buried objects) simply by issuing modifications to the original Delivery Order.[26]   In this manner, the Corps would maintain the ability to refocus the contractor's effort throughout the duration of the Task Order, and balance the contractor's costs against the Corps' needs and available funds.[27]

On the other hand, the cost-reimbursable nature of the TERC required a "labor intensive process on the Corps' part."[28]   In addition to reviewing and approving specific work plans (specifications) and conducting inspections of the contractor's work, the Corps also needed "to intently monitor, [to] work with the contractor in a team type approach, to track all costs, labor, equipment, materials, [and] personnel."[29]   Among other things, this meant the Corps' on-site Task Order representative always had to "know what was being spent and why it was being spent," so that he or she could decide if each of the contractor's proposed activities were "justifiable or not."[30]

---

[25] Guillory II at 39:11-24; Project Execution Plan, Jun. 1, 1999 [Ex. 18 at 4]; *see also* Deposition of George Bacuta, Ph.D., July 2, 2008 ("Bacuta" attached as Ex. 19), at 23:19-24:13, 52:6-53:16, 55:4-55:17.

[26] *See, e.g.*, Statement of Work ("SOW") for Mod. 10, Aug. 6, 2001 [Ex. 20 at 2]; Deposition of Dennis O'Conner, Aug. 13, 2008 ("O'Conner" attached as Ex. 21) at 174:15-176:19 (Corps issued a new modification and accompanying SOW after the "wedding cake" structure was discovered at Boland Marine); *see also* Deposition of Stephen Roe, Apr. 17, 2008 ("Roe" attached as Ex. 22) at 138:23-139:3 (explaining that a modification "is in essence, a change order . . . if you need more scope, more funding, more schedule, [a modification] is the mechanism to do that").

[27] *See* Roe at 126:15-129:2; Guillory I at 146:3-14.

[28] Guillory II at 40:21-41:3; *see also* O'Conner at 50:15-52:21.

[29] Guillory II at 40:21-41:10.

[30] Deposition of James Montegut, Aug. 8, 2008 ("Montegut" attached as Ex. 23) at 24:4-10.

6

2.      Task Order 26 under the TERC

On July 12, 1999, the Corps formally tasked WGII with preparing to demolish the existing structures in the EBIA, removing surface and subsurface obstructions, characterizing the contaminants on the site and ultimately remediating the site in accordance with the Louisiana Department of Environmental Quality's ("LDEQ") new Risk Evaluation and Corrective Action Program ("RECAP") standards.[31]  This task, considered part of the larger IHNC Lock Replacement Project, became known as "Task Order 26" of the TERC.  WGII initially was to perform Task Order 26 in accordance with the project's first SOW, dated June 1, 1999, which was drafted by the Corps-NOD's Construction Manager and Contracting Officer Representative ("COR"), Lee A. Guillory, P.E.[32]

A SOW "in essence lists the work elements, a little description of the site, [and] a little description of the work to be performed."[33]  The Corps typically would send a SOW to WGII with a Request for Proposal ("RFP") asking WGII to provide an estimated cost for the work identified in the SOW.[34]  In response to the RFP, WGII would draft and submit a proposal.[35]  Mr. Guillory and his staff at the Corps then conducted an independent analysis of the proposal, known as a "Technical Analysis," to determine whether WGII's proposal was reasonable.[36]  The Corps negotiated or commented on WGII's proposal, verbally or in writing, and WGII would

---

[31] *See* Technical Completion Rep., Aug. 2005 [Ex. 24 at 13-14]; PWP [Ex. 4 at 15]; Delivery Order 0026, July 12, 1999 ("Task Order 26") [Ex. 25]; Cmt. Submittal, Draft Rec. Rep., Oct 15, 1999 [Ex. 26 at 6] (cmt. 23:  "The Federal and State soil criteria for screening soils applied prior to 1998 differ from the recently developed LDEQ RECAP guideline.").

[32] *See* SOW No. 1 attached to Task Order 26 [Ex. 25 at 3-7]; Guillory II at 45:4-9, 45:23-46:1.  *See infra* § II.D.1.

[33] Roe at 16:1-12.

[34] *See, e.g.*, RFP for Mod. 10, Aug. 6, 2001 [Ex. 27]; *see also* Roe at 87:3-16.

[35] Guillory II at 116:8-12.

[36] *See, e.g.*, Technical Analysis of Proposal #113, Aug. 31, 2001 [Ex. 28]; Guillory II at 45:14-22.

948424v.1

submit a revised proposal.[37]   This process continued until the Corps accepted WGII's proposal

and issued the Task Order (or modification thereto).[38]   In the end, Task Order 26 and its

modifications (the "contract") included the Corps' SOW, the WGII proposals that the Corps

accepted (which included detailed plans for execution of each task), and the applicable terms of

the TERC.[39]

**D.      Roles And Responsibilities Of Corps And WGII Personnel On Task 26**

       1.      Lee A. Guillory, P.E. (COR, Construction Manager)

Lee Guillory, a professional engineer in the Construction Division of the Corps-NOD and

a Functional Team Leader ("FTL") for the Lock Replacement Project,[40] became the Contracting

Officer Representative ("COR") for Task Order 26 in August 1999.[41]   He served as both COR

and Construction Manager, and was "instrumental in the planning, direction, coordination,

execution and construction management" of Task Order 26.[42]

As COR, the Corps designated Mr. Guillory to perform the following functions on Task

Order 26: (1) verify that WGII performed the technical requirements of the project in accordance

---

[37] Roe at 102:22-103:2; *see, e.g.*, WGII Revised – Final Proposal #113, Sept. 24, 2001 [Ex. 29].

[38] Guillory I at 146:3-148:13.

[39] *See, e.g.*, Contract Mod. 1, Nov. 23, 1999 [Ex. 30 at 1-12]; Contract Mod. 10, Sept. 25, 2001 [Ex. 31 at 2] (modifying Task Order 26 "to provide for the Excavation and Disposal of Additional Subsurface Foundations . . . . This work shall be in accordance with the attached Scope of Work dated 6 August 2001, your revised proposal dated 20 September 2001, and the terms and conditions of your contract.").

[40] *See* Summary of Experience for L. Guillory [Ex. 32 at 1]; Guillory II at 11:5-12:18.  Mr. Guillory had "extensive experience of six years of being a project engineer on the ground in different area offices, supervising, monitoring and administrating construction contracts for earthen levees, hurricane protection levees . . . and major navigational structures."  *Id*. at 18:21-19:5.  From this experience, he understood "how levees and floodwalls are built in New Orleans."  *Id*. at 19:6-9; Summary of Experience for L. Guillory [Ex. 32 at 1, 3].

[41] Ltr. from A. Smith, Aug. 18, 1999 [Ex. 33 at 5-8]; Guillory II at 25:15-26:18.

[42] Summary of Exp. [Ex. 32 at 1-2].

8

with the contract terms and specifications;[43] (2) conduct inspections of the work site throughout

the project to assess WGII's performance;[44] (3) maintain liaison and direct communications with

WGII;[45] and (4) where work deficiencies or other problems were observed, record and report the

incidents to the Contracting Officer, notify WGII of the deficiencies, and direct appropriate

action to effect correction.[46]

### 2.    James Montegut (COR, Project Engineer)

James Montegut, a Project Engineer in the Construction Division of the New Orleans

District, was first assigned to Task Order 26 when site mobilization began in early 2001.[47]  As

the Project Engineer and on-site COR for Task Order 26,[48] Mr. Montegut was responsible to

oversee WGII's performance and ensure it worked in an efficient and cost-effective manner.[49]

Mr. Montegut testified, for example, that he would question WGII personnel if he felt that WGII

---

[43] Ltr. from A. Smith, Aug. 18, 1999 [Ex. 33 at 5-6].  "I oversaw and monitored and managed the Task Order No. 26 with respect to [WGII].  I also monitored and supervised our on-site team of Jim Montegut and our QA inspection staff to ensure that they were performing their quality assurance function, that [WGII] was performing its quality control function . . . ."  Guillory II at 27:23-28:11.

[44] Ltr. from A. Smith, Aug. 18, 1999 [Ex. 33 at 5-6].  To accomplish this task, Mr. Guillory "visited the job site approximately one to three times per week, met with my on-site QA staff, met with [WGII], and we had team meetings to discuss progress and performance on the project, and discussed any particular problems or issues that came that week, and anything that we the government needed to do to help [WGII] resolve any of those issues, take their recommendations into consideration and work those out to the best of our ability." Guillory II at 28:12-29:1. Mr. Guillory delegated responsibility for conducting inspections of WGII's work to Jim Montegut and to "between one and three [Corps] quality assurance inspectors."  *Id*. at 29:2-12.

[45] Ltr. from A. Smith, Aug. 18, 1999 [Ex. 33 at 5-6].  Mr. Guillory maintained communications with the contractor "on a daily, weekly, almost hourly basis with our [WGII] counterparts on the project and my counterparts in the WGI[I] office in Denver."  Guillory II at 30:25-31:14.

[46] Ltr. from A. Smith, Aug. 18, 1999 [Ex. 33 at 5-6].  Mr. Guillory testified that he and/or his QA staff brought any inconsistencies or "anything that we were not 100 percent pleased with, we brought that to the attention of the [WGII] on-site staff, asked them to correct that nonconforming work."  Guillory II at 31:15-32:17.

[47] Montegut at 26:11-24.  Mr. Montegut obtained an undergraduate degree in engineering with a "mechanical engineering option."  *Id*. at 9:24-10:15, 11:4-23.

[48] Guillory II at 29:2-12; Ltr. from J. Weatherly, Jan. 30, 2001 [Ex. 34 at 1-2].

[49] Montegut at 30:12-31:3 ("overseeing the work that . . . [WGII] was going to be performing out there, and with a primary focus on ensuring that they were spending money correctly.  And by correctly, I mean that the work that they were doing was being accomplished in an efficient and an effective manner."); *Id*. at 46:3-18.

"had too many people or too much equipment or the wrong type of equipment to accomplish the job."[50]

In addition to reviewing and approving WGII's proposed expenses on Task Order 26,[51] Mr. Montegut managed the Corps' on-site Quality Assurance Representatives ("QA Representatives" or "QA Inspectors"),[52] met daily with WGII's on site personnel,[53] approved plans for various features of work,[54] and monitored the physical progress of work on a day-to-day basis.[55]  If Mr. Montegut encountered a situation on-site that required additional assistance from the Corps, or if he determined a work plan warranted further engineering review or input before he could approve it, he consulted with Mr. Guillory.[56]

   3.  Quality Assurance Representatives ("QA Inspectors")

At all times, the Corps also had at least one or more QA Inspectors on-site monitoring WGII's and its subcontractors' work.  The QA Inspectors assigned to the EBIA were Alvin Clouatre and Alex Brogna, but at varying times also included Robert Ariatti, P.E. and Steven Keen.[57]  The QA Inspectors monitored the project and WGII's operations to ensure compliance with the Corps' safety regulations, the contract, and the Corps-approved specifications and

---

[50] *Id*. at 43:21-46:2.

[51] *Id*. at 28:5-28:14, 68:12-15.

[52] *Id*. at 42:15-43:19 ("I was what was referred to as a team leader, and so if [the Corps inspectors] had an issue as it related to the job, they had a problem, . . . then yes they would come to me."); *see infra* § II.D.3.

[53] Montegut at 43:21-44:13.

[54] *Id*. at 62:12-63:16 (Montegut's review of subcontractor plans consisted of "reading through the plan and looking it over to determine if it looked like it was going to work, if it was feasible, if it didn't have anything that was really . . . unsafe, you know, obviously unsafe . . . ."); *see id*. at 64:25-66:7 (Montegut established or approved specifications regarding where backfill for the wedding cake excavation would come from); *see also infra* § II.G.3.

[55] Montegut at 43:21-44:2 ("I had daily contact with [the WGII] guys that were out on the site."); *id*. at 55:1-56:7.

[56] *Id*. at 32:9-33:18, 62:12-63:6.

[57] *Id*. at 42:15-43:1; Guillory II at 29:9-14, 96:14-17, 110:8-10, 166:17-20.

10

drawings.[58]  If the QA Inspector saw WGII or its subcontractors proceeding in a way that was

not in compliance with the Corps-approved work plans, he would notify the WGII Quality

Control representative and the on-site COR, Mr. Montegut.[59]  The Corps' QA Inspectors

documented their monitoring activities (and inspection results) in a daily Quality Assurance

Report ("QAR") addressed to Mr. Guillory and initialed by Mr. Montegut.[60]

        4.     Primary WGII Employees on Task Order 26

        Steven Roe was WGII's Program Manager for the overall TERC from mid-1997 until

May 2001.[61]  Mr. Roe drafted and negotiated the original proposal for Task Order 26,[62] and was

responsible for "provid[ing] overall program leadership and direction" from WGII's Denver

Office.[63]  Dennis O'Conner was WGII's Project Manager from Task Order 26's inception in

1999 to June 7, 2004.[64]  He had an undergraduate degree in geology and geography, but was not

an engineer.[65]  Mr. O'Conner was "responsible for all performance aspects of the project and

[was] the point of contact for the USACE on-site supervision."[66]  He also was accountable for

---

[58] Deposition of Alvin Clouatre, June 20, 2008 ("Clouatre" attached as Ex. 35) at 29:3-10; Deposition of Phillip Staggs, Apr. 26, 2008 ("Staggs" attached as Ex. 36) at 126:7-11, 223:23-224:4.

[59] Clouatre at 55:13-56:3.  Mr. Clouatre testified that he reviewed the work plans for Task Order 26, as well as "any drawings that might be associated with those plans.  And that became what [] I verified the contractor was doing.  So that was in the sense the plans and specifications on the project."  *Id.* at 51:25-52:17; *see also id.* at 89:23-90:9.

[60] Guillory II at 93:5-15; Montegut 69:6-70:25; *see, e.g.*, Inspectors Quality Assurance Rep. ("QAR") #267, Jan. 16, 2002 [Ex. 37]; QAR #318, Mar. 19, 2002 [Ex. 38]; QAR #324, Mar. 26, 2002 [Ex. 39].

[61] Roe at 10:8-19, 18:13-19:5; *see* Ltr. from J. Sensebe, May 20, 2001 [Ex. 40 at 1-2].  WGII designated Mr. Roe as a 30(b)(6) witness on topics 7-17 and 62-63.  Roe at 7:18-23; Amended 30(b)(6) Dep. Notice, Mar. 20, 2008 [Ex. 41 at 9-10, 15].

[62] PWP [Ex. 4 at 19].

[63] Roe at 103:6-9; *see also id.* at 92:2-16; PWP [Ex. 4 at 19].

[64] O'Conner at 18:21-19:19, 81:3-12; *see also* Email from D. O'Conner, June 2, 2004 [Ex. 42 at 1].  In August 2002, O'Conner spent 50% of his time working on Task Order 26, and he did so from the Denver office.  But O'Conner flew to the New Orleans site on a monthly basis, as needed.  Org. Chart, June 19, 2002 [Ex. 43 at 1-2].

[65] O'Conner at 16:15-24.

[66] PWP [Ex. 4 at 19].

11

"project cost, schedule, safety and overall quality and technical management."[67]  Finally, Phillip Staggs was WGII's on-site Construction Manager from July 2000 to March 2005.[68]  Mr. Staggs, an experienced construction worker (but not an engineer), supervised all WGII and subcontractor site activities related to demolition, remediation and site restoration.  He also reviewed daily subcontractor reports and coordinated field activities with the Corps.[69]

**E.     Phase I:  Recommendation Report for Demolition and Site Preparation**

1.     Statement of Work for Demolition and Remediation of EBIA

In its June 1999 SOW for Task Order 26, the Corps directed WGII to provide "all engineering services . . ., as required, in connection with the technical review of site documents, attendance at site meetings and travel necessary for the period of approximately 21 June 99 through 30 Sep 99 associated with the demolition and remediation" of the EBIA.[70]  It also directed WGII to draft a "Recommendation Report" describing the scope and duration of the needed EBIA remediation and demolition activities, "including any data gaps that may need to [be] filled by sampling or other investigations."[71]  Mr. Guillory, who drafted the SOW,[72] testified that "all engineering services" was "a general description to include all engineering, administration, design, contract bidding, subcontract bidding, award, any self-performed construction that [WGII] or M-K would do themselves."[73]  It did not include, and the Corps did not expect WGII to perform, engineering services related to the nearby levees and floodwalls,

---

[67] *Id.*

[68] Staggs at 26:16-22, 28:3-22.  WGII designated Mr. Staggs as a 30(b)(6) witness on topics 18-61 (except 27-28) and 64-66.  *See* Staggs at 6:21-7:7; Amended 30(b)(6) Notice [Ex. 41].

[69] PWP [Ex. 4 at 19]; *see* Staggs at 13:19-26:5 (describing his work experience).

[70] SOW No. 1 attached to Task Order 26 [Ex. 25 at 3-4].

[71] *Id.* at 4; *see also* Roe at 43:15-44:5.

[72] Guillory I at 98:15-99:2; Guillory II at 44:24-46:1.

[73] Guillory II at 46:2-16.

which were "outside of [the Corps'/WGII's] work site."[74]  Indeed, the Corps' COR testified that

throughout Task Order 26, the Corps never requested or expected any geotechnical engineering

support from WGII relating to these levees and floodwalls.[75]

2.    "Back and forth" in developing the Recommendation Report

The Recommendation Report established a "chronological approach to the demolition

and preparation of the site," and the "work methodologies for the 32-acre project site."[76]  The

Report included a list of more than twenty proposed tasks or "Definable Features Of Work"

("DFOWs") ranging from the development of each work plan to site mobilization to building

demolition, piling removal and remediation of the EBIA.[77]

The Corps substantively reviewed and commented on WGII's outline and its drafts of the

Recommendation Report.[78]  Mr. Guillory testified that he and his HTRW team[79] provided

---

[74] Guillory I at 121:1-5 (levees/floodwalls were excluded from the EBIA work site); Guillory II at 47:2-11 ("The Jourdan Avenue levee and floodwall served mainly as a perimeter of our 32-acre site.  It did not include any physical work on . . . those two particular flood control works."); Clouatre at 77:23-78:17 (the sheet piles in the levees along the EBIA were not discussed at any project meetings because "we didn't work on the levee system out there"); Roe at 123:14-124:8 ("[T]he scope [of the contract] was not for us to investigate the flood control structure.").

[75] Guillory II at 46:17-47:1, 57:17-58:8 (EBIA levees and floodwalls "were not included in the actual scope of the demolition and remediation of the site"); see also Staggs at 136:8-137:1.  "If there was a specific requirement that the government wanted to task [WGII] with or a specific discipline that the government wanted of [WGII], we would have addressed it in a modification to Task Order 26."  Guillory II at 254:21-255:14.  But the Corps never issued a modification tasking WGII with any engineering analyses related to levees and floodwalls.  Guillory II at 255:15-20; see also Guillory II at 53:24-56:5 (if a geotechnical engineer was never specifically listed under "home office support" in a Proposal from WGII, then the Corps never requested a geotechnical engineer from WGII's home office to work on the project); Roe at 107:14-108:10.

[76] Rec. Rep., Dec. 1999 [Ex. 44 at 13].

[77] Id. at 66 (Table 6-1).  A "definable feature of work" is "a task which is separate and distinct from other tasks and has separate control requirements.  It could be identified by different trades or disciplines, or it could be work by the same trade in a different environment."  TERC [Ex. 15 at 23].

[78] WGII participated in a four-stage drafting "process."  Guillory II at 48:20-49:6.  First, WGII submitted an outline of the Recommendation Report to the Corps for review and comments, then it submitted a draft Report to the Corps for review and comment, then it submitted a final draft Report to the Corps for review and comment, and finally, WGII submitted its final Report for the Corps' approval.  Id.; see, e.g., Cmt. Submittal, Rec. Rep., Aug. 6, 1999 [Ex. 45]; Cmt. Submittal, Draft - Rev. B Rec. Rep., Nov. 5, 1999 [Ex. 46].

[79] See, e.g., Transmittal and Cmts., Final PWP, Nov. 1, 2000 [Ex. 47] (listing the Corps' reviewers of the Final PWP); see also Bacuta at 74:2-23; Guillory II at 152:4-16.

13

written comments on each draft of the Recommendation Report on a virtually line-by-line basis in the form of a "Comment Submittal" spreadsheet.[80]  After reviewing the Corps' comments, WGII would either concur or take exception to the comment, as well as add any rebuttal or clarification comments to the spreadsheet.[81]  The Corps reviewed WGII's responses, and could either agree or disagree.[82]  If the Corps disagreed with WGII's response, the Corps typically called a team meeting and "discussed the issue until we came to a consensus of opinion."[83]  It was through this back-and-forth process that many of the basic project specifications, such as final slope of the site and the depth of piling removal, were developed.[84]  The Corps formally accepted WGII's final Recommendation Report on January 19, 2000,[85] and the Report "formed the basis of subsequent specifications for work and work orders and proposals."[86]

### F.    Phase II:  Development of Eight Major Work Plans

In the next major phase of work, from August to October 2000, the Corps' modification to Task Order 26 directed WGII to, *inter alia*, draft eight major work plans for various aspects of the remediation and demolition project:  a Project Work Plan ("PWP"), Waste Management Plan ("WMP"), Storm Water Pollution Prevention Plan ("SWPPP"), Sampling and Analysis Plan ("SAP"), Contractor Quality Control Plan ("CQCP"), Site Safety & Health Plan ("SSHP"),

---

[80] *See, e.g.*, Cmt. Submittal, Rec. Rep. [Ex. 45]; Guillory II at 61:15-63:2 (discussing Corps comment submittal process); Bacuta at 74:12-76:17.

[81] Guillory II at 63:3-19.

[82] *Id.*

[83] *Id.* at 63:20-24.  Mr. Guillory said he met with WGII "on a continual basis to brainstorm together and identify all the different gaps that we needed, all the various agencies that we had to coordinate with, permits that we needed and the like."  *Id.* at 49:7-19.

[84] For example, the Corps advised WGII that "[s]hore protection is not required, however, a stable, 1:3 final slope is required at the shoreline, with the site draining toward the canal;" and "[t]he depth of removal will be to the depth of excavation required for the IHNC Lock's temporary bypass channel."  These Corps specifications were included in the final Recommendation Report.  *See* Cmt. Submittal, Rec. Rep. [Ex. 45 at 2].

[85] Rec. Rep. [Ex. 44]; Guillory II at 64:17-65:9.

[86] Guillory I at 78:7-11.

14

Hurricane Preparedness Plan ("HPP"), and a Perimeter Monitoring Plan ("PMP").[87]  In developing each work plan, WGII received substantial input from both the Corps and the LDEQ during meetings[88] and through written comments to drafts.[89]  At the end of this process, the Corps approved and accepted the general specifications set forth in each final work plan.[90]

The work plans incorporated requirements of the TERC, the Corps' SOWs, applicable RECAP requirements, and previously approved guidelines from the Recommendation Report.[91]  However, because there were still a significant number of unknowns about the site (*e.g.*, the extent of contamination and the number and type of buried or submerged obstructions),[92] these eight work plans were designed to provide "guidance and reference for the execution of project activities," but not to provide detailed specifications for each and every DFOW.[93]  The more detailed plans and specifications for each DFOW typically were drafted by WGII's subcontractors and were reviewed, discussed and approved by WGII and the Corps on an on-going basis (before or during the "Preparatory Phase," described below).[94]

---

[87] *See* SOW, May 15, 2000 [Ex. 48 at 2]; Guillory I at 98:7-24; PWP [Ex. 4 at 9]; *see also* Guillory I at 80:5-8 (the eight major plans "determine[d] the scope of work" that WGII would perform).

[88] *See, e.g.*, Work Plan Gen. Discussion Mtg., Aug. 3, 2000 [Ex. 49]; Guillory I at 119:6-120:4; Work Plan LDEQ Mtg. Min., Aug. 21, 2000 [Ex. 50]; Work Plan Gen. Discussion Mtg., Oct. 17, 2000 [Ex. 51]; Guillory I at 116:23-25; Cmt. Submittal, Draft PWP, Oct. 27, 2000 [Ex. 52]; Bacuta at 110:18-112:10.

[89] *See* Transmittal and Cmts., Final PWP [Ex. 47].

[90] CQCP, Nov. 1, 2000 [Ex. 53, Approval at 2]; SWPPP Approval Page, Nov. 14, 2000 [Ex. 54]; HPP Approval Page, Nov. 14, 2000 [Ex. 55]; PMP Approval Page, Nov. 14, 2000 [Ex. 56]; PWP [Ex. 4, Approval at 2].

[91] *See, e.g.*, PWP [Ex. 4 at 9-10].

[92] Guillory II at 47:12-48:11; Roe at 128:6-18.

[93] Rec. Rep. [Ex. 44 at 38]; Guillory I at 111:4-112:18 (the eight project work plans "were used as guidelines [by the government and WGI] to accomplish the entire work"), 144:17-145:11 (the PWP is a "general work plan," which did not include the "specifics for each individual item or task" performed on the site).

[94] *See infra* § II.F.3. (subcontractors), § II.F.2.a. (Prep. Phase Mtgs.); *see also* Clouatre at 89:23-90:9 (in addition to the PWP, "there were other documents . . . that they developed as we went along with the job, and so I would have reviewed the individual documents that were prepared for the phase of work coming up, and that's primarily the ones that I would use, the ones specific for the work we were about to do").

1.      <u>Project Work Plan ("PWP")</u>

      a.      *Back-and-forth between Corps and WGII in developing the PWP*

The PWP was "one of the eight project plans" that was "developed jointly between [WGII] and the Corps to begin" remediation and demolition activities on the site.[95]  Among other things, the PWP generally described the currently-known structures and foundations to be demolished,[96] the types of equipment to be used,[97] depth for piling removal,[98] and remediation procedures.[99]  The PWP also called for the removal of Surekote Road at the end of the project, and upon the Corps' approval, the final grading and re-vegetating of the area.[100]

The Corps held numerous meetings with WGII regarding the PWP, and reviewed drafts and commented on each aspect.[101]  The Corps, for example, instructed WGII that the use of certain equipment it proposed for demolition "would not be appropriate," or was "not an approved method" for the project.[102]  WGII resolved and incorporated all of the comments raised by the Corps into the Final PWP, which Mr. Guillory approved on November 16, 2000.[103]

      b.      *Corps instructions regarding the levees/floodwalls*

Per the Corps' instruction, the PWP also set the work site's boundaries:  all soil remediation and associated excavations were confined to "the area 15-feet west of the

---

[95] Guillory I at 78:12-79:2.

[96] PWP [Ex. 4 at 41-44] (Table 3-5).

[97] *Id*. at 41 (Demolition); *Id*. at 50 (Soils remediation and subsurface issues).

[98] *Id*. at 45-46 (Piling Removal).

[99] *Id*. at 55-56 (Corrective Action Plan Implementation (Remediation)).

[100] *Id*. at 58 (Road Removal and Final Grade).

[101] *See* Work Plan LDEQ Mtg. Min. [Ex. 50]; LDEQ Mtg. Min. [Ex. 57]; Transmittal and Cmts., Final PWP [Ex. 47].

[102] *See, e.g.*, Transmittal and Cmts., Final PWP [Ex. 47 at 8-9] (cmts. 38, 41 & 48); Guillory II at 37:6-24.

[103] Guillory II at 84:24-85:17.

948424v.1

floodwall."[104]  The Corps issued this "guideline at the beginning of the project that the contractors, [WGII], should not place any moving equipment, heavy equipment, within 15 feet of the floodwall face, which coincided with the curb side of Surekote Road, and would use that as like a clearance zone that you do not do any work in there because it has the possibility of the equipment impacting the floodwall."[105]  Mr. Guillory developed the 15-foot guideline based on a "consensus of opinion between myself and the rest of the small HTRW team" at the Corps-NOD.[106]

2.    Contractor Quality Control Plan ("CQCP")

As mentioned above, the "USACE managed its prime contractor [WGII] by identifying Definable Features of Work (DFOWs)" for Task Order 26.[107]  For each DFOW, the CQCP mandated that WGII and its subcontractors follow a three-phase quality control system to ensure that the work was performed in accordance with contract requirements and with Corps approval.[108]  The three-phase quality control system consisted of the "Preparatory Phase," the "Initial Phase," and the "Follow-Up Phase."[109]  Additionally, the CQCP required WGII to submit

---

[104] PWP [Ex. 4 at 55].

[105] Guillory I at 159:21-160:5; *see* Guillory II at 82:20-83:13.

[106] Guillory II at 83:2-7; *see* Deposition of John Grieshaber, Vol. II, Aug. 21, 2008 ("Grieshaber II" attached as Ex. 58) at 8:18-9:20 (as Construction Manager, Mr. Guillory "had authority to" or "had discretion to" initially determine whether there were geotechnical concerns associated with a task *without* consulting the Corps-NOD's Geotechnical Branch).

[107] Technical Completion Rep. [Ex. 24 at 30]; *see supra* note 77 (definition of Definable Feature of Work or "DFOW").

[108] CQCP [Ex. 53 at 22]; TERC [Ex. 15 at 21-23]; SOW, May 15, 2000 [Ex. 48 at 4-5].  As with the other work plans, before approving the CQCP, Mr. Guillory and the Corps' HTRW team reviewed the proposed CQC plan in draft format, and completed a spreadsheet documenting their comments.  Guillory II at 90:2-10.

[109] CQCP [Ex. 53 at 22-24].

a "photographic record" consisting of at least 36 exposures of "progress photographs of field activities, inspection locations, and final constructed features" on a monthly basis.[110]

a. *The Preparatory Phase*

The Preparatory Phase commenced just prior to the start of each DFOW, and required WGII to, *inter alia*:  (1) review each paragraph of the applicable specifications; (2) review any applicable plans (*e.g.*, SAP, SSHP, PWP, etc.); (3) verify that appropriate drawings and submittals for materials and equipment were submitted and that the Corps actually approved them; (4) examine the work area to ensure all preliminary work was complete; (5) discuss field methods and procedures for the work; and (6) ensure that the work plan for the specific task has been approved by the Corps.[111]  WGII held a preparatory meeting for each defined feature (or subfeature) of work and provided an agenda to the Corps in advance.[112]  At least one Corps representative, as well as relevant subcontractors, attended each Preparatory Phase meeting, and the Corps' QA Inspectors "would make comments, you know, if we felt like something was missed or something needed to be addressed specifically, . . . whether it was work related or safety related."[113]  After every meeting, WGII drafted meeting minutes and submitted them to the Corps for review and correction.[114]

---

[110] *Id*. at 27; *see also* Guillory II at 130:19-25; Monthly Photo Log, Nov. 20, 2001 [Ex. 59]; Monthly Photo Log, Nov. 29, 2004 [Ex. 60].

[111] *See* CQCP [Ex. 53 at 22-23]; Guillory II at 91:6-22.  There were more than 12 Preparatory Phase meetings held during Task Order 26.  While all meeting minutes and submittals in WGII's custody have been produced, only a sample of them are exhibits hereto.  *See infra* notes 135, 138, 150, 169 and 199; *see also* Roe at 126:15-130:2, 144:21-145:10 ("[A]dditional requirements were developed by subcontractor work plans in these initial preparatory . . . quality assurance reviews."); Roe at 146:20-148:14 (in the preparatory meeting "you're bringing your subs on and they're telling you what equipment they're going to use and, you know, the real detail").

[112] Guillory II at 91:15-22, 104:18-106:11.

[113] *Id*. at 91:15-22; Clouatre at 65:7-14; 65:17-66:2; *see also* Guillory II at 100:20-103:7.

[114] *See* Guillory II at 58:18-59:13; *see also id*. at 77:3-78:3.

18

948424v.1

b.    *The Initial Phase*

WGII's Contractor Quality Control System Manager ("CQCSM") conducted Initial

Phase inspections with a Corps QA Inspector as work began on each DFOW.[115]  While

observing WGII or subcontractor personnel at work, the CQCSM and QA Inspector, *inter alia*,

(1) checked the preliminary work for compliance with the contract and the Preparatory Phase

meeting minutes; (2) verified that the level of workmanship met acceptable standards; (3)

resolved any conflicts; and (4) checked that any required inspections or tests had been or were

being performed.[116]  The results of this inspection were recorded in a form attached to WGII's

Daily Quality Control Report ("DQCR"), which was then submitted to the Corps for review.[117]

c.    *The Follow-Up Phase*

WGII's CQCSM, with the Corps QA Inspector, also performed follow-up phase

inspections on a daily basis throughout the duration of a particular DFOW.  The follow-up phase

consisted of monitoring contract compliance and workmanship to ensure that tests were

performed, that "rework items" were corrected and that subcontractors were not concealing any

non-conforming work.[118]  The CQCSM reported the results of WGII's follow-up phase

---

[115] CQCP [Ex. 53 at 23]; Guillory II at 91:23-92:9.

[116] CQCP [Ex. 53 at 23]; Guillory II at 91:23-92:9; O'Conner at 166:4-15.

[117] WGII submitted DQCRs for the Corps' review on every work day of the five-year project.  Guillory II at 92:17-93:4; Montegut at 69:6-19.  A typical DQCR included, *inter alia*, a description of work performed and equipment used, the results of any preparatory, initial and/or follow-up inspections, the results of noise and air monitoring tests, notes on any instructions from the Corps, and a "Contractor's Verification" certifying that the "[m]aterials and equipment used and work performed are in compliance with the contract plans and specifications."  *See, e.g., infra* notes 174 [Ex. 37 (DQCR #267 at 3-5)], 175 [Ex. 84 (DQCR #298 at 3-6), Ex. 85 (DQCR #300 at 4-6)], 185 [Ex. 38 (DQCR #319 at 3-5)], 186 [Ex. 39 (DQCR #325 at 3-5)], 199 [Ex. 93 (DQCR #341 at 3-5)], 209 [Ex. 95 (DQCR #431 at 3-6)], 212 [Ex. 97 (DQCR #390 at 3-5), Ex. 98 (DQCR #769 at 3-5), Ex. 99 (DQCR #959 at 3-5), Ex. 100 (DQCR #1014 at 3-5)], 213 [Ex. 101 (DQCR #473 at 3-6), Ex. 102 (DQCR #485 at 3-6)].

[118] CQCP [Ex. 53 at 23-24]; Guillory II at 92:10-93:4.

948424v.1

inspections in the DQCR submitted to the Corps for review.[119]   The Corps' QA inspectors

similarly reported their observations to Messrs. Guillory and Montegut in a daily QAR.[120]

d.   <em>Corps' Pre-Final and Final Acceptance Inspections</em>

In addition to the three-phase system, the CQCP provided for the Corps' own inspections

at the end of each DFOW.   During this Pre-Final Inspection, the Corps often established a

"punch list" of items that needed to be finished or corrected before Final Inspection and

completion.[121]   Thereafter, during the Final Acceptance Inspection, the Corps made sure any

such punch-list items were remedied and that the contractors' work complied with plans and

specifications.[122]

3.   <u>Subcontractor Work Plans</u>

WGII used local subcontractors to complete many tasks.[123]   To do so, WGII and the

Corps "got together, discussed what had to be accomplished" and "worked hand in hand in

developing the scopes of work for the subcontracts."[124]   Once the scope of work was finalized,

---

[119] *See, e.g., infra* notes 174 [Ex. 37 (DQCR #267 at 3-5)], 175 [Ex. 84 (DQCR #298 at 3-6), Ex. 85 (DQCR #300 at 4-6)], 185 [Ex. 38 (DQCR #319 at 3-5)], 186 [Ex. 39 (DQCR #325 at 3-5)], 199 [Ex. 93 (DQCR #341 at 3-5)], 209 [Ex. 95 (DQCR #431 at 3-6)], 212 [Ex. 97 (DQCR #390 at 3-5), Ex. 98 (DQCR #769 at 3-5), Ex. 99 (DQCR #959 at 3-5), Ex. 100 (DQCR #1014 at 3-5)], 213 [Ex. 101 (DQCR #473 at 3-6), Ex. 102 (DQCR #485 at 3-6)]; *see also* Guillory II at 92:10-93:4.

[120] *See, e.g., infra* notes 140 [Ex. 69 (QAR #183), Ex. 70 (QAR #220), Ex. 71 (QAR #245)], 160 [Ex. 80 (QAR # 221), Ex. 81 (QAR #225)], 174 [Ex. 37 (QAR #267)], 175 [Ex. 84 (QAR #297), Ex. 85 (QAR #299)], 185 [Ex. 38 (QAR #318)], 186 [Ex. 39 (QAR #324)], 199 [Ex. 93 (QAR #340)], 209 [Ex. 95 (QAR #430)], 212 [Ex. 97 (QAR #389)], Ex. 98 (QAR #759), Ex. 99 (QAR #949), Ex. 100 (QAR #999)], 213 [Ex. 101 (QAR #471), Ex. 102 (QAR #483)]; *see also* Clouatre at 36:6-37:2; 152:17-153:17; Guillory II at 92:10-93:4.

[121] CQCP [Ex. 53 at 30]; Guillory II at 93:23-94:6, 113:11-114:8.

[122] CQCP [Ex. 53 at 30]; Guillory II at 94:7-16; 94:22-95:2; 95:4-96:13; 113:11-114:8.

[123] *See* Rec. Rep. [Ex. 44 at 50] ("Activities anticipated to be subcontracted include barge salvage, building demolition, waste hauling, barges, and excavation efforts."); Staggs at 38:1-39:8; Guillory I at 144:15-16 (WGII "subcontracted 80 to 90 percent of the work out").

[124] Guillory II at 100:20-103:7; Guillory I at 144:24-145:11; *see, e.g.,* Email from L. Guillory, June 18, 2001 [Ex. 61] (providing comments on SOW for subcontractor excavation).

20

WGII sent a Request For Proposal ("RFP") to potential subcontractors.[125]  Potential

subcontractors then drafted and submitted plans in response to the RFP, which included proposed

means and methods for accomplishing the work.[126]  Upon receiving proposals from potential

subcontractors, WGII "evaluated them based on technical merit and cost, made a spreadsheet of

all the different bidders, and made a recommendation to the Corps as to who they thought would

be the most appropriate subcontractor to do that portion of the work."[127]  The Corps reviewed

WGII's recommendation and, if an agreement was reached, the subcontractor was hired.[128]

Thereafter, the Corps reviewed, revised and approved the subcontractor's work plans for all

major DFOWs before physical work began.[129]

### G.    Phase III:  Performance of DFOWs Per Corps-Approved Plans

Between February 2001 and May 2005, WGII performed, *inter alia*, the following seven

DFOWs.  All of these DFOWs were completed in accordance with the guidelines developed with

and approved by the Corps in the eight major work plans, and with the work plans and

specifications reviewed by the Corps during the Preparatory Phase Meetings.[130]

---

[125] Guillory I at 144:24-145:11; Guillory II at 100:20-103:7; O'Conner at 152:8-153:5.

[126] O'Conner at 152:13-16; *see, e.g.*, Hamp's Demo. Work Plan, Apr. 12, 2001 [Ex. 62]; Wedding Cake Final Work Plan, Dec. 11, 2001 [Ex. 63]; Lift Station Removal Plan (Revised) [Ex. 64].

[127] Guillory I at 145:13-19; *see also* Guillory II at 100:20-103:7.

[128] Guillory I at 145:20-146:2; *see also* O'Conner at 152:8-19; Guillory II at 100:20-103:7.

[129] *See infra* §§ II.G.1.a., II.G.2.a., II.G.3.a., II.G.4.a.; *see also* Guillory II at 106:22-107:14 (remarks and red-line changes to subcontractor plan were made by Guillory or his field staff); Guillory II at 122:15-123:7 (Guillory reviewed and commented on several drafts of cofferdam subcontractor plan).

[130] *See supra* § II.F.2. (three-phase quality control system).

1.     Demolition and Piling Removal

     a.     *Plans/specifications were reviewed and approved by the Corps*

The PWP set forth general guidelines for demolition and piling removal activities.[131] WGII submitted a more specific proposed work plan to the Corps through its local demolition subcontractor, Hamp's Construction, L.L.C.[132]  The Hamp's demolition work plan described the means and methods for all major demolition tasks, including building demolition and removal of pilings, bulk heads, and sheet pilings.[133]

Hamp's submitted its initial draft plan to WGII in February 2001.[134]  On March 29, 2001, WGII held a Preparatory Phase meeting with Hamp's and four Corps representatives to address the demolition feature of work.[135]  During the meeting, Mr. Guillory explained, "we would have taken the actual scope of work from the subcontract and the project work plans and quality control plans and have discussed each of the phases of work, what we expected from the contractors and subcontractors, what level of quality control that we expected of all the different tiers and what type of QA the government would provide during those phases of work."[136]

On April 11, 2001, WGII, its subcontractors and the Corps held an additional Preparatory Phase meeting to further discuss and coordinate quality assurance/control requirements and site safety issues for the structural demolition feature of work.[137]  Finally, after the preparatory

---

[131] *See supra* § II.F.1. (PWP).

[132] Hamp's Demo. Work Plan, Apr. 12, 2001 [Ex. 62 at 17-26].

[133] *See id.*

[134] *See id.* at 11.

[135] Prep. Phase Mtg. Min., Demo., Mar. 29, 2001 [Ex. 65]; Guillory II at 104:18-105:13.

[136] Guillory II at 105:22-106:11; *see also id.* at 106:22-107:2.

[137] Supervisory Coordination Mtg. Min., Demo., Apr. 11, 2001 [Ex. 66]; Guillory II at 109:2-110:16.

22

meetings, but before major field work actually began, the Corps formally approved Hamp's work plan subject to its "red-lined changes."[138]

> b.    *WGII's work conformed with approved plans/specifications and was accepted by the Corps*

Once the subcontractors began working, WGII and the Corps conducted two different Initial Phase inspections in accordance with the CQCP.  All work was determined to be "in full compliance with work plans."[139]  WGII and the Corps QA's performed daily follow-up phase inspections for this feature of work until its completion.  The QA Inspectors reported the results of their inspections in a QAR, which documented, among other things, any "deficiencies observed," any "corrective action" taken or any "verbal instructions given to [the] contractor" by the Corps.[140]  Ultimately, WGII and the Corps conducted Pre-Final and then Final Inspections for the demolition/piling removal feature of work on a site-by-site basis.[141]  After the Final Inspections were complete, the Corps signed "Acceptance Reports" for each site verifying that "all work is complete, acceptable, and complies with contract requirements."[142]

> 2.    <u>Sewer Lift Station at Saucer Marine</u>

Based on investigations conducted at the EBIA prior to Task Order 26, the Corps knew that subsurface structures, including an abandoned sewer lift station, would have to be excavated

---

[138] Hamp's Demo. Work Plan, Apr. 12, 2001 [Ex. 62 at 1]; Guillory II at 107:3-14.  In August 2001, WGII and the Corps held a separate Preparatory Phase Meeting for bulkhead/sheet piling removal near Mayer Yacht, which was part of the demolition feature of work.  *See* Prep. Phase Inspection Mtg., Demo., Aug. 8, 2001 [Ex. 67 at 1-5]; Guillory II at 111:14-22.

[139] *See* Initial Phase Inspection, Demo., Apr. 23, 2001 [Ex. 68]; *see also* Guillory II at 110:19:111:13; Initial Phase Inspection, Piling Removal, Aug. 28, 2001 [Ex. 67 at 6-7]; Guillory II at 111:14-22; *supra* § F.2.b. (Initial Phase Inspections).

[140] *See, e.g.*, QAR #183, Sept. 18, 2001 [Ex. 69 at 2]; QAR #220, Nov. 6, 2001 [Ex. 70 at 2]; QAR #245, Dec. 13, 2001 [Ex. 71 at 2].

[141] *See* Pre-Final Inspection Reps., Demo., Aug-Sept. 2001 [Ex. 72]; Guillory II at 113:20-24; Final Acceptance Reps., Demo., May-Nov. 2001 [Ex. 73]; Final Acceptance Rep., Demo., McDonough Marine, Sept. 18, 2001 [Ex. 74].

[142] Final Acceptance Reps., Demo. [Ex. 73]; Final Acceptance Rep., Demo., McDonough Marine [Ex. 74].

948424v.1

and removed.[143]   According to Mr. Montegut, the lift station was "basically . . . a large diameter pipe with pumps in it, valves and ladders to get down into it, all encased in . . . metal pipe.  Over the years, being exposed to a brackish water in the Industrial Canal, that thing was deteriorated substantially."[144]   The lift station was located at the corner of the Saucer Marine and Mayer Yacht sites, approximately 80 to 100 feet from the floodwall.[145]

a.   *Plans/specifications were reviewed and approved by the Corps*

WGII's subcontractor, Hamp's, submitted its initial proposal for removing the lift station as part of its February 2001 demolition and piling removal plan.[146]   However, by September 2001, before work on the lift station began, the technical approach in the February plan had to be changed based on newly-acquired information.[147]   The revised plan required the use of a "braced excavation" or "cofferdam"—designed by a licensed professional engineer in Louisiana—to prevent movement of the surrounding soil during excavation.[148]   The subcontractor submitted its first revised proposal to WGII in late September 2001,[149] and a preparatory meeting was held with the Corps on October 3, 2001 to discuss the new plan.[150]   The Corps reviewed and approved

---

[143] Guillory II at 34:20-35:21 ("From the prior investigations that we had on the project site, we knew [in June 1999] that we had some subsurface structures such as . . . [the] sewer lift station.").  However, the Corps did not understand how deep the excavation for the sewer lift station would be until approximately August 2000.  Guillory I at 132:10-20.

[144] Montegut at 75:3-10.

[145] Guillory I at 83:2-6; Guillory II at 132:12-23.

[146] *See* Hamp's Demo. Work Plan [Ex. 62].

[147] *See* Lift Station Removal Plan (Revised) [Ex. 64 at 3]; *see also* QAR #183 [Ex. 69 at 2] ("[Corps of Engineers] informed Hamp's/Envirocon that 100 ton crane was required in proposal and that cofferdam design has to be reviewed by COE prior to starting work.").

[148] *See* Lift Station Revised Work Plan, Oct. 1, 2001 [Ex. 75 at 2-4]; Guillory I at 142:15-143:10 (referring to a "braced cofferdam system" for the removal of the sewer lift station).

[149] *See* Lift Station Revised Work Plan [Ex. 75 at 2] (including Sep. 28, 2001 memorandum from subcontractor to WGII, enclosing plans).

[150] Prep. Phase Inspection Min., Lift Station, Oct. 3, 2001 [Ex. 76].

948424v.1

the sewer lift station submittals under consideration during the meeting,[151] but requested that the subcontractors reevaluate the measurements for the cofferdam sheet pilings and submit a revised plan for approval.[152]  In the end, the Corps reviewed and commented on the plan at least two more times before finally approving it on October 19th.[153]  The final October 19th plan "incorporated all of the [Corps'] review comments," which primarily "had to do with structural integrity of the hole and preventing soil displacement outside the hole, inside the hole, worker safety, equipment safety . . . et cetera."[154]

The approved Lift Station Removal Plan included, among other details, the dimensions of the proposed excavation area, precise design specifications for the cofferdam and requirements for backfilling the excavated hole.[155]  Mr. Guillory testified that, given the design of the cofferdam for the lift station excavation, the Corps was "not concerned it was going to damage the flood control structures" along Jourdan Avenue:

> Location, proximity . . . the rigidity . . . of the design, the depth of the design, the bracing and the waler system.  I felt confident that that was not going to adversely affect any of the adjacent soil or site.[156]

---

[151] *Id*. at 1 (listing the submittals discussed during the preparatory meeting that were "[r]eviewed and [a]pproved"); Guillory II at 134:15-19.

[152] Prep. Phase Inspection Min., Lift Station [Ex. 76 at 4]; Lift Station Revised Work Plan [Ex. 75 at 1] (code "E" indicating disapproval by the Corps).

[153] Guillory I at 167:18-22; Lift Station Removal Plan (Rev. 1), Oct. 10, 2001 [Ex. 77]; Lift Station Removal Plan (Revised-Add. 1), Oct. 12, 2001 [Ex. 78 at 1-4]; Guillory I at 180:17-181:13 (the letter "C" on the transmittal shows the Corps approved the draft plan "subject to comments"); Lift Station Removal Plan (Revised) [Ex. 64]; Guillory II at 134:20-135:16.

[154] Guillory I at 181:14-23, 168:8-19.

[155] The Lift Station Removal Plan called for an excavation area 69 feet wide by 81 feet long, with depths ranging from EL. -2.5 to -19.75.  Lift Station Removal Plan (Revised) [Ex. 64 at 6-7].  The specifications also required the cofferdam excavation to be backfilled with previously-excavated soil in two foot lifts and with material to be provided by WGII.  *Id*. at 7-8.

[156] Guillory I at 169:22-170:9.  Similarly, WGII was not aware of any potential danger to the levees and floodwalls from this excavation.  *See* O'Conner at 206:10-208:20.

25

Moreover, as the Construction Manager on Task Order 26, Mr. Guillory agreed that he would have sought geotechnical engineering input from someone at the Corps if he had any concerns regarding the potential impact of an excavation on the levees.[157]

b.   *WGII's work conformed with approved plan/specifications and was accepted by Corps*

Once the work commenced at Saucer Marine to remove the lift station, the Corps monitored WGII and its subcontractors to verify that the lift station removal process conformed with approved work plans and specifications.  An Initial Phase inspection for the lift station removal and cofferdam installation was held on October 30, 2001.[158]  The results of the inspection, which were reviewed and approved by the Corps, indicated that "[a]ll work is in compliance with the Revised Lift Station Removal Plan submitted on 10/19/01."[159]  WGII and the Corps also held routine follow-up inspections of the lift station excavation to ensure work proceeded in accordance with the Corps-approved plans.[160]  During one follow-up inspection, for example, Mr. Clouatre stated that he:  "Visually assured all debris and pilings have been removed from inside cofferdam and excavator began backfilling with spoil in approx. 2' lifts and compacting to bottom of walers. . . .  No deficiencies observed."[161]  Ultimately, the Corps accepted that the removal of the lift station and the backfilling of the excavation were complete.[162]

---

[157] Guillory II at 141:5-142:8; *see also* Grieshaber II at 8:18-10:1 (Guillory had authority to initially identify potential levee stability problems on Task Order 26).

[158] Initial Phase Inspection, Lift Station, Oct. 30, 2001 [Ex. 79].

[159] *Id.*; Guillory II at 136:5-9.

[160] *See, e.g.*, QAR #220 [Ex. 70 at 2]; QAR # 221, Nov. 7, 2001 [Ex. 80 at 2]; QAR # 225, Nov. 13, 2001 [Ex. 81 at 2].

[161] QAR #220 [Ex. 70 at 2].

[162] Guillory II at 146:10-23.

26

3.      Concrete Block #004 ("Wedding Cake") at Boland Marine

After demolition began, WGII identified eight previously unknown subsurface concrete and steel foundations at the Boland Marine site, including a large concrete block commonly referred to as Concrete Block #004, "the southern block," or the "wedding cake."[163]  Because these concrete/steel structures were not previously contemplated in any of the Corps' existing SOWs for the project (or in any of WGII's proposals in response to the SOWs), in August 2001, the Corps issued Modification 10 to Task Order 26.[164]

a.      *Plans/specifications were reviewed and approved by the Corps*

The Corps' SOW for removal of the wedding cake directed WGII to remove the subsurface slabs, as well as any "concrete, steel and pilings" associated with the slabs, "in their entirety."[165]  The SOW specified that an excavation plan must be submitted to the Corps with a cofferdam design that was "approved by a Louisiana State Registered, P.E."[166]  WGII submitted a proposal on August 31 for accomplishing the task.  The Corps then conducted a Technical Analysis of the proposal and made comments, which WGII negotiated and incorporated into a revised proposal that the Corps accepted on September 25, 2001.[167]

---

[163] *See* Statement of Work ("SOW") for Mod. 10, Aug. 6, 2001 [Ex. 20 at 2]; Sketch 1 – Boland Marine Subsurface Foundations [Ex. 82]; Guillory II at 114:9-115:8, 121:21-122:3; *see also* Montegut at 60:16-23.  The wedding cake structure was at least 100 to 150 feet from the floodwall, but further from the floodwall than the lift station.  Guillory II 115:9-19.

[164] *See* Statement of Work ("SOW") for Mod. 10 [Ex. 20 at 2].

[165] *See id.* (recognizing the excavation of the wedding cake may extend to a depth of at least -25 feet from mean sea level).

[166] *See id.*

[167] WGII Revised – Final Proposal #113, Sept. 24, 2001 [Ex. 29]; *see* Technical Analysis of Proposal #113 [Ex. 28 at 2].

948424v.1

With the Corps' approval, WGII subcontracted excavation of the concrete block to the same local companies that removed the sewer lift station.[168]  During a Preparatory Phase meeting on November 14, 2001, WGII's subcontractors presented their initial work plan to WGII and the Corps.[169]  Although the Corps approved the subcontractor's "pre-job submittal" of the work plan at the meeting, it indicated that a final plan with a cofferdam design for removal of the wedding cake still needed to be approved before work on that particular structure could begin.[170]

The Corps finally approved WGII's submittal of a Cofferdam Installation Plan for removal of the wedding cake on December 13, 2001.[171]  Among other things, this work plan provided drawings/measurements for excavation and cofferdam installation, instructions for backfilling the excavations, specifics on equipment and crew to be used, and an activity hazard analysis.[172]  Mr. Guillory testified that he opted not to seek advice from the Corps' geotechnical experts before approving the work plan because he did not have any concerns about the impact of the wedding cake removal on the levees and floodwalls:

> The location and proximity of those concrete foundations with respect to the floodwall and the levee were quite a bit far away as opposed to McDonough Marine borrowing area.  Also, where those concrete block foundations were located were within the footprint of where the future bypass channels were to be dredged . . . in a stairstep fashion to -22 NGVD and -31 NGVD, and those concrete foundations and their cofferdams fit within those footprints.  So that – those braced structural excavations were designed by a professional engineer . . . hired by WGI and their subcontractors – professionally reviewed

---

[168] *See supra* § F.3. (general subcontracting process).

[169] *See* Prep. Phase Mtg. Min., Concrete Blocks, Nov. 14, 2001 [Ex. 83]; Guillory II at 119:3-25.

[170] *See* Prep. Phase Mtg. Min., Concrete Blocks [Ex. 83 at 1-2].

[171] Wedding Cake Final Work Plan [Ex. 63]; *see* Guillory II at 122:18-123:8.  WGII submitted a draft of the Cofferdam Plan to the Corps for review on November 27, but the plan was re-submitted in early December.  *See* Technical Completion Rep. [Ex. 24 at 63] (Submittal Register of all documents transmitted to the Corps).

[172] *See* Wedding Cake Final Work Plan [Ex. 63 at 3-11, 13-31, 39-56].

by all parties, and constructed, and intense quality control and quality assurance inspection followed on how those were installed and removed.[173]

      b.    *WGII's work conformed with approved plans/specifications and was accepted by the Corps*

During the wedding cake excavation, WGII and the Corps continually monitored and inspected the subcontractors' work to verify compliance with the work plan's specifications.  For instance, in a December 2001 follow-up inspection, Messrs. Clouatre and Ariatti noted that "no deficiencies [were] observed" in connection with the installation of sheet piling for the construction of the cofferdam.[174]  In February 22 and 24 inspections, a Corps QA Inspector reported that he "[v]isually assured all debris and pilings above el. -23 are removed from cofferdam," and that "cofferdam is backfilled in 2' lifts and compacted with bucket."[175]

On March 21, 2002, WGII and the Corps conducted a Pre-Final Inspection of the excavation of the concrete/steel foundations at Boland Marine, and identified punch list items that the subcontractors needed to complete before demobilization.[176]  One week later, upon completion of the punch list items, the Corps signed a Final Acceptance Report for the removal of the concrete blocks, including the wedding cake, and confirmed that "all work is complete, acceptable, and complies with contract requirements."[177]

---

[173] Guillory I at 210:17-212:2.  Similarly, WGII was not aware of any potential danger to the levees and floodwalls from this excavation.  *See* O'Conner at 206:10-208:20.

[174] QAR #245 [Ex. 71 at 2] ("Assured sheetpile alignment is correctly laid out according to contractor's approved drawing #005 . . ."); *see* Guillory II at 123:9-124:19; *see also* QAR #267 [Ex. 37 at 2].

[175] QAR #297, Feb. 22, 2002 [Ex. 84 at 2]; QAR #299, Feb. 24-25, 2002 [Ex. 85 at 2]; *see* Guillory II at 124:20-127:8.

[176] Pre-Final Inspection Rep., Concrete Blocks, Mar. 21, 2002 [Ex. 86 at 1]; *see* Guillory II at 129:3-11.

[177] Final Acceptance Rep., Concrete Blocks, Mar. 27, 2002 [Ex. 86 at 2]; *see* Guillory II at 129:12-130:6.

4.      <u>Submerged Fuel Tanker Car</u>

In addition to demolishing and removing obstructions on land in the EBIA, the Corps' SOW also required WGII to remove sunken or partially sunken barges from the eastern edge of the canal.[178]   One such submerged structure, a railroad fuel tanker car, was located adjacent to the EBIA near Boland Marine.[179]

a.      *Plans/specifications were reviewed and approved by the Corps*

In December 2001, WGII and the Corps selected a local subcontractor, Stewart Construction ("Stewart"), to excavate the tanker car from the canal.[180]   On January 16, 2002, the Corps, WGII and Stewart held a Preparatory Phase meeting for barge and fuel tanker removal.[181] At the meeting, Stewart gave "a detailed description of their work plan with equipment and personnel that will be utilized," and the Corps praised Stewart "for a very detailed Proposal Submittal/Work Plan."[182]   Nevertheless, Stewart was "reminded that all Plans developed would [still] have to be submitted and approved by USACE prior to starting each operation," including the "Product Removal Plan, Cofferdam Design, or any changes in the work plan."[183]   The Corps later commented on and approved Stewart's work plan and cofferdam design before the tanker car removal work began.[184]

---

[178] *See, e.g.,* SOW, May 15, 2000 [Ex. 48 at 2] (PWP shall include the removal of "abandoned barges"); PWP [Ex. 4 at 48] (referring to the removal of sunken barges near the EBIA as the demolition of "Water-based Structures").

[179] Guillory II at 142:9-16; *id.* at 148:1-13 ("[The fuel tanker car] was in the water.").

[180] *See* Stewart Submittal for Removal/Disposal of Barge and Tanker, Dec. 2001, [Ex. 87]; *see also* Guillory II at 148:1-13.

[181] QAR #267 [Ex. 37 at 7-11]; Guillory II at 144:17-145:2.

[182] QAR #267 [Ex. 37 at 7-8].

[183] *Id.* at 7.

[184] Guillory II at 142:25-143:9.

30

> b.   *WGII's work conformed with approved plans/specifications and was accepted by the Corps*

Once the process of removing the submerged tanker car began, WGII and the Corps conducted daily follow-up inspections of Stewart's work.  For example, on March 19, 2002, the Corps' QA Inspector observed construction of the cofferdam for the tanker car, and reported: "No deficiencies observed."[185]  The Corps, WGII and its subcontractor also held an Initial Phase Inspection on March 26, 2002.[186]  The inspection confirmed that Stewart's preliminary work was "complete and correct" and "in full compliance with work plans."[187]  When the tanker car removal ended, the Corps accepted this feature of work as complete.[188]

> 5.   Soil Remediation (Including Remediation of the Canal Bank)

In addition to demolition, the Corps tasked WGII with remediating contaminated soil at the EBIA in accordance with the LDEQ's RECAP standards.[189]  The Corps directed WGII to drill for potential contamination in the EBIA down to a maximum depth of twenty-two feet below ground surface because "of the proposed future lane and transit bypass channels that the Corps was going to dredge through the EBIA for construction of the new lock."[190]

> a.   *Plans/specifications were reviewed and approved by the Corps*

The first step in the remediation process required WGII and its subcontractors to conduct sampling at the EBIA to determine the location and depth of contamination.  In its third modification to Task Order 26, the Corps directed WGII to draft a Sampling and Analysis Plan

---

[185] QAR #318 [Ex. 38 at 2]; *see* Guillory II at 145:6-146:3.

[186] QAR #324 [Ex. 39 at 6-8] (Initial Phase Inspection); Guillory II at 147:18-25.

[187] QAR #324 [Ex. 39 at 6-7].

[188] Guillory II at 148:14-18.

[189] *See* PWP [Ex. 4 at 50]; SOW, Aug. 28, 2000 [Ex. 88 at 6-9].

[190] Guillory II at 88:18-89:17; SAP [Ex. 8 at 58-59] ("RECAP requires the consideration of three soil intervals: Surface Soil (0-3 ft bgs); Potential surface soil (3-15 ft bgs); Sub-surface soil (15-22 ft bgs)").

948424v.1

("SAP"), consisting of a Field Sampling Plan ("FSP") and Quality Assurance Project Plan ("QAPP"), "to provide a comprehensive plan that covers all aspects and definable features of field sampling and analysis . . . in accordance with the 19 Jan 00 USACE-approved Recommendation Report."[191]   The SAP "expressly discusses how [WGII] will design and implement a grid[d]ed sampling and analysis system . . . to determine the various hot spots, contaminants of concern across each of the six sites, and from that will determine . . . which contaminant sources need to be removed and remediated from the site and disposed of . . . ."[192] The Corps read and commented on WGII's drafts before approving the SAP in February 2001.[193]

Later in 2001, the Corps "tasked [WGII] to come up with [a] RECAP criteria document listing all the regulatory levels and limits that we'd have to remediate the various six sites to in order to acquire a final clean or [No Further Action At This Time] letter from the Louisiana DEQ . . . ."[194]   Mr. Guillory and his "entire six-person HTRW team" at the Corps reviewed and commented on the criteria document in draft form before approving it.[195]   Thereafter, WGII provided "supplemental submittals" to the Corps and LDEQ for each of the six individual sites on the EBIA that it sampled for contamination and planned to remediate.[196]

---

[191] SOW, May 15, 2000 [Ex. 48 at 4]; *see* SAP [Ex. 8 at 7].

[192] Guillory II at 86:6-21.

[193] *See* SAP [Ex. 8 at 2]; Cmt. Submittal, Refined SAP, Feb. 1, 2001 [Ex. 89]; Guillory II at 86:6-87:7; *see also supra* § II.F. (discussing Corps' approval of eight major work plans).

[194] Guillory II at 182:5-183:3 ("[The RECAP Submittal Report] "goes through in great detail all of those parameters and regulatory guidelines that we had to meet to reach that goal."); *see* RECAP Submittal Rep. – Criteria Doc., June 2001 [Ex. 90].

[195] Guillory II at 183:4-16; *see* RECAP Submittal Rep. – Criteria Document [Ex. 90] (approved by L. Guillory and two "USACE-NOD technical representatives" on July 11, 2001).

[196] RECAP Submittal Rep. – Criteria Document [Ex. 90 at 18-19].

In accordance with RECAP, after identifying the contaminated soils at a site, WGII had to produce a RECAP Corrective Action Plan ("CAP") for each of the six EBIA sites.[197]  The purpose of the CAP was to:

> [Identify] the specific sites . . . and contaminated hot spots of the six industrial sites to determine what the . . . lateral and vertical depths of excavation for each one of the hot spots will be and what the backfill will be . . . [T]hen this CAP report was submitted to [L]DEQ for their review and approval, and to the Corps also, saying this is what we intend to do to remediate that industrial portion of this site.  Once approval was granted by DEQ and the Corps, . . . then [WGII] could implement this CAP for that particular six-site.[198]

Finally, on April 16, 2002, WGII and the Corps held a Preparatory Phase meeting to discuss in detail the "Remediation Procedures and Work Plan" before starting actual work at the southern end of the EBIA.[199]  At the end of the meeting, among other things, the "USACE advised they would like to inspect each excavation and confirm measurements prior to backfilling."[200]

In June 2002, the Corps agreed that the EBIA's canal bank—an area fifteen feet from the water—also needed to be tested for contamination and remediated in accordance with RECAP.[201]  Because of the proximity to the canal, these areas required "special . . . excavation and remediation techniques."[202]  Thus, the Corps separately "tasked [WGII] to develop this

---

[197] *See* RECAP Corrective Action Plan ("CAP") – Saucer Marine, May 2002 [Ex. 91]; RECAP CAP – Boland Marine, Nov. 2002 [Ex. 92].

[198] Guillory II 186:1-187:16 (stating that the Corps reviewed and commented on the RECAP CAP for Saucer Marine in draft format before approving it); *see also* RECAP CAP – Saucer Marine [Ex. 91 at 2] (approved by L. Guillory); Guillory II at 190:1-22 (the Corps reviewed and commented on the RECAP CAP for Boland Marine in draft format before approving it); RECAP CAP – Boland Marine [Ex. 92 at 2] (approved by L. Guillory on Mar. 11, 2003).

[199] QAR #340, Apr. 16, 2002 [Ex. 93 at 7-10].

[200] *Id*. at 8.

[201] The original SAP did not call for testing along the canal bank because, at the time of the "grid-oriented drilling program," there were "safety and engineering concerns (e.g. lack of soil stability and proximity to water) and composition of the bank (e.g. rip/rap, debris and scrap metal that would impede drilling) as well as inaccessibility rendered by existing structures (e.g. abandoned barges, concrete wharf . . .)."  *See* RECAP Workplan Amend. – Bank Remediation, June 2002 [Ex. 94 at 10].

[202] Guillory II at 198:20-200:6.

948424v.1

RECAP work plan."[203]  The RECAP Work Plan Amendment required WGII to remediate the bank in two phases:  "in-the-dry" and "in-the-wet."[204]  Although the plan generally required WGII to limit excavations to a depth of four feet below ground surface, it allowed excavations to extend deeper inland (*i.e.*, to the east) "based on levels of contamination, soils stability and distance from water."[205]

The Corps reviewed and revised WGII's plan for the canal bank amendment before approving it.[206]  WGII and the Corps also met on at least one occasion to "collaborate" and "finalize" the remediation plan and accompanying figures.[207]  WGII submitted its final draft of the bank remediation amendment in July 2002, and the Corps formally approved it on August 12, 2002.[208]  Finally, WGII and the Corps attended a Preparatory Phase meeting to further discuss the details for the canal bank remediation on August 19, 2002.[209]

> b. *WGII's work conformed with approved plans/specifications and was accepted by the Corps*

After remediation work began, WGII and a Corps QA Inspector immediately conducted an Initial Phase Inspection.[210]  The inspection checklist form indicated the preliminary work was "complete and correct" and "in full compliance with work plans."[211]  WGII and the Corps then

---

[203] Guillory II at 198:20-199:18.

[204] *See* RECAP Workplan Amend. – Bank Remediation [Ex. 94 at 12, 15-17]; Guillory II at 199:19-200:18.

[205] RECAP Workplan Amend. – Bank Remediation [Ex. 94]; Guillory II at 200:19-201:22; QAR #430, Aug. 18, 2002 [Ex. 95 at 22-24] (Preparatory Mtg. Min.).

[206] *See, e.g.*, Email from L. Guillory, June 25, 2002 [Ex. 96] (attaching draft Bank Amendment with handwritten revisions by the Corps' Mr. Guillory and Dr. Bacuta); *see also* Guillory II at 203:9-204:16.

[207] Email from L. Guillory, June 25, 2002 [Ex. 96 at 1]; Guillory II at 204:12-16.

[208] RECAP Workplan Amend. – Bank Remediation [Ex. 94 at 1] (noting code "A," which indicates approval).

[209] QAR #430 [Ex. 95 at 22-24].

[210] QAR #340 [Ex. 93 at 26-27]; *see* Guillory II at 192:22-193:8.

[211] QAR #340 [Ex. 93 at 26].

948424v.1

conducted daily follow-up inspections.  For example, on June 21, 2002, Mr. Montegut monitored

WGII's remediation activities at Saucer Marine and reported:  "Assured that excavation was

initially dug to the dimensions required by the CAP.  Final dimensions expanded to 10' x 10'x 6'

and 16' x 23'x 6' . . . as a result of field screening and visual observations of EM

[("Environmental Manager")]. . . .  Excavation was backfilled with clean material from borrow

pit at McDonough Marine. . . .  No deficiencies observed."[212]  Similar inspections also were

conducted and recorded for the remediation of the canal bank.[213]

At the end of the remediation process for each site, WGII drafted No Further Action At

This Time ("NFAATT") reports on behalf of the Corps to submit to the LDEQ for approval.[214]

The NFAATT report "documents the remediation of [each site] by WGI[I] in accordance with

LDEQ and USACE accepted plans and procedures for a non-industrial exposure scenario and for

protection of groundwater under RECAP."[215]  For Saucer Marine, for example, the NFAATT

describes, *inter alia*, "the sixteen areas that were remediated on [that site], their applicable

boreho[l]es or bank locations that were excavated, the dates they were excavated, the dimensions

. . . of each of the excavations, and the calculated excavated volume of each of the areas in cubic

yards."[216]  Moreover, as per the Corps' directives at the preparatory meeting, the NFAATT also

included an "Excavation Log," which documented the precise location, size and amount of

---

[212] QAR #389, June 21, 2002 [Ex. 97 at 1-2]; *see also,* QAR #759, Jan. 21, 2004 [Ex. 98 at 2] (Follow-up Inspection at Indian Towing and Mayer Yacht); QAR #949, Oct. 30 - Nov. 1, 2004 [Ex. 99 at 2] (Follow-up Inspection at McDonough Marine); QAR #999, Jan. 18, 2005 [Ex. 100 at 2] (same).

[213] *See, e.g.*, QAR #471, Oct. 23, 2002 [Ex. 101 at 12-13] (Initial Phase Inspection for bank remediation)**;** QAR #483, Nov. 7, 2002 [Ex. 102 at 2] ("Follow-up – Canal Bank Excavation:  . . . Observed excavation expanded beyond original CAP dimension due to results of field screening. . . .  No deficiencies observed.").

[214] *See, e.g.*, NFAATT Submittal Rep. – Saucer Marine, May 2003 [Ex. 103]; NFAATT Submittal Rep. – Boland Marine, June 2005 [Ex. 104].

[215] NFAATT Submittal Rep. – Saucer Marine [Ex. 103 at 9].

[216] Guillory II at 195:16-196:2.

backfill used for each excavation on the site.[217]  WGII and the Corps signed each excavation log

as field work was completed.[218]  After the NFAATT for a particular site was reviewed and

approved by the Corps and then LDEQ, the LDEQ sent the Corps a letter verifying that the site

"needs no further action at this time, which is a clean bill of health for that particular site."[219]

6.    Borrow Pit at McDonough Marine Site

Early in the planning stages of Task Order 26, the Corps determined that to the extent

possible, excavations at the EBIA should be backfilled with native clay from an on-site "borrow

pit" rather than with imported material.[220]  Mr. Guillory testified that the Corps' concerns in this

regard were two-fold:  (1) using off-site commercial material would increase the cost of

remediation since the Corps would have to pay for the material and transport it to the site; and

(2) adding new material to the site would increase the future cost of hydraulically dredging and

disposing of soil during construction of the bypass channel.[221]  Thus, the "primary source" of

backfill at the EBIA was the borrow pit on the McDonough Marine site;[222] however, if there was

---

[217] See NFAATT Submittal Rep. – Saucer Marine [Ex. 103 at 49-75]; see also Guillory II at 196:6-197:6; NFAATT Submittal Rep. – Boland Marine [Ex. 104 at 45-72].

[218] See NFAATT Submittal Rep. – Saucer Marine [Ex. 103 at 49-75]; NFAATT Submittal Rep. – Boland Marine [Ex. 104 at 45-72]; Guillory II at 196:6-197:6.  The NFAATTs included the canal bank excavations on each site. See Guillory II at 201:23-202:9.

[219] Guillory II at 194:8-20; Technical Completion Rep. [Ex. 24 at 1-22].

[220] See PWP [Ex. 4 at 26] ("In an attempt to ensure that off-site soil will not need to be brought onto the site, a borrow pit area will be developed" on the site); see also Staggs at 151:4-17 ("The borrow pit, once you got past the topsoil and miscellaneous fill that had been spread across the site, it was all clay."); Guillory I at 194:6-14 (McDonough Marine borrow pit had "thousands of yards of clay" for backfilling).

[221] Guillory II at 116:21-118:4; Technical Analysis of Proposal #113 [Ex. 28 at 2]; SAP [Ex. 8 at 4-3] ("Fill will not be brought on site because that would simply add to the number of tons of soil that ultimately would need removal for the construction of the By Pass Channel at the EBIA.")

[222] Technical Analysis of Proposal #113 [Ex. 28 at 2] (referring to the on-site borrow pit as the "primary source" of backfill for excavations).

36

insufficient borrow pit material, WGII could import backfill material with Corps' approval as to source, quality and cost.[223]

        a.     *Plans/specifications were reviewed and approved by the Corps*

The plan for the on-site borrow pit was included in the Corps-approved PWP and SAP.[224] In August 2001, WGII submitted a more detailed plan to the Corps and the LDEQ for review and approval.[225] This plan proposed to construct the borrow pit on the McDonough Marine site.[226]

By late 2001, remediation work had increased the need for backfill material, so WGII and the Corps asked the LDEQ for permission to expand the borrow pit on McDonough Marine from 0.84 acres to 1.55 acres.[227] Mr. Guillory and the Corps' Geologist, Dr. Bacuta, reviewed WGII's initial proposal for the extension and expressed concern about the impact a larger borrow pit might have on the "structural integrity of the adjacent levee/floodwall."[228] Thus, prior to excavating any more borrow, Mr. Guillory asked engineers in the Corps' Geotechnical Branch to, among other things, "evaluate the stability analysis of the levee/floodwall with respect to the [proposed] fully excavated borrow area":[229]

> We had two ways we could have gone with it; we could have asked [WGII] to evaluate the structural stability of it and submit that to the Corps for final review and approval, or we could just do [the analysis] in-house.  And for

---

[223] Guillory II at 103:8-104:17 (if imported material was ever needed, COR Jim Montegut would have to approve where the material came from, the type of material and the costs associated with purchasing and transporting it "before [WGII] would be allowed to actually bring it onto the site").

[224] *See* PWP [Ex. 4 at 26-27]; SAP [Ex. 8 at 60-61]; *see also supra* § II.F.

[225] *See* RECAP Submittal Rep. – Borrow Pit, Aug. 2001 [Ex. 105]; *see also* Cmt. Submittal, Borrow Pit RECAP Submittal Rep., July 3, 2001 [Ex. 106] (Corps' substantive review); Transmittal, Borrow Pit RECAP Submittal Rep., Sep. 7, 2001 [Ex. 107].

[226] RECAP Submittal Rep. – Borrow Pit [Ex. 105 at 8].

[227] Borrow Pit Extension App., Rev. Jan. 8, 2002, [Ex. 108 at 2-3, 10-11]; *see* Guillory II at 149:11-150:2.

[228] Transmittal and Cmts., Borrow Pit Ext. App., Feb. 4, 2002 [Ex. 109 at 3-4] (cmts. 5-6); *see* Guillory II at 152:17-153:2.

[229] Transmittal and Cmts., Borrow Pit Ext. App. [Ex. 109 at 3-4] (cmts. 5 & 6).

> expediency, and being that Corps had the final say-so in the structural stability analysis, . . . myself and the HTRW team tasked [WGII] to provide us with accurate cross-sections and surveys of the area, and from that I specifically requested, by memo, to our geotechnical engineering branch in engineering division to perform that analysis.[230]

After receiving a formal written response from the Corps' Engineering Division and meeting with a geotechnical engineer at the NOD,[231] Mr. Guillory "took the recommendations and stability control lines from our . . . geotechnical branch and translated those dimensions so that [the Corps] could reference them off of the floodwall itself."[232]  Eventually, the Corps' directions were incorporated into a "design template" for WGII to use in excavating the extended borrow pit.[233]  The Corps did not expect WGII to perform any of its own geotechnical engineering review with respect to the borrow pit design, other than to "implement what [the Corps] recommended."[234]

At the conclusion of Task Order 26, the Corps specifically directed WGII to "slowly breach[]" the dikes between the IHNC and the borrow area "to allow the IHNC water to fill the borrow area and allow intertidal flow between the two water-bodies."[235]

---

[230] Guillory II at 153:3-20; *see* Memo. for Eng'g Div., Geotech. Stability Analysis, Apr. 15, 2002 [Ex. 110 at 2]; *see also* O'Conner at 196:13-197:24; Staggs at 153:18-154:12.  Mr. Staggs testified that before Mr. Montegut told him, he had no knowledge that the proposed borrow pit design might possibility impact the levees/floodwalls.  Staggs at 98:15-99:16.

[231] *See* Memo. for Constr. Div., Geotech. Stability Analysis, May 2, 2002, [Ex. 110 at 1]; Guillory I at 172:24-173:18 (referencing a meeting with a Corps geotechnical engineer, Julie Oliphant, to discuss the design of the borrow pit).

[232] Guillory II at 160:18-161:2; *see also* Transmittal and Cmts., Borrow Pit Ext. App. [Ex. 109 at 5] (cmt. 8) ("WGI and its subcontractors shall be responsible for accurately laying-out the horizontal and vertical limits of this approved borrow area per this approved submittal and ensure to USACE the dimensions and limits are not exceeded.").

[233] *See* Fax from J. Montegut, June 10, 2002 [Ex. 111 at 2-3] (attaching design template for borrow pit); *see also* Guillory I at 175:23-178:21; Staggs at 236:13-21, 239:25-240:19.

[234] Guillory II at 157:17-158:2.

[235] Transmittal and Cmts., Borrow Pit Ext. App. [Ex. 109 at 5] (cmt. 9); *see also* Guillory II at 154:10-155:10 (Corps was not concerned that the borrow pit filled with water could pose a threat to the nearby levees and

948424v.1

> b.    *WGII's work conformed with approved plans/specifications and was accepted by the Corps*

The Corps constantly monitored WGII's borrow pit work to ensure compliance with approved specifications. For example, Corps QA Inspectors oversaw WGII's subcontractors moving material from the borrow pit to adjacent sites for use as backfill.[236] The Corps observed general maintenance activities, including draining the borrow pit of excess water.[237] In addition, the Corps monitored the borrow pit extension excavation to verify that WGII's work conformed to the exact design specifications provided by the Corps.[238] Finally, on January 18, 2005, the Corps inspected the McDonough Marine site and watched WGII remove a dam on the west side of the borrow pit to allow canal water to flow into the excavation.[239] Thereafter, the Corps accepted WGII's work on the borrow pit as complete.[240]

7.    Excavation Under Surekote Road at McDonough Marine

As part of its remediation effort and in accordance with RECAP procedures, in late 2004, WGII excavated a contamination "hot spot" directly beneath Surekote Road at the McDonough Marine site. Surekote Road was approximately 24 or 25 feet wide and located roughly 15 to 20 feet west of the floodwall bordering the eastside of the EBIA.[241]

---

(continued…)

floodwalls, "in fact it's an advantage to have the borrow pit filled with water at the conclusion of the task order rather than staying in the dry.").

[236] *See, e.g.*, QAR #220 [Ex. 70 at 2].

[237] *See, e.g.*, QAR #267 [Ex. 37 at 2].

[238] QAR #389 [Ex. 97 at 2]; QAR #759 [Ex. 98 at 2]; QAR #948, Oct 29, 2004 [Ex. 120 at 2]; *see* Guillory II at 165:20-166:7, 167:4-13.

[239] QAR #999 [Ex. 100 at 2]; Guillory II at 167:15-169:1.

[240] *See* Guillory II at 169:2-6.

[241] *See* Memo. for Constr. Div., Geotech. Stability Analysis [Ex. 110 at 4] (hand-drawn sketch of borrow pit and Surekote Road); *see also* Guillory II at 161:18-162:1.

        a.     *Plans/specifications were reviewed and approved by the Corps*

The initial plans for removing the contaminants beneath Surekote Road were described in the January 2002 McDonough Marine Corrective Action Plan ("CAP").[242]  Like the RECAP submissions for the other EBIA facilities, this CAP was substantively reviewed and approved by the Corps.[243]  Subsequently, due to concerns relating to the impact of "excavation Area 2" of the Surekote Road excavations on the levees and floodwalls, in April 2002, Mr. Guillory requested that the Corps' Engineering Division conduct a stability analysis for the excavation.[244]  The Geotechnical Branch performed the analysis and found that the Surekote Road excavation "did not present a stability problem" for the nearby levees and floodwalls.[245]  Nevertheless, as Mr. Guillory requested, the Geotechnical Branch provided specific guidance to the Corps' Construction Division for backfilling and compacting the excavation under Surekote Road.[246]

        b.     *WGII's work conformed with approved plans/specifications and was accepted by the Corps*

The Corps monitored WGII's work under Surekote Road to verify that it followed the excavation specifications recommended by the Corps' Geotechnical Branch.  For example, in a follow-up inspection in the Fall of 2004, the Corps' QA Inspector reported:  "Assured compacted backfill placed in eight-inch lifts with each lift given four passes with the dozer.  Observed semi-

---

[242] RECAP CAP – McDonough Marine, Jan. 2002 [Ex. 112 at 14-15, 23, 37-38].  The first Surekote Road excavation, named "Area 1," included boreholes 57A, 59A and 61A.  "Area 2" included boreholes 51A and 53A.  *Id.* at 14-15.

[243] Transmittal and Cmts., RECAP CAP – McDonough Marine, Feb. 26, 2002 [Ex. 113] (noting code "A" indicating approval, as well as comments and suggested changes by USACE representatives); Guillory II at 190:14-15 ("Yes, all six sites the CAPs were approved.").

[244] Memo. for Eng'g Div., Geotech. Stability Analysis [Ex. 110 at 2] (requesting the Engineering Division to "[p]rovide a stability control line and assess whether Construction Division and the contractor should utilize a sheeting, shoring or bracing system to safely accomplish this soil excavation"); Guillory II at 153:17-20, 156:7-13, 158:3-18.

[245] Memo. for Constr. Div., Geotech. Stability Analysis [Ex. 110 at 1].

[246] *Id.*

948424v.1

compacted backfill placed in remaining excavation with the PC270 excavator and

compacted . . . .  No deficiencies observed."[247]  In December 2004, WGII submitted an NFAATT

Report for the McDonough Marine site to the Corps and LDEQ, which included a detailed

description of the Surekote Road excavation.[248]  The Corps reviewed and commented on the

NFAATT report in draft form and then accepted WGII's remediation work under Surekote Road

as complete.[249]

### H.    Phase V:  Close Out of EBIA Work Site in May 2005

#### 1.    Final site inspection and "substantial completion"

Mr. Montegut, Mr. Guillory, Mr. John Weatherly (Corps – Tulsa Div.), Mr. Bobby Smith

(WGII Field Supervisor) and Mr. Rick Hedrick (Corps – Tulsa Div.) conducted a final site visit

and inspection of the EBIA on May 26, 2005.[250]  On that day, all field operations officially

concluded.

> [A]ll present agreed that demobilization activities were complete.  The site has
> been fertilized, seeded and graded to drain.  All office trailers, rental equipment
> and WGI[I] vehicles have been removed from the site . . .  Based on this
> information, and visual observations, Mr. Montegut, the project COR, declared
> Task Order 26 substantially complete. . . .  WGI[I] would complete remaining
> closeout activities and deliverable items from its Denver Office.[251]

---

[247] QAR #949 [Ex. 99 at 2]; *see also* Guillory II at 178:9-19 (testifying that the work on the Surekote Road excavations described in QAR #949 comports with the specifications recommended by the Geotechnical Engineering Branch at the Corps); Monthly Photo Log, Nov. 29, 2004 [Ex. 60] (attaching WGII's photographs of the excavations under Surekote Road, which were submitted to the Corps); Guillory II at 178:20-181:25.

[248] NFAATT Submittal Rep. – McDonough Marine, Dec. 2004 [Ex. 114 at 22, 66-67] (identifying excavations at Areas 1 and 2 under Surekote Road).

[249] Transmittal and Cmts., NFAATT Submittal Rep. – McDonough Marine, Mar. 9, 2006 [Ex. 115]; NFAATT Submittal Rep. – McDonough Marine [Ex. 114 at 2]; Guillory II at 197:7-12.

[250] Ltr. from J. Montegut, May 26, 2005 [Ex. 116]; *see also* Guillory II at 204:19-205:9.

[251] Ltr. from J. Montegut [Ex. 116] (emphasis added).

41

Mr. Guillory testified that the significance of "substantial completion" of the contract "is that it stops the time, and we declared the contract physically complete."[252]  After WGII left the EBIA site on May 26, 2005, the Corps continued to visit the EBIA in connection with the next phase of the Lock Replacement Project.[253]

### 2. Technical Completion Report

After the final site inspection, WGII worked on its "final deliverable" under the contract, the Technical Completion Report, which is "a summary report to roll-up all definable features of work that occurred on the project, all clearance NFAATT letters from Louisiana DEQ to the Corps, [and] a tabular listing of all . . . subcontractors and vendors that worked on the project."[254]  The Technical Completion Report was "a final document to conclude Task Order 26."[255]  WGII submitted a draft of the report for the Corps' review and comment in July 2005, and the Corps later approved it on August 23, 2005.[256]  Hurricane Katrina struck New Orleans on August 29, 2005.

### III.   SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "when the pleadings and summary judgment evidence establish that 'there is no genuine issue as to any material fact' and that judgment as a matter of law is appropriate.'"  *Parker v. Crescent Guardian, Inc.*, No. 04-1801, 2006 WL 901756, at *2 (E.D. La. Apr. 3, 2006) (citing Fed. R. Civ. P. 56(c)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Federal Rule of Civil Procedure 56 would be thwarted if a defendant had

---

[252] Guillory II at 30:3-17.

[253] *See, e.g.*, Email from J. Agan, Aug. 9, 2005 [Ex. 117 at 1-2] (regarding "activity at IHNC eastbank site 8/9/05 field visit").

[254] Guillory II at 30:18-24, 207:16-208:3.

[255] Guillory II at 207:16-208:3.

[256] Technical Completion Rep. [Ex. 24 at 5-9]; Guillory II at 30:18-24, 208:23-209:1.

42

"to bear the costs of trying all of the issues in a case when some can and should be resolved on summary judgment." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

After the moving party meets its burden of demonstrating the absence of a genuine issue of material fact, the non-moving party "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Id.* at 1075.  This burden cannot be met merely by pointing to "'some metaphysical doubt as to the material facts,' . . . by 'conclusory allegations,' [or] by 'unsubstantiated assertions.'" *Id.* (citing *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 871-73 (1990); *Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994)).

Courts routinely grant summary judgment and hold federal contractors immune from liability under state law based on the government contractor defense.  *See, e.g.*, *Hudgens v. Bell Helicopters*, 328 F.3d 1329, 1344-45 (11th Cir. 2003); *Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 437-39 (5th Cir. 2000); *In re Air Disaster at Ramstein Air Base, Germany*, 81 F.3d 570, 574-76 (5th Cir. 1996); *Stout v. Borg-Warner Corp.*, 933 F.2d 331, 334-37 (5th Cir. 1991), *cert. denied*, 502 U.S. 981 (1991).

## IV.    APPLICABLE LAW – GOVERNMENT CONTRACTOR DEFENSE

The Supreme Court has long recognized that private contractors who perform work at the request and direction of the federal government cannot be held liable for damages caused by the contractor's implementation of that work.  For example, in *Yearsley v. W.A. Ross Constr. Co.*, plaintiff sued a private construction company that built dikes for the federal government.  309 U.S. 18, 20 (1940).  As a result of the dikes' construction, 95 acres of plaintiff's land suffered from erosion.  *Id.*  The parties did not dispute that "the work which the contractor had done in the river bed was all authorized and directed by the Government of the United States for the purpose of improving the navigation of this navigable river." *Id.*  Accordingly, the Court held that the

43

government contractor was immune from liability:  "if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will."  *Id*. at 20-21.

In *Boyle v. United Tech. Corp.*, the Supreme Court applied the rationale behind *Yearsley*, which protected contractors from liability where they were "'executing [the government's] will'" under a performance contract, to a military procurement contract.  487 U.S. 500, 505-06 (1988). In doing so, the Court held that the applicability of the so-called "government contractor defense" did not depend on whether the contractor was an agent of the government or an independent contractor, or whether the contract was for services or for the procurement of equipment.  *Id*. (citing *Yearsley*, 309 U.S. at 20-21).  Rather, the Court focused on the existence of "uniquely federal interests," which "are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced . . . by [] 'federal common law.'"  *Id*. at 504 (citations omitted).

The *Boyle* Court referred to two unique federal interests implicated by a contract between a private contractor and the federal government.  The first is the law governing the obligations and rights of the United States under its contracts.  *Id*.  The Court found that "[t]he imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price."  *Id*. at 507.  Because "[t]he financial burden of judgments against the contractors would ultimately be passed through . . . to the United States itself," any state law that holds government contractors liable for implementing the government's will presents "a 'significant conflict' with federal policy and must be displaced.'"  *Id*. at 511-12.

44

The second unique federal interest relates to the scope of civil liability of federal officials for discretionary actions taken in the course of their duties. *Id.* at 505. Although Congress generally waived sovereign immunity for tort claims against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 (2000), it specifically exempted from this waiver any claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. §2680(a) (the "discretionary function exception"). Thus, the Court reasoned, allowing plaintiffs to bring state-tort actions against private contractors who implement the discretionary judgments of a federal agency or employee "would produce the same effect sought to be avoided by the FTCA exemption." *Boyle*, 487 U.S. at 511.

To prevent state-tort laws from frustrating the two important federal interests outlined above, federal common law now dictates that a private contractor cannot be liable under state law for alleged negligence where the federal government:

> (a) approves in its discretion reasonably precise specifications, (b) supervises and controls the implementation of those specifications, and (c) the contractor is not aware of reasons not known to the government why the application is unsafe or unreasonable.

*In re Katrina Canal Breaches Consol. Litig.*, No. 05-4182, 2007 WL 4219351, at *5 (E.D. La. Nov. 27, 2007); *see also Boyle*, 487 U.S. at 512 ("The first two [conditions] assure that the suit is within the area where the policy of the 'discretionary function' would be frustrated – *i.e.*, they assure that the [] feature in question was considered by a Government officer, and not merely by the contractor itself.").

If the contractor satisfies the government contractor defense's three conditions, the nature of the contractor's work for the United States (*i.e.*, military, non-military, service or procurement)

45

is irrelevant.[257]  As long as the contractor demonstrates that the United States approved reasonably precise specifications that addressed the challenged feature or features of work, "the contractor's federal contractual duties will inevitably conflict with alleged state tort duties," and state law will be displaced.  *In re Agent Orange*, 517 F.3d 76, 93 (2d Cir. 2008); *see Lewis v. Babcock Indus., Inc.*, 985 F.2d 83, 86-87 (2d Cir. 1993) (holding that "answering the question whether the Government approved reasonably precise specifications for the design feature in question necessarily answers the question whether the federal contract conflicts with state law"); *Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698, 701 (4th Cir. 1989) (holding "extensive governmental participation provides tangible evidence of the strong federal interest which justifies the creation of a federal common law defense for government contractors in the first place"); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001) ("Where the government has directed a contractor to do the very thing that is the subject of the claim, we have recognized this as a special circumstance where the contractor may assert a defense." (citing *Boyle*, 487 U.S. 500)).

---

[257] *See, e.g., In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 197 (2d Cir. 2008) (government contractor defense may apply to contractors providing disaster relief and clean-up services to the federal government); *Hudgens*, 328 F.3d at 1334 (maintenance-service contractor may assert the government contractor defense); *Carley v. Wheeled Coach*, 991 F.2d 1117, 1122 (3rd Cir. 1993) (ambulance manufacturer for the General Services Administration may assert the government contractor defense); *Guillory v. Ree's Contract Serv., Inc.*, 872 F. Supp. 344, 346 (S.D. Miss. 1994) (government contractor defense "applies to all contractors," including non-military and performance contracts) (citations omitted); *In re Katrina Canal Breaches Consol. Litig.*, No. 05-4182, 2007 WL 763742, at *4 (E.D. La. Mar. 9, 2007) (granting dredging service contractor's motion to dismiss based, in part, on the government contractor defense); *Richland-Lexington Airport Dist. v. Atlas Prop., Inc.*, 854 F. Supp. 400, 421-24 (D.S.C. 1994) (remediation contractor working for the Environmental Protection Agency immune under the government contractor defense); *see also Crawford v. Nat'l Lead Co.*, 784 F. Supp. 439, 445-46 n.7 (S.D. Ohio 1989) ("[T]he government contractor defense . . . is viable with regard to performance contracts."); *Askir v. Brown & Root Servs. Corp.*, 1997 WL 598587, at *2, 5-7 (S.D.N.Y. Sept. 23, 1997) (contractor that provided "logistical, operational, maintenance, and construction services" to the United States is immune from liability under government contractor defense).

A.     **Condition 1**:  **Government Approved Reasonably Precise Specifications**

The defense's first condition, that the United States approved reasonably precise specifications, ensures the "feature in question was considered by a Government officer, and not merely by the contractor itself." *Boyle*, 487 U.S. at 512.  Thus, the United States need not have actually prepared the specifications in order to have "approved" them. *Kerstetter*, 210 F.3d at 435.  If the evidence shows that the federal government provided a "substantive review or evaluation" of the contractor's plans, and not merely a bureaucratic "rubber stamp," the first condition of the *Boyle* test is satisfied. *Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir. 1989); *see In re World Trade Ctr.*, 521 F.3d at 197; *In re: Katrina*, 2007 WL 4219351, at *4-5.  Evidence of "continuous back and forth" between the contractor and the government, such as proof that the contractor and the government "worked closely together on the development of [a project] from its planning stages to its full production" generally is sufficient. *In re Air Disaster*, 81 F.3d at 575 (holding that by showing that "the Government did not leave the 'critical design decisions to the private contractor,' but worked closely with the [contractor] every step of the way," defendant met its burden of proof on *Boyle's* first condition (citing *Trevino*, 865 F.2d at 1480)); *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1156 (6th Cir. 1995) (holding that the "back and forth dialogue culminating in approval" of the proposed specifications established *Boyle's* first condition).

In *Stout v. Borg-Warner Corp.*, for example, the Fifth Circuit considered what constitutes the approval of "reasonably precise specifications" for purposes of satisfying the first condition of the government contractor defense.  933 F.2d at 334-36.  Plaintiff, an ex-Army air conditioning repairman, brought a product liability suit against a government contractor that redesigned and later manufactured an air conditioner unit used by the Army. *Id*. at 332 (plaintiff claimed that the contractor's air conditioner design was unreasonably dangerous because it did

47

not include a safety device or screen to prevent one's hand from contacting the rotating blades of the condenser fan). The defendant, a contractor for the Corps, sought summary judgment based on the government contractor defense. *Id*.

Plaintiff argued in opposition that the preliminary design specifications for the air conditioner that the Corps provided to the contractor were "general," and they neither provided for, nor prohibited, the installation of a protective device to cover the fan. *Id*. at 334. Thus, plaintiff insisted the contractor was unable to satisfy the first condition of the government contractor defense that requires government approval of "reasonably precise" specifications. *Id*. at 334-35. Rejecting this argument, and affirming the lower court's decision to grant summary judgment to the contractor, the Court held that defendant had proven reasonably precise specifications for the condenser fan with undisputed evidence of the Corps' "thorough review" and approval of the contractor's design, which included the contractor's "submission of detailed drawings at various progressive stages of the design," and "critical design reviews where Army engineers critiqued [the contractor's] work." *Id*. at 336. In the end, the close collaboration (or "back and forth") between the Army Corps and the contractor throughout the design process ensured that the Corps, and not the contractor, exercised ultimate discretion over the allegedly defective feature of work. *Id*.; *see also Kerstetter*, 210 F.3d at 435 ("The specifications need not address the specific defect alleged; the government need only evaluate the design feature in question." (citing *Boyle*, 487 U.S. at 512; *Trevino*, 865 F.2d at 1486)).

**B.   Condition 2:  Work Conforms To Government-Approved Specifications**

The government contractor defense's second condition tests whether the federal government contractor's work conformed to the government's approved specifications. *Boyle*, 487 U.S. at 512. This condition may be satisfied by showing that the United States "supervise[d] and control[led] the [contractor's] implementation of" approved specifications, *In re Katrina*,

48

2007 WL 4219351, at *5 (citing *Trevino*, 865 F.2d at 1480), or that the government inspected, accepted as complete, or used the contractor's work.  *See Kerstetter*, 210 F.3d at 435-36 (holding "[e]xtensive government involvement in the design, review, development and testing of a product, as well as extensive acceptance and use of the product following production" shows conformance); *Tate*, 55 F.3d at 1156 (second condition satisfied by proof the government "inspected and approved" contractor's work); *Kleemann*, 890 F.2d at 701-02 (where there is a "continuous exchange between the contractor and the government, the process itself becomes persuasive evidence of product conformity to precise specifications").  In all events, absent actual evidence to the contrary, the United States' written acceptance of its contractor's work constitutes compelling evidence that the contractor's work conformed to the government's approved specifications.  *See, e.g.*, *Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 420 (5th Cir. 2001).

Importantly, plaintiffs cannot negate a contractor's showing of conformance with reasonably precise specifications merely by asserting that defendant's work did not comply with some "'general admonition against an unwanted condition.'"  *Kleemann*, 890 F.2d at 703 (quoting *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1319 n.3) (11th Cir. 1989) (precatory contract terms "represent little more than the hopes of participants that the project on which they are to embark will turn out well"); *In re Air Disaster*, 81 F.3d at 575 (holding overly general contract language "'calling for such vagaries as a failsafe, simple or inexpensive'" work have no role in the government contractor defense analysis) (quoting *Kleemann*, 890 F.2d at 703).

Instead, a plaintiff must show an allegedly defective feature—which caused plaintiff's damages—"result[ed] from" the contractor's departure from reasonably precise specifications.

49

rt

ort

*See Kerstetter*, 210 F.3d at 435-36 (harmonizing prior decisions); *see also Beaver Valley Power Co. v. Nat'l Eng'g & Contracting Co.*, 883 F.2d 1210, 1219 n.9 (3d Cir. 1989) (partially affirming summary judgment because the plaintiff never showed how the contractor's alleged nonconformance with a permitting requirement specified in the contract "caused its damages").[258]

C.     **Condition 3**: **Contractor Told United States Of Dangers Associated With Contractor's Work About Which Contractor Had Actual Knowledge**

A federal contractor satisfies the government contractor defense's third condition by proving it knew of no "reasons not known to the government why the application" of the approved specifications "[wa]s unsafe or unreasonable."  *In re Katrina*, 2007 WL 4219351, at *5; *see also Kerstetter*, 210 F.3d at 436; *In re Air Disaster*, 81 F.3d at 575-76; *Stout*, 933 F.2d at 336-37.  The Supreme Court imposed this requirement to eliminate any incentive for the contractor to withhold information relevant to discretionary government decisions.  *Boyle*, 487 U.S. at 512-13.

Notably, however, *Boyle's* third condition does not oblige the contractor to test for or discover inherent risks that neither the United States nor its contractor ever considered to be problematic.  *See Boyle*, 487 U.S. at 513 (the standard is not what a contractor should have "reasonably known" because that is inadequate to "protect the federal interest embodied in the 'discretionary function' exemption"); *see also Kerstetter*, 210 F.3d at 436 (holding the government contractor defense applies "even when the contractor did not warn the government of latent defects . . . that neither the contractor nor the government considered").  Instead, under this third condition, the contractor must warn the United States "of dangers about which it has

---

[258] The Third Circuit decided *Beaver Valley Power Co.* under Pennsylvania's state government contractor defense. 883 F.2d at 1212.  Nevertheless, because the elements of the state-law defense are nearly identical to the elements of *Boyle*'s defense, 883 F.2d at 1216, and the Circuit Court referred to Pennsylvania's "government agency defense" as the likely origin of the federal government contractor defense, *id.* at 1215 n.4, the court's analysis is applicable here.

*actual knowledge*," and not about dangers which, in hindsight, the contractor allegedly *should have* identified.  *See Kerstetter*, 210 F.3d at 436 (quoting *Trevino*, 865 F.2d at 1487) (emphasis in original).

For example, in *Kerstetter*, the plaintiff argued a contractor could not benefit from the government contractor defense unless the contractor actually had proposed, and the United States had rejected, "a safer alternative" to an allegedly defective pilot restraint system.  210 F.3d at 436.  The court rejected the plaintiff's "should have" alternative as "*contrary to the case law.*"  *Id.* (emphasis in original).  "The government contractor defense does *not* require a contractor to warn the government of defects about which it only *should* have known."  *Miller*, 275 F.3d at 422 (quoting *Kerstetter*, 210 F.3d at 436) (emphasis in original).  The court relied on the *Boyle* Court's holding that "it does not seem to us sound policy to penalize, and thus deter, active contractor participation in the design process, placing the contractor at risk *unless it identifies all design defects.*"  *Kerstetter*, 210 F.3d at 436 (quoting *Boyle*, 487 U.S. at 513) (emphasis added).  Both the district court and the Fifth Circuit interpreted this language as "mean[ing] only that the defense applies even when the contractor did not warn the government of latent defects—in other words, defects that neither the contractor nor the government considered at all."  *Kerstetter*, 210 F.3d at 436.

Finally, *Boyle's* third condition tests only whether the contractor knew of dangers "not known to the government."  *In re Katrina*, 2007 WL 4219351, at *5.  Thus, a contractor also may satisfy this third condition by showing the United States' knowledge of potential risks either equaled or exceeded the contractor's knowledge.  *See*, *e.g.*, *Miller*, 275 F.3d at 422-23 (affirming summary judgment partly because the United States knew of the danger posed by a byproduct of Agent Orange); *Kerstetter*, 210 F.3d at 438 n.9 (affirming summary judgment partly because the

51

United States "knew at least as much as the contractors"); *In re Air Disaster*, 81 F.3d at 575 (affirming summary judgment partly because the United States knew of the alleged risk); *Stout*, 933 F.2d at 336-37 (affirming summary judgment partly because the United States' verbal and written warnings to the plaintiff showed the United States knew of the risk).

## V.   THE GOVERNMENT CONTRACTOR DEFENSE BARS PLAINTIFFS' CLAIMS

Plaintiffs' Amended Complaint alleges that WGII's remediation and demolition work on behalf of the Corps ultimately "resulted in underseepage-induced erosion and other damage" to the levees and floodwalls along the eastside of the IHNC.  *See* Amended Compl. ¶¶ 42-44.  After extensive discovery spanning more than two years, Plaintiffs have focused their allegations on certain discrete features of WGII's work on Task Order 26, including:  demolition and piling removal; removal of the sewer lift station; removal of concrete block #004 (or the "wedding cake"); removal of a submerged tanker car; excavations associated with soil remediation (including under Surekote Road); and the excavation of a borrow pit.[259]  Because the Corps "directed" WGII to do these features of work, and since they are "the very thing that is the subject of" Plaintiffs' claims, the government contractor defense bars Plaintiffs' claims entirely, *Corr. Servs. Corp.*, 534 U.S. at 74 n.6 (citing *Boyle*, 487 U.S. 500 (1988)), and summary judgment should be granted.[260]

---

[259] *See generally* 2006 Bea Decl. [Ex. 14 at 24]; Expert Report of Robert Bea, filed in *Robinson v. United States*, No. 06-2268, July 14, 2008 [Ex. 118] (the "2008 Bea Expert Rep."); *see also In re Katrina*, 2007 WL 4219351, at *7 (referring to the 2006 Bea Declaration as raising issues about the Corps' involvement in and oversight of WGII's work).

[260] To the extent Plaintiffs complain about any other features of work that are not specifically described herein, WGII has shown that the Corps' involvement so permeated every aspect of WGII's work on Task Order 26 that the government contractor defense displaces those claims as well.  *See Kleemann*, 890 F.2d at 701 ("[E]xtensive government participation" in its contractor's work "provides tangible evidence of the strong federal interest which justifies the creation of a federal common law defense for government contractors in the first place.").

948424v.1

A.      **Demolition And Removal Work On Task Order 26 (Demolition And Removal of Pilings, Sewer Lift Station, Wedding Cake And Tanker Car)**

1.      The Corps approved reasonably-precise specifications for WGII's work

As described above, the Corps' back-and-forth reviews of the proposed work plans for WGII's work on Task Order 26 satisfies the first condition of the government contractor defense because they show the Corps acted as "the agent of decision" over these features of WGII's work.[261]  *See In re Agent Orange*, 597 F.3d at 91.  Indeed, the Corps commented on, discussed, revised, and ultimately approved all of the proposed work plans before allowing WGII or its subcontractors to proceed with these tasks.[262]  Moreover, during numerous Preparatory Phase meetings, WGII, its subcontractors and the Corps reviewed the implementation of those plans to make sure, among other things, that the Corps' expectations for the task were understood.[263]  In the end, the Corps never left "the critical design decisions" relating to demolition and removal to WGII but instead "worked closely with" WGII "every step of the way."  *In re Air Disaster*, 81 F.3d at 574-75 (quoting *Trevino*, 865 F.2d at 1480).

In addition to the Corps' back-and-forth review, the Corps' inspections and supervision of "every aspect of" WGII's work further shows the Corps approved reasonably-precise specifications for WGII's demolition work.  *In re Air Disaster*, 81 F.3d at 575.  Here, some of the same Corps personnel that attended preparatory meetings later inspected WGII's or its subcontractors' demolition and piling removal, lift station removal, wedding cake removal, and

---

[261] These work plans included demolition and piling removal, sewer lift station removal, concrete block removal and the tanker car removal.

[262] *See supra* § II.G.1.a. (demolition and piling removal), § II.G.2.a. (sewer lift station), § II.G.3.a. (wedding cake), § II.G.4.a. (tanker car).

[263] *See* Guillory II at 105:22-106:11; *see also* Prep. Phase Mtg. Min., Demo. [Ex. 65]; Supervisory Coordination Mtg. Min., Demo. [Ex. 66]; Prep. Phase Inspection Mtg., Demo. [Ex. 67 at 1-5]; Prep. Phase Inspection Min., Lift Station [Ex. 76]; Prep. Phase Mtg. Min. Concrete Blocks [Ex. 83]; QAR #267 [Ex. 37]; O'Conner at 50:12-53:12 (before making a determination about whether to bring in a shoring engineer on-site for a particular excavation, WGII had to talk with the Corps and "we will arrive at a solution. . . .  I can advise, but I can't direct.").

948424v.1

tanker removal work.[264]  By participating in initial planning meetings and then supervising its

contractor's implementation of the Corps' approved specifications, the Corps had complete

discretion over these features of work.[265]  Accordingly, the Court should find that the facts here

undisputedly satisfy the government contractor defense's first condition for all of the demolition

and removal work WGII performed.  *See In re Air Disaster*, 81 F.3d at 575 (inspection and

supervision of "every aspect of" contractor's work shows government approval of specifications

"far beyond mere rubber stamping").

2.   WGII's work conformed to Corps-approved specifications

WGII's demolition and removal work conformed to the Corps' approved specifications

because the Corps supervised, inspected, and expressly accepted WGII's work.  *See In re Air

Disaster*, 81 F.3d at 575.  The undisputed facts demonstrate that the Corps inspected its

contractor's initial work and then conducted daily follow-up inspections of the demolition and

piling removal,[266] the lift station removal,[267] the wedding cake removal,[268] and the tanker car

removal.[269]  During the follow-up inspections, the QA Inspectors actively assured adherence to

---

[264] *See supra* § II.G.1.b. (demolition and piling removal), § II.G.2.a. (sewer lift station), § II.G.3.a. (wedding cake), § II.G.4.a. (tanker car).

[265] *See* Guillory II at 120:23-121:7 (Corps' QA inspectors "were responsible for making sure that what was discussed during these preparatory phase meetings was actually carried out by" contractors); Montegut at 43:21-46:2 (Corps questioned WGII if it "may have had too many people or too much equipment or the wrong type of equipment to accomplish the job"); Guillory II at 31:15-32:17 (if the Corps was "not 100 percent pleased with" WGII's work "we brought that to the attention of the [WGII] on-site staff, [and] asked them to correct that nonconforming work").

[266] *See, e.g.*, Initial Phase Inspection, Demo. [Ex. 68]; Prep. Phase Inspection Mtg., Demo. [Ex. 67]; Nov. 6, 2001 [Ex. 70]; QAR #245 [Ex. 71].

[267] *See, e.g.*, Initial Phase Inspection, Lift Station [Ex. 79]; QAR #220 [Ex. 70 at 2].

[268] *See, e.g.*, QAR #297 [Ex. 84 at 2]; QAR #299 [Ex. 85 at 2]; *see also* Guillory II at 124:20-127:8.

[269] *See, e.g.*, QAR #324, Mar. 26, 2002 [Ex. 39 at 6-7]; QAR #318 [Ex. 38 at 2].

54

the Corps-approved specifications and noted any deficiencies to be corrected.[270]  These

inspection records clearly show that the Corps exercised "supervisory judgment" over the

"particularities" of the work.  *In re Katrina*, 2007 WL 4219351, at *5; *see also In re Air Disaster*,

81 F.3d at 575 (holding "inspectors . . . actively involved" showed conformance).

        Furthermore, WGII satisfies the defense's second condition since the Corps evaluated

and expressly accepted WGII's work.  *See Kerstetter*, 210 F.3d at 435-36 (holding acceptance

showed conformance); *In re Air Disaster*, 81 F.3d at 575 (same).  During Pre-Final Inspections,

the Corps identified "punch-list" items for its contractor to correct.[271]  After WGII and its

subcontractors corrected each item, the Corps held a Final Inspection.  The record shows that in

the end the Corps formally accepted as complete all of WGII's work relating to demolition and

removal of the pilings, the sewer lift station, wedding cake, and the tanker.[272]  Because the Corps

made that express determination, WGII's work necessarily conformed with the Corps-approved

specifications.  *See Miller*, 275 F.3d at 420 (collecting cases); *Kerstetter*, 210 F.3d at 435-36

(acceptance showed conformance); *In re Air Disaster*, 81 F.3d at 575 (same).  Accordingly, the

Court should find that WGII satisfies the second condition of the government contractor defense

for all of the demolition and removal features of WGII's work.

---

[270] *See, e.g.*, QAR #220 [Ex. 70 at 2] ("Assured 7 – 30' pilings were pulled . . . all debris and pilings have been removed . . . began backfilling with spoil in approx. 2' lifts and compacting."); QAR #297 [Ex. 84 at 2] ("[A]ssured all debris and pilings above el. – 23.0 are removed from cofferdam . . . Assured cofferdam is backfilled in 2' lifts and compacted with bucket . . . "); QAR #245 [MSY 71 at 2] ("Assured sheetpile alignment is correctly laid out according to contractor's approved drawing."); QAR #318 [Ex. 38 at 2].

[271] *See, e.g.*, Pre-Final Inspection Reps., Demo. [Ex. 72]; Guillory II at 113:15-24; Pre-Final Inspection Rep., Concrete Blocks [Ex. 86 at 1]; Guillory II at 129:3-11.

[272] *See* Final Acceptance Reps., Demo. [Ex. 73] (final acceptance reports for demolition/piling removal); Final Acceptance Rep., Demo., McDonough Marine [Ex. 74]; Guillory II at 146:10-23 (lift station removal); Pre-Final Inspection Rep., Concrete Blocks [Ex. 86 at 2] (wedding cake); Guillory II at 148:1-18 (tanker removal).

   3.      WGII had no actual knowledge that the Corps-approved specifications
           might endanger levees and floodwalls

Neither WGII nor the Corps had any knowledge that implementing the Corps-approved

specifications on Task Order 26 would adversely affect the levees or floodwalls along Jourdan

Avenue.[273]   In fact, in 2004, after Hurricane Ivan flooded the EBIA work site up to the "base of

the concrete portion of the floodwall," the Corps and WGII inspected the protected side of the

floodwall along the EBIA and did not detect any visible signs of damage relating to the levees

and floodwalls.[274]   This alone satisfies the government contractor defense's third condition.  *See*

*Kerstetter*, 210 F.3d at 436 ("[A] government contractor is only responsible for warning the

government of dangers *about which it has actual knowledge*." (quoting *Trevino*, 865 F.2d at

1487)) (emphasis added); *see also In re Katrina*, 2007 WL 4219351, at *5.

Additionally, the Corps' knowledge of the levees and floodwalls bordering the EBIA not

only equaled, but clearly exceeded that of WGII.[275]   The Corps-NOD's employees who

supervised, monitored, inspected and approved WGII and its subcontractors' work on Task

Order 26 had significant experience working on or near levees and floodwalls in the New

Orleans area.  For example, the Corps' Construction Manager, Mr. Guillory, had six years of

prior experience as a project engineer "supervising, monitoring and administrating construction

contracts for earthen levees, hurricane protection levees . . . and major navigational

---

[273] *See infra* notes 156, 173, 230 and accompanying text; Guillory II at 173:4-175:1; Montegut at 72:5-77:14; O'Conner at 206:10-208:20; *see also* O'Conner at 79:25-81:2 ("Q. . . Would you tell the contracting party, 'Hey, look, you may not realize it, but if we dig this hole as you want me to'" we may have "'a potential problem with regard to . . . impairing the structure of the levee?' . . . . Q. And you would tell them?  A. I would make them aware of it if they weren't aware of it.  Or I would make them aware of my concerns.").  Of course, WGII disputes Plaintiffs' allegations that its work actually caused damage to the levees and floodwalls.

[274] *Id*.

[275] *See* Order, dated Oct. 1, 2008 (Doc. 15618) (Wilkinson, M. J.) (stating with respect to Topic 37 [of the Corps' 30(b)(6) Notice] that the Corps "above all others, would be expected to have the most knowledge and information from an indisputably unique and important perspective" about the performance of flood control structures) (emphasis in original).

structures . . . ."[276]  Thus, he understood "how levees and floodwalls are built in New

Orleans."[277]  Mr. Montegut, the on-site COR and Project Engineer, testified that he had "thirty-

three years of experience on the job" relating to "issues of underseepage with floodwalls."[278]  At

the time, neither Messrs. Guillory or Montegut believed the braced excavation or backfilling of

the sewer lift station or wedding cake structure would damage the levees or floodwalls.[279]

      In contrast, neither WGII nor the Corps expected that WGII, as a TERC contractor,

would staff Task Order 26 with personnel capable of making geotechnical engineering decisions

relevant to the levees and floodwalls.[280]  As the Corps' geotechnical engineer (and a 30(b)(6)

witness for the United States) stated, "the guy who's digging or building" near a levees or

floodwall is not expected "to evaluate to determine whether there's a potential for damage to the

flood control structure" since "that's something that the Corps of Engineers has to do."[281]  Indeed,

Mr. Guillory does not believe he even directed WGII to review the as-built drawings of the

levees and floodwalls along the EBIA in connection with the project.[282]  Thus, without question,

WGII satisfies the defense's third condition because the Corps "knew at least as much as the

contractors" about any potential hazards relating to the levees.  *Kerstetter*, 210 F.3d at 438 n.9;

---

[276] Guillory II at 18:17-19:5.

[277] Guillory II at 19:6-9; *see also* Guillory II at 15:18-16:2; Grieshaber II at 11:16-12:9 (as a civil engineer with experience in engineering/geotechnical work in the NOD, Mr. Guillory had discretion to determine whether particular issues arising on Task Order 26 required additional expertise from the Corps' Geotechnical Branch).

[278] Montegut at 47:4-17.  Also, Mr. Clouatre, previously served as a project inspector on "at least a couple of hurricane protections levees" in addition to river levee projects.  Clouatre at 32:2-21; *see also* Clouatre at 35:13-24.

[279] *See supra* notes 156, 173 and accompanying text; Montegut at 72:6-77:14.

[280] *See supra* § II.E.1. and notes 74, 75; *see also* Guillory II at 23:10-25:18.

[281] *See* Deposition of John Grieshaber, Volume I, June 27, 2008 ("Grieshaber I" attached as Ex. 119) at 70:5-70:20 (responding to Plaintiffs' questions during 30(b)(6) deposition).

[282] *See* Guillory II at 49:20-51:8; *see also* Guillory II at 185:15-22 ("[T]he actual depth of the sheet pile [for the floodwalls bordering the EBIA] was immaterial to the project.").

948424v.1

*see also In re Air Disaster*, 81 F.3d at 575 (the defense's third condition is satisfied if the United States knew of the alleged risk); *Stout*, 933 F.2d at 336-37 (same).

**B.     Remediation Work On Task Order 26 (Remediation/Removal Of Contaminants And Excavation Of Borrow Pit):**

1.     The Corps approved reasonably-precise specifications

Again, as discussed above, the Corps' back-and-forth review of the proposed plans for all aspects of WGII and its subcontractors' remediation and associated excavation work on Task Order 26 satisfies the government contractor defense's first condition because it demonstrates that the Corps substantively considered and evaluated WGII's work before it was implemented. *See Kerstetter*, 210 F.3d at 435-36; *Stout*, 933 F.2d at 335-36.  For example, the Corps and LDEQ reviewed, commented on and/or revised all of the proposed RECAP plans before approving final versions that addressed every significant feature of remediation work.[283]

Additionally, as with the demolition and removal features, the Corps monitored and inspected "every aspect of" WGII's remediation work once it began.  *In re Air Disaster*, 81 F.3d at 575 (holding inspection and supervision of "every aspect of" a contractor's work shows the United States approved reasonably-precise specifications).  After attending the preparatory meetings to review the work plans with its contractors,[284] the Corps also inspected the remediation of the site (including the canal bank),[285] the excavation of the borrow pit,[286] and the remediation under Surekote Road.[287]  Accordingly, the Court should find that WGII satisfies the

---

[283] *See supra* § II.G.5.a. (soil/bank remediation), § II.G.6.a. (borrow pit), § II.G.7.a. (excavation under Surekote Road).

[284] QAR #340 [Ex. 93 at 7-10] (prep. phase mtg. for remediation); QAR #430 [Ex. 95 at 22-24] ("supplemental" prep. phase mtg. for canal bank remediation).

[285] *See supra* § II.G.5.b.

[286] *See supra* § II.G.6.b.

[287] *See supra* § II.G.7.b.

948424v.1

government contractor defense's first condition for all of the remediation features of WGII's work.

>    2.    WGII's remediation work conformed to Corps-approved specifications.

WGII's remediation work conformed to the Corps' approved specifications because the Corps supervised, inspected, and expressly accepted WGII's work as such. *See In re Air Disaster*, 81 F.3d at 575. The Corps' QA Inspectors conducted initial inspections and daily follow-up inspections of the soil and canal bank remediation,[288] borrow pit excavation,[289] and the excavations under Surekote Road.[290] During these inspections, the Corps' inspector "assured" adherence to approved specifications.[291]

Perhaps more importantly, the Corps evaluated and expressly accepted WGII's remediation work by approving WGII's "No Further Action At This Time" (or NFAATT) Submittals for each site prior to their submission to LDEQ.[292] *See Kerstetter*, 210 F.3d at 435-38 (holding acceptance of work is evidence of conformance with specifications); *In re Air Disaster*, 81 F.3d at 575-76 (same). Moreover, the Corps' May 26, 2005 Final Inspection and acceptance of WGII's physical work on the site necessarily included an express determination that the borrow pit work—which took up 1.53 acres of the site—conformed with Corps-approved specifications.[293] Accordingly, the Court should find that WGII satisfies the government

---

[288] QAR # 340 [Ex. 93 at 26-27]; QAR #389 [Ex. 97 at 1-2]; QAR #483 [Ex. 102 at 2]; *see also* Guillory II at 193:3-8.

[289] *See, e.g.,* QAR #759 [Ex. 98 at 2]; QAR #267 [Ex. 37 at 2]; QAR #948 [Ex. 120 at 2]; *see also* Guillory II at 165:20-166:7, 167:4-13.

[290] *See, e.g.,* QAR #949 [Ex. 99 at 2]; *see also* Guillory II at 176:11-177:19.

[291] *See, e.g.,* QAR #389 [Ex. 97 at 2]; QAR #759 [Ex. 98 at 2]; QAR #949 [Ex. 99 at 2].

[292] *See supra* notes 214-19 and accompanying text.

[293] *See* Guillory II at 168:3-169:6; Ltr. from J. Montegut, May 26, 2005 [Ex. 116 at 1]; Technical Completion Rep. [Ex. 24 at 5, 8, 35-36].

contractor defense's second condition for all of the remediation features of WGII's work.  *See*

*Miller*, 275 F.3d at 420 (collecting cases); *Kerstetter*, 210 F.3d at 435-36 (acceptance showed

conformance); *In re Air Disaster*, 81 F.3d at 575 (same).

   3. <u>WGII had no actual knowledge of potential danger to levees/floodwalls</u>

  For all the reasons described above for demolition and removal activities, WGII had no

actual knowledge that implementing the Corps-approved remediation specifications would

adversely affect the nearby levees or floodwalls.[294]  In addition, with respect to the borrow pit

excavation and the Surekote Road remediation work specifically, the Corps, on its own initiative,

chose to undertake an extensive stability analysis relating to the nearby levees/floodwalls to

make sure that work would not cause any damage.[295]  As Mr. Guillory testified, the Corps had

the expertise at the NOD office to make this call, and thus chose not to involve WGII or its

subcontractors in its geotechnical analysis.[296]  WGII only was expected to "implement" the

Corps' recommendations.[297]  *Cf. Miller*, 275 F.3d at 422 (contractor may satisfy *Boyle's* third

condition by showing the United States' knowledge of potential risks either equaled or exceeded

the contractor's knowledge).  Accordingly, the Court should find that WGII satisfies the

government contractor defense's third condition for all remediation and related excavation

features of WGII's work.

    **VI. CONCLUSION**

  For all of the foregoing reasons, WGII respectfully requests that the Court grant its

motion for summary judgment.

---

[294] *See supra* § V.A.3.

[295] *See supra* §§ II.G.6.a., II.G.7.a.; Memo. for Constr. Div., Geotech. Stability Analysis [Ex. 110 at 1-2].

[296] Guillory II at 153:3-20; *see* O'Conner at 196:13-197:24; Staggs at 153:18-154:12; *supra* § II.G.6.a.

[297] Guillory II at 157:17-158:2.

948424v.1

Dated:  October 9, 2008                              Respectfully submitted,


                                                      */s/ William D. Treeby*
                                                      William D. Treeby, 12901
                                                      Carmelite M. Bertaut, 3054
  Heather S. Lonian, 29956
  Stone Pigman Walther Wittmann L.L.C.
  546 Carondelet Street
  New Orleans, Louisiana  70130
  Telephone:      (504) 581-3200
  Facsimile:       (504) 581-3361

  Adrian Wager-Zito
  Debra S. Clayman
  Jones Day
  51 Louisiana Avenue, N.W.
  Washington, D.C. 20001-2113
  Telephone:      (202) 879-4645
  Facsimile:       (202) 626-1700

  Attorneys for
  Washington Group International, Inc.

948424v.1

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Memorandum of Points and Authorities in Support of Motion for Summary Judgment have been served upon all counsel of record through the Court's CM/ECF electronic filing system or by placing same in the United States mail, postage prepaid and properly addressed, this 9th day of October, 2008.


_____*/s/ William D. Treeby*_____