**Declaration of Dr. Robert G. Bea**

Robert G. Bea, under penalty of perjury, states as follows:

1. This Declaration is submitted on behalf of the Plaintiffs in *Robinson v. United States*. This Declaration addresses the Defendant United States Memorandum of Law in Support of Defendant's Motion for Partial Summary Judgment (Case 2:05-cv-04182-SRD-JCW Document 15317-2 Filed 09/24/2008, Pertains to MRGO, Robinson 06-2268) ("Memorandum" or "Defendant's Memorandum"). The purpose of this Declaration is to correct misstatements, mischaracterizations, and omissions made by Defendant in its Memorandum about the analyses and conclusions in my various Declarations and Technical Reports filed in this case. In this Declaration, I do not set forth any new analyses and conclusions that are not contained in my earlier Declarations and Technical Reports.

2. The Defendants correctly assert (p. 1) "Plaintiffs allege that the dredging of the MRGO and the absence of adequate bank stabilization caused flooding of their properties." In my Declarations and Technical Reports, through analyses and field observations, I demonstrate that the dredging led to creation of navigation channels along the MRGO Reach 1 and Reach 2 that facilitated water flows leading to induction of salt water and localized intensifications of Hurricane Katrina surge, currents, and waves. Absence of adequate channel protection contributed substantially to increased vulnerabilities and degraded performance characteristics of the Reach 2 EBSBs (Earthern Berms – Spoil Banks, not to be confused with properly engineered, constructed, and maintained 'Levees'), the associated navigation structures (at Bayous Dupre and Bienvenue), and other adjacent hurricane flood

protection structures along Reach 1 during Hurricane Katrina. *See* Bea Expert Report at pp. 6-9 and 17-22, and Declaration I at pp. 41-44 and 141-142.

     3. The Defendants incorrectly assert (p. 2) "The Court should grant a summary judgment on this part of Plaintiffs claim because they have failed to identify sufficient facts to sustain their allegation that the collapse of the levees and the flood that followed were caused by negligent "operation and maintenance of MRGO." My Declaration and Technical Reports address much more than operation and maintenance of the MRGO.

          (a) My analyses of the performance of the Reach 2 and Reach 1 hurricane flood protection and navigation structures shows that the performance of these structures during hurricane Katrina are an integrated effect of the entire life-cycle of activities that background the history of the MRGO from the time of its inception (concept development), through its design, construction, operation, and maintenance to the time of hurricane Katrina. *See* Bea Expert Report at pp. 6-9, pp. 17-19, Declaration I at pp. 141-142, and Declaration II, at pp. 150-152.

          (b) Further, the performance of the Reach 2 and Reach 1 hurricane flood protection and navigation structures are a function of the hydrologic 'system' of which the MRGO is a critical component including the Gulf of Mexico, Lake Borgne, the Gulf Intra Coastal Water Way (GIWW), the Inner Harbor Navigation Canal (IHNC) and their connections to Lake Pontachatrain. *See* Bea Declaration I at pp. 47-58 and pp. 86-88 and Declaration III at pp. 51-73. *See* Kemp Expert Report at pp. 96-147.

          (c) The crux of these analyses is based on the premise that a fundamental goal of the MRGO life-cycle activities and the influences of the MRGO on the hydrologic system should be to 'do no harm' to the adjacent hurricane flood protection and

2

navigation structures and the surrounding environment of people and property. My Declarations and Technical Reports have identified these life-cycle conditions and characteristics as "Neutral MR-GO Conditions." *See* Bea Expert Report at pp. 17-20, Declaration I at pp.41-44, and Declaration III at pp. 50-52.

(d) These "Neutral MR-GO Conditions" have been analyzed within the context of the associated hydrologic system. *See* Kemp Expert Report 2008. As documented in my Declarations and Technical Reports, these "Neutral MR-GO Conditions" (Scenario 2C) consist of the MR-GO channel modeled in a pre-construction condition (before 1958), the GIWW, the IHNC and the other associated components in this hydrologic system in their original Congressionally-authorized conditions, the Reach 1 and Reach 2 man-made hurricane flood protection and navigation structures in their pre-Katrina condition, and the surrounding wetlands, swamps, and other coastal features in their pre-MGGO construction (before 1958) conditions. *See* Bea Expert Report at pp. 17-20, Declaration I at pp. 41-44, and Declaration III at pp. 50-52.  This configuration is necessary and appropriate because it is important in terms of the causation issues to determine whether the presence of the MRGO channel itself has important negative environmental and protective structure impacts which should not be isolated from the other directly associated negative environmental and protective structure impacts (surge, waves, and currents) important to the Reach 1 and Reach 2 hurricane flood protection structures.

4. The Defendants incorrectly assert (p. 2) "Plaintiffs experts used computers to simulate surge that the hurricane would have produced if the MRGO had been perfectly maintained and "operated" throughout its 50 year existence, with no impacts whatsoever on neighboring wetlands." The computer based analytical simulations addressed the multiple

hurricane Katrina hydrodynamic characteristics (surge, currents, waves time histories of magnitudes, directions, and frequency characteristics) that influenced performance of the MRGO Reach 2 and Reach 1 hurricane flood protection and navigation structures (e.g., Reach 2 EBSBs and navigation structures at Bayous Dupre and Bievenue, levees and floodwalls adjacent to GIWW and IHNC). *See* Bea Declaration I and Declaration III 2008. The analytical simulations also addressed the multiple, interconnected and interactive elements that constituted the MRGO and the associated hydrologic system from the time of its inception to the time that the Plaintiffs' properties were flooded. *See* Bea Expert Report at pp. 17-20. Because of the multiple variable and uncertain factors involved during the life-cycle activities that developed with the MRGO prior to Hurricane Katrina, multiple analytical simulations (parametric studies) were performed to develop a fundamental understanding of the various factors and parameters as they influenced the performance of the hurricane flood protection and navigation structures along Reach 2 and Reach 1. *See* Bea Declaration III at pp. 150-152.

(a) By necessity, this work addressed much more than the negative impacts of the MRGO on the neighboring wetlands. The associated hydrodynamic impacts (surge, currents, waves) of the adjacent EBSB alignment, the MRGO channel geometry, the Gulf of Mexico – Lake Borgne - MRGO – GIWW – IHNC – Lake Pontachatrain hydrologic 'system', and the geometry of the adjacent hurricane flood protection structures and navigation structures were analyzed to develop a comprehensive understanding of how the MRGO had affected the performance of the hurricane flood protection and navigation structures.

(b) In the specific case of the Reach 2 EBSBs, their performance was significantly affected by the characteristics of the waves that were able to directly attack their exposed surfaces (protected and unprotected sides). Before surge overtopping, wave attack scour and erosion of the EBSBs proved to be an important and pervasive mechanism that led to early and catastrophic breaching of these hurricane protection structures. As explained in my Declarations and Technical Reports, due to 'scale constraints', the hydrodynamic analyses of the Hurricane Katrina conditions performed by Kok et al (2008), de Wit et al (2008) and Gautier et al (2008) for the Reach 2 EBSBs did not address critically important local topographic and vegetation effects existing between the MRGO channel and the faces of the Reach 2 EBSBs (Figure 1). In my Expert Report, Declarations and Technical Reports, I addressed the important aspects of the 'local' hydrodynamic input characteristics necessary to develop realistic analyses of the performance of the Reach 2 EBSBs.

5. The Defendants incorrectly assert (p. 2) "By comparing the two (with reference to comparison of Scenario 1 Katrina 'as was' and Scenario 3 Katrina MRGO with authorized alignments and cross sections hydrodynamic characterizations), they ironically discovered the perfect "operation and maintenance" of the MRGO would have increased surge by an inch or two at the critical MRGO Reach 2 levee." This is a grossly misleading assertion.

(a) The fundamental reference hydrodynamic characterizations were those for the Katrina 'as was' conditions, i.e., Scenario 1 as modified to define the hydrodynamic characteristics at the faces of the Reach 2 EBSBs (refer to Figure 1 – Condition 1). The 'Neutral MRGO' reference hydrodynamic characterizations as modified to define the hydrodynamic characteristics at the faces of the Reach 2 EBSBs (refer to Figure 1

5

– Condition 4) were identified as Scenario 2C. This scenario represents the Plaintiffs expert assessment of a valid set of reference hydrodynamic characterizations for "perfect" life-cycle conception, design, "operation and maintenance." This set of hydrodynamic characteristics addressed the MRGO in a "do no harm" configuration for assessment of the performance of the hurricane flood protection structures along Reach 2 and Reach 1. *See* Bea Expert Report at pp. 6-9 and pp. 17-20, Declaration I at pp. 41-44, and Declaration III at pp. 50-52.

      (b) While along Reach 2 there were generally small differences in the hurricane Katrina surge hydrographs (time versus water level elevations Scenario 1 compared with Scenarios 2C and 3 – see Figure 2), there were substantial differences between the Katrina 'as was' conditions and the 'Neutral MRGO' <u>wave</u> conditions (see Figure 1). These wave conditions played the primary role in development of unprotected side scour, erosion, and subsequent breaching combined with overtopping breach expansion of the Reach 2 EBSBs. For the range of Scenario 1 'as was' conditions evaluated, the EBSBs would breach due to wave side attack before overtopping by the Hurricane Katrina surge (e.g. see Figure 3). For the range of Scenario 2C 'Neutral MRGO' Conditions, the EBSBs would not breach due to wave side attack before overtopping by the Hurricane Katrina surge (e.g. see Figure 4). *See* Bea Expert Report at pp. 13-14, Declaration I at pp. 51-58, 86-88, 118-123, and 132-142, Declaration III at pp. 67-74, 105-109, 117-119, 123-128, and 140-144, and Kemp Expert Report at pp. 159-179.



Figure 1: Transit effects as hurricane waves propagate from Lake Borgne to the toes of the EBSBs (based on simulation results provided by Gautier, et al 2008). Source: Bea Declaration I p. 87 and Declaration III p. 108.



Figure 2: Surge hydrographs for MR-GO midway between Bayou Dupre and Bayou Bienvenue (Wit, et al 2008). Times on horizontal scale are local CDT. Source: Bea Declaration I p. 46 and Declaration III p. 55.

7



Figure 3: Lateral erosion induced from wave-attack on the MR-GO EBSB for the Scenario 1 hydrodynamic conditions with high erodibility materials and different levels of grass armor (good grass turf, poor grass turf, and no grass turf). Surge overtopping of EBSB crest initiated at 700 CDT. Source: Bea Declaration I p. 111 and Technical Report I p. 116



Figure 4: A plot of lateral erosion induced from wave-attack on the MR-GO EBSB for the Scenario 2C hydrodynamic conditions with high erodibility materials and different levels of grass armor (good grass turf, poor grass turf, and no grass turf). Surge overtopping of EBSB crest initiated at 700 CDT. See Bea Declaration I p. 113, Declaration III p. 115, and Technical Report I p. 118.

8

6. The Defendants incorrectly assert (p. 2) "Plaintiffs experts went on to report that perfect "operation and maintenance" (defined as keeping the waterway at its design dimensions, with no impact on wetlands) [Scenario 3] would have reduced the largest significant waves at the Reach 2 levee from about 7 feet to six." There are three fundamental fallacies in this statement.

(a) As defined in my Declarations and Technical Reports, "Perfect operation and maintenance" of the MRGO is not restricted to "keeping the waterway at its design dimensions, with no impact on wetlands." *See* Bea Expert Report at pp. 6-9 and 17-20, Declaration I at pp. 41-44, and Declaration III at pp. 50-52. *See* Kemp Expert Report at pp. 96-184.

(b) Second, as I documented and explained in my Declarations and Technical Reports, there were no "levees" along Reach 2 – there were EBSBs and two navigation structures with important embedded weaknesses and flaws. *See* Bea Declaration I at pp. 10-11, 23-27, and p 144 and Declaration III at pp. 9-11 and 16-17.

(c) Third, as I documented and explained in my Declarations and Technical Reports, the differences between the maximum significant wave heights at the reference EBSB location (chosen for detailed analyses) were 6.0 feet (Katrina 'as was' Scenario 1) and 2.2 feet (Neutral MRGO Scenario 2C) (Technical Report I, pp. 48 - 49). Relative to wave attack erosion and scour potential, this difference in significant wave height at the face of the EBSB translates to about a 50 fold increase in wave erosion – scour – breaching effects—a significant increase caused by the MR-GO's defects and a substantial cause of the EBSB failures and overtopping. The results for the Katrina 'as was' Base Case (Scenario 1) and the extensive parametric variations studied all indicated a high probability

9

for unprotected side wave attack initiated breaching *before overtopping*. Results for the 'Neutral MRGO' hydrodynamic conditions and parametric variations (Scenario 2c/non-negligent) <u>all indicated a low probability for either unprotected side wave attack or overtopping attack</u>.  In other words, our analyses and observations demonstrate just the opposite of what the Defendant asserts that they demonstrate:  the Hurricane Neutral MR-GO would not have caused catastrophic flooding.

      7.   The Defendants incorrectly assert (p. 2) "Crucially, however, Plaintiffs' experts did not analyze whether the smaller waves would have resulted in less breaching or flooding than occurred during the storm." This is simply not true.

          (a)   My Declarations and Technical Reports document analyses of a wide range of significant wave heights acting on the Reach 2 EBSB study location:  2.2 feet to 7.9 feet (*See* Bea Declaration I, at pp. 86-88, 110-114, and 131-137; Technical Report I, at pp. 46-49, 125-127, and 131-135).

          (b) The parametric studies included the Hurricane Katrina 'as was' conditions developed by the USACE IPET (2008). Analyses of EBSB performance for the range of maximum significant wave heights for the Katrina 'as was conditions"(Scenario 1) <u>all</u> indicated a high probability of wave side attack initiated breaching before overtopping (Figure 5). *See* Bea Declaration I at pp. 132-137 and Technical Report I at pp. 131-135.

          (c) Analyses of EBSB performance for the 'Neutral MRGO'  - 'do no harm' - hydrodynamic conditions (Scenario 2C) all indicated a low probability of wave side attack initiated breaching  before overtopping. *See* Bea Declaration I, at pp. 86-88, 110-114, and 131-137; Technical Report I, at pp. 46-49, 125-127, and 131-135.

(d) Only in the cases of inadequate wave attack and erosion protection was there a high probability of wave scour and erosion that when the EBSB was overtopped could lead to substantial breaching. *See* Bea Declaration I, at pp. 86-88, 110-114, and 131-137; Technical Report I, at pp. 46-49, 125-127, and 131-135.



Figure 5: Wave breaching analytical results from parametric analyses of Hurricane Katrina 'as was' conditions. Surge overtopping of EBSB crest initiated at 1200 UTC. Source: Bea Declaration I p. 134 and Technical Report I p. 134.

8. The Defendants incorrectly assert (p. 2) "Because they did not analyze the flooding that would have occurred in a "no negligence" scenario – i.e., what would have happened "but for" the alleged negligence – Plaintiffs can not identify significant facts to sustain their claim that the negligent "operation and maintenance" of the MRGO caused their alleged damage." This is a mischaracterization of the Plaintiffs' expert reports based on a false assertion that Scenario 3 is the Plaintiffs' "no negligence" scenario.

11

(a) None of my Declarations nor any those of the other experts representing the Plaintiffs used the term "no negligence." This term has been coined by the Defendants and should not be attributed to the Plaintiffs' expert Declarations or Technical Reports—none of Plaintiffs' experts use this term to describe Scenario 3 (MR-GO at authorized width and pristine wetlands) because that is not a set of conditions that would constitute no fault on the part of the Defendant with regard to the design, construction, operation, and maintenance of the MR-GO over its half century life cycle. For example, Scenario 3 does not take into account the fact that Reach 2 of the MR-GO is a potential conduit of storm surge from the Gulf of Mexico and from Lake Borgne and that there is a potential for "funneling" of surge down Reach 1 GIWW and into the IHNC, thereby omitting any provision for surge barriers (Kemp Expert Report 2008).

(b) The term "Neutral MRGO"—Scenario 2C—was used in my Expert Report, Declarations and Technical Reports to designate the set of hydrodynamic and environmental characteristics that represented a "do no harm" set of conditions for Hurricane Katrina along Reach 2 and Reach 1. The Defendants erroneously adopted a sub-set of characteristics associated with Scenario 3 as the "do no harm" set of characteristics and conditions. As documented in my Expert Report, Declarations and Technical Reports, this is not appropriate because of the critically important additional environmental negative impacts introduced by the presence of the MRGO navigation channels and their connections with the other bodies of water in this hydrologic system. *See* Bea Expert Report a pp. 17-20; Declaration I at pp. 41-44, and Declaration III at pp. 50-52 (description of Scenario 2C and rationale).

12

9. The Defendants incorrectly assert (p. 2) "Without the assistance of expert opinion, the finder of fact cannot determine where, when and how extensively the Reach 2 levee would have breached if the surge had been a bit lower and the waves slightly higher." In fact, my expert analyses document the critical difference as to Reach 2 EBSB performance under Scenario 1 (what happened during Hurricane Katrina) and the true "no negligence" conditions (Scenario 2C).

(a) In my Declarations and Technical Reports, a wide variety of Hurricane Katrina conditions and EBSB characteristics (e.g. grass cover, soil composition, compaction, cross-section profile, channel bank vegetation) were studied (analytical simulations and field observations) to determine where, when and how the Reach 2 EBSBs were breached (e.g., Figure 6). This extensive set of analyses and field observations indicated that wave attack on the unprotected sides of the EBSBs during the Hurricane Katrina 'as was' conditions in many instances and locations would have likely led to EBSB crown 'crenenllation' (localized breaching through the EBSB crest or crown) so that when the EBSBs were overtopped, complete breaching of the EBSB cross sections could be developed during the overtopping flow conditions. *See* Bea Declaration I at pp. 110-114 and 132-142; Declaration III at pp. 105-106, 114-118, and 140-144; and Technical Report I at pp. 46-49, 131-135, and 136-143.

(b) These observations were not true for the navigation structures that developed breaching at the EBSB to navigation structure 'interfaces' (north side at Bayou Dupre and south side at Bayou Bievenue). These important breaches (particularly at Bayou Bienvenue due to its early development) developed due to seepage – instability (at Bayou Bienvenue) and overtopping EBSB erosion of the interface (at Bayou Dupre). *See* Bea

13

Expert Report at pp. 20-21; Declaration I at pp. 147-151 and 156-161, Declaration III at pp. 138-140; and Technical Report II at pp. 68-86, 87-95, and 95-96.



Figure 6: Identification of wave-induced breach sites based on visual examination of 2005 aerial LiDAR data. Source: Bea Declaration I p. 142; Declaration III p. 106; and Technical Report I p. 142.

10. The Defendants incorrectly assert (p. 18) "Professor Bea expressed no opinion as to the breaching that would have occurred if the MRGO had been operated and maintained with the utmost care." Once again, this is a mischaracterization of my work.

(a) In my Declarations and Technical reports, I addressed this aspect in the form of the Reach 1 and Reach 2 flood defense structures breaching analyses (Table 1 from Declaration III, at p. 152).

14

(b) The integrated effects of the life-cycle developments (concept development, design, construction, operation, maintenance) cannot be decomposed because of their interactive and interdependent effects on what existed at the time of Hurricane Katrina and on what could and should have existed at the time of Hurricane Katrina as performed "with the utmost care." The attempted decomposition of the life-cycle effects of the MRGO by the Defendants is a classic mistake in development of accurate and realistic understandings of the behavior of real complex "systems." Synthesis – or understanding the behavior of the entire system (assembly of components) – must take place <u>before</u> there are attempts to decompose the system to develop additional insights into workings of components and their interactive and interdependent relationships with other components. In the science of analysis of complex systems, the mistake of premature decomposition is expressed as "you can not cut a cow in half and have two cows."

(c) The integrated interactive hydrologic – environmental – constructed system condition was expressed in these analyses as the "do no harm" "Neutral MRGO" conditions (Scenario 2C). The other scenarios and parametric sensitivity studies were performed to gain an understanding of how the various parts of this complex system interacted in the Hurricane Katrina 'as is' MRGO condition (Scenario 1) and in the Hurricane Katrina "do no harm" "Neutral MRGO" condition (Scenario 2C). *See* Bea Declaration I at pp. 41-44 and Declaration III at pp. 50-52.

11. The Defendants incorrectly assert (p. 18) "All told, Professor Bea, who modeled breaching, and the Dutch reports, who modeled surge and flooding, produced fifteen reports totaling nearly 2000 pages. Yet not one of those reports includes a study of how the levees would have performed during Hurricane Katrina if the MRGO had been at its design

15

dimensions and the wetlands had been in pristine condition." The crux of the last sentence and the ensuing sentences in the paragraph hang on the assertion "if the MRGO had been at its design dimensions." This is a half-truth because, as noted several times earlier, the Defendant is premising its assertion on the wrong set of conditions for their 'non-negligent' MRGO condition (Scenario 3) instead of the set of conditions for "do no harm" established by Plaintiffs' experts (Scenario 2C). See Bea Expert Report at pp. 17-20; Declaration I at pp. 41-44; and Declaration III at pp. 50-52.

(a) The Declarations and Expert Reports by Kemp (2008), Kok et al (2008), de Wit et al (2008), and Gautier (2008) show that the negative impacts of the MRGO channel went far beyond maintenance of the channel at its design dimensions and/or loss of surge-buffering wetlands.

(b) Perfect maintenance of those dimensions would not have eliminated the important attendant negative hydrodynamic and hydrologic system impacts including water flow from the Gulf of Mexico and Lake Borgn affecting surge elevations and durations, wave generation, and the lack of appropriate defenses to effectively negate these negative impacts. See Kemp Expert Report (2008). Hence, the erroneous reference to Scenario 3 Conditions and the lack of breaching and flooding analyses of those conditions is misplaced because such reference would necessarily result in an inaccurate, incomplete, and distorted understanding of how the defects and deficiencies introduced during the life-cycle of the MRGO negatively impacted the performance of the adjacent hurricane flood protection and navigation structures during Hurricane Katrina. In short, the Defendant is knocking down a "straw man" in using Scenario 3 as its self-appointed "no negligence" set of conditions.

Table 1: Results of analyses of New Orleans East Polder, IHNC West side, Reach 2 MR-GO and Lower 9th Ward breach development during Hurricane Katrina 'as was' conditions (Scenario 1) and during 'Neutral' MR-GO Hurricane Katrina conditions (Scenario 2C). Source Bea Declaration III p. 152.

| Location | Maximum Surge Scenario 1 (feet) | Maximum Surge Scenario 2C (feet) | Elevation range (+ feet NGVD88) | Primary failure modes Scenario 1 | Primary failure modes Scenario 2c |
|---|---|---|---|---|---|
| GIWWW NO East Back Levee | 17.0 | 16.0 | 15.5-18.0 | wave and surge breaching. main point of entry of floodwater into NOE polder | **no breaching** – limited surge overtopping. waves insufficient height to breach (vegetation effects–outboard protection & grass). |
| GIWW Paris Road Area | 16.2 | 15.5 | 14.5-16.5 | overtopping | **no breaching except at Air Products Plant** flood wall to levee sheet pile connection due to sheet pile interlock failure. |
| GIWW Bulk Terminal | 16.2 | 14.5 | 14.0-15.0 | overtopping | **no breaching** of floodwalls or levees |
| IHNC Junction Port of New Orleans | 17.0 | 14.0 | 14.0-15.4 | overtopping | **no breaching of floodwalls. through seepage breach of two roadway sections behind Port of New Orleans.** |
| IHNC I10 CSX Railroad | 14.0 | 13.0 | 13.0-14.0 | sand bags blew out at 9 ft surge elevation | **breaching -** sand bags would blow out again. no breach if CSX Railroad flood gate was in place. |
| IHNC Seabrook NOE Area | 12.0 | 12.0 | 13.0-14.0 | overtopping | **no breaching** |
| Lower 9th Ward | 17.5 | 14.5 | 12.0-12.5 | seepage, overtopping, lateral instability breaching | **breaching at North and South Breaches** due to seepage, limited overtopping, lateral instability breaching |
| MR-GO Dupre | 17.6 | 16.5 | 14.5 | overtopping breaching at wingwall | **no breaching** |
| MR-GO Reach 2 EBSBs | 18.0 | 17.0 | 15.0 – 20.0 | wave and surge breaching, overtopping, failure of some sheet pile repair inerlocks. | **no breaching** (good turf – ground cover conditions). where surge elevation exceeds crest elevation for more than 1 hour (good grass cover), breaching can develop. **breaching** at sheet pile repairs interlock failure locations |
| MR-GO Bievenue | 17.8 | 17.2 | 15.5 | seepage, lateral instability breaching | **breaching after overtopping (after peak surge when surge at 15.5 ft)** due to seepage and lateral stability at wing wall to EBSB interface. |
| 40 Arpent Levee | 8.5-5.0 | 3.8-2.0 | 6.5 | no breaching | **no breaching** |

17

12. The statements cited in this Declaration indicate significant and fundamental flaws in the Defendant's understanding of the technical elements (engineering, hydrologic system, hydrodynamics, fluid-structure interactions) involved in delineating the 'Neutral MRGO' – 'do no harm' – conditions and characteristics that could and should have been developed during its 50+ year history. The "Neutral MR-GO Hurricane Katrina Conditions" assessments which are contained in My Declarations and Technical Reports—and represented in the Scenario 2C conditions and modeling results—are based on the assumption that the Congressionally mandated and authorized MRGO project should 'do no harm' to the environment, population, property, and the man-made flood protection structures that were intended to defend this storm-prone region against hurricane flooding. It is further assumed that if there would be negative effects of the MRGO that would have substantial deleterious effects on these elements, it was incumbent that the USACE properly address and mitigate these negative effects. Such negative effects—all of which were foreseeable, if not actually foreseen, before 1958, include:

(a) destruction and degradation of the natural hurricane flood protection features,

(b) salinity increases resulting in degradation of protective vegetation (marshes, swamps, wetlands, forests) both natural and associated with other constructed works (e.g. protective berms for flood protection levees and other man-made structures);

(c) water flow increases from unimpeded stormwaters from the Gulf of Mexico and Lake Borgne resulting in increases in surge elevations, currents, and waves;

(d) channel effects ("funneling") resulting in increases in the intensity of the hurricane waves and currents;

(e) erosion of both natural and man-made flood protection elements and the Reach 2 banks; and

(f) channel erosion which caused a three to four times widening of the MR-GO channel (and thereby more distance and volume of water for waves and currents) and which caused the MR-GO channel to encroach into the protective berm of the man-made hurricane flood protection structures of the LPV causing loss of crest elevation of these structures

13. No effective and early action was taken to prevent these various processes from continuing. These cumulative negative effects have been evaluated in development of the "Neutral MRGO Hurricane Katrina Conditions." It was the combined effects of the integrated combination of the MRGO life-cycle negative environmental impacts that adversely affected the performance of the Reach 2 and Reach 1 hurricane flood protection structures during hurricane Katrina. The effects of the integrated combination of these life-cycle negative environmental impacts are properly represented in the Scenario 2C conditions as applied in the performance analyses (analytical simulations and field observations) of the hurricane flood protection structures as documented in my Declarations and Technical Reports. The Defendant's interpretations of these technical elements are critically flawed.

14. My analyses, evaluations, assessments and conclusions have been based on the background information and documentation cited in this Declaration and the Expert Reports, Declarations and Technical reports previously submitted. I reserve the right to modify my analyses, evaluations, assessments, and conclusions in the case that new or additional information becomes available in the future.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 7, 2008 in Moraga, California.

Robert Bea, Ph.D, PE