UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO:  *Robinson* (No. 06-2268) | |

## PLAINTIFFS' STATEMENT OF UNCONTESTED FACTS

1.      Plaintiffs maintain that the negligent design, construction, maintenance and operation of the Mississippi River Gulf Outlet ("MR-GO") caused the catastrophic flooding which damaged their property.  702c MSJ Order (Doc No. 12946) at 1; First Amended Complaint For Damages Caused By The Negligent Design, Construction, Operation, and Maintenance Of The Mississippi River-Gulf Outlet ("FAC"), *Robinson v. United States*, Case No. 06-2268, ¶¶1, 2, 5, 9, 91, 95, 97, 99, 102.

2.      At no time have Plaintiffs asserted that operation and maintenance, standing alone, was a substantial factor in causing the catastrophic destruction of their properties.

3.      Plaintiffs' causation theory is predicated on the claim that the cumulative effect of the MRGO's negligent design, construction, operation, and maintenance—and the resulting dangerous conditions caused by the unimpeded surge conduit from the Gulf of Mexico and Lake Borgne, the geometry of the funnel, destroyed wetlands, and channel widening by 300 to 400%—were substantial factors in causing the flooding of Plaintiffs' properties.  FAC ¶¶1, 3, 49, 50, 53, 57, 59, 72, 73, 75, 83-87.

4.      Plaintiffs' experts analyzed the cumulative impact of all four dangerous conditions (design, construction, operation, and maintenance) on the catastrophic flooding, without detaching the effects of operation and maintenance from the effects of design and construction.  Bea Supplemental Declaration at ¶¶3(a)(b), 4(a), 8(a), 10(b); Expert Report of Dr. Bea (Ex. 1) ("Bea Expert Report"), July 14, 2008, at ¶3; Bea Declaration I (Ex. 2), July 11, 2008, at ¶37; Kemp Supplemental Declaration at ¶9; Kemp Expert Report (Ex. 3), July 11, 2008, at p. 185; de Wit et al 2008 (Defendant's Ex. 10) Flow Modeling New Orleans -Mississippi River Gulf Outlet, Hurricane Katrina August 2005 - FINAL REPORT Scenario 1, 2A, 2B, 2C, 2D, 3.

5.      From a scientific standpoint, it is inappropriate to separate out only the effects of two challenged activities (MR-GO's operation and maintenance) from the complex and interdependent hydraulic system that was created by the project's design and construction. Kemp Supplemental Declaration at ¶9(a)(b).

6.      By focusing on how the entirety of critical changes caused by the MR-GO that cumulatively contributed to the catastrophic flooding, Plaintiffs properly do not detach operation and maintenance from design and construction.  Kemp Supplemental Declaration at ¶9(a)(b).

7.      The performance of Reach 1, Reach 2, and the IHNC flood protection and navigation structures during Hurricane Katrina is an integrated effect of the entire life-cycle of activities over the MR-GO's history from the time of its inception through its design, construction, operation, and maintenance to the time of Hurricane Katrina.  Bea Supplemental Declaration at ¶¶3(a), 11(b); Bea Expert Report (Ex. 1) at pp. 6-9, 17-19; Bea Declaration I (Ex. 2) at pp. 141-42; Bea Declaration III (Ex. 4) at pp. 50-52.

8.      The performance of Reach 1, Reach 2, and the IHNC flood protection and navigation structures during Hurricane Katrina is a function of the hydrologic "system" of which

the MR-GO is a critical component, including the Gulf of Mexico, Lake Borgne, the Gulf Intracoastal Water Way (GIWW), the Inner Harbor Navigation Canal (IHNC), and their connections to Lake Pontchartrain.  Bea Supplemental Declaration at ¶3(b); Bea Declaration I (Ex. 2) at pp. 47-58, 86-88; Bea Declaration III (Ex. 4) at pp. 51-73; Kemp Expert Report (Ex. 3) at pp. 96-147.

9.     Any analysis of the MR-GO's contribution to the catastrophic flooding must address the multiple, interconnected, and interactive elements constituting the MR-GO and the associated hydrologic system from the time of its inception to the time that the Plaintiffs' properties were flooded.  Bea Supplemental Declaration at ¶4; Bea Expert Report (Ex. 1) at pp. 17-20.

10.     Given the MR-GO's multiple elements that interacted with a regional hydrologic system over a half century, analysis of its role in causing flooding during Hurricane Katrina must necessarily assess more than its negative impacts on the neighboring wetlands.  Bea Supplemental Declaration at ¶4(a).

11.     Plaintiffs' experts analyzed the associated hydrodynamic impacts (surge, currents, and waves) on the adjacent Reach 1 and Reach 2 flood control structures, the MR-GO channel geometry, the Gulf of Mexico – Lake Borgne – MR-GO – GIWW – IHNC – Lake Pontchartrain hydrologic "system," and the geometry of the adjacent hurricane flood protection structures and navigation structures.  Bea Supplemental Declaration at ¶4(a).

12.     Plaintiffs' experts' investigations yielded a comprehensive understanding of how the MR-GO affected the performance of the hurricane flood protection and navigation structures. Bea Supplemental Declaration at ¶4(a).

13.     In terms of computer modeling, Plaintiffs' experts performed multiple analytical simulations (parametric studies) to develop a fundamental understanding of how the various factors and parameters influenced the performance of the hurricane flood protection and navigation structures along Reach 2 and Reach 1.  Bea Supplemental Declaration at ¶4; Bea Declaration III (Ex. 4) at pp. 150-52; Kemp Supplemental Declaration at ¶4; Defendant's Ex. 10 (de Wit et al 2008. Flow Modeling New Orleans -Mississippi River Gulf Outlet, Hurricane Katrina August 2005 - FINAL REPORT Scenario 1, 2A, 2B, 2C, 2D, 3); Defendant's Ex. 12 (Gautier et al 2008 a. Wave Modeling New Orleans - Mississippi River Gulf Outlet, Hurricane Katrina August 2005 - FINAL REPORT); Gautier et al 2008 b. (Ex. 15) Wave Modeling New Orleans - Mississippi River Gulf Outlet, Hurricane Katrina August 2005 – APPENDICES.

14.     Plaintiffs' modeling demonstrates that the negative impacts of the MR-GO channel went beyond maintenance of the channel at its design dimensions and/or loss of surge-buffering wetlands.  Bea Supplemental Declaration at ¶11(a); Kemp Expert Report (Ex. 3) at pp. 196-97; Kemp Supplemental Declaration at ¶32; Defendant's Exh. 17 (Kok et al (2008)); Defendant's Ex. 10 (de Wit et al (2008)), Defendant's Ex. 12 (Gautier et al 2008(a)); Ex. 15 (Gautier et al 2008(b)).

15.     Dr. Kemp is a highly-respected coastal geologist and oceanographer who has taught at Louisiana State University, was the principal author of the Team Louisiana Report, and is presently Vice President, National Audubon Society.  Kemp Expert Report (Ex. 3), Appendix A.

16.     In his expert report, Dr. Kemp offers a comprehensive expert analysis supporting his conclusion that the MR-GO's four major adverse effects —creation of a direct surge conduit from the Gulf of Mexico, the "funnel effect," destroyed wetlands, and substantial channel

widening—were "a substantial contributing factor to the catastrophic flooding of the Robinson plaintiffs' homes and communities."  Kemp Expert Report (Ex. 3) at pp. 2-3, 7, 38, 196.

17.     Dr. Bea and Dr. Kemp's analyses demonstrated that absence of surge buffering wetlands and the three to four times expansion of the Reach 2 channel—even when evaluated in isolation—(1) materially affected performance of the flood control structures along both Reach 1 and Reach 2 and the IHNC and (2) was a substantial factor in the overtopping and failures occurring during Hurricane Katrina and the inundation of New Orleans East, Lower 9th Ward, and St. Bernard Parish with ten feet or more of water.  Bea Supplemental Declaration at ¶¶2, 4(b), Figure 1; Bea Declaration I (Ex. 2) at ¶¶69, 100; Kemp Supplemental Declaration at ¶¶18-27, 29-32.

18.     The presence of the MR-GO channel as it existed on 29 August 2005 increased the wave energy impinging on the MRGO Reach 2 levees and led to greater surge discharges in the funnel, particularly in Reach 1 and the IHNC, than would have occurred if the authorized dimensions had been maintained.  Kemp Supplemental Declaration at ¶32.

19.     The MR-GO's channel size matters in that the operations and maintenance program executed by the USACE, consisting primarily of channel dredging, increased the total oceanographic stresses to which the LPV structures were exposed during Katrina, and significantly increased the likelihood of breaching and catastrophic flooding of Plaintiffs' properties.  Kemp Supplemental Declaration at ¶32.

20.     Scenario 3 is not Plaintiffs' "no negligence" scenario.  Kemp Supplemental Declaration at ¶¶5-6; Bea Supplemental Declaration at ¶¶3(c), (d), 5(a), 11(b).

21.     None of the Plaintiffs' expert reports used the term "no negligence."  Bea Supplemental Declaration at ¶8(a)

22.     Scenario 3 does not take into account the fact that Reach 2 of the MR-GO is a potential conduit of storm surge from the Gulf of Mexico and from Lake Borgne and that there is a potential for "funneling" of surge down Reach 1/GIWW and into the IHNC, thereby omitting any provision for surge barriers .  Bea Supplemental Declaration at ¶8(a).

23.     Nevertheless, the flood modeling results for Scenario 3 in fact demonstrate that the loss of wetlands and channel widening *by themselves* had a material impact on the amplitude of surge, wave generation, onset of flooding, duration of flooding, and rate of overtopping and thereby the extent of flooding in the three polders.  Kemp Supplemental Declaration at ¶20; Bea Supplemental Declaration at ¶2.

24.     The loss of wetlands and channel widening contributed substantially to increased vulnerabilities and degraded performance characteristics of the Reach 2 earthen berms/spoil banks ("EBSBs"), the navigation structures at Bayous Dupre and Bienvenue, and the Reach 1 flood protection structures.  Bea Supplemental Declaration at ¶4; Bea Expert Report (Ex. 1) at pp. 17-20; Bea Declaration I (Ex. 2) at pp. 41-44; Bea Declaration III (Ex. 4) at pp. 50-52.

25.     It is well known that healthy wetlands have a positive effect in reducing the height and intensity of storm surge—anywhere from 1 foot per 2.75 miles (0.36 feet/mile) to 1 foot per 1.4 miles (0.71feet/mile) depending on the type of vegetation.  Kemp Expert Report (Ex. 3) at pp. 184, Figure 9.5; *see also* Ex. 11 (U.S. Army Corps of Engineers, Lake Pontchartrain and Vicinity, Louisiana, Design Memorandum No. 1 Hydrology and Hydraulic Analysis Part 4 – Chalmette Extension, Plate No. 6 "Overland Surge Elevations, Coastal Louisiana" (October 1967)).

26.     With healthy cypress forests and marshlands, surge across the Central Wetlands Unit between the MR-GO and the 40 Arpent Canal Levee is reduced by *a critical three feet.* Kemp Expert Report (Ex. 3) at pp.123, 182.

27.     The Government's own expert, Dr. Robert Dalrymple, attributes over three feet of additional storm surge against Reach 2 EBSBs because of the destroyed adjacent wetlands. Deposition of Robert Dalrymple (Exh. 6) ("Dalrymple Depo.") at 143:6-145:1.

28.     Plaintiffs' modeling scenarios establish that the cumulative impact of the MR-GO's four defects (no surge barriers, "funnel effect," loss of wetlands, and channel widening) in fact increased surge elevation along Reach 1/GIWW and the IHNC by at least three feet. Kemp Expert Report (Ex. 3) at p. 125.

29.     If the cypress forests and marshlands had not been destroyed by the MR-GO, these natural defenses would have reduced surge caused by Hurricane Katrina by about three feet and spared Greater New Orleans from catastrophic flooding. Expert Report of Dr. John Day, May 1, 2008 (Ex. 19) at pp. 18-22; Dalrymple Depo. (Ex. 6) at 143:6-145:1.

30.     Channel widening and the resultant destruction of protective vegetation on the water side promoted prolonged, severe wave side attack of the Reach 2 earthen berms/spoil banks ("EBSBs"). Bea Supplemental Declaration at ¶5(b).

31.     The modeling data for Scenarios 1 and 3 also establishes that the waves crossing the MR-GO grew significantly due to the depth of the channel and its fetch. Kemp Supplemental Declaration at ¶31.

32.     The widening of Reach 2 by 300 to 400%—from 650' to 2,000' and 3,000'—created a broader expanse and volume of water enabling the generation of higher and more intense waves and currents that directly attacked the EBSBs' exposed surfaces (protected and

unprotected sides) creating wave attack scour and erosion of the EBSBs before overtopping.  Bea Supplemental Declaration at ¶¶4(b), 5(b), 12(f).

33.     This wave side attack proved to be an important and pervasive—and primary— mechanism that led to early and catastrophic breaching of these hurricane protection structures due to unprotected side scour, erosion, and subsequent breaching combined with overtopping by the Hurricane Katrina surge.  Bea Supplemental Declaration at ¶¶4(b), 5(b); Kemp Supplemental Declaration at ¶30(c).

34.     The reduction in protective wetlands (both in the Golden Triangle and Central Wetlands Unit and immediately in front of the LPV structures) and increase in channel width had demonstrable effects on flooding levels.  Kemp Supplemental Declaration at ¶¶ 19-27.

35.     Waves generated by Katrina winds in Lake Borgne would have traversed a much narrower channel and buffering wetlands and been greatly diminished before striking the Reach 2 embankments if the MR-GO navigation channel had not destroyed tens of thousands of acres of wetlands due to construction, bank erosion, and saltwater intrusion.  Kemp Supplemental Declaration at ¶31.

36.     Plaintiffs' experts' data shows that the wider channel materially increased storm surge intensity and overtopping rates.  Kemp Supplemental Declaration at ¶¶19-27.

37.     Plaintiffs have presented facts that an "as authorized" MR-GO—with pristine wetlands and "as authorized" channel width—is still a major conveyer of surge and a major source of devastating overtopping flows.  Kemp Supplemental Declaration at ¶16.

38.     The MR-GO's operation and maintenance cannot be decomposed because of their interactive and interdependent effects on what existed at the time of Hurricane Katrina and on

what could and should have existed at the time of Hurricane Katrina as performed "with the utmost care."  Bea Supplemental Declaration at ¶10(b).

39.     The attempted decomposition of the life-cycle effects of the MR-GO by the Defendants is a classic mistake in development of accurate and realistic understandings of the behavior of real complex "systems."  Bea Supplemental Declaration at ¶10(b).

40.     Synthesis – or understanding the behavior of the entire system (assembly of components) – must take place before there are attempts to decompose the system to develop additional insights into workings of components and their interactive and interdependent relationships with other components.  Bea Supplemental Declaration at ¶10(b) (emphasis in original).

41.     Defendant focuses on only two measurements of the MR-GO's impact (maximum surge and wave height).  Kemp Supplemental Declaration at ¶¶10, 12(a), 19-27, 29-32; Bea Supplemental Declaration at ¶4.

42.     Defendant ignores three more reliable measurements (time of onset, duration, and rate of structure overtopping by surge).  Kemp Supplemental Declaration at ¶¶10, 12(a), 19-27, 29-32; Bea Supplemental Declaration at ¶4.

43.     Defendant mischaracterizes Plaintiffs' modeling data demonstrating that the MR-GO had a direct effect on substantially increasing oceanographic stresses on the LPV flood control structures due to earlier onset and more prolonged duration of surge above a critical elevation.  Kemp Supplemental Declaration at ¶¶10, 12(a), 19-27, 29-32; Bea Supplemental Declaration at ¶4.

44.     Defendant ignores the role of wave side attack before overtopping in the failure of the EBSBs along Reach 2.  Bea Supplemental Declaration at ¶5(b).

45.     For over five decades, the Army Corps ignored the MR-GO's known potential for exacerbating hurricane-driven surge and waves and increasing overtopping flows when the MRGO bank lines were not stabilized.  Kemp Supplemental Declaration at ¶10; Kemp Expert Report (Ex. 3) at pp. 31, 186, 196.

46.     The Army Corps ignored the potential for exacerbating hurricane-driven surge and increasing overtopping flows when no effort was made to counteract the ruinous effect of the channel on buffering wetlands or, ultimately, on the more rapid propagation of surge leading to earlier and more catastrophic flooding of developed areas.  Kemp Supplemental Declaration at ¶10; Kemp Expert Report (Ex. 3) at pp. 31, 186, 196.

47.     Surge and wave height alone do not reflect the reality of the total universe of interactive hydrodynamics during a hurricane.  Kemp Supplemental Declaration at ¶¶19, 27.

48.     Once the combined surge and waves reach the top of a flood control structure, they cannot and do not rise any higher.  Instead, the water overflows the crown and continues to do so until the water level recedes below the crown.  This is like a bathtub that overflows once the water reaches the top and continues to overflow until the water is turned off.  While the water level remains constant, the volume of water and rate of overflowing are more indicative of the amount and extent of flooding.  Catastrophic flooding is similarly a function of when the levee (bathtub) overflows, how long it overflows (time of onset and duration), and the intensity (rate) of water flow.  Thus, the water's elevation is not the most predictive or sensitive factor, but merely an indicator of the mean crown elevation of the flood protection works (assuming that they do not breach).  Kemp Supplemental Declaration at ¶¶19, 27.

49.     By evaluating the more predictive factors of time of onset, duration, and rate of structure overtopping by surge,  Plaintiffs' experts concluded that the addition of the MR-GO

channel, whether at its authorized dimensions or at the swollen cross-section during Hurricane Katrina, significantly increased the rate of surge water introduction into MR-GO Reach 1 and the IHNC and thereby caused more water to inundate Plaintiffs' neighborhoods when the flood control structures were overtopped or breached before overtopping.  Kemp Supplemental Declaration at ¶23, Table 1.

50.     Not only did Reach 2 erode from 650' to 2,000 to 3,000', but the critical Reach 1/GIWW widened beyond its authorized width.  Kemp Supplemental Declaration at ¶2.

51.     The Government's focus on only the modeling results for Scenario 3 is improper. Bea Supplemental Declaration at ¶11(b).

52.     Perfect maintenance of the MR-GO would not have eliminated the significant attendant negative hydrodynamic and hydrologic system impacts, including water flow from the Gulf of Mexico and Lake Borgne affecting surge elevations, wave generation, and the lack of appropriate defenses to effectively neutralize these negative effects.  Bea Supplemental Declaration at ¶11(b).

53.     Plaintiffs' experts therefore pursued a more intellectually defensible analytical approach by evaluating a range of assumed conditions to test the sensitivity of relevant variables on the flooding outcome.  *See* Defendant's Ex. 10 (de Wit et al 2008. Flow Modeling New Orleans -Mississippi River Gulf Outlet, Hurricane Katrina August 2005 - FINAL REPORT Scenario 1, 2A, 2B, 2C, 2D, 3); Defendant's Ex. 12 (Gautier et al 2008 a.) Wave Modeling New Orleans - Mississippi River Gulf Outlet, Hurricane Katrina August 2005 - FINAL REPORT; Gautier et al 2008 b. (Ex. 15) Wave Modeling New Orleans - Mississippi River Gulf Outlet, Hurricane Katrina August 2005 – APPENDICES).

54.     The three most pertinent scenarios are Scenario 1 (what actually happened during Hurricane Katrina), Scenario 2c (pristine wetlands before 1958 and no MR-GO surge and "funnel effect" impact), and Scenario 3 (pristine wetlands before 1958 and channel at authorized width [650' top width] but no surge or "funnel effect" reduction/prevention safeguards).  Kemp Supplemental Declaration at ¶4.

55.     In addition to Scenarios 1, 2c, and 3, Plaintiffs' experts performed other scenarios and parametric sensitivity studies to gain an understanding of how the various parts of this complex system interacted in the Hurricane Katrina 'as is' MRGO condition (Scenario 1) and in the Hurricane Katrina "do no harm"/"Neutral MR-GO" condition (Scenario 2c).  Bea Supplemental Declaration at ¶10(c); Bea Declaration I (Ex. 2) at pp. 41-44, Bea Declaration III (Ex. 4) at pp. 50-52.

56.     The MR-GO—considerably deeper and wider than authorized, denuded of adjacent surge buffering wetlands, and without any surge inhibitors—was a substantial factor in overtopping, breaching before overtopping, and breaching LPV structures and thereby causing the destruction of Plaintiffs' properties.  Kemp Supplemental Declaration at ¶32; Bea Supplemental Declaration at ¶¶4(b), 5(b), 6(c), 7(b)(c), 9(a), 10(a), 11(a), Table 1, 12, 13.

57.     Dr. Bea concludes: "It was the combined effects of the integrated combination of MR-GO life-cycle negative environmental impacts that adversely affected the performance of the Reach 1 and Reach 2 hurricane protection structures during Hurricane Katrina."  Bea Supplemental Declaration at ¶13.

58.     Dr. Kemp concludes that "our studies demonstrate that the cumulative impact of all four defects [no surge barriers, "funnel effect," loss of wetlands, and channel widening] is synergistic, *i.e.*, acting in combination, they not only significantly increased surge and waves but

also materially influenced additional, more sensitive indicators of the MRGO's impact such as time of onset, duration, and rate of overtopping by surge."  Kemp Supplemental Declaration at ¶6.

59.    Scenario 2c is the set of conditions that Plaintiffs established for "no negligence"/"hurricane neutral" MR-GO in the sense that the waterway does no harm to adjacent flood protection structures, property, and population because the pre-1958 wetlands are intact (and not destroyed by salt water intrusion) and the MR-GO has no affect on surge either in terms opening Greater New Orleans to surge from the Gulf of Mexico or funneling surge into Reach 1/GIWW and the IHNC.  Kemp Supplemental Declaration at ¶¶5, 16; Bea Supplemental Declaration at ¶¶3(c), 3(d), 8(a)(b).

60.    Scenario 2c is also described as the "No MRGO" scenario because it tests the effect of the absence of any channel and whether it introduced increased volumes of water and surge.  Defendant's Ex. 10 (de Wit et al 2008) at p. 37; Kemp Expert Report (Ex. 3) at p. 92.

61.    This "Neutral MRGO" condition has no trace of the MR-GO project, or the wetland destruction that it caused, but retains all of the levees, EBSBs, and other flood prevention structures added over the years in the pre-Katrina condition, all of which are presumed beyond reproach in the condition in which they were tested by Hurricane Katrina. Defendant's Ex. 10 (de Wit et al 2008) at p. 37; Kemp Expert Report (Ex. 3) at p. 92.

62.    Scenario 2c represents the Plaintiffs' expert assessment of a valid set of reference hydrodynamic characterizations for "perfect" life-cycle conception, design, operation and maintenance characterizing the MR-GO in a do "no harm" configuration for assessment of the performance of he hurricane flood protection structures along Reach 2 and Reach 1.  Bea

Supplemental Declaration at ¶5(a); Bea Expert Report (Ex. 1) at pp. 6-9, 17-20; Bea Declaration I (Ex. 2) at pp. 41-44, and Bea Declaration III (Ex. 4) at pp. 50-52.

63.     The rationale for the "no harm" assumption is that the Army Corps had a Congressionally-directed responsibility to manage the MR-GO navigation project so that it caused no added unmitigated impact on the ability of the LPV hurricane protection structure to fulfill its other Congressionally-mandated mission to protect the City of New Orleans and St. Bernard Parish from hurricane induced flooding.  Kemp Expert Report (Ex. 3) at p. 92.

64.     Contrasting the modeling results of Scenario 2c (Neutral MR-GO) with Scenario 1 (MR-GO as is) shows overtopping is reduced by 80% for all three polders that experienced catastrophic flooding.  Kemp Supplemental Declaration at ¶22.

65.     Contrasting the modeling results of Scenario 2c (Neutral MR-GO) with Scenario 1 (MR-GO as is) shows surge discharge into the IHNC via Reach 1/GIWW decreased by 274%.  Kemp Supplemental Declaration at ¶21, Table 1.

66.     Contrasting the modeling results of Scenario 2c (Neutral MR-GO) with Scenario 1 (MR-GO as is) shows surge velocity diminishes by 246%.  Kemp Supplemental Declaration at ¶21, Table 1.

67.     Contrasting the modeling results of Scenario 2c (Neutral MR-GO) with Scenario 1 (MR-GO as is) shows wave height is reduced by more than 50%.  Kemp Supplemental Declaration at ¶30(a).

68.     Contrasting the modeling results of Scenario 2c (Neutral MR-GO) with Scenario 1 (MR-GO as is) shows wave period plummets about 60%.  Kemp Supplemental Declaration ¶30(b).

69.     Contrasting the modeling results of Scenario 2c (Neutral MR-GO) with Scenario 1 (MR-GO as is) shows wave energy eroding the EBSBs along Reach 2 dissipates by 300%. Kemp Supplemental Declaration ¶30(c).

70.     In order to remediate the "funnel effect" as part of its 100 Year Level Protection Plan the Army Corps is constructing the IHNC Surge Reduction Barrier across the mouth of the funnel and the Golden Triangle between the GIWW and Reach 2.  Deposition of Gibb Owen (Ex. 7) (October 16, 2008) at 77:9-78:7; 119:18-121:23; Ex. 8 (Owen Depo. Exhibit 1); Ex. 9 (Owen Depo. Exhibit 7); Ex. 10 (Owen Depo. Exhibit 8); Ex. 13 at pp. 52-53 (Owen Depo. Exhibit 5).

71.     The purpose of the IHNC Surge Reduction Barrier is a new feature, authorized by Congress in 2006, that will reduce risk of storm damage to some of the region's areas most vulnerable to flooding—New Orleans East, metro New Orleans, the 9th Ward, and St. Bernard Parish.  Ex. 10 at pp. 1-2 (Owen Depo. Exhibit  8); Ex. 13 at pp. 52-53 (Owen Depo. Exhibit 5); Ex. 7 (Owen Depo.) at 77:9-78:7; 119:18-121:23.

72.     The Army Corps has stated that "[t]he overall purpose of the project is to provide a comprehensive, integrated protection system that would reduce the imminent and continuing threat to life, health, and property posed by flooding from hurricanes and other tropical storm events."  Ex. 20 at p. 4, ¶1.1 (Owen Depo. Exhibit 4).

73.     The Army Corps selected the IHNC Surge Reduction Barrier over the alternative of raising the existing hurricane protection system to the 100-year level of protection because the raised levee and floodwall system would still be vulnerable to "potentially catastrophic consequences resulting if any portion of the system fails" and the IHNC Surge Reduction Barrier

"would instead provide a first line of storm surge defense, providing risk redundancy for many miles of levees and floodwalls."  Ex. 12 at p. 6 (Owen Depo. Exhibit 4).

74.    The project planners are assuming that surge levels might reach as high as 24 to 26 feet.  Ex. 7 (Owen Depo.) at 40:25-41:6.

75.    This project aims to protect these areas form storm surge coming from the Gulf of Mexico and Lake Borgne.  Ex. 10 at p. 1 (Owen Depo. Exhibit 8); Ex. 13 at pp. 52-53 (Owen Depo. Exhibit 5); Ex. 7 (Owen Depo.) at 77:9-78:7; 119:18-121:23.

76.    The Army Corps is requiring that this initiative include expedited surge reduction measures that can be in place by the 2009 hurricane season.  Ex. 10 at p. 2 (Owen Depo. Exhibit 8).

77.    The IHNC Surge Reduction Barrier is the "linchpin" of the Army Corps's Hurricane and Storm Damage Risk Reduction System ("HSDRSS") for providing Southeast Louisiana a 100 Year Level of Flood Protection by 2011.  Ex. 9 at p. 7 (Owen Depo. Exhibit 7); Ex. 10 at p. 1 (Owen Depo. Exhibit 8).

78.    The Army Corps is constructing the IHNC Surge Reduction Barrier on an emergency, expedited basis in an unprecedented period of slightly more than four years from start to completion.  Ex. 7 (Owen Depo.) at 123:14-124:5, 127:10-18.

79.    The project's design build contract is the largest civil works project in Army Corps history with a presently estimated cost of over $800 million.  Ex. 7 (Owen Depo.) at 46:7-47:3; Ex. 9 at p. 7 (Owen Depo. Exhibit 7).

80.    The Army Corps's decision to recommend the IHNC Surge Reduction Barrier comes in the wake of  the following IPET recommendation: "To prevent storm surge in Lake Borgne from influencing water levels experienced in the IHNC or GIWW/MRGO sections of

waterway, flow through Reach 1 channel must be dramatically reduced or eliminated, either by a permanent closure or some type of structure that temporarily serves to eliminate this hydraulic connectivity [between Lake Borgne and Lake Pontchartrain via GIWW/MRGO and the IHNC]." Final IPET Report (Ex. 14) at p. IV-135; Ex. 7 (Owen Depo.) at 68:23-70:4.

81.    The type of surge barrier to be constructed is the type recommended by IPET. Ex. 7 (Owen Depo.) at 68:23-70:4.

82.    The Army Corps's planners took into account IPET data from Hurricane Katrina showing that as a result of storm surges from Lake Borgne propagating down the GIWW/MR-GO into the IHNC, the water elevation during Hurricane Katrina rose seven feet higher in the IHNC (water level of three feet plus waves up to 4 feet high).  Ex. 12 at p. 36 (Owen Depo. Exhibit 4); Ex. 7 (Owen Depo.) at 91:14-93:9.

83.    Four decades before Hurricane Katrina, the Army Corps acknowledged the MR-GO was a direct, efficient route for hurricane surge into the heart of Greater New Orleans, created undesirable effects of excessive, high velocity, and erosive currents in the IHNC and significant salinity increases, and had the potential to deliver storm surges that would cause catastrophic property damage and loss of human life.  House Document 231, 89th Congress (1965) (Ex. 39) at pp. 17, 63; Memo re: LPV to Chief of Engineers, Department of the Army from Major General R.G. MacDonnell (Ex. 23) (July 24, 1963) at NED-213-000000433; Ex. 40 at p. 25; Letter of Department of the Army, New Orleans District, Corps of Engineers from Colonel Thomas J. Bowen, District Engineer to Acting Division Engineer, Lower Mississippi Valley (Ex. 35) (October 19, 1966) at p. AFW-467-000001821; Team Louisiana Report (Ex. 16) at pp. vii; 223; Final IPET Report (Ex. 14) at p. IV-2, IV-135 to IV-136; Naomi Depo (Ex. 17) at 323:24-325:6.

84.     In 1988, the Lower Mississippi Valley Division of the Army Corps recommended that completely closing the MR-GO should be evaluated in order to "reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up this waterway [the MR-GO]. . . ."  1988 Army Corps Reconnaissance Report (Ex. 18) at Comment 2.

85.     After construction of the MR-GO was completed, the Army Corps received notice on multiple occasions about the risk of serious flooding posed by the hazards to life and property that it created in placing into Greater New Orleans a deep channel with direct access to the Gulf of Mexico.  Kemp Expert Report (Ex. 3) at pp. 21-31, 170-92, 191-95.

86.     In 1962, the Army Corps considered construction of two "floodgates" to control hurricane surge at Bayou Bienvenue and Bayou Dupre along Reach 2 of the MR-GO.  Letter from U.S. Department of the Interior to District Engineer, NOD (Ex. 29) (October 22, 1962).

87.     In 1966, the Army Corps acknowledged that during Hurricane Betsy, it was observed that large amounts of water flowed through the MRGO Reach 1 into the IHNC which then exited into Lake Pontchartrain.  Lake Pontchartrain and Vicinity Design Memorandum No. 2: Citrus Back Levee, Appendix E: Report on the Controlling Elevation of the Seabrook Lock (Ex. 38) (October 1966) p. 4.

88.     After Hurricane Betsy, the Corps considered in 1967 and again in 1969 the construction of a hurricane surge barrier from the GIWW to Reach 2 of the MR-GO in order to prevent hurricane surge from Lake Borgne entering the combined GIWW/MRGO Reach 1 and the IHNC west of Paris Road.  Lake Pontchartrain and Vicinity Design Memorandum No. 2: Citrus Back Levee, Appendix C: Report on Evaluation of Alternative Plans Involving Modifications in the Alignment of the Lake Pontchartrain Barrier (Ex. 37) at p. 2 (March 1967); Ex. 34 at AFW-467-000001698-1699.

89.     In 1975, the Army Corps acknowledged that a storm surge barrier from the GIWW to Reach 2 of the MR-GO "would have provided hurricane protection for the industrial development along the IHNC outside the authorized protective works" and "[a] relatively safe harbor, during hurricane conditions, would be provided in the IHNC and the MR-GO/GIWW since the navigation structures would control the ingress of hurricane tides and reduce wave action."  Ex. 24 at NED-125-000000995-997.

90.     Long before Hurricane Katrina, the Army Corps knew or should have known about the role of the MR-GO "funnel" as a potential hurricane highway that could cause catastrophic flooding.  As stated by the Congressional Research Service:  "In contrast to continuing differences of opinion regarding the role of the MRGO as a hurricane highway for moving water from the Gulf to the City, there is a degree of consensus on the channel's funnel effect at the intersection of Reach 1, Reach 2, and the GIWW.  The Berkeley, IPET, and Louisiana Working Group reports all noted that at the confluence of the MRGO and the GIWW, there was no barrier in place to prevent the channeling of the waters from Lake Borgne into the narrow confines of Reach 1.  As a result, Reach 1 hydraulically connected Lake Pontchartrain and Lake Borgne, and allowed the Lake Borgne waters to be pushed into the interior of New Orleans and toward Lake Pontchartrain. . . .  This connectivity is shown to have both amplified surge level and velocity through the interior of the city, and raised the level of Lake Pontchartrain.  As pressure on the levees throughout this area increased, structural failures along the IHNC and Lake Pontchartrain canals occurred."  CRS Report for Congress, *Mississippi River Gulf Outlet (MRGO):  Issues for Congress*, Nicole T. Carter, Charles V. Stern, Aug. 4, 2006 (Ex. 36) at p. 7.

91.     From the time the MR-GO was being constructed and thereafter, the Army Corps knew that the MR-GO created a funnel that could enhance surge, waves, and currents during hurricanes and create a serious flooding risk. Letter from Kenneth J. Le Sieur to Colonel Thomas J. Bowen, November 24, 1965 (Ex. 30); October 1, 1969 draft memorandum regarding the proposed Mississippi River-Gulf Outlet New Ship Lock and reviewing the Dock Board Proposals for a St. Bernard Parish Site (Ex. 31) (AFW-143-000001049); Naomi Depo. (Ex. 17) at 357:15-360:12; Disposition Form dated 06-21-1971; Subject: MR-GO—New Ship Lock; Return Levees; signed by Mask (Ex. 33) (AFW-440-000000938); Letter dated 08-16-1971; Subject: MR-GO—New Ship Lock; Return Levees; signed by Becnel (Ex. 32) (AFW-440-000000936); Environmental Impact Study Ship Channel Project prepared by Coastal Environments, Inc., prepared for St. Bernard Parish Police Jury dated October 1972 (Ex. 26). (MRGO-CEI-000340) p. 54; Army Corps, Environmental Considerations of an Expanded Mississippi River-Gulf Outlet, Appendix I (Ex. 22) at NED-111-000001197).

92.     The Army Corps-commissioned IPET investigation of the causes of the catastrophic funding during Hurricane Katrina acknowledged the funneling of water in the IHNC from the GIWW during hurricanes.  Final IPET Report (Ex. 14) at p. IV-258.

93.     In 1966 and after Hurricane Betsy but before completion of the MR-GO's construction, the Army Corps commissioned a report (Bretschneider and Collins, *Storm Surge Effects of the Mississippi River Gulf Outlet* (1966) ("Bretschneider and Collins Report") which concluded that in all cases (slow, moderate, and rapidly rising surge during hurricanes), the predicted effect of building the contemplated LPV levee system that now forms the throat of the funnel was to hasten the onset of peak surge and to lengthen the period of highest water.  Team Louisiana Report (Ex. 16) at pp. 249-50.

94.      Long before Hurricane Katrina, the Army Corps knew that the MR-GO was destroying tens of thousands of acres of cypress forests, grasses, marshes, swamps, trees, shrubs and other wetlands ("wetlands") that provided a natural barrier and sponge for storm surge and that the loss of these wetlands reduced storm surge protection for New Orleans and St. Bernard Parish.  Report to the Police Jury of the Parish of St. Bernard of the Tidewater Channel Advisory Committee (Ex. 27) (1957) at p. 2; "Interim Survey Report on Hurricane Study of Morgan City, Louisiana, and Vicinity." (November 1962); USACE Fact Sheet (Ex. 20), January 2005; Letter from Fred A. Seaton to Wilbur M. Brucker, dated September 23, 1957 (Ex. 41) at p. 2; U.S. Department of the Interior, U.S. Fish and Wildlife Service, Press Release, "Louisiana Canal's Effects on Fish and Wildlife Arouse Concern of Conservationists," September 26, 1957 (Ex. 42) at p. 1; U.S. Fish and Wildlife Service, An Interim Report on Fish and Wildlife Resources as Related to Mississippi River Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies (Ex. 25) (April 1958); UDI-001-000000120; 1988 Army Corps Reconnaissance Report (Ex. 18) at p. 27; Team Louisiana Report (Ex. 16) at p. 112.

95.      Long before Hurricane Katrina, the Army Corps knew that erosion of the unarmored banks of Reach 2 of the MR-GO had vastly widened the channel beyond its authorized 650' top width, caused large breaches in the rapidly dwindling marsh buffer between the navigation channel and the open waters of Lake Borgne and Breton Sound, and exposed neighboring people and property to direct hurricane attacks from Lake Borgne.  Corps Reconnaissance Report (Ex. 18) at Comment 2; Army Corps, Habitat Impact of the Construction of the MRGO (Ex. 28) (December 1999) at NED-188-000001556 et seq.

Dated: October 22, 2008                                      Respectfully submitted,


**O'Donnell & Associates P.C.**

By: s/ Pierce O'Donnell

Pierce O'Donnell (*pro hac vice*)
550 S. Hope St., Suite 1000
Los Angeles, California 90071
Phone:  (213) 347-0290
Fax:  (213) 347-0298


**Law Offices of Joseph M. Bruno**
By: s/ Joseph M. Bruno
Joseph M. Bruno (LSBA No. 3604)
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

**The Andry Law Firm, LLC**                          **Domengeaux Wright Roy & Edwards LLC**
By: s/ Jonathan B. Andry                             Bob F. Wright (LSBA No. 13691)
Jonathan B. Andry (LSBA No. 20081)                   James P. Roy (LSBA No. 11511)
610 Baronne Street                                   556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113                         P.O. Box 3668
Telephone: (504) 586-8899                            Lafayette, Louisiana 70502-3668
Facsimile:  (504) 585-1788                           Telephone: (337) 233-3033
                                                     Facsimile:  (337) 233-2796

**Fayard & Honeycutt**                               **Girardi & Keese**
Calvin C. Fayard, Jr. (LSBA No. 5486)                Thomas V. Girardi (*pro hac vice*)
Blayne Honeycutt (LSBA No. 18264)                    1126 Wilshire Boulevard
519 Florida Avenue, S.W.                             Los Angeles, CA 90017
Denham Springs, Louisiana 70726                      Telephone: (213) 489-5330
Telephone: (225) 664-4193                            Facsimile:  (213) 481-1554
Facsimile:  (225) 664-6925

**Ranier, Gayle & Elliot, LLC**                      **Levin, Papantonio, Thomas, Mitchell**
N. Frank Elliot III                                  **Echsner & Proctor, P.A.**
1419 Ryan Street                                     Clay Mitchell (*pro hac vice*)
Lake Charles, LA 70601                               Matt Schultz (*pro hac vice*)
Telephone: (337) 494-7171                            316 S. Baylen Street, Suite 600

Facsimile: (337).494.7218

Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123

**McKernan Law Firm**
Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202

**Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC**
Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Law Office of Elwood C. Stevens, Jr., a Professional Law Corporation**
Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Cotchett, Pitre, Simon & McCarthy**
Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**
Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Robinson, Calcagnie & Robinson, Inc.**
Mark Robinson (Cal State Bar No. 54426
620 Newport Center Drive – 7th Floor
Newport Beach, CA 92660
1-888-701-1288

## <u>CERTIFICATE OF SERVICE</u>

I, Pierce O'Donnell, hereby certify that on October 22, 2008, I caused to be served

**<u>PLAINTIFFS' STATEMENT OF UNCONTESTED FACTS</u>**, upon Defendants' counsel,

Robin D. Smith, George Carter, Keith Liddle, and Richard Stone by ECF and email at

robin.doyle.smith@usdoj.gov; george.carter@usdoj.gov, keith.liddle@usdoj.gov, and

richard.stone@usdoj.gov.

<u>/s/ Pierce O'Donnell</u>