UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO:  *Robinson* (No. 06-2268) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES' STATEMENT OF UNCONTESTED FACTS**

Plaintiffs hereby respond to the Defendant's Statement of Uncontested Facts filed in support of the United States' Motion for Partial Summary Judgment.

**1.     On the morning of August 29, 2005, Hurricane Katrina struck southeast Louisiana and triggered what would become one of the worst disasters ever to befall an American city.  M. Kok, et al.,** *Polder Flood Simulations for Greater New Orleans: Hurricane Katrina August 2005,* **at 1 (July 30, 2007) (Ex. 7) [hereinafter** *"Katrina Real Run" Flood Report***]; L. De Wit et al.,** *Flow Modeling New Orleans– Mississippi River Gulf Outlet* **4 (Final Report) (June 23, 2008) (Ex. 1) [hereinafter** *Katrina Surge Report***].**

Uncontested.

**2.     The storm overtopped levees and floodwalls throughout southeast Louisiana.** *"Katrina Real Run" Flood Report* **1;** *Katrina Surge Report* **4.**

Uncontested.

**3.      The storm also caused the levees and floodwalls in the New Orleans area to fail or breach in more than 50 locations.  *"Katrina Real Run" Flood Report* 1; *Katrina Surge Report* 4.**

Contested.  There is a factual dispute as to the cause-in-fact of the failure of the purported "levees" and "floodwalls" in the New Orleans area as well as the cause-in-fact of Plaintiffs' damages.  Specifically, Defendant contends that Katrina's storm surge exceeded the design height of the MR-GO levees, and as a result, Plaintiffs suffered damages.  Defendant's 702c MSJ at 9 (Doc. No. 10335).  Plaintiffs contend that the Army Corps's negligent design, construction, operation and maintenance of the MR-GO was a substantial factor in causing the failure and overtopping of the purported levees and floodwalls as well as Plaintiffs' resulting damages.  Plaintiffs' Memorandum in Opposition to United States' Motion for Partial Summary Judgment (Causation) ("Plaintiffs' Opposition") at pp. 5, 10, 19-22; *see also* Bea Supplemental Declaration at ¶¶2-13; Kemp Supplemental Declaration at ¶¶2, 8, 32.

**4.      Water rushed into New Orleans and flooded over 80 percent of the city— more than ten feet deep in some neighborhoods.  *"Katrina Real Run" Flood Report* 1; *Katrina Surge Report* 4.**

Uncontested to the extent of flooding in New Orleans.  New Orleans East, the Lower Ninth Ward, and Upper St. Bernard Parish were nearly 100 percent flooded.

**5.      Flooding of the city of New Orleans was caused by several sources (or causes):  breaches, overtopping (of the levees and flood control structures), and rainfall. *"Katrina Real Run" Flood Report* 1; *Katrina Surge Report* 4.**

Contested.  Initially, Defendant -- without explanation -- omits from its citation the very next sentence from page 4 of the *Katrina Surge Report* that states: "One of the causes of the

breaches might be the amplified surges generated by the Mississippi River Gulf Outlet

(MRGO)." That said, there is a factual dispute as to the cause-in-fact of the failure of the

purported "levees" and "floodwalls" in the Greater New Orleans area as well as the cause-in-fact

of Plaintiffs' damages. Specifically, Defendant contends in part that Katrina's storm surge

exceeded the design height of the MR-GO levees, and as a result, Plaintiffs suffered damages.

Defendant's 702c MSJ at 9 (Doc. No. 10335). Plaintiffs contend that the Army Corps's

negligent design, construction, operation and maintenance of the MR-GO was a substantial

factor in causing the failure and overtopping of the purported levees and floodwalls as well as

Plaintiffs' resulting damages. Plaintiffs' Opposition at pp. 5, 10, 19-22; *see also* Bea

Supplemental Declaration at ¶¶2-13; Kemp Supplemental Declaration at ¶¶2, 8, 32.

      **6.** **Plaintiffs' experts modeled the flow dynamics of Hurricane Katrina in six**

**scenarios, applying the storm dynamics to the actual topography of the Lake Borgne region**

**and to five hypothetical topographies.** *Katrina Surge Report* **4-5.**

      Uncontested.

      **7.** **Plaintiffs' experts first simulated the surge that developed across the land**

**and seascape that actually existed on August 29, 2005—the "Katrina Real Run" scenario.**

*Katrina Surge Report* **4-5 (Ex. 1), 7-36 (Ex. 10; full copy of report).**

      Uncontested. This is identified as "Scenario 1."

      **8.** **Plaintiffs' experts second simulated the surge that would have developed if**

**there had been no MRGO when the storm struck and the wetlands had been in pristine**

**condition—the "No MRGO" scenario.** *Katrina Surge Report* **4-5 (Ex. 1), 37-63 (Ex. 10; full**

**copy of report).**

Contested as incomplete.  The "No MRGO" scenario detailed in the *Katrina Surge Report* included more than just "no MRGO when the storm struck and the wetlands [] in pristine condition" as the Defendant contends.  Specifically, the precise description of the "No MRGO" scenario (aka, "Scenario 2C" or "Hurricane Neutral MRGO") is a:

(1)   90% reduction in the cross-section area of the MRGO Reach 1 to the dimensions of the GIWW (pre-MRGO);

(2)   MRGO Reach 2 is removed and replaced with land at the elevation of the surrounding marsh and swamp areas;

(3)   The levees along MRGO Reach 1 and 2 are at their pre-Katrina crest elevation (same as Scenario 1);

(4)   Bayou LaLoutre ridge is restored to fill-in the hole dredged for MRGO Reach 2;

(5)   The area between the 40 Arpent levee and the Mississippi is added to the model grid.  The pre-Katrina crest level of 6.5 ft NAVD is used for the 40 Arpent levee.

(6)   The Cypress trees originally present between the MRGO and the 40 Arpent levees have influence on the water current velocities and the wind velocities.  A higher Manning's roughness is used for the Cypress forests reflecting their greater frictional impacts on surge currents, and the wind velocities are reduced by 80% inside the Cypress forests due to the wind break/canopy effect of tall forests.

Defendant's Exhibit 10, *Katrina Surge Report* at 37.

**9.   Plaintiffs' experts third simulated the surge that would have developed if the MRGO had been at its design dimensions (depth and width) and the wetlands pristine—the "MRGO as Designed" scenario.  *Katrina Surge Report* 4-5 (Ex. 1), 64-89 (Ex. 10, full copy of report).**

Contested as incomplete.  The "MRGO as Designed" scenario detailed in the *Katrina Surge Report* included more than just "the MRGO [] at its design dimensions (depth and width)

4

and the wetlands pristine" as the Defendant contends.  Specifically, the precise description of the

"MRGO as Designed" scenario (aka, "Scenario 3") is:

> (1)    MRGO Reach 1 and 2 are modeled as approved by the U.S. Congress under the Rivers and Harbor Act of 1956 (PL 84-455) and authorized as a 76-mile ship channel with a 36 foot controlling depth, 500 feet wide at the bottom and 650 feet wide at the top, that would cut through the marshes of lower St. Bernard Parish and across the shallow waters of Breton Sound (USACE, 1999);

> (2)    The levees along MRGO Reach 1 and 2 are input at their pre-Katrina crest elevations;

> (3)    The pre-MRGO (1958) wetlands/swamps elevations and shoreline are used;

> (4)    The Cypress trees originally present between the MRGO and the 40 Arpent levees have influence on the water current velocities and the wind velocities.  A higher Manning's roughness is used for the Cypress forests reflecting their greater frictional impacts on surge currents, and the wind velocities are reduced by 80% inside the Cypress forests due to the wind break/canopy effect of tall forests.

Defendant's Exhibit 10, *Katrina Surge Report* at 64.

**10.    Plaintiffs' experts compared the storm surge in the "MRGO as Designed"**

**scenario to the surge in the "Katrina Real Run" scenario and concluded that the surges**

**were "almost similar." *Katrina Surge Report* 90 (Ex. 1).**

Contested.  Defendant's statement is incomplete and misleading.  Initially, Defendant has

premised its instant motion by isolating certain test scenarios and ignoring the proper set of

conditions detailed in the "Neutral MR-GO Conditions" (Scenario 2C).  As stated in Drs. Bea

and Kemp's Supplemental Reports, Scenario 2C is the proper "do no harm" scenario under

which to analyze the cause of Plaintiffs' damages because Scenario 2C

> consists of the MR-GO channel modeled in a pre-construction condition (before 1958), the GIWW, the IHNC and the other associated components in this hydrologic system in their original Congressionally-authorized conditions, the Reach 1 and Reach 2 man-made hurricane flood protection and navigation structures in their pre-Katrina condition, and the

surrounding wetlands, swamps, and other coastal features in their pre-
MGGO construction (before 1958) conditions. *See* Bea Expert Report at
pp. 17-20, Declaration I at pp. 41-44, and Declaration III at pp. 50-52.
*This configuration is necessary and appropriate because it is important in*
*terms of the causation issues to determine whether the presence of the*
*MRGO channel itself has important negative environmental and protective*
*structure impacts which should not be isolated from the other directly*
*associated negative environmental and protective structure impacts*
*(surge, waves, and currents) important to the Reach 1 and Reach 2*
*hurricane flood protection structures.*

Bea Supplemental Declaration at ¶3(d) (emphasis added); *see also* Kemp

Supplemental Declaration at ¶5 ("Scenario 2C reflects the Plaintiffs' position that

Government had a legal duty to design, construct, operate, and maintain the MRGO

so that it did not create any added risk of flooding the neighborhood.")

By isolating its analysis on the "MRGO as Designed" scenario, Defendant disregards

sound scientific principles which establish that the MRGO's

integrated effects of the life-cycle developments (concept, development,
design, construction, operation, maintenance) cannot be decomposed of
their interactive and interdependent effects on what existed at the time of
Hurricane Katrina and on what could and should have existed at the time
of Hurricane Katrina as performed "with the utmost care." The attempted
decomposition of the life-cycle effects of the MRGO by the Defendants is
a classic mistake in development of accurate and realistic understandings
of the behavior of real complex "systems." Synthesis – or understanding
the behavior of the entire system (assembly of components) – must take
place before there are attempts to decompose the system to develop
additional insights into workings of components and their interactive and
interdependent relationships with other components.

Bea Supplemental Declaration at ¶10(b); *see also* Kemp Supplemental Declaration at ¶9 ("From

a technical standpoint, the rigorous (and arbitrary) separation along the line that the Defendant

seeks to draw (widened banks and wetlands loss only) is not possible since we are dealing with

linked system responses throughout the artificial funnel; isolating only these two factors is an

artificial construct that ignores the reality on the ground.")

Furthermore, Plaintiffs' experts have established that under Scenario 2C, the

"Neutral MR-GO,"

> (1) the Army Corps's purported flood control features would not have breached (Bea Supplemental Declaration at ¶5(b));
>
> (2) overtopping was reduced by about 80 percent for all of the three polders that experienced catastrophic flood damage (Kemp Supplemental Declaration at ¶22);
>
> (3) the differences between maximum significant wave heights at relevant Reach 2 EBSB sites were 6 feet (Scenario 1) and 2.2 feet, which was "a substantial cause of the EBSB failures and overtopping" (Bea Supplemental Declaration at ¶6(c));
>
> (4) there was a "low probability for either unprotected side wave attack or overtopping attack" on the Reach 2 EBSBs (Bea Supplemental Declaration at ¶6(c));
>
> (5) there are significantly lower wave heights, wave periods, and erosive wave energy during Hurricane Katrina under Scenario 2C (Kemp Supplemental Declaration at ¶30);
>
> (6) the cumulative impact of all four defects of the MR-GO—(a) the creation of a previously non-existent direct, efficient conduit for storm surge; (b) the "funnel effect" created by the convergent channel geometry connecting Reach 2 and the GIWW/Reach 1; (c) destruction of tens of thousands of acres of storm surge buffering wetlands; and (d) substantial widening of the MRGO channel from its authorized width—"not only significantly increased surge and waves but also materially influenced additional indicators of the MRGO's impact such as time of onset, duration, channel discharge and rate of overtopping by surge, all more sensitive than surge height alone" (Kemp Supplemental Declaration at ¶¶2, 6);
>
> (7) the MRGO's very existence in its defective condition was the determinative factor in causing the catastrophic flooding of New Orleans East, Lower 9th Ward, and St. Bernard Parish (Kemp Supplemental Declaration at ¶¶5, 25-26); and
>
> (8) *the Hurricane Neutral MR-GO would not have caused catastrophic flooding*." (Bea Supplemental Declaration at ¶6(c) (emphasis added); *see also id.* at ¶7(c)(d)).

Moreover, Defendant's characterization of and reliance on Scenario 3 as a "no

negligence" scenario is improper because Scenario 3 views the MR-GO in a vacuum that does

not comport with reality.  Scenario 3 disregards the decades of knowledge the Army Corps had

about the MR-GO's potential to amplify and accelerate hurricane generated storm surge and

cause flood damage to adjacent land and home owners, and Scenario 3 also disregards the Army

Corps's negligent failure to provide for any surge barriers or other protections along the MRGO in order to prevent such destruction and damages.  Kemp Supplemental Declaration at ¶16; Bea Supplemental Declaration at ¶12.

Finally, Defendant's reliance on wave height is misleading because it is only one of several factors in a competent scientific analysis of flooding, and Defendant omits any mention of other, more reliable indicators such as time of onset, duration, and rate of structure overtopping by surge.  Kemp Supplemental Declaration at ¶¶ 19, 27.  Wave elevation is merely an indicator of the mean crown elevation of the flood protection works (assuming that they do not breach).  *Id.*  By evaluating the more predictive factors of time of onset, duration, and rate of structure overtopping by surge, Plaintiffs' experts concluded that the addition of the MR-GO channel, whether at its authorized dimensions or at the greater cross-section that existed during Hurricane Katrina, significantly increased the rate of surge water introduction into MR-GO Reach 1 and the IHNC and thereby caused more water to inundate Plaintiffs' neighborhoods when the flood control structures were overtopped or breached before overtopping.  Kemp Supplemental Declaration at ¶23, and p. 9, Table 1.

**11.    The models created by Plaintiffs' experts showed that the surge at the MRGO Reach 2 levee in the "MRGO as Designed" scenario would have been "a tiny bit higher" (less than 2.4 inches) than the surge at the levee during the storm.  *Id.***

Contested.  Defendant's statement is incomplete and misleading.  Initially, Defendant has premised its instant motion by isolating certain test scenarios and ignoring the proper set of conditions detailed in the "Neutral MR-GO Conditions" (Scenario 2C).  As stated in Drs. Bea and Kemp's Supplemental Reports, Scenario 2C is the proper "do no harm" scenario under which to analyze the cause of Plaintiffs' damages because Scenario 2C

consists of the MR-GO channel modeled in a pre-construction condition (before 1958), the GIWW, the IHNC and the other associated components in this hydrologic system in their original Congressionally-authorized conditions, the Reach 1 and Reach 2 man-made hurricane flood protection and navigation structures in their pre-Katrina condition, and the surrounding wetlands, swamps, and other coastal features in their pre-MGGO construction (before 1958) conditions. *See* Bea Expert Report at pp. 17-20, Declaration I at pp. 41-44, and Declaration III at pp. 50-52. *This configuration is necessary and appropriate because it is important in terms of the causation issues to determine whether the presence of the MRGO channel itself has important negative environmental and protective structure impacts which should not be isolated from the other directly associated negative environmental and protective structure impacts (surge, waves, and currents) important to the Reach 1 and Reach 2 hurricane flood protection structures.*

Bea Supplemental Declaration at ¶3(d) (emphasis added); *see also* Kemp Supplemental Declaration at ¶5 ("Scenario 2C reflects the Plaintiffs' position that Government had a legal duty to design, construct, operate, and maintain the MRGO so that it did not create any added risk of flooding the neighborhood.")

By isolating its analysis on the "MRGO as Designed" scenario, Defendant disregards sound scientific principles which establish that the MRGO's

integrated effects of the life-cycle developments (concept, development, design, construction, operation, maintenance) cannot be decomposed of their interactive and interdependent effects on what existed at the time of Hurricane Katrina and on what could and should have existed at the time of Hurricane Katrina as performed "with the utmost care." The attempted decomposition of the life-cycle effects of the MRGO by the Defendants is a classic mistake in development of accurate and realistic understandings of the behavior of real complex "systems." Synthesis – or understanding the behavior of the entire system (assembly of components) – must take place before there are attempts to decompose the system to develop additional insights into workings of components and their interactive and interdependent relationships with other components.

Bea Supplemental Declaration at ¶10(b); *see also* Kemp Supplemental Declaration at ¶9 ("From a technical standpoint, the rigorous (and arbitrary) separation along the line that the Defendant seeks to draw (widened banks and wetlands loss only) is not possible since we are dealing with

9

linked system responses throughout the artificial funnel; isolating only these two factors is an

artificial construct that ignores the reality on the ground.")

Furthermore, Plaintiffs' experts have established that under Scenario 2C, the

"Neutral MR-GO,"

(1) the Army Corps's purported flood control features would not have breached (Bea Supplemental Declaration at ¶5(b));

(2) overtopping was reduced by about 80 percent for all of the three polders that experienced catastrophic flood damage (Kemp Supplemental Declaration at ¶22);

(3) the differences between maximum significant wave heights at relevant Reach 2 EBSB sites were 6 feet (Scenario 1) and 2.2 feet, which was "a substantial cause of the EBSB failures and overtopping" (Bea Supplemental Declaration at ¶6(c));

(4) there was a "low probability for either unprotected side wave attack or overtopping attack" on the Reach 2 EBSBs (Bea Supplemental Declaration at ¶6(c));

(5) there are significantly lower wave heights, wave periods, and erosive wave energy during Hurricane Katrina under Scenario 2C (Kemp Supplemental Declaration at ¶30);

(6) the cumulative impact of all four defects of the MR-GO—(a) the creation of a previously non-existent direct, efficient conduit for storm surge; (b) the "funnel effect" created by the convergent channel geometry connecting Reach 2 and the GIWW/Reach 1; (c) destruction of tens of thousands of acres of storm surge buffering wetlands; and (d) substantial widening of the MRGO channel from its authorized width—"not only significantly increased surge and waves but also materially influenced additional indicators of the MRGO's impact such as time of onset, duration, channel discharge and rate of overtopping by surge, all more sensitive than surge height alone" (Kemp Supplemental Declaration at ¶¶2, 6);

(7) the MRGO's very existence in its defective condition was the determinative factor in causing the catastrophic flooding of New Orleans East, Lower 9th Ward, and St. Bernard Parish (Kemp Supplemental Declaration at ¶¶5, 25-26); and

(8) "*the Hurricane Neutral MR-GO would not have caused catastrophic flooding*." (Bea Supplemental Declaration at ¶6(c) (emphasis added); *see also id.* at ¶7(c)(d)).

Moreover, Defendant's characterization of and reliance on Scenario 3 as a "no

negligence" scenario is improper because Scenario 3 views the MR-GO in a vacuum that does

not comport with reality.  Scenario 3 disregards the decades of knowledge the Army Corps had

about the MR-GO's potential to amplify and accelerate hurricane generated storm surge and cause flood damage to adjacent land and home owners, and Scenario 3 also disregards the Army Corps's negligent failure to provide for any surge barriers or other protections along the MRGO in order to prevent such destruction and damages.  Kemp Supplemental Declaration at ¶16; Bea Supplemental Declaration at ¶12.

Finally, Defendant's reliance on wave height is misleading because it is only one of several factors in a competent scientific analysis of flooding, and Defendant omits any mention of other, more reliable indicators such as time of onset, duration, and rate of structure overtopping by surge.  Kemp Supplemental Declaration at ¶¶ 19, 27.  Wave elevation is merely an indicator of the mean crown elevation of the flood protection works (assuming that they do not breach).  *Id.*  By evaluating the more predictive factors of time of onset, duration, and rate of structure overtopping by surge, Plaintiffs' experts concluded that the addition of the MR-GO channel, whether at its authorized dimensions or at the greater cross-section that existed during Hurricane Katrina, significantly increased the rate of surge water introduction into MR-GO Reach 1 and the IHNC and thereby caused more water to inundate Plaintiffs' neighborhoods when the flood control structures were overtopped or breached before overtopping.  Kemp Supplemental Declaration at ¶23, and p. 9, Table 1.

**12.     The models created by Plaintiffs' experts showed that the surge at the MRGO Reach 1 levees would have been six inches lower in the "MRGO as Designed" scenario and would have been about five inches lower at the IHNC floodwall.  *Id.***

Contested.  Defendant's statement is incomplete and misleading.  Initially, Defendant has premised its instant motion by isolating certain test scenarios and ignoring the proper set of conditions detailed in the "Neutral MR-GO Conditions" (Scenario 2C).  As stated in Drs. Bea

and Kemp's Supplemental Reports, Scenario 2C is the proper "do no harm" scenario under

which to analyze the cause of Plaintiffs' damages because Scenario 2C

> consists of the MR-GO channel modeled in a pre-construction condition
> (before 1958), the GIWW, the IHNC and the other associated components
> in this hydrologic system in their original Congressionally-authorized
> conditions, the Reach 1 and Reach 2 man-made hurricane flood protection
> and navigation structures in their pre-Katrina condition, and the
> surrounding wetlands, swamps, and other coastal features in their pre-
> MGGO construction (before 1958) conditions. *See* Bea Expert Report at
> pp. 17-20, Declaration I at pp. 41-44, and Declaration III at pp. 50-52.
> *This configuration is necessary and appropriate because it is important in
> terms of the causation issues to determine whether the presence of the
> MRGO channel itself has important negative environmental and protective
> structure impacts which should not be isolated from the other directly
> associated negative environmental and protective structure impacts
> (surge, waves, and currents) important to the Reach 1 and Reach 2
> hurricane flood protection structures*.

Bea Supplemental Declaration at ¶3(d) (emphasis added); *see also* Kemp Supplemental

Declaration at ¶5 ("Scenario 2C reflects the Plaintiffs' position that Government had a legal duty

to design, construct, operate, and maintain the MRGO so that it did not create any added risk of

flooding the neighborhood.")

By isolating its analysis on the "MRGO as Designed" scenario, Defendant disregards

sound scientific principles which establish that the MRGO's

> integrated effects of the life-cycle developments (concept, development,
> design, construction, operation, maintenance) cannot be decomposed of
> their interactive and interdependent effects on what existed at the time of
> Hurricane Katrina and on what could and should have existed at the time
> of Hurricane Katrina as performed "with the utmost care." The attempted
> decomposition of the life-cycle effects of the MRGO by the Defendants is
> a classic mistake in development of accurate and realistic understandings
> of the behavior of real complex "systems." Synthesis – or understanding
> the behavior of the entire system (assembly of components) – must take
> place before there are attempts to decompose the system to develop
> additional insights into workings of components and their interactive and
> interdependent relationships with other components.

Bea Supplemental Declaration at ¶10(b); *see also* Kemp Supplemental Declaration at ¶9 ("From a technical standpoint, the rigorous (and arbitrary) separation along the line that the Defendant seeks to draw (widened banks and wetlands loss only) is not possible since we are dealing with linked system responses throughout the artificial funnel; isolating only these two factors is an artificial construct that ignores the reality on the ground.")

Furthermore, Plaintiffs' experts have established that under Scenario 2C, the "Neutral MR-GO,"

(1) the Army Corps's purported flood control features would not have breached (Bea Supplemental Declaration at ¶5(b));

(2) overtopping was reduced by about 80 percent for all of the three polders that experienced catastrophic flood damage (Kemp Supplemental Declaration at ¶22);

(3) the differences between maximum significant wave heights at relevant Reach 2 EBSB sites were 6 feet (Scenario 1) and 2.2 feet, which was "a substantial cause of the EBSB failures and overtopping" (Bea Supplemental Declaration at ¶6(c));

(4) there was a "low probability for either unprotected side wave attack or overtopping attack" on the Reach 2 EBSBs (Bea Supplemental Declaration at ¶6(c));

(5) there are significantly lower wave heights, wave periods, and erosive wave energy during Hurricane Katrina under Scenario 2C (Kemp Supplemental Declaration at ¶30);

(6) the cumulative impact of all four defects of the MR-GO—(a) the creation of a previously non-existent direct, efficient conduit for storm surge; (b) the "funnel effect" created by the convergent channel geometry connecting Reach 2 and the GIWW/Reach 1; (c) destruction of tens of thousands of acres of storm surge buffering wetlands; and (d) substantial widening of the MRGO channel from its authorized width—"not only significantly increased surge and waves but also materially influenced additional indicators of the MRGO's impact such as time of onset, duration, channel discharge and rate of overtopping by surge, all more sensitive than surge height alone" (Kemp Supplemental Declaration at ¶¶2, 6);

(7) the MRGO's very existence in its defective condition was the determinative factor in causing the catastrophic flooding of New Orleans East, Lower 9th Ward, and St. Bernard Parish (Kemp Supplemental Declaration at ¶¶5, 25-26); and

(8) "*the Hurricane Neutral MR-GO would not have caused catastrophic flooding.*"  (Bea Supplemental Declaration at ¶6(c) (emphasis added); *see also id.* at ¶7(c)(d)).

Moreover, Defendant's characterization of and reliance on Scenario 3 as a "no negligence" scenario is improper because Scenario 3 views the MR-GO in a vacuum that does not comport with reality.  Scenario 3 disregards the decades of knowledge the Army Corps had about the MR-GO's potential to amplify and accelerate hurricane generated storm surge and cause flood damage to adjacent land and home owners, and Scenario 3 also disregards the Army Corps's negligent failure to provide for any surge barriers or other protections along the MRGO in order to prevent such destruction and damages.  Kemp Supplemental Declaration at ¶16; Bea Supplemental Declaration at ¶12.

Finally, Defendant's reliance on wave height is misleading because it is only one of several factors in a competent scientific analysis of flooding, and Defendant omits any mention of other, more reliable indicators such as time of onset, duration, and rate of structure overtopping by surge.  Kemp Supplemental Declaration at ¶¶ 19, 27.  Wave elevation is merely an indicator of the mean crown elevation of the flood protection works (assuming that they do not breach).  *Id.*  By evaluating the more predictive factors of time of onset, duration, and rate of structure overtopping by surge, Plaintiffs' experts concluded that the addition of the MR-GO channel, whether at its authorized dimensions or at the greater cross-section that existed during Hurricane Katrina, significantly increased the rate of surge water introduction into MR-GO Reach 1 and the IHNC and thereby caused more water to inundate Plaintiffs' neighborhoods when the flood control structures were overtopped or breached before overtopping.  Kemp Supplemental Declaration at ¶23, and p. 9, Table 1.

**13.     Plaintiffs' experts also modeled the waves that were produced by the storm, and they modeled the waves that would have been produced in the "MRGO as Designed"**

**scenario.  *See* C. Gautier et al., *Wave Modeling New Orleans—Mississippi River Gulf Outlet 8 (Final Report) (July 9, 2008) (Ex. 3).***

Uncontested that this was one of the modeling scenarios run by Plaintiffs' experts. Contested in that Defendant's statement is incomplete and misleading.  Initially, Defendant has premised its instant motion by isolating certain test scenarios and ignoring the proper set of conditions detailed in the "Neutral MR-GO Conditions" (Scenario 2C).  As stated in Drs. Bea and Kemp's Supplemental Reports, Scenario 2C is the proper "do no harm" scenario under which to analyze the cause of Plaintiffs' damages because Scenario 2C

> consists of the MR-GO channel modeled in a pre-construction condition (before 1958), the GIWW, the IHNC and the other associated components in this hydrologic system in their original Congressionally-authorized conditions, the Reach 1 and Reach 2 man-made hurricane flood protection and navigation structures in their pre-Katrina condition, and the surrounding wetlands, swamps, and other coastal features in their pre-MGGO construction (before 1958) conditions. *See* Bea Expert Report at pp. 17-20, Declaration I at pp. 41-44, and Declaration III at pp. 50-52. *This configuration is necessary and appropriate because it is important in terms of the causation issues to determine whether the presence of the MRGO channel itself has important negative environmental and protective structure impacts which should not be isolated from the other directly associated negative environmental and protective structure impacts (surge, waves, and currents) important to the Reach 1 and Reach 2 hurricane flood protection structures.*

Bea Supplemental Declaration at ¶3(d) (emphasis added); *see also* Kemp Supplemental Declaration at ¶5 ("Scenario 2C reflects the Plaintiffs' position that Government had a legal duty to design, construct, operate, and maintain the MRGO so that it did not create any added risk of flooding the neighborhood.")

By isolating its analysis on the "MRGO as Designed" scenario, Defendant disregards sound scientific principles which establish that the MRGO's

> integrated effects of the life-cycle developments (concept, development, design, construction, operation, maintenance) cannot be decomposed of

their interactive and interdependent effects on what existed at the time of Hurricane Katrina and on what could and should have existed at the time of Hurricane Katrina as performed "with the utmost care." The attempted decomposition of the life-cycle effects of the MRGO by the Defendants is a classic mistake in development of accurate and realistic understandings of the behavior of real complex "systems." Synthesis – or understanding the behavior of the entire system (assembly of components) – must take place before there are attempts to decompose the system to develop additional insights into workings of components and their interactive and interdependent relationships with other components.

Bea Supplemental Declaration at ¶10(b); *see also* Kemp Supplemental Declaration at ¶9 ("From a technical standpoint, the rigorous (and arbitrary) separation along the line that the Defendant seeks to draw (widened banks and wetlands loss only) is not possible since we are dealing with linked system responses throughout the artificial funnel; isolating only these two factors is an artificial construct that ignores the reality on the ground.")

Furthermore, Plaintiffs' experts have established that under Scenario 2C, the "Neutral MR-GO,"

(1) the Army Corps's purported flood control features would not have breached (Bea Supplemental Declaration at ¶5(b));

(2) overtopping was reduced by about 80 percent for all of the three polders that experienced catastrophic flood damage (Kemp Supplemental Declaration at ¶22);

(3) the differences between maximum significant wave heights at relevant Reach 2 EBSB sites were 6 feet (Scenario 1) and 2.2 feet, which was "a substantial cause of the EBSB failures and overtopping" (Bea Supplemental Declaration at ¶6(c));

(4) there was a "low probability for either unprotected side wave attack or overtopping attack" on the Reach 2 EBSBs (Bea Supplemental Declaration at ¶6(c));

(5) there are significantly lower wave heights, wave periods, and erosive wave energy during Hurricane Katrina under Scenario 2C (Kemp Supplemental Declaration at ¶30);

(6) the cumulative impact of all four defects of the MR-GO—(a) the creation of a previously non-existent direct, efficient conduit for storm surge; (b) the "funnel effect" created by the convergent channel geometry connecting Reach 2 and the GIWW/Reach 1; (c) destruction of tens of thousands of acres of storm surge buffering wetlands; and (d) substantial widening of the MRGO channel from its authorized

16

width—"not only significantly increased surge and waves but also materially influenced additional indicators of the MRGO's impact such as time of onset, duration, channel discharge and rate of overtopping by surge, all more sensitive than surge height alone" (Kemp Supplemental Declaration at ¶¶2, 6);

(7) the MRGO's very existence in its defective condition was the determinative factor in causing the catastrophic flooding of New Orleans East, Lower 9th Ward, and St. Bernard Parish (Kemp Supplemental Declaration at ¶¶5, 25-26); and

(8) "*the Hurricane Neutral MR-GO would not have caused catastrophic flooding*." (Bea Supplemental Declaration at ¶6(c) (emphasis added); *see also id.* at ¶7(c)(d)).

Moreover, Defendant's characterization of and reliance on Scenario 3 as a "no negligence" scenario is improper because Scenario 3 views the MR-GO in a vacuum that does not comport with reality. Scenario 3 disregards the decades of knowledge the Army Corps had about the MR-GO's potential to amplify and accelerate hurricane generated storm surge and cause flood damage to adjacent land and home owners, and Scenario 3 also disregards the Army Corps's negligent failure to provide for any surge barriers or other protections along the MRGO in order to prevent such destruction and damages. Kemp Supplemental Declaration at ¶16; Bea Supplemental Declaration at ¶12.

Finally, Defendant's reliance on wave height is misleading because it is only one of several factors in a competent scientific analysis of flooding, and Defendant omits any mention of other, more reliable indicators such as time of onset, duration, and rate of structure overtopping by surge. Kemp Supplemental Declaration at ¶¶ 19, 27. Wave elevation is merely an indicator of the mean crown elevation of the flood protection works (assuming that they do not breach). *Id.* By evaluating the more predictive factors of time of onset, duration, and rate of structure overtopping by surge, Plaintiffs' experts concluded that the addition of the MR-GO channel, whether at its authorized dimensions or at the greater cross-section that existed during Hurricane Katrina, significantly increased the rate of surge water introduction into MR-GO Reach 1 and the IHNC and thereby caused more water to inundate Plaintiffs' neighborhoods

when the flood control structures were overtopped or breached before overtopping.  Kemp

Supplemental Declaration at ¶23, and p. 9, Table 1.

14.    **Plaintiffs' experts concluded that the "significant" wave height on the**

**MRGO Reach 2 levee in the "MRGO as Designed" scenario would have been "roughly"**

**one foot lower than the height in the "Katrina Real Run" scenario, *i.e.,*, about six feet high**

**rather than seven.  *See id.* App. E at 35.**

Contested.  Defendant's statement is incomplete and misleading.  Initially, Defendant has

premised its instant motion by isolating certain test scenarios and ignoring the proper set of

conditions detailed in the "Neutral MR-GO Conditions" (Scenario 2C).  As stated in Drs. Bea

and Kemp's Supplemental Reports, Scenario 2C is the proper "do no harm" scenario under

which to analyze the cause of Plaintiffs' damages because Scenario 2C

> consists of the MR-GO channel modeled in a pre-construction condition
> (before 1958), the GIWW, the IHNC and the other associated components
> in this hydrologic system in their original Congressionally-authorized
> conditions, the Reach 1 and Reach 2 man-made hurricane flood protection
> and navigation structures in their pre-Katrina condition, and the
> surrounding wetlands, swamps, and other coastal features in their pre-
> MGGO construction (before 1958) conditions. *See Bea Expert Report at*
> pp. 17-20, Declaration I at pp. 41-44, and Declaration III at pp. 50-52.
> *This configuration is necessary and appropriate because it is important in*
> *terms of the causation issues to determine whether the presence of the*
> *MRGO channel itself has important negative environmental and protective*
> *structure impacts which should not be isolated from the other directly*
> *associated negative environmental and protective structure impacts*
> *(surge, waves, and currents) important to the Reach 1 and Reach 2*
> *hurricane flood protection structures*.

Bea Supplemental Declaration at ¶3(d) (emphasis added); *see also* Kemp Supplemental

Declaration at ¶5 ("Scenario 2C reflects the Plaintiffs' position that Government had a legal duty

to design, construct, operate, and maintain the MRGO so that it did not create any added risk of

flooding the neighborhood.")

By isolating its analysis on the "MRGO as Designed" scenario, Defendant disregards sound scientific principles which establish that the MRGO's

> integrated effects of the life-cycle developments (concept, development, design, construction, operation, maintenance) cannot be decomposed of their interactive and interdependent effects on what existed at the time of Hurricane Katrina and on what could and should have existed at the time of Hurricane Katrina as performed "with the utmost care." The attempted decomposition of the life-cycle effects of the MRGO by the Defendants is a classic mistake in development of accurate and realistic understandings of the behavior of real complex "systems." Synthesis – or understanding the behavior of the entire system (assembly of components) – must take place before there are attempts to decompose the system to develop additional insights into workings of components and their interactive and interdependent relationships with other components.

Bea Supplemental Declaration at ¶10(b); *see also* Kemp Supplemental Declaration at ¶9 ("From a technical standpoint, the rigorous (and arbitrary) separation along the line that the Defendant seeks to draw (widened banks and wetlands loss only) is not possible since we are dealing with linked system responses throughout the artificial funnel; isolating only these two factors is an artificial construct that ignores the reality on the ground.")

Furthermore, Plaintiffs' experts have established that under Scenario 2C, the "Neutral MR-GO,"

(1) the Army Corps's purported flood control features would not have breached (Bea Supplemental Declaration at ¶5(b));

(2) overtopping was reduced by about 80 percent for all of the three polders that experienced catastrophic flood damage (Kemp Supplemental Declaration at ¶22);

(3) the differences between maximum significant wave heights at relevant Reach 2 EBSB sites were 6 feet (Scenario 1) and 2.2 feet, which was "a substantial cause of the EBSB failures and overtopping" (Bea Supplemental Declaration at ¶6(c));

(4) there was a "low probability for either unprotected side wave attack or overtopping attack" on the Reach 2 EBSBs (Bea Supplemental Declaration at ¶6(c));

(5) there are significantly lower wave heights, wave periods, and erosive wave energy during Hurricane Katrina under Scenario 2C (Kemp Supplemental Declaration at ¶30);

(6) the cumulative impact of all four defects of the MR-GO—(a) the creation of a previously non-existent direct, efficient conduit for storm surge; (b) the "funnel effect" created by the convergent channel geometry connecting Reach 2 and the GIWW/Reach 1; (c) destruction of tens of thousands of acres of storm surge buffering wetlands; and (d) substantial widening of the MRGO channel from its authorized width—"not only significantly increased surge and waves but also materially influenced additional indicators of the MRGO's impact such as time of onset, duration, channel discharge and rate of overtopping by surge, all more sensitive than surge height alone" (Kemp Supplemental Declaration at ¶¶2, 6);

(7) the MRGO's very existence in its defective condition was the determinative factor in causing the catastrophic flooding of New Orleans East, Lower 9th Ward, and St. Bernard Parish (Kemp Supplemental Declaration at ¶¶5, 25-26); and

(8) "*the Hurricane Neutral MR-GO would not have caused catastrophic flooding*." (Bea Supplemental Declaration at ¶6(c) (emphasis added); *see also id.* at ¶7(c)(d)).

Moreover, Defendant's characterization of and reliance on Scenario 3 as a "no negligence" scenario is improper because Scenario 3 views the MR-GO in a vacuum that does not comport with reality. Scenario 3 disregards the decades of knowledge the Army Corps had about the MR-GO's potential to amplify and accelerate hurricane generated storm surge and cause flood damage to adjacent land and home owners, and Scenario 3 also disregards the Army Corps's negligent failure to provide for any surge barriers or other protections along the MRGO in order to prevent such destruction and damages. Kemp Supplemental Declaration at ¶16; Bea Supplemental Declaration at ¶12.

Finally, Defendant's reliance on wave height is misleading because it is only one of several factors in a competent scientific analysis of flooding, and Defendant omits any mention of other, more reliable indicators such as time of onset, duration, and rate of structure overtopping by surge. Kemp Supplemental Declaration at ¶¶ 19, 27. Wave elevation is merely an indicator of the mean crown elevation of the flood protection works (assuming that they do not breach). *Id.* By evaluating the more predictive factors of time of onset, duration, and rate of structure overtopping by surge, Plaintiffs' experts concluded that the addition of the MR-GO

20

channel, whether at its authorized dimensions or at the greater cross-section that existed during Hurricane Katrina, significantly increased the rate of surge water introduction into MR-GO Reach 1 and the IHNC and thereby caused more water to inundate Plaintiffs' neighborhoods when the flood control structures were overtopped or breached before overtopping.  Kemp Supplemental Declaration at ¶23, and p. 9, Table 1.

**15.    Plaintiffs' experts modeled erosion and breach development in only two scenarios—the "Katrina Real Run" scenario and the "No MRGO" scenario.  *See* Robert Bea & Rune Storesund, *Technical Report No. I:  Analyses of Breaching of MR-GO Reach 2 EBSBs During Hurricane Katrina & The 'Neutral' MR-GO Hurricane Katrina Conditions*, at 46-47 (June 11, 2008) (noting that they did not evaluate effects of 1958 "MRGO as Designed" conditions on wave-induced erosion of levees) (Ex. 4) [hereinafter *Bea Technical Report I*]; *Expert Report of Robert Glenn Bea* 4 (Ex. 9) (complete list of studies by Bea); *see generally* Robert Bea, *Declaration No. I:  Engineering Forensic Studies of Performance of the Man-made Features Bordering the Reach 2 of the Mississippi River-Gulf Outlet (MR-GO) During Hurricane Katrina* (July 11, 2008) (Ex. 14); Robert Bea, *Declaration No. III: Engineering Forensic Studies of Performance of the Man-made Features Bordering the Reach 2 of the Mississippi River-Gulf Outlet (MR-GO) During Hurricane Katrina* (July 11, 2008) (Ex. 15).**

Contested.  Defendant's statement is incomplete and misleading.  Initially, Defendant has premised its instant motion by isolating certain test scenarios and ignoring the proper set of conditions detailed in the "Neutral MR-GO Conditions" (Scenario 2C).  As stated in Drs. Bea and Kemp's Supplemental Reports, Scenario 2C is the proper "do no harm" scenario under which to analyze the cause of Plaintiffs' damages because Scenario 2C

consists of the MR-GO channel modeled in a pre-construction condition (before 1958), the GIWW, the IHNC and the other associated components in this hydrologic system in their original Congressionally-authorized conditions, the Reach 1 and Reach 2 man-made hurricane flood protection and navigation structures in their pre-Katrina condition, and the surrounding wetlands, swamps, and other coastal features in their pre-MGGO construction (before 1958) conditions. *See* Bea Expert Report at pp. 17-20, Declaration I at pp. 41-44, and Declaration III at pp. 50-52. *This configuration is necessary and appropriate because it is important in terms of the causation issues to determine whether the presence of the MRGO channel itself has important negative environmental and protective structure impacts which should not be isolated from the other directly associated negative environmental and protective structure impacts (surge, waves, and currents) important to the Reach 1 and Reach 2 hurricane flood protection structures.*

Bea Supplemental Declaration at ¶3(d) (emphasis added); *see also* Kemp Supplemental

Declaration at ¶5 ("Scenario 2C reflects the Plaintiffs' position that Government had a legal duty

to design, construct, operate, and maintain the MRGO so that it did not create any added risk of

flooding the neighborhood.")

By isolating its analysis on the "MRGO as Designed" scenario, Defendant disregards

sound scientific principles which establish that the MRGO's

integrated effects of the life-cycle developments (concept, development, design, construction, operation, maintenance) cannot be decomposed of their interactive and interdependent effects on what existed at the time of Hurricane Katrina and on what could and should have existed at the time of Hurricane Katrina as performed "with the utmost care." The attempted decomposition of the life-cycle effects of the MRGO by the Defendants is a classic mistake in development of accurate and realistic understandings of the behavior of real complex "systems." Synthesis – or understanding the behavior of the entire system (assembly of components) – must take place before there are attempts to decompose the system to develop additional insights into workings of components and their interactive and interdependent relationships with other components.

Bea Supplemental Declaration at ¶10(b); *see also* Kemp Supplemental Declaration at ¶9 ("From

a technical standpoint, the rigorous (and arbitrary) separation along the line that the Defendant

seeks to draw (widened banks and wetlands loss only) is not possible since we are dealing with

linked system responses throughout the artificial funnel; isolating only these two factors is an artificial construct that ignores the reality on the ground.")

Furthermore, Plaintiffs' experts have established that under Scenario 2C, the "Neutral MR-GO,"

(1) the Army Corps's purported flood control features would not have breached (Bea Supplemental Declaration at ¶5(b));

(2) overtopping was reduced by about 80 percent for all of the three polders that experienced catastrophic flood damage (Kemp Supplemental Declaration at ¶22);

(3) the differences between maximum significant wave heights at relevant Reach 2 EBSB sites were 6 feet (Scenario 1) and 2.2 feet, which was "a substantial cause of the EBSB failures and overtopping" (Bea Supplemental Declaration at ¶6(c));

(4) there was a "low probability for either unprotected side wave attack or overtopping attack" on the Reach 2 EBSBs (Bea Supplemental Declaration at ¶6(c));

(5) there are significantly lower wave heights, wave periods, and erosive wave energy during Hurricane Katrina under Scenario 2C (Kemp Supplemental Declaration at ¶30);

(6) the cumulative impact of all four defects of the MR-GO—(a) the creation of a previously non-existent direct, efficient conduit for storm surge; (b) the "funnel effect" created by the convergent channel geometry connecting Reach 2 and the GIWW/Reach 1; (c) destruction of tens of thousands of acres of storm surge buffering wetlands; and (d) substantial widening of the MRGO channel from its authorized width—"not only significantly increased surge and waves but also materially influenced additional indicators of the MRGO's impact such as time of onset, duration, channel discharge and rate of overtopping by surge, all more sensitive than surge height alone" (Kemp Supplemental Declaration at ¶¶2, 6);

(7) the MRGO's very existence in its defective condition was the determinative factor in causing the catastrophic flooding of New Orleans East, Lower 9th Ward, and St. Bernard Parish (Kemp Supplemental Declaration at ¶¶5, 25-26); and

(8) "*the Hurricane Neutral MR-GO would not have caused catastrophic flooding*." (Bea Supplemental Declaration at ¶6(c) (emphasis added); *see also id.* at ¶7(c)(d)).

Moreover, Defendant's characterization of and reliance on Scenario 3 as a "no negligence" scenario is improper because Scenario 3 views the MR-GO in a vacuum that does not comport with reality. Scenario 3 disregards the decades of knowledge the Army Corps had

about the MR-GO's potential to amplify and accelerate hurricane generated storm surge and cause flood damage to adjacent land and home owners, and Scenario 3 also disregards the Army Corps's negligent failure to provide for any surge barriers or other protections along the MRGO in order to prevent such destruction and damages.  Kemp Supplemental Declaration at ¶16; Bea Supplemental Declaration at ¶12.

Finally, Defendant's reliance on surge and wave height is misleading because these are only two of several factors in a competent scientific analysis of flooding, and Defendant omits any mention of other, more reliable indicators such as time of onset, duration, and rate of structure overtopping by surge.  Kemp Supplemental Declaration at ¶¶ 19, 27.  Surge and wave elevation is merely an indicator of the mean crown elevation of the flood protection works (assuming that they do not breach).  *Id.*  By evaluating the more predictive factors of time of onset, duration, and rate of structure overtopping by surge, Plaintiffs' experts concluded that the addition of the MR-GO channel, whether at its authorized dimensions or at the greater cross-section that existed during Hurricane Katrina, significantly increased the rate of surge water introduction into MR-GO Reach 1 and the IHNC and thereby caused more water to inundate Plaintiffs' neighborhoods when the flood control structures were overtopped or breached before overtopping.  Kemp Supplemental Declaration at ¶23, and p. 9, Table 1.

Data relating to erosion and breach development under various scenarios is contained in Dr. Bea's various expert reports.  Dr. Bea has confirmed the following about Scenario 2c:

(a) the Army Corps's purported flood control features would not have breached (Bea Supplemental Declaration at 6, ¶(b));

(b) the differences between maximum significant wave heights at relevant Reach 2 EBSB sites were 6 feet (Scenario 1) and 2.2 feet, which was "a substantial cause of the EBSB failures and overtopping" (Bea Supplemental Declaration at 9, ¶(c));

(c) there was a "low probability for either unprotected side wave attack or overtopping attack" on the Reach 2 EBSBs (Bea Supplemental Declaration at 9, ¶(c)); and

(d) "*the Hurricane Neutral MR-GO would not have caused catastrophic flooding*."  (Bea Supplemental Declaration at 9, ¶(c) (emphasis added); *see also* p. 10, ¶(c)).

**16.     Plaintiffs' experts simulated the flow of water through breaches into the St. Bernard and New Orleans East polders in only two scenarios—the "Katrina Real Run" scenario and the "No MRGO" scenario.  *See "Katrina Real Run" Flood Report* 1 (Ex. 7); *see also* M. Kok et al., *Polder Flood Simulations for Greater New Orleans:  the Neutral MRGO Scenario* 7, 17-18, 25-27 (Ex. 8).**

Uncontested that Plaintiffs' experts simulated the flow of water through breaches into the St. Bernard and New Orleans East polders in the "Katrina Real Run" scenario and the "No MRGO" scenario.  Contested as incomplete in that Plaintiffs' experts performed other simulations as well.

**17.     Plaintiffs' experts did not model the effect of surge and waves on levees and floodwalls in the "MRGO as Designed" scenario—the "no negligence" scenario—nor did they simulate flooding in the "MRGO as Designed" scenario.  *See ""Katrina Real Run" Flood* Report 1; *"No MRGO" Flood Report* 7; *Bea Technical Report No. 1*, 46-47 (Final Report) (July 11, 2008) (Ex. 4); *Expert Report of Robert Glenn Bea* 4 (Ex. 9) (complete list of studies by Bea).**

Contested.  Defendant's statement is incomplete and misleading.  Initially, Defendant has premised its instant motion by isolating certain test scenarios and ignoring the proper set of conditions detailed in the "Neutral MR-GO Conditions" (Scenario 2C).  As stated in Drs. Bea and Kemp's Supplemental Reports, Scenario 2C is the proper "do no harm" scenario under which to analyze the cause of Plaintiffs' damages because Scenario 2C

> consists of the MR-GO channel modeled in a pre-construction condition (before 1958), the GIWW, the IHNC and the other associated components in this hydrologic system in their original Congressionally-authorized

conditions, the Reach 1 and Reach 2 man-made hurricane flood protection
and navigation structures in their pre-Katrina condition, and the
surrounding wetlands, swamps, and other coastal features in their pre-
MGGO construction (before 1958) conditions. *See* Bea Expert Report at
pp. 17-20, Declaration I at pp. 41-44, and Declaration III at pp. 50-52.
*This configuration is necessary and appropriate because it is important in
terms of the causation issues to determine whether the presence of the
MRGO channel itself has important negative environmental and protective
structure impacts which should not be isolated from the other directly
associated negative environmental and protective structure impacts
(surge, waves, and currents) important to the Reach 1 and Reach 2
hurricane flood protection structures.*

Bea Supplemental Declaration at ¶3(d) (emphasis added); *see also* Kemp Supplemental

Declaration at ¶5 ("Scenario 2C reflects the Plaintiffs' position that Government had a legal duty

to design, construct, operate, and maintain the MRGO so that it did not create any added risk of

flooding the neighborhood.")

By isolating its analysis on the "MRGO as Designed" scenario, Defendant disregards

sound scientific principles which establish that the MRGO's

integrated effects of the life-cycle developments (concept, development,
design, construction, operation, maintenance) cannot be decomposed of
their interactive and interdependent effects on what existed at the time of
Hurricane Katrina and on what could and should have existed at the time
of Hurricane Katrina as performed "with the utmost care." The attempted
decomposition of the life-cycle effects of the MRGO by the Defendants is
a classic mistake in development of accurate and realistic understandings
of the behavior of real complex "systems." Synthesis – or understanding
the behavior of the entire system (assembly of components) – must take
place before there are attempts to decompose the system to develop
additional insights into workings of components and their interactive and
interdependent relationships with other components.

Bea Supplemental Declaration at ¶10(b); *see also* Kemp Supplemental Declaration at ¶9 ("From

a technical standpoint, the rigorous (and arbitrary) separation along the line that the Defendant

seeks to draw (widened banks and wetlands loss only) is not possible since we are dealing with

linked system responses throughout the artificial funnel; isolating only these two factors is an

artificial construct that ignores the reality on the ground.")

Furthermore, Plaintiffs' experts have established that under Scenario 2C, the

"Neutral MR-GO,"

(1) the Army Corps's purported flood control features would not have breached (Bea Supplemental Declaration at ¶5(b));

(2) overtopping was reduced by about 80 percent for all of the three polders that experienced catastrophic flood damage (Kemp Supplemental Declaration at ¶22);

(3) the differences between maximum significant wave heights at relevant Reach 2 EBSB sites were 6 feet (Scenario 1) and 2.2 feet, which was "a substantial cause of the EBSB failures and overtopping" (Bea Supplemental Declaration at ¶6(c));

(4) there was a "low probability for either unprotected side wave attack or overtopping attack" on the Reach 2 EBSBs (Bea Supplemental Declaration at ¶6(c));

(5) there are significantly lower wave heights, wave periods, and erosive wave energy during Hurricane Katrina under Scenario 2C (Kemp Supplemental Declaration at ¶30);

(6) the cumulative impact of all four defects of the MR-GO—(a) the creation of a previously non-existent direct, efficient conduit for storm surge; (b) the "funnel effect" created by the convergent channel geometry connecting Reach 2 and the GIWW/Reach 1; (c) destruction of tens of thousands of acres of storm surge buffering wetlands; and (d) substantial widening of the MRGO channel from its authorized width—"not only significantly increased surge and waves but also materially influenced additional indicators of the MRGO's impact such as time of onset, duration, channel discharge and rate of overtopping by surge, all more sensitive than surge height alone" (Kemp Supplemental Declaration at ¶¶2, 6);

(7) the MRGO's very existence in its defective condition was the determinative factor in causing the catastrophic flooding of New Orleans East, Lower 9th Ward, and St. Bernard Parish (Kemp Supplemental Declaration at ¶¶5, 25-26); and

(8) "*the Hurricane Neutral MR-GO would not have caused catastrophic flooding*." (Bea Supplemental Declaration at ¶6(c) (emphasis added); *see also id.* at ¶7(c)(d)).

Moreover, Defendant's characterization of and reliance on Scenario 3 as a "no

negligence" scenario is improper because Scenario 3 views the MR-GO in a vacuum that does

not comport with reality.  Scenario 3 disregards the decades of knowledge the Army Corps had

27

about the MR-GO's potential to amplify and accelerate hurricane generated storm surge and cause flood damage to adjacent land and home owners, and Scenario 3 also disregards the Army Corps's negligent failure to provide for any surge barriers or other protections along the MRGO in order to prevent such destruction and damages.  Kemp Supplemental Declaration at ¶16; Bea Supplemental Declaration at ¶12.

Finally, Defendant's reliance on surge and wave height is misleading because these are only two of several factors in a competent scientific analysis of flooding, and Defendant omits any mention of other, more reliable indicators such as time of onset, duration, and rate of structure overtopping by surge.  Kemp Supplemental Declaration at ¶¶ 19, 27.  Surge and wave elevation is merely an indicator of the mean crown elevation of the flood protection works (assuming that they do not breach).  *Id.*  By evaluating the more predictive factors of time of onset, duration, and rate of structure overtopping by surge, Plaintiffs' experts concluded that the addition of the MR-GO channel, whether at its authorized dimensions or at the greater cross-section that existed during Hurricane Katrina, significantly increased the rate of surge water introduction into MR-GO Reach 1 and the IHNC and thereby caused more water to inundate Plaintiffs' neighborhoods when the flood control structures were overtopped or breached before overtopping.  Kemp Supplemental Declaration at ¶23, and p. 9, Table 1.

Data relating to erosion and breach development under various scenarios is contained in Dr. Bea's various expert reports.  Dr. Bea has confirmed the following about Scenario 2c:

(a) the Army Corps's purported flood control features would not have breached (Bea Supplemental Declaration at 6, ¶(b));

(b) the differences between maximum significant wave heights at relevant Reach 2 EBSB sites were 6 feet (Scenario 1) and 2.2 feet, which was "a substantial cause of the EBSB failures and overtopping" (Bea Supplemental Declaration at 9, ¶(c));

(c) there was a "low probability for either unprotected side wave attack or overtopping attack" on the Reach 2 EBSBs (Bea Supplemental Declaration at 9, ¶(c)); and

(d) "*the Hurricane Neutral MR-GO would not have caused catastrophic flooding*."  (Bea Supplemental Declaration at 9, ¶(c) (emphasis added); *see also* p. 10, ¶(c)).

**18.      Based on a simulation of the flow of water in the "Katrina Real Run" scenario, Plaintiffs' experts concluded that overtopping and breaching were the main causes of flooding in New Orleans East.  *"Katrina Real Run" Flood Report* 34 (Ex. 7).**

Contested.  Defendant's statement is incomplete and misleading.  Initially, Defendant has premised its instant motion by isolating certain test scenarios and ignoring the proper set of conditions detailed in the "Neutral MR-GO Conditions" (Scenario 2C).  As stated in Drs. Bea and Kemp's Supplemental Reports, Scenario 2C is the proper "do no harm" scenario under which to analyze the cause of Plaintiffs' damages because Scenario 2C

> consists of the MR-GO channel modeled in a pre-construction condition (before 1958), the GIWW, the IHNC and the other associated components in this hydrologic system in their original Congressionally-authorized conditions, the Reach 1 and Reach 2 man-made hurricane flood protection and navigation structures in their pre-Katrina condition, and the surrounding wetlands, swamps, and other coastal features in their pre-MGGO construction (before 1958) conditions. *See* Bea Expert Report at pp. 17-20, Declaration I at pp. 41-44, and Declaration III at pp. 50-52. *This configuration is necessary and appropriate because it is important in terms of the causation issues to determine whether the presence of the MRGO channel itself has important negative environmental and protective structure impacts which should not be isolated from the other directly associated negative environmental and protective structure impacts (surge, waves, and currents) important to the Reach 1 and Reach 2 hurricane flood protection structures.*

Bea Supplemental Declaration at ¶3(d) (emphasis added); *see also* Kemp Supplemental Declaration at ¶5 ("Scenario 2C reflects the Plaintiffs' position that Government had a legal duty to design, construct, operate, and maintain the MRGO so that it did not create any added risk of flooding the neighborhood.")

By isolating its analysis on the "MRGO as Designed" scenario, Defendant disregards sound scientific principles which establish that the MRGO's

integrated effects of the life-cycle developments (concept, development, design, construction, operation, maintenance) cannot be decomposed of their interactive and interdependent effects on what existed at the time of Hurricane Katrina and on what could and should have existed at the time of Hurricane Katrina as performed "with the utmost care." The attempted decomposition of the life-cycle effects of the MRGO by the Defendants is a classic mistake in development of accurate and realistic understandings of the behavior of real complex "systems." Synthesis – or understanding the behavior of the entire system (assembly of components) – must take place before there are attempts to decompose the system to develop additional insights into workings of components and their interactive and interdependent relationships with other components.

Bea Supplemental Declaration at ¶10(b); *see also* Kemp Supplemental Declaration at ¶9 ("From a technical standpoint, the rigorous (and arbitrary) separation along the line that the Defendant seeks to draw (widened banks and wetlands loss only) is not possible since we are dealing with linked system responses throughout the artificial funnel; isolating only these two factors is an artificial construct that ignores the reality on the ground.")

Furthermore, Plaintiffs' experts have established that under Scenario 2C, the "Neutral MR-GO,"

(1) the Army Corps's purported flood control features would not have breached (Bea Supplemental Declaration at ¶5(b));

(2) overtopping was reduced by about 80 percent for all of the three polders that experienced catastrophic flood damage (Kemp Supplemental Declaration at ¶22);

(3) the differences between maximum significant wave heights at relevant Reach 2 EBSB sites were 6 feet (Scenario 1) and 2.2 feet, which was "a substantial cause of the EBSB failures and overtopping" (Bea Supplemental Declaration at ¶6(c));

(4) there was a "low probability for either unprotected side wave attack or overtopping attack" on the Reach 2 EBSBs (Bea Supplemental Declaration at ¶6(c));

(5) there are significantly lower wave heights, wave periods, and erosive wave energy during Hurricane Katrina under Scenario 2C (Kemp Supplemental Declaration at ¶30);

(6) the cumulative impact of all four defects of the MR-GO—(a) the creation of a previously non-existent direct, efficient conduit for storm surge; (b) the "funnel effect" created by the convergent channel geometry connecting Reach 2 and the

GIWW/Reach 1; (c) destruction of tens of thousands of acres of storm surge buffering wetlands; and (d) substantial widening of the MRGO channel from its authorized width—"not only significantly increased surge and waves but also materially influenced additional indicators of the MRGO's impact such as time of onset, duration, channel discharge and rate of overtopping by surge, all more sensitive than surge height alone" (Kemp Supplemental Declaration at ¶¶2, 6);

(7) the MRGO's very existence in its defective condition was the determinative factor in causing the catastrophic flooding of New Orleans East, Lower 9th Ward, and St. Bernard Parish (Kemp Supplemental Declaration at ¶¶5, 25-26); and

(8) "*the Hurricane Neutral MR-GO would not have caused catastrophic flooding*." (Bea Supplemental Declaration at ¶6(c) (emphasis added); *see also id.* at ¶7(c)(d)).

Moreover, Defendant's characterization of and reliance on Scenario 3 as a "no negligence" scenario is improper because Scenario 3 views the MR-GO in a vacuum that does not comport with reality. Scenario 3 disregards the decades of knowledge the Army Corps had about the MR-GO's potential to amplify and accelerate hurricane generated storm surge and cause flood damage to adjacent land and home owners, and Scenario 3 also disregards the Army Corps's negligent failure to provide for any surge barriers or other protections along the MRGO in order to prevent such destruction and damages. Kemp Supplemental Declaration at ¶16; Bea Supplemental Declaration at ¶12.

Finally, Defendant's reliance on surge and wave height is misleading because these are only two of several factors in a competent scientific analysis of flooding, and Defendant omits any mention of other, more reliable indicators such as time of onset, duration, and rate of structure overtopping by surge. Kemp Supplemental Declaration at ¶¶ 19, 27. Surge and wave elevation is merely an indicator of the mean crown elevation of the flood protection works (assuming that they do not breach). *Id.* By evaluating the more predictive factors of time of onset, duration, and rate of structure overtopping by surge, Plaintiffs' experts concluded that the addition of the MR-GO channel, whether at its authorized dimensions or at the greater cross-section that existed during Hurricane Katrina, significantly increased the rate of surge water

introduction into MR-GO Reach 1 and the IHNC and thereby caused more water to inundate Plaintiffs' neighborhoods when the flood control structures were overtopped or breached before overtopping. Kemp Supplemental Declaration at ¶23, and p. 9, Table 1.

Data relating to erosion and breach development under various scenarios is contained in Dr. Bea's various expert reports. Dr. Bea has confirmed the following about Scenario 2c:

(a) the Army Corps's purported flood control features would not have breached (Bea Supplemental Declaration at 6, ¶(b));

(b) the differences between maximum significant wave heights at relevant Reach 2 EBSB sites were 6 feet (Scenario 1) and 2.2 feet, which was "a substantial cause of the EBSB failures and overtopping" (Bea Supplemental Declaration at 9, ¶(c));

(c) there was a "low probability for either unprotected side wave attack or overtopping attack" on the Reach 2 EBSBs (Bea Supplemental Declaration at 9, ¶(c)); and

(d) "*the Hurricane Neutral MR-GO would not have caused catastrophic flooding*." (Bea Supplemental Declaration at 9, ¶(c) (emphasis added); *see also* p. 10, ¶(c)).

**19.     Based on a simulation of the flow of water in the "Katrina Real Run" scenario, Plaintiffs' experts concluded that "the main causes for the flooding of the populated area inside the St. Bernard bowl are the breaches in the IHNC and MRGO." *Id.* at 45.**

Contested. Defendant's statement is incomplete and misleading. Initially, Defendant has premised its instant motion by isolating certain test scenarios and ignoring the proper set of conditions detailed in the "Neutral MR-GO Conditions" (Scenario 2C). As stated in Drs. Bea and Kemp's Supplemental Reports, Scenario 2C is the proper "do no harm" scenario under which to analyze the cause of Plaintiffs' damages because Scenario 2C

> consists of the MR-GO channel modeled in a pre-construction condition
> (before 1958), the GIWW, the IHNC and the other associated components
> in this hydrologic system in their original Congressionally-authorized
> conditions, the Reach 1 and Reach 2 man-made hurricane flood protection
> and navigation structures in their pre-Katrina condition, and the

> surrounding wetlands, swamps, and other coastal features in their pre-MGGO construction (before 1958) conditions. *See* Bea Expert Report at pp. 17-20, Declaration I at pp. 41-44, and Declaration III at pp. 50-52. *This configuration is necessary and appropriate because it is important in terms of the causation issues to determine whether the presence of the MRGO channel itself has important negative environmental and protective structure impacts which should not be isolated from the other directly associated negative environmental and protective structure impacts (surge, waves, and currents) important to the Reach 1 and Reach 2 hurricane flood protection structures.*

Bea Supplemental Declaration at ¶3(d) (emphasis added); *see also* Kemp Supplemental Declaration at ¶5 ("Scenario 2C reflects the Plaintiffs' position that Government had a legal duty to design, construct, operate, and maintain the MRGO so that it did not create any added risk of flooding the neighborhood.")

By isolating its analysis on the "MRGO as Designed" scenario, Defendant disregards sound scientific principles which establish that the MRGO's

> integrated effects of the life-cycle developments (concept, development, design, construction, operation, maintenance) cannot be decomposed of their interactive and interdependent effects on what existed at the time of Hurricane Katrina and on what could and should have existed at the time of Hurricane Katrina as performed "with the utmost care." The attempted decomposition of the life-cycle effects of the MRGO by the Defendants is a classic mistake in development of accurate and realistic understandings of the behavior of real complex "systems." Synthesis – or understanding the behavior of the entire system (assembly of components) – must take place before there are attempts to decompose the system to develop additional insights into workings of components and their interactive and interdependent relationships with other components.

Bea Supplemental Declaration at ¶10(b); *see also* Kemp Supplemental Declaration at ¶9 ("From a technical standpoint, the rigorous (and arbitrary) separation along the line that the Defendant seeks to draw (widened banks and wetlands loss only) is not possible since we are dealing with linked system responses throughout the artificial funnel; isolating only these two factors is an artificial construct that ignores the reality on the ground.")

Furthermore, Plaintiffs' experts have established that under Scenario 2C, the

"Neutral MR-GO,"

> (1) the Army Corps's purported flood control features would not have breached (Bea Supplemental Declaration at ¶5(b));

> (2) overtopping was reduced by about 80 percent for all of the three polders that experienced catastrophic flood damage (Kemp Supplemental Declaration at ¶22);

> (3) the differences between maximum significant wave heights at relevant Reach 2 EBSB sites were 6 feet (Scenario 1) and 2.2 feet, which was "a substantial cause of the EBSB failures and overtopping" (Bea Supplemental Declaration at ¶6(c));

> (4) there was a "low probability for either unprotected side wave attack or overtopping attack" on the Reach 2 EBSBs (Bea Supplemental Declaration at ¶6(c));

> (5) there are significantly lower wave heights, wave periods, and erosive wave energy during Hurricane Katrina under Scenario 2C (Kemp Supplemental Declaration at ¶30);

> (6) the cumulative impact of all four defects of the MR-GO—(a) the creation of a previously non-existent direct, efficient conduit for storm surge; (b) the "funnel effect" created by the convergent channel geometry connecting Reach 2 and the GIWW/Reach 1; (c) destruction of tens of thousands of acres of storm surge buffering wetlands; and (d) substantial widening of the MRGO channel from its authorized width—"not only significantly increased surge and waves but also materially influenced additional indicators of the MRGO's impact such as time of onset, duration, channel discharge and rate of overtopping by surge, all more sensitive than surge height alone" (Kemp Supplemental Declaration at ¶¶2, 6);

> (7) the MRGO's very existence in its defective condition was the determinative factor in causing the catastrophic flooding of New Orleans East, Lower 9th Ward, and St. Bernard Parish (Kemp Supplemental Declaration at ¶¶5, 25-26); and

> (8) *the Hurricane Neutral MR-GO would not have caused catastrophic flooding*." (Bea Supplemental Declaration at ¶6(c) (emphasis added); *see also id.* at ¶7(c)(d)).

Moreover, Defendant's characterization of and reliance on Scenario 3 as a "no

negligence" scenario is improper because Scenario 3 views the MR-GO in a vacuum that does

not comport with reality. Scenario 3 disregards the decades of knowledge the Army Corps had

about the MR-GO's potential to amplify and accelerate hurricane generated storm surge and

cause flood damage to adjacent land and home owners, and Scenario 3 also disregards the Army

Corps's negligent failure to provide for any surge barriers or other protections along the MRGO in order to prevent such destruction and damages.  Kemp Supplemental Declaration at ¶16; Bea Supplemental Declaration at ¶12.

Finally, Defendant's reliance on surge and wave height is misleading because these are only two of several factors in a competent scientific analysis of flooding, and Defendant omits any mention of other, more reliable indicators such as time of onset, duration, and rate of structure overtopping by surge.  Kemp Supplemental Declaration at ¶¶ 19, 27.  Surge and wave elevation is merely an indicator of the mean crown elevation of the flood protection works (assuming that they do not breach).  *Id.*  By evaluating the more predictive factors of time of onset, duration, and rate of structure overtopping by surge, Plaintiffs' experts concluded that the addition of the MR-GO channel, whether at its authorized dimensions or at the greater cross-section that existed during Hurricane Katrina, significantly increased the rate of surge water introduction into MR-GO Reach 1 and the IHNC and thereby caused more water to inundate Plaintiffs' neighborhoods when the flood control structures were overtopped or breached before overtopping.  Kemp Supplemental Declaration at ¶23, and p. 9, Table 1.

Data relating to erosion and breach development under various scenarios is contained in Dr. Bea's various expert reports.  Dr. Bea has confirmed the following about Scenario 2c:

(a) the Army Corps's purported flood control features would not have breached (Bea Supplemental Declaration at 6, ¶(b));

(b) the differences between maximum significant wave heights at relevant Reach 2 EBSB sites were 6 feet (Scenario 1) and 2.2 feet, which was "a substantial cause of the EBSB failures and overtopping" (Bea Supplemental Declaration at 9, ¶(c));

(c) there was a "low probability for either unprotected side wave attack or overtopping attack" on the Reach 2 EBSBs (Bea Supplemental Declaration at 9, ¶(c)); and

(d) "*the Hurricane Neutral MR-GO would not have caused catastrophic flooding.*"  (Bea Supplemental Declaration at 9, ¶(c) (emphasis added); *see also* p. 10, ¶(c)).

**20. The overtopping of the MRGO levee during Hurricane Katrina was not enough to fill the wetlands basin between the MRGO and the 40-Arpent levee up to the crest elevation of the 40-Arpent levee.** *Id.* **at 44.**

Contested. Defendant appears to be relying on the results from the hypothetical test runs detailed in the *Katrina Real Run Report* (July 2007)—which was prepared in conjunction with the 702c motions and before the most recent modeling— where there was only overtopping (and no breaching) of the MRGO "levees." *See e.g.*, Scenario 2 (without any breaches); Scenario 3 (without breaches at MRGO); Scenario 5 represents "only overtopping (without breaches and without rainfall)." *Katrina Real Run Report* at 43. All of these hypothetical scenarios disregard what actually occurred during Hurricane Katrina in that they all fail to account for the significant "levee" breaches that were caused by the MR-GO. *Compare* water level measurements of Scenario 1 "All Causes" at *Katrina Real Run Report* at 46-50; *see also* Bea Supplemental Declaration at 18, ¶12; Kemp Supplemental Declaration at 3-4, ¶8; 22, ¶32.

In fact, the *Katrina Real Run Repor*t states:

> Between 5:00 and 8:30am the erosion of the MRGO levee takes place, and after 6:30am *substantial volumes of surge water from the MRGO flow into the wetlands bowl between the MRGO and 40-Arpent levee.* In the simulation the 40-Arpent levee starts to overflow at 8:00am and at 8:30am the first water enters Chalmette from a northeastern direction as a consequence of overtopping the 40-Arpent levee. IPET in their report state this overtopping starts at about 8:20am, which is in agreement with Team Louisiana's 8:30am.

*Katrina Real Run Report* at 38.

Moreover, the *Katrina Real Run Report* states that the St. Bernard bowl would have received the same volume of flood water from the Scenario 1 "All Causes" scenario (*i.e.*, with the "levee" breaching along the MRGO) even with the IHNC breaches taken out. *Katrina Real Run Report* at 45.

Dated: October 22, 2008                              Respectfully submitted,


**O'Donnell & Associates P.C.**

By: s/ Pierce O'Donnell

Pierce O'Donnell (*pro hac vice*)
550 S. Hope St., Suite 1000
Los Angeles, California 90071
Phone:  (213) 347-0290
Fax:  (213) 347-0298


**Law Offices of Joseph M. Bruno**
By: s/ Joseph M. Bruno
Joseph M. Bruno (LSBA No. 3604)
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

**The Andry Law Firm, LLC**          **Domengeaux Wright Roy & Edwards LLC**
By: s/ Jonathan B. Andry               Bob F. Wright (LSBA No. 13691)
Jonathan B. Andry (LSBA No. 20081)     James P. Roy (LSBA No. 11511)
610 Baronne Street                     556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113           P.O. Box 3668
Telephone: (504) 586-8899              Lafayette, Louisiana 70502-3668
Facsimile:  (504) 585-1788             Telephone: (337) 233-3033
                                       Facsimile:  (337) 233-2796


**Fayard & Honeycutt**                 **Girardi & Keese**
Calvin C. Fayard, Jr. (LSBA No. 5486)  Thomas V. Girardi (*pro hac vice*)
Blayne Honeycutt (LSBA No. 18264)      1126 Wilshire Boulevard
519 Florida Avenue, S.W.               Los Angeles, CA 90017
Denham Springs, Louisiana 70726        Telephone: (213) 489-5330
Telephone: (225) 664-4193              Facsimile:  (213) 481-1554
Facsimile:  (225) 664-6925


**Ranier, Gayle & Elliot, LLC**        **Levin,  Papantonio,  Thomas,  Mitchell**
N. Frank Elliot III                    **Echsner & Proctor, P.A.**
1419 Ryan Street                       Clay Mitchell (*pro hac vice*)
Lake Charles, LA 70601                 Matt Schultz (*pro hac vice*)
Telephone: (337) 494-7171              316 S. Baylen Street, Suite 600

Facsimile: (337).494.7218

Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123

**McKernan Law Firm**
Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202

**Gainsburgh, Benjamin, David, Meunier &
Warshauer, LLC**
Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Law Office of Elwood C. Stevens, Jr., a
Professional Law Corporation**
Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Cotchett, Pitre, Simon & McCarthy**
Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**
Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Robinson, Calcagnie & Robinson, Inc.**
Mark Robinson (Cal State Bar No. 54426
620 Newport Center Drive – 7th Floor
Newport Beach, CA 92660
1-888-701-1288

<u>**CERTIFICATE OF SERVICE**</u>

I, Pierce O'Donnell, hereby certify that on October 22, 2008, I caused to be served

<u>**PLAINTIFFS' OPPOSITION TO DEFENDANT UNITED STATES' STATEMENT**</u>

<u>**OF UNCONTESTED FACTS**</u>, upon Defendants' counsel, Robin D. Smith, George Carter,

Keith Liddle, and Richard Stone by ECF and email at robin.doyle.smith@usdoj.gov;

george.carter@usdoj.gov, keith.liddle@usdoj.gov, and richard.stone@usdoj.gov.

<u>/s/ Pierce O'Donnell</u>