# MISSISSIPPI RIVER GULF OUTLET EFFECTS ON STORM SURGE, WAVES AND FLOODING DURING HURRICANE KATRINA

## EXPERT REPORT

### BY

### G. PAUL KEMP, Ph.D.

*ROBINSON V. UNITED STATES*

JULY 11, 2008

# MISSISSIPPI RIVER GULF OUTLET EFFECTS ON STORM SURGE, WAVES AND FLOODING DURING HURRICANE KATRINA

## G. PAUL KEMP, Ph.D.

## July 11, 2008

## PREFACE

I, G. Paul Kemp, am a geologist and oceanographer currently employed by the National Audubon Society, and at the time of Katrina by the Louisiana State University (LSU) Hurricane Center. My qualifications are attached as Appendix A. The opinions expressed in this report are solely my own, and not those of the National Audubon Society or LSU. This is the fourth expert report that I have written as a member of the Robinson expert team, including ones submitted to the Court on July 28, 2007 (Kemp Class Certification 2007a), September 14, 2007 (Kemp 702(c) immunity 2007b) and May 1, 2008. The current report supplements and essentially replaces the report of May 1, 2008, with the addition of information developed over the past two months. I incorporate by reference everything I have written in the three previous reports into the current report.

The Government takes the position that the Mississippi River Gulf Outlet navigation project (MRGO) had no effect on the catastrophic flooding of Greater New Orleans during Hurricane Katrina. Our analyses show that the Government is incorrect. It is my opinion that the MRGO navigation project:

> (1) created a funnel, the dangerous convergence of channels and spoil disposal areas, later augmented by addition of the Lake Pontchartrain & Vicinity (LPV) berms east of New Orleans, and by the subtraction of buffering wetlands, that foreseeably amplified the threat posed by hurricane surge to the Greater New Orleans area; and
> (2) greatly enlarged the original Gulf Intracoastal Waterway (GIWW) connection between the throat of the funnel and the IHNC (MRGO Reach 1), which foreseeably increased surge transmission into the city earlier, adding to the height and duration of surge experienced in the IHNC during Katrina and contributing to the early failure of floodwalls and levees adjacent to the IHNC; and
> (3) created a Reach 2 channel with unstable side slopes that caused it to predictably expand over time, reducing the natural marsh buffer that previously separated it from Lake Borgne and from the adjacent LPV berms, thereby compromising foreshore protection fort the man-made surge protection elements and hastening the onset of damaging wave action on these delicate structures (EBSBs) so that they breached earlier in the storm sequence; and

>    (4) created a channel in Reach 2 that predictably exposed freshwater swamps and marshes within the Lake Borgne funnel to increased salinity, accelerating their conversion to open water and thereby reducing the wetland surge and wave buffer between Lake Borgne and populated areas; and
>    (5) was a substantial contributing factor to the catastrophic flooding of the Robinson plaintiffs' homes and communities.

In addition, throughout the history of the MRGO project, up to the time of Hurricane Katrina, the U.S. Army Corps of Engineers (USACE or Corps), in my opinion, has continuously adopted a policy of denial and deliberate disregard of well documented adverse effects of the channel, most of which were known or suspected prior to construction and others that became apparent later, soon thereafter ensuring that a real threat for flooding during hurricanes remained unaddressed for five decades. Throughout this period, the USACE issued increasingly soothing but inaccurate statements to two generations of New Orleans and St. Bernard residents that they were well protected and that the MRGO project posed no hazard to their lives or property.

Furthermore, this approach is much the same today, in my opinion, coloring the conclusions of the Corps sponsored investigations that have followed Katrina, and the nature of solutions that have been proposed. This, in particular, includes an obdurate unwillingness to provide wave protection to the hastily rebuilt berms that parallel MRGO Reach 2 despite overwhelming evidence that they were largely destroyed by waves. Today, the Corps still refuses to acknowledge, in the face of compelling scientific evidence, that the MRGO project was a significant cause of the early and catastrophic flooding of the Upper and Lower 9th Ward, St. Bernard Parish and New Orleans East during Hurricane Katrina.

Ultimately, the extent of damage and the harm caused by the flooding of St. Bernard and the Lower 9th Ward through the MRGO was not significantly reduced by the LPV berms and floodwalls. The structures that Dr. Bea has described as "earthen berm/spoil banks" (EBSBs) (to differentiate them from properly engineered coastal defense dykes) along MRGO Reach 2 served merely as "speed bumps" that were swept aside during Katrina by the surge and waves generated in, and transmitted by the MRGO channel. Most of the flooding of the Lower 9th Ward and New Orleans East, as well as a significant portion of the early flooding of the Orleans Metro area, is attributable to the enlarged cross-section of MRGO Reach 1.

Finally, I believe that the USACE, and certainly the larger oceanographic community, possessed a knowledge base prior to the construction of the MRGO project, and certainly after the Betsy disaster, that should have led to actions to tightly integrate the MRGO economic development project with the LPV public safety project, and thereby reduce or eliminate the added and substantial hazards uniquely posed by the ship channel. Instead, with regard to this particular project and, significantly, not in all comparable cases around the country, the Corps adopted a policy of institutional denial that stymied efforts of local leaders, engineers and scientists to address critical, long-known deficiencies that were

wetlands, that foreseeably amplified the threat posed by hurricane surge to the Greater New Orleans area; and;

(2) greatly enlarged the original Gulf Intracoastal Waterway (GIWW) connection between the throat of the funnel and the IHNC (MRGO Reach 1), which foreseeably increased surge transmission into the city earlier, adding to the height and duration of surge experienced in the IHNC during Katrina and contributing to the early failure of floodwalls and levees adjacent to the IHNC; and

(3) created a Reach 2 channel with unstable side slopes that caused it to predictably expand over time, reducing the natural marsh buffer that previously separated it from Lake Borgne and from the adjacent LPV berms, thereby compromising foreshore protection fort the man-made surge protection elements and hastening the onset of damaging wave action on these delicate structures (EBSBs) so that they breached earlier in the storm sequence; and

(4) created a channel in Reach 2 that predictably exposed freshwater swamps and marshes within the Lake Borgne funnel to increased salinity, accelerating their conversion to open water and thereby reducing the wetland surge and wave buffer between Lake Borgne and populated areas; and

(5) was a substantial contributing factor to the catastrophic flooding of the Robinson plaintiffs' homes and communities.

Each of the conclusions presented here is addressed in separate chapters to follow, combining results from new analyses carried out by the Robinson expert team with those contributed by others since Katrina. To facilitate this discussion, however, we first lay out in Chapter 2 our understanding of the geography, terminology and hydraulic significance of the various man-made and natural components of the Lake Borgne funnel, our study area for this project. Then, in Chapter 3, we describe a chronology of actions and positions taken by the USACE that cover the roughly 50 year period from the authorization of the MRGO project through its recent de-authorization, and continuing on into current mitigation efforts. We review earlier studies of surge dynamics in Chapter 4, and explain the modeling techniques adopted for the current investigation in Chapter 5 showing how that forms the basis of the technical oceanographic discussion. The results of that analysis are then discussed in separate chapters (Chapters 6 through 8) that address sequentially the points enumerated above. Chapter 9 reviews high points of an MRGO chronology that has been created and is included with this report (Appendix B) and is followed by a short statement of my opinion in Chapter 10. We conclude with a summation chapter that pulls together all of the elements supporting our overarching contention that the MRGO project played a significant causative and contributory role in the catastrophic flooding and damages experienced by the Robinson plaintiffs in New Orleans East, the Lower 9th Ward and St. Bernard Parish, and a supporting role in the inundation of the Orleans Metro area west of the Inner Harbor Navigation Canal (IHNC).

The brief history of the MRGO that I recount here is indeed brief, and should not be regarded as comprehensive. To facilitate a more in-depth review, the Robinson expert team has compiled a searchable, hyperlinked chronological inventory of MRGO documents that begins in 1852 with the first concepts for a tidewater channel east of New Orleans and extends up to the present. That comprehensive "MRGO Chronology" is attached as **Appendix B**.

Once the MRGO was built, local residents quickly came to understand that the project was far more effective as an agent of environmental and community destruction than as an engine of economic development. For five decades, they tried unsuccessfully to put the MRGO genie back in the bottle, while the taxpayers of the Nation continued to pay an average of $12.5 million every year to keep the MRGO open to the few ships that ever came to call (USACE 2007).

Two months after the Hurricane Betsy flood in 1965, the New Orleans East based Citizens Committee for Hurricane Flood Control, recommended revisions to the 1962 USACE hurricane protection plan for Lake Pontchartrain and Vicinity, that was about to be adopted by Congress in the Flood Control Act of 1965 (PL 89-298). The Citizens Committee sent a letter and report to the USACE New Orleans District Engineer containing these recommendations (Citizens Committee for Hurricane Flood Control 1965). Significantly, the recommendations of this committee were ignored then, but have now been adopted almost in their entirety by the USACE since Hurricane Katrina for the 100 year protection plan (http://www.mvn.usace.army.mil/hps/100yr_design_map.html). One reason that the 1965 Committee made such recommendations was as follows:

> "The US Engineers proposal for a levee along the south shore of the Gulf Outlet to Bayou Dupre, and along the north shore of the Intracoastal Waterway would *form a funnel* channeling surges and wind driven water into the Intracoastal Waterway and Industrial Canal."
> (Citizens Committee for Hurricane Flood Control 1965, p. 2, *emphasis added*).

The second reference made in this 1965 statement to the "Intracoastal Waterway" is to that segment of the MRGO project that occupies the original GIWW right-of-way (**Figure 3.1**) that has become known since Katrina as "MRGO Reach 1," the six-mile connection to the Inner Harbor Navigation Canal (IHNC). The IHNC is still commonly called the Industrial Canal. MRGO Reach 1 was often described in USACE documents over the years as a part of the GIWW, though it has the far greater dimensions of the MRGO ship channel rather than those of the original GIWW barge canal. The channels of the pre-existing GIWW to the north and MRGO Reach 2 to the south delineate the sides of the "funnel" referred to in the 1965 Committee report (**Figure 3.1**). The 1965 Committee report and recommendations included a sketch of what later was called the "Crosby" plan or alternative discussed below (**Figure 3.2**).

21

By this time, construction of the LPV flood control project was in progress on the east side of New Orleans. The oceanographic basis for the LPV Barrier Plan had been developed by a joint USACE/Weather Bureau study team in the mid- to late-1950s prior to the construction of the MRGO (Team Louisiana 2007). Local engineers at the USACE New Orleans District (NOD) faced the task of re-interpreting the 1950s hurricane science and oceanography to incorporate the massive new channel – not included in the original hurricane analysis -- they had now built into the City. For this reason, and because the NOD was facing legal proceedings similar to those now before the federal court in *Robinson v. United States*, the USACE commissioned the National Science and Engineering Company (NESCO) to quickly study the potential of the MRGO to enhance and transmit storm surge to populated areas (Bretschneider and Collins 1966). Significantly, the NESCO study was limited to hurricane effects on surge in the Lake Borgne funnel and included no discussion of waves, although one of the authors, Dr. Bretschneider, was at the time perhaps the worlds foremost authority on wave forecasting.

The NESCO study released in 1966 would remain the only investigation commissioned by the USACE on potential impacts of the MRGO project for almost 40 years. A second, more narrowly focused investigation was conducted by the USACE at the request of the State of Louisiana beginning in 1999, but it was not completed until September, 2005, a month after New Orleans was flooded (USACE 2005). Neither of these studies considered wave regeneration in the MRGO channel.

The NESCO study was a respectable piece of "armchair science" for the time, given the limitations of modeling technology and the lack of an independent field data collection program to confirm and augment information provided by the NOD. This important document will be discussed in more detail later. Suffice it to say here that it raised as many questions as it answered, and included numerous caveats about how broadly the findings should be interpreted (See Team Louisiana 2007, p. 244-252). The limitations of the NESCO study were well understood by scientists at the time, including the eminent oceanographic meteorologist, S. A. Hsu, a professor at the Louisiana State University (LSU) Coastal Studies Institute. He produced a report that was finalized in 1973 entitled "The Impact of the Mississippi River-Gulf Outlet on Hurricane Floods of St. Bernard Parish and New Orleans Metropolitan Area." This report was appended to a larger volume produced by Coastal Environments, Inc. (CEI), under contract to St. Bernard Parish (Hsu 1973; CEI 1973). In his analysis of the NESCO report, Dr. Hsu states the following (p. A-11).

> "(a) The basic technique used in the [NESCO] report is to first develop a reasonably sound theoretical model and then compare it to observations. The comparison is poor as clearly admitted by the authors on page 62, (here is an excellent negative critique on its own).
>
> (b) The next steps utilize various techniques which essentially readjust the assumed coefficients or factors to force them to the agreement with observations....The weakness of the technique is that it utilizes a circular

22

> argument. The same observations are used to verify the model that provided the basis for calibration. In other words, the authors started with a model, then readjusted it with data from one observational case, and then compared the models predicted results with the same observational case data. The approach virtually guarantees good agreement."
> (Hsu 1973, p. A-11)

Several proposals were developed by the USACE NOD and by local interests to provide enhanced hurricane surge protection for port facilities and developed areas adjacent to the combined MRGO Reach 1/GIWW and the IHNC in the years following Hurricane Betsy, and in the immediate aftermath of flooding caused by Hurricane Camille in 1969. These proposals included placing floodgates in the IHNC at its junction with the MRGO, a floating gate in MRGO Reach 1 in the vicinity of Paris Road, and a crescent-shaped levee to connect the proposed barrier structure at Chef Menteur Pass with the LPV in the vicinity of Bayou Bienvenue **(Figure 3.2)**. Furthermore, the Corps realized that the enormous outflow of surge during Hurricanes Betsy and Camille from the IHNC to Lake Pontchartrain -- what Dr. Bea has called "venting"-- was effective in preventing surge levels from rising higher in the IHNC and causing more damage to the adjacent dock areas then more heavily populated by businesses than they are today. This led the USACE to reassess the controlling elevation of the "Seabrook Lock," at that time a proposed component of both the MRGO -- to prevent saltwater from entering Lake Pontchartrain under normal tides -- and LPV projects. Its role under LPV would be to prevent storm surge from entering the IHNC from the Lake, and vice versa. It is important to note that this first tentative step toward integrating the two projects never made it past the drawing board.

In all instances, the Corps chose the "no-action alternative." The three structural proposals to supply enhanced protection were rejected on the rationale that the incremental cost increase to the overall LPV project was not deemed justified by the incremental reduction in expected flood damage to businesses along the IHNC. *None of the relevant design memoranda discuss a weighing of public safety concerns, just property damage.* Significantly, one of these plans, known as the Crosby Plan, appeared as Alternate Plan C in the Citrus Back Levee Design Memorandum 2, (USACE 1967, App. C, Plate 4). This plan incorporated features similar to those included in the 1965 recommendations of the Citizens Committee **(Figure 3.2)**. Additional reasons that the Corps rejected this plan were given in a September 23, 1969 letter from Colonel Herbert Haar, Jr., NOD District Engineer, to Congressman F. Edward Hebert (Haar,1969), stating:

> "Beyond the fact that the plan is not economically justified, it is undesirable for a number of other reasons. Its adoption would mean that none of the work already accomplished by local interests subsequent to the project authorization would be incorporated into the Federal project and no credit for such work would be allowed. Further, the modifications involved are so broad in scope as to be beyond the discretionary authority of the Chief of Engineers to adopt, so that project review and subsequent

23

> Congressional action would be required. During the time that this process was being accomplished, progress in planning and construction of some of the most urgently needed project features would be discontinued...In addition to the above, operation of two features of the plan, namely the navigation gate in the Mississippi River-Gulf Outlet and the lock in the Gulf Intracoastal Waterway, would significantly impede seagoing and inland navigation...The interest expressed by Mr. Crosby relative to the need for construction of the aforementioned project is greatly appreciated."
> (USACE Col. Haar, Jr., in 1969 letter to Congressman F. Edward Hebert)

Upon receiving this shot across the bows from the USACE with respect to the Crosby Plan, the Orleans Levee District and Louisiana Department of Public Works -- the two state agencies that had originally asked for its consideration -- quickly withdrew their support for this alternative. Ironically, a variant of this plan has re-emerged since Katrina as the 100-year protection plan for which the Corps has recently let a $750 million design-build construction contract, as will be discussed in more detail below.

This brings us to a central theme that I will return to several times in this report, namely, that the USACE adopted a policy of denial following Hurricane Betsy that effectively stifled acquisition or analysis of new information on the potential of the MRGO to increase hurricane surge, waves and flooding. This policy was clearly expressed in 1973 by Mr. P.A. Becnel, Jr., then Chief of the Hydraulics and Hydrologic Branch, NOD, in a "Memorandum for Record" addressing the "Apparent Funneling Effects of Citrus and Chalmette Hurricane Protection Levees" in 1973 (Becnel Memorandum 1973).



**Figure 3.2 Alternate Plan C from Citrus Back Levee Design Memorandum 2 showing a rejected proposal to incorporate the MRGO into the LPV flood protection plan through construction of a levee across the funnel and a floating closure gate across the MRGO (USACE 1967). See USACE post-Katrina "100-Year Hurricane Protection Plan" for comparison (Figure 3.6)**

24

Mr. Becnel was responding to statements made in public hearings by Dr. Sherwood Gagliano, a respected coastal geologist, LSU professor and president of CEI who often served as a consultant to the Corps, and had provided early drafts of the St. Bernard Parish report quoted above (CEI 1973). In one of them, Dr. Gagliano recommended a "re-evaluation of hurricane storm surge threat in the funnel formed by the MRGO and the GIWW and associated hurricane protection levees" stating that "the buildup of tides in naturally constricting estuaries is a well known phenomenon" (CEI 1972).

Mr. Cecil Soileau, then an employee in Mr. Becnel's branch, has described his role in drafting this important memorandum for Mr. Becnel's signature in his deposition (Deposition of Mr. Cecil Soileau). In the first enumerated paragraph, the Becnel (1973) memorandum states that:

> "The purpose of this memorandum is to provide a *unitive statement on the position of the New Orleans District* concerning the accusation by Dr. Sherwood M. Gagliano or anyone else, that the alinement (*sic*) of the protection levees creates a funnel effect in the vicinity of Paris Road at Lake Borgne...At these meetings Dr. Gagliano et al., presented three reports which are a matter of record of the public hearings." (*emphasis added*)

It is an added irony that the hearings referenced in Mr. Becnel's memorandum were being held not to address public safety concerns, but to receive input on a proposal being floated by the Corps at that time to enlarge the MRGO from a bottom width of 500 feet to 750 feet, and to increase the authorized depth from 36 to 50 feet. This context may help explain the frustrated tone of the memo. Mr. Becnel seems aggrieved that those who were flooded during Hurricane Betsy would continue, seven years later, to "accuse" the Corps of operating a ship channel that posed a hazard to public safety. The channel expansion then under discussion was never authorized, at least in part because such concerns continued to be expressed. But local residents knew that the channel was expanding anyway, and taking the swamps and marshes with it. In the second paragraph, Mr. Becnel's memorandum goes on to describe what is termed the "Bases of Position."

> "The bases of our position are the results of a study performed by the National Engineering Science Company (NESCO) in 1966 while under contract with the U.S. Army Corps of Engineers and the heights of water levels experienced during hurricanes Betsy and Camille."
> (1973 Memo from USACE-NOD Chief Hydraulics and Hydrologic Branch)

The rest of this memorandum provides an apparent technical justification for a lack of NOD concern. Becnel (1973) ignores the clearly stated caveats expressed by the authors of the NESCO study that he cites to avoid extending the Betsy statistical model to other storms. Instead, he bases an official position that all is well – and therefore that any further analysis is unnecessary and disruptive -- on the observation that a similar peak surge elevation was observed at one gage on the MRGO (Paris Road) during Camille as

25

was recorded four years earlier during Betsy. Oceanographers who have tried to follow this logic find any similarity at a single gage station to be purely coincidental, given the profound differences between the two storms and the unique characteristics of the surge that each generated (**Figure 3.3**). Hurricane Betsy, a category 3 storm at landfall, followed a track to the south and then west of the City, while Hurricane Camille passed well east of New Orleans in 1969 to strike the Mississippi coast as a compact category 5 storm.



**Figure 3.3 Paths of Hurricane Betsy (left) on September 8-9, 1965 (USACE 1965) and Hurricane Camille (right) on the evening of August 17, 1969 (USACE 1970).**

The technical justification stated in the Becnel Memorandum is thin, but what is missing entirely is any evidence, again, of a weighing or balancing of competing public policy concerns. Why did a high-level NOD official find it necessary to counter legitimate technical questions about MRGO with a subjective "unitive statement" (party line) designed to be imposed hierarchically upon an entire organization responsible for public safety? This is a recurring feature in the annals of the District. The reluctance to update the 1959 Standard Project Hurricane surge analyses with new weather service information is now well known (Team Louisiana 2007, p. 95-114), as is the infamous 1985 benchmark "policy" forcing contractors to use an obsolete survey datum that resulted in construction of drainage canal floodwall crowns two feet lower than design grade in the 1990s (IPET 2006, Vol. II, p. 78). The 1973 Becnel memo is woven of the same fabric.

Similarly, the Corps' had a long-standing policy against spending operations and maintenance (O&M) funds on stabilizing the banks of any of its navigation channels against erosion unless shoreline slumping and retreat began to affect the ability to maintain the controlling navigation channel dimensions. The standard practice apparently has been to force local partners to take on this task if at all possible. The MRGO GDM 1B (USACE 1959) specifically excluded any engineered measures to maintain the bank lines following construction, even though the side slopes of the dredged cut were specified at a highly unrealistic 1V:2H slope. It was known prior to construction that they would not be stable.

26

> "No channel protection is recommended initially; however, erosion due to wave wash in open areas can be expected in the upper part of the channel slope where the peat and highly organic clays are exposed. Protection for this area can be provided if and when the need for it becomes necessary. No channel protection is included in the overall cost estimate of the project. It is presumed that sufficient rights-of-way will be furnished by local interests to preclude use of channel protection, or that additional rights-of-way will be furnished if the need arises" (GDM 1B 1959, p. 5).

The Corps did purchase a relatively wide right-of-way extending well outside of the authorized channel footprint so that any issues arising from bank retreat could be put off for some time, perhaps forever, given that there was no development or government asset near the MRGO channel ROW at the time the channel was dredged (USACE 1959).

Later, after the Corps constructed the LPV Chalmette structures, it became apparent that the first asset that would be threatened by the rapid retreat of the channel bank on the south side was theirs. A useful chronology of the development of this issue appears in a briefing package dated September 15, 1982, prepared by the New Orleans District and titled "Data for Testifying Officers on FY 1984 Civil Works Budget, Mississippi River-Gulf Outlet, Louisiana," where it is stated on p. 3 (AIN-046-000000862) that in 1967:

> "The project was modified under the discretionary authority of the Chief of Engineers to include as a mitigating measure, the costs of protecting a portion of the foreshore lying between the Lake Pontchartrain and Vicinity Hurricane Protection project and the Mississippi River-Gulf Outlet. Construction of the Mississippi River-Gulf Outlet project exposed levees and their foreshore along both banks of the navigation channel in the City of New Orleans to damages from waves generated by seagoing vessels utilizing the waterway. *The navigation project should have included adequate protection for these levees and their foreshore. The new levees in the Lake Pontchartrain project located adjacent to the Mississippi River-Gulf Outlet ship channel will also require protection.* The cost of this work has been deleted from the Lake Pontchartrain project and added to the Mississippi River-Gulf Outlet project. (There are about 6 miles of levees along the north bank and 18 miles along the south bank of the Gulf Outlet navigation project which require protection.)
>
> The chairman of the House and Senate Committees on Appropriations were informed by the Chief of Engineers of the modification to include, as a *mitigation measure*, the wavewash protection for levees and foreshore...being included in the project. The above change in scope was first reflected in the project cost estimate presented to Congress in connection with the appropriation request for FY 1969." (*emphasis added*)

Technical memos were exchanged over the years between 1967 and 1990 between the USACE District and Division offices indicating an increasing level of alarm over the

27

potential for MRGO bank erosion to undermine the foundational stability of the LPV EBSBs, but no action was taken beyond installation of some test sections of foreshore armor for the banks of the channel (not EBSBs) with rocks, geotextiles or articulated concrete mattresses. These tests demonstrated that the channel bank erosion could indeed be abated by one or more of these standard techniques.

A bureaucratic snafu appears to have arisen about where the money would come from for the relatively expensive measures required. This partly explains why nothing happened on the ground in that diminishing "foreshore," until the Secretary of the Louisiana Department of Natural Resources (LDNR) provoked a crisis in a May 5, 1991, letter to the District threatening to find that the next proposed cycle of maintenance dredging for the MRGO was "inconsistent" with Coastal Use Guidelines approved by the State under its newly reauthorized, federally approved Coastal Zone Management Plan (CZMP) because the dredging plan did include measures for stabilizing the banks of the federal channel. This letter resulted in a May 30, 1991, briefing memo from the District to the Chief of Engineers that enumerated ten additional "policy" justifications for inaction in "Tab B: Policy and other considerations" (NOP-007-000000779) that begins:

1. "Long standing Army/Corps policy that bank stabilization projects have low funding priority (effectively zero funding)

2. Precedent – if Corps fixes mi 50-56 as condition of dredged material placement, expect continued demands throughout LA coastal zone

3. Corps policy says Sec 1136 will not be used to fix bank erosion

4. Per 33 CFR 336, when at impasse with State, Corps should defer dredging awaiting additional Congressional appropriations"

And continuing....

7. If Congressional "add," Cong must tell us in law – forces LA delegation to get agreement of colleagues

8. Long term viability is questionable. 36 ft channel is not as competitive as deeper drafts. PONO is considering container port facilities on Mississippi River to access deep draft channel

9. Local opposition to MRGO is considerable based on perceptions that MRGO is environmental disaster and its economic promises never materialized"

Nearly 40 years after the 1967 discretionary modification of the MRGO project, an MRGO "Fact Sheet" was prepared for the public (in contrast to the internal 1991 memo above) by the District and dated May 12, 2004, that gives perhaps the clearest

28

explanation of what had happened in the intervening years on p. 5 (NOP-004-000000984):

> "By-in-large, the MRGO banks remain un-lined with protection. This is a feature of the channel established upon its initial design and construction. Ship wakes generated by vessels passing along the MRGO have been for many years and continue to be major contributors to bank erosion. Measured long-term erosion rates are about 15 and 32 feet per year, on the south and north banks, respectively. This is an on-going problem, widely recognized by the Corps, other agencies, state and local governments, as well as the general public.
>
> Form 1990 to the present, the district has built and maintained about 8.3 miles of foreshore rock bank protection along the MRGO. This armoring substantially abates wave erosion; reduces channel sedimentation, and associated cyclic dredging needs and costs; as well as preserves valued wetlands, land features, and infrastructure along the channel. An additional 17.8 miles of foreshore rock protection are planned for construction and maintenance are planned for construction and maintenance in the future."

All of the bank armoring completed at that time was along the south shore of MRGO Reach 2, where it would more effectively address LPV stability concerns than any for the environment. But clearly the attitude within the district had changed since 1991, primarily in response to the growing public support and funding for environmental restoration, but the District felt obliged to justify the slow progress as follows:

> "Bank armoring will curtail erosion and cyclic O&M dredging requirements along the inland reach of the MRGO, in proportion to the rate that program is funded for execution. The project's O&M budget, indexed for inflation, has been relatively constant over the last decade. *This has limited the rate of execution in bank armoring, in favor of dredging to sustain the critical function of providing serviceable dimensions for shipping.* There is a capability to accomplish bank armoring at a higher rate with increased O&M Program funding levels, as well as through other authorizations and funding streams." (*emphasis added*)

It can be seen that the old "policy considerations" expressed in the 1991 internal memo continued to exert an influence on Corps behavior with respect to the MRGO project right up to a year before Hurricane Katrina. Furthermore, the 1973 Becnel "unitive statement" appeared to be fully in effect, in that public safety considerations and protection from hurricane surge and waves exacerbated by the MRGO project are never mentioned.

29

The most serious consequence of this tendency to meet new ideas, information and technology from external sources with officially imposed "policies" of denial had a cumulative effect over time of isolating NOD technical personnel from much of the rest of the technical community. The self-imposed insularity of the District was compounded by a lack of truly independent review or critical oversight at the Division or Headquarters levels, as Woolley and Shabman (2008) have pointed out in their Corps-commissioned LPV decision-making chronology (that ignores the MRGO). This combination ensured that mistakes made would not be corrected. Regrettably, we believe, the long conditioned response of the Corps to ignore or deny conflicting information on MRGO continues to influence some critical post-Katrina decisions on the re-engineering of the hurricane protection system on the east side of New Orleans, and the remediation of MRGO-caused impacts.

In 1999, the State of Louisiana and the USACE started a seemingly endless "re-evaluation study" of the MRGO that was not concluded until immediately after Hurricane Katrina in 2005 (USACE 2005). This study provided some useful information, confirming, for example, that the MRGO had more than doubled salinity in Lake Borgne (**Table 3.1**), and in the eastern part of Lake Pontchartrain, providing a robust explanation for much of the conversion and loss of wetlands that had been observed. The study documented the retreat of the unstable MRGO Reach 2 channel banks. This re-evaluation study also included an early ADCIRC model study of the effects of a closure of MRGO Reach 2 at Bayou LaLoutre on hurricane surge (USACE 2005). Despite being unable to accurately capture wetland effects on surge, the modelers got roughly the same answer for a closure east of Lake Borgne (where the surge comes from) as have all subsequent model studies, namely that the surge reduction effects of a flood gate at this location would be negligible. Establishing a tradition that IPET also adopted (2007), this USACE study never looked at the effects of such a closure in the more surge "critical" GIWW/MRGO Reach 1.

More importantly, however, the 2005 MRGO re-evaluation study explored a range of remedies to these problems and identified those thought to be most effective short of complete closure. It was found, for example, that narrowing the Reach 2 channel would more effectively reduce salinity intrusion on normal tides than reducing its depth, and that a closure at Bayou LaLoutre would be perform even better for this purpose. Similarly, the study saw no difficulty with stabilizing the MRGO banks using lightweight articulated concrete mattresses similar to those used on the Mississippi River banks for decades (USACE 2005).

But, despite showing that it was feasible to address some of the problems known to be caused by the MRGO Reach 2, the USACE fell back into the old denial pattern and concluded *in the month after Katrina hit* that the MRGO – an anachronism before its time – remained economically viable:

> "The analysis of National Economic Development (NED) benefits shows, that when compared to the alternatives, continued O & M (maintenance dredging) of the MRGO is justified. The recommended plan is the No

30

> Action Alternative, i.e., to continue current O & M activities to maintain deep-draft navigation on the MRGO. Interested parties, the most vocal of which are St. Bernard Parish and the Lake Pontchartrain Basin Foundation, remain very concerned about the loss of wetlands due to bank erosion caused by vessel wave action and the environmental consequences caused by saltwater intrusion. However, ecosystem restoration measures are outside the authority of the re-evaluation study and are not included in this report"
> (USACE 2005, MRGO General Reevaluation Study Report Executive Summary, p. 11)

Further, it is significant that even after Katrina, the USACE never thought to mention in this report the possibility that encroachment of the Reach 2 channel into the toe of the adjacent EBSBs might have contributed to their catastrophic destruction by waves. This is another example of an institutional blind spot (Team Louisiana 2007) that will loom larger when we compare the results of our more comprehensive analysis using the SWAN wave model (Gautier et al. 2008) with that conducted by IPET (2006, 2007).

It took almost exactly two years after the 2005 report was issued – and some very insistent Congressional prodding -- for the USACE to confront reality and reverse itself in November 2007 with a new report recommending MRGO de-authorization and a closure at the Bayou LaLoutre ridge (USACE 2007). The Corps still refuses to acknowledge that the waterway poses a threat to public safety, relying on a newly-discovered deficiency in the cost-benefit ratio. This break with the past on MRGO, the first chink in the defensive policy armor built by the USACE after Hurricane Betsy, is discussed in more detail below. But still no weighing of the costs in lives and property.

**Table 3.1   Increase in salinity in Lake Borgne funnel caused by USACE after construction of the MRGO ship channel in 1963 (USACE 2005)**

| | Shell Beach/South L. Borgne | | | Chef Menteur Pass/North L. Borgne | | |
|---|---|---|---|---|---|---|
| Month | Salinity 1951-63 (ppt) | Salinity 1963-77 (ppt) | % Increase | Salinity 1951-63 (ppt) | Salinity 1963-77 (ppt) | % Increase |
| January | 6.5 | 9.8 | 51 | 3.8 | 5.7 | 50 |
| February | 6.4 | 9.7 | 52 | 2.9 | 4.8 | 66 |
| March | 6.3 | 10.4 | 65 | 2.2 | 4.3 | 95 |
| April | 7.0 | 10.0 | 43 | 2.2 | 4.0 | 82 |
| May | 9.5 | 10.2 | 7 | 2.6 | 4.0 | 54 |
| June | 9.0 | 12.3 | 37 | 3.3 | 4.2 | 27 |
| July | 7.9 | 16.0 | 103 | 3.2 | 6.3 | 97 |
| August | 8.6 | 16.1 | 87 | 4.8 | 7.5 | 56 |
| September | 8.2 | 12.9 | 57 | 6.0 | 8.5 | 42 |
| October | 7.6 | 13.8 | 82 | 5.2 | 8.4 | 62 |
| November | 8.0 | 13.1 | 64 | 5.2 | 8.0 | 54 |
| December | 8.0 | 12.5 | 56 | 4.2 | 7.0 | 67 |
| **Mean** | **7.8** | **12.2** | **59** | **3.8** | **6.1** | **63** |

Hurricane Katrina. In some cases, we have merely carried some of the same analyses initiated by the USACE to a more logical and instructive endpoint. Based on everything that I have seen, I conclude that the MRGO project was a substantial contributing factor to the catastrophic flooding of the Robinson plaintiffs' homes and communities. Put another way, but for the adverse effects of the MRGO (funnel configuration, destruction of wetlands, channel expansion), Hurricane Katrina would not have triggered the catastrophic degree of flooding that destroyed New Orleans East, the Lower 9th Ward and St. Bernard Parish (**Figure 3.7**).



**Figure 3.7 View of a flooded city looking west from above the Lower 9th Ward toward the IHNC and the Orleans Metro area four days after Katrina**

38

MRGO Reach 1 into the IHNC leads to an earlier initiation of overtopping of floodwalls along both sides of the IHNC.

Our modeling program was developed to allow quantification of both the individual and interactive effects of (1) the expanded channels to conduct surge and waves, (2) the effects of the LPV flood protection structures to drive up surge and break waves, and (3) the effects of various types of marshes and swamps to attenuate surge and dissipate wave energy. This was accomplished with both FINEL and SWAN. Only then could we identify the interactive effect of, for example, allowing the MRGO Reach 2 channel to expand to the toe of the Chalmette EBSBs, or the loss of the swamp.

We also conducted a series of experiments using ADCIRC to quantify incrementally the effect of constricting the GIWW/MRGO Reach 1 from its pre-Katrina cross-section down to its pre-MRGO condition for the Katrina base case. The pre-MRGO end-member of this analysis was later confirmed with a series of FINEL runs (2a, 2b, 2c, 2d). Finally, using SOBEK, we were able to examine the relative severity of Katrina flooding if the MRGO project had been constructed and operated in a more prudent manner that did not expose the LPV flood control structures to elevated surge and wave forces.

We have used hydrodynamic modeling packages that are, we believe, the best of those commonly used in modern engineering practice. But some of the analyses by Bretschneider and Collins (1966) should have led an alert oceanographer or coastal engineer to many of the same conclusions over 40 years ago following Hurricane Betsy. Evaluating the effect of enlarging the GIWW/MRGO Reach 1 cross-section that IPET has called "critical" to surge transmission could have been accomplished with HEC-2, a ancient 1D model developed by the USACE that engineers have used since the late 1960s. Similarly, wave regeneration in deep channels is by no means a new concept, and should have particularly aroused concern as the MRGO channel expanded into Lake Borgne and toward the toe of the Chalmette Loop EBSBs. Analytical models for wave hindcasting were a particular specialty of Dr. Bretschneider, the lead author of the 1966 NESCO report, but he was never asked to look at waves.

Neutral MRGO analyses
Special attention is directed to scenario 2C in FINEL (de Wit et al., appendices 2008) and 2Ci in SWAN (Gautier et al Appendix 2008), a configuration that Dr. Bea calls the "Neutral MRGO" condition. It differs from the "2005 Katrina-As-Is" situation in one way. It has no trace of the MRGO project, or of the wetland destruction that it caused, but retains all of the LPV structures that were added over the years in the pre-Katrina condition. The "Neutral MRGO" analyses conducted by Dr. Bea are based on the rationale that the USACE had a Congressionally directed responsibility to manage the MRGO navigation project so that it caused no added unmitigated impact on the ability of the LPV hurricane protection project to fulfill its mission -- also Congressionally mandated – to protect the City of New Orleans and St. Bernard Parish from hurricane induced flooding. Further, it is accepted under this hypothesis that the levees, EBSBs, floodwalls and other structures built by the Corps as part of the LPV project are beyond reproach in the condition in which they were tested by Hurricane Katrina.