The reduced dimensions of the 'as-authorized' channel in scenario 3 also reduce discharge proportional to cross-section compared to scenario 1 only at the surge peak when flow velocities reach a maximum when it appears that conveyance is restricted.

As might be expected, discharge through the Reach 1 section is greatly diminished when the ship channel is removed as is the case in scenarios 2a, 2b and 2c. Flow then is largely overland even if it is constrained by LPV berms, as under scenario 2c. Peak discharge for this scenario in Reach 1 is only slightly more than a third of the 'Katrina-As-Is' discharge (**Table 6.4**). The Reach 2 discharge across the unbroken marsh at the Bayou Bienvenue cross-section is less than 20 percent of its value when the fully enlarged channel section is available. The direction of flow reverses to the east at this location by 0900 as the winds shift. When a channel is absent in Reach 2, there is little reason to think that this cross-section should contribute much more flow to Reach 1 than any other marsh traverse of similar length, but it does, roughly 30 percent, at least until the winds shift. This occurs in all likelihood because as the surge piles up on the LPV EBSBs along the south margin of the funnel, flow is deflected preferentially along the levee face toward the entrance to Reach 1. To return to the 'hurricane bowling' analogy, balls that hit the lane divider will tend to follow it toward the outlet even if the MRGO 'gutter' is not there. Such is the nature of a 'funnel.' Because the water is incompressible and cannot escape, changes made to the geometry in one place propagate throughout the system either as surge elevation increases or decreases, or as delays in surge rise or fall.

The cross-section of the 2a and 2b scenario that crosses the Reach 1 location occupied by the GIWW conveys far more flow, essentially the same as Reach 1 with the 'as-authorized' channel (scenario 3). This water is moving much slower through the marshes and swamps toward the IHNC than it does in the smaller cross-section available in scenario 2c, which is also missing the ship channel but is constrained by the LPV berms spaced about 2,000 feet apart. The discharge for scenario 2b climbs slowly throughout the sequence reaching its peak discharge at 0900 when the surge is already dropping in most parts of the funnel. The increased ability for the surge to spread out and flow through the Central Wetlands and over the 40 Arpent Levee delays the arrival of peak surge at the entrance to Reach 1 almost until the storm has already left for Mississippi. This is not the case for scenario 2a where the higher levee on the 40 Arpent alignment is not overtopped and the surge backs up toward the entrance to Reach 1.

## 6.5 Funnel Summary

We established first that converging shorelines and channels can increase peak surge elevation and hasten the onset of overtopping. Further, the USACE had a mature corporate knowledge of these effects from analyses conducted in many places around the U.S. prior to construction of either the MRGO or LPV projects and from experience designing surge barriers and gates developed specifically to address them. Then, we reported on a series of experiments using the FINEL model to detect changes in surge dynamics that could be attributed to the man-made geometry created by the USACE around Lake Borgne. We found that indeed surge would be a serious problem in this embayment even without the presence of MRGO or LPV project elements because of the

proximity of the margins of Lake Borgne to low-lying developed areas. This already precarious situation was made worse, however, by the construction of the MRGO ship channel that destroyed the cypress forest and much of the coastal marsh which had provided a very significant natural protection against most storms, both in the Central Wetlands and at the head of the estuary on its western margin near the IHNC. Comparison of scenarios 1, 3 and 2c showed that enlargement of the GIWW to create MRGO Reach 1 provided a much greater potential for conveyance of Lake Borgne surge into New Orleans particularly after the forests were destroyed.

The Reach 2 channel was the main cause of the deterioration of the wetland buffer because of its effect on salinity (See Table 3.1). It posed less of a problem, however, for enhancing storm surge than Reach 1 until the surge funnel geometry was worsened by construction of the LPV EBSBs along the its south bank. First, the LPV EBSBs took 'off-line' the significant amount of storage afforded by the 32,000 acre Central Wetlands. Second, the levee project introduced a new and very dangerous dynamic in the hydraulic feedback between the ship channel and the adjacent berms. After the LPV construction surge could then build up on the slopes of the EBSBs and drive added flow through the adjacent deep channel toward Reach 1, an interaction that would not have occurred if one or the other of these projects had not been built in the close conjunction that they were. These interactions were studied in the Reach 1 and Reach 2 discharge analyses just summarized above (See Table 6.4).

It has taken some time, but we have finally discovered the reason why when ADCIRC removed only MRGO Reach 2 from their ADCIRC model, it reduced flooding of the developed polders even though the drop in peak surge elevation that this produced appeared trivial to the IPET researchers at the time. We tested a scenario in which the MRGO was missing, but the LPV berms were present and allowed to survive throughout the Katrina simulation. This is the 'Neutral MRGO' condition. We found that surge elevation was reduced slightly and the rise was delayed almost everywhere around the margins of the funnel, but more so toward the west. We made use of a rigorous approach for predicting overtopping of structures developed by our colleagues in the Netherlands that was normalized to prevent aliasing due to model inaccuracies. This analysis showed that even slight reductions in peak surge elevation or delays in peak onset could combine to significantly reduce overtopping of the LPV flood protection structures throughout the funnel. When both reaches of the MRGO were removed, overtopping was reduced by about 80 percent for all of the three developed polders that experienced catastrophic flood damage on August 29, 2005.

The USACE has quibbled with the use of the term 'funnel' to describe the geometry and dynamics that developed during the Katrina event, as they have with the term 'hurricane highway' to characterize MRGO Reach 1. We believe these are quite accurate evocations of what happened. Because the greatest build-up of surge was observed along the Reach 2 EBSBs south of Lake Borgne rather than in the throat at the entrance to Reach 1 as it did during Hurricane Betsy (Compare Figures 6.1 and 6.2), the USACE IPET team has stated that there was no 'funnel' effect during Katrina. We believe that this argument is rendered untenable by the presence of the Reach 2 channel at the toe of

the EBSB alignment which effectively delivered surplus surge to the throat almost undiminished during Katrina. The Lake Borgne funnel, with all its natural and man-made features and the geometry that has been created, becomes an integrated system connected hydraulically when it is filled to the brim with hurricane delivered surge as it was during Katrina. We believe we have rigorously demonstrated that because the water is incompressible and cannot escape, changes made to the geometry in one place propagate throughout the system either as surge elevation increases or decreases, or as delays in surge rise or fall. Even small changes in the onset or elevation of surge when the funnel is at capacity translate into very significant differences in the likelihood of overtopping or damage to protective structures. If we do not want to call it a surge funnel, then what better name should we use to alert engineers designing integrated defensive systems about the integrated nature of the hazard they are confronting, and the duty they have to at least do no harm when they are considering modifications to the geometry that appear unconnected outside of the critical surge condition.





Figure 3.2.b:   SWAN results significant wave height (Hs [ft]) and wave direction, 6:00 am
and 7:00 am LT on grid M

**Figure 8.12  Significant wave heights in southern Lake Borgne and the MRGO at 06:00 and 07:00, showing 9 foot waves in the channel at 07:00 (Gautier et al. expert report 2008) Figure 8.13a  Close-up of significant wave heights in the throat of the funnel and western lobe of Lake Borgne and the MRGO channel at 06:00 and 07:00, showing waves between 8 and 9 feet in that channel, and 6 to 7 feet in the GIWW.**



**Figure 8.13b  Close-up of significant wave heights in the western lobe of Lake Borgne and the MRGO channel at 08:00 and 09:00, showing waves between 8 and 9 feet in that channel, and 6 to 8 feet in the GIWW at 08:00.  A significant reduction is apparent everywhere by 09:00 as the surge drops.**



**Figure 8.14  Close-up of the distribution of predominant wave period, Tp, in the funnel and MRGO and GIWW channels at the peak 08:00, and as the surge falls (Gautier et al. expert report 2008).**

We asked the SWAN modelers to provide us with some transects, what they call "rays," across the channel at seven key locations, six crossing the MRGO, and one crossing the GIWW (**Figure 8.15**). Here we will look in more detail at two, Rays 2 and 6 that correspond to the locations of the Bayou Bienvenue and Bayou Dupre water control structures, respectively, restricting ourselves only to the 08:00 snapshot, approaching the surge peak (**Figure 8.16a,b**).



**Figure 8.15  Locations of wave transects, including six crossing the MRGO, and one crossing the GIWW, with details of bathymetry Ray 2, Bayou Bienvenue, and Ray 6, Bayou Dupre.**



**Figure 8.16a  SWAN generated wave parameters for 08:00 along rays including 2 (Bienvenue) and 6 (Dupre), ending on the EBSBs at right, showing color-coded points described in Figure 8.15.  The top blue line is significant wave height, Hs, in feet, dashed red line is wave period, Tp, in seconds; black line is wave direction multiplied by 10 in degrees north; and the bottom green line is water depth multiplied by 10 in feet (Gautier et al. expert report 2008).**



**Figure 8.16b  SWAN generated wave parameters for 08:00 along rays including 2 (Bienvenue) and 6 (Dupre), ending on the EBSBs at right, showing color-coded points described in Figure 8.15.  The top blue line is significant wave height, Hs, in feet, dashed red line is wave period, Tp, in seconds; black line is wave direction multiplied by 10 in degrees north; and the bottom green line is water depth multiplied by 10 in feet (Gautier et al. expert report 2008).**

Ray 2 starts in the marsh where the water depth is about 15 feet, and significant waves are 7 feet high (**Figure 8.16a**). The period is about 5 seconds and the waves direction is 55 degrees, from the north east. That general orientation holds true for all waves impinging on the MRGO and reflects the prevailing wind direction. As the waves approach the channel, they cross a slightly lower shelf at about 5,000 feet from the origin where the marsh has been lost, as it has in many places along the MRGO north bank (**Figure 8.16a**). Significant wave height begins to rise, reaching 9 feet before getting to the channel proper at 6,000 feet. Hs rises again to peak at close to 10 feet as the waves cross the 60 foot deep channel and do not diminish until they break as 6 foot seas against the submerged levee face.

The pattern is similar for Ray 6 at Bayou Dupre, except that the ray begins on the margin of Lake Borgne, so it starts at a depth of about 20 feet (**Figure 8.16b**). The period is longer, about 6 seconds, and the wave direction is somewhat more easterly than at Bayou Bienvenue. The significant wave height in Lake Borgne is higher than over the marsh, about 10 feet and diminishes gradually as it encounters marsh at 6,000 feet from the origin, at the Lake edge. Significant wave height drops dramatically to 7 feet as the waves cross 1,500 feet of marsh, but begins to rise again as the waves begin to cross the channel. The waves grow to 9 feet before breaking abruptly on the more complex shoreline at this location.

SWAN can provide directional wave spectra, showing distribution of wave energy across the frequency domain, as well as its distribution on the compass. We will again focus on the ends of the two rays we have been discussing (**Figure 8.17**). The energy contained within the spectra for both show the expected loss between the toe and higher up the face of the EBSBs. Slightly more energy appears to be in lower frequencies at Bayou Dupre than at Bienvenue, as would also be expected given the proximity to Lake Borgne and the more limited filtering by the narrower intervening marsh. But these lower frequencies do not include any waves with periods greater than 10 seconds (0.1 Hz). The waves are all coming from the northeast, as would be expected for waves locally generated in Lake Borgne by the prevailing winds blowing down the long axis of that waterbody.

These illustrations by Gautier et al (expert report 2008) clearly show the effects of the marsh, even a relatively narrow swath, to greatly reduce the significant height of significant waves both on the Lake Borgne side of MRGO Reach 2 and on the side facing the EBSB toe. Morris et al (expert report 2008) has shown the effect of wave erosion on both sides of the channel since it was constructed (**Figure 8.18**)

In summary, it is my opinion that the USACE and IPET got the wave climate on the MRGO and GIWW wrong in two respects. First, they underestimated the total wave energy and the size of the waves that impacted the EBSBs flanking the MRGO and GIWW navigation channels. Second, they missed entirely the nature of the waves, mischaracterizing them as residual offshore swells rather than higher frequency, locally generated waves. Third, we believe that all analyses to date have missed the significance of channel widening on the energy of waves impacting the Reach 2 EBSBs because they have underestimated both the potential for waves to reform in the channel and of the

effects of marsh and foreshore erosion to increase the wave energy to which they were exposed during Katrina

Returning to our original "tale of two levees," it is interesting to note that the waves along the Verret return EBSB reach, in contrast to those fronting the MRGO, never experienced significant waves over 4 feet high, less than half the significant height of the waves that grew as they crossed the MRGO (**Figure 8.19**). This is what made the difference for these fragile structures, and for the early onset of the flooding or the Robinson plaintiffs in St. Bernard.



**Figure 8.17  Wave energy spectra at the toe (green) and face (blue) of the EBSBs at Bayou Bienvenue (top) and Bayou Dupre (bottom), showing the relatively narrow range of locally generated wind wave periods, with no energy in waves with periods longer than 10 seconds (0.1 Hz).**

177



**Figure 8.18 Aerial view of MRGO Reach 2 Channel at the Bayou Bienvenue control structure. Authorized channel location and 650 foot top-width is outlined in the orange showing extent of erosion on both north and south banks that has expanded top with to about 2,500 feet (Morris expert report 2008)**



**Figure 8.19  A tale of two levees, told in SWAN model output (Gautier et al expert report 2008) and post-Katrina LiDAR (Ebersole USACE 2007 presentation).**

## CHAPTER 8
## EFFECTS OF MRGO CAUSED WETLAND LOSS ON SURGE, WAVES AND FLOODING

**Point (4). The MRGO Project created a channel in Reach 2 that exposed freshwater swamps and marshes to increased salinity, accelerating their conversion to open water and thereby reducing the wetland surge and wave buffer between Lake Borgne and populated areas.**

We have discussed the proximal effect of the MRGO channel widening and wetland loss along the north and south banks of the MRGO on diminishment of effective foreshore protection for the LPV EBSBs along Reach 2. But there is also the issue of the tens of thousands of buffering wetlands, particularly cypress forests as a result of hydrological modification and salinity intrusion associated with the ship channel.

It should be noted that we use ADCIRC only to simulate the surge at the shoreline of Lake Borgne, where it reaches its greatest development in a natural system. ADCIRC should be reliable until we cross the shoreline boundary and leave the open water. We found this problem after collecting high water marks in the coastal marshes inundated by Hurricane Rita a month after Katrina (September 24, 2005). Hurricane Rita was a Category 3 storm that produced surge elevations (15 to 16 feet NAVD88) along the Cameron Parish shoreline in southwest Louisiana comparable to the Katrina surge in the funnel east of New Orleans a month earlier **(Figure 9.1)**. For Rita, the same ADCIRC model used to forecast Katrina predicted surge elevations accurately at the coast but showed the simulated surge continuing to rise across the shoreline, and dropping only 10 to 15 percent over nearly 20 miles of unbroken marsh in the Grand Chenier area. This turned out to be wrong.

The ADCIRC S08 model and its successors do not yet include verified physics to simulate the reduction in peak water level that occurs as a surge moves inland through swamps and wetlands, even though this phenomenon was parameterized empirically from 7 storms prior to 1960 by the USACE (1965) for levee design purposes (1 foot reduction every 2.75 miles). This lack was apparent not only in our comparisons of field data with model results after Rita, but also in a consultant's report URS (2006) about hurricane surge effects of the MRGO commissioned by the Louisiana Department of Natural Resources (LDNR) prior to both storms, and amended after Katrina.

ADCIRC (with the proper wind speeds) did a good job of simulating the Katrina surge in the funnel only because the LPV berms in the funnel were constructed adjacent to open water and were not fronted by significant areas of intact wetlands. So to test the effect of the entire MRGO project, we simulate surge along the shores of Lake Borgne without the LPV levees, and then project that surge inland across the swamps and marshes of the Central Wetlands to a 40 Arpent Levee that, as in URS (2006), has been raised to the design elevation of the LPV levee that was supposed to be built along the MRGO. Because ADCIRC is incapable of predicting the attenuation that occurs when the surge crosses the shoreline into coastal wetlands, a second more empirical method is required to



**Figure 9.1   Locations of surge gages installed before Hurricane Rita landfall (September 24. 2005) by the USGS with maximum surge elevations in parentheses (McKee et al. 2006).  Maximum surge at the coast for about 50 miles east of Sabine Lake was 15+ feet and diminished inland.**



**Figure 9.2   Location of USGS gages and FEMA high water marks in Rita marsh swath east of Calcasieu Lake in Cameron Parish.**

181

project surge across the MRGO right of way and Central Wetlands to the 40 Arpent Levee. We base this projection of surge across the wetlands on study of the Hurricane Rita surge of September 24, 2008. Rita was a Category 3 hurricane like Katrina that struck a marsh fronted coast with no levees in southwest Louisiana (**Figure 9.1**). Rita generated a surge that attained an elevation of 14.5 to 16 feet along about 50 miles of coast extending east from the Texas line. This coastal surge was quite similar in magnitude to that at the southern Lake Borgne shoreline during Katrina.

I mention the problem with ADCIRC primarily because of what I perceive to be an undervaluing of the importance of swamp and marsh buffering to reduce storm surge in places where vegetated storage areas like the Central Wetlands are available. There is a perception that if a factor is not incorporated in an engineering model that it may not exist. Our Dutch colleagues have gone to considerable effort to better quantify wetland effects both on surge (de Wit et al. expert report 2008) and waves (Gautier et al expert report 2008). Through sensitivity analysis, we were able to understand better when and where these effects will be most significant as is indicated by discussions in Chapter 7 and 8. We saw both surge reductions of up to 3 feet across the Central Wetlands area as delays in the onset of surge through cypress forest in FINEL scenarios 2a and 2b, which modeled 1950s conditions in the Lake Borgne funnel.

For Katrina, unfortunately, no gage data exists either in open water or in the marsh that allows precise reconstruction of surge propagation, and we must rely almost entirely on model output and sparse high water mark information from the edges of the funnel. Prior to the landfall of Rita, however, the U.S. Geological Survey (USGS) exercised great initiative to emplace 47 recording gages in the path of the surge (**Figure 9.1**), and these gages recorded a remarkable sequence of surge propagation across the marsh (McKee et al. 2007). This data set was checked against hundreds of high water marks surveyed by the Federal Emergency Management Agency (FEMA) that compared well with marks previously obtained by the LSU Hurricane Center as the surge receded (**Figure 9.2**).

We focus here on a swath of marsh about 15 miles wide extending about 25 miles inland (**Figure 9.2**) isolated from large water bodies like Calcasieu Lake to the west and Grand Lake to the east (**Figure 9.1**). Each of these large lakes experienced its own surge that was disconnected in time and space from the coastal surge. Calcasieu Lake, for example, is nearly as long on a north-south axis as Lake Pontchartrain. Downtown Lake Charles, which is nearly 30 miles inland at the northern end of Calcasieu Lake, was inundated by 9 foot surge that occurred more than 8 hours after the surge at the coast (**Figure 9.3**).

182



**Figure 8.3.  Surge at the head of Calcasieu Lake in Lake Charles during Hurricane Rita lagged the surge at the coast by more than 8 hours (McKee et al. 2007).**



**Figure 8.4.  Surge propagation through the marsh at Grand Chenier during Hurricane Rita (McKee et al. 2007)**

The situation was quite different for surge through the marsh swath to the east (**Figure 9.2**) also recorded by USGS gages (**Figure 9.4**).  There, the surge that peaked at 14.8 feet

183

2 miles from the coast was reduced to 7.4 feet at 8 miles from the shoreline, and to less than 4 feet at a gage 27 miles inland, where river flooding was also a factor. It can be seen that the surge 8 miles inland lagged that at the coast by more than 4 hours. While the surge rose rapidly at both locations, the falling leg of the more inland hydrograph was elongated, showing that drainage of the marsh was relatively slow. Water level at the most inland station 27 miles from the coast did not peak until more than two days after the storm passed.

We compared maximum surge elevation for all of the USGS hydrographs and FEMA high water marks in the Calcasieu Lake and Grand Chenier marsh transects to develop an understanding of the variation in inland response to the same surge at the coast (**Figure 9.5**). Data from the Grand Chenier marsh transect yielded a statistically significant linear relationship between the surge maxima and distance from the coast. This rate was 1 foot for every 1.4 miles (0.71 ft/mile), or approximately twice the reduction traditionally applied by the USACE (1965) for levee design on the Louisiana coast (0.36 ft/mile).



**Figure 9.5. Relationship between maximum Rita surge and distance from the coast documented by USGS gages (squares) and FEMA high water marks from the Calcasieu Lake transect (triangles) and from the Grand Chenier marsh transect (diamonds). Surge was between 15 and 16 feet at the coast for both transects (McKee et al. 2007). The marsh transect yielded a statistically significant linear correlation indicating surge reduction at the rate of 1 foot for every 1.4 miles of marsh. The original USACE (1965) estimate of 1 foot for every 2.75 miles is also shown for comparison.**

# CHAPTER 9
# NEED FOR INSTITUTIONAL REFORM

Over the course of the past year, the USACE has produced in the *Robinson* litigation several million pages of documents relating to the history of the MRGO. These documents—most of which have never before been made public—include internal and external USACE communications, draft and final studies, and other writings memorializing the agency's planning, investigation, design, construction, operation, and maintenance of the MRGO navigable waterway as well as the record of the Corps's mounting knowledge over time of the risk of flooding or EBSB failure caused by the adverse effects created by the MRGO. From this repository, over 130,000 documents were culled and reviewed, and a subset has been further selected because of the light that they shed on the USACE organizational treatment of these issues.

I have read more than my share of these documents to gain an understanding of how the USACE "managed" the threat to life, property and the environment posed by the MRGO and have made use of an invaluable MRGO chronology that I attach as an appendix to this report (Appendix B). This timeline summarizes information contained in the referenced documents as it relates to milestone events and acknowledgement of, and response to knowledge about, adverse effects created by the MRGO, including the funnel, loss of wetlands, and erosion and widening of the channel. While the listing of documents is not exhaustive, the contents provide remarkable insights into how and why the MRGO disaster happened, how it could have been avoided, and, perhaps most important, how we can prevent another repeat. The Corps got so entrenched in the habit of fending off reasonable queries about the MRGO after Hurricane that they fooled even themselves.

Long Time Awareness of Risks Posed by the MRGO
The history of the MRGO is characterized by a stubborn unwillingness on the part of Corps—to acknowledge, much less seek to ameliorate, the growing body of data indicating that the channel posed a serious threat of flooding the neighboring communities along Reaches 1 and 2 and the IHNC.

- Beginning in the mid-1950s, the Corps was well aware that the construction of the MRGO—as designed to cut through 43 miles of marshland and break the natural barrier at Bayou LaLoutre separating fresh/brackish water from salt water—would result in the intrusion of salt water from the Gulf of Mexico and the death of the Central Wetlands Unit in the upper region of Reach 2. Nevertheless, the USACE ignored the entreaties of the U.S. Fish and Wildlife Service and Louisiana Wild Life and Fisheries to delay construction and allow further environmental studies. The predictable, tragic result—as documented in scores of USACE documents over a half century—was the destruction of tens of thousands of acres of storm-surge buffering wetlands. If these wetlands had not been destroyed, Greater New Orleans would not have been catastrophically flooded.

185

- Similarly, as early as 1966 immediately after Hurricane Betsy, the Corps was told that the MRGO created a storm surge enhancing "funnel" effect by joining Reach 2 at the GIWW/Reach 1 and a surge barrier was recommended. The USACE dismissed the concern—as it did again in 1969 and 1973. And as noted earlier, the NESCO study contained significant information about Hurricane Betsy and storm surge that should have further alerted the Corps about the risk of funneling. The solutions recommended to the Corps in 1966, 1969, and 1973 were feasible and would have prevented the propagation of enhanced surge through Reach1/GIWW into the IHNC and the failure of the floodwalls along the IHNC. Indeed, the Corps is now proposing a surge barrier across the mouth of the funnel—the very recommendation rejected by the USACE over 40 years earlier.

- Even before the first dredging began in the process that ultimately decimated so many acres of swamp and marsh in the Lake Borgne funnel, the USACE acknowledged that the channel's banks would erode and widen due to the lack of any armoring or other protection from ship wakes. Over time, the Corps chronicled the ever-widening channel, documenting the further killing of tens of thousands of acres of wetlands and lamenting the increased cost of continuous dredging. Meanwhile, as the channel's width grew from the Congressionally-authorized 650 feet to 2,000 feet and in some places even wider, the dredged material was not used until recently to effectively restore or protect the adjacent marshes, further accelerating the MRGO's decimation of the protective cypress swamps and other vegetation.

The Team Louisiana (2007) forensics team, of which I was a part, acknowledged the USACE's consistent refusal to take any remedial action with respect to these well known dangerous conditions caused by the MRGO.

> "The MRGO and GIWW channels provide efficient conduits to funnel surge into the heart of New Orleans. As a result, surge elevations peaked in Lake Borgne and the IHNC at nearly the same time, and at higher levels relative to levee and floodwall crowns than would have been true if the MRGO did not exist and had not caused so much wetland loss. The effect of these federally constructed and operated channels on surge and waves has consistently been underestimated by the USACE from before Hurricane Betsy right through to the recent IPET report, as has the effect of accelerated wetland loss in the funnel area. One consequence of *this institutional "blind spot"* was that a hurricane barrier of the type proposed in the original pre-1980s HPS for the other two main passes into Lake Pontchartrain was never even considered for the MRGO. (Team Louisiana, p. 223) (emphasis added).

This "institutional blind spot" is starkly evident as one reads the USACE documents referenced in the MRGO Chronology. What is most noteworthy is that the Corps's inveterate response was to undertake study after study that updated its knowledge about

the problems, studied possible solutions, and weighed alternatives. But the agency never took any decisive action to recommend to Congress necessary changes in the MRGO and remediation of its adverse effects. The Corps simply did nothing.

By no later than 1988 (and likely much earlier), the Corps had identified the interrelationship between the loss of wetlands and bank erosion and the threat to life and property. As the 1988 *Corps Erosion Report* detailed, there was a need to study potential benefits of completely closing MRGO. Indeed, the Army Corps' Lower Mississippi Valley Division ("LMVD"), to which the New Orleans District reported, suggested prophetically:

> [A complete closure]…will control all future channel maintenance problems by controlling bank erosion, prevent[] the associated biological resources problem…[and] *reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up [MRGO]* . . . .

LMVD Comments to the *Corps Erosion Report*, at 1 (emphasis added).

Tragically, the USACE ignored its own predictions that the MRGO would in fact serve as a storm surge delivery system aimed at the heart of Greater New Orleans.

Twelve years later, the Corps participated in a multi-agency review of the MRGO and endorsed the unanimous recommendation that the MRGO be closed. (Mississippi River-Gulf Outlet (MRGO) Task Force, Report of Findings (2000)). Rather than submit a recommendation to Congress, however, the Corps insisted that it had to study the issue further and that it was the only entity that could make a formal proposal for closure to Congress. Like it had always had done in the past, the agency delayed and delayed its study and never reached a definitive conclusion. When Hurricane Katrina hit on August 29, 2005, the USACE had still not completed its evaluation—and the draft still did not recommend closure. Indeed, in its reevaluation study issued shortly after the hurricane destroyed the nation's 35th largest city, the Corps still maintained that the MRGO should remain open.

The MRGO Chronology reveals that at no time prior to Hurricane Katrina did the USACE ever recommend to Congress a plan to mitigate or eliminate the risk of flooding posed by the MRGO, whether the recommendation was complete closure or some prophylactic measures to retard bank erosion and protect banks from wave action of ships and storms, prevent wetlands destruction, restore wetlands to their pre-1958 condition, and/or to prevent enhanced surge, waves, and current from the funnel effect. For a half century, the consistent course of action was no action—despite detailed institutional knowledge decades before Hurricane Katrina that the MRGO, in the Corps's own words in 1988, posed a possible threat "of catastrophic damage to urban areas by a hurricane surge coming up [MRGO] . . . ."

187

Failure to Heed Specific and Mounting Warnings About Flood Risks

As much as anything else, this is a record of disregard of public safety that is unimaginable given the wealth of knowledge and expertise possessed by the USACE and the known potential hazard of introducing a major body of water susceptible of transporting storm surge into a major metropolitan area from the Gulf of Mexico. As previously noted, the Corps adopted early in the life of the MRGO (in 1973) a party line—the "unitive statement"—to reject any suggestions (even from respected experts like Dr. Sherwood Gagliano who had been a USACE consultant on the MRGO) that the MRGO's design created a funnel for transmitting deadly storm surge down Reach 1/GIWW and into the IHNC, just as had occurred during Hurricane Betsy. (CEI 1973) The Corps would not be swayed by objective scientific facts or empirical data on this or any other issue relating to the MRGO.

This was only one of many warnings that the Corps received—from its own employees and outsiders—over the life of the project about the substantial risk of flooding caused by the MRGO. The following is a sampling of other alarm bells that went unheeded:

*It is well documented that before MRGO construction began, the USACE was warned in detail by the U.S. Fish and Wildlife Service that the MRGO would destroy the sensitive ecosystem along its channel by the construction itself as well as the intrusion of salt water from the Gulf of Mexico. The document—entitled *An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies* (April 1958) (the "*Fish & Wildlife Report*")—predicted the very environmental disaster that the MRGO would inflict on the region of the Central Wetlands Unit.

*In the same vein, the Louisiana Department of Wildlife and Fisheries, or its predecessor also predicted before groundbreaking that the MRGO would adversely affect the local wetlands and urged further study.

* The St. Bernard Police Jury passed a resolution in April 1958 opposing the MRGO channel, stating that "[d]uring the times of hurricane conditions the existence of the channel will be an enormous danger to the heavily populated areas of the parish." This resolution was preceded by the 1957 Tidewater Advisory Committee report (referenced earlier) predicting that the MRGO would destroy the wetlands and cause catastrophic flooding.

*In September 1965, Hurricane Betsy flooded New Orleans East, St. Bernard Parish, and the Lower Ninth Ward. As noted earlier in my report, valuable lessons about the effect of the MRGO on propagating storm surge were not factored into the design of the LPV flood protection system.

*In 1970, Louisiana coastal scientist, Dr. Sherwood Gagliano, warned the Army Corps that the disappearing wetlands just east of MRGO would intensify storm surges and create "deathtraps."

188

*In its 1976 Environmental Impact Statement for the MRGO, the USACE acknowledged the rapid decimation of the wetlands and bank erosion.

*In October 1988, National Hurricane Center Director Jerry Jarrell depicted a scenario concerning a Category 4 or 5 hurricane that, after destroying islands in the Caribbean and parts of Florida, intensifies over the Gulf of Mexico and "assail[s] New Orleans with a storm surge that overwhelms the city's levee system."

*In the fall of 1988, the St. Bernard Parish Council unanimously adopted another resolution urging closure of the MRGO because it constituted a threat to public health and safety.

*In 1988, in its *MRGO Bank Erosion Reconnaissance* Report which as noted earlier recognized the threat "*of catastrophic damage to urban areas by a hurricane surge coming up [the MRGO,*" the Corps admitted that the MRGO had accelerated the "loss of marshes, ridges, bayous, ponds, aquatic grass beds and shorelines needed for the Lake Borgne, Lake Pontchartrain and Breton Sound statuaries." The same Corps study characterized MRGO as one of the eight areas in south Louisiana where "erosion stabilization measures are urgently needed."

*In 1994, the Corps completed its *MRGO Bank Erosion Reconnaissance Report* that detailed the already well documented phenomenon of the widening of the Reach 2 channel and loss of tens of thousands of acres of wetlands.

*Six years before Katrina, the *Times-Picayune* summarized a consensus of expert and lay opinion about the MRGO:

> But the [MRGO] has not fulfilled its earlier promise of bringing port-related development along it in St. Bernard parish. It has instead become an environmental and economic disaster. Its original width was to be 500 feet, but it has eroded in some places to 2,000 feet. It has changed the salinity of the marsh, leading to further erosion and ruining oyster beds. *But worse it has threatened lives, acting as a pathway for hurricane storm surges and even surges from storms short of hurricane force*.

Editorial, "Light at the End of the Channel," *Times-Picayune*, June 1, 1999, at B-6 (emphasis added).

*In 2000, the Corps acknowledged MRGO's shortcomings and endorsed a coastal restoration plan calling for the canal's eventual closure. Bending under pressure, however, the Army Corps did not move forward to recommend to Congress closing the MRGO, instead initiating a reevaluation study to assess (once again) the environmental and economic implications of closing the channel or keeping it open. Safety concerns were once again conspicuously ignored.

*In his book *Holding Back The Sea: The Struggle for American's Natural Legacy on the Gulf Coast* (Harper Collins, 2001), Christopher Hallowell warned (and the Corps already knew) that "erosion from ships and storms has gouged it [the MRGO] 2,000 feet wide and made it a freeway to New Orleans for any hurricane that happens to come from the right direction . . . . The surrounding marsh, now vulnerable to storms and salt water, has all but died as a result, along with 40,000 acres of mature cypress trees. Now, storm surges can invade the marsh through the straight arrow channel and smash into New Orleans."

*In October 2001, *Scientific American* magazine published "Drowning New Orleans" that predicted "[a] major hurricane could swamp New Orleans under 20 feet of water, killing thousands. Human activities along the Mississippi River have dramatically increased the risk, and now only massive reengineering of southeastern Louisiana can save the city."

*Another forewarning of the MRGO's imminent dangers came from proponents of the outlet's closing. In June 2002, the critics described MRGO as "a shotgun pointed straight at New Orleans should a major hurricane approach from that angle."

*In June 2002, Corps acknowledged that its own safety estimates of MRGO— created in the 1960s with tools that are low-tech and unsophisticated by modern standards—are antiquated and unreliable. Local engineer Lee Butler estimated the risk of MRGO overtopping in St. Bernard Parish may be double the Army Corps' original estimates. In addition, the Army Corps agreed that MRGO is a "weak spot" and more likely to be affected by a hurricane storm surge than other areas because of its proximity to the Gulf of Mexico.

*In July 2004, Hurricane Pam—a federally-funded hurricane simulation drill conducted by an LSU team of which I was a member—prophetically concluded that surges from a Category 3 hurricane would be "funneled" by the MRGO, flooding surrounding areas and killing tens of thousands of people in Greater New Orleans.

*In October 2004, the Louisiana Legislature passed a resolution urging closure of the MRGO and immediate implementation of remedial measures to address the risk posed by the MRGO and "more drastic tidal surges and more prolonged flooding as a result of tropical storms and hurricane."

*In May 2005, a hydrodynamic model from LSU's Hurricane Center further exposed MRGO as a "superhighway for storm surge" and predicted that a "funnel" created by MRGO could amplify storm surges by 20 to 40 percent.

All of this evidence—and much more in the record—shows that Hurricane Katrina and its devastating aftermath were clearly foreseeable and foreseen events to the Corps. It cannot be seriously disputed that the USACE before 1958 had actual notice that the construction of the MRGO would destroy the storm surge buffering wetlands and sustain

significant bank erosion from lack of shore protection. Likewise, the Corps should have known (because coastal engineers around the world knew) that the design of the MRGO—the geometry of creating a funnel at the Reach 2 and Reach 1/GIWW confluence—would exacerbate a hurricane's power and destructive effect on the local population and property. Similarly, before construction, the Corps—based on its experience in designing and operating other waterways—knew or should have known that the unarmored banks of the MRGO need to be armored to avoid inevitable erosion from ship waves.

Even if the Corps did not appreciate the potential for these adverse effects in the planning and design stage, it acquired information throughout the operation and maintenance of the MRGO—both from its own personnel and civilian engineers and coastal scientists—that the waterway posed a significant risk of accentuating storm surge during a hurricane. Unfortunately, such notice was ignored, and no corrective action was ever recommended to Congress before Hurricane Katrina. Nor was the LPV—40 years in the making and still incomplete—ever designed or redesigned to take into account the need for added safety margins because of the MRGO.

Mission Myopia
The question that I continue to ask is "How could this situation have persisted for so long?"

I think the answer lies in the USACE's shortsightedness about its role and responsibility for correcting the serious hazards that it created in placing a deep channel with direct access to the Gulf of Mexico into a major metropolitan area. As discussed in the next section, the failures here also stem from a stunning failure of leadership and vision.

The record shows that the USACE had a chronic myopia about its mission with regard to the waterway. Time and time again, the Corps indicated that its sole responsibility was to maintain the channel so that it could be used by deep draft vessels. That entailed a continuous dredging and maintenance program because of the Corps's decision not to armor the banks and the resulting soil erosion from ship wakes and periodic storms.

Actions taken (or more accurately, not taken) by the Corps reflect this tunnel vision. Despite knowing from the outset that the MRGO would destroy the storm surge buffering wetlands, no remedial program was ever undertaken. The agency perceived that its sole responsibility was keeping the channel open.

Corps officials did not view protection of the environment as part of its primary mission at the outset, but this should have changed a long time ago. While the loss of the wetlands from the MRGO construction and ongoing operation and maintenance was well documented and maybe even regreted, the agency did not consider itself obligated to fix the problem. In other words, the USACE knew that it created a bad situation and by 1988 had acknowledged the nexus between loss of wetlands and potentially disastrous hurricane surge flooding Greater New Orleans. Nevertheless, the Corps never exhibited any sense of urgency to develop a comprehensive set of policy recommendations for

Congress to authorize funding for ameliorating these defects. The Corps's left hand was regularly reporting the burgeoning ecological disaster, while its right hand slavishly persisted in the fiction that making the channel safe for shipping was its only priority.

The Corps also had a narrow view of its constituency. The agency showed concern only for what it termed its "customers"—the Port of New Orleans, shipping, dredging, and pilot boat interests. These were the commercial sectors that had successfully lobbied for the MRGO's creation, and they were the lobbies that kept the Corps in the navigable waterway business.

At the same time that they sought to accommodate shipping interests in a channel in which that group gradually lost interest, the Corps turned a deaf ear to the crescendo of public, local government, and expert voices sounding the alarm about the potential for catastrophic flooding and calling for closure or remediation of the MRGO. The St. Bernard local government—from the Tidewater Advisory Committee's prescient report that I quote in Chapter 2 in 1957 to its numerous commissioned expert reports by Dr. Sherwood Gagliano and others to the resolution urging closure in 2004—continuously monitored the MRGO and documented for the Corps the escalating risk of catastrophic flooding from the loss of wetlands, bank erosion, and the funnel effect. The concerns of other federal and state agencies and respected scientists and scholars were likewise ignored. Public safety was simply not a factor in the Corps's decision-making calculus.

A Failure of Leadership
The roots of this catastrophe can also be directly traced to a monumental failure of leadership. As noted earlier, at the same time that the USACE was planning the MRGO, it was planning the LPV in an effort to give Greater New Orleans an added measure of hurricane flood protection. In other words, the same agency—with the same leadership in New Orleans, Vicksburg, and Washington, D.C.—was making critical decisions about fundamental engineering and scientific issues affecting the welfare of the residents. Over the intervening half century between the authorization of the MRGO in 1956 and Hurricane Katrina, the same Corps senior management would be responsible for dealing with (or more accurately, ignoring) the known flood risks posed by the MRGO.

Much post-Katrina attention has been focused on the deficiencies in the USACE decision-making process with respect to the planning, design, construction, and operation of the LPV and the reasons for the catastrophic failure of the levees. Douglas Woolley and Leonard Shabman recently prepared a Decision-Making Chronology for the Lake Pontchartrain & Vicinity Hurricane Protection Project: Final Report for the Headquarters, U.S. Army Corps of Engineers Submitted to the Institute for Water Resources of the U.S. Army Corps of Engineers (March 2008) ("LPV Decision-Making Chronology") that sheds some light, though it studiously avoids mentioning the MRGO. The authors gained valuable insights into the processes by which the Corps gains and shares knowledge, evaluates alternatives, and implements its decisions. The authors found that the Corps proceeded with the LPV as originally planned despite knowing that it was using inappropriate technical data and assumptions such as continuing to plan on the basis of outdated datum benchmarks for levee crown elevations and outmoded Standard Project

192

Hurricane parameters. Many of the same patterns emerged for me in my study of the MRGO record Woolley and Shabman write:

> "Project construction was not yet underway when significant project design changes were requested and approved following Hurricane Betsy. At that time, the increase in project costs associated with the design change might have appeared readily affordable to project sponsors, and the change involved virtually no delay in project implementation.
>
> In later years, however, the accommodation of new information in project design and construction would have required adjustments to ongoing construction activities as well as retrofitting project features that had already been constructed. Such changes would have significantly increased project costs and implementation delays at a time when local concerns about project costs and urgency for project protection were paramount, and a stagnant Corps construction general budget had to be spread among competing priorities. It was in the context of a history of local sponsors' frustrations over project delays and costs, federal and local budget limits, and increasing scrutiny of water project investment proposals at the Washington, DC level, that new information suggesting the need for project reevaluation and redesign that might take years to analyze and get approved was either put aside for later consideration (e.g., the 1985 datum benchmark decision), or subjected to further study (e.g., the decision to refine the ADCIRC surge model before applying it for project reevaluation) (see Chapter 6)."

This pattern of deferring hard choices by engaging in "further study" is a recurring institutional response to problems not only with regard to the LPV but also the MRGO. The Corps conducted numerous reconnaissance, evaluation, and reevaluation studies with regard to the MRGO's glaring defects. Like the LPV, until the final report on MRGO closure issued last year, however, there was never a resolution and a recommendation to Congress to deviate from the originally authorized plan.

Woolley and Shabman also found that the USACE lacked any organizational systems to monitor and reassess whether program objectives were being realized in light of changed circumstances or new information.

> "The District was not expected to routinely track and as needed revisit—using whatever tools were available at the time—the ability of the project to provide the authorized degree of protection as new information became available. The absence of a standing, agency-wide process for continuing assessment and reporting of project performance capability left the District to make its own determination as to whether the analytical foundation was adequate for requesting changes to project designs, and for satisfying higher federal authorities and local sponsors that additional project funding was warranted" (see Chapter 6).

193

The same was true with regard to the MRGO. There does not appear to have been any centralized responsibility within the USACE for determining whether the agency should seek Congressional authorization and funding for remedying known defects with regard to the MRGO. While the Corps was able to monitor its dredging costs and make annual appropriations requests for routine and emergency funding for maintaining the channel, no similar institutional focus ever materialized as to recommending a comprehensive plan to Congress before Hurricane Katrina.

The LPV Decision-Making Chronology also criticizes the Corps for how it communicated flooding risk and the LPV's level of protection to the stakeholders. *Id.* at ES-19. This failing is magnified many times with respect to the MRGO and the agency's persistent claim—based on its "unitive statement"—that the channel had not been during Hurricane Betsy, and would not be in the future, a source of enhances hurricane storm surge. Certainly, by 1988 if not much earlier, the Corps knew that the destruction of the wetlands and widening of the channel posed a serious threat of catastrophic flooding. This ostrich-like approach to its duty to warn and remediate was a critical factor in the tragedy of Hurricane Katrina.

There is a broad consensus about the failure of leadership by the Corps in protecting New Orleans and St. Bernard Parish. In his earlier-referenced decision dismissing the lawsuits against the USACE for faulty levees along the 17th Street and London Avenue Canals, Judge Stanwood Duval, Jr., in summarizing the evidence, criticized the Corps for its "monumental miscalculations," "gross incompetence," "egregious myopia," and "catastrophic failure . . . to fulfill its mission" by constructing seriously flawed levees that set the stage for the calamity that engulfed 80% of the region. "This story—fifty years in the making—is heart-wrenching."

The same can be said with respect to the MRGO. Tragically, the same Corps officials who egregiously mismanaged the LPV were also derelict in their duty to protect the public and property from the long-known defects of its waterway. There can be no justification for the USACE failing to take corrective action to prevent the MRGO from becoming a major cause of the catastrophic flooding of St. Bernard Parish, New Orleans East, and the Lower Ninth Ward.

Final Thoughts

For over five decades, the USACE's stewardship over the MRGO—amidst the mounting evidence of its adverse effects on the environment and the potential for greatly enhanced storm surge leading to catastrophic flooding—can best be described as one of studied indifference to long-recognized threats to life, property and the environment. Consistently, the Corps preferred the interests of its commercial constituency—its "customers"—over those of the hundreds of thousands of local residents put in harm's way by the MRGO. This "keep the channel open at all costs" mindset never calculated (or appreciated) the costs in human life, property, and the environment from cataclysmic flooding that the agency long knew could happen because of the MRGO.

Throughout this half century, the Corps conducted numerous studies of the channel's adverse effects. However, it never reached a definitive conclusion or recommendation for any plan of action until more than two years after Hurricane Katrina devastated Greater New Orleans. Indeed, at no time before the catastrophic flooding did the Corps weigh alternatives, balance the social, financial, and political considerations in favor of and against each potential course of action, evaluate the risk to people and property, *and* make a recommendation to Congress in the exercise of its policy-making judgment about the preferable course of action with respect to the MRGO's defects.

Only in late 2007—more than two years after Hurricane Katrina—did the Corps actually exercise its judgment and recommend to Congress the MRGO's closure and one remediation measure to construct a barrier at Bayou La Loutre to prevent further intrusion of salt water from the Gulf of Mexico. Even then, the Corps did not acknowledge the MRGO's contribution to the severe flooding during Hurricane Katrina and its continuing danger; nor did the USACE recommend as elements of its plan essential remedial steps for ecosystem restoration and prevention of storm surge along Reach 1, Reach 2, and the IHNC. In typical fashion, the agency continues to study these issues to the present day.

# CHAPTER 10
# CONCLUSIONS

The Government takes the position that the Mississippi River Gulf Outlet navigation project (MRGO) had no effect on the catastrophic flooding of Greater New Orleans during Hurricane Katrina. Our analyses show that the Government is incorrect. It is my opinion that the MRGO navigation project:

(1) created a funnel, the dangerous convergence of channels and spoil disposal areas, later augmented by addition of the Lake Pontchartrain & Vicinity (LPV) berms east of New Orleans, and by the subtraction of buffering wetlands, that foreseeably amplified the threat posed by hurricane surge to the Greater New Orleans area; and

(2) greatly enlarged the original Gulf Intracoastal Waterway (GIWW) connection between the throat of the funnel and the IHNC (MRGO Reach 1), which foreseeably increased surge transmission into the city earlier, adding to the height and duration of surge experienced in the IHNC during Katrina and contributing to the early failure of floodwalls and levees adjacent to the IHNC; and

(3) created a Reach 2 channel with unstable side slopes that caused it to predictably expand over time, reducing the natural marsh buffer that previously separated it from Lake Borgne and from the adjacent LPV berms, thereby compromising foreshore protection fort the man-made surge protection elements and hastening the onset of damaging wave action on these delicate structures (EBSBs) so that they breached earlier in the storm sequence; and

(4) created a channel in Reach 2 that predictably exposed freshwater swamps and marshes within the Lake Borgne funnel to increased salinity, accelerating their conversion to open water and thereby reducing the wetland surge and wave buffer between Lake Borgne and populated areas; and

(5) was a substantial contributing factor to the catastrophic flooding of the Robinson plaintiffs' homes and communities.

In addition, throughout the history of the MRGO project, up to the time of Hurricane Katrina, the U.S. Army Corps of Engineers (USACE or Corps), in my opinion, has continuously adopted a policy of denial and deliberate disregard of well documented adverse effects of the channel, most of which were known or suspected prior to construction and others that became apparent later, soon thereafter ensuring that a real threat for flooding during hurricanes remained unaddressed for five decades. Throughout this period, the USACE issued increasingly soothing but inaccurate statements to two generations of New Orleans and St. Bernard residents that they were well protected and that the MRGO project posed no hazard to their lives or property.

Furthermore, this approach is much the same today, in my opinion, coloring the conclusions of the Corps sponsored investigations that have followed Katrina, and the

nature of solutions that have been proposed. This, in particular, includes an obdurate unwillingness to provide wave protection to the hastily rebuilt berms that parallel MRGO Reach 2 despite overwhelming evidence that they were largely destroyed by waves. Today, the Corps still refuses to acknowledge, in the face of compelling scientific evidence, that the MRGO project was a significant cause of the early and catastrophic flooding of the Upper and Lower 9th Ward, St. Bernard Parish and New Orleans East during Hurricane Katrina.

Ultimately, the extent of damage and the harm caused by the flooding of St. Bernard and the Lower 9th Ward through the MRGO was not significantly reduced by the LPV berms and floodwalls. The structures that Dr. Bea has described as "earthen berm/spoil banks" (EBSBs) (to differentiate them from properly engineered coastal defense dykes) along MRGO Reach 2 served merely as "speed bumps" that were swept aside during Katrina by the surge and waves generated in, and transmitted by the MRGO channel. Most of the flooding of the Lower 9th Ward and New Orleans East, as well as a significant portion of the early flooding of the Orleans Metro area, is attributable to the enlarged cross-section of MRGO Reach 1.

Finally, I believe that the USACE, and certainly the larger oceanographic community, possessed a knowledge base prior to the construction of the MRGO project, and certainly after the Betsy disaster, that should have led to actions to tightly integrate the MRGO economic development project with the LPV public safety project, and thereby reduce or eliminate the added and substantial hazards uniquely posed by the ship channel. Instead, with regard to this particular project and, significantly, not in all comparable cases around the country, the Corps adopted a policy of institutional denial that stymied efforts of local leaders, engineers and scientists to address critical, long-known deficiencies that were fully manifested during the Katrina event. My reading of the record indicates that certainly by 1988, if not earlier, the Corps knew about the nexus between many of the deficiencies noted above and the likelihood of catastrophic flooding. Nevertheless, before Hurricane Katrina, the Corps never completed any study recommending a plan to Congress to mitigate known hazards. The storm has provided an opportunity for new leadership at the Corps to mobilize all of the authority, resources and expertise that it has been given by Congress to mitigate the damage that the MRGO has caused. We are still waiting.

**APPENDIX A**

**QUALIFICATIONS OF DR. G. PAUL KEMP**

I, G. Paul Kemp, declare as follows:

1.  I am a coastal geologist and oceanographer living in Baton Rouge, Louisiana. I have been employed since February 2007 as Vice-President of the Gulf Coast Initiative of the National Audubon Society, a 100 year old conservation organization headquartered in New York City. Prior to holding this position, I had been an Associate Professor, Research, and Director of the Natural Systems Modeling Group (NSMG) at the Louisiana State University (LSU) School of the Coast and Environment for twelve years. I received a B.S. degree in 1975 from Cornell University in Ithaca, New York, and I was awarded M.S. (1978) and Ph.D. (1986) degrees from the LSU Department of Marine Sciences, now the Department of Oceanography and Coastal Sciences, and from the Coastal Studies Institute at Louisiana State University. The opinions given here are my own and should not be construed as positions held by LSU or the National Audubon Society.

2.  I submit this declaration on behalf of Plaintiffs Norman Robinson, Kent Lattimore, Lattimore & Associates, Tanya Smith, Anthony Franz, Jr., and Lucille Franz in *Robinson v. United States*, Case No. Civ. 06-2268 (SRD). I reserve the right to amend and supplement my Declaration when and if additional information is acquired as a result of the production of documents by the U.S. Army Corps of Engineers ("USACE").

3.  This Declaration is submitted to address: (a) the effect of the design, construction, and maintenance of the Mississippi River Gulf Outlet ("MR-GO") on the storm surge and waves that occurred during Hurricane Katrina ("Katrina"); and (b) the