GO101608

```
                                                              1


 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4   IN RE: KATRINA CANAL BREACHES    * CIVIL ACTION
     CONSOLIDATED LITIGATION          * NO. 05-4182
 5                                    * Consolidated
     PERTAINS TO:                     * SECTION K(2)
 6                                    *
     MRGO, ROBINSON                   * JUDGE DUVAL
 7   (No. 06-2268)                    *
                                      * MAG. WILKINSON
 8                                    *
     * * * * * * * * * * * * * * **

 9

10

11

12

13            Videotaped Deposition of UNITED

14   STATES OF AMERICA, BY AND THROUGH THE UNITED

15   STATES ARMY CORPS OF ENGINEERS, through its

16   designee, GIB A. OWEN, taken in the

17   above-entitled cause, pursuant to the

18   following stipulation, before Dawn H. Hymel,

19   Certified Court Reporter, at the U.S. Army

20   Corps of Engineers, 7400 Leake Avenue, New

21   Orleans, Louisiana, on Thursday, the 16th of

22   October, 2008, commencing at 10:10 a.m.

23

24

25
```

G0101608

10  A.   The -- I mean, we will be building the
11  barrier.  Now, we will be restoring marsh or
12  whatever as part of our mitigation efforts for
13  what we destroy, but that's not -- It's
14  strictly a mitigation effort.  It's not --
15  It's not an ecosystem restoration effort.
16  Q.   I understand that.  So a more
17  comprehensive ecosystem restoration is not
18  part of this budget?
19  A.   That's correct.
20  Q.   There's other projects underway or
21  studies, I understand it, the LCA project, for
22  example, and others, that are focusing on that
23  effort?
24  A.   That's correct.
25  Q.   Okay.  Fine.  You said that the final

41

1   constructed barrier will be approximately 24
2   to 26 feet high because the modeling showed
3   that that would be appropriate in the event of
4   a 100-year event, correct?
5   A.   That -- That is my understanding, yes,
6   sir.
7   Q.   Okay.  What modeling was done to get to
8   that conclusion?
9   A.   I -- I do not know that.
10  Q.   Who did the modeling?
11  A.   I don't know for sure.  I would imagine

G0101608

20  A.  June of 2011.
21  Q.  So it spans a little more than four
22  years, right?
23  A.  Correct.
24  Q.  So the Corps believes that, that in a
25  little over four years from initial concept,

46

1   study process to actual completion and
2   providing the full protection is a process
3   that spans over four, a little over four
4   years?
5   A.  I did -- I didn't understand the question
6   in that one.  I'm sorry.
7   Q.  The project from, I'll assume its
8   earliest stages, maybe not the very earliest,
9   but its earliest stages in March 2007 to the
10  targeted completion of June '11 is a little
11  more than four years?
12  A.  Yes, sir.
13  Q.  At a cost slightly under 700 million
14  dollars?
15  A.  That -- That cost has actually risen
16  since then, but that was the initial cost
17  awarded.
18  Q.  It's risen since April 3, 2008, which
19  says -- which is on Page 2 of -- Page 1 of
20  Exhibit 1 indicates what the date issued was?
21  A.  Yes, sir.

G0101608

22  Q.  How much?
23  A.  I believe --
24  Q.  I'm sorry.  Go ahead.
25  A.  I believe in the Tier 2 document we talk

47

1   about it being 822 million, and that, that
2   number may still continue to change.  It's a
3   cost -- It's a cost plus contract.
4   Q.  We better hurry up and get this sucker
5   built, right?
6   A.  We're -- We're working on it.
7   Q.  Okay.  That's only a fraction of the 700
8   billion bailout, so I wouldn't worry too much
9   about it, but --
10      The -- Okay.  So we have a slightly more
11  than four year process going on here.  Let's
12  go through the criteria.  The first one you
13  identified, sir, was, I believe, risk and
14  reliability?
15  A.  That's correct.
16  Q.  What does that generally entail?
17  A.  It would generally entail trying to
18  ascertain some kind of, of idea of what the
19  risk of a structure would be.  You know, is it
20  a mile long or is it ten miles long?  How many
21  openings would it have?  And then tied with
22  that is the reliability of it.  You know, is a
23  levee stronger than a floodwall?  Is a gate

G0101608

3   A.   Right.
4   Q.   So one of the goals in erecting this
5   surge protection barrier in the location it's
6   being constructed is to reduce or minimize the
7   surge that could impact levees along the IHNC
8   in the event of a hurricane
9   A.   Yes, sir.  I mean, the goal, the goal of
10  the barrier is to keep water out, entirely out
11  of that area --
12  Q.   Right.
13  A.   -- during an event.
14  Q.   So -- So the water would stay essentially
15  at a very low and nonthreatening level?
16  A.   Correct.  You would have -- You'd have
17  whatever came from your rainwater or your --
18  any of the pumping stations filling up that
19  basin, but not, not from the surge.
20  Q.   But not a dramatic increase like occurred
21  during Katrina, correct?
22  A.   Correct.
23  Q.   Fair.  Okay.  Good.  Then I want to focus
24  on the paragraph below Figure 3 (sic).  I'll
25  break it up a little bit.  IPET states, quote,

69

1   to prevent storm surge in Lake Borgne from
2   influencing the water levels experienced in
3   the IHNC or GIWW/MRGO sections of waterway,
4   flow through Reach 1 channel must be

Page 64

G0101608

5   dramatically reduced or eliminated, either by
6   a permanent closure or some type of structure
7   that temporarily serves to eliminate this
8   hydraulic connectivity.  The presence of an
9   open channel is the key factor.
10      Do you see that?
11  A.  Yes, sir.
12  Q.  So what is now being constructed by the
13  Corps as depicted on Exhibit 1, the IHNC surge
14  reduction barrier, is, in fact, that type of a
15  structure recommended by IPET?
16  A.  It is what we are recommending.  I mean,
17  it's not under construction yet because it
18  hasn't -- there hasn't been a final decision
19  by the Colonel, but you are correct, I mean,
20  that would be meeting what they are
21  referencing.
22  Q.  Assuming -- Assuming the Colonel approves
23  what's been recommended at sometime, and given
24  the fact that the design-build contract is
25  awarded, I assume, depending on that

70

1   determination, the barrier that's going to be
2   constructed is the kind of barrier recommended
3   by IPET?
4   A.  It would appear so.
5   Q.  Okay.  It goes on to say, the hyd --
6   Again, I'm on Page 135, Volume IV of Exhibit

G0101608

19  from the east tend to maximize the local
20  funneling effect.
21       Do you see that?
22       MS. GREIF:
23            A small, a small local increase.
24  A.   Yes.
25       MR. O'DONNELL:

77

1            What did I say?
2       MS. GREIF:
3            You just left out the word local.
4  BY MR. O'DONNELL:
5  Q.   Strong winds from the east tend to
6  maximize the local funneling effect.  And
7  yeah, it says, can lead to a small local
8  increase in surge amplitude.  I'm sorry.
9       Let's go back to the map, Exhibit 1.  The
10  funnel that's being described here is
11  generally the V that comes together at the
12  GIWW just to the west of where the dotted line
13  is?  Is that the funnel?
14  A.   It would actually be the entire levee on
15  the MRGO side and the entire levee on the
16  St. Bernard.
17  Q.   And so in terms of the funnel, we're
18  talking about, again, what we call the Bay of
19  Fundy effect, where a large volume of water
20  off of Lake Borgne gets reduced and

G0101608

21  concentrated into the smaller area there at
22  the confluence of the GIWW and Reach 2?
23  A.   That's correct.
24  Q.   Okay.  And I take it that the funneling
25  effect was taken into consideration in the

78

1   design and construction of the surge reduction
2   barrier for the IHNC?
3        MS. GREIF:
4             Objection.
5   A.   Yes, sir.  Of the five alternatives, they
6   all -- many of them had different elevations
7   they would be built due to that effect.
8   BY MR. O'DONNELL:
9   Q.   Okay.  And was the 24 to 26 foot
10  elevation the highest alternative studied?
11  A.   No, sir.  The ones farther to the west
12  had higher elevations.
13  Q.   And why was that?
14  A.   Because you're, you're narrowing it down
15  further and further each time.
16  Q.   Therefore, the surge amplitude is higher?
17  A.   Correct.
18  Q.   Right.  Again, confining it to a smaller
19  and smaller area?
20  A.   That's correct.
21  Q.   So the maximum, the most feasible, one of
22  the factors in terms of feasibility was

Page 73

G0101608
15  if we may.  3.2.1.1 under Hydrology, there is
16  a discussion of existing conditions, correct?
17  A.   Yes, sir.
18  Q.   And we see a discussion of paragraph two,
19  hydrological connection.  Let's go to the next
20  page, if you would.  Let's go to the paragraph
21  that begins on Page 36, modeling conducted by
22  IPET.
23       Do you see that?
24  A.   Yes, sir.
25  Q.   In the third sentence of this paragraph

91

1   it states, quote, the IPET models suggest that
2   the levees along the GIWW/MRGO can locally
3   enhance storm surge in this vicinity depending
4   on wind speed and direction, with strong winds
5   from the east tending to maximize the local
6   effect, and a citation.
7        Do you see that?
8   A.   Yes, sir.
9   Q.   However, the models also suggest that the
10  increase in storm surge amplitude due to this
11  effect is, is small.
12       Do you see that?
13  A.   Yes, sir.
14  Q.   And the next paragraph tells us, quote,
15  during major storm events, storm surges can
16  propagate north into Lake Borgne.

G0101608

17      That's presumably from the Gulf of
18 Mexico, right, sir?
19 A.   Yes, sir.
20 Q.   And then -- And are then redirected west,
21 converging into the IHNC and resulting in high
22 water levels and large waves.
23      Do you see that?
24 A.   Yes, sir.
25 Q.   And then the next, finally I find the

92

1  number, I've been waiting to find the number,
2  we got one, next sentence, observed peak water
3  levels in the IHNC during Hurricane Katrina
4  indicate a maximum water level gradient of
5  three feet between the intersection of the
6  GIWW and Lake Pontchartrain.
7       Do you see that?
8  A.   Yes, sir.
9  Q.   Does that mean that there was an increase
10 in water level of about three feet?
11 A.   I believe that's what it's saying.
12 Q.   Okay.  Then it says, also, model analyses
13 of conditions during that event suggests that
14 waves up to four feet high occurred within the
15 IHNC.
16      Do you see that?
17 A.   Yes, sir.
18 Q.   Now, if I do the math correctly, the

Page 86

G0101608

19  water level rises three feet, then on top of
20  that there's another four feet of waves,
21  correct?
22  A.   That is what that is basically saying,
23  yes, sir.
24  Q.   Okay.  Again, English major, but I think
25  four and three is seven, right?

93

1   A.   That -- That would have been if it all
2   occurred at the same time.  Your four foot
3   waves might not have occurred at the same time
4   you had a full three foot change in the
5   elevation.
6   Q.   Then again, there may have been
7   interludes when they did occur together,
8   right?
9   A.   It could have, yes.
10  Q.   Okay.  And we know that there was
11  overtopping along Reach 1 during Katrina,
12  correct?
13       MS. GREIF:
14            Objection.
15  A.   I'm not for sure, to be honest.
16  BY MR. O'DONNELL:
17  Q.   Do you know whether there was overtopping
18  along Reach 1 on any -- on the north or south
19  side during Katrina?
20  A.   Not -- Not that I know of.  I know we had

G0101608

21   the breaches that we discussed earlier, but

22   I'm not aware of the overtopping.

23   Q.   Do you know whether there was any

24   overtopping along the IHNC in the same -- in

25   the Lower Ninth Ward area during Katrina?

94

1   A.   I'm not aware of that.

2   Q.   There were two breaches on the east side

3   and two on the west side of the IHNC during

4   Katrina, correct?

5   A.   I think that's correct.  There were

6   breaches.  I think two, two and two was

7   correct, I believe.

8   Q.   Okay.

9       MR. HART:

10         Excuse me.

11   BY MR. O'DONNELL:

12   Q.   And on the eastern side they're sometimes

13   called the north breach and the south breach?

14   A.   I haven't heard it called that, but --

15       MR. HART:

16         Excuse me.  We need to go off the

17   record to change tapes.  This is the end of

18   Tape 1.  We're going off the record.

19         (Off-the-record discussion).

20       MR. HART:

21         This is the beginning of Tape 2.

22   We're back on the record.  Please continue.

G0101608

8   begins, surge modeling and flood risk
9   assessment.
10      Do you see that?
11  A.  Yes, sir.
12  Q.  And then there's a (USACE 2007e).  Can
13  you tell me what document that's referencing?
14  Oh, do I have to look at the back for
15  references?
16  A.  Yes, sir.
17  Q.  All right.  Let's do that.  USAC is, of
18  course, Army Corps, right?
19  A.  Yes, sir.
20  Q.  You go to Page 248, 2007e is described as
21  HPO Storm Protection Alternatives to Surge
22  Modeling Study, Draft Report.
23      Do you see that?
24  A.  Yes, sir.
25  Q.  Is that a public document

119

1   A.  I don't know, to be honest.
2   Q.  If a document is referenced in an
3   environmental document like this, does that
4   mean that it would be available to the public
5   upon request?
6   A.  I believe it, it typically would be, yes,
7   sir.
8   Q.  Okay.  Do you know who did this?  What
9   does HPO stand for?

G0101608

10  A.   That is, we call it, it's the Hurricane
11  Protection Office.  It's a -- It's a group
12  within our, the Corps of Engineers here at
13  this building that's working on certain
14  aspects of the hurricane system.
15  Q.   And they document their modeling results
16  in this 2000, 27 -- 2007e document, correct?
17  A.   Yes, sir.
18  Q.   Okay.  And then, let me read the whole
19  sentence, Page 52, surge modeling and flood
20  risk assessment of the project area, citing
21  (USACE 2007e), continuing, demonstrates that
22  surge height increase -- surge height
23  increases as it moves from east to west in the
24  Borgne complex, due to the narrowing of the
25  corridor between GIWW and the MRGO as it

120

1   approaches the IHNC, citing another Corps
2   study, 2008d, right?
3   A.   Yes, sir.
4   Q.   We go to Page 48, 248 again, the
5   reference section, we see that 2008d is a
6   document called Water Level Rise for Different
7   Lake Borgne Barrier Alignments.
8   A.   Yes, sir.
9   Q.   Is that also an internal Corps study?
10  A.   I couldn't tell you if it was done by the
11  Corps itself or done by a contractor.  I don't

```
                               G0101608
12    know.
13    Q.   But it's something the Corps used in this
14    analysis?
15    A.   Yes, sir.
16    Q.   And generally what that sentence I read
17    describes is the funneling effect of the
18    larger volume of water into the more narrow
19    corridor, right?
20    A.   Yes, sir.
21    Q.   Let's go, if you would, thank you, sir,
22    to Page 53 of the document, the next section,
23    and there we have something called, italicized
24    near the top of the page, Cumulative Impacts
25    to Hydrology.
```

121

```
1          Do you see that?
2     A.   Yes, sir.
3     Q.   And this seems to be some conclusions
4     that have been reached based on the modeling,
5     and let me read this sentence.  By providing a
6     storm surge barrier across the Golden Triangle
7     marsh, the incremental effect of the proposed
8     action, in combination with other projects in
9     the vicinity (discussed in section 4.0) would
10    significantly reduce the effect of surges from
11    extreme events up to the 100-year level and
12    beyond.
13         Do you see that?
```

Page 113

G0101608
14   A.   Yes, sir.
15   Q.   I take it that's considered beneficial,
16   right?  That's a good thing?
17   A.   Yes.
18   Q.   Next sentence, this would result in
19   further enhancement of the entire proposed
20   100-year hurricane and storm damage risk
21   reduction system throughout the area.
22        Do you see that?
23   A.   Yes, sir.
24   Q.   And again, the reference is on Page 248,
25   just so we keep the citation in our mind, the

122

1    citation is 2008b, and that is your prior
2    study of IER report #11, correct?
3    A.   Yes, sir.
4    Q.   Okay.  So would it be fair to say, from
5    the conclusion articulated, which I just read
6    under Cumulative Impacts to Hydrology here on
7    Page 53 of Exhibit 5, that the Corps has
8    concluded that the IHE -- IHNC storm surge
9    reduction barrier that we've been discussing
10   is an important and integral component to
11   improving flood protection for greater New
12   Orleans?
13   A.   Yes, sir.
14   Q.   Is there a sense of urgency in the Corps
15   in trying to get this project done from start

G0101608
16  to finish in a little over four years?
17       MS. GREIF:
18            Objection.
19  A.    Absolutely.  We're working under
20  emergency alternative arrangements.  You know,
21  we've set very aggressive schedules to get
22  these things done.
23  BY MR. O'DONNELL:
24  Q.    If you had not been working in an
25  emergency mode, how long would the planning

123

1   process alone have taken for a project like
2   this, in your experience, just the plannings
3   phase?
4   A.    If we did not have alternative
5   arrangements in place?  We would have been
6   writing an EIS for the entire Lake
7   Pontchartrain and vicinity project.  It would
8   have been probably, a minimum of probably
9   seven years.
10  Q.    Okay.  And then there would have been the
11  construction and implementation phase beyond
12  that, right?
13  A.    That's correct.
14  Q.    Okay.  So it would be fair to say that
15  this -- the storm surge reduction barrier
16  piece of the 100-year plan is done -- being
17  done with a sense of urgency and with unusual

G0101608
18  alacrity?
19  A.   I don't know what the word you just used
20  was.
21  Q.   Speed.
22  A.   Speed, yes, sir.
23  Q.   With an -- Speed.
24  A.   Yes, sir.
25  Q.   It's not all due deliberate speed, it's

124

1   let's get this thing done, it's important to
2   protecting the people of greater New Orleans?
3   A.   We are doing a deliberate approach, but
4   it is -- We're trying very hard to do it as
5   fast as possible.
6   Q.   Okay.  And one indicia of the fact that
7   you're working under exigent or urgent
8   circumstances is that you have issued a
9   design-build contract, correct?
10  A.   Correct.
11  Q.   Ordinarily, without exigent circumstances
12  such as you have here, you would have a
13  contract issued for a design, right?
14  A.   Possibly.  This -- This is the first
15  design-build project ever done by the Corps
16  for civil works, so it could possibly have
17  occurred under a normal situation, also.
18  Q.   So it's unprecedented?
19  A.   It is unprecedented.

Page 116

G0101608

24  Q.   You said under normal, normal, not
25  emergency circumstances, just the planning

127

1   process alone for this kind of a barrier might
2   take seven years?
3   A.   If we were writing a normal environmental
4   impact statement, I would, I would say on
5   average they probably take at least seven
6   years.
7   Q.   And then the construction of this would
8   take at least another number of years, right?
9   A.   Number of years, yes, sir.
10  Q.   But the process has been conflated, and I
11  don't mean that pejoratively, I'm happy you're
12  doing it, although I live in Los Angeles, the
13  process has been conflated for the entire
14  system, including the surge reduction barrier,
15  to a much shorter period of time, and in the
16  case of this barrier, about a four year plus
17  time?
18  A.   That's correct.
19       MR. O'DONNELL:
20           Why don't we take another break and
21  we'll move on to another area, and we're
22  making good progress and I still hope to honor
23  my goal of getting out of here within about an
24  hour from now.  Is that all right?
25       THE WITNESS:

Page 119