

**DEPARTMENT OF THE ARMY**
NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P.O. BOX 60267
NEW ORLEANS, LOUISIANA  70160-0267

REPLY TO
ATTENTION OF

Planning, Programs, and
  Project Management Division
Environmental Planning
  and Compliance Branch

## Decision Record

Individual Environmental Report #11
Improved Protection on the Inner Harbor Navigation Canal

IER #11

Description of Proposed Action. The New Orleans District, US Army Corps of Engineers (CEMVN) proposes to provide structural barriers to prevent damaging storm surges from entering the Inner Harbor Navigation Canal (IHNC) from Lake Pontchartrain and/or the Gulf Intracoastal Waterway (GIWW)-Mississippi River Gulf Outlet (MRGO)-Lake Borgne complex.

The first proposed action, referred to as "Borgne 1," encompasses a location range within which a barrier could be built to provide 100-year storm damage risk reduction from Lake Borgne complex storm surges. This location range extends from the vicinity of the Paris Road Bridge east along the GIWW to the Maxent Canal and south to the MRGO approximately four miles south of the Bayou Bienvenue Floodgate.

The second proposed action, referred to as "Pontchartrain 2," encompasses a location range within which a barrier could be built to provide 100-year storm damage risk reduction from Lake Pontchartrain storm surge. This location range encompasses the northernmost portion of the IHNC, from the Senator Ted Hickey Bridge to approximately 2,500 feet south of the bridge.

For both proposed actions, any storm surge protection structure built within these location ranges would include static barriers across non-navigable portions of the location range, and gated or otherwise navigable structures across authorized channels, such as the IHNC or GIWW. Additionally, gates would be provided across any channel or portion thereof designated as a Natural and Scenic River under the Louisiana Natural and Scenic River Act.

Draft IER #11, which detailed the impacts to the proposed actions, was released for public review on January 31, 2008. Stakeholders had until February 29, 2008 to comment on the document. Comments were received from governmental agencies, non-governmental organizations, and citizens.

CEMVN has proposed the use of a design-build delivery approach for this project. Inasmuch as achieving the goals of the design-build delivery method depends upon not limiting innovative processes, CEMVN anticipates achieving National Environmental Policy Act (NEPA) compliance in a tiered process. In order to achieve the purpose and need of this project, and to allow optimization of technology, construction methods and exact locations, IER #11 serves as the first tier of the NEPA process and does not analyze the impacts of an exact alignment, construction materials, or other such design details for either of the proposed actions.  Because of the timing of the NEPA document relative to the procurement of a design-build firm, the exact footprints and technologies proposed by competing firms cannot be disclosed outside of the

CEMVN is coordinating with USFWS to implement the recommendations laid out in the USFWS Programmatic Coordination Act Report (CAR) (letter dated November 1, 2007). The recommendations of the USFWS, and CEMVN responses, are found on pages 143-148 of IER #11.  A subsequent final CAR will be provided by the USFWS, and will be addressed by CEMVN, during the Tier 2 process for each proposed action.

Formal Section 106 consultation for IER #11 was initiated with the State Historic Preservation Officer and Indian Tribes in a letter dated April 9, 2007.  This letter provided preliminary project documentation, draft scopes of work for proposed cultural resources investigations, and notification that a Programmatic Agreement (PA) would be developed to tailor the Section 106 process.  A public meeting was held on July 18, 2007 to discuss the draft PA.  Execution of the PA is anticipated in April 2008.  Section 106 consultation is on-going.  When a more detailed project description is available for the proposed actions, additional cultural resource investigations may be required during the Tier 2 phase.  The State Historic Preservation Officer and Indian Tribes will be provided the opportunity to review the proposed action and comment on CEMVN's effect determination. Appropriate measures will be initiated under the Section 106 review process to ensure that impacts to significant cultural resources are avoided, minimized or mitigated prior to project construction.

Furthermore, throughout the Tier 2 document phase as well as future design efforts, CEMVN will continue to closely coordinate with concerned parties, such as Federal and state resource agencies, navigation interests, and the public to develop a design that maximizes innovation and engineering effectiveness while minimizing adverse impacts.

Agency & Public Involvement. Various governmental agencies, non-governmental organizations, and citizens were engaged throughout the preparation of IER #11. Agency staff from USFWS, National Marine Fisheries Service, US Environmental Protection Agency, US Geologic Survey, National Park Service, Louisiana Department of Natural Resources, and Louisiana Department of Wildlife and Fisheries were part of an interagency team that has and will continue to have input throughout the Hurricane Storm Damage Risk Reduction System (HSDRRS) planning process (Appendix D).

There have been over 42 public meetings since March 2007 about proposed HSDRRS work, nine of which focused in part on IER #11 (June 12, 2007; July 24, 2007; August 16, 2007; August 21, 2007; September 25, 2007; October 25, 2007; November 1, 2007; January 17, 2008 and February 7, 2008). CEMVN sends out public notices in local and national newspapers, news releases (routinely picked up by television and newspapers in stories and scrolls), and mail notifications to stakeholders for each public meeting.  In addition, www.nolaenvironmental.gov was set up to provide information to the public regarding proposed HSDRRS work.  CEMVN has recently started sending out e-mail notifications of the meetings to approximately 300 stakeholders who requested to be notified by this method. Public meetings will continue throughout the planning process, including the Tier 2 process.

*Draft IER #11 Public Review Period*
   1.  Agency Comments (found in Appendix E)
         a.  U.S. Fish and Wildlife Service
               1.  Comment letter dated February 26, 2008
         b.  National Marine Fisheries Service
               1.  Comment letter dated February 26, 2008
               2.  Comment letter dated February 27, 2008

      c. Environmental Protection Agency
          1. Comment letter dated February 26, 2008
      d. Louisiana Department of Natural Resources
          1. Comment letter dated February 28, 2008

2. Public Comments (found in Appendix B)
    a. Mr. Thomas Nolan Thomas: Comment letter dated February 10, 2008
    b. Mr. Michael Tritico, Restore Explicit Symmetry To Our Ravaged Earth: Comment letter dated February 5, 2008
    c. Mr. Gerald A. Willey: Comment letter dated February 11, 2008
    d. Mr. Joseph Cocchiara, Board of Commissioners of the Port of New Orleans: E-mail comment received February 12, 2008
    e. Anonymous E-mail comment received February 7, 2008
    f. Mr. Clayton Miller, Port of New Orleans: E-mail comment received February 7, 2008
    g. Kelley Haggar, Riparian, Inc.: E-mail comment received February 29, 2008

Decision. The CEMVN Environmental Planning and Compliance Branch has assessed the potential environmental impacts of the proposed action described in this IER, and performed a review of the comments received during the public review period for Draft IER #11.

The public interest will be best served by implementing the proposed actions as described in IER #11 in accordance with the design considerations discussed above.

IER #11 discloses the possible impacts of the proposed actions to the maximum extent practicable given the level of design available at this time. A more precise and exhaustive impacts analysis will be disclosed in the Tier 2 documents for all reasonable alternatives when exact alignments and designs are available. However, measures have been taken through the inclusion of design parameters in the solicitation for acquisition of a design-build firm for this project, including measures to avoid or minimize impacts to the environment and navigation. All practicable means to avoid or minimize adverse impacts will be incorporated into the Tier 2 proposed action and the final design.

In addition to the Tier 2 documents which will further analyze the impacts of the reasonable alternatives, CEMVN will prepare a Comprehensive Environmental Document (CED) that may contain additional information related to IER #11 as it becomes available after the execution of the Final Tier 2 IERs. The CED will provide a final mitigation plan and a comprehensive cumulative impacts analysis, for all the IERs

I have reviewed IER #11, and have considered agency recommendations and comments received from the public during the scoping phase and comment periods. The proposed actions are the most justified and responsive solution of the reasonable alternatives investigated for the purpose and need of this project. It is an effective engineering solution that minimizes uncertainty and risk to acceptable levels in a reasonable period of time. It balances storm damage risk reduction benefits with costs and impacts among significant resources.

Construction of storm surge protection structures was selected in lieu of raising the existing storm damage risk reduction system (formerly known as the hurricane protection system or HPS) to the 100-year level of protection alternative for several reasons. The expanded footprint

required to raise the existing storm damage risk reduction system along the IHNC and GIWW could have adverse socioeconomic impacts, affecting adjacent homes and businesses (up to 155 homes and 121 industrial structures). Secondly, despite the use of strict design standards and safety criteria, the raised levee and floodwall system would still be subject to subsidence and damage from storm surges, retaining a level of risk and uncertainty with potentially catastrophic consequences resulting if any portion of the system fails. The proposed action of storm surge protection structures would instead provide a first line of storm surge defense, providing risk reduction redundancy for many miles of levees and floodwalls.

The Borgne 1 location range was selected because it provides 100-year protection while allowing the most opportunity for minimization of environmental impacts, particularly in regards to wetland and fisheries impacts.

The Pontchartrain 2 location range was selected over the Pontchartrain 1 location range because this range avoids the unfavorable foundation conditions for construction and likely impacts to Gulf Sturgeon critical habitat in the Pontchartrain 1 location range.

I find the recommended plan fully addresses the objectives as set forth by the Administration and Congress in the 4th and 5th Supplemental Appropriations.

The plan is justified, in accordance with environmental statutes, and it is in the public interest to further analyze the proposed actions as described in this document in Tier 2 documents.

3-14-08
Date

Alvin Lee
Colonel, US Army
District Commander

- Avoid or minimize disturbance of contaminated sediments and other hazardous, toxic, or radioactive waste (HTRW) in the study area if they are found to be present.

The tiered NEPA process by which CEMVN intends to comply with all applicable environmental laws and regulations will fully analyze and disclose the impacts of the proposed actions and all reasonable alternatives before a decision on a constructible alternative is made. Every effort has been made to carefully coordinate the design-build and NEPA processes with each other to ensure that the design-build process does not drive the NEPA decision in any way so that CEMVN does not act in a "pre-decisional" manner. For example, the design-build solicitation was designed to allow the firms to propose a solution that falls anywhere within the range of alternatives in this NEPA document and did not restrict them to the limits of the proposed action. Moreover, CEMVN retains the right not to award any design-build contract if the no-action alternative is chosen. No irreversible or irrevocable commitment of resources will be made prior to completion of both tiers of this NEPA analysis.

## 1.1   PURPOSE AND NEED FOR THE PROPOSED ACTION

The purpose of the proposed action is to improve hurricane protection on the IHNC, which is a critical component of the Lake Pontchartrain and Vicinity (LPV) Hurricane Protection Project in Orleans and St. Bernard Parishes, Louisiana.  The overall purpose of the project is to provide a comprehensive, integrated protection system that would reduce the imminent and continuing threat to life, health, and property posed by flooding from hurricanes and other tropical storm events.  This purpose would be achieved by providing a 100-year level of hurricane protection.  In addition, these measures are vital to the recovery of the area and need to be addressed in a timely and comprehensive manner.

The term "100-year level of protection," as it is used throughout this document, refers to a level of protection that reduces the risk of hurricane surge and wave-driven flooding that the New Orleans Metropolitan Area has a 1 percent chance of experiencing each year.

## 1.2   AUTHORITY FOR THE PROPOSED ACTION

The authority for the proposed action was originally provided by the Flood Control Act of 1965.  Congress and the Administration granted a series of supplemental appropriations acts following Hurricanes Katrina and Rita to repair and upgrade the project systems damaged by the storms. These supplemental appropriation acts gave additional authority to the USACE to construct 100-year HPS projects in the New Orleans metropolitan area.

The LPV Hurricane Protection Project was authorized under the Flood Control Act of 1965 (Public Law [P.L.] 89-298, Title II, Sec. 204) which, amended, authorized a "project for hurricane protection on Lake Pontchartrain, Louisiana … substantially in accordance with the recommendations of the Chief of Engineers in House Document 231, Eighty-ninth

Congress." The original statutory authorization for the LPV Hurricane Protection Project was amended by the Water Resources Development Acts (WRDA) of 1974 (P.L. 93-251, Title I, Sec. 92); 1986 (P.L. 99-662, Title VIII, Sec. 805); 1990 (P.L. 101-640, Sec. 116); 1992 (P.L. 102-580, Sec. 102); 1996 (P.L. 104-303, Sec. 325); 1999 (P.L. 106-53, Sec. 324); and 2000 (P.L. 106-541, Sec. 432).

The Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery of 2006 (4th Supplemental - P.L. 109-234, Title II, Chapter 3, Construction, and Flood Control and Coastal Emergencies) authorized construction of a 100-year level of protection; the replacement or reinforcement of floodwalls; the construction of permanent closures at the outfall canals; the improvement of the IHNC; and the construction of levee armoring at critical locations. Additional supplemental appropriations include P.L. 110-28, U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007 (5th Supplemental).

## 1.3   PRIOR REPORTS

A number of studies and reports on water resources development in the proposed project area have been prepared by the USACE, other Federal, state, and local agencies, research institutes, and individuals. The pertinent studies, reports, and projects are summarized below and are herein incorporated by reference:

- Integrated Final Report and Legislative Environmental Impact Statement for the Mississippi River Gulf Outlet Deep-Draft De-Authorization Study, 2007, investigates alternatives for de-authorizing a portion of the MRGO from Mile 60 to the Gulf of Mexico to deep-draft navigation and proposes the construction of a total closure structure made of rock near Bayou La Loutre.

- In July 2006, CEMVN signed a Finding of No Significant Impact (FONSI) on EA #433 entitled "USACE Response to Hurricanes Katrina & Rita in Louisiana." The document was prepared to evaluate the potential impacts associated with the actions taken by the USACE as a result of Hurricanes Katrina and Rita.

- Ecosystem Restoration Study and Programmatic EIS, 2004, Louisiana Coastal Area.

- Evaluation Report and Environmental Impact Statement, March 1997, entitled "Mississippi River – Gulf Outlet, New Lock and Connecting Channels." This document addresses the feasibility of improving navigation between the Mississippi River in New Orleans, Louisiana, and the Gulf Intracoastal Waterway (GIWW) and the Mississippi River Gulf Outlet (MRGO) on the east side of the river.

- On 4 August 1989, CEMVN signed a FONSI on EA #89 entitled "LPV Hurricane Protection, High Level Plan - Alternate Borrow Site 1C-2B." The report addresses the impacts associated with the excavation of a borrow area along Chef Menteur Highway,

5

through November, surface ebb and bottom velocities in the IHNC average about 0.8 and 1.7 fps, respectively (USACE 1997).

The basin is susceptible to flooding from hurricane storm surge. Lake levels are increased by the influx of surges from Lake Borgne and the Gulf of Mexico that accompany hurricanes from the southeast, south, and southwest (USACE 1967; USACE 1995; USACE 2007f; Westerink et al. 2006).

Modeling conducted by the Interagency Performance Evaluation Task Force (IPET) indicates that the GIWW reach has effects on storm surge due to the fact it connects Lake Borgne and Lake Pontchartrain (USACE 2007g). During storms, the surges experienced in the GIWW and the IHNC are functions of the surges generated from both Lake Borgne in the east and Lake Pontchartrain in the north. The IPET models suggest that the levees along the GIWW and MRGO can locally enhance storm surge in this vicinity depending on wind speed and direction, with strong winds from the east tending to maximize the local effect (USACE 2007g). However, the models also suggest that the increase in storm surge amplitude due to this effect is small.

During major storm events, storm surges can propagate north into Lake Borgne and are then redirected west, converging into the IHNC and resulting in high water levels and large waves. Observed peak water levels in the IHNC during Hurricane Katrina indicate a maximum water level gradient of 3 feet between the intersection with the GIWW and Lake Pontchartrain. Also, model analysis of conditions during that event suggests that waves up to 4 feet high occurred within the IHNC (USACE 2007g).

The historic gage record (1923-2006) at the IHNC Lock shows that the median range of low to high water levels is -0.79 to 3.71 feet NGVD29. The recorded water level was 10.61 feet NGVD29 during Hurricane Betsy. Although there are no water level records at the IHNC Lock for Hurricane Georges, records are available for nearby locations. During Hurricane Georges, the highest recorded water level in the IHNC at the Florida Avenue Bridge was 8.35 feet NGVD (1983 ADJ.) on 27 September 1998 (USACE 1998). The highest recorded water level (high water mark), due to Hurricane Katrina, was recorded at 14.28 feet NAVD88 2004.65 (USACE 2007g).

Currently, the MRGO acts as a tidal conduit for the exchange of saline water from the Gulf of Mexico into the IHNC and Lake Pontchartrain. Measurements of non-storm event flows in the IHNC have demonstrated the presence of an upper layer of water flowing out from Lake Pontchartrain and a lower layer flowing toward the lake (USGS 2007). This suggests that dense saline water flows into Lake Pontchartrain even during periods when the average tidal flow is retreating out of the lake. However, the construction of the deauthorization closure structure at Bayou La Loutre should alter this direct saline influence.

In addition to flows and water levels, sediment transport is another aspect of hydrology. The conveyance of sediment in the water column can significantly affect aquatic habitat, including benthic fauna and emergent wetland plants. Suspended sediment is important to the biological structure and function of a water body or wetland, and the amount and composition of suspended sediments is affected by both natural and human factors.

36