# TEAM LOUISIANA

Ivor Ll. van Heerden, Ph.D. - Lead, G. Paul Kemp, Ph.D., Hassan Mashriqui, Ph.D. & PE, Radhey Sharma, Ph.D., Billy Prochaska, PE, Lou Capozzoli, Ph.D. & PE, Art Theis, PE, Ahmet Binselam, M.S., Kate Streva, B.S., and Ezra Boyd, M.A.



## The Failure of the New Orleans Levee System during Hurricane Katrina






A Report prepared for Secretary Johnny Bradberry
Louisiana Department of Transportation and Development, Baton Rouge, Louisiana
State Project No. 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, 20 --- December 18, 2006

MRGO-TLA-0168

have followed the 1954 TR-4 Shore Protection Planning and Design (Beach Erosion Board) or its successor, the Shore Protection Manual, first published in 1973. Instead of the required analysis, Design Memoranda for the New Orleans East and Chalmette Levees substitute the following disclaimer.

> "Due to the short duration of hurricane flood stages and the resistant nature of clayey soils, no erosion protection is considered necessary on the levee slopes."

These levees were not designed to withstand general overtopping, as was amply demonstrated in Katrina, but were expected to experience overtopping by waves greater than the significant wave provided in the oceanographic analysis. Many miles of the Chalmette and New Orleans East Levees were constructed of shell-rich sands with poor erosion resistance derived from the hydraulic excavation of the adjacent GIWW and MRGO channels, rather than the hauled clay soils specified for levees protecting urban areas (EM 1110-2-1913, 1978 ed.).

**Question 4.** Did the free-flowing, deep-draft navigation canal that pierces the HPS on its eastern side compromise system performance?

**Answer 4.** Yes. The MRGO and GIWW channels provide efficient conduits to funnel surge into the heart of New Orleans. As a result, surge elevations peaked in Lake Borgne and the IHNC almost simultaneously at higher levels relative to levee and floodwall crowns, and earlier, than would have been true if the MRGO had not been built, and if the wetland loss it caused had not occurred. The effect of these federally constructed and operated channels on surge and waves has consistently been underestimated by the USACE from before Hurricane Betsy, right through to the recent IPET report, as has the effect of accelerated wetland loss in the funnel area. One consequence of this institutional "blind spot" was that a hurricane barrier of the type proposed in the original pre-1980s HPS for the other two main passes into Lake Pontchartrain was never included for the MRGO.

The ILIT and IPET have indicated that the original "barrier" approach was a better design than the "high-level," levees-only HPS ultimately adopted twenty years after authorization. But our work indicates that disastrous flooding during Katrina from the Lake Borgne funnel and the IHNC would have been exacerbated by the barrier proposed at the Lake Pontchartrain terminus of the IHNC (Seabrook). On the other hand, the Lake Pontchartrain surge along the south shore might have been reduced by up to 3 ft, and by a greater margin on the north shore, by the barriers that were proposed for the two other Lake Pontchartrain passes. This might have been enough to

prevent one or more of the failures of the defective Orleans Metro drainage canal floodwalls built in the 1990s, and this would have greatly reduced the severity of prolonged flooding in Orleans Metro. Such trade-offs were never rigorously assessed when the decision was made to change the HPS design in such a major way in 1985 at a time when surge modeling techniques using SLOSH were available. Again, the level of protection was reduced without informing the population at risk.

**Question 5.** Was the system maintained and operated to assure the required level of protection through time? Specifically, how did the 40-year construction schedule impact system performance?

**Answer 5.**  No. The GNO HPS was managed like a circa 1965 flood control museum. Design assumptions and policy made in 1965 continue to diminish the HPS today. Local sea level has risen 0.4 ft since the 1960s and much of New Orleans has sunk over 1.5 ft in the same period for a combined change of nearly 2 ft relative to sea level, but as IPET (II-78)  noted,

> "It was not clear how projected subsidence rates were applied in structural elevation design, if at all. Subsidence was apparently not factored into the design freeboard allowance."

Prudent engineers operating in coastal Louisiana have made allowances for subsidence for a century. The New Orleans District was one of the first agencies to directly map coastal wetland loss in Louisiana, but this ever continuing diminishment of surge protection was never incorporated into design philosophies. An analysis of all factors affecting levee elevation is required as part of FEMA Levee Elevation and Certification Requirements (44CFR65.10). It is inexcusable that this was not done for what was the most critical urban coastal protection project in the country.

Most public works structures would be scheduled for replacement or rehabilitation after 40 years, but planning for a more modern system was put off while the original project fell farther and farther behind. Because the USACE never completed the 1965 project, it could not legally pass responsibility for major maintenance or upgrades to the local sponsors, or initiate a new project to bring protection to a higher standard. Local sponsors kept levees and rights of way mowed, operated drainage structures, commented on USACE design memoranda, and participated in inspections. They were not, however, consulted on design or construction decisions. On the other hand, they were required to pay 30 percent of all costs incurred for a level of protection that appeared on some reaches to diminish over time. When Katrina struck, the crown height on most levee and floodwall reaches was between 1 and 3 ft low relative to

MRGO-TLA-0178

insufficient to prevent overtopping by a wide range of Category 3 hurricanes. While there was nearly universal agreement in the scientific community that SLOSH was a superior tool in many ways for predicting the oceanographic response to hurricane winds, there is no indication that the Corps ever used the SLOSH model in developing GDMs for the HPS.

The GAO was more critical of the USACE in a 1982 report than it had been in 1976, noting that estimated costs to complete the GNO HPS had escalated by a factor of ten and were now close to $1 billion, while the originally authorized work was only 49 percent complete after 15 years (http://archive.gao.gov/d42t14/119206.pdf). The increases in costs were largely attributed to foundation problems discovered after the work began, but were also attributed to the need to raise levees, particularly along the drainage canals to meet the "Weather Bureau's new data pertaining to hurricane severity." It is not clear what steps, if any, the USACE took to address the deficiency in maximum sustained wind speed associated with the pre-1965 SPH-based analysis. While the USACE offered many excuses about the slow progress and cost overruns, it does not appear that they ever raised alarms about the inadequacy of the level of protection that they were, in fact, expecting to provide. The report quotes statements by local sponsors that they believed that the work would not be expedited until another tragedy struck the city. These statements, sadly, have been proved correct.

**Coastal wetland loss in Louisiana and its significance**
The scientific community had been raising the alarm about Louisiana's disappearing wetlands since the late 1970's. The Corps was obviously aware of this problem because in September 1986 the chief of the Engineering Division of the New Orleans district wrote the commander and director of the Waterways Department Station requesting funding to undertake an assessment of the wetlands loss. Specifically they investigated land loss between 1932 and 1983. July 1987 the Corps released its report "Geological Investigation of the Mississippi River Deltaic Plan- Land Loss and Land Accretion", authored by J. May and L. Britsch. This excellent reports shows in detail, just how devastating the land loss had been since 1932.

This action proves that the NOD was fully aware of the land loss problem and surely the consequences for reduction in surge protection. But nowhere in the GDM's does the NOD discuss the need to give extra free board to levees and floodwalls because of the worsening land loss. The land loss research ordered and paid for by the USCAE was ignored by those responsible for the GNO HPS.

# CHAPTER SEVEN

# WAS THE HURRICANE PROTECTION SYSTEM EAST OF THE IHNC COMPROMISED BY POOR INTEGRATION OF NAVIGATION CHANNEL AND LEVEE DESIGNS?

**Question 4.**  Did the MRGO, a free-flowing, deep-draft navigation canal that pierces the HPS on its eastern side, compromise system performance?

**Answer 4.**   Yes.  The MRGO and GIWW channels provide efficient conduits to funnel surge into the heart of New Orleans.  As a result, surge elevations peaked in Lake Borgne and the IHNC at nearly the same time, and at higher levels relative to levee and floodwall crowns than would have been true if the MRGO did not exist and had not caused so much wetland loss.  The effect of these federally constructed and operated channels on surge and waves has consistently been underestimated by the USACE from before Hurricane Betsy right through to the recent IPET report, as has the effect of accelerated wetland loss in the funnel area.  One consequence of this institutional "blind spot" was that a hurricane barrier of the type proposed in the original pre-1980s HPS for the other two main passes into Lake Pontchartrain was never even considered for the MRGO.

The ILIT and IPET have indicated that the original "barrier" approach was a better design than the "high-level," levees-only HPS ultimately adopted twenty years after authorization.  But our work indicates that disastrous flooding during Katrina into two of the three GNO basins (New Orleans East and St. Bernard), those adjacent to the Lake Borgne funnel and the IHNC, would have been exacerbated by the barrier proposed at the Lake Pontchartrain terminus of the IHNC (Seabrook).  On the other hand, the Lake Pontchartrain surge along the south shore might have been reduced by up to 3 ft by the barriers that were proposed for the other Lake Pontchartrain passes.  This might have been enough to prevent one or more of the failures of the defective Orleans Metro drainage canal floodwalls built in the 1990s, and this would likely have reduced the severity of flooding in Orleans Metro.  Certainly, the barrier plan would also have reduced surge along the north shore of the Lake by 4 to 5 feet.  Such trade-offs were never rigorously assessed when the decision was made to change the HPS design in such a radical way at a time when surge modeling techniques using SLOSH were available.  Again, the level of protection was reduced without informing the population at risk.

assumption that is inherently at odds with actual storm surge dynamics. The steady-state assumption results in an exact balancing of forces that removes or disregards the spatial and temporal variations in velocity that govern surge generation. It is not surprising then, that the residual influence of the MRGO channel "had an effect of increasing the storm surge throughout the marshland for Hurricane Betsy by about 0.3 to 0.4 feet maximum." Although the methodology is suspect, it is important to note that Bretschneider and Collins (1966) conclude that the MRGO did have an effect on surge, albeit a small one during Betsy, which would not have been considered by the designers of the GNO HPS nearly a decade earlier.

In thinking about the generalizability of this result to other storms, it should be pointed out here that Bretschneider and Collins (1966) used a diminutive 19,000 square foot channel cross-section for the MRGO that corresponds to the dimensions of the maintained navigation channel, rather than the size of the dredged cut (Figure 178). That channel now averages 29,000 square feet in Reach 1 and 41,000 square feet in Reach 2 when the water is at mean sea level (Figure 161). And of course, the marsh was represented as a large lake with a bed 3 to 4 feet below the actual elevation, so this would have worked to increase the flow over the marsh at the expense of the channel. Given that the channel is twice the size modeled, and that the marsh has a much higher elevation than modeled, it is expected that the actual effect of the MRGO on surge during Betsy might have been greater than the consultants reported by a factor of 4 to 6. An increase in surge associated with Betsy of 1.2 to 2.4 feet over the expected elevation should have been of interest to the levee designers, but the conclusions of this report tended to reduce rather than raise concern.

The most interesting analysis carried out by Bretschneider and Collins (1966), and the only part that withstands modern scrutiny, pertains to the effect of the levee alignments and channel in the vicinity of Reach 1 on surge in the IHNC. This was a simpler problem than the others that the consultants tackled, because it essentially reduced to one of channel and overbank conveyance in Reach 1. They presented results for fast-, moderately fast-, and slow-rising hypothetical storm surges that attained an elevation in Breton Sound of 10 feet (Figure 182) for the four cases described earlier (Figure 178). Bretschneider and Collins (1966) predicted that (1) changing the levee configuration and (2) including or excluding the MRGO channel would each affect surge transmission to the IHNC for all rates of surge development in the Lake Borgne estuary.

For the most rapidly rising surge, the IHNC does not rise at all without the MRGO (Cases I and IV), because there is insufficient time for the surge to propagate up the estuary. For the moderate rate of rise, the surge that reaches the IHNC without the

MRGO-TLA-0433

MRGO has a lower peak elevation and a narrower peak signifying a shorter duration of high water conditions.  For the slow rising surge, the peak elevation in Lake Borgne is attained, or nearly attained, in the IHNC for all cases, after lags of varying duration, but the width of the peak is reduced without the MRGO (Cases I and IV).  The period above 8 feet, or the 80 percent exceedence interval, in the slow-rise scenario drops from 3.5 to 2.0 hours for the condition with and without the MRGO, respectively, with the new levees in place (Cases III and IV).  In all cases, the predicted effect of building the "proposed" levee system that now forms the throat of the funnel (Cases III and IV) is to hasten the onset of peak surge and to lengthen the period of highest water.

Given these results, it is interesting to look at the consultants' summation of the effects of the channel.

> "It is seen that the effect of the Mississippi River-Gulf Outlet is almost negligible for all large hurricanes accompanied by slow rising storm surges.  It may be expected that once in a while a storm may occur which has a somewhat freakish, more rapidly rising surge in which case the Gulf Outlet may have a very marked effect.  However, such a storm will not produce tides as high as the more critical hurricane tracks such as Betsy or the synthetic hurricanes."

The synthetic hurricanes referred to are those based on the 1959 SPH that were used as a basis for design of the GNO HPS.  We now know that Bretschneider and Collins (1966) were generally correct with regard to peak surge height, if not duration.   The surge of Betsy rose in 10 hours and Camille in 8.  Katrina's surge rose in two stages that together lasted 25.5 hours (Figure 183).  Nearly 17 hours of slow rise from 3 to 6 feet (NAVD88) occurred on August 28, the day before Katrina made landfall.  A rapid rise of more than 8 feet occurred over the first 8 to 9 hours of August 29.  Surge in the IHNC peaked at about 15 feet, an estimated 2 feet lower than the peak on the MRGO/GIWW at Paris Road (Figure 183).  The lower peak stage in the IHNC was probably due largely to the flow lost over levees on the north and south sides of Reach 1 that had crown elevations varying from 12 to 14 feet.  Drainage toward Lake Pontchartrain, which was 3 to 6 feet lower at the time, also lowered surge level in the northern reach of the IHNC.

All three storms that flooded New Orleans through the open 'back door' were accompanied by what Bretschneider and Collins (1966) would classify as slow rising surges.  The study could have been interpreted as cautionary with respect to the