UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION
                                 NO. 05-4182
                          and Consolidated Cases
                                   "K" (2)
                                 JUDGE DUVAL

                                 MAG. WILKINSON
------------------------------------------------

ROBINSON                         CIVIL ACTION

                                 NO. 05-4182

VERSUS

THE UNITED STATES

     VIDEOTAPED 30 (b)(6) DEPOSITION OF
   UNITED STATES ARMY CORPS OF ENGINEERS
               by
         WALTER O. BAUMY, JR.,
         ALFRED CHARLES NAOMI,
         NANCY JEAN POWELL,
               and
         KEITH JOSEPH O'CAIN,
given in the offices of Lambert & Nelson, 701
Magazine Street, New Orleans, Louisiana 70130
on Wednesday, November 14, 2007 and Thursday,
November 15, 2007.

Page 322

1 navigation channel and the other waters of
2 Lake Borgne and Breton Sound."
3    A.  Yes.
4    Q.  And then it says "Once the buffering
5 margins --"  Excuse me, "Buffering --"
6 Again.  "Once the buffering margins are lost,
7 dredging frequency and quantity in the
8 vicinity of the breached bank area will
9 increase significantly."  Why is that?
10    A.  Well, it's my understanding is when
11 that happens, it causes sediments to be driven
12 into the deeper channel from Lake Borgne and
13 that would cause increased dredging
14 requirements.
15    Q.  Right.  Thank you.  Then it says
16 "The navigation channel will be exposed to
17 storms, currents, and less attenuated tidal
18 action from the north and northeast."  Do you
19 see that?
20    A.  Yes.
21    Q.  And there's less attenuated tidal
22 action because there's no buffering effect of
23 the marshes?
24    A.  I believe so, yes.
25    Q.  Okay.  Inside the Army Corps, the

Page 323

1 New Orleans District, is there, or was there
2 when you were working on the LPV, a
3 differentiation between the MRGO and the LPV?
4    A.  Oh, yes.
5    Q.  Okay.  And why is that?
6    A.  Well, the MRGO was in operation and
7 maintenance phase, appropriations.  We were in
8 the construction appropriations and, as such,
9 they were handled and operated separately.
10    Q.  Okay.
11    A.  By different people.
12    Q.  Different people.  Your funding for
13 the LPV came from a separate Congressional
14 appropriation from whatever ongoing operation
15 and maintenance dredging appropriations for
16 the MRGO?
17    A.  No.  Lake Pontchartrain and Vicinity
18 funding comes from the Construction General
19 Account.
20    Q.  Okay.
21    A.  MRGO comes from the O and M and
22 general appropriations.  It was separate
23 appropriations.
24    Q.  Got you.  Page 8, please.  Under the
25 section underlined "Water resources", there's

Page 324

1 a second heading called "Surface water".  Do
2 you see that?
3    A.  Yes.
4    Q.  And it says "Major surface waters in
5 the study area include the MRGO, the GIWW, the
6 IHNC, the Mississippi River, Lakes
7 Pontchartrain and Borgne, Chandelier and
8 Breton Sounds."  Right?
9    A.  Okay.
10    Q.  And Chandelier and Breton Sounds are
11 down in the Gulf; right?
12    A.  Close to the Gulf, yes.
13    Q.  Close to the Gulf.  And then it says
14 "All of these waters bodies are connected
15 hydraulically."  Right?
16    A.  Okay.
17    Q.  Okay.  What does that mean, to be
18 connected hydraulically?
19    A.  I am not sure what they mean there.
20 There's probably some indication that if a
21 hydrological event occurs in one, it affects
22 the other.  I think in this case I'd have to
23 caution one about the Mississippi River since
24 the lock -- the only connection, hydrologic,
25 direct hydrologic connection would be down

Page 325

1 near the mouth of the river.
2    Q.  But the MRGO, GIWW, and IHNC have a
3 hydrologic connection?
4    A.  Yes.  There's no impediments to flow
5 if you want -- That's the way I think it's
6 intended to read.
7    Q.  Right.  Page 10.  Again, this is a
8 1988 document.  It says under "Land
9 resources", "Most of the Mississippi River
10 Gulf Outlet is experiencing severe erosion
11 along its unleveed banks."  Do you see that?
12    A.  Yes.
13    Q.  "The erosion is a result of both
14 man-induced and natural forces, including
15 combinations of channelization, ship- and
16 wind-generated waves, storm activity, and
17 subsidence."
18    A.  Okay.
19    Q.  Up to the time of Katrina, the Corps
20 never actually implemented any measures to
21 retard or lessen bank erosion.  Is that
22 correct?
23    A.  Oh, I disagree.  I think there were
24 rock diked -- rock structures constructed
25 along some of the banks.  I couldn't tell you

Page 354

1  they were doing there, in terms of trying to
2  gain marsh land, was overwhelmed by loss of
3  marsh land; right?
4      A.  I don't know.
5          MR. O'DONNELL:
6             We'll mark this as the next one.
7             We have about two minutes of tape
8          left, so that means we have to stop.
9          MR. ANDRY:
10            32.
11 EXAMINATION BY MR. O'DONNELL:
12     Q.  Number 32.  Exhibit 32 is a letter
13 from Thomas A. Sands, Colonel, District
14 Engineer in the Corps of Engineers, dated
15 March 25, 1980.  It's again to Jack Stephens,
16 who is the Director Secretary of the St.
17 Bernard Parish Planning Commission.  Do you
18 see that?
19     A.  Yes.
20     Q.  Do you recall that there was an
21 ongoing dialogue between St. Bernard Parish
22 and the Army Corps of Engineers between the
23 late 1950s right up to the time of Katrina
24 about the MRGO?
25     A.  Yeah.  Generally, yeah.

Page 355

1      Q.  Okay.  The second paragraph states
2  "As you may know, we previously prepared a
3  plan for fore shore protection of the MRGO
4  bank and Chalmette hurricane protection
5  levee.  However, due to technical problems
6  related to extremely poor foundation
7  conditions, additional study and revision of
8  the overall design is necessary."  Do you see
9  that?
10     A.  Yes.
11     Q.  What were the extremely poor
12 foundation conditions in that area?
13     A.  I have no idea.
14     Q.  The nature of the soil?
15     A.  I would assume, but again, I don't
16 know.
17         MR. O'DONNELL:
18            Okay.  This is a pretty good time
19         to stop.  It's about 5:15.  I'll be
20         able to finish the witness in the
21         morning, and then we're going to bring
22         in -- You want to finish him first and
23         then bring in the other two?
24         MR. SMITH:
25            Yes.

Page 356

1          MR. O'DONNELL:
2             9:00 o'clock a good time?
3          MR. SMITH:
4             Yes.
5          THE WITNESS:
6             Yes.
7          MR. O'DONNELL:
8             Great.  Super.  I'd say we
9          validate, but you probably -- Did you
10         park in the building downstairs?
11         THE WITNESS:
12            Yes, I did.
13         MR. O'DONNELL:
14            Great.
15         VIDEO OPERATOR:
16            Off the record.
17     (Testimony continued at this point.)

Page 357

1          VIDEO OPERATOR:
2             We are on the record.  This is
3          the continuing deposition of Mr.
4          Alfred Naomi.  Today's date is
5          November 15th, 2007.
6          MR. SMITH:
7             Just for point of clarification,
8          this is a deposition of the United
9          States, not Mr. Naomi.
10 EXAMINATION BY MR. O'DONNELL:
11     Q.  Morning, sir.  How are you?
12     A.  Fine.
13     Q.  Good.
14         MR. O'DONNELL:
15            Let's mark this as the next
16         exhibit in order if we could.  33.
17 EXAMINATION BY MR. O'DONNELL:
18     Q.  Sir, I put before you a letter dated
19 26 November, 1969 from Steven G. West, Acting
20 District Engineer for the Army Corps of
21 engineers for the New Orleans District --
22     A.  Uh-huh (affirmatively).
23     Q.  -- to a Mr. Manuel Pinto, P I N T O,
24 a New Orleans resident.  Do you see that?
25     A.  Yes.

Page 358

```
 1    Q.  And if you look later in the
 2  document, I'll represent to you that Mr. Pinto
 3  wrote a letter to -- now here's a name from
 4  the past, Vice President Spiro Agnew, who I
 5  guess was still Vice President then, and
 6  attached to -- toward the back of the letter
 7  is his letter of October 21, 1969 to Vice
 8  President Agnew.  That's it right there.  Do
 9  you see that?
10    A.  Okay.
11    Q.  And he signs it on the second page.
12  And he attaches a drawing from a map from a
13  newspaper article in The Times-Picayune of
14  December 10, looks like 1965, but I am not
15  sure, and he has drawn an arrow and written
16  the word "The funnel".  Do you see that?
17    A.  Yeah.
18    Q.  Where Lake Borgne is and moving
19  toward the confluence of the GIWW, MRGO, Reach
20  1, Reach 2.  Do you see that arrow, sir?
21    A.  Yes.
22    Q.  He attached that to his letter.  And
23  in the letter, on the bottom paragraph I have
24  highlighted a sentence.  Do you see that?
25    A.  Yes.
```

Page 359

```
 1    Q.  And would you read that for us?
 2    A.  This is Mr. Pinto's letter?
 3    Q.  Yes, sir.  To the Vice President.
 4    A.  He says " This will cause water to
 5  funnel up Intracoastal Canal into the
 6  Industrial Canal from the Gulf of Mexico."
 7    Q.  Okay.  And then if we just move
 8  forward in the letter to the first page, Major
 9  West was forwarded this correspondence and
10  he's responding to Mr. Pinto, and I have
11  highlighted the last paragraph of the first
12  page continuing on to the top.  Would you just
13  read that for us?
14    A.  We're starting with "You"?
15    Q.  Yes.
16    A.  "You also recommend construction of
17  a lock in the MRGO, Mississippi River Gulf
18  Outlet, west of Paris Road in order to prevent
19  hurricane surges from entering the IHNC, Inner
20  Harbor Navigation Canal."  Continue?
21    Q.  Please.
22    A.  "We have previously investigated a
23  similar plan and found the net increase in
24  benefits was small in comparison to the
25  increased cost if the plan would provide the
```

Page 360

```
 1  same degree of protection as the currently
 2  authorized plan."
 3    Q.  You can ignore the handwriting and
 4  the highlighting.  It wasn't in the original.
 5        Do you know what investigation
 6  Major West is referring to that the Corps had
 7  conducted prior to November, 1969 about the
 8  funnel effect?
 9    A.  I have no idea.
10    Q.  Okay.  You have never seen such a
11  study?
12    A.  No.
13    Q.  Okay.
14       MR. O'DONNELL:
15         We'll mark this next in order,
16     Robin.
17       MR. ANDRY:
18         34.
19  EXAMINATION BY MR. O'DONNELL:
20    Q.  I have placed before you what's been
21  marked as Exhibit Number 34.  It's a draft
22  report, version 2.1, of the Army Corps, New
23  Orleans District, dated 28 February 2006.  The
24  title is "Elevations for design of hurricane
25  protection levees and structures within the
```

Page 361

```
 1  New Orleans District."  Do you see that?
 2    A.  Yes.
 3    Q.  Can you just tell me generically
 4  what this document is?
 5    A.  That's the first time I have ever
 6  seen it.
 7    Q.  Oh, okay.  Has there been a planning
 8  process since Hurricane Katrina for raising
 9  the elevation of levees in the hurricane
10  protection system?
11    A.  There's been a process to evaluate
12  elevations to come up with the proper heights
13  based on the Congressional mandate to go to
14  100 year level protection.
15    Q.  Right.  And so technical studies are
16  being done and drafted?
17    A.  Oh, yes.  Sure.
18    Q.  Great.
19       MR. O'DONNELL:
20         I'll represent to you, Robin, I
21     believe there's a final version of
22     this document.  For some reason I
23     couldn't download it.  So if and when
24     I get it, I'll send it to you.  Okay?
25       MR. SMITH:
```