10/1/69

Davis

MISSISSIPPI RIVER-GULF OUTLET
NEW SHIP LOCK
REVIEW OF DOCK BOARD PROPOSALS
FOR
ST. BERNARD PARISH SITE

On 25 Sep 69 the Board of Commissioners of the Port of New Orleans (Dock Board) presented several alternate sites and alignments resulting from their preliminary and recent studies of St. Bernard Parish project locations. At the meeting on that date, it was agreed that NOD would review the various proposals within 2 weeks.

This time restriction did not allow an adequate period to accomplish complete studies of the alternates. However, every effort has been made within the allowed time frame to give thorough coverage in the review.

1. One of the major points which arose for all alternates was what would be the <u>hurricane surge effect</u> in MR-GO and the connection channel. The required levee elevation along MR-GO is 17.5 ft m.s.l. This height was derived in consideration of wave runup which will occur along this front. The levee grade along the connection channel is to be 14.0 ft m.s.l. beginning at the end of a transition 2,000 ft from the MR-GO levee. This reflects the (logical) assumption that the surge height will be the same along MR-GO as within the channel and there will not be any waves in the connection channel. There has been no challenge of the integrity of the MR-GO Chalmette levee plan. Since the levees on either side of the connection channel are to be of the same type, there appears to be no reason to doubt the integrity of these structures.

It is pointed out that the grades of levees north of Bayou Bienvenue are also 14.0 ft m.s.l. although the geometry of that area would indicate

AFW-143-000001049

that additional water would tend to be funneled toward those structures.

    2. The question of drainage is a significant one. At present, drainage is confined to that area between the 40-arpent back levee and the river levee. This existing drainage will be intercepted by whichever alternate is chosen. Fromherz Engineers are investigating the remedies called for by the interception of existing drainage by each alternate connection channel.

The exact requirements for the drainage intercepted between the Chalmette Area Plan levees now under construction and the existing 40-arpent levee have not yet been finally determined for each alternate site. However, some generalities can be made for each alternate with regard to the disposition of this drainage.

    a. For the Lower Site and the Lower Site Alternate, drainage structures or pumps will have to be provided at least on the downstream side of the connection channel to discharge the intercepted flows. Additionally, the Dupre gate would be deleted and the Bienvenue gate would have to be reviewed to determine if it is adequate. There is also a question as to how to treat the Lake Borgne Canal. The Dupre gate might be relocated at the intersection of this canal. Some discussion has already developed to the effect that this canal should be acquired and then abandoned to obviate the requirement of providing navigation access to this channel and the consequent levee or closure gate protection. If it were acquired, it could be filled with spoil and, therefore, present no drainage problem. If the filling would not come to pass, the area is so small that drainage provisions would be minor.

2

b. For the Upper Site and the Upper Site Alternate, it would appear that very little would have to be done to existing plans. However, both gate structures would be checked to confirm their adequacies.

c. Should the Saxonholm site be selected, it would be necessary to provide means to discharge the runoff intercepted to the north of the channel. Most likely the Bienvenue gate would be relocated to the north connection levee. Runoff south of the channel would be directed to the Dupre structure.

3. What are the comparative effects on the project benefit-cost ratio of one site versus the other sites? It is rather clear that costs for each alternate can be readily obtained on a comparative basis. One would think that benefits might also be easily obtained. However, this is not the case since the benefits derived from transport of various items might have been derived from the savings differential of shipping by water or some alternate means. These alternate means may have the identical rate for the entire area under consideration. Thus, by this method no savings of one site over the other could be calculated. Even if the differential benefits could be readily and accurately calculated, the magnitude of these benefits would be of such small PROPORTIONS so as not to warrant consideration. For example, what is the significance of considering $100,000 if the overall benefits amount to $70,000,000? In summary, comparative costs should be considered since they are measureable, and comparative benefits should be ignored as being insignificant.

4. Without the benefit of comments from Operations and Design, the following statements are made with regard to navigation considerations for the project:

3

AFW-143-000001051



COMPARISONS

    a. The majority of water traffic that is projected to use the new ship lock is of shallow draft nature entering the river at or headed for Algiers Lock or above. In consideration of these facts, it is obvious that the closer the new lock is to the south of the Algiers facility, fewer river miles needed to be traveled, and costs must, therefore, be less. On this basis, the Saxonholm Site would be preferable.

    b. The angle at which the new channel enters the river is of prime importance. If the angle is too acute, channel exiting traffic would have difficulty in heading upstream. If the angle is too oblique, traffic entering the channel would have difficulty and experience extreme hazard in their entering maneuvers. From these considerations, the site at Saxonholm is again best.

    c. The location of the channel entrance at the river with respect to bends in the river is also improtant. In order that steerage can be maintained, all traffic entering the channel from the river must head upstream prior to the act of entering. Thus, traffic headed east must execute a complete 180° turn. This action must be at reduced speed at which time such traffic is vulnerable to through river traffic. The bend at the Lower Site obscures traffic headed upriver which creates an extremely hazardous condition. The Upper Site can be termed more or less in a neutral location. However, the Saxonholm Site has the most advantage since it offers unobstructed site over longer reaches both up and downstream.

4

d. Again, with the realization that the majority of traffic is shallow draft and headed to or coming from the GIWW, the closer the MR-GO exit of the new channel to this juncture, the better. On this basis, Saxonholm is far better. River ship traffic would assumedly be headed toward developments in Orleans Parish. The Saxonholm Site must again be adjudged better from this viewpoint.

e. Also of importance to shallow draft traffic is the distance between the lock and the river. The further from the river, the more river exit speed can be used. This would contribute greatly to traffic maneuverability. In turn, this could reduce hazards and ultimately increase potential lock capacity. Model tests would give an indication of the optimum location of the lock with respect to the river. This location would be guided to some degree by the alignment and length of the railroad relocation. It is conceivable that if the lock were placed far enough from the river, barge and ship lay-up or staging areas could be developed in the forebay and, perhaps, two-way traffic in that area might be allowed. Again the Saxonholm Site seems to offer more flexibility with regard to lock placement. This site also offers a shorter length of required railroad relocation.

f. If curves in the connection channel can be avoided, navigation interests would prefer the elimination thereof. The alignment of the Upper Site Alternate was arranged specifically to include a curve to avoid a major pipeline relocation. Since this is a project for navigation and not for pipeline interests, it can be said that this curve is not warranted. The curve in the Lower Site alignment was no doubt

5

included to obtain a more favorable MR-GO entrance angle. However, the same MR-GO entrance could be effected by realignment of a tangent from the river. This new tangent might improve the river entrance angle. The Saxonholm alignment is on one tangent.

    g. Prime benefits from the provision of a turning basin would accrue to ships which would then have an ample area in which to turn around, or anchor. As traffic becomes more dense on MR-GO, the need of a turning basin will become more apparent. Another potential use of a turning basin is for a staging area for shallow craft. Such an area might be well used in conjunction with LASH operations. If a levee were constructed on the east side of the planned turning area, the basin could then be used as a semi-projected harbor during some manifestations of inclement weather. Going another step along this line, this additional levee could be connected to the MR-GO levee system in emergency situations by means of a flood gate and the GIWW could be retouted to provide protection to all upstream areas. Only in the case of the Saxonholm Site could the connection channel be included in the potentially protected area. ← Bull – OTHERS COULD @ MORE COST.

    5. One alarming feature of the Upper Site is that its juncture with MR-GO would contain a major pipeline relocation. There is, of course, a great deal of expense involved with that required relocation. In addition, it seems to be uncommon bad judgement to have the MR-GO junction with its inherent susceptibility to collisions, over any pipeline. The risk of damage to the pipeline would be increased considerably by the choice of this geometry. Since the pipeline is carrying highly explosive and flammable gas and would be exposed to accidental damage, hazards to shipping at this channel location are untennable.

6

AFW-143-000001055

6. In both of the Lower Site alignments, the present development at the MR-GO end of Bayou Dupre would either be cutoff from deep water egress or cause levee realignment. It is to be remembered that many of the political figures of St. Bernard have improvements in this locale.

7. It is noted that in the cases of the Upper and Lower sites the railroad relocations would enclose existing subdivisions. This feature is particularly detrimental to real estate values of adjacent properties for many reasons, i.e., noise, blocked and bumpy vehicular access, unwanted conveyance for disreputable people into the area, weed and trash accumulation area, etc. The Saxonholm Site does not require this dissatisfactory relocation solution.

8. At the Saxonholm Site the undeveloped expanse adjacent to the river affords far less confinement for the construction of the facility. In fact, it is the only site which, without major disruption of existing improvements, contains sufficient area in which a buffer zone could be constructed. It is not an absolute necessity that along with the navigation facilities an eyesore also be erected. If plans are not made to contain an area of transition between an industrialized channel and suburbia, areal degradation and loss of community pride are sure to result. This transitional real estate can be functional and a point of civic pride. This area, with proper separation by landscaping, could well be reserved as a rail marshalling yard which would be an incentive to industrialization.

9. Only the Lower Sites could be constructed in phase with the present highway program. Project construction at any one of the upstream sites would require the reconstruction of a newly completed portion of Judge Perez Drive, the main vehicular thoroughfare in the area.

7

10. The required lengths of channel and levee for the Upper and Lower sites are nearly identical. These lengths are considerably greater for the Saxonholm Site. The corresponding costs for these items are also greater for the Saxonholm Site than for the other proposed locations.

11. Not only does the Saxonholm Site contain the potential of incorporation into an area of protection, but its alignment is sufficiently close to established vehicular and rail access, support industry, and labor force to state that the area between Paris Road and this site would be most prone to early development.

8

AFW-143-000001057