APPENDIX E

REPORT ON CONTROLLING ELEVATION OF SEABROOK LOCK

APPENDIX E

1507-03 (Lake Pontchartrain)   18 Jan 67

LMVED-TD (NOD 19 Oct 66)           3d Ind
SUBJECT:  Lake Pontchartrain, La. and Vicinity - Report on Controlling
          Elevation of Seabrook Lock

DA, Lower Miss. Valley Div, CE, Vicksburg, Miss.  39180   18 Jan 67

TO:  District Engineer, New Orleans District, ATTN:  LMNED-PP

    Referred to note approval of controlling elevation of 7.2 feet msl for Seabrook, unless modified by studies now underway.

    FOR THE DIVISION ENGINEER:

*[signature]*
A. J. DAVIS
Chief, Engineering Division

12



DEPARTMENT OF THE ARMY

NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P. O. BOX 60267
NEW ORLEANS, LOUISIANA

IN REPLY REFER TO
LMNED-PP
                                          19 October 1966

SUBJECT:  Lake Pontchartrain, La. and Vicinity - Report on Controlling Elevation of Seabrook Lock

TO:       Acting Division Engineer, Lower Mississippi Valley
          ATTN:  LMVED-TD

     1.  *Authority and scope.*  This report is prepared in accordance with instructions contained in LMVED-TD 1st Indorsement dated 8 December 1965 to LMNED-PP letter dated 5 November 1965, subject "Revised Outline of Planning Procedure for 'Lake Pontchartrain, La. & Vicinity,' project," and in paragraph 9.b. of EM 1110-2-1150 dated 1 July 1966, for the purpose of establishing the bases for changing the controlling elevation of the authorized Seabrook Lock from that specified in the project document.

     2.  *Project authorization.*  The "Lake Pontchartrain, La. and Vicinity," project was authorized by the Flood Control Act of 1965 (Public Law 89-298, approved 27 October 1965), substantially in accordance with the recommendations of the Chief of Engineers in his report printed as House Document No. 231, 89th Congress.

     3.  *Project description.*  The project consists of two independent features: the Lake Pontchartrain Barrier Plan and the Chalmette Area Plan. Only the former is pertinent to this report. The Lake Pontchartrain Barrier Plan will serve to protect areas contiguous to the shores of Lake Pontchartrain from flooding by hurricane surges. The keystone around which the plan is built is the Lake Pontchartrain barrier--a system of levees and control structures, the purpose of which is to limit uncontrolled entry of hurricane tides into Lake Pontchartrain, while preserving navigation access. The barrier would comprise enlarged embankments along the existing seaward levee system, new embankment extending to high ground on the north side of the Rigolets with regulating tidal and navigation structures in the Rigolets and Chef Menteur Pass, and a dual-purpose navigation lock in the Inner Harbor Navigation Canal (IHNC) at Seabrook. In addition to the barrier, additional protective works consisting of new lakeshore levees in St. Charles Parish and the Citrus and New Orleans East areas of Orleans Parish, and enlargement or strengthening of existing protective works in Jefferson and Orleans Parishes and at Mandeville will be provided (see incl 1).

LMNED-PP                                              19 October 1966
SUBJECT: Lake Pontchartrain, La. and Vicinity - Report on Controlling Elevation of Seabrook Lock

4. <u>Need for Seabrook Lock</u>. Prior to construction of the Mississippi River-Gulf Outlet (MR-GO), the salinity regimen in Lake Pontchartrain was largely controlled by the interaction between surface runoff entering it, and tidal inflows from Lake Borgne via the Rigolets and Chef Menteur Pass. The 30-foot deep IHNC channel (see incl 2) was connected to Lake Borgne by the Gulf Intracoastal Waterway (GIWW) through the Rigolets and Chef Menteur Pass (see incl 1), but, because of the relatively small, shallow cross section (12' by 125') of the Waterway, this connection exerted little influence on salinities in Lake Pontchartrain. Construction of the MR-GO established a large, deep (36' by 500') direct connection with the highly saline waters of Breton Sound. Tidal flow in the MR-GO reaches Lake Pontchartrain via the IHNC, and salinities in the lake and in the marsh adjacent to the MR-GO have increased significantly since its completion. Unless means are provided to restore a favorable salinity regimen, major damage to marine life in the lake and in the marsh traversed by the MR-GO may be anticipated.

5. A related problem deriving from the construction of the MR-GO is the generation of excessive tidal currents in the IHNC. These increased currents produce navigation difficulties and aggravate scour problems at bridges and along harbor developments.

6. The problems described above relate to normal tidal conditions, and even in the absence of hurricane effects, control works in mitigation are warranted.

7. As alluded to previously, the Lake Pontchartrain Barrier Plan is based upon limiting the entry of hurricane-driven waters into Lake Pontchartrain. In order that this may be accomplished, the MR-GO - IHNC link must be controlled. Further, some means for controlling flow from Lake Pontchartrain into the IHNC during hurricanes which produce conditions critical to the south shore of Lake Pontchartrain is essential.

8. Study of various alternatives leads to the conclusion that control of salinity in Lake Pontchartrain, management of excessive currents in the IHNC, and control of flow from the canal to Lake Pontchartrain and vice versa during hurricane periods can be best achieved by a control structure at Seabrook. Inasmuch as navigation between Lake Pontchartrain and the IHNC must be preserved, a lock is essential.

2

LMNED-PP                                                    19 October 1966
SUBJECT:  Lake Pontchartrain, La. and Vicinity - Report on Controlling
          Elevation of Seabrook Lock

   9. <u>Description of Seabrook Lock (as authorized)</u>. The lock as authorized would have a concrete chamber 800 feet long and 84 feet wide with sill elevation at -15.8 feet m.s.l. Gates would be of the 60° radial type. The landward gate bay structure would be connected to shore by a rockfill embankment. The top elevations of the rockfill embankment and the landward gate bay and radial gates would be 13.2 feet m.s.l.

   10. <u>Considerations involved in selecting the controlling elevation of Seabrook Lock</u>. The term "controlling elevation" as used herein refers to the elevation at which uncontrolled overflow of the Seabrook structure will commence. The structure may be thought of as having two distinct parts--the lock structure proper, consisting of the gate bays, gates and lock chamber, and the rock dike. In considering uncontrolled overflow of the structure, only the rock dike should be considered inasmuch as the required elevations of the chamber walls, gates, and gate bays must be based on considerations relating to the safe and efficient operation of the lock under various conditions, whereas the elevation of the rock dike may be determined on the basis of how well it will serve hurricane flood control objectives. As will be shown later herein, factors relating to the safe and efficient operation of the lock will require top elevations for the walls, gates, and gate bay which are essentially confining insofar as design hurricane surges are concerned. Thus uncontrolled overflow will involve the rock dike only and, as a practical matter, the controlling elevation of the structure will be equal to the crest elevation of the rock dike. This report will be limited in scope to fixing the crest elevation of the rock dike; elevations relating to the lock proper and the bases therefor will be established in the general design memorandum for the lock.

   11. In the studies which led to authorization of the Seabrook Lock, it was considered that, irrespective of any requirements imposed by considerations of hurricane control, the lock, in order to be operable for navigation on a full-time basis (exclusive of major storms and hurricanes), would require a controlling elevation of 8.0 feet m.l.g. (7.2 feet m.s.l.). This elevation was based on the assumption that the lock should be usable for any combination of tides up to three feet and winds up to 25 m.p.h. Based on the conclusion that any interchange of flow between Lake Pontchartrain and the IHNC during a hurricane should be prevented, the controlling elevation was set at 13.2 feet m.s.l.-- the elevation required to prevent overtopping of the rock dike and lock by a tidal surge resulting from passage of the standard project hurricane (SPH) critical to the IHNC; i.e., overtopping from the Canal side. The probable crest elevation on the Lake Pontchartrain side, resulting from passage of the SPH on a track critical to the south shore, including wind setup and wave runup, would be some two feet lower.

3

LMNED-PP                                              19 October 1966
SUBJECT:  Lake Pontchartrain, La. and Vicinity - Report on Controlling
          Elevation of Seabrook Lock

   12. The passage of hurricane "Betsy" in September 1965 demonstrated
that, under certain conditions, permitting flow to enter Lake
Pontchartrain from the IHNC is advantageous. "Betsy's" surge crested
at approximately 11 feet m.s.l. at the junction of the Canal and the
MR-GO, while at Seabrook the crest stage was about 6 feet m.s.l.

   13. Flow computations in the IHNC for passage of the SPH (using
latest U. S. Weather Bureau hurricane parameters) on a path critical to
the IHNC, assuming that the Seabrook structure is built so that the
rock dike overtops at elevation 7.2 feet m.s.l., indicate that a
discharge of 27,000 c.f.s. would flow from the IHNC into Lake Pontchartrain
at the crest of the hurricane surge. The water surface elevations at the
MR-GO junction and at Seabrook (canal end of the lock) would be 14.0
feet m.s.l. and 11.5 feet m.s.l., respectively. The profiles of the
water surface between these two points for both a confining structure
at Seabrook and one which would overtop at elevation 7.2 feet m.s.l. are
shown on incl 3. In addition to reducing the required levee grades
on the IHNC, the overtopping structure would reduce flood damages to
industrial plants along the Canal which are located outside the levee
system.

   14. With a controlling elevation of 7.2 feet m.s.l. for the
Seabrook structure, water will flow from the IHNC into the lake for a
period of about 15 hours during the passage of the SPH as described
in paragraph 13 above. This inflow would raise the average lake
level by about 0.05 foot. The increase would have no significant
effect on grade requirements for the lakefront levee systems.

   15. Storm paths other than that critical to the IHNC can produce
higher stages in the lake than in the canal. With the barrier in place,
however, the peak stillwater elevation lakeward of Seabrook for the SPH
critical to the south shore of Lake Pontchartrain would be about 7 feet
m.s.l. Thus overtopping from the lake into the canal would be limited
to wave action only. Inasmuch as this overtopping would occur at a
time when the winds would be tending to reduce stages in the canal, it
would be of little significance.

   16. Lowering the controlling elevation below 7.2 feet m.s.l.
would further reduce the stage in the canal at Seabrook. The point
of diminishing returns in this regard is largely reached, however, at
the crest elevation of 7.2 feet m.s.l., since, to achieve significant
lowerings in the water surface at the lakeward end of the canal, a
substantial additional lowering of the dike would be required. On
the other hand, any substantial reduction in the crest of the rock dike
below elevation 7.2 feet m.s.l. would be undesirable for a number of

4

LMNED-PP                                                  19 October 1966
SUBJECT: Lake Pontchartrain, La. and Vicinity - Report on Controlling
         Elevation of Seabrook Lock

    12. The passage of hurricane "Betsy" in September 1965 demonstrated that, under certain conditions, permitting flow to enter Lake Pontchartrain from the IHNC is advantageous. "Betsy's" surge crested at approximately 11 feet m.s.l. at the junction of the Canal and the MR-GO, while at Seabrook the crest stage was about 6 feet m.s.l.

    13. Flow computations in the IHNC for passage of the SPH (using latest U. S. Weather Bureau hurricane parameters) on a path critical to the IHNC, assuming that the Seabrook structure is built so that the rock dike overtops at elevation 7.2 feet m.s.l., indicate that a discharge of 27,000 c.f.s. would flow from the IHNC into Lake Pontchartrain at the crest of the hurricane surge. The water surface elevations at the MR-GO junction and at Seabrook (canal end of the lock) would be 14.0 feet m.s.l. and 11.5 feet m.s.l., respectively. The profiles of the water surface between these two points for both a confining structure at Seabrook and one which would overtop at elevation 7.2 feet m.s.l. are shown on incl 3. In addition to reducing the required levee grades on the IHNC, the overtopping structure would reduce flood damages to industrial plants along the Canal which are located outside the levee system.

    14. With a controlling elevation of 7.2 feet m.s.l. for the Seabrook structure, water will flow from the IHNC into the lake for a period of about 15 hours during the passage of the SPH as described in paragraph 13 above. This inflow would raise the average lake level by about 0.05 foot. The increase would have no significant effect on grade requirements for the lakefront levee systems.

    15. Storm paths other than that critical to the IHNC can produce higher stages in the lake than in the canal. With the barrier in place, however, the peak stillwater elevation lakeward of Seabrook for the SPH critical to the south shore of Lake Pontchartrain would be about 7 feet m.s.l. Thus overtopping from the lake into the canal would be limited to wave action only. Inasmuch as this overtopping would occur at a time when the winds would be tending to reduce stages in the canal, it would be of little significance.

    16. Lowering the controlling elevation below 7.2 feet m.s.l. would further reduce the stage in the canal at Seabrook. The point of diminishing returns in this regard is largely reached, however, at the crest elevation of 7.2 feet m.s.l., since, to achieve significant lowerings in the water surface at the lakeward end of the canal, a substantial additional lowering of the dike would be required. On the other hand, any substantial reduction in the crest of the rock dike below elevation 7.2 feet m.s.l. would be undesirable for a number of

LMNED-PP                                           19 October 1966
SUBJECT:  Lake Pontchartrain, La. and Vicinity - Report on Controlling
          Elevation of Seabrook Lock

reasons. First, it would result in a measurable increase in the
design levels of Lake Pontchartrain with a corresponding increase
in the grades for the lakefront levee systems. Because of the length
of levees involved in these systems, the costs for effecting even a
small increase in grade would be excessive when compared to the benefits
which would result in the IHNC. Second, it would place the crown of the
rock dike below the maximum stillwater level in Lake Pontchartrain
for major hurricanes on tracks critical to the south shore of the lake
and permit direct overflow of the dike to the detriment of conditions
in the IHNC. Third, it would subject the dike to overtopping by
waves for a number of combinations of non-hurricane winds and tides.
Normal access to the lock for operating personnel will be along the
crown of the dike and such overtopping would be most undesirable.
Finally, the dike would have little or no freeboard over tidal ele-
vations which are experienced outside of the hurricane season every year:
sustained east and southeast winds of moderate velocity may be
expected to generate tidal stages between 4 and 5 feet m.s.l. at least
once each year.

    17. Inasmuch as the above considerations rule out a controlling
elevation lower than 7.2 feet m.s.l. and since a higher controlling
elevation would result in higher stages on the IHNC lakeward of the
MR-GO without offering advantages elsewhere, a controlling elevation of
7.2 feet m.s.l. is optimum insofar as limitation of hurricane-
generated flows in the IHNC is concerned.

    18. Insofar as the requirements of navigation are concerned, con-
sideration must be given to needs arising out of lock operation under
normal or average conditions as well as those from combinations of
abnormal winds and/or tides. The top of the lockwalls and gates
should be at least 10 feet above the normal high tides to facilitate
mooring of light-loaded barges in day-to-day operations. Further, the
lockwalls should be high enough to permit personnel to work thereon
under the most extreme conditions of wind and tide for which the lock is
likely to be used; similarly, the gates should be high enough to permit
use of the gate walkways under such conditions. The above considera-
tions require that the tops of the lockwalls and gates be well above
7.2 feet m.s.l. They relate to the lock structure only, however, and
impose no limitation on the elevation of the rock dike. Overtopping of
the rock dike with crest at elevation 7.2 feet m.s.l. would occur
infrequently, and would not seriously impede navigation when it does
occur.

5

LMNED-PP                                                     19 October 1966
SUBJECT: Lake Pontchartrain, La. and Vicinity - Report on Controlling
         Elevation of Seabrook Lock

19. With the crown of the rock dike at elevation 7.2 feet m.s.l. maximum velocities in the IHNC for passage of the SPH on the track critical to the Canal would range from about 1.5 f.p.s. in the Canal proper to 5 f.p.s. at the bridges. Considering the short interval of time during which these velocities would obtain, major scour problems are not anticipated.

20. <u>Implications to local cooperation involved in lowering the controlling elevation of Seabrook Lock</u>. In the survey report on which project authorization is based, the provision of a navigation lock at Seabrook for mitigation of undesirable effects resulting from the construction of the MR-GO was recognized to be a Federal responsibility, and a cost estimate for a lock with a controlling elevation of 7.2 feet m.s.l. (which elevation was considered adequate to meet the needs of navigation) was prepared to establish the basic Federal responsibility under the navigation function. A second cost estimate for a lock with a controlling elevation of 13.2 feet m.s.l. (which elevation was considered necessary to meet the needs of hurricane flood control) also was prepared. The difference between these two estimated costs was then taken to be the added cost for hurricane flood control. The survey report recommended construction of the Lake Pontchartrain Barrier Plan subject to the condition, inter alia, that local interests contribute not less than 30% of the first cost of the project including the hurricane flood control increment of the cost of the Seabrook Lock as computed above. The local interest share of the increment, based on survey report estimates, was $120,000.

21. The recommendations relative to Seabrook Lock contained in the survey report were approved by the Division Engineer, Lower Mississippi Valley, the Board of Engineers for Rivers and Harbors, and the Chief of Engineers. The Bureau of the Budget, however, questioned the allocated cost, noted that standard methods of cost allocation appeared to be inapplicable, and recommended that the cost be allocated equally between the navigation and hurricane flood control functions. Under these cost-sharing arrangements, local interests are required to contribute 30% of half of the total construction cost for the lock with controlling elevation of 13.2 feet m.s.l., rather than 30% of the added cost for such a lock over a similar lock with controlling elevation 6 feet lower. Based on survey report estimates, this results in additional costs to local interests of $687,000. In transmitting the report of the Chief of Engineers to Congress, the Secretary of the Army concurred in the view of the Bureau of the Budget with "...the understanding that this apportionment of costs would not unduly delay construction...." Authorization of the project by Public Law 89-298 specified that the recommendations of the Secretary of the Army with respect to Seabrook Lock would apply.

LMNED-PP                                                   19 October 1966
SUBJECT:  Lake Pontchartrain, La. and Vicinity - Report on Controlling
          Elevation of Seabrook Lock

    22.  **Views of local interests.**  By letter dated 13 April 1966, the State of Louisiana, Department of Public Works, the agency appointed by the Governor of Louisiana to coordinate the local cooperation on the project, informed the District Engineer, U. S. Army Engineer District, New Orleans, that local interests favored a reduction in the controlling elevation of the Seabrook Lock, and were opposed to the local cooperation requirements for the lock as authorized.  A copy of the letter is inclosed (see incl 4).  Despite this opposition, the Orleans Levee District, the agency appointed by the Governor of Louisiana to furnish the local cooperation required for the project, on 28 July 1966 adopted an acceptable act of assurance covering the local cooperation for the entire Lake Pontchartrain Barrier Plan.  The act of assurance was accepted by and for the United States on 10 October 1966.

    23.  **Discussion.**  The approaches of the reporting officers and the Bureau of the Budget in determining the local cooperation for the Seabrook Lock were radically different.  The reporting officers hold, in effect, that the needs for mitigation of MR-GO effects, which are assignable to the navigation function, are prior to those of hurricane flood control and should be assumed to have been met before hurricane flood control requirements are considered.  This is essentially equivalent to assuming that a lock capable of meeting the needs for mitigation is in place before hurricane flood control requirements are considered and that the cost for meeting these requirements is limited to the cost of any modifications to the basic lock which are necessary to provide for the hurricane flood control requirements (except, of course, that the cost advantage of concurrent construction is enjoyed). The Bureau of the Budget takes a contrary view, concluding that the lock is needed as much for one function as the other and rejecting the reporting officers' incremental approach to providing for hurricane flood control requirements.

    24.  In transmitting the survey report to Congress, the Secretary of the Army concurred in the views of the Bureau of the Budget in regard to the requirements of local cooperation for Seabrook Lock with the proviso that "...this apportionment of costs would not unduly delay construction,...."  Accordingly, it would appear that an opportunity for modifying the authorized requirements of local cooperation for the lock, without further Congressional action, would arise only in the event that local interests refused to provide the required assurances of local cooperation for the project and cited as the reason therefor their dissatisfaction with the cost-sharing arrangements for Seabrook Lock. Inasmuch as local interests have provided the requisite assurances of local cooperation for the entire barrier plan, the requirements authorized for the Seabrook Lock will have to remain in force unless and until they are modified by the Congress.