## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | |
| | * | NUMBER: 05-4182 "K"(2) |
| | * | |
| | * | JUDGE DUVAL |
| PERTAINS TO: MRGO, Robinson | * | |
| (No. 06-2268) | * | MAG. WILKINSON |

**********************************

### MRGO PSLC'S STATEMENT OF DISPUTED FACTS

### I.

### WGI Failed to Provide Reasonably Precise Geotechnical Specifications

1.      The institutional mismanagement of the Corps, along with WGI's own failure to fulfill its independent duty of due care, led to critical errors in the design features of the project.

2.      These critical errors contributed directly to the under-seepage erosion during hurricane Katrina.

3.      WGI failed to address the data gaps that would have given the Corps further specifications to evaluate the scope of the work

4.      Once the Statement of Work was issued, WGI was then "required to provide input to support the planning, scheduling and formulation of the [Corps]'s statement of work."[1]

_____

[1] Depo. transcript of WGI by Anne Patten Veigel,, p. 85, l. 11-16.

1

5.      In order to accomplish this task, WGI would receive back up data from the Corps that was available from the Corps' prior investigations.[2]

6.      WGI's review of these documents would allow it to meet one of the goals of the TERC - "to develop the performance specifications needed to remediate a particular location."

7.      On June 1,1999 the Corps issued a Statement of Work that constituted the opening of Task Order 26, and set forth the project requirements that WGI would "furnish all engineering services, materials, supplies, labor, as required, in connection with the technical review of site documents ... associated with the demolition and remediation of the [EBIA]."[3] [4]

8.      One of WGI's essential roles as the contractor at this point was to "initiate recommendations to the ... Corps about any alternative methods of executing a remedial action that would result in improvements."[5]

9.      WGI was expected to provide complete architectural-engineering services to support the implementation of the remedial action.[6]

10.      Having no "understanding about the quality of the soils in Louisiana in or around bodies of water like ...[IHNC],"[7] WGI assigned Dennis O'Connor (not an engineer)[8] to perform a

---

[2] Depo. transcript of WGI by Anne Patten Veigel, p. 86, l. 13-20.

[3] Statement of Work, § 3;

[4] Depo. transcript of WGI by Anne Patten Veigel, p. 85, l. 17-16.

[5] Depo. transcript of WGI by Anne Patten Veigel, p. 86, l. 3-9.

[6] Depo. transcript of WGI by Anne Patten Veigel, p. 87, l. 5-11.

[7] Depo. transcript of WGI by Stephen Clay Roe,p. 56, l. 16-21.

[8] Depo. transcript of Dennis O'Connor, p.16, l. 19-21.

2

technical review of the site documents provided by the Corps and draft an initial

Recommendation Report.[9]

11.     Without reviewing any Corps engineering manuals or technical manuals to

ascertain whether or not there were Corps recommendations or guidelines about working within

the critical area of the flood control project,[10] O'Connor along with Jim Blazek[11] produced

WGI's Recommendation Report.

12.     The Recommendation Report set forth both the scope and duration of the

remediation and demolition that would be required, as well as any *data gaps* that might need to

be filled at a later date by sampling and other investigations.[12]

13.     Once the Corps had a chance to digest the scope of work as specified by WGI, the

Corps directed WGI to develop a number of work plans to act as specifications and guidelines to

accomplish the work.[13]

14.     However, a specific plan, the "Project Work Plan," would set the performance

standards regarding the project processes, including the depths of excavation.[14]

15.     Because the Project Work Plan would involve a vast array of engineering

---

[9] Depo. transcript of WGI by Stephen Clay Roe,p. 43, l. 7-13 & p. 44, 1.1-5.

[10] Depo. transcript of WGI by Stephen Clay Roe,p. 156, l. 2-12.

[11] An environmental manager and project engineer, employed by WGI's subcontractor Materials Management Group ("MMG"), specializing in environmental services, including Louisiana RECAP.

[12] Depo. transcript of WGI by Stephen Clay Roe,p. 43, l. 3-13.;  Exhibit ? - Depo. transcript of WGI by Phillip Lee Staggs,p. 159, l. 10-18.

[13] Corps 30(b)(6) (Guillory) deposition transcript, pg. 154, l.8-10.

[14] WGI038704 @ WGI38731, Sec 5.1.2.1.3.

processes, WGI would be required to provide engineering details, including geotechnical and geology/hydrology.[15]

16.    The Corps knew that the TERC required WGI to have available a geotechnical engineer, and expected WGI to advise it of geotechnical issues it encountered.[16]

17.    WGI recognized it had an obligation not to damage the levee or flood wall that was in the proximity of the work site, and realized that there was a potential for damage to a flood control structure caused by subsurface excavations near a flood wall.[17]

18.    Nonetheless, WGI failed to recommend or undertake further investigation of this potential for harm,[18] and did not feel it had an obligation to warn the government of the potential for harm because it *assumed* that the government was going to evaluate that potential for harm.[19]

19.    WGI failed to confirm that the Corps was evaluating the proposed work to determine if it would damage the flood wall.[20]

20.    In addition to the proposed work plans, WGI's Recommendation Report specifies that it would develop procedures to remediate the EBIA to meet the State of Louisiana's RECAP Standards.[21]

---

[15] WGI038704 @ WGI38731-2, 5.1.2.1.5.

[16] Corps 30(b)(6) (Guillory) deposition transcript, p. 83, l. 24-25 & p. 84, l. 1-18; p. 151, l.5-12.

[17] Depo. transcript of WGI by Stephen Clay Roe, p. 168, l. 20 to p. 170, l. 11.

[18] Depo. transcript of WGI by Stephen Clay Roe, p. 170, l.1-10.

[19] Depo. transcript of WGI by Phillip Staggs, p. 192, l.5-19 & p. 194, l. 21 through p. 195, l. 16.

[20] Depo. transcript of WGI by Phillip Lee Staggs, p. 183, l.14-19.

[21] WGI038704 @ WGI38754, Sec. 5.7.

21.     In furtherance of this responsibility, Dennis O'Connor and Jim Blazek prepared a RECAP Submittal Report-Criteria Document, first dated June 2000.[22]  This was a "master document" providing information for the entire EBIA; [23] in it W.I. indicated to the Corps that the flood wall sheet pile adjacent to the EBIA  reached "a depth of at least 25 ft. and this would essentially interrupt the water flow in the easterly direction at lower elevations to 25 ft."[24]  This assertion was patently false; the sheet pile tip depth only reached to minus eight (-8) feet, therefore sub-surface ground water flow was not interrupted below the depth of the sheet pile.[25]

22.     WGI acknowledged data gaps for soils and subsurface issues "Project Work Plan" ,[26] but indicated that these data gaps would be addressed after the completion of the various phases of the demolition.[27]

23.     As of October, 2000, the depth of soils considered to be removed was indicated as three (3) feet at the Boland site and seven (7) feet at the Saucer site.[28]

24.     Having undertaken no independent geotechnical investigations of the EBIA, and providing the Corps with a crucially defective report misleading the Corps's EBIA project team about the depth of the sheet pile at the adjacent flood wall, WGI mobilized on site in January,

---

[22] Depo. transcript of WGI by Stephen Clay Roe, p. 218, l. 23 to p. 219, l. 16; Exhibit ? - Depo. transcript of WGI by Phillip Lee Staggs, p. 264, l.6-9.

[23]  WGI047682-83.

[24] WGI047691.

[25] Corps 30(b)(6) (Grieshaber) deposition transcript, pg. 150, l. 9-25.

[26] WGI041893, Sec 1.5.

[27] WGI041928, Sec 3.7.

[28] WGI041930, Sec. 3.7.4.

2001 to commence the physical aspects of the EBIA project.

## II.

### WGI Failed to Address the Data Gaps that Would Have Given the Corps Further Specifications to Evaluate the Scope of the Work

25.     It was the agreed between the Corps and WGI that once the physical aspects of the project were underway, additional work plans would be developed by WGI to address engineering considerations for specific tasks not addressed in the Project Work Plan.  This would include the removal of bank materials from the Industrial Canal, the removal of a sewer lift station at the Saucer Marine site, the removal of a submerged railroad car from the Industrial Canal bank, the removal of a concrete anchor foundation at the Boland Marine site, as well as any additional subsurface structures encountered.

26.     WGI's failure to provide reasonably precise geotechnical specifications in the initial work plans was compounded by its failure to provide sufficient information to resolve the data gaps previously identified.

27.     As a precursor to the specific defalcations that WGI would soon be perpetrating, WGI had already assured the Corps of the following:

1.      that it had the relevant engineering expertise to develop the project's scope of work;

2.      that it had reviewed the relevant technical documents provided to it;

3.      that it would secure any necessary permits to perform works on the facility;

4.      that the adjacent flood wall sheet pile tip depth reached down to minus twenty five (-25) feet below ground surface essentially interrupting any ground water flow to that depth;

5.      that any data gaps from the prior reports would be filled by further investigation.

6

28.     WGI's conduct resulted in substantial excavations throughout the EBIA that altered the flow of sub-surface ground water, opened portals to sub-surface permeable layers, and allowed the unabated under-seepage through permeable soils below the flood wall during hurricane Katrina when the EBIA was covered with high water.

29.     Two particularly deep excavations requiring specific excavation plans were for the Sewer Lift Station at the Saucer Marine site and the "wedding cake" structure at Boland Marine. However, in  presenting their "specifications" for review, WGI did not know that the Corps had "guidelines for work proposed near or within a federally constructed flood control project," nor did it know that local sponsors were "responsible for controlling all construction that occurs within a critical area" of the flood wall (an area defined as being generally the area from 300 feet riverward to 500 feet landward of a flood control project center line).[29]

30.     Both of these deep excavations (>20 ft.) were within 300 feet of the center line of the flood wall;[30] however, WGI chose to use what engineers refer to as general specifications for important considerations (such as the type of materials to use as backfill and the compaction specifications of the backfill) instead of the more precise "prescribed" specifications.

31.     WGI had been originally tasked with determining which permits would be necessary to carry out the project, in particular that of the Orleans Levee District ("OLD"), the local sponsor of the flood wall.  This permitting requirement would have provided an additional level of investigation to perhaps insure the integrity of the flood wall; however, WGI never obtained the permit.

---

[29] Depo. transcript of WGI by Stephen Clay Roe,p. 153, l.23-25 & p. 154, l. 1-23.

[30] Corps 30(b)(6) (Guillory) deposition transcript, pg. 160, l.20 through p. 161, l. 6.

### III.

### The Orleans Levee District Permit

32.     On August 28, 2000, the Corps produced a Statement of Work for Project Site Development and Remedial Action of EBIA, requiring WGI to "furnish all services, materials, supplies labor, equipment, superintendence, procurement, security services, surveying services, subcontracting, **all necessary permits, licenses**...for the project site."[31]

33.     WGI understood that both pursuant to the TERC and the August 2000 Statement of Work that it was responsible for obtaining all necessary permits to undertake the project.  WGI assigned Dennis O'Connor with the task of identifying the permits needed for the job.[32]  The Orleans Levee District ("OLD") was quickly identified as potential permitter because WGI would be working so close to the vicinity of the flood wall.[33]  The Corps contemplated that WGI would make application for any permit on behalf of the Corps that was deemed necessary by OLD.[34]

34.     On April 6, 2001, the Corps of Engineers issued a Letter of No Objection to OLD informing them that it had no objection to the issuance of a permit to WGI.[35]

35.     Based upon this Letter of No Objection, the OLD forwarded a permit letter to WGI requiring strict adherence to the DOTD letter of December 29, 2000 as well as to establish

---

[31] WGI000093.

[32]  Depo. transcript of WGI by Stephen Clay Roe, p. 62, l. 6-9.

[33] Depo. transcript of WGI by Stephen Clay Roe, p. 158, l.18 through p. 159, l. 3.

[34] Corps 30(b)(6) (Guillory) deposition transcript, pg. 103, l.19 through p. 104, l. 11.

[35] Exhibit ?.

8

an initial inspection.[36] In order for this permit to be executory, WGI was required to sign the permit and return it to the OLD.

36.    Once the permit was sent to WGI's legal counsel, WGI was advised not to sign the permit letter.[37]  This issue regarding the permit did not get past the time frame of April 2001.[38]

37.    The Corps did not press the matter any further after WGI reported to Lee Guillory that it (WGI) had talked to the levee district and "the levee district told them, you don't need to get a permit, just keep us apprized as to what's going on."[39]

38.    WGI did not inform the OLD of the completion of demolition activities.[40]

## IV.

## The Wedding Cake Excavation

39.    As work proceeded at the EBIA, a large subsurface structure was discovered at the Boland Marine site.  The removal of this concrete and steel anchor block (known informally as the "wedding cake structure") had not been previously contemplated by the Corps or WGI.  On August 6, 2001, the Corps issued Modification 2610, a Statement of Work for Excavation and Removal of Additional Subsurface Foundations that required a specialized excavation plan.[41]

---

[36] Exhibit ?

[37] Depo. transcript of WGI by Stephen Clay Roe, p. 177, l.1-17.

[38]  Depo. transcript of WGI by Stephen Clay Roe, p. 202, l. 3-6.

[39] Corps 30(b)(6) (Guillory) deposition transcript, pg. 130, l.3-15.

[40] Depo. transcript of WGI by Stephen Clay Roe, p. 171, l.14 through p. 172, l.4.

[41] WGI054419 & WGI054420, Sec. 3.1.

40.     The Corps acceptance of this Final Work Plan for the excavation of the wedding cake structure was based upon the Corps expectation that if there was going to be any potential effect or damage to the flood wall, that the licensed engineers that WGI hired would address those issues.[42]

41.     WGI was free to use either on-site borrow or import sand to fill the Boland Marine wedding cake structure excavation,[43] believing that either material was acceptable to use as backfill.[44]

42.     There was no specification for the compaction of the backfill.[45]

43.     The non-specific designations of the type of backfill material to use, as well as the lack of compaction requirements, were general specifications.[46]

44.     WGI could easily have opted to use "prescribed specifications" that delineate a soil type based upon its impervious nature, as well as a degree of compaction based upon the moisture content of the soil as regulated by recognized engineering standards.

45.     Such a specification would have allowed WGI to meet the contractual requirements of Task Order 26 while still fulfilling its legal duty of due care under Louisiana law.

---

[42] Corps 30(b)(6) (Guillory) deposition transcript, pg. 166, l.25 through p. 166, l. 6.

[43] Depo. transcript of WGI by Phillip Lee Staggs, p. 219, l.5-21.

[44] Depo. transcript of WGI by Phillip Lee Staggs, p. 220, l.2-14.

[45] Depo. transcript of WGI by Phillip Lee Staggs, p. 222, l.19-24; Exhibit ? - Depo. transcript of WGI by Stephen Clay Roe, p. 213, l.3-25; Exhibit ? - Depo. transcript of Dennis O'Connor, p.198, l.1-10.

[46] Corps 30(b)(6) (Guillory) deposition transcript, pg. 203, l.21 through p. 204, l. 25.

46.     With the work plan allowing the excavation to be filled with either import sand or onsite borrow, WGI's project manager Dennis O'Connor insisted that sand would not be used as backfill because the Corps would not have allowed WGI to purchase sand and bring it on site, instead requiring that WGI utilize on-site borrow.

47.     WGI didn't bring any sand on the site.[47]

48.     At least 46,494 cubic yards of sand/fill had been brought onto the Boland Marine site by one of the contractors.[48]

49.     This material was utilized as backfill for the wedding cake excavation.

## V.

## The Lift Station Excavation

50.     Although the sewer lift station at Saucer Marine had been identified by the Corps as an obstruction to future dredging operations, no specific excavation plan had been developed.

51.     On October 19, 2001, WGI produced a Lift Station Removal Plan that again provided general specifications that would allow WGI to fill the excavation with sand if it chose to do so.[49]

52.     Sand was used as backfill.

53.     Sara Alvey, WGI's quality control manager, noted on November 7, 2001 that the subcontractor McDonald's was loading sand from ITT to be hauled for backfill at the cofferdam

---

[47] Depo. transcript of Dennis O'Connor, p.187, l.1-9.

[48] Depo. transcript of Dennis O'Connor, p.189, l.16 through p. 190, l. 3.

[49] Depo. transcript of Dennis O'Connor, p.154, l. 2 through p. 155, l. 6.

excavation.[50]

54.     A stockpile of sand was located at the ITT site,[51]

55.     The Corps's Quality Assurance Report from that same date similarly reported that McDonald "loaded dump truck with  sand pile from ITT for Saucer marine sewer lift station backfill."[52]

56.     Sand is "porous," "permeable," and "conducts water pretty well."

57.     It was "possible under high water conditions in the canal that if you have a hole filled with sand that it might conduct water down to one of the strata below the surface which conducts water and might conduct water underneath the foundation" of the flood wall. [53]

**VI.**

**The Corps Did Not Perform A Substantive Review Of The Specifications**

58.     The EBIA flood wall was built on alluvial deposits, with pervious organic zones that allow water to pass through that layer.[54]

59.     This type of soil stratification allows for under-seepage of the flood wall at the EBIA.[55]

60.     Because of the adverse affect under-seepage could have on the integrity of the flood wall, the Corps considers it mandatory that a geotechnical evaluation be performed on

---

[50] WGI021810 & WGI021811.

[51] Depo. transcript of Dennis O'Connor, p.168, l.2-4.

[52] WGI008586.

[53] Depo. transcript of Dennis O'Connor, p.171, l.2-4.

[54] Corps 30(b)(6) (Grieshaber) deposition transcript, pg. 106, l.23 through p.107, l. 6.

[55] Corps 30(b)(6) (Grieshaber) deposition transcript, pg. 100, l. 5-25.

excavations such as the two at the Saucer Marine and Boland Marine sites.[56]

61.     However, the Corps did not perform any geotechnical evaluations of WGI's proposed work plans related to under-seepage that could qualify as "extensive testing."

62.     In order to understand an excavation's potential impact on a  flood wall, proper specifications must begin with an examination of the soil stratigraphy to evaluate if it impacts the stability and/or seepage analysis.[57]

63.     In particular, for an excavation 25 ft deep excavation within 300 ft. of the flood wall, it is mandatory that the Corps evaluate the wall stability, seepage, and global stability of the wall.[58]

64.     The Corps did not perform any such geotechnical evaluations of WGI's excavation work plans.

65     Lee Guillory, the Corps' Task Order 26 Project Manager and head of the Project Delivery Team, did not ask the geotechnical division to evaluate the plan that was submitted by WGI for removal of the sewer lift station.[59]

66.     The southern breach of the flood wall took place adjacent to this deep excavation.

67.     The northern breach likewise occurred adjacent to a deep excavation of the "wedding cake" structure at the Boland Marine site.

68.     Lee Guillory did not ask the geotechnical division to evaluate the plan that was

---

[56] Corps 30(b)(6) (Grieshaber) deposition transcript, pg. 88, l. 7-21.

[57] Corps 30(b)(6) (Grieshaber) deposition transcript, pg. 74, l.11 through p. 75, l. 13.

[58] Corps 30(b)(6) (Grieshaber) deposition transcript, pg. 88, l.7-21.

[59] Corps 30(b)(6) (Lee Guillory) deposition transcript, pg. 154.

submitted by WGI.[60]

69.     Lee Guillory was neither a geotechnical engineer, nor an expert on under seepage

issues.

70.     For each of the project work plans that he signed off on and "approved," the

Corps was not approving or agreeing that whatever work was done was not having any impact on

the potential for under seepage to affect the flood wall.[61]

71.     WGI was not evaluating the potential for under seepage, nor was concerned about

making sure that the Corps was either.

72.     WGI assumed that the Corps's site representative Jim Montegut was

knowledgeable about the potential for excavations to affect the flood wall.[62]

73.     Mr. Montegut had never studied the soil stratigraphy of the EBIA,[63] did not know

the depth of the sheet pile at the EBIA flood wall,[64] and was not involved with the analysis of

subsurface ground water flow.[65]

74.     WGI was of the impression that Mr. Montegut could approve the work plan to

remove the wedding cake structure at the Boland site.[66]

---

[60] Corps 30(b)(6) (Lee Guillory) deposition transcript, pg. 206,l. 23- pg. 207, l. 10.

[61] Corps 30(b)(6) (Guillory II) deposition transcript, pg. 219, l.22 through p. 222, l. 8.

[62]  Depo. transcript of WGI by Phillip Lee Staggs, p. 146, l.6-20.

[63] Depo. transcript of James Montegut,p. 50, l.9-16.

[64] Depo. transcript of James Montegut,p. 77, l.16-22.

[65] Depo. transcript of James Montegut,p. 138, l. 8-20.

[66] Depo. transcript of WGI by Phillip Lee Staggs, p. 204, l.14-25.

75.     Montegut did not consider himself an expert in geotechnical issues such as foundations subsidence or seepage,[67]

76.     The removal of the sub-surface structures probably improved the potential for seepage.[68]

## VII.

## WGI Failed To Conform To Specifications That The Work Not Harm The Flood Wall

77.     There two borrow pits the EBIA, one at the McDonough Marine site and one at the ITT site.

78.     After remediation of the EBIA and the removal of structures, the soil subsurface at the EBIA had been modified on account of excavation/removal/new fill, and the groundwater flow had been altered to flow away from the IHNC.[69]

## VIII.

## WGI Withheld Knowledge That Would Have Influenced The Corps's

## Decision Making Process

79.     Beginning in July of 2001 and continuing through August 2002, WGI's subcontractor MMG conducted exploratory drilling at the Saucer Marine site to characterize the geology of the soils by drilling 99 boreholes of up to depths of 22 feet around the site.  These boreholes revealed plant-derived organics throughout the borehole depth, but increasing after fourteen (14) feet.  Additionally, peat layers were encountered in several boreholes at varied

---

[67] Depo. transcript of James Montegut, p. 52, l. 2-10.

[68] Depo. transcript of James Montegut, p. 139, l. 13-20.

[69] WGI079929.

depths, indicating a swamp or marsh like area.[70]

80.     A similar drilling effort to characterize the geology of the soils at the Boland Marine site was undertaken by MMG between September 13, 2001 and October 11, 2001 by drilling 99 boreholes of up to depths of 22 feet around the site.  Silts and clays, including organic rich clays and silts, were the main constituents of the native soils containing greatly interbedded sediments.  As at the Saucer Marine site, plant-derived organics such as roots, grasses, leaves, wood and peat were found throughout the borehole depth.[71]

81.     WGI's project manager Dennis O'Connor understood that the soils of the EBIA were not homogenous;[72]

82.     WGI's project manager Dennis O'Connor understood  that once a porous layer was charged with water from above, water could flow laterally underneath the flood control structure and cause some undermining of the structural integrity of the levee.[73]

83.     By utilizing only general specifications for both the fill material used and the degree of compaction, WGI was exposing the sub-surface permeable layers to being charged by a hydrostatic head during high water conditions.

84.     Both of these drilling exercises were completed before the execution of the deep excavation work plans.

85.     This confirmation that sub-surface permeable layers existed throughout the Saucer

---

[70] Saucer Marine Site Assessment Drilling Report (WGI069840), p.5 (WGI069846).

[71] Boland Marine Site Assessment Drilling Report (WGI357813), p.5 (WGI357819).

[72] Depo. transcript of Dennis O'Connor, p.72, l. 16-21.

[73] Depo. transcript of Dennis O'Connor, p.78, l. 2-17; p. 171, l. 10-18.

Marine and Boland Marine sites substantiated the potential for under-seepage erosion of the flood walls in high water conditions.

86.    By failing to adequately report the findings of the drilling reports to the Corps, along with failing to properly specify the depth of the sheet pile depth that would cut off potential under- seepage, WGI failed to fully inform the government about a hazard related to the government's exercise of discretion, one that was "substantial enough to influence the ...decision made" regarding the various work plans and the acceptance of general specifications to perform the work at the EBIA.

87.    The EBIA job was "fairly simplistic, the only way you could endanger the flood wall was by some form of inappropriate excavation or inappropriate backfill."[74]

> **Respectfully Submitted,**
> **APPROVED PLAINTIFFS LIAISON COUNSEL**
>    /s/  Joseph M. Bruno
> JOSEPH M. BRUNO (La. Bar # 3604)
> PLAINTIFFS LIAISON COUNSEL
> Law Offices of Joseph M. Bruno
> 855 Baronne Street
> New Orleans, Louisiana 70113
> Telephone: (504) 525-1335
> Facsimile: (504) 561-6775
> Email: jbruno@jbrunolaw.com

---

[74] Corps 30(b)(6) (Grieshaber II) deposition transcript, pg. 15, l. 6-9.

MR-GO PLAINTIFFS SUB-GROUP
LITIGATION COMMITTEE

s/ James Parkerson Roy
JAMES PARKERSON ROY
MR-GO PSLC Liaison Counsel
LA Bar Roll Number: 11511
Domengeaux Wright Roy & Edwards LLC
Post Office Box 3668
Lafayette, Louisiana 70502
Telephone: (337) 593-4190 or (337) 233-3033
Email: jimr@wrightroy.com

for
MR-GO PLAINTIFFS SUB GROUP
LITIGATION COMMITTEE

Jonathan Andry (The Andry Law Firm,
    New Orleans, Louisiana)
Clay Mitchell (Levin, Papantonio, et al.,
    Pensacola, Florida)
Pierce O'Donnell (O'Donnell & Associates,
    Los Angeles, California)
James Parkerson Roy (Domengeaux, Wright, et al.,
    Lafayette, Louisiana)

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing upon all counsel of

record by placing same in the United States mail, properly addressed and with first-class postage,

or by facsimile or other electronic transmission this 30th day of October, 2008.

                    /s/ Joseph M. Bruno
                    Joseph M. Bruno